# EXHIBIT 2

# REDACTED VERSION OF DOCUMENT
# FILED UNDER SEAL



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| | |
|---|---|
| **RESPONDENT NAME** | Anthony Scott Levandowski |
| **ADDRESS** | ▇▇▇▇▇▇▇ |
| **CITY** | ▇▇▇▇▇ **STATE** ▇ **ZIP** ▇▇ |
| **PHONE** | **FAX** **EMAIL** ▇▇▇▇ |

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | |
| **FIRM/ COMPANY** | |
| **ADDRESS** | |
| **CITY** | **STATE** **ZIP** |
| **PHONE** | **FAX** **EMAIL** |

## FROM CLAIMANT

| | |
|---|---|
| **CLAIMANT NAME** | Google Inc. |
| **ADDRESS** | 1600 Amphitheatre Parkway |
| **CITY** | Mountain View **STATE** CA **ZIP** 94043 |
| **PHONE** | **FAX** **EMAIL** |

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Robert Van Nest & Rachael Meny |
| **FIRM/ COMPANY** | Keker & Van Nest LLP |
| **ADDRESS** | 633 Battery Street |
| **CITY** | San Francisco **STATE** CA **ZIP** 94111 |
| **PHONE** | 415-391-5400 **FAX** 4153977188 **EMAIL** rmeny@kvn.com |

GONZALEZ EX. 2, Page 1 of 40



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

See Arbitration Demand (Attachment A).

AMOUNT IN CONTROVERSY (US DOLLARS)

GONZALEZ EX. 2, Page 2 of 40



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT
This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach two copies of entire agreement.*

**ARBITRATION PROVISION LOCATION**

The following relevant agreements contain arbitration provisions:

1. Google/Levandowski "Non-Competition and Non-Solicitation Agreement" (Attachment B, "Robots Agreement"), at Paragraph 9.

2. Google/Levandowski "Non-Competition and Non-Solicitation Agreement" (Attachment C, "510 Agreement"), at Paragraph 9.

## RESPONSE
The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with two copies to JAMS.*

## REQUEST FOR HEARING
**REQUESTED LOCATION**   Santa Clara, California

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)
See: Comprehensive Rule 16.1

☐  *By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.*

## SUBMISSION INFORMATION
**SIGNATURE** _[signature]_                                   **DATE** 10/28/2016

**NAME (PRINT/TYPED)**   Rachael E. Meny

GONZALEZ EX. 2, Page 3 of 40

 Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims initiated in California.</u>

## CONSUMER ARBITRATION

Please indicate if this is a **CONSUMER ARBITRATION as defined by** *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*:

☐ <u>YES</u>, this is a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e).

☑ <u>NO</u>, this is not a CONSUMER ARBITRATION as defined by California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e).

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

**If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.**

## EMPLOYMENT MATTERS

**If this is an EMPLOYMENT matter, Claimant must complete the following information:**

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000　　☐ $100,000 to $250,000　　☐ More than $250,000　　☑ Decline to State

## WAIVER OF ARBITRATION FEES

**In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.** In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.

GONZALEZ EX. 2, Page 4 of 40



# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

RESPONDENT
NAME

ADDRESS

CITY                                    STATE              ZIP

PHONE                    FAX            EMAIL

## RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/
COMPANY

ADDRESS

CITY                                    STATE              ZIP

PHONE                    FAX            EMAIL

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

RESPONDENT
NAME

ADDRESS

CITY                                    STATE              ZIP

PHONE                    FAX            EMAIL

## RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/
COMPANY

ADDRESS

CITY                                    STATE              ZIP

PHONE                    FAX            EMAIL

---

GONZALEZ EX. 2, Page 5 of 40


## CLAIMANT #2

**CLAIMANT NAME**

**ADDRESS**

**CITY**      **STATE**      **ZIP**

**PHONE**      **FAX**      **EMAIL**

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

**REPRESENTATIVE/ATTORNEY**

**FIRM/ COMPANY**

**ADDRESS**

**CITY**      **STATE**      **ZIP**

**PHONE**      **FAX**      **EMAIL**

## CLAIMANT #3

**CLAIMANT NAME**

**ADDRESS**

**CITY**      **STATE**      **ZIP**

**PHONE**      **FAX**      **EMAIL**

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

**REPRESENTATIVE/ATTORNEY**

**FIRM/ COMPANY**

**ADDRESS**

**CITY**      **STATE**      **ZIP**

**PHONE**      **FAX**      **EMAIL**

GONZALEZ EX. 2, Page 6 of 40

# ATTACHMENT A

1    KEKER & VAN NEST LLP
      ROBERT A. VAN NEST - #84065
2    rvannest@kvn.com
      RACHAEL E. MENY - #178514
3    rmeny@kvn.com
      JENNIFER A. HUBER - #250143
4    jhuber@kvn.com
      THOMAS E. GORMAN - #279409
5    tgorman@kvn.com
      W. HAMILTON JORDAN - #295004
6    wjordan@kvn.com
      633 Battery Street
7    San Francisco, CA 94111-1809
      Telephone:    415 391 5400
8    Facsimile:    415 397 7188

9    Attorneys for Claimant
      GOOGLE INC.

10

11       BEFORE JAMS (JUDICIAL ARBITRATION AND MEDIATION SERVICES)

12

| | |
|---|---|
| 13   GOOGLE INC., | **CONFIDENTIAL** |
| 14       Claimant, | **ARBITRATION DEMAND** |
| 15       v. | |
| 16   ANTHONY LEVANDOWSKI, | |
| 17       Respondent. | |

18

19

20

21

22

23

24

25

26

27

28

ARBITRATION DEMAND<br>CONFIDENTIAL

1121952

I.     INTRODUCTION

1.     Claimant Google Inc. ("Google") brings this arbitration demand against a former senior employee, Respondent Anthony Levandowski. While Levandowski was still on Google's payroll, he breached his contractual obligations and duties to Google by building a company that would ultimately compete with Google's self-driving car project. Levandowski's acts included, among other things, a campaign during his employment at Google to use Google's confidential information regarding the unique skills, experiences and compensation packages of Google employees and contractors to lure them from Google to a new, competing venture named OttoMotto LLC ("Otto").

2.     Levandowski assisted and/or developed competing companies during his time at Google even though his obligations to, and agreements with, Google prohibited him from taking such actions, including, among other things, by prohibiting him from soliciting Google employees and consultants to join another company during his employment at Google and prohibiting him from engaging in activities that would compete with Google.

3.     As one example of Levandowski's violations of these obligations and agreements, beginning at least in the late Summer or Fall 2015, Levandowski embarked on a campaign to unlawfully use confidential Google information to target and recruit valuable Google employees by soliciting them and inducing them to leave Google to join a different company in the self-driving space. That company would ultimately become Otto. Levandowski concealed his conduct from Google management, a concealment that allowed him to profit greatly. Among other things, this concealment allowed Levandowski to ultimately collect over          in incentive payments from Google for his supposed contributions to Google's self-driving car project—all while he was breaching his obligations to Google and building a company that would compete with Google.

4.     Google brings this demand to obtain damages for, and to put an end to, Levandowski's breaches of contract.

5.     This demand for arbitration is closely related to Google's concurrently-filed arbitration demand against both Respondent Levandowski and Otto co-founder and former

ARBITRATION DEMAND

CONFIDENTIAL

1121952

1  Google employee          ("Joint Demand"). The Joint Demand asserts claims for breach of

2  contract and tortious acts that arise under, or relate to, the Google employment agreements

3  entered into by Levandowski and   .

4      6.      Google brings this separate demand under contracts that Levandowski signed in

5  2011 in connection with Google's purchase of two companies founded by Levandowski. As set

6  forth in this demand, Levandowski has breached at least two of those contracts: (1) a "Non-

7  Competition and Non-Solicitation Agreement" that was part of Google's acquisition of Anthony's

8  Robots, LLC and which went into effect on October 7, 2011 ("Robots Agreement"); and (2) a

9  "Non-Competition and Non-Solicitation Agreement" that was part of Google's acquisition of 510

10  Systems, LLC and which went into effect on October 7, 2011 ("510 Agreement").

11      7.      Out of an abundance of caution, Google brings these claims as a separate,

12  confidential Demand because the Robots Agreement and 510 Agreement each contain a

13  confidentiality clause requiring Levandowski and Google to treat as confidential any disputes

14  arising out of those agreements.[1]

15  **II.     FACTUAL ALLEGATIONS**

16      **A.     Respondent Anthony Levandowski**

17      8.      Google hired Respondent Anthony Levandowski as an engineer in April 2007.

18  Towards the end of his tenure at Google, Levandowski managed the team of engineers on

19  Google's self-driving car project that developed Google's LiDAR sensors, sensors that are crucial

20  to Google's development of a self-driving car. Levandowski abruptly resigned from Google on

21  January 27, 2016, without prior notice. On information and belief, Levandowski is now a co-

22  founder, and employee, of Otto.

23      **B.     Respondent Anthony Levandowski's Purchase Agreements with Google**

24      9.      During his employment with Google, in October 2011, Respondent Levandowski

25  sold two companies to Google: 510 Systems, LLC and Anthony's Robots, LLC. In return for

26

27  [1] Assuming that procedural distinctions in the arbitration agreements at issue can be reconciled
    (including that with respect to confidentiality of the dispute), Google intends to seek
28  consolidation of the Joint Demand and this Demand into a single arbitration proceeding.

GONZALEZ EX. 2, Page 10 of 40

1 receiving significant payments for these two companies, Levandowski promised that he would

2 not solicit Google employees and consultants for outside ventures during his employment with

3 Google and that he would not compete with Google.

4     10.    Google is informed and believes that Levandowski breached both the non-

5 competition and non-solicitation provisions contained in the Robots Agreement and 510

6 Agreement. Google has recently discovered that, during his continued employment with Google,

7 Levandowski became involved in several competing side businesses.

8     C.    **Odin Wave/Tyto Lidar**

9     11.    On information and belief, Levandowski's involvement in competing side

10 businesses which violated the Robots Agreement and 510 Agreement began by at least 2013.

11     12.    Google is now informed and believes that, during Levandowski's tenure at

12 Google, he was involved in competing side businesses, including enterprises known as Odin

13 Wave, LLC ("Odin Wave") and Tyto Lidar LLC ("Tyto").

14     13.    Odin Wave was incorporated in or around August 2012. The physical address

15 used for Odin Wave was 2201 Dwight Way in Berkeley, California. On information and belief,

16 2201 Dwight Way is owned by Levandowski.

17     14.    In July 2013, a Google hardware vendor contacted a Google employee to inform

18 him that, on information and belief, a company named Odin Wave had just submitted an order for

19 a custom-fabricated part that was similar to a part used by Google in its unique and proprietary

20 laser technology for self-driving vehicles.

21     15.    After receiving this call, two Google employees investigated Odin Wave and

22 discovered that there appeared to be several connections between Levandowski and Odin Wave.

23 Those connections included Odin Wave's location at 2201 Dwight Way. Levandowski was

24 questioned about his affiliation with Odin Wave in mid-2013 but denied having any ownership

25 interest in Odin Wave.

26     16.    Google is now informed and believes that, by February 2014, Odin Wave LLC

27 merged with an entity named Tyto Lidar LLC ("Tyto"). Public records list Ognen Stojanovski as

28

ARBITRATION DEMAND

CONFIDENTIAL

GONZALEZ EX. 2, Page 11 of 40

1 | the manager of Tyto Lidar. On information and belief, Stojanovski is friends with Levandowski
2 | and worked with Levandowski on an early, self-driving vehicle prototype.

3 |     17.    On information and belief, Odin Wave/Tyto was developing LiDAR sensor
4 | modules which can be used in self-driving vehicles.

5 |     18.    Google is now informed and believes that Levandowski had some involvement
6 | with Odin Wave/Tyto since at least 2013 at the same time that he was working on Google's
7 | development of LiDAR sensor modules.

8 |     19.    In or around Spring 2015, Google—seeing a potential overlap between Tyto's
9 | technology and Google's development goals for self-driving technology—began investigating
10 | whether to begin buying or using Tyto's products.

11 |     20.    Google also investigated whether to purchase Tyto.

12 |     21.    Levandowski participated in Google's investigation into Tyto's products and
13 | business, including at least one site visit to Tyto headquarters. Based on information and belief,
14 | he was privy to Google's impressions of Tyto's products and process, including Google's
15 | confidential opinion of Tyto's technology and the viability of Tyto's business. Throughout this
16 | process, Levandowski never disclosed a relationship with Tyto and its employees. Based on
17 | information and belief, Google now believes that Levandowski in fact had a relationship with
18 | Tyto and its employees that conflicted with Levandowski's duties to Google.

19 |     22.    Google's interest in Tyto's products carried over into 2016, including beyond
20 | Levandowski's departure from Google.

21 |     23.    Google is informed and believes that at least by May 18, 2016, Tyto Lidar LLC
22 | had merged with Otto.

23 |     **D.**    **Otto**

24 |     24.    Google is also informed and believes that, in 2015, Levandowski began executing
25 | a plan to compete with Google in the self-driving vehicle space, while he was still employed by
26 | Google.

27 |
28 |

GONZALEZ EX. 2, Page 12 of 40

25. Google is informed and believes that Levandowski's plan—which he hatched with Google colleague ▮▮▮—included taking employees and consultants from Google, including employees and consultants with access to Google confidential information and trade secrets.

26. Because Levandowski was believed to be a trusted agent of Google, Google shared confidential information with him about Google employees, including the employees' unique skills, work experiences, responsibilities, compensation, and work performance. Prior to Levandowski's and ▮▮▮ resignations, on information and belief, Levandowski misused this confidential Google information, including while actively soliciting Google employees to leave for his competing venture, Otto.

27. Google is informed and believes that, at the time Levandowski began taking steps to create a competing company and staff it with Google employees and contractors, Levandowski had not yet become eligible for, or received payment of, a substantial incentive payment related to his work on Google's self-driving car project.

28. Google is informed and believes that, in approximately August 2015, Levandowski told some Google colleagues that he had been asked to "transfer a group of people" from Google's self-driving car project to a competing company. Levandowski then attempted to solicit Google colleagues to leave Google and join Levandowski's efforts to "transfer" other employees to this competing company.

29. In late Summer 2015, one of the managers of Google's self-driving car project heard rumors of Levandowski's on-going solicitation efforts and sought to terminate Levandowski for this disloyalty. Google, however, could not confirm Levandowski's solicitation efforts at the time, and he was not terminated.

30. On information and belief, Levandowski took steps to conceal his competing and solicitation activities from Google management, in part to ensure that he received payment of the substantial incentive payment from Google. Indeed, Levandowski did not publicly release full details of his competing company until after he received the final payout of this incentive payment following his departure from Google.

ARBITRATION DEMAND
CONFIDENTIAL

1121952

GONZALEZ EX. 2, Page 13 of 40

1    31.    Google is informed and believes that, by Fall 2015, Levandowski had approached,
2    and/or had begun working with, ▮ to lay the foundation for their new competing company. In
3    Fall 2015, Levandowski and ▮ settled on a name ("280 Systems") for their new company and
4    took steps to bring this company to fruition. That company—280 Systems—would later be
5    renamed Otto.

6    32.    Google is also informed and believes that Levandowski's and ▮ efforts to
7    develop a competing company persisted through late 2015 and into early 2016. Google is
8    informed and believes that, by approximately December 2015, Levandowski again began
9    approaching Google employees about leaving Google and asking them to help start a new
10   company focusing on self-driving vehicles.

11   33.    Google is informed and believes that, by January 2016, Levandowski had
12   increased and expanded his solicitations of Google employees. As part of these efforts,
13   Levandowski made repeated efforts to solicit many of his direct reports to leave Google.
14   Levandowski's solicitations occurred both during the work day and outside of the work day,
15   including at numerous times when Levandowski solicited individuals on the Google campus. On
16   at least some occasions, Levandowski also used his managerial role on Google's self-driving car
17   project to solicit his direct reports during the private 1-on-1 meetings he held with various Google
18   employees and to encourage his direct reports to leave Google during other meetings.

19   34.    Google is informed and believes that Levandowski took other steps to hide his
20   efforts to set up a competing company from Google. Levandowski's steps included, but are not
21   limited to, instructing Google employees not to discuss Levandowski's business or recruitment
22   efforts via company email or on other company systems.

23   35.    Google is informed and believes that, in January 2016, Levandowski and ▮ also
24   hosted at least two off-site meetings at Levandowski's Palo Alto home with the goal of
25   persuading numerous Google employees to leave Google and join Levandowski and ▮ new
26   venture. Both Levandowski and ▮ set up these meetings, attended them, and led them. At
27   least one such meeting occurred while Levandowski and ▮ were Google employees, and both
28   meetings occurred during Levandowski's employment at Google.

ARBITRATION DEMAND

CONFIDENTIAL

1121952

36. Google is informed and believes that Levandowski used these January 2016 meetings and solicitation efforts to encourage Google employees to depart Google and move to his competing venture.

37. On information and belief, acting in concert with a 280 Systems recruiter, Levandowski also sought to induce Google employees to sign written employment agreements that obligated them to quit Google and commence work immediately.

38. Google is informed and believes that Levandowski's and ▇ plan to develop a competing business included an effort to have the "entire" Laser Team on Google's self-driving car project to quit Google en masse in January 2016 and join Levandowski and ▇ at their new venture. Levandowski encouraged a large group of Google employees to resign without prior notice, and upon specific day(s) designated by Levandowski and ▇.

39. Google is further informed and believes that Levandowski and ▇ encouraged and/or assisted others, including both Google employees and third parties associated with 280 Systems/Otto, to solicit Google employees and contractors to leave Google for 280 Systems/Otto.

E. **Levandowski's Actions Caused Damage to Google.**

40. Levandowski's efforts to set up competing business(es) and to solicit Google employees and contractors to leave Google for his Otto business have harmed Google. This harm has included, but is not limited to, lost employees and contractors, recruiting and retention costs, and numerous other costs and damages.

41. For example, Levandowski's campaign to create a competing company named Otto and to solicit Google's employees and contractors to leave Google for Otto was a partial success. Beginning in January 2016, and continuing through at least September 2016, numerous employees and contractors have left Google to join Otto. Google is informed and believes that many—if not all—of these departures are attributable to the solicitation campaign that Levandowski initiated and spearheaded, with ▇, while he was a Google employee.

42. Google is also informed and believes that Levandowski's efforts to solicit employees and contractors from Google have continued following his departure from Google. Among other things, Levandowski provided information to Google employees about other Otto

ARBITRATION DEMAND

CONFIDENTIAL

GONZALEZ EX. 2, Page 15 of 40

1    agents who continued to solicit Google employees and contractors to leave and join Levandowski

2    at his new company. As a result of Levandowski's actions, Google has spent significant time and

3    money persuading Google employees and contractors to reject Levandowski's solicitation efforts.

4    Google ultimately has been able to convince numerous employees and contractors to stay with

5    Google, but only after devoting significant time and resources to this effort and, in some

6    instances, providing incentives to stay.

7        43.     Google has incurred significant costs to search for and obtain replacements for the

8    Google employees and contractors who have left for employment at Otto.

9        **F.**     **Levandowski and** ▮ **Sell Otto to Uber**

10        44.     Given the unique training, experience, and skills of Google's employees and

11    contractors in the self-driving space, Levandowski's campaign to lure employees and contractors

12    away from Google enabled Levandowski and ▮ to rapidly grow and profit from their new,

13    competing venture.

14        45.     Google is informed and believes that Uber acquired Otto in Summer 2016. Uber

15    reportedly paid approximately $680 million up front for the several month old company, plus a

16    stream of future compensation. Uber recently announced that Levandowski will be in charge of

17    Uber's self-driving-car project, and Uber has presented Levandowski as the new face of that

18    competing project in a series of media interviews.[2]

19        46.     Google is informed and believes that Levandowski was able to jumpstart his Otto

20    business, and able to obtain such a lofty acquisition price for Otto, only because of

21    Levandowski's breaches as described in this Statement of Claims, including his taking key talent

22    from Google's self-driving project, and such other conduct as may be established at hearing.

23

24    ――――――――――――――
      [2] *See, e.g.*, https://newsroom.uber.com/rethinking-transportation/ ("Anthony Levandowski, Otto's

25    co-founder, will now lead our combined self-driving efforts ....");
      https://www.theguardian.com/technology/2016/aug/19/self-driving-car-anthony-levandowski-

26    uber-otto-google ("Uber just announced that self-driving cars will start pick up passengers later
      this month in Pittsburgh. And the man leading the project ...? Anthony Levandowski.");

27    http://www.bloomberg.com/news/features/2016-08-18/uber-s-first-self-driving-fleet-arrives-in-
      pittsburgh-this-month-is06r7on ("When the Otto acquisition closes, likely this month, Otto co-

28    founder Levandowski will assume leadership of Uber's driverless car operation.").

ARBITRATION DEMAND

CONFIDENTIAL

1121952

GONZALEZ EX. 2, Page 16 of 40

## FIRST CAUSE OF ACTION

### Breach of Contract

47. Claimant Google hereby incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth here.

48. Levandowski and Google entered into numerous valid contracts in connection with Google's purchase of two companies owned by Levandowski. Levandowski has breached at least two of those contracts: (1) a "Non-Competition and Non-Solicitation Agreement" that was part of Google's acquisition of Anthony's Robots, LLC and which went into effect on October 7, 2011 ("Robots Agreement"); and, (2) a "Non-Competition and Non-Solicitation Agreement" that was part of Google's acquisition of 510 Systems, LLC and which went into effect on October 7, 2011 ("510 Agreement").

49. Google fully performed its obligations under these Agreements.

50. Levandowski breached his obligations under the Robots Agreement and the 510 Agreement in in numerous ways, including but not limited to:

Non-Solicitation Agreements

51. During his employment at Google, Levandowski was prohibited by contract from soliciting Google employees or consultants to leave Google or terminate their provision of services to Google.

52. By entering the Robots Agreement, Levandowski promised not to—whether "personally or through any other Person"—"encourage, induce, attempt to induce, recruit, solicit, attempt to solicit . . . or take any other action that is intended to induce or encourage" any Google employee or consultant to leave Google or to take away other employees or consultant. This obligation applied until the end of Levandowski's employment with Google.

53. Under the 510 Agreement, Levandowski also promised not to—whether "personally or through any other Person"—"encourage, induce, attempt to induce, recruit, solicit, attempt to solicit . . . or take any other action that is intended to induce or encourage" any Google employee or consultant to engage in a competing business. This obligation also applied until the end of Levandowski's employment with Google.

9

GONZALEZ EX. 2, Page 17 of 40

1    54.    Levandowski breached the non-solicitation obligations set forth in the 510
2    Agreement and Robots Agreement during his employment with Google.

3    55.    Levandowski's breaches of his non-solicitation obligations caused significant
4    harm to Google, including by causing a loss of key employees and contractors, causing Google to
5    expend resources to recruit, replace, and train new employees, and causing Google to pay
6    retention bonuses to fend off his solicitation efforts.

7    Non-Competition Agreements

8    56.    The Robots Agreement and 510 Agreement each also prohibit Levandowski from
9    competing with Google for at least two years following Google's purchase of 510 Systems and
10   Anthony's Robots, which occurred on October 7, 2011.

11   57.    The Agreements further provide that if Levandowski breaches his non-competition
12   obligations, the two-year term of those obligations "shall be extended by the period of the
13   duration of such breach."

14   58.    In particular, the 510 Agreement bars Levandowski from "directly or indirectly . . .
15   engag[ing]" in any "Competing Business Purpose," which is defined as any "business or
16   enterprise (including research and development), operations, activities or services that (i) are
17   related to the design, development, manufacture or commercialization [of] positioning,
18   navigation, sensor, high-speed data acquisition, 3D data analysis, machine control, or robotics
19   technologies, or (ii) provides the products and services of [Google] as such exist or are
20   contemplated as of the Closing date."

21   59.    The 510 Agreement also bars Levandowski from any involvement with any person
22   "or business that engages or participates in a Competing Business Purpose," including a
23   prohibition on Levandowski from being or becoming "an officer, director, member, stockholder,
24   owner, affiliate, salesperson, co-owner, trustee, promoter, technician, engineer, analyst,
25   employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to [that
26   person or business], or to otherwise acquire or hold any interest in, or participate in or facilitate
27   the financing, operation, management or control of [that person or business]."

28

10

ARBITRATION DEMAND

CONFIDENTIAL

GONZALEZ EX. 2, Page 18 of 40

1     60.    The Robots Agreement contains similar restrictions, but defines a "Competing

2  Business Purpose" as any "business or enterprise (including research and development),

3  operations, activities or services that . . . are related to the design, development, manufacture or

4  commercialization of autonomous vehicles or any technologies for use in autonomous vehicles."

5     61.    Google is informed and believes that Levandowski breached all of these non-

6  competition obligations during their initial two-year terms through his improper moonlighting

7  activities, including—but not limited to—his involvement in Odin Wave/Tyto.

8     62.    Google is informed and believes that Levandowski was in continuous breach of

9  these agreements beginning before October 7, 2013 and continuing at least throughout his

10  employment at Google.

11     63.    Google is also informed and believes that Levandowski was in further breach of

12  these non-competition obligations as a result of his Otto-related activities, which began by at least

13  August 2015.

14     64.    Levandowski's breaches of his contractual non-competition obligations harmed

15  Google in numerous ways, including by causing a loss of key employees and contractors, causing

16  Google to expend resources to recruit, replace, and train new employees, and causing Google to

17  pay retention bonuses to fend off his solicitation efforts.

18  **III.    STATEMENT OF REMEDIES SOUGHT**

19     WHEREFORE, Claimant Google respectfully requests the following relief:

20     1.    Judgment in Google's favor and against Levandowski on all causes of action

21  alleged herein;

22     2.    For damages in an amount to be proven at an arbitration hearing;

23     3.    For injunctive relief;

24     4.    For prejudgment and post-judgment interest; and

25     5.    For such other and further relief as the Arbitrator may deem to be just and proper.

26

27

28

11
.ARBITRATION DEMAND

CONFIDENTIAL

1121952

| 1 | Dated: October 28, 2016 | KEKER & VAN NEST LLP |
|---|---|---|

2

3    By:    /s/ Rachael E. Meny
          ROBERT A. VAN NEST
4          RACHAEL E. MENY
          JENNIFER A. HUBER
5          THOMAS E. GORMAN
          W. HAMILTON JORDAN
6
          Attorneys for Claimant
7          GOOGLE INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12

1121952

GONZALEZ EX. 2, Page 20 of 40

# ATTACHMENT B

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This Non-Competition and Non-Solicitation Agreement (this "**Agreement**") is being executed and delivered as of July 28, 2011 by Anthony Levandowski ("**Member**") in favor and for the benefit of Google Inc., a Delaware corporation ("**Buyer**"). Capitalized terms used herein but not otherwise defined shall have the respective meanings ascribed to such terms in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, concurrently with the execution of this Agreement, Buyer, Anthony's Robots, LLC, a California limited liability company (the "**Company**") and Member have entered into a Membership Interest Purchase Agreement, dated as of July 28, 2011 (the "**Purchase Agreement**"), pursuant to which Buyer will purchase from Member all of the issued and outstanding Membership Interests held by Member (the "**Purchase**");

WHEREAS, Member has a substantial ownership interest in the Company as the holder of all of the Membership Interests in the Company, and, as a result of the Purchase, Member shall receive significant consideration in connection with the Purchase;

WHEREAS, Buyer and Member mutually desire that the entire goodwill of the Company be transferred to Buyer as part of the Purchase and acknowledge that Buyer's failure to receive the entire goodwill contemplated by the Purchase would have the effect of reducing the value of the Company to Buyer; and

WHEREAS, (i) as a condition and mutual inducement to the Purchase, (ii) as additional consideration for the consideration to be paid to Member under the Purchase Agreement and (iii) to preserve the value and goodwill of the Company after the Purchase, the Purchase Agreement contemplates, among other things, that Member shall enter into this Agreement and that this Agreement shall become effective as of the Closing.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises made herein and in the Purchase Agreement, Buyer and Member hereby agree as follows:

1. <u>Effective Date</u>. This Agreement shall be effective as of the Closing. This Agreement shall be null and void if the Purchase Agreement is terminated in accordance with Article IX thereof.

2. <u>Noncompetition</u>. During the Non-Competition Period (as defined below), Member shall not (other than in connection with his or her provision of services as an employee or consultant to any Buyer Entity (as defined below)), without the prior written consent of Buyer, directly or indirectly:

(a)    engage, anywhere in the Restricted Territory (as defined below), in any Competing Business Purpose (as defined below);

(b)    be or become an officer, director, member, stockholder, owner, affiliate, salesperson, co-owner, partner, trustee, promoter, technician, engineer, analyst, employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to, or otherwise acquire or hold any interest in, or participate in or facilitate the financing, operation, management or control of, any Person or business that engages or participates in a Competing Business Purpose in the Restricted Territory; or

5569030_1.DOC

(c)  contact, solicit or communicate with any Person known to Member to be a customer of any Buyer Entity or any former customer of the Company in connection with a Competing Business Purpose (whether or not such Member has had personal contact with such Person);

provided, that nothing in this Agreement shall prevent or restrict Member from any of the following: (i) owning as a passive investment less than 1% of the outstanding shares of the capital stock of a corporation (whether public or private) that is engaged in a Competing Business Purpose, provided that Member is not otherwise associated with such corporation; (ii) performing speaking engagements and receiving honoraria in connection with such engagements; (iii) being employed by any government agency, college, university or other non-profit research organization; (iv) owning a passive equity interest in a private debt or equity investment fund in which Member does not have the ability to control or exercise any managerial influence over such fund; or (v) any activity consented to in advance in writing by Buyer.

"**Competing Business Purpose**" means any business or enterprise (including research and development), operations, activities or services that (i) are related to the design, development, manufacture or commercialization of autonomous vehicles or any technologies for use in autonomous vehicles, or (ii) provides the products and services of the Company as such exist or are contemplated as of the Closing Date.

"**Non-Competition Period**" means the period commencing on the Closing Date and ending on the two (2) year anniversary of the Closing Date.

"**Buyer Entity**" means the Buyer, any subsidiary, affiliate or designee of Buyer, or Buyer's successors or assigns.

"**Restricted Territory**" means each and every country, province, state, city, or other political subdivision of the world in which the Company or any of its subsidiaries or affiliates is currently engaged, or currently plans to engage in a Competing Business Purpose, or otherwise distributes, licenses or sells its products in connection with the Competing Business Purpose as of the Closing Date.

3.  Non-Solicitation. Member further agrees that Member shall not during the period commencing on the Closing Date and ending on the later of the two (2) year anniversary of the Closing Date or the termination of Member's employment with or provision of consulting services to any Buyer Entity (the "**Non-Solicitation Period**"), directly or indirectly, without the prior written consent of Buyer:

(a)  personally or through any other Person, encourage, induce, attempt to induce, recruit, solicit, attempt to solicit (on Member's own behalf or on behalf of any other Person), or take any other action that is intended to induce or encourage, any Former Company Employee (as defined below) or any other employee or consultant of any Buyer Entity, to leave his or her employment or service with any Buyer Entity or take away employees or consultants; or

(b)  personally or through any other Person, encourage, induce, attempt to induce, recruit, solicit, attempt to solicit (on Member's own behalf or on behalf of any other Person), or take any other action that is intended to induce or encourage any Former Company Employee or any other employee or consultant of any Buyer Entity to engage in any activity in which Member would, under the provisions of Section 2 hereof, be prohibited from engaging.

"**Former Company Employee**" means any current employee or consultant of the Company who accepts an offer of employment with any Buyer Entity.

GONZALEZ EX. 2, Page 23 of 40

Notwithstanding the foregoing, for purposes of this Agreement, the placement of general advertisements that may be targeted to a particular geographic or technical area but that are not specifically targeted toward any Former Company Employee(s) or any employee(s) of any Buyer Entity shall not be deemed to be a breach of this Section 3.

4.    Term and Severability of Covenants. If Member breaches any covenant set forth in Section 2 or Section 3 hereof, the term of such covenant shall be extended by the period of the duration of such breach. The covenants contained in Section 2 hereof shall be construed as a series of separate covenants, one for each country, province, state, city or other political subdivision of the Restricted Territory. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant contained in Section 2 hereof. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), Buyer and Member agree that such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. If the provisions of Section 2 or Section 3 are deemed to exceed the time, geographic or scope limitations permitted by applicable law, Buyer and Member agree that such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, permitted by applicable law.

5.    Non-Disparagement. Member shall not, at any time during or after the Non-Solicitation Period, directly or indirectly, disparage any Buyer Entity. Notwithstanding the foregoing, nothing in this Section 5 shall preclude Member from making truthful and accurate statements or disclosures that are required by applicable laws or legal process.

·  6.    Independence of Obligations. The covenants and obligations of Member set forth in this Agreement shall be construed as independent of any other agreement or arrangement between Member, on the one hand, and any Buyer Entity, on the other.

7.    Member Acknowledgement. Member acknowledges that (i) Member is a significant holder of Membership Interests, key employee, or key member of the management of the Company; (ii) the goodwill associated with the existing business, customers and assets of the Company prior to the Purchase is an integral component of the value of the Company to Buyer and is reflected in the consideration payable to Member in connection with the Purchase, and (iii) Member's agreement as set forth herein is necessary to preserve the value of the Company for Buyer following the Closing. Member also acknowledges that the limitations of time, geography and scope of activity agreed to in this Agreement are reasonable because, among other things: (A) the Company and Buyer are engaged in a highly competitive industry, (B) Member has had unique access to the trade secrets and know-how of the Company, including the plans and strategy (and, in particular, the competitive strategy) of the Company, (C) Member has accepted an employment or consulting position with Buyer in connection with the Purchase on terms that Member believes are favorable to him, (D) by virtue of the Member's employment or consulting arrangement with Buyer, Member will have access to Buyer's trade secrets and know how, including Buyer's plans and strategy (and, in particular, Buyer's competitive strategy), (E) in the event Member's employment or consulting arrangement with the Buyer Entity ended, Member believes he or she would be able to obtain suitable and satisfactory employment without violation of this Agreement and (F) Member believes that this Agreement provides no more protection than is reasonably necessary to protect Buyer's legitimate interest in the goodwill, trade secrets and confidential information of the Company.

8.    Forum and Venue. Subject to Section 9(f), each of Member and Buyer irrevocably (i) consents to the exclusive jurisdiction and venue of any court located within Santa Clara County, State of California, in connection with any Dispute (as defined below) or the matters contemplated herein or any matter relating to any arbitration in which the parties are participants, (ii) agrees that process may be

5569030_1.DOC

- 3 -

GONZALEZ EX. 2, Page 24 of 40

served upon them in any manner authorized by the laws of the State of California for such persons and (iii) waives and covenants not to assert or plead any objection that he or she might otherwise have to such jurisdiction, venue and such process. Subject to Section 9(f), each party hereto agrees not to commence any legal proceedings related hereto except in such courts.

9.    Resolution of Conflicts; Arbitration. Subject to Section 9(f) hereof, any claim or dispute arising out of, related to or in connection with this Agreement, or the interpretation, making, performance, breach or termination thereof (each, a "Dispute"), shall (except as specifically set forth in this Agreement) be finally settled by binding arbitration in the County of Santa Clara, California in accordance with the Comprehensive Arbitration Rules and Procedures (the "Rules") then in effect of the Judicial Arbitration and Mediation Services, Inc. and judgment upon any such award rendered may be entered in any court having jurisdiction thereof. The arbitrator shall have the authority to grant any equitable and legal remedies that would be available in any judicial proceeding instituted to resolve a Dispute.

(a)    Selection of Arbitrators. Such arbitration shall be conducted by a single independent arbitrator chosen by mutual agreement of Buyer and Member. Alternatively, at the request of either party before the commencement of arbitration, the arbitration shall be conducted by three independent arbitrators, none of whom shall have any competitive interests with Buyer or the Company. Buyer and Member shall each select one arbitrator. The two arbitrators so selected shall select a third arbitrator.

(b)    Discovery. In any arbitration under this Section 9, each party shall be limited to calling a total of three witnesses both for purposes of deposition and the arbitration hearing. Subject to the foregoing limitation on the number of witnesses, the arbitrator or arbitrators, as the case may be, shall set a limited time period and establish procedures designed to reduce the cost and time for discovery while allowing the parties an opportunity, adequate in the sole judgment of the arbitrator, or a majority of the three arbitrators, as the case may be, to discover relevant information from the opposing parties about the subject matter of the Dispute. The arbitrator, or a majority of the three arbitrators, as the case may be, shall rule upon motions to compel or limit discovery and shall have the authority to impose sanctions for discovery abuses, including attorneys' fees and costs, to the same extent as a competent court of law or equity, should the arbitrator, or a majority of the three arbitrators, as the case may be, determine that discovery was sought without substantial justification or that discovery was refused or objected to without substantial justification.

(c)    Governing Law. The arbitrator or arbitrators will apply California substantive and procedural law to any Dispute, without reference to rules of conflict of law, and shall administer and conduct any arbitration in accordance with the California Code of Civil Procedure. To the extent that the Rules conflict with California law, California law shall take precedence. The arbitrator, or a majority of the three arbitrators, as the case may be, shall have the power to decide any motions brought by either party to the arbitration, including motions for summary judgment or adjudication, and motions to dismiss and demurrers, prior to any arbitration hearing. The arbitrator, or a majority of the three arbitrators, as the case may be, shall have the power to award any remedies available under applicable laws, including injunctive relief, and shall award attorneys' fees and costs to the prevailing party except as prohibited by applicable laws.

(d)    Decision. The decision of the arbitrator or a majority of the three arbitrators, as the case may be, shall be final, binding, and conclusive on the parties to the arbitration. Such decision shall be written and shall be supported by written findings of fact and conclusions that shall set forth the award, judgment, decree or order awarded by the arbitrator or arbitrators. Judgment may be entered on the arbitrator's or arbitrators' decision in any court having jurisdiction.

5569030_1.DOC

- 4 -

(e) Except as provided for in this Agreement and subject to Section 9(f), neither Member nor Buyer will be permitted to pursue court action regarding any Dispute that is subject to arbitration. Notwithstanding anything to the contrary contained herein, the arbitrator or arbitrators shall not have the authority to disregard or refuse to enforce any lawful policy of Buyer, and the arbitrator or arbitrators shall not order or require Buyer to adopt a policy not otherwise required by laws that Buyer has not adopted.

(f) Other Relief. The parties agree that, pursuant to California Code of Civil Procedure Section 1281.8, any party may petition a court of competent jurisdiction for a temporary restraining order, preliminary injunction, or other interim or conservatory relief, as necessary to enforce the provisions of Section 2 and Section 3 of this Agreement and without breach of this arbitration provision and without abridgement of the powers of the arbitrator or arbitrators. The parties understand and agree that any breach or threatened breach of this Agreement shall cause irreparable injury and that money damages will not provide an adequate remedy therefor, and that any relief to which the non-breaching party may be entitled may be rendered ineffectual without injunctive relief and, accordingly, both parties hereby consent to the issuance of an injunction. If either party seeks injunctive relief, the prevailing party shall be entitled to recover reasonable costs and attorneys' fees.

(g) Costs and Expenses. Subject to Section 9(b), each party shall pay its own costs and expenses (including counsel fees) of any such arbitration, and each party waives its right to seek an order compelling the other party to pay its portion of its costs and expenses (including counsel fees) for any arbitration.

(h) Confidentiality. Member and Buyer agree to maintain in complete confidence any Dispute arising out of, relating to, or in connection with this Agreement, or the interpretation, validity, construction, performance, breach, or termination hereof, including the existence of an arbitration proceeding and the outcome thereof, and shall not disclose or publicize any such information to any third party (other than to each parties' legal advisors bound by confidentiality restrictions).

(i) Agreement to Arbitrate. Member has read and understands this Section 9, which discusses arbitration. Member understands that by signing this Agreement, Member agrees, to the extent permitted by applicable laws, to submit any future claims arising out of, relating to, or in connection with this Agreement, or the interpretation, validity, construction, performance, breach, or termination thereof, to binding arbitration, and that this arbitration clause constitutes a waiver of Member's right to a jury trial and relates to the resolution of all Disputes referred to in this Section 9.

10. Non-Exclusivity. The rights and remedies of Buyer hereunder are not exclusive of or limited by any other rights or remedies that Buyer hereunder may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative). Without limiting the generality of the foregoing, the rights and remedies of Buyer hereunder, and the obligations and liabilities of Member hereunder, are in addition to their respective rights, remedies, obligations and liabilities under the laws of unfair competition, misappropriation of trade secrets and the like. This Agreement does not limit Member's obligations or the rights of any Buyer Entity under the terms of any other agreement between Member and any Buyer Entity.

11. Termination of Services to any Buyer Entity. Member's obligations under this Agreement shall not be eliminated or diminished by the termination of Member's provision of consulting services to or employment with any Buyer Entity for any reason, including as a result of Member's resignation. Member shall, during the Non-Competition Period, within ten days after accepting any employment, consulting engagement, engagement as an independent contractor, partnership or other association, advise Buyer in writing of the identity of the new employer, client, partner or other Person with whom such

5569030_1.DOC

- 5 -

Member has become associated. Buyer may serve notice upon each such Person that such Member is bound by this Agreement and furnish each such Person with a copy of this Agreement or relevant portions hereof.

12.    Notices. Any notice or other communication required or permitted to be delivered to any party under this Agreement shall be in writing and shall be deemed to be properly delivered, given and received (a) when delivered in person, (b) when transmitted by facsimile (with written confirmation), (c) on the third business day following the mailing thereof by certified or registered mail (return receipt requested) or (d) when delivered by an express courier with written confirmation, to the respective parties at the following addresses (or to such other address or facsimile number as such party may have specified in a written notice given to the other parties):

    (a)    if to Buyer, to:

                Google Inc.
                1600 Amphitheatre Parkway
                Mountain View, CA 94043
                Attn: Director, Corporate Development
                Facsimile: (650) 253-8632

                with a copy to:

                Attn: Legal Department, Corporate Group
                Facsimile: (650) 887-1790

    (b)    if to Member, to the address for notice set forth on Member's signature page hereto.

13.    Severability. Subject to Section 4, if any provision of this Agreement or any part of any such provision is held under any circumstances to be invalid or unenforceable in any jurisdiction, then (a) such provision or part thereof shall, with respect to such circumstances and in such jurisdiction, be deemed amended to conform to applicable laws so as to be valid and enforceable to the fullest possible extent, (b) the invalidity or unenforceability of such provision or part thereof under such circumstances and in such jurisdiction shall not affect the validity or enforceability of (i) such provision or part thereof under any other circumstances or in any other jurisdiction or (ii) the remainder of such provision or the validity or enforceability of any other provision of this Agreement.

14.    Governing Law. This Agreement shall be governed in all respects by the United States of America and the laws of the State of California, as such laws apply to agreements entered into and to be performed entirely within the State of California by California residents.

15.    Waiver. The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, privilege or remedy under this Agreement, and no delay on the part of any party in exercising any right, power, privilege or remedy under this Agreement, shall operate as a waiver of such right, power, privilege or remedy; and no single or partial exercise of any such right, power, privilege or remedy shall preclude any other or further exercise thereof or of any other right, power, privilege or remedy. No party shall be deemed to have waived any claim arising out of this Agreement, or any right, power, privilege or remedy under this Agreement, unless the waiver of such claim, right, power, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of the waiving party; and any such waiver shall only apply to the specific instance to which such waiver relates.

5569030_1.DOC

-6-

GONZALEZ EX. 2, Page 27 of 40

16.    Entire Agreement. This Agreement, and the other agreements referred to herein, set forth the entire understanding of Member and Buyer relating to the subject matter hereof and supersedes all prior agreements and understandings between any of such parties relating to the subject matter hereof. Member understands and agrees that he or she has had an opportunity to seek his or her own counsel in his or her review of this Agreement.

17.    Amendments. This Agreement may not be amended, modified, altered, or supplemented other than by means of a written instrument duly executed and delivered on behalf of Buyer and Member.

18.    Assignment. This Agreement and all obligations hereunder are personal to Member and may not be assigned, delegated or otherwise transferred by Member at any time. Buyer may assign this Agreement and all other rights acquired hereunder in their entirety or in part at any time to any of its affiliates.

19.    Binding Nature. Subject to Section 18, this Agreement will be binding upon Member and Member's representatives, executors, administrators, estate, heirs, successors and assigns, and will inure to the benefit of, the Buyer Entities.

20.    Counterpart Execution. This Agreement may be executed in counterparts and may be delivered by facsimile transmission, which, when taken together, shall constitute one agreement.

21.    Construction. For purposes of this Agreement, the parties hereto agree that, unless a clear contrary intention appears: (a) the singular number shall include the plural, and vice versa; (b) reference to any gender includes each other gender; (c) reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof; (d) reference to any legal requirement means such legal requirement as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any legal requirement means that provision of such legal requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision; (e) "include" and "including", and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation"; (f) all references in this Agreement to "Sections" are intended to refer to Sections of this Agreement, except as otherwise indicated; (g) the headings in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement, and shall not be referred to in connection with the construction or interpretation of this Agreement; (h) "or" is used in the inclusive sense of "and/or"; (i) with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and (j) "hereunder," "hereof," "hereto," and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision hereof.

22.    Each party has been represented by counsel or has had the opportunity to retain counsel during the negotiation and execution of this Agreement and waives the application of any law, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

*[Remainder of page intentionally left blank]*

5569030_1.DOC

-7-

GONZALEZ EX. 2, Page 28 of 40

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

"MEMBER"

**ANTHONY LEVANDOWSKI**

Address: _____

"BUYER"

GOOGLE INC.
a Delaware corporation

By: David Lawee
Its: Vice President, Corporate Development

GONZALEZ EX. 2, Page 29 of 40

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

"MEMBER"

/ANTHONY LEVANDOWSKI

Address:

"BUYER"

GOOGLE INC,
a Delaware corporation

By: _____
Its:

GONZALEZ EX. 2, Page 30 of 40

# ATTACHMENT C

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This Non-Competition and Non-Solicitation Agreement (this "Agreement") is being executed and delivered as of July 28, 2011 by Anthony Levandowski ("Member") in favor and for the benefit of Google Inc., a Delaware corporation ("Parent"). Capitalized terms used herein but not otherwise defined shall have the respective meanings ascribed to such terms in the Merger Agreement (as defined below).

## RECITALS

WHEREAS, concurrently with the execution of this Agreement, Parent, Plus 490 LLC, a California limited liability company and a wholly-owned subsidiary of Parent ("Merger Sub"), 510 Systems, LLC, a California limited liability company (the "Company"), and with respect to Articles VI, VIII, IX and X only, Anthony Levandowski as Member Representative and U.S. Bank National Association as Escrow Agent have entered into an Agreement and Plan of Merger, dated as of July 28, 2011 (the "Merger Agreement"), pursuant to which Merger Sub shall be merged with and into the Company, the separate corporate existence of Merger Sub shall cease, and the Company shall continue as the surviving corporation and as a wholly-owned subsidiary of Parent (the "Merger");

WHEREAS, Member has a substantial ownership interest in the Company as the holder of a significant membership interest in the Company, and, as a result of the Merger, Member shall receive significant consideration in connection with the Merger;

WHEREAS, Parent and Member mutually desire that the entire goodwill of the Company be transferred to Parent as part of the Merger and acknowledge that Parent's failure to receive the entire goodwill contemplated by the Merger would have the effect of reducing the value of the Company to Parent; and

WHEREAS, (i) as a condition and mutual inducement to the Merger, (ii) as additional consideration for the consideration to be paid to Member under the Merger Agreement and (iii) to preserve the value and goodwill of the Company after the Merger, the Merger Agreement contemplates, among other things, that Member shall enter into this Agreement and that this Agreement shall become effective as of the Closing.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises made herein and in the Merger Agreement, Parent and Member hereby agree as follows:

1. **Effective Date**. This Agreement shall be effective as of the Closing. This Agreement shall be null and void if the Merger Agreement is terminated in accordance with Article IX thereof.

2. **Noncompetition**. During the Non-Competition Period (as defined below), Member shall not (other than in connection with his or her provision of services as an employee or consultant to any Parent Entity (as defined below)), without the prior written consent of Parent, directly or indirectly:

(a) engage, anywhere in the Restricted Territory (as defined below), in any Competing Business Purpose (as defined below);

(b) be or become an officer, director, member, stockholder, owner, affiliate, salesperson, co-owner, partner, trustee, promoter, technician, engineer, analyst, employee, agent, representative, supplier, contractor, consultant, advisor or manager of or to, or otherwise acquire or hold any interest in, or participate in or facilitate the financing, operation, management or control of, any

5369028_1.DOCX

Person or business that engages or participates in a Competing Business Purpose in the Restricted Territory; or

(c) contact, solicit or communicate with any Person known to Member to be a customer of any Parent Entity or any former customer of the Company in connection with a Competing Business Purpose (whether or not such Member has had personal contact with such Person);

provided, that nothing in this Agreement shall prevent or restrict Member from any of the following: (i) owning as a passive investment less than 1% of the outstanding shares of the capital stock of a corporation (whether public or private) that is engaged in a Competing Business Purpose, provided that Member is not otherwise associated with such corporation; (ii) performing speaking engagements and receiving honoraria in connection with such engagements; (iii) being employed by any government agency, college, university or other non-profit research organization; (iv) owning a passive equity interest in a private debt or equity investment fund in which Member does not have the ability to control or exercise any managerial influence over such fund; or (v) any activity consented to in advance in writing by Parent.

"Competing Business Purpose" means any business or enterprise (including research and development), operations, activities or services that (i) are related to the design, development, manufacture or commercialization or positioning, navigation, sensor, high-speed data acquisition, 3D data analysis, machine control, or robotics technologies, or (ii) provides the products and services of the Company as such exist or are contemplated as of the Closing Date.

"Non-Competition Period" means the period commencing on the Closing Date and ending on the two (2) year anniversary of the Closing Date.

"Parent Entity" means the Parent, any subsidiary, affiliate or designee of Parent, or Parent's successors or assigns.

"Restricted Territory" means each and every country, province, state, city, or other political subdivision of the world in which the Company or any of its subsidiaries or affiliates is currently engaged, or currently plans to engage in a Competing Business Purpose, or otherwise distributes, licenses or sells its products in connection with the Competing Business Purpose as of the Closing Date.

3.     Non-Solicitation. Member further agrees that Member shall not during the period commencing on the Closing Date and ending on the later of the two (2) year anniversary of the Closing Date or the termination of Member's employment with or provision of consulting services to any Parent Entity (the "Non-Solicitation Period"), directly or indirectly, without the prior written consent of Parent:

(a) personally or through any other Person, encourage, induce, attempt to induce, recruit, solicit, attempt to solicit (on Member's own behalf or on behalf of any other Person), or take any other action that is intended to induce or encourage, any Former Company Employee (as defined below) or any other employee or consultant of any Parent Entity, to leave his or her employment or service with any Parent Entity or take away employees or consultants; or

(b) personally or through any other Person, encourage, induce, attempt to induce, recruit, solicit, attempt to solicit (on Member's own behalf or on behalf of any other Person), or take any other action that is intended to induce or encourage any Former Company Employee or any other employee or consultant of any Parent Entity to engage in any activity in which Member would, under the provisions of Section 2 hereof, be prohibited from engaging.

5569028_1.DOCX

- 2 -

"**Former Company Employee**" means any current employee or consultant of the Company who accepts an offer of employment with any Parent Entity.

Notwithstanding the foregoing, for purposes of this Agreement, the placement of general advertisements that may be targeted to a particular geographic or technical area but that are not specifically targeted toward any Former Company Employee(s) or any employee(s) of any Parent Entity shall not be deemed to be a breach of this Section 3.

4.    Term and Severability of Covenants. If Member breaches any covenant set forth in Section 2 or Section 3 hereof, the term of such covenant shall be extended by the period of the duration of such breach. The covenants contained in Section 2 hereof shall be construed as a series of separate covenants, one for each country, province, state, city or other political subdivision of the Restricted Territory. Except for geographic coverage, each such separate covenant shall be deemed identical in terms to the covenant contained in Section 2 hereof. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), Parent and Member agree that such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. If the provisions of Section 2 or Section 3 are deemed to exceed the time, geographic or scope limitations permitted by applicable law, Parent and Member agree that such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, permitted by applicable law.

5.    Non-Disparagement. Member shall not, at any time during or after the Non-Solicitation Period, directly or indirectly, disparage any Parent Entity or the Surviving Corporation. Notwithstanding the foregoing, nothing in this Section 5 shall preclude Member from making truthful and accurate statements or disclosures that are required by applicable laws or legal process.

6.    Independence of Obligations. The covenants and obligations of Member set forth in this Agreement shall be construed as independent of any other agreement or arrangement between Member, on the one hand, and any Parent Entity, on the other.

7.    Member Acknowledgement. Member acknowledges that (i) Member is a significant holder of Membership Interests, key employee, or key member of the management of the Company; (ii) the goodwill associated with the existing business, customers and assets of the Company prior to the Merger is an integral component of the value of the Company to Parent and is reflected in the consideration payable to Member in connection with the Merger, and (iii) Member's agreement as set forth herein is necessary to preserve the value of the Company for Parent following the Closing. Member also acknowledges that the limitations of time, geography and scope of activity agreed to in this Agreement are reasonable because, among other things: (A) the Company and Parent are engaged in a highly competitive industry, (B) Member has had unique access to the trade secrets and know-how of the Company, including the plans and strategy (and, in particular, the competitive strategy) of the Company, (C) Member has accepted an employment or consulting position with Parent in connection with the acquisition of the Company on terms that Member believes are favorable to him, (D) by virtue of the Member's employment or consulting arrangement with Parent, Member will have access to Parent's trade secrets and know how, including Parent's plans and strategy (and, in particular, Parent's competitive strategy), (E) in the event Member's employment or consulting arrangement with the Parent Entity ended, Member believes he or she would be able to obtain suitable and satisfactory employment without violation of this Agreement and (F) Member believes that this Agreement provides no more protection than is reasonably necessary to protect Parent's legitimate interest in the goodwill, trade secrets and confidential information of the Company.

GONZALEZ EX. 2, Page 34 of 40

8.      Forum and Venue. Subject to Section 9(f), each of Member and Parent irrevocably (i) consents to the exclusive jurisdiction and venue of any court located within Santa Clara County, State of California, in connection with any Dispute (as defined below) or the matters contemplated herein or any matter relating to any arbitration in which the parties are participants, (ii) agrees that process may be served upon them in any manner authorized by the laws of the State of California for such persons and (iii) waives and covenants not to assert or plead any objection that he or she might otherwise have to such jurisdiction, venue and such process. Subject to Section 9(f), each party hereto agrees not to commence any legal proceedings related hereto except in such courts.

9.      Resolution of Conflicts; Arbitration. Subject to Section 9(f) hereof, any claim or dispute arising out of, related to or in connection with this Agreement, or the interpretation, making, performance, breach or termination thereof (each, a "Dispute"), shall (except as specifically set forth in this Agreement) be finally settled by binding arbitration in the County of Santa Clara, California in accordance with the Comprehensive Arbitration Rules and Procedures (the "Rules") then in effect of the Judicial Arbitration and Mediation Services, Inc. and judgment upon any such award rendered may be entered in any court having jurisdiction thereof. The arbitrator shall have the authority to grant any equitable and legal remedies that would be available in any judicial proceeding instituted to resolve a Dispute.

        (a)     Selection of Arbitrators. Such arbitration shall be conducted by a single independent arbitrator chosen by mutual agreement of Parent and Member. Alternatively, at the request of either party before the commencement of arbitration, the arbitration shall be conducted by three independent arbitrators, none of whom shall have any competitive interests with Parent or the Company. Parent and Member shall each select one arbitrator. The two arbitrators so selected shall select a third arbitrator.

        (b)     Discovery. In any arbitration under this Section 9, each party shall be limited to calling a total of three witnesses both for purposes of deposition and the arbitration hearing. Subject to the foregoing limitation on the number of witnesses, the arbitrator or arbitrators, as the case may be, shall set a limited time period and establish procedures designed to reduce the cost and time for discovery while allowing the parties an opportunity, adequate in the sole judgment of the arbitrator, or a majority of the three arbitrators, as the case may be, to discover relevant information from the opposing parties about the subject matter of the Dispute. The arbitrator, or a majority of the three arbitrators, as the case may be, shall rule upon motions to compel or limit discovery and shall have the authority to impose sanctions for discovery abuses, including attorneys' fees and costs, to the same extent as a competent court of law or equity, should the arbitrator, or a majority of the three arbitrators, as the case may be, determine that discovery was sought without substantial justification or that discovery was refused or objected to without substantial justification.

        (c)     Governing Law. The arbitrator or arbitrators will apply California substantive and procedural law to any Dispute, without reference to rules of conflict of law, and shall administer and conduct any arbitration in accordance with the California Code of Civil Procedure. To the extent that the Rules conflict with California law, California law shall take precedence. The arbitrator, or a majority of the three arbitrators, as the case may be, shall have the power to decide any motions brought by either party to the arbitration, including motions for summary judgment or adjudication, and motions to dismiss and demurrers, prior to any arbitration hearing. The arbitrator, or a majority of the three arbitrators, as the case may be, shall have the power to award any remedies available under applicable laws, including injunctive relief, and shall award attorneys' fees and costs to the prevailing party except as prohibited by applicable laws.

5569022_1.DOCX

- 4 -

GONZALEZ EX. 2, Page 35 of 40

(d)     Decision. The decision of the arbitrator or a majority of the three arbitrators, as the case may be, shall be final, binding, and conclusive on the parties to the arbitration. Such decision shall be written and shall be supported by written findings of fact and conclusions that shall set forth the award, judgment, decree or order awarded by the arbitrator or arbitrators. Judgment may be entered on the arbitrator's or arbitrators' decision in any court having jurisdiction.

(e)     Except as provided for in this Agreement and subject to Section 9(f), neither Member nor Parent will be permitted to pursue court action regarding any Dispute that is subject to arbitration. Notwithstanding anything to the contrary contained herein, the arbitrator or arbitrators shall not have the authority to disregard or refuse to enforce any lawful policy of Parent, and the arbitrator or arbitrators shall not order or require Parent to adopt a policy not otherwise required by laws that Parent has not adopted.

(f)     Other Relief. The parties agree that, pursuant to California Code of Civil Procedure Section 1281.8, any party may petition a court of competent jurisdiction for a temporary restraining order, preliminary injunction, or other interim or conservatory relief, as necessary to enforce the provisions of Section 2 and Section 3 of this Agreement and without breach of this arbitration provision and without abridgement of the powers of the arbitrator or arbitrators. The parties understand and agree that any breach or threatened breach of this Agreement shall cause irreparable injury and that money damages will not provide an adequate remedy therefor, and that any relief to which the non-breaching party may be entitled may be rendered ineffectual without injunctive relief and, accordingly, both parties hereby consent to the issuance of an injunction. If either party seeks injunctive relief, the prevailing party shall be entitled to recover reasonable costs and attorneys' fees.

(g)     Costs and Expenses. Subject to Section 9(b), each party shall pay its own costs and expenses (including counsel fees) of any such arbitration, and each party waives its right to seek an order compelling the other party to pay its portion of its costs and expenses (including counsel fees) for any arbitration.

(h)     Confidentiality. Member and Parent agree to maintain in complete confidence any Dispute arising out of, relating to, or in connection with this Agreement, or the interpretation, validity, construction, performance, breach, or termination hereof, including the existence of an arbitration proceeding and the outcome thereof, and shall not disclose or publicize any such information to any third party (other than to each parties' legal advisors bound by confidentiality restrictions).

(i)     Agreement to Arbitrate. Member has read and understands this Section 9, which discusses arbitration. Member understands that by signing this Agreement, Member agrees, to the extent permitted by applicable laws, to submit any future claims arising out of, relating to, or in connection with this Agreement, or the interpretation, validity, construction, performance, breach, or termination thereof, to binding arbitration, and that this arbitration clause constitutes a waiver of Member's right to a jury trial and relates to the resolution of all Disputes referred to in this Section 9.

10.     Non-Exclusivity. The rights and remedies of Parent hereunder are not exclusive of or limited by any other rights or remedies that Parent hereunder may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative). Without limiting the generality of the foregoing, the rights and remedies of Parent hereunder, and the obligations and liabilities of Member hereunder, are in addition to their respective rights, remedies, obligations and liabilities under the laws of unfair competition, misappropriation of trade secrets and the like. This Agreement does not limit Member's obligations or the rights of any Parent Entity under the terms of any other agreement between Member and any Parent Entity.

5369028_1.DOCX

- 5 -

11.     Termination of Services to any Parent Entity. Member's obligations under this Agreement shall not be eliminated or diminished by the termination of Member's provision of consulting services to or employment with any Parent Entity for any reason, including as a result of Member's resignation. Member shall, during the Non-Competition Period, within ten days after accepting any employment, consulting engagement, engagement as an independent contractor, partnership or other association, advise Parent in writing of the identity of the new employer, client, partner or other Person with whom such Member has become associated. Parent may serve notice upon each such Person that such Member is bound by this Agreement and furnish each such Person with a copy of this Agreement or relevant portions hereof.

12.     Notices. Any notice or other communication required or permitted to be delivered to any party under this Agreement shall be in writing and shall be deemed to be properly delivered, given and received (a) when delivered in person, (b) when transmitted by facsimile (with written confirmation), (c) on the third business day following the mailing thereof by certified or registered mail (return receipt requested) or (d) when delivered by an express courier with written confirmation, to the respective parties at the following addresses (or to such other address or facsimile number as such party may have specified in a written notice given to the other parties):

    (a)     if to Parent, to:

                Google Inc.
                1600 Amphitheatre Parkway
                Mountain View, CA 94043
                Attn: Director, Corporate Development
                Facsimile: (650) 253-8632

                with a copy to:

                Attn: Legal Department, Corporate Group
                Facsimile: (650) 887-1790

    (b)     if to Member, to the address for notice set forth on Member's signature page
            hereto.

13.     Severability. Subject to Section 4, if any provision of this Agreement or any part of any such provision is held under any circumstances to be invalid or unenforceable in any jurisdiction, then (a) such provision or part thereof shall, with respect to such circumstances and in such jurisdiction, be deemed amended to conform to applicable laws so as to be valid and enforceable to the fullest possible extent, (b) the invalidity or unenforceability of such provision or part thereof under such circumstances and in such jurisdiction shall not affect the validity or enforceability of (i) such provision or part thereof under any other circumstances or in any other jurisdiction or (ii) the remainder of such provision or the validity or enforceability of any other provision of this Agreement.

14.     Governing Law. This Agreement shall be governed in all respects by the United States of America and the laws of the State of California, as such laws apply to agreements entered into and to be performed entirely within the State of California by California residents.

15.     Waiver. The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, privilege or remedy under this Agreement, and no delay on the part of any party in exercising any right, power, privilege or remedy under this Agreement, shall operate as a waiver of such right, power, privilege or remedy; and no single or partial exercise of any such right, power, privilege or remedy shall preclude any other or further exercise thereof or of any other right, power, privilege or remedy. No party shall be
5569028_1.DOCX

- 6 -

deemed to have waived any claim arising out of this Agreement, or any right, power, privilege or remedy under this Agreement, unless the waiver of such claim, right, power, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of the waiving party; and any such waiver shall only apply to the specific instance to which such waiver relates.

16.     Entire Agreement. This Agreement, and the other agreements referred to herein, set forth the entire understanding of Member and Parent relating to the subject matter hereof and supersedes all prior agreements and understandings between any of such parties relating to the subject matter hereof. Member understands and agrees that he or she has had an opportunity to seek his or her own counsel in his or her review of this Agreement.

17.     Amendments. This Agreement may not be amended, modified, altered, or supplemented other than by means of a written instrument duly executed and delivered on behalf of Parent and Member.

18.     Assignment. This Agreement and all obligations hereunder are personal to Member and may not be assigned, delegated or otherwise transferred by Member at any time. Parent may assign this Agreement and all other rights acquired hereunder in their entirety or in part at any time to any of its affiliates.

19.     Binding Nature. Subject to Section 18, this Agreement will be binding upon Member and Member's representatives, executors, administrators, estate, heirs, successors and assigns, and will inure to the benefit of, the Parent Entities.

20.     Counterpart Execution. This Agreement may be executed in counterparts and may be delivered by facsimile transmission, which, when taken together, shall constitute one agreement.

21.     Construction. For purposes of this Agreement, the parties hereto agree that, unless a clear contrary intention appears: (a) the singular number shall include the plural, and vice versa; (b) reference to any gender includes each other gender; (c) reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof; (d) reference to any legal requirement means such legal requirement as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any legal requirement means that provision of such legal requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision; (e) "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation"; (f) all references in this Agreement to "Sections" are intended to refer to Sections of this Agreement, except as otherwise indicated; (g) the headings in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement, and shall not be referred to in connection with the construction or interpretation of this Agreement; (h) "or" is used in the inclusive sense of "and/or"; (i) with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and (j) "hereunder," "hereof," "hereto," and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision hereof.

22.     Each party has been represented by counsel or has had the opportunity to retain counsel during the negotiation and execution of this Agreement and waives the application of any law, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

*[Remainder of page intentionally left blank]*

5509028_1.DOCX

- 7 -

GONZALEZ EX. 2, Page 38 of 40

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

"MEMBER"

_____
Anthony Levandowski

Address: _____
_____
_____

"PARENT"

GOOGLE INC.
a Delaware corporation

By: David Lawee
Its: Vice President, Corporate Development

GONZALEZ EX. 2, Page 39 of 40

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

"MEMBER"

Anthony Levandowski

Address: ███████████████
D54

"PARENT"

GOOGLE INC.
a Delaware corporation

By:
Its:

GONZALEZ EX. 2, Page 40 of 40