UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

WAYMO, LLC,                          )
          Plaintiff,                 )
                                     )
  VS.                                )   No. C 17-00939 WHA
                                     )
UBER TECHNOLOGIES, INC.,             )
et al.,                              )
          Defendants.                )
_____)   San Francisco, California
                                         Wednesday, April 5, 2017

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:
                    QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                    50 California Street
                    22nd Floor
                    San Francisco, California  94111
               BY:  DAVID A. PERLSON, ESQ.
                    JORDAN R. JAFFE, ESQ.
                    LINDSAY COOPER, ESQ.
                    JEFFREY W. NARDINELLI, ESQ.
For Defendants:
                    MORRISON & FOERSTER, LLP
                    425 Market Street
                    San Francisco, California  94105
               BY:  ARTURO J. GONZALEZ, ESQ.
                    MICHELLE YANG, ESQ.

                    BOIES, SCHILLER AND FLEXNER, LLP
                    5301 Wisconsin Avenue, N.W.
                    Washington, D.C.  20015
               BY:  KAREN L. DUNN, ESQ.
                    HAMISH HUME, ESQ.

Reported By:  BELLE BALL, CSR 8785, CRR, RDR
              Official Reporter, U.S. District Court

(Appearances continued, next page)

APPEARANCES, CONTINUED:

For Intervenor Defendant Levandowski:
                              RAMSEY & EHRLICH, LLP
                              803 Hearst Avenue
                              Berkeley, California  94710

<u>**Wednesday, April 5, 2017**</u>                                    <u>**10:06 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

**THE CLERK:**  Calling Civil 17-939, that's Waymo LLC versus Uber Technologies Inc. et al.  It is on for a discovery hearing.

Counsel, can you please state your appearances for the record.

**MR. PERLSON:**  Your Honor, David Perlson from Quinn Emanuel on behalf of plaintiff Waymo.  I'm here with my partner Jordan Jaffe (Indicating), and Jeff Nardinelli, and Lindsay Cooper.

Mr. Verhoeven wanted me to let you know he is disappointed he couldn't make it, but he's out of town and couldn't get back in time for the hearing.

**THE COURT:**  All right.

And?

**MR. GONZALEZ:**  Good morning, Your Honor.  Arturo Gonzalez and Michelle Yang from Morrison & Foerster, along with our co-counsel.

**MS. DUNN:**  Karen Dunn and Hamish Hume from Boies Schiller.

**THE COURT:**  Good morning, welcome to you.

And?

**MR. RAMSEY:**  Good morning, Your Honor.  Ismail Ramsey from Ehrlich & Ramsey on behalf of Levandowski.

**THE COURT:**  Thank you, Mr. Ramsey, welcome to you.

**MR. RAMSEY:**  Thank you, Your Honor.

**THE COURT:**  Is there anyone representing -- I've lost it

now -- Samir Kshirsagar or Radu Raduta?

    **MR. GONZALEZ:**  Your Honor, it is my understanding that both of them have retained separate counsel.

    Radu is no longer employed by Uber.  And therefore, we do not represent him in any capacity.  We do represent Samir.  He is currently an employee, and we do represent him, Your Honor, with respect to the case.

    **THE COURT:**  Did he turn over the document he downloaded?

    **MR. GONZALEZ:**  Your Honor, we did collect documents from him.  And thus far, I believe we have only found one document from his computers that matches the documents that were identified in the complaint and the moving papers.

    That one document, it's my understanding, was not on his Uber computer, but on private information that we were given access to.

    **THE COURT:**  I don't know if that's a complete answer or not, but they have proof on their side that he downloaded at least one document.  They've identified what that document is, I think; right?

    **MR. PERLSON:**  (Nods head)

    **THE COURT:**  And you've got to produce it or have good reason not to.  So what you have said so far is not a complete answer.  So, I'm not blessing what you have just said, but I want you to know that I'm following what's happened on those two guys as well as the -- Mr. Levandowski.

1    **MR. GONZALEZ:**  Understood, your Honor.

2    One bit of information is that we have learned that that

3    information was downloaded to his work computer while he was at

4    Google, just for your information.  But we are searching --

5    **THE COURT:**  You're saying that he did not take it with him

6    when he left?

7    **MR. GONZALEZ:**  It's my understanding, Your Honor, that he

8    did not take all of the documents that have been raised in the

9    complaint and the moving papers by Google.  I do --

10   **THE COURT:**  That's a different -- you are not answering my

11   question.  Did he take any documents?

12   **MR. GONZALEZ:**  I do believe, Your Honor, that we found one

13   hit.  And that document will be produced.

14   **MR. PERLSON:**  Your Honor, that hasn't been produced to date,

15   as far as we understand.

16   **MR. GONZALEZ:**  (Nods head)

17   **THE COURT:**  All right.  Let's hear your motion.

18   **MR. PERLSON:**  Well, Your Honor, the Court gave its order,

19   very clear order as to what was supposed to be produced by

20   March 31st.  It was agreed to by the parties.  And thus far,

21   there's been a -- they have not complied with the order in

22   numerous respects.  There has not been a -- a sufficient search

23   done to date for many reasons.

24   For example, we made the 14,000 files available to

25   defendants to come and inspect.  They never came and inspected

1    any of them.  So there was no way that they could use those

2    files to actually do their search.

3         And obviously, they haven't -- for reasons that we have

4    heard before, they haven't obtained anything from

5    Mr. Levandowski, himself, personally.  As we understand it, he

6    was not even personally involved in the investigation as to

7    complying with the Court's March 16th order.  And it's -- we're

8    not aware that Samir was involved in that, either.

9         Instead, what we understand was done was that there were

10   some search terms that were used for -- in relation to e-mail,

11   some documents on Google Drive, and on ten custodians, on their

12   work -- work computer.  There's -- and that's it.  We don't know

13   if there's other stuff out there that they didn't search.

14   Defendants' counsel was unable to say.

15        There does not seem to have been any search that was done to

16   look for documents that have pictures or schematics.  Many of

17   the files that the -- the 14,000 files that were downloaded by

18   Mr. Levandowski have schematics and things of that nature, were

19   not -- we don't understand there to have been any real search

20   done in relation to finding where those documents may or may not

21   have appeared.  The -- because -- and they couldn't know,

22   because Mr. Levandowski won't show them the documents that he

23   has.  And they never bothered to come and look to inspect the

24   documents that we made available to them.

25        And then they -- also we -- let's see -- they were -- and in

1   the ten custodians that they searched, they were the three

2   individuals who were named in the complaint.  And then there

3   were seven more individuals that they randomly selected.

4   　　　But there's at least 40 former Waymo employees now at Uber.

5   And presumably many other people who have done LiDAR.  And they

6   basically just took this very small search and just assumed that

7   was enough.

8   　　　Now, one of this things that we have heard in our

9   meet-and-confer this morning is that they just weren't able to

10  do the search for the 14,000 files because there were just too

11  many of them.

12  　　　Well, this was the relief that Your Honor ordered, was

13  something that they agreed to.  And not once before the -- the

14  documents became due did they raise any concerns with us that

15  they were unable to comply with the Court's order.  They didn't

16  say that it was too broad, that they couldn't do it.  They

17  certainly didn't seek relief from Your Honor.  And it seems they

18  have simply decided that it was just too hard, and that -- or

19  that they didn't have an obligation to do it.

20  　　　And Your Honor, that's not our understanding of how things

21  work.  If there was a problem, if there was an issue, that they

22  should have raised that ahead of time.  But it seems that as of

23  to date, it's been woefully inadequate.

24  　　　And it is not for our want of trying to, you know, get help

25  in the process.  We've repeatedly asked them for return of these

14,000 documents.  They have basically ignored us.  And, and apparently, a lot of this is due to the fact that, potentially, that Mr. Levandowski is not cooperating, will not provide the materials on some baseless Fifth-Amendment privilege ground.

But as Your Honor noted at the hearing last week, they -- you know, there are things that they can do.  They can fire Mr. Levandowski.  Apparently they haven't done that.  He still works there.  They could have some sort of disciplinary measures.  They haven't done that.  We asked them today whether there were any disciplinary measures.  They refused to answer.

And apparently they -- they asked him for the files, and he took the Fifth, and they didn't do anything else.  And it seems to have clouded their entire investigation into this whole thing.

And I don't know how they could have possibly complied with Your Honor's order -- the fact they haven't gotten the 14,000 files from Mr. Levandowski himself is bad enough, but it doesn't seem like he was involved even in looking for these files within Uber.  He's the head of their -- the division that is running their self-driving program this all relates to.  How could they possibly comply with the Court's order without having him deeply involved in this?  And we've heard no sufficient explanation as to that.

And Your Honor ordered defendants to produce, you know, various pieces of information in relation to the hearing today.

We asked that as part of our meet-and-confer.  They refused to give that to us.  So we don't know the specifics of that information.

We still haven't seen the privilege log; we haven't seen the list of the servers; we haven't seen the list of the people who were involved.

So, you know, we are at a -- a disadvantage of even being able to articulate the very specifics of their failures.  But it seems quite clear that there has been a -- a willful failure to comply with Your Honor's order.  And, we would submit, justifies the adverse inference that we requested in our letter brief.

**THE COURT:**  Mr. Gonzalez.

**MR. GONZALEZ:**  So Your Honor, if I can respond briefly.  I believe that we will demonstrate to you that those 14,000 files never made it to Uber.

Now, I want to start by telling you what we've done.  Because you just heard that we didn't do this and we didn't do that.  Let me tell you what we've done to comply with your order.

First, we interviewed 85 people that currently work for Uber, who used to work at Google.  Of those people, 42 used to work in their automotive division.

Given that we only had a limited amount of time, I wanted to take 25 percent of that 42, essentially ten, and look at all of their computers.  So we took the three people who are named in

their papers and we selected seven others randomly.  And we had a consultant come in and look at all of their computer information at Uber to see if we could find any of these 41,000 (sic) files.

In addition to that, we looked at the cell phone that Samir has.  He let us look at his cell phone, and so we did look at that.  We also looked at the entire GIT (Phonetic) repository.  That is a repository for Uber's engineers.  And we looked at that to see if we could find any hits.  We looked for the file names or for hash values.  And in addition to that, working with our consultants and with our clients, we came up with 120 additional search terms that we could search to see if we can find any evidence of these files.

In total, Your Honor -- this is important for you to know -- we searched 12 terabytes of data, in just the two weeks or so that we have had.  That's the equivalent of 8.3 billion pages of text.  So, any suggestion that we are not looking is extremely unfair.

And what did we find?  We found 3,100 hits.  But you know what they are?  They're not substantive.  You are going to see this in the declaration that we will file on Friday with our opposition, Your Honor.  That will detail it a lot better than I can right now.

But we're not getting substantive hits.  You know why?  Because these 14,000 files, they're not trade secrets.  Most of

1  this stuff isn't trade secret at all.  So we're getting hits of

2  things --

3      **THE COURT:**  Why did he take it, then?

4      **MR. GONZALEZ:**  Your Honor --

5      **THE COURT:**  The record -- the record that we have and that

6  you are faced with is that shortly before Mr. Levandowski left

7  the company, he downloaded 14,000 files, then he wiped clean the

8  computer, and he took it with him.  That's the record.

9      If all you can show is that you can't find them in your

10  files, there's going to be a preliminary injunction of some

11  sort.  It can't be helped.  You have got to do more than what

12  you are telling me.

13      Your guy should return -- he's not denying it, you're not

14  denying it, no one on your side is denying that he has the

15  14,000 files.  Maybe you will, maybe you will.  But so far, you

16  haven't denied it.  And if it's going to be denied, then how can

17  you take the Fifth Amendment?  Or how can he take the Fifth

18  Amendment?

19      This is an extraordinary case.  I have never seen a record

20  this strong in 42 years.  So you are up against it.

21      **MR. GONZALEZ:**  (Nods head)

22      **THE COURT:**  And you are looking at a preliminary injunction,

23  even if what you tell me is true.

24      Now, what the scope of the injunction is, I don't know.

25  That's a -- calls for some careful judgment.  But this -- you

just can't escape this by saying:  We have been working hard, we can't find any hits.

And you are dodging the main issue, which is:  The record very clearly shows, so far, that he has 14,000 files.

**MR. GONZALEZ:**  Let me just --

**THE COURT:**  And whether they are trade secrets or not, they came from -- they came from them.  So, I can't just take your word for it that they're not trade secrets.  They're -- why would he take them if they didn't have some valuable information in there?  The inferences work against you here.

So, I am very anxious to see what you are going to -- I'm going to read it with great interest, to see what you can come up with.  But you are up against a strong record that they have made.

Now, maybe you have blown this guy out of the water, the guy who did the computer analysis, and it's a fraud.  That would be amazing.  But it could happen.  I haven't seen what you have done on his deposition yet.

Did you take his deposition?  Maybe -- maybe you didn't take it.  But on the face of it, it's a powerful showing that the plaintiff has made here.

So what you are telling me is not going to be a get-out-of-jail-free card.

**MR. GONZALEZ:**  Your Honor, may I add something here that is very important for you to know?

1    **THE COURT:**  Sure.

2    **MR. GONZALEZ:**  This really is important, because you are

3    making an assumption that these are 14,000 really important

4    files.  I think you are making that assumption because you are

5    saying:  Why would he have taken them if they are not important?

6    Right?

7    **THE COURT:**  Yeah.

8    **MR. GONZALEZ:**  Here's --

9    **THE COURT:**  Or, or important enough to take.

10   **MR. GONZALEZ:**  All right.  So --

11   **THE COURT:**  Even if it's just proprietary information.

12   Doesn't have to qualify as trade secrets.  You take 14,000

13   files, you wipe the computer clean, and then you leave the

14   company.  Doesn't that sound suspicious to you?

15   **MR. GONZALEZ:**  All right, Your Honor.  Here's a question

16   that I have.

17       The one thing that you may or may not have asked yourself

18   yet, if you look at their complaint (Indicating), and if you

19   look at their motion for preliminary injunction, and if you even

20   look at the declaration of the guy who says he discovered the

21   14,000 files had been downloaded -- I believe his name's

22   Brown -- you know what's missing?

23   **THE COURT:**  What?

24   **MR. GONZALEZ:**  When did they discover that?

25   **THE COURT:**  I thought that they said in December.  I think

that's what their -- their declaration says that after they got the thing from the supplier that seemed to be suspiciously similar to their own design, they started doing an investigation. Seemed to me that they said that happened in December.

**MR. GONZALEZ:** What I would say is two things. Number one, if you find out in December that somebody took 14,000 important files, why do you wait until February 20th to file the complaint?

But it's better than that. They didn't find out in December, Your Honor. They found out in October. They found out in October that these files were allegedly taken, and yet they sat on their hands for four months, and did nothing. And then when they filed the complaint, they waited two weeks to serve it. And then they waited another week to file the injunction.

I just think you need to get --

**THE COURT:** Is all of this going to be laid out very clearly, under oath, with admissible evidence?

**MR. GONZALEZ:** Absolutely.

**THE COURT:** What is your proof that they knew this in October?

**MR. GONZALEZ:** Your Honor, I took the deposition of the guy who found the stuff, and I asked him that question. Because it seemed like a very interesting omission to me. Why is it

they're not telling Judge Alsup when they found this stuff?

He said:  I found 14,000 files were downloaded.  But he

doesn't say when.  They don't say when, anywhere, so I asked

them that.

**THE COURT:**  I thought the declaration said December.

**MR. GONZALEZ:**  Your Honor, the declaration says that in

December they inadvertently received an email from somebody that

alerted them to the fact that something was going wrong.

What they don't tell you is that in October, they learned

that these 14,000 files were downloaded, and they didn't say

"Boo" for five months.

**THE COURT:**  Any --

**MR. PERLSON:**  Your Honor, can I respond to this?

**THE COURT:**  Is that true?

**MR. PERLSON:**  Well, first of all, what the -- the, in

December is when we received the email.

**THE COURT:**  Yeah.

**MR. PERLSON:**  And there was knowledge of the documents being

downloaded earlier than that.  I don't know of the exact date.

It could have been as early as October.  And -- but that has

nothing to do with the fact that they violated this Court order.

We're happy to go into that.

I mean, the reason -- there's one thing of taking the

documents.  And then there's another thing of having evidence of

their use.  The gorilla email was the evidence of their -- the

first evidence we had that they were actually being used.  Then we had further evidence when there was a Freedom of Information Act request from Nevada that showed their plans that they were going to imminently release some new product.

So that's when we had it all lined up that there was use, irrepairable harm, and that's when we brought it.

But Your Honor, none of this has anything to do with our current motion regarding an order that they agreed to.

And Your Honor, for him to say up -- to get up here and say that these 14,000 files are not trade secrets, no one at his firm has ever looked at these files.  We made them available weeks ago.  So for him to get up here and say that they're junk, that they're nothing, they don't know.  And they haven't looked to see whether they were deleted.

We found out this -- one of the things, Your Honor, is that -- you ordered is that the -- is that the -- excuse me -- is that they provide evidence about the deletion of these files. We asked them about this this morning.  They said it was just too hard.  Their forensic adviser said it was just too hard.  So they didn't even do anything in relation to that.

Plus, the knowledge -- and if we are talking about knowledge about these things that have been going on for some time, it was counsel at Morrison & Foerster, Mr. Tate, who has appeared in this case, who signed the common interest agreement that is intending to hide the due diligence report that Mr. Levandowski

1   is trying -- is trying to prevent from this Court and us from

2   hearing.

3        **THE COURT:**  Well, we are going to argue that tomorrow.

4        **MR. PERLSON:**  Right.  But I just want to say that the

5   knowledge and the involvement and the possession of these

6   documents and materials regarding this case and the taking of

7   these files we think has been long known to defendants' counsel

8   here, but yet we haven't -- nothing has been produced to us in

9   relation to the acquisition of Otto by Uber or the due diligence

10  report or anything relating to that.

11       **THE COURT:**  All right, look.  I -- I want to give you a -- I

12  want to give you a tentative view, and then let you try to argue

13  with me.

14       But Mr. Gonzalez, you get -- you haven't even given me a

15  brief on this.  So, you get to -- I am going to give you another

16  opportunity to just stick with the problem that you have not

17  complied, allegedly, with the order that you agreed to, to

18  produce this material by March 31.

19       **MR. GONZALEZ:**  So, Your Honor, a couple of things.

20       First of all, I very much wanted to file a written response.

21  But your standing order says that when somebody files a letter

22  brief, you will let us know if you want a response or if you

23  want to us to show up for a hearing.  So I would very much like

24  to file a written response, if you will give me leave to do

25  that.

1    But here's what I want to say.

2    **THE COURT:**  You know, that's funny, because that's not been

3    the practice.  I'll have to go back and look at what the order

4    says.

5    But in every case, the front side comes in, I set a hearing

6    date, and then your side always submits an opposition.  I've

7    never had anyone say:  Judge -- That's the first I'm ever heard

8    that argument.  I'll go back and look and see if the order says

9    that.

10   **MR. GONZALEZ:**  Yeah, look at the order, Your Honor.  The

11   order says that you'll let us know if you want a response.

12   And because you didn't, we were concerned -- we don't want

13   to file something and have Judge Alsup get upset that we filed

14   something when he didn't ask us to.  But we very much wanted to,

15   and frankly, had drafted a letter.

16   **THE COURT:**  Then you have until 5:00 today to submit your

17   letter.

18   **MR. GONZALEZ:**  Fine.  I'll do that, Your Honor.  And that

19   letter will have the authorities -- the authorities are, on this

20   point -- I'll just make it briefly.

21   **THE COURT:**  All right, go ahead.

22   **MR. GONZALEZ:**  Briefly, Your Honor.

23   We can't produce something that we do not have.  They --

24   **THE COURT:**  You haven't searched well enough for it.

25   **MR. GONZALEZ:**  Well, no, Your Honor.  They have --

1    **THE COURT:**  Have you searched every server?

2    **MR. GONZALEZ:**  Every server, no, Your Honor, because that

3  will take us weeks.

4    **THE COURT:**  I want you to search every server.  So you

5  haven't done -- I don't know where all this stuff could be.  I

6  think you ought to -- first I want to see -- I ordered you to

7  bring a list of servers.

8    You got that with you?

9    **MR. GONZALEZ:**  I have that.

10    **THE COURT:**  All right.  Hand it to counsel, and give it to

11  me, too.

12    **MR. GONZALEZ:**  Your Honor, this --

13    **THE COURT:**  I want all those things right now that I asked

14  you, including the privilege log.  Where is that?

15    **MR. GONZALEZ:**  So Your Honor, I have the list that includes

16  all of our suppliers, which you asked us to bring.  I have that

17  (Indicating).  And at your direction, I will hand it to opposing

18  counsel.

19    I would note that they are taking the position that this is

20  all trade secret information.

21    **THE COURT:**  What do you want me to do about this trade

22  secret information?  Do you want it under seal, attorneys' eyes

23  only?  For the time being, I'm willing to do that.

24    **MR. GONZALEZ:**  Yeah, Your Honor --

25    **THE COURT:**  All right.  For the time, what you are handing

1   up to me will be attorneys' eyes only.

2      (Document handed up to the Court)

3      (Document tendered)

4      **THE COURT:** Be sure counsel gets it.

5      **MR. PERLSON:** I have a copy of it, Your Honor (Indicating).

6      **MR. GONZALEZ:** Your Honor, may I mention one thing while you

7   are looking at that?

8      **THE COURT:** Yeah.

9      **MR. GONZALEZ:** That we accomplished in the meet-and-confer?

10      **THE COURT:** What?

11      **MR. GONZALEZ:** I told them on Monday after they sent you

12   that letter where they wanted to pick 15 search terms, that same

13   day we said: Give us the 15 search terms, and we will use them.

14   We didn't hear a response until this morning. Now they've given

15   us the list; we're using those terms. That's number one.

16      Number two, we are in the process of reviewing the computer

17   data for five additional individuals that are working in the

18   autonomous area that used to work at Google. And I have told

19   them, I have told them, Your Honor: If there's any other person

20   who you think might have taken something, let me know and we'll

21   search them as well.

22      So it's not as though we're not continuing to try. We're

23   digging and we're digging. But what I'm telling you,

24   Your Honor, is I firmly believe that the reason we're not

25   finding this information is because it never made it to Uber.

1    The only thing the record shows thus far is that 14,000

2    files may or may not have been taken by someone.  I'm not going

3    to take a position on that.  My view is they have to show that

4    we are using them.  Because they didn't sue Mr. Levandowski,

5    Your Honor, he's not a defendant --

6    **THE COURT:**  No, no, no, they have made a showing that your

7    chief person has 14,000 of their files.

8    **MR. GONZALEZ:**  That he had at one point --

9    **THE COURT:**  That could lead to a preliminary injunction that

10   Mr. Levandowski cannot work on this project anymore, until this

11   case is over.  That's what you're looking at.  And these other

12   two guys, too, maybe.

13   But that's the relief that this record -- I'm not saying

14   that I'm going to grant it; it's is a matter of a lot of

15   equities have to come into play.  But the fact that they didn't

16   sue Levandowski, they did sue you.  And you keep on your payroll

17   somebody who has 14,000 of their documents, and is liable to use

18   them.

19   So that's the possible relief that could come out of this in

20   a few weeks.

21   **MR. PERLSON:**  Your Honor, could I just briefly respond to

22   what Mr. Gonzalez said?

23   **THE COURT:**  All right.

24   **MR. PERLSON:**  Okay.  Well, first of all, in terms of them,

25   you know, requesting search terms, we reached out to them on

1    Saturday; they ignored us; we reached out to them on Sunday;

2    they ignored us.

3        We were supposed to meet and confer on Monday.  Mr. Gonzalez

4    walked out of the room and would not talk to us, saying that

5    they would send us a letter, which came seconds before we filed

6    our motion.

7        We've provided the 15 search terms.  We're happy to have

8    them do it.  These are all discussions and things that should

9    have been accomplished beforehand, if they thought they could

10   not do it.

11       On the record, it's very clear that they have not complied

12   with the Court order, that they have no legitimate reason not to

13   do it, and they never asked for any relief from the Court's

14   order.  And so --

15       **THE COURT:**  Look.  They have been working.  I believe them

16   when they say they have been working hard.

17       All right, maybe they didn't -- they should have made all

18   those -- but I think the question is:  What is the way forward

19   for progress to be made?

20       And I'm not prepared to say there's going to be an adverse

21   inference yet on account of this problem.  But there may be.

22       Here's what I think we ought to do.  I think you ought to go

23   back and search all servers.  You ought to do all 15 of those

24   search terms.  And you ought to search anybody that has anything

25   to do with LiDAR.

1    Now, is that too hard?  For a case this big, where maybe

2 your company is going to get a preliminary injunction?  Is that

3 too hard to do that?

4    **MR. GONZALEZ:**  Your Honor, we will search those 15 terms,

5 Your Honor.  And what I don't know --

6    **THE COURT:**  No, no, no.  All servers, 15 terms, anybody that

7 has anything to do with LiDAR.

8    **MR. GONZALEZ:**  I'm understanding you.

9    What I don't know, Your Honor, and I'll certainly find out

10 very soon, is how long would it take to do that on all these

11 servers.  It is an enormous amount of data.

12    But I hear you, Your Honor.  I want to use their terms.  And

13 I haven't even had a chance to talk to the client --

14    **THE COURT:**  Let's do it in two steps.  First is, go back and

15 use the 15 terms on the servers, and the employees that you

16 already have done.

17    **MR. GONZALEZ:**  Correct.

18    **THE COURT:**  So that will be step one.

19    **MR. GONZALEZ:**  Yep.

20    **THE COURT:**  All right.  Step two is going to be to let your

21 side pick out an additional ten employees.  Let them pick the

22 employees.

23    **MR. GONZALEZ:**  Fair enough.

24    **THE COURT:**  And then you search them.  On whatever servers

25 that they -- those ten have got records on, using the 15 search

1   terms.

2      **MR. GONZALEZ:** We can do that, your Honor. That will be --

3      **THE COURT:** All right. And then after all of that is done,

4   you come back and pick up the rest with all the other servers,

5   and all the other employees that have anything to do with LiDAR.

6      But I think, that way, we can prioritize and have a better

7   chance of getting to -- now, I recognize that this is a large

8   undertaking, and I have some sympathy for the fact that you

9   can't do everything at once, and this was an ambitious project.

10  So I -- all right.

11     Where is the fully-completed privilege log?

12     **MR. GONZALEZ:** So, Your Honor --

13     **MR. PERLSON:** Your Honor, can I just -- a quick

14  clarification on a couple of things.

15     First of all, we provided 15 additional terms to the terms

16  that they had already done. So to the extent that they are

17  going to be doing additional custodians. I think that they

18  should be using the terms that they had already done, and the 15

19  terms, because --

20     **THE COURT:** All right. Can you do that?

21     **MR. GONZALEZ:** So here's the only issue. I'll do whatever

22  you direct. We picked 120 terms. They're telling us: These

23  are the 15 that are magic.

24     I can do 135 terms, but it's just going to take longer. So

25  it's up to them. If I have to run 135 terms --

1    **THE COURT:** All right, here. Do this. Can you do it in

2    stages?

3        **MR. GONZALEZ:** Yes.

4        **THE COURT:** Can you do their 15 first, and then go back and

5    do the other 120.

6        **MR. GONZALEZ:** So Your Honor, to be clear, I will do the 15

7    terms they just gave me on the employees we've already done.

8    Then I'll do the 15 terms on ten other employees that they will

9    give me. Then I'll go back to this ten other employees and do

10   the additional 120 terms. So that all 20 people --

11       **THE COURT:** All right. And then you've got to do all the

12   other servers, and eventually get around to everybody. But that

13   is -- that sounds right to me.

14       **MR. GONZALEZ:** I understand, and we will do that.

15       Your Honor, you asked about a log. And as you know, there

16   is an objection to the log. I have it. I want to stop there.

17   I have it. There's an objection to the log. And that's what

18   you are going to be hearing about tomorrow.

19       **THE COURT:** With respect to the one item that is in dispute,

20   that due diligence report, you can leave that off for now.

21   Because we're going to address this tomorrow. But that doesn't

22   give us an excuse to not turn over a privilege log for

23   everything else.

24       **MR. GONZALEZ:** So, Your Honor, I believe that the motion

25   addresses more than just the document, itself. For example, if

there were attachments to the document, I believe the motion
addresses that.

I will tell you, we've prepared a log that deals with that
issue.  But I think you're going to have that argued tomorrow.
If you like, I could present it to Your Honor, under seal, just
give it to you, because you're going to have a hearing on it
tomorrow.

**THE COURT:**  No, I don't want to take it under seal yet.

**MR. GONZALEZ:**  But that's the issue.

**THE COURT:**  Well, can you turn over a privilege log that is
complete except for the things that are still in play in that
motion tomorrow?

**MR. GONZALEZ:**  So, because your ruling on that motion is
going to determine what we can and cannot put into this log, let
me tell you what else we are doing, so you can understand and
appreciate how we are working very hard on this.

I have a separate log that doesn't -- that is not that
document that you are going to have a hearing about tomorrow.
That separate log that we started to work on is more than 200
pages long.  And it's basically the due diligence work that was
done at the time of the acquisition.  It's already 200 pages,
and we're about halfway through.

But what I'm allowed to turn over is going to depend on your
ruling tomorrow.  So that log will be done this week.  But what
we are allowed to give them is going to depend on your ruling.

So I don't want to make a mistake here.

THE COURT: All right, all right. I will postpone the privilege log until we hear -- have our argument tomorrow.

MR. PERLSON: Your Honor, I had the understanding of the motion for tomorrow as you did, that it concerned simply the identity of the -- of a name on the privilege log.

THE COURT: That is what I thought, too, but now I'm hearing that it's more than just the due diligence report.

MR. GONZALEZ: It's that the name is --

THE COURT: Can I just -- you know, I -- maybe I -- maybe I should get back on the turnip truck. But I must tell you, when I was practicing, there was a purpose for a privilege log. It has to be detailed enough that you can see that the privilege actually does apply, and has not been waived. And sufficient information that the person trying to challenge it can challenge it.

I'll give you an example. Let's say that some -- not this case at all. Let's say somebody invokes the attorney/client privilege over some document. And they say -- a document goes from A to Attorney B on such and such a date, and it says regarding -- seeking legal advice regarding statute of limitations. So on its face, it look like it applies.

But what if, in fact, they gave that same document to ten other of their friends for fun reading? A total waiver.

That must be -- every recipient of the document must be

identified.  And if a single one of them is not qualified --
let's say it's somebody who is a lawyer but not yet admitted to
practice law.  Cases say:  Waiver.

So, bone-crushing detail.

**MR. GONZALEZ:**  Understood.

**THE COURT:**  One of these little -- one of these fast glides
over thin ice is not going to work.

**MR. GONZALEZ:**  Understood.

**THE COURT:**  It's got to be complete and accurate.

**MR. GONZALEZ:**  We read your order, Your Honor.

**THE COURT:**  All right.

**MR. GONZALEZ:**  We appreciate that.  Thank you.

**THE COURT:**  Now, so -- and you have got to be ready to do
this if you lose this motion.

**MR. GONZALEZ:**  It's not my motion.

**THE COURT:**  Well, if Mr. Izzy Ramsey loses his motion, you
have got to be ready to turn it over, pronto.

**MR. GONZALEZ:**  Understood, Your Honor.

**THE COURT:**  Now, I told you to be ready today to explain
why -- he has a good story to tell, but you are supposedly
unable to talk to him.  We are going to save that for tomorrow
because that's more related until tomorrow.

Do you have on your side the top 50 of the most important
files and documents from among the 14,000?

**MR. PERLSON:**  We do.

1    **THE COURT:**  All right.  Let's -- let's discuss for a moment,

2    is there a way -- the reason I asked for that, it may be a way

3    for us to prioritize the searches.  So instead of looking for

4    some minuscule thing that doesn't have much to do with the case,

5    we are focusing on things that matter the most to your side.

6        So is there a way to do that?  In other words, you identify

7    the top 50, give that to Mr. Gonzalez, and then his team goes

8    back there and they do a better search for those 50 than they

9    would for the entire 14,000.

10   **MR. PERLSON:**  Your Honor, we are happy to provide them that,

11   and have them do that.  I will note that our trade-secret list

12   identified several files that they could have already done, and

13   should have done that, but we can do that now and provide it to

14   them.

15   **MR. GONZALEZ:**  In fact, I forgot to mention that.  Thank

16   Your Honor for remembering.  That's exactly what our consultants

17   recommended.  They said:  Look, we're looking for 14,000 files

18   and stuff, and most of this is not even important.  Tell them to

19   give us their best stuff, and that way we can cover ground much

20   faster.

21   **THE COURT:**  Okay, I'm going to say that -- I'm not even

22   going to hold them to the fact that No. 51 or 52 won't be a

23   trade secret.  Don't come back later and say:  Oh, that's not a

24   trade -- that wasn't on the list.

25       But as a way to prioritize discovery, I think if we take at

1   least the top 50, then that would be a way to help do a better

2   job.

3     So can you turn that over to them?  And it'll be under

4   attorneys' eyes only because it may have secrets.

5     **MR. GONZALEZ:**  We will prioritize that, Your Honor.  Thank

6   you.  That's very helpful.

7     **THE COURT:**  All right.  Are there witnesses at the

8   company -- at their company that you could take depositions of

9   to try to see how thorough the search has been?

10    **MR. PERLSON:**  I don't know.  I don't know who at the company

11  has been involved.

12    **THE COURT:**  Well, you are probably going to learn in a

13  couple of days when we see this submission, right?

14    **MR. GONZALEZ:**  That's exactly right, Your Honor.

15    **THE COURT:**  So maybe the thing to do is you wait -- you get

16  to take some of those depositions anyway.  So you remember under

17  the March 13th order, when they make their submission, you get

18  to take a number of depositions.  So you could --

19    **MR. JAFFE:**  Agreed.

20    **THE COURT:**  -- use those to show that they have done a

21  crappy job, arguably, on their document search.

22    **MR. PERLSON:**  Okay.  Depending on what we see, I don't know

23  whether their declarants will be the right people to ask for

24  that or not, but --

25    **THE COURT:**  You've got three other depositions anyway.

1    **MR. PERLSON:** Yeah, maybe a custodian -- a 30(b)(6) on the

2  search may be appropriate.

3    **THE COURT:** Well, you got to be careful on those 30(b)(6)s

4  because I -- read my -- I know I have got rules on that.  I

5  don't like the way big firms use 30(b)(6).  So you got to do it

6  my way, but okay, I won't rule 30(b)(6) out.

7    **MR. PERLSON:** Okay.

8    **MR. GONZALEZ:** But as you say in your order, they may count

9  for multiple depositions.

10   **THE COURT:** Maybe, may be.

11   How about this?  When I was a lawyer, people still had

12  manual files.  I believe that your people still have manual

13  files, even though computers are the way people go these days.

14  Have you looked for manual files?

15   **MR. GONZALEZ:** So, Your Honor, the answer is yes.  And you

16  would be quite surprised.  Today's generation, they don't keep a

17  lot of paper.

18   **THE COURT:** Well --

19   **MR. GONZALEZ:** I still do binders (Indicating).

20   **THE COURT:** Not keeping a lot of paper is not the same thing

21  as keeping no paper.

22   **MR. GONZALEZ:** Understood, Your Honor.  And yes, when we

23  interviewed the 85 Uber employees, we are obviously asking that

24  question, and are finding that the Me Generation does not

25  maintain very much paper at all.

1    **THE COURT:** Well, the ones that they do keep, you ought to

2  look at them and see if they're any of these key documents.

3    **MR. GONZALEZ:** Exactly. And we are doing that, Your Honor.

4    **MR. PERLSON:** And Your Honor, I think that there could be

5  potentially physical documents at defendants' counsel of

6  Morrison & Foerster, because they were involved, apparently, in

7  the due diligence that we're somehow now trying to --

8    **THE COURT:** All right. Let's say -- you're going to put

9  those on the privilege log or -- right?

10   **MR. GONZALEZ:** That is part of the 200-page log that's in

11  process.

12   **THE COURT:** All right. We need to have a plan in place.

13  And maybe you've already got one.

14   The plaintiff has, I believe, made a sufficient showing that

15  they ought to be able to inspect your LiDAR system, to see if

16  the way it's actually implemented, they can -- they believe it

17  violates any of their proprietary information. So, an

18  inspection ought to be done.

19   So, what are we doing on that front?

20   **MR. PERLSON:** Well, Your Honor, that was part of the relief

21  we asked in our letter. I think that next week would be an

22  appropriate time to do it after we get their -- I mean, we could

23  do it before, but I wouldn't want to have my only chance be

24  before we get their opposition.

25   So I would think that some time early next week would be an

1    opportune time to do the inspection.

2    **THE COURT:**  Do you personally know this technology well

3    enough to go in there and look at it, yourself, without the

4    benefit of an expert?

5    **MR. PERLSON:**  First of all, I don't think going in by

6    myself, me, personally, would be -- if we were to have one

7    person to do it, it probably wouldn't be me.  But I would think

8    we do need our expert who is disclosed under the protective

9    order, and I think it would be appropriate to do that.

10   **THE COURT:**  So you and your expert go look at their LiDAR

11   system.  How, the physical layout, the software.

12   Why shouldn't they be allowed do that?

13   (Off-the-Record discussion between counsel)

14   **MR. PERLSON:**  I'm bringing up Mr. Jaffe, who knows a little

15   bit more about the technology than I do.

16   **MR. GONZALEZ:**  So, Your Honor, a couple of things.  I'm

17   trying to balance two things.

18   Number one, we have nothing to hide.  Number two, this is

19   arguably the most sensitive trade secret we have.

20   And I'm wondering if the Court has considered this:  What if

21   you get a neutral expert to come look at our machine?

22   **THE COURT:**  Well, I thought about that, but I have also

23   thought about it being a delay gimmick.

24   **MR. GONZALEZ:**  Oh, no, we're not seeking any delay,

25   Your Honor --

**THE COURT:** Well, then, how about by 5:00 tomorrow, you two agree on who that expert could be. I have a feeling you would never agree because you have an incentive to delay, and -- so I don't know.

I -- can you -- I sent out an order yesterday saying: Hurry up and agree on a special master. This is one of the scenarios that I had in mind.

**MR. PERLSON:** Your Honor, Your Honor, having a special master review something perhaps independently could be something -- assuming we could work someone out. We have already started figuring out who that could be, and looking into that. We haven't run that to ground, since it was just recently.

But if they're going to come back and say that they are not using our trade secrets, they are not infringing our patents, presumably that will be done in reference to some device that is there, that is in place. In order to respond to that, we are going to necessarily need to see the device that these people are referring to.

**THE COURT:** It seems like that is right because, look, when we go to trial -- even you, yourself, want to keep the patent part in -- so they're going to get to see the -- at least some of your LiDAR system, no matter what. Because they have to be able to present a case at trial.

**MR. GONZALEZ:** Exactly. But it's the part that pertains to

the patents.  These are very weak patents that I don't think are going to survive a summary judgment.  But if they do, Your Honor, I'm agreeing with you that the little piece of the case that involves the patent, fine.  But they want to come over and look at our whole machine.  This is like somebody coming over and looking at the Pepsi formula.

And to have their paid expert do that?  I'm saying we have nothing to hide, Your Honor.  If you want to appoint any one of your magistrates, how about that?  Well, anyone who is sophisticated in technology, anybody.

All we're asking --

**THE COURT:**  So you put the burden on me.  Why don't you come up with -- give them three names of people that you think will -- I'm going to throw out one name right now.  John Cooper. Farella, Braun & Martel.  I think he would understand this technology.  He's an outstanding lawyer.  He's been a great service to the Court in other cases you all know about.  He would be doing this for money, though.  He would not do this for free like...

So you contact Mr. John Cooper.  I haven't talked to him. I'm just saying someone like that might be a temporary solution on the trade secrets.  But I'm not -- even if we did that, I would not rule out the possibility that your opponent is going to be able to see how you are implemented LiDAR.

**MR. GONZALEZ:**  Understood, Your Honor.  And we certainly

1   don't have any problem --

2       **THE COURT:**  And I'm not ruling -- the burden is on you.  You

3   got to move fast on this, otherwise I'm going to let them come

4   see this.

5       On the other hand, if they drag their feet and say:  No, we

6   don't like Mr. Cooper, no -- then maybe they don't get to do any

7   inspection at all.

8       **MR. PERLSON:**  Your Honor, if I could just respond real

9   quickly to a couple of things you said.

10      First of all, we've already produced, you know, Waymo's --

11  all sorts of trade secrets, internal information.  They have

12  taken the deposition of one of our key engineers, and asked him

13  all sorts of questions about the technology.

14      So for them to say that we can't see theirs is just

15  manifestly unfair, especially considering that we need to make

16  our case.

17      And then additionally, just in relation to the off-the-cuff

18  comment about the patents, I think Your Honor probably not

19  persuaded by their invalidity by his comments about how very

20  weak they are.

21      And I'll point out that Mr. Levandowski --

22      **THE COURT:**  Every -- everyone always does that.

23      **MR. PERLSON:**  Yeah.  Mr. Levandowski is one of the named

24  inventors on some of these patents.  So apparently --

25      **THE COURT:**  At least he won't be able to deny their

1   validity.

2       **MR. PERLSON:**  That's what we think, Your Honor.

3       **MR. GONZALEZ:**  Your Honor when I say -- we will demonstrate

4   to you on Friday that our product is different than what is in

5   those patents.  That's all I'm going to say now.  It is

6   different than what is in those patents.

7       **THE COURT:**  Do you use one lens or two?

8       **MR. GONZALEZ:**  Your Honor, I don't know that I can say that

9   publicly.  But I'll say this.  We don't do it the way the patent

10  does it.  And you will know that on Friday.

11      **MR. PERLSON:**  Your Honor, that is exactly the reason why we

12  have to see it.  I mean, this is a very typical thing that would

13  happen -- I mean, for us not to be able to see the very thing

14  accused --

15      **MR. GONZALEZ:**  (Inaudible)

16      **THE COURT:**  If they used two, he would have told me.  So

17  they use one.  And -- they use one.

18      **MR. GONZALEZ:**  Your Honor, actually, you'd be surprised.  I

19  just don't want to say it publicly, because we consider that a

20  trade secret.

21      **THE COURT:**  We'll see.

22      **MR. GONZALEZ:**  You've got a lot of media here.  Don't think

23  all these people who were wandering around the hallway decided

24  to walk in here today.

25      You'll find out on Friday, Your Honor.  Our product is

1   different.

2      Anyway, I'll get back to you tomorrow on John Cooper

3   Your Honor.  We'll get back to you tomorrow.

4      **THE COURT:**  I want you to know, though, they do have to make

5   a case.

6      **MR. GONZALEZ:**  Understood.

7      **THE COURT:**  And they can't get to the end of the case and

8   say:  Oh, Mr. Cooper's going to come testify.

9      He would only be -- he can't be a total substitute for the

10   plaintiffs having the right to see the accused product.

11      So I'm not sure -- but I do think in terms of the special

12   master for several purposes in this case, Mr. Cooper would be an

13   excellent choice.  And I urge you both to consider him.

14      All right.  The issue of adverse inference is a very real

15   possibility, but I'm not going rule on that today.  That's for

16   later on.  That will probably come up at the actual hearing.  On

17   May 3rd.  And if I -- if I decide that -- there are a lot of

18   circumstances under which I could draw an adverse inference

19   here.

20      So I think we have a plan to do better on discovery.

21      **MR. GONZALEZ:**  We do.  Thank Your Honor.

22      And may I just ask for one point of clarification, so we

23   don't miscommunicate on this.  Just on your practice,

24   Your Honor, if there ever is a another instance where they file

25   a discovery letter brief, are we allowed to respond to that --

1    **THE COURT:**  Immediately.

2    **MR. GONZALEZ:**  Fine, thank you.  That's all I need to know.

3    **THE COURT:**  Immediately, you are.  And I'm going to go back

4    and look and see if my order really says what you say it says.

5    **MR. GONZALEZ:**  You might want to modify that order,

6    Your Honor.

7    **THE COURT:**  But you have until 5:00 today to file whatever

8    you say you were thinking -- wanted to file, but stayed your

9    hand because of my alleged order.

10    **MR. GONZALEZ:**  Thank Your Honor.

11    **THE COURT:**  All right.  We have a hearing tomorrow.

12    **MR. GONZALEZ:**  We'll be back.

13    **THE COURT:**  While I got you here, I want to -- are you

14    filing a brief on -- aren't you filing a brief on this, the one

15    for tomorrow?

16    **MR. PERLSON:**  Yeah.  You ordered us to file by 4:00 today.

17    **THE COURT:**  All right.  I think we're done for today.  Thank

18    you.

19    **MR. PERLSON:**  Thank you, Your Honor.

20    **MR. GONZALEZ:**  Thank you, Your Honor.

21    (Proceedings concluded)

22

23

24

25

```
 1
 2
 3
 4                    CERTIFICATE OF REPORTER

 5         I, BELLE BALL, Official Reporter for the United States

 6    Court, Northern District of California, hereby certify that the

 7    foregoing is a correct transcript from the record of proceedings

 8    in the above-entitled matter.

 9

10

11    _____ /s/ Belle Ball

12              Wednesday, April 5, 2017

13         Belle Ball, CSR 8785, CRR, RDR

14

15

16

17

18

19

20

21

22

23

24

25
```