UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

WAYMO LLC,                          )
                                    )
              Plaintiff,            )
                                    )
   VS.                              )     **NO. C 17-00939 WHA**
                                    )
UBER TECHNOLOGIES, INC.; OTTO       )
TRUCKING LLC; and OTTOMOTTO         )
LLC,                                )
                                    )
              Defendants.           )
_____    )

San Francisco, California
Thursday, April 6, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    QUINN, EMANUEL, URQUHART, OLIVER
                       & SULLIVAN LLP
                    50 California Street - 22nd Floor
                    San Francisco, California  94111
            BY:  **MELISSA J. BAILY, ATTORNEY AT LAW**
                 **CHARLES K. VERHOEVEN, ATTORNEY AT LAW**
                 **JORDAN R. JAFFE, ATTORNEY AT LAW**

For Defendants:
                    MORRISON & FOERSTER LLP
                    425 Market Street
                    San Francisco, California  94105
            BY:  **ARTURO J. GONZALEZ, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

**APPEARANCES**:  (CONTINUED)

For Defendants:
                    BOIES, SCHILLER & FLEXNER LLP
                    5301 Wisconsin Avenue, N.W.
                    Washington, D.C.  20015
            BY:  **KAREN L. DUNN, ATTORNEY AT LAW**

For Intervenor Defendant Anthony Levandowski:
                    RAMSEY & EHRLICH LLP
                    803 Hearst Avenue
                    Berkeley, California 94710
            BY:  **ISMAIL RAMSEY, ATTORNEY AT LAW**
                 **MILES EHRLICH, ATTORNEY AT LAW**

```
 1    Thursday - April 6, 2017                    9:31 a.m.

 2                    P R O C E E D I N G S

 3                        ---oOo---

 4         THE CLERK:  Calling Civil 17-939 WHA, Waymo LLC versus

 5    Uber Technologies, Inc., et al.  It's on for motion hearing.

 6       Counsel, please state your appearances.

 7         MS. BAILY:  Your Honor, Melissa Baily and my

 8    colleagues Charlie Verhoeven and Jordan Jaffe for Waymo.

 9         THE COURT:  Thank you.

10         MR. RAMSEY:  Good morning, Your Honor.  Ismail Ramsey

11    and my colleague Miles Ehrlich of Ramsey & Ehrlich on behalf of

12    Anthony Levandowski.

13         THE COURT:  Thank you.

14         MR. GONZALEZ:  Good morning, Your Honor.  Arturo

15    Gonzalez for Morrison & Foerster on behalf of Uber.

16         MS. DUNN:  And Karen Dunn from Boies, Schiller &

17    Flexner on behalf of Uber.

18         THE COURT:  All right.  Thank you.  Good morning to

19    all of you.

20       Motion to intervene, what do you have to say on that

21    motion?

22         MR. RAMSEY:  Your Honor, just we'll submit it.  We're

23    asking for a permissive motion to intervene just with respect

24    to this motion -- not this motion, I'm sorry -- the motion to

25    modify.
```

1    **THE COURT:** All right.  Let me ask.  Is anyone going

2  to be arguing that granting this motion would somehow improve

3  chances for arbitration?

4                     (Pause in proceedings.)

5    **THE COURT:** Mr. Gonzalez, I want to know if this is

6  going to be used to say that this improves the argument for

7  arbitration.

8    **MR. GONZALEZ:** Your Honor, candidly, I hadn't given it

9  any thought at all.  That's not our intent.

10   **THE COURT:** All right.  I'll take you at your word it

11 is not your intent, so I'm going to allow the intervention, but

12 solely for purposes of this motion and it has nothing to do

13 with arbitration.

14    All right.  Let's hear your motion.

15   **MR. RAMSEY:** Your Honor, you want me to begin?

16   **THE COURT:** I'm sorry?

17   **MR. RAMSEY:** You'd like me to begin?

18   **THE COURT:** What?

19   **MR. RAMSEY:** I just would ask --

20   **THE COURT:** Yes, please begin.

21   **MR. RAMSEY:** Okay.  Your Honor, Anthony Levandowski

22 has asserted his Fifth Amendment broadly.  Waymo wants to get

23 certain information from Anthony.  They want to know to whom

24 did he give materials in his possession to review for due

25 diligence.  The Fifth Amendment prevents this.

So what they can't get from Mr. Levandowski, Waymo is seeking to pry out from his lawyers. It's the equivalent of serving an interrogatory *To whom did you give the materials to for review?* Answering this question on a privilege log or through production of documents carries the implicit testimony of, one, *What were the files that you gave?* and, two, *Where are they and who may have them now?*

So what they can't get from Anthony, they're trying to get from his lawyers. This information, the tacit testimony that comes with any active production of documents is the heart of what the Supreme Court in *Hubbell* says the Fifth Amendment protects. It's the testimony about the existence of documents, the possession and location, and that these are the documents that are requested.

This is implicit testimony Mr. Levandowski gave to his lawyer, information about these documents, when he produced, to the extent that he did, any documents to his lawyer, and then those lawyers would share under a valid joint defense privilege.

*Gonzalez* teaches us that a common interest privilege is an extension of the attorney-client privilege. So the attorneys within that joint defense privilege stand in the shoes of the client with respect to asserting the Fifth Amendment privilege. The extension of that attorney-client privilege carries with it the duty of confidentiality. Not only is there the extension

of the attorney-client privilege, but the requirements of the Business and Professions Code and the legal ethics to not reveal client confidences.

We've shown here that this information, to the extent that it was, was provided in the context of this joint defense privilege.  The privilege is valid.

As we submitted, there was a written joint defense agreement which explicitly set forth the purposes; and as we pointed out, it was prepared and entered into in contemplation -- and I'm quoting, Your Honor -- "in contemplation of potential investigations, litigation, and/or other proceedings relating to the proposed transactions."

THE COURT:  What were those proceedings?

MR. RAMSEY:  Well, it's the -- there were no active proceedings at that time, but they were the potential proceedings.

I would actually quote --

THE COURT:  Well, what were they?  What were the potential proceedings?

MR. RAMSEY:  Well, there's various things.  One of those could have been this very litigation.  As I would quote the opening paragraph from Waymo's brief opposing our motion, it says (reading):

"That agreement," the joint defense agreement, "expressly contemplated potential litigation regarding the

1      yet-to-be-consummated acquisition; i.e., Uber, Otto.

2      Mr. Levandowski and their lawyers anticipated that there

3      would be a legal proceeding just like this one."

4      **THE COURT:**  So tell me, have I got this right, that

5 way back before any of this litigation started and at the time

6 this acquisition was being negotiated, your client and Uber

7 were fearful that litigation like this would arise?  True?

8      **MR. RAMSEY:**  I would say, yes, fearful general

9 litigation and the potential that litigation like this would

10 arise.

11      **THE COURT:**  But why?  If it was a legitimate deal, why

12 would they have anything to fear?

13      **MR. RAMSEY:**  Well, there's a lot of aggressive

14 litigation surrounding patents.  There are employment issues,

15 particularly when someone's going from one company to another

16 and there are noncompete agreements.  So there's a variety of

17 various issues that arise when an employee moves from one

18 company to another; and some of the issues that, quite frankly,

19 were raised in the arbitration are ones that are potential.

20      **THE COURT:**  But that came later, didn't it?

21      **MR. RAMSEY:**  Not the issue, not the potential issue

22 for it.  I think here you've got the issue of an acquisition of

23 an individual moving from one company to another, and the

24 potential for litigation in various aspects are present,

25 particularly where you have companies or employers who

aggressively assert a patent. Technology has come to fruition in this lawsuit. There's a variety of areas, and I think that that's the legal proceeding.

As the Ninth Circuit pointed out in *Gonzalez*, the proceeding doesn't have to be active or present; it can be anticipation of future proceedings. And that was the legal advice that was being sought. In that sense, the joint defense is valid, and the information that --

**THE COURT:** Where does the joint defense agreement reference privilege logs?

**MR. RAMSEY:** It doesn't.

**THE COURT:** It doesn't.

**MR. RAMSEY:** It doesn't reference privilege logs, but the issue here, Your Honor, is the testimony.

**THE COURT:** It does say that both sides will try to make a claim of privilege in response to a subpoena, that's true, but the way you make a claim of privilege is through a privilege log. So where in your agreement does it say that you won't do a privilege log?

**MR. RAMSEY:** Well, it doesn't say that in the agreement, Your Honor, but this is an unusual situation because that claim of privilege relates to attorney-client privilege and work product privilege, but what we're talking about here are the protections of the Fifth Amendment.

**THE COURT:** Where does your agreement refer to the

Fifth Amendment?

      **MR. RAMSEY:** It doesn't, but the --

      **THE COURT:** No.

      **MR. RAMSEY:** It doesn't specifically but it doesn't change the fact that, as *Gonzalez* has pointed out, that the duty of confidence extends to confidentiality, extends to the other lawyers within that joint defense agreement, and that they stand in the shoes of the client.

    And Mr. Levandowski retains his Fifth Amendment privilege, and that's what's at the heart of this issue, Your Honor, and that is that there is implicit testimony that Mr. Levandowski has given to his lawyers. And I don't think there's any question that --

      **THE COURT:** What is that testimony?

      **MR. RAMSEY:** Well, like I pointed out initially, Your Honor, it's the implicit idea of, one, *What were the files that you gave*? and, two, *Where are they and who may have them now?*

    And there's no question that -- and I don't think there's any debate or opposition to the notion that Waymo could not serve interrogatories on Mr. Levandowski at this time and ask those questions and he not have the ability to assert his Fifth Amendment privilege. So --

      **THE COURT:** Possibly that's true, but no one's trying to get that information right now. We're trying to just get a

1    privilege log.

2         **MR. RAMSEY:**  But I think what *Hubbell* teaches us is

3    that there are sometimes implicit testimony that is given, both

4    in the production of documents -- and I would also point the

5    Court to the *Chin* case that we referenced, where the

6    requirements of a privilege log were suspended because the

7    information that's being conveyed and the implicit testimony is

8    such that it implicates the Fifth Amendment.

9         So ordinarily if we were just talking about the

10   attorney-client privilege or a work product doctrine assertion,

11   we wouldn't have this issue because the actual information that

12   was conveyed in the privilege log would not be such that it

13   would provide a link in the chain for potentially building a

14   criminal case.

15        But this is the very point of why Waymo wants this

16   information, so that they can get a link in the chain to start

17   down the path -- to get the beginning point of a lead that can

18   start them down the path towards understanding where those

19   documents are.  And that's what the Fifth Amendment prevents,

20   and that's the point of *Hubbell*, and that's the implicit

21   testimony that Mr. Levandowski has provided to his counsel in

22   the context of this joint defense privilege.

23        And when the requirements for that privilege log, which

24   really should be the minimal necessary, but when they encroach

25   upon the Fifth Amendment, I mean, I think that that

Fifth Amendment protection trumps.

And here there, you know, is information that we can give, in any event, to test the validity of the joint defense privilege, and the name, for example, of the third-party vendors are not necessary to do that. To the extent that the Court feels that it is, we think that that information should be properly provided in camera and the Court could observe that.

But to give that information to Waymo is to require Mr. Levandowski indirectly through his lawyers to answer the very questions that I just raised, and that is testimony. It may be tacit testimony, it may be implicit testimony, but it's still testimony. And Waymo should not be allowed to use the power of this Court to pry that information out of Mr. Levandowski either directly or indirectly through his lawyers.

THE COURT: All right. Let me hear from the other side.

MS. BAILY: Good morning, Your Honor.

THE COURT: Remind me your name.

MS. BAILY: Melissa Baily.

THE COURT: Baily?

MS. BAILY: Baily.

THE COURT: Thank you. Go ahead.

MS. BAILY: So we just heard that Mr. Levandowski is

1    asserting his Fifth Amendment very broadly, and that's going to

2    have severe and significant consequences on this case; but,

3    frankly, it's not really relevant to why we're here today

4    because what we're here to talk about today is not Waymo trying

5    to pry certain information from Mr. Levandowski or from his

6    lawyers; what we're here to talk about today is Your Honor's

7    order that defendants, Uber and Otto, provide certain documents

8    and certain information.  Uber and Otto do not have

9    Fifth Amendment rights.  They're corporations.

10    Mr. Levandowski, through your order and what we're talking

11    about today, has not been asked to testify about anything.  And

12    the Fifth Amendment privilege is a personal privilege.

13    Mr. Levandowski can assert it all he wants when he's asked to

14    testify, but he cannot ask others to assert it for him.  That

15    is contrary to Supreme Court precedent.

16    So there is no Fifth Amendment that we're here to discuss

17    today with respect to Your Honor's order related to Uber and

18    Otto.

19    Now, if Uber and Otto want to assert that there's a common

20    interest privilege with respect to Mr. Levandowski stealing

21    documents, then they can do that in a privilege log, but they

22    need to do it in a lot of detail; and I believe Your Honor

23    covered that to some degree yesterday.  And there is no reason

24    that they should not be forced to provide the name of a

25    third-party author of a document over which they are seeking

1    the privilege.

2         **THE COURT:** Well, could I ask this? It's very unclear

3    to me whether we're talking about one document or many

4    documents.

5         **MS. BAILY:** It's unclear to me, Your Honor.

6         **THE COURT:** Just stay right there.

7         **MS. BAILY:** Okay.

8         **THE COURT:** Mr. Gonzalez, how many documents are at

9    issue -- in play on the privilege log that --

10        **MR. RAMSEY:** Your Honor, I'm sorry. I would like to

11   object. I mean, this goes --

12        **THE COURT:** What's the objection?

13        **MR. RAMSEY:** That this would violate the

14   Fifth Amendment privilege.

15        **THE COURT:** Overruled.

16        **MR. RAMSEY:** Well, can I just -- for the record,

17   Your Honor, could I just --

18        **THE COURT:** You've made your record.

19        **MR. RAMSEY:** Thank you.

20        **THE COURT:** Mr. Gonzalez, so how many documents are we

21   talking about? You led me to believe it was just one, the due

22   diligence report; but on reflection, I'm not sure you actually

23   said that. How many documents are in play?

24        **MR. GONZALEZ:** So, Your Honor, it depends on what the

25   question is. I mean, we've been talking about this due

1    diligence report for, it seems, many multiple days.

2         **THE COURT:**  I'll make it very clear to you, and I

3    don't want any evasion.  I gave a direct order on March 13th or

4    16th to produce documents, and I said what they were, what you

5    had to produce.  Now, you know what you had to produce.  You

6    want to claim privilege at least as to one, but is it more than

7    one?

8         **MR. GONZALEZ:**  There is a report.  There are,

9    Your Honor, many, many e-mails that talk about the general

10   issue of the report and related issues.

11        **THE COURT:**  How many of those would you be putting on

12   the privilege log if you were to claim privilege?  That's what

13   I want to know.

14        **MR. GONZALEZ:**  So we're being overinclusive,

15   Your Honor.  Right now the log, we're just about finished with

16   it, is about 300 pages.

17        **THE COURT:**  That would be --

18        **MR. GONZALEZ:**  It's thousands of e-mails.

19        **THE COURT:**  -- under this privilege thing based --

20   that relate to this problem; is that what you're saying?

21        **MR. GONZALEZ:**  Yes.

22        **THE COURT:**  You've got 300 items that are hanging fire

23   waiting on the order that I'm going to make on this motion?

24        **MR. GONZALEZ:**  To be clear, I believe the log at this

25   point is 300 pages, which it's hundreds -- basically,

Your Honor, it's hundreds of e-mails, possibly thousands.  I
know that we were reviewing at least 7,000 e-mails, Your Honor,
and we've got a log --

**THE COURT:**  All right.  So there's more than just one
due diligence report?

**MR. GONZALEZ:**  If you're asking me broadly about the
privileges that are at issue, the answer is yes.

**THE COURT:**  All right.  I appreciate the
clarification.  Thank you.  Please have a seat.

**MR. GONZALEZ:**  You're welcome.

**THE COURT:**  All right.  Go ahead.

**MS. BAILY:**  Well, Your Honor, with respect to all of
those documents, even if we were asking that Mr. Levandowski
provide information about those documents, the Fifth Amendment
doesn't even apply.

We already know that the documents exist.  The public
knows.  The government knows.  We already know that the
documents relate to the 14,000 documents that
Mr. Levandowski --

**THE COURT:**  But he hasn't admitted himself, I don't --
maybe -- I don't know if he has; I don't think he has -- he
hasn't admitted himself that he has possession of 14,000
documents or that he took the 14,000 documents that you allege.

Now, you made a pretty good record that he did, but that's
your side of the story.  If we actually heard his side of the

story, he might say something different.

So I guess counsel's point is that it would be admitting to trade secret theft in violation of Title 18 of the United States Code possibly if he admitted to it, or maybe state law violations, a very serious proposition; therefore, he wants to invoke the Fifth Amendment.

**MS. BAILY:**  Your Honor, we're not asking for his testimony right now.  We're asking for the production of documents or the production of a privilege log.  And what I'm saying is, even if we were asking Mr. Levandowski for the documents, we know that there's a due diligence report that exists and we know where it is.

**THE COURT:**  Well, where is it?  I don't know where it is.

**MS. BAILY:**  Well, we know Uber has it.  They're going to put it on a log.

**THE COURT:**  Well, that's a fair point.

**MS. BAILY:**  And if we know that it exists and we know where it is, then there is no Fifth Amendment right with respect to production.  So even if we were asking Mr. Levandowski for it, he would have to provide a log.  We already know about the documents and we already know where they are.  It's beside the point.

It's Uber.  Uber doesn't have a Fifth Amendment right, and --

**THE COURT:** What do you say -- that's true. That's true, but what do you say to the joint defense agreement argument that that extends not the privilege, not the -- that the attorney-client privilege would cover the information in that report?

**MS. BAILY:** Right. So if what you're asking me, Your Honor, is setting aside the Fifth Amendment, because it has no role here, what about the common interest privilege, then I would say with respect to the common interest privilege, currently Uber's position is that there is no common interest with respect to the 14,000 documents.

If they're going to assert that before they even acquired Otto that there was some common interest with respect to the stolen documents, then we need enough information to evaluate exactly what the common legal interest was, how these documents furthered that common interest agreement, and whether the documents were privileged to begin with, whether they were disclosed to third parties.

We're talking a lot about keeping secret the identity of a third party who had access to what is now the privilege is being claimed over. Well, that would usually be a waiver of the attorney-client privilege. So the idea that Uber is going to be able to hide that from us so that we can't test these privileges, I just don't know of any authority for it, especially when the Fifth Amendment doesn't come into play at

1  all.

2      **THE COURT:** Is there -- I'm going to ask Mr. Ramsey to

3  answer this question too.

4      Is there any decision in the history of the universe that

5  says you don't have to provide a privilege log in circumstances

6  like ours?

7      **MS. BAILY:** I am not aware of one. My understanding

8  is that this would be an unprecedented decision that explicitly

9  contradicts settled Supreme Court law.

10      **THE COURT:** All right. Mr. Ramsey, what's the answer

11  to that one question, please.

12      **MR. RAMSEY:** Your Honor, I think that there are two

13  that are analogous or are best cases.

14      **THE COURT:** That say privilege log, please. Now,

15  don't give me general platitudes. I want to know is there

16  anything that takes your principles that you're relying on to

17  the point to say you don't even have to put it on a privilege

18  log?

19      **MR. RAMSEY:** Yes, Your Honor.

20      **THE COURT:** Okay. That's great to hear. Tell me what

21  they are.

22      **MR. RAMSEY:** *SEC versus Chin*, which is a

23  District Court of Colorado case that we cited. It's 2012 U.S.

24  District Lexis 182252.

25      **THE COURT:** Okay. What was the fact pattern in that

case?

   **MR. RAMSEY:** It's similar -- the difference I would
point out to the Court is it's not a joint defense case. It's
one directly in which a privilege log was requested from the
counsel themselves. So there was a request for -- I'm sorry --
privilege -- one second. I'm just trying to pull directly up.

   But there was a request for a privilege log where the
assertion of sort of various categories of documents would
provide information about the -- information -- it says
(reading):

      "Compliance with the subpoena would require the
      respondents to provide information apparently not known to
      the government and which may be incriminating."

   And then it went on to talk about that being in the
context of a privilege log and specifically suspended that
requirement.

   It says (reading):

      "Consequently, under the unique circumstances of this
      case and given the nature of the requests contained in the
      subpoenas, requiring Ronald and Misty Touchard to provide
      a detailed privilege log of the documents claimed to be
      subject to the protections of the Fifth Amendment is
      testimonial, could be incriminating, and falls within the
      protection of being self-incrimination."

   **THE COURT:** Hold that thought. We're going to come

1　back to it.  I'm going to ask Ms. Baily to comment on *SEC*

2　*versus Chin*.

3　　　　What's your -- you said you had another decision.  What's

4　that?

5　　　　　　**MR. RAMSEY:**  That's *In Re Syncor ERISA Litigation*.

6　That's a Central District of California case.  It's 229 F.R.D.

7　636, 649.

8　　　　　　**THE COURT:**  And what was the fact pattern there?

9　　　　　　**MR. RAMSEY:**  Your Honor, I'm sorry.  I'm blanking

10　right at this moment, but if you give me just a moment, I can

11　get the --

12　　　　　　**THE COURT:**  All right.  I'll come back to that.

13　　　　Ms. Baily, what do you say about *SEC v. Chin*?

14　　　　　　**MS. BAILY:**  Well, I have the same thing to say about

15　both cases.  I have two things to say about them.  The first is

16　that in both of those cases it was the person who was asserting

17　the personal right not to incriminate himself who was objecting

18　to the production of the log, so --

19　　　　　　**THE COURT:**  No, no.  Mr. Ramsey said it was the

20　attorney.

21　　　　　　**MS. BAILY:**  My understanding is that whether it was --

22　my understanding is that it was the, for example, the defendant

23　who was asserting his personal privilege not to provide

24　information in a log.

25　　　　　　**THE COURT:**  Well, who was the subpoena directed to?

1  **MS. BAILY:** I believe it was the defendant. I could
2  be wrong. I would like to look again.

3  **MR. RAMSEY:** I believe that -- I'm sorry. I didn't
4  mean to interrupt.

5  I believe she's correct. I didn't mean to suggest that it
6  wasn't --

7  **THE COURT:** Well, then, how can that help you? I
8  mean, I see that that's a good point if the subpoena was
9  directed directly at Mr. Levandowski, but that's not our fact
10 pattern.

11 **MR. RAMSEY:** But here what this is doing is -- and I'm
12 prying out information -- well, let me point to a couple cases,
13 and that's *Fisher* makes clear that attorneys when it comes to
14 the Fifth Amendment stand in the shoes of their client. So
15 prosecutors have to --

16 **THE COURT:** No, they didn't really say that. What it
17 said was the client has the Fifth Amendment privilege but the
18 lawyer is bound by the attorney-client privilege. It does not
19 say that the lawyer stands in the shoes of the client and
20 asserts the Fifth Amendment.

21 **MR. RAMSEY:** I think what it says is with respect to
22 information that's covered by the Fifth, just because it's in
23 the hands of the lawyer does not create an independent source.
24 So a prosecutor cannot circumvent a client's Fifth Amendment
25 protection simply because the information is in the hands of

their lawyer. To, you know, take that to its logical

conclusion in the criminal setting, it would --

     **THE COURT:** *Fisher*, I read it, does it even mention a

privilege log?

     **MR. RAMSEY:** *Fisher* does not mention a privilege log.

     **THE COURT:** No, it doesn't.

     **MR. RAMSEY:** But --

     **THE COURT:** It says the documents themselves, but how

are we ever going to test the existence of the privilege

without a privilege log?

     **MR. RAMSEY:** Well, I think here the question is

whether there's an existence of a valid common interest

privilege, and that's established through the face of the

common interest agreement, and that's the privilege that we're

talking about.

    Because once that's established, to the extent that

Mr. Levandowski has the right to assert the Fifth Amendment

privilege over the information, he gets to do that through his

lawyers. His lawyers are not situated differently to establish

an independent source. That source of asking that information

from his lawyers is the equivalent of asking that information

from him, and that's what we have here.

     **THE COURT:** You know that if we were to adopt your

view, then it looks like thousands of documents would be

relegated to secrecy with no way for us to -- or at least no

1  way for Waymo to challenge the claim of privilege.

2         **MR. RAMSEY:**  No.  I actually --

3         **THE COURT:**  Almost anything could be swept under the

4  rug.

5         **MR. RAMSEY:**  No, I don't think that's correct,

6  Your Honor.

7         **THE COURT:**  Why isn't that correct?

8         **MR. RAMSEY:**  Because we are asserting his

9  Fifth Amendment privilege, and this is the distinction between

10  the Fifth Amendment privilege and the attorney-client

11  privilege.  We are asserting his Fifth Amendment privilege with

12  respect to 42 documents.  And so --

13         **THE COURT:**  Forty-two?  That's the first time I've

14  heard that.  Where did you say that?

15         **MR. RAMSEY:**  I did not put it in our brief.  We talked

16  about the log that was being prepared; and in terms of the log

17  entries that relate to the due diligence report, my

18  understanding is that's 42 documents and we've reviewed those.

19         **THE COURT:**  Listen, I have been pulling my hair out

20  trying to figure out what's at stake in this motion.

21         **MR. RAMSEY:**  Forty-two documents, Your Honor.

22         **THE COURT:**  Forty-two documents.

23         **MR. RAMSEY:**  Forty-two line entries.

24         **THE COURT:**  How come Mr. Gonzalez told me there were

25  thousands?

1      **MR. RAMSEY:**  I think there was some confusion in the

2   way the question was phrased.  The question was:  How many

3   privileges will Uber assert?  Now, Uber has its own

4   attorney-client and work product privileges that it plans to

5   assert with respect to documents, but that's separate and apart

6   from the Fifth Amendment invocations.

7      **THE COURT:**  How am I supposed to know what these 42

8   documents are?

9      **MR. RAMSEY:**  Well, there is some basic information

10   that can allow you to test the Fifth -- for example, that it's

11   a due diligence report -- but we'd invite the Court to --

12      **THE COURT:**  Who did the due diligence report?

13      **MR. RAMSEY:**  Well, that, Your Honor, is what we're

14   fighting about because disclosing that information provides a

15   link in the chain, and it's not a question about whether the

16   information itself is somehow inculpatory.  The question is

17   whether the information could provide a prosecutor a starting

18   point, a link in the chain, a lead.  And that's what we're

19   talking about.

20      They want this information because if they know who

21   provided that -- who prepared that report, who is the author,

22   that would tend to reveal the location.  It would start to

23   establish the link in the chain for those documents, and that

24   is exactly what we're --

25      **THE COURT:**  What's so wrong about that?

1          **MR. RAMSEY:**  *Hubbell* says that that's --

2          **THE COURT:**  It would be the third party doing all the

3     testifying.  Mr. Levandowski wouldn't have to inculpate

4     himself.

5          **MR. RAMSEY:**  No, it would be --

6          **THE COURT:**  It would be somebody else that would say,

7     "Hey, he brought 14,000 documents over here.  We reviewed them.

8     We told him they were all trade secrets."

9          **MR. RAMSEY:**  It would be --

10          **THE COURT:**  Something like that, that's what they're

11     trying to get it for, and that would be a very legitimate use

12     of the process.

13          **MR. RAMSEY:**  It would not be legitimate, Your Honor.

14     They're trying to build their case.  It would be a third party

15     who's been employed in the context of the joint defense

16     agreement, and that is -- and who received the information

17     about those documents.  The implicit testimony --

18          **THE COURT:**  I want to give you a hypothetical because

19     you are hiding from me what the real facts are, and you want me

20     to be in the dark.  This is not a criticism of Ms. Baily

21     because she's trying to shed light on these circumstances, but

22     you're asking me to rule on something that is amorphous and in

23     the dark.  So I want -- I'm going to give you a hypothetical

24     that I thought of.  I'm not saying it's true.  I'm saying it

25     could be true and I don't know, and Waymo has got a right to

find out if this is true or not, in my humble opinion.

So let's say somebody steals trade secrets from their employer, not necessarily Mr. Levandowski, they go out and they go to a competitor and they say, "Let's form a competing company."

And the competitor says, "By the way, can you take with you some of the documents?  It would be good to give us a head start."

So let's just say for purposes of my hypothetical that both sides have a lot of guilty knowledge, and they say, "How can we deal with this?"  No problem, joint defense agreement.

Then one side says, "Well, listen, maybe we can get an opinion from somebody that these are not really trade secrets. Maybe that will help us protect us if we ever get sued.  So let's give them to a third party, get a due diligence report. We'll get them to tell us that it's not a trade secret."

So they turn it over to a law firm, third-party law firm, who gives them that opinion, or maybe they turn it over to an economist firm who tells them what it's worth so they can set the price for the transaction.

Now, that entire transaction, which is hypothetical and not necessarily anything close to what's going on in our case, though it is comprehended by what you're telling me, is within the ambit of what you're telling me, and there would be thoroughly guilty people on both sides, thoroughly guilty

1   people on both sides who want to cloak everything and even the

2   assertion of privilege they want to get away with not having to

3   list it on a privilege log.  You want to bless that kind of

4   transaction, don't you?

5        **MR. RAMSEY:**  When there's a legitimate legal purpose,

6   which there was here in performing the due diligence.

7        **THE COURT:**  I just have your word for it.  I don't

8   know that it was legitimate.  Where did you get that idea?

9        **MR. RAMSEY:**  Well, there's a reasonable basis for

10  that.

11       **THE COURT:**  No, there's not.  There's nothing in the

12  record that shows me that it was reasonable.

13       **MR. RAMSEY:**  I also think that the Fifth Amendment

14  protection is supposed to be interpreted broadly, and waivers

15  of the Fifth Amendment are disfavored.  And so I think in this

16  situation there is a reasonable basis to believe that that

17  information was shared for a legitimate legal purpose.

18       **THE COURT:**  No, it's not.  There is no such basis to

19  infer that.

20       **MR. RAMSEY:**  It's what's on the face of the joint

21  defense agreement, which Waymo in their brief specifically said

22  that there was an anticipation of various types of litigation

23  such as this that they were preparing a defense, if necessary,

24  to.  And that's a legitimate purpose.  That's not a business

25  purpose.  That's a legal purpose.  And when there is a legal

purpose, a joint defense is valid.

**THE COURT:** In 42 years in practice and this job, I have seen joint defense agreements used as a cloak for wrongdoing. I have also seen them used for legitimate purposes. I don't know which one applies here. I just can't take your word because they wrote it the right way and used the right magic recitals that they have a legitimate purpose here.

**MR. RAMSEY:** And I would ask the Court to view this in camera and --

**THE COURT:** Well, give it to me right now and I'll review it while I'm on the bench. Give me the 42 documents that you want to be withheld. I'll do it right now.

**MR. RAMSEY:** I do not have the 42 documents.

**THE COURT:** See, that's just a bluff.

**MR. RAMSEY:** No, that's not a bluff, Your Honor.

**THE COURT:** It's a bluff.

**MR. RAMSEY:** It's not a bluff.

**THE COURT:** I'm going to make a ruling very quickly and you're not prepared. I will read them right now. Give them to me.

**MR. RAMSEY:** I would ask Your Honor to move slowly here. This is a constitutional protection and, quite frankly, it's -- like I said, waivers are disfavored and it's the sort of protection that could create problems down the line. A *Kastigar* hearing ultimately is what would be needed to the

extent that this information is compelled.

It is a difficult row to hoe for, you know, various sides down the line, but I would ask the Court to move slowly. And I don't have the 42 documents with me. They were not in our possession, and so I, you know, couldn't have those; but I would ask --

THE COURT: So you're making this offer that I review it in camera but you don't even have it in your possession, so you're not in a position to deliver on it, are you?

MR. RAMSEY: I am in a position to deliver on it because --

THE COURT: No, no. It's a delay tactic.

MR. RAMSEY: No, Your Honor.

THE COURT: Mr. Ramsey, I will do it if you give them to me. With their permission, I would review them today.

MR. RAMSEY: May I have just a moment, Your Honor?

THE COURT: Yeah. I want to make one other thing clear before you confer.

MR. RAMSEY: I'm sorry, Your Honor?

THE COURT: I want to make it clear that if I review them, I may decide that they need to see them in order to assist me in determining whether or not there should be a privilege asserted. I'm not giving you any guarantee that I would never take the next step of saying I need more information.

1   So I am not going to buy into the idea that I would make a

2   decision solely on what you on an *ex parte* basis gave me, but I

3   am willing, I am willing to at least look at *ex parte* to see

4   what you want me to look at and then make a decision whether to

5   require you to disclose more so that they would have a fair

6   opportunity to make their case.

7   So if you want to give them to me with that caveat, I

8   will -- and today, they have to be today because you should

9   have come with them in your hand today if you wanted me -- I

10  knew that was a bluff, but go ahead.  You confer.

11                  (Pause in proceedings.)

12          **MR. GONZALEZ:**  Your Honor?

13          **THE COURT:**  Yes.

14          **MR. GONZALEZ:**  So I thought we were here today to

15  argue about whether or not we have to provide a privilege log.

16  We have a privilege log, and we don't have any objection to the

17  Court viewing --

18          **THE COURT:**  You're not the one making the motion.

19  Look, we are here -- that was one of the reasons we're here,

20  but Mr. Ramsey trying to make some record that I refused to

21  look at the things in camera threw that out there.

22  I know how this works.  I didn't -- I've been around, and

23  then he would go up on appeal on an emergency motion saying I

24  refused even to do that, and now you're trying to divert me off

25  that.

1      **MR. GONZALEZ:** No, Your Honor.

2      **THE COURT:** Too bad. Just have a seat.

3   Mr. Ramsey, what is your answer?

4      **MR. RAMSEY:** I would suggest, Your Honor, you look at

5   the privilege log unredacted in camera and with our suggested

6   redactions.

7      **THE COURT:** No, I'm not going to do that. That

8   will -- that won't help me much. How would that possibly help

9   me?

10     **MR. RAMSEY:** Well, it actually will show you the

11  information that we think should be redacted because it

12  establishes the implicit testimony, which is really what's at

13  issue here. It's the information in the privilege log that is

14  being disclosed.

15     And so to the extent that we can show you the information

16  that we think should be redacted, because our motion is to

17  suspend the requirements of the privilege log, that is our

18  request, and that would allow you to see the information that

19  we are -- the actual information that we're asking to be

20  suspended and will allow you to evaluate whether there's

21  implicit testimony that's included with that, and at the same

22  time it would still preserve Uber's rights to make later claims

23  about other privileges.

24     But this goes to the core of what we're asking, and it's

25  the information that the Court needs to evaluate. This is the

specific --

     **THE COURT:** Would that be accompanied by a declaration from someone like Mr. Levandowski who could show that it would be incriminating in some way, or would I just have to take your word for it again?

     **MR. RAMSEY:** You don't have to take my word, Your Honor. The Supreme Court in *Hubbell* has said that the location of documents -- and this is what they're trying to get at, it's the location, it's the possession of documents. The Supreme Court in *Hubbell* and *Fisher* said that that implicit testimony is what could establish a link in the chain.

     And so when they're trying to find out that information about location, they don't know the location, Your Honor, that is what they are trying to find out. That is what they just said to this Court, was that they didn't know where the documents were.

     So that's what we're talking about, information that would provide a link in the chain, and that's what *Hoffman* says, the information itself does not have to be inculpatory.

     **THE COURT:** I'm going to come back to your in camera proposal, and I want to get Ms. Baily's view on that too.

     But let me get your view on that first before I go on. I have some more questions for you.

     **MS. BAILY:** Your Honor, well, especially with respect to this sort of staged, *Oh, look at the privilege log; Oh, then*

*maybe look at the documents,* I mean, this is clearly a shell game that is created for delay.

We have to move quickly.  Mr. Levandowski is still at Uber and still seemingly has our documents, and so the notion that we are going to take -- you know, even my friend's original motion said, "Oh, we're going to make serial motions about these Fifth Amendment issues."  Well, you know, serial motions are not going to work here while Mr. Levandowski is still running Uber's self-driving car program and still has my most confidential material.

And I hate to come back to the basics here, but we today are not talking about Mr. Levandowski offering any testimony at all.  We are talking about a privilege log about documents.  We know where the documents are.  They're at Uber.  Uber is putting them on a log.  If they want to establish a common interest privilege and an attorney-client privilege, then they have to do what is required to do that, and they have to identify third parties who have had access to the documents.

We're not asking Mr. Levandowski to do it.  Uber has to do it.  Mr. Levandowski can't say to everyone else in the world, "Don't offer evidence that's incriminating to me." It is his personal privilege.  It's just the theory that we're all sort of assuming is correct here just doesn't hold water under Supreme Court precedent.

THE COURT:  All right.  You said that earlier, so I

1   have that point in mind.

2       Did the author of the due diligence report sign the joint

3   defense agreement or sign some other agreement?

4           **MR. RAMSEY:**  One moment, Your Honor.

5           **THE COURT:**  I'd like to understand that.

6                   (Pause in proceedings.)

7           **MR. RAMSEY:**  Yes, Your Honor, there is a signed

8   letter.

9           **THE COURT:**  To the joint -- no, no, no.  Answer my

10  question.  Did they sign on to the joint defense agreement?

11                  (Pause in proceedings.)

12          **MR. RAMSEY:**  Yes, Your Honor.  There's a signed letter

13  that indicates that the documents were being provided under the

14  joint defense agreement for review under the joint defense

15  agreement.

16          **THE COURT:**  All right.  Now, the copy of the joint

17  defense agreement you gave me does not show any third party

18  signing on to it.  So what you gave me is actually concealing

19  something from me, isn't it?

20          **MR. RAMSEY:**  Not intentionally, Your Honor.

21          **THE COURT:**  How many other people signed letters like

22  that?

23          **MR. RAMSEY:**  I believe that is -- I believe that's the

24  only one, Your Honor.

25          **THE COURT:**  You believe or you know?  Anytime a lawyer

says they believe, there's a high risk it's not true.  They

just don't know.

      **MR. RAMSEY:**  Well, it's not --

      **THE COURT:**  They're guessing.

      **MR. RAMSEY:**  But, Your Honor, it's not a high risk, or

at least I'm not trying to intentionally deceive the Court.

      **THE COURT:**  I know you're not, but as a lawyer, you've

got to tell me whether you know or not.

      **MR. RAMSEY:**  I don't know for absolute.

      **THE COURT:**  So you don't know.  All right.

   Was this a law firm, this third party?  Was it a law firm?

      **MR. RAMSEY:**  It's not a law firm, Your Honor.

               (Pause in proceedings.)

      **THE COURT:**  Did this third party provide any of that

information to somebody else?

      **MR. RAMSEY:**  Not outside of the joint defense

privilege.

      **THE COURT:**  Is there a sworn declaration that says

that somewhere, or do I just take your word for it?

      **MR. RAMSEY:**  We could submit -- there's not a

declaration that we have, but we can submit a declaration that

it was only disclosed for that limited purpose and that there

is written protocol that says that it is only being --

      **THE COURT:**  You see how problematic this is?

      **MR. RAMSEY:**  -- released for that information.

**THE COURT:** Ordinarily if there's a claim of privilege, we look to see every single person who got the information because there could easily be a waiver. It happens all the time.

You want me to assume everything went right. It could have gone haywire. There could be any number of ways in which even if your theory works, it was waived; and very likely maybe your theory doesn't even work under the joint defense agreement.

But the whole purpose of a privilege log is to test the claim of privilege, and you want me to just take your word as an honorable person -- honorable lawyer who's appeared in front of me many times and for whom I have great respect, you want me to -- you want to ride on that and me to just take your word for it in an important case like this. I can't do that. I just can't do it. It's got to be a sworn record.

**MR. RAMSEY:** Your Honor, the redacted log that we'd like you to view *ex parte* in camera --

**THE COURT:** Have you given the redacted version to them?

**MR. RAMSEY:** No, Your Honor. That's what --

**THE COURT:** You won't even give them the redacted version? That's the version you want me to let them see; right? And yet you haven't even given it to them for comment.

**MR. RAMSEY:** That's a fair point. We can give the

```
1    redacted version.  We were waiting to get some guidance from I
2    think --
3            THE COURT:  No, no, no, no.  You're waiting to do --
4    anytime a lawyer says they want guidance from the judge,
5    they're waiting to see what they've got to tell the judge in
6    order to get to -- in other words, they want me to make a
7    ruling and then they'll give me whatever it is that I want.
8        No.  You make your record -- you make your record and it's
9    either good enough or it's not good enough.
10           MR. RAMSEY:  We can provide them a redacted copy,
11   Your Honor.
12           THE COURT:  Mr. Gonzalez, I want you to come up here
13   for a minute.
14       Now I'm confused.  You told me there were thousands of
15   documents that you were going to claim privilege on, but now
16   Mr. Ramsey says there's only 42.  So are you trying to do some
17   kind of riding on the coattails of this to conceal information
18   from the other side?  What's going on here?
19           MR. GONZALEZ:  Not whatsoever, Your Honor.  The 42
20   number that you heard is the report plus exhibits to the
21   report.  My bigger number includes e-mail communications back
22   and forth during the due diligence process, and that's why it's
23   a substantially larger number.  There's no intent to hide
24   anything.  We're preparing a very lengthy log that will have a
25   substantial amount of detail.
```

1    **MS. BAILY:**  Your Honor, I'm not sure why we didn't get

2    any nonredacted entries in the log.

3         **THE COURT:**  You should have.  Of course, you should

4    have.  If they were going to make this argument, you should

5    have had it before the hearing.

6                   (Pause in proceedings.)

7         **THE COURT:**  Ms. Baily, I cut you off several times.

8    You go ahead and say what else you would like to say.

9         **MS. BAILY:**  Well, Your Honor, I do just -- going back

10   to the two District Court cases, because I do just want to

11   finish the record on that, and I know it does go back to

12   something that you've told me you understand, but my

13   understanding of those two cases is, A, that it was the

14   personal privilege that was being asserted with respect to the

15   person -- the person who is asserting the Fifth Amendment

16   privilege, in order to avoid providing the log, was the

17   equivalent of Mr. Levandowski in this situation.  We don't have

18   that here.

19        The other thing I would just say is in both of those

20   cases, there was a question as to whether the existence and

21   location of the documents would otherwise be known without the

22   log.  We don't have that here.  We know where the documents are

23   and we know that they exist.  Uber has them.  So those are the

24   cases.

25        So just coming back to Your Honor's original question, it

1    would still be unprecedented for Uber to be able to assert

2    Mr. Levandowski's Fifth Amendment privilege in order to avoid

3    providing information on a privilege log.

4        With respect to the information on a privilege log, we

5    need that information for exactly the reasons Your Honor

6    already commented on, so I'll be brief, but there's no reason

7    why we should not be able to depose this third party to

8    understand whether there has been a waiver.  And even to take a

9    declaration's word for it I think would be unfair here.

10        And the last thing I'd like to say is, we really can't

11   move slowly here.  I mean, moving slowly is what has been

12   happening.  You know, sometimes I feel like -- again, like it's

13   a shell game because, you know, yesterday -- you know, we heard

14   about a due diligence report yesterday, we heard about a

15   400-page -- 200- to 400-page privilege log, today we heard that

16   only 42 entries are at issue but then we didn't get the rest of

17   the entries.  And, you know, we're on a fast schedule that we

18   need because Mr. Levandowski is still at Uber and we still have

19   not received our documents back.

20        So, Your Honor, unless you have other questions.

21        **THE COURT:**  I understand that.  Okay.  And I'm

22   sympathetic to that point, but yesterday I heard Mr. Gonzalez

23   say that you've known since October about the 14,000 documents.

24        **MS. BAILY:**  Your Honor, so my friend should re-review

25   the preliminary injunction motion where we set out explicitly

the timeline of when the investigation started, also when we
found out that the defendants had our documents, and when we
found out that the defendants' technology looks like our own.
That is all set out explicitly in the preliminary injunction
motion.

     **THE COURT:** Okay. Mr. Gonzalez, I have a -- I'm
still -- see, I don't want to get myself into a mess where I --
and here's the mess: That Mr. Ramsey is going to hand up to me
now maybe two documents, one redacted, one unredacted, that
only refers to 42 documents. And then if you give me another
one that doesn't track what he's giving me, then it's going to
be confusing what I'm ruling because you're the one that's
supposed to be asserting the privilege. In other words, you're
the one that's supposed to be giving me the privilege log, not
Mr. Ramsey. No one is subpoenaing his client. So how am I
going -- have you seen his document --

     **MR. GONZALEZ:** Yes.

     **THE COURT:** -- he's pointing to?

     **MR. GONZALEZ:** I'm familiar with the log, Your Honor.

     **THE COURT:** With his version of the 42?

     **MR. GONZALEZ:** Your Honor --

     **THE COURT:** How am I going to tie that into your
thousands of pages then?

     **MR. GONZALEZ:** Transparency, I prepared that log. We
prepared that log, so I'm familiar with it. The log that I'm

talking about is a separate log so that there is no confusion.

That log --

    **THE COURT:**  How can you have one that has thousands of

entries and yet they say that they're only claiming privilege

over 42?

    **MR. GONZALEZ:**  Your Honor, I can't -- I can't tell you

why they're picking the 42, but what I can tell you is that the

42 are exhibits to the report, and that's probably where their

focus is.  My list is a very broad list.

    **THE COURT:**  All right.  Here's what we're going to do,

unless I hear an objection.  Ms. Baily, I'm going to let you

object before I actually do it.

    I'm going to sit right here and I'm going to let

Mr. Ramsey hand up to me two documents, the redacted version

and the unredacted version that refer to the 42, and he's got

to give you right now the unredacted version.

    And you, Mr. Gonzalez, have got to give me the privilege

log that you want to use so that I can see -- because you're

the one at the end of the day that's got to file the privilege

log, not Mr. Ramsey.

    **MR. GONZALEZ:**  Understood, Your Honor.

    **THE COURT:**  I'll sit right here.  What do you --

    **MS. BAILY:**  You said that I was going to get the

unredacted version.

    **THE COURT:**  You're going to get for now the unredacted

1    version.

2          **MS. BAILY:** So we're all going to look at --

3          **THE COURT:** I might at the end of the day rule that

4    you get everything --

5          **MS. BAILY:** Okay.

6          **THE COURT:** -- but I don't want Mr. Ramsey to argue on

7    appeal that I spurned his offer.

8          **MR. GONZALEZ:** Your Honor, did you mean redacted, that

9    they'll get the redacted version?

10          **THE COURT:** Exactly. That's what I meant, redacted.

11          **MS. BAILY:** That's why I was asking.

12          **THE COURT:** I misspoke. I misspoke. I'm sorry. I

13    meant you get the redacted version for now.

14       All right. So let's sit right here. We're going to do

15    some homework.

16       Do you have any objection to that, Ms. Baily?

17                    (Pause in proceedings.)

18          **THE COURT:** Mr. Gonzalez, do you have any objection?

19          **MR. GONZALEZ:** I don't have any objection to your

20    seeing those logs, Your Honor. The only thing I want to be

21    careful about, and this is very important, is we're not here

22    today -- I haven't had a chance to even brief joint interest,

23    so we're here today to talk about this log and whether there's

24    a Fifth Amendment concern.

25          **THE COURT:** Listen, if you lose -- if this is lost,

1  I'm going to get out an order that very quickly you're going to

2  produce a privilege log.  If you had something to tag along to

3  this, you should have done it promptly.  Too bad.

4      **MR. GONZALEZ:**  Your Honor, I'm fine with that.  I'm

5  fine with producing the log.  I just want to make clear that

6  they keep talking about moving quickly, and we will produce the

7  log, Your Honor.  That's not an issue.  I'm only pointing out

8  that there's been a lot of discussion here about joint interest

9  privilege, which we haven't even had a chance to brief.

10      **THE COURT:**  Yeah, you did.  There was a motion.  You

11  could have put in a brief.

12      **MR. GONZALEZ:**  But the motion, Your Honor, is whether

13  or not we have to produce a log that discloses the name of the

14  consultant.  That's the issue before the Court, and I just want

15  to make it clear that that's --

16      **THE COURT:**  I think -- no, no, no.  It was a much

17  broader motion than that.  That's not what -- that was not the

18  only item on the table, so I'm not buying in to what you're

19  saying.

20      If you don't want to turn over your records, you don't

21  have to.  I'm asking -- I just do not want to be spurning an

22  opportunity to try to help Mr. Ramsey, who is going to argue on

23  appeal that I refused to look at his version.

24      **MR. GONZALEZ:**  Your Honor, we have no objection.

25      **THE COURT:**  I'm going to look at it right now.

1    **MR. GONZALEZ:**  We have no objection.

2    **THE COURT:**  All right.

3    **MS. BAILY:**  Your Honor, I'm just going to state two

4  objections only for the record.  One is we object to not seeing

5  the unredacted log; and, two, I just have to state for the

6  record the objection that this procedure assumes that somehow

7  the Fifth Amendment could somehow apply to something that Uber

8  is providing.  And, as you know --

9    **THE COURT:**  I understand.

10    **MS. BAILY:**  You understand that.

11    **THE COURT:**  I'm not ruling against that.  I tend to

12  agree with you, but since this is an amorphous motion, I'm

13  trying my best to get my arms around it --

14    **MS. BAILY:**  I understand.

15    **THE COURT:**  -- and I want to see the materials.

16    All right.

17    **MR. RAMSEY:**  Your Honor, what I have is I have an

18  unredacted log with highlights of what we propose to be

19  redacted.  I do not --

20    **THE COURT:**  So you don't have what you told me you

21  had?

22    **MR. RAMSEY:**  I didn't tell you I have a redacted

23  version.  What I have --

24    **THE COURT:**  Do you have something you can give to

25  Ms. Baily right now?

1          **MR. RAMSEY:**  No, Your Honor.

2          **THE COURT:**  All right.  Then your offer is rejected.

3          **MR. RAMSEY:**  But, Your Honor, momentarily I could sit

4     through and line through one.  We just have to black it out.

5          What I was prepared was to give the Court the log with the

6     highlights of our proposed redactions, and so I have no

7     objection to getting to her forthwith, immediately sitting and

8     doing it right away, a redacted version of this log.  But what

9     I have for the Court at this moment is a copy of the log with

10    highlights that show our proposed redactions.

11         **THE COURT:**  All right.  What we're going to do is --

12    do you have another copy of that thing?

13         **MR. RAMSEY:**  We do have a clean copy.

14         **MR. GONZALEZ:**  I have a clean one, Your Honor.

15         **THE COURT:**  All right.  Then you will stay right here

16    after the hearing is over, Ms. Baily will stay, you will go

17    through and you will do the redactions that conform exactly to

18    what you give me, and then -- and do not change it in any way.

19    It's got to be exact, and then -- except that it will be

20    blacked out so that she can't see the things.  Then you give

21    me -- then you leave with my deputy clerk the one copy, and I

22    will work with that one copy.

23         **MR. RAMSEY:**  Yes, Your Honor.

24         **THE COURT:**  All right.

25         **MR. RAMSEY:**  Thank you.

**THE COURT:** So you have to stay a little later till you get your version.

**MS. BAILY:** That's fine, Your Honor.

Can we have the other massive log that was due on Friday that doesn't have any redactions?

**THE COURT:** Just one second. Have you turned over any log at all?

**MR. GONZALEZ:** No, we haven't, Your Honor. The massive log was not due on Friday. Your order says to produce it promptly, and the order -- the log that was ready on Friday is the one that's being objected to; and I told them yesterday we're working on the lengthier one, which requires a review of thousands of e-mails, and we're probably 80 percent done with that.

**THE COURT:** How does the longer -- I still do not understand how the longer privilege log that has thousands of entries ties into the 42 that Mr. Ramsey wants me to look at.

**MR. GONZALEZ:** I believe this is the answer, Your Honor: The only tie-in is that the objection that's been made is that they don't want the disclosure of the consultant to be made; and so the only thing that I would have to redact from my very long log is the name of that consultant if Your Honor concludes that we should not be disclosing that.

**THE COURT:** I believe you are grossly misinformed about the purpose of today's hearing. That's not what I

1  understood this was about.  So I hope the Court of Appeals

2  judges will read this record to see the obfuscation that the

3  poor judge has been subjected to on this motion.

4      You tell me it's only about one -- the name of one

5  provider due diligence, and Mr. Ramsey is arguing this in an

6  extremely broad -- much broader context, all of which is

7  impossible for us to -- the other side in fairness to be able

8  to respond to because they don't even have the privilege log,

9  which is the traditional way to assert a privilege.

10      Mr. Ramsey, do you want to -- I'm going to --

11  nevertheless, I'm going to let you do what I said I would do.

12  I want you to know there is a substantial risk that I'm going

13  to order all of it to be produced promptly, and you better be

14  ready to make an emergency motion to the Court of Appeals

15  because I'm not going to stay this very long, maybe 24 hours.

16      So they're going to be producing a privilege log

17  probably -- I'm talking to Uber now -- soon; and so if you

18  want -- if I rule against you, you better be ready to go to the

19  Court of Appeals on an emergency motion.

20      **MR. RAMSEY:**  Yes, Your Honor, we would be requesting a

21  stay if you decide that.

22      **THE COURT:**  I won't stay it long.  I will stay it just

23  long enough for you to present an emergency motion to the Court

24  of Appeals --

25      **MR. RAMSEY:**  Yes, Your Honor.

1     **THE COURT:**  -- if I rule against you.

2     All right.  Are we done for today?

3     **MR. RAMSEY:**  Your Honor, there's only one other issue.

4  You mentioned whether there had been any distribution of the

5  report outside the joint defense.  Your Honor, we could submit

6  a brief declaration today that there was no authorization from

7  Mr. Levandowski to distribute this information outside of the

8  common interest privilege.

9     **THE COURT:**  Listen, see, once again you're fishing for

10  what it is.  You have made a record.  The record is what it is.

11  If you want to try to beef up the record and file more, I would

12  consider possibly allowing you to do that, although it would be

13  unfair because now it's a rolling motion where you're making it

14  up as you go along.

15     So I don't know whether I would allow that or not, but

16  it's up to you.  If you want to decide to go down that path and

17  try to supplement your record, I will consider whether or not

18  that should be allowed.

19     **MR. RAMSEY:**  Thank you, Your Honor.

20     And I would just also point to paragraph 4 of the

21  declaration that was submitted indicating that it was

22  prepared -- a third party prepared a due diligence report that

23  may have referenced documents reviewed pursuant to the common

24  interest privilege.

25     So with that, Your Honor, I'm prepared to start redacting.

1    THE COURT:  Ms. Baily, are we done now?

2    MR. VERHOEVEN:  Your Honor, this is Mr. Verhoeven.  I

3    apologize for not being here yesterday.

4    THE COURT:  That's okay.

5    MR. VERHOEVEN:  But I did read the transcript, and

6    Your Honor had said that with respect to their statement, the

7    defendant's statement or Uber's statement, that they had a good

8    story to tell and how does that --

9    THE COURT:  I'm glad you reminded me.

10   Mr. Gonzalez, you did tell me that.  You did tell me that

11   he has a good story to tell, but now you're saying that he

12   won't tell it.  How did you get -- how do you square those two

13   things?

14   MR. GONZALEZ:  All right, Your Honor, it's publicly

15   available.  He went to college at Berkeley.  He --

16   THE COURT:  That's all you were talking about?

17   MR. GONZALEZ:  No, Your Honor.  I just started.  I

18   just started.

19   THE COURT:  He went to Berkeley?  That's a good story?

20   MR. GONZALEZ:  No.  The good story is this, and it is

21   a good story:  He went to Berkeley, studied there also for a

22   master's.  Created a motorcycle, Your Honor, that drove itself.

23   It was the only motorcycle in a national competition of

24   autonomous vehicles.  And you know where that motorcycle is

25   today, Your Honor?  In the Smithsonian.

After that he set up two separate companies on autonomous vehicles, and he did all of that before he ever set foot on Google grounds, before he ever set foot there.

This is not someone, in my view, since you asked me to give you my opinion, this is not someone who has to steal anything. He knows this stuff.

**THE COURT:** Well, then why did he take the 14,000 documents?

**MR. GONZALEZ:** Your Honor, that, I don't have an answer to, but I do think he's got a very good story to tell.

**THE COURT:** That's the story that the jury is going to want to know about.

**MR. GONZALEZ:** Well, Your Honor, if I have my way, he'll testify but I can't compel him.

**MR. VERHOEVEN:** Your Honor, with respect to the order, I think it was the March 16th order that compelled production of documents on the 31st of March, we've been told by counsel for Uber that they don't have any ability to review Mr. Levandowski's files.

We know that they're a signatory -- counsel for Uber was a signatory for the joint defense agreement -- or the common interest agreement they're talking about. They now say they have hundreds of items related to that on their logs, but they say they don't have any control to produce any of that.

They produced a signed employment agreement for

Mr. Levandowski last Friday when they submitted a brand new demand for arbitration. Notably Mr. Levandowski wasn't even a signatory to it.

The notion they don't have control of these documents and that's the reason they haven't even reviewed them is not credible, Your Honor. And Your Honor's order said that they were to produce not just the 14,000 documents, but documents of subsequent use of the information in those documents.

Now, Your Honor, what they're doing interpreting your order -- and I want to make this perfectly clear -- is they're not looking for the information in those 14,000 documents and whether they've been used. All they're doing is they're asking us for file names and they're running searches for exact file names. They asked us for hashtags. They're running searches of just attached hashtags.

**THE COURT:** You weren't here for the hearing when I dealt with it the best I could yesterday. Your side is getting 15 more search terms and they're going to run those search terms. I'm not going to go back and re -- you make good points, but I'm not going to go back and let you reargue. You weren't here. Your other side did a great job arguing, but it's too late. No.

**MR. VERHOEVEN:** The only point I want to make is we've made those documents available for inspection. We've made our trade secret list available confidentially to the other side.

1  They need to review those in order to comply with Your Honor's

2  order to determine whether or not the information is used by

3  them, and they have not done that.

4      Thank you, Your Honor.

5      THE COURT:  Look, you can -- you made your point, and

6  I'm not rejecting that latter point, but I'm not going to go

7  back and revisit what happened yesterday.

8      MR. VERHOEVEN:  Thank you, Your Honor.

9      THE COURT:  All right.  Mr. Ramsey, do you have

10 something to say?

11     MR. RAMSEY:  Yes, Your Honor.  Just with respect to a

12 stay, we would ask that if you do decide to rule against us,

13 that the order be that Uber be required to turn over the

14 privilege log with all the information except what we have

15 proposed be redacted.  And if you decide that that additional

16 proposed redaction should be turned over, we'd ask that just

17 with respect to those redactions, that that order be stayed.

18     THE COURT:  Just a minute.  I thought you were going

19 to turn over the redacted version to Ms. Baily --

20     MR. RAMSEY:  We are.

21     THE COURT:  -- in a few minutes.

22     MR. RAMSEY:  We are, Your Honor.

23     THE COURT:  So what are you --

24     MR. RAMSEY:  My point is to the redactions themselves.

25 So just where I could say with respect to the unredacted

version, we would ask for -- we ask the Court just to have that limited order, which could be hopefully stayed longer than the 24 hours that the Court indicated.

**THE COURT:** Why? Why can't you do a brief? Why can't you get your emergency motion ready now?

**MR. RAMSEY:** Well, we can try, but I'm concerned that 24 hours may not be enough.

**THE COURT:** Well, I'll consider what you say, but the other side makes a good point; and that is, this is a fast-moving industry and I've already delayed the hearing till May 3rd. And come May 3rd, I don't want someone to be saying that *There are unresolved issues*. *They haven't had a chance to look at materials*. *They're still producing documents*.

So this is not -- earlier you were saying, yes, go slow, go slow, Fifth Amendment. Okay. Fair point.

On the other side of the ledger, though, is they have made a record. Right now the record available to the Court under oath is pretty convincing that Mr. Levandowski downloaded 14,000 documents, wiped his computer clean, transferred those documents to a thumb drive, and took the thumb drive with him when he went to start a new company. That's the record undenied.

So it's possible that tomorrow whenever the Uber opposition comes in, we will see that that's completely false, but right now it's not and that record warrants some

1  expedition.  So I have to balance that in there too.

2       **MR. RAMSEY:**  And I understand that, Your Honor, and I

3  would just note that we are moving and have been moving

4  quickly.  We made our --

5       **THE COURT:**  Yes, you did.

6       **MR. RAMSEY:**  -- appearance in this case last week on

7  Thursday.  I think the next day, Friday, we were issued an

8  order to turn around a brief over the weekend and then by

9  Tuesday at noon.  Just so the Court knows, you know, both my

10  law partner and I had vacations scheduled.  We worked straight

11  through our vacations to turn around that brief by noon on

12  Tuesday.

13      We then had the response yesterday at 4:00 o'clock.  My

14  law partner canceled the end part of his vacation, came back.

15  We are here today.  We were here yesterday.

16      So we are trying everything we can, and I know the Court's

17  familiar with the size of our firm.  We are not the size of

18  Morrison & Foerster or Quinn Emmanuel, but --

19       **THE COURT:**  You're both excellent lawyers, so that

20  makes up for a lot of things.

21       **MR. RAMSEY:**  So we have been moving --

22       **THE COURT:**  So just get cracking is all I have to say.

23       **MR. RAMSEY:**  Well, I would just ask the Court's

24  consideration.  We do have some other significant cases that

25  we're working on as well.

1          THE COURT:  I'll keep that in mind.  I will consider

2     that, your point.

3          MR. RAMSEY:  Thank you, Your Honor.

4          THE COURT:  All right.  So you need to stay behind

5     long enough to do the redacted version and to give that to

6     Ms. Baily.  And then I'm going -- I've got an 11:00 o'clock

7     hearing.  I've got to be out here at 11:00 o'clock, but I will

8     look at the version that you leave behind with the highlighting

9     that you want to have redacted before I'll make a decision.

10    All right?

11         MR. RAMSEY:  Thank you, Your Honor.

12         THE COURT:  All right.  Thank you.

13         MR. GONZALEZ:  Your Honor, just one very quick thing.

14         THE COURT:  Yes.

15         MR. GONZALEZ:  Yesterday you had mentioned John Cooper

16    as a potential special master.  I just wanted you to know that

17    I've conferred with my clients, and even though his firm

18    actually represents Google, we would be fine with that.

19         THE COURT:  Well, what does the other side say?

20         MR. VERHOEVEN:  Your Honor, we need a little bit more

21    time to get back to you.  I just got back to town at 11:30 last

22    night.

23         THE COURT:  All right.  Would you do that?  I am

24    not -- I don't have the specific assignment yet for Mr. Cooper;

25    however, somebody like him who's got some technical abilities

and a superb lawyer I believe will in due course be of great

value in this case, and I don't want there to be a snafu when

the time comes, *Oh, it will take us two more weeks.*  So,

please, by tomorrow could you let me know?

           **MR. VERHOEVEN:**  Absolutely, Your Honor.

           **MR. GONZALEZ:**  And, Your Honor, the last thing that

you had asked, we have no objection -- our client has no

objection to Mr. Cooper inspecting our device if the Court

would deem that appropriate.

           **THE COURT:**  Well, fine.

           **MR. VERHOEVEN:**  Your Honor, on --

           **THE COURT:**  Wait.

But I let your in-house lawyer see their trade secrets

over their objection.  They get to see your product over your

objection.  It works both ways.  I can see a legitimate need

going both ways.  I'm not ruling out Mr. Cooper for that role

yet, but I'm saying it may work both ways.

           **MR. GONZALEZ:**  Understood.  Thank you, Your Honor.

           **MR. VERHOEVEN:**  Your Honor, really quickly, on that

subject, we're going back and forth on privileges.  It looks

like most of the relevant production is going to be claimed as

privilege here.

Your Honor, one way to help us is to order an inspection

of their product so under the protective order, our technical

team and our technical expert could look at it next week, cut

through all of this tape, and see what they're doing so that we can adequately prepare our reply in time and on schedule, Your Honor.

If we use -- if we have to go through the process in order to get access to it to use a third-party special master, it's going to take time for that person to get up to speed on the technology.

THE COURT:  Well, who is the exact person that you want to inspect their LiDAR system?

MR. VERHOEVEN:  So Mr. Kintz -- has he been cleared?

MR. JAFFE:  Yes.

MR. VERHOEVEN:  -- has been cleared under the protective order procedure.

THE COURT:  And so your proposal is just he and he alone would inspect the system?

MR. VERHOEVEN:  He and Mr. Jordan, who has technical background, Your Honor.

THE COURT:  Just those two?

MR. JAFFE:  I think we would prefer some of our colleagues to come with us, but a small group.

THE COURT:  No.  No.

MR. JAFFE:  If the Court says just me and Mr. Kintz, we will do that.

THE COURT:  What's wrong with those two?

MR. GONZALEZ:  So, Your Honor, as I said, if you want

1  to appoint somebody neutral, we have no objection to that.

2          **THE COURT:**  No.  The answer is no.  I'm ordering what

3  they want.  By the end of next week, your expert and you, but

4  nobody else, gets to go inspect their LiDAR system.

5      Mr. Gonzalez, it's fair.

6          **MR. VERHOEVEN:**  Thank you, Your Honor.

7          **THE COURT:**  14,000 documents.  This is the -- they've

8  got a right to see if your client has stolen it and using it.

9  This record warrants that.  I'm going to order it.

10         **MR. VERHOEVEN:**  Thank you, Your Honor.

11         **THE COURT:**  All right.  Thank you.

12         **MR. GONZALEZ:**  Thank you, Your Honor.

13             (Proceedings adjourned at 10:47 a.m.)

14                     ---oOo---

## <u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Thursday, April 6, 2017

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter