# EXHIBIT B

## INTERNATIONAL CHAMBER OF COMMERCE
## INTERNATIONAL COURT OF ARBITRATION

### GOOGLE INC. (U.S.A.), as successor to DOUBLECLICK INC. (U.S.A.)

**Claimant,**

**v.**

### DOUBLECLICK JAPAN, INC. (Japan),

**Respondent.**

---

## REQUEST FOR ARBITRATION

---

Scott Nonaka, Esq.
Hiroshi Naito, Esq.
O'MELVENY & MYERS LLP
Meiji Yasuda Seimei Building
11th Floor
2-1-1 Marunouchi, Chiyoda-ku
Tokyo  100-0005   JAPAN
Tel. +81 (0)3 5293-2700
Fax +81 (0)3 5293-2780

Claudia Ray, Esq.
Steven Rosenstein, Esq.
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036   USA
Tel.  +1 (212) 326-2000
Fax +1 (212) 326-2061

Attorneys for Claimant
GOOGLE INC.

Dated:  November 4, 2008

Claimant Google Inc. ("Google"), as successor-in-interest (by merger) to DoubleClick Inc. ("DoubleClick"), respectfully submits this Request for Arbitration to enforce its rights against DoubleClick Japan, Inc. ("DCJ") under the parties' Second Amended and Restated DART Agreement dated November 25, 2002, as amended (the "2002 DART Agreement"), a true and correct copy of which is annexed hereto as Exhibit 1.

## I.   INTRODUCTION

1.      This is an arbitration for breach of contract.  Google seeks (a) money damages arising from DCJ's material breaches of its non-compete and good faith obligations under the 2002 DART Agreement, (b) injunctive relief to prevent irreparable harm that would result from DCJ's expected refusal to comply with Google's planned termination of the 2002 DART Agreement and (c) an award of costs, including attorneys' fees.

2.      Google, as successor-in-interest to DoubleClick, and DCJ are parties to several agreements related to the license, sale, use and support of certain website advertising technology known as DART.  The DART Technology,[1] as it has been termed, was developed by DoubleClick in the 1990s and in turn licensed to companies in the United States and across the globe, including DCJ, which was originally a joint venture between DoubleClick and several Japanese companies and is now controlled by Trans Cosmos, Inc. ("TCI"), a Japanese corporation.  The DART Technology provides a comprehensive advertising service platform that gives website operators (publishers) and advertisers the ability to track and analyze web traffic to deliver targeted advertisements to the right audience.

3.      Although the relationship between DCJ and DoubleClick has evolved over time through a number of agreements, the core of their relationship has remained constant: DoubleClick has licensed the DART Technology to DCJ and given DCJ the "exclusive" right

---

[1]  **DART Technology** is defined in the 2002 DART Agreement to include "(i) the Service[]and the System and shall mean the technology developed by DoubleClick for the targeted delivery, measurement and reporting of advertisements to Web sites, and (ii) the DARTmail Service and DoubleClick's DARTmail System and shall mean the technology developed by DoubleClick for targeted delivery of email campaigns from DoubleClick's servers to marketers' Lists and measurement and reporting thereof. The term DART Technology includes, without limitation, any and all, (1) of the DART Technology Products, (2) technology, know-how and other technical information owned or used by DoubleClick as part of the DART Technology, (3) all information, products and processes necessary for the operation of the DART Technology, (4) Upgrades, and (5) Related Products.  DART Technology specifically excludes [DCJ's] proprietary product branded as "Infomail." (2002 DART Agreement § 1(21)).

to enter into DART Technology service agreements with DCJ's customers, and in return, DCJ has agreed, among other things, that it would not directly or indirectly "engage in activities competitive with DoubleClick or any of its Affiliates outside Japan and inside Japan with respect to activities of DoubleClick."  (2002 DART Agreement § 16).  DCJ has further agreed that the DART Technology service would be the only service DCJ would use "in connection with the delivery and management of advertising by [DCJ] through the DoubleClick Japan Network" and that it would use "no other technology, software or other services . . . for said delivery and management of such advertising. . . ."  (2002 DART Agreement § 2).  In other words, at the core of their relationship was a mutual exclusivity that DoubleClick and DCJ agreed to honor.

4.     For several years, DCJ enjoyed the benefits of marketing, selling and managing the DART Technology.  Indeed, DCJ prospered and its customer base grew as DoubleClick's exclusive DART Technology reseller in Japan.  The DoubleClick Japan Network, which consisted of a collection of high quality web sites in Japan, continued to grow.  It was through this network that DCJ helped publishers and advertisers in Japan build relationships with their target audience.  Through the DoubleClick Japan Network and the DART Technology, DCJ also made headway into mobile web sites.

5.     Unfortunately for DoubleClick, although it held up its end of the bargain by providing the DART Technology to DCJ, DCJ failed to live up to its promises not to compete with DoubleClick and to use only DART Technology for the delivery and management of advertising through the DoubleClick Japan Network.[2]

6.     By around early 2006, DoubleClick had begun development of technology for mobile web content providers and advertisers that would be fully integrated with the DART Technology.  DoubleClick Mobile, as it was named, was intended to help publishers and advertisers manage and report on the effectiveness of their mobile web advertising efforts.

7.     DCJ was involved, in the early stages, in the development of DoubleClick

---

[2] In fact, the current dispute is not the first time DCJ has run afoul of the non-competition provision of the 2002 DART Agreement.  Earlier this year, the parties agreed to settle a dispute over DCJ's use of a product competitive with a DART Technology known as "DARTmail."

Mobile and DoubleClick provided DCJ with a test copy of the software, which DCJ used until at least February 22, 2008.

8.      However, despite DCJ's participation in the development of DoubleClick Mobile and its obligations under the 2002 DART Agreement, DCJ never accepted DoubleClick's offers to license DoubleClick Mobile.  Instead, in direct violation of its obligations under the 2002 DART Agreement, DCJ embarked on a plan to develop, market, distribute and promote its own ad service for mobile web content providers and advertisers.  DCJ contracted with a third party and began to develop a mobile advertising service called Mobile MK and Mobile MK Analytics.

9.      According to information from DCJ, Mobile MK helps users create web content, promote their site, monitor traffic and gather information from visitors and cross-promote to these visitors based on their usage information.  In short, Mobile MK is a service used in connection with the management and delivery of advertisements and promotions for web site operators (publishers).  On information and belief, Mobile MK is used in connection with DCJ's affiliates in the DoubleClick Japan Network.

10.     In addition to Mobile MK, DCJ also developed and began distributing another mobile ad system to its customers, also in direct violation of DCJ's obligations under the 2002 DART Agreement.  DCJ also acquired additional mobile web advertising and marketing technology known as Mo-on that DCJ markets to its customers.  (MK Mobile, MK Mobile Analytics, Mo-on and the related ad delivery technology will be referred to collectively as the "DCJ Mobile Products").  Finally, DCJ has made direct overtures to a competing mobile ad network company about partnering on mobile advertising solutions for DCJ's customers.

11.     DCJ's marketing and sale of the DCJ Mobile Products and its efforts to partner with a competing mobile ad network company are direct violations of its obligations under the 2002 DART Agreement and material breaches of the non-competition provisions and the implied covenant of good faith and fair dealing.  Moreover, by refusing to market and sell DoubleClick Mobile in Japan, DCJ blocked the introduction of a mobile DART Technology into the Japan market thereby depriving DoubleClick (now Google) of the benefits it expected

to receive under the 2002 DART Agreement.

12.     Pursuant to the terms of the 2002 DART Agreement, on October 1, 2008, Google sent DCJ written notice of the breach.  Google notified DCJ that it intended to terminate pursuant to section 10 of the 2002 DART Agreement, absent cure by DCJ.  Section 10 permits termination, absent cure, thirty-business-days after delivery of a breach notice.

13.     On October 3, 2008, DCJ invoked the dispute resolution provisions of the 2002 DART Agreement and called for a meeting with Google in Tokyo.  The parties met on October 16, 2008, the date requested by DCJ, but were unable to reach a resolution.

14.     Despite the unambiguous provisions of the 2002 DART Agreement and DCJ's blatant breaches, DCJ has continued to refuse to acknowledge that the DCJ Mobile Products compete with DoubleClick Mobile and has actively sought to block Google from exercising its contractual right to terminate.  On October 29, 2008, DCJ obtained *ex parte* an Order to Show Cause, in New York State Supreme Court, seeking to enjoin Google from terminating the 2002 DART Agreement.  Following a hearing in court on October 31, 2008, the court is set to hear DCJ's injunction application on November 17, 2008.

15.     Google has been harmed and continues to suffer harm as a result of DCJ's breaches of the non-competition provision and related provisions of the 2002 DART Agreement and the implied covenant of good faith and fair dealing as well as DCJ's refusal to acknowledge Google's right to terminate the 2002 DART Agreement as a result of those breaches.

16.     Accordingly, Google is entitled to an award of damages to compensate for the harm caused by DCJ's material breaches.  Google is also entitled to an award enjoining DCJ from continuing activities under the 2002 DART Agreement, once that agreement is terminated.  Finally, Google requests an award of the costs of arbitration, including attorneys' fees.

## II.     THE PARTIES

17.     Claimant Google is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1600 Amphitheatre Parkway,

Mountain View, California 94043, USA.  Google is successor-in-interest to DoubleClick, which was acquired by Google in a statutory merger that closed in March 2008 and is now a division of Google.

18.     Respondent DCJ is a corporation organized under the laws of Japan.  DCJ has its address at 3F, Sumitomo Oimachi Bldg. (North) 1-20-6, Oi, Shinagawa-ku, Tokyo, 140-0014, Japan.

**III.     THE ARBITRATION AGREEMENT**

19.     The 2002 DART Agreement's arbitration provision provides, in relevant part, as follows:

> Any dispute hereunder ("Dispute") shall be resolved as set forth in this Section 20.  Each party shall give written notice to the other party of any dispute claimed by such party ("Disputing Party").  Promptly upon delivery of such notice, such Dispute Party or a designated senior officer of such Disputing Party, as applicable, shall meet with the other party in Tokyo, Japan, and attempt in good faith to resolve the Dispute.  If such persons are unable to resolve the Dispute within thirty (30) days after delivery of the written notice, then the Dispute shall be settled through binding arbitration at the request of either party ("Arbitrating Party").  If the Arbitrating Party is DoubleClick, then arbitration shall be conducted in Tokyo, Japan, in the English language in accordance with the arbitration rules of the International Chamber of Commerce.  If the Arbitrating Party is [DCJ], then arbitration shall be conducted in New York City, New York, U.S.A., in the Japanese language in accordance with the arbitration rules of the International Chamber of Commerce. The arbitration shall be conducted before a single arbitrator selected by both Parties. . . .
>
> Upon conclusion of any arbitration proceedings hereunder, the arbitrator shall render findings of fact and conclusions of law and a written opinion setting forth the basis and reasons and for any decision reached by such arbitrator.  Such arbitrator shall deliver or have delivered such documents to each Party and to the other parties along with a signed copy of the award.  Any judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction of the subject matter thereof.  The arbitrator shall have the authority to grant any equitable and legal remedies that would be available in any judicial proceeding institute to resolve a Dispute.  Except as specifically otherwise provided in this Agreement, arbitration shall be the sole and exclusive remedy of the parties for any Dispute arising out of this Agreement.

(2002 DART Agreement § 20).

5

### A. **Place and Language of the Arbitration**

20.     Because Google has submitted this Request for Arbitration, the place of arbitration shall be Tokyo, Japan and English shall be the language of the arbitration.  (2002 DART Agreement § 20).

### B. **Applicable Rules**

21.     The Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC Rules") shall be the applicable rules of the arbitration.  (*Id.*).

### C. **Applicable Law**

22.     Pursuant to section 20 thereof, the 2002 DART Agreement is "governed by the laws of New York, without reference to its conflict of laws rules or principles."  (*Id.*).

### D. **Appointment of the Arbitrator**

23.     Section 20 of the 2002 DART Agreement provides that the arbitration shall be conducted before a sole arbitrator selected by both parties.  Google shall consult with DCJ to reach agreement on the nomination of an arbitrator.  Should the parties fail to agree on the nomination, Google shall request that the Secretariat appoint an arbitrator pursuant to, and consistent with, Article 8(3) and Article 9(5) of the ICC Rules.

## IV. **NATURE AND CIRCUMSTANCES OF THE PARTIES' DISPUTE**

### A. **DoubleClick's Internet Advertising Technology**

24.     DoubleClick was incorporated in January 1996.  Within months, DoubleClick began selling ads to a network of web sites; it also continued to develop its website advertising technology.  By 1997, DoubleClick had completed development of, and introduced to the marketplace, a sophisticated website advertising system called DART (Dynamic Advertising Reporting and Targeting).  This new DART Technology enabled web site operators (publishers) and advertisers to track web browsing activity and analyze that activity so that advertisements could be targeted to web users based on their browsing history. As a result of its innovative technology, DoubleClick quickly became one of the leading internet advertising companies in an ever growing field.

6

### B.   DCJ Is Formed and Becomes DoubleClick's Licensee in Japan

25.     Following the development and rollout of DART, DoubleClick began efforts to expand globally.  Among the countries DoubleClick entered were Canada, the United Kingdom and Japan.  In Japan, DoubleClick entered into a joint venture with three Japanese companies to form DoubleClick Japan.  That joint venture was memorialized on August 18, 1997 in a Joint Venture Agreement between DoubleClick, TCI, Nippon Telegraph & Telephone Corporation ("NTT"), and NTT Advertising Inc. ("NTTAD").

26.     In September 1997, a month after the Joint Venture agreement was executed, DCJ entered into a License, Service and Network Agreement with DoubleClick (the "September 1997 License Agreement"), a true and correct copy of which is annexed hereto as Exhibit 2.  Among other things, that agreement provided DCJ with "an exclusive license and right to use the DART Technology in the DCJ Territory [Japan] for purposes of the targeted delivery, measurement and reporting of Advertising of Advertisers to web sites."  (September 1997 License Agreement § 3.1(1)).  DART Technology was defined, in relevant part, as "the technology acquired or developed by Licensor [DoubleClick] for the targeted delivery, measurement and reporting of Advertising to web sites . . . ."  (*Id.* at Art. 1).

### C.   The Parties' Relationship Between September 1997 and November 2002

27.     From September 1997 until November 2002, DoubleClick and DCJ's relationship evolved through a series of agreements and amendments.  For example, on May 8, 2000, DoubleClick and TCI entered into a Shareholders Agreement that terminated the Joint Venture Agreement and reconstituted DCJ in preparation for an initial public offering of DCJ's shares.

28.     In addition, on July 10, 2000, DoubleClick and DCJ entered into an agreement called the "DART Agreement" (the "July 2000 DART Agreement"), which set forth the terms and conditions of DCJ's license and rights to the DART technology.  A true and correct copy of the July 2000 DART Agreement is annexed hereto as Exhibit 3.  The July 2000 DART Agreement, which effectively supplanted the September 1997 License Agreement, provided DCJ with rights to use DART Services related to the DART Technology.

29.     Under the agreement, DCJ agreed that the DART Services "shall be the only service used in connection with the delivery and management of Advertising by [DCJ] though the DoubleClick Japan Network and no other technology, software or other services shall by used by [DCJ] for said delivery and management of such Advertising."  (July 2000 DART Agreement, § 2).  The July 2000 DART Agreement was amended on at least two occasions, once in 2000 and again in 2001.

**D.      The Second Amended and Restated DART Agreement**

30.     On November 25, 2002, DoubleClick and DCJ entered into another series of agreements that further reshaped the parties' relationships.  Pursuant to a Tender Offer Agreement and an Amended and Restated Shareholders Agreement, TCI gained a majority voting interest over DCJ (which previously had been lost following sales of stock pursuant to the planned initial public offering).  True and correct copies of the Tender Offer Agreement and the Restated Shareholders Agreement are annexed hereto, respectively, as Exhibits 4 and 5.  As a result of these agreements, DoubleClick's ownership interest in DCJ was sharply reduced.

31.     On the same day, DoubleClick and TCI entered into a Non-Compete Agreement, a true and correct copy of which is annexed hereto as Exhibit 6.  Among other things, the Non-Compete Agreement prohibited DCJ from "Dealing in products directly competitive with the DCJ Technology Suite," which was defined to include "DART Products" and certain "Related Products" to DART Products.  (Non-Compete Agreement § 1.1).

32.     Most importantly, for purposes of this arbitration, on November 25, 2002, DoubleClick and DCJ executed the 2002 DART Agreement.

33.     Like the definition contained in predecessor agreements, the 2002 DART Agreement defined "DART Technology" to include, in relevant part, "the technology developed by DoubleClick for the targeted delivery, measurement and reporting of advertisements to Web sites."  (2002 DART Agreement § 1(21)).  The term "DART Technology" was further defined to include, "without limitation, any and all, (1) of the DART

8

Technology Products, (2) technology, know-how and other technical information owned or used by DoubleClick as part of the DART Technology, (3) all information, products and processes necessary for the operation of the DART Technology, (4) Upgrades, and (5) Related Products."  (*Id.*).

34.     The Agreement granted DCJ a right "to use the Service[3] in connection with delivery of advertisements of Japanese Advertisers to the DoubleClick Japan Network" and the "exclusive right to enter into service agreements with DART Clients[4] . . . to make the Service available to such DART Clients for the purposes of enabling them to deliver advertising to Web sites."  (2002 DART Agreement §§ 2, 6(a)).

       1.     DCJ's Non-Compete and Related Obligations under the 2002 DART Agreement

35.     Section 16 of the 2002 DART Agreement prohibits DCJ from engaging in activities competitive with DoubleClick:

> Neither [DCJ] nor any of [DCJ's] Affiliates will, directly or indirectly, engage in activities competitive with DoubleClick or any of its Affiliates outside Japan and inside Japan with respect to activities of DoubleClick or any of its Affiliates so long as [DCJ is] using or [has] the right to use the "DoubleClick" trade name or mark.

(*Id.* § 16).

36.     The 2002 DART Agreement also imposes certain related exclusivity obligations and restrictions on DCJ.  For example, section 2 of the DART Agreement, provides that "the Service[5] shall be the only service used in connection with the delivery and management of advertising by [DCJ] through the DoubleClick Japan Network and no other technology, software or other services shall be used by [DCJ]."

37.     The "DoubleClick Japan Network" is defined as:

---

[3]  *"Service"* is defined as "a service provided, through the use of the DART Technology, by DoubleClick for targeted and measured delivery of ad banners from DoubleClick's servers to the Web sites." (2002 DART Agreement § 1(48)).

[4]  *"DART Clients"* is defined to mean "any DCJ client which is or becomes a  consumer of a DART Technology Product in the Territory, which, (i) with respect to publishers, shall mean publishers whose primary place of business is in the Territory, and (ii) with respect to advertisers, shall mean advertisers which are, or whose agents are, invoiced in the Territory, and (iii) with respect to agencies, shall mean agencies which are invoiced in the Territory, and including Japanese Publishers, Japanese Agencies and Japanese Advertisers." (*Id.* § 1(19)).

[5]  *See supra* n. 3.

> the network of Web sites commonly referred to as the
> DoubleClick Japan Network and all successor networks thereto
> and any alternative or additional networks created by [DCJ] or
> one or more of [DCJ's] Affiliates, which includes but is not
> limited to all Web sites owned, Controlled or operated by [DCJ]
> or one or more of [DCJ's] Affiliates, or for which [DCJ] or one
> of [DCJ's] Affiliates perform ad sale and Representation
> services . . .

(*Id.* § 1(32)).  The DoubleClick Japan Network was first launched at the time of DCJ's

formation and consists of Japanese web content providers (publishers) and advertisers who

work with DCJ and DCJ's affiliates.

38.     In addition, Section 3 of the DART Agreement provides that "[w]ith respect to

the DoubleClick Japan Network, [DCJ] and DoubleClick understand that [DCJ is] required to

use DoubleClick's proprietary System[6] in order to receive the Service."

### 2.     The 2002 DART Agreement's Termination Provision

39.     The 2002 DART Agreement provides that it may be terminated if a party

materially breaches the agreement and then fails to cure the breach within thirty business days

of delivery of a notice of breach:

> This Agreement may be terminated . . . thirty (30) Business
> Days after a party's notice to the other party that such other
> party is in material breach hereunder, unless the other party
> cures such breach within said thirty (30) day period . . . .

(*Id.* §10).  Notably, if the material breach has not been cured after the thirty-day cure period,

the Agreement permits the non-breaching party to terminate without any further requirements

or conditions.

### 3.     The 2002 DART Agreement's Dispute Resolution Provision

40.     The 2002 DART Agreement provides for all disputes to be resolved as

follows:

> Any dispute hereunder ("Dispute") shall be resolved as set forth
> in this Section 20.  Each party shall give written notice to the
> other party of any dispute claimed by such party ("Disputing
> Party").  Promptly upon delivery of such notice, such Dispute
> Party or a designated senior officer of such Disputing Party, as

---

[6] ***"System"*** is defined as "DoubleClick's proprietary ad management system software technology."  (*Id.* § 1(50)).

applicable, shall meet with the other party in Tokyo, Japan, and attempt in good faith to resolve the Dispute.  If such persons are unable to resolve the Dispute within thirty (30) days after delivery of the written notice, then the Dispute shall be settled through binding arbitration at the request of either party ("Arbitrating Party").

(*Id.* § 20).

### 4.   The March 26, 2008 Addendum to the Agreement

41.     On March 26, 2008, following a dispute that arose out of DCJ's use of a product that was competitive with a DART Technology known as DARTmail, in violation of the non-competition provision of the 2002 DART Agreement, DoubleClick and DCJ entered into an Addendum to that agreement (the "Addendum"), which amended the non-competition clause as follows:

Neither [DCJ] nor any of [DCJ's]Affiliates will, directly or indirectly, engage in activities competitive with DoubleClick or any of its Affiliates outside Japan and inside Japan with respect to activities of DoubleClick or any of its Affiliates so long as [DCJ is] using or [has] the right to use the "DoubleClick" trade name or mark except that [DCI] and [DCI's] Affiliates shall be free to compete with DoubleClick or any of its Affiliates with respect to the provision of email services, and specifically with respect to DART mails (a/k/a DREAMmail), both inside and outside Japan.

(Addendum § 3).  A true and correct copy of the Addendum is annexed hereto as <u>Exhibit</u> <u>7</u>.

42.     The Addendum also provided:

Except as expressly set forth in this Addendum, all terms and conditions of the DART Agreement not specifically modified in this Addendum shall remain in full force and effect in accordance with their original terms, as amended.

(*Id*. § 4).

### E.   **In Breach of the Non-Compete and Related Provisions, DCJ Marketed And Sold Products in Direct Competition with DoubleClick**

43.     In or around 2006, DCJ contacted DoubleClick to discuss developing technology designed for mobile websites that would be compatible with the DART Technology.  DoubleClick informed DCJ that it was already in the process of developing such technology and allowed DCJ to participate in the early stages of development of DoubleClick's new mobile web technology (DoubleClick Mobile).  DoubleClick Mobile was

11

intended to provide an integrated solution for web content providers to extend their digital advertising to mobile devices.  The providers would now be able to create mobile web pages and to integrate their ad services for scheduling, targeting, selecting and delivering ads on mobile web pages and on computer web pages.

44.     Instead of waiting for the development of DoubleClick Mobile, however, DCJ began developing its own mobile technology, Mobile MK and Mobile MK Analytics, which it acquired from a third party.  Mobile MK and Mobile MK Analytics provide mobile web advertising management services to mobile web content providers.  According to DCJ, Mobile MK is a marketing tool that helps mobile content providers create content, promote their site, monitor traffic and provide cross-promotion opportunities to visitors based on their web usage information.  In other words, the Mobile MK products allow parties to measure and enhance the effectiveness of their advertising and promotional activities targeted at mobile web users in the much the same way that the DART Technology allows publishers and advertisers to develop and deliver effective advertisements directed at computer web users.  Mobile MK and the DART Technology also share some common technical functionality.

45.     In around 2007, DoubleClick made a test copy of DoubleClick Mobile available to DCJ.  The parties then began a series of protracted discussions, lasting many months, but ultimately DCJ failed to license DoubleClick Mobile or to sell it in Japan. Instead, DCJ continued to develop and acquire competing technologies.  In addition to Mobile MK, DCJ developed and acquired mobile ad delivery software and a mobile marketing technology known as Mo-on.

46.     DCJ has been selling the DCJ Mobile Products rather than DoubleClick Mobile.  Thus, while DCJ has leveraged off the DoubleClick Japan Network and its position as the exclusive reseller of DART Technology to sell a competing technology, it has blocked DoubleClick from entering the Japan mobile web market with DoubleClick Mobile.

47.     In short, DCJ's efforts to market the DCJ Mobile Products and its refusal to license and market DoubleClick Mobile are in direct and material breach of its express

obligations under the 2002 DART Agreement as well as the implied covenant of good faith and fair dealing.

48.     In May 2008, DCJ also approached a competitor of Google, a company known as AdMob that operates a competing mobile ad network.  DCJ sought to integrate its mobile ad systems with the AdMob's competing ad network, and offered to promote the competing ad network to DCJ's Japanese customers instead of promoting DoubleClick Mobile.  This, too, was a direct breach of DCJ's obligations under the 2002 DART Agreement.

**F.     Google's Acquisition of DoubleClick**

49.     Pursuant to a statutory merger transaction that closed on March 11, 2008, Google acquired DoubleClick.  Effective May 1, 2008, DoubleClick merged into Google, and Google succeeded to DoubleClick's rights and duties under the 2002 DART Agreement and became party to it.  The 2002 DART Agreement specifically provides that it "may be assigned by DoubleClick . . . to a person or entity who acquires substantially all of DoubleClick's assets, stock or business by sale, merger or otherwise."  (2002 DART Agreement § 19).

**G.     DCJ Threatens Google With the Filing of an Application for a Preliminary Injunction in Japan**

50.     Since Google's merger with DoubleClick, DCJ and Google have had numerous discussions concerning the parties' respective rights under the DCJ-DoubleClick agreements.  DCJ has taken an aggressive stance in these discussions seeking to bar Google from engaging in a number of activities on the ground that Google is barred under the existing agreements.  At the same time, DCJ has also made overtures to Google in an effort to be acquired by Google.  Throughout the course of these discussions, DCJ has engaged in a number of tactics designed to gain leverage over Google.  For example, in mid-August 2008, and in the midst of their business negotiations, DCJ provided Google with a sealed draft of an Application for Preliminary Injunction to the Tokyo District Court (the "Japan Preliminary Injunction Application").  The Japan Preliminary Injunction Application sought an injunction with the following provisions:

(1) The obligor DoubleClick Inc. may not let a third party to enter into, or cause another third party to enter into, any license agreement with a client with respect to advertisement delivery services using DART Technology in Japan.

(2) The obligor DoubleClick Inc. may not, by itself or in conjunction with a third party, distribute or sell advertisements through networks using any technology identical or similar to DART Technology, or plan to construct, sell or localize advertisement delivery networks which use any technology identical or similar to DART Technology, or negotiate for or enter into any agreement on such construction, sale or localization in Japan.

(3) The obligor Google Inc. may not provide, or cause a third party to provide, advertisement delivery services using cookies sent by the obligor DoubleClick Inc. in Japan.

51.     At a meeting shortly after DCJ provided Google with a draft of the Japan Preliminary Injunction Application, DCJ told Google that it would file the application in the Tokyo District Court by the end of August.  DCJ, however, never filed the Japan Preliminary Injunction Application, suggesting strongly that its actions were nothing more than an attempt to bully Google into accepting DCJ's demands in their ongoing business negotiations.

**H.     Google Provides Notice of DCJ's Material Breaches of the 2002 DART Agreement and Google's Intent to Terminate Absent Cure**

52.     Following its merger with DoubleClick, Google learned of DCJ's breaches of the 2002 DART Agreement.  As a result, on October 1, 2008, Google sent a notice, pursuant to Section 10 of the 2002 DART Agreement, advising DCJ that it was in breach of the non-competition provisions of the agreement and that Google intended to terminate if DCJ failed to cure such breaches (the "Notice of Breach").  A true and correct copy of the Notice of Breach is annexed hereto as Exhibit 8.  The Notice of Breach explained that:

- DoubleClick markets, sells, and promotes DoubleClick Mobile, which is fully integrated with the DART technology.

- Google had learned that DCJ is marketing, selling, and promoting its own mobile ad systems.

- Some or all of DCJ's mobile ad systems have features such as click tracking and ad performance that are materially similar to the functionality offered by DoubleClick Mobile.

14

- DCJ's mobile ad systems compete with DoubleClick Mobile.

- Google also had recently learned that DCJ approached a competing mobile ad network, AdMob, regarding integrating DCJ's mobile ad systems into AdMob's competing ad network, and that DCJ offered to promote AdMob's system—and not DoubleClick's system—to customers.

53.    The Notice of Breach further informed DCJ that:

> DCJ's efforts to market, sell, operate, and promote its own mobile ad systems with functionality materially similar to DoubleClick Mobile is in direct breach of the non-competition provisions of Section 16 of the DART Agreement and constitutes a material breach of the DART Agreement. The same is true for DCJ's attempts to partner with one of DoubleClick's competitors.
>
> In light of DCJ's material breaches of the DART Agreement, DoubleClick hereby provides notice of its intent to terminate the DART Agreement pursuant to Section 10 thereof.

**I.      DCJ Invokes the Dispute Resolution Procedure of the 2002 DART Agreement**

54.    On October 3, 2008, DCJ responded to the Notice of Breach by denying "each and every allegation contained" in it.  A true and correct copy of DCJ's October 3, 2008 letter is annexed hereto as Exhibit 9.  DCJ claimed that the DCJ Mobile Products were not competitive with DoubleClick Mobile:

> Your description of DCJ's mobile products, Moon, Mobile-Mk, and Mobile MK Analytics as an "ad system" is incorrect. Moon, Mobile-MK and Mobile MK Analytics are e-marketing promotion solutions; they do not constitute an ad delivery system and they do not compete with DoubleClick Mobile.

55.    DCJ also contended that even if DCJ's products were deemed competitive with DoubleClick Mobile, the non-competition provision did not apply because (i) DCJ is not distributing DoubleClick Mobile and (ii) DoubleClick or its affiliates are also not distributing DoubleClick Mobile in Japan.  Such an interpretation is inconsistent with a plain reading of Section 16 of the 2002 DART Agreement.  In an effort to discuss the issues with DCJ, Google's business people attended a meeting on October 9, 2008.

56.    DCJ also called for a meeting in Tokyo pursuant to Section 20 of the 2002 DART Agreement and unilaterally set the date and place for the meeting for October 16, 2008

at TCI's offices.  Google agreed to the meeting.

**J.      Google Negotiates in Good Faith With DCJ**

57.      On October 16, 2008, Emmanuel Sauquet, Google's Director of Asia Business Development flew from Singapore to Tokyo to meet with Yoshimitsu Nakayama, DCJ's President and CEO, at TCI's offices in Tokyo, as DCJ had requested.  Both parties also had their counsel present.  At the start of the meeting, Google provided DCJ with a letter responding to DCJ's October 3, 2008 letter.  Although the parties discussed the dispute for more than two and a half hours, they were not able to reach a resolution.

58.      On October 23, 2008, DCJ's outside counsel wrote to Google continuing to deny that the DCJ Mobile Products competed with DoubleClick Mobile.  A true and correct copy of the October 23, 2008 letter is annexed hereto as Exhibit 10.  Among other things, DCJ maintained that DCJ was not competing with Google because DoubleClick Mobile was not distributed or offered for sale in Japan, ignoring the fact that because DCJ refused to license and sell DoubleClick Mobile, Google was prohibited from making DoubleClick Mobile available in Japan.

59.      Despite DCJ's refusal to acknowledge its breaches, Google continued to pursue resolution of the dispute in good faith.  Immediately following the October 16 meeting, Google reached out to DCJ's senior executives and Google's executives in Japan have made almost daily efforts to contact DCJ to work out a resolution of their dispute.  Those efforts culminated in a meeting between Google's and DCJ's business people scheduled for October 30, 2008 (Tokyo time).  However, unbeknownst to Google, as it was working toward a business resolution, DCJ was preparing papers to file in court seeking injunctive relief against Google.

**K.      DCJ's Application for an Order Compelling Arbitration, a Temporary Restraining Order and a Preliminary Injunction**

60.      On October 29, 2008, DCJ filed an application in the New York State Supreme Court and obtained *ex parte* an Order to Show Cause for an Order Compelling Arbitration and for a Temporary Restraining Order and Preliminary Injunction.  A true and correct copy of the

Order to Show Cause is annexed hereto as <u>Exhibit 11</u>.  The Order directed Google, DoubleClick, and Google Japan, Inc.[7] (the "Respondents") to show cause why the Court should not issue an order compelling Respondents to arbitrate under the Agreement's Dispute Resolution Provision, despite the fact that the earliest an arbitration could commence under the Agreement was not until four days later, on November 3, 2008.

61.    The Order also directed Respondents to show cause why the Court should not issue a temporary restraining order and preliminary injunction enjoining Respondents from terminating the 2002 DART Agreement pending arbitration.  Further, in a blatant attempt at overreaching, DCJ sought an order prohibiting Respondents:

> (2) from failing to in good faith provide support for, or to develop, DART Technology and related products and services; (3) from directly or indirectly offering products and services in Japan in violation of DCJ's exclusivity and non-competition rights under the Agreements, including any product or service that uses DART Technology, upgrades and related products and services; [and] (4) from otherwise breaching their obligations under the Agreements, including by depriving DCJ of the ability to sell and support the upgraded DART Enterprise 6.5 software.

(Order to Show Cause at 2).

62.    A hearing was scheduled on DCJ's Order to Show Cause for October 31, 2008. At that hearing, Justice Charles E. Ramos of the New York State Supreme Court heard argument from DCJ and Google.  Following argument, the Court continued the hearing to a date and time to be mutually agreed to by the parties.  The continued hearing is currently scheduled for November 17, 2008.[8]

### L.    Google Submits This Request for Arbitration

63.    Despite good-faith efforts at negotiating a resolution, the parties have been

---

[7]  Google Japan is not a party to any of the relevant agreements and was not a proper party to the court action.

[8]  The Court also ordered that to the extent DCJ's application for an injunction is denied, any termination of the 2002 DART Agreement not take effect until 15 business days after the Court issues its ruling.

unable to resolve their dispute in the thirty days since DCJ delivered its dispute resolution notice.  Pursuant to Section 20 of the 2002 DART Agreement, absent resolution in that thirty-day period, an arbitration proceeding may be commenced by either party.  Since DCJ delivered the notice of a dispute on October 3, 2008, arbitration may be commenced as of November 2, 2008.

## V.     CLAIMS FOR RELIEF AND RELIEF REQUESTED

### A.     First Claim for Relief:  Breach of Contract

64.     Google and DCJ are parties to the 2002 DART Agreement, a valid and enforceable contract.  Google has fully performed its obligations thereunder.

65.     Section 16 of the 2002 DART Agreement prohibits DCJ from directly or indirectly, engaging in activities competitive with Google outside Japan and inside Japan. Furthermore, in section 2 of the 2002 DART Agreement DCJ agreed "that the Service shall be the only service used in connection with the delivery and management of advertising by [DCJ] through the DoubleClick Japan Network. . ."  Section 3 of the 2002 DART Agreement further provides that DCJ is "required to use DoubleClick's proprietary System in order to receive the Service."

66.     DCJ has willfully and materially breached Section 16 of the agreement, as well as its related obligations contained in sections 2 and 3 of the 2002 DART Agreement.

67.     Rather than license and distribute DoubleClick Mobile, a mobile ad system fully integrated with the DART service, system and technology, DCJ has marketed, sold and promoted its own competing mobile ad systems.  DCJ Mobile Products contain functionality that is materially similar to, and therefore competitive with, that found in DoubleClick Mobile, Google's mobile web ad system.

68.     In addition, upon information and belief, DCJ approached AdMob, a mobile ad network that is competitive with DoubleClick Mobile, seeking to establish a business relationship using AdMob's competitive software.  DCJ sought to integrate DCJ's mobile ad systems with AdMob's competitive ad network, and offered to promote AdMob's competitive ad network to DCJ's Japanese customers instead of promoting DoubleClick Mobile and the

18

DART Technology.

69.     As a result of DCJ's willful and material breaches, Google has lost business opportunities to market, sell and promote DoubleClick Mobile to DCJ's clients in Japan, while DCJ has wrongly profited from its improper sales of the competing DCJ Mobile Products to its customers.

70.     Accordingly, Google requests an award of damages directly and proximately caused by DCJ's breached, together with the maximum interest under the law.

**B.     Second Claim for Relief:  Breach of Implied Covenant of Good Faith and Fair Dealing**

71.     Under New York law, every contract has an implied covenant of good faith and fair dealing, which prevents a party from destroying or injuring the other party's right to receive the fruits of the contract.

72.     In light of the exclusivity and non-competition provisions of the 2002 DART Agreement, Google had a reasonable expectation that DCJ would not engage in sales or marketing efforts competitive with the DART Technology, including DoubleClick Mobile. Google also had a reasonable expectation that DCJ would not use the DoubleClick Japan Network and the contacts it has acquired through that network to engage in actions competitive with Google.  Google also had a reasonable expectation that DCJ would license and sell DoubleClick Mobile.

73.     DCJ has wrongfully exploited the relationships it has acquired as an exclusive DART licensee to promote and sell a mobile web technology that competes with DoubleClick Mobile while effectively blocking Google from introducing DoubleClick Mobile into the Japan market.

74.     DCJ has also engaged in conduct designed solely to harm Google in an effort to increase DCJ's negotiating leverage with Google.

75.     DCJ's wrongful and bad faith conduct has deprived Google of the benefits it reasonably expected to receive under the 2002 DART Agreement.  As a result of DCJ's conduct, Google has lost business opportunities to market, sell and promote DoubleClick

Mobile to DCJ's clients in Japan, while DCJ has wrongly profited from its improper sales of the competing DCJ Mobile Products to its customers.

76.     Accordingly, Google requests an award finding that DCJ has materially breached the implied covenant of good faith and fair dealing and an award of damages directly and proximately caused by DCJ's breach, together with the maximum interest under the law.

### C.     Third Claim for Relief:  Injunctive Relief

77.     Pursuant to section 10 thereof, the 2002 DART Agreement can be terminated thirty business days after delivering notice that a party is in material breach of the agreement, provided that the party fails to cure the breach.  Google sent notice of breach to DCJ on October 1, 2008.  November 14, 2008 is the thirtieth business day after October 1, 2008. Accordingly, under the terms of the 2002 DART Agreement, absent cure by DCJ, Google may terminate the agreement on or after November 17, 2008, the first business day after November 14, subject to the fifteen-day extension ordered by the New York State Supreme Court (*supra* n. 8).

78.     Upon termination of the 2002 DART Agreement, DCJ shall no longer be licensed or authorized to market or sell the DART Technology services, systems or products.

79.     DCJ has refused to acknowledge Google's right to terminate the 2002 DART Agreement and has actively sought to prevent Google from terminating the agreement.   DCJ has also demonstrated intent not to abide by a termination of the 2002 DART Agreement.

80.     Google will suffer irreparable harm if DCJ continues to exercise rights under the 2002 DART Agreement upon termination, for which monetary damages can not provide an adequate remedy.  Google will suffer substantial harm to its intellectual property, its reputation, a loss of goodwill in the marketplace, and a competitive disadvantage if DCJ is allowed to continue to enjoy its rights under the 2002 DART Agreement, such as marketing and selling the DART Technology, after that agreement is terminated.

81.     Accordingly, Google requests an award preliminarily and permanently enjoining DCJ from continuing to exercise any rights under the 2002 DART Agreement upon

termination of that agreement, including, but not limited to, enjoining DCJ from continuing to use, market, or sell the DART Technology.

**D.**   **Attorneys' Fees and Costs**

82.   The 2002 DART Agreement provides for the prevailing party in an arbitration to be reimbursed for its attorneys' fees and its costs of arbitration:

> Each Party shall pay its proportional share of the arbitration costs and expenses of the arbitration during arbitration; provided that the prevailing Party or Parties in any arbitration shall be entitled to an award of the particular attorney's fees and the particular costs for the prevailing Party or Parties.  All costs of arbitration shall ultimately, and promptly upon the conclusion of arbitration, be borne by the non-prevailing Party or Parties in the form of a reimbursement to the prevailing Party or Parties for the Party's or Parties' share or shares of the arbitration costs and expenses.

(2002 DART Agreement § 20).

83.   Accordingly, Google also requests that the arbitrators award Google its costs of arbitration and it attorneys' fees.

**VI.**   **PAYMENT OF ADVANCE ON COSTS**

84.   Google submits with this Request for Arbitration an advance payment of US$2,500 for administrative expenses.

Dated:  November 4, 2008          Respectfully submitted,

O'MELVENY & MYERS LLP

By _____
   Scott Nonaka
   Claudia Ray
   Steven Rosenstein
   Hiroshi Naito

*Attorneys for Claimant*
*Google Inc.*