Pages 1 - 118

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

WAYMO LLC,                        )
                                  )
            Plaintiff,            )
                                  )
   VS.                            )    NO. C 17-00939 WHA
                                  )
UBER TECHNOLOGIES, INC.; OTTO     )
TRUCKING LLC; and OTTOMOTTO       )
LLC,                              )
                                  )
            Defendants.           )
_____   )

                          San Francisco, California
                          Wednesday, April 12, 2017

                  TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:
                    QUINN, EMANUEL, URQUHART, OLIVER
                       & SULLIVAN LLP
                    50 California Street - 22nd Floor
                    San Francisco, California  94111
             BY:    JORDAN R. JAFFE, ATTORNEY AT LAW
                    FELIPE CORREDOR, ATTORNEY AT LAW
                    DAVID A. PERLSON, ATTORNEY AT LAW
                    JEFFREY W. NARDINELLI, ATTORNEY AT LAW

For Defendants:
                    MORRISON & FOERSTER LLP
                    425 Market Street
                    San Francisco, California  94105
             BY:    ARTURO J. GONZALEZ, ATTORNEY AT LAW

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendants:
                             MORRISON & FOERSTER LLP
 3                           425 Market Street
                             San Francisco, California  94105
 4                  BY:  MICHAEL A. JACOBS, ATTORNEY AT LAW
                         WENDY J. RAY, ATTORNEY AT LAW
 5                       MICHELLE YANG, ATTORNEY AT LAW
                         ESTHER KIM CHANG, ATTORNEY AT LAW

 6
     For Intervenor Defendant Anthony Levandowski:
 7                           RAMSEY & EHRLICH LLP
                             803 Hearst Avenue
 8                           Berkeley, California 94710
                    BY:  ISMAIL RAMSEY, ATTORNEY AT LAW
 9                       MILES EHRLICH, ATTORNEY AT LAW

10   Also Present:        John L. Cooper, Special Master
                          Rudolph Kim, Morrison & Foerster LLP
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **Wednesday - April 12, 2017**                              **10:01 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Calling Civil 17-939.  It's Waymo versus |
| 5 | Uber Technology.  The matter is on for a tutorial. |
| 6 | Counsel, can you please state your appearances. |
| 7 | **MR. JAFFE:**  Good morning, Your Honor.  Jordan Jaffe |
| 8 | for the plaintiff Waymo.  With me today is Mr. Perlson, |
| 9 | Mr. Nardinelli, Mr. Corredor. |
| 10 | **THE COURT:**  Welcome to all of you. |
| 11 | **MR. GONZALEZ:**  Good morning, Your Honor.  Arturo |
| 12 | Gonzalez for Morrison & Foerster on behalf of Uber.  Also here |
| 13 | is my partner Michael Jacobs, my partner Wendy Ray, and the two |
| 14 | associates who will be doing the presentation are Esther Kim |
| 15 | Chang and Michelle Yang. |
| 16 | **THE COURT:**  Welcome to all of you. |
| 17 | **MR. COOPER:**  Your Honor, John Cooper.  I believe that |
| 18 | Mr. Gonzalez and Mr. Perlson and I worked out conflict issues |
| 19 | yesterday and terms and conditions, and I have an engagement |
| 20 | letter for a special master.  So I'm here at your disposal. |
| 21 | **THE COURT:**  We're going to come to that.  Can you stay |
| 22 | for a while? |
| 23 | **MR. COOPER:**  I will be here. |
| 24 | **THE COURT:**  Okay.  Good.  That's great news to hear. |
| 25 | I have some projects in mind for you, but maybe we won't |

```
 1   get to that today but possibly we will.

 2           MR. COOPER:  I will be here till the end.  Thank you.

 3           THE COURT:  Okay.  Thank you for coming.

 4       All right.  So we're here for a tutorial, and let's do

 5   this -- what did I say?  40 minutes?  45 minutes?  40?

 6           MR. JAFFE:  40.

 7           MR. GONZALEZ:  40 minutes.

 8           MR. JAFFE:  40 minutes.

 9           THE COURT:  So you get to go first, and you get to go

10   second.  The floor is yours.

11           MR. JAFFE:  Thank you, Your Honor.  I'll use this

12   podium since it's next to the --

13           THE COURT:  Just so the public out there will know,

14   the ground rule for this tutorial is everything has got to be

15   in the public domain.  So there's no trade secrets going to be

16   shown today.  If that's what you came for, too bad.  You won't

17   see anything.  But this is to educate the judge on things in

18   the public domain.  So there we go.

19       All right.  Go ahead.

20           MR. JAFFE:  Thank you, Your Honor.

21       Once again, my name is Jordan Jaffe, and I'm going to be

22   presenting this today with my colleague Mr. Corredor.

23       I forgot my clicker.  One second, please.

24                       (Pause in proceedings.)

25           MR. JAFFE:  All right.  So before I get started, I
```

1  wanted to kind of give you a road map of where we're going to

2  go today, the topics that we're going to touch, at least with

3  regard to our portion of the tutorial.

4      So the first thing that I'm going to talk about are basic

5  principles of LiDAR.  What is LiDAR?  How does it work?  The

6  basic kind of underlying principles in play.

7      Then we're going to transition into early applications of

8  LiDAR, what it's been used for historically.  It's actually --

9  in its most primitive forms, it's actually not that new.  It's

10 been around for about 50 or so years.

11     Then we're going to fast forward in time, how it's

12 developed over the past few years; and then we're going to

13 transition to how it's been used in self-driving cars, most

14 relevant to this case.

15     And then continuing on the timeline, we're going to talk

16 about the early self-driving cars, how they use LiDAR, how they

17 use some other sensors that are relevant here.

18     And then, lastly, we put together some slides on the two

19 patents that we highlighted in our preliminary injunction

20 motion, speaking about the example in the specification, and we

21 can go through those in as much detail as Your Honor wants at

22 the end.

23         THE COURT:  And while you're pausing, I have a

24 question about the way it's spelled, and I want to make sure

25 there's no trick involved here.  How do you spell the generic

1   version of LiDAR?

2         MR. JAFFE:  Sure.  So we actually have a slide on this

3   exact point, which is LiDAR or LADAR.

4         THE COURT:  You anticipated me.  Go ahead.

5      Okay.  Is that it?

6         MR. JAFFE:  The short answer is, they're two words

7   that essentially describe the same thing.  LiDAR would be light

8   detection and ranging.  LADAR would be laser detection and

9   ranging.  But laser is a form of light, so we're talking about

10  two forms of the same thing.

11        THE COURT:  All right.  But I notice that sometimes

12  it's spelled with a small "I" and sometimes with everything

13  else capitalized, and sometimes it's just the "L" is

14  capitalized.  And I want to make sure that when I -- if I use

15  "LiDAR" in one way or the other, that one side is not going to

16  come back and say, *Oh, Judge, we thought you were talking about*

17  *the trademarked thing.  We didn't know you really meant*

18  *generic.*  I don't want to be the victim of that.

19     So I want us to all agree.  Here, Mr. Gonzalez, you need

20  to stand up and let's all agree that -- you tell me, does L

21  small i-D-A-R mean any and all versions of LiDAR, or does it

22  mean just the Waymo-trademarked version?

23        MR. GONZALEZ:  The answer is yes, any and all.

24        THE COURT:  Any and all.

25     All right.  So if I were to give you an interrogatory,

```
1   which I'm inclined to do, that you've got to go dig up some
2   information within your company on LiDAR, you're not going to
3   come back to me later and say, Oh, we thought you just meant
4   the Waymo version?
5           MR. GONZALEZ:  Correct.
6           THE COURT:  Okay.  All right.
7       That's what -- you understand it that way too?
8           MR. JAFFE:  Yes, Your Honor.
9           THE COURT:  All right.  So that's good.
10      So my law clerks, we're going to use L, small I, capital
11  D, capital A, capital R.  That way -- now, I'm reserving the
12  right to use any other version too, but if I happen to -- I
13  just don't want to be accused of referring to something much
14  more narrower than I intended.
15      All right.  Go ahead.
16          MR. JAFFE:  All right.  So to jump back into this
17  slide, I'm going to start by just talking about the basic
18  underlying principles of LiDAR.  And we have a little animation
19  here to help with this, and this is kind of a different kind of
20  detection, sonar.
21          THE COURT:  Echo location.
22          MR. JAFFE:  So we have a little -- we have our little
23  bat here, which is going to send out sonar, so noise.  And
24  you're going to see that it's going to bounce off the small
25  little object on the right-hand side, and the time it takes for
```

those waves to go out and come back is how the bat kind of,
quote-quote, knows how far away the object is.  And so it's the
calculation of the time that it takes to bounce that we're
looking at.

So how does this go to LiDAR?  So LiDAR is another form of
this kind of analysis but instead of sound waves, we're going
to use light.

And what we put here on this slide is kind of a definition
of what we're talking about in terms of LiDAR or LADAR, with
whatever capitalization we may want to use.  But the point
being is that it's a device consisting of a photon source, that
is a light source as it notes here, frequently but not
necessarily a laser; and a photon detection system, that is
something that detects light coming back; and a timing circuit.
And then we also have some optics to help make this all work.

So what are we talking about?  How does this work in the
LiDAR context specifically?

So what we've got here is we've got another little
animation, and we're showing that there's a laser on the
left-hand side.  It shoots out, it hits the object, and comes
back, and we're timing how long that takes.

So let me just do the animation again here.  We can see it
takes 100 nanoseconds.

And what we do in the little timing circuit on the
left-hand side is we're going to ask:  Okay.  I know the time

of flight, which is this 100 nanoseconds.  I know how long the
speed of light is.  I can use this formula on the top in order
to figure out how far away the object is.

So what we've done now is plugged in these numbers --
speed of light on the left-hand side, the time of flight that
we just accessed -- divide by two, and we now understand that
the object is 15 meters away.  And then we've added this little
annotation that says, you know, a rule of thumb to put it in a
different form is approximately half a foot per nanosecond.

Now, one thing that's going to come up a little bit later
that I just want to touch on now is the idea that in our prior
slide here you can see that the laser just goes out and shoots
right back.

In reality, what we have is we have one laser that comes
out and then it doesn't bounce back like in a science fiction
movie.  What happens instead is it bounces in all sorts of
different directions, and what we've labeled it here is kind of
this diffuse reflection.  And what this means is we need to
shoot a lot of lasers out in order to get photons back coming
in the second direction.

And some of the literature actually talks about when you
shoot out a million photons, only one will come back in the
same direction.  So we need to use a lot of photons in order to
kind of make this work.

Now, taking this a step further, I've depicted here an

1   example of a LiDAR, and I'm going to just walk through each of

2   the pieces.

3        Basically what we're doing here is we're going another

4   step under the covers and saying, *Okay.  We understand the*

5   *principles involved.  How does it work?*

6        So the first thing we're going to talk about is what's

7   called this control and acquisition part, and what we've done

8   here is shown a circuit.  This is similar to the timing circuit

9   that we talked about before.  This is telling the signal when

10  to go, measuring the time of flight, things like that.

11       So the first thing it's going to do is tell the signal

12  generator, *All right.  Time to generate a signal.*  And

13  specifically what it's going to do is do a pulse of light.

14  It's going to generate kind of a wave of light in a laser or

15  other light source.  The example here I'm going to use is a

16  laser.

17       It's then going to go out through the transmit lens, which

18  we'll talk about in a little bit more detail shortly, but it's

19  going to go out through the transmit lens, which is going to do

20  a couple things.  But then it's going to go to a target,

21  assuming there is a target or other object, and it's going to

22  come back, and then it's going to hit this receiver or detector

23  that we've talked about here.  And what this is is a

24  photodetector.

25       So what this means is it's a piece of semiconductor

 1   material that takes photons in and converts those in an

 2   equivalent amount or some relationship to an amount of current.

 3   So then it can send a signal back to the control and

 4   acquisition part and say, *Okay.  I've got some hits.*  And then

 5   it can do that time-of-flight calculation we talked about

 6   before in order to figure out how far away the target is.

 7        So I touched a little bit earlier on the two lenses here.

 8   Just to give a little bit more detail on what they are doing in

 9   the example that I talked about before, the top one is going to

10   do two things.  It's going to collimate the light, which is

11   project, and the two things it's going to do are project the

12   outgoing beams and make them parallel to one another.  So you

13   can see it changes which direction they're going and makes them

14   parallel.

15        On the other side, the receive lens, what it's going to do

16   is it's going to focus the incoming beams on the detector that

17   we talked about earlier.  So it's got to aim them in exactly

18   the right spot where the detector is or that small number of

19   photons, we're going to miss them and then we're not going to

20   get any range information.

21        Taking a step forward, what we have here is an example of

22   a laser, and what this diagram shows is essentially a laser

23   diode.  Now, a laser diode is an example of a laser that's

24   useful for one reason because it's small, and it's also

25   relatively inexpensive; but some systems get more expensive

1    when they use laser diodes because there's what's called a high

2    divergence -- and that's what we've marked in red here on the

3    right-hand side -- which means that the light kind of sprays

4    out in a cone formation and it's an unequal cone.  It's kind of

5    an elliptical as it's noted here.  So that creates all other

6    sorts of problems that have to be compensated for in the

7    system.

8        So the example LiDAR I was talking about before is what's

9    called a bistatic LiDAR.

10       Now, I'm going to show a second example here, and this one

11   is called monostatic.  What that means is there's one lens

12   instead of two, and there's what's called a transmit and

13   receive combiner.  And "TX" and "RX" in this context means

14   transmit and receive.

15       Now, this design typically talks about a single-beam

16   design, and the reason for that is because we have this

17   combiner that includes some kind of specifics in order to make

18   this work in order to be able to transmit and receive using the

19   same area.

20       And just to give a little bit more detail in an example of

21   how this works, again, in the single-beam context, what we have

22   here is a different diagram showing how a single-beam

23   monostatic LiDAR works.  Again, we're talking about single

24   lens, single beam.

25       So here what we're showing is on the left-hand side we

1    have our laser.  It goes through what's called a polarizing

2    beam splitter and then it goes through a couple other things.

3    But, in essence, it goes out into the world through the lens.

4         On the reverse side in terms of reception, it comes back

5    and hits this polarizing beam splitter, and it reflects down to

6    the bottom.

7         Now, just to give a little bit more detail on what is a

8    polarizing beam splitter, how does this work.  So, in essence,

9    what it is, is it's a filter that lets light go through one

10   direction -- that's the laser on the left -- but when light

11   comes back the other direction, it's going to block it and hit

12   it to a mirror and that goes on the bottom.

13        Now, it gets difficult here because there's certain

14   optical problems, which we've eliminated from this picture, but

15   there's certain optical problems and degrees of tolerance that

16   become harder in this design versus the bistatic design that we

17   were talking about earlier.

18        So next we're going to talk about early applications of

19   LiDAR.  I'm going to hand it off to my colleague Mr. Corredor.

20             **THE COURT:**  All right.  Thank you.

21             **MR. CORREDOR:**  Thank you, Mr. Jaffe.

22        Hi.  I'm Felipe Corredor.  I'll be continuing our

23   presentation today.

24        So now that we've covered what the basic principles of

25   LiDAR are, I'd like to discuss what has LiDAR actually been

 1   used for.

 2        Some of the earliest applications, as you can probably

 3   figure out, is just finding the distance to a target.  This is

 4   called range finding, and this was a very widespread

 5   application soon after the invention of the laser in the 1960s

 6   and 1970s, especially by militaries around the world.

 7        Here I'm depicting an example to illustrate that the same

 8   time-of-flight principle that we've been discussing with

 9   Mr. Jaffe can apply to longer distances.  So, for example, in a

10   military application it might take 10 microseconds for the beam

11   to reach the target; and then using the formula that we saw

12   earlier, you can compute that that translates to 1.5 kilometers

13   distance.

14        Now, in the literature, this is sometimes known as

15   single-point or zero-dimensional LiDAR because all you're

16   getting -- the only information you're getting is the distance

17   to a specific point in the environment, your target.  So that's

18   why it's known as 0-D LiDAR.

19        What you can do with such a single-beam LiDAR is you can

20   actually sweep it across a plane, as will be shown in this

21   slide.  And by sweeping the single-beam LiDAR across a plane,

22   you can get information about the points lying on that

23   two-dimensional plane.  For example, NASA and the U.S.

24   Geological Survey did this in the early 2000s to map out the

25   topography of areas of interest as depicted here.

1          And what it looks like is there's a neat animation here.

2     It's still the single beam and you're finding the distance to

3     each point; and as the plane moves forward, this

4     two-dimensional plane where the LiDAR is scanning moves forward

5     and gets you a little bit of a sense of a three-dimensional map

6     of the underlying environment.

7          Now, how does this actually work?  This next slide

8     explains how people used to do this in those early days.

9     Basically you have some kind of mechanical moving part.

10    Usually a rotating mirror.  And your laser and detector

11    electronics, the components Mr. Jaffe talked about earlier,

12    stay largely stationary.  And then as the rotating mirror

13    moves, you're able to scan across the plane depicted here by

14    the blue semicircle, and you get information about all the

15    points lying on that plane.

16         Now, what does that information look like?  That

17    information is called a point cloud.  So what you're getting is

18    range information, how far each point that the laser hits is

19    from your LiDAR unit.  And as you scan it across a plane, you

20    can figure out how far each point is.

21         So, for example, if you have a room here with a blue

22    curved wall and a little green box in the middle, as you sweep

23    the single-beam LiDAR system across the plane of the room, you

24    get the following:  Which is a bunch of blue points

25    representing the blue wall; and then where the wall is

1   obstructed by the green object, you see closer points.

2       This is a very important concept for LiDARs, the point

3   cloud, because this is basically what enables a LiDAR to see

4   the environment by making lots of different range calculations

5   to many different points in the environment.

6       So that's how we get to self-driving cars.  I mean, LiDAR

7   systems using the point cloud concept are able to see the

8   environment around there, and that enables self-driving cars to

9   not only see the world but also feed this information, the 3-D

10  point cloud, into the computer and run the software and make

11  decisions -- get the computer to make decisions for how to

12  drive the car, when to slow it down, when to stop, et cetera.

13      So here's a depiction of an early 3-D point cloud from the

14  early 2000s from the report we submitted to Your Honor I

15  believe last week.  So as you can see, it's a very detailed

16  point cloud.  You can make out two very clear cars on a flat

17  road, perhaps a parking lot under a tree.

18      Now, the main problem with the LiDARs, if you're scanning

19  a three-dimensional environment with a single-beam scanning

20  LiDAR, is you need to scan in two directions.  So not only are

21  you moving across a plane, but you also have to scan the plane

22  up and down, and this takes a long time.

23      In this paper they noted that to generate this high

24  quality of a point cloud, you needed to spend several minutes

25  sweeping the LiDAR across the environment.

1          But when you do get the 3-D point cloud, this 3-D point

2     cloud has a lot of information.  So as you may have figured

3     out, each point has at least four parameters.  Three of them

4     are the obvious X, Y, Z parameters, which tell you where

5     exactly in the world is this point in relation to your LiDAR

6     unit.

7          And then many LiDAR systems -- we have not discussed this

8     yet, but many LiDAR systems also allow you to make a measure of

9     reflectivity.  As Mr. Jaffe mentioned, when you shoot out

10    lasers, very few photons actually come back, but different

11    surfaces and different colors can have different reflectivity.

12         So, for example, if you're looking at the road surface,

13    there might be white lane markings on a dark pavement, and the

14    white lane markings send more photons back -- reflect more

15    photons back, and so that you will be able to see this using

16    the LiDAR system because you can -- the detector can measure

17    that there was more photons that actually came back as opposed

18    to the dark pavement next to it, which had very few photons

19    coming back.

20         And another neat thing you can do with point clouds is you

21    can actually rotate them and manipulate them.  So these four

22    parameters are very easy for a computer to manipulate and it's

23    very powerful.  You know, it's basically an image of the entire

24    world around the car.

25         Now, how would you do this with the single-beam scanning

1    LiDARs that we've been discussing?  Basically the single-beam

2    LiDARs scan across a plane, which is not good enough for

3    self-driving cars because you need to be able to see short

4    objects, you need to be able to see signs hanging overhead.  So

5    what people figured out early on is you'll just take one of

6    these 2-D scanning systems and you'll just nod the unit up and

7    down so that you scan the 3-D environment around you.

8        Now, this has a big problem in that it takes a long time.

9    It misses a lot of points so you get very low resolution in the

10   point cloud.  And because it takes a long time, the refresh

11   rate is very low.  And what the refresh rate is, is how often

12   does the scenery update.  Like this 3-D point cloud is what the

13   world looked like several minutes ago versus a few seconds ago.

14   And in a self-driving car you really want to be able to update

15   the scene several times every second.

16       Now, with those early types of LiDARs, if you mounted them

17   on a moving car and you tried to sweep the three-dimensional

18   environment around the car, this is what you would get:  A very

19   low resolution, low quality point cloud that you can't really

20   make out the objects in.  For example, maybe you can tell the

21   road is flat in front of the car and that there's, like, some

22   kind of objects on the sides of the road, but that's about it.

23   It's a far cry from the nice picture we were looking at just a

24   few moments ago.

25       So this slide just summarizes the points I've already

 1   discussed, which is scanning generates very low quality point

 2   clouds because you're scanning a three-dimensional environment

 3   using an inherently one-dimensional single-beam LiDAR, and you

 4   need to sweep that in at least two directions and then it takes

 5   too much time leading to low resolution and a low refresh rate.

 6        And, in addition, there's a very fundamental limitation

 7   you have to understand when you have a single beam is that you

 8   have to wait for the laser to hit the target, come back, and

 9   then you can sweep.  So it's a very mechanical process and it

10   takes a long time.  You're just inherently limited by the fact

11   that you only have one laser and one detector and you cannot

12   take more than one measurement in parallel.

13        So when the Department of Defense looked at this in the

14   early 2000s, they wanted to make self-driving cars for military

15   applications in combat zones, and they realized that the

16   ongoing research and development programs were -- actually they

17   were not good enough.  They didn't see anything promising and

18   so what they did is they instituted what's called the Grand

19   Challenges, which were a contest for anyone who wanted to

20   enter -- usually academic institutions or big companies -- and

21   the point of these was to try and build a self-driving car in a

22   simplified environment.

23        They used -- in the first two Grand Challenges they used a

24   desert course.  And in that course, you have two main

25   requirements for sensing of the environment.  One is sensing,

which is mapping out what it looks like:  Is there other
cars -- are there other cars near you?  Is there any obstacle
in the way?  And you also want to be able to map out the
terrain underneath the car so that you can localize the car on
a map and figure out where it is and where you want to go if
the car is going to drive itself.

So in 2004, the first course took place in the Nevada
desert, and no team was able to complete the course despite the
relatively simple nature of the challenge being in a desert and
not too many obstacles around.

Now, so DARPA doubled the reward, and in 2005 the
challenge had a $2 million prize, and five teams completed the
course.  The Stanford team won, and the Stanford team was led
by Sebastian Thrun who later went on to found and lead the
self-driving car at Google.

Then in 2007, the challenge got a little bit more
complicated.  They wanted to see if you could figure out a way
to run self-driving cars in a simplified urban environment, so
they used a closed Air Force base.  And in this contest,
several teams completed it and CMU, Carnegie Mellon University,
won the race, and that team was led by Chris Urmson, who also
later after Sebastian Thrun led the self-driving car project at
Google.

Now, what did the DARPA contestants learn from these Grand
Challenges?  What they figured out is that you needed to use

1   different sensors in combination to be able to get you a view

2   of the world.  And so many of the teams would use LiDARs,

3   radars, and cameras together.

4        Now, LiDARs we've been discussing, so we should be

5   familiar with by now; but radars have an inherent disadvantage

6   in that because they use radio waves, the wavelengths are very

7   long and the resolution is just limited, you can't get as sharp

8   a resolution as you can with LiDAR.

9        And cameras, the inherent problem with cameras is that you

10  rely on outside light to take pictures.  So if it's night out,

11  if it's dark, if you're under shadows, if the sun is too bright

12  and it's blinding your camera, you can't really see.

13       Now, this is still a developing area so no one knows what

14  combination of sensors, you know, commercial self-driving cars

15  will have, but not everyone thinks commercial self-driving cars

16  will have LiDAR.  For example, Tesla opts not to use LiDARs in

17  their systems.

18       There's a regulatory framework in the contest.  So DARPA

19  really started a lot of research and development in this area.

20  Eventually the NHTSA instituted a regulatory framework that

21  really maps out the self-driving car classification from level

22  one, which is assisted, very simple self-driving tasks,

23  basically just like follow the car in front of you, adaptive

24  cruise control.  And for that you can use very simple like 1-D

25  LiDARs.  You don't even need to sweep them perhaps.

1    And then levels four and five are the most complex.  When

2  you talk about self-driving cars, you really are talking about

3  levels four and five, which is no human driver is needed,

4  basically.

5    What did the DARPA teams use in terms of LiDAR?  Some of

6  the early commercial systems that the DARPA teams used were

7  RIEGL and SICK LiDARs.  These are two of the scanning LiDARs of

8  the types we've been discussing.

9    But there were also options with a multibeam scanning

10  LiDAR, so this is an extension of the principle of the

11  single-beam scanning LiDARs but now you have multiple beams,

12  one on top of the other, so as to get a better view of the

13  world.  For example, in this patent from 1993, you could be

14  able to make out the stop sign by shooting four light beams --

15  laser beams at it.

16    The main disadvantage, as Mr. Jaffe briefly mentioned, is

17  that doing so really complicates the optics, but it was known

18  that -- I mean, people had done it in self-driving ranging

19  cars.

20    At the time of the DARPA challenges in the late 2000s,

21  there were commercial systems, such as Ibeo's LUX system, that

22  could use four scanning beams to sweep the environment so as to

23  get a little better 3-D sense of what's around the car.

24    One of the teams in the 2005 -- one of the teams in the

25  2005 challenge actually developed their own LiDAR system, which

1    was a 64-beam LiDAR system that had a 360-degree field of view

2    horizontally and a 20-degree vertical field of view.  This was

3    team DAD, which was composed of two brothers, David Hall and

4    Bruce Hall.  They ended up commercializing this system under

5    the company Velodyne, and this is depicted here.  Their system

6    was called the HDL-64.

7         This is a good example of how complicated the optics can

8    get when you have a lot of beams.  I'll show you an image

9    that's still oversimplified.

10        Basically the Velodyne system has two optical cavities,

11   one on top of each other, and each optical cavity has three

12   sets of lenses; two transmit lenses on the outside and two

13   receive lenses, which are slightly larger in the middle.

14        Now, you shoot outgoing beams from the transmit lenses and

15   then you receive the incoming reflection in the receive lens,

16   and you do that a lot of times.  Here we've only depicted it

17   four times but in reality there's 64, there's 16 behind each

18   transmit lens, and this goes on very fast as the whole unit

19   rotates.

20        In 2007, however, at the Urban Challenge, people realized

21   that, you know, the Velodyne sensors were pretty good but they

22   were not good enough for urban driving.  And the main problems

23   that people found out was that it had insufficient angular

24   resolution at long ranges and it was a very unwieldy unit.

25        And how unwieldy is illustrated in the next slide where we

show an 8 by 8 by 11 unit that weighs 28 pounds.  And this is

meant to be mounted on top of the car, so it's going to be a

really big ugly contraption on top of the car.  Not only that,

because it's so unwieldy -- partly because it's unwieldy, its

price is over $70,000, which is more than the cost of most cars

out in the world.

    And this last slide is meant to illustrate a little bit of

why the system is so expensive and why the optics are so

complicated.  And the main point is that the lenses --

manufacturing lenses is challenging and you can never really

get two lenses the way you've designed them.  There's always

some kind of manufacturing tolerance that introduces error into

the system.

    And so what you need is to align each laser diode

perfectly with the receiver on the other end.  But because of

the laser -- of the lens imperfections, you don't know exactly

how the alignment is going to work out until you actually build

the system and test it out.

    So Velodyne thought of doing a laser diode, placing one

laser diode on each board as shown in the middle figure here,

and that would allow you to manually align each laser so that,

you know, if you see that when you're getting a receive signal

back, you're actually missing the detector slightly, you can

slightly move the laser beam -- laser diode so that the beam

adjusts orientation.

```
 1          And this is a very painstaking and expensive process
 2   because, remember, there's 64 of these and you have to repeat
 3   the process 64 times leading to a very expensive overall
 4   system.
 5          Now, I'd like to turn it back to Mr. Jaffe to conclude our
 6   presentation.
 7               THE COURT:  Sure.
 8               MR. CORREDOR:  Thank you.
 9               MR. JAFFE:  All right.  So I'm going to speak a little
10   bit about the two patents that we've asserted in the
11   preliminary injunction motion.  I'm just going to go through
12   the example in the specification to talk about that design and
13   how it works in the context of the technology that we've talked
14   about today.
15          Just as a little bit of background, it was filed in 2013
16   and issued in 2014.  And this is the '922 patent that I'm
17   speaking about right now, and then it lists the named inventors
18   here.
19          And then on the next slide, we have the '464 patent, and
20   the main thing to be aware of when we're talking about the '464
21   patent is that it's a continuation of the '922.  So the
22   specifications between the two of them are going to be
23   identical.  So I'm going to refer to the '922 patent here, but
24   just with the caveat that the specification in the '464 is the
25   same.
```

1          The first thing we're going to look at here are a couple

2     of the figures.  And on the right-hand side is kind of what

3     we're talking about here, which is a LiDAR.  And what this is

4     is a multibeam LiDAR, and one of the uses for this is shown on

5     the left-hand side, which it can be mounted on the top of a

6     car.  It can be a LiDAR for use in self-driving car

7     applications.

8          So on the left-hand side we have a picture of kind of what

9     it looks like on the outside.  All you can see is the housing

10    and the lens.  That's element 350 there labeled.  It's kind of

11    small to see, but we'll go into it in more detail in a second.

12         So taking a step further into this, what we're going to do

13    is on the next slide here what I've shown is Figure 2.  So what

14    Figure 2 is is basically what we have in Figure 3; but imagine

15    if we looked in the top of it, took off the top, and are kind

16    of looking at an x-ray version of what's shown in Figure 3.

17         And so what I'm going to do now is walk through the

18    different parts of Figure 2 and talk about how this particular

19    example of a LiDAR in the '922 and '464 patents works.  And

20    what I'm going to do is I'm just going to walk through the

21    different parts of the specification in order to do that.  So

22    just talking about the basic building blocks here.

23         What we have -- and I've highlighted each part -- is there

24    are a number of different elements.  So the first element that

25    we've kind of put in a yellowish-orange, I guess, is the device

itself.  We're talking about a LiDAR device.  And I think here we can see it's all in caps and that's still -- we're still talking about LiDAR, though.

The next thing to see is what's labeled as the housing -- that's in blue -- and that's just the circle that kind of houses the device.

And then kind of getting to the inside of it, the next element that we have is marked in red, and that's called the transmit block.  And as we'll see in a minute, what we're talking about here is the part of the LiDAR that transmits the lasers; that is, where we're going to shoot lasers from.

What we have in green is called the receive block.  So what we're talking about here are the photodetectors that I spoke about earlier, the part that's going to be able to detect the photons that come back in order to conduct that time-of-flight calculation I talked about before.

Next what we have, we have the lens, which is in purple.

And then the area that's labeled in gray -- or marked in gray I should say -- is what's called a shared space.  And in this example why it's called a shared space is because there are photons that are being received and some photons that are being sent both sharing in some sense some of the same area.

So let's talk about the transmit block in particular.  So what this is going to have is a plurality of light sources. What does that mean?  In this example, we're talking about a

1    plurality of lasers; for example, laser diodes.  And here we

2    have these elements that are labeled in yellow 222A through

3    222C, and they're going to be arranged along a curved focal

4    surface.

5         Now, what does that mean?  What that means is that the way

6    that the laser diodes are arranged on this transmit board,

7    which is a printed circuit board, in some sense mirrors -- or

8    not mirrors but matches the way that the lens is curved and the

9    focal curvature of the lens.

10        So we have -- again, we have a plurality of light sources

11   and they're arranged along a curved focal surface.  And here

12   we're showing three transmit boards that are aimed in kind of a

13   similar direction.  And so what we're going to see now is the

14   lasers are going to shoot out, and I've marked that in red.

15   Those are the plurality of light beams.  And they're going to

16   hit a mirror here (indicating), which is labeled 224 in purple.

17        And what they're going to do after they hit that mirror is

18   they're going to go through what's labeled 226, which is called

19   an aperture.  And for purposes of this example, it's a hole.

20   And what it is, it's a hole that goes through what's labeled in

21   244, which we'll talk about in a bit, but it goes through that

22   small aperture and then it goes out into the lens; and the lens

23   does the collimation which we were talking about earlier, which

24   is projecting the lens and making them parallel to one another.

25        Now --

```
 1              THE COURT:  So just to pause on that for a moment.

 2              MR. JAFFE:  Sure.

 3              THE COURT:  You say "parallel to each other."  So if

 4    they're parallel to each other, they're not going to focus on

 5    anything.  They'll always be parallel.  Do you really mean

 6    parallel, or do you mean that they're going to focus on

 7    something, say, a hundred feet out?

 8              MR. JAFFE:  Sure.  So let me clarify.

 9              THE COURT:  What's the answer to that?

10              MR. JAFFE:  Yeah, so let me clarify that.

11         So one of the important things that this LiDAR is doing is

12    what's called a multibeam LiDAR, so what we want to do is send

13    out multiple beams to look at things.

14         So if you look at the kind of arrows that are above what's

15    labeled as 250, the lens, they're each going to be directed at

16    different points out in the environment; and then they're each

17    going to come back in different areas, and they're going to go

18    to separate photodetectors which are on the receive side.

19         So instead of having -- so if you can imagine it like we

20    have -- I talked about single-beam LiDARs before.  Imagine if I

21    had six -- the most simple example, imagine if I had six of

22    them on a table and I were going to shoot them all out together

23    and get responses.  I would get more information about the

24    environment by doing that.

25              THE COURT:  All right.  So in your diagram, though,
```

1   you have three.

2         MR. JAFFE:  Right.

3         THE COURT:  Right.  And you're telling me that each of

4   those three arrows is aimed at a different far field, near

5   field, medium field, whatever you want, but it's aimed at three

6   different spots?

7         MR. JAFFE:  Right.

8         THE COURT:  All right.  Well, okay.  They can't then

9   be parallel.  They would be slightly off, wouldn't they, just

10  ever so slightly off?

11        MR. JAFFE:  I think that may be right.  To some

12  extent, it depends on the curvature of the lens.

13        THE COURT:  I question that, but all right.  It's your

14  tutorial.  You go ahead.

15        MR. JAFFE:  Okay.

16        THE COURT:  But your main point is that each of the

17  three beams will hit some three different spots somewhere out

18  there, and they're going to bounce back?  Some of the light is

19  going to bounce back?

20        MR. JAFFE:  That's right.

21        THE COURT:  All right.  Okay.  I got that part.

22        MR. JAFFE:  So to talk about the flip side of this

23  equation here, we're going to -- as I mentioned earlier, we're

24  going to send all this light out.  Some amount of light is

25  going to come back.  It's going to come into the receive

lens -- I mean, into the lens here that we've labeled 250 here

in purple; and you can see that it's going to come back, and

it's going to hit this reflective surface 242.  And for our

purposes, we can just treat it as a mirror here.

        And the photons, they're going to come back through the

lens, they're going to be bounced off this mirror, and they're

going to go to the receive block 230, which we've labeled in

yellow.

        What is the receive block?  So it's a plurality of

photodetectors.  And so to just expand on the point that

Your Honor was raising, it's important to understand that we

were talking about the transmit boards and the laser diodes on

there.  And let's say -- just to use an overly simple example,

let's say we had six on the transmit side.  In this kind of

example, a similar design, we have six individual

photodetectors on the receive side and they would map one to

another.  They'd be pairs.

        And the lens --

        **THE COURT:**  Wait.  What do you mean pairs?  You mean

the transmit and receiver pairs?

        **MR. JAFFE:**  Exactly.

        **THE COURT:**  Okay.

        **MR. JAFFE:**  Yes.

        **THE COURT:**  But if you had -- you keep saying -- you

say six, but on the diagram here we've got three; right?

1          **MR. JAFFE:**  Sorry.  I was just making a simple

2     example.

3          **THE COURT:**  Let's stick with three for a minute.  Each

4     of those three on the receive side are focusing on a unique

5     point out in the real world somewhere; correct?

6          **MR. JAFFE:**  Correct.

7          **THE COURT:**  But three different points?

8          **MR. JAFFE:**  Yeah.  I mean, to clarify one part, I was

9     making this example a little bit simpler by talking about six.

10         Just to go a little bit ahead just to show you something,

11     what we're looking at here is another figure from the patent.

12     On the left-hand side, this is an example of a transmit board

13     that we've been talking about; and on the left-hand side what

14     you can see is an array of these laser diodes that we've been

15     speaking about.

16         And so when we're talking about this diagram here in

17     Figure 2 and in particular the elements 220 -- so let me see

18     one where there's highlighted -- the ones in yellow, those

19     yellow points, if we were to pull them out and look at them,

20     are these (indicating) on the left-hand side.

21         **THE COURT:**  Right, except you've got more than three,

22     but -- now, in your -- on this one, this Slide Number, looks

23     like, 61 -- is that right?

24         **MR. JAFFE:**  That's correct.

25         **THE COURT:**  -- this slide, does each one of those

1   light-emitting diodes focus on a unique point or -- I think the

2   answer is yes, but let me make sure I understand it.

3         So on that one, you've got what, 10 or 11 diodes and each

4   one of those would focus on some unique point separate from the

5   others?

6               **MR. JAFFE:**  That's right.

7               **THE COURT:**  Okay.  Now, on this example, though,

8   you've got one diode and it's -- you have it emitting two

9   different beams.  Do you see that?  You've got two red lines

10  going to the lens.

11              **MR. JAFFE:**  Yeah.  So that's just showing the kind of

12  how it expands.

13              **THE COURT:**  What do you mean?

14              **MR. JAFFE:**  So I spoke earlier about the -- how the

15  light kind of expands out.  This is just a diagram kind of

16  showing how it expands out.

17              **THE COURT:**  It wouldn't really expand that much, would

18  it, or does it?

19              **MR. JAFFE:**  No.  You're right.

20              **THE COURT:**  It would be a very slight -- all right.

21  But, in any event, the purpose of the lens is to refocus it --

22              **MR. JAFFE:**  That's right.

23              **THE COURT:**  -- on a unique point in the field.

24        All right.

25              **MR. JAFFE:**  That's right.

1          THE COURT:  Okay.

2          MR. JAFFE:  So just to rewind a little bit where we

3    were --

4          THE COURT:  By the way, I think the way you have that,

5    this color-coded thing, is extremely great.  That's one of the

6    best animations I've ever seen, so good for you.

7          MR. JAFFE:  All credit to Mr. Corredor on that one.

8          THE COURT:  All right.  Well, he gets an A plus.

9          MR. JAFFE:  So I think where I left off was we were at

10   the receive block in talking about the plurality of detectors;

11   and so just to rewind a little bit, we sent out some light.  It

12   went out through this aperture.  It goes through the lens,

13   comes out.  We get some amount of photons that come back.  And

14   then they bounce off the mirror and go to the individual

15   photodetectors that correspond to individual laser diodes.

16        Now, I have a little bit more, but I realize I'm running

17   short.

18        THE COURT:  You're almost out of time.

19        MR. JAFFE:  So I wanted to just --

20        THE COURT:  So how do they align these things in

21   there?  If that's a trade secret, I don't want to get into it,

22   but if it's in the public domain.  Do you sit there with a

23   little tiny screwdriver and having somebody 75 yards away and

24   you know exactly what point you want to hit and you just keep

25   adjusting it till it hits that spot?  How do they align these

1   things so precisely?

2        **MR. JAFFE:**  So what I'll say is the way that this

3   example talks about when we're talking about the patent is the

4   curvature of the transmit board in a sense matches the

5   curvature on the receive side, and in that way it can help with

6   the alignment that you're talking about.

7        **THE COURT:**  All right.  I have one other question.  It

8   has nothing really -- in 50 years or 10 years or 5 years,

9   whenever the entire roadways are filled with these cars, how

10  are they going to know -- aren't the light beams from some

11  other car going to confuse your car, or is there a way to

12  distinguish between your light beam versus somebody else's

13  light beam?

14       **MR. JAFFE:**  So that's actually a good question, and

15  the -- what we found and what I've -- you know, I'm not a LiDAR

16  engineer by training, but what we found on this case is that's

17  one of the things that Waymo has been investigating; and when

18  they log all these miles, they've actually found some edge

19  cases that relate to this problem and come up with some

20  solutions to that.

21       **THE COURT:**  All right.  But it is a question.  They're

22  working on it.  I don't think that's part of our case, but I am

23  curious about that.

24       Okay.  Why don't you -- you've run out of time, but I'm

25  going to give you kind of like a rebuttal, three or four

```
 1   minutes, later if you want to comment on their presentation.
 2   But why don't you have a seat, and my thanks to you both.
 3   Let's hear from the other side.
 4            MR. JAFFE:   Thank you, Your Honor.
 5            MS. CHANG:   Your Honor, may I place this device on the
 6   lectern?
 7            THE COURT:   Yes, please put it right there.
 8            MS. YANG:   Your Honor, before I begin, we gave copies
 9   to the reporter, but can I bring copies to your clerks?
10            THE COURT:   Sure.  Go ahead.
11                      (Pause in proceedings.)
12            THE COURT:   And your name again?
13            MS. YANG:   Good morning, Your Honor.  My name is
14   Michelle Yang.  I thank you.  I'm from Morrison & Foerster.
15   I'm here on behalf of defendants.  And with me is my colleague
16   Esther Kim Chang, and she will present a portion of this
17   presentation.
18            THE COURT:   Great.  Go right ahead.
19            MS. YANG:   I will begin the presentation with a
20   discussion of the history of LiDAR in the context of
21   self-driving cars.  And then Ms. Kim Chang will talk about
22   optical concepts, she will discuss the Velodyne HDL-64E sensor
23   that's placed right here on the lectern, and she'll walk
24   through some design and manufacturing considerations in the
25   public domain.
```

1   Your Honor asked about prior art bearing on this case, and

2   so we will discuss some sources, such as papers, dissertations,

3   textbooks.  And you have that before you in a binder, but it's

4   fairly massive so we will actually have the quotes on the

5   slide.

6   In the end, I will come back and talk about one of the

7   design considerations, that of beam spacing, and what that has

8   to do with LiDAR technology and the information about beam

9   spacing in the public domain.

10   To recap slightly, LiDAR stands for light detection and

11   ranging, and you saw that people also use the terms LADAR or

12   laser radar in older references.

13   Perhaps the best way to discuss how LiDAR works is to

14   discuss an early application of LiDAR.  One of the earliest

15   applications of LiDAR was the use of retroreflectors placed on

16   the moon by the whole missions to measure the distance between

17   the earth and the moon.

18   What happened was scientists directed a laser beam at

19   those retroreflectors.  The beam bounced off those reflectors,

20   came back to earth, and was detected as a signal.  From there,

21   the scientists calculate the time elapsed between sending out

22   the beam and receiving a signal, and then they use the equation

23   the time elapsed by the speed of light divided by two for the

24   round trip from the earth to the moon, and that's how we know

25   the moon is a certain distance away from the earth.

1          **THE COURT:**  What is that distance?

2          **MS. YANG:**  I don't know unfortunately.  I'll find out.

3          **THE COURT:**  186,000 miles I think, but what is the

4    exact number?

5          **MS. YANG:**  I'll have to find out, but I do know that

6    they got it within 3 centimeters of the distance.

7          **THE COURT:**  Really?

8          **MS. YANG:**  Yes.  This is from an episode of

9    *MythBusters*.  I think season four.

10                         (Laughter)

11          **THE COURT:**  All right.  That's good.  Go ahead.

12          **MS. YANG:**  In 1985, the Defense Advanced Research

13    Projects Agency, DARPA, funded the Autonomous Land Vehicle

14    Project.  And you saw previously a photo of the NavLab.

15          So Carnegie Mellon University's Robotics Institute funded

16    with DARPA money the Navigation Laboratory Project.  And the

17    first NavLab, the NavLab 1, was a van that was computer

18    controlled -- so no human behind the wheel -- using a laser

19    range finder from the Environmental Research Institute in

20    Michigan, the EIRM laser.  That range finder here is marked in

21    a giant red box, so that's the size of the range finder.

22          The EIRM laser used two mirrors to direct the beam in an

23    80-degree horizontal field of view and a 30-degree vertical

24    field of view.

25          And as shown on the next slide, what was needed was to

1   measure the time of flight, calculate the time elapsed between

2   sending the beam and receiving a signal, and from there they

3   could calculate the distance of objects in front of the NavLab

4   vehicle.

5        Through the rack of computers shown here in this

6   diagram -- back then the rack of computers was 639 centimeters

7   wide -- an entire stack of them, they could calculate the data

8   and produce a 64 by 256 pixel image.  That was advanced

9   technology for 1985.

10       By the 2000s, DARPA used congressional money from public

11  funding to provide million-dollar prizes for the DARPA Grand

12  Challenge.

13       And you heard about the 2004 and 2005 races.  Well, in

14  2007, it was the DARPA Urban Grand Challenge.  It was a closed

15  course, 60 miles on an Air Force base.  Unlike the previous

16  DARPA Grand Challenges, the self-driving cars there had to

17  navigate traffic laws -- traffic rules and avoid bumping into

18  each other.

19       The winner of the 2007 DARPA Grand Challenge was Carnegie

20  Mellon University in a General Motors car, the "Boss," and on

21  top of that "Boss" car was a Velodyne sensor, a 360-degree

22  spinning LiDAR with 64 laser beams.

23       I do want to note that one of the entrants in the

24  2004-2005 DARPA challenge was the "Ghostrider."  It took me a

25  moment to realize this, but it's called the "Ghostrider"

because there's no rider on the actual car -- on the actual
motorcycle.

   This "Ghostrider" did not use LiDAR.  It used two
forward-facing stereo cameras.  In the back folded up are two
arms that could right the motorcycle when it toppled over.

   And the "Ghostrider" was the only two-wheeled entrant to
enter -- to make it to the semifinals of the 2005 Grand
Challenge.  Today it is in the Smithsonian, and it was created
by a team from the University of California at Berkeley led by
Anthony Levandowski.

   In the modern self-driving car, a variety of sensing
options are used.  Marked in red here, it's a 360-degree
spinning LiDAR, but there are also front-facing cameras, rear
and side cameras, radar coverage, as well as an inertial
measurement unit because the car is being jolted.  So the IMU
measures the pitch and adjusts the data to account for the
shaking and jolting.  And, of course, you need significant
computer and data storage capabilities to handle processing all
this data.

   And with that, I pass the presentation on to my colleague.

      **THE COURT:**  Okay.  I may be wrong about the 186.  I
think that's the speed of light.

      **MS. YANG:**  Yeah.

      **THE COURT:**  So one of you will give me the right
answer about the moon.

1              **MS. YANG:**  I'll go back and watch *MythBusters*.

2              **THE COURT:**  You'll get that for me.

3              **MS. YANG:**  Absolutely.  Thank you.

4              **MS. CHANG:**  Good morning, Your Honor.

5              **THE COURT:**  So your name again?

6              **MS. CHANG:**  Esther Kim Chang.

7              **THE COURT:**  Perfect.  Thank you.

8              **MS. CHANG:**  I'd like to begin by explaining some

9       optical concepts as applied to LiDAR applications.

10          To recap briefly how a LiDAR system works, I'd like to use

11       an illustration from the *Field Guide to LiDAR*.  This field

12       guide was authored by Dr. Paul McManamon who is our expert in

13       this case.

14          This diagram from the field guide demonstrates the basic

15       idea by the LiDAR system.  Pulses of laser light are emitted

16       from a light source.  They go out into the world, hit a target,

17       reflect off of that target, and come back to detectors and the

18       receiver on the LiDAR sensor.

19          An actual LiDAR sensor will use multiple laser beams, but

20       for simplicity sake, what we did was shaded all the outgoing

21       light in red and all the incoming light in blue.

22          LiDAR systems can be categorized as either monostatic or

23       bistatic.  A monostatic LiDAR system uses one lens for both the

24       outgoing transmit beam as well as the incoming receive beam.

25          Monostatic systems were described in a publicly available

1    reference on laser radar from the National Academy of Sciences.

2    Incidentally, our expert, Dr. Paul McManamon chaired the

3    committee that was responsible for this publication.

4        Here I've taken an illustration from this reference to

5    illustrate how a monostatic system works.  You have light from

6    the laser light source going out into the world hitting a

7    target.  The light reflects off of the target and the reflected

8    light comes back to the sensor through the same lens that was

9    used to send the light out.

10       In the bottom right corner of your screen you'll see a

11   picture of the AGM-129A cruise missile.  That's an advanced

12   cruise missile, and in 1983 General Dynamics got a contract to

13   develop this missile.  It's a stealth nuclear-capable missile

14   that was used by U.S. Air Force B-52 bombers, and it's one of

15   the earliest examples of a monostatic LiDAR system.

16       Another more recent --

17            **THE COURT:**  Well, what did it do?  What was it trying

18   to detect?

19            **MS. CHANG:**  I think targets to hit, Your Honor.

20            **THE COURT:**  Okay.

21            **MS. CHANG:**  It's a missile.

22       Another more recent example of a monostatic LiDAR system

23   is disclosed in the '922 and '464 patents, which are two of the

24   patents that are asserted in this case.  As explained by

25   Waymo's counsel, these patents describe a monostatic LiDAR

1    system because the outbound transmit light and the inbound

2    receive light go through the same lens.

3          As shown in Waymo's Slide 54, you can see that the red

4    laser beams that are being transmitted from the diodes go

5    through the lens that's labeled 250 and shaded in pink and go

6    out into the world.

7          The light hits on objects in the world, gets reflected

8    back; and as shown in Slide 56 of Waymo's presentation -- 56 --

9    the light comes back through the exact same lens labeled 250

10   and shaded pink.  So this is a monostatic LiDAR system.

11         The other type -- going back to our presentation, the

12   other type of LiDAR system is the bistatic LiDAR system.  In

13   contrast to a monostatic LiDAR system, which uses one lens for

14   the outgoing transmit beam and the same lens for the incoming

15   receive beam, a bistatic LiDAR system uses a separate lens for

16   the transmit beam and the incoming receive beam.

17         Here I've taken an illustration from the *Field Guide to*

18   *LiDAR* that was authored by Dr. Paul McManamon, and as Mr. Jaffe

19   indicated earlier, "TX" is often used as an abbreviation for

20   transmit and "RX" indicates receive.

21         So in this illustration, this indicates a bistatic system.

22   You can see with the red arrow that I've drawn here that the

23   light goes through the TX or transmit lens out into the world,

24   hits a target, and the reflected light comes back and comes

25   through another separate lens, the receive lens, back to the

 1  LiDAR sensor and then to the detector where that reflected

 2  light is analyzed.

 3       One example of a bistatic system is the Velodyne HDL-64E.

 4  You have a picture of that in the lower right corner of your

 5  screen.  I'll go in to more detail on the Velodyne sensor

 6  shortly, but for now I want to point out a couple of features

 7  of the Velodyne sensor.

 8            **THE COURT:**  Is that what's up there?

 9            **MS. CHANG:**  Yes, sir.

10            **THE COURT:**  That's the same unit?

11            **MS. CHANG:**  Yes, Your Honor.

12            **THE COURT:**  All right.

13            **MS. CHANG:**  You'll see that the Velodyne sensor has

14  two optical cavities; one on top, one on bottom.  Each optical

15  cavity has three lenses.  There are two transmit lenses on

16  either side and one receive lens in the center.

17       It's a little bit hard to tell from this picture, but the

18  two transmit lenses are smaller than the receive lens, and

19  that's because when the light goes out into the world and

20  deflects off of objects, the light becomes scattered and

21  dispersed.  So having a larger receive lens helps collect more

22  of the reflected light.

23            **THE COURT:**  Receive is on the top?

24            **MS. CHANG:**  No.  So actually these are two units that

25  are similar to one another.  You have the two transmit lenses

 1   on either side on the top and the receive lens in the center of

 2   the top cavity, and you have the same setup in the bottom:  Two

 3   transmit lenses on either side and one receive lens on the

 4   bottom.

 5        The way the HDL-64E is set up is you have a total of 64

 6   laser diodes, but 32 of them are contained in the top cavity

 7   and 32 are contained in the lower cavity.  And there is a tilt

 8   of the two optical cavities to allow for detecting items in

 9   different distances.  The one -- the optical cavity in the

10   bottom is tilted downward to be able to detect things that are

11   closer to the sensor.

12        **THE COURT:**  I got that part, but you said that the

13   receive lens was larger, and I understand your logic, but

14   that's only true on the bottom one.

15        **MS. CHANG:**  I think in the picture it's -- in the

16   picture it's harder to tell because of the downward angle of

17   the lower optical cavity; but if you look here, you can see

18   that this receive lens here (indicating) is bigger than the two

19   transmit lenses on either side.

20        **THE COURT:**  All right.  I take your word for it.  I

21   can't tell from that --

22        **MS. CHANG:**  Oh, sorry.

23        **THE COURT:**  -- but your diagram makes them look the

24   same.

25        **MS. CHANG:**  Yeah, the picture is misleading.  I blame

1    our photographer.

2          THE COURT:  Okay.  But on the bottom one it's clearly

3    the receive is larger than those two red ones.

4          MS. CHANG:  Yep.

5          THE COURT:  All right.  I got --

6          MS. CHANG:  I think if you -- maybe after the

7    tutorial, if you want to come take a look at the device.  It's

8    hard to tell from where you're sitting, but the two transmit

9    lenses on either side are smaller than the receive ones.

10          THE COURT:  How heavy is that thing?  You can hand it

11    up to me, or is it heavy?

12          MS. CHANG:  May I approach the bench?

13          THE COURT:  Is it heavy?

14          MS. CHANG:  It's 33 pounds.  It's not too bad.

15          THE COURT:  All right.  Why don't you bring that.

16    Just walk it up here.

17          MS. CHANG:  Okay.  Sure.

18                    (Pause in proceedings.)

19          THE COURT:  Put it right here (indicating).

20                    (Pause in proceedings.)

21          THE COURT:  Okay.  Here, you can take it back unless

22    there's more that I need to look at.

23          MS. CHANG:  Okay.

24          THE COURT:  I can't really tell.  I take your word

25    that it is larger.  It's hard to tell because of the cabinet

```
 1   there --

 2           MS. CHANG:  Yep.

 3           THE COURT:  -- the housing.

 4           MS. CHANG:  This is to point out that the Velodyne

 5   sensor is a bistatic system because it has separate lenses for

 6   transmit, which are the two lenses outlined in red, and another

 7   lens for the receive; and that's multiplied twice, in the top

 8   optical cavity and the lower optical cavity.  So there are four

 9   transmit lenses, two receive lenses in the Velodyne sensor.

10           THE COURT:  How long has the Velodyne sensor been

11   available?

12           MS. CHANG:  Since 2007.  So the founders of Velodyne

13   were David Hall and Bruce Hall, two brothers.  They founded a

14   company called Velodyne in 1983, and it started as an audio

15   company, an acoustics company.  And they specialized in

16   low-frequency sound and subwoofer technology.  But then in

17   2005, you heard about the DARPA Grand Challenge, they decided

18   to enter that competition.

19           THE COURT:  Kind of like the Wright brothers.

20           MS. CHANG:  Yes.  And as part of that competition,

21   they developed a LiDAR-based system that laid the groundwork

22   for the current LiDAR products that Velodyne is selling today.

23       And by 2007, two years after they initially entered the

24   competition, five of the six vehicles that finished the 2007

25   DARPA Challenge were using the Velodyne HDL-64 sensor.
```

1    **THE COURT:**  Does that unit, in addition to having the

2    light-emitting diodes and the lenses and the cavities, does it

3    actually have the computer and the software built into it to

4    evaluate what the return signals are?

5    **MS. CHANG:**  Yes, Your Honor.  So there's a circuit

6    board on top that processes all of the information, and then

7    there's an ethernet cable that sends all of the information to

8    a computer.

9    **THE COURT:**  A special computer or would one of our

10   computers here in the courtroom work?

11   **MS. CHANG:**  You know, I'll have to -- I don't know.  I

12   would have to confirm that information and get back to you.

13   **THE COURT:**  It would be kind of nifty if we could hook

14   it up right now and get my computer to show the courtroom.

15   That would be --

16   **MS. CHANG:**  Your Honor, yesterday I was at

17   737 Harrison, and from the sidewalk you can see autotrucks with

18   Velodyne sensors spinning.  So if you're interested, you could

19   take a walk down to Harrison and Fifth and see that for

20   yourself.

21   **THE COURT:**  Maybe I will.

22   All right.  Okay.  Continue on, please.

23   **MS. CHANG:**  You may ask -- one thing I wanted to note

24   is -- we discussed the '922 and the '464 patents and how it

25   describes a monostatic LiDAR system.  I wanted to note that the

1    '922 and '464 patents do not cover a bistatic system.  They

2    only disclose a monostatic LiDAR system.

3        You may ask --

4        **THE COURT:**  Just I don't want to get too far into this

5    part, but on those patents do they -- is the claimed invention

6    one lens?  You're making it sound like one lens was already

7    known all the way back to the cruise missile.

8        **MS. CHANG:**  Well, Your Honor, we think --

9        **THE COURT:**  What is it that they -- it must be more

10   than that.  It must be one lens plus something else.

11       **MS. CHANG:**  There is more, but may I state what Waymo

12   has stated in their papers?

13       **THE COURT:**  Yes.

14       **MS. CHANG:**  Okay.  So they tout the single lens

15   innovation of the '464 and '922 patents, and they talk about

16   how groundbreaking the single-lens design was.  Obviously we

17   disagree with that allegation because we see monostatic systems

18   in the prior art, and we're talking about some of them today.

19       **THE COURT:**  Okay.  All right.  We'll have a lot more

20   on that later on.  But, okay, thank you for that.

21       Please go ahead.

22       **MS. CHANG:**  So you may ask:  Why choose one type of

23   system over another?  Well, each system has disadvantages and

24   advantages.

25       In a monostatic system you're dealing with one lens for

```
 1   both the transmit and receive beams.  Because you only have one
 2   lens, it's more compact, it's lighter, but you have this issue
 3   with getting some backscatter because you're using the same
 4   lens.
 5        On the other hand, with the bistatic system, you don't
 6   have that interference issue because the lenses are separated,
 7   but then you have to be really careful about aligning the two
 8   lenses so that the angular relationship between the emitters
 9   and the transmit lens is the same as the detectors in the
10   receive lens because that's the only way that the detectors
11   will be able to pick up the reflected light from the emitting
12   diodes.
13             THE COURT:  Okay.
14             MS. CHANG:  So we've talked a little bit about the
15   Velodyne HDL-64E, and that's the product or the device that
16   I've brought to court today.
17        As I mentioned earlier, Velodyne is a Silicon Valley
18   company based nearby in Morgan Hill.  And we discussed how by
19   2007, five of the six vehicles that completed the DARPA Grand
20   Challenge used the Velodyne.  And today it's the most widely
21   used, commercially available LiDAR sensor on the market, and
22   it's been used by many companies, including the parties to this
23   litigation.
24             THE COURT:  What other self-driving companies are
25   using it?
```

1          **MS. CHANG:**  I would say -- I don't have an accurate

2    inventory, but I would say the majority of companies have or

3    are using the Velodyne sensor.  There are other LiDAR sensors,

4    but by far Velodyne -- the Velodyne HDL sensors are the most

5    popular.

6          **THE COURT:**  I read in one of these things Tesla

7    doesn't use LiDAR at all.

8          **MS. CHANG:**  At all, yes, that's correct, Your Honor.

9          **THE COURT:**  Okay.

10         **MS. CHANG:**  So I think both parties have mentioned

11   that there are a lot of different sensor technologies, like

12   radar cameras, and there are pros and cons of all of the

13   technologies.  Some people think that LiDAR-based technology,

14   while it is popular in the short term, will be replaced by

15   better camera technology and other sensor technologies down the

16   road.

17     The Velodyne HDL-64E is a 360-degree LiDAR.  You can see

18   it's spinning here.  And what it does --

19         **THE COURT:**  How fast does it spin?

20         **MS. CHANG:**  So the Velodyne sensor can go from 5 Hz,

21   which is 300 revolutions per minute, up to 15 Hz, which is 900

22   revolutions per minute.  Human reaction time to step on the

23   brakes in response to an object or an event is 5 Hz per

24   second -- is 5 Hz or 300 revolutions per minute.  So the

25   Velodyne sensor is at least as good as human reaction time.

 1          **THE COURT:**  Wait a minute.  So in one second it goes

 2     around how many times?

 3          **MS. CHANG:**  300 -- sorry.  One minute.

 4          **THE COURT:**  In one minute it goes around 300?

 5          **MS. CHANG:**  Yes, Your Honor.

 6          **THE COURT:**  So that would be -- what? -- five in a

 7     second?  Five times per second?

 8          **MS. CHANG:**  Yes.  Yes.

 9          **THE COURT:**  All right.  So that's kind of a

10     herky-jerky image, isn't it?  Because the old movies used to

11     be, you know, even faster than five frames per second, but I

12     guess what you're saying is that -- all right.  The refresh

13     rate is what you're talking about.

14          **MS. CHANG:**  Yes.  Well, it's going around 300 times.

15     So during that time --

16          **THE COURT:**  But in a minute.  Five times in a second.

17          **MS. CHANG:**  Yes, Your Honor.

18          **THE COURT:**  All right.  But how fast can a car go in a

19     fifth of a second?  I don't know.  What's the answer to that?

20          **MS. CHANG:**  My understanding is --

21          **THE COURT:**  Somebody's going 60 miles an hour -- I'm

22     just curious.  If you go 60 miles an hour -- let's work this

23     out -- how many feet per second is that?

24          **MS. YANG:**  Your Honor --

25          **THE COURT:**  I used to know the answer to that.

1              **MS. YANG:**  Your Honor, 60 miles an hour, 1 mile a

2    minute, that's 88 feet per second.

3              **THE COURT:**  All right.  So 88 divided by 5, what is

4    that?  About --

5              **MS. YANG:**  17.

6              **THE COURT:**  17.  So between each spin, it goes

7    17 feet.  You could be going 17 feet before you get a refresh.

8              **MS. CHANG:**  My understanding is --

9              **THE COURT:**  Is that safe?  I don't know.  That's

10   something -- a lot of things could happen in that length of

11   time.

12             **MS. CHANG:**  The current LiDAR devices are limited to a

13   range of 35 miles per hour because if you go faster than that,

14   you outpace the LiDAR sensor.

15             **THE COURT:**  I see.  All right.  So that helps.  That

16   reduces the problem a lot.  Okay.

17             **MS. CHANG:**  So that's why the parties and other

18   companies that are working in this space have different types

19   of LiDARs.  They have medium-range LiDARs, long-range LiDARs.

20   So I believe the HDL-64E goes up to 120 meters, if I'm

21   remembering the product spec correctly.  So definitely the

22   LiDAR sensors are intended to only have a certain range.

23             **THE COURT:**  What is the -- on this particular unit

24   here, you have one that looks down; right?  The near field.

25   And we have one that looks -- what? -- you call it the far

1    field?

2            **MS. CHANG:**  Out.

3            **THE COURT:**  The medium field?  What do you call that?

4            **MS. CHANG:**  So you can call it long-range.

5            **THE COURT:**  All right.  You've got the long-range, but

6    the other one is what?  Short-range or medium-range?

7            **MS. CHANG:**  Short-range.  It depends.  I would

8    probably say medium-range and long-range.

9            **THE COURT:**  Let's say medium, whatever you want to

10   call.  But when it's on top of the car, what are the zones that

11   are being imaged as you drive?

12           **MS. CHANG:**  My understanding is that medium-range

13   LiDARs typically cover up to 30 meters and the long-range

14   further out, but I may be misrepresented -- misremembering

15   facts.

16           **THE COURT:**  All right.

17           **MS. CHANG:**  But I do know that a lot of cars use

18   different types of sensors.  So Velodyne also has the

19   short-range sensors, and a lot of people will combine sensors

20   or camera technologies to get objects closer to the car.

21           **THE COURT:**  So on this particular one we have right

22   here, what is the closest it will image?

23           **MS. CHANG:**  I don't know, Your Honor --

24           **THE COURT:**  Okay.  That's all right.

25           **MS. CHANG:**  -- but I can get back to you.

1           **THE COURT:**  We can learn that.

2       All right.  Okay.  You've got about 15 more minutes total.

3           **MS. CHANG:**  Okay.  I will talk very quickly.

4       We're going to skip some videos that I had.

5       I do want to show you the end product of a LiDAR sensor.

6   On the left -- this is actually taken from a video featuring

7   Velodyne co-founder Bruce Hall, and he used the Velodyne sensor

8   to image a parking lot.  On the left you see a picture of the

9   parking lot.  On the right you see the point cloud that was

10  generated using the Velodyne sensor.

11      The Velodyne sensor will take data at about 2.2 million

12  points per second and generate an image or 3-D map of the car's

13  environment, and that 3-D map is referred to as a point cloud.

14      We've talked about how a LiDAR sensor works and we've

15  discussed the Velodyne sensor.  I want to turn now to a

16  discussion of some of the design and manufacturing

17  considerations that come into play when designing a LiDAR

18  sensor and how those considerations have been addressed by

19  literature in the public domain.

20      As I noted, in the Velodyne LiDAR sensor, you have one

21  laser diode per printed circuit board, but that's not the only

22  way that you can do it.  In the Velodyne sensor you have 32

23  printed circuit boards on top, each circuit board having one

24  diode.  On the bottom you have 32 printed circuit boards, each

25  circuit board having one diode.

1          But as a 2015 textbook discussed, you don't have to have

2     just one diode on one substrate.  You can have multiple diodes

3     on a substrate; and, in fact, you can have multiple substrates

4     with multiple diodes.

5          This textbook describes a laser stack with three

6     substrates each having 10 laser diodes.

7          When you have multiple substrates or printed circuit

8     boards, there's an issue that arises, and that issue is:  How

9     do you align the circuit boards?

10         It's really important for a LiDAR sensor to have

11    accurately aligned printed circuit boards, and there's a lot of

12    manufacturing tolerance that affects the manufacture of printed

13    circuit boards.  So you have to figure out a way to accurately

14    align the circuit boards so that the laser diodes are also

15    accurately aligned.

16         The concept of using guide holes to help with the

17    alignment of printed circuit boards is something that has been

18    known to the public since at least the 1970s.  For example, in

19    this patent that was filed in 1976 and assigned to a company

20    called Pertec Computer, it describes the use of two holes

21    outlined in red on the right in Figure 1 to assure alignment of

22    the PCB or printed circuit board.

23              **THE COURT:**  What did that printed circuit board do?

24              **MS. CHANG:**  What did this circuit board do?

25              **THE COURT:**  Was that a diode light-emitting thing or

 1  something else?

 2          **MS. CHANG:**  I believe these were laser diodes.

 3          **THE COURT:**  Okay.

 4          **MS. CHANG:**  But I can double-check that for you,

 5  Your Honor.  This reference is also included in your reference

 6  binder.

 7          And on the right it indicates the use of the guide holes

 8  to align the printed circuit board to another structure.  And

 9  the way those guide holes are used is that pins outlined in

10  green in Figure 3 are inserted through the guide holes, and on

11  the left in Figure 2 you see a cross-sectional view of the pins

12  being in the guide holes.  And that was how this patent

13  disclosed aligning a printed circuit board to a structure.

14          There is another alignment issue that comes up when you're

15  dealing with printed circuit boards and diodes, and that's:

16  How do you position components on the circuit board, including

17  diodes, when you are manufacturing these boards?

18          To solve this problem, it was well known that you could

19  also use holes as a reference point to position internal

20  components.

21          So here in this patent that was filed in 1981 and assigned

22  to Siemens, it describes location holes 7 and 8 outlined in

23  red, and those location holes are used as a reference point for

24  position determination of components on the printed circuit

25  board.  So those holes 7 and 8 are used as a reference point to

1    get to the X-Y coordinates of other components that you want to

2    place on the reference board.

3        So we've talked about holes to align printed circuit

4    boards to each other or to another structure, and we've also

5    talked about using holes to position components on the circuit

6    board, but holes are not the only way that you can use to

7    position components on the circuit board.  Another way is to

8    use something called fiducial marks.

9        This is a diagram I pulled from the website from a PCB

10   manufacturer and it discusses the use of fiducial marks to

11   align components on the board.  The fiducial marks are the red

12   marks, which are called out by the yellow arrows, and these

13   marks are used as reference locations so that you can measure X

14   and Y positions of other components relative to the fiducial.

15       Let's take -- okay.  I am going to skip my next slide

16   because I see I'm running short on time, and I want to talk

17   about one last issue before I turn it back over to Ms. Yang.

18       So we've talked about using holes or fiducials to position

19   the diode on the PCB.  That tells you how to position a diode

20   on the circuit board, but it doesn't answer the question of

21   what is the best position for a diode.  An issue that often

22   arises when you're trying to position a diode on the circuit

23   board is how much of the diode should lie on top of the

24   substrate.

25       In a 2015 textbook, it describes the issue of how much to

1   position -- how much of the diode should be positioned on the

2   substrate, and it talks about the consequences of each

3   scenario.

4        In an ideal world, you will want the laser diode, which is

5   illustrated by the black box in this diagram, you will want it

6   to be flush with the substrate.  In our scenario, it would

7   generally be a printed circuit board.

8        But due to manufacturing tolerances, you can't always get

9   it to be flush, so you have two choices.  You can either push

10  it out a bit causing the laser diode to overhang the edge of

11  the substrate, or you can push it in a little bit to make sure

12  that the entire diode is laying on top of the substrate.

13       The 2015 textbook discusses two considerations that come

14  into play in terms of the benefits or disadvantages of having

15  an overhanging diode versus an underhanging diode.

16       One thing to keep in mind is heat dissipation.  Laser

17  diodes generate a lot of heat and the main way that they get

18  rid of the heat is through conduction.  So the more of the

19  laser diode that you have sitting on the substrate, the better

20  heat dissipation that you have.

21       But the competing concern is that when these laser diodes

22  emit light, if you have it too -- pushed back too far, the

23  laser diode -- the laser beam gets obstructed by the edge of

24  the substrate.

25       So considerations relating to the overhanging or

1    underhanging of diodes was something that was known in the
2    public domain, and even as far back as 2007 in a dissertation
3    that was publicly available it discusses the benefits of
4    overhanging the laser diode over the edge of a substrate.

5         Here the laser diode is labeled "laser bar" and the
6    substrate is labeled "heat sink," and it discusses the benefits
7    of overhanging the diode because it limits the obstruction of
8    the emitting light.

9         As you can see, the advantages and disadvantages of diode
10   overhang and underhang were well known and out in the public
11   domain.

12        At this time I'd like to turn it back over to my colleague
13   Ms. Yang.

14             THE COURT:  All right.  Thank you.

15             MS. YANG:  Your Honor, I know we're a bit short on
16   time, so let's talk about a question you asked, which is:  What
17   happens when you're driving a car at speed?

18        If you're driving at 30 miles per hour, for example,
19   you're traveling 44 feet every second, which means you want to
20   see more than 44 feet in front because you want to have time to
21   react, to brake or turn your car.

22        The laser patterns that come out of a LiDAR sensor have a
23   formation called beam spacing, which refers to how you allocate
24   or space out the beams in a given vertical field of view.

25        As you can see here, the beams that are tilted downwards

1  will hit the ground or closer obstructions and be bounced back

2  very quickly; but it's the beams that go the farthest into a

3  horizon, which we call the level horizon as 0 degrees forward,

4  it is those beams that will go and show you the object in the

5  distance; for example, the lady on the right-hand side of the

6  slide.

7       However, you may notice that as beams travel farther from

8  the LiDAR, the space between them becomes farther apart.  And

9  as shown in a simplified illustration, the beams will not hit

10  the short cone next to the lady at about knee height, and

11  that's the problem having gaps in the beams that go furthest

12  into the horizon.

13       One group of engineers tried to solve this problem by

14  looking to nature.  Here is a paper published in 2015 from some

15  folks at HRL Laboratories in Malibu, California, and they said

16  (reading):

17            "We address this issue by looking to nature and to

18       create a higher density foveate region."

19       So I was a biology major, and foveated vision refers to

20  something inherit in our eyes.  In the back of your eye there's

21  an indentation where the retina thins out slightly and the

22  cones there are in their highest concentration.  That means

23  that the cones there receive the most light and see with the

24  greatest visual acuity.  In other words, you have higher

25  resolution visually at the center of your vision and lower

```
 1    resolution at the periphery.  Foveated vision is inherent to
 2    our eyes.
 3        These engineers at HRL laboratory tried to replicate
 4    foveate vision using two LiDARs.  What they did was balance one
 5    of the 32-channel Velodyne LiDARs, which means one of those
 6    gray barrels, on top of the other to create a double density
 7    pattern.  And let me show you how that worked.
 8        The first Velodyne sensor, 32 beams, illustrated here in
 9    simplified form, sends out a pattern; and as you see into the
10    distance, there's a gap between the lasers that go furthest
11    towards the horizon.
12            THE COURT:  I don't understand.  What do you mean
13    "gap"?
14            MS. YANG:  If you look at the human, so on the
15    left-hand side when the beams are emitted from a center point,
16    they're very close together.  By the time they reach a human,
17    there's a gap.  For example, one beam might hit his shoulder
18    and the next beam will go towards halfway down his arm.
19            THE COURT:  You mean as you get farther away --
20            MS. YANG:  Yes.
21            THE COURT:  -- the beams are -- the gap is larger?
22            MS. YANG:  That's right.
23            THE COURT:  Okay.  I see that point.  All right.
24            MS. YANG:  Okay.  I had a Lego diorama I was hoping to
25    bring it out at this moment, but I think we're short on time.
```

1    **THE COURT:**  No, no.  I want you to finish this point.

2    **MS. YANG:**  Okay.

3    **THE COURT:**  You're talking about the strategy of how

4    you do the beams.

5    **MS. YANG:**  To eliminate the gaps.

6    **THE COURT:**  So let's hear your point.  Go ahead.

7    **MS. YANG:**  Okay.  What they did was they balanced a

8    second LiDAR on top of it to send out 32 beams as well.  In

9    this, these experimenters, they balanced two LiDARs together so

10   that there was an overlap region; and where there was a gap

11   before, now there's a denser concentration of the laser beams.

12       And what they cared about was what they called the fovea,

13   the center region, which is where the person is standing here,

14   and because that is a region furthest in the distance into the

15   horizon and you want to see objects in the distance when you're

16   driving at speed.

17       Your Honor, if I may move --

18   **THE COURT:**  I'm sorry.

19   **MS. YANG:**  Oh, please.

20   **THE COURT:**  You say -- your title there says "Greater

21   resolution needed for farther distances."

22   **MS. YANG:**  For objects at farther distances.

23   **THE COURT:**  But, I mean, just I'm asking.  It seems to

24   me that if something is farther away, you're less likely to hit

25   it than something that's real close, like -- so why couldn't

1   you make the argument that it's more important to have more

2   beams in the near field than the far field?

3         MS. YANG:  The reason is because the beams in the near

4   field, if you have downward tilted beams, they travel, hit the

5   object, and come back very quickly; whereas, the beams further

6   afield, the light goes out, comes back, and in the meantime

7   your car is moving forward.  And that's why you would be

8   arriving at, say, the lady in the distance very quickly,

9   44 feet per second.

10        And also --

11        THE COURT:  But we're talking about the speed of

12  light.  It's so fast that -- I have to think about that.

13        MS. YANG:  I think the point is vertical resolution is

14  about the density of the angles.  So having narrower angles

15  between the beams to eliminate gaps between the beams, it's to

16  cover objects of certain size.

17        THE COURT:  All right.  So what was the source -- the

18  public domain reference that discussed the strategy for how you

19  align your beams?  What was that again?

20        MS. YANG:  For how to align the beams, this paper is a

21  2015 paper.

22        THE COURT:  The one about the -- they said they were

23  going to follow what nature does.

24        MS. YANG:  Yes.  That's this paper, a 2015 paper, from

25  the HRL Laboratories.  And so I'm quoting, previously they say,

1    "We addressed this by looking to nature."  That's on page 2.

2    And then we go back and here's an image from page 1 of how they

3    did it, and here's a figure from the same paper.

4         Now, I just want to close by talking about this strategy

5    was applied using two LiDARs, one balanced on top of each

6    other; but --

7              THE COURT:  Like this one right here.

8              MS. YANG:  Yes.  Sort of like this one.

9         The Velodyne, the folks who made that LiDAR, they actually

10   talked about how to do it within one cavity.

11        Here is the '190 patent.  It was filed on in 2006, issued

12   in 2014.  There it talked about having a fan pattern of stacks,

13   PCBs, with one emitter per PCB.  However, they say within just

14   that one cavity, you can create an intentionally variable

15   density in your emitters.  You can create the higher density at

16   desired regions.

17        And they close by saying some uses require increased

18   density, which is desirable to facilitate seeing further --

19   objects at further distances and with more vertical resolution.

20        And today in the Velodyne LiDAR what they do is they have

21   two separate cavities.  The one on top is aimed towards the

22   horizon, and you notice in the spec sheet here from the

23   Velodyne website, that the emitters are more tightly packed

24   together so that the beams that go for the horizon are more

25   densely grouped.

1          In contrast, the beams which are in the lower cavity which

2     are pointing downwards to see objects closer to you, they're

3     more -- spaced more far apart.  And that's in the spec sheet on

4     their website.

5          In closing, I just want to provide the context in terms of

6     timeline where here above we have earlier autonomous vehicles

7     going through the DARPA Challenge today, and we note that the

8     Velodyne LiDAR you have before you was introduced in 2006 and

9     2007.

10         Below I just note that the manufacturing and design

11    considerations you saw just now for individual components in

12    LiDAR were introduced, well-known, and in the public domain in

13    the earlier periods leading up to before 2015.

14         And with that, I conclude my presentation.  Thank you very

15    much.

16         **THE COURT:**  All right.  You two did a great job too.

17    Thank you.

18         All right.  Rebuttal.  I'll give you a few minutes for

19    rebuttal if you would like to use that.

20         **MR. JAFFE:**  Thank you, Your Honor.  Just a couple

21    brief points.

22         Your Honor raised some discussion of the '922 and the '464

23    patents and kind of what is that design versus the monostatic

24    designs that they talked about before, and I just wanted to be

25    responsive to that point.

 1          THE COURT:  Sure.

 2          MR. JAFFE:  So there's a couple things to be aware of.

 3   Number one is we're talking about the use of a single lens in

 4   an example in the specification and then a plurality of laser

 5   diodes.  And so there are all sorts of complications that come

 6   up when you use multiple lasers and a single lens.  So that's

 7   just one of the reasons why the design that's described in that

 8   patent -- in those patents are different from the designs that

 9   they were talking about.

10          THE COURT:  So you're saying that the first time

11   anyone ever used more than one diode with a single lens for

12   transmit and receive was in your patent?

13          MR. JAFFE:  I think it's -- I don't want to recite all

14   the claim limitations right here, but I think generally that's

15   the idea.

16          THE COURT:  Really?  Okay.  All right.  Great.

17          MR. JAFFE:  And then the other thing I just wanted to

18   mention is we've talked a little bit about the Velodyne and the

19   pluses and minuses.  I wanted to give a little bit more context

20   for the Court on how what's described in the '922 and the '464

21   patents relates or compares to what's described right here.

22          And just for the Court's benefit, so what we're looking at

23   there is about 28 pounds and, again, I think, as Mr. Corredor

24   mentioned, it's about $70,000 at one time; whereas, what's

25   described in the '922 and '464 patents, it's about this big

```
 1   (indicating) and you can -- I don't know, it's probably 5 to
 2   10 pounds at most.  And so there's all sorts of manufacturing
 3   benefits that flow from these designs that are not present in
 4   this design right here, and that actually leads to lower costs
 5   as well.
 6        THE COURT:  Great.  Thank you.
 7        I think both sides did a fantastic job.  I learned a lot.
 8   We're going to take a short recess, and then we're going to
 9   come back and hear your discovery disputes in, say, ten
10   minutes.
11        All right.  Thank you.
12                  (Recess taken at 11:35 a.m.)
13                  (Proceedings resumed at 11:42 a.m.)
14        THE COURT:  Are we ready?
15        MR. GONZALEZ:  We're ready, Your Honor.
16        THE COURT:  Let's see, are the plaintiffs ready?  I
17   can wait a few more minutes.  Do you have more to come?
18        MR. GONZALEZ:  They're coming right now.
19        THE COURT:  All right.  Are the lawyers for
20   Mr. Levandowski here?
21        MR. RAMSEY:  Yes, Your Honor.
22        THE COURT:  All right.  Let's take up first the issue
23   concerning -- I'm sorry.  I misplaced everything.  I thought I
24   had it all here organized -- the one about the Fifth Amendment
25   and the deposition.
```

 1      Here it is.

 2      Okay.  So summarize for me what is the relief that -- what

 3  is going on here?  What do I need to decide?

 4          MR. PERLSON:  Well, Your Honor, so we sent a subpoena

 5  to Mr. Levandowski asking for his deposition on Friday and

 6  included with it document requests.

 7          THE COURT:  You mean this coming Friday you want to

 8  take it?

 9          MR. PERLSON:  Correct.

10          THE COURT:  What do you mean by "Friday"?

11          MR. PERLSON:  This Friday two days from now.

12          THE COURT:  All right.  Okay.

13          MR. PERLSON:  And, you know, we used the allotted, you

14  know, five days that were agreed to under the expedited

15  discovery order; and counsel for Mr. Levandowski accepted

16  service, and shortly afterwards indicated that they thought

17  that the responses -- so we also included some document

18  requests, six document requests.

19          THE COURT:  I'm going to come to that.  Some of these

20  are so broad, I'm not going to allow them, but -- they're

21  supposed to be narrowly directed for expedited discovery -- but

22  not all of them.  Some of them were okay, but -- all right.

23      So this -- and so then what?  Then what happened?

24          MR. PERLSON:  And so counsel for Mr. Levandowski

25  basically said three things:  One, that we're not allowed to

1  ask Mr. Levandowski for documents under Your Honor's expedited

2  discovery order; two, that they're going to plead -- that

3  Mr. Levandowski is going to plead the Fifth as to every single

4  one of the responses in terms of even producing documents; and,

5  three, that they're unduly burdensome.

6      THE COURT:  All we are concerned about are the

7  document part?

8      MR. PERLSON:  Right.

9      THE COURT:  But he's otherwise going to appear and --

10     MR. PERLSON:  As far as I know.  We have not received

11 any objection that Mr. Levandowski will -- as to whether he

12 will appear.

13     THE COURT:  All right.  Your turn, Mr. Ramsey.

14     MR. RAMSEY:  Your Honor, Ismail Ramsey and

15 Miles Ehrlich on behalf of Mr. Levandowski.

16     I think it was summarized well.  We received the subpoena

17 for deposition and the accompanying document request.  We

18 viewed the order for expedited discovery and did not believe

19 that it allowed for documents.

20     THE COURT:  Well, that's wrong.  They're entitled to

21 ask for documents.  So that part is wrong, but your part about

22 overbroad has some merit.

23     So you want me to just give you my take on this?  You

24 know, I can tell you right now which ones are overbroad and

25 which ones I'm going to allow.  So let's just go through it.

1          Request Number 1, it's really a sneaky thing.  You tried

2     to get two of them in there and called it one.  So where -- I'm

3     going to divide it in to two.  Misappropriated materials,

4     including media, that contains or contained the misappropriated

5     materials, any documents derived from or reflecting the

6     substance of the misappropriated materials outside of Waymo.

7          All right.  That's -- I'm going to allow that.  That one

8     is okay.

9          The next part is any documents reflecting any meetings or

10    discussions regarding the substance of the misappropriated...

11    I'm going to allow that one too, but that counts as a second

12    request.  So those two are fine.

13         All right.  Number 2, any communications re ownership or

14    relationship.  That's way too broad.  Quashed.  Thrown into

15    outer darkness, Number 2.

16         Number 3, any communication -- all communications between

17    you and Uber between January 2015 and August 2016.  That's

18    fine.  We're going to require that one to be enforced.

19         Number 3 -- I'm sorry -- Number 4, all documents regarding

20    your creation of Otto and/or 280 systems including...  That's

21    too broad.  Quashed.  Not enforced at all.

22         Number 5, documents sufficient to show the nature and

23    timing of Otto's technology.  Quashed.  Too broad.

24         6, documents and communications regarding acquisition of

25    Otto by Uber, including all documents.  No.  Quashed.  Too

broad.

These were not narrowly directed, except I'm going to allow Number 1 -- I'm counting it as two -- Number 1 is enforced.  Number 3 is enforced.  All the rest are quashed.

Now, he's got to appear.  You've got to ask question by question.  For example, we heard about this motorcycle.  You ought to ask questions about the motorcycle.  If he invokes the Fifth Amendment, then maybe later on at the trial nobody gets to talk about the motorcycle.  You're going to have to -- the Fifth Amendment has to be invoked question by question.  It will be a long day, but you've got to go through the process.

Now, sometimes if you get down to a line of questions and Mr. Ramsey says, *Look, anything else on this subject, anything else, no matter what it is, he's going to invoke the Fifth Amendment,* okay, then you have that agreement.

But you can't just wing it and say, *Oh, he told -- he raised the Fifth Amendment, therefore...*  You've got to do your job and ask the questions subject by subject and see if he really is going to invoke the Fifth Amendment.  Maybe he won't.  You don't know that yet.

Now, if you're going to invoke the Fifth Amendment on producing the documents, that's got to be done in a proper way.  You need to file a motion for protective order and all of that and do it pronto, but he has to -- he has to produce the documents that I indicated I'm going to enforce the subpoena

1    on.

2        Okay.  So you can try to talk me out of that ruling.

3    Anything you want to talk me out of?

4            MR. PERLSON:  Understood, Your Honor, on the

5    Fifth Amendment during the deposition, and we'll see how long

6    it takes to go through all those things.  We have a limited

7    amount of time and potentially may come back.

8            THE COURT:  I know you do but, nevertheless --

9            MR. PERLSON:  Yeah.

10           THE COURT:  -- you've got to do it.  You can't just

11   assume he's going to take the Fifth.  I promise you, if you

12   don't ask the questions, later on, if you say, well, you didn't

13   ask it because he would have taken the Fifth, I've seen that

14   scenario.  You make the record you want to make.

15           MR. PERLSON:  We intend to make the record,

16   Your Honor.

17           THE COURT:  Mr. Ramsey, do you want to talk me out of

18   any of this?

19           MR. RAMSEY:  I do, Your Honor.

20           THE COURT:  By the way, have you filed your emergency

21   motion yet?

22           MR. RAMSEY:  We are in the process of doing that.

23           THE COURT:  Well, you know, time is running out.

24           MR. RAMSEY:  Your Honor, we expect to have it filed

25   within the next couple of hours, but we wanted to appear this

1    morning.

2         THE COURT:  All right.  I'm not extending the time

3    because I warned you last week you should be ready to do this.

4    We're on an expedited schedule here.  If I had more time, I'd

5    be generous with time, but we don't have more time.  We're on a

6    very expedited schedule, so I've given you the deadline.  It

7    runs out tomorrow.

8         MR. RAMSEY:  I feel the --

9         THE COURT:  So, you know, you've got to ask the Court

10   of Appeals to give you relief because I don't believe you

11   deserve relief, and I'm not going to give you any more time.

12        MR. RAMSEY:  I understand that, Your Honor.  We're

13   trying to move as expeditiously as possible; and once we

14   received your order, we've moved right away to try to file the

15   motion for emergency stay.  And we've made the required Notice

16   of Appeal and have met and conferred with both parties as to

17   whether they object to the motion for emergency stay.

18        So we are moving as expeditiously as possible, and

19   obviously we're here today as ordered by the Court to deal with

20   this letter brief motion.

21        THE COURT:  All right.  What do you want to say about

22   the tentative ruling that I've given you?

23        MR. RAMSEY:  Just with respect to the document

24   request, Your Honor, we did consult the letter of your order,

25   and paragraph 6 is the paragraph that covered document

1   requests, and the paragraph itself specifically related to

2   defendants.  It said specifically (reading):

3          "Defendants must produce specific documents 24 hours

4      before that deposition of defendant personnel."

5   There is nowhere in the order that it talks about

6   documents being requested on an expedited --

7          THE COURT:  I think I clarified it later on, and I

8   will clarify it now.  He's entitled -- they're entitled to ask

9   for these documents.  So your point is noted, overruled, and

10  we're moving forward.

11      So if you're going to object to the categories that I

12  have, you need to do a proper -- on Fifth Amendment grounds,

13  you need to make your record.

14          MR. RAMSEY:  Okay, Your Honor.

15      And in terms of the timing for the production of those

16  documents, just so that I'm clear, because the order, as I

17  said, by its express terms before didn't refer to them and the

18  Court had said before you weren't adding or subtracting from

19  the order as written, and I understand now that there is an

20  addition, but just so I understand specifically what we're up

21  against, the depositions filed for -- or as noticed now for

22  Friday morning, so about 36 hours or so -- maybe a little bit

23  more actually, but a little less than two days -- in terms of

24  when the documents are supposed to be produced for us to be --

25          THE COURT:  At the deposition.  At the deposition

1  would be when they're due.

2       MR. PERLSON:  Your Honor, under the order, they're due

3  24 hours before the deposition.

4       THE COURT:  I'm going to give them -- because of the

5  confusion, I'll give them until the morning of the deposition.

6  Then if you need more time to review them at the deposition,

7  we'll work out some scheme for you to do it.

8       I don't think it would be hard.  The ones -- I don't

9  believe it would be burdensome to produce.  If I understand the

10  record here, there's a thumb drive somewhere that has got

11  everything that was downloaded from Waymo.  I don't know how

12  many documents there are that copied any of that, but my guess

13  is not too many; and my guess is there's not many

14  communications between Uber, except the contract.

15       I was looking in your files -- your filing.  I couldn't

16  find the employment agreement that was signed by

17  Mr. Levandowski with Uber.  Is there one?  I found prototypes

18  that other people signed.

19       But, Mr. Gonzalez, did you file such a thing?

20       MR. GONZALEZ:  Your Honor, I'm not sure.  I'll have to

21  check with our team.

22       THE COURT:  All right.  Maybe you can answer that

23  before we're done here.

24       But, anyway, that would be an example of something that

25  might be in that Category Number 3, but I don't think it would

1   be burdensome to produce this stuff.  So we're going to do it.

2        If you want to assert the Fifth, then what you do is you

3   assert the Fifth to the production of the documents and you

4   don't have to do it, but you do have to give a privilege log.

5        **MR. RAMSEY:**  Well, a couple of things, Your Honor, at

6   least with respect to the assertion of the Fifth.  And we'll

7   look into doing a protective order, but I don't believe that a

8   protective order is the sole reason -- or sole way -- manner in

9   which an individual can assert their Fifth Amendment privilege.

10  That's one.  But we'll look into that and see if we can get one

11  done quickly, but I don't think that that is a requirement for

12  an invocation of the Fifth.

13       And, second --

14       **THE COURT:**  On the privilege log, if you want to just

15  submit it to me completed but in camera, I will consider it in

16  camera, and you can give me a brief along with it and explain

17  why it is that the Fifth Amendment would apply.  So I'll even

18  make it easier for you.  You don't even have to do a protective

19  order, but you do have to give me a privilege log.

20       **MR. RAMSEY:**  Typically I don't believe that a

21  privilege log is required for assertion of the Fifth Amendment.

22       **THE COURT:**  I never heard of that.  Typically it is in

23  my court, so this is -- under your theory -- under your theory,

24  all kinds of wrongdoing could go unchecked, undiscovered

25  forever until the criminal prosecution is either going to be

1  brought or not going to be brought.  Meanwhile, I've got a case

2  to run here.

3      **MR. RAMSEY:**  Well, that is the heart of the

4  Fifth Amendment in *Hubbell*, and that is that there is certain

5  information that may tend to incriminate an individual that

6  doesn't have to be produced.  I think that is the heart of the

7  Fifth Amendment.

8      And what we're trying to avoid, I think, is all sorts of

9  complications that could happen down the road in a criminal

10 proceeding where if this Court compels this testimony, be it

11 tacit or direct, that then what the Court will be facing in a

12 different proceeding, if it comes to a criminal investigation

13 and Indictment, is a *Kastigar* hearing.  And the government then

14 would be forced to meet its burden to demonstrate wholly

15 independent sources and nonuse of any of the compelled

16 testimony.

17     So that's the issue that we're dealing with.  And in the

18 context of the Fifth Amendment, it is contemplated that there

19 will be certain information that might incriminate or be able

20 to help the government build a case that will be withheld.

21     **THE COURT:**  What I've told you is that you can submit

22 the privilege log to me in camera without giving it to anyone

23 else, and then I can evaluate whether or not I think which

24 aspects, if any, would be incriminating under the *Hubbell*

25 theory.

```
 1            So that I'm not ruling against the ultimate assertion of

 2     the privilege, but I am saying that you've got to do more than

 3     just say in court "Fifth Amendment."  You have to do a

 4     privilege log.  You have to go through the process, otherwise

 5     it's an unchecked -- it just is unworkable.

 6            MR. RAMSEY:  We do have to provide enough information

 7     to make sure -- to allow the Court to be able to determine that

 8     the invocation of the Fifth Amendment is proper, but the

 9     standards for that are different than the invocation for

10     attorney-client privilege or work product.  They're much less.

11     We just have to show --

12            THE COURT:  You submit *ex parte* with whatever it is --

13     you've got to give the other side enough of the argument so

14     that they can respond to it, but you submit with your privilege

15     log whatever it is that you think is a good argument and I

16     will, of course, consider that.  I'm not ruling against you yet

17     on that, on the ultimate answer, but I have to have it.  I

18     can't just -- I just can't take your word for it.

19            MR. RAMSEY:  Yes, Your Honor, but I would point this

20     Court to the Supreme Court's ruling in *Hoffman* with respect to

21     the Fifth Amendment, which says it's just the possibility of

22     a -- the possibility of a criminal prosecution being brought.

23     It's not the existence of a criminal prosecution but just the

24     possibility --

25            THE COURT:  Yeah, I understand that.
```

1          **MR. RAMSEY:**  -- and then it's the information --

2          **THE COURT:**  I think there is a possibility here, so I

3     don't deny that that's the right, but that still doesn't get

4     you all the way there.

5          **MR. RAMSEY:**  That's the first prong, and the second

6     prong is just that the information sought could be used as a

7     link in the chain.  It's not that it's inculpatory; it's just

8     that a prosecutor could get a lead, a lead, a starting point

9     for an investigation; and from that information -- and if

10    that's the case, then that is information that is considered

11    incriminating.

12         And between --

13         **THE COURT:**  That proposition I don't think I -- I

14    would have to have a Ninth Circuit or Supreme Court decision

15    exactly on -- that says that or close to it before I accepted

16    that idea.  That's a very extreme proposition.

17         **MR. RAMSEY:**  Well, *Kastigar* and I would point you to

18    *Danielson*, Your Honor, in the Ninth Circuit as well, but we can

19    brief this, but *Danielson*, which interprets *Kastigar* and

20    applies it, sets forward the nonuse and the level of -- well,

21    the bounds of the Fifth Amendment.  And so it talks about

22    nonuse, both evidentiary and nonevidentiary, and indirect and

23    direct use.  But the standards are with respect to the

24    Fifth Amendment, so it's a broad protection.

25         **MR. PERLSON:**  Your Honor, if I could just respond

1    briefly.

2        This is -- once again, Mr. Levandowski's counsel is

3    raising new issues that they didn't seek relief for as they

4    find and react to your counsel's -- to your rulings.  If they

5    wanted to be excused from the privilege log that you just

6    ordered, they should have put that in their brief.  They --

7        **THE COURT:**  Look, I'm going to let them do the

8    privilege log.  So they can submit that on Friday.  They can --

9    there.

10        **MR. PERLSON:**  What --

11        **MR. RAMSEY:**  Your Honor --

12        **THE COURT:**  You get to make one last point, and then

13    I've got to move on.

14        **MR. RAMSEY:**  In terms of the timing of the privilege

15    log, there's no way that we are going to be able to complete a

16    privilege log in 24 hours with all else that's going on in this

17    case and having this just been modified.

18        **THE COURT:**  All right.  I'll give you until Monday,

19    Monday at noon.

20        **MR. RAMSEY:**  Realistically for us to be able to do

21    this search -- and in their letter brief they point to the lack

22    of burden because we are asserting the Fifth; that essentially

23    they say we don't have to do the full search for documents

24    because we're asserting the Fifth to these questions.  So even

25    they --

1          **THE COURT:**  I don't think it's that hard.

2          **MR. RAMSEY:**  For us to be able to identify any

3    potential document and to go through the --

4          **THE COURT:**  What you do is item one:  Thumb drive

5    containing 14,000 documents.  That would be item number one.

6    Item number two:  13 letters from employment agreement.  It's

7    not going to be that hard.  There would be a way to do this.

8          **MR. RAMSEY:**  For us to be able to make sure that we've

9    done a full search for these documents, it's not going to be

10   possible, Your Honor, in 24 hours.

11       Also, with respect to those --

12         **THE COURT:**  I said I will give you until Monday at

13   noon.

14         **MR. RAMSEY:**  Even Monday by noon.  I mean, ordinarily

15   a nonparty would get 45 days for a document production.  We're

16   talking about a situation in which we're responding to the

17   deposition that we're going to be in, there's two depositions

18   that are happening on Friday that relate to the Fifth Amendment

19   issue that's going to spread myself and Mr. Ehrlich thin.  We

20   are talking about completing the Ninth Circuit -- I mean,

21   excuse me, the Fed. Circuit motion for emergency stay, and

22   we're still writing the appeal because the appeal itself is

23   due.

24       And in addition to that, we have items that are coming up

25   in the arbitration with respect to the Fifth Amendment that we

1   were being requested to brief.

2       In addition to that, I've been ordered by other judges in

3   other cases.  I have to appear tomorrow morning before Judge

4   Westmore and then move to Judge Gilliam in a case.  We have put

5   off multiple sentencings for this.

6       I know that the Court is familiar with the size of our

7   firm, but --

8          **THE COURT:**  You have associates.

9          **MR. RAMSEY:**  We do have associates, and they're filing

10  the briefs right now; and we're spreading -- we've spread

11  ourselves as thinly as possible, but I'm just trying to be

12  realistic with the Court and trying to protect our client's

13  constitutional rights, at the same time trying to work with

14  this expedited schedule.  But we are a nonparty.  They chose

15  not to sue us.  They could have.  And there's only so much we

16  can do, Your Honor.

17      And, you know, we yesterday received an order from the

18  Court to file the brief by tonight -- we were in the middle of

19  doing our emergency stay -- we did that.  We were ordered to

20  come here today, we did that.

21        **THE COURT:**  You can -- I don't think you need it

22  because I don't think it will be that long a document -- you

23  can have until Wednesday at noon to supply your privilege log.

24  He still has to appear at the deposition on Friday and to

25  answer questions or invoke the Fifth Amendment on a

question-by-question basis.

And then if the deposition is -- if your objections are overruled on Fifth Amendment grounds, which I'm not saying they will be, then he has to come back and sit again for the deposition.

So we'll take it in those steps.  I don't believe that you need until Wednesday at noon to do what I've asked you to do. It overlaps so much with what you're already doing on the Federal Circuit front, that this will be easy to do.

So that's the end of it.  I think I've made my ruling on this motion.  There's nothing more that I need to do on this one.

All right.  Thank you.

Now we go to the one about the inspections.

**MR. JAFFE:**  Before we start, is it possible to take the LiDAR down?  I don't want to break it.

(Pause in proceedings.)

**THE COURT:**  That's $70,000.  Be very careful.

All right.  Let's hear your motion.

**MR. JAFFE:**  Good afternoon, Your Honor.

So as you probably recall, we appeared in front of you last week and we requested to inspect their LiDAR systems, and in particular we requested a couple different LiDAR systems, including one that was described in a Nevada regulatory submission.  So what they told the Nevada regulatory submission

1   is they had this particular LiDAR.

2       We asked if we could see it.  They didn't tell us.  They

3   refused to tell us.  We asked over and over again.  We couldn't

4   get that information.  We filed a brief because we were -- I

5   was going to see it yesterday and wanted to have that on file

6   before the inspection occurred.

7       Subsequent to the actual inspection, which was yesterday,

8   they responded to our letter brief and not to our

9   correspondence asking for this information.

10      But on this Nevada submission in particular -- and there

11  are other issues but I'm just starting with this one -- they're

12  not -- it doesn't seem like they're actually answering the

13  question that we're asking about.

14      They disclosed to the Nevada regulatory submission that a

15  particular custom LiDAR exists, and they are now refusing to

16  make it available to us.

17      **THE COURT:**  They said that was a mistake.  They said

18  that what they told the Nevada people was in error.

19      **MR. JAFFE:**  So -- and this is exactly the point that

20  we've been trying to raise with them.  Every time we ask them

21  about this, what they respond is they say *There was no LiDAR*

22  *disclosed to Nevada regulators*.  They don't say that such a

23  device never exists.  And when I asked this exact question when

24  I met and conferred with their counsel yesterday, he refused to

25  tell me whether such a device ever existed.

1    And so this is what we're asking, is to look at this

2  device and the other devices.

3    And I just want to step back and --

4    **THE COURT:**  Who was it that made that representation

5  to the Nevada people?  What was the name of the person?

6    **MR. JAFFE:**  So I have it here, Your Honor, and it's

7  filed as Docket 27-32.  There's a gentleman named Gautam Gupta.

8  And I Googled him last night and I don't know if it's still the

9  case, but he was chief financial officer of Uber.  And this was

10  filed September 15th, 2016.

11    And the certification says (reading):

12        "I understand that providing false information or the

13        omission of the requested information in this

14        application" --

15    **THE COURT:**  All right.  Read the one sentence that's

16  the key sentence from that original submission.  Read it out

17  loud I mean.

18    **MR. JAFFE:**  Sure.  So I'm going to fast forward to

19  page 10, and it says (reading):

20        "In-house custom built 64 laser (Class 1) emitting

21        6.4 million beams a second at 10 Hz."

22    That's the device we've been asking about.

23    **THE COURT:**  But what did they say?  Read the whole

24  sentence.  Wasn't it something like it's under development

25  or -- read that to me.

1      **MR. JAFFE:** So there's a long list of things. The

2  beginning of that list, which is I think what you're asking

3  about, says (reading):

4          "Selected advanced self-driving technologies

5      developed in-house and/or currently deployed in Otto's

6      autonomous vehicles include..."

7  And then it has this list including what I just mentioned.

8      **THE COURT:** Okay. Read the one about the 10 Hz again.

9      **MR. JAFFE:** Sure. It says (reading):

10      "LiDAR - In-house custom built 64 laser (Class 1)

11     emitting 6.4 million beams a second at 10 Hz."

12      **THE COURT:** All right. So just hold that thought.

13     Why can't they see that? First, does that -- what were

14 they referring to whenever they made that representation under

15 oath to the Nevada people?

16      **MR. GONZALEZ:** So, Your Honor, we clarified that on

17 Chang Exhibit 8, which is a letter that we sent to the Nevada

18 Department of Motor Vehicles once they saw that they were

19 making it an issue, clarifying that we are developing but we

20 have not yet deployed any in-house custom-built LADAR.

21     What we --

22      **THE COURT:** Well, whether it was deployed or not, it

23 sounds like somebody was working on it.

24      **MR. GONZALEZ:** Precisely. And, Your Honor --

25      **THE COURT:** That would be an update. Why don't you

1    let them see what they were working on?

2          MR. GONZALEZ:  Because, Your Honor, we showed it to

3    them yesterday.  It's the Fuji.

4          MR. JAFFE:  So this --

5          THE COURT:  Does Fuji track on that description?

6          MR. JAFFE:  So we don't know if these are the same

7    devices, but I can tell you what we know from the information

8    that we have, which is that it doesn't appear to be Fuji.  And

9    the reason for this is because the certification that I was

10   talking about was filed September 15th, 2016; and in the papers

11   they just filed last Friday, one of their declarants notes that

12   the Fuji project didn't start until October.  And so based on

13   the evidence that we have, Fuji didn't even exist when they

14   were filing this.

15         THE COURT:  All right.  So that may be, but answer my

16   question.  That description of 10 Hz -- and I've forgotten all

17   the other things.  Read it again.  There were about six items

18   in there.

19         MR. JAFFE:  Sure.  One second, please.

20                     (Pause in proceedings.)

21         MR. JAFFE:  (reading)

22          "In-house custom built 64 laser (Class 1) emitting

23      6.4 million beams a second at 10 Hz."

24         THE COURT:  All right.  Does the Fuji do that?

25         MR. JAFFE:  It could be.  You know, it's not -- we

1   don't know from the short inspection that we had.  We haven't

2   gotten any document production from them on this issue.

3           THE COURT:  Let me ask.  Does it do that?

4           MR. GONZALEZ:  Where's Rudy?

5                   (Pause in proceedings.)

6           MR. KIM:  We don't know.  Your Honor, we have to

7   confirm that and get back to you.

8           THE COURT:  Who is that that just said something?

9           MR. GONZALEZ:  My partner Rudy Kim, Your Honor.  He's

10  the one that was there for the inspection.  He knows more about

11  technology than I know.

12          THE COURT:  Why don't we get Mr. Gupta -- is that his

13  name?

14          MR. JAFFE:  Yes, Your Honor.

15          THE COURT:  Bring him in here, put him under oath, and

16  I can ask him or you can ask him *What in the world were you*

17  *talking about?*

18          MR. GONZALEZ:  That's what I've suggested, Your Honor.

19  I said, *You can take people's depositions and ask them the*

20  *questions you want to ask and you'll get your answers.*

21      We're not hiding some device, Your Honor.  We've got two

22  devices basically and we showed both of them to them yesterday.

23          THE COURT:  But just be clear, I read your papers and

24  there's a difference between prototypes and final devices or

25  devices and work.  For example, whenever I do an order, the

1    final is the order but along the way I do a lot of work.  My

2    law clerks do a lot of work.  It might have a lot of things

3    that get cut out on the cutting room floor.

4        I am concerned from the narrow way in which you have

5    presented your opposition that you are focusing on two

6    things -- Fuji and the original Velodyne -- and you are

7    ignoring all of the other work, and you never mention what

8    Mr. Levandowski did.  You always talk about the professor, but

9    you never say what he was working on.  Well, why did you hire

10   that guy for 680 million if he wasn't doing anything?  So I

11   wonder, what was he working on?

12       It does leave the impression that you have cleverly

13   written around the problem of what was Levandowski working on

14   all this time even if it didn't turn into a prototype.  That's

15   a fair question and they're entitled to an answer on that.

16       And so if it turned out that the Nevada thing was one of

17   those projects or work, even if it wasn't a project, then they

18   ought to get a chance to see whatever it was.

19       **MR. GONZALEZ:**  So what I've told them, Your Honor, is

20   they're going to have an opportunity to take a lot of

21   depositions.  They can ask all those people those questions.

22       There is one other device, Your Honor --

23       **THE COURT:**  You're evading.  You're not giving me a

24   direct answer.  You're not giving me a direct answer.

25       Was there something -- are you telling me there was

 1   nothing, absolutely nothing other than Fuji was the reference

 2   in that Nevada thing?

 3        **MR. GONZALEZ:**  Your Honor, my understanding is the

 4   only other thing that could have been referenced is the

 5   commercially available Velodyne that was here on the counter.

 6        And there's one other that we did show them yesterday,

 7   Your Honor, because we tried to be overinclusive in what we

 8   showed them.  We brought something that was called the "Owl,"

 9   which was, I believe, a predecessor to the Fuji, and it's no

10   longer being developed, but we brought that as well.

11        **THE COURT:**  Were there any other things that were just

12   on the drawing boards or in schematics?  Any other work on

13   laser that never got to the stage of a prototype or even close

14   to a prototype but, nevertheless, represented work and thought

15   and planning?

16        **MR. GONZALEZ:**  That, I don't know, Your Honor.  I was

17   focused on their request was about Nevada; and what I can tell

18   you is that with respect to Nevada, there was the Fuji and

19   there was the Velodyne.

20        **THE COURT:**  All right.  What can I do?  Look, you're

21   asking me to do the impossible.  It's Mr. Jaffe; right?

22        **MR. JAFFE:**  It is.

23        **THE COURT:**  Mr. Jaffe, what do you want me to do?

24   What is the relief you're seeking here?

25        **MR. JAFFE:**  So what I think we would seek,

1    Your Honor -- and just to respond briefly to what he said -- we

2    think we're only getting a small slice of the story here.

3    They're talking about this Fuji device, which started work in

4    October, and they're leaving out this entire timeline where

5    Mr. Levandowski and other folks, what were they doing for the

6    past eight months?

7         THE COURT:  Well, focus just on Nevada for a minute.

8    What can I do to help your problem on Nevada in the face of

9    what's being represented to me?

10        MR. JAFFE:  Well, I think we first --

11        THE COURT:  In due course you will get to take those

12   depositions.  Maybe you'll find that there's more to the story

13   than has been told me, but right now what can I do?

14        MR. JAFFE:  Sure.  I think as an initial matter, what

15   we'd ask for is if there's a design that that relates to, we

16   want to look at it.  And if there are other designs that they

17   have, dead-end designs, prototypes that they have that they

18   jettisoned in anticipation of this litigation, we would want to

19   look at those devices.

20        THE COURT:  When did the correction get sent into the

21   Nevada people?

22        MR. GONZALEZ:  March 15th, 2017.

23        THE COURT:  Well, what took them so long?  March 15th,

24   2017, is when this litigation was underway.

25        MR. GONZALEZ:  That's correct, Your Honor.

1      **THE COURT:**  That sounds like somebody's fixing the

2  record.

3      **MR. GONZALEZ:**  Well, that -- I'm not going to deny

4  that, Your Honor.  In their papers they cited this letter to

5  Nevada.  We looked at the letter.  We discussed it with our

6  client.  The letter wasn't clear, so we submitted a

7  clarification.

8      **THE COURT:**  All right.  Is Mr. Gupta still with the

9  company?

10     **MR. GONZALEZ:**  Yes, Your Honor.

11     **THE COURT:**  Why don't you depose him?  Have you gone

12  and interviewed him to see what he was referring to?

13     **MR. GONZALEZ:**  Someone on my team, Your Honor, has dug

14  into this, and that's why we sent the clarification letter.

15     **THE COURT:**  I will just say this:  I'm not ordering

16  anything more on the Nevada front.  I will just say that I

17  absolutely believe that plaintiff is entitled to inspect

18  whatever was being referred to back at the time, not in March

19  but back when that thing was filed with the Nevada people in

20  2016.  Whatever that was that was being referred to, they're

21  entitled to look at it even if it never got to the level of a

22  prototype.  If it was just work in progress and thoughts in

23  progress or designs in progress, they're entitled to see if any

24  of their secrets were being used.

25     So I'm just making that observation, but there's nothing

1  more that I feel that I can order.  It's a legitimate request.

2  They've told you -- they've given you an answer on it.  So for

3  these purposes, you've got to live with that answer.

4      All right.  What else can I help you with on your

5  inspection front?

6          MR. JAFFE:  So I think that was the main issue, and

7  I've addressed the other devices that we don't know about.  So

8  I think you've given us what we've asked for in terms of the

9  device that we do know about.

10      What we would ask for is if there are devices that we

11  don't know about from previous -- from the past year, we do

12  want to inspect those and I would just reiterate that request.

13      And perhaps as a middle ground --

14          THE COURT:  Well, I'll give you -- I've thought about

15  this problem.  How long was Otto in existence before Uber came

16  along?

17          MR. JAFFE:  I mean, that's unclear to us before Uber

18  came along.  They served a privilege log and the first date --

19          THE COURT:  Were they working on -- for example,

20  before Uber bought them in August 2016, was Otto working on

21  something?  What was the design then?

22          MR. JAFFE:  We don't know.  We want to know.

23          THE COURT:  I think that would be a legitimate design

24  for you to get your hands on.  The next one would be whatever

25  Mr. Levandowski was working on.  Even if it never got to the

1    prototype stage, even if it just didn't get to the device stage

2    but it was just something on paper that was a possibility that

3    they were mulling over, that's okay.  That should be -- that

4    should be discoverable.

5        So it's not even -- I mean, you're characterizing it as a

6    device.  I'm saying that even before the predevice stage, the

7    thinking stage, the work stage, the analysis stage where

8    various designs are being thrown about, as long as

9    Mr. Levandowski was working on it, I think that's fair game.

10       Now, maybe you haven't asked for that, and that's for the

11   future, but that -- I'm just saying in the future, that ought

12   to be fair game.

13       So, again, I don't know what specifics I can order for you

14   today.

15           **MR. JAFFE:**  What I think we can do is we can ask them

16   to make all the material that you've just described available,

17   and we can come back to you if there's any problems with it.

18           **MR. GONZALEZ:**  So, Your Honor, I think you've said it

19   right.  It's not clear that they've even asked for it.

20       The way this started, if you recall, is you asked us to

21   make the device available for their inspection.  We did that.

22   Everything that you just said that they're entitled to see, I

23   think a lot of that we're already collecting in response.

24           **THE COURT:**  That's a good point.  That's a good point.

25           **MR. GONZALEZ:**  Yeah.

1          **THE COURT:**  And I should learn my lesson by now.

2    Mr. Verhoeven stood up and on the fly without a letter, without

3    anything, he just said, *We want to inspect,* and I got sucked in

4    and I said, *You've got to let them inspect*, because I thought

5    it sounded reasonable.

6          But when these things come out of left field and then I

7    have to make a ruling on the fly -- not have to make, wind up

8    making -- I should learn my lesson by now -- then we get into

9    jams like this.

10         And so, Mr. Gonzalez is correct that this was not even a

11   letter that you sent them.  It was an on-the-fly, out-of-

12   left-field thing and that I said okay to.

13         So I do think you're entitled to see those inspections,

14   but I have now morphed off into not the inspections but looking

15   at documents, design documents, communications with

16   Mr. Levandowski that may not have a thing to do with actual

17   designs and inspections.

18         So I am -- I'll just leave that thought out there for you,

19   but I feel like I've given you all the relief I can on

20   inspections, which was the subject of your letter.  Okay?

21         All right.  Now we're going to go to the other side's

22   complaint that you're working hard supposedly and, yet, come to

23   find out you've got someone named Stroz doing your work for

24   you.

25         **MR. GONZALEZ:**  So, Your Honor, I want to clarify that,

1    and in hindsight I realize we should have submitted a

2    declaration from our firm.

3         So, Your Honor, we have 42 contract lawyers who have been

4    working around the clock since Friday afternoon.  We also have

5    11 Morrison & Foerster lawyers who have been contributing to

6    this effort.  So it's not just Stroz.  And then with respect to

7    Stroz, Your Honor, it's not just one guy.  We have 39 people at

8    Stroz.

9         So we're throwing a ton of resources at this.  And as it

10   turns out, Your Honor, it's just impossible to do what you've

11   asked us to do in the limited amount of time, and we wanted to

12   raise that with you.

13        We've spent 1550 hours since we were here, including,

14   Your Honor, I think --

15        **THE COURT:**  All right.  It does seem to me they

16   deserve some more time.

17        **MR. JAFFE:**  So --

18        **THE COURT:**  Look, you're the one that wants this on a

19   hurry-up basis.  If you want to push the hearing out -- I mean,

20   I think you -- you're the plaintiff.  You've got to make -- you

21   can't have everything.  So we either have the early -- early,

22   it's not that early -- but we either have the hearing on

23   May 3rd, but you're not going to get a full deck of cards.

24   You're going to get a half a deck of cards because it's all

25   expedited.  It's impossible to get everything.  Or we can push

1    it off two months and you'll get 25 percent more.

2        So what do you want to do?

3            **MR. JAFFE:**  So I think it's --

4            **THE COURT:**  I feel like he's raising -- Mr. Gonzalez

5    is raising a good point.

6            **MR. JAFFE:**  So I want to -- if I may make two brief

7    points, Your Honor.

8        The first point is we don't want to move the hearing, and

9    we're willing to do whatever it takes to keep the hearing.  So

10   I'm going to start with that point.

11       But the second point, which is the broader point that

12   we've tried to underline in a couple of our letters here, which

13   is we don't think that the kind of -- Stroz Friedberg, which is

14   a forensics firm -- the analysis that they're doing is really

15   an effort to find the files that were taken.  And let me just

16   tell you why.

17       Because --

18           **THE COURT:**  What kind of firm is that?  I don't know.

19   Practice must have changed since I was -- what do they do for a

20   living?

21           **MR. JAFFE:**  They do forensic analysis.

22           **THE COURT:**  What does that mean, though?

23           **MR. JAFFE:**  So that means they're going to look at one

24   file and see if it has similar metadata to another file.

25   They're not going to look at the technical substance of any

1   sort of trade secrets or content.  They're just going to

2   compare file name to file name or metadata to metadata and say,

3   *Ah ha, I found a match.*  But there's no sort of intelligent

4   analysis between the two things.

5        And so to us them saying *Stroz is working X number of*

6   *hours* is not responsive to Your Honor's order that they had on

7   the 13th and, I'll add, agreed to at our initial case

8   management conference.

9        So for us -- for them to come in and say, *We can't do it,*

10  what they've been doing doesn't make sense.

11       **THE COURT:**  Well, you came in when the order didn't

12  say specifically that you could depose third parties or get

13  documents from a third party.  Okay.  You got a little add on

14  there, and so he gets a little consideration too.

15       **MR. JAFFE:**  So I -- we spoke earlier, and I think for

16  at least some of the custodians that we identified, we told him

17  that we would give him, I think, three or four more days.  And

18  so we don't oppose a modification in that fashion.

19       We're trying to work together.  We're not being

20  intransient, but our kind of dispute is as to how they're doing

21  the search.  Because they've stood up a number of times and

22  said *The files never made it to Uber*.  *The files never made it*

23  *to Uber*.  But they didn't even come and look at the files.

24  Mr. Gonzalez has never seen the files unless he saw them from

25  Mr. Levandowski.  So for them to say they never made it to Uber

1  without even looking at the files doesn't make sense to us.

2     **THE COURT:**  Well, maybe Mr. Levandowski told

3  Mr. Gonzalez that they didn't make it.  Maybe they've got a

4  good source.

5     **MR. JAFFE:**  We'd like to find out.

6     **MR. GONZALEZ:**  You're getting warm, Your Honor.  Those

7  files are not, I think, at Uber, Your Honor.

8    But here's what we agreed to do an hour ago, or a couple

9  of hours ago it seems like.  We met at 9:00 o'clock --

10    **THE COURT:**  That doesn't mean that they weren't used.

11 It just may mean that they're not physically on site.

12    **MR. GONZALEZ:**  Your Honor, it is my view that they

13 were not used either, and I think we'll prove that.

14   But here --

15    **THE COURT:**  I don't know.  I don't know.  That's a

16 wholly different point.

17    **MR. GONZALEZ:**  Your Honor, here's what I wanted to

18 inform you about.  We met at 9:00 a.m. and we did confer, and

19 what we've agreed, Your Honor, is that our experts -- we've

20 been asking for this -- they have now agreed that our experts

21 will get together with the lawyers tomorrow to try to come up

22 with a plan.

23   Here's my response to we're not looking in the right place

24 or we're not looking the right way.  Here's my proposal.  I

25 said *We will do anything reasonable that your side proposes to*

1   *find these things* because, in my view, we're looking for a

2   ghost; but we will do whatever is reasonable that they propose,

3   and they haven't proposed anything.

4        So tomorrow we're going to meet with our experts, get

5   together, and hopefully we'll come up with a proposal; and if

6   they have a way to streamline, we'll do it.

7        I'll also note just briefly, last time we were here, you

8   asked him to give me 10 more names to search.  Remember that?

9   Well, we just got five names yesterday.  I still don't have the

10  other five.  I'm not complaining.  I'm just raising it as an

11  issue.

12       **THE COURT:**  Is there -- Mr. Cooper here, what do you

13  think about having Mr. Cooper go to Uber and just park there --

14  himself there, not as your client, not -- he would be an

15  officer of the court for me, a special master, to help me

16  figure out and maybe hear both of you out, learn what the files

17  are, learn how these searches are being done, and come back and

18  give me a recommendation?

19       This is not to suspend anything that you're doing already,

20  no.  This would be, *Judge, here is a way to get more quickly at*

21  *what would be most probative in this case saving for later some*

22  *of the other things since we're on an expedited schedule.*

23       I personally think that would be -- that he is more

24  qualified than I am to do that kind of a thing, and I would

25  like to have him employ that, but I don't want to do that

1    unless both of you agree.

2          **MR. GONZALEZ:**  I love it and I suggested it at the

3    break before you came back to the bench, Your Honor.

4          **THE COURT:**  What do you say to that, Mr. Jaffe?

5          **MR. JAFFE:**  So I think, first, I just want to

6    understand the protocol that you're envisioning.  Would it be

7    that Uber would have *ex parte* communications with Mr. Cooper

8    without us there?

9          **THE COURT:**  I think -- I don't know.  He would have to

10   do some investigating to -- if you want to be there too, okay,

11   I guess, but somebody from your firm could be there at all

12   times.

13         **MR. GONZALEZ:**  Your Honor, that is the only place I

14   would draw the line is, if we're talking about them coming into

15   our building, I would be concerned about that.

16      But I'm fine with Mr. Cooper participating at our meeting

17   tomorrow where our experts are going to talk about what the

18   situation is, what the status is; and I'm also fine with both

19   sides separately spending half an hour with Mr. Cooper

20   explaining their views.  Both sides can explain their views.

21         **THE COURT:**  Why can't we do something like that?

22         **MR. JAFFE:**  I mean, I think we can do something like

23   that.

24         **THE COURT:**  What do you think, Mr. Cooper?

25         **MR. COOPER:**  I think that would be fine.  I am

1    somewhat concerned about unilateral communication, but if

2    that's worked out between the parties, I'm okay with it.

3           THE COURT:  Well, let's do this:  Now, for the time

4    being, subject to changing, this is not fixed, but for the time

5    being, his fee would be 50-50.

6           MR. GONZALEZ:  Correct.  We've agreed to that,

7    Your Honor.

8           THE COURT:  All right.  But at the end of the case or

9    maybe even before that I might say, if I get upset with

10   Mr. Gonzalez and his client, that you pay 100 percent --

11          MR. GONZALEZ:  Understood.

12          THE COURT:  -- and shift it all back; or if I decide

13   this case was trumped up to begin with, maybe you wind up

14   paying 100 percent.  But for the time being 50-50.

15       I would like you to do a couple of things.  I would like

16   you to go to this meeting.  I would like for you-all to agree

17   on a framework of -- you know, because there's got to be --

18   what's the word? -- a reference, an order of reference, a

19   commission in other words, and then you've got to sign it

20   saying you'll do it.  But I think you three could craft that

21   better than I can.

22          MR. COOPER:  Yes.  We had a conversation yesterday,

23   and I believe we agreed to the terms, and I have an engagement

24   letter here.  We can do a commission.  We can do an engagement

25   letter.

1          **THE COURT:**  I think it ought to be -- look at the

2     rule -- I think it's 54 or 53 -- and see what special

3     masters -- I think there are rules on this, and I don't want to

4     get -- so, okay.  You submit that to me.

5          **MR. COOPER:**  Okay.

6          **THE COURT:**  Now, that's not the -- I think that may be

7     just the first in several projects, but let's start with just

8     one project.

9          **MR. COOPER:**  Okay.

10          **THE COURT:**  My goal is we're on an expedited schedule.

11     There's no way the plaintiff is going to see everything that

12     they want to see, but they are entitled -- and I'm impressed

13     with the amount of work that you have done on Mr. Gonzalez's

14     side, but given that we have short time, the resources ought to

15     go into whatever endeavor is going to produce the most

16     probative evidence.

17          And, by the way, if that turns out to be manual review of

18     desk files, like if Mr. Levandowski had a desk file -- like I

19     have desk files, you probably have them -- a manual review is

20     good and do that.  If it turns out that computer searches are

21     the way to get at it most effectively, do that instead.  I

22     don't know what the right answer is, but we are on a short

23     fuse.  We have a hearing on May 3rd.

24          But I want to give you an extra week to complete what you

25     owe me, and I want over and above that for Mr. Cooper to help

1   both sides and me figure out the best way to use our time.

2        Now, one thing, there's a condition on that, is I've

3   devised four interrogatories that I'm going to have

4   Mr. Gonzalez answer.  So I'll send those out today, but -- and

5   the reason I crafted them is that the answers will help me --

6   I'm going to give you till, I think, April 25 so it's not

7   immediate -- it would help me in deciding what the right -- how

8   to manage what the shape of the discovery plan ought to be

9   going forward, and I think it would produce some worthwhile

10  evidence anyway.

11       **MR. PERLSON:**  Your Honor, if I can just point out one

12  thing.  Mr. Perlson again.

13       Our brief is due on April 21st at noon, and so if we

14  extend that deadline, I think it could actually be past the

15  date that that's due.

16       **THE COURT:**  I'm sorry.  What do you want me to do

17  about it?

18       **MR. PERLSON:**  Well --

19       **THE COURT:**  Maybe if they come up with something in

20  the -- I don't want to extend your date.  It's an enormous

21  amount of paper I've already got to read.  Maybe if there's

22  some great document in there, you can do a supplement.

23       **MR. PERLSON:**  That's all I was going to propose,

24  Your Honor.

25       **THE COURT:**  Okay.

 1          **MR. GONZALEZ:**  So, Your Honor, I'm going to keep our

 2   people working literally hundreds of hours every day, but I

 3   want to say this to you now, because I want to be straight with

 4   you from the outset:  All of the amount of data that you asked

 5   us to review, if I'm doing my math right, it's almost half a

 6   billion pages of data.  There is no way, it's not humanly

 7   possible to do that even within a week.

 8          And so what we're going to do is we're going to keep the

 9   pedal to the metal, and I'm going to have people work all

10   weekend, like we have the last four weekends I think now, and

11   continue to do this.  But I want you to know that given the

12   scope of what you asked us to look at, every server in the

13   company --

14          **THE COURT:**  Well, you know, maybe Mr. Cooper can

15   recommend a way to prioritize what I've asked you to do --

16          **MR. GONZALEZ:**  Yes, exactly.

17          **THE COURT:**  -- and keeping in mind not only the burden

18   but the likely probative value.

19          **MR. GONZALEZ:**  I agree, Your Honor.  That's what we

20   need to do and that's what I've suggested to the other side so

21   we can -- you know, whatever they want us to do within reason,

22   we'll do it.

23          **THE COURT:**  All right.  Now, one last thing.

24   Magistrate Judge Corley has graciously agreed to take over all

25   the discovery fights, but she can't start on that for sometime.

1  This would be in addition to Mr. Cooper, and I'm sure she would

2  find Mr. Cooper to be of enormous help too.

3       By the way, you get paid in this case.

4            **MR. COOPER:**  Thank you, Your Honor.

5            **THE COURT:**  All right.  Everyone ought to know that

6  Mr. Cooper *pro bono* did a huge thing in the *Oracle versus*

7  *Google* case, and he did that without any compensation; and he's

8  a model of what lawyers are in this district, and so -- but

9  this time I want it to be clear, you get paid.

10           **MR. COOPER:**  Thank you.

11           **MR. JAFFE:**  Your Honor, may I make one brief point?

12           **THE COURT:**  Wait.  Wait.  I'm not finished.

13           **MR. JAFFE:**  Oh, excuse me.

14           **THE COURT:**  So, anyway, Judge Corley would like, for

15  planning purposes -- maybe if you could come too, Mr. Cooper,

16  that would be good -- at 10:00 o'clock on Friday she can meet

17  with you to kind of go over -- she's not going to decide

18  anything.  She just wants you to say hello, tell you how

19  motions will be filed in her court.  I think she does it kind

20  of like the way I do it on a hurry-up basis, but it would be

21  good for you to send somebody who -- please go see her at

22  10:00 o'clock on Friday.

23           **MR. GONZALEZ:**  We'll do that, Your Honor.  Thank you.

24           **THE COURT:**  All right.  Now you may make your point.

25           **MR. JAFFE:**  I just had one -- I wanted to seek

```
 1    guidance from the Court.

 2        So we received at 11:00 p.m. last night a privilege log

 3    from them, and it's 700 pages long comprising 2400 plus

 4    entries.  And so as you might imagine --

 5            THE COURT:  But there should not have been any

 6    redactions in that.

 7            MR. JAFFE:  So there were redactions in the copy that

 8    we received.

 9            MR. GONZALEZ:  Let me explain what happened,

10    Your Honor.

11        So we've been working on this log.  As I told you last

12    time, it was 300 pages last time we spoke and now it's 700.

13    When you issued your order, you divided up the log into those

14    impacted and those not impacted by your order.  Frankly, we

15    just weren't able to split it out that way by 11:00.  So what I

16    did, Your Honor, was I gave them a log that was overinclusive.

17    I gave them everything that --

18            THE COURT:  I want you to give them one so we know

19    that these don't depend on the Fifth Amendment.

20            MR. GONZALEZ:  And the way they know that, Your Honor,

21    is because -- if you really want one, I can give you a set --

22    everything that's not redacted is not impacted by the

23    Fifth Amendment.  That's the easy way for them to tell.

24        The only thing that I redacted, Your Honor -- and I'm

25    choosing my words very carefully -- is the same thing that we
```

1    redacted in the log that you've seen.  That's it.  And so

2    everything --

3            THE COURT:  So is this a fair statement?  What you

4    gave them that is unredacted has nothing to do with the

5    Fifth Amendment?

6            MR. GONZALEZ:  Correct.

7            THE COURT:  And the ones that are redacted, those are

8    the ones that turn on the Fifth Amendment issue?

9            MR. GONZALEZ:  That is correct.  On the issue that

10   Your Honor ruled on that is now being appealed, correct.

11           THE COURT:  All right.  I'm okay with that as long as

12   you understand it that way.

13           MR. JAFFE:  It is, and so I was -- and we kind of

14   understand that with that clarification.

15       The point I wanted to raise was that as you might imagine,

16   we have some serious concerns about how privilege is being

17   asserted here.  The first date on this log that we found is

18   three days after Mr. Levandowski left Google at the time where

19   they're saying it's anticipation of litigation three days after

20   he leaves.

21       At the same time Mr. Gonzalez and I were meeting and

22   conferring this morning, and I was asking him:  Is

23   Mr. Levandowski working on LiDAR?  And they kind of -- he

24   wasn't really sure.  And I asked if he was walled off from

25   their LiDAR designs because they put that at issue in their

1    papers.  And, you know, I didn't get a straight answer.

2          **THE COURT:**  Three days was three days after what?

3          **MR. JAFFE:**  Mr. Levandowski quit Google.

4          **THE COURT:**  So I missed it.  So that was well before

5    August 2016.

6          **MR. JAFFE:**  Correct.

7          **THE COURT:**  All right.  So what he was working on --

8    he was working on -- he wasn't part of Uber at that point.

9          **MR. JAFFE:**  They're putting in their log that they

10   were anticipating litigation with Google at the time relating

11   to this due diligence starting three days after he left.

12         **THE COURT:**  Who's the "they"?  You mean there was a

13   joint defense agreement way back then?

14         **MR. JAFFE:**  That's what they're asserting.

15         **THE COURT:**  Is that in the redacted stuff or in the --

16   which group is that in?  The redacted group or the unredacted

17   group?

18         **MR. PERLSON:**  Your Honor, sorry to interrupt here, but

19   it's a long log and I looked at this part of it.

20        So the -- it's in the unredacted portion of it.  And

21   what's so remarkable about it is that as Mr. Jaffe said, it's

22   two, three days after Mr. Levandowski left Google.  And the

23   recipient of -- there's one e-mail from a Mr. Tate, who's

24   counsel for Uber here, and there's a recipient that is at Uber,

25   a Mr. Surh (phonetic) at Uber, and then there's others cc'd on

1    it at Uber, and this is the subject matter, it says (reading):

2              "E-mail providing legal analysis or advice in

3         anticipation of litigation regarding due diligence for

4         potential acquisition of Ottomotto."

5         And then it's an e-mail reflecting communication made in

6    confidence by Anthony Levandowski and/or John Gardner, who I

7    think is one of Mr. Levandowski's lawyers, pursuant to joint

8    defense agreement to further investigation for the purpose of

9    obtaining or giving legal advice in anticipation of litigation

10   regarding due diligence for potential acquisition of Ottomotto.

11        So we have this incredible situation where three days

12   after Mr. Levandowski has left Google, months and months before

13   any acquisition by Uber of Otto, that they are claiming that

14   there is somehow a joint defense common interest privilege

15   regarding an anticipation of litigation.

16        **THE COURT:**  Well, the written joint defense agreement

17   was later.

18        **MR. PERLSON:**  Yes, in April, three months later.  And

19   so --

20        **THE COURT:**  When was this then?

21        **MR. PERLSON:**  This is January 29th, 2016.

22        **THE COURT:**  All right.  So they'll say they had an

23   oral agreement.

24        **MR. PERLSON:**  What we're saying, Your Honor, is that

25   this is a -- and I guess, you know, perhaps this is a preview

1    of some issues to come, but there are 700 pages of logs of

2    apparently an anticipation of litigation between Otto and Uber

3    and Mr. Levandowski that stems -- starting back three days from

4    when he left.

5            THE COURT:  Here's one thing I don't get.  The one you

6    read to me, is that redacted in any way?

7            MR. PERLSON:  No.

8            THE COURT:  All right.  So that one is not redacted.

9        Okay.  So just to be clear, I see the distinction now.

10   The Fifth Amendment issue -- or let me put it differently.

11       The things that are allegedly covered by the joint defense

12   agreement could include a lot more than just the

13   Fifth Amendment issue.  So that's why that one's not redacted I

14   guess.

15           MR. GONZALEZ:  That's correct, Your Honor.

16           THE COURT:  All right.  So isn't this something that

17   you'll in due course bring before Magistrate Judge Corley?

18           MR. PERLSON:  Well, I think that it may well be, and I

19   think we wanted to flag it because it's part of what Mr. Jaffe

20   is saying, is that without Mr. Levandowski involved -- and

21   apparently it's unclear what exactly they've even asked for

22   Mr. Levandowski in terms of his documents even while he was at

23   Uber or at Otto -- that this investigation is manifestly

24   incomplete as shown by the fact that from the very minute that

25   he apparently left Google, he was working on anticipation of

1   litigation with Google or Waymo.

2       And, additionally, I'll note that Mr. Levandowski

3   himself -- I mean, I did a word search using the PDF -- doesn't

4   appear anywhere in this log himself individually.

5           **THE COURT:**  I thought when you read that one off, I

6   heard the name "Levandowski."

7           **MR. PERLSON:**  Right.  That's what's curious about it.

8   That's the description, but he's not a recipient of the e-mail.

9       And so when we asked counsel about this earlier as to why

10  is it that every single one of the recipients and custodians on

11  the 700-page log is listed as Morrison & Foerster, the answer

12  is that this is not Uber's privilege log that you ordered to

13  provide.  It's Morrison & Foerster's privilege log.

14      Now, we are told there will be a short privilege log from

15  Uber later this week that we haven't received yet, but one

16  wonders how it is it would only be short and that this log

17  doesn't contain anything from Mr. Levandowski when they have

18  been working on from -- apparently for eight months on this.

19  Every single one -- almost every single one of these is

20  anticipation of litigation that seems to stem from what

21  happened when Mr. Levandowski left.

22      So we seriously question what they've really searched for

23  of Mr. Levandowski given the fact that his name doesn't even

24  show up here as a recipient.

25          **THE COURT:**  See, this is what Mr. Verhoeven did to me.

1   He out of left field stands up and makes a speech like that,

2   and I get sucked in and say *You get an inspection.*  So you're

3   now trying to get me to make some kind of ruling, and I'm not

4   going to do it.  It's going to go to Judge Corley.  It sounds

5   interesting.

6           **MR. PERLSON:**  Your Honor --

7           **THE COURT:**  It sounds interesting.

8           **MR. PERLSON:**  Understood, Your Honor.

9           **THE COURT:**  Is it true that you haven't completed the

10  privilege log from Uber like you were supposed to have?

11          **MR. GONZALEZ:**  No, no.  Here's what I told them.  What

12  I said to them is two things.  Number one, it is not our

13  intention to log the same exact e-mails that are on that

14  700-page document from the Uber side.  In other words, Uber was

15  our client.  If there's an e-mail from MoFo to Uber --

16          **THE COURT:**  I don't know that you're right about that

17  I think because the copy at Uber may have been shown to

18  somebody who shouldn't have seen it and that would have been a

19  waiver.  I think you've got to log both of them.

20          **MR. GONZALEZ:**  Well, here's, Your Honor, what -- I

21  understand I think in part what you're saying.

22      Obviously if we sent an e-mail to somebody at Uber and

23  that person forwards it to anybody else, we're going to log

24  that.  I'm just saying that if it's simply an e-mail from A to

25  B, it would just be a dupe, a duplicate e-mail.

1          **THE COURT:**  Well, I'm not even blessing the forward

2     thing because that's something you're --

3          **MR. GONZALEZ:**  And the last thing --

4          **THE COURT:**  They could have showed it to somebody --

5          **MR. GONZALEZ:**  Sure.

6          **THE COURT:**  -- that was not authorized, not forwarded

7     to them.  Just said, *Hey, look at this.*  And they might know

8     it.  I'm not blessing the idea that you can omit the other

9     people's copies.

10          **MR. GONZALEZ:**  And the other thing that I told them,

11     Your Honor, is because of the issue that we've been discussing,

12     we haven't completed -- we're nowhere near completing the Uber

13     review, is that I'm just going to give them a rolling privilege

14     log as we get through the documents.

15          And what I've told them is that thus far we don't have

16     very many.  We don't have very many from Uber that would even

17     fall on to a log; but I said, *By the end of the week, I'll give*

18     *you what we've got to date*, and I'll just give them a rolling

19     log as we get through the stuff.  And that, too, we can discuss

20     with the special master.

21          **THE COURT:**  Mr. Cooper is going to solve this problem

22     for me too.

23          **MR. COOPER:**  We can certainly talk about it.

24          **THE COURT:**  Can I just ask who else are you deposing

25     on your side now?  I'm curious now that I've read these

1 declarations and so forth.  Who are you deposing?

2       **MR. JAFFE:**  We are deposing the declarants that they

3 put forward, which I think was on the range of five to seven,

4 maybe a little bit more, and then we've noticed

5 Mr. Levandowski's deposition.

6       **THE COURT:**  I have a legal question for you.  Does the

7 Federal Trade Secrets Act cover proprietary information as well

8 as trade secrets or only trade secrets?

9       **MR. JAFFE:**  I think -- offhand I think it covers only

10 trade secrets.

11       **MR. GONZALEZ:**  That's correct.

12       **THE COURT:**  How about the state law?

13       **MR. JAFFE:**  I think it also talks about trade secrets,

14 but there's a broad definition of what is a trade secret.

15       **THE COURT:**  Is it true that in order for me to grant a

16 preliminary injunction -- this is what Mr. Gonzalez's brief

17 said -- that I have to specifically find that there was a trade

18 secret in the 14,000 documents as opposed to just, *Okay, this*

19 *is all confidential, this is proprietary*?  But do I have to

20 find that there was actually a trade secret, something that

21 qualifies as a trade secret in there?

22       **MR. JAFFE:**  So I think under the -- as we've alleged

23 under the Federal Trade Secret Act and the California Act,

24 we've requested an injunction based on those; and so to do so,

25 I think there would have to be some findings as to whether

1    something is a trade secret.

2          THE COURT:  Have you covered that point in your

3    opening brief?

4          MR. JAFFE:  Yes, Your Honor.

5          THE COURT:  All right.

6       Okay.  My thanks again to Mr. Cooper.

7          MR. COOPER:  Thank you, Your Honor.

8          THE COURT:  And I want you to know, I think you may

9    have already figured it out from my calendar, but tomorrow my

10   wife and I are leaving for a week.  I'm leaving for a week

11   anyway.  I'll be out of the country.  It will be extremely hard

12   for me to rule on anything.  I will say if it was a true

13   emergency, they could reach me and I could possibly get a short

14   order out, but it's unlikely.  So I hope while I'm gone you

15   don't -- if you really need emergency relief, it's going to

16   have to go to the general duty judge because Judge Corley is

17   not available either.

18      So why don't you two behave for a week and reduce your

19   fights.  All right?

20         MR. GONZALEZ:  We'll do that, Your Honor.

21         THE COURT:  Tell me, I'm just curious, how many of

22   these lawyers out here are working on the case just so I can

23   welcome them to the court?

24         MR. GONZALEZ:  Raise your hand if you're working on

25   the case, if you're a lawyer working on the case.

1              **THE COURT:**  Good.  Welcome to you.

2        And how about over there?  Any of you working on the case?

3    How many?  Raise your hand again.  So just two people over

4    there.

5        All right.  Well, my sympathies are with these young

6    people, and I applaud you for getting some of the younger

7    people up here to perform today, and I encourage that.  I think

8    it's important that they learn to stand where you're standing

9    and perform and not just sit in front of a computer doing word

10   searches.  So I hope to see all of you up here at some point in

11   the case.

12       We're done for today; right?

13              **MR. GONZALEZ:**  Yes, Your Honor, I believe so.

14              **THE COURT:**  All right.  Thank you.

15              **MR. GONZALEZ:**  Have a safe trip, Your Honor.

16       **MR. JAFFE:**  Thank you.

17              (Proceedings adjourned at 12:50 p.m.)

18                        ---oOo---

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Thursday, April 13, 2017

8

9

10

11    _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25