# EXHIBIT 67
# FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

   _____

5   WAYMO LLC,                       )

6                  Plaintiff,        )

7          vs.                       )  Case No.

8   UBER TECHNOLOGIES, INC.,         )  3:17-cv-00939-WHA

9   OTTOMOTTO LLC; OTTO              )

10  TRUCKING LLC,                    )

11                 Defendants.       )

   _____)

12

13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15      VIDEOTAPED DEPOSITION OF SCOTT BOEHMKE

16            San Francisco, California

17            Monday, April 17, 2017

18                  Volume I

19

20

21  Reported by:

22  SUZANNE F. GUDELJ, CSR No. 5111

23  Job No. 2596382

24

25  PAGES 1 - 79

                                        Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4

 5    _____

 6    WAYMO LLC,                        )

 7                   Plaintiff,         )

 8          vs.                         )   Case No.

 9    UBER TECHNOLOGIES, INC.,          )   3:17-cv-00939-WHA

10    OTTOMOTTO LLC; OTTO               )

11    TRUCKING LLC,                     )

12                   Defendants.        )

13    _____)

14

15       Videotaped Deposition of SCOTT BOEHMKE,

16       Volume I, taken on behalf of Plaintiff Waymo

17       LLC, at the Law Offices of Quinn Emanuel

18       Urquhart & Sullivan LLP, 50 California Street,

19       22nd Floor, San Francisco, California,

20       beginning at 2:08 p.m. and ending at 4:01 p.m.

21       a.m., on Monday, April 17, 2017, before SUZANNE

22       F. GUDELJ, Certified Shorthand Reporter No.

23       5111.

24

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    was in the office in one of -- you know, people

2    wanted us to talk lasers.

3        Q    Who were those people?

4        A    I don't know -- know exactly who it was.

5    There were various people that knew he was into          02:13:44

6    lasers, and that was my responsibility.

7        Q    Who were the various people?

8        A    Like I said, I don't remember who or how

9    this got set up.

10       Q    So he just appeared in your office, and you  02:13:57

11   guys started talking about LiDAR technology?

12       A    I -- I didn't know the circumstances around

13   which he was there.

14       Q    So you can't identify a single person that

15   prompted the discussion between you and Mr.               02:14:10

16   Levandowski; is that accurate?

17           MR. KIM:  Objection.  Misstates character

18   -- testimony.

19           THE WITNESS:  I don't recall who arranged

20   the setup.                                                02:14:21

21   BY MR. JAFFE:

22       Q    My question was a little different.  Can

23   you identify a single person that prompted you and

24   Mr. Levandowski to have that first LiDAR discussion?

25       A    Not right now, no.                              02:14:37

                                                   Page 11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          Q     Okay.  So you started talking with Mr.

2    Levandowski about LiDAR sensors for Uber's

3    self-driving cars in April of 2016, correct?

4          A     Yes.

5          Q     And you were interested in talking to him      02:14:52

6    because he was going to provide custom LiDAR

7    technology for Uber, right?

8                MR. KIM:  Objection.  Vague.

9                THE WITNESS:  Could you be more specific?

10               MR. JAFFE:  So Mr. Kim, I don't know if        02:15:06

11   you've read Judge Alsup's standing order recently,

12   but he has very specific guidance about the type of

13   objections, and so at this point, I would just

14   suggest to you that what you're doing is a little

15   bit farther out of bounds than what has been done in    02:15:23

16   this case so far.  But --

17               MR. KIM:  So I'll --

18               MR. JAFFE:  So putting that aside --

19               MR. KIM:  I've read Judge Alsup's standing

20   order, and I disagree with that characterization.      02:15:33

21   My objection was just as to the improper form of the

22   question.  It's also consistent with the objections

23   we made in depositions taken by yourself and

24   Mr. Perlson for both Mr. Levandowski and also others

25   in this case.                                           02:15:52

                                                    Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. JAFFE:

2        Q    Mr. Boehmke, you were interested in talking

3    with Mr. Levandowski because he was going to provide

4    Uber with custom LiDAR technology, right?

5        A    He was going to provide a sensor for our        02:16:06

6    cars.

7        Q    What kind of a sensor?

8        A    A laser sensor -- LiDAR sensor.

9        Q    A custom LiDAR sensor?

10       A    Correct.                                         02:16:17

11       Q    So again, you'd agree with me, then, that

12   you were interested in talking with Mr. Levandowski

13   because he was going to provide a custom LiDAR

14   solution for Uber, right?

15       A    Yes.                                             02:16:27

16       Q    And this was three months, or actually

17   February, March, two and a half to three months

18   since he left at the time Google, right?

19           MR. KIM:  Objection to the extent it calls

20   for speculation.                                         02:16:37

21           THE WITNESS:  I don't know when he left

22   Google.

23   BY MR. JAFFE:

24       Q    Did you ask him?

25       A    No.                                              02:16:41

                                                     Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     right?

2         A    Yes.

3         Q    He didn't come to you with any sort of

4     technology proposal; is that right?

5         A    Yes.                                    02:17:54

6         Q    Okay.  So you communicated these

7     requirements to Mr. Levandowski.  What happened

8     next?

9         A    So I met with him on -- in the end of

10    April.  I went out to the Otto facility in the     02:18:07

11    beginning of May and furthered discussions with

12    others at Otto.

13        Q    Who were these others?

14        A    Most primarily Daniel Gruver.

15        Q    Anyone else?                             02:18:23

16        A    There were a number of other minor players

17    that I was introduced to.  Didn't have as many

18    technical conversations with them.

19        Q    What are their names?

20        A    There was a Rattner.  The names escape me.  02:18:34

21        Q    So the only two people that you can

22    remember speaking with at Otto were Mr. Levandowski,

23    Mr. Gruver and a Mr. Rattner; is that right?

24        A    And there was a Nancy who let me in the

25    door.                                             02:18:55

                                                    Page 15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q    Great.

2         MR. JAFFE:  I'm going to mark as Exhibit 51

3    a document Bates labeled UBER00008569.  Oh, sorry,

4    this is going to be a different -- I'll mark my one

5    52, then.                                     02:19:12

6         (Deposition Exhibit 52 marked by the court

7         reporter.)

8    BY MR. JAFFE:

9    Q    Mr. Boehmke, have you seen what I've marked

10   as Exhibit 52 before?                          02:19:46

11   A    I believe I have.

12   Q    Why were you sending Mr. Levandowski an

13   email entitled "Simulation" in April of 2016?

14   A    This was one of the configurations that he

15   and I had discussed on the 27th.  It was based on a  02:20:01

16   simulation I had done in December of 2015, and so I

17   gave him a output from that simulation.

18   Q    Okay.  What is Mr. Levandowski's job at

19   Uber right now?

20   A    He's leading the self-driving car effort.  02:20:33

21   Q    Including LiDAR?

22   A    It's under his purview.

23   Q    So he's in charge of Uber's LiDAR

24   development efforts, right?

25   A    I don't report directly to him, but the   02:20:45

Page 16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    chain of command would go to him.

 2        Q    So "yes"?

 3        A    Yes.

 4        Q    Okay.  Does -- do you work on any other

 5    projects other than Fuji right now?              02:20:58

 6        A    Yes.

 7        Q    What are the other projects you work on?

 8        A    ████████████████████████████████

 9    ████████████████

10        Q    Any other LiDAR projects?              02:21:08

11        A    ████████████████████████████████

12    ████████████████████

13        Q    ██████████████████

14        A    ████████████████████████████  ██████

15    ████████████████████████████████████       02:21:25

16    ████

17             MR. KIM:  At this point, I'm going on

18    designate the entire transcript Attorneys' Eyes Only

19    subject to the protective order in this case.

20             MR. JAFFE:  Okay.                     02:21:42

21    BY MR. JAFFE:

22        Q    All right.  We'll come back to that.

23    ████████████████████████████████

24    ████████████████████████████████████

25        A    ████████████████████████████        02:21:55
```



Page 17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1   ▬▬▬▬▬▬▬▬▬▬▬▬▬

 2       Q    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

 3   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

 4   ▬▬▬▬▬▬

 5            MR. KIM:  Objection to the extent it calls   02:22:08

 6   for speculation.

 7            THE WITNESS:  Fuji solves one of many

 8   problems.

 9   BY MR. JAFFE:

10       Q    What does that mean?                         02:22:16

11       A    There are -- there are several ways to

12   solve the self-driving sensor problem.  Fuji attacks

13   it from one direction.  ▬▬▬▬▬▬▬▬▬▬▬

14   ▬▬▬▬▬▬▬▬▬▬▬▬

15       Q    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬                             02:22:32

16       A    ▬▬▬▬▬▬▬▬▬▬

17       Q    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

18   ▬▬▬▬

19       A    ▬▬

20       Q    Okay.  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬                     02:22:42

21   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

22       A    Like I said, Fuji solves a particular

23   solution.  There are other aspects where LiDAR can

24   also be helpful.

25       Q    What is the particular -- particular         02:22:57
```

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    solution that Fuji solves?

2         A    ███████████████████████████████

3    ███████████████████████████

4         Q    ███████████████████████████████

5    ████████████████████████                    02:23:13

6         A    ████████████████████████  --

7              (Reporter clarification.)

8         ███████████████████████████████████████

9    ███████

10        Q    Does Uber have any custom LiDAR technology   02:23:26

11   related to ██████████████████████████?

12              MR. KIM:  Objection.  Vague.

13              THE WITNESS:  We have demonstrated  ██████

14   ████  yes.

15   BY MR. JAFFE:                                02:23:42

16        Q    What's the name of the  ██████████████████

17        A    It's in-house.

18        Q    What's the name of it?

19        A    I don't have -- don't have a project name.

20        Q    When was the first time that it was   02:23:49

21   demonstrated?

22        A    ████████████████████████████████

23        Q    Okay.  So you said you don't have a project

24   name.  When you want to refer to this to your -- to

25   your colleagues, what -- how do you do it?   02:24:06
```

Page 19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A    I don't know.  I don't know.  I don't have

 2    a name for it.  I don't -- I refer to it as a --

 3    it's ████████████████████████

 4        Q    ████████████  you said?

 5        A    Mm-hmm.                            02:24:39

 6        Q    Does it use ███████████?

 7        A    Yes.

 8        Q    Who designed it?

 9        A    It was demonstrated by myself and a

10    coworker, Jim Gasbarro.                    02:24:49

11        Q    So going back to this timeline, you met Mr.

12    Levandowski in April.  You started working on a

13    custom LiDAR solution where he would implement it

14    for Uber based on your specifications; is that

15    right?                                     02:25:10

16        A    Yes.

17        Q    Okay.  At what point did you understand

18    that Uber was in potential discussions to acquire

19    Otto?

20        A    I don't recall the timeline.       02:25:21

21        Q    Can you give me any sort of bounding time?

22    Was it -- were you surprised -- well, let me start

23    over.  Is that all right?

24        A    That's fine.

25        Q    When he heard about the acquisition, did it  02:25:33
```

Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    surprise you?

2        A    No, it made sense.

3        Q    I'm not asking if it made sense.  Sorry, my

4    question was a little bit unclear.

5             When you heard about the acquisition, were    02:25:43

6    you surprised because you hadn't found out about it

7    before it was publicly announced?

8        A    No.

9        Q    Did you know about it in June?

10       A    I don't recall.                               02:25:54

11       Q    What about May?

12       A    I couldn't tell you the date we acquired

13   them.  I don't recall.

14       Q    Sure.  I'm asking something a little bit

15   different, which is:  When is your first              02:26:01

16   recollection of having an understanding that Uber

17   was in potential discussions to acquire Otto?

18           MR. KIM:  Objection.  Asked and answered.

19           THE WITNESS:  I don't know.

20   BY MR. JAFFE:                                         02:26:13

21       Q    Okay.  Are you aware that Uber has claimed

22   in this case that it was having discussions with Mr.

23   Levandowski and Otto about a potential acquisition

24   as early as January 2016?

25           MR. KIM:  Objection.  Assumes facts not in    02:26:36

                                                    Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  ████████████  ███████████████████████

2      Right?

3      A    That's what it says.

4      Q    So Mr. Haslim is proposing transitioning to

5  this Fuji project in October -- on October 26th,          02:54:04

6  2016, right?

7      A    Yes.

8      Q    So you hadn't really started transitioning

9  to Fuji before this email, right?

10     A    This email was days after his meeting with   02:54:16

11 us in Pittsburgh, yes.

12     Q    When you say "us," who are you referring

13 to?

14     A    The meetings with Eric and myself.

15     Q    And your testimony is that Mr. Levandowski   02:54:27

16 was not at that meeting, right?

17     A    No.

18     Q    He didn't come into that meeting at all?

19     A    No.

20     Q    Okay.  Now, later in his email he talks      02:54:36

21 about an optical cavity.  Do you see that?

22     A    Mm-hmm.

23     Q    And it talks about the transmit elements --

24 and I'm paraphrasing here -- are ████████████████████

25 ███████████████████████████████████████████           02:54:50

                                                       Page 43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      ██████████████ .

 2              Do you know what that refers to?

 3      A    Yes.

 4      Q    What does it refer to?

 5      A    So they were ██████████████████████    02:54:57

 6      ████████████████████████████████████████████

 7      ████████████████████████████████████

 8      Q    And it -- there's a reference here to a

 9      ██████████████████████████████████████████

10      ██████                                       02:55:14

11              Do you see that?

12      A    Mm-hmm.

13      Q    What does that refer that?

14      A    That was the ████████████████████████

15      ████████████                                 02:55:21

16      Q    And why are -- what's the point of ████████

17      ██████████████████████████████

18      A    ████████████████████████████████

19      ████████████████████████████████████████████

20      ███████████████████████████████████          02:55:36

21      ██████████████████████████████████

22      ████████████████████████████████████████

23      ████████████████████████████████

24      Q    Okay.  I see.  So we're talking about a

25      ████████████████████████ here; is that right?  02:55:49
```

Page 44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A    Yes.

2      Q    Okay.  So in October, Otto was working on

3    ██████████████████████████████████

4      A    No.  This was an optical cavity for V1.

5      Q    I see.  ████████████████████████     02:56:04

6    ██████

7      A    There was ████████████████████

8      Q    █████████████████████████████

9    ██████████████████████████████████████

10   ████████████████████████████████████     02:56:19

11   ██████

12         MR. KIM:  Objection.  Vague.

13         THE WITNESS: ████████████████████

14   ████████████████████████

15   BY MR. JAFFE:                               02:56:30

16     Q    Who came up with that design?

17     A    That would have been the West Coast team.

18     Q    Mr. Levandowski?

19     A    No, Mr. Haslim.

20     Q    Mr. Levandowski wasn't involved in the     02:56:44

21   ████████████████████ in V1?

22         MR. KIM:  Objection.  Calls for

23   speculation.

24         THE WITNESS:  I have no way of knowing his

25   involvement.                                 02:56:53

Page 45

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. JAFFE:

 2        Q    What about Mr. Gruver, ███████████████

 3    ████████████████████   in V1?

 4            MR. KIM:  Same objection.

 5            THE WITNESS:  My interface technically was    02:56:59

 6    with Mr. Haslim.

 7    BY MR. JAFFE:

 8        Q    So that doesn't answer my question.

 9    Apologies if it wasn't clear, but I'm just going to

10    ask it again.                                          02:57:13

11            Was Mr. Gruver involved in ███████████

12    ██████   in V1?

13            MR. KIM:  Objection.  Vague and to the

14    extent it calls for speculation.

15            THE WITNESS:  So I don't know who did the     02:57:21

16    design.  I'm saying that I was working with the two

17    of them.  I don't know who did the optical design.

18    BY MR. JAFFE:

19        Q    I see.  So you don't know who came up with

20    the ████████████████   in V1, true?                   02:57:32

21            MR. KIM:  Objection.  Calls for

22    speculation.

23            THE WITNESS:  I don't know.

24    BY MR. JAFFE:

25        Q    Okay.  All you know is it was someone in     02:57:39
```

Page 46

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              MR. KIM:  Objection.  Lacks foundation.

 2    Calls for speculation.

 3              THE WITNESS:  I don't --

 4              MR. KIM:  Also asked and answered.

 5              THE WITNESS:  I don't recall him commenting    03:20:02

 6    on that.

 7    BY MR. JAFFE:

 8        Q    I want to go back to your declaration,

 9    which is Exhibit 50, and then I want to look at

10    paragraph 13.                                            03:20:38

11        A    Okay.

12        Q    So you say here in your declaration that

13    you, quote:

14              "Envisioned ███████████████████████

15        ████████████████████████████████ to             03:20:57

16        enable the use of a simple lens design."

17              Do you see that?

18        A    Mm-hmm.

19        Q    And you cite as evidence for that what is

20    Exhibit G to your declaration, right?                    03:21:08

21        A    Right.

22        Q    And that's in that pile next to you with

23    the exhibits, so if you could just look at

24    Exhibit G.

25              Where does it say in Exhibit G that you        03:21:52
```

Page 57

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    were envisioning ████████████████████████

2    ████████████████████

3         A    It does not say that in this document.

4         Q    Okay.

5         A    This document was to demonstrate                03:22:11

6    positioning ████████████████████ that were the

7    lines shown in the graphs.

8         Q    What lines?

9         A    These lines (indicating).

10        Q    And after you came up with what's in         03:22:34

11   Exhibit G, what did you -- what did you do with this

12   information?

13        A    So this information was the plan B which

14   was not pursued after going through commercial

15   third-party efforts with ██████████              03:22:50

16        Q    And plan A was ██████████

17        A    Mm-hmm.

18        Q    Plan B was -- did it have a name other than

19   plan B?

20        A    It turned into Fuji.                           03:22:59

21        Q    And then what was plan C?

22        A    Plan C was the ██████████

23        Q    Okay.  Was there a plan D?

24        A    Not by name.

25        Q    What does that mean, "not by name"?            03:23:09

                                                        Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A      There were other configurations that we

2   were discussing, but they were not in that document

3   where I spelled out A, B and C.

4       Q      So going back to Exhibit G of your

5   declaration --                                    03:23:31

6       A      Mm-hmm.

7       Q      -- where does it say in this document that

8   -- where the -- ████████████████████████████

9   ████████████████████████████

10      A      Each of the lines was a straight board.   03:23:44

11      Q      Where does it say that?

12      A      It's a spreadsheet.  It doesn't say it.

13      Q      Right.  So there actually is no information

14  in here that says:  Hey, we should put ████████████

15  ██████████████████████, right?                    03:23:58

16          MR. KIM:  Objection.  Mischaracterizes the

17  evidence.

18          THE WITNESS:  The diagram in the

19  declaration on the previous page shows ████████

20  ██████████████████████ as they would have been    03:24:07

21  in this board.  This board -- this spreadsheet shows

22  how many boards would be required given a particular

23  pitch and a certain desire for a number of beams.

24  BY MR. JAFFE:

25      Q      You came up with Exhibit G in February,    03:24:22

Page 59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    right?

2        A    Yes.

3        Q    And this doesn't have any sort of notation

4    or information at all to note that each of these

5    points would be on a single circuit board, right?    03:24:38

6        A    The document does not say that.

7        Q    Okay.  Now, let's go to the other document

8    we were referring to, which I think is Exhibit C to

9    your declaration.

10            So why don't you first go to page 12,        03:25:21

11   please.

12       A    12.  Okay.

13       Q    Do you see that there's some beam spacings

14   depicted here?

15       A    Yes.                                          03:25:34

16       Q    They're all -- looking at the left-hand

17   side, the one under VLP-16, all those dots are in a

18   row just like we looked at Exhibit G, right?

19            MR. KIM:  Objection.  Mischaracterizes

20   evidence.                                              03:25:45

21            THE WITNESS:  The VLP-16 is ███████████

22   ████████████████████████████████████

23   BY MR. JAFFE:

24       Q    And that looks like, just like what we were

25   looking at in Exhibit G, right?                        03:25:55

Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        Q     Okay.  So we referred to ████████   What --

2   how far into the process did Uber and Otto get with

3   ███████

4        A     ███████████████████████████    ██████████

5   ███████████████████████████████                    03:57:48

6        Q     Why not?

7        A     We turned.

8        Q     So you were building it, and then you

9   pivoted to Fuji; is that right?

10       A     Yes.                                    03:58:00

11       Q     And then you totally ceased development on

12  ██████████

13       A     That's my understanding, yes.

14       Q     So a hundred percent of the LiDAR, custom

15  LiDAR resources went from ██████ to Fuji?         03:58:09

16       A     I can not say a hundred percent.  I don't

17  know.  My understanding is that we moved on to Fuji.

18       Q     All right.  Were any of the components in

19  Fuji derivative of components that were originally

20  designed for ████████                              03:58:24

21            MR. KIM:  Objection.  Vague.

22            THE WITNESS:  Components.  ████████████

23  ██████████████████████████████████████████████████

24  █████████████████████████████

25  BY MR. JAFFE:                                       03:58:40
```

Page 74

```
 1        Q     What about the transmit board design?

 2        A     That would be ridiculous.  A transmit board

 3   for the fiber laser is entirely different.

 4        Q     We talked about the design of the ▓▓▓▓▓

 5   and that it's a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; is that          03:58:57

 6   right?

 7        A     The ▓▓▓▓▓ was ▓▓▓▓▓▓▓  It had behind it

 8   ▓▓▓▓▓▓▓▓▓

 9        Q     I see.  So there would be ▓▓▓▓▓▓▓▓

10   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓           03:59:13

11   ▓▓▓▓▓▓▓ is that right?

12        A     Yes.

13        Q     And your testimony is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14   ▓▓▓▓▓▓▓  is that right?

15        A     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ no.              03:59:28

16        Q     So it didn't answer my question.  My

17   question --

18        A     To my knowledge, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

19   ▓▓▓▓▓▓▓

20        Q     Okay.  Thank you.                   03:59:38

21              Is there anything else relevant to your

22   declaration, or as you understand it, the

23   allegations in this case, that we haven't discussed

24   today?

25        A     We've overlooked a document provided to  03:59:54

                                              Page 75
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Otto where we called out the interest in putting

2      ████████████████████████████████

3          Q    Where is that?

4          A    It's document H.

5          Q    Is that the one you referred to earlier?      04:00:06

6          A    Yes.

7               MR. JAFFE:   Okay.   I have no further

8      questions, although I'm going to reserve our rights

9      with regard to any late document production and

10     inspection of the ████-related device.             04:00:18

11              MR. KIM:   Okay.   Short redirect.

12

13                         EXAMINATION

14     BY MR. KIM:

15         Q    Mr. Boehmke, you just referred to           04:00:30

16     Exhibit H.   Is that the document that you asked to

17     see earlier in your deposition?

18         A    Yes.

19         Q    And why did you want to refer to that

20     exhibit?                                             04:00:39

21         A    This exhibit on page 10 clearly shows ████

22     ████████████████████████████ something that I

23     was called out for in the -- one of the documents

24     saying that we had never mentioned we were going to

25     do that, and it's clearly spelled out in plan B.     04:00:55

                                                  Page 76