# Exhibit 108

FINAL FORM

# UBER TECHNOLOGIES, INC.
## 2013 EQUITY INCENTIVE PLAN
### NOTICE OF RESTRICTED STOCK AWARD

**Name: Anthony Levandowski**

You ("**Participant**") have been granted the number of shares (the "**Shares**") of the Class A Common Stock of Uber Technologies, Inc., a Delaware corporation (the "**Company**"), subject to the terms and conditions of the Uber Technologies, Inc. 2013 Equity Incentive Plan (the "**Plan**"), this Notice of Restricted Stock Award (the "**Notice**") and the attached Restricted Stock Award Agreement, including any and all exhibits and appendices thereto (the "**Restricted Stock Award Agreement**" and together with the Notice, the "**Award**"), as set forth below. Unless otherwise defined in this Notice or the Restricted Stock Award Agreement, the terms used herein shall have the meanings defined in the Plan.

**Total Number of Shares:** _____Redacted_____

**Grant Date:** _____

**Vesting Commencement Date:** _____Redacted_____

**Vesting Schedule:** The Shares are subject to a (1) a time-based vesting condition (the "**Time Condition**") described in paragraph (a) below, (2) a performance-based vesting condition related to a liquidity event of the Company (the "**Liquidity Condition**") described in paragraph (b) below, and (3) certain milestone-based vesting conditions described in paragraph (c) below and Exhibit A to this Notice (the "**Milestone Conditions**"), all of which must be satisfied before the Shares will be deemed "**Vested Shares**". Until all three conditions have been satisfied, the Shares shall be "**Unvested Shares**."

(a)  **Time Condition.** So long as your employment with the Company or an Affiliate does not terminate, the Time Condition shall be satisfied in accordance with the following schedule: 12/48ths of the Total Number of Shares shall satisfy the Time Condition on the one year anniversary of the Vesting Commencement Date and thereafter $1/48^{th}$ of the Total Number of Shares shall satisfy the Time Condition on the monthly anniversary of the Vesting Commencement Date (each such date, a "**Time-Based Vesting Date**").

(b)  **Liquidity Condition.** The Liquidity Condition shall be satisfied on the earlier to occur of (i) the closing of a Liquidation Transaction or (ii) the effective date of an IPO (as defined in Section 3 of the Restricted Stock Award Agreement) (the date on which the first such event occurs, a "**Liquidity-Based Vesting Date**"). "**Liquidation Transaction**" means an

event that constitutes a liquidation, dissolution, or winding up of the Company for purposes of the Company's Restated Certificate of Incorporation, as amended or restated from time to time. Notwithstanding any other provision herein, if a Liquidity-Based Vesting Date does not occur on or before the tenth (10th) anniversary of August 19, 2016, the Liquidity Condition will not be met as to any Shares, and the Shares will not vest and will be forfeited as provided in Section 6 of the Restricted Stock Award Agreement attached hereto.

(c)    **Milestone Conditions.**  The milestone-based vesting conditions will be based on the milestones listed in Exhibit A to this Notice (each a "*Milestone Achievement*" and collectively, the "*Milestone Achievements*"); provided, that the Milestone Achievements (and Exhibit A) may be amended or modified at any time as mutually agreed between the Company, on the one hand, and Anthony Levandowski and Lior Ron, on the other hand (subject to their continued employment with the Company or an Affiliate as of the date of such modification or amendment), and that such amendments or modifications to the Milestone Achievements will not require your prior consent. If any Milestone Achievement is so amended or modified, the Company will promptly notify you of such amendments or modifications and provide you with an updated Exhibit A. The number of Shares that will have satisfied the Milestone Condition upon the achievement of each Milestone Achievement (the "*Milestone Shares*") shall be as set forth in Exhibit A to this Notice.

The Milestone Condition will be met with respect to the Milestone Shares associated with each Milestone Achievement as follows:

- Such Milestone Achievement is completed by or before **Redacted Redacted**

- You were hired by the Company or Ottomotto LLC ("*Ottomotto*") prior to such Milestone Achievement; and

- You remain an employee of Uber or an Affiliate continuously from your date of hire until the date of completion of such Milestone Achievement; **Redacted**

**Redacted**

**Redacted**

- "Qualified Termination" means a termination of your employment with Uber or an Affiliate for any reason other than a termination by Uber or such Affiliate for Cause (as defined below).

(d) **Vesting Date.** The first date as of which all of the Time Condition, the Liquidity Condition and the associated Milestone Condition described in paragraphs (a), (b) and (c) above have been satisfied with respect to any Shares shall be referred to as a "*Vesting Date*" of such Shares.

**By signing this Notice, you acknowledge that the vesting of the Shares granted pursuant to this Award is conditioned on the satisfaction of the Time Condition, the Liquidity Condition and the applicable Milestone Conditions.**

(e) **Fractional Shares.** If application of the Vesting Schedule set forth above would cause vesting of a fractional Share, then such vesting shall be rounded down to the nearest whole Share and such fractional Share shall cumulate with any other fractional Shares and such fractions shall vest as they aggregate into a whole Share.

        (f)    **No Section 83(b) Election.**  As a material inducement to the Company to grant this Award, you agree not to make an election under Section 83(b) of the Code covering the Unvested Shares.

**Termination Prior to Vesting**: If your employment terminates for any reason *following* the satisfaction of both the Time Condition and the applicable Milestone Condition, but prior to the satisfaction of the Liquidity Condition, then the Milestone Shares associated with the applicable Milestone Conditions that have been satisfied will remain outstanding following the date of such termination and, if the Liquidity Condition is satisfied following your termination of employment, will not be subject to the Unvested Share Forfeiture Condition contained in Section 6 of the Restricted Stock Award Agreement.

**Redacted**

**Other Forfeiture Conditions:**

**Redacted**

**Definition of Cause:** "**Cause**" shall mean the termination of your employment by the Company or any Affiliate (or a successor, if appropriate) based on one or more of the following events having occurred during your employment with the Company or any Affiliate (or a successor, if appropriate), **Redacted**

**Redacted**

**Redacted**

Redacted For the avoidance of doubt, the inclusion of the definition of "Cause" in this Award or in any other agreement will not, in any manner, modify the "at-will" nature of your employment contract with the Company.

Redacted

**Redacted**

**Acknowledgment:** By your acceptance of this Notice through the Company's online acceptance procedure (or by your signature and the signature of the Company's representative on this Notice), you and the Company agree that the Shares are granted under and governed by the terms and conditions of this Notice, the Restricted Stock Award Agreement and the Plan. You acknowledge that you have received a copy of the Restricted Stock Award Agreement and the Plan and have read this Notice, the Restricted Stock Award Agreement and the Plan in their entirety.

**PARTICIPANT**

*/s/ [signature]*

**UBER TECHNOLOGIES, INC.**

*/s/ Jeffrey A. Holden*

# EXHIBIT A
## TO NOTICE OF RESTRICTED STOCK AWARD

### Milestones

[*To insert Schedule A-1 from Term Sheet and Number of Shares Allocated to Each Milestone*]

UBER00011864

# UBER TECHNOLOGIES, INC.
# 2013 EQUITY INCENTIVE PLAN

## RESTRICTED STOCK AWARD AGREEMENT

Pursuant to the Notice of Restricted Stock Award (the "*Notice*") and this Restricted Stock Award Agreement (the "*Agreement*" and together with the Notice, the "*Award*") and its 2013 Equity Incentive Plan (the "*Plan*"), Uber Technologies, Inc., a Delaware corporation (the "*Company*") has awarded to Participant, in exchange for Participant's services to the Company, the number of shares of the Company's Class A Common Stock subject to the Award as indicated in the Notice. Capitalized terms not explicitly defined in this Agreement but defined in the Plan will have the same definitions as in the Plan. If there is any conflict between the terms in this Agreement and the Plan, the terms of this Agreement will control.

1. **Effect of Capitalization Adjustments on Shares.** The term "*Shares*" refers to the Shares set forth in the Notice and all securities received as stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or any other capitalization adjustment described in Section 2.2 of the Plan (a "*Capitalization Adjustment*"), and all new, substituted or additional securities or other property to which Participant is entitled by reason of Participant's ownership of the Shares, including for purposes of the transfer restrictions contained in Section 3, the Right of First Refusal contained in Section 4, the Forfeiture Condition contained in Section 6, and the Lock-Up Agreement contained in Section 10.

2. **Vesting; No Section 83(b) Election.** The Unvested Shares (as defined in the Notice) subject to this Award will vest, and the Unvested Share Forfeiture Condition set forth in Section 6 of this Agreement shall lapse, subject to the Vesting Schedule provided in the Notice. Participant represents and warrants that Participant shall not make an election pursuant to Section 83(b) of the Code covering the Unvested Shares.

3. **Restrictions and Limitations on Transfer.** In addition to any other limitation on transfer created by applicable securities laws, Participant shall not assign, encumber or dispose of any interest in the Shares except in compliance with the provisions below and applicable securities laws.

    (a) The holder of any security of the Company (a "*Security Holder*"), including Participant, shall not, directly or indirectly, transfer, assign, pledge, encumber, hypothecate or otherwise dispose of or encumber (including any conveyance of any economic or pecuniary interest in) any security of the Company (a "*Security*"), other than by means of a Permitted Transfer (as defined below), without the prior written consent of the Board (or an authorized committee of the Board), which consent may be withheld in its sole discretion. If any provision(s) of any agreement(s) currently in effect by and between the Company and any Security Holder (the "*Security Holder Agreement(s)*") conflicts with Section 8.12 of the Company's bylaws, Section 8.12 shall govern, and the non-conflicting remainder of the Security Holder Agreement(s) shall continue in full force and effect; provided that Section 3(b) shall be deemed not to conflict with Section 8.12 of the Company's bylaws.

    (b) For purposes of the transfer restrictions set forth herein, a Security shall be deemed to be "*Transferred*" in (a) any sale, assignment, transfer, conveyance, hypothecation or

1

other transfer or disposition of a share of any security of the Company or any legal or beneficial interest in such security, whether or not for value and whether voluntary or involuntary or by operation of law, including, without limitation, a transfer of a share of any security to a broker or other nominee (regardless of whether there is a corresponding change in beneficial ownership), or the transfer of, or entering into a binding agreement with respect to, voting control over such security by proxy or otherwise, (b) any hedging or other transaction which is designed to or which reasonably could be expected to lead to or result in a sale or disposition of any security of the Company, even if any security of the Company would be disposed of by someone other than the Security Holder, (c) any transaction involving any short sale or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to any security of the Company or with respect to any security that includes, relates to, or derives any significant part of its value from any security of the Company, or (d) any other transaction by Participant related to or affecting the ownership, possession or other rights (voting, economic or otherwise) of a security that the Board, in good faith, deems Transferred.

>**(c)** A "***Permitted Transfer***" as used in this Section 3 shall be defined as:

>>(i) any repurchase of a Security by the Company: (i) at cost, upon the occurrence of certain events, such as the termination of employment or services; or (ii) at any price pursuant to the Company's exercise of a right of first refusal to repurchase such shares;

>>(ii) the transfer of any or all of the Securities held by a Security Holder to a single trust for the benefit of the Security Holder or the Security Holder's Immediate Family;

>>(iii) any transfer effected pursuant to the Security Holder's will or the laws of intestate succession;

>>(iv) any transfer of any or all of the Securities held by a Security Holder in connection with a Secondary Offering as provided in the Notice;

>>(v) if the Security Holder is a partnership, limited liability company or a corporation, no more than five (5) transfers to an Affiliate (as defined below) of such partnership, limited liability company or corporation; and/or

>>(vi) the transfer by a Major Investor (as defined in the Amended and Restated Right of First Refusal and Co-Sale Agreement dated August 1, 2013, as amended from time to time, or any successor agreement (the "***Co-Sale Agreement***")) exercising such Major Investor's Co-Sale Right (as defined in the Co-Sale Agreement).

>**(d)** In the case of any transfer consented to by the Company or described in subsection (c) above, the transferee, assignee, or other recipient shall receive and hold the Securities subject to the provisions of this Section 3, and there shall be no further transfer of such stock except in accordance with this Section 3.

>**(e)** The restrictions in this Section 3 shall terminate upon the earlier to occur of (i) the closing of a Liquidation Transaction (as such term is defined in the Company's Restated Certificate of Incorporation, as amended or restated from time to time) (a "***Liquidation Transaction***") or (ii) immediately prior to an initial public offering under the Securities Act of

1933, as amended, and the rules and regulations promulgated thereunder (the "**Securities Act**") pursuant to which all outstanding shares of the Company's preferred stock convert to common stock (an "**IPO**"). Upon termination of such restrictions, if certificates are issued, a new certificate or certificates representing the outstanding Shares shall be issued, on request, without the legend referred to in subsection 8(a)(iv) below and delivered to Participant.

**(f)** Participant shall comply with the Company's insider trading policy and code of conduct (or related policies) as may be adopted or amended from time to time by the Board (the "**Policies**"). To the extent Participant is not an employee of the Company, Participant shall comply with the Policies in the same manner as-if Participant were deemed an employee of the Company as defined in the Policies.

> # Redacted

4. **Right of First Refusal.**

(a) **Right of First Refusal.** Subject to the limitations set forth in Section 3 above, before any Shares held by Participant or any transferee of Participant (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section 4(a) (the "Right of First Refusal").

(i) **Notice of Proposed Transfer.** The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating: (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed Participant or other transferee ("Proposed Transferee"); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the terms and conditions of each proposed sale or transfer. The Holder shall offer the Shares at the same price (the "Purchase Price") and upon the same terms (or terms as similar as reasonably possible) to the Company or its assignee(s).

(ii) **Exercise of Right of First Refusal.** At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the Purchase Price. If the Purchase Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board in good faith.

(iii) **Payment.** Payment of the Purchase Price shall be made, at the election of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness, or by any combination thereof within sixty (60) days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(iv) **Holder's Right to Transfer.** If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section 4(a), then the Holder may sell or otherwise

transfer such Shares to that Proposed Transferee at the Purchase Price or at a higher price, provided that such sale or other transfer is consummated within one hundred twenty (120) days after the date of the Notice and provided further that any such sale or other transfer is effected in accordance with any applicable securities laws and the Proposed Transferee agrees in writing that the provisions of Section 3 and this Section 4 shall continue to apply to the Shares in the hands of such Proposed Transferee. If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(v) **Exception for Certain Family Transfers.** Anything to the contrary contained in this Section 4(a) notwithstanding, and provided that such transfer complies with Section 3 and applicable securities laws, the transfer of any or all of the Shares during Participant's lifetime or on Participant's death by will or intestacy to Participant's Immediate Family or a single trust for the benefit of the Participant or the Participant's Immediate Family shall be exempt from the provisions of this Section 4(a).

(b) **Company's Right to Purchase upon Involuntary Transfer.** In the event of any transfer by operation of law or other involuntary transfer (including death or divorce, but excluding a transfer to Immediate Family as set forth in Section 4(a)(v) above) of all or a portion of the Shares by the record holder thereof, the Company shall have an option to purchase all of the Shares transferred at the greater of the purchase price paid by Participant pursuant to this Agreement or the Fair Market Value of the Shares on the date of transfer (as determined by the Board). Upon such a transfer, the person acquiring the Shares shall promptly notify the Secretary of the Company of such transfer. The right to purchase such Shares shall be provided to the Company for a period of thirty (30) days following receipt by the Company of written notice by the person acquiring the Shares.

(c) **Assignment.** The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any holder or holders of capital stock of the Company or other persons or organizations.

(d) **Restrictions Binding on Transferees.** All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the provisions of this Agreement. Any sale or transfer of the Company's Shares shall be void unless the provisions of this Agreement are satisfied.

(e) **Termination of Rights.** The right of first refusal granted the Company by Section 4(a) above and the option to repurchase the Shares in the event of an involuntary transfer granted the Company by Section 4(b) above shall terminate upon the earlier to occur of (i) the closing of a Liquidation Transaction or (ii) immediately prior to an IPO. Upon termination of the right of first refusal described in Section 4(a) above pursuant to this paragraph (e), the Company will remove any stop-transfer notices referred to in Section 8(b) below and related to the restrictions in this Section 4 and, if certificates are issued, a new certificate or certificates representing the Shares not repurchased shall be issued, on request, without the legend referred to in Section 8(a)(ii) below and delivered to Participant.

   5.  **Investment and Taxation Representations.** In connection with the purchase of the Shares, Participant represents to the Company the following:

    (a) Participant is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Participant is purchasing these securities for investment for his or her own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law. Participant does not have any present intention to transfer the Shares to any person or entity.

    (b) Participant understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Participant's investment intent as expressed herein.

    (c) Participant further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Participant further acknowledges and understands that the Company is under no obligation to register the securities. Participant understands that the transfer of the securities is prohibited unless they are registered or such registration is not required in the opinion of counsel for the Company, which opinion is in a form satisfactory to the Company, and that the certificate(s) evidencing the securities will be imprinted with a legend providing for the foregoing.

    (d) Participant is familiar with the provisions of Rules 144 and 701, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Participant understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144 or Rule 701, which rules require, among other things, that the Company be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions. Notwithstanding this paragraph (d), Participant acknowledges and agrees to the restrictions set forth in paragraph (e) below.

    (e) Participant further understands that in the event all of the applicable requirements of Rule 144 or 701 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 or 701 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

    (f) Participant understands that Participant may suffer adverse tax consequences as a result of Participant's purchase or disposition of the Shares. Participant

represents that Participant has consulted any tax consultants Participant deems advisable in connection with the purchase or disposition of the Shares and that Participant is not relying on the Company for any tax advice.

(g) Participant hereby acknowledges that Participant has been informed that as a result of not filing an election with the Internal Revenue Service covering the Unvested Shares pursuant to Section 83(b) of the Code, there may be a recognition of taxable income to the Participant, measured by the excess, if any, of the Fair Market Value of the Unvested Shares at the time they cease to be Unvested Shares, over the purchase price of the Unvested Shares, if any.

6. **Forfeiture of Shares**.

(a) Forfeiture Conditions. Shares shall automatically be reacquired by the Company without payment therefor and without further action by the Company or Participant, and Participant's rights in any such Shares shall thereupon terminate and expire (each a "Forfeiture Condition"), in connection with any of the following events:

(i) Forfeiture of Unvested Shares on Termination of Employment. The termination of Participant's employment for any reason (after taking into consideration any accelerated vesting that may occur in connection with such termination, if any) if either the Time Condition or the applicable Milestone Condition have not been satisfied as of the date of such termination, in which case only the Unvested Shares which have not satisfied both such conditions shall be subject to forfeiture (the "*Unvested Share Forfeiture Condition*") as of such termination date.

(ii) Forfeiture of Unvested Shares if Liquidity Condition Not Met. In the event a Liquidity-Based Vesting Date does not occur on or before the tenth (10th) anniversary of August 19, 2016, the Shares shall be forfeited.

**Redacted**

(b) Corporate Transactions. To the extent a Forfeiture Condition remains in effect following an Acquisition or Other Transaction (each as defined in the Plan), unless otherwise provided by the Board pursuant to the terms of the Plan, it will apply to the new capital stock, cash or other property received in exchange for the Shares in consummation of the Acquisition or Other Transaction, as applicable, but only to the extent the Shares were at the time covered by such right.

(c) <u>Right of Termination Unaffected</u>. Nothing in this Agreement shall be construed to limit or otherwise affect in any manner whatsoever the right or power of the Company to terminate Participant's employment at any time, for any reason or no reason, with or without Cause. For purposes of this Agreement, Participant shall be considered to be employed by the Company if Participant is an officer, director or full-time employee of the Company or any Parent, Subsidiary or Affiliate of the Company. The Committee of the Company shall have discretion to determine whether Participant's employment with the Company or any Parent, Subsidiary or Affiliate of the Company has Terminated and the date of such Termination, and such determination shall be binding on Participant.

7. **Escrow of Unvested Shares.** The Shares may be certificated or uncertificated and held in book-entry form. For purposes of facilitating the enforcement of the provisions of Section 3 and 6 above, Participant agrees, immediately upon receipt of the certificate(s) for the Shares or, in the case of uncertificated securities, notice of issuance, to deliver any such certificate(s) (if applicable) and a Stock Power in the form attached to this Agreement as <u>Attachment A</u> executed by Participant and by Participant's spouse (if required for transfer), in blank, to the Secretary of the Company, or the Secretary's designee, to hold such Shares (and stock certificate(s), if any) and Stock Power in escrow and to take all such actions and to effectuate all such transfers and/or releases as are in accordance with the terms of this Agreement. Participant hereby acknowledges that the Secretary of the Company, or the Secretary's designee, is so appointed as the escrow holder with the foregoing authorities as a material inducement to make this Agreement and that said appointment is coupled with an interest and is accordingly irrevocable. Participant agrees that said escrow holder shall not be liable to any party hereof (or to any other party). The escrow holder may rely upon any letter, notice or other document executed by any signature purported to be genuine and may resign at any time. Participant agrees that if the Secretary of the Company, or the Secretary's designee, resigns as escrow holder for any or no reason, the Board shall have the power to appoint a successor to serve as escrow holder pursuant to the terms of this Agreement.

8. **Restrictive Legends and Stop-Transfer Orders.**

(a) **Legends.** The certificate or certificates representing the Shares shall bear the following legends (as well as any legends required by applicable state and federal corporate and securities laws):

(i) THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL FOR THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

(ii) THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE HOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

        (iii)    THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON PUBLIC RESALE AND TRANSFER, INCLUDING THE FORFEITURE CONDITION AND RIGHT OF FIRST REFUSAL HELD BY THE ISSUER AND/OR ITS ASSIGNEE(S), AND A LOCK-UP AGREEMENT AS SET FORTH IN A RESTRICTED STOCK AWARD AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.  SUCH PUBLIC SALE AND TRANSFER RESTRICTIONS INCLUDING THE RIGHT OF REPURCHASE, RIGHT OF FIRST REFUSAL AND THE MARKET STANDOFF ARE BINDING ON TRANSFEREES OF THESE SHARES.

        (iv)    THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER CONTAINED IN THE BYLAWS OF THE COMPANY.

(b)  **Stop-Transfer Notices.**  Participant agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)  **Refusal to Transfer.**  The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

9.  **No Employment Rights.**  Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent or subsidiary of the Company, to terminate Participant's employment or consulting relationship, for any reason, with or without cause.

10.  **Lock-Up Agreement.**  In connection with the IPO and upon request of the Company or the underwriters managing any underwritten offering of the Company's securities, Participant agrees not to sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (other than those included in the registration) without the prior written consent of the Company or such underwriters, as the case may be, for such period of time (not to exceed one hundred eighty (180) days) from the effective date of such registration as may be requested by the Company or such managing underwriters and to execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of the public offering; provided however that, if during the last 17 days of the restricted period the Company issues an earnings release or material news or a material event relating to the Company occurs, or prior to the expiration of the restricted period the Company announces that it will release earnings results during the 16-day period beginning on the last day of the restricted period, then, upon the request of the managing underwriter, to the extent required by any FINRA rules, the restrictions imposed by this Section 10 shall continue to apply until the end of the third trading day following the expiration of the 15-day period beginning on the issuance of the earnings release or the occurrence of the material news or

material event (such period, the "Lock-Up Period"). In no event will the Lock-Up Period extend beyond 216 days after the effective date of the registration statement.

11. **Tax Withholding**. Upon any vesting of the Shares, the Company shall be entitled to withhold and reacquire the appropriate number of whole Shares, valued at their then Fair Market Value, to satisfy any withholding obligations of the Company or its subsidiaries with respect to such vesting at the applicable withholding rates. Notwithstanding the foregoing, prior to the vesting of the Shares, Participant may alternatively elect to make a cash payment and/or instruct the Company to deduct from other compensation payable to Participant any sums required by federal, state or local tax law to be withheld with respect to such vesting of Shares. Any such election shall be made in accordance with the requirements established by the Company and be in writing in a form acceptable to the Company. If no such election is made, or such election is not timely made by the deadline prescribed by the Company, then Participant's withholding obligations shall be satisfied through share withholding.

12. **Miscellaneous.**

(a) **Governing Law.** This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of California, without giving effect to principles of conflicts of law.

(b) **Entire Agreement; Enforcement of Rights.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. The failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of any rights of such party.

(c) **Severability.** If one or more provisions of this Agreement are held to be unenforceable under Applicable Laws, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(d) **Notices.** Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient when delivered personally or at time of transmission if sent by telegram or fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, or at the time an electronic confirmation of receipt is received if delivery is by email, and addressed to the party to be notified at such party's address as set forth below or as subsequently modified by written notice.

(e) **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

(f) **Successors and Assigns.** The rights and benefits of this Agreement shall inure to the benefit of, and be enforceable by the Company's successors and assigns. The rights

and obligations of Participant under this Agreement may only be assigned with the prior written consent of the Company.

(g) **California Corporate Securities Law.** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

*[Signature Page Follows]*

UBER00011874

The parties have executed this Restricted Stock Award Agreement as of the date first set forth above.

THE COMPANY:

UBER TECHNOLOGIES, INC.

By: ____*Jeffrey A. Holden*____
 (signature)

Name:  Jeffrey Holden

Title:  Chief Product Officer

Address:  1455 Market Street, 4th Floor
San Francisco, CA 94103

PARTICIPANT:

Anthony Levandowski

_____
(signature)

I, _____, spouse of Anthony Levandowski, have read and hereby approve the foregoing Agreement.  In consideration of the Company's granting my spouse the right to purchase the Shares as set forth in the Agreement, I hereby agree to be irrevocably bound by the Agreement and further agree that any community property or other such interest shall hereby by similarly bound by the Agreement.  I hereby appoint my spouse as my attorney-in-fact with respect to any amendment or exercise of any rights under the Agreement.

_____
Spouse of Anthony Levandowski (if applicable)

FINAL FORM

## ATTACHMENT A TO
## RESTRICTED STOCK AWARD AGREEMENT

## STOCK POWER

**FOR VALUE RECEIVED** and pursuant to that certain Notice of Restricted Stock Award and Restricted Stock Award Agreement dated _____ (the "Award"), Anthony Levandowski hereby sells, assigns and transfers unto Uber Technologies, Inc., a Delaware corporation (the "Company") _____ (_____) shares of the Class A Common Stock of the Company, standing in the undersigned's name on the books of the Company represented by Certificate No(s). \_\_\_\_\_, whether held in certificated or uncertificated form, and does hereby irrevocably constitute and appoint the Company's Secretary as attorney-in-fact to transfer the said Common Stock on the books of the Company with full power of substitution in the premises. This Stock Power may be used only in accordance with and subject to the terms and conditions of the Award.

Dated:_____      HOLDER

_____
(Signature)

Anthony Levandowski_____
(Print Name)

[**INSTRUCTIONS:** Please do not fill in any blanks other than the "Signature" line and the "Print Name" line. The purpose of this Stock Power is to enable to Company to exercise its reacquisition rights set forth in the Award without requiring additional signatures on the part of the Holder.]

1

UBER00011876