Pages 1 - 56

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE


```
WAYMO, LLC,                      )
                                 )
                Plaintiff,       )
                                 )
     v.                          )   NO. 3:17-cv-00939-WHA
                                 )
UBER TECHNOLOGIES, INC.;         )
OTTO TRUCKING, LLC;              )
OTTOMOTTO, LLC, et al.,          )
                                 )
                Defendants.      )   San Francisco, California
_____ )   Tuesday, April 25, 2017
```


**<u>TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING</u>**
**<u>OF PROCEEDINGS</u>**

FTR 2:00 p.m. - 3:04 p.m. =  64 minutes


**<u>APPEARANCES</u>**:

```
For Plaintiff:          Quinn, Emanuel, Urquhart, Oliver
                          & Hedges, LLP
                        50 California Street, 22nd floor
                        San Francisco, California  94111
                  BY:   CHARLES KRAMER VERHOEVEN, ESQ.
                        DAVID ANDREW PERLSON, ESQ.
                        JEFFREY WILLIAM NARDINELLI, ESQ.


For Defendants:         Morrison & Foerster
                        425 Market Street
                        San Francisco, California  94105-2482
                  BY:   ARTURO J. GONZALEZ, ESQ.

           (Appearances continued on following page.)

Transcribed by:         Leo T. Mankiewicz, Transcriber
                        leomank@gmail.com
                        (415) 722-7045
```

```
APPEARANCES:   (cont.)


For Defendant Otto Trucking, LLC:

                        Goodwin Procter, LLP
                        135 Commonwealth Drive
                        Menlo Park, California  94025
                BY:  INDRA NEEL CHATTERJEE, ESQ.


ALSO PRESENT:  John Cooper, Special Master
```

<u>Tuesday, April 25, 2017</u>

<u>2:00 p.m.</u>

P R O C E E D I N G S

(Transcriber's Note:  Due to counsel's failure to identify

themselves when speaking, many speaker attributions were

made by educated guess.)

---oOo---

**THE CLERK:**  Calling 17-979, Waymo versus Uber.
Counsel, please come to the podium and state your appearance.

**MR. VERHOEVEN:**  Good afternoon, your Honor.  Charles
Verhoeven from Quinn Emanuel on behalf of plaintiff Waymo, and
with me is my partner David Perlson, and Jeff Nardinelli.

**THE COURT:**  Got it right this time?

**MR. VERHOEVEN:**  I got it.

**THE COURT:**  Good afternoon.

**MR. VERHOEVEN:**  Good afternoon.

**MR. GONZALEZ:**  Good afternoon, your Honor.  Arturo
Gonzalez from Morrison & Foerster on behalf of Uber.

**THE COURT:**  Good afternoon.

**MR. CHATTERJEE:**  Good afternoon, your Honor.  Neel
Chatterjee at the Goodwin firm, on behalf of Otto Trucking,
LLC.

**THE COURT:**  Good afternoon.  I understand from the
docket you just entered this fine litigation today.

**MR. CHATTERJEE:**  I entered either today or late last

night.

        **MR. COOPER:**  And John Cooper, as special master.

        **THE COURT:**  Good afternoon.  All right, I just, before we begin, I want to caution the parties that we are on the record in a public proceeding, so do not mention any material that a party has identified as confidential.  After the hearing, we'll address the redactions and the like, but for purposes of the proceeding, let's not discuss it.

        All right.  So let's first address the proposed deposition of Mr. Page, which is indisputably an apex deposition.  I'll tell you sort of how I look at it, which is, Uber has three additional depositions, and they haven't used them all.  I understand the argument that whether it's responsive to the reply or not.  I think that is more an argument for Judge Alsup, although it plays some role, since we are talking about an apex deposition.

        I am not at all persuaded -- but I do think that the same rule applies, as always, which is, whether we allow it depends on whether there are other better people to provide that information.

        So I'm not inclined to allow the deposition to go forward on joint interest privilege or general policies of Google and the like.  The two things I'm interested in are the proffer that Mr. Page has some personal information as to conversations that he had with Mr. Levandowski, and Mr. -- I'm

going to mispronounce his name -- Kandinsky?  Am I pronouncing
that right?  Uber's CEO.

        **MR. GONZALEZ:**  Kalanick, your Honor.

        **THE COURT:**  Kalanick?

        **MR. GONZALEZ:**  Yes.

        **THE COURT:**  There you go, Mr. Kalanick.

        All right, and I guess with respect to that, let's
start with the latter.  Mr. Gonzalez, why couldn't Mr. Kalanick
simply give evidence as to that conversation?

        **MR. GONZALEZ:**  So, your Honor, what is important here
is not just that the conversation happened, but what Waymo's
version is of that conversation, and I should say
conversations, plural.  It wasn't just one conversation, there
were multiple.  And who did Mr. Page then speak to about those
conversations?

        This is why it's so important.  They're seeking an
injunction to try to stop us from participating in a market,
and the whole reason why we've been scrambling -- and we have
been scrambling -- the last five weeks is because they claim
that there's some emergency that is urgent, because these
14,000 files they claim were taken by Mr. Levandowski, so they
then believe they're being used at Uber.

        This is their whole thing, these 14,000 files, is the
only reason why we have this hearing next week and a trial in
October.

Well, as it turns out, we learned during the few depositions that we took that they actually knew about these 14,000 files way back in October, and they actually did sue the person who they claim stole the files, twice, in two separate arbitrations.  Didn't say anything about the 14,000 files.

THE COURT:  Didn't say anything to whom?

MR. GONZALEZ:  In the complaints that they filed against them.

THE COURT:  Okay, so you can make that argument.

MR. GONZALEZ:  True.  The question then is, why, when our CEO is having conversations with him in the same time period, doesn't he say anything about these files, or even generally about a concern that this employee is now working for us?

THE COURT:  Wait.  So -- so the thing is, we're in a little bit of a cabin situation here, which is, we're only talking about evidence relevant to preliminary injunction hearing --

MR. GONZALEZ:  Correct.

THE COURT:  -- and the evidence as far as Uber -- I mean, Uber -- Google is now closed, or Alphabet or Waymo, I know -- it's important to them that I keep it separate.  Got it.  I understand.  Waymo, thank you, Waymo is closed, right?  That's it.

So we're only talking about at this point potentially

evidence that you would put forth in your surreply.  So you can

make whatever argument you want in your surreply.  I don't know

why you need -- and maybe Waymo would stipulate that Mr. Page

didn't say anything in those conversations about the 14,000

files.

        **MR. VERHOEVEN:**  Well, your Honor, you're looking at me

right now.  I mean, I'm not prepared to say what we stipulate

or not, but if I could make some points on this --

        **THE COURT:**  Well we'll get to that.  Okay, so you're

not.  But I mean, that's also -- in other words, if this is all

about --

        **MR. VERHOEVEN:**  I'm sorry, you're talking about the

14,000...?

        **THE COURT:**  The conversation that Mr. Page --

conversations that Mr. Page had with Mr. Kalanick, in the

October 26 time frame, their argument is that notwithstanding

knowing about these 14 -- or at least they argue he knew about

these 14,000 files in October, that he did not mention to

Mr. Kalanick anything about those 14,000 files.  Maybe you'd

say, yes, he didn't.

        **MR. VERHOEVEN:**  I can look into that.  I could

probably -- my client is here, I could probably take a break

and ask if we can stipulate.

        **THE COURT:**  So then that's what you needed to know and

then you know it.

But also Mr. Kalanick can testify to that.

**MR. GONZALEZ:**  Yes, your Honor, but that's only part of the equation.  It's only part of the equation.  Then it's, who else -- who else at Waymo knew about these 14,000 files that may have been having conversations with our client and never said anything about it?

**THE COURT:**  No, no, no, you know that.

**MR. GONZALEZ:**  No.

**THE COURT:**  Your client knows who they had conversations with.

**MR. GONZALEZ:**  No, but I don't know who knew about the 14,000 files, and -- and before I move on --

**THE COURT:**  Okay, so Mr. Page, though, I don't know that he's the person to be asking.  We're at the tippity-top of a gigantic company.  So you're going to have to do a much better showing than that.

**MR. GONZALEZ:**  True, true.  But what I can ask Mr. Page about is his knowledge, and his conversations with Mr. Levandowski, who now --

**THE COURT:**  Okay, I understand that's one or two -- those were two separate --

**MR. GONZALEZ:**  Yes.

**THE COURT:**  I'm still talking about Mr. Kalanick now.

**MR. GONZALEZ:**  Okay, all right.  I mean, I've made my point on Mr. Kalanick.

**THE COURT:**  Okay.

**MR. GONZALEZ:**  I need to know who did he talk to about his conversations that he with Mr. Kalanick, and about whether or not he should say anything to Mr. Kalanick about these files.

**THE COURT:**  No, no, I don't think so.  Not for this very -- Mr. Page, on this point, and certainly conversations they had, may very well be relevant in general going forward in the litigation, but we're talking about a very narrow point in time right now.

**MR. GONZALEZ:**  Understood.  Let me just try it one -- one point, to make sure at least to make this point, and if you disagree with me, that's fine, I respect your opinion --

**THE COURT:**  Okay.

**MR. GONZALEZ:**  -- but here's the point, and why it's so important at preliminary injunction.  They are claiming that this is urgent, that they need this injunction because of these 14,000 files.

**THE COURT:**  Yes.

**MR. GONZALEZ:**  If Mr. Page at a high level is having discussions within Waymo -- within Waymo -- about whether or not he should tell my CEO about those files, that is information I don't have.  And if he's having conversations, which I'm almost certain this happened, "These 14,000 files, I'm going to meet with Uber's CEO, should I tell him about

these files?  Should I tell him about the fact that the guy
that's now running his autonomous vehicle program has our
files?  Should I tell him that?"

Those conversations are critical --

**THE COURT:**  Why?

**MR. GONZALEZ:**  Because they decided not to.

**THE COURT:**  I know, and that -- that's the critical
fact, as far as you're concerned.  That's your argument to
Judge Alsup.  There's no urgency here because they knew about
it in October and they didn't do anything about it.  That's the
argument, not why they didn't.

The "why" might matter if they were able to then file
a response.  But we're done.  That's it.  They did the reply,
and this is it.  And so you are now free in your surreply to
point out, over and over and over again, they knew in October,
he had this conversation with Mr. Kalanick and he didn't
mention it.

The why he didn't, we actually don't get to know the
why, because the evidence is closed.

**MR. GONZALEZ:**  So let me (indecipherable) my other
argument.

**THE COURT:**  Okay, let me ask Mr. --

(Simultaneous colloquy.)

**THE COURT:**  Yeah.

**UNIDENTIFIED SPEAKER:**  I'm the new guy, so I'm not

saddled with facts, law or procedure, I suppose, but the one issue that I'm really concerned about here --

**THE COURT:**  Yes.

**UNIDENTIFIED SPEAKER:**  -- with Mr. Page is the fact that, I understand your point, that there are two people in a conversation.  People on the Uber side can offer their own witness, but when you're talking about injunction and did someone act promptly or not, it's not just the inferences that your Honor suggests that be drawn, but what did Mr. Page actually do following those discussions.

If he told his people internally, "I don't want to do anything," that's a pretty material fact on injunction, and that he's the only person who knows what he did following those conversations.

And that is -- that has an important admission when we're trying to combat a preliminary injunction motion.

**THE COURT:**  Well, but we know they didn't do anything. We know they didn't do anything.  So what you're saying is, we want to know the why, and I guess I'm wondering --

(Simultaneous colloquy.)

**UNIDENTIFIED SPEAKER:**  But -- decision to not do anything.  If he actually said to people, let's sit back and see what happens, you know, that's a pretty important admission.

**THE COURT:**  All right.

**MR. VERHOEVEN:**  May I be heard, please?

**THE COURT:**  Yes.

**MR. VERHOEVEN:**  Thank you.  What you're hearing is maybe he did this, maybe he did that.  There's absolutely no evidence here for anything that would support the heavy burden for apex.

Uber had an opportunity to submit its evidence.  What they're telling you about is a conversation their CEO allegedly had.  They elected, your Honor, not to even file a declaration on this.  They elected, in their opposition, not even to mention it.  We filed our reply, your Honor, we didn't talk about it.  And now, after we filed our reply, after we used our three picks, we get this gamesmanship to harass us, asking to depose the CEO of the parent of the parent of the parent of Waymo.

It's clearly harassment, and this justification here makes no sense.  None of this is based on anything in our reply brief, and they're basically saying that we should get -- they should get the deposition of our CEO while simultaneously saying they don't have to provide a declaration to support that there's a need for it, or any other evidence besides attorneys making things up, and furthermore, that they should not even be compelled to produce Mr. Kalanick for a deposition.

**THE COURT:**  Well, no, no, that's why we're answering the first question first, because if Mr. Page isn't going to be

giving testimony about his conversation with Mr. Kalanick, then the latter question goes away.

   **MR. VERHOEVEN:**  Yes, your Honor.

   **THE COURT:**  Right, right.

   **MR. VERHOEVEN:**  But the point I'm making is, this isn't even an even-handed request that they're making.  So for these reasons, your Honor, we don't think that that basis applies.

   And very, very briefly for the record, I know you probably don't want to hear this, but we take great issue with the characterization of our delay.  The notion --

   **THE COURT:**  Okay, I am going to stop you there.

   **MR. VERHOEVEN:**  Okay.

   **THE COURT:**  Because fortunately, or unfortunately, I don't have to make that decision.  You can save that for Judge Alsup.

   All right, so tell me -- I think here with -- the proffer is that he had a conversation with Mr. Kalanick, although it is interesting, if you would -- you had that knowledge from the beginning, Mr. Kalanick could have submitted a declaration, and Uber at least would have had the opportunity to respond.

   But in any event, I don't even know that it's undisputed, and it's not undisputed that they didn't do anything.  I think that argument is there, and for the apex

deposition, I think at least this stage, I don't think it's been shown.

So tell about the conversation, then, with Mr. Levandowski.

**MR. GONZALEZ:** So Mr. Levandowski's important because he obviously is not testifying, and he is not going to be introducing a declaration or anything else, but yet they are claiming, in their reply brief, that because there were conversations between Mr. Levandowski and Uber, somehow that is evidence of improper conduct or motive.

In fact, what they've argued is that we actually told Mr. Levandowski to take these files, so he could then use them at Uber.  That is what they have argued.

If, in fact, their CEO knew, which he did know, that Mr. Levandowski was having discussions with Uber about possibly coming over to Uber, and he knows about these files and does nothing, that is material information that I can't get before Judge Alsup, because there are two people to those conversations, the CEO of Google and Mr. Levandowski.

And so there, I think it's especially important, because it shows -- think about it this way, your Honor.  This is why we say it's not a garden-variety trade secrets case. Here is a man, their CEO, who has knowledge that this person who works for him supposedly stole something really, really important, and he knows that he's coming over to Uber to do

exactly the same thing, and they have conversations about it, because he's trying to talk him out of it and all of that, and yet, when he comes over to Uber, he says nothing.

The fact that he knew that he was coming to Uber and yet did nothing, man, that is significant.

**THE COURT:**  But so is the proffer that Mr. Page had the conversation with --

**MR. GONZALEZ:**  Absolutely.

**THE COURT:**  All right.

**MR. GONZALEZ:**  Absolutely.

**THE COURT:**  I wasn't clear, because in Waymo's response, you pointed out, there was something about Uber.

So is that agreeing that Mr. Page did have conversations with Mr. Levandowski?

**MR. VERHOEVEN:**  I'm not agreeing to anything.  What you just heard, your Honor, was something was made up in the mind of Mr. Gonzalez.  He's completely speculating, and making allegations about the CEO of Alphabet that are completely made up, without any evidentiary basis, your Honor, and it's just outrageous.

**THE COURT:**  So what is the offer of proof?

**MR. VERHOEVEN:**  Yes, where's the evidence?

**THE COURT:**  No, no, I'll ask the questions.

**MR. VERHOEVEN:**  Sorry.

**THE COURT:**  Who -- it's just, in the end, it's all

about money.  So calm down, calm down.  Okay?

What is the offer of proof with respect to these conversations?  Because of course, we have this problem.

MR. GONZALEZ:  Sure, and I made the offer of proof front of the special master.  I told them, in front of the special master, exactly what I just told you, and I said if those conversations didn't happen, then you give me a declaration from your CEO saying, "I never spoke to the guy, I never knew he was going to Uber."

They haven't done that, and when you ask them a very simple question, "I'm not answering anything," he says, because he doesn't want to lie to the Court.

They had those conversations, and there were multiple conversations.  This is the man, your Honor, who was in charge of their autonomous driving program, and you see from this submission -- I'll be careful not to say anything AEO -- you see from the submission how much money they had predicted --

THE COURT:  Okay, we don't need to go into that.

MR. VERHOEVEN:  Your Honor, if I may respond to that, first of all, I know your Honor knows the background, but just to set the stage, the allegations here are that Mr. Levandowski intentionally downloaded files, 14,000 files, secretly and he wiped his tracks, and then gave notice without -- or quit without giving notice.  The privilege log has -- that's been received shows that two days later, he's having conversations

in anticipation of litigation with Uber, and we have tried,
your Honor, to obtain discovery of these facts.  Discovery was
ordered by Judge Alsup, and Mr. Levandowski has refused to
testify.  He has taken the Fifth Amendment.  We took his
deposition.  Every single substantive question on this issue,
any of the issues in this case, he took the Fifth.  He took the
Fifth on what he did at Google, your Honor.

So they have no evidence of what Mr. -- what you're
hearing, and Mr. Gonzalez admitted this, at the
meet-and-confer, is that his basis for making the allegation
that there's a conversation is his conversation with
Levandowski.

That's -- if he's going to rely on that, he's just
waived the common interest privilege.  You can't assert
privilege as a shield, your Honor, and bar us from taking any
discovery, and use it as a shield, and then turn around and
actually use the privileged information you've blocked as the
basis for taking the deposition of a CEO -- indisputably apex
CEO.  It's unheard of.

**THE COURT:**  Well, it's true you can't use it, and
certainly, I would expect will not be allowed to then, you
know, waive the privilege and testify and the like.  So that
Mr. Page would have the last word, and the only word, on what
was ever said in those conversations.

But let me ask you about that, Mr. Gonzalez, though.

That is -- normally, we don't allow a party -- and
Mr. Levandowski is still employed by Uber?

   **MR. GONZALEZ:**  Yes.

   **THE COURT:**  Okay.  So it's one and the same.  It's
Uber, then -- Uber, then, refusing to give to testify on it and
say, but I get to get that testimony from you.  That does seem
a little troubling.

   **MR. VERHOEVEN:**  Your Honor, and if I may finish the
point, as you know, under the apex doctrine, you have to
demonstrate that you've tried lesser means.  Well, here what's
happened.  Their own officer, the guy running their whole
program, won't submit a declaration.  It's not that he can't
get him, he won't, and they have asserted the common interest
privilege and withhold over 3,000 documents.  You ever seen a
privilege log 3,000 documents long?

   **THE COURT:**  Coincidentally, no.

   **MR. VERHOEVEN:**  They've withheld 3,000 documents on
this supposed common interest privilege.

   **THE COURT:**  We'll get to that next, but --

   **MR. VERHOEVEN:**  But my point is, they have a lesser
means.  They could choose to have him talk about any
conversations he had.  He's under their control.  He's their
officer.  They've chosen not to, they've asserted a shield over
all of that and blocked us from taking discovery, and given
that, they cannot use a basis, which is solely based on

information that is privileged that they have withheld from us
to assert that the apex depositions should occur, resulting in
huge harassment of the parent company, Alphabet.

      **MR. GONZALEZ:**  So, first, Uber has not asserted any
Fifth Amendment privilege.  Mr. Levandowski has separate
counsel for criminal and civil for asserting that privilege.
That's exactly why Neel is here, because of this argument they
keep making that Uber is asserting the Fifth.  Uber is not.
Uber is doing everything it can to open its doors to allow an
inspection of its files to show that there's nothing there.

      **THE COURT:**  Yes, but Mr. Levandowski's still employed
by Uber.

      **MR. GONZALEZ:**  He is.  He is, your Honor, he is.

      **THE COURT:**  Well, so I don't know that it's done
everything in its power.

      **MR. GONZALEZ:**  Well, your Honor, we cannot compel an
employee to waive his constitutional rights.

      **THE COURT:**  But you can compel him not to be an
employee.

      **MR. GONZALEZ:**  Well --

      **THE COURT:**  Then you might have a better argument,
I would think, if he truly is a third party at that point, but
now he's -- he's an officer or...?

      **MR. GONZALEZ:**  Your Honor, I don't even know if he's
an officer, but he's...

**THE COURT:**  He's a high-ranking --

**MR. GONZALEZ:**  He's a high-ranking employee.

**THE COURT:**  He's a high-ranking executive, so it's really one and the same.  Anything he would say would be binding on Uber and that kind of thing, so...

**MR. GONZALEZ:**  So, but your Honor, what it comes back to is, I mean, he just made the argument for me.  He's talking about lesser alternative means, and then he doesn't offer any other than Mr. Levandowski.

We have an employee who is not going to testify about critical conversations.

**THE COURT:**  Yes.

**MR. GONZALEZ:**  The other person to that conversation happens to be their CEO.  They are not denying that.  He's here.  You can put him in the chair, you can just ask him:  Did you have conversations with Mr. Levandowski about him going to Uber?  And if the answer is yes, that's my point.  How else can I get that information?

Sure, you're saying, but I can fire him.  Great, I can fire him.  He's still not going to testify.

**THE COURT:**  But you might be in a little bit of a different position at that point, but always, when somebody takes the Fifth, it has certain consequences.  Right?

**MR. GONZALEZ:**  Absolutely.

**THE COURT:**  And often very negative, but there is a

little bit of fairness to the other side, which is, they don't
get any evidence whatsoever from him.

        **MR. GONZALEZ:**  But your Honor --

        **THE COURT:**  Or Uber, to a large extent.

        **MR. GONZALEZ:**  But what are we saying?  That logic
would mean that whenever somebody asserts the Fifth, anybody
they spoke to is now immune from --

        **THE COURT:**  No, no.  Oh, no, no.  Of course, not at
all.  Not at all.  What we're talking about is an apex
deposition --

        **MR. GONZALEZ:**  Correct.

        **THE COURT:**  -- in which you make a showing as to a
particular need from this particular person, and as I said,
we're in this very cabin thing.  His deposition may very well
be appropriate once discovery is opened on particular -- on
particular things, but at this time, I'm not sure --

        **MR. GONZALEZ:**  So your Honor, can I say one thing?

        **THE COURT:**  Yes.

        **MR. GONZALEZ:**  You're saying that we can ask him about
a particular thing.  The particular thing here is his
conversation with the person accused.  This guy -- this guy had
conversations with the person who allegedly stole the stuff.
How else can we get the information, given that he's asserting
the Fifth?

        This is not a fishing expedition.  I wouldn't be here

wasting my time.  If he didn't have any conversations, why do
I want to go over there on a Friday afternoon, "Did you have
conversations?"  "No."  "Well, thank you for coming," I pack my
bags and I drive two hours back.

   THE COURT:  Well, do you have any cases or anything
that suggest that that is appropriate, that when an employee --
I mean, it's really Uber taking the Fifth at that point.

   MR. VERHOEVEN:  Your Honor, may I be -- some
clarification on that?

   THE COURT:  Yeah.

   MR. VERHOEVEN:  Mr. Gonzalez has repeatedly said, and
I think it's misleading, that Uber is not taking the Fifth,
that Mr. Levandowski is.  Let's be clear.  Uber is asserting a
common interest privilege to withhold Uber documents and to
prevent Mr. Levandowski from testifying, based on Uber, not on
the Fifth Amendment.

   Uber has also alleged -- and this is their position --
that the Fifth Amendment extends, since there's a common
interest, to all these documents that they're withholding.

   So not only is Mr. Levandowski still an officer of the
company and head of the program in which the accused secrets
are alleged to have been used, but Uber itself is asserting a
common interest with Mr. Levandowski.

   So the notion that, oh, we can't do anything, oh,
there's no other option, is, to understate it, meritless, your

Honor.

        **MR. GONZALEZ:**  I'm still --

        **MR. VERHOEVEN:**  And I'm not quite done, sir.

        And Mr. Gonzalez says, "Well, I wouldn't be wasting my time, this is really important."  If it was really important, they would have done the subpoena during the window contemplated by the Court, and exercised it as one of their depositions, so that they could prepare their opposition.  They didn't.  They intentionally waited, your Honor, until we had used up our picks, and then asked the CEO of the company, and took the position, aha, you can't --

        **THE COURT:**  I don't know what difference that makes, really --

        **MR. VERHOEVEN:**  Well, it's gamesmanship, is what it is.

        **THE COURT:**  No, but how does it work to his advantage?  It's actually a disadvantage, because there's a risk, a real risk, that whatever evidence they get, Judge Alsup won't consider.

        **MR. VERHOEVEN:**  So then you have to ask yourself why are they doing it, other than harassment.

        **THE COURT:**  Well, I don't know that it's harassment.  Any deposition, if there was, would be very brief.  So I don't think that's probably --

        **MR. GONZALEZ:**  Yes, so your Honor --

THE COURT:  -- harassment.

MR. CHATTERJEE:  Your Honor, if I may speak for a moment?

THE COURT:  Yes.

MR. CHATTERJEE:  As I said at the beginning, I represent Otto Trucking, LLC.  We are a distinct entity from Uber.  Uber does not own our company.  So I'm in a situation where their employee is asserting the Fifth, the other guy who knows is over there, and I think we should be allowed to get the information from their CEO about what those conversations were, in defending against the injunction request.

MR. VERHOEVEN:  Your Honor, we don't even know -- we got a notice of appearance from Mr. Chatterjee.  That's all we know.  He's just made some representations.  We don't have any evidence of who owns Otto Trucking.

MR. CHATTERJEE:  Your Honor, look at the document.

MR. VERHOEVEN:  Please, don't interrupt me.

And so for him to come in, and two-against-one me here on something that's been briefed up by myself and Mr. Gonzalez is not appropriate, and I don't think it's appropriate for the Court to rely on factual statements made by Mr. Chatterjee that aren't in the record, about Otto Trucking.

THE COURT:  In the end, all this is going to, right, is the propriety, assuming all other elements are satisfied, of a preliminary injunction, and the argument is, because of the

delay, it's not -- there's no irreparable injury, or it's not
as harmful as Waymo is claiming.

      **MR. CHATTERJEE:**  It's more than that, your Honor, if
I may start.

      **MR. GONZALEZ:**  Yeah, yeah, go ahead.

      **MR. CHATTERJEE:**  The issue here is really, if Mr. Page
knew about what was going on, and he's talking to
Mr. Levandowski and Mr. Levandowski is saying, "I'm going to
work for a competitor," and then he does nothing, you can make
the argument that Mr. Levandowski acted in reliance on what
statements --

      **THE COURT:**  Well, wait a minute.  First of all, you're
allowed, under California law, to go work for a competitor.  So
there's really nothing to do at that point, in California.

      **MR. CHATTERJEE:**  But the difference is -- I agree with
that.  But the difference is, in light of all these other
facts, the more salacious facts that Google or Waymo is setting
forth, and being able to establish that, and what Mr. Page's
intentions were, and what he did as the executive of the
company, goes directly to the issue of the urgency of relief.
It isn't just a delay question.  It can go to a number of the
other equitable factors the Court has to consider.

      **THE COURT:**  But what do we do about the fact that this
is an apex deposition, indisputably, and we don't have any
admissible evidence?  Basically, all you can say to me is,

well, I've had a conversation with the person who's refusing to testify.  I mean, why is that proffered?  I understand it puts Otto in a bind, but so be it.  That's the bind that they're in.

        **MR. GONZALEZ:**  Your Honor, we've made an offer of proof twice.  I did it with the special master, I'm doing it with you.  If it's not true, then they just need to tell you it's not true, that my client never had a conversation with Mr. Levandowski, he never knew that he was talking to Uber, never knew he went to Uber.  If they want to --

        **THE COURT:**  Though it may very well be true, the question is:  Is it fair?  Is it fair, though, to use the privilege and deprive them of any discovery themselves into those conversations at all and to allow it just to be one way?  That's what you're saying.  We get it, one way only.  That's the question.

        **MR. GONZALEZ:**  And that's always the case when somebody asserts the privilege.  Whether it's attorney-client, Fifth Amendment or anything else, that's always the case.  It doesn't mean the other side is immune.

        I've made a representation that they're not denying.  Their client has material information that's relevant to the state of mind of the CEO, and they're seeking an injunction to stop us from being in this industry.  How can that not be information that we're entitled to when there's no other way to get it?  There's no other way.

You're not allowed, your Honor, to fire somebody if they exercise their constitutional rights, but even if we did, it's not going to help us here.  He's not going to testify.  He's made that clear.  He's got very good criminal counsel who have made that clear.

So this is not gamesmanship where we're trying to deprive them of anything.  I've said to Judge Alsup, and I'll say it to you, I wish Anthony would testify, because I happen to think you've got a good story to say, and I've told Judge Alsup what the story is.

So this is not, we're trying to have it both ways.  This is, one of our employees is exercising a right that's in the Bill of Rights.  We can't stop him from doing that.  So then, how else do we get that information?  Their CEO is the only other person.

This is not gamesmanship.  We've agreed to limit it to two hours --

**THE COURT:**  Yeah, well, this conversation will be about 15 minutes, but the real question, though, is, can you, with an apex deposition, which we look at differently -- so it's not a question of immunity, right?  We're talking about a very particular apex deposition.  Do you get it if you don't have any admissible evidence?  You just don't have it.  You don't have it.

I don't know, and they have no way of testing, if what

Mr. Levandowski said to you is true or not.  It could be completely made up, and there's no way of knowing.

      **MR. GONZALEZ:**  But here's what you do know.  What you do know, because I'm telling you and the Special Master is here, is that I made this offer of proof a week ago.  I told them what I'm telling you now, and they have never denied it. That's what you know.  And that is critical, because if they said to you, "Your Honor, here's a declaration from my guy, he wasn't even at the meeting," okay, now you got me.  Now you got me, I got nowhere to run.

      But I'm telling you, they had conversations.  They know he had conversations, and that's why when you ask them, what, did you have the conversation, just tell me yes or no, they don't want to tell you.  How else can I meet my offer of proof when you have one person exercising their constitutional rights?  I can't.

      **THE COURT:**  Your high-level executive exercising their constitutional rights.

      **MR. GONZALEZ:**  Granted, granted, granted, but the point is --

      **THE COURT:**  I mean, the granted, you're going to be prejudiced by that just to begin with.  I mean, granted, and -- right?  There's nothing you can do with that.  That's just a consequence that flows from that.  There's going to be adverse inferences that flow from that, right?  And we don't --

      **MR. GONZALEZ:**  I don't know.  We're going to have a big fight about that, that's for sure.

      **THE COURT:**  Well, generally there are.  I mean, they just are.  You know, you're a trial lawyer --

      **MR. GONZALEZ:**  No, but I'm talking about whether they're appropriate as against Uber as opposed to against the person asserting the Fifth Amendment.

      **THE COURT:**  Well, I'm sure there will be a fight about that.

      **MR. GONZALEZ:**  Oh, there will.

      **THE COURT:**  But I'm just saying that, as a practical matter, there always just is, right?

      **MR. GONZALEZ:**  Understood, your Honor.

      **THE COURT:**  Right?  And --

      **MR. VERHOEVEN:**  Just a couple of points.  I'll try to make them short.  There has been no offer of proof, just attorney argument, and that's been true throughout the process.

      What I've heard from counsel on the other side is that this is somehow relevant to the delay and arguments for the delay.  But your Honor, we've provided witnesses on the time line.  We have disclosed when we became aware of what, and we've disclosed what actions we've taken.

      Mr. Gonzalez referred to -- or maybe it was Mr. Chatterjee -- referred to Mr. Page as an executive of Waymo.  He's not an executive of Waymo.  He's the CEO of

Alphabet.  They're not asking for the deposition of the CEO of Waymo, your Honor.

We disclosed in our filing papers and in our preliminary injunction papers exactly when, or what we knew at the time, as to when we knew what, and then we provided witnesses who testified under oath as to when we knew what and what actions we took, your Honor.

So the notion that you need to go up three corporations higher to the CEO in an apex company, it's the second largest company in the world, to verify stuff we've already testified to, simply does not meet the apex doctrine.

**THE COURT:**  Well, they're -- it's different.  I mean, their argument is that he had conversations with Mr. Levandowski, so it's personal knowledge.  I mean, that's it.  It's that he had conversations -- and that's the only thing I consider, is that he actually had conversations, right?

**MR. VERHOEVEN:**  But again, they have no evidence except for evidence, admittedly -- admittedly -- is from the very person who is still their employee, with respect to which they're still asserting a common interest privilege and with respect to which there's been a claim of -- a blanket claim of both Fifth Amendment and attorney-client privilege, for every single conversation concerning anything in this case.

**MR. GONZALEZ:**  That's not accurate.  I want to just separate a couple of things, so you're comfortable.

This notion that we're asserting the Fifth Amendment for every conversation is ridiculous.  They've taken the depositions of 12 of our people, 12, in the last 10 days.  How many asserted the Fifth Amendment?  Zero.  Okay, so let's knock that off.

There is a very strong distinction between common interest privilege and Fifth Amendment.  We are claiming a common interest privilege that's completely valid.  We're going to have an argument at some point about it, totally separate and distinct from the Fifth Amendment.

Look, it all boils down to this.  There is a witness that has critical information, and it's not just, your Honor, that there was a delay.  It's knowledge.  It's knowledge.  You've got to put the two together.  It's knowledge.

They are claiming that the reason why they delayed is because they had no knowledge that Uber was involved in any wrongdoing.  Wait a minute.  If your CEO knows before he leaves that he's thinking of coming to Uber and he's having conversations with Uber, and then he comes to Uber, and they put in their reply brief -- and they just told you that a couple of days after he left, we're having conversations.  Why do they say that?  Because they want you to draw an adverse inference.  Same thing they did in their reply brief.

Well, if their CEO knows about all this stuff, how can they do that?  How is it fair to draw an adverse inference from

the fact that we're talking if their CEO knows that we're
talking?  Which he knows, and which they haven't denied.

          So it goes to knowledge, not just to delay.

          **MR. VERHOEVEN:**  Again, this is all made up by
Mr. Gonzalez, it's not evidence.

          **THE COURT:**  So we're talking about an apex
deposition --

          **MR. VERHOEVEN:**  That's right.

          **THE COURT:**  -- and the burden.  What if it was
something other than a deposition?  What if it was merely just
an interrogatory that asked, did you have a conversation with
Mr. Levandowski in which he said that he was thinking about
coming to Uber?  Yes or no.  I mean, that's not the burden
that's relevant.

          **MR. VERHOEVEN:**  Well, my position, your Honor, I'll
check with my client, but the obvious answer from my position
is, they haven't met the standard for apex.

          **THE COURT:**  I know, but that's not an apex deposition.

          **MR. VERHOEVEN:**  Oh, you're saying it's an
interrogatory?

          **THE COURT:**  No, no -- yes, yeah, sorry.  I'm just
saying an interrogatory, and your argument is, then you can
make your argument, they knew, right?  But if the answer is no,
well, then --

          **MR. GONZALEZ:**  Your Honor, my argument is, when you

follow up.

       **THE COURT:**  No, I know you would like follow-up.  We have this problem, and it's an apex deposition, and that you actually can't offer any admissible evidence to make the showing that he has any personal knowledge, right?

       **MR. GONZALEZ:**  That is true.

       **THE COURT:**  But -- but the evidence is relevant, I don't think there's any question.  So I'm trying to figure out if there's another way of getting that evidence without, you know, without putting the apex deponent to that burden, and give you the information.

       **MR. VERHOEVEN:**  My partner is checking with the client right now.

       **THE COURT:**  Okay, he (indecipherable), and then you have it.  I mean, then you could just say, on the record, no, he didn't.  There you are.  And don't tell me about follow-up, because you don't get follow-up in that case, because your guy won't speak.  So there we go.

       **MR. GONZALEZ:**  That is true.  That last part is true.

       **THE COURT:**  Much to your dismay.

       **MR. VERHOEVEN:**  Maybe I should step out, too --

       **THE COURT:**  Yeah, I could say, as long as he's here, we can just do right now, 15 minutes.

       **MR. VERHOEVEN:**  Let me just go out and --

       **THE COURT:**  Of course.

        **MR. VERHOEVEN:**  -- and be right back, your Honor.

        **THE COURT:**  Well, let's see.  We'll talk about --

        **MR. VERHOEVEN:**  As long as there's no arguing about --

        **THE COURT:**  No, we'll talk about the Warriors, how about that?  Go Warriors.  Yes or no?  And poor Giants.

        How are you, Mr. Cooper?

        **MR. COOPER:**  I'm good.  Sitting back here, observing.

        **THE COURT:**  I know that you've been working very hard. I mean, hours.  I'm very appreciative of that.

        **MR. COOPER:**  Well, thank you.  I think that some of our meetings, meet-and-confers, are very good.

        **THE COURT:**  That's quite obvious.

        **MR. VERHOEVEN:**  Okay, what you suggested, we'll do.

        **THE COURT:**  All right.

        **MR. VERHOEVEN:**  But it's not going to be some multi-part interrogatory that asks for all kinds of details. It's exactly what you said on the record, your Honor.

        **MR. GONZALEZ:**  Well, hold on --

        **THE COURT:**  We don't have a court reporter to read it back.

        **MR. GONZALEZ:**  I don't even remember what you said, but --

        **THE COURT:**  Well, I think what I said was whether he had a conversation with Mr. Levandowski, before he left Waymo, in which he told Mr. Page that he was thinking about going to

Uber.  I believe that's what I said.

       **MR. VERHOEVEN:**  That's what I heard.  We'll do that, your Honor.

       **MR. GONZALEZ:**  So, your Honor, there's at least one other gap that we need.  If he had conversations with Mr. Levandowski after he left where Mr. Levandowski told him he was going to Uber, that would be important knowledge, that he knew that he was at Uber.

       **THE COURT:**  Oh, I see.  You said it was before the Uber deal was announced.  That's what your argument is, that he knew before then.

       **MR. GONZALEZ:**  Before August of -- exactly.

       **THE COURT:**  Can we do that?  It's before August.  So it's not before he left.

       **MR. VERHOEVEN:**  Right, as long as it's the same question, yes.

       **THE COURT:**  It's the same question, and it's before the Uber deal was announced, whatever -- you guys know when that date was.  All right, and can you do that by tomorrow?

       **MR. VERHOEVEN:**  My client's nodding her head, yes.

       **THE COURT:**  It's a phone call.

       **MR. VERHOEVEN:**  For the record, that's Shawna Stanton, in-house at Google.

       **MR. GONZALEZ:**  Your Honor, here's at least one other issue that flows from this is, we have a number of topics that

we wanted to ask him about.  They're making an apex objection, saying that we should be asking somebody else.  Shouldn't they still be required to produce a witness to testify about these other topics that I would otherwise be able to ask him about, if I'm not going to be able to ask him about those topics?

THE COURT:  Well, I mean, you have the -- who do you want to take?

MR. GONZALEZ:  That's a good question, your Honor. I guess I would say, in this type of apex situation, normally what would happen is they would say, your Honor, they don't need my CEO, I can give them Betty, Betty knows all about stuff and Betty can testify at this time, because I don't even know at this point who I can identify, who would have this knowledge, if they're not going to put up their CEO.

THE COURT:  Well, knowledge about what?  Because we --

MR. GONZALEZ:  About the other items, your Honor, that I...  What you don't have is our Notice of Deposition, but it's basically, you know, their participation in joint interest privilege, what they're pooh-poohing right now is something that I'm sure --

THE COURT:  Yeah, that actually has nothing to do with the preliminary injunction or your surreply, right?  That has to do with an issue that's up --

MR. GONZALEZ:  It actually does.

THE COURT:  -- on the Ninth Circuit right now --

**MR. VERHOEVEN:**  Ninth Circuit has ruled, just --

**THE COURT:**  I mean -- Ninth Circuit -- sorry, Federal Circuit.

**MR. VERHOEVEN:**  Federal Circuit.

**THE COURT:**  Oh, they did?

**MR. VERHOEVEN:**  Yes.

**THE COURT:**  Oh.

**MR. VERHOEVEN:**  They denied -- they considered -- I'm going off of memory here, but they considered it as a writ of mandamus, and they denied it.

**THE COURT:**  So it's back before Judge Alsup now.

**MR. VERHOEVEN:**  So the under the current framework -- let me just explain, so your Honor has a background.

**THE COURT:**  Yes.

**MR. VERHOEVEN:**  So Mr. Levandowski appeared personally in the case, and they asserted the Fifth Amendment and claimed that even producing the information that would be required under Judge Alsup's standing order for a privilege log would violate his Fifth Amendment.  And so they only gave us a redacted privilege log, which redacted the names, addressees and other very important information.  In particular, there's a vendor that they were trying to withhold from us.

So Judge Alsup issued an order denying their request, and he stayed the order, its effectiveness, for three days or something like to that, and the day before the end of the stay,

counsel for Levandowski took an appeal.  They filed a notice of appeal.  I think they may have filed something saying -- later saying, in the alternative, consider it's a writ of mandamus.

The Court -- the Federal Circuit stayed that, and that's the subject of what the Federal Circuit ruled on today, a few hours ago.

**THE COURT:**  Oh.

**MR. VERHOEVEN:**  So the effect of that is that the unredacted privilege log is now compelled, and we expect to see it.

**MR. GONZALEZ:**  So can I come back to the question, your Honor?

**THE COURT:**  Um-hum.

**MR. GONZALEZ:**  The more I think about it, the more it troubles me, and here's why, and this is why they like it.

The way it's phrased, all he has to say is yes, no, and that's it.  It's a one-word answer.  That's it, yes, no. So he says yes, they had conversations.  They're going to say, what does that mean?  It means nothing.  He had conversations, we don't know anything about what they were.  It means nothing.

Why couldn't we say -- just change it with a couple of words.  Why couldn't we say, describe any conversations that you had with Anthony Levandowski before August?  And then he can tell us -- he can tell us what those conversations were.

**THE COURT:**  Describe any conversations about his --

      **MR. GONZALEZ:**  Going to Uber.

      **THE COURT:**  -- going to Uber.

      **MR. GONZALEZ:**  Yeah, about --

      **MR. VERHOEVEN:**  Your Honor, I agreed to a deal.  We had a deal and --

      **MR. GONZALEZ:**  Well, I didn't have a deal.  I never made the deal.

      **THE COURT:**  It wasn't a deal.  It wasn't a deal, it was a proposal, because what we're talking about is an apex deposition, and to avoid burden.  So what I proposed was an interrogatory.  I mean, maybe you don't know the answer, because if the answer is no, then it's easy --

      **MR. VERHOEVEN:**  I'll have to check.

      **THE COURT:**  -- I don't know --

      **MR. VERHOEVEN:**  Especially because of the date, I'll have to check.

      **THE COURT:**  I mean, I guess I hear what you're saying. I'm just trying to do something that gives you something to do it, because I do think it's a problem.  It's a problem, that Mr. Levandowski isn't -- I mean, you have a person who's there. So I'm giving you something.  I don't know how valuable it is to begin with, in any event.

      **MR. CHATTERJEE:**  Your Honor, what I understood you to be saying, I may have misunderstood, and Mr. Gonzalez's concern may be a little different than mine, is that if he answered the

question yes --

      **THE COURT:**  Yes?

      **MR. CHATTERJEE:**  -- that gives us the evidentiary foundation to come in and say, we need to take his deposition to see what actually happened.  And, you know, because you're concerned -- because I understood it, and their argument was, there's no evidence there was ever a conversation.

      **THE COURT:**  No, no, I wasn't doing it so that -- to create your evidence so you could come in and do it.  I'm doing it so you can make your argument.  Mr. Gonzales was saying, I can't even make the argument --

      **MR. GONZALEZ:**  If they just say yes.

      **THE COURT:**  -- that Mr. Levandowski told Mr. Page that he was thinking about going to Uber.  I can't even make that argument.  Now I can make that argument.  Now I can make that argument, and sort of the details don't really matter so much; or they could matter, depending on what they are.  I have no idea what they are, but Mr. Levandowski knows what they are, and there we are with that whole...

      So I realize I'm just giving you an inch when you would like a mile, but that's what -- you can make that argument, then.

      **MR. GONZALEZ:**  So, your Honor, I'm not even asking for a mile.  I'm asking for a couple of feet.  All I'm saying is, describe the conversation that you had.  All I'm saying is,

describe the conversations that you had.  It's a few sentences.
Just a little bit more detail.  Your Honor, it's, what did they
talk about?  "Well, he told me he was thinking about going.
I told him if he stayed, I'd give him a bonus, but, you know,
he said he was leaving."

        **THE COURT:**  Well, why does that matter?  I mean, what
matters to you is that, according to you, that Mr. Page was
aware that he was going to Uber with all his knowledge, and
that therefore, when he learned of those 14,000 files, he knew
of the connection to Uber at that point, right?  You can make
that argument.

        **MR. GONZALEZ:**  Your Honor, can you read the question?
I don't know if you wrote it down.

        **THE COURT:**  Somebody must have written it down.

        **MR. VERHOEVEN:**  It got revised after it was stated.

        **UNIDENTIFIED SPEAKER:**  He's going to read it.
Everyone take notes, please.

        **MR. VERHOEVEN:**  I'm reading off of Jeff's notes, but,
"Did Anthony Levandowski and Larry Page have a pre-acquisition
conversation in which he told Mr. Page that he was thinking of
going to Uber?"

        **UNIDENTIFIED SPEAKER:**  That's how I heard it.

        **THE COURT:**  So not even that he was going.  Obviously,
if he was going, that would be included within it, but even if
he was thinking about it.

MR. GONZALEZ:  All right, your Honor, can I then move on to the related issues that stem from this ruling?  If we're not allowed to take this deposition, with every deposition that we've taken, we've shared six document requests, and both sides have been responding.

Those six document requests are outstanding, and there's no reason why they shouldn't respond to them.  I just want to make sure, before I leave here, that they intend to do that, and then the question is, we obviously still have a deposition to take, and we have very little time to do it, because our hearing is a week from tomorrow.  So --

THE COURT:  Wait, so is your question whether you get the six document requests that were made in connection with Mr. Page's deposition?

MR. GONZALEZ:  Yes, because those document requests would apply whether it was Mr. Page or whether it was his subordinate --

THE COURT:  Oh, I see.

MR. GONZALEZ:  -- if they appointed a subordinate to speak on his behalf --

THE COURT:  Okay.

MR. GONZALEZ:  -- as an apex.

THE COURT:  All right, but you're not saying you get those six plus another deposition --

MR. GONZALEZ:  No.

**THE COURT:**  -- and another six.

**MR. GONZALEZ:**  No, not another six.  No, no.  Those would be our six.  Since they've been served for almost a week now, they know what they are, presumably they've searched for them.  I want to make sure that they're still going to respond to them.  I think they are, but I want to be sure about that.

**MR. VERHOEVEN:**  I think we are, too, your Honor.

**THE COURT:**  All right.

**MR. VERHOEVEN:**  But, you know, there's a procedure set forth about depositions, and we get a certain amount of notice by agreement, and so ordered by the Court.  And so I would expect any further notices to abide by that, and we'll meet and confer with them.  I think we're getting ahead of ourselves raising new issues and expecting you to mediate them without talking about them.

**MR. GONZALEZ:**  It's not new issues.  I'm trying to avoid them.  So your Honor, the --

**THE COURT:**  So let's start with the first one.  So you're going to produce the documents.

**UNIDENTIFIED SPEAKER:**  Your Honor, their document requests are extremely broad, calling for things like, every common interest that Google has ever entered into and things like that, and they've gone way beyond the scope of the narrowly tailored --

**THE COURT:**  You know, it actually doesn't matter,

I have to tell you.  I know you want it, but it doesn't matter.
Like, we don't decide these things on tit-for-tat.  It may very
well be that they're taking a position here in this litigation
that is completely contrary to a position they take in another
litigation.  You guys are lawyers.  You do that all the time
with your clients.  I actually think it's not that valuable.

        **MR. GONZALEZ:**  Let me tell you why it is.  Judge Alsup
has asked for the positions that the parties have taken
previously -- not the lawyers, but the parties have taken --

        **THE COURT:**  Well, never mind, then.  If he asked for
it, then there you are.

        **MR. GONZALEZ:**  He did.

        **MR. VERHOEVEN:**  And we provided it.

        **MR. GONZALEZ:**  With respect to arbitration, with
respect to arbitration, the positions they've taken with
respect to arbitration, because of the issue that he's going to
decide on Thursday.  And so here again, if there is proof that
they've taken -- that not the lawyers, but that the client has
taken certain positions, that would matter to Judge Alsup.

        **MR. VERHOEVEN:**  So I think the translation is, Judge
Alsup has not asked for it.

        **MR. GONZALEZ:**  But your Honor --

        **MR. VERHOEVEN:**  But if I can just -- hopefully I can
just shortcut this.  We intend to treat these document requests
the exact same way we've treated the previous document

requests.  We will respond to them in a timely fashion.  If they're over-broad, we'll assert certain objections, just like we have in the past, and we'll meet and confer, as we have in the past, to achieve what they need within the reasonable parameters of burden, and I really think that's as far as we can go right now, your Honor.

THE COURT:  Well, okay, except that we have a hearing on Monday.

MR. GONZALEZ:  Yeah, here's the problem, and this is what they're not telling you.  The practice has been, and it has been Judge Alsup's order, that you produce documents in four days and the deposition happens on day five.

They are taking a deposition now that because this deposition is up in the air about whether it's going to happen at all or who it's going to be, that they don't have to produce documents until 24 hours before that deposition, even though they've now had our deposition notice for the requisite four days.

So we shouldn't be messing around here.  They ought to be responding to the document requests now, and if there's an issue with their response, we will confer with them and with the special master, and if we need to, run into court.

THE COURT:  Yeah.

MR. GONZALEZ:  But what I don't want is them just sitting around saying we're not going to respond --

THE COURT:  No, no, what I want you to do is to meet and confer with the special master following this hearing, to do it, and we can set a hearing, you know, and if we need to get on tomorrow afternoon, you can get on tomorrow afternoon.

MR. GONZALEZ:  Great, thank you.

MR. VERHOEVEN:  Thank you, your Honor.

THE COURT:  All right.

MR. VERHOEVEN:  I think we have the right -- these document requests and the privilege log.

THE COURT:  Yeah, but Mr. Gonzalez had brought up -- I don't know about another deposition, because you haven't noticed another deposition.

MR. GONZALEZ:  Well, we have to do that very soon, your Honor.

THE COURT:  All right.

MR. GONZALEZ:  We've got five days to do it, and --

THE COURT:  Part of it is, you've had a lot of other time -- I understand, sometimes you don't learn things until later.  Okay.  All right, so what's next?

MR. VERHOEVEN:  There's two categories that we've briefed in the one-page letter, both of which we believe are ripe for argument today, and my partner Mr. Perlson is going to address those.  The first is violation of the Court's repeated orders on document requests, and the second is failure to comply with the Court's --

**THE COURT:**  We're not talking about the Kalanick deposition anymore, right?

**MR. VERHOEVEN:**  Correct.

**THE COURT:**  All right.

**MR. VERHOEVEN:**  And the second is the lack of information that would comply with Judge Alsup's order on the privilege log.  So Mr. Perlson will handle those.

**MR. PERLSON:**  Good afternoon, your Honor.  So I'll address -- first I'll address the document insufficiencies. Your Honor, just -- I think it's useful to get a little context, going back.

The Court entered an expedited discovery order on March 16th that was agreed by the parties, and one of the things that the Court ordered Uber -- or actually, all defendants -- to do is to produce by the 31st a specific category of files relating to these 14,000 documents that have been taken, specifically that all files or documents downloaded by Anthony Levandowski, Sameer Kshirsagar and Radu Raduta, before leaving plaintiff's payroll, and thereafter taken by them.

And then additionally, it said,

> "Defendants shall also produce for copying the card
> reader, thumb drive, or other media used for the
> downloads, as well as all subsequent e-mails,
> memoranda, PowerPoints, text messages or notes that

have ordered, used or referred to any part of said

downloaded material."

And then it said, if any of that material has been

destroyed, that they have to provide details of that.

But on the 31st, we got a small production that

Mr. Gonzalez himself referred to as relatively light, and, you

know, had very few documents, and we sought the Court's

assistance on it, because it was clear to us that the order had

not been followed.

We had a hearing that was on April 5th, and the Court

agreed with us that they had not complied with what they were

supposed to do, and he said things -- then he ordered them to

search every server, and the next day there was an order that

said that they're to search every, as well as any -- every

server as well as any officers, directors or employees that

have anything to do with defendant's LiDAR technology.  They

were supposed to search their documents, and the Court said

that that production would need to be by the 14th.

They sought assistance from the Court, and there was

another hearing that was set on April 12th, and at that time

the defendants said, "We can't make it by the 14th, too many

documents," and the Court gave them a week extension to

April 21st.

**THE COURT:**  You know, I'm just going to interrupt you

for a second.  There's no way I can decide this right now.

What I want you to do is meet and confer with the Special
Master, and let's come back tomorrow, and to the extent there's
something still left, when I have something in front of me,
like all these things that you're saying we can do, 2:00, 3:00
o'clock tomorrow?  I see, all you guys are doing...

      MR. CHATTERJEE:  So, your Honor, we have a settlement
conference, too, in this case.

      THE COURT:  Oh.  With judge Laporte?

      MR. CHATTERJEE:  Yes, we do.

      THE COURT:  Well, how about this.  Why don't you, when
you're done, if you're done -- if you're not done, then we
don't need to do that -- but when you're done, then let
Ms. Means know, and then we'll just come over here.  I have a
settlement, I don't think it will take too long.  It's just
counsel only.

      MR. CHATTERJEE:  So can I just make one procedural
point?  I thought that the whole idea was that if there was an
issue that the parties had, we were supposed to discuss it with
the Special Master.  That's exactly what Judge Alsup told us to
do.

      THE COURT:  That's what I just said to do, is to have
you guys meet with the Special -- I heard what you said in your
papers --

      MR. GONZALEZ:  Here's what you need to know.  So we
did that, and the special master suggested a procedure for how

we prioritize, and we did precisely what the special master asked us to do.

So I don't know what exactly it is that they're raising now, but whatever it is, we should have a discussion with the Special Master and try to work that out, or else we just have to cut them out of the process all together.

If it's going to be just come in here every day, we could do that, but there was a specific procedure that he put into place, and we did exactly what he asked us to do, and then Sunday night at 8:52, they sent a letter complaining about four things, and yesterday we pointed out, those four documents have all been produced and here are the Bates numbers, and they didn't say boo about it in their one-pager.

So that's how it's supposed to work, which is you go to the Special Master, you prioritize, and if there's an issue, we confer. But now they're going all the way back to the beginning of time, and what I told Judge Alsup, and I'll tell you the same thing, it is impossible to search all of our servers by the date he gave. It is impossible. And I told him that. And I explained to him that we have now spent thousands of hours, thousands, without exaggerating, looking for this ghost that they say is at Uber.

We'll continue to do that, but the only thing that's going to happen, if we come back in here tomorrow, is I'm going to give you an update as to how much time we've done, how much

time we spent and where we are, and if you want us to do that,

we can, but I'll say to you the same thing I said to Judge

Alsup.  We cannot search all of our servers in a week, two

weeks, or even a month.

**THE COURT:**  All right, I don't know what it is, but

that's why I want you to meet with the special master, because

I do have to have things teed up.  I can't -- you know, I have

to have something in writing, teed up, and -- but also, is this

relevant to Monday's hearing?  That's the question, because if

it's not, then I don't want to put it on that abbreviated

thing.  Like --

**MR. PERLSON:**  It is absolutely relevant to the May 3rd

preliminary injunction hearing.

**THE COURT:**  All right.

**MR. PERLSON:**  And it was the very first thing that

plaintiff was supposed to produce and, you know, just real

quick, they may have said -- defendants may have said that they

can't meet the order, but the Court never excused them from the

order --

**THE COURT:**  And whatever consequence may flow from

that may flow from that, but tomorrow, all I'm going to be

concerned about, assuming there is a tomorrow, then, you know,

after you meet with Mr. Cooper, maybe there won't be, as a

practical matter, is there anything to be done?

If, as a practical matter, there's nothing to be done,

then it is what it is, and what flows from it flows from it, right?

     **MR. PERLSON:**  Understood, your Honor, and we're happy to submit a brief, we were prepared to do it, you know, we were following the direction of saying what was right, but -- so I'd suggest, yeah, we'll meet, and we can meet today, if that works, and then I do think it would be productive for your Honor to have a brief with, you know, setting forth our positions, and -- on this.

     And then additionally, the privilege log issue, if I could address that briefly?

     **THE COURT:**  No, same thing, I want you to talk with Mr. Cooper.

     **MR. PERLSON:**  Okay.

     **THE COURT:**  I mean, what we'd talked about when you were first here is we were going to -- well, first of all, I wonder if the privilege log issue, if now, given the Federal Circuit's ruling today, that sort of changes things --

     **MR. PERLSON:**  No, it really doesn't, and I'll tell you why.  First of all, one of the things that they had -- I mean, the main thing, and Mr. Verhoeven had referred to, is that there were certain information such as the names of this third party that did the due diligence report, and then some descriptions and things like that.

     **THE COURT:**  Okay, all right, all right.

MR. PERLSON:  So those privilege issues, which are, you know, basically manifest throughout the thousands of entries they have, really, they'll exist, you know -- they existed regardless of what happened at the Federal Circuit.

THE COURT:  All right, all right, then I want you to meet with Mr. Cooper, Mr. Gonzalez, following the hearing today, and see what you can resolve, narrow, come up with a process, but maybe you'll be able to resolve --

MR. GONZALEZ:  Your Honor, we do have a process for dealing with the privilege log issue that Special Master Cooper recommended, and that's all we're asking to do, is just go through that process, and they're insisting to just bypass it and run into court, and, you know -- that's another letter again Sunday night.  That one came in at 5:58 Sunday night.

MR. PERLSON:  Your Honor, I met and conferred with one of his partners on the privilege log two weeks ago.  The notion that we're -- is ridiculous.

THE COURT:  It's okay.  This is a 24/7 case and you each have armies of lawyers helping you, and so it is what it is, and you're on the tight schedule that you're on.

But I do have to have it presented --

MR. PERLSON:  Understood, Judge.

THE COURT:  -- in a way that I have something to read, and that it's teed up and it's gone...  Mr. Cooper has been and will continue to be enormously helpful.  There is simply no way

that I can just do this, as you come in like that, and it's not
necessary for me to do either, because in my experience, often
having a neutral just helps you sort of just work things out,
to the extent you can, just as a practical matter, is
enormously helpful.  So I'd like you to continue to do that.

As we saw, Mr. Cooper contacted Ms. Means, and we were
able to get you in right away, and, you know, and tee it up and
be ready.  And so I want -- yes, Mr. Cooper?

**MR. COOPER:**  What I was going to propose is that we
meet and confer, we go to the attorneys' lounge and meet and
confer, like we did before --

**THE COURT:**  Yes.

**MR. COOPER:**  -- and that if we can't resolve it, that
we -- that the parties tender to you, by tomorrow morning,
two-page letter briefs that are single-spaced, so that you can
internalize that and be prepared to make a ruling.

**MR. PERLSON:**  Your Honor, that's fine if it's on each
issue.  I don't think it's practical to have both the documents
and the privilege log issues in --

**THE COURT:**  That's fine.  I think that's what he's
proposing, one for the privilege log and one for the documents.
Right?  And if you could have it by -- 10:00?  I guess you're
not really going to be the ones writing it, but --

**MR. GONZALEZ:**  Again, my complication is that I'm
supposed to be here, I think, at 9:00 tomorrow for a settlement

conference.

        **MR. PERLSON:**  Starts at 9:30.

        **MR. GONZALEZ:**  9:30.

        **MR. COOPER:**  One of my questions, which Judge Alsup directed us to do, one of my questions is, is this a priority, is it necessary for the May 3rd hearing on preliminary injunction?  If it's not, we get more time.

        **THE COURT:**  Yes.

        **MR. COOPER:**  But if it is, then I think that's one of the things that the first paragraph ought to address.

        **THE COURT:**  I agree.  I agree, because we'll address things in time, but what I'm concerned about is, is this something that needs to be addressed for -- the production of something that's going to be used on Monday, and then I think, actually, if I recall, Judge Alsup even said, depending on what happens on Monday, there's an evidentiary hearing -- what, about two or three weeks after that?

        **MR. PERLSON:**  Potentially that, and your Honor, absolutely it is.  I mean, this goes to the heart -- critical --

        **THE COURT:**  No, no, you don't have to argue it now. What Mr. Cooper is saying is you put it in your letter.

        **MR. COOPER:**  Trying to get through.

        **MR. PERLSON:**  Understood, yes.

        **MR. GONZALEZ:**  Your Honor, just two things, 30

seconds, less than --

       **MR. PERLSON:**  Just trying to get an early...

       **THE COURT:**  I know.

       **MR. GONZALEZ:**  Two things.  Number one, so we have our surreply brief due on Friday.  So it's not like we're not doing anything.

       And number two, I want to make sure we have clarity on this response.  They're going to get us the response to the interrogatory tomorrow, and it's going to be under oath.
I think that's obvious, but I just wanted to make sure that was clear on the record that it's under oath and not just their lawyer.

       **THE COURT:**  It was an interrogatory, but yeah.

       **MR. VERHOEVEN:**  That's fine.

       **THE COURT:**  Agreed.

       **MR. GONZALEZ:**  All right, thank you.

       **THE COURT:**  All right.  Good luck.

       **MR. PERLSON:**  Thank you, your Honor.

       **MR. GONZALEZ:**  Thank you.

       **THE COURT:**  Thank you.

<u>3:04 p.m.</u>

---o0o---

## CERTIFICATE OF TRANSCRIBER

I, Leo Mankiewicz, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____  04/25/2017

Signature of Transcriber        Date