MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzalez@mofo.com
ERIC A. TATE (CA SBN 178719)
ETate@mofo.com
RUDY Y. KIM (CA SBN 199426)
RKim@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:     415.268.7000
Facsimile:     415.268.7522

Attorneys for Defendants
UBER TECHNOLOGIES, INC.,
OTTOMOTTO LLC, and OTTO TRUCKING LLC

KAREN L. DUNN (*Pro Hac Vice*)
kdunn@bsfllp.com
HAMISH P.M. HUME (*Pro Hac Vice*)
hhume@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington DC 20005
Telephone:     202.237.2727
Facsimile:     202.237.6131

Attorneys for Defendants
UBER TECHNOLOGIES, INC.
and OTTOMOTTO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>UBER TECHNOLOGIES, INC.,<br>OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>                    Defendants. | Case No.      3:17-cv-00939-WHA<br><br>**DEFENDANTS UBER TECHNOLOGIES, INC., OTTOMOTTO LLC, AND OTTO TRUCKING LLC'S RESPONSES TO COURT'S QUESTIONS FOR HEARING ON PLAINTIFF'S MOTION FOR PROVISIONAL RELIEF (DKT. NO. 327)**<br><br>Judge:   The Honorable William Alsup<br>Trial Date: October 2, 2017 |

**REDACTED VERSION OF DOCUMENT SUBMITTED UNDER SEAL**



1      1.   How detailed is the ███████████ design that Waymo claims as a trade secret?  For

2  example, does Waymo claim trade secret protection over any LiDAR design that uses any ████

   ██████████████████████████████?  Or does it claim only the specific design used

3  in ████ including the ████████?

4  **Response to Question 1**:

5      The ██████████ design that Waymo claims as a trade secret is not detailed.  Waymo

6  claims trade secret protection over any LiDAR design that uses ***any*** ██████████████████

7  ███████████████████████ that █████████████████████████████████████

8  ████████████████ (Declaration of Jordan Jaffe in Support of Waymo's Motion for a

9  Preliminary Injunction ("Jaffe Decl."), Ex. 1 at 2.)  Waymo does not claim only the specific design

10 used in ████.

11     The relevant trade secrets are numbers 1 and 4.  (Waymo's Motion for a Preliminary

12 Injunction ("Motion") at 13-14.)

13     Trade Secret 1 states: ████████████████████████████████████████

14 ██████████████████████████████████████████████████████

15 ██████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 █████████████████ (Jaffe Decl. Ex. 1, at 2.)

18     Trade Secret 4 states: ████████████████████████████████████████████

19 ██████████████████████████████████████████████████████████████

20 ████████████████████████████ (Jaffe Decl. Ex. 1 at 3.)

21     As demonstrated in the wording of the trade secrets above, Waymo does not claim any

22 specific ████████ between the diodes (other than to indicate a ██████████████), nor any specific

23 ██████████ for the diodes, nor any specific ████████████ for the diodes, nor any specific

24 percent deviation from ██████████████████, nor does it teach any specific

25 patterns.  Much less does it claim the specific design used in ████.  Even if it did, Fuji does not

26 use the specific ████ of ████.  No transmit board in Fuji has the same ████ as ████.

27 (Supplemental Declaration of Michael Lebby in Support of Defendants' Sur-Reply to Plaintiff

28 Waymo LLC's Motion for Preliminary Injunction ("Suppl. Lebby Declaration") at 3.)  The only

1   specific value that the trade secrets claim is ████████ between diodes.  By

2   contrast, Fuji has a ████████ between diodes.

3        After Uber demonstrated that the concept of ████████ is known to the

4   public, Gregory Kintz, Waymo's expert, testified to a narrower definition of

5   ████████

6   ████████ (Suppl. Lebby Decl., Ex. 2 (Kintz Dep. at 63:6-

7   14).)  Fuji does not use ████████, however, as Mr. Kintz defined it.  Mr. Kintz

8   testified that ████████ is not present if the ████████

9   ████████

10  ████████ (Suppl. Lebby Decl., Ex. 2 (Kintz Dep. at 63:15-64:14).)  Most of the

11  boards in Fuji have portions where the ████████

12  ████████.  (Suppl. Lebby Decl. at 24-25.)

13       2.   If you want the LiDAR points of illumination ████████

14  as a matter of optics, ████████?

15  **Response to Question 2**:

16       Yes.  As a matter of trigonometry, ████████

17  ████████ The relationship between ████████ad is a

18  simple trigonometric function: ████████

19       Assuming a sensor elevation of six feet (the approximate elevation of Fuji), the table

20  below illustrates the ████████

21  ████████

22  ████████

1

2

3   3.  How is a ███████████ superior to any other ███████████?  Where in the
4   record does Waymo supply evidence concerning the specific effects of ███████

5   **Response to Question 3**:

6   ████████████████ is superior to any other degree of
7   ████████.

8   The relevant trade secret, i.e., Trade Secret 7, states:

9   ████████████████████████████████████████

10  ████████████████████████████████

11  ████████████████████████  The trade

12  secret does not specifically claim ████████████████████.

13  Uber engineer Gaetan Pennecot testified that there was nothing special or important about
14  ████████████; rather it was an easy number to "type."  (Pennecot Dep. 21:18-22:1.)

15  In addition, Mr. Kintz, Waymo's expert, testified that the trade secret does not require
16  ████████ specifically.  (Suppl. Lebby Decl. Ex. 2 (Kintz Dep. 115:6-13).)   Mr. Kintz further
17  testified that a diode that is ████████████████ would have the same benefits as a ████████
18  ████████, given manufacturing tolerances.  (Suppl. Lebby Decl. Ex. 2 (Kintz Dep. 114:20-25).)

19  4.  What are the standard practices, if any, in the LiDAR field for distributing 64 diodes
20  across multiple printed circuit boards?

21  **Response to Question 4**:

22  Defendants are not aware of standard practices for distributing 64 diodes across multiple

23  printed circuit boards.  Velodyne's HDL-64E distributes 64 diodes across 64 printed circuit

24  boards, with one diode per board.  U.S. Patent 8,836,922, one of the asserted patents in this case,

25  discloses "four PCBs, with each PCB mounting sixteen light sources, so as to provide 64 light

26  sources."  (Col. 5:22-26.)

27  64 diodes can also be distributed among more than one cavity.  For example, Defendants

28  considered a design consisting of two cavities, with 32 laser diodes mounted on a single PCB per

1    cavity.  (Supplemental Declaration of Scott Boehmke in Support of Defendants' Sur-Reply ¶ 10.)

2    Fuji has two cavities and ████████ per cavity.

3          Once the number of boards is determined, it is a matter of simple arithmetic how to

4    distribute the 64 diodes across the boards.  In his declaration, Mr. Kintz states that "████████

5    ████████████████████████████████████████████████████████████

6    (Opening Declaration of Gregory Kintz ¶ 41), and Defendants' expert, Michael Lebby, agreed

7    (Suppl. Lebby Decl. ¶ 35).  Dr. Lebby further opined:  "[A]n engineer designing a LiDAR transmit

8    block would logically choose a configuration in a 64-laser system with a middling number of

9    PCBs (e.g., ███) and diodes per PCB (e.g., ███), to balance the size and cost concerns."  (*Id.*

10   ¶ 36.)  "The ████████ arrangement is one of a few obvious configurations that strikes that

11   balance."  (*Id.*)

12         5.  How, if at all, does Fuji's configuration of two 32-diode transmit blocks specifically
     map on to ████████ configuration of ████████████████?  For example, do each of the ███
13   printed circuit boards within each configuration serve comparable functions in their respective
     LiDAR systems?  Does the patent law doctrine of equivalents have an equivalent in trade secret
14   law?

15   **Response to Question 5**:

16         Aside from the fact that both include transmit PCBs, Fuji's configuration of two 32-diode

17   transmit blocks does not map on to ████████s configuration of ████████████████.

18         Fuji is a combination of two bistatic systems.  (Declaration of Paul McManamon in

19   Support of Defendants' Opposition to Waymo's Preliminary Injunction Motion ¶ 36.)  It is made

20   up of two cavities, with ████████████ each:  a medium-range cavity and a long-range

21   cavity.  (*Id.*)  Each cavity has separate transmit and receive paths divided by non-reflective metal

22   walls, with separate lenses for each path.  (*Id.*)  In total, the Fuji has four exterior apertures fitted

23   with four separate lenses.  (*Id.*)  The transmit and receive light paths do not overlap in the Fuji

24   system, because each path is physically separated from the others.  (*Id.*)  The long-range cavity is

25   positioned level with the ground, while the medium-range cavity is tilted downwards by

26   12 degrees from level.  (*Id.*)  When the two cavities are mounted next to each other, there is a

27   substantial metal wall between them.  (*Id.*)  The two cavities in the Fuji system are really two

28   LiDARs packaged in a single rotating housing.  (*Id.*)

1    By contrast, Waymo's ███████ LiDAR is a monostatic system.  (*Id.* ¶ 35) ███████ has a shared

2    lens fitted in the exterior aperture that is used both to collimate the outbound transmitted light and

3    collect the inbound received light.  (*Id.*)  GBr3 is comprised of a single optical cavity, consisting of

4    ███████████████████, in which the transmit path and receive path will overlap.  (*Id.*)

5    ████████████████ in 2 cavities and a █████████████ in one cavity are fundamentally

6    distinct.  (Suppl. Lebby Decl. ¶ 62.)  Fuji's arrangement of lasers is a physically and functionally

7    distinct design from ██████ reflecting Fuji's fundamentally different two-cavity, multi-lens

8    structure.  (*Id.*)  While ██████ has a ███████████████ aligned to one lens and paired with

9    ███████████████████████████████████████, Fuji's █████████ are each

10   separately (1) mounted in different LiDAR cavities, (2) aligned to permit laser light to pass

11   through two lenses, and (3) paired with flat receive boards with ████████ of photoreceptors.

12   (*Id.*)  At deposition, Mr. Kintz acknowledged that it would not be "simple modification" to arrange

13   boards distributed across two optical cavities into a single cavity.  (Suppl. Lebby Decl., Ex. 2

14   (Kintz Dep. 160:3-11, 158:7-160:2).)

15   Further, Fuji does not use an inductor, because it complicates the circuity and takes up

16   more space on the PCB.  (Declaration of James Haslim in Support of Defendants' Opposition to

17   Waymo's Preliminary Injunction Motion ("Haslim Decl.") ¶ 16.)  By contrast, ██████ includes an

18   ██████████████████████████████████████████████████████████

19   ████████████████ (Trade Secret 15.)  In addition, the shapes of the boards in Fuji are

20   different from those of █████ (*Compare* Haslim Decl. ¶ 15, *with* Jaffe Decl. Ex. 2, p.16.)

21   In patent law, the doctrine of equivalents serves the purpose of preventing infringers from

22   escaping liability through overly literal interpretations of patent claims vetted though Patent Office

23   examination.  The question in trade secret law is whether features of the defendant's products or

24   processes were derived from misappropriated trade secrets or from the defendant's pre-existing

25   skill; knowledge, training, and experience; independent efforts; or public-domain materials.  *See,*

26   *e.g.*, Cal. Civ. Code § 3426.1(a); *Mattel, Inc. v. MGA Entm't, Inc. & Consol .Consol. Actions*, 782

27   F. Supp. 2d 911, 963 (C.D. Cal. 2010).  Merely making minor variations does not defeat a trade

28   secret claim.  *See Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1244 (Fed. Cir. 1989)

1    (applying California law).

2         6.   Does Velodyne or any other company manufacture or commercialize LiDAR systems
     using any of Waymo's purported trade secrets?  For example, is the ███████████████
3    ████ configuration used by any other company?  Has Waymo's use of this configuration or any
     other asserted trade secret been disclosed to any public agency?  Under the law, could anything
4    actually used by other companies be deemed a trade secret by Waymo?

5         **Response to Question 6**:

6         Yes.  The Velodyne VLP-32A has "non-linear channel distribution" with "denser channel

7    configuration on the horizon," and thus discloses ██████████████ .  (*See*

8    http://velodynelidar.com/vlp-32a.php.)  Uber engineer Daniel Gruver testified that Velodyne

9    LiDARs have ██████████████ .  (Supplemental Declaration of Esther Kim Chang in Support of

10   Defendants' Sur-Reply, Ex. 14 (Gruver Dep. 51:4-15, 51:22-52:5.)  Several LiDAR component

11   vendors provide ████████████████████████████████ in LiDAR

12   applications (Suppl. Lebby Decl. ¶ 42) and ██████████████ (*id.* ¶ 40).  Defendants are

13   unware of any other company using the ██████████████ .

14   Defendants have insufficient information whether Waymo's use of this configuration or any other

15   asserted trade secret has been disclosed to a public agency.

16        Under trade secret law, it is possible for two companies to independently derive a trade

17   secret and for that trade secret to maintain its status, assuming no public disclosure.  Coca-Cola

18   and Pepsi might have the same formula, but each would consider it a trade secret.  When

19   information "is generally known in the trade and already used by good faith competitors, however,

20   it is not a protectable trade secret and injunction should not issue." *Logtale, Ltd. v. IKOR, Inc.*,

21   2012 U.S. Dist. LEXIS 173321, NO. *18-19 (N.D. Cal. Dec. 5, 2012) (quoting *Am. Paper &*

22   *Packaging Prods., Inc. v. Kirgan*, 183 Cal. App. 3d 1318, 1326 (1986).)  Therefore, any

23   engineering concepts or techniques generally known in the trade and used by other companies do

24   not—and cannot—constitute Waymo's trade secrets.

25        7.   Even if defendants themselves have not misappropriated any trade secrets, can they still
     be held liable for misappropriation by Levandowski that was never used for their benefit?
26

27

28

**Response to Question 7**:

No.  In order for Waymo to show that Defendants misappropriated Waymo's alleged trade secrets, it must show that Uber either acquired, used, or disclosed those trade secrets. If Levandowski never used any alleged Waymo trade secrets for Defendants' benefit, he either (a) never used those trade secrets at all while he was an employee of Defendants, or (b) he somehow used those trade secrets while an employee of Defendants in a manner that was not of any benefit to Defendants.  There is zero evidence of the latter, and Waymo does not even allege this.  Thus, the only conclusion that can be drawn is that Levandowski never used the trade secrets while an employee of Defendants.

The case law confirms that an employee's misappropriation is not sufficient to hold his new employer liable for misappropriation.  In *Globespan, Inc. v. O'Neil*, for example, the defendant new employer hired a former employee of the plaintiff who allegedly brought several binders containing plaintiff's trade secrets with him to his job with defendant.  *Globespan, Inc. v. O'Neil*, 151 F. Supp. 2d 1229, 1235 (C.D. Cal. 2001).  But the court granted defendant new employer's motion to dismiss because plaintiff failed to allege that the new employer had used or disclosed the trade secrets.  Specifically, the court ruled that, "Plaintiff has not alleged that Defendant Broadcom has used or disclosed Plaintiff's trade secrets.  Thus, Plaintiff has not alleged misappropriation by Defendant Broadcom, as required by the claim."  *Id*.  Likewise, in *Danjaq, LLC v. Sony Corp.*, the Central District granted summary judgment where the company defendant hired one of plaintiff's former employees who had access to alleged trade secret information, but where there was no evidence of disclosure of the information by the employee or use by the new employer.  *Danjaq, LLC v. Sony Corp.*, No. CV 97-8414-ER (MCx), 1999 U.S. Dist. LEXIS 22486, at *6 (C.D. Cal. Mar. 11, 1999).  Similarly, in *United Rentals*, *(North America), Inc. v. Keizer*, 355 F.3d 399, 412 (6th Cir. 2004), the court granted summary judgment in favor of defendant employer on the misappropriation claim where defendant hired a former employee of plaintiff who brought a customer list with him, showed it to defendant employer, but defendant employer did not use the list.  Further, in *Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F. Supp. 2d 1326, 1338 (S.D. Fla. 2001), the court denied a preliminary injunction against a

1   competitor where the competitor merely hired plaintiff's employee, finding under California or

2   Florida law "[plaintiff] must show more than mere possession of a trade secret by [employee]" to

3   establish misappropriation).

4        Waymo does not allege a theory of vicarious liability.

5        8.   If Waymo shows that Levandowski misappropriated trade secrets but fails to further
    show that defendants did so, would it be enough, to show likelihood of success and irreparable
6   injury, that defendants knowingly employed an executive who misappropriated trade secrets and
    who remains in a position to misuse said secrets for defendants' benefit?  Please provide case law
7   on point.

8   **<u>Response to Question 8</u>**:

9        No.  Uber's employment of Mr. Levandowski is not sufficient to show either likelihood of

10  success or irreparable harm.

11       <u>Likelihood of success:</u>  To show a likelihood of success against *Defendants*, Waymo must

12  demonstrate that *Defendants* misappropriated Waymo's trade secrets, not that Mr. Levandowski

13  did.  The definition of "misappropriation" requires a showing of either (a) Uber's "acquisition of a

14  trade secret" or (b) Uber's "disclosure or use of a trade secret." 18 U.S.C. § 1839 (5)(A); Cal. Civ.

15  Code § 3426.1.  Waymo cannot show either.  Extensive discovery confirms that Uber has not

16  acquired any of the downloaded files (which Waymo has not proven to be trade secrets), and that

17  Uber's LiDAR device is not using (or disclosing) any of Waymo's alleged trade secrets.

18       The cases cited in response to Question 7 further show that mere employment of

19  Levandowski is not sufficient to impose liability on Defendants.  *See, e.g., FLIR Sys., Inc. v.*

20  *Parrish*, 174 Cal. App. 4th 1270, 1277 (2009) ("[S]peculation that a departing employee may

21  misappropriate and use a trade secret in a startup business will not support an injunction.").

22  Further, California has rejected the doctrine of "inevitable disclosure," and therefore does not

23  permit a holding that the mere employment of a person who has trade secret information is

24  sufficient to create a showing that the employer has misappropriated trade secrets.  *Whyte v.*

25  *Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1463 (2002).  A contrary holding would violate

26  California's strong public policy "in favor of open competition and employee mobility." *Edwards*

27  *v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 (2008).

28

1    Moreover, as Uber stated in its opposition brief, Waymo has forgone any claim of

2 "threatened misappropriation" in support of its motion for a preliminary injunction. Waymo's

3 Reply did not dispute this.  In any event, Levandowski's continued employment with Uber would

4 be insufficient and Waymo otherwise has not met its burden for a preliminary injunction under a

5 "threatened misappropriation" theory. In the absence of any actual evidence that Uber has misused

6 Waymo trade secrets, Levandowski's continued employment at Uber—especially given his recusal

7 from LiDAR work—simply cannot "indicate[] imminent misuse." *CanWe Studios LLC v. Sinclair,*

8 No. CV 13-6299 PSG (FFMx), 2013 WL 12120437, at *2 (C.D. Cal. Nov. 20, 2013) (citing *FLIR*

9 *Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1279 (2009) (absent evidence that contents were

10 improperly accessed, used, or copied, hard drive "download was not a threatened

11 misappropriation").  Indeed, Levandowski left Google and founded Otto more than fifteen months

12 ago. Otto and Uber began collaborating on LiDAR a year ago. Uber acquired Otto almost eight

13 months ago. If Levandowski's involvement has not resulted in misappropriation of Waymo trade

14 secrets by defendants at this point, there is simply no basis to find "imminent misuse."  *See*

15 *Gibson-Homans Co. v. Wall-Tite, Inc.,* No. 92 2750 JGD, 1992 U.S. Dist. LEXIS 21909, at *11-12

16 (C.D. Cal. Oct. 27, 1992) ("[t]here is no evidence to suggest that defendants intend to use or

17 disclose to other competitors the Shur-Stik formulas.  If in the future the threat of misappropriation

18 becomes real, plaintiff will have a remedy . . . .").

19    <u>Irreparable harm:</u>  Uber's continued employment of Levandowski is irrelevant to the issue

20 of irreparable harm.  As Uber has already shown, Uber ████████████████████████████

21 ████████████████████████████████████████████████████  Thus, if there is any

22 merit to Waymo's claims, Waymo will be fully protected ████████████████  *Id.* at *11-

23 12 (granting defendants' motion for summary judgment, where defendants possessed notebook

24 containing plaintiff's alleged trade secrets, but "defendants have not used the formulas or

25 otherwise impaired their commercial benefit to plaintiff"). The ongoing employment of Mr.

26 Levandowski does not change these facts.

27    Thus, even if the Court were to disagree with the above and conclude there is a likelihood

28 of success on the merits, Waymo cannot show irreparable harm and therefore is not entitled to a

DEFENDANTS' RESPONSES TO COURT'S QUESTIONS FOR HEARING (DKT. NO. 327)
Case No. 3:17-cv-00939-WHA
sf-3765107

9

1    preliminary injunction.  The law is clear that a court is not permitted to issue a preliminary

2    injunction if it concludes that plaintiff has shown a likelihood of success on the merits, but is

3    unable to show irreparable harm.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th

4    Cir. 2011) (quoting *Save Strawberry Canyon v. Dep't of Energy*, No. C 08–03494 WHA, 2009

5    WL 1098888, at *1–3 (N.D. Cal. Apr. 22, 2009) (Alsup, J.)).

6        9.  Does an accounting as part of provisional relief require a finding of irreparable injury?
     (An accounting, as used in this question, would be an order to defendants to conduct a thorough
7    company-wide investigation and to itemize every use or communication concerning specific
     alleged trade secrets and involving Levandowski.)
8
         **Response to Question 9**:
9
         Technically, to issue an order for an accounting based on Waymo's motion would require a
10
     finding of irreparable harm, but Defendants would agree not to object to such an order in order to
11
     satisfy the Court that no alleged Waymo trade secrets have been used by Uber.  Defendants agree
12
     to complete the extensive review ordered by the Court and will agree to supplement that work with
13
     any reasonable additional search to satisfy the Court that no alleged Waymo trade secrets have
14
     been used by Defendants.
15
         10. If the Court adopts defendants' recusal plan for Levandowski, will defendants further
16   consent to a mandatory reporting provision requiring their employees to report violations of said
     plan to the general counsel and thence to the Court and the parties?
17
18       **Response to Question 10**:

19       Yes.  We have given some thought to how this might be implemented and have the

20   following suggestion.  Uber's General Counsel would advise Special Master John Cooper of any

21   report.  The Special Master would be given access to any employee who comes forward and would

22   be able to conduct an investigation of the employee's report, including questioning any other

23   relevant person.  Once a month, the Special Master will make a report to the Court (with a copy to

24   opposing counsel) of any investigation or conclusions that he reached.  The recusal plan would

25   continue through trial, at which point the parties and the Court can revisit whether the limitations

26   and reporting provisions should continue, and if so, for how long.  If this matter is referred to

27   arbitration, then the recusal plan would continue through the end of the year, at which point the

28   parties and the Court can revisit whether the limitations and reporting provisions should continue.

1    Dated: May 2, 2017                    MORRISON & FOERSTER LLP

2
                                           By:  /s/ Arturo J. González
3                                               ARTURO J. GONZÁLEZ

4                                          Attorneys for Defendants
                                           UBER TECHNOLOGIES, INC.,
5                                          OTTOMOTTO LLC, and OTTO TRUCKING LLC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28