MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzalez@mofo.com
ERIC A. TATE (CA SBN 178719)
ETate@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:    415.268.7000
Facsimile:     415.268.7522

Attorneys for Defendants
UBER TECHNOLOGIES, INC.,
OTTOMOTTO LLC, and OTTO TRUCKING LLC

KAREN L. DUNN (*Pro Hac Vice*)
kdunn@bsfllp.com
HAMISH P.M. HUME (*Pro Hac Vice*)
hhume@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington DC  20005
Telephone:    202.237.2727
Facsimile:     202.237.6131

Attorneys for Defendants
UBER TECHNOLOGIES, INC.
and OTTOMOTTO LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>                     Plaintiff,<br><br>          v.<br><br>UBER TECHNOLOGIES, INC.,<br>OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>                     Defendants. | Case No.       3:17-cv-00939-WHA<br><br>**DEFENDANTS' UBER TECHNOLOGIES, INC., OTTOMOTTO LLC, AND OTTO TRUCKING LLC'S OPPOSITION TO PLAINTIFF WAYMO LLC'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:     May 3, 2017<br>Time:     7:30 a.m.<br>Ctrm:     8, 19th Floor<br>Judge:    The Honorable William H. Alsup<br><br>Trial Date: October 2, 2017 |

## REDACTED VERSION OF DOCUMENT SUBMITTED UNDER SEAL

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................... 1

FACTS ............................................................................................................................ 3

I.     UBER IS THE LEADER IN THE RIDE-SHARING INDUSTRY ................................... 3

II.    UBER INDEPENDENTLY DEVELOPED ITS OWN LIDAR TECHNOLOGY ........... 3

III.   UBER'S FUJI LIDAR IS SUBSTANTIALLY DIFFERENT FROM WAYMO'S
       GBR3 LIDAR ......................................................................................................... 5

ARGUMENT ................................................................................................................... 7

I.     LEGAL STANDARD .............................................................................................. 7

II.    WAYMO IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS TRADE
       SECRET MISAPPROPRIATION, PATENT INFRINGEMENT, AND UNFAIR
       BUSINESS PRACTICES CLAIMS ........................................................................... 7

       A.     Waymo Is Not Likely to Prevail on Its Trade Secrets Claims. ............... 7

              1.     Defendants Did Not Improperly Acquire Any Alleged Confidential
                     Information. .......................................................................................... 8

              ██     ██████████████████████████████████████████ ................... 10

              ██     ████████████████████████████████ ................................. 12

              4.     Alleged Use of Waymo PCB Transmit Board Design Files .................... 13

              ██     ████████████████████████████ ................................. 14

              ██     ████████████████████████████ ................................. 14

       B.     Waymo Is Not Likely to Prevail On Its Patent Claims. ......................... 16

              1.     Uber's Fuji Design Does Not Infringe the '922 Patent. .......................... 16

              2.     Uber's Fuji Design Does Not Infringe the '464 Patent. .......................... 17

III.   WAYMO HAS FAILED TO SHOW IRREPARABLE INJURY. .................................. 17

       A.     There is No Presumption of Irreparable Harm. ...................................... 18

       B.     Waymo Relies Solely on Speculative and Unsupported Harm. ............... 19

       C.     Waymo's Delay in Filing This Action Refutes the Alleged Irreparable
              Harm. .................................................................................................... 21

IV.    THE BALANCE OF HARDSHIPS STRONGLY DISFAVORS AN
       INJUNCTION. ...................................................................................................... 22

V.     THE PUBLIC INTEREST DISFAVORS AN INJUNCTION ....................................... 24

CONCLUSION .............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AccuImage Diagnostics Corp. v. Terarecon, Inc.*,
   260 F. Supp. 2d 941 (N.D. Cal. 2003) ....................................................................7

*Advanced Instructional Systems, Inc. v. Competentum USA, Ltd.*,
   No. 1:15CV858, 2015 WL 7575925 (M.D.N.C. Nov. 25, 2015) ............................19

*Advanced Rotorcraft Tech., Inc. v. L-3 Commc'ns Corp.*,
   No. C 06-06470 WHA, 2007 WL 437682 (N.D. Cal. Feb. 6, 2007) .......................24

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127, 1135 (9th Cir. 2011).......................................................................7

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009)..................................................................................7

*Bayer Corp. v. Roche Molecular Sys., Inc.*,
   72 F. Supp. 2d 1111 (N.D. Cal. 1999) .............................................................12, 22

*Blackmon v. Tobias*,
   No. C 11-2853 SBA, 2011 WL 2445963 (N.D. Cal. June 16, 2011) ......................21

*Bladeroom Grp. Ltd. v. Facebook, Inc.*,
   No. 5:15-cv-01370-EJD, 2015 WL 8028294 (N.D. Cal. Dec. 7, 2015) .................11

*Caribbean Marine Servs. Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988)..................................................................................17

*Cent. Valley Gen. Hosp. v. Smith*,
   162 Cal. App. 4th 501 (2008) ..................................................................................9

*Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*,
   908 F.2d 951 (Fed. Cir. 1990)..................................................................................7

*Delphon Indus. LLC v. Int'l Test Sols., Inc.*
   No. 11-CV-1338-PSG, 2011 WL 4915792 (N.D. Cal. Oct. 17, 2011) ...................20

*Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*,
   448 F.3d 1118 (9th Cir. 2006)................................................................................17

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ..........................................................................................18, 19

*Edwards v. Arthur Andersen LLP*,
   44 Cal. 4th 937 (2008) ...........................................................................................25

*In re Excel Innovations, Inc.*,
    502 F.3d 1086 (9th Cir. 2007)...................................................................................19

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
    654 F.3d 989 (9th Cir. 2011)................................................................................18, 19

*FLIR Sys., Inc. v. Parrish*,
    174 Cal. App. 4th 1270 (2009) ..................................................................................9

*Friends of the Wild Swan v. Weber*,
    767 F.3d 936 (9th Cir. 2014)....................................................................................17

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) (en banc)....................................................................21

*GSI Tech., Inc. v. United Memories, Inc.*,
    No. C 13-1081 PSG, 2013 WL 12172990 (N.D. Cal. Aug. 21, 2013) .....................18

*Hanginout, Inc. v. Google, Inc.*,
    54 F. Supp. 3d 1109 (S.D. Cal. 2014) ......................................................................21

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013)..................................................................................18

*Hiramanek v. Clark*,
    No. C-13-0228 EMC, 2013 WL 5082640 (N.D. Cal. Sept. 13, 2013) .....................21

*Hologic, Inc. v. Senorx, Inc.*,
    No. C-08-00133 RMW, 2008 WL 1860035 (N.D. Cal. Apr. 25, 2008) ....................21

*Jack Guttman, Inc. v. Kopycake Enters., Inc.*,
    302 F.3d 1352 (Fed. Cir. 2002)..................................................................................7

*Kahala Franchising LLC v. Kim*,
    No. CV 13-02933-MWF, 2013 WL 12086126 (C.D. Cal. July 10, 2013) ...............18

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*,
    No. C 12-03762 SI, 2013 WL 244999 (N.D. Cal. Jan. 22, 2013),
    *aff'd*, 551 F. App'x 298 (9th Cir. 2013)..................................................................21

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir. 1991)....................................................................................19

*Larsen v. City of San Carlos*,
    No. 14-CV-04731-JD, 2014 WL 5473515 (N.D. Cal. Oct. 28, 2014).....................21

*Lear, Inc. v. Adkins*,
    395 U.S. 653 (1969)..................................................................................................24

*Leatt Corp. v. Innovative Safety Tech., LLC*,
    No. 09-CV-1301-IEG (POR), 2010 WL 1526382 (S.D. Cal. Apr. 15, 2010) .........................22

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997)................................................................................................................7

*McCormack v. Hiedeman*,
    694 F.3d 1004 (9th Cir. 2012).............................................................................................24

*Mitigation Techs., Inc. v. Pennartz*,
    No. ED CV 14-01954-AB, 2015 WL 12656936 (C.D. Cal. Mar. 13, 2015) .........................22

*Nationwide Life Ins. Co. v. Richards*,
    541 F.3d 903 (9th Cir. 2008)..................................................................................................2

*Netlist Inc. v. Diablo Techs. Inc*,
    No. 13-CV-05962-YGR, 2015 WL 153724 (N.D. Cal. Jan. 12, 2015) ..................................19

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
    762 F.2d 1374 (9th Cir. 1985)..............................................................................................21

*On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer, GMBH*,
    386 F.3d 1133 (Fed. Cir. 2004)............................................................................................11

*Perfect 10, Inc. v. Google Inc.*,
    2005 WL 4705034 (C.D. Cal. Sept. 30, 2005).....................................................................21

*Pixon Imaging, Inc. v. Empower Techs. Corp.*,
    No. 11-CV-1093-JM (MDD), 2011 WL 3739529 (S.D. Cal. Aug. 24, 2011).........................19

*Precision Automation, Inc. v. Tech. Servs., Inc.*,
    No. 07-CV-707-AS, 2007 WL 4480739 (D. Or. Dec. 14, 2007)............................................18

*Se. X-Ray, Inc. v. Spears*,
    929 F. Supp. 2d 867 (W.D. Ark. 2013).................................................................................18

*Stanley v. Univ. of S. Cal.*,
    13 F.3d 1313 (9th Cir. 1994)................................................................................................20

*Sunbelt Rentals, Inc. v. Victor*,
    No. C 13-4240 SBA, 2014 WL 492364 (N.D. Cal. Feb. 5, 2014).....................................9, 25

*Titan Tire Corp. v. Case New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009)............................................................................................16

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
    748 F.3d 1159 (Fed. Cir. 2014)..............................................................................................7

*V'Guara Inc. v. Dec*,
    925 F. Supp. 2d 1120 (D. Nev. 2013)...................................................................................18

*Whyte v. Schlage Lock Co.*,
   101 Cal. App. 4th 1443 (2002) .......................................................................................25

*Winston Research Corp. v. Minnesota Min. & Mfg. Co.*,
   350 F.2d 134 (9th Cir. 1965)................................................................................12, 14

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).......................................................................................................7, 17

*Yamashita v. Wilbur-Ellis Co.*,
   No. C 06-01690 WHA, 2006 WL 1320470 (N.D. Cal. May 15, 2006)............................24, 25

*Zodiac Pool Sys., Inc. v. Aquastar Pool Prods., Inc.*,
   No. 13cv343-GPC (WMC), 2013 WL 690616 (S.D. Cal. Feb. 22, 2013)...............................20

**Statutes**

18 U.S.C. § 1836.................................................................................................................7

18 U.S.C. § 1839(5) ...........................................................................................................8

18 U.S.C. § 1839(6) ......................................................................................................8, 11

Cal. Bus. & Prof. Code §§ 16600-16601 ........................................................................25

Cal. Civ. Code § 3426.1(a)...........................................................................................8, 11

Cal. Civ. Code § 3426.1(b) ...............................................................................................8

**INTRODUCTION**

Uber[1] has been a visionary in the transportation industry since 2009, effectively creating the concept of ride-sharing and pioneering other innovative solutions in transportation.  Since late 2014, Uber has been one of the companies leading the charge in self-driving technology, investing hundreds of millions of dollars in unique technology and hiring the best and brightest in the field.  Uber created a revolution in the ride-sharing space through hard work, creativity, and pride in its own innovation.  It is this same philosophy and drive that Uber is now applying to its work on self-driving vehicles.

Waymo's[2] preliminary injunction motion is a misfire.  Both of its central premises—that former Waymo employees brought thousands of confidential Waymo documents to Uber to build a copycat LiDAR and that Uber's LiDAR closely mimics Waymo's single-lens design—are demonstrably false.  A search of Uber's computers has not yielded any of the 14,000 files Waymo alleges that Uber misappropriated.  Uber made sure to have policies and practices in place to prevent misappropriation, and these measures have worked.

The self-proclaimed innovation of Waymo's LiDAR is its ***single-lens design***, touted by Waymo as a "game-changer."  Uber's LiDAR design is fundamentally different; it is, instead, a ***four-lens design***, with two lenses for transmitting laser light and two for receiving it.  This fact alone demonstrates the misguided nature of Waymo's request for "extraordinary and drastic relief."  Waymo took one Uber schematic (inadvertently sent to a Waymo employee) and made several assumptions based on that one document to conclude that Uber's LiDAR used a single-lens design.  Waymo could not be more wrong, and Uber's design could not be more different.  And no wonder—Uber's LiDAR was developed by a different team, using a different beam pattern, and leveraging different know-how.

And this is not the only fundamental difference between the two designs.  Uber's design uses two optical cavities, compared to just one cavity in Waymo's unit.  Importantly, Uber began developing its LiDAR design *before* it hired Anthony Levandowski.  Waymo cannot show that

---

[1] "Uber" refers to Uber Technologies, Inc., Ottomotto LLC, and Otto Trucking LLC.
[2] "Waymo" refers to Waymo LLC, Google Inc., and Alphabet Inc.

Uber misappropriated Waymo's trade secrets or infringed Waymo's patents.  A cursory inspection of Uber's LiDAR and Waymo's allegations fall like a house of cards.

And there is more: Waymo has been sitting on the information that underpins its allegations of downloads of Waymo documents since October, but filed suit only in February and filed this motion only in March.  Waymo's delay militates strongly against granting an injunction.  Moreover, there is no commercial urgency—Uber's LiDAR is still in development, and █████████

████████████████████████████████████████████████████

To be sure, Uber finds itself in a complicated situation:  it is unambiguously developing its own technology independent of Waymo, but its employee Mr. Levandowski is accused of downloading 14,000 files from Waymo before he joined Uber.  Uber is blocked at this stage from providing an explanation against that accusation because Mr. Levandowski has asserted his Fifth Amendment constitutional rights.  Faced with Mr. Levandowski's assertion of his constitutional privileges, the Court has stated that it is considering entering an injunction.  Such an injunction is not necessary against Uber because there is no evidence that any downloaded files ever made it onto Uber's systems.  Even if the Court disagrees as to the need for some injunction, given the current facts—and more to come after Uber conducts further searches, and Waymo deposes Uber employees who can attest to never seeing, much less using, Waymo files at Uber—the Court should not enjoin Uber's independent research on important new technology.

The Court also should not draw an adverse inference that Uber engaged in wrongdoing with respect to trade secrets by virtue of Mr. Levandowski's assertion of his rights.  Whether to draw an adverse inference is a question that must be examined on a "case-by-case basis under the microscope of the circumstances of that particular civil litigation."[3]  It is not permissible to draw an adverse inference unless there is "independent evidence of the fact about which" an individual declines to testify.[4]  The record here shows that no independent evidence of the alleged use of trade secrets exists.  On the contrary, the record shows that Uber never possessed—and never used—any information Mr. Levandowski allegedly took from Waymo.

---

[3] *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 912 (9th Cir. 2008).
[4] *Id.*

Finally, there is the other side of the equation—the harm to Uber and to the public—if Waymo's motion is granted. To hinder Uber's continued progress in its independent development of an in-house LiDAR that is fundamentally different than Waymo's, when Uber has not used any of Waymo's trade secrets, would impede Uber's efforts to remain a viable business, stifle the talent and ingenuity that are the primary drivers of this emerging industry, and risk delaying the implementation of technology that could prevent car accidents. Ultimately, that would be harmful to the public. When all factors are considered, the scales of justice tilt heavily in favor of denying this motion.

## FACTS

### I.    UBER IS THE LEADER IN THE RIDE-SHARING INDUSTRY

Uber is the pioneer and recognized leader in the urban transportation business. It has the world's largest ride-sharing network, serving more than 55 million monthly active riders in 574 cities. (Chang Decl. ¶ 4.)[5] Founded in 2009, Uber revolutionized transportation when it introduced its groundbreaking smartphone app. (*Id.*) What started as an app to request premium black cars in a few metropolitan areas is now changing the logistical fabric of cities around the world. (*Id.*) With the push of a button, riders can now reliably get an affordable ride across town.[6] Uber has also made carpooling a reality, helping to reduce congestion and pollution. (*Id.*)

Seeking to further its mission to deliver safe, accessible, and reliable transportation to the world, Uber has built one of the strongest autonomous vehicle engineering groups in the industry, leveraging the experience that comes from running ridesharing services in hundreds of cities and the data and intelligence that comes from doing 1.2 billion miles on the road every month. (*Id.*)

### II.    UBER INDEPENDENTLY DEVELOPED ITS OWN LIDAR TECHNOLOGY

In February 2015, Uber began building its autonomous vehicle engineering group by partnering with Carnegie Mellon University and establishing its Advanced Technologies Center ("ATC") in Pittsburgh, Pennsylvania. Uber hired Scott Boehmke to research and develop autonomous vehicle technology. (Boehmke Decl. ¶ 2.) Mr. Boehmke was never employed by

---

[5](Chang Decl. Ex. 2, https://www.uber.com/our-story/.)
[6](Chang Decl. Ex. 3 https://newsroom.uber.com/rethinking-transportation.)

1  Waymo.  (*Id.*)  Mr. Boehmke began meeting with LiDAR sensor manufacturers in early 2015.

2  (*Id.* ¶ 4.)  On April 17, 2015, Mr. Boehmke prepared his first analysis of the field of view and

3  beam spacing requirements for autonomous vehicles.  (*Id.*)  He quickly recognized that the

4  vertical field of view and resolution requirements for a LiDAR were heavily dependent on the

5  speed of the vehicle.  (*Id.* ¶ 6.)  As a result, he concluded that it might be necessary to adjust the

6  angular spacing in the vertical dimension based on the speed of the vehicle.  (*Id.*)

7      In October 2015, Mr. Boehmke reviewed various LiDAR sensors, including ▮▮▮▮▮,

8  which could be customized to create a ▮▮▮▮▮▮▮▮▮▮, in which the

9  laser diodes that ▮▮▮▮▮▮▮▮▮.  (*Id.* ¶ 8.)  By

10  November 2015, Mr. Boehmke had also decided to use separate lenses for the transmit and

11  receive paths.  (*Id.* ¶ 12.)

12      By late 2015, Uber had decided to develop a customized LiDAR in partnership with

13  ▮▮▮—long before Uber's acquisition of Mr. Levandowski's company.  (*Id.* ¶ 9.)  Between

14  November 2015 and March 2016, Mr. Boehmke worked on developing a custom beam pattern for

15  a LiDAR suited for Uber's automotive use.  (*Id.*)  In March 2016, Uber's ATC entered into a

16  contract with ▮▮▮▮▮▮▮▮▮, which Uber

17  would combine into a "dual stack" LiDAR to provide 64-channel resolution, based on Uber's

18  custom beam pattern.  (*Id.*) ▮▮▮▮▮▮▮, but during that time,

19  Mr. Boehmke experimented with the positioning and orientation of lasers on as few boards as

20  possible for an in-house LiDAR, to simplify alignment and calibration.  (*Id.* ¶¶ 11, 13.)

21      In August 2016, Uber acquired Ottomotto, a company co-founded by Anthony

22  Levandowski, which originally focused on self-driving trucks.  Uber acquired Ottomotto for its

23  expert personnel, not trade secrets; in fact, all Ottomotto employees signed offer letters and

24  attestations swearing that they would not bring any other company's trade secrets to Uber or use

25  them in connection with their Uber work.  To be clear, Uber never had possession of or used any

26  of Waymo's trade secrets or the 14,000 files that Waymo alleges Mr. Levandowski downloaded.

27      After Uber's acquisition of Ottomotto, its existing ATC team merged with Ottomotto's

28  team to form the Advanced Technologies Group ("ATG").  A few months prior, Ottomotto had

1  acquired Tyto LiDAR, LLC ("Tyto"), a startup dedicated to developing remote sensing

2  technologies for the geospatial industry.  The Tyto team, which included James Haslim, who was

3  never employed by Waymo, became part of Uber's self-driving car team.  (Haslim Decl. ¶¶ 2-3.)

4          The newly minted ATG team at Uber decided to revisit the dual 32-channel diode-based

5  LiDAR concept that Mr. Boehmke had worked on in late 2015 and early 2016, for its in-house

6  mid-range LiDAR solution.  (Boehmke Decl. ¶ 16.)  This project was code-named "Fuji," after

7  Mount Fuji.  (Haslim Decl. ¶ 5.)  On November 4, 2016, Mr. Boehmke provided Mr. Haslim and

8  his team with a custom beam pattern for Fuji, based on Mr. Boehmke's earlier work.  (Boehmke

9  Decl. ¶ 18; Haslim Decl. ¶ 18.)

10         During this development, Mr. Haslim and his team decided to use two cavities for Fuji, to

11  allow two laser diodes—one from each cavity—to fire simultaneously.  (Haslim Decl. ¶ 8.) The

12  team first attempted to place all 32 laser diodes on a single transmit board.  (*Id.* ¶ 11.)  Through

13  trial and error, they realized that ███████████████████████████████ provided

14  sufficient spacing between the laser diodes.  (*Id.*)  Having determined that ███████████

15  were needed, they decided to distribute ███████████████████████████████████

16  ███████████████████████████████████, to ensure an even thermal load.

17  (*Id.*)  The position and orientation of the diodes on the transmit boards in Fuji were based on the

18  custom beam spacing and angles provided by Mr. Boehmke.  (*Id.* ¶ 18.) The Fuji design was

19  largely the result of the collaboration between Mr. Boehmke and Mr. Haslim and their teams—

20  neither of whom ever worked for Waymo.  (Boehmke Decl. ¶ 2; Haslim Decl. ¶ 3.)

21         Although Uber is developing its own LiDAR, ███████████████████████████

22  ███████████████████████.  Every single self-driving car that Uber has put on the road to

23  date uses commercially available LiDAR sensors from third parties.  (Haslim Decl. ¶ 21.)

24  **III.   UBER'S FUJI LIDAR IS SUBSTANTIALLY DIFFERENT FROM WAYMO'S
25          GBR3 LIDAR**

26         The Fuji LiDAR system that Mr. Haslim and Mr. Boehmke developed is dramatically

27  different from Waymo's GBr3 LiDAR in numerous respects, beginning with the fact that GBr3 is

28  a monostatic system (single transmit/receive lens) while Fuji is a dual bistatic system (two

LiDAR cavities, each with separate transmit and receive lenses, for a total of four lenses).  The chart below highlights some of the major differences between the systems (details are provided in the expert declarations of Dr. McManamon and Dr. Lebby):

| Comparison of Systems | |
|---|---|
| **GBr3 LiDAR** | **Fuji LiDAR** |
|  |  |
| ***Single lens aperture***:  Single shared lens for transmitted and received light.<br><br>***Single cavity:***  Overlapping transmit and receive paths in single cavity.<br><br><br><br>***Transmit PCB***:  Different diode positions, angular orientation, component layout. | ***Four lens apertures***:  Separate lenses for each of 2 transmit paths and 2 receive paths.<br><br>***Two cavities***:  Separate medium-range and long-range cavities, each with separate transmit and receive paths.<br><br><br><br>***Transmit PCB***:  Different diode positions, angular orientation, component layout. |

1

**ARGUMENT**

2

**I.    LEGAL STANDARD**

3      A preliminary injunction is "an extraordinary and drastic remedy, one that should not be

4  granted unless the movant, *by a clear showing*, carries the burden of persuasion."[7]  To establish a

5  right to a preliminary injunction, a plaintiff must demonstrate that:  (1) it is likely to succeed on

6  the merits; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of

7  equities tips in its favor; and (4) the injunction is in the public interest.[8]

8      "[A] plaintiff must prove each element of the preliminary injunction test to prevail at the

9  district court."[9]  "[T]he absence of an adequate showing on any one factor may suffice, on

10  balance, to justify the denial of the injunction."[10]  Likewise, the Ninth Circuit recognizes that

11  Waymo must establish each of the four *Winter* factors to prevail on its motion for injunctive

12  relief.[11]  A preliminary injunction is improper if the movant fails to establish likelihood of success

13  on the merits or likelihood of irreparable harm.[12]  Here, Waymo fails on both counts.

14
15  **II.    WAYMO IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS TRADE
        SECRET MISAPPROPRIATION, PATENT INFRINGEMENT, AND UNFAIR
        BUSINESS PRACTICES CLAIMS**

16      **A.    Waymo Is Not Likely to Prevail on Its Trade Secrets Claims.**

17      Waymo alleges that Defendants misappropriated its proprietary and confidential

18  information in violation of the California Uniform Trade Secrets Act ("CUTSA") and the federal

19  Defend Trade Secrets Act ("DTSA").  In order to demonstrate a likelihood of success on its trade

20  secret claim under CUTSA or DTSA, a plaintiff must show both:  (1) the existence of a trade

21  secret and (2) misappropriation of the trade secret.[13]  Waymo cannot.

22      To establish misappropriation, a plaintiff must establish "[d]isclosure or use of a trade

23

24      [7] *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in the original).
       [8] *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008); *Am. Trucking Ass'ns, Inc. v.
25  City of Los Angeles,* 559 F.3d 1046, 1054 (9th Cir. 2009).
       [9] *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014).
26      [10] *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.,* 908 F.2d 951, 953 (Fed. Cir.
   1990).
       [11] *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).
27      [12] *Jack Guttman, Inc. v. Kopycake Enters., Inc.,* 302 F.3d 1352, 1356 (Fed. Cir. 2002).
       [13] *AccuImage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 950 (N.D. Cal.
28  2003); *see also* 18 U.S.C. § 1836.

secret of another without express or implied consent" or "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."[14]  The standards are identical under the DTSA.[15]  Moreover, under both the CUTSA and DTSA, independent derivation is a complete defense to alleged trade-secret misappropriation.[16]

Waymo contends it obtained proof of the alleged misappropriation when it received a December 13, 2016 email with a drawing of an Uber printed circuit board.  As demonstrated below, that email contains no such proof.[17]  Rather, it reflects Uber's independently developed design, and any similarities between the two systems are drawn from concepts that are publicly known or from techniques within the toolkit of one of skill in the art.

### 1. Defendants Did Not Improperly Acquire Any Alleged Confidential Information.

There is no evidence that Uber acquired—improperly or otherwise—the alleged trade secrets.  First and foremost, ***Uber and its employees have never used any alleged confidential Waymo files from Mr. Levandowski or anyone else*** in the development of its LiDAR systems.  Indeed, Waymo's witnesses testified that they were not aware of any evidence that Uber was using Waymo's trade secrets.  (Chang Decl. Exs. 4, 5, 6, 7 (Willis Dep. 103:16–20; Brown Dep. 42:6–15; Janosko Dep. 25:1–4; Droz Dep. 177:14–21, 179:8–14; Chu Dep. 52:6-13; Medford Dep. 57:3-6).)

Forensic analysis confirms that none of Waymo's documents crossed over to Uber.  (Faulkner Decl. ¶ 7.)  Uber conducted 86 custodial interviews of former Waymo employees, which established that none of these employees was aware of any Waymo confidential information on Uber's computer systems.  Uber then conducted a search of all Uber-issued laptops belonging to former Waymo employees.  (*Id.* ¶¶ 4-6.)  In all, 106.5 terabytes of data were

---

[14] Cal. Civ. Code § 3426.1(b).

[15] *See* 18 U.S.C. § 1839(5); 18 U.S.C. § 1839(6).

[16] Cal. Civ. Code § 3426.1(a) ("Reverse engineering or independent derivation alone shall not be considered improper means."); *see also* 18 U.S.C. § 1839(6).

[17] This email cannot be the smoking gun Waymo claims it is, because the assumptions Waymo draws from it are false.  For instance, Waymo repeatedly argues that the architecture of the board necessitates a single-lens design, which Uber does not use.

imaged.  (*Id.* ¶ 4.)  Uber searched data belonging to Messrs. Levandowski, Kshirsagar, and

Raduta, as well as that of seven other former Waymo employees who worked on Chauffeur or

LiDAR sensors, for the approximately 14,000 filenames and hash values identified by Waymo as

corresponding to allegedly downloaded files, as well as the filenames included in Waymo's

preliminary injunction papers.  (*Id.* ¶ 5.)  In addition, Uber used search terms derived from

Waymo's preliminary injunction papers.  (*Id.* ¶ 6.)  These searches did not reveal any confidential

Waymo material on Uber's systems.  (*Id.* ¶ 7.)  Moreover, Uber took strict precautions to ensure

that no trade secrets belonging to a former employer would be brought to or used at Uber.

(Morgan Decl. ¶¶ 5-6.)  On these facts, Waymo is unable to meet its burden of showing that Uber

improperly acquired Waymo's trade secrets.

Waymo tries to raise an inference of improper use by claiming that the employees

downloaded files during the course of their employment at Waymo, but this is not an out-of-

bounds practice for Waymo or Google employees.  Indeed, the fact that Messrs. Levandowski,

Kshirsagar, and Raduta had legitimate access to Waymo's confidential information before their

separation is insufficient to establish that they improperly acquired that information.[18]

Mr. Kshirsagar, for example, explained that every single one of the files he accessed was

done for legitimate purposes relating to his employment at Waymo.[19]  Specifically,

Mr. Kshirsagar accessed two of the files at issue ***on his Waymo-issued laptop*** in order to prepare

a transition memorandum for several of his successors.  (Kshirsagar Decl. ¶¶ 10-11.)  He prepared

the memorandum at the direction of Tim Willis, ironically the very person who now accuses him

of accessing the files improperly.  (Kshirsagar Decl. ¶ 10.)  The documents are referenced in the

transition memorandum itself.  (*Id.*)  Mr. Kshirsagar accessed an additional file ***on his Waymo-***

[18] *See Cent. Valley Gen. Hosp. v. Smith,* 162 Cal. App. 4th 501, 528–29 (2008) (mere possession of a trade secret does not constitute misappropriation); *see also FLIR Sys., Inc. v. Parrish,* 174 Cal. App. 4th 1270, 1279 (2009) ("Mere possession of trade secrets by a departing employee is not enough for an injunction.").

[19] *Sunbelt Rentals, Inc. v. Victor*, No. C 13-4240 SBA, 2014 WL 492364, at *7 (N.D. Cal. Feb. 5, 2014) (holding that "simple fact that [former employee] emailed himself . . . proprietary information" for the purpose of "ensuring that [former employer] properly paid him for all commissions owed," "without more, does not show misappropriation" and did not warrant preliminary injunction).

1  *issued laptop* for general educational purposes in the course of his work at Waymo.  (*Id.* ¶ 13.)

2  Mr. Kshirsagar then returned his Waymo laptop to the Waymo IT department when he left, and

3  did not take it or the files with him.  (Kshirsagar Decl. ¶¶ 11, 13 & Ex. 1.)  Mr. Kshirsagar

4  accessed two additional files on his Waymo-issued laptop that he then emailed to his personal

5  mobile device to review them offline *while he was still at Waymo* for the purpose of fulfilling his

6  duties to Waymo—a practice that Mr. Willis himself admits he engages in on occasion—and

7  never once accessed those files after he left his employment at Waymo.  (*See* Kshirsagar Decl.

8  ¶¶ 12-13; Chang Decl. Ex. 4, Willis Dep. 46:10–17.)

9      Moreover, while Waymo makes much of the 14,000 files that Mr. Levandowski allegedly

10  downloaded, Waymo admits that this represents the entire Waymo SVN repository,

11  demonstrating that Mr. Levandowski did not "pick and choose" which files to download.  Waymo

12  further admits that *four-fifths* of this download were not trade secrets.  (Janosko Decl. ¶ 23–24,

13  ECF No. 24-15; Mot. 7–8.)  Moreover, when an employee first accesses the SVN repository on a

14  laptop, the entire repository is replicated locally by default.  (*See* Janosko Dep. 15:4–9.)  Thus,

15  downloading a local copy of the SVN repository is not something that would be investigated by

16  Google's or Waymo's security team, because it does not indicate nefarious activity.  (*Id*. 23:10-

17  16.)

18      Finally, Mr. Radu Raduta is only accused of downloading three documents.  (Willis

19  Decl. ¶ 10, ECF No. 24-16.)  Like with Mr. Kshirsagar, what Waymo failed to tell the Court is

20  that he downloaded those documents *onto his Waymo-issued laptop*, not some personal or other

21  device.  (*See* Chang Decl. Ex. 5, Brown Dep. 39:11–19; 41:15–42:5.)  None of those files were

22  located on Mr. Raduta's Uber-issued devices.  (Faulkner Decl. ¶ 7.)  Moreover, the three files

23  appear to be random lists of publicly known vendors.  (Willis Decl. Exs. G–I, ECF Nos. 24-23,

24  24-24, 24-25.)  As this Court noted, there is no showing that these documents comprise trade

25  secrets at all.  (CMC Hr'g Tr. 7, Mar. 29, 2017, ECF No. 131.)

26  ██    ████████████████████████████████████

27      ***Not a trade secret.***  In its motion, Waymo alleges that the ████████████████

28  ████████████ is a trade secret that "has not been disclosed to the public" and that Uber's design,

as reflected in the December 13, 2016 email, contains such spacing and orientation.  (Mot. 11.)

The concept of ██████████████████████████████, however, is expressly recited

in Velodyne's U.S. Patent No. 8,767,190 (the "'190 patent"), titled "High Definition LiDAR

System."  The '190 patent discloses that the density of laser diodes within a curved pattern around

a central axis (i.e., a "fan pattern") can be varied to achieve greater resolution at longer distances.

('190 patent at 5:56-57.)  The patent states:  "The density of emitter/detector pairs populated

along the vertical FOV is **intentionally variable**."  ('190 patent at 6:45-46.)  The patent further

explains:  "For some uses increased density is desirable to facilitate seeing objects at further

distances and with more vertical resolution."  (*Id.* at 6:54-56.)  ████████████████████

████████████████████████████████████████████████████████████████████

███████████████.  Because the concept of ███████████████████████████████████ is

in the public domain, Waymo cannot claim it as a trade secret.[20]

       ***No misappropriation due to independent derivation.***  Waymo has failed to demonstrate

that the █████████████████████████████████████ is a trade secret, but even if it was

shown to be a trade secret, Uber independently developed the ███████████████████████

████████████████████████████ on its Fuji system, based on the custom beam pattern and angles

that Scott Boehmke developed, using parameters and calculations that he began developing in

December 2015—before Mr. Levandowski had even left Waymo and before Uber's acquisition of

Otto.[21]  As Waymo's Mr. Droz testified during deposition, ██████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████ GBr3 LiDAR system.  (Chang Decl. Ex. 7, Droz

Dep. 107:3-108:10.)  Moreover, the ████████████████████ on Uber's Fuji transmit boards

are not the same as those in Waymo's GBr3 boards.  If Uber had copied Waymo's design, the

---

[20] *Bladeroom Grp. Ltd. v. Facebook, Inc.*, No. 5:15-cv-01370-EJD, 2015 WL 8028294, at *4 (N.D. Cal. Dec. 7, 2015) ("[i]t is well established that the disclosure of a trade secret in a patent places the information comprising the secret into the public domain."); *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer, GMBH*, 386 F.3d 1133, 1141 (Fed. Cir. 2004) ("After a patent has issued, the information contained within it is ordinarily regarded as public and not subject to protection as a trade secret.")
[21] Cal. Civ. Code § 3426.1(a); 18 U.S.C. § 1839(6) (independent derivation defense).

1  ██████████████████—the result of painstaking, iterative testing and simulation—should

2  be the same, but they are not.  For these reasons, each of which independently negates Waymo's

3  trade secret claim, Waymo cannot show that it is likely to succeed on the merits of this claim.

4  █ █████████████████████

5  ***Not a trade secret due to prior public knowledge and use***.  Waymo also alleges that █

6  ████████████████████████████████████████████████████████████

7  █████████ is a trade secret.  (Mot. 11, 15.)  Waymo's █████████ arrangement is one of a limited

8  number of workable configurations for the transmit block of any █-laser LiDAR system that a

9  designer would evaluate in light of well-known design considerations, particularly the desire to

10  reduce the size, cost, and complexity of the system.  A "general approach" that is "dictated by

11  well known principles of physics" is not protectable under accepted trade secret doctrine because

12  such principles are not "secret"—they are instead "general engineering principles in the public

13  domain and part of the intellectual equipment of technical employees."[22]

14  ***No misappropriation due to no use.***  Notwithstanding the obviousness of the

15  configuration, and unlike Waymo's GBr3 design, Uber's Fuji system does not contain a ██████

16  transmit stack.  Rather, the Fuji system comprises two separate LiDAR cavities, the transmit

17  portion of each cavity containing a █████████ stack having a total of 32 diodes.  The ████████

18  stacks in the two cavities are not connected and are situated at different vertical angles from each

19  other (corresponding to the different angles of the two cavities).  Because there is no evidence of

20  use of the █████████ transmit stack in Fuji, a preliminary injunction is improper.[23]

21  Additionally, the ████████████████████████ is different in the Fuji

22  system from that of GBr3.  The █ diodes in the █████████████ GBr3 system are distributed in

23  the following pattern: ███████████████.  Waymo claims that positioning the ███████████████

24  ███████████████ is a trade secret.  As noted, the ███████████████ of the Fuji system are

25  independent transmit blocks and do not constitute a ███████████████.  However, considered

26

27  ───────────────────
   [22] *Winston Research Corp. v. Minnesota Min. & Mfg. Co.*, 350 F.2d 134, 139 (9th Cir. 1965).
   [23] *Bayer Corp. v. Roche Molecular Sys., Inc.*, 72 F. Supp. 2d 1111 (N.D. Cal. 1999) (denying

28  preliminary injunction where plaintiff failed to demonstrate "specific evidence of actual use").

1   together, the distribution of diodes across Fuji's transmit PCBs is: ██████████████. (Haslim

2   Decl. ¶ 13.)

3         ***No misappropriation due to independent development.***  Not only does Fuji not use a

4   ██████████████, its ██████████ design in each of two cavities was independently

5   developed.  As described previously, Mr. Haslim's team decided to use ██████████████ in

6   each of Fuji's two cavities after realizing, through trial and error, that neither a ██████████

7   ██████████████████ provided enough space between the laser diodes.  (Haslim Decl.

8   ¶ 11.)  They distributed the ████████████████████████████████████████████████

9   ████████████████████████████████, as it was the most symmetric way of

10  distributing ██████████████████.  (*Id.*)  Because Uber's Fuji design is fundamentally

11  different from Waymo's design and because Uber independently developed its two-cavity, ████

12  ██████████ design, Waymo cannot prevail on its trade secret claim.

13              **4.      Alleged Use of Waymo PCB Transmit Board Design Files**

14        ***No misappropriation due to independent development and no use.***  Waymo alleges that

15  the design of Uber's Fuji transmit PCB was adapted from design files for Waymo's GBr3

16  transmit PCB.  This allegation is based on a comparison of Waymo's GBr3 transmit PCB to a

17  machine drawing of what is purportedly an Otto PCB that Waymo inadvertently received by

18  email from the vendor ████████████.  A comparison of the PCBs and a review of the Fuji

19  development history make clear that the Fuji PCB was not adapted from the Waymo design.

20  (Lebby Decl. ¶ 61.)

21        First, as explained above, Fuji's transmit PCBs and its ██████████████████ for the

22  transmit block were independently developed by Uber engineers who had no connection with the

23  allegedly misappropriated Waymo confidential documents.

24        Second, an inspection of the two PCBs side-by-side reveals numerous design differences,

25  including:  (1) different shape and curvature along the curved edge of the PCBs; (2) different

26  ████████████████ of the laser diodes; (3) different arrangement of the components behind the

27  diodes; (4) different components and layouts on the side of the PCBs nearest the flat edge; and

28  (5) different arrangement of holes in the PCBs.  (Lebby Decl. ¶ 61.)

1    Third, because the Fuji system has a ███████████████████████████████

2   GBr3, the precise positioning and angles of the diodes on the transmit PCBs are different.  (*Id.*

3   ¶ 62.)  Fuji's ████████████████████████████████████████████████████████████████

4   ██████████████████████████████████████████████ (*Id.*)  By contrast, the

5   GBr3 design has a ███████████████████████████.  (*Id.*)  These differences in vertical

6   FOV dictated a different design for the Fuji transmit PCBs.

7        ███   ██████████████

8        ***Not a trade secret due to prior public knowledge and use.***  Waymo alleges that the

9   concept of ████████████████████████████████████ is a trade secret.

10   (Mot. 11, 14.)  The ██████████████████████████████████████████████ is

11   a known design choice in the fabrication of laser diode systems and has been disclosed in the

12   public technical literature.  For example, a textbook on the subject of semiconductor lasers

13   illustrates ████████████████████████████ and notes the technical concerns associated

14   with each:  "Overhang and underhang characterize the alignment between the diode laser die . . .

15   and the mounting substrate.  The consequence of overhang and underhang is ineffective heat

16   conduction and blockage of light transmission, respectively."[24]  In addition, a 2007 dissertation

17   on laser diode systems describes a system in which laser diodes are deliberately █████████

18   ██████████████████████████, in order to avoid obstruction of the laser light—the

19   very goal that Waymo aims to achieve with its alleged trade secret.[25]  Thus, Waymo cannot claim

20   the ████████████████ as a trade secret.[26]

21        ███   ████████████████████

22        ***No misappropriation due to no use.***  Waymo claims as a trade secret the concept of ████

23   ████████████████████████████████████████████████████████████████████

24   ████████████  (Mot. 11, 15-16.)  Uber's Fuji transmit board, however, does not use ████████

25   ─────────────────────────

26   [24] (LebbyDecl. Ex. 4, Xingsheng Liu et al., *Packaging of High Power Semiconductor Lasers* 224 (2015).)

27   [25] (Lebby Decl. Ex. 5, Christian Scholz, *Thermal & Mech. Optimisation of Diode Laser Bar Packaging* 28 (2007) (emphasis added).)

28   [26] *Winston Research Corp*, 350 F.2d at 139 ("general engineering principles in the public domain and part of the intellectual equipment of technical employees" are not trade secrets).

1   ██████████████████████████████████████████   Rather, it uses fiducial reference marks that are printed

2   on the circuit board—a common technique in the fabrication of printed circuit boards and

3   mounting of optical components on a circuit board.  (Haslim Decl. ¶ 14.)  Waymo's witness

4   Mr. Droz emphasized that the valuable innovation in Waymo's use of ████████████████████

5   ██████████████████   (Droz Dep. 129:8-131:1)—something that Uber does not use the guide

6   holes for.

7        ***Not a trade secret due to public disclosure.***  Moreover, the use of ███████████ for these

8   purposes is not a protectable trade secret.  The concept of ███████████████████████████████

9   ██████████████████████████████████████   is as simple and as general as a Tinker Toy,

10   and such general concepts dictated by basic scientific principles cannot be trade secrets.  In fact,

11   the concept of using ██████████████████████████   in the LiDAR context has been known to

12   the public since the 1970s, as conceded by Waymo's witness Mr. Droz.  (Chang Decl. Ex.7, Droz

13   Dep. 128:16-128:24.)  For example, a patent filed in 1976 describes a "means suitable for

14   aligning and mounting a printed circuit board (PCB)" that involves mounting a "PCB [that] is

15   provided with holes spaced apart to receive the supporting member pins" on top of a supporting

16   member in which the "pins are spaced apart along a datum line or center line to which the PCB is

17   to be aligned."[27]  Similarly, a German patent application filed in 1980 described how "[p]rinted

18   circuit boards that are stacked and compacted into multi-layer circuit boards require to be

19   accurately aligned," and the use of "bored holes" that "all the holes will have an exact relative

20   position to one another."[28]

21        Similarly, ████████████████████████████   is a well-known concept in the

22   field.  For example, U.S. Patent No.  4,432,037, with a priority date of December 2, 1980, entitled

23   "Multi-layer printed circuit board and method for determining the actual position of internally

24   located terminal areas," describes a "fitting or alignment system" that consists of "location holes

25   which fix a reference point and a reference line from which the position determination of the

26

27   ─────────────────

28     [27] (Lebby Decl. Ex. 6, U.S. Patent No. 4,244,109 at 1:8-9, 1:65-68.)
  [28] (Lebby Decl. Ex. 7, German Pat. App. No. DE 3031103, Abstract.)

conductive patterns on the individual sheets [of printed circuit board layer] takes place."[29]  In this known solution, the "conductive patterns of the individual inner layers" are "disposed on a nominally known position relative to the location system."  (*See* '037 patent, Fig. 1, location holes 7 and 8.)  Because the ███████████████████████████████████████

██████ was well-known to the public long before Waymo's LiDAR systems were developed, Waymo cannot claim ██████████ as a trade secret.

### B.    Waymo Is Not Likely to Prevail On Its Patent Claims.

To establish a likelihood of success on the merits of its patent infringement claims, Waymo bears the burden of showing that it will likely prove at trial that the accused devices infringe upon the patents.[30]  Here, because Uber has shown that it does not infringe the '922 and '464 patents, a preliminary injunction should not be granted.

### 1.    Uber's Fuji Design Does Not Infringe the '922 Patent.

Claim 1[31] of the'922 patent requires "an optical configuration that uses a ***common lens*** to both transmit and receive light beams, rather than using separate lenses for transmission and receipt."  (Mot. 16; Kintz Decl. ¶ 65, ECF No. 24-26.)  Waymo characterizes the '922 patent as disclosing a "fundamental single-lens architecture."  (Mot. 5.)

Based on the layout of the laser diodes on Fuji's PCB, Waymo assumes that Fuji must be using a common-lens system.  (Kintz Decl. ¶¶ 65-74.)  Waymo is wrong.  In contrast to the '922 patent and Waymo's GBr design, Uber's Fuji design does not use a single, common lens for both the transmit beam and receive beam.  (Haslim Decl. ¶¶ 7, 9.)  Rather, Fuji uses one lens for the outbound transmit beam and a separate lens for the inbound receive beam.  (McManamon Decl. ¶¶ 78-81, 86.)   Because Fuji uses two separate lenses for the transmit and receive beam, it does not infringe claim 1 of the '922 patent.

Fuji also does not infringe claim 1 because it is missing other limitations required by the claim.  For example, claim 1 requires "an interior space that includes . . . a transmit path, and a

---

[29] '037 patent at 1:52-60.
[30] *Titan Tire Corp. v. Case New Holland, Inc.,* 566 F.3d 1372, 1376 (Fed. Cir. 2009).
[31] Claim 13 of the '922 patent depends from claim 1, and Uber's Fuji design does not infringe claim 13 for the same reasons it does not infringe claim 1.

1  receive path." Fuji does not have one interior space that contains both the transmit and receive

2  path. Rather, each cavity of Fuji has two compartments—one interior space for the transmit path

3  and a separate interior space for the receive path. (*Id.* ¶¶ 78-83; Haslim Decl. ¶ 9.) Further, Fuji

4  does not use a "reflective surface" for the receive path – the light received from the lens is

5  focused directly onto the receive board.

6  ### 2.   Uber's Fuji Design Does Not Infringe the '464 Patent.

7  The '464 patent is a continuation of the '922 patent and shares a common specification

8  and figures. Like the '922 patent, claim 1[32] of the '464 patent requires "a common lens for both

9  transmit and receive beams" and "an interior space that includes . . . a transmit path, and a receive

10  path." For the same reasons as stated above, Fuji does not satisfy these limitations and thus does

11  not infringe claim 1 of the '464 patent. (McManamon Decl. ¶¶ 95-96, 99-100.)

12  In addition, claim 1 of the '464 patent also requires that "the transmit path at least partially

13  overlaps the receive path in the interior space between the transmit block and the receive block."

14  The Fuji design, however, contains a separate compartment for the transmit path and the receive

15  path. Thus, the transmit and receive paths never overlap or intersect. (*Id.* ¶ 97; Haslim Decl.

16  ¶ 9.)

17  ## III.   WAYMO HAS FAILED TO SHOW IRREPARABLE INJURY.

18  Waymo is not entitled to the extraordinary remedy it seeks because it has not and cannot

19  demonstrate that without a preliminary injunction it will suffer irreparable harm in the five months

20  between the Court's hearing on its motion and the scheduled trial. Waymo delayed filing suit for

21  roughly that same amount of time, and thus any alleged harm is not immediate.

22  The Supreme Court has held "that plaintiffs seeking preliminary relief [must] demonstrate

23  that irreparable injury is ***likely*** in the absence of an injunction."[33] To show this, Waymo must

24  establish that the threatened injury is immediate, significant, and concrete or non-speculative.[34]

25

26  [32] Claim 14 of the '464 patent depends from claim 1, and Uber's Fuji design does not infringe claim 14 for the same reasons it does not infringe claim 1.

27  [33] *Winter v. Nat. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original).

28  [34] *See Friends of the Wild Swan v. Weber*, 767 F.3d 936, 946 (9th Cir. 2014) (immediate); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (non-speculative);

Waymo has not satisfied this heavy burden.  Rather, Waymo relies on:  (1) a presumption of irreparable harm that both the Supreme Court and the Ninth Circuit have rejected; (2) speculative harm about market impact in a currently nonexistent market, in which ███████ ████████████████████████████████████████████████████████ (3) an ambiguous statement in a Nevada DMV filing; and (4) conjectural concerns about public disclosure.  Waymo's arguments do not meet its burden of demonstrating that the allegedly threatened injury is likely, immediate, significant, and non-speculative.  And Waymo's claim of irreparable harm is fatally undermined by its lengthy delay in filing for relief almost one year after it became suspicious of the alleged conduct by Defendants.

## A.     There is No Presumption of Irreparable Harm.

Waymo broadly proclaims that "continued use of another party's trade secrets generally creates irreparable harm" and that a "similar analysis applies to Defendants' patent infringement." (Mot. 20–22.)  But the Supreme Court flatly rejected such a presumption in *eBay Inc. v. MercExchange*, *L.L.C.*,[35] where the Court held that it was error to assume that a permanent injunction should issue if patent infringement and validity were shown; instead, the plaintiff must satisfy the four-factor test.  This holding has been extended to preliminary injunctions.[36]

Following *eBay*, the Ninth Circuit held that any "presumption of irreparable harm" in copyright cases is likewise "dead,"[37] and that the presumption is also "foreclose[d]" in trademark cases.[38]  Consistent with this precedent, federal courts within and outside the Ninth Circuit have easily rejected the presumption in trade secret cases as well.[39]  The cases Waymo cites to the

*Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1123–24 (9th Cir. 2006) (significant).

[35] 547 U.S. 388, 391–94 (2006).
[36] *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 996 (9th Cir. 2011).
[37] *Id.* at 995.
[38] *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).
[39] *GSI Tech., Inc. v. United Memories, Inc.*, No. C 13-1081 PSG, 2013 WL 12172990, at *11 (N.D. Cal. Aug. 21, 2013) ("misappropriation of proprietary information alone does not create a presumption of irreparable harm"); *V'Guara Inc. v. Dec*, 925 F. Supp. 2d 1120, 1126 (D. Nev. 2013) ("In light of [*Flexible Lifeline*], the Court declines to rely on such a presumption" in a trade-secret case.); *Precision Automation, Inc. v. Tech. Servs., Inc.*, No. 07-CV-707-AS, 2007 WL 4480739, at *7 (D. Or. Dec. 14, 2007) (refusing to apply presumption in case involving both trade secrets and patents); *Kahala Franchising LLC v. Kim*, No. CV 13-02933-MWF (FFMx), 2013 WL 12086126, at *2 (C.D. Cal. July 10, 2013) (same); *Se. X-Ray, Inc. v. Spears*, 929 F.

1    contrary are inapposite (Mot. 20), because they either predate the Supreme Court's decision in

2    *eBay* or predate *Flexible Lifeline* or rely on precedent that does.[40]

3        **B.    Waymo Relies Solely on Speculative and Unsupported Harm.**

4        Waymo contends it will suffer irreparable harm if Uber is allowed to use Waymo's

5    intellectual property to gain a "critical edge" in the race "to become the first to offer a full suite of

6    commercial self-driving services." (Mot. 20–21.)  But there is no evidence that Uber has

7    commercialized this technology, or even that ███████████████████████████████████

8    ██████████████████████████████.  Waymo merely speculates that this ***may*** happen.  Such

9    speculative injury is precisely the type of irreparable harm that this Circuit has flatly rejected as a

10   basis for granting provisional relief.[41]

11       ***Harm not imminent.***  Contrary to Waymo's assertions that Uber's "deploy[ment]" of its

12   LiDAR technology in a "product launch" is "imminent" (Mot. 12), █████████████████

13   ████████████████████████████████████████████████████████████.  (Haslim

14   Decl. ¶ 22.)  To date, Uber has never installed a LiDAR of its own design on a vehicle; instead, it

15   uses commercially available technology from third parties, such as Velodyne, in all of its cars that

16   are currently on the road.  (*Id.* ¶ 21.)  There simply is no risk that ████████████████████

17   ███████████████████████████████████████.

18       To support its claim of immediate harm, Waymo relies only on a September 2016 Nevada

19   DMV filing,[42] in which Otto stated that it had "developed in-house and/or currently deployed" a

20   custom LiDAR system.  Otto trucks deployed in Nevada, however, did not have any LiDAR on

21   them at all, much less LiDAR developed in-house, as shown by pictures taken of an Otto truck

---

Supp. 2d 867, 872 (W.D. Ark. 2013) (applying four-factor analysis to trade-secret claims, "making no presumptions as to irreparable harm.").

[40] *Pixon Imaging, Inc. v. Empower Techs. Corp.*, No. 11-CV-1093-JM (MDD), 2011 WL 3739529, at *6 n.7 (S.D. Cal. Aug. 24, 2011), relies on precedent that predates *eBay* and was issued only two days after *Flexible Lifeline*.  The other, *Advanced Instructional Systems, Inc. v. Competentum USA, Ltd.*, No. 1:15CV858, 2015 WL 7575925, at *4 (M.D.N.C. Nov. 25, 2015), fails to cite *eBay* altogether, instead relying on two district court cases from the 1990s.

[41] *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007).

[42] The language was imprecise and ambiguous given the term "and/or."  Uber subsequently clarified this regulatory filing, explaining that "Otto has been developing its own LiDAR systems, but ***has not yet*** deployed an '[i]n-house custom built 64-laser' in its autonomous vehicles." (Chang Decl. Ex. 8.) (emphasis added).

1   during its test runs.  The cases in Waymo's motion can be distinguished on this basis—they

2   involved well-established markets.[43]  (Mot. 21.)  Accordingly, Waymo cannot establish

3   irreparable harm based on an unfounded concern over imminent commercialization.[44]

4          ***No threat of disclosure of Waymo's trade secrets.***  Waymo also argues that it will suffer

5   irreparable harm because the absence of an injunction will "result in further **disclosure**" of its

6   trade secrets.  (Mot. 21.) (emphasis in original)  This also is unsupported speculation.  First,

7   without any citation to evidence, Waymo claims that "Defendants have already begun making

8   regulatory filings that reference Waymo's trade secrets."  (Mot. 21.)  That is false.  To the extent

9   Waymo is relying on the September 2016 Nevada DMV filing, that filing does not disclose any

10  trade secrets, as it is publicly known that custom built 64-diode lasers are being employed in the

11  development of self-driving vehicles.  (*E.g.*, Droz Dep. 19:3-11 (testifying that Velodyne

12  specification sheet disclosed a 64-diode laser).)  Waymo's claim that unspecified ***future*** regulatory

13  filings will contain Waymo's trade secrets is the hallmark of speculation without evidence.

14  Second, Waymo asserts that Defendants' so-called "disrespectful" behavior leaves "little doubt

15  that Defendants would not hesitate to throw Waymo's trade secrets open to the general public"

16  should it suit them.  (Mot. 21.)  This is attorney argument and nothing more.[45]

17         ***Money damages are adequate.***  Finally, Waymo does not argue that money damages are

18  inadequate to compensate it for any injury.[46]  Indeed, "[e]conomic damages are not traditionally

19  considered irreparable because the injury can later be remedied by a damage award."[47]  Waymo

20  makes no attempt to explain why money damages would be inadequate to remedy any

21  competitive injury.  And courts have held that a decrease in market share and profits, such as that

22

23  [43] *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970 (9th Cir. 1991), involved the
    French-fries market and *Netlist Inc. v. Diablo Techs. Inc*, No. 13-CV-05962-YGR, 2015 WL
    153724 (N.D. Cal. Jan. 12, 2015), involved computer-server memory market.

24  [44] *Zodiac Pool Sys., Inc. v. Aquastar Pool Prods., Inc.*, No. 13cv343-GPC (WMC), 2013 WL
    690616, at *5 (S.D. Cal. Feb. 22, 2013) (holding no irreparable harm where product will not be

25  sold imminently).

26  [45] Tellingly, Waymo never even attempts to argue that it could win a preliminary injunction
    based on threatened, rather than actual, misappropriation.

27  [46] *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (holding that where
    monetary damages can compensate plaintiff, preliminary injunction is not justified).

28  [47] *Delphon Indus. LLC v. Int'l Test Sols., Inc.* No. 11-CV-1338-PSG, 2011 WL 4915792, at
    *3 (N.D. Cal. Oct. 17, 2011).

1    which Waymo fears, can be compensated monetarily.[48]

2           **C.     Waymo's Delay in Filing This Action Refutes the Alleged Irreparable Harm.**

3           Waymo's claim of irreparable harm is fatally undermined by its delay in filing for relief.

4    A "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable

5    harm."[49]  An unreasonable delay can be a matter of months.[50]  Indeed, in multiple cases, Google

6    itself has argued that even a four or five-month delay undermines a claim of irreparable harm.[51]

7           In this inquiry, the proper focus is on the point in time when plaintiff was "aware, or

8    should have been aware" of the alleged wrongdoing.[52]  When a plaintiff suspects wrongdoing, the

9    clock has already started ticking.[53]  Here, that clock began to tick *a year ago*, if not earlier.

10   Waymo's "Incident Response Team" began working to analyze Mr. Levandowski's Waymo-

11   issued laptops in March 2016.  (Chang Decl. Ex. 5, Brown Dep. 11:2–4, 11:20–12:8.)  Waymo

12   generated Google Drive activity logs in July and August 2016 for Mr. Levandowski, which

13   allegedly showed that Mr. Levandowski exported files to a personal device that was not issued by

14   Waymo.  (Chang Decl. Ex. 5, Brown Dep. 47:23–49:4; Brown Decl. ¶ 22, ECF No. 24-2.)  By

15   August 2016, the departure of certain engineers had raised additional "suspicion[]," (Mot. 9), and

16   Uber's acquisition of Mr. Levandowski's startup allegedly caused "grave concern."  (Compl.

17   ¶ 57, ECF No. 1.)  By no later than October 2016—***five months before Waymo filed its motion***—

18   Waymo claims it had identified network traffic indicating that Mr. Levandowski had downloaded

19   thousands of files prior to his departure from Waymo, something Waymo found "suspicious."

20   (Chang Decl. Ex. 5, Brown Dep. 31:21–32:21.)  The same month, Waymo filed claims against

21
22          [48] *Hologic, Inc. v. Senorx, Inc.*, No. C-08-00133 RMW, 2008 WL 1860035, at *16–17 (N.D. Cal. Apr. 25, 2008).
            [49] *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).
23          [50] *Larsen v. City of San Carlos*, No. 14-CV-04731-JD, 2014 WL 5473515, at *3 (N.D. Cal.
24   Oct. 28, 2014) (three months)); *Hiramanek v. Clark*, No. C-13-0228 EMC, 2013 WL 5082640, at *1 (N.D. Cal. Sept. 13, 2013) (one month).
            [51] *Perfect 10, Inc. v. Google Inc.*, Google's Opposition to Perfect 10's Motion for Preliminary
25   Injunction, 2005 WL 4705034, at *23 (C.D. Cal. Sept. 30, 2005); *see also Garcia v. Google, Inc.*,
26   786 F.3d 733, 746 (9th Cir. 2015) (en banc); *Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1132–33 (S.D. Cal. 2014).
            [52] *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, No. C 12-03762 SI, 2013 WL 244999,
27   at *8 (N.D. Cal. Jan. 22, 2013), *aff'd*, 551 F. App'x 298 (9th Cir. 2013).
            [53] *See Blackmon v. Tobias*, No. C 11-2853 SBA, 2011 WL 2445963, at *4 (N.D. Cal.
28   June 16, 2011).

1   Mr. Levandowski in arbitration.  (Gonzalez Decl. ISO Mot. to Compel Arbitration, Ex. 1, ECF

2   No. 114-7.)  Thus, the existence of the downloading Waymo alleges cannot be the basis for

3   seeking emergency relief.  Waymo waited five months after learning of that downloading before

4   seeking relief.

5         Waymo attempts to gloss over its delay by emphasizing a December 2016 email that

6   allegedly contained "proof" of misappropriation and infringement in the form of images of a

7   single Uber LiDAR circuit board.  (Mot. 10.)  But this email does not materially change what

8   Waymo already concluded:  Mr. Levandowski had allegedly exported files to a personal device

9   that was not issued by Waymo, and he went to work for a competitor.  Moreover, the December

10  2016 email does not show that any alleged harm to Waymo is in any way "immediate."  It merely

11  shows that Uber is working on a LiDAR system that Waymo (incorrectly) believes is similar to

12  its LiDAR.  That fact is vigorously disputed, but there is no dispute that Waymo has presented

13  zero evidence that Uber is about to deploy an in-house-developed LiDAR system in the

14  immediate future.[54]

15  **IV.    THE BALANCE OF HARDSHIPS STRONGLY DISFAVORS AN INJUNCTION.**

16        Even when a party, unlike Waymo here, has demonstrated likelihood of success of the

17  merits, this Court has held that the "party must also show that the balance of hardships tip sharply

18  in its favor in order to prevail on its motion for a preliminary injunction."[55]  Where, as here,

19  Waymo has neither shown likelihood of success on the merits nor irreparable harm, the burden is

20  even greater.  Waymo has not met this burden.

21        Just as there is no presumption of irreparable harm, there is also no presumption of

22  hardship simply because this is a case concerning intellectual property.[56]  As discussed above,

23  there is no cognizable irreparable harm that Waymo would experience between now and the date

24

25        [54] Waymo also points again to the September 2016 Nevada DMV filing.  (Compl. ¶ 61.)  The assertion that this generic and equivocal regulatory filing somehow constituted the "final piece of the puzzle" is simply implausible.

26        [55] *Bayer Corp. v. Roche Molecular Sys., Inc.*, 72 F. Supp. 2d 1111, 1120 (N.D. Cal. 1999) (Alsup, J.).

27        [56] *Mitigation Techs., Inc. v. Pennartz*, No. ED CV 14-01954-AB (SPx), 2015 WL 12656936,

28  at *8 (C.D. Cal. Mar. 13, 2015); *Leatt Corp. v. Innovative Safety Tech., LLC*, No. 09-CV-1301-IEG (POR), 2010 WL 1526382, at *11 (S.D. Cal. Apr. 15, 2010).

1    of trial that an injunction would forestall.  Contrary to Waymo's contention, it would not be

2    "forced 'to compete against its own patented invention,'" (Mot. 24), because ███████████

3    ████████████████████████████████████████████████████████████████████████████████████████

4    (Haslim Decl. ¶ 22.).

5          On the other hand, the burden in the intervening months on Uber would be substantial.

6    First, Waymo overreaches in the scope of its requested injunction.  As this Court noted twice in

7    recent hearings, in the more than one hundred alleged "trade secrets" that Waymo seeks to enjoin

8    Defendants from using (along with "any colorable variation"), Waymo overreaches and attempts

9    to claim trade secret protection over clearly unprotectable material, such as commonplace

10   knowledge about vendors and suppliers, techniques that are dictated by physics, and information

11   disclosed in the prior art.  By effectively prohibiting Defendants from using such technology and

12   techniques, the injunction should would unfairly undermine and burden Defendants' independent

13   LiDAR development, which was built without any of Waymo's trade secrets, and on which Uber

14   has spent thousands of man-hours.  (Haslim Decl. ¶ 20.)  It would also limit the work of about 25

15   employees.  (Haslim Decl. ¶ 5.)  Waymo admits that this outcome would be improper:  "Waymo

16   is not seeking to enjoin Defendants from pursuing self-driving car projects *in toto*."  (Mot. 23.)

17         For example, one of the "trade secrets" that Waymo seeks to enjoin Uber from using is the

18   "identity" of "Waymo's LiDAR component or subsystem vendors, suppliers, and consultants."

19   (Jaffe Decl. Ex. 1, ¶ 93, ECF No. 25-7.)  This Court has already noted that Waymo's argument

20   that its supplier list is a trade secret is "bogus."  (CMC Hr'g Tr. 7, Mar. 29, 2017, ECF No. 131

21   ("[S]ome of the things in your motion are bogus.  You've got things in there like lists of suppliers

22   as trade secrets.  Come on.  It undermines the whole thing.").  In other words, the injunction that

23   Waymo seeks could theoretically prevent Uber from even ***identifying*** and interacting with ***any***

24   Waymo component vendor if an employee knew that the vendor also supplied Waymo.  Many of

25   these vendors are companies with websites, public offerings, and relationships that are not

26   exclusive to Waymo, and that make frequent appearances at public trade shows.  (Chang Decl.

27   Ex. 4, Willis Dep. 87:22–88:12.)  Barring such contact would be potentially devastating to Uber's

28   legitimate efforts to compete, and flies in the face of the requirement that any injunction must be

1  "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"

2  and "tailored to remedy the specific harm alleged."[57]

3      Second, Waymo incorrectly assumes that Uber could easily continue developing

4  self-driving cars by acquiring LiDAR technology from third-party vendors.  Existing vendors of

5  LiDAR technology cannot keep up with demand for the quantities needed for testing, much less

6  for commercial use.  (Boehmke Decl. ¶¶ 11, 15, 16.)  In fact, the impetus for Defendants to

7  develop an in-house customized LiDAR was, in part, due to the difficulty in obtaining LiDAR

8  sensors in sufficient quantities from commercial sources.  ███████ Uber's primary supplier for

9  the cars currently on the road, cannot meet the demand for its LiDARs.  (Haslim Decl. ¶ 21.)  The

10  fact that there is "no readily available substitute" also tilts the balance of hardships in Defendants'

11  favor.[58]

12  **V.   THE PUBLIC INTEREST DISFAVORS AN INJUNCTION**

13      Waymo acknowledges—as it must—that the public has a strong interest in promoting

14  "competition and consumer choice" in the development and creation of a self-driving car

15  marketplace.  (Mot. 25.)  As this Court has held, the best way to promote that public interest is by

16  encouraging fair and vigorous competition in the use of ideas in this developing industry.[59]

17      Uber has been a visionary and a pioneer in the transportation industry, essentially creating

18  the concept of ride-sharing, offering economic opportunities for hundreds of thousands of drivers,

19  and pioneering other innovative solutions in transportation.  In that vein, Uber is competing

20  vigorously but fairly to eliminate the number one cause of car accidents—human error.

21  Especially where there is no risk of an imminent commercialization or deployment of the

22  disputed technology, the public interest weighs against any injunction.

23      The only public interest that Waymo argues would be furthered by a preliminary

24

25  [57] *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012).

26  [58] *Advanced Rotorcraft Tech., Inc. v. L-3 Commc'ns Corp.*, No. C 06-06470 WHA, 2007 WL 437682, at *9 (N.D. Cal. Feb. 6, 2007).

27  [59] *Yamashita v. Wilbur-Ellis Co.*, No. C 06-01690 WHA, 2006 WL 1320470, at *8 (N.D. Cal. May 15, 2006); *Lear, Inc. v. Adkins*, 395 U.S. 653, 670 (1969) ("[T]he equities of the licensor do

28  not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain.").

1    injunction is "vindicating both trade secret and patent rights."  (Mot. 24.)  But Uber has not

2    impinged on Waymo's trade secret and patent rights.  Rather, Uber developed—and continues to

3    develop—its own technology without the use of any of Waymo's trade secrets and without

4    infringing Waymo's patents.  (*Supra* at 3:23-6:28; 8:11-15:4.)  Moreover, many of Waymo's

5    claimed "trade secrets" are known in the prior art, have been publicly disclosed, or are dictated by

6    the laws of physics.[60]  The public's interest is not served by an injunction preventing infringement

7    that Waymo "has not shown has [occurred] or is likely to occur."[61]

8        Moreover, as this Court has held, while there exists a public interest in protecting rights

9    secured by valid patents, the public interest may be better served by purchasers "having access to

10   competitive products, being able to determine which products better suit their needs, and

11   receiving reduced prices due to the availability of competing products."[62]  This is especially true

12   here, where the overreaching scope of Waymo's requested injunction would severely slow

13   development of a competing LiDAR system, as it would even capture activity that builds on

14   public material and prior art.  (*Supra* at 10:25-11:10; 12:3-11; 14:6-18; 15:5-16:4; 23:3-24:9.)

15       Finally, California has a strong public policy in favor of employee mobility and free

16   competition.[63]  This is particularly important where talent and ingenuity is the primary resource

17   that drives competition in the creation of a new industry.  Waymo has presented no evidence that

18   Mr. Levandowski—or anyone else at Uber—ever used the allegedly downloaded files.  In the

19   absence of such evidence, Waymo must argue that its technology for building autonomous cars

20   might somehow be inevitably disclosed to Uber by virtue of talented individuals going to work

21   there.  But California has definitively rejected the "inevitable disclosure" doctrine.[64]

22                                **CONCLUSION**

23       For these reasons, Waymo's Motion for a Preliminary Injunction should be denied.

24   _____

25   [60] *See* declarations of Paul McManamon and Michael Lebby.
     [61] *Sunbelt Rentals, Inc.*, 2014 WL 492364, at *11.
26   [62] *Yamashita*, 2006 WL 1320470, at *8.
     [63] *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 (2008); CAL. BUS. & PROF. CODE
27   §§ 16600-16601 (recognizing California's "settled legislative policy in favor of open competition
     and employee mobility").
28   [64] *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1463 (2002) ("Lest there be any doubt
     about our holding, our rejection of the inevitable disclosure doctrine is complete.").

1

2   Dated:  April 7, 2017                          MORRISON & FOERSTER LLP

3                                                  By:  */s/ Arturo J. González*
                                                         ARTURO J. GONZÁLEZ
4

5                                                  Attorneys for Defendants
                                                   UBER TECHNOLOGIES, INC.,
6                                                  OTTOMOTTO LLC, and OTTO TRUCKING LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28