MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzalez@mofo.com
ERIC A. TATE (CA SBN 178719)
ETate@mofo.com
RUDY Y. KIM (CA SBN 199426)
RKim@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:    415.268.7000
Facsimile:     415.268.7522

KAREN L. DUNN (*Pro Hac Vice*)
kdunn@bsfllp.com
HAMISH P.M. HUME (*Pro Hac Vice*)
hhume@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington DC 20005
Telephone:    202.237.2727
Facsimile:     202.237.6131

Attorneys for Defendants
UBER TECHNOLOGIES, INC. and
OTTOMOTTO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>UBER TECHNOLOGIES, INC.;<br>OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>                    Defendants. | Case No.        3:17-cv-00939-WHA<br><br>**DEFENDANTS UBER TECHNOLOGIES, INC. AND, OTTOMOTTO LLC'S OPPOSITION TO MOTION TO COMPEL**<br><br>Date:       June 8, 2017<br>Time:      10:00 a.m.<br>Ctrm:      F, 15th Floor<br>Judge:    Hon. Jacqueline Scott Corley<br><br>Trial Date: October 2, 2017 |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................ 1

II.  BACKGROUND ......................................................................................................... 2

III. ARGUMENT .............................................................................................................. 4

    A.   It is Uncontested that The Report and Six of its Exhibits Are Covered By
        The Attorney-Client Privilege. ................................................................... 4

        1.   The Report Was Created To Facilitate The Provision Of Legal
               Advice. ......................................................................................... 5

    B.   The Report and its Exhibits are Quintessential Protected Work Product. ............. 6

        1.   The Parties Reasonably Anticipated Possible Litigation With
               Google. ......................................................................................... 7

        2.   The Report and its Exhibits Are Protected Opinion Work Product. ........... 9

        3.   Waymo's Arguments That the Work Product Doctrine Is
               Inapplicable Fail. ......................................................................... 10

    C.   The Report And Its Exhibits Are Also Protected Under The Common
        Interest Doctrine. ..................................................................................... 13

    D.   The Crime-Fraud Exception Does Not Apply. ..................................................... 17

    E.   Uber's Privilege Log Complies with the Federal Rules and the Court's
        Standing Order ......................................................................................... 20

    F.   The Court Should Reject Waymo's Substantial Need Argument. ........................ 22

    G.   Additional Discovery Is Unnecessary ................................................................. 24

IV.  CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cmty. Ass'n for Restoration of the Env't, Inc. v. COW Palace, LLC*,
  No. 13-CV-3016-TOR, 2014 WL 11514516 (E.D. Wash. Sept. 8, 2014)................................10

*Ellis v. J.P. Morgan Chase & Co.*,
  No. 12-CV-03897-YGR (JCS), 2014 WL 1510884 (N.D. Cal. Apr. 1, 2014) .........................16

*FastVDO LLC v. AT&T Mobility LLC*,
  No. 16-CV-385-H (WVG), 2016 U.S. Dist. LEXIS 146373
  (S.D. Cal. Oct. 21, 2016).........................................................................................11, 12, 15

*Fox v. Ca. Sierra Fin. Servs.*,
  120 F.R.D. 520 (N.D. Cal. 1988) ................................................................................................8

*FTC v. Abbvie, Inc.*,
  No. CV 14-5151, 2015 U.S. Dist. LEXIS 166723 (E.D. Pa. Dec. 14, 2015) ....................14, 16

*FTC v. Lights of Am., Inc.*,
  No. SACV 10-1333 (E.D. Pa. Dec. 14, 2015) ....................................................................12, 13

*GenOn Mid-Atl., LLC v. Stone & Webster, Inc.*,
  No. 11 CIV. 1299 (HB) (FM), 2011 WL 5439046 (S.D.N.Y. Nov. 10, 2011).........................13

*GTE Directories Serv. Corp. v. Pacific Bell Directory*,
  135 F.R.D. 187 (N.D. Cal. 1991) ..............................................................................................24

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*,
  115 F.R.D. 308 (N.D. Cal. 1987)....................................................................................8, 14, 16

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*,
  116 F.R.D. 533 (N.D. Cal. 1987)..................................................................................................6

*Holmes v. Collection Bureau of Am., Ltd.*,
  No. 09-02540- WHA, 2010 U.S. Dist. LEXIS 4253 (N.D. Cal. Jan. 8, 2010)
  (Alsup, J.)....................................................................................................................1, 8, 13, 14

*Holmgren v. State Farm Mut. Auto. Ins. Co.*,
  976 F.2d 573 (9th Cir. 1992).......................................................................................9, 23, 24

*Hunt v. Blackburn*,
  128 U.S. 464 (1888).....................................................................................................................2

*In re Crazy Eddie Sec. Litig.*,
  No. 87 CV 0033 (EHN), 1991 WL 17287 (E.D.N.Y. Jan. 28, 1991)........................................23

*In re Grand Jury Investigation*,
    974 F.2d 1068 (9th Cir. 1992) ................................................................................................17

*In re Grand Jury Proceedings*,
    867 F.2d 539 (9th Cir. 1989) ..................................................................................................18

*In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*,
    357 F.3d 900 (9th Cir. 2004) ...................................................................................7, 11, 12

*In re John Doe Corp.*,
    675 F.2d 482 (2d Cir. 1982) ...................................................................................................23

*In re JP Morgan Chase & Co. Securities Litigation*,
    MDL No. 1783, 2007 WL 2363311 (N.D. Ill. Aug. 13, 2007) ................................................16

*In re Napster Copyright Litig.*,
    462 F. Supp. 2d 1060 (N.D. Cal. 2006) .................................................................................12

*In re Napster Inc. Copyright Litig.*,
    479 F.3d 1078 (9th Cir. 2007) ................................................................................................17

*In re Oracle Sec. Litig.*,
    No. C-01-0988 MJJ (JCS), 2005 WL 6768164 (N.D. Cal. Aug. 5, 2005) ...............................24

*In re Vitamins Antitrust Litig.*,
    211 F.R.D. 1 (D.D.C. 2002) .....................................................................................................23

*La. Muni. Police Empls. Retirement Sys. v. Sealed Air Corp.*,
    253 F.R.D. 300 (D.N.J. 2008) ...........................................................................................11, 12

*Laser Indus. Ltd. v. Reliant Techs., Inc.*,
    167 F.R.D. 417 (N.D. Cal. 1996) ......................................................................................17, 24

*Lennar Mare Island, LLC v. Steadfast Ins. Co.*,
    No. 2:12-CV-2182 KJM KJN, 2014 WL 1366252 (E.D. Cal. Apr. 7, 2014) .......................8, 12

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
    No. 4:11-cv-05341, 2013 U.S. Dist. LEXIS 147032 (N.D. Cal. Oct. 10, 2013) ...................5, 6

*Morvil Tech., LLC v. Ablation Frontiers, Inc.*,
    No. 10-CV-2088-BEN (BGS), 2012 WL 760603 (S.D. Cal. Mar. 8, 2012) ..............................14

*Mushroom Assocs. v. Monterey Mushrooms, Inc.*,
    No. C-91-1092 TEH (PJH), 1992 WL 442892 (N.D. Cal. May 19, 1992) ...............................24

*Nidec Corp. v. Victor Co. of Japan*,
    249 F.R.D. 575 (N.D. Cal. 2007) ............................................................................................14

*O'Connor v. Boeing N. Am., Inc.*,
    216 F.R.D. 640 (C.D. Cal. 2003) ............................................................................................24

*Phillips v. C.R. Bard, Inc.*,
  290 F.R.D. 615 (D. Nev. 2013)............................................................................21

*Rembrandt Patent Innovations, LLC v. Apple, Inc.*,
  No. C14-05094 WHA, 2016 U.S. Dist. LEXIS 13749 (N.D. Cal. Feb. 4, 2016)
  (Alsup, J.)............................................................................4, 14, 15

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
  232 F.3d 1258 (9th Cir. 2000)............................................................................19

*S.E.C. v. Brady*,
  238 F.R.D. 429 (N.D. Tex. 2006) ............................................................9, 10, 24

*S.E.C. v. Schroeder*,
  No. C07-03798 JW (HRL), 2009 WL 1125579 (N.D. Cal. Apr. 27, 2009) ............9

*Skynet Elect. Co. v. Flextronics Int'l, Ltd.*,
  No. C 12–06317 WHA, 2013 WL 6623874 (N.D. Cal. Dec. 16, 2013)..................18

*Sporck v. Peil*,
  759 F.2d 312 (3d Cir. 1985)............................................................................10, 22

*Tierno v. Rite Aid Corp.*,
  No. C 05-02520 TEH, 2008 WL 2705089 (N.D. Cal. July 8, 2008) ..................9, 24

*U.S. v. Bauer*,
  132 F.3d 504 (9th Cir. 1997)............................................................................2, 4, 18

*U.S. v. Christensen*,
  828 F.3d 763 (9th Cir. 2016)............................................................................4

*U.S. v. de la Jara*,
  973 F.2d 746 (9th Cir. 1992)............................................................................18

*U.S. v. Gonzalez*,
  669 F.3d 974 (2012)............................................................................8

*U.S. v. Saccoccia*,
  898 F. Supp. 53 (D.R.I. 1995)............................................................................20

*U.S. ex rel. Bagley v. TRW, Inc.*,
  212 F.R.D. 554 (C.D. Cal. 2003) ............................................................9, 10, 24

*Ullman-Briggs, Inc. v. Salton/Maxim Housewares, Inc.*,
  No. 92-c-680, 1996 WL 535083 (N.D. Ill. Sept. 17, 1996) ..................................19

*Zamani v. Carnes*,
  491 F.3d 990 (9th Cir. 2007)............................................................................4

**Other Authorities**

Fed. R. Civ. P.
26(b)(3)(A)(ii) ................................................................................................................22
26(b)(3)(B) .......................................................................................................................9
26(b)(5)(A) ......................................................................................................................21
26(b)(5)(A)(ii) ................................................................................................................20

I.    **INTRODUCTION**

On February 22, 2016, Uber Technologies, LLC ("Uber") executed a term sheet in anticipation of an acquisition of two newly-formed companies, Ottomotto LLC ("Ottomotto") and Otto Trucking LLC ("Otto Trucking") (collectively "Otto").  Two of Otto's co-founders, Anthony Levandowski and Lior Ron, were ex-Google employees.   And competition within the autonomous vehicle space was intense.  Litigation was a distinct possibility.  Accordingly, the parties engaged separate counsel for the purpose of obtaining legal advice, including an evaluation of claims that could be brought against them in a litigation initiated by Google.  The parties also entered into a joint defense and common interest agreement to facilitate the free-exchange of information and legal analysis—a common action to take under the circumstances. *See Holmes v. Collection Bureau of Am., Ltd.*, No. 09-02540- WHA, 2010 U.S. Dist. LEXIS 4253, at *5-6 (N.D. Cal. Jan. 8, 2010) (Alsup, J.)

On March 4, 2016, the parties' litigation counsel—Morrison & Foerster LLP ("MoFo") for Uber and O'Melveny and Myers ("OMM") for Otto—retained a well-known and reputable company, Stroz Friedberg, LLC ("Stroz"), to conduct an investigation of facts pertinent to their legal advice.  Stroz prepared a privileged report of its findings (the "Report") to enable MoFo and OMM to render legal advice, along with a number of exhibits showing its underlying investigatory work or selecting specific documents as relevant to the investigation.  Waymo now seeks to compel production of this Report and its exhibits, arguing that they were not prepared in anticipation of litigation even though Waymo admits Google began discussions about litigation against Mr. Levandowski in March 2016 (the same time Stroz was retained) and against Uber in August 2016 (as the Stroz investigation was ongoing) and even though they filed two separate arbitrations against Mr. Levandowski just two months after the acquisition was announced.

Waymo's motion must be denied.  The Report and its exhibits are protected by the attorney-client privilege and work product doctrine—foundational privileges that lawyers rely upon every day in providing legal advice to clients who may face litigation, as happened here.  Those privileges were never waived.  While Waymo argues that parties to a merger do not "typically" share a common interest, courts routinely recognize such an interest where parties are

analyzing a possible joint litigation risk.  Waymo's motion seeks to eviscerate fundamental legal privileges, including "the most sacred of all legally recognized privileges." *U.S. v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997); *see also Hunt v. Blackburn*, 128 U.S. 464, 470 (1888) ("The rule which places the seal of secrecy upon communications between client and attorney is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.").  Uber and Otto respectfully request that this Court not allow that to happen.

## II.     BACKGROUND

On February 22, 2016, Uber and Otto executed a term sheet setting forth the parameters of Uber's potential acquisition of the newly formed companies Ottomotto and Otto Trucking.  (Tate Decl. ¶ 5; Suhr Decl. ¶ 2.)  They were founded by two ex-Google employees, Mr. Levandowski and Mr. Ron.  (Tate Decl. ¶ 3.)  Based on several factors, including the recent formation of Ottomotto and Otto Trucking, the fact that the founders were recent ex-Google employees and other ex-Google employees might be joining the venture, and the fact that the autonomous vehicle space is extremely competitive, Otto, its founders, and Uber all thought it was possible that Google would initiate some form of legal action against one or more of the parties to the transaction.  (*Id.*; Suhr Decl. ¶ 5.)  Consistent with the belief that there was a possibility of litigation by Google, Uber agreed to indemnify certain employees under certain circumstances regardless of whether the deal closed.  (Tate Decl. ¶ 5.)  In recognition of this risk, Otto, Mr. Levandowski, Mr. Ron, and Uber (collectively "the joint defense group") entered into a joint defense and common interest agreement, so that they could jointly evaluate their legal positions against Google, and take steps to strengthen their defenses in the event that any investigation or legal action were initiated against them related to the acquisition.  (Tate Decl. ¶ 7; Suhr Decl. ¶ 6.)  On February 24, 2016, the parties confirmed that agreement orally shortly after executing the term sheet.  (Tate Decl. ¶ 7; Suhr Decl. ¶ 6.)  This understanding was confirmed in an email the following day.  (Tate Decl. ¶ 8 , Ex. 1.)  On April 11, 2016, the parties memorialized their oral agreement in writing when they signed the Joint Defense, Common Interest, and Confidentiality

Agreement ("JDA").   (Tate Decl. ¶ 11, Ex. 2[1] at 2 (noting that the written agreement memorializes the parties' "pre-existing understanding and oral agreement.")

Uber retained MoFo as litigation counsel on this project.  (*Id.* ¶¶ 2-3; Suhr Decl. ¶ 3.) Uber had separate deal counsel, Cooley LLP, for the underlying transaction.  (Tate Decl. ¶ 2; Suhr Decl. ¶ 3.)  Otto was represented by OMM.[2]  (Bentley Decl. ¶ 3.)  Mr. Levandowski and Mr. Ron also retained separate legal counsel, Donahue Fitzgerald LLP ("Donahue") and Levine & Baker LLP ("Levine"), respectively.  (Gardner Decl. ¶ 2; Baker Decl. ¶ 2.)

On March 4, 2016, MoFo and OMM, jointly retained an investigative firm, Stroz, to develop the facts relevant to the lawyers' work in providing legal advice that identifies and evaluates legal risks and potential claims that could be developed for potential litigation by Google.  (Tate Decl. ¶ 9; Bentley Decl. ¶ 11; Ex. 3.)  Pursuant to the JDA, respective counsel for the joint defense group gave input as to what topics Stroz should investigate and how to investigate them.   (*Id.* ¶ 15; *see also* Ex. 3.)   The parties understood and agreed that all communications with, and information provided to, Stroz would be protected by the attorney-client privilege, the common interest doctrine and/or attorney work product doctrine.  (Tate Decl. ¶ 12; Ex. 2 ¶¶ 2-3; Ex. 3 at 2.)  Stroz was required to keep confidential all information developed through the investigation as well as all of its work product and communications with individuals and counsel.   (Friedberg Decl. ¶¶ 6-7.)   Under the Stroz engagement agreement, separate agreements with counsel for Mr. Levandowski, and the JDA, confidential information could only be disclosed to members of the joint defense group and their counsel.  (Ex. 2 ¶¶ 2-3; Ex. 3 at 2; Friedberg Decl. ¶ 7.)

Stroz issued its Report on August 5, 2016.  (Friedberg Decl. ¶ 8.)  The Report's Appendix

---

[1] Unless otherwise noted, all citations to numbered exhibits are to those appended to the Tate Declaration, and all citations to lettered exhibits are to those appended to the Gonzalez Declaration.

[2] In order to comply with the Court's order that Defendants provide a "sworn record as to all necessary predicates," Defendants sought a declaration from Eric Amdursky, a partner at OMM and counsel to Otto during the proposed transaction.  (Chatterjee Decl. ¶ 3.)  As detailed in the Chatterjee Declaration submitted herewith, OMM would not provide that declaration (in support of its current client, Otto Trucking) without the consent of its *other* current client, Google Inc.  Waymo's counsel refused to assist Defendants in obtaining that consent.  (*Id.* ¶ 5 & Ex. A to Chatterjee Decl.)

of Exhibits was provided to counsel for the joint defense group on August 11, 2016 and was marked attorneys' eyes only and password protected.  (*Id.* ¶ 9; Tate Decl. ¶ 22.)  Counsel at MoFo, OMM, Donahue, and Levine received the Report.  (Tate Decl. ¶ 18.)  Cooley did not receive the Report.  (Leigh Decl. ¶ 3.)  Certain in-house counsel at Uber also received a copy of the Report, as reflected on Uber's privilege log.  (Ex. 4; Suhr Decl. ¶ 13.)  Messrs. Levandowski and Ron received the Report through their counsel.  (Baker Decl. ¶ 17.)  And, while counsel at MoFo, OMM, Donahue, and Levine received the Appendix of Exhibits, no in-house counsel or other individuals at Uber did.  (Tate Decl. ¶ 22; Suhr Decl. ¶ 14.)  Every person who received the Report and Appendix of Exhibits has kept them confidential.  (Tate Decl. ¶ 19; Bentley Decl. ¶ 17; Baker Decl. ¶¶ 16-17; Gardner Decl. ¶ 12; Suhr Decl. ¶¶ 15-16; Friedberg Decl ¶¶ 11-12.)

## III.   ARGUMENT

### A.   It is Uncontested that The Report and Six of its Exhibits Are Covered By The Attorney-Client Privilege.[3]

"[T]he attorney-client privilege is, perhaps, the most sacred of all legally recognized privileges, and its preservation is essential to the just and orderly operation of our legal system. . . ."  *Bauer*, 132 F.3d at 510.  "Privilege is generally demonstrated by satisfying an eight-part test:  (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived."  *Rembrandt Patent Innovations, LLC v. Apple, Inc.*, No. C14-05094 WHA, 2016 U.S. Dist. LEXIS 13749, at *12 (N.D. Cal. Feb. 4, 2016) (Alsup, J.) (quoting *U.S. v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009)).  Communications between a client and an attorney's agent or representative are also covered by the privilege—an uncontroversial principle not disputed here.  *U.S. v. Christensen*, 828 F.3d 763, 802 (9th Cir.

---

[3] Waymo does not contest that the Report and some of its exhibits are protected by the attorney-client privilege.  Waymo has thus waived this issue as to those documents and cannot argue for production based on any alleged inapplicability of the attorney-client privilege in its reply brief.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (affirming district court's finding of waiver when argument was not raised until the reply brief).  Waymo's motion as to all entries subject to the attorney client privilege—which includes the Report—should be denied on this basis alone.

1   2016) (finding privilege covered communications between a lawyer and a private investigator).

2   Here, the Report and several of its exhibits[4] reflect information provided in confidence to an

3   agent of counsel, at the direction of counsel, for the purpose of obtaining legal advice from OMM

4   and MoFo and is therefore covered by the privilege.

5              **1.**       **The Report Was Created To Facilitate The Provision Of Legal Advice.**

6         Waymo does not dispute that the Report was created to facilitate the rendering of legal

7   advice to Uber and Otto.  (Tate Decl. ¶ 9; Friedberg Decl. ¶ 3; Bentley Decl. ¶ 11; Ex. 3.)  The

8   firms' engagement letter with Stroz expressly states that:

9           The purpose of the Engagement is to enable Uber, Otto, Anthony

10          Levandowski and Lior Ron (who are parties to a Joint Defense and
            Common Interest Agreement), along with their respective counsel,

11          to understand certain factual matters potentially related to potential
            litigation[.]

12  (Ex. 3 at 2; *see also* Tate Decl. ¶ 13.)

13        This Court's analysis in *MediaTek* instructive.  There, this Court determined that a final

14  report "regarding various patents" was not covered by the attorney-client privilege because:  (1)

15  there was no evidence that attorneys ever received or reviewed the report, (2) the context in which

16  it was prepared indicated a business purpose, (3) there was nothing in the language of the report

17  that "even hint[ed]" it was to be relied on by counsel, and (4) the confidentiality agreement did

18  not reference that the report was intended to be covered by the attorney-client privilege.

19  *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 4:11-cv-05341, 2013 U.S. Dist. LEXIS

20  147032, at *10-18 (N.D. Cal. Oct. 10, 2013).  These same four factors compel the conclusion that

21  the Report in this case *is* privileged because:

22       •  The recipients of the Report—23 out of the 37 people who received it—

23         were lawyers.  (Ex. 4 at 17.)  The only non-lawyers to receive the Report, aside

24         from the individuals at Stroz who compiled the Report and three members of

25         MoFo's legal staff, were Mr. Levandowski and Mr. Ron.  (*Id.*)

26

27       [4] Defendants have claimed attorney client privilege over seven entries (1-6 and 11) on the
    privilege log.  Defendants have claimed work product privilege and joint interest privilege over

28  every entry on the privilege log.  (Ex. 4.)

- The primary purpose of the Report was to conduct an investigation, gather particular facts, synthesize information, and render expert opinions about those facts in such fashion that would enable OMM and MoFo to render legal advice to their clients.  Consistent with this purpose, OMM and MoFo engaged Stroz *after* they had signed a term sheet for the acquisition.  Counsel for all the parties directed Stroz' work.  (Tate Decl. ¶¶ 9, 12; Bentley Decl. ¶ 11.)

- The Court's *in camera* review of the Report will confirm that, unlike in *MediaTek*, the Report was created for the express purpose of facilitating the rendering of legal advice to OMM and MoFo's clients.  (*Id.*)

- The Stroz Engagement Letter expressly provides that "all of its work product, and all information and data received [from the joint defense parties] are covered by the common interest, attorney-client privilege and/or attorney work product doctrine."  (Ex. 3 at 2.)

In addition, the Report and the underlying communications were made and held in the strictest of confidence.  As documented in the Stroz Engagement Letter, Stroz adhered to a confidentiality protocol prohibiting materials connected to the investigation from being shared or discussed outside of the joint defense group.  (*Id.* at 2-3; Friedberg Decl. ¶¶ 11-12.)  Likewise, the JDA prohibited the parties from sharing confidential information, including the Report, outside of the joint defense group.  (Ex. 2 ¶ 3).  Consistent with those agreements, the Report was not shared with anyone outside of Stroz, the joint defense group, and their counsel.  (Tate Decl. ¶ 19; Bentley Decl. ¶ 17; Baker Decl. ¶¶ 16-17; Gardner Decl. ¶ 12; Suhr Decl. ¶¶ 15-16; Friedberg Decl ¶¶ 11-12.)

### B.       The Report and its Exhibits are Quintessential Protected Work Product.

In addition to being protected by the attorney-client privilege, the Report and its exhibits are quintessential attorney work product, protection of which is necessary to "preserve the vigor of the dialectic by creating an environment in which each lawyer feels not only free, but pressured, to do his own work and to make both his investigation and his evaluation of the case as aggressive, as thorough, and as internally frank as possible." *Hewlett-Packard Co. v. Bausch &*

*Lomb, Inc.*, 116 F.R.D. 533, 538 (N.D. Cal. 1987).  "[T]o qualify for protection against discovery under Rule 26(b)(3)[, the work product doctrine,] documents must have two characteristics:  (1) they must be 'prepared in anticipation of litigation or for trial', and (2) they must be prepared by or for another party or 'by or for that party's representative.'"  *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 907 (9th Cir. 2004) (citing *In re Ca. Pub. Utils. Comm'n*, 892 F.2d 778, 780-81 (9th Cir. 1989)).  The Report easily satisfies both; Waymo does not even contest the second.

### 1.      The Parties Reasonably Anticipated Possible Litigation With Google.

It is ironic that in the midst of two separate arbitrations filed by Google two months after the acquisition was announced, as well as this separate litigation, Google strenuously argues that there is no way Uber, Otto, and Otto's founders could have reasonably anticipated the possibility of a challenge by Google.  Regardless, the facts in the record establish that Uber and Otto reasonably anticipated litigation would be commenced by Google.  (Tate Decl. ¶ 5; Suhr Decl. ¶¶ 5-6; 10.)  Specifically, the parties' agreements—the JDA and the Stroz Engagement Letter—make this clear on their face.  The JDA specifically notes that it is in "contemplation of potential … litigation."  (Ex. 2 at 1.)  And the Stroz Engagement Letter states that the "purpose of the Engagement is to enable Uber, Otto, Anthony Levandowski and Lior Ron (who are parties to a Joint Defense and Common Interest Agreement), along with their respective counsel, to understand certain factual matters potentially related to potential litigation."  (Ex. 3 at 2.)  MoFo was retained in January 2016 specifically to analyze litigation risk, while Uber maintained separate corporate counsel for the deal.  (Tate Decl. ¶ 3; Suhr Decl. ¶ 3; Leigh Decl. ¶ 2.)  The lawyers involved expressly attest that the Report was commissioned by counsel precisely *because* of the possibility of litigation.  (Tate Decl. ¶ 9; Bentley Decl. ¶ 11; Gardner Decl. ¶¶ 3-6; Baker Decl. ¶ 10; Suhr Decl. ¶ 10.)  And, consistent with the belief that there was a possibility of litigation by Google, Uber agreed to indemnify certain employees under certain circumstances regardless of whether the deal closed.  (Tate Decl. ¶ 5.)

Waymo argues that Stroz was engaged and "began preparing memoranda as part of its due diligence 'investigation' before the cited common interest agreement even existed."  (Mot. 7.)

But it is well-settled that a joint defense agreement may be oral and may be implied from conduct and situation, such as attorneys exchanging confidential communications from clients who are or potentially may be codefendants or have common interests in litigation. *U.S. v. Gonzalez*, 669 F.3d 974, 979 (2012).  Here, the parties to the joint defense and common interest agreement had an oral agreement in place at least as of February 24, 2016—after the signing of the term sheet, before Stroz was engaged on March 4, 2016, and well before Stroz began preparing any memoranda as part of its investigation.  (Tate Decl. ¶¶ 7-8; Bentley Decl. ¶ 8; Ex. 1 at 1 (email dated February 25, 2016 explicitly referencing the oral common interest agreement between the parties)).  The Stroz Engagement Letter specifically references a pre-existing common interest agreement.  (Ex. 3 at 2.)  And the JDA dated April 11, 2016, notes that it memorializes the parties' "pre-existing understanding and oral agreement."  (Ex. 2 at 2.)  There can be no question that an oral joint defense and common interest agreement was in place prior to the commencement of Stroz's work, that it was later memorialized in writing, and that it must be respected. *See Holmes*, 2010 U.S. Dist. LEXIS 4253, at *10-11 (recognizing oral common interest agreement where attorneys submit sworn declarations establishing its existence and emails later memorialize that agreement).

Waymo also argues that there is no evidence that at the time the withheld documents were created, there was a "substantial probability" that litigation would commence.  (Mot. 8.)  This argument is inconsistent with Rule 26's standard, which attaches protection to work product created in "anticipation" of litigation.[5]  To satisfy the "in anticipation of litigation" requirement, an attorney must have "a subjective belief that litigation was a real possibility, and that belief must be objectively reasonable." *Lennar Mare Island, LLC v. Steadfast Ins. Co.,* No. 2:12-CV-2182 KJM KJN, 2014 WL 1366252, at *4 (E.D. Cal. Apr. 7, 2014) (citations omitted); *see also Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 310 (N.D. Cal. 1987).

Apart from the evidence that Uber and Otto reasonably anticipated litigation in early

---

[5] It is equally true that, as stated in the *Fox* case cited by Waymo, "there must be more than a remote possibility of litigation" and that litigation need not "have already commenced" to trigger work product protections. *Fox v. Ca. Sierra Fin. Servs.*, 120 F.R.D. 520, 524 (N.D. Cal. 1988).

2016, which is by itself sufficient to warrant application of work product protection to the Report, Google and Waymo's subsequent conduct confirms that Uber and Otto's anticipation of litigation was well-founded.  Specifically, Google filed two arbitrations against Mr. Levandowski in October 2016, just two months after Uber announced its acquisition of Otto.  Moreover, Waymo has conceded that Google began investigating Mr. Levandowski over one year ago and throughout the summer of 2016—during the same time period that Stroz was conducting its investigation.  And Waymo has admitted that Google discussed possible litigation against Mr. Levandowski as early as *March* 2016—*the same month the Stroz Engagement letter was signed*—and that Google discussed possible litigation against Uber as early as *August 23,* 2016.  (Gonzalez Decl. ¶¶ 2-3; Exs. A & B.)

### 2.     The Report and its Exhibits Are Protected Opinion Work Product.

The Report and its Exhibits are opinion work product, a particular class of work product afforded "nearly absolute" protection from disclosure, *U.S. ex rel. Bagley v. TRW, Inc.*, 212 F.R.D. 554, 566 (C.D. Cal. 2003), because they reflect the "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 576 (9th Cir. 1992); *see also Tierno v. Rite Aid Corp.*, No. C 05-02520 TEH, 2008 WL 2705089, at *4 (N.D. Cal. July 8, 2008); Fed. R. Civ. P. 26(b)(3)(B) (the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorneys or other representative concerning the litigation").  Stroz prepared the Report pursuant to directives from the lawyers as to what potential facts and theories those attorneys deemed legally significant.  Stroz conducted its investigation, drafted the Report, and selected the exhibits based on those directives.  (Friedberg Decl. ¶ 10; Tate Decl. ¶¶ 23-26; Gardner Decl. ¶ 6; Suhr Decl. ¶ 12; Baker Decl. ¶ 11.)

In *S.E.C. v. Brady*, 238 F.R.D. 429, 442–43 (N.D. Tex. 2006), the court determined that an investigative report and related documents prepared by an attorney's consultant, KPMG, were opinion work product because they were "suffused" with the mental impressions of the investigators.  *See also S.E.C. v. Schroeder*, No. C07-03798 JW (HRL), 2009 WL 1125579, at *12 (N.D. Cal. Apr. 27, 2009), *objections overruled*, No. C 07-03798 JW, 2009 WL 1635202

(N.D. Cal. June 10, 2009) (protecting as opinion work product "documents related to methods for document review and retention, discussions regarding how to locate and interpret metadata, a collection of documents that LECG [forensic accounting consultant] deemed important related to a particular witness, and emails discussing special projects that LECG completed during the investigation"); *Cmty. Ass'n for Restoration of the Env't, Inc. v. COW Palace, LLC*, No. 13-CV-3016-TOR, 2014 WL 11514516, at *3 (E.D. Wash. Sept. 8, 2014) (holding that production of report by environmental consultant hired to conduct a scientific investigation into soil samples "would necessarily reveal the mental processes behind the litigation strategy").  The same is true here; the Report and exhibits inescapably reveal the mental impressions and processes of the investigators and attorneys.

In addition, while certain of the exhibits are underlying memoranda prepared by Stroz, others are files selected by Stroz out of a much larger group of files to be exhibits.  (Tate Decl. ¶ 26; Friedberg Decl. ¶ 10.)  "[T]he selection and compilation of documents . . . falls within the highly-protected category of opinion work product" because the selection of documents out of thousands necessarily "reveal[s] important aspects of [one's] understanding of the case." *Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir. 1985); *see also Brady*, 238 F.R.D. at 442–43 (finding that the documents reviewed and relied upon for the report were opinion work product because they were specifically selected by the investigators to create the report).  The rule applies to selections made by Stroz investigators.  *Bagley*, 212 F.R.D. at 563 ("Where the selection, organization, and characterization of facts reveals the theories, opinions, or mental impressions of a party *or the party's representative*, that material qualifies as opinion work product.") (emphasis added).  The Report and exhibits are also protected as the culmination of "the more subjective and analytical process of culling, organizing, and summarizing the factual information" learned through various document reviews and other investigative tasks.  *Id*. at 564.

### 3. Waymo's Arguments That the Work Product Doctrine Is Inapplicable Fail.

Waymo argues that the work product doctrine is not applicable because Uber "ha[s] not explained why the due diligence report 'would not have been created in substantially similar form

but for the prospect of litigation.'" (Mot. 8.) Waymo is arguing that the Report was created for a business, not a litigation purpose. This is incorrect. The Report would not have existed but for anticipation of litigation. (Tate Decl. ¶ 9; Suhr Decl. ¶ 10.) Indeed, Uber's authorization of the Stroz engagement was atypical and was done because of the litigation risks the proposed acquisition of Otto presented. (Suhr Decl. ¶ 10.)

Documents prepared exclusively in anticipation for litigation, like the Report, are considered "single purpose" documents, which are clearly afforded work product protection. *In re Grand Jury Subpoena*, 357 F.3d at 907 ("[S]ingle purpose documents clearly pass the two-part test . . . and are afforded protection under Rule 26(b)(3).").

Even if the Report were to be classified as a "dual purpose" document—*i.e.*, prepared for litigation and business purposes—it remains protected by the work product doctrine. *FastVDO LLC v. AT&T Mobility LLC,* No. 16-CV-385-H (WVG), 2016 U.S. Dist. LEXIS 146373 (S.D. Cal. Oct. 21, 2016), is instructive. In *FastVDO*, the plaintiff had acquired the at-issue patent from Boeing, and the defendant moved to compel production as to claim charts and an infringement analysis that was shared between Boeing and the plaintiff, whom the court found were parties to a common interest agreement. *Id.* at *7-8. The court denied the motion to compel, finding that the subject documents were prepared in anticipation of litigation because the prospect of litigation was discussed prior to the purchase of the asserted patent and the terms of the final purchase confirm the anticipation of litigation. *Id.* at *9. The court further found that, even if litigation was not the sole purpose for the creation of the documents, the totality of the circumstance indicated that they at minimum served a dual purpose, and that the "litigation purpose of the Subject Documents permeates any potential non-litigation purpose so much so that the two cannot be separated." *Id.* at *10; *see also In re Grand Jury Subpoena*, 357 F.3d at 909-10 (documents prepared by third party, who assisted defendant in environmental cleanup, were protected work product "notwithstanding their dual purpose character . . . because, taking into account the facts surrounding their creation, their litigation purpose so permeate[d] any non-litigation purpose"); *La. Muni. Police Empls. Retirement Sys. v. Sealed Air Corp.* ("*Sealed Air*"), 253 F.R.D. 300, 308 (D.N.J. 2008) (holding that diligence materials analyzing legal risk of the merger were legal in

1    nature even if they also served a business purpose).

2        As in *FastVDO, In re Grand Jury Subpoena*, and *Sealed Air*, to the extent a separate

3    business purpose existed for the Report, the litigation purpose permeates the Report so greatly

4    that the two cannot be separated.  OMM and MoFo engaged Stroz and commissioned the Report

5    to gather information to aid counsel in providing legal advice in anticipation of potential litigation

6    with Google.  *See supra* at III.B.1.  Thus, even if there is an ancillary business purpose to the

7    Report, it nonetheless is protected work product.

8        Waymo also contends that Defendants cannot meet the factual predicates for work product

9    protection because they did not implement a litigation hold until October 2016.  (Mot. 9.)  But

10   Uber was not required to issue a litigation hold at the time Stroz was engaged because the

11   standard for instituting a legal hold is higher than the standard for invoking the work product

12   doctrine.  And the issuance of a litigation hold is just one factor that a court may consider, in

13   appropriate circumstances, in determining whether an entity anticipated possible litigation.

14       The work product doctrine requires "a subjective belief that litigation was a real

15   possibility, and that belief must be objectively reasonable."  *Lennar Mare Island*, 2014 WL

16   1366252, at *4.  By contrast, the duty to preserve documents does not attach until litigation is

17   "***probable***," which has been held to mean "***more than a possibility***."  *In re Napster Copyright*

18   *Litig.*, 462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006) (quoting *Hynix Semiconductor Inc. v.*

19   *Rambus, Inc.*, 2006 U.S. Dist. LEXIS 30690, at *57 (N.D. Cal. 2006) (emphasis added)).

20   Litigation is "probable" when an entity has received a threat of litigation—even through informal

21   means such as text message or verbally.  *See, e.g. In re Napster Litig.*, 462 F. Supp. 2d at 1069.

22   Simply put, a party often reasonably *anticipates* the *possibility* of litigation (thus triggering work

23   product protection) long before its adversary's statements and actions indicate that the anticipated

24   litigation is in fact *probable* (thus triggering the duty to issue a litigation hold).

25       It was not until October 28, 2016, three days after Otto publicly released video of the

26   world's first commercial delivery by a self-driving truck, that Google filed arbitrations against the

27   founders of Otto.  (Tate Decl. ¶ 30; Suhr Decl. ¶ 17.)  That is when the need to preserve evidence

28   arose.  *See FTC v. Lights of Am., Inc.*, No. SACV 10-1333 JVS (MLGx), 2012 U.S. Dist. LEXIS

1   17212, at *10-13 (C.D. Cal. Jan. 20, 2012) (finding that the initiation of an investigation does not

2   necessarily require instituting a legal hold and that the need to institute a legal hold did not arise

3   until the FTC decided to bring suit).   Uber thus properly issued its litigation hold in November,

4   2016, shortly after Google filed arbitrations against Mr. Levandowski and another employee.[6]

5   (Suhr Decl. ¶ 17.)

### C.   The Report And Its Exhibits Are Also Protected Under The Common Interest Doctrine.

Uber and Otto were parties to a common interest agreement beginning at least on

February 24, 2016.  (Tate Decl. ¶¶ 6-8; Suhr Decl. ¶ 6.)  Messrs. Levandowski and Ron became

parties to that agreement shortly thereafter.  (Gardner Decl. ¶ 7-10; Baker Decl. ¶¶ 5-8.)

Disclosure of the Report and its exhibits among those parties did not waive either the attorney

client privilege or the work product privilege that otherwise protects those documents.  Waymo

contends that the common interest doctrine does not apply here because the parties did not have a

common legal interest.  (Mot. 10.)  Waymo is wrong.

"The 'joint-defense' or 'common-interest' privilege is an extension of the attorney-client

privilege and work-product doctrine designed to facilitate communication among joint parties

regarding matters that are important to protect their interests in litigation."  *Holmes*, 2010 U.S.

Dist. LEXIS 4253, at *5-6.  It is an exception to the ordinary rule that sharing privileged

communications with third parties waives the privilege.  *Id.* at *6.

Uber shared a common interest with Otto and its founders based on the anticipated

possibility of joint defense litigation with Google.  (Tate Decl. ¶¶ 3-12; Suhr Decl. ¶¶ 5-10; Baker

Decl. ¶¶ 3-11; Gardner Decl. ¶¶ 3-10.)  Counsel for Uber and Otto engaged Stroz to gather facts

---

[6] Even if the Court were to determine that Uber should have instituted a legal hold earlier, that finding would not be dispositive as to the whether the Report was created in anticipation of litigation.  *See, e.g., Lights of Am., Inc.*, 2012 U.S. Dist. LEXIS 17212, at *13 (whether the FTC instituted a legal hold did not "bear[] significantly on the issue of whether the FTC foresaw litigation); *GenOn Mid-Atl., LLC v. Stone & Webster, Inc.*, No. 11 CIV. 1299 (HB) (FM), 2011 WL 5439046, at *5 (S.D.N.Y. Nov. 10, 2011) (finding that whether the party anticipates litigation is a fact-intensive exercise and that no one factor is dispositive).  Waymo provides no authority to support its contention that it should be dispositive—all of its purported authority (*see* Mot. at 9 n.10) pertains to spoliation, which is not at issue in this motion.

related to the risk of joint litigation with Google. The Report was shared between the common interest parties in furtherance of that common legal interest. (Tate Decl. ¶¶ 18-22.) Thus, disclosure of the Report to the common interest parties does not constitute a waiver of either the attorney client privilege or work product protection. *See Holmes*, 2010 U.S. Dist. LEXIS 4253, at *6 (for the common interest privilege exception to apply to communications protected by the attorney client privilege, the communication must be made in furtherance of the joint defense or legal strategy); *Nidec Corp. v. Victor Co. of Japan,* 249 F.R.D. 575, 580 (N.D. Cal. 2007) (*work product protection* is only "waived where disclosure of the otherwise privileged documents is made to a third party, and that disclosure enables *an adversary* to gain access to the information").

Waymo argues that there can be no common legal interest between an acquirer and a potential target while the former is conducting due diligence on the latter. (Mot. 10.) But courts recognize that parties to a merger agreement may share a common legal interest in exchanging privileged materials before the merger closes, and specifically that they can reasonably anticipate possible joint defense of future litigation, just as the parties here did. *See, e.g., Hewlett-Packard Co.*, 115 F.R.D. at 308.[7]

In *Rembrandt*, this Court found that the common interest doctrine protected communications between named inventors of a patent and a potential patent purchaser once the purchaser obtained an exclusive license to purchase the patent. 2016 U.S. Dist. LEXIS 13749, at *24. In so finding, the Court reasoned that after the potential patent purchaser obtained the exclusive license, it was "engaged in a joint legal enterprise" with the named inventors and that "communications with them were 'part of an on-going and joint effort to set up a common…strategy for perfecting title in the patent and enforcing it through litigation.'" *Id.* at

---

[7] *See also Morvil Tech., LLC v. Ablation Frontiers, Inc.*, No. 10-CV-2088-BEN (BGS), 2012 WL 760603, at *3 (S.D. Cal. Mar. 8, 2012) (finding common interest was satisfied when two companies were contemplating the wholesale acquisition of one by the other; "these legal interests were aligned as both parties were committed to the transaction and working towards its successful completion."); *FTC v. Abbvie, Inc.,* No. CV 14-5151, 2015 U.S. Dist. LEXIS 166723, at *30-37 (E.D. Pa. Dec. 14, 2015) (finding a common interest in litigation (or potential thereof) once the parties had an agreement in principle to merge).

*22-24.   It further found that the documents submitted for *in camera* review supported the conclusion that once the option to purchase the patent was acquired, "the parties' interests aligned and they began to pursue joint legal interests[,]" including "conducting due diligence."  *Id.* at *21, *24.   Similarly, *FastVDO* is again instructive.   There, the court found that a common legal interest existed between a patent owner and the potential acquirer of that patent because the "essential terms of the purchase agreement" were agreed to prior to transmission of the patent owner's protected work product to the potential purchaser.  2016 WL 6138036, at *14.

Here, Uber and Otto agreed to the "essential terms" of Uber's acquisition on February 22, 2016, before any party shared privileged communications or confidential information in order to further their joint legal interest with respect to potential litigation.  (Tate Decl. ¶¶ 7-9.)  That Uber and Otto continued to negotiate terms of the acquisition while they were sharing information and analysis pertaining to potential litigation does not destroy the common interest protections because, as the *FastVDO* court reasoned, "simply because there was negotiation over some terms that continued over a period of months did not transform the relationship between" the parties "into an adversarial relationship."  2016 WL 6138036, at *14.   Once an agreement in principle was reached through the term sheet, Otto, its founders, and Uber immediately began "engag[ing] in a common legal enterprise" by entering into a joint defense agreement and jointly retaining Stroz to investigate potential claims that Google may have.  (Tate Decl. ¶¶ 3-12); *Rembrandt*, 2016 U.S. Dist. LEXIS 13749, at *24.

This Court has also recognized that important policy considerations weigh in favor of preserving attorney-client protection over pre-merger communications:

> Unless it serves some significant interest courts should not create procedural doctrine that restricts communication between buyers and sellers, erects barriers to business deals, and increases the risk that prospective buyers will not have access to important information that could play key roles in assessing the value of the business or product they are considering buying.  Legal doctrine that impedes frank communication between buyers and sellers also sets the stage for more lawsuits, as buyers are more likely to be unpleasantly surprised by what they receive.  By refusing to find waiver in these settings courts create an environment in which businesses can share more freely information that is relevant to their transactions.

1  *Hewlett-Packard*, 115 F.R.D. at 311.

2       Waymo relies heavily on *In re JP Morgan Chase & Co. Securities Litigation*, MDL No.

3  1783, 2007 WL 2363311 (N.D. Ill. Aug. 13, 2007), to support the proposition that parties to a

4  proposed merger agreement cannot possibly share common legal interests prior to the actual

5  signing of that merger agreement if a due diligence process is ongoing.  (Mot. 11.)   But *JP*

6  *Morgan Chase* is entirely distinguishable because the documents that JP Morgan sought to

7  withhold were had nothing to do with possible litigation or legal exposure.   Nothing in *JP*

8  *Morgan Chase* abrogates the principle that where parties to a potential merger have established a

9  common legal interest in possible litigation arising out of the proposed merger, communications

10  about the possible litigation are protected by the common interest doctrine.[8]  *See FTC v. Abbvie,*

11  *Inc.*, 2015 U.S. Dist. LEXIS 166723, at *30-37 (differentiating between documents prepared for a

12  business purpose in the merger context, which were discoverable, and recognizing a common

13  legal interest where the parties "shared at least a substantially similar legal interest in actual or

14  potential litigation against a common adversary") (citations omitted).   Moreover, here, in contrast

15  to *JP Morgan Chase*, the parties had common legal interests when the report was disseminated.

16  Thus, whatever the Report contained, the parties' legal interests were aligned as to any potential

17  legal claims brought by Google.

18       Finally, even if the Court were to determine that the common interest doctrine does not

19  apply, the work product privilege would nonetheless protect the Report and all of the exhibits

20  from disclosure.   As long as work product is not shared with a party's *adversary*, it remains

21  protected.   "The work product doctrine can be waived, but waiver does not occur simply by virtue

22  of sharing the privileged information with any third party."   *Ellis v. J.P. Morgan Chase & Co.*,

23  No. 12-CV-03897-YGR (JCS), 2014 WL 1510884, at *5 (N.D. Cal. Apr. 1, 2014).   "Waiver

24  occurs only "where disclosure of the otherwise privileged documents is made to a third party, and

25  that disclosure enables an *adversary* to gain access to the information."   *Id.* (citing *Nidec Corp.*,

26

27  _____

   [8] Nor do any of Waymo's other cases cited for the proposition (*see* Mot. 12 n.13) as none
28  of those cases involved parties analyzing joint litigation risk or work product commissioned and
   generated for the benefit of multiple parties to provide legal advice.

249 F.R.D. at 578) (emphasis added).  Here, there is no suggestion that disclosure of the Report and exhibits among the joint defense group somehow allowed Google—the relevant adversary— to gain access to the Report and related materials or even increased the risk that Google would gain access to them.  Thus, the work product doctrine protects the Report and exhibits from disclosure regardless of the applicability of the common interest doctrine.

### D.      The Crime-Fraud Exception Does Not Apply.

The crime-fraud exception applies only in very limited circumstances—where an attorney is engaged to "solicit or offer advice for the commission of a crime or fraud."  *In re Grand Jury Investigation,* 974 F.2d 1068, 1071 (9th Cir. 1992).   Accordingly, to compel disclosure of privileged documents pursuant to the crime-fraud exception, Waymo has the burden of showing that (1) "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme" and (2) "the attorney-client communications for which production is sought are 'sufficiently related to' and were made in furtherance of the intended, or present, continuing illegality."  *In re Napster Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007), *abrogated in part on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009).  Waymo must prove both of these elements by "a preponderance of the evidence."  *Id.* at 1095.[9]   Moreover, a court must exercise "considerable caution when . . . pressed during the discovery stage of complex litigation to find that a showing of crime or fraud . . . sufficient to justify penetrating a privilege has been made."  *Laser Indus. Ltd. v. Reliant Techs., Inc.,* 167 F.R.D. 417, 436 (N.D. Cal. 1996).

Waymo cannot meet its burden.  First, it cannot show that Defendants were "engaged in or planning a criminal or fraudulent scheme."  To make such a showing, Waymo must "present evidence which, if believed by the jury would establish the elements of the alleged crime or fraud."  *Id.* at  434. (quotations omitted).  Waymo has not even attempted to identify evidence that meets the elements of any ongoing crime or fraud perpetrated by Defendants.  That is because

---

[9] The preponderance of the evidence standard is a higher standard than the one required to satisfy merely a request for *in camera* review (as opposed to full disclosure of the documents).  *In re Napster*, 479 F.3d at 1092 ("the threshold for *in camera* review is considerably lower than that for fully disclosing documents").

1   they cannot make this showing.  Waymo has *zero* evidence that Uber or Otto ever knew about,

2   much less were "engaged in or planning," an ongoing or future crime or fraud.  (Ex. F (Judge

3   Alsup: "All that has been proven is he downloaded 14,000 documents.  And you have -- and I've

4   given you lots of discovery, and so far you don't -- you don't have any smoking gun.").)  The

5   mere fact that Uber acquired Ottomotto is not sufficient under any standard to show that Uber,

6   Ottomotto, and Otto Trucking were "engaged in or planning a criminal or fraudulent scheme,"

7   and certainly does not meet the "preponderance of the evidence" standard.

8         Second, Waymo has presented no evidence that Mr. Levandowski, Mr. Ron, Otto, and

9   Uber were all using their lawyers and the Stroz investigation "in furtherance" of any "intended or

10  continuing criminal or fraudulent conduct."  *U.S. v. de la Jara*, 973 F.2d 746, 748 (9th Cir. 1992);

11  *Bauer*, 132 F.3d at 509-10 (crime-fraud exception "applies only to documents and

12  communications that were themselves *in furtherance* of illegal or fraudulent conduct.")

13  (emphasis added).  Waymo has offered only unsupported and unjustified speculation that

14  Defendants' purpose in soliciting the Report and entering into the joint defense and common

15  interest agreement was to perpetrate an ongoing or intended crime.  This Court has rejected

16  arguments like those made by Waymo here, holding that "mere speculation" about the purpose

17  for which attorney-client communications and work product were generated does not satisfy a

18  party's burden of proving the applicability of the crime-fraud exception.  *Skynet Elect. Co. v.*

19  *Flextronics Int'l, Ltd.*, No. C 12–06317 WHA, 2013 WL 6623874, at *4 (N.D. Cal. Dec. 16,

20  2013) (after *in camera* review, holding that "[D]efendants have never had access to the referenced

21  memorandum, so their arguments as to this document constitute mere speculation. . . .

22  Accordingly, defendants have failed to make a showing of plaintiff's deceptive intent.").[10]

23

24        [10] Furthermore, the Report constitutes *opinion* work product, and *opinion* work product is
      only subject to the crime-fraud exception if Waymo can show that the attorneys and their agents
25    who authored it knew of the alleged crime or fraud.  *In re Grand Jury Proceedings*, 867 F.2d
      539, 541 (9th Cir. 1989) (affirming district court holding that author of work product, who was
26    not shown to have had knowledge of alleged criminal or fraudulent activity, had the right to
      maintain protection over "opinion work product" as distinguished from "fact work product" even
27    where the crime-fraud exception was found to apply to fact work product).  Waymo has not even
      attempted to make such a showing.  On that basis, Waymo's argument seeking to apply the
28    crime-fraud exception should be rejected.

With no evidence to cite that would support the application of the crime-fraud exception, Waymo relies almost completely on asking the Court to draw adverse inferences from Mr. Levandowski's Fifth Amendment invocation.  Waymo argues that "Mr. Levandowski apparently contends that answering any questions about the report could expose him to criminal prosecution" and that the Court "may infer from these invocations . . . that Mr. Levandowski and Defendants had a common interest in planning, engaging in, or concealing the misappropriation of Waymo's trade secrets."  (Mot. 13.)  But the law does not permit Waymo to get around the absence of evidence in this fashion.  As Defendants have shown in their preliminary injunction sur-reply, the Ninth Circuit instructs that an adverse inference requires independent, corroborating evidence. *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000) ("[W]hen there is no corroborating evidence to support the fact under inquiry, the proponent of the fact must come forward with evidence to support the allegation, otherwise no negative inference will be permitted.").  The requirement of independent corroboration exists in part to avoid opportunistic practice by attorneys.  *See, e.g., Ullman-Briggs, Inc. v. Salton/Maxim Housewares, Inc.*, No. 92-c-680, 1996 WL 535083, at *17 (N.D. Ill. Sept. 17, 1996) (barring adverse inferences where counsel was "able to fashion the questions in such a way as to be able to create the most damaging testimony through negative inference, safe from any contradiction by the witness no matter what the actual facts") (quotation omitted).  Where, as here, there is no independent, corroborating evidence that Defendants conspired with Mr. Levandowski to steal Waymo's trade secrets, there is no permissible adverse inference against Defendants based on Mr. Levandowski's invocation.

Waymo also claims that Defendants' privilege log shows that "the withheld due diligence report is related to and in furtherance of at least concealing that trade secret theft."  (ECF No. 321 at 14.)  But the log shows no such thing.  The log may reflect that Stroz and the outside lawyers reviewed information provided by Mr. Levandowski, but that merely shows that Stroz and the lawyers conducted a review of information Mr. Levandowski and others had that could potentially be relevant to litigation.  It does not show that (a) Stroz or the lawyers had any knowledge that Mr. Levandowski *deliberately downloaded* anything from Google's files, (b) that

1    any such downloads contained *trade secret* information, or (c) that Uber or anyone else was

2    engaged in an effort to conceal any such downloading.  There is no evidence of any of those

3    things, and therefore no evidence of the due diligence effort or the Report being "in furtherance of"

4    a crime or fraud.[11]

5    **E.    Uber's Privilege Log Complies with the Federal Rules and the Court's Standing Order**

6    Defendants' privilege log "describe[s] the nature of the documents, communications, or

7    tangible things not produced or disclosed" and is therefore compliant with the Federal Rules of

8    Civil Procedure and this Court's standing order.  Fed. R. Civ. P. 26(b)(5)(A)(ii); Supplemental

9    Order to Order Setting Initial Case Mgmt. Conf. in Civil Cases Before Judge William Alsup,

10   ¶ 16.  Waymo argues that despite Defendants' compliance with the rules and this Court's order,

11   Defendants' log is nonetheless deficient.[12]  Waymo is wrong.

12   And to be clear: Waymo does not argue that Defendants' have waived any privilege by

13   virtue of the alleged deficiencies in Defendants' log.  (Mot. 5-8.)  Rather, Waymo simply

14   contends—incorrectly—that the log is insufficient to allow the privilege to be challenged in a

15   motion to compel.  But the fact that Waymo was able to file a 19-page motion challenging the

16   assertions of privilege laid out in the log belies the contention that the log is somehow

17   insufficiently detailed.

18   Waymo first contends that Defendants failed to identify each author/sender and recipient

19   of every communication that disseminated the Report.  (Mot. 6.)  But Waymo concedes that

20   Defendants' log provides a list of the 37 recipients of the Report on page 17 of the log.  (*Id.*)

21   Moreover, although the communications by which Uber in-house counsel received the report are

22

23

24   _____

25   [11] Waymo cites *U.S. v. Saccoccia*, 898 F. Supp. 53, 62 (D.R.I. 1995), for the proposition
     that "a claim of attorney-client privilege is logically inconsistent with a Fifth Amendment claim
     over the same information because the crime-fraud exception would vitiate the attorney-client
     privilege."  (Mot. 14.)  But Waymo misunderstands *Saccoccia*, which held that the invocation of
     the Fifth Amendment by a defendant **and his attorneys** gives rise to an inference that the crime-
     fraud exception applies.  *Saccoccia*, 898 F. Supp. at 61-62.  That is obviously different from this
     case.

26

27   [12] Waymo's claim that Defendants' privilege log is deficient is disingenuous given that
     Waymo's own privilege logs, produced earlier in the case than Defendants' log, provide the same
     level of detail as Defendants' log.  (*See, e.g.*, Exs. D, E.)

28

1   not logged in the privilege log for the Report and exhibits, Defendants produced to Waymo three

2   additional privilege logs that do contain entries for such communications.[13]  (*See, e.g.,* Ex. G.)

3        Waymo next argues that Defendants failed to provide information sufficient to confirm

4   that the asserted privileges have not been waived by disclosure to a third party because

5   Defendants' log contains only a blanket statement that to "Uber's knowledge no unauthorized

6   persons have received" the Report.   (Mot. 6-7.)   Neither the federal nor local rules require

7   Defendants to include more detail about whether the privileged communication was received by

8   unauthorized individuals.  *See* Fed. R. Civ. P. 26(b)(5)(A); *Phillips v. C.R. Bard, Inc.*, 290 F.R.D.

9   615, 637 (D. Nev. 2013) (medical device manufacturers were not obligated to produce supporting

10  affidavits in conjunction with their privilege log to establish attorney-client privilege or work

11  product protection; rather, manufacturers were required only to make a showing to establish the

12  element of the privilege or protection claimed).   Moreover, Defendants have now submitted

13  evidence that 1) an oral common interest agreement was established between Uber and Otto at

14  least of February 24, 2016, and joined shortly thereafter by Messrs. Levandowski and Ron,[14] (*see*

15  Tate Decl. ¶¶ 6-8; Suhr Decl. ¶ 6; Gardner Decl. ¶¶ 7-10; Baker Decl. ¶¶ 5-8; Bentley Decl. ¶ 8;

16  *see also* Ex. 1); 2) a written joint defense and common interest agreement was entered between

17  those parties on April 11, 2016 that memorializes the parties "pre-existing understanding and oral

18  agreement" (Ex. 2 at 2); 3) MoFo and OMM jointly engaged Stroz to gather relevant information

19  to aid them in providing legal advice to their respective clients about litigation risks and potential

20  claims that could be brought by Google in connection with Uber's acquisition of Otto (Ex. 3 at

---

[13] Waymo also complains that Defendants have not listed the communications by which Mr. Levandowski or Mr. Ron received the Report.  Those communications are not in the custody or control of Defendants.  Mr. Gardner and Ms. Baker disseminated the report to their respective clients and to no other individuals.  (Gardner Decl. ¶ 12; Baker Decl. ¶ 17.)

[14] Waymo contends that "Defendants have refused to provide any information about an alleged oral common interest agreement entered into" before April 11, 2016.  (Mot. 7.)  This is not accurate.  On April 27, 2017, Defendants produced to Waymo UBER00012735 (Tate Decl. Ex. 1), which explicitly references the oral agreement between the parties.  Moreover, the written joint defense and common interest agreement that Defendants produced explicitly states that it memorializes the parties' "pre-existing understanding and oral agreement."  (Tate Decl. Ex. 2 at 2.)

2),[15] and 4) the common interest agreement encompasses all persons to whom the Report was disclosed (*see* Tate Decl. ¶ 18; Gardner Decl. ¶ 12; Baker Decl. ¶¶ 14-17.)  Defendants have accordingly more than satisfied their burden of demonstrating that they have not waived privilege over the Report and exhibits.

Finally, Waymo argues that Defendants' privilege log fails to justify the asserted work product protection because Defendants have not disclosed the date and author of the exhibits to the Report.  (Mot. 8.)  This argument misapprehends Defendants' basis for the work product privilege assertion.  As explained above, the exhibits to the Report are protected opinion work product under *Sporck*, 759 F.2d at 316.  (*See supra* at III.B.3.)  Waymo's assertion that Defendants have not established that there was a substantial possibility that litigation would commence is also wrong.  (*See supra* at III.B.1.)

**F.     The Court Should Reject Waymo's Substantial Need Argument.**

Waymo asks the Court to compel production of the Report and all of its exhibits based on a claim of "substantial need."  (Mot. 16.)  This argument fails for four reasons.

First, a showing of "substantial need" is relevant only to an effort to compel production of documents protected solely by the work product privilege—and even then, it only applies to documents that constitute ***fact*** work product rather than opinion work product.  Fed. R. Civ. P. 26(b)(3)(A)(ii).  Here, the Report is protected not just by the work product privilege, but also by the attorney-client privilege.  The Report was prepared to gather facts for the lawyers representing Uber and Otto so that those lawyers could render legal advice to their clients relating to the proposed transaction.  (Friedberg Decl. ¶¶ 2-4; Tate Decl. ¶¶ 9-13.)  Likewise, entries 2-6 in Defendants' privilege log are subject not only to the work product privilege but also to the attorney-client privilege because they consist of factual communications provided to lawyers on behalf of the clients for the purpose of obtaining legal advice.

Second, both the Report and all of the exhibits constitute "opinion work product," which

---

[15] Waymo notes that Stroz did not sign the common interest agreement but Stroz is not a third party for purposes of waiver analysis because it authored the Report at the direction of counsel for purposes of providing legal advice in anticipation of litigation.

1    cannot be produced under the "substantial need" test, but instead requires a showing of

2    "compelling need." *Holmgren*, 976 F.2d at 576.  As addressed above, the Report and its exhibits

3    reflect the "mental impressions, conclusions, opinions, or legal theories of an attorney or other

4    representative of a party concerning litigation," and hence are opinion work product.  (*See supra*

5    III.B.2.)

6         Third, Waymo has not shown either a substantial or a compelling need.  Contrary to

7    Waymo's argument, Mr. Levandowski's invocation of the Fifth Amendment does not create a

8    substantial or compelling need for production, and the three cases Waymo cites are inapposite.  In

9    *In re Vitamins Antitrust Litig.*, 211 F.R.D. 1, 5 (D.D.C. 2002), the court carefully distinguished

10   between fact and opinion work product and ordered that opinion work product should ***not*** be

11   produced notwithstanding some witnesses' invocation of the Fifth Amendment.  Likewise, *In re*

12   *John Doe Corp.*, 675 F.2d 482, 492 & n.10 (2d Cir. 1982) is distinguishable on two grounds:  (1)

13   there was a waiver of attorney-client communication over the requested documents—here, there

14   is not; and (2) the court recognized that opinion work product was not discoverable

15   notwithstanding the Fifth Amendment invocation.  Furthermore, the specific documents at issue

16   in John Doe were *fact* work product, not opinion work product.  Finally, in *In re Crazy Eddie Sec.*

17   *Litig.*, No. 87 CV 0033 (EHN), 1991 WL 17287, at *1 (E.D.N.Y. Jan. 28, 1991), the plaintiffs did

18   not dispute that the defendant had shown a substantial need for the requested production of work

19   product and did not oppose the motion to compel its production.  Notably, the court recognized

20   that opinion work product (like the Report and its exhibits) is subject to protection from discovery

21   even upon a showing of substantial need and ordered redaction of the portions of the documents

22   that constituted opinion work product.

23        Waymo argues it has a substantial and compelling need for the exhibits attached to the

24   report "to the extent that Defendants no longer possess versions of these documents that were not

25   attached to the report."  (Mot. 17.)  But Waymo has presented no evidence that it has a substantial

26   or compelling need for those documents other than its bald assertion.

27        Fourth, as opinion work product, the Report and exhibits are afforded "nearly absolute

28

1  protection," *Bagley*, 212 F.R.D. at 566,[16] and are discoverable only if "the mental impressions are

2  *at issue* in a case **and** the need for the material is compelling." *Holmgren*, 976 F.2d at 577

3  (emphasis in original); *see also Bagley*, 212 F.R.D. at 566 (requiring "rare or compelling

4  circumstances" to justify abrogating opinion work product protections). The mental impressions

5  of Stroz investigators are not at issue in this case, and Waymo does not—and cannot—argue

6  otherwise.[17] Waymo therefore fails to meet its burden of persuasion. *Brady*, 238 F.R.D. 429 at

7  444 (party did not argue it had a compelling need, and failed the substantial need test, where it

8  was "free to discover underlying facts through other avenues of the discovery process").

9          **G.     Additional Discovery Is Unnecessary**

10         The Court's April 25, 2017 Order (ECF No. 271) directed the parties "to address the

11  possibility that discovery into the predicates for any privilege be allowed." Defendants do not

12  believe that any further discovery is necessary. As demonstrated above and through the attached

13  declarations, the Report and its exhibits are squarely protected by the attorney-client privilege, the

14  work product doctrine, and the common interest doctrine. The Court has all of the facts necessary

15  to rule on Waymo's motion to compel, and courts regularly rule on motions to compel allegedly

16  privileged material without ordering any discovery into the predicates of the privileges asserted.

17  *See, e.g., GTE Directories Serv. Corp. v. Pacific Bell Directory*, 135 F.R.D. 187 (N.D. Cal.

18  1991); *Laser Indus., Ltd. v. Reliant Techs., Inc.*, 167 F.R.D. at 417.

19         Although Waymo agrees that "no further discovery is necessary," (Mot. 18), it

20  nonetheless requests the opportunity to take additional discovery, (*id.*). Waymo's additional

21  _____

22         [16] *See also O'Connor v. Boeing N. Am., Inc.*, 216 F.R.D. 640, 642–43 (C.D. Cal. 2003)
    ("[O]pinion work product enjoys almost absolute immunity and can be discovered only in very

23  rare and extraordinary circumstances, such as when the material demonstrates that an attorney
    engaged in illegal conduct or fraud."); *Tierno*, 2008 WL 2705089, at *4.

24         [17] *Compare Mushroom Assocs. v. Monterey Mushrooms, Inc.*, No. C-91-1092 TEH (PJH),
    1992 WL 442892, at *5 (N.D. Cal. May 19, 1992) (mental impressions "at issue" in case

25  involving advice of counsel defense, where "knowing what the attorney thought about
    infringement bears directly on [the asserted defense]" *with In re Oracle Sec. Litig.*, No. C-01-

26  0988 MJJ (JCS), 2005 WL 6768164, at *5 (N.D. Cal. Aug. 5, 2005) (mental impressions of
    counsel retained to conduct internal investigation not at issue in securities fraud case, where

27  investigators interviewed witnesses and prepared a report used to inform decision of special

28  litigation committee whether to settle, dismiss, or prosecute a separate derivative action).

1   requests for discovery should be denied as overly broad, unduly burdensome, and duplicative.

2   For example, Waymo requests a 30(b)(6) deposition on Defendants' privilege log.  (*Id.*)  But the

3   information Waymo seeks to elicit is already available in the log itself and the declarations

4   Defendants have submitted with its opposition, which detail the bases for the privileges asserted,

5   all of the individuals who received the Report and exhibits, as well as the efforts to maintain the

6   confidentiality of those documents.  (*See e.g.*, Friedberg Decl. ¶¶ 11-13; Tate Decl. ¶¶ 18-26.)

7   Waymo also seeks to take a 30(b)(6) deposition of Stroz regarding the circumstances surrounding

8   its analysis of Mr. Levandowski's files and electronic media, and its preparation of the Report.

9   These subject matters are privileged.  Further, Stroz has submitted a declaration in support of

10  Defendants' opposition that discusses the dissemination of the Report and the recipients thereof.

11  (Friedberg Decl. ¶¶ 11-13.)  Defendants have already attached to their opposition the Stroz

12  Engagement Letter.  Although the letter is lightly redacted, Waymo has access to the critical

13  "Confidentiality" provision of the letter that establishes the purpose of the engagement, the basis

14  for the asserted privileges, and Stroz's confidentiality obligations.  (*See also* Ex. 2 ¶ 3 (requiring

15  experts and outside vendors to keep joint defense material confidential).)

16      Waymo cites no cases where a court permitted additional discovery into the predicates of

17  the attorney-client and work product protections, and certainly not after the parties asserting the

18  privilege provided declarations establishing their essential predicates.  Waymo's request for

19  additional discovery can only be construed as an attempt to invade those privileges, something

20  this Court should not allow.

21  **IV.    CONCLUSION**

22      Waymo's Motion to Compel should be denied.

23

24

25

26

27

28

1    Dated:      May 8, 2017              MORRISON & FOERSTER LLP

2

3                                        By:   */s/ Arturo J. González*
                                                 ARTURO J. GONZÁLEZ

4                                        Attorneys for Defendants
                                         UBER TECHNOLOGIES, INC. and
5                                        OTTOMOTTO LLC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28