QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:      (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br>            Plaintiff,<br><br>     vs.<br><br>UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC,<br>            Defendants. | CASE NO. 3:17-cv-00939<br><br>**PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**<br><br>**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

Plaintiff, Waymo LLC ("Waymo"), respectfully submits this authorized supplemental brief in support of its Motion of Preliminary Injunction (Dkt. 25-4). Per the Court's direction at the May 3, 2017 hearing (P.M. Sealed Session Tr. at 71:17-23), this brief addresses the additional evidence gathered at the Court-ordered May 4, 2017 deposition of Uber Technologies, Inc. ("Uber") engineer James Haslim.[1]

**INTRODUCTION**

Uber faces an undisputed record showing that the head of its self-driving car program misappropriated more than 14,000 highly sensitive files from Waymo. The evidence gathered during the expedited discovery period demonstrates that Uber uses the trade secrets contained in those files—including trade secrets where Uber does not even allege independent development—and Uber copied Waymo's design down to the micron.

In a bid to save its tainted LiDAR program, Uber has attempted to spin a one-sided story by submitting carefully phrased pleadings and attorney-drafted declarations designed to conceal the true history of Uber's LiDAR development. The story started with Uber's Opposition brief, where it tried to limit the scope of the case to the Fuji device. According to Uber, the Fuji device was its only LiDAR system, and it was developed independently based on "beam spacing parameters" that Scott Boehmke came up with prior to the Otto acquisition. Those arguments quickly unraveled as soon as Waymo began taking discovery. Waymo uncovered the Spider device, which Uber hid from the Court and which indisputably infringes the asserted '922 and '464 Patents. Waymo also demonstrated significant holes in Uber's independent development story, including a complete failure by Uber to produce evidence tying Mr. Boehmke's early work to the Fuji design. And Waymo demonstrated that the Fuji and Spider devices use numerous Waymo trade secrets including Trade Secret No. 1 directed to ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, Trade Secret Nos. 2 and 3 directed to ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, Trade Secret No. 7 directed to ▆▆▆▆▆▆

---

[1] After examination by Waymo counsel, counsel for Uber conducted a substantial re-redirect—over an hour in length. And, contrary to this Court's standing order, Mr. Haslim and his counsel had private conferences during the court-ordered deposition. (Jaffe Supp. Decl. Ex. 132, Haslim Tr. at 143:25-147:2.) Uber's counsel improperly instructed the witness not to reveal the substance of the private conference. (*Id.* at 147:3-148:11.)

████████, Trade Secret No. 14 directed to ████████ ████████████████████████████████████████, and Trade Secret Nos. 48 and 90 directed to a ████████████.

Faced with voluminous record evidence, Uber doubled down in its sur-reply and submitted brand new arguments and declarations. For the first time, Uber argued that the Fuji device does not use Trade Secret No. 1, based on arguments from its expert that ████████████████████████████████. Uber also supplemented its independent development story by arguing that the Fuji device was based on a so-called "Plan B" that Mr. Boehmke developed in mid-2016. And Uber attempted to explain away its prior concealment of the Spider device by arguing that it was never used, and that its features that indisputably use Waymo's trade secrets were known in the public domain.

Once again, these arguments have fallen apart, this time in light of the Court-ordered deposition testimony of James Haslim. As explained in detail below, Mr. Haslim's testimony revealed numerous inconsistencies and outright contradictions in Uber's litigation-driven narrative. For example, Mr. Haslim directly contradicted Uber's sur-reply argument that Fuji does not use Trade Secret No. 1, and explained that the interpretation Uber used to argue "no use" incorrectly focused on the ████████████████. As another example, Uber's sur-reply declarations completely omitted the origin of the ████████████ in Spider device, yet Mr. Haslim explained during his deposition that the design was based on a circuit drawing from Anthony Levandowski that maps directly to a presentation that Mr. Levandowski stole from Waymo on his way out the door. Mr. Haslim also revealed that Uber's own responses to Court-ordered requests for information are inaccurate: Mr. Haslim identified four LiDAR suppliers that Uber is working with; the list Uber's lawyers provided to the Court omits three of them.

Mr. Haslim's recent testimony confirms that Uber infringes Waymo's patents and uses Waymo's trade secrets, and that Uber did not independently develop its LiDAR technology. The testimony confirms that Waymo will prevail on its patent and trade secret claims, and that Waymo is entitled to preliminary relief in order to stop Uber's ongoing misuse of Waymo's technology.

# ARGUMENT

## I. MR. HASLIM DEPOSITION TESTIMONY PROVIDES FURTHER PROOF THAT UBER'S LIDAR DEVICES USE WAYMO'S TRADE SECRETS

### A. Mr. Haslim Confirmed that Fuji Uses Waymo's Trade Secret No. 1

In its sur-reply, Uber disputed for the first time that it uses Trade Secret No. 1, directed to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Sur-Reply (Dkt. 295-3) at 5:3.) The new argument relied on a fresh declaration from Uber's expert Dr. Lebby, who previously had not even addressed Trade Secret No. 1. (Lebby Sur-Reply Decl. (Dkt. 309) ¶ 56.) Mr. Haslim's recent deposition testimony directly contradicts this new argument, and shows that the Fuji device uses Trade Secret No. 1 exactly how it is phrased in Waymo's Trade Secret disclosure:



| Waymo's Trade Secret No. 1 | Mr. Haslim's May 4 Deposition |
|---|---|
| ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Jaffe Opening Decl. (Dkt. 25-6) Ex. 1 (Waymo's trade secret disclosure).) | Q.  So referring to this ▮▮▮▮▮▮, you would agree that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮? <br> MR. KIM:  Objection; form. <br> THE WITNESS:  Yes.[2] <br> (Jaffe Supp. Decl. Ex. 132, Haslim Tr. at 125:19-126:1.) |

Waymo identified Trade Secret No. 1 with particularity in accordance with this Court's guidance in *JobScience, Inc. v. CVPartners, Inc.*, No. C 12-04519-WHA, 2014 WL 852477 (N.D. Cal. Feb. 28, 2014). Each bullet under the numbered trade secrets in Waymo's list corresponds to the four requirements set out by this Court in *JobScience*. What is quoted above for Trade Secret No. 1 comprises "the precise claimed trade secret[], numbered, with a list of the specific elements for each, as claims would appear at the end of a patent." *Id.* Importantly, Waymo identified Trade Secret No. 1 (and all of its trade secrets) prior to taking any discovery.

---

[2] Mr. Haslim agreed that the terms ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are synonyms in this regard. (Jaffe Supp. Decl. Ex. 132, Haslim Tr. at 227:3-18.)

1   Contrary to Uber's recent arguments, at no point has Waymo attempted to redefine Trade
2   Secret No. 1 or stray from the express descriptions in the trade secret list. (Dkt. 363.) Instead, it is
3   Uber that has repeatedly tried to mischaracterize the trade secret. First, Uber generalized the trade
4   secret as directed to ███████████████████████"—in order to argue that it was generally
5   known in the public domain. (Opp. (Dkt. 173-3) at 10:27-11:12.) When that failed, Uber pivoted and
6   argued that the trade secret requires ████████████████████████████
7   ███████████████████████████████—in order to argue that the Fuji device does
8   not meet this requirement. (Sur-Reply (Dkt. 295-3) at 5:3; Lebby Sur-Reply Decl. (Dkt. 309) ¶ 56
9   ("████████████████████████████████████████████████████
10  ██████████████████████████.") (emphasis added)).

11   Mr. Haslim confirmed that ███████████ values Uber relied on to allege "no use" are not
12   the same thing as ██████████ as recited in Waymo's trade secret. First, he explained that Uber's
13   and Dr. Lebby's ██████████ values do not describe the █████████████████████.
14   (Jaffe Supp. Decl. Ex. 132, Haslim Tr. at 100:20-25 ("Q. So the ████████████████, that's
15   here at the end of 17, that's not referring to the █████████████████████████████
16   in Fuji; right? A. That's right."). Second, he explained that the correct way to determine ████
17   ██████████████████████████████████████████████████████. (*Id.* 120:22-
18   121:7 ("████████████████████████████████████████████████████
19   ████████████████████████████████████████████████████████
20   ████████████████████████████████████████████████████████
21   ████████████████████████████████████████████████████████
22   ████████████████████████████████████").

23   Comparing Mr. Haslim's fact testimony side-by-side with language of Waymo's trade secret
24   list, there can be no dispute that Fuji uses Trade Secret No. 1.

25   **B.    Mr. Haslim Confirmed that Uber Has Failed to Produce Evidence Showing Independent Development of Trade Secret No. 1**
26   

27   Waymo demonstrated in its reply papers that Uber failed to produce any credible evidence to
28   show that it independently developed the ██████████████████████████████ on the Fuji

1  circuit boards. (Reply at 3:23-4:9.) Specifically, Uber offered no evidence to support its theory that
2  Mr. Boehmke's work in 2015 and 2016 somehow led to the Fuji design that materialized less than two
3  months after Uber pivoted to Fuji in October 2016.[3] In an effort to fill the gap in its development
4  timeline, Uber pointed the Court to a design called "Plan B" from Mr. Boehmke's May 2016 design
5  notebook, and argued that Plan B was a "Pre-cursor to Fuji":

| Uber's PI Hearing Presentation For Independent Development | Mr. Haslim's May 4 Deposition |
|---|---|
| [redacted] | Q. So to your knowledge, what's described here as Plan B isn't the basis for the Fuji design?<br><br>MR. KIM: Objection; form.<br><br>THE WITNESS: I am not aware of a link between this Plan B in this document and the Fuji design."<br><br>(Jaffe Supp. Decl. Ex. 132, Haslim Tr. at 143:2-6.)<br><br>Mr. Haslim further testified that based on his job, he "would expect to know" if it was the basis for the Fuji design. (*Id.* at 143:14-17.) |

Mr. Haslim confirmed that there is no evidence tying Mr. Boehmke's early work to [redacted] in the Fuji device. First, he explained that the term "beam spacing" that Uber uses to characterize Mr. Boehmke's early work relates to the [redacted] —not to the [redacted] as recited in Waymo's Trade Secret

---

[3] The burden of producing evidence to show independent development indisputably lies with Uber. *Sargent Fletcher, Inc. v. Able Corp.*, 3 Cal. Rptr. 3d 279, 289-90 (2003) ("The plaintiff can introduce a variety of evidence to raise an inference of improper use: it can demonstrate that defendant had access to its trade secret; that the defendant's design mirrors the plaintiffs design; that the defendant could not have discovered the intricate details of the plaintiffs design independently or through reverse engineering from publicly available material; that the defendant's design configuration is one of many that were possible and matches the plaintiffs design; or that the defendant designed the product in less time than typically required to complete the trial and error process of independent derivation or reverse engineering. . . . Once credible evidence is presented to establish improper use by the defendant, the burden of producing evidence shifts to the defendant.").

1  No. 1.  (Jaffe Supp. Decl. Ex. 132, Haslim Tr. at 99:1-11 ("Q. 'Beam spacing,' what do you mean? A.
2  So beam spacing can be used to refer to the ███████████████████████████████████████
3  ███████████. Since it refers to ███████████████████████████████████████
4  ███████████. Q. … [W]hen you're talking about ███████████████████████████
5  ███████████████████████████████████████; is that fair?  A. That's fair.").)
6  Second, Mr. Haslim admitted that, even as late as November 2016, Mr. Boehmke's work did not show
7  the position or distribution of Fuji's laser diodes on printed circuit boards.  (*Id*. 96:14-97:2 ("Q. And if
8  we go to the November 2016 data that you were looking at that formed the basis of this, it did not
9  include these letterings; right? A. Right. Q. So in November 2016, there was no – Mr. Boehmke did
10 not provide the distribution of these beams onto particular boards; right? A. Right. Q. So the
11 November 2016 data from Mr. Boehmke, that did not provide any information as to how these beams
12 would be distributed ██████████████████████████, for that matter; right? A. It provided no
13 prescription for that distribution.").)

14       There remains no evidence in the record showing Uber's development of the ██████████
15 ██████████████████ in the Fuji device.  The design materialized sometime in December
16 2016 (around the time that Uber's vendor inadvertently emailed Waymo the Fuji design files), and
17 Uber has produced no evidence to demonstrate that it resulted from Mr. Boehmke's prior work or any
18 other independent source.

19       To qualify for trade secret protection (as opposed to patent protection), a plaintiff must show
20 that the information is not generally known, has independent economic value from not being generally
21 known, and is subject to reasonable steps to maintain secrecy.  18 U.S.C.A. § 1839(3); Cal. Civ. Code
22 § 3426.1(d).  Waymo has shown that its Trade Secret No. 1 meets all these criteria.  There's no
23 reasonable dispute that Waymo's ██████████████████ is not generally known to the public, has
24 economic value by virtue of not being known and is subject to reasonable steps to maintain its
25 secrecy.

C.   **Mr. Haslim Confirmed that Uber Has Produced No Evidence to Show that It Independently Developed Trade Secret Nos. 2 and 3**

Mr. Haslim's testimony also confirmed the significant gaps in Uber's independent development story for Fuji's ■■■■■■■■. In its opposition brief, Uber relied on a single paragraph from Mr. Haslim's declaration to support its independent development theory. (Opp. at 13:3-12.) The paragraph cited a single document: an email from Mr. Haslim to Mr. Boehmke that vaguely stated, ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ (Haslim Opening Decl. (Dkt. 180) ¶ 11, Ex. A.) Mr. Haslim's recent deposition testimony plainly discredits Uber's argument. Mr. Haslim explained that the email "is not indicative of the—or this is not evidential to the ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■." (Jaffe Supp. Decl. Ex. 132, Haslim Tr. at 174:4-10.)

Furthermore, in connection with its sur-reply, Uber submitted a new declaration from Mr. Haslim that included tables assigning Mr. Boehmke's November 2016 beam angles assigned to ■■■■■■■■■■■■■■■■■■■■■■■—presumably to make the data look more like the current Fuji design. (Dkt. 297 ¶ 17.) Mr. Haslim admitted in his deposition that the tables in his declaration were drafted by Uber's lawyers, and that Mr. Boehmke's November 2016 data did not assign the ■■■■■■■■■■■■■■, or any specific boards for that matter. (Jaffe Supp. Decl. Ex. 132, Haslim Tr. at 96:4-21 ("Q. So just for clarification here, the letters that are on there, those are letters that you added for purposes of your declaration; right? A. Yes, those were added for this declaration. In the document as it was created in November did not have these letters on it; right? Q. Right. So this is a modified version for your declaration. A. Yes."); 98:1-8 ("Q. So no one should be confused as to whether this data is originally from November 2016 in terms of the ■■■■■; right? A. Nobody should be confused that the ■■■■■ from Scott, because it did not. Q. Right. You added it in here for purposes of your declaration. A. Yeah."); 233:13-20 ("Q. And during your testimony by your counsel, you said—you referred to these ■■■■■, and you said whoever did these letters. A. Um-

hum. Q. You didn't prepare 8A and 8B, did you? A. No. Q. Who prepared 8A and 8B? A. Counsel.").)[4]

Mr. Boehmke himself had no involvement in the selecting the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*Id*. 96:18-97:2 ("Q. So the November 2016 data from Mr. Boehmke, that did not provide any information as to how these beams would be distributed ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, for that matter; right? A. It provided no prescription for that distribution.").) Instead, Mr. Haslim explained that it was former Waymo engineer Gaetan Pennecot who primarily was responsible for the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (*Id*. at 262:3-264:2.) And Mr. Haslim admitted that he did not know whether Mr. Pennecot discussed the design with Anthony Levandowski. (*Id.* at 74:1-10.) Mr. Haslim testified that Uber came up with the design within "something on the order of a week." (*Id.* at 91:9-14.) But he admitted that there is no documentary evidence to corroborate such a short development timeline because, at some point in the November 2016 timeframe, "the documentation stopped." (*Id.* at 77:14-79:15.) Significantly, Uber has never provided a declaration from Mr. Pennecot.

Again, Mr. Haslim's testimony confirms that Uber has no produced no credible evidence to support its independent development story.

**D.   Mr. Haslim Confirmed that ▓▓▓▓▓▓ Did Not Use ▓▓▓▓▓▓▓▓▓▓▓▓▓ as Recited In Waymo's Trade Secret No. 7**

Waymo's Trade Secret No. 7 recites ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Dkt. No. 25-6.) As Waymo explained in its reply papers, Uber failed to demonstrate that Trade Secret No. 7 was "generally known" because the literature Uber relied on was outside the field of LiDAR, did not disclose ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[4] Mr. Haslim admitted at his deposition that content in his Supplemental Declaration was prepared by counsel for Uber, and he reviewed this content in only a limited fashion before signing. (*Id.* at 233:13-235:16, 235:17-236:25, 237:1-20, 237:24-240:5, 240:7-242:15, 242:24-243:21, 243:22-244:2, 245:3-245:21.)

1  ████████████████████████████████. (Reply at 5:26; Kintz Reply Decl. ¶¶ 42-45.)
2  Recognizing the weakness of its public domain evidence, Uber again tried to supplement the record on
3  sur-reply with a brand new argument that ██████ allegedly used ████████████████. (Sur-
4  reply at 5:21-24.)  This argument was based on nothing more than uncorroborated deposition
5  testimony from current Uber engineer and former Waymo engineer Daniel Gruver. (*Id.*)

6     Mr. Haslim—who previously worked at ████████—discredited this argument in his recent
7  deposition testimony. (Haslim Tr. 165:1-11 ("Q. ██████████████████████████████
8  ████████████████████████████████████████████████████████████
9  ████████████████████████████████████████████████████████████
10 ████████████████████████████████████████████████████████████
11 ████").)  Mr. Haslim's testimony confirms that Uber has provided zero evidence to show that was
12 generally known in the public domain.

13     **E.     Mr. Haslim Confirmed that Fuji Uses Trade Secret No. 14.**

14     In its opposition and sur-reply, Uber argued that the Fuji device does not use Trade Secret No.
15 14, directed to ████████████████████████████████████████████████
16 ████████████████. (*See*, *e.g.*, Opp. (Dkt. 173-3) at 14:22-15:6 ("Uber's Fuji transmit board,
17 however, does not use ████████████████████████████████████.").)  As Waymo explained in
18 its Reply brief, Exhibit B to Mr. Haslim's original declaration flatly contradicts this argument because
19 it shows ████████████████████████████████████████████. (Reply (Dkt. 245-
20 4) at 7:20-8:1.)  Mr. Haslim confirmed this fact during his recent deposition. (Jaffe Supp. Decl. Ex.
21 132, Haslim Tr. at 114:4-115:23 ("Q. So the X and Y data here shows—██████████████████
22 ████████████████████████; right? A. Yes.").)  Mr. Haslim further explained that it was
23 former Waymo engineer Gaetan Pennecot—not Mr. Haslim or Mr. Boehmke—who incorporated the
24 ████████████ design into Fuji. (*Id.*)  Mr. Haslim's testimony confirms that Fuji uses Trade Secret
25 No. 14, and contradicts Uber's suggestion that former Waymo engineers did not influence the design
26 of the device. (*See*, *e.g.*, Opp. at 5:18-20 ("The Fuji design was largely the result of the collaboration
27 between Mr. Boehmke and Mr. Haslim and their teams—neither of whom ever worked for
28 Waymo.").)

**F. Mr. Haslim Revealed that Anthony Levandowski Personally Designed the ▮▮▮▮▮▮ in Uber's Spider Device *While Working at Waymo***

| Uber's Sur-Reply Declaration | Mr. Haslim's May 4 Deposition |
|---|---|
| Mr. Haslim's supplemental declaration suggested that the ▮▮▮▮▮▮ in the Spider device was based on a "well-known technique to amplify the output power of a fiber laser." (Haslim Supp. Decl. (Dkt. 297) ¶ 7.) | In his deposition, Mr. Haslim admitted that it was Mr. Levandowski who came up with Spider's ▮▮▮▮▮▮. (Jaffe Supp. Decl. Ex. 132, Haslim Tr. at 17:24-24:24.) |

Waymo explained in its Reply brief how Uber's Spider LiDAR system improperly incorporates Waymo's trade secret ▮▮▮▮▮▮, including as described in a presentation downloaded by Mr. Levandowski detailing "How Google Does It" for a ▮▮▮▮▮▮ (Dkt. 254 at 8.) Mr. Haslim's declaration made no mention of the origins of Uber's ▮▮▮▮▮▮, instead pointing at undated documents to support that some aspects of the design were in the public domain, though admittedly Uber did not even allege independent development of the relevant trade secrets.

Mr. Haslim's recent testimony now reveals, however, that Mr. Levandowski drew ▮▮▮▮▮▮ for Mr. Haslim personally—while he was employed at Waymo. Mr. Haslim testified that while he was still at Tyto LiDAR, Mr. Levandowski described to him "a schematic, a layout, an approach for ▮▮▮▮▮▮." (Jaffe Supp. Decl. Ex. 132, Haslim Tr. at 17:24-19:11.) Mr. Levandowski also steered Mr. Haslim towards Waymo's key ▮▮▮▮▮▮ suppliers.[5] (*Id.* at 18:20-25.) When Mr. Haslim was asked to draw the specific circuitry proposed to him by Mr. Levandowski (*id.* at 20:16-24:24), he produced a schematic (left drawing below) that bears a striking resemblance to Waymo's trade secret ▮▮▮▮▮▮:

---

[5] One of these suppliers, ▮▮▮▮▮▮ is Waymo's confidential vendor for providing the ▮▮▮▮▮▮. Mr. Haslim relies on information from ▮▮▮▮▮▮ Tellingly, however, Mr. Haslim omits the fact that he *actually* relied on Mr. Levandowski's guidance in order to develop this approach. (*See* Jaffe Reply Decl. (Dkt. 248) Ex. 86 (email showing Levandowski directing Otto employees to get "▮▮▮▮▮▮").)

| Schematic from Levandowski | Waymo's Trade Secret Schematic |
|---|---|
|  | |

Mr. Haslim admitted that he never asked Mr. Levandowski whether he was permitted to reveal this information, and that it was "not impossible" that the schematic provided had been derived from Waymo's confidential information. (Jaffe Supp. Decl. Ex. 132, Haslim Tr. at 23:13-24:6.). Mr. Haslim also could not provide any information as to whether the alleged public domain evidence cited in his declaration was available before Mr. Levandowski revealed the designs to him. (*Id.* at 244:14-245:2.)

## II. ANTHONY LEVANDOWSKI HAS HAD SIGNIFICANT INFLUENCE OVER UBER'S LIDAR PROGRAM

### A. Levandowski Has Been Involved In Uber's LiDAR Program from the Beginning

When Mr. Haslim joined Otto as part of the LiDAR team, he reported directly to Mr. Levandowski. (Jaffe Supp. Decl. Ex. 132, Haslim Tr. at 31:25-32:2). He had regular staff meetings with Mr. Levandowski where "LiDAR would definitely come up in conversations with him, at that point, on a probably fairly routine basis, like weekly basis." (*Id.* at 32:3-13). Mr. Levandowski was similarly a member of the ▇▇▇▇▇▇ email list, which Mr. Haslim explained is the list of "Otto LiDAR development employees." (*Id.* at 151:21-152:2).

Beyond weekly staff meetings with Mr. Levandowski, Mr. Haslim further testified that he received feedback on LiDAR development from Anthony Levandowski by telephone while Mr. Levandowski was at Uber's ATC headquarters in Pittsburgh prior to Otto being acquired by Uber. (*Id.* at 33:12-35:25.) According to Mr. Haslim, Mr. Levandowski was discussing design approaches

described in a document titled "LiDAR Thoughts." (*Id.* at 34:21-35:22.) Importantly, a May 16, 2016 document bearing this exact title serves as alleged link in the "independent development" story that Uber attempts to tell through the Declaration of Scott Boehmke. (Boehmke Opening Decl. (Dkt. 176) ¶ 14 & Ex. H.) Mr. Boehmke is silent on the authorship of this document, and Mr. Haslim was also unable to testify regarding its origin. (Jaffe Supp. Decl. Ex. 132, Haslim Tr. at 35:3-14.) The fact that Mr. Levandowski was contemporaneously describing the contents of this key, early Uber development document from Uber's ATC headquarters severely undermines Uber's attempt to construct an independent development narrative apart from Mr. Levandowski's involvement.

Mr. Haslim confirmed that the statement in his original declaration about Mr. Levandowski's lack of involvement in the Fuji device is not credible. When asked what he would do to determine what development input Mr. Levandowski had into Otto and Uber's LiDAR designs, he explained that he would (1) "talk to the various engineers that had LiDAR responsibilities"; (2) "look at Anthony's email"; and; (3) "look for Google docs with his authorship." (*Id.* at 175:15-177:4).

When asked about the first sentence of paragraph 19 of his declaration, which specifically states that Mr. Levandowski was not involved in the Fuji, Mr. Haslim states he did "no investigation" to confirm the statement is accurate. (*Id.* at 253:1-13, 288:6-23.) He did not talk to anyone, including anyone on the LiDAR team. (*Id.* at 288:25-289:2, 289:6-8.) He did not look any documents. (*Id.*at 289:3-5.) He did nothing at all other than "refer to [his] recollection." (*Id.* at 288:20-23.) In short, Mr. Haslim did not even do the items he testified he would do to learn Mr. Levandowsi's LiDAR involvement. The statement is not credible and the evidence indicates otherwise: Mr. Levandowski was personally involved in Uber's LiDAR development, including the Fuji

### B. Levandowski Regularly Used His Personal Laptop During the Course of His Work on Uber's LiDAR Program

Prior to Otto's announced acquisition by Uber, Mr. Haslim recalled regularly seeing Mr. Levandowski with his Macintosh laptop computer into Otto's offices. (*Id.* at 40:9-45:16.) Because this was months before Uber acquired Otto, it cannot be Mr. Levandowski's "Uber laptop." At the same time, Mr. Levandowski was collaborating with Uber on its LiDAR designs. (*Id.* at 33:12-35:22.) Mr. Haslim testified he saw Mr. Levandowski with this laptop approximately a few times each week

Mr. Levandowski was in Otto's San Francisco offices. (*Id.* at 44:8-45:16.) Mr. Haslim also testified that he received work related emails from Mr. Levandowski on a "regular basis" while Mr. Levandowski was not physically present in Otto's offices. (*Id.* at 46:19-22.)

### C. Uber's Sequestration of Anthony Levandowski is Ineffective

Defendants assert in their sur-reply, with no evidence, that they have "recused Mr. Levandowski from all LiDAR development" at Uber. (Dkt. 295-3 at 2.) Mr. Haslim, however, testified that ███████████████████████████████████████████████████████████████ ███████████████████████████████. (Jaffe Supp. Decl. Ex. 132, Haslim Tr. at 54:24-55:12.) Further, Mr. Haslim confirmed that ███████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ████ (*Id.* at 56:18-60:25.) Mr. Haslim also confirmed that the new head of Uber's LiDAR development team, Eric Meyhofer, continues to work closely with Mr. Levandowski on a day-to-day basis. (*Id.* at 14:1-6.)

Mr. Haslim confirmed ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ (*Id.* at 63:9-15.)

### III. UBER STILL HAS NOT DISCLOSED THE FULL BREADTH OF ITS LIDAR PROGRAM

Throughout this case, Uber has tried to convince the Waymo and the Court that Fuji is its only LiDAR project—even after Waymo discovered the Spider device. (Opp. at 1:15-23; Sur-reply at 6:27-7:7.) Mr. Haslim's deposition testimony reveals even more evidence that Uber has concealed the nature of it LiDAR program. Mr. Haslim identified four LiDAR suppliers that Uber is currently working with—three of which were not listed on Uber's disclosure to the Court. (*Id.* at 108:17-110:1.) And in some cases, Mr. Levandowski is emailing with these suppliers, while Uber is withholding the entire communication under claims of privilege. (*Id.* at 112:7-14 & Depo. Ex. 154.) Mr. Haslim also explained that ███ employees on Uber's list of LiDAR employees provided to the Court were not working on Fuji—Mr. Haslim could not say which other LiDAR projects these

employees might be working on. (*Id.* at 105:5-108:16.) Uber's tack with its court-ordered disclosure regarding its LiDAR employees and suppliers is endemic to its approach to the injunction proceedings.

## CONCLUSION

Waymo maintains its objection to Uber's improper arguments and new declarations submitted on its sur-reply. Even if the Court considers these arguments, however, the litigation-driven narrative falls apart under the cross examination of Uber's key technical witness, Mr. Haslim. The arguments fail to overcome Waymo's strong evidence showing that Uber misappropriated Waymo's trade secrets and used them to develop its LiDAR program.

DATED: May 8, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By */s/David A. Perlson*
David A. Perlson
Attorneys for WAYMO LLC