# EXHIBIT 132
# FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

    WAYMO LLC,

5

                    Plaintiff,

6                                     Case

    vs.                          No. 3:17-cv-00939-WHA

7

    UBER TECHNOLOGIES, INC.;

8   OTTOMOTTO LLC; OTTO TRUCKING LLC,

9           Defendants,
    _____/

10

11

12

13

14

15      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16      VIDEOTAPED DEPOSITION OF JAMES HASLIM

17            THURSDAY, MAY 4, 2017

18

19

20

21

22  Reported by:

23  Anrae Wimberley

24  CSR No. 7778

25  Job No.  2610396
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4

5  WAYMO LLC,

6              Plaintiff,

                              Case

7  vs.                   No. 3:17-cv-00939-WHA

8  UBER TECHNOLOGIES, INC.;

    OTTOMOTTO LLC; OTTO TRUCKING LLC,

9

              Defendants.

10  _____/

11

12

13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15          Transcript of video-recorded deposition of

16  JAMES HASLIM, taken at Quinn Emanuel Urquhart &

17  Sullivan LLP, 50 California Street, 22nd Floor, San

18  Francisco, California 94111, beginning at 10:16 a.m.

19  and ending at 7:11 p.m. on Thursday, May 4, 2017,

20  before Anrae Wimberley, Certified Shorthand Reporter

21  No. 7778.

22

23

24

25

                                  Page 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   My recollection is shaky.  I want to say | 10:22:43 |
| 2 | shortly after joining Otto, I can recall Mason being | 10:22:49 |
| 3 | around at that time frame.  And when it ended I'm not | 10:22:53 |
| 4 | sure, but that would have been maybe in the | 10:22:56 |
| 5 | past -- let me try to bookend this -- past -- this is | 10:23:03 |
| 6 | very hard because I don't remember.  I believe as | 10:23:07 |
| 7 | shortly as a few, couple months ago, perhaps.  And | 10:23:13 |
| 8 | this could also be found pretty readily.  Mr. Feldman | 10:23:17 |
| 9 | was reporting to a facilities manager. | 10:23:22 |
| 10 | Q.   Does Mr. Feldman still work for Uber or Otto? | 10:23:26 |
| 11 | A.   Yes. | 10:23:27 |
| 12 | Q.   What does he do now? | 10:23:29 |
| 13 | A.   I understand he's working for a facilities | 10:23:31 |
| 14 | manager. | 10:23:33 |
| 15 | Q.   When you say "facilities manager," what do | 10:23:35 |
| 16 | you mean by that? | 10:23:36 |
| 17 | A.   I wish I knew better in detail, but I don't. | 10:23:41 |
| 18 | We have somebody on staff that I believe would be | 10:23:44 |
| 19 | called a facilities manager, perhaps manages what goes | 10:23:48 |
| 20 | on with buildings, facilities' needs, be it the need | 10:23:55 |
| 21 | for air-conditioning, a repair, something of that | 10:23:59 |
| 22 | nature. | 10:23:59 |
| 23 | Q.   Where is Mr. Feldman located? | 10:24:02 |
| 24 | A.   To my knowledge, he has a desk in our offices | 10:24:07 |
| 25 | in San Francisco. | 10:24:09 |

Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    Other than Mr. Feldman, who are you aware of        10:24:20

2   that most closely works with Mr. Levandowski on a           10:24:27

3   day-to-day basis?                                           10:24:29

4      A.    On a day-to-day basis, the only other              10:24:32

5   employee I'm aware of that works closely with him I         10:24:35

6   would say is Eric Meyhofer.                                 10:24:44

7      Q.    Mr. Meyhofer, how do you know him?                 10:24:50

8      A.    Eric is my boss.                                   10:24:52

9      Q.    How long have yourself and Mr. Meyhofer known      10:24:59

10  each other?                                                 10:25:00

11     A.    I met Eric Meyhofer -- I don't remember when,      10:25:09

12  but I can tell you it was when he visited Tyto LiDAR        10:25:13

13  with Scott Boehmke, and they visited to evaluate our       10:25:20

14  products.                                                   10:25:21

15     Q.    And you said you didn't remember when this        10:25:26

16  meeting was.                                                10:25:30

17           Can you give it a year?                            10:25:31

18     A.    It was prior to acquisition by Otto, but a        10:25:40

19  significant time went by between our meeting and being     10:25:46

20  acquired by Otto.  So I don't even want to hazard the      10:25:52

21  year, because it could be off.                             10:25:55

22     Q.    So there was a meeting between Mr. Meyhofer,       10:26:03

23  Mr. Boehmke and Tyto LiDAR; is that right?                 10:26:08

24     A.    That's right.                                      10:26:09

25     Q.    And it was sometime before the acquisition of     10:26:12

Page 14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Tyto by Otto; correct? | 10:26:15 |
| 2 | A.   Correct. | 10:26:15 |
| 3 | Q.   Who else was at that meeting? | 10:26:19 |
| 4 | A.   That would have included Brent Schwarz.  I'm | 10:26:26 |
| 5 | not certain whether Mike Karasoff would have been at | 10:26:30 |
| 6 | that meeting as well. | 10:26:32 |
| 7 | Q.   Anybody else? | 10:26:32 |
| 8 | A.   I don't recall. | 10:26:33 |
| 9 | Q.   Was Mr. Levandowski at that meeting? | 10:26:37 |
| 10 | A.   Not that I recall. | 10:26:38 |
| 11 | Q.   You're not sure, though? | 10:26:41 |
| 12 | A.   I'm fairly sure that he was not.  That would | 10:26:45 |
| 13 | have been awkward. | 10:26:48 |
| 14 | Q.   You said, "That would have been awkward." | 10:26:50 |
| 15 | Why do you say that? | 10:26:52 |
| 16 | A.   Well, he wasn't an employee of Tyto. | 10:26:57 |
| 17 | Q.   Mr. Levandowski. | 10:26:57 |
| 18 | A.   That's what I meant. | 10:26:59 |
| 19 | Q.   So you're saying it would have been awkward | 10:27:02 |
| 20 | for Mr. Levandowski to be involved in a meeting | 10:27:06 |
| 21 | between Tyto and Uber because he wasn't involved in | 10:27:10 |
| 22 | Tyto; is that right? | 10:27:12 |
| 23 | A.   It would be awkward because he was not an | 10:27:14 |
| 24 | employee, yes. | 10:27:15 |
| 25 | Q.   So I see you changed words there a little | 10:27:17 |

Page 15

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | bit -- | 10:27:17 |
| 2 | A.   I did. | 10:27:19 |
| 3 | Q.   -- and I just want to clarify that. | 10:27:20 |
| 4 | Why did you change -- my question was about | 10:27:23 |
| 5 | whether he was involved, and you answered about | 10:27:26 |
| 6 | whether he was an employee. | 10:27:27 |
| 7 | Why did you do that? | 10:27:28 |
| 8 | A.   Because I would need clarification on the | 10:27:31 |
| 9 | word "involved."  We would occasionally have dinner, | 10:27:38 |
| 10 | chat, see how the business was going on a friendly | 10:27:41 |
| 11 | term. | 10:27:42 |
| 12 | Q.   What is your understanding as to | 10:27:43 |
| 13 | Mr. Levandowski's involvement in Tyto LiDAR? | 10:27:48 |
| 14 | A.   My understanding of his involvement with Tyto | 10:27:53 |
| 15 | LiDAR was he was providing us a place of work when we | 10:27:58 |
| 16 | were still Odin Wave, early -- when we were getting | 10:28:02 |
| 17 | started.  He sourced contract employees.  He was a | 10:28:11 |
| 18 | friend who would stop by occasionally for chats. | 10:28:15 |
| 19 | Q.   Chats about what? | 10:28:16 |
| 20 | A.   What we're working on, what would the next | 10:28:21 |
| 21 | product be if we finished the current product. | 10:28:24 |
| 22 | Q.   Why were you chatting with Mr. Levandowski | 10:28:26 |
| 23 | about what you were working on at Tyto LiDAR? | 10:28:29 |
| 24 | A.   I couldn't tell you -- if your question is | 10:28:34 |
| 25 | why that was appropriate or why that was something | 10:28:41 |

Page 16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | that was to discuss, the question came up, he would | 10:28:45 |
| 2 | ask, we would talk. | 10:28:47 |
| 3 | Q.   Was there anyone else that you would have | 10:28:50 |
| 4 | these kind of chats with, that weren't employees, | 10:28:53 |
| 5 | about your work at Tyto? | 10:28:58 |
| 6 | A.   Not that I recall. | 10:29:02 |
| 7 | Q.   Did you ever raise to any of your fellow | 10:29:05 |
| 8 | employees at Tyto LiDAR, hey, why are we talking with | 10:29:10 |
| 9 | Mr. Levandowski about the work that we're doing? | 10:29:14 |
| 10 | A.   No. | 10:29:14 |
| 11 | Q.   Never came up? | 10:29:16 |
| 12 | A.   Not to my recollection. | 10:29:17 |
| 13 | Q.   You never asked anyone? | 10:29:18 |
| 14 | A.   No. | 10:29:18 |
| 15 | Q.   You didn't think it was odd that this person | 10:29:21 |
| 16 | who doesn't work for the company was talking about | 10:29:23 |
| 17 | your work with you? | 10:29:24 |
| 18 | A.   No. | 10:29:25 |
| 19 | Q.   Did you know that Mr. Levandowski was working | 10:29:27 |
| 20 | on LiDAR at Waymo at the time? | 10:29:31 |
| 21 | A.   I knew he was working for Google at the time, | 10:29:35 |
| 22 | and I didn't know the details of what specifically he | 10:29:39 |
| 23 | was working on. | 10:29:41 |
| 24 | Q.   Have you ever spoken with Mr. Levandowski | 10:29:44 |
| 25 | about █████████████████████████████ | 10:29:51 |

Page 17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    Yes.                                      10:29:51

 2        Q.    When?                                     10:29:52

 3        A.    This would be some date, I can't recall when,  10:30:01

 4   at Tyto LiDAR.                                       10:30:05

 5        Q.    And what did you guys talk about?         10:30:12

 6        A.    We talked about our need to design our own  10:30:15

 7   fiber laser in order to eliminate costs and lead time.  10:30:21

 8   And he gave me what I would call a tech tutorial on   10:30:29

 9   fiber lasers.                                        10:30:31

10        Q.    What did he say?                          10:30:35

11        A.    I don't remember the words of our         10:30:37

12   conversation.                                        10:30:38

13        Q.    Tell me everything you remember about that  10:30:40

14   conversation, please.                                10:30:41

15        A.    He -- trying to recall -- described a     10:30:53

16   schematic, a layout, an approach for ████████████  ████████

     ████████████████████ generally how they work.  Told me  10:31:03

18   to go find a YouTube video from a professor on lasers  10:31:09

19   in general.  I believe he recommended some suppliers.  10:31:18

20        Q.    Who are the suppliers?                    10:31:20

21        A.    I believe he recommended ████████████  ████████

     ████████    And I believe he recommended ██████.     10:31:41

23        Q.    And ████████ that's the same vendor used for  10:31:47

24   the fiber in the Spider design; right?               10:31:51

25        A.    Yes.                                      10:31:51
```

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    Sorry I interrupted.                        10:31:55

 2            Are you finished telling me everything that 10:31:57

 3      you remember about that conversation?             10:31:58

 4            MR. JAFFE:  Can you get me a piece of paper? 10:32:07

 5      MR. McCAULEY:  (Hands document.)                  10:32:15

 6      THE WITNESS:  I recall he was telling me to hurry 10:32:18

 7      up and order the ████████ because they were long  10:32:25

 8      lead items.  I think he suggested some ████████    ████████

 █      ████████████████████████████████████████████████  ████████

 █      ████████████████████████ I don't recall any more  10:32:46

11      than that.                                         10:32:48

12      BY MR. JAFFE:                                      10:32:48

13      Q.    Thank you.                                   10:32:49

14            So we talked about that conversation, and you 10:32:53

15      said you didn't remember when it was.  I just want to 10:32:56

16      see if we can bound that time with any more        10:32:59

17      specificity.                                       10:33:00

18      A.    Ooh.  I recall it occurred at our -- after we 10:33:09

19      moved out of Berkeley, so this was in San Leandro. 10:33:16

20      This would have been prior to my starting to develop 10:33:22

21      the fiber lasers, so it had to be relatively       10:33:25

22      shortly -- I would say -- this is all qualitative, I'm 10:33:32

23      sorry -- shortly after that move to San Leandro.   10:33:34

24      Q.    All right.  So based on those kind of        10:33:36

25      considerations, what approximate timeline did you guys 10:33:42
```

Page 19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    move to San Leandro?                            10:33:43

 2        A.   There's a lot of years between here and    10:33:45

 3    there.  It's tractable [sic] from other information 10:33:52

 4    sources, but I don't have it in my head right now.  10:33:55

 5        Q.   2015?                                   10:33:56

 6        A.   Could be.  I don't know.                10:33:57

 7        Q.   So sitting here today, you can't give me any 10:34:00

 8    more specificity as to the time of that conversation? 10:34:03

 9        A.   I cannot.                               10:34:04

10        Q.   I'm going to hand you this.             10:34:06

11        MR. JAFFE:  And we're going to mark it as -- now 10:34:09

12    I've lost what exhibit we're at, so I'm just going to 10:34:14

13    say 150 so we don't run over another exhibit.   10:34:14

14             (Plaintiff's Exhibit 150 was marked.)

15    BY MR. JAFFE:

16        Q.   Can you please draw the schematic that 10:34:17

17    Mr. Levandowski provided to you during that     10:34:20

18    conversation.  And here I'll hand you my pen.   10:34:25

19        A.   I can do my best.                       10:34:26

20             So I want to state, as I'm going to attempt 10:34:56

21    to do this for you, that there is a very real risk 10:35:00

22    that I'm going to take information that I know now, 10:35:03

23    after having built the fiber laser, and get that 10:35:06

24    somehow accidently contaminated into a vague    10:35:13

25    recollection of what schematic he gave me.      10:35:16
```

Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   I just want your best recollection of the | 10:35:18 |
| 2 | schematic that he gave you. | 10:35:19 |
| 3 | A.   I understand that. | |
| 4 | Q.   That's all I'm asking for. | 10:35:21 |
| 5 | A.   I understand that. | 10:35:23 |
| 6 | (Witness draws diagram.) | 10:35:31 |
| 7 | (Pause in proceedings.) | |
| 8 | MR. KIM:  Just going to object on form | 10:35:39 |
| 9 | grounds here, for the record. | 10:35:41 |
| 10 | THE WITNESS:  Okay.  I think this is the best | 10:38:17 |
| 11 | of my recollection.  I put a note on here there's ████   ██████ | |
|  | ██  ██████    I don't know what the order was in his | 10:38:24 |
| 13 | recommendation. | 10:38:25 |
| 14 | BY MR. JAFFE: | |
| 15 | Q.   Can I take a look at it? | 10:38:31 |
| 16 | A.   Yes.  And I've drawn ████████.  And I | 10:38:35 |
| 17 | don't know if he recommended ██████.  And I can | 10:38:37 |
| 18 | explain any abbreviations. | 10:38:39 |
| 19 | Q.   Sure. | 10:38:40 |
| 20 | So I'm just going -- just want to talk a | 10:38:45 |
| 21 | couple things here. | 10:38:46 |
| 22 | So ██████ what does that stand for? | 10:38:49 |
| 23 | A.   ████████. | 10:38:52 |
| 24 | Q.   Okay.  And then ██████ here on Exhibit 150, | 10:38:54 |
| 25 | what does that stand for? | 10:38:56 |

Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    ███████████████████████.              10:39:04

 2      Q.    And in terms -- I again want to talk about   10:39:07

 3    the timing of this briefly.                    10:39:09

 4          Do you know before -- whether it was before   10:39:12

 5    or after 2011?                                 10:39:14

 6      A.    I don't know.                          10:39:24

 7      Q.    So did you talk about ████████████  ██████   10:39:
     ███████████████████at this time?                10:39:40

 9      A.    I don't recall.                        10:39:41

10      Q.    Did you talk about ████████████████   10:39:44

11    at this time?                                  10:39:45

12      A.    Yes.                                   10:39:46

13      Q.    What did you talk about?               10:39:48

14      A.    We talked about the need to optimize ███  ██████   10:39:
     ████████████████ and that that could be done   10:39:58

16    through an experimental approach.              10:40:01

17      Q.    What was the experimental approach that   10:40:03

18    Mr. Levandowski told you about?                10:40:05

19      A.    He didn't give a lot of detail.  He called it   10:40:09

20    a ██████  I can't remember how he called it.  But as   10:40:15

21    he described it, █████████████████████  ██████   10:40:
     ████████████████████████████████  ██████
     ████████████████████████████████  ██████
     ██████████████████████████
     ████████████████                               10:40:34
```

Page 22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    Did you and Mr. Levandowski discuss the      10:40:39

 2      ████████████████████████████████████     ████████

 ▮      ████████████████████████████████████     10:40:49

 4      A.    Possibly, yeah.  I think there -- he may have  10:40:54

 5    described the relationship between -- almost the      10:40:58

 6    equivalence.  ███████████████████████     ████████

 ▮      ███████████████████████████████     ████████

 ▮      ██████████████████████████     10:41:07

 9      Q.    All right.  After you had this conversation  10:41:16

10    with Mr. Levandowski, did you build the fiber laser   10:41:22

11    that he described?     10:41:23

12      A.    Yeah.     10:41:23

13      Q.    And when you had this conversation with him,  10:41:27

14    did you ask him whether he was allowed to reveal this  10:41:29

15    information to you?     10:41:31

16      A.    No.     10:41:31

17      Q.    Why not?     10:41:35

18      A.    I can't recall what I was feeling or thinking  10:41:37

19    at the time, but this looks like general information   10:41:41

20    to me.     10:41:42

21      Q.    So you didn't think, when he provided a      10:41:44

22    schematic on how to build a fiber laser, that this    10:41:48

23    could have been confidential information of Google?   10:41:52

24      A.    I wouldn't say so.     10:41:54

25      Q.    That didn't cross your mind?     10:41:56
```

Page 23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    I don't recall what crossed my mind. | 10:41:57 |
| 2 | Q.    So you're not denying that it could have | 10:42:00 |
| 3 | happened? | 10:42:02 |
| 4 | A.    It didn't happen that I recall -- | 10:42:04 |
| 5 | Q.    Did you -- | |
| 6 | A.    -- but it's not impossible. | 10:42:07 |
| 7 | Q.    Sorry.  I didn't mean to interrupt. | 10:42:09 |
| 8 | Did you ever discuss with anyone any question | 10:42:11 |
| 9 | in your mind as to whether Mr. Levandowski was allowed | 10:42:14 |
| 10 | to reveal this information to you? | 10:42:17 |
| 11 | A.    No. | 10:42:17 |
| 12 | Q.    Didn't cross your mind? | 10:42:20 |
| 13 | A.    There's enough prior art.  As I began to | 10:42:26 |
| 14 | study this online, it looked pretty plain vanilla to | 10:42:32 |
| 15 | me. | 10:42:33 |
| 16 | Q.    All right.  So we talk about ██████        ████████ | |
| | ██  ████████████  and you built this fiber laser. | 10:42:38 |
| 18 | Is this the resulting design -- or the basis | 10:42:41 |
| 19 | for the design that is in the fiber laser in Spider? | 10:42:45 |
| 20 | MR. KIM:  Objection; form. | 10:42:48 |
| 21 | THE WITNESS:  I would be willing to say that this | 10:42:53 |
| 22 | was a starting point for my development of the fiber | 10:42:57 |
| 23 | laser that did end up in the Owl sensor and later the | 10:43:03 |
| 24 | Spider. | 10:43:04 |
| 25 | BY MR. JAFFE: | 10:43:04 |

Page 24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    Right.
 2            So, for example, the fiber laser in Spider,    10:43:08
 3      ███████████████████████ right?                       10:43:10
 4      A.    Yes.                                            10:43:10
 5      Q.    And the ██████████████████████████  ████████   10:43:16
 ■      ████████████████████ right?                          10:43:16
 7      A.    Right.                                          10:43:16
 8      Q.    And it's ██████████████████████               10:43:20
 9      right?                                                10:43:20
10      A.    Right.                                          10:43:20
11      Q.    And all those elements are described here in   10:43:23
12      Exhibit 150, the drawing that you described; right?  10:43:26
13      A.    Right.                                          10:43:26
14      Q.    And you determined ████████████████  ████████  10:43:39
 ■      ██████████████████████████████████ based on          10:43:39
16      Mr. Levandowski's kind of guidance with you on the   10:43:44
17      experimental approach to take; right?                10:43:46
18      MR. KIM:  Objection; form.                           10:43:48
19      THE WITNESS:  I would say that his guidance on a     10:43:57
20      ██████████████████ put me on the right direction to  10:44:01
21      develop ████████████████ for this, yes.             10:44:05
22      BY MR. JAFFE:                                         10:44:05
23      Q.    So we talked about ██████████████████████     10:44:08
24            What was the next conversation that you had     10:44:10
25      with Mr. Levandowski about LiDAR?                     10:44:18
```

Page 25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | a sensor that was capable of long-range performance | 10:50:31 |
| 2 | and that they would need a sensor for long-range | 10:50:35 |
| 3 | viewing on an autonomous vehicle. | 10:50:40 |
| 4 | And so our angle with Uber at the time was we | 10:50:44 |
| 5 | think we can build such a sensor, but we're not | 10:50:47 |
| 6 | working on it right now.  Our company is open for | 10:50:51 |
| 7 | acquisition. | 10:50:55 |
| 8 | Q.   So the sensor that you were coming up with, | 10:51:00 |
| 9 | that was going to be a bistatic design; right? | 10:51:03 |
| 10 | A.   Yes. | 10:51:05 |
| 11 | Q.   At some point, Spider came about and | 10:51:12 |
| 12 | transformed it to a monostatic design; right? | 10:51:15 |
| 13 | A.   True. | 10:51:17 |
| 14 | Q.   Do you know who was responsible for the | 10:51:19 |
| 15 | change from what you were coming up with, which was a | 10:51:22 |
| 16 | bistatic design, to the monostatic design in Spider? | 10:51:26 |
| 17 | A.   I don't recall who among the team was | 10:51:34 |
| 18 | involved in our conversations first to move away from | 10:51:39 |
| 19 | supplemental design to one design that would cover all | 10:51:44 |
| 20 | the way from directly in front of the vehicle out to | 10:51:47 |
| 21 | long range.  But that was a decision that was made | 10:51:50 |
| 22 | that pretty much negated the proposal I had made of | 10:51:56 |
| 23 | using a tight-packed purely long-range sensor. | 10:52:00 |
| 24 | Q.   So you shifted into the passive voice there. | 10:52:05 |
| 25 | You're talking about -- who is making these | 10:52:07 |

Page 30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    decisions?                                           10:52:08

2        A.    Exactly.  I'm trying to recall.  I don't    10:52:10

3    know, of all the people that were involved, who was in  10:52:14

4    those conversations.  So it would include me.  It    10:52:17

5    would include most likely Anthony Levandowski.  I    10:52:23

6    believe it would also include Daniel Gruver.  And I'm   10:52:28

7    not sure if there's anyone else.                     10:52:30

8        Q.    And do you know, in the context of those   10:52:35

9    communications, who just said, Hey, James, your design 10:52:44

10   looks great, but we're going to go with the monostatic 10:52:46

11   design and we think it's better?                     10:52:50

12       MR. KIM:  Objection; form.                       10:52:50

13       THE WITNESS:  The monostatic design that uses one 10:52:56

14   lens for transmit and receive, I don't know who came  10:52:59

15   up with that.  At some point I saw it, seemed okay to  10:53:05

16   me, it seemed compact, let's use it.                 10:53:09

17   BY MR. JAFFE:                                        10:53:09

18       Q.    So you don't know -- you have no information 10:53:12

19   of who came up with the monostatic design in Spider?  10:53:15

20       A.    True.                                      10:53:16

21       Q.    Okay.  So we were still -- going back to our 10:53:25

22   chron of conversations with Mr. Levandowski, when is  10:53:28

23   the next conversation that you had with              10:53:31

24   Mr. Levandowski about LiDAR that you can recall?      10:53:34

25       A.    It's very hard for me to recall specific   10:53:43

Page 31

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | conversations, especially in sequence.  At this point, | 10:53:47 |
| 2 | I report to Anthony Levandowski. | 10:53:50 |
| 3 | Q.   And just for purposes of the record, when | 10:53:52 |
| 4 | you're talking about "this point," what date are you | 10:53:54 |
| 5 | talking about? | 10:53:55 |
| 6 | A.   I'm talking about immediately following | 10:53:56 |
| 7 | Tyto's acquisition by Otto -- or I should say Otto's | 10:54:03 |
| 8 | acquisition of Tyto.  We joined -- at that time, I | 10:54:08 |
| 9 | reported to Anthony Levandowski.  There would be | 10:54:12 |
| 10 | regular staff meetings.  Since my team is working on | 10:54:19 |
| 11 | LiDAR, LiDAR would definitely come up in conversations | 10:54:22 |
| 12 | with him, at that point, on a probably fairly routine | 10:54:25 |
| 13 | basis, like weekly basis. | 10:54:28 |
| 14 | Q.   And what did you and Mr. Levandowski discuss? | 10:54:31 |
| 15 | A.   Progress, approach, schedule or timing, | 10:54:39 |
| 16 | volumes. | 10:54:41 |
| 17 | Q.   Can you tell me any more specifics about the | 10:54:44 |
| 18 | routine and regular conversations you were having with | 10:54:48 |
| 19 | Mr. Levandowski about LiDAR? | 10:54:49 |
| 20 | A.   He would ask about what the design was | 10:54:56 |
| 21 | looking like, how we were approaching it.  Beyond | 10:55:00 |
| 22 | that, I don't recall specifics of our conversations. | 10:55:03 |
| 23 | Q.   So sitting here today, in this time period | 10:55:06 |
| 24 | that you're talking about, after you joined Otto in | 10:55:10 |
| 25 | May of 2016, you would have regular conversations with | 10:55:15 |

Page 32

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Mr. Levandowski about LiDAR, but you can't recall any | 10:55:18 |
| 2 | specifics of those conversations; is that fair? | 10:55:21 |
| 3 | A.   That's fair to say I cannot recall beyond the | 10:55:26 |
| 4 | details I already told you. | 10:55:28 |
| 5 | Q.   I see. | 10:55:29 |
| 6 | When is the next -- moving forward in time | 10:55:34 |
| 7 | here, when is the next substantive conversation with | 10:55:38 |
| 8 | Mr. Levandowski about LiDAR that you recall? | 10:55:40 |
| 9 | A.   I don't know. | 10:55:56 |
| 10 | Q.   You don't know? | 10:55:57 |
| 11 | A.   I don't know. | 10:55:57 |
| 12 | Q.   I'm not trying to do a memory test here.  If | 10:56:02 |
| 13 | there's just too many conversations for you to recall, | 10:56:05 |
| 14 | that's fine, and you can just tell me that.  But | 10:56:08 |
| 15 | otherwise I'm just going to keep asking. | 10:56:10 |
| 16 | MR. KIM:  Objection; form. | 10:56:10 |
| 17 | THE WITNESS:  Most of our conversations, that is | 10:56:21 |
| 18 | between me and Anthony Levandowski, were not | 10:56:24 |
| 19 | substantive in LiDAR design per se.  So I'm having a | 10:56:30 |
| 20 | hard time remembering further conversations or | 10:56:35 |
| 21 | specifics. | 10:56:35 |
| 22 | Most of the time, he wanted to know where | 10:56:38 |
| 23 | we were in our progress, and he may have asked | 10:56:41 |
| 24 | what the design was shaping up like. | 10:56:44 |
| 25 | I do recall one more. | 10:56:49 |

Page 33

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | He was visiting Uber.  He got me on the phone | 10:56:56 |
| 2 | and was starting to describe using eight fiber | 10:57:02 |
| 3 | lasers -- that's right -- eight fiber lasers, | 10:57:08 |
| 4 | splitting their outputs to multiply the number of | 10:57:12 |
| 5 | channels and then routing a fiber from each fiber | 10:57:17 |
| 6 | laser into a number of optical cavities. | 10:57:24 |
| 7 | There was also, at that time frame, a | 10:57:26 |
| 8 | document published or shared with the team.  I think | 10:57:31 |
| 9 | that came from Scott Boehmke.  So this would be | 10:57:38 |
| 10 | substantive in terms of shaping up what Spider would | 10:57:43 |
| 11 | eventually become. | 10:57:44 |
| 12 | BY MR. JAFFE: | 10:57:44 |
| 13 | Q.   And you said Mr. Levandowski called you from | 10:57:48 |
| 14 | Uber in Pittsburgh; is that right? | 10:57:53 |
| 15 | A.   My understanding he was either at Uber or in | 10:57:55 |
| 16 | transit to or from Uber in Pittsburgh. | 10:57:58 |
| 17 | Q.   Approximately what time period was this? | 10:58:01 |
| 18 | A.   This would be relatively early in the | 10:58:04 |
| 19 | development of the Spider.  Beyond that, I would defer | 10:58:08 |
| 20 | to e-mails.  I don't remember. | 10:58:10 |
| 21 | Q.   When you say you would "defer to e-mails," | 10:58:12 |
| 22 | are there e-mails about this conversation? | 10:58:15 |
| 23 | A.   There were e-mails -- I should say there was | 10:58:19 |
| 24 | an e-mail with a document that was published that | 10:58:24 |
| 25 | contained the substance of what he was describing. | 10:58:27 |

Page 34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   What was the name of that document? | 10:58:29 |
| 2 | A.   I think it had the name like LiDAR Thoughts. | 10:58:36 |
| 3 | Q.   And that was authored by Mr. Levandowski? | 10:58:39 |
| 4 | MR. KIM:  Objection; form. | 10:58:39 |
| 5 | THE WITNESS:  I don't know that Anthony authored | 10:58:43 |
| 6 | that or if Scott authored that. | 10:58:46 |
| 7 | BY MR. JAFFE: | 10:58:46 |
| 8 | Q.   Mr. Levandowski had design input into what -- | 10:58:49 |
| 9 | the LiDAR described in that document, though; is that | 10:58:53 |
| 10 | fair? | 10:58:54 |
| 11 | MR. KIM:  Objection; form. | 10:58:54 |
| 12 | THE WITNESS:  That's a good question.  He | 10:58:58 |
| 13 | described it to me, but I don't know whether he was | 10:59:02 |
| 14 | describing his idea or Scott's idea.  I don't know. | 10:59:06 |
| 15 | BY MR. JAFFE: | 10:59:06 |
| 16 | Q.   So just to back up, Mr. Levandowski called | 10:59:14 |
| 17 | you and provided some thoughts on how to do the fiber | 10:59:20 |
| 18 | laser design in Spider.  And he was describing | 10:59:23 |
| 19 | something that was in a document called LiDAR | 10:59:25 |
| 20 | Thoughts; is that fair? | 10:59:27 |
| 21 | A.   He was describing something that was later | 10:59:30 |
| 22 | published in an e-mail with LiDAR Thoughts. | 10:59:34 |
| 23 | Q.   And at this time, Otto was an independent | 10:59:41 |
| 24 | company; right? | 10:59:43 |
| 25 | A.   Yes. | 10:59:43 |

Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    Why was Mr. Levandowski at Uber? | 10:59:46 |
| 2 | A.    As I understood it, we were considering | 10:59:52 |
| 3 | selling our LiDAR sensors to Uber. | 10:59:56 |
| 4 | Q.    When you say "As I understood it," what was | 10:59:59 |
| 5 | the basis for that understanding? | 11:00:01 |
| 6 | MR. KIM:  Just caution you not to reveal | 11:00:04 |
| 7 | privileged communications with lawyers.  If you can | 11:00:07 |
| 8 | answer it without doing that, you can do so. | 11:00:10 |
| 9 | THE WITNESS:  Um-hum. | 11:00:11 |
| 10 | I don't recall the exact timing and | 11:00:15 |
| 11 | sequencing.  At some point, engineers from Uber | 11:00:23 |
| 12 | Pittsburgh visited our office.  And I have a vague | 11:00:33 |
| 13 | recollection Anthony telling us to be helpful, to | 11:00:41 |
| 14 | share information freely.  It seemed almost like a | 11:00:48 |
| 15 | partnership.  Around the time, Anthony put an | 11:00:56 |
| 16 | e-mail to the entire company saying we were going | 11:00:59 |
| 17 | to be working with them, providing sensor to them, | 11:01:03 |
| 18 | possibly involving autonomous software as well. | 11:01:09 |
| 19 | MR. JAFFE:  Counsel, I don't think that e-mail has | 11:01:12 |
| 20 | been produced, and we ask that it be produced | 11:01:14 |
| 21 | immediately. | 11:01:16 |
| 22 | MR. KIM:  I don't know which e-mail that | 11:01:17 |
| 23 | specifically refers to.  I believe we produced a bunch | 11:01:21 |
| 24 | of e-mails that are similar to that description, but | 11:01:24 |
| 25 | we can confirm. | 11:01:26 |

Page 36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A. This would be distinct from status and | 11:05:08 |
| 2 | updates. | 11:05:09 |
| 3 | Q. Okay. I just want that to be clear. | 11:05:10 |
| 4 | Okay. When you joined Tyto, when did you | 11:05:14 |
| 5 | first hear that Mr. Levandowski would be your boss on | 11:05:19 |
| 6 | the LiDAR team? | 11:05:21 |
| 7 | A. I believe my offer letter for joining Otto | 11:05:28 |
| 8 | would have indicated that he would be my manager, I | 11:05:33 |
| 9 | believe. | 11:05:33 |
| 10 | Q. So Mr. Levandowski decided that you | 11:05:41 |
| 11 | were -- that he was -- you were going -- excuse me -- | 11:05:44 |
| 12 | that he was going to be your boss on the LiDAR team | 11:05:47 |
| 13 | when you joined Otto; right? | 11:05:48 |
| 14 | A. I presumed that, yes. | 11:05:51 |
| 15 | Q. Do you think the LiDAR team needed | 11:05:56 |
| 16 | Mr. Levandowski to accomplish its goals? | 11:06:01 |
| 17 | MR. KIM: Objection; form. | 11:06:01 |
| 18 | THE WITNESS: Honestly, no. | 11:06:08 |
| 19 | BY MR. JAFFE: | 11:06:08 |
| 20 | Q. Why not? | 11:06:09 |
| 21 | A. We have a team that probably could have come | 11:06:13 |
| 22 | up with a number of different LiDAR sensors without | 11:06:17 |
| 23 | his input. | 11:06:18 |
| 24 | Q. But that's not what happened; right? | 11:06:20 |
| 25 | A. That's not what happened. | 11:06:22 |

Page 39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   So when was the first time you worked with        11:06:32

2   Max Levandowski on LiDAR?                                 11:06:35

3      A.   That would be immediately following my            11:06:38

4   joining Otto.                                             11:06:39

5      Q.   And what is your working relationship with        11:06:43

6   Max Levandowski?                                          11:06:45

7      A.   He reports to me.                                 11:06:47

8      Q.   He reports to you.  I see.                        11:06:49

9           So, actually, let's go back in time to when       11:06:56

10   you first joined Otto.                                   11:06:58

11          And you're having regular interactions with       11:07:00

12   Mr. Levandowski; right?                                  11:07:02

13     A.   Um-hum.                                           11:07:03

14     Q.   What devices are you aware of him using at        11:07:06

15   that time in terms of computers?                         11:07:09

16     A.   I believe he had a laptop, probably a             11:07:12

17   Macintosh.                                               11:07:14

18     Q.   Is that his personal laptop?                      11:07:17

19     MR. KIM:  Objection; form.                             11:07:17

20     THE WITNESS:  I don't know.                            11:07:19

21   BY MR. JAFFE:                                            11:07:19

22     Q.   What about a phone?  Was he using a phone?        11:07:22

23     A.   Sure.  I don't know if he had one phone,          11:07:24

24   multiple phones.  I didn't really pay attention, but     11:07:27

25   I'm sure he had a phone.                                 11:07:28

Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   How often did Mr. Levandowski bring his | 11:07:32 |
| 2 | personal laptop to work with him? | 11:07:35 |
| 3 | MR. KIM:  Objection; form. | 11:07:35 |
| 4 | THE WITNESS:  I couldn't possibly know. | 11:07:37 |
| 5 | BY MR. JAFFE: | 11:07:37 |
| 6 | Q.   Every day? | 11:07:39 |
| 7 | MR. KIM:  Objection; form. | 11:07:39 |
| 8 | THE WITNESS:  The reason I couldn't possibly know | 11:07:42 |
| 9 | is I don't know whether the laptop he may have carried | 11:07:45 |
| 10 | was his personal laptop or the work laptop. | 11:07:48 |
| 11 | BY MR. JAFFE: | 11:07:48 |
| 12 | Q.   I see.  All right.  So let's just talk about | 11:07:51 |
| 13 | the one laptop that you know about. | 11:07:53 |
| 14 | How often did he bring that laptop to work | 11:07:55 |
| 15 | with him? | 11:07:56 |
| 16 | MR. KIM:  Objection; form. | 11:07:56 |
| 17 | THE WITNESS:  I don't know.  I have no idea. | 11:08:02 |
| 18 | BY MR. JAFFE: | 11:08:02 |
| 19 | Q.   You saw him at work with the personal laptop; | 11:08:06 |
| 20 | right? | 11:08:06 |
| 21 | A.   I'm sure I've seen him at work with a laptop. | 11:08:10 |
| 22 | Q.   And that was a regular occurrence; right? | 11:08:12 |
| 23 | MR. KIM:  Objection; form. | 11:08:14 |
| 24 | THE WITNESS:  I hardly paid attention to how often | 11:08:18 |
| 25 | he was carrying a laptop. | 11:08:20 |

Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. JAFFE: | 11:08:20 |
| 2 | Q.   I understand you're saying that you hardly | 11:08:23 |
| 3 | pay attention to this.  The judge specifically asked | 11:08:25 |
| 4 | to find out this information, and that's the reason | 11:08:27 |
| 5 | I'm asking this question.  I just want that to be | 11:08:30 |
| 6 | clear. | 11:08:31 |
| 7 | How often -- so let me just pause there, | 11:08:34 |
| 8 | okay, and I'm going to ask my question again. | 11:08:36 |
| 9 | How often did you see Anthony Levandowski | 11:08:38 |
| 10 | with his Macintosh laptop at Otto? | 11:08:42 |
| 11 | MR. KIM:  Objection; form. | 11:08:42 |
| 12 | THE WITNESS:  I don't recall how often. | 11:08:48 |
| 13 | BY MR. JAFFE: | 11:08:48 |
| 14 | Q.   Every day? | 11:08:53 |
| 15 | MR. KIM:  Objection; form. | 11:08:53 |
| 16 | THE WITNESS:  Not necessarily. | 11:08:55 |
| 17 | BY MR. JAFFE: | 11:08:55 |
| 18 | Q.   Four, five days a week; is that fair? | 11:08:58 |
| 19 | A.   I don't know. | 11:09:03 |
| 20 | Q.   You're not willing to tell me any sort of | 11:09:06 |
| 21 | numbers? | 11:09:07 |
| 22 | MR. KIM:  Objection; form. | 11:09:07 |
| 23 | THE WITNESS:  I can't give you any number for how | 11:09:12 |
| 24 | often I can recall seeing him carrying a laptop.  And | 11:09:16 |
| 25 | I would also mention he spent a lot of time traveling | 11:09:20 |

Page 42

| | | |
|---|---|---|
| 1 | to the Pittsburgh office, and I would have no idea how | 11:09:23 |
| 2 | often he carried a laptop for that as well. | 11:09:26 |
| 3 | BY MR. JAFFE: | 11:09:26 |
| 4 | Q.  Fair. | 11:09:27 |
| 5 | I'm not trying to ask you -- I'm only asking | 11:09:28 |
| 6 | for your understanding based on your interactions with | 11:09:31 |
| 7 | him. | 11:09:32 |
| 8 | Understand? | 11:09:32 |
| 9 | A.  Understand. | 11:09:33 |
| 10 | Q.  Would you agree that you probably saw | 11:09:36 |
| 11 | Mr. Levandowski with his laptop three days a week, | 11:09:41 |
| 12 | approximately? | 11:09:42 |
| 13 | MR. KIM:  Objection to form.  Same objection. | 11:09:49 |
| 14 | THE WITNESS:  I really don't recall.  I really do | 11:09:51 |
| 15 | not recall. | 11:09:52 |
| 16 | BY MR. JAFFE: | 11:09:52 |
| 17 | Q.  All right.  Let me come at this the other | 11:09:55 |
| 18 | way. | 11:09:56 |
| 19 | You saw him at least once with the laptop; | 11:09:58 |
| 20 | right? | |
| 21 | A.  Sure. | 11:09:59 |
| 22 | Q.  At least, let's say, 50 times? | 11:10:01 |
| 23 | MR. KIM:  Objection to form. | 11:10:02 |
| 24 | THE WITNESS:  At least some number of times.  I | 11:10:06 |
| 25 | don't know. | 11:10:06 |

Page 43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    BY MR. JAFFE:

2        Q.   Okay.  You're aggressively resisting giving    11:10:09

3    any sort of number.  And the judge asked for this, so    11:10:12

4    I'm just going to press on this a little bit longer?     11:10:13

5    Okay?

6        MR. KIM:  Objection to form.                          11:10:17

7    BY MR. JAFFE:                                             11:10:17

8        Q.   More than 30 times?                              11:10:20

9        A.   Possibly.                                        11:10:21

10        Q.   Would you dispute if someone said to the       11:10:22

11    court that he -- you saw his laptop at least 30 times   11:10:27

12    when you were working at Otto before the Uber

13    acquisition?

14        MR. KIM:  Objection to form.                         11:10:30

15        THE WITNESS:  If someone claimed to see him with a  11:10:32

16    laptop 30 times, I would not object to that.            11:10:34

17    BY MR. JAFFE:                                            11:10:34

18        Q.   And just talking about regularly, if we were  11:10:38

19    going to put an approximate amount, would you say       11:10:41

20    approximately two to four times a week you saw him      11:10:44

21    with a laptop at Otto?  Is that fair?                   11:10:46

22        MR. KIM:  Objection; form.                          11:10:46

23        THE WITNESS:  I don't know if kept his laptop with 11:10:50

24    him everywhere he went in the office, so --             11:10:53

25    BY MR. JAFFE:
```

Page 44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   I'm just asking about what you saw with your      11:10:56

2   own eyes.                                                 11:10:57

3      A.   So I would say a few times a week when he was    11:11:04

4   spending that week in the office.                         11:11:07

5      Q.   Fair.                                             11:11:08

6           So just to clean that up for purposes of the     11:11:12

7   record, your testimony, based on your personal           11:11:17

8   knowledge, is you approximately saw Mr. Levandowski      11:11:21

9   when he was in San Francisco with his Macintosh laptop   11:11:27

10  a few times a week --                                     11:11:29

11     MR. KIM:   Objection; form.                            11:11:31

12  BY MR. JAFFE:                                             11:11:31

13     Q.   -- is that fair?                                  11:11:33

14     MR. KIM:   Objection; form.                            11:11:34

15     THE WITNESS:   It's fair as long as we emphasize      11:11:37

16  approximately.                                            11:11:39

17  BY MR. JAFFE:                                             11:11:39

18     Q.   Okay.   All right.   Did you ever get e-mails    11:11:45

19  from Mr. Levandowski while he was working from home?     11:11:51

20     A.   I don't know.                                     11:11:54

21     Q.   Why don't you know?                               11:11:57

22     A.   I would occasionally get e-mails from Anthony    11:12:00

23  Levandowski, but I don't know how to tell you where he   11:12:03

24  was when he sent those e-mails.                           11:12:05

25     Q.   So there's no instance where you're sitting      11:12:09

Page 45

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | in the office and you look around and he's not there | 11:12:11 |
| 2 | and he hasn't been there all day and he's sending | 11:12:16 |
| 3 | e-mails?  That's never happened? | 11:12:19 |
| 4 | A.    Incorrect. | 11:12:19 |
| 5 | Q.    So can you please explain then. | 11:12:21 |
| 6 | A.    He travels a lot.  So I quite likely got | 11:12:25 |
| 7 | e-mails from him when I didn't see him in the office. | 11:12:30 |
| 8 | Q.    So you don't know where he is a lot of the | 11:12:32 |
| 9 | time; is that fair? | 11:12:33 |
| 10 | A.    That's fair. | 11:12:34 |
| 11 | Q.    So you got e-mails from Mr. Levandowski when | 11:12:37 |
| 12 | you were working at Otto, but he wasn't sitting with | 11:12:39 |
| 13 | you in the office; right? | 11:12:40 |
| 14 | A.    I believe that's true, yes. | 11:12:45 |
| 15 | Q.    So he wasn't in the office, you don't know | 11:12:47 |
| 16 | where he is, but he's e-mailing you about Otto; is | 11:12:50 |
| 17 | that fair? | 11:12:52 |
| 18 | A.    That's fair. | 11:12:53 |
| 19 | Q.    And was that something that happened on a | 11:12:58 |
| 20 | regular basis? | 11:12:59 |
| 21 | MR. KIM:  Objection; form. | 11:12:59 |
| 22 | THE WITNESS:  I think that's fair. | 11:13:04 |
| 23 | BY MR. JAFFE: | 11:13:04 |
| 24 | Q.    So I want to talk about Fuji for a second | 11:13:11 |
| 25 | here. | 11:13:13 |

Page 46

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | In the Fuji design -- and we'll just go | 11:13:17 |
| 2 | cavity by cavity. | 11:13:18 |
| 3 | But for the mid-range cavity, there are three | 11:13:20 |
| 4 | transmit boards; right? | 11:13:21 |
| 5 | A.   Right. | 11:13:23 |
| 6 | Q.   And in the mid-range cavity, there are three | 11:13:27 |
| 7 | transmit boards and they are pointed -- and they're | 11:13:30 |
| 8 | parallel to one another; right? | 11:13:31 |
| 9 | A.   Right. | 11:13:31 |
| 10 | Q.   The transmit lens for the mid-range cavity is | 11:13:37 |
| 11 | less in width than the width of the transmit boards; | 11:13:43 |
| 12 | right? | 11:13:44 |
| 13 | MR. KIM:  Objection; form. | 11:13:44 |
| 14 | THE WITNESS:  Could you clarify.  I'm confused | 11:13:50 |
| 15 | which lens you're referring to. | 11:13:52 |
| 16 | BY MR. JAFFE: | 11:13:52 |
| 17 | Q.   Yes.  Let me just mark something and make | 11:13:56 |
| 18 | this easier. | 11:13:57 |
| 19 | MR. JAFFE:  And we'll have this be 151. | 11:14:04 |
| 20 | (Plaintiff's Exhibit 151 was marked.) | 11:14:08 |
| 21 | MR. KIM:  At some point -- we've been going for I | 11:14:10 |
| 22 | think over an hour -- if we can take a break.  You can | 11:14:12 |
| 23 | ask your line of questions.  I'm just saying at a | 11:14:15 |
| 24 | convenient time. | 11:14:16 |
| 25 | MR. JAFFE:  Sure. | 11:14:16 |

Page 47

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | ████████████████████████ | 11:16:25 |
| 2 | BY MR. JAFFE: | 11:16:25 |
| 3 | Q.   What do you mean, "necessarily"? | 11:16:26 |
| 4 | A.   Any time you have a lens placed in | 11:16:32 |
| 5 | relationship to the source of light, the lateral | 11:16:38 |
| 6 | resolution -- wrong word -- the lateral relationship | 11:16:42 |
| 7 | between a light source and a lens will dictate the | 11:16:47 |
| 8 | exit angle of the light coming out of that lens. | 11:16:50 |
| 9 | So if you want the light to go straight, you | 11:16:54 |
| 10 | have to carefully place the FAC lens, or fast-axis | 11:16:59 |
| 11 | collimation lens, in a position that will cause the | 11:17:04 |
| 12 | light to exit perhaps parallel to the board, if you | 11:17:07 |
| 13 | want that. | 11:17:08 |
| 14 | Q.   So in the Fuji design -- and we'll call it | 11:17:11 |
| 15 | the FAC lens for the benefit of the court reporter | 11:17:13 |
| 16 | here -- ████████████████████ | ███████ |
| ██ | ████████████████████████ | ███████ |
| ██ | ████████████████ is that fair? | 11:17:26 |
| 19 | MR. KIM:  Objection; form. | 11:17:26 |
| 20 | THE WITNESS:  Maybe I don't like the word███ | ███████ |
| ██ | ██████████████████████████ And | 11:17:38 |
| 22 | so to clarify, the FAC lens precollimates the light | 11:17:44 |
| 23 | ██████████████████ | 11:17:47 |
| 24 | BY MR. JAFFE: | 11:17:47 |
| 25 | Q.   ██████████████████████ | 11:17:49 |

Page 50

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ███████████████    right?                    11:17:50

 2       MR. KIM:  Objection; form.               11:17:50

 3   BY MR. JAFFE:                                 11:17:50

 4       Q.   That's all I mean by ████████        11:17:54

 5       MR. KIM:  Objection; form.               11:17:54

 6       THE WITNESS:  On two of our laser boards, the    11:17:59

 7   ████████████████████████████████████    ███████████

 █   ████████████████████████████████████    ███████████

 █   ████████████████████████           11:18:11

10   BY MR. JAFFE:                                 11:18:11

11       Q.   Okay.  So I don't have real-time, so I'm    11:18:18

12   going to try and just repeat back to make sure I     11:18:21

13   understand what you said.                     11:18:22

14       The fast-axis collimation -- ████████████    ███████████

 █   ████████████████████████████████████    ███████████

 █   ██████████████████████████████████████    ███████████

 █   ████████████████████████████    true?        11:18:42

18       MR. KIM:  Objection; form.               11:18:42

19       THE WITNESS:  True as long as we clarify           11:18:48

20   horizontal is horizontal in the drawing.      11:18:51

21   BY MR. JAFFE:                                 11:18:51

22       Q.   So if anyone testified or said that there's    11:18:57

23   ██████████████████████████    that would      11:19:01

24   be wrong; right?                              11:19:02

25       MR. KIM:  Objection; form.               11:19:02
```

Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        THE WITNESS:  Not necessarily.  The word        11:19:05

 2    ███████████ in LiDAR often means ████████████   ████████

 █    ██████████████████████████████████                    11:19:13

 4  BY MR. JAFFE:                                           11:19:13

 5      Q.   I see.                                         11:19:13

 6           So it's just kind of -- if they said there's  11:19:18

 7    ████████████ they could be right, but they could be  11:19:21

 8  wrong?                                                  11:19:21

 9      MR. KIM:  Objection; form.                          11:19:21

10      THE WITNESS:  Could.                                11:19:23

11  BY MR. JAFFE:                                           11:19:23

12      Q.   And if someone said ███████████████████   ████████

 █  ██████████████████████████████████████████████████  ████████

 █  ██████████████████████████ right?                     11:19:32

15      MR. KIM:  Objection; form.                          11:19:32

16      THE WITNESS:  Too many words at once.  Could you    11:19:36

17  repeat your last question.                             11:19:38

18      MR. JAFFE:  Why don't we just have the court        11:19:47

19  reporter repeat it.

20           (Record read by reporter as follows:

21           "Question:  And if someone said it's

22    ████████████████████████████████████████

 █    █████████████████████████████████████████████

 █           ██████████████ right?")                       11:19:47

25      MR. KIM:  Objection; form.                          11:19:47
```

Page 52

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        THE WITNESS:  If they say it's ██████yes, they      11:19:52

 2   are not necessarily denying the fact that ██████    ████████

 █   ██████████████████████████████.                           11:19:57

 4   BY MR. JAFFE:                                              11:19:57

 5        Q.   Sorry.  There was a missing word there.          11:19:59

 6             If they say it's not ████████--                  11:20:01

 7        A.   Oh.

 8        Q.   -- they're not denying that it ████████    ████████

 █   ████████████████████████████████                          11:20:08

10   true?                                                      11:20:08

11        MR. KIM:  Objection; form.                            11:20:08

12        THE WITNESS:  If I were to say it's not ████████      11:20:18

13   I would not be denying that ██████████████  I             11:20:21

14   can't tell you what they would say.                        11:20:22

15        MR. JAFFE:  Okay.  Why don't we take our first        11:20:27

16   break.                                                     11:20:28

17        THE VIDEOGRAPHER:  We are off the record at 11:20     11:20:31

18   a.m.                                                       11:20:31

19             (Recess taken.)                                  11:20:31

20        THE VIDEOGRAPHER:  We're back on the record at        11:33:47

21   11:33 a.m.                                                 11:33:49

22   BY MR. JAFFE:                                              11:33:49

23        Q.   Welcome back.                                    11:34:13

24        A.   Thank you.                                       11:34:14

25        Q.   Last Thursday it was reported in the press       11:34:19
```

Page 53

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | that Mr. Levandowski was demoting himself in some way. | 11:34:26 |
| 2 | Are you familiar with that? | 11:34:27 |
| 3 | A.   I'm familiar with the announcement that his | 11:34:31 |
| 4 | position was changing.  I only take issue with your | 11:34:37 |
| 5 | comment -- or your phrase that says he was demoting | 11:34:40 |
| 6 | himself.  I don't know who decided his position should | 11:34:45 |
| 7 | change. | 11:34:45 |
| 8 | Q.   I see. | 11:34:45 |
| 9 | So you don't know who actually decided that | 11:34:49 |
| 10 | his position should change? | 11:34:51 |
| 11 | A.   Correct. | 11:34:51 |
| 12 | Q.   And do you take issue with the idea that he | 11:34:54 |
| 13 | was demoted in some way? | 11:34:56 |
| 14 | A.   Not necessarily. | 11:34:58 |
| 15 | Q.   Okay.  So if I call it his demotion, that's a | 11:35:03 |
| 16 | fair statement? | 11:35:03 |
| 17 | A.   I won't argue with that. | 11:35:05 |
| 18 | Q.   So how did you find out about | 11:35:09 |
| 19 | Mr. Levandowski's demotion? | 11:35:12 |
| 20 | A.   I received an e-mail.  I believe the whole | 11:35:16 |
| 21 | company received an e-mail describing that change. | 11:35:21 |
| 22 | I want to say Anthony sent the e-mail, but | 11:35:25 |
| 23 | I'm not 100 percent positive on that. | 11:35:28 |
| 24 | ███  ██████████████████████████████████ | 11:35:33 |
| 25 | ██████████████████████████████████ | 11:35:36 |

Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 ███████                                                    ███████

█  ███  ████████████                                        ███████

█  ███  ████████████████████████                           ███████

█  ██████████████████████████████████████                 ███████

█  ███  █████████████████████████████                      ███████

█  ███████████████████████████████████████                ███████

█  █████████████████████████████████████                  ███████

█  ██████                                                   ███████

█  ███  ██████  ████████████                               ███████

█  ███  █████████  ████████████████████                    ███████

█  █████████████████████████████████████                  ███████

█  █████████████████████                          11:36:13

13    BY MR. JAFFE:                                11:36:13

14       Q.    Before that e-mail on Thursday, there was no    11:36:18

15    sort of company policy excluding Mr. Levandowski from     11:36:23

16    providing input onto LiDAR; right?               11:36:27

17       MR. KIM:   Objection; form.                  11:36:27

18       THE WITNESS:   I'm not aware of any policy before    11:36:31

19    that date regarding excluding him from any aspect of    11:36:35

20    any work at the company.                         11:36:36

21    BY MR. JAFFE:                                    11:36:36

22       Q.    Including LiDAR?                        11:36:41

23       A.    Including LiDAR.                        11:36:41

24       Q.    So you never received any sort of special    11:36:45

25    instructions about what you could and couldn't do    11:36:47

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | working with Mr. Levandowski before last Thursday; is | 11:36:52 |
| 2 | that fair? | 11:36:53 |
| 3 |     A.   That seems -- yeah, that's a true statement. | 11:36:58 |
| 4 |     Q.   Are you aware of anyone else receiving | 11:37:00 |
| 5 | special instructions about what they could and | 11:37:02 |
| 6 | couldn't do in working with Mr. Levandowski before | 11:37:05 |
| 7 | last Thursday? | 11:37:06 |
| 8 |     MR. KIM:  Objection; form. | 11:37:06 |
| 9 |     THE WITNESS:  I'm not aware of anything like that. | 11:37:10 |
| 10 | BY MR. JAFFE: | 11:37:10 |
| 11 |     Q.   So before last Thursday Mr. -- as far as you | 11:37:14 |
| 12 | know, Mr. Levandowski was free to provide input into | 11:37:18 |
| 13 | all parts of the self-driving project, including LiDAR | 11:37:20 |
| 14 | and other parts; right? | 11:37:24 |
| 15 |     MR. KIM:  Objection; form. | 11:37:24 |
| 16 |     THE WITNESS:  That's my understanding. | 11:37:26 |
| 17 | BY MR. JAFFE: | 11:37:26 |
| 18 |     Q.   And today as of right now, he's free to | 11:37:32 |
| 19 | provide input into all parts of the self-driving | 11:37:36 |
| 20 | project except for LiDAR? | 11:37:38 |
| 21 |     MR. KIM:  Objection; form. | 11:37:38 |
| 22 |     THE WITNESS:  I don't recall if there was any | 11:37:45 |
| 23 | other restrictions, but definitely LiDAR was mentioned | 11:37:48 |
| 24 | specifically. | 11:37:52 |
| 25 | BY MR. JAFFE: | 11:37:52 |

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.    You don't recall whether there were any other    11:37:54

 2   restrictions in the e-mail?                                  11:37:56

 3        A.    In the e-mail, correct.                           11:37:57

 4        Q.    I see.  Okay.  So let me try this again.          11:38:00

 5             So apart from the restrictions that are            11:38:02

 6   stated in the e-mail, you're not -- today you're not         11:38:04

 7   aware of any other limitations on Mr. Levandowski's          11:38:08

 8   input into the self-driving project?                         11:38:11

 9        A.    Correct, I'm not aware of any such additional     11:38:13

10   limitations.                                                 11:38:14

11        Q.    ███████████████████████████████    ███████████   

█    ██████████████████████                                       11:38:20

13        MR. KIM:  Objection; form.                              11:38:22

14        THE WITNESS:  █████████████████                         11:38:23

15   BY MR. JAFFE:                                                11:38:23

16        Q.    ████████████████████████████████   ███████████   

█    █████████████████████████████████████████    ███████████   

█    ████████                                                     11:38:32

19        MR. KIM:  Objection; form.                              11:38:36

20        THE WITNESS:  ██████████                                11:38:38

21   BY MR. JAFFE:                                                11:38:38

22        Q.    ███████████████████████████████    ███████████   

█    ████████████████████████████████████████     ███████████   

█    ████████                                      ███████████   

█    ████     █████                                               11:38:47
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. KIM:  Objection; form. | 11:38:48 |
| 2 | BY MR. JAFFE: | 11:38:48 |
| 3 | Q.  ███████████████████ | |
| ■ | ███████████████ | 11:38:54 |
| 5 | MR. KIM:  Objection; form. | 11:38:55 |
| 6 | THE WITNESS:  ████████████ | ████ |
| ■ | ████████████████████ | ████ |
| ■ | █████████ | 11:39:02 |
| 9 | BY MR. JAFFE: | |
| 10 | Q.  ██████████████████ | ████ |
| ■ | ██ | ████ |
| ■ | ██  ███ | ████ |
| ■ | ██  ███████████ | ████ |
| ■ | ██  █████████████████ | ████ |
| ■ | ███████████████████████ | ████ |
| ■ | █████████████████  ████ ▪ | ████ |
| ■ | ████████ | |
| ■ | ██  █████ | 11:39:22 |
| 19 | Just for the purposes of the record, can you | 11:39:23 |
| 20 | just explain what you mean by that for a lay audience. | 11:39:26 |
| 21 | A.  So again, my understanding of how our | 11:39:29 |
| 22 | autonomous software works, is limited -- with that | 11:39:34 |
| 23 | preface, I would suggest my understanding of the | 11:39:37 |
| 24 | perception team is to take LiDAR and other sources of | 11:39:42 |
| 25 | data and determine what objects exist outside the | 11:39:50 |

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | vehicle. | 11:39:52 |
| 2 | If you refer generically to a compute team, | 11:39:58 |
| 3 | there may be other aspects of software after or | 11:40:01 |
| 4 | downstream in the data path after perception that | 11:40:05 |
| 5 | would need to use data that the perception software | 11:40:09 |
| 6 | generates in order to determine the car's proper | 11:40:15 |
| 7 | driving course. | 11:40:17 |
| 8 | Q.   So even today -- well, actually, let me back | 11:40:22 |
| 9 | up. | 11:40:22 |
| 10 | What is "perception" in this context? | 11:40:25 |
| 11 | A.   In this context, my use of the word | 11:40:29 |
| 12 | "perception" would be software that takes sensored | 11:40:36 |
| 13 | data input from LiDAR, camera, radar, possibly | 11:40:42 |
| 14 | inertial measurement sensors, wheel sensors, to | 11:40:49 |
| 15 | identify distinct objects in the world around it and | 11:40:54 |
| 16 | possibly classify those objects in terms of perhaps, | 11:41:00 |
| 17 | for example, being a person, a pedestrian, another car | 11:41:06 |
| 18 | or a bus and passing that information to the next | 11:41:12 |
| 19 | layers of software that could exist. | 11:41:15 |
| 20 | Q.   And in the context of our conversation, what | 11:41:18 |
| 21 | does the compute team do? | 11:41:20 |
| 22 | A.   So this would be a vague term.  I can only | 11:41:24 |
| 23 | guess what you might be hinting at, but I know that | 11:41:27 |
| 24 | there are other software and software groups writing | 11:41:32 |
| 25 | software that operate on an autonomous vehicle. | 11:41:37 |

Page 59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   What is a software that decides when to turn    11:41:39

 2   and when to stop?  What is that called within Uber?     11:41:43

 3      A.   If I'm not mistaken, I believe that is called   11:41:45

 4   planning.                                               11:41:46

 5      Q.   ████████████████████████████████████████   ██████

        ██████████████████████████████████            11:41:51

 7      MR. KIM:  Objection; form.                           11:41:53

 8      THE WITNESS:  ██████████████████████████   ██████

        ████████████████████████████████████████   ██████

        ██████████████████████████████████          11:42:04

11   BY MR. JAFFE:                                           11:42:04

12      Q.   And you understand that the planning software   11:42:06

13   leverages LiDAR data; right?                            11:42:09

14      MR. KIM:  Objection; form.                           11:42:13

15      THE WITNESS:  I want to be specific and say I        11:42:16

16   don't know whether the planning software leverages      11:42:19

17   native LiDAR data or data that's output from the        11:42:24

18   perception software.  I just don't know.                11:42:28

19   BY MR. JAFFE:                                           11:42:28

20      Q.   Let's be clear, though.                         11:42:29

21           The planning software leverages data that       11:42:32

22   came from the LiDAR?                                    11:42:34

23      A.   Yes.                                            11:42:34

24      Q.   You don't dispute that; right?                  11:42:36

25      A.   No.                                             11:42:36
```

Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   Okay.                                    11:42:39

 2      MR. JAFFE:  Let's mark -- this will be 152.   11:43:26

 3      THE REPORTER:  Correct.                       11:43:26

 4   It's the supplemental declaration, 152?

 5      MR. JAFFE:  Correct.

 6      THE REPORTER:  I think you need this one.

 7           (Plaintiff's Exhibit 152 was marked.)    11:43:29

 8   BY MR. JAFFE:                                    11:43:29

 9      Q.   Did I give you two copies?               11:43:55

10      A.   Yeah.

11      Q.   Mr. Haslim, whose idea was it for you to 11:44:05

12   write this supplemental declaration?             11:44:08

13      MR. KIM:  Objection to the extent it calls for 11:44:12

14   privileged information.                          11:44:14

15           Instruct you not to answer or            11:44:18

16   reveal -- answer to the extent it reveals any    11:44:23

17   privileged communications with any attorneys.    11:44:27

18      THE WITNESS:  So I would say the legal team   11:44:33

19   working for Uber instructed this.                11:44:37

20   BY MR. JAFFE:

21      Q.   And I don't want to get into properly    11:44:40

22   privileged conversations.  All I want to ask is, in 11:44:46

23   terms of this document, 152, your declaration, was it 11:44:49

24   something where you said, I want to put in a new 11:44:52

25   declaration or someone approached you and said, we 11:44:54
```

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | want a new declaration? | 11:44:56 |
| 2 | MR. KIM:  And, again, you can answer whether or | 11:44:59 |
| 3 | not it was done at the direction of counsel, but don't | 11:45:03 |
| 4 | reveal any privileged communications with counsel. | 11:45:07 |
| 5 | THE WITNESS:  Okay.  So this was generated at the | 11:45:11 |
| 6 | instruction of counsel. | 11:45:12 |
| 7 | BY MR. JAFFE: | 11:45:12 |
| 8 | Q.   Okay.  So we're clear, the lawyers -- and I | 11:45:17 |
| 9 | don't want to get into the substance of any | 11:45:18 |
| 10 | communications here, but just for the purposes of the | 11:45:21 |
| 11 | record, your supplemental declaration was put together | 11:45:26 |
| 12 | at the request of Uber's lawyers; fair? | 11:45:30 |
| 13 | A.   Yes. | 11:45:30 |
| 14 | Q.   Since our last deposition, have you discussed | 11:45:39 |
| 15 | any content of your declarations or the deposition | 11:45:42 |
| 16 | with any nonlawyers? | 11:45:50 |
| 17 | A.   I don't recall any substantive discussion | 11:45:53 |
| 18 | with nonlawyers. | 11:45:55 |
| 19 | Q.   Have you spoken with Mr. Levandowski about | 11:45:58 |
| 20 | the subject matter of this case? | 11:46:01 |
| 21 | A.   Not in any substantive way. | 11:46:06 |
| 22 | Q.   At all? | 11:46:07 |
| 23 | A.   It's probably -- yes. | 11:46:11 |
| 24 | Q.   What did you and Mr. Levandowski discuss? | 11:46:14 |
| 25 | MR. KIM:  And I want to caution you -- if you had | 11:46:17 |

Page 62

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    any of these discussions in the presence of lawyers,     11:46:20

 2    would caution you not to reveal any privileged            11:46:22

 3    communications.                                           11:46:25

 4        THE WITNESS:  This jovial, high-level,                11:46:30

 5    nonsubstantive discussion -- "discussion" is almost a     11:46:35

 6    strong term.  How about, how are you doing, how are       11:46:39

 7    you feeling?                                              11:46:40

 8    BY MR. JAFFE:                                             11:46:40

 9        Q.   Please tell me everything that you remember      11:46:44

10    about the conversations that you had with                 11:46:46

11    Mr. Levandowski about the subject matter of this case?    11:46:50

12        A.   ████████████████████████████        ████████

      ███  ████████████████████████  ████████████   ████████

      ███  ████  ██████████████████████████████     ████████

      ███  ████████  ██████████████████████████     ████████

      ███     ██  ████████████████████████████      ████████

      ███  ████████                                          11:47:15

18        MR. KIM:  Objection; form.                          11:47:17

19        THE WITNESS:  ████                                  11:47:17

20    BY MR. JAFFE:                                            11:47:17

21        Q.   ████████████████████              ████████    11:47:17

      ███  ████  ██████████████████████████████     ████████

      ███  ██████████████████████████████████████   ████████

      ███  ██████████                                         11:47:26

25        Q.   Sorry.  Continue.                              11:47:30
```

Page 63

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1      A. ████████████████████    ████████

       ████████████████████████    ████████

       ██████████████████  ████████████    ████████

       ████                                11:47:45

5      Q.  Anything else?                   11:47:46

6      A. ████████████████████    ████████

       ██████████████████████    ████████

       ████████                          ████████

          ██  ████████████          ████████

       ██  ██  ████████  ████████      ████████

       ██  ██  ██████████        ████████

       ██  ██  ████████████          11:48:13

13     Q.  Anything else?                   11:48:15

14     A.  No.                             11:48:15

15     Q. █████████████████  ██████    ████████

       ████████████████████████    ████████

       ████████                    ████████

       ██  ██                          11:48:25

19     Q.  Why not?                        11:48:26

20     A.  I don't know.                   11:48:29

21     Q.  You don't care?                 11:48:30

22     A.  No.                             11:48:31

23        ██  ████████████████    ████████

       ████████████████████████    ████████

       ████████                    11:48:39

Page 64

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1

11:49:32

16      Q.    You're aware that Mr. Levandowski, when asked    11:49:36

17  whether these files were at Uber, pled the Fifth    11:49:41

18  Amendment to avoid self-incrimination; right?    11:49:46

19      MR. KIM:   Objection; form.    11:49:47

20      THE WITNESS:   I've read articles that said that,    11:49:48

21  yes.    11:49:49

22  BY MR. JAFFE:    11:49:49

23

11:49:59

Page 65

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. KIM:  Objection; form. | 11:50:00 |
| 2 | THE WITNESS:  I'm sorry. | 11:50:01 |
| 3 | BY MR. JAFFE: | 11:50:01 |
| 4 | Q.   You think it's a joke? | 11:50:02 |
| 5 | A.   I think it's impossible, in my opinion, that | 11:50:07 |
| 6 | those files would be at Uber. | 11:50:10 |
| 7 | Q.   How can you possibly know? | 11:50:14 |
| 8 | A.   I cannot know, but it strikes me as | 11:50:18 |
| 9 | ridiculous. | 11:50:19 |
| 10 | Q.   It strikes you as ridiculous? | 11:50:21 |
| 11 | A.   Yeah. | 11:50:21 |
| 12 | Q.   You think it's ridiculous that | 11:50:24 |
| 13 | Mr. Levandowski pleads his constitutional right to | 11:50:26 |
| 14 | avoid self-incrimination when asked where these files | |
| 15 | are and it's ridiculous for us to ask where they are; | 11:50:32 |
| 16 | that's what you think? | 11:50:34 |
| 17 | MR. KIM:  Objection; form. | 11:50:36 |
| 18 | THE WITNESS:  You're asking my personal opinion. | 11:50:38 |
| 19 | I think it's extremely unlikely to the point of | 11:50:43 |
| 20 | ridiculous that those files are on a computer somehow | 11:50:47 |
| 21 | at Uber after all of the forensics that were done on | 11:50:53 |
| 22 | Anthony's computer, as it was described to us, after | 11:50:58 |
| 23 | all the searching of all the hard drives that we can | 11:51:02 |
| 24 | come up with. | 11:51:03 |
| 25 | BY MR. JAFFE: | 11:51:03 |

Page 66

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

```
 1        Q.   You do know that no one has searched        11:51:07

 2   Mr. Levandowski's personal computer; right?            11:51:10

 3        MR. KIM:  Objection; form.                        11:51:10

 4        THE WITNESS:  I have read that in an article or   11:51:12

 5   two.                                                   11:51:14

 6   BY MR. JAFFE:                                          11:51:14

 7        Q.   And he's refusing to turn those over, again  11:51:17

 8   based on his rights to avoid incriminating himself?    11:51:23

 9        MR. KIM:  Objection; form.                        11:51:24

10        THE WITNESS:  That's my understanding.            11:51:25

11   BY MR. JAFFE:                                          11:51:25

12        Q.   ████████████████████████████  ██████

██        ████                                             11:51:31

14        MR. KIM:  Objection; form.                        11:51:31

15        ██████      █████████████████   ██████

██   ████   █████████████████████████   ██████

██   ██████████████████                                   11:51:40

18   BY MR. JAFFE:                                          11:51:40

19        Q.   ████████████████████████   ██████

██   ████████████████████████████████   ██████

██   ████████████████████████                             11:51:48

22        MR. KIM:  Objection; form.                        11:51:50

23        THE WITNESS:  Is that a question?                 11:51:51

24   BY MR. JAFFE:                                          11:51:51

25        ██   ████████████████████████                    11:51:53
```

Page 67

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. KIM:  Objection; form. | 11:51:54 |
| 2 | THE WITNESS:  ███ | 11:51:55 |
| 3 | BY MR. JAFFE: | 11:51:55 |
| 4 | Q.   Do you take intellectual property rights | 11:51:59 |
| 5 | seriously? | 11:52:01 |
| 6 | A.   Yes. | 11:52:01 |
| 7 | Q.   Do you think it's wrong for one company to | 11:52:03 |
| 8 | steal another company's intellectual property rights? | 11:52:07 |
| 9 | A.   Yes. | 11:52:07 |
| 10 | Q.   Do you think that's a joke? | 11:52:10 |
| 11 | A.   No. | 11:52:10 |
| 12 | Q.   Do you think that's something that should be | 11:52:12 |
| 13 | taken seriously? | 11:52:15 |
| 14 | A.   Yes. | 11:52:15 |
| 15 | Q.   ████████████████████████████ | ██████ |
| ██ | ████████████████████████████ | ██████ |
| ██ | ████████████████████ | 11:52:31 |
| 18 | MR. KIM:  Objection; form. | 11:52:35 |
| 19 | THE WITNESS:  No. | 11:52:36 |
| 20 | BY MR. JAFFE: | 11:52:36 |
| 21 | Q.   ████████████████████ | 11:52:40 |
| 22 | MR. KIM:  Same objection. | 11:52:42 |
| 23 | THE WITNESS:  ████████████████ | ██████ |
| ██ | ████████████████████████████ | ██████ |
| ██ | ███████ | 11:52:49 |

Page 68

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. JAFFE:                                              11:52:49

2         ███   ██████████████████████      ████████

 ██      ███   ████████████              ████████

 ██      ███   ██████████████████████    ████████

 ██      ███████████████████████              11:53:02

6         MR. KIM:  Objection; form.                           11:53:05

7         THE WITNESS:  I don't know.                          11:53:06

8    BY MR. JAFFE:                                             11:53:06

9         Q.   You don't know?                                 11:53:07

10        A.   ████████████████████████       ████████

 ██   █████████████████████              ████████

 ██      ███   ████████████████████      ████████

 ██      ███   ███████████████████████   ████████

 ██      ███   █████████                 ████████

 ██      ███   ███████████████████████   ████████

 ██   ████████████████████                    11:53:28

17        Q.   Okay.  Turning back to your supplemental        11:53:38

18   declaration, which is 151.  Let's go to paragraph 13.     11:53:46

19        Actually, before we get there, start with            11:53:51

20   paragraph 7.                                              11:53:53

21        Here you're talking about the fiber lasers in        11:54:00

22   the Spider design; right?                                 11:54:01

23        A.   Sorry.  152 or 151?                             11:54:05

24        Q.   152.  Excuse me.                                11:54:07

25        A.   Sorry.                                          11:54:08

                                                        Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | (Witness reviews document.) | 11:54:26 |
| 2 | A. Repeat your question, please. | 11:54:27 |
| 3 | Q. Paragraph 7 of your supplemental declaration, | 11:54:30 |
| 4 | Exhibit 152, is talking about the design of the fiber | 11:54:32 |
| 5 | laser in the Spider? | 11:54:36 |
| 6 | A. Yes. Yes. | 11:54:37 |
| 7 | Q. You don't mention Mr. Levandowski's | 11:54:40 |
| 8 | involvement in paragraph 7, do you? | 11:54:43 |
| 9 | A. No. | 11:54:43 |
| 10 | Q. You don't mention that Mr. Levandowski | 11:54:45 |
| 11 | pointed you to ████ right? | 11:54:52 |
| 12 | A. No. | 11:54:52 |
| 13 | Q. You don't mention his role in the design of | 11:54:55 |
| 14 | the laser at all in paragraph 7, do you? | 11:54:58 |
| 15 | A. No. | 11:55:00 |
| 16 | Q. All right. Let's go to paragraph 13, talking | 11:55:13 |
| 17 | about Fuji again. So here you're pointing -- you | 11:55:27 |
| 18 | excerpt a document that you say discusses beam spacing | 11:55:32 |
| 19 | and angles for the Fuji design; is that right? | 11:55:35 |
| 20 | A. Yes. | 11:55:36 |
| 21 | Q. And just looking at what's depicted here, | 11:55:41 |
| 22 | where is ██████████ mentioned? | 11:55:47 |
| 23 | A. Neither ████ are mentioned, nor ███ ████ | 11:55:xx |
| ██ | ██████████ However, it can be implied | 11:56:00 |
| 25 | from ████████ and it can be implied | 11:56:06 |

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    BY MR. JAFFE:                                      11:59:09

2        Q.   And did you ever discuss the idea to use ███  ████

     ████████████  with Mr. Levandowski?               11:59:19

4        A.   No, not that I recall.                    11:59:22

5        Q.   So when you were presenting the pivot to  11:59:27

6    Mr. Levandowski, it never came up how many transmit 11:59:30

7    boards there would be?                             11:59:31

8        A.   No.                                        11:59:31

9        Q.   He had no idea?                            11:59:33

10       A.   He had no idea.                            11:59:34

11       Q.   And you never discussed with Mr. Levandowski 11:59:40

12   the details of the Fuji design in terms of the number 11:59:43

13   of transmit boards; is that true?                  11:59:45

14       A.    I don't recall having any discussion like 11:59:48

15   that at all.                                       11:59:49

16       Q.   So you're saying you don't recall?  I just 11:59:53

17   want to be clear.                                  11:59:55

18       A.    Yes.                                      11:59:56

19       Q.   So I'll ask my question again.            11:59:58

20            Have you ever discussed with Mr. Levandowski 12:00:01

21   the number of transmit boards in the Fuji design?  12:00:05

22       MR. KIM:   Objection; form.                    12:00:07

23       THE WITNESS:   I don't recall having any discussion 12:00:11

24   about the number of transmit boards.               12:00:14

25   BY MR. JAFFE:                                       12:00:14
```

Page 73

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Are you aware of any conversations between | 12:00:17 |
| 2 | Mr. Gruver or Mr. Pennecot and Mr. Levandowski | 12:00:20 |
| 3 | regarding the number of transmit boards in the Fuji | 12:00:24 |
| 4 | design? | 12:00:24 |
| 5 | MR. KIM:  Objection; form. | 12:00:26 |
| 6 | THE WITNESS:  I am not aware. | 12:00:28 |
| 7 | BY MR. JAFFE: | 12:00:28 |
| 8 | Q.   So it's possible that they have discussed | 12:00:29 |
| 9 | this issue with them, you wouldn't know that; right? | 12:00:32 |
| 10 | A.   I wouldn't know that. | 12:00:34 |
| 11 | Q.   So you're not saying that Mr. Levandowski has | 12:00:36 |
| 12 | never had discussions or input into the idea to use | 12:00:40 |
| 13 | ████████████████; right? | 12:00:43 |
| 14 | MR. KIM:  Objection; form. | 12:00:46 |
| 15 | THE WITNESS:  What I am saying is that Anthony | 12:00:48 |
| 16 | never had input into my decision with my electrical | 12:00:55 |
| 17 | engineer to put ███████████████. | 12:01:00 |
| 18 | BY MR. JAFFE: | 12:01:00 |
| 19 | Q.   Right. | 12:01:00 |
| 20 | But you talked about that decision with | 12:01:02 |
| 21 | Mr. Gruver, for example; right? | 12:01:03 |
| 22 | A.   I think discussions with Gruver came later, | 12:01:07 |
| 23 | yeah. | 12:01:07 |
| 24 | Q.   Or Mr. Pennecot, for example? | 12:01:10 |
| 25 | A.   Mr. Pennecot was probably consulted in that | 12:01:13 |

Page 74

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    process as well.                                    12:01:14

2       Q.   And you're not aware and you can't testify, 12:01:16

3    sitting here today, whether either of those two     12:01:19

4    gentleman discussed this idea with Mr. Levandowski; is 12:01:23

5    that right?                                          12:01:24

6       MR. KIM:  Objection; form.                        12:01:25

7       THE WITNESS:  I couldn't say.                      12:01:25

8    BY MR. JAFFE:

9       Q.   So in your declaration or in anywhere, can't 12:01:28

10   say that Mr. Levandowski had no input into the number 12:01:32

11   of boards because you don't know all the conversations 12:01:35

12   that Mr. Levandowski had; fair?                       12:01:37

13      MR. KIM:  Objection; form.                         12:01:37

14      THE WITNESS:  No, I disagree with that.            12:01:39

15   BY MR. JAFFE:                                          12:01:39

16      Q.   Why?                                           12:01:41

17      A.   When you go so far as to say input into the   12:01:44

18   design, I don't see how some conversation with Anthony 12:01:49

19   could have influenced what I saw as a need to split   12:01:53

20   the lasers █████████████████    ███████               12:01:58

22      Q.   So where did you get that idea from?          12:02:01

23      A.   I don't recall where the idea came from, but  12:02:12

24   it seemed like a requirement from the beginning.      12:02:16

25      Q.   What does that mean?                          12:02:17
```

Page 75

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   We knew that we were placing edge-emitting        12:02:22

2  laser diodes on a flat PCB.                              12:02:26

3    Q.   And that was the PCB that Mr. Pennecot            12:02:29

4  designed; right?                                          12:02:29

5    A.   Yes.                                               12:02:29

6    Q.   And that's the board that eventually was sent     12:02:35

7  to Gorilla in December?                                   12:02:38

8    A.   That was one of the boards.                        12:02:40

9         So when we knew we were placing these boards      12:02:48

10 flat onto a PCB, edge-emitting diodes, and we realized   12:02:53

11 they ███████████████████████████████████  ██████████

   ████████████████████████████████████████████, as        12:03:01

13 I recall, ████████████████████████████████  ██████████

   ██████████████████████████████ was obvious.              12:03:08

15   Q.   I see.                                             12:03:08

16        So you got the board design from Mr. Pennecot     12:03:13

17 and you knew you wanted 64 channels because you           12:03:17

18 were -- wanted to do something similar to what            12:03:21

19 Velodyne was doing and then derivative from that is       12:03:25

20 how you got to ████████████████                           12:03:28

21   MR. KIM:  Objection; form.                              12:03:29

22   THE WITNESS:  That's taking it actually out of          12:03:32

23 sequence.                                                 12:03:33

24 BY MR. JAFFE:                                             12:03:33

25   Q.   Okay.  Can you put it in sequence, please.         12:03:36

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1       A.   Yes.                                      12:03:36

 2            We knew we needed a laser circuit, so I had  12:03:40

 3  Florin design multiple laser circuits onto a board for  12:03:45

 4  test and evaluation.  We picked one of those circuits  12:03:48

 5  that we thought performed the best.  He began         12:03:51

 6  considering the size of his circuit in one of those --  12:03:56

 7  I believe it was 10 different circuits.  The one we    12:03:59

 8  chose, he could look at the design of it and tell me   12:04:02

 9  the size.                                              12:04:04

10            So at this point, as I recall, Gaetan did not  12:04:10

11  have a laser board design in his CAD model.  He had a  12:04:20

12  lens design.  He may have had -- I even doubt he had   12:04:26

13  taken that into CAD yet.                               12:04:29

14       Q.   So I'm a little bit confused.               12:04:32

15            Where did the idea to have ███████ come      12:04:34

16  from?                                                  12:04:35

17      ██    ████████████████████████  ████  ███████

██      ██████████████████████ The need to               12:04:49

19      ████████████████ developed quickly between        12:04:56

20  Florin and I looking at the size of the circuit,       12:04:59

21  knowing when Scott Boehmke defines a certain ████  ████  12:05:08

██      ███████████████████ when Gaetan has              12:05:08

23  designed a lens that has a 150 millimeter focal        12:05:13

24  length, it becomes apparent that the ████  ███████     12:05:19

██      ███████████████████████████                      12:05:19
```

Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ████████████████████████████████████    ████████
 ■   ██████████████████████                   12:05:24
 3        It was obvious to me that wasn't going to   12:05:26
 4   work and we would have to ████████████    ████████
 ■   ██████  Later we went back and looked closer, and I   12:05:33
 6   realized, wait a minute, ████████████████████   ████████
 ■   ██████  So we can't put circuits on ████████████   ████████
 ■   ████████████████████████████████████    ████████
 ■   ██████████████████                       12:05:47
10        Furthermore, we were starting to look at   12:05:50
11   components on the receiver.  We saw components on the   12:05:53
12   receiver that were themselves ████████████   12:05:58
13   Those were high voltage components.  They needed   12:06:00
14   additional space between them as well.  So it seemed   12:06:01
15   pretty clear at the time ████████████████  was not   12:06:05
16   going to work, so we said ████████████  Florin   12:06:09
17   thought he could ████████████████          12:06:14
18        So that ended up with ████████████    ████████
 ■   ██████  We already had decided two cavities to make   12:06:20
20   64 channels, so that ended up with ████████████████   12:06:24
21   in the sensor.                             12:06:25
22      Q.   Where are the documents that reflect the   12:06:27
23   discussions that you were just talking about?   12:06:31
24      A.   We did not document our discussions.   12:06:33
25      Q.   Okay.  So there are no -- there's no   12:06:35
```

Page 78

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   documentary evidence to evidence -- to support what      12:06:39
 2   you just said?                                           12:06:40
 3       MR. KIM:  Objection; form.                           12:06:42
 4   BY MR. JAFFE:                                             12:06:42
 5       Q.   Is that fair?                                   12:06:42
 6       A.   Not quite.                                      12:06:43
 7            We have documents showing and indicating to     12:06:47
 8   us what the vertical angles were to be for the sensor    12:06:52
 9   as specified by Scott Boehmke.  We have a lens design    12:06:57
10   that's documented from Gaetan.  We have the original     12:07:03
11   circuit Florin had developed for testing out lasers.     12:07:10
12            At that point, the documentation stopped.       12:07:14
13   And we don't have documents for discussions describing   12:07:22
14   how ███████████████████████████████████████████   █████████
     ███  ████████████████████████                           12:07:27
16       Q.   Okay.  So I just want to run through that       12:07:30
17   real quick.                                              12:07:30
18            So you're saying that you got the idea for      12:07:34
19   ██████████ based on three things.  One is the █████████   ██████████
     ███  ██████████ of the diodes that you wanted.  Two is the   12:07:43
21   ██████████████████.  And three is the ███████████   ██████████
     ███  █████████████████████████████████████           12:07:49
23            Generally, is that fair?                        12:07:53
24       A.   I'd like you to add a fourth, which is the      12:07:56
25   ██████████████████████████████ and possibly a           12:08:04
```

Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   ███████████████████████████████████  ██████████

    ███████                                            12:08:10

3      Q.   So that's part of the circuitry, though?   12:08:12

4      A.   Yeah.                                       12:08:12

5      Q.   So if we say number 3 is the ████████  ██████████

    ████████  would that capture everything that you're 12:08:19

7   talking about?                                      12:08:20

8      A.   With the clarification that circuitry       12:08:22

9   involves a channel, both receive and transmit, then I 12:08:26

10  can agree to that.                                  12:08:27

11     Q.   Fair enough.                                12:08:28

12          So there were three, generally, things, now 12:08:29

13  that we've kind of established our terminology, that 12:08:33

14  you say --                                          12:08:36

15     A.   Sorry.  Did you include the focal length of 12:08:40

16  the lens Gaetan was designing?                      12:08:41

17     Q.   No.                                         12:08:41

18     A.   That's important.                           12:08:43

19     Q.   Okay.  So add that as number 4, focal length 12:08:48

20  of lens.  All right.                                12:08:51

21          So the ████████████  that you're talking    12:08:54

22  about -- the issue that you're talking about there is 12:08:58

23  that ███████████████████████████  ██████████

    █████████████████████████████████████  ██████████

    ███████████████  right?                            12:09:08

                                              Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1       A.   I think you misspoke.  The resulting ████    ████████

 ▮   ██████████████████████████████████████████    ████████

 ▮       ████████████████████████                              12:09:20

 4       Q.   I see.                                           12:09:21

 5            So the fact that you needed to have the          12:09:23

 6   ████████████████████████████████████████    ████████

 ▮   ████████████████████████████  is that basically          12:09:31

 8   it or am I messing it up again?                           12:09:34

 9       MR. KIM:  Objection; form.                            12:09:35

10       THE WITNESS:  It was the ██████████████    ████████

 ▮   ████████████████--                                       12:09:39

12   BY MR. JAFFE:

13       Q.   I see.                                           12:09:39

14       A.   -- that required them eventually to ████    ████████

 ▮   ██████████████████                                       12:09:45

16       Q.   And the ████████████████████████    ████████

 ▮   ██████████████  is that right?                            12:09:49

18       A.   The ████████████████████████    ████████

 ▮   ████████████████████████████████    ████████

 ▮   ████████████████████████                                 12:09:59

21       Q.   And -- okay.  And the spacing, that's what       12:10:08

22   Mr. Boehmke -- continue to mispronounce his name         12:10:14

23   probably correctly -- he provided to you in November     12:10:16

24   of 2016?                                                 12:10:17

25       A.   Yes, he provided the angular spacing, if I      12:10:20
```

Page 81

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   may.                                              12:10:21

 2       Q.   Okay.  We'll get to that a little bit later.  12:10:25

 3            Mr. Boehmke didn't provide you how many   12:10:29

 4   boards to use; right?                              12:10:30

 5       A.   Right.                                    12:10:30

 6       Q.   And then the FAC lens, that was provided by  12:10:35

 7   Mr. Pennecot; right?                               12:10:36

 8       A.   That is my understanding.                 12:10:39

 9       Q.   He came up with the FAC lens design; right?  12:10:42

10       A.   That's my understanding.                  12:10:44

11       Q.   And it's a ███████████ FAC lens; right?  12:10:47

12       MR. KIM:  Objection; form.                     12:10:48

13       THE WITNESS:  It's ███████████               12:10:51

14   BY MR. JAFFE:                                      12:10:51

15       Q.   That's larger than -- sorry.              12:10:53

16       A.   It's 2███████████████████  ████████

██   ████████████████                                12:10:59

18       Q.   Do you know how large the FAC lenses are for  12:11:03

19   Velodyne's devices?                                12:11:05

20      ███  ██████████████████████  ████████

██   ████████████████████████  ████████

██   ██████████████████.                             12:11:16

23       Q.   Do you know how large it is?              12:11:16

24       A.   Are you asking diameter or are you asking

25   length?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    To compare it to ████████████████        12:11:17

 2      ██  ██████████████████████████████    ████████

 █  ███████████████████                              12:11:24

 4      Q.    And so that lens design came from        12:11:30

 5  Mr. Pennecot and the circuitry came from Florin; is  12:11:33

 6  that right?                                         12:11:34

 7      A.    Yes.                                     12:11:34

 8      Q.    So none of those folks came up with ████  ████████

 █  ██████████████████████████████  right?            12:11:45

10      MR. KIM:  Objection; form.                     12:11:47

11      THE WITNESS:  They were certainly involved in the  12:11:49

12  decision to go to █████████████████  because I      12:11:53

13  had to consult with them in terms of what would be  12:11:56

14  possible for circuit spacing, in the case of Florin.  12:12:00

15  And to make sure that Gaetan's group lens can handle  12:12:06

16  the ████████████████████████                       12:12:09

17  BY MR. JAFFE:

18      Q.    And just to go back to your declaration here,  12:12:12

19  this diagram that you're showing in Figure 6 in     12:12:16

20  paragraph 13, there's no discussion in here of ██████  ████████

 █  ██████████████████████  right?                     12:12:22

22      A.    There's no discussion of ████████████████  ████████

 █  ███████  in Figure 6.  Although if you understand Figure  12:12:31

24  6, it could be easily derived.                      12:12:36

25      Q.    That wasn't my question.                 12:12:36
```

Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.    So just going back to what we were talking        12:23:09

2    about earlier, you're saying that Mr. Boehmke provided      12:23:12

3    you the custom beam spacing and you imported that data      12:23:17

4    into Zemax to determine the resultant emitting points       12:23:23

5    of the laser diodes, and those you just picked as a         12:23:28

6    first matter, ██████████████████████████                   12:23:32

7        MR. KIM:  Objection; form.                              12:23:36

8        THE WITNESS:  We didn't pick it as first matter.        12:23:38

9    We discussed this already, that I would have loved to       12:23:41

10   ████████████████████ and we found we couldn't do           12:23:45

11   that. ████████████████████   We decided we had             12:23:45

12   to ████████████████████████          ████████              12:23:58

█    ████████████████████.  That decision went               12:23:58

14   into the first -- earliest CAD designs of the optical      12:24:04

15   cavity for Fuji.                                            12:24:06

16   BY MR. JAFFE:                                               12:24:06

17       Q.    So you didn't do any sort of other Zemax          12:24:08

18   simulations of other board and diode arrangements?         12:24:14

19       A.    I'm not aware.  I don't recall doing any CAD      12:24:19

20   designs for other board arrangements.                      12:24:23

21       Q.    So by November 4th, 2016, you and your team       12:24:29

22   had already arrived at ████████████████████  ████████      12:24:29

█    ████████████████ is that right?                         12:24:35

24       A.    It's possible that that was by November 4th.      12:24:40

25   It's also possible that it was shortly after the 4th.      12:24:44

Page 90

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1       Q.   So you -- sorry.                          12:24:46

 2       A.   There's a potential for a time lag from   12:24:50

 3   Scott's prescribed beam angles and when we actually 12:24:55

 4   did the determination of six total boards and got   12:24:59

 5   those into a CAD model.                             12:25:01

 6       Q.   And you only started the Fuji project at the 12:25:03

 7   end of October; right?                              12:25:05

 8       A.   Yes.

 9       Q.   So you came up with the █████████   ████████  12:25:14

█    ████████ design in a week, approximately?         12:25:14

11       MR. KIM:  Objection; form.                     12:25:16

12       THE WITNESS:  I don't know if it was exactly a 12:25:17

13   week.  Or could have been more than a week, but it was 12:25:20

14   something on the order of a week.                   12:25:22

15   BY MR. JAFFE:                                       12:25:22

16       Q.   About a week?                              12:25:24

17       A.   Within some small multiple of one week.  One 12:25:30

18   week, two weeks, three weeks possible, yes, on a very 12:25:34

19   short time scale.                                   12:25:36

20       Q.   And you didn't -- after receiving these beam 12:25:41

21   spacings from Mr. Boehmke, you didn't even consider 12:25:44

22   other designs other than ██████████████  ████████   12:25:51

█    ██████████████ right?                              12:25:51

24       A.   That feels a little out of sequence.  So I 12:25:59

25   believe we got the angles from Scott for our sensor. 12:26:05
```

Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    The decision for how many boards to place them on        12:26:08
 2    would have to occur after we knew what those angles       12:26:12
 3    were.                                                     12:26:13
 4        Q.   So you got the custom beam spacing from          12:26:32
 5    Mr. Boehmke; and then one to three weeks later, you       12:26:37
 6    knew you were doing ███████████████████████  ████████     12:26:43
 ██   ██████                                                    12:26:43
 8        A.   Yes.                                             12:26:43
 9        Q.   And at that time, in between receiving           12:26:46
10    Mr. Boehmke's custom beam spacing, you didn't             12:26:50
11    consider -- even consider any other designs other than    12:26:52
12    ██████████████████████████████████████████               12:26:57
13    right?                                                    12:26:57
14        A.   No.  When Scott gave us the prescribed           12:27:02
15    angles, we had to first consider ███████████  ████████    12:27:06
 ██   ██████      And that was the process we've already        12:27:07
17    discussed to arrive at ██████████  but that's after       12:27:11
18    Scott originally told us what the angles would be.        12:27:14
19        Q.   But I'm confused.                                12:27:15
20             Because when we were talking earlier about       12:27:17
21    after you received the data, you said you only            12:27:19
22    provided one summary into Zemax and that was ████  ████   12:27:21
 ██   ████████████████████                                     12:27:24
24        A.   Yes.                                             12:27:24
25        Q.   So you didn't even -- when you were looking      12:27:27
```

Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Google? | 12:29:47 |
| 2 | A.  No. | 12:29:47 |
| 3 | Q.  You didn't have any understanding? | 12:29:49 |
| 4 | A.  No. | 12:29:49 |
| 5 | Shall we go back to our list in terms of | 12:29:56 |
| 6 | elements that are important? | 12:29:57 |
| 7 | Q.  Let me see if I can short-circuit this. | 12:30:00 |
| 8 | My understanding is you're saying they were | 12:30:02 |
| 9 | all required, so one isn't more important than the | 12:30:06 |
| 10 | other; is that fair? | 12:30:07 |
| 11 | A.  That's fair. | 12:30:08 |
| 12 | Q.  So then we don't need to go through them. | 12:30:11 |
| 13 | Let's turn to page 17 of your declaration. | 12:30:14 |
| 14 | A.  Page or paragraph? | 12:30:17 |
| 15 | Q.  Excuse me.  Paragraph 17. | 12:30:21 |
| 16 | A.  Okay. | 12:30:21 |
| 17 | Q.  It's on page 11. | 12:30:23 |
| 18 | A.  Thank you. | 12:30:24 |
| 19 | Q.  And I'm in your supplemental declaration, | 12:30:28 |
| 20 | which is 152. | 12:30:30 |
| 21 | MR. KIM:  What paragraph? | 12:30:34 |
| 22 | MR. JAFFE:  17.  It's the long paragraph, so it's | 12:30:38 |
| 23 | page 11 if you're looking for it. | 12:30:40 |
| 24 | BY MR. JAFFE: | 12:30:40 |
| 25 | Q.  So there are two things labeled here, Figure | 12:30:45 |

Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | 8A and 8B. | 12:30:48 |
| 2 | Do you see that? | 12:30:49 |
| 3 | A.   Yes. | 12:30:49 |
| 4 | Q.   So just for clarification here, the letters | 12:30:55 |
| 5 | that are on there, those are letters that you added | 12:30:58 |
| 6 | for purposes of your declaration; right? | 12:30:59 |
| 7 | A.   Yes, those were added for this declaration. | 12:31:04 |
| 8 | Q.   In the document as it was created in November | 12:31:06 |
| 9 | 2016, it did not have these letters on it; right? | 12:31:09 |
| 10 | A.   Right. | 12:31:09 |
| 11 | Q.   So this is a modified version for your | 12:31:12 |
| 12 | declaration? | 12:31:13 |
| 13 | A.   Yes. | 12:31:14 |
| 14 | Q.   And if we go to the November 2016 data that | 12:31:22 |
| 15 | you were looking at that formed the basis of this, it | 12:31:28 |
| 16 | did not include these letterings; right? | 12:31:29 |
| 17 | A.   Right. | 12:31:29 |
| 18 | Q.   So in November 2016, there was no -- | 12:31:36 |
| 19 | Mr. Boehmke did not provide the distribution of these | 12:31:40 |
| 20 | beams onto particular boards; right? | 12:31:43 |
| 21 | A.   Right. | 12:31:43 |
| 22 | Q.   So the November 2016 data from Mr. Boehmke, | 12:31:55 |
| 23 | that did not provide any information as to how these | 12:31:59 |
| 24 | beams would be distributed ████████████    ██████ | |
| ██ | ████████████████████████ right? | 12:32:04 |

Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   It provided no prescription for that | 12:32:07 |
| 2 | distribution. | 12:32:09 |
| 3 | Q.   Let's go to the next page here at the end of | 12:32:17 |
| 4 | paragraph 17. | 12:32:18 |
| 5 | So this chart here at the end of paragraph | 12:32:22 |
| 6 | 17, again, this is something you generated for your | 12:32:26 |
| 7 | declaration; right? | 12:32:26 |
| 8 | A.   Yes. | 12:32:27 |
| 9 | Q.   This isn't some document that you're just | 12:32:31 |
| 10 | showing?  This is something that you generated for | 12:32:33 |
| 11 | this case? | 12:32:34 |
| 12 | A.   Um-hum.  That's right. | 12:32:35 |
| 13 | Q.   Now, what is being shown here in this table? | 12:32:40 |
| 14 | A.   So this table is showing the vertical beam | 12:32:46 |
| 15 | angles in a November 16th document from Scott Boehmke | 12:32:51 |
| 16 | in this first white column.  The next column labeled | 12:32:57 |
| 17 | "Current" contains the angles that we actually used. | 12:33:03 |
| 18 | And the green shows the discrepancy between them. | 12:33:07 |
| 19 | Q.   Okay.  And again the ███████████████   ████████ | |
| | ███████████████   that's all information that you added | 12:33:20 |
| 21 | later? | 12:33:21 |
| 22 | A.   Added later for clarity, yes. | 12:33:22 |
| 23 | Q.   That's not information that came from the | 12:33:24 |
| 24 | November 16th document provided by Mr. Boehmke; right? | 12:33:27 |
| 25 | A.   Right. | 12:33:27 |

Page 97

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So no one should be confused as to whether | 12:33:30 |
| 2 | this data is originally from November 2016 in terms of | 12:33:35 |
| 3 | the ███████     right? | 12:33:37 |
| 4 | A.   Nobody should be confused that the ███████ | 12:33:41 |
| 5 | had come from Scott, because it did not. | 12:33:43 |
| 6 | Q.   Right.  You added it in here for purposes of | 12:33:45 |
| 7 | your declaration? | 12:33:46 |
| 8 | A.   Yeah. | 12:33:46 |
| 9 | Q.   All right.  So you've mentioned -- I want to | 12:33:50 |
| 10 | just clarify a little bit of terminology here.  What's | 12:33:55 |
| 11 | shown here at the end of paragraph 17 is talking about | 12:34:00 |
| 12 | angles; right? | 12:34:01 |
| 13 | A.   Right. | 12:34:01 |
| 14 | Q.   And what angle are we talking about? | 12:34:04 |
| 15 | A.   We're talking about the vertical angle | 12:34:08 |
| 16 | reference to a horizontal plane measured in degrees | 12:34:12 |
| 17 | such that positive numbers are above horizontal, | 12:34:18 |
| 18 | negative numbers are below horizontal. | 12:34:20 |
| 19 | Q.   Okay.  Are you familiar with the concept of | 12:34:23 |
| 20 | beam spacing? | 12:34:24 |
| 21 | A.   Perhaps you could clarify. | 12:34:26 |
| 22 | Q.   Let's go back to the prior page.  And to page | 12:34:35 |
| 23 | 10.  The heading, do you see it says "Beam spacing in | 12:34:41 |
| 24 | Fuji"? | 12:34:41 |
| 25 | A.   Um-hum. | 12:34:42 |

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    "Beam spacing," what do you mean?              12:34:44

 2      A.    So beam spacing can be used to refer to the    12:34:49

 3   ███████████████████████████████████████████        █████████

        ███████████████████.  Since it refers to beam and not  12:35:04

 5   laser spacing, then I'm going to say probably does not   12:35:07

 6   refer to linear dimensions.                              12:35:10

 7      Q.    When you are saying ██████ -- what you're      12:35:12

 8   saying -- when you're talking about ███████████        █████████

     ████████████████████████████████████████        █████████

      ██████████████████████████████ is that fair?      12:35:20

11      A.    That's fair.                                   12:35:20

12      Q.    Just to be clear, again, when -- we're going   12:35:24

13   back to the end of paragraph 17.  You are not talking   12:35:27

14   about ████████████████████████████████████        █████████

       ████████ right?                                       12:35:33

16      MR. KIM:  Objection; form.                           12:35:36

17      THE WITNESS:  This does not refer to the absolute    12:35:38

18   positions of the diodes.  I'm referring to the end of   12:35:40

19   paragraph 17.  The figure refers to the angular         12:35:44

20   prescribed angles.                                      12:35:47

21   BY MR. JAFFE:                                           12:35:47

22      Q.    So I want to introduce a new term here.        12:35:50

23           You're familiar -- when we have the diodes,     12:35:53

24   one way that they're represented, they're position is   12:35:56

25   X and Y; right?                                         12:35:58
```

Page 99

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Right. | 12:35:58 |
| 2 | Q.   And I want to refer to the difference between | 12:36:02 |
| 3 | two diodes on the Y axis as vertical spacing. | 12:36:07 |
| 4 | Do you understand what I'm referring to? | 12:36:08 |
| 5 | A.   Yes. | 12:36:08 |
| 6 | Q.   What you're talking about here in paragraph | 12:36:10 |
| 7 | 17 does not show the differences in the vertical | 12:36:12 |
| 8 | spacing between the diodes; right? | 12:36:16 |
| 9 | MR. KIM:  Objection; form. | 12:36:17 |
| 10 | THE WITNESS:  Agreed, paragraph 16 does not refer | 12:36:20 |
| 11 | to vertical -- | 12:36:22 |
| 12 | BY MR. JAFFE: | 12:36:22 |
| 13 | Q.   17. | 12:36:22 |
| 14 | A.   Sorry.  In paragraph 17, we are not referring | 12:36:26 |
| 15 | to -- | |
| 16 | MR. KIM:  Same objection. | 12:36:28 |
| 17 | THE WITNESS:  -- the vertical dimension on a laser | 12:36:30 |
| 18 | board. | 12:36:31 |
| 19 | BY MR. JAFFE: | |
| 20 | Q.   So the ███████████████████, that's | 12:36:35 |
| 21 | here at the end of 17, that's not referring to the | 12:36:36 |
| 22 | ████████████████████████████ | 12:36:39 |
| 23 | in Fuji; right? | 12:36:40 |
| 24 | MR. KIM:  Objection; form. | 12:36:42 |
| 25 | THE WITNESS:  That's right. | 12:36:43 |

Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        MR. KIM:  We've been going over an hour.  Can we      12:37:24

2   break for lunch?                                           12:37:26

3        MR. JAFFE:  Yes, we can break.                        12:37:28

4        THE VIDEOGRAPHER:  We are off the record at 12:37     12:37:30

5   p.m.                                                       12:37:30

6             (Lunch recess was taken at 12:37 p.m.)           12:37:30

7             (Nothing omitted or deleted.  See next page).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 101

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     AFTERNOON SESSION                    1:38 P.M.

 2                      - - -

 3        THE VIDEOGRAPHER:  We are back on the record at   13:38:23

 4     1:38 p.m.                                            13:38:24

 5                    EXAMINATION RESUMED                   13:38:24

 6     BY MR. JAFFE:                                        13:38:24

 7        Q.    Welcome back.                               13:38:28

 8        A.    Thank you.                                  13:38:28

 9        Q.    I want to turn to your original declaration. 13:38:31

10     I think it's 151.  And in particular, in paragraph 20, 13:38:39

11     you state, "There are approximately █employees        13:38:41

12     currently working on the Fuji project."             13:38:44

13           Is that right?                                13:38:45

14        A.    Yes, I see it.                              13:38:48

15        Q.    How many employees are working at Uber on   13:38:54

16     LiDAR-related responsibilities?                      13:38:56

17        MR. KIM:  Objection; form.                        13:39:02

18        THE WITNESS:  There would be approximately █      13:39:03

19     employees at Uber working on LiDAR responsibilities  13:39:06

20     that I'm aware of.                                   13:39:10

21     BY MR. JAFFE:                                        13:39:10

22        Q.    Your understanding is that there are only █ 13:39:12

23     employees at Uber with LiDAR-related responsibilities; 13:39:16

24     is that right?                                       13:39:17

25        MR. KIM:  Objection; form.                        13:39:19
```

Page 102

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  When I came up with the number, I | 13:39:22 |
| 2 | wanted to pick ones -- employees that had primary | 13:39:26 |
| 3 | responsibilities on LiDAR. | 13:39:29 |
| 4 | BY MR. JAFFE: | 13:39:29 |
| 5 |     Q.   So let me ask my question again then. | 13:39:32 |
| 6 |          What is the number of employees at Uber that | 13:39:37 |
| 7 | have LiDAR-related responsibilities or projects? | 13:39:43 |
| 8 |     MR. KIM:  Objection; form. | 13:39:43 |
| 9 |     THE WITNESS:  I don't know off the top of my head | 13:39:46 |
| 10 | how many more employees have minor LiDAR | 13:39:48 |
| 11 | responsibilities. | 13:39:50 |
| 12 | BY MR. JAFFE: | 13:39:50 |
| 13 |     Q.   So when you're talking about this number of | 13:39:52 |
| 14 | employees here, you're not talking about the number of | 13:39:54 |
| 15 | employees working on LiDAR entirely at Uber; right? | 13:39:59 |
| 16 |     MR. KIM:  Objection; form. | 13:40:02 |
| 17 |     THE WITNESS:  Correct.  I believe there may be a | 13:40:07 |
| 18 | few more employees that also have some minor | 13:40:11 |
| 19 | responsibility for LiDAR activities. | 13:40:15 |
| 20 | BY MR. JAFFE: | 13:40:15 |
| 21 |     Q.   What LiDAR technology are they working on? | 13:40:18 |
| 22 |     A.   They're not working on LiDAR technology. | 13:40:21 |
| 23 | They're working on perhaps sourcing components, just | 13:40:26 |
| 24 | general supply chain people. | 13:40:28 |
| 25 |     Q.   Okay.  Are there any other LiDAR projects | 13:40:32 |

Page 103

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | within Uber other than the Fuji project? | 13:40:35 |
| 2 | A.   No, there's not. | 13:40:37 |
| 3 | Q.   You're not working on building LiDARs with | 13:40:40 |
| 4 | third-party companies? | 13:40:42 |
| 5 | MR. KIM:  Objection; form. | 13:40:44 |
| 6 | THE WITNESS:  I'm not working on LiDAR projects | 13:40:48 |
| 7 | with third-party companies. | 13:40:50 |
| 8 | BY MR. JAFFE: | 13:40:50 |
| 9 | Q.   Right.  So let me ask my question a little | 13:40:53 |
| 10 | bit differently. | 13:40:53 |
| 11 | Is Uber working on designing LiDARs with | 13:40:58 |
| 12 | third-party companies? | 13:40:59 |
| 13 | MR. KIM:  Objection; form. | 13:41:00 |
| 14 | THE WITNESS:  I think Scott Boehmke is working | 13:41:05 |
| 15 | with some third-party LiDAR suppliers. | 13:41:09 |
| 16 | BY MR. JAFFE: | 13:41:09 |
| 17 | Q.   Who's he working with? | 13:41:12 |
| 18 | A.   I am aware of ████ | 13:41:13 |
| 19 | Q.   Um-hum. | |
| 20 | A.   There's ██████.  There is -- and I'll say | 13:41:31 |
| 21 | this confidential information.  There's ███████ | 13:41:35 |
| 22 | I'm not aware of any others at this point. | 13:41:40 |
| 23 | MR. KIM:  At this point I'll just designate the | 13:41:42 |
| 24 | transcript attorneys' eyes only. | 13:41:46 |
| 25 | MR. JAFFE:  What number are we at? | 13:41:48 |

Page 104

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE REPORTER:  153. | 13:41:50 |
| 2 | MR. JAFFE:  Okay.  So this is going to be 153. | 13:41:53 |
| 3 | (Plaintiff's Exhibit 153 was marked.) | 13:42:07 |
| 4 | BY MR. JAFFE: | |
| 5 | Q.  So I'll just tell you for the record, this | 13:42:09 |
| 6 | was a document that Uber's lawyers prepared and | 13:42:13 |
| 7 | submitted to the court.  That's where we got this | 13:42:17 |
| 8 | from. | 13:42:18 |
| 9 | A.  Um-hum. | 13:42:19 |
| 10 | Q.  Now, you were talking earlier about ▮folks | 13:42:23 |
| 11 | working on the Fuji project and that that's the only | 13:42:26 |
| 12 | LiDAR project.  If you look at Section 2 here -- and | 13:42:29 |
| 13 | you can see my handwriting on this copy.  Actually, I | 13:42:33 |
| 14 | hope my math is right, but on the bottom, on the | 13:42:36 |
| 15 | second page, I totaled it up.  And I counted about ▮ | 13:42:40 |
| 16 | employees here that said that they have LiDAR-related | 13:42:43 |
| 17 | responsibilities or projects. | 13:42:45 |
| 18 | A.  Okay. | 13:42:46 |
| 19 | Q.  What are those other folks doing? | 13:42:48 |
| 20 | A.  I don't know what all these other people are | 13:42:56 |
| 21 | doing.  So, for instance -- shall we just go down the | 13:43:06 |
| 22 | list? | 13:43:06 |
| 23 | Q.  Well, let me ask generally. | 13:43:09 |
| 24 | If they're not working on Fuji, but they're | 13:43:11 |
| 25 | working on LiDAR, what are they working on? | 13:43:15 |

Page 105

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A. If they're not working on Fuji . . . so let's | 13:43:20 |
| 2 | take -- I don't know if Phillip Haban, I don't know | 13:43:26 |
| 3 | what he's working on. I don't know Jacob Fischer. I | 13:43:31 |
| 4 | don't know what he's working on. Robert Doll, | 13:43:34 |
| 5 | he's -- I know he's an employee for the Pittsburgh | 13:43:40 |
| 6 | team. He's related to the hardware group or some | 13:43:47 |
| 7 | manufacturing aspect of that, but I don't know what | 13:43:50 |
| 8 | he's working on. | 13:43:52 |
| 9 | Sean Chin, I don't know who that is. Not | 13:44:07 |
| 10 | sure who Jay Kuvelker is and what he's working on. | 13:44:13 |
| 11 | Anthony Levandowski, he's a manager. I don't know how | 13:44:19 |
| 12 | he's working on Fuji or what he's working on. I would | 13:44:23 |
| 13 | say he's not working on Fuji, but we already | 13:44:27 |
| 14 | established that. | 13:44:28 |
| 15 | Q. Actually, why don't we pause there for a | 13:44:30 |
| 16 | second. | 13:44:30 |
| 17 | For the ■ employees in your declaration, | 13:44:32 |
| 18 | does that include Mr. Levandowski? | 13:44:34 |
| 19 | A. No. | 13:44:34 |
| 20 | Q. So if he has LiDAR-related responsibilities | 13:44:37 |
| 21 | or projects here in Section 2 of this document, you | 13:44:42 |
| 22 | don't know what those are; is that fair? | 13:44:44 |
| 23 | A. I would say so. | 13:44:45 |
| 24 | And if I can be more clear about the ■ | 13:44:53 |
| 25 | employees currently working on the Fuji project, I do | 13:44:56 |

Page 106

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | mean people working directly on the Fuji project.  I | 13:45:00 |
| 2 | did not include people who were some levels of | 13:45:03 |
| 3 | management up who had some sort of dotted line or | 13:45:06 |
| 4 | eventual path of ownership or responsibility.  I was | 13:45:12 |
| 5 | coming up with ■ as people that I felt I could | 13:45:14 |
| 6 | solidly say would be adversely affected if the Fuji | 13:45:19 |
| 7 | project ended. | 13:45:21 |
| 8 | So there's still a lot of names on here.  For | 13:45:29 |
| 9 | instance, take Ana Rayo, she's in a supply chain | 13:45:32 |
| 10 | group.  She's responsible, I think, for some aspects | 13:45:36 |
| 11 | of receiving material.  I would not have counted her | 13:45:39 |
| 12 | as primarily working on Fuji. | 13:45:41 |
| 13 | Q.   Let me actually just stop you and ask a | 13:45:44 |
| 14 | different question, which is, how many of these people | 13:45:47 |
| 15 | you don't know what they're doing in terms of LiDAR | 13:45:51 |
| 16 | work.  Can you just provide me a count? | 13:45:54 |
| 17 | A.   Yep. | 13:45:55 |
| 18 | Q.   And, actually, why don't we do this, I'm | 13:46:01 |
| 19 | going to hand you a pen.  And why don't you just mark | 13:46:04 |
| 20 | the people that you don't know what they're doing with | 13:46:06 |
| 21 | LiDAR. | 13:46:07 |
| 22 | A.   With LiDAR in general.  Okay. | 13:46:09 |
| 23 | Q.   Well, let me state it this way:  You don't | 13:46:11 |
| 24 | know why they're on this list of "Defendants' | 13:46:15 |
| 25 | Officers, Directors, and Employees with LiDAR-Related | 13:46:17 |

Page 107

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Responsibilities Or Projects"? | 13:46:18 |
| 2 | A.    Okay.   I will mark those. | 13:46:20 |
| 3 | (Witness complies.) | 13:46:20 |
| 4 | Okay.   So these -- I've marked -- | 13:48:19 |
| 5 | Q.    Can I have my pen back. | 13:48:21 |
| 6 | A.    Sorry. | 13:48:21 |
| 7 | I've marked those for whom I don't know what | 13:48:24 |
| 8 | they're working on. | 13:48:25 |
| 9 | Q.    Can you just tell me how many you've marked? | 13:48:28 |
| 10 | A.    Sorry. | 13:48:29 |
| 11 | Thirteen. | 13:48:? |
| 12 | Q.    So those are 13 employees that Uber's lawyers | 13:48:40 |
| 13 | said had LiDAR-related responsibilities or projects | 13:48:43 |
| 14 | and they don't work on the Fuji, but you don't know | 13:48:46 |
| 15 | what they work on? | 13:48:47 |
| 16 | A.    That's correct, to my knowledge. | 13:48:50 |
| 17 | Q.    And then you mentioned that Uber was working | 13:48:52 |
| 18 | with some suppliers, third parties, on LiDAR and you | 13:48:56 |
| 19 | mentioned ███████████████.   And then what else? | 13:49:00 |
| 20 | A.    ███████ | 13:49:01 |
| 21 | Q.    ███████ | 13:49:02 |
| 22 | Anyone else? | 13:49:05 |
| 23 | A.    Perhaps, yeah.   ████████   I don't think I'm | 13:49:28 |
| 24 | aware of any other development activities. | 13:49:32 |
| 25 | Q.    So let's look at Section 3 here.   You see it | 13:49:37 |

Page 108

```
 1    says, "List of defendant suppliers and consultants who      13:49:40

 2    have LiDAR-related responsibilities or projects"?           13:49:42

 3        A.   Okay.                                              13:49:43

 4        Q.   Is _____ listed here?                            13:49:59

 5        A.   Nope.                                              13:49:59

 6        Q.   So _____ is a LiDAR supplier that's not          13:50:03

 7    listed on this list of defendant suppliers?                13:50:07

 8        MR. KIM:  Objection; form.                             13:50:10

 9        THE WITNESS:  Yes.                                     13:50:11

10    BY MR. JAFFE:                                              13:50:11

11        Q.   What about _____is that on here?                 13:50:15

12        A.   Nope.                                             13:50:22

13        Q.   Okay.  And what about _____ is that on           13:50:29

14    here?                                                      13:50:29

15        A.   Nope.                                             13:50:34

16        Q.   And then I think _____actually is on here;       13:50:38

17    right?                                                     13:50:38

18        A.   Yes.                                              13:50:41

19        Q.   And what are you guys doing with _____           13:50:45

20        A.   I believe -- I believe we're buying some demo     13:50:51

21    units or some early evaluation units.                     13:50:54

22        Q.   You're working with them on designing a           13:50:58

23    custom LiDAR; right?                                      13:50:59

24        A.   They're developing a new LiDAR.  I don't know     13:51:02

25    that it's custom for us or just -- I don't know that       13:51:05
```

Page 109

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    detail.

 2        Q.   Are you providing them any Uber confidential   13:51:09

 3    information.

 4        A.   I'm not aware of that happening, no.           13:51:12

 5        Q.   So there is no Uber confidential information   13:51:16

 6    that is going from Uber to ████████ is that true?       13:51:21

 7        A.   I'm not aware of any.                          13:51:23

 8        MR. JAFFE:   Let's mark -- where is that thing?     13:51:31

 9    This one?  No.  It's this one.  This is going to be     13:51:45

10    Exhibit . . .                                           13:51:48

11        THE REPORTER:  154.                                 13:51:50

12        MR. JAFFE:  -- 154.                                 13:51:50

13            Thank you.                                      13:51:52

14            (Plaintiff's Exhibit 154 was marked.)          13:52:13

15    BY MR. JAFFE:

16        Q.   So I've marked as Exhibit 159 [sic] a         13:52:15

17    document that's heavily redacted.  But I just want to   13:52:17

18    ask --

19        MR. KIM:  159?                                      13:52:21

20        MR. JAFFE:  Yeah, Exhibit 159.                      13:52:24

21        MR. KIM:  154.                                      13:52:25

22        MR. JAFFE:  Oh, my handwriting is off.              13:52:27

23    BY MR. JAFFE:                                           13:52:27

24        Q.   154 is a document that's heavily redacted.     13:52:31

25            Is this an e-mail exchange with ███████         13:52:36
```

                                             Page 110

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   If it is, I'm not aware. | 13:52:43 |
| 2 | Q.   You can't tell because of the redaction; | 13:52:44 |
| 3 | right? | 13:52:45 |
| 4 | A.   I'm also looking at the names.  The name | 13:52:50 |
| 5 | addresses.  And I can't say it's an exchange with | 13:52:54 |
| 6 | ████   because I see only Uber or Uber ATC employees. | 13:52:59 |
| 7 | Q.   Right. | 13:52:59 |
| 8 | But if you look on the earlier e-mails, the | 13:53:05 |
| 9 | other e-mails are redacted. | 13:53:06 |
| 10 | A.   Oh, okay.  All right. | 13:53:10 |
| 11 | Q.   So, for example, if you go to the page 12132. | 13:53:17 |
| 12 | Do you see that? | |
| 13 | A.   12132, yes. | 13:53:20 |
| 14 | Q.   "Hey, Anthony, been trying to reach you a | 13:53:23 |
| 15 | while via text." | 13:53:24 |
| 16 | A.   Okay. | 13:53:25 |
| 17 | Q.   You were cc'd on this; right? | 13:53:27 |
| 18 | A.   Yes. | 13:53:27 |
| 19 | Q.   What is this e-mail about? | 13:53:29 |
| 20 | (Witness reviews document.) | 13:54:11 |
| 21 | A.   I'm not 100 percent sure.  Yeah, I'm not sure | 13:54:28 |
| 22 | who [sic] this is about. | 13:54:30 |
| 23 | Q.   It's hard to tell with the redactions, huh? | 13:54:34 |
| 24 | A.   It is. | 13:54:35 |
| 25 | Q.   Yeah, I agree with you. | 13:54:37 |

Page 111

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yeah, I don't recall. | 13:54:47 |
| 2 | Q.   And so just turning to the first page, | 13:54:49 |
| 3 | there's an e-mail from Mr. Levandowski, and you're on | 13:54:52 |
| 4 | the cc line. | 13:54:53 |
| 5 | A.   Yeah. | 13:54:53 |
| 6 | Q.   The entire e-mail is redacted. | 13:54:58 |
| 7 | What is Mr. Levandowski talking about in this | 13:55:01 |
| 8 | e-mail? | 13:55:02 |
| 9 | A.   I don't recall. | 13:55:03 |
| 10 | Q.   You don't recall this e-mail at all? | 13:55:05 |
| 11 | A.   I don't recall this e-mail. | 13:55:06 |
| 12 | Q.   So it's possible that Mr. -- who knows what | 13:55:08 |
| 13 | Mr. Levandowski would be talking about? | 13:55:10 |
| 14 | A.   Who knows. | 13:55:11 |
| 15 | Q.   Okay.  Put that aside. | 13:55:13 |
| 16 | A.   Okay. | 13:55:14 |
| 17 | Q.   Let's go back to your opening declaration, | 13:55:31 |
| 18 | which is Exhibit 151.  And if you can look at | 13:55:41 |
| 19 | paragraph 15, please. | 13:55:45 |
| 20 | Do you see that you refer to an Exhibit B | 13:55:58 |
| 21 | here? | 13:56:00 |
| 22 | A.   Yes. | 13:56:01 |
| 23 | Q.   And what are you saying that Exhibit B is? | 13:56:05 |
| 24 | A.   Exhibit B is a file that lays out the X,Y and | 13:56:28 |
| 25 | rotation coordinates for each of the laser diodes on | 13:56:35 |

Page 112

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ███████████████       while the final dimensions it would    13:56:40

 2   be used for fiducial-based diode placement is not yet    13:56:53

 3   defined for ████████████████                              13:56:56

 4        MR. JAFFE:  Let's mark as Exhibit 155 a document     13:57:01

 5   entitled, "Exhibit B."                                    13:57:03

 6   BY MR. JAFFE:

 7        Q.   It looks like you have it.                      13:57:06

 8        A.   Yes.                                            13:57:06

 9        Q.   Did you bring your declaration with you?        13:57:08

10        A.   Yeah.                                           13:57:09

11        Q.   Why don't we look at your copy then, but        13:57:11

12   we'll just mark this for the record so we have a          13:57:14

13   complete record.                                          13:57:15

14        MR. JAFFE:  Just for the record, I'm marking         13:57:19

15   Exhibit B as 155.  And Mr. Haslim is looking at his       13:57:24

16   own copy.                                                 13:57:25

17        (Plaintiff's Exhibit 155 was marked.)                13:57:26

18   BY MR. JAFFE:                                             13:57:26

19        Q.   So on the top right-hand side, there's a        13:57:32

20   little picture of a transmit board; right?                13:57:33

21        A.   Right.                                          13:57:33

22        Q.   And that's an image of one of the Fuji          13:57:37

23   transmit boards; correct?                                 13:57:38

24        A.   Correct.                                        13:57:38

25        Q.   And the table below, that includes some X,Y     13:57:44
```

Page 113

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    and theta values for each of the diodes on the         13:57:50

 2    transmit board depicted there?                         13:57:53

 3       A.   Yes.                                            13:57:53

 4       Q.   So what does ██████████ refer to in this        13:57:58

 5    chart?                                                  13:57:59

 6       A.   In this chart, the term ██████████ labels       13:58:06

 7    ████████████████████████████████████████████     ████

      ████████████████████████████████████████████     ████

      ████████████████████████████████████             13:58:21

10       Q.   And why are you providing ████████████     ████

      ████████████████████████████████████             13:58:27

12       A.   I believe the person who made this file      13:58:34

13    provided ████████████████████████████████████     ████

      ████████████████████████████ -- that's the        13:58:44

15    wrong term -- so that ██████████████████████████     ████

      ████████████████████████████████████████████     ████

      ████████████████████████████████████████████     ████

      ████████████████████████████████████████████     ████

      ██████████    And these dimensions never left the  13:59:06

20    document.                                          13:59:07

21       Q.   "These dimensions never left the document," 13:59:11

22    what do you mean?                                   13:59:12

23       A.   The dimensions labeled ████████████ remain in 13:59:15

24    this document even as new information is being added 13:59:19

25    ██████████████████████████████████████             13:59:23
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.    So the X and Y data here shows --  ████████     ████████

          ████████████████████████████████████████████████     ████████

          ████████   right?                                    13:59:35

 4        A.    Yes.                                            13:59:36

 5        Q.    So the X and Y data for  ████████████  shows    13:59:39

 6        ████████████████████████████████████████████████     ████████

          ████████████████████████████████████████████████████ ████████

          ████████████████████████████████   right?            13:59:48

 9        A.    Right.                                          

10        Q.    Okay.  And you said the person who created      13:59:56

11   this document.                                             13:59:57

12             Who are you referring to?                        13:59:59

13        A.    This document would have been created by        14:00:03

14   Gaetan Pennecot.                                           14:00:05

15        Q.    And why would Mr. Pennecot include ████████     ████████

          ████████████   in this document?                     14:00:13

17        A.    Gaetan did the original ████████████            14:00:13

          ████████████████████████████████████████████████     ████████

          ████████████████████████████   And he was responsible 14:00:27

20   for  ████████████████████████████████████████████████     ████████

          ████████████████████████████.  This information would 14:00:36

22   then have been given to our electrical engineer, who       14:00:38

23   did  ████████████████████████  for this.                  14:00:40

24        Q.    So that doesn't answer my question.             14:00:43

25             Why is  ████████████████████████████████        14:00:45
```

Page 115

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      ███████████████████   ████████████████   █████████
▮      ████████████████                          14:00:49
3         A.    I'm sorry.  I don't think I was clear before.  14:00:53
4               When Gaetan designed the outline of this        14:00:56
5      board and specified ████████████████████████████   █████████
▮      ████████████████████████████████████████████████   █████████
▮      ██████████████████   ██████████████████████████████   █████████
▮      ███████████████████████████   █████████████████████   █████████
▮      ████████████████████████████████████████████████   █████████
▮      ██████████████████████████████████████████████       14:01:17
11        Q.    So the original idea was ███████████████████   █████████
▮      ███████████████████████                               14:01:22
13        A.    No.                                           14:01:22
14        Q.    So then let me ask my question again then.     14:01:25
15              What is the point of including █████████████   █████████
▮      ████████████████-- in this chart?                      14:01:30
17        A.    This information could have been provided to    14:01:36
18     the electrical engineer so that ███████████████████   █████████
▮      ████████████████████████████████████████             14:01:43
20     And if he hasn't ██████████████████████████████████   █████████
▮      ████████████████████████████████████████████████     █████████
▮      ████████████████   ████████████████████████████       14:01:55
23        Q.    Why do you think he did that?                  14:01:57
24        A.    He needs to ████████████████████, that's as    14:02:00
25     good as -- better than an outline of a board which is  14:02:03
```

Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 1 | A. These are six decimal places. | 14:06:06 |
| 2 | Q. Is that pretty accurate? | 14:06:08 |
| 3 | A. It's an unnecessary number of decimals. This | 14:06:10 |
| 4 | goes to nanometers. | 14:06:13 |
| 5 | Q. Yeah. So this is talking about aligning the | 14:06:16 |
| 6 | diodes to the nanometer; is that fair? | 14:06:18 |
| 7 | A. No. | 14:06:18 |
| 8 | Q. No? I thought you said it goes to | 14:06:21 |
| 9 | nanometers. | 14:06:22 |
| 10 | A. It goes to nanometers, but I don't think | 14:06:24 |
| 11 | anybody was under the impression that we're actually | 14:06:25 |
| 12 | in a postion to get something to a nanometer scale. | 14:06:26 |
| 13 | Q. But that's what this document is listing? | 14:06:28 |
| 14 | A. This document lists the ideal dimension, yes, | 14:06:32 |
| 15 | down to the nanometer. | 14:06:34 |
| 16 | Q. Got it. | 14:06:35 |
| 17 | We talked about X. | 14:06:38 |
| 18 | Y, that talks about the millimeters | 14:06:41 |
| 19 | difference from the fiducial to A1 on the -- in the | 14:06:48 |
| 20 | vertical axis; right? | 14:06:50 |
| 21 | A. Right. | 14:06:50 |
| 22 | Q. ███████████████████████ | 14:06:56 |
| 23 | █████████████████████████████ | 14:07:03 |
| 24 | MR. KIM: Objection; form. | 14:07:06 |
| 25 | THE WITNESS: ████████████████ | 14:07:09 |

Page 120

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ██████████████████████████████████    ███████

     ██████████████████████████████        ███████

     ██████████████████████████████████    ███████

     ██████████████████████████████████    ███████

     █████   ██████████████████████████    ███████

     ████████████████████████████████

     ████████████████                      14:07:36

 8   BY MR. JAFFE:

 9       Q.   The theta column here, what does that tell    14:07:42

10   us?                                                    14:07:42

11       A.   That tells us, relative to some zero angle on 14:07:50

12   this board, which we can presume is either vertical or 14:07:55

13   horizontal, the ideal placement angle for the laser    14:08:00

14   diode on the board.                                    14:08:02

15       Q.   We're just talking about A again, Board A.    14:08:11

16           Which is the ████████████████    ███████

             ████████████████████            14:08:22

18       A.   As the light is projected out past the       14:08:26

19   sensor, the █████████████████████        14:08:32

20       Q.   All right.  Am I correct then that ██████     ███████

             ████████████████████████         14:08:44

22       A.   Yes, that's correct.                         14:08:45

23       Q.   Okay.  So is it fair to say that ████████     ███████

     █████████████████████████████████        ███████

     ████████████████                         14:09:01

                                   Page  121
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    In this coordinate system, that's true. | 14:09:04 |
| 2 | Q.    Referring to Board A, the diodes go from -- | 14:09:15 |
| 3 | ███████████████████████████████████████████ | ████████ |
| | ███████████████████████████████████████████ | 14:09:23 |
| 5 | A.    Yes. | 14:09:23 |
| 6 | Q.    Okay. | 14:09:27 |
| 7 | MR. JAFFE:  So what I'd like to do is mark as a | 14:09:36 |
| 8 | new exhibit Exhibit 156. | 14:09:41 |
| 9 | (Plaintiff's Exhibit 156 was marked.) | 14:10:07 |
| 10 | BY MR. JAFFE: | |
| 11 | Q.    I'm going to hand you a calculator as well. | 14:10:10 |
| 12 | A.    Okay. | 14:10:11 |
| 13 | Q.    So what we have here is a reproduction, if we | 14:10:17 |
| 14 | cut and paste correctly, which I think that we did, of | 14:10:21 |
| 15 | the data that's here for Board A in Exhibit B to your | 14:10:27 |
| 16 | declaration.  And you can see on the right that I've | 14:10:33 |
| 17 | left open something called delta Y. | 14:10:36 |
| 18 | A.    Yes. | 14:10:37 |
| 19 | Q.    Do you see that? | 14:10:38 |
| 20 | A.    Yes. | 14:10:38 |
| 21 | Q.    And do you understand what I'm trying to | 14:10:41 |
| 22 | refer to here by "delta Y"? | 14:10:43 |
| 23 | A.    Yes.  I'll go ahead and identify what I | 14:10:46 |
| 24 | believe you intend by "delta Y." | 14:10:48 |
| 25 | Q.    But before you do, I will tell you exactly | 14:10:50 |

Page 122

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    starting one, so that can be blank.  And you can start    14:12:07

 2    from the next one.

 3        A.    Perfect.  So I will calculate these.           14:12:11

 4            (Witness performs calculations.)                 14:12:11

 5        A.    Okay.                                          14:16:45

 6        Q.    Thank you.  You're handing this to me for me   14:16:48

 7    to look at.  All right.  I'm going to hand it back to    14:16:59

 8    you.                                                     14:16:59

 9            Exhibit 156 now reflects you've penciled in      14:17:03

10    the delta Y here.                                        14:17:07

11            In looking at this completed table, would you    14:17:13

12    agree that the delta Y values ███████████████     ████████

██    ███████████████████████████████████              14:17:24

14        MR. KIM:  Objection; form.                           14:17:24

15        THE WITNESS:  Yes, I would agree that the delta Y    14:17:31

16    values ████████████████████████████████           ████████

██    █████████████████████████████████                14:17:41

██    ████████                                         14:17:41

19    BY MR. JAFFE:                                            14:17:41

20        Q.    Okay.  In other words, ██████████████     ████████

██    ███████████████████████████████████              ████████

██    █████████████████                                14:17:52

23        MR. KIM:  Objection; form.                           14:17:55

24        THE WITNESS:  It's true, the delta Y, ██████████     ████████

██    █████████████████████████████████                14:18:01
```

Page 124

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1    ███████████████████████████████  --

2        THE REPORTER:  I'm sorry, I'm sorry.  It's

3    true . . .

4        THE WITNESS:  ████████████████  ████████

     ██████████████████████████████████  ████████

     █████████████████████████████████  ████████

     ████████████████████████████  14:18:24

8    BY MR. JAFFE:                    14:18:24

9        Q.   And as we talked about before, as the   14:18:30

10   █████████████████████████████  ████████

     ████████████████████████████  ████████

     ████████████████  right?         14:18:41

13       MR. KIM:  Objection; form.    14:18:43

14       THE WITNESS:  Yes, we agreed -- I agree that the   14:18:46

15   ████████████████████████████████  ████████

     ██████████████████████████████  ████████

     ███████████████████████████  14:19:01

18   BY MR. JAFFE:                    14:19:01

19       Q.   So referring to this ██████████, you   14:19:05

20   would agree that ██████████████████████  ████████

     █████████████████████████████  ████████

     █████████████████████████████  ████████

     ████████████████████████████  ████████

     ███████████████████  14:19:20

25       MR. KIM:  Objection; form.    14:19:25

                                    Page 125

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        THE WITNESS:  Yes.                          14:19:25

 2   BY MR. JAFFE:

 3        Q.   Okay.  You can put that aside, please.  14:19:30

 4             We talked about Max Levandowski earlier.  You  14:19:36

 5   said he was on your team.                        14:19:38

 6        A.   Yes.                                    14:19:40

 7        Q.   What does he do?                        14:19:41

 8        A.   He's a mechanical engineer.  He designs the  14:19:47

 9   optical cavity that the lenses and the lasers and  14:19:52

10   detector boards attach to.                       14:19:55

11        Q.   Is what is his LiDAR experience?        14:19:58

12        A.   I am not aware of any LiDAR experience prior  14:20:01

13   to working for Otto and Uber.                    14:20:04

14        Q.   Did he know a lot about LiDAR when he   14:20:07

15   started?                                         14:20:07

16        MR. KIM:  Objection; form.                  14:20:08

17        THE WITNESS:  I don't know.                 14:20:09

18   BY MR. JAFFE:                                    14:20:09

19        Q.   He works for you; right?               14:20:10

20        A.   He works for me.  He worked for Otto before I  14:20:14

21   joined.                                          14:20:15

22        Q.   When you joined, did he -- was he      14:20:18

23   sufficiently educated about how LiDAR works?     14:20:21

24        MR. KIM:  Objection; form.                  14:20:22

25        THE WITNESS:  He seemed sufficiently educated as a  14:20:26
```

Page 126

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | mechanical engineer. | 14:20:27 |
| 2 | BY MR. JAFFE: | 14:20:27 |
| 3 | Q.   So that wasn't really my question. | 14:20:29 |
| 4 | A.   Yes. | 14:20:30 |
| 5 | Q.   So -- | 14:20:31 |
| 6 | A.   I didn't quiz him on his LiDAR expertise, but | 14:20:35 |
| 7 | at the same time, I'll grant you that I was not aware | 14:20:38 |
| 8 | of any LiDAR expertise in his background prior to | 14:20:42 |
| 9 | Otto. | 14:20:43 |
| 10 | Q.   Why -- well, actually, let me back up. | 14:20:58 |
| 11 | Do you know if Max Levandowski and Anthony | 14:21:01 |
| 12 | Levandowski are -- they're brothers; right? | 14:21:04 |
| 13 | A.   That's my understanding. | 14:21:05 |
| 14 | Q.   Do you know if they're close? | 14:21:07 |
| 15 | MR. KIM:  Objection; form. | 14:21:08 |
| 16 | THE WITNESS:  I don't know how close they are. | 14:21:12 |
| 17 | BY MR. JAFFE: | 14:21:12 |
| 18 | Q.   Do you know about any conversations that they | 14:21:13 |
| 19 | had regarding LiDAR? | |
| 20 | MR. KIM:  Same objection. | 14:21:14 |
| 21 | THE WITNESS:  No. | 14:21:15 |
| 22 | BY MR. JAFFE: | 14:21:15 |
| 23 | Q.   And what does Max Levandowski -- excuse me -- | 14:21:17 |
| 24 | do at Otto today? | 14:21:23 |
| 25 | A.   At Uber today? | 14:21:25 |

Page 127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   (Nods head affirmatively.)              14:21:25

 2      A.   He continues to be the mechanical engineer   14:21:29

 3  responsible for designing the optical cavity that     14:21:32

 4  mounts the lenses, the laser transmit block and the   14:21:36

 5  receiver boards.                                       14:21:37

 6      Q.   Did he come up with the optical cavity design  14:21:41

 7  for Fuji?                                              14:21:42

 8      A.   In as much as that responsibility refers    14:21:50

 9  to --                                                  14:21:50

10      MR. KIM:  Objection; form.                         14:21:53

11      THE REPORTER:  I'm sorry.                           14:21:53

12      THE WITNESS:  Inasmuch as that responsibility       14:21:55

13  refers to designing a mechanical housing, yes.  He      14:22:01

14  designed that for Fuji.                                14:22:02

15  BY MR. JAFFE:                                          14:22:02

16      Q.   Who came up with the optical cavity design    14:22:05

17  for Fuji?                                              14:22:06

18      MR. KIM:  Objection; form.                         14:22:11

19      THE WITNESS:  The optical cavity design for Fuji    14:22:14

20  is related to the lens and the lens requirements.  So  14:22:19

21  Gaetan plays a responsibility for that.  As a          14:22:23

22  mechanical element in terms of mounting and housing    14:22:27

23  those features, those components, Max Levandowski is    14:22:29

24  responsible for that aspect.                           14:22:31

25  BY MR. JAFFE:                                          14:22:31
```

Page 128

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   So it's Mr. Pennecot and Mr. Max Levandowski    14:22:34

2    who came up with the optical cavity design for Fuji;    14:22:39

3    is that fair?    14:22:40

4    MR. KIM:   Objection; form.    14:22:40

5    THE WITNESS:   My hesitancy is I'm trying to decide    14:22:51

6    in my mind whether the transmit and receive components    14:22:54

7    also play a part -- are considered part of the optical    14:23:00

8    cavity.   I think they fairly should be considered part    

9    of the optical cavity.    

10        So then I also add Will Treichler, Florin    14:23:05

11   Ignatescu contributing to the design of the    14:23:09

12   optical cavity for the Fuji, or coming up with it.    14:23:13

13   I would claim some responsibility as well because    14:23:22

14   I'm looking at the designs that these engineers    14:23:25

15   are generating.   I could have contributed some    14:23:28

16   aspect as well.    14:23:30

17   BY MR. JAFFE:    14:23:30

18        Q.   You could have or you did?    14:23:31

19        A.   I'm sure I had some influence, yes.    14:23:35

20        Q.   Going back to Max Levandowski, do you    14:23:43

21   know -- he and Anthony, do they live together?    14:23:46

22        A.   I don't know.    14:23:48

23        Q.   Do you know how much time they spend together    14:23:52

24   outside of the office?    14:23:53

25        A.   I don't know that.    14:23:54

Page 129

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    and Otto were already talking at this time?        14:37:43
 2         A.    Yes.   Then this would be indicative of their  14:37:48
 3    discussion.                                         14:37:48
 4         Q.    Okay.   So going back to page 10.        14:37:53
 5         A.    Yes.                                      14:37:54
 6         Q.    Do you see there's a section entitled, ███  ████
      ███                                                14:38:04
 8         A.    Yes.                                      14:38:06
 9         ███ ███████████████████████████████            14:38:09
10         A.    No, I'm not familiar with this page.     14:38:11
11         Q.    So you're -- well, you said you're not   14:38:15
12    familiar with this page.   I'm referring --         14:38:16
13              Are you familiar with ████████████  █████  14:38:22
      ███ ██████████████████████                          14:38:22
15         A.    So I was not aware of this design, especially  14:38:41
16    with this date.   No, I'm not familiar with this    14:38:45
17    design, actually.                                   14:38:46
18         Q.    Do you know what the ████████ referred to  14:38:48
19    here refers to?                                     14:38:49
20         A.    To my knowledge, the term ████████ has   14:38:55
21    been applied to be synonymous, more or less, with an  14:38:59
22    optical cavity.                                     14:39:00
23         Q.    Do you know whether Mr. Levandowski had any  14:39:06
24    input into this ████████                            14:39:09
25         A.    I don't know.                            14:39:09
```

Page 140

1       Q.   In this concept here, you would agree that        14:39:18

2    the PCBs are arranged along a straight-edge board?        14:39:25

3       MR. KIM:  Objection; form.                             14:39:26

4       THE WITNESS:  No, that's -- this appears to be a       14:39:29

5    schematic, and it doesn't tell me anything about the      14:39:32

6    plan view of the board.                                   14:39:34

7    BY MR. JAFFE:                                             14:39:34

8       Q.   Would you agree that the -- what apparently       14:39:41

9    are the emitters are ████████████████                     14:39:44

10      MR. KIM:  Objection; form.                             14:39:48

11      THE WITNESS:  Let me see.                              14:39:49

12         (Witness reviews document.)

13      THE WITNESS:  It's not clear if they are ██████   ████████

██    ██████  They look ██████████  from what's          14:39:59

15   clearly a simple type of PowerPoint graphic, but it's    14:40:06

16   not clear if they say one degree native if they could    14:40:10

17   actually achieve ████████████████████████          ██████

██    ████████████████████████████████              14:40:17

19   BY MR. JAFFE:

20      Q.   The last bullet says, ███████████████████   ████████

██    ██████████████████████                        14:40:23

22         Do you see that?                                   14:40:24

23      A.   I see that.                                      14:40:24

24      Q.   What does ████████████████ refer to there?       14:40:27

25      MR. KIM:  Objection; form.                            14:40:28

                                            Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        THE WITNESS:  I can't be sure what was meant        14:40:31
2   exactly; but given what I know, ███████████    ████████
▮   ██████████████████████████████████████████████.        14:40:40
4   BY MR. JAFFE:                                            14:40:40
5        Q.   We're talking about the Y delta again?         14:40:43
6        MR. KIM:  Objection; form.                          14:40:43
7        THE WITNESS:  Not necessarily.                      14:40:45
8   BY MR. JAFFE:                                            14:40:45
9        Q.   You said, "Not necessarily."                   14:40:47
10        What do you mean by that?                          14:40:48
11        A.   My guess would have been angular spacing.     14:40:52
12        Q.   In the top part of this page, it talks about  14:41:06
13   ████████████████ █████████████████████████   ████████
▮   █████████████████                                        14:41:12
15        A.   I see that.                                    14:41:14
16        Q.   That's the ████████████; right?               14:41:17
17        A.   Yes.                                           14:41:19
18        Q.   ███████████████████████████████████████       14:41:24
19   this is different than the Fuji design; right?           14:41:27
20        MR. KIM:  Objection; form.                          14:41:32
21        THE WITNESS:  There's not a lot of detail in here;  14:41:35
22   but it's not the Fuji design yet, that's for sure.       14:41:39
23   BY MR. JAFFE:                                            14:41:39
24        Q.   And you helped start the Fuji project, and    14:41:41
25   you're not familiar with this Plan B at all; right?      14:41:44
```

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Right. | 14:41:44 |
| 2 | Q.   So to your knowledge, what's described here | 14:41:48 |
| 3 | as Plan B isn't the basis for the Fuji design? | 14:41:52 |
| 4 | MR. KIM:  Objection; form. | 14:41:55 |
| 5 | THE WITNESS:  I am not aware of a link between | 14:41:59 |
| 6 | this Plan B in this document and the Fuji design. | 14:42:04 |
| 7 | BY MR. JAFFE: | 14:42:04 |
| 8 | Q.   And you would be in a position to know; | 14:42:08 |
| 9 | right? | 14:42:09 |
| 10 | MR. KIM:  Objection; form. | 14:42:11 |
| 11 | THE WITNESS:  I would have to make that | 14:42:13 |
| 12 | presumption.  And it's just a presumption. | 14:42:15 |
| 13 | BY MR. JAFFE: | 14:42:15 |
| 14 | Q.   In your job, you would be in a position to | 14:42:18 |
| 15 | know that; right? | 14:42:18 |
| 16 | MR. KIM:  Objection; form. | 14:42:25 |
| 17 | THE WITNESS:  I would expect to know that. | 14:42:26 |
| 18 | MR. JAFFE:  Let's take a break. | 14:42:32 |
| 19 | THE VIDEOGRAPHER:  We are off the record at 2:42 | 14:42:36 |
| 20 | p.m. | 14:42:36 |
| 21 | (Recess taken.) | 14:42:36 |
| 22 | THE VIDEOGRAPHER:  We are back on the record at | 14:55:55 |
| 23 | 2:56 p.m. | 14:55:57 |
| 24 | BY MR. JAFFE: | 14:55:57 |
| 25 | Q.   Have you discussed the subject matter of your | 14:56:03 |

Page 143

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    testimony during any of the breaks today?            14:56:05

2        A.   Nothing in terms of like what we said in this  14:56:10

3    testimony.                                           14:56:11

4        Q.   What does that mean?                        14:56:13

5        A.   That means the legal team may have advised me  14:56:19

6    on procedural matters, general terms without        14:56:23

7    referencing the actual content of our discussion.   14:56:26

8        Q.   What did they tell you?                     14:56:27

9        MR. KIM:  Objection.                             14:56:27

10            Going to instruct you not to answer on the  14:56:31

11   grounds of attorney-client privilege.               14:56:33

12   BY MR. JAFFE:                                        14:56:33

13       Q.   Did your legal team tell you how to testify  14:56:36

14   after these meetings?                                14:56:37

15       MR. KIM:  You can answer that yes or no.         14:56:39

16       THE WITNESS:  Could you be clear by what you mean  14:56:41

17   by "how to testify"?                                 14:56:42

18   BY MR. JAFFE:                                        14:56:42

19       Q.   I don't think I can be any clearer.         14:56:46

20       A.   Like what to say?                           14:56:47

21       Q.   I'm trying to understand what the legal team  14:56:51

22   told you in terms of general terms, procedural      14:56:55

23   matters, which is what you said.                     14:56:57

24            What did they tell you?                     14:56:58

25       MR. KIM:  Instruct you not to reveal any         14:57:00
```

                                                    Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | privileged conversations. | 14:57:11 |
| 2 | THE WITNESS:  Are you instructing me not to | 14:57:13 |
| 3 | answer? | 14:57:14 |
| 4 | MR. KIM:  You can answer his prior question yes or | 14:57:17 |
| 5 | no. | 14:57:17 |
| 6 | THE WITNESS:  If your question is, did they tell | 14:57:24 |
| 7 | me what to say, no.  Did they tell me how to testify, | 14:57:28 |
| 8 | no. | 14:57:29 |
| 9 | BY MR. JAFFE: | 14:57:29 |
| 10 | Q.   When you said that they told you things about | 14:57:31 |
| 11 | general things and procedural considerations, what | 14:57:34 |
| 12 | general things did they tell you? | 14:57:37 |
| 13 | MR. KIM:  I'm going to instruct you not to answer | 14:57:39 |
| 14 | on the grounds of attorney-client privilege. | 14:57:40 |
| 15 | BY MR. JAFFE: | 14:57:40 |
| 16 | Q.   What procedural -- what general terms about | 14:57:42 |
| 17 | your testimony did they tell you? | 14:57:45 |
| 18 | A.   Let's see.  We discussed how much time is | 14:57:52 |
| 19 | left, something called redirect. | 14:57:59 |
| 20 | Q.   What did they talk to you about redirect? | 14:58:01 |
| 21 | MR. KIM:  And I'm going to instruct you not to | 14:58:05 |
| 22 | reveal any attorney-client privileged conversations. | 14:58:09 |
| 23 | And I don't think you can answer that without doing | 14:58:11 |
| 24 | so.  I'm going to instruct you not to answer. | 14:58:14 |
| 25 | BY MR. JAFFE: | 14:58:14 |

Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.   You talked about redirect on a break?  Yes or    14:58:21

2    no?                                                       14:58:21

3       A.   Yes, we talked about the term "redirect."         14:58:24

4       Q.   And what did you talk about redirect?             14:58:28

5       A.   That is a situation where, instead of you,        14:58:33

6    the lawyer on my side of the table is going to ask me     14:58:36

7    questions.                                                 14:58:36

8       Q.   And how did redirect come up in the context      14:58:39

9    of your conversation?                                      14:58:40

10      A.   In the context of time remaining and that         14:58:45

11   redirect would occur after your allotted time has         14:58:49

12   ended, so it's going to take longer than I might          14:58:54

13   think.                                                     14:58:54

14      Q.   Did Uber's lawyers tell you that they were        14:58:58

15   going to do redirect questions?                            14:59:00

16      A.   Yes.                                               14:59:02

17      Q.   And did they tell you what those questions        14:59:04

18   were going to be about?                                    14:59:06

19      A.   No.                                                14:59:07

20      Q.   Did you talk at all about what sort of            14:59:11

21   redirect would happen?                                     14:59:13

22      A.   No.                                                14:59:16

23      Q.   What did you talk about about redirect?           14:59:19

24      A.   That they will ask me questions just like you     14:59:24

25   ask me questions and that it's going to take longer       14:59:27

Page 146

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | than the hour, approximately, that we have remaining, | 14:59:30 |
| 2 | so not to expect it to be over at that time. | 14:59:34 |
| 3 | Q.   What else, in general terms, did you and your | 14:59:36 |
| 4 | lawyers talk about on the breaks? | 14:59:38 |
| 5 | MR. KIM:  I'm going to advise you not to reveal | 14:59:46 |
| 6 | any attorney-client privileged communications. | 14:59:49 |
| 7 | THE WITNESS:  So I'm not a lawyer.  I don't know | 14:59:55 |
| 8 | what is considered attorney-client privilege and what | 14:59:58 |
| 9 | wouldn't be in that context of conversations, so I | 15:00:01 |
| 10 | need to be careful not to answer and disclose | 15:00:03 |
| 11 | something I'm not supposed to say. | 15:00:06 |
| 12 | MR. KIM:  Do you need to consult with me about a | 15:00:09 |
| 13 | privilege issue? | 15:00:09 |
| 14 | THE WITNESS:  Yes, that would help. | 15:00:12 |
| 15 | MR. KIM:  Can we go off the record so he can | 15:00:15 |
| 16 | consult with me on a privilege issue before he answers | 15:00:18 |
| 17 | any further questions about what we discussed? | 15:00:20 |
| 18 | MR. JAFFE:  I'll withdraw the question and I'll | 15:00:22 |
| 19 | ask a different question. | 15:00:23 |
| 20 | BY MR. JAFFE: | 15:00:23 |
| 21 | Q.   Tell me the substance of your private | 15:00:26 |
| 22 | conferences -- private conferences during the break | 15:00:28 |
| 23 | that you had with Uber's lawyers, all of it. | 15:00:32 |
| 24 | MR. KIM:  I'm going to object on the grounds of | 15:00:36 |
| 25 | privilege. | 15:00:37 |

Page 147

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. JAFFE:  Are you instructing him not to answer? | 15:00:41 |
| 2 | MR. KIM:  Instruct him not to answer. | 15:00:42 |
| 3 | MR. JAFFE:  Okay.  I think you know that's | 15:00:47 |
| 4 | directly contrary to Judge Alsup's order. | 15:00:50 |
| 5 | MR. KIM:  Can you clarify that. | 15:00:53 |
| 6 | MR. JAFFE:  Judge Alsup's order says no private | 15:00:56 |
| 7 | conferences after testimony begins. | 15:00:58 |
| 8 | MR. KIM:  He's testified that we haven't had any | 15:01:01 |
| 9 | private conferences about his testimony. | 15:01:03 |
| 10 | MR. JAFFE:  The record speaks for itself.  You | 15:01:06 |
| 11 | instructed him not to answer.  I'm going to move on. | 15:01:09 |
| 12 | This is going to be Exhibit 158.  It's a | 15:01:15 |
| 13 | document entitled UBER00012240. | 15:01:19 |
| 14 | (Plaintiff's Exhibit 158 was marked.) | 15:01:37 |
| 15 | BY MR. JAFFE: | 15:01:37 |
| 16 | Q.   This is an e-mail from earlier in March of | 15:01:40 |
| 17 | this year; right -- excuse me, April. | 15:01:47 |
| 18 | A.   Thank you.  Yes. | 15:01:48 |
| 19 | Q.   And on this e-mail is yourself, Anthony | 15:01:53 |
| 20 | Levandowski, Claire Delaunay and Eric Meyhofer; right? | 15:01:57 |
| 21 | A.   Yes. | 15:01:59 |
| 22 | Q.   What is Claire Delaunay's role at Uber? | 15:02:06 |
| 23 | A.   She's a software engineer or software | 15:02:08 |
| 24 | engineering manager. | 15:02:10 |
| 25 | Q.   And there's -- on the "To" line, it says, | 15:02:13 |

Page 148

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ████████████████████                    15:02:15

 2        Do you see that?                    15:02:17

 3   A.   I see that.                         15:02:19

 4   Q.   Why does it say ████████ there?     15:02:23

 5   A.   I don't know.                       15:02:23

 6   Q.   And you said, ████ -- so referring to the   15:02:28

 7   substance of the e-mail that you wrote, you said,   15:02:30

 8   ████  █████████████                      15:02:32

 9        What are you referring to?          15:02:33

10   A.   I referred to this web link.  I can't   15:02:42

11   remember right now what I was looking at. ████  ███████   15:02:54

██   █████████████████████████████            15:02:54

13        This could be a LiDAR sensor, but clicking on   15:02:59

14   the web link would make it very clear what this was.   15:03:03

15   Q.   ████████████ that's Anthony Levandowski's   15:03:20

16   address; right?                          15:03:20

17   A.   I believe it is, yes.               15:03:20

18   Q.   So someone had in their address book Anthony   15:03:25

19   Levandowski's e-mail address, but the name was just   15:03:29

20   ████████████                             15:03:31

21   A.   Apparently.                         15:03:31

22   Q.   Did you notice that when you received this   15:03:36

23   e-mail?                                  15:03:36

24   A.   No, I did not.                      15:03:38

25   Q.   Are you aware of whether Mr. Levandowski   15:03:40
```

Page 149

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    consulted for Uber?                                 15:03:45

 2        A.   No.  Consulted, no.                        15:03:48

 3        Q.   Okay.  You can put that aside.             15:04:04

 4             This has been previously marked as Exhibit 15:04:18

 5    60.  So if you can go to 85 -- oh, this is the wrong 15:04:37

 6    doc.                                                15:04:37

 7             Going back in time, there's an e-mail from -- 15:04:52

 8    Scott Boehmke wrote, ████████████████████  ████████ 15:05:00

      ████████████████████████████████████              15:05:00

10             Do you see that?  It's on the last page.   15:05:03

11             (Witness reviews document.)                15:05:14

12        A.   Okay.  I see that.                         15:05:16

13        Q.   Do you know what the "doc" being referred to 15:05:19

14    here is?                                            15:05:20

15        MR. KIM:  Objection; form.                      15:05:26

16        THE WITNESS:  No.  I don't know what the doc was. 15:05:35

17    BY MR. JAFFE:                                       15:05:35

18        Q.   And then in the next e-mail in time, you were 15:05:47

19    added to the thread.                                15:05:54

20             Do you see that?                           15:05:55

21        A.   Yes.                                       15:05:58

22        Q.   Do you remember being added to this e-mail 15:06:01

23    thread?                                             15:06:02

24        A.   Remember?  This dates back pretty far.  I  15:06:09

25    don't remember.  About a year ago.                  15:06:11
```

Page 150

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   But at this time, immediately when you were     15:06:20

 2   involved, Mr. Boehmke and Mr. Levandowski were having    15:06:26

 3   LiDAR-related discussions; right?                        15:06:31

 4      MR. KIM:  Objection; form.                            15:06:38

 5      THE WITNESS:  It's not -- it's not clear, when it     15:06:40

 6   says, ██████████████████████████████████  ████████████  15:06:49

 7   ████████  meant Scott and Anthony or Scott and somebody  15:06:49

 8   else, so I don't know.                                   15:06:50

 9   BY MR. JAFFE:                                            15:06:50

10      Q.   Do you think that's ambiguous?                   15:06:52

11      A.   I think that's ambiguous.                        15:06:54

12      MR. JAFFE:  You can set that aside.                   15:07:11

13           We're on 158?                                    15:07:13

14      THE REPORTER:  159.                                   15:07:15

15      MR. JAFFE:  Get it right one of these times.          15:07:18

16           (Plaintiff's Exhibit 159 was marked.)           15:07:35

17   BY MR. JAFFE:                                            15:07:35

18      Q.   In June of 2016, you were working at Otto;       15:07:39

19   right?                                                   15:07:39

20      A.   Yes.                                             15:07:41

21      Q.   And do you see, in the second e-mail, there's    15:07:43

22   ██████████████████████████  [sic]?                      15:07:47

23           Do you see that?                                 15:07:50

24      A.   Yes.                                             15:07:50

25      Q.   What is that e-mail list?                        15:07:54
```

Page 151

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    That should be the list of Otto LiDAR     15:07:59

 2   development employees.                             15:08:00

 3      Q.    Who's on that -- well, Mr. Levandowski is on  15:08:01

 4   that list; right?                                 15:08:02

 5      A.    Okay.                                     15:08:03

 6      Q.    I'm asking you.                           15:08:03

 7      A.    I don't know if he's on that list.        15:08:05

 8      Q.    Well, this e-mail indicates -- because he  15:08:08

 9   forwarded an e-mail to that list -- to Mr. Boehmke, it  15:08:11

10   indicates that he's on that list.  You would agree  15:08:14

11   with that; right?                                 15:08:15

12            (Witness reviews document.)              15:08:23

13      A.    Yeah, seems that way.                     15:08:28

14      Q.    So Mr. Levandowski is on the e-mail LISTSERV  15:08:34

15   for the LiDAR development team; right?            15:08:36

16      A.    He may have been, yes.                    15:08:39

17      Q.    He was?                                   15:08:39

18      A.    Okay.                                     15:08:41

19      Q.    No, I'm asking you.                       15:08:42

20            He was; right?                            15:08:42

21      A.    It appears from this e-mail chain, assuming  15:08:45

22   there's nothing deleted from it, that he would have  15:08:48

23   got it from the chain and continued it on.        15:08:51

24      Q.    Let me ask you:  Do you have any personal  15:08:54

25   knowledge whether Mr. Levandowski was on this e-mail  15:08:56
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | list or not? | 15:08:57 |
| 2 | A.   I don't recall if he was on the list or not. | 15:09:00 |
| 3 | Q.   Okay.  So sitting here today, you have no | 15:09:02 |
| 4 | personal knowledge whether Mr. Levandowski was on the | 15:09:04 |
| 5 | laser-dev e-mail list; right? | 15:09:07 |
| 6 | A.   Sitting here right now, I don't remember if | 15:09:10 |
| 7 | he was on the list. | 15:09:11 |
| 8 | Q.   Who else was on that list at this time that | 15:09:14 |
| 9 | you remember? | 15:09:15 |
| 10 | A.   I would assume it was the other people | 15:09:19 |
| 11 | developing the LiDAR sensors. | 15:09:21 |
| 12 | Q.   And who are those people? | 15:09:23 |
| 13 | A.   It would be -- to my expectation, people like | 15:09:28 |
| 14 | Gaetan, Dan Gruver, Daniel Ratner.  I don't know if | 15:09:38 |
| 15 | Radu was part of the company at the time.  Mike | 15:09:55 |
| 16 | Karasoff.  Probably Matt Palomar, Benjamin Becker. | 15:10:00 |
| 17 | That's all I can remember right now.  Certainly also | 15:10:22 |
| 18 | could have involved Anthony Levandowski for | 15:10:25 |
| 19 | informative purposes. | 15:10:27 |
| 20 | Q.   What about Max? | 15:10:28 |
| 21 | A.   I'm sorry.  Of course, Max Levandowski as | 15:10:30 |
| 22 | well.  Who else am I forgetting?  Refer back to my | 15:10:41 |
| 23 | list. | 15:10:42 |
| 24 | Q.   For the record, you're looking at Exhibit | 15:10:45 |
| 25 | 153; right? | 15:10:46 |

Page 153

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1         Where did the idea to do ███████████      ████████
 █    ███████████████████ come from in the Fuji mid-range   15:24:56
 3    transmit board design?                                15:24:58
 4       MR. KIM:  Objection; form.                         15:25:03
 5       THE WITNESS:  I think it's a mischaracterization   15:25:04
 6    to call it -- the vertical spacing as something that  15:25:08
 7    had an idea -- that had an origin as an idea.  The    15:25:12
 8    fact that ███████████████████████████████      ████████
 █    ███████████████████ is a side effect of the optics    15:25:21
10    in the optical cavity.                                15:25:24
11    BY MR. JAFFE:                                         15:25:24
12       Q.   So you can't tell me where it came from, who  15:25:26
13    came up with the idea?                                15:25:28
14       A.   I'm trying to explain -- I don't think        15:25:31
15    anybody had this idea to █████████████████████  ████████
 █    ███████████████████████████ on the laser board.      15:25:40
17    I believe that was a side effect that was unavoidable  15:25:46
18    when you take a set of vertical angles, especially if  15:25:51
19    they're nearly or equivalently spaced in terms of     15:25:56
20    angle, and project those onto a curved focal surface.  15:26:01
21       Q.   You said it's unavoidable.                    15:26:03
22            You worked at Velodyne; right?                15:26:05
23       A.   Yes.                                          15:26:05
24       Q.   You didn't do █████████████████████ at        15:26:09
25    Velodyne; right?                                      15:26:11
```

Page 163

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1        MR. KIM:  Objection; form.              15:26:12

 2   BY MR. JAFFE:                                 15:26:12

 3        Q.   In terms of the X and Y positions of the   15:26:15

 4   diodes?                                       15:26:15

 5        A.                                       15:26:20
```

```
24        Q.   Okay.  You worked at Velodyne; right?   15:27:28

25        A.   Yes.                                15:27:28
```

Page 164

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1       Q.    And you worked on LiDAR at Velodyne?        15:27:32

 2       A.    Yes.                                         15:27:32

 3   ███  ████████████████████████████████████████       ████████

     ███  ███████████████████████████████               ████████

     ███  ███  ████                                       ████████

     ███  ███  ████████████████████████████████████████  ████████

     ███  █████                                           ████████

     ███  ███  ████████████████████████████████████████  ████████

     ███  ███████████████████████  ██████████████████    ████████

     ███  ████████████████████████████████████████████   ████████

     ███  ████████████████████                            15:27:57

12       Q.    So I want to again go back to this idea of  15:28:20

13   where did the idea to do the vertical spacing design  15:28:23

14   in Fuji come from?  You've said -- you've mentioned   15:28:26

15   the things -- the drivers, but I haven't heard who    15:28:29

16   came up with the idea, where it came from.            15:28:32

17       A.    Again, you're referring, I believe, to a    15:28:34

18   linear vertical -- what we call delta Y; is that      15:28:37

19   correct?                                              15:28:38

20       Q.    Yes.                                         15:28:39

21       A.    I have to give you the same answer.  It was 15:28:43

22   not a concept that drove the design.  There was nobody 15:28:48

23   coming up with the idea to do that.  The idea for the 15:28:54

24   vertical angles I would attribute to Scott Boehmke.   15:28:58

25   The lens design I would attribute to Gaetan Pennecot. 15:29:01
```

Page 165

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | So what you end up with on the board at that point is | 15:29:06 |
| 2 | just derived from those pieces of information. | 15:29:10 |
| 3 | Q.   So talking about the angles, you said when | 15:29:13 |
| 4 | you were at Velodyne, you did constant angles. | 15:29:17 |
| 5 | A.   Yes. | 15:29:17 |
| 6 | Q.   Why didn't you want to get ███████████ | ███████ |
| | ████████████████████ when you were working at | 15:29:26 |
| 8 | Velodyne? | 15:29:27 |
| 9 | A.   I don't know. | 15:29:28 |
| 10 | Q.   You guys didn't come up with that?  You | 15:29:31 |
| 11 | didn't think of that idea? | 15:29:33 |
| 12 | ██ ██████ ██████████████████ | ██████ |
| | █████████████████████████████████████ | ██████ |
| | █████████████████████████████████████ | ██████ |
| | ████████ ████████████████████ | ██████ |
| | █████████ | 15:29:50 |
| 17 | Q.   It not something that you guys considered, | 15:29:54 |
| 18 | which is you want ████████████████████ as you | 15:29:59 |
| 19 | go down the road? | 15:30:00 |
| 20 | A.   ██████████████████████ | 15:30:00 |
| 21 | Q.   Yes. | 15:30:01 |
| 22 | A.   That was the design that Velodyne ended up | 15:30:04 |
| 23 | with -- | 15:30:05 |
| 24 | Q.   Sorry. | 15:30:05 |
| 25 | A.   -- still 32. | |

Page 166

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        THE WITNESS:  ████████████████████    ████████

 ▮    ████████████████████████████████    ████████

 ▮    ████████████                         15:39:47

 4    BY MR. JAFFE:                         15:39:47

 5        ██    ████████████████████       ████████

 ▮    ████████████████████████████████     15:39:55

 ▮    ████████████████                     15:39:55

 8        MR. KIM:  Objection; form.        15:39:56

 9        THE WITNESS:  No, I'm sorry.  Could you be more  15:40:04

10    specific in your question.  I'm confused.  15:40:07

11    BY MR. JAFFE:                         15:40:07

12        Q.    Because I'm short on time, I'll just skip  15:40:10

13    that.

14            Here in this e-mail, these are early 905  15:40:13

15    nanometer discussions.                 15:40:15

16        A.    Yes.

17        Q.    And you wrote,  ████████████    ████████

 ▮    ████████████████████████████████    ████████

 ▮    ████████████                         15:40:23

20            Do you see that?               15:40:25

21        A.    Yes.                         15:40:25

22        Q.    So at the time of this e-mail, October 28th,  15:40:30

23    you had the idea of  ████████████████  15:40:35

24        A.    Yes.                         15:40:35

25        Q.    So at this point, in October, you didn't  15:40:38
```

Page 173

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    actually have the idea of ████████████████        ██████████
█                ████████████████                      15:40:44
3        A.    True.                                   15:40:45
4        Q.    So this is not evidence of -- this e-mail is  15:40:50
5    not indicative of you coming up with the ████████  ██████████
█                ████████████████████████ right?       15:41:00
7        MR. KIM:  Objection; form.                    15:41:01
8        THE WITNESS:  This is not indicative of the -- or  15:41:04
9    this is not evidential to the ████████████████    ██████████
█                ████████████████████████████          15:41:12
11   BY MR. JAFFE:                                      15:41:12
12       Q.    And what you were thinking on October 26th  15:41:14
13   [sic] is ████████████████████████████; right?     15:41:18
14       A.    Yes, on October 28th.                    15:41:20
15       Q.    Okay.                                    15:41:40
16       MR. KIM:  Jordan, are you wrapping up?         15:41:40
17       MR. JAFFE:  I only have a few more minutes, so I  15:41:43
18   think I'm wrapping up.                             15:41:45
19       MR. KIM:  I think we've got one.               15:41:47
20   BY MR. JAFFE:                                      15:41:47
21       Q.    What documents are you aware of that would  15:42:04
22   show Anthony -- all of Anthony Levandowski's input  15:42:08
23   into Uber and Otto's LiDAR designs?                15:42:12
24       MR. KIM:  Objection; form.                     15:42:14
25       THE WITNESS:  I'm not aware of a list of documents  15:42:17
```

Page 174

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   or a source for documents to go to to document all of    15:42:20

 2   his influence.                                           15:42:21

 3   BY MR. JAFFE:                                            15:42:21

 4       Q.   How would you find out about how               15:42:25

 5   Mr. Levandowski has influenced LiDAR design at Uber      15:42:30

 6   and Otto?                                                15:42:31

 7       MR. KIM:  Objection; form.                           15:42:41

 8       THE WITNESS:  That's difficult.                      15:42:42

 9   BY MR. JAFFE:                                            15:42:42

10       Q.   Why?                                            15:42:44

11       A.   When you're looking for all of something and   15:42:49

12   you need to miss nothing, that's not an easy problem     15:42:53

13   to solve.  If you look at all the possible sources of    15:42:58

14   influence, I'm not sure they would all be documented.    15:43:01

15       Q.   How would you go about trying to find out as    15:43:04

16   much as you could about how Mr. Levandowski has had      15:43:08

17   input into Uber and Otto's LiDAR designs?                15:43:13

18       MR. KIM:  Objection; form.                           15:43:16

19       THE WITNESS:  I suppose I would talk to the          15:43:18

20   various engineers that had LiDAR responsibilities.       15:43:21

21   BY MR. JAFFE:                                            15:43:21

22       Q.   Who?                                            15:43:22

23       A.   Shall we pick up --                             15:43:31

24       Q.   Would you talk to everyone on this list?  Is    15:43:32

25   that the idea?                                           15:43:33
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I suppose, yeah, if I'm trying not to miss | 15:43:37 |
| 2 | anything. | 15:43:37 |
| 3 | Q.   Where would you look for documents? | 15:43:41 |
| 4 | A.   I suppose e-mail. | 15:43:43 |
| 5 | MR. KIM:  Can we have the time on the record, | 15:43:45 |
| 6 | please. | 15:43:48 |
| 7 | THE VIDEOGRAPHER:  3 hours and 59 minutes. | 15:43:52 |
| 8 | MR. KIM:  Thanks. | 15:43:53 |
| 9 | THE WITNESS:  I said e-mail. | 15:43:55 |
| 10 | BY MR. JAFFE: | 15:43:55 |
| 11 | Q.   Anything else? | 15:43:56 |
| 12 | A.   Not that occurs to me. | 15:43:59 |
| 13 | Q.   So if you wanted to figure out as much as you | 15:44:03 |
| 14 | could about Mr. Levandowski's input into Uber and Otto | 15:44:08 |
| 15 | LiDAR, you would talk to everyone on the LiDAR team | 15:44:11 |
| 16 | and you would look at Mr. Levandowski's e-mail and | 15:44:15 |
| 17 | everyone else's e-mail; is that fair? | 15:44:17 |
| 18 | MR. KIM:  Objection; form. | 15:44:20 |
| 19 | THE WITNESS:  I wouldn't look at everybody's | 15:44:23 |
| 20 | e-mail.  I would look at Anthony's e-mail because if | 15:44:26 |
| 21 | he's going to have an influence, I would expect it to | 15:44:27 |
| 22 | come from his account outward, and that's going to | 15:44:28 |
| 23 | limit the search. | 15:44:29 |
| 24 | BY MR. JAFFE: | |
| 25 | Q.   Is there any -- is there any other source of | 15:44:31 |

Page 176

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | documents that you would look at or data, anything? | 15:44:34 |
| 2 | MR. KIM:  Objection; form. | 15:44:35 |
| 3 | THE WITNESS:  I don't know.  I might look for | 15:44:48 |
| 4 | Google docs with his authorship. | 15:44:51 |
| 5 | BY MR. JAFFE: | 15:44:51 |
| 6 | Q.   Anything else? | 15:44:55 |
| 7 | A.   No. | 15:44:56 |
| 8 | Q.   Okay. | 15:44:56 |
| 9 | MR. JAFFE:  Well, I think I have run out of time. | 15:45:01 |
| 10 | MR. KIM:  Okay. | 15:45:06 |
| 11 | THE REPORTER:  Do you want this as 161? | 15:45:20 |
| 12 | MR. KIM:  Yes. | |
| 13 | THE REPORTER:  Next number?  Okay. | |
| 14 | MR. JAFFE:  I'm going to object -- | |
| 15 | THE REPORTER:  Hang on.  Let me just write this. | |
| 16 | MR. KIM:  Oh.  1061. | |
| 17 | THE REPORTER:  161? | |
| 18 | MR. KIM:  You know, I think we're alternating -- | |
| 19 | MR. JAFFE:  We have different blocks of exhibits. | 15:45:31 |
| 20 | So his exhibit numbers, they start at 1000; ours start | 15:45:35 |
| 21 | at zero.  So I don't know what number you're at. | 15:45:36 |
| 22 | MR. KIM:  Actually, can we start at 1060. | 15:45:39 |
| 23 | (Defendants' Exhibit 1060 was marked.) | 15:46:05 |
| 24 | REDIRECT EXAMINATION | |
| 25 | BY MR. KIM: | 15:46:05 |

Page 177

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        THE WITNESS:  I wasn't sure.  I don't recall the        17:28:43

 2   strict definition of ████████████████████    ██████████        17:28:52

 ▉   ████████████████████████████                                  17:28:52

 4   BY MR. JAFFE:                                                 17:28:52

 5        Q.   I see.  So if we exclude zero change, if           17:28:55

 6   something is ███████████████████████████    ██████████        17:29:01

 ▉   ████████████████████████  right?                             17:29:01

 8        MR. KIM:  Objection; form.                              17:29:04

 9        THE WITNESS:  I believe so, yes.                        17:29:07

10   BY MR. JAFFE:                                                17:29:07

11        Q.   And if we go back and we look at -- I don't       17:29:12

12   have the number in front of me.  It's the one where         17:29:14

13   you pencilled out all the changes.                          17:29:16

14        A.   The changes.                                      17:29:18

15        Q.   The changes, yeah.                                17:29:18

16        A.   Let's see, this one; right?                       17:29:22

17        Q.   Not that one.  The one that looks like this       17:29:25

18   (indicating).  The Fuji data.                               17:29:28

19        A.   Is that not the one I wrote for you?              17:29:31

20        Q.   Yes.  It should be over there in that pile.       17:29:36

21   It's just going to be one sheet of paper.                   17:29:40

22        MR. KIM:  Thank you.                                   17:29:42

23          (Witness reviews documents.)                         17:29:52

24        THE WITNESS:  This one?                                17:29:53

25   BY MR. JAFFE:                                                17:29:53
```

Page 226

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   That's it.                              17:29:54

 2      A.   Okay.                                   17:29:55

 3      Q.   Do you remember when we were talking about  17:29:56

 4  the delta Y column?                              17:29:58

 5      A.   Yes.                                    17:29:58

 6      Q.   Does the delta Y column -- I guess we'll say,  17:30:03

 7      ██████████████████████                       17:30:10

 8      MR. KIM:  Objection; form.                   17:30:14

 9      THE WITNESS:  Yes, it appears to ███████  ████████  17:30:17

██      ████████████████████                         17:30:17

11  BY MR. JAFFE:                                    17:30:17

12      Q.   So the difference between ████████████  ████████  17:30:23

██      ████████████████  is immaterial to what we were talking  17:30:23

14  about in Exhibit 156; right?                     17:30:25

15      MR. KIM:  Objection; form.                   17:30:26

16      THE WITNESS:  I can say that the delta Y column  17:30:31

17  appears to be ███████████████████████████  ████████  17:30:31

██      █████████████████  yes.                      17:30:35

19  BY MR. JAFFE:                                    17:30:35

20      Q.   You talked about ██████████ with your   17:30:38

21  counsel.                                         17:30:39

22      Do you remember that?                        17:30:40

23      A.   Yes.                                    17:30:40

24      Q.   And you said that you reuse some of the parts  17:30:42

25  from ██████████ in the Fuji design; is that right?  17:30:45
```

Page 227

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes. | 17:30:46 |
| 2 | Q.   Is that common to reuse parts from old | 17:30:49 |
| 3 | projects? | 17:30:50 |
| 4 | MR. KIM:  Objection; form. | 17:30:53 |
| 5 | THE WITNESS:  Depends what you mean by "common." | 17:30:57 |
| 6 | Can it be done?  Certainly.  Is it done?  I've seen it | 17:31:01 |
| 7 | done, yeah. | 17:31:02 |
| 8 | BY MR. JAFFE: | 17:31:02 |
| 9 | Q.   Is it something you've seen happen fairly | 17:31:04 |
| 10 | regularly? | 17:31:05 |
| 11 | MR. KIM:  Objection; form. | 17:31:06 |
| 12 | THE WITNESS:  Again, I don't want to try to | 17:31:09 |
| 13 | qualify the rate of currents, but I have seen it done | 17:31:13 |
| 14 | before. | 17:31:14 |
| 15 | BY MR. JAFFE: | 17:31:14 |
| 16 | Q.   Let me ask it this way:  Reusing parts from | 17:31:15 |
| 17 | old projects is not uncommon; right? | 17:31:18 |
| 18 | MR. KIM:  Objection; form. | 17:31:19 |
| 19 | THE WITNESS:  It's not very uncommon. | 17:31:21 |
| 20 | BY MR. JAFFE: | 17:31:21 |
| 21 | Q.   And was ███████ -- how would you describe | 17:31:25 |
| 22 | what happened with that project? | 17:31:27 |
| 23 | A.   I would describe it as a LiDAR sensor | 17:31:35 |
| 24 | development that started probably before I joined | 17:31:39 |
| 25 | Otto, made some progress in designing an FAC lens, | 17:31:46 |

Page 228

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    THE WITNESS:  No.                                    17:35:55

2  BY MR. JAFFE:

3    Q.   So Spider, you're never going to use it        17:36:02

4  again; right?                                          17:36:03

5    A.   I don't have any intention of reusing it        17:36:05

6  again right now.                                       17:36:06

7    Q.   That's not my question.  My question is, Uber   17:36:09

8  is never going to use Spider; right?                   17:36:12

9    A.   You're asking if the company is going to do     17:36:18

10  something in the future?                               17:36:20

11    Q.   That's right.                                   17:36:20

12    A.   I don't know.                                   17:36:21

13    Q.   So sitting here today, you can't tell me        17:36:24

14  whether Uber is going to use Spider in the future?     17:36:27

15    A.   No.  I can only tell you my intentions right    17:36:31

16  now.                                                   17:36:31

17    Q.   All right.  You mentioned Fuji.  Oh, I'm        17:36:47

18  sorry, going back to Spider.                           17:36:50

19         Why save the parts if you're never going to     17:36:53

20  use it?                                                17:36:54

21    A.   That's a good question.                         17:36:57

22    Q.   Why didn't you throw it away?                   17:37:00

23    A.   I don't know if we've thrown anything away.     17:37:03

24  I don't know.  It should have, could have easily been  17:37:05

25  recycled, yeah.                                        17:37:07

                                                    Page 232

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      Q.   So you don't know why you kept it?        17:37:10

2      A.   Just because we didn't throw it away, as far  17:37:13

3  as I know.                                         17:37:14

4      Q.   So sitting here today, again, you can't tell  17:37:19

5  me why you kept the Spider; right?                 17:37:21

6      A.   Yes.                                       17:37:26

7      Q.   Okay.  I want to ask about your supplemental  17:37:42

8  declaration that you went into detail with with your  17:37:46

9  counsel.  And let's start with page 11.  And there's  17:38:07

10 Figures 8A and 8B here.                             17:38:09

11          Do you see that?                           17:38:10

12     A.   I see that.                                17:38:11

13     Q.   And during your testimony by your counsel,  17:38:13

14 you said -- you referred to these ████████, and you  17:38:17

15 said whoever did these letters.                     17:38:21

16     A.   Um-hum.                                    17:38:28

17     Q.   You didn't prepare 8A and 8B, did you?     17:38:28

18     A.   No.                                        17:38:28

19     Q.   Who prepared 8A and 8B?                    17:38:31

20     A.   Counsel.                                   17:38:33

21     Q.   Who?                                       17:38:34

22     A.   Jackie Choy [sic], I believe.             17:38:39

23     Q.   So Uber's lawyers prepared this and sent this  17:38:43

24 to you; is that right?                             17:38:44

25     A.   Yes.                                       17:38:45
```

Page 233

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    And you signed it without actually checking   17:38:47

 2   it was accurate?                                        17:38:49

 3      A.    Whoa.   I looked at these numbers.             17:38:52

 4      Q.    But you didn't check what you did today        17:38:54

 5   before you signed this declaration, did you?            17:38:59

 6      A.    What do you mean?   Identifying, double        17:39:02

 7   checking the ███████                                    17:39:04

 8      Q.    Yes.                                           17:39:04

 9      A.    I did check that.                              17:39:06

10      Q.    So why today did you need to check it again?   17:39:09

11      A.    I like to be careful.                          17:39:11

12      Q.    You like to be careful?                        17:39:12

13      A.    Yeah.   I want to be sure we can show the ██   ████████

     ██   ████████████████  that they matched.              17:39:19

15      Q.    Did you know when you signed your declaration  17:39:22

16   whether these actually matched every single angle and   17:39:26

17   every single board?                                     17:39:27

18      A.    Yes, I believe I did.                          17:39:28

19      Q.    What do you mean you believe you did?          17:39:31

20      A.    To my recollection, I checked ███████████   ████████

     ██   █████████████████████████  And I checked the     17:39:42

22   initial ██████  and knew that they would follow the     17:39:46

23   same pattern so I didn't check every single angle.      17:39:50

24      Q.    How many of these did you actually check       17:39:52

25   yourself before you signed your declaration?            17:39:55
```

Page 234

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   I remember at least checking the initial ███   ██████        17:40:04
 █      ██████████████████████████████████████
 3      Q.   So you checked about six out of the 64; is      17:40:08
 4  that fair?                                               17:40:09
 5      A.   Yeah.                                           17:40:09
 6      Q.   And the rest are purely from counsel; you're    17:40:12
 7  just relying on them?                                    17:40:14
 8      A.   Not exactly.                                    17:40:16
 9      Q.   You didn't check.                               17:40:19
10           How did you know it was accurate?              17:40:21
11      A.   How would the pattern change?                   17:40:24
12      Q.   I don't know.  It's your declaration.           17:40:26
13      A.   I understand.  From my understanding, the       17:40:30
14  pattern is consistent in the letters.  So once you       17:40:35
15  start the pattern properly, it's going to finish out     17:40:39
16  properly.                                                17:40:40
17      Q.   Let's go to the next page, page 12.             17:40:42
18           Who prepared this table?                        17:40:44
19      A.   Counsel for Uber.                               17:40:51
20      Q.   And you had to double check it here at your     17:40:54
21  deposition; you didn't know whether it was accurate      17:40:55
22  when you signed it, did you?                             17:40:57
23      MR. KIM:  Objection; form.                           17:40:58
24      THE WITNESS:  I believe I checked that before as     17:41:00
25  well.                                                    17:41:01
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. JAFFE:                                    17:41:01

 2        Q.   You did?  How many?                     17:41:03

 3        A.   I don't recall.  Some.                  17:41:14

 4        Q.   How many?                               17:41:16

 5        A.   I would have checked first sets of angles.  I  17:41:25

 6    don't know.                                      17:41:25

 7        Q.   I'm not asking what you would have done.  I'm  17:41:28

 8    asking what you did.                             17:41:29

 9        A.   I don't remember what I did.            17:41:30

10        Q.   You don't remember checking any of these, do  17:41:33

11    you?                                             17:41:33

12        MR. KIM:  Objection; form.                   17:41:34

13        THE WITNESS:  That's not true.               17:41:35

14    BY MR. JAFFE:                                    17:41:35

15        Q.   So you checked one?                     17:41:36

16        MR. KIM:  Objection; form.                   17:41:38

17        THE WITNESS:  I specifically was checking those  17:41:40

18    that had the ███ degree, and I was specifically  17:41:44

19    checking those that began the pattern as well.   17:41:47

20    BY MR. JAFFE:                                    17:41:47

21        Q.   So you checked probably, what, five or six?  17:41:50

22        A.   Should be at least six, was at least six.  17:41:54

23        Q.   At least six.  You don't remember checking  17:41:56

24    anymore on this one?                             17:41:59

25        A.   I don't remember checking more.         17:42:00
```

Page 236

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    Let's go to the next page.  There's another | 17:42:03 |
| 2 | chart, page 13. | 17:42:04 |
| 3 |     Who wrote this chart? | 17:42:06 |
| 4 | A.    Same person who prepared the previous chart. | 17:42:10 |
| 5 | Q.    And how many angles did you check in this | 17:42:14 |
| 6 | one? | 17:42:15 |
| 7 | A.    Again, I would -- I believe I checked maybe | 17:42:20 |
| 8 | six. | 17:42:20 |
| 9 | Q.    And how did you know that the data that | 17:42:23 |
| 10 | Uber's lawyers were relying on was accurate? | 17:42:27 |
| 11 | A.    I would say there's a certain level of | 17:42:40 |
| 12 | expectation of accuracy when you're pulling data out | 17:42:45 |
| 13 | of a spreadsheet into another spreadsheet. | 17:42:47 |
| 14 | Q.    You mean you were relying on Uber's lawyers | 17:42:50 |
| 15 | to give you accurate data? | 17:42:52 |
| 16 | MR. KIM:  Objection; form. | 17:42:53 |
| 17 | THE WITNESS:  I was relying on Uber's lawyers to | 17:42:58 |
| 18 | do the obvious simple thing, cut and paste from a | 17:43:01 |
| 19 | spreadsheet, and not inject an errors by manually | 17:43:05 |
| 20 | changing numbers. | 17:43:07 |
| 21 | BY MR. JAFFE: | 17:43:07 |
| 22 | Q.    You see it says "Current" here? | 17:43:09 |
| 23 | A.    Yes. | 17:43:09 |
| 24 | Q.    Where did Uber's lawyers get the numbers that | 17:43:13 |
| 25 | go in the "Current" column? | 17:43:15 |

Page 237

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   What is this document called?  This would be    17:43:24

2    from Exhibit 155.    17:43:26

3    Q.   How do you know that?    17:43:28

4    A.   Because she said so.    17:43:30

5    Q.   Uber's lawyer told you that she derived these    17:43:35

6    numbers from Exhibit B?    17:43:37

7    MR. KIM:  I'm going to object on grounds of    17:43:41

8    privilege and instruct you not to answer that.    17:43:45

9    BY MR. JAFFE:    17:43:45

10    Q.   So again, I just want to ask, how do you know    17:43:50

11    the numbers that say "Current" here where they were    17:43:58

12    derived from?  And wait for your counsel to object, if    17:44:02

13    he does.    17:44:03

14    A.   I would inspect Exhibit 155 in the theta    17:44:14

15    column for these boards to find the angles that match.    17:44:22

16    THE REPORTER:  To find the angles that . . .    17:44:22

17    MR. JAFFE:  Excuse me.

18    THE WITNESS:  To find the angles that match.

19    BY MR. JAFFE:

20    Q.   Mr. Haslim, I'm not asking what you would do.    17:44:26

21    I'm asking what happened.    17:44:28

22    A.   So as I said, I compared some number, maybe    17:44:34

23    six, of the angles under "Current" against the angles    17:44:41

24    listed under the theta column in Exhibit 155.    17:44:46

25    Q.   Where do the numbers from the "Current"    17:44:48

Page 238

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | column come from in your declaration? | 17:44:51 |
| 2 | A.   They came from the spreadsheet that we're | 17:44:59 |
| 3 | printing out and calling Exhibit 155. | 17:45:02 |
| 4 | Q.   And how do you know that?  How did you know | 17:45:05 |
| 5 | that at the time? | 17:45:05 |
| 6 | A.   How did I know to look there as a source? | 17:45:09 |
| 7 | Q.   No.  How did you know that the source of | 17:45:11 |
| 8 | these numbers were from that spreadsheet before you | 17:45:14 |
| 9 | signed your declaration? | 17:45:16 |
| 10 | A.   So in the process of developing this | 17:45:20 |
| 11 | document, I was in communication with Uber's counsel. | 17:45:24 |
| 12 | Q.   So Uber's lawyers told you that these numbers | 17:45:29 |
| 13 | come from the "Current" number and they sent them to | 17:45:32 |
| 14 | you and that's the basis of your understanding that | 17:45:34 |
| 15 | these numbers actually are current? | 17:45:36 |
| 16 | MR. KIM:  I'm going to object on the grounds of | 17:45:39 |
| 17 | privilege and instruct you not to answer the question | 17:45:42 |
| 18 | to the extent it asks what Uber's lawyers told you. | 17:45:48 |
| 19 | THE WITNESS:  I would refer to my discussion with | 17:45:50 |
| 20 | Uber's lawyer for the source of the information that | 17:45:55 |
| 21 | allows me to go back and check myself at least some of | 17:45:59 |
| 22 | the numbers with the belief that the other numbers in | 17:46:02 |
| 23 | between for every logical reason should be the correct | 17:46:06 |
| 24 | numbers. | 17:46:07 |
| 25 | BY MR. JAFFE: | 17:46:07 |

Page 239

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   But you didn't check that before you signed      17:46:09

2   your declaration; right?                               17:46:11

3    MR. KIM:  Objection; form.                            17:46:12

4    THE WITNESS:  I did not recall checking all 32        17:46:20

5   angles in this table, or 64 as the case may be.        17:46:24

6   BY MR. JAFFE:                                          17:46:24

7    Q.   So you couldn't -- at the time you signed        17:46:28

8   this declaration, you couldn't say that what's in here 17:46:35

9   actually does represent all the current angles because 17:46:39

10  you didn't check each one?                             17:46:41

11   MR. KIM:  Objection; form.                            17:46:42

12   THE WITNESS:  I really believe without checking       17:46:44

13  every single one, I could have a very high reasonable  17:46:48

14  confidence that they are correct.                      17:46:50

15  BY MR. JAFFE:                                          17:46:50

16   Q.   Because you believe Uber's lawyers?              17:46:52

17   MR. KIM:  Objection; form.                            17:46:55

18   THE WITNESS:  Because I checked the beginning and     17:46:57

19  the end and have every reason to believe that a cut    17:47:02

20  and paste from one spreadsheet to another would be     17:47:05

21  without error.                                         17:47:05

22  BY MR. JAFFE:                                          17:47:05

23   Q.   But what spreadsheet did it come from?           17:47:09

24   A.   The spreadsheet that's printed out in Exhibit    17:47:13

25  155.                                                   17:47:13

Page 240

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   How do you know that? | 17:47:14 |
| 2 | A.   By talking to the lawyer. | 17:47:16 |
| 3 | Q.   So Uber's lawyer told you that he or she cut | 17:47:20 |
| 4 | and paste out of a spreadsheet and put it into this | 17:47:23 |
| 5 | chart? | 17:47:23 |
| 6 | MR. KIM:   Objection; calls for privileged | 17:47:26 |
| 7 | information.   Instruct you not to answer to the extent | 17:47:29 |
| 8 | it's asking you what Uber's lawyers told you. | 17:47:31 |
| 9 | MR. JAFFE:   This is waived. | 17:47:33 |
| 10 | I mean, the only basis for him to say that this is | 17:47:35 |
| 11 | current is what a lawyer told him, so that's not a | 17:47:39 |
| 12 | proper privilege instruction. | 17:47:40 |
| 13 | MR. KIM:   He's already told you that it's based on | 17:47:42 |
| 14 | communications with his lawyers.   You're not entitled | 17:47:45 |
| 15 | to know exactly what his lawyers told him. | 17:47:47 |
| 16 | MR. JAFFE:   I'm entitled to know exactly that. | 17:47:49 |
| 17 | MR. KIM:   Disagree. | 17:47:50 |
| 18 | BY MR. JAFFE: | 17:47:50 |
| 19 | Q.   Mr. Haslim, what did Uber's lawyers tell you | 17:47:56 |
| 20 | was the source of the data in the "Current" column? | 17:47:59 |
| 21 | MR. KIM:   Same objection with instruction not to | 17:48:01 |
| 22 | answer. | 17:48:02 |
| 23 | You can answer that question generally if | 17:48:08 |
| 24 | you can without revealing the exact -- the | 17:48:12 |
| 25 | specific communications that you've had with the | 17:48:14 |

Page 241

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    lawyer.  But I think you've already done that.        17:48:17

 2          Can you rephrase the question to avoid asking   17:48:24

 3    with him what Uber's lawyers told him?                17:48:26

 4    BY MR. JAFFE:                                          17:48:26

 5       Q.   I'm asking him, what is the basis for his     17:48:30

 6    knowledge, to the extent that he has any, about where 17:48:33

 7    the data in the "Current" column in your declaration  17:48:36

 8    came from?                                             17:48:38

 9       A.   I'll have to say my knowledge of where the    17:48:42

10    data in the "Current" column came from would come from 17:48:47

11    inspecting where I believed it came from and finding a 17:48:51

12    reasonable match from some number of channels that    17:48:55

13    begin the pattern and end the pattern.                 17:48:57

14       Q.   How did you know to look in that document?    17:49:01

15       A.   Discussion with counsel.                       17:49:05

16       Q.   Okay.  So let me start again.  What was your  17:49:07

17    basis for understanding that what's in the "Current"  17:49:10

18    column actually reflects anything in Fuji?             17:49:13

19       A.   Again, my basis for understanding what was    17:49:18

20    reflected in the "Current" column reflects what was   17:49:21

21    actually built in Fuji was to compare some subset of  17:49:26

22    the numbers at least to the angles in a document that 17:49:29

23    I know was used to build Fuji.                         17:49:33

24       Q.   So again, for the chart on page 13 here, you  17:49:37

25    didn't prepare that chart; right?                      17:49:39
```

Page 242

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        MR. KIM:  Objection; form.                    17:49:42

 2        THE WITNESS:  I did not prepare this spreadsheet   17:49:44

 3    chart.

 4    BY MR. JAFFE:                                     17:49:45

 5        Q.   It came to you fully formed with the current

 6    column and the November 16th column already populated;

 7    right?

 8        A.   Yes.                                     17:49:52

 9        Q.   And you only checked a couple of the angles;   17:49:55

10    right?                                            17:49:55

11        A.   I checked more than a couple, but I checked a   17:50:00

12    subset of the angles.                             17:50:01

13        Q.   And what about the November 16th one, how   17:50:04

14    many of those did you check?                      17:50:05

15        A.   I would have -- I don't remember exactly how   17:50:09

16    many I checked.                                   17:50:09

17        Q.   Do you remember checking any?            17:50:11

18        A.   Yes.                                     17:50:12

19        Q.   More than one?                           17:50:15

20        A.   Yeah.  It would have been more than one, but   17:50:17

21    I don't remember exactly how many.                17:50:19

22        Q.   What else in your declaration did you rely on   17:50:23

23    representations from counsel about?               17:50:25

24        A.   Annotations in Figure 2B.               17:50:45

25        Q.   That's relied on by counsel?            17:50:48
```

Page 243

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Counsel created the annotations.  I looked at | 17:50:52 |
| 2 | it, thought it looked correct. | 17:50:55 |
| 3 | Q.   What about -- let's go to page 4. | 17:51:02 |
| 4 | A.   Okay. | 17:51:03 |
| 5 | Q.   Do you see there's some large footnotes | 17:51:06 |
| 6 | there? | 17:51:07 |
| 7 | A.   Yes. | 17:51:07 |
| 8 | Q.   Who provided those references? | 17:51:09 |
| 9 | A.   I did. | 17:51:10 |
| 10 | Q.   And where did you find them? | 17:51:12 |
| 11 | A.   On the web. | 17:51:13 |
| 12 | Q.   So you went out and found each of those? | 17:51:16 |
| 13 | A.   Yes. | 17:51:16 |
| 14 | Q.   And the iXBlue one that you're referring to? | 17:51:20 |
| 15 | A.   IXBlue, yes. | |
| 16 | Q.   IXBlue, excuse me. | 17:51:23 |
| 17 | Do you know when that specialty fiber web | 17:51:27 |
| 18 | page first was published? | 17:51:29 |
| 19 | A.   No. | 17:51:29 |
| 20 | Q.   Do you know if it was published before or | 17:51:31 |
| 21 | after you started designing █████████████     ███████ | |
| █ | █████████████████████████ | 17:51:39 |
| 23 | A.   I don't know. | 17:51:40 |
| 24 | Q.   Again on page 5 looking at Figure 4, do you | 17:51:43 |
| 25 | know whether that website was posted before or after | 17:51:46 |

Page 244

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | the conversation with Mr. Levandowski? | 17:51:47 |
| 2 | A.   I don't know. | 17:51:48 |
| 3 | Q.   Is there anything else in the declaration in | 17:51:54 |
| 4 | which you're relying on representations from Uber's | 17:51:59 |
| 5 | lawyers? | 17:51:59 |
| 6 | MR. KIM:  Objection; form. | 17:52:01 |
| 7 | THE WITNESS:  Figure 6, I relied on Uber's lawyers | 17:52:06 |
| 8 | to excerpt this section from the spreadsheet. | 17:52:09 |
| 9 | Figure 7A and 7B, I relied on Uber lawyer to put | 17:52:20 |
| 10 | down these files that were sourced by somebody | 17:52:23 |
| 11 | else. | 17:52:24 |
| 12 | BY MR. JAFFE: | 17:52:24 |
| 13 | Q.   Who were they sourced by? | 17:52:26 |
| 14 | A.   I'm fairly certainly they would be sourced by | 17:52:29 |
| 15 | Gaetan. | 17:52:29 |
| 16 | Q.   So Gaetan provided these pictures? | 17:52:31 |
| 17 | A.   I believe so, yes. | 17:52:32 |
| 18 | Q.   Did you talk to Gaetan about what you wanted | 17:52:34 |
| 19 | to provide, what you wanted him to put in here? | 17:52:37 |
| 20 | MR. KIM:  Objection; form. | 17:52:39 |
| 21 | THE WITNESS:  No. | 17:52:39 |
| 22 | BY MR. JAFFE: | 17:52:39 |
| 23 | Q.   What was your understanding of what | 17:52:41 |
| 24 | Mr. Pennecot went out and looked for? | 17:52:44 |
| 25 | A.   My understanding was these were documents | 17:52:52 |

Page 245

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | that were already produced and were gathered for the | 17:52:55 |
| 2 | purpose of this declaration. | 17:52:57 |
| 3 | Q.   And it refers to ██████████████ ████████ | |
| ██ | ████████████ | 17:53:03 |
| 5 | A.   Yes. | 17:53:03 |
| 6 | Q.   Has the FAC lens in Fuji always been | 17:53:12 |
| 7 | ██████████████ | 17:53:14 |
| 8 | THE REPORTER:  I'm sorry, can you repeat that? | 17:53:14 |
| 9 | BY MR. JAFFE: | |
| 10 | Q.   Has the FAC lens in Fuji always been | |
| 11 | ████████████ | |
| 12 | A.   I've only known it to be ████████ | 17:53:19 |
| 13 | Q.   So you've never seen a version of a FAC lens | 17:53:23 |
| 14 | that is ██████████ | 17:53:24 |
| 15 | A.   No, not to my knowledge. | 17:53:26 |
| 16 | Q.   And would it surprise you if Uber -- go | 17:53:29 |
| 17 | ahead. | 17:53:29 |
| 18 | A.   You left the question very general and I | 17:53:32 |
| 19 | answered too quickly.  I've never seen ██████████ ████████ | |
| ██ | ████████████████████████████████ | 17:53:41 |
| 21 | Q.   What other design have you seen? | 17:53:47 |
| 22 | ██ ████████████████████████████████ ████████ | |
| ██ | ██████ | 17:53:54 |
| 24 | Q.   In terms of the custom FAC lens that includes | 17:53:57 |
| 25 | a cylindrical optical surface, have you ever seen one | 17:54:01 |

Page 246

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | of those? | 17:54:02 |
| 2 | MR. KIM: Objection; form. | 17:54:03 |
| 3 | THE WITNESS: Are you asking about anywhere? | 17:54:05 |
| 4 | BY MR. JAFFE: | 17:54:05 |
| 5 | Q. At Uber or Otto. | 17:54:07 |
| 6 | A. If -- I don't know of seeing a cylindrical | 17:54:12 |
| 7 | custom FAC lens at Otto. | 17:54:14 |
| 8 | Q. And you don't know whether Fuji ever had a | 17:54:19 |
| 9 | cylindrical FAC lens ever? | 17:54:22 |
| 10 | A. To my knowledge, ██████████ ██████ | |
| | ███████████████████████ ██████ | |
| | ███████ | 17:54:32 |
| 13 | Q. What about ██████████, are you familiar | 17:54:34 |
| 14 | with that? | 17:54:35 |
| 15 | A. I've seen the name ███████████ | 17:54:38 |
| 16 | Q. What is that? | 17:54:39 |
| 17 | A. I believe it's the FAC lens. | 17:54:41 |
| 18 | Q. And do you know whether there are any | 17:54:43 |
| 19 | versions of that design that had a cylindrical optical | 17:54:46 |
| 20 | surface? | 17:54:47 |
| 21 | A. I'm not aware. If there were, I'm not aware | 17:54:50 |
| 22 | of them. So we have to go back to Gaetan's design | 17:54:52 |
| 23 | record to see if he started with a cylindrical design. | 17:54:57 |
| 24 | Q. So we talked about some of the charts where | 17:55:00 |
| 25 | you said that you relied on Uber's counsel. | 17:55:04 |

Page 247

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | What about any of the text?  Are any of the | 17:55:05 |
| 2 | numbers in here, do they come from Uber's counsel as | 17:55:09 |
| 3 | opposed to you? | 17:55:10 |
| 4 | A.   A large part of the text, perhaps the bulk of | 17:55:17 |
| 5 | the text in this declaration, came from Uber's | 17:55:20 |
| 6 | counselors. | 17:55:20 |
| 7 | Q.   Okay.  So they provided you basically all the | 17:55:24 |
| 8 | text in this draft; is that fair? | 17:55:26 |
| 9 | MR. KIM:  Objection; form. | 17:55:28 |
| 10 | THE WITNESS:  It's a little too much to say "all," | 17:55:30 |
| 11 | but I could say more than half and that I was given an | 17:55:33 |
| 12 | opportunity to edit. | 17:55:37 |
| 13 | BY MR. JAFFE: | 17:55:37 |
| 14 | Q.   Okay.  So I want to go back to my original | 17:55:43 |
| 15 | question which was, what part of the text are you | 17:55:47 |
| 16 | relying on representations from Uber's lawyers for | 17:55:50 |
| 17 | purposes of your declaration? | 17:55:52 |
| 18 | A.   Since Uber's lawyers originated most of the | 17:56:13 |
| 19 | text, I relied on Uber's lawyers to originate most of | 17:56:18 |
| 20 | the text in here. | 17:56:19 |
| 21 | Q.   Meaning, most of the text you're relying on | 17:56:26 |
| 22 | on their representations; is that fair? | 17:56:29 |
| 23 | A.   I'm relaying on their -- | 17:56:30 |
| 24 | MR. KIM:  Objection; form. | 17:56:31 |
| 25 | THE REPORTER:  I'm relaying on their . . . | |

Page 248

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I'm relying on their origination. | 17:56:37 |
| 2 | BY MR. JAFFE: | 17:56:37 |
| 3 | Q.   So for example, looking at page 13, there's a | 17:56:43 |
| 4 | chart comparing Spider and Fuji.  Uber's lawyer came | 17:56:49 |
| 5 | up with that chart; right? | 17:56:51 |
| 6 | MR. KIM:  Objection; form. | 17:56:52 |
| 7 | THE WITNESS:  Yes. | 17:56:53 |
| 8 | BY MR. JAFFE: | 17:56:53 |
| 9 | Q.   The idea -- going back to page 8, the idea of | 17:57:09 |
| 10 | excerpting what's in Figure 6, was that -- did that | 17:57:14 |
| 11 | idea come from Uber's lawyers? | 17:57:17 |
| 12 | MR. KIM:  Objection; form.  Also on grounds of | 17:57:20 |
| 13 | work product. | 17:57:25 |
| 14 | THE WITNESS:  I presume it was. | 17:57:30 |
| 15 | BY MR. JAFFE: | 17:57:30 |
| 16 | Q.   And going back to -- | 17:57:42 |
| 17 | MR. KIM:  How long have we been going on the | 17:57:57 |
| 18 | record? | 17:57:58 |
| 19 | THE VIDEOGRAPHER:  The entire time? | 17:57:59 |
| 20 | MR. KIM:  Yes.  Oh, just since the last break. | 17:58:05 |
| 21 | THE VIDEOGRAPHER:  54 minutes. | 17:58:07 |
| 22 | MR. JAFFE:  I'm referring to your original | 17:58:32 |
| 23 | declaration.  Let's go to your original declaration, | 17:58:32 |
| 24 | please. | |
| 25 | MR. KIM:  I'm going to object to this whole line | 17:58:34 |

Page 249

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | of questioning as outside the scope of recross. | 17:58:39 |
| 2 | BY MR. JAFFE: | 17:58:39 |
| 3 | Q.   Did Uber's lawyers, did they prepare your | 17:58:42 |
| 4 | original declaration as well? | 17:58:44 |
| 5 | MR. KIM:  Objection; form. | 17:58:45 |
| 6 | THE WITNESS:  I would say Uber's lawyers | 17:58:54 |
| 7 | originated most of this declaration. | 17:58:58 |
| 8 | BY MR. JAFFE: | 17:58:58 |
| 9 | Q.   What percentage of the words in your original | 17:59:00 |
| 10 | declaration came from Uber's lawyers? | 17:59:03 |
| 11 | MR. KIM:  Objection; form. | 17:59:07 |
| 12 | THE WITNESS:  I don't know what the percentage is. | 17:59:08 |
| 13 | BY MR. JAFFE: | 17:59:08 |
| 14 | Q.   Over 80 percent? | 17:59:10 |
| 15 | MR. KIM:  Objection; form, outside the scope. | 17:59:14 |
| 16 | THE WITNESS:  Yeah, I'm not sure. | 17:59:18 |
| 17 | I know I had some textural editing input to this | 17:59:25 |
| 18 | document, but I don't remember like percentagewise | 17:59:26 |
| 19 | on the words.  It was less than half. | 17:59:31 |
| 20 | BY MR. JAFFE: | 17:59:31 |
| 21 | Q.   But in terms of the drafting, they sent you a | 17:59:34 |
| 22 | full draft of your declaration? | 17:59:36 |
| 23 | MR. KIM:  Objection; form. | 17:59:38 |
| 24 | BY MR. JAFFE: | 17:59:38 |
| 25 | Q.   Is that right? | 17:59:39 |

Page 250

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes, I got -- | 17:59:44 |
| 2 | MR. KIM:  Outside the scope of redirect.  Recross. | 17:59:47 |
| 3 | THE WITNESS:  Yes.  I got a more or less complete | 17:59:51 |
| 4 | draft from Uber's lawyers. | 17:59:54 |
| 5 | BY MR. JAFFE: | 17:59:54 |
| 6 | Q.   And I want to take you particularly to page | 17:59:56 |
| 7 | 12 of your original declaration. | 18:00:00 |
| 8 | A.   Okay. | 18:00:03 |
| 9 | Q.   Do you see where you refer to | 18:00:06 |
| 10 | Mr. Levandowski's input? | 18:00:08 |
| 11 | A.   Yes. | 18:00:16 |
| 12 | Q.   What did you do -- well, let me start this, | 18:00:19 |
| 13 | was this paragraph drafted by Uber's lawyers? | 18:00:22 |
| 14 | MR. KIM:  Objection; form outside the scope. | 18:00:26 |
| 15 | THE WITNESS:  I believe they wrote the first draft | 18:00:32 |
| 16 | of this. | 18:00:33 |
| 17 | BY MR. JAFFE: | 18:00:33 |
| 18 | Q.   And what did you do to verify before signing | 18:00:38 |
| 19 | your declaration that what's here in paragraph 19 and | 18:00:43 |
| 20 | written by Uber's lawyers was true and accurate based | 18:00:46 |
| 21 | on your personal knowledge? | 18:00:48 |
| 22 | A.   I used my personal knowledge, my personal | 18:00:55 |
| 23 | experience, my recollection, read this, agreed.  To my | 18:01:02 |
| 24 | knowledge, to the best of my knowledge, that the | 18:01:04 |
| 25 | statement in paragraph 19 was true. | 18:01:06 |

Page 251

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   So Uber's lawyers sent you paragraph 19.  You      18:01:09

2    said looks good and you signed it?                        18:01:11

3      MR. KIM:  Objection; form.                              18:01:12

4      THE WITNESS:  They sent me 19.  I may have made an      18:01:15

5    edit in it.  I don't recall.  And then gave that edit     18:01:21

6    back.  Got a final draft, read through, and signed it.    18:01:25

7    BY MR. JAFFE:                                             18:01:25

8      Q.   What was the edit you gave to paragraph 19 to      18:01:27

9    make it accurate?                                         18:01:28

10     MR. KIM:  Objection; form.                              18:01:35

11     THE WITNESS:  I may have suggested that we make a       18:01:39

12   strong statement as possible regarding the 14,000         18:01:44

13   files having not seen any evidence of that in the         18:01:48

14   development of this sensor.                               18:01:49

15   BY MR. JAFFE:                                             18:01:49

16     Q.   Anything else?                                     18:01:51

17     A.   I don't recall.                                    18:01:55

18     Q.   So for purposes of the first sentence here         18:01:59

19   about Mr. Levandowski never had nor currently has any     18:02:03

20   design input, that was written wholesale by Uber's        18:02:08

21   lawyers?                                                  18:02:08

22     MR. KIM:  Objection; form.                              18:02:10

23     THE WITNESS:  I don't recall if I may have -- if I      18:02:13

24   had made any edits to this first sentence or not.         18:02:16

25   BY MR. JAFFE:                                             18:02:16

Page 252

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And what did you do to verify -- well, | 18:02:19 |
| 2 | actually I think you already said this. | 18:02:21 |
| 3 | You didn't do anything to verify that this | 18:02:24 |
| 4 | statement was accurate in paragraph 19 of your | 18:02:27 |
| 5 | declaration after it was provided to you by Uber's | 18:02:30 |
| 6 | lawyers; right? | 18:02:31 |
| 7 | MR. KIM:  Objection; form. | 18:02:37 |
| 8 | THE WITNESS:  I did no investigation to verify | 18:02:40 |
| 9 | that the statements made in paragraph 19 were | 18:02:46 |
| 10 | absolutely true. | 18:02:49 |
| 11 | BY MR. JAFFE: | 18:02:49 |
| 12 | Q.   Did you talk to Mr. Levandowski? | 18:02:52 |
| 13 | A.   No. | 18:02:52 |
| 14 | Q.   Okay.  All right.  So what parts of your | 18:03:03 |
| 15 | original declaration are you relying on information | 18:03:08 |
| 16 | from Uber's lawyers? | 18:03:11 |
| 17 | A.   Can you be specific when you say relying on | 18:03:21 |
| 18 | the Uber's lawyers. | 18:03:25 |
| 19 | Q.   The basis for it being in your declaration is | 18:03:28 |
| 20 | something provided to you by counsel. | 18:03:32 |
| 21 | MR. KIM:  Objection; form. | 18:03:35 |
| 22 | THE WITNESS:  Again, this document was, in the | 18:03:41 |
| 23 | majority, sourced by lawyers for Uber. | 18:03:47 |
| 24 | BY MR. JAFFE: | 18:03:47 |
| 25 | Q.   So you would say the majority of the document | 18:03:49 |

Page 253

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | you're relying on information from counsel; is that | 18:03:51 |
| 2 | right? | 18:03:52 |
| 3 | A.  For the majority of the document, I'm relying | 18:03:58 |
| 4 | on Uber's counsel to originate the document.  I'm not | 18:04:01 |
| 5 | necessarily relying on them.  If you're implying -- | 18:04:04 |
| 6 | Q.  Let me -- | 18:04:04 |
| 7 | MR. KIM:  Let him finish. | 18:04:06 |
| 8 | BY MR. JAFFE: | 18:04:06 |
| 9 | Q.  That's fine.  Let me be more clear. | 18:04:10 |
| 10 | MR. KIM:  Wait.  Are you cutting off the witness | 18:04:11 |
| 11 | here? | 18:04:12 |
| 12 | MR. JAFFE:  I think I'm trying to clarify.  I'll | 18:04:16 |
| 13 | withdraw the prior question. | 18:04:18 |
| 14 | BY MR. JAFFE: | |
| 15 | Q.  I want to understand what facts are in your | 18:04:20 |
| 16 | declaration that you relied on from counsel. | 18:04:24 |
| 17 | A.  I'm still having a hard time understanding | 18:04:27 |
| 18 | when you say relying on counsel for facts, whether | 18:04:31 |
| 19 | you're implying I'm relying on Uber's counsel for the | 18:04:35 |
| 20 | veracity or whether I'm relying on Uber's counsel to | 18:04:39 |
| 21 | put that information into the declaration. | 18:04:41 |
| 22 | Q.  That's fair.  Let me help clarify this. | 18:04:43 |
| 23 | So what I'm trying to get at is, were you | 18:04:48 |
| 24 | relying on Uber's counsel for the basis of these | 18:04:51 |
| 25 | facts, that is, you don't have independent personal | 18:04:52 |

Page 254

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1   ████████████████████████████████████    ██████████

█   ██████████                              18:12:20

3   BY MR. JAFFE:

4       Q.   Okay.  Going back to your declaration here,   18:12:25

5   we're looking at paragraph 18.                         18:12:26

6       MR. KIM:  Jordan, how long do you plan on going?   18:12:30

7   It's about 6:10.  Been going over an hour since the    18:12:34

8   last break.                                            18:12:35

9       MR. JAFFE:  Just kind of keep going.               18:12:37

10      MR. KIM:  Yeah, well -- I think we should take a    18:12:40

11  break.                                                 18:12:40

12      MR. JAFFE:  Why don't we do this quick question    18:12:44

13  and then we'll take a break.                           18:12:45

14  BY MR. JAFFE:

15      Q.   Are you looking at paragraph 18 of your       18:12:47

16  original declaration?                                  18:12:49

17      A.   Yes.                                          18:12:51

18      Q.   So you referred to this in the redirect       18:12:55

19  testimony.  You talked about the custom beam spacing   18:12:58

20  and angle summary Scott provided.                      18:13:01

21           Do you see that?                              18:13:02

22      A.   Yes.                                          18:13:02

23      Q.   So at the bottom of the page -- and this is   18:13:07

24  what we talked about earlier today, you said my team   18:13:10

25  imported the data.                                     18:13:11
```

Page 261

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Do you see that? | 18:13:12 |
| 2 | A.   Yes. | 18:13:12 |
| 3 | Q.   And based on what you talked about with | 18:13:14 |
| 4 | Mr. Kim, Uber's lawyer, it was Mr. Pennecot that | 18:13:18 |
| 5 | imported the data into Zemax; right? | 18:13:21 |
| 6 | A.   Yes. | 18:13:22 |
| 7 | Q.   And it was Mr. Pennecot that then determined | 18:13:25 |
| 8 | the resultant emitting points of the laser diodes; | 18:13:29 |
| 9 | right? | 18:13:29 |
| 10 | A.   Yes. | 18:13:29 |
| 11 | Q.   And it was Mr. Pennecot that then exported it | 18:13:33 |
| 12 | into CAD software; right? | 18:13:36 |
| 13 | A.   Yes, that's my understanding. | 18:13:38 |
| 14 | Q.   And so Mr. Pennecot was the one who actually | 18:13:42 |
| 15 | came up with ██████████████████████ | 18:13:47 |
| 16 | based on Mr. Boehmke's beam angles; isn't that right? | 18:13:51 |
| 17 | A.   No, I don't think so. | 18:13:52 |
| 18 | Q.   So what Mr. Pennecot exported into CAD | 18:13:56 |
| 19 | software, that wasn't ████████████████████ | 18:14:04 |
| 20 | A.   So if we go back carefully to transcripts, | 18:14:07 |
| 21 | what I should point out is, since this declaration, I | 18:14:11 |
| 22 | have more detailed information of exactly how | 18:14:14 |
| 23 | Mr. Pennecot did his import.  To be accurate, I want | 18:14:19 |
| 24 | to say that there's an error in here that he brought | 18:14:25 |
| 25 | the angles into CAD software, brought the lens design | 18:14:31 |

Page 262

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | and field curvature shape from Zemax into CAD | 18:14:37 |
| 2 | software. | 18:14:37 |
| 3 | Now you're asking did Mr. Pennecot in fact | 18:14:40 |
| 4 | design the ████████████████████████████ ██████ | 18:14:50 |
| █ | ████████████ Mr. Pennecot was dependent on | 18:14:50 |
| 6 | somebody else to tell him how many boards the angles | 18:14:53 |
| 7 | had to be divided among, and then Mr. Pennecot set the | 18:14:58 |
| 8 | positions of the laser diodes onto those boards. | 18:15:02 |
| 9 | Q.   Who told Mr. Pennecot to use ████████ | 18:15:05 |
| 10 | A.   I told Mr. Pennecot to use ████████ in | 18:15:09 |
| 11 | the optical cavity. | 18:15:10 |
| 12 | Q.   Who told him to use ████████ in total? | 18:15:13 |
| 13 | A.   I don't think anybody told him to use ████ ██████ | 18:15:18 |
| █ | ██████ in total. | 18:15:18 |
| 15 | Q.   Who told him to put ████████████████ ██████ | 18:15:22 |
| █ | ██████ | 18:15:22 |
| 17 | A.   Mr. Pennecot understood the reason we were | 18:15:31 |
| 18 | going to ████████, so I'll -- with that said, I'm | 18:15:35 |
| 19 | not aware that anybody had to tell him to ████████ ██████ | 18:15:41 |
| █ | ████████████ | 18:15:41 |
| 21 | Q.   You don't know where Mr. Pennecot ████████ ██████ | 18:15:45 |
| █ | ██████ from? | 18:15:45 |
| 23 | A.   No, I know exactly where he got it from. | 18:15:48 |
| 24 | Q.   Where did he get it from? | 18:15:49 |
| 25 | A.   The need to ████████████████████ | 18:15:52 |

Page 263

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    If you're asking do I know from whom, no.  I would say    18:15:57

2    that he could derive that himself.                        18:15:59

3         Q.    Okay.  So -- but just to be clear,             18:16:04

4    Mr. Pennecot -- you told him ████████████    ████████      18:16:13

     ██████████████████████████████ in the SolidWorks

6    CAD software, and you told him 64 channels and he         18:16:16

7    created ███████████████████████; is that fair?            18:16:21

8         A.    I didn't necessarily tell him 64 channels.     18:16:24

9    He got the list of angles that Scott Boehmke had          18:16:28

10   generated.                                                18:16:29

11        Q.    So he knew that there were 64 channels;        18:16:31

12   right?                                                    18:16:31

13        A.    Without me telling him.                        18:16:33

14        Q.    So the sequence of events was there was Scott  18:16:36

15   Boehmke provided beam angles for 64 channels?             18:16:40

16        A.    Yes.                                           18:16:40

17        Q.    That went to Mr. Pennecot.  He imported that   18:16:45

18   data into Zemax.  And after he outputted into CAD         18:16:50

19   software, the result was a design with ███████    ████████  18:17:01

     ████████████████████████████████████ is that

21   right?                                                    18:17:02

22        A.    Can you read that back.                        18:17:04

23             (Record read by reporter as follows:            18:17:04

24             "Question:  He imported that data into Zemax.   18:17:04

25             And after he outputted into CAD software, the
```

Page 264

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    as a whole taken with no prior knowledge that this      19:08:02
 2    document does not completely represent accurately what  19:08:06
 3    goes into Boards ███████ together as a whole.           19:08:09
 4    BY MR. JAFFE:                                            19:08:09
 5         Q.   Let me ask the question again.                19:08:11
 6              Sitting here today, you cannot -- sitting      19:08:14
 7    here today, Exhibit 1060 does not accurately represent  19:08:18
 8    what is in Fuji?  Yes or no.                             19:08:20
 9         MR. KIM:  Objection; form.                          19:08:26
10         THE WITNESS:  Yes, but only in the strictest       19:08:29
11    meaning of accuracy.                                    19:08:33
12    BY MR. JAFFE:                                            19:08:33
13         Q.   What does that mean?                          19:08:35
14         A.   That means the magnitudes in here match but  19:08:41
15    the sign change has not been consistently applied.  If  19:08:45
16    I had to use this data and no other data to build a     19:08:49
17    Fuji, then I would have a problem in the strict sense.  19:08:53
18         Q.   I see.  Okay.                                 19:08:54
19              So Exhibit 1060 has some inaccuracies and     19:09:00
20    problems, but it's generally accurate; is that right?   19:09:05
21         A.   I'm more comfortable saying that, yes.        19:09:07
22         Q.   So you couldn't build Fuji looking at Exhibit 19:09:10
23    1060; right?  Using this data?                          19:09:12
24         A.   Right.                                        19:09:12
25         Q.   And it wouldn't be fair to try and build a    19:09:16
```

Page 287

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Fuji using just this data; right?                  19:09:18

 2        MR. KIM:  Objection; form.                      19:09:20

 3        THE WITNESS:  It would not render a correct Fuji 19:09:24

 4    based on this data only by itself.                 19:09:27

 5    BY MR. JAFFE:                                       19:09:27

 6        Q.   Now, I want to go back to paragraph 19 of  19:09:34

 7    your declaration, your original declaration, the   19:09:40

 8    sentence about Mr. Levandowski.                     19:09:42

 9        A.   Okay.                                       19:09:53

10        Q.   We talked about this before and you testified 19:09:56

11    that you did no investigation to confirm the sentence 19:10:01

12    in paragraph -- the first sentence in paragraph 19; 19:10:04

13    right?                                             19:10:04

14        A.   Right.                                      19:10:04

15        Q.   And I just want to make sure that it's clear. 19:10:09

16             When you said you did no investigation, did 19:10:11

17    you do anything to confirm this statement before you 19:10:14

18    signed your declaration?                           19:10:16

19        MR. KIM:  Objection; form.                      19:10:21

20        THE WITNESS:  I refer to my recollection of how 19:10:23

21    the Fuji was developed, remembered no evidence of   19:10:28

22    Anthony coming in and controlling or designing those 19:10:31

23    aspects of the Fuji.                               19:10:33

24    BY MR. JAFFE:                                       19:10:33

25        Q.   Did you talk to anyone to confirm this     19:10:35
```

Page 288

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | statement? | 19:10:36 |
| 2 | A.   No. | 19:10:38 |
| 3 | Q.   Did you look at any documents to confirm this | 19:10:41 |
| 4 | statement? | 19:10:41 |
| 5 | A.   No. | 19:10:44 |
| 6 | Q.   Did you talk to anyone else on the LiDAR | 19:10:46 |
| 7 | team? | 19:10:47 |
| 8 | A.   No. | 19:10:50 |
| 9 | Q.   Okay.  Other than consulting your memory, did | 19:10:58 |
| 10 | you do anything to confirm the first sentence of | 19:11:00 |
| 11 | paragraph 19 of your original declaration? | 19:11:02 |
| 12 | A.   No, not that I recall. | 19:11:12 |
| 13 | Q.   Okay.  Let's -- | 19:11:13 |
| 14 | MR. KIM:  So we've gone 30 minutes on the record. | 19:11:18 |
| 15 | We're going to conclude this deposition | 19:11:23 |
| 16 | as we discussed at the break on the grounds that | 19:11:27 |
| 17 | we've given you more time than we took on | 19:11:32 |
| 18 | redirect, and he's now gone close to seven hours | 19:11:35 |
| 19 | on the record. | 19:11:36 |
| 20 | MR. JAFFE:  I understand your position. | 19:11:39 |
| 21 | THE VIDEOGRAPHER:  This is the end of today's | 19:11:44 |
| 22 | deposition of Mr. James Haslim. | 19:11:46 |
| 23 | We are off the record at 7:11 p.m. | 19:11:50 |
| 24 | The total number of media used was six and it | 19:11:53 |
| 25 | will be retained by Veritext.  Thank you. | 19:11:56 |

Page 289