# EXHIBIT 132
# FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4

   WAYMO LLC,

5

                      Plaintiff,

6                                        Case

   vs.                              No. 3:17-cv-00939-WHA

7

   UBER TECHNOLOGIES, INC.;

8  OTTOMOTTO LLC; OTTO TRUCKING LLC,

9                      Defendants,

   _____/

10

11

12

13

14

15        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16         VIDEOTAPED DEPOSITION OF JAMES HASLIM

17                THURSDAY, MAY 4, 2017

18

19

20

21

22  Reported by:

23  Anrae Wimberley

24  CSR No. 7778

25  Job No.  2610396

                                          Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5   WAYMO LLC,

6                    Plaintiff,

                                      Case

7   vs.                     No. 3:17-cv-00939-WHA

8   UBER TECHNOLOGIES, INC.;

    OTTOMOTTO LLC; OTTO TRUCKING LLC,

9

                     Defendants.

10  _____/

11

12

13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15          Transcript of video-recorded deposition of

16  JAMES HASLIM, taken at Quinn Emanuel Urquhart &

17  Sullivan LLP, 50 California Street, 22nd Floor, San

18  Francisco, California 94111, beginning at 10:16 a.m.

19  and ending at 7:11 p.m. on Thursday, May 4, 2017,

20  before Anrae Wimberley, Certified Shorthand Reporter

21  No. 7778.

22

23

24

25

                                            Page  2
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   My recollection is shaky.  I want to say | 10:22:43 |
| 2 | shortly after joining Otto, I can recall Mason being | 10:22:49 |
| 3 | around at that time frame.  And when it ended I'm not | 10:22:53 |
| 4 | sure, but that would have been maybe in the | 10:22:56 |
| 5 | past -- let me try to bookend this -- past -- this is | 10:23:03 |
| 6 | very hard because I don't remember.  I believe as | 10:23:07 |
| 7 | shortly as a few, couple months ago, perhaps.  And | 10:23:13 |
| 8 | this could also be found pretty readily.  Mr. Feldman | 10:23:17 |
| 9 | was reporting to a facilities manager. | 10:23:22 |
| 10 | Q.   Does Mr. Feldman still work for Uber or Otto? | 10:23:26 |
| 11 | A.   Yes. | 10:23:27 |
| 12 | Q.   What does he do now? | 10:23:29 |
| 13 | A.   I understand he's working for a facilities | 10:23:31 |
| 14 | manager. | 10:23:33 |
| 15 | Q.   When you say "facilities manager," what do | 10:23:35 |
| 16 | you mean by that? | 10:23:36 |
| 17 | A.   I wish I knew better in detail, but I don't. | 10:23:41 |
| 18 | We have somebody on staff that I believe would be | 10:23:44 |
| 19 | called a facilities manager, perhaps manages what goes | 10:23:48 |
| 20 | on with buildings, facilities' needs, be it the need | 10:23:55 |
| 21 | for air-conditioning, a repair, something of that | 10:23:59 |
| 22 | nature. | 10:23:59 |
| 23 | Q.   Where is Mr. Feldman located? | 10:24:02 |
| 24 | A.   To my knowledge, he has a desk in our offices | 10:24:07 |
| 25 | in San Francisco. | 10:24:09 |

Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Other than Mr. Feldman, who are you aware of | 10:24:20 |
| 2 | that most closely works with Mr. Levandowski on a | 10:24:27 |
| 3 | day-to-day basis? | 10:24:29 |
| 4 | A.   On a day-to-day basis, the only other | 10:24:32 |
| 5 | employee I'm aware of that works closely with him I | 10:24:35 |
| 6 | would say is Eric Meyhofer. | 10:24:44 |
| 7 | Q.   Mr. Meyhofer, how do you know him? | 10:24:50 |
| 8 | A.   Eric is my boss. | 10:24:52 |
| 9 | Q.   How long have yourself and Mr. Meyhofer known | 10:24:59 |
| 10 | each other? | 10:25:00 |
| 11 | A.   I met Eric Meyhofer -- I don't remember when, | 10:25:09 |
| 12 | but I can tell you it was when he visited Tyto LiDAR | 10:25:13 |
| 13 | with Scott Boehmke, and they visited to evaluate our | 10:25:20 |
| 14 | products. | 10:25:21 |
| 15 | Q.   And you said you didn't remember when this | 10:25:26 |
| 16 | meeting was. | 10:25:30 |
| 17 | Can you give it a year? | 10:25:31 |
| 18 | A.   It was prior to acquisition by Otto, but a | 10:25:40 |
| 19 | significant time went by between our meeting and being | 10:25:46 |
| 20 | acquired by Otto.  So I don't even want to hazard the | 10:25:52 |
| 21 | year, because it could be off. | 10:25:55 |
| 22 | Q.   So there was a meeting between Mr. Meyhofer, | 10:26:03 |
| 23 | Mr. Boehmke and Tyto LiDAR; is that right? | 10:26:08 |
| 24 | A.   That's right. | 10:26:09 |
| 25 | Q.   And it was sometime before the acquisition of | 10:26:12 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Tyto by Otto; correct? | 10:26:15 |
| 2 | A.   Correct. | 10:26:15 |
| 3 | Q.   Who else was at that meeting? | 10:26:19 |
| 4 | A.   That would have included Brent Schwarz.  I'm | 10:26:26 |
| 5 | not certain whether Mike Karasoff would have been at | 10:26:30 |
| 6 | that meeting as well. | 10:26:32 |
| 7 | Q.   Anybody else? | 10:26:32 |
| 8 | A.   I don't recall. | 10:26:33 |
| 9 | Q.   Was Mr. Levandowski at that meeting? | 10:26:37 |
| 10 | A.   Not that I recall. | 10:26:38 |
| 11 | Q.   You're not sure, though? | 10:26:41 |
| 12 | A.   I'm fairly sure that he was not.  That would | 10:26:45 |
| 13 | have been awkward. | 10:26:48 |
| 14 | Q.   You said, "That would have been awkward." | 10:26:50 |
| 15 | Why do you say that? | 10:26:52 |
| 16 | A.   Well, he wasn't an employee of Tyto. | 10:26:57 |
| 17 | Q.   Mr. Levandowski. | 10:26:57 |
| 18 | A.   That's what I meant. | 10:26:59 |
| 19 | Q.   So you're saying it would have been awkward | 10:27:02 |
| 20 | for Mr. Levandowski to be involved in a meeting | 10:27:06 |
| 21 | between Tyto and Uber because he wasn't involved in | 10:27:10 |
| 22 | Tyto; is that right? | 10:27:12 |
| 23 | A.   It would be awkward because he was not an | 10:27:14 |
| 24 | employee, yes. | 10:27:15 |
| 25 | Q.   So I see you changed words there a little | 10:27:17 |

Page 15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | bit -- | 10:27:17 |
| 2 | A.   I did. | 10:27:19 |
| 3 | Q.   -- and I just want to clarify that. | 10:27:20 |
| 4 | Why did you change -- my question was about | 10:27:23 |
| 5 | whether he was involved, and you answered about | 10:27:26 |
| 6 | whether he was an employee. | 10:27:27 |
| 7 | Why did you do that? | 10:27:28 |
| 8 | A.   Because I would need clarification on the | 10:27:31 |
| 9 | word "involved."  We would occasionally have dinner, | 10:27:38 |
| 10 | chat, see how the business was going on a friendly | 10:27:41 |
| 11 | term. | 10:27:42 |
| 12 | Q.   What is your understanding as to | 10:27:43 |
| 13 | Mr. Levandowski's involvement in Tyto LiDAR? | 10:27:48 |
| 14 | A.   My understanding of his involvement with Tyto | 10:27:53 |
| 15 | LiDAR was he was providing us a place of work when we | 10:27:58 |
| 16 | were still Odin Wave, early -- when we were getting | 10:28:02 |
| 17 | started.  He sourced contract employees.  He was a | 10:28:11 |
| 18 | friend who would stop by occasionally for chats. | 10:28:15 |
| 19 | Q.   Chats about what? | 10:28:16 |
| 20 | A.   What we're working on, what would the next | 10:28:21 |
| 21 | product be if we finished the current product. | 10:28:24 |
| 22 | Q.   Why were you chatting with Mr. Levandowski | 10:28:26 |
| 23 | about what you were working on at Tyto LiDAR? | 10:28:29 |
| 24 | A.   I couldn't tell you -- if your question is | 10:28:34 |
| 25 | why that was appropriate or why that was something | 10:28:41 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | that was to discuss, the question came up, he would | 10:28:45 |
| 2 | ask, we would talk. | 10:28:47 |
| 3 | Q.   Was there anyone else that you would have | 10:28:50 |
| 4 | these kind of chats with, that weren't employees, | 10:28:53 |
| 5 | about your work at Tyto? | 10:28:58 |
| 6 | A.   Not that I recall. | 10:29:02 |
| 7 | Q.   Did you ever raise to any of your fellow | 10:29:05 |
| 8 | employees at Tyto LiDAR, hey, why are we talking with | 10:29:10 |
| 9 | Mr. Levandowski about the work that we're doing? | 10:29:14 |
| 10 | A.   No. | 10:29:14 |
| 11 | Q.   Never came up? | 10:29:16 |
| 12 | A.   Not to my recollection. | 10:29:17 |
| 13 | Q.   You never asked anyone? | 10:29:18 |
| 14 | A.   No. | 10:29:18 |
| 15 | Q.   You didn't think it was odd that this person | 10:29:21 |
| 16 | who doesn't work for the company was talking about | 10:29:23 |
| 17 | your work with you? | 10:29:24 |
| 18 | A.   No. | 10:29:25 |
| 19 | Q.   Did you know that Mr. Levandowski was working | 10:29:27 |
| 20 | on LiDAR at Waymo at the time? | 10:29:31 |
| 21 | A.   I knew he was working for Google at the time, | 10:29:35 |
| 22 | and I didn't know the details of what specifically he | 10:29:39 |
| 23 | was working on. | 10:29:41 |
| 24 | Q.   Have you ever spoken with Mr. Levandowski | 10:29:44 |
| 25 | about ████████████████████████ | 10:29:51 |

Page 17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes. | 10:29:51 |
| 2 | Q.   When? | 10:29:52 |
| 3 | A.   This would be some date, I can't recall when, | 10:30:01 |
| 4 | at Tyto LiDAR. | 10:30:05 |
| 5 | Q.   And what did you guys talk about? | 10:30:12 |
| 6 | A.   We talked about our need to design our own | 10:30:15 |
| 7 | fiber laser in order to eliminate costs and lead time. | 10:30:21 |
| 8 | And he gave me what I would call a tech tutorial on | 10:30:29 |
| 9 | fiber lasers. | 10:30:31 |
| 10 | Q.   What did he say? | 10:30:35 |
| 11 | A.   I don't remember the words of our | 10:30:37 |
| 12 | conversation. | 10:30:38 |
| 13 | Q.   Tell me everything you remember about that | 10:30:40 |
| 14 | conversation, please. | 10:30:41 |
| 15 | A.   He -- trying to recall -- described a | 10:30:53 |
| 16 | schematic, a layout, an approach for ███████████    █████████ | |
| ██ | ████████████████ generally how they work.  Told me | 10:31:03 |
| 18 | to go find a YouTube video from a professor on lasers | 10:31:09 |
| 19 | in general.  I believe he recommended some suppliers. | 10:31:18 |
| 20 | Q.   Who are the suppliers? | 10:31:20 |
| 21 | A.   I believe he recommended ████████████    █████████ | |
| ██ | ██████████   And I believe he recommended ████████. | 10:31:41 |
| 23 | Q.   And ████████ that's the same vendor used for | 10:31:47 |
| 24 | the fiber in the Spider design; right? | 10:31:51 |
| 25 | A.   Yes. | 10:31:51 |

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Sorry I interrupted. | 10:31:55 |
| 2 | Are you finished telling me everything that | 10:31:57 |
| 3 | you remember about that conversation? | 10:31:58 |
| 4 | MR. JAFFE:  Can you get me a piece of paper? | 10:32:07 |
| 5 | MR. McCAULEY:  (Hands document.) | 10:32:15 |
| 6 | THE WITNESS:  I recall he was telling me to hurry | 10:32:18 |
| 7 | up and order the ███████ because they were long | 10:32:25 |
| 8 | lead items.  I think he suggested some ███████  ███████ | |
| | ██████████████████████████  ███████ | |
| | ████████████████  I don't recall any more | 10:32:46 |
| 11 | than that. | 10:32:48 |
| 12 | BY MR. JAFFE: | 10:32:48 |
| 13 | Q.   Thank you. | 10:32:49 |
| 14 | So we talked about that conversation, and you | 10:32:53 |
| 15 | said you didn't remember when it was.  I just want to | 10:32:56 |
| 16 | see if we can bound that time with any more | 10:32:59 |
| 17 | specificity. | 10:33:00 |
| 18 | A.   Ooh.  I recall it occurred at our -- after we | 10:33:09 |
| 19 | moved out of Berkeley, so this was in San Leandro. | 10:33:16 |
| 20 | This would have been prior to my starting to develop | 10:33:22 |
| 21 | the fiber lasers, so it had to be relatively | 10:33:25 |
| 22 | shortly -- I would say -- this is all qualitative, I'm | 10:33:32 |
| 23 | sorry -- shortly after that move to San Leandro. | 10:33:34 |
| 24 | Q.   All right.  So based on those kind of | 10:33:36 |
| 25 | considerations, what approximate timeline did you guys | 10:33:42 |

Page 19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | move to San Leandro? | 10:33:43 |
| 2 | A.   There's a lot of years between here and | 10:33:45 |
| 3 | there.  It's tractable [sic] from other information | 10:33:52 |
| 4 | sources, but I don't have it in my head right now. | 10:33:55 |
| 5 | Q.   2015? | 10:33:56 |
| 6 | A.   Could be.  I don't know. | 10:33:57 |
| 7 | Q.   So sitting here today, you can't give me any | 10:34:00 |
| 8 | more specificity as to the time of that conversation? | 10:34:03 |
| 9 | A.   I cannot. | 10:34:04 |
| 10 | Q.   I'm going to hand you this. | 10:34:06 |
| 11 | MR. JAFFE:  And we're going to mark it as -- now | 10:34:09 |
| 12 | I've lost what exhibit we're at, so I'm just going to | 10:34:14 |
| 13 | say 150 so we don't run over another exhibit. | |
| 14 | (Plaintiff's Exhibit 150 was marked.) | |
| 15 | BY MR. JAFFE: | |
| 16 | Q.   Can you please draw the schematic that | 10:34:17 |
| 17 | Mr. Levandowski provided to you during that | 10:34:20 |
| 18 | conversation.  And here I'll hand you my pen. | 10:34:25 |
| 19 | A.   I can do my best. | 10:34:26 |
| 20 | So I want to state, as I'm going to attempt | 10:34:56 |
| 21 | to do this for you, that there is a very real risk | 10:35:00 |
| 22 | that I'm going to take information that I know now, | 10:35:03 |
| 23 | after having built the fiber laser, and get that | 10:35:06 |
| 24 | somehow accidently contaminated into a vague | 10:35:13 |
| 25 | recollection of what schematic he gave me. | 10:35:16 |

Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   I just want your best recollection of the | 10:35:18 |
| 2 | schematic that he gave you. | 10:35:19 |
| 3 | A.   I understand that. | |
| 4 | Q.   That's all I'm asking for. | 10:35:21 |
| 5 | A.   I understand that. | 10:35:23 |
| 6 | (Witness draws diagram.) | 10:35:31 |
| 7 | (Pause in proceedings.) | |
| 8 | MR. KIM:  Just going to object on form | 10:35:39 |
| 9 | grounds here, for the record. | 10:35:41 |
| 10 | THE WITNESS:  Okay.  I think this is the best | 10:38:17 |
| 11 | of my recollection.  I put a note on here there's ▮▮    ▮▮ | |
| | ▮   ▮▮   I don't know what the order was in his | 10:38:24 |
| 13 | recommendation. | 10:38:25 |
| 14 | BY MR. JAFFE: | |
| 15 | Q.   Can I take a look at it? | 10:38:31 |
| 16 | A.   Yes.  And I've drawn ▮▮▮.  And I | 10:38:35 |
| 17 | don't know if he recommended ▮▮.  And I can | 10:38:37 |
| 18 | explain any abbreviations. | 10:38:39 |
| 19 | Q.   Sure. | 10:38:40 |
| 20 | So I'm just going -- just want to talk a | 10:38:45 |
| 21 | couple things here. | 10:38:46 |
| 22 | So ▮▮ what does that stand for? | 10:38:49 |
| 23 | A.   ▮▮▮. | 10:38:52 |
| 24 | Q.   Okay.  And then ▮▮ here on Exhibit 150, | 10:38:54 |
| 25 | what does that stand for? | 10:38:56 |

Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A.    ███████████████████████.            10:39:04

2        Q.    And in terms -- I again want to talk about  10:39:07

3   the timing of this briefly.                    10:39:09

4        Do you know before -- whether it was before   10:39:12

5   or after 2011?                                 10:39:14

6        A.    I don't know.                        10:39:24

7        Q.    So did you talk about ████████████  ██████  10:39:32

█   ████████████████████at this time?             10:39:40

9        A.    I don't recall.                      10:39:41

10       Q.    Did you talk about ████████████████  10:39:44

11  at this time?                                  10:39:45

12       A.    Yes.                                 10:39:46

13       Q.    What did you talk about?             10:39:48

14       A.    We talked about the need to optimize ████  ██████  10:39:52

█   ████████████████ and that that could be done   10:39:58

16  through an experimental approach.              10:40:01

17       Q.    What was the experimental approach that  10:40:03

18  Mr. Levandowski told you about?                10:40:05

19       A.    He didn't give a lot of detail.  He called it  10:40:09

20  a ██████   I can't remember how he called it.  But as  10:40:15

21  he described it, ██████████████████████  ██████  10:40:20

█   ████████████████████████████████████  ██████

█   ████████████████████████████████████  ██████

█   ████████████████████████████████

█   ████████████████████                          10:40:34
```

Page 22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Did you and Mr. Levandowski discuss the        10:40:39

2    ████████████████████████████████████   █████████     

     ████████████████████████████████████               10:40:49

4    A.    Possibly, yeah.  I think there -- he may have  10:40:54

5    described the relationship between -- almost the     10:40:58

6    equivalence.  ███████████████████████████   ███████  

     ██████████████████████████████   ███████             

     ████████████████████████████                        10:41:07

9    Q.    All right.  After you had this conversation    10:41:16

10   with Mr. Levandowski, did you build the fiber laser  10:41:22

11   that he described?                                   10:41:23

12   A.    Yeah.                                          10:41:23

13   Q.    And when you had this conversation with him,   10:41:27

14   did you ask him whether he was allowed to reveal this 10:41:29

15   information to you?                                  10:41:31

16   A.    No.                                            10:41:31

17   Q.    Why not?                                       10:41:35

18   A.    I can't recall what I was feeling or thinking  10:41:37

19   at the time, but this looks like general information 10:41:41

20   to me.                                               10:41:42

21   Q.    So you didn't think, when he provided a        10:41:44

22   schematic on how to build a fiber laser, that this   10:41:48

23   could have been confidential information of Google?  10:41:52

24   A.    I wouldn't say so.                             10:41:54

25   Q.    That didn't cross your mind?                   10:41:56

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I don't recall what crossed my mind. | 10:41:57 |
| 2 | Q.   So you're not denying that it could have | 10:42:00 |
| 3 | happened? | 10:42:02 |
| 4 | A.   It didn't happen that I recall -- | 10:42:04 |
| 5 | Q.   Did you -- | |
| 6 | A.   -- but it's not impossible. | 10:42:07 |
| 7 | Q.   Sorry.  I didn't mean to interrupt. | 10:42:09 |
| 8 | Did you ever discuss with anyone any question | 10:42:11 |
| 9 | in your mind as to whether Mr. Levandowski was allowed | 10:42:14 |
| 10 | to reveal this information to you? | 10:42:17 |
| 11 | A.   No. | 10:42:17 |
| 12 | Q.   Didn't cross your mind? | 10:42:20 |
| 13 | A.   There's enough prior art.  As I began to | 10:42:26 |
| 14 | study this online, it looked pretty plain vanilla to | 10:42:32 |
| 15 | me. | 10:42:33 |
| 16 | Q.   All right.  So we talk about ███████     ███████ | |
| | ███ ████████████ and you built this fiber laser. | 10:42:38 |
| 18 | Is this the resulting design -- or the basis | 10:42:41 |
| 19 | for the design that is in the fiber laser in Spider? | 10:42:45 |
| 20 | MR. KIM:  Objection; form. | 10:42:48 |
| 21 | THE WITNESS:  I would be willing to say that this | 10:42:53 |
| 22 | was a starting point for my development of the fiber | 10:42:57 |
| 23 | laser that did end up in the Owl sensor and later the | 10:43:03 |
| 24 | Spider. | 10:43:04 |
| 25 | BY MR. JAFFE: | 10:43:04 |

Page 24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1       Q.    Right.                                          
2             So, for example, the fiber laser in Spider,     10:43:08
3    ████████████████████████████████ right?                 10:43:10
4       A.    Yes.                                            10:43:10
5       Q.    And the ████████████████████████████ ████████  10:43:13
█    ██████████████████████ right?                           10:43:16
7       A.    Right.                                          10:43:16
8       Q.    And it's████████████████████████████           10:43:20
9    right?                                                   10:43:20
10      A.    Right.                                          10:43:20
11      Q.    And all those elements are described here in    10:43:23
12   Exhibit 150, the drawing that you described; right?      10:43:26
13      A.    Right.                                          10:43:26
14      Q.    And you determined ██████████████████ ████████  10:43:30
█    ████████████████████████████████████████ based on       10:43:39
16   Mr. Levandowski's kind of guidance with you on the       10:43:44
17   experimental approach to take; right?                    10:43:46
18      MR. KIM:  Objection; form.                            10:43:48
19      THE WITNESS:  I would say that his guidance on a      10:43:57
20   ████████████████████████ put me on the right direction to 10:44:01
21   develop ████████████████████ for this, yes.             10:44:05
22   BY MR. JAFFE:                                            10:44:05
23      Q.    So we talked about ████████████████████████    10:44:08
24             What was the next conversation that you had    10:44:10
25   with Mr. Levandowski about LiDAR?                        10:44:18
```

Page 25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | a sensor that was capable of long-range performance | 10:50:31 |
| 2 | and that they would need a sensor for long-range | 10:50:35 |
| 3 | viewing on an autonomous vehicle. | 10:50:40 |
| 4 | And so our angle with Uber at the time was we | 10:50:44 |
| 5 | think we can build such a sensor, but we're not | 10:50:47 |
| 6 | working on it right now.  Our company is open for | 10:50:51 |
| 7 | acquisition. | 10:50:55 |
| 8 | Q.   So the sensor that you were coming up with, | 10:51:00 |
| 9 | that was going to be a bistatic design; right? | 10:51:03 |
| 10 | A.   Yes. | 10:51:05 |
| 11 | Q.   At some point, Spider came about and | 10:51:12 |
| 12 | transformed it to a monostatic design; right? | 10:51:15 |
| 13 | A.   True. | 10:51:17 |
| 14 | Q.   Do you know who was responsible for the | 10:51:19 |
| 15 | change from what you were coming up with, which was a | 10:51:22 |
| 16 | bistatic design, to the monostatic design in Spider? | 10:51:26 |
| 17 | A.   I don't recall who among the team was | 10:51:34 |
| 18 | involved in our conversations first to move away from | 10:51:39 |
| 19 | supplemental design to one design that would cover all | 10:51:44 |
| 20 | the way from directly in front of the vehicle out to | 10:51:47 |
| 21 | long range.  But that was a decision that was made | 10:51:50 |
| 22 | that pretty much negated the proposal I had made of | 10:51:56 |
| 23 | using a tight-packed purely long-range sensor. | 10:52:00 |
| 24 | Q.   So you shifted into the passive voice there. | 10:52:05 |
| 25 | You're talking about -- who is making these | 10:52:07 |

Page 30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | decisions? | 10:52:08 |
| 2 | A.   Exactly.  I'm trying to recall.  I don't | 10:52:10 |
| 3 | know, of all the people that were involved, who was in | 10:52:14 |
| 4 | those conversations.  So it would include me.  It | 10:52:17 |
| 5 | would include most likely Anthony Levandowski.  I | 10:52:23 |
| 6 | believe it would also include Daniel Gruver.  And I'm | 10:52:28 |
| 7 | not sure if there's anyone else. | 10:52:30 |
| 8 | Q.   And do you know, in the context of those | 10:52:35 |
| 9 | communications, who just said, Hey, James, your design | 10:52:44 |
| 10 | looks great, but we're going to go with the monostatic | 10:52:46 |
| 11 | design and we think it's better? | 10:52:50 |
| 12 | MR. KIM:  Objection; form. | 10:52:50 |
| 13 | THE WITNESS:  The monostatic design that uses one | 10:52:56 |
| 14 | lens for transmit and receive, I don't know who came | 10:52:59 |
| 15 | up with that.  At some point I saw it, seemed okay to | 10:53:05 |
| 16 | me, it seemed compact, let's use it. | 10:53:09 |
| 17 | BY MR. JAFFE: | 10:53:09 |
| 18 | Q.   So you don't know -- you have no information | 10:53:12 |
| 19 | of who came up with the monostatic design in Spider? | 10:53:15 |
| 20 | A.   True. | 10:53:16 |
| 21 | Q.   Okay.  So we were still -- going back to our | 10:53:25 |
| 22 | chron of conversations with Mr. Levandowski, when is | 10:53:28 |
| 23 | the next conversation that you had with | 10:53:31 |
| 24 | Mr. Levandowski about LiDAR that you can recall? | 10:53:34 |
| 25 | A.   It's very hard for me to recall specific | 10:53:43 |

Page 31

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | conversations, especially in sequence.  At this point, | 10:53:47 |
| 2 | I report to Anthony Levandowski. | 10:53:50 |
| 3 | Q.   And just for purposes of the record, when | 10:53:52 |
| 4 | you're talking about "this point," what date are you | 10:53:54 |
| 5 | talking about? | 10:53:55 |
| 6 | A.   I'm talking about immediately following | 10:53:56 |
| 7 | Tyto's acquisition by Otto -- or I should say Otto's | 10:54:03 |
| 8 | acquisition of Tyto.  We joined -- at that time, I | 10:54:08 |
| 9 | reported to Anthony Levandowski.  There would be | 10:54:12 |
| 10 | regular staff meetings.  Since my team is working on | 10:54:19 |
| 11 | LiDAR, LiDAR would definitely come up in conversations | 10:54:22 |
| 12 | with him, at that point, on a probably fairly routine | 10:54:25 |
| 13 | basis, like weekly basis. | 10:54:28 |
| 14 | Q.   And what did you and Mr. Levandowski discuss? | 10:54:31 |
| 15 | A.   Progress, approach, schedule or timing, | 10:54:39 |
| 16 | volumes. | 10:54:41 |
| 17 | Q.   Can you tell me any more specifics about the | 10:54:44 |
| 18 | routine and regular conversations you were having with | 10:54:48 |
| 19 | Mr. Levandowski about LiDAR? | 10:54:49 |
| 20 | A.   He would ask about what the design was | 10:54:56 |
| 21 | looking like, how we were approaching it.  Beyond | 10:55:00 |
| 22 | that, I don't recall specifics of our conversations. | 10:55:03 |
| 23 | Q.   So sitting here today, in this time period | 10:55:06 |
| 24 | that you're talking about, after you joined Otto in | 10:55:10 |
| 25 | May of 2016, you would have regular conversations with | 10:55:15 |

Page 32

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Mr. Levandowski about LiDAR, but you can't recall any | 10:55:18 |
| 2 | specifics of those conversations; is that fair? | 10:55:21 |
| 3 | A.   That's fair to say I cannot recall beyond the | 10:55:26 |
| 4 | details I already told you. | 10:55:28 |
| 5 | Q.   I see. | 10:55:29 |
| 6 | When is the next -- moving forward in time | 10:55:34 |
| 7 | here, when is the next substantive conversation with | 10:55:38 |
| 8 | Mr. Levandowski about LiDAR that you recall? | 10:55:40 |
| 9 | A.   I don't know. | 10:55:56 |
| 10 | Q.   You don't know? | 10:55:57 |
| 11 | A.   I don't know. | 10:55:57 |
| 12 | Q.   I'm not trying to do a memory test here.  If | 10:56:02 |
| 13 | there's just too many conversations for you to recall, | 10:56:05 |
| 14 | that's fine, and you can just tell me that.  But | 10:56:08 |
| 15 | otherwise I'm just going to keep asking. | 10:56:10 |
| 16 | MR. KIM:  Objection; form. | 10:56:10 |
| 17 | THE WITNESS:  Most of our conversations, that is | 10:56:21 |
| 18 | between me and Anthony Levandowski, were not | 10:56:24 |
| 19 | substantive in LiDAR design per se.  So I'm having a | 10:56:30 |
| 20 | hard time remembering further conversations or | 10:56:35 |
| 21 | specifics. | 10:56:35 |
| 22 | Most of the time, he wanted to know where | 10:56:38 |
| 23 | we were in our progress, and he may have asked | 10:56:41 |
| 24 | what the design was shaping up like. | 10:56:44 |
| 25 | I do recall one more. | 10:56:49 |

Page 33

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | He was visiting Uber.  He got me on the phone | 10:56:56 |
| 2 | and was starting to describe using eight fiber | 10:57:02 |
| 3 | lasers -- that's right -- eight fiber lasers, | 10:57:08 |
| 4 | splitting their outputs to multiply the number of | 10:57:12 |
| 5 | channels and then routing a fiber from each fiber | 10:57:17 |
| 6 | laser into a number of optical cavities. | 10:57:24 |
| 7 | There was also, at that time frame, a | 10:57:26 |
| 8 | document published or shared with the team.  I think | 10:57:31 |
| 9 | that came from Scott Boehmke.  So this would be | 10:57:38 |
| 10 | substantive in terms of shaping up what Spider would | 10:57:43 |
| 11 | eventually become. | 10:57:44 |
| 12 | BY MR. JAFFE: | 10:57:44 |
| 13 | Q.   And you said Mr. Levandowski called you from | 10:57:48 |
| 14 | Uber in Pittsburgh; is that right? | 10:57:53 |
| 15 | A.   My understanding he was either at Uber or in | 10:57:55 |
| 16 | transit to or from Uber in Pittsburgh. | 10:57:58 |
| 17 | Q.   Approximately what time period was this? | 10:58:01 |
| 18 | A.   This would be relatively early in the | 10:58:04 |
| 19 | development of the Spider.  Beyond that, I would defer | 10:58:08 |
| 20 | to e-mails.  I don't remember. | 10:58:10 |
| 21 | Q.   When you say you would "defer to e-mails," | 10:58:12 |
| 22 | are there e-mails about this conversation? | 10:58:15 |
| 23 | A.   There were e-mails -- I should say there was | 10:58:19 |
| 24 | an e-mail with a document that was published that | 10:58:24 |
| 25 | contained the substance of what he was describing. | 10:58:27 |

Page 34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   What was the name of that document? | 10:58:29 |
| 2 | A.   I think it had the name like LiDAR Thoughts. | 10:58:36 |
| 3 | Q.   And that was authored by Mr. Levandowski? | 10:58:39 |
| 4 | MR. KIM:  Objection; form. | 10:58:39 |
| 5 | THE WITNESS:  I don't know that Anthony authored | 10:58:43 |
| 6 | that or if Scott authored that. | 10:58:46 |
| 7 | BY MR. JAFFE: | 10:58:46 |
| 8 | Q.   Mr. Levandowski had design input into what -- | 10:58:49 |
| 9 | the LiDAR described in that document, though; is that | 10:58:53 |
| 10 | fair? | 10:58:54 |
| 11 | MR. KIM:  Objection; form. | 10:58:54 |
| 12 | THE WITNESS:  That's a good question.  He | 10:58:58 |
| 13 | described it to me, but I don't know whether he was | 10:59:02 |
| 14 | describing his idea or Scott's idea.  I don't know. | 10:59:06 |
| 15 | BY MR. JAFFE: | 10:59:06 |
| 16 | Q.   So just to back up, Mr. Levandowski called | 10:59:14 |
| 17 | you and provided some thoughts on how to do the fiber | 10:59:20 |
| 18 | laser design in Spider.  And he was describing | 10:59:23 |
| 19 | something that was in a document called LiDAR | 10:59:25 |
| 20 | Thoughts; is that fair? | 10:59:27 |
| 21 | A.   He was describing something that was later | 10:59:30 |
| 22 | published in an e-mail with LiDAR Thoughts. | 10:59:34 |
| 23 | Q.   And at this time, Otto was an independent | 10:59:41 |
| 24 | company; right? | 10:59:43 |
| 25 | A.   Yes. | 10:59:43 |

Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    Why was Mr. Levandowski at Uber? | 10:59:46 |
| 2 | A.    As I understood it, we were considering | 10:59:52 |
| 3 | selling our LiDAR sensors to Uber. | 10:59:56 |
| 4 | Q.    When you say "As I understood it," what was | 10:59:59 |
| 5 | the basis for that understanding? | 11:00:01 |
| 6 | MR. KIM:  Just caution you not to reveal | 11:00:04 |
| 7 | privileged communications with lawyers.  If you can | 11:00:07 |
| 8 | answer it without doing that, you can do so. | 11:00:10 |
| 9 | THE WITNESS:  Um-hum. | 11:00:11 |
| 10 | I don't recall the exact timing and | 11:00:15 |
| 11 | sequencing.  At some point, engineers from Uber | 11:00:23 |
| 12 | Pittsburgh visited our office.  And I have a vague | 11:00:33 |
| 13 | recollection Anthony telling us to be helpful, to | 11:00:41 |
| 14 | share information freely.  It seemed almost like a | 11:00:48 |
| 15 | partnership.  Around the time, Anthony put an | 11:00:56 |
| 16 | e-mail to the entire company saying we were going | 11:00:59 |
| 17 | to be working with them, providing sensor to them, | 11:01:03 |
| 18 | possibly involving autonomous software as well. | 11:01:09 |
| 19 | MR. JAFFE:  Counsel, I don't think that e-mail has | 11:01:12 |
| 20 | been produced, and we ask that it be produced | 11:01:14 |
| 21 | immediately. | 11:01:16 |
| 22 | MR. KIM:  I don't know which e-mail that | 11:01:17 |
| 23 | specifically refers to.  I believe we produced a bunch | 11:01:21 |
| 24 | of e-mails that are similar to that description, but | 11:01:24 |
| 25 | we can confirm. | 11:01:26 |

Page 36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A. This would be distinct from status and | 11:05:08 |
| 2 | updates. | 11:05:09 |
| 3 | Q. Okay. I just want that to be clear. | 11:05:10 |
| 4 | Okay. When you joined Tyto, when did you | 11:05:14 |
| 5 | first hear that Mr. Levandowski would be your boss on | 11:05:19 |
| 6 | the LiDAR team? | 11:05:21 |
| 7 | A. I believe my offer letter for joining Otto | 11:05:28 |
| 8 | would have indicated that he would be my manager, I | 11:05:33 |
| 9 | believe. | 11:05:33 |
| 10 | Q. So Mr. Levandowski decided that you | 11:05:41 |
| 11 | were -- that he was -- you were going -- excuse me -- | 11:05:44 |
| 12 | that he was going to be your boss on the LiDAR team | 11:05:47 |
| 13 | when you joined Otto; right? | 11:05:48 |
| 14 | A. I presumed that, yes. | 11:05:51 |
| 15 | Q. Do you think the LiDAR team needed | 11:05:56 |
| 16 | Mr. Levandowski to accomplish its goals? | 11:06:01 |
| 17 | MR. KIM: Objection; form. | 11:06:01 |
| 18 | THE WITNESS: Honestly, no. | 11:06:08 |
| 19 | BY MR. JAFFE: | 11:06:08 |
| 20 | Q. Why not? | 11:06:09 |
| 21 | A. We have a team that probably could have come | 11:06:13 |
| 22 | up with a number of different LiDAR sensors without | 11:06:17 |
| 23 | his input. | 11:06:18 |
| 24 | Q. But that's not what happened; right? | 11:06:20 |
| 25 | A. That's not what happened. | 11:06:22 |

Page 39

```
1       Q.   So when was the first time you worked with       11:06:32

2   Max Levandowski on LiDAR?                                  11:06:35

3       A.   That would be immediately following my           11:06:38

4   joining Otto.                                              11:06:39

5       Q.   And what is your working relationship with        11:06:43

6   Max Levandowski?                                           11:06:45

7       A.   He reports to me.                                 11:06:47

8       Q.   He reports to you.   I see.                        11:06:49

9            So, actually, let's go back in time to when       11:06:56

10  you first joined Otto.                                     11:06:58

11           And you're having regular interactions with       11:07:00

12  Mr. Levandowski; right?                                    11:07:02

13      A.   Um-hum.                                            11:07:03

14      Q.   What devices are you aware of him using at        11:07:06

15  that time in terms of computers?                           11:07:09

16      A.   I believe he had a laptop, probably a            11:07:12

17  Macintosh.                                                 11:07:14

18      Q.   Is that his personal laptop?                      11:07:17

19      MR. KIM:  Objection; form.                             11:07:17

20      THE WITNESS:  I don't know.                            11:07:19

21  BY MR. JAFFE:                                              11:07:19

22      Q.   What about a phone?  Was he using a phone?        11:07:22

23      A.   Sure.   I don't know if he had one phone,         11:07:24

24  multiple phones.  I didn't really pay attention, but       11:07:27

25  I'm sure he had a phone.                                   11:07:28
```

Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   How often did Mr. Levandowski bring his | 11:07:32 |
| 2 | personal laptop to work with him? | 11:07:35 |
| 3 | MR. KIM:  Objection; form. | 11:07:35 |
| 4 | THE WITNESS:  I couldn't possibly know. | 11:07:37 |
| 5 | BY MR. JAFFE: | 11:07:37 |
| 6 | Q.   Every day? | 11:07:39 |
| 7 | MR. KIM:  Objection; form. | 11:07:39 |
| 8 | THE WITNESS:  The reason I couldn't possibly know | 11:07:42 |
| 9 | is I don't know whether the laptop he may have carried | 11:07:45 |
| 10 | was his personal laptop or the work laptop. | 11:07:48 |
| 11 | BY MR. JAFFE: | 11:07:48 |
| 12 | Q.   I see.  All right.  So let's just talk about | 11:07:51 |
| 13 | the one laptop that you know about. | 11:07:53 |
| 14 | How often did he bring that laptop to work | 11:07:55 |
| 15 | with him? | 11:07:56 |
| 16 | MR. KIM:  Objection; form. | 11:07:56 |
| 17 | THE WITNESS:  I don't know.  I have no idea. | 11:08:02 |
| 18 | BY MR. JAFFE: | 11:08:02 |
| 19 | Q.   You saw him at work with the personal laptop; | 11:08:06 |
| 20 | right? | 11:08:06 |
| 21 | A.   I'm sure I've seen him at work with a laptop. | 11:08:10 |
| 22 | Q.   And that was a regular occurrence; right? | 11:08:12 |
| 23 | MR. KIM:  Objection; form. | 11:08:14 |
| 24 | THE WITNESS:  I hardly paid attention to how often | 11:08:18 |
| 25 | he was carrying a laptop. | 11:08:20 |

Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. JAFFE: | 11:08:20 |
| 2 | Q.   I understand you're saying that you hardly | 11:08:23 |
| 3 | pay attention to this.  The judge specifically asked | 11:08:25 |
| 4 | to find out this information, and that's the reason | 11:08:27 |
| 5 | I'm asking this question.  I just want that to be | 11:08:30 |
| 6 | clear. | 11:08:31 |
| 7 | How often -- so let me just pause there, | 11:08:34 |
| 8 | okay, and I'm going to ask my question again. | 11:08:36 |
| 9 | How often did you see Anthony Levandowski | 11:08:38 |
| 10 | with his Macintosh laptop at Otto? | 11:08:42 |
| 11 | MR. KIM:  Objection; form. | 11:08:42 |
| 12 | THE WITNESS:  I don't recall how often. | 11:08:48 |
| 13 | BY MR. JAFFE: | 11:08:48 |
| 14 | Q.   Every day? | 11:08:53 |
| 15 | MR. KIM:  Objection; form. | 11:08:53 |
| 16 | THE WITNESS:  Not necessarily. | 11:08:55 |
| 17 | BY MR. JAFFE: | 11:08:55 |
| 18 | Q.   Four, five days a week; is that fair? | 11:08:58 |
| 19 | A.   I don't know. | 11:09:03 |
| 20 | Q.   You're not willing to tell me any sort of | 11:09:06 |
| 21 | numbers? | 11:09:07 |
| 22 | MR. KIM:  Objection; form. | 11:09:07 |
| 23 | THE WITNESS:  I can't give you any number for how | 11:09:12 |
| 24 | often I can recall seeing him carrying a laptop.  And | 11:09:16 |
| 25 | I would also mention he spent a lot of time traveling | 11:09:20 |

Page 42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | to the Pittsburgh office, and I would have no idea how | 11:09:23 |
| 2 | often he carried a laptop for that as well. | 11:09:26 |
| 3 | BY MR. JAFFE: | 11:09:26 |
| 4 | Q.  Fair. | 11:09:27 |
| 5 | I'm not trying to ask you -- I'm only asking | 11:09:28 |
| 6 | for your understanding based on your interactions with | 11:09:31 |
| 7 | him. | 11:09:32 |
| 8 | Understand? | 11:09:32 |
| 9 | A.  Understand. | 11:09:33 |
| 10 | Q.  Would you agree that you probably saw | 11:09:36 |
| 11 | Mr. Levandowski with his laptop three days a week, | 11:09:41 |
| 12 | approximately? | 11:09:42 |
| 13 | MR. KIM:  Objection to form.  Same objection. | 11:09:49 |
| 14 | THE WITNESS:  I really don't recall.  I really do | 11:09:51 |
| 15 | not recall. | 11:09:52 |
| 16 | BY MR. JAFFE: | 11:09:52 |
| 17 | Q.  All right.  Let me come at this the other | 11:09:55 |
| 18 | way. | 11:09:56 |
| 19 | You saw him at least once with the laptop; | 11:09:58 |
| 20 | right? | |
| 21 | A.  Sure. | 11:09:59 |
| 22 | Q.  At least, let's say, 50 times? | 11:10:01 |
| 23 | MR. KIM:  Objection to form. | 11:10:02 |
| 24 | THE WITNESS:  At least some number of times.  I | 11:10:06 |
| 25 | don't know. | 11:10:06 |

Page 43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    BY MR. JAFFE:

2         Q.   Okay.   You're aggressively resisting giving    11:10:09

3    any sort of number.  And the judge asked for this, so     11:10:12

4    I'm just going to press on this a little bit longer?       11:10:13

5    Okay?

6         MR. KIM:  Objection to form.                          11:10:17

7    BY MR. JAFFE:                                              11:10:17

8         Q.   More than 30 times?                              11:10:20

9         A.   Possibly.                                        11:10:21

10        Q.   Would you dispute if someone said to the         11:10:22

11   court that he -- you saw his laptop at least 30 times      11:10:27

12   when you were working at Otto before the Uber

13   acquisition?

14        MR. KIM:  Objection to form.                          11:10:30

15        THE WITNESS:  If someone claimed to see him with a    11:10:32

16   laptop 30 times, I would not object to that.               11:10:34

17   BY MR. JAFFE:                                              11:10:34

18        Q.   And just talking about regularly, if we were     11:10:38

19   going to put an approximate amount, would you say          11:10:41

20   approximately two to four times a week you saw him         11:10:44

21   with a laptop at Otto?  Is that fair?                      11:10:46

22        MR. KIM:  Objection; form.                            11:10:46

23        THE WITNESS:  I don't know if kept his laptop with    11:10:50

24   him everywhere he went in the office, so --                11:10:53

25   BY MR. JAFFE:
```

Page 44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   I'm just asking about what you saw with your      11:10:56

2   own eyes.                                                 11:10:57

3      A.   So I would say a few times a week when he was     11:11:04

4   spending that week in the office.                         11:11:07

5      Q.   Fair.                                             11:11:08

6           So just to clean that up for purposes of the      11:11:12

7   record, your testimony, based on your personal           11:11:17

8   knowledge, is you approximately saw Mr. Levandowski      11:11:21

9   when he was in San Francisco with his Macintosh laptop    11:11:27

10  a few times a week --                                     11:11:29

11     MR. KIM:  Objection; form.                             11:11:31

12  BY MR. JAFFE:                                             11:11:31

13     Q.   -- is that fair?                                  11:11:33

14     MR. KIM:  Objection; form.                             11:11:34

15     THE WITNESS:  It's fair as long as we emphasize        11:11:37

16  approximately.                                            11:11:39

17  BY MR. JAFFE:                                             11:11:39

18     Q.   Okay.  All right.  Did you ever get e-mails       11:11:45

19  from Mr. Levandowski while he was working from home?      11:11:51

20     A.   I don't know.                                     11:11:54

21     Q.   Why don't you know?                               11:11:57

22     A.   I would occasionally get e-mails from Anthony     11:12:00

23  Levandowski, but I don't know how to tell you where he    11:12:03

24  was when he sent those e-mails.                           11:12:05

25     Q.   So there's no instance where you're sitting       11:12:09

Page 45

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | in the office and you look around and he's not there | 11:12:11 |
| 2 | and he hasn't been there all day and he's sending | 11:12:16 |
| 3 | e-mails?  That's never happened? | 11:12:19 |
| 4 | A.   Incorrect. | 11:12:19 |
| 5 | Q.   So can you please explain then. | 11:12:21 |
| 6 | A.   He travels a lot.  So I quite likely got | 11:12:25 |
| 7 | e-mails from him when I didn't see him in the office. | 11:12:30 |
| 8 | Q.   So you don't know where he is a lot of the | 11:12:32 |
| 9 | time; is that fair? | 11:12:33 |
| 10 | A.   That's fair. | 11:12:34 |
| 11 | Q.   So you got e-mails from Mr. Levandowski when | 11:12:37 |
| 12 | you were working at Otto, but he wasn't sitting with | 11:12:39 |
| 13 | you in the office; right? | 11:12:40 |
| 14 | A.   I believe that's true, yes. | 11:12:45 |
| 15 | Q.   So he wasn't in the office, you don't know | 11:12:47 |
| 16 | where he is, but he's e-mailing you about Otto; is | 11:12:50 |
| 17 | that fair? | 11:12:52 |
| 18 | A.   That's fair. | 11:12:53 |
| 19 | Q.   And was that something that happened on a | 11:12:58 |
| 20 | regular basis? | 11:12:59 |
| 21 | MR. KIM:  Objection; form. | 11:12:59 |
| 22 | THE WITNESS:  I think that's fair. | 11:13:04 |
| 23 | BY MR. JAFFE: | 11:13:04 |
| 24 | Q.   So I want to talk about Fuji for a second | 11:13:11 |
| 25 | here. | 11:13:13 |

Page 46

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | In the Fuji design -- and we'll just go | 11:13:17 |
| 2 | cavity by cavity. | 11:13:18 |
| 3 | But for the mid-range cavity, there are three | 11:13:20 |
| 4 | transmit boards; right? | 11:13:21 |
| 5 | A.   Right. | 11:13:23 |
| 6 | Q.   And in the mid-range cavity, there are three | 11:13:27 |
| 7 | transmit boards and they are pointed -- and they're | 11:13:30 |
| 8 | parallel to one another; right? | 11:13:31 |
| 9 | A.   Right. | 11:13:31 |
| 10 | Q.   The transmit lens for the mid-range cavity is | 11:13:37 |
| 11 | less in width than the width of the transmit boards; | 11:13:43 |
| 12 | right? | 11:13:44 |
| 13 | MR. KIM:  Objection; form. | 11:13:44 |
| 14 | THE WITNESS:  Could you clarify.  I'm confused | 11:13:50 |
| 15 | which lens you're referring to. | 11:13:52 |
| 16 | BY MR. JAFFE: | 11:13:52 |
| 17 | Q.   Yes.  Let me just mark something and make | 11:13:56 |
| 18 | this easier. | 11:13:57 |
| 19 | MR. JAFFE:  And we'll have this be 151. | 11:14:04 |
| 20 | (Plaintiff's Exhibit 151 was marked.) | 11:14:04 |
| 21 | MR. KIM:  At some point -- we've been going for I | 11:14:10 |
| 22 | think over an hour -- if we can take a break.  You can | 11:14:12 |
| 23 | ask your line of questions.  I'm just saying at a | 11:14:15 |
| 24 | convenient time. | 11:14:16 |
| 25 | MR. JAFFE:  Sure. | 11:14:16 |

Page 47

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   ████████████████████████████████████████   11:16:25

2   BY MR. JAFFE:   11:16:25

3      Q.   What do you mean, "necessarily"?   11:16:26

4      A.   Any time you have a lens placed in   11:16:32

5   relationship to the source of light, the lateral   11:16:38

6   resolution -- wrong word -- the lateral relationship   11:16:42

7   between a light source and a lens will dictate the   11:16:47

8   exit angle of the light coming out of that lens.   11:16:50

9        So if you want the light to go straight, you   11:16:54

10   have to carefully place the FAC lens, or fast-axis   11:16:59

11   collimation lens, in a position that will cause the   11:17:04

12   light to exit perhaps parallel to the board, if you   11:17:07

13   want that.   11:17:08

14      Q.   So in the Fuji design -- and we'll call it   11:17:11

15   the FAC lens for the benefit of the court reporter   11:17:13

16   here -- ████████████████████████████   ████████

    ██  ████████████████████████████████████████   ████████

    ██  ████████████████████████   is that fair?   11:17:26

19      MR. KIM:  Objection; form.   11:17:26

20      THE WITNESS:  Maybe I don't like the word████████   ████████

    ██  ████████████████████████████████████   And   11:17:38

22   so to clarify, the FAC lens precollimates the light   11:17:44

23   ████████████████████████████████   11:17:47

24   BY MR. JAFFE:   11:17:47

25      Q.   ████████████████████████████████   11:17:49

Page 50

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 1 | ██████████████  right? | 11:17:50 |
|---|---|---|
| 2 | MR. KIM:  Objection; form. | 11:17:50 |
| 3 | BY MR. JAFFE: | 11:17:50 |
| 4 | Q.   That's all I mean by ████████ | 11:17:54 |
| 5 | MR. KIM:  Objection; form. | 11:17:54 |
| 6 | THE WITNESS:  On two of our laser boards, the | 11:17:59 |
| 7 | ████████████████████████████████ | ██████ |
| ■ | ████████████████████████████████ | ██████ |
| ■ | ████████████████████ | 11:18:11 |
| 10 | BY MR. JAFFE: | 11:18:11 |
| 11 | Q.   Okay.  So I don't have real-time, so I'm | 11:18:18 |
| 12 | going to try and just repeat back to make sure I | 11:18:21 |
| 13 | understand what you said. | 11:18:22 |
| 14 | The fast-axis collimation -- █████████ | ██████ |
| ■ | ████████████████████████████████ | ██████ |
| ■ | ████████████████████████████████ | ██████ |
| ■ | ██████████████████████████  true? | 11:18:42 |
| 18 | MR. KIM:  Objection; form. | 11:18:42 |
| 19 | THE WITNESS:  True as long as we clarify | 11:18:48 |
| 20 | horizontal is horizontal in the drawing. | 11:18:51 |
| 21 | BY MR. JAFFE: | 11:18:51 |
| 22 | Q.   So if anyone testified or said that there's | 11:18:57 |
| 23 | ████████████████████████  that would | 11:19:01 |
| 24 | be wrong; right? | 11:19:02 |
| 25 | MR. KIM:  Objection; form. | 11:19:02 |

Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  Not necessarily.  The word | 11:19:05 |
| 2 | ████████   in LiDAR often means ██████████ | ████████ |
| ▮ | ██████████████████████ | 11:19:13 |
| 4 | BY MR. JAFFE: | 11:19:13 |
| 5 | Q.   I see. | 11:19:13 |
| 6 | So it's just kind of -- if they said there's | 11:19:18 |
| 7 | ██████████  they could be right, but they could be | 11:19:21 |
| 8 | wrong? | 11:19:21 |
| 9 | MR. KIM:  Objection; form. | 11:19:21 |
| 10 | THE WITNESS:  Could. | 11:19:23 |
| 11 | BY MR. JAFFE: | 11:19:23 |
| 12 | Q.   And if someone said ████████████ | ████████ |
| ▮ | ██████████████████████████████ | ████████ |
| ▮ | ████████████████ right? | 11:19:32 |
| 15 | MR. KIM:  Objection; form. | 11:19:32 |
| 16 | THE WITNESS:  Too many words at once.  Could you | 11:19:36 |
| 17 | repeat your last question. | 11:19:38 |
| 18 | MR. JAFFE:  Why don't we just have the court | 11:19:47 |
| 19 | reporter repeat it. | |
| 20 | (Record read by reporter as follows: | |
| 21 | "Question:  And if someone said it's | |
| 22 | ██████████████████████████ | |
| ▮ | ██████████████████████████████ | |
| ▮ | ████████████ right?") | 11:19:47 |
| 25 | MR. KIM:  Objection; form. | 11:19:47 |

Page 52

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        THE WITNESS:  If they say it's ████████ yes, they    11:19:52

 2   are not necessarily denying the fact that ████████       ████████

 █   ████████████████████████████████████.                    11:19:57

 4   BY MR. JAFFE:                                             11:19:57

 5        Q.   Sorry.  There was a missing word there.         11:19:59

 6             If they say it's not ████████--                 11:20:01

 7        A.   Oh.                                             11:20:01

 8        Q.   -- they're not denying that it ████████        ████████

 █   ████████████████████████████████████                     11:20:08

10   true?                                                     11:20:08

11        MR. KIM:  Objection; form.                           11:20:08

12        THE WITNESS:  If I were to say it's not ████████     11:20:18

13   I would not be denying that ████████████████   I         11:20:21

14   can't tell you what they would say.                       11:20:22

15        MR. JAFFE:  Okay.  Why don't we take our first       11:20:27

16   break.                                                    11:20:28

17        THE VIDEOGRAPHER:  We are off the record at 11:20    11:20:31

18   a.m.                                                      11:20:31

19             (Recess taken.)                                 11:20:31

20        THE VIDEOGRAPHER:  We're back on the record at       11:33:47

21   11:33 a.m.                                                11:33:49

22   BY MR. JAFFE:                                             11:33:49

23        Q.   Welcome back.                                   11:34:13

24        A.   Thank you.                                      11:34:14

25        Q.   Last Thursday it was reported in the press      11:34:19
```

Page 53

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | that Mr. Levandowski was demoting himself in some way. | 11:34:26 |
| 2 | Are you familiar with that? | 11:34:27 |
| 3 | A.   I'm familiar with the announcement that his | 11:34:31 |
| 4 | position was changing.  I only take issue with your | 11:34:37 |
| 5 | comment -- or your phrase that says he was demoting | 11:34:40 |
| 6 | himself.  I don't know who decided his position should | 11:34:45 |
| 7 | change. | 11:34:45 |
| 8 | Q.   I see. | 11:34:45 |
| 9 | So you don't know who actually decided that | 11:34:49 |
| 10 | his position should change? | 11:34:51 |
| 11 | A.   Correct. | 11:34:51 |
| 12 | Q.   And do you take issue with the idea that he | 11:34:54 |
| 13 | was demoted in some way? | 11:34:56 |
| 14 | A.   Not necessarily. | 11:34:58 |
| 15 | Q.   Okay.  So if I call it his demotion, that's a | 11:35:03 |
| 16 | fair statement? | 11:35:03 |
| 17 | A.   I won't argue with that. | 11:35:05 |
| 18 | Q.   So how did you find out about | 11:35:09 |
| 19 | Mr. Levandowski's demotion? | 11:35:12 |
| 20 | A.   I received an e-mail.  I believe the whole | 11:35:16 |
| 21 | company received an e-mail describing that change. | 11:35:21 |
| 22 | I want to say Anthony sent the e-mail, but | 11:35:25 |
| 23 | I'm not 100 percent positive on that. | 11:35:28 |
| 24 | ██   ███████████████████████████████████████████ | 11:35:33 |
| 25 | █████████████████████████████████████████ | 11:35:36 |

Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 ███████                                          ███████

██  ███  ███████████                              ███████

██  ███  ████████████████████                     ███████

██  █████████████████████████████████             ███████

██  ███  █████████████████████                    ███████

██  ███████████████████████████                   ███████

██  ██████████████████████████                    ███████

██  ██████                                         ███████

██  ███  ████████  █████████                       ███████

██  █████████  ██  ██████████████                  ███████

██  █████████████████████████████                  ███████

██  ███████████████████                            11:36:13

13  BY MR. JAFFE:                                   11:36:13

14       Q.   Before that e-mail on Thursday, there was no   11:36:18

15  sort of company policy excluding Mr. Levandowski from   11:36:23

16  providing input onto LiDAR; right?                11:36:27

17       MR. KIM:   Objection; form.                 11:36:27

18       THE WITNESS:   I'm not aware of any policy before   11:36:31

19  that date regarding excluding him from any aspect of   11:36:35

20  any work at the company.                          11:36:36

21  BY MR. JAFFE:                                     11:36:36

22       Q.   Including LiDAR?                        11:36:41

23       A.   Including LiDAR.                        11:36:41

24       Q.   So you never received any sort of special   11:36:45

25  instructions about what you could and couldn't do   11:36:47

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | working with Mr. Levandowski before last Thursday; is | 11:36:52 |
| 2 | that fair? | 11:36:53 |
| 3 | A.   That seems -- yeah, that's a true statement. | 11:36:58 |
| 4 | Q.   Are you aware of anyone else receiving | 11:37:00 |
| 5 | special instructions about what they could and | 11:37:02 |
| 6 | couldn't do in working with Mr. Levandowski before | 11:37:05 |
| 7 | last Thursday? | 11:37:06 |
| 8 | MR. KIM:  Objection; form. | 11:37:06 |
| 9 | THE WITNESS:  I'm not aware of anything like that. | 11:37:10 |
| 10 | BY MR. JAFFE: | 11:37:10 |
| 11 | Q.   So before last Thursday Mr. -- as far as you | 11:37:14 |
| 12 | know, Mr. Levandowski was free to provide input into | 11:37:18 |
| 13 | all parts of the self-driving project, including LiDAR | 11:37:20 |
| 14 | and other parts; right? | 11:37:24 |
| 15 | MR. KIM:  Objection; form. | 11:37:24 |
| 16 | THE WITNESS:  That's my understanding. | 11:37:26 |
| 17 | BY MR. JAFFE: | 11:37:26 |
| 18 | Q.   And today as of right now, he's free to | 11:37:32 |
| 19 | provide input into all parts of the self-driving | 11:37:36 |
| 20 | project except for LiDAR? | 11:37:38 |
| 21 | MR. KIM:  Objection; form. | 11:37:38 |
| 22 | THE WITNESS:  I don't recall if there was any | 11:37:45 |
| 23 | other restrictions, but definitely LiDAR was mentioned | 11:37:48 |
| 24 | specifically. | 11:37:52 |
| 25 | BY MR. JAFFE: | 11:37:52 |

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   You don't recall whether there were any other | 11:37:54 |
| 2 | restrictions in the e-mail? | 11:37:56 |
| 3 | A.   In the e-mail, correct. | 11:37:57 |
| 4 | Q.   I see.  Okay.  So let me try this again. | 11:38:00 |
| 5 | So apart from the restrictions that are | 11:38:02 |
| 6 | stated in the e-mail, you're not -- today you're not | 11:38:04 |
| 7 | aware of any other limitations on Mr. Levandowski's | 11:38:08 |
| 8 | input into the self-driving project? | 11:38:11 |
| 9 | A.   Correct, I'm not aware of any such additional | 11:38:13 |
| 10 | limitations. | 11:38:14 |
| 11 | Q.   ██████████████████████████ | ████████ |
| ██ | █████████████████ | 11:38:20 |
| 13 | MR. KIM:  Objection; form. | 11:38:22 |
| 14 | THE WITNESS: ████████████ | 11:38:23 |
| 15 | BY MR. JAFFE: | 11:38:23 |
| 16 | Q.   ██████████████████████████ | ████████ |
| ██ | ████████████████████████████ | ████████ |
| ██ | ██████ | 11:38:32 |
| 19 | MR. KIM:  Objection; form. | 11:38:36 |
| 20 | THE WITNESS: ████████ | 11:38:38 |
| 21 | BY MR. JAFFE: | 11:38:38 |
| 22 | Q.   ████████████████████ | ████████ |
| ██ | ██████████████████████████ | ████████ |
| ██ | ██████ | ████████ |
| ██ | ████  ████ | 11:38:47 |

Page 57

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        MR. KIM:  Objection; form.                    11:38:48

2   BY MR. JAFFE:                                       11:38:48

3        Q.   ███████████████████████████████          11:38:54
     ████████████████████████████

5        MR. KIM:  Objection; form.                     11:38:55

6        THE WITNESS:  █████████████████████            ██████
██  █████████████████████████████████                   ██████

██  █████████████████                                   11:39:02

9   BY MR. JAFFE:                                       

10       Q.   ██████████████████████████████           ████
██  █████████                                           ████

██  ████  ████                                          ████

██  ████  █████████████████████████                     ████

██  ████  ████████████████████████████████             ████

██  ███████████████████████████████████████████        ████

██  ████████████████████████  ███████  █                ████

██  ████████████████

██  ████  ████████████                                  11:39:22

19            Just for the purposes of the record, can you   11:39:23

20   just explain what you mean by that for a lay audience.   11:39:26

21       A.   So again, my understanding of how our     11:39:29

22   autonomous software works, is limited -- with that   11:39:34

23   preface, I would suggest my understanding of the    11:39:37

24   perception team is to take LiDAR and other sources of   11:39:42

25   data and determine what objects exist outside the   11:39:50
```

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | vehicle. | 11:39:52 |
| 2 | If you refer generically to a compute team, | 11:39:58 |
| 3 | there may be other aspects of software after or | 11:40:01 |
| 4 | downstream in the data path after perception that | 11:40:05 |
| 5 | would need to use data that the perception software | 11:40:09 |
| 6 | generates in order to determine the car's proper | 11:40:15 |
| 7 | driving course. | 11:40:17 |
| 8 | Q.   So even today -- well, actually, let me back | 11:40:22 |
| 9 | up. | 11:40:22 |
| 10 | What is "perception" in this context? | 11:40:25 |
| 11 | A.   In this context, my use of the word | 11:40:29 |
| 12 | "perception" would be software that takes sensored | 11:40:36 |
| 13 | data input from LiDAR, camera, radar, possibly | 11:40:42 |
| 14 | inertial measurement sensors, wheel sensors, to | 11:40:49 |
| 15 | identify distinct objects in the world around it and | 11:40:54 |
| 16 | possibly classify those objects in terms of perhaps, | 11:41:00 |
| 17 | for example, being a person, a pedestrian, another car | 11:41:06 |
| 18 | or a bus and passing that information to the next | 11:41:12 |
| 19 | layers of software that could exist. | 11:41:15 |
| 20 | Q.   And in the context of our conversation, what | 11:41:18 |
| 21 | does the compute team do? | 11:41:20 |
| 22 | A.   So this would be a vague term.  I can only | 11:41:24 |
| 23 | guess what you might be hinting at, but I know that | 11:41:27 |
| 24 | there are other software and software groups writing | 11:41:32 |
| 25 | software that operate on an autonomous vehicle. | 11:41:37 |

Page 59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    What is a software that decides when to turn      11:41:39

 2   and when to stop?  What is that called within Uber?       11:41:43

 3      A.    If I'm not mistaken, I believe that is called    11:41:45

 4   planning.                                                  11:41:46

 5      Q.    ███████████████████████████████████   ███████

        ████████████████████████████               11:41:51

 7      MR. KIM:  Objection; form.                             11:41:53

 8      THE WITNESS:  ███████████████████████   ███████

        ███████████████████████████████████████   ███████

        ██████████████████████████████             11:42:04

11   BY MR. JAFFE:                                             11:42:04

12      Q.    And you understand that the planning software    11:42:06

13   leverages LiDAR data; right?                              11:42:09

14      MR. KIM:  Objection; form.                             11:42:13

15      THE WITNESS:  I want to be specific and say I          11:42:16

16   don't know whether the planning software leverages        11:42:19

17   native LiDAR data or data that's output from the          11:42:24

18   perception software.  I just don't know.                  11:42:28

19   BY MR. JAFFE:                                             11:42:28

20      Q.    Let's be clear, though.                          11:42:29

21         The planning software leverages data that           11:42:32

22   came from the LiDAR?                                      11:42:34

23      A.    Yes.                                              11:42:34

24      Q.    You don't dispute that; right?                   11:42:36

25      A.    No.                                               11:42:36
```

Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   Okay.                                    11:42:39

 2      MR. JAFFE:  Let's mark -- this will be 152.   11:43:26

 3      THE REPORTER:  Correct.                       11:43:26

 4   It's the supplemental declaration, 152?

 5      MR. JAFFE:  Correct.

 6      THE REPORTER:  I think you need this one.

 7           (Plaintiff's Exhibit 152 was marked.)    11:43:29

 8   BY MR. JAFFE:                                    11:43:29

 9      Q.   Did I give you two copies?               11:43:55

10      A.   Yeah.

11      Q.   Mr. Haslim, whose idea was it for you to 11:44:05

12   write this supplemental declaration?             11:44:08

13      MR. KIM:  Objection to the extent it calls for 11:44:12

14   privileged information.                          11:44:14

15           Instruct you not to answer or            11:44:18

16   reveal -- answer to the extent it reveals any    11:44:23

17   privileged communications with any attorneys.    11:44:27

18      THE WITNESS:  So I would say the legal team   11:44:33

19   working for Uber instructed this.                11:44:37

20   BY MR. JAFFE:

21      Q.   And I don't want to get into properly    11:44:40

22   privileged conversations.  All I want to ask is, in 11:44:46

23   terms of this document, 152, your declaration, was it 11:44:49

24   something where you said, I want to put in a new 11:44:52

25   declaration or someone approached you and said, we 11:44:54
```

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | want a new declaration? | 11:44:56 |
| 2 | MR. KIM:  And, again, you can answer whether or | 11:44:59 |
| 3 | not it was done at the direction of counsel, but don't | 11:45:03 |
| 4 | reveal any privileged communications with counsel. | 11:45:07 |
| 5 | THE WITNESS:  Okay.  So this was generated at the | 11:45:11 |
| 6 | instruction of counsel. | 11:45:12 |
| 7 | BY MR. JAFFE: | 11:45:12 |
| 8 | Q.   Okay.  So we're clear, the lawyers -- and I | 11:45:17 |
| 9 | don't want to get into the substance of any | 11:45:18 |
| 10 | communications here, but just for the purposes of the | 11:45:21 |
| 11 | record, your supplemental declaration was put together | 11:45:26 |
| 12 | at the request of Uber's lawyers; fair? | 11:45:30 |
| 13 | A.   Yes. | 11:45:30 |
| 14 | Q.   Since our last deposition, have you discussed | 11:45:39 |
| 15 | any content of your declarations or the deposition | 11:45:42 |
| 16 | with any nonlawyers? | 11:45:50 |
| 17 | A.   I don't recall any substantive discussion | 11:45:53 |
| 18 | with nonlawyers. | 11:45:55 |
| 19 | Q.   Have you spoken with Mr. Levandowski about | 11:45:58 |
| 20 | the subject matter of this case? | 11:46:01 |
| 21 | A.   Not in any substantive way. | 11:46:06 |
| 22 | Q.   At all? | 11:46:07 |
| 23 | A.   It's probably -- yes. | 11:46:11 |
| 24 | Q.   What did you and Mr. Levandowski discuss? | 11:46:14 |
| 25 | MR. KIM:  And I want to caution you -- if you had | 11:46:17 |

Page 62

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | any of these discussions in the presence of lawyers, | 11:46:20 |
| 2 | would caution you not to reveal any privileged | 11:46:22 |
| 3 | communications. | 11:46:25 |
| 4 | THE WITNESS:  This jovial, high-level, | 11:46:30 |
| 5 | nonsubstantive discussion -- "discussion" is almost a | 11:46:35 |
| 6 | strong term.  How about, how are you doing, how are | 11:46:39 |
| 7 | you feeling? | 11:46:40 |
| 8 | BY MR. JAFFE: | 11:46:40 |
| 9 | Q.  Please tell me everything that you remember | 11:46:44 |
| 10 | about the conversations that you had with | 11:46:46 |
| 11 | Mr. Levandowski about the subject matter of this case? | 11:46:50 |
| 12 | A.  ███████████████████    ███████ |
| | ███████████████████████    ██████████    ███████ |
| | ███████  ████████████████████████    ███████ |
| | ██████████    █████████████████████    ███████ |
| | ████    ███████████████████████    ███████ |
| | ████████ | 11:47:15 |
| 18 | MR. KIM:  Objection; form. | 11:47:17 |
| 19 | THE WITNESS:  ████ | 11:47:17 |
| 20 | BY MR. JAFFE: | 11:47:17 |
| 21 | Q.  █████████████████    ███████ |
| | ████    ████████████████████████████    ███████ |
| | ████████████████████████████████████    ███████ |
| | ████████████ | 11:47:26 |
| 25 | Q.  Sorry.  Continue. | 11:47:30 |

Page 63

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1    A.    ████████████████████████    ████████

     ██    ████████████████████████    ████████

     ██    ████████████████████████    ████████

     ██    ████                        11:47:45

5    Q.    Anything else?              11:47:46

6    A.    ████████████████████████    ████████

     ██    ████████████████████████    ████████

     ██    ████████                    ████████

     ██    ██    ████████████          ████████

     ██    ██    ████████  ████████    ████████

     ██    ██    ████████████          ████████

     ██    ██    ████████████████      11:48:13

13   Q.    Anything else?              11:48:15

14   A.    No.                         11:48:15

15   Q.    ██████████████████  ████    ████████

     ██    ████████████████████████    ████████

     ██    ██████                      ████████

     ██    ██    ██                     11:48:25

19   Q.    Why not?                    11:48:26

20   A.    I don't know.               11:48:29

21   Q.    You don't care?             11:48:30

22   A.    No.                         11:48:31

23   ██    ████████████████            ████████

     ██    ████████████████████████    ████████

     ██    ████                         11:48:39

                                  Page 64

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



16      Q.   You're aware that Mr. Levandowski, when asked      11:49:36

17   whether these files were at Uber, pled the Fifth      11:49:41

18   Amendment to avoid self-incrimination; right?      11:49:46

19      MR. KIM:   Objection; form.      11:49:47

20      THE WITNESS:   I've read articles that said that,      11:49:48

21   yes.      11:49:49

22   BY MR. JAFFE:      11:49:49

23

      11:49:59

                                             Page 65

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. KIM:  Objection; form. | 11:50:00 |
| 2 | THE WITNESS:  I'm sorry. | 11:50:01 |
| 3 | BY MR. JAFFE: | 11:50:01 |
| 4 | Q.   You think it's a joke? | 11:50:02 |
| 5 | A.   I think it's impossible, in my opinion, that | 11:50:07 |
| 6 | those files would be at Uber. | 11:50:10 |
| 7 | Q.   How can you possibly know? | 11:50:14 |
| 8 | A.   I cannot know, but it strikes me as | 11:50:18 |
| 9 | ridiculous. | 11:50:19 |
| 10 | Q.   It strikes you as ridiculous? | 11:50:21 |
| 11 | A.   Yeah. | 11:50:21 |
| 12 | Q.   You think it's ridiculous that | 11:50:24 |
| 13 | Mr. Levandowski pleads his constitutional right to | 11:50:26 |
| 14 | avoid self-incrimination when asked where these files | 11:50:32 |
| 15 | are and it's ridiculous for us to ask where they are; | 11:50:32 |
| 16 | that's what you think? | 11:50:34 |
| 17 | MR. KIM:  Objection; form. | 11:50:36 |
| 18 | THE WITNESS:  You're asking my personal opinion. | 11:50:38 |
| 19 | I think it's extremely unlikely to the point of | 11:50:43 |
| 20 | ridiculous that those files are on a computer somehow | 11:50:47 |
| 21 | at Uber after all of the forensics that were done on | 11:50:53 |
| 22 | Anthony's computer, as it was described to us, after | 11:50:58 |
| 23 | all the searching of all the hard drives that we can | 11:51:02 |
| 24 | come up with. | 11:51:03 |
| 25 | BY MR. JAFFE: | 11:51:03 |

Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    You do know that no one has searched | 11:51:07 |
| 2 | Mr. Levandowski's personal computer; right? | 11:51:10 |
| 3 | MR. KIM:  Objection; form. | 11:51:10 |
| 4 | THE WITNESS:  I have read that in an article or | 11:51:12 |
| 5 | two. | 11:51:14 |
| 6 | BY MR. JAFFE: | 11:51:14 |
| 7 | Q.    And he's refusing to turn those over, again | 11:51:17 |
| 8 | based on his rights to avoid incriminating himself? | 11:51:23 |
| 9 | MR. KIM:  Objection; form. | 11:51:24 |
| 10 | THE WITNESS:  That's my understanding. | 11:51:25 |
| 11 | BY MR. JAFFE: | 11:51:25 |
| 12 | Q.  ███████████████████████████  ██████ | |
| ██ | ██████ | 11:51:31 |
| 14 | MR. KIM:  Objection; form. | 11:51:31 |
| 15 | █████████  ███████████████  ██████ | |
| ██ | ██████  █████████████████████  ██████ | |
| ██ | ███████████████████ | 11:51:40 |
| 18 | BY MR. JAFFE: | 11:51:40 |
| 19 | Q.  ████████████████████  ██████ | |
| ██ | ███████████████████████████████  ██████ | |
| ██ | ████████████████████ | 11:51:48 |
| 22 | MR. KIM:  Objection; form. | 11:51:50 |
| 23 | THE WITNESS:  Is that a question? | 11:51:51 |
| 24 | BY MR. JAFFE: | 11:51:51 |
| 25 | ██  ████████████████████ | 11:51:53 |

Page 67

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. KIM:  Objection; form. | 11:51:54 |
| 2 | THE WITNESS:  █████ | 11:51:55 |
| 3 | BY MR. JAFFE: | 11:51:55 |
| 4 | Q.   Do you take intellectual property rights | 11:51:59 |
| 5 | seriously? | 11:52:01 |
| 6 | A.   Yes. | 11:52:01 |
| 7 | Q.   Do you think it's wrong for one company to | 11:52:03 |
| 8 | steal another company's intellectual property rights? | 11:52:07 |
| 9 | A.   Yes. | 11:52:07 |
| 10 | Q.   Do you think that's a joke? | 11:52:10 |
| 11 | A.   No. | 11:52:10 |
| 12 | Q.   Do you think that's something that should be | 11:52:12 |
| 13 | taken seriously? | 11:52:15 |
| 14 | A.   Yes. | 11:52:15 |
| 15 | Q.   ████████████████████████████ | ███████ |
| ██ | ██████████████████████████ | ███████ |
| ██ | ████████████████████ | 11:52:31 |
| 18 | MR. KIM:  Objection; form. | 11:52:35 |
| 19 | THE WITNESS:  No. | 11:52:36 |
| 20 | BY MR. JAFFE: | 11:52:36 |
| 21 | Q.   █████████████████ | 11:52:40 |
| 22 | MR. KIM:  Same objection. | 11:52:42 |
| 23 | THE WITNESS:  ███████████████ | ███████ |
| ██ | ██████████████████████████ | ███████ |
| ██ | █████████ | 11:52:49 |

Page 68

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. JAFFE:                                              11:52:49

2    ▓▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   ▓▓▓▓

▓    ▓▓  ▓▓▓▓▓▓▓   ▓▓▓▓

▓    ▓▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   ▓▓▓▓

▓    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓    11:53:02

6        MR. KIM:  Objection; form.                            11:53:05

7        THE WITNESS:  I don't know.                           11:53:06

8    BY MR. JAFFE:                                             11:53:06

9        Q.   You don't know?                                  11:53:07

10       A.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   ▓▓▓▓

▓    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   ▓▓▓▓

▓    ▓▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   ▓▓▓▓

▓    ▓▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   ▓▓▓▓

▓    ▓▓  ▓▓▓▓▓   ▓▓▓▓

▓    ▓▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   ▓▓▓▓

▓    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓    11:53:28

17       Q.   Okay.  Turning back to your supplemental         11:53:38

18   declaration, which is 151.  Let's go to paragraph 13.     11:53:46

19       Actually, before we get there, start with             11:53:51

20   paragraph 7.                                              11:53:53

21       Here you're talking about the fiber lasers in         11:54:00

22   the Spider design; right?                                 11:54:01

23       A.   Sorry.  152 or 151?                              11:54:05

24       Q.   152.  Excuse me.                                 11:54:07

25       A.   Sorry.                                           11:54:08

                                                           Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1           (Witness reviews document.)              11:54:26
 2      A.   Repeat your question, please.            11:54:27
 3      Q.   Paragraph 7 of your supplemental         11:54:30
 4  declaration, Exhibit 152, is talking about the    11:54:32
 5  design of the fiber laser in the Spider?          11:54:36
 6      A.   Yes.  Yes.                               11:54:37
 7      Q.   You don't mention Mr. Levandowski's      11:54:40
 8  involvement in paragraph 7, do you?               11:54:43
 9      A.   No.                                      11:54:43
10      Q.   You don't mention that Mr. Levandowski   11:54:45
11  pointed you to ████ right?                        11:54:52
12      A.   No.                                      11:54:52
13      Q.   You don't mention his role in the design of  11:54:55
14  the laser at all in paragraph 7, do you?          11:54:58
15      A.   No.                                      11:55:00
16      Q.   All right.  Let's go to paragraph 13, talking  11:55:13
17  about Fuji again.  So here you're pointing -- you  11:55:27
18  excerpt a document that you say discusses beam spacing  11:55:32
19  and angles for the Fuji design; is that right?    11:55:35
20      A.   Yes.                                     11:55:36
21      Q.   And just looking at what's depicted here,  11:55:41
22  where is █████████████ mentioned?                 11:55:47
23      A.   Neither ██████ are mentioned, nor ██████ ██████
    ██ ██████████████████ However, it can be implied  11:56:00
25  from ████████████ and it can be implied           11:56:06
```

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. JAFFE: | 11:59:09 |
| 2 | Q.   And did you ever discuss the idea to use ███ ████ | |
| | ██████████████ with Mr. Levandowski? | 11:59:19 |
| 4 | A.   No, not that I recall. | 11:59:22 |
| 5 | Q.   So when you were presenting the pivot to | 11:59:27 |
| 6 | Mr. Levandowski, it never came up how many transmit | 11:59:30 |
| 7 | boards there would be? | 11:59:31 |
| 8 | A.   No. | 11:59:31 |
| 9 | Q.   He had no idea? | 11:59:33 |
| 10 | A.   He had no idea. | 11:59:34 |
| 11 | Q.   And you never discussed with Mr. Levandowski | 11:59:40 |
| 12 | the details of the Fuji design in terms of the number | 11:59:43 |
| 13 | of transmit boards; is that true? | 11:59:45 |
| 14 | A.   I don't recall having any discussion like | 11:59:48 |
| 15 | that at all. | 11:59:49 |
| 16 | Q.   So you're saying you don't recall?  I just | 11:59:53 |
| 17 | want to be clear. | 11:59:55 |
| 18 | A.   Yes. | 11:59:56 |
| 19 | Q.   So I'll ask my question again. | 11:59:58 |
| 20 | Have you ever discussed with Mr. Levandowski | 12:00:01 |
| 21 | the number of transmit boards in the Fuji design? | 12:00:05 |
| 22 | MR. KIM:  Objection; form. | 12:00:07 |
| 23 | THE WITNESS:  I don't recall having any discussion | 12:00:11 |
| 24 | about the number of transmit boards. | 12:00:14 |
| 25 | BY MR. JAFFE: | 12:00:14 |

Page 73

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.   Are you aware of any conversations between        12:00:17

2   Mr. Gruver or Mr. Pennecot and Mr. Levandowski              12:00:20

3   regarding the number of transmit boards in the Fuji         12:00:24

4   design?                                                     12:00:24

5        MR. KIM:  Objection; form.                             12:00:26

6        THE WITNESS:  I am not aware.                          12:00:28

7   BY MR. JAFFE:                                               12:00:28

8        Q.   So it's possible that they have discussed         12:00:29

9   this issue with them, you wouldn't know that; right?        12:00:32

10       A.   I wouldn't know that.                             12:00:34

11       Q.   So you're not saying that Mr. Levandowski has     12:00:36

12   never had discussions or input into the idea to use        12:00:40

13   ██████████████████████; right?                             12:00:43

14       MR. KIM:  Objection; form.                             12:00:46

15       THE WITNESS:  What I am saying is that Anthony          12:00:48

16   never had input into my decision with my electrical        12:00:55

17   engineer to put ██████████████████.                        12:01:00

18   BY MR. JAFFE:                                              12:01:00

19       Q.   Right.                                            12:01:00

20            But you talked about that decision with           12:01:02

21   Mr. Gruver, for example; right?                            12:01:03

22       A.   I think discussions with Gruver came later,       12:01:07

23   yeah.                                                      12:01:07

24       Q.   Or Mr. Pennecot, for example?                     12:01:10

25       A.   Mr. Pennecot was probably consulted in that       12:01:13

Page 74

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   process as well.                                  12:01:14

 2      Q.   And you're not aware and you can't testify,   12:01:16

 3   sitting here today, whether either of those two    12:01:19

 4   gentleman discussed this idea with Mr. Levandowski; is   12:01:23

 5   that right?                                        12:01:24

 6      MR. KIM:   Objection; form.                    12:01:25

 7      THE WITNESS:   I couldn't say.                 12:01:25

 8   BY MR. JAFFE:

 9      Q.   So in your declaration or in anywhere, can't   12:01:28

10   say that Mr. Levandowski had no input into the number   12:01:32

11   of boards because you don't know all the conversations   12:01:35

12   that Mr. Levandowski had; fair?                    12:01:37

13      MR. KIM:   Objection; form.                    12:01:37

14      THE WITNESS:   No, I disagree with that.       12:01:39

15   BY MR. JAFFE:                                      12:01:39

16      Q.   Why?                                      12:01:41

17      A.   When you go so far as to say input into the   12:01:44

18   design, I don't see how some conversation with Anthony   12:01:49

19   could have influenced what I saw as a need to split   12:01:53

20   the lasers ███████████████████        ████████

     ██  ███████████████                              12:01:58

22      Q.   So where did you get that idea from?      12:02:01

23      A.   I don't recall where the idea came from, but   12:02:12

24   it seemed like a requirement from the beginning.   12:02:16

25      Q.   What does that mean?                      12:02:17
```

Page 75

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   We knew that we were placing edge-emitting | 12:02:22 |
| 2 | laser diodes on a flat PCB. | 12:02:26 |
| 3 | Q.   And that was the PCB that Mr. Pennecot | 12:02:29 |
| 4 | designed; right? | 12:02:29 |
| 5 | A.   Yes. | 12:02:29 |
| 6 | Q.   And that's the board that eventually was sent | 12:02:35 |
| 7 | to Gorilla in December? | 12:02:38 |
| 8 | A.   That was one of the boards. | 12:02:40 |
| 9 | So when we knew we were placing these boards | 12:02:48 |
| 10 | flat onto a PCB, edge-emitting diodes, and we realized | 12:02:53 |
| 11 | they ███████████████████████████████████ ████████ | |
| | ████ ███████████████████████████████████████, as | 12:03:01 |
| 13 | I recall, █████████████████████████████████ ████████ | |
| | ████ ████████████████████████████ was obvious. | 12:03:08 |
| 15 | Q.   I see. | 12:03:08 |
| 16 | So you got the board design from Mr. Pennecot | 12:03:13 |
| 17 | and you knew you wanted 64 channels because you | 12:03:17 |
| 18 | were -- wanted to do something similar to what | 12:03:21 |
| 19 | Velodyne was doing and then derivative from that is | 12:03:25 |
| 20 | how you got to ████████████ | 12:03:28 |
| 21 | MR. KIM:  Objection; form. | 12:03:29 |
| 22 | THE WITNESS:  That's taking it actually out of | 12:03:32 |
| 23 | sequence. | 12:03:33 |
| 24 | BY MR. JAFFE: | 12:03:33 |
| 25 | Q.   Okay.  Can you put it in sequence, please. | 12:03:36 |

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A.   Yes.                                    12:03:36

2             We knew we needed a laser circuit, so I had   12:03:40

3    Florin design multiple laser circuits onto a board for 12:03:45

4    test and evaluation.  We picked one of those circuits  12:03:48

5    that we thought performed the best.  He began         12:03:51

6    considering the size of his circuit in one of those -- 12:03:56

7    I believe it was 10 different circuits.  The one we    12:03:59

8    chose, he could look at the design of it and tell me   12:04:02

9    the size.                                             12:04:04

10            So at this point, as I recall, Gaetan did not  12:04:10

11   have a laser board design in his CAD model.  He had a  12:04:20

12   lens design.  He may have had -- I even doubt he had   12:04:26

13   taken that into CAD yet.                              12:04:29

14       Q.   So I'm a little bit confused.               12:04:32

15            Where did the idea to have ████████ come     12:04:34

16   from?                                                 12:04:35

17   ██  █████████████████████████  ██████  ████████

██   █████████████████████████████  The need to          12:04:49

19   ████████████████████  developed quickly between       12:04:56

20   Florin and I looking at the size of the circuit,      12:04:59

21   knowing when Scott Boehmke defines a certain ██████  ████████

██   ███████████████████████████  when Gaetan has        12:05:08

23   designed a lens that has a 150 millimeter focal       12:05:13

24   length, it becomes apparent that the ████████  ████████

██   ████████████████████████████████████████           12:05:19
```

Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ███████████████████████████████████     ████████
 █   ██████████████████████               12:05:24
 3        It was obvious to me that wasn't going to  12:05:26
 4   work and we would have to ██████████████    ████████
 █   ██████   Later we went back and looked closer, and I  12:05:33
 6   realized, wait a minute, ████████████████████   ████████
 █   ██████   So we can't put circuits on ██████████   ████████
 █   ██████████████████████████████████████     ████████
 █   ██████████████████                      12:05:47
10        Furthermore, we were starting to look at  12:05:50
11   components on the receiver.  We saw components on the  12:05:53
12   receiver that were themselves ███████████       12:05:58
13   Those were high voltage components.  They needed  12:06:00
14   additional space between them as well.  So it seemed  12:06:01
15   pretty clear at the time ██████████████████ was not  12:06:05
16   going to work, so we said ████████████   Florin  12:06:09
17   thought he could████████████████        12:06:14
18        So that ended up with ████████████████    ████████
 █   ██████   We already had decided two cavities to make  12:06:20
20   64 channels, so that ended up with ████████████████  12:06:24
21   in the sensor.                          12:06:25
22     Q.   Where are the documents that reflect the  12:06:27
23   discussions that you were just talking about?  12:06:31
24     A.   We did not document our discussions.  12:06:33
25     Q.   Okay.  So there are no -- there's no  12:06:35
```

Page 78

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   documentary evidence to evidence -- to support what      12:06:39

 2   you just said?                                           12:06:40

 3      MR. KIM:  Objection; form.                            12:06:42

 4   BY MR. JAFFE:                                            12:06:42

 5      Q.   Is that fair?                                    12:06:42

 6      A.   Not quite.                                       12:06:43

 7           We have documents showing and indicating to      12:06:47

 8   us what the vertical angles were to be for the sensor    12:06:52

 9   as specified by Scott Boehmke.  We have a lens design    12:06:57

10   that's documented from Gaetan.  We have the original     12:07:03

11   circuit Florin had developed for testing out lasers.     12:07:10

12           At that point, the documentation stopped.        12:07:14

13   And we don't have documents for discussions describing   12:07:22

14   how ██████████████████████████████████████  ██████████

     ██  ██████████████████████████                12:07:27

16      Q.   Okay.  So I just want to run through that        12:07:30

17   real quick.                                              12:07:30

18           So you're saying that you got the idea for       12:07:34

19   ████████████  based on three things.  One is the ██████ ██████████

     ██  █████████  of the diodes that you wanted.  Two is the  12:07:43

21   █████████████████.  And three is the ████████████  ██████████

     ██  █████████████████████████████                12:07:49

23           Generally, is that fair?                         12:07:53

24      A.   I'd like you to add a fourth, which is the       12:07:56

25   █████████████████████████  and possibly a                12:08:04
```

Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   ██████████████████████████████████   ███████

▮   ██████                                        12:08:10

3       Q.   So that's part of the circuitry, though?   12:08:12

4       A.   Yeah.                                 12:08:15

5       Q.   So if we say number 3 is the ██████   ███████

▮   ██████   would that capture everything that you're   12:08:19

7   talking about?                              12:08:20

8       A.   With the clarification that circuitry   12:08:22

9   involves a channel, both receive and transmit, then I   12:08:26

10  can agree to that.                           12:08:27

11      Q.   Fair enough.                          12:08:28

12          So there were three, generally, things, now   12:08:29

13  that we've kind of established our terminology, that   12:08:33

14  you say --                                   12:08:36

15      A.   Sorry.  Did you include the focal length of   12:08:40

16  the lens Gaetan was designing?               12:08:41

17      Q.   No.                                  12:08:41

18      A.   That's important.                     12:08:43

19      Q.   Okay.  So add that as number 4, focal length   12:08:48

20  of lens.  All right.                         12:08:51

21          So the ████████████ that you're talking   12:08:54

22  about -- the issue that you're talking about there is   12:08:58

23  that ████████████████████████   ███████

▮   ██████████████████████████████   ███████

▮   ██████████   right?                          12:09:08

Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   I think you misspoke.  The resulting ██████   ██████

       ████████████████████████████████████████████   ██████

       ████████████████████████████                           12:09:20

4      Q.   I see.                                             12:09:21

5           So the fact that you needed to have the           12:09:23

6      ████████████████████████████████████████████   ██████

       ████████████████████████████ is that basically         12:09:31

8      it or am I messing it up again?                         12:09:34

9      MR. KIM:  Objection; form.                              12:09:35

10     THE WITNESS:  It was the ███████████████████   ██████

       ████████████████--                                      12:09:39

12     BY MR. JAFFE:

13     Q.   I see.                                             12:09:39

14     A.   -- that required them eventually to ██████   ██████

       ████████████████████                                    12:09:45

16     Q.   And the ████████████████████████████   ██████

       ████████████ is that right?                             12:09:49

18     A.   The ████████████████████████████   ██████

       ████████████████████████████████████████████   ██████

       ████████████████████████████                            12:09:59

21     Q.   And -- okay.  And the spacing, that's what   12:10:08

22     Mr. Boehmke -- continue to mispronounce his name   12:10:14

23     probably correctly -- he provided to you in November   12:10:16

24     of 2016?                                                12:10:17

25     A.   Yes, he provided the angular spacing, if I   12:10:20

                                                   Page 81

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   may.                                                    12:10:21

2        Q.   Okay.  We'll get to that a little bit later.  12:10:25

3             Mr. Boehmke didn't provide you how many       12:10:29

4   boards to use; right?                                   12:10:30

5        A.   Right.                                         12:10:30

6        Q.   And then the FAC lens, that was provided by    12:10:35

7   Mr. Pennecot; right?                                     12:10:36

8        A.   That is my understanding.                      12:10:39

9        Q.   He came up with the FAC lens design; right?    12:10:42

10        A.   That's my understanding.                       12:10:44

11        Q.   And it's a ███████████████ FAC lens; right?    12:10:47

12        MR. KIM:  Objection; form.                          12:10:48

13        THE WITNESS:  It's ███████████████                  12:10:51

14   BY MR. JAFFE:                                            12:10:51

15        Q.   That's larger than -- sorry.                   12:10:53

16        A.   It's 2███████████████████████  ███████████     12:10:59
     ██████████████████████████

18        Q.   Do you know how large the FAC lenses are for   12:11:03

19   Velodyne's devices?                                      12:11:05

20        ██  ████████████████████████████████  ███████████
     ██  ████████████████████████████████  ███████████
     ██  █████████████████████.                             12:11:16

23        Q.   Do you know how large it is?

24        A.   Are you asking diameter or are you asking

25   length?

                                                    Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    To compare it to ███████████    12:11:17

2    ███   ████████████████████████    ████████

██    ███████████████    12:11:24

4      Q.    And so that lens design came from    12:11:30

5    Mr. Pennecot and the circuitry came from Florin; is    12:11:33

6    that right?    12:11:34

7      A.    Yes.    12:11:34

8      Q.    So none of those folks came up with ████    ████████

██    ██████████████████████  right?    12:11:45

10    MR. KIM:  Objection; form.    12:11:47

11    THE WITNESS:  They were certainly involved in the    12:11:49

12    decision to go to ███████████████ because I    12:11:53

13    had to consult with them in terms of what would be    12:11:56

14    possible for circuit spacing, in the case of Florin.    12:12:00

15    And to make sure that Gaetan's group lens can handle    12:12:06

16    the ████████████████████    12:12:09

17    BY MR. JAFFE:    

18      Q.    And just to go back to your declaration here,    12:12:12

19    this diagram that you're showing in Figure 6 in    12:12:16

20    paragraph 13, there's no discussion in here of ████    ████████

██    ███████████████  right?    12:12:22

22      A.    There's no discussion of ██████████    ████████

██   ████ in Figure 6.  Although if you understand Figure    12:12:31

24    6, it could be easily derived.    12:12:36

25      Q.    That wasn't my question.    12:12:36

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So just going back to what we were talking | 12:23:09 |
| 2 | about earlier, you're saying that Mr. Boehmke provided | 12:23:12 |
| 3 | you the custom beam spacing and you imported that data | 12:23:17 |
| 4 | into Zemax to determine the resultant emitting points | 12:23:23 |
| 5 | of the laser diodes, and those you just picked as a | 12:23:28 |
| 6 | first matter, ███████████████████████ | 12:23:32 |
| 7 | MR. KIM:   Objection; form. | 12:23:36 |
| 8 | THE WITNESS:   We didn't pick it as first matter. | 12:23:38 |
| 9 | We discussed this already, that I would have loved to | 12:23:41 |
| 10 | ███████████████ and we found we couldn't do | 12:23:45 |
| 11 | that. ████████████████   We decided we had | 12:23:45 |
| 12 | to ███████████████████████   ██████ | 12:23:58 |
| ██ | ████████████████████.   That decision went | 12:23:58 |
| 14 | into the first -- earliest CAD designs of the optical | 12:24:04 |
| 15 | cavity for Fuji. | 12:24:06 |
| 16 | BY MR. JAFFE: | 12:24:06 |
| 17 | Q.   So you didn't do any sort of other Zemax | 12:24:08 |
| 18 | simulations of other board and diode arrangements? | 12:24:14 |
| 19 | A.   I'm not aware.   I don't recall doing any CAD | 12:24:19 |
| 20 | designs for other board arrangements. | 12:24:23 |
| 21 | Q.   So by November 4th, 2016, you and your team | 12:24:29 |
| 22 | had already arrived at ████████████████   ██████ | 12:24:32 |
| ██ | ███████████████ is that right? | 12:24:35 |
| 24 | A.   It's possible that that was by November 4th. | 12:24:40 |
| 25 | It's also possible that it was shortly after the 4th. | 12:24:44 |

Page 90

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        Q.    So you -- sorry.                          12:24:46

2        A.    There's a potential for a time lag from   12:24:50

3    Scott's prescribed beam angles and when we actually  12:24:55

4    did the determination of six total boards and got    12:24:59

5    those into a CAD model.                              12:25:01

6        Q.    And you only started the Fuji project at the  12:25:03

7    end of October; right?                               12:25:05

8        A.    Yes.

9        Q.    So you came up with the ███████████  ████████

         ██████████ design in a week, approximately?     12:25:14

11       MR. KIM:  Objection; form.                       12:25:16

12       THE WITNESS:  I don't know if it was exactly a  12:25:17

13   week.  Or could have been more than a week, but it was  12:25:20

14   something on the order of a week.                     12:25:22

15   BY MR. JAFFE:                                         12:25:22

16       Q.    About a week?                               12:25:24

17       A.    Within some small multiple of one week.  One  12:25:30

18   week, two weeks, three weeks possible, yes, on a very  12:25:34

19   short time scale.                                     12:25:36

20       Q.    And you didn't -- after receiving these beam  12:25:41

21   spacings from Mr. Boehmke, you didn't even consider   12:25:44

22   other designs other than ████████████████  ████████

         ████████████████ right?                         12:25:51

24       A.    That feels a little out of sequence.  So I  12:25:59

25   believe we got the angles from Scott for our sensor.  12:26:05
```

Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    The decision for how many boards to place them on        12:26:08

 2    would have to occur after we knew what those angles       12:26:12

 3    were.                                                     12:26:13

 4        Q.   So you got the custom beam spacing from          12:26:32

 5    Mr. Boehmke; and then one to three weeks later, you       12:26:37

 6    knew you were doing ████████████████████████  ████████    12:26:43

 7    ██  ██████                                                12:26:43

 8        A.   Yes.                                             12:26:43

 9        Q.   And at that time, in between receiving           12:26:46

10    Mr. Boehmke's custom beam spacing, you didn't             12:26:50

11    consider -- even consider any other designs other than    12:26:52

12    ███████████████████████████████████████████████          12:26:57

13    right?                                                    12:26:57

14        A.   No.   When Scott gave us the prescribed          12:27:02

15    angles, we had to first consider ████████████  ████████    12:27:07

16    ██  ██████████  And that was the process we've already    12:27:07

17    discussed to arrive at ████████████ but that's after     12:27:11

18    Scott originally told us what the angles would be.        12:27:14

19        Q.   But I'm confused.                                12:27:15

20             Because when we were talking earlier about       12:27:17

21    after you received the data, you said you only            12:27:19

22    provided one summary into Zemax and that was ██████  ████████  12:27:24

23    ██  █████████████████████████                             12:27:24

24        A.   Yes.                                             12:27:24

25        Q.   So you didn't even -- when you were looking      12:27:27
```

Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Google? | 12:29:47 |
| 2 | A.   No. | 12:29:47 |
| 3 | Q.   You didn't have any understanding? | 12:29:49 |
| 4 | A.   No. | 12:29:49 |
| 5 | Shall we go back to our list in terms of | 12:29:56 |
| 6 | elements that are important? | 12:29:57 |
| 7 | Q.   Let me see if I can short-circuit this. | 12:30:00 |
| 8 | My understanding is you're saying they were | 12:30:02 |
| 9 | all required, so one isn't more important than the | 12:30:06 |
| 10 | other; is that fair? | 12:30:07 |
| 11 | A.   That's fair. | 12:30:08 |
| 12 | Q.   So then we don't need to go through them. | 12:30:11 |
| 13 | Let's turn to page 17 of your declaration. | 12:30:14 |
| 14 | A.   Page or paragraph? | 12:30:17 |
| 15 | Q.   Excuse me.  Paragraph 17. | 12:30:21 |
| 16 | A.   Okay. | 12:30:21 |
| 17 | Q.   It's on page 11. | 12:30:23 |
| 18 | A.   Thank you. | 12:30:24 |
| 19 | Q.   And I'm in your supplemental declaration, | 12:30:28 |
| 20 | which is 152. | 12:30:30 |
| 21 | MR. KIM:  What paragraph? | 12:30:34 |
| 22 | MR. JAFFE:  17.  It's the long paragraph, so it's | 12:30:38 |
| 23 | page 11 if you're looking for it. | 12:30:40 |
| 24 | BY MR. JAFFE: | 12:30:40 |
| 25 | Q.   So there are two things labeled here, Figure | 12:30:45 |

Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    8A and 8B.                                          12:30:48

 2          Do you see that?                              12:30:49

 3    A.    Yes.                                          12:30:49

 4    Q.    So just for clarification here, the letters   12:30:55

 5    that are on there, those are letters that you added 12:30:58

 6    for purposes of your declaration; right?            12:30:59

 7    A.    Yes, those were added for this declaration.   12:31:04

 8    Q.    In the document as it was created in November 12:31:06

 9    2016, it did not have these letters on it; right?   12:31:09

10    A.    Right.                                        12:31:09

11    Q.    So this is a modified version for your        12:31:12

12    declaration?                                        12:31:13

13    A.    Yes.                                          12:31:14

14    Q.    And if we go to the November 2016 data that   12:31:22

15    you were looking at that formed the basis of this, it 12:31:28

16    did not include these letterings; right?            12:31:29

17    A.    Right.                                        12:31:29

18    Q.    So in November 2016, there was no --          12:31:36

19    Mr. Boehmke did not provide the distribution of these 12:31:40

20    beams onto particular boards; right?                12:31:43

21    A.    Right.                                        12:31:43

22    Q.    So the November 2016 data from Mr. Boehmke,   12:31:55

23    that did not provide any information as to how these 12:31:59

24    beams would be distributed ████████████████ ██████

      █ ████████████████████████████ right?               12:32:04
```

Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   It provided no prescription for that          12:32:07

2    distribution.                                      12:32:09

3    Q.   Let's go to the next page here at the end of  12:32:17

4    paragraph 17.                                       12:32:18

5         So this chart here at the end of paragraph    12:32:22

6    17, again, this is something you generated for your 12:32:26

7    declaration; right?                                 12:32:26

8    A.   Yes.                                           12:32:27

9    Q.   This isn't some document that you're just     12:32:31

10   showing?  This is something that you generated for 12:32:33

11   this case?                                          12:32:34

12   A.   Um-hum.  That's right.                         12:32:35

13   Q.   Now, what is being shown here in this table?  12:32:40

14   A.   So this table is showing the vertical beam    12:32:46

15   angles in a November 16th document from Scott Boehmke 12:32:51

16   in this first white column.  The next column labeled 12:32:57

17   "Current" contains the angles that we actually used. 12:33:03

18   And the green shows the discrepancy between them.   12:33:07

19   Q.   Okay.  And again the ███████████████    ███████████

     ███████████████  that's all information that you added 12:33:20

21   later?                                              12:33:21

22   A.   Added later for clarity, yes.                  12:33:22

23   Q.   That's not information that came from the      12:33:24

24   November 16th document provided by Mr. Boehmke; right? 12:33:27

25   A.   Right.                                         12:33:27

                                                    Page 97

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    So no one should be confused as to whether      12:33:30

 2   this data is originally from November 2016 in terms of    12:33:35

 3   the  ███████     right?                                   12:33:37

 4      A.    Nobody should be confused that the  ████████     12:33:41

 5   had come from Scott, because it did not.                  12:33:43

 6      Q.    Right.  You added it in here for purposes of     12:33:45

 7   your declaration?                                         12:33:46

 8      A.    Yeah.                                            12:33:46

 9      Q.    All right.  So you've mentioned -- I want to     12:33:50

10   just clarify a little bit of terminology here.  What's    12:33:55

11   shown here at the end of paragraph 17 is talking about    12:34:00

12   angles; right?                                            12:34:01

13      A.    Right.                                           12:34:01

14      Q.    And what angle are we talking about?            12:34:04

15      A.    We're talking about the vertical angle           12:34:08

16   reference to a horizontal plane measured in degrees       12:34:12

17   such that positive numbers are above horizontal,          12:34:18

18   negative numbers are below horizontal.                    12:34:20

19      Q.    Okay.  Are you familiar with the concept of      12:34:23

20   beam spacing?                                             12:34:24

21      A.    Perhaps you could clarify.                       12:34:26

22      Q.    Let's go back to the prior page.  And to page    12:34:35

23   10.  The heading, do you see it says "Beam spacing in     12:34:41

24   Fuji"?                                                    12:34:41

25      A.    Um-hum.                                          12:34:42
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        Q.    "Beam spacing," what do you mean?        12:34:44

2        A.    So beam spacing can be used to refer to the   12:34:49

3        ███████████████████████████████████████████      ████████

██       ██████████████████.  Since it refers to beam and not   12:35:04

5        laser spacing, then I'm going to say probably does not   12:35:07

6        refer to linear dimensions.              12:35:10

7        Q.    When you are saying ████████ -- what you're      12:35:12

8        saying -- when you're talking about ████████████      ████████

██       ████████████████████████████████████          ████████

██       ██████████████████████████ is that fair?      12:35:20

11       A.    That's fair.                    12:35:20

12       Q.    Just to be clear, again, when -- we're going   12:35:24

13       back to the end of paragraph 17.  You are not talking   12:35:27

14       about ███████████████████████████████████      ████████

██       ██████ right?                      12:35:33

16       MR. KIM:  Objection; form.              12:35:36

17       THE WITNESS:  This does not refer to the absolute   12:35:38

18       positions of the diodes.  I'm referring to the end of   12:35:40

19       paragraph 17.  The figure refers to the angular   12:35:44

20       prescribed angles.                  12:35:47

21       BY MR. JAFFE:                     12:35:47

22       Q.    So I want to introduce a new term here.   12:35:50

23             You're familiar -- when we have the diodes,   12:35:53

24       one way that they're represented, they're position is   12:35:56

25       X and Y; right?                     12:35:58
```

Page 99

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Right. | 12:35:58 |
| 2 | Q.   And I want to refer to the difference between | 12:36:02 |
| 3 | two diodes on the Y axis as vertical spacing. | 12:36:07 |
| 4 | Do you understand what I'm referring to? | 12:36:08 |
| 5 | A.   Yes. | 12:36:08 |
| 6 | Q.   What you're talking about here in paragraph | 12:36:10 |
| 7 | 17 does not show the differences in the vertical | 12:36:12 |
| 8 | spacing between the diodes; right? | 12:36:16 |
| 9 | MR. KIM:  Objection; form. | 12:36:17 |
| 10 | THE WITNESS:  Agreed, paragraph 16 does not refer | 12:36:20 |
| 11 | to vertical -- | 12:36:22 |
| 12 | BY MR. JAFFE: | 12:36:22 |
| 13 | Q.   17. | 12:36:22 |
| 14 | A.   Sorry.  In paragraph 17, we are not referring | 12:36:26 |
| 15 | to -- | |
| 16 | MR. KIM:  Same objection. | 12:36:28 |
| 17 | THE WITNESS:  -- the vertical dimension on a laser | 12:36:30 |
| 18 | board. | 12:36:31 |
| 19 | BY MR. JAFFE: | |
| 20 | Q.   So the ██████████████, that's | 12:36:35 |
| 21 | here at the end of 17, that's not referring to the | 12:36:36 |
| 22 | ███████████████████████████ | 12:36:39 |
| 23 | in Fuji; right? | 12:36:40 |
| 24 | MR. KIM:  Objection; form. | 12:36:42 |
| 25 | THE WITNESS:  That's right. | 12:36:43 |

Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        MR. KIM:  We've been going over an hour.  Can we    12:37:24

 2   break for lunch?                                         12:37:26

 3        MR. JAFFE:  Yes, we can break.                      12:37:28

 4        THE VIDEOGRAPHER:  We are off the record at 12:37   12:37:30

 5   p.m.                                                     12:37:30

 6             (Lunch recess was taken at 12:37 p.m.)         12:37:30

 7             (Nothing omitted or deleted.  See next page).

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 101

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     AFTERNOON SESSION                    1:38 P.M.

 2                       - - -

 3         THE VIDEOGRAPHER:  We are back on the record at   13:38:23

 4     1:38 p.m.                                             13:38:24

 5                    EXAMINATION RESUMED                    13:38:24

 6     BY MR. JAFFE:                                         13:38:24

 7         Q.    Welcome back.                               13:38:28

 8         A.    Thank you.                                  13:38:28

 9         Q.    I want to turn to your original declaration. 13:38:31

10     I think it's 151.  And in particular, in paragraph 20, 13:38:39

11     you state, "There are approximately ███employees      13:38:41

12     currently working on the Fuji project."               13:38:44

13             Is that right?                                13:38:45

14         A.    Yes, I see it.                              13:38:48

15         Q.    How many employees are working at Uber on   13:38:54

16     LiDAR-related responsibilities?                       13:38:56

17         MR. KIM:  Objection; form.                        13:39:02

18         THE WITNESS:  There would be approximately ██     13:39:03

19     employees at Uber working on LiDAR responsibilities   13:39:06

20     that I'm aware of.                                    13:39:10

21     BY MR. JAFFE:                                         13:39:10

22         Q.    Your understanding is that there are only ██ 13:39:12

23     employees at Uber with LiDAR-related responsibilities; 13:39:16

24     is that right?                                        13:39:17

25         MR. KIM:  Objection; form.                        13:39:19
```

Page 102

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  When I came up with the number, I | 13:39:22 |
| 2 | wanted to pick ones -- employees that had primary | 13:39:26 |
| 3 | responsibilities on LiDAR. | 13:39:29 |
| 4 | BY MR. JAFFE: | 13:39:29 |
| 5 | Q.   So let me ask my question again then. | 13:39:32 |
| 6 | What is the number of employees at Uber that | 13:39:37 |
| 7 | have LiDAR-related responsibilities or projects? | 13:39:43 |
| 8 | MR. KIM:  Objection; form. | 13:39:43 |
| 9 | THE WITNESS:  I don't know off the top of my head | 13:39:46 |
| 10 | how many more employees have minor LiDAR | 13:39:48 |
| 11 | responsibilities. | 13:39:50 |
| 12 | BY MR. JAFFE: | 13:39:50 |
| 13 | Q.   So when you're talking about this number of | 13:39:52 |
| 14 | employees here, you're not talking about the number of | 13:39:54 |
| 15 | employees working on LiDAR entirely at Uber; right? | 13:39:59 |
| 16 | MR. KIM:  Objection; form. | 13:40:02 |
| 17 | THE WITNESS:  Correct.  I believe there may be a | 13:40:07 |
| 18 | few more employees that also have some minor | 13:40:11 |
| 19 | responsibility for LiDAR activities. | 13:40:15 |
| 20 | BY MR. JAFFE: | 13:40:15 |
| 21 | Q.   What LiDAR technology are they working on? | 13:40:18 |
| 22 | A.   They're not working on LiDAR technology. | 13:40:21 |
| 23 | They're working on perhaps sourcing components, just | 13:40:26 |
| 24 | general supply chain people. | 13:40:28 |
| 25 | Q.   Okay.  Are there any other LiDAR projects | 13:40:32 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   within Uber other than the Fuji project?          13:40:35

 2       A.   No, there's not.                          13:40:37

 3       Q.   You're not working on building LiDARs with 13:40:40

 4   third-party companies?                             13:40:42

 5       MR. KIM:  Objection; form.                     13:40:44

 6       THE WITNESS:  I'm not working on LiDAR projects 13:40:48

 7   with third-party companies.                        13:40:50

 8   BY MR. JAFFE:                                       13:40:50

 9       Q.   Right.  So let me ask my question a little 13:40:53

10   bit differently.                                   13:40:53

11            Is Uber working on designing LiDARs with  13:40:58

12   third-party companies?                             13:40:59

13       MR. KIM:  Objection; form.                     13:41:00

14       THE WITNESS:  I think Scott Boehmke is working 13:41:05

15   with some third-party LiDAR suppliers.             13:41:09

16   BY MR. JAFFE:                                       13:41:09

17       Q.   Who's he working with?                    13:41:12

18       A.   I am aware of ████                         13:41:13

19       Q.   Um-hum.                                    13:41:31

20       A.   There's █████.  There is -- and I'll say  13:41:31

21   this confidential information.  There's ███████    13:41:35

22   I'm not aware of any others at this point.         13:41:40

23       MR. KIM:  At this point I'll just designate the 13:41:42

24   transcript attorneys' eyes only.                   13:41:46

25       MR. JAFFE:  What number are we at?             13:41:48
```

Page 104

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE REPORTER:  153. | 13:41:50 |
| 2 | MR. JAFFE:  Okay.  So this is going to be 153. | 13:41:53 |
| 3 | (Plaintiff's Exhibit 153 was marked.) | 13:42:07 |
| 4 | BY MR. JAFFE: | |
| 5 | Q.  So I'll just tell you for the record, this | 13:42:09 |
| 6 | was a document that Uber's lawyers prepared and | 13:42:13 |
| 7 | submitted to the court.  That's where we got this | 13:42:17 |
| 8 | from. | 13:42:18 |
| 9 | A.  Um-hum. | 13:42:19 |
| 10 | Q.  Now, you were talking earlier about ▮ folks | 13:42:23 |
| 11 | working on the Fuji project and that that's the only | 13:42:26 |
| 12 | LiDAR project.  If you look at Section 2 here -- and | 13:42:29 |
| 13 | you can see my handwriting on this copy.  Actually, I | 13:42:33 |
| 14 | hope my math is right, but on the bottom, on the | 13:42:36 |
| 15 | second page, I totaled it up.  And I counted about ▮ | 13:42:40 |
| 16 | employees here that said that they have LiDAR-related | 13:42:43 |
| 17 | responsibilities or projects. | 13:42:45 |
| 18 | A.  Okay. | 13:42:46 |
| 19 | Q.  What are those other folks doing? | 13:42:48 |
| 20 | A.  I don't know what all these other people are | 13:42:56 |
| 21 | doing.  So, for instance -- shall we just go down the | 13:43:06 |
| 22 | list? | 13:43:06 |
| 23 | Q.  Well, let me ask generally. | 13:43:09 |
| 24 | If they're not working on Fuji, but they're | 13:43:11 |
| 25 | working on LiDAR, what are they working on? | 13:43:15 |

Page 105

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    If they're not working on Fuji . . . so let's | 13:43:20 |
| 2 | take -- I don't know if Phillip Haban, I don't know | 13:43:26 |
| 3 | what he's working on.  I don't know Jacob Fischer.  I | 13:43:31 |
| 4 | don't know what he's working on.  Robert Doll, | 13:43:34 |
| 5 | he's -- I know he's an employee for the Pittsburgh | 13:43:40 |
| 6 | team.  He's related to the hardware group or some | 13:43:47 |
| 7 | manufacturing aspect of that, but I don't know what | 13:43:50 |
| 8 | he's working on. | 13:43:52 |
| 9 | Sean Chin, I don't know who that is.  Not | 13:44:07 |
| 10 | sure who Jay Kuvelker is and what he's working on. | 13:44:13 |
| 11 | Anthony Levandowski, he's a manager.  I don't know how | 13:44:19 |
| 12 | he's working on Fuji or what he's working on.  I would | 13:44:23 |
| 13 | say he's not working on Fuji, but we already | 13:44:27 |
| 14 | established that. | 13:44:28 |
| 15 | Q.    Actually, why don't we pause there for a | 13:44:30 |
| 16 | second. | 13:44:30 |
| 17 | For the ■ employees in your declaration, | 13:44:32 |
| 18 | does that include Mr. Levandowski? | 13:44:34 |
| 19 | A.    No. | 13:44:34 |
| 20 | Q.    So if he has LiDAR-related responsibilities | 13:44:37 |
| 21 | or projects here in Section 2 of this document, you | 13:44:42 |
| 22 | don't know what those are; is that fair? | 13:44:44 |
| 23 | A.    I would say so. | 13:44:45 |
| 24 | And if I can be more clear about the ■ | 13:44:53 |
| 25 | employees currently working on the Fuji project, I do | 13:44:56 |

Page 106

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | mean people working directly on the Fuji project.  I | 13:45:00 |
| 2 | did not include people who were some levels of | 13:45:03 |
| 3 | management up who had some sort of dotted line or | 13:45:06 |
| 4 | eventual path of ownership or responsibility.  I was | 13:45:12 |
| 5 | coming up with ▮ as people that I felt I could | 13:45:14 |
| 6 | solidly say would be adversely affected if the Fuji | 13:45:19 |
| 7 | project ended. | 13:45:21 |
| 8 | So there's still a lot of names on here.  For | 13:45:29 |
| 9 | instance, take Ana Rayo, she's in a supply chain | 13:45:32 |
| 10 | group.  She's responsible, I think, for some aspects | 13:45:36 |
| 11 | of receiving material.  I would not have counted her | 13:45:39 |
| 12 | as primarily working on Fuji. | 13:45:41 |
| 13 | Q.   Let me actually just stop you and ask a | 13:45:44 |
| 14 | different question, which is, how many of these people | 13:45:47 |
| 15 | you don't know what they're doing in terms of LiDAR | 13:45:51 |
| 16 | work.  Can you just provide me a count? | 13:45:54 |
| 17 | A.   Yep. | 13:45:55 |
| 18 | Q.   And, actually, why don't we do this, I'm | 13:46:01 |
| 19 | going to hand you a pen.  And why don't you just mark | 13:46:04 |
| 20 | the people that you don't know what they're doing with | 13:46:06 |
| 21 | LiDAR. | 13:46:07 |
| 22 | A.   With LiDAR in general.  Okay. | 13:46:09 |
| 23 | Q.   Well, let me state it this way:  You don't | 13:46:11 |
| 24 | know why they're on this list of "Defendants' | 13:46:15 |
| 25 | Officers, Directors, and Employees with LiDAR-Related | 13:46:17 |

Page 107

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Responsibilities Or Projects"? | 13:46:18 |
| 2 | A.    Okay.  I will mark those. | 13:46:20 |
| 3 | (Witness complies.) | 13:46:20 |
| 4 | Okay.  So these -- I've marked -- | 13:48:19 |
| 5 | Q.    Can I have my pen back. | 13:48:21 |
| 6 | A.    Sorry. | 13:48:21 |
| 7 | I've marked those for whom I don't know what | 13:48:24 |
| 8 | they're working on. | 13:48:25 |
| 9 | Q.    Can you just tell me how many you've marked? | 13:48:28 |
| 10 | A.    Sorry. | 13:48:29 |
| 11 | Thirteen. | 13:48:31 |
| 12 | Q.    So those are 13 employees that Uber's lawyers | 13:48:40 |
| 13 | said had LiDAR-related responsibilities or projects | 13:48:43 |
| 14 | and they don't work on the Fuji, but you don't know | 13:48:46 |
| 15 | what they work on? | 13:48:47 |
| 16 | A.    That's correct, to my knowledge. | 13:48:50 |
| 17 | Q.    And then you mentioned that Uber was working | 13:48:52 |
| 18 | with some suppliers, third parties, on LiDAR and you | 13:48:56 |
| 19 | mentioned ███████████████.  And then what else? | 13:49:00 |
| 20 | A.    ███████ | 13:49:01 |
| 21 | Q.    ███████ | 13:49:02 |
| 22 | Anyone else? | 13:49:05 |
| 23 | A.    Perhaps, yeah.  ████████  I don't think I'm | 13:49:28 |
| 24 | aware of any other development activities. | 13:49:32 |
| 25 | Q.    So let's look at Section 3 here.  You see it | 13:49:37 |

Page 108

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    says, "List of defendant suppliers and consultants who    13:49:40

 2    have LiDAR-related responsibilities or projects"?          13:49:42

 3         A.   Okay.                                            13:49:43

 4         Q.   Is ████████      listed here?                   13:49:59

 5         A.   Nope.                                            13:49:59

 6         Q.   So ████████   is a LiDAR supplier that's not    13:50:03

 7    listed on this list of defendant suppliers?                13:50:07

 8         MR. KIM:  Objection; form.                           13:50:10

 9         THE WITNESS:  Yes.                                    13:50:11

10    BY MR. JAFFE:                                              13:50:11

11         Q.   What about █████is that on here?               13:50:15

12         A.   Nope.                                            13:50:22

13         Q.   Okay.  And what about ███████  is that on      13:50:29

14    here?                                                      13:50:29

15         A.   Nope.                                            13:50:34

16         Q.   And then I think ██████actually is on here;    13:50:38

17    right?                                                     13:50:38

18         A.   Yes.                                            13:50:41

19         Q.   And what are you guys doing with ██████        13:50:45

20         A.   I believe -- I believe we're buying some demo   13:50:51

21    units or some early evaluation units.                      13:50:54

22         Q.   You're working with them on designing a         13:50:58

23    custom LiDAR; right?                                       13:50:59

24         A.   They're developing a new LiDAR.  I don't know   13:51:02

25    that it's custom for us or just -- I don't know that       13:51:05
```

                                                    Page 109

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    detail.

 2         Q.   Are you providing them any Uber confidential   13:51:09

 3    information.

 4         A.   I'm not aware of that happening, no.            13:51:12

 5         Q.   So there is no Uber confidential information    13:51:16

 6    that is going from Uber to ██████ is that true?           13:51:21

 7         A.   I'm not aware of any.                           13:51:23

 8         MR. JAFFE:  Let's mark -- where is that thing?       13:51:31

 9    This one?  No.  It's this one.  This is going to be       13:51:45

10    Exhibit . . .                                             13:51:48

11         THE REPORTER:  154.                                  13:51:50

12         MR. JAFFE:  -- 154.                                  13:51:50

13              Thank you.                                      13:51:52

14              (Plaintiff's Exhibit 154 was marked.)          13:52:13

15    BY MR. JAFFE:

16         Q.   So I've marked as Exhibit 159 [sic] a          13:52:15

17    document that's heavily redacted.  But I just want to    13:52:17

18    ask --

19         MR. KIM:  159?                                       13:52:21

20         MR. JAFFE:  Yeah, Exhibit 159.                       13:52:24

21         MR. KIM:  154.                                       13:52:25

22         MR. JAFFE:  Oh, my handwriting is off.              13:52:27

23    BY MR. JAFFE:                                             13:52:27

24         Q.   154 is a document that's heavily redacted.     13:52:31

25              Is this an e-mail exchange with ██████          13:52:36
```

Page 110

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   If it is, I'm not aware.              13:52:43

 2        Q.   You can't tell because of the redaction;  13:52:44

 3   right?                                          13:52:45

 4        A.   I'm also looking at the names.  The name  13:52:50

 5   addresses.  And I can't say it's an exchange with  13:52:54

 6   ████████  because I see only Uber or Uber ATC employees.  13:52:59

 7        Q.   Right.                                13:52:59

 8             But if you look on the earlier e-mails, the  13:53:05

 9   other e-mails are redacted.                     13:53:06

10        A.   Oh, okay.  All right.                 13:53:10

11        Q.   So, for example, if you go to the page 12132.  13:53:17

12             Do you see that?                      13:53:20

13        A.   12132, yes.                           13:53:20

14        Q.   "Hey, Anthony, been trying to reach you a  13:53:23

15   while via text."                                13:53:24

16        A.   Okay.                                 13:53:25

17        Q.   You were cc'd on this; right?         13:53:27

18        A.   Yes.                                  13:53:27

19        Q.   What is this e-mail about?            13:53:29

20             (Witness reviews document.)           13:54:11

21        A.   I'm not 100 percent sure.  Yeah, I'm not sure  13:54:28

22   who [sic] this is about.                        13:54:30

23        Q.   It's hard to tell with the redactions, huh?  13:54:34

24        A.   It is.                                13:54:35

25        Q.   Yeah, I agree with you.               13:54:37
```

Page 111

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yeah, I don't recall. | 13:54:47 |
| 2 | Q.   And so just turning to the first page, | 13:54:49 |
| 3 | there's an e-mail from Mr. Levandowski, and you're on | 13:54:52 |
| 4 | the cc line. | 13:54:53 |
| 5 | A.   Yeah. | 13:54:53 |
| 6 | Q.   The entire e-mail is redacted. | 13:54:58 |
| 7 | What is Mr. Levandowski talking about in this | 13:55:01 |
| 8 | e-mail? | 13:55:02 |
| 9 | A.   I don't recall. | 13:55:03 |
| 10 | Q.   You don't recall this e-mail at all? | 13:55:05 |
| 11 | A.   I don't recall this e-mail. | 13:55:06 |
| 12 | Q.   So it's possible that Mr. -- who knows what | 13:55:08 |
| 13 | Mr. Levandowski would be talking about? | 13:55:10 |
| 14 | A.   Who knows. | 13:55:11 |
| 15 | Q.   Okay.  Put that aside. | 13:55:13 |
| 16 | A.   Okay. | 13:55:14 |
| 17 | Q.   Let's go back to your opening declaration, | 13:55:31 |
| 18 | which is Exhibit 151.  And if you can look at | 13:55:41 |
| 19 | paragraph 15, please. | 13:55:45 |
| 20 | Do you see that you refer to an Exhibit B | 13:55:58 |
| 21 | here? | 13:56:00 |
| 22 | A.   Yes. | 13:56:01 |
| 23 | Q.   And what are you saying that Exhibit B is? | 13:56:05 |
| 24 | A.   Exhibit B is a file that lays out the X,Y and | 13:56:28 |
| 25 | rotation coordinates for each of the laser diodes on | 13:56:35 |

Page 112

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  ████████████████  while the final dimensions it would    13:56:40

2  be used for fiducial-based diode placement is not yet    13:56:53

3  defined for ██████████████████    13:56:56

4      MR. JAFFE:  Let's mark as Exhibit 155 a document    13:57:01

5  entitled, "Exhibit B."    13:57:03

6  BY MR. JAFFE:

7      Q.   It looks like you have it.    13:57:06

8      A.   Yes.    13:57:06

9      Q.   Did you bring your declaration with you?    13:57:08

10     A.   Yeah.    13:57:09

11     Q.   Why don't we look at your copy then, but    13:57:11

12  we'll just mark this for the record so we have a    13:57:14

13  complete record.    13:57:15

14     MR. JAFFE:  Just for the record, I'm marking    13:57:19

15  Exhibit B as 155.  And Mr. Haslim is looking at his    13:57:24

16  own copy.    13:57:25

17         (Plaintiff's Exhibit 155 was marked.)    13:57:26

18  BY MR. JAFFE:    13:57:26

19     Q.   So on the top right-hand side, there's a    13:57:32

20  little picture of a transmit board; right?    13:57:33

21     A.   Right.    13:57:33

22     Q.   And that's an image of one of the Fuji    13:57:37

23  transmit boards; correct?    13:57:38

24     A.   Correct.    13:57:38

25     Q.   And the table below, that includes some X,Y    13:57:44

Page 113

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    and theta values for each of the diodes on the        13:57:50

 2    transmit board depicted there?                        13:57:53

 3        A.   Yes.                                          13:57:53

 4        Q.   So what does ███████████ refer to in this     13:57:58

 5    chart?                                                 13:57:59

 6        A.   In this chart, the term ███████ labels        13:58:06

 7    ████████████████████████████████████████  █████████

      ██████████████████████████████████████    █████████

      ████████████████████████████                13:58:21

10        Q.   And why are you providing █████████  █████████

      ██████████████████████████████                13:58:27

12        A.   I believe the person who made this file       13:58:34

13    provided ██████████████████████████████████  █████████

      █████████████████████████ -- that's the        13:58:44

15    wrong term -- so that ████████████████████████  █████████

      ███████████████████████████████████  █████████

      ██████████████████████████████████████████  █████████

      ██████████████████████████████████████████  █████████

      ██████████  And these dimensions never left the    13:59:06

20    document.                                             13:59:07

21        Q.   "These dimensions never left the document,"   13:59:11

22    what do you mean?                                      13:59:12

23        A.   The dimensions labeled ███████████ remain in  13:59:15

24    this document even as new information is being added   13:59:19

25    ████████████████████████████████████████████          13:59:23
```

Page 114

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    So the X and Y data here shows -- ███████    ███████

       ████████████████████████████████████████    ███████

       ███████  right?                                      13:59:35

4      A.    Yes.                                           13:59:36

5      Q.    So the X and Y data for ██████████ shows        13:59:39

6      ████████████████████████████████████████    ███████

       ████████████████████████████████████████████    ███████

       ████████████████████████████  right?                13:59:48

9      A.    Right.

10     Q.    Okay.  And you said the person who created     13:59:56

11     this document.                                       13:59:57

12           Who are you referring to?                      13:59:59

13     A.    This document would have been created by       14:00:03

14     Gaetan Pennecot.                                     14:00:05

15     Q.    And why would Mr. Pennecot include ████████    ███████

       ████████████  in this document?                     14:00:13

17     A.    Gaetan did the original █████████████    ███████

       ████████████████████████████████████████    ███████

       ████████████████████  And he was responsible         14:00:27

20     for ██████████████████████████████████████    ███████

       █████████████████████.  This information would      14:00:36

22     then have been given to our electrical engineer, who 14:00:38

23     did ████████████████████  for this.                  14:00:40

24     Q.    So that doesn't answer my question.            14:00:43

25           Why is ██████████████████████████             14:00:45

                                        Page 115

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     ██████████████████████     ████████████████████     ████████████
 
 2     ████████████████                                      14:00:49

 3        A.   I'm sorry.  I don't think I was clear before.  14:00:53

 4             When Gaetan designed the outline of this        14:00:56

 5     board and specified █████████████████████████████████   ████████

 6     █████████████████████████████████████████████████████   ████████

 7     ███████████████████████     █████████████████████████   ████████

 8     ████████████████████████     ████████████████████████   ████████

 9     █████████████████████████████████████████████████████   ████████

10     █████████████████████████████████████████████████       14:01:17

11        Q.   So the original idea was ██████████████████████   ████████

12     ████████████████████████                                14:01:22

13        A.   No.                                             14:01:22

14        Q.   So then let me ask my question again then.      14:01:25

15             What is the point of including ██████████████     ████████

16     ██████████████-- in this chart?                         14:01:30

17        A.   This information could have been provided to    14:01:36

18     the electrical engineer so that ████████████████████████ ████████

19     ████████████████████████████████████████                14:01:43

20     And if he hasn't ███████████████████████████████████████ ████████

21     █████████████████████████████████████████████████████   ████████

22     ██████████████████     ████████████████████████████     14:01:55

23        Q.   Why do you think he did that?                   14:01:57

24        A.   He needs to ███████████████████████, that's as  14:02:00

25     good as -- better than an outline of a board which is   14:02:03
```

Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    These are six decimal places.              14:06:06

 2        Q.    Is that pretty accurate?                   14:06:08

 3        A.    It's an unnecessary number of decimals.  This  14:06:10

 4   goes to nanometers.                                   14:06:13

 5        Q.    Yeah.  So this is talking about aligning the  14:06:16

 6   diodes to the nanometer; is that fair?                14:06:18

 7        A.    No.                                         14:06:18

 8        Q.    No?  I thought you said it goes to          14:06:21

 9   nanometers.                                            14:06:22

10        A.    It goes to nanometers, but I don't think    14:06:24

11   anybody was under the impression that we're actually  14:06:25

12   in a postion to get something to a nanometer scale.   14:06:28

13        Q.    But that's what this document is listing?   14:06:28

14        A.    This document lists the ideal dimension, yes,  14:06:32

15   down to the nanometer.                                 14:06:34

16        Q.    Got it.                                      14:06:35

17              We talked about X.                           14:06:38

18              Y, that talks about the millimeters          14:06:41

19   difference from the fiducial to A1 on the -- in the    14:06:48

20   vertical axis; right?                                  14:06:50

21        A.    Right.                                       14:06:50

22        Q.    ███████████████████████████████            14:06:56

23   ██████████████████████████████████████████            14:07:03

24        MR. KIM:  Objection; form.                        14:07:06

25        THE WITNESS:  ████████████████████               14:07:09
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 ████████████████████████████████  ████████

   ██████████████████████████  ████████

   ████████████████████████████  ████████

   ████████████████████████████  ████████

   █████  ████████████████████  ████████

   ██████████████████████████

   ████████████  14:07:36

8  BY MR. JAFFE:

9       Q.   The theta column here, what does that tell  14:07:42

10 us?                                                    14:07:42

11      A.   That tells us, relative to some zero angle on  14:07:50

12 this board, which we can presume is either vertical or  14:07:55

13 horizontal, the ideal placement angle for the laser   14:08:00

14 diode on the board.                                   14:08:02

15      Q.   We're just talking about A again, Board A.   14:08:11

16      Which is the ████████████  ████████

        ████████████  14:08:22

18      A.   As the light is projected out past the      14:08:26

19 sensor, the ████████████████  14:08:32

20      Q.   All right.  Am I correct then that ████████  ████████

        ██████████████████  14:08:44

22      A.   Yes, that's correct.                         14:08:45

23      Q.   Okay.  So is it fair to say that ████████  ████████

   ██████████████████████████  ████████

   ████████████  14:09:01

Page 121

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    In this coordinate system, that's true.      14:09:04

 2        Q.    Referring to Board A, the diodes go from --   14:09:15

 3    ████████████████████████████████████████████████      ████████

      ███████████████████████████████████████                14:09:23

 5        A.    Yes.                                          14:09:23

 6        Q.    Okay.                                         14:09:27

 7        MR. JAFFE:  So what I'd like to do is mark as a     14:09:36

 8    new exhibit Exhibit 156.                                14:09:41

 9            (Plaintiff's Exhibit 156 was marked.)           14:10:07

10    BY MR. JAFFE:

11        Q.    I'm going to hand you a calculator as well.   14:10:10

12        A.    Okay.                                         14:10:11

13        Q.    So what we have here is a reproduction, if we 14:10:17

14    cut and paste correctly, which I think that we did, of 14:10:21

15    the data that's here for Board A in Exhibit B to your  14:10:27

16    declaration.  And you can see on the right that I've    14:10:33

17    left open something called delta Y.                     14:10:36

18        A.    Yes.                                          14:10:37

19        Q.    Do you see that?                              14:10:38

20        A.    Yes.                                          14:10:38

21        Q.    And do you understand what I'm trying to      14:10:41

22    refer to here by "delta Y"?                             14:10:43

23        A.    Yes.  I'll go ahead and identify what I       14:10:46

24    believe you intend by "delta Y."                        14:10:48

25        Q.    But before you do, I will tell you exactly    14:10:50
```

                                                    Page 122

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    starting one, so that can be blank.  And you can start    14:12:07
 2    from the next one.
 3        A.   Perfect.  So I will calculate these.           14:12:11
 4            (Witness performs calculations.)               14:12:11
 5        A.   Okay.                                          14:16:45
 6        Q.   Thank you.  You're handing this to me for me  14:16:48
 7    to look at.  All right.  I'm going to hand it back to   14:16:59
 8    you.                                                    14:16:59
 9            Exhibit 156 now reflects you've penciled in     14:17:03
10    the delta Y here.                                       14:17:07
11            In looking at this completed table, would you   14:17:13
12    agree that the delta Y values ███████████         █████ 
██    █████████████████████████████████████████             14:17:24
14        MR. KIM:  Objection; form.                          14:17:24
15        THE WITNESS:  Yes, I would agree that the delta Y   14:17:31
16    values ██████████████████████████████████         █████ 
██    ████████████████████████████████████             █████ 
██    ██████                                               14:17:41
19    BY MR. JAFFE:                                           14:17:41
20        Q.   Okay.  In other words, ████████████████    █████ 
██    ████████████████████████████████████████         █████ 
██    ████████████████████                                14:17:52
23        MR. KIM:  Objection; form.                          14:17:55
24        THE WITNESS:  It's true, the delta Y, ███████████  █████ 
██    █████████████████████████████████████             14:18:01
```

Page 124

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1   ████████████████████████████  --

 2        THE REPORTER:  I'm sorry, I'm sorry.  It's

 3   true . . .

 4        THE WITNESS:  ██████████████  ████████

 █   ████████████████████████████████  ████████

 █   ███████████████████████████████  ████████

 █   ██████████████████████████              14:18:24

 8   BY MR. JAFFE:                           14:18:24

 9        Q.   And as we talked about before, as the   14:18:30

10   ████████████████████████████████  ████████

 █   ████████████████████████████████  ████████

 █   ████████████████████  right?            14:18:41

13        MR. KIM:  Objection; form.          14:18:43

14        THE WITNESS:  Yes, we agreed -- I agree that the   14:18:46

15   ████████████████████████████████  ████████

 █   ██████████████████████████████  ████████

 █   ████████████████████████████              14:19:01

18   BY MR. JAFFE:                           14:19:01

19        Q.   So referring to this ████████████, you   14:19:05

20   would agree that ████████████████████████  ████████

 █   ████████████████████████████████  ████████

 █   ████████████████████████████████  ████████

 █   ████████████████████████████              14:19:20

 █   ███████████████████████

25        MR. KIM:  Objection; form.          14:19:25
```

Page 125

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        THE WITNESS:  Yes.                        14:19:25

 2   BY MR. JAFFE:

 3        Q.   Okay.  You can put that aside, please.  14:19:30

 4             We talked about Max Levandowski earlier.  You  14:19:36

 5   said he was on your team.                      14:19:38

 6        A.   Yes.                                  14:19:40

 7        Q.   What does he do?                      14:19:41

 8        A.   He's a mechanical engineer.  He designs the  14:19:47

 9   optical cavity that the lenses and the lasers and  14:19:52

10   detector boards attach to.                      14:19:55

11        Q.   Is what is his LiDAR experience?      14:19:58

12        A.   I am not aware of any LiDAR experience prior  14:20:01

13   to working for Otto and Uber.                   14:20:04

14        Q.   Did he know a lot about LiDAR when he  14:20:07

15   started?                                        14:20:07

16        MR. KIM:  Objection; form.                 14:20:08

17        THE WITNESS:  I don't know.                14:20:09

18   BY MR. JAFFE:                                   14:20:09

19        Q.   He works for you; right?              14:20:10

20        A.   He works for me.  He worked for Otto before I  14:20:14

21   joined.                                         14:20:15

22        Q.   When you joined, did he -- was he     14:20:18

23   sufficiently educated about how LiDAR works?    14:20:21

24        MR. KIM:  Objection; form.                 14:20:22

25        THE WITNESS:  He seemed sufficiently educated as a  14:20:26
```

Page 126

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | mechanical engineer. | 14:20:27 |
| 2 | BY MR. JAFFE: | 14:20:27 |
| 3 | Q.   So that wasn't really my question. | 14:20:29 |
| 4 | A.   Yes. | 14:20:30 |
| 5 | Q.   So -- | 14:20:31 |
| 6 | A.   I didn't quiz him on his LiDAR expertise, but | 14:20:35 |
| 7 | at the same time, I'll grant you that I was not aware | 14:20:38 |
| 8 | of any LiDAR expertise in his background prior to | 14:20:42 |
| 9 | Otto. | 14:20:43 |
| 10 | Q.   Why -- well, actually, let me back up. | 14:20:58 |
| 11 | Do you know if Max Levandowski and Anthony | 14:21:01 |
| 12 | Levandowski are -- they're brothers; right? | 14:21:04 |
| 13 | A.   That's my understanding. | 14:21:05 |
| 14 | Q.   Do you know if they're close? | 14:21:07 |
| 15 | MR. KIM:  Objection; form. | 14:21:08 |
| 16 | THE WITNESS:  I don't know how close they are. | 14:21:12 |
| 17 | BY MR. JAFFE: | 14:21:12 |
| 18 | Q.   Do you know about any conversations that they | 14:21:13 |
| 19 | had regarding LiDAR? | |
| 20 | MR. KIM:  Same objection. | 14:21:14 |
| 21 | THE WITNESS:  No. | 14:21:15 |
| 22 | BY MR. JAFFE: | 14:21:15 |
| 23 | Q.   And what does Max Levandowski -- excuse me -- | 14:21:17 |
| 24 | do at Otto today? | 14:21:23 |
| 25 | A.   At Uber today? | 14:21:25 |

Page 127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.    (Nods head affirmatively.)              14:21:25

 2        A.    He continues to be the mechanical engineer  14:21:29

 3   responsible for designing the optical cavity that   14:21:32

 4   mounts the lenses, the laser transmit block and the 14:21:36

 5   receiver boards.                                     14:21:37

 6        Q.    Did he come up with the optical cavity design 14:21:41

 7   for Fuji?                                            14:21:42

 8        A.    In as much as that responsibility refers 14:21:50

 9   to --                                               14:21:50

10        MR. KIM:  Objection; form.                    14:21:53

11        THE REPORTER:  I'm sorry.                      14:21:53

12        THE WITNESS:  Inasmuch as that responsibility 14:21:55

13   refers to designing a mechanical housing, yes.  He 14:22:01

14   designed that for Fuji.                             14:22:02

15   BY MR. JAFFE:                                       14:22:02

16        Q.    Who came up with the optical cavity design 14:22:05

17   for Fuji?                                           14:22:06

18        MR. KIM:  Objection; form.                    14:22:11

19        THE WITNESS:  The optical cavity design for Fuji 14:22:14

20   is related to the lens and the lens requirements.  So 14:22:19

21   Gaetan plays a responsibility for that.  As a       14:22:23

22   mechanical element in terms of mounting and housing 14:22:27

23   those features, those components, Max Levandowski is 14:22:29

24   responsible for that aspect.                        14:22:31

25   BY MR. JAFFE:                                       14:22:31
```

Page 128

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    So it's Mr. Pennecot and Mr. Max Levandowski | 14:22:34 |
| 2 | who came up with the optical cavity design for Fuji; | 14:22:39 |
| 3 | is that fair? | 14:22:40 |
| 4 | MR. KIM:  Objection; form. | 14:22:40 |
| 5 | THE WITNESS:  My hesitancy is I'm trying to decide | 14:22:51 |
| 6 | in my mind whether the transmit and receive components | 14:22:54 |
| 7 | also play a part -- are considered part of the optical | 14:23:00 |
| 8 | cavity.  I think they fairly should be considered part | |
| 9 | of the optical cavity. | |
| 10 | So then I also add Will Treichler, Florin | 14:23:05 |
| 11 | Ignatescu contributing to the design of the | 14:23:09 |
| 12 | optical cavity for the Fuji, or coming up with it. | 14:23:13 |
| 13 | I would claim some responsibility as well because | 14:23:22 |
| 14 | I'm looking at the designs that these engineers | 14:23:25 |
| 15 | are generating.  I could have contributed some | 14:23:28 |
| 16 | aspect as well. | 14:23:30 |
| 17 | BY MR. JAFFE: | 14:23:30 |
| 18 | Q.    You could have or you did? | 14:23:31 |
| 19 | A.    I'm sure I had some influence, yes. | 14:23:35 |
| 20 | Q.    Going back to Max Levandowski, do you | 14:23:43 |
| 21 | know -- he and Anthony, do they live together? | 14:23:46 |
| 22 | A.    I don't know. | 14:23:48 |
| 23 | Q.    Do you know how much time they spend together | 14:23:52 |
| 24 | outside of the office? | 14:23:53 |
| 25 | A.    I don't know that. | 14:23:54 |

Page 129

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    and Otto were already talking at this time?      14:37:43

 2         A.   Yes.   Then this would be indicative of their   14:37:48

 3    discussion.                                      14:37:48

 4         Q.   Okay.   So going back to page 10.      14:37:53

 5         A.   Yes.                                   14:37:54

 6         Q.   Do you see there's a section entitled, ███████  ███████

 █    ███                                              14:38:04

 8         A.   Yes.                                   14:38:06

 9    ███  ██████████████████████████████████████████ 14:38:09

10         A.   No, I'm not familiar with this page.   14:38:11

11         Q.   So you're -- well, you said you're not 14:38:15

12    familiar with this page.   I'm referring --      14:38:16

13              Are you familiar with ██████████████  ███████

 █    ██████████████████████████                       14:38:22

15         A.   So I was not aware of this design, especially  14:38:41

16    with this date.   No, I'm not familiar with this 14:38:45

17    design, actually.                                14:38:46

18         Q.   Do you know what the ████████ referred to  14:38:48

19    here refers to?                                  14:38:49

20         A.   To my knowledge, the term █████████ has 14:38:55

21    been applied to be synonymous, more or less, with an  14:38:59

22    optical cavity.                                  14:39:00

23         Q.   Do you know whether Mr. Levandowski had any  14:39:06

24    input into this ██████████                       14:39:09

25         A.   I don't know.                          14:39:09
```

Page 140

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   In this concept here, you would agree that        14:39:18

2   the PCBs are arranged along a straight-edge board?        14:39:25

3      MR. KIM:   Objection; form.                            14:39:26

4      THE WITNESS:   No, that's -- this appears to be a      14:39:29

5   schematic, and it doesn't tell me anything about the     14:39:32

6   plan view of the board.                                  14:39:34

7   BY MR. JAFFE:                                             14:39:34

8      Q.   Would you agree that the -- what apparently       14:39:41

9   are the emitters are ██████████████                      14:39:44

10     MR. KIM:   Objection; form.                            14:39:48

11     THE WITNESS:   Let me see.                             14:39:49

12          (Witness reviews document.)

13     THE WITNESS:   It's not clear if they are ██████    ████████

██   ██████   They look ██████████   from what's        14:39:59

15  clearly a simple type of PowerPoint graphic, but it's   14:40:06

16  not clear if they say one degree native if they could   14:40:10

17  actually achieve ███████████████████████          ████████

██  ██████████████████████████                         14:40:17

19  BY MR. JAFFE:

20     Q.   The last bullet says, ████████████████      ████████

██  ████████████████████                               14:40:23

22          Do you see that?                                 14:40:24

23     A.   I see that.                                      14:40:24

24     Q.   What does ██████████████ refer to there?        14:40:27

25     MR. KIM:   Objection; form.                           14:40:28

                                       Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        THE WITNESS:  I can't be sure what was meant      14:40:31

 2   exactly; but given what I know, ███████████  ████████

 █   ████████████████████████████████████████████.        14:40:40

 4   BY MR. JAFFE:                                         14:40:40

 5        Q.   We're talking about the Y delta again?      14:40:43

 6        MR. KIM:  Objection; form.                       14:40:43

 7        THE WITNESS:  Not necessarily.                   14:40:45

 8   BY MR. JAFFE:                                         14:40:45

 9        Q.   You said, "Not necessarily."                14:40:47

10        What do you mean by that?                        14:40:48

11        A.   My guess would have been angular spacing.   14:40:52

12        Q.   In the top part of this page, it talks about 14:41:06

13   ██████████████████  ████████████████████████████  ████████████

 █   ████████████████████                                 14:41:12

15        A.   I see that.                                 14:41:14

16        Q.   That's the ███████████████; right?          14:41:17

17        A.   Yes.                                        14:41:19

18        Q.   ██████████████████████████████████         14:41:24

19   this is different than the Fuji design; right?        14:41:27

20        MR. KIM:  Objection; form.                       14:41:32

21        THE WITNESS:  There's not a lot of detail in here; 14:41:35

22   but it's not the Fuji design yet, that's for sure.    14:41:39

23   BY MR. JAFFE:                                         14:41:39

24        Q.   And you helped start the Fuji project, and  14:41:41

25   you're not familiar with this Plan B at all; right?   14:41:44
```

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Right. | 14:41:44 |
| 2 | Q.   So to your knowledge, what's described here | 14:41:48 |
| 3 | as Plan B isn't the basis for the Fuji design? | 14:41:52 |
| 4 | MR. KIM:  Objection; form. | 14:41:55 |
| 5 | THE WITNESS:  I am not aware of a link between | 14:41:59 |
| 6 | this Plan B in this document and the Fuji design. | 14:42:04 |
| 7 | BY MR. JAFFE: | 14:42:04 |
| 8 | Q.   And you would be in a position to know; | 14:42:08 |
| 9 | right? | 14:42:09 |
| 10 | MR. KIM:  Objection; form. | 14:42:11 |
| 11 | THE WITNESS:  I would have to make that | 14:42:13 |
| 12 | presumption.  And it's just a presumption. | 14:42:15 |
| 13 | BY MR. JAFFE: | 14:42:15 |
| 14 | Q.   In your job, you would be in a position to | 14:42:18 |
| 15 | know that; right? | 14:42:18 |
| 16 | MR. KIM:  Objection; form. | 14:42:25 |
| 17 | THE WITNESS:  I would expect to know that. | 14:42:26 |
| 18 | MR. JAFFE:  Let's take a break. | 14:42:32 |
| 19 | THE VIDEOGRAPHER:  We are off the record at 2:42 | 14:42:36 |
| 20 | p.m. | 14:42:36 |
| 21 | (Recess taken.) | 14:42:36 |
| 22 | THE VIDEOGRAPHER:  We are back on the record at | 14:55:55 |
| 23 | 2:56 p.m. | 14:55:57 |
| 24 | BY MR. JAFFE: | 14:55:57 |
| 25 | Q.   Have you discussed the subject matter of your | 14:56:03 |

Page 143

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    testimony during any of the breaks today?        14:56:05

 2        A.   Nothing in terms of like what we said in this  14:56:10

 3    testimony.                                        14:56:11

 4        Q.   What does that mean?                     14:56:13

 5        A.   That means the legal team may have advised me  14:56:19

 6    on procedural matters, general terms without      14:56:23

 7    referencing the actual content of our discussion. 14:56:26

 8        Q.   What did they tell you?                  14:56:27

 9        MR. KIM:  Objection.                          14:56:27

10        Going to instruct you not to answer on the    14:56:31

11    grounds of attorney-client privilege.            14:56:33

12    BY MR. JAFFE:                                     14:56:33

13        Q.   Did your legal team tell you how to testify  14:56:36

14    after these meetings?                             14:56:37

15        MR. KIM:  You can answer that yes or no.       14:56:39

16        THE WITNESS:  Could you be clear by what you mean  14:56:41

17    by "how to testify"?                              14:56:42

18    BY MR. JAFFE:                                     14:56:44

19        Q.   I don't think I can be any clearer.      14:56:46

20        A.   Like what to say?                        14:56:47

21        Q.   I'm trying to understand what the legal team  14:56:51

22    told you in terms of general terms, procedural    14:56:55

23    matters, which is what you said.                  14:56:57

24        What did they tell you?                       14:56:58

25        MR. KIM:  Instruct you not to reveal any      14:57:00
```

Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | privileged conversations. | 14:57:11 |
| 2 | THE WITNESS:  Are you instructing me not to | 14:57:13 |
| 3 | answer? | 14:57:14 |
| 4 | MR. KIM:  You can answer his prior question yes or | 14:57:17 |
| 5 | no. | 14:57:17 |
| 6 | THE WITNESS:  If your question is, did they tell | 14:57:24 |
| 7 | me what to say, no.  Did they tell me how to testify, | 14:57:28 |
| 8 | no. | 14:57:29 |
| 9 | BY MR. JAFFE: | 14:57:29 |
| 10 | Q.   When you said that they told you things about | 14:57:31 |
| 11 | general things and procedural considerations, what | 14:57:34 |
| 12 | general things did they tell you? | 14:57:37 |
| 13 | MR. KIM:  I'm going to instruct you not to answer | 14:57:39 |
| 14 | on the grounds of attorney-client privilege. | 14:57:40 |
| 15 | BY MR. JAFFE: | 14:57:40 |
| 16 | Q.   What procedural -- what general terms about | 14:57:42 |
| 17 | your testimony did they tell you? | 14:57:45 |
| 18 | A.   Let's see.  We discussed how much time is | 14:57:52 |
| 19 | left, something called redirect. | 14:57:59 |
| 20 | Q.   What did they talk to you about redirect? | 14:58:01 |
| 21 | MR. KIM:  And I'm going to instruct you not to | 14:58:05 |
| 22 | reveal any attorney-client privileged conversations. | 14:58:09 |
| 23 | And I don't think you can answer that without doing | 14:58:11 |
| 24 | so.  I'm going to instruct you not to answer. | 14:58:14 |
| 25 | BY MR. JAFFE: | 14:58:14 |

Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    You talked about redirect on a break?  Yes or | 14:58:21 |
| 2 | no? | 14:58:21 |
| 3 | A.    Yes, we talked about the term "redirect." | 14:58:24 |
| 4 | Q.    And what did you talk about redirect? | 14:58:28 |
| 5 | A.    That is a situation where, instead of you, | 14:58:33 |
| 6 | the lawyer on my side of the table is going to ask me | 14:58:36 |
| 7 | questions. | 14:58:36 |
| 8 | Q.    And how did redirect come up in the context | 14:58:39 |
| 9 | of your conversation? | 14:58:40 |
| 10 | A.    In the context of time remaining and that | 14:58:45 |
| 11 | redirect would occur after your allotted time has | 14:58:49 |
| 12 | ended, so it's going to take longer than I might | 14:58:54 |
| 13 | think. | 14:58:54 |
| 14 | Q.    Did Uber's lawyers tell you that they were | 14:58:58 |
| 15 | going to do redirect questions? | 14:59:00 |
| 16 | A.    Yes. | 14:59:02 |
| 17 | Q.    And did they tell you what those questions | 14:59:04 |
| 18 | were going to be about? | 14:59:06 |
| 19 | A.    No. | 14:59:07 |
| 20 | Q.    Did you talk at all about what sort of | 14:59:11 |
| 21 | redirect would happen? | 14:59:13 |
| 22 | A.    No. | 14:59:16 |
| 23 | Q.    What did you talk about about redirect? | 14:59:19 |
| 24 | A.    That they will ask me questions just like you | 14:59:24 |
| 25 | ask me questions and that it's going to take longer | 14:59:27 |

Page 146

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | than the hour, approximately, that we have remaining, | 14:59:30 |
| 2 | so not to expect it to be over at that time. | 14:59:34 |
| 3 | Q.   What else, in general terms, did you and your | 14:59:36 |
| 4 | lawyers talk about on the breaks? | 14:59:38 |
| 5 | MR. KIM:  I'm going to advise you not to reveal | 14:59:46 |
| 6 | any attorney-client privileged communications. | 14:59:49 |
| 7 | THE WITNESS:  So I'm not a lawyer.  I don't know | 14:59:55 |
| 8 | what is considered attorney-client privilege and what | 14:59:58 |
| 9 | wouldn't be in that context of conversations, so I | 15:00:01 |
| 10 | need to be careful not to answer and disclose | 15:00:03 |
| 11 | something I'm not supposed to say. | 15:00:06 |
| 12 | MR. KIM:  Do you need to consult with me about a | 15:00:09 |
| 13 | privilege issue? | 15:00:09 |
| 14 | THE WITNESS:  Yes, that would help. | 15:00:12 |
| 15 | MR. KIM:  Can we go off the record so he can | 15:00:15 |
| 16 | consult with me on a privilege issue before he answers | 15:00:18 |
| 17 | any further questions about what we discussed? | 15:00:20 |
| 18 | MR. JAFFE:  I'll withdraw the question and I'll | 15:00:22 |
| 19 | ask a different question. | 15:00:23 |
| 20 | BY MR. JAFFE: | 15:00:23 |
| 21 | Q.   Tell me the substance of your private | 15:00:26 |
| 22 | conferences -- private conferences during the break | 15:00:28 |
| 23 | that you had with Uber's lawyers, all of it. | 15:00:32 |
| 24 | MR. KIM:  I'm going to object on the grounds of | 15:00:36 |
| 25 | privilege. | 15:00:37 |

Page 147

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      MR. JAFFE:  Are you instructing him not to answer?   15:00:41

2      MR. KIM:  Instruct him not to answer.   15:00:42

3      MR. JAFFE:  Okay.  I think you know that's   15:00:47

4   directly contrary to Judge Alsup's order.   15:00:50

5      MR. KIM:  Can you clarify that.   15:00:53

6      MR. JAFFE:  Judge Alsup's order says no private   15:00:56

7   conferences after testimony begins.   15:00:58

8      MR. KIM:  He's testified that we haven't had any   15:01:01

9   private conferences about his testimony.   15:01:03

10      MR. JAFFE:  The record speaks for itself.  You   15:01:06

11   instructed him not to answer.  I'm going to move on.   15:01:09

12         This is going to be Exhibit 158.  It's a   15:01:15

13   document entitled UBER00012240.   15:01:19

14         (Plaintiff's Exhibit 158 was marked.)   15:01:37

15   BY MR. JAFFE:   15:01:37

16      Q.   This is an e-mail from earlier in March of   15:01:40

17   this year; right -- excuse me, April.   15:01:47

18      A.   Thank you.  Yes.   15:01:48

19      Q.   And on this e-mail is yourself, Anthony   15:01:53

20   Levandowski, Claire Delaunay and Eric Meyhofer; right?   15:01:57

21      A.   Yes.   15:01:59

22      Q.   What is Claire Delaunay's role at Uber?   15:02:06

23      A.   She's a software engineer or software   15:02:08

24   engineering manager.   15:02:10

25      Q.   And there's -- on the "To" line, it says,   15:02:13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    ███████████████████████                              15:02:15

 2          Do you see that?                               15:02:17

 3      A.   I see that.                                   15:02:19

 4      Q.   Why does it say ██████████████ there?         15:02:23

 5      A.   I don't know.                                 15:02:23

 6      Q.   And you said, ███████ -- so referring to the  15:02:28

 7    substance of the e-mail that you wrote, you said,    15:02:30

 8    ██████  ██████████████████                           15:02:32

 9          What are you referring to?                     15:02:33

10      A.   I referred to this web link.  I can't         15:02:42

11    remember right now what I was looking at.  ████████  ██████████  15:02:54
                                                                      15:02:54

██    ███████████████████████████████████████████████     15:02:54

13          This could be a LiDAR sensor, but clicking on  15:02:59

14    the web link would make it very clear what this was. 15:03:03

15      Q.   ██████████████████  that's Anthony Levandowski's  15:03:20

16    address; right?                                      15:03:20

17      A.   I believe it is, yes.                         15:03:20

18      Q.   So someone had in their address book Anthony  15:03:25

19    Levandowski's e-mail address, but the name was just  15:03:29

20    ████████████████████                                 15:03:31

21      A.   Apparently.                                   15:03:31

22      Q.   Did you notice that when you received this    15:03:36

23    e-mail?                                              15:03:36

24      A.   No, I did not.                                15:03:38

25      Q.   Are you aware of whether Mr. Levandowski      15:03:40
```

Page 149

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    consulted for Uber?                                    15:03:45

2        A.   No.  Consulted, no.                           15:03:48

3        Q.   Okay.  You can put that aside.                15:04:04

4            This has been previously marked as Exhibit     15:04:18

5    60.  So if you can go to 85 -- oh, this is the wrong   15:04:37

6    doc.                                                   15:04:37

7            Going back in time, there's an e-mail from --  15:04:52

8    Scott Boehmke wrote, ██████████████████    ████████     

     ██████████████████████████████                         15:05:00

10           Do you see that?  It's on the last page.       15:05:03

11           (Witness reviews document.)                    15:05:14

12       A.   Okay.  I see that.                            15:05:16

13       Q.   Do you know what the "doc" being referred to  15:05:19

14   here is?                                               15:05:20

15       MR. KIM:  Objection; form.                         15:05:26

16       THE WITNESS:  No.  I don't know what the doc was.  15:05:35

17   BY MR. JAFFE:                                          15:05:35

18       Q.   And then in the next e-mail in time, you were 15:05:47

19   added to the thread.                                   15:05:54

20           Do you see that?                               15:05:55

21       A.   Yes.                                          15:05:58

22       Q.   Do you remember being added to this e-mail    15:06:01

23   thread?                                                15:06:02

24       A.   Remember?  This dates back pretty far.  I     15:06:09

25   don't remember.  About a year ago.                     15:06:11

                                                  Page 150

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    But at this time, immediately when you were | 15:06:20 |
| 2 | involved, Mr. Boehmke and Mr. Levandowski were having | 15:06:26 |
| 3 | LiDAR-related discussions; right? | 15:06:31 |
| 4 | MR. KIM:  Objection; form. | 15:06:38 |
| 5 | THE WITNESS:  It's not -- it's not clear, when it | 15:06:40 |
| 6 | says, ███████████████████████████████  ████████ | 15:06:49 |
| 7 | ████ meant Scott and Anthony or Scott and somebody | 15:06:49 |
| 8 | else, so I don't know. | 15:06:50 |
| 9 | BY MR. JAFFE: | 15:06:50 |
| 10 | Q.    Do you think that's ambiguous? | 15:06:52 |
| 11 | A.    I think that's ambiguous. | 15:06:54 |
| 12 | MR. JAFFE:  You can set that aside. | 15:07:11 |
| 13 | We're on 158? | 15:07:13 |
| 14 | THE REPORTER:  159. | 15:07:15 |
| 15 | MR. JAFFE:  Get it right one of these times. | 15:07:18 |
| 16 | (Plaintiff's Exhibit 159 was marked.) | 15:07:35 |
| 17 | BY MR. JAFFE: | 15:07:35 |
| 18 | Q.    In June of 2016, you were working at Otto; | 15:07:39 |
| 19 | right? | 15:07:39 |
| 20 | A.    Yes. | 15:07:41 |
| 21 | Q.    And do you see, in the second e-mail, there's | 15:07:43 |
| 22 | ████████████████████████ [sic]? | 15:07:47 |
| 23 | Do you see that? | 15:07:50 |
| 24 | A.    Yes. | 15:07:50 |
| 25 | Q.    What is that e-mail list? | 15:07:54 |

Page 151

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    That should be the list of Otto LiDAR | 15:07:59 |
| 2 | development employees. | 15:08:00 |
| 3 | Q.    Who's on that -- well, Mr. Levandowski is on | 15:08:01 |
| 4 | that list; right? | 15:08:02 |
| 5 | A.    Okay. | 15:08:03 |
| 6 | Q.    I'm asking you. | 15:08:03 |
| 7 | A.    I don't know if he's on that list. | 15:08:05 |
| 8 | Q.    Well, this e-mail indicates -- because he | 15:08:08 |
| 9 | forwarded an e-mail to that list -- to Mr. Boehmke, it | 15:08:11 |
| 10 | indicates that he's on that list.  You would agree | 15:08:14 |
| 11 | with that; right? | 15:08:15 |
| 12 | (Witness reviews document.) | 15:08:23 |
| 13 | A.    Yeah, seems that way. | 15:08:28 |
| 14 | Q.    So Mr. Levandowski is on the e-mail LISTSERV | 15:08:34 |
| 15 | for the LiDAR development team; right? | 15:08:36 |
| 16 | A.    He may have been, yes. | 15:08:39 |
| 17 | Q.    He was? | 15:08:39 |
| 18 | A.    Okay. | 15:08:41 |
| 19 | Q.    No, I'm asking you. | 15:08:42 |
| 20 | He was; right? | 15:08:42 |
| 21 | A.    It appears from this e-mail chain, assuming | 15:08:45 |
| 22 | there's nothing deleted from it, that he would have | 15:08:48 |
| 23 | got it from the chain and continued it on. | 15:08:51 |
| 24 | Q.    Let me ask you:  Do you have any personal | 15:08:54 |
| 25 | knowledge whether Mr. Levandowski was on this e-mail | 15:08:56 |

Page 152

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   list or not?                                    15:08:57

 2       A.   I don't recall if he was on the list or not.  15:09:00

 3       Q.   Okay.  So sitting here today, you have no  15:09:02

 4   personal knowledge whether Mr. Levandowski was on the  15:09:04

 5   laser-dev e-mail list; right?                   15:09:07

 6       A.   Sitting here right now, I don't remember if  15:09:10

 7   he was on the list.                             15:09:11

 8       Q.   Who else was on that list at this time that  15:09:14

 9   you remember?                                    15:09:15

10       A.   I would assume it was the other people  15:09:19

11   developing the LiDAR sensors.                   15:09:21

12       Q.   And who are those people?              15:09:23

13       A.   It would be -- to my expectation, people like  15:09:28

14   Gaetan, Dan Gruver, Daniel Ratner.  I don't know if  15:09:38

15   Radu was part of the company at the time.  Mike  15:09:55

16   Karasoff.  Probably Matt Palomar, Benjamin Becker.  15:10:00

17   That's all I can remember right now.  Certainly also  15:10:22

18   could have involved Anthony Levandowski for  15:10:25

19   informative purposes.                           15:10:27

20       Q.   What about Max?                        15:10:28

21       A.   I'm sorry.  Of course, Max Levandowski as  15:10:30

22   well.  Who else am I forgetting?  Refer back to my  15:10:41

23   list.                                           15:10:42

24       Q.   For the record, you're looking at Exhibit  15:10:45

25   153; right?                                     15:10:46
```

Page 153

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Where did the idea to do ███████████        ██████        15:24:56

2   ███████████ come from in the Fuji mid-range        15:24:56

3   transmit board design?                             15:24:58

4       MR. KIM:  Objection; form.                     15:25:03

5       THE WITNESS:  I think it's a mischaracterization   15:25:04

6   to call it -- the vertical spacing as something that   15:25:08

7   had an idea -- that had an origin as an idea.  The    15:25:12

8   fact that ███████████████████         ████        15:25:21

9   ███████████ is a side effect of the optics            15:25:21

10  in the optical cavity.                             15:25:24

11  BY MR. JAFFE:                                      15:25:24

12      Q.   So you can't tell me where it came from, who   15:25:26

13  came up with the idea?                             15:25:28

14      A.   I'm trying to explain -- I don't think    15:25:31

15  anybody had this idea to ██████████        ████    15:25:40

16  ███████████ on the laser board.                    15:25:40

17  I believe that was a side effect that was unavoidable   15:25:46

18  when you take a set of vertical angles, especially if   15:25:51

19  they're nearly or equivalently spaced in terms of   15:25:56

20  angle, and project those onto a curved focal surface.   15:26:01

21      Q.   You said it's unavoidable.                15:26:03

22           You worked at Velodyne; right?            15:26:05

23      A.   Yes.                                      15:26:05

24      Q.   You didn't do █████████████ at            15:26:09

25  Velodyne; right?                                   15:26:11

                                                Page 163

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| 1 | MR. KIM:  Objection; form. | 15:26:12 |
| 2 | BY MR. JAFFE: | 15:26:12 |
| 3 | Q.   In terms of the X and Y positions of the | 15:26:15 |
| 4 | diodes? | 15:26:15 |
| 5 | A. | |
| | | 15:26:20 |
| 7 | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | 15:27:24 |
| 24 | Q.   Okay.  You worked at Velodyne; right? | 15:27:28 |
| 25 | A.   Yes. | 15:27:28 |

Page 164

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    And you worked on LiDAR at Velodyne?           15:27:32

2      A.    Yes.                                           15:27:32

3    ██    ████████████████████████████████████         ████████

     █    ██████████████████████████                     ████████

     █    ██      ████                                   ████████

     █    ██    █████████████████████████████████████    ████████

     █    █████                                          ████████

     █    ██████████████████████████████████████████    ████████

     █    ████████████████████████    ████████████████  ████████

    █    ██████████████████████████████████████████████  ████████

    █    ███████████████████                              15:27:57

12     Q.    So I want to again go back to this idea of    15:28:20

13   where did the idea to do the vertical spacing design  15:28:23

14   in Fuji come from?  You've said -- you've mentioned   15:28:26

15   the things -- the drivers, but I haven't heard who    15:28:29

16   came up with the idea, where it came from.            15:28:32

17     A.    Again, you're referring, I believe, to a      15:28:34

18   linear vertical -- what we call delta Y; is that      15:28:37

19   correct?                                              15:28:38

20     Q.    Yes.                                          15:28:39

21     A.    I have to give you the same answer.  It was   15:28:43

22   not a concept that drove the design.  There was nobody 15:28:48

23   coming up with the idea to do that.  The idea for the 15:28:54

24   vertical angles I would attribute to Scott Boehmke.   15:28:58

25   The lens design I would attribute to Gaetan Pennecot. 15:29:01

Page 165

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    So what you end up with on the board at that point is      15:29:06

2    just derived from those pieces of information.             15:29:10

3         Q.    So talking about the angles, you said when     15:29:13

4    you were at Velodyne, you did constant angles.             15:29:17

5         A.    Yes.                                            15:29:17

6         Q.    Why didn't you want to get ███████      ████████

     ████████████████████   when you were working at           15:29:26

8    Velodyne?                                                  15:29:27

9         A.    I don't know.                                   15:29:28

10        Q.    You guys didn't come up with that?  You         15:29:31

11   didn't think of that idea?                                 15:29:33

12   ██ ████████ ██████████████████ ███████████

     ████████████████████████████████████████████ ████████

     ████████████████████████████████████████████ ████████

     ████████ ██████████████████████████████

     ██████████████                                            15:29:50

17        Q.    It not something that you guys considered,      15:29:54

18   which is you want ███████████████████████ as you           15:29:59

19   go down the road?                                          15:30:00

20        A.    ██████████████████████████████████              15:30:00

21        Q.    Yes.                                            15:30:01

22        A.    That was the design that Velodyne ended up      15:30:04

23   with --                                                    15:30:05

24        Q.    Sorry.                                          15:30:05

25        A.    -- still 32.
```

Page 166

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        THE WITNESS:  ███████████████████████████    ████████████

████████████████████████████████████████    ████████████

████████████████████                         15:39:47

4   BY MR. JAFFE:                             15:39:47

5        ██     █████████████████████████     ████████████

████████████████████████████████████████████  15:39:55

████████████████████                         15:39:55

8        MR. KIM:  Objection; form.           15:39:56

9        THE WITNESS:  No, I'm sorry.  Could you be more    15:40:04

10   specific in your question.  I'm confused.    15:40:07

11   BY MR. JAFFE:                            15:40:07

12       Q.   Because I'm short on time, I'll just skip    15:40:10

13   that.                                    15:40:13

14            Here in this e-mail, these are early 905    15:40:13

15   nanometer discussions.                   15:40:15

16       A.   Yes.

17       Q.   And you wrote, ████████████████████    ████████████

████████████████████████████████████████████  ████████████

███████████████████                          15:40:23

20            Do you see that?                15:40:25

21       A.   Yes.                            15:40:25

22       Q.   So at the time of this e-mail, October 28th,    15:40:30

23   you had the idea of ████████████████████    15:40:35

24       A.   Yes.                            15:40:35

25       Q.   So at this point, in October, you didn't    15:40:38
```

Page 173

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    actually have the idea of ███████████████    ████████
 █    ████████████████                             15:40:44
 3       A.   True.                                15:40:45
 4       Q.   So this is not evidence of -- this e-mail is   15:40:50
 5    not indicative of you coming up with the ███████  ████████
 █    █████████████████████████████ right?         15:41:00
 7       MR. KIM:  Objection; form.                15:41:01
 8       THE WITNESS:  This is not indicative of the -- or   15:41:04
 9    this is not evidential to the ██████████████   ████████
 █    ████████████████████████████                 15:41:12
11    BY MR. JAFFE:                                 15:41:12
12       Q.   And what you were thinking on October 26th   15:41:14
13    [sic] is ████████████████████████; right?     15:41:18
14       A.   Yes, on October 28th.                 15:41:20
15       Q.   Okay.                                 
16       MR. KIM:  Jordan, are you wrapping up?     15:41:40
17       MR. JAFFE:  I only have a few more minutes, so I   15:41:43
18    think I'm wrapping up.                        15:41:45
19       MR. KIM:  I think we've got one.           15:41:47
20    BY MR. JAFFE:                                 15:41:47
21       Q.   What documents are you aware of that would   15:42:04
22    show Anthony -- all of Anthony Levandowski's input   15:42:08
23    into Uber and Otto's LiDAR designs?           15:42:12
24       MR. KIM:  Objection; form.                 15:42:14
25       THE WITNESS:  I'm not aware of a list of documents   15:42:17
```

Page 174

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | or a source for documents to go to to document all of | 15:42:20 |
| 2 | his influence. | 15:42:21 |
| 3 | BY MR. JAFFE: | 15:42:21 |
| 4 | Q.   How would you find out about how | 15:42:25 |
| 5 | Mr. Levandowski has influenced LiDAR design at Uber | 15:42:30 |
| 6 | and Otto? | 15:42:31 |
| 7 | MR. KIM:  Objection; form. | 15:42:41 |
| 8 | THE WITNESS:  That's difficult. | 15:42:42 |
| 9 | BY MR. JAFFE: | 15:42:42 |
| 10 | Q.   Why? | 15:42:44 |
| 11 | A.   When you're looking for all of something and | 15:42:49 |
| 12 | you need to miss nothing, that's not an easy problem | 15:42:53 |
| 13 | to solve.  If you look at all the possible sources of | 15:42:58 |
| 14 | influence, I'm not sure they would all be documented. | 15:43:01 |
| 15 | Q.   How would you go about trying to find out as | 15:43:04 |
| 16 | much as you could about how Mr. Levandowski has had | 15:43:08 |
| 17 | input into Uber and Otto's LiDAR designs? | 15:43:13 |
| 18 | MR. KIM:  Objection; form. | 15:43:16 |
| 19 | THE WITNESS:  I suppose I would talk to the | 15:43:18 |
| 20 | various engineers that had LiDAR responsibilities. | 15:43:21 |
| 21 | BY MR. JAFFE: | 15:43:21 |
| 22 | Q.   Who? | 15:43:22 |
| 23 | A.   Shall we pick up -- | 15:43:31 |
| 24 | Q.   Would you talk to everyone on this list?  Is | 15:43:32 |
| 25 | that the idea? | 15:43:33 |

Page 175

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I suppose, yeah, if I'm trying not to miss | 15:43:37 |
| 2 | anything. | 15:43:37 |
| 3 | Q.   Where would you look for documents? | 15:43:41 |
| 4 | A.   I suppose e-mail. | 15:43:43 |
| 5 | MR. KIM:  Can we have the time on the record, | 15:43:45 |
| 6 | please. | 15:43:48 |
| 7 | THE VIDEOGRAPHER:  3 hours and 59 minutes. | 15:43:52 |
| 8 | MR. KIM:  Thanks. | 15:43:53 |
| 9 | THE WITNESS:  I said e-mail. | 15:43:55 |
| 10 | BY MR. JAFFE: | 15:43:55 |
| 11 | Q.   Anything else? | 15:43:56 |
| 12 | A.   Not that occurs to me. | 15:43:59 |
| 13 | Q.   So if you wanted to figure out as much as you | 15:44:03 |
| 14 | could about Mr. Levandowski's input into Uber and Otto | 15:44:08 |
| 15 | LiDAR, you would talk to everyone on the LiDAR team | 15:44:11 |
| 16 | and you would look at Mr. Levandowski's e-mail and | 15:44:15 |
| 17 | everyone else's e-mail; is that fair? | 15:44:17 |
| 18 | MR. KIM:  Objection; form. | 15:44:20 |
| 19 | THE WITNESS:  I wouldn't look at everybody's | 15:44:23 |
| 20 | e-mail.  I would look at Anthony's e-mail because if | 15:44:26 |
| 21 | he's going to have an influence, I would expect it to | 15:44:27 |
| 22 | come from his account outward, and that's going to | 15:44:28 |
| 23 | limit the search. | 15:44:29 |
| 24 | BY MR. JAFFE: | |
| 25 | Q.   Is there any -- is there any other source of | 15:44:31 |

Page 176

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | documents that you would look at or data, anything? | 15:44:34 |
| 2 | MR. KIM:  Objection; form. | 15:44:35 |
| 3 | THE WITNESS:  I don't know.  I might look for | 15:44:48 |
| 4 | Google docs with his authorship. | 15:44:51 |
| 5 | BY MR. JAFFE: | 15:44:51 |
| 6 | Q.   Anything else? | 15:44:55 |
| 7 | A.   No. | 15:44:56 |
| 8 | Q.   Okay. | 15:44:56 |
| 9 | MR. JAFFE:  Well, I think I have run out of time. | 15:45:01 |
| 10 | MR. KIM:  Okay. | 15:45:06 |
| 11 | THE REPORTER:  Do you want this as 161? | 15:45:20 |
| 12 | MR. KIM:  Yes. | |
| 13 | THE REPORTER:  Next number?  Okay. | |
| 14 | MR. JAFFE:  I'm going to object -- | |
| 15 | THE REPORTER:  Hang on.  Let me just write this. | |
| 16 | MR. KIM:  Oh.  1061. | |
| 17 | THE REPORTER:  161? | |
| 18 | MR. KIM:  You know, I think we're alternating -- | |
| 19 | MR. JAFFE:  We have different blocks of exhibits. | 15:45:31 |
| 20 | So his exhibit numbers, they start at 1000; ours start | 15:45:35 |
| 21 | at zero.  So I don't know what number you're at. | 15:45:36 |
| 22 | MR. KIM:  Actually, can we start at 1060. | 15:45:39 |
| 23 | (Defendants' Exhibit 1060 was marked.) | 15:46:05 |
| 24 | REDIRECT EXAMINATION | |
| 25 | BY MR. KIM: | 15:46:05 |

Page 177

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I wasn't sure.  I don't recall the | 17:28:43 |
| 2 | strict definition of ███████████████████  █████████ | 17:28:52 |
| █ | ███████████████████████████ | 17:28:52 |
| 4 | BY MR. JAFFE: | 17:28:52 |
| 5 | Q.   I see.  So if we exclude zero change, if | 17:28:55 |
| 6 | something is ██████████████████████  █████████ | 17:29:01 |
| █ | ███████████████████  right? | 17:29:01 |
| 8 | MR. KIM:  Objection; form. | 17:29:04 |
| 9 | THE WITNESS:  I believe so, yes. | 17:29:07 |
| 10 | BY MR. JAFFE: | 17:29:07 |
| 11 | Q.   And if we go back and we look at -- I don't | 17:29:12 |
| 12 | have the number in front of me.  It's the one where | 17:29:14 |
| 13 | you pencilled out all the changes. | 17:29:16 |
| 14 | A.   The changes. | 17:29:18 |
| 15 | Q.   The changes, yeah. | 17:29:18 |
| 16 | A.   Let's see, this one; right? | 17:29:22 |
| 17 | Q.   Not that one.  The one that looks like this | 17:29:25 |
| 18 | (indicating).  The Fuji data. | 17:29:28 |
| 19 | A.   Is that not the one I wrote for you? | 17:29:31 |
| 20 | Q.   Yes.  It should be over there in that pile. | 17:29:36 |
| 21 | It's just going to be one sheet of paper. | 17:29:40 |
| 22 | MR. KIM:  Thank you. | 17:29:42 |
| 23 | (Witness reviews documents.) | 17:29:52 |
| 24 | THE WITNESS:  This one? | 17:29:53 |
| 25 | BY MR. JAFFE: | 17:29:53 |

Page 226

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.   That's it.                             17:29:54

 2        A.   Okay.                                  17:29:55

 3        Q.   Do you remember when we were talking about  17:29:56

 4   the delta Y column?                              17:29:58

 5        A.   Yes.                                    17:29:58

 6        Q.   Does the delta Y column -- I guess we'll say,  17:30:03

 7   ██████████████████████                           17:30:10

 8        MR. KIM:  Objection; form.                   17:30:14

 9        THE WITNESS:  Yes, it appears to ████████   ██████   17:30:17

██   ███████████████                                  17:30:17

11   BY MR. JAFFE:                                    17:30:17

12        Q.   So the difference between ███████████  ████████  17:30:23

██   ████████████████   is immaterial to what we were talking  17:30:23

14   about in Exhibit 156; right?                     17:30:25

15        MR. KIM:  Objection; form.                   17:30:26

16        THE WITNESS:  I can say that the delta Y column  17:30:31

17   appears to be █████████████████████████   █████  17:30:35

██   ████████████████   yes.                          17:30:35

19   BY MR. JAFFE:                                    17:30:35

20        Q.   You talked about ████████ with your     17:30:38

21   counsel.                                         17:30:39

22        Do you remember that?                       17:30:40

23        A.   Yes.                                    17:30:40

24        Q.   And you said that you reuse some of the parts  17:30:42

25   from ██████████ in the Fuji design; is that right?  17:30:45
```

Page 227

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A.   Yes.                                    17:30:46

2        Q.   Is that common to reuse parts from old  17:30:49

3   projects?                                         17:30:50

4        MR. KIM:  Objection; form.                   17:30:53

5        THE WITNESS:  Depends what you mean by "common."  17:30:57

6   Can it be done?  Certainly.  Is it done?  I've seen it  17:31:01

7   done, yeah.                                       17:31:02

8   BY MR. JAFFE:                                     17:31:02

9        Q.   Is it something you've seen happen fairly  17:31:04

10  regularly?                                        17:31:05

11       MR. KIM:  Objection; form.                   17:31:06

12       THE WITNESS:  Again, I don't want to try to  17:31:09

13  qualify the rate of currents, but I have seen it done  17:31:13

14  before.                                           17:31:14

15  BY MR. JAFFE:                                     17:31:14

16       Q.   Let me ask it this way:  Reusing parts from  17:31:15

17  old projects is not uncommon; right?              17:31:18

18       MR. KIM:  Objection; form.                   17:31:19

19       THE WITNESS:  It's not very uncommon.        17:31:21

20  BY MR. JAFFE:                                     17:31:21

21       Q.   And was ██████████ -- how would you describe  17:31:25

22  what happened with that project?                  17:31:27

23       A.   I would describe it as a LiDAR sensor   17:31:35

24  development that started probably before I joined  17:31:39

25  Otto, made some progress in designing an FAC lens,  17:31:46
```

Page 228

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  No. | 17:35:55 |
| 2 | BY MR. JAFFE: | |
| 3 | Q.   So Spider, you're never going to use it | 17:36:02 |
| 4 | again; right? | 17:36:03 |
| 5 | A.   I don't have any intention of reusing it | 17:36:05 |
| 6 | again right now. | 17:36:06 |
| 7 | Q.   That's not my question.  My question is, Uber | 17:36:09 |
| 8 | is never going to use Spider; right? | 17:36:12 |
| 9 | A.   You're asking if the company is going to do | 17:36:18 |
| 10 | something in the future? | 17:36:20 |
| 11 | Q.   That's right. | 17:36:20 |
| 12 | A.   I don't know. | 17:36:21 |
| 13 | Q.   So sitting here today, you can't tell me | 17:36:24 |
| 14 | whether Uber is going to use Spider in the future? | 17:36:27 |
| 15 | A.   No.  I can only tell you my intentions right | 17:36:31 |
| 16 | now. | 17:36:31 |
| 17 | Q.   All right.  You mentioned Fuji.  Oh, I'm | 17:36:47 |
| 18 | sorry, going back to Spider. | 17:36:50 |
| 19 | Why save the parts if you're never going to | 17:36:53 |
| 20 | use it? | 17:36:54 |
| 21 | A.   That's a good question. | 17:36:57 |
| 22 | Q.   Why didn't you throw it away? | 17:37:00 |
| 23 | A.   I don't know if we've thrown anything away. | 17:37:03 |
| 24 | I don't know.  It should have, could have easily been | 17:37:05 |
| 25 | recycled, yeah. | 17:37:07 |

Page 232

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Q.   So you don't know why you kept it?                    17:37:10

2   A.   Just because we didn't throw it away, as far         17:37:13

3   as I know.                                                 17:37:14

4   Q.   So sitting here today, again, you can't tell         17:37:19

5   me why you kept the Spider; right?                         17:37:21

6   A.   Yes.                                                  17:37:26

7   Q.   Okay.  I want to ask about your supplemental         17:37:42

8   declaration that you went into detail with with your      17:37:46

9   counsel.  And let's start with page 11.  And there's      17:38:07

10  Figures 8A and 8B here.                                    17:38:09

11       Do you see that?                                      17:38:10

12  A.   I see that.                                           17:38:11

13  Q.   And during your testimony by your counsel,           17:38:13

14  you said -- you referred to these ██████, and you         17:38:17

15  said whoever did these letters.                            17:38:21

16  A.   Um-hum.                                               17:38:21

17  Q.   You didn't prepare 8A and 8B, did you?               17:38:28

18  A.   No.                                                   17:38:28

19  Q.   Who prepared 8A and 8B?                              17:38:31

20  A.   Counsel.                                              17:38:33

21  Q.   Who?                                                  17:38:34

22  A.   Jackie Choy [sic], I believe.                        17:38:39

23  Q.   So Uber's lawyers prepared this and sent this        17:38:43

24  to you; is that right?                                     17:38:44

25  A.   Yes.                                                  17:38:45

Page 233

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      Q.   And you signed it without actually checking   17:38:47
2   it was accurate?                                       17:38:49
3      A.   Whoa.  I looked at these numbers.              17:38:52
4      Q.   But you didn't check what you did today        17:38:54
5   before you signed this declaration, did you?           17:38:59
6      A.   What do you mean?  Identifying, double         17:39:02
7   checking the ███████                                   17:39:04
8      Q.   Yes.                                           17:39:04
9      A.   I did check that.                              17:39:06
10     Q.   So why today did you need to check it again?   17:39:09
11     A.   I like to be careful.                          17:39:11
12     Q.   You like to be careful?                        17:39:12
13     A.   Yeah.  I want to be sure we can show the ██  ███████
    ███  ██████████████  that they matched.               17:39:19
15     Q.   Did you know when you signed your declaration  17:39:22
16  whether these actually matched every single angle and  17:39:26
17  every single board?                                    17:39:27
18     A.   Yes, I believe I did.                          17:39:28
19     Q.   What do you mean you believe you did?          17:39:31
20     A.   To my recollection, I checked ████████  ███████
    ██  ████████████████████  And I checked the           17:39:42
22  initial ███████ and knew that they would follow the    17:39:46
23  same pattern so I didn't check every single angle.     17:39:50
24     Q.   How many of these did you actually check       17:39:52
25  yourself before you signed your declaration?           17:39:55
```

Page 234

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      A.   I remember at least checking the initial ██   ████████
██   ████████████████████████████████████████████         17:40:04
3      Q.   So you checked about six out of the 64; is     17:40:08
4    that fair?                                            17:40:09
5      A.   Yeah.                                          17:40:09
6      Q.   And the rest are purely from counsel; you're   17:40:12
7    just relying on them?                                 17:40:14
8      A.   Not exactly.                                   17:40:16
9      Q.   You didn't check.                              17:40:19
10          How did you know it was accurate?              17:40:21
11     A.   How would the pattern change?                  17:40:24
12     Q.   I don't know.  It's your declaration.          17:40:26
13     A.   I understand.  From my understanding, the      17:40:30
14   pattern is consistent in the letters.  So once you    17:40:35
15   start the pattern properly, it's going to finish out  17:40:39
16   properly.                                             17:40:40
17     Q.   Let's go to the next page, page 12.            17:40:42
18          Who prepared this table?                       17:40:44
19     A.   Counsel for Uber.                              17:40:51
20     Q.   And you had to double check it here at your    17:40:54
21   deposition; you didn't know whether it was accurate   17:40:55
22   when you signed it, did you?                          17:40:57
23     MR. KIM:  Objection; form.                          17:40:58
24     THE WITNESS:  I believe I checked that before as    17:41:00
25   well.                                                 17:41:01
```

Page 235

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. JAFFE: | 17:41:01 |
| 2 | Q.   You did?  How many? | 17:41:03 |
| 3 | A.   I don't recall.  Some. | 17:41:14 |
| 4 | Q.   How many? | 17:41:16 |
| 5 | A.   I would have checked first sets of angles.  I | 17:41:25 |
| 6 | don't know. | 17:41:25 |
| 7 | Q.   I'm not asking what you would have done.  I'm | 17:41:28 |
| 8 | asking what you did. | 17:41:29 |
| 9 | A.   I don't remember what I did. | 17:41:30 |
| 10 | Q.   You don't remember checking any of these, do | 17:41:33 |
| 11 | you? | 17:41:33 |
| 12 | MR. KIM:  Objection; form. | 17:41:34 |
| 13 | THE WITNESS:  That's not true. | 17:41:35 |
| 14 | BY MR. JAFFE: | 17:41:35 |
| 15 | Q.   So you checked one? | 17:41:36 |
| 16 | MR. KIM:  Objection; form. | 17:41:38 |
| 17 | THE WITNESS:  I specifically was checking those | 17:41:40 |
| 18 | that had the ▮ degree, and I was specifically | 17:41:44 |
| 19 | checking those that began the pattern as well. | 17:41:47 |
| 20 | BY MR. JAFFE: | 17:41:47 |
| 21 | Q.   So you checked probably, what, five or six? | 17:41:50 |
| 22 | A.   Should be at least six, was at least six. | 17:41:54 |
| 23 | Q.   At least six.  You don't remember checking | 17:41:56 |
| 24 | anymore on this one? | 17:41:59 |
| 25 | A.   I don't remember checking more. | 17:42:00 |

Page 236

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Let's go to the next page.  There's another | 17:42:03 |
| 2 | chart, page 13. | 17:42:04 |
| 3 |       Who wrote this chart? | 17:42:06 |
| 4 | A.   Same person who prepared the previous chart. | 17:42:10 |
| 5 | Q.   And how many angles did you check in this | 17:42:14 |
| 6 | one? | 17:42:15 |
| 7 | A.   Again, I would -- I believe I checked maybe | 17:42:20 |
| 8 | six. | 17:42:20 |
| 9 | Q.   And how did you know that the data that | 17:42:23 |
| 10 | Uber's lawyers were relying on was accurate? | 17:42:27 |
| 11 | A.   I would say there's a certain level of | 17:42:40 |
| 12 | expectation of accuracy when you're pulling data out | 17:42:45 |
| 13 | of a spreadsheet into another spreadsheet. | 17:42:47 |
| 14 | Q.   You mean you were relying on Uber's lawyers | 17:42:50 |
| 15 | to give you accurate data? | 17:42:52 |
| 16 | MR. KIM:  Objection; form. | 17:42:53 |
| 17 | THE WITNESS:  I was relying on Uber's lawyers to | 17:42:58 |
| 18 | do the obvious simple thing, cut and paste from a | 17:43:01 |
| 19 | spreadsheet, and not inject an errors by manually | 17:43:05 |
| 20 | changing numbers. | 17:43:07 |
| 21 | BY MR. JAFFE: | 17:43:07 |
| 22 | Q.   You see it says "Current" here? | 17:43:09 |
| 23 | A.   Yes. | 17:43:09 |
| 24 | Q.   Where did Uber's lawyers get the numbers that | 17:43:13 |
| 25 | go in the "Current" column? | 17:43:15 |

Page 237

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    What is this document called?  This would be      17:43:24

2    from Exhibit 155.                                         17:43:26

3      Q.    How do you know that?                             17:43:28

4      A.    Because she said so.                              17:43:30

5      Q.    Uber's lawyer told you that she derived these     17:43:35

6    numbers from Exhibit B?                                   17:43:37

7      MR. KIM:  I'm going to object on grounds of             17:43:41

8    privilege and instruct you not to answer that.           17:43:45

9    BY MR. JAFFE:                                             17:43:45

10     Q.    So again, I just want to ask, how do you know     17:43:50

11   the numbers that say "Current" here where they were      17:43:58

12   derived from?  And wait for your counsel to object, if   17:44:02

13   he does.                                                  17:44:03

14     A.    I would inspect Exhibit 155 in the theta         17:44:14

15   column for these boards to find the angles that match.   17:44:22

16     THE REPORTER:  To find the angles that . . .           17:44:22

17     MR. JAFFE:  Excuse me.

18     THE WITNESS:  To find the angles that match.

19   BY MR. JAFFE:

20     Q.    Mr. Haslim, I'm not asking what you would do.     17:44:26

21   I'm asking what happened.                                 17:44:28

22     A.    So as I said, I compared some number, maybe       17:44:34

23   six, of the angles under "Current" against the angles    17:44:41

24   listed under the theta column in Exhibit 155.            17:44:46

25     Q.    Where do the numbers from the "Current"           17:44:48

Page 238

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    column come from in your declaration?              17:44:51

 2        A.   They came from the spreadsheet that we're  17:44:59

 3    printing out and calling Exhibit 155.             17:45:02

 4        Q.   And how do you know that?  How did you know  17:45:05

 5    that at the time?                                 17:45:05

 6        A.   How did I know to look there as a source?  17:45:09

 7        Q.   No.  How did you know that the source of  17:45:11

 8    these numbers were from that spreadsheet before you  17:45:14

 9    signed your declaration?                          17:45:16

10        A.   So in the process of developing this      17:45:20

11    document, I was in communication with Uber's counsel.  17:45:24

12        Q.   So Uber's lawyers told you that these numbers  17:45:29

13    come from the "Current" number and they sent them to  17:45:32

14    you and that's the basis of your understanding that  17:45:34

15    these numbers actually are current?               17:45:36

16        MR. KIM:  I'm going to object on the grounds of  17:45:39

17    privilege and instruct you not to answer the question  17:45:42

18    to the extent it asks what Uber's lawyers told you.  17:45:48

19        THE WITNESS:  I would refer to my discussion with  17:45:50

20    Uber's lawyer for the source of the information that  17:45:55

21    allows me to go back and check myself at least some of  17:45:59

22    the numbers with the belief that the other numbers in  17:46:02

23    between for every logical reason should be the correct  17:46:06

24    numbers.                                          17:46:07

25    BY MR. JAFFE:                                     17:46:07
```

                                                    Page 239

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   But you didn't check that before you signed | 17:46:09 |
| 2 | your declaration; right? | 17:46:11 |
| 3 | MR. KIM:  Objection; form. | 17:46:12 |
| 4 | THE WITNESS:  I did not recall checking all 32 | 17:46:20 |
| 5 | angles in this table, or 64 as the case may be. | 17:46:24 |
| 6 | BY MR. JAFFE: | 17:46:24 |
| 7 | Q.   So you couldn't -- at the time you signed | 17:46:28 |
| 8 | this declaration, you couldn't say that what's in here | 17:46:35 |
| 9 | actually does represent all the current angles because | 17:46:39 |
| 10 | you didn't check each one? | 17:46:41 |
| 11 | MR. KIM:  Objection; form. | 17:46:42 |
| 12 | THE WITNESS:  I really believe without checking | 17:46:44 |
| 13 | every single one, I could have a very high reasonable | 17:46:48 |
| 14 | confidence that they are correct. | 17:46:50 |
| 15 | BY MR. JAFFE: | 17:46:50 |
| 16 | Q.   Because you believe Uber's lawyers? | 17:46:52 |
| 17 | MR. KIM:  Objection; form. | 17:46:55 |
| 18 | THE WITNESS:  Because I checked the beginning and | 17:46:57 |
| 19 | the end and have every reason to believe that a cut | 17:47:02 |
| 20 | and paste from one spreadsheet to another would be | 17:47:05 |
| 21 | without error. | 17:47:05 |
| 22 | BY MR. JAFFE: | 17:47:05 |
| 23 | Q.   But what spreadsheet did it come from? | 17:47:09 |
| 24 | A.   The spreadsheet that's printed out in Exhibit | 17:47:13 |
| 25 | 155. | 17:47:13 |

Page 240

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 1 | Q.    How do you know that? | 17:47:14 |
| 2 | A.    By talking to the lawyer. | 17:47:16 |
| 3 | Q.    So Uber's lawyer told you that he or she cut | 17:47:20 |
| 4 | and paste out of a spreadsheet and put it into this | 17:47:23 |
| 5 | chart? | 17:47:23 |
| 6 | MR. KIM:  Objection; calls for privileged | 17:47:26 |
| 7 | information.  Instruct you not to answer to the extent | 17:47:29 |
| 8 | it's asking you what Uber's lawyers told you. | 17:47:31 |
| 9 | MR. JAFFE:  This is waived. | 17:47:33 |
| 10 | I mean, the only basis for him to say that this is | 17:47:35 |
| 11 | current is what a lawyer told him, so that's not a | 17:47:39 |
| 12 | proper privilege instruction. | 17:47:40 |
| 13 | MR. KIM:  He's already told you that it's based on | 17:47:42 |
| 14 | communications with his lawyers.  You're not entitled | 17:47:45 |
| 15 | to know exactly what his lawyers told him. | 17:47:47 |
| 16 | MR. JAFFE:  I'm entitled to know exactly that. | 17:47:49 |
| 17 | MR. KIM:  Disagree. | 17:47:50 |
| 18 | BY MR. JAFFE: | 17:47:50 |
| 19 | Q.    Mr. Haslim, what did Uber's lawyers tell you | 17:47:56 |
| 20 | was the source of the data in the "Current" column? | 17:47:59 |
| 21 | MR. KIM:  Same objection with instruction not to | 17:48:01 |
| 22 | answer. | 17:48:02 |
| 23 | You can answer that question generally if | 17:48:08 |
| 24 | you can without revealing the exact -- the | 17:48:12 |
| 25 | specific communications that you've had with the | 17:48:14 |

Page 241

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    lawyer.  But I think you've already done that.         17:48:17

 2           Can you rephrase the question to avoid asking   17:48:24

 3    with him what Uber's lawyers told him?                 17:48:26

 4    BY MR. JAFFE:                                          17:48:26

 5       Q.   I'm asking him, what is the basis for his      17:48:30

 6    knowledge, to the extent that he has any, about where  17:48:33

 7    the data in the "Current" column in your declaration   17:48:36

 8    came from?                                             17:48:38

 9       A.   I'll have to say my knowledge of where the     17:48:42

10    data in the "Current" column came from would come from 17:48:47

11    inspecting where I believed it came from and finding a 17:48:51

12    reasonable match from some number of channels that     17:48:55

13    begin the pattern and end the pattern.                 17:48:57

14       Q.   How did you know to look in that document?     17:49:01

15       A.   Discussion with counsel.                       17:49:05

16       Q.   Okay.  So let me start again.  What was your   17:49:07

17    basis for understanding that what's in the "Current"   17:49:10

18    column actually reflects anything in Fuji?             17:49:13

19       A.   Again, my basis for understanding what was     17:49:18

20    reflected in the "Current" column reflects what was    17:49:21

21    actually built in Fuji was to compare some subset of   17:49:26

22    the numbers at least to the angles in a document that  17:49:29

23    I know was used to build Fuji.                         17:49:33

24       Q.   So again, for the chart on page 13 here, you   17:49:37

25    didn't prepare that chart; right?                      17:49:39
```

Page 242

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        MR. KIM:  Objection; form.                    17:49:42

 2        THE WITNESS:  I did not prepare this spreadsheet  17:49:44

 3    chart.

 4    BY MR. JAFFE:                                       17:49:45

 5        Q.   It came to you fully formed with the current

 6    column and the November 16th column already populated;

 7    right?

 8        A.   Yes.                                        17:49:52

 9        Q.   And you only checked a couple of the angles;  17:49:55

10    right?                                               17:49:55

11        A.   I checked more than a couple, but I checked a  17:50:00

12    subset of the angles.                               17:50:01

13        Q.   And what about the November 16th one, how   17:50:04

14    many of those did you check?                        17:50:05

15        A.   I would have -- I don't remember exactly how  17:50:09

16    many I checked.                                      17:50:09

17        Q.   Do you remember checking any?              17:50:11

18        A.   Yes.                                        17:50:12

19        Q.   More than one?                             17:50:15

20        A.   Yeah.  It would have been more than one, but  17:50:17

21    I don't remember exactly how many.                  17:50:19

22        Q.   What else in your declaration did you rely on  17:50:23

23    representations from counsel about?                 17:50:25

24        A.   Annotations in Figure 2B.                  17:50:45

25        Q.   That's relied on by counsel?              17:50:48
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    Counsel created the annotations.  I looked at       17:50:52

2   it, thought it looked correct.                                17:50:55

3      Q.    What about -- let's go to page 4.                    17:51:02

4      A.    Okay.                                                17:51:03

5      Q.    Do you see there's some large footnotes             17:51:06

6   there?                                                        17:51:07

7      A.    Yes.                                                 17:51:07

8      Q.    Who provided those references?                       17:51:09

9      A.    I did.                                               17:51:10

10      Q.    And where did you find them?                        17:51:12

11      A.    On the web.                                         17:51:13

12      Q.    So you went out and found each of those?           17:51:16

13      A.    Yes.                                                17:51:16

14      Q.    And the iXBlue one that you're referring to?   17:51:20

15      A.    IXBlue, yes.                                        

16      Q.    IXBlue, excuse me.                                  17:51:23

17            Do you know when that specialty fiber web            17:51:27

18   page first was published?                                    17:51:29

19      A.    No.                                                 17:51:29

20      Q.    Do you know if it was published before or          17:51:31

21   after you started designing ███████████        ████████

███    █████████████████████                                      17:51:39

23      A.    I don't know.                                       17:51:40

24      Q.    Again on page 5 looking at Figure 4, do you        17:51:43

25   know whether that website was posted before or after        17:51:46

                                                    Page 244

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | the conversation with Mr. Levandowski? | 17:51:47 |
| 2 | A.   I don't know. | 17:51:48 |
| 3 | Q.   Is there anything else in the declaration in | 17:51:54 |
| 4 | which you're relying on representations from Uber's | 17:51:59 |
| 5 | lawyers? | 17:51:59 |
| 6 | MR. KIM:  Objection; form. | 17:52:01 |
| 7 | THE WITNESS:  Figure 6, I relied on Uber's lawyers | 17:52:06 |
| 8 | to excerpt this section from the spreadsheet. | 17:52:09 |
| 9 | Figure 7A and 7B, I relied on Uber lawyer to put | 17:52:20 |
| 10 | down these files that were sourced by somebody | 17:52:23 |
| 11 | else. | 17:52:24 |
| 12 | BY MR. JAFFE: | 17:52:24 |
| 13 | Q.   Who were they sourced by? | 17:52:26 |
| 14 | A.   I'm fairly certainly they would be sourced by | 17:52:29 |
| 15 | Gaetan. | 17:52:29 |
| 16 | Q.   So Gaetan provided these pictures? | 17:52:31 |
| 17 | A.   I believe so, yes. | 17:52:32 |
| 18 | Q.   Did you talk to Gaetan about what you wanted | 17:52:34 |
| 19 | to provide, what you wanted him to put in here? | 17:52:37 |
| 20 | MR. KIM:  Objection; form. | 17:52:39 |
| 21 | THE WITNESS:  No. | 17:52:39 |
| 22 | BY MR. JAFFE: | 17:52:39 |
| 23 | Q.   What was your understanding of what | 17:52:41 |
| 24 | Mr. Pennecot went out and looked for? | 17:52:44 |
| 25 | A.   My understanding was these were documents | 17:52:52 |

Page 245

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    that were already produced and were gathered for the    17:52:55

 2    purpose of this declaration.                            17:52:57

 3        Q.   And it refers to ███████████        ████████

 █        ███████                                            17:53:03

 5        A.   Yes.                                           17:53:03

 6        Q.   Has the FAC lens in Fuji always been           17:53:12

 7    ████████████                                            17:53:14

 8        THE REPORTER:  I'm sorry, can you repeat that?      17:53:14

 9    BY MR. JAFFE:

10        Q.   Has the FAC lens in Fuji always been           17:53:18

11    ████████████                                            17:53:19

12        A.   I've only known it to be ████████             17:53:19

13        Q.   So you've never seen a version of a FAC lens   17:53:23

14    that is ████████                                        17:53:24

15        A.   No, not to my knowledge.                       17:53:26

16        Q.   And would it surprise you if Uber -- go        17:53:29

17    ahead.                                                  17:53:29

18        A.   You left the question very general and I       17:53:32

19    answered too quickly.  I've never seen █████████  ████████

 █    ████████████████████████████                            17:53:41

21        Q.   What other design have you seen?               17:53:47

22    ███  ██████████████████████  ████████

 █    ██████                                                  17:53:54

24        Q.   In terms of the custom FAC lens that includes  17:53:57

25    a cylindrical optical surface, have you ever seen one   17:54:01
```

Page 246

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    of those?                                          17:54:02

2         MR. KIM:  Objection; form.                    17:54:03

3         THE WITNESS:  Are you asking about anywhere?  17:54:05

4    BY MR. JAFFE:                                      17:54:05

5         Q.   At Uber or Otto.                         17:54:07

6         A.   If -- I don't know of seeing a cylindrical  17:54:12

7    custom FAC lens at Otto.                           17:54:14

8         Q.   And you don't know whether Fuji ever had a  17:54:19

9    cylindrical FAC lens ever?                         17:54:22

10        A.   To my knowledge, ██████████████  ████████

██   ████████████████████████████████  ████████

██   ███████████████                               17:54:32

13        Q.   What about ████████████, are you familiar  17:54:34

14   with that?                                         17:54:35

15        A.   I've seen the name ████████████          17:54:38

16        Q.   What is that?                            17:54:39

17        A.   I believe it's the FAC lens.             17:54:41

18        Q.   And do you know whether there are any    17:54:43

19   versions of that design that had a cylindrical optical  17:54:46

20   surface?                                           17:54:47

21        A.   I'm not aware.  If there were, I'm not aware  17:54:50

22   of them.  So we have to go back to Gaetan's design  17:54:52

23   record to see if he started with a cylindrical design.  17:54:57

24        Q.   So we talked about some of the charts where  17:55:00

25   you said that you relied on Uber's counsel.        17:55:04
```

Page 247

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | What about any of the text?  Are any of the | 17:55:05 |
| 2 | numbers in here, do they come from Uber's counsel as | 17:55:09 |
| 3 | opposed to you? | 17:55:10 |
| 4 | A.   A large part of the text, perhaps the bulk of | 17:55:17 |
| 5 | the text in this declaration, came from Uber's | 17:55:20 |
| 6 | counselors. | 17:55:20 |
| 7 | Q.   Okay.  So they provided you basically all the | 17:55:24 |
| 8 | text in this draft; is that fair? | 17:55:26 |
| 9 | MR. KIM:  Objection; form. | 17:55:28 |
| 10 | THE WITNESS:  It's a little too much to say "all," | 17:55:30 |
| 11 | but I could say more than half and that I was given an | 17:55:33 |
| 12 | opportunity to edit. | 17:55:37 |
| 13 | BY MR. JAFFE: | 17:55:37 |
| 14 | Q.   Okay.  So I want to go back to my original | 17:55:43 |
| 15 | question which was, what part of the text are you | 17:55:47 |
| 16 | relying on representations from Uber's lawyers for | 17:55:50 |
| 17 | purposes of your declaration? | 17:55:52 |
| 18 | A.   Since Uber's lawyers originated most of the | 17:56:13 |
| 19 | text, I relied on Uber's lawyers to originate most of | 17:56:18 |
| 20 | the text in here. | 17:56:19 |
| 21 | Q.   Meaning, most of the text you're relying on | 17:56:26 |
| 22 | on their representations; is that fair? | 17:56:29 |
| 23 | A.   I'm relaying on their -- | 17:56:30 |
| 24 | MR. KIM:  Objection; form. | 17:56:31 |
| 25 | THE REPORTER:  I'm relaying on their . . . | |

Page 248

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I'm relying on their origination. | 17:56:37 |
| 2 | BY MR. JAFFE: | 17:56:37 |
| 3 | Q.   So for example, looking at page 13, there's a | 17:56:43 |
| 4 | chart comparing Spider and Fuji.  Uber's lawyer came | 17:56:49 |
| 5 | up with that chart; right? | 17:56:51 |
| 6 | MR. KIM:  Objection; form. | 17:56:52 |
| 7 | THE WITNESS:  Yes. | 17:56:53 |
| 8 | BY MR. JAFFE: | 17:56:53 |
| 9 | Q.   The idea -- going back to page 8, the idea of | 17:57:09 |
| 10 | excerpting what's in Figure 6, was that -- did that | 17:57:14 |
| 11 | idea come from Uber's lawyers? | 17:57:17 |
| 12 | MR. KIM:  Objection; form.  Also on grounds of | 17:57:20 |
| 13 | work product. | 17:57:25 |
| 14 | THE WITNESS:  I presume it was. | 17:57:30 |
| 15 | BY MR. JAFFE: | 17:57:30 |
| 16 | Q.   And going back to -- | 17:57:42 |
| 17 | MR. KIM:  How long have we been going on the | 17:57:57 |
| 18 | record? | 17:57:58 |
| 19 | THE VIDEOGRAPHER:  The entire time? | 17:57:59 |
| 20 | MR. KIM:  Yes.  Oh, just since the last break. | 17:58:05 |
| 21 | THE VIDEOGRAPHER:  54 minutes. | 17:58:07 |
| 22 | MR. JAFFE:  I'm referring to your original | 17:58:32 |
| 23 | declaration.  Let's go to your original declaration, | 17:58:32 |
| 24 | please. | |
| 25 | MR. KIM:  I'm going to object to this whole line | 17:58:34 |

Page 249

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | of questioning as outside the scope of recross. | 17:58:39 |
| 2 | BY MR. JAFFE: | 17:58:39 |
| 3 | Q.   Did Uber's lawyers, did they prepare your | 17:58:42 |
| 4 | original declaration as well? | 17:58:44 |
| 5 | MR. KIM:  Objection; form. | 17:58:45 |
| 6 | THE WITNESS:  I would say Uber's lawyers | 17:58:54 |
| 7 | originated most of this declaration. | 17:58:58 |
| 8 | BY MR. JAFFE: | 17:58:58 |
| 9 | Q.   What percentage of the words in your original | 17:59:00 |
| 10 | declaration came from Uber's lawyers? | 17:59:03 |
| 11 | MR. KIM:  Objection; form. | 17:59:07 |
| 12 | THE WITNESS:  I don't know what the percentage is. | 17:59:08 |
| 13 | BY MR. JAFFE: | 17:59:08 |
| 14 | Q.   Over 80 percent? | 17:59:10 |
| 15 | MR. KIM:  Objection; form, outside the scope. | 17:59:14 |
| 16 | THE WITNESS:  Yeah, I'm not sure. | 17:59:18 |
| 17 | I know I had some textural editing input to this | 17:59:25 |
| 18 | document, but I don't remember like percentagewise | 17:59:26 |
| 19 | on the words.  It was less than half. | 17:59:31 |
| 20 | BY MR. JAFFE: | 17:59:31 |
| 21 | Q.   But in terms of the drafting, they sent you a | 17:59:34 |
| 22 | full draft of your declaration? | 17:59:36 |
| 23 | MR. KIM:  Objection; form. | 17:59:38 |
| 24 | BY MR. JAFFE: | 17:59:38 |
| 25 | Q.   Is that right? | 17:59:39 |

Page 250

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   Yes, I got --                        17:59:44

 2        MR. KIM:  Outside the scope of redirect.  Recross.  17:59:47

 3        THE WITNESS:  Yes.  I got a more or less complete  17:59:51

 4   draft from Uber's lawyers.                     17:59:54

 5   BY MR. JAFFE:                                  17:59:54

 6        Q.   And I want to take you particularly to page  17:59:56

 7   12 of your original declaration.               18:00:00

 8        A.   Okay.                                18:00:03

 9        Q.   Do you see where you refer to        18:00:06

10   Mr. Levandowski's input?                       18:00:08

11        A.   Yes.                                 18:00:16

12        Q.   What did you do -- well, let me start this,  18:00:19

13   was this paragraph drafted by Uber's lawyers?  18:00:22

14        MR. KIM:  Objection; form outside the scope.  18:00:26

15        THE WITNESS:  I believe they wrote the first draft  18:00:32

16   of this.                                       18:00:33

17   BY MR. JAFFE:                                  18:00:33

18        Q.   And what did you do to verify before signing  18:00:38

19   your declaration that what's here in paragraph 19 and  18:00:43

20   written by Uber's lawyers was true and accurate based  18:00:46

21   on your personal knowledge?                    18:00:48

22        A.   I used my personal knowledge, my personal  18:00:55

23   experience, my recollection, read this, agreed.  To my  18:01:02

24   knowledge, to the best of my knowledge, that the  18:01:04

25   statement in paragraph 19 was true.            18:01:06
```

Page 251

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So Uber's lawyers sent you paragraph 19.  You | 18:01:09 |
| 2 | said looks good and you signed it? | 18:01:11 |
| 3 | MR. KIM:  Objection; form. | 18:01:12 |
| 4 | THE WITNESS:  They sent me 19.  I may have made an | 18:01:15 |
| 5 | edit in it.  I don't recall.  And then gave that edit | 18:01:21 |
| 6 | back.  Got a final draft, read through, and signed it. | 18:01:25 |
| 7 | BY MR. JAFFE: | 18:01:25 |
| 8 | Q.   What was the edit you gave to paragraph 19 to | 18:01:27 |
| 9 | make it accurate? | 18:01:28 |
| 10 | MR. KIM:  Objection; form. | 18:01:35 |
| 11 | THE WITNESS:  I may have suggested that we make a | 18:01:39 |
| 12 | strong statement as possible regarding the 14,000 | 18:01:44 |
| 13 | files having not seen any evidence of that in the | 18:01:48 |
| 14 | development of this sensor. | 18:01:49 |
| 15 | BY MR. JAFFE: | 18:01:49 |
| 16 | Q.   Anything else? | 18:01:51 |
| 17 | A.   I don't recall. | 18:01:55 |
| 18 | Q.   So for purposes of the first sentence here | 18:01:59 |
| 19 | about Mr. Levandowski never had nor currently has any | 18:02:03 |
| 20 | design input, that was written wholesale by Uber's | 18:02:08 |
| 21 | lawyers? | 18:02:08 |
| 22 | MR. KIM:  Objection; form. | 18:02:10 |
| 23 | THE WITNESS:  I don't recall if I may have -- if I | 18:02:13 |
| 24 | had made any edits to this first sentence or not. | 18:02:16 |
| 25 | BY MR. JAFFE: | 18:02:16 |

Page 252

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And what did you do to verify -- well, | 18:02:19 |
| 2 | actually I think you already said this. | 18:02:21 |
| 3 |         You didn't do anything to verify that this | 18:02:24 |
| 4 | statement was accurate in paragraph 19 of your | 18:02:27 |
| 5 | declaration after it was provided to you by Uber's | 18:02:30 |
| 6 | lawyers; right? | 18:02:31 |
| 7 |     MR. KIM:  Objection; form. | 18:02:37 |
| 8 |     THE WITNESS:  I did no investigation to verify | 18:02:40 |
| 9 | that the statements made in paragraph 19 were | 18:02:46 |
| 10 | absolutely true. | 18:02:49 |
| 11 | BY MR. JAFFE: | 18:02:49 |
| 12 |     Q.   Did you talk to Mr. Levandowski? | 18:02:52 |
| 13 |     A.   No. | 18:02:52 |
| 14 |     Q.   Okay.  All right.  So what parts of your | 18:03:03 |
| 15 | original declaration are you relying on information | 18:03:08 |
| 16 | from Uber's lawyers? | 18:03:11 |
| 17 |     A.   Can you be specific when you say relying on | 18:03:21 |
| 18 | the Uber's lawyers. | 18:03:25 |
| 19 |     Q.   The basis for it being in your declaration is | 18:03:28 |
| 20 | something provided to you by counsel. | 18:03:32 |
| 21 |     MR. KIM:  Objection; form. | 18:03:35 |
| 22 |     THE WITNESS:  Again, this document was, in the | 18:03:41 |
| 23 | majority, sourced by lawyers for Uber. | 18:03:47 |
| 24 | BY MR. JAFFE: | 18:03:47 |
| 25 |     Q.   So you would say the majority of the document | 18:03:49 |

Page 253

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | you're relying on information from counsel; is that | 18:03:51 |
| 2 | right? | 18:03:52 |
| 3 |     A.   For the majority of the document, I'm relying | 18:03:58 |
| 4 | on Uber's counsel to originate the document.  I'm not | 18:04:01 |
| 5 | necessarily relying on them.  If you're implying -- | 18:04:04 |
| 6 |     Q.   Let me -- | 18:04:04 |
| 7 |     MR. KIM:  Let him finish. | 18:04:06 |
| 8 | BY MR. JAFFE: | 18:04:06 |
| 9 |     Q.   That's fine.  Let me be more clear. | 18:04:10 |
| 10 |     MR. KIM:  Wait.  Are you cutting off the witness | 18:04:11 |
| 11 | here? | 18:04:12 |
| 12 |     MR. JAFFE:  I think I'm trying to clarify.  I'll | 18:04:16 |
| 13 | withdraw the prior question. | 18:04:18 |
| 14 | BY MR. JAFFE: | |
| 15 |     Q.   I want to understand what facts are in your | 18:04:20 |
| 16 | declaration that you relied on from counsel. | 18:04:24 |
| 17 |     A.   I'm still having a hard time understanding | 18:04:27 |
| 18 | when you say relying on counsel for facts, whether | 18:04:31 |
| 19 | you're implying I'm relying on Uber's counsel for the | 18:04:35 |
| 20 | veracity or whether I'm relying on Uber's counsel to | 18:04:39 |
| 21 | put that information into the declaration. | 18:04:41 |
| 22 |     Q.   That's fair.  Let me help clarify this. | 18:04:43 |
| 23 |     So what I'm trying to get at is, were you | 18:04:48 |
| 24 | relying on Uber's counsel for the basis of these | 18:04:51 |
| 25 | facts, that is, you don't have independent personal | 18:04:52 |

Page 254

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   ███████████████████████████████   ██████████

    ████████████                                    18:12:20

3   BY MR. JAFFE:

4       Q.   Okay.   Going back to your declaration here,   18:12:25

5   we're looking at paragraph 18.                            18:12:26

6       MR. KIM:   Jordan, how long do you plan on going?     18:12:30

7   It's about 6:10.   Been going over an hour since the      18:12:34

8   last break.                                               18:12:35

9       MR. JAFFE:   Just kind of keep going.                 18:12:37

10      MR. KIM:   Yeah, well -- I think we should take a      18:12:40

11  break.                                                    18:12:40

12      MR. JAFFE:   Why don't we do this quick question       18:12:44

13  and then we'll take a break.                              18:12:45

14  BY MR. JAFFE:

15      Q.   Are you looking at paragraph 18 of your           18:12:47

16  original declaration?                                     18:12:49

17      A.   Yes.                                             18:12:51

18      Q.   So you referred to this in the redirect           18:12:55

19  testimony.   You talked about the custom beam spacing     18:12:58

20  and angle summary Scott provided.                         18:13:01

21          Do you see that?                                  18:13:02

22      A.   Yes.                                             18:13:02

23      Q.   So at the bottom of the page -- and this is       18:13:07

24  what we talked about earlier today, you said my team      18:13:10

25  imported the data.                                        18:13:11

                                                    Page 261

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Do you see that? | 18:13:12 |
| 2 | A.   Yes. | 18:13:12 |
| 3 | Q.   And based on what you talked about with | 18:13:14 |
| 4 | Mr. Kim, Uber's lawyer, it was Mr. Pennecot that | 18:13:18 |
| 5 | imported the data into Zemax; right? | 18:13:21 |
| 6 | A.   Yes. | 18:13:22 |
| 7 | Q.   And it was Mr. Pennecot that then determined | 18:13:25 |
| 8 | the resultant emitting points of the laser diodes; | 18:13:29 |
| 9 | right? | 18:13:29 |
| 10 | A.   Yes. | 18:13:29 |
| 11 | Q.   And it was Mr. Pennecot that then exported it | 18:13:33 |
| 12 | into CAD software; right? | 18:13:36 |
| 13 | A.   Yes, that's my understanding. | 18:13:38 |
| 14 | Q.   And so Mr. Pennecot was the one who actually | 18:13:42 |
| 15 | came up with ███████████████████████ | 18:13:47 |
| 16 | based on Mr. Boehmke's beam angles; isn't that right? | 18:13:51 |
| 17 | A.   No, I don't think so. | 18:13:52 |
| 18 | Q.   So what Mr. Pennecot exported into CAD | 18:13:56 |
| 19 | software, that wasn't ████████████████████ | 18:14:04 |
| 20 | A.   So if we go back carefully to transcripts, | 18:14:07 |
| 21 | what I should point out is, since this declaration, I | 18:14:11 |
| 22 | have more detailed information of exactly how | 18:14:14 |
| 23 | Mr. Pennecot did his import.  To be accurate, I want | 18:14:19 |
| 24 | to say that there's an error in here that he brought | 18:14:25 |
| 25 | the angles into CAD software, brought the lens design | 18:14:31 |

Page 262

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    and field curvature shape from Zemax into CAD        18:14:37
2    software.                                            18:14:37
3            Now you're asking did Mr. Pennecot in fact   18:14:40
4    design the ████████████████████████████████ ███████  18:14:50
█    ████████████████ Mr. Pennecot was dependent on
6    somebody else to tell him how many boards the angles 18:14:53
7    had to be divided among, and then Mr. Pennecot set the 18:14:58
8    positions of the laser diodes onto those boards.     18:15:02
9        Q.   Who told Mr. Pennecot to use ███████        18:15:05
10       A.   I told Mr. Pennecot to use ██████████  in   18:15:09
11   the optical cavity.                                  18:15:10
12       Q.   Who told him to use ██████████ in total?     18:15:13
13       A.   I don't think anybody told him to use ████  ████████  18:15:18
█    ████████ in total.
15       Q.   Who told him to put ████████████████████ ███████  18:15:22
█    ████████                                            18:15:22
17       A.   Mr. Pennecot understood the reason we were  18:15:31
18   going to ██████████, so I'll -- with that said, I'm  18:15:35
19   not aware that anybody had to tell him to ██████████ ███████  18:15:41
█    ████████████████                                    18:15:41
21       Q.   You don't know where Mr. Pennecot ████████ ███████  18:15:45
█    ████████  from?
23       A.   No, I know exactly where he got it from.    18:15:48
24       Q.   Where did he get it from?                   18:15:49
25       A.   The need to ██████████████████████████████  18:15:52
```

Page 263

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | If you're asking do I know from whom, no.  I would say | 18:15:57 |
| 2 | that he could derive that himself. | 18:15:59 |
| 3 |     Q.    Okay.  So -- but just to be clear, | 18:16:04 |
| 4 | Mr. Pennecot -- you told him ████████████ ████████ | 18:16:13 |
| | █████████████████████ in the SolidWorks | |
| 6 | CAD software, and you told him 64 channels and he | 18:16:16 |
| 7 | created ████████████████████; is that fair? | 18:16:21 |
| 8 |     A.    I didn't necessarily tell him 64 channels. | 18:16:24 |
| 9 | He got the list of angles that Scott Boehmke had | 18:16:28 |
| 10 | generated. | 18:16:29 |
| 11 |     Q.    So he knew that there were 64 channels; | 18:16:31 |
| 12 | right? | 18:16:31 |
| 13 |     A.    Without me telling him. | 18:16:33 |
| 14 |     Q.    So the sequence of events was there was Scott | 18:16:36 |
| 15 | Boehmke provided beam angles for 64 channels? | 18:16:40 |
| 16 |     A.    Yes. | 18:16:40 |
| 17 |     Q.    That went to Mr. Pennecot.  He imported that | 18:16:45 |
| 18 | data into Zemax.  And after he outputted into CAD | 18:16:50 |
| 19 | software, the result was a design with ████████ ████████ | 18:16:57 |
| | ██████████████████████████ is that | 18:17:01 |
| 21 | right? | 18:17:02 |
| 22 |     A.    Can you read that back. | 18:17:04 |
| 23 |     (Record read by reporter as follows: | 18:17:04 |
| 24 |     "Question:  He imported that data into Zemax. | 18:17:04 |
| 25 |     And after he outputted into CAD software, the | |

Page 264

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | as a whole taken with no prior knowledge that this | 19:08:02 |
| 2 | document does not completely represent accurately what | 19:08:06 |
| 3 | goes into Boards ▮▮▮▮ together as a whole. | 19:08:09 |
| 4 | BY MR. JAFFE: | 19:08:09 |
| 5 | Q.   Let me ask the question again. | 19:08:11 |
| 6 | Sitting here today, you cannot -- sitting | 19:08:14 |
| 7 | here today, Exhibit 1060 does not accurately represent | 19:08:18 |
| 8 | what is in Fuji?  Yes or no. | 19:08:20 |
| 9 | MR. KIM:  Objection; form. | 19:08:26 |
| 10 | THE WITNESS:  Yes, but only in the strictest | 19:08:29 |
| 11 | meaning of accuracy. | 19:08:33 |
| 12 | BY MR. JAFFE: | 19:08:33 |
| 13 | Q.   What does that mean? | 19:08:35 |
| 14 | A.   That means the magnitudes in here match but | 19:08:41 |
| 15 | the sign change has not been consistently applied.  If | 19:08:45 |
| 16 | I had to use this data and no other data to build a | 19:08:49 |
| 17 | Fuji, then I would have a problem in the strict sense. | 19:08:53 |
| 18 | Q.   I see.  Okay. | 19:08:54 |
| 19 | So Exhibit 1060 has some inaccuracies and | 19:09:00 |
| 20 | problems, but it's generally accurate; is that right? | 19:09:05 |
| 21 | A.   I'm more comfortable saying that, yes. | 19:09:07 |
| 22 | Q.   So you couldn't build Fuji looking at Exhibit | 19:09:10 |
| 23 | 1060; right?  Using this data? | 19:09:12 |
| 24 | A.   Right. | 19:09:12 |
| 25 | Q.   And it wouldn't be fair to try and build a | 19:09:16 |

Page 287

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Fuji using just this data; right? | 19:09:18 |
| 2 | MR. KIM:  Objection; form. | 19:09:20 |
| 3 | THE WITNESS:  It would not render a correct Fuji | 19:09:24 |
| 4 | based on this data only by itself. | 19:09:27 |
| 5 | BY MR. JAFFE: | 19:09:27 |
| 6 | Q.   Now, I want to go back to paragraph 19 of | 19:09:34 |
| 7 | your declaration, your original declaration, the | 19:09:40 |
| 8 | sentence about Mr. Levandowski. | 19:09:42 |
| 9 | A.   Okay. | 19:09:53 |
| 10 | Q.   We talked about this before and you testified | 19:09:56 |
| 11 | that you did no investigation to confirm the sentence | 19:10:01 |
| 12 | in paragraph -- the first sentence in paragraph 19; | 19:10:04 |
| 13 | right? | 19:10:04 |
| 14 | A.   Right. | 19:10:04 |
| 15 | Q.   And I just want to make sure that it's clear. | 19:10:09 |
| 16 | When you said you did no investigation, did | 19:10:11 |
| 17 | you do anything to confirm this statement before you | 19:10:14 |
| 18 | signed your declaration? | 19:10:16 |
| 19 | MR. KIM:  Objection; form. | 19:10:21 |
| 20 | THE WITNESS:  I refer to my recollection of how | 19:10:23 |
| 21 | the Fuji was developed, remembered no evidence of | 19:10:28 |
| 22 | Anthony coming in and controlling or designing those | 19:10:31 |
| 23 | aspects of the Fuji. | 19:10:33 |
| 24 | BY MR. JAFFE: | 19:10:33 |
| 25 | Q.   Did you talk to anyone to confirm this | 19:10:35 |

Page 288

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | statement? | 19:10:36 |
| 2 | A.   No. | 19:10:38 |
| 3 | Q.   Did you look at any documents to confirm this | 19:10:41 |
| 4 | statement? | 19:10:41 |
| 5 | A.   No. | 19:10:44 |
| 6 | Q.   Did you talk to anyone else on the LiDAR | 19:10:46 |
| 7 | team? | 19:10:47 |
| 8 | A.   No. | 19:10:50 |
| 9 | Q.   Okay.  Other than consulting your memory, did | 19:10:58 |
| 10 | you do anything to confirm the first sentence of | 19:11:00 |
| 11 | paragraph 19 of your original declaration? | 19:11:02 |
| 12 | A.   No, not that I recall. | 19:11:12 |
| 13 | Q.   Okay.  Let's -- | 19:11:13 |
| 14 | MR. KIM:  So we've gone 30 minutes on the record. | 19:11:18 |
| 15 | We're going to conclude this deposition | 19:11:23 |
| 16 | as we discussed at the break on the grounds that | 19:11:27 |
| 17 | we've given you more time than we took on | 19:11:32 |
| 18 | redirect, and he's now gone close to seven hours | 19:11:35 |
| 19 | on the record. | 19:11:36 |
| 20 | MR. JAFFE:  I understand your position. | 19:11:39 |
| 21 | THE VIDEOGRAPHER:  This is the end of today's | 19:11:44 |
| 22 | deposition of Mr. James Haslim. | 19:11:46 |
| 23 | We are off the record at 7:11 p.m. | 19:11:50 |
| 24 | The total number of media used was six and it | 19:11:53 |
| 25 | will be retained by Veritext.  Thank you. | 19:11:56 |

Page 289