**quinn emanuel** trial lawyers | san francisco

50 California Street, 22nd Floor, San Francisco, California 94111-4788 | TEL (415) 875-6600 FAX (415) 875-6700

May 8, 2017

<u>VIA ECF</u>

Magistrate Judge Jacqueline Scott Corley
USDC, Northern District of California
San Francisco Courthouse
Courtroom F - 15th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

Re:     *Waymo LLC v. Uber Technologies, Inc., et al.*, N.D. Cal. Case No. 3:17-cv-00939-WHA

Dear Magistrate Judge Corley:

Waymo seeks the expedited production of the Acquisition Agreement between Uber and Ottomotto.  At the May 3 hearing on Waymo's Motion for Preliminary Injunction, the Court stated it would like to see the agreement through which defendant Uber Technologies, Inc. acquired defendant Ottomotto LLC (the "Acquisition Agreement"[1]), and directed Defendants to produce the Acquisition Agreement because it is a "key document in the case" that "should never have been withheld":

> MR. VERHOEVEN: So, your Honor, this information was withheld by Uber despite repeated efforts by counsel for Waymo to obtain it until yesterday.  And as you can see -- by the way, ***the Acquisition Agreement*** that goes along with this ***is still being withheld by Uber***. They won't even give us the acquisition documents.

> THE COURT: Wait a minute. I have been wondering about that from time to time. In fact, ***I had wanted to read the Acquisition Agreement***, but I keep forgetting to get around to ask people about it. Are you telling me that they have refused to turn over the Acquisition Agreement?

> MR. VERHOEVEN: Yes, despite repeated requests.

---

[1]   Waymo uses the term "Acquisition Agreement" to refer to the document or documents that discloses the terms under which Uber acquired Ottomotto.  The Acquisition Agreement would therefore include both the executed agreement itself, and any exhibits, appendices, schedules, or documents incorporated into the agreement.

THE COURT: Did you actually ask for it in a legitimate way or was it one of these broad things where it was a bad request to begin with?

MR. VERHOEVEN: I will let Mr. Jaffe answer that because I wasn't personally involved.

THE COURT: Mr. Jaffe, what's the answer?

MR. JAFFE: The first RFP that we asked was about the acquisition and the due diligence included in that.  Fairly includes the agreement itself.

THE COURT: That's not answering my question.  Did you specifically ask for the acquisition document, the transaction documents?

MR. JAFFE: Do we have an RFP that corresponds to that or did we ask them in email?

THE COURT: Let's take the RFP first.

MR. JAFFE: So the RFP that we asked, the first one we asked about the acquisition, including due diligence.  So I think the answer to your question is we didn't say "agreement," but we asked about the acquisition.

THE COURT: All right. Let me ask the other side. Just this one, why didn't you turn over the Acquisition Agreement?

MR. GONZALEZ: Your Honor, the answer to your question was no.

THE COURT: No, what?

MR. GONZALEZ: They didn't specifically ask for that document in a document request. We have been, for four weeks, conferring about a variety of different things that they want.  We have been producing documents literally almost on a daily basis.

THE COURT: Did they, in emails, ask you for that  document?

MR. GONZALEZ: I honestly don't remember, your Honor.  This is not -- I just don't remember.

THE COURT: Are you willing to turn it over to them?  *I would like myself to see it.*

MR. GONZALEZ: I would have to talk to the clients, your Honor, but I don't think there's any reason --

THE COURT: *You better hurry up, because the judge wants to see it.*

MR. GONZALEZ: I understand.  I understand, your Honor.

1

THE COURT: All right. *That document should never have been withheld,* but they should also ask for it clearly.  So I'm not casting blame on anyone yet, but *that's a key document in the case*.

MR. JAFFE: We were going to move to compel, and we were meeting with -- meeting and conferring with Mr. Gonzalez last week.  He represented to us that everything would be produced by Saturday morning.

THE COURT: Everything -- no, look.  You should have asked specifically for the acquisition transaction documents.  And then you should have gotten a clear-cut no. All right.  But, nevertheless, *that's a key document. The judge even wants to see it. So you lawyers help me out on this.*

(Dkt. 354 at 30:14-33:6 (emphases added).)

Waymo had specifically asked for the Acquisition Agreement prior to the May 3 hearing.[2] Following the hearing, Waymo reiterated its requests for the Acquisition Agreement, noted the Court's comments, and attempted to meet and confer on May 4 and then again on May 8.  (Baily Decl. ¶¶ 2-3; Perlson Decl. ¶ 2.)  Yet, Defendants have still failed to produce it.  Indeed, despite the extensive correspondence and discussion in Court at the May 3 hearing on this very topic, counsel for Defendants represented on a telephonic conference this morning that he had "not yet thought about the issue enough" to provide Defendants' position on whether they would produce the Acquisition Agreement.  (Baily Decl. ¶ 3.)

Defendants argue that they do not have to produce this "key document" because it has not been identified by name in a Request for Production.  But Waymo was not required, either under the Court's Expedited Discovery Order or the Federal Rules, to identify the Acquisition Agreement (or any other specific document) by name in order to make it responsive to a document request.  Nor did Defendants identify specific documents by name in their own discovery requests, or consistently limit their production of documents responsive to Waymo's requests to those only specifically identified by name in the requests.

Further, even if the Acquisition Agreement were not responsive to Waymo's document requests – which it is – the Court has "nevertheless" asked to see this "key document."  (Dkt. 354 at 33:5-6.)  That is an independent reason that Defendants should produce the Acquisition Agreement

---

[2]  *See* 5/1/2017 email from J. Nardinelli ("We have been unable to locate the Uber/Otto acquisition agreement in any document production.  Please let us know the Bates number if you have produced it, or produce it immediately.  This document is responsive to at least Linaval RFP 1[.]") (Baily Decl. Ex. C.); Meall RFP No. 1 ("All agreements signed between Anthony Levandowski and any of Defendants."); Linaval RFP No. 1 ("Documents sufficient to show the reasons behind Uber's decision to acquire Otto, beginning with Uber's first interest in Odin Wave, Otto, Tyto LiDAR, and/or 280 Systems, all due diligence on such acquisition, and any consulting work by Anthony Levandowski and/or Odin Wave, Otto, Tyto LiDAR, and/or 280 Systems for Uber before the acquisition."); and Meall R No. 4 ("Documents sufficient to show the identity of anyone with an ownership interest in Otto, 280 Systems, Tyto LiDAR, or Odin Wave, at any time, and the amount of that person's ownership interest.") (Baily Decl. Exs. A and B.).

promptly, regardless of how Defendants purport to construe the scope of Waymo's document requests.

On the afternoon of May 8, the parties – joined by Special Master Cooper – conducted an additional telephonic meet and confer on Defendants' refusal to produce the Acquisition Agreement. (Perlson Decl. ¶ 2.)  Counsel for Defendants represented on that call that he had never even seen the Acquisition Agreement, had no idea how many exhibits, attachments, or schedules it comprised, had never discussed the Acquisition Agreement with his clients (who were in attendance at the Preliminary Injunction hearing), and in fact had not planned to discuss it with them until the following day.  (*Id.*)  As a result, counsel for Defendants was unable to provide a position on whether Defendants would agree to produce the Acquisition Agreement, or – in the event they would agree – a date certain whereby the Acquisition Agreement would actually be produced to Waymo.  (*Id.*)[3]

Defendants' foot-dragging should not be tolerated.  The Court should order Defendants to immediately produce the complete Acquisition Agreement, with its exhibits, appendices, schedules, and any document incorporated into the agreement.  Defendants' continued failure to produce relevant documents as ordered by the Court also further supports the adverse inferences against Defendants detailed in Waymo's prior briefing.  (Dkt. 254 at 10-13; Dkt. 250 at 5-6; Dkt. 159 at 8-10; Dkt. 135 at 2-3.)

Sincerely,

*/s/ Charles K. Verhoeven*
Charles K. Verhoeven

cc:      All counsel of record.

---

[3]   Moreover, counsel for Defendants indicated that any agreement to produce even a subset of the Uber-Otto acquisition documentation was contingent upon Waymo's agreement to provide completely unrelated discovery, which, unlike the Acquisition Agreement, Defendants do not even argue is responsive to any outstanding discovery request.  Specifically, Defendants demand that Waymo identify the first "date or dates on which Google and or Waymo first communicated with Quinn Emanuel about a potential violation of the law or potential legal action against Anthony Levandowski" and "the same information as to their first communication with Quinn Emanuel about a potential violation of the law or potential legal action against Uber."  (Perlson Decl., Ex. 1.)  Although Waymo appreciates the Special Master's attempt to resolve disputes between the parties through compromise rather than through motion practice, Waymo does not agree to tether Defendants' obligation to produce highly relevant and responsive documents that "should never have been withheld" to demands that Waymo provide irrelevant and nonresponsive information.