HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN FRANCISCO DIVISION

 4

    WAYMO LLC,

 5

                       Plaintiff,

 6                                          Case

    vs.                                     No. 3:17-cv-00939-WHA

 7

    UBER TECHNOLOGIES, INC.;

 8  OTTOMOTTO LLC; OTTO TRUCKING LLC,

 9                  Defendants,

    _____/

10

11

12

13

14

15       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16          VIDEOTAPED DEPOSITION OF JAMES HASLIM

17                 THURSDAY, MAY 4, 2017

18

19

20

21

22  Reported by:

23  Anrae Wimberley

24  CSR No. 7778

25  Job No.  2610396
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   How often did Mr. Levandowski bring his | 11:07:32 |
| 2 | personal laptop to work with him? | 11:07:35 |
| 3 | MR. KIM:  Objection; form. | 11:07:35 |
| 4 | THE WITNESS:  I couldn't possibly know. | 11:07:37 |
| 5 | BY MR. JAFFE: | 11:07:37 |
| 6 | Q.   Every day? | 11:07:39 |
| 7 | MR. KIM:  Objection; form. | 11:07:39 |
| 8 | THE WITNESS:  The reason I couldn't possibly know | 11:07:42 |
| 9 | is I don't know whether the laptop he may have carried | 11:07:45 |
| 10 | was his personal laptop or the work laptop. | 11:07:48 |
| 11 | BY MR. JAFFE: | 11:07:48 |
| 12 | Q.   I see.  All right.  So let's just talk about | 11:07:51 |
| 13 | the one laptop that you know about. | 11:07:53 |
| 14 | How often did he bring that laptop to work | 11:07:55 |
| 15 | with him? | 11:07:56 |
| 16 | MR. KIM:  Objection; form. | 11:07:56 |
| 17 | THE WITNESS:  I don't know.  I have no idea. | 11:08:02 |
| 18 | BY MR. JAFFE: | 11:08:02 |
| 19 | Q.   You saw him at work with the personal laptop; | 11:08:06 |
| 20 | right? | 11:08:06 |
| 21 | A.   I'm sure I've seen him at work with a laptop. | 11:08:10 |
| 22 | Q.   And that was a regular occurrence; right? | 11:08:12 |
| 23 | MR. KIM:  Objection; form. | 11:08:14 |
| 24 | THE WITNESS:  I hardly paid attention to how often | 11:08:18 |
| 25 | he was carrying a laptop. | 11:08:20 |

Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | that Mr. Levandowski was demoting himself in some way. | 11:34:26 |
| 2 | Are you familiar with that? | 11:34:27 |
| 3 | A.   I'm familiar with the announcement that his | 11:34:31 |
| 4 | position was changing.  I only take issue with your | 11:34:37 |
| 5 | comment -- or your phrase that says he was demoting | 11:34:40 |
| 6 | himself.  I don't know who decided his position should | 11:34:45 |
| 7 | change. | 11:34:45 |
| 8 | Q.   I see. | 11:34:45 |
| 9 | So you don't know who actually decided that | 11:34:49 |
| 10 | his position should change? | 11:34:51 |
| 11 | A.   Correct. | 11:34:51 |
| 12 | Q.   And do you take issue with the idea that he | 11:34:54 |
| 13 | was demoted in some way? | 11:34:56 |
| 14 | A.   Not necessarily. | 11:34:58 |
| 15 | Q.   Okay.  So if I call it his demotion, that's a | 11:35:03 |
| 16 | fair statement? | 11:35:03 |
| 17 | A.   I won't argue with that. | 11:35:05 |
| 18 | Q.   So how did you find out about | 11:35:09 |
| 19 | Mr. Levandowski's demotion? | 11:35:12 |
| 20 | A.   I received an e-mail.  I believe the whole | 11:35:16 |
| 21 | company received an e-mail describing that change. | 11:35:21 |
| 22 | I want to say Anthony sent the e-mail, but | 11:35:25 |
| 23 | I'm not 100 percent positive on that. | 11:35:28 |

Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13    BY MR. JAFFE:                                          11:36:13

14        Q.    Before that e-mail on Thursday, there was no   11:36:18

15    sort of company policy excluding Mr. Levandowski from  11:36:23

16    providing input onto LiDAR; right?                     11:36:27

17        MR. KIM:  Objection; form.                         11:36:27

18        THE WITNESS:  I'm not aware of any policy before    11:36:31

19    that date regarding excluding him from any aspect of   11:36:35

20    any work at the company.                               11:36:36

21    BY MR. JAFFE:                                          11:36:36

22        Q.    Including LiDAR?                              11:36:41

23        A.    Including LiDAR.                              11:36:41

24        Q.    So you never received any sort of special     11:36:45

25    instructions about what you could and couldn't do      11:36:47

                                              Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.    Who came up with ████████████████        11:57:45

 2    for Fuji?                                           11:57:46

 3        A.    I would say that was a decision reached by me   11:57:56

 4    with collaboration with my electrical engineer Florin   11:58:00

 5    Ignatescu.                                          11:58:02

 6        Q.    Anyone else?                              11:58:07

 7        A.    I believe the discussion of the ████████   11:58:13

 8    also involved Gaetan as it pertains to the performance   11:58:20

 9    of his lens and how it would work with ████████.    11:58:25

10    I'm sure we informed other people.  Scott may have   11:58:34

11    been in the office when we were making this decision   11:58:36

12    as well.  Dan Gruver would probably be informed as   11:58:41

13    well, but I don't recall Dan playing any role in that   11:58:45

14    decision.                                           11:58:45

15        Q.    Who was involved in coming up with ██████  ████49

      ██ ████████████                                      11:58:50

17        MR. KIM:  Objection; form.                      11:58:53

18        THE WITNESS:  In coming up with ████████████  I   11:58:57

19    would say that was primarily me and the electrical   11:59:00

20    engineer, Florin.                                   11:59:02

21    BY MR. JAFFE:                                       

22        Q.    And then you discussed it with the LiDAR   11:59:05

23    team?                                               11:59:07

24        MR. KIM:  Objection; form.                      11:59:09

25        THE WITNESS:  Yes.                              11:59:09
```

Page 72

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Are you aware of any conversations between | 12:00:17 |
| 2 | Mr. Gruver or Mr. Pennecot and Mr. Levandowski | 12:00:20 |
| 3 | regarding the number of transmit boards in the Fuji | 12:00:24 |
| 4 | design? | 12:00:24 |
| 5 | MR. KIM:  Objection; form. | 12:00:26 |
| 6 | THE WITNESS:  I am not aware. | 12:00:28 |
| 7 | BY MR. JAFFE: | 12:00:28 |
| 8 | Q.   So it's possible that they have discussed | 12:00:29 |
| 9 | this issue with them, you wouldn't know that; right? | 12:00:32 |
| 10 | A.   I wouldn't know that. | 12:00:34 |
| 11 | Q.   So you're not saying that Mr. Levandowski has | 12:00:36 |
| 12 | never had discussions or input into the idea to use | 12:00:40 |
| 13 | ██████████████████; right? | 12:00:43 |
| 14 | MR. KIM:  Objection; form. | 12:00:46 |
| 15 | THE WITNESS:  What I am saying is that Anthony | 12:00:48 |
| 16 | never had input into my decision with my electrical | 12:00:55 |
| 17 | engineer to put ████████████████. | 12:01:00 |
| 18 | BY MR. JAFFE: | 12:01:00 |
| 19 | Q.   Right. | 12:01:00 |
| 20 | But you talked about that decision with | 12:01:02 |
| 21 | Mr. Gruver, for example; right? | 12:01:03 |
| 22 | A.   I think discussions with Gruver came later, | 12:01:07 |
| 23 | yeah. | 12:01:07 |
| 24 | Q.   Or Mr. Pennecot, for example? | 12:01:10 |
| 25 | A.   Mr. Pennecot was probably consulted in that | 12:01:13 |

Page 74

```
 1        A.   Yes.                                      12:03:36

 2             We knew we needed a laser circuit, so I had  12:03:40

 3   Florin design multiple laser circuits onto a board for  12:03:45

 4   test and evaluation.  We picked one of those circuits  12:03:48

 5   that we thought performed the best.  He began         12:03:51

 6   considering the size of his circuit in one of those --  12:03:56

 7   I believe it was 10 different circuits.  The one we    12:03:59

 8   chose, he could look at the design of it and tell me   12:04:02

 9   the size.                                              12:04:04

10             So at this point, as I recall, Gaetan did not  12:04:10

11   have a laser board design in his CAD model.  He had a  12:04:20

12   lens design.  He may have had -- I even doubt he had   12:04:26

13   taken that into CAD yet.                               12:04:29

14        Q.   So I'm a little bit confused.               12:04:32

15             Where did the idea to have ██████████come    12:04:34

16   from?                                                  12:04:35

██   ████████████████████████████████████████████████████████41

██   ████████████████████████████████████. The need to    12:04:49

19   ████████████████████ developed quickly between        12:04:56

20   Florin and I looking at the size of the circuit,       12:04:59

21   knowing when Scott Boehmke defines a certain ████████  ███04

██   ████████████████████████████, when Gaetan has         12:05:08

23   designed a lens that has a 150 millimeter focal        12:05:13

24   length, it becomes apparent that the ██████████  ██████16

██   ████████████████████████████████████████             12:05:19
```

Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ████████████████████████████████████████
 ▮   ████████████████████.                    12:05:24
 3        It was obvious to me that wasn't going to   12:05:26
 4   work and we would have to ██████████████████   
 ▮   ██████ Later we went back and looked closer, and I   12:05:33
 6   realized, wait a minute, ████████████████████
 ▮   ██████ So we can't put circuits on ██▮████████   12:05:33
 ▮   ████████████████████████████████████████
 ▮   ████████████████.                        12:05:47
10        Furthermore, we were starting to look at   12:05:50
11   components on the receiver.  We saw components on the   12:05:53
12   receiver that were themselves ██████████████   12:05:58
13   Those were high voltage components.  They needed   12:06:00
14   additional space between them as well.  So it seemed   12:06:01
15   pretty clear at the time████████████████ was not   12:06:05
16   going to work, so we said ████████████   Florin   12:06:09
17   thought he could ████████████████         12:06:14
18        So that ended up with ████████████████████   
 ▮   ██████ We already had decided two cavities to make   12:06:20
20   64 channels, so that ended up with ██████████████   12:06:24
21   in the sensor.                            12:06:25
22      Q.   Where are the documents that reflect the   12:06:27
23   discussions that you were just talking about?   12:06:31
24      A.   We did not document our discussions.   12:06:33
25      Q.   Okay.  So there are no -- there's no   12:06:35
```

Page 78

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    documentary evidence to evidence -- to support what    12:06:39

 2    you just said?                                         12:06:40

 3        MR. KIM:  Objection; form.                         12:06:42

 4    BY MR. JAFFE:                                          12:06:42

 5        Q.   Is that fair?                                 12:06:42

 6        A.   Not quite.                                    12:06:43

 7            We have documents showing and indicating to    12:06:47

 8    us what the vertical angles were to be for the sensor  12:06:52

 9    as specified by Scott Boehmke.  We have a lens design  12:06:57

10    that's documented from Gaetan.  We have the original   12:07:03

11    circuit Florin had developed for testing out lasers.   12:07:10

12            At that point, the documentation stopped.      12:07:14

13    And we don't have documents for discussions describing 12:07:22

14    how ████████████████████████████████████████████████

      ███████████████████████████                           12:07:27

16        Q.   Okay.  So I just want to run through that     12:07:30

17    real quick.                                            12:07:30

18            So you're saying that you got the idea for     12:07:34

19    ███████████ based on three things.  One is the ███████

      ███████ of the diodes that you wanted.  Two is the     12:07:43

21    ████████████████.  And three is the ██████████████████

      ██████████████████████████████                        12:07:49

23            Generally, is that fair?                       12:07:53

24        A.   I'd like you to add a fourth, which is the    12:07:56

25    ████████████████████████████████and possibly a        12:08:04
```

Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 ██████████████████████ ███████████████████   ██████████

2 ████████████                                   14:00:49

3    A.   I'm sorry.  I don't think I was clear before.   14:00:53

4         When Gaetan designed the outline of this   14:00:56

5 board and specified █████████████████████████   ██████████

6 ██████████████████████████████████████████   ██████████

7 ████████████████████████ ████████████████   ██████████

8 ██████████████████████ ██████████████████   ██████████

9 ██████████████████████████████████████████   ██████████

10 ██████████████████████████████████████████   14:01:17

11    Q.   So the original idea was ████████████████   ██████████

12 ████████████████████?                         14:01:22

13    A.   No.                                    14:01:22

14    Q.   So then let me ask my question again then.   14:01:25

15         What is the point of including ██████████████   ██████████

16 ███████████ -- in this chart?                 14:01:30

17    A.   This information could have been provided to   14:01:36

18 the electrical engineer so that ████████████████████████   ██████████

19 ██████████████████████████████████████████.   14:01:43

20 And if he hasn't █████████████████████████████   ██████████

21 ██████████████████████████████████████████   ██████████

22 ████████████████ █████████████████████████   14:01:55

23    Q.   Why do you think he did that?         14:01:57

24    A.   He needs to ██████████████████████, that's as   14:02:00

25 good as -- better than an outline of a board which is   14:02:03

Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   I see that, yes.                          14:28:10

 2        Q.   The "LiDAR team" right there, that includes   14:28:15

 3   Anthony Levandowski; right?                         14:28:17

 4        MR. KIM:  Objection; form.                     14:28:17

 5        THE WITNESS:  I wouldn't have considered him part   14:28:24

 6   of the LiDAR team, but clearly he was informed of the   14:28:30

 7   decision and we got his buyoff because it affected the   14:28:33

 8   program.                                            14:28:34

 9   BY MR. JAFFE:                                       14:28:34

10        Q.   So, again, I'm referring to what's in your   14:28:36

11   declaration.  Your declaration says, "The LiDAR team's   14:28:39

12   decision."                                          14:28:39

13             Is Mr. Levandowski part of the LiDAR team in   14:28:41

14   your declaration or not?                            14:28:43

15        MR. KIM:  Objection; form.                     14:28:46

16        THE WITNESS:  No.                              14:28:46

17   BY MR. JAFFE:                                       14:28:46

18        Q.   So when you said, "The LiDAR team's decision   14:28:51

19   to abandon the project," you're excluding           14:28:54

20   Mr. Levandowski?                                    14:28:55

21        A.   I am.                                     14:28:56

22        Q.   Even though he had to actually make the    14:28:59

23   decision to pivot?                                  14:29:00

24        A.   I would say the LiDAR team proper made a   14:29:03

25   decision based on technical matters; whereas, Anthony   14:29:06
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. JAFFE:  Which number are we at? | 14:34:23 |
| 2 | THE REPORTER:  I think we're on 156. | |
| 3 | MR. KIM:  How long have you gone on the record? | 14:35:02 |
| 4 | THE REPORTER:  We're on 157. | |
| 5 | THE VIDEOGRAPHER:  Three hours and four minutes. | |
| 6 | MR. KIM:  We've got another hour.  If there's a | |
| 7 | convenient time for a break. | |
| 8 | MR. JAFFE:  I'll do this -- | 14:35:04 |
| 9 | MR. KIM:  You can ask your next -- | |
| 10 | MR. JAFFE:  -- really quick and then we can take a | 14:35:07 |
| 11 | quick break. | 14:35:08 |
| 12 | (Plaintiff's Exhibit 157 was marked.) | 14:35:23 |
| 13 | BY MR. JAFFE: | |
| 14 | Q.  I've marked as Exhibit 157 a document with | 14:35:26 |
| 15 | the slip sheet labeled "Exhibit H."  And then the | 14:35:30 |
| 16 | document underlying that says, ███████████ | 14:35:33 |
| 17 | Is this a document that you were referring to | 14:35:36 |
| 18 | before that Mr. Levandowski, Anthony Levandowski that | 14:35:40 |
| 19 | is, called you about and discussed? | 14:35:41 |
| 20 | MR. KIM:  Objection; form. | 14:35:52 |
| 21 | THE WITNESS:  No, this is not, to my recollection, | 14:35:56 |
| 22 | the same document.  There does appear to be some | 14:36:00 |
| 23 | features in here, but for reasons I don't understand, | 14:36:03 |
| 24 | there seems to be pages I'm not familiar with. | 14:36:07 |
| 25 | BY MR. JAFFE: | 14:36:07 |

Page 138

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So you're familiar with some pages of this | 14:36:15 |
| 2 | document, but not others; is that fair? | 14:36:18 |
| 3 | A.   I think so, yeah. | 14:36:19 |
| 4 | Q.   Let's go to page 10. | 14:36:20 |
| 5 | A.   Okay. | 14:36:22 |
| 6 | Q.   And, actually, before we get there, going | 14:36:30 |
| 7 | back to the first page, it's dated May 16th, 2016. | 14:36:33 |
| 8 | You worked at Otto at that time; right? | 14:36:36 |
| 9 | A.   I believe I did, yes. | 14:36:38 |
| 10 | Q.   And you had had conversations with | 14:36:39 |
| 11 | Mr. Boehmke by that time? | 14:36:41 |
| 12 | A.   Probably not. | 14:36:43 |
| 13 | Q.   Okay.  But were you aware of Uber and Otto | 14:36:46 |
| 14 | having conversations at that time? | 14:36:50 |
| 15 | A.   I don't think so. | 14:36:51 |
| 16 | Q.   So you weren't aware of the conversations, to | 14:36:55 |
| 17 | the extent that they were happening, between Uber and | 14:36:58 |
| 18 | Otto? | 14:36:59 |
| 19 | A.   I don't recall if I had become aware of Uber | 14:37:04 |
| 20 | and Otto discussions at this early date in May. | 14:37:07 |
| 21 | Q.   So if you look at page 14. | 14:37:28 |
| 22 | A.   Okay. | 14:37:34 |
| 23 | Q.   You see it says, ██████████ | 14:37:35 |
| 24 | A.   Yes. | 14:37:36 |
| 25 | Q.   Does this refresh your recollection that Uber | 14:37:39 |

Page 139

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    Right.                                    14:41:44

 2        Q.    So to your knowledge, what's described here  14:41:48

 3   as Plan B isn't the basis for the Fuji design?       14:41:52

 4        MR. KIM:  Objection; form.                       14:41:55

 5        THE WITNESS:  I am not aware of a link between    14:41:59

 6   this Plan B in this document and the Fuji design.     14:42:04

 7   BY MR. JAFFE:                                         14:42:04

 8        Q.    And you would be in a position to know;    14:42:08

 9   right?                                                14:42:09

10        MR. KIM:  Objection; form.                       14:42:11

11        THE WITNESS:  I would have to make that          14:42:13

12   presumption.  And it's just a presumption.            14:42:15

13   BY MR. JAFFE:                                         14:42:15

14        Q.    In your job, you would be in a position to  14:42:18

15   know that; right?                                     14:42:18

16        MR. KIM:  Objection; form.                       14:42:25

17        THE WITNESS:  I would expect to know that.       14:42:26

18        MR. JAFFE:  Let's take a break.                  14:42:32

19        THE VIDEOGRAPHER:  We are off the record at 2:42  14:42:36

20   p.m.                                                  14:42:36

21            (Recess taken.)                              14:42:36

22        THE VIDEOGRAPHER:  We are back on the record at   14:55:55

23   2:56 p.m.                                             14:55:57

24   BY MR. JAFFE:                                         14:55:57

25        Q.    Have you discussed the subject matter of your  14:56:03
```

Page 143

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | testimony during any of the breaks today? | 14:56:05 |
| 2 | A.   Nothing in terms of like what we said in this | 14:56:10 |
| 3 | testimony. | 14:56:11 |
| 4 | Q.   What does that mean? | 14:56:13 |
| 5 | A.   That means the legal team may have advised me | 14:56:19 |
| 6 | on procedural matters, general terms without | 14:56:23 |
| 7 | referencing the actual content of our discussion. | 14:56:26 |
| 8 | Q.   What did they tell you? | 14:56:27 |
| 9 | MR. KIM:  Objection. | 14:56:27 |
| 10 | Going to instruct you not to answer on the | 14:56:31 |
| 11 | grounds of attorney-client privilege. | 14:56:33 |
| 12 | BY MR. JAFFE: | 14:56:33 |
| 13 | Q.   Did your legal team tell you how to testify | 14:56:36 |
| 14 | after these meetings? | 14:56:37 |
| 15 | MR. KIM:  You can answer that yes or no. | 14:56:39 |
| 16 | THE WITNESS:  Could you be clear by what you mean | 14:56:41 |
| 17 | by "how to testify"? | 14:56:42 |
| 18 | BY MR. JAFFE: | 14:56:44 |
| 19 | Q.   I don't think I can be any clearer. | 14:56:46 |
| 20 | A.   Like what to say? | 14:56:47 |
| 21 | Q.   I'm trying to understand what the legal team | 14:56:51 |
| 22 | told you in terms of general terms, procedural | 14:56:55 |
| 23 | matters, which is what you said. | 14:56:57 |
| 24 | What did they tell you? | 14:56:58 |
| 25 | MR. KIM:  Instruct you not to reveal any | 14:57:00 |

Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | privileged conversations. | 14:57:11 |
| 2 | THE WITNESS:  Are you instructing me not to | 14:57:13 |
| 3 | answer? | 14:57:14 |
| 4 | MR. KIM:  You can answer his prior question yes or | 14:57:17 |
| 5 | no. | 14:57:17 |
| 6 | THE WITNESS:  If your question is, did they tell | 14:57:24 |
| 7 | me what to say, no.  Did they tell me how to testify, | 14:57:28 |
| 8 | no. | 14:57:29 |
| 9 | BY MR. JAFFE: | 14:57:29 |
| 10 | Q.   When you said that they told you things about | 14:57:31 |
| 11 | general things and procedural considerations, what | 14:57:34 |
| 12 | general things did they tell you? | 14:57:37 |
| 13 | MR. KIM:  I'm going to instruct you not to answer | 14:57:39 |
| 14 | on the grounds of attorney-client privilege. | 14:57:40 |
| 15 | BY MR. JAFFE: | 14:57:40 |
| 16 | Q.   What procedural -- what general terms about | 14:57:42 |
| 17 | your testimony did they tell you? | 14:57:45 |
| 18 | A.   Let's see.  We discussed how much time is | 14:57:52 |
| 19 | left, something called redirect. | 14:57:59 |
| 20 | Q.   What did they talk to you about redirect? | 14:58:01 |
| 21 | MR. KIM:  And I'm going to instruct you not to | 14:58:05 |
| 22 | reveal any attorney-client privileged conversations. | 14:58:09 |
| 23 | And I don't think you can answer that without doing | 14:58:11 |
| 24 | so.  I'm going to instruct you not to answer. | 14:58:14 |
| 25 | BY MR. JAFFE: | 14:58:14 |

Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   You talked about redirect on a break?  Yes or | 14:58:21 |
| 2 | no? | 14:58:21 |
| 3 | A.   Yes, we talked about the term "redirect." | 14:58:24 |
| 4 | Q.   And what did you talk about redirect? | 14:58:28 |
| 5 | A.   That is a situation where, instead of you, | 14:58:33 |
| 6 | the lawyer on my side of the table is going to ask me | 14:58:36 |
| 7 | questions. | 14:58:36 |
| 8 | Q.   And how did redirect come up in the context | 14:58:39 |
| 9 | of your conversation? | 14:58:40 |
| 10 | A.   In the context of time remaining and that | 14:58:45 |
| 11 | redirect would occur after your allotted time has | 14:58:49 |
| 12 | ended, so it's going to take longer than I might | 14:58:54 |
| 13 | think. | 14:58:54 |
| 14 | Q.   Did Uber's lawyers tell you that they were | 14:58:58 |
| 15 | going to do redirect questions? | 14:59:00 |
| 16 | A.   Yes. | 14:59:02 |
| 17 | Q.   And did they tell you what those questions | 14:59:04 |
| 18 | were going to be about? | 14:59:06 |
| 19 | A.   No. | 14:59:07 |
| 20 | Q.   Did you talk at all about what sort of | 14:59:11 |
| 21 | redirect would happen? | 14:59:13 |
| 22 | A.   No. | 14:59:16 |
| 23 | Q.   What did you talk about about redirect? | 14:59:19 |
| 24 | A.   That they will ask me questions just like you | 14:59:24 |
| 25 | ask me questions and that it's going to take longer | 14:59:27 |

Page 146

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | than the hour, approximately, that we have remaining, | 14:59:30 |
| 2 | so not to expect it to be over at that time. | 14:59:34 |
| 3 | Q.   What else, in general terms, did you and your | 14:59:36 |
| 4 | lawyers talk about on the breaks? | 14:59:38 |
| 5 | MR. KIM:  I'm going to advise you not to reveal | 14:59:46 |
| 6 | any attorney-client privileged communications. | 14:59:49 |
| 7 | THE WITNESS:  So I'm not a lawyer.  I don't know | 14:59:55 |
| 8 | what is considered attorney-client privilege and what | 14:59:58 |
| 9 | wouldn't be in that context of conversations, so I | 15:00:01 |
| 10 | need to be careful not to answer and disclose | 15:00:03 |
| 11 | something I'm not supposed to say. | 15:00:06 |
| 12 | MR. KIM:  Do you need to consult with me about a | 15:00:09 |
| 13 | privilege issue? | 15:00:09 |
| 14 | THE WITNESS:  Yes, that would help. | 15:00:12 |
| 15 | MR. KIM:  Can we go off the record so he can | 15:00:15 |
| 16 | consult with me on a privilege issue before he answers | 15:00:18 |
| 17 | any further questions about what we discussed? | 15:00:20 |
| 18 | MR. JAFFE:  I'll withdraw the question and I'll | 15:00:22 |
| 19 | ask a different question. | 15:00:23 |
| 20 | BY MR. JAFFE: | 15:00:23 |
| 21 | Q.   Tell me the substance of your private | 15:00:26 |
| 22 | conferences -- private conferences during the break | 15:00:28 |
| 23 | that you had with Uber's lawyers, all of it. | 15:00:32 |
| 24 | MR. KIM:  I'm going to object on the grounds of | 15:00:36 |
| 25 | privilege. | 15:00:37 |

Page 147

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    taking -- and we can do this for more angles if you            15:51:42

2    wish, but it looks like the diodes --                          15:51:43

3                                                                    15:51:48

4                                                                    15:51:56

5        Q.    Could you describe generally how you                 15:51:59

6    calculated that or determined that?                            15:52:01

7        A.    Yeah.  So                                            15:52:05

8                                                                    15:52:10

9                                                                    15:52:16

10                                                                   15:52:22

11                                                                   15:52:25

12   I don't know if you need any more --                           15:52:29

13       Q.    Is there a name for that equation that you           15:52:31

14   just described?                                                15:52:32

15       A.                                                         15:52:36

16                                 or -- yeah.                       15:52:41

17       Q.    And then going back to the channel spacing           15:52:45

18   under "delta" --                                               15:52:46

19             Is that the term you used?                           15:52:48

20       A.    Under "delta" -- channel spacing, yes.  This         15:52:55

21   is an angular spacing.                                         15:52:57

22       Q.    Does that reflect the accurate channel               15:52:59

23   spacing for the Fuji Board A?                                  15:53:02

24       A.    These do appear to be the channel spacing.          15:53:07

25   In terms of accurate, these numbers are already                15:53:11

                                                 Page 181

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yeah. | 16:01:00 |
| 2 | MR. JAFFE:   Objection; leading. | 16:01:03 |
| 3 | BY MR. KIM: | 16:01:03 |
| 4 | Q.   Have you ever used the term ███████ | 16:01:08 |
| 5 | A.   I'm familiar with the term from mathematics. | 16:01:13 |
| 6 | Q.   What does that term mean to you? | 16:01:17 |
| 7 | A.   To me, especially in reference to a | 16:01:20 |
| 8 | mathematical function, the term ███████ means that | 16:01:25 |
| 9 | ████████████████████████████████████████ | |
| ██ | ████████████████████████████████████████ | |
| ██ | ████████████████████████████████████████ | |
| ██ | ████████████████████████████████████████ | |
| ██ | ████████████████████. | 16:01:53 |
| 14 | Q.   In your opinion, do -- the channel spacing | 16:01:55 |
| 15 | for Board A for Fuji, do they ██████████     ██████ | |
| ██ | ██████████████ | 16:02:07 |
| 17 | A.   Channel spacing related to the "Delta" column | 16:02:10 |
| 18 | we've labeled? | 16:02:11 |
| 19 | Q.   Yes. | 16:02:12 |
| 20 | A.   To my understanding, that is not ██████ | 16:02:30 |
| 21 | Q.   Why is that? | 16:02:31 |
| 22 | A.   I see numbers that start at the "Delta" | 16:02:34 |
| 23 | column, the channel spacing we called it, ██████████ | |
| ██ | ████████████████████████████████████████ | |
| ██ | ████████████████████████ | 16:02:49 |

Page 186

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    ████████████████████                              16:02:51

 2        Q.   Same question for the distance between   16:02:53

 3    diodes.                                           16:02:54

 4              Is that distance ████████████████  ████████

 █    █████████████████  for Fuji?                      16:03:06

 6        A.   No.   The linear distance is not ███████  ████████

 █    ████████████  ████████████████████████████  ████████

 █    ████████████████████████████████  ████████

 █    ██████████████████████████████                    16:03:26

10        Q.   Is that also true for the channel spacing for  16:03:32

11    Board █ for Fuji?                                 16:03:34

12        MR. JAFFE:   Objection; leading.              16:03:40

13        THE WITNESS:   I see the same ██████████  ████████

 █    ████████████████████████████████████████  ████████

 █    ████████████████████████████████  ████████

 █    ████████████████████████████████████  ████████

 █    ████████  ██████████████████████████████      16:04:05

18    BY MR. KIM:

19        Q.   And that's for Board █ for Fuji?         16:04:08

20        A.   For Board █ on this document, yes.       16:04:10

21        Q.   What about for Board █ are the channel   16:04:15

22    spacings ██████████████████                       16:04:23

23        A.   No.   █████████████████████████  ████████

 █    ████████████████████████████████████  ████████

 █    ████████████████████████████████        16:04:36
```

Page 187

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   Um-hum.  Let me ask it a different way.      16:13:45

 2           Does the ████████████████████████████████████

 ■           ████████████████████████████████████████████████

 ■           ████████████████████████████████████████████████

 ■           ████████████████████████████████████          16:14:10

 6      MR. JAFFE:  Objection; form, leading.              16:14:14

 7      THE WITNESS:  There is a ███████████████████████████

 ■           ████████████████████████████████████████████████

 ■           ████████████████████████████████████████████████

 ■           ████████████████████████████████████████████████

 ■           █████████████████████████                     16:14:40

12   BY MR. KIM:                                           16:14:40

13      Q.   Okay.  And earlier you were asked about the   16:14:47

14   term ████████████████████; correct?                  16:14:48

15      A.   Yes.                                          16:14:50

16      Q.   And ████████████████████ refers to what when 16:14:53

17   you're using the term?                                16:14:56

18      A.   It depends on the context.  I have to be      16:14:59

19   careful to clarify. █████████████████████████████████

 ■           ████████████████████████████████████████████████

 ■           ████████████████████████████████████████████████

 ■           ████████████████████████████████████████████████

 ■           ████████████████████████████             16:15:20

24      Q.   And how -- how do you use the term?           16:15:23

25      A.   Most of the time we've been talking, at Uber, 16:15:31
```

Page 192

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  This does not refer to Fuji.  It | 16:19:00 |
| 2 | could not refer to Fuji.  And if you look at the | 16:19:08 |
| 3 | e-mail -- let me find this.  Sorry. | 16:19:14 |
| 4 | Perhaps Section B discussion -- it sounds to | 16:19:22 |
| 5 | me like this is discussing Spider, where we're talking | 16:19:28 |
| 6 | about groups of eight.  The date would be consistent | 16:19:33 |
| 7 | with what we ultimately called Spider. | 16:19:41 |
| 8 | BY MR. KIM: | 16:19:41 |
| 9 | Q.   Okay.  So looking at UBER00008499, you | 16:19:50 |
| 10 | believe that what's described in A there that you were | 16:19:53 |
| 11 | asked about earlier actually refers to Spider and not | 16:19:56 |
| 12 | Fuji? | 16:19:58 |
| 13 | A.   That's what it seems like to me, yes. | 16:20:01 |
| 14 | Q.   I would like to go back to your Exhibit B | 16:20:11 |
| 15 | from your original declaration. | 16:20:14 |
| 16 | Do you see that column with the heading | 16:20:32 |
| 17 | ██████████ | |
| 18 | A.   Yes.  There's two. | 16:20:36 |
| 19 | Q.   Okay.  Let's look at the leftmost column. | 16:20:42 |
| 20 | A.   Yes. | 16:20:43 |
| 21 | Q.   Are ██████████████████████████████████ | |
| ██ | ████████ on Fuji boards? | 16:20:49 |
| 23 | MR. JAFFE:  Objection; form and leading. | 16:20:52 |
| 24 | THE WITNESS:  No.  As I understand it, the | 16:20:55 |
| 25 | ████████████████████████████████████ | 16:21:01 |

Page 195

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    ████████████████████████████████████          16:21:04

2    BY MR. KIM:                                     16:21:04

3        Q.   Do you have an understanding as to why there   16:21:07

4    are  ████████  listed there?                    16:21:09

5        A.   Yeah.  As I was discussing earlier, my   16:21:17

6    understanding is these coordinates referencing the   16:21:22

7    ████████  were generated early in the development of   16:21:29

8    Fuji when ██████████████████████████████       16:21:33

9    More specifically, these coordinates were given to the   16:21:37

10   electrical engineer before the electrical engineer had   16:21:39

11   laid out the circuits onto the board and added the   16:21:42

12   fiducial mark onto the board.                   16:21:45

13       Q.   Are there any plans at Uber to use ███████████   16:21:57

     ██  ████████████████████████  on any transmit boards for   16:22:07

15   Fuji?                                            16:22:08

16       A.   Not that I'm aware of.                 16:22:11

17       Q.   Okay.  You can set that one aside.     16:22:28

18            Actually, a couple follow-up questions on   16:22:46

19   Exhibit 155.                                     16:22:48

20            I believe you were asked when this document   16:22:52

21   was created -- let me just ask it.              16:22:56

22            Do you know when this document was created?   16:22:58

23       MR. JAFFE:  Objection; form.                16:23:01

24       THE WITNESS:  Which version are you referring to?   16:23:03

25   BY MR. KIM:                                      16:23:03
```

Page 196

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Scott Boehmke --                                  16:24:46

 2        MR. JAFFE:  Objection; leading, outside the scope.  16:24:51

 3    BY MR. KIM:                                        16:24:51

 4        Q.   -- that you discussed in paragraph 18 of your  16:24:55

 5    original declaration?                             16:24:57

 6        MR. JAFFE:  Objection; outside the scope, improper  16:25:00

 7    redirect.                                         16:25:01

 8        THE WITNESS:  155?  151?                       16:25:20

 9    BY MR. KIM:                                        16:25:26

10        Q.   It's either 151 or 152.  It's 151.        16:25:26

11            (Witness reviews documents.)              16:25:58

12        A.   Do you have a paragraph?                  16:25:59

13        Q.   Paragraph 18.                            16:26:00

14        A.   Thank you.  Okay.  Okay.  18.            16:26:08

15            (Witness reviews document.)               16:26:19

16        A.   Okay.                                    16:26:20

17        Q.   And for the record, earlier today you were  16:26:22

18    asked about this paragraph.                       16:26:25

19            Do you recall that?                       16:26:26

20        A.   Yes.                                     16:26:26

21        MR. JAFFE:  Objection; leading.               16:26:29

22    BY MR. KIM:                                        16:26:29

23        Q.   And you were asked about whether there was  16:26:33

24    any evidence that the information you received from  16:26:38

25    Scott Boehmke referred to in this paragraph was   16:26:41
```

Page 198

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    actually used in Fuji, and you referred to CAD files.    16:26:45

2         What did you -- what CAD files are you              16:26:47

3    referring to?                                            16:26:47

4         MR. JAFFE:  Objection; form and leading.            16:26:51

5         THE WITNESS:  I was referring --                    16:26:52

6         MR. JAFFE:  Beyond the scope.                       16:26:55

7         THE WITNESS:  I was referring to mechanical CAD     16:26:58

8    files in the SolidWorks software created by Gaetan       16:27:05

9    that have the angles specified by Scott Boehmke that     16:27:14

10   end up terminating in a set of points for each laser     16:27:20

11   diode emitting point.                                    16:27:24

12        He then also included a CAD model of the            16:27:29

13   laser board outline that he developed that also had     16:27:33

14   those same emitting points on there.  And then,          16:27:41

15   finally, you can see the theta angle matches the         16:27:46

16   prescribed angles that we got from Scott.                16:27:50

17   BY MR. KIM:                                              16:27:50

18        Q.   Can you explain step by step the process from  16:27:54

19   going from the angles that you received from Scott --    16:27:57

20        A.   Okay.                                          16:27:58

21        Q.   -- to what ultimately ended up being the       16:28:02

22   diode placement angles reflected in Exhibit B of your    16:28:08

23   original declaration and marked as Exhibit 155 for       16:28:11

24   your deposition?                                         16:28:13

25        MR. JAFFE:  Objection; form, leading.  This is      16:28:15
```

                                        Page 199

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | improper redirect, outside the scope.  We're just | 16:28:20 |
| 2 | going to object to all this evidence; I think I've | 16:28:24 |
| 3 | made that clear. | 16:28:25 |
| 4 | THE WITNESS:  My understanding of the process that | 16:28:28 |
| 5 | led to the coordinates we have in Exhibit 155, | 16:28:32 |
| 6 | starting with angles that Scott Boehmke provided, was | 16:28:36 |
| 7 | that Gaetan designed a lens in Zemax.  We had decided | 16:28:44 |
| 8 | on 150 millimeter focal length, chosen material for | 16:28:49 |
| 9 | the lens. | 16:28:50 |
| 10 | From the lens optimization provided by the | 16:28:52 |
| 11 | Zemax software, we had the focal length behind the | 16:28:59 |
| 12 | lens to the beginning of a focal surface.  And he had | 16:29:05 |
| 13 | a radius of curvature for the focal surface. | 16:29:10 |
| 14 | From that information in Zemax, you can take | 16:29:14 |
| 15 | that into SolidWorks software, model up a curved | 16:29:19 |
| 16 | surface with the same radius of curvature as the focal | 16:29:23 |
| 17 | surface defined by Zemax.  That could be -- he modeled | 16:29:30 |
| 18 | that at a location behind the lens with a consistent | 16:29:36 |
| 19 | focal length developed in Zemax. | 16:29:41 |
| 20 | He then, as I understand it, created lines or | 16:29:48 |
| 21 | rays in the CAD geometry that reflected the vertical | 16:29:52 |
| 22 | angles specified by Scott Boehmke, one by one, | 16:29:57 |
| 23 | individually, for the ▮ different beam angles for the | 16:30:01 |
| 24 | ▮▮▮▮ boards in the mid-range cavity. | 16:30:05 |
| 25 | He extended those lines or rays until it | 16:30:10 |

Page 200

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | intersected this curved focal surface.  The point of | 16:30:17 |
| 2 | intersection defined the location for the laser diodes | 16:30:23 |
| 3 | emitting surface.  He then put that into his model, | 16:30:30 |
| 4 | modeled a PCB behind that. | 16:30:33 |
| 5 | In this case specifically, he had ███████. | 16:30:40 |
| 6 | So he had ██████████████ where rays would | 16:30:48 |
| 7 | intersect a -- I guess you would call this a | 16:30:54 |
| 8 | two-dimensional flat, curved focal surface. | 16:30:57 |
| 9 | From that, he had designed this laser board | 16:31:06 |
| 10 | mechanical outline relative to that outline and | 16:31:10 |
| 11 | relative to the mounting features that were included | 16:31:13 |
| 12 | in that design, including ████████.  He had | 16:31:16 |
| 13 | locations for laser diodes on that board. | 16:31:21 |
| 14 | Individually, those models of the Laser | 16:31:28 |
| 15 | Boards ████████ were sent to the electrical | 16:31:32 |
| 16 | engineer, Will Treichler, who then proceeded to lay | 16:31:38 |
| 17 | out the circuit behind each of the laser diodes. | 16:31:41 |
| 18 | BY MR. KIM: | |
| 19 | Q.   And earlier I believe you mentioned Florin. | 16:31:49 |
| 20 | What was Florin's role in all this? | 16:31:52 |
| 21 | A.   Florin is another electrical engineer.  He | 16:31:55 |
| 22 | used to work at Velodyne.  I consider him a senior | 16:32:00 |
| 23 | electrical engineer.  So I asked him to design some | 16:32:02 |
| 24 | candidate laser pulsing circuits.  He designed that | 16:32:09 |
| 25 | test board.  And the circuits on there, he tested the | 16:32:15 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Go ahead. | 17:21:07 |
| 2 | BY MR. KIM: | 17:21:07 |
| 3 | Q.    Are the current beam angles for ▮▮▮▮▮ | 17:21:11 |
| 4 | reflected in Exhibit 155 that we were looking at | 17:21:14 |
| 5 | earlier? | 17:21:15 |
| 6 | A.    Yes. | 17:21:27 |
| 7 | Q.    Okay. | 17:21:34 |
| 8 | A.    Let me double check.  Hold on.  Sorry. | 17:21:37 |
| 9 | (Witness performs calculation.) | |
| 10 | A.    Okay.  Yes.  Angles in Exhibit 155 do appear | 17:22:07 |
| 11 | to be the accurate angles that we designed the Fuji to | 17:22:12 |
| 12 | and -- and started building Fuji to. | 17:22:15 |
| 13 | Q.    Earlier you were asked about whether or not | 17:22:23 |
| 14 | Mr. Levandowski had input into the Fuji design. | 17:22:30 |
| 15 | Did Mr. Levandowski have any technical input | 17:22:34 |
| 16 | for the Fuji design? | 17:22:36 |
| 17 | MR. JAFFE:  Objection; form, leading. | 17:22:38 |
| 18 | THE WITNESS:  To my recollection, the only | 17:22:44 |
| 19 | potentially technical input Anthony Levandowski had on | 17:22:49 |
| 20 | the Fuji design were telling us to make it as good as | 17:22:55 |
| 21 | the Velodyne or better.  To under-regard any concerns | 17:23:03 |
| 22 | given to us from people in Pittsburgh regarding size | 17:23:06 |
| 23 | and weight, that that should not be a prioritized | 17:23:09 |
| 24 | requirement. | 17:23:10 |
| 25 | BY MR. KIM: | |

Page 221

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   At the very beginning of your deposition you | 17:23:19 |
| 2 | were asked about whether you had communications with | 17:23:22 |
| 3 | Mr. Levandowski while you were at Tyto. | 17:23:23 |
| 4 | Do you remember that? | 17:23:26 |
| 5 | A.   Vaguely. | 17:23:27 |
| 6 | Q.   When you were asked whether or not he gave | 17:23:32 |
| 7 | you any confidential information, you said you thought | 17:23:36 |
| 8 | it was general information.  What did you mean by | 17:23:39 |
| 9 | that? | 17:23:40 |
| 10 | A.   I believe information Anthony provided | 17:23:50 |
| 11 | regarding a ██████████████████████ was | 17:23:57 |
| 12 | information that I've seen other places on the | 17:24:02 |
| 13 | Internet as white papers, as publicly-available | 17:24:07 |
| 14 | information in terms of architect or configuration for | 17:24:11 |
| 15 | a laser.  I felt recommendations for vendors would be | 17:24:19 |
| 16 | information, again, publicly available by doing Google | 17:24:23 |
| 17 | search for components like that. | 17:24:26 |
| 18 | Q.   And at the very start of your deposition you | 17:24:32 |
| 19 | were asked about 64 channels and the convenience of | 17:24:34 |
| 20 | two.  Do you recall that line of questioning? | 17:24:37 |
| 21 | A.   Wasn't it the power of two. | 17:24:40 |
| 22 | Q.   Maybe it was the power of two. | 17:24:42 |
| 23 | A.   Yeah. | 17:24:43 |
| 24 | Q.   What was the reason that Fuji had -- or the | 17:24:53 |
| 25 | Fuji design has 64 channels? | 17:24:57 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    And you signed it without actually checking | 17:38:47 |
| 2 | it was accurate? | 17:38:49 |
| 3 | A.    Whoa.  I looked at these numbers. | 17:38:52 |
| 4 | Q.    But you didn't check what you did today | 17:38:54 |
| 5 | before you signed this declaration, did you? | 17:38:59 |
| 6 | A.    What do you mean?  Identifying, double | 17:39:02 |
| 7 | checking the ██████. | 17:39:04 |
| 8 | Q.    Yes. | 17:39:04 |
| 9 | A.    I did check that. | 17:39:06 |
| 10 | Q.    So why today did you need to check it again? | 17:39:09 |
| 11 | A.    I like to be careful. | 17:39:11 |
| 12 | Q.    You like to be careful? | 17:39:12 |
| 13 | A.    Yeah.  I want to be sure we can show the ███ | 17:39:16 |
| 14 | ████████████ that they matched. | 17:39:19 |
| 15 | Q.    Did you know when you signed your declaration | 17:39:22 |
| 16 | whether these actually matched every single angle and | 17:39:26 |
| 17 | every single board? | 17:39:27 |
| 18 | A.    Yes, I believe I did. | 17:39:28 |
| 19 | Q.    What do you mean you believe you did? | 17:39:31 |
| 20 | A.    To my recollection, I checked ████████████ | 17:39:36 |
| 21 | ██████████████████████████.  And I checked the | 17:39:42 |
| 22 | initial ██████ and knew that they would follow the | 17:39:46 |
| 23 | same pattern so I didn't check every single angle. | 17:39:50 |
| 24 | Q.    How many of these did you actually check | 17:39:52 |
| 25 | yourself before you signed your declaration? | 17:39:55 |

Page 234

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    I remember at least checking the initial ██    17:40:01
 2    ████████████████████████████████████                  17:40:04
 3      Q.    So you checked about six out of the 64; is     17:40:08
 4    that fair?                                             17:40:09
 5      A.    Yeah.                                          17:40:09
 6      Q.    And the rest are purely from counsel; you're   17:40:12
 7    just relying on them?                                  17:40:14
 8      A.    Not exactly.                                   17:40:16
 9      Q.    You didn't check.                              17:40:19
10            How did you know it was accurate?              17:40:21
11      A.    How would the pattern change?                  17:40:24
12      Q.    I don't know.  It's your declaration.          17:40:26
13      A.    I understand.  From my understanding, the      17:40:30
14    pattern is consistent in the letters.  So once you     17:40:35
15    start the pattern properly, it's going to finish out   17:40:39
16    properly.                                              17:40:40
17      Q.    Let's go to the next page, page 12.            17:40:42
18            Who prepared this table?                       17:40:44
19      A.    Counsel for Uber.                              17:40:51
20      Q.    And you had to double check it here at your    17:40:54
21    deposition; you didn't know whether it was accurate    17:40:55
22    when you signed it, did you?                           17:40:57
23      MR. KIM:  Objection; form.                           17:40:58
24      THE WITNESS:  I believe I checked that before as     17:41:00
25    well.                                                  17:41:01
```

Page 235

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1            Do you see that?                      18:13:12

2      A.   Yes.                                    18:13:12

3      Q.   And based on what you talked about with 18:13:14

4   Mr. Kim, Uber's lawyer, it was Mr. Pennecot that 18:13:18

5   imported the data into Zemax; right?            18:13:21

6      A.   Yes.                                    18:13:22

7      Q.   And it was Mr. Pennecot that then determined 18:13:25

8   the resultant emitting points of the laser diodes; 18:13:29

9   right?                                          18:13:29

10     A.   Yes.                                    18:13:29

11     Q.   And it was Mr. Pennecot that then exported it 18:13:33

12  into CAD software; right?                       18:13:36

13     A.   Yes, that's my understanding.           18:13:38

14     Q.   And so Mr. Pennecot was the one who actually 18:13:42

15  came up with ████████████████████████           18:13:47

16  based on Mr. Boehmke's beam angles; isn't that right? 18:13:51

17     A.   No, I don't think so.                   18:13:52

18     Q.   So what Mr. Pennecot exported into CAD  18:13:56

19  software, that wasn't ████████████████████████  18:14:04

20     A.   So if we go back carefully to transcripts, 18:14:07

21  what I should point out is, since this declaration, I 18:14:11

22  have more detailed information of exactly how   18:14:14

23  Mr. Pennecot did his import.  To be accurate, I want 18:14:19

24  to say that there's an error in here that he brought 18:14:25

25  the angles into CAD software, brought the lens design 18:14:31
```

Page 262

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    and field curvature shape from Zemax into CAD          18:14:37

 2    software.                                              18:14:37

 3             Now you're asking did Mr. Pennecot in fact    18:14:40

 4    design the ████████████████████████████████████       18:14:45

 5    ████████████████    Mr. Pennecot was dependent on      18:14:50

 6    somebody else to tell him how many boards the angles   18:14:53

 7    had to be divided among, and then Mr. Pennecot set the 18:14:58

 8    positions of the laser diodes onto those boards.       18:15:02

 9        Q.    Who told Mr. Pennecot to use ████████████    18:15:05

10        A.    I told Mr. Pennecot to use ██████████  in    18:15:09

11    the optical cavity.                                    18:15:10

12        Q.    Who told him to use ███████  in total?       18:15:13

13        A.    I don't think anybody told him to use ████   18:15:17

14    ██████  in total.                                      18:15:18

15        Q.    Who told him to put █████████████████████    18:15:21

16    █████                                                  18:15:22

17        A.    Mr. Pennecot understood the reason we were   18:15:31

18    going to █████████, so I'll -- with that said, I'm     18:15:35

19    not aware that anybody had to tell him to ███████████  18:15:39

20    █████████████████                                      18:15:41

21        Q.    You don't know where Mr. Pennecot ███████    18:15:44

22    ████████  from?                                        18:15:45

23        A.    No, I know exactly where he got it from.     18:15:48

24        Q.    Where did he get it from?                    18:15:49

25        A.    The need to █████████████████████████.       18:15:52
```

Page 263

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    If you're asking do I know from whom, no.  I would say   18:15:57

2    that he could derive that himself.                       18:15:59

3         Q.   Okay.  So -- but just to be clear,             18:16:04

4    Mr. Pennecot -- you told him ███████████████████████     18:16:08

5    ███████████████████████████████  in the SolidWorks       18:16:13

6    CAD software, and you told him 64 channels and he        18:16:16

7    created ███████████████████████; is that fair?           18:16:21

8         A.   I didn't necessarily tell him 64 channels.     18:16:24

9    He got the list of angles that Scott Boehmke had         18:16:28

10   generated.                                               18:16:29

11        Q.   So he knew that there were 64 channels;        18:16:31

12   right?                                                   18:16:31

13        A.   Without me telling him.                        18:16:33

14        Q.   So the sequence of events was there was Scott  18:16:36

15   Boehmke provided beam angles for 64 channels?            18:16:40

16        A.   Yes.                                            18:16:40

17        Q.   That went to Mr. Pennecot.  He imported that   18:16:45

18   data into Zemax.  And after he outputted into CAD        18:16:50

19   software, the result was a design with ███████████       18:16:56

20   █████████████████████████████████████; is that          18:17:01

21   right?                                                   18:17:02

22        A.   Can you read that back.                        18:17:04

23             (Record read by reporter as follows:           18:17:04

24             "Question:  He imported that data into Zemax.  18:17:04

25             And after he outputted into CAD software, the
```

Page 264