QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David A. Perlson (Bar No. 209502)
  davidperlson@quinnemanuel.com
  Melissa J. Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  John Neukom (Bar No. 275887)
  johnneukom@quinnemanuel.com
  Jordan Jaffe (Bar No. 254886)
  jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:      (415) 875-6600
Facsimile:      (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>            Plaintiff,<br><br>      v.<br><br>UBER TECHNOLOGIES, INC.;<br>OTTOMOTTO LLC; OTTO TRUCKING<br>LLC,<br><br>            Defendants. | CASE NO. 3:17-cv-00939-WHA<br><br>**PLAINTIFF WAYMO'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF WITHHELD DOCUMENTS**<br><br>**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>Date:  May 24, 2017<br>Time:  2:00 p.m.<br>Place: Courtroom F, 15th Floor<br>Judge:  The Honorable Jacqueline Scott Corley |

# TABLE OF CONTENTS

Page

I.   DEFENDANTS DO NOT REBUT THE INFIRMITIES IN THEIR LOG AND HAVE SUBMITTED A DEFICIENT SWORN RECORD THAT FALLS FAR SHORT OF SHOWING THAT ANY PRIVILEGES APPLY AND HAVE NOT BEEN WAIVED ................................................................................................2

II.  DEFENDANTS HAVE NOT ESTABLISHED AND CANNOT ESTABLISH THAT ANY PRIVILEGE APPLIES TO THE PURPORTED "DUE DILIGENCE" MATERIALS .......................................................................................................3

    A.   Defendants' Incomplete Record Does Not Justify The Claimed Privileges .............4

    B.   The Acquisition Documents Confirm That Uber's Conduct Is Not Privileged As A Matter Of Law ................................................................................5

    C.   Defendants Do Not Even Submit The Declarations They Concede Are Necessary To Make A Prima Facie Showing That The Asserted Privileges Apply And Were Not Waived ................................................................................7

III. EVEN IF THE LOGGED DOCUMENTS WOULD OTHERWISE BE PROTECTED, THE CRIME-FRAUD EXCEPTION APPLIES ........................................10

IV.  DEFENDANTS DO NOT DISPUTE THAT THEY SHOULD BE COMPELLED TO PRODUCE ALL DOCUMENTS AND FORENSIC DATA PROVIDED TO STROZ FOR USE IN ITS INVESTIGATION ....................................................................13

V.   WAYMO HAS SHOWN THE REQUISITE NEED FOR THE LOGGED DOCUMENTS .........................................................................................................14

VI.  DISCOVERY ...........................................................................................................15

The Court has already found that "troves of likely probative evidence have been concealed from Waymo under relentless assertions of privilege that shroud dealings between Levandowski and defendants in secrecy."  (Dkt. 433 at 18-19.)  In its motion to compel, Waymo demonstrated that Defendants have not met their burden to justify this shroud over what Defendants call the "due diligence materials" related to Uber's investigation of Mr. Levandowski and other former Waymo employees prior to Uber's acquisition of Otto.  Defendants do not substantively rebut that their (tardy) privilege log fails to comply with the Court's standing order.  Instead, in opposition to Waymo's motion, Defendants raise *new* supposed grounds, not found in their log, to justify their privilege assertions.  These new grounds should be ignored altogether, though even they do not support Defendants' positions, as detailed below.

Defendants' recent production of documents regarding Uber's acquisition of Otto – initially withheld even after the Court explicitly asked for those documents[1] – only further shows that there is no basis to assert privilege over the "due diligence materials."  These acquisition agreements reveal that ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ (*E.g.*, Ex.[2] 9 at 3-4 & Exh. C; Ex. 10.)  Incredibly, these ████████████████████ ██████████████████████████████████████ (*E.g.*, Ex. 9, Exh. C at 4; Ex. 10 at 2.) ███████████████████████████████████████████████████████████████████████████ (*E.g.*, Ex. 9, Exh. A; *see also* Dkt. 433 at 3-4.)  What is still unclear from Defendants' statements and incomplete discovery is whether Uber learned about the ██████████ through due diligence (and then

---

[1]   In connection with expedited discovery ordered for the purpose of informing Waymo's motion for a preliminary injunction, Waymo had asked for all agreements related to Uber's acquisition of Otto, including those executed by Mr. Levandowski.  With no legitimate justification whatsoever, Defendants intentionally waited until *after* the Court issued its preliminary injunction ruling to produce *any* such agreements.  If the Court had not made known that Defendants should "hurry up" and produce them, Defendants would have concealed the acquisition agreements for even longer – at least until after this motion to compel was decided.  But, with the Court forcing their hand, on Thursday night and on Saturday, Defendants provided an incomplete set of heavily redacted acquisition agreements executed by Mr. Levandowski.
[2]   All Exhibits are attached to the Declaration of Patrick Schmidt.

1    sought to cover them up) or whether Uber was complicit in the theft of Waymo's confidential

2    documents from the start.  Uber's shroud of secrecy cannot be justified in either scenario.

3    **I.    DEFENDANTS DO NOT REBUT THE INFIRMITIES IN THEIR LOG AND HAVE
         SUBMITTED A DEFICIENT SWORN RECORD THAT FALLS FAR SHORT
4        OF SHOWING THAT ANY PRIVILEGES APPLY AND HAVE NOT BEEN WAIVED**

5            The Court made clear to Defendants that they needed to provide "bone-crushing detail" in

6    their privilege logs.  (4/5/17 Hr'g Tr. 27:10-28:4.)  Defendants do not substantively dispute that

7    they did not provide such detail.  Indeed, the new arguments Defendants make in their opposition

8    only confirm that the log describing the due diligence materials was grossly deficient.  As just one

9    example, while Defendants' log based their privilege assertions solely on an April 11, 2016 Joint

10   Defense Agreement (Dkt. 370-4 at 1 n.2), Defendants now point to all manner of oral and written

11   agreements (*e.g.*, Opp. 3 (Stroz engagement letter, side agreement between Stroz and

12   Levandowski), 7 (referring to an "indemnification construct"), 8 (February 2016 term sheet,

13   various emails purportedly related to oral agreements)).  As expressly called out in Waymo's

14   motion (at 5-6), Defendants' failure to reference these agreements "at the time of the assertion" of

15   the privileges should be "deemed a waiver" pursuant to Judge Alsup's standing order.

16          More problematic, however, is Defendants' failure to make the vast majority of the

17   agreements that they are now relying on part of the sworn record in opposition to Waymo's

18   motion to compel.  Referring to these various agreements in declarations is not sufficient.[3]

19   Indeed, Defendants ***intentionally*** limited their record to such references – as opposed to providing

20   the documents themselves – seemingly for a specific improper purpose:  to use self-serving

21   characterizations of the documents as a sword in opposition to Waymo's motion to compel, while

22   simultaneously shielding the problematic content of the documents from Waymo and the Court for

23   as long as possible, prejudicing Waymo with respect to not only this motion to compel but also its

24   motion for a preliminary injunction.  Defendants voluntarily submitted an incomplete record, and

25   that record cannot satisfy Defendants' burden to establish the applicability of the asserted

26

27   _____
     3   Such references do not pass muster on the best evidence rule.  *Groppi v. Barham*, 157 F. App'x
28   10, 11–12 (9th Cir. 2005); *United States v. Bennett*, 363 F.3d 947, 953 (9th Cir. 2004).

1  privileges and the lack of any waiver thereof.

2  **II.     DEFENDANTS HAVE NOT ESTABLISHED AND CANNOT ESTABLISH THAT
          ANY PRIVILEGE APPLIES TO THE PURPORTED "DUE DILIGENCE"
3          MATERIALS**

4          Regardless of Defendants' waiver in the context of its relentless efforts to obfuscate in this

5  case, there is no viable privilege here.  Defendants have taken the position that all parties related to

6  a potential acquisition – including a potential acquirer, potential acquirees (whether ultimately

7  acquired or not), individuals being investigated during "due diligence," and third-party

8  investigators – can collectively use privilege to cloak unfavorable facts in secrecy.  That is not the

9  law, and "all manner of mischief could be concealed" (Dkt. 202 at 12) if it were.

10         The following colloquy regarding a hypothetical posed by Judge Alsup is instructive.

11         **THE COURT:** All right. So let's say that the scenario is somebody is jumping
           ship, coming over.  The acquiring company learns in the course of the
12         negotiations that, by the way, the guy jumping ship has downloaded a bunch of
           secret documents.  And then the acquirer says: Well, that's a problem.  We've got
13         to come up with some kind of a solution to this.  So there's a lot of negotiation.
           Let's just say that, hypothetically, they all get put into a vault somewhere.  They
14         are not—you know, they're put into a vault and he promises in writing
           somewhere he will never look at them.  He won't use them.  The company tries to
15         protect itself in every possible way.  But isn't that—isn't that agreement part of
           the acquisition itself and something that everybody ought to see?
16
           **MR. GONZALEZ:** So, your Honor, what you just described, in my opinion, is
17         classic joint interest material because—
18
           **THE COURT:** The magistrate judge ought to take a very, very close look at your
19         position.
20
           **MR. GONZALEZ:**  Understood, Your Honor.  Understood.  But if what we're
21         describing is something like that, where the acquiring company is trying to do the
           right thing, such as in the hypothetical you just mentioned, putting things in a
22         vault so that we never get it, that's why you have the joint interest privilege.
23
           **THE COURT:**  I don't think that's correct, in my view.  That's not what it's for.
24         But that's for the magistrate judge to decide.

25  (5/3/2017 Public Hr'g Tr. 52:6-53:8.)  Defendants' expansive understanding of privilege – as

26  revealed in response to Judge Alsup's hypothetical – is not supportable.  There is "no binding

27  authority" to support the notion that litigants can "abuse" privilege to conceal whatever they like

28

1   "so long as they cleverly passed it on as part of 'due diligence.'"  (Dkt. 202 at 10.)

2       **A.**    **Defendants' Incomplete Record Does Not Justify The Claimed Privileges**

3       Even the limited information that Defendants provided in opposition to Waymo's motion –

4   which was cherry-picked to reflect what Defendants thought was most helpful while omitting what

5   they deemed to be unhelpful – makes clear that Defendants have not come anywhere near meeting

6   their burden to establish the asserted privileges.

7       For example, contrary to Defendants' statement that "Otto, its founders, and Uber . . .

8   jointly retain[ed] Stroz to investigate potential claims that Google may have" (Opp. 15), the

9   evidentiary record submitted by Defendants reveals that Mr. Levandowski and Mr. Ron did ***not***

10   participate in retaining Stroz and did ***not*** have a common interest with those who did.  Only

11   Uber/MoFo and Otto/OMM (not Mr. Levandowski, Mr. Ron, or their counsel) engaged Stroz

12   (Dkt. 370-3 at 1); the Stroz engagement was for the purpose of ***investigating*** Mr. Levandowski,

13   Mr. Ron, and other former Waymo employees (Dkt. 370 ¶ 9); Stroz communicated substantively

14   about its ongoing investigation only with MoFo and OMM (not with Mr. Levandowski, Mr. Ron,

15   or their attorneys) (*id.* ¶ 16); Ottomotto, Otto Trucking, and Mr. Levandowski did ***not*** permit Stroz

16   to share their attorney/client communications with Uber/MoFo (Dkt. 370-3 at 3); and Stroz had to

17   seek permission from Mr. Levandowski – which Mr. Levandowski only sometimes granted – to

18   share information uncovered in the investigation with Uber/MoFo (Dkt. 380 ¶ 7).  None of these

19   facts supports Defendants' conclusory assertion that all of these actors had a common legal

20   interest.  To the contrary, these facts show that those doing the investigating and those being

21   investigated were protecting their own, personal interests vis-à-vis the group and third parties.

22       As another example, Uber makes a point of stating that it authorized the Stroz

23   investigation[4] "prior to any understanding of the facts informing" the "litigation risks that the

24   proposed acquisition presented."  (Dkt. 378 ¶ 10.)  Uber should not be heard to both disclaim

25   knowledge of the facts informing purported litigation risks and seek to conceal those same facts

26   _____

27   [4]   Defendants provide no date for this "authorization," though it now seems clear that Defendants ███████████████████████████████████████████████.  (*Compare* Ex. 9

28   (dated February 22, 2016), *with* Dkt. 370-3 (dated March 4, 2016).)

based on purported litigation risks.   Moreover, Uber's assertion begs the question of how the interests of various purported members of the common interest group fluctuated over time.  What exactly did Uber know about Mr. Levandowski's theft of Waymo's confidential and proprietary documents and when did it know it?  Were Uber's and Mr. Levandowski's interests aligned with respect to that theft from the start or did their interests diverge once Uber gained "any understanding of the facts informing the litigation risks"?  Defendants' record provides no answer.

Similarly, Defendants contend that Otto Trucking was initially an acquisition target but was not ultimately acquired by Uber.  Although Otto Trucking is a purported member of the common interest group, Defendants provide no information regarding the purpose of Otto Trucking's receipt of any due diligence materials or its alleged change in status with respect to the acquisition.  Did Otto Trucking's interests change vis-à-vis Waymo when the decision was made that Otto Trucking would not be acquired?  Again, the record is silent.

The Court in this case made clear that Defendants' burden was to establish that each and every recipient of the due diligence materials had a common legal interest related to those materials.  But the limited evidence submitted by Defendants only raises doubts as to how that could have possibly been the case.  Such a record is insufficient to justify the asserted privileges.

**B.      The Acquisition Documents Confirm That Uber's Conduct Is Not Privileged As A Matter Of Law**

This Court previously anticipated the possibility that Uber asked Mr. Levandowski to disclose information to Stroz, so that Uber could "evaluate the extent to which Levandowski would arrive with attendant liabilities."  (Dkt. 202 at 10.)  And that Mr. Levandowski, in turn, "transferred any incriminating documents to [Stroz] . . . for the purpose of selling his ventures to Uber for $680 million."  (*Id.* at 11.)  The Court intimated that such a scenario would not be privileged, as it would constitute due diligence related to a commercial transaction between parties on opposing sides.  (*See id.* at 10.)  Of course the actual facts here are much more troubling, as

██████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

(Ex. 9 at Exh. C), and Defendants appear to have set up the purported "due diligence" protocol to conceal ████████████████████████  But this more

1    nefarious scenario does not change the conclusion that, as a matter of law, no privilege applies.

2           To try to argue otherwise, Defendants heavily rely on Judge Alsup's opinion in *Rembrandt*

3    *Patent Innovations, LLC v. Apple Inc.*, No. C 14-05093 WHA, 2016 WL 427363 (N.D. Cal. Feb.

4    4, 2016).  But that case actually supports Waymo's position.  *Rembrandt* held that, before a

5    purchaser had acquired a binding option from inventors to purchase their patent, communications

6    between these parties could not be protected by the common interest doctrine.  *Id.* at *8.  "At that

7    point, Rembrandt's interest was in pitching the value of a business partnership to the named

8    inventors and possibly in highlighting concerns about invalidity and title in order to drive down

9    the price" – which was an interest assuredly not shared by the inventors.  *Id.*  The same logic

10   applies here.  Unless there was a concerted plan for all purported members of the common interest

11   group – including Uber, Otto, Mr. Levandowski, and Mr. Ron – to steal Waymo's trade secrets

12   (which the circumstantial evidence suggests and in which case the crime-fraud exception applies),

13   those entities and individuals would have had starkly divergent interests vis-à-vis Waymo in the

14   period before the acquisition closed.[5]  And Mr. Levandowski and Mr. Ron – the subjects of the

15   Stroz investigation – clearly had unique personal interests vis-à-vis those who were investigating

16   them and vis-à-vis third parties who might be interested in the results of the investigation.

17          Even if Defendants were to argue that the acquisition was effectively a done deal by the

18   time the due diligence materials were circulated among the group (an argument unsupported by

19   the record), there still would not be a common legal interest here.  This can be seen by the way in

20   which the litigation against Waymo has actually unfolded:  the legal interests of at least Mr.

21   Levandowski and Uber are certainly not common.  Mr. Levandowski has broadly taken the Fifth

22   Amendment to protect himself against self-incrimination while exposing Uber to possible adverse

23   inferences.  Uber purportedly took steps to ***remove*** Mr. Levandowski from responsibilities for

24   which he was originally hired even before the Court issued its Order enjoining Mr. Levandowski

25

26   [5]  The Court has recognized this, stating: "I have been in this job a long time.  I have seen many
     cases involving acquisitions, but I have never heard of an acquisition itself being cloaked in
27   secrecy every -- ***because you're really on adverse sides.  It's a business deal.***"  (5/3/17 Public
     Hr'g Tr. at 47:24-48:3 (emphasis added).)

28

1  from working Uber's LiDAR technology (Dkt. 433 at 7-8).  And the Court's preliminary

2  injunction Order makes clear that Uber can threaten Mr. Levandowski with termination of his

3  employment should he fail to return the "14,000-plus pilfered files" to Waymo.  (*Id.* at 23 n.9.)

4          Needless to say, these divergent interests existed and were readily apparent at the time the

5  purportedly privileged materials were circulated to Uber, Mr. Levandowski, and others in August

6  2016.  Indeed, this Court recognized at the very outset of this litigation that Mr. Levandowski had

7  vastly different legal interests from Uber, suggesting that Mr. Levandowski may need his own

8  counsel.  (3/16/17 Hr'g Tr. at 16:16-17:3.)  And Defendants' counsel acknowledged that there was

9  a "conflict" with respect to their representation of both Defendants and Mr. Levandowski.

10  (3/29/17 Hr'g Tr. at 17:15-20.)  In sum, all of the dynamics that make clear that Uber and Mr.

11  Levandowski have divergent legal interests in this case would have been equally apparent in

12  August 2016, when the parties were discussing the theft of Waymo's confidential design server

13  and other proprietary documents in the context of purported "due diligence."[6]

14      **C.    Defendants Do Not Even Submit The Declarations They Concede Are**
              **Necessary To Make A Prima Facie Showing That The Asserted Privileges**
15            **Apply And Were Not Waived**

16          In connection with any opposition to Waymo's motion to compel, the Court ordered

17  

18  ───────────────

   [6]   In their Opposition, Defendants only cite cases in which the parties to a common interest

19  agreement would actually pursue a joint defense as opposed to the divergent legal defenses that

    Uber and Mr. Levandowski are pursuing here.  For example, in *Hewlett-Packard Co. v. Bausch &*

20  *Lomb, Inc.*, 115 F.R.D. 308, 310 (N.D. Cal. 1987), there was a common interest between a

    corporate buyer and seller with respect to possible future patent litigation because "they could be

21  expected to conduct a joint defense on all the liability issues."  *Id.* at 310; *see also FastVDO LLC*

    *v. AT&T Mobility LLC*, No. 16-CV-385-H (WVG), 2016 WL 6138036, at *4 (S.D. Cal. Oct. 21,

22  2016) ("[T]he Subject Documents, the final agreement signed by Boeing and Plaintiff, and other

    documents lodged with the Court clearly demonstrate that the parties had, at the time of the

23  communication of the Subject Documents, a common legal interest.  This legal interest was

    ultimately aligned with a final agreement regarding the asserted patent."); *Morvil Tech., LLC v.*

24  *Ablation Frontiers, Inc.*, No. 10-CV-2088-BEN BGS, 2012 WL 760603, at *3 (S.D. Cal. Mar. 8,

    2012) ("AFI and Medtronic shared common legal interests in whether the products that AFI and

25  Medtronic would market infringed third party IP, and the communications addressing the scope of

    the IP certainly were designed to further that interest."); *FTC v. Abbvie, Inc.*, No. CV 14-5151,

26  2015 WL 8623076, at *12 (E.D. Pa. Dec. 14, 2015) ("Having signed an agreement to acquire

    Solvay on September 26, 2009, Abbott and Solvay shared a common interest in litigation

27  concerning Solvay products when these emails were exchanged in October 2009.").

28

1    Defendants to "submit a proper sworn record as to all necessary predicates" for their privilege

2    assertions.  But whether one looks to the story told by Defendants in their opposition or the story

3    told by the acquisition agreements, the fact is that Defendants submitted no sworn declaration

4    from Mr. Ron, Mr. Levandowski, or OMM, even though each received all 42 of the logged "due

5    diligence" documents.  For this reason as well, Defendants have not carried their burden of

6    establishing that the asserted privileges "appl[y] and ha[ve] not been waived."  (Dkt. 202 at 5;

7    4/6/17 Hr'g Tr. at 36:1-4 ("Ordinarily if there's a claim of privilege, we look to see every single

8    person who got the information because there could easily be a waiver.  It happens all the time.").)

9           Defendants offer no explanation or justification for why they did not submit a sworn

10   declaration from Mr. Ron.  The absence of such a declaration is particularly problematic, given

11   that Mr. Ron was a *target* of the Stroz investigation that Defendants contend they authorized.  The

12   declaration from Mr. Ron's counsel, Ms. Baker, does not solve the problem.  For example, with

13   respect to whether Mr. Ron disseminated the due diligence report – a critical point that must be

14   supported by the sworn record in order for Defendants to prevail here (4/6/17 Hr'g Tr. at 36:1-

15   16) – Ms. Baker states only: "I have no reason to believe, and do not believe, that Mr. Ron has, at

16   any time, failed to keep the Due Diligence Report and exhibits thereto confidential."  (Dkt. 375 ¶

17   17.)  Ms. Baker apparently has no personal knowledge of Mr. Ron's activities since receiving the

18   purportedly privileged documents – her declaration does not even state that she *spoke* to Mr. Ron

19   regarding his efforts, if any, to keep those documents confidential.  Her statement that she has "no

20   reason to believe" Mr. Ron waived confidentiality is essentially meaningless.  *See United States v.*

21   *Wallace*, 961 F. Supp. 969, 976 (N.D. Tex. 1996).

22          Similarly, Defendants offer no declaration from Mr. Levandowski, another *target* of the

23   Stroz investigation that Defendants contend they initiated and one whose interests were *not*

24   aligned with Defendants' interests with respect to the Stroz investigation.  (*See supra* II.A & Dkt.

25   380 ¶ 7 (noting that Mr. Levandowski did *not* permit Stroz to share information uncovered in the

26   investigation with Defendants or with Mr. Ron).)  The declaration from Mr. Levandowski's

27   corporate counsel does not state *any* belief as to whether Mr. Levandowski maintained the

28

1  confidentiality of the purportedly privileged materials, and Mr. Levandowski did disclose those

2  materials at least to his criminal counsel, non-parties to any alleged joint defense agreement.

3      Although Mr. Levandowski moves for leave to submit a declaration *in camera*, Mr.

4  Levandowski cites ***no*** authority that supports his request.  This is not a criminal proceeding in

5  which Mr. Levandowski faces a Hobson's choice between two fundamental constitutional rights

6  or even between a constitutional right and the attorney-client privilege.  Here, Mr. Levandowski

7  chose – voluntarily – to disclose information to Stroz, Uber, and others "for the purpose of selling

8  his ventures to Uber for $680 million" (Dkt. 202 at 11).  Defendants should not now be excused

9  from having to establish the predicates for a privilege "merely because [those predicates] might

10  connect the dots back to a non-party in a possible criminal investigation."  (*Id.* at 12.)

11      Finally, Defendants concede that they were required to submit a declaration from OMM in

12  order to comply with the Court's order that they "submit a proper sworn record as to all necessary

13  predicates" for their privilege assertions.  (Opp. at 3 n.2.)  OMM is identified as a recipient of all

14  the purportedly privileged documents.  (Dkt. 370-4.)  Accordingly, a declaration from OMM

15  would need to address, OMM's purported representation of Ottomoto and Otto Trucking, the

16  nature of the asserted common interest privilege that OMM, Ottomoto, and Otto Trucking

17  purportedly shared with the other recipients of the due diligence report, and any efforts OMM

18  made and continue to make to limit the dissemination of the documents at issue.  Defendants state

19  that "OMM would not provide that declaration . . ."  (Opp. at 3 n.2.)  Although Defendants try to

20  cast blame on "Waymo's counsel" for refusing to assist Defendants in obtaining such a declaration

21  (*id.*), Waymo's counsel certainly did not stand in the way of OMM contacting OMM's client,

22  Google, regarding any conflicts issues (indeed, Waymo's counsel suggested just that to

23  Defendants' counsel) or otherwise stand in the way of OMM submitting a declaration regarding

24  any issues it deemed appropriate.  Waymo does not have an obligation to assist Defendants in

25  obtaining declarations necessary to support ***their*** claims of privilege.

26      Defendants' failure to submit declarations from Mr. Ron, Mr. Levandowski, and OMM is

27  an independent reason for finding that Defendants did not meet their burden to establish the

28

1  applicability of the asserted privileges and the lack of any waiver thereof.

2  **III.   EVEN IF THE LOGGED DOCUMENTS WOULD OTHERWISE BE PROTECTED, THE CRIME-FRAUD EXCEPTION APPLIES**

3          No one in this case has ever disputed that Mr. Levandowski – purported joint holder of the

4  alleged "common interest" – stole Waymo's confidential and proprietary materials or that stealing

5  confidential and proprietary materials is a crime.  Indeed, Mr. Levandowski has broadly asserted

6  his right against self-incrimination in this case, which has now been referred to the U.S. attorney's

7  office for investigation (Dkt. 428).  As summarized in the Restatement (Third) of the Law

8  Governing Lawyers (§ 82 cmt. e), for crimes like theft that have continuing legal consequences,

9  "[c]onfidential communications concerning ways in which Client can continue to possess the

10  stolen goods, including information supplied by Client about their present location, are not

11  protected by the privilege because of the crime-fraud exception."  Communicating for the purpose

12  of concealing evidence of a crime also constitutes obstruction of justice, making the crime-fraud

13  exception to the attorney-client privilege applicable.  *United States v. Laurins*, 857 F.2d 529, 540

14  (9th Cir. 1988) ("Obstruction of justice is an offense serious enough to defeat the privilege."); *see*

15  *also United States v. Edison*, No. CR 07-0074, 2008 WL 170660, at *4 (N.D. Cal. Jan. 17, 2008)

16  (Alsup, J.) (holding that under the crime-fraud exception, "conversations that furthered ongoing

17  efforts to obstruct justice would not be protected").[7]

18          Here, Defendants cannot dispute that the logged materials are related to the theft of

19  Waymo's proprietary and confidential materials.  *See In re Napster, Inc. Copyright Litig.*, 479

20  F.3d 1078, 1095 (9th Cir. 2007), *abrogated on other grounds by Mohawk Indus., Inc. v.*

21  *Carpenter*, 558 U.S. 100 (2009).  Defendants themselves logged those materials in response to

22  Judge Alsup's March 15 Order that Defendants produce the stolen materials – *i.e.*, "all files and

23  documents downloaded by Anthony Levandowski, Sameer Kshirsagar, or Radu Raduta before

24  leaving plaintiff's payroll and thereafter taken by them" – as well as all documents that reference

25  the stolen materials.  (Dkt. 61 ¶ 4.)

26

27  [7]  Communications in furtherance of receiving stolen property in violation of California Penal Code 496 would also be a sufficient predicate for invoking the crime-fraud exception.

28

1    Moreover, a preponderance of the evidence indicates that the logged communications were

2  "made 'in furtherance of [the] intended, or present, continuing illegality.'" *Napster*, 479 F.3d at

3  1095 (citation omitted).  Indeed, Defendants' claim that "Waymo has **zero** evidence that Uber or

4  Otto ever knew about," much less furthered a continuing illegality (Opp. at 18), does not pass the

5  straight-face test.  As an initial matter, even Defendants' otherwise deficient privilege log makes

6  clear that the due diligence documents relate to at least the possession and location of stolen

7  materials, as Stroz itself apparently received those stolen materials for review in its investigation

8  (*e.g.*, Dkt. 370-4 at No. 10 (referring to "electronic media collected from A. Levandowski")).

9  More tellingly, Judge Alsup has already found that:

> Waymo has made a strong showing that Levandowski absconded with over 14,000
> files from Waymo, evidently to have them available to consult on behalf of Otto
> and Uber.  As of the date of this order, those files have not been returned and likely
> remain in Levandowski's possession.  The record further indicates that Uber knew
> or at least should have known of the downloading but nevertheless proceeded to
> bring Levandowski and Otto on board.  Even after this litigation commenced, Uber
> kept Levandowski as the head of its self-driving efforts until his "recusal" from
> LiDAR development on the day before defendants' sur-reply in opposition to
> provisional relief.
>
> Defendants maintain that Waymo's files never crossed over to Uber's servers or
> devices and that "Uber took strict precautions to ensure that no trade secrets
> belonging to a former employer would be brought to or used at Uber."  These
> denials, however, leave open the danger of all manner of mischief.  For example, it
> remains entirely possible that Uber knowingly left Levandowski free to keep that
> treasure trove of files as handy as he wished (so long as he kept it on his own
> personal devices), and that Uber willfully refused to tell Levandowski to return the
> treasure trove to its rightful owner.  At best (and this has *not* been shown), Uber
> may have required Levandowski, as a matter of form, to commit not to use the
> Waymo files.  But even if Levandowski so agreed, his word under these
> circumstances would be cold comfort against the danger of trade secret
> misappropriation for Uber's benefit.

(Dkt. 433 at 7-8 (citations omitted).)  And the documents that Defendants were withholding until

after the issuance of the preliminary injunction order confirm that Uber and Otto not only knew

about Mr. Levandowski's theft but – at best – did absolutely nothing about it.

The Stroz investigation was specifically directed to ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.  (*See, e.g.*, Ex. 10

1   § 2.1(a).)  But, despite its knowledge of ████████ Uber did not require the files to be

2   returned to Waymo; Uber did not require that any existing technology at Ottomoto be scrubbed for

3   Waymo trade secrets; Uber did not require that Mr. Levandowski's consulting work for Uber to be

4   scrubbed for Waymo trade secrets; Uber did not ensure that Mr. Levandowski did not keep

5   Waymo's files handy on his personal devices; and Uber did not make Levandowski commit not to

6   use the Waymo files even as a matter of form.  By failing to take *any* remedial or prophylactic

7   measures whatsoever with respect to Mr. Levandowski's ████████ Uber ratified and furthered

8   those ████████████████████ for its own benefit.  Indeed, Uber

9   *incentivized* Mr. Levandowski to use Waymo's stolen files by tying his compensation to

10  aggressive technology milestones.  (*E.g.*, Dkt. 248-19.)  Defendants should not be permitted to

11  rely on any privilege regarding Mr. Levandowski's ████████ under such circumstances.

12          Of course, further supporting the existence of the crime-fraud exception is Mr.

13  Levandowski's across-the-board assertion of the Fifth Amendment (*see generally* Dkt. 273).

14  *Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 428 (S.D.N.Y. 2013) ("Courts have drawn

15  [adverse inferences from invocation of the Fifth Amendment] when determining if the crime-fraud

16  exception applies to evidence protected by the attorney-client privilege or work-product

17  doctrine.").[8]  Mr. Levandowski now says that he cannot even submit a declaration that some sort

18  of common interest with Uber ever existed because, apparently, admitting the fact of the common

19  interest would incriminate him.  (Dkt. 382 at 4 ("Mr. Levandowski cannot fully explain to the

20  Court the basis for the application of the common interest, attorney-client, or work product

21  privileges to the communications at issue without risking a waiver of his Fifth Amendment

22  privilege against self-incrimination.").)  Under these circumstances, an adverse inference that

23  ────────────────

[8]  Defendants ignore most of Waymo's authority that an assertion of the Fifth Amendment

24  properly results in an adverse inference for purposes of the crime-fraud analysis.  Defendants also

25  fail to distinguish *United States v. Saccoccia*, 898 F. Supp. 53, 62 (D.R.I. 1995), which held that a
    claim of attorney-client privilege is logically inconsistent with a Fifth Amendment claim over the
    same information.  Although Defendants argue that *Saccoccia* involved an *attorney*, as opposed to

26  a client, asserting the Fifth Amendment, the Ninth Circuit has made clear that an attorney's

27  knowledge or involvement in the criminal activity is not necessary to establish the crime-fraud
    exception.  *Laurins*, 857 F.2d at 540.

28

1   further supports the application of the crime-fraud exception is appropriate.[9]

2   **IV.    DEFENDANTS DO NOT DISPUTE THAT THEY SHOULD BE COMPELLED TO
3          PRODUCE ALL DOCUMENTS AND FORENSIC DATA PROVIDED TO STROZ
          FOR USE IN ITS INVESTIGATION**

4              As explained in Waymo's Motion, Defendants should also be compelled to produce all

5   documents and forensic data that Mr. Levandowski or others provided to Stroz for use in its

6   investigation.  (Dkt. 321 at 15:24-16:5.)  Indeed, this issue was even called out in the Notice of

7   Waymo's motion.  (*Id.* at (i) (requesting "that the Court compel production of the withheld report

8   and attachments *in addition to all other relevant information, files, and electronic media*

9   *currently in the possession of Stroz Friedberg.*" (emphasis added)).)  Notably, the Court's March

10  16 discovery order already required Defendants to produce any of Mr. Levandowski's

11  information, files, and media that remain in the possession of Uber or its agents, or to alternatively

12  provide a statement regarding the extent to which such materials have been deleted, destroyed, or

13  modified.  (Dkt. 61 at 2.)  Defendants' refusal to produce these materials, despite the Court's

14  discovery order and Waymo's explicit request for these materials, is unjustifiable.

15             Defendants' Opposition does not address these materials at all.  Defendants' Opposition

16  never argues that the full set of documents and data provided to Stroz are privileged or

17  protected.  Nor do Defendants dispute that Stroz is their agent such that they can compel

18  production of those materials in this case.  Thus, there appears to be no dispute that these materials

19  should be produced in full.  *I-Enterprise Co. v. Draper Fisher Jurvetson Mgmt. Co. V*, No. C-03-

20  1561, 2005 WL 1661959, at *14 (N.D. Cal. July 15, 2005) (non-movant's failure to address an

21  issue in its opposition brief "effective concedes" the issue).

22             Nor *could* there be any dispute that these materials are not privileged and should be

23  produced.  Defendants' Opposition states again and again that Stroz was retained to investigate

24  facts.  (*E.g.*, Opp. at 1:13-16; 3:8-11; 5:9-11; 6:1-2; 7:16-19; 13:21-14:1; 22:19.)  Facts are not

25  privileged.  (Dkt. 202 at 9:22-10:1 (*citing Upjohn Co. v. United States*, 449 U.S. 383, 395-96

26  ─────────────
    [9]   There is sufficient evidence of both Mr. Levandowski's theft (Dkt. 433 at 1-2; 5/3/17 Hr'g Tr.
27  Public AM 75:22-76:1)  and Uber's complicity therein (Dkt. 433 at 2; Exs. 9-11) to justify the
    Court drawing adverse inferences here.  (Dkt. 245-4 at 10-12.)
28

1   (1981) ("The [attorney-client] privilege only protects disclosure of communications; it does not

2   protect disclosure of the underlying facts by those who communicated with the attorney.").)  The

3   underlying documents and forensic data provided to Stroz for use in its investigation are classic

4   factual material that must be produced.

5   **V.   WAYMO HAS SHOWN THE REQUISITE NEED FOR THE LOGGED DOCUMENTS**

6       Defendants have not rebutted Waymo's showing that Defendants should be compelled to

7   produce the documents due to Waymo's substantial and compelling need, even if they were

8   privileged and even if the privilege had not been made.

9       As an initial matter, Defendants have not established that every document on their 42-entry

10  log is "opinion work product," thereby raising the standard for compelling their production.  (Opp.

11  at 22-23.)  Defendants' own declarant states that the logged exhibits to the due diligence report are

12  "documents collected by Stroz" and "interview memoranda."  (Dkt. 370 ¶ 23.)  But the mere fact

13  that a document was "collected by Stroz" cannot transform that document into ***any*** type of work

14  product.  And "interview notes" are commonly classified as "fact" work product.  *In re*

15  *Healthsouth Corp. Secs. Litig.,* 250 F.R.D. 8, 12 (D.D.C. 2008).  Neither Defendants' log nor their

16  Opposition demonstrate that the contents of purported "interview memoranda" include any

17  attorney opinion.  To the contrary, the interviews were performed by Stroz Friedberg, not

18  Defendants' counsel, and they were not part of a business transaction, all of which weighs in favor

19  of a finding that the documents at issue reflect "fact" not "opinion" work product.[10]

20      Defendants next fail to persuasively distinguish authority holding that a witness'

21  invocation of the Fifth Amendment privilege creates a need for production of work product related

22  to that witness.[11]  (Opp. at 23.)  Mr. Levandowski should not be permitted to make statements

23

24  _____

    [10]   *See In re Vitamins Antitrust Litig.*, 211 F.R.D. 1, 5 (D.D.C. 2002).

25  [11]   Defendants argue that the reasoning in *In re John Doe Corp.*, 675 F.2d 482, 492 & n.10 (2d
    Cir. 1982), applies only to "fact" not "opinion" work product.  Defendants similarly attempt to
26  limit *In re Crazy Eddie Secs. Litig.*, No. 87 CV 0033 (EHN), 1991 WL 17287, at *1 (E.D.N.Y.
    Jan. 28, 1991) and *In re Vitamins Antitrust Litig.*, 211 F.R.D. 1, 5 (D.D.C. 2002), to "fact work
27  product."  But Defendants' own record establishes that at least some of the logged documents are
    "interview memoranda" and "documents collected," (Dkt. 370 ¶23), *i.e.*, "fact work product."
28

1    about his ██████ when it suits him – *i.e.*, for the purpose of selling his company for $680

2    million – while shielding those same statements from discovery here.

3         Finally, Defendants cite *Holmgren v. State Farm Mutual Auto Ins. Co.*, 976 F.2d 573, 577

4    (9th Cir. 1992), to argue that opinion work product can only be compelled where "mental

5    impressions" are at issue.  (Opp. at 24.)  Here, Defendants' mental impressions ***are*** at issue.

6    Waymo has alleged that Defendants' misappropriation is intentional, knowing, willful, malicious

7    and fraudulent.  (Dkt. 23 ¶¶ 75, 86.)  And since Mr. Levandowski is an employee and officer at

8    Uber and a central perpetrator of the theft, his mental impressions in particular are at issue.

9         In light of Mr. Levandowski's broad assertion of the Fifth, the withheld documents may be

10   the only source for highly relevant information here; Defendants have identified no alternative.

11   **VI.   DISCOVERY**

12        Defendants should be compelled to provide discovery related to the privileges they have

13   asserted over the due diligence materials – they should be required to provide un-redacted versions

14   of the agreements they cite in their opposition; they should be required to provide still-withheld

15   documents cited in their opposition; witnesses should be subject to depositions about the

16   declarations they have submitted; and so on.  As indicated in its motion, Waymo requests leave to

17   conduct discovery on these fronts outside the to-be-determined limits on discovery in this case.

18        But that discovery is not needed to grant Waymo's motion.  Defendants have been

19   preparing their positions on this 42-entry privilege log since before the March 29 hearing they

20   initiated to discuss it.[12]  Defendants chose to provide an insufficient log, even after receiving

21   guidance from Judge Alsup and requests for additional information from Waymo.  And they chose

22   to provide a sworn record that falls short of their burden to establish that any privileges apply and

23   that there has been no waiver.  Discovery is closing in a little over two months.  Defendants

24   should be compelled to produce the due diligence materials now, without further delay.

25   _____

26   [12]   As the Court has described:  "On March 29, at Uber's cryptic request, the Court convened a
     non-public conference at which separate counsel appeared for Levandowski.  At that conference,
     defense counsel explained, 'Before the acquisition [of Otto] some due diligence was done.  A third
27   party prepared a report based on that due diligence.  We intend to put that report on  a privilege
     log.'"  (Dkt. 433 at 6.)

28

1

2    DATED:  May 16, 2017                    QUINN EMANUEL URQUHART & SULLIVAN,
                                            LLP
3
                                            By  *Charles K. Verhoeven*
4                                               Charles K. Verhoeven
                                                Attorneys for WAYMO LLC
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28