# EXHIBIT 9
# FILED UNDER SEAL

EXECUTION COPY

# PROJECT ZING
## Draft Term Sheet

*Date: 5:00 PM PST, February 22, 2016*

This term sheet (the "**Term Sheet**") is a summary of certain indicative terms of a proposed acquisition of Ottomotto Inc., a Delaware corporation (the "**Company**"), by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (together with its affiliates, "**Unicorn**"), as further described herein.

| | |
|---|---|
| **Transaction Parties:** | <ul><li>Company</li><li>Unicorn</li><li>Uber</li></ul>It is understood and agreed that Uber, in addition to Unicorn, will be a party to the Put Call Agreement for purposes of guaranteeing the obligations of Uber and Unicorn under the Put Call Agreement (e.g., indemnification, representations and warranties, agreements regarding closing conditions, obligations to fund operating plans and budgets, etc.).  In accordance with the preceding sentence, references to Unicorn in this Term Sheet shall also be deemed to include references to Uber in all such contexts. |
| **Structure:** | Unicorn will directly or indirectly acquire 100% ownership of the equity securities of the Company based on the transaction structure and other terms and conditions set forth in this Term Sheet (the "**Transaction**").<br><br>As of or promptly following the date hereof, the Company holds both (i) the business of the development or commercialization of consumer autonomous vehicles and related services (the "**Consumer Business**"), and (ii) the Trucking Business (as defined in Exhibit D). Following the consummation of the Transaction, the Company will be a direct or indirect wholly-owned subsidiary of Unicorn.<br><br>Prior to signing the Put Call Agreement (as defined below), the Company will (i) designate two series of units in order to achieve the parties desired economics regarding the allocation of (x) the Milestone RSUs (as defined below) with respect to the Consumer Business and (y) the Trucking Company Pool (as defined below) with respect to the Trucking Business, (ii) form a new Delaware limited liability company that operates the Trucking Business (the "**Trucking Company**"), or (iii) mutually agree with Unicorn on another transaction structure that achieves the same desired economics and has substantially similar tax consequences (including a structure whereby a separate put call arrangement exists for each of the Company and the Trucking Company) (an "**Alternative Structure**"). If the Trucking Company is formed, all intellectual property related to the Consumer Business will be transferred from the Company to, and be held by, the Trucking Company, and the parties will mutually agree to adjust the transaction structure as necessary to ensure that the Transaction includes the |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

acquisition of the Trucking Company (in addition to the Company).

Prior to signing the Put Call Agreement, Unicorn will complete all of the due diligence in accordance with <u>Exhibit C</u>. Subject to any Alternative Structure, the Transaction shall be structured as follows:

- As promptly as practicable after the date hereof, Unicorn and the Company will enter into a definitive Put / Call Agreement (the "**Put Call Agreement**").
- Either attached to the Put Call Agreement will be an acquisition agreement (which will provide for a stock purchase, merger or other transaction structure mutually agreed by the parties, whereby Unicorn acquires 100% ownership of the equity securities of the Company) in a form mutually agreed upon between the parties or the Put Call Agreement will itself be an acquisition agreement (in either case, the "**Acquisition Agreement**"). ██████ (i) ██████ to all employees other than Anthony Levandowski, Lior Ron and other key employees to be identified and mutually agreed upon (collectively, the "**Key Employees**") or (ii) ██████ ██████ The parties shall have the ability to update the Acquisition Agreement in good faith as mutually agreed upon based on changes to the structure of the Transaction.
- Subject to any Alternative Structure, at any time from (i) February 28, 2017 until (ii) March 31, 2017 (such date, the "**Put Call End Date**"), (x) the Company shall have the right, subject to the below, to cause Unicorn to execute the Acquisition Agreement and consummate the Transaction (the "**Put**"), subject to the "Closing Conditions" set forth below, and (y) Unicorn shall have the right, subject to the below, to cause the Company to execute the Acquisition Agreement and consummate the Transaction (the "**Call**"), subject to the "Closing Conditions" set forth below.
- Unicorn and the Company shall consummate the Transaction (the "**Closing**") as promptly as practicable after the exercise of the Put or the Call (as applicable); ██████████████████
- ██████████████████

| | |
|---|---|
| **Consideration /** | At the Closing, Unicorn will pay the Company a mutually agreed upon |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

| | |
|---|---|
| **Employment Arrangements:** | amount that is no greater than ██████████ (such amount, the "**Cash Consideration**") for 100% of the equity securities of the Company ██ ████████████████████████████████████████████████████<br><br>Additionally, at the Closing, employees of the Company who accept employment offers with Uber will receive:<br><br>• Base salary in accordance with Uber's customary practices; and<br>• In the aggregate, a pool of restricted stock units of Uber Technologies, Inc., a Delaware corporation ("**Uber**") with respect to shares of Uber's Common Stock ("**RSUs**"), which shall be allocated by the Company in accordance with, and which shall be determined in accordance with, the terms set forth in <u>Exhibit A</u>.<br><br>After the date hereof, the parties and their respective counsel will explore in good faith alternative mutually beneficial transaction and compensation structures (i.e. earn-outs for the Trucking Company Pool, restricted stock, formation of trusts, etc.) with the objective of being tax-efficient for the employees and stockholders of the Company.<br><br>Anthony Levandowski's employment agreement with Uber shall provide that he shall report to Jeff Holden. |
| **Put / Call Closing Conditions:** | The exercise of the Put by the Company will be subject to the Company providing to Unicorn an officer's certificate certifying the satisfaction of the following conditions (the "**Put Conditions**"), which such Put Conditions shall also be satisfied immediately prior to the consummation of the Transaction; ████████████████████████████████████████████████████████████████████████████████████████████████████████<br><br>• A customary bring down of representations and warranties with respect to the Company and stockholders (if applicable depending on the structure) set forth in the Put Call Agreement and/or Acquisition Agreement, except as would not have a material adverse effect (other than certain fundamental representations and warranties, which will be brought down to a more stringent standard as mutually agreed by the parties in definitive documentation); provided, that, other than (i) with respect to fundamental representations and warranties or (ii) ██ ████████████████████████████████████████████████████████████<br><br>• Except as explicitly set forth in <u>Exhibit C</u>, all of the covenants of the |

3



EXECUTION COPY

Company and stockholders (if applicable depending on the structure) in the Put Call Agreement and/or Acquisition Agreement shall have been performed and/or complied with in all material respects;

███████████████████████████████████

- No material adverse change with respect to the Company; ████

███████████████████████████████████

- No material claims or litigation with respect to the Company, including without limitation the Company's intellectual property (including claims of infringement or misappropriation of any intellectual property of any third party) or with respect to any of the Key Employees;

███████████████████████████████████

- All governmental approvals or authorizations with respect to the Transaction (including HSR, if required) have been obtained;

- No (i) injunctions prohibiting the Transaction or (ii) legal proceedings brought by governmental entities prohibiting the Transaction;

- The Company has not received capital, financing or other funding from any third party other than (i) Unicorn or (ii) employees of the Company, including the Key Employees;

- Unless mutually agreed by the parties, execution and delivery to Uber (and non-revocation) by ████ employees of the Company (which such ████ employees shall include all of the Key Employees) (i) an employment offer letter on terms and conditions acceptable to Uber, which such offer letter will include, among other things, base salary, benefits and equity incentive grants (with customary vesting terms over four years beginning on employee's start date at the Company) in accordance with Uber's customary practices), and (ii) Uber's standard form of employee proprietary information and inventions assignment agreement;

- Receipt by Unicorn of any material third-party consents (if any)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

| | |
|---|---|
| | mutually agreed between the parties; and |
| | • Other customary conditions as mutually agreed upon by Unicorn and the Company. |
| | In the event Unicorn exercises the Call, the Company shall promptly, but in any event within five (5) business days, provide an officer's certificate certifying the satisfaction of the Put Conditions, which, if not provided by the Company, Unicorn shall have the option, in its sole discretion, to either (i) consummate the Transaction or (ii) cancel and nullify the Call in all respects. The Put Conditions shall also be satisfied as of immediately prior to the consummation of the Transaction. |
| | The exercise of the Call by Unicorn will be subject to Unicorn providing to the Company an officer's certificate certifying the satisfaction of the following conditions (the "**Call Conditions**"), which such Call Conditions shall also be satisfied immediately prior to the consummation of the Transaction: |
| | • A customary bring down of representations and warranties with respect to Unicorn set forth in the Put Call Agreement and/or Acquisition Agreement; |
| | • All of the covenants of Unicorn in the Put Call Agreement and/or Acquisition Agreement shall have been performed in all material respects; |
| | • All governmental approvals or authorizations with respect to the Transaction (including HSR, if required) have been obtained; |
| | • No (i) injunctions prohibiting the Transaction or (ii) legal proceedings brought by governmental entities prohibiting the Transaction; and |
| | • A certificate as to capitalization of Uber certifying that the RSUs in the aggregate represent ███ of Uber's issued and outstanding shares of capital stock on a fully diluted basis as of ███████. |
| | In the event the Company exercises the Put, Unicorn shall promptly, but in any event within five (5) business days, provide an officer's certificate certifying the satisfaction of the Call Conditions, which, if not provided by Unicorn, the Company shall have the option, in its sole discretion, to either (i) consummate the Transaction or (ii) cancel and nullify the Put in all respects. The Call Conditions shall also be satisfied as of immediately prior to the consummation of the Transaction. |
| **Covenants / Interim** | Interim Financing |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

| | |
|---|---|
| **Financing:** | The parties agree that from the execution of the Put Call Agreement until the earlier of the Put Call End Date and the termination of the Put Call Agreement, the Company shall not seek or receive any financing (debt or equity) from any third party other than (i) Unicorn, Uberand/or (ii) employees of the Company, including the Key Employees.<br><br>Prior to signing the Put Call Agreement, Unicorn and the Company will agree on an operating plan and budget for the Company's Consumer Business and the Trucking Business prepared for each quarter from the signing of the Put Call Agreement until the later of the (i) Closing and (ii) Put Call End Date (the "**Operating Plan**"); ███████████████<br>████████████████████████████████████████<br>████████████████████ Beginning upon the signing of the Put Call Agreement, Unicorn and Uber shall be obligated to fund the Company for each quarter in advance in accordance with the Operating Plan, so long as the Operating Plan for all prior quarters (if any) has been materially complied with by the Company, or as mutually agreed upon by the parties.  Unicorn and the Company shall have the ability to amend the Operating Plan at any time by mutual written consent.<br><br>    • ████████████████████████████████████<br>       ████████████████████████████████████<br>       ████████████████████████████████████<br><br>    • ████████████████████████████████████<br>       ████████████████████████████████████<br>       ████████████████████████████████████<br><br>█████████████████████████████████████████<br>█████████████████████████████████████████<br>█████████████████████████████████████████<br>█████████████████████████████████████████<br><br><u>Other Covenants</u><br><br>In addition to any covenants set forth in <u>Exhibit C</u>, the Put Call Agreement and/or the Acquisition Agreement shall contain other customary interim |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

| | |
|---|---|
| | covenants (including with respect to exclusivity negative covenants regarding Competitive Transactions) of the Company covering the period between the dates of the Put Call Agreement and/or the Acquisition Agreement and the Closing. |
| **Representations and Warranties:** | The Put Call Agreement and/or the Acquisition Agreement will contain customary representations and warranties for a transaction of this nature. |
| ████████ | ████████████████████████████████████████████ |
| **Trucking Company:** | The parties shall agree on an earn-out whereby, after the Closing, a combination of (x) certain employees of the Company prior to the Closing and (y) employees of the Trucking Company (if formed) prior to the Closing (collectively, the "**Trucking Company Pool**") shall receive ███████████████████████████████████████████████████████████████████████████████████ ████████████████ shall be measured each fiscal year and paid to the Trucking Company Pool employees (in their respective shares) in accordance with the principals set forth herein promptly following the end of each fiscal year. In order for the profits to vest for any member of the Trucking Company Pool, ██████████████████████████████████████████████████ ██████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**



Time Vesting Condition

12/48 of the profits will vest on the one-year anniversary of each such Trucking Company Pool employee's start date with the Company, Trucking Company or Uber (whichever is earlier) and 1/48 of the profits will vest on each monthly anniversary thereafter.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

| | |
|---|---|
| | ███████████████ |
| | ████████████████████████████████ |
| | ████████████████████████ |
| | ████████████████████████████████ |
| **Confidentiality:** | Each party to this Term Sheet agrees to keep confidential the existence, status and terms of this Term Sheet in accordance with the terms of the Mutual Non-Disclosure Agreement, dated as of February 1, 2016, by and between Uber, the Company and the Founders. |
| **Exclusivity:** | Each of the Founders and the Company (each a "**Restricted Party**") shall negotiate exclusively with Unicorn with respect to the subject matter of this Term Sheet for an initial period of 45 days from the date hereof (the "**Exclusivity Period**"); provided, that the Exclusivity Period shall be automatically extended for two successive 15 day periods so long as each of Unicorn, the Company and the Founders and their respective advisors are |

EXECUTION COPY

continuing to negotiate the Transaction in good faith as of the end of each preceding period. During the Exclusivity Period no such Restricted Party shall (i) solicit, or encourage the initiation or submission of, any indication of interest, proposal or offer from any party other than Unicorn (including, without limitation, any Competitor (as defined below)) regarding (x) a transaction or other arrangement that is similar and/or competitive to the Transaction or (y) any other commercial arrangement with any Competitor (in either the case of clause (x) or clause (y), a "**Competitive Transaction**"), or (ii) participate, or engage in any discussions, negotiations or otherwise with, or provide any information to, any party other than Unicorn (including, without limitation, with any competitors of Unicorn) regarding a Competitive Transaction. "**Competitor**" shall mean party 

Each of the Restricted Parties shall immediately terminate and cease any ongoing discussions, communications or negotiations with any party (other than Unicorn) regarding a Competitive Transaction, and shall promptly provide Unicorn with an oral and a written notice of any expression of interest, inquiry, proposal or offer that (i) is in the form of a written term sheet, letter of intent, indication of interest letter or similar written document and/or (ii) relates to a possible acquisition of more than 20% of the equity interests (including via convertible debt) of the Company (which notice shall, to the extent permitted by any applicable non-disclosure agreements that were in place as of the date of this Term Sheet and remain in force as of the time of such notice, identify the other party(ies) involved, and set forth the material terms and conditions, including the amount and form of consideration and material conditions of any such offer, expression of interest, inquiry or proposal) that is received by any of such Restricted Parties from any party (other than Unicorn) after the date of this Term Sheet and on or prior to the expiration of the Exclusivity Period.

| | |
|---|---|
| **Governing Law:** | This Term Sheet and all definitive documentation will be governed by and construed in accordance with the laws of the State of California, without giving effect to any provisions or principles thereof with respect to conflict of laws. |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

| | |
|---|---|
| **Costs & Expenses:** | Each party to this Term Sheet shall bear its own costs and expenses incidental to the preparation of this Term Sheet and any definitive documentation and the consummation of the Transaction. |
| **Counterparts:** | This Term Sheet may be executed in one or more counterparts and when so executed such counterparts shall constitute a single agreement. Execution by facsimile or scanned to e-mail format signatures shall be legal, valid and binding. |
| **Termination:** | If this Term Sheet has not been fully-executed by each of the parties to this Term Sheet as of 9 p.m. Pacific Time on February 22, 2016, this Term Sheet shall terminate and be of no further force or effect. |
| **Binding Effect; Liability:** | The parties to this Term Sheet hereto agree and acknowledge that, except for the obligations of the parties set forth in the sections "**Confidentiality**", "**Exclusivity,**" ███████████████ "**Governing Law,**" "**Costs & Expenses,**" "**Counterparts,**" "**Termination**" and "**Binding Effect; Liability,**" which are intended to be and shall be legally binding, this Term Sheet is not intended to be and shall not be a legally binding agreement.  For the avoidance of doubt, no party hereto shall be under any obligation to enter into and deliver any legally binding definitive agreements with respect to the Transaction, and failure to do so shall not impose any liability on any party hereto. <br><br> The parties also acknowledge and agree that this Term Sheet does not constitute an offer for the sale of, or an invitation or a solicitation of any offer for the purchase or acquisition of, securities or any interests in or assets or business of the Company or any of its affiliates. |

\*\*\*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

IN WITNESS WHEREOF, the undersigned have executed and delivered this Term Sheet as of the date first written above.

By:

Ottomotto Inc.

By:  _____
     Name:
     Title:

_____
Anthony Levandowski

_____
Lior Ron

13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

IN WITNESS WHEREOF, the undersigned have executed and delivered this Term Sheet as of the date first written above.

████████████████████████████

By: _____

    Name: ███████████
    Title: General Partner

On behalf of ██████████
    Name:
    Title:  Manager

Ottomotto Inc.

By: _____

    Name: LIOR RON
    Title: PRESIDENT

_____

Anthony Levandowski

_____

Lior Ron

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

## <u>Exhibit A</u>

### Incentive Compensation

The Company will have the ability to allocate (in accordance with the terms of the next paragraph) a number of Uber restricted stock units with respect to shares of Uber's Common Stock on a fully diluted basis as of immediately prior to the date of this Term Sheet less the Cash Consideration. (the "**Milestone RSUs**"), unless mutually agreed by the parties, if at least ▮ employees of the Company accept employment with Uber prior to or as of the Closing.

Allocation of the Milestone RSUs shall be determined by the Company prior to the Closing and shall be subject to Unicorn's good faith approval ("**Allocation Percentages**"). At the Closing, the Company shall be entitled, subject to Unicorn's good faith approval, to reserve a portion of the Allocation Percentages for future employees of the Company and Trucking Company. Once the Company sets the Allocation Percentages in accordance with the preceding sentence, any changes to the Allocation Percentages shall require the mutual written consent of Unicorn and the Company or the Founders (each of which shall be provided in such party's sole discretion). The sum of the Allocation Percentages for the RSUs shall not exceed 100%.

The Milestone RSUs will have a milestone-based condition, a time-based condition, and a performance-based condition, all of which must be met in order for the Milestone RSUs to vest.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

- The time-based condition will be met as follows: 12/48 of the RSUs on the one-year anniversary of each employee's start date with the Company or Uber (whichever is earlier) and 1/48 of the RSUs on each monthly anniversary thereafter.

- The performance-based condition will be met on the earlier to occur of: (i) an initial public offering ("**IPO**") of Uber stock or (ii) a liquidation transaction, which includes customary liquidation, dissolution or winding up of Uber transactions (each of clause (i) and (ii), a "**Liquidity Event**").

- The RSUs and any shares acquired pursuant to the RSUs will be subject to customary limitations on transfer, including, but not limited to, a six-month lock-up period following an IPO and a one-year holding period from the date the RSUs meet the time-based condition.

- If employment is terminated prior to the occurrence of a Liquidity Event and if, and to the extent, the RSUs have not met the time-based condition as of the date of such termination, the RSUs that have not met the time-based condition will terminate and be forfeited.

By way of example, if, for any particular employee who was employed by Uber or the Company beginning on January 1, 2017, (i) the total number of Milestone RSU's granted to such employee was 100, (ii) Milestone A was allocated 10% of the total Milestone RSU's (i.e., such employee was granted 10 RSU's that were associated with Milestone A), and (iii) Milestone A was achieved on ████████ if the employee was (x) still employed by Uber on January 1, 2019 or (y) was terminated (other than for cause) after ████████ (provided, that, for the avoidance of doubt, such ████████ would not be required in the case of Milestone 7), then on such date:

(1) the milestone-based condition would be satisfied with respect to such 10 Milestone RSU's;

(2) the time-based condition would be satisfied with respect to 5 out of such 10 Milestone RSU's;

(3) if a Liquidity Event occurred prior to January 1, 2019, then with respect to the 5 Milestone RSU's for which the milestone-based condition and time-based condition have been satisfied in accordance with clauses (1) and (2) above, such 5 Milestone RSU's would be fully vested;

(4) the remaining 5 Milestone RSU's for which the time-based condition has not yet been satisfied as of ████████ of such 5 remaining milestone RSU's Milestone RSU's would be become fully vested over each of the next ██ months so long as such employee remains employed by Uber; and

(5) the other 90 Milestone RSUs shall vest similarly based on achievement of the Milestones with which they are associated.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**





16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**



17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



19

EXECUTION COPY



20

**EXECUTION COPY**





21
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



23
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY





25

EXECUTION COPY





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

## **Exhibit B**

**Commercial Agreement Terms**

**(see attached)**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



2
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



3
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



4



5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



8
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



14
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

## **Exhibit C**

**Indemnity Construct**

**(see attached)**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



# Redacted

Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Redacted**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



3
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

**<u>Exhibit D</u>**

███████████████

**(see attached)**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit D**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY