QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David A. Perlson (Bar No. 209502)
  davidperlson@quinnemanuel.com
  Melissa J. Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  John Neukom (Bar No. 275887)
  johnneukom@quinnemanuel.com
  Jordan Jaffe (Bar No. 254886)
  jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>            Plaintiff,<br>      v.<br><br>UBER TECHNOLOGIES, INC.;<br>OTTOMOTTO LLC; OTTO TRUCKING<br>LLC,<br><br>            Defendants. | CASE NO. 3:17-cv-00939-WHA<br><br>**SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF WAYMO LLC'S MOTION TO COMPEL PRODUCTION OF WITHHELD DOCUMENTS**<br><br>**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

1   Pursuant to the Court's authorization at the May 25, 2017 hearing (5/25/2017 Hr'g Tr. at
2   28:21-23), Plaintiff Waymo LLC ("Waymo") hereby submits this supplemental brief in support of
3   its Motion To Compel Withheld Documents (the "Motion") (Dkt. 321).

**INTRODUCTION**

Defendants have now produced a fully un-redacted version of the February 22, 2016 Term Sheet for Uber's acquisition of Otto, including the ███████████ at Exhibit C.  The newly provided information further establishes that the "due diligence" materials are not subject to any valid claim of privilege.

The newly produced evidence confirms that the "Outside Expert" conducting the due diligence activities was operating as ███████████████████████ who was preparing a ███████████ to produce to ███████████████████████████ ███████████████████████. (Ex. 12 at -7572, -7569 (emphasis added.).)[1]  This evidence establishes that there is no possible claim of attorney-client privilege over the communications between ███████████████████████.  This also undermines Defendants' work product claims as it indicates that the Outside Expert was merely reporting to ███████████████, and not working at their direction in anticipation of litigation.

Additionally, the newly produced information confirms that the Term Sheet called for these due diligence efforts to be undertaken and completed for a business, and not a legal purpose. The information demonstrates that the ███████████ was required to ███████████ ███████████████████████ (*Id.* at -7566 (emphasis added).)  While Exhibit C to the Term Sheet includes a ███████████ provision that ███████████████████ ███████████████████████████████ no similar provision prevented Uber from ███████████████████████████████ ███████████████████. (*Id.* at -7569.)  This reinforces the conclusion that the entire due

---

[1]  References to "Ex. __" are to the accompanying Declaration of Patrick Schmidt.  Exhibit numbering begins at Exhibit 12, to maintain continuity with Exhibits 1-8 to Waymo's Opening Brief and 9-11 to its Reply Brief.  Pin cites correspond to the last four digits of the Bates number of the cited page.

1 diligence process was conducted in furtherance of an arms-length, commercial transaction, which
2 is not entitled to the protections of the common interest doctrine.  As such, the sharing of the due
3 diligence materials amongst the members of the purported joint defense group waived any
4 applicable claim of privilege.

5  Finally, the previously redacted material confirms that the due diligence efforts were
6 primarily directed towards collecting and compiling factual information pursuant to a ▮▮▮▮▮,
7 commercial transaction between parties that were at arms-length to one another.  Exhibit C to the
8 Term Sheet itself defines ▮▮▮▮▮ as the report produced by ▮▮▮▮▮
9 ▮▮▮▮▮
10 ▮▮▮▮▮
11 ▮▮▮▮▮ (*Id.* at -7569 (emphasis added).)  Under these
12 circumstances, no possible claim of attorney-client or work product privilege can attach to what is
13 undeniably factual material collected pursuant to a ▮▮▮▮▮.
14 At a minimum, the factual nature of the due diligence investigation defeats any possible claim that
15 the materials were opinion work product, rendering them at least discoverable in light of Waymo's
16 "substantial need."

17 **BACKGROUND**

18  Defendants are withholding from production documents relating to a "due diligence"
19 investigation conducted by Stroz Friedberg ("Stroz") in conjunction with Uber's acquisition of
20 Anthony Levandowski's company Otto.  However, it was not until May 11th that Defendants
21 finally, for the first time, produced the underlying acquisition documents, albeit in heavily
22 redacted form.  After Waymo objected in a conference with the Special Master, Defendants agreed
23 to revisit the redactions, and on May 12th produced somewhat less redacted versions, which were
24 attached as Exhibits 9, 10, and 11 to Waymo's May 16th Reply Brief.  (Dkt. 445 Exs. 9, 10, and
25 11.)  Even at this time, however, four key provisions of Exhibit C ▮▮▮▮▮) to the
26 February 22, 2016 Term Sheet (Dkt. 445-2 (Ex. 9 to Reply) at pp. 50-59) remained redacted: (i) a
27 paragraph titled ▮▮▮▮▮; (ii) a portion of the ▮▮▮▮▮
28

1  ███ paragraph; (iii) a paragraph titled ██████████; and (iv) two full pages that turned out

2  to be an "Attachment A," ████████████████████████████████████████████████.

3       At the May 25th hearing on Waymo's Motion, the Magistrate Judge ordered Uber to

4  produce a fully un-redacted version of the Term Sheet, and provided Waymo an opportunity to

5  supplement the record to respond to this previously undisclosed evidence. Below, Waymo

6  addresses this newly provided evidence, its relationship to the underlying transaction, and its

7  impact on Defendants' claimed privileges.

## **ARGUMENT**

### **A.     Defendants Redacted Key Portions Of The Relevant Acquisition Documents.**

10       When Defendants first produced the February 22, 2016 Term Sheet relating to the Uber-

11  Otto transaction, they did so in a way that obscured the relationship between the due diligence

12  investigation and the transaction being discussed at the time.

13       As originally produced, the February 22, 2016 Term Sheet describes a ████████

14  ████████[2] that would provide ████████████████████████████████████████████

15  ████████████████████████████████████████████. (Ex. 12 at -7519.)

16  Exhibit C, the ████████ to the Term Sheet, provides that ████████████████████

17-22  ████████████████████████████████████████████████████████████████████████. (*Id.* at -7566.) Exhibit C excludes ████████████████████████████████████████████████████████████████████████



---

[2] On April 11, 2016, the ████████████ was executed in a document called ████████
████████ (Ex. 13 at §§ 1.1, 1.2 ████████████).) The ████████████ provides that, prior to its effective date, ████████████████████ (*Id.* at 7.) Exhibit P is described ████████████████████ (*id.* at v), but Exhibit P has not yet been produced to Waymo.

1   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*Id.*
2   at -7566 – -7567.)

3   As Waymo argued at the May 25th hearing, this evidence strongly indicated that no possible common interest could have arisen with respect to the due diligence investigation, because while Uber had an interest in ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ the interest of the Diligenced Employees was ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Indeed, the structure of the agreement, including the ▓▓▓▓▓▓▓▓▓▓▓▓—which only provides ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓—is an acknowledgement that the relevant parties held very different legal interests with respect to the proposed transaction.

Because of Defendants' improper redactions, however, the acquisition documents as originally produced provided little or no insight regarding the purpose of the due diligence efforts, the timing of the investigation, or the procedures under which the investigation was to take place. This prevented Waymo from fully understanding the relationship between the due diligence investigation and the overall transaction. As discussed below, that information, which has only recently been produced, confirms that there is no valid privilege over the withheld due diligence materials.

**B.   The Unredacted Provisions Of The Term Sheet Confirm That Stroz Was Not Working At The Direction Of The Parties' Attorneys.**

Unsurprisingly, the portions of the Term Sheet that Defendants were most reluctant to disclose are also the portions that most clearly demonstrate that no valid privilege exists. For example, the now un-redacted ▓▓▓▓▓▓▓▓▓▓▓▓ includes the following definition for the term ▓▓▓▓▓▓▓▓▓▓▓▓:

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

1  (Ex. 12 at -7569 (emphasis added).) This definition makes clear that the due diligence efforts of

2  Stroz were ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3  ▓▓▓▓▓▓▓ (Ex. 12 at -7569.) Notably absent from this definition is any indication that the Outside

4  Expert was directed by or engaged by ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5  This eliminates any possible claim of attorney-client privilege over materials pertaining to Stroz's

6  communications with ▓▓▓▓▓▓▓▓▓▓▓ (5/25/2017 Hr'g Tr. at 41:5-11 ("And he may have been

7  involved and under what circumstances he would allow his client to be interviewed. But that's

8  very different from saying that he retained, right, that Stroz Friedberg was his agent, because you

9  agree with that, *it would have to be his agent for it to be attorney-client privilege*." (Emphasis

10  added).)

11       Moreover, the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ included as part of

12  Attachment A to the un-redacted version of Exhibit C, clarifies that Stroz was acting as ▓▓

13  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14  ▓▓▓▓▓▓▓▓ (Ex. 12 at -7572 (emphasis added).) This suggests that Stroz was not working

15  at the direction of ▓▓▓▓▓▓▓▓ in anticipation of litigation, but rather that Stroz was retained to

16  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

18  described in the Term Sheet. This severely undermines Defendants' contention that the Stroz

19  report and related materials are the "work product" of Uber's and Otto's attorneys. *Lewis v. Wells*

20  *Fargo & Co.*, 266 F.R.D. 433, 440 (N.D. Cal. 2010) (finding that work product did not attach to

21  documents that "were not created in anticipation of litigation but rather, would have been created

22  in substantially similar form even if no litigation was anticipated.").

23       For these reasons, the newly provided evidence strongly suggests that no privilege—

24  attorney-client or work product—attaches to the due diligence materials in the first place.

25  **C.   The Unredacted Term Sheet Confirms That The Due Diligence Materials Were Not
           Prepared Pursuant To A Common Legal Interest.**
26
       In addition, the previously redacted material makes clear that at the work of Stroz and its
27
28  resulting report was performed for an unprivileged business purpose, and not for formulating a

1  joint legal strategy on a matter of common *legal* interest.  See *Elan Microelectronics Corp. v.*
2  *Apple, Inc.*, 2011 WL 3443923, at *2 (N.D. Cal. Aug. 8, 2011) (holding that the common interest
3  doctrine "does not extend to communications about a joint business strategy that happens to
4  include a concern about litigation."); *see also In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th
5  Cir. 2012) ("[A] shared desire to see the same outcome in a legal matter is insufficient to bring a
6  communication between two parties within [the common interest] exception.").
7        *First*, the un-redacted version of Exhibit C to the Term Sheet now includes a paragraph
8  titled ███████████████████ which is reproduced below:
9  ███████████████
10 ████████████████████████████████
11 ████████████████████████████████
12 ████████████████████████████████
13 ████████████████████████████████
14 ████████████████████████████████
15 ████████████████████████████████
16 █████████████████
17 (Ex. 12 at -7566 (emphasis added).)  This provision makes clear that the ███████████ of
18 the ████████████████████████████ was to be ████
19 ████████████████████████  In other words, ████
20 ████████████████████████████████
21 ████████████████  This confirms the argument that Waymo has been making all
22 along:  Uber was requiring the due diligence process not because it was preparing a joint legal
23 strategy with the Diligenced Employees, but rather because it was investigating whether ████
24 ████████████████████████.
25      Further reinforcing this conclusion is the requirement that the ████████
26 ████████████████████████████ in regards to
27
28

1  the due diligence efforts.[3]  If, as Defendants contend, the due diligence efforts were directed

2  towards formulating a common legal interest, there would be no need for Uber to include such a

3  contractual provision, because it would have been ▮▮▮

4  ▮▮▮.  The fact that Uber ▮▮▮

5  ▮▮▮

6  ▮▮▮—disproves

7  Defendants' claim that this was all somehow pursuant to a common legal interest.

8      *Second*, also included in the un-redacted version of Exhibit C to the Term Sheet is a

9  paragraph titled "▮▮▮":

10  ▮▮▮

11  ▮▮▮

12  ▮▮▮

13  (Ex. 12 at -7569 (emphasis added).)  Again, this previously redacted paragraph supports Waymo's

14  argument that the due diligence efforts of Stroz were for the purposes of facilitating a contingent

15  business transaction and not a joint legal strategy.  Although the ▮▮▮ paragraph

16  clarifies that ▮▮▮

17  ▮▮▮

18  ▮▮▮ (*See also id.* at -7529 (providing that ▮▮▮

19  ▮▮▮

20  ▮▮▮).  In other words, Uber was reserving its right to

21  ▮▮▮ based on the results of the Stroz due diligence efforts which,

22  as described above, were to be ▮▮▮ (*Id.*

23  at -7566.)

---

[3] The ▮▮▮ also references such ▮▮▮
▮▮▮ (Ex. 13 at 7.)  The Agreement references an Exhibit P
(which has been withheld) that is the ▮▮▮ (*Id.* at v.)
Waymo requests that Exhibit P to the Put Call Agreement, as well as all executed versions of the
▮▮▮ be produced immediately.



***Third***, the now un-redacted "Attachment A" to the "███████" describes in detail the procedures and parameters of the planned due diligence efforts. (Ex. 12 at -7571.) Amongst these procedures is a ███████ that calls for the ███████ —*i.e.*, exactly the type of documents that one would expect to be requested as part of a due diligence effort in advance of consummating a proposed commercial transaction between parties operating at arms-length.

For these reasons, the due diligence investigation was intended to inform the parties' business decision about whether to enter into the Put Call Agreement, and the common interest doctrine therefore does not apply. All due diligence materials must be produced.

**D.    The Unredacted Provisions Of The Term Sheet Confirm That Stroz Was Compiling Factual Material, ███████ To Which No Privilege Can Attach.**

Finally, the now unredacted definition for the term "███████" in the "███████" makes clear that the purpose of the due diligence efforts was merely to ███████[4] (Ex. 12 at -7569 (emphasis added).) That is, the parties to the Term Sheet negotiated, at arms length, the definition of ███████ and the direction to be provided to Stroz with respect to due diligence related ███████. This is not a situation where an attorney retains an agent for the purposes of compiling facts relevant to an anticipated litigation. Rather, in this case, parties with conflicting legal interests mutually agreed upon an ███████ to collect factual material pursuant to a pre-agreed protocol for the purposes of facilitating ███████ commercial transaction. (Ex. 12 at -7572 (emphasis added).) Under these circumstances, Defendants are simply trying to use the privilege to shield disclosure of underlying facts, which is

---

[4] ███████ are defined by Exhibit C to include ███████ (Ex. 12 at -7569.)

1  improper. *See O'Connor v. Boeing N. Am., Inc.*, 185 F.R.D. 272, 280 (C.D. Cal. 1999) ("As to documents subject to the attorney-client privilege or work product doctrine, the plaintiffs are correct in contending that not all attachments to, or enclosures with, such documents are necessarily protected by the privilege.").

At a minimum, the revelation that the Stroz due diligence efforts were directed towards compiling underlying factual material ████████████████████████ ████ confirms that the "████████," including all attachments, are at most, "fact" and not "opinion" work product that should be produced to satisfy Waymo's "substantial need" for these materials in light of the Mr. Levandowski's assertion of the Fifth Amendment privilege. Fed. R. Civ. P. 26(b)(1); *In re John Doe Corp.*, 675 F.2d 482, 492 & n.10 (2d Cir. 1982) (substantial need shown where "potential witnesses have invoked the privilege against self-incrimination"). Thus, particularly in light of the newly revealed evidence, Defendants should be compelled to produce all relevant due diligence materials.

## CONCLUSION

For the foregoing reasons, as well as those stated in Waymo's Opening (Dkt. 321) and Reply Briefs (Dkt. 444), Waymo respectfully requests that the Motion be granted in full.

DATED: May 30, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/Charles K. Verhoeven*
Charles K. Verhoeven
Attorneys for WAYMO LLC