UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAYMO LLC,<br><br>              Plaintiff,<br><br>      v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>              Defendants. | Case No. 17-cv-00939-WHA   (JSC)<br><br>**ORDER RE: WAYMO'S MOTION TO COMPEL**<br><br>Re: Dkt. No. 321 |

Waymo has sued Uber for violating federal and state trade secret laws.  In particular, Waymo accuses its former employee Anthony Levandowski of downloading thousands of Waymo documents related to its driverless vehicle technology, forming competing driverless vehicle companies Ottomotto and Ottomotto Trucking, and then selling Ottomotto to Uber, all along taking the downloaded documents with him.  In March 2016, after Levandowski departed Waymo but before the Ottomotto/Uber transaction closed, Ottomotto and Uber jointly retained an outside forensic expert, Stroz Friedman, to investigate certain Ottomotto employees who were formerly employed by Waymo, including Levandowski and Lior Ron. Stroz interviewed the employees, reviewed their digital devices and cloud storage, and prepared a report, memos and exhibits recording the results of their investigation ("the Stroz Report").  Waymo seeks to compel Uber to produce the Stroz Report and its exhibits in full.  (Dkt. No. 321.)  After carefully reviewing the record, including an *in camera* review of the Report and its exhibits, and having held oral argument on May 25, 2017, the Court GRANTS the motion to compel.  Neither Uber nor Levandowski has met their burden to show that the Report and any of its exhibits are protected by the attorney-client privilege and Uber has waived any claim of attorney work-product.  Thus, there is no basis to withhold the Report from Waymo. Waymo's motion to compel must be granted.

United States District Court
Northern District of California

# BACKGROUND

Levandowski formed Ottomotto ("Otto") on January 15, 2016.  Twelve days later he resigned from Waymo.  On February 1, 2016, he formed Otto Trucking.

## A.      The Uber/Otto Term Sheet

On February 22, 2016, Uber and Otto signed a Term Sheet.  Uber was represented, in part, by Morrison and Foerster ("MoFo") and Otto by O'Melveny and Myers ("OMM").  The Term Sheet created a process for Uber to potentially acquire 100% ownership of Otto through the execution of a Put Call Agreement.  (Dkt. No. 510-3 at 3.[1]).  Exhibit C to the Term Sheet required Uber to complete certain "Pre-signing Due Diligence" on Otto and certain of its employees in accordance with Attachment A to Exhibit C.  (*Id.* at 50, 55-56.)  Such due diligence was to be conducted by Stroz, identified in the Term Sheet as "an independent third party digital forensic expert," and included Stroz's completion of a Third Party Report.  (*Id.* at 50, 53.)  The Term Sheet defines the Third Party Report as:

> the written report(s) produced by the Outside Expert summarizing in detail all of the facts, circumstances, activities or events obtained by the Outside Expert from any Diligenced Employee that the Outside Expert deems reasonably related to any Bad Act of such Diligenced Employee, in each case, based on the interviews, forensic due diligence and other due diligence investigation with respect to all Diligenced Employees conducted by the Outside Expert, as jointly directed by and engaged by [Otto] and [Uber].

(*Id.* at 53.)  A "Bad Act" means fraud, misappropriation of Waymo's patents, copyrights, trademarks or trade secrets, breach of a fiduciary duty owed to Waymo, or breach of a non-solicitation agreement with Waymo.  (*Id.*).

Exhibit C required the initial due diligence of Otto employees, including Levandowski and Ron, to be completed prior to the signing of the Put Call Agreement.  (*Id.* at 50.)  Also prior to any signing of the Put Call Agreement, each diligenced  employee had to certify that he or she had completed the due diligence in good faith and had responded truthfully to Stroz. (*Id.*)

Following the execution of the Put Call Agreement, and regardless of whether the

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

1   Uber/Otto transaction actually closed, Uber is required to indemnify Otto and/or any diligenced

2   employee, including Levandowski, for any claim brought by an employee's former employer

3   (Waymo) for a "Bad Act," including misappropriation of trade secrets.  (*Id.* at 50-51.)  However,

4   the indemnification obligation excludes claims for misappropriation of trade secrets, among other

5   "Bad Acts," committed *before* the signing of the Put Call Agreement if they

6           reasonably arise or result from any facts, circumstances, activities or
            events that either (x) were not truthfully disclosed by [Otto] and/or
7           the Diligenced Employees to [Stroz] in response to relevant
            inquiries in connection with the due diligence performed by the
8           [Stroz], or (y) were not contained or reflected in the due diligence
            materials provided by the Diligenced Employees to [Stroz].
9

10   (*Id.* at 51.)  In other words, Uber agrees to indemnify Levandowski and others for Bad Acts

11   committed before Uber entered into the Put Call Agreement, provided the employees disclosed the

12   Bad Acts to Stroz during its pre-signing due diligence; that is, the due diligence conducted before

13   the signing of the Put Call Agreement.  Uber's indemnification obligation also excludes certain

14   "Bad Acts" committed after the signing of the Put Call Agreement.  (*Id.* at 51-52.)

15           Following the settlement or final adjudication of a diligenced employee's indemnified

16   claim, Uber has the right to dispute through arbitration or a court whether it was obligated to

17   indemnify the employee; for example, to determine whether the indemnification is excluded

18   because it arose from pre-signing Bad Acts that the indemnified employee did not properly

19   disclose to Stroz.  (*Id.* at 51.)  If the court or arbitrator so concludes, the indemnified employee is

20   required to reimburse Uber for expenses paid in indemnification. (*Id.* at 52.)

21           The Term Sheet did not obligate Uber or Otto to enter into the Put Call Agreement or to

22   eventually close the transaction; that is, Uber was not required to enter into the Put Call agreement

23   regardless of the results of the initial Stroz due diligence. (*Id.* at 13 ("For the avoidance of doubt,

24   no party hereto shall be under any obligation to enter into and deliver any legally binding

25   definitive agreements with respect to the Transaction, and failure to do so shall not impose any

26   liability on any party hereto").)  To the contrary, the Term Sheet provides that *if* Uber enters into

27   the Put Call Agreement, its obligation to close the transaction *shall not* be conditioned upon a

28   determination that there were no Bad Acts, including misappropriation, prior to the signing of the

3

Put Call Agreement. (*Id.* at 53.)  Thus, if Uber did not want to do the deal because Levandowski or other Otto employees misappropriated Waymo's trade secrets, that decision had to be made before it entered into the Put Call Agreement.

### B.    The Stroz Pre-Signing Due Diligence

A few days after the execution of the Term Sheet, Otto and Uber formally engaged Stroz to investigate Levandowski, Ron and other Otto employees, and to create the Third Party Report required by the Term Sheet.  (Dkt. No. 370 ¶ 10; Dkt. No. 370-3; Stroz Report, Exh. 4.)  Stroz identified its clients as Otto and Uber.  (Dkt. No. 370-3.)

By letter dated March 14, 2016, Levandowski's personal attorney John Gardner wrote Stroz.  (Stroz Report, Exh. 2.)  Gardner stated that his firm represents Levandowski "individually, with respect to a proposed examination by Stroz . . . of Mr. Levandowski's electronic media, personal accounts and related materials, all as described in your joint engagement letter with Morrison & Foerster LLP and its client Uber USA, LLC, and O'Melveny & Myers LLP and its client Ottomotto Inc. (collectively, 'Clients'), dated March 4, 2016 ('Stroz Examination')." (*Id.*)  The letter went on to recite how Stroz had requested certain information of Levandowski, and how Levandowski would only disclose such information to Stroz provided Stroz agreed to certain conditions, including not disclosing certain of the information to Otto or Uber.  Gardner sent a similar letter to Stroz one week later involving a Stroz request that Levandowski disclose additional information.  (Stroz Report, Exh. 3.)  In both letters Gardner represented that Levandowski and Otto "share a common legal interest in the subject matter of the Stroz Examination, and in Stroz's retention through O'Melveny & Meyers, as counsel for Ottomotto Inc., as a related party to Mr. Levandowski."  He made no mention of any purported common interest with Uber.  (Stroz Report Exhs. 2, 3.)

Stroz interviewed Levandowski, without counsel present, at Stroz's office on March 22 and 23, 2016 and conducted a follow up telephone interview on April 1, 2016.  (Stroz Report, Exh. 5.)  Prior to the interviews, on March 18, he provided certain information to Stroz via a written questionnaire.  Stroz interviewed Ron on March 22, 2016, also without any counsel present, and on April 11 Stroz conducted a follow-up telephone interview.  (Stroz Report, Exh. 6.)

United States District Court
Northern District of California

1    Stroz interviewed other Otto employees on March 23 and 24, 2016.  (Stroz Report, Exhs. 7 & 8.)

2    Stroz also collected and analyzed the interviewees' devices and cloud-based storage.  Prior to the

3    commencement of the interviews, Stroz adopted a protocol for its investigation which gave OMM

4    the right to require Stroz to withhold from disclosure to MoFo documents that OMM contends are

5    protected by a privilege from disclosure to MoFo.  (Stroz Report, Exh. 1.)

6         In early April 2016, prior to the execution of the Put Call Agreement, and at MoFo's

7    request, Stroz provided MoFo with an interim report; in particular, it provided MoFo with its

8    memos of its interviews of Levandowski, Ron and the diligenced employees; data regarding

9    information found on the diligenced employees' devices; and an oral report regarding certain Stroz

10   fact finding. (Stroz Report at 3-4.)   The interview memos were redacted as requested by OMM

11   and Gardner.  In August 2016, counsel for the diligenced employees consented to Stroz producing

12   its Report to MoFo, OMM, Gardner and Ron's counsel, Levine & Baker LLP, as well as in-house

13   counsel at Uber and Otto. (Stroz Report at 5.)

14        **C.**       **The Execution of the Put Call and Joint Defense Agreements**

15        At some point Uber and Otto executed the Put Call Agreement, dated April 11, 2016,

16   obligating them to complete the transaction assuming certain conditions were satisfied.  (Dkt. No.

17   515-3.)  As was stated in the Term Sheet, the Put Call Agreement reiterated that the closing

18   conditions will be deemed satisfied regardless of whether Levandowski or any other diligenced

19   employee committed a Bad Act prior to the signing of the Put Call Agreement.  (*Id.* at 39.)

20        Also dated April 11, 2016, is a "Joint Defense, Common Interest and Confidentiality

21   Agreement" among Otto, Otto Trucking, Uber, Levandowski and Ron.  (Dkt. No. 370-2 at 2-11.)

22   The first paragraph states that it is entered into "in contemplation of potential investigations,

23   litigation, and/or other proceedings relating to the proposed transactions between Ottomotto, Otto

24   Trucking and Uber and/or any affiliates of Uber."  (*Id.* at 2.)

25        Four months later, in August 2016, Stroz issued its final report.  That same month, Uber

26   bought Otto for approximately $680 million and hired Levandowski to lead its self-driving car

27   program.  (Dkt. No. 433 at 4:24-25.)

28        This litigation commenced in February 2017.  Waymo now moves to compel production of

Stroz's August 5 Report and all of its exhibits.  (Dkt. No. 321.)

**DISCUSSION**

Uber contends that the Stroz Report and all of its exhibits are protected from disclosure as attorney work-product.  It also contends that six of the documents comprising the Report and its exhibits are protected by the attorney-client privilege: (1) the Stroz Report itself, (2) Stroz's protocol for review of data and devices, (3) Levandowski's side letter agreement with Stroz dated March 14, 2016, (4) Levandowski's side letter agreement with Stroz dated March 21, 2016, (5) Stroz's memorandum of its interview of Levandowski, and (6) Stroz's memorandum of its interview with Ron.  Mr. Levandowski, on the other hand, contends that the Stroz Report and all of the exhibits, even those for which Uber only claims the work-product privilege, are protected from disclosure by his personal attorney-client privilege. As requested by the district court, the undersigned has reviewed the Stroz Report and its exhibits *in camera.* (Dkt. No. 271 at 2; Dkt. No. 350.)

**A.  The Report and its Exhibits are not Protected by the Attorney-Client Privilege**

"Issues concerning application of the attorney-client privilege in the adjudication of federal law are governed by federal common law."  *United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009).  "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Id.* (quoting *Weil v. Inv./Indicators, Research & Mgmt., Inc.,* 647 F.2d 18, 24 (9th Cir. 1981)). "[T]he privilege stands in derogation of the public's 'right to every man's evidence' and as 'an obstacle to the investigation of the truth,' [and] thus, . . . '[i]t ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (quoting *In re Horowitz,* 482 F.2d 72, 81 (2d Cir. 1973)). "[A] party asserting the attorney-client privilege has the burden of establishing the relationship *and* the privileged nature of the communication."  *Ruehle*, 583 F.3d at 607 (internal quotation marks and citation omitted; emphasis in original).

An eight-part test determines whether information is covered by the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating

6

to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*In re Grand Jury Investigation,* 974 F.2d 1068, 1071 n.2 (9th Cir. 1992) (quoting *United States v. Margolis (In re Fischel),* 557 F.2d 209, 211 (9th Cir. 1977)). The attorney-client privilege may extend to communications with third parties who have been engaged to assist the attorney in providing legal advice. *See United States v. Richey,* 632 F.3d 559, 566 (9th Cir. 2011) "'What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining *legal* advice *from the lawyer.*'" *Id.* at 566, n.3 (quoting *United States v. Gurtner,* 474 F.2d 297, 299 (9th Cir. 1973) (emphasis in original)).

### 1.  Levandowski's Attorney-Client Privilege

As a preliminary matter, the Court grants Levandowski's motion to intervene for the limited purpose of opposing Waymo's motion to compel the Stroz Report. (Dkt. No. 371.) As the district court already directed that Levandowski may file an opposition (Dkt. No. 270), he has done so (Dkt. No. 379), and he claims an attorney-client and attorney work-product privilege in the documents, the limited motion is granted.  His additional request, however, to provide the Court with an ex parte declaration in support of his privilege assertion is denied in the exercise of the Court's discretion. (Dkt. No. 382.)  The cases he cites in support of his request involve a court reviewing the withheld privileged materials *in camera*, which the Court has done here; none state that in a civil case a court may entertain an ex parte declaration from a witness who is refusing to provide any discovery or testimony in the case.

Levandowski contends that the Stroz Report and all of its exhibits are protected by *his* attorney-client privilege. Not so. The record is clear that Uber and Otto alone engaged Stroz to conduct the due diligence required by the Term Sheet. First, the Term Sheet provides that Otto and Uber will engage Stroz.  (Dkt. No. at 510-3 at 50 (Exhibit C).)  Second, Uber's own counsel attests that Uber and Otto engaged Stroz.  (Dkt. No. 370, Tate Decl. ¶ 9.)  Third, the Stroz engagement letter likewise identifies Stroz's clients as Uber and Otto.  (Dkt. No. 370-3.)  It also states that Uber and Otto will direct Stroz's efforts.  Fourth, Levandowski's personal attorney acknowledged as much in his side letter agreements with Stroz.  The letters recite that Stroz's

clients are Otto and Uber with no mention of Levandowski or his attorney Gardner being a Stroz client. (Stroz Report, Exhs. 2, 3.) Fifth, the Stroz Report itself, which the Court has reviewed *in camera*, recites that the Stroz protocol was revised on April 11, 2016 to clarify that Uber's outside lawyers MoFo and Otto's outside lawyers OMM were directing the Stroz investigation and "making all legal determinations." (Stroz Report at 4.) Thus, the rule that the attorney-client privilege may extend to third parties who have been engaged to assist the lawyer in providing advice to his client, *see Richey,* 632 F.3d at 566*,* does not apply to Levandowski and Stroz. Levandowski's attorney did not engage Stroz.

While Levandowski was an Otto executive, this position did not give him a personal attorney-client relationship with Otto's counsel OMM, who did engage Stroz (along with Uber's counsel MoFo).

> [I]individual corporate officers or employees seeking to assert a personal claim of attorney-client privilege must affirmatively show five factors: First, they must show they approached counsel for the purpose of seeking legal advice. Second, they must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with counsel were confidential. And fifth, they must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company.

*United States v. Graf*, 610 F.3d 1148, 1159–60 (9th Cir. 2010). Applying the first two factors, there is nothing in the record that even remotely suggests that OMM was acting as Levandowski's personal counsel at the time Levandowski gave his personal devices and interview to Stroz in March 2016; to the contrary, Levandowski retained Gardner as his personal counsel from as early as January 2016. (Dkt. No. 381 ¶ 2.) Further, the record demonstrates that Levandowski was complying with the Term Sheet, rather than seeking OMM's legal advice, when he participated in Stroz's investigation. Gardner's side letter agreements confirm that Levandowski's participation was pursuant to the Term Sheet's requirement that he cooperate with Stroz's due diligence and the Term Sheet establishes that his cooperation was a precondition to his receiving any personal indemnification from Uber should the parties enter into the Put Call Agreement. As for the third

8

factor, there is nothing in the record that suggests OMM communicated with Levandowski as attorneys giving him advice in his individual capacity, let alone that they did so knowing that a conflict could arise.  The fifth requirement is also not satisfied: the Court's *in camera* review of the Stroz Report and its exhibits establishes that the matters on which he gave evidence to Stroz concerned him personally, although there could be some spillover effect on Otto.  The fourth element is satisfied as Levandowski attempted to keep his conversations and disclosures to Stroz confidential generally, and partially confidential from Uber and Otto.  However, as all five factors must be shown, Levandowski has not met his burden.

Since Gardner did not retain Stroz to assist with Gardner's provision of legal advice to Levandowski, and Levandowski did not have an attorney-client relationship with OMM in his individual capacity, it follows that the documents Levandowski gave Stroz by providing Stroz with his personal digital devices and cloud storage are not protected by Levandowski's attorney-client privilege. While they might be so protected if provided to a third party retained by Gardner and privileged in and of themselves, for example, if they are incriminating and therefore protected by the Fifth Amendment privilege, *see Fisher v. United States*, 425 U.S. 391, 410 (1976), Stroz was not so retained. The case cited by Levandowski is not to the contrary.  *See Segerstrom v. United States*, No. C 00-0833 SI, 2001 WL 283805, at *2 (N.D. Cal. Feb. 6, 2001) ("confidential communications passing through persons acting as the attorney or client's agent are also covered by the privilege. The privilege also covers papers prepared by the attorney or by a third party at the attorney's request for the purpose of advising the client, insofar as the papers are based on and would tend to reveal the client's confidential communications.").

Levandowski also argues that his confidential communications with his attorney Gardner are protected by the attorney-client privilege unless waived.  Agreed.  The Stroz Report, however, is based on Levandowski's communications with Stroz during two days of in-person interviews and one follow up call at which Gardner was not present; indeed, no attorney was present.  (Stroz Report, Exh. 5.)  Similarly, there is no evidence that Gardner provided Levandowski's devices and passwords and the like to Stroz; rather, the Term Sheet directs that such information is to come directly from the diligenced employee.  (Dkt. No. 510-3 at 56, Term Sheet, Exh. C, Attch. A.;

Stroz Report at 6.)  If Gardner had provided Levandowski's statement and documents to Stroz, the Court would have to determine whether counsel giving that information to Stroz waived any attorney-client privilege; but since there is nothing in the record to support such a finding, and abundant evidence to support the opposite, the Court does not have to reach that question.

### 2.   Uber's Attorney-Client Privilege

Uber contends that the six documents it has identified as attorney-client privileged are protected because "[c]ommunications between a client and attorney's agent or representative are also covered by the privilege." (Dkt. No. 369 at 10:21-23 (citing *U.S. v. Christensen*, 828 F.3d 763, 802 (9th Cir. 2016)).)  *Christensen*, however, merely held that conversations between a lawyer and an investigator retained by the lawyer about the lawyer's client were privileged.  Just as MoFo and OMM were not Levandowski's attorneys, neither was Levandowski the client of MoFo or OMM.  Thus, the memo regarding Stroz's interview of Levandowski is not protected by an attorney-client privilege held by Uber or Otto.  Again, the Term Sheet and Gardner's side agreements with Stroz establish that Stroz's interview of Levandowski was performed in Levandowski's individual capacity, and not as an Otto executive.  The same is true of the Ron interview memo; there is no evidence that he had an attorney-client relationship with OMM in his individual capacity.  Uber has therefore not met its burden of showing that those interviews are protected by Uber's attorney-client privilege, even assuming that Uber may now assert an attorney-client privilege previously held by Otto.

In any event, Uber has not proven that it has a protectable attorney-client privilege in any of the six identified documents given that it retained Stroz jointly with Otto.  At the time Uber and Otto engaged Stroz, and directed its investigation, Uber and Otto were on the opposite sides of a proposed transaction represented by separate counsel. MoFo did not represent Otto and OMM did not represent Uber.  Uber cites no case, and the Court is aware of none, that holds that communications between separate parties with separate counsel on opposite sides of a proposed transaction are protected by the attorney-client privilege. Thus, those separate counsel's joint communications with an independent expert are likewise not protected by an attorney-client privilege.  While Uber represented in its opposition brief that the Term Sheet was "an agreement

in principle" (Dkt. No. 369 at 21), once the Term Sheet was produced (by Waymo, not Uber), it became apparent that there was no such agreement; to the contrary, the Term Sheet explicitly disclaims that it creates an obligation on Uber or Otto to proceed with the transaction. (Dkt. No. 510-3 at 13.) It obligated Uber and Otto to certain terms, such as confidentiality and exclusivity with respect to negotiating, but it did not in any way obligate them to consummate the contemplated transaction. Thus, at the time they jointly retained Stroz they were parties to a potential acquisition, and nothing more. Two clients represented by separate counsel do not create an attorney-client relationship by jointly retaining an agent. Such a result would run contrary to the rule that the attorney-client privilege is to be strictly construed. *See United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009).

Uber insists that Waymo has waived any argument that these particular documents are not protected by the attorney-client privilege. Not so. It is Uber's burden, not Waymo's, to prove that they are privileged from discovery. *Ruehle*, 583 F.3d at 607. Moreover, Waymo argued that Uber had not met its burden because its privilege log is inadequate. And Waymo does not have the benefit of *in camera* review of the documents as does the Court. Further, at the time Waymo filed its motion to compel, Uber had withheld from Waymo many of the documents central to evaluation of Uber's argument, including the Term Sheet, the Stroz engagement letter, and the Put Call Agreement. Waymo has not waived a challenge to Uber's assertion of the attorney-client privilege and neither Uber nor Levandowski has met their burden to show that the privilege applies.

### 3.     A Purported Common Interest Does not Create an Attorney-Client Privilege

Uber and Levandowski appear to be contending that because they assert that they along with Otto and Ron had a common interest in preparing for potential litigation against Waymo, Levandowski's communications with OMM and MoFo, or more precisely, communications with their agent Stroz, are protected by the attorney-client privilege. They thus highlight the Stroz engagement letter's statement that "Stroz Friedberg's communications with Clients, Uber, Ottomotto, (and Messrs. Levandowski and Ron (including their respective counsel), Stroz Friedberg's work product, and all information and data received from Clients, Uber, and

11

Ottomotto (including its employees and/or their respective counsel) are covered by common interest, attorney-client privilege and/or attorney work-product doctrine." (Dkt. No. 370-3 at 3.) The Court disagrees.

The common interest/joint defense doctrine does not make a document or communication privileged; rather, it is a doctrine that prevents waiver of a pre-existing privilege if the privileged information is shared only with those with a common legal interest. Thus, it "is not technically a privilege in and of itself but instead constitutes an exception to the rule on waiver where communications are disclosed to third parties." *Holmes v. Collection Bureau of Am., Ltd.*, No. C 09-02540 WHA, 2010 WL 143484, at *2 (N.D. Cal. Jan. 8, 2010). As one court has explained:

> Therefore, a party seeking to rely on the common interest doctrine does not satisfy its burden to justify a claim of privilege simply by demonstrating that a confidential communication took place between parties who purportedly share a common interest. Rather, the party seeking to invoke the doctrine must first establish that the communicated information would otherwise be protected from disclosure by a claim of privilege. For example, the content of the communication may comprise information shared in confidence by a client with his or her attorney, a legal opinion formed and advice given by the lawyer in the course of the attorney-client relationship, or a writing reflecting an attorney's impressions, conclusions, or theories. The next step in the analysis is to determine whether disclosing the information to a party outside the attorney-client relationship waived any applicable privileges.

*OXY Res. California LLC v. Superior Court*, 115 Cal. App. 4th 874, 890, 9 Cal. Rptr. 3d 621, 635 (2004), *as modified* (Mar. 4, 2004); *see also Lennar Mare Island, LLC v. Steadfast Ins. Co.*, No. 2:12-CV-2182 KJM KJN, 2014 WL 1366252, at *5 (E.D. Cal. Apr. 7, 2014) ("The common interest doctrine does *not* mean there is an expanded attorney-client relationship encompassing all parties and counsel who share a common interest.") (internal quotation marks and citation omitted); *In re Commercial Money Ctr., Inc., Equip. Lease Litig.*, 248 F.R.D. 532, 536 (N.D. Ohio 2008) (explaining that the common interest/joint defense doctrine "is not an independent source of privilege or confidentiality. If a communication or document is not otherwise protected by the attorney-client privilege or work-product doctrine, the common interest doctrine has no application."); *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) ("The joint defense and common interest doctrines are not privileges in and of themselves. Rather, they

12

1  constitute exceptions to the rule on waiver where communications are disclosed to third parties.").

2       In all of the cases cited by Uber and Levandowski, the document or communication was

3  protected by the attorney-client privilege before counsel provided it to another party.  The

4  circumstances here are different.  Levandowski, without his attorney present, gave an interview in

5  his individual capacity to Stroz, an agent for Otto's separate counsel and Uber's separate counsel.

6  As is explained above, Stroz was not an agent for Levandowski's attorney and thus

7  Levandowski's communications with Stroz are not protected by the attorney-client privilege. That

8  Otto, Uber, Levandowski and Ron purportedly shared a common legal interest at the time of

9  Levandowski's communications does not make Levandowski's communications with Uber's

10  attorney's agent an attorney-client privileged communication. To hold that the common interest

11  creates a privilege in these circumstances would be unprecedented and violate the long-standing

12  rule that the attorney-client privilege shall be strictly construed. *Ruehle*, 583 F.3d at 607.

13       Finally, that the attorneys for Levandowski and Ron provided input as to the protocol Stroz

14  implemented, and the preconditions for their clients' cooperation with Stroz, does not make OMM

15  and MoFo (and their agent Stroz) the attorneys for Levandowski and Ron any more than an

16  attorney-client relationship is created when an attorney for the government negotiates a

17  cooperation agreement with a defendant's counsel.  No one, including Levandowski, claims that

18  Levandowski's and Ron's personal attorneys retained Stroz.  No attorney-client privilege attached

19  to the Stroz Report or any of its exhibits.

20       **B.  Uber Waived any Attorney Work-Product Privilege**

21       The attorney work-product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3),

22  protects "from discovery documents and tangible things prepared by a party or his representative

23  in anticipation of litigation." *Admiral Ins. Co. v. United States Dist. Court for the Dist. Ariz.*, 881

24  F.2d 1486, 1494 (9th Cir. 1989). "The doctrine provides an attorney working on a case 'with a

25  certain degree of privacy' so that he may 'prepare his legal theories and plan his strategy without

26  undue and needless interference.'" *Elan Microelectronics Corp. v. Apple, Inc.*, No. C 09-01531

27  RS PSG, 2011 WL 3443923, at *2 (N.D. Cal. Aug. 8, 2011) (quoting *Hickman v. Taylor*, 329 U.S.

28  495, 511 (1947).). "The doctrine aims to balance the promotion of an attorney's preparation in

United States District Court
Northern District of California

representing a client" and "society's general interest in revealing all true and material facts to the resolution of a dispute." *Phoenix Techs. Ltd. v. VMware, Inc.*, 195 F. Supp. 3d 1096, 1101 (N.D. Cal. 2016) (quoting *In re Seagate Tech., LLC*, 497 F.3d 1360, 1375 (Fed. Cir. 2007)).  The doctrine applies to documents created by investigators working for attorneys, provided the documents were created in anticipation of litigation.  *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 907 (9th Cir. 2004).  Uber, as the party resisting discovery, bears the burden of proving that the Stroz documents are attorney work-product.  *See, e.g.*, *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1069 (N.D. Cal. 2002).  The work-product privilege, like the attorney-client privilege, can be waived by disclosure to a third party.  *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010).

Assuming the Stroz investigation qualifies as Uber's attorney work-product, the question is whether Uber waived any privilege by disclosing the work product to Otto.  MoFo and OMM together engaged Stroz to conduct the Term Sheet's required due diligence, although Uber alone paid for it.  And they directed Stroz to jointly and simultaneously communicate the investigation's factual findings to MoFo and OMM.  Thus, the Stroz work product was simultaneously disclosed to Otto at the time it was created. Uber contends that its work-product privilege was nonetheless not waived because Otto and Uber shared a common legal interest in defending against claims by Waymo.

### 1.   The Common Interest Doctrine does not Apply

As was explained in connection with the attorney-client privilege argument, the "joint defense" or "common interest" privilege is an exception to the rule that a claim of privilege is waived by disclosure to a third party.

> The concept applies where parties are represented by separate counsel but engage in a common legal enterprise. The interests of the parties involved in a common defense need not be identical, and, indeed may even be adverse in some respects. The joint-defense exception, however, protects *only* those communications that are part of an on-going and joint effort to set up a common defense strategy.

*Holmes v. Collection Bureau of Am., Ltd.*, No. 09-02540 WHA, 2010 WL 143484, at *2 (N.D. Cal. Jan. 8, 2010) (internal citation omitted) (emphasis in original).  Thus, for non-waiver of a

privilege to apply, the parties must have a common legal interest and the communications sought to be shielded from discovery must have been in furtherance of a joint strategy in support of that legal interest. *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 579 (N.D. Cal. 2007); *see also In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012) (for the common interest doctrine to apply, "a shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception. Instead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement— whether written or unwritten."). Uber argues that as soon as it and Otto signed the Term Sheet they had a common legal interest in jointly developing a strategy to defend potential litigation by Waymo; therefore, their joint retention of Stroz did not waive the attorney work-product privilege. The Court disagrees.

The Term Sheet required the Stroz investigation and Uber and Otto did not have a common legal interest at the time they entered into it. At that time, Otto and Uber were on the opposite sides of a proposed acquisition with no obligation to consummate the transaction. Uber and Otto could only have a common legal interest in pursuing a defense of a possible lawsuit by Waymo once Uber was obligated (if certain conditions were met) to acquire Otto and thus inherit or create any liabilities to Waymo. If Uber did not acquire Otto and hire Otto's former Waymo employees, Uber and Otto did not have a common legal interest. But as the Term Sheet demonstrates, no acquisition obligation existed until the subsequent execution of the Put Call Agreement. Thus, Uber and Otto did not share a common legal interest and therefore Uber's sharing of its work product with Otto waived any work-product privilege.

Moreover, even if Otto and Uber shared a common legal interest notwithstanding the lack of any acquisition agreement, the common legal interest doctrine prevents waiver only if the communications at issue were "designed to further *that* [legal] effort." *Nidec*, 249 F.R.D. at 579 (internal quotation marks and citation omitted). The Term Sheet itself is the best evidence of the purpose of the Stroz investigation: it calls for the investigation, sets its parameters, and even in detail describes what information the diligenced employees must give to Stroz. The Term Sheet reveals two purposes of the Stroz investigation: (1) to allow Uber to conduct due diligence into

certain Otto employees prior to making a decision to sign the Put Call Agreement, and (2) to create a record that will control whether any diligenced employees have to reimburse Uber for indemnification expenses should Waymo sue the diligenced employees.  Neither of these purposes is in furtherance of some common interest in defending against potential litigation by Waymo.

Stroz's interim disclosure to MoFo of its investigation findings just before Uber signed the Put Call Agreement is further evidence that the purpose of the Stroz investigation was to enable Uber to evaluate whether to purchase Otto rather than to develop a joint strategy regarding Waymo litigation.  There is no reason for Uber to receive that interim report other than to evaluate whether to sign the Put Call Agreement. And, indeed, it appears that within days of receiving the interim Stroz report Uber did just that.

Uber's reliance on *Rembrant Patent Innovations, LLC v. Apple Inc.*, 2016 WL 427363 (N.D. Cal. Feb. 4, 2016), is misplaced.  There, privileged communications regarding a patent were shared after Rembrant obtained an exclusive option to purchase the patent from the named inventors.  Following the option purchase, Rembrandt hired the inventors as consultants and they jointly obtained an attorney to provide legal advice regarding patent ownership. Rembrandt subsequently exercised the option and filed suit against an alleged infringer. The district court held that once Rembrandt had acquired an exclusive option to purchase the patent, "it was already 'engage[d] in a common legal enterprise' with the named inventors and communications between them were 'part of an on-going and joint effort to set up a common ...strategy' for perfecting title in the patent and enforcing it through litigation." *Id.* at *7.  The court added that his review of the withheld documents *in camera* confirmed that once Rembrant purchased the exclusive option the "the parties' interests aligned and they began to pursue joint legal interests." *Id.*

Here, in contrast, the Court's review of the Term Sheet, the Stroz Report, and its exhibits confirms the opposite: Uber and Otto's interests were not aligned.  The interviewees were required to "attest" to the truth of what they reported to Stroz and to "certify" that they had complied with Uber's due diligence in good faith.  The protocol set up an elaborate process to ensure that Stroz did not share Otto's attorney-client privileged communications with Uber.  And, most significantly, whether Uber decided to go forward with the acquisition depended in part on what it

United States District Court
Northern District of California

16

learned from the Stroz pre-signing due diligence. Thus, Otto's interest was in Uber not learning anything that would cause it not to sign the Put Call Agreement, whereas Uber's interest was in learning as many facts as possible before it committed to the Put Call Agreement. Accordingly, Uber and Otto's interests, legal or otherwise, were not aligned.  This is why on March 14 and March 21, Levandowski's counsel told Stroz that Levandowski shared a common legal interest with Otto, but did not also claim to share a common interest with Uber.  (Stroz Report, Exhs. 2, 3.) Uber and Otto were on opposite sides of a proposed transaction.

The Court's review of the Term Sheet, the Stroz Report and its exhibits also shows that Uber was not "engage[d] in a common legal enterprise" with Otto and their joint communications with Stroz were not "part of an on-going and joint effort to set up a common . . . strategy." *Rembrandt*, 2016 WL 427363, at *7.  Instead, the Stroz investigation was a process designed to allow Uber to discover facts relevant to its acquisition decision and to create a record to control reimbursement of indemnification expenses to Uber.

Some district courts have held that so long as parties are contemplating a merger or similar transaction they share a common interest sufficient to avoid waiver through the sharing of privileged documents.  *See, e.g.*, *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308 (N.D. Cal. 1987).  These cases, however, involve the sharing of already privileged information, and not the joint production of purportedly privileged work product.  Uber does not cite any case in which parties on opposing sides of a proposed transaction were allowed to claim attorney work-product for due diligence jointly conducted by the parties.  But, to the extent the *Hewlett-Packard* analysis could be extended to the joint creation of work product, this Court simply disagrees. "Such an exception would remove the common interest doctrine far from its historical antecedent, the joint defense doctrine*." Nidec Corp.,* 249 F.R.D. at 580.  Thus, the Court finds that Otto and Uber did not share a common legal interest at the time they jointly engaged Stroz to conduct a factual investigation into certain Otto employees and the Stroz investigation was not designed to further a joint defense strategy.[2]  The common interest/joint defense doctrine therefore does not

---

[2] The outcome might be different after the signing of the Put Call Agreement.  At that point Uber and Otto, and perhaps even Levandowski and Ron, arguably shared a common legal interest.

United States District Court
Northern District of California

1   prevent Uber's waiver of any work-product privilege in the Stroz Report.

2         Uber relies on the Stroz engagement letter and the written joint defense agreement as

3   evidence of the parties' common legal interest.  Once again it emphasizes that the letter recites that

4   the "purpose of the Engagement is to enable Uber, Otto, Anthony Levandowski and Lior Ron

5   (who are parties to a Joint Defense and Common Interest Agreement), along with respective

6   counsel, to understand certain factual matters potentially related to potential litigation," and that

7   the "Joint Defense, Common Interest and Confidentiality Agreement" states that it is in

8   contemplation of potential litigation. (Dkt. No. 369 at 13.)  None of this evidence is persuasive.

9         The engagement letter attached to Uber's opposition (and provided with its *in camera*

10  submission) is not evidence of the parties' intent when MoFo and OMM engaged Stroz. The

11  engagement letter does not appear to be the version that was operative when Stroz began its

12  investigation and, specifically, when it interviewed Levandowski and Ron and received their

13  devices in March 2016 and when it provided its interim report to MoFo in early April

14  2016.  Instead, there appears to be an earlier version of the letter which Uber has not

15  produced.  Although the version Uber produced is dated "as of March 4, 2016," Uber's

16  authenticating witness does not provide any evidence as to when that version of the letter was

17  created.  (Dkt. 370 ¶ 12.)  The objective evidence suggests it was not created on March 4, and was

18  instead drafted or modified around the time of the April 11 execution of the Put Call Agreement

19  and Joint Defense Common Interest and Confidentiality Agreement.

20        On March 14 and March 21, Levandowski's counsel Gardner writes Stroz regarding

21  Levandowski's upcoming examination by Stroz "pursuant to the engagement letter"; thus, there

22  seems to have been some engagement letter that was written prior to those dates.  Counsel also

23  states, however, that his client Levandowski shares a common interest with Otto, but he does not

24  state that Levandowski shares a common interest with Uber.  Nor does he disclose the existence of

25

26  _____

27  Once the Put Call Agreement was signed Uber had an indemnification obligation and the parties
    could bind one or the other to the sale, provided certain conditions were met. Uber's only
    argument to the Court, however, is that the common legal interest arose upon the signing of the

28  Term Sheet and, in any event, the Stroz investigation began well before the Put Call Agreement
    was signed.

United States District Court
Northern District of California

a "Joint Defense and Common Interest Agreement."  This omission directly contradicts the "as of March 4, 2016" engagement letter's statement that Uber, Otto, Levandowski and Ron are parties to a "Joint Defense and Common Interest Agreement."  If as of March 14 Levandowski had entered into such an agreement, Gardner would have certainly referenced that in his communication with Stroz, rather than simply stating that Levandowski shares a common interest with Otto and not with Uber.  Further, the written "Joint Defense and Common Interest Agreement" was not entered into until April 11, 2016, weeks after the purportedly "as of March 4" engagement letter.

Finally, the Court's *in camera* review of the Stroz Report reveals that the Stroz investigation protocol was revised on April 11, 2016, but then given the date of "as of March 4, 2016." (Stroz Report at 4.)  The protocol is an exhibit to the engagement letter, and both are attached as Exhibit 4 to the Stroz Report and both dated "as of March 4, 2016."  The Court thus finds that the engagement letter, like the protocol, was most likely revised on April 11, 2016 and then given the date "as of March 4, 2016."  It is thus not evidence of the parties' intent when Stroz began its investigation in early March 2016. What might be probative is the engagement letter, if any, Stroz actually sent MoFo and OMM on March 4, but Uber has chosen not to place such document in the record.

The engagement letter's probative value as to Uber's intent in retaining Stroz is further undermined by what is missing from the "as of March 4" letter; namely, any reference whatsoever to the very Term Sheet which required the hiring of Stroz in the first instance and set forth in detail Stroz's duties and responsibilities. The Term Sheet also dictated that the Stroz investigation would create a record to determine whether an employee, such as Levandowski, must reimburse Uber for indemnification, should Uber incur an indemnification obligation.  Yet, the engagement letter is silent as to the existence of the Term Sheet.

The written Joint Defense, Common Interest and Confidentiality Agreement also does not persuade the Court that Uber and Otto retained Stroz to further a common legal interest in litigation with Waymo.  The Agreement was entered into at the same time as the signing of the Put Call Agreement and primarily references that Agreement and the need for the parties to cooperate

United States District Court
Northern District of California

in the "proceedings" that are likely to occur as a result of the acquisition.  The February 24, 2016 email among counsel for Uber and Otto referencing discussions about a "JDA" is insufficient to support a finding that Stroz was engaged to further a common legal interest in defending against litigation brought by Waymo rather than the purposes set forth in the Term Sheet.  The email may have been referencing the "JDA" that would be entered into upon the signing of the Put Call Agreement, exactly what happened here.  And, in any event, parties cannot create a common legal interest where none exists merely by entering into a joint defense agreement.

Counsel's declarations are also not persuasive evidence that Otto and Uber retained Stroz to pursue a common legal strategy.  MoFo, for example, declares that it and OMM engaged Stroz "to aid MoFo and OMM in providing legal advice to their respective clients about litigation risks and potential claims that could be brought by Google in connection with Uber's acquisition of Otto." (Dkt. No. 370 ¶ 9.)  Nowhere in the declaration, however, or even in Uber's opposition, is it disclosed that MoFo retained Stroz as required by the Term Sheet to enable Uber to conduct due diligence before deciding whether to enter into the Put Call Agreement.  Nowhere in the declaration is it disclosed that the Stroz investigation would control whether an employee, such as Levandowski, would be required to reimburse Uber for indemnification expenses as determined by an arbitrator or a court.  And nowhere in the declaration does it disclose that the Term Sheet did not obligate either party, even conditionally, to close the transaction.  The only objective contemporaneous evidence as to the purpose of the Stroz engagement—Exhibit C to the February 22, 2016 Term Sheet—is omitted from all of the counsel declarations.  Accordingly, the Court accords them little weight.

In sum, the Court finds that Uber and Otto did not share a common legal interest when they jointly retained Stroz and that the Stroz investigation was not in furtherance of any common legal strategy.  Thus, the common interest/joint defense doctrine does not prevent Uber's disclosure of its work product to Otto from waiving Uber's work-product privilege.  It also appears that the Stroz Report, or at least portions of it, were disclosed to Levandowski and Ron before the execution of the Put Call Agreement.  (Stroz Report at 4.)  Levandowski/Ron also did

1    not share a common legal interest with Uber for the same reasons as Otto. This is an additional

2    reason the common interest doctrine does not prevent waiver of Uber's work-product privilege.

3        **2.   Uber Disclosed the Stroz Investigation to an Adversary**

4        "Unlike for the attorney-client privilege, waiver of attorney work-product protection

5    requires more than the disclosure of confidential information, it requires an act inconsistent with

6    the adversary system." *Great Am. Assur. Co. v. Liberty Surplus Ins. Corp.*, 669 F. Supp. 2d 1084,

7    1092 (N.D. Cal. 2009); *see also United States v. Bergonzi*, 216 F.R.D. 487, 497 (N.D. Cal. 2003).

8    (work-product protection is waived when the privileged documents are disclosed to a third party

9    and that disclosure enables an adversary to access the information).

10       This additional hurdle does not save Uber's waiver here. Uber disclosed the Stroz

11   investigation to its then adversaries Otto, Levandowski and Ron. Before the signing of the Put

12   Call Agreement, Otto was Uber's adversary because they were on opposite sides of a potential

13   transaction. Further, Uber engaged Stroz to investigate Otto and its employees and the results of

14   that investigation could have caused Uber to not proceed with the acquisition. In *Bergonzi*, for

15   example, a company disclosed to the government its internal investigation into its officers'

16   securities fraud. After the government sued the officers, the officer defendants sought discovery

17   from the company of the internal investigation. The district court held that the company waived

18   any work-product privilege in the investigation by disclosing it to the government; the government

19   was its adversary since it was investigating the company. 216 F.R.D. at 498. Similarly, here,

20   Uber was investigating Otto and the results of that investigation could have resulted in no

21   acquisition. Otto was Uber's adversary.

22       Levandowski and Ron were also Uber's adversaries as Uber was investigating them too.

23   The investigation results could have led to Levandowski and Ron losing millions of dollars if Uber

24   decided not to sign the Put Call Agreement because of what it learned. Or, the investigation could

25   lead to Levandowski or Ron having to reimburse Uber for indemnification expenses if an

26   arbitrator or court finds that they were not truthful with Stroz. Levandowski and Ron were Uber's

27   adversaries with respect to the Stroz investigation and thus Uber's disclosure of its work product

28   to Levandowski and Ron waived any work-product privilege.

United States District Court
Northern District of California

1    Once a party has disclosed work product to one adversary, it waives work-product

2    protection as to all other adversaries. *See Bergonzi*, 216 F.R.D. at 498 (holding that since the

3    company had disclosed its work product to the government, an adversary, the company had to

4    disclose it to the officer defendants).  As Uber disclosed its Stroz work product to its adversaries

5    Otto, Levandowski and Ron, it must disclose the same work product to Waymo.

6       **C.    Waymo has a Substantial Need for Parts of the Stroz Report**

7    Even if the Stroz Report and exhibits are non-waived attorney work-product, some of the

8    documents must nonetheless be produced to Waymo.  Ordinary fact work product is discoverable

9    when the moving party has a substantial need for the documents. *See* Fed. R. Civ. P.

10   26(b)(3)(A)(ii). Opinion work product, in contrast, "receives greater protection than ordinary work

11   product and is discoverable only upon a showing of rare and exceptional circumstances." *Tennison*

12   *v. City & Cnty. Of San Francisco,* 226 F.R.D. 615, 623 (N.D. Cal. 2005) (citation omitted); *see*

13   *also Holmgren v. State Farm Mut. Auto. Ins. Co*., 976 F.2d 573, 577 (9th Cir. 1992) ("A party

14   seeking opinion work product must make a showing beyond the substantial need/undue hardship

15   test required under Rule 26(b)(3) for non-opinion work product."). Opinion work product reveals

16   an attorney's or the attorney's representative's mental impressions, conclusions, opinions or legal

17   theories.  *Holmgren*, 976 F.2d at 577.  To the extent that an investigator's interview reports reflect

18   essentially verbatim witness statements, they are only factual work product that are discoverable

19   based on a showing of substantial need.  *See In re Convergent Technologies Second Half 1984*

20   *Secs. Litig.*, 122 F.R.D. 555, 559 (N.D. Cal. 1988).

21   Waymo has made a showing of a substantial need for Levandowski's interview memo and

22   the documents retrieved from his devices and cloud storage.  The district court has already found

23   that Levandowski downloaded 14,000 Waymo files shortly before decamping for Otto; thus, he is

24   the key witness in this trade secret litigation.  However, he has refused to testify or produce any

25   documents on Fifth Amendment grounds, including any documents he may have taken from

26   Waymo. Thus, the Stroz investigation is the only way for Waymo to obtain this relevant

27   information; Waymo has thus met its burden of showing a substantial need for these documents.

28   *See, e.g., In re Vitamins Antitrust Litig.*, No. 99-197, 2003 WL 1867908, at *1 (D. D.C. Jan. 24,

2003).

Having reviewed the documents and the memo *in camera*, the Court finds that they are ordinary fact work product.  The memo is nearly a verbatim recitation of what Levandowski told Stroz and in the end he even attests to the truth of what he reported.  Levandowski, or at least his counsel, also reviewed the memo before Stroz disclosed it to OMM and MoFo.  (Stroz Report at 5.)  It does not contain any Stroz impressions, conclusions, opinions or legal theories.  Much of the Report itself, in contrast, reflects Stroz's "findings and methodology" and thus, may be opinion work product.

The exhibits, which are documents Stroz retrieved rather than created, are also, at best, fact work product.  The Court rejects Uber's argument that ordering the documents produced will reveal Stroz's mental impressions and opinions in deciding which documents to attach to the Report.  As neither the Court nor Waymo has access to all of the documents Stroz reviewed, producing these pre-existing documents will not reveal Stroz's strategies or opinions.  *Compare with Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir. 1985) (holding that an attorney's binder of a few documents used to prepare his client for deposition out of the thousands produced in the litigation was opinion work product).

Because the Court has concluded that the entire Stroz Report and its exhibits must be produced as they are not protected by attorney-client privilege and any work-product privilege has been waived, the Court will not in this Order identify with specificity which documents or portions of documents are ordinary fact work product for which Waymo has demonstrated a substantial need.  The Court will do so when and if needed.

## CONCLUSION

Neither Uber nor Levandowski has met its/his burden of showing that the Stroz Report and any of its exhibits are protected from discovery in this civil action by an attorney-client privilege.  As there is no separate "common interest privilege" that protects documents from discovery that are not otherwise privileged, that is the end of the Court's inquiry on the attorney-client privilege question.  To the extent the Report and its exhibits are Uber's attorney work-product, Uber waived any privilege by disclosing, indeed jointly creating, that work product with Otto and later to

United States District Court
Northern District of California

1    Levandowski and Ron. Waymo's motion to compel is therefore GRANTED.

2           Any party wishing to file an objection to this Order with the district court in accordance

3    with N.D. Cal. Civil L.R. 72-2 must file its objection on or before Thursday, June 8, 2017.  In the

4    meantime, the Court STAYS this Order until further order of the district court or unless or until no

5    objection is filed.

6           This Order disposes of Docket Nos. 321, 371, 382.

7           **IT IS SO ORDERED.**

8    Dated:  June 5, 2017

9

10

11   JACQUELINE SCOTT CORLEY
     United States Magistrate Judge

United States District Court
Northern District of California