# EXHIBIT 66
# FILED UNDER SEAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

WAYMO LLC,

Plaintiff,

vs. No. 3:17-cv-00939-WHA

UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING, INC.,

Defendants.

________________________________/

ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF ANTHONY LEVANDOWSKI

SAN FRANCISCO, CALIFORNIA

FRIDAY, APRIL 14, 2017

BY: ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

CSR LICENSE NO. 9830

JOB NO. 2594023

Pages 1 - 184

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
---oOo---

WAYMO LLC,
Plaintiff,
vs. No. 3:17-cv-00939-WHA
UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING, INC.,
Defendants.
_______________________________/

Videotaped Deposition of Anthony Levandowski, taken on behalf of the Plaintiffs, on April 14, 2017, at Quinn Emanuel Urquhart & Sullivan, 50 California street, Suite 2200, San Francisco, California 94111, beginning 9:05 a.m., and commencing at 3:13 p.m., Pursuant to Notice, and before me, ANDREA M. IGNACIO, CSR, RPR, CRR, CLR ~ License No. 9830.

A P P E A R A N C E S:

FOR THE PLAINTIFFS:
QUINN EMANUEL URQUHART & SULLIVAN LLP
By: DAVID A. PERLSON, Esq.
PATRICK SCHMIDT, Esq. (Los Angeles)
50 California Street, Suite 2200
San Francisco, California 94111
Phone: 415.875.6600
davidperlson@quinnemanuel.com
patrickschmidt@quinnemanuel.com

FOR THE WITNESS:
RAMSEY EHRLICH LLP
By: MILES EHRLICH, Esq.
ISMAIL RAMSEY, Esq.
803 Hearst Avenue
Berkeley, California 94710
Phone: 510.548.3600
miles@ramsey-ehrlich.com
ismail@ramsey-ehrlich.com

A P P E A R A N C E S: (Cont.)

FOR THE DEFENDANTS:
MORRISON & FOERSTER LLP
By: WENDY RAY, Esq.
707 Wilshire Boulevard, Suite 6000
Los Angeles, California 90017
Phone: 213.892.5446
wray@mofo.com

ALSO PRESENT: Nicole T. Bartow, Uber
Shana Stanton, Waymo Inc.
Jeffrey Anderson, Videographer

---oOo---

I N D E X

WITNESS: Anthony Levandowski

| EXAMINATION | PAGE |
|---|---|
| Mr. Perlson | 8, 179 |
| Ms. Ray | 165 |

E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 25 | Schematic for Uber's Fuji board | 135 |
| Exhibit 26 | PCB Configuration for the Fuji board | 142 |

---oOo---

SAN FRANCISCO, CALIFORNIA
FRIDAY, APRIL 14, 2017
9:05 A.M.

THE VIDEOGRAPHER: Good morning. 09:03
THE WITNESS: Good morning. 09:05
MR. EHRLICH: Good morning. 09:05
THE VIDEOGRAPHER: We are on the record at 09:05 9:05 a.m. on April 14th, 2017. 09:05
This is the video recorded deposition of 09:06 Anthony Levandowski. 09:06
My name is Jeffrey Anderson, here with our 09:06 court reporter, Andrea Ignacio. We're here from 09:06 Veritext Legal Solutions at the request of counsel for 09:06 the defendant. 09:06
This deposition is being held at 09:06 50 California Street in San Francisco, California. 09:06
The caption of this case is Waymo, LLC versus 09:06 Uber Technologies. Case No. 317-CV-00939 WHA. 09:06
Please note that audio and video recording 09:06 will take place, unless all parties agree to go off 09:06 the record. Microphones are sensitive and may pick up 09:06 whispers, private conversations, and cellular 09:06

interference, so please be aware of that. 09:06
Please state your name and the firm you 09:06 represent, beginning with the noticing attorney. 09:06
MR. PERLSON: I just want to correct one 09:06 thing you said. Plaintiff Waymo requested the 09:06 deposition, not the defendant. 09:07
THE VIDEOGRAPHER: I apologize about that. 09:07
MR. PERLSON: David Perlson from Quinn 09:07 Emanuel, on behalf of plaintiff Waymo. 09:07
MR. SCHMIDT: Patrick Schmidt from Quinn 09:07 Emanuel, on behalf of plaintiff Waymo. 09:07
MS. STANTON: Shana Stanton from Waymo. 09:07
MS. BARTOW: Nicole Bartow, in-house at Uber. 09:07
MS. RAY: Wendy Ray of Morrison & Foerster, 09:07 on behalf of defendants Uber Technologies, Ottomoto, 09:07 and Otto Trucking. 09:07
MR. EHRLICH: Miles Ehrlich from Ramsey & 09:07 Ehrlich, on behalf of the deponent, Anthony 09:07 Levandowski. 09:07
THE VIDEOGRAPHER: Thank you. 09:07
The witness will be sworn in, and counsel may 09:07 begin the examination. 09:07
/// 09:07
/// 09:07
/// 09:07

ANTHONY LEVANDOWSKI, 09:06
having been sworn as a witness
by the Certified Shorthand Reporter,
testified as follows:

EXAMINATION

BY MR. PERLSON:
Q Can you please state and spell your name for 09:07 the record. 09:07
A Anthony Levandowski. A-N-T-H-O-N-Y, 09:07 L-E-V-A-N-D-O-W-S-K-I. 09:07
Q And where do you live? 09:07
A I live in Oakland, California. 09:07
Q And have you ever been deposed before? 09:07
A I have not. 09:08
Q Well, you understand that you're testifying 09:08 under oath, the same oath that you would take if you 09:08 were testifying in front of a jury? 09:08
A I understand that. 09:08
Q Is there any reason you can't give complete 09:08 and accurate testimony today? 09:08
A I don't see why not. 09:08
Q I'm going to try to be as clear as I can. 09:08 But, if I'm not clear, please do let me know, and I'll 09:08 do my best to rephrase the question. 09:08

Is that acceptable? 09:08
A That sounds great. 09:08
Q And, you need to give audible answers, yes or 09:08 no, rather than nodding of the head or shaking of the 09:08 head. 09:08
A Of course. I understand that. 09:08
Q I see you have a couple of pieces of paper in 09:08 front of you. Can you tell me what those are. 09:08
A Yeah, my counsel gave me two pieces of paper. 09:08 They say very similar things. Do you want me to read 09:08 them out to you? 09:08
Q No. I suspect that you'll probably read them 09:08 later. 09:08
A You'll hear them, most likely. 09:09
Q Yeah. Okay. 09:09
Well, where do you work currently? 09:09
A I work at Uber. 09:09
Q Okay. And what's your position there? 09:09
A I'm vice president of engineering. 09:09
Q And in what aspect of -- what -- what -- what 09:09 are your responsibilities as vice president of 09:09 engineering? 09:09
MR. EHRLICH: I'm going to instruct you to 09:09 invoke your constitutional rights. 09:09
THE WITNESS: I'll read from the paper: 09:09

"On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States." 09:09
MR. PERLSON: Q. How long have you worked at Uber? 09:09
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:09
Q You are a former employee of Google; correct? 09:10
A That's correct. 09:10
Q When did you leave the employ of Google? 09:10
MR. EHRLICH: You can answer. 09:10
THE WITNESS: Okay. In January of 2016. I don't know the exact date, yeah. 09:10
MR. PERLSON: Q. When you worked at Google, you received tens of millions of dollars in compensation from Google; is that accurate? 09:10
MR. EHRLICH: I'm going to instruct you to assert your rights. 09:10
THE WITNESS: Okay. On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the

United States. 09:10
MR. PERLSON: Q. You understood that, while you were at Google, that you were obligated to keep Google sensitive information confidential? 09:10
A On the advice of -- on the -- on the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:11
Q You understand that, while you were at Google, you were not allowed to use Google's confidential information for a competitor? 09:11
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:11
Q Mr. Levandowski, you were in discussions with Uber for months prior to your departure from Google regarding working for Uber; correct? 09:11
A On the advice of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:11
Q You and Uber discussed how you would form a new company while you were employed by Google? 09:11

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:12
Q You and Uber discussed that your new company would eventually be acquired by Uber while you were still employed at Google? 09:12
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:12
Q You began forming your new company that would eventually be acquired by Uber in early 2016; is that correct? 09:12
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:12
Q That new company eventually became Otto; correct? 09:12
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:12
Q While you were still employed by Google, you

recruited engineers to join your new company so that your new company could replicate Google's LiDar technology; correct? 09:13
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:13
Q You made Uber aware of your plan to replicate Google's LiDar technology for your new company; correct? 09:13
A On the -- on the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:13
Q Travis Kalanick recruited you personally to do -- to work for Uber; correct? 09:13
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me on the Fifth Amendment -- under the Fifth Amendment of the United States -- the Fifth Amendment of the Constitution of the United States. 09:14
Q Mr. Kalanick was aware of your plan to replicate Google's LiDar technology for your new company; correct? 09:14

A On the advice and direction of my counsel, I 09:14
respectfully decline to answer. And I assert the 09:14
rights guaranteed to me under the Fifth Amendment of 09:14
the Constitution of the United States. 09:14
Q In fact, Uber -- Uber encouraged you to 09:14
replicate Google's LiDar technology at Otto; correct? 09:14
A On the advice and direction of my counsel, I 09:14
respectfully decline to answer. And I assert the 09:14
rights guaranteed to me under the Fifth Amendment of 09:14
the Constitution of the United States. 09:14
Q And Mr. Kalanick encouraged you to replicate 09:14
Google's LiDar technology at Otto; correct? 09:14
A On the advice and direction of my counsel, I 09:14
respectfully decline to answer. And I assert the 09:14
rights guaranteed to me under the Fifth Amendment of 09:14
the Constitution of the United States. 09:14
Q Uber encouraged you to replicate Google's 09:14
LiDar technology so that it would be available to Uber 09:15
when it acquired Otto; correct? 09:15
A On the advice and direction of my counsel, I 09:15
respectfully decline to answer. And I assert the 09:15
rights guaranteed to me under the Fifth Amendment of 09:15
the Constitution of the United States. 09:15
Q You took over 14,000 confidential documents 09:15
from Google prior to your departure from Google; 09:15

correct? 09:15
A On the advice and direction of my counsel, I 09:15
respectfully decline to answer. And I assert the 09:15
rights guaranteed to me under the Fifth Amendment of 09:15
the Constitution of the United States. 09:15
Q You made these 14,000 confidential documents, 09:15
that you took from Google, available to your new 09:15
company, Otto; correct? 09:15
A On the advice and direction of my counsel, I 09:15
respectfully decline to answer. And I assert the 09:15
rights guaranteed to me under the Fifth Amendment of 09:15
the Constitution of the United States. 09:15
Q Among the 14,000 documents you took from 09:15
Google, there were documents that reflected Google's 09:15
proprietary LiDar technology; correct? 09:15
A On the advice and direction of my counsel, I 09:16
respectfully decline to answer. And I assert the 09:16
rights guaranteed to me under the Fifth Amendment of 09:16
the Constitution of the United States. 09:16
Q You took the 14,000 documents from Google so 09:16
that you could get -- so that you could more quickly 09:16
replicate Google's technology at Otto; correct? 09:16
A On the advice and direction of my counsel, I 09:16
respectfully decline to answer. And I assert the 09:16
rights guaranteed to me under the Fifth Amendment of 09:16

the Constitution of the United States. 09:16
Q Uber knew that you took 14,000 confidential 09:16
documents from Google in order to accelerate your 09:16
development of LiDar technology at Otto -- 09:16
A On -- 09:16
Q -- correct? 09:16
A On the advice and direction of my counsel, I 09:16
respectfully decline to answer. And I assert the 09:16
rights guaranteed to me under the Fifth Amendment of 09:16
the Constitution of the United States. 09:16
Q Uber encouraged you to take the 09:16
14,000 confidential Google documents so that the 09:16
information would be available to Uber when it 09:16
acquired Otto; correct? 09:16
A On the -- on the advice and direction of my 09:16
counsel, I respectfully decline to answer. And I 09:17
assert the rights guaranteed to me under the Fifth 09:17
Amendment of the Constitution of the United States. 09:17
Q Uber helped you conceal the fact that you had 09:17
taken 14,000 confidential documents from Google; 09:17
correct? 09:17
A On the advice and direction of my counsel, I 09:17
respectfully decline to answer. And I assert the 09:17
rights guaranteed to me under the Fifth Amendment of 09:17
the Constitution of the United States. 09:17

Q Uber developed a plan in which a joint 09:17
defense agreement would be entered for the sole 09:17
purpose of hiding the fact that you had taken 09:17
14,000 confidential documents from Google? 09:17
MS. RAY: I instruct you not to answer on the 09:17
basis of attorney-client privilege. 09:17
MR. PERLSON: Q. Are you aware of the 09:18
existence of a due diligence report regarding that -- 09:18
regarding Uber's acquisition of Otto? 09:18
MS. RAY: Can you hold on a second. 09:18
You may answer. 09:18
MR. EHRLICH: I'm going to instruct you to 09:18
decline to answer based on attorney-client privilege, 09:18
and also instruct you to assert your rights. 09:18
THE WITNESS: Okay. On the -- 09:18
MS. RAY: Join in that instruction on 09:18
attorney-client privilege. 09:18
MR. PERLSON: Can you identify the attorney 09:18
and the client in that instruction. 09:18
MR. EHRLICH: The attorney and the client in 09:19
that instruction? 09:19
The client is Mr. Levandowski, and the 09:19
attorney at the time was John Gardner, and other 09:19
attorneys associated with Uber and Otto, whose names I 09:19
don't know at the present time. 09:19

And it's related to joint defense common interest privilege that's been under discussion before Judge Alsup. 09:19

MR. PERLSON: Q. Do you want to read your -- 09:19

MR. EHRLICH: Please go ahead. 09:19

MS. RAY: Well, he's gotten an instruction not to answer; right? 09:19

Miles, you're instructing him not to answer? 09:19

MR. EHRLICH: Yeah, that's a good point. The instruction is not to answer. 09:19

And you're going to follow my instruction? 09:19

THE WITNESS: I will follow your instruction. 09:19

MR. EHRLICH: Okay. 09:19

MR. PERLSON: Q. Mr. Levandowski, you and Uber discussed how you should exploit Google's confidential information regarding LiDar technology in a way that wouldn't subject Uber to liability for that use; correct? 09:20

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:20

Q Before you left Google, you and Uber discussed you starting a new company in January -- January 2016? 09:20

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:20

Q You and Uber decided that you should start a new company so that you could start exploiting Google's confidential information without leaving a trail at Uber; correct? 09:20

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:21

Q You and Uber had an understanding by at least early 2016 that your new company would be acquired by Uber; correct? 09:21

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:21

Q In January of 2016, you and Uber discussed how to cover up the fact that you had taken 14,000 confidential documents from Google; correct? 09:21

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of

the Constitution of the United States. 09:21

Q Throughout the first half of 2016 you did, in fact, use the 14,000 confidential Google documents that you took; correct? 09:21

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:22

Q Throughout the first half of 2016, you used the 14,000 confidential Google documents that you took in order to accelerate your development of LiDar systems at Otto; correct? 09:22

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:22

Q And, even while you were employed by Uber, you used the 14,000 confidential Google documents that you took in order to accelerate the development of LiDar systems at Uber? 09:24

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:22

THE WITNESS: Can you stop a minute? The sun

has moved, and there's a glare. If we -- 09:22

MR. PERLSON: Why don't we take a break. 09:22

THE VIDEOGRAPHER: Going off the record. The time is 9:22 a.m. 09:23

(Recess taken.) 09:23

THE VIDEOGRAPHER: We are back on the record. The time is 9:24 a.m. 09:24

MR. PERLSON: Q. Mr. Levandowski, the 14 confident- -- let me start over again. 09:25

Mr. Levandowski, the 14,000 confidential documents that you took from Google allowed you to develop LiDar systems at Otto more quickly than if you'd started with a clean sheet design? 09:25

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:25

Q Mr. Levandowski, your use of the 14,000 confidential documents you took from Google allowed you to sell Otto to Uber for over $680 million in just a few months? 09:25

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:25

Q You disclosed the status of your development of LiDar systems at Otto before the acquisition of Otto by Uber? 09:25
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:26
Q The advanced status of Otto's LiDar systems substantially contributed to the value of Otto; correct? 09:26
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:26
Q You understand that Uber paid $680 million for Otto because they knew that Otto had leveraged Google's confidential information; correct? 09:26
MS. RAY: Objection; calls for speculation. 09:26
MR. EHRLICH: Go ahead and answer. 09:26
THE WITNESS: Okay. 09:26
On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:26
MR. PERLSON: Q. Uber told you that they 09:26

paid $680 million for Otto because they knew that Otto had leveraged Google's confidential information? 09:27
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:27
Q You used confidential information you took from Google to develop LiDar at Uber; correct? 09:27
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:27
Q You used information from the 14,000 files you took from Uber -- from -- let me start over again. 09:27
You used confidential information from the 14,000 files you took from Google to develop LiDar at Uber; correct? 09:27
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:28
Q You used information from the 14,000 files you took from Google to develop the OWL device; correct? 09:28
A On the advice and direction of my counsel, I 09:28

respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:28
Q You used confidential information from the 14,000 files you took from Google to develop the Fuji device at Uber; correct? 09:28
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:28
Q You used confidential information from the 14,000 files you took from Google to develop the Spider device; correct? 09:28
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:29
Q Without the use of the 14,000 -- let me start over again. 09:29
Without the use of information from the 14,000 files you took from Google, Otto would not have been able to develop any of its LiDar devices; correct? 09:29
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the 09:29

rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:29
Q Without the information from the 14,000 files you took from Google, Uber would not have been able to develop any of its LiDar devices; correct? 09:29
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:30
Q Uber continues to use information from the 14,000 files you took from Goober -- from Google to develop its LiDar systems even today? 09:30
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:30
Q Information from the 14,000 files you took from Google has made its way onto Uber's servers; correct? 09:30
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment -- 09:30
Q On what -- 09:30
A -- of the Constitution of the United States. 09:30
Q On what servers at Uber does Google's 09:30

confidential information from the 14,000 files you took from Google reside? 09:31
MS. RAY: Objection; calls for speculation. 09:31
MR. EHRLICH: Go ahead and answer. 09:31
THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:31
MR. PERLSON: Q. At least some portion of the 14,000 files you took from Google remains on Uber's servers; correct? 09:31
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:31
Q As head of its self-driving car program, you agree that Google and Waymo's confidential information is the source of all of -- let me start over again. 09:32
All of Uber's LiDar designs are a derivative of Google's and Waymo's confidential information that you took and used at Uber as head of its self-driving car program; correct? 09:32
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of 09:32

Page 26

the Constitution of the United States. 09:32
Q Are you aware that defendants in this case have served on plaintiff almost 1,000 pages of privilege logs? 09:32
MS. RAY: Objection. 09:32
I instruct you not to answer to the extent that calls for attorney-client privileged information. 09:32
MR. EHRLICH: And, to the extent it doesn't call for privileged information, I instruct you to assert your rights. 09:33
THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 09:33
MR. PERLSON: Q. Are you aware that the basis for nearly every single assertion of privilege in this document is based on communications made at least in part by you? 09:33
MS. RAY: Objection. 09:33
I instruct you not to answer to the extent it calls for attorney-client privileged information. 09:33
The only information he would know is from attorneys. 09:33
I instruct you not to answer. 09:33
MR. EHRLICH: And I will instruct you to 09:33

Page 27

follow that instruction. 09:33
THE WITNESS: On the advice and direction of my counsel -- 09:33
MR. EHRLICH: Well, so you're not going to answer. 09:33
THE WITNESS: I'm not going to answer? Okay. 09:33
MR. EHRLICH: You're not going to answer on the instruction of counsel for Uber. 09:34
THE WITNESS: I will follow advice from counsel. 09:34
MR. PERLSON: Understood. 09:34
I -- the premise that the only way that he could know that information is from counsel is demonstrably false. But, if you want to make that instruction, you can go right ahead. 09:34
MS. RAY: Looking at the question, I don't believe that's true. 09:34
MR. PERLSON: You can make your instruction and live with the consequences of it. 09:34
Do you want me to go on? 09:34
Q Are you aware that there are entries on the privilege log that defendants have served in this case as early as January 29th, 2016? 09:34
MS. RAY: Objection. 09:34
I instruct you not to answer on the basis of 09:34

Page 28

attorney-client privilege. 09:34
MR. EHRLICH: Let me just read this. Excuse me. 09:35
And, to the extent it does not call for privileged information, I'm going to instruct you to assert your rights. 09:35
MR. PERLSON: Well, she instructed him not to answer. 09:35
So, are you following that instruction? 09:35
MR. EHRLICH: I'm going to ask you to follow that instruction. 09:35
THE WITNESS: Okay. 09:35
MR. EHRLICH: But to be safe and so the record is clear, in case there is information that he may know that is not from a privi- -- privileged source, I think it's best that he provide an answer for the record. 09:35
MR. PERLSON: Okay. I mean, I understand why you're saying that, but that's not how it works. You either answer the question or you don't. 09:35
So, if you want to take a break to figure out what the appropriate thing to do is, that's fine. But we don't want to -- we're not going to waste time. 09:35
MS. RAY: Let's go off the record. 09:35
MR. EHRLICH: It's -- just for the record, so 09:35

Page 29

the only -- I respect that Uber is making a privileged 09:35
objection. 09:35
I want to make sure that nothing 09:35
Mr. Levandowski does undermines the privilege that 09:36
Uber is asserting. 09:36
If -- to the extent it's a common interest 09:36
privilege, I would be advising Mr. Levandowski to 09:36
assert it as well. 09:36
But I just want -- I just want to be clear. 09:36
I'm not -- I think if there is an answer that's 09:36
required, I'm going to instruct him to assert his 09:36
rights. 09:36
MR. PERLSON: Okay. I think -- once again, I 09:36
think the objection is improper. 09:36
Q But, are you going to follow -- are you going 09:36
to follow Uber's instructions -- 09:36
A I'm going to follow -- 09:36
Q -- not to answer the question? 09:36
A I'm going to follow Miles' instructions. 09:36
MR. EHRLICH: And I'm going to ask him to 09:36
follow that instruction. 09:36
MR. PERLSON: Okay. 09:36
THE WITNESS: So that means I follow -- 09:36
MR. EHRLICH: So we can move on. 09:36
MR. PERLSON: Okay. 09:36

Q January 29, 2016, is within days of you 09:36
leaving Google; correct? 09:37
A On the advice and direction of my counsel, I 09:37
respectfully decline to answer. And I assert the 09:37
rights guaranteed to me under the Fifth Amendment of 09:37
the Constitution of the United States. 09:37
Q On January 29, 2016, were you receiving legal 09:37
advice regarding due diligence for an acquisition of 09:37
Ottomoto? 09:37
A On the advice and direction of my counsel, I 09:37
respectfully decline to answer. And I assert the 09:37
rights guaranteed to me under the Fifth Amendment of 09:37
the Constitution of the United States. 09:37
Q Did Ottomoto exist on January 29, 2016? 09:37
A On the advice and direction of my counsel, I 09:37
respectfully decline to answer. And I assert the 09:37
rights guaranteed to me under the Fifth Amendment of 09:37
the Constitution of the United States. 09:37
Q When did you first start receiving legal 09:37
advice regarding an acquisition of the company that 09:37
would become Ottomoto? 09:37
A On the advice and direction of my counsel, I 09:37
respectfully decline to answer. And I assert the 09:37
rights guaranteed to me under the Fifth Amendment of 09:37
the Constitution of the United States. 09:38

Q When did you first start discussing an 09:38
acquisition of what would become Ottomoto with Uber? 09:38
A On the advice and direction of my counsel, I 09:38
respectfully decline to answer. And I assert the 09:38
rights guaranteed to me under the Fifth Amendment of 09:38
the Constitution of the United States. 09:38
Q When did you first receive any -- let me 09:38
start over again. 09:38
When was your first attorney-client 09:38
communication with Eric Tate at Morrison & Foerster 09:38
regarding the acquisition of Ottomoto? 09:38
A On the advice and direction of my counsel, I 09:38
respectfully decline to answer. And I assert the 09:38
rights guaranteed to me under the Fifth Amendment of 09:38
the Constitution of the United States. 09:39
Q When did you first enter into a joint defense 09:39
agreement -- let me start over again. 09:39
When did you first enter into a common 09:39
interest agreement with Uber regarding a potential 09:39
acquisition of Otto? 09:39
A On the advice and direction of my counsel, I 09:39
respectfully decline to answer. And I assert the 09:39
rights guaranteed to me under the Fifth Amendment of 09:39
the Constitution of the United States. 09:39
Q What common interest do you have with Uber 09:39

regarding a potential acquisition of Otto? 09:39
MS. RAY: I instruct you not to answer on the 09:39
basis of attorney-client privilege. 09:39
MR. PERLSON: Again, I don't think that's a 09:39
proper instruction. 09:39
Q But, do you want to -- are you following 09:39
Uber's advice or instruction? 09:39
MR. EHRLICH: Let me look at the question. 09:39
I'm sorry. 09:39
THE VIDEOGRAPHER: Just cover your mic. 09:40
(Soto-voce discussion.) 09:40
MR. EHRLICH: Okay. I'm going to accept that 09:40
instruction and -- and advise you to follow it and 09:40
decline to answer. 09:40
THE WITNESS: I'm going to follow the advice. 09:40
MR. PERLSON: Q. What common interest did 09:40
Otto have with Uber regarding an acquisition by 09:40
Otto -- let me start over again. 09:40
What -- what common interest did Otto have 09:40
with Uber regarding a potential acquisition of Otto? 09:40
MS. RAY: I instruct you not to answer on the 09:40
basis of attorney-client privilege and common interest 09:40
privilege. 09:40
MR. EHRLICH: And same instruction from me to 09:40
follow that advice. 09:40

THE WITNESS: Okay. I will follow that 09:40
advice. 09:40
MR. PERLSON: Q. Did you anticipate 09:41
litigation regarding a potential acquisition of Otto 09:41
in as early as January 29, 2016? 09:41
A On the advice and direction of my counsel, I 09:41
respectfully decline to answer. And I assert the 09:41
rights guaranteed to me under the Fifth Amendment of 09:41
the Constitution of the United States. 09:41
Q Did Otto anticipate litigation regarding a 09:41
potential acquisition of Otto as early as January 29, 09:41
2016? 09:42
A On the advice and direction of my counsel, I 09:42
respectfully decline to answer. And I assert the 09:42
rights guaranteed to me under the Fifth Amendment of 09:42
the Constitution of the United States. 09:42
Q When did Otto first anticipate litigation 09:42
regarding a potential acquisition of Otto? 09:42
A On the advice and direction of my counsel, I 09:42
respectfully decline to answer. And I assert the 09:42
rights guaranteed to me under the Fifth Amendment of 09:42
the Constitution of the United States. 09:42
Q When did Uber first anticipate litigation 09:42
regarding a potential acquisition of Otto? 09:42
MS. RAY: Objection; calls for speculation. 09:42

MR. EHRLICH: You can answer. 09:42
THE WITNESS: Okay. 09:42
On the advice and direction of my counsel, I 09:42
respectfully decline to answer. And I assert the 09:42
rights guaranteed to me under the Fifth Amendment of 09:42
the Constitution of the United States. 09:42
MR. PERLSON: Q. When did Uber first tell 09:42
you they anticipated litigation regarding a potential 09:42
acquisition of Otto? 09:42
A On the advice and direction of my counsel, I 09:42
respectfully decline to answer. And I assert the 09:42
rights guaranteed to me under the Fifth Amendment of 09:42
the Constitution of the United States. 09:43
Q Isn't it correct that the common interest 09:43
that Otto and Uber had, in anticipation of litigation 09:43
regarding the Otto acquisition was concealing the fact 09:43
that you had taken 14,000 confidential documents from 09:43
Google? 09:43
A On the advice and -- 09:43
MS. RAY: Objection; form. 09:43
MR. EHRLICH: You can go ahead and answer. 09:43
MS. RAY: Hold on. 09:43
I instruct you not to answer on the basis of 09:43
attorney-client privilege. 09:43
MR. EHRLICH: One second.

MR. PERLSON: Do you want to go off the
record?
THE WITNESS: Yeah, why don't we do that.
THE VIDEOGRAPHER: Going off the record. The
time is 9:44.
(Recess taken.) 09:52
THE VIDEOGRAPHER: We are back on the record. 09:52
The time is 9:53. 09:53
MR. PERLSON: Q. Are you going to follow 09:53
your counsel's instruction? 09:53
THE WITNESS: Do we have any question? 09:53
MR. EHRLICH: Let me -- let me go back. 09:53
MS. RAY: I instructed him not to answer. 09:53
MR. EHRLICH: Okay. Ms. Ray instructed him 09:53
not to answer. 09:53
And I will now instruct you to follow that 09:53
instruction from Ms. Ray on the basis of 09:53
attorney-client privilege. 09:53
THE WITNESS: I'll follow that instruction. 09:53
MR. PERLSON: Q. Isn't it correct that the 09:53
common interest that Otto and Uber had in anticipation 09:54
of litigation regarding the Otto acquisition was 09:54
exploiting the confidential information you had 09:54
taken -- in the 14,000 documents you had taken from 09:54
Google? 09:54

MS. RAY: Objection; form. 09:54
I instruct you not to answer on the basis of 09:54
attorney-client and common interest privilege. 09:54
MR. EHRLICH: And the same instruction from 09:54
me to follow that instruction. 09:54
THE WITNESS: I will follow that instruction. 09:54
MR. PERLSON: Q. Your common interest with 09:54
Uber began while you were still employed at Google; 09:54
correct? 09:54
MS. RAY: Objection; form. 09:54
MR. EHRLICH: And -- and by "form," Counsel, 09:54
do you mean attorney-client privilege? 09:54
MS. RAY: No. I mean that it's a legal 09:55
conclusion what common interest is. I don't think he 09:55
knows what that is. So, it's speculation. 09:55
MR. EHRLICH: Okay. So, you can answer. 09:55
THE WITNESS: On -- on the advice and 09:55
direction of my counsel, I respectfully decline to 09:55
answer. And I assert the rights guaranteed to me 09:55
under the Fifth Amendment of the Constitution of the 09:55
United States. 09:55
MR. PERLSON: Q. Otto's common interest with 09:55
Uber began while you were still employed at Google? 09:55
MS. RAY: Objection; form. 09:55
THE WITNESS: On the advice and direction of 09:55

my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States.

MR. PERLSON: Q. Otto's common interest with Uber was to prevent the detection of your scheme to funnel Waymo's technology to Uber via Otto?

MS. RAY: Objection to form.

I instruct you not to answer on the basis of attorney-client and common interest privilege.

MR. EHRLICH: And I'll advise you to follow that instruction from Counsel.

MR. PERLSON: And whose -- who are the -- what common interest are you asserting then? Between who is it with?

And who is the attorney and the client in your instruction?

MS. RAY: Your question is about Otto's interests with Uber. And so, at the time, I believe Otto's attorneys were O'Melveny & Myers, and Uber's counsel was Morrison & Foerster. And you're making an assertion about the common interest, so we wouldn't agree with that.

MR. PERLSON: Well, that's not a basis for an attorney-client privilege instruction, so --

MS. RAY: You're asking him what the interest

is. And one, he doesn't know because he doesn't -- he's not a lawyer. He doesn't --

MR. PERLSON: Hey, hey, enough of the coaching.

MS. RAY: I'm not coaching.

MR. PERLSON: If you want to make an -- an -- I am -- I am asking a very specific question.

MS. RAY: You asked me a question --

MR. PERLSON: You instructed him not to answer on the basis of attorney-client privilege. You don't need to get into speculation or anything about that.

Answer my question: What is the common interest you're identifying? And who are the attorneys? And who is the client?

MS. RAY: I'm not being deposed here. We can discuss that at --

MR. PERLSON: Are you refusing to provide this information now? This is a very serious issue, and I need an answer.

MS. RAY: We can go -- if you want, we can go off the record.

MR. PERLSON: No. I want you to put this on the record.

MS. RAY: All right. Well, I need to take a

look at your question.

MR. PERLSON: Take -- take the time you need.

MS. RAY: So, you have asked the witness a question about the common interest; right? You're saying --

MR. PERLSON: You -- you made the instruction.

MS. RAY: I understand.

MR. PERLSON: You need to know what it is.

If you -- if we want to stop, get off the record, so you can figure out why you made your attorney-client privilege instruction, then you can do that.

But, I would suspect that, when you made the instruction, that you know --

MS. RAY: I do know.

MR. PERLSON: -- the answer to the question. So answer me, please.

MS. RAY: I'm happy to answer you.

MR. PERLSON: Okay.

MS. RAY: You want to be taught.

MR. PERLSON: Go.

MS. RAY: You were asking him about what the common interest is. The only way he would know that is from an attorney discussion. And so, that is

attorney-client privilege, and I'm not going to let him answer the question.

MR. PERLSON: Who is the attorney? Who is the client?

MS. RAY: I already identified that to you.

MR. PERLSON: When? In this question --

MS. RAY: Do you want me to ask the reporter to read it back? I'm happy to repeat it.

Otto's attorneys were O'Melveny & Myers, and Uber's counsel was Morrison & Foerster. Those are the attorneys.

MR. PERLSON: Okay. And what's the common interest, and who is it between?

MS. RAY: The common interest was between Otto and Uber, at least as to your question, and it was in anticipation of litigation.

Also, I just want to note that the record says on here -- on here that I am coaching. But I meant to say, if I didn't say it correctly, I am not coaching.

MR. PERLSON: Q. Isn't it correct that the common interest that Otto and Uber had in -- in anticipation of litigation, regarding the Otto acquisition, was exploiting the confidential information you had taken in the 14,000 documents you

had -- that's not the question. Let's start over again. 09:59

Isn't it correct that, before you left Google, there was a common interest between Otto and Uber to prevent the detection of your scheme to funnel Waymo's technology to Uber via Otto? 09:59

MS. RAY: Objection; form. 10:00

MR. EHRLICH: And -- and, Ms. Ray, is there an objection based on attorney-client privilege or joint -- or common interest privilege? 10:00

MS. RAY: I instruct you not to answer on the basis of attorney-client or common interest privilege. 10:00

MR. EHRLICH: So -- so I would ask you to follow that instruction and decline to answer. 10:00

MR. PERLSON: And that's based on the same common interest and the same attorneys that you had noted in reference to the last question; correct? 10:00

MS. RAY: Yes, sir. I'm not agreeing to your timing or characterization. 10:00

MR. PERLSON: I'm just asking you the basis of the instruction. 10:00

MS. RAY: The basis of the instruction is that the only way he knows about the common interest is because of attorney-client privileged discussions. 10:00

MR. PERLSON: I just want the record to be 10:01

very clear that the attorney-clients -- the attorney and the client and the common interest that you are basing your instruction on, is the same one that you had based your instruction on in the current -- in the previous question. 10:01

MS. RAY: Correct, without buying into your presumption about the timing. 10:01

THE REPORTER: Excuse me, Counsel. You're not mic'ed, so if you can try to keep your hand away. 10:01

MS. RAY: Oh, sure. I'm sorry. 10:01

MR. PERLSON: Q. At the time Uber acquired Otto, Uber had a due diligence report done in connection with that acquisition; correct? 10:01

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:02

Q The purpose of the due diligence report done before the -- Uber's acquisition of Otto was to determine the potential exposure for your theft of confidential information from Google? 10:02

MR. EHRLICH: Hold on. 10:02

MS. RAY: I instruct you not to answer on the basis of attorney-client and common interest privilege. 10:02

MR. EHRLICH: I advise you to follow that instruction. 10:02

THE WITNESS: I will follow that instruction. 10:02

MR. PERLSON: Q. As part of the due diligence report that was done in connection with the Otto acquisition, someone examined all of the computer systems at Otto for Google con- -- confidential information; correct? 10:02

MS. RAY: I instruct you not to answer on the basis of attorney-client and common interest privilege. 10:03

MR. PERLSON: Q. As part of the due diligence report, in connection with the Otto acquisition, someone examined all the computer systems at Otto for the 14,000 documents you had taken from Google? 10:03

MS. RAY: Same instruction. 10:03

MR. PERLSON: Q. Are you following that instruction? 10:03

A (Witness nods head.) 10:03

Q "Yes"? 10:03

A Yes. I'm sorry. No gestures. 10:03

But you didn't let me answer the last one, so -- 10:03

MR. EHRLICH: Go ahead. You're following 10:03

that instruction? 10:03

THE WITNESS: I'm following that instruction. 10:03

MR. PERLSON: Thank you. 10:03

Q As part of the due diligence report in connection with the Otto acquisition, it was determined that the 14,000 files that you had taken from Google did exist on Otto's servers; correct? 10:04

MS. RAY: Same -- same instruction. 10:04

MR. EHRLICH: And same instruction from me. 10:04

THE WITNESS: And I'm following. 10:04

MR. PERLSON: Q. As part of the due diligence report in connection with the Otto acquisition, it was determined that the 14,000 files that had been taken by you from Google should be deleted from Otto's servers; correct? 10:04

MS. RAY: Same instruction. 10:04

MR. EHRLICH: Same instruction, as well, from me. 10:04

THE WITNESS: I will follow. 10:04

MR. PERLSON: Q. If Uber had a third-party report done in connection with the Otto acquisition, and got a clean bill of health on Otto, why wouldn't Uber share that with Waymo? 10:05

MS. RAY: Objection; form. 10:05

Hold on. 10:05

Go ahead. 10:05
MR. EHRLICH: I'm looking -- so, there is an -- there is an objection on form. I'm not hearing an objection based on attorney-client or joint defense privilege. 10:05
So, you can answer. 10:05
THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:05
MR. PERLSON: Q. If Uber had a third-party report done in connection with the Otto acquisition and got a clean bill of health on Otto, why wouldn't Uber share that with the Court? 10:06
MS. RAY: Objection; form. 10:06
THE VIDEOGRAPHER: Excuse me. Can you use this? 10:06
MS. RAY: Sure. 10:06
THE VIDEOGRAPHER: Is it going to reach? 10:06
MS. RAY: You know what, can we just move that? 10:06
MR. EHRLICH: I'm going to instruct you to answer. 10:06
THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I 10:06

assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:06
MR. PERLSON: Q. It would be in Uber's interests to provide exculpatory evidence regarding the 14,000 files you took from Google; correct? 10:06
MS. RAY: Objection; form. 10:07
MR. EHRLICH: You can answer. 10:07
THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:07
MR. PERLSON: Q. It would be in your interests to provide exculpatory evidence regarding the 14,000 files you took from Google; correct? 10:07
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:07
THE VIDEOGRAPHER: Excuse me. I'd like to go off the record for one moment. 10:07
MR. PERLSON: Sure. 10:07
THE VIDEOGRAPHER: Going off the record. The time is 10:07. 10:07
(Recess taken.) 10:07
THE VIDEOGRAPHER: We are back on the record. 10:07

The time is 10:07. 10:07
MR. PERLSON: Q. There would be no reason for you to withhold exculpatory evidence regarding the 14,000 files you took from Google; correct? 10:08
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:08
Q When did you first suspect that your conduct at Google might become the subject of litigation? 10:08
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:08
Q Did you ever suspect that your operation of -- let me start over again. 10:09
Did you ever suspect that your discussions with Uber between 2015 and 2016, while you were a Google employee, would become the subject of litigation? 10:09
MS. RAY: Objection; form. 10:09
MR. EHRLICH: Go ahead. 10:09
THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth 10:09

Amendment of the Constitution of the United States. 10:09
MR. PERLSON: Q. Did you ever suspect that your formation of -- of a company, that eventually became Otto in late 2015, while you were still a Google employee, would become the subject of litigation? 10:09
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:10
Q Have you ever destroyed any documents related to this litigation? 10:10
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:10
Q Have you ever deleted any documents related to this litigation? 10:10
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:10
Q Has Otto deleted any documents related to this litigation? 10:10
A On the advice and direction of my counsel, I 10:10

respectfully decline to answer. And I assert the 10:10
rights guaranteed to me under the Fifth Amendment of 10:10
the Constitution of the United States. 10:10
Q Have you deleted any documents reflecting 10:10
your relationship to Odin Wave or Tyto Lidar at any 10:10
time in which you had anticipated litigation? 10:10
A On the advice and direction of my counsel, I 10:10
respectfully decline to answer. And I assert the 10:10
rights guaranteed to me under the Fifth Amendment of 10:10
the Constitution of the United States. 10:11
Q Have you ever destroyed or permanently 10:11
deleted any documents relating to this litigation when 10:11
litiga- -- during the time in which litigation was 10:11
anticipated, regarding the Otto acquisition? 10:11
A On the advice and direction of my counsel, I 10:11
respectfully decline to answer. And I assert the 10:11
rights guaranteed to me under the Fifth Amendment of 10:11
the Constitution of the United States. 10:11
Q Have you deleted any communications with 10:11
former Google employees instructing them to take 10:11
confidential information from Google? 10:11
A On the advice and direction of my counsel, I 10:11
respectfully decline to answer. And I assert the 10:11
rights guaranteed to me under the Fifth Amendment of 10:11
the Constitution of the United States. 10:12

Q While you were at Google, you were issued a 10:12
laptop computer that ran the Windows operating system; 10:12
correct? 10:12
A On the advice and direction of my counsel, I 10:12
respectfully decline to answer. And I assert the 10:12
rights guaranteed to me under the Fifth Amendment of 10:12
the Constitution of the United States. 10:12
Q Before you left Google, you downloaded 10:12
documents onto that laptop computer for use when you 10:12
left Google; correct? 10:12
A On the advice and direction of my counsel, I 10:12
respectfully decline to answer. And I assert the 10:12
rights guaranteed to me under the Fifth Amendment of 10:12
the Constitution of the United States. 10:12
Q Before you left Google, you downloaded 10:12
documents onto that laptop for use at Otto; correct? 10:12
A On the advice and direction of my counsel, I 10:13
respectfully decline to answer. And I assert the 10:13
rights guaranteed to me under the Fifth Amendment of 10:13
the Constitution of the United States. 10:13
Q Before you left Google, you downloaded 10:13
documents onto that laptop for use at Uber; correct? 10:13
A On the advice of my counsel, I respectfully 10:13
decline to answer. And I assert the rights guaranteed 10:13
to me under the Fifth Amendment of the Constitution of 10:13

the United States. 10:13
Q To this day, Uber continues to use 10:13
confidential information downloaded onto that laptop 10:13
computer; correct? 10:13
A On the advice and direction of my counsel, I 10:13
respectfully decline to answer. And I assert the 10:13
rights guaranteed to me under the Fifth Amendment of 10:13
the Constitution of the United States. 10:13
Q Is there any wall at Uber from your work on 10:13
LiDar technology? 10:14
A What's a wall? 10:14
Q Is -- are -- 10:14
MR. EHRLICH: Do you want to clarify? 10:14
MR. PERLSON: Yeah, sure. 10:14
Q The -- is -- is there any policy at Uber that 10:14
you are not allowed to work on LiDar technology? 10:14
A On the advice and direction of my counsel, I 10:14
respectfully decline to answer. And I assert the 10:14
rights guaranteed to me under the Fifth Amendment of 10:14
the Constitution of the United States. 10:14
Q Isn't it true that, since you have been 10:14
working at Uber, you have done work regarding LiDar 10:14
technology? 10:14
A On the advice and direction of my counsel, I 10:14
respectfully decline to answer. And I assert the 10:14

rights guaranteed to me under the Fifth Amendment of 10:14
the Constitution of the United States. 10:14
Q Isn't it true that, during your work at Uber, 10:14
you have contributed to the design and development of 10:15
LiDar technology? 10:15
A On the advice and direction of my -- excuse 10:15
me. 10:15
On the advice and direction of counsel -- of 10:15
my counsel, I respectfully decline to answer. And I 10:15
assert the rights guaranteed to me under the Fifth 10:15
Amendment of the Constitution of the United States 10:15
Q Isn't it true that, during your work at Uber, 10:15
you have contributed to the design and development of 10:15
LiDar technology using confidential information in the 10:15
14,000 documents that you took from Google before you 10:15
left Google? 10:15
A On the advice and direction of my counsel, I 10:15
respectfully decline to answer. And I assert the 10:15
rights guaranteed to me under the Fifth Amendment of 10:15
the Constitution of the United States. 10:15
Q Isn't it true that, even today, you continue 10:15
to use the confidential information in 10:15
14,000 documents you took from Google in your 10:15
contributions to the design and development of LiDar 10:16
technology at Uber? 10:16

A On the advice and direction of my counsel, I 10:16
respectfully decline to answer. And I assert the 10:16
rights guaranteed to me under the Fifth Amendment of 10:16
the Constitution of the United States. 10:16
Q Between March 2nd, 2015, and March 25th, 10:16
2015, your Google-issued laptop did not perform 10:16
regular check-ins to Google's network; correct? 10:16
MS. RAY: Objection; form. 10:16
MR. EHRLICH: Let me read the question. 10:16
You can answer. 10:16
THE WITNESS: On the advice and direction of 10:16
my counsel, I respectfully decline to answer. And I 10:16
assert the rights guaranteed to me under the Fifth 10:16
Amendment of the Constitution of the United States. 10:16
MR. PERLSON: Q. Between March 2nd and 10:16
2 -- 2 -- between March 2nd, 2015, and November 25th, 10:17
2015, the network interfaces of your Google-issued 10:17
laptop made only three appearances on Google's 10:17
corporate logs? 10:17
MS. RAY: Objection; form. 10:17
THE WITNESS: Is there a question? 10:17
MR. EHRLICH: Did -- did you hear the 10:17
question? 10:17
MR. PERLSON: I'll -- let me just ask it 10:17
again. 10:17

MR. EHRLICH: Okay. 10:17
MR. PERLSON: Q. Do you have any reason to 10:17
dispute that, between March 15th -- let me start over 10:17
again. 10:17
Between -- scratch that. 10:17
Do you have any reason to -- to dispute that 10:17
between March 2nd, 2015, and November 25th, 2015, that 10:17
the network interfaces of your Google-issued laptop 10:17
made only three appearances on Goo- -- Google's 10:17
corporate network log? 10:18
A On the advice and direction of my counsel, I 10:18
respectfully decline to answer. And I assert the 10:18
rights guaranteed to me under the Fifth Amendment of 10:18
the Constitution of the United States. 10:18
Q You caused your Google-issued laptop to 10:18
access Goo- -- the Google corporate network for 10:18
unauthorized purposes for approximately two hours on 10:18
October 22nd, 2015? 10:18
A On the direction of my counsel, I 10:18
respectfully decline to answer. And I assert the 10:18
rights guaranteed to me under the Fifth Amendment of 10:18
the Constitution of the United States. 10:18
Q You caused your Google-issued laptop to 10:18
access the Google corporate network for unauthorized 10:18
purposes for approximately two hours on November 20th, 10:18

2015? 10:18
A On the advice and direction of my counsel, I 10:18
respectfully decline to answer. And I assert the 10:18
rights guaranteed to me under the Fifth Amendment of 10:18
the Constitution of the United States. 10:19
Q You caused your Google-issued laptop to 10:19
access the corporate -- the Google corporate network 10:19
for unauthorized purposes on November 25th, 2015 -- 10:19
A Is that a question? 10:19
Q -- correct? 10:19
A Okay. 10:19
On the advice and direction of my counsel, I 10:19
respectfully decline to answer. And I assert the 10:19
rights guaranteed to me under the Fifth Amendment of 10:19
the Constitution of the United States. 10:19
Q On -- on November 26th, 2015, you then 10:19
reinstalled the Windows operating system on your 10:19
Google-issued laptop; correct? 10:19
A On the advice and direction of my counsel, I 10:19
respectfully decline to answer. And I assert the 10:19
rights guaranteed to me under the Fifth Amendment of 10:19
the Constitution of the United States. 10:19
Q You reinstalled the Windows operating system 10:19
on November 26, 2015, in an effort to conceal the fact 10:20
that you had been accessing Google's corporate 10:20

network; correct? 10:20
A On the advice and direction of my counsel, I 10:20
respectfully decline to answer. And I assert the 10:20
rights guaranteed to me under the Fifth Amendment of 10:20
the Constitution of the United States. 10:20
Q On December 3rd, 2015, you ran keyword 10:20
searches across the Google network from your 10:20
Google-issued laptop; correct? 10:20
A On the advice and direction of my counsel, I 10:20
respectfully decline to answer. And I assert the 10:20
rights guaranteed to me under the Fifth Amendment of 10:20
the Constitution of the United States. 10:20
Q On December 3rd, 2015, you ran a search for 10:20
the strings CHAUFFEUR SVN LOGIN; correct? 10:20
A On the advice and direction of my counsel, I 10:20
respectfully decline to answer. And I assert the 10:20
rights guaranteed to me under the Fifth Amendment of 10:20
the Constitution of the United States. 10:20
Q On December 3rd, 2015, you ran a search for 10:20
the string CHAUFFEUR SVN EEE SETUP; correct? 10:21
MR. EHRLICH: EEE SETUP? 10:21
MR. PERLSON: Yeah. 10:21
THE WITNESS: On the advice and direction of 10:21
my counsel, I respectfully decline to answer. And I 10:21
assert -- 10:21

MR. PERLSON: On December -- 10:21
THE WITNESS: -- the rights guaranteed to -- 10:21
MR. EHRLICH: Go ahead and finish. 10:21
THE WITNESS: Yeah. 10:21
And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:21
THE VIDEOGRAPHER: I need to take a break. 10:21
MR. PERLSON: Okay. You need to take a break? 10:21
THE VIDEOGRAPHER: Going off the record. The time is 10:21. 10:21
(Recess taken.) 10:21
THE VIDEOGRAPHER: This marks the beginning of DVD No. 2 in the deposition of Anthony Levandowski. 10:25 10:34
We are going back on the record. The time is 10:34. 10:34
MR. PERLSON: Q. The searches that you ran on December 3rd, 2015, were run to locate files relating to Google's self-driving car project at that time; correct? 10:34 10:35
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:35

Q SVN is the name of the document repository containing Waymo's design files, schematics, and other confidential information relating to the self-driving car project; correct? 10:35
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment rights -- under the Fifth Amendment of the Constitution of the United States. 10:35
Q The searches you ran across the Google network on December 3rd, 2013, were not related to any legitimate duties you were performing for Google at that time? 10:35 10:36
A On the advice and direction of my counsel, I respectfully disagree -- I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:36
Q The searches you ran across the Google network on December 3rd, 2015, were made without authorization from Google; correct? 10:36
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:36

Q On December 11, 2015, you downloaded software to your Google-issued laptop that would allow you to access files on the SVN repository; correct? 10:36
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:36
Q On December 11, 2015, you downloaded software called Tortoise SVN; correct? 10:36
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:37
Q On December 11th, 2015, after you downloaded Tortoise SVN, you then downloaded approximately 14,000 files from the SVN repository; correct? 10:37
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:37
Q The files you downloaded from the SVN repository on December 11, 2015, totaled 9.7 gigabytes of data; correct? 10:37
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the 10:37

rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:37
Q The files downloaded from the SVN repository on December 11, 2015, included approximately 2 gigabytes of data from LiDar subdirectories; correct? 10:37 10:38
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:39
Q The approximately 14,000 files you downloaded from Google's SVN repository on December 11, 2015, was not related to any legitimate work by you in your role as a Google Waymo employee; correct? 10:38
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:38
Q You downloaded approximately 14,000 files from Google's SVN repository without authorization from Google; correct? 10:38
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:38

Q On December 11th, 2015, you downloaded approximately 14,000 files from Google's SVN repository so that you could use them for the new company you were founding; correct? 10:38 10:38 10:38 10:39
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:39 10:39 10:39 10:39
Q You downloaded approximately 14,000 files on December 11, 2015, from Google's SVN repository so that you could use them to compete with Google; correct? 10:39 10:39 10:39 10:39
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:39 10:39 10:39 10:39
Q On December 14, 2015, you attached to your Google-issued laptop a Transcend RDF 45 USB 3.0 Card Reader; correct? 10:39 10:39 10:39
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:40 10:40 10:40 10:40
Q On December 14, 2015, you attached an external storage device to your Google-issued laptop 10:40 10:40

for approximately eight hours; correct? 10:40
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:40 10:40 10:40 10:40
Q On December 14, 2015, you copied approximately 14,000 confidential Google files which you had previously downloaded from the SVN server to an external storage device; correct? 10:40 10:40 10:40 10:40
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:40 10:40 10:40 10:40
Q On December 14th, 2015, you copied approximately 14,000 confidential Google files to an external storage device without authorization from Google; correct? 10:40 10:40 10:40 10:40
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:40 10:40 10:40 10:40
Q On December 14th, 2015, you copied 14 -- approximately 14,000 confidential Google files to an external storage device so you could use them for the new company you were founding; correct? 10:40 10:41 10:41 10:41

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:41 10:41 10:41 10:41
Q On December 14, 2015, you copied approximately 14,000 confidential Google files to an external storage device so that you could use them to compete with Google; correct? 10:41 10:41 10:41 10:41
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:41 10:41 10:41 10:41
Q On December 18, 2015, you reformatted the Windows operating system on your Google-issued laptop to a Linux operating system; correct? 10:41 10:41 10:41
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Uni- -- of the Constitution of the United States. 10:41 10:41 10:41 10:41
Q On December 18, 2015, you reformatted the operating system on your Google-issued laptop because you thought this would conceal the fact that you had downloaded and copied 14,000 confidential Google files from the SVN server; correct? 10:41 10:42 10:42 10:42 10:42
A On the advice and direction of my counsel, I 10:42

respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:42 10:42 10:42
Q You had access to Google's internal drive database while you were a Google employee; correct? 10:42 10:42
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert my rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:42 10:42 10:42 10:42
Q On January 3rd, 2016, you exported five -- five files from Google Drive's database to a personal device; correct? 10:42 10:42 10:42
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:42 10:42 10:42 10:42
Q On January 3rd, 2016, you exported a file called "PBR Intensity Calibration" from Google's internal drive database; correct? 10:42 10:42 10:43
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:43 10:43 10:43 10:43
Q On January 3rd, 2016, you exported a file called "PBR Extrinsic Calibration" from Google's 10:43 10:43

internal drive database; correct? 10:43
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:43
Q On January 3rd, 2016, you also exported files called "TX and RX Tuning Instructions," "GBR Assembly Flowchart SOP," and "TBR Testing Station" from Google's internal drive database; correct? 10:43
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:44
Q The five files you exported from Google's internal drive database on January 3rd, 2016, were exported so that you could use them to support the new company you were founding? 10:44
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:44
Q The five files that you exported from Google's internal drive database on January 3rd, 2016, were exported so that you could use them to compete with Google; correct? 10:44

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:44
Q The 14,000 files that you exported to an external device on December 14th, 2015, were exported so that you could use them to compete with Google by using Google's confidential information; correct? 10:45
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:45
Q The five files you exported on January 3rd, 2016, were exported so that you could compete with Google by using Google's confidential information? 10:46
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:46
Q On January 11th, 2016, you exported a file called "Chauffeur TL Weekly Updates Q4 2015" from Google's internal drive database? 10:46
A On the direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of 10:46

the Constitution of the United States. 10:46
Q On January 11, 2016, you exported a file from Google's internal drive database so that you could use it to support the new company you were founding -- founding; correct? 10:46
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:47
Q On January 11, 2016, you exported a file from Google's internal drive database so that you could use it at your new company to compete with Google? 10:47
A On the advice of and -- and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:47
Q You directed Google employees that you asked to join you at your new company to export documents from Google computers, before departing Google, to bring with you to Waymo -- to Otto? 10:47
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:48
Q Let me just ask that again, because I asked 10:48

it wrong. 10:48
You directed Google employees, that you asked to join you at your new company, to export documents from Google computers, before departing Google, to bring them with you to Otto? 10:48
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:48
Q You asked that former Google employees bring Google confidential information with them when they joined your new company? 10:48
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:49
Q Sameer Kshirsagar was a former Google employee who you asked to take confidential information from Google to Otto; correct? 10:49
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 10:49
Q You encouraged Sameer to bring confidential information with him when you recruited him to join 10:49

Otto; correct? 10:49
A On the advice and direction of my counsel, I 10:49
respectfully decline to answer. And I assert the 10:49
rights guaranteed to me under the Fifth Amendment of 10:49
the Constitution of the United States. 10:49
Q You recruited Google employees to join you at 10:49
Otto because they had access to Google's confidential 10:50
information? 10:50
A On the advice and direction of my counsel, I 10:50
respectfully decline to answer. And I assert the 10:50
rights guaranteed to me under the Fifth Amendment of 10:50
the Constitution of the United States. 10:50
Q You continue to retain documents, including 10:50
Google and Waymo confidential information, that you 10:50
downloaded prior to your resignation of Google? 10:50
A On the advice and direction of my counsel, I 10:50
respectfully decline to answer. And I assert the 10:50
rights guaranteed to me under the Fifth Amendment of 10:50
the Constitution of the United States. 10:50
Q You continue to retain the 14,000 documents 10:50
that you downloaded in December 15 -- December 2015 10:50
from the Google SVN server? 10:50
A On the advice and direction of my counsel, I 10:50
respectfully decline to answer. And I assert the 10:50
rights guaranteed to me under the Fifth Amendment of 10:50

the Constitution of the United States. 10:51
Q You still have the media device through which 10:51
you downloaded the approximately 14,000 files in 10:51
December 15 -- December 2015; correct? 10:51
A On the advice and direction of my counsel, I 10:51
respectfully decline to answer. And I assert the 10:51
rights guaranteed to me under the Fifth Amendment of 10:51
the Constitution of the United States. 10:51
Q You have referred to the 14,000 documents 10:51
downloaded in 2015 during your work at Otto; correct? 10:51
A On the advice and direction of my counsel, I 10:51
respectfully decline to answer. And I assert the 10:51
rights guaranteed to me under the Fifth Amendment of 10:51
the Constitution of the United States. 10:51
Q You have referred to the 14,000 documents 10:51
downloaded in 2015 during your work at Uber; correct? 10:51
A On the advice and direction of my counsel, I 10:51
respectfully decline to answer. And I assert the 10:51
rights guaranteed to me under the Fifth Amendment of 10:51
the Constitution of the United States. 10:52
Q Uber is aware that you have referred to the 10:52
14,000 documents downloaded in December 2015 during 10:52
your work at Uber; correct? 10:52
A On the advice and direction of my counsel, I 10:52
respectfully decline to answer. And I assert the 10:52

rights guaranteed to me under the Fifth Amendment of 10:52
the Constitution of the United States. 10:52
Q Uber has encouraged you to use the 10:52
14,000 documents downloaded in December 2015 during 10:52
your work at Uber; correct? 10:52
A On the advice and direction of my counsel, I 10:52
respectfully decline to answer. And I assert the 10:52
rights guaranteed to me under the Fifth Amendment of 10:52
the Constitution of the United States. 10:52
Q Uber and its management know that you have 10:52
retained the 14,000 documents you downloaded in 10:52
December 2015? 10:52
MS. RAY: Objection; form. 10:52
MR. EHRLICH: You can answer. 10:52
THE WITNESS: On the advice and direction of 10:52
my counsel, I respectfully decline to answer. And I 10:52
assert the rights guaranteed to me under the Fifth 10:52
Amendment of the Constitution of the United States. 10:53
MR. PERLSON: Q. You have informed Goober 10:53
and -- Uber and its management that you still have the 10:53
14,000 documents downloaded in December 2015 from 10:53
Google? 10:53
A On the advice and direction of my counsel, I 10:53
respectfully decline to answer. And I assert the 10:53
rights guaranteed to me under the Fifth Amendment of 10:53

the Constitution of the United States. 10:53
Q You told Uber that you had in your personal 10:53
possession the 14,000 documents downloaded from Google 10:53
before the Otto acquisition; correct? 10:53
A On the advice and direction of my counsel, I 10:53
respectfully decline to answer. And I assert the 10:53
rights guaranteed to me under the Fifth Amendment of 10:53
the Constitution of the United States. 10:53
Q You told Uber that you had in your personal 10:53
possession the 14,000 documents downloaded in 2015 10:53
before you even left Google; correct? 10:54
A On the advice and direction of my counsel, I 10:54
respectfully decline to answer. And I assert the 10:54
rights guaranteed to me under the Fifth Amendment of 10:54
the Constitution of the United States. 10:54
Q When Mr. Kalanick recruited you to join Uber, 10:54
you informed him that you had taken the 10:54
14,000 documents downloaded in 2015 from Google? 10:54
A On the advice and direction of my counsel, I 10:54
respectfully decline to answer. And I assert the 10:54
rights guaranteed to me under the Fifth Amendment of 10:54
the Constitution of the United States. 10:54
Q While Mr. Kalanick was recruiting you to join 10:54
Uber, he did not tell you to return the 14,000 10:54
documents you had downloaded in 2015 from Google? 10:55

A On the advice and direction of my counsel, I 10:55
respectfully decline to answer. And I assert the 10:55
rights guaranteed to me under the Fifth Amendment of 10:55
the Constitution of the United States. 10:55
Q When Mr. Kalanick recruited you to join Uber, 10:55
he encouraged you to keep the 14,000 documents you had 10:55
downloaded in 2015 from Google and use them at Uber 10:55
when you joined Uber; correct? 10:55
A On the advice and direction of my counsel, I 10:55
respectfully decline to answer. And I assert the 10:55
rights guaranteed to me under the Fifth Amendment of 10:55
the Constitution of the United States. 10:55
Q You were retained as a consultant by Uber 10:55
before the Otto acquisition; correct? 10:55
A On the advice and direction of my counsel, I 10:55
respectfully decline to answer. And I assert the 10:55
rights guaranteed to me under the Fifth Amendment of 10:55
the Constitution of the United States. 10:56
Q You were retained as a consultant by Uber 10:56
before you left Google; correct? 10:56
A On the advice and direct- -- and direction of 10:56
my counsel, I respectfully decline to answer. And I 10:56
assert the rights guaranteed to me under the Fifth 10:56
Amendment of the Constitution of the United States. 10:56
Q The reason you were retained as a consultant 10:56

by Uber before the Otto acquisition was so that you 10:56
could share the confidential information you learned 10:56
while you were employed by Google with Uber? 10:56
A On the advice and direction of my counsel, I 10:56
respectfully decline to answer. And I assert the 10:56
rights guaranteed to me under the Fifth Amendment of 10:56
the Constitution of the United States. 10:56
Q While you were acting as a consultant for 10:56
Uber, you did share Google confidential information 10:56
you learned while you were employed by Google with 10:57
Uber? 10:57
A On the advice and direction of my counsel, I 10:57
respectfully decline to answer. And I assert the 10:57
rights guaranteed to me under the Fifth Amendment of 10:57
the Constitution of the United States. 10:57
Q While the -- the -- start over again. 10:57
The information that you shared with 10:57
Google -- let me start over again. 10:57
The information that you shared with Uber 10:57
while you were a consultant for Uber included 10:57
information from the 14,000 files you downloaded in 10:57
December 2015? 10:57
A On the advice and direction of my counsel, I 10:57
respectfully decline to answer. And I assert the 10:57
rights guaranteed to me under the Fifth Amendment of 10:57

the Constitution of the United States. 10:57
Q Uber was aware that you were sharing with 10:57
them information obtained from the 14,000 files you 10:58
downloaded in December 15 -- 2015 as part of your 10:58
consulting work for Uber? 10:58
MS. RAY: Objection; form. 10:58
MR. EHRLICH: You can answer. 10:58
THE WITNESS: Okay. 10:58
On the advice and direction of my counsel, I 10:58
respectfully decline to answer. And I assert the 10:58
rights guaranteed to me under the Fifth Amendment of 10:58
the Constitution of the United States. 10:58
MR. PERLSON: Q. Uber has never asked you to 10:58
return to Google or Waymo the 14,000 files you 10:58
downloaded in December 2015? 10:58
A On the advice and direction of my counsel, I 10:58
respectfully decline to answer. And I assert the 10:58
rights guaranteed to me under the Fifth Amendment of 10:58
the Constitution of the United States. 10:58
Q You have retained the -- the 14,000 files you 10:58
downloaded in December 2015 so that you can continue 10:59
to use this information at your work at Uber? 10:59
A On the advice and direction of my counsel, I 10:59
respectfully decline to answer. And I assert the 10:59
rights guaranteed to me under the Fifth Amendment of 10:59

the Constitution of the United States. 10:59
Q Uber has -- start over again. 10:59
Uber has instructed you, and continues to 10:59
instruct you, to keep the 14,000 files you downloaded 10:59
in December 2015 so that you can continue to use this 10:59
information at your work at Uber? 10:59
A On the advice and direction of my counsel, I 10:59
respectfully decline to answer. And I assert the 10:59
rights guaranteed to me under the Fifth Amendment of 10:59
the Constitution of the United States. 11:00
Q You have retained the information -- let me 11:00
start over again. 11:00
You have retained the 14,000 documents and 11:00
other -- strike that. 11:00
You have retained the 14,000 documents you 11:00
downloaded in December 2015 because it contains 11:00
information that is not generally known in the 11:00
relevant field of that information? 11:00
A On the advice and direction of my counsel, I 11:00
respectfully decline to answer. And I assert the 11:00
rights guaranteed to me under the Fifth Amendment of 11:00
the Constitution of the United States. 11:00
Q You have retained the -- the 14,000 files you 11:00
downloaded in December 2015 and the other information 11:00
you took with you -- let me start over again. 11:00

You have retained the 14,000 files you downloaded in 2015 because it derives independent economic value from the fact that the information in those documents is not generally known in the relevant field; correct? 11:00 11:01

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:01

Q The 14,000 files that you downloaded in December 2015 contain trade secrets; correct? 11:01

MS. RAY: Objection; form. 11:01

MR. EHRLICH: You can answer. 11:01

THE WITNESS: Okay. 11:01

On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:01 11:02

MR. PERLSON: Q. You retained the five files you exported in January 2016 because it contains informa- -- they contain information that derive independent economic value from the fact that it is not generally known? 11:02

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the 11:02

rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:02

Q You have used the confidential information contained in the five files exported on January 3rd, 2016, for the benefit of Uber in the past? 11:02 11:03

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:03

Q You expect to continue to use the 14,000 documents you downloaded in December 2015 for the benefit of Uber; correct? 11:03

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:03

Q You expect to continue to use the five files you downloaded on January 3rd, 2016, for the benefit of Uber? 11:03 11:04

A On the advice and direction of my counsel, I respect -- I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:04

Q Are you aware that, in a hearing before the judge in this case, Uber's lawyer, Arturo Gonzalez, 11:04

said that he would love to put you on the witness stand to explain what happened, because he thinks you have a good story to tell? 11:04

MS. RAY: I instruct you not to answer to the extent that what you know is as the result of attorney-client privileged communications. But you may otherwise answer. 11:04

MR. EHRLICH: I join in that instruction. But, to the extent it goes beyond that, I instruct you to assert your rights. 11:04

THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:04 11:05

MR. PERLSON: Q. Do you have a good story to tell in this case? 11:05

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:05

Q Have you told your good story to Mr. Gonzalez? 11:05

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights granted to me under the Fifth Amendment of the 11:05

Constitution of the United States. 11:05

Q Is part of your good story that you received a bachelor of science degree in industrial engineering and operations research in 2002 from the University of California at Berkeley? 11:05

MR. EHRLICH: Hold on one second. Let me just -- the question is whether that's part of your good story. 11:05

So, I'm going to instruct you to assert your rights. Go ahead. 11:05

THE WITNESS: Okay. 11:05

On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:05 11:06

MR. EHRLICH: Mr. Perlson, just -- can I -- for the record, my partner, Ismail Ramsey, has joined. 11:06

And, if I could just take a pause. I know that wasn't your question here. But as is clear, he's -- he's being instructed to assert his constitutional rights very broadly. 11:06

However, if you did want to ask about any of his work or upbringing before joining Google, you can go ahead and ask those questions, if -- if that's of interest. 11:06

MR. PERLSON: Thanks. 11:06
Q Is part of your good story that you received a master's degree from Berkeley in 2003? 11:06
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:07
Q Is part of your good story that you developed technology for a robotic motorcycle between 2003 and 2006? 11:07
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:07
MR. EHRLICH: And excuse me, Counsel. I just want to make clear -- I want to make sure I understand. 11:07
You're not asking the question of fact whether he, in fact, did these things, or whether he had this education or, you know, developed this robotic motorcycle. 11:07
You're framing it in terms of whether that's part of the good story that Mr. Gonzalez was referring to? 11:07
MR. PERLSON: I'm asking the questions that 11:07

I'm asking. And the -- Judge Alsup's rules, I think, are pretty clear that, if you have an objection, you say it in the basis of form. 11:07
MR. EHRLICH: Okay. 11:07
MR. PERLSON: So, if you want to object on the basis of form -- 11:07
MR. EHRLICH: So no, I don't want to object. I just would -- thought it might be helpful if you want answers to those questions. But I'll -- I'll -- I won't object, and you can go ahead. 11:08
I don't know if there's a question. 11:08
MR. PERLSON: I don't, either. 11:08
MR. EHRLICH: I think there wasn't, but I -- I wanted to offer that. 11:08
MR. PERLSON: Okay. 11:08
MS. RAY: Could -- could you hold on a moment. 11:08
May we chat a moment. 11:08
Can we go off the record a moment, please. 11:08
MR. PERLSON: Sure. There's not -- I don't think there's a question. 11:08
THE VIDEOGRAPHER: We are going off the record. The time is 11:08. 11:08
(Recess taken.) 11:08
THE VIDEOGRAPHER: We are back on the record. 11:24

The time is 11:24. 11:24
MR. PERLSON: Q. Mr. Levandowski, is part of your good story that you developed a self-driving motorcycle that entered the DARPA Challenge of -- in 2004? 11:24
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:24
Q Is part of your good story that you were the chief technologist of unmanned systems at ENSCO, Inc., from 2006 to 2007? 11:25
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:25
Q Is part of your story the work you did -- I'm sorry. 11:25
Is part of your good story the work you did for Google between 2007 and 2016? 11:25
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:25
Q Did the work that you did while you were at 11:25

Berkeley have to do with -- have anything to do with the work that you did while you were at Google? 11:25
MR. EHRLICH: You can answer the question about your work at Berkeley -- the -- the nature of your work at Berkeley. 11:25
THE WITNESS: Sure. 11:25
I -- 11:25
MR. EHRLICH: But -- but I'm going to instruct you not to answer in any way about matters that occurred after the date you began employment with Google. 11:26
THE WITNESS: Okay. 11:26
Well, I can't answer whether it relates or not. But I can say that, at Berkeley, I worked on self-driving vehicles, indoors, outdoors, and other robotic vehicles. 11:26
MR. PERLSON: Q. And, did the work that you -- and does the work that you did at Berkeley relating to self-driving vehicles have anything to do with the work that you did at Google? 11:26
A I'm going to -- 11:26
MR. EHRLICH: On -- on that question, because I'm trying to be very clear to preserve Mr. Levandowski's Fifth Amendment privilege here, that if the question is calling for the nature of his work 11:26

prior to joining Google, then you can answer. 11:26
But I'm instructing you not to draw any 11:26
comparisons between the two, because you are not 11:26
answering questions about matters occurring after you 11:27
began employment with Google. 11:27
Go ahead. 11:27
THE WITNESS: Can I have you repeat the 11:27
question then. 11:27
MR. PERLSON: Sure. 11:27
THE WITNESS: I can probably read it. 11:27
MR. EHRLICH: Yeah, maybe you can look here. 11:27
THE WITNESS: Yeah. 11:27
And does -- okay. And, did the work that -- 11:27
the work that you did at Berkeley, relating to 11:27
self-driving vehicle, have anything to do with the 11:27
work that you did at Google? 11:27
MR. EHRLICH: At Google. So, answer the 11:27
first part. 11:27
THE WITNESS: At Berkeley, I worked on 11:27
multiple projects, including navigation of vehicles, 11:27
self-driving vehicles built on -- using Java for 11:27
navigation, using cameras, GPS, and other sensors, 11:27
too. 11:28
MR. PERLSON: Q. And does the work that you 11:28
just described that you did at Ber- -- Berkeley have 11:28

any relation to the work that you did at Google? 11:28
A On the -- 11:28
MR. EHRLICH: I'll instruct you -- 11:28
THE WITNESS: -- advice of -- on the -- on 11:28
the advice and direction of my counsel, I respectfully 11:28
decline to answer. And I assert the rights guaranteed 11:28
to me under the Fifth Amendment of the Constitution of 11:28
the United States. 11:28
MR. PERLSON: Q. And, does the work that you 11:28
just described, while you were at Berkeley, have 11:28
anything to do with the work that you do at Uber? 11:28
A On the advice and direction of my counsel, I 11:28
respectfully decline to answer. And I assert the 11:28
rights guaranteed to me under the Fifth Amendment of 11:28
the Constitution of the United States. 11:28
Q And, does the work that you did at Berkeley 11:28
cause you to be knowledgeable as to the state of 11:28
self-driving car technology today? 11:28
MR. EHRLICH: You can answer that. 11:28
THE WITNESS: Yeah, I was one of the first 11:28
pioneers in the field in terms of building 11:28
self-driving vehicles. 11:29
MR. PERLSON: Q. And what -- and how -- how 11:29
does Uber's current self-driving technology compare to 11:29
the technology that you worked on at Berkeley? 11:29

MR. EHRLICH: I'm going to instruct you. 11:29
THE WITNESS: On the advice and direction of 11:29
my counsel, I respectfully decline to answer. And I 11:29
assert the rights and -- I assert the rights 11:29
guaranteed to me under the Fifth Amendment of the 11:29
Constitution of the United States. 11:29
MR. PERLSON: Q. And how does the 11:29
self-driving vehicle technology that you worked on at 11:29
Goo- -- at Google relate to the work you've described 11:29
at Berkeley? 11:29
A On the advice and direction of my counsel, I 11:29
respectfully decline to answer. And I assert the 11:29
rights guaranteed to me under the Fifth Amendment of 11:29
the Constitution of the United States. 11:29
Q How does the work that you did, in relation 11:29
to the self-driving motorcycle that entered the DARPA 11:29
Grand Challenge in 2004, relate to the work that you 11:30
did for Google in self-driving vehicle technology? 11:30
A On the advice and direction of my counsel, I 11:30
respectfully decline to answer. And I assert the 11:30
rights guaranteed to me under the Fifth Amendment of 11:30
the Constitution of the United States. 11:30
MR. EHRLICH: And Counsel, can I just make a 11:30
comment? 11:30
I really want you to get answers to any 11:30

questions you can, consistent with his Fifth Amendment 11:30
rights. 11:30
So, if you are interested in asking questions 11:30
about the -- the self-driving motorcycle related to 11:30
the DARPA Grand Challenge, I encourage you to ask 11:30
that. He can answer those questions. 11:30
You don't have to answer -- you don't have to 11:30
ask him, of course. It's your choice. 11:30
MR. PERLSON: Q. How does the work that you 11:30
did, in relation to the self-driving motorcycle that 11:31
entered the DARPA Challenge in 2004, relate to the 11:31
work that you are doing now at Uber? 11:31
A On the advice and direction of my counsel, I 11:31
respectfully decline to answer. And I assert the 11:31
rights guaranteed to me under the Fifth Amendment of 11:31
the Constitution of the United States. 11:31
Q What are the advances that have been made at 11:31
Uber regarding self-driving technology over the 11:31
self-driving motorcycle that you developed in relation 11:31
to the 2004 DARPA Grand Challenge? 11:31
MR. EHRLICH: Hold on. Let me read the 11:31
question. 11:31
I'm going to instruct you to assert your 11:32
rights. 11:32
THE WITNESS: On the advice and direction of 11:32

my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:32
MR. PERLSON: Q. What are the differences between the self-driving car technology that you worked on at Google and the self-driving car technology that you currently work on at Uber? 11:32
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:32
Q Do you agree that, while you were at Google, Google invested time and money to allow you to develop self-driving car technology? 11:33
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:33
Q Do you agree that the development of self-driving car technology at Google took years of work? 11:33
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:33

Q Do you agree that Waymo's self-driving car technology today is a result of years of work and a substantial investment of time and money? 11:33
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:33
Q Do you agree that development of self-driving car technology, while you were at Google, involved trial and error? 11:34
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:34
Q Isn't it correct that you use the knowledge you learned through trial and error, while you were working on self-driving car technology at Google, in your work for Uber? 11:34
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:34
Q How does your work at Google relate to the allegations in this case? 11:34
A On the advice of my counsel, I respectfully

decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:34
Q Have you read the complaint in this case? 11:34
A On the advice of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:35
Q Have you read the -- Waymo's motion for preliminary injunction in this case? 11:35
A On the advice and direction of my counsel, I respectfully decline to answer. 11:35
Q Can you identify any allegation in Waymo's complaint that you believe is incorrect? 11:35
A Do you want me to finish my answer to the previous one? 11:35
MR. EHRLICH: Yeah, go ahead -- go ahead and answer -- give the full answer. 11:35
THE WITNESS: So, on the previous question, let me just finish -- 11:35
MR. PERLSON: Q. Oh, did I cut you off? 11:35
A Yeah, it's okay. No worries. I'll just repeat. 11:35
Q I'm not really listening to -- 11:35
A I -- I imagine it's repetitive. 11:35

But on the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:35
Okay. Now, this current question? 11:35
Q Let me just repeat it. 11:35
A Yes. Thank you. 11:35
Q Can you identify any allegation in Waymo's complaint that you believe is incorrect? 11:35
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:36
Q Can you identify any allegation in Waymo's preliminary injunction motion that is incorrect? 11:36
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States. 11:36
Q Isn't it correct that you cannot identify any allegation or assertion made in any of the declarations attached to Google's -- I'm sorry -- Waymo's motion for a preliminary injunction that is incorrect? 11:36
MR. EHRLICH: I'm going to object to 11:36

foundation. 11:36
But, I'm going to instruct you to assert your 11:36
rights. 11:36
MS. RAY: Join. 11:36
THE WITNESS: On the advice and direction of 11:36
my counsel, I respectfully decline to answer. And I 11:36
assert the rights guaranteed to me under the Fifth 11:36
Amendment of the Constitution of the United States. 11:37
MR. PERLSON: Q. Have you reviewed any of 11:37
the declarations attached to Waymo's motion for 11:37
preliminary injunction? 11:37
A On the advice and direction of my counsel, I 11:37
respectfully decline to answer. And I assert the 11:37
rights guaranteed to me under the Fifth Amendment of 11:37
the Constitution of the United States. 11:37
Q While at Otto, were you developing technology 11:37
relating to mid- and long-range LiDar systems? 11:37
A On the advice and direction of my counsel, I 11:37
respectfully decline to answer. And I assert the 11:37
rights guaranteed to me under the Fifth Amendment of 11:37
the Constitution of the United States. 11:37
Q Uber is currently developing long- and 11:37
midrange LiDar systems; correct? 11:37
A On the advice and direction of my counsel, I 11:37
respectfully decline to answer. And I assert the 11:37

rights guaranteed to me under the Fifth Amendment of 11:37
the Constitution of the United States. 11:38
Q Uber's current LiDar development program 11:38
incorporates technology from Otto's LiDar development 11:38
program; correct? 11:38
A On the advice and direction of my counsel, I 11:38
respectfully decline to answer. And I assert the 11:38
rights guaranteed to me under the Fifth Amendment of 11:38
the Constitution of the United States. 11:38
Q Are you currently participating in Uber's 11:38
LiDar work? 11:38
A On the advice and direction of my counsel, I 11:38
respectfully decline to answer. And I assert the 11:38
rights guaranteed to me under the Fifth Amendment of 11:38
the Constitution of the United States. 11:38
Q Were you involved at all in Uber's regulatory 11:38
filing in September of 2016 regarding its self-driving 11:38
car technology? 11:39
A On the advice and direction of my counsel, I 11:39
respectfully decline to answer. And I assert the 11:39
rights guaranteed to me under the Fifth Amendment of 11:39
the Constitution of the United States. 11:39
Q Isn't it true that the in-house technology 11:39
referred to in Uber's submission to Nevada, regarding 11:39
its self-driving car technology referred to a version 11:39

of its LiDar system that preceded the Fuji system? 11:39
MS. RAY: Objection; form. 11:39
THE WITNESS: On the advice and direction of 11:39
my counsel, I respectfully decline to answer. And I 11:39
assert the rights guaranteed to me under the Fifth 11:39
Amendment of the Constitution of the United States. 11:39
MR. PERLSON: Q. Isn't it true that the -- 11:39
that Uber's submission in September 2016 of -- 11:40
regarding its self-driving car technology to the 11:40
Nevada government, referred to a prototype that was 11:40
then in existence? 11:40
A On the advice and direction of my counsel, I 11:40
respectfully decline to answer. And I assert the 11:40
rights guaranteed to me under the Fifth Amendment of 11:40
the Constitution of the United States. 11:40
Q Did Otto ever use or solicit [redacted] as a 11:40
vendor in developing its technology? 11:40
MS. RAY: Objection; form. 11:40
THE WITNESS: On the advice and direction of 11:40
my counsel, I respectfully decline to answer. And I 11:40
assert the rights guaranteed to me under the Fifth 11:40
Amendment of the Constitution of the United States. 11:41
MR. PERLSON: Q. Did Otto ever use or 11:41
solicit a company called [redacted] as a vendor in developing 11:41
its laser technology? 11:41

MS. RAY: Objection; form. 11:41
THE WITNESS: I'm sorry. I was distracted. 11:41
Do you mind repeating it. 11:41
MR. PERLSON: Sure. 11:41
Q Did Otto ever use or solicit a company called 11:41
[redacted] as a vendor in developing its laser technology? 11:41
MS. RAY: Objection; form. 11:41
THE WITNESS: On the advice and direction of 11:41
my counsel, I respectfully decline to answer. And I 11:41
assert the rights guaranteed to me under the Fifth 11:41
Amendment to the Constitution of the United States. 11:41
MR. PERLSON: Q. Did Otto ever use or 11:41
solicit a company called [redacted] as a vendor in developing 11:41
its laser technology? 11:41
MS. RAY: Objection; form. 11:41
THE WITNESS: On the advice and direction of 11:41
my counsel, I respectfully decline to answer. And I 11:41
assert the rights guaranteed to me under the Fifth 11:41
Amendment to the Constitution of the United States. 11:41
MR. PERLSON: Q. Has -- did Otto select 11:41
third-party vendors because of their knowledge of 11:41
Google's confidential technology? 11:41
A On the advice and direction of my counsel, I 11:41
respectfully decline to answer. And I assert the 11:41
rights guaranteed to me under the Fifth Amendment to 11:41

the Constitution of the United States. 11:41
Q Gorilla Circuits is a supplier for Uber; 11:41
correct? 11:42
A On the advice and direction of my counsel, I 11:42
respectfully decline to answer. And I assert the 11:42
rights guaranteed to me under the Fifth Amendment to 11:42
the Constitution of the United States. 11:42
Q On December 12th, 2016, Gorilla Circuits sent 11:42
an e-mail to individuals at Uber, that inadvertently 11:42
included a Waymo employee; correct? 11:42
A On the advice and direction of my counsel, I 11:42
respectfully decline to answer. And I assert the 11:42
rights guaranteed to me under the Fifth Amendment to 11:42
the Uni- -- to the Constitution of the United States. 11:42
Q And that e-mail -- the -- the December 13th, 11:42
2016, e-mail included a board that Gorilla Circuits is 11:43
developing for Uber; correct? 11:43
A On the advice and direction of my counsel, I 11:43
respectfully decline to answer. And I assert the 11:43
rights guaranteed to me under the Fifth Amendment to 11:43
the Constitution of the United States. 11:43
Q And that December 13, 2016, e-mail attached a 11:43
board design that was derived from information you 11:43
took from Google before you left Google; correct? 11:43
A On the advice and direction of my counsel, I 11:43

respectfully decline to answer. And I assert the 11:43
rights granted to me -- guaranteed to me under the 11:43
Fifth Amendment to the -- to the Constitution of the 11:43
United States. 11:44
Q And that 2 -- and the December 13, 2016, 11:44
Gorilla e-mail attached a board design that used 11:44
information that was contained in the 14,000 documents 11:44
you downloaded from Google in December 15 -- 11:44
December 2015; correct? 11:44
A On the advice and direction of my counsel, I 11:44
respectfully decline to answer. And I assert the 11:44
rights guaranteed to me under the Fifth Amendment to 11:44
the Constitution of the United States. 11:44
Q Uber would not have been able to have 11:44
developed the board design attached to the 11:44
December 13, 2016, Gorilla e-mail without using 11:44
information contained in the 14,000 documents you 11:45
downloaded from Google in 2 -- December 2015; correct? 11:45
A On the advice and direction of my counsel, I 11:45
respectfully decline to answer. And I assert the 11:45
rights guaranteed to me under the Fifth Amendment to 11:45
the Constitution of the United States. 11:45
MR. EHRLICH: Do you need a break? 11:45
THE WITNESS: I'm okay. 11:45
MR. EHRLICH: Do you need a break? We can 11:45

keep going. 11:45
MR. PERLSON: I don't care. 11:45
THE WITNESS: Let's do it. 11:45
MR. EHRLICH: Keep going? 11:45
THE WITNESS: Yeah. 11:45
MR. PERLSON: The -- you threw me off, man. 11:45
MR. EHRLICH: We can take a break, if you 11:45
want. 11:45
MR. PERLSON: Q. Fuji relates to a LiDar 11:45
system prototype that Uber has developed; correct? 11:45
A On the advice and direction of my counsel, I 11:45
respectfully decline to answer. And I assert the 11:45
rights guaranteed to me under the Fifth Amendment to 11:45
the Constitution of the United States. 11:46
Q Work started on Fuji in October 2016; 11:46
correct? 11:46
A On the advice and direction of my counsel, I 11:46
respectfully decline to answer. And I assert the 11:46
rights guaranteed to me under the Fifth Amendment to 11:46
the Constitution of the United States. 11:46
Q You personally are involved in the 11:46
development of Fuji; correct? 11:46
A On the advice and direction of my counsel, I 11:46
respectfully decline to answer. And I assert the 11:46
rights guaranteed to me under the Fifth Amendment to 11:46

the -- to the Constitution of the United States. 11:46
Q Would you agree with me that the following 11:46
statement is incorrect: 11:46
"Anthony Levandowski has never had nor 11:46
currently has any design input in the number of 11:46
[REDACTED] number of [REDACTED] number of [REDACTED] 11:46
[REDACTED] or [REDACTED] and [REDACTED] of the [REDACTED] 11:47
[REDACTED] on the transmit PCBs for Fuji." 11:47
MR. EHRLICH: Hold on. Let me read that 11:47
question. 11:47
I instruct you to assert your rights. 11:47
THE WITNESS: On the advice and direction of 11:47
my counsel, I respectfully decline to answer. And I 11:47
assert the rights guaranteed to me under the Fifth 11:47
Amendment to the Constitution of the United States. 11:47
MR. PERLSON: Q. Is it correct that the 11:47
current Fuji system borrows technology from each of 11:47
Otto, Tyto, and Odin Wave? 11:47
A On the advice and direction of my counsel, I 11:48
respectfully decline to answer. And I assert the 11:48
rights guaranteed to me under the Fifth Amendment to 11:48
the Constitution of the United States. 11:48
Q At Uber, your team is experience -- 11:48
experimenting with [REDACTED]; is that 11:48
correct? 11:48



A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States.

Q At Uber, your team is experiment -- experimenting with [REDACTED] to help build a [REDACTED]; correct?

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States.

Q At Uber, your team is developing [REDACTED]

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States.

Q The [REDACTED] that your team is working on at Uber relies on [REDACTED] technology; correct?

A On the advice and direction of my counsel, I respectfully decline to answer.

Page 102

Q The fi -- oh, sorry.

A That's okay.

And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States.

Q The [REDACTED]aser technology your team is working on at Uber uses a [REDACTED] [REDACTED] correct?

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States.

Q The [REDACTED] technology your team is working on at Uber uses [REDACTED] correct?

A On the advice and direction of my counsel, I respectfully decline to answer. And I'm asserting the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States.

Q While you were at Google, Google's self-driving car project used [REDACTED] correct?

A On the advice and direction of my counsel, I

Page 103

respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States.

Q [REDACTED] is not generally known; correct?

A This is a general question.

MR. EHRLICH: Let -- let me read it.

MR. PERLSON: Let -- let me -- let me ask it again.

THE WITNESS: Okay.

MR. PERLSON: Q. Before you left Google, [REDACTED] was not generally known; correct?

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States.

Q Uber's use of [REDACTED] is not generally known; correct?

Page 104

A On -- on the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution to the United States.

Q The -- since -- let's start over.

During your work at Otto, you did work in relation -- let me start over again.

Otto did development work regarding a LiDar system that uses a common transmit and receive lens; correct?

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States.

Q Otto developed a prototype LiDar system that used a common transmit/receive lens; correct?

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States.

Q Otto tested a LiDar system that used a common transmit/receive lens; correct?

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to

Page 105

the Constitution of the United States. 11:55
Q If a LiDar system that uses a common transmit/receive lens does not presently exist at Uber, it is because it was destroyed; correct? 11:55
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 11:56
Q While at Uber -- let me start over again. 11:56
Since your employment with Google ended, you have done work on LiDar systems at Otto and Uber where the transmit and receive paths overlap -- 11:56
MS. RAY: Objection; form. 11:56
MR. PERLSON: Q. -- correct? 11:56
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Uni- -- to the Constitution of the United States. 11:57
Q Since your employment with Google ended, you have done work on LiDar systems at Otto and Uber, where the transmit and receive paths overlap and prototypes of such a system existed? 11:57
MS. RAY: Objection; form. 11:57
THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I 11:57

assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 11:57
MR. PERLSON: Q. If a prototype of work you did on LiDar systems at Otto, and Uber where the transmit and receive paths overlap does not exist, it is because such a prototype has been destroyed? 11:58
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 11:58
Q Any destruction of any Otto prototypes would have been done at the instruction of Uber; correct? 11:58
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 11:58
Q There has been instruction from management at Uber to you to destroy prototypes that existed and were designed at Uber? 11:58
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 11:59
Q Management at Uber instructed you and Otto employees to destroy prototypes to hide the existence 11:59

of patent infringement? 11:59
MS. RAY: Objection; form. 11:59
THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 11:59
MR. PERLSON: Q. Management at Uber instructed you and Otto employees to destroy prototypes to hide the existence of trade secret misappropriation? 11:59
MS. RAY: Objection; form. 11:59
THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 11:59
MR. PERLSON: Q. When you were employed by Google, you had a duty to keep Google confidential information secret; correct? 12:00
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 12:00
Q You understood that were you to disclose confidential and proprietary information of Google to those outside of Google without Google's permission, 12:00

that that would be a breach of your duty of loyalty as an employee to Google? 12:00
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 12:00
Q And, despite that understanding of the duty to keep confidential, confidential and proprietary information of Google, you took such confidential and proprietary information with you to your work at Otto and Uber? 12:01
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 12:01
Q And the taking of that information was done at the direction and with knowledge of Uber management; correct? 12:01
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 12:01
Q And you continue to use that confidential and proprietary information that you took from Google at your work at Google [sic]? 12:01

A On the advice and direction of my counsel, I 12:02
respectfully decline to answer. And I assert the 12:02
rights guaranteed to me under the Fifth Amendment to 12:02
the United States -- to the Constitution of the 12:02
United States. 12:02
Q And that use of confidential and proprietary 12:02
information that you took from Google is at the 12:02
direction of and with the knowledge of Uber 12:02
management? 12:02
A On the advice and direction of my counsel, I 12:02
respectfully decline to answer. And I assert the 12:02
rights guaranteed to me under the Fifth Amendment of 12:02
the Constitution of the United States. 12:02
MR. PERLSON: Why don't we take a break. 12:02
MR. EHRLICH: Okay. 12:02
THE VIDEOGRAPHER: Going off the record. The 12:02
time is 12:02. 12:02
(Lunch break taken at 12:02 p.m.) 12:02
---oOo---

Page 110

AFTERNOON SESSION 12:13
1:06 P.M. 12:13
12:13
12:13
THE VIDEOGRAPHER: We are back on the record. 12:29
The time is 1:06. 13:06
MR. PERLSON: Q. Mr. Levandowski, while you 13:07
were employed at Google, you started a company called 13:07
510 Systems; correct? 13:07
A On the advice and direction of my counsel, I 13:07
respectfully decline to answer. 13:07
Q While you were at Google -- 13:07
A Oh, wait. Sorry. My microphone fell off. 13:07
And I assert the rights guaranteed to me 13:07
under the Fifth Amendment to the Constitution of the 13:07
United States. 13:07
Q While you were at Google, you started a 13:07
company called Anthony's Robots LLC; correct? 13:07
A On the advice of -- and direction of my 13:07
counsel, I respectfully decline to answer. And I 13:07
assert the rights guaranteed to me under the Fifth 13:07
Amendment to the Constitution of the United States. 13:07
Q And your employment with Google overlapped 13:07
with your involvement with 510 Systems and Anthony's 13:07
Robots; correct? 13:07

Page 111

A On the advice and direction of my counsel, I 13:07
respectfully decline to answer. And I assert the 13:07
rights guaranteed to me under the Fifth Amendment -- 13:07
Q You did not -- 13:07
A -- to the Constitution of the United States. 13:08
Q Sorry. 13:08
A Sorry. I apologize. 13:08
Q You did not disclose to Google your 13:08
involvement with 510 Systems and Anthony's Robots 13:08
before Google discovered your involvement with them; 13:08
correct? 13:08
A On the advice and direction of my counsel, I 13:08
respectfully decline to answer. And I assert the 13:08
rights guaranteed to me under the Fifth Amendment to 13:08
the Constitution of the United States. 13:08
Q When Google discovered that you were involved 13:08
in 510 Systems and Anthony's Robots, it thought -- it 13:08
was concerned about potential conflicts; correct? 13:08
A On the advice and direction of my counsel, I 13:08
respectfully decline to answer. And I assert the 13:08
rights guaranteed to me under the Fifth Amendment to 13:08
the Constitution of the United States. 13:08
Q And, given Google's concerns regarding the 13:08
conflict, you entered into a side agreement with 13:09
Google regarding 510 Systems and Anthony's Robots? 13:09

Page 112

A On the advice and direction of my counsel, I 13:09
respectfully decline to answer. And I assert the 13:09
rights guaranteed to me under the Fifth Amendment to 13:09
the Constitution of the United States. 13:09
Q And 510 Systems was doing work on 13:09
self-driving car technology between 2009 and 2011; 13:09
correct? 13:09
A On the advice and direction of my counsel, I 13:09
respectfully decline to answer. And I assert the 13:09
rights guaranteed to me under the Fifth Amendment to 13:09
the Constitution of the United States. 13:09
Q Given what happened with 510 Systems and 13:09
Anthony's Robots, you were aware of Google's concern 13:09
with you operating side businesses that related to 13:09
your work at Google; correct? 13:10
A On the advice of -- on the advice and 13:10
direction of my counsel, I respectfully decline to 13:10
answer. And I assert the rights guaranteed to me 13:10
under the Fifth Amendment to the Constitution to the 13:10
United States. 13:10
Q You used confidential information from Google 13:10
to help develop technology at 510 Systems; correct? 13:10
A On the advice and direction of my counsel, I 13:10
respectfully decline to answer. And I assert the 13:10
rights guaranteed to me under the Fifth Amendment to 13:10

Page 113

ATTORNEYS EYES ONLY

the Constitution of the United States. 13:10
Q You brought Google Street View source code to 13:10
510 Systems in order to [redacted]
[redacted] correct? 13:10
A On the advice and direction of my counsel, I 13:10
respectfully decline to answer. And I assert the 13:10
rights guaranteed to me under the Fifth Amendment to 13:10
the Constitution of the United States. 13:11
Q You misused Google's confidential source code 13:11
to help advance 510 Systems' technology; didn't you? 13:11
A On the advice and direction of my counsel, I 13:11
respectfully decline to answer. And I assert the 13:11
rights guaranteed to me under the Fifth Amendment to 13:11
the Constitution of the United States. 13:11
Q The Little Bear system at 510 Systems was 13:11
named after a mountain; is that correct? 13:11
A On the advice and direction of my counsel, I 13:11
respectfully decline to answer. And I assert the 13:11
rights guaranteed to me under the Fifth Amendment to 13:11
the Constitution of the United States. 13:12
Q And, while you were at Google, you developed 13:12
LiDar systems that were named after mountains; 13:12
correct? 13:12
A On the advice and direction of my counsel, I 13:12
respectfully decline to answer. And I assert the 13:12

Page 114

rights guaranteed to me under the Fifth Amendment to 13:12
the Constitution of the United States. 13:12
Q And the Fuji system at Uber is named after 13:12
Mount Fuji; correct? 13:12
A On the advice and direction of my counsel, I 13:12
respectfully decline to answer. And I assert the 13:12
rights guaranteed to me under the Fifth Amendment to 13:12
the Constitution of the United States. 13:12
Q And the reason that the Fuji system at Uber 13:12
is named after Mount Fuji is that it is derived from 13:12
Google technology that was also code named with names 13:13
of mountains; correct? 13:13
A On the advice and direction of my counsel, I 13:13
respectfully decline to answer. And I assert the 13:13
rights guaranteed to me under the Fifth Amendment to 13:13
the Constitution of the United States. 13:13
Q Google had a -- the first -- an early version 13:13
of LiDar, during your work at Google, was called 13:14
Grizzly Bear; correct? 13:14
A On the advice and direction of my counsel, I 13:14
respectfully decline to answer. And I assert the 13:14
rights guaranteed to me under the Fifth Amendment to 13:14
the Constitution of the United States. 13:14
Q And the sec- -- and a later version of 13:14
Google's LiDar was called Grizzly Bear 2; correct? 13:14

Page 115

A On the advice and direction of my counsel, I 13:14
respectfully decline to answer. And I assert the 13:14
rights guaranteed to me under the Fifth Amendment to 13:14
the Constitution of the United States. 13:14
Q And a still later version of LiDar at Google 13:14
was Grizzly Bear 3; correct? 13:15
A On the advice and direction of my counsel, I 13:15
respectfully decline to answer. And I assert the 13:15
rights guaranteed to me under the Fifth Amendment to 13:15
the Constitution of the United States. 13:15
Q And each of the development -- and the 13:15
development from each of the different versions of 13:15
LiDar at Google was a result of significant trial and 13:15
error work by Google engineers; correct? 13:15
A On the advice and direction of my counsel, I 13:15
respectfully decline to answer. And I assert the 13:15
rights guaranteed to me under the Fifth Amendment to 13:15
the Constitution of the United States. 13:15
Q And the development of LiDar through Grizzly 13:15
Bear to Grizzly Bear 2 to Grizzly Bear 3 was the 13:15
result of significant investment of time and money by 13:15
Google; correct? 13:15
A On the advice and direction of my counsel, I 13:15
respectfully decline to answer. And I assert the 13:15
rights guaranteed to me under the Fifth Amendment to 13:15

Page 116

the Constitution of the United States. 13:16
Q You are a named inventor on U.S. Patent 13:16
Nos. 8,836,922 and 9,285,464; correct? 13:16
MR. EHRLICH: Counsel, can I just ask the -- 13:16
the date of those patent submissions, if that's the 13:16
correct word, just so I can advise my client, if you 13:16
know. 13:16
MR. PERLSON: It was while he was at Google, 13:16
if that helps. 13:16
MR. EHRLICH: Okay. That helps. 13:16
I'm going to advise you -- 13:16
THE WITNESS: Okay. 13:16
MR. EHRLICH: -- to assert your rights then. 13:16
THE WITNESS: On the advice and direction of 13:16
my counsel, I respectfully de- -- decline to answer. 13:16
And I assert the rights guaranteed to me under the 13:16
Fifth Amendment to the Constitution of the United 13:16
States. 13:16
MR. PERLSON: Q. You agree that you assigned 13:16
all your rights and interests to the -- in the 13:16
'922 patent and '464 patent to Google? 13:17
A On the advice and direction of my counsel, I 13:17
respectfully decline to answer. And I assert the 13:17
rights guaranteed to me under the Fifth Amendment to 13:17
the Constitution of the United States. 13:17

Page 117

Q You are currently employed at Uber Technologies, Inc.? 13:17
MR. EHRLICH: You can answer. 13:17
THE WITNESS: Yes. 13:17
MR. PERLSON: Q. Uber is affiliated with Ottomoto, LLC and Otto Trucking, LLC? 13:17
MS. RAY: Objection; form. 13:17
MR. EHRLICH: You can answer. 13:17
THE WITNESS: Yes. 13:17
MR. PERLSON: Q. You were hired at Uber to oversee its self-driving car technology; correct? 13:17
MR. EHRLICH: I'm going to advise you to assert your rights. 13:17
THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:18
MR. PERLSON: I had a streak of two questions. 13:18
THE WITNESS: I know. It was -- keep going. 13:18
MR. EHRLICH: Very impressive. 13:18
THE WITNESS: It's good. 13:18
MR. PERLSON: Q. The -- you agree that, after you joined, Uber continued to develop its self-driving car technology; correct? 13:18

Page 118

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:18
Q You agree that you were involved in Uber's decision-making process to continue developing its self-driving car technology; correct? 13:18
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:18
Q You agree that Uber began developing its current self-driving car technology around the same time you joined Uber; correct? 13:19
MS. RAY: Objection to form. 13:19
MR. EHRLICH: You can answer. 13:19
THE WITNESS: Okay. 13:19
On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:19
MR. PERLSON: Q. You have a leadership role at Uber Technologies, Inc.; correct? 13:19
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the 13:19

Page 119

rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:19
Q You have an equity interest in Uber Technologies, Inc.; correct? 13:19
A On the advice of my counsel, I respectively decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:19
Q You have an equity interest in Ottomoto, LLC; correct? 13:19
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:20
Q You have an equity interest in Otto Trucking, LLC; correct? 13:20
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:20
Q While you were at Goo- -- at Google, Google employees had a duty to keep confidential information of Google confidential; correct? 13:20
A On the -- on the advice and direction of my counsel, I respectfully decline to answer. And I 13:20

Page 120

assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:20
Q While you were at Google, Google required employees to password protect their computers and other hardware; correct? 13:20
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:21
Q While you were at Google, Google's networks and other storage repositories were password protected; correct? 13:21
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:21
Q While you were at Google, Google monitored use and access to its devices and networks for security purposes; correct? 13:21
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:21
Q You understand that, while you were at Google, Google maintained security software to prevent 13:21

Page 121

unauthorized access; correct? 13:21
A On the advice and direction of my counsel, I 13:20 respectfully decline to answer. And I assert the 13:20 rights guaranteed to me under the Fifth Amendment to 13:20 the Constitution of the United States. 13:22
Q While you were at Google, Google provided 13:22 network security training to employees with access to 13:22 networks? 13:22
A On the advice and direction of my counsel, I 13:22 respectfully decline to answer. And I assert the 13:22 rights guaranteed to me under the Fifth Amendment to 13:22 the Constitution of the United States. 13:22
Q While you were at Google, Google generally 13:22 limited application access and network access 13:22 containing sensitive material to users with a need to 13:22 know; correct? 13:22
A On the advice and direction of my counsel, I 13:20 respectfully decline to answer. And I assert the 13:20 rights guaranteed to me under the Fifth Amendment to 13:20 the Constitution of the United States. 13:22
Q While you were at Google, Google had a policy 13:22 requiring its employees to safeguard its computer 13:22 networks and digital information; correct? 13:22
A On the advice and direction of my counsel, I 13:20 respectfully decline to answer. And I assert the 13:20

rights guaranteed to me under the Fifth Amendment to 13:20 the Constitution of the United States. 13:22
Q While you were at Google, Google had a policy 13:22 against its employees accessing its digital 13:23 information for reasons unrelated to business 13:23 activities; correct? 13:23
A On the advice and direction of my counsel, I 13:23 respectfully decline to answer. And I assert the 13:23 rights guaranteed to me under the Fifth Amendment to 13:23 the Constitution of the United States. 13:23
Q While you were at Google, Google took 13:23 reasonable measures to protect the secrecy of its 13:23 networks and digital information; correct? 13:23
A On the advice and direction of my counsel, I 13:20 respectfully decline to answer. And I assert the 13:20 rights guaranteed to me under the Fifth Amendment to 13:20 the Constitution of the United States. 13:23
Q While you were at Google, Google's SVN server 13:23 was password protected? 13:23
A On the advice and direction of my counsel, I 13:20 respectfully decline to answer. And I assert the 13:20 rights guaranteed to me under the Fifth Amendment to 13:20 the Constitution of the United States. 13:23
Q While you were at Google, Google's SVN server 13:23 was limited to only certain employees -- 13:23

A On the -- 13:23
Q -- correct? 13:24
A On the advice and direction of my counsel, I 13:20 respectfully decline to answer. And I assert the 13:20 rights guaranteed to me under the Fifth Amendment to 13:20 the Constitution of the United States. 13:24
Q While you were at Google, Google's SVN server 13:24 was limited to only those on a need-to-know basis? 13:24
A On the advice and direction of my counsel, I 13:20 respectfully decline to answer. And I assert the 13:20 rights guaranteed to me under the Fifth Amendment to 13:20 the Constitution of the United States. 13:24
Q While you were at Google, the SVN server 13:24 required specialized software to access; correct? 13:24
A On the advice and direction of my counsel, I 13:20 respectfully decline to answer. And I assert the 13:20 rights guaranteed to me under the Fifth Amendment to 13:20 the Constitution of the United States. 13:24
Q While you were at Google, Google took 13:24 reasonable measures to protect the secrecy of its SVN 13:24 server; correct? 13:24
A On the advice and direction of my counsel, I 13:24 respectfully decline to answer. And I assert the 13:24 rights guaranteed to me under the Fifth Amendment to 13:24 the Constitution of the United States. 13:24

Q Do you agree that Google Waymo outside 13:24 vendors were generally required to sign nondisclosure 13:25 statements? 13:25
MS. RAY: Objection; form. 13:25
THE WITNESS: On the advice and direction of 13:25 my counsel, I respectfully decline to answer. And I 13:25 assert the rights guaranteed to me under the Fifth 13:25 Amendment to the Constitution of the United States. 13:25
MR. PERLSON: Q. Do you recall the passwords 13:25 to any of your Google computers? 13:25
A On the advice and direction of my counsel, I 13:20 respectfully decline to answer. And I assert the 13:20 rights guaranteed to me under the Fifth Amendment to 13:20 the Constitution of the United States. 13:25
Q You owned a company and still own -- let me 13:25 start over again. 13:25
While you were at Google and to this day, you 13:25 have an ownership interest in Dogwood Leasing; 13:25 correct? 13:25
A On the advice and direction of my counsel, I 13:20 respectfully decline to answer. And I assert the 13:20 rights guaranteed to me under the Fifth Amendment to 13:20 the Constitution of the United States. 13:25
Q Dogwood Leasing engages, and has engaged, in 13:25 business that relate to self-driving car technology? 13:26

A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:26
Q You employed Asheem Linval at Dogwood Leasing 13:26
for self-driving car technology; correct? 13:26
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:26
Q You asked Mr. Linval to use confidential 13:26
information he learned while at Google in connection 13:26
with his work at Dogwood Leasing; correct? 13:26
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:27
Q You started Odin Wave while you were still 13:27
working at Google? 13:27
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:27
Q You had to move the location of Odin Wave 13:27
because you were concerned that Google may find out 13:27

about its existence? 13:27
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:27
Q You used Google confidential information at 13:27
Odin Wave; correct? 13:27
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:28
Q Did you have an ownership interest in 13:28
Odin Wave? 13:28
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:28
Q Did you have a managerial role at Odin Wave? 13:28
A On the advice and direction of my counsel, I 13:20
respectfully dis- -- decline to answer. And I assert 13:20
the rights guaranteed to me under the Fifth Amendment 13:20
to the Constitution of the United States. 13:28
Q Were you involved in the day-to-day 13:28
operations at Odin Wave? 13:28
A On the advice and direction of my counsel, I 13:20

respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:28
Q Were you involved in technology development 13:28
at Odin Wave? 13:28
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:29
Q Were you paying individuals to work at 13:29
Odin Wave? 13:29
A On the advice and direction of my counsel, I 13:29
respectfully decline to answer. And I assert the 13:29
rights guaranteed to me under the Fifth Amendment to 13:29
the Constitution of the United States. 13:29
Q Isn't it correct that Odin Wave ordered parts 13:29
from [redacted] that were similar to parts used by Google in 13:29
its own LiDar system? 13:29
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:29
Q In 2013, [redacted] called Google because it had an 13:29
order from Odin Wave that was so similar to parts used 13:29
by Google; correct? 13:29

A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:30
Q And, because of this incident, Odin Wave 13:30
moved to a different location to get distance from 13:30
you; correct? 13:30
A On the advice and direction of my counsel, I 13:30
respectfully decline to answer. And I assert the 13:30
rights -- the rights guaranteed to me under the Fifth 13:30
Amendment to the Constitution of the United States. 13:30
Q Isn't it true that you were guiding Google 13:30
towards an in-house KBR solution so that you could use 13:30
that technology at Odin Wave? 13:30
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:30
Q You -- isn't it true that you directed 13:30
Odin Wave to file patent applications on its 13:31
technology development that stemmed from Google 13:31
confidential information? 13:31
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20

ATTORNEYS EYES ONLY

the Constitution of the United States. 13:31
Q Odin Wave renamed itself to Tyto LiDAR; 13:31
correct? 13:31
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:31
Q Odin Wave was renamed to Tyto LiDAR in order 13:31
to conceal your involvement; correct? 13:31
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:31
Q After the name change, Tyto -- Tyto LiDAR 13:31
continued in the same business with the same employees 13:31
as Odin Wave; correct? 13:32
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:32
Q You had an ownership interest in Tyto LiDAR; 13:32
correct? 13:32
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights granted to me under the Fifth Amendment to the 13:20

Constitution of the United States. 13:32
Q You had a managerial role at Tyto LiDAR; 13:32
correct? 13:32
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:32
Q You were involved in the day-to-day 13:32
operations of -- at Tyto LiDAR; correct? 13:32
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights granted to me under the Fifth Amendment to the 13:20
Constitution of the United States. 13:32
Q You were involved in the technology 13:32
development at Tyto LiDAR; correct? 13:32
A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights guaranteed to me under the Fifth Amendment to 13:20
the Constitution of the United States. 13:33
Q You used Google -- start over. 13:33
You used information taken from -- let me 13:33
start over. 13:33
You used confidential information taken from 13:33
Google in connection with your work at Tyto LiDAR; 13:33
correct? 13:33

A On the advice and direction of my counsel, I 13:20
respectfully decline to answer. And I assert the 13:20
rights granted to me under the Fifth Amendment to the 13:20
Constitution of the United States. 13:33
Q You did not disclose your involvement with 13:33
Tyto LiDAR to Google; correct? 13:33
A On the advice and direction of my counsel, I 13:33
respectfully decline to answer. And I assert the 13:33
rights guaranteed to me under the Fifth Amendment to 13:33
the Constitution of the United States. 13:34
Q And in fact, you joined a Google team that 13:34
visited Tyto facilities when [REDACTED]
[REDACTED] and you still did not tell Google that 13:34
you had an ownership interest in Tyto? 13:34
A On the advice and direction of my counsel, I 13:34
respectfully decline to answer. And I assert the 13:34
rights guaranteed to me under the Fifth Amendment to 13:34
the Constitution of the United States. 13:34
Q You attempted to influence Google's 13:34
[REDACTED] even 13:34
though you did not disclose that you had an ownership 13:34
interest in Tyto LiDAR; correct? 13:34
A On the advice and direction of my counsel, I 13:33
respectfully decline to answer. And I assert the 13:33
rights guaranteed to me under the Fifth Amendment to 13:33

the Constitution of the United States. 13:33
Q You were positioning Tyto to [REDACTED]
[REDACTED]
[REDACTED]
[REDACTED] correct? 13:35
A On the advice and direction of my counsel, I 13:33
respectfully decline to answer. And I assert the 13:33
rights guaranteed to me under the Fifth Amendment to 13:33
the Constitution of the United States. 13:35
Q You registered a domain name for 280 Systems 13:35
in November 2015; correct? 13:35
A On the advice and direction of my counsel, I 13:33
respectfully decline to answer. And I assert the 13:33
rights guaranteed to me under the Fifth Amendment to 13:33
the Constitution of the United States. 13:35
Q On February 11th, 2016, the corporation 13:35
restated its name and stock as 280 Systems, Inc.; 13:35
correct? 13:35
A On the advice and direction of my counsel, I 13:35
respectfully decline to answer. And I assert the 13:35
rights guaranteed to me under the Fifth Amendment to 13:35
the Constitution of the United States. 13:35
Q On April 6, 2016, 280 Systems was re- -- 13:35
renamed Ottomoto, Inc.; correct? 13:36
A On the advice and direction of my counsel, I 13:33

respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:33 13:33 13:36

THE WITNESS: Can we take a break? I just want to fill up my water. 13:36 13:36

MR. PERLSON: Yeah. 13:36

THE VIDEOGRAPHER: Going off the record. The time is 1:36. 13:36 13:36

(Recess taken.) 13:36

THE VIDEOGRAPHER: We are back on the record. The time is 1:37. 13:37 13:37

MR. PERLSON: Q. Ottomoto acquired Tyto in May 2016; correct? 13:37 13:37

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:33 13:33 13:33 13:37

Q In August 2016 Uber acquired Ottomoto? 13:37

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:33 13:33 13:33 13:38

Q Otto acquired Tyto LiDAR; correct? 13:38

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the 13:33

rights guaranteed to me under the Fifth Amendment to the Constitution of the United States.

Q Otto acquired Tyto LiDAR in anticipation of Otto being acquired by Uber; correct?

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights agreed -- granted to me under the Fifth Amendment to the Constitution of the United States. 13:33 13:33 13:33 13:38

Q Uber directed Otto to acquire Tyto LiDAR; correct? 13:38 13:39

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:33 13:33 13:33 13:39

Q Uber knew that you had been using Google confidential information to develop Tyto LiDAR's technology? 13:39 13:39 13:39

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:33 13:33 13:33 13:40

(Document marked Exhibit 25 for identification.) 13:40 13:40

MS. RAY: May I have a copy? Thank you. 13:40

MR. PERLSON: You've been handed what's been 13:40

marked as Exhibit 25. 13:40

Q Do you recognize this document? 13:40

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:40 13:40 13:40 13:41

Q You agree that this is a schematic for Uber's Fuji board; correct? 13:41 13:41

A On the device -- on the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:41 13:41 13:41 13:41

Q Do you see that there are diodes in the drawing on the far left? 13:41 13:41

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:41 13:41 13:41 13:41

Q The diodes are [REDACTED]; correct? 13:41

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:41 13:41 13:41 13:42

Q D1_TX1 is the [REDACTED] diode? 13:42

MR. EHRLICH: I don't know if it's possible 13:42

to see. You can direct us, Counsel? 13:42

MR. PERLSON: Do we need to get a magnifying glass? 13:42 13:42

MR. SCHMIDT: Yeah. 13:42

MR. PERLSON: Q. Well, let me ask it -- let me ask it this way: In -- in Uber -- in Uber's Fuji board, the diode D1_TX1 is the [REDACTED] diode? 13:42 13:42 13:42 13:43

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:43 13:43 13:43 13:43

Q And if the -- the next diode down is the [REDACTED] diode; correct? 13:43 13:43

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:43 13:43 13:43 13:43

Q The diodes on the board shown on the far left are generally less [REDACTED] [REDACTED]; correct? 13:43 13:43 13:43

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:43 13:43 13:43 13:44

ATTORNEYS EYES ONLY

Q The [redacted] diodes on the board on the -- shown on the upper left is [redacted] diode from the [redacted] 13:44
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:44
Q There is a [redacted] between the [redacted] diode from the [redacted] correct? 13:44
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:44
Q The [redacted] the diodes [redacted] as the [redacted] of the diode [redacted] correct? 13:44
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:45
Q The diodes on the [redacted] are more [redacted] the [redacted] correct? 13:45
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to

the Constitution of the United States. 13:45
Q The diode [redacted] shown on the board on the far left was derived from [redacted] correct? 13:45
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:45
Q You used the confidential information you learned at Google to derive the diode [redacted] shown on the board, on the upper left in Exhibit 25; correct? 13:46
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:46
Q Uber would not have been able to have developed the Fuji board shown on Exhibit 25 without using the confidential information learned at Google by you; correct? 13:46
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:47
Q Uber would not have been able to have developed the [redacted] on the Fuji board shown on

Exhibit 25, without reference to the 14,000 files you downloaded in December 2015; correct? 13:47
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:47
Q Uber is aware that the Fuji board shown on Exhibit 25 has diode [redacted] that is derived from the confidential information you took from Google to Uber; correct? 13:48
MS. RAY: Objection; form. 13:48
MR. EHRLICH: You can answer. 13:48
THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:48
MR. PERLSON: Q. [redacted] that is reflected in documents you took from Google, including the 14,000 files you downloaded in December 2015, is not generally known; correct? 13:48
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:48

Q [redacted] that is reflected in documents you took from Google, including the 14,000 files you downloaded in December 2015, has independent economic value because it is not generally known; correct? 13:49
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights granted to me under the Fifth Amendment to the Constitution of the United States. 13:49
Q The diode [redacted] that is reflected on Exhibit 25, that was derived from information taken by you from Google, reflects the diode [redacted] that is not generally known; correct? 13:49
MS. RAY: Objection; form. 13:49
THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 13:50
MR. PERLSON: Q. Uber did not independently develop the diode [redacted] that is reflected on Exhibit 25 in the upper left-hand corner of the first page, on its own without reference to confidential information taken from Google; correct? 13:50
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the 13:50

rights guaranteed to me under the Fifth Amendment to 13:50
the Constitution of the United States. 13:50
Do you want this one back? 13:51
Q You can just keep it there. Thanks. 13:51
A Okay. 13:51
(Document marked Exhibit 26 13:51
for identification.) 13:51
THE VIDEOGRAPHER: Five more minutes. 13:51
MR. PERLSON: Okay. Okay. 13:51
Q You've been handed what's been marked as 13:51
Exhibit 26, which I'll represent was attached as 13:51
Exhibit B to the Haslim declaration submitted by Uber. 13:51
This document reflects the PCB configuration 13:51
and diode layout for the Fuji system, corresponding to 13:51
the sys- -- the system shown in Exhibit 25; is that 13:52
correct? 13:52
A On the advice and direction of my counsel, I 13:52
respectfully decline to answer. And I assert the 13:52
rights guaranteed to me under the Fifth Amendment to 13:52
the Constitution of the United States. 13:51
Q Exhibit 26 shows the Fuji LiDAR system has 13:52
[redacted] PCBs; correct? 13:52
A On the advice and direction of my counsel, I 13:52
respectfully decline to answer. And I assert the 13:52
rights guaranteed to me under the Fifth Amendment to 13:52

the Constitution of the United States. 13:53
Q The [redacted] PCBs shown on Exhibit 26 are similar 13:53
to the PCB drawing we saw in Exhibit 25; correct? 13:53
A On the advice and direction of my counsel, I 13:53
respectfully decline to answer. And I assert the 13:53
rights guaranteed to me under -- under the Fifth 13:53
Amendment to the Constitution of the United States. 13:53
Q [redacted] PCBs on Exhibit 26 show [redacted]
[redacted] correct? 13:53
A On the advice and direction of my counsel, I 13:53
respectfully decline to answer. And I assert the 13:53
rights guaranteed to me under the Fifth Amendment to 13:53
the Constitution of the United States. 13:54
Q The PCB configuration, and diode arrangement 13:54
shown on Exhibit 26, was developed using Google 13:54
confidential information; correct? 13:54
A On the advice and direction of my counsel, I 13:54
respectfully decline to answer. And I assert the 13:54
rights guaranteed to me under the Fifth Amendment to 13:54
the Constitution of the United States. 13:54
Q The PCB configuration and diode arrangement 13:54
shown on Exhibit 26 was developed using Google 13:54
confidential information reflected in documents 13:54
downloaded by you in December 2015; correct? 13:54
A On the advice and direction of my counsel, I 13:54

respectfully decline to answer. And I assert the 13:54
rights guaranteed to me under the Fifth Amendment to 13:54
the Constitution of the United States. 13:54
Q Uber would not have been able to have 13:55
developed the PCB configuration and diode arrangement 13:55
shown in Exhibit 26 without reference to Google 13:55
confidential information taken by you, including 13:55
documents downloaded by you in December 2015? 13:55
A On the advice and direction of my counsel, I 13:55
respectfully decline to answer. And I assert the 13:55
rights guaranteed to me under the Fifth Amendment to 13:55
the Constitution of the United States. 13:55
MR. PERLSON: He has to change the tape. 13:55
THE WITNESS: Okay. 13:55
THE VIDEOGRAPHER: Okay. We are going off 13:55
the record. The time is 1:55. 13:55
(Recess taken.) 13:55
THE VIDEOGRAPHER: This marks the 13:58
deposition -- or excuse me. 14:06
This marks the beginning of DVD No. 3 in the 14:06
deposition of Anthony Levandowski. 14:06
Going back on the record. The time is 2:06. 14:06
MR. PERLSON: Q. Would you agree that the -- 14:06
let me start over again. 14:06
Isn't it correct that the PCB configuration 14:06

and diode arrangement that is reflected in the 14:06
documents you downloaded from Google in 2015, and are 14:06
used in the configuration shown at Exhibit 26, are not 14:06
generally known? 14:07
A On the advice and direction of my counsel, I 14:07
respectfully decline to answer. And I assert the 14:07
rights guaranteed to me under the Fifth Amendment to 14:07
the Constitution of the United States. 14:07
Q Isn't it correct that the PCB configuration, 14:07
and diode arrangement that is reflected in the 14:07
documents you downloaded from Google in December 2015 14:07
are -- then are used in configuration -- let me start 14:07
over again. 14:07
Isn't it correct that the PCB configuration 14:07
and diode arrangement, that is reflected in the Google 14:07
documents you downloaded from Google on December -- 14:07
December 2015, and are used in the configuration shown 14:07
at Exhibit 26 derive -- have independent economic 14:08
value by virtue of their not being publicly known? 14:08
A On the advice and direction of my counsel, I 14:08
respectfully decline to answer. And I assert the 14:08
rights guaranteed to me under the Fifth Amendment to 14:08
the Constitution of the United States. 14:08
Q If you can refer back to Exhibit 25, please. 14:08
A (Witness complies.) 14:08

Q For the record, Exhibit 25 is UBER000727. It looked like that got cut off when it was printed. 14:08
In the drawing on the far left of Exhibit 25, there are [redacted] diodes [redacted] of the board. 14:09
Do you see that? 14:09
A That's your question? 14:09
Q Yeah. 14:09
A Okay. 14:09
On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:09
Q The diodes shown on the drawing on the far left of Exhibit 25 [redacted] correct? 14:10
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:10
Q You would agree that the [redacted] the diodes in the Fuji board are [redacted] 14:10
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the

rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:10
Q You agree that, in the Fuji system, that each of the diodes have a [redacted] placed in [redacted] them? 14:10
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:11
Q Isn't it correct that, in the Fuji system, [redacted] of the diodes have a [redacted] placed in [redacted] them? 14:11
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:11
Q Isn't it correct that the light emitted from the diodes is [redacted] in the Fuji system? 14:11
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:12
Q Isn't it correct that the placement of the diodes, as shown on Exhibit 25 -- let me start over again. 14:12
Isn't it correct that the placement of the

diodes, [redacted] was derived from Google confidential information reflected among the 14,000 documents you downloaded in December 2015? 14:12
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:12
Q Isn't it correct that the placement of the diodes, [redacted] would not have been able to be developed by Uber without use of the Google confidential information reflected among the 14,000 documents you downloaded from Google in December 2015? 14:13
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:13
Q Isn't it correct that the placement of the diodes [redacted] is a placement that is not publicly known? 14:13
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:14
Q Isn't it correct that the placement of the

diodes, [redacted] is a placement that has economic value because it is not publicly known? 14:14
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:14
Q If you could please turn to the -- 14:14
MR. PERLSON: It's this one; right? 14:14
MR. SCHMIDT: Yeah. 14:14
MR. PERLSON: Q. The second page of Exhibit 25. 14:14
A (Witness complies.) 14:14
Q Do you see that there are [redacted] on the [redacted] [redacted] in the middle of the page annotated with a 12? 14:15
MR. EHRLICH: He's just asking if you see it now. You can answer that. Just, do you see -- 14:15
THE WITNESS: I do see -- 14:15
MR. EHRLICH: -- what he's referencing? 14:15
THE WITNESS: I see that he's pointing at [redacted] 14:15
MR. EHRLICH: Okay. 14:15
THE WITNESS: And there's a legend that says: [redacted] 14:15

MR. EHRLICH: Okay. 14:15
MR. PERLSON: Q. And the legend 14:15
corresponding to the annotation for 12 shows: 14:15
14:15
Do you see that? 14:15
A Yes, I do see that. 14:15
Q And it says that the 14:16
on Exhibit 25, second page, underneath that 14:16
says: 14:16
14:16
Do you see that it says that? 14:16
A Yep, I do. I can read that. 14:16
Q And then, underneath 14:16
it says: 14:16
14:16
14:16
Do you see that? 14:16
A I -- I see the text, yes. 14:16
Q And then, underneath that, it says: 14:16
14:16
14:16
MR. EHRLICH: Or 14:17
THE WITNESS: They're mils, not millimeters. 14:17

Page 150

MR. PERLSON: Mils. Okay. Mils. 14:17
Q So, when I said millimeter before, those are 14:17
mils? 14:17
A Right, mils. 14:17
MR. EHRLICH: And you see that? 14:17
THE WITNESS: I do see that, yes. 14:17
MR. EHRLICH: Okay. 14:17
MR. PERLSON: Q. And, is the for 14:17
the -- and -- let me start over again. 14:17
The as reflected on 14:17
the second page of Exhibit 25, is an accurate 14:17
reflection of the Fuji board at Uber? 14:17
A On the advice and direction of my counsel, I 14:17
respectfully decline to answer. And I assert the 14:17
rights guaranteed to me under the Fifth Amendment to 14:17
the Constitution of the United States. 14:17
Q And you would agree that the annotation 14:17
is referring to in the PCBs for 14:18
correct? 14:18
A On the advice and direction of my counsel, I 14:18
respectfully decline to answer. And I assert the 14:18
rights guaranteed to me under the Fifth Amendment to 14:18
the Constitution of the United States. 14:18
Q The annotation is referring to in 14:18
the PCB for ; correct? 14:18

Page 151

A On the advice and direction of my counsel, I 14:18
respectfully decline to answer. And I assert rights 14:18
guaranteed to me under the Fifth Amendment to the 14:18
Constitution of the United States. 14:18
Q
correct? 14:19
A Excuse me. 14:19
On the advice and direction of my counsel, I 14:19
respectfully decline to answer. And I assert the 14:19
rights guaranteed to me under the Fifth Amendment to 14:19
the Constitution of the United States. 14:19
Q And, it is correct, as it says next to the 14:19
on the legend, that: 14:19
14:19
A What's the question? 14:19
And it is correct... 14:19
On the advice and direction of my counsel, I 14:19
respectfully decline to answer. And I assert the 14:19
rights guaranteed to me under the Fifth Amendment to 14:19
the Constitution of the United States. 14:20
Q And it is true that the dimensions reflected 14:20

Page 152

on the second page of Exhibit 25 for the 14:20
was derived from Google confidential information; 14:20
correct? 14:20
A On the advice and direction of my counsel, I 14:20
respectfully decline to answer. And I assert the 14:20
right -- the rights guaranteed to me under the Fifth 14:20
Amendment to the Constitution of the United States. 14:20
Q And you would agree, that the use of the 14:20
for is derived from Google 14:21
confidential information; is that correct? 14:21
A On the advice and direction of my counsel, I 14:21
respectfully decline to answer. And I assert the 14:21
rights guaranteed to me under the Fifth Amendment to 14:21
the Constitution of the United States. 14:21
Q And you would agree that the use of the 14:21
for reflected in Exhibit 25, page 2, was 14:21
derived from confidential information downloaded by 14:21
you from Google in December 2015; correct? 14:22
A On the advice and direction of my counsel, I 14:22
respectfully decline to answer. And I assert the 14:22
rights guaranteed to me under the Fifth Amendment to 14:22
the Constitution of the United States. 14:22
Q And you would agree that, without the 14:22
confidential information you downloaded from Google in 14:22
December 2015, Uber would not have been able to have 14:22

Page 153

ATTORNEYS EYES ONLY

designed a system [redacted] correct? 14:22
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:22
Q And you agree that [redacted] that was derived from Google's confidential information, and reflected in Exhibit 25 on the second page, is not commonly known? 14:23
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:23
Q And, you would agree that [redacted] that was derived from Google confidential information, and reflected in Exhibit 25 on the second page, has economic value because it is not commonly known? 14:23
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:24
Q It's correct that you attended a meeting at Uber's headquarters in mid-January 2016? 14:24

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:24
Q At this mid-January 2016 meeting, you discussed Uber potentially acquiring the new venture you were planning; correct? 14:24
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:24
Q And, at this meeting in mid-January 2016, you discussed the technology that Uber would be able to acquire if it bought your new venture; correct? 14:24
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:25
Q You met with Brian McClendon at Uber in the summer of 2015; correct? 14:25
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:25
Q You discussed sharing Google's confidential 14:25

information with Uber at your meeting in -- with Brian McClendon in the summer of 2015; correct? 14:25
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:25
Q By at least January 2016, you understood that Uber was already interested in investing or acquiring the new company you were finding? 14:26
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:26
Q You agree that Uber -- let me start over again. 14:26
You agree that Uber's LiDar lens designs are derived from Google confidential information that you took from Google? 14:26
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:26
Q You agree that Uber would not have been able to have developed its Li- -- LiDar lens designs without using the confidential information that you 14:26

took from Google? 14:26
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the United States Constitution. 14:27
Q You agree that, without the use of information reflected in the 14,000 documents you downloaded in December 2015, Uber would not have been able to develop its own LiDar lens design; correct? 14:27
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:27
Q Uber's LiDar laser design was designed using Google's confidential information, including information contained in the 14,000 documents you downloaded from Google in 2015; correct? 14:28
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:28
Q The number and configuration of LiDar lasers in Uber's system is derived from Google confidential information you took, including information in the 14,000 files you downloaded in December 2015? 14:28

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:28
Q The pulse rate of Uber's LiDar lasers is derived from confidential information you took from Google, including information in the 14,000 files you downloaded in 2015; correct? 14:29
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:29
Q Uber's LiDar optical cavity design is derived from confidential information that you took from Google, including 14,000 files you downloaded in December 2015; correct? 14:29
A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:29
Q You agree tha[REDACTED] [REDACTED] [REDACTED], used by Uber, is derived from confidential information that you took from Google, including the 14,000 files you downloaded in December 2015; correct? 14:30

A On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:30
Q Did you discuss the substance of your testimony at all with counsel during any breaks in today's deposition? 14:30
MR. EHRLICH: I'm going to object on attorney-client privilege grounds. 14:30
And, to the extent it's not covered by privilege, I'm going to direct you to assert your constitutional rights. 14:31
THE WITNESS: On the advice -- 14:31
MR. EHRLICH: Go ahead. 14:31
THE WITNESS: -- and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:31
MR. PERLSON: Well, so are you instruct -- so I -- I am just asking a yes-or-no question first. 14:31
Q Did you discuss the substance of your testimony today with counsel during any breaks in today's deposition? 14:31
It's a yes-or-no question. 14:31
MR. EHRLICH: Let me? 14:31

THE WITNESS: Maybe I -- 14:31
MR. EHRLICH: Yeah, yeah, yeah. 14:31
I do think that calls for attorney-client privileged information. I'm going to direct him not to answer. 14:31
MR. PERLSON: Okay. Have you read Judge Alsup's rules regarding this? 14:32
MR. EHRLICH: Candidly, I have not read. If there's a rule directly on point, I have not. 14:32
MR. PERLSON: Well, why don't we take a break, and you can read the rule. 14:32
MR. EHRLICH: Okay. We can do that. 14:32
THE VIDEOGRAPHER: We are going off the record. The time is 2:31. 14:32
(Recess taken.) 14:32
THE VIDEOGRAPHER: We are back on the record. The time is 2:42. 14:43
MR. EHRLICH: So -- 14:43
MR. PERLSON: Go ahead. 14:43
MR. EHRLICH: So, I've now had a chance to read the order. I can -- I do think the question calls for attorney-client privileged information, and I'm going to instruct him not to answer. 14:43
But, as an Officer of the Court, I will represent there was no discussion between 14:43

Mr. Levandowski and either Mr. Ramsey or myself about the substance of his testimony, period. 14:43
There was, however, very brief discussion between Mr. Levandowski and counsel for Uber, limited to the subject of his employment history, prior to his employment at Google. 14:43
MS. RAY: And, to make clear, it had nothing to do -- we did not discuss your questioning at all. I asked some informational questions -- 14:44
MR. EHRLICH: That's correct. 14:44
MS. RAY: -- of Mr. Levandowski. 14:44
MR. EHRLICH: There -- there was no discussion about answers he gave or questions you had asked up to that point in the deposition. 14:44
MR. PERLSON: Okay. 14:44
MR. EHRLICH: And that, other than that very brief discussion, there's been no further communication at all. 14:44
MR. PERLSON: And who was -- who specifically was involved in that discussion? 14:44
MR. EHRLICH: The discussion with Mr. Levandowski and Uber's counsel was with Ms. Ray. I believe I was listening. Mr. Ramsey may have been present. And I'm not sure if there was anyone else there at the time. 14:44

MS. RAY: It was less than a couple of minutes, and it was a factual clarification. Not related to your questioning; related to my understanding of something. 14:44

MR. PERLSON: Okay. 14:44

MR. EHRLICH: So, thank you for letting me clarify the record. 14:44

MR. PERLSON: Okay. 14:44

Q The -- did you do anything to look for documents in relation to this deposition, Mr. Levandowski? 14:45

MR. EHRLICH: I'm going to instruct you to use this one. Assert your rights. 14:45

THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:45

MR. PERLSON: Q. Do you have documents responsive to the subpoena document requests that we propounded on you? 14:45

MR. EHRLICH: I'm going to direct Mr. Levandowski to assert his rights. 14:45

But I can address that, if you would like me to, on the record. 14:45

MR. PERLSON: I would, but I -- 14:45

THE WITNESS: Okay. 14:45

MR. PERLSON: Why don't you do this first. 14:45

THE WITNESS: Yeah. 14:46

On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution of the United States. 14:46

MR. EHRLICH: And, Counsel, to address that, we have been searching, racing as fast as possible to search in every location we can come up with, that may have responsive documents. 14:46

As of this morning, when we appeared for the deposition, we have not located any responsive non-privileged documents. We are continuing to search, of course. 14:46

And, as Counsel knows, Judge Alsup has ordered us to produce in-camera a log identifying any documents that are responsive at all to which we assert any privileges. And we will certainly comply with that order on Wednesday. 14:47

But, as of today, there are no responsive non-privileged documents that we have located. 14:47

MR. PERLSON: Okay. And, when you say "non-privileged," that obviously includes the Fifth Amendment privilege? 14:47

MR. EHRLICH: Correct. It does include the Fifth Amendment, as well as other -- as attorney-client privilege. But, primarily, the issue at hand is the -- is the Fifth Amendment privilege as well. 14:47

MR. PERLSON: And the Fifth Amendment is being asserted by Mr. Levandowski as to the document requests as modified by the judge at the hearing on Wednesday; is that correct? 14:47

MR. EHRLICH: Correct. We -- as we made clear at the hearing, we intend to assert Mr. Levandowski's Fifth Amendment privilege broadly as against any active production that would be covered under the Hubbel [sic] line of cases. 14:47

And so, that is something -- the -- the standard practice for Fifth Amendment privilege is to make an in-camera showing so the judge could evaluate whether the privilege is being asserted properly or not, and we intend to do that. 14:48

MR. PERLSON: Okay. Well, we don't need to talk further about that on the record. 14:48

MR. EHRLICH: Thank you. 14:48

MR. PERLSON: I think that's it -- 14:48

MR. EHRLICH: Okay. 14:48

MR. PERLSON: -- from us. 14:48

MS. RAY: I have some questions. May I switch seats with you? 14:48

MR. PERLSON: Sure. 14:48

THE VIDEOGRAPHER: Shall we go off the record to do this? 14:48

MS. RAY: Sure. 14:48

THE VIDEOGRAPHER: We are going off the record. The time is 2:48. 14:48

(Recess taken.) 14:48

THE VIDEOGRAPHER: We are back on the record. The time is 2:50. 14:50

14:50

EXAMINATION 14:50

BY MS. RAY: 14:50

Q Mr. Levandowski, do you recall that your counsel stated, during this deposition, that if there were questions about your background before you joined Google, you would answer them? 14:50

MR. PERLSON: Objection; form. 14:51

THE WITNESS: Does that mean I answer or not? I'm not clear. 14:51

MR. EHRLICH: If he objects, you still have to answer. 14:51

THE WITNESS: I still have to answer. Okay. 14:51

MR. EHRLICH: You can answer. 14:51

THE WITNESS: I -- I do remember saying that, yes. 14:51
MS. RAY: Q. So, let me ask you some -- 14:51
A Or I do remember -- 14:51
Q Let me ask you some questions about your background. 14:51
Where were you born? 14:51
A I was born -- 14:51
MR. EHRLICH: You can answer. 14:51
THE WITNESS: Okay. 14:51
I was born in Brussels, Belgium. 14:51
MS. RAY: Q. Where were you raised? 14:51
A I was raised in Brussels, Belgium, until I was 14, and then I came to the United States. 14:51
Q And, did you come to California then? 14:51
A I did, yes. 14:51
Q Do you have any children? 14:51
A I do, yes. 14:51
Q What are their ages? 14:51
A I have two. Alex is six, and Miles is three. 14:51
Q I'd like to ask you some questions about your education. 14:51
Where did you attend high school? 14:51
A I went to two high schools. First is Tamalpais High School in Marin County, and then 14:51

Page 166

University High School in San Francisco. 14:52
Q When did you graduate from high school? 14:52
A In 1998. 14:52
Q Did you go to college? 14:52
A I did, yes. 14:52
Q Where did you go to college? 14:52
A I went to college at UC Berkeley for undergrad and grad school. 14:52
Q When did you graduate from undergrad? 14:52
A In 2002. 14:52
Q When did you graduate from graduate school? 14:52
A In 2003. 14:52
Q What was your major during undergrad? 14:52
A I studied industrial engineering and operations research. 14:52
Q And what was your master's degree in? 14:52
A It was in industrial engineering and operations research, as well as management of technology. 14:52
Q While you were in high school, did you have any business ventures? 14:52
A I did, yes. 14:52
Q What were they? 14:52
A I started selling candy freshman year to the fellow students there. And then, I built websites, 14:52

Page 167

and I built a website for seeing the inside locations of things. I made a map of campus. 14:53
Q Can you give me an example of a website that you built for seeing the inside of things. 14:53
A So, the Tamalpais High School website had an internal version that described this system where there was, you know, pictures that you could navigate and click through and see forward or back or around. 14:53
You know, there's other websites that I created later on post-high school. Once -- one was an internal website for a company called Central Garden and Pets which allowed the business to share internal information about their customers and their products, as well as their employees; similar things that you call, you know, intranets today. 14:53
Q Why did you build the website so that you could see the inside of the high school? 14:54
A I received the first digital camera from my family, and I thought it was interesting to be able to take pictures and kind of visit a location remotely. I thought that would be interesting to have the students to be able to show off the school, as well as show that off to my friends and my mom, who lived in Belgium still. 14:54
Q When you were an undergraduate, did you have 14:54

Page 168

any business ventures? 14:54
A I did, yes. 14:54
Q What was one of your businesses during undergrad? 14:54
A It was called La Raison, and it was the -- 14:54
MR. EHRLICH: How do you spell that? 14:54
THE WITNESS: L-A, R-A-I-S-O-N. 14:54
MS. RAY: Q. And what was La Raison? 14:54
A It was a business that was making websites and intranets for other businesses. 14:54
Q When did you get involved with autonomous or driverless vehicles? 14:55
A It started in a class where we were learning Java and robotics with Professor Roger Glassey. And we built self-driving vehicles out of, you know, Lego Mindstorms using the Java programming language. 14:55
MR. EHRLICH: Did you say Lego? 14:55
THE WITNESS: Lego, L-E-G- -- like the toys that my kids play with now. 14:55
MS. RAY: Q. Did this work receive any recognition? 14:55
A Well, after the class, I entered a competition which was several universities competing, including, I believe, Stanford and Santa Clara University, that was organized by the Sun 14:55

Page 169

Microsystems, and specifically organized by the folks 14:55
that created the -- the language of Java. 14:55
And it was competing for what they -- at the 14:55
time was the Gosling Award, which was named after 14:56
James Gosling, who is the inventor of Java. 14:56
And for that, I created a monopoly build 14:56
sorting robots that won the competition. I then 14:56
received the Gosling Award. 14:56
Q Earlier we heard about the DARPA Challenge. 14:56
How did you learn about that challenge? 14:56
A My mom knew how much I loved robots and that 14:56
I loved making things. And she gave me a call when 14:56
she found out about this competitions sponsored by the 14:56
defense department. And she thought it was really 14:56
exciting for me to be able to know that I was going 14:56
on. And when I saw it, I couldn't resist, and I 14:56
decided to enter. 14:56
Q Can you tell me a little bit more about what 14:56
the DARPA race was. 14:56
A So, the DARPA Grand Challenge was a set of 14:56
three competitions. The -- the first one was 14:56
obviously, we didn't know there was going to be a 14:56
follow-up system. 14:57
And it was a -- effectively, it was a race 14:57
from LA to Vegas across the desert. It was really 14:57

Barstow to Vegas, you know, across the desert. And 14:57
the goal was to release a vehicle into the world on 14:57
its own without any remote control or assistance in 14:57
order to try to get, you know, a piece of equipment 14:57
from one location to the next without any supervision 14:57
or input. 14:57
And, it was kind of a monumental step in 14:57
thinking how things were done before, where 14:57
previously, the defense department, clearly wanting to 14:57
move materials and troops from one point to the other, 14:57
had done contract works for specific objectives, and 14:57
the progress had been very slow. 14:57
And so, this DARPA was attempting to 14:57
circumvent that by having a competition that was just 14:57
clean, saying, Here is the start. Here is the finish. 14:57
We'll give you a road that you can follow, in other 14:58
words. And then we'll -- you'll turn the switch and 14:58
let the vehicle go through and see if it makes it or 14:58
not. 14:58
Q What was your entry into the DARPA Challenge? 14:58
A The entry was called Ghost Rider, and it was 14:58
a two-wheeled motorcycle. It was the first of its 14:58
kind, to our knowledge, at that time and, you know, 14:58
self-driving motorcycle. 14:58
Q What was your personal contribution to 14:58

building the Ghost Rider? 14:58
A I built a substantial portion of it myself, 14:58
but I also created a team to help me build the tools 14:58
and software and hardware to make the system work. 14:58
Q Was the Ghost Rider ever used on public 14:58
streets? 14:58
A It was. We did some testing on -- on public 14:58
roads prior to the event to make sure that it was able 14:58
to go up certain hills and stay in -- in the right 14:58
lanes and so forth. 14:59
Q Where did you do that testing on public 14:59
streets? 14:59
A We did that in Richmond, California. 14:59
Q How many other two-wheeled entrants were in 14:59
that same competition? 14:59
A There were none. It was, frankly, a pretty 14:59
crazy idea to go and make things even harder than 14:59
everybody already believed the challenge to be. 14:59
Q Why was it harder to have a two-wheel -- 14:59
two-wheel entry? 14:59
A Well, to get a car to move down the street, 14:59
you know, 20 feet, you can kind of apply a little bit 14:59
of accelerator and not steer, and the vehicle will do 14:59
that. 14:59
To get a motorcycle to move forward, you have 14:59

to build a lot of technology beforehand to make it to 14:59
be able to just drive in a straight line. And so, 14:59
you're just making the problem harder than it needs to 14:59
be. 14:59
Q How did the Ghost Rider do in the 14:59
competition? 14:59
A It didn't do as well as I was hoping. It -- 14:59
it turned out that the complexities and challenges of 15:00
adding the balancing before you could start testing 15:00
all of the other navigation and optical were hard. 15:00
But, on the first year, we actually did 15:00
manage to qualify. And out of the 109 teams or so 15:00
that applied, you know, 14 or so qualified, and we 15:00
were one of them. 15:00
On the day of the race, I -- I made a 15:00
mistake, and I forgot to turn on the software for 15:00
stabilizing the vehicle. And the -- the motorcycle 15:00
went out of the gate and fell down. So that was very 15:00
embarrassing. 15:00
Q What happened to the Ghost Rider after the 15:00
race? 15:00
A We used it again for the following 15:00
competition, which was, I think, a year or so later. 15:00
And then after that one, where the performance was 15:00
much better than before, the Smithsonian thought that 15:00

it was pretty unique and novel and new, and so they 15:00
requested it for an exhibit on autonomous vehicles. 15:01
And I donated it to the Smithsonian, where it is 15:01
today. 15:01
Q After graduate school, where did you work? 15:01
A After graduate school, so I -- long day, so I 15:01
don't have the whole chronology down. 15:01
But I did a couple of things, one of which 15:01
was I was the -- having met all of the teams in a very 15:01
nonthreatening way by making a robotic motorcycle 15:01
through the Grand Challenge, one of the teams was Team 15:01
Dad. Dad, are we there yet? And it was by Bruce Hall 15:01
and Dave Hall, the founders of Velodyne Acoustics who, 15:01
at the time for the first Grand Challenge, made a 15:01
stereo camera, and in the second Grand Challenge made 15:01
a 360 laser that has evolved into the Velodyne that 15:02
they sell today. 15:02
And, after the race, I helped them get their 15:02
unit from the early, early prototype that just 15:02
outputted video data, as well as specific outputs, 15:02
into outputting Ethernet packets so that others could 15:02
use it. 15:02
And then, I became also the first Velodyne 15:02
sales rep. And then I, you know, went around and 15:02
traveled and met many of the teams that were building 15:02

these vehicles and helped them get the Velodyne and 15:02
helped them integrate and just understand what this 15:02
new sensor could do for -- for their teams. 15:02
Q When you say that you were working on the 15:02
prototype that evolved into the Velodyne they sell 15:02
today, do you mean the LiDar that Velodyne -- 15:02
A Correct, the LiDar, yes. 15:02
Q -- sells -- sells today? 15:02
A There is a LiDar Gen 1, which was about this 15:02
large, which is in the Smithsonian as well. 15:03
And, for people to understand what the value 15:03
of that was, looking at a video screen wasn't enough. 15:03
You want to be able to get Ethernet packets. And Dave 15:03
Hall was working on getting that working. 15:03
And I remember a couple of times where, in 15:03
getting that ready for demonstration and sale, I 15:03
helped him get the Ethernet devices, you know, up and 15:03
running. 15:03
Q What else did you do after graduate school 15:03
around that time after you graduated? 15:03
A I had -- I took the software for the Ghost 15:03
Rider and applied that to self-driving tractors so 15:03
that you -- a farmer could actually go and, you know, 15:03
ride along the tractor, and the tractor would go very 15:03
precisely straight down the whole field, and it could 15:03

manually turn around and precisely drive back so that 15:03
you could plant your seeds in one specific time, and 15:04
then harvest them at a very different specific time, 15:04
and abstract out the skill of the operator and turn 15:04
that into the machine. 15:04
Q What did you do next after that project? 15:04
A After that, we -- this is where I worked with 15:04
Professor Thrun and a couple of his students, and we 15:04
started a company that was known as -- as VueTool. I 15:04
don't recall if we actually founded the company, but 15:04
we did have a company together, and we called it that. 15:04
And we made a demo of kind of an evolution of 15:04
something called Movie Maps that was made by an MIT 15:04
professor -- I think an MIT professor -- a while back, 15:04
where you could actually view the world as kind of a 15:04
person would be there without actually physically 15:05
being in that location. 15:05
And we did that where we drove around 15:05
San Francisco and built maps so you could just drop 15:05
yourself in a location in San Francisco and see 15:05
that -- what the specific area looked like. 15:05
Q Did that project involve LiDar? 15:05
A There was a LiDar on the vehicle that we were 15:05
collecting information on. The generating of the 15:05
pictures did not use it, but we were logging laser 15:05

information as well. 15:05
Q What ultimately happened with VueTool? 15:05
A The -- the VueTool team and technology ended 15:05
up at Google through an acquisition, even though it 15:05
wasn't -- 15:05
MR. EHRLICH: Okay. Excuse me, Counsel. 15:05
I'm -- Mr. Levandowski, I'm going to instruct 15:05
you not to give any answers that reference activities 15:05
after you started -- after that first day you started 15:05
at Google. 15:05
THE WITNESS: Okay. 15:05
MR. EHRLICH: Okay. 15:05
THE WITNESS: Okay. 15:05
MS. RAY: Q. What became of your VueTool 15:05
product? 15:06
A The VueTool product team joined Google, and 15:06
then what it became there is something that happened 15:06
afterwards. But it's -- it was about building 15:06
pictures of seeing the world so you can -- 15:06
MR. EHRLICH: You can give the name, if 15:06
there's any -- 15:06
THE WITNESS: The name -- Street View is -- 15:06
is what the technology and team eventually became. 15:06
MR. EHRLICH: Okay. 15:06
MS. RAY: Q. Did you ever work at a company 15:06

called ENSCO? 15:06
A I did, yes. 15:06
Q What was ENSCO? 15:06
A ENSCO stands for Engineering Science and Computers, and it's a research organization where I helped build simulators for understanding how self-driving vehicles would go and navigate the world. 15:06
And I helped put proposals on how to integrate cameras and LiDar for augmenting the resolution and the depth of specific information. 15:06
So, if you had a picture and a set of points from a laser, you could extract more information by combining the two than just using them separately. 15:07
Q Have we discussed all of your business and employment ventures before you started at Google at this point? 15:07
A I think so, but I don't know. There may be a couple of other ones I don't recall right now. 15:07
Q Thank you. 15:07
MS. RAY: I don't have any further questions. 15:07
THE WITNESS: Okay. Thank you. 15:07
MR. PERLSON: I'm going to have some. Why don't you stop. 15:07
THE VIDEOGRAPHER: Do you want me to go off? 15:07
MR. PERLSON: Yeah. 15:07

THE VIDEOGRAPHER: We are going off the record. The time is 3:07. 15:07
(Recess taken.) 15:07
THE VIDEOGRAPHER: We are back on the record. The time is 3:08. 15:08
MS. RAY: Before I forget, can we designate this transcript "Attorneys' Eyes Only"? And then we'll go through the process of de-designating. 15:08
MR. PERLSON: That's acceptable. 15:08
MS. RAY: Great. 15:08
MR. EHRLICH: Thank you. 15:08
15:08
FURTHER EXAMINATION 15:08
BY MR. PERLSON: 15:08
Q Mr. Levandowski, you understand that Ms. Ray is Uber's lawyer? 15:08
A I do understand that, although I do think that MoFo is also representing me. 15:08
Q And -- 15:08
MR. EHRLICH: Can I just say, your understanding is that MoFo represents you. Not in this matter, however; correct? 15:08
THE WITNESS: Correct, yes. 15:09
MR. EHRLICH: Okay. 15:09
MR. PERLSON: Q. But even though Ms. Ray 15:09

represents Uber in this case, she didn't ask you any questions about what you did at Uber; did she? 15:09
A I -- 15:09
MR. EHRLICH: You can answer that. 15:09
THE WITNESS: Yeah, I -- she did not ask me any questions about what I do at Uber. 15:09
MR. PERLSON: Q. And Uber is a defendant in this case? You understand that? 15:09
A I do understand that, yeah. 15:09
Q Don't you think that's a little strange, that Uber's counsel didn't ask you any questions about what you did at Uber? 15:09
A Well, I did clarify that I was only answering questions about things that I did before I joined Google. And I did not join Uber before I joined Google. 15:09
Q And what you did before you joined Google doesn't have any bearing on whether you stole documents from Google; does it? 15:09
MR. EHRLICH: You can answer, as long as you confine your answer to what happened before you joined Google. 15:10
MS. RAY: Objection; form. 15:10
THE WITNESS: What I -- what I did before I joined Google does not affect the things that I did

after I joined Google. 15:10
MR. PERLSON: And, Ms. Ray talked about things you had done from an engineering perspective before you joined Google. 15:10
Q But, if you were such an accomplished engineer, why did you steal 14,000 documents from Google? 15:10
MS. RAY: Objection; form. 15:10
THE WITNESS: On the advice of -- on -- on the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment to the Constitution to the United States. 15:10
MR. PERLSON: Q. Don't you think that the jury would be more interested in whether you stole 14,000 documents from Google than what you did before you were at Google? 15:11
MS. RAY: Objection; form. 15:11
THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution to the United States. 15:10
MR. PERLSON: Q. Don't you think that the question of whether you stole 14,000 documents and used them at Uber is more relevant to this case than 15:11

anything that Ms. Ray asked you? 15:11

MS. RAY: Objection; form. 15:11

THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution to the United States. 15:11

MR. PERLSON: Q. Did the clarification that Ms. Ray asked of you during this deposition today have anything to do with the subject matter that was addressed in her examination of you that just preceded me? 15:11

MS. RAY: Objection. 15:11

I instruct him not to answer on attorney-client privilege grounds. 15:12

MR. EHRLICH: And I instruct you to follow that -- that instruction as well. 15:12

MS. RAY: I'll represent to you, all I did was ask a factual clarification. 15:12

MR. PERLSON: If you -- 15:12

MS. RAY: But I'm not going to let him talk to you about privileged matters. 15:12

MR. PERLSON: I'll reserve all rights on that, but we can deal with that later. 15:12

That's all. 15:12

THE WITNESS: Thank you. 15:12

THE VIDEOGRAPHER: Okay. This marks the end of DVD No. 3 in the deposition of Anthony Levandowski. 15:12

We are going off the record. The time is 3:12 p.m. 15:12

THE REPORTER: Counsel, did you need a copy? 15:12

MR. EHRLICH: I think we will. 15:12

MS. RAY: Can you e-mail Ethel and ask her for the order? We have a standing order. 15:13

THE REPORTER: They have a standing for immediate delivery today. Are you wanting it the same time everybody else gets it? 15:13

MS. RAY: Yes. 15:13

MR. EHRLICH: Sure, sure. That's -- we do. 15:13

(WHEREUPON, the deposition ended at 3:13 p.m.) 15:13

---oOo---

CERTIFICATE OF REPORTER

I, ANDREA M. IGNACIO, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [ ] was [x] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

Dated: April 14, 2017

ANDREA M. IGNACIO,
RPR, CRR, CCRR, CLR, CSR No. 9830