**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1 | MICHAEL A. JACOBS (CA SBN 111664)
    MJacobs@mofo.com
2 | ARTURO J. GONZÁLEZ (CA SBN 121490)
    AGonzalez@mofo.com
3 | ERIC A. TATE (CA SBN 178719)
    ETate@mofo.com
4 | RUDY Y. KIM (CA SBN 199426)
    RKim@mofo.com
5 | MORRISON & FOERSTER LLP
    425 Market Street
6 | San Francisco, California 94105-2482
    Telephone: 415.268.7000
7 | Facsimile: 415.268.7522

8 | Attorneys for Defendants
    UBER TECHNOLOGIES, INC.,
9 | OTTOMOTTO LLC, and OTTO TRUCKING LLC

10 | KAREN L. DUNN (*Pro Hac Vice*)
     kdunn@bsfllp.com
11 | HAMISH P.M. HUME (*Pro Hac Vice*)
     hhume@bsfllp.com
12 | BOIES SCHILLER FLEXNER LLP
     1401 New York Avenue, N.W.
13 | Washington DC 20005
     Telephone: 202.237.2727
14 | Facsimile: 202.237.6131

15 | Attorneys for Defendants
     UBER TECHNOLOGIES, INC.
16 | and OTTOMOTTO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.,<br>OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>Defendants. | Case No. 3:17-cv-00939-WHA<br><br>**DEFENDANTS UBER TECHNOLOGIES, INC., OTTOMOTTO LLC, AND OTTO TRUCKING LLC'S RESPONSES TO COURT'S QUESTIONS FOR HEARING ON PLAINTIFF'S MOTION FOR PROVISIONAL RELIEF (DKT. NO. 327)**<br><br>Judge: The Honorable William Alsup<br>Trial Date: October 2, 2017 |

**UNREDACTED VERSION OF DOCUMENT SUBMITTED UNDER SEAL**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1. How detailed is the ▇▇▇ design that Waymo claims as a trade secret? For example, does Waymo claim trade secret protection over any LiDAR design that uses any ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇? Or does it claim only the specific design used in GBr3, including the ▇▇▇▇▇▇▇▇▇▇ that Waymo ▇▇▇▇▇▇▇▇▇▇▇▇▇?

**Response to Question 1**:

The ▇▇▇ design that Waymo claims as a trade secret is not detailed. Waymo claims trade secret protection over any LiDAR design that uses *any* ▇▇▇▇▇▇ that ▇▇▇▇▇▇▇▇▇▇▇▇ (Declaration of Jordan Jaffe in Support of Waymo's Motion for a Preliminary Injunction ("Jaffe Decl."), Ex. 1 at 2.) Waymo does not claim only the specific design used in GBr3.

The relevant trade secrets are numbers 1 and 4. (Waymo's Motion for a Preliminary Injunction ("Motion") at 13-14.)

Trade Secret 1 states: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Jaffe Decl. Ex. 1, at 2.)

Trade Secret 4 states: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Jaffe Decl. Ex. 1 at 3.)

As demonstrated in the wording of the trade secrets above, Waymo does not claim any specific ▇▇▇ between the diodes (other than to indicate a ▇▇▇▇▇▇), nor any specific ▇▇▇▇ for the diodes, nor any specific ▇▇▇▇▇▇ for the diodes, nor any specific percent deviation from ▇▇▇▇▇▇, nor does it teach any specific ▇▇▇▇ patterns. Much less does it claim the specific design used in GBr3. Even if it did, Fuji does not use the specific ▇▇▇ of GBr3. No transmit board in Fuji has the same ▇▇▇ as GBr3. (Supplemental Declaration of Michael Lebby in Support of Defendants' Sur-Reply to Plaintiff Waymo LLC's Motion for Preliminary Injunction ("Suppl. Lebby Declaration") at 3.) The only

1  specific value that the trade secrets claim is ████████████████ between diodes. By

2  contrast, Fuji has a ████████████████ between diodes.

3  After Uber demonstrated that the concept of ████████████████ is known to the

4  public, Gregory Kintz, Waymo's expert, testified to a narrower definition of ████████

5  ████████████████████████████████████████████████████████████████

6  ████████████████████████████ (Suppl. Lebby Decl., Ex. 2 (Kintz Dep. at 63:6-

7  14).) Fuji does not use ████████████████ however, as Mr. Kintz defined it. Mr. Kintz

8  testified that ████████████████ is not present if the ████████████████

9  ████████████████████████████████████████████████████████████████

10  ████████████████ (Suppl. Lebby Decl., Ex. 2 (Kintz Dep. at 63:15-64:14).) Most of the

11  boards in Fuji have portions where the ████████████████████████████

12  ████████████████████████ (Suppl. Lebby Decl. at 24-25.)

13  2. If you want the LiDAR points of illumination along a roadway to land at evenly spaced intervals along said roadway (e.g., every ten feet from ten feet to 110 feet), wouldn't you, simply

14  as a matter of optics, have to variably space the diodes on the printed circuit board?

15  **Response to Question 2**:

16  Yes. As a matter of trigonometry, the diodes would have to be variably spaced on the

17  printed circuit board. The relationship between the beam angle and a point on a flat road is a

18  simple trigonometric function: Tangent(beam angle from horizontal) = sensor height / downrange

19  distance. Assuming a sensor elevation of six feet (the approximate elevation of Fuji), the table

20  below illustrates the beam angle required for illumination at every ten feet from ten feet to 110

21  feet, as well as the deltas between the required beam angles.

| Distance from sensor | Beam Angle Required | Delta of Beam Angles (with Previous Beam Angle) |
|---|---|---|
| 10 | 30.96375653 | |
| 20 | 16.69924423 | 14.2645123 |
| 30 | 11.30993247 | 5.38931176 |
| 40 | 8.53076561 | 2.779166864 |
| 50 | 6.842773413 | 1.687992197 |
| 60 | 5.710593137 | 1.132180275 |
| 70 | 4.899092454 | 0.811500684 |
| 80 | 4.289153329 | 0.609939125 |

| | | |
|---|---|---|
| 90 | 3.814074834 | 0.475078495 |
| 100 | 3.433630362 | 0.380444472 |
| 110 | 3.122130462 | 0.3114999 |

3.  How is a ▉▉▉▉▉▉▉ superior to any other ▉▉▉▉▉▉▉? Where in the record does Waymo supply evidence concerning the specific effects of ▉▉▉▉▉▉▉

**Response to Question 3**:

There is no evidence that a ▉▉▉▉▉▉▉ is superior to any other degree of ▉▉▉▉.

The relevant trade secret, i.e., Trade Secret 7, states: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (Jaffe Decl. Ex. 1 at 6.) The trade secret does not specifically claim ▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Uber engineer Gaetan Pennecot testified that there was nothing special or important about ▉▉▉▉▉▉; rather it was an easy number to "type." (Pennecot Dep. 21:18-22:1.)

In addition, Mr. Kintz, Waymo's expert, testified that the trade secret does not require ▉▉▉▉ specifically. (Suppl. Lebby Decl. Ex. 2 (Kintz Dep. 115:6-13).) Mr. Kintz further testified that a diode that is ▉▉▉▉▉▉▉▉▉▉ would have the same benefits as ▉▉▉▉▉▉, given manufacturing tolerances. (Suppl. Lebby Decl. Ex. 2 (Kintz Dep. 114:20-25).)

4.  What are the standard practices, if any, in the LiDAR field for distributing 64 diodes across multiple printed circuit boards?

**Response to Question 4**:

Defendants are not aware of standard practices for distributing 64 diodes across multiple printed circuit boards. Velodyne's HDL-64E distributes 64 diodes across 64 printed circuit boards, with one diode per board. U.S. Patent 8,836,922, one of the asserted patents in this case, discloses "four PCBs, with each PCB mounting sixteen light sources, so as to provide 64 light sources." (Col. 5:22-26.)

64 diodes can also be distributed among more than one cavity. For example, Defendants considered a design consisting of two cavities, with 32 laser diodes mounted on a single PCB per

1  cavity. (Supplemental Declaration of Scott Boehmke in Support of Defendants' Sur-Reply ¶ 10.)

2  Fuji has two cavities and ▮▮▮▮ per cavity.

3  　　　Once the number of boards is determined, it is a matter of simple arithmetic how to

4  distribute the 64 diodes across the boards. In his declaration, Mr. Kintz states that "▮▮▮

5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"

6  (Opening Declaration of Gregory Kintz ¶ 41), and Defendants' expert, Michael Lebby, agreed

7  (Suppl. Lebby Decl. ¶ 35). Dr. Lebby further opined: "[A]n engineer designing a LiDAR transmit

8  block would logically choose a configuration in a 64-laser system with a middling number of

9  PCBs (e.g., ▮▮ and diodes per PCB (e.g., ▮▮), to balance the size and cost concerns." (*Id.*

10  ¶ 36.) "The ▮▮▮▮ arrangement is one of a few obvious configurations that strikes that

11  balance." (*Id.*)

12  　　　5.  How, if at all, does Fuji's configuration of two 32-diode transmit blocks specifically map on to GBr3's configuration of ▮▮▮▮▮▮▮▮▮▮▮▮▮? For example, do each of the ▮
13  printed circuit boards within each configuration serve comparable functions in their respective
14  LiDAR systems? Does the patent law doctrine of equivalents have an equivalent in trade secret law?

15  **Response to Question 5**:

16  　　　Aside from the fact that both include transmit PCBs, Fuji's configuration of two 32-diode

17  transmit blocks does not map on to GBr3's configuration of ▮▮▮▮▮▮▮▮▮▮▮▮.

18  　　　Fuji is a combination of two bistatic systems. (Declaration of Paul McManamon in

19  Support of Defendants' Opposition to Waymo's Preliminary Injunction Motion ¶ 36.) It is made

20  up of two cavities, with ▮▮▮▮▮▮▮▮▮ each: a medium-range cavity and a long-range

21  cavity. (*Id.*) Each cavity has separate transmit and receive paths divided by non-reflective metal

22  walls, with separate lenses for each path. (*Id.*) In total, the Fuji has four exterior apertures fitted

23  with four separate lenses. (*Id.*) The transmit and receive light paths do not overlap in the Fuji

24  system, because each path is physically separated from the others. (*Id.*) The long-range cavity is

25  positioned level with the ground, while the medium-range cavity is tilted downwards by

26  12 degrees from level. (*Id.*) When the two cavities are mounted next to each other, there is a

27  substantial metal wall between them. (*Id.*) The two cavities in the Fuji system are really two

28  LiDARs packaged in a single rotating housing. (*Id.*)

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1       By contrast, Waymo's GBr3 LiDAR is a monostatic system. (*Id.* ¶ 35) GBr3 has a shared
2 lens fitted in the exterior aperture that is used both to collimate the outbound transmitted light and
3 collect the inbound received light. (*Id.*) GBr3 is comprised of a single optical cavity, consisting of
4 ▮▮▮▮▮▮▮▮▮▮ in which the transmit path and receive path will overlap. (*Id.*)
5 ▮▮▮▮▮▮▮▮▮▮ in 2 cavities and a ▮▮▮▮▮▮ in one cavity are fundamentally
6 distinct. (Suppl. Lebby Decl. ¶ 62.) Fuji's arrangement of lasers is a physically and functionally
7 distinct design from GBr3, reflecting Fuji's fundamentally different two-cavity, multi-lens
8 structure. (*Id.*) While GBr3 has a ▮▮▮▮▮▮▮▮▮▮ aligned to one lens and paired with
9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Fuji's ▮▮▮▮▮▮ are each
10 separately (1) mounted in different LiDAR cavities, (2) aligned to permit laser light to pass
11 through two lenses, and (3) paired with flat receive boards with ▮▮▮▮▮▮ of photoreceptors.
12 (*Id.*) At deposition, Mr. Kintz acknowledged that it would not be "simple modification" to arrange
13 boards distributed across two optical cavities into a single cavity. (Suppl. Lebby Decl., Ex. 2
14 (Kintz Dep. 160:3-11, 158:7-160:2).)
15       Further, Fuji does not use an inductor, because it complicates the circuity and takes up
16 more space on the PCB. (Declaration of James Haslim in Support of Defendants' Opposition to
17 Waymo's Preliminary Injunction Motion ("Haslim Decl.") ¶ 16.) By contrast, GBr3 includes an
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮ (Trade Secret 15.) In addition, the shapes of the boards in Fuji are
20 different from those of GBr3. (*Compare* Haslim Decl. ¶ 15, *with* Jaffe Decl. Ex. 2, p.16.)
21       In patent law, the doctrine of equivalents serves the purpose of preventing infringers from
22 escaping liability through overly literal interpretations of patent claims vetted though Patent Office
23 examination. The question in trade secret law is whether features of the defendant's products or
24 processes were derived from misappropriated trade secrets or from the defendant's pre-existing
25 skill; knowledge, training, and experience; independent efforts; or public-domain materials. *See,*
26 *e.g.*, Cal. Civ. Code § 3426.1(a); *Mattel, Inc. v. MGA Entm't, Inc. & Consol .Consol. Actions*, 782
27 F. Supp. 2d 911, 963 (C.D. Cal. 2010). Merely making minor variations does not defeat a trade
28 secret claim. *See Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1244 (Fed. Cir. 1989)

1  (applying California law).

2  6. Does Velodyne or any other company manufacture or commercialize LiDAR systems using any of Waymo's purported trade secrets? For example, is the ▮▮▮▮▮▮▮▮▮▮ configuration used by any other company? Has Waymo's use of this configuration or any other asserted trade secret been disclosed to any public agency? Under the law, could anything actually used by other companies be deemed a trade secret by Waymo?

**Response to Question 6**:

Yes. The Velodyne VLP-32A has "non-linear channel distribution" with "denser channel configuration on the horizon," and thus discloses ▮▮▮▮▮▮▮. (*See* http://velodynelidar.com/vlp-32a.php.) Uber engineer Daniel Gruver testified that Velodyne LiDARs have ▮▮▮▮▮▮▮. (Supplemental Declaration of Esther Kim Chang in Support of Defendants' Sur-Reply, Ex. 14 (Gruver Dep. 51:4-15, 51:22-52:5).) Several LiDAR component vendors provide ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in LiDAR applications (Suppl. Lebby Decl. ¶ 42) and ▮▮▮▮▮▮▮▮▮▮ (*id*. ¶ 40). Defendants are unaware of any other company using the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Defendants have insufficient information whether Waymo's use of this configuration or any other asserted trade secret has been disclosed to a public agency.

Under trade secret law, it is possible for two companies to independently derive a trade secret and for that trade secret to maintain its status, assuming no public disclosure. Coca-Cola and Pepsi might have the same formula, but each would consider it a trade secret. When information "is generally known in the trade and already used by good faith competitors, however, it is not a protectable trade secret and injunction should not issue." *Logtale, Ltd. v. IKOR, Inc.*, 2012 U.S. Dist. LEXIS 173321, NO. *18-19 (N.D. Cal. Dec. 5, 2012) (quoting *Am. Paper & Packaging Prods., Inc. v. Kirgan*, 183 Cal. App. 3d 1318, 1326 (1986).) Therefore, any engineering concepts or techniques generally known in the trade and used by other companies do not—and cannot—constitute Waymo's trade secrets.

7. Even if defendants themselves have not misappropriated any trade secrets, can they still be held liable for misappropriation by Levandowski that was never used for their benefit?

**Response to Question 7**:

No.  In order for Waymo to show that Defendants misappropriated Waymo's alleged trade secrets, it must show that Uber either acquired, used, or disclosed those trade secrets. If Levandowski never used any alleged Waymo trade secrets for Defendants' benefit, he either (a) never used those trade secrets at all while he was an employee of Defendants, or (b) he somehow used those trade secrets while an employee of Defendants in a manner that was not of any benefit to Defendants.  There is zero evidence of the latter, and Waymo does not even allege this.  Thus, the only conclusion that can be drawn is that Levandowski never used the trade secrets while an employee of Defendants.

The case law confirms that an employee's misappropriation is not sufficient to hold his new employer liable for misappropriation.  In *Globespan, Inc. v. O'Neil*, for example, the defendant new employer hired a former employee of the plaintiff who allegedly brought several binders containing plaintiff's trade secrets with him to his job with defendant.  *Globespan, Inc. v. O'Neil*, 151 F. Supp. 2d 1229, 1235 (C.D. Cal. 2001).  But the court granted defendant new employer's motion to dismiss because plaintiff failed to allege that the new employer had used or disclosed the trade secrets.  Specifically, the court ruled that, "Plaintiff has not alleged that Defendant Broadcom has used or disclosed Plaintiff's trade secrets.  Thus, Plaintiff has not alleged misappropriation by Defendant Broadcom, as required by the claim."  *Id*.  Likewise, in *Danjaq, LLC v. Sony Corp.*, the Central District granted summary judgment where the company defendant hired one of plaintiff's former employees who had access to alleged trade secret information, but where there was no evidence of disclosure of the information by the employee or use by the new employer.  *Danjaq, LLC v. Sony Corp.*, No. CV 97-8414-ER (MCx), 1999 U.S. Dist. LEXIS 22486, at *6 (C.D. Cal. Mar. 11, 1999).  Similarly, in *United Rentals*, *(North America), Inc. v. Keizer*, 355 F.3d 399, 412 (6th Cir. 2004), the court granted summary judgment in favor of defendant employer on the misappropriation claim where defendant hired a former employee of plaintiff who brought a customer list with him, showed it to defendant employer, but defendant employer did not use the list.  Further, in *Del Monte Fresh Produce Co. v. Dole Food Co.,* 148 F. Supp. 2d 1326, 1338 (S.D. Fla. 2001), the court denied a preliminary injunction against a

competitor where the competitor merely hired plaintiff's employee, finding under California or Florida law "[plaintiff] must show more than mere possession of a trade secret by [employee]" to establish misappropriation).

Waymo does not allege a theory of vicarious liability.

8.  If Waymo shows that Levandowski misappropriated trade secrets but fails to further show that defendants did so, would it be enough, to show likelihood of success and irreparable injury, that defendants knowingly employed an executive who misappropriated trade secrets and who remains in a position to misuse said secrets for defendants' benefit?  Please provide case law on point.

**Response to Question 8**:

No.  Uber's employment of Mr. Levandowski is not sufficient to show either likelihood of success or irreparable harm.

Likelihood of success:  To show a likelihood of success against *Defendants*, Waymo must demonstrate that *Defendants* misappropriated Waymo's trade secrets, not that Mr. Levandowski did.  The definition of "misappropriation" requires a showing of either (a) Uber's "acquisition of a trade secret" or (b) Uber's "disclosure or use of a trade secret." 18 U.S.C. § 1839 (5)(A); Cal. Civ. Code § 3426.1.  Waymo cannot show either.  Extensive discovery confirms that Uber has not acquired any of the downloaded files (which Waymo has not proven to be trade secrets), and that Uber's LiDAR device is not using (or disclosing) any of Waymo's alleged trade secrets.

The cases cited in response to Question 7 further show that mere employment of Levandowski is not sufficient to impose liability on Defendants.  *See, e.g., FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1277 (2009) ("[S]peculation that a departing employee may misappropriate and use a trade secret in a startup business will not support an injunction."). Further, California has rejected the doctrine of "inevitable disclosure," and therefore does not permit a holding that the mere employment of a person who has trade secret information is sufficient to create a showing that the employer has misappropriated trade secrets.  *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1463 (2002).  A contrary holding would violate California's strong public policy "in favor of open competition and employee mobility." *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 (2008).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Moreover, as Uber stated in its opposition brief, Waymo has forgone any claim of "threatened misappropriation" in support of its motion for a preliminary injunction. Waymo's Reply did not dispute this. In any event, Levandowski's continued employment with Uber would be insufficient and Waymo otherwise has not met its burden for a preliminary injunction under a "threatened misappropriation" theory. In the absence of any actual evidence that Uber has misused Waymo trade secrets, Levandowski's continued employment at Uber—especially given his recusal from LiDAR work—simply cannot "indicate[] imminent misuse." *CanWe Studios LLC v. Sinclair*, No. CV 13-6299 PSG (FFMx), 2013 WL 12120437, at *2 (C.D. Cal. Nov. 20, 2013) (citing *FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1279 (2009) (absent evidence that contents were improperly accessed, used, or copied, hard drive "download was not a threatened misappropriation"). Indeed, Levandowski left Google and founded Otto more than fifteen months ago. Otto and Uber began collaborating on LiDAR a year ago. Uber acquired Otto almost eight months ago. If Levandowski's involvement has not resulted in misappropriation of Waymo trade secrets by defendants at this point, there is simply no basis to find "imminent misuse." *See Gibson-Homans Co. v. Wall-Tite, Inc.,* No. 92 2750 JGD, 1992 U.S. Dist. LEXIS 21909, at *11-12 (C.D. Cal. Oct. 27, 1992) ("[t]here is no evidence to suggest that defendants intend to use or disclose to other competitors the Shur-Stik formulas. If in the future the threat of misappropriation becomes real, plaintiff will have a remedy . . . .").

Irreparable harm: Uber's continued employment of Levandowski is irrelevant to the issue of irreparable harm. As Uber has already shown, Uber ███████████████████ ███████████████████████████████████████. Thus, if there is any merit to Waymo's claims, Waymo will be fully protected ███████████████. *Id.* at *11-12 (granting defendants' motion for summary judgment, where defendants possessed notebook containing plaintiff's alleged trade secrets, but "defendants have not used the formulas or otherwise impaired their commercial benefit to plaintiff"). The ongoing employment of Mr. Levandowski does not change these facts.

Thus, even if the Court were to disagree with the above and conclude there is a likelihood of success on the merits, Waymo cannot show irreparable harm and therefore is not entitled to a

preliminary injunction. The law is clear that a court is not permitted to issue a preliminary injunction if it concludes that plaintiff has shown a likelihood of success on the merits, but is unable to show irreparable harm. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011) (quoting *Save Strawberry Canyon v. Dep't of Energy*, No. C 08–03494 WHA, 2009 WL 1098888, at *1–3 (N.D. Cal. Apr. 22, 2009) (Alsup, J.)).

9. Does an accounting as part of provisional relief require a finding of irreparable injury? (An accounting, as used in this question, would be an order to defendants to conduct a thorough company-wide investigation and to itemize every use or communication concerning specific alleged trade secrets and involving Levandowski.)

**Response to Question 9**:

Technically, to issue an order for an accounting based on Waymo's motion would require a finding of irreparable harm, but Defendants would agree not to object to such an order in order to satisfy the Court that no alleged Waymo trade secrets have been used by Uber. Defendants agree to complete the extensive review ordered by the Court and will agree to supplement that work with any reasonable additional search to satisfy the Court that no alleged Waymo trade secrets have been used by Defendants.

10. If the Court adopts defendants' recusal plan for Levandowski, will defendants further consent to a mandatory reporting provision requiring their employees to report violations of said plan to the general counsel and thence to the Court and the parties?

**Response to Question 10**:

Yes. We have given some thought to how this might be implemented and have the following suggestion. Uber's General Counsel would advise Special Master John Cooper of any report. The Special Master would be given access to any employee who comes forward and would be able to conduct an investigation of the employee's report, including questioning any other relevant person. Once a month, the Special Master will make a report to the Court (with a copy to opposing counsel) of any investigation or conclusions that he reached. The recusal plan would continue through trial, at which point the parties and the Court can revisit whether the limitations and reporting provisions should continue, and if so, for how long. If this matter is referred to arbitration, then the recusal plan would continue through the end of the year, at which point the parties and the Court can revisit whether the limitations and reporting provisions should continue.

1 | Dated: May 2, 2017

MORRISON & FOERSTER LLP

By: */s/ Arturo J. González*
     ARTURO J. GONZÁLEZ

Attorneys for Defendants
UBER TECHNOLOGIES, INC.,
OTTOMOTTO LLC, and OTTO TRUCKING LLC