# EXHIBIT 132
# FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN FRANCISCO DIVISION

 4

     WAYMO LLC,

 5

                      Plaintiff,

 6                                        Case

     vs.                             No. 3:17-cv-00939-WHA

 7

     UBER TECHNOLOGIES, INC.;

 8   OTTOMOTTO LLC; OTTO TRUCKING LLC,

 9             Defendants,

     _____/

10

11

12

13

14

15       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16         VIDEOTAPED DEPOSITION OF JAMES HASLIM

17                THURSDAY, MAY 4, 2017

18

19

20

21

22   Reported by:

23   Anrae Wimberley

24   CSR No. 7778

25   Job No.  2610396
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4

5    WAYMO LLC,

6                    Plaintiff,

                                        Case

7    vs.                         No. 3:17-cv-00939-WHA

8    UBER TECHNOLOGIES, INC.;

     OTTOMOTTO LLC; OTTO TRUCKING LLC,

9

                     Defendants.

10   _____/

11

12

13       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15          Transcript of video-recorded deposition of

16   JAMES HASLIM, taken at Quinn Emanuel Urquhart &

17   Sullivan LLP, 50 California Street, 22nd Floor, San

18   Francisco, California 94111, beginning at 10:16 a.m.

19   and ending at 7:11 p.m. on Thursday, May 4, 2017,

20   before Anrae Wimberley, Certified Shorthand Reporter

21   No. 7778.

22

23

24

25

                                           Page 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   My recollection is shaky.  I want to say | 10:22:43 |
| 2 | shortly after joining Otto, I can recall Mason being | 10:22:49 |
| 3 | around at that time frame.  And when it ended I'm not | 10:22:53 |
| 4 | sure, but that would have been maybe in the | 10:22:56 |
| 5 | past -- let me try to bookend this -- past -- this is | 10:23:03 |
| 6 | very hard because I don't remember.  I believe as | 10:23:07 |
| 7 | shortly as a few, couple months ago, perhaps.  And | 10:23:13 |
| 8 | this could also be found pretty readily.  Mr. Feldman | 10:23:17 |
| 9 | was reporting to a facilities manager. | 10:23:22 |
| 10 | Q.   Does Mr. Feldman still work for Uber or Otto? | 10:23:26 |
| 11 | A.   Yes. | 10:23:27 |
| 12 | Q.   What does he do now? | 10:23:29 |
| 13 | A.   I understand he's working for a facilities | 10:23:31 |
| 14 | manager. | 10:23:33 |
| 15 | Q.   When you say "facilities manager," what do | 10:23:35 |
| 16 | you mean by that? | 10:23:36 |
| 17 | A.   I wish I knew better in detail, but I don't. | 10:23:41 |
| 18 | We have somebody on staff that I believe would be | 10:23:44 |
| 19 | called a facilities manager, perhaps manages what goes | 10:23:48 |
| 20 | on with buildings, facilities' needs, be it the need | 10:23:55 |
| 21 | for air-conditioning, a repair, something of that | 10:23:59 |
| 22 | nature. | 10:23:59 |
| 23 | Q.   Where is Mr. Feldman located? | 10:24:02 |
| 24 | A.   To my knowledge, he has a desk in our offices | 10:24:07 |
| 25 | in San Francisco. | 10:24:09 |

Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Other than Mr. Feldman, who are you aware of | 10:24:20 |
| 2 | that most closely works with Mr. Levandowski on a | 10:24:27 |
| 3 | day-to-day basis? | 10:24:29 |
| 4 | A.   On a day-to-day basis, the only other | 10:24:32 |
| 5 | employee I'm aware of that works closely with him I | 10:24:35 |
| 6 | would say is Eric Meyhofer. | 10:24:44 |
| 7 | Q.   Mr. Meyhofer, how do you know him? | 10:24:50 |
| 8 | A.   Eric is my boss. | 10:24:52 |
| 9 | Q.   How long have yourself and Mr. Meyhofer known | 10:24:59 |
| 10 | each other? | 10:25:00 |
| 11 | A.   I met Eric Meyhofer -- I don't remember when, | 10:25:09 |
| 12 | but I can tell you it was when he visited Tyto LiDAR | 10:25:13 |
| 13 | with Scott Boehmke, and they visited to evaluate our | 10:25:20 |
| 14 | products. | 10:25:21 |
| 15 | Q.   And you said you didn't remember when this | 10:25:26 |
| 16 | meeting was. | 10:25:30 |
| 17 | Can you give it a year? | 10:25:31 |
| 18 | A.   It was prior to acquisition by Otto, but a | 10:25:40 |
| 19 | significant time went by between our meeting and being | 10:25:46 |
| 20 | acquired by Otto.  So I don't even want to hazard the | 10:25:52 |
| 21 | year, because it could be off. | 10:25:55 |
| 22 | Q.   So there was a meeting between Mr. Meyhofer, | 10:26:03 |
| 23 | Mr. Boehmke and Tyto LiDAR; is that right? | 10:26:08 |
| 24 | A.   That's right. | 10:26:09 |
| 25 | Q.   And it was sometime before the acquisition of | 10:26:12 |

Page 14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Tyto by Otto; correct? | 10:26:15 |
| 2 | A.   Correct. | 10:26:15 |
| 3 | Q.   Who else was at that meeting? | 10:26:19 |
| 4 | A.   That would have included Brent Schwarz.  I'm | 10:26:26 |
| 5 | not certain whether Mike Karasoff would have been at | 10:26:30 |
| 6 | that meeting as well. | 10:26:32 |
| 7 | Q.   Anybody else? | 10:26:32 |
| 8 | A.   I don't recall. | 10:26:33 |
| 9 | Q.   Was Mr. Levandowski at that meeting? | 10:26:37 |
| 10 | A.   Not that I recall. | 10:26:38 |
| 11 | Q.   You're not sure, though? | 10:26:41 |
| 12 | A.   I'm fairly sure that he was not.  That would | 10:26:45 |
| 13 | have been awkward. | 10:26:48 |
| 14 | Q.   You said, "That would have been awkward." | 10:26:50 |
| 15 |      Why do you say that? | 10:26:52 |
| 16 | A.   Well, he wasn't an employee of Tyto. | 10:26:57 |
| 17 | Q.   Mr. Levandowski. | 10:26:57 |
| 18 | A.   That's what I meant. | 10:26:59 |
| 19 | Q.   So you're saying it would have been awkward | 10:27:02 |
| 20 | for Mr. Levandowski to be involved in a meeting | 10:27:06 |
| 21 | between Tyto and Uber because he wasn't involved in | 10:27:10 |
| 22 | Tyto; is that right? | 10:27:12 |
| 23 | A.   It would be awkward because he was not an | 10:27:14 |
| 24 | employee, yes. | 10:27:15 |
| 25 | Q.   So I see you changed words there a little | 10:27:17 |

Page 15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   bit --                                          10:27:17

 2        A.   I did.                                10:27:19

 3        Q.   -- and I just want to clarify that.   10:27:20

 4             Why did you change -- my question was about  10:27:23

 5   whether he was involved, and you answered about  10:27:26

 6   whether he was an employee.                     10:27:27

 7             Why did you do that?                   10:27:28

 8        A.   Because I would need clarification on the  10:27:31

 9   word "involved."  We would occasionally have dinner,  10:27:38

10   chat, see how the business was going on a friendly  10:27:41

11   term.                                           10:27:42

12        Q.   What is your understanding as to     10:27:43

13   Mr. Levandowski's involvement in Tyto LiDAR?    10:27:48

14        A.   My understanding of his involvement with Tyto  10:27:53

15   LiDAR was he was providing us a place of work when we  10:27:58

16   were still Odin Wave, early -- when we were getting  10:28:02

17   started.  He sourced contract employees.  He was a  10:28:11

18   friend who would stop by occasionally for chats.  10:28:15

19        Q.   Chats about what?                     10:28:16

20        A.   What we're working on, what would the next  10:28:21

21   product be if we finished the current product.  10:28:24

22        Q.   Why were you chatting with Mr. Levandowski  10:28:26

23   about what you were working on at Tyto LiDAR?   10:28:29

24        A.   I couldn't tell you -- if your question is  10:28:34

25   why that was appropriate or why that was something  10:28:41
```

Page 16

| | | |
|---|---|---|
| 1 | that was to discuss, the question came up, he would | 10:28:45 |
| 2 | ask, we would talk. | 10:28:47 |
| 3 | Q.   Was there anyone else that you would have | 10:28:50 |
| 4 | these kind of chats with, that weren't employees, | 10:28:53 |
| 5 | about your work at Tyto? | 10:28:58 |
| 6 | A.   Not that I recall. | 10:29:02 |
| 7 | Q.   Did you ever raise to any of your fellow | 10:29:05 |
| 8 | employees at Tyto LiDAR, hey, why are we talking with | 10:29:10 |
| 9 | Mr. Levandowski about the work that we're doing? | 10:29:14 |
| 10 | A.   No. | 10:29:14 |
| 11 | Q.   Never came up? | 10:29:16 |
| 12 | A.   Not to my recollection. | 10:29:17 |
| 13 | Q.   You never asked anyone? | 10:29:18 |
| 14 | A.   No. | 10:29:18 |
| 15 | Q.   You didn't think it was odd that this person | 10:29:21 |
| 16 | who doesn't work for the company was talking about | 10:29:23 |
| 17 | your work with you? | 10:29:24 |
| 18 | A.   No. | 10:29:25 |
| 19 | Q.   Did you know that Mr. Levandowski was working | 10:29:27 |
| 20 | on LiDAR at Waymo at the time? | 10:29:31 |
| 21 | A.   I knew he was working for Google at the time, | 10:29:35 |
| 22 | and I didn't know the details of what specifically he | 10:29:39 |
| 23 | was working on. | 10:29:41 |
| 24 | Q.   Have you ever spoken with Mr. Levandowski | 10:29:44 |
| 25 | about ███████████████████████████████? | 10:29:51 |

Page 17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Yes. | 10:29:51 |
| 2 | Q.    When? | 10:29:52 |
| 3 | A.    This would be some date, I can't recall when, | 10:30:01 |
| 4 | at Tyto LiDAR. | 10:30:05 |
| 5 | Q.    And what did you guys talk about? | 10:30:12 |
| 6 | A.    We talked about our need to design our own | 10:30:15 |
| 7 | fiber laser in order to eliminate costs and lead time. | 10:30:21 |
| 8 | And he gave me what I would call a tech tutorial on | 10:30:29 |
| 9 | fiber lasers. | 10:30:31 |
| 10 | Q.    What did he say? | 10:30:35 |
| 11 | A.    I don't remember the words of our | 10:30:37 |
| 12 | conversation. | 10:30:38 |
| 13 | Q.    Tell me everything you remember about that | 10:30:40 |
| 14 | conversation, please. | 10:30:41 |
| 15 | A.    He -- trying to recall -- described a | 10:30:53 |
| 16 | schematic, a layout, an approach for ▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮ | |
| | ▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮ generally how they work.  Told me | 10:31:03 |
| 18 | to go find a YouTube video from a professor on lasers | 10:31:09 |
| 19 | in general.  I believe he recommended some suppliers. | 10:31:18 |
| 20 | Q.    Who are the suppliers? | 10:31:20 |
| 21 | A.    I believe he recommended ▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮ | |
| | ▮▮   ▮▮▮▮.  And I believe he recommended ▮▮▮▮▮▮▮ | 10:31:41 |
| 23 | Q.    And ▮▮▮▮▮ that's the same vendor used for | 10:31:47 |
| 24 | the fiber in the Spider design; right? | 10:31:51 |
| 25 | A.    Yes. | 10:31:51 |

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    Sorry I interrupted. | 10:31:55 |
| 2 | Are you finished telling me everything that | 10:31:57 |
| 3 | you remember about that conversation? | 10:31:58 |
| 4 | MR. JAFFE:  Can you get me a piece of paper? | 10:32:07 |
| 5 | MR. McCAULEY:  (Hands document.) | 10:32:15 |
| 6 | THE WITNESS:  I recall he was telling me to hurry | 10:32:18 |
| 7 | up and order the ██████████ because they were long | 10:32:25 |
| 8 | lead items.  I think he suggested some ██████████   ██████████ | |
| | ██████████████████████████████████   ██████████ | |
| | ████████████████████, I don't recall any more | 10:32:46 |
| 11 | than that. | 10:32:48 |
| 12 | BY MR. JAFFE: | 10:32:48 |
| 13 | Q.    Thank you. | 10:32:49 |
| 14 | So we talked about that conversation, and you | 10:32:53 |
| 15 | said you didn't remember when it was.  I just want to | 10:32:56 |
| 16 | see if we can bound that time with any more | 10:32:59 |
| 17 | specificity. | 10:33:00 |
| 18 | A.    Ooh.  I recall it occurred at our -- after we | 10:33:09 |
| 19 | moved out of Berkeley, so this was in San Leandro. | 10:33:16 |
| 20 | This would have been prior to my starting to develop | 10:33:22 |
| 21 | the fiber lasers, so it had to be relatively | 10:33:25 |
| 22 | shortly -- I would say -- this is all qualitative, I'm | 10:33:32 |
| 23 | sorry -- shortly after that move to San Leandro. | 10:33:34 |
| 24 | Q.    All right.  So based on those kind of | 10:33:36 |
| 25 | considerations, what approximate timeline did you guys | 10:33:42 |

Page 19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | move to San Leandro? | 10:33:43 |
| 2 | A.   There's a lot of years between here and | 10:33:45 |
| 3 | there.  It's tractable [sic] from other information | 10:33:52 |
| 4 | sources, but I don't have it in my head right now. | 10:33:55 |
| 5 | Q.   2015? | 10:33:56 |
| 6 | A.   Could be.  I don't know. | 10:33:57 |
| 7 | Q.   So sitting here today, you can't give me any | 10:34:00 |
| 8 | more specificity as to the time of that conversation? | 10:34:03 |
| 9 | A.   I cannot. | 10:34:04 |
| 10 | Q.   I'm going to hand you this. | 10:34:06 |
| 11 | MR. JAFFE:  And we're going to mark it as -- now | 10:34:09 |
| 12 | I've lost what exhibit we're at, so I'm just going to | 10:34:14 |
| 13 | say 150 so we don't run over another exhibit. | |
| 14 | (Plaintiff's Exhibit 150 was marked.) | |
| 15 | BY MR. JAFFE: | |
| 16 | Q.   Can you please draw the schematic that | 10:34:17 |
| 17 | Mr. Levandowski provided to you during that | 10:34:20 |
| 18 | conversation.  And here I'll hand you my pen. | 10:34:25 |
| 19 | A.   I can do my best. | 10:34:26 |
| 20 | So I want to state, as I'm going to attempt | 10:34:56 |
| 21 | to do this for you, that there is a very real risk | 10:35:00 |
| 22 | that I'm going to take information that I know now, | 10:35:03 |
| 23 | after having built the fiber laser, and get that | 10:35:06 |
| 24 | somehow accidently contaminated into a vague | 10:35:13 |
| 25 | recollection of what schematic he gave me. | 10:35:16 |

Page 20

| | | |
|---|---|---|
| 1 | Q.   I just want your best recollection of the | 10:35:18 |
| 2 | schematic that he gave you. | 10:35:19 |
| 3 | A.   I understand that. | |
| 4 | Q.   That's all I'm asking for. | 10:35:21 |
| 5 | A.   I understand that. | 10:35:23 |
| 6 | (Witness draws diagram.) | 10:35:31 |
| 7 | (Pause in proceedings.) | |
| 8 | MR. KIM:  Just going to object on form | 10:35:39 |
| 9 | grounds here, for the record. | 10:35:41 |
| 10 | THE WITNESS:  Okay.  I think this is the best | 10:38:17 |
| 11 | of my recollection.  I put a note on here there's ███   ███ | |
| 12 | ████.  I don't know what the order was in his | 10:38:24 |
| 13 | recommendation. | 10:38:25 |
| 14 | BY MR. JAFFE: | |
| 15 | Q.   Can I take a look at it? | 10:38:31 |
| 16 | A.   Yes.  And I've drawn ████████   And I | 10:38:35 |
| 17 | don't know if he recommended ██████   And I can | 10:38:37 |
| 18 | explain any abbreviations. | 10:38:39 |
| 19 | Q.   Sure. | 10:38:40 |
| 20 | So I'm just going -- just want to talk a | 10:38:45 |
| 21 | couple things here. | 10:38:46 |
| 22 | So ████ what does that stand for? | 10:38:49 |
| 23 | A.   ████████. | 10:38:52 |
| 24 | Q.   Okay.  And then ████ here on Exhibit 150, | 10:38:54 |
| 25 | what does that stand for? | 10:38:56 |

Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.      ██████████████████████.                    10:39:04

 2      Q.      And in terms -- I again want to talk about  10:39:07

 3   the timing of this briefly.                            10:39:09

 4           Do you know before -- whether it was before    10:39:12

 5   or after 2011?                                         10:39:14

 6      A.      I don't know.                                10:39:24

 7      Q.      So did you talk about ████████ ████████     ████████

 8   ███████████████ at this time?                          10:39:40

 9      A.      I don't recall.                              10:39:41

10      Q.      Did you talk about ████████████████          10:39:44

11   at this time?                                          10:39:45

12      A.      Yes.                                         10:39:46

13      Q.      What did you talk about?                     10:39:48

14      A.      We talked about the need to optimize ███    ████████

15   ████████████████ and that that could be done           10:39:58

16   through an experimental approach.                      10:40:01

17      Q.      What was the experimental approach that      10:40:03

18   Mr. Levandowski told you about?                        10:40:05

19      A.      He didn't give a lot of detail.  He called it 10:40:09

20   a ████████  I can't remember how he called it.  But as 10:40:15

21   he described it, ██████████████████████████████ ████████

     ████████████████████████████████████████████████ ████████

     ████████████████████████████████████████████████ ████████

     ████████████████████████████████████████             ████████

     ██████████████████████                               10:40:34
```

Page 22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    Did you and Mr. Levandowski discuss the | 10:40:39 |
| 2 | ███████████████████████████████████ ██████ | 10:40:49 |
| ■ | ██████████████████████████████ | |
| 4 | A.    Possibly, yeah.  I think there -- he may have | 10:40:54 |
| 5 | described the relationship between -- almost the | 10:40:58 |
| 6 | equivalence. ████████████████████ ██████ | |
| ■ | ████████████████████████ ██████ | |
| ■ | ███████████████████ | 10:41:07 |
| 9 | Q.    All right.  After you had this conversation | 10:41:16 |
| 10 | with Mr. Levandowski, did you build the fiber laser | 10:41:22 |
| 11 | that he described? | 10:41:23 |
| 12 | A.    Yeah. | 10:41:23 |
| 13 | Q.    And when you had this conversation with him, | 10:41:27 |
| 14 | did you ask him whether he was allowed to reveal this | 10:41:29 |
| 15 | information to you? | 10:41:31 |
| 16 | A.    No. | 10:41:31 |
| 17 | Q.    Why not? | 10:41:35 |
| 18 | A.    I can't recall what I was feeling or thinking | 10:41:37 |
| 19 | at the time, but this looks like general information | 10:41:41 |
| 20 | to me. | 10:41:42 |
| 21 | Q.    So you didn't think, when he provided a | 10:41:44 |
| 22 | schematic on how to build a fiber laser, that this | 10:41:48 |
| 23 | could have been confidential information of Google? | 10:41:52 |
| 24 | A.    I wouldn't say so. | 10:41:54 |
| 25 | Q.    That didn't cross your mind? | 10:41:56 |

Page 23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I don't recall what crossed my mind. | 10:41:57 |
| 2 | Q.   So you're not denying that it could have | 10:42:00 |
| 3 | happened? | 10:42:02 |
| 4 | A.   It didn't happen that I recall -- | 10:42:04 |
| 5 | Q.   Did you -- | |
| 6 | A.   -- but it's not impossible. | 10:42:07 |
| 7 | Q.   Sorry.  I didn't mean to interrupt. | 10:42:09 |
| 8 | Did you ever discuss with anyone any question | 10:42:11 |
| 9 | in your mind as to whether Mr. Levandowski was allowed | 10:42:14 |
| 10 | to reveal this information to you? | 10:42:17 |
| 11 | A.   No. | 10:42:17 |
| 12 | Q.   Didn't cross your mind? | 10:42:20 |
| 13 | A.   There's enough prior art.  As I began to | 10:42:26 |
| 14 | study this online, it looked pretty plain vanilla to | 10:42:32 |
| 15 | me. | 10:42:33 |
| 16 | Q.   All right.  So we talk about ▮▮▮▮▮        ▮▮▮▮▮ | |
| 17 | ▮▮▮▮▮▮▮▮ and you built this fiber laser. | 10:42:38 |
| 18 | Is this the resulting design -- or the basis | 10:42:41 |
| 19 | for the design that is in the fiber laser in Spider? | 10:42:45 |
| 20 | MR. KIM:  Objection; form. | 10:42:48 |
| 21 | THE WITNESS:  I would be willing to say that this | 10:42:53 |
| 22 | was a starting point for my development of the fiber | 10:42:57 |
| 23 | laser that did end up in the Owl sensor and later the | 10:43:03 |
| 24 | Spider. | 10:43:04 |
| 25 | BY MR. JAFFE: | 10:43:04 |

Page 24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    Right.                                        10:43:08
 2            So, for example, the fiber laser in Spider,   10:43:08
 3      ███████████████████; right?                         10:43:10
 4      A.    Yes.                                          10:43:10
 5      Q.    And the ████████████████████████ ██████████   10:43:16
 6   ██ ██████████████████ right?                           10:43:16
 7      A.    Right.                                        10:43:16
 8      Q.    And it's ██████████████████████████;          10:43:20
 9   right?                                                 10:43:20
10      A.    Right.                                        10:43:20
11      Q.    And all those elements are described here in  10:43:23
12   Exhibit 150, the drawing that you described; right?    10:43:26
13      A.    Right.                                        10:43:26
14      Q.    And you determined ████████████████ ███████   10:43:39
15   ██ ██████████████████████████████ based on            10:43:39
16   Mr. Levandowski's kind of guidance with you on the     10:43:44
17   experimental approach to take; right?                  10:43:46
18      MR. KIM:  Objection; form.                          10:43:48
19      THE WITNESS:  I would say that his guidance on a    10:43:57
20   ████████████████ put me on the right direction to      10:44:01
21   develop █████████████ for this, yes.                   10:44:05
22   BY MR. JAFFE:                                          10:44:05
23      Q.    So we talked about ████████████████.          10:44:08
24            What was the next conversation that you had    10:44:10
25   with Mr. Levandowski about LiDAR?                       10:44:18
```

Page 25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | a sensor that was capable of long-range performance | 10:50:31 |
| 2 | and that they would need a sensor for long-range | 10:50:35 |
| 3 | viewing on an autonomous vehicle. | 10:50:40 |
| 4 | And so our angle with Uber at the time was we | 10:50:44 |
| 5 | think we can build such a sensor, but we're not | 10:50:47 |
| 6 | working on it right now.  Our company is open for | 10:50:51 |
| 7 | acquisition. | 10:50:55 |
| 8 | Q.   So the sensor that you were coming up with, | 10:51:00 |
| 9 | that was going to be a bistatic design; right? | 10:51:03 |
| 10 | A.   Yes. | 10:51:05 |
| 11 | Q.   At some point, Spider came about and | 10:51:12 |
| 12 | transformed it to a monostatic design; right? | 10:51:15 |
| 13 | A.   True. | 10:51:17 |
| 14 | Q.   Do you know who was responsible for the | 10:51:19 |
| 15 | change from what you were coming up with, which was a | 10:51:22 |
| 16 | bistatic design, to the monostatic design in Spider? | 10:51:26 |
| 17 | A.   I don't recall who among the team was | 10:51:34 |
| 18 | involved in our conversations first to move away from | 10:51:39 |
| 19 | supplemental design to one design that would cover all | 10:51:44 |
| 20 | the way from directly in front of the vehicle out to | 10:51:47 |
| 21 | long range.  But that was a decision that was made | 10:51:50 |
| 22 | that pretty much negated the proposal I had made of | 10:51:56 |
| 23 | using a tight-packed purely long-range sensor. | 10:52:00 |
| 24 | Q.   So you shifted into the passive voice there. | 10:52:05 |
| 25 | You're talking about -- who is making these | 10:52:07 |

Page 30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    decisions?                                        10:52:08

 2        A.   Exactly.  I'm trying to recall.  I don't 10:52:10

 3    know, of all the people that were involved, who was in 10:52:14

 4    those conversations.  So it would include me.  It  10:52:17

 5    would include most likely Anthony Levandowski.  I  10:52:23

 6    believe it would also include Daniel Gruver.  And I'm 10:52:28

 7    not sure if there's anyone else.                   10:52:30

 8        Q.   And do you know, in the context of those  10:52:35

 9    communications, who just said, Hey, James, your design 10:52:44

10    looks great, but we're going to go with the monostatic 10:52:46

11    design and we think it's better?                   10:52:50

12        MR. KIM:  Objection; form.                     10:52:50

13        THE WITNESS:  The monostatic design that uses one 10:52:56

14    lens for transmit and receive, I don't know who came 10:52:59

15    up with that.  At some point I saw it, seemed okay to 10:53:05

16    me, it seemed compact, let's use it.               10:53:09

17    BY MR. JAFFE:                                      10:53:09

18        Q.   So you don't know -- you have no information 10:53:12

19    of who came up with the monostatic design in Spider? 10:53:15

20        A.   True.                                     10:53:16

21        Q.   Okay.  So we were still -- going back to our 10:53:25

22    chron of conversations with Mr. Levandowski, when is 10:53:28

23    the next conversation that you had with            10:53:31

24    Mr. Levandowski about LiDAR that you can recall?   10:53:34

25        A.   It's very hard for me to recall specific  10:53:43
```

Page 31

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | conversations, especially in sequence.  At this point, | 10:53:47 |
| 2 | I report to Anthony Levandowski. | 10:53:50 |
| 3 | Q.   And just for purposes of the record, when | 10:53:52 |
| 4 | you're talking about "this point," what date are you | 10:53:54 |
| 5 | talking about? | 10:53:55 |
| 6 | A.   I'm talking about immediately following | 10:53:56 |
| 7 | Tyto's acquisition by Otto -- or I should say Otto's | 10:54:03 |
| 8 | acquisition of Tyto.  We joined -- at that time, I | 10:54:08 |
| 9 | reported to Anthony Levandowski.  There would be | 10:54:12 |
| 10 | regular staff meetings.  Since my team is working on | 10:54:19 |
| 11 | LiDAR, LiDAR would definitely come up in conversations | 10:54:22 |
| 12 | with him, at that point, on a probably fairly routine | 10:54:25 |
| 13 | basis, like weekly basis. | 10:54:28 |
| 14 | Q.   And what did you and Mr. Levandowski discuss? | 10:54:31 |
| 15 | A.   Progress, approach, schedule or timing, | 10:54:39 |
| 16 | volumes. | 10:54:41 |
| 17 | Q.   Can you tell me any more specifics about the | 10:54:44 |
| 18 | routine and regular conversations you were having with | 10:54:48 |
| 19 | Mr. Levandowski about LiDAR? | 10:54:49 |
| 20 | A.   He would ask about what the design was | 10:54:56 |
| 21 | looking like, how we were approaching it.  Beyond | 10:55:00 |
| 22 | that, I don't recall specifics of our conversations. | 10:55:03 |
| 23 | Q.   So sitting here today, in this time period | 10:55:06 |
| 24 | that you're talking about, after you joined Otto in | 10:55:10 |
| 25 | May of 2016, you would have regular conversations with | 10:55:15 |

Page 32

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Mr. Levandowski about LiDAR, but you can't recall any | 10:55:18 |
| 2 | specifics of those conversations; is that fair? | 10:55:21 |
| 3 | A.   That's fair to say I cannot recall beyond the | 10:55:26 |
| 4 | details I already told you. | 10:55:28 |
| 5 | Q.   I see. | 10:55:29 |
| 6 | When is the next -- moving forward in time | 10:55:34 |
| 7 | here, when is the next substantive conversation with | 10:55:38 |
| 8 | Mr. Levandowski about LiDAR that you recall? | 10:55:40 |
| 9 | A.   I don't know. | 10:55:56 |
| 10 | Q.   You don't know? | 10:55:57 |
| 11 | A.   I don't know. | 10:55:57 |
| 12 | Q.   I'm not trying to do a memory test here.  If | 10:56:02 |
| 13 | there's just too many conversations for you to recall, | 10:56:05 |
| 14 | that's fine, and you can just tell me that.  But | 10:56:08 |
| 15 | otherwise I'm just going to keep asking. | 10:56:10 |
| 16 | MR. KIM:  Objection; form. | 10:56:10 |
| 17 | THE WITNESS:  Most of our conversations, that is | 10:56:21 |
| 18 | between me and Anthony Levandowski, were not | 10:56:24 |
| 19 | substantive in LiDAR design per se.  So I'm having a | 10:56:30 |
| 20 | hard time remembering further conversations or | 10:56:35 |
| 21 | specifics. | 10:56:35 |
| 22 | Most of the time, he wanted to know where | 10:56:38 |
| 23 | we were in our progress, and he may have asked | 10:56:41 |
| 24 | what the design was shaping up like. | 10:56:44 |
| 25 | I do recall one more. | 10:56:49 |

Page 33

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | He was visiting Uber.  He got me on the phone | 10:56:56 |
| 2 | and was starting to describe using eight fiber | 10:57:02 |
| 3 | lasers -- that's right -- eight fiber lasers, | 10:57:08 |
| 4 | splitting their outputs to multiply the number of | 10:57:12 |
| 5 | channels and then routing a fiber from each fiber | 10:57:17 |
| 6 | laser into a number of optical cavities. | 10:57:24 |
| 7 | There was also, at that time frame, a | 10:57:26 |
| 8 | document published or shared with the team.  I think | 10:57:31 |
| 9 | that came from Scott Boehmke.  So this would be | 10:57:38 |
| 10 | substantive in terms of shaping up what Spider would | 10:57:43 |
| 11 | eventually become. | 10:57:44 |
| 12 | BY MR. JAFFE: | 10:57:44 |
| 13 | Q.   And you said Mr. Levandowski called you from | 10:57:48 |
| 14 | Uber in Pittsburgh; is that right? | 10:57:53 |
| 15 | A.   My understanding he was either at Uber or in | 10:57:55 |
| 16 | transit to or from Uber in Pittsburgh. | 10:57:58 |
| 17 | Q.   Approximately what time period was this? | 10:58:01 |
| 18 | A.   This would be relatively early in the | 10:58:04 |
| 19 | development of the Spider.  Beyond that, I would defer | 10:58:08 |
| 20 | to e-mails.  I don't remember. | 10:58:10 |
| 21 | Q.   When you say you would "defer to e-mails," | 10:58:12 |
| 22 | are there e-mails about this conversation? | 10:58:15 |
| 23 | A.   There were e-mails -- I should say there was | 10:58:19 |
| 24 | an e-mail with a document that was published that | 10:58:24 |
| 25 | contained the substance of what he was describing. | 10:58:27 |

Page 34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   What was the name of that document? | 10:58:29 |
| 2 | A.   I think it had the name like LiDAR Thoughts. | 10:58:36 |
| 3 | Q.   And that was authored by Mr. Levandowski? | 10:58:39 |
| 4 | MR. KIM:  Objection; form. | 10:58:39 |
| 5 | THE WITNESS:  I don't know that Anthony authored | 10:58:43 |
| 6 | that or if Scott authored that. | 10:58:46 |
| 7 | BY MR. JAFFE: | 10:58:46 |
| 8 | Q.   Mr. Levandowski had design input into what -- | 10:58:49 |
| 9 | the LiDAR described in that document, though; is that | 10:58:53 |
| 10 | fair? | 10:58:54 |
| 11 | MR. KIM:  Objection; form. | 10:58:54 |
| 12 | THE WITNESS:  That's a good question.  He | 10:58:58 |
| 13 | described it to me, but I don't know whether he was | 10:59:02 |
| 14 | describing his idea or Scott's idea.  I don't know. | 10:59:06 |
| 15 | BY MR. JAFFE: | 10:59:06 |
| 16 | Q.   So just to back up, Mr. Levandowski called | 10:59:14 |
| 17 | you and provided some thoughts on how to do the fiber | 10:59:20 |
| 18 | laser design in Spider.  And he was describing | 10:59:23 |
| 19 | something that was in a document called LiDAR | 10:59:25 |
| 20 | Thoughts; is that fair? | 10:59:27 |
| 21 | A.   He was describing something that was later | 10:59:30 |
| 22 | published in an e-mail with LiDAR Thoughts. | 10:59:34 |
| 23 | Q.   And at this time, Otto was an independent | 10:59:41 |
| 24 | company; right? | 10:59:43 |
| 25 | A.   Yes. | 10:59:43 |

Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Why was Mr. Levandowski at Uber? | 10:59:46 |
| 2 | A.   As I understood it, we were considering | 10:59:52 |
| 3 | selling our LiDAR sensors to Uber. | 10:59:56 |
| 4 | Q.   When you say "As I understood it," what was | 10:59:59 |
| 5 | the basis for that understanding? | 11:00:01 |
| 6 | MR. KIM:  Just caution you not to reveal | 11:00:04 |
| 7 | privileged communications with lawyers.  If you can | 11:00:07 |
| 8 | answer it without doing that, you can do so. | 11:00:10 |
| 9 | THE WITNESS:  Um-hum. | 11:00:11 |
| 10 | I don't recall the exact timing and | 11:00:15 |
| 11 | sequencing.  At some point, engineers from Uber | 11:00:23 |
| 12 | Pittsburgh visited our office.  And I have a vague | 11:00:33 |
| 13 | recollection Anthony telling us to be helpful, to | 11:00:41 |
| 14 | share information freely.  It seemed almost like a | 11:00:48 |
| 15 | partnership.  Around the time, Anthony put an | 11:00:56 |
| 16 | e-mail to the entire company saying we were going | 11:00:59 |
| 17 | to be working with them, providing sensor to them, | 11:01:03 |
| 18 | possibly involving autonomous software as well. | 11:01:09 |
| 19 | MR. JAFFE:  Counsel, I don't think that e-mail has | 11:01:12 |
| 20 | been produced, and we ask that it be produced | 11:01:14 |
| 21 | immediately. | 11:01:16 |
| 22 | MR. KIM:  I don't know which e-mail that | 11:01:17 |
| 23 | specifically refers to.  I believe we produced a bunch | 11:01:21 |
| 24 | of e-mails that are similar to that description, but | 11:01:24 |
| 25 | we can confirm. | 11:01:26 |

Page 36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   This would be distinct from status and      11:05:08

2   updates.                                            11:05:09

3      Q.   Okay.  I just want that to be clear.         11:05:10

4           Okay.  When you joined Tyto, when did you    11:05:14

5   first hear that Mr. Levandowski would be your boss on  11:05:19

6   the LiDAR team?                                      11:05:21

7      A.   I believe my offer letter for joining Otto   11:05:28

8   would have indicated that he would be my manager, I   11:05:33

9   believe.                                             11:05:33

10      Q.   So Mr. Levandowski decided that you          11:05:41

11   were -- that he was -- you were going -- excuse me --  11:05:44

12   that he was going to be your boss on the LiDAR team   11:05:47

13   when you joined Otto; right?                         11:05:48

14      A.   I presumed that, yes.                        11:05:51

15      Q.   Do you think the LiDAR team needed           11:05:56

16   Mr. Levandowski to accomplish its goals?             11:06:01

17      MR. KIM:  Objection; form.                        11:06:01

18      THE WITNESS:  Honestly, no.                       11:06:08

19   BY MR. JAFFE:                                        11:06:08

20      Q.   Why not?                                     11:06:09

21      A.   We have a team that probably could have come  11:06:13

22   up with a number of different LiDAR sensors without   11:06:17

23   his input.                                           11:06:18

24      Q.   But that's not what happened; right?         11:06:20

25      A.   That's not what happened.                    11:06:22

Page 39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So when was the first time you worked with | 11:06:32 |
| 2 | Max Levandowski on LiDAR? | 11:06:35 |
| 3 | A.   That would be immediately following my | 11:06:38 |
| 4 | joining Otto. | 11:06:39 |
| 5 | Q.   And what is your working relationship with | 11:06:43 |
| 6 | Max Levandowski? | 11:06:45 |
| 7 | A.   He reports to me. | 11:06:47 |
| 8 | Q.   He reports to you.  I see. | 11:06:49 |
| 9 | So, actually, let's go back in time to when | 11:06:56 |
| 10 | you first joined Otto. | 11:06:58 |
| 11 | And you're having regular interactions with | 11:07:00 |
| 12 | Mr. Levandowski; right? | 11:07:02 |
| 13 | A.   Um-hum. | 11:07:03 |
| 14 | Q.   What devices are you aware of him using at | 11:07:06 |
| 15 | that time in terms of computers? | 11:07:09 |
| 16 | A.   I believe he had a laptop, probably a | 11:07:12 |
| 17 | Macintosh. | 11:07:14 |
| 18 | Q.   Is that his personal laptop? | 11:07:17 |
| 19 | MR. KIM:  Objection; form. | 11:07:17 |
| 20 | THE WITNESS:  I don't know. | 11:07:19 |
| 21 | BY MR. JAFFE: | 11:07:19 |
| 22 | Q.   What about a phone?  Was he using a phone? | 11:07:22 |
| 23 | A.   Sure.  I don't know if he had one phone, | 11:07:24 |
| 24 | multiple phones.  I didn't really pay attention, but | 11:07:27 |
| 25 | I'm sure he had a phone. | 11:07:28 |

Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   How often did Mr. Levandowski bring his | 11:07:32 |
| 2 | personal laptop to work with him? | 11:07:35 |
| 3 | MR. KIM:  Objection; form. | 11:07:35 |
| 4 | THE WITNESS:  I couldn't possibly know. | 11:07:37 |
| 5 | BY MR. JAFFE: | 11:07:37 |
| 6 | Q.   Every day? | 11:07:39 |
| 7 | MR. KIM:  Objection; form. | 11:07:39 |
| 8 | THE WITNESS:  The reason I couldn't possibly know | 11:07:42 |
| 9 | is I don't know whether the laptop he may have carried | 11:07:45 |
| 10 | was his personal laptop or the work laptop. | 11:07:48 |
| 11 | BY MR. JAFFE: | 11:07:48 |
| 12 | Q.   I see.  All right.  So let's just talk about | 11:07:51 |
| 13 | the one laptop that you know about. | 11:07:53 |
| 14 | How often did he bring that laptop to work | 11:07:55 |
| 15 | with him? | 11:07:56 |
| 16 | MR. KIM:  Objection; form. | 11:07:56 |
| 17 | THE WITNESS:  I don't know.  I have no idea. | 11:08:02 |
| 18 | BY MR. JAFFE: | 11:08:02 |
| 19 | Q.   You saw him at work with the personal laptop; | 11:08:06 |
| 20 | right? | 11:08:06 |
| 21 | A.   I'm sure I've seen him at work with a laptop. | 11:08:10 |
| 22 | Q.   And that was a regular occurrence; right? | 11:08:12 |
| 23 | MR. KIM:  Objection; form. | 11:08:14 |
| 24 | THE WITNESS:  I hardly paid attention to how often | 11:08:18 |
| 25 | he was carrying a laptop. | 11:08:20 |

Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. JAFFE:                                         11:08:20

 2        Q.   I understand you're saying that you hardly   11:08:23

 3    pay attention to this.  The judge specifically asked  11:08:25

 4    to find out this information, and that's the reason    11:08:27

 5    I'm asking this question.  I just want that to be      11:08:30

 6    clear.                                                 11:08:31

 7             How often -- so let me just pause there,      11:08:34

 8    okay, and I'm going to ask my question again.          11:08:36

 9             How often did you see Anthony Levandowski     11:08:38

10    with his Macintosh laptop at Otto?                     11:08:42

11        MR. KIM:  Objection; form.                         11:08:42

12        THE WITNESS:  I don't recall how often.            11:08:48

13    BY MR. JAFFE:                                          11:08:48

14        Q.   Every day?                                    11:08:53

15        MR. KIM:  Objection; form.                         11:08:53

16        THE WITNESS:  Not necessarily.                     11:08:55

17    BY MR. JAFFE:                                          11:08:55

18        Q.   Four, five days a week; is that fair?         11:08:58

19        A.   I don't know.                                 11:09:03

20        Q.   You're not willing to tell me any sort of     11:09:06

21    numbers?                                               11:09:07

22        MR. KIM:  Objection; form.                         11:09:07

23        THE WITNESS:  I can't give you any number for how  11:09:12

24    often I can recall seeing him carrying a laptop.  And  11:09:16

25    I would also mention he spent a lot of time traveling  11:09:20
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | to the Pittsburgh office, and I would have no idea how | 11:09:23 |
| 2 | often he carried a laptop for that as well. | 11:09:26 |
| 3 | BY MR. JAFFE: | 11:09:26 |
| 4 | Q.  Fair. | 11:09:27 |
| 5 | I'm not trying to ask you -- I'm only asking | 11:09:28 |
| 6 | for your understanding based on your interactions with | 11:09:31 |
| 7 | him. | 11:09:32 |
| 8 | Understand? | 11:09:32 |
| 9 | A.  Understand. | 11:09:33 |
| 10 | Q.  Would you agree that you probably saw | 11:09:36 |
| 11 | Mr. Levandowski with his laptop three days a week, | 11:09:41 |
| 12 | approximately? | 11:09:42 |
| 13 | MR. KIM:  Objection to form.  Same objection. | 11:09:49 |
| 14 | THE WITNESS:  I really don't recall.  I really do | 11:09:51 |
| 15 | not recall. | 11:09:52 |
| 16 | BY MR. JAFFE: | 11:09:52 |
| 17 | Q.  All right.  Let me come at this the other | 11:09:55 |
| 18 | way. | 11:09:56 |
| 19 | You saw him at least once with the laptop; | 11:09:58 |
| 20 | right? | |
| 21 | A.  Sure. | 11:09:59 |
| 22 | Q.  At least, let's say, 50 times? | 11:10:01 |
| 23 | MR. KIM:  Objection to form. | 11:10:02 |
| 24 | THE WITNESS:  At least some number of times.  I | 11:10:06 |
| 25 | don't know. | 11:10:06 |

Page 43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MR. JAFFE:

 2       Q.   Okay.  You're aggressively resisting giving    11:10:09

 3   any sort of number.  And the judge asked for this, so    11:10:12

 4   I'm just going to press on this a little bit longer?     11:10:13

 5   Okay?

 6       MR. KIM:  Objection to form.                         11:10:17

 7   BY MR. JAFFE:                                            11:10:17

 8       Q.   More than 30 times?                             11:10:20

 9       A.   Possibly.                                       11:10:21

10       Q.   Would you dispute if someone said to the        11:10:22

11   court that he -- you saw his laptop at least 30 times    11:10:27

12   when you were working at Otto before the Uber

13   acquisition?

14       MR. KIM:  Objection to form.                         11:10:30

15       THE WITNESS:  If someone claimed to see him with a   11:10:32

16   laptop 30 times, I would not object to that.            11:10:34

17   BY MR. JAFFE:                                            11:10:34

18       Q.   And just talking about regularly, if we were    11:10:38

19   going to put an approximate amount, would you say        11:10:41

20   approximately two to four times a week you saw him       11:10:44

21   with a laptop at Otto?  Is that fair?                    11:10:46

22       MR. KIM:  Objection; form.                           11:10:46

23       THE WITNESS:  I don't know if kept his laptop with   11:10:50

24   him everywhere he went in the office, so --             11:10:53

25   BY MR. JAFFE:
```

Page 44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   I'm just asking about what you saw with your | 11:10:56 |
| 2 | own eyes. | 11:10:57 |
| 3 | A.   So I would say a few times a week when he was | 11:11:04 |
| 4 | spending that week in the office. | 11:11:07 |
| 5 | Q.   Fair. | 11:11:08 |
| 6 | So just to clean that up for purposes of the | 11:11:12 |
| 7 | record, your testimony, based on your personal | 11:11:17 |
| 8 | knowledge, is you approximately saw Mr. Levandowski | 11:11:21 |
| 9 | when he was in San Francisco with his Macintosh laptop | 11:11:27 |
| 10 | a few times a week -- | 11:11:29 |
| 11 | MR. KIM:  Objection; form. | 11:11:31 |
| 12 | BY MR. JAFFE: | 11:11:31 |
| 13 | Q.   -- is that fair? | 11:11:33 |
| 14 | MR. KIM:  Objection; form. | 11:11:34 |
| 15 | THE WITNESS:  It's fair as long as we emphasize | 11:11:37 |
| 16 | approximately. | 11:11:39 |
| 17 | BY MR. JAFFE: | 11:11:39 |
| 18 | Q.   Okay.  All right.  Did you ever get e-mails | 11:11:45 |
| 19 | from Mr. Levandowski while he was working from home? | 11:11:51 |
| 20 | A.   I don't know. | 11:11:54 |
| 21 | Q.   Why don't you know? | 11:11:57 |
| 22 | A.   I would occasionally get e-mails from Anthony | 11:12:00 |
| 23 | Levandowski, but I don't know how to tell you where he | 11:12:03 |
| 24 | was when he sent those e-mails. | 11:12:05 |
| 25 | Q.   So there's no instance where you're sitting | 11:12:09 |

Page 45

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | in the office and you look around and he's not there | 11:12:11 |
| 2 | and he hasn't been there all day and he's sending | 11:12:16 |
| 3 | e-mails?  That's never happened? | 11:12:19 |
| 4 | A.   Incorrect. | 11:12:19 |
| 5 | Q.   So can you please explain then. | 11:12:21 |
| 6 | A.   He travels a lot.  So I quite likely got | 11:12:25 |
| 7 | e-mails from him when I didn't see him in the office. | 11:12:30 |
| 8 | Q.   So you don't know where he is a lot of the | 11:12:32 |
| 9 | time; is that fair? | 11:12:33 |
| 10 | A.   That's fair. | 11:12:34 |
| 11 | Q.   So you got e-mails from Mr. Levandowski when | 11:12:37 |
| 12 | you were working at Otto, but he wasn't sitting with | 11:12:39 |
| 13 | you in the office; right? | 11:12:40 |
| 14 | A.   I believe that's true, yes. | 11:12:45 |
| 15 | Q.   So he wasn't in the office, you don't know | 11:12:47 |
| 16 | where he is, but he's e-mailing you about Otto; is | 11:12:50 |
| 17 | that fair? | 11:12:52 |
| 18 | A.   That's fair. | 11:12:53 |
| 19 | Q.   And was that something that happened on a | 11:12:58 |
| 20 | regular basis? | 11:12:59 |
| 21 | MR. KIM:  Objection; form. | 11:12:59 |
| 22 | THE WITNESS:  I think that's fair. | 11:13:04 |
| 23 | BY MR. JAFFE: | 11:13:04 |
| 24 | Q.   So I want to talk about Fuji for a second | 11:13:11 |
| 25 | here. | 11:13:13 |

Page 46

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | In the Fuji design -- and we'll just go | 11:13:17 |
| 2 | cavity by cavity. | 11:13:18 |
| 3 | But for the mid-range cavity, there are three | 11:13:20 |
| 4 | transmit boards; right? | 11:13:21 |
| 5 | A.   Right. | 11:13:23 |
| 6 | Q.   And in the mid-range cavity, there are three | 11:13:27 |
| 7 | transmit boards and they are pointed -- and they're | 11:13:30 |
| 8 | parallel to one another; right? | 11:13:31 |
| 9 | A.   Right. | 11:13:31 |
| 10 | Q.   The transmit lens for the mid-range cavity is | 11:13:37 |
| 11 | less in width than the width of the transmit boards; | 11:13:43 |
| 12 | right? | 11:13:44 |
| 13 | MR. KIM:  Objection; form. | 11:13:44 |
| 14 | THE WITNESS:  Could you clarify.  I'm confused | 11:13:50 |
| 15 | which lens you're referring to. | 11:13:52 |
| 16 | BY MR. JAFFE: | 11:13:52 |
| 17 | Q.   Yes.  Let me just mark something and make | 11:13:56 |
| 18 | this easier. | 11:13:57 |
| 19 | MR. JAFFE:  And we'll have this be 151. | 11:14:04 |
| 20 | (Plaintiff's Exhibit 151 was marked.) | 11:14:08 |
| 21 | MR. KIM:  At some point -- we've been going for I | 11:14:10 |
| 22 | think over an hour -- if we can take a break.  You can | 11:14:12 |
| 23 | ask your line of questions.  I'm just saying at a | 11:14:15 |
| 24 | convenient time. | 11:14:16 |
| 25 | MR. JAFFE:  Sure. | 11:14:16 |

Page 47

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | ████████████████████████████████. | 11:16:25 |
| 2 | BY MR. JAFFE: | 11:16:25 |
| 3 | Q.    What do you mean, "necessarily"? | 11:16:26 |
| 4 | A.    Any time you have a lens placed in | 11:16:32 |
| 5 | relationship to the source of light, the lateral | 11:16:38 |
| 6 | resolution -- wrong word -- the lateral relationship | 11:16:42 |
| 7 | between a light source and a lens will dictate the | 11:16:47 |
| 8 | exit angle of the light coming out of that lens. | 11:16:50 |
| 9 | So if you want the light to go straight, you | 11:16:54 |
| 10 | have to carefully place the FAC lens, or fast-axis | 11:16:59 |
| 11 | collimation lens, in a position that will cause the | 11:17:04 |
| 12 | light to exit perhaps parallel to the board, if you | 11:17:07 |
| 13 | want that. | 11:17:08 |
| 14 | Q.    So in the Fuji design -- and we'll call it | 11:17:11 |
| 15 | the FAC lens for the benefit of the court reporter | 11:17:13 |
| 16 | here -- ████████████████████████ | ████ |
| | ██ ████████████████████████████ | ████ |
| | ██ ██████████████████; is that fair? | 11:17:26 |
| 19 | MR. KIM:  Objection; form. | 11:17:26 |
| 20 | THE WITNESS:  Maybe I don't like the word ██████ | ████ |
| | ██ ████████████████████████ And | 11:17:38 |
| 22 | so to clarify, the FAC lens precollimates the light | 11:17:44 |
| 23 | ████████████████████████. | 11:17:47 |
| 24 | BY MR. JAFFE: | 11:17:47 |
| 25 | Q.    ████████████████████████ | 11:17:49 |

Page 50

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    ██████████████████; right?                    11:17:50

2       MR. KIM:  Objection; form.                 11:17:50

3    BY MR. JAFFE:                                  11:17:50

4       Q.    That's all I mean by ███████.         11:17:54

5       MR. KIM:  Objection; form.                  11:17:54

6       THE WITNESS:  On two of our laser boards, the   11:17:59

7    ████████████████████████████████   ████████

     ████████████████████████████████   ████████

     ███████████████████████                      11:18:11

10   BY MR. JAFFE:                                 11:18:11

11      Q.    Okay.  So I don't have real-time, so I'm   11:18:18

12   going to try and just repeat back to make sure I   11:18:21

13   understand what you said.                     11:18:22

14          The fast-axis collimation -- ██████████   ████████

     ████████████████████████████████   ████████

     ████████████████████████████████   ████████

     ████████████████████████████; true?          11:18:42

18      MR. KIM:  Objection; form.                 11:18:42

19      THE WITNESS:  True as long as we clarify   11:18:48

20   horizontal is horizontal in the drawing.      11:18:51

21   BY MR. JAFFE:                                 11:18:51

22      Q.    So if anyone testified or said that there's   11:18:57

23   ████████████████████████████, that would      11:19:01

24   be wrong; right?                              11:19:02

25      MR. KIM:  Objection; form.                 11:19:02
```

Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      THE WITNESS:  Not necessarily.  The word          11:19:05

2    ██████████ in LiDAR often means ██████████    ██████████

▮    ██████████████████                              11:19:13

4  BY MR. JAFFE:                                      11:19:13

5      Q.   I see.                                    11:19:13

6           So it's just kind of -- if they said there's  11:19:18

7  ██████████, they could be right, but they could be   11:19:21

8  wrong?                                             11:19:21

9      MR. KIM:  Objection; form.                     11:19:21

10     THE WITNESS:  Could.                           11:19:23

11 BY MR. JAFFE:                                      11:19:23

12     Q.   And if someone said ██████████████  ██████████

▮  ████████████████████████████████████  ██████████

▮  ██████████████████████; right?                    11:19:32

15     MR. KIM:  Objection; form.                     11:19:32

16     THE WITNESS:  Too many words at once.  Could you  11:19:36

17 repeat your last question.                         11:19:38

18     MR. JAFFE:  Why don't we just have the court   11:19:47

19 reporter repeat it.

20          (Record read by reporter as follows:

21          "Question:  And if someone said it's

22          ██████████████████████

▮          ████████████████████████████

▮          ██████████████; right?")               11:19:47

25     MR. KIM:  Objection; form.                     11:19:47

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  If they say it's ████ yes, they | 11:19:52 |
| 2 | are not necessarily denying the fact that ████  ████ | 11:19:57 |
| ██ | ████████████████. | 11:19:57 |
| 4 | BY MR. JAFFE: | 11:19:57 |
| 5 | Q.   Sorry.  There was a missing word there. | 11:19:59 |
| 6 | If they say it's not ████ -- | 11:20:01 |
| 7 | A.   Oh. | |
| 8 | Q.   -- they're not denying that it ████  ████ | |
| ██ | ████████████████████; | 11:20:08 |
| 10 | true? | 11:20:08 |
| 11 | MR. KIM:  Objection; form. | 11:20:08 |
| 12 | THE WITNESS:  If I were to say it's not ████ | 11:20:18 |
| 13 | I would not be denying that ████    I | 11:20:21 |
| 14 | can't tell you what they would say. | 11:20:22 |
| 15 | MR. JAFFE:  Okay.  Why don't we take our first | 11:20:27 |
| 16 | break. | 11:20:28 |
| 17 | THE VIDEOGRAPHER:  We are off the record at 11:20 | 11:20:31 |
| 18 | a.m. | 11:20:31 |
| 19 | (Recess taken.) | 11:20:31 |
| 20 | THE VIDEOGRAPHER:  We're back on the record at | 11:33:47 |
| 21 | 11:33 a.m. | 11:33:49 |
| 22 | BY MR. JAFFE: | 11:33:49 |
| 23 | Q.   Welcome back. | 11:34:13 |
| 24 | A.   Thank you. | 11:34:14 |
| 25 | Q.   Last Thursday it was reported in the press | 11:34:19 |

Page 53

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | that Mr. Levandowski was demoting himself in some way. | 11:34:26 |
| 2 | Are you familiar with that? | 11:34:27 |
| 3 | A.   I'm familiar with the announcement that his | 11:34:31 |
| 4 | position was changing.  I only take issue with your | 11:34:37 |
| 5 | comment -- or your phrase that says he was demoting | 11:34:40 |
| 6 | himself.  I don't know who decided his position should | 11:34:45 |
| 7 | change. | 11:34:45 |
| 8 | Q.   I see. | 11:34:45 |
| 9 | So you don't know who actually decided that | 11:34:49 |
| 10 | his position should change? | 11:34:51 |
| 11 | A.   Correct. | 11:34:51 |
| 12 | Q.   And do you take issue with the idea that he | 11:34:54 |
| 13 | was demoted in some way? | 11:34:56 |
| 14 | A.   Not necessarily. | 11:34:58 |
| 15 | Q.   Okay.  So if I call it his demotion, that's a | 11:35:03 |
| 16 | fair statement? | 11:35:03 |
| 17 | A.   I won't argue with that. | 11:35:05 |
| 18 | Q.   So how did you find out about | 11:35:09 |
| 19 | Mr. Levandowski's demotion? | 11:35:12 |
| 20 | A.   I received an e-mail.  I believe the whole | 11:35:16 |
| 21 | company received an e-mail describing that change. | 11:35:21 |
| 22 | I want to say Anthony sent the e-mail, but | 11:35:25 |
| 23 | I'm not 100 percent positive on that. | 11:35:28 |
| 24 | ███ █████████████████████████     ██████ | |
| 25 | ████████████████████████████████ | 11:35:36 |

Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
```

13   BY MR. JAFFE:                                          11:36:13

14       Q.   Before that e-mail on Thursday, there was no  11:36:18

15   sort of company policy excluding Mr. Levandowski from  11:36:23

16   providing input onto LiDAR; right?                     11:36:27

17       MR. KIM:   Objection; form.                        11:36:27

18       THE WITNESS:   I'm not aware of any policy before  11:36:31

19   that date regarding excluding him from any aspect of   11:36:35

20   any work at the company.                               11:36:36

21   BY MR. JAFFE:                                          11:36:36

22       Q.   Including LiDAR?                              11:36:41

23       A.   Including LiDAR.                              11:36:41

24       Q.   So you never received any sort of special    11:36:45

25   instructions about what you could and couldn't do     11:36:47

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | working with Mr. Levandowski before last Thursday; is | 11:36:52 |
| 2 | that fair? | 11:36:53 |
| 3 | A.   That seems -- yeah, that's a true statement. | 11:36:58 |
| 4 | Q.   Are you aware of anyone else receiving | 11:37:00 |
| 5 | special instructions about what they could and | 11:37:02 |
| 6 | couldn't do in working with Mr. Levandowski before | 11:37:05 |
| 7 | last Thursday? | 11:37:06 |
| 8 | MR. KIM:  Objection; form. | 11:37:06 |
| 9 | THE WITNESS:  I'm not aware of anything like that. | 11:37:10 |
| 10 | BY MR. JAFFE: | 11:37:10 |
| 11 | Q.   So before last Thursday Mr. -- as far as you | 11:37:14 |
| 12 | know, Mr. Levandowski was free to provide input into | 11:37:18 |
| 13 | all parts of the self-driving project, including LiDAR | 11:37:20 |
| 14 | and other parts; right? | 11:37:24 |
| 15 | MR. KIM:  Objection; form. | 11:37:24 |
| 16 | THE WITNESS:  That's my understanding. | 11:37:26 |
| 17 | BY MR. JAFFE: | 11:37:26 |
| 18 | Q.   And today as of right now, he's free to | 11:37:32 |
| 19 | provide input into all parts of the self-driving | 11:37:36 |
| 20 | project except for LiDAR? | 11:37:38 |
| 21 | MR. KIM:  Objection; form. | 11:37:38 |
| 22 | THE WITNESS:  I don't recall if there was any | 11:37:45 |
| 23 | other restrictions, but definitely LiDAR was mentioned | 11:37:48 |
| 24 | specifically. | 11:37:52 |
| 25 | BY MR. JAFFE: | 11:37:52 |

Page 56

```
 1      Q.    You don't recall whether there were any other    11:37:54

 2   restrictions in the e-mail?                               11:37:56

 3      A.    In the e-mail, correct.                          11:37:57

 4      Q.    I see.  Okay.  So let me try this again.         11:38:00

 5            So apart from the restrictions that are          11:38:02

 6   stated in the e-mail, you're not -- today you're not      11:38:04

 7   aware of any other limitations on Mr. Levandowski's       11:38:08

 8   input into the self-driving project?                      11:38:11

 9      A.    Correct, I'm not aware of any such additional    11:38:13

10   limitations.                                              11:38:14

11      Q.    ████████████████████████████████████   ████████

12   ███████████████████████                                   11:38:20

13      MR. KIM:  Objection; form.                             11:38:22

14      THE WITNESS:  ████████████████.                        11:38:23

15   BY MR. JAFFE:                                             11:38:23

16      Q.    ██████████████████████████████           ███████

17   ████████████████████████████████████████            ██████

18   █████████                                            ██████

19      MR. KIM:  Objection; form.                             11:38:36

20      THE WITNESS:  ████████████                             11:38:38

21   BY MR. JAFFE:                                             11:38:38

22      Q.    ███████████████████████████████         █████████

23   ███████████████████████████████████████          █████████

24   ████████                                          █████████

25     ████   ██████                                          11:38:47
```

Page 57

| | | |
|---|---|---|
| 1 | MR. KIM:  Objection; form. | 11:38:48 |
| 2 | BY MR. JAFFE: | 11:38:48 |
| 3 | Q. ████████████████████ | ███████ |
| 4 | ████████████████ | 11:38:54 |
| 5 | MR. KIM:  Objection; form. | 11:38:55 |
| 6 | THE WITNESS: ████████████ | ███████ |
| 7 | ████████████████████ | ███████ |
| 8 | ██████████ | ███████ |
| 9 | BY MR. JAFFE: | |
| 10 | Q. ██████████████ | ███████ |
| 11 | ████ | ███████ |
| 12 | ██ ███ | ███████ |
| 13 | ██ ███████ | ███████ |
| 14 | ██ ████████████ | ███████ |
| 15 | ████████████████████ | ███████ |
| 16 | ████████████████ ████ ██ | ███████ |
| 17 | ████████ | |
| 18 | ██ ████████ | 11:39:22 |
| 19 | Just for the purposes of the record, can you | 11:39:23 |
| 20 | just explain what you mean by that for a lay audience. | 11:39:26 |
| 21 | A.  So again, my understanding of how our | 11:39:29 |
| 22 | autonomous software works, is limited -- with that | 11:39:34 |
| 23 | preface, I would suggest my understanding of the | 11:39:37 |
| 24 | perception team is to take LiDAR and other sources of | 11:39:42 |
| 25 | data and determine what objects exist outside the | 11:39:50 |

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | vehicle. | 11:39:52 |
| 2 | If you refer generically to a compute team, | 11:39:58 |
| 3 | there may be other aspects of software after or | 11:40:01 |
| 4 | downstream in the data path after perception that | 11:40:05 |
| 5 | would need to use data that the perception software | 11:40:09 |
| 6 | generates in order to determine the car's proper | 11:40:15 |
| 7 | driving course. | 11:40:17 |
| 8 | Q.   So even today -- well, actually, let me back | 11:40:22 |
| 9 | up. | 11:40:22 |
| 10 | What is "perception" in this context? | 11:40:25 |
| 11 | A.   In this context, my use of the word | 11:40:29 |
| 12 | "perception" would be software that takes sensored | 11:40:36 |
| 13 | data input from LiDAR, camera, radar, possibly | 11:40:42 |
| 14 | inertial measurement sensors, wheel sensors, to | 11:40:49 |
| 15 | identify distinct objects in the world around it and | 11:40:54 |
| 16 | possibly classify those objects in terms of perhaps, | 11:41:00 |
| 17 | for example, being a person, a pedestrian, another car | 11:41:06 |
| 18 | or a bus and passing that information to the next | 11:41:12 |
| 19 | layers of software that could exist. | 11:41:15 |
| 20 | Q.   And in the context of our conversation, what | 11:41:18 |
| 21 | does the compute team do? | 11:41:20 |
| 22 | A.   So this would be a vague term.  I can only | 11:41:24 |
| 23 | guess what you might be hinting at, but I know that | 11:41:27 |
| 24 | there are other software and software groups writing | 11:41:32 |
| 25 | software that operate on an autonomous vehicle. | 11:41:37 |

Page 59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    What is a software that decides when to turn    11:41:39

2  and when to stop?  What is that called within Uber?    11:41:43

3    A.    If I'm not mistaken, I believe that is called    11:41:45

4  planning.    11:41:46

5    Q.    ███████████████████████████    ██████████

6  ██████████████████████████    11:41:51

7    MR. KIM:  Objection; form.    11:41:53

8    THE WITNESS:    ███████████████    ██████████

9  ███████████████████████████████████    ██████████

10  ███████████████████████    11:42:04

11  BY MR. JAFFE:    11:42:04

12    Q.    And you understand that the planning software    11:42:06

13  leverages LiDAR data; right?    11:42:09

14    MR. KIM:  Objection; form.    11:42:13

15    THE WITNESS:  I want to be specific and say I    11:42:16

16  don't know whether the planning software leverages    11:42:19

17  native LiDAR data or data that's output from the    11:42:24

18  perception software.  I just don't know.    11:42:28

19  BY MR. JAFFE:    11:42:28

20    Q.    Let's be clear, though.    11:42:29

21    The planning software leverages data that    11:42:32

22  came from the LiDAR?    11:42:34

23    A.    Yes.    11:42:34

24    Q.    You don't dispute that; right?    11:42:36

25    A.    No.    11:42:36

Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Okay. | 11:42:39 |
| 2 | MR. JAFFE:  Let's mark -- this will be 152. | 11:43:26 |
| 3 | THE REPORTER:  Correct. | 11:43:26 |
| 4 | It's the supplemental declaration, 152? | |
| 5 | MR. JAFFE:  Correct. | |
| 6 | THE REPORTER:  I think you need this one. | |
| 7 | (Plaintiff's Exhibit 152 was marked.) | 11:43:29 |
| 8 | BY MR. JAFFE: | 11:43:29 |
| 9 | Q.   Did I give you two copies? | 11:43:55 |
| 10 | A.   Yeah. | |
| 11 | Q.   Mr. Haslim, whose idea was it for you to | 11:44:05 |
| 12 | write this supplemental declaration? | 11:44:08 |
| 13 | MR. KIM:  Objection to the extent it calls for | 11:44:12 |
| 14 | privileged information. | 11:44:14 |
| 15 | Instruct you not to answer or | 11:44:18 |
| 16 | reveal -- answer to the extent it reveals any | 11:44:23 |
| 17 | privileged communications with any attorneys. | 11:44:27 |
| 18 | THE WITNESS:  So I would say the legal team | 11:44:33 |
| 19 | working for Uber instructed this. | 11:44:37 |
| 20 | BY MR. JAFFE: | |
| 21 | Q.   And I don't want to get into properly | 11:44:40 |
| 22 | privileged conversations.  All I want to ask is, in | 11:44:46 |
| 23 | terms of this document, 152, your declaration, was it | 11:44:49 |
| 24 | something where you said, I want to put in a new | 11:44:52 |
| 25 | declaration or someone approached you and said, we | 11:44:54 |

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | want a new declaration? | 11:44:56 |
| 2 | MR. KIM:  And, again, you can answer whether or | 11:44:59 |
| 3 | not it was done at the direction of counsel, but don't | 11:45:03 |
| 4 | reveal any privileged communications with counsel. | 11:45:07 |
| 5 | THE WITNESS:  Okay.  So this was generated at the | 11:45:11 |
| 6 | instruction of counsel. | 11:45:12 |
| 7 | BY MR. JAFFE: | 11:45:12 |
| 8 | Q.   Okay.  So we're clear, the lawyers -- and I | 11:45:17 |
| 9 | don't want to get into the substance of any | 11:45:18 |
| 10 | communications here, but just for the purposes of the | 11:45:21 |
| 11 | record, your supplemental declaration was put together | 11:45:26 |
| 12 | at the request of Uber's lawyers; fair? | 11:45:30 |
| 13 | A.   Yes. | 11:45:30 |
| 14 | Q.   Since our last deposition, have you discussed | 11:45:39 |
| 15 | any content of your declarations or the deposition | 11:45:42 |
| 16 | with any nonlawyers? | 11:45:50 |
| 17 | A.   I don't recall any substantive discussion | 11:45:53 |
| 18 | with nonlawyers. | 11:45:55 |
| 19 | Q.   Have you spoken with Mr. Levandowski about | 11:45:58 |
| 20 | the subject matter of this case? | 11:46:01 |
| 21 | A.   Not in any substantive way. | 11:46:06 |
| 22 | Q.   At all? | 11:46:07 |
| 23 | A.   It's probably -- yes. | 11:46:11 |
| 24 | Q.   What did you and Mr. Levandowski discuss? | 11:46:14 |
| 25 | MR. KIM:  And I want to caution you -- if you had | 11:46:17 |

Page 62

```
 1    any of these discussions in the presence of lawyers,      11:46:20

 2    would caution you not to reveal any privileged            11:46:22

 3    communications.                                           11:46:25

 4        THE WITNESS:  This jovial, high-level,                11:46:30

 5    nonsubstantive discussion -- "discussion" is almost a     11:46:35

 6    strong term.  How about, how are you doing, how are       11:46:39

 7    you feeling?                                              11:46:40

 8    BY MR. JAFFE:                                             11:46:40

 9        Q.   Please tell me everything that you remember      11:46:44

10    about the conversations that you had with                 11:46:46

11    Mr. Levandowski about the subject matter of this case?    11:46:50

12        A.   ████████████████████████████████    ██████

13    ████████████████████████████    ██████████    ██████

14    ████████    ████████████████████████████████    ██████

15    ██████    ████████████████████████████████    ██████

16      ████    ██████████████████████████████████    ██████

17    ████████                                                  11:47:15

18        MR. KIM:  Objection; form.                            11:47:17

19        THE WITNESS:  ██████                                  11:47:17

20    BY MR. JAFFE:                                             11:47:17

21        Q.   ██████████████████████            ██████████

22      ████    ████████████████████████████████    ██████████

23    ████████████████████████████████████████    ██████████

24    ████████                                          ██████████

25        Q.   Sorry.  Continue.                                11:47:30
```

Page 63



| 1 | A. | ▮▮▮▮▮▮▮▮▮▮ | ▮▮▮ |
| 2 | ▮▮▮▮▮▮▮▮▮▮▮ | | ▮▮▮ |
| 3 | ▮▮▮▮▮▮▮▮ ▮▮▮▮ | | ▮▮▮ |
| 4 | ▮▮ | | ▮▮▮ |
| 5 | Q. | Anything else? | 11:47:46 |
| 6 | A. | ▮▮▮▮▮▮▮▮▮ | ▮▮▮ |
| 7 | ▮▮▮▮▮▮▮▮▮▮ | | ▮▮▮ |
| 8 | ▮▮▮▮▮ | | 11:48:04 |
| 9 | ▮ ▮▮▮▮▮ | | ▮▮▮ |
| 10 | ▮ ▮▮▮ ▮▮ ▮▮ | | ▮▮▮ |
| 11 | ▮ ▮▮▮▮ | | ▮▮▮ |
| 12 | ▮ ▮▮▮▮▮▮ | | 11:48:13 |
| 13 | Q. | Anything else? | 11:48:15 |
| 14 | A. | No. | 11:48:15 |
| 15 | Q. | ▮▮▮▮▮▮ ▮▮ | 11:48:20 |
| 16 | ▮▮▮▮▮▮▮▮▮▮ | | 11:48:22 |
| 17 | ▮▮▮ | | 11:48:23 |
| 18 | ▮ ▮ | | 11:48:25 |
| 19 | Q. | Why not? | 11:48:26 |
| 20 | A. | I don't know. | 11:48:29 |
| 21 | Q. | You don't care? | 11:48:30 |
| 22 | A. | No. | 11:48:31 |
| 23 | ▮ ▮▮▮▮▮▮ | | 11:48:34 |
| 24 | ▮▮▮▮▮▮▮▮▮▮ | | 11:48:38 |
| 25 | ▮▮▮ | | 11:48:39 |

Page 64



```
 1                                                              
 2                                              11:48:44
 3                                              11:48:54
 4                                              11:48:57
 5                                              11:49:01
 6                                              11:49:04
 7                                              11:49:06
 8                                              
 9                                              11:49:16
10                                              
11                                              11:49:23
12                                              
13                                              
14                                              
15                                              
```

    16        Q.    You're aware that Mr. Levandowski, when asked    11:49:36

    17    whether these files were at Uber, pled the Fifth          11:49:41

    18    Amendment to avoid self-incrimination; right?             11:49:46

    19        MR. KIM:   Objection; form.                           11:49:47

    20        THE WITNESS:   I've read articles that said that,     11:49:48

    21    yes.                                                      11:49:49

    22    BY MR. JAFFE:                                             11:49:49

    23                                                              

    24                                                              

    25                                                              

                                                          Page 65

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. KIM:  Objection; form. | 11:50:00 |
| 2 | THE WITNESS:  I'm sorry. | 11:50:01 |
| 3 | BY MR. JAFFE: | 11:50:01 |
| 4 | Q.   You think it's a joke? | 11:50:02 |
| 5 | A.   I think it's impossible, in my opinion, that | 11:50:07 |
| 6 | those files would be at Uber. | 11:50:10 |
| 7 | Q.   How can you possibly know? | 11:50:14 |
| 8 | A.   I cannot know, but it strikes me as | 11:50:18 |
| 9 | ridiculous. | 11:50:19 |
| 10 | Q.   It strikes you as ridiculous? | 11:50:21 |
| 11 | A.   Yeah. | 11:50:21 |
| 12 | Q.   You think it's ridiculous that | 11:50:24 |
| 13 | Mr. Levandowski pleads his constitutional right to | 11:50:26 |
| 14 | avoid self-incrimination when asked where these files | |
| 15 | are and it's ridiculous for us to ask where they are; | 11:50:32 |
| 16 | that's what you think? | 11:50:34 |
| 17 | MR. KIM:  Objection; form. | 11:50:36 |
| 18 | THE WITNESS:  You're asking my personal opinion. | 11:50:38 |
| 19 | I think it's extremely unlikely to the point of | 11:50:43 |
| 20 | ridiculous that those files are on a computer somehow | 11:50:47 |
| 21 | at Uber after all of the forensics that were done on | 11:50:53 |
| 22 | Anthony's computer, as it was described to us, after | 11:50:58 |
| 23 | all the searching of all the hard drives that we can | 11:51:02 |
| 24 | come up with. | 11:51:03 |
| 25 | BY MR. JAFFE: | 11:51:03 |

Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 1  | Q.    You do know that no one has searched | 11:51:07 |
| 2  | Mr. Levandowski's personal computer; right? | 11:51:10 |
| 3  | MR. KIM:  Objection; form. | 11:51:10 |
| 4  | THE WITNESS:  I have read that in an article or | 11:51:12 |
| 5  | two. | 11:51:14 |
| 6  | BY MR. JAFFE: | 11:51:14 |
| 7  | Q.    And he's refusing to turn those over, again | 11:51:17 |
| 8  | based on his rights to avoid incriminating himself? | 11:51:23 |
| 9  | MR. KIM:  Objection; form. | 11:51:24 |
| 10 | THE WITNESS:  That's my understanding. | 11:51:25 |
| 11 | BY MR. JAFFE: | 11:51:25 |
| 12 | Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | ▮▮▮ |
| 13 | ▮▮▮ | 11:51:31 |
| 14 | MR. KIM:  Objection; form. | 11:51:31 |
| 15 | ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ | ▮▮▮ |
| 16 | ▮▮▮ ▮▮▮▮▮▮▮▮▮ | ▮▮▮ |
| 17 | ▮▮▮▮▮▮ | 11:51:40 |
| 18 | BY MR. JAFFE: | 11:51:40 |
| 19 | Q. ▮▮▮▮▮▮▮▮ | ▮▮▮ |
| 20 | ▮▮▮▮▮▮▮▮▮▮▮▮ | ▮▮▮ |
| 21 | ▮▮▮▮▮▮ | ▮▮▮ |
| 22 | MR. KIM:  Objection; form. | 11:51:50 |
| 23 | THE WITNESS:  Is that a question? | 11:51:51 |
| 24 | BY MR. JAFFE: | 11:51:51 |
| 25 | ▮▮ ▮▮▮▮▮▮ | 11:51:53 |

Page 67

| | | |
|---|---|---|
| 1 | MR. KIM:  Objection; form. | 11:51:54 |
| 2 | THE WITNESS:  ██ | 11:51:55 |
| 3 | BY MR. JAFFE: | 11:51:55 |
| 4 | Q.  Do you take intellectual property rights | 11:51:59 |
| 5 | seriously? | 11:52:01 |
| 6 | A.  Yes. | 11:52:01 |
| 7 | Q.  Do you think it's wrong for one company to | 11:52:03 |
| 8 | steal another company's intellectual property rights? | 11:52:07 |
| 9 | A.  Yes. | 11:52:07 |
| 10 | Q.  Do you think that's a joke? | 11:52:10 |
| 11 | A.  No. | 11:52:10 |
| 12 | Q.  Do you think that's something that should be | 11:52:12 |
| 13 | taken seriously? | 11:52:15 |
| 14 | A.  Yes. | 11:52:15 |
| 15 | Q. ████████████████████ | ████ |
| 16 | ████████████████████ | ████ |
| 17 | ████████████████ | ████ |
| 18 | MR. KIM:  Objection; form. | 11:52:35 |
| 19 | THE WITNESS:  No. | 11:52:36 |
| 20 | BY MR. JAFFE: | 11:52:36 |
| 21 | Q. ████████████████ | 11:52:40 |
| 22 | MR. KIM:  Same objection. | 11:52:42 |
| 23 | THE WITNESS:  ██████████ | ████ |
| 24 | ████████████████████ | ████ |
| 25 | ████ | ████ |

Page 68

```
 1    BY MR. JAFFE:                                    11:52:49

 2    ██  ████████████████████████████        ██████

 3    ██  ██████████████                       ██████

 4    ██  █████████████████████████████        ██████

 5    ██████████████████████████████████       11:53:02

 6         MR. KIM:  Objection; form.           11:53:05

 7         THE WITNESS:  I don't know.          11:53:06

 8    BY MR. JAFFE:                             11:53:06

 9         Q.   You don't know?                 11:53:07

10         A.   █████████████████████████       ██████

11    ████████████████████████                 ██████

12    ██  ████████████████████████             ██████

13    ██  ████████████████████████             ██████

14    ██  ██████████                           ██████

15    ██  ████████████████████████             ██████

16    ██████████████████                       11:53:28

17         Q.   Okay.  Turning back to your supplemental   11:53:38

18    declaration, which is 151.  Let's go to paragraph 13.  11:53:46

19              Actually, before we get there, start with  11:53:51

20    paragraph 7.                             11:53:53

21              Here you're talking about the fiber lasers in  11:54:00

22    the Spider design; right?                11:54:01

23         A.   Sorry.  152 or 151?            11:54:05

24         Q.   152.  Excuse me.               11:54:07

25         A.   Sorry.                         11:54:08
```

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | (Witness reviews document.) | 11:54:26 |
| 2 | A.   Repeat your question, please. | 11:54:27 |
| 3 | Q.   Paragraph 7 of your supplemental declaration, | 11:54:30 |
| 4 | Exhibit 152, is talking about the design of the fiber | 11:54:32 |
| 5 | laser in the Spider? | 11:54:36 |
| 6 | A.   Yes.  Yes. | 11:54:37 |
| 7 | Q.   You don't mention Mr. Levandowski's | 11:54:40 |
| 8 | involvement in paragraph 7, do you? | 11:54:43 |
| 9 | A.   No. | 11:54:43 |
| 10 | Q.   You don't mention that Mr. Levandowski | 11:54:45 |
| 11 | pointed you to ███████ right? | 11:54:52 |
| 12 | A.   No. | 11:54:52 |
| 13 | Q.   You don't mention his role in the design of | 11:54:55 |
| 14 | the laser at all in paragraph 7, do you? | 11:54:58 |
| 15 | A.   No. | 11:55:00 |
| 16 | Q.   All right.  Let's go to paragraph 13, talking | 11:55:13 |
| 17 | about Fuji again.  So here you're pointing -- you | 11:55:27 |
| 18 | excerpt a document that you say discusses beam spacing | 11:55:32 |
| 19 | and angles for the Fuji design; is that right? | 11:55:35 |
| 20 | A.   Yes. | 11:55:36 |
| 21 | Q.   And just looking at what's depicted here, | 11:55:41 |
| 22 | where is ██████████████████ mentioned? | 11:55:47 |
| 23 | A.   Neither ████████ are mentioned, nor ████████  ████████ | 11:55:47 |
| ██ | ████████████████████.  However, it can be implied | 11:56:00 |
| 25 | from ████████████ and it can be implied | 11:56:06 |

Page 70

```
 1   BY MR. JAFFE:                                            11:59:09

 2       Q.   And did you ever discuss the idea to use ███   ████████

         ████████████ with Mr. Levandowski?                  11:59:19

 4       A.   No, not that I recall.                          11:59:22

 5       Q.   So when you were presenting the pivot to        11:59:27

 6   Mr. Levandowski, it never came up how many transmit      11:59:30

 7   boards there would be?                                   11:59:31

 8       A.   No.                                             11:59:31

 9       Q.   He had no idea?                                 11:59:33

10       A.   He had no idea.                                 11:59:34

11       Q.   And you never discussed with Mr. Levandowski    11:59:40

12   the details of the Fuji design in terms of the number    11:59:43

13   of transmit boards; is that true?                        11:59:45

14       A.   I don't recall having any discussion like       11:59:48

15   that at all.                                             11:59:49

16       Q.   So you're saying you don't recall?  I just      11:59:53

17   want to be clear.                                        11:59:55

18       A.   Yes.                                            11:59:56

19       Q.   So I'll ask my question again.                  11:59:58

20            Have you ever discussed with Mr. Levandowski    12:00:01

21   the number of transmit boards in the Fuji design?        12:00:05

22       MR. KIM:  Objection; form.                           12:00:07

23       THE WITNESS:  I don't recall having any discussion   12:00:11

24   about the number of transmit boards.                     12:00:14

25   BY MR. JAFFE:                                            12:00:14
```

Page 73

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.    Are you aware of any conversations between      12:00:17

 2   Mr. Gruver or Mr. Pennecot and Mr. Levandowski            12:00:20

 3   regarding the number of transmit boards in the Fuji       12:00:24

 4   design?                                                   12:00:24

 5        MR. KIM:  Objection; form.                           12:00:26

 6        THE WITNESS:  I am not aware.                         12:00:28

 7   BY MR. JAFFE:                                             12:00:28

 8        Q.    So it's possible that they have discussed       12:00:29

 9   this issue with them, you wouldn't know that; right?      12:00:32

10        A.    I wouldn't know that.                           12:00:34

11        Q.    So you're not saying that Mr. Levandowski has  12:00:36

12   never had discussions or input into the idea to use       12:00:40

13   ████████████████████; right?                              12:00:43

14        MR. KIM:  Objection; form.                           12:00:46

15        THE WITNESS:  What I am saying is that Anthony        12:00:48

16   never had input into my decision with my electrical       12:00:55

17   engineer to put ████████████████████.                     12:01:00

18   BY MR. JAFFE:                                             12:01:00

19        Q.    Right.                                          12:01:00

20              But you talked about that decision with         12:01:02

21   Mr. Gruver, for example; right?                           12:01:03

22        A.    I think discussions with Gruver came later,    12:01:07

23   yeah.                                                     12:01:07

24        Q.    Or Mr. Pennecot, for example?                   12:01:10

25        A.    Mr. Pennecot was probably consulted in that    12:01:13
```

Page 74

| | | |
|---|---|---|
| 1 | process as well. | 12:01:14 |
| 2 | Q.   And you're not aware and you can't testify, | 12:01:16 |
| 3 | sitting here today, whether either of those two | 12:01:19 |
| 4 | gentleman discussed this idea with Mr. Levandowski; is | 12:01:23 |
| 5 | that right? | 12:01:24 |
| 6 | MR. KIM:  Objection; form. | 12:01:25 |
| 7 | THE WITNESS:  I couldn't say. | 12:01:25 |
| 8 | BY MR. JAFFE: | |
| 9 | Q.   So in your declaration or in anywhere, can't | 12:01:28 |
| 10 | say that Mr. Levandowski had no input into the number | 12:01:32 |
| 11 | of boards because you don't know all the conversations | 12:01:35 |
| 12 | that Mr. Levandowski had; fair? | 12:01:37 |
| 13 | MR. KIM:  Objection; form. | 12:01:37 |
| 14 | THE WITNESS:  No, I disagree with that. | 12:01:39 |
| 15 | BY MR. JAFFE: | 12:01:39 |
| 16 | Q.   Why? | 12:01:41 |
| 17 | A.   When you go so far as to say input into the | 12:01:44 |
| 18 | design, I don't see how some conversation with Anthony | 12:01:49 |
| 19 | could have influenced what I saw as a need to split | 12:01:53 |
| 20 | the lasers ███████████████████████    ████████ | |
| | ███  ████████. | 12:01:58 |
| 22 | Q.   So where did you get that idea from? | 12:02:01 |
| 23 | A.   I don't recall where the idea came from, but | 12:02:12 |
| 24 | it seemed like a requirement from the beginning. | 12:02:16 |
| 25 | Q.   What does that mean? | 12:02:17 |

Page 75

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1       A.    We knew that we were placing edge-emitting     12:02:22
 2   laser diodes on a flat PCB.                               12:02:26
 3       Q.    And that was the PCB that Mr. Pennecot          12:02:29
 4   designed; right?                                          12:02:29
 5       A.    Yes.                                            12:02:29
 6       Q.    And that's the board that eventually was sent   12:02:35
 7   to Gorilla in December?                                   12:02:38
 8       A.    That was one of the boards.                     12:02:40
 9             So when we knew we were placing these boards    12:02:48
10   flat onto a PCB, edge-emitting diodes, and we realized    12:02:53
11   they ███████████████████████████████  ████████
                                                    as        12:03:01
13   I recall, ███████████████████████████) ████████
         ██████████████████████████████ was obvious.          12:03:08
15       Q.    I see.                                          12:03:08
16             So you got the board design from Mr. Pennecot   12:03:13
17   and you knew you wanted 64 channels because you           12:03:17
18   were -- wanted to do something similar to what            12:03:21
19   Velodyne was doing and then derivative from that is       12:03:25
20   how you got to ███████████████?                           12:03:28
21       MR. KIM:  Objection; form.                            12:03:29
22       THE WITNESS:  That's taking it actually out of        12:03:32
23   sequence.                                                 12:03:33
24   BY MR. JAFFE:                                             12:03:33
25       Q.    Okay.  Can you put it in sequence, please.      12:03:36
```

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Yes. | 12:03:36 |
| 2 | We knew we needed a laser circuit, so I had | 12:03:40 |
| 3 | Florin design multiple laser circuits onto a board for | 12:03:45 |
| 4 | test and evaluation.  We picked one of those circuits | 12:03:48 |
| 5 | that we thought performed the best.  He began | 12:03:51 |
| 6 | considering the size of his circuit in one of those -- | 12:03:56 |
| 7 | I believe it was 10 different circuits.  The one we | 12:03:59 |
| 8 | chose, he could look at the design of it and tell me | 12:04:02 |
| 9 | the size. | 12:04:04 |
| 10 | So at this point, as I recall, Gaetan did not | 12:04:10 |
| 11 | have a laser board design in his CAD model.  He had a | 12:04:20 |
| 12 | lens design.  He may have had -- I even doubt he had | 12:04:26 |
| 13 | taken that into CAD yet. | 12:04:29 |
| 14 | Q.    So I'm a little bit confused. | 12:04:32 |
| 15 | Where did the idea to have ███████ come | 12:04:34 |
| 16 | from? | 12:04:35 |
| 17 | ██  ████████████████████  ███  ████ | |
| 18 | ████████████████████  The need to | 12:04:49 |
| 19 | ███████████████  developed quickly between | 12:04:56 |
| 20 | Florin and I looking at the size of the circuit, | 12:04:59 |
| 21 | knowing when Scott Boehmke defines a certain ██████  ████ | |
| ██ | ████████████, when Gaetan has | 12:05:08 |
| 23 | designed a lens that has a 150 millimeter focal | 12:05:13 |
| 24 | length, it becomes apparent that the ████████  ████ | |
| ██ | ████████████████████████ | 12:05:19 |

Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ████████████████████████████████████████   ██████████

 █   ████████████████████████                   12:05:24

 3        It was obvious to me that wasn't going to   12:05:26

 4   work and we would have to ████████████████   ██████████

 █   ███████   Later we went back and looked closer, and I   12:05:33

 6   realized, wait a minute, ████████████████████   ██████████

 █   ███████   So we can't put circuits on ████████   ██████████

 █   ████████████████████████████████████████   ██████████

 █   ██████████████████                          12:05:47

10        Furthermore, we were starting to look at   12:05:50

11   components on the receiver.  We saw components on the   12:05:53

12   receiver that were themselves ████████████.   12:05:58

13   Those were high voltage components.  They needed   12:06:00

14   additional space between them as well.  So it seemed   12:06:01

15   pretty clear at the time ████████████████ was not   12:06:05

16   going to work, so we said ████████████   Florin   12:06:09

17   thought he could ████████████████.   12:06:14

18        So that ended up with ████████████   ██████████

 █   ███████   We already had decided two cavities to make   12:06:20

20   64 channels, so that ended up with ████████████   12:06:24

21   in the sensor.                             12:06:25

22        Q.   Where are the documents that reflect the   12:06:27

23   discussions that you were just talking about?   12:06:31

24        A.   We did not document our discussions.   12:06:33

25        Q.   Okay.  So there are no -- there's no   12:06:35
```

                                            Page 78

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | documentary evidence to evidence -- to support what | 12:06:39 |
| 2 | you just said? | 12:06:40 |
| 3 | MR. KIM:  Objection; form. | 12:06:42 |
| 4 | BY MR. JAFFE: | 12:06:42 |
| 5 | Q.   Is that fair? | 12:06:42 |
| 6 | A.   Not quite. | 12:06:43 |
| 7 | We have documents showing and indicating to | 12:06:47 |
| 8 | us what the vertical angles were to be for the sensor | 12:06:52 |
| 9 | as specified by Scott Boehmke.  We have a lens design | 12:06:57 |
| 10 | that's documented from Gaetan.  We have the original | 12:07:03 |
| 11 | circuit Florin had developed for testing out lasers. | 12:07:10 |
| 12 | At that point, the documentation stopped. | 12:07:14 |
| 13 | And we don't have documents for discussions describing | 12:07:22 |
| 14 | how ███████████████████████████████ ███████ | |
| | ██ █████████████████████. | 12:07:27 |
| 16 | Q.   Okay.  So I just want to run through that | 12:07:30 |
| 17 | real quick. | 12:07:30 |
| 18 | So you're saying that you got the idea for | 12:07:34 |
| 19 | ██████████ based on three things.  One is the ██████ ████ | |
| | ██████ of the diodes that you wanted.  Two is the | 12:07:43 |
| 21 | ██████████████████.  And three is the ██████████ ██████ | |
| | ██ ███████████████████████. | 12:07:49 |
| 23 | Generally, is that fair? | 12:07:53 |
| 24 | A.   I'd like you to add a fourth, which is the | 12:07:56 |
| 25 | ████████████████████ and possibly a | 12:08:04 |

Page 79

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    ███████████████████████████   ██████
 ▮    ██████                                      12:08:10
 3         Q.   So that's part of the circuitry, though?   12:08:12
 4         A.   Yeah.
 5         Q.   So if we say number 3 is the ██████      ██████
 ▮    ██████      would that capture everything that you're   12:08:19
 7    talking about?                                 12:08:20
 8         A.   With the clarification that circuitry   12:08:22
 9    involves a channel, both receive and transmit, then I   12:08:26
10    can agree to that.                             12:08:27
11         Q.   Fair enough.                         12:08:28
12              So there were three, generally, things, now   12:08:29
13    that we've kind of established our terminology, that   12:08:33
14    you say --                                     12:08:36
15         A.   Sorry.  Did you include the focal length of   12:08:40
16    the lens Gaetan was designing?                 12:08:41
17         Q.   No.                                  12:08:41
18         A.   That's important.                    12:08:43
19         Q.   Okay.  So add that as number 4, focal length   12:08:48
20    of lens.  All right.                          12:08:51
21              So the ██████████   that you're talking   12:08:54
22    about -- the issue that you're talking about there is   12:08:58
23    that ████████████████████████   ██████
 ▮    ███████████████████████████   ██████
 ▮    ██████████  ; right?                           12:09:08
```

Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   I think you misspoke.  The resulting ████████  ████████

 █  ████████████████████████████████████████████████████  ████████

 █  ████████████████████████████████████████.              12:09:20

 4      Q.   I see.                                         12:09:21

 5           So the fact that you needed to have the        12:09:23

 6  ████████████████████████████████████████████  ████████

 █  ████████████████████████████████; is that basically    12:09:31

 8  it or am I messing it up again?                         12:09:34

 9      MR. KIM:  Objection; form.                          12:09:35

10      THE WITNESS:  It was the ██████████████████  ████████

██  ██████████████████████ --                              12:09:39

12  BY MR. JAFFE:

13      Q.   I see.                                         12:09:39

14      A.   -- that required them eventually to ██████  ████████

██  ████████████████████.                                  12:09:45

16      Q.   And the █████████████████████████████  ████████

██  ████████████████; is that right?                       12:09:49

18      A.   The ██████████████████████████        ████████

██  ██████████████████████████████████████████  ████████

██  █████████████████████████.                             12:09:59

21      Q.   And -- okay.  And the spacing, that's what     12:10:08

22  Mr. Boehmke -- continue to mispronounce his name        12:10:14

23  probably correctly -- he provided to you in November    12:10:16

24  of 2016?                                                12:10:17

25      A.   Yes, he provided the angular spacing, if I     12:10:20
```

Page 81

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | may. | 12:10:21 |
| 2 | Q.   Okay.  We'll get to that a little bit later. | 12:10:25 |
| 3 | Mr. Boehmke didn't provide you how many | 12:10:29 |
| 4 | boards to use; right? | 12:10:30 |
| 5 | A.   Right. | 12:10:30 |
| 6 | Q.   And then the FAC lens, that was provided by | 12:10:35 |
| 7 | Mr. Pennecot; right? | 12:10:36 |
| 8 | A.   That is my understanding. | 12:10:39 |
| 9 | Q.   He came up with the FAC lens design; right? | 12:10:42 |
| 10 | A.   That's my understanding. | 12:10:44 |
| 11 | Q.   And it's a ▮▮▮▮▮▮▮▮ FAC lens; right? | 12:10:47 |
| 12 | MR. KIM:  Objection; form. | 12:10:48 |
| 13 | THE WITNESS:  It's ▮▮▮▮▮▮▮▮. | 12:10:51 |
| 14 | BY MR. JAFFE: | 12:10:51 |
| 15 | Q.   That's larger than -- sorry. | 12:10:53 |
| 16 | A.   It's ▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮ | |
| | ▮ ▮▮▮▮▮▮▮▮▮▮▮ | 12:10:59 |
| 18 | Q.   Do you know how large the FAC lenses are for | 12:11:03 |
| 19 | Velodyne's devices? | 12:11:05 |
| 20 | ▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮ | |
| 21 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮ | |
| 22 | ▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮ | |
| 23 | Q.   Do you know how large it is? | |
| 24 | A.   Are you asking diameter or are you asking | |
| 25 | length? | |

Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   To compare it to ███████. | 12:11:17 |
| 2 | A.   To compare it to ████████████ | |
| ▉ | ███████████ | 12:11:24 |
| 4 | Q.   And so that lens design came from | 12:11:30 |
| 5 | Mr. Pennecot and the circuitry came from Florin; is | 12:11:33 |
| 6 | that right? | 12:11:34 |
| 7 | A.   Yes. | 12:11:34 |
| 8 | Q.   So none of those folks came up with ████ | |
| ▉ | ████████████████████; right? | 12:11:45 |
| 10 | MR. KIM:  Objection; form. | 12:11:47 |
| 11 | THE WITNESS:  They were certainly involved in the | 12:11:49 |
| 12 | decision to go to ██████████ because I | 12:11:53 |
| 13 | had to consult with them in terms of what would be | 12:11:56 |
| 14 | possible for circuit spacing, in the case of Florin. | 12:12:00 |
| 15 | And to make sure that Gaetan's group lens can handle | 12:12:06 |
| 16 | the ██████████████. | 12:12:09 |
| 17 | BY MR. JAFFE: | |
| 18 | Q.   And just to go back to your declaration here, | 12:12:12 |
| 19 | this diagram that you're showing in Figure 6 in | 12:12:16 |
| 20 | paragraph 13, there's no discussion in here of ████ | |
| ▉ | ████████████; right? | 12:12:22 |
| 22 | A.   There's no discussion of ██████████ | |
| ▉ | ██████ in Figure 6.  Although if you understand Figure | 12:12:31 |
| 24 | 6, it could be easily derived. | 12:12:36 |
| 25 | Q.   That wasn't my question. | 12:12:36 |

Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So just going back to what we were talking | 12:23:09 |
| 2 | about earlier, you're saying that Mr. Boehmke provided | 12:23:12 |
| 3 | you the custom beam spacing and you imported that data | 12:23:17 |
| 4 | into Zemax to determine the resultant emitting points | 12:23:23 |
| 5 | of the laser diodes, and those you just picked as a | 12:23:28 |
| 6 | first matter, █████████████████████████████ | 12:23:32 |
| 7 | MR. KIM:  Objection; form. | 12:23:36 |
| 8 | THE WITNESS:  We didn't pick it as first matter. | 12:23:38 |
| 9 | We discussed this already, that I would have loved to | 12:23:41 |
| 10 | ████████████████████ and we found we couldn't do | 12:23:45 |
| 11 | that.  ████████████████.  We decided we had | 12:23:45 |
| 12 | to ███████████████████████████████  ████████ | 12:23:58 |
| █ | ████████████████████  That decision went | |
| 14 | into the first -- earliest CAD designs of the optical | 12:24:04 |
| 15 | cavity for Fuji. | 12:24:06 |
| 16 | BY MR. JAFFE: | 12:24:06 |
| 17 | Q.   So you didn't do any sort of other Zemax | 12:24:08 |
| 18 | simulations of other board and diode arrangements? | 12:24:14 |
| 19 | A.   I'm not aware.  I don't recall doing any CAD | 12:24:19 |
| 20 | designs for other board arrangements. | 12:24:23 |
| 21 | Q.   So by November 4th, 2016, you and your team | 12:24:29 |
| 22 | had already arrived at ████████████████████  ████████ | 12:24:29 |
| █ | ████████████████████; is that right? | 12:24:35 |
| 24 | A.   It's possible that that was by November 4th. | 12:24:40 |
| 25 | It's also possible that it was shortly after the 4th. | 12:24:44 |

Page 90

```
 1       Q.    So you -- sorry.                          12:24:46

 2       A.    There's a potential for a time lag from   12:24:50

 3   Scott's prescribed beam angles and when we actually 12:24:55

 4   did the determination of six total boards and got   12:24:59

 5   those into a CAD model.                             12:25:01

 6       Q.    And you only started the Fuji project at the 12:25:03

 7   end of October; right?                              12:25:05

 8       A.    Yes.

 9       Q.    So you came up with the ████████   ████   12:25:14

██       ████████ design in a week, approximately?       12:25:14

11       MR. KIM:  Objection; form.                      12:25:16

12       THE WITNESS:  I don't know if it was exactly a  12:25:17

13   week.  Or could have been more than a week, but it was 12:25:20

14   something on the order of a week.                   12:25:22

15   BY MR. JAFFE:                                       12:25:22

16       Q.    About a week?                             12:25:24

17       A.    Within some small multiple of one week.  One 12:25:30

18   week, two weeks, three weeks possible, yes, on a very 12:25:34

19   short time scale.                                   12:25:36

20       Q.    And you didn't -- after receiving these beam 12:25:41

21   spacings from Mr. Boehmke, you didn't even consider 12:25:44

22   other designs other than ████████████   ████████    12:25:51

██       ████████; right?                                12:25:51

24       A.    That feels a little out of sequence.  So I 12:25:59

25   believe we got the angles from Scott for our sensor. 12:26:05
```

Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | The decision for how many boards to place them on | 12:26:08 |
| 2 | would have to occur after we knew what those angles | 12:26:12 |
| 3 | were. | 12:26:13 |
| 4 | Q.   So you got the custom beam spacing from | 12:26:32 |
| 5 | Mr. Boehmke; and then one to three weeks later, you | 12:26:37 |
| 6 | knew you were doing ████████████████ ███████ | 12:26:43 |
| | █ ██████ | 12:26:43 |
| 8 | A.   Yes. | 12:26:43 |
| 9 | Q.   And at that time, in between receiving | 12:26:46 |
| 10 | Mr. Boehmke's custom beam spacing, you didn't | 12:26:50 |
| 11 | consider -- even consider any other designs other than | 12:26:52 |
| 12 | ████████████████████████████████; | 12:26:57 |
| 13 | right? | 12:26:57 |
| 14 | A.   No.   When Scott gave us the prescribed | 12:27:02 |
| 15 | angles, we had to first consider ████████████ ██████ | 12:27:07 |
| | █ ██████   And that was the process we've already | 12:27:07 |
| 17 | discussed to arrive at ███████, but that's after | 12:27:11 |
| 18 | Scott originally told us what the angles would be. | 12:27:14 |
| 19 | Q.   But I'm confused. | 12:27:15 |
| 20 | Because when we were talking earlier about | 12:27:17 |
| 21 | after you received the data, you said you only | 12:27:19 |
| 22 | provided one summary into Zemax and that was ███ ██████ | 12:27:24 |
| | █ ████████████. | 12:27:24 |
| 24 | A.   Yes. | 12:27:24 |
| 25 | Q.   So you didn't even -- when you were looking | 12:27:27 |

Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Google?                                           12:29:47

 2        A.   No.                                      12:29:47

 3        Q.   You didn't have any understanding?       12:29:49

 4        A.   No.                                      12:29:49

 5             Shall we go back to our list in terms of  12:29:56

 6    elements that are important?                       12:29:57

 7        Q.   Let me see if I can short-circuit this.   12:30:00

 8             My understanding is you're saying they were  12:30:02

 9    all required, so one isn't more important than the  12:30:06

10    other; is that fair?                               12:30:07

11        A.   That's fair.                              12:30:08

12        Q.   So then we don't need to go through them.  12:30:11

13             Let's turn to page 17 of your declaration.  12:30:14

14        A.   Page or paragraph?                        12:30:17

15        Q.   Excuse me.  Paragraph 17.                 12:30:21

16        A.   Okay.                                     12:30:21

17        Q.   It's on page 11.                          12:30:23

18        A.   Thank you.                                12:30:24

19        Q.   And I'm in your supplemental declaration,  12:30:28

20    which is 152.                                      12:30:30

21        MR. KIM:  What paragraph?                      12:30:34

22        MR. JAFFE:  17.  It's the long paragraph, so it's  12:30:38

23    page 11 if you're looking for it.                  12:30:40

24    BY MR. JAFFE:                                      12:30:40

25        Q.   So there are two things labeled here, Figure  12:30:45
```

Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | 8A and 8B. | 12:30:48 |
| 2 | Do you see that? | 12:30:49 |
| 3 | A.   Yes. | 12:30:49 |
| 4 | Q.   So just for clarification here, the letters | 12:30:55 |
| 5 | that are on there, those are letters that you added | 12:30:58 |
| 6 | for purposes of your declaration; right? | 12:30:59 |
| 7 | A.   Yes, those were added for this declaration. | 12:31:04 |
| 8 | Q.   In the document as it was created in November | 12:31:06 |
| 9 | 2016, it did not have these letters on it; right? | 12:31:09 |
| 10 | A.   Right. | 12:31:09 |
| 11 | Q.   So this is a modified version for your | 12:31:12 |
| 12 | declaration? | 12:31:13 |
| 13 | A.   Yes. | 12:31:14 |
| 14 | Q.   And if we go to the November 2016 data that | 12:31:22 |
| 15 | you were looking at that formed the basis of this, it | 12:31:28 |
| 16 | did not include these letterings; right? | 12:31:29 |
| 17 | A.   Right. | 12:31:29 |
| 18 | Q.   So in November 2016, there was no -- | 12:31:36 |
| 19 | Mr. Boehmke did not provide the distribution of these | 12:31:40 |
| 20 | beams onto particular boards; right? | 12:31:43 |
| 21 | A.   Right. | 12:31:43 |
| 22 | Q.   So the November 2016 data from Mr. Boehmke, | 12:31:55 |
| 23 | that did not provide any information as to how these | 12:31:59 |
| 24 | beams would be distributed ██████████████      ████████ | |
| | ██   ████████████████████; right? | 12:32:04 |

Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    It provided no prescription for that | 12:32:07 |
| 2 | distribution. | 12:32:09 |
| 3 | Q.    Let's go to the next page here at the end of | 12:32:17 |
| 4 | paragraph 17. | 12:32:18 |
| 5 | So this chart here at the end of paragraph | 12:32:22 |
| 6 | 17, again, this is something you generated for your | 12:32:26 |
| 7 | declaration; right? | 12:32:26 |
| 8 | A.    Yes. | 12:32:27 |
| 9 | Q.    This isn't some document that you're just | 12:32:31 |
| 10 | showing?  This is something that you generated for | 12:32:33 |
| 11 | this case? | 12:32:34 |
| 12 | A.    Um-hum.  That's right. | 12:32:35 |
| 13 | Q.    Now, what is being shown here in this table? | 12:32:40 |
| 14 | A.    So this table is showing the vertical beam | 12:32:46 |
| 15 | angles in a November 16th document from Scott Boehmke | 12:32:51 |
| 16 | in this first white column.  The next column labeled | 12:32:57 |
| 17 | "Current" contains the angles that we actually used. | 12:33:03 |
| 18 | And the green shows the discrepancy between them. | 12:33:07 |
| 19 | Q.    Okay.  And again the ▮▮▮▮▮▮▮▮▮▮      ▮▮▮▮ | |
| ▮ | ▮▮▮▮▮▮▮, that's all information that you added | 12:33:20 |
| 21 | later? | 12:33:21 |
| 22 | A.    Added later for clarity, yes. | 12:33:22 |
| 23 | Q.    That's not information that came from the | 12:33:24 |
| 24 | November 16th document provided by Mr. Boehmke; right? | 12:33:27 |
| 25 | A.    Right. | 12:33:27 |

Page 97

| | | |
|---|---|---|
| 1 | Q.   So no one should be confused as to whether | 12:33:30 |
| 2 | this data is originally from November 2016 in terms of | 12:33:35 |
| 3 | the ▮▮▮▮▮▮; right? | 12:33:37 |
| 4 | A.   Nobody should be confused that the ▮▮▮▮▮▮ | 12:33:41 |
| 5 | had come from Scott, because it did not. | 12:33:43 |
| 6 | Q.   Right.  You added it in here for purposes of | 12:33:45 |
| 7 | your declaration? | 12:33:46 |
| 8 | A.   Yeah. | 12:33:46 |
| 9 | Q.   All right.  So you've mentioned -- I want to | 12:33:50 |
| 10 | just clarify a little bit of terminology here.  What's | 12:33:55 |
| 11 | shown here at the end of paragraph 17 is talking about | 12:34:00 |
| 12 | angles; right? | 12:34:01 |
| 13 | A.   Right. | 12:34:01 |
| 14 | Q.   And what angle are we talking about? | 12:34:04 |
| 15 | A.   We're talking about the vertical angle | 12:34:08 |
| 16 | reference to a horizontal plane measured in degrees | 12:34:12 |
| 17 | such that positive numbers are above horizontal, | 12:34:18 |
| 18 | negative numbers are below horizontal. | 12:34:20 |
| 19 | Q.   Okay.  Are you familiar with the concept of | 12:34:23 |
| 20 | beam spacing? | 12:34:24 |
| 21 | A.   Perhaps you could clarify. | 12:34:26 |
| 22 | Q.   Let's go back to the prior page.  And to page | 12:34:35 |
| 23 | 10.  The heading, do you see it says "Beam spacing in | 12:34:41 |
| 24 | Fuji"? | 12:34:41 |
| 25 | A.   Um-hum. | 12:34:42 |

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    "Beam spacing," what do you mean?                      12:34:44

2    A.    So beam spacing can be used to refer to the           12:34:49

3    ██████████████████████████████████████████        ████████

     ████████████████████; Since it refers to ████████  ████████

     ██████████████████████████████████████████████████ ████████

     ██████████████████████████████.                             12:35:10

7    Q.    When you are saying ████████ -- what you're            12:35:12

8    saying -- when you're talking about ███████████████  ████████

     ████████████████████████████████████████████       ████████

     ████████████████████████████████; is that fair?            12:35:20

11   A.    That's fair.                                          12:35:20

12   Q.    Just to be clear, again, when -- we're going         12:35:24

13   back to the end of paragraph 17.  You are not talking      12:35:27

14   about █████████████████████████████████████████     ████████

     ████████  right?                                           12:35:33

16   MR. KIM:  Objection; form.                                 12:35:36

17   THE WITNESS:  This does not refer to the absolute          12:35:38

18   positions of the diodes.  I'm referring to the end of      12:35:40

19   paragraph 17.  The figure refers to the angular            12:35:44

20   prescribed angles.                                         12:35:47

21   BY MR. JAFFE:                                              12:35:47

22   Q.    So I want to introduce a new term here.              12:35:50

23         You're familiar -- when we have the diodes,          12:35:53

24   one way that they're represented, they're position is     12:35:56

25   X and Y; right?                                            12:35:58

Page 99

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Right. | 12:35:58 |
| 2 | Q.   And I want to refer to the difference between | 12:36:02 |
| 3 | two diodes on the Y axis as vertical spacing. | 12:36:07 |
| 4 | Do you understand what I'm referring to? | 12:36:08 |
| 5 | A.   Yes. | 12:36:08 |
| 6 | Q.   What you're talking about here in paragraph | 12:36:10 |
| 7 | 17 does not show the differences in the vertical | 12:36:12 |
| 8 | spacing between the diodes; right? | 12:36:16 |
| 9 | MR. KIM:  Objection; form. | 12:36:17 |
| 10 | THE WITNESS:  Agreed, paragraph 16 does not refer | 12:36:20 |
| 11 | to vertical -- | 12:36:22 |
| 12 | BY MR. JAFFE: | 12:36:22 |
| 13 | Q.   17. | 12:36:22 |
| 14 | A.   Sorry.  In paragraph 17, we are not referring | 12:36:26 |
| 15 | to -- | |
| 16 | MR. KIM:  Same objection. | 12:36:28 |
| 17 | THE WITNESS:  -- the vertical dimension on a laser | 12:36:30 |
| 18 | board. | 12:36:31 |
| 19 | BY MR. JAFFE: | |
| 20 | Q.   So the ████████████████████, that's | 12:36:35 |
| 21 | here at the end of 17, that's not referring to the | 12:36:36 |
| 22 | ██████████████████████████████████████ | 12:36:39 |
| 23 | in Fuji; right? | 12:36:40 |
| 24 | MR. KIM:  Objection; form. | 12:36:42 |
| 25 | THE WITNESS:  That's right. | 12:36:43 |

Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      MR. KIM:  We've been going over an hour.  Can we      12:37:24

2   break for lunch?                                         12:37:26

3      MR. JAFFE:  Yes, we can break.                        12:37:28

4      THE VIDEOGRAPHER:  We are off the record at 12:37     12:37:30

5   p.m.                                                     12:37:30

6           (Lunch recess was taken at 12:37 p.m.)          12:37:30

7           (Nothing omitted or deleted.  See next page).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 101

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      AFTERNOON SESSION                        1:38 P.M.

 2                         - - -

 3          THE VIDEOGRAPHER:  We are back on the record at    13:38:23

 4      1:38 p.m.                                              13:38:24

 5                    EXAMINATION RESUMED                      13:38:24

 6      BY MR. JAFFE:                                          13:38:24

 7          Q.   Welcome back.                                 13:38:28

 8          A.   Thank you.                                    13:38:28

 9          Q.   I want to turn to your original declaration.  13:38:31

10      I think it's 151.  And in particular, in paragraph 20, 13:38:39

11      you state, "There are approximately ▮▮ employees       13:38:41

12      currently working on the Fuji project."                13:38:44

13              Is that right?                                 13:38:45

14          A.   Yes, I see it.                                13:38:48

15          Q.   How many employees are working at Uber on     13:38:54

16      LiDAR-related responsibilities?                        13:38:56

17          MR. KIM:  Objection; form.                         13:39:02

18          THE WITNESS:  There would be approximately ▮        13:39:03

19      employees at Uber working on LiDAR responsibilities    13:39:06

20      that I'm aware of.                                     13:39:10

21      BY MR. JAFFE:                                          13:39:10

22          Q.   Your understanding is that there are only ▮   13:39:12

23      employees at Uber with LiDAR-related responsibilities; 13:39:16

24      is that right?                                         13:39:17

25          MR. KIM:  Objection; form.                         13:39:19
```

Page 102

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  When I came up with the number, I | 13:39:22 |
| 2 | wanted to pick ones -- employees that had primary | 13:39:26 |
| 3 | responsibilities on LiDAR. | 13:39:29 |
| 4 | BY MR. JAFFE: | 13:39:29 |
| 5 | Q.   So let me ask my question again then. | 13:39:32 |
| 6 | What is the number of employees at Uber that | 13:39:37 |
| 7 | have LiDAR-related responsibilities or projects? | 13:39:43 |
| 8 | MR. KIM:  Objection; form. | 13:39:43 |
| 9 | THE WITNESS:  I don't know off the top of my head | 13:39:46 |
| 10 | how many more employees have minor LiDAR | 13:39:48 |
| 11 | responsibilities. | 13:39:50 |
| 12 | BY MR. JAFFE: | 13:39:50 |
| 13 | Q.   So when you're talking about this number of | 13:39:52 |
| 14 | employees here, you're not talking about the number of | 13:39:54 |
| 15 | employees working on LiDAR entirely at Uber; right? | 13:39:59 |
| 16 | MR. KIM:  Objection; form. | 13:40:02 |
| 17 | THE WITNESS:  Correct.  I believe there may be a | 13:40:07 |
| 18 | few more employees that also have some minor | 13:40:11 |
| 19 | responsibility for LiDAR activities. | 13:40:15 |
| 20 | BY MR. JAFFE: | 13:40:15 |
| 21 | Q.   What LiDAR technology are they working on? | 13:40:18 |
| 22 | A.   They're not working on LiDAR technology. | 13:40:21 |
| 23 | They're working on perhaps sourcing components, just | 13:40:26 |
| 24 | general supply chain people. | 13:40:28 |
| 25 | Q.   Okay.  Are there any other LiDAR projects | 13:40:32 |

Page 103

| | | |
|---|---|---|
| 1 | within Uber other than the Fuji project? | 13:40:35 |
| 2 | A.   No, there's not. | 13:40:37 |
| 3 | Q.   You're not working on building LiDARs with | 13:40:40 |
| 4 | third-party companies? | 13:40:42 |
| 5 | MR. KIM:  Objection; form. | 13:40:44 |
| 6 | THE WITNESS:  I'm not working on LiDAR projects | 13:40:48 |
| 7 | with third-party companies. | 13:40:50 |
| 8 | BY MR. JAFFE: | 13:40:50 |
| 9 | Q.   Right.  So let me ask my question a little | 13:40:53 |
| 10 | bit differently. | 13:40:53 |
| 11 | Is Uber working on designing LiDARs with | 13:40:58 |
| 12 | third-party companies? | 13:40:59 |
| 13 | MR. KIM:  Objection; form. | 13:41:00 |
| 14 | THE WITNESS:  I think Scott Boehmke is working | 13:41:05 |
| 15 | with some third-party LiDAR suppliers. | 13:41:09 |
| 16 | BY MR. JAFFE: | 13:41:09 |
| 17 | Q.   Who's he working with? | 13:41:12 |
| 18 | A.   I am aware of ███████ | 13:41:13 |
| 19 | Q.   Um-hum. | |
| 20 | A.   There's ██████.  There is -- and I'll say | 13:41:31 |
| 21 | this confidential information.  There's ████████ | 13:41:35 |
| 22 | I'm not aware of any others at this point. | 13:41:40 |
| 23 | MR. KIM:  At this point I'll just designate the | 13:41:42 |
| 24 | transcript attorneys' eyes only. | 13:41:46 |
| 25 | MR. JAFFE:  What number are we at? | 13:41:48 |

Page 104

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE REPORTER:  153. | 13:41:50 |
| 2 | MR. JAFFE:  Okay.  So this is going to be 153. | 13:41:53 |
| 3 | (Plaintiff's Exhibit 153 was marked.) | 13:42:07 |
| 4 | BY MR. JAFFE: | |
| 5 | Q.   So I'll just tell you for the record, this | 13:42:09 |
| 6 | was a document that Uber's lawyers prepared and | 13:42:13 |
| 7 | submitted to the court.  That's where we got this | 13:42:17 |
| 8 | from. | 13:42:18 |
| 9 | A.   Um-hum. | 13:42:19 |
| 10 | Q.   Now, you were talking earlier about ▮ folks | 13:42:23 |
| 11 | working on the Fuji project and that that's the only | 13:42:26 |
| 12 | LiDAR project.  If you look at Section 2 here -- and | 13:42:29 |
| 13 | you can see my handwriting on this copy.  Actually, I | 13:42:33 |
| 14 | hope my math is right, but on the bottom, on the | 13:42:36 |
| 15 | second page, I totaled it up.  And I counted about ▮ | 13:42:40 |
| 16 | employees here that said that they have LiDAR-related | 13:42:43 |
| 17 | responsibilities or projects. | 13:42:45 |
| 18 | A.   Okay. | 13:42:46 |
| 19 | Q.   What are those other folks doing? | 13:42:48 |
| 20 | A.   I don't know what all these other people are | 13:42:56 |
| 21 | doing.  So, for instance -- shall we just go down the | 13:43:06 |
| 22 | list? | 13:43:06 |
| 23 | Q.   Well, let me ask generally. | 13:43:09 |
| 24 | If they're not working on Fuji, but they're | 13:43:11 |
| 25 | working on LiDAR, what are they working on? | 13:43:15 |

Page 105

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   If they're not working on Fuji . . . so let's | 13:43:20 |
| 2 | take -- I don't know if Phillip Haban, I don't know | 13:43:26 |
| 3 | what he's working on.  I don't know Jacob Fischer.  I | 13:43:31 |
| 4 | don't know what he's working on.  Robert Doll, | 13:43:34 |
| 5 | he's -- I know he's an employee for the Pittsburgh | 13:43:40 |
| 6 | team.  He's related to the hardware group or some | 13:43:47 |
| 7 | manufacturing aspect of that, but I don't know what | 13:43:50 |
| 8 | he's working on. | 13:43:52 |
| 9 | Sean Chin, I don't know who that is.  Not | 13:44:07 |
| 10 | sure who Jay Kuvelker is and what he's working on. | 13:44:13 |
| 11 | Anthony Levandowski, he's a manager.  I don't know how | 13:44:19 |
| 12 | he's working on Fuji or what he's working on.  I would | 13:44:23 |
| 13 | say he's not working on Fuji, but we already | 13:44:27 |
| 14 | established that. | 13:44:28 |
| 15 | Q.   Actually, why don't we pause there for a | 13:44:30 |
| 16 | second. | 13:44:30 |
| 17 | For the ▮ employees in your declaration, | 13:44:32 |
| 18 | does that include Mr. Levandowski? | 13:44:34 |
| 19 | A.   No. | 13:44:34 |
| 20 | Q.   So if he has LiDAR-related responsibilities | 13:44:37 |
| 21 | or projects here in Section 2 of this document, you | 13:44:42 |
| 22 | don't know what those are; is that fair? | 13:44:44 |
| 23 | A.   I would say so. | 13:44:45 |
| 24 | And if I can be more clear about the ▮ | 13:44:53 |
| 25 | employees currently working on the Fuji project, I do | 13:44:56 |

Page 106

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 1 | mean people working directly on the Fuji project.  I | 13:45:00 |
| 2 | did not include people who were some levels of | 13:45:03 |
| 3 | management up who had some sort of dotted line or | 13:45:06 |
| 4 | eventual path of ownership or responsibility.  I was | 13:45:12 |
| 5 | coming up with ███ as people that I felt I could | 13:45:14 |
| 6 | solidly say would be adversely affected if the Fuji | 13:45:19 |
| 7 | project ended. | 13:45:21 |
| 8 | So there's still a lot of names on here.  For | 13:45:29 |
| 9 | instance, take Ana Rayo, she's in a supply chain | 13:45:32 |
| 10 | group.  She's responsible, I think, for some aspects | 13:45:36 |
| 11 | of receiving material.  I would not have counted her | 13:45:39 |
| 12 | as primarily working on Fuji. | 13:45:41 |
| 13 | Q.   Let me actually just stop you and ask a | 13:45:44 |
| 14 | different question, which is, how many of these people | 13:45:47 |
| 15 | you don't know what they're doing in terms of LiDAR | 13:45:51 |
| 16 | work.  Can you just provide me a count? | 13:45:54 |
| 17 | A.   Yep. | 13:45:55 |
| 18 | Q.   And, actually, why don't we do this, I'm | 13:46:01 |
| 19 | going to hand you a pen.  And why don't you just mark | 13:46:04 |
| 20 | the people that you don't know what they're doing with | 13:46:06 |
| 21 | LiDAR. | 13:46:07 |
| 22 | A.   With LiDAR in general.  Okay. | 13:46:09 |
| 23 | Q.   Well, let me state it this way:  You don't | 13:46:11 |
| 24 | know why they're on this list of "Defendants' | 13:46:15 |
| 25 | Officers, Directors, and Employees with LiDAR-Related | 13:46:17 |

Page 107

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Responsibilities Or Projects"? | 13:46:18 |
| 2 | A.   Okay.  I will mark those. | 13:46:20 |
| 3 | (Witness complies.) | 13:46:20 |
| 4 | Okay.  So these -- I've marked -- | 13:48:19 |
| 5 | Q.   Can I have my pen back. | 13:48:21 |
| 6 | A.   Sorry. | 13:48:21 |
| 7 | I've marked those for whom I don't know what | 13:48:24 |
| 8 | they're working on. | 13:48:25 |
| 9 | Q.   Can you just tell me how many you've marked? | 13:48:28 |
| 10 | A.   Sorry. | 13:48:29 |
| 11 | Thirteen. | 13:48:40 |
| 12 | Q.   So those are 13 employees that Uber's lawyers | 13:48:40 |
| 13 | said had LiDAR-related responsibilities or projects | 13:48:43 |
| 14 | and they don't work on the Fuji, but you don't know | 13:48:46 |
| 15 | what they work on? | 13:48:47 |
| 16 | A.   That's correct, to my knowledge. | 13:48:50 |
| 17 | Q.   And then you mentioned that Uber was working | 13:48:52 |
| 18 | with some suppliers, third parties, on LiDAR and you | 13:48:56 |
| 19 | mentioned ██████████████████    And then what else? | 13:49:00 |
| 20 | A.   ████████ | 13:49:01 |
| 21 | Q.   ████████ | 13:49:02 |
| 22 | Anyone else? | 13:49:05 |
| 23 | A.   Perhaps, yeah.  ████████  I don't think I'm | 13:49:28 |
| 24 | aware of any other development activities. | 13:49:32 |
| 25 | Q.   So let's look at Section 3 here.  You see it | 13:49:37 |

Page 108

| | | |
|---|---|---|
| 1 | says, "List of defendant suppliers and consultants who | 13:49:40 |
| 2 | have LiDAR-related responsibilities or projects"? | 13:49:42 |
| 3 | A.   Okay. | 13:49:43 |
| 4 | Q.   Is ███████ listed here? | 13:49:59 |
| 5 | A.   Nope. | 13:49:59 |
| 6 | Q.   So ███████ is a LiDAR supplier that's not | 13:50:03 |
| 7 | listed on this list of defendant suppliers? | 13:50:07 |
| 8 | MR. KIM:  Objection; form. | 13:50:10 |
| 9 | THE WITNESS:  Yes. | 13:50:11 |
| 10 | BY MR. JAFFE: | 13:50:11 |
| 11 | Q.   What about ██████; is that on here? | 13:50:15 |
| 12 | A.   Nope. | 13:50:22 |
| 13 | Q.   Okay.  And what about ████████ is that on | 13:50:29 |
| 14 | here? | 13:50:29 |
| 15 | A.   Nope. | 13:50:34 |
| 16 | Q.   And then I think ███████actually is on here; | 13:50:38 |
| 17 | right? | 13:50:38 |
| 18 | A.   Yes. | 13:50:41 |
| 19 | Q.   And what are you guys doing with ██████? | 13:50:45 |
| 20 | A.   I believe -- I believe we're buying some demo | 13:50:51 |
| 21 | units or some early evaluation units. | 13:50:54 |
| 22 | Q.   You're working with them on designing a | 13:50:58 |
| 23 | custom LiDAR; right? | 13:50:59 |
| 24 | A.   They're developing a new LiDAR.  I don't know | 13:51:02 |
| 25 | that it's custom for us or just -- I don't know that | 13:51:05 |

Page 109

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    detail.

 2        Q.   Are you providing them any Uber confidential    13:51:09

 3    information.

 4        A.   I'm not aware of that happening, no.            13:51:12

 5        Q.   So there is no Uber confidential information    13:51:16

 6    that is going from Uber to ████████; is that true?       13:51:21

 7        A.   I'm not aware of any.                           13:51:23

 8        MR. JAFFE:  Let's mark -- where is that thing?       13:51:31

 9    This one?  No.  It's this one.  This is going to be      13:51:45

10    Exhibit . . .                                            13:51:48

11        THE REPORTER:  154.                                  13:51:50

12        MR. JAFFE:  -- 154.                                  13:51:50

13            Thank you.                                       13:51:52

14            (Plaintiff's Exhibit 154 was marked.)           13:52:13

15    BY MR. JAFFE:

16        Q.   So I've marked as Exhibit 159 [sic] a          13:52:15

17    document that's heavily redacted.  But I just want to    13:52:17

18    ask --

19        MR. KIM:  159?                                       13:52:21

20        MR. JAFFE:  Yeah, Exhibit 159.                       13:52:24

21        MR. KIM:  154.                                       13:52:25

22        MR. JAFFE:  Oh, my handwriting is off.              13:52:27

23    BY MR. JAFFE:                                            13:52:27

24        Q.   154 is a document that's heavily redacted.     13:52:31

25            Is this an e-mail exchange with ██████          13:52:36
```

Page 110

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   If it is, I'm not aware. | 13:52:43 |
| 2 | Q.   You can't tell because of the redaction; | 13:52:44 |
| 3 | right? | 13:52:45 |
| 4 | A.   I'm also looking at the names.  The name | 13:52:50 |
| 5 | addresses.  And I can't say it's an exchange with | 13:52:54 |
| 6 | ██████ because I see only Uber or Uber ATC employees. | 13:52:59 |
| 7 | Q.   Right. | 13:52:59 |
| 8 | But if you look on the earlier e-mails, the | 13:53:05 |
| 9 | other e-mails are redacted. | 13:53:06 |
| 10 | A.   Oh, okay.  All right. | 13:53:10 |
| 11 | Q.   So, for example, if you go to the page 12132. | 13:53:17 |
| 12 | Do you see that? | |
| 13 | A.   12132, yes. | 13:53:20 |
| 14 | Q.   "Hey, Anthony, been trying to reach you a | 13:53:23 |
| 15 | while via text." | 13:53:24 |
| 16 | A.   Okay. | 13:53:25 |
| 17 | Q.   You were cc'd on this; right? | 13:53:27 |
| 18 | A.   Yes. | 13:53:27 |
| 19 | Q.   What is this e-mail about? | 13:53:29 |
| 20 | (Witness reviews document.) | 13:54:11 |
| 21 | A.   I'm not 100 percent sure.  Yeah, I'm not sure | 13:54:28 |
| 22 | who [sic] this is about. | 13:54:30 |
| 23 | Q.   It's hard to tell with the redactions, huh? | 13:54:34 |
| 24 | A.   It is. | 13:54:35 |
| 25 | Q.   Yeah, I agree with you. | 13:54:37 |

Page 111

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yeah, I don't recall. | 13:54:47 |
| 2 | Q.   And so just turning to the first page, | 13:54:49 |
| 3 | there's an e-mail from Mr. Levandowski, and you're on | 13:54:52 |
| 4 | the cc line. | 13:54:53 |
| 5 | A.   Yeah. | 13:54:53 |
| 6 | Q.   The entire e-mail is redacted. | 13:54:58 |
| 7 | What is Mr. Levandowski talking about in this | 13:55:01 |
| 8 | e-mail? | 13:55:02 |
| 9 | A.   I don't recall. | 13:55:03 |
| 10 | Q.   You don't recall this e-mail at all? | 13:55:05 |
| 11 | A.   I don't recall this e-mail. | 13:55:06 |
| 12 | Q.   So it's possible that Mr. -- who knows what | 13:55:08 |
| 13 | Mr. Levandowski would be talking about? | 13:55:10 |
| 14 | A.   Who knows. | 13:55:11 |
| 15 | Q.   Okay.  Put that aside. | 13:55:13 |
| 16 | A.   Okay. | 13:55:14 |
| 17 | Q.   Let's go back to your opening declaration, | 13:55:31 |
| 18 | which is Exhibit 151.  And if you can look at | 13:55:41 |
| 19 | paragraph 15, please. | 13:55:45 |
| 20 | Do you see that you refer to an Exhibit B | 13:55:58 |
| 21 | here? | 13:56:00 |
| 22 | A.   Yes. | 13:56:01 |
| 23 | Q.   And what are you saying that Exhibit B is? | 13:56:05 |
| 24 | A.   Exhibit B is a file that lays out the X,Y and | 13:56:28 |
| 25 | rotation coordinates for each of the laser diodes on | 13:56:35 |

Page 112

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | ▓▓▓▓▓▓▓▓▓ while the final dimensions it would | 13:56:40 |
| 2 | be used for fiducial-based diode placement is not yet | 13:56:53 |
| 3 | defined for ▓▓▓▓▓▓▓. | 13:56:56 |
| 4 | MR. JAFFE:  Let's mark as Exhibit 155 a document | 13:57:01 |
| 5 | entitled, "Exhibit B." | 13:57:03 |
| 6 | BY MR. JAFFE: | |
| 7 | Q.   It looks like you have it. | 13:57:06 |
| 8 | A.   Yes. | 13:57:06 |
| 9 | Q.   Did you bring your declaration with you? | 13:57:08 |
| 10 | A.   Yeah. | 13:57:09 |
| 11 | Q.   Why don't we look at your copy then, but | 13:57:11 |
| 12 | we'll just mark this for the record so we have a | 13:57:14 |
| 13 | complete record. | 13:57:15 |
| 14 | MR. JAFFE:  Just for the record, I'm marking | 13:57:19 |
| 15 | Exhibit B as 155.  And Mr. Haslim is looking at his | 13:57:24 |
| 16 | own copy. | 13:57:25 |
| 17 | (Plaintiff's Exhibit 155 was marked.) | 13:57:26 |
| 18 | BY MR. JAFFE: | 13:57:26 |
| 19 | Q.   So on the top right-hand side, there's a | 13:57:32 |
| 20 | little picture of a transmit board; right? | 13:57:33 |
| 21 | A.   Right. | 13:57:33 |
| 22 | Q.   And that's an image of one of the Fuji | 13:57:37 |
| 23 | transmit boards; correct? | 13:57:38 |
| 24 | A.   Correct. | 13:57:38 |
| 25 | Q.   And the table below, that includes some X,Y | 13:57:44 |

Page 113

```
 1   and theta values for each of the diodes on the        13:57:50

 2   transmit board depicted there?                         13:57:53

 3        A.   Yes.                                          13:57:53

 4        Q.   So what does ███████████ refer to in this    13:57:58

 5   chart?                                                 13:57:59

 6        A.   In this chart, the term ██████████ labels    13:58:06

 7   ████████████████████████████████████████  ████████

 █   ████████████████████████████████████████  ████████

 █   ████████████████████████████████████.                 13:58:21

10        Q.   And why are you providing ████████████       ████████

 █   ████████████████████████████████████?                 13:58:27

12        A.   I believe the person who made this file      13:58:34

13   provided ████████████████████████████████  ████████

 █   ████████████████████████████████ -- that's the        13:58:44

15   wrong term -- so that ████████████████████  ████████

 █   ████████████████████████████████████████  ████████

 █   ████████████████████████████████████████  ████████

 █   ████████████████████████████████████████  ████████

 █   ████████  And these dimensions never left the          13:59:06

20   document.                                              13:59:07

21        Q.   "These dimensions never left the document,"  13:59:11

22   what do you mean?                                      13:59:12

23        A.   The dimensions labeled ██████████ remain in  13:59:15

24   this document even as new information is being added   13:59:19

25   ████████████████████████████████████████.             13:59:23
```

Page 114

```
 1      Q.    So the X and Y data here shows --  ████████   ████████

██      ████████████████████████████████████████████████   ████████

██      ██████:  right?                                        13:59:35

 4      A.    Yes.                                              13:59:36

 5      Q.    So the X and Y data for ██████████  shows         13:59:39

 6      ████████████████████████████████████████████   ████████

██      ████████████████████████████████████████████████   ████████

██      ██████████████████████████████:  right?                13:59:48

 9      A.    Right.                                            13:59:56

10      Q.    Okay.  And you said the person who created        13:59:56

11      this document.                                          13:59:57

12            Who are you referring to?                         13:59:59

13      A.    This document would have been created by          14:00:03

14      Gaetan Pennecot.                                        14:00:05

15      Q.    And why would Mr. Pennecot include ████████   ████████

██      ██████████████  in this document?                       14:00:13

17      A.    Gaetan did the original ████████████   ████████

██      ████████████████████████████████████████████   ████████

██      ████████████████████████.  And he was responsible       14:00:27

20      for ████████████████████████████████████████   ████████

██      ██████████████████████████████.  This information would  14:00:36

22      then have been given to our electrical engineer, who    14:00:38

23      did ██████████████████████  for this.                   14:00:40

24      Q.    So that doesn't answer my question.               14:00:43

25            Why is ██████████████████████████████             14:00:45

                                                        Page 115
```

```
 1    ███████████████████████  ██████████████████
 ■    ████████████████                                    14:00:49
 3         A.    I'm sorry.  I don't think I was clear before.  14:00:53
 4               When Gaetan designed the outline of this    14:00:56
 5    board and specified ██████████████████████  ███████
 ■    ████████████████████████████████████  ███████
 ■    █████████████████████████  █████████████████  ███████
 ■    ███████████████████████  ████████████████  ███████
 ■    ████████████████████████████████████  ███████
 ■    ███████████████████████████████████████        14:01:17
11         Q.    So the original idea was ████████████  ███████
 ■    ████████████████?                                    14:01:22
13         A.    No.                                        14:01:22
14         Q.    So then let me ask my question again then.  14:01:25
15               What is the point of including ███████  ███████
 ■    ███████████  -- in this chart?                       14:01:30
17         A.    This information could have been provided to  14:01:36
18    the electrical engineer so that ████████████  ███████
 ■    █████████████████████████████████████.              14:01:43
20    And if he hasn't ████████████████████████  ███████
 ■    ████████████████████████████████████  ███████
 ■    █████████████  █████████████████████            14:01:55
23         Q.    Why do you think he did that?              14:01:57
24         A.    He needs to ████████████████  that's as   14:02:00
25    good as -- better than an outline of a board which is  14:02:03
```

Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   These are six decimal places. | 14:06:06 |
| 2 | Q.   Is that pretty accurate? | 14:06:08 |
| 3 | A.   It's an unnecessary number of decimals.   This | 14:06:10 |
| 4 | goes to nanometers. | 14:06:13 |
| 5 | Q.   Yeah.   So this is talking about aligning the | 14:06:16 |
| 6 | diodes to the nanometer; is that fair? | 14:06:18 |
| 7 | A.   No. | 14:06:18 |
| 8 | Q.   No?   I thought you said it goes to | 14:06:21 |
| 9 | nanometers. | 14:06:22 |
| 10 | A.   It goes to nanometers, but I don't think | 14:06:24 |
| 11 | anybody was under the impression that we're actually | 14:06:25 |
| 12 | in a postion to get something to a nanometer scale. | 14:06:26 |
| 13 | Q.   But that's what this document is listing? | 14:06:28 |
| 14 | A.   This document lists the ideal dimension, yes, | 14:06:32 |
| 15 | down to the nanometer. | 14:06:34 |
| 16 | Q.   Got it. | 14:06:35 |
| 17 | We talked about X. | 14:06:38 |
| 18 | Y, that talks about the millimeters | 14:06:41 |
| 19 | difference from the fiducial to A1 on the -- in the | 14:06:48 |
| 20 | vertical axis; right? | 14:06:50 |
| 21 | A.   Right. | 14:06:50 |
| 22 | Q.   ███████████████████████ | 14:06:56 |
| 23 | ████████████████████████████ | 14:07:03 |
| 24 | MR. KIM:   Objection; form. | 14:07:06 |
| 25 | THE WITNESS:   ████████████ | 14:07:09 |

Page 120

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 ████████████████████████████████████████████

██ ████████████████████████████████████████████████

██ ████████████████████████████████████████████████

██ ████████████████████████████████████████████████

██ █████████████████████████████████████████████████

██ ████████████████████████████████████████████████

██ ██████████████████████                    14:07:36

8  BY MR. JAFFE:

9     Q.   The theta column here, what does that tell   14:07:42

10 us?                                                   14:07:42

11    A.   That tells us, relative to some zero angle on  14:07:50

12 this board, which we can presume is either vertical or  14:07:55

13 horizontal, the ideal placement angle for the laser   14:08:00

14 diode on the board.                                   14:08:02

15    Q.   We're just talking about A again, Board A.    14:08:11

16         Which is the ███████████████████████████████

██ ████████████████████████?                  14:08:22

18    A.   As the light is projected out past the       14:08:26

19 sensor, the ██████████████████████.          14:08:32

20    Q.   All right.  Am I correct then that ██████████████

██ ████████████████████████████████?          14:08:44

22    A.   Yes, that's correct.                         14:08:45

23    Q.   Okay.  So is it fair to say that █████████████████

██ ██████████████████████████████████████████████

██ ██████████████████?                        14:09:01

                                            Page 121

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    In this coordinate system, that's true. | 14:09:04 |
| 2 | Q.    Referring to Board A, the diodes go from -- | 14:09:15 |
| 3 | ███████████████████████████████████████ | |
| 4 | ███████████████████████████████ | 14:09:23 |
| 5 | A.    Yes. | 14:09:23 |
| 6 | Q.    Okay. | 14:09:27 |
| 7 | MR. JAFFE:  So what I'd like to do is mark as a | 14:09:36 |
| 8 | new exhibit Exhibit 156. | 14:09:41 |
| 9 | (Plaintiff's Exhibit 156 was marked.) | 14:10:07 |
| 10 | BY MR. JAFFE: | |
| 11 | Q.    I'm going to hand you a calculator as well. | 14:10:10 |
| 12 | A.    Okay. | 14:10:11 |
| 13 | Q.    So what we have here is a reproduction, if we | 14:10:17 |
| 14 | cut and paste correctly, which I think that we did, of | 14:10:21 |
| 15 | the data that's here for Board A in Exhibit B to your | 14:10:27 |
| 16 | declaration.  And you can see on the right that I've | 14:10:33 |
| 17 | left open something called delta Y. | 14:10:36 |
| 18 | A.    Yes. | 14:10:37 |
| 19 | Q.    Do you see that? | 14:10:38 |
| 20 | A.    Yes. | 14:10:38 |
| 21 | Q.    And do you understand what I'm trying to | 14:10:41 |
| 22 | refer to here by "delta Y"? | 14:10:43 |
| 23 | A.    Yes.  I'll go ahead and identify what I | 14:10:46 |
| 24 | believe you intend by "delta Y." | 14:10:48 |
| 25 | Q.    But before you do, I will tell you exactly | 14:10:50 |

Page 122

| | | |
|---|---|---|
| 1 | starting one, so that can be blank.  And you can start | 14:12:07 |
| 2 | from the next one. | |
| 3 | A.    Perfect.  So I will calculate these. | 14:12:11 |
| 4 | (Witness performs calculations.) | 14:12:11 |
| 5 | A.    Okay. | 14:16:45 |
| 6 | Q.    Thank you.  You're handing this to me for me | 14:16:48 |
| 7 | to look at.  All right.  I'm going to hand it back to | 14:16:59 |
| 8 | you. | 14:16:59 |
| 9 | Exhibit 156 now reflects you've penciled in | 14:17:03 |
| 10 | the delta Y here. | 14:17:07 |
| 11 | In looking at this completed table, would you | 14:17:13 |
| 12 | agree that the delta Y values ███████████████████████ | |
| ██ | █████████████████████████████████████████ | 14:17:24 |
| 14 | MR. KIM:  Objection; form. | 14:17:24 |
| 15 | THE WITNESS:  Yes, I would agree that the delta Y | 14:17:31 |
| 16 | values ██████████████████████████████ ███████ | |
| ██ | ██████████████████████████████████████ ███████ | |
| ██ | ████████ | 14:17:41 |
| 19 | BY MR. JAFFE: | 14:17:41 |
| 20 | Q.    Okay.  In other words, ████████████████████ | |
| ██ | ████████████████████████████████████████████████ | |
| ██ | ███████████████? | 14:17:52 |
| 23 | MR. KIM:  Objection; form. | 14:17:55 |
| 24 | THE WITNESS:  It's true, the delta Y, ████████████ | |
| ██ | █████████████████████████████████████ | 14:18:01 |

Page 124

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1   ████████████████████████████████  --

 2        THE REPORTER:  I'm sorry, I'm sorry.  It's

 3   true . . .

 4        THE WITNESS:  ████████████████████████████

 5   ████████████████████████████████████████████████

 6   ████████████████████████████████████████████████

 7   █████████████████████████████████        14:18:24

 8   BY MR. JAFFE:                            14:18:24

 9        Q.   And as we talked about before, as the  14:18:30

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ███████████████████████  right?         14:18:41

13        MR. KIM:  Objection; form.          14:18:43

14        THE WITNESS:  Yes, we agreed -- I agree that the  14:18:46

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ██████████████████████████████          14:19:01

18   BY MR. JAFFE:                            14:19:01

19        Q.   So referring to this ██████████, you  14:19:05

20   would agree that ████████████████████████████████

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████████

23   ██████████████████████████████████

24   ██████████████████████  ?                14:19:20

25        MR. KIM:  Objection; form.          14:19:25
```

Page 125

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          THE WITNESS:  Yes.                       14:19:25

 2     BY MR. JAFFE:

 3          Q.   Okay.  You can put that aside, please.  14:19:30

 4               We talked about Max Levandowski earlier.  You  14:19:36

 5     said he was on your team.                     14:19:38

 6          A.   Yes.                                14:19:40

 7          Q.   What does he do?                    14:19:41

 8          A.   He's a mechanical engineer.  He designs the  14:19:47

 9     optical cavity that the lenses and the lasers and  14:19:52

10     detector boards attach to.                    14:19:55

11          Q.   Is what is his LiDAR experience?    14:19:58

12          A.   I am not aware of any LiDAR experience prior  14:20:01

13     to working for Otto and Uber.                 14:20:04

14          Q.   Did he know a lot about LiDAR when he  14:20:07

15     started?                                      14:20:07

16          MR. KIM:  Objection; form.               14:20:08

17          THE WITNESS:  I don't know.              14:20:09

18     BY MR. JAFFE:                                 14:20:09

19          Q.   He works for you; right?            14:20:10

20          A.   He works for me.  He worked for Otto before I  14:20:14

21     joined.                                       14:20:15

22          Q.   When you joined, did he -- was he   14:20:18

23     sufficiently educated about how LiDAR works?  14:20:21

24          MR. KIM:  Objection; form.               14:20:22

25          THE WITNESS:  He seemed sufficiently educated as a  14:20:26
```

Page 126

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | mechanical engineer. | 14:20:27 |
| 2 | BY MR. JAFFE: | 14:20:27 |
| 3 | Q.   So that wasn't really my question. | 14:20:29 |
| 4 | A.   Yes. | 14:20:30 |
| 5 | Q.   So -- | 14:20:31 |
| 6 | A.   I didn't quiz him on his LiDAR expertise, but | 14:20:35 |
| 7 | at the same time, I'll grant you that I was not aware | 14:20:38 |
| 8 | of any LiDAR expertise in his background prior to | 14:20:42 |
| 9 | Otto. | 14:20:43 |
| 10 | Q.   Why -- well, actually, let me back up. | 14:20:58 |
| 11 | Do you know if Max Levandowski and Anthony | 14:21:01 |
| 12 | Levandowski are -- they're brothers; right? | 14:21:04 |
| 13 | A.   That's my understanding. | 14:21:05 |
| 14 | Q.   Do you know if they're close? | 14:21:07 |
| 15 | MR. KIM:  Objection; form. | 14:21:08 |
| 16 | THE WITNESS:  I don't know how close they are. | 14:21:12 |
| 17 | BY MR. JAFFE: | 14:21:12 |
| 18 | Q.   Do you know about any conversations that they | 14:21:13 |
| 19 | had regarding LiDAR? | |
| 20 | MR. KIM:  Same objection. | 14:21:14 |
| 21 | THE WITNESS:  No. | 14:21:15 |
| 22 | BY MR. JAFFE: | 14:21:15 |
| 23 | Q.   And what does Max Levandowski -- excuse me -- | 14:21:17 |
| 24 | do at Otto today? | 14:21:23 |
| 25 | A.   At Uber today? | 14:21:25 |

Page 127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   (Nods head affirmatively.) | 14:21:25 |
| 2 | A.   He continues to be the mechanical engineer | 14:21:29 |
| 3 | responsible for designing the optical cavity that | 14:21:32 |
| 4 | mounts the lenses, the laser transmit block and the | 14:21:36 |
| 5 | receiver boards. | 14:21:37 |
| 6 | Q.   Did he come up with the optical cavity design | 14:21:41 |
| 7 | for Fuji? | 14:21:42 |
| 8 | A.   In as much as that responsibility refers | 14:21:50 |
| 9 | to -- | 14:21:50 |
| 10 | MR. KIM:  Objection; form. | 14:21:53 |
| 11 | THE REPORTER:  I'm sorry. | 14:21:53 |
| 12 | THE WITNESS:  Inasmuch as that responsibility | 14:21:55 |
| 13 | refers to designing a mechanical housing, yes.  He | 14:22:01 |
| 14 | designed that for Fuji. | 14:22:02 |
| 15 | BY MR. JAFFE: | 14:22:02 |
| 16 | Q.   Who came up with the optical cavity design | 14:22:05 |
| 17 | for Fuji? | 14:22:06 |
| 18 | MR. KIM:  Objection; form. | 14:22:11 |
| 19 | THE WITNESS:  The optical cavity design for Fuji | 14:22:14 |
| 20 | is related to the lens and the lens requirements.  So | 14:22:19 |
| 21 | Gaetan plays a responsibility for that.  As a | 14:22:23 |
| 22 | mechanical element in terms of mounting and housing | 14:22:27 |
| 23 | those features, those components, Max Levandowski is | 14:22:29 |
| 24 | responsible for that aspect. | 14:22:31 |
| 25 | BY MR. JAFFE: | 14:22:31 |

Page 128

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    So it's Mr. Pennecot and Mr. Max Levandowski    14:22:34

2    who came up with the optical cavity design for Fuji;    14:22:39

3    is that fair?    14:22:40

4        MR. KIM:  Objection; form.    14:22:40

5        THE WITNESS:  My hesitancy is I'm trying to decide    14:22:51

6    in my mind whether the transmit and receive components    14:22:54

7    also play a part -- are considered part of the optical    14:23:00

8    cavity.  I think they fairly should be considered part    14:23:00

9    of the optical cavity.

10        So then I also add Will Treichler, Florin    14:23:05

11   Ignatescu contributing to the design of the    14:23:09

12   optical cavity for the Fuji, or coming up with it.    14:23:13

13   I would claim some responsibility as well because    14:23:22

14   I'm looking at the designs that these engineers    14:23:25

15   are generating.  I could have contributed some    14:23:28

16   aspect as well.    14:23:30

17   BY MR. JAFFE:    14:23:30

18       Q.    You could have or you did?    14:23:31

19       A.    I'm sure I had some influence, yes.    14:23:35

20       Q.    Going back to Max Levandowski, do you    14:23:43

21   know -- he and Anthony, do they live together?    14:23:46

22       A.    I don't know.    14:23:48

23       Q.    Do you know how much time they spend together    14:23:52

24   outside of the office?    14:23:53

25       A.    I don't know that.    14:23:54

Page 129

| | | |
|---|---|---|
| 1 | and Otto were already talking at this time? | 14:37:43 |
| 2 | A.   Yes.   Then this would be indicative of their | 14:37:48 |
| 3 | discussion. | 14:37:48 |
| 4 | Q.   Okay.   So going back to page 10. | 14:37:53 |
| 5 | A.   Yes. | 14:37:54 |
| 6 | Q.   Do you see there's a section entitled, ▮▮▮ | 14:38:03 |
| 7 | ▮▮ | 14:38:04 |
| 8 | A.   Yes. | 14:38:06 |
| 9 | ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | 14:38:09 |
| 10 | A.   No, I'm not familiar with this page. | 14:38:11 |
| 11 | Q.   So you're -- well, you said you're not | 14:38:15 |
| 12 | familiar with this page.   I'm referring -- | 14:38:16 |
| 13 | Are you familiar with ▮▮▮▮▮ ▮▮▮▮ | |
| 14 | ▮▮▮▮▮▮▮▮▮ | 14:38:22 |
| 15 | A.   So I was not aware of this design, especially | 14:38:41 |
| 16 | with this date.   No, I'm not familiar with this | 14:38:45 |
| 17 | design, actually. | 14:38:46 |
| 18 | Q.   Do you know what the ▮▮▮▮▮' referred to | 14:38:48 |
| 19 | here refers to? | 14:38:49 |
| 20 | A.   To my knowledge, the term ▮▮▮▮ has | 14:38:55 |
| 21 | been applied to be synonymous, more or less, with an | 14:38:59 |
| 22 | optical cavity. | 14:39:00 |
| 23 | Q.   Do you know whether Mr. Levandowski had any | 14:39:06 |
| 24 | input into this ▮▮▮▮ | 14:39:09 |
| 25 | A.   I don't know. | 14:39:09 |

Page 140

| | | |
|---|---|---|
| 1 | Q.   In this concept here, you would agree that | 14:39:18 |
| 2 | the PCBs are arranged along a straight-edge board? | 14:39:25 |
| 3 | MR. KIM:  Objection; form. | 14:39:26 |
| 4 | THE WITNESS:  No, that's -- this appears to be a | 14:39:29 |
| 5 | schematic, and it doesn't tell me anything about the | 14:39:32 |
| 6 | plan view of the board. | 14:39:34 |
| 7 | BY MR. JAFFE: | 14:39:34 |
| 8 | Q.   Would you agree that the -- what apparently | 14:39:41 |
| 9 | are the emitters are &#9608;&#9608;&#9608;&#9608;&#9608; | 14:39:44 |
| 10 | MR. KIM:  Objection; form. | 14:39:48 |
| 11 | THE WITNESS:  Let me see. | 14:39:49 |
| 12 | (Witness reviews document.) | |
| 13 | THE WITNESS:  It's not clear if they are &#9608;&#9608;&#9608; | |
| 14 | &#9608;&#9608;.   They look &#9608;&#9608;&#9608;&#9608; from what's | 14:39:59 |
| 15 | clearly a simple type of PowerPoint graphic, but it's | 14:40:06 |
| 16 | not clear if they say one degree native if they could | 14:40:10 |
| 17 | actually achieve &#9608;&#9608;&#9608;&#9608; | |
| 18 | &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;. | 14:40:17 |
| 19 | BY MR. JAFFE: | |
| 20 | Q.   The last bullet says, &#9608;&#9608;&#9608;&#9608; &#9608;&#9608;&#9608; | |
| 21 | &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;." | 14:40:23 |
| 22 | Do you see that? | 14:40:24 |
| 23 | A.   I see that. | 14:40:24 |
| 24 | Q.   What does &#9608;&#9608;&#9608;&#9608; refer to there? | 14:40:27 |
| 25 | MR. KIM:  Objection; form. | 14:40:28 |

Page 141

```
 1        THE WITNESS:  I can't be sure what was meant      14:40:31
 2   exactly; but given what I know, I would assume this    14:40:35
 3   has to do with effective                        .      14:40:40
 4   BY MR. JAFFE:                                          14:40:40
 5        Q.   We're talking about the Y delta again?       14:40:43
 6        MR. KIM:  Objection; form.                        14:40:43
 7        THE WITNESS:  Not necessarily.                    14:40:45
 8   BY MR. JAFFE:                                          14:40:45
 9        Q.   You said, "Not necessarily."                 14:40:47
10             What do you mean by that?                    14:40:48
11        A.   My guess would have been angular spacing.    14:40:52
12        Q.   In the top part of this page, it talks about 14:41:06
13                                                          14:41:11
14                                                          14:41:12
15        A.   I see that.                                  14:41:14
16        Q.   That's the                     right?        14:41:17
17        A.   Yes.                                         14:41:19
18        Q.                                                14:41:24
19   this is different than the Fuji design; right?         14:41:27
20        MR. KIM:  Objection; form.                        14:41:32
21        THE WITNESS:  There's not a lot of detail in here; 14:41:35
22   but it's not the Fuji design yet, that's for sure.     14:41:39
23   BY MR. JAFFE:                                          14:41:39
24        Q.   And you helped start the Fuji project, and   14:41:41
25   you're not familiar with this Plan B at all; right?    14:41:44
```

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      A.   Right.                                    14:41:44

2      Q.   So to your knowledge, what's described here   14:41:48

3  as Plan B isn't the basis for the Fuji design?    14:41:52

4      MR. KIM:  Objection; form.                     14:41:55

5      THE WITNESS:  I am not aware of a link between  14:41:59

6  this Plan B in this document and the Fuji design.  14:42:04

7  BY MR. JAFFE:                                      14:42:04

8      Q.   And you would be in a position to know;   14:42:08

9  right?                                             14:42:09

10     MR. KIM:  Objection; form.                     14:42:11

11     THE WITNESS:  I would have to make that        14:42:13

12 presumption.  And it's just a presumption.         14:42:15

13 BY MR. JAFFE:                                      14:42:15

14     Q.   In your job, you would be in a position to 14:42:18

15 know that; right?                                  14:42:18

16     MR. KIM:  Objection; form.                     14:42:25

17     THE WITNESS:  I would expect to know that.     14:42:26

18     MR. JAFFE:  Let's take a break.                14:42:32

19     THE VIDEOGRAPHER:  We are off the record at 2:42 14:42:36

20 p.m.                                               14:42:36

21          (Recess taken.)                           14:42:36

22     THE VIDEOGRAPHER:  We are back on the record at 14:55:55

23 2:56 p.m.                                          14:55:57

24 BY MR. JAFFE:                                      14:55:57

25     Q.   Have you discussed the subject matter of your 14:56:03
```

Page 143

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | testimony during any of the breaks today? | 14:56:05 |
| 2 | A.   Nothing in terms of like what we said in this | 14:56:10 |
| 3 | testimony. | 14:56:11 |
| 4 | Q.   What does that mean? | 14:56:13 |
| 5 | A.   That means the legal team may have advised me | 14:56:19 |
| 6 | on procedural matters, general terms without | 14:56:23 |
| 7 | referencing the actual content of our discussion. | 14:56:26 |
| 8 | Q.   What did they tell you? | 14:56:27 |
| 9 | MR. KIM:  Objection. | 14:56:27 |
| 10 | Going to instruct you not to answer on the | 14:56:31 |
| 11 | grounds of attorney-client privilege. | 14:56:33 |
| 12 | BY MR. JAFFE: | 14:56:33 |
| 13 | Q.   Did your legal team tell you how to testify | 14:56:36 |
| 14 | after these meetings? | 14:56:37 |
| 15 | MR. KIM:  You can answer that yes or no. | 14:56:39 |
| 16 | THE WITNESS:  Could you be clear by what you mean | 14:56:41 |
| 17 | by "how to testify"? | 14:56:42 |
| 18 | BY MR. JAFFE: | |
| 19 | Q.   I don't think I can be any clearer. | 14:56:46 |
| 20 | A.   Like what to say? | 14:56:47 |
| 21 | Q.   I'm trying to understand what the legal team | 14:56:51 |
| 22 | told you in terms of general terms, procedural | 14:56:55 |
| 23 | matters, which is what you said. | 14:56:57 |
| 24 | What did they tell you? | 14:56:58 |
| 25 | MR. KIM:  Instruct you not to reveal any | 14:57:00 |

Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | privileged conversations. | 14:57:11 |
| 2 | THE WITNESS:  Are you instructing me not to | 14:57:13 |
| 3 | answer? | 14:57:14 |
| 4 | MR. KIM:  You can answer his prior question yes or | 14:57:17 |
| 5 | no. | 14:57:17 |
| 6 | THE WITNESS:  If your question is, did they tell | 14:57:24 |
| 7 | me what to say, no.  Did they tell me how to testify, | 14:57:28 |
| 8 | no. | 14:57:29 |
| 9 | BY MR. JAFFE: | 14:57:29 |
| 10 | Q.   When you said that they told you things about | 14:57:31 |
| 11 | general things and procedural considerations, what | 14:57:34 |
| 12 | general things did they tell you? | 14:57:37 |
| 13 | MR. KIM:  I'm going to instruct you not to answer | 14:57:39 |
| 14 | on the grounds of attorney-client privilege. | 14:57:40 |
| 15 | BY MR. JAFFE: | 14:57:40 |
| 16 | Q.   What procedural -- what general terms about | 14:57:42 |
| 17 | your testimony did they tell you? | 14:57:45 |
| 18 | A.   Let's see.  We discussed how much time is | 14:57:52 |
| 19 | left, something called redirect. | 14:57:59 |
| 20 | Q.   What did they talk to you about redirect? | 14:58:01 |
| 21 | MR. KIM:  And I'm going to instruct you not to | 14:58:05 |
| 22 | reveal any attorney-client privileged conversations. | 14:58:09 |
| 23 | And I don't think you can answer that without doing | 14:58:11 |
| 24 | so.  I'm going to instruct you not to answer. | 14:58:14 |
| 25 | BY MR. JAFFE: | 14:58:14 |

Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   You talked about redirect on a break?  Yes or | 14:58:21 |
| 2 | no? | 14:58:21 |
| 3 | A.   Yes, we talked about the term "redirect." | 14:58:24 |
| 4 | Q.   And what did you talk about redirect? | 14:58:28 |
| 5 | A.   That is a situation where, instead of you, | 14:58:33 |
| 6 | the lawyer on my side of the table is going to ask me | 14:58:36 |
| 7 | questions. | 14:58:36 |
| 8 | Q.   And how did redirect come up in the context | 14:58:39 |
| 9 | of your conversation? | 14:58:40 |
| 10 | A.   In the context of time remaining and that | 14:58:45 |
| 11 | redirect would occur after your allotted time has | 14:58:49 |
| 12 | ended, so it's going to take longer than I might | 14:58:54 |
| 13 | think. | 14:58:54 |
| 14 | Q.   Did Uber's lawyers tell you that they were | 14:58:58 |
| 15 | going to do redirect questions? | 14:59:00 |
| 16 | A.   Yes. | 14:59:02 |
| 17 | Q.   And did they tell you what those questions | 14:59:04 |
| 18 | were going to be about? | 14:59:06 |
| 19 | A.   No. | 14:59:07 |
| 20 | Q.   Did you talk at all about what sort of | 14:59:11 |
| 21 | redirect would happen? | 14:59:13 |
| 22 | A.   No. | 14:59:16 |
| 23 | Q.   What did you talk about about redirect? | 14:59:19 |
| 24 | A.   That they will ask me questions just like you | 14:59:24 |
| 25 | ask me questions and that it's going to take longer | 14:59:27 |

Page 146

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | than the hour, approximately, that we have remaining, | 14:59:30 |
| 2 | so not to expect it to be over at that time. | 14:59:34 |
| 3 |     Q.  What else, in general terms, did you and your | 14:59:36 |
| 4 | lawyers talk about on the breaks? | 14:59:38 |
| 5 |     MR. KIM:  I'm going to advise you not to reveal | 14:59:46 |
| 6 | any attorney-client privileged communications. | 14:59:49 |
| 7 |     THE WITNESS:  So I'm not a lawyer.  I don't know | 14:59:55 |
| 8 | what is considered attorney-client privilege and what | 14:59:58 |
| 9 | wouldn't be in that context of conversations, so I | 15:00:01 |
| 10 | need to be careful not to answer and disclose | 15:00:03 |
| 11 | something I'm not supposed to say. | 15:00:06 |
| 12 |     MR. KIM:  Do you need to consult with me about a | 15:00:09 |
| 13 | privilege issue? | 15:00:09 |
| 14 |     THE WITNESS:  Yes, that would help. | 15:00:12 |
| 15 |     MR. KIM:  Can we go off the record so he can | 15:00:15 |
| 16 | consult with me on a privilege issue before he answers | 15:00:18 |
| 17 | any further questions about what we discussed? | 15:00:20 |
| 18 |     MR. JAFFE:  I'll withdraw the question and I'll | 15:00:22 |
| 19 | ask a different question. | 15:00:23 |
| 20 | BY MR. JAFFE: | 15:00:23 |
| 21 |     Q.  Tell me the substance of your private | 15:00:26 |
| 22 | conferences -- private conferences during the break | 15:00:28 |
| 23 | that you had with Uber's lawyers, all of it. | 15:00:32 |
| 24 |     MR. KIM:  I'm going to object on the grounds of | 15:00:36 |
| 25 | privilege. | 15:00:37 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. JAFFE:  Are you instructing him not to answer? | 15:00:41 |
| 2 | MR. KIM:  Instruct him not to answer. | 15:00:42 |
| 3 | MR. JAFFE:  Okay.  I think you know that's | 15:00:47 |
| 4 | directly contrary to Judge Alsup's order. | 15:00:50 |
| 5 | MR. KIM:  Can you clarify that. | 15:00:53 |
| 6 | MR. JAFFE:  Judge Alsup's order says no private | 15:00:56 |
| 7 | conferences after testimony begins. | 15:00:58 |
| 8 | MR. KIM:  He's testified that we haven't had any | 15:01:01 |
| 9 | private conferences about his testimony. | 15:01:03 |
| 10 | MR. JAFFE:  The record speaks for itself.  You | 15:01:06 |
| 11 | instructed him not to answer.  I'm going to move on. | 15:01:09 |
| 12 | This is going to be Exhibit 158.  It's a | 15:01:15 |
| 13 | document entitled UBER00012240. | 15:01:19 |
| 14 | (Plaintiff's Exhibit 158 was marked.) | 15:01:37 |
| 15 | BY MR. JAFFE: | 15:01:37 |
| 16 | Q.  This is an e-mail from earlier in March of | 15:01:40 |
| 17 | this year; right -- excuse me, April. | 15:01:47 |
| 18 | A.  Thank you.  Yes. | 15:01:48 |
| 19 | Q.  And on this e-mail is yourself, Anthony | 15:01:53 |
| 20 | Levandowski, Claire Delaunay and Eric Meyhofer; right? | 15:01:57 |
| 21 | A.  Yes. | 15:01:59 |
| 22 | Q.  What is Claire Delaunay's role at Uber? | 15:02:06 |
| 23 | A.  She's a software engineer or software | 15:02:08 |
| 24 | engineering manager. | 15:02:10 |
| 25 | Q.  And there's -- on the "To" line, it says, | 15:02:13 |

Page 148

```
 1    ██████████████████                              15:02:15

 2          Do you see that?                          15:02:17

 3     A.   I see that.                               15:02:19

 4     Q.   Why does it say ████████████  there?      15:02:23

 5     A.   I don't know.                             15:02:23

 6     Q.   And you said, ██████ -- so referring to the  15:02:28

 7    substance of the e-mail that you wrote, you said,  15:02:30

 8    ██████ ████████████                             15:02:32

 9          What are you referring to?               15:02:33

10     A.   I referred to this web link.  I can't     15:02:42

11    remember right now what I was looking at.  ██████  15:02:47

12    ████████████████████████████████."             15:02:54

13          This could be a LiDAR sensor, but clicking on  15:02:59

14    the web link would make it very clear what this was.  15:03:03

15     Q.   ████████████████  that's Anthony Levandowski's  15:03:20

16    address; right?                                 15:03:20

17     A.   I believe it is, yes.                     15:03:20

18     Q.   So someone had in their address book Anthony  15:03:25

19    Levandowski's e-mail address, but the name was just  15:03:29

20    ██████████████                                  15:03:31

21     A.   Apparently.                               15:03:31

22     Q.   Did you notice that when you received this  15:03:36

23    e-mail?                                         15:03:36

24     A.   No, I did not.                            15:03:38

25     Q.   Are you aware of whether Mr. Levandowski  15:03:40
```

Page 149

```
 1    consulted for Uber?                                    15:03:45

 2         A.   No.  Consulted, no.                          15:03:48

 3         Q.   Okay.  You can put that aside.               15:04:04

 4              This has been previously marked as Exhibit   15:04:18

 5    60.  So if you can go to 85 -- oh, this is the wrong   15:04:37

 6    doc.                                                   15:04:37

 7              Going back in time, there's an e-mail from --15:04:52

 8    Scott Boehmke wrote,  █████████████████████████        15:04:56

 9    ████████████████████████████████████████"             15:05:00

10              Do you see that?  It's on the last page.     15:05:03

11              (Witness reviews document.)                  15:05:14

12         A.   Okay.  I see that.                           15:05:16

13         Q.   Do you know what the "doc" being referred to 15:05:19

14    here is?                                               15:05:20

15         MR. KIM:  Objection; form.                        15:05:26

16         THE WITNESS:  No.  I don't know what the doc was. 15:05:35

17    BY MR. JAFFE:                                          15:05:35

18         Q.   And then in the next e-mail in time, you were15:05:47

19    added to the thread.                                   15:05:54

20              Do you see that?                             15:05:55

21         A.   Yes.                                         15:05:58

22         Q.   Do you remember being added to this e-mail   15:06:01

23    thread?                                                15:06:02

24         A.   Remember?  This dates back pretty far.  I    15:06:09

25    don't remember.  About a year ago.                     15:06:11
```

Page 150

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   But at this time, immediately when you were | 15:06:20 |
| 2 | involved, Mr. Boehmke and Mr. Levandowski were having | 15:06:26 |
| 3 | LiDAR-related discussions; right? | 15:06:31 |
| 4 | MR. KIM:  Objection; form. | 15:06:38 |
| 5 | THE WITNESS:  It's not -- it's not clear, when it | 15:06:40 |
| 6 | says, ███████████████████████████  ████████ | |
| 7 | ████  meant Scott and Anthony or Scott and somebody | 15:06:49 |
| 8 | else, so I don't know. | 15:06:50 |
| 9 | BY MR. JAFFE: | 15:06:50 |
| 10 | Q.   Do you think that's ambiguous? | 15:06:52 |
| 11 | A.   I think that's ambiguous. | 15:06:54 |
| 12 | MR. JAFFE:  You can set that aside. | 15:07:11 |
| 13 | We're on 158? | 15:07:13 |
| 14 | THE REPORTER:  159. | 15:07:15 |
| 15 | MR. JAFFE:  Get it right one of these times. | 15:07:18 |
| 16 | (Plaintiff's Exhibit 159 was marked.) | 15:07:35 |
| 17 | BY MR. JAFFE: | 15:07:35 |
| 18 | Q.   In June of 2016, you were working at Otto; | 15:07:39 |
| 19 | right? | 15:07:39 |
| 20 | A.   Yes. | 15:07:41 |
| 21 | Q.   And do you see, in the second e-mail, there's | 15:07:43 |
| 22 | ███████████████████[sic]? | 15:07:47 |
| 23 | Do you see that? | 15:07:50 |
| 24 | A.   Yes. | 15:07:50 |
| 25 | Q.   What is that e-mail list? | 15:07:54 |

Page 151

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   That should be the list of Otto LiDAR | 15:07:59 |
| 2 | development employees. | 15:08:00 |
| 3 | Q.   Who's on that -- well, Mr. Levandowski is on | 15:08:01 |
| 4 | that list; right? | 15:08:02 |
| 5 | A.   Okay. | 15:08:03 |
| 6 | Q.   I'm asking you. | 15:08:03 |
| 7 | A.   I don't know if he's on that list. | 15:08:05 |
| 8 | Q.   Well, this e-mail indicates -- because he | 15:08:08 |
| 9 | forwarded an e-mail to that list -- to Mr. Boehmke, it | 15:08:11 |
| 10 | indicates that he's on that list.  You would agree | 15:08:14 |
| 11 | with that; right? | 15:08:15 |
| 12 | (Witness reviews document.) | 15:08:23 |
| 13 | A.   Yeah, seems that way. | 15:08:28 |
| 14 | Q.   So Mr. Levandowski is on the e-mail LISTSERV | 15:08:34 |
| 15 | for the LiDAR development team; right? | 15:08:36 |
| 16 | A.   He may have been, yes. | 15:08:39 |
| 17 | Q.   He was? | 15:08:39 |
| 18 | A.   Okay. | 15:08:41 |
| 19 | Q.   No, I'm asking you. | 15:08:42 |
| 20 | He was; right? | 15:08:42 |
| 21 | A.   It appears from this e-mail chain, assuming | 15:08:45 |
| 22 | there's nothing deleted from it, that he would have | 15:08:48 |
| 23 | got it from the chain and continued it on. | 15:08:51 |
| 24 | Q.   Let me ask you:  Do you have any personal | 15:08:54 |
| 25 | knowledge whether Mr. Levandowski was on this e-mail | 15:08:56 |

Page 152

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | list or not? | 15:08:57 |
| 2 | A.   I don't recall if he was on the list or not. | 15:09:00 |
| 3 | Q.   Okay.  So sitting here today, you have no | 15:09:02 |
| 4 | personal knowledge whether Mr. Levandowski was on the | 15:09:04 |
| 5 | laser-dev e-mail list; right? | 15:09:07 |
| 6 | A.   Sitting here right now, I don't remember if | 15:09:10 |
| 7 | he was on the list. | 15:09:11 |
| 8 | Q.   Who else was on that list at this time that | 15:09:14 |
| 9 | you remember? | 15:09:15 |
| 10 | A.   I would assume it was the other people | 15:09:19 |
| 11 | developing the LiDAR sensors. | 15:09:21 |
| 12 | Q.   And who are those people? | 15:09:23 |
| 13 | A.   It would be -- to my expectation, people like | 15:09:28 |
| 14 | Gaetan, Dan Gruver, Daniel Ratner.  I don't know if | 15:09:38 |
| 15 | Radu was part of the company at the time.  Mike | 15:09:55 |
| 16 | Karasoff.  Probably Matt Palomar, Benjamin Becker. | 15:10:00 |
| 17 | That's all I can remember right now.  Certainly also | 15:10:22 |
| 18 | could have involved Anthony Levandowski for | 15:10:25 |
| 19 | informative purposes. | 15:10:27 |
| 20 | Q.   What about Max? | 15:10:28 |
| 21 | A.   I'm sorry.  Of course, Max Levandowski as | 15:10:30 |
| 22 | well.  Who else am I forgetting?  Refer back to my | 15:10:41 |
| 23 | list. | 15:10:42 |
| 24 | Q.   For the record, you're looking at Exhibit | 15:10:45 |
| 25 | 153; right? | 15:10:46 |

Veritext Legal Solutions
866 299-5127

```
 1              Where did the idea to do  ██████      ███████
 █       ██████████████  come from in the Fuji mid-range  15:24:56
 3   transmit board design?                               15:24:58
 4       MR. KIM:  Objection; form.                        15:25:03
 5       THE WITNESS:  I think it's a mischaracterization  15:25:04
 6   to call it -- the vertical spacing as something that  15:25:08
 7   had an idea -- that had an origin as an idea.  The    15:25:12
 8   fact that  ██████████████████████████        ███████
 █       █████████████  is a side effect of the optics  15:25:21
10   in the optical cavity.                               15:25:24
11   BY MR. JAFFE:                                        15:25:24
12       Q.   So you can't tell me where it came from, who 15:25:26
13   came up with the idea?                               15:25:28
14       A.   I'm trying to explain -- I don't think      15:25:31
15   anybody had this idea to  █████████████         ███████
 █       ███████████████████████████  on the laser board. 15:25:40
17   I believe that was a side effect that was unavoidable 15:25:46
18   when you take a set of vertical angles, especially if 15:25:51
19   they're nearly or equivalently spaced in terms of    15:25:56
20   angle, and project those onto a curved focal surface. 15:26:01
21       Q.   You said it's unavoidable.                  15:26:03
22            You worked at Velodyne; right?              15:26:05
23       A.   Yes.                                         15:26:05
24       Q.   You didn't do  ████████████████████  at     15:26:09
25   Velodyne; right?                                     15:26:11
```

Page 163

```
 1         MR. KIM:  Objection; form.                    15:26:12

 2    BY MR. JAFFE:                                       15:26:12

 3         Q.   In terms of the X and Y positions of the 15:26:15

 4    diodes?                                             15:26:15

 5         A.   I'm not aware that they were              15:26:20

           , as a matter of fact.                         15:26:20

 7         Q.   You don't know?                           15:26:22

 8         A.   I -- actually, if I had to guess, because it  15:26:25

 9    was never something we directly measured or         15:26:27

10    considered, they probably are              .        15:26:31

11         Q.   And why do you say that?                  15:26:34

12         A.                                             

13                                                        15:26:46

14                                                        15:26:51

15                                                        15:26:56

16                                                        15:27:00

17                                                        15:27:00

18         Q.   What do you mean, it's               ?    15:27:02

19         A.   I would have to do the math or do a CAD   15:27:08

20    simulation, but I fully expect                      15:27:13

21                                                        15:27:19

22                                                        15:27:22

23                                                        15:27:24

24         Q.   Okay.  You worked at Velodyne; right?     15:27:28

25         A.   Yes.                                      15:27:28
```

                                                Page 164



| 1 | Q. And you worked on LiDAR at Velodyne? | 15:27:32 |
| 2 | A. Yes. | 15:27:32 |
| 3 | ▮ ▮ | ▮ |
| 4 | ▮ | 15:27:37 |
| 5 | A. ▮ | 15:27:39 |
| 6 | Q. Do you know whether ▮ | ▮ |
| 7 | ▮? | 15:27:43 |
| 8 | ▮ ▮ | 15:27:48 |
| 9 | ▮ ▮ | ▮ |
| 10 | ▮ ▮ ▮ | ▮ |
| 11 | ▮ ▮. | 15:27:57 |
| 12 | Q. So I want to again go back to this idea of | 15:28:20 |
| 13 | where did the idea to do the vertical spacing design | 15:28:23 |
| 14 | in Fuji come from? You've said -- you've mentioned | 15:28:26 |
| 15 | the things -- the drivers, but I haven't heard who | 15:28:29 |
| 16 | came up with the idea, where it came from. | 15:28:32 |
| 17 | A. Again, you're referring, I believe, to a | 15:28:34 |
| 18 | linear vertical -- what we call delta Y; is that | 15:28:37 |
| 19 | correct? | 15:28:38 |
| 20 | Q. Yes. | 15:28:39 |
| 21 | A. I have to give you the same answer. It was | 15:28:43 |
| 22 | not a concept that drove the design. There was nobody | 15:28:48 |
| 23 | coming up with the idea to do that. The idea for the | 15:28:54 |
| 24 | vertical angles I would attribute to Scott Boehmke. | 15:28:58 |
| 25 | The lens design I would attribute to Gaetan Pennecot. | 15:29:01 |

Page 165

| | | |
|---|---|---|
| 1 | So what you end up with on the board at that point is | 15:29:06 |
| 2 | just derived from those pieces of information. | 15:29:10 |
| 3 | Q.   So talking about the angles, you said when | 15:29:13 |
| 4 | you were at Velodyne, you did constant angles. | 15:29:17 |
| 5 | A.   Yes. | 15:29:17 |
| 6 | Q.   Why didn't you want to get ▮▮▮▮ | ▮▮▮▮ |
| 7 | ▮▮▮▮▮▮▮▮ when you were working at | 15:29:26 |
| 8 | Velodyne? | 15:29:27 |
| 9 | A.   I don't know. | 15:29:28 |
| 10 | Q.   You guys didn't come up with that?  You | 15:29:31 |
| 11 | didn't think of that idea? | 15:29:33 |
| 12 | A.   I don't think so.   I mean, I would -- at that | 15:29:40 |
| 13 | point, ▮▮▮▮ had a very strong influence on this | 15:29:43 |
| 14 | is what your LiDAR is going to be, this is the angle | 15:29:46 |
| 15 | spacing.  So it's not something that I had ever | 15:29:49 |
| 16 | thought of. | 15:29:50 |
| 17 | Q.   It not something that you guys considered, | 15:29:54 |
| 18 | which is you want ▮▮▮▮▮▮ as you | 15:29:59 |
| 19 | go down the road? | 15:30:00 |
| 20 | A.   ▮▮▮▮▮▮▮▮? | 15:30:00 |
| 21 | Q.   Yes. | 15:30:01 |
| 22 | A.   That was the design that Velodyne ended up | 15:30:04 |
| 23 | with -- | 15:30:05 |
| 24 | Q.   Sorry. | 15:30:05 |
| 25 | A.   -- still 32. | |

Page 166

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        THE WITNESS: ████████████████████████     ████████

 2   ████████████████████████████████████████        ████████

 3   ████████████████                                 ████████

 4   BY MR. JAFFE:                                    15:39:47

 5       ██ ████████████████████████████             ████████

 6   ████████████████████████████████████████        ████████

 7   ████████████████████                             ████████

 8       MR. KIM:  Objection; form.                   15:39:56

 9       THE WITNESS:  No, I'm sorry.  Could you be more   15:40:04

10   specific in your question.  I'm confused.        15:40:07

11   BY MR. JAFFE:                                    15:40:07

12       Q.   Because I'm short on time, I'll just skip   15:40:10

13   that.

14            Here in this e-mail, these are early 905   15:40:13

15   nanometer discussions.                           15:40:15

16       A.   Yes.

17       Q.   And you wrote, ████████████ █████████   ████████

18   ████████████████████████████████████ █████      ████████

19   ████████████████████                            15:40:23

20            Do you see that?                        15:40:25

21       A.   Yes.                                    15:40:25

22       Q.   So at the time of this e-mail, October 28th,   15:40:30

23   you had the idea of ████████████████████?       15:40:35

24       A.   Yes.                                    15:40:35

25       Q.   So at this point, in October, you didn't   15:40:38
```

Page 173

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    actually have the idea of ██████████████████        ████████   15:40:44
      ████████████?
 3        A.    True.                                                 15:40:45
 4        Q.    So this is not evidence of -- this e-mail is          15:40:50
 5    not indicative of you coming up with the ████████    ████████   15:41:00
      ██████████████████████; right?
 7        MR. KIM:  Objection; form.                                  15:41:01
 8        THE WITNESS:  This is not indicative of the -- or           15:41:04
 9    this is not evidential to the ████████████████    ████████      15:41:12
      ███████████████████████████.
11    BY MR. JAFFE:                                                   15:41:12
12        Q.    And what you were thinking on October 26th            15:41:14
13    [sic] is ████████████████████; right?                          15:41:18
14        A.    Yes, on October 28th.                                 15:41:20
15        Q.    Okay.
16        MR. KIM:  Jordan, are you wrapping up?                      15:41:40
17        MR. JAFFE:  I only have a few more minutes, so I            15:41:43
18    think I'm wrapping up.                                          15:41:45
19        MR. KIM:  I think we've got one.                            15:41:47
20    BY MR. JAFFE:                                                   15:41:47
21        Q.    What documents are you aware of that would            15:42:04
22    show Anthony -- all of Anthony Levandowski's input              15:42:08
23    into Uber and Otto's LiDAR designs?                             15:42:12
24        MR. KIM:  Objection; form.                                  15:42:14
25        THE WITNESS:  I'm not aware of a list of documents          15:42:17
```

Page 174

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | or a source for documents to go to to document all of | 15:42:20 |
| 2 | his influence. | 15:42:21 |
| 3 | BY MR. JAFFE: | 15:42:21 |
| 4 |     Q.  How would you find out about how | 15:42:25 |
| 5 | Mr. Levandowski has influenced LiDAR design at Uber | 15:42:30 |
| 6 | and Otto? | 15:42:31 |
| 7 |     MR. KIM:  Objection; form. | 15:42:41 |
| 8 |     THE WITNESS:  That's difficult. | 15:42:42 |
| 9 | BY MR. JAFFE: | 15:42:42 |
| 10 |     Q.  Why? | 15:42:44 |
| 11 |     A.  When you're looking for all of something and | 15:42:49 |
| 12 | you need to miss nothing, that's not an easy problem | 15:42:53 |
| 13 | to solve.  If you look at all the possible sources of | 15:42:58 |
| 14 | influence, I'm not sure they would all be documented. | 15:43:01 |
| 15 |     Q.  How would you go about trying to find out as | 15:43:04 |
| 16 | much as you could about how Mr. Levandowski has had | 15:43:08 |
| 17 | input into Uber and Otto's LiDAR designs? | 15:43:13 |
| 18 |     MR. KIM:  Objection; form. | 15:43:16 |
| 19 |     THE WITNESS:  I suppose I would talk to the | 15:43:18 |
| 20 | various engineers that had LiDAR responsibilities. | 15:43:21 |
| 21 | BY MR. JAFFE: | 15:43:21 |
| 22 |     Q.  Who? | 15:43:22 |
| 23 |     A.  Shall we pick up -- | 15:43:31 |
| 24 |     Q.  Would you talk to everyone on this list?  Is | 15:43:32 |
| 25 | that the idea? | 15:43:33 |

Page 175

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I suppose, yeah, if I'm trying not to miss | 15:43:37 |
| 2 | anything. | 15:43:37 |
| 3 | Q.   Where would you look for documents? | 15:43:41 |
| 4 | A.   I suppose e-mail. | 15:43:43 |
| 5 | MR. KIM:  Can we have the time on the record, | 15:43:45 |
| 6 | please. | 15:43:48 |
| 7 | THE VIDEOGRAPHER:  3 hours and 59 minutes. | 15:43:52 |
| 8 | MR. KIM:  Thanks. | 15:43:53 |
| 9 | THE WITNESS:  I said e-mail. | 15:43:55 |
| 10 | BY MR. JAFFE: | 15:43:55 |
| 11 | Q.   Anything else? | 15:43:56 |
| 12 | A.   Not that occurs to me. | 15:43:59 |
| 13 | Q.   So if you wanted to figure out as much as you | 15:44:03 |
| 14 | could about Mr. Levandowski's input into Uber and Otto | 15:44:08 |
| 15 | LiDAR, you would talk to everyone on the LiDAR team | 15:44:11 |
| 16 | and you would look at Mr. Levandowski's e-mail and | 15:44:15 |
| 17 | everyone else's e-mail; is that fair? | 15:44:17 |
| 18 | MR. KIM:  Objection; form. | 15:44:20 |
| 19 | THE WITNESS:  I wouldn't look at everybody's | 15:44:23 |
| 20 | e-mail.  I would look at Anthony's e-mail because if | 15:44:26 |
| 21 | he's going to have an influence, I would expect it to | 15:44:27 |
| 22 | come from his account outward, and that's going to | 15:44:28 |
| 23 | limit the search. | 15:44:29 |
| 24 | BY MR. JAFFE: | |
| 25 | Q.   Is there any -- is there any other source of | 15:44:31 |

Page 176

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | documents that you would look at or data, anything? | 15:44:34 |
| 2 | MR. KIM:  Objection; form. | 15:44:35 |
| 3 | THE WITNESS:  I don't know.  I might look for | 15:44:48 |
| 4 | Google docs with his authorship. | 15:44:51 |
| 5 | BY MR. JAFFE: | 15:44:51 |
| 6 | Q.   Anything else? | 15:44:55 |
| 7 | A.   No. | 15:44:56 |
| 8 | Q.   Okay. | 15:44:56 |
| 9 | MR. JAFFE:  Well, I think I have run out of time. | 15:45:01 |
| 10 | MR. KIM:  Okay. | 15:45:06 |
| 11 | THE REPORTER:  Do you want this as 161? | 15:45:20 |
| 12 | MR. KIM:  Yes. | |
| 13 | THE REPORTER:  Next number?  Okay. | |
| 14 | MR. JAFFE:  I'm going to object -- | |
| 15 | THE REPORTER:  Hang on.  Let me just write this. | |
| 16 | MR. KIM:  Oh.  1061. | |
| 17 | THE REPORTER:  161? | |
| 18 | MR. KIM:  You know, I think we're alternating -- | |
| 19 | MR. JAFFE:  We have different blocks of exhibits. | 15:45:31 |
| 20 | So his exhibit numbers, they start at 1000; ours start | 15:45:35 |
| 21 | at zero.  So I don't know what number you're at. | 15:45:36 |
| 22 | MR. KIM:  Actually, can we start at 1060. | 15:45:39 |
| 23 | (Defendants' Exhibit 1060 was marked.) | 15:46:05 |
| 24 | REDIRECT EXAMINATION | |
| 25 | BY MR. KIM: | 15:46:05 |

Page 177

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        THE WITNESS:  I wasn't sure.  I don't recall the    17:28:43

2   strict definition of ███████████████       ████████     17:28:52

    ████████████████████████.                               17:28:52

4   BY MR. JAFFE:                                            17:28:52

5        Q.   I see.  So if we exclude zero change, if       17:28:55

6   something is ████████████████████       ████████        17:28:55

    ████████████████████; right?                            17:29:01

8        MR. KIM:  Objection; form.                          17:29:04

9        THE WITNESS:  I believe so, yes.                    17:29:07

10  BY MR. JAFFE:                                            17:29:07

11       Q.   And if we go back and we look at -- I don't    17:29:12

12  have the number in front of me.  It's the one where      17:29:14

13  you pencilled out all the changes.                       17:29:16

14       A.   The changes.                                   17:29:18

15       Q.   The changes, yeah.                             17:29:18

16       A.   Let's see, this one; right?                    17:29:22

17       Q.   Not that one.  The one that looks like this    17:29:25

18  (indicating).  The Fuji data.                            17:29:28

19       A.   Is that not the one I wrote for you?           17:29:31

20       Q.   Yes.  It should be over there in that pile.    17:29:36

21  It's just going to be one sheet of paper.                17:29:40

22       MR. KIM:  Thank you.                                17:29:42

23          (Witness reviews documents.)                     17:29:52

24       THE WITNESS:  This one?                             17:29:53

25  BY MR. JAFFE:                                            17:29:53
```

Page 226

| | | |
|---|---|---|
| 1 | Q. That's it. | 17:29:54 |
| 2 | A. Okay. | 17:29:55 |
| 3 | Q. Do you remember when we were talking about | 17:29:56 |
| 4 | the delta Y column? | 17:29:58 |
| 5 | A. Yes. | 17:29:58 |
| 6 | Q. Does the delta Y column -- I guess we'll say, | 17:30:03 |
| 7 | ▆▆▆▆▆▆▆▆▆▆? | 17:30:10 |
| 8 | MR. KIM: Objection; form. | 17:30:14 |
| 9 | THE WITNESS: Yes, it appears to ▆▆▆▆ ▆▆▆▆ | |
| ▆ | ▆▆▆▆▆▆▆▆ | 17:30:17 |
| 11 | BY MR. JAFFE: | 17:30:17 |
| 12 | Q. So the difference between ▆▆▆▆▆▆ ▆▆▆▆ | |
| ▆ | ▆▆▆▆▆ is immaterial to what we were talking | 17:30:23 |
| 14 | about in Exhibit 156; right? | 17:30:25 |
| 15 | MR. KIM: Objection; form. | 17:30:26 |
| 16 | THE WITNESS: I can say that the delta Y column | 17:30:31 |
| 17 | appears to be ▆▆▆▆▆▆▆▆ ▆▆▆▆ | |
| ▆ | ▆▆▆▆▆ yes. | 17:30:35 |
| 19 | BY MR. JAFFE: | 17:30:35 |
| 20 | Q. You talked about ▆▆▆▆ with your | 17:30:38 |
| 21 | counsel. | 17:30:39 |
| 22 | Do you remember that? | 17:30:40 |
| 23 | A. Yes. | 17:30:40 |
| 24 | Q. And you said that you reuse some of the parts | 17:30:42 |
| 25 | from ▆▆▆▆▆ in the Fuji design; is that right? | 17:30:45 |

Page 227

```
 1      A.   Yes.                                            17:30:46

 2      Q.   Is that common to reuse parts from old          17:30:49

 3   projects?                                               17:30:50

 4      MR. KIM:  Objection; form.                           17:30:53

 5      THE WITNESS:  Depends what you mean by "common."     17:30:57

 6   Can it be done?  Certainly.  Is it done?  I've seen it  17:31:01

 7   done, yeah.                                             17:31:02

 8   BY MR. JAFFE:                                           17:31:02

 9      Q.   Is it something you've seen happen fairly       17:31:04

10   regularly?                                              17:31:05

11      MR. KIM:  Objection; form.                           17:31:06

12      THE WITNESS:  Again, I don't want to try to          17:31:09

13   qualify the rate of currents, but I have seen it done   17:31:13

14   before.                                                 17:31:14

15   BY MR. JAFFE:                                           17:31:14

16      Q.   Let me ask it this way:  Reusing parts from     17:31:15

17   old projects is not uncommon; right?                    17:31:18

18      MR. KIM:  Objection; form.                           17:31:19

19      THE WITNESS:  It's not very uncommon.                17:31:21

20   BY MR. JAFFE:                                           17:31:21

21      Q.   And was ▮▮▮▮▮▮▮ -- how would you describe        17:31:25

22   what happened with that project?                        17:31:27

23      A.   I would describe it as a LiDAR sensor           17:31:35

24   development that started probably before I joined       17:31:39

25   Otto, made some progress in designing an FAC lens,      17:31:46
```

                                                    Page 228

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  No. | 17:35:55 |
| 2 | BY MR. JAFFE: | |
| 3 | Q.   So Spider, you're never going to use it | 17:36:02 |
| 4 | again; right? | 17:36:03 |
| 5 | A.   I don't have any intention of reusing it | 17:36:05 |
| 6 | again right now. | 17:36:06 |
| 7 | Q.   That's not my question.  My question is, Uber | 17:36:09 |
| 8 | is never going to use Spider; right? | 17:36:12 |
| 9 | A.   You're asking if the company is going to do | 17:36:18 |
| 10 | something in the future? | 17:36:20 |
| 11 | Q.   That's right. | 17:36:20 |
| 12 | A.   I don't know. | 17:36:21 |
| 13 | Q.   So sitting here today, you can't tell me | 17:36:24 |
| 14 | whether Uber is going to use Spider in the future? | 17:36:27 |
| 15 | A.   No.  I can only tell you my intentions right | 17:36:31 |
| 16 | now. | 17:36:31 |
| 17 | Q.   All right.  You mentioned Fuji.  Oh, I'm | 17:36:47 |
| 18 | sorry, going back to Spider. | 17:36:50 |
| 19 | Why save the parts if you're never going to | 17:36:53 |
| 20 | use it? | 17:36:54 |
| 21 | A.   That's a good question. | 17:36:57 |
| 22 | Q.   Why didn't you throw it away? | 17:37:00 |
| 23 | A.   I don't know if we've thrown anything away. | 17:37:03 |
| 24 | I don't know.  It should have, could have easily been | 17:37:05 |
| 25 | recycled, yeah. | 17:37:07 |

Page 232

```
 1        Q.   So you don't know why you kept it?              17:37:10

 2        A.   Just because we didn't throw it away, as far    17:37:13

 3   as I know.                                                17:37:14

 4        Q.   So sitting here today, again, you can't tell    17:37:19

 5   me why you kept the Spider; right?                        17:37:21

 6        A.   Yes.                                            17:37:26

 7        Q.   Okay.  I want to ask about your supplemental    17:37:42

 8   declaration that you went into detail with with your      17:37:46

 9   counsel.  And let's start with page 11.  And there's      17:38:07

10   Figures 8A and 8B here.                                   17:38:09

11             Do you see that?                                17:38:10

12        A.   I see that.                                     17:38:11

13        Q.   And during your testimony by your counsel,      17:38:13

14   you said -- you referred to these ████████, and you       17:38:17

15   said whoever did these letters.                           17:38:21

16        A.   Um-hum.                                         17:38:26

17        Q.   You didn't prepare 8A and 8B, did you?          17:38:28

18        A.   No.                                             17:38:28

19        Q.   Who prepared 8A and 8B?                         17:38:31

20        A.   Counsel.                                        17:38:33

21        Q.   Who?                                            17:38:34

22        A.   Jackie Choy [sic], I believe.                   17:38:39

23        Q.   So Uber's lawyers prepared this and sent this   17:38:43

24   to you; is that right?                                    17:38:44

25        A.   Yes.                                            17:38:45
```

Page 233

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    And you signed it without actually checking | 17:38:47 |
| 2 | it was accurate? | 17:38:49 |
| 3 | A.    Whoa.  I looked at these numbers. | 17:38:52 |
| 4 | Q.    But you didn't check what you did today | 17:38:54 |
| 5 | before you signed this declaration, did you? | 17:38:59 |
| 6 | A.    What do you mean?  Identifying, double | 17:39:02 |
| 7 | checking the ███████ | 17:39:04 |
| 8 | Q.    Yes. | 17:39:04 |
| 9 | A.    I did check that. | 17:39:06 |
| 10 | Q.    So why today did you need to check it again? | 17:39:09 |
| 11 | A.    I like to be careful. | 17:39:11 |
| 12 | Q.    You like to be careful? | 17:39:12 |
| 13 | A.    Yeah.  I want to be sure we can show the ██ ████████ | |
| | ██ ███████████████, that they matched. | 17:39:19 |
| 15 | Q.    Did you know when you signed your declaration | 17:39:22 |
| 16 | whether these actually matched every single angle and | 17:39:26 |
| 17 | every single board? | 17:39:27 |
| 18 | A.    Yes, I believe I did. | 17:39:28 |
| 19 | Q.    What do you mean you believe you did? | 17:39:31 |
| 20 | A.    To my recollection, I checked ████████ ███████ | |
| | ██ ██████████████████████████ And I checked the | 17:39:42 |
| 22 | initial ████████ and knew that they would follow the | 17:39:46 |
| 23 | same pattern so I didn't check every single angle. | 17:39:50 |
| 24 | Q.    How many of these did you actually check | 17:39:52 |
| 25 | yourself before you signed your declaration? | 17:39:55 |

Page 234

| | | |
|---|---|---|
| 1 | A.   I remember at least checking the initial ████ | |
| | ████ | 17:40:04 |
| 3 | Q.   So you checked about six out of the 64; is | 17:40:08 |
| 4 | that fair? | 17:40:09 |
| 5 | A.   Yeah. | 17:40:09 |
| 6 | Q.   And the rest are purely from counsel; you're | 17:40:12 |
| 7 | just relying on them? | 17:40:14 |
| 8 | A.   Not exactly. | 17:40:16 |
| 9 | Q.   You didn't check. | 17:40:19 |
| 10 | How did you know it was accurate? | 17:40:21 |
| 11 | A.   How would the pattern change? | 17:40:24 |
| 12 | Q.   I don't know.  It's your declaration. | 17:40:26 |
| 13 | A.   I understand.  From my understanding, the | 17:40:30 |
| 14 | pattern is consistent in the letters.  So once you | 17:40:35 |
| 15 | start the pattern properly, it's going to finish out | 17:40:39 |
| 16 | properly. | 17:40:40 |
| 17 | Q.   Let's go to the next page, page 12. | 17:40:42 |
| 18 | Who prepared this table? | 17:40:44 |
| 19 | A.   Counsel for Uber. | 17:40:51 |
| 20 | Q.   And you had to double check it here at your | 17:40:54 |
| 21 | deposition; you didn't know whether it was accurate | 17:40:55 |
| 22 | when you signed it, did you? | 17:40:57 |
| 23 | MR. KIM:  Objection; form. | 17:40:58 |
| 24 | THE WITNESS:  I believe I checked that before as | 17:41:00 |
| 25 | well. | 17:41:01 |

Page 235

| 1 | BY MR. JAFFE: | 17:41:01 |
| 2 |    Q.  You did?  How many? | 17:41:03 |
| 3 |    A.  I don't recall.  Some. | 17:41:14 |
| 4 |    Q.  How many? | 17:41:16 |
| 5 |    A.  I would have checked first sets of angles.  I | 17:41:25 |
| 6 | don't know. | 17:41:25 |
| 7 |    Q.  I'm not asking what you would have done.  I'm | 17:41:28 |
| 8 | asking what you did. | 17:41:29 |
| 9 |    A.  I don't remember what I did. | 17:41:30 |
| 10 |    Q.  You don't remember checking any of these, do | 17:41:33 |
| 11 | you? | 17:41:33 |
| 12 |    MR. KIM:  Objection; form. | 17:41:34 |
| 13 |    THE WITNESS:  That's not true. | 17:41:35 |
| 14 | BY MR. JAFFE: | 17:41:35 |
| 15 |    Q.  So you checked one? | 17:41:36 |
| 16 |    MR. KIM:  Objection; form. | 17:41:38 |
| 17 |    THE WITNESS:  I specifically was checking those | 17:41:40 |
| 18 | that had the ■■ degree, and I was specifically | 17:41:44 |
| 19 | checking those that began the pattern as well. | 17:41:47 |
| 20 | BY MR. JAFFE: | 17:41:47 |
| 21 |    Q.  So you checked probably, what, five or six? | 17:41:50 |
| 22 |    A.  Should be at least six, was at least six. | 17:41:54 |
| 23 |    Q.  At least six.  You don't remember checking | 17:41:56 |
| 24 | anymore on this one? | 17:41:59 |
| 25 |    A.  I don't remember checking more. | 17:42:00 |

Page 236

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Let's go to the next page.  There's another | 17:42:03 |
| 2 | chart, page 13. | 17:42:04 |
| 3 | Who wrote this chart? | 17:42:06 |
| 4 | A.   Same person who prepared the previous chart. | 17:42:10 |
| 5 | Q.   And how many angles did you check in this | 17:42:14 |
| 6 | one? | 17:42:15 |
| 7 | A.   Again, I would -- I believe I checked maybe | 17:42:20 |
| 8 | six. | 17:42:20 |
| 9 | Q.   And how did you know that the data that | 17:42:23 |
| 10 | Uber's lawyers were relying on was accurate? | 17:42:27 |
| 11 | A.   I would say there's a certain level of | 17:42:40 |
| 12 | expectation of accuracy when you're pulling data out | 17:42:45 |
| 13 | of a spreadsheet into another spreadsheet. | 17:42:47 |
| 14 | Q.   You mean you were relying on Uber's lawyers | 17:42:50 |
| 15 | to give you accurate data? | 17:42:52 |
| 16 | MR. KIM:  Objection; form. | 17:42:53 |
| 17 | THE WITNESS:  I was relying on Uber's lawyers to | 17:42:58 |
| 18 | do the obvious simple thing, cut and paste from a | 17:43:01 |
| 19 | spreadsheet, and not inject an errors by manually | 17:43:05 |
| 20 | changing numbers. | 17:43:07 |
| 21 | BY MR. JAFFE: | 17:43:07 |
| 22 | Q.   You see it says "Current" here? | 17:43:09 |
| 23 | A.   Yes. | 17:43:09 |
| 24 | Q.   Where did Uber's lawyers get the numbers that | 17:43:13 |
| 25 | go in the "Current" column? | 17:43:15 |

Page 237

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    What is this document called?  This would be | 17:43:24 |
| 2 | from Exhibit 155. | 17:43:26 |
| 3 | Q.    How do you know that? | 17:43:28 |
| 4 | A.    Because she said so. | 17:43:30 |
| 5 | Q.    Uber's lawyer told you that she derived these | 17:43:35 |
| 6 | numbers from Exhibit B? | 17:43:37 |
| 7 | MR. KIM:  I'm going to object on grounds of | 17:43:41 |
| 8 | privilege and instruct you not to answer that. | 17:43:45 |
| 9 | BY MR. JAFFE: | 17:43:45 |
| 10 | Q.    So again, I just want to ask, how do you know | 17:43:50 |
| 11 | the numbers that say "Current" here where they were | 17:43:58 |
| 12 | derived from?  And wait for your counsel to object, if | 17:44:02 |
| 13 | he does. | 17:44:03 |
| 14 | A.    I would inspect Exhibit 155 in the theta | 17:44:14 |
| 15 | column for these boards to find the angles that match. | 17:44:22 |
| 16 | THE REPORTER:  To find the angles that . . . | 17:44:22 |
| 17 | MR. JAFFE:  Excuse me. | |
| 18 | THE WITNESS:  To find the angles that match. | |
| 19 | BY MR. JAFFE: | |
| 20 | Q.    Mr. Haslim, I'm not asking what you would do. | 17:44:26 |
| 21 | I'm asking what happened. | 17:44:28 |
| 22 | A.    So as I said, I compared some number, maybe | 17:44:34 |
| 23 | six, of the angles under "Current" against the angles | 17:44:41 |
| 24 | listed under the theta column in Exhibit 155. | 17:44:46 |
| 25 | Q.    Where do the numbers from the "Current" | 17:44:48 |

Page 238

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   column come from in your declaration?              17:44:51

 2       A.   They came from the spreadsheet that we're  17:44:59

 3   printing out and calling Exhibit 155.              17:45:02

 4       Q.   And how do you know that?  How did you know 17:45:05

 5   that at the time?                                  17:45:05

 6       A.   How did I know to look there as a source?  17:45:09

 7       Q.   No.  How did you know that the source of   17:45:11

 8   these numbers were from that spreadsheet before you 17:45:14

 9   signed your declaration?                           17:45:16

10       A.   So in the process of developing this       17:45:20

11   document, I was in communication with Uber's counsel. 17:45:24

12       Q.   So Uber's lawyers told you that these numbers 17:45:29

13   come from the "Current" number and they sent them to 17:45:32

14   you and that's the basis of your understanding that 17:45:34

15   these numbers actually are current?                17:45:36

16       MR. KIM:  I'm going to object on the grounds of 17:45:39

17   privilege and instruct you not to answer the question 17:45:42

18   to the extent it asks what Uber's lawyers told you.  17:45:48

19       THE WITNESS:  I would refer to my discussion with 17:45:50

20   Uber's lawyer for the source of the information that 17:45:55

21   allows me to go back and check myself at least some of 17:45:59

22   the numbers with the belief that the other numbers in 17:46:02

23   between for every logical reason should be the correct 17:46:06

24   numbers.                                           17:46:07

25   BY MR. JAFFE:                                      17:46:07
```

Page 239

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   But you didn't check that before you signed        17:46:09

2    your declaration; right?                                17:46:11

3    MR. KIM:  Objection; form.                              17:46:12

4    THE WITNESS:  I did not recall checking all 32          17:46:20

5    angles in this table, or 64 as the case may be.         17:46:24

6    BY MR. JAFFE:                                            17:46:24

7    Q.   So you couldn't -- at the time you signed          17:46:28

8    this declaration, you couldn't say that what's in here  17:46:35

9    actually does represent all the current angles because  17:46:39

10   you didn't check each one?                              17:46:41

11   MR. KIM:  Objection; form.                              17:46:42

12   THE WITNESS:  I really believe without checking         17:46:44

13   every single one, I could have a very high reasonable   17:46:48

14   confidence that they are correct.                       17:46:50

15   BY MR. JAFFE:                                            17:46:50

16   Q.   Because you believe Uber's lawyers?                17:46:52

17   MR. KIM:  Objection; form.                              17:46:55

18   THE WITNESS:  Because I checked the beginning and       17:46:57

19   the end and have every reason to believe that a cut     17:47:02

20   and paste from one spreadsheet to another would be      17:47:05

21   without error.                                          17:47:05

22   BY MR. JAFFE:                                            17:47:05

23   Q.   But what spreadsheet did it come from?            17:47:09

24   A.   The spreadsheet that's printed out in Exhibit      17:47:13

25   155.                                                    17:47:13

                                                     Page 240

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      Q.    How do you know that?                      17:47:14

2      A.    By talking to the lawyer.                  17:47:16

3      Q.    So Uber's lawyer told you that he or she cut  17:47:20

4   and paste out of a spreadsheet and put it into this  17:47:23

5   chart?                                               17:47:23

6      MR. KIM:  Objection; calls for privileged         17:47:26

7   information.  Instruct you not to answer to the extent  17:47:29

8   it's asking you what Uber's lawyers told you.        17:47:31

9      MR. JAFFE:  This is waived.                       17:47:33

10  I mean, the only basis for him to say that this is   17:47:35

11  current is what a lawyer told him, so that's not a   17:47:39

12  proper privilege instruction.                        17:47:40

13     MR. KIM:  He's already told you that it's based on  17:47:42

14  communications with his lawyers.  You're not entitled  17:47:45

15  to know exactly what his lawyers told him.           17:47:47

16     MR. JAFFE:  I'm entitled to know exactly that.    17:47:49

17     MR. KIM:  Disagree.                               17:47:50

18  BY MR. JAFFE:                                        17:47:50

19     Q.    Mr. Haslim, what did Uber's lawyers tell you  17:47:56

20  was the source of the data in the "Current" column?  17:47:59

21     MR. KIM:  Same objection with instruction not to  17:48:01

22  answer.                                              17:48:02

23            You can answer that question generally if  17:48:08

24  you can without revealing the exact -- the           17:48:12

25  specific communications that you've had with the     17:48:14
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | lawyer.  But I think you've already done that. | 17:48:17 |
| 2 | Can you rephrase the question to avoid asking | 17:48:24 |
| 3 | with him what Uber's lawyers told him? | 17:48:26 |
| 4 | BY MR. JAFFE: | 17:48:26 |
| 5 | Q.   I'm asking him, what is the basis for his | 17:48:30 |
| 6 | knowledge, to the extent that he has any, about where | 17:48:33 |
| 7 | the data in the "Current" column in your declaration | 17:48:36 |
| 8 | came from? | 17:48:38 |
| 9 | A.   I'll have to say my knowledge of where the | 17:48:42 |
| 10 | data in the "Current" column came from would come from | 17:48:47 |
| 11 | inspecting where I believed it came from and finding a | 17:48:51 |
| 12 | reasonable match from some number of channels that | 17:48:55 |
| 13 | begin the pattern and end the pattern. | 17:48:57 |
| 14 | Q.   How did you know to look in that document? | 17:49:01 |
| 15 | A.   Discussion with counsel. | 17:49:05 |
| 16 | Q.   Okay.  So let me start again.  What was your | 17:49:07 |
| 17 | basis for understanding that what's in the "Current" | 17:49:10 |
| 18 | column actually reflects anything in Fuji? | 17:49:13 |
| 19 | A.   Again, my basis for understanding what was | 17:49:18 |
| 20 | reflected in the "Current" column reflects what was | 17:49:21 |
| 21 | actually built in Fuji was to compare some subset of | 17:49:26 |
| 22 | the numbers at least to the angles in a document that | 17:49:29 |
| 23 | I know was used to build Fuji. | 17:49:33 |
| 24 | Q.   So again, for the chart on page 13 here, you | 17:49:37 |
| 25 | didn't prepare that chart; right? | 17:49:39 |

Page 242

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. KIM:  Objection; form. | 17:49:42 |
| 2 | THE WITNESS:  I did not prepare this spreadsheet | 17:49:44 |
| 3 | chart. | |
| 4 | BY MR. JAFFE: | 17:49:45 |
| 5 | Q.   It came to you fully formed with the current | |
| 6 | column and the November 16th column already populated; | |
| 7 | right? | |
| 8 | A.   Yes. | 17:49:52 |
| 9 | Q.   And you only checked a couple of the angles; | 17:49:55 |
| 10 | right? | 17:49:55 |
| 11 | A.   I checked more than a couple, but I checked a | 17:50:00 |
| 12 | subset of the angles. | 17:50:01 |
| 13 | Q.   And what about the November 16th one, how | 17:50:04 |
| 14 | many of those did you check? | 17:50:05 |
| 15 | A.   I would have -- I don't remember exactly how | 17:50:09 |
| 16 | many I checked. | 17:50:09 |
| 17 | Q.   Do you remember checking any? | 17:50:11 |
| 18 | A.   Yes. | 17:50:12 |
| 19 | Q.   More than one? | 17:50:15 |
| 20 | A.   Yeah.  It would have been more than one, but | 17:50:17 |
| 21 | I don't remember exactly how many. | 17:50:19 |
| 22 | Q.   What else in your declaration did you rely on | 17:50:23 |
| 23 | representations from counsel about? | 17:50:25 |
| 24 | A.   Annotations in Figure 2B. | 17:50:45 |
| 25 | Q.   That's relied on by counsel? | 17:50:48 |

Page 243

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   Counsel created the annotations.  I looked at    17:50:52

 2   it, thought it looked correct.                             17:50:55

 3        Q.   What about -- let's go to page 4.                17:51:02

 4        A.   Okay.                                            17:51:03

 5        Q.   Do you see there's some large footnotes          17:51:06

 6   there?                                                     17:51:07

 7        A.   Yes.                                             17:51:07

 8        Q.   Who provided those references?                   17:51:09

 9        A.   I did.                                           17:51:10

10        Q.   And where did you find them?                     17:51:12

11        A.   On the web.                                      17:51:13

12        Q.   So you went out and found each of those?         17:51:16

13        A.   Yes.                                             17:51:16

14        Q.   And the iXBlue one that you're referring to?     17:51:20

15        A.   IXBlue, yes.

16        Q.   IXBlue, excuse me.                               17:51:23

17             Do you know when that specialty fiber web        17:51:27

18   page first was published?                                 17:51:29

19        A.   No.                                              17:51:29

20        Q.   Do you know if it was published before or        17:51:31

21   after you started designing ████████████      ████████

     ████████████████████████████ ?                            17:51:39

23        A.   I don't know.                                    17:51:40

24        Q.   Again on page 5 looking at Figure 4, do you      17:51:43

25   know whether that website was posted before or after      17:51:46
```

                                                          Page 244

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | the conversation with Mr. Levandowski? | 17:51:47 |
| 2 | A.   I don't know. | 17:51:48 |
| 3 | Q.   Is there anything else in the declaration in | 17:51:54 |
| 4 | which you're relying on representations from Uber's | 17:51:59 |
| 5 | lawyers? | 17:51:59 |
| 6 | MR. KIM:  Objection; form. | 17:52:01 |
| 7 | THE WITNESS:  Figure 6, I relied on Uber's lawyers | 17:52:06 |
| 8 | to excerpt this section from the spreadsheet. | 17:52:09 |
| 9 | Figure 7A and 7B, I relied on Uber lawyer to put | 17:52:20 |
| 10 | down these files that were sourced by somebody | 17:52:23 |
| 11 | else. | 17:52:24 |
| 12 | BY MR. JAFFE: | 17:52:24 |
| 13 | Q.   Who were they sourced by? | 17:52:26 |
| 14 | A.   I'm fairly certainly they would be sourced by | 17:52:29 |
| 15 | Gaetan. | 17:52:29 |
| 16 | Q.   So Gaetan provided these pictures? | 17:52:31 |
| 17 | A.   I believe so, yes. | 17:52:32 |
| 18 | Q.   Did you talk to Gaetan about what you wanted | 17:52:34 |
| 19 | to provide, what you wanted him to put in here? | 17:52:37 |
| 20 | MR. KIM:  Objection; form. | 17:52:39 |
| 21 | THE WITNESS:  No. | 17:52:39 |
| 22 | BY MR. JAFFE: | 17:52:39 |
| 23 | Q.   What was your understanding of what | 17:52:41 |
| 24 | Mr. Pennecot went out and looked for? | 17:52:44 |
| 25 | A.   My understanding was these were documents | 17:52:52 |

Page 245

```
 1   that were already produced and were gathered for the     17:52:55

 2   purpose of this declaration.                              17:52:57

 3        Q.   And it refers to ████████████████████           ███████

 4   ███████████                                               17:53:03

 5        A.   Yes.                                             17:53:03

 6        Q.   Has the FAC lens in Fuji always been            17:53:12

 7   ████████████████                                          17:53:14

 8        THE REPORTER:  I'm sorry, can you repeat that?       17:53:14

 9   BY MR. JAFFE:

10        Q.   Has the FAC lens in Fuji always been            17:53:19

11   ██████████████

12        A.   I've only known it to be████████████            17:53:19

13        Q.   So you've never seen a version of a FAC lens    17:53:23

14   that is █████████████                                     17:53:24

15        A.   No, not to my knowledge.                        17:53:26

16        Q.   And would it surprise you if Uber -- go         17:53:29

17   ahead.                                                    17:53:29

18        A.   You left the question very general and I        17:53:32

19   answered too quickly.  I've never seen ███████████        17:53:35

20   ███████████████████████████████████                      17:53:41

21        Q.   What other design have you seen?                17:53:47

22        A.  ████████████████████████████████        ███████ 

23   ████████                                                  17:53:54

24        Q.   In terms of the custom FAC lens that includes   17:53:57

25   a cylindrical optical surface, have you ever seen one     17:54:01
```

Page 246

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | of those? | 17:54:02 |
| 2 | MR. KIM:  Objection; form. | 17:54:03 |
| 3 | THE WITNESS:  Are you asking about anywhere? | 17:54:05 |
| 4 | BY MR. JAFFE: | 17:54:05 |
| 5 | Q.   At Uber or Otto. | 17:54:07 |
| 6 | A.   If -- I don't know of seeing a cylindrical | 17:54:12 |
| 7 | custom FAC lens at Otto. | 17:54:14 |
| 8 | Q.   And you don't know whether Fuji ever had a | 17:54:19 |
| 9 | cylindrical FAC lens ever? | 17:54:22 |
| 10 | A.   To my knowledge, ███████████    ████████ | |
| 11 | ████████████████████████    ████████ | |
| 12 | █████████         ████████ | |
| 13 | Q.   What about ███████████ are you familiar | 17:54:34 |
| 14 | with that? | 17:54:35 |
| 15 | A.   I've seen the name ████████ | 17:54:38 |
| 16 | Q.   What is that? | 17:54:39 |
| 17 | A.   I believe it's the FAC lens. | 17:54:41 |
| 18 | Q.   And do you know whether there are any | 17:54:43 |
| 19 | versions of that design that had a cylindrical optical | 17:54:46 |
| 20 | surface? | 17:54:47 |
| 21 | A.   I'm not aware.  If there were, I'm not aware | 17:54:50 |
| 22 | of them.  So we have to go back to Gaetan's design | 17:54:52 |
| 23 | record to see if he started with a cylindrical design. | 17:54:57 |
| 24 | Q.   So we talked about some of the charts where | 17:55:00 |
| 25 | you said that you relied on Uber's counsel. | 17:55:04 |

Page 247

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | What about any of the text?  Are any of the | 17:55:05 |
| 2 | numbers in here, do they come from Uber's counsel as | 17:55:09 |
| 3 | opposed to you? | 17:55:10 |
| 4 | A.   A large part of the text, perhaps the bulk of | 17:55:17 |
| 5 | the text in this declaration, came from Uber's | 17:55:20 |
| 6 | counselors. | 17:55:20 |
| 7 | Q.   Okay.  So they provided you basically all the | 17:55:24 |
| 8 | text in this draft; is that fair? | 17:55:26 |
| 9 | MR. KIM:  Objection; form. | 17:55:28 |
| 10 | THE WITNESS:  It's a little too much to say "all," | 17:55:30 |
| 11 | but I could say more than half and that I was given an | 17:55:33 |
| 12 | opportunity to edit. | 17:55:37 |
| 13 | BY MR. JAFFE: | 17:55:37 |
| 14 | Q.   Okay.  So I want to go back to my original | 17:55:43 |
| 15 | question which was, what part of the text are you | 17:55:47 |
| 16 | relying on representations from Uber's lawyers for | 17:55:50 |
| 17 | purposes of your declaration? | 17:55:52 |
| 18 | A.   Since Uber's lawyers originated most of the | 17:56:13 |
| 19 | text, I relied on Uber's lawyers to originate most of | 17:56:18 |
| 20 | the text in here. | 17:56:19 |
| 21 | Q.   Meaning, most of the text you're relying on | 17:56:26 |
| 22 | on their representations; is that fair? | 17:56:29 |
| 23 | A.   I'm relaying on their -- | 17:56:30 |
| 24 | MR. KIM:  Objection; form. | 17:56:31 |
| 25 | THE REPORTER:  I'm relaying on their . . . | |

Page 248

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        THE WITNESS:  I'm relying on their origination.        17:56:37

2    BY MR. JAFFE:                                              17:56:37

3        Q.   So for example, looking at page 13, there's a     17:56:43

4    chart comparing Spider and Fuji.  Uber's lawyer came       17:56:49

5    up with that chart; right?                                 17:56:51

6        MR. KIM:  Objection; form.                             17:56:52

7        THE WITNESS:  Yes.                                     17:56:53

8    BY MR. JAFFE:                                              17:56:53

9        Q.   The idea -- going back to page 8, the idea of     17:57:09

10   excerpting what's in Figure 6, was that -- did that        17:57:14

11   idea come from Uber's lawyers?                             17:57:17

12       MR. KIM:  Objection; form.  Also on grounds of         17:57:20

13   work product.                                              17:57:25

14       THE WITNESS:  I presume it was.                        17:57:30

15   BY MR. JAFFE:                                              17:57:30

16       Q.   And going back to --                              17:57:42

17       MR. KIM:  How long have we been going on the           17:57:57

18   record?                                                    17:57:58

19       THE VIDEOGRAPHER:  The entire time?                    17:57:59

20       MR. KIM:  Yes.  Oh, just since the last break.         17:58:05

21       THE VIDEOGRAPHER:  54 minutes.                         17:58:07

22       MR. JAFFE:  I'm referring to your original             17:58:32

23   declaration.  Let's go to your original declaration,       17:58:32

24   please.                                                    17:58:34

25       MR. KIM:  I'm going to object to this whole line       17:58:34

Page 249

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | of questioning as outside the scope of recross. | 17:58:39 |
| 2 | BY MR. JAFFE: | 17:58:39 |
| 3 |     Q.   Did Uber's lawyers, did they prepare your | 17:58:42 |
| 4 | original declaration as well? | 17:58:44 |
| 5 |     MR. KIM:  Objection; form. | 17:58:45 |
| 6 |     THE WITNESS:  I would say Uber's lawyers | 17:58:54 |
| 7 | originated most of this declaration. | 17:58:58 |
| 8 | BY MR. JAFFE: | 17:58:58 |
| 9 |     Q.   What percentage of the words in your original | 17:59:00 |
| 10 | declaration came from Uber's lawyers? | 17:59:03 |
| 11 |     MR. KIM:  Objection; form. | 17:59:07 |
| 12 |     THE WITNESS:  I don't know what the percentage is. | 17:59:08 |
| 13 | BY MR. JAFFE: | 17:59:08 |
| 14 |     Q.   Over 80 percent? | 17:59:10 |
| 15 |     MR. KIM:  Objection; form, outside the scope. | 17:59:14 |
| 16 |     THE WITNESS:  Yeah, I'm not sure. | 17:59:18 |
| 17 | I know I had some textural editing input to this | 17:59:25 |
| 18 | document, but I don't remember like percentagewise | 17:59:26 |
| 19 | on the words.  It was less than half. | 17:59:31 |
| 20 | BY MR. JAFFE: | 17:59:31 |
| 21 |     Q.   But in terms of the drafting, they sent you a | 17:59:34 |
| 22 | full draft of your declaration? | 17:59:36 |
| 23 |     MR. KIM:  Objection; form. | 17:59:38 |
| 24 | BY MR. JAFFE: | 17:59:38 |
| 25 |     Q.   Is that right? | 17:59:39 |

Page 250

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   Yes, I got --                          17:59:44

 2      MR. KIM:  Outside the scope of redirect.  Recross.  17:59:47

 3      THE WITNESS:  Yes.  I got a more or less complete  17:59:51

 4  draft from Uber's lawyers.                      17:59:54

 5  BY MR. JAFFE:                                    17:59:54

 6      Q.   And I want to take you particularly to page  17:59:56

 7  12 of your original declaration.                 18:00:00

 8      A.   Okay.                                   18:00:03

 9      Q.   Do you see where you refer to          18:00:06

10  Mr. Levandowski's input?                         18:00:08

11      A.   Yes.                                    18:00:16

12      Q.   What did you do -- well, let me start this,  18:00:19

13  was this paragraph drafted by Uber's lawyers?    18:00:22

14      MR. KIM:  Objection; form outside the scope.  18:00:26

15      THE WITNESS:  I believe they wrote the first draft  18:00:32

16  of this.                                         18:00:33

17  BY MR. JAFFE:                                    18:00:33

18      Q.   And what did you do to verify before signing  18:00:38

19  your declaration that what's here in paragraph 19 and  18:00:43

20  written by Uber's lawyers was true and accurate based  18:00:46

21  on your personal knowledge?                      18:00:48

22      A.   I used my personal knowledge, my personal  18:00:55

23  experience, my recollection, read this, agreed.  To my  18:01:02

24  knowledge, to the best of my knowledge, that the  18:01:04

25  statement in paragraph 19 was true.             18:01:06
```

Page 251

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So Uber's lawyers sent you paragraph 19.  You | 18:01:09 |
| 2 | said looks good and you signed it? | 18:01:11 |
| 3 | MR. KIM:  Objection; form. | 18:01:12 |
| 4 | THE WITNESS:  They sent me 19.  I may have made an | 18:01:15 |
| 5 | edit in it.  I don't recall.  And then gave that edit | 18:01:21 |
| 6 | back.  Got a final draft, read through, and signed it. | 18:01:25 |
| 7 | BY MR. JAFFE: | 18:01:25 |
| 8 | Q.   What was the edit you gave to paragraph 19 to | 18:01:27 |
| 9 | make it accurate? | 18:01:28 |
| 10 | MR. KIM:  Objection; form. | 18:01:35 |
| 11 | THE WITNESS:  I may have suggested that we make a | 18:01:39 |
| 12 | strong statement as possible regarding the 14,000 | 18:01:44 |
| 13 | files having not seen any evidence of that in the | 18:01:48 |
| 14 | development of this sensor. | 18:01:49 |
| 15 | BY MR. JAFFE: | 18:01:49 |
| 16 | Q.   Anything else? | 18:01:51 |
| 17 | A.   I don't recall. | 18:01:55 |
| 18 | Q.   So for purposes of the first sentence here | 18:01:59 |
| 19 | about Mr. Levandowski never had nor currently has any | 18:02:03 |
| 20 | design input, that was written wholesale by Uber's | 18:02:08 |
| 21 | lawyers? | 18:02:08 |
| 22 | MR. KIM:  Objection; form. | 18:02:10 |
| 23 | THE WITNESS:  I don't recall if I may have -- if I | 18:02:13 |
| 24 | had made any edits to this first sentence or not. | 18:02:16 |
| 25 | BY MR. JAFFE: | 18:02:16 |

Page 252

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      Q.   And what did you do to verify -- well,      18:02:19
2   actually I think you already said this.            18:02:21
3           You didn't do anything to verify that this  18:02:24
4   statement was accurate in paragraph 19 of your     18:02:27
5   declaration after it was provided to you by Uber's 18:02:30
6   lawyers; right?                                    18:02:31
7      MR. KIM:  Objection; form.                       18:02:37
8      THE WITNESS:  I did no investigation to verify   18:02:40
9   that the statements made in paragraph 19 were      18:02:46
10  absolutely true.                                   18:02:49
11  BY MR. JAFFE:                                      18:02:49
12     Q.   Did you talk to Mr. Levandowski?           18:02:52
13     A.   No.                                        18:02:52
14     Q.   Okay.  All right.  So what parts of your   18:03:03
15  original declaration are you relying on information 18:03:08
16  from Uber's lawyers?                               18:03:11
17     A.   Can you be specific when you say relying on 18:03:21
18  the Uber's lawyers.                                18:03:25
19     Q.   The basis for it being in your declaration is 18:03:28
20  something provided to you by counsel.              18:03:32
21     MR. KIM:  Objection; form.                       18:03:35
22     THE WITNESS:  Again, this document was, in the   18:03:41
23  majority, sourced by lawyers for Uber.             18:03:47
24  BY MR. JAFFE:                                      18:03:47
25     Q.   So you would say the majority of the document 18:03:49
```

Page 253

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | you're relying on information from counsel; is that | 18:03:51 |
| 2 | right? | 18:03:52 |
| 3 | A.   For the majority of the document, I'm relying | 18:03:58 |
| 4 | on Uber's counsel to originate the document.  I'm not | 18:04:01 |
| 5 | necessarily relying on them.  If you're implying -- | 18:04:04 |
| 6 | Q.   Let me -- | 18:04:04 |
| 7 | MR. KIM:  Let him finish. | 18:04:06 |
| 8 | BY MR. JAFFE: | 18:04:06 |
| 9 | Q.   That's fine.  Let me be more clear. | 18:04:10 |
| 10 | MR. KIM:  Wait.  Are you cutting off the witness | 18:04:11 |
| 11 | here? | 18:04:12 |
| 12 | MR. JAFFE:  I think I'm trying to clarify.  I'll | 18:04:16 |
| 13 | withdraw the prior question. | 18:04:18 |
| 14 | BY MR. JAFFE: | |
| 15 | Q.   I want to understand what facts are in your | 18:04:20 |
| 16 | declaration that you relied on from counsel. | 18:04:24 |
| 17 | A.   I'm still having a hard time understanding | 18:04:27 |
| 18 | when you say relying on counsel for facts, whether | 18:04:31 |
| 19 | you're implying I'm relying on Uber's counsel for the | 18:04:35 |
| 20 | veracity or whether I'm relying on Uber's counsel to | 18:04:39 |
| 21 | put that information into the declaration. | 18:04:41 |
| 22 | Q.   That's fair.  Let me help clarify this. | 18:04:43 |
| 23 | So what I'm trying to get at is, were you | 18:04:48 |
| 24 | relying on Uber's counsel for the basis of these | 18:04:51 |
| 25 | facts, that is, you don't have independent personal | 18:04:52 |

Page 254

| | | |
|---|---|---|
| 1 | ████████████████████████████ | 18:12:20 |
| 2 | ████████ | 18:12:20 |
| 3 | BY MR. JAFFE: | |
| 4 | Q.   Okay.   Going back to your declaration here, | 18:12:25 |
| 5 | we're looking at paragraph 18. | 18:12:26 |
| 6 | MR. KIM:   Jordan, how long do you plan on going? | 18:12:30 |
| 7 | It's about 6:10.   Been going over an hour since the | 18:12:34 |
| 8 | last break. | 18:12:35 |
| 9 | MR. JAFFE:   Just kind of keep going. | 18:12:37 |
| 10 | MR. KIM:   Yeah, well -- I think we should take a | 18:12:40 |
| 11 | break. | 18:12:40 |
| 12 | MR. JAFFE:   Why don't we do this quick question | 18:12:44 |
| 13 | and then we'll take a break. | 18:12:45 |
| 14 | BY MR. JAFFE: | |
| 15 | Q.   Are you looking at paragraph 18 of your | 18:12:47 |
| 16 | original declaration? | 18:12:49 |
| 17 | A.   Yes. | 18:12:51 |
| 18 | Q.   So you referred to this in the redirect | 18:12:55 |
| 19 | testimony.   You talked about the custom beam spacing | 18:12:58 |
| 20 | and angle summary Scott provided. | 18:13:01 |
| 21 | Do you see that? | 18:13:02 |
| 22 | A.   Yes. | 18:13:02 |
| 23 | Q.   So at the bottom of the page -- and this is | 18:13:07 |
| 24 | what we talked about earlier today, you said my team | 18:13:10 |
| 25 | imported the data. | 18:13:11 |

Page 261

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Do you see that? | 18:13:12 |
| 2 | A.   Yes. | 18:13:12 |
| 3 | Q.   And based on what you talked about with | 18:13:14 |
| 4 | Mr. Kim, Uber's lawyer, it was Mr. Pennecot that | 18:13:18 |
| 5 | imported the data into Zemax; right? | 18:13:21 |
| 6 | A.   Yes. | 18:13:22 |
| 7 | Q.   And it was Mr. Pennecot that then determined | 18:13:25 |
| 8 | the resultant emitting points of the laser diodes; | 18:13:29 |
| 9 | right? | 18:13:29 |
| 10 | A.   Yes. | 18:13:29 |
| 11 | Q.   And it was Mr. Pennecot that then exported it | 18:13:33 |
| 12 | into CAD software; right? | 18:13:36 |
| 13 | A.   Yes, that's my understanding. | 18:13:38 |
| 14 | Q.   And so Mr. Pennecot was the one who actually | 18:13:42 |
| 15 | came up with ███████████████████████ | 18:13:47 |
| 16 | based on Mr. Boehmke's beam angles; isn't that right? | 18:13:51 |
| 17 | A.   No, I don't think so. | 18:13:52 |
| 18 | Q.   So what Mr. Pennecot exported into CAD | 18:13:56 |
| 19 | software, that wasn't ███████████████████? | 18:14:04 |
| 20 | A.   So if we go back carefully to transcripts, | 18:14:07 |
| 21 | what I should point out is, since this declaration, I | 18:14:11 |
| 22 | have more detailed information of exactly how | 18:14:14 |
| 23 | Mr. Pennecot did his import.  To be accurate, I want | 18:14:19 |
| 24 | to say that there's an error in here that he brought | 18:14:25 |
| 25 | the angles into CAD software, brought the lens design | 18:14:31 |

Page 262

```
 1   and field curvature shape from Zemax into CAD      18:14:37

 2   software.                                          18:14:37

 3           Now you're asking did Mr. Pennecot in fact 18:14:40

 4   design the                                         

 5                          Mr. Pennecot was dependent on 18:14:50

 6   somebody else to tell him how many boards the angles 18:14:53

 7   had to be divided among, and then Mr. Pennecot set the 18:14:58

 8   positions of the laser diodes onto those boards.   18:15:02

 9       Q.  Who told Mr. Pennecot to use              ?  18:15:05

10       A.  I told Mr. Pennecot to use            in   18:15:09

11   the optical cavity.                                18:15:10

12       Q.  Who told him to use            in total?   18:15:13

13       A.  I don't think anybody told him to use      18:15:18

14              in total.                               18:15:18

15       Q.  Who told him to put                        18:15:22

16          ?                                           18:15:22

17       A.  Mr. Pennecot understood the reason we were 18:15:31

18   going to            so I'll -- with that said, I'm  18:15:35

19   not aware that anybody had to tell him to          18:15:41

20                                                      18:15:41

21       Q.  You don't know where Mr. Pennecot          18:15:45

22              from?                                    18:15:45

23       A.  No, I know exactly where he got it from.   18:15:48

24       Q.  Where did he get it from?                  18:15:49

25       A.  The need to                                18:15:52
```

Page 263

```
 1    If you're asking do I know from whom, no.  I would say    18:15:57

 2    that he could derive that himself.                        18:15:59

 3        Q.   Okay.  So -- but just to be clear,               18:16:04

 4    Mr. Pennecot -- you told him ███████████████████████████

      █████████████████████████████████ in the SolidWorks      18:16:13

 6    CAD software, and you told him 64 channels and he         18:16:16

 7    created ███████████████████████████ is that fair?        18:16:21

 8        A.   I didn't necessarily tell him 64 channels.       18:16:24

 9    He got the list of angles that Scott Boehmke had          18:16:28

10    generated.                                                18:16:29

11        Q.   So he knew that there were 64 channels;          18:16:31

12    right?                                                    18:16:31

13        A.   Without me telling him.                          18:16:33

14        Q.   So the sequence of events was there was Scott    18:16:36

15    Boehmke provided beam angles for 64 channels?             18:16:40

16        A.   Yes.                                             18:16:40

17        Q.   That went to Mr. Pennecot.  He imported that     18:16:45

18    data into Zemax.  And after he outputted into CAD         18:16:50

19    software, the result was a design with ██████████████████

      ███████████████████████████████████████; is that         18:17:01

21    right?                                                    18:17:02

22        A.   Can you read that back.                          18:17:04

23             (Record read by reporter as follows:             18:17:04

24             "Question:  He imported that data into Zemax.    18:17:04

25             And after he outputted into CAD software, the
```

Page 264

| | | |
|---|---|---|
| 1 | as a whole taken with no prior knowledge that this | 19:08:02 |
| 2 | document does not completely represent accurately what | 19:08:06 |
| 3 | goes into Boards ████████ together as a whole. | 19:08:09 |
| 4 | BY MR. JAFFE: | 19:08:09 |
| 5 |    Q.  Let me ask the question again. | 19:08:11 |
| 6 |       Sitting here today, you cannot -- sitting | 19:08:14 |
| 7 | here today, Exhibit 1060 does not accurately represent | 19:08:18 |
| 8 | what is in Fuji?  Yes or no. | 19:08:20 |
| 9 |   MR. KIM:  Objection; form. | 19:08:26 |
| 10 |   THE WITNESS:  Yes, but only in the strictest | 19:08:29 |
| 11 | meaning of accuracy. | 19:08:33 |
| 12 | BY MR. JAFFE: | 19:08:33 |
| 13 |    Q.  What does that mean? | 19:08:35 |
| 14 |    A.  That means the magnitudes in here match but | 19:08:41 |
| 15 | the sign change has not been consistently applied.  If | 19:08:45 |
| 16 | I had to use this data and no other data to build a | 19:08:49 |
| 17 | Fuji, then I would have a problem in the strict sense. | 19:08:53 |
| 18 |    Q.  I see.  Okay. | 19:08:54 |
| 19 |       So Exhibit 1060 has some inaccuracies and | 19:09:00 |
| 20 | problems, but it's generally accurate; is that right? | 19:09:05 |
| 21 |    A.  I'm more comfortable saying that, yes. | 19:09:07 |
| 22 |    Q.  So you couldn't build Fuji looking at Exhibit | 19:09:10 |
| 23 | 1060; right?  Using this data? | 19:09:12 |
| 24 |    A.  Right. | 19:09:12 |
| 25 |    Q.  And it wouldn't be fair to try and build a | 19:09:16 |

Page 287

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Fuji using just this data; right?                    19:09:18

 2        MR. KIM:  Objection; form.                       19:09:20

 3        THE WITNESS:  It would not render a correct Fuji  19:09:24

 4    based on this data only by itself.                   19:09:27

 5    BY MR. JAFFE:                                         19:09:27

 6        Q.   Now, I want to go back to paragraph 19 of   19:09:34

 7    your declaration, your original declaration, the     19:09:40

 8    sentence about Mr. Levandowski.                      19:09:42

 9        A.   Okay.                                        19:09:53

10        Q.   We talked about this before and you testified 19:09:56

11    that you did no investigation to confirm the sentence 19:10:01

12    in paragraph -- the first sentence in paragraph 19;  19:10:04

13    right?                                               19:10:04

14        A.   Right.                                       19:10:04

15        Q.   And I just want to make sure that it's clear. 19:10:09

16            When you said you did no investigation, did   19:10:11

17    you do anything to confirm this statement before you 19:10:14

18    signed your declaration?                             19:10:16

19        MR. KIM:  Objection; form.                       19:10:21

20        THE WITNESS:  I refer to my recollection of how  19:10:23

21    the Fuji was developed, remembered no evidence of    19:10:28

22    Anthony coming in and controlling or designing those 19:10:31

23    aspects of the Fuji.                                 19:10:33

24    BY MR. JAFFE:                                         19:10:33

25        Q.   Did you talk to anyone to confirm this      19:10:35
```

Page 288

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | statement? | 19:10:36 |
| 2 | A.   No. | 19:10:38 |
| 3 | Q.   Did you look at any documents to confirm this | 19:10:41 |
| 4 | statement? | 19:10:41 |
| 5 | A.   No. | 19:10:44 |
| 6 | Q.   Did you talk to anyone else on the LiDAR | 19:10:46 |
| 7 | team? | 19:10:47 |
| 8 | A.   No. | 19:10:50 |
| 9 | Q.   Okay.  Other than consulting your memory, did | 19:10:58 |
| 10 | you do anything to confirm the first sentence of | 19:11:00 |
| 11 | paragraph 19 of your original declaration? | 19:11:02 |
| 12 | A.   No, not that I recall. | 19:11:12 |
| 13 | Q.   Okay.  Let's -- | 19:11:13 |
| 14 | MR. KIM:  So we've gone 30 minutes on the record. | 19:11:18 |
| 15 | We're going to conclude this deposition | 19:11:23 |
| 16 | as we discussed at the break on the grounds that | 19:11:27 |
| 17 | we've given you more time than we took on | 19:11:32 |
| 18 | redirect, and he's now gone close to seven hours | 19:11:35 |
| 19 | on the record. | 19:11:36 |
| 20 | MR. JAFFE:  I understand your position. | 19:11:39 |
| 21 | THE VIDEOGRAPHER:  This is the end of today's | 19:11:44 |
| 22 | deposition of Mr. James Haslim. | 19:11:46 |
| 23 | We are off the record at 7:11 p.m. | 19:11:50 |
| 24 | The total number of media used was six and it | 19:11:53 |
| 25 | will be retained by Veritext.  Thank you. | 19:11:56 |

Page 289