# EXHIBIT 6

# FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3             SAN FRANCISCO DIVISION
 4
     WAYMO LLC,
 5
                   Plaintiff,
 6                                    Case
     vs.                        No. 3:17-cv-00939-WHA
 7
     UBER TECHNOLOGIES, INC.;
 8   OTTOMOTTO LLC; OTTO TRUCKING LLC,
 9              Defendants,
                                    /
10
11
12
13
14
15      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
16        VIDEOTAPED DEPOSITION OF JAMES HASLIM
17             THURSDAY, MAY 4, 2017
18
19
20
21
22   Reported by:
23   Anrae Wimberley
24   CSR No. 7778
25   Job No.  2610396
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4

 5   WAYMO LLC,

 6                   Plaintiff,

                                      Case

 7   vs.                      No. 3:17-cv-00939-WHA

 8   UBER TECHNOLOGIES, INC.;

     OTTOMOTTO LLC; OTTO TRUCKING LLC,

 9

                     Defendants.

10                                   /

11

12

13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15           Transcript of video-recorded deposition of

16   JAMES HASLIM, taken at Quinn Emanuel Urquhart &

17   Sullivan LLP, 50 California Street, 22nd Floor, San

18   Francisco, California 94111, beginning at 10:16 a.m.

19   and ending at 7:11 p.m. on Thursday, May 4, 2017,

20   before Anrae Wimberley, Certified Shorthand Reporter

21   No. 7778.

22

23

24

25

                                         Page  2
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES:

 2

 3    For Plaintiff Waymo LLC:

 4

 5              QUINN EMANUEL URQUHART & SULLIVAN LLP

 6              BY:  JORDAN R. JAFFE, ESQ.

 7              JOHN McCAULEY, ESQ.

 8              50 California Street, 22nd Floor

 9              San Francisco, California 94111

10              (415) 498-0556

11              jordanjaffe@quinnemanuel.com

12              johnmccauley@quinnemanuel.com

13

14    For Defendants Uber Technologies, Inc., Ottomotto LLC;

15    Otto Trucking LLC:

16

17              MORRISON & FOERSTER

18              BY:  RUDY Y. KIM, ESQ.

19              755 Page Mill Road

20              Palo Alto, California 94304

21              (650) 813-5869

22              rudykim@mofo.com

23

24

25
```

Page  3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Also Present:

2

3          VERITEXT LEGAL SOLUTIONS

4          ROMANO PERASA, VIDEOGRAPHER

5          (415) 274-9977

6          SFDepo@veritext.com

7

8          AARON BERGSTROM, Senior Counsel -

9          Litigation, San Francisco for Uber

10         Technologies.

11

12                    --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                       I N D E X

 2

 3     EXAMINATION BY:                                  PAGE

 4     MR. JAFFE                              9, 102, 224

 5     MR. KIM                                          177

 6                      --oOo--

 7

 8                    E X H I B I T S

 9

10     EXHIBIT        DESCRIPTION                       PAGE

11     PLAINTIFF'S:

12     Exhibit 150    Hand-drawn schematic by witness;    20

13                    1 page

14

15     Exhibit 151    Declaration of James Haslim;        47

16                    14 pages

17

18     Exhibit 152    Supplemental Declaration of James   61

19                    Haslim; 15 pages

20

21     Exhibit 153    Defendants' list of servers,       105

22                    officers, directors and employees;

23                    6 pages

24

25
```

Veritext Legal Solutions
866 299-5127

```
 1              E X H I B I T S  (Cont'd)

 2    EXHIBIT        DESCRIPTION                    PAGE

 3    Exhibit 154    E-mail chain of December 2016;   110

 4                   4 pages

 5

 6    Exhibit 155    Document entitled, "Exhibit B";  113

 7                   3pages

 8

 9    Exhibit 156    Fuji Data from Haslim Declaration 122

10                   Exhibit B; 1 page

11

12    Exhibit 157    Document entitled, "Exhibit H";  138

13                   19 pages

14

15    Exhibit 158    E-mail chain of April 2017;      148

16                   1 page

17

18    Exhibit 159    E-mail chain of June 2016;       151

19                   2 pages

20

21    Exhibit 160    E-mail chain of June 2016;       157

22                   5 pages

23

24    Exhibit 161    Schematic of ██████████          273

25                   1 page


                                         Page  6
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              E X H I B I T S   (Cont'd)

2    EXHIBIT          DESCRIPTION                      PAGE

3    DEFENDANTS':

4    Exhibit 1060   Chart from Haslim Declaration      177

5                   Exhibit B; 1 page

6

7    Exhibit 1061   Exhibit I to Mr. Boehmke's         206

8                   Declaration; 12 pages

9                        --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                           Page  7
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        THURSDAY, MAY 4, 2017; SAN FRANCISCO, CALIFORNIA;

2                        10:16 A.M.

3                          - - -

4            THE VIDEOGRAPHER:  Good morning.

5    We are on the record at 10:16 a.m. on May 4th,

6    2017.

7            This is the videotaped deposition of

8    Mr. James Haslim.                                10:16:44

9            My name is Ramon Perasa, here with our court  10:16:48

10   reporter, Anrae Wimberley.  We are here from Veritext  10:16:51

11   Legal Solutions at the request of counsel for the    10:16:54

12   plaintiff.                                            10:16:54

13   This deposition is being held at Quinn Emanuel in    10:16:57

14   San Francisco.                                        10:16:58

15           The caption of this case is Waymo LLC versus  10:17:03

16   Uber Technologies.  Case No. 3-17-cv-00939-WHA.       10:17:12

17   Please note that audio and video recording will       10:17:15

18   take place unless all parties have agreed to go       10:17:18

19   off the record.  Microphones are sensitive and may    10:17:19

20   pick up whispers or private conversations.

21           At this time, counsel, please identify        10:17:26

22   yourselves for the record and state whom you          10:17:28

23   represent.                                            10:17:29

24     MR. JAFFE:  Jordan Jaffe of Quinn Emanuel on        10:17:29

25   behalf of the plaintiff, Waymo.                       10:17:29
```

                                                    Page 8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. McCAULEY:  John McCauley of Quinn Emanuel also | 10:17:29 |
| 2 | on behalf of Waymo. | 10:17:36 |
| 3 | MR. KIM:  Rudy Kim of Morrison Foerster on behalf | 10:17:39 |
| 4 | of Uber Technologies and Auto Moto LLC. | 10:17:42 |
| 5 | MR. BERGSTROM:  Aaron Bergstrom with Uber. | 10:17:44 |
| 6 | THE VIDEOGRAPHER:  The court reporter may now | 10:17:46 |
| 7 | swear in the witness. | 10:17:47 |
| 8 | JAMES HASLIM, | |
| 9 | sworn as a witness by the Certified | |
| 10 | Shorthand Reporter, testified as follows: | |
| 11 | EXAMINATION | 10:17:47 |
| 12 | BY MR. JAFFE: | 10:17:47 |
| 13 | Q.   Good morning. | 10:18:09 |
| 14 | A.   Good morning. | 10:18:10 |
| 15 | Q.   Welcome back.  We've spoken before. | 10:18:14 |
| 16 | This is your second deposition in this case; | 10:18:19 |
| 17 | right? | 10:18:19 |
| 18 | A.   Right. | 10:18:19 |
| 19 | Q.   Did you have time to prepare -- realize a | 10:18:28 |
| 20 | short amount of time -- to prepare with your counsel | 10:18:30 |
| 21 | for purposes of today's deposition? | 10:18:33 |
| 22 | A.   Yes. | 10:18:33 |
| 23 | Q.   Is there any reason you can't give your full | 10:18:35 |
| 24 | and truthful testimony today? | 10:18:37 |
| 25 | A.   No. | 10:18:37 |

Page 9

| | | |
|---|---|---|
| 1 | Q.   Just like in your last deposition, you | 10:18:40 |
| 2 | understand that you are under oath; correct? | 10:18:41 |
| 3 | A.   Correct. | 10:18:41 |
| 4 | Q.   All right.   Last time -- in your last | 10:18:53 |
| 5 | deposition, I asked you when was the first time you | 10:18:56 |
| 6 | ever spoke with lawyers from Morrison & Foerster.   And | 10:18:59 |
| 7 | my recollection is you said sometime in 2017; is that | 10:19:04 |
| 8 | right? | 10:19:04 |
| 9 | A.   Yes. | 10:19:05 |
| 10 | Q.   I have a different question. | 10:19:08 |
| 11 | Are you familiar with a firm called Stroz | 10:19:11 |
| 12 | Friedberg? | 10:19:13 |
| 13 | A.   I have a little familiarity.   I believe Stroz | 10:19:17 |
| 14 | Friedberg is the firm that is taking laptops and | 10:19:22 |
| 15 | computers and imaging hard drives for us. | 10:19:25 |
| 16 | Q.   When was the first time you ever spoke with | 10:19:28 |
| 17 | someone from Stroz Friedberg or a representative of | 10:19:31 |
| 18 | Stroz Friedberg? | 10:19:32 |
| 19 | A.   First time I spoke with someone from Stroz -- | 10:19:35 |
| 20 | I don't know how to pronounce the name -- Friedberg | 10:19:37 |
| 21 | would be when I handed off my two laptops to them. | 10:19:44 |
| 22 | Q.   Approximately when in time was that? | 10:19:46 |
| 23 | A.   That would be approximately mid April, around | 10:19:49 |
| 24 | the time of my deposition. | 10:19:53 |
| 25 | Q.   Of this year? | 10:19:56 |

Page 10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Of this year. | 10:19:56 |
| 2 | Q.   Did you speak with anyone from Stroz | 10:20:00 |
| 3 | Friedberg as part of the due diligence process for | 10:20:04 |
| 4 | Uber buying Otto? | 10:20:06 |
| 5 | A.   No. | 10:20:06 |
| 6 | Q.   Do you know if anyone spoke with Stroz | 10:20:11 |
| 7 | Friedberg during that due diligence process on the | 10:20:15 |
| 8 | LiDAR team? | 10:20:17 |
| 9 | A.   No. | 10:20:17 |
| 10 | Q.   That wasn't something that you were aware of? | 10:20:20 |
| 11 | A.   Correct. | 10:20:20 |
| 12 | Q.   Okay.  All right.  I'm going to go | 10:20:33 |
| 13 | through -- you understand that we had a preliminary | 10:20:35 |
| 14 | injunction hearing yesterday with the judge; right? | 10:20:39 |
| 15 | A.   Right. | 10:20:39 |
| 16 | Q.   There are certain questions that the judge | 10:20:42 |
| 17 | had that I'm going to get your testimony on so we can | 10:20:45 |
| 18 | then report back to the judge, just so we're all kind | 10:20:47 |
| 19 | of clear. | |
| 20 | One of the questions that the judge had was, | 10:20:50 |
| 21 | "What is the significance of using 64 channels in a | 10:20:54 |
| 22 | LiDAR as opposed to 65 or so on?" | 10:20:59 |
| 23 | Can you answer that, please? | 10:21:01 |
| 24 | A.   Yes.  I'm trying to collect my thoughts on | 10:21:04 |
| 25 | that.  I don't have a strong feeling that there is a | 10:21:06 |

Page 11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | strong significance to the specific number of | 10:21:09 |
| 2 | channels. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | 10:21:13 |
| 3 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | 10:21:17 |
| 4 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | 10:21:21 |
| 5 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | 10:21:26 |
| 6 | Q.    What is the significance of the powers of | 10:21:28 |
| 7 | two? | 10:21:29 |
| 8 | A.    The significance of powers of two can be | 10:21:32 |
| 9 | assessed to the convenience of using computing devices | 10:21:41 |
| 10 | that are binary in nature that have data fields that | 10:21:44 |
| 11 | are some fixed number of bits wide, and it just | 10:21:48 |
| 12 | becomes convenient in that aspect. | 10:21:50 |
| 13 | Q.    Thank you.  All right. | 10:21:55 |
| 14 | Does Mr. Levandowski have an assistant? | 10:22:00 |
| 15 | A.    I don't know if he has an assistant. | 10:22:03 |
| 16 | Q.    Does he have a secretary? | 10:22:05 |
| 17 | A.    I'm not sure. | 10:22:06 |
| 18 | Q.    Has he ever had an assistant or a secretary, | 10:22:10 |
| 19 | to your knowledge? | 10:22:12 |
| 20 | A.    Yes.  Early -- I'm not sure when this was no | 10:22:18 |
| 21 | longer the case.  He had an assistant that I believe | 10:22:22 |
| 22 | he shared with Lior Ron.  I believe the assistant's | 10:22:28 |
| 23 | name is Mason Feldman. | 10:22:30 |
| 24 | Q.    And what is the time period that Mr. Feldman | 10:22:35 |
| 25 | was Mr. Levandowski's assistant? | 10:22:40 |

Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   My recollection is shaky.  I want to say | 10:22:43 |
| 2 | shortly after joining Otto, I can recall Mason being | 10:22:49 |
| 3 | around at that time frame.  And when it ended I'm not | 10:22:53 |
| 4 | sure, but that would have been maybe in the | 10:22:56 |
| 5 | past -- let me try to bookend this -- past -- this is | 10:23:03 |
| 6 | very hard because I don't remember.  I believe as | 10:23:07 |
| 7 | shortly as a few, couple months ago, perhaps.  And | 10:23:13 |
| 8 | this could also be found pretty readily.  Mr. Feldman | 10:23:17 |
| 9 | was reporting to a facilities manager. | 10:23:22 |
| 10 | Q.   Does Mr. Feldman still work for Uber or Otto? | 10:23:26 |
| 11 | A.   Yes. | 10:23:27 |
| 12 | Q.   What does he do now? | 10:23:29 |
| 13 | A.   I understand he's working for a facilities | 10:23:31 |
| 14 | manager. | 10:23:33 |
| 15 | Q.   When you say "facilities manager," what do | 10:23:35 |
| 16 | you mean by that? | 10:23:36 |
| 17 | A.   I wish I knew better in detail, but I don't. | 10:23:41 |
| 18 | We have somebody on staff that I believe would be | 10:23:44 |
| 19 | called a facilities manager, perhaps manages what goes | 10:23:48 |
| 20 | on with buildings, facilities' needs, be it the need | 10:23:55 |
| 21 | for air-conditioning, a repair, something of that | 10:23:59 |
| 22 | nature. | 10:23:59 |
| 23 | Q.   Where is Mr. Feldman located? | 10:24:02 |
| 24 | A.   To my knowledge, he has a desk in our offices | 10:24:07 |
| 25 | in San Francisco. | 10:24:09 |

Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    Other than Mr. Feldman, who are you aware of | 10:24:20 |
| 2 | that most closely works with Mr. Levandowski on a | 10:24:27 |
| 3 | day-to-day basis? | 10:24:29 |
| 4 | A.    On a day-to-day basis, the only other | 10:24:32 |
| 5 | employee I'm aware of that works closely with him I | 10:24:35 |
| 6 | would say is Eric Meyhofer. | 10:24:44 |
| 7 | Q.    Mr. Meyhofer, how do you know him? | 10:24:50 |
| 8 | A.    Eric is my boss. | 10:24:52 |
| 9 | Q.    How long have yourself and Mr. Meyhofer known | 10:24:59 |
| 10 | each other? | 10:25:00 |
| 11 | A.    I met Eric Meyhofer -- I don't remember when, | 10:25:09 |
| 12 | but I can tell you it was when he visited Tyto LiDAR | 10:25:13 |
| 13 | with Scott Boehmke, and they visited to evaluate our | 10:25:20 |
| 14 | products. | 10:25:21 |
| 15 | Q.    And you said you didn't remember when this | 10:25:26 |
| 16 | meeting was. | 10:25:30 |
| 17 | Can you give it a year? | 10:25:31 |
| 18 | A.    It was prior to acquisition by Otto, but a | 10:25:40 |
| 19 | significant time went by between our meeting and being | 10:25:46 |
| 20 | acquired by Otto.  So I don't even want to hazard the | 10:25:52 |
| 21 | year, because it could be off. | 10:25:55 |
| 22 | Q.    So there was a meeting between Mr. Meyhofer, | 10:26:03 |
| 23 | Mr. Boehmke and Tyto LiDAR; is that right? | 10:26:08 |
| 24 | A.    That's right. | 10:26:09 |
| 25 | Q.    And it was sometime before the acquisition of | 10:26:12 |

Page 14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Tyto by Otto; correct? | 10:26:15 |
| 2 | A.   Correct. | 10:26:15 |
| 3 | Q.   Who else was at that meeting? | 10:26:19 |
| 4 | A.   That would have included Brent Schwarz.  I'm | 10:26:26 |
| 5 | not certain whether Mike Karasoff would have been at | 10:26:30 |
| 6 | that meeting as well. | 10:26:32 |
| 7 | Q.   Anybody else? | 10:26:32 |
| 8 | A.   I don't recall. | 10:26:33 |
| 9 | Q.   Was Mr. Levandowski at that meeting? | 10:26:37 |
| 10 | A.   Not that I recall. | 10:26:38 |
| 11 | Q.   You're not sure, though? | 10:26:41 |
| 12 | A.   I'm fairly sure that he was not.  That would | 10:26:45 |
| 13 | have been awkward. | 10:26:48 |
| 14 | Q.   You said, "That would have been awkward." | 10:26:50 |
| 15 | Why do you say that? | 10:26:52 |
| 16 | A.   Well, he wasn't an employee of Tyto. | 10:26:57 |
| 17 | Q.   Mr. Levandowski. | 10:26:57 |
| 18 | A.   That's what I meant. | 10:26:59 |
| 19 | Q.   So you're saying it would have been awkward | 10:27:02 |
| 20 | for Mr. Levandowski to be involved in a meeting | 10:27:06 |
| 21 | between Tyto and Uber because he wasn't involved in | 10:27:10 |
| 22 | Tyto; is that right? | 10:27:12 |
| 23 | A.   It would be awkward because he was not an | 10:27:14 |
| 24 | employee, yes. | 10:27:15 |
| 25 | Q.   So I see you changed words there a little | 10:27:17 |

Page 15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | bit -- | 10:27:17 |
| 2 | A.   I did. | 10:27:19 |
| 3 | Q.   -- and I just want to clarify that. | 10:27:20 |
| 4 | Why did you change -- my question was about | 10:27:23 |
| 5 | whether he was involved, and you answered about | 10:27:26 |
| 6 | whether he was an employee. | 10:27:27 |
| 7 | Why did you do that? | 10:27:28 |
| 8 | A.   Because I would need clarification on the | 10:27:31 |
| 9 | word "involved."  We would occasionally have dinner, | 10:27:38 |
| 10 | chat, see how the business was going on a friendly | 10:27:41 |
| 11 | term. | 10:27:42 |
| 12 | Q.   What is your understanding as to | 10:27:43 |
| 13 | Mr. Levandowski's involvement in Tyto LiDAR? | 10:27:48 |
| 14 | A.   My understanding of his involvement with Tyto | 10:27:53 |
| 15 | LiDAR was he was providing us a place of work when we | 10:27:58 |
| 16 | were still Odin Wave, early -- when we were getting | 10:28:02 |
| 17 | started.  He sourced contract employees.  He was a | 10:28:11 |
| 18 | friend who would stop by occasionally for chats. | 10:28:15 |
| 19 | Q.   Chats about what? | 10:28:16 |
| 20 | A.   What we're working on, what would the next | 10:28:21 |
| 21 | product be if we finished the current product. | 10:28:24 |
| 22 | Q.   Why were you chatting with Mr. Levandowski | 10:28:26 |
| 23 | about what you were working on at Tyto LiDAR? | 10:28:29 |
| 24 | A.   I couldn't tell you -- if your question is | 10:28:34 |
| 25 | why that was appropriate or why that was something | 10:28:41 |

Page 16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | that was to discuss, the question came up, he would | 10:28:45 |
| 2 | ask, we would talk. | 10:28:47 |
| 3 | Q.   Was there anyone else that you would have | 10:28:50 |
| 4 | these kind of chats with, that weren't employees, | 10:28:53 |
| 5 | about your work at Tyto? | 10:28:58 |
| 6 | A.   Not that I recall. | 10:29:02 |
| 7 | Q.   Did you ever raise to any of your fellow | 10:29:05 |
| 8 | employees at Tyto LiDAR, hey, why are we talking with | 10:29:10 |
| 9 | Mr. Levandowski about the work that we're doing? | 10:29:14 |
| 10 | A.   No. | 10:29:14 |
| 11 | Q.   Never came up? | 10:29:16 |
| 12 | A.   Not to my recollection. | 10:29:17 |
| 13 | Q.   You never asked anyone? | 10:29:18 |
| 14 | A.   No. | 10:29:18 |
| 15 | Q.   You didn't think it was odd that this person | 10:29:21 |
| 16 | who doesn't work for the company was talking about | 10:29:23 |
| 17 | your work with you? | 10:29:24 |
| 18 | A.   No. | 10:29:25 |
| 19 | Q.   Did you know that Mr. Levandowski was working | 10:29:27 |
| 20 | on LiDAR at Waymo at the time? | 10:29:31 |
| 21 | A.   I knew he was working for Google at the time, | 10:29:35 |
| 22 | and I didn't know the details of what specifically he | 10:29:39 |
| 23 | was working on. | 10:29:41 |
| 24 | Q.   Have you ever spoken with Mr. Levandowski | 10:29:44 |
| 25 | about ███████████████████████████████ | 10:29:51 |

Page 17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    Yes.                                    10:29:51

 2        Q.    When?                                   10:29:52

 3        A.    This would be some date, I can't recall when,  10:30:01

 4   at Tyto LiDAR.                                     10:30:05

 5        Q.    And what did you guys talk about?       10:30:12

 6        A.    We talked about our need to design our own  10:30:15

 7   fiber laser in order to eliminate costs and lead time.  10:30:21

 8   And he gave me what I would call a tech tutorial on  10:30:29

 9   fiber lasers.                                      10:30:31

10        Q.    What did he say?                        10:30:35

11        A.    I don't remember the words of our       10:30:37

12   conversation.                                      10:30:38

13        Q.    Tell me everything you remember about that  10:30:40

14   conversation, please.                              10:30:41

15        A.    He -- trying to recall -- described a   10:30:53

16   schematic, a layout, an approach for ███████████████████

███████████████████████ generally how they work.  Told me  10:31:03

18   to go find a YouTube video from a professor on lasers  10:31:09

19   in general.  I believe he recommended some suppliers.  10:31:18

20        Q.    Who are the suppliers?                  10:31:20

21        A.    I believe he recommended ███████████████████

█████████████     And I believe he recommended ██████████  10:31:41

23        Q.    And ████████ that's the same vendor used for  10:31:47

24   the fiber in the Spider design; right?             10:31:51

25        A.    Yes.                                    10:31:51
```

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    Sorry I interrupted.                      10:31:55

 2            Are you finished telling me everything that   10:31:57

 3   you remember about that conversation?               10:31:58

 4            MR. JAFFE:  Can you get me a piece of paper?  10:32:07

 5      MR. McCAULEY:   (Hands document.)                10:32:15

 6      THE WITNESS:  I recall he was telling me to hurry  10:32:18

 7   up and order the ███████████ because they were long   10:32:25

 8   lead items.  I think he suggested some ████████████████

     █████████████████████████████████████████████████████

     █████████████████████████ I don't recall any more    10:32:46

11   than that.                                          10:32:48

12   BY MR. JAFFE:                                       10:32:48

13      Q.    Thank you.                                 10:32:49

14            So we talked about that conversation, and you   10:32:53

15   said you didn't remember when it was.  I just want to   10:32:56

16   see if we can bound that time with any more          10:32:59

17   specificity.                                        10:33:00

18      A.    Ooh.  I recall it occurred at our -- after we   10:33:09

19   moved out of Berkeley, so this was in San Leandro.   10:33:16

20   This would have been prior to my starting to develop   10:33:22

21   the fiber lasers, so it had to be relatively         10:33:25

22   shortly -- I would say -- this is all qualitative, I'm   10:33:32

23   sorry -- shortly after that move to San Leandro.     10:33:34

24      Q.    All right.  So based on those kind of       10:33:36

25   considerations, what approximate timeline did you guys   10:33:42
```

Page 19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | move to San Leandro? | 10:33:43 |
| 2 | A.   There's a lot of years between here and | 10:33:45 |
| 3 | there.  It's tractable [sic] from other information | 10:33:52 |
| 4 | sources, but I don't have it in my head right now. | 10:33:55 |
| 5 | Q.   2015? | 10:33:56 |
| 6 | A.   Could be.  I don't know. | 10:33:57 |
| 7 | Q.   So sitting here today, you can't give me any | 10:34:00 |
| 8 | more specificity as to the time of that conversation? | 10:34:03 |
| 9 | A.   I cannot. | 10:34:04 |
| 10 | Q.   I'm going to hand you this. | 10:34:06 |
| 11 | MR. JAFFE:  And we're going to mark it as -- now | 10:34:09 |
| 12 | I've lost what exhibit we're at, so I'm just going to | 10:34:14 |
| 13 | say 150 so we don't run over another exhibit. | |
| 14 | (Plaintiff's Exhibit 150 was marked.) | |
| 15 | BY MR. JAFFE: | |
| 16 | Q.   Can you please draw the schematic that | 10:34:17 |
| 17 | Mr. Levandowski provided to you during that | 10:34:20 |
| 18 | conversation.  And here I'll hand you my pen. | 10:34:25 |
| 19 | A.   I can do my best. | 10:34:26 |
| 20 | So I want to state, as I'm going to attempt | 10:34:56 |
| 21 | to do this for you, that there is a very real risk | 10:35:00 |
| 22 | that I'm going to take information that I know now, | 10:35:03 |
| 23 | after having built the fiber laser, and get that | 10:35:06 |
| 24 | somehow accidently contaminated into a vague | 10:35:13 |
| 25 | recollection of what schematic he gave me. | 10:35:16 |

Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.    I just want your best recollection of the      10:35:18

 2    schematic that he gave you.                              10:35:19

 3        A.    I understand that.                             10:35:21

 4        Q.    That's all I'm asking for.                     10:35:23

 5        A.    I understand that.                             10:35:23

 6              (Witness draws diagram.)                       10:35:31

 7              (Pause in proceedings.)

 8              MR. KIM:   Just going to object on form         10:35:39

 9    grounds here, for the record.                            10:35:41

10              THE WITNESS:   Okay.   I think this is the best 10:38:17

11    of my recollection.   I put a note on here there's ▮▮▮▮▮▮

      ▮▮▮▮▮▮▮▮▮▮▮▮   I don't know what the order was in his     10:38:24

13    recommendation.                                          10:38:25

14    BY MR. JAFFE:

15        Q.    Can I take a look at it?                       10:38:31

16        A.    Yes.   And I've drawn ▮▮▮▮▮▮▮▮   And I          10:38:35

17    don't know if he recommended ▮▮▮▮▮▮   And I can          10:38:37

18    explain any abbreviations.                               10:38:39

19        Q.    Sure.                                          10:38:40

20              So I'm just going -- just want to talk a       10:38:45

21    couple things here.                                      10:38:46

22              So ▮▮▮▮ what does that stand for?              10:38:49

23        A.    ▮▮▮▮▮▮▮▮▮▮                                     10:38:52

24        Q.    Okay.   And then ▮▮▮▮ here on Exhibit 150,     10:38:54

25    what does that stand for?                                10:38:56
```

Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      A.    ███████████████████████.            10:39:04

2      Q.    And in terms -- I again want to talk about   10:39:07

3   the timing of this briefly.                10:39:09

4         Do you know before -- whether it was before   10:39:12

5   or after 2011?                      10:39:14

6      A.    I don't know.                 10:39:24

7      Q.    So did you talk about ██████████████████   10:39:32

   ████████████████████ at this time?          10:39:40

9      A.    I don't recall.               10:39:41

10      Q.    Did you talk about ███████████████████    10:39:44

11   at this time?                      10:39:45

12      A.    Yes.                     10:39:46

13      Q.    What did you talk about?           10:39:48

14      A.    We talked about the need to optimize ██████   10:39:52

   ██████████████████ and that that could be done   10:39:58

16   through an experimental approach.          10:40:01

17      Q.    What was the experimental approach that    10:40:03

18   Mr. Levandowski told you about?            10:40:05

19      A.    He didn't give a lot of detail.  He called it   10:40:09

20   a ██████████  I can't remember how he called it.  But as   10:40:15

21   he described it, ████████████████████████████   10:40:23
```

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

```
                              10:40:34
```

████████████████████████

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        Q.    Did you and Mr. Levandowski discuss the      10:40:39

2    ████████████████████████████████████████████████████████

                                                            10:40:49
     ████████████████████████████████████████████

4        A.    Possibly, yeah.  I think there -- he may have  10:40:54

5    described the relationship between -- almost the       10:40:58

6    equivalence.  ████████████████████████████████████

     ████████████████████████████████████████████████████████

                                                            10:41:07
     ████████████████████████████████████████

9        Q.    All right.  After you had this conversation   10:41:16

10   with Mr. Levandowski, did you build the fiber laser    10:41:22

11   that he described?                                     10:41:23

12       A.    Yeah.                                         10:41:23

13       Q.    And when you had this conversation with him,  10:41:27

14   did you ask him whether he was allowed to reveal this  10:41:29

15   information to you?                                     10:41:31

16       A.    No.                                           10:41:31

17       Q.    Why not?                                      10:41:35

18       A.    I can't recall what I was feeling or thinking 10:41:37

19   at the time, but this looks like general information   10:41:41

20   to me.                                                 10:41:42

21       Q.    So you didn't think, when he provided a       10:41:44

22   schematic on how to build a fiber laser, that this     10:41:48

23   could have been confidential information of Google?    10:41:52

24       A.    I wouldn't say so.                            10:41:54

25       Q.    That didn't cross your mind?                  10:41:56
```

Page 23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    I don't recall what crossed my mind.        10:41:57

 2        Q.    So you're not denying that it could have     10:42:00

 3    happened?                                              10:42:02

 4        A.    It didn't happen that I recall --            10:42:04

 5        Q.    Did you --

 6        A.    -- but it's not impossible.                  10:42:07

 7        Q.    Sorry.  I didn't mean to interrupt.          10:42:09

 8              Did you ever discuss with anyone any question 10:42:11

 9    in your mind as to whether Mr. Levandowski was allowed 10:42:14

10    to reveal this information to you?                     10:42:17

11        A.    No.                                          10:42:17

12        Q.    Didn't cross your mind?                      10:42:20

13        A.    There's enough prior art.  As I began to    10:42:26

14    study this online, it looked pretty plain vanilla to  10:42:32

15    me.                                                    10:42:33

16        Q.    All right.  So we talk about ███████     ████████

17    ███████████████   and you built this fiber laser.      10:42:38

18              Is this the resulting design -- or the basis 10:42:41

19    for the design that is in the fiber laser in Spider?   10:42:45

20        MR. KIM:  Objection; form.                         10:42:48

21        THE WITNESS:  I would be willing to say that this  10:42:53

22    was a starting point for my development of the fiber   10:42:57

23    laser that did end up in the Owl sensor and later the  10:43:03

24    Spider.                                                10:43:04

25    BY MR. JAFFE:                                          10:43:04
```

Page 24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    Right. | |
| 2 | So, for example, the fiber laser in Spider, | 10:43:08 |
| 3 | ██████████████████████    right? | 10:43:10 |
| 4 | A.    Yes. | 10:43:10 |
| 5 | Q.    And the ████████████████████████████ | |
| 6 | ████████████████████    right? | 10:43:16 |
| 7 | A.    Right. | 10:43:16 |
| 8 | Q.    And it's ██████████████████████ | 10:43:20 |
| 9 | right? | 10:43:20 |
| 10 | A.    Right. | 10:43:20 |
| 11 | Q.    And all those elements are described here in | 10:43:23 |
| 12 | Exhibit 150, the drawing that you described; right? | 10:43:26 |
| 13 | A.    Right. | 10:43:26 |
| 14 | Q.    And you determined ████████████████████ | |
| 15 | ███████████████████████████████ based on | 10:43:39 |
| 16 | Mr. Levandowski's kind of guidance with you on the | 10:43:44 |
| 17 | experimental approach to take; right? | 10:43:46 |
| 18 | MR. KIM:  Objection; form. | 10:43:48 |
| 19 | THE WITNESS:  I would say that his guidance on a | 10:43:57 |
| 20 | ██████████████████ put me on the right direction to | 10:44:01 |
| 21 | develop ████████████████ for this, yes. | 10:44:05 |
| 22 | BY MR. JAFFE: | 10:44:05 |
| 23 | Q.    So we talked about ██████████████████████ | 10:44:08 |
| 24 | What was the next conversation that you had | 10:44:10 |
| 25 | with Mr. Levandowski about LiDAR? | 10:44:18 |

Page 25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I don't know. | 10:44:20 |
| 2 | Q.   You can't say? | 10:44:22 |
| 3 | A.   I could not recall the next conversation we | 10:44:25 |
| 4 | had. | 10:44:25 |
| 5 | Q.   Why not? | 10:44:26 |
| 6 | A.   It was a long time ago. | 10:44:28 |
| 7 | Q.   Well, when is the next conversation that you | 10:44:31 |
| 8 | recall between yourself and Mr. Levandowski relating | 10:44:34 |
| 9 | to LiDAR? | 10:44:36 |
| 10 | A.   I recall him stopping by for dinner, asking | 10:44:43 |
| 11 | how we're doing, how we're making progress and saying, | 10:44:47 |
| 12 | what is the next product that we should work on.  He | 10:44:50 |
| 13 | was curious what we thought we should work on.  If | 10:44:54 |
| 14 | this product is successful, what is the next one? | 10:44:58 |
| 15 | Q.   And what did he say? | 10:45:00 |
| 16 | A.   I'm not sure it was his suggestion.  I | 10:45:06 |
| 17 | believe Brent was suggesting we could be looking at | 10:45:08 |
| 18 | doing a terrestrial laser scanner because it leveraged | 10:45:14 |
| 19 | very close to the product we had already built and | 10:45:17 |
| 20 | wouldn't require a lot of design work and there's a | 10:45:22 |
| 21 | mature market ready for it. | 10:45:24 |
| 22 | Q.   What's the mature market you're talking | 10:45:27 |
| 23 | about? | 10:45:28 |
| 24 | A.   Terrestrial laser scanning is used widely in | 10:45:33 |
| 25 | construction and applications like that. | 10:45:36 |

Page 26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.    Do you remember anything else from            10:45:41

 2   Mr. Levandowski in that conversation, anything else he   10:45:44

 3   said about LiDAR or anything?                            10:45:47

 4        A.    No.  No.                                      10:45:48

 5        Q.    When is the next conversation you had?        10:45:50

 6        A.    I have no recollection of what the next       10:45:56

 7   conversation was.                                        10:45:57

 8        Q.    When is the next conversation that you        10:45:59

 9   recall?

10          MR. KIM:  Objection; form.                        10:46:03

11       THE WITNESS:  I can't recall when these              10:46:05

12   conversations took place.  I would say we had dinner     10:46:10

13   occasionally, and he would generally just ask how        10:46:14

14   we're doing.                                             10:46:15

15   ███████████████████████████████████████████

     ███████████████████████████████████████████

     █████████████████████████████████████████    10:46:25

18   LiDAR techniques?                                        10:46:28

19       MR. KIM:  Objection; form.                           10:46:42

20       THE WITNESS:  At this point, I'm leaning towards     10:46:44

21   saying when I joined Otto.                               10:46:46

22   ████████████████████

     ███████████████████████████████████████████

     ███████████████████████████████████████████

     ████████████████████████████████████    10:46:54
```

Page 27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A.    It would have been something to the nature    10:47:01

2   that we need to take -- possibly take the Owl design    10:47:09

3   and convert that into a multichannel LiDAR sensor that  10:47:16

4   could be used on autonomous vehicles.                   10:47:18

5        Q.    And what did Mr. Levandowski say?            10:47:23

6        A.    I think he wanted to know what the plan would 10:47:27

7   be.  I had started -- had sometime in that time frame   10:47:33

8   started working on a CAD model for a design I was       10:47:36

9   going to propose.  And at that time or at a later       10:47:45

10  time, we started to discuss two different design        10:47:49

11  approaches that looked promising to take.               10:47:53

12       Q.    What were those two approaches?             10:47:55

13       A.    One approach was to take the Owl and somehow  10:48:00

14  multiply the channels to get a multichannel LiDAR that  10:48:07

15  could be used on a truck.  The other approach was to    10:48:10

16  basically take the Velodyne style of design and build   10:48:14

17  a sensor in that approach.                              10:48:19

18       Q.    Before we move forward with those two, you   10:48:25

19  said you had built a CAD design for something that you  10:48:29

20  were going to propose.                                  10:48:30

21       A.    Yes.                                         10:48:30

22       Q.    What was the name of that, just for purposes 10:48:34

23  of our conversation?                                    10:48:35

24       A.    It had no name.  Perhaps if I described it.  10:48:39

25       Q.    Sure.                                        10:48:40
```

Page 28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    It was -- I intended to design a LiDAR sensor | 10:48:47 |
| 2 | similar to the Owl, based on the design of the Owl | 10:48:51 |
| 3 | optical cavity.  It was a bistatic LiDAR design.  It | 10:48:57 |
| 4 | would incorporate eight laser sources that would | 10:49:00 |
| 5 | transmit out a transmit lens. | 10:49:03 |
| 6 | It would have eight avalanche photodiodes | 10:49:08 |
| 7 | that would receive through the receive lines.  That | 10:49:14 |
| 8 | would project onto a mirror that could spin that could | 10:49:18 |
| 9 | help scan those beams.  It was intended in my mind to | 10:49:26 |
| 10 | augment something like a Velodyne sensor to provide a | 10:49:29 |
| 11 | longer range, tighter packed field of view. | 10:49:32 |
| 12 | Q.    So what you were coming up with was a | 10:49:36 |
| 13 | long-range sensor that would supplement a mid-range | 10:49:42 |
| 14 | sensor on a self-driving car; is that fair? | 10:49:46 |
| 15 | MR. KIM:  Objection; form. | 10:49:47 |
| 16 | THE WITNESS:  It was meant to supplement the | 10:49:49 |
| 17 | Velodyne-type sensor, yes. | 10:49:53 |
| 18 | BY MR. JAFFE: | 10:49:53 |
| 19 | Q.    Did you have any discussions with | 10:49:54 |
| 20 | Mr. Levandowski in coming up with that design? | 10:49:59 |
| 21 | A.    I don't recall having any discussion with | 10:50:08 |
| 22 | Anthony Levandowski regarding this design.  I want to | 10:50:11 |
| 23 | say that idea came from earlier talks with Eric | 10:50:15 |
| 24 | Meyhofer and Scott Boehmke when they visited.  At that | 10:50:20 |
| 25 | time, Brent Schwarz was proposing to them that we had | 10:50:28 |

Page 29

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | a sensor that was capable of long-range performance | 10:50:31 |
| 2 | and that they would need a sensor for long-range | 10:50:35 |
| 3 | viewing on an autonomous vehicle. | 10:50:40 |
| 4 | And so our angle with Uber at the time was we | 10:50:44 |
| 5 | think we can build such a sensor, but we're not | 10:50:47 |
| 6 | working on it right now.  Our company is open for | 10:50:51 |
| 7 | acquisition. | 10:50:55 |
| 8 | Q.    So the sensor that you were coming up with, | 10:51:00 |
| 9 | that was going to be a bistatic design; right? | 10:51:03 |
| 10 | A.    Yes. | 10:51:05 |
| 11 | Q.    At some point, Spider came about and | 10:51:12 |
| 12 | transformed it to a monostatic design; right? | 10:51:15 |
| 13 | A.    True. | 10:51:17 |
| 14 | Q.    Do you know who was responsible for the | 10:51:19 |
| 15 | change from what you were coming up with, which was a | 10:51:22 |
| 16 | bistatic design, to the monostatic design in Spider? | 10:51:26 |
| 17 | A.    I don't recall who among the team was | 10:51:34 |
| 18 | involved in our conversations first to move away from | 10:51:39 |
| 19 | supplemental design to one design that would cover all | 10:51:44 |
| 20 | the way from directly in front of the vehicle out to | 10:51:47 |
| 21 | long range.  But that was a decision that was made | 10:51:50 |
| 22 | that pretty much negated the proposal I had made of | 10:51:56 |
| 23 | using a tight-packed purely long-range sensor. | 10:52:00 |
| 24 | Q.    So you shifted into the passive voice there. | 10:52:05 |
| 25 | You're talking about -- who is making these | 10:52:07 |

Page 30

```
 1   decisions?                                          10:52:08

 2        A.   Exactly.  I'm trying to recall.  I don't  10:52:10

 3   know, of all the people that were involved, who was in  10:52:14

 4   those conversations.  So it would include me.  It   10:52:17

 5   would include most likely Anthony Levandowski.  I   10:52:23

 6   believe it would also include Daniel Gruver.  And I'm  10:52:28

 7   not sure if there's anyone else.                    10:52:30

 8        Q.   And do you know, in the context of those  10:52:35

 9   communications, who just said, Hey, James, your design  10:52:44

10   looks great, but we're going to go with the monostatic  10:52:46

11   design and we think it's better?                    10:52:50

12        MR. KIM:  Objection; form.                     10:52:50

13        THE WITNESS:  The monostatic design that uses one  10:52:56

14   lens for transmit and receive, I don't know who came  10:52:59

15   up with that.  At some point I saw it, seemed okay to  10:53:05

16   me, it seemed compact, let's use it.                10:53:09

17   BY MR. JAFFE:                                       10:53:09

18        Q.   So you don't know -- you have no information  10:53:12

19   of who came up with the monostatic design in Spider?  10:53:15

20        A.   True.                                     10:53:16

21        Q.   Okay.  So we were still -- going back to our  10:53:25

22   chron of conversations with Mr. Levandowski, when is  10:53:28

23   the next conversation that you had with             10:53:31

24   Mr. Levandowski about LiDAR that you can recall?    10:53:34

25        A.   It's very hard for me to recall specific  10:53:43
```

Page 31

```
 1    conversations, especially in sequence.  At this point,    10:53:47

 2    I report to Anthony Levandowski.                          10:53:50

 3        Q.   And just for purposes of the record, when        10:53:52

 4    you're talking about "this point," what date are you      10:53:54

 5    talking about?                                            10:53:55

 6        A.   I'm talking about immediately following          10:53:56

 7    Tyto's acquisition by Otto -- or I should say Otto's      10:54:03

 8    acquisition of Tyto.  We joined -- at that time, I        10:54:08

 9    reported to Anthony Levandowski.  There would be          10:54:12

10    regular staff meetings.  Since my team is working on      10:54:19

11    LiDAR, LiDAR would definitely come up in conversations    10:54:22

12    with him, at that point, on a probably fairly routine     10:54:25

13    basis, like weekly basis.                                 10:54:28

14        Q.   And what did you and Mr. Levandowski discuss?    10:54:31

15        A.   Progress, approach, schedule or timing,          10:54:39

16    volumes.                                                  10:54:41

17        Q.   Can you tell me any more specifics about the     10:54:44

18    routine and regular conversations you were having with    10:54:48

19    Mr. Levandowski about LiDAR?                              10:54:49

20        A.   He would ask about what the design was           10:54:56

21    looking like, how we were approaching it.  Beyond         10:55:00

22    that, I don't recall specifics of our conversations.      10:55:03

23        Q.   So sitting here today, in this time period       10:55:06

24    that you're talking about, after you joined Otto in       10:55:10

25    May of 2016, you would have regular conversations with    10:55:15
```

Page 32

| | | |
|---|---|---|
| 1 | Mr. Levandowski about LiDAR, but you can't recall any | 10:55:18 |
| 2 | specifics of those conversations; is that fair? | 10:55:21 |
| 3 | A.   That's fair to say I cannot recall beyond the | 10:55:26 |
| 4 | details I already told you. | 10:55:28 |
| 5 | Q.   I see. | 10:55:29 |
| 6 | When is the next -- moving forward in time | 10:55:34 |
| 7 | here, when is the next substantive conversation with | 10:55:38 |
| 8 | Mr. Levandowski about LiDAR that you recall? | 10:55:40 |
| 9 | A.   I don't know. | 10:55:56 |
| 10 | Q.   You don't know? | 10:55:57 |
| 11 | A.   I don't know. | 10:55:57 |
| 12 | Q.   I'm not trying to do a memory test here.  If | 10:56:02 |
| 13 | there's just too many conversations for you to recall, | 10:56:05 |
| 14 | that's fine, and you can just tell me that.  But | 10:56:08 |
| 15 | otherwise I'm just going to keep asking. | 10:56:10 |
| 16 | MR. KIM:  Objection; form. | 10:56:10 |
| 17 | THE WITNESS:  Most of our conversations, that is | 10:56:21 |
| 18 | between me and Anthony Levandowski, were not | 10:56:24 |
| 19 | substantive in LiDAR design per se.  So I'm having a | 10:56:30 |
| 20 | hard time remembering further conversations or | 10:56:35 |
| 21 | specifics. | 10:56:35 |
| 22 | Most of the time, he wanted to know where | 10:56:38 |
| 23 | we were in our progress, and he may have asked | 10:56:41 |
| 24 | what the design was shaping up like. | 10:56:44 |
| 25 | I do recall one more. | 10:56:49 |

Page 33

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | He was visiting Uber.  He got me on the phone | 10:56:56 |
| 2 | and was starting to describe using eight fiber | 10:57:02 |
| 3 | lasers -- that's right -- eight fiber lasers, | 10:57:08 |
| 4 | splitting their outputs to multiply the number of | 10:57:12 |
| 5 | channels and then routing a fiber from each fiber | 10:57:17 |
| 6 | laser into a number of optical cavities. | 10:57:24 |
| 7 | There was also, at that time frame, a | 10:57:26 |
| 8 | document published or shared with the team.  I think | 10:57:31 |
| 9 | that came from Scott Boehmke.  So this would be | 10:57:38 |
| 10 | substantive in terms of shaping up what Spider would | 10:57:43 |
| 11 | eventually become. | 10:57:44 |
| 12 | BY MR. JAFFE: | 10:57:44 |
| 13 | Q.   And you said Mr. Levandowski called you from | 10:57:48 |
| 14 | Uber in Pittsburgh; is that right? | 10:57:53 |
| 15 | A.   My understanding he was either at Uber or in | 10:57:55 |
| 16 | transit to or from Uber in Pittsburgh. | 10:57:58 |
| 17 | Q.   Approximately what time period was this? | 10:58:01 |
| 18 | A.   This would be relatively early in the | 10:58:04 |
| 19 | development of the Spider.  Beyond that, I would defer | 10:58:08 |
| 20 | to e-mails.  I don't remember. | 10:58:10 |
| 21 | Q.   When you say you would "defer to e-mails," | 10:58:12 |
| 22 | are there e-mails about this conversation? | 10:58:15 |
| 23 | A.   There were e-mails -- I should say there was | 10:58:19 |
| 24 | an e-mail with a document that was published that | 10:58:24 |
| 25 | contained the substance of what he was describing. | 10:58:27 |

Page 34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   What was the name of that document? | 10:58:29 |
| 2 | A.   I think it had the name like LiDAR Thoughts. | 10:58:36 |
| 3 | Q.   And that was authored by Mr. Levandowski? | 10:58:39 |
| 4 | MR. KIM:  Objection; form. | 10:58:39 |
| 5 | THE WITNESS:  I don't know that Anthony authored | 10:58:43 |
| 6 | that or if Scott authored that. | 10:58:46 |
| 7 | BY MR. JAFFE: | 10:58:46 |
| 8 | Q.   Mr. Levandowski had design input into what -- | 10:58:49 |
| 9 | the LiDAR described in that document, though; is that | 10:58:53 |
| 10 | fair? | 10:58:54 |
| 11 | MR. KIM:  Objection; form. | 10:58:54 |
| 12 | THE WITNESS:  That's a good question.  He | 10:58:58 |
| 13 | described it to me, but I don't know whether he was | 10:59:02 |
| 14 | describing his idea or Scott's idea.  I don't know. | 10:59:06 |
| 15 | BY MR. JAFFE: | 10:59:06 |
| 16 | Q.   So just to back up, Mr. Levandowski called | 10:59:14 |
| 17 | you and provided some thoughts on how to do the fiber | 10:59:20 |
| 18 | laser design in Spider.  And he was describing | 10:59:23 |
| 19 | something that was in a document called LiDAR | 10:59:25 |
| 20 | Thoughts; is that fair? | 10:59:27 |
| 21 | A.   He was describing something that was later | 10:59:30 |
| 22 | published in an e-mail with LiDAR Thoughts. | 10:59:34 |
| 23 | Q.   And at this time, Otto was an independent | 10:59:41 |
| 24 | company; right? | 10:59:43 |
| 25 | A.   Yes. | 10:59:43 |

Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Why was Mr. Levandowski at Uber? | 10:59:46 |
| 2 | A.   As I understood it, we were considering | 10:59:52 |
| 3 | selling our LiDAR sensors to Uber. | 10:59:56 |
| 4 | Q.   When you say "As I understood it," what was | 10:59:59 |
| 5 | the basis for that understanding? | 11:00:01 |
| 6 | MR. KIM:  Just caution you not to reveal | 11:00:04 |
| 7 | privileged communications with lawyers.  If you can | 11:00:07 |
| 8 | answer it without doing that, you can do so. | 11:00:10 |
| 9 | THE WITNESS:  Um-hum. | 11:00:11 |
| 10 | I don't recall the exact timing and | 11:00:15 |
| 11 | sequencing.  At some point, engineers from Uber | 11:00:23 |
| 12 | Pittsburgh visited our office.  And I have a vague | 11:00:33 |
| 13 | recollection Anthony telling us to be helpful, to | 11:00:41 |
| 14 | share information freely.  It seemed almost like a | 11:00:48 |
| 15 | partnership.  Around the time, Anthony put an | 11:00:56 |
| 16 | e-mail to the entire company saying we were going | 11:00:59 |
| 17 | to be working with them, providing sensor to them, | 11:01:03 |
| 18 | possibly involving autonomous software as well. | 11:01:09 |
| 19 | MR. JAFFE:  Counsel, I don't think that e-mail has | 11:01:12 |
| 20 | been produced, and we ask that it be produced | 11:01:14 |
| 21 | immediately. | 11:01:16 |
| 22 | MR. KIM:  I don't know which e-mail that | 11:01:17 |
| 23 | specifically refers to.  I believe we produced a bunch | 11:01:21 |
| 24 | of e-mails that are similar to that description, but | 11:01:24 |
| 25 | we can confirm. | 11:01:26 |

Page 36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        MR. JAFFE:  Appreciate that.                  11:01:28

 2   BY MR. JAFFE:                                       11:01:28

 3        Q.   So your understanding that Otto was going to  11:01:32

 4   be providing LiDAR technology to Uber came from    11:01:35

 5   Mr. Levandowski; is that true?                     11:01:37

 6        A.   Yes.                                      11:01:38

 7        Q.   And when Otto was in discussions to buy Tyto,  11:01:50

 8   did you know at that time, as a Tyto employee, that  11:01:53

 9   you were going to be supplying LiDAR to Uber?      11:01:58

10        A.   No.                                       11:01:58

11        Q.   It was only after you joined Otto that you  11:02:03

12   found out that Otto was going to be supplying LiDAR to  11:02:06

13   Uber; is that right?                               11:02:07

14        A.   Yes.                                      11:02:07

15        Q.   Did that surprise you?                    11:02:10

16        A.   Yes.                                      11:02:10

17        Q.   Why?                                      11:02:12

18        A.   I had a nice meeting with Eric Meyhofer and  11:02:17

19   Scott Boehmke when we were at Tyto.  A long time had  11:02:22

20   transpired, and it was a pleasant surprise to see that  11:02:25

21   we were going to be making LiDAR sensors for them  11:02:29

22   after all.                                         11:02:30

23        Q.   So it was a pleasant surprise?            11:02:32

24        A.   It was.                                   11:02:33

25        Q.   I see.  I see.                            11:02:34
```

Page 37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | All right.  Are there any other substantive | 11:02:40 |
| 2 | conversations regarding LiDAR with Mr. Levandowski | 11:02:43 |
| 3 | that you can recall? | 11:02:47 |
| 4 | MR. KIM:  Objection; form. | 11:02:50 |
| 5 | THE WITNESS:  I'm not sure I would consider the | 11:03:11 |
| 6 | pivot to Fuji a conversation that was substantive, but | 11:03:18 |
| 7 | he did provide input into the Fuji and that he wanted | 11:03:26 |
| 8 | to make sure it first operated as well or better than | 11:03:33 |
| 9 | Velodyne and suggested that we ignore concerns from | 11:03:38 |
| 10 | the Pittsburgh office regarding size and weight and | 11:03:41 |
| 11 | not to be constrained by that. | 11:03:43 |
| 12 | BY MR. JAFFE: | 11:03:43 |
| 13 | Q.   Anything else? | 11:03:44 |
| 14 | A.   I don't recall. | 11:03:52 |
| 15 | Q.   Just to be clear, is there any other | 11:04:00 |
| 16 | conversation that you had with Mr. Levandowski about | 11:04:04 |
| 17 | LiDAR design that you can recall, sitting here today? | 11:04:10 |
| 18 | MR. KIM:  Objection; form. | 11:04:11 |
| 19 | THE WITNESS:  I don't recall any more. | 11:04:48 |
| 20 | BY MR. JAFFE: | 11:04:48 |
| 21 | Q.   No more? | 11:04:53 |
| 22 | A.   I don't recall any more.  I'm sorry. | 11:04:56 |
| 23 | Q.   And this is apart from the regular | 11:04:58 |
| 24 | conversations that you had with Mr. Levandowski | 11:05:00 |
| 25 | regarding status and updates; right? | 11:05:03 |

Page 38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    This would be distinct from status and | 11:05:08 |
| 2 | updates. | 11:05:09 |
| 3 | Q.    Okay.   I just want that to be clear. | 11:05:10 |
| 4 | Okay.   When you joined Tyto, when did you | 11:05:14 |
| 5 | first hear that Mr. Levandowski would be your boss on | 11:05:19 |
| 6 | the LiDAR team? | 11:05:21 |
| 7 | A.    I believe my offer letter for joining Otto | 11:05:28 |
| 8 | would have indicated that he would be my manager, I | 11:05:33 |
| 9 | believe. | 11:05:33 |
| 10 | Q.    So Mr. Levandowski decided that you | 11:05:41 |
| 11 | were -- that he was -- you were going -- excuse me -- | 11:05:44 |
| 12 | that he was going to be your boss on the LiDAR team | 11:05:47 |
| 13 | when you joined Otto; right? | 11:05:48 |
| 14 | A.    I presumed that, yes. | 11:05:51 |
| 15 | Q.    Do you think the LiDAR team needed | 11:05:56 |
| 16 | Mr. Levandowski to accomplish its goals? | 11:06:01 |
| 17 | MR. KIM:  Objection; form. | 11:06:01 |
| 18 | THE WITNESS:  Honestly, no. | 11:06:08 |
| 19 | BY MR. JAFFE: | 11:06:08 |
| 20 | Q.    Why not? | 11:06:09 |
| 21 | A.    We have a team that probably could have come | 11:06:13 |
| 22 | up with a number of different LiDAR sensors without | 11:06:17 |
| 23 | his input. | 11:06:18 |
| 24 | Q.    But that's not what happened; right? | 11:06:20 |
| 25 | A.    That's not what happened. | 11:06:22 |

Page 39

| | | |
|---|---|---|
| 1 | Q.   So when was the first time you worked with | 11:06:32 |
| 2 | Max Levandowski on LiDAR? | 11:06:35 |
| 3 | A.   That would be immediately following my | 11:06:38 |
| 4 | joining Otto. | 11:06:39 |
| 5 | Q.   And what is your working relationship with | 11:06:43 |
| 6 | Max Levandowski? | 11:06:45 |
| 7 | A.   He reports to me. | 11:06:47 |
| 8 | Q.   He reports to you.  I see. | 11:06:49 |
| 9 | So, actually, let's go back in time to when | 11:06:56 |
| 10 | you first joined Otto. | 11:06:58 |
| 11 | And you're having regular interactions with | 11:07:00 |
| 12 | Mr. Levandowski; right? | 11:07:02 |
| 13 | A.   Um-hum. | 11:07:03 |
| 14 | Q.   What devices are you aware of him using at | 11:07:06 |
| 15 | that time in terms of computers? | 11:07:09 |
| 16 | A.   I believe he had a laptop, probably a | 11:07:12 |
| 17 | Macintosh. | 11:07:14 |
| 18 | Q.   Is that his personal laptop? | 11:07:17 |
| 19 | MR. KIM:  Objection; form. | 11:07:17 |
| 20 | THE WITNESS:  I don't know. | 11:07:19 |
| 21 | BY MR. JAFFE: | 11:07:19 |
| 22 | Q.   What about a phone?  Was he using a phone? | 11:07:22 |
| 23 | A.   Sure.  I don't know if he had one phone, | 11:07:24 |
| 24 | multiple phones.  I didn't really pay attention, but | 11:07:27 |
| 25 | I'm sure he had a phone. | 11:07:28 |

Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   How often did Mr. Levandowski bring his | 11:07:32 |
| 2 | personal laptop to work with him? | 11:07:35 |
| 3 | MR. KIM:  Objection; form. | 11:07:35 |
| 4 | THE WITNESS:  I couldn't possibly know. | 11:07:37 |
| 5 | BY MR. JAFFE: | 11:07:37 |
| 6 | Q.   Every day? | 11:07:39 |
| 7 | MR. KIM:  Objection; form. | 11:07:39 |
| 8 | THE WITNESS:  The reason I couldn't possibly know | 11:07:42 |
| 9 | is I don't know whether the laptop he may have carried | 11:07:45 |
| 10 | was his personal laptop or the work laptop. | 11:07:48 |
| 11 | BY MR. JAFFE: | 11:07:48 |
| 12 | Q.   I see.  All right.  So let's just talk about | 11:07:51 |
| 13 | the one laptop that you know about. | 11:07:53 |
| 14 | How often did he bring that laptop to work | 11:07:55 |
| 15 | with him? | 11:07:56 |
| 16 | MR. KIM:  Objection; form. | 11:07:56 |
| 17 | THE WITNESS:  I don't know.  I have no idea. | 11:08:02 |
| 18 | BY MR. JAFFE: | 11:08:02 |
| 19 | Q.   You saw him at work with the personal laptop; | 11:08:06 |
| 20 | right? | 11:08:06 |
| 21 | A.   I'm sure I've seen him at work with a laptop. | 11:08:10 |
| 22 | Q.   And that was a regular occurrence; right? | 11:08:12 |
| 23 | MR. KIM:  Objection; form. | 11:08:14 |
| 24 | THE WITNESS:  I hardly paid attention to how often | 11:08:18 |
| 25 | he was carrying a laptop. | 11:08:20 |

Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. JAFFE:                                        11:08:20

 2       Q.   I understand you're saying that you hardly   11:08:23

 3    pay attention to this.  The judge specifically asked 11:08:25

 4    to find out this information, and that's the reason   11:08:27

 5    I'm asking this question.  I just want that to be     11:08:30

 6    clear.                                                11:08:31

 7            How often -- so let me just pause there,      11:08:34

 8    okay, and I'm going to ask my question again.         11:08:36

 9            How often did you see Anthony Levandowski     11:08:38

10    with his Macintosh laptop at Otto?                    11:08:42

11       MR. KIM:  Objection; form.                         11:08:42

12       THE WITNESS:  I don't recall how often.            11:08:48

13    BY MR. JAFFE:                                         11:08:48

14       Q.   Every day?                                    11:08:53

15       MR. KIM:  Objection; form.                         11:08:53

16       THE WITNESS:  Not necessarily.                     11:08:55

17    BY MR. JAFFE:                                         11:08:55

18       Q.   Four, five days a week; is that fair?         11:08:58

19       A.   I don't know.                                 11:09:03

20       Q.   You're not willing to tell me any sort of    11:09:06

21    numbers?                                              11:09:07

22       MR. KIM:  Objection; form.                         11:09:07

23       THE WITNESS:  I can't give you any number for how 11:09:12

24    often I can recall seeing him carrying a laptop.  And 11:09:16

25    I would also mention he spent a lot of time traveling 11:09:20
```

Page 42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | to the Pittsburgh office, and I would have no idea how | 11:09:23 |
| 2 | often he carried a laptop for that as well. | 11:09:26 |
| 3 | BY MR. JAFFE: | 11:09:26 |
| 4 | Q.   Fair. | 11:09:27 |
| 5 | I'm not trying to ask you -- I'm only asking | 11:09:28 |
| 6 | for your understanding based on your interactions with | 11:09:31 |
| 7 | him. | 11:09:32 |
| 8 | Understand? | 11:09:32 |
| 9 | A.   Understand. | 11:09:33 |
| 10 | Q.   Would you agree that you probably saw | 11:09:36 |
| 11 | Mr. Levandowski with his laptop three days a week, | 11:09:41 |
| 12 | approximately? | 11:09:42 |
| 13 | MR. KIM:  Objection to form.  Same objection. | 11:09:49 |
| 14 | THE WITNESS:  I really don't recall.  I really do | 11:09:51 |
| 15 | not recall. | 11:09:52 |
| 16 | BY MR. JAFFE: | 11:09:52 |
| 17 | Q.   All right.  Let me come at this the other | 11:09:55 |
| 18 | way. | 11:09:56 |
| 19 | You saw him at least once with the laptop; | 11:09:58 |
| 20 | right? | |
| 21 | A.   Sure. | 11:09:59 |
| 22 | Q.   At least, let's say, 50 times? | 11:10:01 |
| 23 | MR. KIM:  Objection to form. | 11:10:02 |
| 24 | THE WITNESS:  At least some number of times.  I | 11:10:06 |
| 25 | don't know. | 11:10:06 |

Page 43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. JAFFE:

 2        Q.    Okay.  You're aggressively resisting giving    11:10:09

 3    any sort of number.  And the judge asked for this, so    11:10:12

 4    I'm just going to press on this a little bit longer?      11:10:13

 5    Okay?

 6        MR. KIM:  Objection to form.                          11:10:17

 7    BY MR. JAFFE:                                             11:10:17

 8        Q.    More than 30 times?                             11:10:20

 9        A.    Possibly.                                       11:10:21

10        Q.    Would you dispute if someone said to the       11:10:22

11    court that he -- you saw his laptop at least 30 times    11:10:27

12    when you were working at Otto before the Uber

13    acquisition?

14        MR. KIM:  Objection to form.                         11:10:30

15        THE WITNESS:  If someone claimed to see him with a   11:10:32

16    laptop 30 times, I would not object to that.             11:10:34

17    BY MR. JAFFE:                                            11:10:34

18        Q.    And just talking about regularly, if we were   11:10:38

19    going to put an approximate amount, would you say        11:10:41

20    approximately two to four times a week you saw him       11:10:44

21    with a laptop at Otto?  Is that fair?                    11:10:46

22        MR. KIM:  Objection; form.                           11:10:46

23        THE WITNESS:  I don't know if kept his laptop with   11:10:50

24    him everywhere he went in the office, so --              11:10:53

25    BY MR. JAFFE:
```

Page 44

| | | |
|---|---|---|
| 1 | Q.   I'm just asking about what you saw with your | 11:10:56 |
| 2 | own eyes. | 11:10:57 |
| 3 | A.   So I would say a few times a week when he was | 11:11:04 |
| 4 | spending that week in the office. | 11:11:07 |
| 5 | Q.   Fair. | 11:11:08 |
| 6 | So just to clean that up for purposes of the | 11:11:12 |
| 7 | record, your testimony, based on your personal | 11:11:17 |
| 8 | knowledge, is you approximately saw Mr. Levandowski | 11:11:21 |
| 9 | when he was in San Francisco with his Macintosh laptop | 11:11:27 |
| 10 | a few times a week -- | 11:11:29 |
| 11 | MR. KIM:  Objection; form. | 11:11:31 |
| 12 | BY MR. JAFFE: | 11:11:31 |
| 13 | Q.   -- is that fair? | 11:11:33 |
| 14 | MR. KIM:  Objection; form. | 11:11:34 |
| 15 | THE WITNESS:  It's fair as long as we emphasize | 11:11:37 |
| 16 | approximately. | 11:11:39 |
| 17 | BY MR. JAFFE: | 11:11:39 |
| 18 | Q.   Okay.  All right.  Did you ever get e-mails | 11:11:45 |
| 19 | from Mr. Levandowski while he was working from home? | 11:11:51 |
| 20 | A.   I don't know. | 11:11:54 |
| 21 | Q.   Why don't you know? | 11:11:57 |
| 22 | A.   I would occasionally get e-mails from Anthony | 11:12:00 |
| 23 | Levandowski, but I don't know how to tell you where he | 11:12:03 |
| 24 | was when he sent those e-mails. | 11:12:05 |
| 25 | Q.   So there's no instance where you're sitting | 11:12:09 |

Page 45

| | | |
|---|---|---|
| 1 | in the office and you look around and he's not there | 11:12:11 |
| 2 | and he hasn't been there all day and he's sending | 11:12:16 |
| 3 | e-mails?  That's never happened? | 11:12:19 |
| 4 | A.   Incorrect. | 11:12:19 |
| 5 | Q.   So can you please explain then. | 11:12:21 |
| 6 | A.   He travels a lot.  So I quite likely got | 11:12:25 |
| 7 | e-mails from him when I didn't see him in the office. | 11:12:30 |
| 8 | Q.   So you don't know where he is a lot of the | 11:12:32 |
| 9 | time; is that fair? | 11:12:33 |
| 10 | A.   That's fair. | 11:12:34 |
| 11 | Q.   So you got e-mails from Mr. Levandowski when | 11:12:37 |
| 12 | you were working at Otto, but he wasn't sitting with | 11:12:39 |
| 13 | you in the office; right? | 11:12:40 |
| 14 | A.   I believe that's true, yes. | 11:12:45 |
| 15 | Q.   So he wasn't in the office, you don't know | 11:12:47 |
| 16 | where he is, but he's e-mailing you about Otto; is | 11:12:50 |
| 17 | that fair? | 11:12:52 |
| 18 | A.   That's fair. | 11:12:53 |
| 19 | Q.   And was that something that happened on a | 11:12:58 |
| 20 | regular basis? | 11:12:59 |
| 21 | MR. KIM:  Objection; form. | 11:12:59 |
| 22 | THE WITNESS:  I think that's fair. | 11:13:04 |
| 23 | BY MR. JAFFE: | 11:13:04 |
| 24 | Q.   So I want to talk about Fuji for a second | 11:13:11 |
| 25 | here. | 11:13:13 |

Page 46

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | In the Fuji design -- and we'll just go | 11:13:17 |
| 2 | cavity by cavity. | 11:13:18 |
| 3 | But for the mid-range cavity, there are three | 11:13:20 |
| 4 | transmit boards; right? | 11:13:21 |
| 5 | A.   Right. | 11:13:23 |
| 6 | Q.   And in the mid-range cavity, there are three | 11:13:27 |
| 7 | transmit boards and they are pointed -- and they're | 11:13:30 |
| 8 | parallel to one another; right? | 11:13:31 |
| 9 | A.   Right. | 11:13:31 |
| 10 | Q.   The transmit lens for the mid-range cavity is | 11:13:37 |
| 11 | less in width than the width of the transmit boards; | 11:13:43 |
| 12 | right? | 11:13:44 |
| 13 | MR. KIM:  Objection; form. | 11:13:44 |
| 14 | THE WITNESS:  Could you clarify.  I'm confused | 11:13:50 |
| 15 | which lens you're referring to. | 11:13:52 |
| 16 | BY MR. JAFFE: | 11:13:52 |
| 17 | Q.   Yes.  Let me just mark something and make | 11:13:56 |
| 18 | this easier. | 11:13:57 |
| 19 | MR. JAFFE:  And we'll have this be 151. | 11:14:04 |
| 20 | (Plaintiff's Exhibit 151 was marked.) | |
| 21 | MR. KIM:  At some point -- we've been going for I | 11:14:10 |
| 22 | think over an hour -- if we can take a break.  You can | 11:14:12 |
| 23 | ask your line of questions.  I'm just saying at a | 11:14:15 |
| 24 | convenient time. | 11:14:16 |
| 25 | MR. JAFFE:  Sure. | 11:14:16 |

Page 47

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. JAFFE: | 11:14:16 |
| 2 | Q.   So if you can turn to page 4. | 11:14:23 |
| 3 | MR. KIM:  What are we looking at?  Is this marked? | 11:14:29 |
| 4 | MR. JAFFE:  Yes, I just marked it as 151. | 11:14:34 |
| 5 | MR. KIM:  Do you have an extra copy or -- | 11:14:34 |
| 6 | MR. JAFFE:  Oh, I thought I handed it to you. | |
| 7 | Apologies.  Here you go. | |
| 8 | MR. KIM:  Thanks. | |
| 9 | BY MR. JAFFE: | 11:14:34 |
| 10 | Q.   So if you can turn to page 4, please. | 11:14:39 |
| 11 | This is a depiction of the CAD drawing of the | 11:14:44 |
| 12 | Fuji design; right? | 11:14:45 |
| 13 | A.   Right. | 11:14:45 |
| 14 | Q.   So let's take the right-hand side. | 11:14:47 |
| 15 | Do you see there's the transmit path? | 11:14:49 |
| 16 | A.   Yes. | 11:14:49 |
| 17 | Q.   And there are three boards and they're | 11:14:52 |
| 18 | parallel to one another? | 11:14:53 |
| 19 | A.   Yes. | 11:14:53 |
| 20 | Q.   And then do you see the transmit lens at the | 11:14:56 |
| 21 | top? | 11:14:57 |
| 22 | A.   Yes. | 11:14:57 |
| 23 | Q.   The width of the transmit lens is smaller | 11:15:01 |
| 24 | than -- you know, if you were to go from one -- from | 11:15:09 |
| 25 | the leftmost transmit board to the rightmost transmit | 11:15:13 |

Page 48

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | board; right? | 11:15:13 |
| 2 | A.   They look very close. | 11:15:17 |
| 3 | Q.   But they're not very close? | 11:15:19 |
| 4 | MR. KIM:  Objection; form. | 11:15:21 |
| 5 | THE WITNESS:  If you're telling me the transmit | 11:15:22 |
| 6 | lens is smaller, I would not dispute that. | 11:15:25 |
| 7 | BY MR. JAFFE: | 11:15:25 |
| 8 | Q.   I'm not trying to tell you anything.  I'm | 11:15:27 |
| 9 | trying to ask you because you helped come up with this | 11:15:29 |
| 10 | design.  So if you don't know, that's fine, but I'm | 11:15:32 |
| 11 | just trying to ask the question here. | 11:15:34 |
| 12 | A.   Yes, the transmit lens appears to be what I | 11:15:42 |
| 13 | would say narrower than the grouping of transmit | 11:15:46 |
| 14 | boards. | 11:15:47 |
| 15 | Q.   Great. | 11:15:48 |
| 16 | My question is, how do you get the beams to | 11:15:50 |
| 17 | go into the transmit lens if the transmit lens is | 11:15:55 |
| 18 | narrower than the width of the transmit boards? | 11:15:58 |
| 19 | MR. KIM:  Objection; form. | 11:15:58 |
| 20 | BY MR. JAFFE: | 11:15:58 |
| 21 | Q.   In the Fuji design. | 11:16:01 |
| 22 | A.   (Indecipherable.) | |
| 23 | THE REPORTER:  I'm sorry? | 11:16:08 |
| 24 | THE WITNESS:  The fast-axis collimation lens | 11:16:15 |
| 25 | collimates the light coming out of the laser diodes | 11:16:21 |

Page 49

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   ████████████████████████████                        11:16:25

2   BY MR. JAFFE:                                        11:16:25

3       Q.   What do you mean, "necessarily"?           11:16:26

4       A.   Any time you have a lens placed in         11:16:32

5   relationship to the source of light, the lateral    11:16:38

6   resolution -- wrong word -- the lateral relationship 11:16:42

7   between a light source and a lens will dictate the   11:16:47

8   exit angle of the light coming out of that lens.     11:16:50

9        So if you want the light to go straight, you    11:16:54

10  have to carefully place the FAC lens, or fast-axis   11:16:59

11  collimation lens, in a position that will cause the  11:17:04

12  light to exit perhaps parallel to the board, if you  11:17:07

13  want that.                                           11:17:08

14      Q.   So in the Fuji design -- and we'll call it  11:17:11

15  the FAC lens for the benefit of the court reporter   11:17:13

16  here -- ██████████████████████████████████

    ████████████████████████████████████████████████

    ██████████████████████████ is that fair?            11:17:26

19      MR. KIM:  Objection; form.                       11:17:26

20      THE WITNESS:  Maybe I don't like the word ███████

    ████████████████████████████████████████ And        11:17:38

22  so to clarify, the FAC lens precollimates the light  11:17:44

23  ████████████████████████████████                     11:17:47

24  BY MR. JAFFE:                                         11:17:47

25      Q.   ████████████████████████████                11:17:49

                                                    Page 50

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

|   |   |   |
|---|---|---|
| | ██████████████████ right? | 11:17:50 |
| 2 | MR. KIM:  Objection; form. | 11:17:50 |
| 3 | BY MR. JAFFE: | 11:17:50 |
| 4 | Q.   That's all I mean by ████████ | 11:17:54 |
| 5 | MR. KIM:  Objection; form. | 11:17:54 |
| 6 | THE WITNESS:  On two of our laser boards, the | 11:17:59 |
| 7 | ████████████████████████████████████████ | |
| | ████████████████████████████████████████ | |
| | ████████████████████████ | 11:18:11 |
| 10 | BY MR. JAFFE: | 11:18:11 |
| 11 | Q.   Okay.  So I don't have real-time, so I'm | 11:18:18 |
| 12 | going to try and just repeat back to make sure I | 11:18:21 |
| 13 | understand what you said. | 11:18:22 |
| 14 | The fast-axis collimation - ████████████████ | |
| | ████████████████████████████████████████ | |
| | ████████████████████████████████████████ | |
| | ████████████████████████████████ true? | 11:18:42 |
| 18 | MR. KIM:  Objection; form. | 11:18:42 |
| 19 | THE WITNESS:  True as long as we clarify | 11:18:48 |
| 20 | horizontal is horizontal in the drawing. | 11:18:51 |
| 21 | BY MR. JAFFE: | 11:18:51 |
| 22 | Q.   So if anyone testified or said that there's | 11:18:57 |
| 23 | ████████████████████████████████ that would | 11:19:01 |
| 24 | be wrong; right? | 11:19:02 |
| 25 | MR. KIM:  Objection; form. | 11:19:02 |

Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        THE WITNESS:  Not necessarily.  The word        11:19:05
 2   ████████████  in LiDAR often means ███████████████████
     ████████████████████████████████████              11:19:13
 4   BY MR. JAFFE:                                       11:19:13
 5        Q.   I see.                                     11:19:13
 6             So it's just kind of -- if they said there's  11:19:18
 7   ████████████  they could be right, but they could be  11:19:21
 8   wrong?                                               11:19:21
 9        MR. KIM:  Objection; form.                      11:19:21
10        THE WITNESS:  Could.                            11:19:23
11   BY MR. JAFFE:                                        11:19:23
12        Q.   And if someone said ████████████████████████
     ██████████████████████████████████████████████████
     ███████████████████████████  right?                 11:19:32
15        MR. KIM:  Objection; form.                      11:19:32
16        THE WITNESS:  Too many words at once.  Could you  11:19:36
17   repeat your last question.                           11:19:38
18        MR. JAFFE:  Why don't we just have the court     11:19:47
19   reporter repeat it.                                  11:19:47
20             (Record read by reporter as follows:
21             "Question:  And if someone said it's
22                  ████████████████████████████
     ██████████████████████████████████████████
     ███████████████████████  right?")                   11:19:47
25        MR. KIM:  Objection; form.                      11:19:47

                                            Page 52
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      THE WITNESS:  If they say it's ███████  yes, they   11:19:52
 2  are not necessarily denying the fact that ████████  ████████
    ██████████████████████████████████████████            11:19:57
 4  BY MR. JAFFE:                                           11:19:57
 5      Q.  Sorry.  There was a missing word there.         11:19:59
 6          If they say it's not ███████ --                 11:20:01
 7      A.  Oh.
 8      Q.  -- they're not denying that it ██████████████████
    ████████████████████████████████████████               11:20:08
10  true?                                                   11:20:08
11      MR. KIM:  Objection; form.                          11:20:08
12      THE WITNESS:  If I were to say it's not ███████     11:20:18
13  I would not be denying that ██████████████  I           11:20:21
14  can't tell you what they would say.                     11:20:22
15      MR. JAFFE:  Okay.  Why don't we take our first      11:20:27
16  break.                                                  11:20:28
17      THE VIDEOGRAPHER:  We are off the record at 11:20   11:20:31
18  a.m.                                                    11:20:31
19          (Recess taken.)                                 11:20:31
20      THE VIDEOGRAPHER:  We're back on the record at      11:33:47
21  11:33 a.m.                                              11:33:49
22  BY MR. JAFFE:                                           11:33:49
23      Q.  Welcome back.                                   11:34:13
24      A.  Thank you.                                      11:34:14
25      Q.  Last Thursday it was reported in the press      11:34:19
```

Page 53

| | | |
|---|---|---|
| 1 | that Mr. Levandowski was demoting himself in some way. | 11:34:26 |
| 2 | Are you familiar with that? | 11:34:27 |
| 3 | A.   I'm familiar with the announcement that his | 11:34:31 |
| 4 | position was changing.  I only take issue with your | 11:34:37 |
| 5 | comment -- or your phrase that says he was demoting | 11:34:40 |
| 6 | himself.  I don't know who decided his position should | 11:34:45 |
| 7 | change. | 11:34:45 |
| 8 | Q.   I see. | 11:34:45 |
| 9 | So you don't know who actually decided that | 11:34:49 |
| 10 | his position should change? | 11:34:51 |
| 11 | A.   Correct. | 11:34:51 |
| 12 | Q.   And do you take issue with the idea that he | 11:34:54 |
| 13 | was demoted in some way? | 11:34:56 |
| 14 | A.   Not necessarily. | 11:34:58 |
| 15 | Q.   Okay.  So if I call it his demotion, that's a | 11:35:03 |
| 16 | fair statement? | 11:35:03 |
| 17 | A.   I won't argue with that. | 11:35:05 |
| 18 | Q.   So how did you find out about | 11:35:09 |
| 19 | Mr. Levandowski's demotion? | 11:35:12 |
| 20 | A.   I received an e-mail.  I believe the whole | 11:35:16 |
| 21 | company received an e-mail describing that change. | 11:35:21 |
| 22 | I want to say Anthony sent the e-mail, but | 11:35:25 |
| 23 | I'm not 100 percent positive on that. | 11:35:28 |
| 24 | ███████████████████████████████████ | |
| | ███████████████████████████████████ | 11:35:36 |

Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| | | |
|---|---|---|
| 1 | | 11:35:38 |
| 2 | | 11:35:43 |
| 3 | | 11:35:46 |

```
13    BY MR. JAFFE:                                    11:36:13

14        Q.    Before that e-mail on Thursday, there was no   11:36:18

15    sort of company policy excluding Mr. Levandowski from   11:36:23

16    providing input onto LiDAR; right?               11:36:27

17        MR. KIM:   Objection; form.                  11:36:27

18        THE WITNESS:   I'm not aware of any policy before   11:36:31

19    that date regarding excluding him from any aspect of   11:36:35

20    any work at the company.                         11:36:36

21    BY MR. JAFFE:                                    11:36:36

22        Q.    Including LiDAR?                        11:36:41

23        A.    Including LiDAR.                        11:36:41

24        Q.    So you never received any sort of special   11:36:45

25    instructions about what you could and couldn't do   11:36:47
```

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | working with Mr. Levandowski before last Thursday; is | 11:36:52 |
| 2 | that fair? | 11:36:53 |
| 3 | A.    That seems -- yeah, that's a true statement. | 11:36:58 |
| 4 | Q.    Are you aware of anyone else receiving | 11:37:00 |
| 5 | special instructions about what they could and | 11:37:02 |
| 6 | couldn't do in working with Mr. Levandowski before | 11:37:05 |
| 7 | last Thursday? | 11:37:06 |
| 8 | MR. KIM:  Objection; form. | 11:37:06 |
| 9 | THE WITNESS:  I'm not aware of anything like that. | 11:37:10 |
| 10 | BY MR. JAFFE: | 11:37:10 |
| 11 | Q.    So before last Thursday Mr. -- as far as you | 11:37:14 |
| 12 | know, Mr. Levandowski was free to provide input into | 11:37:18 |
| 13 | all parts of the self-driving project, including LiDAR | 11:37:20 |
| 14 | and other parts; right? | 11:37:24 |
| 15 | MR. KIM:  Objection; form. | 11:37:24 |
| 16 | THE WITNESS:  That's my understanding. | 11:37:26 |
| 17 | BY MR. JAFFE: | 11:37:26 |
| 18 | Q.    And today as of right now, he's free to | 11:37:32 |
| 19 | provide input into all parts of the self-driving | 11:37:36 |
| 20 | project except for LiDAR? | 11:37:38 |
| 21 | MR. KIM:  Objection; form. | 11:37:38 |
| 22 | THE WITNESS:  I don't recall if there was any | 11:37:45 |
| 23 | other restrictions, but definitely LiDAR was mentioned | 11:37:48 |
| 24 | specifically. | 11:37:52 |
| 25 | BY MR. JAFFE: | 11:37:52 |

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.    You don't recall whether there were any other   11:37:54

 2    restrictions in the e-mail?                               11:37:56

 3        A.    In the e-mail, correct.                          11:37:57

 4        Q.    I see.  Okay.  So let me try this again.         11:38:00

 5              So apart from the restrictions that are          11:38:02

 6    stated in the e-mail, you're not -- today you're not      11:38:04

 7    aware of any other limitations on Mr. Levandowski's       11:38:08

 8    input into the self-driving project?                      11:38:11

 9        A.    Correct, I'm not aware of any such additional   11:38:13

10    limitations.                                              11:38:14

11    ████  ██  █████████████████████████████  ████  ██████

██  ███████████████████████████                             11:38:20

13        MR. KIM:  Objection; form.                            11:38:22

14        THE WITNESS:  ██████████████████                      11:38:23

15    BY MR. JAFFE:                                             11:38:23

16    ████  ██  ███████████████████████████  ████  ██████

██  ████████████████████████████████████████  ████  ██████

██  ██  ████████                                            11:38:32

19        MR. KIM:  Objection; form.                            11:38:36

20        THE WITNESS:  ████████                                11:38:38

21    BY MR. JAFFE:                                             11:38:38

22        Q.    ██████████████████████████████      ████████

23    ████████████████████████████████████████      ████████

24    ████████                                      ████████

25      ██    ██████                                11:38:47

                                                  Page 57
```



```
 1        MR. KIM:  Objection; form.                    11:38:48

 2   BY MR. JAFFE:                                       11:38:48

 3   ████████████████████████████████████████████       11:38:52

 4   ████████████████████████████████████               11:38:54

 5        MR. KIM:  Objection; form.                     11:38:55

 6        THE WITNESS: ████████████████████████          11:38:56

 7   ████████████████████████████████████████████████████

     ████████████████████                              11:39:02

 9   BY MR. JAFFE:                                       11:39:09

10   ████████████████████████████████████████████████████

     ████████████████████████████████████████████████████

     ████████████████████████████████████████████████████

     ████████████████████████████████████████████████████

     ████████████████████████████████████████████████████

     ████████████████████████████████████████████████████

     ████████████████████████████████████████████████████

     ████████████████████████

     ████████████████████████                           11:39:22

19        Just for the purposes of the record, can you   11:39:23

20   just explain what you mean by that for a lay audience.  11:39:26

21        A.   So again, my understanding of how our     11:39:29

22   autonomous software works, is limited -- with that  11:39:34

23   preface, I would suggest my understanding of the    11:39:37

24   perception team is to take LiDAR and other sources of  11:39:42

25   data and determine what objects exist outside the   11:39:50
```

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | vehicle. | 11:39:52 |
| 2 | If you refer generically to a compute team, | 11:39:58 |
| 3 | there may be other aspects of software after or | 11:40:01 |
| 4 | downstream in the data path after perception that | 11:40:05 |
| 5 | would need to use data that the perception software | 11:40:09 |
| 6 | generates in order to determine the car's proper | 11:40:15 |
| 7 | driving course. | 11:40:17 |
| 8 | Q.   So even today -- well, actually, let me back | 11:40:22 |
| 9 | up. | 11:40:22 |
| 10 | What is "perception" in this context? | 11:40:25 |
| 11 | A.   In this context, my use of the word | 11:40:29 |
| 12 | "perception" would be software that takes sensored | 11:40:36 |
| 13 | data input from LiDAR, camera, radar, possibly | 11:40:42 |
| 14 | inertial measurement sensors, wheel sensors, to | 11:40:49 |
| 15 | identify distinct objects in the world around it and | 11:40:54 |
| 16 | possibly classify those objects in terms of perhaps, | 11:41:00 |
| 17 | for example, being a person, a pedestrian, another car | 11:41:06 |
| 18 | or a bus and passing that information to the next | 11:41:12 |
| 19 | layers of software that could exist. | 11:41:15 |
| 20 | Q.   And in the context of our conversation, what | 11:41:18 |
| 21 | does the compute team do? | 11:41:20 |
| 22 | A.   So this would be a vague term.  I can only | 11:41:24 |
| 23 | guess what you might be hinting at, but I know that | 11:41:27 |
| 24 | there are other software and software groups writing | 11:41:32 |
| 25 | software that operate on an autonomous vehicle. | 11:41:37 |

Page 59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     Q.   What is a software that decides when to turn    11:41:39

 2   and when to stop?  What is that called within Uber?    11:41:43

 3     A.   If I'm not mistaken, I believe that is called   11:41:45

 4   planning.                                              11:41:46

 5   ███████  ██  ████████████████████████████  ██  ██████

     █  ██████████████████████████████████████              11:41:51

 7     MR. KIM:  Objection; form.                           11:41:53

 8     THE WITNESS:  ██████████████████                     11:41:57

 9   ██████████████████████████████████████  ██  ███████

     █  ████████████████████████████████████                11:42:04

11   BY MR. JAFFE:                                          11:42:04

12     Q.   And you understand that the planning software   11:42:06

13   leverages LiDAR data; right?                           11:42:09

14     MR. KIM:  Objection; form.                           11:42:13

15     THE WITNESS:  I want to be specific and say I        11:42:16

16   don't know whether the planning software leverages     11:42:19

17   native LiDAR data or data that's output from the       11:42:24

18   perception software.  I just don't know.               11:42:28

19   BY MR. JAFFE:                                          11:42:28

20     Q.   Let's be clear, though.                         11:42:29

21          The planning software leverages data that       11:42:32

22   came from the LiDAR?                                   11:42:34

23     A.   Yes.                                            11:42:34

24     Q.   You don't dispute that; right?                  11:42:36

25     A.   No.                                             11:42:36
```

Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      Q.   Okay.                                       11:42:39

2      MR. JAFFE:  Let's mark -- this will be 152.      11:43:26

3      THE REPORTER:  Correct.                          11:43:26

4  It's the supplemental declaration, 152?

5      MR. JAFFE:  Correct.

6      THE REPORTER:  I think you need this one.

7           (Plaintiff's Exhibit 152 was marked.)       11:43:29

8  BY MR. JAFFE:                                        11:43:29

9      Q.   Did I give you two copies?                  11:43:55

10     A.   Yeah.

11     Q.   Mr. Haslim, whose idea was it for you to    11:44:05

12 write this supplemental declaration?                 11:44:08

13     MR. KIM:  Objection to the extent it calls for   11:44:12

14 privileged information.                              11:44:14

15          Instruct you not to answer or               11:44:18

16 reveal -- answer to the extent it reveals any        11:44:23

17 privileged communications with any attorneys.        11:44:27

18     THE WITNESS:  So I would say the legal team      11:44:33

19 working for Uber instructed this.                    11:44:37

20 BY MR. JAFFE:

21     Q.   And I don't want to get into properly       11:44:40

22 privileged conversations.  All I want to ask is, in  11:44:46

23 terms of this document, 152, your declaration, was it 11:44:49

24 something where you said, I want to put in a new      11:44:52

25 declaration or someone approached you and said, we   11:44:54
```

Page 61

| | | |
|---|---|---|
| 1 | want a new declaration? | 11:44:56 |
| 2 | MR. KIM:  And, again, you can answer whether or | 11:44:59 |
| 3 | not it was done at the direction of counsel, but don't | 11:45:03 |
| 4 | reveal any privileged communications with counsel. | 11:45:07 |
| 5 | THE WITNESS:  Okay.  So this was generated at the | 11:45:11 |
| 6 | instruction of counsel. | 11:45:12 |
| 7 | BY MR. JAFFE: | 11:45:12 |
| 8 | Q.   Okay.  So we're clear, the lawyers -- and I | 11:45:17 |
| 9 | don't want to get into the substance of any | 11:45:18 |
| 10 | communications here, but just for the purposes of the | 11:45:21 |
| 11 | record, your supplemental declaration was put together | 11:45:26 |
| 12 | at the request of Uber's lawyers; fair? | 11:45:30 |
| 13 | A.   Yes. | 11:45:30 |
| 14 | Q.   Since our last deposition, have you discussed | 11:45:39 |
| 15 | any content of your declarations or the deposition | 11:45:42 |
| 16 | with any nonlawyers? | 11:45:50 |
| 17 | A.   I don't recall any substantive discussion | 11:45:53 |
| 18 | with nonlawyers. | 11:45:55 |
| 19 | Q.   Have you spoken with Mr. Levandowski about | 11:45:58 |
| 20 | the subject matter of this case? | 11:46:01 |
| 21 | A.   Not in any substantive way. | 11:46:06 |
| 22 | Q.   At all? | 11:46:07 |
| 23 | A.   It's probably -- yes. | 11:46:11 |
| 24 | Q.   What did you and Mr. Levandowski discuss? | 11:46:14 |
| 25 | MR. KIM:  And I want to caution you -- if you had | 11:46:17 |

Page 62

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | any of these discussions in the presence of lawyers, | 11:46:20 |
| 2 | would caution you not to reveal any privileged | 11:46:22 |
| 3 | communications. | 11:46:25 |
| 4 | THE WITNESS:  This jovial, high-level, | 11:46:30 |
| 5 | nonsubstantive discussion -- "discussion" is almost a | 11:46:35 |
| 6 | strong term.  How about, how are you doing, how are | 11:46:39 |
| 7 | you feeling? | 11:46:40 |
| 8 | BY MR. JAFFE: | 11:46:40 |
| 9 | Q.   Please tell me everything that you remember | 11:46:44 |
| 10 | about the conversations that you had with | 11:46:46 |
| 11 | Mr. Levandowski about the subject matter of this case? | 11:46:50 |
| 12 | | |
| | | |
| | | |
| | | |
| | | |
| | | 11:47:15 |
| 18 | MR. KIM:  Objection; form. | 11:47:17 |
| 19 | THE WITNESS: | 11:47:17 |
| 20 | BY MR. JAFFE: | 11:47:17 |
| 21 | | |
| | | |
| | | |
| | | 11:47:26 |
| 25 | Q.   Sorry.  Continue. | 11:47:30 |

Page 63



| 1 | | | |
| 2 | | | 11:47:41 |
| 3 | | | 11:47:44 |
| 4 | | | 11:47:45 |
| 5 | Q. | Anything else? | 11:47:46 |
| 6 | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| 12 | | | 11:48:13 |
| 13 | Q. | Anything else? | 11:48:15 |
| 14 | A. | No. | 11:48:15 |
| 15 | | | |
| | | | |
| | | | |
| 18 | | | 11:48:25 |
| 19 | Q. | Why not? | 11:48:26 |
| 20 | A. | I don't know. | 11:48:29 |
| 21 | Q. | You don't care? | 11:48:30 |
| 22 | A. | No. | 11:48:31 |

Page 64



```
16      Q.    You're aware that Mr. Levandowski, when asked   11:49:36

17   whether these files were at Uber, pled the Fifth         11:49:41

18   Amendment to avoid self-incrimination; right?           11:49:46

19      MR. KIM:  Objection; form.                            11:49:47

20      THE WITNESS:  I've read articles that said that,     11:49:48

21   yes.                                                     11:49:49

22   BY MR. JAFFE:                                            11:49:49
```

Page 65

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. KIM:  Objection; form. | 11:50:00 |
| 2 | THE WITNESS:  I'm sorry. | 11:50:01 |
| 3 | BY MR. JAFFE: | 11:50:01 |
| 4 | Q.  You think it's a joke? | 11:50:02 |
| 5 | A.  I think it's impossible, in my opinion, that | 11:50:07 |
| 6 | those files would be at Uber. | 11:50:10 |
| 7 | Q.  How can you possibly know? | 11:50:14 |
| 8 | A.  I cannot know, but it strikes me as | 11:50:18 |
| 9 | ridiculous. | 11:50:19 |
| 10 | Q.  It strikes you as ridiculous? | 11:50:21 |
| 11 | A.  Yeah. | 11:50:21 |
| 12 | Q.  You think it's ridiculous that | 11:50:24 |
| 13 | Mr. Levandowski pleads his constitutional right to | 11:50:26 |
| 14 | avoid self-incrimination when asked where these files | 11:50:... |
| 15 | are and it's ridiculous for us to ask where they are; | 11:50:32 |
| 16 | that's what you think? | 11:50:34 |
| 17 | MR. KIM:  Objection; form. | 11:50:36 |
| 18 | THE WITNESS:  You're asking my personal opinion. | 11:50:38 |
| 19 | I think it's extremely unlikely to the point of | 11:50:43 |
| 20 | ridiculous that those files are on a computer somehow | 11:50:47 |
| 21 | at Uber after all of the forensics that were done on | 11:50:53 |
| 22 | Anthony's computer, as it was described to us, after | 11:50:58 |
| 23 | all the searching of all the hard drives that we can | 11:51:02 |
| 24 | come up with. | 11:51:03 |
| 25 | BY MR. JAFFE: | 11:51:03 |

Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.   You do know that no one has searched        11:51:07

 2   Mr. Levandowski's personal computer; right?           11:51:10

 3        MR. KIM:  Objection; form.                       11:51:10

 4        THE WITNESS:  I have read that in an article or   11:51:12

 5   two.                                                  11:51:14

 6   BY MR. JAFFE:                                         11:51:14

 7        Q.   And he's refusing to turn those over, again 11:51:17

 8   based on his rights to avoid incriminating himself?   11:51:23

 9        MR. KIM:  Objection; form.                       11:51:24

10        THE WITNESS:  That's my understanding.           11:51:25

11   BY MR. JAFFE:                                         11:51:25

12   ███████████████████████████████████████████████

     ███████████████████████████████████████████████      11:51:31

14        MR. KIM:  Objection; form.                       11:51:31

15   ███████████████████████████████████████████████

     ███████████████████████████████████████████████

     ███████████████████████████████████████          11:51:40

18   BY MR. JAFFE:                                         11:51:40

19   ███████████████████████████████████████████████

     ███████████████████████████████████████████████

     ████████████████████████████████████?             11:51:48

22        MR. KIM:  Objection; form.                       11:51:50

23        THE WITNESS:  Is that a question?               11:51:51

24   BY MR. JAFFE:                                         11:51:51

25   ███████████████████████████████████████            11:51:53
```

Page 67

| | | |
|---|---|---|
| 1 | MR. KIM:  Objection; form. | 11:51:54 |
| 2 | THE WITNESS:  ███ | 11:51:55 |
| 3 | BY MR. JAFFE: | 11:51:55 |
| 4 | Q.   Do you take intellectual property rights | 11:51:59 |
| 5 | seriously? | 11:52:01 |
| 6 | A.   Yes. | 11:52:01 |
| 7 | Q.   Do you think it's wrong for one company to | 11:52:03 |
| 8 | steal another company's intellectual property rights? | 11:52:07 |
| 9 | A.   Yes. | 11:52:07 |
| 10 | Q.   Do you think that's a joke? | 11:52:10 |
| 11 | A.   No. | 11:52:10 |
| 12 | Q.   Do you think that's something that should be | 11:52:12 |
| 13 | taken seriously? | 11:52:15 |
| 14 | A.   Yes. | 11:52:15 |
| 15 | ████████████ | |
| | ████████████ | |
| | ████████████ | 11:52:31 |
| 18 | MR. KIM:  Objection; form. | 11:52:35 |
| 19 | THE WITNESS: ███ | 11:52:36 |
| 20 | BY MR. JAFFE: | 11:52:36 |
| 21 | Q.   ████████ | 11:52:40 |
| 22 | MR. KIM:  Same objection. | 11:52:42 |
| 23 | THE WITNESS:  ████████ | 11:52:44 |
| 24 | ████████████ | |
| | ████████████ | 11:52:49 |

Page 68

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. JAFFE:                                    11:52:49
 2                                                     
 3                                                     11:52:56
                                                       
                                                       11:53:02
 6        MR. KIM:  Objection; form.                   11:53:05
 7        THE WITNESS:  I don't know.                  11:53:06
 8    BY MR. JAFFE:                                    11:53:06
 9        Q.   You don't know?                         11:53:07
10                                                     
                                                       
                                                       
                                                       
                                                       
                                                       11:53:28
17        Q.   Okay.  Turning back to your supplemental   11:53:38
18    declaration, which is 151.  Let's go to paragraph 13.   11:53:46
19             Actually, before we get there, start with   11:53:51
20    paragraph 7.                                     11:53:53
21             Here you're talking about the fiber lasers in   11:54:00
22    the Spider design; right?                        11:54:01
23        A.   Sorry.  152 or 151?                     11:54:05
24        Q.   152.  Excuse me.                        11:54:07
25        A.   Sorry.                                  11:54:08
```

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | (Witness reviews document.) | 11:54:26 |
| 2 | A. Repeat your question, please. | 11:54:27 |
| 3 | Q. Paragraph 7 of your supplemental declaration, | 11:54:30 |
| 4 | Exhibit 152, is talking about the design of the fiber | 11:54:32 |
| 5 | laser in the Spider? | 11:54:36 |
| 6 | A. Yes. Yes. | 11:54:37 |
| 7 | Q. You don't mention Mr. Levandowski's | 11:54:40 |
| 8 | involvement in paragraph 7, do you? | 11:54:43 |
| 9 | A. No. | 11:54:43 |
| 10 | Q. You don't mention that Mr. Levandowski | 11:54:45 |
| 11 | pointed you to ████████ right? | 11:54:52 |
| 12 | A. No. | 11:54:52 |
| 13 | Q. You don't mention his role in the design of | 11:54:55 |
| 14 | the laser at all in paragraph 7, do you? | 11:54:58 |
| 15 | A. No. | 11:55:00 |
| 16 | Q. All right. Let's go to paragraph 13, talking | 11:55:13 |
| 17 | about Fuji again. So here you're pointing -- you | 11:55:27 |
| 18 | excerpt a document that you say discusses beam spacing | 11:55:32 |
| 19 | and angles for the Fuji design; is that right? | 11:55:35 |
| 20 | A. Yes. | 11:55:36 |
| 21 | Q. And just looking at what's depicted here, | 11:55:41 |
| 22 | where is ███████████████████ mentioned? | 11:55:47 |
| 23 | A. Neither ████████ are mentioned, nor ████████ | |
| | ████████████████ However, it can be implied | 11:56:00 |
| 25 | from ████████████████ and it can be implied | 11:56:06 |

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    from ████████████████████████████████████████

     ██████████████████████                    11:56:14

3        Q.    Again, there's no mention in what you're    11:56:20

4    depicting here of ████████████████████████████████

     ████████████████████    right?                11:56:25

6        A.    There's no depiction of ██████████████████

     ███████████    There's no depiction of ███████████████

     ████████████████████████████████████████        11:56:41

9        THE REPORTER:  ██████████████████████        11:56:41

10       THE WITNESS:  Two cavities.

11       THE REPORTER:  Two cavities.  T-o?

12       THE WITNESS:  T-w-o.

13       THE REPORTER:  Thank you.

14   BY MR. JAFFE:                                11:56:41

15       Q.    The Fuji project, who came up with the idea    11:56:51

16   to have 64 channels?                         11:56:53

17       A.    I'm not sure.  I believe early on we    11:57:04

18   discussed making a Velodyne replacement that has 64    11:57:09

19   beams.  At some point, I was considering whether we    11:57:12

20   could put more channels on to make it better.  And I    11:57:17

21   believe, if my recollection serves, working with    11:57:19

22   Scott, came to the conclusion that more beams would    11:57:26

23   change the timing between subsequent shots of the same    11:57:31

24   laser and would have an effect on the horizontal    11:57:34

25   spacing of those measurements.                11:57:37

                                            Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    Who came up with ████████████████      11:57:45

 2   for Fuji?                                        11:57:46

 3      A.    I would say that was a decision reached by me   11:57:56

 4   with collaboration with my electrical engineer Florin   11:58:00

 5   Ignatescu.                                      11:58:02

 6      Q.    Anyone else?                           11:58:07

 7      A.    I believe the discussion of the ██████████   11:58:13

 8   also involved Gaetan as it pertains to the performance   11:58:20

 9   of his lens and how it would work with ██████████   11:58:25

10   I'm sure we informed other people.  Scott may have   11:58:34

11   been in the office when we were making this decision   11:58:36

12   as well.  Dan Gruver would probably be informed as   11:58:41

13   well, but I don't recall Dan playing any role in that   11:58:45

14   decision.                                       11:58:45

15      Q.    Who was involved in coming up with ████   ████████   11:58:50

16   ██████████████

17      MR. KIM:  Objection; form.                   11:58:53

18      THE WITNESS:  In coming up with ██████████  I   11:58:57

19   would say that was primarily me and the electrical   11:59:00

20   engineer, Florin.                               11:59:02

21   BY MR. JAFFE:

22      Q.    And then you discussed it with the LiDAR   11:59:05

23   team?                                           11:59:07

24      MR. KIM:  Objection; form.                   11:59:09

25      THE WITNESS:  Yes.                           11:59:09
```

Page 72

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. JAFFE:                                    11:59:09

 2        Q.   And did you ever discuss the idea to use ████████

      ████████████████   with Mr. Levandowski?         11:59:19

 4        A.   No, not that I recall.                   11:59:22

 5        Q.   So when you were presenting the pivot to  11:59:27

 6    Mr. Levandowski, it never came up how many transmit 11:59:30

 7    boards there would be?                             11:59:31

 8        A.   No.                                        11:59:31

 9        Q.   He had no idea?                            11:59:33

10        A.   He had no idea.                            11:59:34

11        Q.   And you never discussed with Mr. Levandowski 11:59:40

12    the details of the Fuji design in terms of the number 11:59:43

13    of transmit boards; is that true?                  11:59:45

14        A.   I don't recall having any discussion like 11:59:48

15    that at all.                                        11:59:49

16        Q.   So you're saying you don't recall?  I just 11:59:53

17    want to be clear.                                   11:59:55

18        A.   Yes.                                        11:59:56

19        Q.   So I'll ask my question again.             11:59:58

20             Have you ever discussed with Mr. Levandowski 12:00:01

21    the number of transmit boards in the Fuji design?  12:00:05

22        MR. KIM:   Objection; form.                     12:00:07

23        THE WITNESS:   I don't recall having any discussion 12:00:11

24    about the number of transmit boards.               12:00:14

25    BY MR. JAFFE:                                       12:00:14
```

Page 73

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.   Are you aware of any conversations between    12:00:17

 2   Mr. Gruver or Mr. Pennecot and Mr. Levandowski          12:00:20

 3   regarding the number of transmit boards in the Fuji     12:00:24

 4   design?                                                 12:00:24

 5        MR. KIM:  Objection; form.                         12:00:26

 6        THE WITNESS:  I am not aware.                       12:00:28

 7   BY MR. JAFFE:                                           12:00:28

 8        Q.   So it's possible that they have discussed     12:00:29

 9   this issue with them, you wouldn't know that; right?    12:00:32

10        A.   I wouldn't know that.                          12:00:34

11        Q.   So you're not saying that Mr. Levandowski has 12:00:36

12   never had discussions or input into the idea to use     12:00:40

13   ████████████████████  right?                            12:00:43

14        MR. KIM:  Objection; form.                         12:00:46

15        THE WITNESS:  What I am saying is that Anthony      12:00:48

16   never had input into my decision with my electrical     12:00:55

17   engineer to put ███████████████████████                 12:01:00

18   BY MR. JAFFE:                                           12:01:00

19        Q.   Right.                                        12:01:00

20             But you talked about that decision with       12:01:02

21   Mr. Gruver, for example; right?                         12:01:03

22        A.   I think discussions with Gruver came later,   12:01:07

23   yeah.                                                   12:01:07

24        Q.   Or Mr. Pennecot, for example?                 12:01:10

25        A.   Mr. Pennecot was probably consulted in that   12:01:13
```

Page 74

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    process as well.                                12:01:14

 2        Q.   And you're not aware and you can't testify,    12:01:16

 3    sitting here today, whether either of those two    12:01:19

 4    gentleman discussed this idea with Mr. Levandowski; is    12:01:23

 5    that right?                                       12:01:24

 6        MR. KIM:  Objection; form.                    12:01:25

 7        THE WITNESS:  I couldn't say.                 12:01:25

 8    BY MR. JAFFE:

 9        Q.   So in your declaration or in anywhere, can't    12:01:28

10    say that Mr. Levandowski had no input into the number    12:01:32

11    of boards because you don't know all the conversations    12:01:35

12    that Mr. Levandowski had; fair?                   12:01:37

13        MR. KIM:  Objection; form.                    12:01:37

14        THE WITNESS:  No, I disagree with that.       12:01:39

15    BY MR. JAFFE:                                     12:01:39

16        Q.   Why?                                     12:01:41

17        A.   When you go so far as to say input into the    12:01:44

18    design, I don't see how some conversation with Anthony    12:01:49

19    could have influenced what I saw as a need to split    12:01:53

20    the lasers ███████████████████████████████

      ████████████████████                            12:01:58

22        Q.   So where did you get that idea from?     12:02:01

23        A.   I don't recall where the idea came from, but    12:02:12

24    it seemed like a requirement from the beginning.  12:02:16

25        Q.   What does that mean?                     12:02:17
```

Page 75

| | | |
|---|---|---|
| 1 | A.   We knew that we were placing edge-emitting | 12:02:22 |
| 2 | laser diodes on a flat PCB. | 12:02:26 |
| 3 | Q.   And that was the PCB that Mr. Pennecot | 12:02:29 |
| 4 | designed; right? | 12:02:29 |
| 5 | A.   Yes. | 12:02:29 |
| 6 | Q.   And that's the board that eventually was sent | 12:02:35 |
| 7 | to Gorilla in December? | 12:02:38 |
| 8 | A.   That was one of the boards. | 12:02:40 |
| 9 | So when we knew we were placing these boards | 12:02:48 |
| 10 | flat onto a PCB, edge-emitting diodes, and we realized | 12:02:53 |
| 11 | they ███████████████████████████████████████████████ | |
| | ██████████████████████████████████████ as | 12:03:01 |
| 13 | I recall, ████████████████████████████████ | |
| | ███████████████████████ was obvious. | 12:03:08 |
| 15 | Q.   I see. | 12:03:08 |
| 16 | So you got the board design from Mr. Pennecot | 12:03:13 |
| 17 | and you knew you wanted 64 channels because you | 12:03:17 |
| 18 | were -- wanted to do something similar to what | 12:03:21 |
| 19 | Velodyne was doing and then derivative from that is | 12:03:25 |
| 20 | how you got to ████████████? | 12:03:28 |
| 21 | MR. KIM:  Objection; form. | 12:03:29 |
| 22 | THE WITNESS:  That's taking it actually out of | 12:03:32 |
| 23 | sequence. | 12:03:33 |
| 24 | BY MR. JAFFE: | 12:03:33 |
| 25 | Q.   Okay.  Can you put it in sequence, please. | 12:03:36 |

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   Yes.                                      12:03:36

 2             We knew we needed a laser circuit, so I had  12:03:40

 3   Florin design multiple laser circuits onto a board for  12:03:45

 4   test and evaluation.  We picked one of those circuits  12:03:48

 5   that we thought performed the best.  He began         12:03:51

 6   considering the size of his circuit in one of those --  12:03:56

 7   I believe it was 10 different circuits.  The one we    12:03:59

 8   chose, he could look at the design of it and tell me   12:04:02

 9   the size.                                              12:04:04

10             So at this point, as I recall, Gaetan did not  12:04:10

11   have a laser board design in his CAD model.  He had a  12:04:20

12   lens design.  He may have had -- I even doubt he had   12:04:26

13   taken that into CAD yet.                               12:04:29

14        Q.   So I'm a little bit confused.               12:04:32

15             Where did the idea to have ▬▬▬▬▬▬▬ come      12:04:34

16   from?                                                  12:04:35

17   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬  The need to  12:04:49

19   ▬▬▬▬▬▬▬▬▬▬▬  developed quickly between    12:04:56

20   Florin and I looking at the size of the circuit,       12:04:59

21   knowing when Scott Boehmke defines a certain ▬▬▬▬     12:05:03

▬▬▬▬▬▬▬▬▬▬▬▬▬▬  when Gaetan has  12:05:08

23   designed a lens that has a 150 millimeter focal        12:05:13

24   length, it becomes apparent that the ▬▬▬▬▬▬          12:05:19

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬              12:05:19
```

                                                   Page 77

```
 1  ███████████████████████████████████████
                                           12:05:24
    ███████████████████████
 3       It was obvious to me that wasn't going to  12:05:26
    work and we would have to █████████████████████
    ███████████  Later we went back and looked closer, and I  12:05:33
 6  realized, wait a minute, ███████████████████████
    ██████████  So we can't put circuits on ████████████████
    ████████████████████████████████████████
    ██████████████████                        12:05:47
10       Furthermore, we were starting to look at  12:05:50
11  components on the receiver.  We saw components on the  12:05:53
12  receiver that were themselves ████████████  12:05:58
13  Those were high voltage components.  They needed  12:06:00
14  additional space between them as well.  So it seemed  12:06:01
15  pretty clear at the time ████████████████was not  12:06:05
16  going to work, so we said ████████████  Florin  12:06:09
17  thought he could ████████████████.  12:06:14
18       So that ended up with ████████████████  12:06:20
    ████████████  We already had decided two cavities to make
20  64 channels, so that ended up with ████████████  12:06:24
21  in the sensor.                             12:06:25
22       Q.  Where are the documents that reflect the  12:06:27
23  discussions that you were just talking about?  12:06:31
24       A.  We did not document our discussions.  12:06:33
25       Q.  Okay.  So there are no -- there's no  12:06:35
```

Page 78

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | documentary evidence to evidence -- to support what | 12:06:39 |
| 2 | you just said? | 12:06:40 |
| 3 | MR. KIM:  Objection; form. | 12:06:42 |
| 4 | BY MR. JAFFE: | 12:06:42 |
| 5 | Q.   Is that fair? | 12:06:42 |
| 6 | A.   Not quite. | 12:06:43 |
| 7 | We have documents showing and indicating to | 12:06:47 |
| 8 | us what the vertical angles were to be for the sensor | 12:06:52 |
| 9 | as specified by Scott Boehmke.  We have a lens design | 12:06:57 |
| 10 | that's documented from Gaetan.  We have the original | 12:07:03 |
| 11 | circuit Florin had developed for testing out lasers. | 12:07:10 |
| 12 | At that point, the documentation stopped. | 12:07:14 |
| 13 | And we don't have documents for discussions describing | 12:07:22 |
| 14 | how ███████████████████████████████████████████ | |
| | ██████████████████████████ | 12:07:27 |
| 16 | Q.   Okay.  So I just want to run through that | 12:07:30 |
| 17 | real quick. | 12:07:30 |
| 18 | So you're saying that you got the idea for | 12:07:34 |
| 19 | ██████████ based on three things.  One is the ████████ | |
| | █████████████ of the diodes that you wanted.  Two is the | 12:07:43 |
| 21 | ████████████████ And three is the ████████████████ | |
| | ███████████████████████████████ | 12:07:49 |
| 23 | Generally, is that fair? | 12:07:53 |
| 24 | A.   I'd like you to add a fourth, which is the | 12:07:56 |
| 25 | █████████████████████████████ and possibly a | 12:08:04 |

Page 79

1   ████████████████████████████████████████████

    ██████████                                    12:08:10

3       Q.   So that's part of the circuitry, though?   12:08:12

4       A.   Yeah.                                   12:08:12

5       Q.   So if we say number 3 is the ██████████   12:08:14

    ████████████████  would that capture everything that you're   12:08:19

7   talking about?                                  12:08:20

8       A.   With the clarification that circuitry   12:08:22

9   involves a channel, both receive and transmit, then I   12:08:26

10  can agree to that.                              12:08:27

11      Q.   Fair enough.                            12:08:28

12           So there were three, generally, things, now   12:08:29

13  that we've kind of established our terminology, that   12:08:33

14  you say --                                      12:08:36

15      A.   Sorry.  Did you include the focal length of   12:08:40

16  the lens Gaetan was designing?                  12:08:41

17      Q.   No.                                     12:08:41

18      A.   That's important.                       12:08:43

19      Q.   Okay.  So add that as number 4, focal length   12:08:48

20  of lens.  All right.                            12:08:51

21           So the ████████████  that you're talking   12:08:54

22  about -- the issue that you're talking about there is   12:08:58

23  that ████████████████████████████████████████

    ████████████████████████████████████████████

    ████████████████  right?                        12:09:08

                                           Page 80

1       A.   I think you misspoke.   The resulting ███████

██████████████████████████████████████████████████████

█████████████████████████████████████           12:09:20

4       Q.   I see.                                  12:09:21

5            So the fact that you needed to have the  12:09:23

6       ████████████████████████████████████████████████

███████████████████████████████████  is that basically  12:09:31

8    it or am I messing it up again?                  12:09:34

9       MR. KIM:  Objection; form.                    12:09:35

10      THE WITNESS:  It was the ██████████████████████

██████████████████--                                12:09:39

12   BY MR. JAFFE:

13      Q.   I see.                                    12:09:39

14      A.   -- that required them eventually to ████████

█████████████████████████                           12:09:45

16      Q.   And the ████████████████████████████████████

███████████████████  is that right?                 12:09:49

18      A.   The ████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████                         12:09:59

21      Q.   And -- okay.  And the spacing, that's what  12:10:08

22   Mr. Boehmke -- continue to mispronounce his name  12:10:14

23   probably correctly -- he provided to you in November  12:10:16

24   of 2016?                                          12:10:17

25      A.   Yes, he provided the angular spacing, if I  12:10:20

Page 81

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    may.                                              12:10:21

 2         Q.   Okay.  We'll get to that a little bit later.  12:10:25

 3              Mr. Boehmke didn't provide you how many   12:10:29

 4    boards to use; right?                             12:10:30

 5         A.   Right.                                   12:10:30

 6         Q.   And then the FAC lens, that was provided by  12:10:35

 7    Mr. Pennecot; right?                              12:10:36

 8         A.   That is my understanding.               12:10:39

 9         Q.   He came up with the FAC lens design; right?  12:10:42

10         A.   That's my understanding.                12:10:44

11         Q.   And it's a ███████████████ FAC lens; right?  12:10:47

12    MR. KIM:  Objection; form.                        12:10:48

13         THE WITNESS:  It's ███████████████.          12:10:51

14    BY MR. JAFFE:                                     12:10:51

15         Q.   That's larger than -- sorry.            12:10:53

16         A.   It's ████████████████████████████████

      ████████████████████████████████                 12:10:59

18         Q.   Do you know how large the FAC lenses are for  12:11:03

19    Velodyne's devices?                               12:11:05

20    ████████████████████████████████████████████

      ████████████████████████████████████████████

      ████████████████████████████████████            12:11:16

23         Q.   Do you know how large it is?            12:11:21

24         A.   Are you asking diameter or are you asking

25    length?
```

Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      Q.   To compare it to ████████████████         12:11:17

2      A.   To compare it to ████████████████████     12:11:24
       ████████████████████                           12:11:24

4      Q.   And so that lens design came from          12:11:30

5  Mr. Pennecot and the circuitry came from Florin; is 12:11:33

6  that right?                                         12:11:34

7      A.   Yes.                                       12:11:34

8      Q.   So none of those folks came up with █████  12:11:45
       ████████████████████████████████ right?        12:11:45

10     MR. KIM:  Objection; form.                      12:11:47

11     THE WITNESS:  They were certainly involved in the 12:11:49

12 decision to go to ████████████████ because I       12:11:53

13 had to consult with them in terms of what would be 12:11:56

14 possible for circuit spacing, in the case of Florin. 12:12:00

15 And to make sure that Gaetan's group lens can handle 12:12:06

16 the ████████████████████████                        12:12:09

17 BY MR. JAFFE:

18     Q.   And just to go back to your declaration here, 12:12:12

19 this diagram that you're showing in Figure 6 in     12:12:16

20 paragraph 13, there's no discussion in here of █████ 12:12:22
       █████████████████████ right?                    12:12:22

22     A.   There's no discussion of ████████████████  12:12:31
       █████████ in Figure 6.  Although if you understand Figure 12:12:31

24 6, it could be easily derived.                      12:12:36

25     Q.   That wasn't my question.                   12:12:36
```

Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | My question is, there's no discussion o ███████ | |
| | ████████████████████████ right? | 12:12:40 |
| 3 | A.    Yes. | 12:12:40 |
| 4 | Q.    All right.  So . . . is there any evidence | 12:12:55 |
| 5 | that you're aware of that Uber was considering a | 12:13:03 |
| 6 | ██████████ device before November 2016? | 12:13:12 |
| 7 | A.    I'm not aware of anything. | 12:13:28 |
| 8 | MR. JAFFE:  This is going to be 153. | 12:13:31 |
| 9 | Actually . . . acutally, I'll come back to that. | |
| 10 | BY MR. JAFFE: | 12:13:31 |
| 11 | Q.    All right.  Let's go to 151, your original | 12:14:05 |
| 12 | declaration, in particular, paragraph 18. | 12:14:15 |
| 13 | So here you mention some custom beam spacing | 12:14:39 |
| 14 | provided by Mr. Boehmke on November 4th, 2016. | 12:14:44 |
| 15 | Do you see that? | 12:14:44 |
| 16 | A.    Yes. | 12:14:44 |
| 17 | Q.    And then later you said, "My team imported | 12:14:48 |
| 18 | this data." | 12:14:50 |
| 19 | A.    Um-hum.  Yes. | 12:14:57 |
| 20 | Q.    You don't cite -- in your declaration, you | 12:15:00 |
| 21 | don't cite any contemporaneous document to support | 12:15:05 |
| 22 | this idea; right? | 12:15:06 |
| 23 | A.    Are you referring to the idea of importing | 12:15:09 |
| 24 | the data? | 12:15:10 |
| 25 | Q.    Right. | 12:15:11 |

Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A. That would be documented in CAD files. | 12:15:27 |
| 2 | Q. That's not my question. | 12:15:29 |
| 3 | My question is, here in your original | 12:15:31 |
| 4 | declaration, you don't provide any evidence how what | 12:15:36 |
| 5 | Mr. Boehmke provided to you became or formed the basis | 12:15:40 |
| 6 | of the beam spacing in Fuji; is that fair?  It's just | 12:15:47 |
| 7 | your testimony. | 12:15:47 |
| 8 | A. Right.  So this does not -- I agree that the | 12:15:53 |
| 9 | declaration does not reference other documents to | 12:15:56 |
| 10 | support that path of data. | 12:15:59 |
| 11 | Q. So the only evidence that we have that what | 12:16:01 |
| 12 | Mr. Boehmke provided you in November 2016 that | 12:16:04 |
| 13 | became -- that that information formed the basis of | 12:16:09 |
| 14 | the beam spacing in the Fuji design is based on this | 12:16:14 |
| 15 | part of your declaration? | 12:16:16 |
| 16 | MR. KIM:  Objection; form. | 12:16:19 |
| 17 | THE WITNESS:  I would have to . . . I will agree | 12:16:30 |
| 18 | that Scott Boehmke's contribution to the angles is | 12:16:40 |
| 19 | cited in paragraph 18.  I don't see it cited | 12:16:44 |
| 20 | elsewhere.  And there's an exhibit, I believe -- is | 12:17:00 |
| 21 | that correct?  No, it doesn't seem to be cited in this | 12:17:19 |
| 22 | paragraph. | 12:17:22 |
| 23 | MR. JAFFE:  Can you just repeat my question, | 12:17:25 |
| 24 | please. | 12:17:25 |
| 25 | (Record read by reporter as follows: | |

Page 85

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              "Question:  So the only evidence that we have

 2          that what Mr. Boehmke provided you in

 3          November 2016 -- that that information formed

 4          the basis of the beam spacing in the Fuji

 5          design is based on this part of your

 6          declaration?")                              12:17:25

 7      MR. KIM:  Objection; form.                      12:17:48

 8      THE WITNESS:  I would say, no, I believe you have  12:17:50

 9  other evidence that not only shows the document that  12:17:55

10  Scott generated, but also you have the laser boards   12:17:58

11  themselves.                                        12:17:59

12  BY MR. JAFFE:                                      12:17:59

13      Q.   Right.                                    12:17:59

14           And what I'm saying is, tying the two     12:18:01

15  together, the only evidence we have is what's here in  12:18:05

16  your declaration; right?                           12:18:06

17      MR. KIM:  Objection; form.                     12:18:10

18      THE WITNESS:  I can only say I'm not aware that  12:18:12

19  you have other evidence to tie those two together.    12:18:15

20  BY MR. JAFFE:                                      12:18:15

21      Q.   And so let's just talk about evidence that we  12:18:18

22  do have, which is your declaration here.           12:18:20

23      A.   Okay.                                     12:18:23

24      Q.   So you said you imported the data into Zemax;  12:18:24

25  right?                                             12:18:24
```

Page 86

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Yes. | 12:18:24 |
| 2 | Q.    And then you used software to, quote, | 12:18:27 |
| 3 | "determine the resultant emitting points of the laser | 12:18:31 |
| 4 | diodes." | 12:18:32 |
| 5 | Do you see that? | 12:18:33 |
| 6 | A.    I see that. | 12:18:33 |
| 7 | Q.    What were the resultant emitting points on | 12:18:39 |
| 8 | the laser diodes that you determined based on the data | 12:18:43 |
| 9 | from Scott? | 12:18:43 |
| 10 | A.    Two answers.  The resulting emitting points | 12:18:48 |
| 11 | would be the coordinates of the front center emitting | 12:18:52 |
| 12 | surface of the laser diodes in three-dimensional space | 12:18:57 |
| 13 | behind the lens.  And I think it's worth pointing out | 12:19:00 |
| 14 | that, since this declaration, I've had a conversation | 12:19:04 |
| 15 | with Gaetan to better understand the details of this | 12:19:07 |
| 16 | process that I describe briefly here. | 12:19:11 |
| 17 | Q.    I appreciate that answer.  My question was | 12:19:15 |
| 18 | hopefully a little bit more specific. | 12:19:18 |
| 19 | What were the -- what were the resulting | 12:19:21 |
| 20 | emitting points of the laser diodes that you're | 12:19:26 |
| 21 | referring to in this paragraph in your declaration? | 12:19:28 |
| 22 | A.    The resulting emitting points would consist | 12:19:32 |
| 23 | of coordinates for each laser diode. | 12:19:35 |
| 24 | Q.    And what are those coordinates? | 12:19:39 |
| 25 | A.    They're defined in the number of files -- | 12:19:43 |

Page 87

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | there's a file that defines them for the purpose of | 12:19:46 |
| 2 | doing the actual die attach and they're defined in the | 12:19:50 |
| 3 | laser PCB file package that was sent to Gorilla. | 12:19:56 |
| 4 | Q.   Sorry.   I want to try and focus us again. | 12:20:00 |
| 5 | I'm asking you, sitting here today -- | 12:20:02 |
| 6 | A.   Yes. | |
| 7 | Q.   -- what are the resultant emitting points of | 12:20:07 |
| 8 | the laser diodes that you refer to here, the numbers? | 12:20:09 |
| 9 | A.   I don't have them off the top of my head. | |
| 10 | Q.   So you can't, sitting here today, tell me | 12:20:13 |
| 11 | what the resulting emitting points of the laser diodes | 12:20:16 |
| 12 | are; fair? | 12:20:17 |
| 13 | A.   Fair, with caveat, I can find them from a | 12:20:20 |
| 14 | document in a straightforward manner. | 12:20:22 |
| 15 | Q.   And then the data that was exported to the | 12:20:32 |
| 16 | SolidWorks CAD software, you don't cite or attach that | 12:20:37 |
| 17 | to your original declaration either; right? | 12:20:40 |
| 18 | A.   I don't. | 12:20:42 |
| 19 | Q.   And the specific resulting emitting diodes | 12:20:45 |
| 20 | that you referred to in the prior sentence, you don't | 12:20:48 |
| 21 | cite or attach that to your declaration; right? | 12:20:50 |
| 22 | A.   Sorry, I lost you there.   Could you repeat | 12:20:54 |
| 23 | the question. | 12:20:55 |
| 24 | Q.   The resultant emitting points of the laser | 12:20:58 |
| 25 | diodes that you referred to on line 26 of your | 12:21:01 |

Page 88

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    declaration, you don't cite or attach that to your      12:21:03

 2    declaration; right?                                      12:21:04

 3        A.   I don't believe they're in this declaration,   12:21:09

 4    no.                                                      12:21:09

 5        Q.   Can you tell me, for the resulting emitting     12:21:20

 6    points of the laser diodes, whether those resultant     12:21:23

 7    emitting points that you refer to in your declaration   12:21:27

 8    were for ███████████████████████████?                   12:21:31

 9        A.   Yes, they are.                                  12:21:36

10        Q.   Okay.  And how do you know that?                12:21:39

11        A.   I know that because I know -- I've looked       12:21:46

12    at -- independent of this declaration, I have looked    12:21:50

13    at the file that defines the coordinate locations for   12:21:55

14    ███████████████████████████████████████████████████     

      ████████████████████████████  I know these also        12:22:04

16    by finding the similar values in the PCB file that was  12:22:09

17    sent to Gorilla for one of those boards.                12:22:12

18        Q.   So the initial optical cavity designs that     12:22:26

19    are referred to on the next page of your declaration,   12:22:31

20    what are you referring to there?                        12:22:33

21        A.   This would be CAD file.  The optical cavity    12:22:50

22    is the mechanical housing that holds the lens.  We      12:22:53

23    eventually have a CAD model that includes the housing,  12:22:56

24    the lens, PCBs with coordinates for the laser diodes    12:23:04

25    in one CAD file.                                        12:23:05
```

Page 89

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.   So just going back to what we were talking      12:23:09
 2   about earlier, you're saying that Mr. Boehmke provided    12:23:12
 3   you the custom beam spacing and you imported that data    12:23:17
 4   into Zemax to determine the resultant emitting points     12:23:23
 5   of the laser diodes, and those you just picked as a       12:23:28
 6   first matter, ███████████████████████████████████        12:23:32
 7        MR. KIM:   Objection; form.                          12:23:36
 8        THE WITNESS:   We didn't pick it as first matter.    12:23:38
 9   We discussed this already, that I would have loved to     12:23:41
10   ██████████████████████ and we found we couldn't do       12:23:45
11   that.  ███████████████████████████   We decided we had   12:23:45
12   to █████████████████████████████████████████████████     12:23:58
     ████████████████████████████████████   That decision went
14   into the first -- earliest CAD designs of the optical     12:24:04
15   cavity for Fuji.                                          12:24:06
16   BY MR. JAFFE:                                             12:24:06
17        Q.   So you didn't do any sort of other Zemax        12:24:08
18   simulations of other board and diode arrangements?        12:24:14
19        A.   I'm not aware.  I don't recall doing any CAD    12:24:19
20   designs for other board arrangements.                     12:24:23
21        Q.   So by November 4th, 2016, you and your team     12:24:29
22   had already arrived at ██████████████████████████████     12:24:35
     ██████████████████████   is that right?
24        A.   It's possible that that was by November 4th.    12:24:40
25   It's also possible that it was shortly after the 4th.     12:24:44
```

Page 90

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.    So you -- sorry.                        12:24:46

 2      A.    There's a potential for a time lag from  12:24:50

 3  Scott's prescribed beam angles and when we actually  12:24:55

 4  did the determination of six total boards and got   12:24:59

 5  those into a CAD model.                             12:25:01

 6      Q.    And you only started the Fuji project at the  12:25:03

 7  end of October; right?                              12:25:05

 8      A.    Yes.                                      

 9      Q.    So you came up with the █████████████████

10  ███████████████  design in a week, approximately?  12:25:14

11      MR. KIM:  Objection; form.                     12:25:16

12      THE WITNESS:  I don't know if it was exactly a  12:25:17

13  week.  Or could have been more than a week, but it was  12:25:20

14  something on the order of a week.                   12:25:22

15  BY MR. JAFFE:                                       12:25:22

16      Q.    About a week?                            12:25:24

17      A.    Within some small multiple of one week.  One  12:25:30

18  week, two weeks, three weeks possible, yes, on a very  12:25:34

19  short time scale.                                   12:25:36

20      Q.    And you didn't -- after receiving these beam  12:25:41

21  spacings from Mr. Boehmke, you didn't even consider  12:25:44

22  other designs other than ██████████████████████████

██████████████████████  right?                         12:25:51

24      A.    That feels a little out of sequence.  So I  12:25:59

25  believe we got the angles from Scott for our sensor.  12:26:05
```

                                                    Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | The decision for how many boards to place them on | 12:26:08 |
| 2 | would have to occur after we knew what those angles | 12:26:12 |
| 3 | were. | 12:26:13 |
| 4 |     Q.   So you got the custom beam spacing from | 12:26:32 |
| 5 | Mr. Boehmke; and then one to three weeks later, you | 12:26:37 |
| 6 | knew you were doing ███████████████████ | |
| 7 | ███████? | 12:26:43 |
| 8 |     A.   Yes. | 12:26:43 |
| 9 |     Q.   And at that time, in between receiving | 12:26:46 |
| 10 | Mr. Boehmke's custom beam spacing, you didn't | 12:26:50 |
| 11 | consider -- even consider any other designs other than | 12:26:52 |
| 12 | ████████████████████ | 12:26:57 |
| 13 | right? | 12:26:57 |
| 14 |     A.   No.  When Scott gave us the prescribed | 12:27:02 |
| 15 | angles, we had to first consider ██████████ | |
| 16 | ██████████  And that was the process we've already | 12:27:07 |
| 17 | discussed to arrive at ████████ but that's after | 12:27:11 |
| 18 | Scott originally told us what the angles would be. | 12:27:14 |
| 19 |     Q.   But I'm confused. | 12:27:15 |
| 20 |     Because when we were talking earlier about | 12:27:17 |
| 21 | after you received the data, you said you only | 12:27:19 |
| 22 | provided one summary into Zemax and that was ████████ | |
| 23 | ██████████████████ | 12:27:24 |
| 24 |     A.   Yes. | 12:27:24 |
| 25 |     Q.   So you didn't even -- when you were looking | 12:27:27 |

Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    at other options, you didn't even do one simulation of    12:27:30

 2    another option?                                            12:27:31

 3         A.    I don't think we did.  I don't recall doing     12:27:34

 4    any others.                                                12:27:35

 5         Q.    So must have been a pretty short decision to    12:27:38

 6    arrive at ███████████████████████████████ if              12:27:42

 7    you didn't even simulate another option?                   12:27:46

 8         A.    Yeah.  It didn't take a long time to find out   12:27:49

 9    ███████████████████████████                                

10         Q.    Because you had the custom beam spacing from    12:27:52

11    Mr. Boehmke, the FAC lens, the size of the circuitry       12:27:54

12    and the focal length of the lens designed by               12:27:56

13    Mr. Pennecot; right?                                       12:27:59

14         A.    Already had those.                              12:27:59

15         Q.    So because you had all that information, you    12:28:00

16    were steered very quickly to ████████████████████████████

17    ██████████████████████  do you agree with that?           12:28:07

18         MR. KIM:  Objection; form.                            12:28:09

19         THE WITNESS:  I would agree that it was a very        12:28:11

20    quick decision to arrive at ████████████████████          12:28:14

21    yeah.                                                      12:28:14

22    BY MR. JAFFE:                                              12:28:14

23         Q.    And would you say that if one of those          12:28:18

24    factors was more important than another in arriving at    12:28:21

25    that design, that it drove that design more than any      12:28:25
```

Page 93

```
 1   others of the four that we talked about?           12:28:27

 2       A.   It's hard to -- if all of those are required   12:28:35

 3   elements, it's hard to say one would be more        12:28:39

 4   important, but if you want to say one was more      12:28:43

 5   important, it could have a stronger influence.      12:28:46

 6       Q.   Which one would that be?                   12:28:48

 7       A.   I don't believe these are necessarily --   12:28:51

 8       Q.   And you're looking at my handwriting.  Don't   12:28:53

 9   look at my handwriting.  I'm happy to go through these   12:28:58

10   things with you.                                    12:28:59

11       A.   Let's list them off.                       12:29:02

12                ██████████   we had that originally    12:29:04

13   designed sometime, quite a while earlier, a long lead   12:29:07

14   time.                                               12:29:09

15       Q.   What do you mean quite a while earlier?    12:29:09

16       A.   In our previous discussion -- deposition, we   12:29:12

17   talked about -- I think we called it ████████  or   12:29:17

18   something like that.  So basically shortly after   12:29:20

19   joining Otto, Gaetan was working on this FAC lens.   12:29:24

20       Q.   Why was he working on it?                  12:29:25

21       A.   I presume, but I don't know, that they were   12:29:28

22   considering a design like this even before I joined.   12:29:32

23       Q.   And did you have any idea as to any        12:29:38

24   commonalities between the FAC lens that Mr. Pennecot   12:29:43

25   was working on and Mr. Levandowski's prior work at   12:29:46
```

                                                    Page 94

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Google? | 12:29:47 |
| 2 | A.   No. | 12:29:47 |
| 3 | Q.   You didn't have any understanding? | 12:29:49 |
| 4 | A.   No. | 12:29:49 |
| 5 | Shall we go back to our list in terms of | 12:29:56 |
| 6 | elements that are important? | 12:29:57 |
| 7 | Q.   Let me see if I can short-circuit this. | 12:30:00 |
| 8 | My understanding is you're saying they were | 12:30:02 |
| 9 | all required, so one isn't more important than the | 12:30:06 |
| 10 | other; is that fair? | 12:30:07 |
| 11 | A.   That's fair. | 12:30:08 |
| 12 | Q.   So then we don't need to go through them. | 12:30:11 |
| 13 | Let's turn to page 17 of your declaration. | 12:30:14 |
| 14 | A.   Page or paragraph? | 12:30:17 |
| 15 | Q.   Excuse me.   Paragraph 17. | 12:30:21 |
| 16 | A.   Okay. | 12:30:21 |
| 17 | Q.   It's on page 11. | 12:30:23 |
| 18 | A.   Thank you. | 12:30:24 |
| 19 | Q.   And I'm in your supplemental declaration, | 12:30:28 |
| 20 | which is 152. | 12:30:30 |
| 21 | MR. KIM:  What paragraph? | 12:30:34 |
| 22 | MR. JAFFE:  17.   It's the long paragraph, so it's | 12:30:38 |
| 23 | page 11 if you're looking for it. | 12:30:40 |
| 24 | BY MR. JAFFE: | 12:30:40 |
| 25 | Q.   So there are two things labeled here, Figure | 12:30:45 |

Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | 8A and 8B. | 12:30:48 |
| 2 | Do you see that? | 12:30:49 |
| 3 | A.   Yes. | 12:30:49 |
| 4 | Q.   So just for clarification here, the letters | 12:30:55 |
| 5 | that are on there, those are letters that you added | 12:30:58 |
| 6 | for purposes of your declaration; right? | 12:30:59 |
| 7 | A.   Yes, those were added for this declaration. | 12:31:04 |
| 8 | Q.   In the document as it was created in November | 12:31:06 |
| 9 | 2016, it did not have these letters on it; right? | 12:31:09 |
| 10 | A.   Right. | 12:31:09 |
| 11 | Q.   So this is a modified version for your | 12:31:12 |
| 12 | declaration? | 12:31:13 |
| 13 | A.   Yes. | 12:31:14 |
| 14 | Q.   And if we go to the November 2016 data that | 12:31:22 |
| 15 | you were looking at that formed the basis of this, it | 12:31:28 |
| 16 | did not include these letterings; right? | 12:31:29 |
| 17 | A.   Right. | 12:31:29 |
| 18 | Q.   So in November 2016, there was no -- | 12:31:36 |
| 19 | Mr. Boehmke did not provide the distribution of these | 12:31:40 |
| 20 | beams onto particular boards; right? | 12:31:43 |
| 21 | A.   Right. | 12:31:43 |
| 22 | Q.   So the November 2016 data from Mr. Boehmke, | 12:31:55 |
| 23 | that did not provide any information as to how these | 12:31:59 |
| 24 | beams would be distributed ███████████  █████████ | |
| | ████████████████████████  right? | 12:32:04 |

Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    It provided no prescription for that | 12:32:07 |
| 2 | distribution. | 12:32:09 |
| 3 | Q.    Let's go to the next page here at the end of | 12:32:17 |
| 4 | paragraph 17. | 12:32:18 |
| 5 | So this chart here at the end of paragraph | 12:32:22 |
| 6 | 17, again, this is something you generated for your | 12:32:26 |
| 7 | declaration; right? | 12:32:26 |
| 8 | A.    Yes. | 12:32:27 |
| 9 | Q.    This isn't some document that you're just | 12:32:31 |
| 10 | showing?  This is something that you generated for | 12:32:33 |
| 11 | this case? | 12:32:34 |
| 12 | A.    Um-hum.  That's right. | 12:32:35 |
| 13 | Q.    Now, what is being shown here in this table? | 12:32:40 |
| 14 | A.    So this table is showing the vertical beam | 12:32:46 |
| 15 | angles in a November 16th document from Scott Boehmke | 12:32:51 |
| 16 | in this first white column.  The next column labeled | 12:32:57 |
| 17 | "Current" contains the angles that we actually used. | 12:33:03 |
| 18 | And the green shows the discrepancy between them. | 12:33:07 |
| 19 | Q.    Okay.  And again the ███████████████████ | |
| 20 | ████████████  that's all information that you added | 12:33:20 |
| 21 | later? | 12:33:21 |
| 22 | A.    Added later for clarity, yes. | 12:33:22 |
| 23 | Q.    That's not information that came from the | 12:33:24 |
| 24 | November 16th document provided by Mr. Boehmke; right? | 12:33:27 |
| 25 | A.    Right. | 12:33:27 |

Page 97

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1       Q.    So no one should be confused as to whether        12:33:30

 2   this data is originally from November 2016 in terms of      12:33:35

 3   the  ██████████   right?                                    12:33:37

 4       A.    Nobody should be confused that the  ████████      12:33:41

 5   had come from Scott, because it did not.                    12:33:43

 6       Q.    Right.  You added it in here for purposes of      12:33:45

 7   your declaration?                                           12:33:46

 8       A.    Yeah.                                             12:33:46

 9       Q.    All right.  So you've mentioned -- I want to      12:33:50

10   just clarify a little bit of terminology here.  What's      12:33:55

11   shown here at the end of paragraph 17 is talking about      12:34:00

12   angles; right?                                              12:34:01

13       A.    Right.                                            12:34:01

14       Q.    And what angle are we talking about?              12:34:04

15       A.    We're talking about the vertical angle            12:34:08

16   reference to a horizontal plane measured in degrees         12:34:12

17   such that positive numbers are above horizontal,            12:34:18

18   negative numbers are below horizontal.                      12:34:20

19       Q.    Okay.  Are you familiar with the concept of       12:34:23

20   beam spacing?                                               12:34:24

21       A.    Perhaps you could clarify.                        12:34:26

22       Q.    Let's go back to the prior page.  And to page     12:34:35

23   10.  The heading, do you see it says "Beam spacing in       12:34:41

24   Fuji"?                                                      12:34:41

25       A.    Um-hum.                                           12:34:42
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.    "Beam spacing," what do you mean?        12:34:44

 2        A.    So beam spacing can be used to refer to the  12:34:49

 3    ███████████████████████████████████████████████

              Since it refers to  █████████████████████████

      █████████████████████████████████████████████████████

      ████████████████████████████████████         12:35:10

 7        Q.    When you are saying  ██████  -- what you're  12:35:12

 8    saying -- when you're talking about ██████████████████

      █████████████████████████████████████████████████████

      ██████████████████████████████    is that fair?   12:35:20

11        A.    That's fair.                          12:35:20

12        Q.    Just to be clear, again, when -- we're going  12:35:24

13    back to the end of paragraph 17.  You are not talking  12:35:27

14    about ████████████████████████████████████████████████

      ████████████████   right?                      12:35:33

16        MR. KIM:  Objection; form.                  12:35:36

17        THE WITNESS:  This does not refer to the absolute  12:35:38

18    positions of the diodes.  I'm referring to the end of  12:35:40

19    paragraph 17.  The figure refers to the angular  12:35:44

20    prescribed angles.                              12:35:47

21    BY MR. JAFFE:                                   12:35:47

22        Q.    So I want to introduce a new term here.   12:35:50

23              You're familiar -- when we have the diodes,  12:35:53

24    one way that they're represented, they're position is  12:35:56

25    X and Y; right?                                 12:35:58
```

                                                Page 99

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   Right.                                  12:35:58

 2        Q.   And I want to refer to the difference between  12:36:02

 3   two diodes on the Y axis as vertical spacing.     12:36:07

 4             Do you understand what I'm referring to?  12:36:08

 5        A.   Yes.                                     12:36:08

 6        Q.   What you're talking about here in paragraph  12:36:10

 7   17 does not show the differences in the vertical  12:36:12

 8   spacing between the diodes; right?               12:36:16

 9        MR. KIM:  Objection; form.                   12:36:17

10        THE WITNESS:  Agreed, paragraph 16 does not refer  12:36:20

11   to vertical --                                    12:36:22

12   BY MR. JAFFE:                                      12:36:22

13        Q.   17.                                      12:36:22

14        A.   Sorry.  In paragraph 17, we are not referring  12:36:26

15   to --                                             12:36:22

16        MR. KIM:  Same objection.                     12:36:28

17        THE WITNESS:  -- the vertical dimension on a laser  12:36:30

18   board.                                            12:36:31

19   BY MR. JAFFE:                                      12:36:22

20        Q.   So the ███████████████████ that's       12:36:35

21   here at the end of 17, that's not referring to the  12:36:36

22   ████████████████████████████████████████          12:36:39

23   in Fuji; right?                                   12:36:40

24        MR. KIM:  Objection; form.                   12:36:42

25        THE WITNESS:  That's right.                  12:36:43
```

Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. KIM:  We've been going over an hour.  Can we | 12:37:24 |
| 2 | break for lunch? | 12:37:26 |
| 3 | MR. JAFFE:  Yes, we can break. | 12:37:28 |
| 4 | THE VIDEOGRAPHER:  We are off the record at 12:37 | 12:37:30 |
| 5 | p.m. | 12:37:30 |
| 6 | (Lunch recess was taken at 12:37 p.m.) | 12:37:30 |
| 7 | (Nothing omitted or deleted.  See next page). | |

Page 101

```
1       AFTERNOON SESSION                    1:38 P.M.

2                        - - -

3          THE VIDEOGRAPHER:  We are back on the record at   13:38:23

4     1:38 p.m.                                             13:38:24

5                    EXAMINATION RESUMED                    13:38:24

6     BY MR. JAFFE:                                         13:38:24

7          Q.   Welcome back.                               13:38:28

8          A.   Thank you.                                  13:38:28

9          Q.   I want to turn to your original declaration. 13:38:31

10    I think it's 151.  And in particular, in paragraph 20, 13:38:39

11    you state, "There are approximately ▮ employees        13:38:41

12    currently working on the Fuji project."                13:38:44

13              Is that right?                               13:38:45

14         A.   Yes, I see it.                               13:38:48

15         Q.   How many employees are working at Uber on    13:38:54

16    LiDAR-related responsibilities?                        13:38:56

17         MR. KIM:  Objection; form.                        13:39:02

18         THE WITNESS:  There would be approximately ▮       13:39:03

19    employees at Uber working on LiDAR responsibilities    13:39:06

20    that I'm aware of.                                     13:39:10

21    BY MR. JAFFE:                                          13:39:10

22         Q.   Your understanding is that there are only ▮  13:39:12

23    employees at Uber with LiDAR-related responsibilities; 13:39:16

24    is that right?                                         13:39:17

25         MR. KIM:  Objection; form.                        13:39:19
```

Page 102

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1         THE WITNESS:  When I came up with the number, I    13:39:22

 2    wanted to pick ones -- employees that had primary       13:39:26

 3    responsibilities on LiDAR.                              13:39:29

 4    BY MR. JAFFE:                                           13:39:29

 5         Q.   So let me ask my question again then.         13:39:32

 6              What is the number of employees at Uber that  13:39:37

 7    have LiDAR-related responsibilities or projects?        13:39:43

 8         MR. KIM:  Objection; form.                         13:39:43

 9         THE WITNESS:  I don't know off the top of my head  13:39:46

10    how many more employees have minor LiDAR                13:39:48

11    responsibilities.                                       13:39:50

12    BY MR. JAFFE:                                           13:39:50

13         Q.   So when you're talking about this number of   13:39:52

14    employees here, you're not talking about the number of  13:39:54

15    employees working on LiDAR entirely at Uber; right?     13:39:59

16         MR. KIM:  Objection; form.                         13:40:02

17         THE WITNESS:  Correct.  I believe there may be a   13:40:07

18    few more employees that also have some minor            13:40:11

19    responsibility for LiDAR activities.                    13:40:15

20    BY MR. JAFFE:                                           13:40:15

21         Q.   What LiDAR technology are they working on?    13:40:18

22         A.   They're not working on LiDAR technology.      13:40:21

23    They're working on perhaps sourcing components, just    13:40:26

24    general supply chain people.                            13:40:28

25         Q.   Okay.  Are there any other LiDAR projects     13:40:32
```

Page 103

```
1    within Uber other than the Fuji project?           13:40:35

2         A.   No, there's not.                          13:40:37

3         Q.   You're not working on building LiDARs with  13:40:40

4    third-party companies?                              13:40:42

5         MR. KIM:  Objection; form.                     13:40:44

6         THE WITNESS:  I'm not working on LiDAR projects  13:40:48

7    with third-party companies.                         13:40:50

8    BY MR. JAFFE:                                        13:40:50

9         Q.   Right.  So let me ask my question a little  13:40:53

10   bit differently.                                    13:40:53

11              Is Uber working on designing LiDARs with  13:40:58

12   third-party companies?                              13:40:59

13        MR. KIM:  Objection; form.                     13:41:00

14        THE WITNESS:  I think Scott Boehmke is working  13:41:05

15   with some third-party LiDAR suppliers.              13:41:09

16   BY MR. JAFFE:                                        13:41:09

17        Q.   Who's he working with?                    13:41:12

18        A.   I am aware of                             13:41:13

19        Q.   Um-hum.

20        A.   There's              There is -- and I'll say  13:41:31

21   this confidential information.  There's            13:41:35

22   I'm not aware of any others at this point.          13:41:40

23        MR. KIM:  At this point I'll just designate the  13:41:42

24   transcript attorneys' eyes only.                    13:41:46

25        MR. JAFFE:  What number are we at?             13:41:48
```

Page 104

```
 1        THE REPORTER:  153.                         13:41:50

 2        MR. JAFFE:  Okay.  So this is going to be 153.   13:41:53

 3            (Plaintiff's Exhibit 153 was marked.)     13:42:07

 4   BY MR. JAFFE:

 5        Q.   So I'll just tell you for the record, this   13:42:09

 6   was a document that Uber's lawyers prepared and      13:42:13

 7   submitted to the court.  That's where we got this    13:42:17

 8   from.                                              13:42:18

 9        A.   Um-hum.                                  13:42:19

10        Q.   Now, you were talking earlier about ▮▮folks   13:42:23

11   working on the Fuji project and that that's the only   13:42:26

12   LiDAR project.  If you look at Section 2 here -- and   13:42:29

13   you can see my handwriting on this copy.  Actually, I   13:42:33

14   hope my math is right, but on the bottom, on the     13:42:36

15   second page, I totaled it up.  And I counted about ▮   13:42:40

16   employees here that said that they have LiDAR-related   13:42:43

17   responsibilities or projects.                      13:42:45

18        A.   Okay.                                    13:42:46

19        Q.   What are those other folks doing?        13:42:48

20        A.   I don't know what all these other people are   13:42:56

21   doing.  So, for instance -- shall we just go down the   13:43:06

22   list?                                              13:43:06

23        Q.   Well, let me ask generally.              13:43:09

24            If they're not working on Fuji, but they're   13:43:11

25   working on LiDAR, what are they working on?        13:43:15
```

Page 105

```
 1        A.    If they're not working on Fuji . . . so let's   13:43:20

 2   take -- I don't know if Phillip Haban, I don't know        13:43:26

 3   what he's working on.  I don't know Jacob Fischer.  I       13:43:31

 4   don't know what he's working on.  Robert Doll,             13:43:34

 5   he's -- I know he's an employee for the Pittsburgh         13:43:40

 6   team.  He's related to the hardware group or some          13:43:47

 7   manufacturing aspect of that, but I don't know what        13:43:50

 8   he's working on.                                           13:43:52

 9        Sean Chin, I don't know who that is.  Not             13:44:07

10   sure who Jay Kuvelker is and what he's working on.         13:44:13

11   Anthony Levandowski, he's a manager.  I don't know how     13:44:19

12   he's working on Fuji or what he's working on.  I would     13:44:23

13   say he's not working on Fuji, but we already               13:44:27

14   established that.                                          13:44:28

15        Q.    Actually, why don't we pause there for a        13:44:30

16   second.                                                    13:44:30

17        For the ▇ employees in your declaration,             13:44:32

18   does that include Mr. Levandowski?                         13:44:34

19        A.    No.                                             13:44:34

20        Q.    So if he has LiDAR-related responsibilities     13:44:37

21   or projects here in Section 2 of this document, you        13:44:42

22   don't know what those are; is that fair?                   13:44:44

23        A.    I would say so.                                 13:44:45

24        And if I can be more clear about the ▇               13:44:53

25   employees currently working on the Fuji project, I do      13:44:56
```

                                                      Page 106

| | | |
|---|---|---|
| 1 | mean people working directly on the Fuji project.  I | 13:45:00 |
| 2 | did not include people who were some levels of | 13:45:03 |
| 3 | management up who had some sort of dotted line or | 13:45:06 |
| 4 | eventual path of ownership or responsibility.  I was | 13:45:12 |
| 5 | coming up with ██ as people tha  I felt I c uld | 13:45:14 |
| 6 | solidly say would be adversely affected if the Fuji | 13:45:19 |
| 7 | project ended. | 13:45:21 |
| 8 | So there's still a lot of names on here.  For | 13:45:29 |
| 9 | instance, take Ana Rayo, she's in a supply chain | 13:45:32 |
| 10 | group.  She's responsible, I think, for some aspects | 13:45:36 |
| 11 | of receiving material.  I would not have counted her | 13:45:39 |
| 12 | as primarily working on Fuji. | 13:45:41 |
| 13 | Q.   Let me actually just stop you and ask a | 13:45:44 |
| 14 | different question, which is, how many of these people | 13:45:47 |
| 15 | you don't know what they're doing in terms of LiDAR | 13:45:51 |
| 16 | work.  Can you just provide me a count? | 13:45:54 |
| 17 | A.   Yep. | 13:45:55 |
| 18 | Q.   And, actually, why don't we do this, I'm | 13:46:01 |
| 19 | going to hand you a pen.  And why don't you just mark | 13:46:04 |
| 20 | the people that you don't know what they're doing with | 13:46:06 |
| 21 | LiDAR. | 13:46:07 |
| 22 | A.   With LiDAR in general.  Okay. | 13:46:09 |
| 23 | Q.   Well, let me state it this way:  You don't | 13:46:11 |
| 24 | know why they're on this list of "Defendants' | 13:46:15 |
| 25 | Officers, Directors, and Employees with LiDAR-Related | 13:46:17 |

Page 107

| | | |
|---|---|---|
| 1 | Responsibilities Or Projects"? | 13:46:18 |
| 2 | A.   Okay.  I will mark those. | 13:46:20 |
| 3 | (Witness complies.) | 13:46:20 |
| 4 | Okay.  So these -- I've marked -- | 13:48:19 |
| 5 | Q.   Can I have my pen back. | 13:48:21 |
| 6 | A.   Sorry. | 13:48:21 |
| 7 | I've marked those for whom I don't know what | 13:48:24 |
| 8 | they're working on. | 13:48:25 |
| 9 | Q.   Can you just tell me how many you've marked? | 13:48:28 |
| 10 | A.   Sorry. | 13:48:29 |
| 11 | Thirteen. | |
| 12 | Q.   So those are 13 employees that Uber's lawyers | 13:48:40 |
| 13 | said had LiDAR-related responsibilities or projects | 13:48:43 |
| 14 | and they don't work on the Fuji, but you don't know | 13:48:46 |
| 15 | what they work on? | 13:48:47 |
| 16 | A.   That's correct, to my knowledge. | 13:48:50 |
| 17 | Q.   And then you mentioned that Uber was working | 13:48:52 |
| 18 | with some suppliers, third parties, on LiDAR and you | 13:48:56 |
| 19 | mentioned ▇▇▇▇▇▇▇▇▇▇▇▇  And then what else? | 13:49:00 |
| 20 | A.   ▇▇▇▇▇ | 13:49:01 |
| 21 | Q.   ▇▇▇▇▇ | 13:49:02 |
| 22 | Anyone else? | 13:49:05 |
| 23 | A.   Perhaps, yeah.  ▇▇▇▇▇  I don't think I'm | 13:49:28 |
| 24 | aware of any other development activities. | 13:49:32 |
| 25 | Q.   So let's look at Section 3 here.  You see it | 13:49:37 |

Page 108

```
 1    says, "List of defendant suppliers and consultants who   13:49:40

 2    have LiDAR-related responsibilities or projects"?        13:49:42

 3         A.   Okay.                                          13:49:43

 4         Q.   Is ████████ listed  ere?                       13:49:59

 5         A.   Nope.                                          13:49:59

 6         Q.   So ████████ is a Li AR supplier that's not     13:50:03

 7    listed on this list of defendant suppliers?             13:50:07

 8         MR. KIM:  Objection; form.                          13:50:10

 9         THE WITNESS:  Yes.                                  13:50:11

10    BY MR. JAFFE:                                            13:50:11

11         Q.   What about ██████ is that on here?             13:50:15

12         A.   Nope.                                          13:50:22

13         Q.   Okay.  And what about ████████ is that on      13:50:29

14    here?                                                   13:50:29

15         A.   Nope.                                          13:50:34

16         Q.   And then I think ██████ actually is on here;   13:50:38

17    right?                                                  13:50:38

18         A.   Yes.                                           13:50:41

19         Q.   And what are you guys doing with ██████        13:50:45

20         A.   I believe -- I believe we're buying some demo  13:50:51

21    units or some early evaluation units.                   13:50:54

22         Q.   You're working with them on designing a        13:50:58

23    custom LiDAR; right?                                    13:50:59

24         A.   They're developing a new LiDAR.  I don't know  13:51:02

25    that it's custom for us or just -- I don't know that    13:51:05
```

Page 109

```
 1    detail.

 2        Q.   Are you providing them any Uber confidential   13:51:09

 3    information.

 4        A.   I'm not aware of that happening, no.           13:51:12

 5        Q.   So there is no Uber confidential information   13:51:16

 6    that is going from Uber to ███████ is that true?        13:51:21

 7        A.   I'm not aware of any.                          13:51:23

 8        MR. JAFFE:  Let's mark -- where is that thing?      13:51:31

 9    This one?  No.  It's this one.  This is going to be     13:51:45

10    Exhibit . . .                                           13:51:48

11        THE REPORTER:  154.                                 13:51:50

12        MR. JAFFE:  -- 154.                                 13:51:50

13            Thank you.                                      13:51:52

14            (Plaintiff's Exhibit 154 was marked.)          13:52:13

15    BY MR. JAFFE:

16        Q.   So I've marked as Exhibit 159 [sic] a          13:52:15

17    document that's heavily redacted.  But I just want to   13:52:17

18    ask --

19        MR. KIM:  159?                                      13:52:21

20        MR. JAFFE:  Yeah, Exhibit 159.                      13:52:24

21        MR. KIM:  154.                                      13:52:25

22        MR. JAFFE:  Oh, my handwriting is off.             13:52:27

23    BY MR. JAFFE:                                           13:52:27

24        Q.   154 is a document that's heavily redacted.     13:52:31

25            Is this an e-mail exchange with ██████)         13:52:36
```

Page 110

| | | |
|---|---|---|
| 1 | A.    If it is, I'm not aware. | 13:52:43 |
| 2 | Q.    You can't tell because of the redaction; | 13:52:44 |
| 3 | right? | 13:52:45 |
| 4 | A.    I'm also looking at the names.  The name | 13:52:50 |
| 5 | addresses.  And I can't say it's an exchange with | 13:52:54 |
| 6 | ▓▓▓▓▓ because I see only Uber or Uber ATC employees. | 13:52:59 |
| 7 | Q.    Right. | 13:52:59 |
| 8 | But if you look on the earlier e-mails, the | 13:53:05 |
| 9 | other e-mails are redacted. | 13:53:06 |
| 10 | A.    Oh, okay.  All right. | 13:53:10 |
| 11 | Q.    So, for example, if you go to the page 12132. | 13:53:17 |
| 12 | Do you see that? | |
| 13 | A.    12132, yes. | 13:53:20 |
| 14 | Q.    "Hey, Anthony, been trying to reach you a | 13:53:23 |
| 15 | while via text." | 13:53:24 |
| 16 | A.    Okay. | 13:53:25 |
| 17 | Q.    You were cc'd on this; right? | 13:53:27 |
| 18 | A.    Yes. | 13:53:27 |
| 19 | Q.    What is this e-mail about? | 13:53:29 |
| 20 | (Witness reviews document.) | 13:54:11 |
| 21 | A.    I'm not 100 percent sure.  Yeah, I'm not sure | 13:54:28 |
| 22 | who [sic] this is about. | 13:54:30 |
| 23 | Q.    It's hard to tell with the redactions, huh? | 13:54:34 |
| 24 | A.    It is. | 13:54:35 |
| 25 | Q.    Yeah, I agree with you. | 13:54:37 |

Page 111

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yeah, I don't recall. | 13:54:47 |
| 2 | Q.   And so just turning to the first page, | 13:54:49 |
| 3 | there's an e-mail from Mr. Levandowski, and you're on | 13:54:52 |
| 4 | the cc line. | 13:54:53 |
| 5 | A.   Yeah. | 13:54:53 |
| 6 | Q.   The entire e-mail is redacted. | 13:54:58 |
| 7 | What is Mr. Levandowski talking about in this | 13:55:01 |
| 8 | e-mail? | 13:55:02 |
| 9 | A.   I don't recall. | 13:55:03 |
| 10 | Q.   You don't recall this e-mail at all? | 13:55:05 |
| 11 | A.   I don't recall this e-mail. | 13:55:06 |
| 12 | Q.   So it's possible that Mr. -- who knows what | 13:55:08 |
| 13 | Mr. Levandowski would be talking about? | 13:55:10 |
| 14 | A.   Who knows. | 13:55:11 |
| 15 | Q.   Okay.  Put that aside. | 13:55:13 |
| 16 | A.   Okay. | 13:55:14 |
| 17 | Q.   Let's go back to your opening declaration, | 13:55:31 |
| 18 | which is Exhibit 151.  And if you can look at | 13:55:41 |
| 19 | paragraph 15, please. | 13:55:45 |
| 20 | Do you see that you refer to an Exhibit B | 13:55:58 |
| 21 | here? | 13:56:00 |
| 22 | A.   Yes. | 13:56:01 |
| 23 | Q.   And what are you saying that Exhibit B is? | 13:56:05 |
| 24 | A.   Exhibit B is a file that lays out the X,Y and | 13:56:28 |
| 25 | rotation coordinates for each of the laser diodes on | 13:56:35 |

Page 112

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        ███████████████      while the final dimensions it would    13:56:40

2    be used for fiducial-based diode placement is not yet           13:56:53

3    defined for █████████████████                                   13:56:56

4        MR. JAFFE:  Let's mark as Exhibit 155 a document            13:57:01

5    entitled, "Exhibit B."                                          13:57:03

6    BY MR. JAFFE:

7        Q.   It looks like you have it.                             13:57:06

8        A.   Yes.                                                   13:57:06

9        Q.   Did you bring your declaration with you?              13:57:08

10       A.   Yeah.                                                  13:57:09

11       Q.   Why don't we look at your copy then, but              13:57:11

12   we'll just mark this for the record so we have a                13:57:14

13   complete record.                                                13:57:15

14       MR. JAFFE:  Just for the record, I'm marking               13:57:19

15   Exhibit B as 155.  And Mr. Haslim is looking at his            13:57:24

16   own copy.                                                       13:57:25

17           (Plaintiff's Exhibit 155 was marked.)                  13:57:26

18   BY MR. JAFFE:                                                   13:57:26

19       Q.   So on the top right-hand side, there's a              13:57:32

20   little picture of a transmit board; right?                     13:57:33

21       A.   Right.                                                13:57:33

22       Q.   And that's an image of one of the Fuji               13:57:37

23   transmit boards; correct?                                      13:57:38

24       A.   Correct.                                              13:57:38

25       Q.   And the table below, that includes some X,Y          13:57:44
```

Page 113

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    and theta values for each of the diodes on the        13:57:50

 2    transmit board depicted there?                         13:57:53

 3        A.   Yes.                                           13:57:53

 4        Q.   So what does ███████████ refer to in this     13:57:58

 5    chart?                                                  13:57:59

 6        A.   In this chart, the term ██████████ labels     13:58:06

 7    ████████████████████████████████████████████████████

      ████████████████████████████████████████████████████

      █████████████████████████████████████                 13:58:21

10        Q.   And why are you providing ████████████████    13:58:21

      █████████████████████████████████████?                13:58:27

12        A.   I believe the person who made this file        13:58:34

13    provided █████████████████████████████████████████

      ██████████████████████████████████ -- that's the      13:58:44

15    wrong term -- so that ████████████████████████████████

      ████████████████████████████████████████████████████

      ████████████████████████████████████████████████████

      ████████████████████████████████████████████████████

      ████████████████████████ And these dimensions never left the  13:59:06

20    document.                                              13:59:07

21        Q.   "These dimensions never left the document,"    13:59:11

22    what do you mean?                                      13:59:12

23        A.   The dimensions labeled ████████████ remain in 13:59:15

24    this document even as new information is being added    13:59:19

25    ████████████████████████████████████████              13:59:23
```

```
 1      Q.   So the X and Y data here shows --
                                                                13:59:35
                right?                                          13:59:35
 4      A.   Yes.                                               13:59:36
 5      Q.   So the X and Y data for              shows        13:59:39
 6

                                                                13:59:48
                                            right?             13:59:48
 9      A.   Right.                                             13:59:56
10      Q.   Okay.  And you said the person who created        13:59:56
11   this document.                                             13:59:57
12           Who are you referring to?                         13:59:59
13      A.   This document would have been created by          14:00:03
14   Gaetan Pennecot.                                           14:00:05
15      Q.   And why would Mr. Pennecot include
                in this document?                              14:00:13
17      A.   Gaetan did the original

                                           And he was responsible 14:00:27
20   for
                                    This information would    14:00:36
22   then have been given to our electrical engineer, who     14:00:38
23   did                          for this.                    14:00:40
24      Q.   So that doesn't answer my question.               14:00:43
25           Why is                                            14:00:45

                                                      Page 115
```

1      ████████████████████████████████████████

2      █████████████████               14:00:49

3      A.    I'm sorry.  I don't think I was clear before.   14:00:53

4      When Gaetan designed the outline of this     14:00:56

5      board and specified ████████████████████████████

     █████████████████████████████████████████████
     █████████████████████████████████████████████
     █████████████████████████████████████████████
     █████████████████████████████████████████████

10     ████████████████████████████████      14:01:17

11      Q.    So the original idea was ███████████████

12     █████████████████               14:01:22

13      A.    No.                   14:01:22

14      Q.    So then let me ask my question again then.   14:01:25

15      What is the point of including ████████████████

16     ████████████████ -- in this chart?     14:01:30

17      A.    This information could have been provided to   14:01:36

18      the electrical engineer so that █████████████████

19     ████████████████████████████████      14:01:43

20      And if he hasn't ████████████████████████████

     █████████████████████████████████████████████

    ████████████████████████████████      14:01:55

23      Q.    Why do you think he did that?     14:01:57

24      A.    He needs to ████████████████ that's as   14:02:00

25      good as -- better than an outline of a board which is   14:02:03

                                    Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    subject to change.                                14:02:04

 2        Q.   At what point did the fiducial get       14:02:09

 3    introduced?                                       14:02:10

 4        A.   The fiducial was introduced somewhere during  14:02:14

 5    the course of the electrical engineer laying out the   14:02:17

 6    circuit and defining all the pads for all the    14:02:19

 7    components that go on the circuit board.          14:02:21

 8        Q.   Just to rewind a second, what is the point of  14:02:25

 9    ███████████████████████████████ again?            14:02:29

10        MR. KIM:  Objection; form.                     14:02:32

11        THE WITNESS:  I believe the point of ██████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████        14:02:52

16    BY MR. JAFFE                                       14:02:52

17        Q.   I see.  Okay.                             14:02:53

18             And the ███████████████████████████████

██████████████████████        14:02:57

20        A.   We say ████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████        14:03:06

23        Q.   And what are ████████████████ used for?  14:03:11

24        A.   Those ██████████████████████████████████

██████████████████████████████        14:03:19
```

Page 117

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ████████████████████████████████████████████        14:03:23

 2        Q.    All right.   Again Exhibit B here, I want to      14:03:34

 3   start with Board A.                                          14:03:36

 4             What's labeled as ████████████  those are         14:03:40

 5   the X and Y data in terms of the absolute locations of      14:03:45

 6   the diodes for Board A in the Fuji device; is that          14:03:50

 7   right?                                                       14:03:51

 8        A.    Yes.                                              14:03:52

 9        Q.    And is this current?  Did they change or is      14:03:57

10   this still the right data?                                  14:03:59

11        A.    To my knowledge, these are still the right       14:04:01

12   data.                                                       14:04:02

13        Q.    Has Uber changed ████████████████████████        

     ████████████  in the last three months?                    14:04:13

15        A.    Not to my knowledge.  Last I saw, we had a       14:04:19

16   version of this as early as December 2nd with the          14:04:21

17   exact same X,Y coordinates.                                 14:04:26

18        Q.    So let's take -- we're still on Board A.  The    14:04:32

19   X value -- and we'll just use the fiducial one.  The X     14:04:40

20   value, that will tell us the horizontal distance from      14:04:44

21   the fiducial to the emitting point to each laser;          14:04:49

22   right?  That particular one.                                14:04:49

23        A.    Yes.  The fiducial section, if I heard you       14:04:53

24   correctly, the X coordinate gives you the left-right X     14:04:56

25   dimension relative to the fiducial to the laser.           14:04:58
```

                                                    Page 118

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 1 | There's two sections.  One says ▮▮▮▮▮▮▮▮ and | 14:05:01 |
| 2 | one says ▮▮▮▮▮▮▮▮▮▮▮▮)  I want to p int out | 14:05:04 |
| 3 | that those reference two different locations on the | 14:05:07 |
| 4 | laser diode. | 14:05:10 |
| 5 |     Q.   Just to restate that. | 14:05:11 |
| 6 |          For A1, for example, in the first row -- | 14:05:14 |
| 7 |     A.   Yes. | 14:05:17 |
| 8 |     Q.   -- the X number is the horizontal distance | 14:05:20 |
| 9 | from the fiducial to the emitting point of each -- of | 14:05:23 |
| 10 | that laser? | 14:05:24 |
| 11 |     A.   I'm sorry.  Could you specify which "X" | 14:05:25 |
| 12 | you're referring to? | |
| 13 |     Q.   Under the fiducial. | 14:05:27 |
| 14 |          So here, just for A1, it's ▮▮▮▮▮▮▮) | 14:05:35 |
| 15 |     A.   Yes. | 14:05:35 |
| 16 |     Q.   That one, that's the horizontal distance from | 14:05:38 |
| 17 | the fiducial to the emitting point of A1 laser; right? | 14:05:41 |
| 18 |     A.   Yes. | 14:05:41 |
| 19 |     Q.   And again -- well, actually, not again. | 14:05:45 |
| 20 |          What is the unit of measurement that we're | 14:05:48 |
| 21 | looking at here? | 14:05:49 |
| 22 |     A.   These would be X,Y coordinates in the units | 14:05:54 |
| 23 | of milliliters. | 14:05:55 |
| 24 |     Q.   And we are going to -- how many decimal | 14:06:00 |
| 25 | points in are we dealing with here? | 14:06:03 |

Page 119

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    These are six decimal places. | 14:06:06 |
| 2 | Q.    Is that pretty accurate? | 14:06:08 |
| 3 | A.    It's an unnecessary number of decimals.  This | 14:06:10 |
| 4 | goes to nanometers. | 14:06:13 |
| 5 | Q.    Yeah.  So this is talking about aligning the | 14:06:16 |
| 6 | diodes to the nanometer; is that fair? | 14:06:18 |
| 7 | A.    No. | 14:06:18 |
| 8 | Q.    No?  I thought you said it goes to | 14:06:21 |
| 9 | nanometers. | 14:06:22 |
| 10 | A.    It goes to nanometers, but I don't think | 14:06:24 |
| 11 | anybody was under the impression that we're actually | 14:06:25 |
| 12 | in a postion to get something to a nanometer scale. | 14:06:25 |
| 13 | Q.    But that's what this document is listing? | 14:06:28 |
| 14 | A.    This document lists the ideal dimension, yes, | 14:06:32 |
| 15 | down to the nanometer. | 14:06:34 |
| 16 | Q.    Got it. | 14:06:35 |
| 17 | We talked about X. | 14:06:38 |
| 18 | Y, that talks about the millimeters | 14:06:41 |
| 19 | difference from the fiducial to A1 on the -- in the | 14:06:48 |
| 20 | vertical axis; right? | 14:06:50 |
| 21 | A.    Right. | 14:06:50 |
| 22 | Q.    █████████████████████████████ | |
| | █████████████████████████████████ | 14:07:03 |
| 24 | MR. KIM:  Objection; form. | 14:07:06 |
| 25 | THE WITNESS:  ████████████████ | 14:07:09 |

Page 120

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1

14:07:36

8    BY MR. JAFFE:

9        Q.   The theta column here, what does that tell   14:07:42

10  us?   14:07:42

11      A.   That tells us, relative to some zero angle on   14:07:50

12  this board, which we can presume is either vertical or   14:07:55

13  horizontal, the ideal placement angle for the laser   14:08:00

14  diode on the board.   14:08:02

15      Q.   We're just talking about A again, Board A.   14:08:11

16           Which is the

14:08:22

18      A.   As the light is projected out past the   14:08:26

19  sensor, the   14:08:32

20      Q.   All right.  Am I correct then that   14:08:44

    ?

22      A.   Yes, that's correct.   14:08:45

23      Q.   Okay.  So is it fair to say that

14:09:01

Page 121

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    In this coordinate system, that's true.      14:09:04

 2        Q.    Referring to Board A, the diodes go from --   14:09:15

 3    ████████████████████████████████████████████████████

      ███████████████████████████████████████████?           14:09:23

 5        A.    Yes.                                          14:09:23

 6        Q.    Okay.                                         14:09:27

 7        MR. JAFFE:  So what I'd like to do is mark as a     14:09:36

 8    new exhibit Exhibit 156.                                14:09:41

 9        (Plaintiff's Exhibit 156 was marked.)              14:10:07

10    BY MR. JAFFE:

11        Q.    I'm going to hand you a calculator as well.   14:10:10

12        A.    Okay.                                         14:10:11

13        Q.    So what we have here is a reproduction, if we 14:10:17

14    cut and paste correctly, which I think that we did, of 14:10:21

15    the data that's here for Board A in Exhibit B to your  14:10:27

16    declaration.  And you can see on the right that I've    14:10:33

17    left open something called delta Y.                    14:10:36

18        A.    Yes.                                          14:10:37

19        Q.    Do you see that?                              14:10:38

20        A.    Yes.                                          14:10:38

21        Q.    And do you understand what I'm trying to      14:10:41

22    refer to here by "delta Y"?                            14:10:43

23        A.    Yes.  I'll go ahead and identify what I       14:10:46

24    believe you intend by "delta Y."                       14:10:48

25        Q.    But before you do, I will tell you exactly    14:10:50
```

                                                   Page 122

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | what I'm intending. | 14:10:51 |
| 2 | A.   Okay. | 14:10:52 |
| 3 | Q.   Which is, the delta, as in the difference, | 14:10:54 |
| 4 | between the two Y components on each one. | 14:11:03 |
| 5 | A.   And by that you mean the two adjacent | 14:11:05 |
| 6 | components? | 14:11:06 |
| 7 | Q.   That's right. | 14:11:07 |
| 8 | A.   Okay. | 14:11:08 |
| 9 | Q.   I can give you a pen, but I also have a | 14:11:11 |
| 10 | pencil if you would prefer. | 14:11:13 |
| 11 | A.   Perhaps a pencil is a good idea.  Thanks. | 14:11:27 |
| 12 | Q.   Just for the record, using Exhibit 156, | 14:11:32 |
| 13 | please calculate the difference in the vertical | 14:11:34 |
| 14 | spacing between ████████████████ | 14:11:39 |
| 15 | A.   Okay.  And what you'll see is that we | 14:11:43 |
| 16 | have -- | 14:11:43 |
| 17 | MR. KIM:  I'm just going to object to form before | 14:11:45 |
| 18 | you go. | 14:11:46 |
| 19 | THE WITNESS:  What you see is we have a list of | 14:11:50 |
| 20 | empty boxes equal to the number of diodes.  When we do | 14:11:54 |
| 21 | our deltas, we're going to have one less.  So I can | 14:11:57 |
| 22 | shift this up or shift it down; makes no difference to | 14:12:01 |
| 23 | me. | 14:12:02 |
| 24 | BY MR. JAFFE: | 14:12:02 |
| 25 | Q.   Why don't you leave A1, that can be the | 14:12:03 |

Page 123

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    starting one, so that can be blank.  And you can start    14:12:07

 2    from the next one.

 3         A.    Perfect.  So I will calculate these.           14:12:11

 4              (Witness performs calculations.)                14:12:11

 5         A.    Okay.                                           14:16:45

 6         Q.    Thank you.  You're handing this to me for me   14:16:48

 7    to look at.  All right.  I'm going to hand it back to     14:16:59

 8    you.                                                      14:16:59

 9              Exhibit 156 now reflects you've penciled in     14:17:03

10    the delta Y here.                                         14:17:07

11              In looking at this completed table, would you   14:17:13

12    agree that the delta Y values ███████████████████████    

      ██████████████████████████████████████                   14:17:24

14         MR. KIM:  Objection; form.                           14:17:24

15         THE WITNESS:  Yes, I would agree that the delta Y    14:17:31

16    values ████████████████████████████████████████████

      ███████████████████████████████████████████████████████████

      ████████████                                             14:17:41

19    BY MR. JAFFE:                                             14:17:41

20         Q.    Okay.  In other words, ██████████████████████

      ███████████████████████████████████████████████████████████

      ████████████████████████████                             14:17:52

23         MR. KIM:  Objection; form.                           14:17:55

24         THE WITNESS:  It's true, the delta Y, ████████████████

      ████████████████████████████████████████████            14:18:01

                                                    Page 124
```



```
 1    ███████████████████████████████████████  --

 2        THE REPORTER:  I'm sorry, I'm sorry.  It's

 3    true . . .

 4        THE WITNESS:  ████████████████████████████

      ███████████████████████████████████████████████

      ██████████████████████████████████      14:18:24

 8    BY MR. JAFFE:                            14:18:24

 9        Q.   And as we talked about before, as the  14:18:30

10    ████████████████████████████████████████████████

      ████████████████████████████████████████████████

      ████████████████████████  right?        14:18:41

13        MR. KIM:  Objection; form.          14:18:43

14        THE WITNESS:  Yes, we agreed -- I agree that the  14:18:46

15    ████████████████████████████████████████████████

      ████████████████████████████████████████████████

      ██████████████████████████████████      14:19:01

18    BY MR. JAFFE:                            14:19:01

19        Q.   So referring to this ██████████, you  14:19:05

20    would agree that ████████████████████████████████

      ████████████████████████████████████████████████

      ████████████████████████████████████████████████

      █████████████████████████████████████

      ███████████████████████████████         14:19:20

25        MR. KIM:  Objection; form.          14:19:25
```

Page 125

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yes. | 14:19:25 |
| 2 | BY MR. JAFFE: | |
| 3 | Q.   Okay.  You can put that aside, please. | 14:19:30 |
| 4 | We talked about Max Levandowski earlier.  You | 14:19:36 |
| 5 | said he was on your team. | 14:19:38 |
| 6 | A.   Yes. | 14:19:40 |
| 7 | Q.   What does he do? | 14:19:41 |
| 8 | A.   He's a mechanical engineer.  He designs the | 14:19:47 |
| 9 | optical cavity that the lenses and the lasers and | 14:19:52 |
| 10 | detector boards attach to. | 14:19:55 |
| 11 | Q.   Is what is his LiDAR experience? | 14:19:58 |
| 12 | A.   I am not aware of any LiDAR experience prior | 14:20:01 |
| 13 | to working for Otto and Uber. | 14:20:04 |
| 14 | Q.   Did he know a lot about LiDAR when he | 14:20:07 |
| 15 | started? | 14:20:07 |
| 16 | MR. KIM:  Objection; form. | 14:20:08 |
| 17 | THE WITNESS:  I don't know. | 14:20:09 |
| 18 | BY MR. JAFFE: | 14:20:09 |
| 19 | Q.   He works for you; right? | 14:20:10 |
| 20 | A.   He works for me.  He worked for Otto before I | 14:20:14 |
| 21 | joined. | 14:20:15 |
| 22 | Q.   When you joined, did he -- was he | 14:20:18 |
| 23 | sufficiently educated about how LiDAR works? | 14:20:21 |
| 24 | MR. KIM:  Objection; form. | 14:20:22 |
| 25 | THE WITNESS:  He seemed sufficiently educated as a | 14:20:26 |

Page 126

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | mechanical engineer. | 14:20:27 |
| 2 | BY MR. JAFFE: | 14:20:27 |
| 3 | Q.   So that wasn't really my question. | 14:20:29 |
| 4 | A.   Yes. | 14:20:30 |
| 5 | Q.   So -- | 14:20:31 |
| 6 | A.   I didn't quiz him on his LiDAR expertise, but | 14:20:35 |
| 7 | at the same time, I'll grant you that I was not aware | 14:20:38 |
| 8 | of any LiDAR expertise in his background prior to | 14:20:42 |
| 9 | Otto. | 14:20:43 |
| 10 | Q.   Why -- well, actually, let me back up. | 14:20:58 |
| 11 | Do you know if Max Levandowski and Anthony | 14:21:01 |
| 12 | Levandowski are -- they're brothers; right? | 14:21:04 |
| 13 | A.   That's my understanding. | 14:21:05 |
| 14 | Q.   Do you know if they're close? | 14:21:07 |
| 15 | MR. KIM:  Objection; form. | 14:21:08 |
| 16 | THE WITNESS:  I don't know how close they are. | 14:21:12 |
| 17 | BY MR. JAFFE: | 14:21:12 |
| 18 | Q.   Do you know about any conversations that they | 14:21:13 |
| 19 | had regarding LiDAR? | |
| 20 | MR. KIM:  Same objection. | 14:21:14 |
| 21 | THE WITNESS:  No. | 14:21:15 |
| 22 | BY MR. JAFFE: | 14:21:15 |
| 23 | Q.   And what does Max Levandowski -- excuse me -- | 14:21:17 |
| 24 | do at Otto today? | 14:21:23 |
| 25 | A.   At Uber today? | 14:21:25 |

Page 127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        Q.    (Nods head affirmatively.)              14:21:25

2        A.    He continues to be the mechanical engineer   14:21:29

3    responsible for designing the optical cavity that    14:21:32

4    mounts the lenses, the laser transmit block and the  14:21:36

5    receiver boards.                                      14:21:37

6        Q.    Did he come up with the optical cavity design  14:21:41

7    for Fuji?                                             14:21:42

8        A.    In as much as that responsibility refers   14:21:50

9    to --                                                 14:21:50

10       MR. KIM:  Objection; form.                        14:21:53

11       THE REPORTER:  I'm sorry.                          14:21:53

12       THE WITNESS:  Inasmuch as that responsibility    14:21:55

13   refers to designing a mechanical housing, yes.  He    14:22:01

14   designed that for Fuji.                               14:22:02

15   BY MR. JAFFE:                                          14:22:02

16       Q.    Who came up with the optical cavity design  14:22:05

17   for Fuji?                                             14:22:06

18       MR. KIM:  Objection; form.                        14:22:11

19       THE WITNESS:  The optical cavity design for Fuji  14:22:14

20   is related to the lens and the lens requirements.  So  14:22:19

21   Gaetan plays a responsibility for that.  As a         14:22:23

22   mechanical element in terms of mounting and housing   14:22:27

23   those features, those components, Max Levandowski is   14:22:29

24   responsible for that aspect.                          14:22:31

25   BY MR. JAFFE:                                          14:22:31
```

Page 128

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So it's Mr. Pennecot and Mr. Max Levandowski | 14:22:34 |
| 2 | who came up with the optical cavity design for Fuji; | 14:22:39 |
| 3 | is that fair? | 14:22:40 |
| 4 | MR. KIM:  Objection; form. | 14:22:40 |
| 5 | THE WITNESS:  My hesitancy is I'm trying to decide | 14:22:51 |
| 6 | in my mind whether the transmit and receive components | 14:22:54 |
| 7 | also play a part -- are considered part of the optical | 14:23:00 |
| 8 | cavity.  I think they fairly should be considered part | |
| 9 | of the optical cavity. | |
| 10 | So then I also add Will Treichler, Florin | 14:23:05 |
| 11 | Ignatescu contributing to the design of the | 14:23:09 |
| 12 | optical cavity for the Fuji, or coming up with it. | 14:23:13 |
| 13 | I would claim some responsibility as well because | 14:23:22 |
| 14 | I'm looking at the designs that these engineers | 14:23:25 |
| 15 | are generating.  I could have contributed some | 14:23:28 |
| 16 | aspect as well. | 14:23:30 |
| 17 | BY MR. JAFFE: | 14:23:30 |
| 18 | Q.   You could have or you did? | 14:23:31 |
| 19 | A.   I'm sure I had some influence, yes. | 14:23:35 |
| 20 | Q.   Going back to Max Levandowski, do you | 14:23:43 |
| 21 | know -- he and Anthony, do they live together? | 14:23:46 |
| 22 | A.   I don't know. | 14:23:48 |
| 23 | Q.   Do you know how much time they spend together | 14:23:52 |
| 24 | outside of the office? | 14:23:53 |
| 25 | A.   I don't know that. | 14:23:54 |

Page 129

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Do you know how many conversations they may | 14:23:56 |
| 2 | have about LiDAR outside of the office? | 14:23:59 |
| 3 | A.   I don't know that. | 14:24:00 |
| 4 | Q.   Have you ever talked to Max Levandowski about | 14:24:02 |
| 5 | that? | 14:24:03 |
| 6 | A.   About the number of conversations? | 14:24:05 |
| 7 | Q.   About his discussions with Anthony. | 14:24:07 |
| 8 | A.   No. | 14:24:08 |
| 9 | Q.   Have you ever asked him? | 14:24:10 |
| 10 | A.   Asked him what? | 14:24:12 |
| 11 | Q.   Max Levandowski, about his conversations with | 14:24:17 |
| 12 | Anthony. | 14:24:18 |
| 13 | A.   Not to my recollection. | 14:24:20 |
| 14 | Q.   When the 14,000 files allegation came up, did | 14:24:25 |
| 15 | you ever discuss those with Max Levandowski? | 14:24:28 |
| 16 | A.   No, not specifically. | 14:24:29 |
| 17 | Q.   Are you aware of any discussions with Max | 14:24:34 |
| 18 | Levandowski that relate to the subject matter of this | 14:24:38 |
| 19 | lawsuit? | 14:24:38 |
| 20 | A.   I'm not aware of conversations they may have | 14:24:41 |
| 21 | had. | 14:24:42 |
| 22 | Q.   Did you ever think to ask Max whether any of | 14:24:46 |
| 23 | the allegations are true? | 14:24:47 |
| 24 | A.   No. | 14:24:47 |
| 25 | Q.   Have you joked with Max Levandowski about the | 14:24:52 |

Page 130

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     14,000 files?                                   14:24:54

 2         MR. KIM:  Objection; form.                  14:24:54

 3         THE WITNESS:  It's possible.                14:24:58

 4     BY MR. JAFFE:                                   14:24:58

 5     ██████ ██ ████████████████████████ ██ █████

                                                       14:25:03
 ██ ████████████████████████████████████ █

 7         MR. KIM:  Objection; form.                  14:25:05

 8         THE WITNESS:  █████████████████████         14:25:07

 9     ██████████████████████████████████████ ██ ███

 █ ████████████████████████████████████████          14:25:22

11     BY MR. JAFFE:                                   14:25:22

12         Q.   You say alleged, but he's never denied that   14:25:28

13     he took them; right?                            14:25:29

14         A.   Define "took."                         14:25:31

15         Q.   Define "took"?                         14:25:31

16         A.   Yeah.  Downloaded?                     14:25:34

17         Q.   Downloaded, yes.                       14:25:36

18         A.   Have I heard any claim that he didn't?  But   14:25:38

19     as far as taking it to a computer off of Google's or   14:25:43

20     Waymo's campus, I have -- he hasn't talked about that.  14:25:47

21         Q.   Are you aware of any evidence to dispute that  14:25:49

22     he downloaded the files, put them on a PCB -- excuse   14:25:52

23     me -- not a PCB, a USB and took them from Google?   14:25:56

24         A.   No, I have no evidence to argue one way or   14:25:59

25     the other in that matter.                       14:26:01
```

Page 131

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So just to be clear, your testimony about it | 14:26:04 |
| 2 | being alleged, you have no basis to say whether he | 14:26:06 |
| 3 | actually did that or not; right? | 14:26:07 |
| 4 | A.   Exactly my point -- | 14:26:10 |
| 5 | MR. KIM:  Objection to form. | |
| 6 | THE WITNESS:  -- yes. | 14:26:12 |
| 7 | BY MR. JAFFE: | 14:26:12 |
| 8 | Q.   At the end of October 2017 -- we talked about | 14:26:23 |
| 9 | this pivot to Fuji. | 14:26:25 |
| 10 | A.   Yes. | 14:26:26 |
| 11 | Q.   Actually . . . going back to your surreply | 14:27:01 |
| 12 | declaration, there's a discussion about the pivot to | 14:27:08 |
| 13 | Fuji.  Here we are.  End of paragraph 11. | 14:27:25 |
| 14 | You said, "The LiDAR team's decision to | 14:27:30 |
| 15 | abandon the Spider project to work on Fuji was based | 14:27:35 |
| 16 | on the aforementioned design considerations and was | 14:27:38 |
| 17 | not at the instructions of Uber's legal team or due to | 14:27:40 |
| 18 | any legal issues." | 14:27:41 |
| 19 | Do you see that? | 14:27:42 |
| 20 | A.   I'm sorry.  I'm in the wrong place.  Is this | 14:27:48 |
| 21 | the supplemental? | 14:27:49 |
| 22 | Q.   152. | 14:27:50 |
| 23 | A.   152.  End of paragraph 11? | 14:27:53 |
| 24 | Q.   Paragraph 10.  Excuse me. | 14:27:55 |
| 25 | Do you see the sentence that I just read? | 14:28:05 |

Page 132

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I see that, yes. | 14:28:10 |
| 2 | Q.   The "LiDAR team" right there, that includes | 14:28:15 |
| 3 | Anthony Levandowski; right? | 14:28:17 |
| 4 | MR. KIM:  Objection; form. | 14:28:17 |
| 5 | THE WITNESS:  I wouldn't have considered him part | 14:28:24 |
| 6 | of the LiDAR team, but clearly he was informed of the | 14:28:30 |
| 7 | decision and we got his buyoff because it affected the | 14:28:33 |
| 8 | program. | 14:28:34 |
| 9 | BY MR. JAFFE: | 14:28:34 |
| 10 | Q.   So, again, I'm referring to what's in your | 14:28:36 |
| 11 | declaration.  Your declaration says, "The LiDAR team's | 14:28:39 |
| 12 | decision." | 14:28:39 |
| 13 | Is Mr. Levandowski part of the LiDAR team in | 14:28:41 |
| 14 | your declaration or not? | 14:28:43 |
| 15 | MR. KIM:  Objection; form. | 14:28:46 |
| 16 | THE WITNESS:  No. | 14:28:46 |
| 17 | BY MR. JAFFE: | 14:28:46 |
| 18 | Q.   So when you said, "The LiDAR team's decision | 14:28:51 |
| 19 | to abandon the project," you're excluding | 14:28:54 |
| 20 | Mr. Levandowski? | 14:28:55 |
| 21 | A.   I am. | 14:28:56 |
| 22 | Q.   Even though he had to actually make the | 14:28:59 |
| 23 | decision to pivot? | 14:29:00 |
| 24 | A.   I would say the LiDAR team proper made a | 14:29:03 |
| 25 | decision based on technical matters; whereas, Anthony | 14:29:06 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | agreed to it or allowed it perhaps based on business | 14:29:12 |
| 2 | considerations. | 14:29:13 |
| 3 | Q.  Do you know whether Uber legal provided any | 14:29:17 |
| 4 | input to Anthony that influenced his decision to agree | 14:29:24 |
| 5 | or disagree with your decision to pivot to Fuji? | 14:29:28 |
| 6 | MR. KIM:  Objection; form. | 14:29:30 |
| 7 | THE WITNESS:  No, I cannot be aware of any | 14:29:32 |
| 8 | potential conversations between Anthony and legal | 14:29:35 |
| 9 | department. | 14:29:36 |
| 10 | BY MR. JAFFE: | 14:29:36 |
| 11 | Q.  So you have no idea whether Anthony's | 14:29:39 |
| 12 | approval of the pivot was at all influenced by legal | 14:29:43 |
| 13 | issues or Uber's legal team; right? | 14:29:46 |
| 14 | MR. KIM:  Objection; form. | 14:29:47 |
| 15 | THE WITNESS:  I have to agree that I don't have | 14:29:49 |
| 16 | such knowledge, yes. | 14:29:57 |
| 17 | BY MR. JAFFE: | 14:29:57 |
| 18 | Q.  What is your basis for saying that the | 14:30:01 |
| 19 | decision to pivot -- and I'm referring to the overall | 14:30:03 |
| 20 | decision -- was not at the instructions of Uber's | 14:30:07 |
| 21 | legal team or due to any legal issues? | 14:30:10 |
| 22 | A.  So you're referring to the overall decision | 14:30:17 |
| 23 | to include Anthony, but when I wrote this and what my | 14:30:20 |
| 24 | intention was to explain the origination of the pivot. | 14:30:25 |
| 25 | The reason why we pivoted had no influence from Uber's | 14:30:31 |

Page 134

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    legal team.                                      14:30:32

 2        Q.   Right.  So I realize that.              14:30:33

 3             So what you're talking about here is your   14:30:35

 4    recommendation that you should pivot, to Anthony;   14:30:39

 5    right?                                           14:30:39

 6        A.   Yes.                                    14:30:39

 7        Q.   So I want to refer to the decision as a whole   14:30:42

 8    to pivot to Fuji.                                14:30:43

 9             Are you with me?                         14:30:45

10        A.   I am with you.                          14:30:45

11        Q.   In terms of Uber's decision to pivot from   14:30:48

12    Spider to Fuji, do you have any basis to say it was   14:30:53

13    not done at the instructions of Uber's legal team or   14:30:57

14    due to any legal issues?                         14:31:00

15        MR. KIM:  Objection; form.                   14:31:00

16        THE WITNESS:  I've got a really hard time granting   14:31:04

17    that.  Because if we had already made the         14:31:06

18    recommendation, how can I attribute that decision to a   14:31:10

19    legal team other than to simply allow it?  I have a   14:31:16

20    really hard time granting you that statement.    14:31:18

21    BY MR. JAFFE:                                    14:31:18

22        Q.   You have no basis to testify whether there   14:31:22

23    was any legal involvement with Anthony and his   14:31:26

24    decision to agree with your recommendation?      14:31:28

25        MR. KIM:  Objection; form.                   14:31:30
```

Page 135

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I agree with you. | 14:31:31 |
| 2 | BY MR. JAFFE: | 14:31:31 |
| 3 | Q.   So in terms of the overall pivot, you, | 14:31:34 |
| 4 | sitting here today, can't say that there were no legal | 14:31:38 |
| 5 | issues or legal involvement in that overall decision? | 14:31:42 |
| 6 | MR. KIM:  Objection; form. | 14:31:44 |
| 7 | THE WITNESS:  I'll agree with that. | 14:31:46 |
| 8 | BY MR. JAFFE: | 14:31:46 |
| 9 | Q.   Okay.  Let's go to paragraph 11.  And on | 14:32:05 |
| 10 | page 7, you say, "The transmit lens has a focal length | 14:32:14 |
| 11 | of 150 millimeters." | 14:32:17 |
| 12 | A.   Yes. | 14:32:18 |
| 13 | Q.   Which cavity are you referring to here? | 14:32:22 |
| 14 | A.   This would be true of either cavity. | 14:32:25 |
| 15 | Q.   And when you say "focal length," what do you | 14:32:29 |
| 16 | mean by that? | 14:32:30 |
| 17 | A.   I mean if you were to take a set of parallel | 14:32:37 |
| 18 | rays of light coming towards the outside surface of | 14:32:42 |
| 19 | the lens, those parallel rays would converge -- | 14:32:46 |
| 20 | assuming that they're on the parallel to the axis of | 14:32:50 |
| 21 | the lens, would converge at a point on the central | 14:32:55 |
| 22 | axis of the lens that is 150 millimeters from some | 14:33:02 |
| 23 | point within the lens.  And this is the focal length | 14:33:08 |
| 24 | specified in the Zemax software that Gaetan designed. | 14:33:13 |
| 25 | Q.   Would you agree that within any one cavity, | 14:33:16 |

Page 136

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | the diode angles' and spacings are slightly different? | 14:33:23 |
| 2 | MR. KIM:  Objection; form. | 14:33:25 |
| 3 | THE WITNESS:  Yeah, I'm not sure what -- if you | 14:33:28 |
| 4 | could be more specific.  I mean, clearly we've shown | 14:33:31 |
| 5 | changes in the intended angles, so there are some with | 14:33:35 |
| 6 | differences, and now we're talking slight. | 14:33:38 |
| 7 | BY MR. JAFFE: | 14:33:38 |
| 8 | Q.   So that's fine. | 14:33:40 |
| 9 | Do you know what the virtual intersection | 14:33:43 |
| 10 | point is? | 14:33:45 |
| 11 | MR. KIM:  Objection; form. | 14:33:46 |
| 12 | THE WITNESS:  I'm not sure what that refers to. | 14:33:49 |
| 13 | BY MR. JAFFE: | 14:33:49 |
| 14 | Q.   So you don't know what that is?  Let me | 14:33:51 |
| 15 | actually ask that a different way.  Is that all right? | 14:33:54 |
| 16 | A.   Go ahead. | 14:33:55 |
| 17 | Q.   Have you ever heard the term "virtual | 14:33:56 |
| 18 | intersection point" before? | 14:33:59 |
| 19 | A.   I'm not aware of that as a classical or | 14:34:04 |
| 20 | standard lens terminology.  But it does ring a bell | 14:34:08 |
| 21 | with the declaration by Greg Kintz. | 14:34:12 |
| 22 | Q.   Outside of Mr. Kintz's declaration, are you | 14:34:16 |
| 23 | familiar with the term "virtual intersection point"? | 14:34:19 |
| 24 | A.   Not as it would necessarily apply as a | 14:34:22 |
| 25 | standard term, no. | 14:34:23 |

Page 137

```
 1        MR. JAFFE:  Which number are we at?          14:34:23

 2        THE REPORTER:  I think we're on 156.

 3        MR. KIM:  How long have you gone on the record?   14:35:02

 4        THE REPORTER:  We're on 157.

 5        THE VIDEOGRAPHER:  Three hours and four minutes.

 6        MR. KIM:  We've got another hour.  If there's a

 7   convenient time for a break.

 8        MR. JAFFE:  I'll do this --                  14:35:04

 9        MR. KIM:  You can ask your next --

10        MR. JAFFE:  -- really quick and then we can take a  14:35:07

11   quick break.                                      14:35:08

12            (Plaintiff's Exhibit 157 was marked.)    14:35:23

13   BY MR. JAFFE:

14        Q.    I've marked as Exhibit 157 a document with   14:35:26

15   the slip sheet labeled "Exhibit H."  And then the    14:35:30

16   document underlying that says,                        14:35:33

17            Is this a document that you were referring to  14:35:36

18   before that Mr. Levandowski, Anthony Levandowski that   14:35:40

19   is, called you about and discussed?                  14:35:41

20        MR. KIM:  Objection; form.                    14:35:52

21        THE WITNESS:  No, this is not, to my recollection,   14:35:56

22   the same document.  There does appear to be some      14:36:00

23   features in here, but for reasons I don't understand,   14:36:03

24   there seems to be pages I'm not familiar with.        14:36:07

25   BY MR. JAFFE:                                       14:36:07
```

Page 138

```
 1        Q.   So you're familiar with some pages of this     14:36:15
 2   document, but not others; is that fair?                  14:36:18
 3        A.   I think so, yeah.                               14:36:19
 4        Q.   Let's go to page 10.                            14:36:20
 5        A.   Okay.                                           14:36:22
 6        Q.   And, actually, before we get there, going      14:36:30
 7   back to the first page, it's dated May 16th, 2016.       14:36:33
 8             You worked at Otto at that time; right?        14:36:36
 9        A.   I believe I did, yes.                           14:36:38
10        Q.   And you had had conversations with             14:36:39
11   Mr. Boehmke by that time?                                14:36:41
12        A.   Probably not.                                   14:36:43
13        Q.   Okay.  But were you aware of Uber and Otto     14:36:46
14   having conversations at that time?                       14:36:50
15        A.   I don't think so.                               14:36:51
16        Q.   So you weren't aware of the conversations, to  14:36:55
17   the extent that they were happening, between Uber and    14:36:58
18   Otto?                                                     14:36:59
19        A.   I don't recall if I had become aware of Uber   14:37:04
20   and Otto discussions at this early date in May.          14:37:07
21        Q.   So if you look at page 14.                      14:37:28
22        A.   Okay.                                           14:37:34
23        Q.   You see it says,  ███████████████)             14:37:35
24        A.   Yes.                                            14:37:36
25        Q.   Does this refresh your recollection that Uber  14:37:39
```

Page 139

```
 1    and Otto were already talking at this time?        14:37:43

 2         A.   Yes.   Then this would be indicative of their  14:37:48

 3    discussion.                                        14:37:48

 4         Q.   Okay.  So going back to page 10.         14:37:53

 5         A.   Yes.                                      14:37:54

 6         Q.   Do you see there's a s ction entit ed, ████   ████

 7    ██                                                  14:38:04

 8         A.   Yes.                                      14:38:06

 9         ██   █████████████████████████████████        14:38:09

10         A.   No, I'm not familiar with this page.    14:38:11

11         Q.   So you're -- well, you said you're not   14:38:15

12    familiar with this page.  I'm referring --         14:38:16

13              Are you familiar with ████████████  ████

14    ████████████████████                               14:38:22

15         A.   So I was not aware of this design, especially  14:38:41

16    with this date.  No, I'm not familiar with this    14:38:45

17    design, actually.                                  14:38:46

18         Q.   Do you know what the ████████ referred to  14:38:48

19    here refers to?                                    14:38:49

20         A.   To my knowledge, the term ███████ has     14:38:55

21    been applied to be synonymous, more or less, with an  14:38:59

22    optical cavity.                                     14:39:00

23         Q.   Do you know whether Mr. Levandowski had any  14:39:06

24    input into this ████████                           14:39:09

25         A.   I don't know.                            14:39:09
```

                                                     Page 140

| | | |
|---|---|---|
| 1 | Q.   In this concept here, you would agree that | 14:39:18 |
| 2 | the PCBs are arranged along a straight-edge board? | 14:39:25 |
| 3 | MR. KIM:  Objection; form. | 14:39:26 |
| 4 | THE WITNESS:  No, that's -- this appears to be a | 14:39:29 |
| 5 | schematic, and it doesn't tell me anything about the | 14:39:32 |
| 6 | plan view of the board. | 14:39:34 |
| 7 | BY MR. JAFFE: | 14:39:34 |
| 8 | Q.   Would you agree that the -- what apparently | 14:39:41 |
| 9 | are the emitters are ▇▇▇▇▇▇▇▇? | 14:39:44 |
| 10 | MR. KIM:  Objection; form. | 14:39:48 |
| 11 | THE WITNESS:  Let me see. | 14:39:49 |
| 12 | (Witness reviews document.) | |
| 13 | THE WITNESS:  It's not clear if they are ▇▇▇▇ ▇▇▇▇ | |
| | ▇▇▇▇▇  They look ▇▇▇▇▇▇▇▇ from what's | 14:39:59 |
| 15 | clearly a simple type of PowerPoint graphic, but it's | 14:40:06 |
| 16 | not clear if they say one degree native if they could | 14:40:10 |
| 17 | actually achieve ▇▇▇▇▇▇▇▇▇▇▇▇ | |
| | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | 14:40:17 |
| 19 | BY MR. JAFFE: | |
| 20 | Q.   The last bullet says, ▇▇▇▇▇▇▇▇ ▇▇▇▇ | |
| 21 | ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇" | 14:40:23 |
| 22 | Do you see that? | 14:40:24 |
| 23 | A.   I see that. | 14:40:24 |
| 24 | Q.   What does ▇▇▇▇▇▇▇▇ refer to there? | 14:40:27 |
| 25 | MR. KIM:  Objection; form. | 14:40:28 |

Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 1 | THE WITNESS:  I can't be sure what was meant | 14:40:31 |
| 2 | exactly; but given what I know, I would assume this | 14:40:35 |
| 3 | has to do with effective ████████████████ | 14:40:40 |
| 4 | BY MR. JAFFE: | 14:40:40 |
| 5 | Q.   We're talking about the Y delta again? | 14:40:43 |
| 6 | MR. KIM:  Objection; form. | 14:40:43 |
| 7 | THE WITNESS:  Not necessarily. | 14:40:45 |
| 8 | BY MR. JAFFE: | 14:40:45 |
| 9 | Q.   You said, "Not necessarily." | 14:40:47 |
| 10 | What do you mean by that? | 14:40:48 |
| 11 | A.   My guess would have been angular spacing. | 14:40:52 |
| 12 | Q.   In the top part of this page, it talks about | 14:41:06 |
| 13 | ████████████ )  ████████████████████ ) ████████ | |
| 14 | ████████████ ) | 14:41:12 |
| 15 | A.   I see that. | 14:41:14 |
| 16 | Q.   That's the ████████████████ right? | 14:41:17 |
| 17 | A.   Yes. | 14:41:19 |
| 18 | Q.   ████████████████████████ | 14:41:24 |
| 19 | this is different than the Fuji design; right? | 14:41:27 |
| 20 | MR. KIM:  Objection; form. | 14:41:32 |
| 21 | THE WITNESS:  There's not a lot of detail in here; | 14:41:35 |
| 22 | but it's not the Fuji design yet, that's for sure. | 14:41:39 |
| 23 | BY MR. JAFFE: | 14:41:39 |
| 24 | Q.   And you helped start the Fuji project, and | 14:41:41 |
| 25 | you're not familiar with this Plan B at all; right? | 14:41:44 |

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   Right.                                14:41:44

 2        Q.   So to your knowledge, what's described here  14:41:48

 3   as Plan B isn't the basis for the Fuji design?  14:41:52

 4        MR. KIM:  Objection; form.                 14:41:55

 5        THE WITNESS:  I am not aware of a link between  14:41:59

 6   this Plan B in this document and the Fuji design.  14:42:04

 7   BY MR. JAFFE:                                    14:42:04

 8        Q.   And you would be in a position to know;  14:42:08

 9   right?                                           14:42:09

10        MR. KIM:  Objection; form.                 14:42:11

11        THE WITNESS:  I would have to make that    14:42:13

12   presumption.  And it's just a presumption.      14:42:15

13   BY MR. JAFFE:                                    14:42:15

14        Q.   In your job, you would be in a position to  14:42:18

15   know that; right?                               14:42:18

16        MR. KIM:  Objection; form.                 14:42:25

17        THE WITNESS:  I would expect to know that.  14:42:26

18        MR. JAFFE:  Let's take a break.            14:42:32

19        THE VIDEOGRAPHER:  We are off the record at 2:42  14:42:36

20   p.m.                                             14:42:36

21             (Recess taken.)                        14:42:36

22        THE VIDEOGRAPHER:  We are back on the record at  14:55:55

23   2:56 p.m.                                        14:55:57

24   BY MR. JAFFE:                                    14:55:57

25        Q.   Have you discussed the subject matter of your  14:56:03
```

Page 143

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | testimony during any of the breaks today? | 14:56:05 |
| 2 | A.   Nothing in terms of like what we said in this | 14:56:10 |
| 3 | testimony. | 14:56:11 |
| 4 | Q.   What does that mean? | 14:56:13 |
| 5 | A.   That means the legal team may have advised me | 14:56:19 |
| 6 | on procedural matters, general terms without | 14:56:23 |
| 7 | referencing the actual content of our discussion. | 14:56:26 |
| 8 | Q.   What did they tell you? | 14:56:27 |
| 9 | MR. KIM:  Objection. | 14:56:27 |
| 10 | Going to instruct you not to answer on the | 14:56:31 |
| 11 | grounds of attorney-client privilege. | 14:56:33 |
| 12 | BY MR. JAFFE: | 14:56:33 |
| 13 | Q.   Did your legal team tell you how to testify | 14:56:36 |
| 14 | after these meetings? | 14:56:37 |
| 15 | MR. KIM:  You can answer that yes or no. | 14:56:39 |
| 16 | THE WITNESS:  Could you be clear by what you mean | 14:56:41 |
| 17 | by "how to testify"? | 14:56:42 |
| 18 | BY MR. JAFFE: | |
| 19 | Q.   I don't think I can be any clearer. | 14:56:46 |
| 20 | A.   Like what to say? | 14:56:47 |
| 21 | Q.   I'm trying to understand what the legal team | 14:56:51 |
| 22 | told you in terms of general terms, procedural | 14:56:55 |
| 23 | matters, which is what you said. | 14:56:57 |
| 24 | What did they tell you? | 14:56:58 |
| 25 | MR. KIM:  Instruct you not to reveal any | 14:57:00 |

Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | privileged conversations. | 14:57:11 |
| 2 | THE WITNESS:  Are you instructing me not to | 14:57:13 |
| 3 | answer? | 14:57:14 |
| 4 | MR. KIM:  You can answer his prior question yes or | 14:57:17 |
| 5 | no. | 14:57:17 |
| 6 | THE WITNESS:  If your question is, did they tell | 14:57:24 |
| 7 | me what to say, no.  Did they tell me how to testify, | 14:57:28 |
| 8 | no. | 14:57:29 |
| 9 | BY MR. JAFFE: | 14:57:29 |
| 10 | Q.   When you said that they told you things about | 14:57:31 |
| 11 | general things and procedural considerations, what | 14:57:34 |
| 12 | general things did they tell you? | 14:57:37 |
| 13 | MR. KIM:  I'm going to instruct you not to answer | 14:57:39 |
| 14 | on the grounds of attorney-client privilege. | 14:57:40 |
| 15 | BY MR. JAFFE: | 14:57:40 |
| 16 | Q.   What procedural -- what general terms about | 14:57:42 |
| 17 | your testimony did they tell you? | 14:57:45 |
| 18 | A.   Let's see.  We discussed how much time is | 14:57:52 |
| 19 | left, something called redirect. | 14:57:59 |
| 20 | Q.   What did they talk to you about redirect? | 14:58:01 |
| 21 | MR. KIM:  And I'm going to instruct you not to | 14:58:05 |
| 22 | reveal any attorney-client privileged conversations. | 14:58:09 |
| 23 | And I don't think you can answer that without doing | 14:58:11 |
| 24 | so.  I'm going to instruct you not to answer. | 14:58:14 |
| 25 | BY MR. JAFFE: | 14:58:14 |

Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q. You talked about redirect on a break? Yes or | 14:58:21 |
| 2 | no? | 14:58:21 |
| 3 | A. Yes, we talked about the term "redirect." | 14:58:24 |
| 4 | Q. And what did you talk about redirect? | 14:58:28 |
| 5 | A. That is a situation where, instead of you, | 14:58:33 |
| 6 | the lawyer on my side of the table is going to ask me | 14:58:36 |
| 7 | questions. | 14:58:36 |
| 8 | Q. And how did redirect come up in the context | 14:58:39 |
| 9 | of your conversation? | 14:58:40 |
| 10 | A. In the context of time remaining and that | 14:58:45 |
| 11 | redirect would occur after your allotted time has | 14:58:49 |
| 12 | ended, so it's going to take longer than I might | 14:58:54 |
| 13 | think. | 14:58:54 |
| 14 | Q. Did Uber's lawyers tell you that they were | 14:58:58 |
| 15 | going to do redirect questions? | 14:59:00 |
| 16 | A. Yes. | 14:59:02 |
| 17 | Q. And did they tell you what those questions | 14:59:04 |
| 18 | were going to be about? | 14:59:06 |
| 19 | A. No. | 14:59:07 |
| 20 | Q. Did you talk at all about what sort of | 14:59:11 |
| 21 | redirect would happen? | 14:59:13 |
| 22 | A. No. | 14:59:16 |
| 23 | Q. What did you talk about about redirect? | 14:59:19 |
| 24 | A. That they will ask me questions just like you | 14:59:24 |
| 25 | ask me questions and that it's going to take longer | 14:59:27 |

Page 146

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | than the hour, approximately, that we have remaining, | 14:59:30 |
| 2 | so not to expect it to be over at that time. | 14:59:34 |
| 3 | Q.   What else, in general terms, did you and your | 14:59:36 |
| 4 | lawyers talk about on the breaks? | 14:59:38 |
| 5 | MR. KIM:  I'm going to advise you not to reveal | 14:59:46 |
| 6 | any attorney-client privileged communications. | 14:59:49 |
| 7 | THE WITNESS:  So I'm not a lawyer.  I don't know | 14:59:55 |
| 8 | what is considered attorney-client privilege and what | 14:59:58 |
| 9 | wouldn't be in that context of conversations, so I | 15:00:01 |
| 10 | need to be careful not to answer and disclose | 15:00:03 |
| 11 | something I'm not supposed to say. | 15:00:06 |
| 12 | MR. KIM:  Do you need to consult with me about a | 15:00:09 |
| 13 | privilege issue? | 15:00:09 |
| 14 | THE WITNESS:  Yes, that would help. | 15:00:12 |
| 15 | MR. KIM:  Can we go off the record so he can | 15:00:15 |
| 16 | consult with me on a privilege issue before he answers | 15:00:18 |
| 17 | any further questions about what we discussed? | 15:00:20 |
| 18 | MR. JAFFE:  I'll withdraw the question and I'll | 15:00:22 |
| 19 | ask a different question. | 15:00:23 |
| 20 | BY MR. JAFFE: | 15:00:23 |
| 21 | Q.   Tell me the substance of your private | 15:00:26 |
| 22 | conferences -- private conferences during the break | 15:00:28 |
| 23 | that you had with Uber's lawyers, all of it. | 15:00:32 |
| 24 | MR. KIM:  I'm going to object on the grounds of | 15:00:36 |
| 25 | privilege. | 15:00:37 |

Page 147

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. JAFFE:  Are you instructing him not to answer? | 15:00:41 |
| 2 | MR. KIM:  Instruct him not to answer. | 15:00:42 |
| 3 | MR. JAFFE:  Okay.  I think you know that's | 15:00:47 |
| 4 | directly contrary to Judge Alsup's order. | 15:00:50 |
| 5 | MR. KIM:  Can you clarify that. | 15:00:53 |
| 6 | MR. JAFFE:  Judge Alsup's order says no private | 15:00:56 |
| 7 | conferences after testimony begins. | 15:00:58 |
| 8 | MR. KIM:  He's testified that we haven't had any | 15:01:01 |
| 9 | private conferences about his testimony. | 15:01:03 |
| 10 | MR. JAFFE:  The record speaks for itself.  You | 15:01:06 |
| 11 | instructed him not to answer.  I'm going to move on. | 15:01:09 |
| 12 | This is going to be Exhibit 158.  It's a | 15:01:15 |
| 13 | document entitled UBER00012240. | 15:01:19 |
| 14 | (Plaintiff's Exhibit 158 was marked.) | 15:01:37 |
| 15 | BY MR. JAFFE: | 15:01:37 |
| 16 | Q.   This is an e-mail from earlier in March of | 15:01:40 |
| 17 | this year; right -- excuse me, April. | 15:01:47 |
| 18 | A.   Thank you.  Yes. | 15:01:48 |
| 19 | Q.   And on this e-mail is yourself, Anthony | 15:01:53 |
| 20 | Levandowski, Claire Delaunay and Eric Meyhofer; right? | 15:01:57 |
| 21 | A.   Yes. | 15:01:59 |
| 22 | Q.   What is Claire Delaunay's role at Uber? | 15:02:06 |
| 23 | A.   She's a software engineer or software | 15:02:08 |
| 24 | engineering manager. | 15:02:10 |
| 25 | Q.   And there's -- on the "To" line, it says, | 15:02:13 |

Page 148

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      ██████████████████                              15:02:15

 2           Do you see that?                           15:02:17

 3      A.   I see that.                                15:02:19

 4      Q.   Why does it say ████████████ t ere?        15:02:23

 5      A.   I don't know.                              15:02:23

 6      Q.   And you said, █████ -- so referrin  to the 15:02:28

 7      substance of the e-mail that you wrote, you said,  15:02:30

 8      █████  ██████████████                           15:02:32

 9           What are you referring to?                 15:02:33

10      A.   I referred to this web link.  I can't      15:02:42

11      remember right now what I was looking at.  ██████  ████████  15:02:54

12      ████████████████████████████████████           15:02:54

13           This could be a LiDAR sensor, but clicking on  15:02:59

14      the web link would make it very clear what this was.  15:03:03

15      Q.   ████████████████ that's Anthony Levandowski's  15:03:20

16      address; right?                                 15:03:20

17      A.   I believe it is, yes.                      15:03:20

18      Q.   So someone had in their address book Anthony  15:03:25

19      Levandowski's e-mail address, but the name was just  15:03:29

20      ██████████████████                              15:03:31

21      A.   Apparently.                                15:03:31

22      Q.   Did you notice that when you received this  15:03:36

23      e-mail?                                         15:03:36

24      A.   No, I did not.                             15:03:38

25      Q.   Are you aware of whether Mr. Levandowski   15:03:40
```

Page 149

| | | |
|---|---|---|
| 1 | consulted for Uber? | 15:03:45 |
| 2 | A.   No.  Consulted, no. | 15:03:48 |
| 3 | Q.   Okay.  You can put that aside. | 15:04:04 |
| 4 | This has been previously marked as Exhibit | 15:04:18 |
| 5 | 60.  So if you can go to 85 -- oh, this is the wrong | 15:04:37 |
| 6 | doc. | 15:04:37 |
| 7 | Going back in time, there's an e-mail from -- | 15:04:52 |
| 8 | Scott Boehmke wrote, | |
| 9 | | 15:05:00 |
| 10 | Do you see that?  It's on the last page. | 15:05:03 |
| 11 | (Witness reviews document.) | 15:05:14 |
| 12 | A.   Okay.  I see that. | 15:05:16 |
| 13 | Q.   Do you know what the "doc" being referred to | 15:05:19 |
| 14 | here is? | 15:05:20 |
| 15 | MR. KIM:  Objection; form. | 15:05:26 |
| 16 | THE WITNESS:  No.  I don't know what the doc was. | 15:05:35 |
| 17 | BY MR. JAFFE: | 15:05:35 |
| 18 | Q.   And then in the next e-mail in time, you were | 15:05:47 |
| 19 | added to the thread. | 15:05:54 |
| 20 | Do you see that? | 15:05:55 |
| 21 | A.   Yes. | 15:05:58 |
| 22 | Q.   Do you remember being added to this e-mail | 15:06:01 |
| 23 | thread? | 15:06:02 |
| 24 | A.   Remember?  This dates back pretty far.  I | 15:06:09 |
| 25 | don't remember.  About a year ago. | 15:06:11 |

Page 150

| | | |
|---|---|---|
| 1 | Q.    But at this time, immediately when you were | 15:06:20 |
| 2 | involved, Mr. Boehmke and Mr. Levandowski were having | 15:06:26 |
| 3 | LiDAR-related discussions; right? | 15:06:31 |
| 4 |     MR. KIM:  Objection; form. | 15:06:38 |
| 5 |     THE WITNESS:  It's not -- it's not clear, when it | 15:06:40 |
| 6 | says, ███████████████████████████████ | ████████ |
| 7 | ████ meant Scott and Anthony or Scott and s mebody | 15:06:49 |
| 8 | else, so I don't know. | 15:06:50 |
| 9 | BY MR. JAFFE: | 15:06:50 |
| 10 |     Q.    Do you think that's ambiguous? | 15:06:52 |
| 11 |     A.    I think that's ambiguous. | 15:06:54 |
| 12 |     MR. JAFFE:  You can set that aside. | 15:07:11 |
| 13 |         We're on 158? | 15:07:13 |
| 14 |     THE REPORTER:  159. | 15:07:15 |
| 15 |     MR. JAFFE:  Get it right one of these times. | 15:07:18 |
| 16 |         (Plaintiff's Exhibit 159 was marked.) | 15:07:35 |
| 17 | BY MR. JAFFE: | 15:07:35 |
| 18 |     Q.    In June of 2016, you were working at Otto; | 15:07:39 |
| 19 | right? | 15:07:39 |
| 20 |     A.    Yes. | 15:07:41 |
| 21 |     Q.    And do you see, in the second e-mail, there's | 15:07:43 |
| 22 | ███████████████ | [sic]? | 15:07:47 |
| 23 |         Do you see that? | 15:07:50 |
| 24 |     A.    Yes. | 15:07:50 |
| 25 |     Q.    What is that e-mail list? | 15:07:54 |

Page 151

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    That should be the list of Otto LiDAR      15:07:59

 2   development employees.                                15:08:00

 3        Q.    Who's on that -- well, Mr. Levandowski is on  15:08:01

 4   that list; right?                                    15:08:02

 5        A.    Okay.                                      15:08:03

 6        Q.    I'm asking you.                            15:08:03

 7        A.    I don't know if he's on that list.         15:08:05

 8        Q.    Well, this e-mail indicates -- because he  15:08:08

 9   forwarded an e-mail to that list -- to Mr. Boehmke, it  15:08:11

10   indicates that he's on that list.  You would agree   15:08:14

11   with that; right?                                    15:08:15

12              (Witness reviews document.)               15:08:23

13        A.    Yeah, seems that way.                      15:08:28

14        Q.    So Mr. Levandowski is on the e-mail LISTSERV  15:08:34

15   for the LiDAR development team; right?               15:08:36

16        A.    He may have been, yes.                     15:08:39

17        Q.    He was?                                    15:08:39

18        A.    Okay.                                      15:08:41

19        Q.    No, I'm asking you.                        15:08:42

20              He was; right?                             15:08:42

21        A.    It appears from this e-mail chain, assuming  15:08:45

22   there's nothing deleted from it, that he would have  15:08:48

23   got it from the chain and continued it on.            15:08:51

24        Q.    Let me ask you:  Do you have any personal   15:08:54

25   knowledge whether Mr. Levandowski was on this e-mail  15:08:56
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | list or not? | 15:08:57 |
| 2 | A.   I don't recall if he was on the list or not. | 15:09:00 |
| 3 | Q.   Okay.  So sitting here today, you have no | 15:09:02 |
| 4 | personal knowledge whether Mr. Levandowski was on the | 15:09:04 |
| 5 | laser-dev e-mail list; right? | 15:09:07 |
| 6 | A.   Sitting here right now, I don't remember if | 15:09:10 |
| 7 | he was on the list. | 15:09:11 |
| 8 | Q.   Who else was on that list at this time that | 15:09:14 |
| 9 | you remember? | 15:09:15 |
| 10 | A.   I would assume it was the other people | 15:09:19 |
| 11 | developing the LiDAR sensors. | 15:09:21 |
| 12 | Q.   And who are those people? | 15:09:23 |
| 13 | A.   It would be -- to my expectation, people like | 15:09:28 |
| 14 | Gaetan, Dan Gruver, Daniel Ratner.  I don't know if | 15:09:38 |
| 15 | Radu was part of the company at the time.  Mike | 15:09:55 |
| 16 | Karasoff.  Probably Matt Palomar, Benjamin Becker. | 15:10:00 |
| 17 | That's all I can remember right now.  Certainly also | 15:10:22 |
| 18 | could have involved Anthony Levandowski for | 15:10:25 |
| 19 | informative purposes. | 15:10:27 |
| 20 | Q.   What about Max? | 15:10:28 |
| 21 | A.   I'm sorry.  Of course, Max Levandowski as | 15:10:30 |
| 22 | well.  Who else am I forgetting?  Refer back to my | 15:10:41 |
| 23 | list. | 15:10:42 |
| 24 | Q.   For the record, you're looking at Exhibit | 15:10:45 |
| 25 | 153; right? | 15:10:46 |

Page 153

| | | |
|---|---|---|
| 1 | A.   153. | 15:10:47 |
| 2 | Probably would have included Florin | 15:10:59 |
| 3 | Ignatescu.  I don't recall if Adam had joined by then. | 15:11:08 |
| 4 | Would have included Asheem Linaval, Tri Luong, Nancy | 15:11:25 |
| 5 | Sun.  I think that would be it.  And like I said, | 15:11:36 |
| 6 | possibly Anthony.  This is best of my recollection who | 15:11:40 |
| 7 | should have been or could have been on that list. | 15:11:42 |
| 8 | Q.   So Exhibit 159 here is an e-mail from | 15:11:45 |
| 9 | Mr. Levandowski to Mr. Boehmke.  And it says -- | 15:11:47 |
| 10 | Mr. Levandowski says, ███████████████ ██████ | |
| 11 | ██████ | |
| 12 | Do you see that? | 15:11:55 |
| 13 | A.   I see that. | 15:11:56 |
| 14 | Q.   Do you know what that refers to? | 15:11:57 |
| 15 | ███ ████████████████████████████████ ██████ | |
| 16 | ████████████████████ | 15:12:06 |
| 17 | Q.   What does ███████████ refer to, though? | 15:12:10 |
| 18 | A.   It's a wavelength of light for a laser diode. | 15:12:14 |
| 19 | Q.   So Mr. Levandowski is referring to a | 15:12:16 |
| 20 | diode-based LiDAR design here; right? | 15:12:18 |
| 21 | A.   Yes. | 15:12:20 |
| 22 | Q.   And one of the parts of that design was going | 15:12:22 |
| 23 | to be Gaetan Pennecot's FAC lens; right? | 15:12:27 |
| 24 | A.   Yes. | 15:12:27 |
| 25 | Q.   And he was already working with Mr. Boehmke | 15:12:34 |

Page 154

| | | |
|---|---|---|
| 1 | on that design in June of 2016? | 15:12:38 |
| 2 | A.   I'm sorry.  You said Gaetan was working with | 15:12:41 |
| 3 | Boehmke? | 15:12:41 |
| 4 | Q.   Mr. Levandowski was working with Mr. Boehmke | 15:12:43 |
| 5 | on that design in June of 2016; right? | 15:12:46 |
| 6 | A.   It appears that Anthony Levandowski was | 15:12:52 |
| 7 | informing Scott, but to say that Anthony was working | 15:12:55 |
| 8 | on the design, is that an overstatement? | 15:12:58 |
| 9 | Q.   I'm saying Mr. Levandowski and Mr. Boehmke | 15:13:00 |
| 10 | were working together on the ███████████████ | 15:13:04 |
| 11 | in June 2016? | 15:13:06 |
| 12 | MR. KIM:  Objection; form. | 15:13:07 |
| 13 | THE WITNESS:  I don't know that.  And I wouldn't | 15:13:08 |
| 14 | assume that from this e-mail.  As a matter of fact, | 15:13:11 |
| 15 | they had to be notified -- and Boehmke had to be | 15:13:13 |
| 16 | notified of this design, so it seems like "working on" | 15:13:19 |
| 17 | it would be a strong statement even for Scott at this | 15:13:23 |
| 18 | point. | 15:13:24 |
| 19 | BY MR. JAFFE: | 15:13:24 |
| 20 | Q.   Why would Mr. Levandowski forward this e-mail | 15:13:27 |
| 21 | to Mr. Boehmke about ████████████████ that | 15:13:33 |
| 22 | Otto was working on? | 15:13:36 |
| 23 | MR. KIM:  Objection; form. | 15:13:37 |
| 24 | THE WITNESS:  I'd have to -- I don't know.  I | 15:13:37 |
| 25 | would have to guess. | 15:13:38 |

Page 155

| | | |
|---|---|---|
| 1 | BY MR. JAFFE: | 15:13:38 |
| 2 | Q.   The only person that would know would be | 15:13:40 |
| 3 | Anthony; right? | 15:13:40 |
| 4 | A.   Anthony and/or Scott. | 15:13:42 |
| 5 | Q.   But the only person who would know why | 15:13:45 |
| 6 | Anthony was sending this e-mail would be Anthony; | 15:13:49 |
| 7 | right? | 15:13:49 |
| 8 | A.   Probably. | 15:13:50 |
| 9 | Q.   And do you know why Mr. Levandowski was | 15:13:53 |
| 10 | sending e-mails to Mr. Boehmke about ▮▮▮▮▮▮▮▮ ▮▮▮▮▮ | |
| 11 | ▮▮▮▮▮▮▮ in June of 2016? | 15:14:01 |
| 12 | A.   No. | 15:14:02 |
| 13 | Q.   Is it fair to say that Anthony Levandowski | 15:14:10 |
| 14 | was working with Uber on a diode-based design in June | 15:14:15 |
| 15 | of 2016 or no? | 15:14:17 |
| 16 | A.   I couldn't jump to that conclusion. | 15:14:22 |
| 17 | Q.   This e-mail would tend to indicate that he | 15:14:25 |
| 18 | was, though; right? | 15:14:26 |
| 19 | MR. KIM:  Objection; form. | 15:14:27 |
| 20 | THE WITNESS:  I don't read it that way. | 15:14:29 |
| 21 | BY MR. JAFFE: | 15:14:29 |
| 22 | Q.   How do you read it? | 15:14:31 |
| 23 | A.   I read it as Anthony informing somebody at | 15:14:35 |
| 24 | Uber about work that was going on at Otto. | 15:14:39 |
| 25 | Q.   And why would Anthony be doing that? | 15:14:44 |

Page 156

| | | |
|---|---|---|
| 1 | A.    I would have to jump to a guess.  I don't | 15:14:46 |
| 2 | know. | 15:14:47 |
| 3 | Q.    Does it surprise you that he would be | 15:14:51 |
| 4 | forwarding information about Otto's own designs to | 15:14:54 |
| 5 | Uber in June of 2016? | 15:14:57 |
| 6 | A.    I don't know.  At some point, we were working | 15:15:04 |
| 7 | with them as a potential supplier, but June -- is that | 15:15:10 |
| 8 | too early?  I don't know. | 15:15:11 |
| 9 | Q.    So you don't know why Anthony is telling Uber | 15:15:17 |
| 10 | in June of 2016 about the confidential designs for a | 15:15:23 |
| 11 | diode-based device; right? | 15:15:25 |
| 12 | A.    Right. | 15:15:25 |
| 13 | MR. JAFFE:  I think this was marked before, but my | 15:15:46 |
| 14 | version is not marked, so I'm just going to mark it | 15:15:49 |
| 15 | again. | 15:15:50 |
| 16 | THE REPORTER:  160. | 15:16:07 |
| 17 | (Plaintiff's Exhibit 160 was marked.) | 15:16:15 |
| 18 | BY MR. JAFFE: | 15:16:15 |
| 19 | Q.    This is an e-mail dated June 16th, 2016.  And | 15:16:24 |
| 20 | if we go back in time, the first e-mail is from | 15:16:30 |
| 21 | Mr. Levandowski to Scott Boehmke. | 15:16:33 |
| 22 | Do you see that? | 15:16:34 |
| 23 | A.    Um-hum. | 15:16:40 |
| 24 | Q.    And he says, | |
| 25 | | 15:16:46 |

Page 157

```
 1   ███████████████                           15:16:47

 2        Do you see that?                      15:16:48

 3      A.   Yes.                               15:16:48

 4      Q.   Why did Mr. Levandowski send this e-mail to   15:16:51

 5   Uber at this time?                         15:16:53

 6      MR. KIM:  Objection; form.              15:16:57

 7      THE WITNESS:  I would have to assume Anthony was   15:17:02

 8   asking Scott to prescribe angles for the LiDAR sensor   15:17:09

 9   Otto was developing.                       15:17:10

10   BY MR. JAFFE:

11      Q.   Are these the angles that Scott -- are those   15:17:13

12   the angles that went into Fuji?            15:17:16

13      A.   I don't think so.  No.             15:17:22

14      Q.   Are -- these angles that Mr. Boehmke wrote   15:17:25

15   back, are they related at all in the angles that ended   15:17:30

16   up in Fuji?                                15:17:31

17      MR. KIM:  Objection; form.              15:17:55

18        (Witness reviews document.)           15:17:55

19      THE WITNESS:  Are you asking if these are related   15:18:02

20   in any way to the angles in Fuji?  They may have   15:18:06

21   similar origins, similar calculations behind them,   15:18:12

22   similar driving information behind them as what we   15:18:17

23   ended up with Fuji.                        15:18:19

24   BY MR. JORDAN:

25      Q.   What do you mean by "driving information"?   15:18:21
```

Page 158

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   Let's say, for example, there's a piece of        15:18:27

2  driving information -- there could be a desire to have   15:18:33

3  a first lowest laser beam angle come down from a         15:18:38

4  sensor that's mounted on a roof of a car and just miss   15:18:41

5  the hood of the car so that you can see the ground       15:18:45

6  directly in front of the vehicle.  That sort of          15:18:48

7  information could be used over and over to derive         15:18:51

8  required angles like this.                               15:18:54

9    Q.   So other than those kind of basic underlying      15:18:56

10 requirements, is there any other relationship between    15:19:00

11 what Mr. Levandowski asks for and what's in the Fuji?    15:19:06

12     MR. KIM:  Objection; form.                           15:19:11

13     THE WITNESS:  Well, what's sticking out to me is      15:19:14

14 not a similarity, but a difference.  I see angles that    15:19:17

15 have been constrained into groupings of flashlights or    15:19:24

16 optical cavities with specific sets of spacing.  We       15:19:29

17 don't have that restriction on the Fuji, so it seems      15:19:35

18 they should be different.                                 15:19:37

19         Now, are there other calculations that Scott     15:19:40

20 did to determine these angles that could be applied       15:19:44

21 first to something like this and later on still           15:19:48

22 applied to something in Fuji?  It's possible.  But,       15:19:52

23 again, it seems challenging given these extra             15:19:57

24 constraints, like, for example, only two different        15:20:02

25 spacings for your flashlight (indicating).                15:20:08

Page 159

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | So here in Section A, you want the beams to | 15:20:17 |
| 2 | point at -- under two scenarios.  A, you have 64 beams | 15:20:22 |
| 3 | and you can place them individually.  That's | 15:20:25 |
| 4 | unconstrained.  And so here's an early recomm- -- | 15:20:40 |
| 5 | recommended set of angles, paragraph labeled "A" on | 15:20:49 |
| 6 | the final e-mail. | 15:20:50 |
| 7 | BY MR. JAFFE: | 15:20:50 |
| 8 | Q.   Did the angles here in Exhibit 160 form the | 15:20:54 |
| 9 | basis for the beam spacing in the Fuji design? | 15:20:57 |
| 10 | MR. KIM:  Objection; form. | 15:21:01 |
| 11 | THE WITNESS:  Not that I'm aware of.  These angles | 15:21:05 |
| 12 | look different. | 15:21:06 |
| 13 | BY MR. JAFFE: | 15:21:06 |
| 14 | Q.   And what's described here in 160, these are | 15:21:10 |
| 15 | actually groups of uniform spacing; right? | 15:21:15 |
| 16 | MR. KIM:  Objection; form. | 15:21:16 |
| 17 | THE WITNESS:  No.  You have sections where they're | 15:21:20 |
| 18 | not uniformly spaced. | 15:21:22 |
| 19 | BY MR. JAFFE: | 15:21:22 |
| 20 | Q.   So here we've got Mr. Boehmke, who comes up | 15:21:31 |
| 21 | with different zones of spacing; is that fair? | 15:21:39 |
| 22 | MR. KIM:  Objection; form. | 15:21:44 |
| 23 | THE WITNESS:  I'd use the term "groupings," but | 15:21:48 |
| 24 | "zones" might be effective.  It just depends what the | 15:21:52 |
| 25 | final pointing angle of the whole sensor is.  But -- | 15:21:55 |

Page 160

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        THE REPORTER:  "Sounds are fine"?
 2        THE WITNESS:  "Zones" are fine, as a term.      15:22:04
 3   BY MR. JAFFE:                                        15:22:04
 4        Q.   And this is even for Section A of his e-mail  15:22:08
 5   where there's no restrictions on beam groupings;    15:22:11
 6   right?  He's still proposing different zones of beam  15:22:16
 7   spacings; right?                                     15:22:17
 8        MR. KIM:  Objection; form.                      15:22:19
 9        THE WITNESS:  He's not specifically calling out  15:22:21
10   the zones.  There are certain areas that seem to    15:22:25
11   have -- be uniform spacing and other zones that have,  15:22:28
12   to use your term "zones," another area or set of    15:22:32
13   angles that have a different spacing for some number  15:22:35
14   of channels.                                         15:22:38
15   BY MR. JAFFE:                                         15:22:42
16        Q.   So this isn't where the vertical spacing for  15:22:42
17   the Fuji board came from.                            15:22:44
18             So where did the vertical spacing design in  15:22:49
19   Fuji come from?                                       15:22:51
20        MR. KIM:  Objection; form.                      15:22:54
21        THE WITNESS:  In our discussions so far, we've  15:22:57
22   used the term "vertical spacing" with two different  15:23:00
23   meanings.  So I want to be clear to understand whether  15:23:02
24   you mean the linear vertical spacing between, say,   15:23:07
25   diodes on a board or if you mean vertical spacing as  15:23:11
```

Page 161

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    angled deltas between recommended --              15:23:15

 2        THE REPORTER:  "Between recommended" --

 3        THE WITNESS:  Channel angles.                 15:23:19

 4    BY MR. JAFFE:                                     15:23:19

 5        Q.   I'm referring to the delta of the Y that we    15:23:22

 6    talked about earlier.                             15:23:23

 7        A.   Oh.  The delta of the Y -- as you        15:23:29

 8    mentioned -- you're asking where that came from in    15:23:32

 9    Fuji; right?                                      15:23:33

10        Q.   Yes.                                     15:23:33

11        A.   So the delta in Y on a laser board would be    15:23:38

12    constrained by the lens design, that is its focal    15:23:46

13    length, its field curvature.  It would be defined by    15:23:52

14    the desired outcome pointing of angles in the vertical    15:23:57

15    direction.  It would be driven by how many boards you    15:24:03

16    chose to divide those angles among.               15:24:06

17        And then, finally, through the optical        15:24:12

18    projection of the angle to the final field curvature    15:24:19

19    surface, you're going to end up with X and Y       15:24:25

20    coordinates for that optical cavity.              15:24:27

21        Let me add one more thing.  If you're going   15:24:30

22    to tilt your optical cavity, it's going to affect the    15:24:35

23    angles relative to the lens and what we're calling the    15:24:40

24    delta Y dimensions on the board.                  15:24:45

25        Q.   Let me just ask the question directly then.    15:24:49
```

Page 162

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            Where did the idea to do ███████████        15:24:56
   ████████████████████████ come from in the Fuji mid-range
 3   transmit board design?                               15:24:58
 4        MR. KIM:  Objection; form.                      15:25:03
 5        THE WITNESS:  I think it's a mischaracterization 15:25:04
 6   to call it -- the ████████████ as something that     15:25:08
 7   had an idea -- that had an origin as an idea.  The    15:25:12
 8   fact that ██████████████████████████████████████     15:25:21
     ████████████████████████ is a side effect of the optics 15:25:21
10   in the optical cavity.                               15:25:24
11   BY MR. JAFFE:                                        15:25:24
12        Q.   So you can't tell me where it came from, who 15:25:26
13   came up with the idea?                               15:25:28
14        A.   I'm trying to explain -- I don't think     15:25:31
15   anybody had this idea to ██████████████████████████  15:25:40
     █████████████████████████████ on the laser board.    15:25:40
17   I believe that was a side effect that was unavoidable 15:25:46
18   when you take a set of vertical angles, especially if 15:25:51
19   they're nearly or equivalently spaced in terms of    15:25:56
20   angle, and project those onto a curved focal surface. 15:26:01
21        Q.   You said it's unavoidable.                 15:26:03
22             You worked at Velodyne; right?             15:26:05
23        A.   Yes.                                        15:26:05
24        Q.   You didn't do ███████████████████████ at   15:26:09
25   Velodyne; right?                                      15:26:11
```

Page 163

```
 1        MR. KIM:  Objection; form.                    15:26:12

 2   BY MR. JAFFE:                                       15:26:12

 3        Q.   In terms of the X and Y positions of the 15:26:15

 4   diodes?                                             15:26:15

 5        A.   I'm not aware that they were              

                 as a matter of fact.                    15:26:20

 7        Q.   You don't know?                           15:26:22

 8        A.   I -- actually, if I had to guess, because it 15:26:25

 9   was never something we directly measured or        15:26:27

10   considered, they probably are                       15:26:31

11        Q.   And why do you say that?                  15:26:34

12        A.                                             

                                                         

                                                         

                                                         

                                                         

                                                         15:27:00

18        Q.   What do you mean, it's               ?    15:27:02

19        A.   I would have to do the math or do a CAD   15:27:08

20   simulation, but I fully expect                      

                                                         

                                                         

                                                         15:27:24

24        Q.   Okay.  You worked at Velodyne; right?     15:27:28

25        A.   Yes.                                      15:27:28
```

Page 164



```
 1        Q.    And you worked on LiDAR at Velodyne?        15:27:32

 2        A.    Yes.                                        15:27:32

 3                                                          15:27:35

 4                                                          15:27:57

12        Q.    So I want to again go back to this idea of  15:28:20

13    where did the idea to do the              design      15:28:23

14    in Fuji come from?  You've said -- you've mentioned   15:28:26

15    the things -- the drivers, but I haven't heard who    15:28:29

16    came up with the idea, where it came from.            15:28:32

17        A.    Again, you're referring, I believe, to a   15:28:34

18    linear vertical -- what we call delta Y; is that      15:28:37

19    correct?                                              15:28:38

20        Q.    Yes.                                        15:28:39

21        A.    I have to give you the same answer.  It was 15:28:43

22    not a concept that drove the design.  There was nobody 15:28:48

23    coming up with the idea to do that.  The idea for the 15:28:54

24    vertical angles I would attribute to Scott Boehmke.   15:28:58

25    The lens design I would attribute to Gaetan Pennecot. 15:29:01
```

Page 165

```
 1    So what you end up with on the board at that point is    15:29:06

 2    just derived from those pieces of information.           15:29:10

 3         Q.   So talking about the angles, you said when     15:29:13

 4    you were at Velodyne, you did constant angles.           15:29:17

 5         A.   Yes.                                            15:29:17

 6         Q.   Why didn't you want to get ███████████████████

                              ████████████when you were working at    15:29:26

 8    Velodyne?                                                15:29:27

 9         A.   I don't know.                                  15:29:28

10         Q.   You guys didn't come up with that?  You        15:29:31

11    didn't think of that idea?                               15:29:33

12         A.   I don't think so.  I mean, I would -- at that  15:29:40

13    point, ███████████ had a very strong influence on this   15:29:43

14    is what your LiDAR is going to be, this is the angle     15:29:46

15    spacing.  So it's not something that I had ever          15:29:49

16    thought of.                                              15:29:50

17         Q.   It not something that you guys considered,     15:29:54

18    which is you want ████████████████████████  as you       15:29:59

19    go down the road?                                        15:30:00

20         A.   ██████████████████████████████████?           15:30:00

21         Q.   Yes.                                           15:30:01

22         A.   That was the design that Velodyne ended up     15:30:04

23    with --                                                  15:30:05

24         Q.   Sorry.                                         15:30:05

25         A.   -- still 32.
```

                                                            Page 166

| 1 | Q.    Let me ask a different question. | 15:30:07 |
| 2 |        If you wanted to have a point on the road | 15:30:09 |
| 3 | every 10 feet going out to 150 feet, is tha  an idea | 15:30:13 |
| 4 | that you guys came up with at Velodyne? | 15:30:17 |
| 5 | A.    That -- I don't recall that idea at Velodyne, | 15:30:20 |
| 6 | no. | 15:30:20 |
| 7 | Q.    Even though you guys were designing LiDARs | 15:30:24 |
| 8 | for self-driving cars? | 15:30:26 |
| 9 | A.    We were designing LiDARs for mapping, | 15:30:29 |
| 10 | self-driving cars, robots.  So, yes. | 15:30:34 |
| 11 | Q.    And when you came to Otto, who came up with | 15:30:40 |
| 12 | the idea of wanting to get -- hit a point every 10 | 15:30:49 |
| 13 | feet on the road for every 150 feet?  Or that concept, | 15:30:53 |
| 14 | where did that come from? | 15:30:55 |
| 15 | A.    The vertical angles and the concepts behind | 15:31:01 |
| 16 | them I believe, my understanding was, came through | 15:31:04 |
| 17 | Scott Boehmke. | 15:31:05 |
| 18 | Q.    Anyone else? | 15:31:06 |
| 19 | A.    I'm not aware of anyone else. | 15:31:08 |
| 20 | Q.    And you know that Scott Boehmke was talking | 15:31:11 |
| 21 | with Anthony Levandowski about LiDAR design when you | 15:31:15 |
| 22 | were joining; right? | 15:31:16 |
| 23 | A.    Shortly after I joined, we have e-mails that | 15:31:18 |
| 24 | show that they were talking about LiDAR, yes. | 15:31:21 |
| 25 | Q.    And, in particular, the e-mail that we were | 15:31:26 |

Page 167

```
 1    just looking at, for example, shows that          15:31:30

 2    Mr. Levandowski and Mr. Boehmke were talking about how  15:31:35

 3    to implement 64 beams and the angles for each of   15:31:39

 4    those; right?                                      15:31:40

 5         A.    They were talking about that topic, yes.  15:31:45

 6         Q.    And they were talking about that because  15:31:47

 7    Mr. Levandowski was working with Mr. Boehmke on the  15:31:50

 8    beam angles; right?                                15:31:52

 9         A.    Well, you're making it sound like Anthony was  15:31:57

10    working on the beam angles.  So I want to just be  15:32:01

11    clear.  I don't know that he actually worked on beam  15:32:04

12    angles, but it does seem that he was asking Scott  15:32:07

13    Boehmke to design angles based on certain          15:32:10

14    manufacturing restrictions.                        15:32:12

15         Q.    And where do those manufacturing restrictions  15:32:14

16    come from?                                         15:32:17

17         A.    It could have involved a discussion with  15:32:22

18    Anthony Levandowski, but it also included Dan Gruver  15:32:27

19    and myself.  Maybe Gaetan Pennecot; I'm not sure.  15:32:32

20         Q.    So going back to Mr. Levandowski's e-mail.  15:32:42

21         A.    Yes.                                     15:32:43

22         Q.    Gives Option A and Option B.             15:32:48

23         A.    Yes.                                     

24         Q.    Option A, ███████████████████████  █████████

25         ████████████                                   15:32:54
```

Page 168

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   Yes.                                        15:32:54

 2        Q.   What kind of LiDAR design does that refer to?  15:33:00

 3        A.   I'm sorry?

 4        MR. KIM:  Objection; form.                       15:33:03

 5        THE WITNESS:  I don't understand what you mean,  15:33:04

 6   "what kind of LiDAR."                                 15:33:05

 7   BY MR. JAFFE:                                         15:33:05

 8        Q.   So he's describing -- tell me beam angles if  15:33:10

 9   we have the follow constraints:  ███████████████  ███████

10   ████████████████████

11             What kind of a LiDAR does that correspond to?  15:33:18

12        MR. KIM:  Objection; form.                       15:33:18

13        THE WITNESS:  That would correspond to a LiDAR  15:33:21

14   design where the beams can be individually placed     15:33:25

15   without regard to manufacturing different optical     15:33:27

16   cavities.                                             15:33:29

17   BY MR. JAFFE:                                         15:33:29

18        Q.   So does -- Point A here, is that -- is that  15:33:31

19   consistent with the Fuji design?                      15:33:37

20        A.   Both Point A and Fuji lack some sort of     15:33:44

21   applied restraint on the spacing.                     15:33:48

22        Q.   Right.                                       15:33:49

23             So Fuji has 64 beams; right?                15:33:50

24        A.   Fuji has 64 beams.                          15:33:54

25        Q.   And you can place the diodes individually to  15:33:57
```

Page 169

```
 1    adjust their beam angles; right?                  15:34:00

 2        A.   Right.                                    15:34:00

 3        Q.   How did Mr. Boehmke get from the angles that   15:34:25

 4    we're talking about here in Exhibit 160 to the angles   15:34:31

 5    that are in the Fuji design?                       15:34:35

 6        A.   I'm not familiar with his spreadsheet that   15:34:43

 7    calculates these angles.  So I don't know how he went   15:34:47

 8    from this set of angles to the set of angles that   15:34:53

 9    ended up on the Fuji.                              15:34:54

10        Q.   But your understanding is that he did go from   15:34:57

11    the angles that he generated here for Scenario A to   15:35:02

12    the Fuji design; is that right?                    15:35:04

13        A.   I will say only that he developed both sets   15:35:09

14    of angles and that this one predates the other one.   15:35:13

15    But I can't make any causal or development stepping   15:35:16

16    from one to the next.                              15:35:18

17        Q.   I see.                                    15:35:18

18             So you're not aware of any relationship    15:35:20

19    between the angles that are described here in Exhibit   15:35:22

20    160 and what's in the Fuji design; is that right?  15:35:25

21        A.   They're different angles, so I don't know the   15:35:30

22    relationship other than what I mentioned before in   15:35:32

23    terms of drivers that affect this.  ████████       ████████

24    ████████        which looks like it may have similar   15:35:41

25    driving requirements behind it.                    15:35:43
```

Page 170

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. JAFFE:  I think this was marked previously as | 15:36:18 |
| 2 | Exhibit 62.  Doesn't look like it has a sticker, so if | 15:36:22 |
| 3 | you want to mark it again as 62, please. | 15:36:25 |
| 4 | THE REPORTER:  You're saying 62? | 15:36:25 |
| 5 | MR. JAFFE:  Oh, it does have an exhibit number on | 15:36:34 |
| 6 | it.  Excuse me. | 15:36:36 |
| 7 | BY MR. JAFFE: | 15:36:39 |
| 8 | Q.   We talked about this exhibit at your last | 15:36:45 |
| 9 | deposition. | 15:36:46 |
| 10 | Do you recall that? | 15:36:46 |
| 11 | A.   I recall that. | 15:36:47 |
| 12 | Q.   I want to talk about a different part. | 15:36:49 |
| 13 | Do you see, in the optical cavity -- or | 15:36:51 |
| 14 | excuse me.  Where is this?  This isn't right. | 15:37:06 |
| 15 | You can just put that one aside.  I think | 15:37:30 |
| 16 | it's the wrong document. | 15:37:31 |
| 17 | MR. KIM:  How much time have we gone on the | 15:37:49 |
| 18 | record? | 15:37:50 |
| 19 | THE VIDEOGRAPHER:  Three hours and 53 minutes on | 15:37:53 |
| 20 | the record. | 15:37:55 |
| 21 | MR. KIM:  Thank you. | 15:37:56 |
| 22 | MR. JAFFE:  I think this is it.  This was Exhibit | 15:38:06 |
| 23 | 58. | 15:38:07 |
| 24 | BY MR. JAFFE: | 15:38:07 |
| 25 | Q.   This is the e-mail that is attached as | 15:38:29 |

Page 171

```
 1    Exhibit A to your first declaration.  And this is what    15:38:34

 2    you cite in support of the idea that Uber                  15:38:38

 3    independently came up with the idea of ████████████████

                                                                 15:38:44

 5         Do you see that?                                      15:38:45

 6    A.   I see this exhibit.                                   15:38:48

 7    Q.   And in particular, what you say here is -- if         15:38:54

 8    you look at the second -- well, it's the third page        15:38:57

 9    including the slip sheet, the first e-mail.                15:39:01

10    A.   Um-hum.                                               15:39:02

11    Q.   It says, ████████████████                            15:39:05

12         Do you see that paragraph?                            15:39:07

13    A.   Just a moment.                                        15:39:08

14         (Witness reviews document.)                           15:39:08

15    A.   Sorry.  I'm there now.                                15:39:17

16    Q.   Do you see it there, ████████████████                15:39:21

17    A.   Yes, I do.                                            15:39:22

18    Q.   And, again, to orient us, in early 905               15:39:26

19    nanometer discussions, you're referring to Fuji;           15:39:29

20    right?                                                     15:39:29

21    A.   Yes.                                                  15:39:29

22    ██ ████████████████████████████████        ████████████

23    ████████████████████████████████████████   ████████████

24    ████████████████                                           15:39:37

25    MR. KIM:  Objection; form.                                 15:39:40
```

Page 172



```
 1      THE WITNESS:  ███████████████████████       15:39:43

 2   ████████████████████████████████████████       15:39:46

 3   ████████████████                                15:39:47

 4   BY MR. JAFFE:                                   15:39:47

 5   ███████████████████████████████████████████    15:39:55

 6   ████████████████████████████████████████████

 7   ████████████████████████████████               15:39:55

 8      MR. KIM:  Objection; form.                   15:39:56

 9      THE WITNESS:  No, I'm sorry.  Could you be more  15:40:04

10   specific in your question.  I'm confused.       15:40:07

11   BY MR. JAFFE:                                   15:40:07

12      Q.  Because I'm short on time, I'll just skip  15:40:10

13   that.

14          Here in this e-mail, these are early 905  15:40:13

15   nanometer discussions.                          15:40:15

16      A.  Yes.

17      Q.  And you wrote, ████████ ████████████████

18   ████████████████████████████████████████

19   ████████████████                                15:40:23

20          Do you see that?                         15:40:25

21      A.  Yes.                                      15:40:25

22      Q.  So at the time of this e-mail, October 28th,  15:40:30

23   you had the idea of ████████████████            15:40:35

24      A.  Yes.                                      15:40:35

25      Q.  So at this point, in October, you didn't  15:40:38
```

                                                   Page 173

```
 1    actually have the idea of ███████████████████    15:40:44
      ████████████████████████

 3       A.   True.                                        15:40:45

 4       Q.   So this is not evidence of -- this e-mail is  15:40:50

 5    not indicative of you coming up with the ██████████
      ████████████████████████████████████; right?        15:41:00

 7       MR. KIM:  Objection; form.                         15:41:01

 8       THE WITNESS:  This is not indicative of the -- or  15:41:04

 9    this is not evidential to the ██████████████████████
      ████████████████████████████████████████.            15:41:12

11    BY MR. JAFFE:                                         15:41:12

12       Q.   And what you were thinking on October 26th    15:41:14

13    [sic] is ████████████████████████; right?             15:41:18

14       A.   Yes, on October 28th.                         15:41:20

15       Q.   Okay.                                         15:41:40

16       MR. KIM:  Jordan, are you wrapping up?             15:41:40

17       MR. JAFFE:  I only have a few more minutes, so I   15:41:43

18    think I'm wrapping up.                                15:41:45

19       MR. KIM:  I think we've got one.                   15:41:47

20    BY MR. JAFFE:                                         15:41:47

21       Q.   What documents are you aware of that would    15:42:04

22    show Anthony -- all of Anthony Levandowski's input    15:42:08

23    into Uber and Otto's LiDAR designs?                   15:42:12

24       MR. KIM:  Objection; form.                         15:42:14

25       THE WITNESS:  I'm not aware of a list of documents  15:42:17
```

                                                          Page 174

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | or a source for documents to go to to document all of | 15:42:20 |
| 2 | his influence. | 15:42:21 |
| 3 | BY MR. JAFFE: | 15:42:21 |
| 4 |     Q.   How would you find out about how | 15:42:25 |
| 5 | Mr. Levandowski has influenced LiDAR design at Uber | 15:42:30 |
| 6 | and Otto? | 15:42:31 |
| 7 |     MR. KIM:  Objection; form. | 15:42:41 |
| 8 |     THE WITNESS:  That's difficult. | 15:42:42 |
| 9 | BY MR. JAFFE: | 15:42:42 |
| 10 |     Q.   Why? | 15:42:44 |
| 11 |     A.   When you're looking for all of something and | 15:42:49 |
| 12 | you need to miss nothing, that's not an easy problem | 15:42:53 |
| 13 | to solve.  If you look at all the possible sources of | 15:42:58 |
| 14 | influence, I'm not sure they would all be documented. | 15:43:01 |
| 15 |     Q.   How would you go about trying to find out as | 15:43:04 |
| 16 | much as you could about how Mr. Levandowski has had | 15:43:08 |
| 17 | input into Uber and Otto's LiDAR designs? | 15:43:13 |
| 18 |     MR. KIM:  Objection; form. | 15:43:16 |
| 19 |     THE WITNESS:  I suppose I would talk to the | 15:43:18 |
| 20 | various engineers that had LiDAR responsibilities. | 15:43:21 |
| 21 | BY MR. JAFFE: | 15:43:21 |
| 22 |     Q.   Who? | 15:43:22 |
| 23 |     A.   Shall we pick up -- | 15:43:31 |
| 24 |     Q.   Would you talk to everyone on this list?  Is | 15:43:32 |
| 25 | that the idea? | 15:43:33 |

Page 175

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   I suppose, yeah, if I'm trying not to miss | 15:43:37 |
| 2 | anything. | 15:43:37 |
| 3 | Q.   Where would you look for documents? | 15:43:41 |
| 4 | A.   I suppose e-mail. | 15:43:43 |
| 5 | MR. KIM:  Can we have the time on the record, | 15:43:45 |
| 6 | please. | 15:43:48 |
| 7 | THE VIDEOGRAPHER:  3 hours and 59 minutes. | 15:43:52 |
| 8 | MR. KIM:  Thanks. | 15:43:53 |
| 9 | THE WITNESS:  I said e-mail. | 15:43:55 |
| 10 | BY MR. JAFFE: | 15:43:55 |
| 11 | Q.   Anything else? | 15:43:56 |
| 12 | A.   Not that occurs to me. | 15:43:59 |
| 13 | Q.   So if you wanted to figure out as much as you | 15:44:03 |
| 14 | could about Mr. Levandowski's input into Uber and Otto | 15:44:08 |
| 15 | LiDAR, you would talk to everyone on the LiDAR team | 15:44:11 |
| 16 | and you would look at Mr. Levandowski's e-mail and | 15:44:15 |
| 17 | everyone else's e-mail; is that fair? | 15:44:17 |
| 18 | MR. KIM:  Objection; form. | 15:44:20 |
| 19 | THE WITNESS:  I wouldn't look at everybody's | 15:44:23 |
| 20 | e-mail.  I would look at Anthony's e-mail because if | 15:44:26 |
| 21 | he's going to have an influence, I would expect it to | 15:44:27 |
| 22 | come from his account outward, and that's going to | 15:44:28 |
| 23 | limit the search. | 15:44:29 |
| 24 | BY MR. JAFFE: | |
| 25 | Q.   Is there any -- is there any other source of | 15:44:31 |

Page 176

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | documents that you would look at or data, anything? | 15:44:34 |
| 2 | MR. KIM:  Objection; form. | 15:44:35 |
| 3 | THE WITNESS:  I don't know.  I might look for | 15:44:48 |
| 4 | Google docs with his authorship. | 15:44:51 |
| 5 | BY MR. JAFFE: | 15:44:51 |
| 6 | Q.  Anything else? | 15:44:55 |
| 7 | A.  No. | 15:44:56 |
| 8 | Q.  Okay. | 15:44:56 |
| 9 | MR. JAFFE:  Well, I think I have run out of time. | 15:45:01 |
| 10 | MR. KIM:  Okay. | 15:45:06 |
| 11 | THE REPORTER:  Do you want this as 161? | 15:45:20 |
| 12 | MR. KIM:  Yes. | |
| 13 | THE REPORTER:  Next number?  Okay. | |
| 14 | MR. JAFFE:  I'm going to object -- | |
| 15 | THE REPORTER:  Hang on.  Let me just write this. | |
| 16 | MR. KIM:  Oh.  1061. | |
| 17 | THE REPORTER:  161? | |
| 18 | MR. KIM:  You know, I think we're alternating -- | |
| 19 | MR. JAFFE:  We have different blocks of exhibits. | 15:45:31 |
| 20 | So his exhibit numbers, they start at 1000; ours start | 15:45:35 |
| 21 | at zero.  So I don't know what number you're at. | 15:45:36 |
| 22 | MR. KIM:  Actually, can we start at 1060. | 15:45:39 |
| 23 | (Defendants' Exhibit 1060 was marked.) | 15:46:05 |
| 24 | REDIRECT EXAMINATION | |
| 25 | BY MR. KIM: | 15:46:05 |

Page 177

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        Q.   Mr. --                                    15:46:07

2        MR. JAFFE:   I'm just going to object as improper   15:46:10

3   redirect.   And, again, this is improper kind of super  15:46:15

4   surreply evidence here.                            15:46:18

5   BY MR. KIM:                                        15:46:18

6        Q.   Mr. Haslim, you were asked earlier today  15:46:20

7   about angles and delta values for Fuji.            15:46:25

8             Do you recall that?                      15:46:26

9        MR. JAFFE:   Objection; leading.               15:46:26

10       THE WITNESS:   Yes.                            15:46:30

11  BY MR. KIM:                                        15:46:30

12       Q.   Do you recognize the angles depicted on the  15:46:34

13  left-hand column of this document?                 15:46:38

14       A.   Yes.                                      15:46:49

15       Q.   And how do you recognize them?           15:46:51

16       A.   These would be the pointing angles for the  15:46:58

17  laser dowels -- did I say dowels -- laser diodes on  15:47:03

18  the Transmit Board A.   The angles have a --        15:47:09

19       THE REPORTER:   "Sign inversion"?             15:47:13

20       THE WITNESS:   -- sign inversion applied to them.  15:47:13

21            And the angles are rounded down to two    15:47:16

22  decimal places, otherwise they appear to be the same  15:47:19

23  angles.                                            15:47:20

24  BY MR. KIM:                                        15:47:20

25       Q.   And just for the record, are you comparing  15:47:23
```

Page 178

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    these against --                                  15:47:24

 2        A.   Comparing these against Exhibit B from my  15:47:36

 3    original declaration.                             15:47:40

 4        Q.   Okay.  And is that also what's been marked as  15:47:45

 5    Exhibit 155 for this deposition?                  15:47:48

 6        A.   Yes.                                      15:47:48

 7        Q.   And then so these angles look consistent with  15:47:55

 8    the angles in Deposition Exhibit 155?             15:48:00

 9        A.   Yes.                                      15:48:00

10        MR. KIM:  I'm just going to object to all this  15:48:06

11    testimony as improper addition of evidence, outside  15:48:09

12    the scope of redirect.                            15:48:10

13    BY MR. KIM:                                       15:48:10

14        Q.   Next, after "Angles," do you see the column  15:48:13

15    "Delta"?                                          15:48:13

16        A.   Yes.                                      15:48:14

17        Q.   What does that correspond to?

18        MR. JAFFE:  Would you give me a running objection  15:48:18

19    to this document?                                 15:48:18

20        MR. KIM:  Sure.                               15:48:20

21        MR. JAFFE:  Thank you.                        15:48:20

22        THE REPORTER:  What was your question?  I didn't  15:48:20

23    get it.

24    BY MR. KIM:                                       15:48:20

25        Q.   Do you see the numbers under the heading  15:48:30
```

Page 179

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    "Delta"?

2        A.   Yes.                                        15:48:34

3        Q.   Do you know what those correspond to?       15:48:36

4        A.   These are the subtractive difference between 15:48:45

5    two subsequent angles in the first list labeled      15:48:50

6    "Angles."                                            15:48:51

7        Q.   And is there a term for that delta?  Would  15:48:59

8    you just call it delta or the difference, or how would 15:49:02

9    you describe that?                                   15:49:03

10       A.   I may have referred to this as channel      15:49:07

11   spacing.                                             15:49:07

12       Q.   And does that reflect the channel spacing for 15:49:12

13   the Board A in the Fuji product -- or Fuji design?   15:49:19

14       A.   Yes.                                        15:49:20

15       Q.   And next to that column, do you see the     15:49:26

16   column listed under the heading "Distance between    15:49:28

17   diodes in millimeters"?                              15:49:30

18       A.   Yes.                                        15:49:31

19       Q.   Do you know what's reflected in that column? 15:49:35

20       A.   I believe I do.  I can use the calculator to 15:49:39

21   double check one or two of your numbers.  Oh, boy.   15:49:59

22            (Pause in proceedings.)                     15:49:59

23            (Witness performs calculation.)

24       A.   Okay.  This calculator does not do squares  15:50:22

25   apparently.  Apologies.  Okay.  It appears that you're 15:51:37

                                                    Page 180

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | taking -- and we can do this for more angles if you | 15:51:42 |
| 2 | wish, but it looks like the diodes -- the distance | 15:51:43 |
| 3 | between diodes in millimeters is the straight line | 15:51:48 |
| 4 | distance between adjacent laser diodes on the Board A. | 15:51:56 |
| 5 | Q.    Could you describe generally how you | 15:51:59 |
| 6 | calculated that or determined that? | 15:52:01 |
| 7 | A.    Yeah.  So ███████████████████████ | 15:52:05 |
| 8 | ███████████████████████████████████ | 15:52:10 |
| 9 | ██████████████████████████████ | 15:52:16 |
| 10 | ██████████████████████████ | 15:52:22 |
| 11 | ███████████████████████████████████ | 15:52:25 |
| 12 | I don't know if you need any more -- | 15:52:29 |
| 13 | Q.    Is there a name for that equation that you | 15:52:31 |
| 14 | just described? | 15:52:32 |
| 15 | A.    ███████████████████████████ | 15:52:36 |
| 16 | ██████████████████████ or -- yeah. | 15:52:41 |
| 17 | Q.    And then going back to the channel spacing | 15:52:45 |
| 18 | under "delta" -- | 15:52:46 |
| 19 | Is that the term you used? | 15:52:48 |
| 20 | A.    Under "delta" -- channel spacing, yes.  This | 15:52:55 |
| 21 | is an angular spacing. | 15:52:57 |
| 22 | Q.    Does that reflect the accurate channel | 15:52:59 |
| 23 | spacing for the Fuji Board A? | 15:53:02 |
| 24 | A.    These do appear to be the channel spacing. | 15:53:07 |
| 25 | In terms of accurate, these numbers are already | 15:53:11 |

Page 181

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   rounded down to two decimal spaces of angle, so that's   15:53:18

 2   the level of accuracy.

 3        Q.   And do you see the numbers down in red --        15:53:20

 4        A.   Yes.                                             15:53:22

 5        Q.   -- in that column?                              15:53:22

 6             Does that ████████████████████████?             15:53:31

 7        A.   Could you be more specific.                     15:53:33

 8        Q.   Yeah.                                           15:53:35

 9             Are any of those ██████████████?                15:53:38

10        A.   No.                                             15:53:38

11        Q.   They're not?                                    15:53:40

12             What about between ████████  are those ████████████

     ████████████                                             15:53:47

14        A.   ████████   No, ████████████████                 15:53:49

15        Q.   Are we looking at the same thing?  Aren't       15:53:50

16   they 1.16 and --                                         15:53:52

17        A.   ████████.  I'm sorry.  Are you asking --        15:53:55

18        Q.   ██████████████████████

19        A.   -- channel spacing or distance between --

20        Q.   I'm asking channel spacing.

21        THE REPORTER:  Could you repeat that.

22        THE WITNESS:  I'm asking whether he was referring    15:54:04

23   to -- his question referred to the "Delta" column or     15:54:07

24   the "Distance between diodes."                           15:54:09

25   BY MR. KIM:
```

Page 182

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   I'm asking under the "Delta" column.        15:54:11

 2      A.   Okay.  Well, no.  ███████████████████████████

        ████████████████████████                         15:54:19

 4      Q.   And ██████████████████████████████████████

        ████████████                                     15:54:23

 6      A.   Yes.                                         15:54:23

 7      Q.   In your opinion, are these ████████████████████

        ██████████████████████████████████████           15:54:34

 9      A.   No, not necessarily.  You could argue that as  15:54:37

10      ██████████████████████████████████████████████████

        ████████████████████████████████                 15:54:42

12      Q.   And same question for the distance between   15:54:45

13   diodes reflected in -- under the column "Distance    15:54:50

14   between diodes.                                      15:54:53

15      A.   Yes.                                         15:54:54

16      Q.   Looking at Channels ██████████████████████████

        ████████████████████████                         15:55:03

18      MR. JAFFE:  Objection; leading.                   15:55:04

19      THE WITNESS:  No ████████████████████████████      15:55:08

20   BY MR. KIM:                                          15:55:08

21      Q.   Now, █████████████████████████████████████████

        ████████████████████████████████?                15:55:15

23      A.   They ██████████████████████████████████       15:55:20

24      Q.   Do you have an understanding as to whether or  15:55:24

25   not that would still be described as ████████████████  15:55:27
```

                                               Page 183

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ██████████████                                    15:55:31

 2       A.    That -- I would still consider that      15:55:33

 3   ██████████████████.  And we're referring to the    15:55:36

 4   "Distance between diodes in millimeters."          15:55:39

 5       Q.    Okay.  What about for the █ board depicted on  15:55:45

 6   this exhibit?  Can you tell me if the angles listed in  15:55:52

 7   Exhibit 1060 accurately reflect the angles of the █  15:55:58

 8   board for Fuji?                                    15:56:00

 9           (Witness reviews documents.)               15:56:17

10       A.    Again, the angles you've listed under the  15:56:19

11   "Angles" column for Board █ appear to be ██████████  15:56:23

12   ██████████████████████████████████with two  15:56:30

13   decimal place rounding.                            15:56:32

14       Q.    And what about the channel spacing for the █  15:56:36

15   board; does this Exhibit 1060 accurately depict the  15:56:42

16   channel spacing for the █ board for Fuji?          15:56:58

17           (Witness reviews documents.)               15:56:58

18       A.    Just do this.  This is faster.           15:57:04

19           (Witness performs calculation.)            15:57:08

20       A.    I've only seen .01 error so far in the delta  15:58:14

21   values.  That could be a rounding error, I suppose.  15:58:17

22       Q.    For which channel?                       15:58:18

23       A.    Delta after ███ was listed ████████████████  15:58:22

24   ██████████████████                                  15:58:29

25       Q.    But that could be due to the fact that ████████  15:58:32
```

Page 184

```
 1   ███ are listed in -- to two decimal places?        15:58:38

 2        A.   To two decimal places.  So if you have --   15:58:40

 3        MR. JAFFE:  Objection; leading.              15:58:42

 4        THE WITNESS:  Okay.  If this was simply a     15:58:47

 5   spreadsheet like these commonly are, it's quite    15:58:50

 6   possible that the ███ is a more accurate difference  15:58:55

 7   between the angles in the "Angles" column, which have 15:58:59

 8   been rounded up or rounded down to two decimal places. 15:59:06

 9             (Witness performs calculation.)

10        THE WITNESS:  Again, it looks like --

11        THE REPORTER:  I'm sorry, can you repeat.

12        THE WITNESS:  Again, it looks like delta for ███  15:59:53

13   has a ███████                                       15:59:56

14   BY MR. KIM:

15        Q.   What do you get for ██, rounded to two     16:00:02

16   decimal places?                                     16:00:03

17        A.   I thought I was gettin ██████  So let me   16:00:07

18   double check here.                                  16:00:08

19             (Witness performs calculation.)

20        A.   Yeah, I'm getting ██████                   16:00:16

21             Delta for ██ is off by ███ degrees.        16:00:43

22        Q.   What number do you get?                    16:00:44

23        A.   ██████                                     16:00:46

24             (Witness performs calculation.)

25        Q.   The rest of the numbers look accurate?     16:01:00
```

Page 185

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    Yeah.                                     16:01:00

 2        MR. JAFFE:   Objection; leading.                16:01:03

 3   BY MR. KIM:                                          16:01:03

 4        Q.    Have you ever used the term ██████        16:01:08

 5        A.    I'm familiar with the term from mathematics.  16:01:13

 6        Q.    What does that term mean to you?          16:01:17

 7        A.    To me, especially in reference to a       16:01:20

 8   mathematical function, the term ████████ means that  16:01:25

 9   ████████████████████████████████████████████████

     ██████████████████████████████████████████████████
     ██████████████████████████████████████████████████
     ██████████████████████████████████████████████████

     ████████████████████████                            16:01:53

14        Q.    In your opinion, do -- the channel spacing  16:01:55

15   for Board A for Fuji, do they ████████████████████   16:01:? 

     ████████████████████                                16:02:07

17        A.    Channel spacing related to the "Delta" column  16:02:10

18   we've labeled?                                       16:02:11

19        Q.    Yes.                                       16:02:12

20        A.    To my understanding, that is not ██████   16:02:30

21        Q.    Why is that?                               16:02:31

22        A.    I see numbers that start at the "Delta"   16:02:34

23   column, the channel spacing we called it, ████████  16:02:?

     ██████████████████████████████████████████████████

     ████████████████████████████████████████████       16:02:49
```

Page 186



1   ████████████████                                        16:02:51

2       Q.   Same question for the distance between           16:02:53

3   diodes.                                                  16:02:54

4            Is that distance ████████████████████████████

    ████████████████████            for Fuji?               16:03:06

6       A.   No.  The linear distance is not ██████████████

    ██████████████████████████████████████████████████████

    ██████████████████████████████████████████████████████

    ████████████████████████████                           16:03:26

10      Q.   Is that also true for the channel spacing for   16:03:32

11  Board █ for Fuji?                                        16:03:34

12      MR. JAFFE:  Objection; leading.                      16:03:40

13      THE WITNESS:  I see the same ██████████████████████

    ██████████████████████████████████████████████████████

    ██████████████████████████████████████████████████████

    ██████████████████████████████████████████████████████

    ██████████████████████████████████                     16:04:05

18  BY MR. KIM:                                             16:04:05

19      Q.   And that's for Board █ for Fuji?                16:04:08

20      A.   For Board █ on this document, yes.             16:04:10

21      Q.   What about for Board █ are the channel          16:04:15

22  spacings ████████████████████████?                      16:04:23

23      A.   No.  ████████████████████████████████████

    ██████████████████████████████████████████████████████

    ██████████████████████████████████████                 16:04:36

                                                Page 187

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   What about the distance between diodes for          16:04:39

2   Board ███ for Fuji?                                         16:04:41

3      A.   Board ███ shows a similar behavior.  █████████████  

████████████████████████████████████████████████████████████████

████████████████████████████████                               16:05:01

7      Q.   Does this Exhibit 1060 accurately reflect the       16:05:04

8   angles for Diodes ████████████████████████████              16:05:09

9   within two decimal points?                                  16:05:12

10         (Witness reviews documents.)                         16:05:48

11     A.   The angles in the "Angle" columns for ██████████    

████████████████████████████████████ accurately represent the  16:05:58

13  magnitude of the angles to a couple decimal places.         16:06:03

14  However, I note that there's a sign inversion.  The         16:06:09

15  sign is flipped.                                            16:06:11

16     Q.   And why is there a sign inversion?                  16:06:15

17     A.   It looks like a mistake in this document.           16:06:21

18     Q.   You're talking about Exhibit 1060?                  16:06:24

19     A.   Yes.                                                16:06:24

20     Q.   If the signs were inverted from how they're         16:06:34

21  depicted in 1060, can you tell me whether or not the        16:06:40

22  beam channels under the heading "Delta" accurately          16:06:44

23  reflect the -- the beam channels for ███████████████████    

████████████████████████████ within two decimal places?        16:06:59

25         (Witness performs calculation.)

                                                    Page 188

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   The "Delta" column has a          for          16:08:21

 2                     --                                    16:08:23

 3      Q.   And what is the correct value?                 16:08:25

 4      A.          if I subtract the rounded values.       16:08:29

 5                                                          16:08:37

 6      Q.   Using those corrected numbers, do the beam     16:08:45

 7  channels                                   in Fuji?     16:08:52

 8      A.   No.                                            16:09:06


12      THE REPORTER:  "As we said before" --              16:09:06

13      THE WITNESS:                                        16:09:16

15  BY MR. KIM:                                             16:09:16

16      Q.   And what about the distance between diodes     16:09:19

17  for Board   for Fuji; do they                 ?         16:09:24

18      MR. JAFFE:  Objection; leading.                     16:09:26

19      THE WITNESS:  No.                                   16:09:41

22  BY MR. KIM:                                             16:09:41

23      Q.   What about Board    do you know if those       16:09:49

24  would likely have                                       16:09:59
```

Page 189

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.    I have not looked at those angles.  Are you          16:10:08

2  asking me to calculate that?                                 16:10:10

3    Q.    Well, I'm wondering if you can -- referring          16:10:13

4  to Exhibit B, if there's anything you can tell me            16:10:18

5  about the diode angles and whet er they ███        ██████████

   ████████████████████████████████████████████████             16:10:27

7    A.    Specifically you're asking whether the angles        16:10:31

8  change or the delta or channel spacing --                    16:10:35

9    Q.    Let's start with the delta.                          16:10:37

10   A.    Okay.  I would have to go ahead and just             16:10:41

11 calculate those out, to calculate all the deltas.  I'm       16:10:44

12 not sure I would expect anything different than I'm          16:10:48

13 seeing on the lower portion of ████████████                  16:10:53

14   Q.    Before you do that, let me ask you, are              16:11:02

15 Boards ███████████████████████████████████████████

   ████████████████████                                         16:11:13

17   A. ████████████████████████████████████████████████

   ███████████████████████████████████████████████████████████

   ██████████████████████                                       16:11:27

20   Q.    Why is that?                                         16:11:29

21   A. ███████████████████████████████████████████████

   ███████████████████████████████████████████████████████████
   ███████████████████████████████████████████████████████████
   ███████████████████████████████████████████████████████████
   ███████████████████████████████████████████████████████████

   ████████████████████████████████████████████████             16:11:52

Page 190



1  ████████████████████████████████████████

   █████████████████████              █████████

   ████████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████

   ████████████████████████                16:12:23

8      Q.    Referring back to Exhibit 1060, earlier you   16:12:29

9  were asked about ████████████████████████████

   ████████████████████████                16:12:36

11         Do you recall that?                16:12:37

12     A.    Yes.                            16:12:37

13     Q.    For Board █ in Fuji, does the distance   16:12:43

14  between ████████████████████████████████   

   ███████████████████████████████?        16:12:55

16     A.    I'm sorry.  You've asked whether the distance   16:13:00

17  between the █████████████--              16:13:05

18     THE REPORTER:  I'm sorry, I can't -- what?   16:13:11

19     THE WITNESS:  You've asked whether the two ████████   16:13:19

   ████████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████

   ████████████████████████████            16:13:37

25  BY MR. KIM:

                                        Page 191

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q.   Um-hum.  Let me ask it a different way.        16:13:45

 2           Does the ████████████████████████████████████

 ████████████████████████████████████████████████████████

 ████████████████████████████████████████████████

 ██████████████████████████████████████████?              16:14:10

 6      MR. JAFFE:  Objection; form, leading.              16:14:14

 7      THE WITNESS:  There is a ███████████████████████

 ████████████████████████████████████████████████████████

 ████████████████████████████████████████████████████████

 ████████████████████████████                             16:14:40

12   BY MR. KIM:                                           16:14:40

13      Q.   Okay.  And earlier you were asked about the   16:14:47

14   term ████████████████████  correct?                   16:14:48

15      A.   Yes.                                          16:14:50

16      Q.   And ███████████████████  refers to what when   16:14:53

17   you're using the term?                                16:14:56

18      A.   It depends on the context.  I have to be      16:14:59

19   careful to clarify. ██████████████████████  ██████████

 ████████████████████████████████████████████████████████

 ████████████████████████████████████████████████████████

 ███████████████████████████                              16:15:20

24      Q.   And how -- how do you use the term?           16:15:23

25      A.   Most of the time we've been talking, at Uber,  16:15:31

                                                   Page 192
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    about ███████████████  I would have assumed it just    16:15:36

 2    meant angle.                                           16:15:37

 3        Q.   Angular spacing?                              16:15:38

 4        A.   Angular spacing.                              16:15:40

 5        MR. JAFFE:  Sorry.  Objection; leading to the last 16:15:58

 6    question.                                              16:15:58

 7    BY MR. KIM:                                            16:15:58

 8        Q.   Okay.  Can we go back to Exhibit 160.         16:16:04

 9             Take a look at the second page, bearing Bates 16:16:35

10    stamp UBER00008496.                                    16:16:41

11        A.   Yes.                                          16:16:41

12        Q.   And do you see the values next to angles      16:16:49

13    ████████████████████████████████                      16:16:56

14        A.   Yes.                                          16:16:57

15        Q.   Do the deltas █████████████████████████████   

      ██████████████                                         16:17:04

17             (Witness performs calculation.)

18        A.   Yes.                                          16:17:22

19        Q.   And when you were asked about -- in the       16:17:25

20    e-mail at the end of this document, under "A" --       16:17:33

21        A.   Yes.                                          16:17:39

22        Q.   -- where it says, ████████████████████ ██████ 

23    ██████████████████████████                             16:17:46

24        A.   Yes.                                          16:17:46

25        Q.   And you were asked if that would describe     16:17:49
```

Page 193

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Fuji. | 16:17:50 |
| 2 | Do you recall that? | 16:17:52 |
| 3 | A.   I think so. | 16:17:55 |
| 4 | Q.   Would that also apply to Velodyne's LiDAR | 16:17:59 |
| 5 | too? | 16:18:00 |
| 6 | MR. JAFFE:  Objection; form, leading. | 16:18:02 |
| 7 | THE WITNESS:  Could you be more specific. | 16:18:05 |
| 8 | BY MR. KIM: | 16:18:06 |
| 9 | Q.   Does Velodyne have a LiDAR with 64 beams? | 16:18:10 |
| 10 | MR. JAFFE:  Same objections. | 16:18:11 |
| 11 | THE WITNESS:  Yes, Velodyne has a LiDAR with 64 | 16:18:14 |
| 12 | beams. | 16:18:15 |
| 13 | BY MR. KIM: | 16:18:15 |
| 14 | Q.   And can you place them individually? | 16:18:17 |
| 15 | MR. JAFFE:  Same objections. | 16:18:21 |
| 16 | THE WITNESS:  Can?  Within some limit, that they | 16:18:25 |
| 17 | don't crash into each other, but Velodyne 64 doesn't. | 16:18:34 |
| 18 | BY MR. KIM: | 16:18:34 |
| 19 | Q.   Do you know one way or the other whether or | 16:18:37 |
| 20 | not A specifically refers to the Fuji design? | 16:18:41 |
| 21 | A.   I'm sorry.  What do you mean? | 16:18:43 |
| 22 | Q.   Do you know whether A was intended -- do you | 16:18:46 |
| 23 | know one way or the other whether A was intended to | 16:18:49 |
| 24 | refer to Fuji? | 16:18:51 |
| 25 | MR. JAFFE:  Objection; form. | 16:18:52 |

Page 194

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  This does not refer to Fuji.  It | 16:19:00 |
| 2 | could not refer to Fuji.  And if you look at the | 16:19:08 |
| 3 | e-mail -- let me find this.  Sorry. | 16:19:14 |
| 4 | Perhaps Section B discussion -- it sounds to | 16:19:22 |
| 5 | me like this is discussing Spider, where we're talking | 16:19:28 |
| 6 | about groups of eight.  The date would be consistent | 16:19:33 |
| 7 | with what we ultimately called Spider. | 16:19:41 |
| 8 | BY MR. KIM: | 16:19:41 |
| 9 | Q.   Okay.  So looking at UBER00008499, you | 16:19:50 |
| 10 | believe that what's described in A there that you were | 16:19:53 |
| 11 | asked about earlier actually refers to Spider and not | 16:19:56 |
| 12 | Fuji? | 16:19:58 |
| 13 | A.   That's what it seems like to me, yes. | 16:20:01 |
| 14 | Q.   I would like to go back to your Exhibit B | 16:20:11 |
| 15 | from your original declaration. | 16:20:14 |
| 16 | Do you see that column with the heading | 16:20:32 |
| 17 | ███████████ | |
| 18 | A.   Yes.  There's two. | 16:20:36 |
| 19 | Q.   Okay.  Let's look at the leftmost column. | 16:20:42 |
| 20 | A.   Yes. | 16:20:43 |
| 21 | Q.   Are ████████████████████████████ | |
| | ███████████ on Fuji boards? | 16:20:49 |
| 23 | MR. JAFFE:  Objection; form and leading. | 16:20:52 |
| 24 | THE WITNESS:  No.  As I understand it, the | 16:20:55 |
| 25 | ████████████████████████████ | 16:21:01 |

Page 195

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    ████████████████████████████████████        16:21:04

2    BY MR. KIM:                                   16:21:04

3        Q.    Do you have an understanding as to why there   16:21:07

4    are ████████████ listed there?               16:21:09

5        A.    Yeah.   As I was discussing earlier, my   16:21:17

6    understanding is these coordinates referencing the   16:21:22

7    ████████████ were generated early in the development of   16:21:29

8    Fuji when ██████████████████████████████████   16:21:33

9    More specifically, these coordinates were given to the   16:21:37

10   electrical engineer before the electrical engineer had   16:21:39

11   laid out the circuits onto the board and added the   16:21:42

12   fiducial mark onto the board.                 16:21:45

13       Q.    Are there any plans at Uber to use ████████████

14   ██████████████████████████████████ on any transmit boards for   16:22:07

15   Fuji?                                          16:22:08

16       A.    Not that I'm aware of.             16:22:11

17       Q.    Okay.   You can set that one aside.   16:22:28

18            Actually, a couple follow-up questions on   16:22:46

19   Exhibit 155.                                   16:22:48

20            I believe you were asked when this document   16:22:52

21   was created -- let me just ask it.            16:22:56

22            Do you know when this document was created?   16:22:58

23       MR. JAFFE:   Objection; form.             16:23:01

24       THE WITNESS:   Which version are you referring to?   16:23:03

25   BY MR. KIM:                                    16:23:03
```

Page 196

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Do you know if these numbers in Exhibit | 16:23:08 |
| 2 | 155 -- if they are still accurate today for Fuji? | 16:23:12 |
| 3 | A.   To my knowledge, the numbers in this document | 16:23:16 |
| 4 | are still accurate to what we're placing on our laser | 16:23:20 |
| 5 | diode boards.  We have not revised or changed the | 16:23:25 |
| 6 | design of our ███████ laser boards -- | 16:23:29 |
| 7 | Q.   Since what time? | 16:23:30 |
| 8 | A.   -- or ███████ for that matter. | 16:23:34 |
| 9 | Since they were first built. | 16:23:36 |
| 10 | Q.   And when was that? | 16:23:37 |
| 11 | A.   Sometime in December the design was created | 16:23:48 |
| 12 | by the electrical engineer and sent out.  Sometime in | 16:23:51 |
| 13 | mid January, we first placed laser diodes on this | 16:24:00 |
| 14 | board. | 16:24:00 |
| 15 | Q.   Just to be clear, so -- | 16:24:02 |
| 16 | A.   Let me be specific.  On Board A. | 16:24:05 |
| 17 | Q.   Sure. | 16:24:05 |
| 18 | Okay.  Document 155, this was not created for | 16:24:13 |
| 19 | the purposes of litigation; is that correct? | 16:24:15 |
| 20 | A.   That's correct. | 16:24:17 |
| 21 | Q.   Was this created in the ordinary course of | 16:24:20 |
| 22 | business, to your knowledge? | 16:24:21 |
| 23 | A.   Yes. | 16:24:22 |
| 24 | Q.   So how does the information reflected in 155 | 16:24:38 |
| 25 | relate to the beam parameters that you received from | 16:24:45 |

Page 197

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Scott Boehmke -- | 16:24:46 |
| 2 | MR. JAFFE:  Objection; leading, outside the scope. | 16:24:51 |
| 3 | BY MR. KIM: | 16:24:51 |
| 4 | Q.   -- that you discussed in paragraph 18 of your | 16:24:55 |
| 5 | original declaration? | 16:24:57 |
| 6 | MR. JAFFE:  Objection; outside the scope, improper | 16:25:00 |
| 7 | redirect. | 16:25:01 |
| 8 | THE WITNESS:  155?  151? | 16:25:20 |
| 9 | BY MR. KIM: | |
| 10 | Q.   It's either 151 or 152.  It's 151. | 16:25:26 |
| 11 | (Witness reviews documents.) | 16:25:58 |
| 12 | A.   Do you have a paragraph? | 16:25:59 |
| 13 | Q.   Paragraph 18. | 16:26:00 |
| 14 | A.   Thank you.  Okay.  Okay.  18. | 16:26:08 |
| 15 | (Witness reviews document.) | 16:26:19 |
| 16 | A.   Okay. | 16:26:20 |
| 17 | Q.   And for the record, earlier today you were | 16:26:22 |
| 18 | asked about this paragraph. | 16:26:25 |
| 19 | Do you recall that? | 16:26:26 |
| 20 | A.   Yes. | 16:26:26 |
| 21 | MR. JAFFE:  Objection; leading. | 16:26:29 |
| 22 | BY MR. KIM: | 16:26:29 |
| 23 | Q.   And you were asked about whether there was | 16:26:33 |
| 24 | any evidence that the information you received from | 16:26:38 |
| 25 | Scott Boehmke referred to in this paragraph was | 16:26:41 |

Page 198

| | | |
|---|---|---|
| 1 | actually used in Fuji, and you referred to CAD files. | 16:26:45 |
| 2 | What did you -- what CAD files are you | 16:26:47 |
| 3 | referring to? | 16:26:47 |
| 4 | MR. JAFFE:  Objection; form and leading. | 16:26:51 |
| 5 | THE WITNESS:  I was referring -- | 16:26:52 |
| 6 | MR. JAFFE:  Beyond the scope. | 16:26:55 |
| 7 | THE WITNESS:  I was referring to mechanical CAD | 16:26:58 |
| 8 | files in the SolidWorks software created by Gaetan | 16:27:05 |
| 9 | that have the angles specified by Scott Boehmke that | 16:27:14 |
| 10 | end up terminating in a set of points for each laser | 16:27:20 |
| 11 | diode emitting point. | 16:27:24 |
| 12 | He then also included a CAD model of the | 16:27:29 |
| 13 | laser board outline that he developed that also had | 16:27:33 |
| 14 | those same emitting points on there.  And then, | 16:27:41 |
| 15 | finally, you can see the theta angle matches the | 16:27:46 |
| 16 | prescribed angles that we got from Scott. | 16:27:50 |
| 17 | BY MR. KIM: | 16:27:50 |
| 18 | Q.   Can you explain step by step the process from | 16:27:54 |
| 19 | going from the angles that you received from Scott -- | 16:27:57 |
| 20 | A.   Okay. | |
| 21 | Q.   -- to what ultimately ended up being the | 16:28:02 |
| 22 | diode placement angles reflected in Exhibit B of your | 16:28:08 |
| 23 | original declaration and marked as Exhibit 155 for | 16:28:11 |
| 24 | your deposition? | 16:28:13 |
| 25 | MR. JAFFE:  Objection; form, leading.  This is | 16:28:15 |

Page 199

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | improper redirect, outside the scope.  We're just | 16:28:20 |
| 2 | going to object to all this evidence; I think I've | 16:28:24 |
| 3 | made that clear. | 16:28:25 |
| 4 |     THE WITNESS:  My understanding of the process that | 16:28:28 |
| 5 | led to the coordinates we have in Exhibit 155, | 16:28:32 |
| 6 | starting with angles that Scott Boehmke provided, was | 16:28:36 |
| 7 | that Gaetan designed a lens in Zemax.  We had decided | 16:28:44 |
| 8 | on 150 millimeter focal length, chosen material for | 16:28:49 |
| 9 | the lens. | 16:28:50 |
| 10 |         From the lens optimization provided by the | 16:28:52 |
| 11 | Zemax software, we had the focal length behind the | 16:28:59 |
| 12 | lens to the beginning of a focal surface.  And he had | 16:29:05 |
| 13 | a radius of curvature for the focal surface. | 16:29:10 |
| 14 |         From that information in Zemax, you can take | 16:29:14 |
| 15 | that into SolidWorks software, model up a curved | 16:29:19 |
| 16 | surface with the same radius of curvature as the focal | 16:29:23 |
| 17 | surface defined by Zemax.  That could be -- he modeled | 16:29:30 |
| 18 | that at a location behind the lens with a consistent | 16:29:36 |
| 19 | focal length developed in Zemax. | 16:29:41 |
| 20 |         He then, as I understand it, created lines or | 16:29:48 |
| 21 | rays in the CAD geometry that reflected the vertical | 16:29:52 |
| 22 | angles specified by Scott Boehmke, one by one, | 16:29:57 |
| 23 | individually, for the ███ different beam angles for the | 16:30:01 |
| 24 | ██████ boards in the mid-range cavity. | 16:30:05 |
| 25 |         He extended those lines or rays until it | 16:30:10 |

Page 200

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | intersected this curved focal surface.  The point of | 16:30:17 |
| 2 | intersection defined the location for the laser diodes | 16:30:23 |
| 3 | emitting surface.  He then put that into his model, | 16:30:30 |
| 4 | modeled a PCB behind that. | 16:30:33 |
| 5 |      In this case specifically, he had ███████ | 16:30:40 |
| 6 | So he had ████████████ where rays would | 16:30:48 |
| 7 | intersect a -- I guess you would call this a | 16:30:54 |
| 8 | two-dimensional flat, curved focal surface. | 16:30:57 |
| 9 |      From that, he had designed this laser board | 16:31:06 |
| 10 | mechanical outline relative to that outline and | 16:31:10 |
| 11 | relative to the mounting features that were included | 16:31:13 |
| 12 | in that design, including ██████████.  He had | 16:31:16 |
| 13 | locations for laser diodes on that board. | 16:31:21 |
| 14 |      Individually, those models of the Laser | 16:31:28 |
| 15 | Boards ██████ were sent to the electrical | 16:31:32 |
| 16 | engineer, Will Treichler, who then proceeded to lay | 16:31:38 |
| 17 | out the circuit behind each of the laser diodes. | 16:31:41 |
| 18 | BY MR. KIM: | |
| 19 |    Q.   And earlier I believe you mentioned Florin. | 16:31:49 |
| 20 |      What was Florin's role in all this? | 16:31:52 |
| 21 |    A.   Florin is another electrical engineer.  He | 16:31:55 |
| 22 | used to work at Velodyne.  I consider him a senior | 16:32:00 |
| 23 | electrical engineer.  So I asked him to design some | 16:32:02 |
| 24 | candidate laser pulsing circuits.  He designed that | 16:32:09 |
| 25 | test board.  And the circuits on there, he tested the | 16:32:15 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | output, selected one as a preferred candidate and gave | 16:32:21 |
| 2 | that circuit design to Will Treichler so that Will | 16:32:26 |
| 3 | could do the layout of all ▮ channels, basically | 16:32:30 |
| 4 | copying that one circuit ▮ times. | 16:32:33 |
| 5 | Q.   You mentioned ▮, that was work -- | 16:32:40 |
| 6 | when did ▮ start? | 16:32:43 |
| 7 | A.   I don't know.  It was -- it seemed to be | 16:32:49 |
| 8 | under way by the time I already came to Otto.  So I | 16:32:54 |
| 9 | can't say when it started. | 16:32:55 |
| 10 | Q.   And you started at Otto when? | 16:32:56 |
| 11 | A.   Early May 2016. | 16:33:00 |
| 12 | Q.   And ▮, what did that relate to? | 16:33:06 |
| 13 | MR. JAFFE:  Objection; form. | 16:33:09 |
| 14 | THE WITNESS: ▮ referred to what appeared | 16:33:15 |
| 15 | to me to be a direct diode projection LiDAR sensor. | 16:33:21 |
| 16 | BY MR. KIM: | 16:33:21 |
| 17 | Q.   And was ▮ -- any of the work from | 16:33:28 |
| 18 | ▮ incorporated into Fuji? | 16:33:31 |
| 19 | A.   Yes.  The FAC lens design that was designed | 16:33:37 |
| 20 | during that time frame, ultimately arrived from the | 16:33:41 |
| 21 | supplier, was available when we needed to decide | 16:33:45 |
| 22 | whether to pivot to Fuji and has since become part of | 16:33:50 |
| 23 | the Fuji product. | 16:33:52 |
| 24 | Furthermore, I believe at that same time | 16:33:56 |
| 25 | frame, laser diodes had been purchased and we probably | 16:34:00 |

Page 202

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    used those laser diodes as well.                  16:34:03

 2        Q.   Were there any other components of Fuji that  16:34:11

 3    were started prior to October 2016?              16:34:14

 4        MR. JAFFE:  Objection; leading, form.        16:34:17

 5        THE WITNESS:  I don't recall any -- any others.  16:34:25

 6    BY MR. KIM:                                       16:34:25

 7        Q.   If we can turn to your supplemental      16:34:34

 8    declaration.  I believe that's No. 152.  Turn to  16:34:56

 9    paragraph 7.                                      16:34:57

10        Why didn't you mention Anthony Levandowski in  16:35:05

11    paragraph 7?                                      16:35:07

12        MR. JAFFE:  Objection; form.                  16:35:12

13        THE WITNESS:  I don't see the point of mentioning  16:35:14

14    Anthony Levandowski in paragraph 7.              16:35:18

15    BY MR. KIM:                                       16:35:18

16        Q.   What was paragraph 7 intended to convey?  16:35:23

17        A.   Paragraph 7 conveys the design of Spider --  16:35:32

18    or some aspect of the design of Spider, specifically  16:35:38

19    the fiber laser.                                  16:35:39

20        Q.   Let's move to paragraph No. 13.          16:35:57

21        Do you recall being asked whether or not the  16:36:11

22    figure depicted in paragraph 13 disclosed  ████████  16:36:20

23        A.   Yes.                                     16:36:20

24        Q.   And you said it was implied.             16:36:23

25        What did you mean by that?                    16:36:25
```

Page 203

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        MR. JAFFE:  Objection; leading and form.        16:36:28

 2        THE WITNESS:  What I was trying to convey was if a    16:36:32

 3   person was familiar with this spreadsheet and what    16:36:36

 4   these fields meant, that you would understand that  ████████

     ██████████████████████████████████████████████████████

     ███████████████████████████████████████████         16:36:55

 7            So ███████████████████████████████████████████

     ████████████         And so this -- in my opinion, this documents    16:37:03

 9   at some point in time knowledge of our design intent    16:37:07

10   to have  ██████████████████████████████            16:37:10

11   BY MR. KIM:                                         16:37:10

12        Q.   And what document is this screen shot taken    16:37:17

13   from or excerpt taken from?                         16:37:20

14        MR. JAFFE:  Objection; leading.                16:37:21

15        THE WITNESS:  My understanding is this came from    16:37:23

16   the spreadsheet that Scott used to define the vertical    16:37:28

17   angles for the LiDAR designs, including Fuji.       16:37:32

18   BY MR. KIM:                                         16:37:32

19        Q.   Is that the spreadsheet that you used to    16:37:36

20   determine the diode placement for Fuji?            16:37:41

21        A.   Yes, that's my understanding.             16:37:44

22        MR. KIM:  Mark this.                           16:38:52

23        MR. JAFFE:  Are you marking a new exhibit on    16:38:55

24   redirect?  Mr. Kim?                                 16:39:02

25        MR. KIM:  Yes.                                 16:39:03
```

Page 204

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. JAFFE:  Are you trying to mark a new exhibit | 16:39:05 |
| 2 | on redirect? | 16:39:06 |
| 3 | MR. KIM:  This is an Exhibit I to Mr. Boehmke's | 16:39:13 |
| 4 | declaration. | 16:39:14 |
| 5 | MR. JAFFE:  You're not answering my question. | 16:39:15 |
| 6 | Are you trying to introduce a new exhibit on | 16:39:18 |
| 7 | redirect? | 16:39:19 |
| 8 | MR. KIM:  I am. | 16:39:20 |
| 9 | MR. JAFFE:  Okay.  We're going to object to this | 16:39:22 |
| 10 | exhibit as clearly outside the scope, and we're going | 16:39:25 |
| 11 | to move to strike all of this testimony.  So I want to | 16:39:27 |
| 12 | make that clear for the record. | |
| 13 | This is a court-ordered deposition because | 16:39:30 |
| 14 | you sandbagged us on surreply.  And you're trying to | 16:39:34 |
| 15 | introduce more evidence. | 16:39:35 |
| 16 | MR. KIM:  I'm just trying to confirm -- | |
| 17 | MR. JAFFE:  That's egregious. | 16:39:35 |
| 18 | MR. KIM:  I'm asking him about the source of | 16:39:39 |
| 19 | what's depicted on page 8 of his supplemental | 16:39:42 |
| 20 | declaration, which you questioned him extensively on. | 16:39:43 |
| 21 | MR. JAFFE:  I did not question him on this | 16:39:49 |
| 22 | exhibit. | 16:39:50 |
| 23 | MR. KIM:  You questioned him on the surreply.  And | 16:39:50 |
| 24 | you've asked him for what document -- documentary | 16:39:54 |
| 25 | evidence exists to show that the beam parameters that | 16:40:00 |

Page 205

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | he received from Mr. Boehmke were used to determine | 16:40:04 |
| 2 | the diode placement for the Fuji transmit boards. | 16:40:09 |
| 3 | MR. JAFFE:  And now you're just coaching the | 16:40:12 |
| 4 | witness.  So that's fine. | 16:40:13 |
| 5 | So we're going to object to all this | 16:40:15 |
| 6 | testimony. | 16:40:16 |
| 7 | MR. KIM:  Okay.  So -- understood. | 16:40:20 |
| 8 | MR. JAFFE:  Do I have a running objection to this | 16:40:23 |
| 9 | document? | 16:40:23 |
| 10 | MR. KIM:  Yes, you do. | 16:40:25 |
| 11 | MR. JAFFE:  Okay. | 16:40:25 |
| 12 | MR. KIM:  Can we mark that as Document 1061. | 16:40:29 |
| 13 | MR. JAFFE:  This is completely improper. | 16:40:31 |
| 14 | (Defendants' Exhibit 1061 was marked.) | 16:40:49 |
| 15 | BY MR. KIM: | 16:40:49 |
| 16 | Q.  So, Mr. Haslim, what's been marked as 1061, | 16:40:53 |
| 17 | is that what's -- is this the source document for what | 16:40:58 |
| 18 | you excerpted in paragraph 13 of your surreply? | 16:41:04 |
| 19 | MR. JAFFE:  Objection; leading and form.  And | 16:41:05 |
| 20 | objection in addition to my running objection. | 16:41:09 |
| 21 | THE WITNESS:  Yes.  This is -- Figure 6 is | 16:41:31 |
| 22 | excerpted from apparently the first page of this | 16:41:36 |
| 23 | spreadsheet. | 16:41:38 |
| 24 | BY MR. KIM: | 16:41:38 |
| 25 | Q.  And this is what you used to -- let me ask it | 16:41:52 |

Page 206

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    a different way.                                16:41:53

 2          Is this -- did you use this -- the        16:41:55

 3    information in this document to arrive at what's 16:42:00

 4    depicted in Document -- Exhibit 155 that we were 16:42:07

 5    discussing earlier?                             16:42:08

 6        MR. JAFFE:  Objection; leading and form.    16:42:11

 7        THE WITNESS:  Yes, to my knowledge, it appears 16:42:27

 8    that this document, Exhibit 1061 -- that that    16:42:31

 9    information was used in the derivation of the    16:42:35

10    information in Exhibit 155.                      16:42:39

11    BY MR. KIM:                                      16:42:39

12        Q.   And how can you tell?                   16:42:43

13        MR. JAFFE:  Same objections.                 16:42:44

14        THE WITNESS:  Besides starting to become familiar 16:42:48

15    with these angles, what I would do is I would take the 16:42:53

16    angles in this first column, "Angle" column.  I would 16:42:58

17    subtract 12, because the cavity was tilted 12 degrees. 16:43:06

18    Realize there's another sign inversion between these 16:43:10

19    two documents.  And I think we can show -- if you want 16:43:14

20    I can do a handful of calculations.  I think it will 16:43:18

21    show that this, therefore, is the source for angles 16:43:21

22    for ███████████                                 16:43:23

23    BY MR. KIM:                                      16:43:23

24        Q.   What calculations could you do?         16:43:25

25        A.   Specifically, like I said, the first telltale 16:43:31
```

Page 207

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 1 | would be looking at the angles, Exhibit 155 "Theta" | 16:43:38 |
| 2 | column and the "Angle" column in Exhibit 1061, noting | 16:43:47 |
| 3 | there would be a 12-degree offset and a sign shift | 16:43:52 |
| 4 | between the angles -- the first ███ angles in Exhibit | 16:43:56 |
| 5 | 1061 and the angles under "Theta" for ████████ | 16:44:05 |
| 6 | Q.   Can you go ahead and do some calculations to | 16:44:07 |
| 7 | verify it. | 16:44:09 |
| 8 | MR. JAFFE:  Objection -- | 16:44:09 |
| 9 | THE WITNESS:  Yes. | 16:44:12 |
| 10 | MR. JAFFE:  -- form, leading.  And still the | 16:44:18 |
| 11 | objection -- same running objection that I mentioned | 16:44:21 |
| 12 | earlier. | 16:44:22 |
| 13 | (Witness performs calculation.) | |
| 14 | THE WITNESS:  How many would you like me to do? | 16:45:01 |
| 15 | I've done the first three angles specified by Scott. | 16:45:05 |
| 16 | And when I invert the sign, subtract 12 degrees, I get | 16:45:10 |
| 17 | ████████████████████████████  Knowing that | 16:45:17 |
| 18 | we decided to ██████████████████████████████ | |

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████  Again, we've seen   16:45:53

Page 208

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | this before, maybe it's a rounding error. | 16:45:57 |
| 2 | Do you want me to do any more? | 16:46:02 |
| 3 | Q. No, that's fine. | 16:46:03 |
| 4 | Can you turn to page 11 of your supplemental | 16:46:06 |
| 5 | declaration. | 16:46:07 |
| 6 | MR. JAFFE: How long are you planning to go, | 16:46:14 |
| 7 | Mr. Kim? Shall we take a break? We've been going an | 16:46:18 |
| 8 | hour. | 16:46:18 |
| 9 | MR. KIM: Should be wrapping up soon. | 16:46:21 |
| 10 | THE WITNESS: What's the number? Is that 151? | 16:46:23 |
| 11 | BY MR. KIM: | 16:46:23 |
| 12 | Q. Yes -- 152. | 16:46:29 |
| 13 | A. 152? | |
| 14 | Q. Yes, 152. | |
| 15 | A. I got it. | 16:46:32 |
| 16 | Q. Okay. Remember you were asked about -- | 16:46:34 |
| 17 | A. Sorry. Paragraph? | 16:46:35 |
| 18 | Q. Page 11. | 16:46:36 |
| 19 | A. Page 11. | 16:46:37 |
| 20 | Q. You were asked about the table depicted in | 16:46:42 |
| 21 | page 11. | 16:46:42 |
| 22 | Do you recall that? | 16:46:43 |
| 23 | A. Yes. | 16:46:44 |
| 24 | Q. And you were asked whether or not it was | 16:46:46 |
| 25 | modified with the letters ███████ | 16:46:51 |

Page 209

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yes. | 16:46:51 |
| 2 | Q.   Was it modified in any other way other than | 16:46:54 |
| 3 | the addition of ████████ -- the letters and colors | 16:46:58 |
| 4 | in the first column? | 16:47:01 |
| 5 | A.   No.  I think . . . check the exact angles | 16:47:07 |
| 6 | again from Scott's exhibit.  Go back up to the top. | 16:47:24 |
| 7 | (Witness reviews document.) | 16:47:24 |
| 8 | A.   Okay.  These are the same angles as in | 16:47:46 |
| 9 | Scott's spreadsheet. | 16:47:47 |
| 10 | Q.   What was the source of what's depicted on | 16:47:50 |
| 11 | page 11 of your supplemental declaration? | 16:47:53 |
| 12 | MR. JAFFE:  Objection; form. | 16:47:55 |
| 13 | THE WITNESS:  The source of the angle and the | 16:47:57 |
| 14 | delta would have been directly from Scott's | 16:47:58 |
| 15 | spreadsheet.  The source of the ████████ could have | 16:48:05 |
| 16 | come from me telling whoever prepared this that █ had | 16:48:08 |
| 17 | ████████████.  And it could also be | 16:48:11 |
| 18 | determined independently by looking at Exhibit 155 and | 16:48:18 |
| 19 | looking at the theta board -- excuse me -- the theta | 16:48:21 |
| 20 | angles associated with Boards ████████likewise for | 16:48:26 |
| 21 | ████████ | 16:48:27 |
| 22 | Q.   Can you confirm whether or not those | 16:48:28 |
| 23 | notations are accurate? | 16:48:30 |
| 24 | A.   Yes.  So, again, going through the difference | 16:48:37 |
| 25 | between Exhibit 155, being that it has 12 degrees | 16:48:41 |

Page 210

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    removed and a sign change, I can immediately --
```

```
                      should be consistent.          16:49:00
```

```
 5           I'm going to take the next angle down that's   16:49:03
 6    labeled "A" in green.
                              in Exhibit 155.         16:49:19
 8           At this point, we've got our pattern     16:49:23
 9    The only board left is     so I'm not going to bore   16:49:27
10    you.  The whole purpose of going to
```

```
                                                     16:49:44
15           Do you want me to do it for              16:49:48
16    Q.   Sure.                                      16:49:55
17    MR. JAFFE:  Objection; form and leading.        16:49:58
18    THE REPORTER:  And at some point, I need to take a   16:49:58
19    break to send the transcript because I'm --
20    MR. KIM:  Okay.
21    MR. JAFFE:  Okay.
22    MR. KIM:  Okay.  Do you want to take a break now?
23    THE REPORTER:  Yes, I really do.
24    MR. KIM:  Let's take a break now.               16:50:17
25    THE VIDEOGRAPHER:  We are off the record at 4:50   16:50:19
```

Page 211

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | p.m. | 16:50:19 |
| 2 | (Recess taken.) | |
| 3 | THE VIDEOGRAPHER:  We are back on the record at | 17:03:55 |
| 4 | 5:04 p.m. | 17:03:57 |
| 5 | BY MR. KIM: | 17:03:57 |
| 6 | Q.   Mr. Haslim, we were going over your | 17:04:00 |
| 7 | supplemental declaration. | 17:04:03 |
| 8 | If you could turn to page 12 of that | 17:04:09 |
| 9 | document. | 17:04:09 |
| 10 | A.   Yes. | 17:04:10 |
| 11 | MR. JAFFE:  I'm sorry.  I just realized I left | 17:04:13 |
| 12 | something on the printer.  Just give me 30 seconds, | 17:04:17 |
| 13 | less than 30 seconds. | 17:04:19 |
| 14 | (Pause in proceedings.) | 17:05:26 |
| 15 | (Discussion off the record.) | 17:05:26 |
| 16 | MR. KIM:  Are we still on? | 17:05:36 |
| 17 | THE VIDEOGRAPHER:  Yes. | 17:05:37 |
| 18 | MR. KIM:  Okay. | 17:05:38 |
| 19 | BY MR. KIM: | 17:05:38 |
| 20 | Q.   Mr. Haslim, we were discussing Depo Exhibit | 17:05:42 |
| 21 | 152, which is your supplemental declaration. | 17:05:45 |
| 22 | And you recall being asked about the chart on | 17:05:48 |
| 23 | page 12? | 17:05:50 |
| 24 | A.   Yes. | 17:05:51 |
| 25 | Q.   And you were asked whether or not this chart | 17:05:54 |

Page 212

```
 1    references vertical spacing of the diodes.              17:05:58

 2           Do you recall that?                              17:06:00

 3       MR. JAFFE:  Objection; leading, form.                17:06:01

 4       THE WITNESS:  Not exactly.  I don't remember         17:06:03

 5    exactly how I was asked.                                17:06:05

 6    BY MR. KIM:                                             17:06:05

 7       Q.   Let me just ask you:  Does this reference       17:06:08

 8    vertical spacing of diodes for the Fuji?               17:06:13

 9       MR. JAFFE:  Objection; form.                         17:06:15

10       THE WITNESS:  The columns labeled "Current," to my   17:06:20

11    knowledge, represent the vertical channel angles of     17:06:26

12    the Fuji.  So the difference between them could be       17:06:29

13    vertical spacing, if it's meant to imply a vertical      17:06:33

14    angle.                                                  17:06:35

15    BY MR. KIM:                                             17:06:35

16       Q.   Okay.  What are the numbers listed under the    17:06:37

17    heading "November 16"?                                  17:06:39

18       A.   Those are angles prescribed by Scott Boehmke    17:06:45

19    in a version of his spreadsheet dated November 16th.    17:06:51

20       Q.   And is that the same document we were looking   17:06:53

21    at earlier?                                             17:06:54

22       A.   Yes.  That would be Exhibit 1061.               17:07:06

23       Q.   Are the numbers accurate?  Are -- the numbers   17:07:10

24    in 152 accurately reflect what was in the November 16   17:07:16

25    document, which is labeled 1061?                        17:07:20
```

Page 213

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              (Witness reviews documents.)              17:08:31

 2       A.    Yes.  Page 12, columns for ████████  laser  17:08:35

 3   boards under the column "November 16" are accurately  17:08:38

 4   representing the angles in Exhibit 1061.              17:08:45

 5       Q.    What about the numbers under the "Current"  17:08:46

 6   heading; where are those from?                        17:08:49

 7       A.    Those are representative of what we're       17:08:53

 8   actually building into the Fuji.  Those would be      17:08:57

 9   mirrored after a sign change in a 12 degree offset in  17:09:06

10   the theta angles listed on Exhibit 155 representing    17:09:13

11   the actual angles of the laser diodes and their        17:09:18

12   intended pointing angles.                              17:09:20

13       Q.    And the numbers in the chart on page 12 of   17:09:23

14   Exhibit 152, your supplemental declaration, do they    17:09:27

15   appear to be accurate?                                 17:09:30

16       A.    152 is right in front of me.                 17:09:41

17             Repeat your question.                         17:09:42

18       Q.    Do -- the numbers under the "Current"        17:09:43

19   heading, are they accurate?                            17:09:46

20       MR. JAFFE:  Objection; leading, form.              17:09:49

21       THE WITNESS:  I feel like we went through an       17:09:55

22   exercise like this.  So when you say "accurate," do    17:10:13

23   you have a tolerance --                                17:10:15

24       THE REPORTER:  "Tolerance bend"?                   17:10:09

25       THE WITNESS:  -- tolerance bend on that one, or    17:10:20
```

Page 214

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | tolerance range? | 17:10:21 |
| 2 | BY MR. KIM: | |
| 3 | Q.   Can you just describe where these numbers | 17:10:23 |
| 4 | come from generally? | 17:10:25 |
| 5 | A.   So generally, under the "Current" column, | 17:10:28 |
| 6 | these are -- would be the angles that we designed the | 17:10:31 |
| 7 | Fuji to. | 17:10:34 |
| 8 | Q.   And how would you -- are these numbers from | 17:10:40 |
| 9 | Document 155, or are they based on any numbers -- | 17:10:44 |
| 10 | A.   These are reflected after the mathematical | 17:10:53 |
| 11 | offset and sign change.  They're represented in | 17:10:58 |
| 12 | Exhibit 155 or, I should say, reflected in there. | 17:11:03 |
| 13 | They're also the angles -- to my understanding, these | 17:11:07 |
| 14 | are the angles that we used designing Fuji. | 17:11:11 |
| 15 | Q.   Do you see the paragraph right above that | 17:11:38 |
| 16 | chart? | 17:11:43 |
| 17 | A.   Yes. | 17:11:43 |
| 18 | Q.   Is that how -- does that accurately depict | 17:11:47 |
| 19 | how the numbers under the "Current" heading were | 17:11:50 |
| 20 | derived? | 17:11:51 |
| 21 | MR. JAFFE:  Objection; form, leading. | 17:11:54 |
| 22 | THE WITNESS:  I'm sorry.  I don't understand what | 17:11:55 |
| 23 | you're asking. | 17:11:57 |
| 24 | BY MR. KIM: | 17:11:57 |
| 25 | Q.   I'm just asking if you can explain how the | 17:12:01 |

Page 215

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | numbers under the "Current" heading are extracted from | 17:12:05 |
| 2 | the numbers in Document 155. | 17:12:11 |
| 3 | A.   So the theta angles in Document 155 for | 17:12:18 |
| 4 | Boards ███████ need a 12 degree additive offset | 17:12:24 |
| 5 | applied to them and a sign change to the answer in | 17:12:27 |
| 6 | order to represent the angles you see in the "Current" | 17:12:30 |
| 7 | column. | 17:12:31 |
| 8 | The reason for the 12 degrees is that the | 17:12:34 |
| 9 | medium-range cavity is tilted down by 12 degrees.  And | 17:12:39 |
| 10 | as far as the sign change, I attribute that to simply | 17:12:42 |
| 11 | an arbitrary sign convention in the angles that place | 17:12:48 |
| 12 | the -- | 17:12:48 |
| 13 | THE REPORTER:  "That place the" -- | |
| 14 | THE WITNESS:  -- laser diodes on the board. | 17:12:52 |
| 15 | BY MR. KIM: | |
| 16 | Q.   And is that described in the paragraph | 17:12:57 |
| 17 | immediately preceding the table? | 17:13:00 |
| 18 | A.   Let me make sure they account for the sign | 17:13:12 |
| 19 | change. | 17:13:25 |
| 20 | (Witness reviews documents.) | 17:13:25 |
| 21 | A.   So the paragraph before the table that -- | 17:13:34 |
| 22 | referring to in Exhibit 152 describes or accounts for | 17:13:38 |
| 23 | the 12 degree offset.  But as I see it, it doesn't | 17:13:46 |
| 24 | explain the sign change. | 17:13:49 |
| 25 | Q.   So in that paragraph above, where it refers | 17:13:55 |

Page 216

```
 1    to ████████████    where does th t number co e from?    17:13:59

 2        A.   Without explanation, it's implying the sign      17:14:06

 3    change was being taken into consideration to arrive at    17:14:11

 4    the ████████ ██████                                       17:14:15

 5        Q.   And where does that number come from?            17:14:20

 6        MR. JAFFE:  Objection; form, leading.                 17:14:22

 7        THE WITNESS:  Which number?                           17:14:23

 8    BY MR. KIM:                                               17:14:23

 9        Q.   ████████████████                                 17:14:26

10        A.   Okay.  So the theta angle documented for         17:14:36

11    Laser A1 in Exhibit 155 is ██████    This is              17:14:49

12    explaining -- this is a direct one-to-one mapping with    17:14:52

13    the magnitude --                                          17:14:53

14        THE REPORTER:  "The magnitude" --

15        THE WITNESS:  -- magnitude of the number in           17:14:58

16    parentheses, ██████  But the sign change is correcting    17:15:03

17    for the fact that angles under "Theta" in Exhibit 155     17:15:12

18    have an arbitrary sign flip.                              17:15:17

19    BY MR. KIM:                                               17:15:17

20        Q.   So just looking at the number negative ██████    17:15:28

21    for Diode A1, does that accurately reflect the            17:15:37

22    information for A1 in Document 155 with the               17:15:42

23    understanding that there's a sign flip and a negative     17:15:46

24    12 degree offset?                                         17:15:48

25        MR. JAFFE:  Objection; form, leading.                 17:15:50
```

                                                    Page 217

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yes. | 17:15:51 |
| 2 | BY MR. KIM: | 17:15:51 |
| 3 | Q.   And what about the "Delta Degree" column; | 17:15:56 |
| 4 | what does that depict? | 17:15:59 |
| 5 | MR. JAFFE:  Objection; form, leading. | 17:16:02 |
| 6 | THE WITNESS:  So the "Delta" column in 152 is | 17:16:11 |
| 7 | accounting for -- best way to explain it -- is showing | 17:16:18 |
| 8 | a discrepancy between the angles we designed the Fuji | 17:16:24 |
| 9 | to and the angles prescribed in Scott Boehmke's | 17:16:29 |
| 10 | November 16th file revision. | 17:16:32 |
| 11 | BY MR. KIM: | 17:16:32 |
| 12 | Q.   So how did you calculate those numbers? | 17:16:34 |
| 13 | A.   The "Delta Degree" column is simply the | 17:16:38 |
| 14 | difference between numbers in the same row to the left | 17:16:43 |
| 15 | of it.  That is to say, for instance, in ██████████ | 17:16:53 |
| 16 | ████████████ under the "November 16" column and a | 17:16:53 |
| 17 | ████████████ under the "Current" column for A1. | 17:16:59 |
| 18 | Those numbers are subtracted.  The answer is | 17:17:03 |
| 19 | placed into the "Delta Degree" column.  And this | 17:17:07 |
| 20 | process would be repeated for Boards ████████ | 17:17:12 |
| 21 | Q.   Do you consider these to be small or large | 17:17:16 |
| 22 | discrepancies? | 17:17:17 |
| 23 | MR. JAFFE:  Objection; form. | 17:17:21 |
| 24 | THE WITNESS:  That's a rather small angle, in my | 17:17:25 |
| 25 | opinion, but it is a discrepancy. | 17:17:28 |

Page 218

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. KIM: | 17:17:28 |
| 2 | Q.    And is there any conclusions you can draw | 17:17:31 |
| 3 | from the fact there is something that you consider to | 17:17:36 |
| 4 | be a small discrepancy? | 17:17:39 |
| 5 | MR. JAFFE:  Objection; form, leading.  Same | 17:17:44 |
| 6 | running objection that I've had on all this testimony | 17:17:46 |
| 7 | as improper redirect and against the court's order. | 17:17:55 |
| 8 | THE WITNESS:  I don't have a definitive | 17:17:55 |
| 9 | understanding for this discrepancy.  I have a | 17:18:03 |
| 10 | suspicion, but I haven't verified it.  So I still | 17:18:08 |
| 11 | don't know for sure why we accumulated this increase | 17:18:12 |
| 12 | in error.  I believe, given the history of working | 17:18:18 |
| 13 | with Scott Boehmke and him coming to the office, that | 17:18:21 |
| 14 | there may have been a revision change while we were | 17:18:27 |
| 15 | working together that somehow maybe didn't get saved | 17:18:31 |
| 16 | into his spreadsheet. | 17:18:32 |
| 17 | BY MR. KIM: | 17:18:32 |
| 18 | Q.    But do you have any doubt that the document | 17:18:38 |
| 19 | you referenced in your declaration and described as | 17:18:42 |
| 20 | the November 16 document, which today you confirm | 17:18:48 |
| 21 | referred to Deposition Exhibit 1061, was the basis for | 17:18:54 |
| 22 | the numbers in your Exhibit B, Document 155? | 17:19:01 |
| 23 | MR. JAFFE:  Objection; leading, form. | 17:19:02 |
| 24 | THE WITNESS:  I'm comfortable saying that I | 17:19:11 |
| 25 | remember Scott's spreadsheet defining the angles that | 17:19:16 |

Page 219

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    we locked in for the Fuji design.  Clearly, we're       17:19:21

 2    showing up to a ▮▮▮▮ degree discrepancy from his        17:19:29

 3    document and this document (indicating).                17:19:30

 4         So I would say it's evidence that he was           17:19:39

 5    working with us -- it supports the fact that he         17:19:42

 6    was working with us, but still raises that              17:19:45

 7    question of that small angle change.                    17:19:48

 8    BY MR. KIM:                                             17:19:48

 9      Q.   After Scott provided you the November 16         17:19:56

10    document, did you work with Scott to further optimize   17:19:59

11    any of these beam angles?                               17:20:02

12       MR. JAFFE:  Objection; leading, form.                17:20:05

13       THE WITNESS:  Somewhere around November 16th, when   17:20:08

14    Scott was visiting with us, we locked down the angles   17:20:12

15    for the Fuji.  We subsequently made one change to the   17:20:17

16    angles.  When it came closer time to actually building  17:20:22

17    the Fuji, we made a design decision to shift the        17:20:27

18    angles for the ▮▮▮▮▮▮ boards.                           17:20:32

19         Scott's original prescription had ▮▮▮▮▮▮▮▮▮

      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                            17:20:41

21    I felt that was wasteful.  I believe his rationale      17:20:45

22    was to accommodate manufacturing tolerances.  So I     17:20:52

23    made a guess at manufacturing tolerance that we        17:20:55

24    could hold comfortably and added an offset for the     17:20:59

25    lasers on ▮▮▮▮▮▮ boards.                               17:21:05
```

Page 220

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Go ahead. | 17:21:07 |
| 2 | BY MR. KIM: | 17:21:07 |
| 3 | Q. Are the current beam angles for ███████ | 17:21:11 |
| 4 | reflected in Exhibit 155 that we were looking at | 17:21:14 |
| 5 | earlier? | 17:21:15 |
| 6 | A. Yes. | 17:21:27 |
| 7 | Q. Okay. | 17:21:34 |
| 8 | A. Let me double check. Hold on. Sorry. | 17:21:37 |
| 9 | (Witness performs calculation.) | |
| 10 | A. Okay. Yes. Angles in Exhibit 155 do appear | 17:22:07 |
| 11 | to be the accurate angles that we designed the Fuji to | 17:22:12 |
| 12 | and -- and started building Fuji to. | 17:22:15 |
| 13 | Q. Earlier you were asked about whether or not | 17:22:23 |
| 14 | Mr. Levandowski had input into the Fuji design. | 17:22:30 |
| 15 | Did Mr. Levandowski have any technical input | 17:22:34 |
| 16 | for the Fuji design? | 17:22:36 |
| 17 | MR. JAFFE: Objection; form, leading. | 17:22:38 |
| 18 | THE WITNESS: To my recollection, the only | 17:22:44 |
| 19 | potentially technical input Anthony Levandowski had on | 17:22:49 |
| 20 | the Fuji design were telling us to make it as good as | 17:22:55 |
| 21 | the Velodyne or better. To under-regard any concerns | 17:23:03 |
| 22 | given to us from people in Pittsburgh regarding size | 17:23:06 |
| 23 | and weight, that that should not be a prioritized | 17:23:09 |
| 24 | requirement. | 17:23:10 |
| 25 | BY MR. KIM: | |

Page 221

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    At the very beginning of your deposition you | 17:23:19 |
| 2 | were asked about whether you had communications with | 17:23:22 |
| 3 | Mr. Levandowski while you were at Tyto. | 17:23:23 |
| 4 | Do you remember that? | 17:23:26 |
| 5 | A.    Vaguely. | 17:23:27 |
| 6 | Q.    When you were asked whether or not he gave | 17:23:32 |
| 7 | you any confidential information, you said you thought | 17:23:36 |
| 8 | it was general information.  What did you mean by | 17:23:39 |
| 9 | that? | 17:23:40 |
| 10 | A.    I believe information Anthony provided | 17:23:50 |
| 11 | regarding a ██████████████████████████ was | 17:23:57 |
| 12 | information that I've seen other places on the | 17:24:02 |
| 13 | Internet as white papers, as publicly-available | 17:24:07 |
| 14 | information in terms of architect or configuration for | 17:24:11 |
| 15 | a laser.  I felt recommendations for vendors would be | 17:24:19 |
| 16 | information, again, publicly available by doing Google | 17:24:23 |
| 17 | search for components like that. | 17:24:26 |
| 18 | Q.    And at the very start of your deposition you | 17:24:32 |
| 19 | were asked about 64 channels and the convenience of | 17:24:34 |
| 20 | two.  Do you recall that line of questioning? | 17:24:37 |
| 21 | A.    Wasn't it the power of two. | 17:24:40 |
| 22 | Q.    Maybe it was the power of two. | 17:24:42 |
| 23 | A.    Yeah. | 17:24:43 |
| 24 | Q.    What was the reason that Fuji had -- or the | 17:24:53 |
| 25 | Fuji design has 64 channels? | 17:24:57 |

Page 222

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    There could be multiple reasons such as | 17:25:05 |
| 2 | initial instructions to make a Velodyne 64, but | 17:25:11 |
| 3 | better.  I considered possibly adding more angles to | 17:25:16 |
| 4 | it.  Scott worked through the spreadsheet with me and | 17:25:23 |
| 5 | was showing me that if we did that, the horizontal | 17:25:26 |
| 6 | angle between subsequent shots of the same laser | 17:25:30 |
| 7 | channel was going to become wider, which would be a | 17:25:33 |
| 8 | detriment to the sensor, and suggested not increasing | 17:25:37 |
| 9 | to a larger number like 80. | 17:25:40 |
| 10 | We've also discussed considerations that | 17:25:44 |
| 11 | there could be some convenience to people writing | 17:25:49 |
| 12 | software that takes the data from the sensor that | 17:25:54 |
| 13 | software had already been written for the Velodyne, | 17:25:57 |
| 14 | and there could be some aspect of convenience or | 17:26:01 |
| 15 | expediency to replace a sensor with one that had | 17:26:05 |
| 16 | identical, as much as possible, data format. | 17:26:10 |
| 17 | MR. KIM:  Okay.  No further questions at this | 17:26:14 |
| 18 | time.  Reserving the right for further redirect. | 17:26:18 |
| 19 | MR. JAFFE:  Okay.  Just again for the record, we | 17:26:25 |
| 20 | object to any redirect as well beyond the court | 17:26:30 |
| 21 | ordered deposition. | 17:26:31 |
| 22 | Uber was not given leave to file | 17:26:34 |
| 23 | anything.  So the time extent that Uber is | 17:26:36 |
| 24 | planning on filing anything or submitting any of | 17:26:39 |
| 25 | that testimony, we are going to move to strike.  I | 17:26:42 |

Page 223

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    want to make that clear on the record before we       17:26:45

 2    get going again.                                       17:26:47

 3                 FURTHER CROSS-EXAMINATION

 4    BY MR. JAFFE:

 5         Q.   So Mr. Haslim, we talked for a long time     17:26:51

 6    earlier today; right?                                  17:26:52

 7         A.   Yes.                                          17:26:52

 8         Q.   Do you stand by your testimony?              17:26:54

 9         A.   To the best of my knowledge, yes.            17:26:58

10         Q.   Is there anything that you said today that   17:27:00

11    was inaccurate?                                        17:27:02

12         A.   Not aware.                                   17:27:03

13         Q.   So everything that we talked about earlier   17:27:05

14    today, you stand by that testimony as true and        17:27:07

15    accurate; right?                                       17:27:09

16         MR. KIM:  Objection; form.                        17:27:11

17         THE WITNESS:  To the best of my knowledge, yes.   17:27:14

18    BY MR. JAFFE:                                          17:27:14

19         Q.   Counsel for Uber introduced a term called   17:27:18

20    ████████████████████                                   17:27:19

21         Do you remember that?                             17:27:20

22         A.   Yes.                                         17:27:20

23         Q.   What is your understanding of the           17:27:21

24    relationship between something that ████████████████   17:27:28
      ████████████████████████████████████████
```

Page 224

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A.   I would say that something that was        17:27:32

2   ████████████████████████████████████████████████████

    ████████████████████████████████                      17:27:37

4        Q.   And so what's your understanding of         17:27:39

5   ████████████  then?                                   17:27:41

6        A.   In the context of what we've discussed so   17:27:45

7   far, ██████████  suggests in the context of           17:27:49

8   ████████████████████████████████████████████████████

    ████████████████████████████████████████████████████

    ██████████████████████                                17:27:57

11       Q.   And what's your understanding of            17:27:58

12  ██████████  again?                                    17:28:00

13       A.   My understanding of monotonically is a set of  17:28:06

14  values, or in the case of a ████████████████████████████

    ████████████████████████████████████████████████████

    ████████████████████████████████████████████████████

    ████████████████████████████████████████████████████

    ███████████████████████████████████

19       THE REPORTER:  Excuse me.

20       THE WITNESS ████████████████████████████████████

    ████████████████████████████████████████              17:28:34

22  BY MR. JAFFE:

23       Q.   If something increases ████████████████████

    ████████████████████████  right?                      17:28:39

25       MR. KIM:  Objection; form.                       17:28:40
```

Page 225

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        THE WITNESS:  I wasn't sure.  I don't recall the    17:28:43
 2   strict definition of  ████████████████████████████████
     ████████████████████████████████████████              17:28:52
 4   BY MR. JAFFE:                                          17:28:52
 5        Q.   I see.  So if we exclude zero change, if     17:28:55
 6   something is  ███████████████████████████████████████
     ███████████████████████████; right?                   17:29:01
 8        MR. KIM:  Objection; form.                        17:29:04
 9        THE WITNESS:  I believe so, yes.                  17:29:07
10   BY MR. JAFFE:                                          17:29:07
11        Q.   And if we go back and we look at -- I don't  17:29:12
12   have the number in front of me.  It's the one where    17:29:14
13   you pencilled out all the changes.                     17:29:16
14        A.   The changes.                                 17:29:18
15        Q.   The changes, yeah.                           17:29:18
16        A.   Let's see, this one; right?                  17:29:22
17        Q.   Not that one.  The one that looks like this  17:29:25
18   (indicating).  The Fuji data.                          17:29:28
19        A.   Is that not the one I wrote for you?         17:29:31
20        Q.   Yes.  It should be over there in that pile.  17:29:36
21   It's just going to be one sheet of paper.              17:29:40
22        MR. KIM:  Thank you.                              17:29:42
23           (Witness reviews documents.)                   17:29:52
24        THE WITNESS:  This one?                           17:29:53
25   BY MR. JAFFE:                                          17:29:53
```

Page 226

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.   That's it.                              17:29:54

 2        A.   Okay.                                   17:29:55

 3        Q.   Do you remember when we were talking about   17:29:56

 4   the delta Y column?                               17:29:58

 5        A.   Yes.                                    17:29:58

 6        Q.   Does the delta Y column -- I guess we'll say,   17:30:03

 7   ████████████████████████?                         17:30:10

 8        MR. KIM:  Objection; form.                   17:30:14

 9        THE WITNESS:  Yes, it appears to ████████████   17:30:17

10   ████████████████████.                             17:30:17

11   BY MR. JAFFE:                                     17:30:17

12        Q.   So the difference between ███████████████████   17:30:23

13   ███████████████████ is immaterial to what we were talking   17:30:23

14   about in Exhibit 156; right?                      17:30:25

15        MR. KIM:  Objection; form.                   17:30:26

16        THE WITNESS:  I can say that the delta Y column   17:30:31

17   appears to be ████████████████████████████████    17:30:35

18   ██████████████, yes.                              17:30:35

19   BY MR. JAFFE:                                     17:30:35

20        Q.   You talked about ████████████ with your   17:30:38

21   counsel.                                          17:30:39

22             Do you remember that?                   17:30:40

23        A.   Yes.                                    17:30:40

24        Q.   And you said that you reuse some of the parts   17:30:42

25   from ████████████ in the Fuji design; is that right?   17:30:45
```

Page 227

```
 1      A.   Yes.                                       17:30:46

 2      Q.   Is that common to reuse parts from old     17:30:49

 3  projects?                                           17:30:50

 4      MR. KIM:  Objection; form.                      17:30:53

 5      THE WITNESS:  Depends what you mean by "common." 17:30:57

 6  Can it be done?  Certainly.  Is it done?  I've seen it  17:31:01

 7  done, yeah.                                         17:31:02

 8  BY MR. JAFFE:                                       17:31:02

 9      Q.   Is it something you've seen happen fairly  17:31:04

10  regularly?                                          17:31:05

11      MR. KIM:  Objection; form.                      17:31:06

12      THE WITNESS:  Again, I don't want to try to     17:31:09

13  qualify the rate of currents, but I have seen it done  17:31:13

14  before.                                             17:31:14

15  BY MR. JAFFE:                                       17:31:14

16      Q.   Let me ask it this way:  Reusing parts from  17:31:15

17  old projects is not uncommon; right?                17:31:18

18      MR. KIM:  Objection; form.                      17:31:19

19      THE WITNESS:  It's not very uncommon.           17:31:21

20  BY MR. JAFFE:                                       17:31:21

21      Q.   And was ▇▇▇▇▇▇▇▇ -- how would you describe  17:31:25

22  what happened with that project?                    17:31:27

23      A.   I would describe it as a LiDAR sensor       17:31:35

24  development that started probably before I joined   17:31:39

25  Otto, made some progress in designing an FAC lens,  17:31:46
```

Page 228

| | | |
|---|---|---|
| 1 | probably purchasing a couple basic components for it. | 17:31:50 |
| 2 | And then got shelved, I would say, when we decided to | 17:31:58 |
| 3 | go with the Spider design. | 17:32:00 |
| 4 | Q.   Would you say that you abandoned the LiDAR | 17:32:02 |
| 5 | zero design? | 17:32:04 |
| 6 | MR. KIM:  Objection; form. | 17:32:14 |
| 7 | THE WITNESS:  Not exactly, because it's semantics. | 17:32:19 |
| 8 | I'll grant that. | 17:32:22 |
| 9 | But even when we moved away from LiDAR | 17:32:27 |
| 10 | zero, Dan Gruver really wanted to do ▮▮▮▮ | 17:32:33 |
| 11 | which reflects in what we're doing now is Fuji. | 17:32:38 |
| 12 | So we continued to have an employee looking at the | 17:32:44 |
| 13 | machine that would place the FAC lens, even though | 17:32:50 |
| 14 | we're working on Spider. | 17:32:52 |
| 15 | BY MR. JAFFE: | 17:32:52 |
| 16 | Q.   And you're talking about Mr. Pennecot? | 17:32:54 |
| 17 | A.   No.  This was George Lagui.  So he was | 17:33:03 |
| 18 | working on this machine. | 17:33:04 |
| 19 | Q.   So you didn't really abandoned ▮▮▮▮ | 17:33:07 |
| 20 | then? | 17:33:07 |
| 21 | MR. KIM:  Objection; form. | 17:33:13 |
| 22 | THE WITNESS:  I'm not sure if I would say we | 17:33:15 |
| 23 | abandoned it or not.  Definitely back shelved it.  But | 17:33:20 |
| 24 | it seemed like potential valuable capability to have. | 17:33:26 |
| 25 | BY MR. JAFFE: | 17:33:26 |

Page 229

| | | |
|---|---|---|
| 1 | Q.   So I want to fast forward and talk about | 17:33:31 |
| 2 | Spider. | 17:33:32 |
| 3 | A.   Okay. | 17:33:33 |
| 4 | Q.   The Spider device, did you abandon that | 17:33:37 |
| 5 | project in the same way that yo  abandoned ▮▮▮▮▮ | 17:33:45 |
| 6 | MR. KIM:  Objection; form. | 17:33:46 |
| 7 | THE WITNESS:  No. | 17:33:47 |
| 8 | BY MR. JAFFE: | 17:33:47 |
| 9 | Q.   How are they different? | 17:33:49 |
| 10 | A.   In the case of what we're calling ▮▮▮▮ | 17:33:53 |
| 11 | we kept an employee working on this machine that could | 17:33:56 |
| 12 | someday be used to place FAC lenses.  That project was | 17:34:03 |
| 13 | put on the shelf because what we thought was a more | 17:34:07 |
| 14 | expedient design was selected, not for any fault of | 17:34:11 |
| 15 | that approach. | 17:34:12 |
| 16 | So Spider, I feel like that could probably be | 17:34:20 |
| 17 | fairly said to have been abandoned because it was | 17:34:23 |
| 18 | rejected on its merit or lack thereof. | 17:34:27 |
| 19 | Q.   You use some of the learnings from the Spider | 17:34:30 |
| 20 | design in Fuji?  You agree with that; right? | 17:34:33 |
| 21 | MR. KIM:  Objection; form. | 17:34:34 |
| 22 | THE WITNESS:  Like what? | 17:34:35 |
| 23 | BY MR. JAFFE: | |
| 24 | Q.   I'm asking you. | 17:34:37 |
| 25 | MR. KIM:  Objection; form. | 17:34:43 |

Page 230

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I got to think this through. | 17:34:45 |
| 2 | We've got different laser source, different | 17:34:49 |
| 3 | detector, different physical arrangement, | 17:34:52 |
| 4 | different lens arrangement, completely different | 17:34:58 |
| 5 | motor, perhaps in a noncontact power transfer | 17:35:08 |
| 6 | design work, that could have been leveraged from | 17:35:12 |
| 7 | Spider into Fuji. | 17:35:14 |
| 8 | BY MR. JAFFE: | 17:35:14 |
| 9 | Q.   In fact, Spider was de cribed as ██; right? | 17:35:17 |
| 10 | A.   Yes. | |
| 11 | Q.   And Fuji was described as ██ right? | 17:35:20 |
| 12 | A.   Yes. | 17:35:22 |
| 13 | Q.   And ████████████████████ | 17:35:27 |
| 14 | MR. KIM:  Objection; form. | 17:35:27 |
| 15 | THE WITNESS:  I call them ████ with that in | 17:35:31 |
| 16 | mind. | 17:35:32 |
| 17 | BY MR. JAFFE: | 17:35:32 |
| 18 | Q.   Wouldn't you agree that you reused some of | 17:35:35 |
| 19 | the receptor designs that you had for Spider in Fuji? | 17:35:41 |
| 20 | MR. KIM:  Objection; form. | 17:35:43 |
| 21 | THE WITNESS:  No. | 17:35:44 |
| 22 | BY MR. JAFFE: | 17:35:44 |
| 23 | Q.   You didn't consider reusing any of the | 17:35:46 |
| 24 | receptor, the APDs in Spider from Fuji? | 17:35:54 |
| 25 | THE REPORTER:  In Spider from Fuji. | 17:35:54 |

Page 231

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  No. | 17:35:55 |
| 2 | BY MR. JAFFE: | |
| 3 | Q.   So Spider, you're never going to use it | 17:36:02 |
| 4 | again; right? | 17:36:03 |
| 5 | A.   I don't have any intention of reusing it | 17:36:05 |
| 6 | again right now. | 17:36:06 |
| 7 | Q.   That's not my question.  My question is, Uber | 17:36:09 |
| 8 | is never going to use Spider; right? | 17:36:12 |
| 9 | A.   You're asking if the company is going to do | 17:36:18 |
| 10 | something in the future? | 17:36:20 |
| 11 | Q.   That's right. | 17:36:20 |
| 12 | A.   I don't know. | 17:36:21 |
| 13 | Q.   So sitting here today, you can't tell me | 17:36:24 |
| 14 | whether Uber is going to use Spider in the future? | 17:36:27 |
| 15 | A.   No.  I can only tell you my intentions right | 17:36:31 |
| 16 | now. | 17:36:31 |
| 17 | Q.   All right.  You mentioned Fuji.  Oh, I'm | 17:36:47 |
| 18 | sorry, going back to Spider. | 17:36:50 |
| 19 | Why save the parts if you're never going to | 17:36:53 |
| 20 | use it? | 17:36:54 |
| 21 | A.   That's a good question. | 17:36:57 |
| 22 | Q.   Why didn't you throw it away? | 17:37:00 |
| 23 | A.   I don't know if we've thrown anything away. | 17:37:03 |
| 24 | I don't know.  It should have, could have easily been | 17:37:05 |
| 25 | recycled, yeah. | 17:37:07 |

Page 232

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So you don't know why you kept it? | 17:37:10 |
| 2 | A.   Just because we didn't throw it away, as far | 17:37:13 |
| 3 | as I know. | 17:37:14 |
| 4 | Q.   So sitting here today, again, you can't tell | 17:37:19 |
| 5 | me why you kept the Spider; right? | 17:37:21 |
| 6 | A.   Yes. | 17:37:26 |
| 7 | Q.   Okay.  I want to ask about your supplemental | 17:37:42 |
| 8 | declaration that you went into detail with with your | 17:37:46 |
| 9 | counsel.  And let's start with page 11.  And there's | 17:38:07 |
| 10 | Figures 8A and 8B here. | 17:38:09 |
| 11 | Do you see that? | 17:38:10 |
| 12 | A.   I see that. | 17:38:11 |
| 13 | Q.   And during your testimony by your counsel, | 17:38:13 |
| 14 | you said -- you referred to these ███████ and you | 17:38:17 |
| 15 | said whoever did these letters. | 17:38:21 |
| 16 | A.   Um-hum. | |
| 17 | Q.   You didn't prepare 8A and 8B, did you? | 17:38:28 |
| 18 | A.   No. | 17:38:28 |
| 19 | Q.   Who prepared 8A and 8B? | 17:38:31 |
| 20 | A.   Counsel. | 17:38:33 |
| 21 | Q.   Who? | 17:38:34 |
| 22 | A.   Jackie Choy [sic], I believe. | 17:38:39 |
| 23 | Q.   So Uber's lawyers prepared this and sent this | 17:38:43 |
| 24 | to you; is that right? | 17:38:44 |
| 25 | A.   Yes. | 17:38:45 |

Page 233

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    And you signed it without actually checking | 17:38:47 |
| 2 | it was accurate? | 17:38:49 |
| 3 | A.    Whoa.   I looked at these numbers. | 17:38:52 |
| 4 | Q.    But you didn't check what you did today | 17:38:54 |
| 5 | before you signed this declaration, did you? | 17:38:59 |
| 6 | A.    What do you mean?   Identifying, double | 17:39:02 |
| 7 | checking the ▇▇▇▇ | 17:39:04 |
| 8 | Q.    Yes. | 17:39:04 |
| 9 | A.    I did check that. | 17:39:06 |
| 10 | Q.    So why today did you need to check it again? | 17:39:09 |
| 11 | A.    I like to be careful. | 17:39:11 |
| 12 | Q.    You like to be careful? | 17:39:12 |
| 13 | A.    Yeah.   I want to be sure we can show the ▇▇▇ | |
| | ▇▇▇▇▇▇▇▇ that they matched. | 17:39:19 |
| 15 | Q.    Did you know when you signed your declaration | 17:39:22 |
| 16 | whether these actually matched every single angle and | 17:39:26 |
| 17 | every single board? | 17:39:27 |
| 18 | A.    Yes, I believe I did. | 17:39:28 |
| 19 | Q.    What do you mean you believe you did? | 17:39:31 |
| 20 | A.    To my recollection, I checked ▇▇▇▇▇▇ | |
| | ▇▇▇▇▇▇▇▇▇▇.   And I checked the | 17:39:42 |
| 22 | initial ▇▇▇▇ and knew that they would follow the | 17:39:46 |
| 23 | same pattern so I didn't check every single angle. | 17:39:50 |
| 24 | Q.    How many of these did you actually check | 17:39:52 |
| 25 | yourself before you signed your declaration? | 17:39:55 |

Page 234

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A.    I remember at least checking the initial ████████

         ███████████████████████████████            17:40:04

3        Q.    So you checked about six out of the 64; is    17:40:08

4    that fair?                                              17:40:09

5        A.    Yeah.                                         17:40:09

6        Q.    And the rest are purely from counsel; you're  17:40:12

7    just relying on them?                                   17:40:14

8        A.    Not exactly.                                  17:40:16

9        Q.    You didn't check.                             17:40:19

10             How did you know it was accurate?             17:40:21

11       A.    How would the pattern change?                 17:40:24

12       Q.    I don't know.  It's your declaration.         17:40:26

13       A.    I understand.  From my understanding, the     17:40:30

14   pattern is consistent in the letters.  So once you      17:40:35

15   start the pattern properly, it's going to finish out    17:40:39

16   properly.                                               17:40:40

17       Q.    Let's go to the next page, page 12.           17:40:42

18             Who prepared this table?                      17:40:44

19       A.    Counsel for Uber.                             17:40:51

20       Q.    And you had to double check it here at your   17:40:54

21   deposition; you didn't know whether it was accurate     17:40:55

22   when you signed it, did you?                            17:40:57

23       MR. KIM:  Objection; form.                          17:40:58

24       THE WITNESS:  I believe I checked that before as    17:41:00

25   well.                                                   17:41:01
```

Page 235

```
 1    BY MR. JAFFE:                                    17:41:01

 2        Q.   You did?  How many?                     17:41:03

 3        A.   I don't recall.  Some.                  17:41:14

 4        Q.   How many?                               17:41:16

 5        A.   I would have checked first sets of angles.  I  17:41:25

 6    don't know.                                      17:41:25

 7        Q.   I'm not asking what you would have done.  I'm  17:41:28

 8    asking what you did.                             17:41:29

 9        A.   I don't remember what I did.            17:41:30

10        Q.   You don't remember checking any of these, do  17:41:33

11    you?                                             17:41:33

12        MR. KIM:  Objection; form.                   17:41:34

13        THE WITNESS:  That's not true.               17:41:35

14    BY MR. JAFFE:                                    17:41:35

15        Q.   So you checked one?                     17:41:36

16        MR. KIM:  Objection; form.                   17:41:38

17        THE WITNESS:  I specifically was checking those  17:41:40

18    that had the ████ degree, and I was specifically  17:41:44

19    checking those that began the pattern as well.   17:41:47

20    BY MR. JAFFE:                                    17:41:47

21        Q.   So you checked probably, what, five or six?  17:41:50

22        A.   Should be at least six, was at least six.  17:41:54

23        Q.   At least six.  You don't remember checking  17:41:56

24    anymore on this one?                             17:41:59

25        A.   I don't remember checking more.         17:42:00
```

Page 236

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Let's go to the next page.  There's another | 17:42:03 |
| 2 | chart, page 13. | 17:42:04 |
| 3 | Who wrote this chart? | 17:42:06 |
| 4 | A.   Same person who prepared the previous chart. | 17:42:10 |
| 5 | Q.   And how many angles did you check in this | 17:42:14 |
| 6 | one? | 17:42:15 |
| 7 | A.   Again, I would -- I believe I checked maybe | 17:42:20 |
| 8 | six. | 17:42:20 |
| 9 | Q.   And how did you know that the data that | 17:42:23 |
| 10 | Uber's lawyers were relying on was accurate? | 17:42:27 |
| 11 | A.   I would say there's a certain level of | 17:42:40 |
| 12 | expectation of accuracy when you're pulling data out | 17:42:45 |
| 13 | of a spreadsheet into another spreadsheet. | 17:42:47 |
| 14 | Q.   You mean you were relying on Uber's lawyers | 17:42:50 |
| 15 | to give you accurate data? | 17:42:52 |
| 16 | MR. KIM:  Objection; form. | 17:42:53 |
| 17 | THE WITNESS:  I was relying on Uber's lawyers to | 17:42:58 |
| 18 | do the obvious simple thing, cut and paste from a | 17:43:01 |
| 19 | spreadsheet, and not inject an errors by manually | 17:43:05 |
| 20 | changing numbers. | 17:43:07 |
| 21 | BY MR. JAFFE: | 17:43:07 |
| 22 | Q.   You see it says "Current" here? | 17:43:09 |
| 23 | A.   Yes. | 17:43:09 |
| 24 | Q.   Where did Uber's lawyers get the numbers that | 17:43:13 |
| 25 | go in the "Current" column? | 17:43:15 |

Page 237

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    What is this document called?  This would be | 17:43:24 |
| 2 | from Exhibit 155. | 17:43:26 |
| 3 | Q.    How do you know that? | 17:43:28 |
| 4 | A.    Because she said so. | 17:43:30 |
| 5 | Q.    Uber's lawyer told you that she derived these | 17:43:35 |
| 6 | numbers from Exhibit B? | 17:43:37 |
| 7 | MR. KIM:  I'm going to object on grounds of | 17:43:41 |
| 8 | privilege and instruct you not to answer that. | 17:43:45 |
| 9 | BY MR. JAFFE: | 17:43:45 |
| 10 | Q.    So again, I just want to ask, how do you know | 17:43:50 |
| 11 | the numbers that say "Current" here where they were | 17:43:58 |
| 12 | derived from?  And wait for your counsel to object, if | 17:44:02 |
| 13 | he does. | 17:44:03 |
| 14 | A.    I would inspect Exhibit 155 in the theta | 17:44:14 |
| 15 | column for these boards to find the angles that match. | 17:44:22 |
| 16 | THE REPORTER:  To find the angles that . . . | 17:44:22 |
| 17 | MR. JAFFE:  Excuse me. | |
| 18 | THE WITNESS:  To find the angles that match. | |
| 19 | BY MR. JAFFE: | |
| 20 | Q.    Mr. Haslim, I'm not asking what you would do. | 17:44:26 |
| 21 | I'm asking what happened. | 17:44:28 |
| 22 | A.    So as I said, I compared some number, maybe | 17:44:34 |
| 23 | six, of the angles under "Current" against the angles | 17:44:41 |
| 24 | listed under the theta column in Exhibit 155. | 17:44:46 |
| 25 | Q.    Where do the numbers from the "Current" | 17:44:48 |

Page 238

```
1    column come from in your declaration?              17:44:51

2        A.   They came from the spreadsheet that we're   17:44:59

3    printing out and calling Exhibit 155.              17:45:02

4        Q.   And how do you know that?  How did you know  17:45:05

5    that at the time?                                  17:45:05

6        A.   How did I know to look there as a source?   17:45:09

7        Q.   No.  How did you know that the source of    17:45:11

8    these numbers were from that spreadsheet before you  17:45:14

9    signed your declaration?                           17:45:16

10       A.   So in the process of developing this        17:45:20

11   document, I was in communication with Uber's counsel.  17:45:24

12       Q.   So Uber's lawyers told you that these numbers  17:45:29

13   come from the "Current" number and they sent them to  17:45:32

14   you and that's the basis of your understanding that  17:45:34

15   these numbers actually are current?                17:45:36

16       MR. KIM:  I'm going to object on the grounds of   17:45:39

17   privilege and instruct you not to answer the question  17:45:42

18   to the extent it asks what Uber's lawyers told you.   17:45:48

19       THE WITNESS:  I would refer to my discussion with  17:45:50

20   Uber's lawyer for the source of the information that  17:45:55

21   allows me to go back and check myself at least some of  17:45:59

22   the numbers with the belief that the other numbers in  17:46:02

23   between for every logical reason should be the correct  17:46:06

24   numbers.                                           17:46:07

25   BY MR. JAFFE:                                      17:46:07
```

Page 239

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   But you didn't check that before you signed | 17:46:09 |
| 2 | your declaration; right? | 17:46:11 |
| 3 | MR. KIM:  Objection; form. | 17:46:12 |
| 4 | THE WITNESS:  I did not recall checking all 32 | 17:46:20 |
| 5 | angles in this table, or 64 as the case may be. | 17:46:24 |
| 6 | BY MR. JAFFE: | 17:46:24 |
| 7 | Q.   So you couldn't -- at the time you signed | 17:46:28 |
| 8 | this declaration, you couldn't say that what's in here | 17:46:35 |
| 9 | actually does represent all the current angles because | 17:46:39 |
| 10 | you didn't check each one? | 17:46:41 |
| 11 | MR. KIM:  Objection; form. | 17:46:42 |
| 12 | THE WITNESS:  I really believe without checking | 17:46:44 |
| 13 | every single one, I could have a very high reasonable | 17:46:48 |
| 14 | confidence that they are correct. | 17:46:50 |
| 15 | BY MR. JAFFE: | 17:46:50 |
| 16 | Q.   Because you believe Uber's lawyers? | 17:46:52 |
| 17 | MR. KIM:  Objection; form. | 17:46:55 |
| 18 | THE WITNESS:  Because I checked the beginning and | 17:46:57 |
| 19 | the end and have every reason to believe that a cut | 17:47:02 |
| 20 | and paste from one spreadsheet to another would be | 17:47:05 |
| 21 | without error. | 17:47:05 |
| 22 | BY MR. JAFFE: | 17:47:05 |
| 23 | Q.   But what spreadsheet did it come from? | 17:47:09 |
| 24 | A.   The spreadsheet that's printed out in Exhibit | 17:47:13 |
| 25 | 155. | 17:47:13 |

Page 240

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    How do you know that?                        17:47:14

2    A.    By talking to the lawyer.                    17:47:16

3    Q.    So Uber's lawyer told you that he or she cut  17:47:20

4    and paste out of a spreadsheet and put it into this  17:47:23

5    chart?                                             17:47:23

6    MR. KIM:  Objection; calls for privileged          17:47:26

7    information.  Instruct you not to answer to the extent  17:47:29

8    it's asking you what Uber's lawyers told you.      17:47:31

9    MR. JAFFE:  This is waived.                        17:47:33

10   I mean, the only basis for him to say that this is  17:47:35

11   current is what a lawyer told him, so that's not a  17:47:39

12   proper privilege instruction.                      17:47:40

13   MR. KIM:  He's already told you that it's based on  17:47:42

14   communications with his lawyers.  You're not entitled  17:47:45

15   to know exactly what his lawyers told him.         17:47:47

16   MR. JAFFE:  I'm entitled to know exactly that.     17:47:49

17   MR. KIM:  Disagree.                                17:47:50

18   BY MR. JAFFE:                                      17:47:50

19   Q.    Mr. Haslim, what did Uber's lawyers tell you  17:47:56

20   was the source of the data in the "Current" column?  17:47:59

21   MR. KIM:  Same objection with instruction not to   17:48:01

22   answer.                                            17:48:02

23        You can answer that question generally if     17:48:08

24   you can without revealing the exact -- the         17:48:12

25   specific communications that you've had with the   17:48:14

Page 241

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | lawyer.  But I think you've already done that. | 17:48:17 |
| 2 | Can you rephrase the question to avoid asking | 17:48:24 |
| 3 | with him what Uber's lawyers told him? | 17:48:26 |
| 4 | BY MR. JAFFE: | 17:48:26 |
| 5 | Q.  I'm asking him, what is the basis for his | 17:48:30 |
| 6 | knowledge, to the extent that he has any, about where | 17:48:33 |
| 7 | the data in the "Current" column in your declaration | 17:48:36 |
| 8 | came from? | 17:48:38 |
| 9 | A.  I'll have to say my knowledge of where the | 17:48:42 |
| 10 | data in the "Current" column came from would come from | 17:48:47 |
| 11 | inspecting where I believed it came from and finding a | 17:48:51 |
| 12 | reasonable match from some number of channels that | 17:48:55 |
| 13 | begin the pattern and end the pattern. | 17:48:57 |
| 14 | Q.  How did you know to look in that document? | 17:49:01 |
| 15 | A.  Discussion with counsel. | 17:49:05 |
| 16 | Q.  Okay.  So let me start again.  What was your | 17:49:07 |
| 17 | basis for understanding that what's in the "Current" | 17:49:10 |
| 18 | column actually reflects anything in Fuji? | 17:49:13 |
| 19 | A.  Again, my basis for understanding what was | 17:49:18 |
| 20 | reflected in the "Current" column reflects what was | 17:49:21 |
| 21 | actually built in Fuji was to compare some subset of | 17:49:26 |
| 22 | the numbers at least to the angles in a document that | 17:49:29 |
| 23 | I know was used to build Fuji. | 17:49:33 |
| 24 | Q.  So again, for the chart on page 13 here, you | 17:49:37 |
| 25 | didn't prepare that chart; right? | 17:49:39 |

Page 242

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. KIM:  Objection; form. | 17:49:42 |
| 2 | THE WITNESS:  I did not prepare this spreadsheet | 17:49:44 |
| 3 | chart. | |
| 4 | BY MR. JAFFE: | 17:49:45 |
| 5 | Q.   It came to you fully formed with the current | |
| 6 | column and the November 16th column already populated; | |
| 7 | right? | |
| 8 | A.   Yes. | 17:49:52 |
| 9 | Q.   And you only checked a couple of the angles; | 17:49:55 |
| 10 | right? | 17:49:55 |
| 11 | A.   I checked more than a couple, but I checked a | 17:50:00 |
| 12 | subset of the angles. | 17:50:01 |
| 13 | Q.   And what about the November 16th one, how | 17:50:04 |
| 14 | many of those did you check? | 17:50:05 |
| 15 | A.   I would have -- I don't remember exactly how | 17:50:09 |
| 16 | many I checked. | 17:50:09 |
| 17 | Q.   Do you remember checking any? | 17:50:11 |
| 18 | A.   Yes. | 17:50:12 |
| 19 | Q.   More than one? | 17:50:15 |
| 20 | A.   Yeah.  It would have been more than one, but | 17:50:17 |
| 21 | I don't remember exactly how many. | 17:50:19 |
| 22 | Q.   What else in your declaration did you rely on | 17:50:23 |
| 23 | representations from counsel about? | 17:50:25 |
| 24 | A.   Annotations in Figure 2B. | 17:50:45 |
| 25 | Q.   That's relied on by counsel? | 17:50:48 |

Page 243

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | | |
|---|---|---|---|
| 1 | A. | Counsel created the annotations.  I looked at | 17:50:52 |
| 2 | it, thought it looked correct. | | 17:50:55 |
| 3 | Q. | What about -- let's go to page 4. | 17:51:02 |
| 4 | A. | Okay. | 17:51:03 |
| 5 | Q. | Do you see there's some large footnotes | 17:51:06 |
| 6 | there? | | 17:51:07 |
| 7 | A. | Yes. | 17:51:07 |
| 8 | Q. | Who provided those references? | 17:51:09 |
| 9 | A. | I did. | 17:51:10 |
| 10 | Q. | And where did you find them? | 17:51:12 |
| 11 | A. | On the web. | 17:51:13 |
| 12 | Q. | So you went out and found each of those? | 17:51:16 |
| 13 | A. | Yes. | 17:51:16 |
| 14 | Q. | And the iXBlue one that you're referring to? | 17:51:20 |
| 15 | A. | IXBlue, yes. | |
| 16 | Q. | IXBlue, excuse me. | 17:51:23 |
| 17 | | Do you know when that specialty fiber web | 17:51:27 |
| 18 | page first was published? | | 17:51:29 |
| 19 | A. | No. | 17:51:29 |
| 20 | Q. | Do you know if it was published before or | 17:51:31 |
| 21 | after you started designing ███████████████████ | | |
| | ████████████████████████████████ | | 17:51:39 |
| 23 | A. | I don't know. | 17:51:40 |
| 24 | Q. | Again on page 5 looking at Figure 4, do you | 17:51:43 |
| 25 | know whether that website was posted before or after | | 17:51:46 |

Page 244

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    the conversation with Mr. Levandowski?              17:51:47

 2        A.   I don't know.                              17:51:48

 3        Q.   Is there anything else in the declaration in  17:51:54

 4    which you're relying on representations from Uber's  17:51:59

 5    lawyers?                                            17:51:59

 6        MR. KIM:  Objection; form.                      17:52:01

 7        THE WITNESS:  Figure 6, I relied on Uber's lawyers  17:52:06

 8    to excerpt this section from the spreadsheet.       17:52:09

 9    Figure 7A and 7B, I relied on Uber lawyer to put    17:52:20

10    down these files that were sourced by somebody      17:52:23

11    else.                                               17:52:24

12    BY MR. JAFFE:                                       17:52:24

13        Q.   Who were they sourced by?                  17:52:26

14        A.   I'm fairly certainly they would be sourced by  17:52:29

15    Gaetan.                                             17:52:29

16        Q.   So Gaetan provided these pictures?         17:52:31

17        A.   I believe so, yes.                         17:52:32

18        Q.   Did you talk to Gaetan about what you wanted  17:52:34

19    to provide, what you wanted him to put in here?     17:52:37

20        MR. KIM:  Objection; form.                      17:52:39

21        THE WITNESS:  No.                               17:52:39

22    BY MR. JAFFE:                                       17:52:39

23        Q.   What was your understanding of what        17:52:41

24    Mr. Pennecot went out and looked for?               17:52:44

25        A.   My understanding was these were documents  17:52:52
```

Page 245

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    that were already produced and were gathered for the      17:52:55

 2    purpose of this declaration.                              17:52:57

 3        Q.   And it refers to ███████████████████            17:53:02

 4    ████████████                                              17:53:03

 5        A.   Yes.                                             17:53:03

 6        Q.   Has the FAC lens in Fuji always been            17:53:12

 7    ██████████████                                            17:53:14

 8        THE REPORTER:  I'm sorry, can you repeat that?        17:53:14

 9    BY MR. JAFFE:

10        Q.   Has the FAC lens in Fuji always been            

11    ██████████████                                            

12        A.   I've only known it to be ████████████           17:53:19

13        Q.   So you've never seen a version of a FAC lens    17:53:23

14    that is ███████████████                                   17:53:24

15        A.   No, not to my knowledge.                        17:53:26

16        Q.   And would it surprise you if Uber -- go         17:53:29

17    ahead.                                                    17:53:29

18        A.   You left the question very general and I        17:53:32

19    answered too quickly.  I've never seen ████████████████   17:53:41

20    ██████████████████████████████████████████              17:53:41

21        Q.   What other design have you seen?                17:53:47

22        A.   ██████████████████████████████████████████     17:53:54

23    ████████                                                  17:53:54

24        Q.   In terms of the custom FAC lens that includes   17:53:57

25    a cylindrical optical surface, have you ever seen one    17:54:01
```

Page 246

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   of those?                                         17:54:02

 2        MR. KIM:  Objection; form.                   17:54:03

 3        THE WITNESS:  Are you asking about anywhere? 17:54:05

 4   BY MR. JAFFE:                                     17:54:05

 5        Q.   At Uber or Otto.                        17:54:07

 6        A.   If -- I don't know of seeing a cylindrical  17:54:12

 7   custom FAC lens at Otto.                          17:54:14

 8        Q.   And you don't know whether Fuji ever had a  17:54:19

 9   cylindrical FAC lens ever?                        17:54:22

10        A.   To my knowledge, ███████████████████

11   ███████████████████████████████████████████████████

12   ████████████████                                  17:54:32

13        Q.   What about ██████████████, are you familiar  17:54:34

14   with that?                                        17:54:35

15        A.   I've seen the name ████████████         17:54:38

16        Q.   What is that?                           17:54:39

17        A.   I believe it's the FAC lens.            17:54:41

18        Q.   And do you know whether there are any   17:54:43

19   versions of that design that had a cylindrical optical  17:54:46

20   surface?                                          17:54:47

21        A.   I'm not aware.  If there were, I'm not aware  17:54:50

22   of them.  So we have to go back to Gaetan's design  17:54:52

23   record to see if he started with a cylindrical design.  17:54:57

24        Q.   So we talked about some of the charts where  17:55:00

25   you said that you relied on Uber's counsel.       17:55:04
```

                                                    Page 247

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | What about any of the text?  Are any of the | 17:55:05 |
| 2 | numbers in here, do they come from Uber's counsel as | 17:55:09 |
| 3 | opposed to you? | 17:55:10 |
| 4 | A.   A large part of the text, perhaps the bulk of | 17:55:17 |
| 5 | the text in this declaration, came from Uber's | 17:55:20 |
| 6 | counselors. | 17:55:20 |
| 7 | Q.   Okay.  So they provided you basically all the | 17:55:24 |
| 8 | text in this draft; is that fair? | 17:55:26 |
| 9 | MR. KIM:  Objection; form. | 17:55:28 |
| 10 | THE WITNESS:  It's a little too much to say "all," | 17:55:30 |
| 11 | but I could say more than half and that I was given an | 17:55:33 |
| 12 | opportunity to edit. | 17:55:37 |
| 13 | BY MR. JAFFE: | 17:55:37 |
| 14 | Q.   Okay.  So I want to go back to my original | 17:55:43 |
| 15 | question which was, what part of the text are you | 17:55:47 |
| 16 | relying on representations from Uber's lawyers for | 17:55:50 |
| 17 | purposes of your declaration? | 17:55:52 |
| 18 | A.   Since Uber's lawyers originated most of the | 17:56:13 |
| 19 | text, I relied on Uber's lawyers to originate most of | 17:56:18 |
| 20 | the text in here. | 17:56:19 |
| 21 | Q.   Meaning, most of the text you're relying on | 17:56:26 |
| 22 | on their representations; is that fair? | 17:56:29 |
| 23 | A.   I'm relaying on their -- | 17:56:30 |
| 24 | MR. KIM:  Objection; form. | 17:56:31 |
| 25 | THE REPORTER:  I'm relaying on their . . . | |

Page 248

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I'm relying on their origination. | 17:56:37 |
| 2 | BY MR. JAFFE: | 17:56:37 |
| 3 | Q.   So for example, looking at page 13, there's a | 17:56:43 |
| 4 | chart comparing Spider and Fuji.  Uber's lawyer came | 17:56:49 |
| 5 | up with that chart; right? | 17:56:51 |
| 6 | MR. KIM:  Objection; form. | 17:56:52 |
| 7 | THE WITNESS:  Yes. | 17:56:53 |
| 8 | BY MR. JAFFE: | 17:56:53 |
| 9 | Q.   The idea -- going back to page 8, the idea of | 17:57:09 |
| 10 | excerpting what's in Figure 6, was that -- did that | 17:57:14 |
| 11 | idea come from Uber's lawyers? | 17:57:17 |
| 12 | MR. KIM:  Objection; form.  Also on grounds of | 17:57:20 |
| 13 | work product. | 17:57:25 |
| 14 | THE WITNESS:  I presume it was. | 17:57:30 |
| 15 | BY MR. JAFFE: | 17:57:30 |
| 16 | Q.   And going back to -- | 17:57:42 |
| 17 | MR. KIM:  How long have we been going on the | 17:57:57 |
| 18 | record? | 17:57:58 |
| 19 | THE VIDEOGRAPHER:  The entire time? | 17:57:59 |
| 20 | MR. KIM:  Yes.  Oh, just since the last break. | 17:58:05 |
| 21 | THE VIDEOGRAPHER:  54 minutes. | 17:58:07 |
| 22 | MR. JAFFE:  I'm referring to your original | 17:58:32 |
| 23 | declaration.  Let's go to your original declaration, | 17:58:32 |
| 24 | please. | |
| 25 | MR. KIM:  I'm going to object to this whole line | 17:58:34 |

Page 249

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | of questioning as outside the scope of recross. | 17:58:39 |
| 2 | BY MR. JAFFE: | 17:58:39 |
| 3 | Q.   Did Uber's lawyers, did they prepare your | 17:58:42 |
| 4 | original declaration as well? | 17:58:44 |
| 5 | MR. KIM:  Objection; form. | 17:58:45 |
| 6 | THE WITNESS:  I would say Uber's lawyers | 17:58:54 |
| 7 | originated most of this declaration. | 17:58:58 |
| 8 | BY MR. JAFFE: | 17:58:58 |
| 9 | Q.   What percentage of the words in your original | 17:59:00 |
| 10 | declaration came from Uber's lawyers? | 17:59:03 |
| 11 | MR. KIM:  Objection; form. | 17:59:07 |
| 12 | THE WITNESS:  I don't know what the percentage is. | 17:59:08 |
| 13 | BY MR. JAFFE: | 17:59:08 |
| 14 | Q.   Over 80 percent? | 17:59:10 |
| 15 | MR. KIM:  Objection; form, outside the scope. | 17:59:14 |
| 16 | THE WITNESS:  Yeah, I'm not sure. | 17:59:18 |
| 17 | I know I had some textural editing input to this | 17:59:25 |
| 18 | document, but I don't remember like percentagewise | 17:59:26 |
| 19 | on the words.  It was less than half. | 17:59:31 |
| 20 | BY MR. JAFFE: | 17:59:31 |
| 21 | Q.   But in terms of the drafting, they sent you a | 17:59:34 |
| 22 | full draft of your declaration? | 17:59:36 |
| 23 | MR. KIM:  Objection; form. | 17:59:38 |
| 24 | BY MR. JAFFE: | 17:59:38 |
| 25 | Q.   Is that right? | 17:59:39 |

Page 250

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   Yes, I got --                         17:59:44

 2        MR. KIM:  Outside the scope of redirect.  Recross.  17:59:47

 3        THE WITNESS:  Yes.  I got a more or less complete  17:59:51

 4   draft from Uber's lawyers.                       17:59:54

 5   BY MR. JAFFE:                                    17:59:54

 6        Q.   And I want to take you particularly to page  17:59:56

 7   12 of your original declaration.                 18:00:00

 8        A.   Okay.                                  18:00:03

 9        Q.   Do you see where you refer to          18:00:06

10   Mr. Levandowski's input?                         18:00:08

11        A.   Yes.                                   18:00:16

12        Q.   What did you do -- well, let me start this,  18:00:19

13   was this paragraph drafted by Uber's lawyers?    18:00:22

14        MR. KIM:  Objection; form outside the scope.  18:00:26

15        THE WITNESS:  I believe they wrote the first draft  18:00:32

16   of this.                                         18:00:33

17   BY MR. JAFFE:                                    18:00:33

18        Q.   And what did you do to verify before signing  18:00:38

19   your declaration that what's here in paragraph 19 and  18:00:43

20   written by Uber's lawyers was true and accurate based  18:00:46

21   on your personal knowledge?                      18:00:48

22        A.   I used my personal knowledge, my personal  18:00:55

23   experience, my recollection, read this, agreed.  To my  18:01:02

24   knowledge, to the best of my knowledge, that the  18:01:04

25   statement in paragraph 19 was true.              18:01:06
```

                                                 Page 251

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   So Uber's lawyers sent you paragraph 19.  You | 18:01:09 |
| 2 | said looks good and you signed it? | 18:01:11 |
| 3 | MR. KIM:  Objection; form. | 18:01:12 |
| 4 | THE WITNESS:  They sent me 19.  I may have made an | 18:01:15 |
| 5 | edit in it.  I don't recall.  And then gave that edit | 18:01:21 |
| 6 | back.  Got a final draft, read through, and signed it. | 18:01:25 |
| 7 | BY MR. JAFFE: | 18:01:25 |
| 8 | Q.   What was the edit you gave to paragraph 19 to | 18:01:27 |
| 9 | make it accurate? | 18:01:28 |
| 10 | MR. KIM:  Objection; form. | 18:01:35 |
| 11 | THE WITNESS:  I may have suggested that we make a | 18:01:39 |
| 12 | strong statement as possible regarding the 14,000 | 18:01:44 |
| 13 | files having not seen any evidence of that in the | 18:01:48 |
| 14 | development of this sensor. | 18:01:49 |
| 15 | BY MR. JAFFE: | 18:01:49 |
| 16 | Q.   Anything else? | 18:01:51 |
| 17 | A.   I don't recall. | 18:01:55 |
| 18 | Q.   So for purposes of the first sentence here | 18:01:59 |
| 19 | about Mr. Levandowski never had nor currently has any | 18:02:03 |
| 20 | design input, that was written wholesale by Uber's | 18:02:08 |
| 21 | lawyers? | 18:02:08 |
| 22 | MR. KIM:  Objection; form. | 18:02:10 |
| 23 | THE WITNESS:  I don't recall if I may have -- if I | 18:02:13 |
| 24 | had made any edits to this first sentence or not. | 18:02:16 |
| 25 | BY MR. JAFFE: | 18:02:16 |

Page 252

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    And what did you do to verify -- well, | 18:02:19 |
| 2 | actually I think you already said this. | 18:02:21 |
| 3 |         You didn't do anything to verify that this | 18:02:24 |
| 4 | statement was accurate in paragraph 19 of your | 18:02:27 |
| 5 | declaration after it was provided to you by Uber's | 18:02:30 |
| 6 | lawyers; right? | 18:02:31 |
| 7 |     MR. KIM:  Objection; form. | 18:02:37 |
| 8 |     THE WITNESS:  I did no investigation to verify | 18:02:40 |
| 9 | that the statements made in paragraph 19 were | 18:02:46 |
| 10 | absolutely true. | 18:02:49 |
| 11 | BY MR. JAFFE: | 18:02:49 |
| 12 |     Q.    Did you talk to Mr. Levandowski? | 18:02:52 |
| 13 |     A.    No. | 18:02:52 |
| 14 |     Q.    Okay.  All right.  So what parts of your | 18:03:03 |
| 15 | original declaration are you relying on information | 18:03:08 |
| 16 | from Uber's lawyers? | 18:03:11 |
| 17 |     A.    Can you be specific when you say relying on | 18:03:21 |
| 18 | the Uber's lawyers. | 18:03:25 |
| 19 |     Q.    The basis for it being in your declaration is | 18:03:28 |
| 20 | something provided to you by counsel. | 18:03:32 |
| 21 |     MR. KIM:  Objection; form. | 18:03:35 |
| 22 |     THE WITNESS:  Again, this document was, in the | 18:03:41 |
| 23 | majority, sourced by lawyers for Uber. | 18:03:47 |
| 24 | BY MR. JAFFE: | 18:03:47 |
| 25 |     Q.    So you would say the majority of the document | 18:03:49 |

Page 253

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | you're relying on information from counsel; is that | 18:03:51 |
| 2 | right? | 18:03:52 |
| 3 | A.   For the majority of the document, I'm relying | 18:03:58 |
| 4 | on Uber's counsel to originate the document.  I'm not | 18:04:01 |
| 5 | necessarily relying on them.  If you're implying -- | 18:04:04 |
| 6 | Q.   Let me -- | 18:04:04 |
| 7 | MR. KIM:  Let him finish. | 18:04:06 |
| 8 | BY MR. JAFFE: | 18:04:06 |
| 9 | Q.   That's fine.  Let me be more clear. | 18:04:10 |
| 10 | MR. KIM:  Wait.  Are you cutting off the witness | 18:04:11 |
| 11 | here? | 18:04:12 |
| 12 | MR. JAFFE:  I think I'm trying to clarify.  I'll | 18:04:16 |
| 13 | withdraw the prior question. | 18:04:18 |
| 14 | BY MR. JAFFE: | |
| 15 | Q.   I want to understand what facts are in your | 18:04:20 |
| 16 | declaration that you relied on from counsel. | 18:04:24 |
| 17 | A.   I'm still having a hard time understanding | 18:04:27 |
| 18 | when you say relying on counsel for facts, whether | 18:04:31 |
| 19 | you're implying I'm relying on Uber's counsel for the | 18:04:35 |
| 20 | veracity or whether I'm relying on Uber's counsel to | 18:04:39 |
| 21 | put that information into the declaration. | 18:04:41 |
| 22 | Q.   That's fair.  Let me help clarify this. | 18:04:43 |
| 23 | So what I'm trying to get at is, were you | 18:04:48 |
| 24 | relying on Uber's counsel for the basis of these | 18:04:51 |
| 25 | facts, that is, you don't have independent personal | 18:04:52 |

Page 254

```
 1    knowledge of how they got into your declaration?       18:04:55

 2        A.    You said independent personal knowledge of   18:05:01

 3    how they got into my --                                18:05:04

 4        Q.    Let me clarify again.  Let me give an example 18:05:05

 5    and maybe that will help.                              18:05:07

 6            So you said in paragraph 22 of your            18:05:10

 7    declaration, "Uber will not be ready to deploy any     18:05:13

 8    public vehicles with Fuji sensors for self-driving     18:05:16

 9    purposes

10                                                           18:05:21

11            Do you see that?                               18:05:22

12        A.    I see that.                                  18:05:23

13        Q.    Here's what I'm trying to get at:  There's   18:05:25

14    two scenarios, one is you know that based on your work 18:05:30

15    and it's in your declaration.  Two is, you don't know  18:05:34

16    that fact or you're not sure about that fact and would 18:05:38

17    need to verify it and Uber's lawyers tell it to you    18:05:43

18    and you put in your declaration anyway and the basis   18:05:45

19    of your declaration is them telling it to you.  I'm    18:05:48

20    getting at the latter point.                           18:05:50

21        A.    Is there maybe a third option?               18:05:51

22        Q.    Perhaps there is.  Feel free to clarify.     18:05:54

23        A.    Maybe option 3 they ask:

24

25                                                           18:06:04
```

Page 255

| | | |
|---|---|---|
| 1 | Q.   I see, okay. | 18:06:07 |
| 2 | A.   I answer and then that comes into the | 18:06:10 |
| 3 | paragraph. | 18:06:10 |
| 4 | Q.   I see.  So you have personal knowledge as to, | 18:06:14 |
| 5 | for example, you have personal   nowledge th t the █████ | ████████ |
| 6 | ████████████████████████████ is that fair? | 18:06:22 |
| 7 | A.   That's fair. | 18:06:23 |
| 8 | Q.   And the basis for that, what's in your | 18:06:26 |
| 9 | declaration is your personal knowledge? | 18:06:28 |
| 10 | A.   Yes. | 18:06:28 |
| 11 | Q.   Has the time line for Fuji changed since you | 18:06:35 |
| 12 | provided your original declaration? | 18:06:36 |
| 13 | A.   I wouldn't say that the time line for Fuji | 18:06:47 |
| 14 | has changed significantly since this declaration. | 18:06:50 |
| 15 | That said, in all fairness, every engineering project | 18:06:53 |
| 16 | has time line change continually.  So as time has | 18:06:57 |
| 17 | elapsed, it it's probably slipped a bit. | 18:07:01 |
| 18 | Q.   What's the current target date to be able to | 18:07:03 |
| 19 | use Fuji on a car? | 18:07:06 |
| 20 | MR. KIM:  Objection; form. | 18:07:07 |
| 21 | THE WITNESS: ████████████████████ ████████ | |
| 22 | ████ | 18:07:10 |
| 23 | BY MR. JAFFE: | 18:07:10 |
| 24 | Q.   ████████████████████ | 18:07:12 |
| 25 | MR. KIM:  Same objection. | 18:07:14 |

Page 256



| | | |
|---|---|---|
| 1 | THE WITNESS: | 18:07:16 |
| 2 | | 18:07:18 |
| 3 | BY MR. JAFFE: | 18:07:18 |
| 4 | Q. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | 18:08:08 |
| 15 | MR. KIM:  Objection; form. | 18:08:09 |
| 16 | THE WITNESS: | 18:08:16 |
| 17 | | |
| | | |
| | | |
| | | |
| | | |
| | | 18:08:39 |
| 23 | BY MR. JAFFE: | 18:08:39 |
| 24 | Q. | |
| | | 18:08:44 |

Page 257



| 1 | MR. KIM:  Objection; form. | 18:08:45 |
| 2 | THE WITNESS: | 18:08:47 |
| 3 | BY MR. JAFFE: | 18:08:47 |
| 4 | Q. | 18:08:49 |
| 5 | MR. KIM:  Objection; form. | 18:08:50 |
| 6 | THE WITNESS: | 18:08:57 |
| 7 | | |
| | | |
| | | 18:09:08 |
| 10 | BY MR. JAFFE: | 18:09:08 |
| 11 | | |
| | | |
| | | 18:09:19 |
| 14 | MR. KIM:  Objection; form. | 18:09:20 |
| 15 | THE WITNESS: | 18:09:24 |
| 16 | | |
| | | |
| | | |
| | | |
| | | 18:09:45 |
| 21 | BY MR. JAFFE: | 18:09:45 |
| 22 | Q.   So I hear you're being very careful with your | 18:09:48 |
| 23 | answers here. | 18:09:48 |
| 24 | My question is, when is Fuji going to be a | 18:09:51 |
| 25 | functioning LiDAR? | 18:09:52 |

Page 258

```
 1        MR. KIM:  Objection; form.                    18:09:53

 2        THE WITNESS:  I                                18:09:55

 3                                                       18:09:57

 4    BY MR. JAFFE:                                      18:09:57

 5        Q.                                             

 6                                                       8:10:05

 7        MR. KIM:  Objection; form.                    18:10:06

 8        THE WITNESS:                                   18:10:13

 9                                                       

10                                                       18:10:24

11    BY MR. JAFFE:                                      18:10:24

12                                                       

13                                                       

14                                                       18:10:33

15        MR. KIM:  Objection; form.                    18:10:33

16        THE WITNESS:                                   18:10:35

17                                                       18:10:38

18    BY MR. JAFFE:                                      18:10:38

19        Q.    You're answering a different question.  18:10:41

20    That's fine.  I'm just trying to get a different   18:10:44

21    question, which is, when is Fuji going to work?    18:10:47

22        MR. KIM:  Objection; form.                    18:10:49

23        THE WITNESS:                                   18:10:50

24    BY MR. JAFFE:                                      18:10:50

25                                                       18:10:54
```

Page 259

```
 1        MR. KIM:  Objection; form.                    18:10:55

 2        THE WITNESS:  Second, I want us to be clear on   18:10:59

 3    what you mean by "work."  Because I can build a       18:11:02

 4    prototype that displays most of the functionality and 18:11:06

 5    still not be something you can put on a car.  So if    18:11:11

 6    you want to clarify.                                   18:11:14

 7    BY MR. JAFFE:                                          18:11:14

 8        Q.   Let me just try and ask this one more time.  18:11:17

 9             When is Fuji going to be a working LiDAR?    18:11:20

10        MR. KIM:  Objection; form.                        18:11:24

11        THE WITNESS:                                       18:11:31

12                                                          

                                                            

                                                            18:11:44

15    BY MR. JAFFE:                                          18:11:44

16                                                          

                                                            

                                                            18:11:54

19        MR. KIM:  Objection; form.                        18:11:55

20        THE WITNESS:  I'm not sure.                        18:11:59

21    BY MR. JAFFE:                                          18:11:59

22                                                          

                                                            18:12:09

24        MR. KIM:  Objection; form.                        18:12:13

25        THE WITNESS:                                       18:12:16
```

Page 260

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1  ████████████████████████████████████████        18:12:20

 2  ██████████                                       18:12:20

 3  BY MR. JAFFE:

 4      Q.   Okay.  Going back to your declaration here,   18:12:25

 5  we're looking at paragraph 18.                   18:12:26

 6      MR. KIM:  Jordan, how long do you plan on going?   18:12:30

 7  It's about 6:10.  Been going over an hour since the    18:12:34

 8  last break.                                      18:12:35

 9      MR. JAFFE:  Just kind of keep going.         18:12:37

10      MR. KIM:  Yeah, well -- I think we should take a    18:12:40

11  break.                                           18:12:40

12      MR. JAFFE:  Why don't we do this quick question    18:12:44

13  and then we'll take a break.                     18:12:45

14  BY MR. JAFFE:

15      Q.   Are you looking at paragraph 18 of your   18:12:47

16  original declaration?                            18:12:49

17      A.   Yes.                                    18:12:51

18      Q.   So you referred to this in the redirect   18:12:55

19  testimony.  You talked about the custom beam spacing   18:12:58

20  and angle summary Scott provided.                18:13:01

21          Do you see that?                         18:13:02

22      A.   Yes.                                    18:13:02

23      Q.   So at the bottom of the page -- and this is   18:13:07

24  what we talked about earlier today, you said my team   18:13:10

25  imported the data.                               18:13:11
```

Page 261

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            Do you see that?                        18:13:12

 2       A.    Yes.                                   18:13:12

 3       Q.    And based on what you talked about with  18:13:14

 4   Mr. Kim, Uber's lawyer, it was Mr. Pennecot that  18:13:18

 5   imported the data into Zemax; right?            18:13:21

 6       A.    Yes.                                   18:13:22

 7       Q.    And it was Mr. Pennecot that then determined  18:13:25

 8   the resultant emitting points of the laser diodes;  18:13:29

 9   right?                                           18:13:29

10       A.    Yes.                                   18:13:29

11       Q.    And it was Mr. Pennecot that then exported it  18:13:33

12   into CAD software; right?                        18:13:36

13       A.    Yes, that's my understanding.          18:13:38

14       Q.    And so Mr. Pennecot was the one who actually  18:13:42

15   came up with ███████████████████████████        18:13:47

16   based on Mr. Boehmke's beam angles; isn't that right?  18:13:51

17       A.    No, I don't think so.                  18:13:52

18       Q.    So what Mr. Pennecot exported into CAD  18:13:56

19   software, that wasn't █████████████████████?     18:14:04

20       A.    So if we go back carefully to transcripts,  18:14:07

21   what I should point out is, since this declaration, I  18:14:11

22   have more detailed information of exactly how     18:14:14

23   Mr. Pennecot did his import.  To be accurate, I want  18:14:19

24   to say that there's an error in here that he brought  18:14:25

25   the angles into CAD software, brought the lens design  18:14:31
```

Page 262

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    and field curvature shape from Zemax into CAD      18:14:37

 2    software.                                          18:14:37

 3            Now you're asking did Mr. Pennecot in fact 18:14:40

 4    design the ███████████████████████████████████████ 18:14:46

      ██████████████████  Mr. Pennecot was dependent on  18:14:50

 6    somebody else to tell him how many boards the angles 18:14:53

 7    had to be divided among, and then Mr. Pennecot set the 18:14:58

 8    positions of the laser diodes onto those boards.   18:15:02

 9        Q.   Who told Mr. Pennecot to use ███████████  18:15:05

10        A.   I told Mr. Pennecot to use ████████████ in 18:15:09

11    the optical cavity.                                18:15:10

12        Q.   Who told him to use ██████████ in total?  18:15:13

13        A.   I don't think anybody told him to use ████ 18:15:16

      █████████████  in total.                           18:15:18

15        Q.   Who told him to put ██████████████████████ 18:15:19

      ██████████?                                        18:15:22

17        A.   Mr. Pennecot understood the reason we were 18:15:31

18    going to ███████████, so I'll -- with that said, I'm 18:15:35

19    not aware that anybody had to tell him to ████████████ 18:15:38

      ██████████████████████████████                     18:15:41

21        Q.   You don't know where Mr. Pennecot ████████ 18:15:42

      ████████████████  from?                            18:15:45

23        A.   No, I know exactly where he got it from.  18:15:48

24        Q.   Where did he get it from?                 18:15:49

25        A.   The need to ████████████████████████████  18:15:52
```

                                                Page 263

1   If you're asking do I know from whom, no.  I would say   18:15:57

2   that he could derive that himself.   18:15:59

3        Q.   Okay.  So -- but just to be clear,   18:16:04

4   Mr. Pennecot -- you told him ████████████████████████████   18:16:13

    ██████████████████████████████████in the SolidWorks   18:16:13

6   CAD software, and you told him 64 channels and he   18:16:16

7   created ██████████████████████ is that fair?   18:16:21

8        A.   I didn't necessarily tell him 64 channels.   18:16:24

9   He got the list of angles that Scott Boehmke had   18:16:28

10  generated.   18:16:29

11       Q.   So he knew that there were 64 channels;   18:16:31

12  right?   18:16:31

13       A.   Without me telling him.   18:16:33

14       Q.   So the sequence of events was there was Scott   18:16:36

15  Boehmke provided beam angles for 64 channels?   18:16:40

16       A.   Yes.   18:16:40

17       Q.   That went to Mr. Pennecot.  He imported that   18:16:45

18  data into Zemax.  And after he outputted into CAD   18:16:50

19  software, the result was a design with ██████████████   18:16:50

    ████████████████████████████████████ is that   18:17:01

21  right?   18:17:02

22       A.   Can you read that back.   18:17:04

23            (Record read by reporter as follows:   18:17:04

24            "Question:  He imported that data into Zemax.   18:17:04

25            And after he outputted into CAD software, the

                                        Page 264

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        result was a design with ███████████████
███████████████████████████████ is that
 3        right?")                              18:17:04
 4     THE WITNESS:  That's not quite right but it    18:17:26
 5  skipped the step of ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████                                18:17:40
10  BY MR. JAFFE:                                18:17:40
11     Q.  But your testimony is that that ███████████
████████████████████ was already in this spreadsheet from    18:17:46
13  Mr. Boehmke; right? So you didn't need to tell him    18:17:50
14  that?                                        18:17:51
15     A.  The spreadsheet from Boehmke shows the number    18:17:56
16  of ███████ was settled on. But did he have a subset of    18:18:01
17  that, did he look at the whole thing, or did we tell    18:18:04
18  him first?  I don't recall the timing.       18:18:07
19        I believe we were having a             18:18:09
20  walking-back-and-forth-between-desks conversation    18:18:11
21  about ████████████████  I went to Gaetan.  I said,    18:18:14
22  we're thinking of ██████████████████████████████
██████████████████████████████████████████████? He    18:18:20
24  checked the Zemax.  It looked okay.  So at that point,    18:18:24
25  you could say he knew at that point that we were going    18:18:27
```

                                                    Page 265

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | to have █████████. | 18:18:28 |
| 2 | Q.   Is Mr. Pennecot -- is he on your team? | 18:18:31 |
| 3 | A.   Yes. | 18:18:31 |
| 4 | Q.   So in terms of -- you didn't mention | 18:18:36 |
| 5 | Mr. Pennecot's involvement in this design in your | 18:18:39 |
| 6 | original declaration, did you? | 18:18:40 |
| 7 | A.   No. | 18:18:41 |
| 8 | Q.   Did you mention his involvement in your | 18:18:43 |
| 9 | supplemental declaration either? | 18:18:45 |
| 10 | (Witness reviews document.) | 18:19:58 |
| 11 | A.   I don't recall his name in here and I don't | 18:20:00 |
| 12 | see his name in here either. | 18:20:01 |
| 13 | Q.   Why did you -- | |
| 14 | MR. KIM:  I think we've gone for well over an hour | 18:20:05 |
| 15 | now.  I think we talked about taking a break after | 18:20:08 |
| 16 | that last line of questioning. | 18:20:10 |
| 17 | Can we take a break? | 18:20:11 |
| 18 | MR. JAFFE:  Sure. | 18:20:12 |
| 19 | THE VIDEOGRAPHER:  We are off the record at 6:20 | 18:20:14 |
| 20 | p.m. | 18:20:15 |
| 21 | (Recess taken.) | 18:20:15 |
| 22 | THE VIDEOGRAPHER:  We are back on the record at | 18:41:06 |
| 23 | 6:41 p.m. | 18:41:09 |
| 24 | BY MR. JAFFE: | 18:41:09 |
| 25 | Q.   When we took a break, I was about to ask you | 18:41:13 |

Page 266

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    why you didn't mention Mr. Pennecot's involvement in    18:41:18
2    coming up with the ████████████████████               18:41:24
3    for Fuji.                                              18:41:26
4        A.   Why his name is not in the declaration?  It   18:41:35
5    wasn't in the original declaration written by legal.   18:41:42
6    It didn't pop out to me that we should add it.  I      18:41:47
7    suppose there might be other people's names left out   18:41:50
8    along the way, I'm not sure.  But when I reference my  18:41:53
9    team, I guess that would also include him too.         18:41:57
10       Q.   Was it Uber's lawyers' decision or your       18:41:59
11   decision to refer to Mr. Pennecot's work as done by    18:42:03
12   the LiDAR team?                                         18:42:04
13       A.   I think that was my decision.                  18:42:09
14       Q.   So you changed it to omit Mr. Pennecot's       18:42:11
15   name?                                                   18:42:12
16       MR. KIM:  Objection; form.                          18:42:14
17       THE WITNESS:  No.  I mean, can we refer to -- find  18:42:18
18   this.  My thinking at the time was it involved more    18:42:20
19   than one person.                                        18:42:21
20   BY MR. JAFFE:                                            18:42:21
21       Q.   Whose decision was it to not mention Mr.       18:42:24
22   Pennecot?  Yours or Uber's lawyers?                     18:42:29
23       A.   That's a funny worded question to decide to   18:42:37
24   not include something that didn't come to mind.  I     18:42:41
25   wouldn't . . . I wouldn't characterize it that way.    18:42:44
```

Page 267

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Right.  But we talked about the work that Mr. | 18:42:47 |
| 2 | Pennecot did. | 18:42:48 |
| 3 | A.   Yes. | 18:42:48 |
| 4 | Q.   He did most of the work that's described in | 18:42:51 |
| 5 | that paragraph; right? | 18:42:51 |
| 6 | A.   Yes. | 18:42:51 |
| 7 | Q.   And so whose decision was it to omit his | 18:42:56 |
| 8 | name? | 18:42:56 |
| 9 | MR. KIM:  Objection; form. | 18:43:00 |
| 10 | THE WITNESS:  I believe it was my recommended text | 18:43:02 |
| 11 | to refer to my team because I believe . . . let me | 18:43:08 |
| 12 | find this.  Of all the steps in there, it involved | 18:43:11 |
| 13 | more than one person.  It was -- just seemed right. | 18:43:17 |
| 14 | BY MR. JAFFE: | 18:43:17 |
| 15 | Q.   Who else did you omit from your declaration | 18:43:21 |
| 16 | that had primary involvement in the LiDAR work that | 18:43:25 |
| 17 | you described? | 18:43:25 |
| 18 | MR. KIM:  Objection; form. | 18:43:35 |
| 19 | THE WITNESS:  Now, we have to go through the work | 18:43:38 |
| 20 | and I need to see if we left anyone out. | 18:43:42 |
| 21 | BY MR. JAFFE: | 18:43:42 |
| 22 | Q.   Let me ask you -- we're short on time.  Your | 18:43:46 |
| 23 | counsel said he's going to cut me off. | 18:43:46 |
| 24 | Is there anyone, sitting here today without | 18:43:49 |
| 25 | reading the whole declaration again, that you recall | 18:43:51 |

Page 268

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | leaving out even though they had a primary involvement | 18:43:55 |
| 2 | in what's described in your declaration? | 18:43:57 |
| 3 | MR. KIM:  Objection; form. | 18:44:00 |
| 4 | THE WITNESS:  I'm not aware of anyone being | 18:44:03 |
| 5 | intentionally left out, but I'm also not aware of | 18:44:07 |
| 6 | -- without going through this, it doesn't strike me as | 18:44:11 |
| 7 | anybody else who you would say is omitted. | 18:44:14 |
| 8 | BY MR. JAFFE: | 18:44:14 |
| 9 | Q.  Just Mr. Pennecot? | 18:44:16 |
| 10 | A.  Well, you see now I've got to go back.  When | 18:44:21 |
| 11 | you said specifically Mr. Pennecot, then I've got to | 18:44:26 |
| 12 | double check, does that include Will Treichler, does | 18:44:29 |
| 13 | that include Scott Boehmke in that reference, does it | 18:44:33 |
| 14 | include Florin Ignatescu? | 18:44:34 |
| 15 | Q.  Well, you mentioned Scott Boehmke; right? | 18:44:40 |
| 16 | A.  His name does come up here.  He plays a | 18:44:40 |
| 17 | larger roles in sourcing the angles. | 18:44:43 |
| 18 | Q.  Sitting here today, Mr. Pennecot is the only | 18:44:45 |
| 19 | one that you can recall that you left out of your | 18:44:48 |
| 20 | declaration by name? | 18:44:50 |
| 21 | MR. KIM:  Objection; form. | 18:44:51 |
| 22 | THE WITNESS:  I though I just explained.  I think | 18:44:51 |
| 23 | there's also the chance that my team left out Will | 18:44:56 |
| 24 | Treichler, Florin Ignatescu, Scott Boehmke. | 18:45:23 |
| 25 | THE REPORTER:  Left out?  Could you slow down. | |

Page 269

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Who is it?  "I think there's also the chance that my
 2    team left out" . . .
 3         THE WITNESS:  Will Treichler, Florin Ignatescu,
 4    Scott Boehmke, although I wouldn't necessarily          18:45:25
 5    consider him on my team in that regard.  He was         18:45:28
 6    already mentioned as the source of those angles so      18:45:32
 7    that doesn't necessarily apply in that paragraph.       18:45:35
 8    BY MR. JAFFE:                                           18:45:35
 9         Q.   So why don't we make this a little more       18:45:38
10    specific.  In terms of what's described in paragraph    18:45:41
11    18, is there anyone else you omitted by name other     18:45:46
12    than Mr. Pennecot that had substantial involvement in   18:45:50
13    what's described here?                                  18:45:52
14         MR. KIM:  Objection; form.                         18:46:06
15              (Witness reviews document.)                   18:46:06
16         THE WITNESS:  No, I think it's probably fair to    18:46:09
17    say in the line 25 and 26 and the following page for    18:46:14
18    the ending of paragraph 18, Mr. Pennecot was the        18:46:18
19    primary one who was not named.                          18:46:21
20    BY MR. JAFFE:                                           18:46:21
21         Q.   I want to go back to your supplemental        18:46:23
22    declaration, 152.                                       18:46:26
23         A.   All right.                                    18:46:27
24         Q.   And in particular page 10 the end of          18:46:30
25    paragraph 15.  You mentioned that Figure 7A and 7B in   18:46:39
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    your supplemental declaration, those came from        18:46:41

 2    Mr. Pennecot as well?                                 18:46:43

 3        A.    My understanding is those files came from   18:46:48

 4    Mr. Pennecot, yes.                                    18:46:49

 5        Q.    And who provided the label ████████         ████████

 6    ███████████                                           18:46:56

 7        A.    I believe that was annotated by Uber legal. 18:46:59

 8        Q.    Do you know for a fact that that is an      18:47:01

 9    ████████████████                                      18:47:04

10        A.    When this was being prepared, I saw a drawing  18:47:14

11    that defined this FAC lens and I saw the formula      18:47:20

12    attributed to the curved surface.  It was an          18:47:25

13    ███████████                                           18:47:28

14        Q.    So you do know based on personal knowledge  18:47:32

15    that what's described here is ██████████████████      18:47:37

16    ██████ is that right?

17        A.    I have good reason to believe so barring the  18:47:40

18    possibility that somehow this three-dimensional CAD   18:47:43

19    image came from some prior or different version but   18:47:46

20    that's unlikely.                                      18:47:48

21        Q.    There are multiple versions of Uber's FAC   18:47:51

22    lenses; right?                                        18:47:52

23        MR. KIM:  Objection; form.                        18:47:53

24        THE WITNESS:  I don't know that.                  18:47:54

25    BY MR. JAFFE:                                         18:47:54
```

Page 271

```
 1        Q.   Are you aware of any other versions of FAC    18:47:56

 2   lenses that Mr. Pennecot designed?                      18:47:58

 3        A.   I'm not aware of any other design than the    18:48:00

 4   one that went into production at the injection molding  18:48:07

 5   house.                                                  18:48:08

 6        Q.   And that was based on ███████████ project;    18:48:12

 7   right?                                                  18:48:12

 8        A.   I believe so.                                 18:48:13

 9        Q.   How do you know that what's described here in 18:48:16

10   7.A and 7.B is actually what's in the Fuji?             18:48:21

11        A.   I don't have the firsthand knowledge to know  18:48:28

12   for sure that that was the case.                        18:48:30

13        Q.   So sitting here today, you can't tell me      18:48:32

14   whether what's described here is actually what's used   18:48:36

15   in the Fuji or not?                                     18:48:38

16        MR. KIM:   Objection; form.                        18:48:38

17        THE WITNESS:   I would say I don't have firsthand  18:48:40

18   knowledge to know that these two files came from the    18:48:44

19   version that was actually fabricated.  But there are    18:48:48

20   features in here that I recognize and I've talked to    18:48:52

21   Gaetan about to know are still valid representations.   18:48:57

22   BY MR. JAFFE:                                           18:48:57

23        Q.   Understood.  Okay.  So let me back up then.   18:49:01

24   It's fair to say that you don't know whether the        18:49:03

25   source files that were used to create Figure 7.A and    18:49:10
```

Page 272

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | 7.B in your declaration correspond to what's currently | 18:49:14 |
| 2 | in Fuji; right? | 18:49:15 |
| 3 | MR. KIM:  Objection; form. | 18:49:17 |
| 4 | THE WITNESS:  Correct.  I don't know that the | 18:49:19 |
| 5 | versions of these files correspond to what was | 18:49:21 |
| 6 | actually built. | 18:49:23 |
| 7 | MR. JAFFE:  I think we're at another exhibit here. | 18:49:27 |
| 8 | I think we're at 160. | |
| 9 | THE REPORTER:  I think we're at 161. | 18:49:33 |
| 10 | MR. JAFFE:  I believe you. | |
| 11 | MR. KIM:  So you're introducing a new exhibit. | 18:49:36 |
| 12 | MR. JAFFE:  Yes.  I was raised by your redirect. | 18:49:40 |
| 13 | (Plaintiff's Exhibit 161 was marked.) | 18:49:53 |
| 14 | BY MR. JAFFE: | 18:49:53 |
| 15 | Q.   Is this the document that formed the basis | 18:49:55 |
| 16 | for what's in your declaration? | 18:49:57 |
| 17 | A.   This looks like the document that was shown | 18:50:04 |
| 18 | to me when my declaration was being prepared.  So I | 18:50:10 |
| 19 | have reasonable assumption that this imagine was | 18:50:15 |
| 20 | extracted into the declaration. | 18:50:17 |
| 21 | Q.   And do you see where there's a diagram here | 18:50:21 |
| 22 | in the middle and then it says ██████████████████ | |
| 23 | ████████████ | 18:50:25 |
| 24 | A.   Yeah. | 18:50:25 |
| 25 | Q.   So this is a ██████████████████ | 18:50:29 |

Page 273

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   right?                                         18:50:30

 2        MR. KIM:  Objection; form.               18:50:31

 3        THE WITNESS:  Only it isn't.             18:50:32

 4   BY MR. JAFFE:                                  18:50:32

 5        Q.   Oh, I see.  So the document is wrong? 18:50:34

 6        A.   Yeah.                                18:50:34

 7        Q.   Okay.  And so when it says

 8        ████████ here on the bottom, th t's also wr ng? 18:50:42

 9        A.   Yes.                                 18:50:42

10        Q.   So even though this document says   18:50:46

11   ██████████████████████████████████           18:50:50

12        A.   True.                               18:50:51

13        Q.   And what is your basis for that belief? 18:50:53

14        A.   The formula below the lower citing of 18:50:57

15   ██████████████████████████████████████████

16   ██████████████████████████████████████████

17   ██████████████████████████████████████████

18   █████████████████████████████                18:51:21

19        Q.   Why is this labeled with ██████████ 18:51:25

20   ████████                                      18:51:26

21        MR. KIM:  Objection; form.               18:51:27

22        THE WITNESS:  I don't know why this was labeled 18:51:29

23   ██████████████████████████████████████████

24   ██████████████████████                        18:51:35

25   BY MR. JAFFE:                                  18:51:35
```

Page 274

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      Q.    Who labeled it ███████████████████     18:51:38

2      A.    I believe Gaetan labeled it ██████      18:51:40

3   ████████                                         18:51:41

4      Q.    Why did he do that?                     18:51:42

5      MR. KIM:  Objection; form.                    18:51:43

6      THE WITNESS:  I don't know.                   18:51:44

7   BY MR. JAFFE:                                    18:51:44

8      Q.    ████████████████████████████████████   

9   ██████████████████                               18:51:53

10     A.    I don't know if some version of it beforehand   18:51:55

11  had a cylindrical surface or not.                18:51:59

12     Q.    Why didn't you mention in your declaration   18:52:01

13  that the diagram that formed the basis for you saying   18:52:06

14  that there's ████████████████ actually said the   18:52:10

15  opposite?                                        18:52:11

16     MR. KIM:  Objection; form.                    18:52:14

17     THE WITNESS:  I don't know.  I didn't think that   18:52:16

18  was necessary.                                   18:52:17

19  BY MR. JAFFE:                                    18:52:17

20     Q.    Why didn't you attach the document that   18:52:21

21  formed the basis of these diagrams?              18:52:26

22     A.    I don't know.  Didn't know that was     18:52:28

23  necessary.                                       18:52:28

24     Q.    Okay.  Would you dispute that at one time   18:52:36

25  Uber was -- and Otto were working on a FAC lens with a   18:52:42
```

Page 275

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | ███████████████████████ | 18:52:44 |
| 2 | MR. KIM:  Objection; form. | 18:52:46 |
| 3 | THE WITNESS:  I would want to ask the person who | 18:52:49 |
| 4 | did the work. | 18:52:50 |
| 5 | BY MR. JAFFE: | 18:52:50 |
| 6 | Q.   You would ask Mr. Pennecot? | 18:52:51 |
| 7 | A.   I would ask Mr. Pennecot. | 18:52:53 |
| 8 | Q.   Why didn't you mention in paragraph 15 here | 18:52:55 |
| 9 | that you got this information from Mr. Pennecot? | 18:52:59 |
| 10 | A.   Because the paragraph is describing the | 18:53:20 |
| 11 | design of the Fuji sensor and does not make a | 18:53:23 |
| 12 | discussion of its origin or history. | 18:53:26 |
| 13 | Q.   But it's discussing the FAC lens and its | 18:53:28 |
| 14 | properties right here at the end of paragraph 15; | 18:53:31 |
| 15 | isn't it? | 18:53:32 |
| 16 | A.   Yeah. | 18:53:32 |
| 17 | Q.   And that's information that you got from | 18:53:34 |
| 18 | Mr. Pennecot; is that right? | 18:53:36 |
| 19 | A.   That was information that was sourced from | 18:53:38 |
| 20 | Mr. Pennecot. | 18:53:39 |
| 21 | Q.   So why didn't you mention that you got the | 18:53:41 |
| 22 | information from Mr. Pennecot? | 18:53:43 |
| 23 | MR. KIM:  Objection; form. | 18:53:44 |
| 24 | THE WITNESS:  The design is described in a file | 18:53:47 |
| 25 | that belongs to Uber. | 18:53:51 |

Page 276

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. JAFFE: | 18:53:51 |
| 2 | Q.   So what's described here in terms of the | 18:53:53 |
| 3 | properties -- as to the properties of the FAC lens, | 18:53:59 |
| 4 | that's not based on your personal knowledge, that's | 18:54:02 |
| 5 | based on representations from Mr. Pennecot | 18:54:03 |
| 6 | communicated to you through Uber's lawyers; is that | 18:54:06 |
| 7 | right? | 18:54:07 |
| 8 | MR. KIM:  Objection; form.  And to the extent it | 18:54:11 |
| 9 | calls for privileged conversations that you may have | 18:54:15 |
| 10 | had with any Uber lawyers. | 18:54:18 |
| 11 | THE WITNESS:  I would say the properties defined | 18:54:24 |
| 12 | in here were communicated to me through this document | 18:54:27 |
| 13 | that Mr. Pennecot created. | 18:54:32 |
| 14 | BY MR. JAFFE: | 18:54:32 |
| 15 | Q.   Right.  But what I'm asking is what's | 18:54:35 |
| 16 | described here in your declaration, your basis for | 18:54:39 |
| 17 | saying that is based on information communicated to | 18:54:45 |
| 18 | you from Mr. Pennecot through Uber's lawyers not based | 18:54:49 |
| 19 | on your personal knowledge? | 18:54:50 |
| 20 | MR. KIM:  Objection; form.  And again to the | 18:54:52 |
| 21 | extent that it calls for privileged communications | 18:54:55 |
| 22 | from Uber lawyers. | 18:54:58 |
| 23 | THE WITNESS:  Some of the information in paragraph | 18:55:01 |
| 24 | 15 I know, from talking with Gaetan specifically | 18:55:05 |
| 25 | directly, some I know just from firsthand knowledge. | 18:55:10 |

Page 277

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   Specifically the same -- this is a true and accurate   18:55:17

 2   Zemax simulation of the beam regarding Figure . . .    18:55:24

 3   albeit with now what I'm now seeing as a numbering      18:55:31

 4   error, was transmitted to me through Uber's lawyers.   18:55:40

 5   BY MR. JAFFE:                                           18:55:40

 6       Q.   What facts in paragraph 15 are you relying on 18:55:45

 7   information from Mr. Pennecot?                          18:55:47

 8            (Witness reviews document.)                   18:56:21

 9       A.   I had a discussion with him to make sure it   18:56:24

10   was ██████████████                                     18:56:26

11       Q.   What did he tell you?                         18:56:27

12       A.   He told me that it was.                       18:56:30

13       THE REPORTER:  Excuse me. ████████████████?        18:56:30

14       THE WITNESS:  I had a discussion with Gaetan to    18:56:40

15   establish that it was ██████████████████               18:56:43

16       MR. JAFFE:  One word.                              18:56:45

17       THE REPORTER:  Thank you.  Just making sure.       18:56:45

18       THE WITNESS:  He told me that it was.  I asked him 18:56:54

19   about the formula and the term ██████████████████      18:57:01

20   He told me that was a mistake.                         18:57:03

21   BY MR. JAFFE:                                          18:57:03

22       Q.   Did you discuss anything else?                18:57:06

23       A.   I asked him about the formula that has the    18:57:12

24   ███████████████████████████████████████████████████

25   ██████████████████████████████████████████            18:57:23
```

Page 278

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | ███████████████████████████ | 18:57:26 |
| 2 | ████████████████████████ | 18:57:30 |
| 3 | ███████████████████████████ | 18:57:35 |
| 4 | █████████████ | 18:57:39 |
| 5 | Q.    Anything else? | 18:57:42 |
| 6 | A.    No. | 18:57:42 |
| 7 | Q.    You didn't mention the basis -- you didn't | 18:57:47 |
| 8 | mention that you were relying on Mr. Pennecot in | 18:57:50 |
| 9 | paragraph 15, did you? | 18:57:52 |
| 10 | A.    No, I don't think I mentioned that. | 18:58:00 |
| 11 | Q.    You leave him out again? | 18:58:02 |
| 12 | MR. KIM:  Objection; form. | 18:58:05 |
| 13 | THE WITNESS:  I did not add his name to the | 18:58:07 |
| 14 | paragraph. | 18:58:08 |
| 15 | BY MR. JAFFE: | 18:58:08 |
| 16 | Q.    Okay.  We mentioned -- we talked about before | 18:58:28 |
| 17 | vertical spacing. | 18:58:33 |
| 18 | Do you remember that? | 18:58:35 |
| 19 | A.    Yes. | 18:58:35 |
| 20 | Q.    And you testified that you had a number of | 18:58:41 |
| 21 | different understandings of what vertical spacing was; | 18:58:45 |
| 22 | is that right? | 18:58:45 |
| 23 | A.    I discussed that there were two possible | 18:58:49 |
| 24 | interpretations of the word.  And I think in our | 18:58:52 |
| 25 | discussion together, you and I, that I was asking for | 18:58:55 |

Page 279

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | some clarification and mentioning the difference.  But | 18:58:58 |
| 2 | then you were clarifying as well that in the terms D,Y | 18:59:02 |
| 3 | we were talking about a vertical spacing that was | 18:59:04 |
| 4 | linear. | 18:59:05 |
| 5 | Q.   Right.  So the delta of the Y axis; right? | 18:59:10 |
| 6 | A.   Right. | |
| 7 | Q.   You've heard vertical spacing referred to | 18:59:12 |
| 8 | refer to the delta of the Y axis; right? | 18:59:16 |
| 9 | MR. KIM:  Objection; form. | 18:59:17 |
| 10 | THE WITNESS:  Here.  I've heard of it here.  I | 18:59:19 |
| 11 | don't think I remember having that reference -- | 18:59:20 |
| 12 | hearing that reference before our deposition today. | 18:59:25 |
| 13 | BY MR. JAFFE: | 18:59:25 |
| 14 | Q.   But calculating the Y delta between laser | 18:59:30 |
| 15 | diodes, that's something that you're familiar with; | 18:59:35 |
| 16 | right? | 18:59:36 |
| 17 | MR. KIM:  Objection; form. | 18:59:37 |
| 18 | THE WITNESS:  It was a simple calculation. | 18:59:40 |
| 19 | BY MR. JAFFE: | 18:59:40 |
| 20 | Q.   So let's look at Exhibit 160. | 18:59:43 |
| 21 | A.   Yes. | 18:59:44 |
| 22 | Q.   Just to orient ourselves.  When is the first | 18:59:47 |
| 23 | time you saw this slide? | 18:59:49 |
| 24 | A.   I don't recall if I've seen this before | 18:59:58 |
| 25 | today. | 18:59:59 |

Page 280

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Did you see this slide before Uber's lawyers | 19:00:03 |
| 2 | started asking you about it today? | 19:00:06 |
| 3 | A.   I don't recall if I've seen it before Uber's | 19:00:11 |
| 4 | asked me about it today. | 19:00:13 |
| 5 | Q.   You're not sure, though? | 19:00:15 |
| 6 | A.   It's possible I saw it during prep last | 19:00:23 |
| 7 | night. | 19:00:23 |
| 8 | Q.   I see.  So it's possible that you saw this | 19:00:27 |
| 9 | document last night; you're not sure? | 19:00:32 |
| 10 | A.   Yeah, I'm not sure. | 19:00:33 |
| 11 | Q.   Did Uber's lawyer tell you that he was going | 19:00:38 |
| 12 | to ask you questions about this document last night? | 19:00:42 |
| 13 | MR. KIM:  You can answer that yes or no.  Caution | 19:00:53 |
| 14 | you not to reveal any privileged communications. | 19:00:57 |
| 15 | THE WITNESS:  I don't recall if he told me he was | 19:01:03 |
| 16 | going to ask me about these last night or not. | 19:01:08 |
| 17 | BY MR. JAFFE: | 19:01:08 |
| 18 | Q.   And did you have an understanding when Uber's | 19:01:14 |
| 19 | lawyers mentioned that they were going to do redirect | 19:01:17 |
| 20 | on a break today that he was going to be asking you | 19:01:19 |
| 21 | about what's in Exhibit 1060? | 19:01:22 |
| 22 | A.   No. | 19:01:22 |
| 23 | Q.   You didn't have any understanding? | 19:01:25 |
| 24 | A.   No. | 19:01:25 |
| 25 | Q.   Did you prepare Exhibit 1060? | 19:01:30 |

Page 281

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    No. | 19:01:31 |
| 2 | Q.    And you weren't involved in coming up with | 19:01:37 |
| 3 | these angles or the deltas in here; right? | 19:01:39 |
| 4 | A.    No. | 19:01:42 |
| 5 | Q.    And as you found when you were checking them, | 19:01:44 |
| 6 | it's not accurate for two of the three boards; right? | 19:01:47 |
| 7 | MR. KIM:  Objection; form. | 19:01:49 |
| 8 | THE WITNESS:  Right. | 19:01:52 |
| 9 | THE REPORTER:  Is that a "right"? | 19:01:55 |
| 10 | THE WITNESS:  Right. | 19:01:57 |
| 11 | BY MR. JAFFE: | 19:01:57 |
| 12 | Q.    Do you know where the source data came from | 19:01:59 |
| 13 | for this board -- or for Exhibit 1060? | 19:02:03 |
| 14 | A.    I believe in the redirect, I checked these | 19:02:11 |
| 15 | angles against the angles in the other exhibit. | 19:02:17 |
| 16 | Q.    So my question is a little bit different | 19:02:20 |
| 17 | which is, do you know where the data came from in | 19:02:22 |
| 18 | Exhibit 1060? | 19:02:24 |
| 19 | MR. KIM:  Objection; form. | 19:02:26 |
| 20 | THE WITNESS:  I don't have firsthand knowledge of | 19:02:28 |
| 21 | where they came from other than to say I don't know | 19:02:31 |
| 22 | where else it could have come from. | 19:02:33 |
| 23 | BY MR. JAFFE: | 19:02:33 |
| 24 | Q.    But you said they weren't accurate? | 19:02:36 |
| 25 | MR. KIM:  Objection; form. | 19:02:37 |

Page 282

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  I clarified these numbers have been | 19:02:38 |
| 2 | rounded to two decimal places. | |
| 3 | BY MR. JAFFE: | 19:02:38 |
| 4 | Q.   And then one of them has a sign problem too? | 19:02:43 |
| 5 | A.   Right. | 19:02:43 |
| 6 | Q.   So these weren't carried one to one from any | 19:02:47 |
| 7 | sort of source document; right? | 19:02:50 |
| 8 | MR. KIM:  Objection; form. | 19:02:54 |
| 9 | THE WITNESS:  Doesn't seem to. | 19:02:55 |
| 10 | BY MR. JAFFE: | 19:02:55 |
| 11 | Q.   Let me just state it another way. | 19:02:57 |
| 12 | Exhibit 1060 does not accurately reflect the | 19:03:01 |
| 13 | diode placement on the Fuji design Board ███; | 19:03:05 |
| 14 | right? | 19:03:06 |
| 15 | MR. KIM:  Objection; form. | 19:03:12 |
| 16 | THE WITNESS:  Exhibit 1060 does not accurately | 19:03:14 |
| 17 | represent the angle of the diodes on Board █ because | 19:03:18 |
| 18 | of the sign error or inconsistency with the other two | 19:03:23 |
| 19 | boards.  Boards ████ have been rounded down to two | 19:03:28 |
| 20 | decimal places.  And now we're just haggling over how | 19:03:33 |
| 21 | to accurate is accurate. | 19:03:34 |
| 22 | BY MR. JAFFE: | 19:03:34 |
| 23 | Q.   Well, I'm just asking for your opinion. | 19:03:37 |
| 24 | In your opinion, is Exhibit 1060 accurate or | 19:03:41 |
| 25 | not, yes or no? | 19:03:43 |

Page 283

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    In my opinion, the inconsistency in the angle | 19:03:50 |
| 2 | makes it somewhat inaccurate.  But the deviations in | 19:03:55 |
| 3 | the second decimal place being off by one digit | 19:03:59 |
| 4 | doesn't cause me concern. | 19:04:01 |
| 5 | Q.   It doesn't you cause you concern, but it's | 19:04:03 |
| 6 | not accurate? | 19:04:04 |
| 7 | MR. KIM:  Objection; form. | 19:04:12 |
| 8 | THE WITNESS:  I don't know that it's not accurate | 19:04:19 |
| 9 | based on the second decimal place being off by one | 19:04:23 |
| 10 | digit.  Because if you operate this in a spreadsheet, | 19:04:26 |
| 11 | these numbers might actually be more accurate than | 19:04:29 |
| 12 | simply subtracting the rounded numbers. | 19:04:32 |
| 13 | BY MR. JAFFE: | 19:04:32 |
| 14 | Q.   But you don't know where the data came from | 19:04:35 |
| 15 | that actually generated this?  They could actually be | 19:04:38 |
| 16 | inaccurate numbers in wherever this data came from; | 19:04:41 |
| 17 | right? | 19:04:42 |
| 18 | MR. KIM:  Objection; form. | 19:04:43 |
| 19 | THE WITNESS:  I don't believe that's the case. | 19:04:45 |
| 20 | BY MR. JAFFE: | 19:04:45 |
| 21 | Q.   But you don't know that's the case? | 19:04:47 |
| 22 | A.   Did I not -- I believe I did, compare these | 19:04:52 |
| 23 | angles to the angles in -- what is it, 155?  Since | 19:04:58 |
| 24 | we're using exhibits.  Where is this damn document? | 19:05:04 |
| 25 | So I've got Exhibit 155 here.  I don't know | 19:05:12 |

Page 284

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | from firsthand where this came from or that it's | 19:05:16 |
| 2 | actually the right numbers used on the Fuji other than | 19:05:19 |
| 3 | to establish some level of trust with document | 19:05:23 |
| 4 | production and collection and labeling as exhibits. | 19:05:28 |
| 5 | If these numbers are good and they compare within a | 19:05:32 |
| 6 | single digit on the second decimal place, I have to | 19:05:37 |
| 7 | believe there's few other places that it could have | 19:05:40 |
| 8 | come from. | 19:05:41 |
| 9 | Q.   You're assuming that it came from Exhibit | 19:05:43 |
| 10 | 155? | 19:05:44 |
| 11 | A.   I'm assuming it came from Exhibit 155. | 19:05:47 |
| 12 | Q.   But you have no personal knowledge on where | 19:05:51 |
| 13 | the numbers in Exhibit 160 [sic] came from? | 19:05:57 |
| 14 | MR. KIM:  Objection; form. | 19:05:58 |
| 15 | THE WITNESS:  I don't like the way you're painting | 19:06:00 |
| 16 | this. | 19:06:00 |
| 17 | If the numbers match, it's quite logical | 19:06:03 |
| 18 | to assume that they are accurately representing | 19:06:06 |
| 19 | the numbers in 155; but no, I don't have firsthand | 19:06:10 |
| 20 | knowledge of how the data was entered into this | 19:06:13 |
| 21 | document. | 19:06:14 |
| 22 | BY MR. JAFFE: | 19:06:14 |
| 23 | Q.   But the numbers don't match; right? | 19:06:17 |
| 24 | MR. KIM:  Objection; form. | 19:06:18 |
| 25 | THE WITNESS:  You say the numbers don't match, but | 19:06:26 |

Page 285

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    the magnitudes do match.                              19:06:28

 2    BY MR. JAFFE:                                         19:06:28

 3        Q.   Right.  But the delta, for example in column 19:06:30

 4    ███ you found three differences in the delta in the   19:06:33

 5    column from what's in Exhibit ███ right?              19:06:34

 6        A.   Yes.                                         19:06:34

 7        Q.   And for -- sorry.  Not Exhibit ███ PCB ███   19:06:40

 8             And for PCB ███ they're all wrong b cause of 19:06:45

 9    the sign conversion; right?                           19:06:47

10        A.   It's casting a greater degree of uncertainty 19:06:56

11    in this than I believe there really is.  First off, I 19:06:59

12    probably need to clarify.  ████████ have sign changes 19:07:05

13    relative to this doc.  We've already established this  19:07:09

14    document has a sign change relative to what's actually 19:07:12

15    on the board and that's understood.  ████████████████ 19:07:15

      ████████████████████████████████████████████.  Does  19:07:20

17    that make it inaccurate?  I don't personally believe   19:07:24

18    it does.                                              19:07:26

19        Q.   Well, this doesn't reflect what is actually  19:07:28

20    in the Fuji device; right?  That's what I'm trying to 19:07:33

21    get at here.                                          19:07:34

22        MR. KIM:  Objection; form.                        19:07:46

23        THE WITNESS:  I would have to know why the sign   19:07:51

24    change was applied to ████████████████████ If         19:07:56

25    there's a discrepancy, then yeah, then I can say that 19:07:58

                                                Page 286
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    as a whole taken with no prior knowledge that this      19:08:02

 2    document does not completely represent accurately what  19:08:06

 3    goes into Boards ████████ together as a whole.          19:08:09

 4    BY MR. JAFFE:                                           19:08:09

 5        Q.    Let me ask the question again.                19:08:11

 6              Sitting here today, you cannot -- sitting     19:08:14

 7    here today, Exhibit 1060 does not accurately represent  19:08:18

 8    what is in Fuji?  Yes or no.                            19:08:20

 9        MR. KIM:  Objection; form.                          19:08:26

10        THE WITNESS:  Yes, but only in the strictest        19:08:29

11    meaning of accuracy.                                    19:08:33

12    BY MR. JAFFE:                                           19:08:33

13        Q.    What does that mean?                          19:08:35

14        A.    That means the magnitudes in here match but   19:08:41

15    the sign change has not been consistently applied.  If  19:08:45

16    I had to use this data and no other data to build a     19:08:49

17    Fuji, then I would have a problem in the strict sense.  19:08:53

18        Q.    I see.  Okay.                                 19:08:54

19              So Exhibit 1060 has some inaccuracies and     19:09:00

20    problems, but it's generally accurate; is that right?   19:09:05

21        A.    I'm more comfortable saying that, yes.        19:09:07

22        Q.    So you couldn't build Fuji looking at Exhibit 19:09:10

23    1060; right?  Using this data?                          19:09:12

24        A.    Right.                                        19:09:12

25        Q.    And it wouldn't be fair to try and build a    19:09:16
```

Page 287

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Fuji using just this data; right? | 19:09:18 |
| 2 | MR. KIM:  Objection; form. | 19:09:20 |
| 3 | THE WITNESS:  It would not render a correct Fuji | 19:09:24 |
| 4 | based on this data only by itself. | 19:09:27 |
| 5 | BY MR. JAFFE: | 19:09:27 |
| 6 | Q.   Now, I want to go back to paragraph 19 of | 19:09:34 |
| 7 | your declaration, your original declaration, the | 19:09:40 |
| 8 | sentence about Mr. Levandowski. | 19:09:42 |
| 9 | A.   Okay. | 19:09:53 |
| 10 | Q.   We talked about this before and you testified | 19:09:56 |
| 11 | that you did no investigation to confirm the sentence | 19:10:01 |
| 12 | in paragraph -- the first sentence in paragraph 19; | 19:10:04 |
| 13 | right? | 19:10:04 |
| 14 | A.   Right. | 19:10:04 |
| 15 | Q.   And I just want to make sure that it's clear. | 19:10:09 |
| 16 | When you said you did no investigation, did | 19:10:11 |
| 17 | you do anything to confirm this statement before you | 19:10:14 |
| 18 | signed your declaration? | 19:10:16 |
| 19 | MR. KIM:  Objection; form. | 19:10:21 |
| 20 | THE WITNESS:  I refer to my recollection of how | 19:10:23 |
| 21 | the Fuji was developed, remembered no evidence of | 19:10:28 |
| 22 | Anthony coming in and controlling or designing those | 19:10:31 |
| 23 | aspects of the Fuji. | 19:10:33 |
| 24 | BY MR. JAFFE: | 19:10:33 |
| 25 | Q.   Did you talk to anyone to confirm this | 19:10:35 |

Page 288

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | statement? | 19:10:36 |
| 2 | A.  No. | 19:10:38 |
| 3 | Q.  Did you look at any documents to confirm this | 19:10:41 |
| 4 | statement? | 19:10:41 |
| 5 | A.  No. | 19:10:44 |
| 6 | Q.  Did you talk to anyone else on the LiDAR | 19:10:46 |
| 7 | team? | 19:10:47 |
| 8 | A.  No. | 19:10:50 |
| 9 | Q.  Okay.  Other than consulting your memory, did | 19:10:58 |
| 10 | you do anything to confirm the first sentence of | 19:11:00 |
| 11 | paragraph 19 of your original declaration? | 19:11:02 |
| 12 | A.  No, not that I recall. | 19:11:12 |
| 13 | Q.  Okay.  Let's -- | 19:11:13 |
| 14 | MR. KIM:  So we've gone 30 minutes on the record. | 19:11:18 |
| 15 | We're going to conclude this deposition | 19:11:23 |
| 16 | as we discussed at the break on the grounds that | 19:11:27 |
| 17 | we've given you more time than we took on | 19:11:32 |
| 18 | redirect, and he's now gone close to seven hours | 19:11:35 |
| 19 | on the record. | 19:11:36 |
| 20 | MR. JAFFE:  I understand your position. | 19:11:39 |
| 21 | THE VIDEOGRAPHER:  This is the end of today's | 19:11:44 |
| 22 | deposition of Mr. James Haslim. | 19:11:46 |
| 23 | We are off the record at 7:11 p.m. | 19:11:50 |
| 24 | The total number of media used was six and it | 19:11:53 |
| 25 | will be retained by Veritext.  Thank you. | 19:11:56 |

Page 289

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          (Whereupon, the deposition was concluded at

2          7:11 p.m.)

3                         ---oOo---

4

5

6

7

8                              JAMES HASLIM

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 290