HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David A. Perlson (Bar No. 209502)
  davidperlson@quinnemanuel.com
  Melissa J. Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  John Neukom (Bar No. 275887)
  johnneukom@quinnemanuel.com
  Jordan Jaffe (Bar No. 254886)
  jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>    Plaintiff,<br>        v.<br><br>UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>    Defendants. | CASE NO. 3:17-cv-00939-WHA<br><br>**PLAINTIFF WAYMO'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF WITHHELD DOCUMENTS**<br><br>**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>Date:  May 24, 2017<br>Time:  2:00 p.m.<br>Place: Courtroom F, 15th Floor<br>Judge: The Honorable Jacqueline Scott Corley |

**TABLE OF CONTENTS**

**Page**

I. DEFENDANTS DO NOT REBUT THE INFIRMITIES IN THEIR LOG AND HAVE SUBMITTED A DEFICIENT SWORN RECORD THAT FALLS FAR SHORT OF SHOWING THAT ANY PRIVILEGES APPLY AND HAVE NOT BEEN WAIVED ................................................................................................................. 2

II. DEFENDANTS HAVE NOT ESTABLISHED AND CANNOT ESTABLISH THAT ANY PRIVILEGE APPLIES TO THE PURPORTED "DUE DILIGENCE" MATERIALS ................................................................................................................. 3

    A. Defendants' Incomplete Record Does Not Justify The Claimed Privileges .............. 4

    B. The Acquisition Documents Confirm That Uber's Conduct Is Not Privileged As A Matter Of Law ................................................................................. 5

    C. Defendants Do Not Even Submit The Declarations They Concede Are Necessary To Make A Prima Facie Showing That The Asserted Privileges Apply And Were Not Waived ................................................................................... 7

III. EVEN IF THE LOGGED DOCUMENTS WOULD OTHERWISE BE PROTECTED, THE CRIME-FRAUD EXCEPTION APPLIES ........................................ 10

IV. DEFENDANTS DO NOT DISPUTE THAT THEY SHOULD BE COMPELLED TO PRODUCE ALL DOCUMENTS AND FORENSIC DATA PROVIDED TO STROZ FOR USE IN ITS INVESTIGATION ................................................................. 13

V. WAYMO HAS SHOWN THE REQUISITE NEED FOR THE LOGGED DOCUMENTS ............................................................................................................... 14

VI. DISCOVERY ............................................................................................................... 15

1 	The Court has already found that "troves of likely probative evidence have been concealed
2 from Waymo under relentless assertions of privilege that shroud dealings between Levandowski
3 and defendants in secrecy." (Dkt. 433 at 18-19.)  In its motion to compel, Waymo demonstrated
4 that Defendants have not met their burden to justify this shroud over what Defendants call the
5 "due diligence materials" related to Uber's investigation of Mr. Levandowski and other former
6 Waymo employees prior to Uber's acquisition of Otto.  Defendants do not substantively rebut that
7 their (tardy) privilege log fails to comply with the Court's standing order.  Instead, in opposition to
8 Waymo's motion, Defendants raise *new* supposed grounds, not found in their log, to justify their
9 privilege assertions.  These new grounds should be ignored altogether, though even they do not
10 support Defendants' positions, as detailed below.

11 	Defendants' recent production of documents regarding Uber's acquisition of Otto –
12 initially withheld even after the Court explicitly asked for those documents[1] – only further shows
13 that there is no basis to assert privilege over the "due diligence materials."  These acquisition
14 agreements reveal that Uber acknowledged what the parties agreed to explicitly call the "Bad
15 Acts" of Waymo's former employees, including Mr. Levandowski, prior to the acquisition.  (*E.g.*,
16 Ex.[2] 9 at 3-4 & Exh. C; Ex. 10.)  Incredibly, these Bad Acts were specifically defined to include
17 the willful misappropriation of Waymo's trade secrets.  (*E.g.*, Ex. 9, Exh. C at 4; Ex. 10 at 2.)
18 And Uber affirmatively incentivized Mr. Levandowski to use the materials he stole from Waymo
19 for Uber's benefit by linking his compensation to aggressive technical deliverables.  (*E.g.*, Ex. 9,
20 Exh. A; *see also* Dkt. 433 at 3-4.)  What is still unclear from Defendants' statements and
21 incomplete discovery is whether Uber learned about the Bad Acts through due diligence (and then

---

[1] In connection with expedited discovery ordered for the purpose of informing Waymo's motion for a preliminary injunction, Waymo had asked for all agreements related to Uber's acquisition of Otto, including those executed by Mr. Levandowski.  With no legitimate justification whatsoever, Defendants intentionally waited until *after* the Court issued its preliminary injunction ruling to produce *any* such agreements.  If the Court had not made known that Defendants should "hurry up" and produce them, Defendants would have concealed the acquisition agreements for even longer – at least until after this motion to compel was decided.  But, with the Court forcing their hand, on Thursday night and on Saturday, Defendants provided an incomplete set of heavily redacted acquisition agreements executed by Mr. Levandowski.
[2] All Exhibits are attached to the Declaration of Patrick Schmidt.

sought to cover them up) or whether Uber was complicit in the theft of Waymo's confidential documents from the start. Uber's shroud of secrecy cannot be justified in either scenario.

## I. DEFENDANTS DO NOT REBUT THE INFIRMITIES IN THEIR LOG AND HAVE SUBMITTED A DEFICIENT SWORN RECORD THAT FALLS FAR SHORT OF SHOWING THAT ANY PRIVILEGES APPLY AND HAVE NOT BEEN WAIVED

The Court made clear to Defendants that they needed to provide "bone-crushing detail" in their privilege logs. (4/5/17 Hr'g Tr. 27:10-28:4.) Defendants do not substantively dispute that they did not provide such detail. Indeed, the new arguments Defendants make in their opposition only confirm that the log describing the due diligence materials was grossly deficient. As just one example, while Defendants' log based their privilege assertions solely on an April 11, 2016 Joint Defense Agreement (Dkt. 370-4 at 1 n.2), Defendants now point to all manner of oral and written agreements (*e.g.*, Opp. 3 (Stroz engagement letter, side agreement between Stroz and Levandowski), 7 (referring to an "indemnification construct"), 8 (February 2016 term sheet, various emails purportedly related to oral agreements)). As expressly called out in Waymo's motion (at 5-6), Defendants' failure to reference these agreements "at the time of the assertion" of the privileges should be "deemed a waiver" pursuant to Judge Alsup's standing order.

More problematic, however, is Defendants' failure to make the vast majority of the agreements that they are now relying on part of the sworn record in opposition to Waymo's motion to compel. Referring to these various agreements in declarations is not sufficient.[3] Indeed, Defendants *intentionally* limited their record to such references – as opposed to providing the documents themselves – seemingly for a specific improper purpose: to use self-serving characterizations of the documents as a sword in opposition to Waymo's motion to compel, while simultaneously shielding the problematic content of the documents from Waymo and the Court for as long as possible, prejudicing Waymo with respect to not only this motion to compel but also its motion for a preliminary injunction. Defendants voluntarily submitted an incomplete record, and that record cannot satisfy Defendants' burden to establish the applicability of the asserted

---

[3] Such references do not pass muster on the best evidence rule. *Groppi v. Barham*, 157 F. App'x 10, 11–12 (9th Cir. 2005); *United States v. Bennett*, 363 F.3d 947, 953 (9th Cir. 2004).

1  privileges and the lack of any waiver thereof.

2  **II.    DEFENDANTS HAVE NOT ESTABLISHED AND CANNOT ESTABLISH THAT ANY PRIVILEGE APPLIES TO THE PURPORTED "DUE DILIGENCE" MATERIALS**

3

4      Regardless of Defendants' waiver in the context of its relentless efforts to obfuscate in this

5  case, there is no viable privilege here.  Defendants have taken the position that all parties related to

6  a potential acquisition – including a potential acquirer, potential acquirees (whether ultimately

7  acquired or not), individuals being investigated during "due diligence," and third-party

8  investigators – can collectively use privilege to cloak unfavorable facts in secrecy.  That is not the

9  law, and "all manner of mischief could be concealed" (Dkt. 202 at 12) if it were.

10     The following colloquy regarding a hypothetical posed by Judge Alsup is instructive.

11     **THE COURT:** All right. So let's say that the scenario is somebody is jumping ship, coming over.  The acquiring company learns in the course of the negotiations that, by the way, the guy jumping ship has downloaded a bunch of secret documents.  And then the acquirer says: Well, that's a problem.  We've got to come up with some kind of a solution to this.  So there's a lot of negotiation.  Let's just say that, hypothetically, they all get put into a vault somewhere.  They are not—you know, they're put into a vault and he promises in writing somewhere he will never look at them.  He won't use them.  The company tries to protect itself in every possible way.  But isn't that—isn't that agreement part of the acquisition itself and something that everybody ought to see?

12

13

14

15

16

17     **MR. GONZALEZ:** So, your Honor, what you just described, in my opinion, is classic joint interest material because—

18

19     **THE COURT:** The magistrate judge ought to take a very, very close look at your position.

20

21     **MR. GONZALEZ:**  Understood, Your Honor.  Understood.  But if what we're describing is something like that, where the acquiring company is trying to do the right thing, such as in the hypothetical you just mentioned, putting things in a vault so that we never get it, that's why you have the joint interest privilege.

22

23

24     **THE COURT:**  I don't think that's correct, in my view.  That's not what it's for.  But that's for the magistrate judge to decide.

25 (5/3/2017 Public Hr'g Tr. 52:6-53:8.)  Defendants' expansive understanding of privilege – as

26 revealed in response to Judge Alsup's hypothetical – is not supportable.  There is "no binding

27 authority" to support the notion that litigants can "abuse" privilege to conceal whatever they like

28

"so long as they cleverly passed it on as part of 'due diligence.'"  (Dkt. 202 at 10.)

**A.  Defendants' Incomplete Record Does Not Justify The Claimed Privileges**

Even the limited information that Defendants provided in opposition to Waymo's motion – which was cherry-picked to reflect what Defendants thought was most helpful while omitting what they deemed to be unhelpful – makes clear that Defendants have not come anywhere near meeting their burden to establish the asserted privileges.

For example, contrary to Defendants' statement that "Otto, its founders, and Uber . . . jointly retain[ed] Stroz to investigate potential claims that Google may have" (Opp. 15), the evidentiary record submitted by Defendants reveals that Mr. Levandowski and Mr. Ron did ***not*** participate in retaining Stroz and did ***not*** have a common interest with those who did.  Only Uber/MoFo and Otto/OMM (not Mr. Levandowski, Mr. Ron, or their counsel) engaged Stroz (Dkt. 370-3 at 1); the Stroz engagement was for the purpose of ***investigating*** Mr. Levandowski, Mr. Ron, and other former Waymo employees (Dkt. 370 ¶ 9); Stroz communicated substantively about its ongoing investigation only with MoFo and OMM (not with Mr. Levandowski, Mr. Ron, or their attorneys) (*id.* ¶ 16); Ottomotto, Otto Trucking, and Mr. Levandowski did ***not*** permit Stroz to share their attorney/client communications with Uber/MoFo (Dkt. 370-3 at 3); and Stroz had to seek permission from Mr. Levandowski – which Mr. Levandowski only sometimes granted – to share information uncovered in the investigation with Uber/MoFo (Dkt. 380 ¶ 7).  None of these facts supports Defendants' conclusory assertion that all of these actors had a common legal interest.  To the contrary, these facts show that those doing the investigating and those being investigated were protecting their own, personal interests vis-à-vis the group and third parties.

As another example, Uber makes a point of stating that it authorized the Stroz investigation[4] "prior to any understanding of the facts informing" the "litigation risks that the proposed acquisition presented."  (Dkt. 378 ¶ 10.)  Uber should not be heard to both disclaim knowledge of the facts informing purported litigation risks and seek to conceal those same facts

---

[4]  Defendants provide no date for this "authorization," though it now seems clear that Defendants were well aware of Mr. Levandowski's Bad Acts before Stroz was retained.  (*Compare* Ex. 9 (dated February 22, 2016), *with* Dkt. 370-3 (dated March 4, 2016).)

based on purported litigation risks. Moreover, Uber's assertion begs the question of how the interests of various purported members of the common interest group fluctuated over time. What exactly did Uber know about Mr. Levandowski's theft of Waymo's confidential and proprietary documents and when did it know it? Were Uber's and Mr. Levandowski's interests aligned with respect to that theft from the start or did their interests diverge once Uber gained "any understanding of the facts informing the litigation risks"? Defendants' record provides no answer.

Similarly, Defendants contend that Otto Trucking was initially an acquisition target but was not ultimately acquired by Uber. Although Otto Trucking is a purported member of the common interest group, Defendants provide no information regarding the purpose of Otto Trucking's receipt of any due diligence materials or its alleged change in status with respect to the acquisition. Did Otto Trucking's interests change vis-à-vis Waymo when the decision was made that Otto Trucking would not be acquired? Again, the record is silent.

The Court in this case made clear that Defendants' burden was to establish that each and every recipient of the due diligence materials had a common legal interest related to those materials. But the limited evidence submitted by Defendants only raises doubts as to how that could have possibly been the case. Such a record is insufficient to justify the asserted privileges.

### B. The Acquisition Documents Confirm That Uber's Conduct Is Not Privileged As A Matter Of Law

This Court previously anticipated the possibility that Uber asked Mr. Levandowski to disclose information to Stroz, so that Uber could "evaluate the extent to which Levandowski would arrive with attendant liabilities." (Dkt. 202 at 10.) And that Mr. Levandowski, in turn, "transferred any incriminating documents to [Stroz] . . . for the purpose of selling his ventures to Uber for $680 million." (*Id.* at 11.) The Court intimated that such a scenario would not be privileged, as it would constitute due diligence related to a commercial transaction between parties on opposing sides. (*See id.* at 10.) Of course the actual facts here are much more troubling, as Uber was already aware of at least some of Mr. Levandowski's Bad Acts before the parties entered into a term sheet for the acquisition (Ex. 9 at Exh. C), and Defendants appear to have set up the purported "due diligence" protocol to conceal those and other Bad Acts. But this more

1  nefarious scenario does not change the conclusion that, as a matter of law, no privilege applies.

2  To try to argue otherwise, Defendants heavily rely on Judge Alsup's opinion in *Rembrandt Patent Innovations, LLC v. Apple Inc.*, No. C 14-05093 WHA, 2016 WL 427363 (N.D. Cal. Feb. 4, 2016). But that case actually supports Waymo's position. *Rembrandt* held that, before a purchaser had acquired a binding option from inventors to purchase their patent, communications between these parties could not be protected by the common interest doctrine. *Id.* at *8. "At that point, Rembrandt's interest was in pitching the value of a business partnership to the named inventors and possibly in highlighting concerns about invalidity and title in order to drive down the price" – which was an interest assuredly not shared by the inventors. *Id.* The same logic applies here. Unless there was a concerted plan for all purported members of the common interest group – including Uber, Otto, Mr. Levandowski, and Mr. Ron – to steal Waymo's trade secrets (which the circumstantial evidence suggests and in which case the crime-fraud exception applies), those entities and individuals would have had starkly divergent interests vis-à-vis Waymo in the period before the acquisition closed.[5] And Mr. Levandowski and Mr. Ron – the subjects of the Stroz investigation – clearly had unique personal interests vis-à-vis those who were investigating them and vis-à-vis third parties who might be interested in the results of the investigation.

Even if Defendants were to argue that the acquisition was effectively a done deal by the time the due diligence materials were circulated among the group (an argument unsupported by the record), there still would not be a common legal interest here. This can be seen by the way in which the litigation against Waymo has actually unfolded: the legal interests of at least Mr. Levandowski and Uber are certainly not common. Mr. Levandowski has broadly taken the Fifth Amendment to protect himself against self-incrimination while exposing Uber to possible adverse inferences. Uber purportedly took steps to *remove* Mr. Levandowski from responsibilities for which he was originally hired even before the Court issued its Order enjoining Mr. Levandowski

---

[5] The Court has recognized this, stating: "I have been in this job a long time. I have seen many cases involving acquisitions, but I have never heard of an acquisition itself being cloaked in secrecy every -- ***because you're really on adverse sides. It's a business deal.***" (5/3/17 Public Hr'g Tr. at 47:24-48:3 (emphasis added).)

1  from working Uber's LiDAR technology (Dkt. 433 at 7-8).  And the Court's preliminary

2  injunction Order makes clear that Uber can threaten Mr. Levandowski with termination of his

3  employment should he fail to return the "14,000-plus pilfered files" to Waymo.  (*Id.* at 23 n.9.)

4      Needless to say, these divergent interests existed and were readily apparent at the time the

5  purportedly privileged materials were circulated to Uber, Mr. Levandowski, and others in August

6  2016.  Indeed, this Court recognized at the very outset of this litigation that Mr. Levandowski had

7  vastly different legal interests from Uber, suggesting that Mr. Levandowski may need his own

8  counsel.  (3/16/17 Hr'g Tr. at 16:16-17:3.)  And Defendants' counsel acknowledged that there was

9  a "conflict" with respect to their representation of both Defendants and Mr. Levandowski.

10 (3/29/17 Hr'g Tr. at 17:15-20.)  In sum, all of the dynamics that make clear that Uber and Mr.

11 Levandowski have divergent legal interests in this case would have been equally apparent in

12 August 2016, when the parties were discussing the theft of Waymo's confidential design server

13 and other proprietary documents in the context of purported "due diligence."[6]

    **C.    Defendants Do Not Even Submit The Declarations They Concede Are Necessary To Make A Prima Facie Showing That The Asserted Privileges Apply And Were Not Waived**

16     In connection with any opposition to Waymo's motion to compel, the Court ordered

---

[6] In their Opposition, Defendants only cite cases in which the parties to a common interest agreement would actually pursue a joint defense as opposed to the divergent legal defenses that Uber and Mr. Levandowski are pursuing here.  For example, in *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 310 (N.D. Cal. 1987), there was a common interest between a corporate buyer and seller with respect to possible future patent litigation because "they could be expected to conduct a joint defense on all the liability issues."  *Id.* at 310; *see also FastVDO LLC v. AT&T Mobility LLC*, No. 16-CV-385-H (WVG), 2016 WL 6138036, at *4 (S.D. Cal. Oct. 21, 2016) ("[T]he Subject Documents, the final agreement signed by Boeing and Plaintiff, and other documents lodged with the Court clearly demonstrate that the parties had, at the time of the communication of the Subject Documents, a common legal interest.  This legal interest was ultimately aligned with a final agreement regarding the asserted patent."); *Morvil Tech., LLC v. Ablation Frontiers, Inc.*, No. 10-CV-2088-BEN BGS, 2012 WL 760603, at *3 (S.D. Cal. Mar. 8, 2012) ("AFI and Medtronic shared common legal interests in whether the products that AFI and Medtronic would market infringed third party IP, and the communications addressing the scope of the IP certainly were designed to further that interest."); *FTC v. Abbvie, Inc.*, No. CV 14-5151, 2015 WL 8623076, at *12 (E.D. Pa. Dec. 14, 2015) ("Having signed an agreement to acquire Solvay on September 26, 2009, Abbott and Solvay shared a common interest in litigation concerning Solvay products when these emails were exchanged in October 2009.").

1  Defendants to "submit a proper sworn record as to all necessary predicates" for their privilege
2  assertions.  But whether one looks to the story told by Defendants in their opposition or the story
3  told by the acquisition agreements, the fact is that Defendants submitted no sworn declaration
4  from Mr. Ron, Mr. Levandowski, or OMM, even though each received all 42 of the logged "due
5  diligence" documents.  For this reason as well, Defendants have not carried their burden of
6  establishing that the asserted privileges "appl[y] and ha[ve] not been waived."  (Dkt. 202 at 5;
7  4/6/17 Hr'g Tr. at 36:1-4 ("Ordinarily if there's a claim of privilege, we look to see every single
8  person who got the information because there could easily be a waiver.  It happens all the time.").)

9        Defendants offer no explanation or justification for why they did not submit a sworn
10 declaration from Mr. Ron.  The absence of such a declaration is particularly problematic, given
11 that Mr. Ron was a *target* of the Stroz investigation that Defendants contend they authorized.  The
12 declaration from Mr. Ron's counsel, Ms. Baker, does not solve the problem.  For example, with
13 respect to whether Mr. Ron disseminated the due diligence report – a critical point that must be
14 supported by the sworn record in order for Defendants to prevail here (4/6/17 Hr'g Tr. at 36:1-
15 16) – Ms. Baker states only: "I have no reason to believe, and do not believe, that Mr. Ron has, at
16 any time, failed to keep the Due Diligence Report and exhibits thereto confidential."  (Dkt. 375 ¶
17 17.)  Ms. Baker apparently has no personal knowledge of Mr. Ron's activities since receiving the
18 purportedly privileged documents – her declaration does not even state that she *spoke* to Mr. Ron
19 regarding his efforts, if any, to keep those documents confidential.  Her statement that she has "no
20 reason to believe" Mr. Ron waived confidentiality is essentially meaningless.  *See United States v.*
21 *Wallace*, 961 F. Supp. 969, 976 (N.D. Tex. 1996).

22       Similarly, Defendants offer no declaration from Mr. Levandowski, another *target* of the
23 Stroz investigation that Defendants contend they initiated and one whose interests were *not*
24 aligned with Defendants' interests with respect to the Stroz investigation.  (*See supra* II.A & Dkt.
25 380 ¶ 7 (noting that Mr. Levandowski did *not* permit Stroz to share information uncovered in the
26 investigation with Defendants or with Mr. Ron).)  The declaration from Mr. Levandowski's
27 corporate counsel does not state *any* belief as to whether Mr. Levandowski maintained the
28

1  confidentiality of the purportedly privileged materials, and Mr. Levandowski did disclose those
2  materials at least to his criminal counsel, non-parties to any alleged joint defense agreement.
3        Although Mr. Levandowski moves for leave to submit a declaration *in camera*, Mr.
4  Levandowski cites *no* authority that supports his request.  This is not a criminal proceeding in
5  which Mr. Levandowski faces a Hobson's choice between two fundamental constitutional rights
6  or even between a constitutional right and the attorney-client privilege.  Here, Mr. Levandowski
7  chose – voluntarily – to disclose information to Stroz, Uber, and others "for the purpose of selling
8  his ventures to Uber for $680 million" (Dkt. 202 at 11).  Defendants should not now be excused
9  from having to establish the predicates for a privilege "merely because [those predicates] might
10 connect the dots back to a non-party in a possible criminal investigation."  (*Id.* at 12.)
11       Finally, Defendants concede that they were required to submit a declaration from OMM in
12 order to comply with the Court's order that they "submit a proper sworn record as to all necessary
13 predicates" for their privilege assertions.  (Opp. at 3 n.2.)  OMM is identified as a recipient of all
14 the purportedly privileged documents. (Dkt. 370-4.)  Accordingly, a declaration from OMM
15 would need to address, OMM's purported representation of Ottomoto and Otto Trucking, the
16 nature of the asserted common interest privilege that OMM, Ottomoto, and Otto Trucking
17 purportedly shared with the other recipients of the due diligence report, and any efforts OMM
18 made and continue to make to limit the dissemination of the documents at issue.  Defendants state
19 that "OMM would not provide that declaration . . ."  (Opp. at 3 n.2.)  Although Defendants try to
20 cast blame on "Waymo's counsel" for refusing to assist Defendants in obtaining such a declaration
21 (*id.*), Waymo's counsel certainly did not stand in the way of OMM contacting OMM's client,
22 Google, regarding any conflicts issues (indeed, Waymo's counsel suggested just that to
23 Defendants' counsel) or otherwise stand in the way of OMM submitting a declaration regarding
24 any issues it deemed appropriate.  Waymo does not have an obligation to assist Defendants in
25 obtaining declarations necessary to support *their* claims of privilege.
26       Defendants' failure to submit declarations from Mr. Ron, Mr. Levandowski, and OMM is
27 an independent reason for finding that Defendants did not meet their burden to establish the
28

applicability of the asserted privileges and the lack of any waiver thereof.

## III. EVEN IF THE LOGGED DOCUMENTS WOULD OTHERWISE BE PROTECTED, THE CRIME-FRAUD EXCEPTION APPLIES

No one in this case has ever disputed that Mr. Levandowski – purported joint holder of the alleged "common interest" – stole Waymo's confidential and proprietary materials or that stealing confidential and proprietary materials is a crime. Indeed, Mr. Levandowski has broadly asserted his right against self-incrimination in this case, which has now been referred to the U.S. attorney's office for investigation (Dkt. 428). As summarized in the Restatement (Third) of the Law Governing Lawyers (§ 82 cmt. e), for crimes like theft that have continuing legal consequences, "[c]onfidential communications concerning ways in which Client can continue to possess the stolen goods, including information supplied by Client about their present location, are not protected by the privilege because of the crime-fraud exception." Communicating for the purpose of concealing evidence of a crime also constitutes obstruction of justice, making the crime-fraud exception to the attorney-client privilege applicable. *United States v. Laurins*, 857 F.2d 529, 540 (9th Cir. 1988) ("Obstruction of justice is an offense serious enough to defeat the privilege."); *see also United States v. Edison*, No. CR 07-0074, 2008 WL 170660, at *4 (N.D. Cal. Jan. 17, 2008) (Alsup, J.) (holding that under the crime-fraud exception, "conversations that furthered ongoing efforts to obstruct justice would not be protected").[7]

Here, Defendants cannot dispute that the logged materials are related to the theft of Waymo's proprietary and confidential materials. *See In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1095 (9th Cir. 2007), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009). Defendants themselves logged those materials in response to Judge Alsup's March 15 Order that Defendants produce the stolen materials – *i.e.*, "all files and documents downloaded by Anthony Levandowski, Sameer Kshirsagar, or Radu Raduta before leaving plaintiff's payroll and thereafter taken by them" – as well as all documents that reference the stolen materials. (Dkt. 61 ¶ 4.)

---

[7] Communications in furtherance of receiving stolen property in violation of California Penal Code 496 would also be a sufficient predicate for invoking the crime-fraud exception.

-10-   No. 3:17-cv-00939-WHA
WAYMO'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF WITHHELD DOCUMENTS

Moreover, a preponderance of the evidence indicates that the logged communications were "made 'in furtherance of [the] intended, or present, continuing illegality.'" *Napster*, 479 F.3d at 1095 (citation omitted). Indeed, Defendants' claim that "Waymo has *zero* evidence that Uber or Otto ever knew about," much less furthered a continuing illegality (Opp. at 18), does not pass the straight-face test. As an initial matter, even Defendants' otherwise deficient privilege log makes clear that the due diligence documents relate to at least the possession and location of stolen materials, as Stroz itself apparently received those stolen materials for review in its investigation (*e.g.*, Dkt. 370-4 at No. 10 (referring to "electronic media collected from A. Levandowski")). More tellingly, Judge Alsup has already found that:

> Waymo has made a strong showing that Levandowski absconded with over 14,000 files from Waymo, evidently to have them available to consult on behalf of Otto and Uber. As of the date of this order, those files have not been returned and likely remain in Levandowski's possession. The record further indicates that Uber knew or at least should have known of the downloading but nevertheless proceeded to bring Levandowski and Otto on board. Even after this litigation commenced, Uber kept Levandowski as the head of its self-driving efforts until his "recusal" from LiDAR development on the day before defendants' sur-reply in opposition to provisional relief.
>
> Defendants maintain that Waymo's files never crossed over to Uber's servers or devices and that "Uber took strict precautions to ensure that no trade secrets belonging to a former employer would be brought to or used at Uber." These denials, however, leave open the danger of all manner of mischief. For example, it remains entirely possible that Uber knowingly left Levandowski free to keep that treasure trove of files as handy as he wished (so long as he kept it on his own personal devices), and that Uber willfully refused to tell Levandowski to return the treasure trove to its rightful owner. At best (and this has *not* been shown), Uber may have required Levandowski, as a matter of form, to commit not to use the Waymo files. But even if Levandowski so agreed, his word under these circumstances would be cold comfort against the danger of trade secret misappropriation for Uber's benefit.

(Dkt. 433 at 7-8 (citations omitted).) And the documents that Defendants were withholding until after the issuance of the preliminary injunction order confirm that Uber and Otto not only knew about Mr. Levandowski's theft but – at best – did absolutely nothing about it.

The Stroz investigation was specifically directed to the theft of Waymo's files and other "Bad Acts" by Mr. Levandowski and other former Waymo employees. (*See, e.g.*, Ex. 10

1  § 2.1(a).)  But, despite its knowledge of these Bad Acts, Uber did not require the files to be
2  returned to Waymo; Uber did not require that any existing technology at Ottomoto be scrubbed for
3  Waymo trade secrets; Uber did not require that Mr. Levandowski's consulting work for Uber to be
4  scrubbed for Waymo trade secrets; Uber did not ensure that Mr. Levandowski did not keep
5  Waymo's files handy on his personal devices; and Uber did not make Levandowski commit not to
6  use the Waymo files even as a matter of form.  By failing to take *any* remedial or prophylactic
7  measures whatsoever with respect to Mr. Levandowski's Bad Acts, Uber ratified and furthered
8  those Bad Acts (including trade secret misappropriation) for its own benefit.  Indeed, Uber
9  *incentivized* Mr. Levandowski to use Waymo's stolen files by tying his compensation to
10 aggressive technology milestones.  (*E.g.*, Dkt. 248-19.)  Defendants should not be permitted to
11 rely on any privilege regarding Mr. Levandowski's Bad Acts under such circumstances.
12      Of course, further supporting the existence of the crime-fraud exception is Mr.
13 Levandowski's across-the-board assertion of the Fifth Amendment (*see generally* Dkt. 273).
14 *Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 428 (S.D.N.Y. 2013) ("Courts have drawn
15 [adverse inferences from invocation of the Fifth Amendment] when determining if the crime-fraud
16 exception applies to evidence protected by the attorney-client privilege or work-product
17 doctrine.").[8]  Mr. Levandowski now says that he cannot even submit a declaration that some sort
18 of common interest with Uber ever existed because, apparently, admitting the fact of the common
19 interest would incriminate him.  (Dkt. 382 at 4 ("Mr. Levandowski cannot fully explain to the
20 Court the basis for the application of the common interest, attorney-client, or work product
21 privileges to the communications at issue without risking a waiver of his Fifth Amendment
22 privilege against self-incrimination.").)  Under these circumstances, an adverse inference that

---

23 [8]  Defendants ignore most of Waymo's authority that an assertion of the Fifth Amendment
24 properly results in an adverse inference for purposes of the crime-fraud analysis.  Defendants also
   fail to distinguish *United States v. Saccoccia*, 898 F. Supp. 53, 62 (D.R.I. 1995), which held that a
25 claim of attorney-client privilege is logically inconsistent with a Fifth Amendment claim over the
   same information.  Although Defendants argue that *Saccoccia* involved an *attorney*, as opposed to
26 a client, asserting the Fifth Amendment, the Ninth Circuit has made clear that an attorney's
27 knowledge or involvement in the criminal activity is not necessary to establish the crime-fraud
   exception.  *Laurins*, 857 F.2d at 540.
28

1 further supports the application of the crime-fraud exception is appropriate.[9]

## IV. DEFENDANTS DO NOT DISPUTE THAT THEY SHOULD BE COMPELLED TO PRODUCE ALL DOCUMENTS AND FORENSIC DATA PROVIDED TO STROZ FOR USE IN ITS INVESTIGATION

As explained in Waymo's Motion, Defendants should also be compelled to produce all documents and forensic data that Mr. Levandowski or others provided to Stroz for use in its investigation. (Dkt. 321 at 15:24-16:5.) Indeed, this issue was even called out in the Notice of Waymo's motion. (*Id.* at (i) (requesting "that the Court compel production of the withheld report and attachments *in addition to all other relevant information, files, and electronic media currently in the possession of Stroz Friedberg.*" (emphasis added)).) Notably, the Court's March 16 discovery order already required Defendants to produce any of Mr. Levandowski's information, files, and media that remain in the possession of Uber or its agents, or to alternatively provide a statement regarding the extent to which such materials have been deleted, destroyed, or modified. (Dkt. 61 at 2.) Defendants' refusal to produce these materials, despite the Court's discovery order and Waymo's explicit request for these materials, is unjustifiable.

Defendants' Opposition does not address these materials at all. Defendants' Opposition never argues that the full set of documents and data provided to Stroz are privileged or protected. Nor do Defendants dispute that Stroz is their agent such that they can compel production of those materials in this case. Thus, there appears to be no dispute that these materials should be produced in full. *I-Enterprise Co. v. Draper Fisher Jurvetson Mgmt. Co. V*, No. C-03-1561, 2005 WL 1661959, at *14 (N.D. Cal. July 15, 2005) (non-movant's failure to address an issue in its opposition brief "effective concedes" the issue).

Nor *could* there be any dispute that these materials are not privileged and should be produced. Defendants' Opposition states again and again that Stroz was retained to investigate facts. (*E.g.*, Opp. at 1:13-16; 3:8-11; 5:9-11; 6:1-2; 7:16-19; 13:21-14:1; 22:19.) Facts are not privileged. (Dkt. 202 at 9:22-10:1 (*citing Upjohn Co. v. United States*, 449 U.S. 383, 395-96

---

[9] There is sufficient evidence of both Mr. Levandowski's theft (Dkt. 433 at 1-2; 5/3/17 Hr'g Tr. Public AM 75:22-76:1) and Uber's complicity therein (Dkt. 433 at 2; Exs. 9-11) to justify the Court drawing adverse inferences here. (Dkt. 245-4 at 10-12.)

(1981) ("The [attorney-client] privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney.").) The underlying documents and forensic data provided to Stroz for use in its investigation are classic factual material that must be produced.

## V. WAYMO HAS SHOWN THE REQUISITE NEED FOR THE LOGGED DOCUMENTS

Defendants have not rebutted Waymo's showing that Defendants should be compelled to produce the documents due to Waymo's substantial and compelling need, even if they were privileged and even if the privilege had not been made.

As an initial matter, Defendants have not established that every document on their 42-entry log is "opinion work product," thereby raising the standard for compelling their production. (Opp. at 22-23.) Defendants' own declarant states that the logged exhibits to the due diligence report are "documents collected by Stroz" and "interview memoranda." (Dkt. 370 ¶ 23.) But the mere fact that a document was "collected by Stroz" cannot transform that document into *any* type of work product. And "interview notes" are commonly classified as "fact" work product. *In re Healthsouth Corp. Secs. Litig.,* 250 F.R.D. 8, 12 (D.D.C. 2008). Neither Defendants' log nor their Opposition demonstrate that the contents of purported "interview memoranda" include any attorney opinion. To the contrary, the interviews were performed by Stroz Friedberg, not Defendants' counsel, and they were not part of a business transaction, all of which weighs in favor of a finding that the documents at issue reflect "fact" not "opinion" work product.[10]

Defendants next fail to persuasively distinguish authority holding that a witness' invocation of the Fifth Amendment privilege creates a need for production of work product related to that witness.[11] (Opp. at 23.) Mr. Levandowski should not be permitted to make statements

---

[10]   *See In re Vitamins Antitrust Litig.*, 211 F.R.D. 1, 5 (D.D.C. 2002).

[11]   Defendants argue that the reasoning in *In re John Doe Corp.*, 675 F.2d 482, 492 & n.10 (2d Cir. 1982), applies only to "fact" not "opinion" work product. Defendants similarly attempt to limit *In re Crazy Eddie Secs. Litig.*, No. 87 CV 0033 (EHN), 1991 WL 17287, at *1 (E.D.N.Y. Jan. 28, 1991) and *In re Vitamins Antitrust Litig.*, 211 F.R.D. 1, 5 (D.D.C. 2002), to "fact work product." But Defendants' own record establishes that at least some of the logged documents are "interview memoranda" and "documents collected," (Dkt. 370 ¶23), *i.e.*, "fact work product."

about his Bad Acts when it suits him – *i.e.*, for the purpose of selling his company for $680 million – while shielding those same statements from discovery here.

Finally, Defendants cite *Holmgren v. State Farm Mutual Auto Ins. Co*., 976 F.2d 573, 577 (9th Cir. 1992), to argue that opinion work product can only be compelled where "mental impressions" are at issue. (Opp. at 24.) Here, Defendants' mental impressions *are* at issue. Waymo has alleged that Defendants' misappropriation is intentional, knowing, willful, malicious and fraudulent. (Dkt. 23 ¶¶ 75, 86.) And since Mr. Levandowski is an employee and officer at Uber and a central perpetrator of the theft, his mental impressions in particular are at issue.

In light of Mr. Levandowski's broad assertion of the Fifth, the withheld documents may be the only source for highly relevant information here; Defendants have identified no alternative.

## VI.     DISCOVERY

Defendants should be compelled to provide discovery related to the privileges they have asserted over the due diligence materials – they should be required to provide un-redacted versions of the agreements they cite in their opposition; they should be required to provide still-withheld documents cited in their opposition; witnesses should be subject to depositions about the declarations they have submitted; and so on. As indicated in its motion, Waymo requests leave to conduct discovery on these fronts outside the to-be-determined limits on discovery in this case.

But that discovery is not needed to grant Waymo's motion. Defendants have been preparing their positions on this 42-entry privilege log since before the March 29 hearing they initiated to discuss it.[12] Defendants chose to provide an insufficient log, even after receiving guidance from Judge Alsup and requests for additional information from Waymo. And they chose to provide a sworn record that falls short of their burden to establish that any privileges apply and that there has been no waiver. Discovery is closing in a little over two months. Defendants should be compelled to produce the due diligence materials now, without further delay.

---

[12] As the Court has described: "On March 29, at Uber's cryptic request, the Court convened a non-public conference at which separate counsel appeared for Levandowski. At that conference, defense counsel explained, 'Before the acquisition [of Otto] some due diligence was done. A third party prepared a report based on that due diligence. We intend to put that report on a privilege log.'" (Dkt. 433 at 6.)

DATED: May 16, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By *Charles K. Verhoeven*
Charles K. Verhoeven
Attorneys for WAYMO LLC