UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA          *ORIGINAL*

Before The Honorable William H. Alsup, Judge

WAYMO LLC,                      )   **Motions Hearing**
                                )   **Case Management Conference**
              Plaintiff,        )
                                )
   vs.                          )   NO. C 17-00939 WHA
                                )
UBER TECHNOLOGIES, INC.;        )   Pages 1 - 95
OTTOMOTTO LLC; OTTO             )
TRUCKING LLC,                   )
                                )   San Francisco, California
              Defendants.       )
_____ )   Wednesday, June 7, 2017


### REPORTER'S TRANSCRIPT OF PROCEEDINGS


<u>APPEARANCES</u>:

Special Master:          Farella Braun & Martel
                         235 Montgomery Street, 17th Floor
                         San Francisco, California  94014
                    BY:  JOHN L. COOPER, ATTORNEY AT LAW


For Plaintiff:           Quinn, Emanuel, Urquhart & Oliver
                         50 California Street, 22nd Floor
                         San Francisco, California  94111
                    BY:  MELISSA I. BAILEY,
                         LINDSAY COOPER,
                         JORDAN R. JAFFE,
                         JAMES D. JUDAH,
                         JOHN W. McCAULEY IV,
                         DAVID A. PERLSON, ATTORNEYS AT LAW

          (APPEARANCES CONTINUED NEXT PAGE)

Reported By:        Raynee H. Mercado, CSR No. 8258

     Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

1                    A P P E A R A N C E S  (CONT'D.)

2

3    For Defendant Uber        Boies Schiller Flexner LLP
     Technologies, Inc.:       1401 New York Avenue NW
4                              Washington, D.C.  20005
                         BY:   KAREN L. DUNN,
5                              HAMISH HUME,
                               MEREDITH DEARBORN, ATTORNEYS AT LAW
6

7                              Morrison & Foerster
                               707 Wilshire Boulevard
8                              Los Angeles, California  90017-3543
                         BY:   SYLVIA RIVERA, ATTORNEY AT LAW
9

10                             Morrison & Foerster
                               425 Market Street
11                             San Francisco, California  94105-2482
                         BY:   ESTHER KIM CHANG,
12                             ERIC AKIRA TATE, ATTORNEYS AT LAW

13

14   For Defendants           Goodwin Procter LLP
     Ottomotto LLC and        Three Embarcadero Center
15   Otto Trucking LLC:       San Francisco, California  94111
                         BY:   BRETT SCHUMAN, ATTORNEY AT LAW
16

17

18                             --o0o--

19

20

21

22

23

24

25

```
 1   Wednesday, June 7, 2017                          8:00 a.m.

 2                    P R O C E E D I N G S

 3        THE CLERK:  Calling 17-939, and it's Waymo LLC versus

 4   Uber Technologies Inc., et al., on for a motion hearing and

 5   also for initial case management conference.

 6      Counsel could you please state your appearances for the

 7   record.

 8        MR. PERLSON:  Good morning, Your Honor.  David

 9   Perlson for plaintiff Waymo, here with Melissa Bailey, Jordan

10   Jaffe, John McNally (phonetic), James Judah, and Lindsay

11   Cooper.

12        THE COURT:  Okay.  Welcome to all of you.

13        MS. DUNN:  Good morning, Your Honor.  On behalf of

14   the Uber defendants from Boies Schiller, Karen Dunn, Hamish

15   Hume, and Meredith Dearborn.

16        THE COURT:  Welcome.

17        MS. RIVERA:  Good morning, Your Honor.  Also on

18   behalf of the Uber defendants, Sylvia Rivera with Morrison &

19   Foerster, along with Esther Chang and Eric Tate.

20        THE COURT:  Well, good morning.

21        THE SPECIAL MASTER:  John Cooper, Special Master.

22        THE COURT:  Welcome to you, too.

23        MR. SCHUMAN:  Morning, Your Honor.  Brett Schuman of

24   behalf of defendant Otto Trucking.

25        THE COURT:  Okay.  We're here for several motions.
```

```
 1    Let's take up the -- where is -- where is Miles Ehrlich?

 2    Where is he?

 3         MR. PERLSON:  Your Honor, the special master had

 4    actually suggested Mr. Levandowski's counsel be here today,

 5    and they said that they didn't think there was any reason for

 6    them to come --

 7         THE COURT:  Why?

 8         MR. PERLSON:  -- on a meet-and-confer last week.  I'm

 9    not sure why.

10         THE COURT:  Didn't they file a motion to be heard

11    today?

12         MS. BAILEY:  Your Honor, I believe that motion is

13    actually set for 11:00 a.m.

14                   (Simultaneous colloquy.)

15         MS. BAILEY:  10:00 a.m.

16         THE COURT:  Okay.  Well, then we can wait till 10:00

17    a.m.  I -- I misunderstood the schedule.

18       All right.  Well, what is set for 8:00 o'clock then?

19         MR. PERLSON:  Your Honor, I believe that the initial

20    case management conference and the motion to dismiss on the

21    unfair competition claim.

22         MS. DUNN:  Yes.  Those two things.

23         THE COURT:  How about the motion for stay?

24         MR. PERLSON:  That is, according to the court's

25    calendar, set for 9:00 o'clock.
```

```
 1              THE COURT:  All right.

 2              MS. DUNN:  But I think the required personnel are

 3     here for that motion, so we could take that --

 4              THE COURT:  We'll -- All right.  So let's -- we can

 5     go to the motion to dismiss.  How's that?

 6              MR. PERLSON:  Sounds good, Your Honor.

 7              THE COURT:  All right.  We'll go to the motion to

 8     dismiss.

 9              MR. PERLSON:  Mr. Judah will be arguing that on our

10     behalf.

11              THE COURT:  Okay.  Please go ahead.

12              MR. TATE:  Morning, Your Honor.

13              THE COURT:  Your name again?

14              MR. TATE:  Eric Tate.

15              THE COURT:  How do you spell that last name?

16              MR. TATE:  "T" as in Tom, "A," "T" as in Tom, "E."

17              THE COURT:  Say it again?

18              MR. TATE:  "T" as in Tom, "A," "T" as in Tom, "E."

19     Tate.

20              THE COURT:  "B" is at the end or "E"?

21              MR. TATE:  "E".

22              THE COURT:  Go ahead, please.

23              MR. TATE:  So, Your Honor, this should be a

24     straightforward motion, and this is the motion to dismiss

25     Waymo's unfair competition claim.
```

1     Waymo concedes that the unfair competition claim would be

2   preempted if it's based on the same nucleus of facts as the

3   CUTSA claim, the trade secrets misappropriation claim.

4     Waymo also concedes as of right now the unfair competition

5   claim is based on the same nucleus of facts as the trade

6   secret claim.

7     What Waymo -- Waymo's position is that, however, the UCL

8   claim, the unfair competition claim, should survive because at

9   some date in the future, this court might find that some of

10  the -- the trade secrets that it's alleging are, in fact, not

11  trade secrets but are, in fact, just confidential information.

12    And if that happens, then Waymo would be able to base its

13  unfair competition claim on something other than just the

14  trade secrets facts.

15    And on this basis alone, its unfair competition claim

16  should be dismissed and preempted by CUTSA and should be

17  dismissed.  And there are several reasons for this.  There are

18  several reasons that Waymo's theory that it could base its

19  unfair competition claim on the potential that in the future,

20  trade secret -- some of its trade secret allegations would be

21  found not to actually be trade secrets.

22    Now, there's several reasons for this.  One, the CUTSA,

23  California's Uniform Trade Secrets Act, does not allow -- is

24  not -- does not allow something more, so there's no CUTSA --

25  there's no something more to avoid CUTSA preemption.

1          Two, you can't defend against preemption under CUTSA based

2    on speculation about -- about what the facts might turn out to

3    be at some later date in the litigation.

4          Three, CUTSA preempts -- CUTSA preempts all claims that

5    are based on confidential information and trade secrets

6    information.  So the fact that information doesn't necessarily

7    rise to the level of a trade secret is -- is no excuse.

8          CUTSA also preempts claims that are based on and arise out

9    of the same wrongful -- alleged wrongful conduct.  And in this

10   case, Waymo concedes that the facts that it says supports its

11   unfair competition claim come out of the same alleged wrongful

12   conduct as its trade secrets claims, namely the alleged

13   downloading of 14,000 files.

14         Five, there's no pleading in the alternative, as Waymo

15   would like to do here.  They would like to plead the trade

16   secrets claim and, based on what happens with the -- the

17   determination of what's a trade secret or not, plead in the

18   alternative the same facts to support its unfair competition

19   claim.  That doesn't work.

20         And finally, you don't even get to this next point, Your

21   Honor, but for sake of argument, this notion -- this notion

22   that Waymo has some sort of independent property right in

23   information -- confidential information that's distinct from

24   trade secret information, has just not -- they cannot and they

25   have not demonstrated that.

1      Thank you.

2           **THE COURT:**  I've got a question for you.  Let's say

3      that there's no -- hypothetically in a case where there's --

4      the plaintiff does not allege any trade secrets but says that

5      an employee downloaded a bunch of files and then left and says

6      none of them are trade secrets but they were -- they were all

7      valuable proprietary information that belonged to the company

8      and -- and this other company stole it.

9           So is your view that that is preempted by this CUTSA

10     thing?

11          **MR. TATE:**  Your Honor, it is my view that it's

12     preempted by CUTSA.  CUTSA's very clear and this -- the

13     Northern District of California in multiple decisions --

14          **THE COURT:**  Wait.  Wait.  No, no, no.  There's no

15     such thing as "the Northern District has decided."  Each of us

16     on the district court are independent, and we're not bound

17     by -- we're not even bound by our own decisions, but we're not

18     definitely bound by each other's decisions.  There's no such

19     thing.  That's a -- That's a non-starter, so don't go there.

20          But tell me what you think CUTSA provides on that point on

21     my hypothetical.

22          **MR. TATE:**  Sure.  So CUTSA's very clear.  It -- The

23     California Uniform Trade Secrets Act takes a very wide

24     approach, and it is -- has been -- it was promulgated and has

25     been interpreted to intend to occupy the full -- the full

```
 1      space, the full realm of trade -- of uniform -- of claims that

 2      might involve trade secrets.

 3              THE COURT:  No, no, not might involve.  My

 4      hypothetical it does not involve trade secrets.  Everybody

 5      concedes that up front.

 6          Let's say that it's a customer list that somebody is --

 7      not only has a customer list, but they -- they write down for

 8      each customer the specific types of things that that customer

 9      likes to buy, the types of pricing that's been given to that

10      customer.  Let's say it's something -- a list that's ten pages

11      long and that this particular company has developed over three

12      or four years of effort but it's not a trade secret.  It's --

13      but it is proprietary information.

14          Now, let's be clear.  Your law firm represents the other

15      side a lot, so let's be real clear --

16              MR. TATE:  Yes, absolutely.

17              THE COURT:  So this is going to go out forth to a new

18      generation of lawyers that Morrison & Foerster is saying

19      that's not proprietary information and it has protection under

20      state law.  I want to hear you say it out loud.

21          In other words, you're telling me that in my hypothetical,

22      there's no protection under California law for stealing that.

23          Correct?

24              MR. TATE:  I don't know that there's no protection

25      under California --
```

```
1              THE COURT:  That's what they're arguing.  They're

2     saying that there ought to be some protection for that.

3     Lets -- I want to give you the hypothetical and give you a

4     fair chance to say yes or no, and no waffling.

5         In my hypothetical, a company has got a ten-page list of

6     customers with all their preferences and purchasing histories

7     and discounts and names of the key people at the company and

8     how many times they took them golfing and all that stuff.  It

9     took them five years of -- to develop.  And company No. 2

10    steals it, sends in a plumber's unit one night and steals it.

11        And you're telling me -- or is that -- is that protected

12    under -- in any way under the Unfair Competition Law in

13    California?

14             MR. TATE:  So to the extent that that information --

15    So what you described in your hypothetical, Your Honor, that

16    information could be a trade secret, and --

17             THE COURT:  I'm saying it's not a trade secret.  It's

18    a -- They concedes it's no a trade secret.  Everybody knows

19    who these customers.  But the -- it would take some time to go

20    and reconstruct it all, but anybody could go out there and if

21    they spent enough time, they would -- they could develop the

22    same information, so in that sense, it's not a trade secret.

23    It's not a trade secret.  The plaintiff says it's not a trade

24    secret, but it's proprietary information.  They -- And they go

25    strictly on the theory of proprietary information.  Is that
```

1    theory dead in California?

2         **MR. TATE:**  So under the *Silvaco Data Systems* case, it

3    is yes.

4         **THE COURT:**  And if -- so that's the position of

5    Morrison & Foerster that under California law, there is no

6    proprietary information in that circumstance.

7         **MR. TATE:**  In every case, you know, there are

8    different facts, but on your hypothetical, that is -- that

9    would be -- I would say yes.

10        **THE COURT:**  Yes what?

11        **MR. TATE:**  That under the *Silvaco Data Systems* case,

12   claims for stealing confidential information, information that

13   is confidential but may not rise to the level of a trade

14   secret is preempted by CUTSA.

15        **THE COURT:**  All right.

16      Okay.  Now, I want you to know I think that's a correct

17   reading of the *Silvaco* case.  I also want you to know, I

18   practiced for 25 years and I been on this job almost 20

19   years -- 18 years coming up, and I am -- I am quite surprised

20   that California law would have embraced the *Silvaco* decision.

21   I think it's wrongly decided.  And that your firm and a lot of

22   other firms, although you're now preempted from making this

23   argument due to your argument, but other law firms will be

24   able to argue that that is a incorrect decision.  However, I'm

25   stuck with it, I think.

 1          All right.  I want to hear from the -- who's going to

 2     argue this for you?

 3          Okay.  Mr. Tate, you can have a seat, please.

 4          I want you to know I'm stuck with the *Silvaco* case.  I'm

 5     sympathetic to your position, I think you lose this motion.

 6     So don't give me blather.  I want -- You're going to have to

 7     honestly come to grips with the *Silvaco* case.

 8          Go ahead.

 9          **MR. JUDAH:**  Well, Your Honor, let me start by

10     saying -- this is James Judah, Quinn Emanuel.

11          I think you asked the exact correct question, which is if

12     a defendant is another company and it steals a lot of

13     information, and let's say none of it's a trade secret.  Let's

14     say some of it's a trade secret, some of it isn't, the idea

15     that CUTSA, which explicitly says that it does not affect

16     other civil remedies --

17          **THE COURT:**  You're not coming to -- I'm telling you,

18     I agree with you except *Silvaco* ties my hands, and, in fact,

19     you're very law firm argued this in the *Total Recall* case, and

20     I ruled against you.  And I'm stuck with that.

21          I'm sorry.  But I -- I feel like you got to go to the

22     legislature and get them to fix this, but it's -- I can't fix

23     it for you.

24          **MR. JUDAH:**  Well, Your Honor, the *Total Recall*

25     case -- I'm glad you brought that up -- because I think that

1    actually supports our position.  As you note in *Total Recall*,

2    you -- you're not preempted under CUTSA if there's a positive

3    right in the property -- information.  And that's exactly --

4            **THE COURT:**  Are you reading from something I wrote?

5            **MR. JUDAH:**  Let me read exactly what you wrote.

6            **THE COURT:**  All right.  Read it to me 'cause I don't

7    remember what you're saying.

8            **MR. JUDAH:**  So in the *Total Recall* case, you wrote

9    CUTSA supersedes claims based on the misappropriation of

10   non-trade secret information except where there is some other

11   provision of positive law granting a property right in that

12   information.

13           **THE COURT:**  All right.  Yeah, that makes sense.

14      Okay.  What is the other property right here?

15           **MR. JUDAH:**  Is -- is exactly the *Kremen* test, which

16   is more or less what your hypothetical was just now to

17   Morrison & Foerster.

18      Under the *Kremen* case --

19           **THE COURT:**  All right.  Read to me where *Kremen* says

20   they have -- there's some property right that's independent of

21   trade secrets.

22           **MR. JUDAH:**  So in the *Kremen* case, the Ninth Circuit,

23   which I will note -- I believe it was in the *Qiang* case, you

24   noted that, yes, there's a *Silvaco* case, which is a Court of

25   Appeals case in California, but there's no Ninth Circuit and

 1    there's no California Supreme Court ruling on the issue that

 2    we're discussing right now.

 3        However, there is a Ninth Circuit ruling on what

 4    constitutes property right.  And the Ninth Circuit wrote in

 5    *Kremen v. Cohen*, 337 F.3d 1024, "we apply a three-part test to

 6    determine whether a property right exists.  First, there must

 7    be an interest capable of precise definition.  Second, it must

 8    be capable of exclusive possession or control; and third, the

 9    putative owner must have established a legitimate claim to

10    exclusivity."

11        And that applies to this case to the information that was

12    taken -- of the many, many thousands of files taken by

13    Mr. Levandowski.  It also applies, Your Honor, to the files

14    that were taken by the other two former Waymo employees who

15    then joined Otto and Uber that we identify in the complaint

16    Mr. Kshirsagar and Mr. Raduta, who took supply information,

17    which since the complaint was filed, we have narrowed the

18    case, and we have said that we are not proceeding on trade

19    secret claims for that information.

20        So that information is clearly not a trade secret, as --

21    as it's alleged in this case.  And it is information which

22    is -- has -- satisfies the *Kremen* test.  We put a lot of time

23    and effort into those supply -- into those supply information

24    lists.  And it clearly qualifies for protection under the

25    Unfair Competition Law 'cause it's not a trade secret, and we

1    have a property right.

2           **THE COURT:**  Look, I'm reading from something here

3    that comes from that very *Silvaco* case that rejects -- says it

4    rejects the suggestion that CUTSA was not intended to preempt

5    common-law conversion claims based on the taking of

6    information that, though not a trade secret, was nonetheless

7    of value to the claimant.

8        So isn't that -- isn't that -- it says it rejects

9    common-law conversion, and that's what this *Kremen* case was

10   all about.

11          **MR. JUDAH:**  Well, so -- so first off, in the *Kremen*

12   case, the Ninth Circuit did find there was a property right in

13   the Internet domain.  Second, the *Silvaco* case was not

14   addressing necessarily unfair competition in that context.  It

15   was conversion.

16       But more importantly, the actual language of the holding

17   says information cannot be stolen unless it constitutes

18   property and information is not property unless some law makes

19   it so.

20       Now, there's a footnote, footnote 22, which uses this

21   term, you know, some provision of positive law.  But this

22   notion of property can be a right, even if it's not a trade

23   secret.  And, again, I mean, *Silvaco* cannot override the

24   statute, the CUTSA statute --

25          **THE COURT:**  It interprets the statute.

```
1          It's the -- It's the California's most authoritative

2     statement on point.  I disagree with it.  I think it's wrongly

3     decided.  However, I have to salute and follow the law.  I

4     can't just wiggle around and say that you win because I think

5     Silvaco -- and by the way, Silvaco was seven years after that

6     Kremen case in the Ninth Circuit.  So the Ninth Circuit didn't

7     have the benefit of the -- of that decision anyway.

8          MR. JUDAH:  Well --

9          THE COURT:  I don't know.  I think this is a problem

10    that you ought to go to the legislature and get it fixed.

11         MR. JUDAH:  Well, Your Honor, in the Total Recall

12    case, which -- which address some of these issues, you -- the

13    reason you gave the plaintiff leave to amend the complaint was

14    that they had not made allegations specific to this property

15    right under positive law that was not based on trade secrets.

16         You know, we think we've made that showing.  We argue that

17    in motion -- in the opposition, rather.  I mean, if you -- if

18    you give us leave to amend, we can -- we can make that clear.

19         THE COURT:  Well, let me ask a different question

20    that relates to case management.  We have a trial date of

21    October 2nd.  Now, you big law firms think that you can just

22    ad infinitum do Rule 12 motions forever.  But if we're going

23    to have a trial on October 2nd, isn't it time to bring the

24    pleadings to an end so we can get the discovery done so you --

25    you're the firm that said you wanted trial on October 2nd.
```

 1          Are you giving up on that?

 2          **MR. JUDAH:**  No.

 3          **THE COURT:**  Well, then, are we going to be litigating

 4     all summer 17200 to see if you can ever make a -- a correct

 5     statement of the law under 17200?

 6          **MR. JUDAH:**  Well, two things, Your Honor, one, case

 7     management issues will be addressed by David Perlson.  Two --

 8     well, three things.  Two, we think this motion should be

 9     denied and we should proceed on the pleadings we have.  But

10     three, you know, if in -- if in a normal case like in *Total*

11     *Recall*, 14 days, leave to amend, given the expedited schedule,

12     we can do this in 7 days and have an expedited briefing

13     schedule if defendants thought there was (sic) any

14     deficiencies left in our pleading.

15          **THE COURT:**  Well, of course they will.

16          All right.  Let me hear from Mr. Tate.  Mr. Tate, you get

17     a rebuttal.

18          **MR. TATE:**  Thank you, Your Honor.

19          A few points here.  So first of all, in their -- counsel

20     for Waymo is basically trying to change what they -- what

21     Waymo alleged or asserted in their opposition this morning.

22          In their opposition, they -- they state that the -- the

23     information that they're saying is -- can potentially form the

24     basis of this unfair competition claim is reflected in the

25     14,000 confidential documents that were allegedly stolen from

```
 1   Waymo.
 2        Those are the facts that, at least in their opposition
 3   they said were going to support their unfair competition
 4   claim, not -- there was no reference to any other documents
 5   that may have allegedly been taken from anyone else, anyone
 6   other than Mr. Levandowski.  So that's -- that's a new fact.
 7   One.
 8        Two this notion of an independent -- so the references to
 9   the Kremen case, Kremen, as you noted, that -- that predated
10   Silvaco by a number of years.  It didn't even involve CUTSA
11   preemption.
12        And the key point here -- the most key point here is
13   you've got to demonstrate that there's some sort of property
14   right that's independent from the -- the property rights
15   that -- you know, that makes the trade secret a -- you know,
16   that apply to the -- to the trade secrets.
17        And they have not -- they cannot -- they cannot do that.
18   They have not done that.  They -- They allege that the -- in
19   their -- in their discussion of Kremen, they say that this --
20   again, this confidential information that might be determined
21   to exist is confidential because it restricts -- they have
22   exclusive possession of -- or control because it restricts
23   access to its confidential information.
24        The legitimate claims -- the exclusivity prong of this
25   Kremen test, if for some reason you wanted apply it, is
```

```
 1    because it maintains the confidential business information on

 2    its secure servers.  The point is all of it ties back to the

 3    confidential nature of the information.

 4         And by the -- And additionally, the -- the court --

 5    another court -- and appreciate that different courts -- no

 6    court's bound by the other in the Northern District, but in

 7    Sunpower, the -- another judge in this court evaluated the

 8    exact same issue and disavowed and didn't -- and disregarded

 9    Kremen.

10         So there's no way that they can, based on what -- how they

11    pled their complaint thus, far how they've argued and what

12    they've said in their opposition, there is no way that they

13    can amend the deficiency in their complaint for the -- to save

14    their unfair competition claim.

15              THE COURT:  Thank you.

16         All right.  That will be under submission.

17         What else is on the calendar for 8:00 o'clock?  I am

18    confused on that.

19              MR. PERLSON:  Your Honor, I think that for 8:00

20    o'clock, it's the -- initial joint or the initial case

21    management conference.

22              THE COURT:  Can we go ahead and argue the motion for

23    stay?  Is everyone here on that one that wants to be here?

24              MR. PERLSON:  We can argue that now from our

25    perspective.
```

```
 1              THE COURT:  Did Miles Ehrlich file a brief on that

 2     issue?

 3              MR. PERLSON:  I don't think so.

 4              THE COURT:  All right.  So we're going to go ahead

 5     and hear that motion.  Go ahead.

 6              MR. HUME:  Good morning, Your Honor.  Hamish Hume

 7     from Boies Schiller for Uber.

 8         Your Honor, our motion for stay is based on, as you know,

 9     the Section 4 of the Federal Arbitration Act, which allows an

10     immediate appeal of a decision denying a motion to compel

11     arbitration.  The Ninth Circuit in the -- I'm not sure how to

12     pronounce it, but the Nken case has laid out the factors, very

13     similar to normal stay factors or preliminary injunction-type

14     factors.

15         The two main inquiries are, is this a serious question; is

16     there some likelihood of success or at least a substantial

17     legal question presented by our appeal.

18         And secondly, will we be irreparably harmed if we don't

19     get a stay?  And how does that balance with whether there will

20     be any harm visited upon Waymo if we did get a stay.

21         As we laid out in our papers, Your Honor, obviously the

22     court has made its decision on our motion to compel.  We

23     respect that.  We do think it's appealable.  We do think there

24     are very significant legal arguments on our side to be

25     presented to the Federal Circuit.
```

1    I would briefly summarize them as follows:  The Ninth

2    Circuit articulation of circumstances in which it is

3    appropriate to compel arbitration based on equitable estoppel

4    under California state law laid out the following

5    circumstances.  First, where the plaintiff must rely on the

6    underlying contract with the signatory to advance claims

7    against the non-signatory.

8    In open court in response to the court's question, Waymo

9    said they won't rely but then waffled on that and then said

10   unless Uber opens the door.

11   They also invoked the confidentiality provisions in the

12   employment agreements in their complaint and chose to enter

13   into a contract with Mr. Levandowski that would govern his

14   confidentiality obligations.  And the heart of this case is

15   their claim that he breached those obligations by taking trade

16   secrets from them.

17   So the heart of this case is about Mr. Levandowski's

18   employment relationship with Waymo, whether he violated the

19   terms of that relationship, which they chose to put into a

20   contract, which they chose to have an arbitration clause in

21   it.

22   So the first question is, is that first circumstance

23   identified in the *Kramer* case and in the California courts

24   limited to or -- or avoided -- is it avoided if the plaintiff

25   chooses to litigate the case as if that contract did not exist

 1    and to pretend that it's invisible even though they chose to

 2    create and chose to put an arb clause in there.  We think that

 3    is a substantial legal question.

 4        The second question presented on the appeal involves the

 5    second part of that first circumstance in the *Kramer* case,

 6    which says that California courts have compelled arbitration

 7    based on equitable estoppel and motions to compel brought by

 8    non-signatories like Uber where the underlying claims by the

 9    plaintiff are intimately founded in and inextricably

10    intertwined --

11             **THE COURT:**  With the contract.

12             **MR. HUME:**  -- with the contract.

13                    (Simultaneous colloquy.)

14             **THE COURT:**  -- they're not here, though.  The -- The

15    basic problem that you have is that the other side, Waymo can

16    litigate this case without trying to have it both ways.  In

17    other words, it's not trying to rely on that contract with

18    Levandowski to win this case.  It's going after Uber directly

19    for stealing trade secrets.  That's what they're trying to

20    prove, that you and Levandowski got -- got in bed together to

21    steal trade secrets.

22        And they don't need that contract if -- to prove that, so

23    they're not trying to have it both ways.  They -- They would

24    be trying to have it both ways if they were suing on that

25    contract or inextricably relying on that contract and then

1    trying to get away from the arbitration clause.  I agree with

2    you on that, but that's not our situation.

3        So I -- I think -- Now, if they try to -- if they do at

4    trial try to do that, they may have a big problem with me

5    based on what they've said.  But I have -- I see plenty of

6    ways to try this case without ever mentioning that contract.

7        You might bring it up, but they don't to have bring it up.

8            MR. HUME:  And I think that's the question, Your

9    Honor.  Obviously, we don't agree that we got in bed with --

10   in effort to steal trade secrets --

11           THE COURT:  I'm not saying you did.  I'm saying

12   that's what they're alleging.

13           MR. HUME:  But that is what they're saying.

14           THE COURT:  But there's some proof to that effect.

15           MR. HUME:  We're not here to ask the court to

16   reconsider its decision but simply to try to persuade the

17   court that there is a substantial legal question, and here's

18   why.

19       That circumstance identified in the *Kramer* case for

20   compelling arbitration at the insistence of a non-signatory

21   like Uber based on equitable estoppel, that circumstance

22   cannot be limited to claims alleging a breach of contract or

23   suing the counter-signatory.

24       We know that from four cases -- or at least the -- the

25   *Metalclad* case, the *Turtle Ridge* case, the *Rodriguez* case, and

```
 1    to some extent, from the Torbit case.  And we think California
 2    law is clear in support of our motion that -- that it does not
 3    require them to rely on the contract explicitly for their
 4    claims to be inextricably intertwined with that contractual
 5    relationship.
 6           THE COURT:  They don't even have to have that
 7    contract to sue.
 8        Listen, there's -- the evidence is pretty strong that
 9    Levandowski, while he's working at Waymo, sneaks over to Uber,
10    has many, many conversations with Uber about how much money
11    he's going to get, beaucoup bucks, and what is it that he's
12    supposed to do to get all that money?  A jury could easily
13    conclude that he was supposed to steal some trade secrets.
14    And he did.
15        So if you think you're going to be able to skate by all
16    those inferences by saying, well, they got to prove what was
17    in our mind, that's not the way mental processes work at the
18    jury-trial level.  They don't to have rely on any kind of a
19    contract.  They got plain old all American old-fashioned theft
20    of trade secrets that don't even have to have -- they don't
21    have to have that contract in any way.
22        You -- If you want to bring it up, you're just trying it
23    up to try to escape a jury trial.
24           MR. HUME:  No.
25           THE COURT:  Yes, you are.  You don't want to go in
```

```
1    front of jury right over there because the inferences all work
2    against you, and you're invoking the attorney-client privilege
3    on 3500 documents -- a huge number; I've never seen such a
4    huge number -- which a jury could reasonably conclude is a
5    coverup.
6            MR. HUME:  Your Honor, I think we're going to address
7    all of those issues, and those issues could also be presented
8    to an arbitration panel --
9            THE COURT:  Oh, yeah, well, they could be.  Okay.
10   Yes, they could be.
11       But nevertheless, they got a right to a jury trial, as I
12   see it, and -- and you don't -- you can't make them arbitrate
13   this case.
14           MR. HUME:  Well, that's the question.  And in the
15   other cases -- I just want to be clear, in the other
16   California cases we've invoked, the non-signatory was being
17   sued for claims that didn't mention the contract at all.  In
18   all of those cases, *Metalclad*, *Turtle Ridge*, and *Rodriguez* --
19           THE COURT:  I extinguish all of those in my prior
20   order.  I'm not going to go back to that.  I'm not going to go
21   back and re-litigate what we've already decided in this case.
22       We're talking now about a stay.  I'm going to give you one
23   more minute to make the rest of your points.  I understand
24   your arguments.
25       What else do you want to say?
```

```
 1              MR. HUME:  The stay is not prejudicial to Waymo,

 2    and --

 3              THE COURT:  Yes, it is.  Yes, it is.  They have a

 4    right -- They have made a compelling case to get to trial and

 5    get as much equitable relief as they can get to undo the

 6    damage that your employee did to them.

 7              MR. HUME:  We --

 8              THE COURT:  That is an equitable compelling right.

 9    Arbitration would be years in the future.  And they have a

10    right to get to go trial on October 2nd, and you're doing

11    everything you can to throw road blocks in the way.  That's

12    the -- that's the equity of it.

13              MR. HUME:  If the case goes to trial on October 2nd

14    and the Federal Circuit agrees with us that it should have

15    been arbitrated, we'll be prejudiced.

16              THE COURT:  Well, they can -- you can -- I will ask

17    that they -- they don't even to expedite.  They could get this

18    decided by October 2nd.  Why can't the Federal Circuit decide

19    this, say, in September?  Then if they say I've made a

20    mistake, I'll salute and say, God bless you, you're going to

21    go to arbitration.

22              MR. HUME:  Okay.

23              THE COURT:  And that would be fine.

24                   (Simultaneous colloquy.)

25              THE COURT:  This is June.
```

1          **MR. HUME:**  It might be worth noting, Your Honor, we

2     asked them to expedite it.  Waymo's trying block that

3     expedition.  We want the decision quickly.

4          **THE COURT:**  Well, I will ask -- Is that true?  Let's

5     hear from Waymo on this.

6          **MR. PERLSON:**  Morning, Your Honor.

7          **THE COURT:**  Is that true, that you're trying to block

8     expedition on this?

9          **MR. PERLSON:**  Well, no.  What we -- what we submitted

10    is that the proposal that they submitted was unfair, and I'll

11    give you some reasons why.  First of all --

12          **THE COURT:**  Proposal to me or to the Federal Circuit?

13          **MR. PERLSON:**  They proposed an expedited discovery

14    schedule to us that we felt was -- was unfair and also --

15          **THE COURT:**  What do you need discovery for in the

16    Federal Circuit?  I don't understand --

17          **MR. PERLSON:**  Not discovery.  I'm sorry.  An

18    expedited briefing schedule, and -- that we felt was unfair.

19         And, first of all, just as a precursor for that, what

20    they've done even to that point has been a point of delay.

21    Your order issued on May 11th and they've sought no relief

22    from the Federal Circuit to expedite anything.

23         And now they say that they can't do that because it's not

24    docketed, but that's not how it's even worked in this case.

25    Like, Mr. Levandowski, when he brought -- when you told him

```
 1     that he had to bring a stay, he brought the stay motion.  The
 2     Federal Circuit --
 3            THE COURT:  Well, hasn't the note -- Wait, wait.
 4     There's been a notice of appeal.  I saw that myself.
 5            MR. PERLSON:  One week after your order.
 6            THE COURT:  All right.  And then once that's done,
 7     they can docket the appeal, right?
 8            MR. PERLSON:  Right.  And they could -- they could
 9     have filed a motion weeks ago, and they didn't.  And they wade
10     until yesterday to file their motion to expedite the appeal.
11     And then even when they did that, Your Honor, incredibly,
12     their proposal says that they get ten days -- not from when --
13     not from now to file their brief, but from when the Federal
14     Circuit rules on their expedited schedule so they want ten
15     more days even after they rule to fill it.
16         So they're doing everything they can, while they want to
17     come here and say that they're trying to push this thing
18     along -- this is after they waited a month to file this --
19     their motion to compel in the first place, then they're --
20     they wait a month to even file a motion to expedite the
21     schedule in the Federal Circuit.
22            THE COURT:  All right.  Look --
23            MR. HUME:  Your Honor, may I just make one point
24     clear?
25            THE COURT:  Go ahead.
```

1            **MR. HUME:**  It wasn't -- We can't file a motion to

2     expedite until the case was docketed.  And for some reason the

3     case was not docketed for a couple of weeks after --

4            **THE COURT:**  Why not?  You could have docketed --

5            **MR. HUME:**  We called the clerk --

6        Your Honor, we called this court's clerk, we called the

7     Federal Circuit's clerk multiple times, and we found out there

8     had been an oversight.  It wasn't docketed.  We wanted it

9     docketed.

10           **THE COURT:**  An oversight by our staff or the

11    federal --

12           **MR. HUME:**  I believe that is correct, Your Honor.

13           **THE COURT:**  You mean, my deputy clerk, Dawn Toland,

14    are you saying that she made a mistake?

15           **MR. HUME:**  I don't know who, Your Honor.  It's not

16    about that.

17           **THE COURT:**  I don't -- I don't like -- I don't think

18    you should be accusing our staff of making a -- if we made a

19    mistake, you should have brought it to our attention on day

20    one.  We fix things right away if we've done it, so you sat on

21    your hands in my opinion.

22           **MR. HUME:**  That's not correct.

23           **THE COURT:**  Then it's not our fault.  Don't blame us.

24           **MR. HUME:**  We --

25           **THE COURT:**  I believe you been dragging your feet.

 1    That's what I believe.  You want to do everything you can to

 2    delay that October 2nd trial.

 3              **MR. HUME:**  That's not correct, Your Honor.

 4              **THE COURT:**  All right.  Have a seat.

 5         All right.  Give me your summary of your argument.

 6              **MR. PERLSON:**  Okay, Your Honor.

 7         When -- When it -- When defendants brought this motion

 8    initially, what they told you was that there was a substantial

 9    question because there were issues of first impression.  And

10    they laid out a number of things that were really just all

11    rehash of their overall argument that because we mention

12    the -- the employment agreement or that the employment

13    agreement exists that it can't -- that there can't be reliance

14    and there can't be -- you know, that the facts aren't

15    intertwined.  And so basically it's a rehash of the arguments

16    that we just heard begin this morning in some respects.

17         And then when we pointed out that they themselves had

18    asserted that there was this significant body of case law that

19    supported their position and so it didn't make any sense for

20    them to say that these were issues of first impression, they

21    come back and they say that the issue on substantial question

22    is whether their appeal is frivolous or not.  They don't offer

23    any support for that either.  That's not what the law is.

24         And basically --

25              **THE COURT:**  Can I ask you a question?

```
 1            MR. PERLSON:  Yeah.

 2            THE COURT:  All right.  Tell me your plan for getting

 3    to trial by October 2nd.

 4            MR. PERLSON:  Okay.

 5        Well --

 6            THE COURT:  Keeping in mind the 3500 documents that

 7    has been concealed under privilege that haven't -- even you

 8    haven't gotten through the briefing on that before Judge

 9    Corley.  Keeping in mind that you haven't --

10        Do we even have a fully done privilege log from

11    Levandowski?

12            MR. PERLSON:  Well, what happened was that on -- on

13    Friday, they served a -- in camera a revised log that Judge

14    Corley had ordered them to do.  They -- They did that in

15    camera so we --

16            THE COURT:  All right.  So it's in camera.  You don't

17    know.  All right.  You don't know.

18            MR. PERLSON:  Well, I don't know if it's sufficient

19    or not because I haven't seen it.

20            THE COURT:  Where does it stand on the 3500 documents

21    that claim privilege by Uber?

22            MR. PERLSON:  Well, Judge Corley on Monday denied --

23    I mean, granted our motion to compel the due diligence report.

24    And we think that all of those -- and I've never heard

25    anything to the contrary that all 3500 of those documents or
```

1   nearly all of them will flow from that because they claim the

2   common interest as to all of them.  So --

3       And I don't know whether they're going to appeal it or

4   not, but it seems like there would be no basis for them to do

5   that --

6           **THE COURT:**  She only ruled on the due diligence

7   report.

8           **MR. PERLSON:**  Well, the -- but those other 3500 pages

9   all reference the due diligence.  And she's saying -- and the

10  court has held that there's no privilege in relation to that

11  due diligence effort at all.

12      And so the common interest that is extinguished by virtue

13  of the due diligence report is going to eliminate the due

14  diligence -- the common interest that they're claiming on

15  those 3500 documents.

16          **THE COURT:**  Maybe -- I'm not buying into that, or

17  it's not -- I've never heard that argument before.  I thought

18  they had independent grounds apart from the due diligence for

19  invoking the privilege.  At least that's what they were

20  claiming.

21          **MR. PERLSON:**  Well, I don't think that's right, Your

22  Honor.  And, in fact, whenever we've sort of broached the

23  issue of, well, you have all these other problems with your

24  privilege log, for example, they -- hardly having the

25  bone-crushing detail that you had suggested earlier -- you

 1   know, hundreds of these entries are nearly identical, an issue

 2   that we've raised.  And they said, well, why are we raising

 3   these issues now when the issue of the common interest is

 4   before Judge Corley?  And let's not deal with these issues.

 5       And so I think it would be a complete about face for them

 6   to come in and say that these 3500 documents are not -- are

 7   now -- that they don't need to disclose them because they're

 8   claiming the same common interest that the judge found not to

 9   exist.

10            THE COURT:  Well, I am not commenting on that one way

11   or the other.  I want to come back to my original question,

12   and that is, are you going to be ready to go trial on October

13   2nd?

14            MR. PERLSON:  Yes, Your Honor.  And we have proposed

15   a schedule that the parties have agreed to to get to that

16   point.

17            THE COURT:  And tell me why you would be prejudiced

18   if we were to derail that.

19            MR. PERLSON:  Well, there's -- well, in several

20   respects.  First one is the one that you mentioned that we are

21   entitled to equitable relief here and that our -- you know, we

22   think we're going to get a permanent injunction in this case

23   regarding the trade secrets, some of which Your Honor had

24   already found that we've made a -- a strong showing on and

25   raised serious questions as to, and we want to get that as

```
 1      soon as possible.

 2           You know, they're -- even today -- even with the

 3      preliminary injunction order, we still -- it hasn't been

 4      enforced.  We still don't have the documents back.  We

 5      still -- and, in fact, they haven't even asked Stroz

 6      Friedberg, their consultant who did the due diligence report,

 7      to return those documents.

 8           And, you know, there are several, you know, intellectual

 9      property rights that we're seeking to be vindicated, and

10      absent permanent relief, we're going to be prejudiced.

11           As Your Honor found just even in granting the preliminary

12      injunction, this is a nascent industry.  Things are moving

13      very quickly.  And so we can't wait longer than we already

14      have to get vindication of the rights.  And they've provided

15      no valid basis for us to have to wait.

16           THE COURT:  Well, what if you -- you have propounded

17      hundreds of document requests.  You have a program of

18      discovery in mind.  And what happens if you get to, say,

19      middle of August, which is only two months away, and you

20      decide you're getting stonewalled and you can't be ready to go

21      to trial?  Then what are you going to do?

22           MR. PERLSON:  Well, Your Honor, it's our goal not to

23      get in this position.  And we're going to bring any issues

24      that come up swiftly.  And with Mr. Cooper's assistance, I'm

25      hopeful that we can avoid --
```

```
 1              THE COURT:  Is Mr. Cooper helping or not?

 2          MR. PERLSON:  Yes, he's helping, Your Honor.  And

 3   he's helping us getting issues before --

 4              THE COURT:  I want -- He's getting $1100 an hour.

 5   That's a phenomenal amount of money.  And he should be solving

 6   these problems.

 7      Mr. Cooper, Special Master, I want you to solve these

 8   problems and get these documents -- if they deserve to be seen

 9   and not -- in other words, if the privilege is no good, we got

10   to get to the bottom of it.  We have a trial on October 2nd,

11   and we can't wait till September to get those documents.

12              THE SPECIAL MASTER:  We're working on that, Your

13   Honor.

14              THE COURT:  All right.  "Working on it" is the

15   present participle tense.  That's like the "check is in the

16   mail," so I urge you to spend as much time as you humanly can

17   at $1100 an hour getting this done.

18              THE SPECIAL MASTER:  Thank you, Your Honor.

19              THE COURT:  All right.

20          MR. PERLSON:  Your Honor, we already have some calls

21   scheduled today, so he's spending quite a bit of time already

22   on these issues and trying to help us work through them.

23              THE COURT:  All right.  Any rebuttal?

24          MR. HUME:  Your Honor, I would just emphasize that

25   the expedited -- the PI order you entered, the expedited
```

```
 1    discovery you granted, we don't seek to stay any of that.

 2    We're really not trying to prevent Waymo --

 3          THE COURT:  Are you seeking to stay the issue of the

 4    privileged documents?  In other words, the 3500 documents that

 5    are being withheld on grounds of privilege that would show

 6    what Uber knew and when they knew it, are you trying to keep

 7    that from going forward?

 8          MR. HUME:  I -- I actually don't think we need to do

 9    that, no.  I think we're simply trying to avoid prejudice of a

10    trial and to expedite our appeal.

11          THE COURT:  All right.  I'm going to give you a

12    little bit of help on that part.  Thank you.  Have a seat.

13       All right.  Here's the answer.

14       The test is -- the test on these circumstances is that

15    four-part test.  I won't repeat it all, but whether this --

16    I'll summarize it whether the stay applicant has made a strong

17    showing that he is likely to succeed on the merits.  Two,

18    whether the applicant will be irreparably injured absent a

19    stay.  Three, whether issuance of the stay will substantially

20    injure the other parties interest in the proceeding.  And,

21    four, where the public interest lies.  And this is within the

22    court's discretion.

23       Now, I've already ruled on the merits of the arbitration

24    point.  I'm going to rule on the -- from the bench on this

25    one, on the stay part.  And I want to make a few observations.
```

1      Before the preliminary injunction motion was decided, I

2   made the observation that if it were to go against Uber, that

3   Uber would want a prompt trial date to get out from under a

4   preliminary injunction.  And conversely, if it went the other

5   way, the plaintiff would want the prompt trial date.  And so I

6   asked you to meet and confer and agree on a date ahead of time

7   so that -- while you were both still uncertain, and you both

8   agreed on October 2nd.  So we have a -- a trial date that is

9   one that both sides have agreed to, a trial date of October

10  2nd.

11      And I want you to know, I have -- I have readjusted my own

12  calendar in a way that would prejudice the court if we were to

13  shift that around.  That's maybe part of the public interest

14  factor here.  But nevertheless, I want you to know it's not

15  just an idle thing.

16      However, once the preliminary injunction came out -- and

17  in one sense that Uber came out ahead because Uber was afraid

18  the court was going to shut down their entire program and the

19  court did not do that.  Now Uber wants to wiggle out from that

20  October 2nd agreement.  In other words, Uber wants to go back

21  on its word and wants a stay of the case.  So that's one point

22  to keep in mind.

23      A second point to keep in mind is that the equities here

24  favor giving Waymo a trial as early as fair and possible

25  because they have made a strong showing that they have been

1    grievously wronged by a former employee who was having

2    meetings with Uber on the sly and ahead of time.

3        And whether Uber knew it or not, maybe they did, they were

4    talking big bucks, millions of dollars, to -- and it -- a jury

5    could reasonably conclude from these facts that Uber knew good

6    and well he was going to steal trade secrets and bring them.

7        Now, maybe Uber can prove that they didn't, but

8    nevertheless, this is -- this is not your ordinary BS

9    plaintiff case.  This is a strong case.  I don't mean that all

10   plaintiffs' cases are BS.  I misspoke on that.  What I mean is

11   this is not blather.  This is serious.

12       This is a serious proposition, and Waymo is entitled to

13   have its day in court to get the relief that it -- it --

14   equity would say that it deserves if it can prove its case to

15   a jury.

16       All right.  Next, I do believe that one practical point

17   that is raised by -- by Uber is that conceivably the judge is

18   wrong, meaning me.  And conceivably the Federal Circuit could

19   go the other way.  I don't -- I wouldn't think so, but I --

20   nevertheless it's always possible.  But hereby urge the

21   Federal Circuit to give as expedited consideration to this

22   appeal as possible.  I think there's plenty of time to get it

23   decided by -- before October 2nd.

24       And -- And that we, can in the meantime, go ahead

25   preparing this case as if it's going to go to trial on October

1    2nd.  And then if the Federal Circuit intervenes and says no,

2    you got to arbitrate the case, then we will salute, send it to

3    arbitration and that will be the end of it, except that --

4    perhaps for the provisional relief part.

5        Now, I do think that both sides -- in fact, I'm going to

6    order both lawyers for both sides to communicate to the

7    Federal Circuit the respectful request by the district judge

8    that -- that they be mindful of the trial date in October and

9    please try to give -- set a briefing schedule that will allow

10   it to be decided by then and to please not let Waymo or Uber

11   delay or obstruct that schedule.

12       In my judgment, it's already been adequately briefed and

13   you don't need a lot of time to brief this before the Federal

14   Circuit.  It can be done on an expedited basis if the Federal

15   Circuit wanted it to be.

16       Here's another point.  Even if this case were to go to

17   arbitration later on, all of this discovery that we're doing

18   would be of benefit to the arbitrators.  All of this discovery

19   in trying to wade through these privilege issues would be of

20   benefit to the arbitrators later on.

21       The only way you could possibly say that it would not be

22   if you were to indulge in the cynical view that arbitrators

23   would cut discovery off and not allow any discovery.  I don't

24   think that would happen here.  I think they would allow

25   discovery.  But that would be too cynical of you in my -- that

1    somehow arbitration is an unfair process and that by running

2    off into arbitration, you can escape discovery.

3        That, I don't accept.  And I -- I believe that the

4    discovery that we're doing in this case will be of benefit to

5    the arbitrators if that day ever comes.

6        In that connection, we have massive privilege logs that

7    have been submitted by Uber and for that matter Levandowski

8    and it's going to take some time, but it ought to be done as

9    quickly as humanly possible to wade through that and find out

10   what Uber knew and when they knew it.  That's one of the key

11   issues in the case.

12       And it could turn out that Uber is totally innocent and --

13   in terms of what they knew and when they knew it, but there's

14   3500 documents that's going to shed some light on that if

15   they're ever -- if they ever see the light of day.

16       Now, another thing that we can possibly do that I -- that

17   has concerned me a bit is that with respect to summary

18   judgment motions, which conceivably an arbitrator might

19   decide -- we will -- we will use précis system that you're all

20   familiar with.  And it could be that we will just not allow

21   summary judgment motions in order to -- to avoid making

22   rulings on the ultimate merits that might affect what in -- in

23   other words, an arbitrator might decide it a different way.

24       So it's conceivable that on a summary judgment, the court

25   would say no, we can put that one off for a while or we'll

 1   do -- that can be brought up on Rule 50 later in order not

 2   to -- not to prejudice possible range of action by the

 3   arbitrator later.

 4       On the other hand, I -- there could be motions for summary

 5   judgment where the equities require that we go ahead and

 6   decide it, so I'll just say I'll consider that on a

 7   case-by-case basis.

 8       So going back to the factors whether the stay applicant

 9   has made a strong showing that he is likely to succeed on the

10   merits, the answer is no.  And that's got to be more than just

11   not frivolous.  It's got to be strong showing on the likely to

12   succeed.  I'd say no, that hasn't been done.

13       Whether the applicant will be irreparably injured absent a

14   stay, I would -- I would say that we're not there yet.  If we

15   were to get to the point where we actually have the trial and

16   the Federal Circuit hasn't decided the stay, then that would

17   be a problem and we can consider it at the final pretrial

18   conference.  But up until that point, there won't be any

19   irreparable injury.

20       Three, whether the issuance of the stay will substantially

21   injure the other parties in the proceeding.  Well, a stay

22   would definitely injure Waymo, and Waymo has a -- has made a

23   showing that deserves an answer.

24       Four, where the public interest lies.  I'm not sure which

25   way this one cuts, so I don't think the public interest favors

1    putting this case in arbitration, but I -- at the same time,

2    I'm not sure that it does -- that the public has an interest

3    in a private dispute, so I don't know.  That one I think

4    doesn't cut much either way.

5        Anyway, the circumstances don't warrant a stay.  And for

6    the reasons I've stated and -- the stay motion is going to be

7    denied as of right now.

8        All right.  So let's go to case management.

9        Okay?

10       I'm not going to do a written order beyond what I've just

11   said on the record.

12       Okay.  Case management.  I handed out -- Did we hand it

13   out?  Oh, we did not.  Okay.  I'm very sorry.  I thought we'd

14   handed it out before.  We're going to do the following:  I'm

15   going to hand you a proposed case management order and then

16   I'll take a short break, and then we'll come back in ten

17   minutes and we can comment on it.

18       I think it will just be better if you have the draft order

19   in front of you.  All right?

20       Okay.  Thank you.

21                    (Pause in the proceedings.)

22           **THE COURT:**  Please get a hold of those lawyers that

23   are missing and ask them if they can get here right away so we

24   don't to have wait till 10:00 o'clock.  All right?

25       Thank you.

```
 1              (Recess taken at 8:55 A.M.; proceedings resumed at 9:19

 2       A.M.)

 3              THE CLERK:  Please come to order.  Court is in

 4       session.

 5              THE COURT:  Please be seated.  Thank you.  Back to

 6       work.

 7          So I need one from each side to come forward and give me

 8       your heartburn.

 9              MR. PERLSON:  Your Honor, David Perlson for Waymo

10       again.  We have no heartburn.  We're fine with the schedule.

11              THE COURT:  No heartburn for your side.  That's

12       great.

13          How about your side?

14              MS. CHANG:  Esther Chang for Morrison & Foerster.

15       The only part of the schedule that we would like to request

16       reconsideration of is the expert report and discovery

17       schedule.  As it currently stands, there's only two -- sorry

18       one week between responsive --

19              THE COURT:  I know.  I had to cut that.  That's

20       normally shorter, but I had to cut it.  You know, we got an

21       October 2nd trial date, and I think if we squeeze it in -- you

22       see the problem.

23          So what would your current proposal be?

24              MS. CHANG:  So the parties have previously agreed to

25       a July 21 fact discovery cutoff date, so rather than extending
```

```
 1    that to the August 31 date that's in your proposal, we suggest

 2    extending the agreed-upon July 21 date by three weeks to

 3    August 11.  If we modify it that way, that would give us two

 4    weeks --

 5              THE COURT:  Wait a minute.  Wait.  August 11?

 6              MS. CHANG:  Yes.

 7              THE COURT:  And then what?  But then --

 8              MS. CHANG:  So August 11, fact discovery would close

 9    and opening expert reports would be due.  Two weeks after on

10    August 25, responsive expert reports would be due.  One week

11    after that, September 1, reply expert reports are due.

12              THE COURT:  All right.  Can we -- Can you go with

13    that?

14              MR. PERLSON:  Well, Your Honor, I think that perhaps

15    the two weeks for their response reports we could agree to,

16    but I think that the -- we'd -- I think we don't need more

17    than a week for expert depositions, and I don't think we need

18    a full week for the --

19              MS. CHANG:  Reply.

20              MR. PERLSON:  -- reply.  And so I think that those

21    dates should stick.  And I do think it's important to have

22    this -- the fact discovery go as it is, so I think if -- you

23    know, maybe just moving --

24              THE COURT:  Well --

25                        (Simultaneous colloquy.)
```

 1            THE COURT:  -- you had agreed to an earlier fact

 2    discovery date?

 3            MR. PERLSON:  We did -- In the proposal, we did agree

 4    to an earlier fact discovery date.

 5            MS. CHANG:  By over a month earlier.

 6            THE COURT:  All right.  We're going to do this.

 7    We'll change the fact discovery to August 24 and also the date

 8    for the expert reports, August 24.  And then -- And then you

 9    want to give two weeks on the opposition?

10            MS. CHANG:  Yes, Your Honor.

11            THE COURT:  Wait.  Let me find that part.  Okay.

12    Instead of 7 calendar days, it will be 14.

13        And then how about the reply to the opposition?  That will

14    be still stay at four; is that all right?

15            MS. CHANG:  I would suggest one week, Your Honor.  I

16    don't think it's going to impact the rest of the schedule that

17    much by giving us an additional three days.

18            THE COURT:  All right.  Within seven days.

19        Okay.  Then the cutoff for all expert discovery, do you

20    want to change that from 7 days to what, 14?

21            MS. CHANG:  Yes, Your Honor, because there will be

22    scheduling issues and there will be several experts that the

23    parties will need to take and defend depositions of.

24            THE COURT:  Right.

25        Okay.  I'll make those changes.

1          **MS. CHANG:**  Thank you, Your Honor.

2          **THE COURT:**  See how reasonable I am?

3          **MS. CHANG:**  Yes, Your Honor.

4     I'd like to raise one additional issue.

5          **THE COURT:**  What's that?

6          **MS. CHANG:**  And that's with respect to your comment

7     about claim construction.

8          **THE COURT:**  Yeah.

9          **MS. CHANG:**  So, as you know, normally claim

10    construction is decided before expert -- often before the

11    experts --

12         **THE COURT:**  True.  Well, who says that?

13         **MS. CHANG:**  Okay.

14         **THE COURT:**  That's just you patent lawyers talking.

15         **MS. CHANG:**  That's correct, Your Honor.

16         **THE COURT:**  And you patent lawyers think you own the

17    courthouse.  But every other lawyer who tries cases, they

18    don't know how the jury's going to get instructed until the

19    jury instructions are settled after the evidence.  So you

20    don't have any God given right to see what the claim

21    construction is going to be until case goes to the jury.  If

22    your expert guessed wrong, well, guess what, too bad for your

23    expert.

24         **MS. CHANG:**  Just to clarify, Your Honor is suggesting

25    that we include our claim construction arguments in our

1    presentation to the jury?

2            **THE COURT:**  No.  You would go with whatever you think

3    is going to win in terms of claim construction, and then if I

4    pull the rug out from under you and say that claim

5    construction was wrong, then too bad for your expert and too

6    bad for your side.

7        This will have the therapeutic effect of causing you to be

8    more -- you patent lawyers like to have everything all set up

9    and all just lined up perfectly, and if that doesn't work,

10   then this will work, and have contingent -- no, you're going

11   to go with the ebb and flow like regular trial lawyers.

12       This is the way I do it.  Plus the most important thing is

13   I've done 13 patent trials now.  I always think I know the

14   case better just before it goes to the jury, and I always wish

15   I could do the claim construction then 'cause I know it cold.

16       Whereas at these so-called *Markman* hearings, it's a

17   exercise in futility where the lawyers try to substitute one

18   vague phrase for another one, so we're not -- I -- I think

19   this is -- my scheme is much better.

20           **MS. CHANG:**  I think that's a fair point.

21           **THE COURT:**  But our -- but I want to follow up on

22   this for a second.

23       I want to give a lecture to Waymo.  You're the plaintiff.

24   You're the one that wants to get to trial.  You're a big firm.

25   You big firms always think you can hold on to every issue and

 1    have it both ways, but at some point you got to cut loose and

 2    decide, do you really think these patent claims are worth the

 3    salt.  In my view, they're not.

 4        I think you're going to lose on all these patent claims

 5    unless you pull some rabbit out of a hat.  And you're just

 6    burning up time and you are wasting time and you're going to

 7    wind up putting us in a position where the trial's got to be

 8    kicked over, and it could be -- then I'm going to lose my law

 9    clerk on the case.  I'm going to lose lots of things.  And it

10    may be a year before I could do it.  You might as well go to

11    arbitration.

12        So why are you putting the court and the other side in the

13    position where you're trying to hold on to these patent

14    claims?

15            MR. PERLSON:  Well, Your Honor, I understand your

16    statements, and we are still in discovery, and we think that

17    there's a lot more.  But I -- I understand and take your

18    position to heart.

19            THE COURT:  Why don't you -- you have to -- that

20    response works in your ordinary case.  You're still in

21    discovery.  You're still trying to figure out if -- you're

22    still on your fishing expedition is what you're trying to say.

23    No, this is not --

24        But you're the one that wants a trial date in October.

25    The other side now wants to push it out for years.  You're the

1   one that wants a trial date.  You need to be thinking -- we're

2   the plaintiff.  You need to be thinking the plaintiff gets to

3   trial and streamlines that case so that there's no obstacles.

4   And these patent claims of yours, to my mind, probably there's

5   nothing there.  I don't know.  I'm just -- I'm just trying to

6   do case management here.

7       So you should be making a prompt decision, not a -- not

8   sometime in August where you burn up a lot of time and effort

9   in discovery, motions, and all that stuff over something that

10  in the end of the day is a distraction.  So you think about

11  that.

12      I will tell you what I think the number one priority in

13  this case -- has got to be.  Really two, one for each side.

14      On the plaintiff's side, Waymo's side, you should be

15  trying to get a hold of those 3500 documents -- and by the

16  way, your theory that everything else falls with the due

17  diligence report is questionable in my mind.  They may be not

18  privileged, but I think it's got to be more refined analysis

19  than that.

20      What Waymo -- what Uber knew and when they knew it is --

21  is an important issue.  And those documents would relate to

22  that.

23      On the other side, what you should be looking at and --

24  but you don't need -- you don't need discovery, really, is to

25  show that these alleged trade secrets are in the public

1        domain.  And -- And you, know, get out there and show that

2        some of these things -- all of these things that are alleged

3        trade secrets are not -- are -- you know, any good engineer

4        would know them anyway, so that is where I think you should be

5        headed.

6            You don't need much discovery from the other side to do

7        that, though you -- some would help you.  That's going to be

8        out there in the literature and the -- maybe you need to go do

9        some discovery from other car companies, driverless car

10       companies in order to see how they do it to, see if they

11       already have discovered the same trade -- alleged trade

12       secret.

13           Anyway, you should be -- that's where you -- now, I want

14       to come back to the plaintiff.  How many trade secrets did you

15       allege, 135 or something like that?

16               **MR. PERLSON:**  I think that sounds about right.

17               **THE COURT:**  So let's -- Let's think that through for

18       a minute.

19                       (Off-the-record discussion.)

20               **THE COURT:**  How are we going to litigate that at

21       trial?  Are you going to reduce that down to less than ten so

22       that that -- and tell the other side when -- that they're --

23       how's that part going to work, 'cause remember you haven't

24       sued Levandowski.  You have sued Uber.  And at some point you

25       got to say, okay, which one of these trade secrets actually

1    made its way into Uber.

2         **MR. PERLSON:**  Understood, Your Honor.

3         **THE COURT:**  So are you going to really say 135 to the

4    jury?

5         **MR. PERLSON:**  Your Honor, I don't think that we would

6    go forward with 135 trade secrets to the jury.  One of the

7    issues, frankly, is that -- you know, we been fighting and

8    it's been difficult to get documents and we're going through

9    the expedited discovery process.  We just got documents -- or

10   responses to those yesterday.

11     We will have some more in -- hopefully later this week.

12   And I think we'll be in a better position to do further

13   narrowing in the coming weeks.  But we understand what you're

14   saying and absolutely take it to heart.

15        **THE COURT:**  Well, when -- Yeah, you're taking it to

16   heart, but don't we need some kind of drop-dead date by which

17   you're going to identify the trade secrets that you're going

18   to go trial with?

19        **MR. PERLSON:**  That hadn't been proposed.  I hadn't

20   thought of a certain date off the top of my head before the

21   hearing.  Perhaps we could suggest meeting and conferring with

22   the other side and coming up with a proposal for that.

23        **THE COURT:**  Well, that's -- just sounds like you

24   dodged the issue for a while, but I'm going to suggest to you

25   that you meet and confer and agree on a date in August before

1    the expert reports are due.  And I won't be any more specific

2    than that.

3        But I think that -- I think by then, both sides ought to

4    know which trade secrets are in play, alleged trade secrets.

5            **MR. PERLSON:**  Understood, Your Honor.

6            **THE COURT:**  And -- And I'm going to say if it's more

7    than ten, I'm going to be disappointed.  I can't say never,

8    but I will just say it's -- the -- the harder you make --

9    harder you make it as a plaintiff to get this case fairly

10   prepared for trial, the more pressure there is on that October

11   2nd date.  And don't just think that, oh, judge, you're the

12   number one case in the courthouse; you get to pick your trial

13   date.  No, I got other cases.  It could be a year before you

14   get another chance at a trial.

15       So you should be -- you should be holding on and doing

16   everything you can to preserve that date and -- and streamline

17   for the benefit of the court and the other side and --

18       All right.  That's all I got to say on that.  So --

19           **MR. PERLSON:**  Understood.

20           **THE COURT:**  -- meet and confer.  Let me know what

21   date -- I want to have an answer on that by the end of next

22   week, so you send me the --

23           **MR. PERLSON:**  Absolutely.

24           **THE COURT:**  Send me the -- the drop-dead date on your

25   trade secret list.

1          **MS. CHANG:**  Your Honor, if I may, I have two

2    questions and one clarification related to the case management

3    schedule.  First is the parties have proposed some additional

4    dates that are not included in your tentative --

5          **THE COURT:**  All right.  Let's -- I don't -- I'm using

6    my standard thing as a -- my template.  That's what I call it,

7    because that's what I'm used to.

8       But okay.  Let's go through some of your other -- give me

9    some other dates that you want.

10          **MS. CHANG:**  So Waymo has already served its

11    infringement contentions, and we have dates for invalidity

12    contentions and exchange of proposed claim terms and

13    exchanging preliminary claim constructions.

14       Based on your order or -- yes, your tentative order

15    regarding no claim construction hearing, I would propose that

16    we delete all the claim construction-related dates.

17          **THE COURT:**  No, you still need to do your claim

18    construction.  I've had this in other cases.  Even though --

19    Even though I'll wait, both sides -- you two need to disclose

20    to each other at least what your contentions are so that it's

21    less of a free-for-all at the time that we get to the end of

22    the trial, and we're trying to figure out what the -- so no,

23    I'm not going to go for that.

24          **MS. CHANG:**  Okay.  And are you -- so we have proposed

25    various dates for the exchange.  I think --

```
 1          THE COURT:  Well, then we'll go with your dates.
 2   What's wrong with your dates?  I'll just enforce the dates
 3   you've already agreed on.
 4          MS. CHANG:  Okay.  Great.
 5      With respect to the other deadlines --
 6          THE COURT:  I do want to say this:  Even though --
 7   Even though I'm going to enforce your dates, I want to
 8   reiterate to the plaintiff here that you should think a lot
 9   about just dropping the patent part of this case.  And instead
10   of making them go through the pain and suffering of answering
11   all those contentions on the patent side of the case.  But I'm
12   not ordering that.  I'm just saying that.  I'm reiterating
13   what I said earlier.
14      Go ahead.  Next point.
15          MS. CHANG:  So there are additional dates which
16   defendants are fine with.  For example, due date for damages
17   contentions, we currently have June 26.  And then the other
18   deadlines are related to dispositive --
19          THE COURT:  Well, let's do them one at a time.  Was
20   that damage contentions?
21          MS. CHANG:  Yes, Your Honor, under the new patent
22   local rules.
23          THE COURT:  All right.  You got to do that.
24          MR. PERLSON:  Understood.
25          THE COURT:  He says he understands.  What's next?
```

```
 1              MS. CHANG:  Okay.  Great.
 2        The next date is the deadline to file dispositive and
 3    Daubert motions, I don't think I saw that but I may have
 4    missed that.
 5              THE COURT:  Okay.  No, the summary judgment you got
 6    to do by precis motion.
 7              MS. CHANG:  Oh, that's right.
 8              THE COURT:  I'm not going to allow you -- it will get
 9    out of control.  So the summary judgment -- and for Daubert,
10    Daubert, I guess I'm going to have to take all of those up at
11    the final pretrial conference.
12              MS. CHANG:  Okay.
13              THE COURT:  If you got a real Daubert motion to go
14    against their expert, of course, I got to hear that, but I
15    would hear it at the final pretrial conference.
16              MS. CHANG:  And what about the briefing schedule
17    related to Daubert motions?
18              THE COURT:  Well, that would be just like any other
19    motion in limine.
20              MS. CHANG:  Okay.
21              THE COURT:  You would file your motion saying knock
22    out expert hired gun -- bought-and-paid-for expert No. 2 on
23    the ground that his methodology is no good.
24              MS. CHANG:  We currently have a September 8 deadline.
25              THE COURT:  Here's another thing I want you to know
```

 1    about experts.  In my old age, I have given up on trying to

 2    give you second bites at the apple.  So if your expert goes

 3    out the door because the methodology sucks, too bad for you.

 4    You just don't have the expert at trial.

 5        You'll be scrambling around saying, judge, we're the

 6    plaintiff, we're the plaintiff.  My God, you can't let us go

 7    to trial without an expert.

 8        I say, yes, I can, because you were greedy.  You asked for

 9    billions of dollars when this was a less -- you know, the

10    damages can't be proven in that amount, and the methodology's

11    crazy.

12        So you need to be reasonable on your methodology.  You

13    don't get a second bite at the apple.  The same is true for

14    both of you.  I can't say "never."  It depends on the

15    circumstances.  I will just say, I found that it is better to

16    give you this stern lecture up front and hope that you -- give

17    you some incentive to be reasonable at the get-go instead of

18    getting two free bites every time.

19        Okay.  What's your next point?

20            MS. CHANG:  We currently have a briefing schedule for

21    motion in limines with opening -- with the motions due

22    September 8, oppositions due September 15 and --

23            THE COURT:  Is that going to work with this schedule

24    we have here with August and so forth?

25            MS. CHANG:  I think so because the -- your final

1    pretrial conference isn't scheduled until September 20.

2           THE COURT:  How many days will I get with all the

3    paperwork?

4           MS. CHANG:  Okay.  Well, that is a good point.

5    Perhaps the parties can negotiate the briefing schedule for

6    the *Daubert* and motion in limines --

7           THE COURT:  I need at least two weeks.

8           MS. CHANG:  Okay.

9           THE COURT:  So I need it completely briefed for at

10   least two weeks.

11          MS. CHANG:  Okay.  Do you want us to give you the

12   dates right now or meet and confer --

13          THE COURT:  If you can.  What do you propose?

14          MS. CHANG:  I think so.  I think defendants could if

15   Waymo can.

16          THE COURT:  You two have a little --

17          MR. PERLSON:  Okay.

18          THE COURT:  -- conference right now and see if you

19   can agree on the dates.

20          MR. PERLSON:  And just to be clear, I -- when -- the

21   dates that we were working off of off the -- the fact

22   discovery was August 24th, and we were going to go later than

23   that -- later from that?

24          MS. CHANG:  So August -- the judge ordered August 24

25   as the fact discovery.

1         **MR. PERLSON:**  Right.

2         **MS. CHANG:**  So this is the new date.

3         **MR. PERLSON:**  Okay.

4              (Off-the-record discussion.)

5         **MR. PERLSON:**  So I wonder, Your Honor, if we could

6    have it so that maybe the -- the motions in limine would be

7    the 23rd and --

8         **MS. CHANG:**  Yeah.

9         **MR. PERLSON:**  And then maybe the *Dauberts* would be a

10   little later, but there wouldn't be two full weeks to rule on

11   them just given that the close of fact discovery is April --

12   or is August 24th.  That's when opening reports are due?

13        **THE COURT:**  When is pretrial conference?

14        **MR. PERLSON:**  September 25th.

15        **MS. CHANG:**  No, I think in his order it's September

16   20.

17        **MR. PERLSON:**  Oh, 20.  Sorry.

18        **THE COURT:**  Back up.  Is it -- I'm sorry.  What is --

19        **MS. CHANG:**  September 20 was in your proposal.

20        **THE COURT:**  20?  Well, then if I go back 20, 14 days

21   from that is what?

22        **MS. CHANG:**  September 6th.

23        **THE COURT:**  How come you can't do it -- you know, you

24   law firms have the gigantic resources.

25              (Simultaneous colloquy.)

1          MR. PERLSON:  Well, under the schedule there, I think

2     that actually -- well, that would only be -- that would

3     just -- you would need to have the expert report to do the

4     *Daubert*.  And if we did them by the 6th -- the responses by

5     the 6th, then we wouldn't have the rebuttal reports even by

6     that date.

7          MS. CHANG:  What might be helpful is if we could push

8     up the expert schedule by a week or two to accommodate the

9     *Daubert*.

10          MR. PERLSON:  I would suggest, Your Honor, that we --

11     I mean, these are kind of dates all pushing off each other.  I

12     would suggest that maybe we could break and try to work out a

13     schedule and propose it to you, you know, perhaps around the

14     next hearing or later today.

15          THE COURT:  We'll do it -- Here's what -- Is this the

16     only issue left?

17          MR. PERLSON:  Well, there are two discovery-related

18     issues.  One, which -- in terms of the -- the depositions and

19     interrogatories per side.  And then additionally, there was an

20     issue regarding storage of backup tapes.

21          THE COURT:  Let's go to the -- I saw somewhere you

22     had 235 requests for documents.

23          Is that true?

24          MR. PERLSON:  Well, both sides have a couple hundred

25     requests, I think.

```
 1            MS. CHANG:  So --
 2            MR. PERLSON:  I'm not sure that either party is
 3     more -- we have -- you know, I think there's, what, like 180
 4     from -- from one defendant and, you know, I don't know if that
 5     many --
 6            MS. CHANG:  Fifty.
 7            MR. PERLSON:  -- fifty from another, so I think we're
 8     both somewhat similar when you're looking --
 9            THE COURT:  Still a case of that magnitude with that
10     many document requests, here, you're the plaintiff trying to
11     get to trial by October 2nd.  Is that feasible?
12            MR. PERLSON:  We think so, Your Honor.  Then I think
13     that the reason why the -- the requests are as voluminous as
14     they are, frankly, is that many of them were very, very
15     specific to try to avoid any concerns about what they mean.
16            MS. CHANG:  Well, defendants take issue with that
17     statement, that they were very specific.  But Waymo has thus
18     far served 265 RFP's.  They've taken 12 depositions during the
19     PI phase.  They have 7 during the expedited phase.  And
20     they're -- it seems from the way Waymo is going, that it
21     intends to serve additional RFP's, so we would like to propose
22     some limits on these discovery requests, because at some
23     point, we need to start reviewing and analyzing the materials
24     that have been produced.  And our ability to do that is
25     hindered when we constantly to have search for documents.
```

1    There are 265 outstanding currently, Your Honor.

2         **THE COURT:**  What has our special master done to

3    alleviate this problem?

4         **MS. CHANG:**  We have held almost daily, sometimes

5    twice daily, meet-and-confers.  But oftentimes the parties are

6    at impasse, and we're teeing RFP requests up for motion

7    practice.

8         **MR. PERLSON:**  Your Honor, what we've done is that

9    we've gone through -- I mean, first of all, we've gone through

10   our expedited discovery requests, which are fewer in number.

11   And I think that the number of overall requests is probably

12   somewhat inflated because we served our initial set of

13   requests before we were limited to 28 expedited discovery

14   requests, so there probably is a little bit of overlap there.

15        But what we've done is we've gone through and as

16   Magistrate Judge Corley has instructed us to do, is to talk to

17   each other before our responses are due to try to work out

18   issues.

19        And, you know, I don't -- we're not going to work out

20   every single issue, but I think we have worked out several

21   issues.  And what we've done is, you know, we've gone through

22   many of their requests of -- you know, their 150-some

23   requests, and we're doing some more of that later today.

24        And we've also previously gone through our expedited

25   requests, you know, there may be, you know, three or four

 1    issues out of those, but I think that's about it.

 2              THE COURT:  How many documents --

 3              MR. PERLSON:  -- in terms of responses.

 4              THE COURT:  -- have the defendants propounded?

 5              MS. CHANG:  Uber and Ottomotto has served 162, and

 6    Otto Trucking has served 61.

 7              THE COURT:  What does that add up to?

 8              MS. CHANG:  Two hundred -- I'm not great at

 9    arithmetic.  I can do difficult math but not easy math.  197.

10              THE COURT:  One what?

11              MS. CHANG:  97.

12              THE COURT:  And how many did the other side do that's

13    not expedited?

14              MS. CHANG:  265.  And then they do also have the 28

15    and the 72 they served during the expedited -- the PI stage.

16         And, Your Honor, attorneys for both sides spend several

17    hours a day on meet-and-confers.  And although we have

18    resolved some issues, there are many outstanding issues and

19    points of disagreement with respect to the discovery requests.

20         As you can imagine, it's a very time-consuming process,

21    and at some point, we need to put some kind of limit on the

22    discovery requests that are being propounded.

23              MR. PERLSON:  Well, Your Honor, part of the reason

24    why we've been meeting and conferring every day or -- I don't

25    know that that's true, but we have been meeting and conferring

1    a lot -- is that we were ordered to do expedited discovery and

2    precluded from doing discovery other than the expedited

3    discovery --

4          THE COURT:  Now you're --

5                (Simultaneous colloquy.)

6          THE COURT:  Now, please.  You're acting like you're

7    blaming me --

8          MR. PERLSON:  No.

9          THE COURT:  -- for having given you expedited

10   discovery.  And I only said that you had to do it before you

11   started your regular discovery; otherwise, you're holding it

12   in the bank and that doesn't -- that's no good.  You got to do

13   your expedited.  And if you don't want the expedited, then

14   throw it away.  Go with regular.  That's okay with me.

15         MR. PERLSON:  All I meant to say is that to the

16   extent that there's a suggestion that we're sort of, you

17   know -- you know, like, steam rolling and doing more than we

18   should, we're doing and trying to get the expedited discovery

19   that you ordered, and we're trying to do that as quickly as we

20   can.

21       Also I think that there may be some -- I think that the

22   math is necessarily wrong.  They actually have 213 document

23   requests as we count them, but I don't know that that makes a

24   huge bit of -- huge difference.

25       But I think that we'll be in a better position to maybe,

1    you know, sort of, you know, try to see, you know, how much

2    more there's going to be down the road once we finish this

3    expedited discovery phase 'cause I think it's hopefully going

4    to get us a lot of what we need.

5            **THE COURT:**  Have you propounded the expedited

6    discovery?

7            **MR. PERLSON:**  Oh, absolutely.  Yeah, we've --

8            **THE COURT:**  You're saying you haven't gotten it yet.

9            **MR. PERLSON:**  Well, the first request -- the first

10   responses were due yesterday.  And so we're actually meeting

11   and conferring about their responses today.  And we have been

12   meeting and conferring in the past week or so regarding their

13   responses to our document requests and we have worked out some

14   issues.

15       We've also served all of our expedited interrogatories as

16   well.  And some of them were -- the responses were -- we got

17   last night.  And some of them we'll be getting over the next

18   several days.

19           **MS. CHANG:**  Your Honor?

20           **MR. PERLSON:**  And we've also noticed some depositions

21   and we hope to complete those within the next --

22           **THE COURT:**  -- say something about the depositions

23   for a minute.  I've read a few of your depositions.  I don't

24   mean you personally but depositions taken in this case.  And I

25   want to just say you should be asking questions that get at

1  facts, that are about ten words or less, as many with one

2  syllable as possible and no argument.

3      I think what I saw there was a lot of argument and smarty

4  pants conduct.  Not a lot.  Some.  I overstated it.  But you

5  should be on both sides trying to get at the facts.

6      All right.  Enough on that.

7          **MS. CHANG:**  Your Honor, I have two comments.

8          **THE COURT:**  I want to come to your -- to your -- the

9  document requests and all that, but please go ahead.  What do

10  you want to say?

11          **MS. CHANG:**  So in addition to 265 document requests

12  that Waymo has propounded, we've also been subject to multiple

13  inspection requests.  They spent seven hours at Ottomotto.

14  And following up on that inspection request, even though it

15  wasn't included in the court's order, they've asked for many

16  documents and follow-up items from the inspection requests.

17  So not only are we responding to the written discovery

18  requests but we're responding to follow-up requests from the

19  inspection.

20          **THE COURT:**  Look, some of this I -- I've referred all

21  discovery grievances to the magistrate judge and the special

22  master, and I don't want to get deeply into this.  I just --

23  here's what I'm going to say for the time being.

24      I'm going to say that no more document requests, except

25  you on the Uber and defense side can get up to 265 from

```
 1    whatever the correct math shows you've already done until such
 2    time as the special master recommends that more should be
 3    allowed.  Or you come back to me in about a month and tell me
 4    that you got to have more.
 5        But you ought to be following up on the discovery you've
 6    propounded.  I'm talking just now about document requests.
 7    I'm not saying there shouldn't be any more -- there should be
 8    depositions.  There should be interrogatories, all that stuff,
 9    but no more.  265 is plenty for the time being.
10        So you should just be enforcing what you've got,
11    negotiating with what you've got, and then when the dust
12    begins to settle on that, if you really need more, we'll find
13    a way to -- to do it.  But 265 -- I mean, that's more than
14    I've ever -- I can't even count that high.  That's a huge
15    number, so you -- that's what it's going to be for now.
16            MS. CHANG:  Thank you, Your Honor.
17            MR. PERLSON:  Okay.  Your Honor, just so I understand
18    that we can't serve any more --
19            THE COURT:  You can't serve any more document
20    requests till the special master thinks you need them, 'cause
21    you're just -- you're just -- that's too many, so -- but maybe
22    later on, you can show that you need them and you ought to be
23    enforcing the ones that you have -- you have propounded
24    instead of coming up with new ones.
25        I don't know on the inspection thing now.  I'm not going
```

1    back on anything I said in the preliminary injunction.  So if

2    I -- if I gave them the right to ask for expedited

3    discovery -- I certainly gave them a right to ask on

4    reasonable short notice for inspections.

5            **MS. CHANG:**  Yes, Your Honor.  But they've used that

6    process to get additional discovery.

7            **THE COURT:**  If they have the right to inspect source

8    code, for example.  That's part of the inspection process.

9    They got the right to inspect a lot of things there, and just

10   because you call it a document request doesn't mean it's not a

11   part of the inspection.

12           **MS. CHANG:**  No, Your Honor.  They're asking for

13   production of items that they've inspected.

14           **THE COURT:**  I -- I'm referring that to the magistrate

15   judge.  I -- you're getting into details that I'm going to get

16   crosswise with her.  So you two ought to be meeting morning

17   and evening with the special master in this case to work this

18   out.

19           **MS. DUNN:**  Your Honor?

20           **THE COURT:**  What was the other thing that you were

21   raising a minute --

22           **MS. CHANG:**  Depositions?

23           **THE COURT:**  The what?

24           **MS. CHANG:**  The deposition limits.

25           **THE COURT:**  Well, I think you need more depositions

1    than the ten that are authorized by the rule here.  What's --

2          **MS. CHANG:**  So Waymo has already taken 12 depositions

3    during the PI phase.  You gave them 7 expedited depositions,

4    but they've only used one.  And just recently noticed 2 more,

5    so they still have 4 in the expedited phase.  They're asking

6    for 15 additional depositions on top of the ones they've

7    already taken.

8          **THE COURT:**  Fifteen's reasonable.  I think 15's okay

9    on top of it, but they don't get those until they use up the

10    expedited ones.

11      But I will say this:  I won't -- I'll say probably you're

12    going to get the 15, but I've learned in this job that you

13    can't just give it to you upfront because then they get abused

14    and I have to wait and see if you're a good citizen and you

15    behave yourself in these depositions on both sides.  And then

16    if you do, you're going to get more depositions.

17      Very likely, you're going to get more, but please behave

18    yourself.

19      This case deserves more than 15 depositions.

20      You to have -- how many people have you put in your

21    initial disclosures.  Probably 60 or 70.

22          **MS. CHANG:**  No, not that many, Your Honor.  I want to

23    say it's something on the order of 20.

24          **THE COURT:**  Every one of those people ought to be

25    deposed.  Same on your side.  They ought to be deposed.  Maybe

```
 1     just for two hours.  That's -- possibly not a full day, but --
 2              MS. CHANG:  Your honor, the other issue I wanted to
 3     raise was the issue of the initial disclosure deadline.  You
 4     had set a date of, I believe, June --
 5              THE COURT:  12.
 6              MS. CHANG:  12.
 7              THE COURT:  Yeah, should have already been done
 8     before today.
 9              MS. CHANG:  We do have the parties have already
10     served initial disclosures, but we took your deadline to mean
11     the final set --
12              THE COURT:  You can update -- The one I put here
13     in -- the thing I have just gave you today?
14              MS. CHANG:  Yes, Your Honor.
15              THE COURT:  Yeah, you can go back and redo
16     everything.
17              MS. CHANG:  Okay.
18              THE COURT:  But it must be done right according to
19     the Rule 26.
20              MS. CHANG:  Okay.
21              THE COURT:  Including contact information for
22     witnesses.
23              MS. CHANG:  Yes, Your Honor.  And just so that I'm
24     clear, we can revise the initial disclosures after June 12th.
25              THE COURT:  No.
```

```
 1              MS. CHANG:  No.

 2              THE COURT:  No, no, no.

 3              MS. CHANG:  Okay.

 4              THE COURT:  Then you have to throw yourself on the

 5    mercies of the court and do supplements for good cause and all

 6    that.  So you can try.  But if there's sandbagging going on,

 7    you would not be allowed to do it.

 8         But I'll give you an example.  This would be perfectly

 9    okay.

10         Let's say that other side answers an interrogatory and

11    says, we contend ABC.  And let's say they do that at the end

12    of July and that you genuinely are taken by surprise that you

13    didn't even know ABC was an issue in the case.

14         This happens sometimes.  So then you scramble around, you

15    say, well, we can easily defeat that issue with witness X.  So

16    then you amend and put witness X as a supplement to your

17    initial disclosures and you explain we just learned about ABC,

18    we're going to have witness X explain why that's bogus.  So

19    that that would be perfectly okay.

20         But you have to have a good reason to amend your

21    disclosures after June 12th.

22              MS. CHANG:  Your Honor, given that the parties are

23    still undergoing fact discovery and we've extended the fact

24    discovery deadline until August 24th, we would request a

25    slight extension to the June 12th deadline you have in here.
```

1          **THE COURT:**  Like what.

2          **MS. CHANG:**  July 21.

3          **THE COURT:**  No.  No, way.

4          **MS. CHANG:**  What about the end of June?

5          **THE COURT:**  You should have already -- but you could

6     amend for good cause.

7          **MS. CHANG:**  Okay.

8          **THE COURT:**  In other words, if you genuinely -- no

9     one could have expected to reasonably know about that witness

10    you don't have to put him down yet.

11         **MS. CHANG:**  Okay.

12         **THE COURT:**  Because it could be that the way they

13    plead the case or the way they litigate the case, you can see

14    there's a new issue in the case and you just put down the new

15    witnesses that you want to deal with that issue.  That's --

16    That's perfectly okay.

17       But I can't let you just have this blank check that you

18    can sandbag, and I don't like sandbagging.

19         **MS. DUNN:**  So --

20         **THE COURT:**  That's what it leads to.

21       Yes?

22         **MS. DUNN:**  Would Your Honor be open to a date that

23    also starts with June but ends with a later number to avoid

24    our to having to throw ourselves on the mercy of the court.

25         **THE COURT:**  Not too much later.  What date do you

 1   have in mind?  Don't say "June 30."

 2          **MS. DUNN:**  It was very tempting.  How about June 21?

 3          **THE COURT:**  All right.

 4          **MS. DUNN:**  Sort of a compromise between June 30 and

 5   June --

 6          **THE COURT:**  So it's like a transposition?  12 goes to

 7   21.

 8          **MS. DUNN:**  Yes, Your Honor.

 9          **THE COURT:**  All right.  I'll give that you.

10          **MS. DUNN:**  We appreciate that.

11      I also want to say, Your Honor, so Ms. Chang is on the

12   front lines of discovery and the meet-and-confers every day.

13   I will say we understand you don't want to get into the weeds

14   and we are not asking for that.  However, hearing from the

15   court that there are limits and that requests of us must be

16   tied to actual discovery, I think would be very helpful.

17          **THE COURT:**  Say it again.

18          **MS. DUNN:**  Often what is happening is there are

19   free-floating requests not tied to certain discovery issues.

20          **THE COURT:**  In other words, a letter comes out of the

21   blue saying, we want to see the source code.

22          **MS. DUNN:**  Or even just questions coming out of the

23   blue very shortly before meet-and-confer conversations.  So I

24   understand that we are big law firms, but we are not -- you

25   know, we're not infinitely clonable.  And it is -- it is very

 1    helpful for the court to -- if the court so wishes to set some

 2    limits on what's going on here.

 3        It's become -- you know, we're on the verge of prejudice

 4    to the --

 5            THE COURT:  What do you say --

 6                    (Simultaneous colloquy.)

 7            THE COURT:  They're accusing you of not only doing

 8    the 265 document requests but bombarding them with letters

 9    sayings we just inspected the machine and now we want to see

10    A, B, and C.  So what do you to that?

11        MR. PERLSON:  Well, I'm not sure exactly what she's

12    talking about.  I disagree that we're bombarding with anything

13    inappropriate.  Perhaps some of the things that she's

14    referring to --

15            THE COURT:  I'm sure she could give me a letter right

16    now.

17        MR. PERLSON:  I can give you an example of what I

18    think she might be talking about.  One of the -- In relation

19    to compliance with the preliminary injunction order, both us

20    and the special master has asked the other side why they have

21    not asked Stroz Friedberg, the people who prepared the due

22    diligence report, whether they have the 14,000 files that were

23    taken in this case.  They've refused to answer whether they

24    even know that Stroz has those files.

25        We all -- and apparently even though you directed them to

send letters and directives to all of their employees and
agents to return the stolen files, they have not even asked
Stroz Friedberg, the people who prepared the diligence report,
to return those documents.  And the -- And the reason they've
given is that they claim -- this is what they're claiming --
that the 14,000 files that Mr. Levandowski stole are his
property.

     And so we've thought that that was something that had to
do with the enforcement of Your Honor's order, and we asked
them that question.  Perhaps that's what they're talking
about.

     They might also be talking about the fact that when Your
Honor demanded or -- or requested that we get access to email,
that we don't have access to all of the emails that Your Honor
said we would.  So we follow up on that.

     So we're following up on the things that they have not
done that you have ordered.  So I don't think that there's any
need for any further directive in that regard, other than the
fact that they need to be complying with your orders.

     And I think that we've been dealing with the special
master.  And to the extent that he thinks that we're going
overboard, he can say so and -- and, you know, put us where we
should be, but I don't think that's occurred.

     And I have been on the front lines.  I have been on almost
every one of these calls.  And we have been pushing, and

1    that's because they're not following Your Honor's orders.

2            **THE COURT:**  Okay.  What do you say to that?

3            **MS. DUNN:**  I would say, Your Honor, that there's a

4    lot I disagree with in what Mr. Perlson just said.  We are

5    making an incredible effort actually to comply with Your

6    Honor's orders.

7        There are lawyers on meet-and-confers, as Ms. Chang said,

8    almost one or two times a day.  The company is being inspected

9    as much as, you know, Waymo has asked for.  We have turned

10   things upside-down.  People are scrambling around to get

11   everything done and answered.  What he says about Stroz is not

12   true, but this is not the forum to litigate that.

13       We are not asking Your Honor to get into the weeds of

14   these disputes, which are normal in litigation.  What we are

15   asking for, however, is reasonable limits, because we are

16   getting to the point where defendants are being prejudiced by

17   the --

18           **THE COURT:**  Well, you're not giving me good -- so

19   you're giving me blather.  You're not giving me a -- you're

20   not handing up something that -- so I feel like I'm -- it

21   could turn out to be what Mr. Perlson is talking about where

22   he's trying to enforce the injunction and you're trying to

23   claim that's a discovery thing, and --

24       Look, it would be disturbing to me if you have the right

25   to get those documents from Stroz and you're not doing it.

```
1   They're your agent, and we're going to get to the bottom of
2   that.  And I'm not going to bless that, if that's what you're
3   asking me to do, is bless that, we're going to -- we need --
4       Look, I issued a very fine-tuned preliminary injunction
5   order, and I'm not going to take back one word of it.  So I'm
6   denying all relief on that request.
7       I am -- I am going to stick with the 265, though.  That
8   part, I'm not going to --
9       All right.  Look, we have a special master to deal with
10  the discovery disputes.  And bring me a motion for contempt or
11  whatever or -- is it going to come up on the -- are you
12  appealing the magistrate judge's ruling against you on the --
13  on due diligence report?
14          MS. DUNN:  We have until tomorrow to decide that.
15          THE COURT:  All right.  Well --
16          MS. DUNN:  And we will avail ourselves of till
17  tomorrow.
18          THE COURT:  All right.  Thank you.  You're entitled
19  to do that.
20      All right.  Did you bring up another -- your last name
21  is...?
22          MS. CHANG:  Chang.
23          THE COURT:  Chang.
24      Did you bring up another thing, Ms. Chang?
25          MS. CHANG:  No, I think we covered everything that I
```

1    was interested in discussing.

2        So I just want to clarify that you're standing by your May

3    11th preliminary injunction order.  The issue that we have is

4    not with the order -- inspection order, which we have been

5    complying with, but rather the end-run that Waymo has been

6    doing around the discovery limits by trying to hedge in RFP

7    and rogs in the guise of --

8        **THE COURT:**  -- where Mr. Cooper comes in.  I want to

9    you to put a stop to end-runs, if there are such things.  I'm

10   not saying there are such things.  But you know one when you

11   see one, and I have full confidence in you and the magistrate

12   judge.

13       **THE SPECIAL MASTER:**  We are addressing, Your Honor,

14   the issue of privilege.  And I see Mr. Ehrlich and Mr. Ramsey

15   are in the courtroom right now.  And that -- that will affect

16   the privilege.

17       Yesterday there was an expedited answer to interrogatories

18   that made reference to privilege, so we're wrestling with

19   that, and we have calls this afternoon at 2:00 and 3:00 on

20   these issues.

21       **THE COURT:**  Thank you.

22       All right.  Are we done with case management?

23       **MS. CHANG:**  I think so.  I think the only --

24       **MR. PERLSON:**  Think so.

25       **MS. CHANG:**  -- only outstanding thing is that Waymo

1     and defendants will talk about the expert schedule and the

2     motion in limine and *Daubert* briefing schedule and get back to

3     you.

4              **THE COURT:**  Yes.  Yes.  And we'll come back.  Thank

5     you for reminding me.

6              **MS. RIVERA:**  Your Honor --

7                       (Off-the-record discussion.)

8              **THE COURT:**  Your name again?

9              **MS. RIVERA:**  This is Sylvia Rivera.  Mr. Gonzalez was

10    unable to make today's hearing, as Your Honor knows.

11       He, as Your Honor may be aware of or may remember, when

12    the trial date was set, Mr. Gonzalez indicated that he has

13    another trial that is set for September 12th.  It looks like

14    that trial is going to go.  I just wanted to gently remind the

15    court.  I -- absolutely --

16             **THE COURT:**  Well, then he'll have to get -- Look,

17    we're going to go to trial October 2nd.

18       Did I promise that I would give some extension earlier?  I

19    don't remember what I said.

20             **MS. RIVERA:**  I don't think that's the case.  I think

21    Mr. Gonzalez was just letting the court know --

22             **THE COURT:**  Well, I appreciate that, but you have a

23    table of some of the best lawyers in California.  If

24    Mr. Gonzalez can't show up, then he will not show up.

25             **MS. CHANG:**  At the time -- at the March 16

1    conference, Your Honor stated that if Mr. Gonzalez's trial

2    went forward, then the October 2 trial date could get kicked

3    down the road.  But you were of the opinion that his case

4    would settle before October 2.

5            **THE COURT:**  Well, I don't remember what I said.  If I

6    promised that, I would continue it.  I might honor that

7    promise, but I don't remember what I said, so I -- but thank

8    you for the heads-up.

9            **MR. PERLSON:**  Your --

10           **THE COURT:**  Thank you.

11       Yes?

12           **MR. PERLSON:**  Your Honor, just before we break, I

13   understand that there are, like, just some of these lingering

14   discovery issues in terms of the order.  I think that you

15   wanted us to work those out with the special master and if

16   needed, with the magistrate?  Is that true?  Like, backup

17   tapes and limits on interrogatories.  I just wanted to make

18   sure that --

19           **THE COURT:**  What?  Discovery goes to them.

20           **MR. PERLSON:**  Okay.  That's what I thought.  Just

21   wanted to make sure.

22           **THE COURT:**  Thank you.

23           **MS. CHANG:**  And, Your Honor, for -- Waymo's raising

24   for the first time this issue of limits on interrogatories.

25   The parties are -- defendants are under the impression that

```
 1    there's a 25 rog limit under the federal rules and the 20 that
 2    you granted them, so -- they have never mentioned additional
 3    interrogatory requests prior to this point.
 4          MR. PERLSON:  Yeah, I -- we'll -- we'll deal with
 5    this with the special master --
 6          THE COURT:  Thank you.
 7          MR. PERLSON:  Yeah.
 8          THE COURT:  Good.
 9       All right.  We're going to go now to the Miles Ehrlich and
10    Izzy Ramsey part of the case.
11       Please come forward.
12       All right.  This is called the motion for -- to intervene
13    and to reconsider the ruling on the Fifth Amendment --
14    preliminary injunction on Fifth Amendment grounds.
15          MR. EHRLICH:  Good morning, Your Honor.  Miles
16    Ehrlich and Izzy Ramsey on behalf of Mr. Levandowski.
17       I will attempt to be very brief.  I was sitting in the
18    second row, and I did hear the court say that you're not going
19    to take back any words in that order on provisional relief, so
20    I recognized that this may be a tall order because I am asking
21    for a --
22          THE COURT:  Well, that was with respect to what they
23    were claiming a minute ago.  I'm going to listen to what you
24    have to say.
25          MR. EHRLICH:  Okay.  Our concern with the language is
```

1    rooted in a very straightforward proposition, that the state

2    either through command or through significant encouragement

3    cannot put an individual to the choice of either waiving a

4    Fifth Amendment right or -- or losing his employment.

5        Think all of us when we read your provisional order

6    understood you to be saying that Uber was required to, in

7    essence, fire every bullet it had against Mr. Levandowski to

8    get him to waive his Fifth Amendment right and to cooperate

9    and participate in the accounting that the court ordered.

10       You've asked, and I'll address it up front, whether the --

11   the all-but-final termination of Mr. Levandowski moots the --

12   the request for the modification in the language.  Our

13   position is it is not moot for two reasons.

14       First, there was a cure period that runs to June 15th, so

15   it is not final.  There is on -- on the -- this record an

16   opportunity for Mr. Levandowski to cure.  But second and

17   perhaps more fundamentally, it's not moot because the

18   modification we are requesting redresses the injury that is

19   still ongoing.

20       The injury is not being fired by a private employer.  The

21   constitutional injury is being forced by state action to this

22   unconstitutional choice, this either/or binary choice of

23   either waiving the constitutional privilege or being

24   terminated.

25       There's a litany of cases since *Garrity* that establish

 1    that this sort of substantial economic coercion exacts an

 2    unconstitutional penalty for the exercise of someone's

 3    Fifth Amendment rights.

 4        We are not -- the modification we've asked for is just for

 5    the court to clarify or modify, more accurately, that there is

 6    no requirement that Uber fire Mr. Levandowski for invoking his

 7    Fifth Amendment rights.

 8        We understand that this modification standing alone is not

 9    going to automatically save Mr. Levandowski's job.  That is

10    something we would need to take up with Uber on

11    Mr. Levandowski's behalf.  But it is a -- but this remedy we

12    are seeking is all that the court can do now to redress the

13    constitutional injury I described, which is putting an

14    individual through state action to that choice.

15        We -- We have explained that we believe it is state

16    action.  The test for state action is -- is what -- you know,

17    as outlined in *Blum v. Yaretsky* and other cases, is simply

18    whether an agent of the government is exercising coercive

19    power or simply providing significant encouragement to a

20    private actor's decision.

21        We think that the record here demonstrates that this order

22    at least provided significant encouragement to Uber's decision

23    to threaten Mr. Levandowski's termination.

24        It -- And the -- the letter itself recognized that Uber

25    had not -- despite Mr. Levandowski's repeated invocation of

1  his constitutional rights, had not taken the step of firing

2  him or threatening to fire him.

3          **THE COURT:**  All right.

4          **MR. EHRLICH:**  That occurred after the court's order.

5          **THE COURT:**  I have a question for the -- for the -- I

6  guess Uber lawyers.

7      Then I want to hear from Waymo, too, but I --

8      Have you finished?

9          **MR. EHRLICH:**  There's a lot more that I could

10  address, but I want to be guided by what the court --

11          **THE COURT:**  Well, how much -- I mean, you put in a

12  brief and all that.  Do you want to repeat what's in your

13  brief?

14          **MR. EHRLICH:**  No, I don't.  I --

15          **THE COURT:**  Okay.  So let me hear from Uber about

16  something.  You -- You had two letters.  I've forgotten the

17  dates.  Help me with the two dates.

18          **MS. DUNN:**  May 15th and May 26th.

19          **THE COURT:**  Yeah.  Now, the May 15th letter blamed

20  the judge, meaning me, and said, oh, the judge is making us do

21  this.  We're going to fire you unless you -- or take adverse

22  employment action against you unless you cooperate with this

23  investigation.  So that was letter No. 1.

24      Then I sent out a thing that -- for briefing on today --

25  for today and for you all to brief for me, and you did, which

1   said, if Uber fails to take on its own initiative adverse

2   action against Levandowski in order to require him to assist

3   in returning the documents, is that ratification by Uber of

4   the wrongful conduct?

5        Then a second letter went out from Uber which didn't

6   mention -- didn't blame the judge.  It was almost like you

7   were getting advice from two different law firms.  And the

8   second letter just said we're going to fire you if you don't

9   cooperate in the investigation.

10       Now, reading just the second one could reasonably

11   conclude -- in fact, the second letter did say you were firing

12   him.  Didn't say you were going to -- you might.  You said you

13   did fire him subject to cure in the contract.

14       So the question I have for you is was that at your own

15   initiative and -- and without regard -- the second letter, was

16   that at Uber's own initiative and without to regard to any

17   compulsion by at the district court?

18           **MS. DUNN:**  So, Your Honor, the first thing I want to

19   say, and I'll directly answer your question, is that I -- I do

20   not agree that we were trying to blame the judge so much as we

21   were trying to convey in the May 15th letter that we take very

22   seriously Your Honor's order.

23       As to your question about the May 26th letter which

24   terminated Mr. Levandowski, that was on Uber's own initiative.

25   And as you stated, it referred to the court's order, but also

1   referred to independent reasons for termination.  For some

2   time -- and an email went out to the company about this

3   explaining -- Uber had been trying get Mr. Levandowski to

4   cooperate.

5        And so what happened is that on the May 15th letter -- I

6   do think it's fair to say the court's order was an impetus to

7   send the May 15th letter.  But in the May 15th letter, Uber

8   set its own deadline, and the court did not order to us set

9   our own internal deadline.

10        And when that internal deadline came and went, Uber made

11   the decision to terminate Mr. Levandowski subject, as Your

12   Honor recognized, to the contractual provision that he is

13   given 20 days to cure, a period that we're still in.

14        And that -- that letter -- actually both letters are very

15   strong.  They arguably go beyond the court order.  And I think

16   it's also important to note that at the time the May 26th

17   letter was sent, Uber knew that Mr. Levandowski was

18   challenging the order, which is the motion that we're here

19   today to discuss, and decided not to wait for resolution of

20   this issue but to go forward and terminate, having decided it

21   was the right decision for the company.

22        **THE COURT:**  So what you seem to be telling me is the

23   termination of Mr. Levandowski by Uber, you would have done on

24   your own anyway without regard to the part of the preliminary

25   injunction that ordered you to use your full employment powers

```
 1   over him to cause him to cooperate.

 2        MS. DUNN:  So I think it is very hard to look at this

 3   entire situation and pretend the court order doesn't exist.

 4     I would say that as a company, Uber was struggling with

 5   some of the same issues as have been played out in court,

 6   which is that we were urging compliance and cooperation from

 7   Mr. Levandowski.

 8     And so the court's order certainly provided additional --

 9   substantial additional heft to what we had been urging and

10   the -- the letters make clear that this has to do with our

11   urging in addition to the court's order.  And so I think that

12   the --

13        THE COURT:  But -- But I think you're trying have it

14   both ways.

15        MS. DUNN:  I don't --

16        THE COURT:  Are you -- Because the issue comes down,

17   is this moot or not.  And if -- if you would have done this

18   and you have done this on your own initiative without regard

19   to the court order -- in other words, even if I hadn't ordered

20   this, you would have gone ahead and fired him anyway, that --

21   that is -- what we're arguing here with Mr. Miles Ehrlich is

22   beside the point.  It's moot.

23        MS. DUNN:  Your Honor, I -- we're not going to take a

24   position on the mootness issue.  I think that is a legal issue

25   for the court to decide.
```

1    We can be in a position of providing facts and

2  representations based on what we did.  And I don't -- the

3  standard in the Ninth Circuit is not but-for causation.  I

4  think it's a hypothetical in this circumstance.

5    I can represent fairly to the court, which I think is

6  clear from the face of the letters, that the termination

7  decision was at Uber's own initiative and for reasons

8  independent from the court order.

9         **THE COURT:**  All right.  Let's hear from Waymo.

10         **MS. BAILEY:**  Morning.  Melissa Bailey for Waymo.

11    Well, I think what Ms. Dunn has described to you does

12  pretty much decide the issue because even if you were to think

13  about the state action issue, the level of coercion and the

14  level of impact that the court order would have had to have

15  had on the termination would need to be close to a hundred

16  percent.  And that is not what Ms. Dunn described.

17    So for that reason alone, I think that Mr. Levandowski's

18  motion needs to be denied.

19    That's number one.

20         **THE COURT:**  But are you saying it's moot?  Is that

21  it?

22         **MS. BAILEY:**  It's either moot or the facts reveal

23  that there was not significant enough coercion from the court

24  order to demonstrate that there was state action.  It could be

25  decided on either ground.

1          I would also say as a preliminary matter because of

2   Mr. Levandowski's argument that this issue could never be moot

3   because of the constitutional dimensions of it, I do think it

4   is important to make clear that there is no case in the record

5   and I'm not aware of one in which compliance with a court

6   order has been deemed to be state action.

7          All of the cases in the record involve coercion by

8   prosecutors, by investigators, by the government in an

9   adversarial role.  But just like compliance with a law does

10  not constitute state action by a private party, there is no

11  case that says compliance with a court order could be deemed

12  state action.  And that would, I would submit, be pretty

13  unprecedented, and it would involve constitutional

14  implications for orders going forward that have not existed

15  with respect to orders, for example, in trade secret cases

16  where companies are ordered to return stolen materials.  That

17  happens.  And it's, you know, routine if the circumstances

18  warrant it.

19         And so I would preface all of this discussion by saying

20  that the notion that a court order ordering Uber to do

21  something to redress a harm and to do something within its

22  power could possibly be state action to begin with.

23         And I think that's an important fundamental point.

24         That said, for the reasons I've already said, what

25  Ms. Dunn said really makes clear both that the issue is moot.

1    He's been fired at Uber's direction.  And also that even if

2    you were to accept the premise that a court order ever could

3    convert private action in compliance into state action, that

4    the level of coercion needed isn't here because there are at

5    least independent bases for Uber's decision.

6              **THE COURT:**  All right.

7              **MR. EHRLICH:**  Can I briefly address --

8              **THE COURT:**  Augment?  Rebuttal, go ahead.

9              **MR. EHRLICH:**  Yeah.  I think -- I think that it's

10   quite clear that court orders do amount to state action.  The

11   question here is whether the -- an action by -- I think that's

12   uncontroversial.  It is the most direct, powerful form of

13   state action that exists and under our system.  The question

14   is whether it -- a private -- a decision -- purportedly

15   decision by a private actor is converted into state action and

16   the tests are clear that the question is whether the state,

17   whatever the branch may be, played a role in significantly

18   encouraging it or coercing it.

19        I agree, we did not find any case that had a court

20   ordering that somebody be fired for not waiving constitutional

21   rights.  I don't think that's dispositive.

22        I think we -- we have a situation -- of course, the court

23   can order a company to return materials or take other actions,

24   but I don't know -- when constitutional rights are at stake,

25   the court cannot say, and if you don't get the cooperation of

1   one of your employees to do so, company, you must fire them.

2   That's the issue.  That's the concern that was presented by

3   the language.

4        And I don't know if it was intended by the court.  But

5   that was the way we read it, and we think that was the fair

6   reading of it.

7              **THE COURT:**  Submitted?

8              **MR. EHRLICH:**  Submitted.

9              **THE COURT:**  Uber submitted?

10             **MS. DUNN:**  Yes, Your Honor.  Thank you.

11             **THE COURT:**  All right.  I'm going to rule from the

12  bench.

13       First, the court will find that issue is -- appears to be

14  moot by reason of the fact that subsequent to the provisional

15  relief granted, the defendant Uber on its own initiative and

16  for reasons arising out of its own investigation decided to

17  terminate Mr. Levandowski.

18       So that's a big point that did not exist at the time that

19  the court issued its provisional relief.  So that's point

20  number one, is that the issue is moot with this minor

21  exception.

22       I suppose within the cure period, which is about to expire

23  anyway, it's not -- it's not really over until it's -- the

24  cure period's over, but I recognize that -- and I say that I'm

25  confident nothing's going to change in the cure period.  No

1    one suggested that it would change in the cure period.  That's

2    a theoretical possibility.

3        Nevertheless, I do want to address the merits in case

4    there is an appeal on this.  I -- Or at least a writ of

5    mandate or whatever you want to try for.  And I -- to my mind,

6    it comes down to three propositions.

7        I want to begin by saying that under the Fifth Amendment,

8    a public employer like the government may not coerce an

9    employee to incriminate himself on pain of being fired.

10   That's the *Garrity* decision, *Garrity vs. New Jersey*, written

11   by Justice Douglas.  And that decision I have no problem with.

12   That's absolutely correct.  And all the cases that follow that

13   are totally correct.

14       Whether it's correct or not, I got to follow it.  I don't

15   mean to suggest that it's got to be correct, but I recognize

16   that that's the controlling law.  And -- So okay.  But we're

17   not dealing with a public employer here.

18       So point number two, a private employer -- a private

19   employer like Uber is totally able to say to its employee,

20   either you cooperate with this internal investigation or we

21   will take adverse employment action against you up to and

22   including termination.

23       Of course, a private employer has the -- the flexibility

24   and the authority to do that without in any way violating the

25   Fifth Amendment.  And if we didn't have that, think of all the

1     mischief that would occur because of -- people could get on

2     the payroll and be a wrongdoer in some sense, and the company

3     wants to do an investigation to find out what happens and then

4     they say, oh, no, my Fifth Amendment rights, and you got to

5     keep me on the payroll forever because I'm going to exercise

6     my Fifth Amendment rights.

7          That would be ridiculous, and that -- I submit that no

8     decision in the history of the universe has ever suggested

9     that that should be the outcome.

10         So I say to you that a private employer like Uber has the

11    authority to say to its employees, either cooperate with the

12    internal investigation or you're going to be fired or other

13    adverse action taken against you.  So that's point No. 2.

14         Now we come to point No. 3.  A court -- certainly a

15    U. S. District Court, when it comes to granting equitable

16    relief in a civil case has to balance all of the equities and

17    try to do justice and equity in the situation.

18         And every case is different, but sometimes in -- on

19    preliminary injunctions, you can order remedial relief that is

20    something that the other side may not be strictly entitled to

21    but is necessary in order to remedy the wrong that has been

22    done.

23         So the remedies that are available to a district judge are

24    of course subject to reason and subject to being just, but --

25    but there is broad equitable power to carry out the -- what is

1     the right thing to do and to follow the equities between a

2     plaintiff and a defendant in a civil action.

3         So point -- the last point or related to that point is

4     that a -- a federal district court surely has the authority to

5     order as part of remedial provisional relief -- to order a

6     defendant to do something that it has the authority to do on

7     its own, meaning -- I'll repeat that.

8         A district court has the authority to order as part of

9     provisional relief a private company to do something that it

10    would have the authority to do, meaning the company, on its

11    own.

12        And if in this case, Uber would have the authority to --

13    to put Mr. Levandowski to a choice between his Fifth Amendment

14    and his job without any problem at all, which, of course, Uber

15    did have the authority to do that in my view, then the

16    district court can say to Uber, you have to do that to satisfy

17    the equities of this situation as part of the provisional

18    relief that the court is granting.

19        There is no decision that anyone has submitted to me that

20    would contradict this basic flow of what in my judgment has to

21    be the right answer under the rule, that the Fifth Amendment

22    is not a bar to the relief that was granted.  And I'm not

23    taking back a single word of it, and it will not be modified

24    in any way.

25        I do want to end, though, with the -- the first comment I

1  made, which is that based on what Ms. Dunn has said -- am I

2  getting your name right?  Dunn?  Yes.  That based on what

3  Ms. Dunn has said, Uber had its own investigation going and

4  for its own reasons, came to the conclusion that

5  Mr. Levandowski should be fired for not cooperating with the

6  investigation.

7      And so maybe we would have gotten a -- sounds like we

8  would have gotten to the same result in the -- therefore

9  there's a serious mootness problem in my mind, but I've

10  addressed the merits nevertheless.

11      All right.  So that there won't be any further order other

12  than I've given you my thinking on the merits on the -- on the

13  public record here.

14      All right.  Are we done for today?

15          MR. PERLSON:  Yes.  From Waymo's end, we don't have

16  anything further, Your Honor.

17          MS. DUNN:  Yes, Your Honor.  Thank you.

18          THE COURT:  Are there any motions in the future on

19  calendar that I need to have in mind?  I don't think there

20  are.  But are there?

21          MR. PERLSON:  Not before you, Your Honor.  I think

22  that, you know, there may be some for the magistrate

23  certainly.

24          THE COURT:  All right.  But before me.

25          MR. PERLSON:  Not currently.  Yeah, I mean, we may as

1  we referenced earlier and as suggested to you, we may be

2  filing a motion for order to show cause, but that's not on the

3  schedule right now.

4          THE COURT:  Okay.

5          MS. DUNN:  And then as Your Honor foreshadows, we

6  will decide by tomorrow whether or not to appeal Judge

7  Corley's order.

8          THE COURT:  I'm going to move that -- if you do, it's

9  going to be very quickly briefed and so forth, so that's --

10  grass will not grow under our feet.  We got an October 2nd

11  trial date.

12          MS. DUNN:  Understood.

13          THE COURT:  That's it?  Everyone, have a nice restful

14  day.  Thank you.

15          MR. PERLSON:  Thank you, Your Honor.

16          THE CLERK:  We're in recess.

17              (Proceedings were concluded at 10:30 A.M.)

18                          --o0o--

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Wednesday, June 7, 2017