**MORRISON | FOERSTER**

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA 94105-2482

TELEPHONE: 415 268 7000
FACSIMILE: 415 268 7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

BEIJING, BERLIN, BRUSSELS, DENVER,
HONG KONG, LONDON, LOS ANGELES,
NEW YORK, NORTHERN VIRGINIA,
PALO ALTO, SACRAMENTO, SAN DIEGO,
SAN FRANCISCO, SHANGHAI, SINGAPORE,
TOKYO, WASHINGTON, D.C.

June 19, 2017

Writer's Direct Contact
+1 (415) 268.7020
AGonzalez@mofo.com

VIA ECF

Magistrate Judge Jacqueline Scott Corley
USDC, Northern District of California
San Francisco Courthouse Courtroom F-15th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

Re: *Waymo LLC v. Uber Technologies, Inc., et al*, N.D. Cal. Case No. 3:17-cv-00939-WHA

Dear Magistrate Judge Corley:

      Defendants Uber Technologies Inc. and Ottomotto LLC (collectively, "Uber") submit this letter in opposition to Waymo LLC's ("Waymo") letter brief (Dkt. 637) regarding certain privilege issues that remain outstanding ("Letter Br.") following the Court's order ("Order") (Dkt. 566) on Waymo's Motion to Compel Production of Withheld Documents (Dkt. 321).

Respectfully submitted,

*/s/ Arturo J. González*

Arturo J. González

sf-3786270

Waymo asserts that Defendants served hundreds of pages of privilege logs in response to the Court's Order that Defendants return the "14,000+ files that Levandowski stole from Waymo." Letter Br. at 1. This is misleading. The Court's March 16 Order required Defendants to "produce for inspection all files and documents downloaded by Anthony Levandowski, Sameer Kshirsagar, or Radu Raduta before leaving plaintiff's payroll and thereafter taken by them[, and] also produce for copying the . . . media used for the downloads, as well as all subsequent [documents] that have forwarded, used, or referred to any part of said downloaded material." Dkt. 61 ¶ 4. Uber searched extensively for the 14,000 files, and found no evidence that they came into Uber's possession. In an abundance of caution, Uber also looked for documents connected to the attorney-directed due diligence process to see if any such documents "referred" to any document that could possibly fall within the broad wording of the Court's March 16 Order. Where a privileged document "referred" to Google information (whether actual or the potential thereof) or material that one of the three employees may have had in their possession, it was identified on the log. That is not a log of stolen files, as Waymo suggests.

Uber has identified the subset of documents on its privilege logs that would be produced if Your Honor's Order is affirmed. Not satisfied with this, Waymo now seeks a blanket order requiring production of *all* privileged communications on the logs on grounds that have been briefed extensively.[1] That is not warranted. Even if Your Honor's Order is affirmed, Uber and the Otto parties had a common interest privilege at least as of April 11, 2016. At least 1,117 communications on the logs are solely between a party and its counsel, and hence are subject to attorney-client and work product privileges that do not require any common interest privilege. Waymo has not shown a "substantial need" for piercing the work product privilege, and cannot show that the crime-fraud exception applies to pierce the attorney-client privilege. And contrary to Waymo's complaints, the information on the privilege logs justifies the privileges invoked.

## I. A Common Legal Interest Among Uber, Ottomotto, Otto Trucking, Levandowski, and Ron Existed at Least as of April 11, 2016.

Between Uber and Ottomotto: Waymo contends that Uber and Ottomotto did not share a common legal interest until August 23, 2016, the date that Uber's acquisition of Ottomotto closed. Waymo is incorrect as both a legal and factual matter. Uber and Ottomotto shared a common legal interest at least as of April 11, 2016, the date the Put Call Agreement was signed.[2]

Waymo cites no authority for its argument, because it runs counter to every authority that Uber has cited in extensive briefing on the common legal interest doctrine. The common interest doctrine protects the sharing of privileged information between parties to a potential acquisition, merger, or purchase well before the potential transaction is finalized. An entire body of law exists concerning the existence of common interest privileges *before* the closing of a transaction. In *Rembrandt*, as this Court explained in the Order, "[t]he district court held that ***once Rembrandt had acquired an exclusive option to purchase the patent***, 'it was already engage[d]

---

[1] Motion to Compel Production of Due Diligence Report (Dkts. 321, 369, 445, 474); Objections to the Order (Dkts. 575, 585, 608); Motion to Quash Stroz Subpoena (Dkts. 581, 632); Motion to Compel re Stroz Subpoena (Dkts. 570, 610, 614, 616, 617); Motion to Compel Production of Unredacted Stroz-Levandowski Agreement (Dkts. 546, 552).

[2] For the avoidance of doubt, Uber does not abandon its prior argument that the common legal interest attached shortly after the parties signed the February 22, 2016 Term Sheet.

1

in a common legal enterprise with the named inventors and communications between them were part of an on-going and joint effort to set up a common . . . strategy for perfecting title in the patent and enforcing it through litigation.'" Order at 16 (quoting *Rembrandt Patent Innovations, LLC v. Apple Inc.*, 2016 WL 427363, at *7 (N.D. Cal. Feb. 4, 2016)).  Similarly, the April 11, 2016, Put Call Agreement ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆;[3] once that agreement was executed, the common interest doctrine protected the sharing of privileged communications and work product between Uber and Ottomotto. *See also FTC v. Abbvie, Inc.*, 2015 WL 8623076, at *11-12 (E.D. Pa. Dec. 14, 2015) (parties "signed an acquisition agreement"; thereafter, and before "acquisition was completed," common legal interest doctrine protected sharing of privileged communications); *FastVDO LLC v. AT&T Mobility LLC*, 2016 WL 6138036, at *3 (S.D. Cal. Oct. 21, 2016) (as soon as parties executed a non-disclosure agreement, common interest doctrine attached because "[t]he essential terms of the purchase agreement were agreed upon"); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 310 (N.D. Cal. 1987) (common interest doctrine attaches as soon as "there was a real possibility" one party would purchase the other, and continued to protect sharing of privileged information even though that party "decided not to buy" the other); *Morvil Tech., LLC v. Ablation Frontiers, Inc.*, 2012 WL 760603, at *3 (S.D. Cal. Mar. 8, 2012) (common interest doctrine attached as soon as one was "contemplating the wholesale acquisition" of the other).[4]  Waymo's cited authority is in accord. *See In re JP Morgan Chase & Co. Sec. Litig.*, 2007 WL 2363311, at *3 (N.D. Ill. Aug. 13, 2007) (common legal interest attaches as soon as parties "agreed to merge," i.e., prior to merger closing).[5]  Waymo urges this Court to rule as if none of this case law exists.

Waymo is also wrong on the facts.  The Put Call Agreement ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. Agr. § 4.3. The Put Call Agreement also ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆; Order at 4 ("Thus, if Uber did not want to do the deal because Levandowski or other Otto employees misappropriated Waymo's trade secrets, that decision had to be made before it entered into the Put Call Agreement.").  Indeed, the Indemnification Agreement obligated Uber to indemnify Ottomotto for such claims even if the acquisition did not close. Indemn. Agr. (Dkt. 599) § 2.1.

To credit Waymo's legal and factual arguments would cast aside substantial authority finding that parties to a merger, acquisition, or purchase can share a common legal interest prior to closing the transaction, and would drastically upend common practices in merger or acquisition situations.  It is a commercial reality that merger agreements typically have exit options for one or both parties, and any contract can be mutually rescinded.

---

[3] The Put Call Agreement ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. Agr. § 4.4.
[4] Cited in Uber's opposition to Waymo's Motion to Compel Withheld Documents (Dkt. 369) and in Uber's Objections to the Order (Dkt. 575).
[5] Cited in Waymo's Motion to Compel the Due Diligence Report (Dkt. 321) and in its Consolidated Response to Objections to the Order (Dkt. 585 at 5 n.5).

<u>With Levandowski</u>:  For the first time, Waymo argues that no party could ever have a common legal interest with Levandowski because his only interest is in protecting himself from criminal liability, but that argument again ignores well-established law.  The common interest doctrine "does not require a complete unity of interests among the participants, and it may apply where the parties' interests are adverse in substantial respects."  *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003); *see also* 5/25/17 Hr'g Tr. at 105:4-10 (Court:  "The point about being a divergence of interest, the classic joint defense, of course, is in a criminal case where there are multiple defendants and they all have divergent interests.  It's all in their interests to point the finger at the other, but they have joint defense agreements that are recognized, right, and well established.").[6]  Levandowski shared a common legal interest with Uber, Ottomotto, and Ron in defending against potential litigation by Google.

<u>With Otto Trucking</u>:  For the first time, Waymo sets up a straw man in arguing that Otto Trucking lacks a common legal interest with anyone.  Prior to the closing of the acquisition, Otto Trucking and Ottomotto were represented by the same attorneys at OMM.  Bentley Decl. (Dkt. 376) ¶ 3.  Otto Trucking signed the Joint Defense Agreement.  Dkt. 370-2.  And Uber obligated itself to indemnify Otto Trucking on April 11, 2016, for the very claims brought here, demonstrating Uber's common legal interest with it.  Indemn. Agr. § 2.1.

## II. Waymo Has Not Met Its Burden of Demonstrating a Substantial Need for Protected Work Product.

Regardless of whether the common interest doctrine applies (it does), Uber has not waived its work product protections by disclosing any logged documents because such disclosure was not to a litigation adversary or potential litigation adversary.  *See* Uber's Objections (Dkt. 575) at 3-4 and cases cited therein.  Furthermore, and in the alternative, Levandowski's Fifth Amendment invocation does not create a substantial need for any "witness statements that touch on the circumstances surrounding [Levandowski's alleged] theft of Waymo's files."  Letter Br. at 3.  If that were the case, this Court would not have limited its ruling to Levandowki's interview memorandum and documents turned over to Stroz.  Order at 22.  Waymo can depose fact witnesses and elicit their non-privileged knowledge of such conduct; Levandowki's Fifth Amendment invocation does not make those witnesses unavailable.  *In re Vitamins Antitrust Litig.*, 211 F.R.D. 1, 3 (D.D.C. 2002) (substantial need demonstrated only for witness statements from those individuals invoking Fifth Amendment); *Sec. & Exch. Comm'n v. Mazzo*, 2013 WL 12172628, at *15 (C.D. Cal. Oct. 24, 2013).[7]

---

[6] Waymo also misreads the Indemnification Agreement; any conflict of interest claim arising between Levandowski and Uber does not void Uber's indemnification obligation.  Indemn. Agr. § 2.2(b).  Uber's indemnification obligation ceases under different circumstances, e.g if Levandowski failed to tell Uber the truth in the Stroz diligence process.  *See id.* § 2.1(b)(ii).  Waymo has also not sued Levandowski for misappropriation of trade secrets, so there is no "Conflict of Interest Claim" at issue.

[7] Waymo's cited cases are inapposite.  In *Rexford v. Olczak*, 176 F.R.D. 90, 93 (W.D.N.Y. 1997), the court found a defendant demonstrated a substantial need for the plaintiff's own diary.  Here, no "contemporaneous" accounts are available.  Likewise, there are no near-contemporaneous transcripts of witness interviews, like in *Smith v. Diamond Offshore Drilling, Inc.*, 168 F.R.D. 582, 584 (S.D. Tex. 1996).

### III. The Crime-Fraud Exception Does Not Apply.

The Court has reviewed the Stroz Report and Exhibits *in camera*, which is itself evidence of whether the crime-fraud exception—which is exceedingly narrow particularly in civil cases—applies. It does not, because the Report, and thus communications regarding the diligence process on Uber's privilege logs, were not "made *in furtherance* of [any] intended, or present, continuing illegality." *In re Napster Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007).

Moreover, Waymo has not met its exacting burden of submitting evidence satisfying every element of the predicate crime of receipt of stolen property.[8] Waymo submits no cognizable evidence showing that Uber ever possessed any alleged downloaded files. Rather, Uber took steps to ensure Levandowski brought no such material to Uber; he warranted to Uber that he had "returned or destroyed all property and confidential information belonging to any prior employer" when accepting employment at Uber. Ex. A to DeStefano Decl. He warranted the same to Ottomotto. Ex. A to Morgan Decl. Uber also conducted an extensive forensic examination for any downloaded files. *See* Dkts. 183, 303, 305, 651. Uber has located no evidence that any alleged downloaded files made their way to Uber. Further, Uber never had access to any material Levandowski provided Stroz; Levandowski at all times controlled access to the materials he provided to Stroz. Mar. 21, 2016 Gardner-Stroz Agr. (Ex. 3, Stroz Rpt. & Dkt. 545-7); Dkt. 634-7. Nor does Uber's counsel's email to Waymo's counsel say that Stroz or MoFo possessed any downloaded material; it expressly says otherwise. Dkt. 634-7; *see also People v. Davis*, 2005 WL 2767132, at *3 (Cal. Ct. App. Oct. 26, 2005) (requiring **receipt** of allegedly stolen property). Uber also did not "constructively possess" any downloaded materials because Uber could not control Stroz or MoFo with respect to those materials given Levandowski's directive not to disclose them to Uber absent his consent. *See* Mar. 21, 2016 Gardner-Stroz Agr. (Dkt. 545-7); *People v. Scott*, 45 Cal. 4th 743, 749 (2009) ("Constructive possession . . . does require that a person knowingly exercise control over or the right to control a thing.").

Waymo also grossly mischaracterizes the content of Uber's privilege logs. Letter Br. at 5 n.7. (Dkt. 637.) The logs do not contain "thousands of communications regarding what to do with the stolen files." *Id.* at 5. These documents were logged in response to the Court's March 16 Order, as explained above. The Court should not order disclosure of the logged documents here, especially where the authority Waymo cites arises under California, not federal, law, and applies a different standard. *In re Uehling*, 2013 WL 3283212, at *7-8 (E.D. Cal. June 27, 2013) (requiring only a "reasonable relationship" between the ongoing crime and attorney-client communication, instead of using attorney-client communications "in furtherance of" the ongoing

---

[8] Uber twice pointed out this deficiency in Waymo's briefing on the Motion to Compel the Due Diligence Report, noting that Waymo failed to even attempt to identify evidence that meets the elements of an ongoing crime. Dkt. 369 at 23; Dkt. 474 at 3. Waymo's attempt to do so now is too little, too late, especially after the Court stated, in response to Waymo's argument about the crime-fraud exception, "[n]obody is going to get to submit more authority. Nobody." 5/25/17 Hr'g Tr. at 110:6-7; *see also* Order (Dkt. 460) (permitting Waymo to respond to Uber's arguments in sur-reply at the May 25, 2017 hearing). Acknowledging the weakness of its crime-fraud argument, Waymo has also abandoned its argument that a predicate crime for the exception's applicability is obstruction of justice.

crime); *see also In re Napster*, 479 F.3d at 1090 (requiring *each and every* attorney-client communication for which production is sought to further the alleged ongoing crime).[9]

Finally, no special discovery is authorized to determine applicability of the crime-fraud exception. *See id.* (outlining procedures for determination of crime-fraud exception; no process for discovery included). Waymo cites no authority for its overreaching request to depose MoFo and OMM, particularly outside the regular discovery process.[10] Moreover, "[t]he practice of forcing trial counsel to testify…has long been discouraged." *FTC v. DirectTV, Inc.*, No. 15-cv-01129-HSG (MEJ), 2016 U.S. Dist. LEXIS 103602, at *9 (N.D. Cal. Aug. 5, 2016) (quoting *Shelton v. Am. Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986)) (setting for the requirements to depose trial counsel). Waymo cannot satisfy this high bar: (1) the information sought from OMM and MoFo falls squarely within the attorney-client and work product privileges, and (2) information as to what *Uber* received, which is the only relevant inquiry, can be obtained from non-privileged sources.

### IV. Uber's Privilege Logs Set Forth Sufficient Information to Support the Privileges.

Uber's privilege logs make a *prima facie* showing of privilege,[11] such that it is Waymo's burden to "show a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged." *Rembrandt*, 2016 WL 427363, at *3 (quoting *In re Grand Jury Investigation*, 974 F.2d 1068, 1075 (9th Cir. 1992)). It has not done so. As summarized below and explained in further detail in the Declaration of Sylvia Rivera ("Rivera Decl."), each of Waymo's complaints lacks merit.

**Uber's privilege logs contain accurate subject matter descriptions**. The privilege logs pertain to a single issue, and therefore accurately use the same document descriptions. Despite seeking production of all logged documents, Waymo cites only one alleged "inaccuracy," pertaining to certain employee attestations, but its critique is unfounded.[12] Rivera Decl. ¶¶7-10.

**Uber appropriately used the date of the parent email for attachments**. "The fact that non-privileged information was communicated to an attorney may be privileged, even if the underlying information remains unprotected." *Muro v. Target Corp.*, 250 F.R.D. 350, 363 (N.D.

---

[9] Waymo has also skipped the step of *in camera* review of the logged communications to determine applicability of the crime-fraud exception. *See In re Napster*, 479 F.3d at 1092 (standard for *in camera* review). Uber requests that, if the Court is inclined to find the crime-fraud exception applies, it first review the logged documents *in camera*.

[10] Waymo's gamesmanship is reflected in its request for the deposition of OMM, made while Waymo is refusing to allow OMM, also Waymo's current counsel, to cooperate on issues in this case with its other current client, Otto Trucking, and its former client, Ottomotto. Chatterjee Decl. (Dkt. 374) & Ex. A. thereto (Dkt. 371-1); Rivera Decl., Ex. C.

[11] "A party [makes] a *prima facie* showing of privilege by submitting a privilege log that identifies: (1) the attorney and client involved, (2) the nature of the document, (3) all persons or entities shown on the document to have received or sent the document, (4) all persons or entities known to have been furnished the document or informed of its substance, and (5) the date the document was generated, prepared, or dated." Uber's logs meet these requirements.

[12] Waymo also challenges the use of "analysis" to describe the Stroz Report, but that report was prepared at the request of counsel and reflects counsels' legal analysis, advice, and conclusions.

5

Ill. 2007), *aff'd*, 580 F.3d 485 (7th Cir. 2009) (citing *Upjohn v. United States*, 449 U.S. 383, 395-96 (1981)). *Upjohn* means "that even though one e-mail is not privileged, a second email which forwards that prior e-mail to counsel may be privileged in its entirety." *Id.* "The forwarded material is similar to prior conversations or documents that are quoted verbatim in a letter to a party's attorney." *Id.* The same rule applies to attachments. *Id.* n.21. This makes sense—revealing that the individual provided specific information to obtain legal advice invades the privilege.[13] As such, where the parent email is privileged and includes an attachment, the transmission of that attachment is privileged and the relevant date for determining privilege as to the communication as a whole is the transmittal date. Moreover, Uber's use of metadata to determine dates is the normal procedure in e-discovery and often provides more accurate information than the face of the document.[14]

**Uber's limited use of "and/or" does not impair its privilege assertions.** Where it was unclear whether a document pertained to Mr. Levandowski or another Diligenced Employee, Uber used "and/or" in the document's "common interest" description. Rivera Decl. ¶ 14. The three individuals who were not parties to the joint defense agreement nonetheless were Ottomotto employees and the privilege extends to their communications. *Upjohn*, 449 U.S. at 395.

**Uber properly listed law firms as authors.** Where a document did not list its individual authors on its face, Uber inserted the names of the law firms that it knows contributed to the document. Rivera Decl. ¶ 15. The names of the individual attorneys from those firms that worked on the engagement are all over the privilege logs. *Id.*

**One miscoding does not undermine the entire log.** To facilitate this briefing, Uber worked diligently in a short timeframe to identify which documents on its privilege logs would continue to be withheld even under the Order. It appears that Waymo has identified one entry out of 3,000+ that should have been designated "Produce in Full" following the Order, rather than "Privileged." *Id.* ¶ 17. That does not undermine the legitimacy of the entire log.[15]

---

[13] To be clear, Uber does not contend that non-privileged information can be protected from discovery by transmitting it to counsel; such information is discoverable where it exists apart from being transmitted to an attorney.

[14] Moreover, where an attached document was created on April 11, 2016 or earlier and is not privileged under the Order (if it becomes final), a copy of the document will be produced with the non-privileged email from April 11 or earlier to which it corresponds. Rivera Decl. ¶ 12.

[15] Waymo's argument that the "Court should order production of all documents for which the "CI" privilege [*sic*] when there was no common interest" is misplaced. As explained *supra*, the common interest doctrine does not even factor into the analysis until a document or communication is shared with someone who would otherwise break the privilege.

6

sf-3786270