**quinn emanuel** trial lawyers | san francisco

50 California Street, 22nd Floor, San Francisco, California 94111-4788 | TEL (415) 875-6600 FAX (415) 875-6700

June 21, 2017

<u>**VIA ECF**</u>

Magistrate Judge Jacqueline Scott Corley
USDC, Northern District of California
San Francisco Courthouse Courtroom F - 15th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

Re:     <u>*Waymo LLC v. Uber Technologies, Inc., et al.*</u>, N.D. Cal. Case No. 3:17-cv-00939-WHA

Dear Magistrate Judge Corley:

Waymo LLC ("Waymo") submits the attached letter briefs in support of Waymo's motion to compel against 1) Defendant Otto Trucking LLC and 2) Defendants Uber Technologies, Inc. and Ottomotto LLC.

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

## WAYMO'S LETTER BRIEF TO COMPEL DEFENDANT OTTO TRUCKING

Waymo requests that the Court order Otto Trucking ("OT") to produce discovery within the possession and custody of its corporate officers and agents.

<u>OT Should Be Compelled to Interview its Officers and Agents in Responding to Waymo's Interrogatories.</u>
A "private corporation" or "partnership" must, in responding to an interrogatory, "furnish the information available to the party" such as "an officer or agent." Fed.R.Civ.P. 33(b). "Rule 33 requires that a corporation furnish such information as is available from the corporation itself **or from sources under its control.**" *In re ATM Fee Antitrust Litig.*, 233 F.R.D. 542, 545 (N.D. Cal. 2005) (emphasis added) (quoting *Brunswick Corp. v. Suzuki Motor Co., Ltd.*, 96 F.R.D. 684, 686 (E.D. Wis., 1983)); *see also Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 590, n.3 (9th Cir. 1983) (rejecting argument that the knowledge of two former officers "should not be imputed to PFEL because those officers left the company three months before PFEL answered interrogatories" because "PFEL had an obligation to obtain relevant information from former officers.").

OT is an LLC with two "managing members" – Anthony Levandowski and Lior Ron. (Dkt 666-5.) As the Court is aware, Mr. Levandowski downloaded over 14,000 confidential files from Waymo shortly before he resigned without notice, and has broadly asserted his Fifth Amendment privilege in connection with this litigation. OT has two other corporate officers, Rhian Morgan (Secretary) and Adam Bentley (████████████). (Ex. 1 at 2.) All of OT's officers are Uber employees, except for Mr. Levandowski who was Uber's Vice President of Engineering until he was fired a few weeks ago. OT says it has no other personnel – no employees, directors, or agents. (Dkt 666-5.)

Notwithstanding its obligations under the Federal Rules, OT has pointedly refused to interview its officers and attorneys – i.e., the only people with any relevant knowledge – in responding to Waymo's expedited interrogatories. For example, Waymo's Interrogatory No. 1 asks OT to "IDENTIFY the locations and custody of all known copies of THE DOWNLOADED MATERIALS, or any documents describing THE DOWNLOADED MATERIALS. If any of the copies have [sic] no longer exist, explain DEFENDANTS' full knowledge as to the destruction." (Ex. 2 at 3.) OT responded that it "does not have knowledge of the locations of any copies of the DOWNLOADED MATERIALS or documents describing the DOWNLOADED MATERIALS." (*Id.* at 4.) But this response is obviously incomplete. For example, both of OT's "managing members" (Mr. Levandowski and Mr. Ron) as well as its agents (O'Melveny & Myers ("OMM")) had copies of the Stroz report, which attached and/or described downloaded materials. (Dkt. 566 at 21-23.) And that is not all – **Uber's** response to Interrogatory No. 1 discloses that Mr. Levandowski told Mr. Ron in early March 2016 that "he had identified five discs in his possession containing Google information" and that "[s]hortly thereafter" Mr. Levandowski "destroyed the discs." (Ex. 3 at 4.) Even beyond this specific episode, Mr. Levandowski has information about the location and/or destruction of downloaded materials because **he is the one who stole the files in the first place**. It would be one thing for OT to try to assert privilege objections over responsive information known to its managing members (although still meritless), but it is a clear violation of its duties under Rule 26 for OT to say it "does not have knowledge" about these issues. OT should be compelled to supplement its response to this (and every other expedited interrogatory) based on information known to Mr. Levandowski, Mr. Ron, any other OT officers, and any of OT's attorneys. *Hitachi, Ltd. v. Amtran Tech. Co.*, No. C 05-2301, 2006 WL 2038248, at *3 (N.D. Cal. July 18, 2006) (compelling party to "respond in full" to an interrogatory and specifically to include information known to an entity that was "acting as [the party's] agent in license agreement negotiations"); *Hickman v. Wal-Mart Stores, Inc.*, 152 F.R.D. 216, 223 (M.D. Fla. 1993) ("Wal–Mart has a duty to make a reasonable search of its business records and make a reasonable inquiry of its employee and agents in order to

obtain the information asked in Plaintiff's interrogatories.  Only after doing such, can the Defendant then aver that it has no knowledge as to the information requested in the interrogatory.").

<u>OT Should be Compelled to Produce Corporate Records in the Possession or Custody of its Officers and Agents</u>.  Under Rule 34(a), a party has "possession, custody, or control" of a document when it "has a legal right to obtain the document or has control over the entity who is in possession of the document." *Soto v. City of Concord*, 162 F.R.D. 603, 619 (N.D. Cal. 1995) (citing *Buckley v. Vidal*, 50 F.R.D. 271, 274 (S.D.N.Y. 1970)); *see also United States v. Int'l Union of Petroleum & Indus. Workers, AFL-CIO*, 870 F.2d 1450, 1452 (9th Cir. 1989) ("Control is defined as the legal right to obtain documents upon demand.") (citation omitted).  As such, a party cannot hide behind the formalities of its corporate form to avoid producing company records simply because such documents are not within its "possession."  Yet that is exactly what OT has been trying to do.

For example, to date OT has produced **zero** emails, arguing that it lacks control over such documents – even those that are OT business records in the possession or custody of its corporate officers – because OT purportedly has no servers, computers, electronic or hard-copy document repositories.  (*See*, *e.g.*, Ex. 4; Ex. 2 at 7.)  But OT is an ongoing business that has entered into dozens of agreements (both with shareholders and with Uber and Ottomotto), and OT has never denied that this business activity has been conducted (at least in part) through email or that its many executed agreements were the result of extensive negotiations, including email negotiations.  OT may not avoid producing its business records simply because it has orchestrated its corporate structure in such a way that its officers and agents use non-OT email addresses and servers to conduct OT's business.[1]  OT has the legal right to obtain emails (and any other documents) sent, received, or prepared by its officers in connection with their work on behalf of OT. "Where [the documents or things at issue] were created in connection with the officer's functions as a corporate employee, the corporation has a proprietary interest in them and the officer has a fiduciary duty to turn them over on demand." *Riddell Sports Inc. v. Brooks*, 158 F.R.D. 555, 559 (S.D.N.Y. 1994); *see also Miniace v. Pac. Martime Ass'n*, No. C 04-03506 SI, 2006 WL 335389, at *2 (N.D. Cal. Feb. 13, 2006) (granting motion to compel and finding that company had legal control over "documents in the possession of [the defendant's] current directors."); *In re Folding Carton Antitrust Litig.*, 76 F.R.D. 420, 422-23 (N.D. Ill. 1977) (finding company had "control" under Rule 34 to compel production of documents in the possession of **former** employees where the former employee was still receiving economic benefits from the company).[2]

---

[1]  *See*, *e.g.*, Ex. 5 (4/4/2016 email sent from Mr. Levandowski's Ottomotto account relating to the "▮▮▮▮▮▮▮▮▮▮▮"); Ex. 6 (2/13/2016 emails to and from Lior Ron's Gmail account relating to the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 7 (11/11/2016 emails between Adam Bentley's Uber account, Rhian Morgan's Ottomotto account, and an OMM attorney related to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

[2]  The cases cited by OT in meet and confer correspondence are all inapposite. *Matthew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-CV-04236-BLF, 2015 WL 8482256 (N.D. Cal. Dec. 10, 2015) dealt with the personal email accounts of a San Jose car dealership's **employees**, not officers.  *Pebble Ltd. P'ship v. United States Envtl. Prot. Agency*, No. 3:14-CV-0199-HRH, 2015 WL 6123614, at *2 (D. Alaska Aug. 24, 2015) involved a FOIA request to the EPA, not a civil lawsuit, and its holding was limited to the issue of whether the EPA has "**possession**" of emails on private servers – the case did not address the issue of "**control**" at all.  Finally, *In re Citric Acid Litig.* 191 F.3d 1090, 1107-08 (9th Cir. 1999) dealt with the issue of whether an "autonomous" US company that shared a name with, but did not "have any economic or legal interest in" a Swiss company (and vice versa), had legal "control" over the Swiss entity's documents.

2

Similarly, OT has the legal right to obtain emails (and any other documents) sent, received, or prepared by its agents – including outside counsel at OMM, Morrison & Foerster, and Goodwin Procter. "A responding party has an affirmative duty to reasonably seek information requested under Rule 34(a) from its agents." *Lopez v. Florez*, No. 08-1975, 2013 WL 1151948, at *2 (E.D. Cal. Mar. 19, 2013) (citing *Hill v. Eddie Bauer*, 242 F.R.D. 556, 560 (C.D. Cal. 2007). It is evident from documents produced by Uber to date that OT's lawyers were sent relevant emails and documents "▓▓▓▓▓▓." (*See, e.g.*, Ex. 7 (11/11/2016 email from Adam Bentley to an OMM attorney ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.) Moreover, discovery to date suggests that some of the most relevant communications were – by design – exchanged between attorneys for the parties, not the parties themselves. (*See, e.g.*, Ex. 8 (3/10/2016 text message from Nina Qi at Uber to Mr. Levandowski, stating "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓").)

Finally, the Court has already overruled OT's objection that producing documents in Mr. Levandowski's possession would somehow violate Mr. Levandowski's Fifth Amendment privilege. (Dkt. 131 at 12:6-11 ("**THE COURT:** Uber has the authority to say to its employees, 'If you have anything at home you bring it in here, give it to Mr. González, and he will turn it over to the Court.' You have the authority to do that. And you also have the authority to say, 'And if you don't do that, you're fired.'").) As with employees, OT has the authority to threaten punitive measures against an officer who fails to provide documents in his or her possession.

For the foregoing reasons, Waymo requests that the Court order OT to 1) supplement its interrogatory responses to include information known to its corporate officers and agents, 2) and search for, and produce, ESI and hard copy files in the possession and custody of its corporate officers and agents.[3]

\*\*\*

**WAYMO'S LETTER BRIEF TO COMPEL DEFENDANTS UBER AND OTTOMOTTO**

Waymo requests that the Court order Defendants Uber and Ottomotto (collectively "Uber") to (1) produce documents responsive to Waymo's Expedited Request for Production Nos. 5, 8, 10, 20, and 25 and (2) provide complete responses to Expedited Interrogatory Nos. 3, 5, 8, and 20.

**Expedited Document Requests**

<u>RFP No. 5 ("All diligence DOCUMENTS provided by OTTOMOTTO or OTTO TRUCKING to UBER prior to August 5, 2016, INCLUDING any Data Room or Virtual Data Room.")</u>. Uber agreed to produce non-privileged "diligence documents provided by Ottomotto and Otto Trucking prior to August 5, 2016" but **only** those that were placed in a "Data Room" associated with the Otto Acquisition. (Ex. 9 at 4.) In so limiting its response, Uber refuses to even identify what additional diligence documents are being withheld or the volume of diligence documents being withheld.

But diligence documents provided by the Otto entities to Uber in connection with a potential acquisition are relevant to central issues in this case, including "what Uber knew and when they knew it," regardless of whether or not they were in this "Data Room." (Dkt. 625 at 36:3-7.) Defendants do not argue otherwise. Instead, Uber simply complains that it would have to look for them with email searches –

---

[3] OT's responses to Waymo's First Set of Expedited Interrogatories and First and Second Sets of Requests for Production are attached hereto as Exhibits 17, 18, and 19, respectively.

which, according to Uber, is not appropriate for expedited discovery. But this discovery is proportional to the needs of the case, particularly because the request seeks a discrete category of highly relevant documents (diligence documents provided by the Otto entities), within a discrete time period (to the best of Waymo's knowledge, less than a year), and likely shared with a discrete set of custodians (the Uber team that negotiated the acquisition).

RFP No. 8 ("All documents regarding potential or actual 'Pre-Signing Bad Acts' as defined in the ACQUISITION DOCUMENTS, including by Levandowski."). Uber objected to this Request and has refused to produce **any** documents, or even confirm it has logged them (whether on the basis of the pending objections to the Motion to Compel ruling or otherwise). (Ex. 10.)

"Pre-Signing Bad Acts" are defined in the acquisition documents to include instances of trade secret theft by any of the Diligenced Employees from their former employer – i.e., Waymo. As such, documents relating to "Pre-Signing Bad Acts" go straight to the "key issue" of "what Uber knew and when they knew it." (Dkt. 625 at 36:3-7.) And because underlying facts are not privileged or work product – nor has Uber said that anything has been logged – Waymo is entitled to any documents that relate to the **facts** of Mr. Levandowski's (or any other Diligenced Employee's) "Pre-Signing Bad Acts." *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981) ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney.").

RFP No. 10 ("All lab notebooks belonging to LiDAR personnel or associated with LiDAR workstations"). Uber agreed to produce "lab notebooks belonging to LiDAR personnel who primarily work on LiDAR," but refuses to produce lab notebooks for employees with – according to Uber – an "attenuated relationship to LiDAR projects." (Ex. 11.) But under both this request and the Court's PI Order (granting Waymo the right to inspect "any and all aspects of defendants' ongoing work involving LiDAR – including, without limitation, schematics, work orders, source code, **notes**, and emails" (Dkt. 433 at 25) (emphasis added)), Waymo is entitled to discovery into **any** LiDAR-related lab notebooks, without regard to whether their authors "primarily" work on LiDAR projects.

Uber objects that this request is not "reasonably narrow," but the category of requested documents is discrete and the universe of disputed notebooks is apparently no more than a few dozen. Given the importance of discovery into Uber and Ottomotto's use of Waymo's LiDAR-related trade secrets, the production of these lab notebooks is proportional to the needs of the case under Rule 26.

RFP No. 20 ("All agreements and 'software modules' identified in sections 2.8, 2.10, and 2.15 of the OTTOMOTTO DISCLOSURE SCHEDULES."). The Disclosure Schedules to the Put Call Agreement disclose, among other things, the "Intellectual Property" that Ottomotto purported to own as of April 11, 2016 – less than three months after Ottomotto was formed. (Dkt. 515-11 at Section 2.8.) The Disclosure Schedule represents that "The Company [Ottomotto] has developed, owns and is using the following software modules," and then lists ▓▓▓▓▓▓▓ : ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*Id.* at Section 2.8(a).)

These software modules are directly relevant to Waymo's trade secret claims. One of the confidential Waymo documents downloaded by Mr. Levandowski in January before his resignation is "Chauffeur TL weekly updates – Q4 2015," which is a collection of proprietary information from technical leads across the entire self-driving program – including Waymo's software team.[4] (Dkt. 25-20 at 3-5; *see*

---

[4] Moreover, as is clear from this document alone, Waymo's trade secret claims are not – as Defendants have argued – limited to LiDAR technology. As another example, the SVN repository

4

*also* Dkt 25-31 ¶ 26.) The document describes, on a weekly basis, Waymo's software development, goals, challenges, and accomplishments, including, for example, the "███████████" to "█████████████████████████████ as well as identifying "██████████████████ software as including a ███████████████████████████" (Dkt. 25-20 at 1, 4, and 20.) Moreover, the relevance of these software modules to Waymo's trade secret claims is heightened by the fact that Don Burnette, the Ottomotto co-founder who designed the software at Ottomotto – seemingly in a matter of weeks – was one of the five "Diligenced Employees" investigated by Stroz and ████████████████████████████████. (Dkt. 515-5 at 22; Ex. 12.) Although Waymo does not yet have a copy of the report, its exhibits, or the over 3500 documents Defendants are withholding on claims of privilege, dozens of entries on the privilege logs responsive to the Court's May 16 Order refer to "information obtained from . . . Don Burnette[.]" (*See*, *e.g.*, Dkt. 637-4 at entries 293-300.)

The software modules are also relevant to Defendants' trade secret defenses. In the Court's words, Waymo alleges that Uber paid Mr. Levandowski "beaucoup bucks" to acquire a months-old company with few assets and no marketable product because of "plain old all American old-fashioned theft of trade secrets[.]" (Dkt. 625 at 24:8-23.) Defendants argue that Uber paid over half a billion dollars for Ottomotto for legitimate reasons. Waymo is entitled to see exactly what Uber was buying – and what Uber knew about what it was buying – for $680 million. All of the assets disclosed in the Ottomotto Disclosure Schedules are probative of that knowledge, including the software modules.

RFP No. 25 ("All DOCUMENTS REGARDING the satisfaction of conditions for closing in the ACQUISITION DOCUMENTS."). In its responses and objections, served on June 9, Uber agreed to produce "a non-privileged version of the final closing checklist to the extent one can be located after a diligent search," but nothing else. (Ex. 13 at 8.) However, almost two weeks later even that single document remains unproduced, let alone the remaining documents called for by the Request.

As the Court is likely aware, the relationship between the April 11 Put Call Agreements (which were signed between Uber and both Ottomotto and Otto Trucking) and the ultimate closing of the Ottomotto acquisition (but not Otto Trucking) on August 23 remains shrouded in mystery. Defendants have made various assertions as to what conditions could (or could not) impede closing, and why Otto Trucking has not (yet) been acquired, but to date no documentation relating to the closing has been produced. Waymo is entitled to basic discovery into what the closing conditions were and how they were (or were not) satisfied. Accordingly, the Court should compel Uber to produce, at minimum, not only the closing checklist, but also documents showing how each condition on the checklist was satisfied.

**Expedited Interrogatories**

Interrogatory No. 3 ("IDENTIFY all Uber Devices and Non-Uber Devices (as those terms are defined in UBER00006444) that LEVANDOWSKI has used to access any of DEFENDANTS' Networks (as that term is defined in UBER00006444), or that LEVANDOWSKI could have used to access any of DEFENDANTS' Networks (as that term is defined in UBER00006444)."). Uber identified two computers in response to this interrogatory, a "MacBook Pro (15-inch, 2016) computer provided to Mr. Levandowski by Uber" and a "personal Macbook Pro (not issued by Uber)." (Ex. 3 at 5-6.) But Uber

---

that Mr. Levandowski raided included thousands of highly confidential and proprietary circuit design schematic files for other types of sensors, such as radar (*see* Dkt. 25-31 ¶ 24), which would also provide output data for "█████████████" and other software modules. Indeed, only 2 GB of the over **9 GB** stolen from the SVN database relates to Waymo's LiDAR technology. (Dkt. 25-47 ¶¶ 23-24.)

5

says it "cannot state the basis for believing that [the non-Uber issued computer] was used to access Uber's network because doing so would reveal work product that is protected from disclosure." (Ex. 14.) Further, Uber's response failed to identify any smartphones or Otto devices belonging to Mr. Levandowski that were used to access Defendants' networks. To address Uber's work product concerns, the Special Master requested that Uber have a forensic computer expert determine what devices (including smartphones) belonging to Mr. Levandowski were used to connect to Defendants' networks and when. (Ex. 10.) Although the Special Master made this request last week, and Uber said it would respond to the Special Master's request by June 19, Uber has not indicated if it will or will not conduct the investigation that the Special Master requested.[5]

This interrogatory seeks highly relevant discovery. Uber admits it has never searched any of Mr. Levandowksi's personal computers, and was essentially relying on the honor system to be sure that he was not consulting copies of the downloaded files on those devices while building LiDAR systems for Uber. Waymo is entitled to know whether Mr. Levandowski – while working for Uber – was using personal devices (storing the downloaded materials) to access Uber's networks, which would directly rebut Uber's public story that "the files never made it to Uber." (*See*, *e.g.*, Dkt. 160 at 9:13-15, 20:22-25.)

Interrogatory No. 5 ("Describe all compensation (whether actual or conditional) discussed, conveyed or promised by DEFENDANTS to LEVANDOWSKI at any time, INCLUDING (without limitation) the DEFENDANT who discussed, conveyed or promised the compensation, the nature of the compensation, the date the compensation was promised and/or conveyed, the amount of the compensation, any conditions, contingencies, clawback rights or reservations associated with the compensation."). Uber's response fails to describe the compensation that Uber and Otto promised or conveyed to Mr. Levandowski. Instead, Uber identifies seven documents by Bates number and name – some of which are redacted and fail to identify any compensation data at all (*e.g.*, UBER00011726-729), as well as a conclusory narrative response that "Representatives of Uber, including Nina Qi and Cameron Poetzscher, began having general discussions with Mr. Levandowski about the compensation component of Uber's acquisition of Ottomotto in early January 2016, and extending periodically until April 2016. These discussions were not specific to Mr. Levandowski's compensation, but instead were general discussions about the consideration that Uber would pay as part of its acquisition of Ottomotto." (Ex. 3 at 7.)

What compensation Mr. Levandowski was promised, by whom, when, and what conditions or clawback rights applied are all highly relevant to Waymo's trade secret claims – to issues of both liability and damages. Uber said that it would provide additional information (but not in the form of an interrogatory response) by June 16, but that date has come and gone. Uber should be compelled to provide a complete response to this interrogatory including, at minimum, a narrative response listing any and all of Levandowski's promised compensation from each Defendant.

Interrogatory No. 8 ("Describe all consulting work performed by LEVANDOWSKI for UBER before August 18, 2016, INCLUDING the terms of the consulting and any compensation arrangements."). Uber's counsel asserted in meet and confer correspondence that Mr. Levandowski "was not a consultant to Uber" before August 18, and stated the same in response to this Interrogatory. (Ex. 14; Ex. 3 at 12.) That attorney argument, however, is flatly contradicted by both the remainder of the Interrogatory response, which suggests Mr. Levandowksi performed work for Uber (work which Uber doesn't consider

---

[5] With respect to this request and others, Uber indicated that it would provide more information and/or whether it would be providing more information. But, Uber has not done so in a timely manner or by the dates Uber said it would. Uber's responses to these expedited discovery requests were due on June 5 and June 9. Waymo cannot wait an indefinite amount of time to get these issues resolved.

to be "consulting" (Ex. 3 at 12-13)), as well as the sworn testimony of Uber witnesses. In response to Waymo's request for clarification from Uber regarding the terms and details of the work performed by Mr. Levandowski for Uber before August 18, 2016, Special Master Cooper suggested to Uber that it provide this information. Uber indicated that it would do so by June 16. Again, that date came and went without further information from Uber. On the same day, however, at his deposition in Pittsburgh, Uber Director John Bares unequivocally testified that Mr. Levandowski was "consulting for the company" from "late April to early May 2016 … up through August 18th plus or minus a few days when Uber acquired his company and therefore he became an employee." (Ex. 15 at 17:6-17.) Uber's unfounded attorney arguments should be rejected and Uber should be required to disclose the metes and bounds of Mr. Levandowski's consulting and any compensation arrangements (whether promised or actualized). Uber should also describe the consulting work itself, which may demonstrate that Uber acquired Waymo's trade secrets from Mr. Levandowski even before he became an Uber employee.

<u>Interrogatory No. 20 ("Identify all communications between UBER and John Gardner, or any other attorney acting on behalf of LEVANDOWSKI prior to August 18, 2016.")</u>. Uber failed to identify any communications in response to this interrogatory. (Ex. 16 at 12.) Communications between Mr. Gardner (or any other of Mr. Levandowski's attorneys) and Uber are relevant to, among other issues, Uber's diligence and specifically what Uber knew about Mr. Levandowski's trade secret theft and when they knew it. Moreover, even Uber concedes that any communications between Mr. Gardner and Uber before February 24, 2016 are not privileged and are discoverable.[6] To the extent any responsive communications are privileged, but not yet included on any of Uber's already voluminous logs, Uber should either log them on a privilege log or provide that same information in a narrative response to this Interrogatory.

For the foregoing reasons, Waymo respectfully requests an order compelling Uber to:

- produce all diligence documents provided by Ottomotto or Otto Trucking to Uber before August 5, 2016 (RFP No. 5);
- produce all documents regarding "Pre-Signing Bad Acts" (RFP No. 8);
- produce all lab notebooks belonging to LiDAR personnel (RFP No. 10);
- produce for inspection all "software modules" identified in Section 2.8 of the Ottomotto Disclosure Schedules (RFP No. 20);
- produce the closing checklist and documents showing how each condition on the checklist was satisfied (RFP No. 25);
- provide a complete response to Interrogatory No. 3;
- provide a complete response to Interrogatory No. 5;
- provide a complete response to Interrogatory No. 8; and
- provide a complete response to Interrogatory No. 20.

Respectfully,

*/s/ Charles K. Verhoeven*
Charles K. Verhoeven
cc:   All counsel of record; Special Master John Cooper

---

[6] For the reasons set forth in Waymo's letter brief on privilege issues (Dkt. 637), no privilege attaches to any communications between Mr. Gardner and Uber prior to August 18, 2016 - the time period of this interrogatory.