# MORRISON | FOERSTER

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA 94105-2482

TELEPHONE: 415.268.7000
FACSIMILE: 415.268.7522

WWW.MOFO.COM

MORRISON FOERSTER LLP

BEIJING, BERLIN, BRUSSELS,
DENVER, HONG KONG, LONDON,
LOS ANGELES, NEW YORK,
NORTHERN VIRGINIA, PALO ALTO,
SAN DIEGO, SAN FRANCISCO, SHANGHAI,
SINGAPORE, TOKYO, WASHINGTON, D.C.

June 21, 2017

Writer's Direct Contact
+1 (415) 268.7020
AGonzalez@mofo.com

Honorable Jacqueline Scott Corley
United States Magistrate Judge
United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

Re:   *Waymo LLC v. Uber Technologies, Inc. et al.,* Case No. 3:17-cv-00939

Dear Judge Corley:

Uber moves to compel responses to interrogatories and production of documents by Waymo that are fundamental to Uber's defenses and that Uber needs to proceed with depositions. Waymo has sought and already obtained massive amounts of discovery from Uber, while at the same time refusing to produce information to which Uber is clearly entitled under the Federal Rules and that are more than proportional to the needs of the case, given the severity and scope of the relief Waymo seeks. Unless the Court promptly puts an end to Waymo's stonewalling, the manifest prejudice to Uber will be severe.

In light of the critical nature of this issue, Uber respectfully asks the Court to order Waymo to produce immediately documents and information in response to Uber's Document Request Nos. 5-17, 19-20, 22-30, 33, 34, 37-43, 47-48, 64, 65, 67, 68, 71, 72, 77, 79, 80, 98-104, 114, 125-130, 134, 145, 149-156, 158-161, and Interrogatory Nos. 1-11, or, in the alternative, schedule a hearing on this motion on July 5-7.

## Background

After serving its first set of document requests on May 12, 2017, and its second set of document requests and first set of interrogatories on May 17, 2017, Uber met and conferred with Waymo and the Special Master regarding Waymo's various objections. (*See* Exs. 1A-1C, RFPs and Interrogs; Ex. 2, 6/9/17 E. Chang Email.)[1] Upon service of Waymo's objections and responses to the first set of documents requests on June 12, 2017, Uber identified a number of deficiencies in (1) Waymo's responses (Waymo provided effectively the same response for 37 requests, and answered another 11 with the same response), and (2) Waymo's accompanying production, which consisted of only 337 documents, totaling only 1623 pages, in response to 146 requests for production. (*See* Ex. 3, Waymo Objs. &

---

[1] All references to "Ex." are to Declaration of Michelle Yang in Support of Defendants' Motion to Compel Response to Interrogatories and Production of Documents by Waymo ("Yang").

dc-888024

MORRISON | FOERSTER

Honorable Jacqueline Scott Corley
June 21, 2017
Page Two

Resp. to 1st Set of RFPs; Ex. 4, 6/14/17 S. Llewellyn Email.)  Waymo again objected, and declined to produce documents, in response to the second set of document requests on June 16, 2017, and failed to respond to a number of interrogatories.  (*See* Ex. 5, Waymo Objs. & Resp. to 2d Set of RFPs; Ex. 6, Waymo Objs. & Resp. to 1st Set of Interrogs.)  Uber made repeated attempts to resolve the issues raised by Waymo.  (Ex. 7, 6/17/17 A. Gonzalez Email re 2d set of RFPs; Ex. 8, 6/18/17 A. Gonzalez Email re 2d set of RFPs; Ex. 9, 6/17/17 S. Llewellyn Email; Ex. 10, 6/17/17 A. Gonzalez Email re 1st set of Interrogs. (No. 11); Ex. 11, 6/17/17 A. Gonzalez Email re 1st Set of Interr. (Nos. 1-10); Ex. 20, 6/17/17 A. Gonzalez Email re Waymo Resp to Doc. Reqs.; Yang ¶¶ 3-5.)  Waymo refused to budge or compromise on any of the requests.  (*See* Ex. 12, 6/16/17 J. Nardinelli Email; Ex. 13, 6/18/17 J. Nardinelli Email; Ex. 14, 6/18/17 F. Corredor Email.)  Accordingly, the Special Master directed Uber to file a seven-page letter brief on the issues at an impasse by June 21, 2017.

**Argument**

**1. Waymo's 121 Trade Secrets:**  Uber's interrogatories seek to obtain basic information regarding the details of Waymo's purported 121 trade secrets.  Waymo objected based on burden, but having chosen to assert 121 secrets, Waymo cannot complain about the burden of responding with specificity as to *each* trade secret.  Waymo failed to respond to Interrogatories 4-7 separately for each secret.  And in response to Uber's Interrogatories 1-10, regarding the nature of the purported secrets, Waymo provided information regarding only a limited subset, based on the theory that the language of Interrogatory No. 1 limits the interrogatories to those for which Waymo has evidence of use by Uber in its self-driving technology.  (Ex. 14, 6/18/17 F. Corredor Email.)  But Interrogatory No. 1 is not so limited; it asks about *all* trade trade secrets asserted against Uber, by asking about trade secrets "used" by Uber generally, without limitation to "use" in the current implementation of Uber's self-driving technology.  Waymo must provide the requested information.  If it has no evidence in connection with some of the alleged secrets, it should explicitly say so.[2]

Waymo's responses to Uber's requests for production of documents are equally evasive.  For example, No. 160 asks for documents where Waymo has advised its employees that the trade secrets *in this case* are trade secret or confidential.  Waymo provided a general response saying it will produce documents regarding the "robust measures" it takes to protect the privacy of its information.  That is not what Uber requested.  **If there are no responsive documents specific to the alleged trade secrets, Waymo must say so**.  Similarly evasive, Waymo provided what is effectively the same response for 37 document requests relating to the technical features, development, and value of Waymo's alleged trade secrets.  In response to Request Nos. 5-17, 19-20, 22-30, 33, 34, 77, 79, 80, 98-104, and 114, Waymo states that "Waymo will produce all documents relating to Waymo's development of the Alleged

---

[2] Two examples of the deficiencies are Nos. 7 (Waymo should confirm that there are no specific communications pertaining to the specific trade secrets at issue) and 10 (response should confirm that unlisted trade secrets are not referenced in the misappropriated files).

MORRISON | FOERSTER

Honorable Jacqueline Scott Corley
June 21, 2017
Page Three

Waymo Trade Secrets as located through a reasonably diligent search" (along with stating objections and/or otherwise qualifying its response). But the requests to which Waymo provides this response are not coextensive in scope, and are not limited to those documents Waymo says it will produce, instead focusing on a variety of different issues relating to Waymo's LiDAR technology. Perhaps more importantly, Waymo fails to specify which portions of the documents "relating to Waymo's development of the alleged Waymo Trade Secrets" are responsive to which document request, specific trade secret, and/or interrogatory response.

**2. Quinn Conflict/Timing of Decision to Sue Uber:** With no prior notice, Quinn Emanuel fired Uber as a client one month before Waymo filed its arbitration action against Mr. Levandowski. (*See* Ex. 15, 9/23/16 S. Swedlow Email; Yang ¶ 2.) If Quinn fired Uber as a client knowing that Mr. Levandowski or Uber was going to be sued by Waymo, that would present serious ethical issues that could lead to Quinn's disqualification. In response to Request Nos. 47-48, and 145 (which ask for communications about suing Mr. Levandowski and Uber ), Waymo states that it will log a communication regarding its first discussion of possibly suing *Mr. Levandowski*. That is deficient for two reasons: (1) Uber is entitled to *all* pre-filing communications about possibly suing Mr. Levandowski, and (2) more importantly, it completely ignores when Waymo first had discussions with *Quinn* about the possibility of suing Quinn's client, *Uber*. Waymo should produce documents sufficient to show when it first discussed *with Quinn* the possibility of legal action against Uber or Mr. Levandowski.

In addition, nonprivileged communications between Waymo business people regarding the possibility of litigation may be relevant to other issues, including (1) Waymo's delay in asserting its rights (relevant to injunctive relief and defenses like laches), and (2) whether Mr. Levandowski's activities were consistent with Waymo policies and practices.

**3. Waymo/Google Practices Regarding Side Businesses**: Uber's Request Nos. 37-43, 125-128 and Interrogatory No. 11 seek information about side businesses operated by Waymo and Google employees. These requests are in response to Waymo's assertion that Anthony Levandowski improperly set up a side business while he was still at Waymo.[3] Waymo alleges that Mr. Levandowski and Uber engaged in a "cover-up scheme" regarding

---

[3] *See, e.g.*, Dkt. 23, First Amended Compl. ¶¶ 5 (Levandowski "set up his own new venture—which eventually became Otto— before leaving Waymo in January 2016."), 41 (Levandowski "was also secretly preparing to launch a competing vehicle automation venture . . . which later would become Otto"), 42 (Levandowski "went to great lengths to take what he needed to 'replicate' Waymo's technology and then to meet with Uber executives, all while still a Waymo employee"), 48 ("[W]hile still a Waymo employee . . . Mr. Levandowski attended meetings with high-level executives at Uber's headquarters").

dc-888024

MORRISON | FOERSTER

Honorable Jacqueline Scott Corley
June 21, 2017
Page Four

the formation of his new company before he left Waymo.[4] These allegations put at issue Waymo's practices regarding side businesses. Because public information indicates that many Google employees, including Larry Page himself, commonly set up and operate side businesses while working at Waymo or Google, discovery on these side businesses is directly relevant to rebutting Waymo's allegations.

Waymo objects to the relevance of these requests, but effectively conceded their relevance by producing policies and requirements for employees engaging in side businesses. (Ex. 3 at 23, Resp. to RFP 36.) In other words, Waymo intends to argue that Mr. Levandowski did not follow its policies, but does not want to produce documents regarding whether other employees followed these policies.[5] Waymo's actual practices regarding side businesses are clearly relevant. For 11 requests, however, Waymo provides effectively the same response, limiting its production only to documents "relating to side businesses of *Anthony Levandowski*." (Ex. 3, Response to Request Nos. 37-43, 125-128 (emphasis added).) These requests are not coextensive in scope, and are not limited to Mr. Levandowski.

Having alleged a "clandestine plan," Waymo cannot complain where Uber seeks documents showing that many Google employees are allowed to operate their own side businesses and to communicate with potential purchasers of services from those companies, and that they have done so without formal adherence to written policies.[6]

Uber's Interrogatory No. 11 seeks the names of the senior executives with side businesses at Google. Waymo objected on the grounds of relevance and proportionality. To the extent other senior executives had side businesses and did not comply with company policy, that is relevant. Waymo fails to explain why an identification of names is disproportionate. (Yang ¶ 4.)

**4. Mr. Levandowski's Reasons for Leaving Waymo**: As explained above, Waymo has repeatedly asserted that (1) Mr. Levandowski's departure from Waymo was part of "cover-up scheme" for a "clandestine plan" between Uber and Mr. Levandowski to have him "build

---

[4] *See, e.g.*, 5/3/17 Public PI Hr'g Tr. at 6:4-14 ("[W]e've learned that Uber and Levandowski, together, created a cover-up scheme for what they were doing . . . . while Mr. Levandowski was still working at Waymo"); 6/12/17 Waymo Ltr. Br. (Dkt. 595-4) ("The record already contains compelling evidence that extensive communications between Levandowski and Uber exist, even prior to the time Levandowski departed Waymo.").

[5] Uber has asked Waymo if it will stipulate not to argue at trial that Mr. Levandowski failed to comply with company policies regarding side businesses, and Waymo refused. (Yang ¶ 3.)

[6] Uber agreed that Waymo could initially produce documents only for its autonomous driving employees and senior executives. The Special Master asked if Waymo could at least determine how many such employees have side businesses, but Waymo refused. It has only produced "side business" documents that it believes will be helpful to its case. (Yang ¶ 4.)

MORRISON | FOERSTER

Honorable Jacqueline Scott Corley
June 21, 2017
Page Five

a custom LiDAR for Uber based on his experience with Waymo's efforts," and (2) Uber "recruit[ed] [Levandowski] away from Waymo" and "enticed" him.  (5/3/17 Public Hr'g Tr. at 6:1-6, 13:25-14:8; Waymo PI Reply at 1.)

Uber's requests directed to issues surrounding Mr. Levandowski's departure are therefore obviously relevant.  Waymo conceded the relevance of the reason for Mr. Levandowski's departure by agreeing to produce documents in response to Request Nos. 44 ("relating to the departure of Anthony Levandowski"); and 138 ("communications between Anthony Levandowski and John Krafcik relating to . . . departure").

Uber's Request Nos. 67 and 68 regarding the DOJ Consent Decree (and related rights to compete for employees) are relevant to Waymo's arguments that Uber improperly recruited Mr. Levandowski while he was employed by Waymo.  Documents relating to compliance with the DOJ Consent Decree are relevant to showing that recruiting employees away from Waymo was expressly allowed under the DOJ Consent Decree, which barred Waymo from entering into "any agreement that in any way prevents any person from soliciting, cold calling, recruiting, or otherwise competing for employees."  (Ex. 16, DOJ Press Release.)

Uber offered to narrow or withdraw these requests if Waymo would stipulate that Uber was free to recruit Mr. Levandowski while he was at Waymo and did nothing improper by doing so (Waymo refused).  (Ex. 2, 6/9/17 E. Chang Email.)  Without such a stipulation, these requests are relevant to an issue Waymo has put in play.

Uber's Request Nos. 64 and 65 regarding the hiring of Waymo CEO John Krafcik are similarly relevant to the reasons for Mr. Levandowski's departure from Waymo and formation of Otto, given media reports that the hiring of Mr. Krafcik created friction at Waymo.  Again, Uber has communicated to Waymo its willingness to narrow or withdraw these requests if Waymo stipulates that Mr. Levandowski had legitimate reasons for leaving Waymo and forming his own company (Waymo refused).  (Ex. 2, 6/9/17 E. Chang Email.)  Without such a stipulation, these requests are relevant to an issue Waymo has put in play.

**5.  Waymo production of Lyft-related documents**:  Waymo has entered into a contract to joint venture with Lyft.  It objects to Request Nos. 149-156 regarding Waymo's reported deal with Lyft on relevance, proportionality, and privilege grounds.  (*See* Ex. 17, 5/14/17 New York Times article (reporting deal).)

The relevance of the Waymo/Lyft deal is obvious: Waymo and Otto both provide self-driving technology; Lyft and Uber are competitors in the ride-sharing business.  In this case, Waymo asserts claims arising out of Uber's acquisition of Otto and its ride-sharing technology, which appears to parallel the Waymo/Lyft deal in many respects.  Based on press reports alone, the terms, diligence, and communications regarding the Waymo/Lyft deal appear at least relevant to (1) the valuation of self-driving technology for purposes of analyzing damages; (2) the appropriateness of injunctive relief, given Waymo's assertions

dc-888024

MORRISON | FOERSTER

Honorable Jacqueline Scott Corley
June 21, 2017
Page Six

that Uber has negatively impacted Waymo's first-mover advantage; and (3) industry practice regarding and knowledge of information about self-driving technology.

Given the scope of relief Waymo seeks—to bar Uber from the self-driving industry that is the subject of the Waymo/Lyft deal—Waymo's relevance and proportionality objections are baseless. In addition, details about the date Waymo began discussions with Lyft (Request No. 156) are relevant to Waymo's actual basis for bringing this suit. A jury can rationally conclude that Waymo's suit is motivated by a desire to take Uber's share of the ride-sharing market, rather than trade-secret issues. That is supported by a document obtained by Uber in discovery, showing Waymo's secret plan to dethrone Uber. (Ex. 18, Chu Dep. Ex. 1031 at 10-12.)

While the details of the Waymo/Lyft deal are generally unknown, that is a consequence of Waymo refusing to disclose them. Where the terms are known only to Waymo and Lyft, Waymo cannot simply assert that the deal is irrelevant without explaining why. *Cf. Am. Broad. Cos., Inc. v. Aereo, Inc.*, No. CV-12-80300-RMW, 2013 WL 1508894, at *1 (N.D. Cal. Apr. 10, 2013) ("A party challenging a subpoena by claiming a privilege must sufficiently describe the withheld material so that the parties and the court can assess the claim."). Accordingly, Waymo should be compelled to produce all non-privileged documents in response to Uber's requests 149-156. If it is withholding documents based on privilege, a log should be prepared.

**6. Damages/relief issues**: Waymo has conceded the relevance of documents relating to the replacement of former employees Messrs. Levandowski, Kshirsagar, and Raduta. (Ex. 19, 6/8/17 J. Nardinelli Email ("To the extent those documents relate to replacing these individuals, Waymo will produce them.").) But Uber's Request Nos. 129 and 130 are directed to the costs of and steps taken for recruiting and training any other employee to replace those former employees who were subsequently employed by Defendants. These documents are relevant not only to Waymo's alleged damages, but also a theory of irreparable harm. (Dkt. 426, 5/12/17 PI Order at 19 ("[I]f defendants use Waymo's trade secrets to accelerate their own progress in LiDAR development, that momentum would improve their ability to attract investors and talented engineers away from competitors—including Waymo itself.").) Contrary to Waymo's objections, these requests are directly relevant to the "momentum" Waymo allegedly has lost in attracting talent and are proportional to the relief Waymo seeks.

Request No. 71 seeks documents relating to the reason for the creation of Waymo, which are similarly relevant to damages and injunctive relief issues, including (1) the value of the self-driving car program to Google, (2) Waymo's business plans for competing in the self-driving car space, and (3) the competitive landscape. This request is not co-extensive with requests relating to Waymo's financial viability, performance, and business plans, because responsive documents would include Google's internal analyses of the competitive landscape, which presumably would reflect the value of and demand for Waymo's self-driving technology.

MORRISON | FOERSTER

Honorable Jacqueline Scott Corley
June 21, 2017
Page Seven

**7. Waymo's Interrelationship with Google:** Waymo refuses to produce documents responsive to Request No. 72 showing the degree of interrelationship between Google and Waymo, and thus Waymo's control over Google's documents. *See Stella Sys., LLC v. MedeAnalytics, Inc.*, No. 14-cv-00880-LB, 2015 WL 1870052, at *3 (N.D. Cal Apr. 22, 2015) ("Critical factors [for control] include . . . any overlap of directors, officers, and employees, and the financial relationship between the two entities"). Waymo concedes that it will produce Project Chauffeur documents "regardless of the entity with technical custody" (Ex. 19, 6/8/17 J. Nardinelli Email), but objects to discovery requests defining "Waymo" to encompass Google and Alphabet. (Ex. 5 at 2.)

**8. Other Document Requests:** Waymo refuses to produce a document that identifies the date it issued a litigation hold (No. 158), an organizational chart (No. 159), and *all* drafts of a critical Waymo document regarding overtaking Uber (No. 161). Waymo has made no effort to identify the number of drafts and instead will only produce the *final* draft prepared on any given day.

Finally, No. 134 regarding the resignation of David Drummond from Uber's board is directed to Waymo's delay in seeking relief, which is relevant to its purported need for injunctive relief. Waymo's own discovery requests regarding meetings of the board while Mr. Drummond was a member belie its arguments regarding the relevancy and proportionality of Uber's Request No. 134. (Ex. 21 at 9, Waymo Request Nos. 168-169.)

We apologize for the number of issues raised, but discovery has to be a two-way street—even in this case.

Respectfully submitted,

Arturo J. González
Counsel for Uber Technologies, Inc.
and Ottomotto LLC

cc: All Counsel of Record
    Special Master John Cooper

dc-888024