# EXHIBIT 19

| | |
|---|---|
| **From:** | Jeff Nardinelli <jeffnardinelli@quinnemanuel.com> |
| **Sent:** | Thursday, June 08, 2017 10:35 PM |
| **To:** | Chang, Esther Kim; QE-Waymo; Brett Schuman (BSchuman@goodwinlaw.com); Matthew Leahy (MLeahy@goodwinlaw.com); Neel Chatterjee (nchatterjee@goodwinlaw.com); Rachel Walsh (RWalsh@goodwinlaw.com); Shane Brun (SBrun@goodwinlaw.com) |
| **Cc:** | UberWaymoMoFoAttorneys; Boies Service (BSF_EXTERNAL_UberWaymoLit@bsfllp.com) |
| **Subject:** | RE: Waymo v. Uber: Uber/Ottomotto's RFPs |

- External Email -

Counsel and John,

I have pasted Esther's statements below (black text), and placed our responses inline (blue text).

- **RFP 64:** Documents relating to hiring of John Krafcik are relevant to showing that the departure of some former Waymo employees was motivated by doubts about John Krafcik, as reported in the press, rather than by a "cover-up scheme," as alleged by Waymo's counsel. (5/3/2017 Public Hr'g Tr. at 6:1-6.)

- **RFP 65:** Documents about Waymo employee reactions to the hiring of John Krafcik are relevant to showing that the departure of some former Waymo employees was motivated by doubts about John Krafcik, as reported in the press, rather than by a "cover-up scheme," as alleged by Waymo's counsel. (5/3/2017 Public Hr'g Tr. at 6:1-6.)

These requests are irrelevant, overbroad, and not proportional to the needs of the case for reasons we have already stated in our meet and confers. The purported relevance of these requests – their relation to employee departures – falls flat. This case concerns patent infringement and trade secret misappropriation, not employee departures generally. The hearing excerpt cited by Ms. Chang confirms this. In the excerpt, Waymo's counsel Mr. Verhoeven did not allege that Waymo employees departed because of a "cover-up scheme." The cover-up scheme related to the theft of Waymo's trade secrets:

> It is now clear, your Honor, that at the time of the download, Uber and Mr. Levandowski were planning to build a replica LiDAR system for Uber. It turns out, through discovery, we've learned that Uber and Levandowski, together, created a cover-up scheme for what they were doing. They concocted a story for public consumption.
>
> The story was that Mr. Levandowski left Waymo because he wanted to found his own company. And only after months later, Uber decided to buy that company. While that is troubling enough, the facts are even more disturbing.
>
> In fact, the evidence shows that while Mr. Levandowski was still working at Waymo, Uber and Mr. Levandowski were planning to have Levandowski build a custom LiDAR for Uber based on his experience with Waymo's efforts.

5/3/2017 Public Hr'g Tr. at 6:1-14. Waymo has agreed to produce documents relating to Mr. Levandowski's departure. See RFP No. 44 ("All documents relating to the departure of Anthony Levandowski…"); RFP No. 138 ("All documents relating to communications between Anthony Levandowski and John Krafcik relating to … Mr. Levandowski's

1

departure from Waymo."). Defendants have never articulated any legitimate basis for these requests and they still do not. Rather, as we have noted before, Defendants appear to seek these documents not for any relevance to the litigation but to harass.

- **RFP 67:** Documents relating to compliance with the DOJ Consent Decree are relevant to showing that recruiting employees away from Waymo was expressly allowed under the DOJ Consent Decree. In other words, Waymo was prohibited from entering into "any agreement that in any way prevents any person from soliciting, cold calling, recruiting, or otherwise competing for employees," as reported in the DOJ's press release. Waymo's counsel argued in its PI briefing and at the hearing that Uber "recruit[ed] [Levandowski] away from Waymo," "enticed" him, and "created a cover-up scheme." In addition, we understand that the Decree was effective until 2016. (Waymo PI Reply at 1; 5/3/2017 Public Hr'g Tr. at 6:1-6.)

- **RFP 68:** Documents relating to changes made by Waymo to restrictive covenants and hiring practices in response to the DOJ Consent Decree are relevant to showing that recruiting employees away from Waymo was expressly allowed under the DOJ Consent Decree. In other words, Waymo was prohibited from entering into "any agreement that in any way prevents any person from soliciting, cold calling, recruiting, or otherwise competing for employees," as reported in the DOJ's press release. Waymo counsel argued in its PI briefing and at hearing that Uber "recruit[ed] [Levandowski] away from Waymo," "enticed" him, and "created a cover-up scheme.") (Waymo PI Reply at 1; 5/3/2017 Public Hr'g Tr. at 6:1-6.)  In addition, we understand that the Decree was effective until 2016. Moreover, Waymo has propounded its own requests seeking all versions of "agreements that Defendants require or have ever required employees to execute as a condition of employment . . . ." (*See* Waymo RFP 69.)

These requests are irrelevant, overbroad, and not proportional to the needs of the case. The DOJ settlement (link) struck agreements through which Google had agreed with Apple, Intel, and Intuit (not Uber) not to recruit highly skilled employees from one another. That settlement has no relation to Waymo's allegations of patent infringement and trade secret misappropriation. Waymo does not allege simply that Uber recruited Mr. Levandowski, but that Uber hired Mr. Levandowski after he stole Waymo trade secrets with a plan to replicate Waymo's technology, then hatched a cover-up scheme to hide this plan. Waymo PI Reply at 1; 5/3/2017 Public Hr'g Tr. at 6:1-4.). And surely Uber does not argue that the DOJ settlement permits Waymo employees to violate federal and state trade-secret law in the course of taking employment with competitors. In short, this request is too far afield to warrant any responsive documents and Defendants have never shown otherwise. Rather, these requests too are intended to harass, rather than for any proper purpose.

- **RFP 69:** Documents relating to Waymo and Project Chauffeur's bonus program are relevant to showing that the departure of some former Waymo employees was motivated by the desire to start new companies after receiving large bonuses, as reported in the press, rather than by a "cover-up scheme," as alleged by Waymo's counsel. (5/3/2017 Public Hr'g Tr. at 6:1-6.)  In addition, Waymo has propounded its own requests seeking all documents and communications about the Project Chauffeur Bonus Program. (*See* Waymo RFP 153.)

Waymo will produce documents sufficient to show the Project Chauffeur bonus program, including its structure, valuation, and payments made to Messrs. Levandowski and others.

- **RFP 71:** Documents relating to the reason(s) for the creation of Waymo are relevant to damages and injunctive relief issues, including the value of the self-driving car program to Google as well as Waymo's business plans for competing in the self-driving car space. As reported in the press, Waymo was spun off as a separate entity in an effort to create a commercially viable company. Responsive documents would include Google's internal analyses about the viability of Waymo as an independent entity. In addition, Waymo has propounded its own request seeking documents showing the reasons behind Uber's acquisition of Ottomotto. (*See* Waymo RFP 27.)

This request is irrelevant, overbroad, and not proportional to the needs of the case. According to Ms. Chang, documents responsive to this request would be relevant insofar as they show the value of the self-driving car program, Waymo's

2

business plans, and Waymo's viability.  These issues are covered by other RFPs.  *See* RFP No. 61 ("Documents relating to Waymo's financial viability, including but not limited to internal business plans, estimates, and future projections at Waymo or Project Chauffeur."); RFP No. 62 ("Documents relating to Waymo's performance, including but not limited to the development of and progress assessment for any schedules and milestones at Waymo LLC or Project Chauffeur."); RFP No. 93 ("Documents relating to Waymo's business plans, strategic plans, operating plans, marketing plans, financial plans, sales plans, and investment plans for its ride-sharing business, including projections for revenue generation and profitability.").  Because Uber has not articulated the relevance of this RFP beyond issues covered by other RFPs, Waymo will not produce documents in response to this RFP.

- **RFP  72:** Documents relating to Google's involvement in the operations, management, governance, and finances of Waymo are relevant to showing the degree of interrelationship between Google and Waymo, such that Waymo has control over Google's documents, such that Google's documents should be produced.   In addition, Waymo has propounded its own requests seeking all documents and communications regarding agreements and showing the relationship between the Defendants.  (*See* Waymo RFP 7-12.)

Ms. Chang's statement indicates that this RFP is relevant to showing that "Waymo has control over Google's documents."  Waymo confirms that it is searching for and producing documents relating to Project Chauffeur/Waymo regardless of the entity with technical custody over the documents.  Thus, no documents relating to Google's involvement in Waymo are necessary for Uber to make its case that Waymo should produce "Google" documents.

- **RFP  114:**  Communications between Waymo and any third party regarding the alleged trade secrets are relevant to:  (1) showing whether the alleged trade secrets are in fact trade secrets (e.g., whether Waymo takes reasonable measures to protect its trade secrets, including whether Waymo discloses the alleged trade secrets to third parties without confidentiality agreements; whether Waymo and the third parties describe the alleged trade secrets as general concepts or principles) and (2) damages (e.g., whether Waymo and third parties describe the alleged trade secrets as valuable).  Moreover, Waymo has propounded its own requests seeking all communications that several named current and former employees of Uber may have had with "any PERSON" regarding a number of matters, including LiDAR, at issue in this lawsuit.  (*See* Waymo RFP 164-167.)

I believe we reached agreement on this on last week's call.  Waymo is broadly searching for and producing documents relating to the development of Waymo's self-driving car technology.  As part of that review, we will produce communications between Waymo and any third party regarding that development.

- **RFP 129:**  Documents relating to the cost for recruiting and training employees to replace former Waymo employees subsequently employed by Defendants is relevant to injunctive relief and the theory of harm described by the Court in the preliminary injunction order.  (PI Order at 19 ("[I]f defendants use Waymo's trade secrets to accelerate their own progress in LiDAR development, that momentum would improve their ability to attract investors and talented engineers away from competitors — including Waymo itself.").)

- **RFP  130:**  Documents relating to the steps taken by Waymo to recruit and train any employee to replace one of the former Waymo employees who were subsequently employed by Defendants is relevant to injunctive relief and the theory of harm described by the Court in the preliminary injunction order.  (PI Order at 19 ("[I]f defendants use Waymo's trade secrets to accelerate their own progress in LiDAR development, that momentum would improve their ability to attract investors and talented engineers away from competitors — including Waymo itself.").)

Waymo's complaint named three employees subsequently employed by Uber:  Messrs. Levandowski, Kshirsagar, and Raduta.  In response to other RFPs, Waymo is producing documents concerning their exits and efforts to retain them.  *See, e.g.,* RFP No. 44 ("All documents relating to the departure of Anthony Levandowski, Sameer Kshirsagar, and Radu Raduta from Waymo, including but not limited to any transition memoranda and transition documents created or collected by Messrs. Levandowski, Kshirsagar, and Raduta."); RFP No. 45 ("All documents relating to Waymo's knowledge of Messrs. Anthony Levandowski, Sameer Kshirsagar, and Radu Raduta's plans or efforts to seek employment outside of Waymo.").  To the extent those documents relate to replacing these individuals, Waymo will produce

3

them.  Beyond that, Waymo objects to this request as irrelevant, overbroad, and not proportional to the needs of the case.

- **RFP 134:** Documents relating to the resignation of David Drummond, Google's SVP of Corporate Development and Chief Legal Officer, from Uber's Board of Directors is relevant to injunctive relief, including when Google/Waymo first became aware of Uber's negotiations to acquire Otto, when Google/Waymo first became aware of the alleged trade secret misappropriation, and Waymo's delay in seeking injunctive relief.  In addition, Waymo has propounded its own requests seeking minutes of any meetings of Uber's Board of Directors, of which Mr. Drummond was a member, during which LiDAR, Mr. Levandowski, Ottomotto, or Otto Trucking were discussed.  (*See* Waymo RFP 168-169.)  Waymo also seeks all documents regarding LiDAR, Mr. Levandowski, Ottomotto, or Otto Trucking prepared for or received by Uber's Board of Directors.  (*See* Waymo RFP 170-171.)

This request is irrelevant, overbroad, and not proportional to the needs of the case.  Uber has presented nothing beyond speculation as to Mr. Drummond's resignation.   Further, Uber has issued separate RFPs on the issues of awareness of Otto and awareness of potential misappropriation, rendering this RFP duplicative and irrelevant.  *See, e.g.,* RFP No. 52 ("Documents sufficient to show the earliest date Waymo became aware of Anthony Levandowski's "new, self-driving vehicle company" as described in Paragraph 5 of the Waymo Complaint."); RFP No. 53 ("All documents relating to when Waymo began investigating the possibility of Anthony Levandowski's retention of Waymo files after his departure from Waymo as alleged in the Waymo Complaint.").

- **RFP 142:** Communications with any third parties regarding this lawsuit are relevant to whether Waymo is disseminating Uber's confidential or other information filed with the Court for improper purposes.  The Supreme Court has warned against using public access of court files to "gratify private spite or promote public scandal," "to serve as reservoirs of libelous statements for press consumption," or "as sources of business information that might harm a litigant's competitive standing."  *Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 598 (1978).  Waymo has already challenged certain of Uber's confidentiality designations (albeit through the wrong procedure), arguing that Defendants "seek to conceal from the public terms of the Otto acquisition" that Waymo alleges are "distasteful but are not confidential."  (Dkt. 526 at 1-2.)  Documents responsive to this request are relevant to showing whether Waymo is disseminating such Uber information to gain an improper strategic advantage.  Moreover, Waymo has propounded its own requests seeking all communications that several named current and former employees of Uber may have had with "any PERSON" regarding a number of matters at issue in this lawsuit.  (*See* Waymo RFP 164-167.)

Waymo will produce documents sufficient to show Waymo's knowledge of Defendants' autonomous vehicle program, including Defendants' design and development of LiDAR sensors, Defendants' testing of autonomous vehicles, Defendants' attempts to commercialize autonomous vehicle technology, and communications by Waymo to third parties regarding this lawsuit, as located after a diligent search of custodial documents.

- **RFP 147:**  Communications with Lyft about competition with Uber are relevant to damages and injunctive relief issues, including the alleged damages and irreparable harm to Waymo in light of competition in the market, Uber's place in the market, the value of the self-driving market, and the potential impact of this litigation (e.g., a potential injunction) on the market.  A May 14, 2017 New York Times article reported that Waymo and Lyft have reached a "deal" to collaborate on self-driving cars.  Waymo has argued that the self-driving car industry "includes several fierce competitors" racing to "gain a critical first-mover advantage," and "were Waymo to lose the race to successfully commercialize this nascent field, the harm would be irreparable." (PI Motion at 20, 22; *see* PI Reply at 15 ("But a nascent market (as here) makes it even more important which competitor can hit the market first.").)  The Court has noted this theory of harm in its PI Order.  (PI Order at 19.)  Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize, such that it would not suffer irreparable harm.  In addition, any documents showing the industry practice with respect to sharing of information regarding technology and/or strategies of competitors and/or potential or contemplated partners, are relevant to the merits of the claims (e.g., whether Waymo's alleged trade secrets are in fact trade secrets).  Moreover, Waymo has

propounded its own request seeking "[a]ll forecasts, market analyses, or market projects REGARDING self-driving vehicles."  (*See* Waymo RFP 174.)

- **RFP 148:**  Documents relating to Waymo's analysis of Lyft as a potential acquisition target, including Lyft's competition with Uber, are relevant to damages and injunctive relief issues, as described above.  (*See* bullet point re RFP 147.)  Waymo has argued that there is a race to commercialize the nascent field of self-driving cars, such that losing the race would be an irreparable harm.  Waymo has a reached a "deal" to collaborate with Lyft.  Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize, such that it would not suffer irreparable harm.  In addition, any documents showing the industry practice with respect to sharing of information regarding technology and/or strategies of competitors and/or potential or contemplated partners are relevant to the merits of the claims (e.g., whether Waymo's alleged trade secrets are, in fact, trade secrets).  Moreover, Waymo has propounded its own request seeking "[a]ll forecasts, market analyses, or market projects REGARDING self-driving vehicles."  (*See* Waymo RFP 174.)

- **RFP 149:** Documents relating to Waymo's agreements with Lyft regarding autonomous vehicles are relevant to damages and injunctive relief issues, as described above.  (*See* bullet point re RFP 147.)  Waymo has argued that there is a race to commercialize the nascent field of self-driving cars, such that losing the race would be an irreparable harm.  Waymo has a reached a "deal" to collaborate with Lyft.  Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize such that it would not suffer irreparable harm.  Moreover, Waymo has propounded its own request seeking documents regarding agreements between LEVANDOWSKI and TYTO and/or ODIN.  (*See* Waymo RFP at 10.)

- **RFP 150:** Any letter of intent or interest relating to the deal between Waymo and Lyft are relevant to damages and injunctive relief issues, as described above.  (*See* above regarding RFP 147.)  Waymo has argued that there is a race to commercialize the nascent field of self-driving cars, such that losing the race would be an irreparable harm.  Waymo has a reached a "deal" to collaborate with Lyft.  Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize, such that it would not suffer irreparable harm.

- **RFP 151:** Any term sheet relating to the deal between Waymo and Lyft are relevant to damages and injunctive relief issues, as described above.  (*See* bullet point re RFP 147.)  Waymo has argued that there is a race to commercialize the nascent field of self-driving cars, such that losing the race would be an irreparable harm.  Waymo has a reached a "deal" to collaborate with Lyft.  Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize, such that it would not suffer irreparable harm.

- **RFP 152:** Any definitive agreement relating to the deal between Waymo and Lyft are relevant to damages and injunctive relief issues, as described above.  (*See* above regarding RFP 147.)  Waymo has argued that there is a race to commercialize the nascent field of self-driving cars, such that losing the race would be an irreparable harm.  Waymo has a reached a "deal" to collaborate with Lyft.  Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize, such that it would not suffer irreparable harm.

- **RFP 153:** Any analysis or due diligence relating to the deal between Waymo and Lyft are relevant to damages and injunctive relief issues, as described above.  (*See* above regarding RFP 147.)  Waymo has argued that there is a race to commercialize the nascent field of self-driving cars, such that losing the race would be an irreparable harm.  Waymo has a reached a "deal" to collaborate with Lyft.  Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize, such that it would not suffer irreparable harm.  In addition, any documents showing the industry practice with respect to sharing of information regarding technology and/or strategies of competitors and/or potential or contemplated partners are relevant to the merits of the claims (e.g., whether

Waymo's alleged trade secrets are, in fact, trade secrets).  Moreover, Waymo has propounded its own request seeking documents and communications regarding Uber's due diligence of Ottomotto.  (*See* Waymo RFP 28.)

- **RFP 154**: Documents sufficient to show the first ten communications between Waymo and Quinn relating to the "deal" between Waymo and Lyft are relevant to Waymo's delay in bringing suit and seeking injunctive relief against Defendants, which could bar injunctive relief.

- **RFP 155:**  Documents sufficient to identify individuals at Waymo or Lyft responsible for negotiating or conducting due diligence relating to the "deal" between Waymo and Lyft are relevant to Waymo's delay in bringing suit and seeking injunctive relief against Defendants, which could bar injunctive relief.  Moreover, Waymo has propounded its own request seeking documents sufficient to show all persons other than Uber that negotiated with Ottomotto or Otto Trucking regarding a potential acquisition.  (*See* Waymo RFP 88.)

- **RFP 156:** Documents sufficient to identify the first date that Waymo began discussion of any potential agreement with Lyft are relevant to Waymo's delay in bringing suit and seeking injunctive relief against Defendants, which could bar injunctive relief.

These requests are irrelevant, vague, overbroad, and not proportional to the needs of the case for all the reasons we have discussed previously.  For example, through these RFPs, Uber seeks broad discovery into a highly sensitive business deal between Waymo and Lyft, as well as documents that are not even tied to that deal.  Request No. 147 for example asks for all communications with Lyft about competition with Uber.  Uber also seeks all documents relating to Waymo's analysis of Lyft as a potential acquisition target—yet, the reported deal is not an acquisition of Lyft.

Uber further seeks extensive documentation about the Waymo-Lyft collaboration.  Uber claims that these requests relate to damages and irreparable harm, but does not coherently connect how they do.  Instead, Uber concludes "Communications with Lyft about competition with Uber are relevant to damages and injunctive relief issues, including the alleged damages and irreparable harm to Waymo in light of competition in the market, Uber's place in the market, the value of the self-driving market, and the potential impact of this litigation (e.g., a potential injunction) on the market."  But the explanation given does not support these assertions.  For example, Uber says:

> "A May 14, 2017 New York Times article reported that Waymo and Lyft have reached a "deal" to collaborate on self-driving cars.  Waymo has argued that the self-driving car industry "includes several fierce competitors" racing to "gain a critical first-mover advantage," and "were Waymo to lose the race to successfully commercialize this nascent field, the harm would be irreparable."  (PI Motion at 20, 22; see PI Reply at 15 ("But a nascent market (as here) makes it even more important which competitor can hit the market first.").)  The Court has noted this theory of harm in its PI Order.  (PI Order at 19.)  Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize, such that it would not suffer irreparable harm."

It is unclear what Uber is saying here.  Is Uber saying that the mere fact that Waymo has a business deal with Lyft means that Waymo would not suffer irreparable harm from Uber's misappropriation of trade secrets?
Uber further says: "In addition, any documents showing the industry practice with respect to sharing of information regarding technology and/or strategies of competitors and/or potential or contemplated partners, are relevant to the merits of the claims (e.g., whether Waymo's alleged trade secrets are in fact trade secrets)."  Initially, Uber's requests do not go to industry practice.  Nor is it clear what the relevance would be of such a "practice" of sharing of information as to whether Waymo's trade secrets are trade secrets, or have been kept as trade secrets.

Uber further says:  "Moreover, Waymo has propounded its own request seeking "[a]ll forecasts, market analyses, or market projects REGARDING self-driving vehicles."  (See Waymo RFP 174.)  But Uber does not explain how this relates to Uber's current requests.

As we previously indicated on our meet and confers, this appears to be a fishing expedition, and the burden of producing documents relating to this highly sensitive deal greatly outweighs their probative value to the issues in this case.

---

**From:** Chang, Esther Kim [mailto:echang@mofo.com]
**Sent:** Wednesday, June 07, 2017 1:24 PM
**To:** Jeff Nardinelli <jeffnardinelli@quinnemanuel.com>; QE-Waymo <qewaymo@quinnemanuel.com>; Brett Schuman (BSchuman@goodwinlaw.com) <BSchuman@goodwinlaw.com>; Matthew Leahy (MLeahy@goodwinlaw.com) <MLeahy@goodwinlaw.com>; Neel Chatterjee (nchatterjee@goodwinlaw.com) <nchatterjee@goodwinlaw.com>; Rachel Walsh (RWalsh@goodwinlaw.com) <RWalsh@goodwinlaw.com>; Shane Brun (SBrun@goodwinlaw.com) <SBrun@goodwinlaw.com>
**Cc:** UberWaymoMoFoAttorneys <UberWaymoMoFoAttorneys@mofo.com>; Boies Service (BSF_EXTERNAL_UberWaymoLit@bsfllp.com) <BSF_EXTERNAL_UberWaymoLit@bsfllp.com>
**Subject:** RE: Waymo v. Uber: Uber/Ottomotto's RFPs

Jeff,

Apologies, you are correct – these responses are due Monday. I was looking at the wrong deadline. In any event, at last week's meet and confer, the parties agreed that Uber and Ottomotto would set forth its position as to the relevance of the disputed RFPs in an email and that Waymo would respond by email, so as to tee it up for motion practice before Judge Corley. I would like discuss this issue at today's meet and confers. Absent a written response from Waymo today, we expect a fulsome production from Waymo responsive to the below document requests.

Esther
Tel: (415) 268-7562

---

**From:** Jeff Nardinelli [mailto:jeffnardinelli@quinnemanuel.com]
**Sent:** Wednesday, June 07, 2017 9:43 AM
**To:** Chang, Esther Kim; QE-Waymo; Brett Schuman (BSchuman@goodwinlaw.com); Matthew Leahy (MLeahy@goodwinlaw.com); Neel Chatterjee (nchatterjee@goodwinlaw.com); Rachel Walsh (RWalsh@goodwinlaw.com); Shane Brun (SBrun@goodwinlaw.com)
**Cc:** UberWaymoMoFoAttorneys; Boies Service (BSF_EXTERNAL_UberWaymoLit@bsfllp.com)
**Subject:** RE: Waymo v. Uber: Uber/Ottomotto's RFPs

- External Email -

---

Esther,

Our responses to Uber and Ottomotto's first set of document requests are due Monday, June 12. We do not concede the relevance of the discovery requests discussed below, and are happy to discuss today.

Thanks,
Jeff

---

**From:** Chang, Esther Kim [mailto:echang@mofo.com]
**Sent:** Tuesday, June 06, 2017 10:15 PM
**To:** QE-Waymo <qewaymo@quinnemanuel.com>; Brett Schuman (BSchuman@goodwinlaw.com) <BSchuman@goodwinlaw.com>; Matthew Leahy (MLeahy@goodwinlaw.com) <MLeahy@goodwinlaw.com>; Neel Chatterjee (nchatterjee@goodwinlaw.com) <nchatterjee@goodwinlaw.com>; Rachel Walsh (RWalsh@goodwinlaw.com) <RWalsh@goodwinlaw.com>; Shane Brun (SBrun@goodwinlaw.com) <SBrun@goodwinlaw.com>

**Cc:** UberWaymoMoFoAttorneys <UberWaymoMoFoAttorneys@mofo.com>; Boies Service (BSF_EXTERNAL_UberWaymoLit@bsfllp.com) <BSF_EXTERNAL_UberWaymoLit@bsfllp.com>
**Subject:** RE: Waymo v. Uber: Uber/Ottomotto's RFPs

Counsel and John,

Given that Waymo's responses to Uber and Ottomotto's document requests are due this Friday and Monday and having received no response from Waymo, we take Waymo's lack of response to mean that Uber and Ottomotto have sufficiently established the relevance of their discovery requests.  If this is not the case, we would like to discuss at tomorrow's meet and confers scheduled at 2pm or 3pm.

Esther
Tel: (415) 268-7562

---

**From:** Chang, Esther Kim
**Sent:** Thursday, June 01, 2017 11:48 PM
**To:** QE-Waymo (qewaymo@quinnemanuel.com) (qewaymo@quinnemanuel.com); Brett Schuman (BSchuman@goodwinlaw.com); Matthew Leahy (MLeahy@goodwinlaw.com); Neel Chatterjee (nchatterjee@goodwinlaw.com); Rachel Walsh (RWalsh@goodwinlaw.com); Shane Brun (SBrun@goodwinlaw.com)
**Cc:** UberWaymoMoFoAttorneys; Boies Service (BSF_EXTERNAL_UberWaymoLit@bsfllp.com)
**Subject:** Waymo v. Uber: Uber/Ottomotto's RFPs

John and counsel,

Pursuant to the parties' meet and confers regarding Waymo's relevance objections to Uber's RFPs, we have identified the relevance of the requests at issue.  As highlighted below, their relevance is confirmed by Waymo's own allegations and statements in this litigation and also, in several instances, by Waymo's own document requests seeking similar information.

- **RFP 64:** Documents relating to hiring of John Krafcik are relevant to showing that the departure of some former Waymo employees was motivated by doubts about John Krafcik, as reported in the press, rather than by a "cover-up scheme," as alleged by Waymo's counsel.  (5/3/2017 Public Hr'g Tr. at 6:1-6.)

- **RFP 65:** Documents about Waymo employee reactions to the hiring of John Krafcik are relevant to showing that the departure of some former Waymo employees was motivated by doubts about John Krafcik, as reported in the press, rather than by a "cover-up scheme," as alleged by Waymo's counsel.  (5/3/2017 Public Hr'g Tr. at 6:1-6.)

- **RFP 67:** Documents relating to compliance with the DOJ Consent Decree are relevant to showing that recruiting employees away from Waymo was expressly allowed under the DOJ Consent Decree.  In other words, Waymo was prohibited from entering into "any agreement that in any way prevents any person from soliciting, cold calling, recruiting, or otherwise competing for employees," as reported in the DOJ's press release.  Waymo's counsel argued in its PI briefing and at the hearing that Uber "recruit[ed] [Levandowski] away from Waymo," "enticed" him, and "created a cover-up scheme."  In addition, we understand that the Decree was effective until 2016.  (Waymo PI Reply at 1; 5/3/2017 Public Hr'g Tr. at 6:1-6.)

- **RFP  68:** Documents relating to changes made by Waymo to restrictive covenants and hiring practices in response to the DOJ Consent Decree are relevant to showing that recruiting employees away from Waymo was expressly allowed under the DOJ Consent Decree.  In other words, Waymo was prohibited from entering into "any agreement that in any way prevents any person from soliciting, cold calling, recruiting, or otherwise competing for employees," as reported in the DOJ's press release.  Waymo counsel argued in its PI briefing and at hearing that Uber "recruit[ed] [Levandowski] away from Waymo," "enticed" him, and "created a cover-up scheme.")  (Waymo PI Reply at 1; 5/3/2017 Public Hr'g Tr. at 6:1-6.)   In addition, we understand that the Decree

was effective until 2016.  Moreover, Waymo has propounded its own requests seeking all versions of "agreements that Defendants require or have ever required employees to execute as a condition of employment . . . ."  (*See* Waymo RFP 69.)

- **RFP 69:**  Documents relating to Waymo and Project Chauffeur's bonus program are relevant to showing that the departure of some former Waymo employees was motivated by the desire to start new companies after receiving large bonuses, as reported in the press, rather than by a "cover-up scheme," as alleged by Waymo's counsel.  (5/3/2017 Public Hr'g Tr. at 6:1-6.)  In addition, Waymo has propounded its own requests seeking all documents and communications about the Project Chauffeur Bonus Program.  (*See* Waymo RFP 153.)

- **RFP 71:** Documents relating to the reason(s) for the creation of Waymo are relevant to damages and injunctive relief issues, including the value of the self-driving car program to Google as well as Waymo's business plans for competing in the self-driving car space.  As reported in the press, Waymo was spun off as a separate entity in an effort to create a commercially viable company.  Responsive documents would include Google's internal analyses about the viability of Waymo as an independent entity.  In addition, Waymo has propounded its own request seeking documents showing the reasons behind Uber's acquisition of Ottomotto.  (*See* Waymo RFP 27.)

- **RFP 72:** Documents relating to Google's involvement in the operations, management, governance, and finances of Waymo are relevant to showing the degree of interrelationship between Google and Waymo, such that Waymo has control over Google's documents, such that Google's documents should be produced.   In addition, Waymo has propounded its own requests seeking all documents and communications regarding agreements and showing the relationship between the Defendants.  (*See* Waymo RFP 7-12.)

- **RFP 114:**  Communications between Waymo and any third party regarding the alleged trade secrets are relevant to:  (1) showing whether the alleged trade secrets are in fact trade secrets (e.g., whether Waymo takes reasonable measures to protect its trade secrets, including whether Waymo discloses the alleged trade secrets to third parties without confidentiality agreements; whether Waymo and the third parties describe the alleged trade secrets as general concepts or principles) and (2) damages (e.g., whether Waymo and third parties describe the alleged trade secrets as valuable).  Moreover, Waymo has propounded its own requests seeking all communications that several named current and former employees of Uber may have had with "any PERSON" regarding a number of matters, including LiDAR, at issue in this lawsuit.  (*See* Waymo RFP 164-167.)

- **RFP 129:**  Documents relating to the cost for recruiting and training employees to replace former Waymo employees subsequently employed by Defendants is relevant to injunctive relief and the theory of harm described by the Court in the preliminary injunction order.  (PI Order at 19 ("[I]f defendants use Waymo's trade secrets to accelerate their own progress in LiDAR development, that momentum would improve their ability to attract investors and talented engineers away from competitors — including Waymo itself.").)

- **RFP 130:**  Documents relating to the steps taken by Waymo to recruit and train any employee to replace one of the former Waymo employees who were subsequently employed by Defendants is relevant to injunctive relief and the theory of harm described by the Court in the preliminary injunction order.  (PI Order at 19 ("[I]f defendants use Waymo's trade secrets to accelerate their own progress in LiDAR development, that momentum would improve their ability to attract investors and talented engineers away from competitors — including Waymo itself.").)

- **RFP 134:**  Documents relating to the resignation of David Drummond, Google's SVP of Corporate Development and Chief Legal Officer, from Uber's Board of Directors is relevant to injunctive relief, including when Google/Waymo first became aware of Uber's negotiations to acquire Otto, when Google/Waymo first became aware of the alleged trade secret misappropriation, and Waymo's delay in seeking injunctive relief.  In addition, Waymo has propounded its own requests seeking minutes of any meetings of Uber's Board of Directors, of which Mr. Drummond was a member, during which LiDAR, Mr. Levandowski, Ottomotto, or Otto Trucking were discussed.  (*See* Waymo RFP 168-169.)  Waymo also seeks all documents regarding LiDAR, Mr. Levandowski, Ottomotto, or Otto Trucking prepared for or received by Uber's Board of Directors.  (*See* Waymo RFP 170-171.)

- **RFP 142:** Communications with any third parties regarding this lawsuit are relevant to whether Waymo is disseminating Uber's confidential or other information filed with the Court for improper purposes. The Supreme Court has warned against using public access of court files to "gratify private spite or promote public scandal," "to serve as reservoirs of libelous statements for press consumption," or "as sources of business information that might harm a litigant's competitive standing." *Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 598 (1978). Waymo has already challenged certain of Uber's confidentiality designations (albeit through the wrong procedure), arguing that Defendants "seek to conceal from the public terms of the Otto acquisition" that Waymo alleges are "distasteful but are not confidential." (Dkt. 526 at 1-2.) Documents responsive to this request are relevant to showing whether Waymo is disseminating such Uber information to gain an improper strategic advantage. Moreover, Waymo has propounded its own requests seeking all communications that several named current and former employees of Uber may have had with "any PERSON" regarding a number of matters at issue in this lawsuit. (*See* Waymo RFP 164-167.)

- **RFP 147:** Communications with Lyft about competition with Uber are relevant to damages and injunctive relief issues, including the alleged damages and irreparable harm to Waymo in light of competition in the market, Uber's place in the market, the value of the self-driving market, and the potential impact of this litigation (e.g., a potential injunction) on the market. A May 14, 2017 New York Times article reported that Waymo and Lyft have reached a "deal" to collaborate on self-driving cars. Waymo has argued that the self-driving car industry "includes several fierce competitors" racing to "gain a critical first-mover advantage," and "were Waymo to lose the race to successfully commercialize this nascent field, the harm would be irreparable." (PI Motion at 20, 22; *see* PI Reply at 15 ("But a nascent market (as here) makes it even more important which competitor can hit the market first.").) The Court has noted this theory of harm in its PI Order. (PI Order at 19.) Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize, such that it would not suffer irreparable harm. In addition, any documents showing the industry practice with respect to sharing of information regarding technology and/or strategies of competitors and/or potential or contemplated partners, are relevant to the merits of the claims (e.g., whether Waymo's alleged trade secrets are in fact trade secrets). Moreover, Waymo has propounded its own request seeking "[a]ll forecasts, market analyses, or market projects REGARDING self-driving vehicles." (*See* Waymo RFP 174.)

- **RFP 148:** Documents relating to Waymo's analysis of Lyft as a potential acquisition target, including Lyft's competition with Uber, are relevant to damages and injunctive relief issues, as described above. (*See* bullet point re RFP 147.) Waymo has argued that there is a race to commercialize the nascent field of self-driving cars, such that losing the race would be an irreparable harm. Waymo has a reached a "deal" to collaborate with Lyft. Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize, such that it would not suffer irreparable harm. In addition, any documents showing the industry practice with respect to sharing of information regarding technology and/or strategies of competitors and/or potential or contemplated partners are relevant to the merits of the claims (e.g., whether Waymo's alleged trade secrets are, in fact, trade secrets). Moreover, Waymo has propounded its own request seeking "[a]ll forecasts, market analyses, or market projects REGARDING self-driving vehicles." (*See* Waymo RFP 174.)

- **RFP 149:** Documents relating to Waymo's agreements with Lyft regarding autonomous vehicles are relevant to damages and injunctive relief issues, as described above. (*See* bullet point re RFP 147.) Waymo has argued that there is a race to commercialize the nascent field of self-driving cars, such that losing the race would be an irreparable harm. Waymo has a reached a "deal" to collaborate with Lyft. Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize such that it would not suffer irreparable harm. Moreover, Waymo has propounded its own request seeking documents regarding agreements between LEVANDOWSKI and TYTO and/or ODIN. (*See* Waymo RFP at 10.)

- **RFP 150:** Any letter of intent or interest relating to the deal between Waymo and Lyft are relevant to damages and injunctive relief issues, as described above. (*See* above regarding RFP 147.)  Waymo has argued that there is a race to commercialize the nascent field of self-driving cars, such that losing the race would be an irreparable harm.  Waymo has a reached a "deal" to collaborate with Lyft.  Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize, such that it would not suffer irreparable harm.

- **RFP 151:** Any term sheet relating to the deal between Waymo and Lyft are relevant to damages and injunctive relief issues, as described above. (*See* bullet point re RFP 147.)  Waymo has argued that there is a race to commercialize the nascent field of self-driving cars, such that losing the race would be an irreparable harm.  Waymo has a reached a "deal" to collaborate with Lyft.  Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize, such that it would not suffer irreparable harm.

- **RFP 152:** Any definitive agreement relating to the deal between Waymo and Lyft are relevant to damages and injunctive relief issues, as described above. (*See* above regarding RFP 147.)  Waymo has argued that there is a race to commercialize the nascent field of self-driving cars, such that losing the race would be an irreparable harm.  Waymo has a reached a "deal" to collaborate with Lyft.  Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize, such that it would not suffer irreparable harm.

- **RFP 153:** Any analysis or due diligence relating to the deal between Waymo and Lyft are relevant to damages and injunctive relief issues, as described above. (*See* above regarding RFP 147.)  Waymo has argued that there is a race to commercialize the nascent field of self-driving cars, such that losing the race would be an irreparable harm.  Waymo has a reached a "deal" to collaborate with Lyft.  Documents responsive to this request are relevant to showing, for example, whether the Waymo-Lyft collaboration would improve Waymo's position in the "race" to commercialize, such that it would not suffer irreparable harm.  In addition, any documents showing the industry practice with respect to sharing of information regarding technology and/or strategies of competitors and/or potential or contemplated partners are relevant to the merits of the claims (e.g., whether Waymo's alleged trade secrets are, in fact, trade secrets).  Moreover, Waymo has propounded its own request seeking documents and communications regarding Uber's due diligence of Ottomotto.  (*See* Waymo RFP 28.)

- **RFP 154**: Documents sufficient to show the first ten communications between Waymo and Quinn relating to the "deal" between Waymo and Lyft are relevant to Waymo's delay in bringing suit and seeking injunctive relief against Defendants, which could bar injunctive relief.

- **RFP 155:**  Documents sufficient to identify individuals at Waymo or Lyft responsible for negotiating or conducting due diligence relating to the "deal" between Waymo and Lyft are relevant to Waymo's delay in bringing suit and seeking injunctive relief against Defendants, which could bar injunctive relief.  Moreover, Waymo has propounded its own request seeking documents sufficient to show all persons other than Uber that negotiated with Ottomotto or Otto Trucking regarding a potential acquisition.  (*See* Waymo RFP 88.)

- **RFP 156:** Documents sufficient to identify the first date that Waymo began discussion of any potential agreement with Lyft are relevant to Waymo's delay in bringing suit and seeking injunctive relief against Defendants, which could bar injunctive relief.

Best regards,

**Esther Kim Chang**
Morrison & Foerster LLP
425 Market St. | San Francisco, CA 94105
Tel: (415) 268.7562 | Fax: (415) 276.7308

EChang@mofo.com | www.mofo.com

===========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email.

===========================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email.