Pages 1 - 60

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Magistrate Judge

| | | |
|---|---|---|
| WAYMO LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. C 17-00939 WHA (JSC)** |
| | ) | |
| UBER TECHNOLOGIES, INC.; OTTO | ) | |
| TRUCKING LLC; and OTTOMOTTO | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Friday, June 23, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
>               QUINN, EMANUEL, URQUHART, OLIVER
>                  & SULLIVAN LLP
>               50 California Street - 22nd Floor
>               San Francisco, California  94111
>     BY:  **CHARLES K. VERHOEVEN, ATTORNEY AT LAW**
>          **DAVID A. PERLSON, ATTORNEY AT LAW**
>          **LINDSAY COOPER, ATTORNEY AT LAW**

For Defendants:
>               MORRISON & FOERSTER LLP
>               700 Wilshire Boulevard
>               Los Angeles, California  90017
>     BY:  **SYLVIA RIVERA, ATTORNEY AT LAW**
>          **SARAH N. DAVIS, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
>               Official Reporter

**APPEARANCES**:   (CONTINUED)

For Defendants:
                          BOIES SCHILLER FLEXNER LLP
                          1401 New York Avenue NW
                          Washington, D.C.  20005
                   BY:  **KAREN L. DUNN, ATTORNEY AT LAW**
                        **MARTHA L. GOODMAN, ATTORNEY AT LAW**

For Defendant Otto Trucking LLC:
                          GOODWIN PROCTER LLP
                          135 Commonwealth Drive
                          Menlo Park, California  94025
                   BY:  **I. NEEL CHATTERJEE, ATTORNEY AT LAW**


Also Present:          **John L. Cooper, Special Master**

<u>**Friday - June 23, 2017**</u>                                   <u>**10:00 a.m.**</u>

**P R O C E E D I N G S**

---oOo---

    **THE CLERK:**  Calling Civil Action C 17-0939, Waymo versus Uber.

    Counsel, please come up to the podium and state your appearance.

    **MR. VERHOEVEN:**  Good morning, Your Honor.  Charles Verhoeven of Quinn Emmanuel, and with me is David Perlson and Lindsay Cooper on behalf of Waymo.

    **THE COURT:**  Good morning.

    **MS. DUNN:**  Good morning, Your Honor.  Karen Dunn and Martha Goodman from Boies, Schiller & Flexner on behalf of Uber and Ottomotto.

    **THE COURT:**  Good morning.

    **MS. RIVERA:**  Good morning, Your Honor.  Sylvia Rivera and Sarah Davis of Morrison & Foerster on behalf of Uber and Ottomotto.

    **THE COURT:**  Good morning.

    **MR. CHATTERJEE:**  Good morning, Your Honor. Neel Chatterjee of Goodwin Procter on behalf of Otto Trucking LLC.

    **THE COURT:**  All right.  Good morning.

    **MR. COOPER:**  Good morning, Your Honor.  John Cooper, special master.

1          **THE COURT:**  Good morning, Mr. Cooper, and as always,

2    thank you.

3       So this is on for a motion regarding Uber's privilege log

4    in response -- the privilege log as produced in response to

5    Judge Alsup's March 16th order.

6       My first question, I guess, for Uber -- I don't know who's

7    going to be speaking -- is the log, I think, begins on

8    March 11th, 2016.  So is it correct, then, that nothing

9    responsive is being withheld as privilege prior to that date?

10         **MS. RIVERA:**  Yes, Your Honor, that's correct.

11         **THE COURT:**  Okay.

12      All right.  So let's start with I think the category would

13   be those entries that show communications between Uber and MoFo

14   and that were not then shared with anyone else.  Normally those

15   would be attorney-client privileged and work product as well.

16      And as I understand Waymo's argument here, the argument is

17   that the crime fraud exception applies; is that correct?

18         **MR. VERHOEVEN:**  That's correct, Your Honor.

19         **THE COURT:**  All right.  So this is my -- I'll give you

20   my tentative view, and then you can respond.

21      As I understand it -- and this is the *Napster* case of the

22   Ninth Circuit -- to find that the crime fraud exception

23   applies, I'd have to find that the client -- and that would be

24   Uber -- was engaged in planning -- engaged in or planning a

25   criminal and a fraudulent scheme when it sought MoFo's

1   advice -- which was, I believe, in January of 2016 -- and that

2   scheme, as alleged by Waymo, was to receipt of stolen property;

3   and that the attorney-client communications for which

4   production is sought are sufficiently related to and were made

5   in furtherance of that scheme as alleged by Waymo of receipt of

6   stolen property.

7        The evidence that Waymo points to here is the evidence, as

8   Judge Alsup found, that Mr. Levandowski took approximately

9   14,000 files from Uber and evidence that Uber likely knew that

10  Levandowski had taken some material.

11       Based on that and my review of documents in camera, and

12  everything, I don't find that Waymo has met its burden by a

13  preponderance of the evidence, and I wouldn't find that the

14  crime fraud exception applies here.

15            MR. VERHOEVEN:  Would you like me to address that?

16            THE COURT:  If you want to.  It's up to you.

17            MR. VERHOEVEN:  The essence of what we're saying here

18  is that if you are aware that someone has stolen files and you

19  come into possession of those stolen files, it is a crime to

20  continue to conceal that from the competitor and to work with

21  the person -- in this case Mr. Levandowski who's taken the

22  Fifth -- to continue either to destroy or hide that evidence or

23  maintain it in some confidential way.

24            THE COURT:  Well, what you alleged in your letter was

25  that it was the crime of receipt of stolen property.  It wasn't

1    some obstruction.  That's what you alleged.  And so what is the

2    case that shows that the facts here would constitute receipt of

3    stolen property such that -- I mean, you're not claiming --

4    somebody could go to a lawyer and provide the documents to a

5    lawyer and the crime fraud exception wouldn't apply.

6              **MR. VERHOEVEN:**  It would if they gave stolen documents

7    to the lawyer.

8              **THE COURT:**  To their own lawyer?

9              **MR. VERHOEVEN:**  Yes.

10             **THE COURT:**  No, it would not.

11             **MR. VERHOEVEN:**  Under --

12             **THE COURT:**  No, it would not.  No, it would not.  That

13   would completely eviscerate the whole purpose of the

14   attorney-client privilege if you couldn't go to your lawyer and

15   give them documents that you had stolen.

16             **MR. VERHOEVEN:**  Well --

17             **THE COURT:**  How would you even seek any advice, then,

18   from a lawyer about that?  The law does not preclude one who is

19   guilty of seeking advice from a lawyer.

20             **MR. VERHOEVEN:**  The attorneys have an ethical

21   obligation -- this is -- we cited *Lynn versus Gateway Unified*

22   in our brief, I think -- to return stolen materials if they

23   come into possession of them.

24             **THE COURT:**  And so that is a crime if they don't?

25   This is the crime fraud exception.  This is the crime fraud

1    you're asking me.

2        These particular e-mails that you're seeking, they're such

3    as the same as you've had with your client.  They are the heart

4    of the attorney-client privilege, the heart of it, that you are

5    asking me to produce.  So you're going to have to -- and the

6    burden is on you to show by a preponderance of the evidence.

7        So what is the case that would show that this would be a

8    crime that it's -- and it has to be, under Ninth Circuit law,

9    the communications, right, that Uber sought MoFo's advice for

10   the purpose of receiving stolen property?

11       **MR. VERHOEVEN:**  We're saying that they sought their

12   advice in how to look at that stolen property, to figure out

13   how to deal with it, and they continued to maintain its

14   secrecy.

15       **THE COURT:**  Okay.  And I'm saying I reviewed in camera

16   the due diligence report, and I don't find that.

17       **MR. VERHOEVEN:**  Well, this log, Your Honor -- just

18   I'll sit down in a second --

19       **THE COURT:**  That's okay.

20       **MR. VERHOEVEN:**  -- but this log, Your Honor, I would

21   just note, initially virtually every single entry on the log

22   said it concerned the due diligence report.  They changed the

23   descriptions now, after they started losing things, in their

24   updated logs; but their first logs said everything on the logs

25   concerned the due diligence investigation, which Your Honor has

ruled is waived.

And in defendants' -- or, excuse me -- Uber's opening opposition -- or opposition letter, Uber says that the Court's order required defendants to produce not only any stolen documents they have, which we're saying they haven't done, but it's also to produce any documents that afford, use, refer to any parts of that downloaded material.

And they state in their opposition that Uber looked for documents connected to the attorney-directed due diligence process to see if such documents referred to any document that could possibly fall within the Court's order.  Where a privileged document referred to Google information or material that one of the three employees may have had in their possession, it was identified in the log.

And so we think that that material is fair game, both under the client fraud and under your Court's prior rulings.

**THE COURT:**  I don't know that the standard is fair game.  The standard is you have to prove by a preponderance of the evidence that Uber was consulting and seeking the advice of MoFo in furtherance of a scheme to receive stolen property.

Now, as I found in my order, what the due diligence report was about, as I found, was that they were -- in order to evaluate whether to acquire Otto, that they were doing an investigation into Mr. Levandowski and Otto, including whether he had taken any documents, but that's not a crime fraud

 1  exception and you're not arguing that.

 2       And the other purpose I found was to create an evidentiary

 3  record should an indemnification obligation arise.  That's not

 4  a crime fraud exception.

 5       So I'm not -- I guess I'm disagreeing with your inference

 6  that there's any evidence that they consulted MoFo in order to

 7  receive stolen property.

 8            **MR. VERHOEVEN:**  Well --

 9            **THE COURT:**  That was the purpose -- that that was the

10  purpose, it was in furtherance.  That's the language straight

11  from *Napster*, that the communications were in furtherance of

12  that scheme.

13            **MR. VERHOEVEN:**  I think, Your Honor -- and, again,

14  I'll try to keep this brief because I know we have a lot of

15  things to do -- I think that if you look at the Penal Code

16  statute we cited, 496(a), it talks about receiving property but

17  it also says it's a crime to aid in the concealing of any

18  property from the owner.  It's right there in the statute.

19       And so receipt is not -- receipt, which we believe has

20  happened, that they actually have through their agents --

21  through MoFo, through Stroz -- received stolen property; and we

22  contend that rather than turning it over or telling them to

23  return it, they helped Levandowski keep it confidential through

24  their conduct at the time and through their conduct in this

25  case.

1    But, in addition, we believe that at a minimum they aid in

2  withholding that information from Google.  The Court,

3  Judge Alsup, has already found compelling evidence that

4  Levandowski downloaded over 14,000 files --

5           **THE COURT:**  I said I accept that fact.

6           **MR. VERHOEVEN:**  -- and that Uber likely knew, or at

7  least should have known, that Levandowski had taken those.

8           **THE COURT:**  I accept that fact as well.

9           **MR. VERHOEVEN:**  He also found that Levandowski has

10  broadly asserted his Fifth Amendment privilege and troves of

11  likely probative evidence had been concealed from Waymo under

12  relentless assertions of privilege that shroud dealings between

13  Levandowski and defendants in secrecy.

14           **THE COURT:**  Yes, this is Uber's consulting MoFo in

15  furtherance of a crime.  Uber consulting MoFo.

16           **MR. VERHOEVEN:**  I understand.

17           **THE COURT:**  Let me here hear -- it was Ms. --

18           **MS. GOODMAN:**  Goodman.

19           **THE COURT:**  Ms. Goodman.

20           **MS. GOODMAN:**  Thank you, Judge.

21    I want to start with the fact that -- to refocus

22  everybody's attention on what we're here about.

23    Mr. Verhoeven and Waymo has made arguments in their briefs

24  that we're here about -- over logs of stolen files, and

25  Your Honor has correctly identified that's not why we're here.

1    Uber took extensive efforts to locate documents that could

2    potentially refer to any material that belongs to Google.

3    Reference to material, that is a very broad order from

4    Judge Alsup; and so because the parties had done this due

5    diligence, we look to those materials to see if any could be

6    possibly responsive to the judge's March 16th order, and that's

7    what we logged.

8         And Your Honor is absolutely correct that under *In Re*

9    *Napster*, the standard that Waymo has to prove is by a

10   preponderance of the evidence, that Uber's consulting of MoFo

11   furthered some ongoing crime.  And all they're pointing to is

12   Uber's attempts in this litigation to protect its fundamental

13   legal privileges.

14        And, in fact, all the evidence shows that Uber is doing

15   all that it can to make Levandowski return anything that

16   belongs to Google.  Uber made very clear to him not to bring

17   anything belonging to Google to Uber.  Ottomotto made very

18   clear to him not to bring anything to Ottomotto.

19        And Uber has conducted extensive searches of its servers

20   and files for these 14,000 files and has found nothing.  And so

21   all evidence is Uber does not even possess these 14,000 files,

22   and there's no evidence that Waymo can point to that Uber

23   consulted MoFo to further any ongoing crime.

24        You know, we're here defending our fundamental legal

25   privileges in court, and that's our right to do; and we've

1  respected the Court's rulings and people are working around the

2  clock to both locate these files, to the extent they exist at

3  Uber, and we're working to comply with the Court's standing

4  orders about privilege logs and to attempt to satisfy Waymo's

5  request with respect to revisions to our privilege logs, and

6  that's not evidence of any crime.

7         THE COURT:  All right.  Anything further?

8         MR. VERHOEVEN:  Just briefly.

9     The record evidence shows that MoFo has downloaded

10  documents or has documents.  Mr. Gonzalez stated in the press

11  that the firm still has the files in question, and --

12         THE COURT:  Right.  Right.  But they -- but there's an

13  inference to be drawn that they were provided to them as part

14  of the due diligence related to the purchase of Otto.  I don't

15  know how I can find by a preponderance of the evidence that's

16  in furtherance of the crime of receipt of stolen property.

17         MR. VERHOEVEN:  Well, I think that it's totally

18  improper for someone to maintain in their possession,

19  notwithstanding a court order, documents from the plaintiff.

20         THE COURT:  Okay.  All right.  Well, that's the

21  argument you've made to Judge Alsup in your Order to Show

22  Cause.

23     So I do not find that the crime fraud exception applies,

24  so I'm not going to order those documents, which are just

25  between Uber and MoFo, to be produced.

```
 1          Now, I do have one question with respect to the log, and
 2     this maybe is Ms. Rivera because she submitted the declaration.
 3          For example, with Docket Entry Number 107, you say that
 4     was actually shared with the joint defense team prior to
 5     April 11th so that ultimately, if Judge Alsup's decision is
 6     appealed and it's affirmed, that you're prepared to produce
 7     that.  But when I look at Entry Number 107, I don't see
 8     anything on there that would indicate at all that it had been
 9     shared.
10          MS. RIVERA:  Sure, Your Honor, and if you can give me
11     a moment to locate that specific entry.
12          THE COURT:  Sure.
13                    (Pause in proceedings.)
14          MS. RIVERA:  Your Honor, are you referring to a
15     specific paragraph in the declaration?
16          THE COURT:  17.
17                    (Pause in proceedings.)
18          MS. RIVERA:  Your Honor, so I might need a little bit
19     more time to chase down the particulars with respect to that,
20     but I believe that that document is a document that exists
21     elsewhere in the log, and that was circulated --
22          THE COURT:  Well, let me read what you said in your
23     declaration.
24          MS. RIVERA:  Right.
25          THE COURT:  (reading)
```

1          "Entry 107 on Smith declaration Exhibit 1," which is

2     Uber's log, "is an updated version of the questionnaire,

3     which was subsequently circulated to the joint defense

4     team.  So if the order becomes final, this version would

5     be produced in full."

6          **MS. RIVERA:**  Actually, I reverse what I said.  It's

7     not that it was circulated earlier.  It's that it subsequently

8     was circulated to the joint defense team.  So they would get a

9     copy of this as it exists when it was circulated to the joint

10    defense team.

11         **THE COURT:**  Yeah, but my question is:  There's nothing

12    on this log that reflects it was circulated; right?  And so my

13    concern is that there are other entries on here and there's no

14    way for Waymo or anyone reviewing this to know that the log

15    itself is inaccurate.

16         Where is an entry on here?  If it was subsequently

17    circulated, there should be an entry on here for it; right?

18         **MS. RIVERA:**  And there may well be, Your Honor.

19    Certainly if it was subsequently circulated and we have the

20    record of it being circulated, it absolutely would be on the

21    log.

22         **THE COURT:**  But, Ms. Rivera, you submitted a

23    declaration -- I'm just going to push you -- you submitted a

24    declaration to me.  What was the basis for your statement in

25    this declaration?  I just can't believe that you don't know.

1    You signed this declaration.

2         **MS. RIVERA:**  Sure.  We investigated this specific

3    document, Your Honor, and concluded that it was circulated to

4    the joint defense group.  I can't say for certain where that's

5    located on the log, but I know that when they raised this

6    issue, we looked into it specifically and it was subsequently

7    circulated, and that's why we would be producing it.

8         **THE COURT:**  Okay.  I have to tell you, see, this isn't

9    good enough.  See, the problem is, what their concern is --

10   which this concern I understand -- is that there may be other

11   documents on here.  Maybe they were just shared in a meeting or

12   something, I don't know, but there's nothing on the log that

13   indicates that.  And I don't -- I can't have any confidence

14   that the log is accurate, especially when you can't even tell

15   me standing here now where this statement came from on 17.

16        But maybe Mr. Verhoeven or maybe one of your colleagues

17   can tell me, whoever knows best, who you prefer can tell me why

18   this concern was even raised by Waymo.

19        Oh, Mr. Smith is not here, is he?

20        **MR. VERHOEVEN:**  No.

21        **THE COURT:**  And neither of you know.  Maybe no one

22   here knows.

23        **MR. VERHOEVEN:**  The general concern is that there's

24   documents that say "CI" -- I think this is the issue you're

25   talking about -- common interest, and we have no -- they've

admitted, basically, that there's errors where they've asserted
common interest -- well, let me put it this way:  They said
common interest, but they're still withholding them even though
they still say common interest.

And they've admitted that there's errors with respect to
that, and so they're withholding documents that they said were,
basically implied on their log, were sent to other people,
they're still withholding them even if -- even under the
initial order of Your Honor on the motion to compel the due
diligence materials, and so we --

**THE COURT:**  Oh, wait.  I think I understand.

So the concern is if it was logged initially as common
interest, which this Court has ruled it's not a privilege,
which means that it wasn't waived, that implies that the
document was shared with someone other than just Uber and MoFo.

**MS. RIVERA:**  So if I can respond to that, Your Honor.

Not necessarily.  So to the extent Uber and its counsel or
Uber's counsel alone are talking to each other and the subject
matter of what they are discussing includes some information
that was acquired as a result of that information being shared
to them pursuant to the joint defense agreement, that is a
communication that would be logged as an attorney-client
communication, possibly also work product, but also common
interest to the extent that some portion of that communication
did include information that was acquired pursuant to -- you

1  know, under the protections of the joint defense agreement.

2         **THE COURT:**  Okay.  I'm not sure I agree -- I mean,

3  agree with necessarily that you would need that.

4      I mean, if Uber is talking to itself, there's no waiver

5  there; and if Uber is talking to MoFo, there's no waiver there.

6  So it doesn't matter what they're talking about or where the

7  information came from, and so I think what the confusion is

8  coming from is that you identified it as "CI."

9         And so what maybe they need to do is go through and remove

10  the "CI" from those entries where the document was not actually

11  shared with anyone outside of Uber and MoFo.

12         **MS. RIVERA:**  Sure, Your Honor.  And it definitely is

13  the case that we addressed the CI privilege in instances where

14  it was not necessary to establish a privilege.  And, in fact,

15  there are, I think, upwards of 2,000 communications or

16  documents on the log that are privileged irrespective of the

17  common interest issue because they are communications just

18  between or among, you know, Uber or its counsel.

19         **THE COURT:**  All right.

20         **MS. RIVERA:**  And we could absolutely go through --

21         **THE COURT:**  Right.

22         **MS. RIVERA:**  -- in fact, we will have to go through

23  all of these for purposes of producing, you know, certain of

24  them.

25         **THE COURT:**  Correct.

1          **MS. RIVERA:**  And I think Your Honor's guidance is,

2    from my perspective, of course spot on in terms of how we could

3    address that issue.

4          **THE COURT:**  Right.  And then you'll get it and you'll

5    see where it's been eliminated; and then you're going to have

6    to give them -- and you can do it through Mr. Cooper -- an

7    explanation as to if it was shared, why isn't that entry

8    otherwise on the log; or if it is, identify the entry that's

9    there -- right? -- so that we can be sure that it's accurate.

10   Does that make sense?

11         **MS. RIVERA:**  Yes, Your Honor.

12         **THE COURT:**  Okay.  All right.

13         **MR. VERHOEVEN:**  So just briefly to respond to that,

14   this is just one example of many, and we've been asking for

15   this log repeatedly and it's still very deficient.  I mean, the

16   descriptions are just a global that they put on all the

17   different descriptions, Your Honor.  They don't tell us enough

18   information to know what the documents are they're talking

19   about.  They don't -- there's agreements where they don't even

20   identify any authors or addressees.  It doesn't meet their

21   burden of proof.  There's --

22         **THE COURT:**  Well, Ms. Rivera addressed that in her

23   declaration, and I thought -- with the exception of this one

24   issue, which I didn't understand, I found what she had said was

25   persuasive.  So if you want to address why it's not.

1          **MR. VERHOEVEN:**  Well, for example, I don't think it's

2     sufficient not to identify addressees or creators or people who

3     received the document.

4          **THE COURT:**  Well, with respect to the authors, what

5     she said is where there are not, it's because they couldn't

6     identify any author.

7          **MR. VERHOEVEN:**  Did they look at the metadata?

8          **THE COURT:**  That's exactly what she says in her

9     declaration.

10         **MR. VERHOEVEN:**  Well, if they can't identify the

11    author, how is it privileged?

12         **THE COURT:**  Well, because if it came from MoFo or the

13    recipients.  Why don't you point to what in her declaration you

14    find is unpersuasive?

15         **MR. VERHOEVEN:**  Well, what we find is what we've said

16    in our briefs, Your Honor, and that is -- there's a whole list

17    of things.  For example, the subject matter -- taking a step

18    back, we're talking about a period of time that's less than a

19    year.  It's before any litigation has been instigated and

20    they're withholding over 3,000 documents, Your Honor.  I've

21    never seen anything like this.

22         And they're saying, "Trust us.  Trust us.  Trust us," and

23    we're getting these logs that are just generated by computer

24    that have the same description on them such that we can't tell

25    what they are.

 1          And, you know, we -- it's very hard for us to go through

 2   and explain all the inaccuracies because we don't have the

 3   documents; but when we do get documents, we find inaccuracies.

 4          So when --

 5              THE COURT:  You found a few.

 6              MR. VERHOEVEN:  We've only been given a few.  The few

 7   we've been given had inaccurate descriptions, Your Honor.  If

 8   we -- you know, if someone looked at it in camera, maybe there

 9   could be a review to see if these are even accurate; but given

10   the course of conduct here with these logs and just the mere

11   fact that there's over 3,000 items and that --

12              THE COURT:  How many e-mails are there between you and

13   your client in this litigation?  I wouldn't be surprised if

14   there are 3,000.

15          During this period, they were deciding whether to acquire

16   Otto for millions and millions of dollars.  They had this

17   elaborate due diligence that was going on.  I mean, that

18   doesn't surprise me in the least that there are those numbers

19   of e-mails.  I don't know what inference I'm supposed to draw

20   from that.

21              MR. VERHOEVEN:  I've never seen it in my career,

22   Your Honor.  This is prelitigation communications.

23          But, in any event, when we do get things, we find out that

24   they're wrong.

25              THE COURT:  Well, there were a couple that were

 1  pointed out to them, and they explained.  There were a couple.

 2  Okay.  That's to be expected in such a large log that was

 3  produced in a pretty short period of time.

 4          **MR. VERHOEVEN:**  That there's errors?

 5          **THE COURT:**  I have the declaration in front of me that

 6  she submitted in response to your motion.  If you want to

 7  identify something in particular that you think is not credible

 8  or persuasive, I can address it.

 9          **MR. VERHOEVEN:**  Well, the use of "and/or."  You know,

10  she comes back and picks on -- you know, we can't -- with the

11  number of pages we have in this letter briefing, we can't go

12  through and highlight every single entry, Your Honor, so we

13  picked some examples.  And, you know, there's excuses for every

14  single one of them, but there's no question that use of

15  "and/or" is not appropriate.  You have to identify who it is,

16  not it could be this person or that person.

17      You know, there's plenty of instances where they --

18          **THE COURT:**  So what she responded is they heard your

19  objection.  You met with the special master, which is what the

20  process is supposed to be.  They revised them.  That now those

21  you object to are those that are just within Uber and MoFo.  So

22  what does it matter?

23          **MR. VERHOEVEN:**  I'd have to go back and look through

24  the whole log.  That's the kind of thing that is -- we've been

25  dealing with, is we constantly are finding issues with this

1    log; and through the vehicle of withholding so many documents,

2    we can't figure out.  We have grave concerns that they're

3    withholding documents that aren't privileged, and --

4         **THE COURT:**  Like what?

5         **MR. VERHOEVEN:**  Like, for example, documents that have

6    attachments that may be completely nonprivileged where they

7    don't even identify the attachment.

8         **THE COURT:**  They said they've gone through and that

9    all those have been identified.  They said they have not

10   withheld any attachment merely because it was sent to an

11   attorney.

12        **MR. VERHOEVEN:**  I read what they're saying is if

13   there's a cover page that they allege is privileged and there's

14   an attachment to it that's not privileged and they haven't

15   otherwise produced it, they don't produce it.

16        **THE COURT:**  Okay.  Well, let me ask Ms. Rivera.

17        **MS. RIVERA:**  So if there is an attachment that if it

18   existed separately and independent of the cover e-mail, it

19   would be not privileged; that is an attachment that would exist

20   in the privilege logs from the period before April 11th, 2016,

21   and would be produced when it was attached to the, you know,

22   nonprivileged parent e-mail, yes.

23        **THE COURT:**  Well, I guess I -- if there is -- are you

24   saying that if the Court's order is affirmed, that it will

25   be -- I don't understand.

1          **MS. RIVERA:**  Sure.  So let's say we're talking about

2     the, you know, negotiation of the engagement letter with Stroz,

3     which was before April 11th.  Where that engagement letter

4     exists on our privilege log as an attachment to e-mails that

5     were exchanged on April 11th or earlier among the joint defense

6     group, that would be produced as attachments to those

7     nonprivileged cover e-mails.

8          But let's say where in July or August, let's say there's

9     an exchange between someone at MoFo and someone at Uber about

10    some topic and they reattach the engagement letter.  We would

11    not produce the engagement letter yet again for the third time

12    and redact the cover e-mail.  At least that's not our present

13    intention, Your Honor.

14         **THE COURT:**  You mean provided it had previously been

15    produced?

16         **MS. RIVERA:**  Correct.

17         **THE COURT:**  At this time it hasn't been produced.

18    That's your intention.

19         **MS. RIVERA:**  Correct.  Yeah.

20         **MR. VERHOEVEN:**  Our concern is what if they -- what if

21    something exists that's clearly not privileged, it's clearly --

22    say it's a document just like she's talking about, but the only

23    place it exists is an attachment to one of these letters?

24         **THE COURT:**  Then it gets produced.

25         **MR. VERHOEVEN:**  I didn't hear that.

1          **THE COURT:**  But I don't even know what it would be,

2     though.   I guess, what would it be?

3          **MR. VERHOEVEN:**  Documents get lost.   Sometimes when

4     you do document review, you find documents that only exist as

5     an attachment to an otherwise privileged cover letter, and the

6     document itself is not privileged.

7          **THE COURT:**  Okay.  Are you going to be withholding

8     anything that is itself not privileged merely because it was

9     forwarded to an attorney even if you can't find an earlier --

10         **MS. RIVERA:**  If it has not been produced previously,

11    Your Honor, then, yes, we would need to produce it in the state

12    in which it's in.  Even though if it was attached to an e-mail

13    between, you know, Uber and MoFo, we would need to produce that

14    document if it hasn't already been produced from the

15    pre-April 11th period if it's a nonprivileged document.

16         **THE COURT:**  They agree with you.

17         **MR. VERHOEVEN:**  All right.  Well, that wasn't clear to

18    us and that's why we raised that, Your Honor.

19         **THE COURT:**  Okay.  That's fine.

20      Okay.  All right.  So I think that takes care of the

21    documents within MoFo.

22      Now, the next thing we have is sort of this date of

23    April 11th, and my question first to Uber is:  Is the

24    representation to the Court that the put-call agreement was

25    signed on April 11th?

1          **MS. GOODMAN:**  Yes, Your Honor, that's our

2  representation.

3          **THE COURT:**  Okay.  And at what time?  You don't know?

4          **MS. GOODMAN:**  I wanted to confer with my colleagues.

5  We have looked into this.  It was very late in the day.  We

6  think sometime -- I think it was after 5:00 p.m.

7          **THE COURT:**  Okay.  All right.  So everything -- so

8  what I want to do is, for those communications from

9  April 11th -- on April 11th that were shared with someone other

10  than between Uber and MoFo, I would like to review them in

11  camera.

12     Rightly or wrongly, I've drawn this distinction between

13  the interests the parties had and their adversity before or

14  after that put-call agreement.  While you disagree with that,

15  you have an alternative argument that really hinges on the

16  signing, and so I need to review those.

17     Because I think if -- well, let me ask you something else.

18  Where on the log is the interim report -- this is in my order,

19  so this is all public -- the interim report that Stroz provided

20  to MoFo prior to the signing of the put-call agreement?  Where

21  is that on the log?

22          **MS. RIVERA:**  Your Honor, I would need to confer with

23  one of my other colleagues who's a little more familiar with

24  the granular details on the log.

25          **THE COURT:**  Who's not here?

1    **MS. RIVERA:**  She is here.  I'm not sure that she has

2    the information at the ready.  It might need to be accessed by

3    computer, but I can ask.

4        **THE COURT:**  Okay.  All right.  Well, I want you to

5    file today, if you can -- please write me a letter with a copy

6    to counsel and identify where on the log that is.

7        **MS. RIVERA:**  The interim report with Stroz?

8        **THE COURT:**  Yes.  I think you should specifically

9    identify that.  It's not a secret anymore.  I mean, what's in

10   it is because that has not finally been ordered produced; but

11   that there was one, I need -- I mean, do you know what day it

12   was?

13       It's not clear to me that it was even on April 11th;

14   right?  That it was done before while they're deciding whether

15   to actually pull the trigger on this thing; right?

16       **MS. RIVERA:**  Sure.  I believe the interim report was

17   before April 11th, and I can confer with my colleagues and get

18   that answer to Your Honor today.

19       **THE COURT:**  Okay.  All right.

20       So that's what -- I would like to see those in camera but,

21   of course, that all needs to show Mr. Verhoeven; that -- I'm

22   inclined to find no waiver once the put-call agreement is

23   signed.

24       And let me give you some of my reasoning.  If the

25   acquisition had never consummated, Uber would still have an

1   indemnification obligation to Mr. Levandowski, Ottomotto,

2   Otto Trucking.

3       And let's say Waymo sued them for misappropriation of

4   trade secrets, which I assume they would if they discovered

5   what they discovered, and Uber would be obligated to indemnify.

6   If I accept your position, Uber and Mr. Levandowski could not

7   share privileged information in defense of that action because

8   the acquisition will have never consummated.  That seems to me

9   hard to swallow.

10      **MR. VERHOEVEN:**  Well, Your Honor, a couple of things.

11  I'm not sure how really to respond to what you just said, but

12  I'll try.

13      First of all, the put-call doesn't create any obligations.

14  Section 1.1 and 1.2.

15      **THE COURT:**  It creates a unilateral obligation.  It's

16  like an exclusive option, isn't it?  That's why it's a

17  put-call.  Uber can pull the trigger.  Otto can pull the

18  trigger.  Isn't that right?

19      **MR. VERHOEVEN:**  I have -- it's very complicated to

20  walk through the different definitions or whatever.  I have

21  something I can hand up that just has the relevant pages, if

22  that would be helpful.

23      **THE COURT:**  Okay.

24      **MS. GOODMAN:**  Mr. Verhoeven, is this excerpts from the

25  agreement --

1          **MR. VERHOEVEN:**  Yes.

2          **MS. GOODMAN:**  -- or is this a summary?

3          **MR. VERHOEVEN:**  Yes.  Here's a copy.

4          **MR. CHATTERJEE:**  May I get a copy too, Your Honor?

5          **MR. VERHOEVEN:**  Oh, sure.

6          **MS. GOODMAN:**  Your Honor, I wanted to briefly respond

7   to some arguments that were mentioned previously about just the

8   sheer volume of communications that Your Honor identified.

9          Of course, lawyers send e-mails back and forth to their

10  clients, and Mr. Verhoeven's -- you know, lawyers send e-mails

11  saying, "Here's a draft.  Here's what I recommend you do.

12  Here's me getting back to your question.  Here's my advice."

13  There's nothing extraordinary about that.

14          **THE COURT:**  I know.  That's what I said.

15          **MS. GOODMAN:**  Yeah.  Okay.

16          **MR. VERHOEVEN:**  If you look at, for example, the first

17  page, page 2.  And we've provided some highlighting.  That's us

18  that provided the highlighting, Your Honor.  In Section 1.1,

19  you can see that there's no conditions, no obligation on the

20  purchaser.  And if you look at 1.2, again, there's no

21  obligations, no conditions.  For any reason whatsoever, the

22  company can cancel everything.

23          And so this is similar to the term sheet, which was

24  nonbinding.  And Your Honor, previously when looking at the

25  term sheet, noted that it was nonbinding is a major reason for

1   finding that the parties' interests weren't aligned.

2        THE COURT:  But I don't understand.  I thought this

3   was more like an option.

4        MS. GOODMAN:  Your Honor, may I respond?

5        THE COURT:  Yeah.  Isn't it that one side can make the

6   other?

7        MS. GOODMAN:  Exactly.  That's precisely correct.

8        MR. VERHOEVEN:  But they haven't done so.

9        THE COURT:  What do you mean?

10       MR. VERHOEVEN:  As of the date of this, their option

11   has not been exercised?

12       THE COURT:  How is it any different from *Rembrandt* --

13   from Judge Alsup's decision in *Rembrandt*?

14       MR. VERHOEVEN:  Well, Judge Alsup's decision on

15   *Rembrandt* is distinguishable on another important basis,

16   Your Honor, and that is the alleged common interest was

17   actually a common interest.

18       THE COURT:  Okay.  That's different.  I'm focusing on

19   the argument you're making to me now, which is different, which

20   is that you're saying it wasn't certain enough; and in

21   *Rembrandt* it was an exclusive option, which seems to me

22   indistinguishable from this, so focus on that.

23       MR. VERHOEVEN:  It was over one patent.  This is an

24   entire deal.

25       THE COURT:  Okay.  I don't know why that matters.

1      Okay.  So I --

2          MR. VERHOEVEN:  The same argument would apply to the

3  term sheet then.  I mean, they weren't --

4          THE COURT:  The term sheet wasn't -- well, if you want

5  me to go back and reconsider that, I will.

6          MR. VERHOEVEN:  I don't --

7          THE COURT:  Okay.

8          MR. VERHOEVEN:  -- but I don't see a distinction

9  between the two is what I'm saying.

10         THE COURT:  Oh, well, maybe I should reconsider it

11 because I see a big distinction between the two.

12         MR. VERHOEVEN:  Okay.

13         THE COURT:  The term sheet created no obligation,

14 no -- on either party.  No -- the term sheet -- except for a

15 few things, which are irrelevant, neither party could make --

16 either party do this.  Ottomotto could make Uber acquire it

17 provided certain conditions were met or not met.

18         MR. VERHOEVEN:  If it exercised the option, yes.

19         THE COURT:  If it did, yes.

20         MR. VERHOEVEN:  Right.

21         THE COURT:  But that's what an option is.  That's what

22 an option is.

23         MR. VERHOEVEN:  Well, we think that that -- that until

24 such time as that's exercised, there's nothing binding on

25 either party.

1          **THE COURT:**  What about the indemnification agreement?

2          **MR. VERHOEVEN:**  The indemnification agreement has a

3    specific carve-out for the very thing that's happened, which is

4    if there's a conflict of interest between Levandowski -- are

5    you talking about between Levandowski?

6          **THE COURT:**  Well, yes.  Well, and Otto as well.

7          **MR. VERHOEVEN:**  Yeah.  Otto doesn't have any

8    obligations whatsoever with respect to the indemnification

9    agreement, Your Honor.  There's nothing --

10         **THE COURT:**  Well, aren't they indemnified?  I guess it

11   doesn't matter because they got -- well, if they had not been

12   acquired --

13         **MR. VERHOEVEN:**  They had not been acquired.

14         **THE COURT:**  If they had not been acquired and they had

15   been sued by your client, Uber in its wisdom agreed that they

16   would indemnify them; right?

17       So if you could answer my first question --

18         **MR. VERHOEVEN:**  Okay.

19         **THE COURT:**  -- which was let's assume no one ever

20   pulls the trigger.  The acquisition doesn't happen.  You sue

21   Otto and Levandowski and Otto Trucking.  Uber's indemnifying

22   them.  Under your reasoning, aren't you saying, then, that

23   there's no common interest, they can't share any privileged

24   material with each other without waiving it, waiving a

25   privilege?

1          **MR. VERHOEVEN:**  Well, I'm saying that there's

2     provisions in this -- in all of this that excepts out very

3     carefully the very situation you're talking about.  So in the

4     indemnification with Levandowski, he can simply declare there's

5     a conflict of interest, which there is in this exact situation,

6     and there's no indemnification obligation.  He can hire his

7     own -- he has to hire his own attorney and proceed in his own

8     way.

9          And the agreements themselves, Your Honor, for example, if

10    you look at Section 6 on page 32, it lists certain conditions.

11    Do you see that, Your Honor?

12          **THE COURT:**  Yes.

13          **MR. VERHOEVEN:**  And then if you turn to the next page,

14    6.12, this is -- you have to go back and look at all the

15    definitions, but basically what this is saying, if you go back

16    and look at all the definitions, is that a condition that

17    would -- is material here is basically that Waymo had -- I

18    don't know if I can say it because it's confidential.

19          **THE COURT:**  No, I see that.  But isn't this talking

20    about the merger and not the indemnification agreement -- the

21    indemnification obligation?  Am I not reading this correctly?

22          **MR. VERHOEVEN:**  This is condition precedent of the

23    merger, yes, Your Honor.

24          **THE COURT:**  Yeah, no, I understand that, there were

25    conditions, but my question was about the indemnification

```
 1  obligation.

 2        MR. VERHOEVEN:  Right.  You can have an

 3  indemnification obligation but just like if you have a merger

 4  agreement, you need to look at the specific issue that is

 5  before the Court, which here is the issue of the allegation by

 6  Waymo that Levandowski stole these files.

 7        And, first of all, I've never heard Uber or Otto say they

 8  had a common interest in the issue of whether Levandowski stole

 9  those files.  They just say they have a common interest in

10  defending against litigation by Google.  That's all they say.

11        And, similarly, by the same token, the indemnification is

12  a general thing, but there are going to be things for which

13  they don't have a common interest even if there's an

14  indemnification.

15        THE COURT:  Well, so the common interest is a legal

16  common interest; right?  A legal common interest in jointly

17  defending.  If they've indemnified Mr. Levandowski, even if

18  they didn't acquire Otto, they have a joint defense interest in

19  defending that litigation, don't they?

20        MR. VERHOEVEN:  I've seen no evidence that they've

21  submitted they've indemnified Levandowski, Your Honor.

22        THE COURT:  I thought that's in the put-call

23  agreement.  Am I misreading it?

24        MS. GOODMAN:  You're not misreading it.  I want to --

25  there are a couple things that Mr. Verhoeven has addressed that
```

1    I would like to respond to.

2          **MR. VERHOEVEN:**  If I could just finish the thought.

3          **MS. GOODMAN:**  I'm sorry.

4          **MR. VERHOEVEN:**  I'm sorry.

5       I'm saying that we don't have any evidence of Levandowski

6    saying "You have to indemnify me" and they agree to indemnify.

7    They have all of these conditions here that provide exceptions,

8    and --

9          **THE COURT:**  It doesn't matter.  What we're looking at

10   is the period -- right? -- post.  Pre you concede that come

11   August 23rd they have a common interest.  So it's between

12   April 11th and August 23rd.

13      At that -- on April 11th, the put-call agreement and

14   indemnification obligation arose at that point; right?  And

15   Waymo hadn't sued them, so that -- I guess that's -- but let me

16   hear from Ms. Goodman.

17         **MS. GOODMAN:**  Thank you.

18      This focus on the indemnity agreement and this conflict of

19   interest provision requires Waymo to actually have brought suit

20   against Mr. Levandowski.  We're here because Waymo has sued

21   Uber and Ottomotto, has explicitly chose not to sue

22   Mr. Levandowski, which it should have done in arbitration.

23   That's one important point to keep in mind.

24      Your Honor --

25         **THE COURT:**  Why?

1          **MS. GOODMAN:**  Because --

2          **THE COURT:**  Why?  I mean --

3          **MS. GOODMAN:**  Because he's --

4          **THE COURT:**  I don't know -- Mr. Levandowski's lawyer

5    is not here.  I don't know that you should be inviting

6    litigation against him.

7          **MS. GOODMAN:**  Because he's focusing on a provision

8    that is only triggered if suit is actually brought.  And

9    Your Honor is correct to refocus the arguments and the issues

10   to the period before anybody sued any other party, which is

11   this period in between signing the merger agreement and closing

12   on the merger.

13       And the indemnification agreement obligated Uber to

14   indemnify Ottomotto, Otto Trucking, Mr. Levandowski, and other

15   diligence employees, and that -- this conflict of interest

16   provision does nothing to change that indemnity obligation.

17         **THE COURT:**  There is an argument to be made that the

18   attorney work product privilege, that waiver should occur and

19   there is an argument to be made.  I don't -- but I don't

20   ascribe to that.  I think that would kind of be out there.

21       It's all judge made, in any event, as it is with respect

22   to waiver.  And waiver of work product, of course, is even a

23   more difficult or higher standard to be met than just

24   privilege, oddly enough.

25       And here, at least upon the signing of the put-call

1   agreement, I don't think that sharing information at that point

2   is inconsistent with litigation, which is what I found earlier.

3   When they really were investigating Otto and Mr. Levandowski to

4   see if we're going to enter into this put-call agreement, which

5   creates, if Ottomotto pulls the trigger, all these obligations

6   on it.  Once it's signed, then they're not adversaries anymore

7   in that same way.

8       That's how I see it, in any event; but, you know, I can

9   see how someone could see it differently, but that's how I see

10   it.  I think that's how the cases up to this point have seen it

11   as well.

12       **MR. VERHOEVEN:**  Can I make just a couple more points?

13       **THE COURT:**  Sure.

14       **MR. VERHOEVEN:**  Thank you.

15       So the Court's ruled there's a waiver, and the waiver is

16   in connection with the project, the due diligence project.  It

17   was set up under the term sheet and -- by the way, this

18   put-call argument wasn't made in response to our initial motion

19   to compel.  Your Honor considered the put-call agreement and

20   noted that it wasn't made.

21       **THE COURT:**  And so I'm not allowing them to go back

22   and pull back the final Stroz report for that very reason.  I

23   think I made that clear in my order the other day.

24       **MR. VERHOEVEN:**  Yes, you did.

25       But what I submit is the project's genesis and setup, as

1   the Court has already found, was not a common interest.  And

2   even after they signed this, that project continued not to be a

3   common interest.  Just by signing it -- for example, let me

4   give you an example.

5        Suppose you indisputably waive something.  Like you give

6   it to the government, and then you say, "We want to sign an

7   agreement that says we're only waiving it to the government."

8   The Ninth Circuit has said you can't do that.

9            **THE COURT:**  Uh-huh.

10           **MR. VERHOEVEN:**  Well, the same would apply to a

11  temporal limitation on a waiver.  I mean, if you've waived the

12  project, then you can't go back and sign an agreement saying,

13  "No, we didn't waive it," and then fix everything.  A waiver is

14  a waiver just like it is for the Ninth Circuit's ruling on

15  selective -- you can't selectively waive.

16           **THE COURT:**  Well, the waiver occurs -- the waiver is

17  at the time of the sharing of the information of the privileged

18  communication.  That's when the waiver occurs.  And so I think

19  I have to look at what was the relationship between the parties

20  at the time of the waiver.

21       I think what you're really arguing -- and I confess I

22  struggled with this even a little bit with the first order --

23  is whether it's in anticipation of litigation.  But you're not

24  arguing that.  You're not arguing it's not work product, but I

25  think that's almost what you're saying.

1    But given the Ninth Circuit's law, which I think is pretty

2  generous in that *In Re Grand Jury*, where pretty much if

3  litigation permeates it, it's hard to say it's not.  I don't

4  think I can do that.  I don't think I can make that finding.

5    Clearly litigation permeates this in the sense that

6  originally they were -- that one reason for the due diligence

7  report was to evaluate litigation risk.  I don't think that

8  makes it privilege.  You can't go to someone that you're about

9  to purchase and do your due diligence and do litigation risk

10  and suddenly cloak all of that in privilege.  That's an

11  expansion, I think -- you disagree, but as I've held, it's way

12  beyond what the attorney-client privilege is there to protect.

13    **MR. VERHOEVEN:**  That's all I'm saying.

14    **THE COURT:**  Yeah.

15    **MR. VERHOEVEN:**  I mean, the put-call agreement didn't

16  address the term sheet.  It didn't say, "We've vacated that and

17  here's a new agreement that applies."

18    **THE COURT:**  No, but, see, that whole presigning due

19  diligence, which I think was key, that goes away because they

20  now have obligated themselves should Otto pull the trigger to

21  indemnify or even to purchase.  They've now obligated

22  themselves to that provided there are certain things that

23  happen or don't happen, and that's, I think, what the

24  distinction is there.

25    **MR. VERHOEVEN:**  Well, let me try it a different way,

1   and then I'll sit down.

2            **THE COURT:**  Okay.

3            **MR. VERHOEVEN:**  The project --

4            **THE COURT:**  It's pretty unique, we can all agree.

5            **MR. VERHOEVEN:**  -- itself -- yeah, it is, very unique.

6       The project itself was not a common legal interest.

7   Your Honor has found that.

8            **THE COURT:**  What does that mean?  I don't know what

9   that means.  The common legal interest is merely a nonwaiver

10  doctrine, and I don't actually think we even go there with

11  respect to work product; right?

12      With respect to work product, the question is:  Was it

13  waived by disclosing it to somebody else?  And post-April 11th,

14  I find it's not waived because they were no longer adversaries

15  at that point.

16           **MR. VERHOEVEN:**  Well, really briefly.  In your initial

17  order, and this is at page 15, line 22, through 16:4,

18  Your Honor even went so far as to say even if Otto and Uber

19  shared a common legal interest, that the doctrine only prevents

20  waiver in the circumstances at issue that were designed to

21  further that legal effort.

22      And then Your Honor went on in that paragraph to find the

23  two purposes of the term sheet and concluded, quote, (reading):

24           "Neither of these purposes is in furtherance of some

25      common interest in defending against Waymo."

1    So even aside from the common interest that they've

2    identified, Your Honor has found that this entire endeavor was

3    not in furtherance of what they are alleging now to this day is

4    the common interest.

5          THE COURT:  I agree with you.  If we were talking

6    about solely attorney-client privilege, I would have to look at

7    that communication and see if it was in furtherance of the

8    joint legal interest.  I agree with you.

9    But if you turn to page 21 of my order --

10          MR. VERHOEVEN:  I shouldn't have gone there.

11          THE COURT:  It's okay.  I mean, it's all very

12   interesting and first impression and complicated.  And actually

13   I think what this case demonstrates is -- me too when I was a

14   lawyer -- is we don't always think deeply about it and follow

15   it all through.

16   But what I said on page 21 is (reading):

17          "Unlike for the attorney-client privilege, waiver of

18          attorney work product protection requires more than the

19          disclosure of confidential information.  It requires an

20          act inconsistent with the adversary system."

21   So even if it wouldn't fall within the nonwaiver of the

22   common interest doctrine, work product is only waived if the

23   disclosure was inconsistent with the adversary system.

24   I agreed, I found -- they disagree, that's okay -- that

25   prior to April 11th that was inconsistent because Uber was

1    investigating Mr. Levandowski, Mr. Ron, and Otto.  They were

2    investigating.  They were out -- and their interests were not

3    aligned.  The interest on one side was "Let's not let them find

4    out everything, or we'll do the minimum or whatever we can to

5    protect ourselves but still have them bias."  And had Uber

6    wanted to find out everything they possibly could, which is

7    probably an explanation for why Mr. Levandowski gave an

8    interview to Stroz without any attorney there just by himself

9    because Uber wanted that.  So they were adversaries.

10        Come April 11th and the signing of the put-call agreement,

11   they're no longer adversaries.  They are now parties to an

12   exclusive option, and Uber now has taken on an obligation to

13   indemnify them no matter what happens now.

14        And so that's why I made that distinction and that's why I

15   think -- I understand your common interest argument.  I don't

16   even disagree with it.  I just think that's not applicable to

17   attorney work product after April 11th.

18        **MR. VERHOEVEN:**  For me it's sort of like the

19   toothpaste is out of the tube.  So they've set up this project

20   and they've hired an independent investigator.  There's no

21   common interest.  Mr. Levandowski's interests are adverse to

22   Uber's, as Your Honor has already found during this time

23   period.

24        They signed this put-call agreement, I'll grant you that,

25   and we've already argued about what it means.  It doesn't

1    reference the term sheet or anything like that.  It doesn't

2    abrogate it.

3        And then the investigation is continuing.  Okay?  And so

4    the toothpaste is out of the tube.  Stroz is still independent.

5    He's still doing his investigation; and so vis-a-vis the

6    investigation, the diligence investigation specifically, there

7    is still no common interest.

8        The horse is out of the barn and Stroz is going to do what

9    it's going to do, and there's no evidence that they

10   renegotiated the Stroz agreement.  And so you still have an

11   independent expert out there who Uber has no control over, who

12   they allege Levandowski has control over to a certain extent in

13   a way that conflicts with the interests of Uber, but it's out

14   there.  The horse is out there.  You can't bring the -- they

15   have no evidence that they canceled that whole project and

16   brought the horse back into the barn.

17       And so with respect to those documents related to the due

18   diligence, that's a different issue than the put-call I would

19   submit.

20           **THE COURT:**  I guess it depends what happened after;

21   right?  I've reviewed the due diligence report that was

22   completed and we know there was an interim report, and we

23   know -- I don't want to say anything that's not public, so I'm

24   just going to read from my order.  We know that what was shared

25   with MoFo -- and we'll know later today where it is on the

1   log -- was its memos of interviews with Levandowski, Ron and

2   the diligenced employees, data regarding information found on

3   the diligenced employees' devices.  So actually maybe almost

4   all of that investigation was completed before.

5        I guess what I'm saying in a way is maybe just hold on.

6   You know, I and Judge Alsup have ruled that you get it; right?

7   And maybe that's almost everything anyway in that extent.

8        Because what are they investigating at that point?  At

9   that point maybe really all they are doing is preparing for the

10  litigation which they believe is coming because, as I found,

11  the whole point of the report, initially at least, was to

12  figure out what was there so they could decide whether to enter

13  into the put-call agreement.

14       **MR. VERHOEVEN:**  I understand.  And I'd appreciate

15  Your Honor -- I mean, we would like to reserve the ability to

16  readdress if new facts come to our attention via the compliance

17  with these orders.

18       **THE COURT:**  Of course.

19       **MR. VERHOEVEN:**  But if it wasn't already completed by

20  April 11th and there was reports from Stroz after April 11th in

21  his capacity as still an independent investigator, maybe he did

22  some interviews after that point, maybe he --

23       **THE COURT:**  We don't have very much on this log

24  post-April 11th from Stroz; right?  We don't have very much, I

25  think.

1          **MS. GOODMAN:**  I don't believe so.

2      And Ms. Rivera just passed a note to me saying that the

3  interim agreement -- interim report -- excuse me -- was shared

4  on April 2nd and it's entries -- 378?

5          **MS. RIVERA:**  378.

6      I'm sorry, Your Honor.  The interim report from Stroz is

7  on Exhibit 1 of the Smith declaration.  It's at entries 378 to

8  381 of the privilege log from April 2nd.  So that was in

9  advance of the put-call agreement being signed.

10         **MS. GOODMAN:**  Your Honor, may I respond to a few of

11  Mr. Verhoeven's arguments?

12         **THE COURT:**  Just one second.

13     378 to 381.  Okay.  Got it.

14     Before I forget, one other thing.  Judge Alsup wanted to

15  know where -- or wanted you to provide him -- you can do it in

16  camera because it's disputed whether it has to be disputed.

17  It's covered in probably my Stroz subpoena order at a minimum.

18  It must be on this log as well -- the earlier versions of any

19  protocol with Stroz.  Okay?  Can you do that by Monday?

20         **MS. RIVERA:**  The earlier versions of any protocol for

21  the Stroz diligence?

22         **THE COURT:**  Correct.  The report -- I believe this is

23  in my order -- the Stroz report alluded to a modification of

24  the protocol, and so if you could provide that to him by Monday

25  in camera, but please advise Waymo of where it is on the

```
 1    privilege log.
 2           MS. RIVERA:  Okay, Your Honor.  I'm not sure of the
 3    exact contents of the protocol.  I just want to mention that to
 4    the extent the protocol is not responsive to the Court's
 5    March 16th order, which is all that these privilege logs refer
 6    to, then it would not be on the log.  I don't know that the
 7    protocol has it, so I'm just not sure.
 8           THE COURT:  Okay.  Well, that may be a different
 9    matter.  It's certainly relevant to all these proceedings.
10           MS. RIVERA:  Sure.  I just don't want to concede that
11    it needed to be on this log if it did not --
12           THE COURT:  If it is on the log.
13           MS. RIVERA:  -- if it wasn't responsive.  Thank you,
14    Your Honor.
15           MS. GOODMAN:  May I have an opportunity to respond to
16    a number of arguments he's --
17           THE COURT:  Yes.  But what --
18           MR. VERHOEVEN:  I'm just going to say something, and I
19    know I'm covering the same ground, but I just can't help myself
20    because I'm a lawyer.
21       None of these entries show anything about an interim
22    report.  I mean, it's the same subject matter.  It's impossible
23    for us to determine from this log differences between these
24    documents.
25           THE COURT:  I know, but whether it's an interim report
```

1    or some other report actually makes no difference to whether

2    it's discoverable or not.  I've already ordered it all

3    discoverable --

4            **MR. VERHOEVEN:**  I understand.

5            **THE COURT:**  -- all that stuff, so I don't know that

6    that's material.  I think it's -- mostly I just wanted to know

7    for timing purposes when it was, not -- that's that.

8        All right.  Go ahead, Ms. Goodman.

9            **MS. GOODMAN:**  The diligence investigation continued

10   after April 11th precisely to develop a joint defense against

11   potential litigation brought by Google.  We submit that that

12   was the purpose prior to April 11th.  Your Honor has already

13   suggested that is not sufficient to maintain -- I'm sorry --

14   not only suggested, ruled it's not sufficient to maintain a

15   common legal interest.

16           **THE COURT:**  No, no.  I don't think it's insufficient.

17   I think I didn't find that wasn't the purpose; that you had,

18   frankly, offered no evidence of that.  Everyone tries to, like,

19   make their record.  I'm going to make mine.

20           **MS. GOODMAN:**  That's fair, Judge.

21       After April 11th, the diligence was continued to develop a

22   joint defense against litigation by Google, and Uber's

23   attorney's declaration from Mr. Sur says this diligence was

24   done precisely for that reason.  It's an incredibly unique

25   thing that Uber does not typically do when it purchases

 1   companies.

 2          **THE COURT:**  I'm sure it doesn't also usually, when it

 3   agrees maybe to purchase a company, to agree to indemnify them

 4   even if they don't purchase it either.  There's a lot that's

 5   unusual about the case.

 6          **MS. GOODMAN:**  I can't speak to that issue, Your Honor.

 7          **THE COURT:**  All right.  Go ahead.

 8          **MS. GOODMAN:**  I had a few other things I wanted to

 9   respond to.

10          **THE COURT:**  Okay.  Go ahead.

11          **MS. GOODMAN:**  Mr. Verhoeven has pointed to the merger

12   agreement saying it hasn't abrogated the term sheet.  Well,

13   that contradicts with their prior argument that the term sheet

14   was nonbinding.  There's nothing that needs to be abrogated.

15   And as Your Honor has suggested, the term sheet is a binding

16   obligation on both Uber and Ottomotto to consummate the

17   transaction if either one exercises their option.

18          He also described Stroz as an independent expert and says

19   that Uber has no control over Stroz.  That's precisely correct

20   with respect to everything that Stroz has in its possession

21   from Mr. Levandowski that we have no control over.  So on the

22   one hand they're -- I just wanted to make that point clear for

23   the record as well.

24          **THE COURT:**  You know, can I go back to something about

25   April 11th?  So you represented to me that it was actually --

 1  the agreement was signed late in the day, so that would, then,

 2  mean the communications made earlier under my order then would

 3  fall before.

 4        MS. GOODMAN:  Right.

 5        THE COURT:  So what I would like you to do is go back,

 6  look at your privilege log, and make -- because I believe you

 7  still marked everything on that day as privileged, that you

 8  didn't actually -- I think so.

 9        MS. GOODMAN:  I think we --

10        MS. RIVERA:  Your Honor, if you did see some of those

11  entries, then that was not our intention.

12        THE COURT:  No, no.  Right.  Yeah.  So if you can just

13  go back and all, then, I want to see is anything that you have

14  still marked as privileged and that was shared, but you don't

15  have to do it -- in other words, you can -- if you want to go

16  back now and change something.

17      For example, let me see if I saw something that was...

18  Well, there was Exhibit or Entry Number 1094, and that was

19  between Stroz and Uber or MoFo, I guess, I should say.

20      And what I didn't understand is because the engagement

21  agreement said that Stroz would only communicate with all

22  parties to the due diligence report, and this seemed to be

23  reflecting only communications with MoFo.

24        MS. GOODMAN:  Your Honor, it's correct that that's

25  what the engagement agreement said; but like all agreements,

1    what the agreement provides for and what happens in practice

2    are two different things.  So if there are communications

3    between MoFo and Stroz that do not include any of the other

4    parties to the engagement or any of the diligenced employees,

5    that's just a historical fact but that privilege should be

6    maintained as --

7              THE COURT:  Well, see, that's a different issue that

8    nobody addressed that we have to figure out, and this is kind

9    of a unique situation; right?

10         Can two adverse parties jointly retain an agent and

11   then -- I guess -- and still have -- maybe -- still have

12   privileged communications if those aren't shared with the other

13   side?  But how do I know?  How have you proven that they

14   wouldn't be shared with the other side especially when all I

15   have in front of me is an engagement letter that says the exact

16   opposite, that they're required to be shared with the other

17   parties?

18             MS. GOODMAN:  If anything was shared with the other

19   side, it's going to be reflected on a separate communication on

20   the log.

21             THE COURT:  Well, that you know; but Stroz was under

22   an obligation, according to the written engagement letter that

23   you've provided and in fact relied upon, to share it with the

24   other side.

25             MS. GOODMAN:  Right.  So --

1          **THE COURT:**  I don't have anything from Stroz -- in any

2     event, I want -- so if it's Stroz, I want to see it in camera

3     as well.

4          **MS. GOODMAN:**  Just to be precise what you want to see,

5     if it's between MoFo and Stroz only?

6          **THE COURT:**  Is it Stroz?  Sorry.  Stroz.  My apologies

7     to Mr. Stroz.

8        Stroz, certainly if it's between MoFo and Otto or Gardner

9     or anybody, or even just MoFo and Stroz.

10         **MS. GOODMAN:**  Sure.

11         **MS. RIVERA:**  And, Your Honor, just a little bit more

12    color here.  We did obtain documents from O'Melveny.  So to the

13    extent there were communications between Stroz and O'Melveny as

14    counsel for Otto, those would have been and were on the

15    privilege log.

16       So to the extent there was a communication from Stroz to

17    Uber or Uber's counsel and if the question you're asking is,

18    "Well, how do I know that that wasn't then shared with Otto,"

19    if it was shared with Otto, it would be on the log of

20    communications between -- with respect to documents that

21    O'Melveny & Myers had in their possession.  So those would be

22    accounted for on that log if, in fact, it was shared.

23         **MR. VERHOEVEN:**  I would disagree.  I would assume that

24    their recordkeeping was exactly 100 percent identical.

25         **THE COURT:**  No, no, no.  That doesn't -- if you have

1    something that came from O'Melveny prior to April 11th or prior

2    to 5:00 o'clock April 11th, it should be marked as "To be

3    produced."

4         MS. RIVERA:  Sure.  And what I was referring to,

5    Your Honor, is the question of if there is something between

6    MoFo and Stroz in the pre-April 11th or, you know, April 11th

7    or earlier period of time, I thought Your Honor was asking how

8    do we know that that wasn't shared with Otto if under the terms

9    of the agreement, Stroz was obligated to share everything with

10   Otto.  And the way that we address that is, well, if it was

11   shared with Otto, presumably Stroz would have sent it to Otto's

12   counsel at O'Melveny and it would be on that privilege log.

13        THE COURT:  Maybe it would be on a phone call with

14   them.  I don't know.  I don't have anything from Stroz.  I

15   don't have anything in front of me.

16      So, anyway, I want to see that in camera.  And that may

17   just -- I mean, that's a different issue that no one's

18   really -- we're not talking about very many communications

19   there, so --

20        MS. RIVERA:  Okay.

21        THE COURT:  -- I want to see those, and I'll have to

22   think about that.  It's a little bit of a different category.

23      Okay.  Let's see, now I asked you -- I told you

24   Judge Alsup wanted to see the protocols.  Okay.  And you're

25   going to produce those in camera to me.

1        All right.

2            **MS. GOODMAN:**  On the Stroz -- Stroz --

3            **THE COURT:**  Ms. Rivera disagrees with you.

4            **MS. GOODMAN:**  That's true.  She's had more contact

5    with them than me.

6        On that issue, Your Honor is relying on the engagement

7    letter, and I just want to point out that that says (reading):

8            "Stroz agrees all communications, including e-mails

9        by it related to the engagement, will be sent to clients

10        all together."

11        So it contemplates that everybody's on the e-mail already

12    and that, of course, is going to be covered in the logs.  So,

13    in other words, Stroz writes an e-mail to MoFo and O'Melveny

14    with both of them in the "To" line, not separate communications

15    that then get forwarded.  That's just --

16            **THE COURT:**  Yeah, but here they seem to have had an

17    e-mail that was not shared with them.

18            **MS. GOODMAN:**  Right, and that's -- my point is, as a

19    matter of practice, perhaps this wasn't followed, that part of

20    the engagement agreement.

21            **THE COURT:**  Okay.  There might be a waiver.  I don't

22    know.  I mean, I don't know.  If you have an agreement that

23    you're supposed to share it, I don't know that you have a

24    reasonable, then, expectation that it won't be, but I'll look

25    at them and we'll figure that out.

1          Okay.  All right.  There we are.

2          Now, before anyone leaves, I want to figure out what all

3     the motions that I have pending and I want to propose -- or

4     order, frankly -- a different procedure because I am finding it

5     nearly impossible to keep track of all the filings that are

6     coming in from you from all these different parties all the

7     time.

8          So what I would like to do is, going forward, is you agree

9     to whatever schedule you agree to with the special master,

10    which has been very helpful.  He'll alert me to that.  I don't

11    want any chambers copies sent to me until everything is filed.

12    If I want to look at something earlier, I can get online and

13    look at it.  I don't want any paper in my chambers until

14    everything is filed.

15         Then I want the moving party to consolidate all the

16    papers -- theirs, the opposing, reply, declarations -- into a

17    binder or two, how many are there, in a nice order, present one

18    copy to me in chambers that way.  That way I get it, it's all

19    together, and I'm not pulling things and trying to put them all

20    together.  Okay?

21         So with respect to what I currently have pending, I have

22    an issue as to Mr. Levandowski's in camera privilege log, and I

23    believe Waymo has filed something with respect to that.

24              **MR. VERHOEVEN:**  Mr. Perlson will deal with this.

25              **THE COURT:**  Mr. Levandowski's counsel is not here.  I

1    don't want to talk the merits.  I just want to say I have that

2    pending; is that right?

3         **MR. PERLSON:**  Yes, Your Honor.

4         **THE COURT:**  Oh, let me, while I'm thinking about it,

5    when the moving party sends me the chambers copy, I'd like

6    there to be a cover letter that identifies everything that's

7    there by docket number and then, of course, copied to the other

8    side so they know you haven't omitted their brief, not that

9    anyone would do that but just so everybody knows it's there.

10   And then I can cross-reference to the docket as well.

11        **MS. GOODMAN:**  Your Honor, would you like just only

12   sealed filings or public and sealed or --

13        **THE COURT:**  Oh.  Great.  Good question.  Yes.  I only

14   need the version of the unsealed highlighted; right?  I don't

15   need the public version that's on the docket.

16        **MS. GOODMAN:**  And the docket numbers don't actually

17   appear on the unsealed versions that attorneys have access to,

18   but it will be in the cover letter.

19        **THE COURT:**  Yeah.  It will just be in the cover

20   letter.  That's fine.  Yes, thank you.

21        Oh, and if you can put in a separate binder the

22   administrative motions to seal, which hopefully as we go on

23   will get narrower and narrower as more and more stuff gets

24   disclosed.

25        All right.  And then I also have a motion to compel a

1   subpoena on Mr. Levandowski; is that correct?  I have that

2   pending?  Is that wrong?

3          **MR. PERLSON:**  Well, I think that there's issues

4   wrapped up in the privilege log motion that deal with that.

5          **THE COURT:**  Okay.  That's really one.  Okay.  Great.

6          **MR. PERLSON:**  Yeah.

7          **THE COURT:**  And then I have a motion to compel Lyft

8   filed by Uber; correct?

9          **MS. GOODMAN:**  Yes.

10          **THE COURT:**  And then I have a motion by Waymo to

11   compel Uber and Otto Trucking.  I think it's with regard to

12   interrogatories, at least the first page I looked at.  There

13   might be more there.

14          **MR. PERLSON:**  Documents as well.

15          **THE COURT:**  Okay.  All right.

16      Is there -- and are all those -- so with respect to the

17   motion to compel Lyft, if I could prevail on Uber to provide me

18   a binder in that format.

19          **MS. GOODMAN:**  I'm sorry.  I was distracted by

20   something my colleague was saying.

21          **THE COURT:**  That's okay.

22          **MS. GOODMAN:**  I wanted to first point out Uber has

23   filed a motion to compel as well with respect to outstanding

24   RFPs and interrogatories.

25          **THE COURT:**  Okay.  Right.  Correct.

1          **MS. GOODMAN:**  It's not yet fully briefed, I don't

2     think, the Waymo motion.

3          **THE COURT:**  When it gets fully briefed, if you

4     could -- if Uber, then, will be responsible for providing the

5     single chambers copies all nicely ordered.  And if you could do

6     the same, even though I believe it is fully briefed now, with

7     respect to the motion as to Lyft.

8          **MS. GOODMAN:**  Yes, we can do that.

9          **THE COURT:**  Okay.  And if you can do the same with

10    respect to the motion as to Uber/Otto Trucking.

11    Mr. Levandowski, I don't need it for that.

12         **MR. PERLSON:**  You don't need it for the one regarding

13    his subpoena and the Fifth Amendment?

14         **THE COURT:**  No.  I've got that.  I'm okay there.

15         **MR. COOPER:**  Your Honor, I believe also that there's a

16    motion by Lyft to quash a subpoena.

17         **THE COURT:**  I'm referring to that one.  It may be both

18    or --

19         **MS. GOODMAN:**  Lyft is the moving party, but we're

20    happy to provide a chambers copy.

21         **THE COURT:**  Uber will provide it, yeah.  Oh, Lyft is

22    the moving party.  Oh, then maybe you should do it.

23         **MS. GOODMAN:**  That would be great.

24         **THE COURT:**  Yeah, you should do it.

25         **MR. PERLSON:**  Okay.

1          **THE COURT:**  I'm sure you might have a little bit to do

2    with that motion.

3          **MR. PERLSON:**  We can handle that.

4          **THE COURT:**  Oh, let me ask Mr. Verhoeven, if you have

5    a common interest with respect to that motion.

6                          (Laughter)

7          **THE COURT:**  All right.  You don't have to answer that.

8        All right.  So that would be great if going forward if you

9    could do that.  I think that would help immensely.  I'm getting

10   to them as quickly as I can.

11       I will write something as today but you have my rulings.

12         **MS. GOODMAN:**  Thank you, Judge.

13         **THE COURT:**  All right.  Oh, one last thing.  I should

14   say, as you know, Judge Alsup is very concerned about keeping

15   the case moving, and he's now issued his ruling.  He stayed it

16   until June 30th, and we'll see what the Federal Circuit does.

17       Uber, of course, should be ready at whatever time to, as

18   soon as a ruling comes -- I don't even know if Uber is going to

19   appeal, but I assume Mr. Levandowski will at a minimum --

20   should be prepared at that point to produce forthwith; right?

21   So I'm sure you're not, but don't sit back and wait until that

22   ruling.  It should be ready to go so when that order comes,

23   you're ready to produce.

24         **MS. GOODMAN:**  Great.

25       And with respect to your order on the Stroz subpoena,

 1   which any objections Uber would be filing are due today, I've

 2   asked counsel for Waymo to agree to a brief stay of that order

 3   pending any resolution of any objections that we filed to

 4   Judge Alsup on that.

 5           THE COURT:  Yes.  I mean, that was sort of the --

 6           MS. GOODMAN:  It wasn't explicitly stated, so I just

 7   wanted to see if the production deadline on that was --

 8           THE COURT:  It's all tied up together with the first

 9   order.  I don't even know that you'll necessarily need a

10   substantive order from Judge Alsup; right?  You're just

11   preserving your arguments.

12           MS. GOODMAN:  Right.  Just to be clear, if Judge Alsup

13   hasn't ruled on any objections before June 27th, which is the

14   date you've ordered Stroz to produce documents, is that

15   deadline stayed?

16           THE COURT:  Oh, I see what you're saying.

17           MR. PERLSON:  It's a different issue, Your Honor.

18           THE COURT:  Oh, yeah, yeah, yeah.  I see what you're

19   saying.  I picked that date with that in mind.  Let me actually

20   just ask Judge Alsup.

21           MS. GOODMAN:  And given the 30th deadline for any

22   appeal on the deadline of the 30th to produce the Stroz report

23   or exhibits.

24           THE COURT:  Because I do want to -- I'm mindful of

25   it's his case, so let's just say, yes, it's stayed; however,

```
 1    I'm going to speak to Judge Alsup and if he tells me otherwise,

 2    I will issue an order clarifying that.

 3            MS. GOODMAN:  Okay.  Thank you, Judge.

 4            MR. PERLSON:  I just -- it's stayed until even if they

 5    file objections today or just stayed until when?

 6            THE COURT:  Well, they have to file objections.  If

 7    they don't file objections, it's not stayed.

 8            MS. GOODMAN:  It's not stayed.

 9            THE COURT:  If they file objections and Judge Alsup

10    has not ruled by June 27th, it's stayed until his ruling.

11            MR. PERLSON:  Okay.  I didn't understand that to be

12    the case, but okay.

13            THE COURT:  You're right.  No, I hadn't said it.

14            MS. GOODMAN:  She just ruled that.

15            THE COURT:  I hadn't said it, and I think I was

16    thinking more you should just ask him; but now that I'm sitting

17    here, I'm thinking why don't I just ask him.  And then if he

18    tells me, "No, they have to file a request from me for a stay,"

19    or something, then I'll change it.  He may rule by June 27th.

20            MR. PERLSON:  Okay.  Well, I understand your ruling.

21    I mean, as they keep on objecting to all these orders, we're

22    just delaying and delaying and delaying, and so it's --

23            THE COURT:  I know, but it's completely tied up with

24    the first order.

25            MR. PERLSON:  But their objections are not tied up in
```

1   the first order, as I understand it.  As I understand it,

2   they're going to be objecting to things not necessarily tied up

3   in the order.  So what they're doing is now that there is going

4   to be the order as to Stroz, they're going to be delaying that

5   too on different reasons, and it's just going to keep on

6   getting delayed and delayed and delayed; and that's exactly

7   what Judge Alsup said wasn't supposed to happen, is that we're

8   supposed to be cutting through this stuff.

9           **THE COURT:**  I know but when you're trying to get

10  evidence from stuff that's with attorneys, that's what's going

11  to happen.

12          **MR. PERLSON:**  Well, they're not attorneys.

13          **MS. GOODMAN:**  Well, Uber is entitled to make its

14  record, and we're just asking for a brief stay before

15  Judge Alsup rules.

16          **THE COURT:**  They were retained by the attorneys.  That

17  is clear.  They were retained.  So that's just -- that's an

18  inherent part of the problem, but Judge Alsup and I are working

19  as fast as we can.

20          **MS. GOODMAN:**  Thank you for that, Judge.

21          **THE COURT:**  All right.  Thank you.

22          **MR. PERLSON:**  Thank you, Your Honor.

23              (Proceedings adjourned at 11:16 a.m.)

24                      ---oOo---

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Friday, June 23, 2017

8

9

10

11    _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                      U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25