quinn emanuel trial lawyers | san francisco

50 California Street, 22nd Floor, San Francisco, California 94111-4788 | TEL (415) 875-6600 FAX (415) 875-6700

June 27, 2017

Magistrate Judge Jacqueline Scott Corley
USDC, Northern District of California
San Francisco Courthouse Courtroom F - 15th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

Re:   *Waymo LLC v. Uber Technologies, Inc., et al.*, N.D. Cal. Case No. 3:17-cv-00939-WHA

Dear Magistrate Judge Corley:

As demonstrated below, Uber fails to meet its burden to show that Waymo's objections are without merit or that Waymo's responses are inadequate.[1] Instead, Uber's motion seeks relief where Waymo is already producing the requested material or has agreed to supplement its production, or raises requests for discovery irrelevant to this litigation and/or too burdensome to produce given the minimal probative value. Uber's motion should be denied in its entirety.

**1.   Waymo Properly Responded to Uber's Discovery Relating To "Waymo's 121 Trade Secrets."**
Uber's Interrogatory No. 1 asks Waymo to identify "each alleged Waymo trade secret… that You contend is used by Uber." In response, Waymo identified 73 trade secrets (Nos. 1-10, 13-17, 19-20, 38-39, 42-43, 46, 48-49, 62-63, and 75-121) contained in the stolen files that Levandowski, on behalf of Uber and in coordination with others at Uber, used to further Uber's LiDAR designs, and reserved its rights to supplement its response if further discovery revealed further use by Uber. Dkt. 688-8, Response to Interrogatory No. 1. Uber Interrogatory Nos. 2-10 each seek additional information about the trade secrets *identified in response to No. 1* for which Waymo has evidence of "use." Waymo responded to these interrogatories accordingly. *Id.*, Responses to Interrogatory Nos. 2-10.

Nevertheless, and despite its clear language, Uber now contends that Interrogatory No. 1 is not limited to the trade secrets Waymo contends are used by Uber. And, thus, by extension, that Interrogatory Nos. 2-10 are not so limited either. But Uber points to no language in these interrogatories suggesting that they seek information about all 121 asserted trade secrets. Instead, Uber contends that it asked "about trade secrets 'used' by Uber generally, without limitation to "use" in the current implementation of Uber's self-driving technology."[2] It is unclear how Uber would be "using" Waymo's self-driving technology trade secrets anywhere but in Uber's self-driving program. But at any rate, Waymo's response went to "Uber's use of Waymo's asserted trade secrets" without limitation. Dkt. 688-8 at 6. In sum, Waymo did not provide further information regarding asserted trade secrets for which Waymo does not have evidence of use for the simple reason that Uber did not

---

[1] "In a motion to compel, the moving party bears the burden of showing why the other party's responses are inadequate or their objections unjustified." *Music Grp. Macao Commercial Offshore Ltd. v. Foote*, No. 14-CV-03078-JSC, 2015 WL 2170121, at *2 (N.D. Cal. May 8, 2015) (Corley, M.J.).
[2] Under 18 U.S.C. § 1839, "misappropriation" includes improper "disclosure or use" of a trade secret as well as improper "acquisition of a trade secret." Uber limited its request to "use."

quinn emanuel urquhart & sullivan, llp
LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

ask for it in the interrogatory. It is improper for Uber to ask the Court to "rewrite discovery requests." *Robin Singh Educ. Servs., Inc. v. Excel Test Prep*, No. C-03-5039 JSW(JCS), 2004 WL 2554454, at *1 (N.D. Cal. Nov. 9, 2004); *Bartolome v. City & Cty. of Honolulu*, No. CIV. 06-00176SOMLEK, 2008 WL 2736016, at *14 (D. Haw. July 14, 2008) ("That is counsel's job.").

Additionally, Uber purports to challenge Waymo's responses to four interrogatories with only a single line of briefing: "Waymo failed to respond to Interrogatories 4-7 separately for each secret." Mot. 2. This terse statement does not explain why Waymo's responses are deficient, and fails for that reason alone. *Foote*, 2015 WL 2170121, at *2 ("[T]he moving party bears the burden of showing why the other party's responses are inadequate."). In any event, Waymo's responses are sufficient. Waymo identified the documents reflecting the development, content, and scope of its trade secrets and will supplement its response with future productions (Rog 4), identified the personnel involved with that development (Rog 5), and offered a multi-page narrative concerning Waymo's developmental timeline and milestones (Rog 6). For Rog 7 ("efforts to maintain the secrecy and confidentiality of [each] trade secret"), Waymo incorporated by reference its trade secret list (which discloses, for each trade secret, measures to maintain secrecy) as well as three declarations, and further provided a narrative description of its security measures.

For the RFPs, RFP Nos. 5-17, 19-20, 22-30, 33, 34, 77, 79, 80, 98-104, and 114 concern the development and value of Waymo's trade secrets. Some target individual trade secrets (*e.g.,* RFP Nos. 9, 10, 12, 13), while others seek documents relating to general developmental processes, such as use of third party components (RFP No. 17) and efforts to reverse engineer other technology (RFP No. 19). In response to each, Waymo agreed to search for and produce documents covering the full gamut of its trade secret development: "Waymo will produce all documents relating to Waymo's development of the Alleged Waymo Trade Secrets as located through a reasonably diligent search of both custodial documents and non-custodial document repositories storing documents relating to the development of Waymo's self-driving technology." Waymo produced its first set of responsive documents on June 16 (Ex. 1[3]), produced more such documents on June 26 (Ex. 5), and continues to search for and produce responsive documents. Declaration of Jeff Nardinelli ("Nardinelli Decl.") ¶ 4.

Uber's motion does not argue that Waymo's production in response to any particular RFP has been deficient, but instead merely repeats a linguistic-based argument that it raised *before* Waymo's production – an argument that Waymo believed already resolved. Specifically, on June 14, Uber complained to Waymo of its similar response to these 37 RFPs. Dkt. 688-6. On a June 16 call with the Special Master, Waymo explained that had issued a similar response because that response broadly covered the full scope of Waymo's trade secret development. Nardinelli Decl. ¶ 2. It does not matter whether Waymo's written response to an RFP is the same as its response to another RFP, but rather whether Waymo's response sufficiently covers the request. Uber accepted this explanation but stated that Waymo's production to date did not seem to cover the RFPs. *Id.* ¶ 3. Waymo informed Uber that its first production to these RFPs would come later that day, which it did. *Id.*

Indeed, the *only* RFP in this category for which Uber raises a specific objection is RFP No. 160: "All documents in which Waymo has advised its employees that a specific Alleged Waymo Trade Secret is in fact trade secret." Waymo has already produced documentation of its policies and instructions to employees to keep *all* of their work confidential, which necessarily includes all trade secret development. Dkt. 688-7, Response to RFP No. 160. Uber now requests "documents where Waymo has advised its employees that the trade secrets *in this case* are trade secret or confidential." Mot. 2. Waymo will

---

[3]  All exhibits are to the Declaration of Jeff Nardinelli, filed herewith.

additionally search for communications specifically instructing employees that a given trade secret is a trade secret.  Nardinelli Decl. ¶ 5.

**2. There is No "Quinn Conflict," and Uber Already Has Discovery Regarding Communications About Potential Suit.**  Uber's RFP No. 145 seeks "the dates of the communications between any law firm and Waymo regarding Levandowski" prior to October 2016.  Waymo already disclosed to Uber that the first such communication occurred on March 23, 2016, and logged that communication.  Dkt. 688-5, Response to RFP No. 145.  Now, Uber seeks documents sufficient to show Waymo's communications with Quinn Emanuel.  Uber alleges, though it failed to raise this issue in meet-and-confer discussions, that it needs these documents to examine whether Quinn Emanuel, which represented Uber on unrelated matters until September 2016, ended its relationship with Uber because Quinn knew that Waymo would sue Uber.  Uber alleges that such actions would present "ethical issues that could lead to Quinn's disqualification."  Mot. 3.  It is improper for Uber to raise this accusation for the first time in a publicly filed letter brief.  In any event, the allegation is false.  There are no responsive documents from Quinn Emanuel prior to October 2016 because Waymo did not contact Quinn Emanuel regarding this case until 2017.[4]  Of course, if Uber was truly concerned about a potential conflict, one would expect that Uber would have raised it at the very outset of the case.

Uber has asked for "[a]ll documents" concerning communications about suing Levandowski (RFP No. 47), and about suing Uber (RFP No. 48), but offers no explanation as to why it is entitled to "all" such documents, all or nearly all of which are surely privileged.  Uber states that these documents go to delay, but Waymo has already disclosed to Uber the date of Waymo's first communication regarding suit against *Levandowski*, *see* Dkt. 688-5 at 27 (Response to RFP No. 47), and will further log Waymo's first communication regarding suit against *Uber* (RFP No. 48).  Uber next states that such communications go to whether Levandowski's actions were consistent with Waymo policies and procedures, but this is unpersuasive because Uber separately asked about Levandowski's compliance, and Waymo has agreed to fulsomely produce documents.  *See infra* at Topic 3.

**3. Documents Regarding "Waymo/Google Practices Regarding Side Businesses" For Employees Other than Levandowski Are Irrelevant.**  Uber RFP Nos. 37-43, 125-128 and Interrogatory No. 11 seek discovery into all personal side projects or businesses of employees of Waymo and Google.  Waymo limited its responses to Levandowski-related documents.  Because Waymo alleges that Levandowski improperly started Otto and engaged with Uber while still a Waymo employee, Uber is fairly entitled to documents relating to Levandowski's actual, proposed, or attempted side businesses, including Waymo's knowledge thereof; Waymo agreed to produce all such documents.  Dkt. 688-5, Responses to RFP Nos. 37-43, 125-128.  Separately, Waymo agreed to produce Waymo policy documents on side businesses.  *Id.*, Responses to RFP Nos. 36, 118.

Uber now moves to compel Waymo to provide discovery into side businesses for *all* Google and Waymo employees and executives.[5]  Such information is irrelevant to the case.  That some other Google employee at some point operated a side business is not a defense to trade secret misappropriation.  Given the lack of relevance of these documents, the burden of searching for them is not proportional to the needs of the

---

[4]  Exhibit 15 to Uber's motion, an email from September 2016, speaks for itself regarding Quinn's reasons for ending its relationship with Uber.  Uber improperly filed the email under seal.  Despite stating in its sealing motion that Uber sought only to "protect the privacy" of the "email addresses of certain high-ranking company executives," Uber sealed the *entire document*.  Dkt. 684.

[5]  Uber offered the "compromise" of seeking all such side businesses "only" over the last five years, which Waymo rejected.  Ex. 3.

case. And while Uber suggests that Waymo's allegations put at issue Waymo's practices regarding side businesses, and that "Waymo intends to argue that Mr. Levandowski did not follow its policies," Mot. 4, that is not Waymo's argument. Levandowski's actions surely violated a host of Waymo policies that are incorporated into Levandowski's employment contracts, but Waymo does not ground its claims on these violations. Indeed, Judge Alsup recognized the irrelevance of Levandowski's non-adherence to any policy or contract, stating that Waymo's claims in this action "don't to have rely on any kind of a contract. They got plain old all American old-fashioned theft of trade secrets." Dkt. 625 (June 7 Hr'g Tr.) at 24:18-20. Judge Alsup having already decided that *Levandowski's* compliance with contracts or policies is irrelevant to this case, it is clear that compliance by *others* is also irrelevant.

Uber further claims that Waymo "conceded" the relevance of requests concerning non-Levandowski side businesses because Waymo produced Google policies relating to side businesses in response to other requests. Mot. 4; *see* Dkt. 688-5, Responses to RFP Nos. 36, 118. Not so. Indeed, as a matter of common sense, merely because Waymo produced documents regarding general policies for side businesses to one RFP does not mean Waymo "conceded" that Uber's RFPs seeking detailed information into the side businesses of everyone at Google or Waymo are relevant or proportional.

**4. Documents Unrelated to "Mr. Levandowski's Reasons for Leaving Waymo" Are Irrelevant.**
Uber wants to show that Levandowski left Waymo for "legitimate reasons" unrelated to Uber's promise of hundreds of millions of dollars in exchange for stealing Waymo's trade secrets to resuscitate Uber's floundering self-driving program. Through its responses to numerous RFPs, Waymo has already agreed to produce all documents needed to litigate that point, including all documents relating to Levandowski's departure and reasons for leaving. Dkt. 688-5, Responses to RFP Nos. 44, 66, 121, 129, 130, 135-140. It is unclear what more discovery Uber seeks concerning Levandowski's reasons for leaving.[6]

Indeed, Uber does not address departure-related RFPs in this misnamed category. Through RFP Nos. 64-65, Uber seeks documents concerning the hiring of Waymo CEO John Krafcik and employee reactions to that hiring. Previously, Uber explained that these requests go to "the reasons for Mr. Levandowski's departure from Waymo and formation of Otto." Dkt. 688-4 (Uber June 9 email). As part of its agreement to produce documents on Levandowski's departure, Waymo is searching Mr. Krafcik's documents for references to Levandowski and searching Levandowski's documents for references to Mr. Krafcik. Now, Uber expands its request to documents generally concerning Mr. Krafcik's hiring, and reactions by other employees to that hiring. Mot. 5. Uber does not, however, explain how such documents could be relevant. Nor can they: such documents have no bearing on whether Levandowski stole trade secrets and took them to Uber, or to any other issue in the case.

RFP Nos. 67-68 seek documents concerning Waymo's efforts to comply with a 2011 Consent Decree. The Consent Decree stemmed from a DOJ investigation into certain alleged agreements, entered amongst and between several tech companies (including Google, but not including Uber), under which the companies agreed not to recruit one another's employees. Under the Consent Decree, the companies agreed, albeit with caveats, to not restrain each other from cross-hiring employees. Ex. 2 at IV.[7] Uber argues that Google's compliance efforts "are relevant to Waymo's arguments that Uber

---

[6] Again, Uber argues that Waymo "conceded the relevance" of Levandowski's reasons for leaving by producing documents in response to RFP Nos. 44 and 138. As explained above, Waymo's production in response to one RFP does not concede the relevance of a separate RFP.

[7] Uber's motion (Mot. 5) misstates the Consent Decree, stating that it barred Waymo from entering into "any" non-solicitation agreement, when in fact the Decree contained exceptions, for instance

4

improperly recruited Mr. Levandowski while he was still employed at Waymo." Mot 5. As an initial point, it is unclear why Google's compliance efforts, rather than the terms of the Decree, would touch on the propriety of Uber's recruitment. More importantly, though, Uber misstates Waymo's argument. Waymo takes no stance on whether Uber could have recruited Levandowski through legal measures. The impropriety of which Waymo complains centers on Uber's offer of enormous sums of money to Levandowski to bring stolen trade secrets to Uber. This allegation is unrelated to the Decree, much less with Google's compliance efforts.

## 5. Uber Is Not Entitled to "Waymo Production of Lyft-Related Documents."

These RFPs (Nos. 149-156) are directed towards an extremely confidential business agreement between two of Uber's prime competitors.[8] Uber has not shown its entitlement to this unusually sensitive information. Its purported justifications are either too speculative to support a discovery request or flat-out illogical, and where Uber does identify a legitimate topic of discovery, Waymo has already agreed to produce documents sufficient to supply that information. Lyft need not, and should not, become part of this litigation.

First, Uber argues that information about the Lyft deal "appear[s] at least relevant to (1) the valuation of self-driving technology for purposes of analyzing damages." Mot. 5. Uber presents no basis to believe that a non-merger acquisition between two companies would involve a valuation, but more importantly, as Uber well knows, Uber has no need to look to Lyft for "valuation" information. This is because in response to a separate RFP, Waymo agreed to produce documents showing the valuations of Project Chauffeur/Waymo. Dkt. 688-5, Response to RFP No. 69.

Second, Uber argues that its requests go to "the appropriateness of injunctive relief, given Waymo's assertions that Uber has negatively impacted Waymo's first-mover advantage." Mot. 5-6. The Lyft deal does not affect Waymo's first-mover advantage. Waymo alleges that Uber eroded Waymo's technical lead by stealing trade secrets to accomplish in months what took Waymo "sustained effort over many years." Dkt. 23 (Complaint) at 5 ¶ 10. The extent of Uber's technological leap-frogging does not grow or shrink based on the nature of Waymo's deal with Lyft. And again, Uber need not look to Lyft for irreparable-harm discovery because Waymo already agreed to provide it. *See* Dkt. 688-5, Response to RFP Nos. 89 (agreeing to produce "all documents on which Waymo intends to rely to demonstrate that it will suffer irreparable harm"); 90-97 (agreeing to produce documents concerning its business plans, forecasts, and analyses and competition and barriers to entry, documents which include discussion and analysis of the first-mover advantage).

Third, Uber argues that its requests go to "industry practice regarding and knowledge about self-driving technology." Mot. 6. To the extent that Uber wants to capture any disclosure by Waymo to Lyft of trade-secret information, Waymo already agreed to produce "communications between Waymo and any third party regarding any of the Alleged Waymo Trade Secrets," whether that third party is Lyft or anyone else  Dkt. 688-5, Response to RFP No. 114. Besides, it is hard to imagine why Lyft would even ask to see the highly confidential technology underlying Waymo's self-driving

---

permitting Waymo to insert such clauses into employee contracts, *see* Ex. 2 at V.A.1 – but the point is irrelevant because these RFPs are irrelevant.

[8] Uber issued similar document requests to Lyft, who separately moved to quash the subpoena. Briefing is complete on that motion. Dkts. 646, 665, 701.

cars, much less that Waymo would disclose it.[9]

Finally, Uber suggests that the date that Waymo entered into discussions with Lyft about any agreement (RFP No. 156) is relevant to Waymo's basis for bringing the suit, arguing that "[a] jury can rationally conclude that Waymo's suit is motivated by a desire to take Uber's share of the ride-sharing market, rather than trade-secret issues." Mot. 6. Evidently, Uber wants to demonstrate that Waymo's desire to explore a business relationship with Lyft suggests that Waymo sued Uber improperly for competitive reasons. Uber offers no support for this theory that wouldn't apply to every suit between competitors, and Uber's insinuation falls particularly flat here given the rampant pre-complaint evidence of Levandowski's theft, including the appearance of Waymo's trade secrets in Uber's schematics. To show that Waymo brought this litigation as an improper competitive sham, Uber must show that Waymo's claims are "so baseless that no reasonable litigant could realistically expect to secure favorable relief." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62 (1993). This case – about which Judge Alsup stated that Waymo "ha[s] made a strong showing that they have been grievously wronged by a former employee who was having meetings with Uber on the sly," and that "a jury could reasonably conclude from these facts that Uber knew good and well [Levandowski] was going to steal trade secrets and bring them," Dkt. 625 at 37:25-38:6 – hardly qualifies.

**6. "Damages/relief issues."** Through RFP 71, Uber seeks documents relating to the creation of Waymo, but based on Uber's articulation of the documents it seeks under this RFP, it is unclear what more Uber seeks beyond what Waymo already agreed to produce. Uber states that this RFP goes to three types of documents: documents showing (1) the value of the self-driving program to Google, (2) Waymo's business plans for competing in the self-driving car space, and (3) the competitive landscape (including internal analyses of the competitive landscape). Mot. 6. Waymo agreed to provide documents responsive to each category. Dkt. 688-5, Responses to RFP Nos. 69 (documents sufficient to show Waymo's valuation); 93-94 (documents sufficient to show Waymo's business plans, strategic plans, operating plans, marketing plans, financial plans, sales plans, and investment plans for its ride-sharing business, and analyses of barriers to entry); 97 (analysis of Uber's self-driving car business).

Requests 129 and 130, concerning Waymo's replacement of employees that departed for Uber, have no place in this litigation. This action concerns trade secret theft. Google filed a separate arbitration concerning employee departures. Uber argues that because Waymo agreed to produce documents in response to this request to the extent that such documents concern Levandowski's departure, "Waymo has conceded the relevance" of these requests. Mot. 6. This is backwards. By limiting its response to documents involving Levandowski, Waymo was disputing, not conceding, the relevance of these requests to the extent they concern other employees. And as explained above, document production is not an admission of relevance.

**7. Uber Does Not Need Documents Regarding "Waymo's Interrelationship with Google."** There is no dispute on RFP No. 72. Counsel for Uber stated that Uber seeks to discover whether "Waymo has control over Google's documents, such that Google's documents should be produced." Dkt. 689-8 at 3. As Waymo already confirmed, Waymo "is searching for and producing documents relating to Project Chauffeur/Waymo regardless of the entity with technical custody over the documents." Dkt. 689-8 at 3.

Uber analogizes its request to *Stella Sys., LLC v. MedeAnalytics, Inc.*, No. 14-cv-00880-LB, 2015 WL 1870052 (N.D. Cal Apr. 22, 2015), a case in which a party refused to produce third-party documents on

---

[9] Further, as Lyft explained in briefing its motion to quash, any disclosures by Waymo to Lyft were protected by a non-disclosure agreement and other confidentiality protections. Dkt. 701 at 4.

the ground that it lacked control over those third-party documents. *Stella* is inapplicable. There is no shell game here. Waymo did issue a general objection to Uber's definition of "Waymo" as including all of Google and Alphabet, but has not claimed to be unable to locate or produce a document because it is a "Google" document. Instead, Waymo applies its general objection where sensible. For example, in response to RFP No. 3 seeking "how often Waymo engineers download documents," Waymo restricted its response to engineers within Waymo, not Google-wide. Dkt. 688-3, Response to RFP No. 3.

**8. Other Document Requests**.

*No. 158.* Uber claims that Waymo refuses to produce a document identifying the date that Waymo instituted a litigation hold. Mot. 7. In response to this RFP, Waymo agreed to "produce or log documents sufficient to identify the first date that Waymo instituted a litigation hold." Dkt. 688-7, Response to RFP No. 158. It is unclear what the dispute is here.

*No. 159.* Uber asks for "organizational charts and personnel lists" for Waymo. Mot. 7. Waymo agreed to produce a personnel list. Waymo does not have an organizational chart, and therefore is not obligated to produce one.

*No. 161.* Uber seeks "[a]ll drafts" of a document Waymo produced in this litigation, a Google Slides slide presentation stored in the cloud. Mot. 7. The only "drafts" of this presentation are those automatically saved by a Google algorithm. These save points are frequent and based on a myriad of factors, and even a trivial change, such as the entrance of a few keystrokes, can trigger a save. In response to this request, Waymo investigated a host of these periodic saves. Each "version" contained the same number of slides, carried the same date on the cover slide, and appeared identical based on visual spot check. Despite the evident lack of additional probative value, Waymo nonetheless manually restored five such "versions," choosing the last version saved on each of the five days on which the algorithm made a save. Waymo produced these on June 16. Uber has not identified any differences in these five versions, thus has not justified its request for intra-day versions as well. Waymo sufficiently responded to this RFP.

*No. 134.* Through this request for "All documents relating to the resignation of David Drummond from Uber's Board of Directors," Uber does not seek legitimate discovery, but rather improperly to "embarrass or harass." *Foote*, 2015 WL 2170121, at *2. Mr. Drummond is the Chief Legal Officer of Alphabet Inc., and Uber fails to show any entitlement to this discovery. Uber argues vaguely that the request "is directed to Waymo's delay in seeking relief, which is relevant to its purported need for injunctive relief," but does not attempt to explain why or how Mr. Drummond's resignation might relate to any alleged delay. Uber's explanation is further curious because Mr. Drummond resigned from Uber's Board in late August, three months before Waymo received an inadvertent email disclosing an Uber LiDAR component that closely resembled Waymo's trade-secret design. Uber alleges that the reasons for Mr. Drummond's resignation are relevant because *Waymo* seeks minutes for Board meetings that Mr. Drummond attended. Mot. 7. But Waymo's requests go to the clearly-relevant issue of what Uber knew and when Uber knew it concerning Levandowski and the Otto acquisition, whereas Uber fails to articulate any tie between its case and Mr. Drummond's resignation. Moreover, Uber's head of corporate development testified at deposition that Mr. Drummond did not attend the Board meeting approving the Otto acquisition. Ex. 4 at 297:20-24. The Court should shut down this attempt by Uber to pry into the irrelevant personal motives of one of Alphabet's highest-ranking executives.

Respectfully,

*/s/ Charles K. Verhoeven*
Charles K. Verhoeven

cc:     All counsel of record; Special Master John Cooper