# MORRISON | FOERSTER

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA  94105-2482

TELEPHONE: 415 268 7000
FACSIMILE: 415 268 7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

BEIJING, BERLIN, BRUSSELS, DENVER,
HONG KONG, LONDON, LOS ANGELES,
NEW YORK, NORTHERN VIRGINIA,
PALO ALTO, SACRAMENTO, SAN DIEGO,
SAN FRANCISCO, SHANGHAI, SINGAPORE,
TOKYO, WASHINGTON, D.C.

June 27, 2017

Writer's Direct Contact
+1 (415) 268.7020
AGonzalez@mofo.com

VIA ECF

Magistrate Judge Jacqueline Scott Corley
USDC, Northern District of California
San Francisco Courthouse Courtroom F-15th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

Re:   *Waymo LLC v. Uber Technologies, Inc., et al*, N.D. Cal. Case No. 3:17-cv-00939-WHA

Dear Magistrate Judge Corley:

Defendants Uber Technologies Inc. and Ottomotto LLC (collectively, "Uber") submit this letter in opposition to Waymo LLC's ("Waymo") motion to compel the production of documents and responses to expedited interrogatories filed on June 21, 2017 ("Waymo Br.") (Dkt. 681-3).

Respectfully submitted,


*/s/ Arturo J. Gonzalez*
Arturo J. González

la-1353118

Waymo's motion pertains to certain of Uber's responses to Waymo's expedited discovery requests. In its May 11, 2017 order, the Court granted Waymo expedited discovery "in aid of possible further provisional relief." (Dkt. 427-1 at 25.) Specifically, "[w]ith respect to its trade secret misappropriation claims *only*," the Court authorized Waymo to propound 28 "reasonably narrow" document requests and 28 "reasonably narrow" interrogatories, "for which the response time is reduced to 14 calendar days." (*Id.* (emphasis in the original).) Despite the Court's admonition, Waymo served overbroad discovery requests. Uber responded appropriately, including by agreeing to produce a more narrow set of documents or information than the request sought where such a response was necessary to cure the overbreadth. Accordingly, and as explained below, Uber submits that the Court should deny Waymo's request for an order that Uber (1) produce additional documents responsive to Waymo's Expedited Request for Production Nos. 5, 8, 10, 20 and 25 and (2) provide additional responses to Expedited Interrogatory Nos. 3, 5, 8 and 20.

**Expedited Document Requests**

***RFP No. 5*** *("All diligence DOCUMENTS provided by OTTOMOTTO or OTTO TRUCKING to UBER prior to August 5, 2016, INCLUDING any Data Room or Virtual Data Room.")*

In response to this Request, Uber agreed to "produce all non-privileged diligence documents provided by Ottomotto and Otto Trucking prior to August 5, 2016 that were placed in the transaction Data Room." (Waymo Br. Ex. 9 at 4.) Uber produced those documents – 810 documents totaling 5,288 pages – on June 5, the same day it served its response. During the course of meeting and conferring, Waymo asked what responsive diligence documents exist that were not included in the Data Room. Contrary to the assertion in Waymo's Letter Brief, in response, Uber followed up with multiple personnel that were involved in the acquisition, and those individuals confirmed they could not identify any categories of responsive documents that were not included in the Data Room. (Ex. 1.) As Uber explained, to the extent additional documents exist that conceivably could be categorized as "diligence documents" provided by Ottomotto or Otto Trucking, they would be in the form of emails with follow up information or one-off email attachments exchanged during the deal. Identifying those would require a burdensome review of every email exchanged on the deal from January to August 2016, which is far beyond the proper scope of a "reasonably narrow," expedited document request. (*Id.*)

Nor has Waymo established the relevance of any such document. The Court authorized expedited discovery "[w]ith respect to [Waymo's] trade secret misappropriation claims *only*." (Dkt. 427-1 at 25 (emphasis in the original).) Other than the platitude that "diligence documents provided by the Otto entities to Uber in connection with a potential acquisition are relevant to central issues in this case, including 'what Uber knew and when they knew it,'" (Waymo Br. at 3), Waymo makes no effort to articulate what types of diligence documents it believes are missing from the more than 800 Data Room documents, the repository of diligence documents for the deal, or how such documents are relevant to Waymo's trade secret claims.

Finally, Waymo has sought the same documents in RFP No. 28 of Waymo's non-expedited document requests, to which Uber responded on June 23. (Ex. 2 ("All DOCUMENTS and COMMUNICATIONS REGARDING UBER's due diligence of OTTOMOTTO.").) To the extent an email-by-email review of all communications related to the acquisition is appropriate,

1

it could only be appropriate in response to a non-expedited request. Further production in response to Waymo's expedited request is unwarranted under the Court's order for limited additional discovery and in light of Uber's substantial production to date.

**RFP No. 8** *("All documents regarding potential or actual "Pre-Signing Bad Acts" as defined in the ACQUISITION DOCUMENTS, including by Levandowski.")*

Uber's written response to this Request stated:

> Defendants object to this Request because it calls for materials protected by the attorney-client privilege, work product doctrine, and common interest privilege. In particular, this Request relates to the issue that is presently before the Court in Waymo's motion to compel. As stated during a call among the parties and the Special Master on June 3, 2017, to the extent responsive documents exist, Defendants will produce or log them at a reasonable time following a judicial resolution of the disputed issue. Defendants further object that the Request is overbroad, not "reasonably narrow," and not proportional to the needs of the case insofar as it seeks documents pertaining to anyone other than Mr. Levandowski, seeks "all" documents, and seeks documents about "potential" acts (though Waymo agreed to delete "potential" as a result of a meet-and-confer regarding these Requests).

(Waymo Br. Ex. 9 at 5.) In the course of meeting and conferring, Uber confirmed that it has "not identified any non-privileged, responsive documents." (Ex. 1.)

Waymo seeks production of all responsive documents, but as stated above, to the extent such documents exist, they are protected from disclosure, at least until the Court's recent orders on privilege issues become final. The Court's orders compelling the production of the report prepared by Stroz Friedberg is currently stayed, as is the order regarding the remaining documents on Uber's privilege logs. As Uber previously informed Waymo, if any documents responsive to this Request as it pertains to Mr. Levandowski exist and are not already on Uber's privilege logs, Uber will log those documents once the orders on those disputed privilege issues are final to avoid hours of potentially wasted effort should the final orders require production.

Moreover, as explained in Uber's written response, to the extent this Request seeks documents pertaining to "Diligenced Employees" other than Mr. Levandowski, it is overbroad and not "reasonably narrow," as required for an expedited request, because Waymo's trade secret claims are based on allegations concerning Mr. Levandowski, Radu Raduta, and Sameer Kshirsagar, not any of the other Diligenced Employees. Uber stands ready to produce or log responsive documents, as appropriate, in conformance with the Court's final orders on the pending disputed privilege issues. The Court should deny Waymo's request for relief as it pertains to this Request.

**RFP No. 10** *(All lab notebooks belonging to LiDAR personnel.)*

Uber's written response to this Request agreed to produce all lab notebooks belonging to all

personnel "who primarily work on LiDAR." It produced notebooks for 19 LiDAR personnel (11 personnel did not have any notebooks), but objected to producing notebooks for 27 additional personnel who worked on LiDAR only tangentially, on the ground the request is overbroad and not "reasonably narrow." (Waymo Br. Ex. 13 at 2.) In its motion, Waymo contends the Court's May 11 Order allows inspection of anything regarding on-going LiDAR work, but Waymo did not request to inspect the notebooks pursuant to the May 11 Order and never raised that during the parties' meet-and-confer sessions. Had Waymo done so, Uber would have allowed an inspection.[1] That notwithstanding, Uber agrees to collect and produce lab notebooks for personnel who worked on LiDAR only tangentially. This Request is resolved.

**RFP No. 20** *(Software Modules cited in disclosure schedules to Put Call Agreement –* ▮ ▮*.)*

The software modules identified by Waymo—are not relevant to Waymo's trade secret misappropriation claims and are outside the scope of the expedited discovery granted by the Court. The Court granted Waymo expedited document discovery "[w]ith respect to its trade secret misappropriation claims *only*." (*See* Dkt. 426 at 25 (emphasis in original).) In its list of 121 trade secrets, Waymo identified only one software-related trade secret— ▮ ▮. (*See* Dkt 25-7 (Jaffe Ex. 1).) In contrast, Waymo does not – and cannot – contend that any of these five software modules for the operation of self-driving vehicles is used for ▮ or receives or uses any LiDAR data.

Waymo argues that these software modules are relevant to its trade secret claims because Anthony Levandowski allegedly downloaded a ▮ ▮ (*See* Dkt. 25-20 (Jaffe Ex.14).) Tellingly, Waymo did not attach this ▮ document to its letter brief. A closer examination of this ▮ document, submitted herewith as Exhibit 3, shows it includes no software algorithms or source code. Waymo was required by Cal. Civ. Proc. Code § 2019.210 to identify its trade secrets with particularity before commencing discovery. Waymo cannot use a ▮ summary of ▮ to expand its asserted trade secrets to cover software that was never part of the trade secrets list or the allegedly downloaded 14,000 files. As the District Court has explained, "[a] true trade secret plaintiff ought to be able to identify, up front, and with specificity the particulars of the trade secrets without any discovery." *Jobscience, Inc. v. CVPartners, Inc.*, No. C 13-04519 WHA, 2014 WL 852477, at *5 (N.D. Cal. Feb. 28, 2014); *see also id.* ("Experience has shown that it is easy to allege theft of trade secrets with vagueness, then take discovery into the defendants' files, and then cleverly specify what ever happens to be there as having been trade secrets stolen from plaintiff."). This is yet another example of Waymo's "use of moving targets as asserted trade secrets." (*See* Dkt. 426 at 14 n.6.) And in any case, Waymo's deadline to amend its complaint to add additional trade secrets has expired.

Waymo further argues that these software modules are relevant because Don Burnette, designer of two of the five modules ▮ ▮ was a "Diligenced

---

[1] To date, Uber has allowed Waymo's counsel to conduct eight inspections of Uber' facilities, computers, and emails, both in San Francisco and Pittsburgh, for a total of 55 hours.

Employee." But being part of the diligence process, by itself, does not establish relevance to Waymo's trade secret claims. As this Court explained, the Stroz investigation was commissioned "to evaluate whether to acquire Otto" and "to create an evidentiary record should an indemnification obligation arise." (*See* 6/23/17 H'rg Tr. at 8-9.) It was not "to assist with obtaining Waymo's trade secrets." (*See* Dkt. 731 at 2.) That Don Burnette was a "Diligenced Employee" has no bearing on software modules unrelated to any of Waymo's 121 alleged trade secrets. Waymo's trade secret claims are based on its allegations about Messrs. Levandowski, Raduta, and Kshirsagar, not Mr. Burnette.

Finally, Waymo argues that it was entitled to see all assets that Uber is buying in its acquisition of Otto. Waymo has already obtained extensive discovery relating to the Otto acquisition (*see, e.g.*, discussion regarding RFP No. 5, *supra*) and deposed Cameron Poetzscher and Nina Qi, Uber personnel who worked on the Otto acquisition. Waymo also had the opportunity to inspect (and has inspected) any schematics, work orders, source code, notes, and emails related to Uber's LiDAR development (including Spider and Fuji's source code). What Waymo is not entitled to do is expand its trade secret claims beyond its list of 121 trade secrets and seek unrelated software. The Court should deny Waymo's requested relief.

***RFP No. 25*** (*"All DOCUMENTS REGARDING the satisfaction of conditions for closing in the ACQUISITION DOCUMENTS."*)

In response to this Request, Uber stated "Defendants will produce a non-privileged version of the final closing checklist to the extent one can be located after a diligent search." (Waymo Br. Ex. 13 at 8.) Uber also objected that the Request calls for materials protected by the attorney-client privilege, work product doctrine, and common interest privilege; is overbroad; and is not "reasonably narrow" as required by the May 11, 2017 Order. (*Id.*)

In later correspondence, Uber explained that it did not locate a non-privileged version of the closing checklist. (Waymo Br. Ex. 11.) The Special Master suggested that Uber create a non-privileged list of the closing conditions to satisfy this Request. While reserving its right not to create documents to respond to future document requests, Uber has set forth the closing conditions in the document submitted herewith as Ex. 4. As is plain from the face of that document, the closing conditions are drawn directly from the acquisition documents, which Waymo has. The closing conditions also are comprised largely of events that have nothing to do with Waymo's trade secret claims (*e.g.*, preparation of Ottomotto's tax returns, selection of a Payment Agent for distribution of Merger Consideration, execution of a Certificate of Merger). Thus, not only is Waymo's request for all documents showing how seven pages of closing conditions were satisfied overbroad for expedited discovery, it seeks irrelevant documents.

**Expedited Interrogatories**

***Interrogatory No. 3*** *(Identify all devices Levandowski used to access Defendants' Networks.)*

Uber's response identified the two devices that, to Uber's knowledge, Mr. Levandowski used to access Uber's network. (Waymo Br. Ex. 3.) At the Special Master's request, Uber is offering a declaration from its testifying expert on forensic computer analysis regarding his investigation into what devices Mr. Levandowski used to connect to Uber's network. As reflected in the

4

la-1353118

concurrently filed Declaration of Kevin Faulkner, his analysis confirms the information contained in Uber's written response: Mr. Levandowski used two devices to access Uber's networks: 1) a MacBook Pro issued to Mr. Levandowski by Uber and 2) a MacBook Pro not issued by Uber. It further confirms he did not locate any record of a mobile device assigned to Mr. Levandowski that accessed Uber's network. Thus, no further response is needed.

***Interrogatory No. 5** (All compensation discussed, conveyed or promised to Levandowski.)*

Uber's written response to this Request stated:

> Representatives of Uber, including Nina Qi and Cameron Poetzscher, began having general discussions with Mr. Levandowski about the compensation component of Uber's acquisition of Ottomotto in early January 2016, and extending periodically until April 2016. These discussions were not specific to Mr. Levandowski's compensation, but instead were general discussions about the consideration that Uber would pay as part of its acquisition of Ottomotto.

(Waymo Br. Ex. 3 at 7.) The response went on to identify specific documents from Uber's production that reflect Mr. Levandowski's compensation, including his 280 Systems and Uber employment agreements, Uber's Equity Incentive Plan, the "Milestones" document, and a ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.[2] (*Id.*) Those documents set forth Mr. Levandowski's ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ Uber further referred Waymo to the documents concerning Uber's acquisition of Ottomotto, including, for example, the Agreement and Plan of Merger and the Term Sheet. (*Id.*) Uber also objected that this Interrogatory is overbroad, unduly burdensome, not "reasonably narrow" as required by the May 11, 2017 Order, and seeks irrelevant information in extending to "all compensation" ever "discussed, conveyed, or promised."

As a result of the meet-and-confer process, Uber supplemented its response on June 22, adding that

> To date, Uber's payments to Mr. Levandowski consist of the following: ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ Uber conducted a diligent search and identified no other compensation provided to Mr. Levandowski.

---

[2] Waymo's letter brief notes that Mr. Levandowski's salary and stock grants were redacted in the version of his 280 Systems employment agreement that Uber produced early in this litigation. Uber will produce an unredacted version of that agreement and designate it "Highly Confidential," as it previously did with his Uber agreement.

(Ex. 5 (6/22 Suppl. Resps).)  Waymo seeks further details about what compensation was "promised" to Mr. Levandowski, but Waymo fails to articulate how that is at all relevant given Uber's disclosure of the compensation Mr. Levandowski actually received.  Waymo's request for a further response is unwarranted.

***Interrogatory No. 8*** *("Describe all consulting work performed by LEVANDOWSKI for UBER before August 18, 2016, INCLUDING the terms of the consulting and any compensation arrangements.")*

Uber's initial response stated that Mr. Levandowski "was not a retained consultant for Uber and there was no consultant agreement or consultancy compensation arrangement between Mr. Levandowski and Uber."  (Waymo Br. Ex. 3 at 12-13.)  However, it went on to state that "[b]eginning in late winter or early spring 2016, and continuing until the transaction between Uber and Ottomotto closed,  Mr. Levandowski would from time to time:  visit Uber's facilities in San Francisco and Pittsburgh; attend Uber meetings related to autonomous vehicles; meet with various Uber tech leads, engineers, and other employees of Uber's autonomous vehicle program; tour Uber's facilities and labs; and examine Uber's autonomous vehicle project records."  (*Id.*)

In an effort to resolve the concern Waymo voiced during the meet-and-confer process that Uber was misinterpreting the term "consultant" and had provided insufficient information about what Mr. Levandowski's role entailed, Uber supplemented its response on June 22, 2017, adding that: "Mr. Levandowski provided unpaid consulting advice," and that in that role he "provided comments and suggestions on how to improve various aspects of Uber's autonomous vehicle program, including hardware and software."[3]  (Ex. 5 at 5.)

Waymo asks this Court to compel Uber "to disclose the metes and bounds of Mr. Levandowski's consulting and any compensation arrangements (whether promised or actualized)" as well as "the consulting work itself" (Dkt. 682 at 7), but as explained above, Uber has responded to this Interrogatory in full.  Waymo's assertion that deposition testimony that Mr. Levandowski was "consulting for the company" is somehow inconsistent with Uber's initial written response and a statement made in meet-and-confer correspondence lacks merit, given that the written response made clear that Mr. Levandowski was not a paid, retained consultant before August 18, but did perform unpaid activities relating to Uber's autonomous vehicle program.  (Waymo Br. Ex. 3 at 12-13; Ex. 5 (6/22 Suppl Resps).)  In any event, the supplemental response clears up any uncertainty.

Finally, Waymo is not entitled to a further response to this Interrogatory because it already has obtained deposition testimony on this topic.  Waymo asked about Mr. Levandowski's role at Uber before August 18, 2016 during the June 16, 2017 deposition of John Bares, who was the director and founder of Uber's Advanced Technologies Center during the relevant time, and Mr. Bares testified that Mr. Levandowski "examined everything we were doing, from sensors to automotive OEM partners to software design, to mapping, to labeling, everything in the self-driving effort.  Reviewed all of those pieces, gave comments and suggested, suggested change of

---

[3] During the parties' meet-and-confer call on June 16, Uber informed Waymo that it could not provide a supplemental response on June 16, but would try to do so before Waymo filed its motion.

la-1353118

direction, paths forward, how to improve what we were doing and gain higher speed." (Ex. 6 (Bares Dep. at 19:10-21).) That testimony is entirely consistent with Uber's written responses. Having obtained testimony from Mr. Bares about what Mr. Levandowski did at Uber before the deal closed, Waymo is not entitled to yet another supplemental response to its interrogatory. *Adobe Sys. v. St. Paul Fire & Marine Ins. Co.*, No. C 07-00385 JSW(MEJ), 2008 WL 1342877, at \*2 (N.D. Cal. April 9, 2008) (denying motion to compel further responses to interrogatories where plaintiff had deposed individuals with knowledge about the subject matter); *Sloan v. Oakland Police Dep't*, No. C 00 4117 CW(JCS), 2006 WL 753013, at \*5 n.2 (N.D. Cal. Mar. 23, 2006) (explaining that a motion to compel further interrogatory responses "will only be granted if the additional interrogatory responses sought are not duplicative of information already obtained, through deposition or otherwise," and that "[i]n particular, Defendants will need to address whether the interrogatories relate to questions that were asked, or could have been asked, at Plaintiff's deposition").

***Interrogatory No. 20*** *(Identify all communications between UBER and John Gardner, or any other attorney acting on behalf of LEVANDOWSKI prior to August 18, 2016.)*

Uber's written response, served on June 9, 2017, provided

> Defendants object to this interrogatory because it implicates information protected by the attorney-client privilege, the work-product doctrine, and the common-interest and joint-defense privileges. In particular, this interrogatory relates in part to the issue addressed by the June 5, 2017 order on Waymo's motion to compel, to which Defendants filed an objection on June 8, 2017. That order is currently stayed "until further order of the district court." Therefore, communications with Mr. Gardner to which that order applies currently remain privileged from disclosure, and communications with Mr. Gardner to which that order does not apply are also privileged from disclosure. Defendants further object that this interrogatory is overbroad in seeking an identification of "all" communications with Mr. Gardner, rather than limiting it to communications connected to the investigation performed by Stroz Friedberg LLC. The interrogatory therefore is not "reasonably narrow." (*See* Order, ECF No. 426.) Given the vast overbreadth of this interrogatory, it is unreasonable to require an expedited response.

(Waymo Br. Ex. 16 at 12.) Waymo's request for a further response lacks merit. Uber is unaware of any responsive verbal communications with John Gardner that pre-date February 24, 2016. Uber produced all non-privileged, responsive documents reflecting communications with Mr. Gardner in response to expedited RFP No. 19. To the extent there are other responsive documents that are protected by the attorney-client privilege, work product doctrine, and/or common interest privilege (at least until the Court's orders on disputed privilege issues become final), those documents were addressed in response to RFP No. 19. (Ex. 7.) And Waymo cites no authority to support its request for an order requiring Uber to create a privilege log of verbal communications with Mr. Gardner. No relief is warranted.

la-1353118