# EXHIBIT A

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**EXECUTION COPY**

**PROJECT ZING**

**Draft Term Sheet**

*Date: 5:00 PM PST, February 22, 2016*

This term sheet (the "**Term Sheet**") is a summary of certain indicative terms of a proposed acquisition of Ottomotto Inc., a Delaware corporation (the "**Company**"), by ████████████████████████████ ████████████████████ (together with its affiliates, "**Unicorn**"), as further described herein.

| | |
|---|---|
| **Transaction Parties:** | • Company<br>• Unicorn<br>• Uber<br><br>It is understood and agreed that Uber, in addition to Unicorn, will be a party to the Put Call Agreement for purposes of guaranteeing the obligations of Uber and Unicorn under the Put Call Agreement (e.g., indemnification, representations and warranties, agreements regarding closing conditions, obligations to fund operating plans and budgets, etc.). In accordance with the preceding sentence, references to Unicorn in this Term Sheet shall also be deemed to include references to Uber in all such contexts. |
| **Structure:** | Unicorn will directly or indirectly acquire 100% ownership of the equity securities of the Company based on the transaction structure and other terms and conditions set forth in this Term Sheet (the "**Transaction**").<br><br>As of or promptly following the date hereof, the Company holds both (i) the business of the development or commercialization of consumer autonomous vehicles and related services (the "**Consumer Business**"), and (ii) the Trucking Business (as defined in Exhibit D). Following the consummation of the Transaction, the Company will be a direct or indirect wholly-owned subsidiary of Unicorn.<br><br>Prior to signing the Put Call Agreement (as defined below), the Company will (i) designate two series of units in order to achieve the parties desired economics regarding the allocation of (x) the Milestone RSUs (as defined below) with respect to the Consumer Business and (y) the Trucking Company Pool (as defined below) with respect to the Trucking Business, (ii) form a new Delaware limited liability company that operates the Trucking Business (the "**Trucking Company**"), or (iii) mutually agree with Unicorn on another transaction structure that achieves the same desired economics and has substantially similar tax consequences (including a structure whereby a separate put call arrangement exists for each of the Company and the Trucking Company) (an "**Alternative Structure**"). If the Trucking Company is formed, all intellectual property related to the Consumer Business will be transferred from the Company to, and be held by, the Trucking Company, and the parties will mutually agree to adjust the transaction structure as necessary to ensure that the Transaction includes the |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

| | |
|---|---|
| | acquisition of the Trucking Company (in addition to the Company). |
| | Prior to signing the Put Call Agreement, Unicorn will complete all of the due diligence in accordance with Exhibit C. Subject to any Alternative Structure, the Transaction shall be structured as follows: |
| | • As promptly as practicable after the date hereof, Unicorn and the Company will enter into a definitive Put / Call Agreement (the "**Put Call Agreement**"). |
| | • Either attached to the Put Call Agreement will be an acquisition agreement (which will provide for a stock purchase, merger or other transaction structure mutually agreed by the parties, whereby Unicorn acquires 100% ownership of the equity securities of the Company) in a form mutually agreed upon between the parties or the Put Call Agreement will itself be an acquisition agreement (in either case, the "**Acquisition Agreement**"). ██████████████ (i) ████ to all employees other than Anthony Levandowski, Lior Ron and other key employees to be identified and mutually agreed upon (collectively, the "**Key Employees**") or (ii) ████████ ████████████████ The parties shall have the ability to update the Acquisition Agreement in good faith as mutually agreed upon based on changes to the structure of the Transaction. |
| | • Subject to any Alternative Structure, at any time from (i) February 28, 2017 until (ii) March 31, 2017 (such date, the "**Put Call End Date**"), (x) the Company shall have the right, subject to the below, to cause Unicorn to execute the Acquisition Agreement and consummate the Transaction (the "**Put**"), subject to the "Closing Conditions" set forth below, and (y) Unicorn shall have the right, subject to the below, to cause the Company to execute the Acquisition Agreement and consummate the Transaction (the "**Call**"), subject to the "Closing Conditions" set forth below. |
| | • Unicorn and the Company shall consummate the Transaction (the "**Closing**") as promptly as practicable after the exercise of the Put or the Call (as applicable): |
| | • ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ |
| **Consideration /** | At the Closing, Unicorn will pay the Company a mutually agreed upon |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

| Employment Arrangements: | amount that is no greater than ███████ (such amount, the "**Cash Consideration**") for 100% of the equity securities of the Company ██ ████████████████████████████████████████████████████ |
|---|---|
| | Additionally, at the Closing, employees of the Company who accept employment offers with Uber will receive: |
| | - Base salary in accordance with Uber's customary practices; and |
| | - In the aggregate, a pool of restricted stock units of Uber Technologies, Inc., a Delaware corporation ("**Uber**") with respect to shares of Uber's Common Stock ("**RSUs**"), which shall be allocated by the Company in accordance with, and which shall be determined in accordance with, the terms set forth in Exhibit A. |
| | After the date hereof, the parties and their respective counsel will explore in good faith alternative mutually beneficial transaction and compensation structures (i.e. earn-outs for the Trucking Company Pool, restricted stock, formation of trusts, etc.) with the objective of being tax-efficient for the employees and stockholders of the Company. |
| | Anthony Levandowski's employment agreement with Uber shall provide that he shall report to Jeff Holden. |
| Put / Call Closing Conditions: | The exercise of the Put by the Company will be subject to the Company providing to Unicorn an officer's certificate certifying the satisfaction of the following conditions (the "**Put Conditions**"), which such Put Conditions shall also be satisfied immediately prior to the consummation of the Transaction; provided that Unicorn agrees that Unicorn shall not be permitted to cause any of the following Put Conditions to not be satisfied (or to claim that they are not satisfied) either at the exercise or the consummation of the Transaction as a result of a claim that arises or results from a Pre-Signing Bad Act (as defined in Exhibit C): |
| | - A customary bring down of representations and warranties with respect to the Company and stockholders (if applicable depending on the structure) set forth in the Put Call Agreement and/or Acquisition Agreement, except as would not have a material adverse effect (other than certain fundamental representations and warranties, which will be brought down to a more stringent standard as mutually agreed by the parties in definitive documentation); provided, that, other than (i) with respect to fundamental representations and warranties or (ii) in the case of a "super duper" litigation (to be defined in definitive documentation), Unicorn shall not be permitted to cause such condition to not be satisfied (either at the exercise or the consummation of the Transaction) as a result of an Indemnified Claim; |
| | - Except as explicitly set forth in Exhibit C, all of the covenants of the |

3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

Company and stockholders (if applicable depending on the structure) in the Put Call Agreement and/or Acquisition Agreement shall have been performed and/or complied with in all material respects; provided, that, other than in the case of a "super duper" litigation (to be defined in definitive documentation), Unicorn shall not be permitted to cause such condition to not be satisfied (either at the exercise or the consummation of the Transaction) as a result of an Indemnified Claim;

- No material adverse change with respect to the Company; provided, that, other than in the case of a "super duper" litigation (to be defined in definitive documentation), Unicorn shall not be permitted to cause such condition to not be satisfied (either at the exercise or the consummation of the Transaction) as a result of an Indemnified Claim;

- No material claims or litigation with respect to the Company, including without limitation the Company's intellectual property (including claims of infringement or misappropriation of any intellectual property of any third party) or with respect to any of the Key Employees; provided, that, except in the case of a "super duper" litigation, Unicorn shall not be permitted to cause such condition to not be satisfied (either at the exercise or the consummation of the Transaction) as a result of an Indemnified Claim;

- All governmental approvals or authorizations with respect to the Transaction (including HSR, if required) have been obtained;

- No (i) injunctions prohibiting the Transaction or (ii) legal proceedings brought by governmental entities prohibiting the Transaction;

- The Company has not received capital, financing or other funding from any third party other than (i) Unicorn or (ii) employees of the Company, including the Key Employees;

- Unless mutually agreed by the parties, execution and delivery to Uber (and non-revocation) by ███ employees of the Company (which such ███ employees shall include all of the Key Employees) (i) an employment offer letter on terms and conditions acceptable to Uber, which such offer letter will include, among other things, base salary, benefits and equity incentive grants (with customary vesting terms over four years beginning on employee's start date at the Company) in accordance with Uber's customary practices), and (ii) Uber's standard form of employee proprietary information and inventions assignment agreement;

- Receipt by Unicorn of any material third-party consents (if any)

4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

|  | mutually agreed between the parties; and |
|---|---|
|  | • Other customary conditions as mutually agreed upon by Unicorn and the Company. |
|  | In the event Unicorn exercises the Call, the Company shall promptly, but in any event within five (5) business days, provide an officer's certificate certifying the satisfaction of the Put Conditions, which, if not provided by the Company, Unicorn shall have the option, in its sole discretion, to either (i) consummate the Transaction or (ii) cancel and nullify the Call in all respects. The Put Conditions shall also be satisfied as of immediately prior to the consummation of the Transaction. |
|  | The exercise of the Call by Unicorn will be subject to Unicorn providing to the Company an officer's certificate certifying the satisfaction of the following conditions (the "**Call Conditions**"), which such Call Conditions shall also be satisfied immediately prior to the consummation of the Transaction: |
|  | • A customary bring down of representations and warranties with respect to Unicorn set forth in the Put Call Agreement and/or Acquisition Agreement; |
|  | • All of the covenants of Unicorn in the Put Call Agreement and/or Acquisition Agreement shall have been performed in all material respects; |
|  | • All governmental approvals or authorizations with respect to the Transaction (including HSR, if required) have been obtained; |
|  | • No (i) injunctions prohibiting the Transaction or (ii) legal proceedings brought by governmental entities prohibiting the Transaction; and |
|  | • A certificate as to capitalization of Uber certifying that the RSUs in the aggregate represent ▮ of Uber's issued and outstanding shares of capital stock on a fully diluted basis as of ▮ |
|  | In the event the Company exercises the Put, Unicorn shall promptly, but in any event within five (5) business days, provide an officer's certificate certifying the satisfaction of the Call Conditions, which, if not provided by Unicorn, the Company shall have the option, in its sole discretion, to either (i) consummate the Transaction or (ii) cancel and nullify the Put in all respects. The Call Conditions shall also be satisfied as of immediately prior to the consummation of the Transaction. |
| **Covenants / Interim** | Interim Financing |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

| **Financing:** | The parties agree that from the execution of the Put Call Agreement until the earlier of the Put Call End Date and the termination of the Put Call Agreement, the Company shall not seek or receive any financing (debt or equity) from any third party other than (i) Unicorn, Uberand/or (ii) employees of the Company, including the Key Employees. |
|---|---|
| | Prior to signing the Put Call Agreement, Unicorn and the Company will agree on an operating plan and budget for the Company's Consumer Business and the Trucking Business prepared for each quarter from the signing of the Put Call Agreement until the later of the (i) Closing and (ii) Put Call End Date (the "**Operating Plan**"); |
| | Beginning upon the signing of the Put Call Agreement, Unicorn and Uber shall be obligated to fund the Company for each quarter in advance in accordance with the Operating Plan, so long as the Operating Plan for all prior quarters (if any) has been materially complied with by the Company, or as mutually agreed upon by the parties.   Unicorn and the Company shall have the ability to amend the Operating Plan at any time by mutual written consent. |
| | • |
| | • |
| | Other Covenants |
| | In addition to any covenants set forth in Exhibit C, the Put Call Agreement and/or the Acquisition Agreement shall contain other customary interim |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

| | |
|---|---|
| | covenants (including with respect to exclusivity negative covenants regarding Competitive Transactions) of the Company covering the period between the dates of the Put Call Agreement and/or the Acquisition Agreement and the Closing. |
| **Representations and Warranties:** | The Put Call Agreement and/or the Acquisition Agreement will contain customary representations and warranties for a transaction of this nature. |
| ███████ | █████████████████████████████████████████████████ |
| **Trucking Company:** | The parties shall agree on an earn-out whereby, after the Closing, a combination of (x) certain employees of the Company prior to the Closing and (y) employees of the Trucking Company (if formed) prior to the Closing (collectively, the "**Trucking Company Pool**") shall receive ████████ ████████████████████████████████████████████████████ shall be measured each fiscal year and paid to the Trucking Company Pool employees (in their respective shares) in accordance with the principals set forth herein promptly following the end of each fiscal year. In order for the profits to vest for any member of the Trucking Company Pool, ██████████████████████████████████████ ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

Time Vesting Condition

12/48 of the profits will vest on the one-year anniversary of each such Trucking Company Pool employee's start date with the Company, Trucking Company or Uber (whichever is earlier) and 1/48 of the profits will vest on each monthly anniversary thereafter.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

| | |
|---|---|
| | ████████████████████████████ |
| | ████████████████████████████ |
| | ████████████████████████████ |
| | ████████████████████████████ |
| **Confidentiality:** | Each party to this Term Sheet agrees to keep confidential the existence, status and terms of this Term Sheet in accordance with the terms of the Mutual Non-Disclosure Agreement, dated as of February 1, 2016, by and between Uber, the Company and the Founders. |
| **Exclusivity:** | Each of the Founders and the Company (each a "**Restricted Party**") shall negotiate exclusively with Unicorn with respect to the subject matter of this Term Sheet for an initial period of 45 days from the date hereof (the "**Exclusivity Period**"); provided, that the Exclusivity Period shall be automatically extended for two successive 15 day periods so long as each of Unicorn, the Company and the Founders and their respective advisors are |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

| | |
|---|---|
| | continuing to negotiate the Transaction in good faith as of the end of each preceding period. During the Exclusivity Period no such Restricted Party shall (i) solicit, or encourage the initiation or submission of, any indication of interest, proposal or offer from any party other than Unicorn (including, without limitation, any Competitor (as defined below)) regarding (x) a transaction or other arrangement that is similar and/or competitive to the Transaction or (y) any other commercial arrangement with any Competitor (in either the case of clause (x) or clause (y), a "**Competitive Transaction**"), or (ii) participate, or engage in any discussions, negotiations or otherwise with, or provide any information to, any party other than Unicorn (including, without limitation, with any competitors of Unicorn) regarding a Competitive Transaction. "**Competitor**" shall mean party <br><br><br><br><br><br> Each of the Restricted Parties shall immediately terminate and cease any ongoing discussions, communications or negotiations with any party (other than Unicorn) regarding a Competitive Transaction, and shall promptly provide Unicorn with an oral and a written notice of any expression of interest, inquiry, proposal or offer that (i) is in the form of a written term sheet, letter of intent, indication of interest letter or similar written document and/or (ii) relates to a possible acquisition of more than 20% of the equity interests (including via convertible debt) of the Company (which notice shall, to the extent permitted by any applicable non-disclosure agreements that were in place as of the date of this Term Sheet and remain in force as of the time of such notice, identify the other party(ies) involved, and set forth the material terms and conditions, including the amount and form of consideration and material conditions of any such offer, expression of interest, inquiry or proposal) that is received by any of such Restricted Parties from any party (other than Unicorn) after the date of this Term Sheet and on or prior to the expiration of the Exclusivity Period. |
| | |
| **Governing Law:** | This Term Sheet and all definitive documentation will be governed by and construed in accordance with the laws of the State of California, without giving effect to any provisions or principles thereof with respect to conflict of laws. |

11

**EXECUTION COPY**

| | |
|---|---|
| **Costs & Expenses:** | Each party to this Term Sheet shall bear its own costs and expenses incidental to the preparation of this Term Sheet and any definitive documentation and the consummation of the Transaction. |
| **Counterparts:** | This Term Sheet may be executed in one or more counterparts and when so executed such counterparts shall constitute a single agreement. Execution by facsimile or scanned to e-mail format signatures shall be legal, valid and binding. |
| **Termination:** | If this Term Sheet has not been fully-executed by each of the parties to this Term Sheet as of 9 p.m. Pacific Time on February 22, 2016, this Term Sheet shall terminate and be of no further force or effect. |
| **Binding Effect; Liability:** | The parties to this Term Sheet hereto agree and acknowledge that, except for the obligations of the parties set forth in the sections "**Confidentiality**", "**Exclusivity,**" ▮▮▮▮▮▮▮▮▮▮▮▮ "**Governing Law,**" "**Costs & Expenses,**" "**Counterparts,**" "**Termination**" and "**Binding Effect; Liability,**" which are intended to be and shall be legally binding, this Term Sheet is not intended to be and shall not be a legally binding agreement. For the avoidance of doubt, no party hereto shall be under any obligation to enter into and deliver any legally binding definitive agreements with respect to the Transaction, and failure to do so shall not impose any liability on any party hereto.<br><br>The parties also acknowledge and agree that this Term Sheet does not constitute an offer for the sale of, or an invitation or a solicitation of any offer for the purchase or acquisition of, securities or any interests in or assets or business of the Company or any of its affiliates. |

\*\*\*

12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

IN WITNESS WHEREOF, the undersigned have executed and delivered this Term Sheet as of the date first written above.

██████████████████

By:  ████████████████

██████████████

Ottomotto Inc.

By: _____
      Name:
      Title:

_____
Anthony Levandowski

_____
Lior Ron

13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY

IN WITNESS WHEREOF, the undersigned have executed and delivered this Term Sheet as of the date first written above.

███████████████████

By:     _____
        Name: ████████
        Title: General Partner

On behalf of ████████
        Name: ████████
        Title:  Manager

Ottomotto Inc.

By:     _____
        Name: LIOR RON
        Title: PRESIDENT

        _____
Anthony Levandowski

        _____
Lior Ron

EXECUTION COPY

## Exhibit A

### Incentive Compensation

The Company will have the ability to allocate (in accordance with the terms of the next paragraph) a number of Uber restricted stock units with respect to shares of Uber's Common Stock on a fully diluted basis as of immediately prior to the date of this Term Sheet less the Cash Consideration. (the "**Milestone RSUs**"), unless mutually agreed by the parties, if at least ▮ employees of the Company accept employment with Uber prior to or as of the Closing.

Allocation of the Milestone RSUs shall be determined by the Company prior to the Closing and shall be subject to Unicorn's good faith approval ("**Allocation Percentages**"). At the Closing, the Company shall be entitled, subject to Unicorn's good faith approval, to reserve a portion of the Allocation Percentages for future employees of the Company and Trucking Company. Once the Company sets the Allocation Percentages in accordance with the preceding sentence, any changes to the Allocation Percentages shall require the mutual written consent of Unicorn and the Company or the Founders (each of which shall be provided in such party's sole discretion). The sum of the Allocation Percentages for the RSUs shall not exceed 100%.

The Milestone RSUs will have a milestone-based condition, a time-based condition, and a performance-based condition, all of which must be met in order for the Milestone RSUs to vest.



14

**EXECUTION COPY**

- The time-based condition will be met as follows: 12/48 of the RSUs on the one-year anniversary of each employee's start date with the Company or Uber (whichever is earlier) and 1/48 of the RSUs on each monthly anniversary thereafter.

- The performance-based condition will be met on the earlier to occur of: (i) an initial public offering ("**IPO**") of Uber stock or (ii) a liquidation transaction, which includes customary liquidation, dissolution or winding up of Uber transactions (each of clause (i) and (ii), a "**Liquidity Event**").

- The RSUs and any shares acquired pursuant to the RSUs will be subject to customary limitations on transfer, including, but not limited to, a six-month lock-up period following an IPO and a one-year holding period from the date the RSUs meet the time-based condition.

- If employment is terminated prior to the occurrence of a Liquidity Event and if, and to the extent, the RSUs have not met the time-based condition as of the date of such termination, the RSUs that have not met the time-based condition will terminate and be forfeited.

By way of example, if, for any particular employee who was employed by Uber or the Company beginning on January 1, 2017, (i) the total number of Milestone RSU's granted to such employee was 100, (ii) Milestone A was allocated 10% of the total Milestone RSU's (i.e., such employee was granted 10 RSU's that were associated with Milestone A), and (iii) Milestone A was achieved on ▮▮▮▮▮▮▮▮▮▮▮ if the employee was (x) still employed by Uber on January 1, 2019 or (y) was terminated (other than for cause) after ▮▮▮▮▮▮▮▮▮ provided, that, for the avoidance of doubt, such ▮▮▮▮▮▮ would not be required in the case of Milestone 7), then on such date:

(1) the milestone-based condition would be satisfied with respect to such 10 Milestone RSU's;

(2) the time-based condition would be satisfied with respect to 5 out of such 10 Milestone RSU's;

(3) if a Liquidity Event occurred prior to January 1, 2019, then with respect to the 5 Milestone RSU's for which the milestone-based condition and time-based condition have been satisfied in accordance with clauses (1) and (2) above, such 5 Milestone RSU's would be fully vested;

(4) the remaining 5 Milestone RSU's for which the time-based condition has not yet been satisfied as of ▮▮▮▮▮▮▮▮▮▮▮ of such 5 remaining milestone RSU's Milestone RSU's would be become fully vested over each of the next ▮ months so long as such employee remains employed by Uber; and

(5) the other 90 Milestone RSUs shall vest similarly based on achievement of the Milestones with which they are associated.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



EXECUTION COPY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**



17

EXECUTION COPY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



20

EXECUTION COPY





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTION COPY



28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**



29

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

**(see attached)**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



2
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



3
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



5
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



7
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



8
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



10
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



11
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



13
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



14
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

<u>**Exhibit C**</u>

**Indemnity Construct**

**(see attached)**

32

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit C**

**Indemnity Construct**

*Pre-Signing Due Diligence Process*

Promptly after the date hereof, Unicorn and its advisors and the Outside Expert (as defined below) shall begin due diligence on Newco and the Diligenced Employees (as defined below), in accordance with the due diligence plan attached hereto as Attachment A, which shall include the completion of the Third Party Report (as defined below).  The initial due diligence of Diligenced Employees employed by Newco prior to the signing of the Put Call Agreement will be completed prior to the execution of the Put Call Agreement. The Diligenced Employees shall certify as to the completion of the due diligence in good faith and that they have responded truthfully to the Outside Expert. Prior to execution of the Put Call Agreement, all Employees (as defined below) (other than Diligenced Employees) shall sign the attestation in accordance with the due diligence plan attached as Attachment A.

*Indemnification Construct*

Unless (i) the Closing does not occur and Unicorn terminates the Put Call Agreement by reason of a Post-Signing Specified Bad Act (as defined below) being committed by or on behalf of Newco by a Diligenced Employee and/or being committed by any Diligenced Employee that was either (A) mutually agreed to have occurred by both Unicorn and Newco or (B) conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such matter) to have occurred, or (ii) if the Closing occurs, but after the Closing, it is conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such matter) that a Post-Signing Specified Bad Act was committed by or on behalf of Newco by a Diligenced Employee and/or was committed by any Diligenced Employee prior to Closing (in each case Unicorn's indemnification obligation pursuant to this paragraph shall become immediately null and void),  following the execution of the Put Call Agreement by Unicorn and Newco, Unicorn will indemnify and hold harmless Newco and/or the Diligenced Employees to the maximum extent permitted by applicable law (subject to the limitations and exclusions set forth herein) from and against any and all Expenses (as defined below) arising out of any claim brought or alleged in writing by any Former Employer (as defined below) of any Diligenced Employee against Newco and/or any Diligenced Employee arising out of or alleged to arise out of (i) the infringement (direct or indirect) or misappropriation by a Diligenced Employee, Newco, or any other entity, of any intellectual property, including any patents, copyrights, trademarks or trade secrets of such Diligenced Employee's Former Employer, and/or (ii) breach of fiduciary duty or duty of loyalty to such Former Employer, and/or (iii) breach of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Diligenced Employee and such Diligenced Employee's Former Employer (collectively, the "Indemnified Claims"); provided, that the Indemnified Claims shall not, regardless of whether the Closing occurs, include any:

(i) claims that have been conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such Indemnified Claim) to arise or result from Bad Acts committed by any Employee (other than a Diligenced Employee), regardless of whether such Bad Acts were committed prior to or after the execution of the Put Call Agreement; provided, that, for the avoidance of doubt, this clause (i) shall not

have any impact on Unicorn's obligation to otherwise indemnify the Diligenced Employees and Newco for any Indemnified Claims in accordance with the provisions herein;

(ii) claims that have been conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such matter) to arise or result from any Pre-Signing Bad Acts committed by or on behalf of Newco by a Diligenced Employee and/or committed by any Diligenced Employee that reasonably arise or result from any facts, circumstances, activities or events that either (x) were not truthfully disclosed by Newco and/or the Diligenced Employees to the Outside Expert in response to relevant inquiries in connection with the due diligence performed by the Outside Expert, or (y) were not contained or reflected in the due diligence materials provided by the Diligenced Employees to the Outside Expert; and

(iii) claims that have been conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such matter) to arise or result from any Post-Signing Specified Bad Acts committed by or on behalf of Newco by a Diligenced Employee and/or committed by any Diligenced Employee (the matters excluded from Indemnified Claims in the preceding clauses (i), (ii) and (iii) collectively, the "Excluded Claims").

The indemnification obligation of Unicorn to a Diligenced Employee with respect to an Indemnified Claim against such Diligenced Employee shall be subject to the following deductible:



Notwithstanding the foregoing, in the event of an Indemnified Claim that Unicorn believes is an Excluded Claim, Unicorn shall have the right within 60 days after the settlement or final adjudication of the Indemnified Claim, in its sole discretion, to invoke binding expedited arbitration between Unicorn and Newco and/or the applicable Diligenced Employee(s) in order to determine whether such claim is an Indemnified Claim or an Excluded Claim, and if such claim is an Excluded Claim then Unicorn shall be entitled to reimbursement from Newco or such Diligenced Employee(s) for all Expenses paid by Unicorn on behalf of Newco or such Diligenced Employee(s) with respect to such Excluded Claim (but not any Indemnified Claim).

Upon written request for Expenses incurred by Newco and/or any Diligenced Employee (Newco or any such Diligenced Employee, the "Indemnified Person") arising out of any Indemnified Claim, Unicorn shall pay to such Indemnified Person the amount of any such Expenses of such request. If Unicorn denies any such request or otherwise fails to advance such Expenses or provide any such indemnification to the applicable Indemnified Person after making such request, such Indemnified Person shall have the right to enforce its indemnification rights

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

by commencing binding expedited arbitration seeking a determination that the Indemnified Person is entitled to such indemnification or advancement of Expenses.  In the event of any such arbitration described in this paragraph, Unicorn shall not be permitted to arbitrate in such arbitration whether such a claim is an Excluded Claim unless, in accordance with the paragraph above, the Indemnified Claim has been settled or finally adjudicated.

Unicorn, on the one hand, and Newco and/or any Diligenced Employee, on the other hand, each hereby agree to appear in any such expedited binding arbitration proceeding set forth above.

In any arbitration or other proceeding between Unicorn, on the one hand, and Newco and/or any Diligenced Employee, on the other hand, to determine whether an Indemnified Claim is an Excluded Claim or whether an Indemnified Person is entitled to indemnification, the burden of proving that an Indemnified Claim is an Excluded Claim and/or that an Indemnified Person is not entitled to indemnification shall, in each case, be on Unicorn. The Put Call Agreement will contain customary provisions regarding indemnification procedures for any Indemnified Claim.

In any arbitration or other proceeding between Unicorn, on the one hand, and Newco and/or any Diligenced Employee, on the other hand (including any arbitration in order to determine whether an Indemnified Claim is an Excluded Claim), the non-prevailing party shall promptly reimburse the prevailing party for all out-of-pocket expenses (including reasonable attorneys' fees) incurred in connection with such arbitration or other proceeding.

For the avoidance of doubt, no Employee other than any Diligenced Employee shall receive any indemnification from Unicorn hereunder.

If Unicorn advances any Expenses of Newco and/or any Diligenced Employees in connection with any Indemnified Claim, and thereafter (i) the Closing does not occur and Unicorn terminates the Put Call Agreement by reason of a Post-Signing Specified Bad Act being committed by or on behalf of Newco by a Diligenced Employee and/or being committed by any Diligenced Employee that was either (A) mutually agreed to have occurred by both Unicorn and Newco or (B) conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such matter) to have occurred, or (ii) if the Closing occurs, but after the Closing, it is conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such Indemnified Claim) that a Post-Signing Specified Bad Act was committed by or on behalf of Newco by a Diligenced Employee and/or was committed by any Diligenced Employee prior to Closing, then Unicorn shall be entitled to reimbursement from Newco or such Diligenced Employee(s) for all Expenses paid by Unicorn on behalf of Newco or such Diligenced Employee(s) with respect to such Indemnified Claim.

All reimbursement of Expenses obligations of Newco and/or the Diligenced Employees hereunder are several and not joint, and any Diligenced Employee is only responsible for the reimbursement of any Expenses to the extent such Expenses related to an Indemnified Claim against such Diligenced Employee.  Except as otherwise provided by law and conclusively determined by a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such matter), no Diligenced Employees are personally liable for the reimbursement obligations of Newco.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

*Certain Defined Terms*

"Bad Acts" shall mean (i) fraud committed by or on behalf of Newco and/or committed by any Employee, and/or (ii) willful, intentional or deliberate conduct by an Employee or Newco that constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee, Newco, or any other entity, of any patents, copyrights, trademarks or trade secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by such Diligenced Employee's Former Employer, and/or (iii) willful and/or intentional breach by Newco or any Employee of fiduciary duty or duty of loyalty to such Former Employer, and/or (iv) willful and/or intentional breach by Newco or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Employee and such Employee's Former Employer.

"Diligenced Employees" means the Key Employees and any other employees mutually agreed upon by the Company and Newco to be deemed "Diligenced Employees" either (i) prior to signing the Put Call Agreement or (ii) after the signing of the Put Call Agreement but prior to Closing.

"Employee" means any employee of Newco.

"Expenses" means (i) any expense, liability, or loss, including reasonable attorneys' fees, mediation fees, arbitration fees, expert witness fees, vendor fees, costs (such as witness fees, duplication charges, data storage fees, filing fees, travel and meals), (ii) any judgments, fines, penalties, damages, awards, and amounts paid or to be paid in settlement; and (iii) any interest, assessments or other charges imposed on any of the items in parts (i) and (ii) of this definition, in each case, that is out-of-pocket and documented.

"Former Employer" means, with respect to any employee or non-employee service provider, any former employer of such employee or non-employee service provider, together with any of such former employer's affiliates.

"Newco" means the Company and the Trucking Company.

"Outside Expert" means Stroz Freidberg LLC.

"Post-Signing Specified Bad Acts" has the meaning set forth in Attachment B.

"Pre-Signing Bad Acts" means any Bad Act occurring prior to the date of the Put Call Agreement.

"Third Party Report" means the written report(s) produced by the Outside Expert summarizing in detail all of the facts, circumstances, activities or events obtained by the Outside Expert from any Diligenced Employee that the Outside Expert deems are reasonably related to any Bad Act of such Diligenced Employee, in each case, based on the interviews, forensic due diligence and other due diligence investigation with respect to all Diligenced Employees conducted by the Outside Expert, as jointly directed by and engaged by Newco and Unicorn.

*Conditionality*

If Unicorn enters into the Put Call Agreement, then Unicorn's obligation to effect the Closing shall not be conditioned on there having been no Pre-Signing Bad Acts.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Newco and the Diligenced Employees shall (i) disclose with reasonable specificity any Post-Signing Specified Bad Acts that have been committed by or on behalf of Newco by a Diligenced Employee and/or have been committed by any Diligenced Employee, or (ii) certify that no Post-Signing Specified Bad Acts have been committed by or on behalf of Newco by a Diligenced Employee and/or have been committed by any Diligenced Employee. The Put Call Agreement will include as a condition to the exercise of the Put or Call (as applicable), and to the Closing, that no Post-Signing Specified Bad Acts have been committed by or on behalf of Newco by a Diligenced Employee and/or have been committed by any Diligenced Employee; the determination of whether a Post-Signing Specified Bad Act have been committed by or on behalf of Newco by a Diligenced Employee and/or have been committed by any Diligenced Employe will be determined by either (A) the mutual agreement of Unicorn and Newco or (B) a non-appealable judgment of a court of competent jurisdiction (or in binding arbitration, if Unicorn elects to pursue arbitration to adjudicate such matter).

The Put Call Agreement will contain affirmative and negative covenants from the date of the Put Call Agreement until Closing, which will contain, among other things, (x) restrictions on Newco and all Employees (including, without limitation, Diligenced Employees) committing any Post-Signing Specified Bad Acts, (y) the right for Unicorn to conduct reasonable audits, inspections and due diligence to uncover any potential Post-Signing Specified Bad Acts, and (z) (i) Newco and Unicorn mutually agreeing on determining whether any newly-hired Employee shall be deemed a Diligenced Employee, (ii) Newco not being permitted to hire any new Diligenced Employee without the prior written consent of Unicorn, and (iii) Newco not being permitted to hire any non-Diligenced Employee who does not complete the attestation described in the due diligence process described above unless consented to by Unicorn. All such covenants must be performed and/or complied with in all material respects prior to the exercise of the Put or Call (as applicable) and the Closing; provided, that the covenant in clause (x) above, solely with respect to Post-Signing Bad Acts being committed by or on behalf of Newco by a Diligenced Employee and/or being committed by any Diligenced Employee, must be performed and/or complied with in all respects.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Attachment A**

**Document Due Diligence Request List**

1) Provide a list of all current and/or former employees, contractors, or other service providers (e.g. interns) hired by the Company ("Workers"), including, as applicable, each individual's name, job title, salary, incentive compensation, date of hire or retention and termination, if applicable, full-time or part-time status, exempt or non-exempt classification, and details of the social benefits for each employee.
2) Provide current organizational chart of the Company (if one exists).
3) As part of the Company's onboarding process for all Workers, each Worker shall provide an attestation that they have not committed any Bad Acts (as defined in the Term Sheet), and the Company shall provide copies of all such attestations.
4) Confirm all Workers executed an undertaking of confidentiality, non-disclosure, non-competition, and assignment of intellectual property rights to the Company, and provide copies of such agreements.
5) Provide any agreement restricting the ability of the Company or any Worker to compete in any line of business, with any person or in any geographic area, committing the Company to continue in any line of business or granting rights of first refusal to any party
6) Provide a list of Workers who contributed to the intellectual property of the Company (if any), and indicate whether they did so while being engaged by a university.  Provide copies of any agreements or university policies relevant for such engagement.
7) Provide all documents (or a written description if any employee plan is unwritten) representing any "employee plans" covering, maintained for the benefit of or relating to, any Workers, officers or directors of the Company. This request shall include all employment agreements, consulting agreements, equity agreements (including equity incentive plans) and other agreements between the Company and any Workers.
8) To the extent there are any former Workers, did they sign a release upon their termination of employment? If so, please provide us with a copy thereof.
9) Confirm that there is no pending or threatened litigation challenging the Company's or any Workers' ownership or right to use intellectual property.
10) Confirm that there is no employment-related (or other) actual or threatened litigation, formal or informal, whether in court, arbitration, before administrative agencies, or otherwise, against the Company or any Worker.
11) Provide all incorporation and formation docs for the Company, including all actions taken by the board of directors of the Company.
12) Provide all agreements pertaining to all stock issuances or debt issuances (including convertible debt) of the Company (including, without limitation, to any Workers of the Company).
13) Provide a detailed capitalization table for the Company.
14) Provide a list of all material assets of the Company.
15) Provide a list of all other material contracts of the Company (if any).

**Diligenced Employee Due Diligence Process**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1) Stroz Freidberg (an independent third party digital forensic expert) (the "**Expert**") shall conduct the relevant due diligence review. The Expert shall simultaneously report back all findings of such due diligence review to outside counsel advisors of both Unicorn and the Company.

2) Due diligence shall be focused on Diligenced Employees (as defined in the Term Sheet) who are no longer employed by ACME.

3) Unicorn's intent is to move through the due diligence process quickly and reasonably, without impairing any privacy rights of the Company or any Diligenced Employee. As such, as promptly as practicable after signing the Term Sheet, Unicorn and the Company shall jointly determine in good faith the scope of the due diligence review. For example, the parties to agree on certain parameters for the due diligence review: (i.e., (i) searching for any emails sent to any @unicorn accounts, searching (ii) any emails or texts sent to any personal accounts of key Unicorn employees within a defined period of time; and (iii) searching based on agreed upon terms, e.g., the Company, ACME, Trucking, etc.).

4) Each Diligenced Employee shall cooperate and exercise best efforts (i) to preserve any information on Devices or Accounts provided by the Company and all Workers, including but not limited to, making forensically-sound images or copies to the extent possible; and (ii) to employ measures to be respectful of personal information of all Workers and third parties.

5) As part of the due diligence process, each Diligenced Employee:

    a. Shall make available (including by providing passwords or any other information needed for access) to the Expert for review, all relevant devices, including, non-ACME laptop, desktop, tablet or other computers, mobile phones, personal digital assistants, or any other devices or sources where information can be stored, (e.g., USB, flash drive, thumb drives, discs, external hard drive, cloud storage) in any medium ("Devices") that may have been used by such Diligenced Employee during and after any such Diligenced Employee's employment with ACME and any predecessor entity that ACME acquired.

    b. Shall make available (including by providing passwords or any other information needed for access) to the Expert for review, all non-ACME accounts for emails, text messages, chats, or other information on social media or networks (including but not limited to Facebook, Twitter, LinkedIn) (collectively, "Information") that may have been used by such Diligenced Employee during and after any such Diligenced Employee's employment with ACME and any predecessor entity that ACME acquired.

    c. Shall provide to the Expert all employment, consulting, confidentiality agreements, non-solicitation agreements, invention assignment agreements and any other material agreements between any Worker and ACME.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

<u>Attachment B</u>

<u>Post-Signing Specified Bad Acts</u>

"Post-Signing Specified Bad Acts" means any of the following Actions by any Employee and/or by Newco after the date of the Put Call Agreement and prior to the Closing; <u>provided</u> that if any such Employee and/or Newco obtains the explicit written consent of Unicorn to engage in any such Action, then such Action shall not be deemed by either Party to be a "Post-Signing Specified Bad Act":

*Parameters/Definitions*:

- **<u>Action</u>** shall mean:  (i) an act; (ii) an action that such Employee has directed, caused, induced, knowingly contributed to, or knowingly permitted someone else to take; and (iii) failure to disclose to Unicorn actual knowledge that such Employee has that a NEWCO employee or Non-Employee Service Provider or other Employee engaged or is engaging in any Post-Signing Specified Bad Act.

- **<u>Non-Employee Service Provider</u>** shall mean a natural person in her or his capacity as a consultant or contractor.

- **<u>Software</u>** shall mean software, including, but not limited to, system software, applications, application program interfaces, firmware, source code, machine or object code, computer programs, program instructions, and any associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe the algorithms or structure of software or hardware designs.

<u>IP/Trade Secrets Misappropriation.</u>
1. Take, retain, not return, transfer, access, or possess any hardware, computers, electronic devices, memory chip, machine readable storage media, transmission media, equipment, tools, jigs, templates, molds, models, samples, mock ups, prototypes, or any other tangible articles of manufacture, machines, or physical materials similar to the foregoing of Former Employer without the express written consent of Former Employer.
2. Disclose, download, upload, copy, re-write from memory, take, retain, store, not return, transfer, access, or possess any confidential or proprietary software of Former Employer without the express written consent of, or an appropriate license from, Former Employer.
3. Disclose, download, upload, copy, re-write from memory, take, retain, store, not return, transfer, access, or possess any hard copy, electronic copy, or any other form of confidential Former Employer document, file, data or information in any medium or form without the express written consent of Former Employer, with the exception of retaining data or information solely in the memory of an Employee, provided the information was not memorized for the purpose of retaining and subsequently using or disclosing such information for any purpose outside the scope of their employment with

1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

their Former Employer, provided such data or information is not used or disclosed in a manner that is otherwise a Post-Signing Specified Bad Act.

4. Load, install, and/or run wiping or specialized or permanent file deletion software (other than that which runs by default on any operating system, provided that such operating system software is not used to intentionally render any files or data permanently unrecoverable) on any:  (1) Former Employer computer or other electronic device without the express written consent of Former Employer; (2) NEWCO computer or other electronic device without the express written consent of NEWCO; or (3) personal computer or other device, to the extent such computer or device is or was used for work related to NEWCO or Former Employer, without the express written consent of NEWCO, but only with respect to use of such file deletion software on any documents, files, data, or information of Former Employer or NEWCO.

5. Without the express written consent of Former Employer, access remotely or otherwise, (a) other than by express invitation of a principal or senior executive of Former Employer, any secured, restricted or non-public facilities or physical premises, or (b) electronic, computer, or cloud systems of Former Employer (other than cloud systems designed for non-employee access, provided such cloud systems are accessed pursuant to a valid user license), including but not limited to by using codes or other access information that were issued during a period of employment or service as a Non-Employee Service Provider with Former Employer or by using access information of another current or former employee or Non-Employee Service Provider of Former Employer.

6. Take, copy, retain, disclose, make, use, sell, offer for sale, or import into the U.S., any confidential information, technology or invention that is a material trade secret of Former Employer or is known by Employee or NEWCO to be protected by Former Employer's patent or material copyright, without the express written consent or an appropriate license of Former Employer, with the exception of retaining confidential information solely in the memory of an Employee, provided the information was not memorized for the purpose of retaining and subsequently using or disclosing such information for any purpose outside the scope of their employment with their Former Employer, provided such information is not used or disclosed in a manner that is otherwise a Post-Signing Specified Bad Act.

Solicitation/Confidentiality/Hiring.

1. Without the express written consent of Former Employer, in any way to benefit NEWCO or Unicorn (a) initiate communications (including by arranging a communication) with (x) any then current employee of Former Employer or (y) any then current Non-Employee Service Provider of Former Employer (in the case of clause (y), solely to the extent that the non-solicitation provisions of an Employee's or NEWCO Non-Employee Service Provider's contractual obligations with Former Employer apply to solicitation of Non-Employee Service Providers) regarding (i) whether such individual should leave Former Employer or join NEWCO or Unicorn, or (ii) the possibility of working for NEWCO or Unicorn, including but not limited to an offer to employ or retain his/her services; or

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

(b) disclose to NEWCO or Unicorn non-public information learned during employment or service with Former Employer regarding the specific skills, experience, or competencies obtained while working for Former Employer or compensation from Former Employer of any then current Former Employer employee or Non-Employee Service Provider (provided that general responses to communications initiated by persons other than Employees or Non-Employee Service Providers of NEWCO of whether any such individual is a good candidate that does not reveal such non-public information shall not violate this provision).

2. Hire any non-Diligenced Employee who, without the consent of Unicorn, does not sign an attestation.

3. Hire any Diligenced Employee without Unicorn's consent.

Notwithstanding anything herein to the contrary, Post-Signing Specified Bad Acts set forth above related to IP/Trade Secrets Misappropriation shall not include use of Residual Information by Newco and/or any Employee, provided such use does not involve knowingly or intentionally using or disclosing a material trade secret of Former Employer, or using any technology known by Employee or NEWCO to be protected by Former Employer's patent or material copyright, without the express written consent of, or an appropriate license of, Former Employer.

"Residual Information" means, with respect to any Employee, the information, skills, knowledge, or know-how of general application in the trade of such Employee that is retained in the unaided memory of such Employee and that is not recollected by Employee with reference to any copies of the Former Employee Materials in written, electronic, or other form. Residual Information shall not include any trade secret or other confidential information memorized by Employee for the purpose of retaining and subsequently using or disclosing such information for any purpose outside the scope of their employment with their Former Employer.

"Former Employer Materials" means copyrightable material or materials embodying trade secrets or other confidential information, including copies of software, product plans, or invention disclosures, in electronic or tangible form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXECUTION COPY**

**Exhibit D**



**(see attached)**

33

**Exhibit D**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY