# EXHIBIT C

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

<u>Exhibit B</u>

Form of Company Unitholders' Written Consent

FINAL FORM

## WRITTEN CONSENT OF THE
## MEMBERS OF
## OTTOMOTTO LLC

April 11, 2016

The undersigned, being holders of a majority of the membership interests (the "Members") of Ottomotto LLC, a Delaware limited liability company (the "Company"), acting pursuant to the Company's Operating Agreement as currently in effect (the "LLC Agreement"), hereby consent to and adopt the following recitals and resolutions as the actions of the Members.

WHEREAS, there has been presented an Agreement and Plan of Merger (the "Merger Agreement"), by and among: Uber Technologies, Inc., a Delaware corporation ("Parent"), █████████ █████████████████ Purchaser"), Zing Merger Sub I, LLC, a Delaware limited liability company and a wholly-owned Subsidiary of Purchaser ("Merger Sub"), Lior Ron, solely in his capacity as the Company Unitholder Representative (the "Company Unitholder Representative"), pursuant to which, among other things, Merger Sub will merge with and into the Company with the Company surviving the merger as a wholly owned subsidiary of Purchaser (the "Merger"), substantially in the form attached hereto as Exhibit A;

WHEREAS, there has been presented forms of agreements ancillary to the Merger Agreement (the "Ancillary Agreements") certain of which are to be entered into by the Company in connection with the Merger Agreement and the transactions contemplated therein;

WHEREAS, the Merger Agreement provides that the Company Unitholder Representative shall be appointed as the representative of the holders of the Company Units outstanding immediately prior to the closing of the Merger in connection with certain matters as set forth in the Merger Agreement, and the Company wishes to designate Lior Ron as the Company Unitholder Representative for such purpose;

WHEREAS, in connection with the Merger Agreement, the Company will file a Certificate of Merger relating to the Merger with the Secretary of State of the State of Delaware (the "Certificate of Merger") in such form as is required by, and executed in accordance with, the relevant provisions of the Limited Liability Company Act of the State of Delaware;

WHEREAS, the Managing Members of the Company have determined that the Merger, the Merger Agreement and the transactions contemplated thereby, the Indemnification Agreement by and among Purchaser, Parent, the Company, Otto Trucking LLC, and the other signatories thereto,  and the Ancillary Agreements (collectively, the "Merger Agreement Transactions") are in the best interests of the Company and its members, and have authorized and approved the Merger, the Merger Agreement and the Merger Agreement Transactions; and

WHEREAS, the undersigned have determined, after due consideration, that the Merger Agreement, the Merger, and the Merger Agreement Transactions are in the best interests of the Company and its members, and desire to authorize and approve the foregoing.

NOW THEREFORE BE IT, RESOLVED, that the Members of the Company hereby authorize and approve the Merger Agreement, the Merger, and the Merger Agreement Transactions;

RESOLVED FURTHER, that the Members of the Company hereby ratify, confirm, approve and adopt all actions previously taken by employees, officers, or Managing Members of the Company

that are approved by the foregoing resolutions; and

**RESOLVED FURTHER**, that the Managing Members be, and each hereby is authorized, empowered and directed, in the name and on behalf of the Company, to do or cause to be done any and all such further acts and things, and to execute and deliver any and all such additional agreements, applications, reports, consents to service of process, powers of attorney, notices and other documents, they may deem necessary or appropriate in order to carry into effect the purposes and intent of the foregoing resolutions.

*[signature page follows]*

FINAL FORM

**IN WITNESS WHEREOF,** each of the undersigned have executed this consent, effective as of the date first written above.

MEMBERS:

_____

By:    Lior Ron

_____

By:    Anthony Levandowski

<u>Exhibit C</u>

Form of Certificate of Merger

FINAL FORM

# CERTIFICATE OF MERGER

## OF

## ZING MERGER SUB I, LLC

### (a Delaware limited liability company)

### WITH AND INTO

### OTTOMOTTO LLC

### (a Delaware limited liability company)

* * * * * * * * * *

*In accordance with the provisions of Title 6, §18-209 of the*
*Delaware Limited Liability Company Act*

* * * * * * * * * *

**Ottomotto LLC**, duly organized and existing under and by virtue of the laws of the State of Delaware (the "Company"), desiring to merge **Zing Merger Sub I, LLC**, a Delaware limited liability company (the "Merger Sub"), with and into itself, pursuant to the provisions of Title 6, §18-209 of the Delaware Limited Liability Company Act, **DOES HEREBY CERTIFY** as follows:

> **FIRST:** The name and state of organization of the constituent limited liability companies of the merger (the "Merger") are as follows:

| NAME | STATE OF ORGANIZATION |
|------|----------------------|
| **Ottomotto LLC** | Delaware |
| **Zing Merger Sub I, LLC** | Delaware |

> **SECOND:** An Agreement and Plan of Merger (the "Merger Agreement") has been approved, adopted, certified, executed and acknowledged by both of the limited liability companies.

**THIRD:**    The name of the surviving limited liability company of the Merger is **Ottomotto LLC** (the "<u>Surviving Company</u>").

**FOURTH:**    An executed copy of the Merger Agreement is on file at the principal place of business of the Surviving Company, Ottomotto LLC, such address is [_____], and a copy of the Merger Agreement will be furnished by the Surviving Company, upon request and without cost, to any member of the limited liability companies or any person holding an interest in any other business entity which is to merge or consolidate.

**FIFTH:**    The Merger shall be effective immediately upon filing.

\*        \*        \*        \*        \*

**IN WITNESS WHEREOF**, said limited liability company has caused this certificate to be signed by an authorized person this [___] day of [_____], 2016.

**Ottomotto LLC**
a Delaware limited liability company

By: _____

Name: _____

Its: _____

<u>Exhibit D</u>

Letter of Transmittal

FINAL FORM

# LETTER OF TRANSMITTAL

**Relating to the Common Units of**
**of**
**Ottomotto LLC ("Company")**

**Pursuant to the Agreement and Plan of Merger by and among Company, Uber Technologies, Inc.** ███████████████, **Zing Merger Sub I, LLC and Lior Ron, AS THE COMPANY UNITHOLDER REPRESENTATIVE**

**Please read this Letter of Transmittal carefully. This Letter of Transmittal should be completed and signed in the space provided in Box A on page 3 and returned to the Company Unitholder Representative (as defined below) in accordance with the "General Instructions" attached hereto.**

**To receive your portion of the Merger Consideration (as defined below), your Letter of Transmittal must be delivered to the Company Unitholder Representative, at the address set forth herein, under the Merger Agreement (as defined below), in connection with the Closing (as defined below), together with the enclosed Internal Revenue Service ("IRS") Form W-9 or appropriate IRS Form W-8, as applicable (see the "General Instructions" attached hereto).**

**THE "GENERAL INSTRUCTIONS" ATTACHED HERETO SHOULD BE READ CAREFULLY BEFORE THIS LETTER OF TRANSMITTAL IS COMPLETED.**

Ladies and Gentlemen:

This Letter of Transmittal is being delivered in connection with the merger (the "Merger") of Zing Merger Sub I, LLC, a Delaware limited liability company ("Merger Sub") with and into Ottomotto LLC, a Delaware limited liability company (the "Company"), pursuant to the Agreement and Plan of Merger, dated as of April 11, 2016 (the "Merger Agreement"), by and among Uber Technologies, Inc., a Delaware corporation ("Parent"), ██████████████████████████████████ ("Purchaser"), Merger Sub, the Company, and Lior Ron, as the Company Unitholder Representative (the "Company Unitholder Representative"), a copy of which is enclosed herewith. Capitalized terms used but not otherwise defined in this Letter of Transmittal have the meanings given to them in the Merger Agreement.

Pursuant to the Merger Agreement, in exchange for the Company Common Units listed below, the undersigned is entitled to a portion of the Merger Consideration, net of any withholding taxes, that is payable at or after the closing of the Merger (the "Closing") to the undersigned (the "Merger Consideration"). No payment shall be made with respect to any Company Common Units until the undersigned delivers this Letter of Transmittal and other documents included herewith to the Company Unitholder Representative. Instructions for the delivery of this Letter of Transmittal and other documents included herewith to the Company Unitholder Representative are set forth in the "General Instructions" included herein.

The undersigned hereby irrevocably nominates, constitutes and appoints the Company Unitholder Representative as agent and true and lawful attorney-in-fact for the undersigned, with full power of substitution, to act in the name, place and stead of the undersigned for purposes of executing, delivering, acknowledging, certifying and filing any documents, agreements and instruments and taking any actions that the Company Unitholder Representative may, in its sole discretion, determine to be necessary, desirable or appropriate in connection with any claim for indemnification, compensation or reimbursement under the Merger Agreement and the transactions contemplated thereby, and otherwise as contemplated by the Merger Agreement pursuant to Section 1.8 therein. The undersigned recognizes and intends that the foregoing power of attorney is coupled with an interest and is irrevocable, may be delegated by the Company Unitholder Representative and shall survive the death or incapacity of the undersigned. The undersigned acknowledges and agrees that Merger Sub (and following the Closing, the Company), Parent, Purchaser and the other parties referred to in the Merger Agreement may rely conclusively (without further evidence of any kind whatsoever), as fully binding on the undersigned, on the instructions and decisions of, and any documents executed or purported to be executed or actions taken or purported to be taken on behalf of the undersigned by, the Company Unitholder Representative in respect of such matters and the other matters referred to in the Merger Agreement.

By signing the Letter of Transmittal, the undersigned hereby agrees that payment of any amounts to the account designated by the undersigned in this Letter of Transmittal and in accordance with the wire transfer instructions provided by the undersigned herein ("Wire Transfer Instructions") shall constitute payment to and, upon delivery to such account, payment received by, the undersigned. Upon payment to the account designated in this Letter of Transmittal and the Wire Transfer Instructions of all amounts due and owing to the undersigned in exchange for the Company Common Units, the undersigned shall thereby waive and release any and all claims relating to the payment to the account designated in this Letter of Transmittal and the Wire Transfer Instructions that the undersigned may have against Parent, Purchaser, Merger Sub, the Company and any of their respective Affiliates or agents.

The undersigned represents and warrants to the following (for the benefit of Parent and its Affiliates):

- The undersigned has full power and authority to transfer and surrender the Company Common Units, free and clear of all Liens, and has good and valid title to the Company Common Units.

- The undersigned has full power and authority to execute and deliver this Letter of Transmittal and to perform all obligations hereunder. The information provided by the undersigned in this Letter of Transmittal is true, correct and complete.

- The execution and delivery of this Letter of Transmittal has been duly authorized by all necessary action, if any, and this Letter of Transmittal constitutes a valid and binding obligation, enforceable against the undersigned in accordance with its terms.

- No person has asserted, or to the undersigned's knowledge, intends to assert, any action, suit, claim or proceeding of any nature against the undersigned, nor to the knowledge of the undersigned is there any investigation pending or threatened in writing by any Governmental Body against the undersigned, arising out of or relating to (i) the undersigned's beneficial ownership of Company Common Units or rights to acquire Company Units, (ii) the undersigned's capacity as a Company Unitholder, (iii) the transactions contemplated by the Merger Agreement, or (iv) any other agreement between the undersigned (or any of its Affiliates) and the Company (or any of its Affiliates).

- The undersigned has received a copy of the Merger Agreement and has carefully read and understands the scope and effect of the provisions of the Merger Agreement and has discussed the foregoing with the undersigned's professional advisors to the extent the undersigned has deemed necessary. The undersigned hereby acknowledges and represents that the undersigned has sought such accounting, legal and tax advice as undersigned has considered necessary to understand the terms and conditions of the Merger Agreement, including with respect to any potential tax consequences to the undersigned resulting from the transactions contemplated by the Merger Agreement.

The undersigned hereby acknowledges and agrees that, as a result of the Merger, the undersigned shall cease to have any rights with respect to or arising from the Company Common Units, except the right to receive payments under the Merger Agreement upon delivery of a properly executed and duly executed Letter of Transmittal.

The undersigned consents to the collection, use and transfer, in electronic or other form, of the undersigned's personal data as described in this Letter of Transmittal by and among, as applicable, the Company, the Company Unitholder Representative, Parent, Purchaser, their respective Affiliates, and respective third party administrators for the exclusive purpose of implementing, administering and managing the undersigned's distribution of the Merger Consideration.

The undersigned understands that he, she or it is solely responsible for the payment of any applicable Taxes imposed on the undersigned attributable to the consideration payable or otherwise deliverable pursuant to the Merger Agreement. The undersigned acknowledges and agrees that each of Parent, Purchaser, the Company and their respective Affiliates and agents shall be entitled to deduct and withhold from any consideration payable or otherwise deliverable to the undersigned pursuant to the Merger Agreement such amounts as Parent, Purchaser, the Company and their respective Affiliates and agents are required to deduct or withhold therefrom under the Code or under any other Tax Law or as they shall determine are necessary to satisfy any other Tax withholding obligations with respect to the undersigned. To the extent such amounts are so deducted or withheld, such amounts will be treated for all purposes under the Merger Agreement as having been paid to the undersigned.

This Letter of Transmittal shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Delaware (without giving effect to principles of conflicts of laws that are not mandatorily applicable by law and would permit or require the application of the law of another jurisdiction). All authority conferred or agreed to be conferred pursuant to this Letter of Transmittal shall be binding upon the successors, assigns, heirs, executors, administrators and legal representatives of the undersigned and shall not be affected by, and shall survive, the dissolution, death or incapacity of the undersigned.

**By executing this Letter of Transmittal, the undersigned hereby agrees to the terms and conditions of the Merger Agreement with respect to the treatment of his, her or its Company Common Units and hereby irrevocably waives any dissenters', appraisal or similar rights in respect of such Company Common Units under applicable law with respect to the transactions contemplated by the Merger Agreement.**

The undersigned certifies, represents and warrants that the information included by or on behalf of the undersigned herein or in connection herewith is true, correct and complete.

**DELIVERY OF THIS LETTER OF TRANSMITTAL TO AN ADDRESS OTHER THAN AS SET FORTH ON THE LAST PAGE HEREOF WILL NOT CONSTITUTE A VALID DELIVERY**

***<u>THE INSTRUCTIONS ACCOMPANYING THIS LETTER OF TRANSMITTAL SHOULD BE READ CAREFULLY BEFORE THIS LETTER OF TRANSMITTAL IS COMPLETED.</u>***

NOTE:  SIGNATURES MUST BE PROVIDED BELOW

**All holders of Company Common Units must complete Boxes A and B and an Internal Revenue Service ("IRS") Form W-9 or appropriate IRS Form W-8, as applicable. Please also read the "General Instructions" below.**

| BOX A – Signature of Registered Holder(s) | BOX B – Units Surrendered |
|---|---|
| (Must be signed by all registered unitholders; include legal capacity if signing on behalf of an entity) | Number of Units and Series of Units: |
| | |
| **Signature(s)** | |
| | |
| **Print Name Here** | |
| **Telephone Number** | |

| BOX C – One Time Delivery Instructions |
|---|
| To be completed *ONLY* if the check is to be delivered to an address other than that listed in Box D. MAIL TO: |
| |
| **Name** |
| **Street Address** |
| **City, State and Zip Code** |

**Please remember to complete and sign the enclosed IRS Form W-9 or, if applicable, the appropriate IRS Form W-8 (see instructions below).**

| BOX D – Name and Address of Registered Holder(s) |
|---|
| Please confirm that your address below is correct or mark any corrections |
| □ indicates permanent address change |
| |

3

| **BOX E – Optional Bank Wire Instructions** | |
|---|---|
| **NOTE:** This wire request is optional. The name on the bank account must be the same as the registered holders.  If you complete this Box E and any of the information is incomplete, illegible or otherwise deficient, you will receive a check for your proceeds. In connection with the above referenced merger, please wire the entitled funds as follows: | |
| **\*ABA Routing Number** | |
| **Bank Name** | |
| **Bank Address** | |
| **Name on Bank Account** | |
| **Bank Account Number** | |
| **For Further Credit To Name** | |
| **For Further Credit To Account Number** | |
| **Swift or IBAN (if applicable)** | |
| **Intermediary Bank ABA (if foreign)** | |

By completion of Box E, the registered holder(s) hereby agree(s) that the above wire instructions are true and correct and by endorsing this Letter of Transmittal the person authorized to act on behalf of this account is directing the Company Unitholder Representative to make payment of the Merger Consideration represented by this Letter of Transmittal to the bank account listed above.

\*The ABA Routing Number for "incoming FED WIRES" is many times different than the ABA Routing Number used for direct deposit or the ABA Routing Number on the bottom of your check or deposit slip.  Please check with your bank to obtain the correct ABA Routing Number for your wire.

The Company Unitholder Representative will use the payment instructions provided in Box E "Optional Bank Wire Instructions" for any future payments unless a new Letter of Transmittal is completed to update such payment instructions.

## General Instructions

### *Please read this information carefully.*

- **BOX A – Signatures:** All registered holders must sign as indicated in Box A. If you are signing on behalf of a registered holder or entity your signature must include your legal capacity.

- **BOX B – Units Surrendered:** List all Company Common Units to be surrendered in exchange for cash consideration in Box B.

- **BOX C – One Time Delivery:** Any address shown in Box C will be treated as a one-time only mailing instruction, and your address in Box D will be used for any future payments and communications.

- **BOX D – Current Name and Address of Registered Holder:** Please confirm that the address here is the address that should be used for all future communications and payments. If your permanent address should be changed on the Company's records, please make the necessary changes in Box D. If your permanent address should change in the future, please notify the Company Unit Representative at the number listed below.

- **BOX E – Wire Instructions:** To elect a bank wire transfer please complete Box E in its entirety. A bank wire transfer, rather than payment by check, will help to expedite your receipt of the funds. Please contact your bank for questions regarding the appropriate bank routing number and account number to be used.

- **IRS Form W-9 or IRS Form W-8:** Under United States federal income tax law, "U.S. persons" (as defined below) who are receiving any consideration in connection with the Merger are required to provide his, her or its current taxpayer identification number ("TIN"). If such holder is an individual, the TIN is his or her social security number. If the holder does not provide the correct TIN or an adequate basis for an exemption, the holder may be subject to a $50 penalty imposed by the IRS, and any consideration such holder receives in the Merger may be subject to backup withholding at the applicable rate (currently 28%). If withholding results in an overpayment of taxes, a refund from the IRS may be obtained if the appropriate information is provided in a timely manner to the IRS. If the person receiving payment for the Company Common Units is a U.S. person, to prevent backup withholding complete and sign the enclosed IRS Form W-9 to certify the payee's TIN. Please provide the social security or employer identification number of the person or entity receiving payment for the above described Company Common Units and sign and date the form. If the person receiving payment for the Company Common Units is not a "U.S. person," to prevent backup withholding (i) complete and sign an applicable IRS Form W-8 certifying under penalties of perjury to such holder's foreign status or (ii) otherwise establish an exemption from withholding. IRS Forms W-8 may be obtained at www.irs.gov or by calling 1-800-829-3676.

  See the enclosed instructions to IRS Form W-9 for additional information and instructions.

  **Failure to provide a properly completed and signed IRS Form W-9 or a properly completed and signed applicable IRS Form W-8 may result in backup withholding under U.S. tax laws on any Merger Consideration payments and may result in a penalty imposed by the IRS.**

  Any tax advice that may be contained herein does not constitute an opinion that meets the requirements of the regulations. Any such tax advice contained herein cannot be used, and was not intended or written to be used by any taxpayer, for the purpose of avoiding any federal tax penalties that may be imposed under the Internal Revenue Code.

- **Definition of "U.S. Person":** For federal tax purposes, you are considered a U.S. person if you are (1) an individual who is a U.S. citizen or U.S. resident alien, (2) a partnership, corporation, company or association created or organized in the United States or under the laws of the United States, (3) an estate (other than a foreign estate), or (4) a domestic trust (as defined in U.S. Treasury Regulations section 301.7701-7).

- **Deficient Presentments:** If you request a registration change that is not in proper form, the required documentation will be requested from you and this will delay processing of any funds.

- **Returning this Letter of Transmittal:** Return this Letter of Transmittal for your portion of the Merger Consideration *__only__* to the Company Unitholder Representative at the physical address and/or email address below. The method of delivery is at your option and your risk, but it is recommended that documents be delivered via a registered method, insured for 2% of the value of your Company Common Units.

*By Mail to:*

[_____]

*By Email to:*

[_____]

*Phone number:*

[_____]

Exhibit E

<u>Exhibit F</u>

Form of Unitholder Release Agreement

### FORM OF UNITHOLDER RELEASE AGREEMENT

THIS UNITHOLDER RELEASE AGREEMENT (this "**Agreement**") is made by and among Uber Technologies, Inc., a Delaware corporation ("**Parent**") and the undersigned holder ("**Holder**") of Company Common Units.  Capitalized terms used in this Agreement and not otherwise defined have the meanings ascribed to such terms in the Merger Agreement (as defined below).

### W I T N E S S E T H :

WHEREAS, pursuant to that certain Agreement and Plan of Merger (as the same may be amended from time to time, the "**Merger Agreement**"), dated as of April, 11, 2016, by and among Parent, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "**Purchaser**"), Ottomotto LLC, a Delaware limited liability company (the "**Company**"), Zing Merger Sub I, LLC, a Delaware limited liability company and a wholly-owned subsidiary of Purchaser ("**Merger Sub**"), and Lior Ron (the "**Company Unitholder Representative**"), subject to the terms and conditions set forth in the Merger Agreement, Merger Sub will merge with and into the Company (the "**Merger**") in accordance with the terms of the Merger Agreement and the Delaware LLC Act, after which Merger Sub will cease to exist as a separate entity, and the Company will become a wholly-owned subsidiary of Purchaser.

WHEREAS, as a result of the consummation of the Merger, the Company Common Units held by the Company Unitholders will be converted into the right to receive an amount of cash equal to the Per Unit Merger Consideration in accordance with Section 1.8 of the Merger Agreement, subject to and conditioned upon the terms and conditions of the Merger Agreement; and

WHEREAS, in order to induce Parent, Purchaser and Merger Sub to complete the transactions contemplated by the Merger Agreement, Holder is willing to enter into this Agreement.

NOW, THEREFORE, intending to be legally bound, in consideration of the foregoing and the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

1.      <u>Representations and Warranties of Holder</u>. Holder hereby represents and warrants to Parent, Purchaser and Merger Sub as follows:

(a)      As of the date hereof, there is no action, suit, claim or proceeding of any nature pending, or to the actual knowledge of Holder, threatened in writing, against Holder, nor to the knowledge of Holder is there any investigation pending or, to the actual knowledge of Holder, threatened in writing by any Governmental Body against Holder, arising out of or relating to (i) Holder's beneficial ownership of Company Common Units or rights to acquire Company Units, (ii) Holder's capacity as a Company Unitholder, (iii) the transactions contemplated by the Merger Agreement, or (iv) any other agreement between Holder (or any of its Affiliates) and the Company (or any of its Affiliates).

(b)      The execution and delivery by Holder of this Agreement and the performance by Holder of its, his or her covenants and obligations hereunder will not, conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Holder or its, his or her properties or assets. No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Body is required on the part of Holder in order to enable Holder to execute and deliver this Agreement and perform its, his or her covenants and obligations under this Agreement.

(c)     Holder has received a copy of the Merger Agreement and has carefully read and understands the scope and effect of the provisions of this Agreement and the Merger Agreement and has discussed the foregoing with Holder's professional advisors to the extent Holder has deemed necessary. Holder hereby acknowledges and represents that Holder has sought such accounting, legal and tax advice as Holder has considered necessary to understand the terms and conditions of the Merger Agreement, including with respect to any potential tax consequences to Holder resulting from the transactions contemplated by the Merger Agreement.

(d)     Holder is the sole record and beneficial owner of, and has the sole right to vote and to dispose of, the Company Common Units set forth on the signature page hereto (subject to, in the case of individuals, applicable community property laws, if any), and such Company Common Units are, or as of the Closing will be, free and clear of any Liens.  Holder is not a party to any Contract with respect to the voting of equity securities of the Company or that is inconsistent with the terms of the Merger Agreement.  Other than as set forth on the signature page to this Agreement, Holder does not beneficially own any other Company Common Units, notes, options, warrants or other rights to acquire Company Common Units or other securities convertible into or exercisable for Company Common Units.

(e)     Holder has not (i) sold, assigned, endorsed, transferred, pledged, pawned, hypothecated, deposited under any agreement or disposed of in any manner any of the Company Common Units set forth on the signature page, or any interest therein, (ii) granted any options, warrants, calls or any other rights to purchase or otherwise acquire any Company Common Units or other securities convertible into or exercisable for Company Common Units  or any interest therein, to any other Person, or (iii) entered into any agreement with respect to any of the matters contemplated by clauses (i) or (ii).

2.     <u>Acknowledgment of Consideration</u>. Holder hereby acknowledges and agrees that it is entering into this Agreement in consideration of (i) its receipt of the Merger Consideration pursuant to the Merger Agreement, (ii) an offer of employment from Parent (or one of its Affiliates, as applicable) pursuant to the Merger Agreement and (iii) its receipt of Parent Restricted Stock Awards in accordance with the Merger Agreement. Holder hereby acknowledges and agrees to the sufficiency of such consideration.

3.     <u>Survival</u>.  The representations and warranties of Holder set forth in <u>Section 1</u> shall survive the Closing and the Effective Time and shall remain in full force and effect until the first anniversary of the Closing.

4.     <u>Company Unitholder Representative</u>. Holder hereby irrevocably and unconditionally agrees to the appointment of Lior Ron as Company Unitholder Representative under the Merger Agreement and appoints Lior Ron as Holder's agent and attorney-in-fact to exercise all or any of the powers, authority and discretion conferred on the Company Unitholder Representative under the Merger Agreement, but only to the extent specified in the Merger Agreement.

5.     <u>Confidentiality</u>. Holder agrees to at all times keep confidential and not divulge, furnish or make accessible any information regarding or relating to this Agreement or the Merger Agreement (or any of the transactions contemplated hereby or thereby), the Closing or any claim or dispute arising out of or related to this Agreement, the Merger Agreement or the transactions contemplated hereby or thereby to anyone (other than directors, officers, managers, members, Affiliates, partners, employees, agents, investors, attorneys, accountants and financial advisors of Holder who need to know such information and are (a) bound by confidentiality restrictions or (b) made aware of the confidential nature of such information, directed by Holder to treat such information as confidential and bound by legally enforceable codes of professional responsibility or agreements that require maintenance of confidentiality, except, to the extent that (i) any information reasonably relevant to enforcing Holder's rights or defending against assertions by Parent or its

Affiliates  is disclosed in connection with exercising any rights or claims that Holder may have under or arising from the Merger Agreement or any other agreement, instrument, certificate, or document entered into pursuant to the Merger Agreement or in connection with any legal proceedings involving a dispute between Parent or its Affiliates and Holder, the Company Unitholder Representative or the Company, or the interpretation, making, performance, breach or termination hereof or thereof; (ii) such information has otherwise been made public (other than as a result of disclosure by Holder in violation of the terms hereof); (iii) Holder is required by applicable law (including any filing or communication with the Internal Revenue Service or other tax authority) or any applicable judgment or decree to divulge or disclose such information, in which case Holder shall use its reasonable best efforts to cooperate with Parent or its Affiliates to limit such disclosure to the extent (x) permitted under applicable law and (y) not unduly burdensome or punitive to Holder; (iv) Holder is required by an applicable process, subpoena or order, provided that Holder uses its reasonable best efforts to cooperate with Parent or its Affiliates to obtain a protective order to take such other legal steps to protect its interest in such information; or (v) disclosure of such information is otherwise expressly provided for in the Merger Agreement; provided however that in the case of any disclosure of information pursuant to (iii) and (iv) above, Holder shall provide Parent or its Affiliates with reasonable prior written notice of such disclosure and use its reasonable best efforts to limit any such disclosure to the maximum extent permitted by any applicable law, applicable judgment or decree, applicable process, subpoena or order.

6.   General Release.  Effective for all purposes as of the Effective Time, Holder acknowledges and agrees, on behalf of himself, herself or itself and each of Holder's agents, trustees, beneficiaries, directors, officers, controlled Affiliates, subsidiaries, estate, successors, assigns, members and partners (each, a "**Releasor**") that:

(a)   Releasor represents and warrants that, as of the date hereof, he, she or it (together with each other Releasor) has no Claims (as defined below) against the Company, Parent, Purchaser or Merger Sub, or any of their parent companies, subsidiaries or Affiliates, or any of their respective employees, directors, partners, stockholders, officers, agents, attorneys, representatives, predecessors, successors, related entities, assigns or the like or any Persons acting by, through, under or in concert with any of them (collectively, the "**Releasees**") relating to any Contract between the Releasor and the Company, or any of  the Releasor's interest in the Company, or in the Releasor's capacity as a current or former officer, Member, Managing Member, employee, consultant or security holder of the Company; *provided*, *however*, that this representation and warranty does not extend to any claim or loss of the Releasor, or obligation to or right or remedy of the Releasor, arising under the items set forth in the proviso included in Section 6(b) below.

(b)   Releasor hereby irrevocably and unconditionally releases the Releasees from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages or causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs incurred) of any nature whatsoever, in law or equity, whether known or unknown, contingent or otherwise, which the Releasor now has, may ever have had in the past or may have in the future against any of the respective Releasees by reason of any act, omission, transaction, occurrence, conduct, circumstance, condition, harm, matter, cause or thing that has occurred or existed at any time from the beginning of time up to and including the Effective Time, including, without limitation, relating to any Contract between the Releasor and the Company, Releasor's employment (either as an employee or consultant, as applicable) with the Company  or the Releasor's interest in the equity of the Company ("**Claims**"), provided, however, that the foregoing release shall not cover Claims arising from rights of Releasor pursuant to (i) the Merger Agreement, that certain Agreement and Plan of Merger (as the same may be amended from time to time), dated April 11, 2016, by and among Parent, Purchaser, Otto Trucking LLC, a Delaware limited liability company, Zing Merger Sub II, LLC, a Delaware limited liability company and a wholly-owned subsidiary of Purchaser, and Company Unitholder Representative (the "**Trucking Merger Agreement**"), or any other agreement,

instrument, certificate or document delivered pursuant to the Merger Agreement or the Trucking Merger Agreement or in connection with the transactions contemplated thereby, (ii) Claims relating to the right to receive amounts payable pursuant to exculpation, indemnification, reimbursement, contribution, payment or advancement of related expenses, hold harmless and liability exculpation covenants, agreements and obligations under provisions contained in (A) any written indemnification agreement with the Holder that is disclosed on the Company Disclosure Schedules, (B) liability insurance policies and(C) applicable law, statute, rule or regulation, (iii) any rights to employment or consulting compensation from the Company, as applicable, that remains unpaid for services rendered in the ordinary course of his or her employment or service to the Company or employee benefits from the Company that remain unpaid pursuant to Company plans that are set forth on the Company Disclosure Schedules, (iv) any Claims for reimbursement for expenses incurred in the ordinary course of his or her employment or service to the Company which are reimbursable under the expense reimbursement policies of the Company, or (v) any obligations under the Organizational Documents of the Company with respect to the indemnification of the Holder.

(c)     Releasor hereby waives (i) and agrees not to assert any appraisal or dissenter's rights under applicable provisions of Delaware Law, California Law or other law, and (ii) any notice requirements relating to any Company action under applicable provisions of Delaware Law, California Law or other law.

(d)     Releasor acknowledges that he, she or it is familiar with Section 1542 of the Civil Code of the State of California ("**Section 1542**"), which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

(e)     Except for Claims not released pursuant to Section 6(b), Releasor hereby waives and relinquishes any rights and benefits that Releasor may have under Section 1542 or any similar statute or common law principle of any jurisdiction. Releasor acknowledges that he, she or it may hereafter discover facts in addition to or different from those that Releasor now knows or believes to be true with respect to the subject matter of this release, but it is Releasor's intention, subject to Section 6(a) and Section 1(a), to fully and finally and forever settle and release any and all Claims that do now exist, may exist or heretofore have existed with respect to the subject matter of this release. In furtherance of this intention, except for Claims not released pursuant to Section 6(b), the releases contained herein shall be and remain in effect as full and complete general releases notwithstanding the discovery or existence of any such additional or different facts.

7.     Termination. To the extent this Agreement is executed prior to the consummation of the Merger, this Agreement is conditioned upon the consummation of the Merger as contemplated in the Merger Agreement and shall become null and void and shall have no effect whatsoever, without any action on the part of any Person, upon termination of the Merger Agreement for any reason prior to the Closing.

8.     Miscellaneous.

(a)  The provisions of Section 9.3, 9.4, 9.5, 9.6, 9.10, and 9.12 of the Merger Agreement shall apply, mutatis mutandis, to this Agreement, except that all references in such sections of the Merger Agreement to "Party" or "Parties" shall instead refer to Parent and Holder as applicable, and all references in such sections of the Merger Agreement to "Agreement" shall instead refer to this Agreement. The parties acknowledge and agree that, in the event of any conflict between the terms and provisions of this Agreement and the Merger Agreement or any ambiguity in the provisions of this Agreement, the Merger Agreement shall control.

[Signature page follows]

FINAL FORM

IN WITNESS WHEREOF, the parties hereto have caused this Unitholder Release Agreement to be duly executed as of the day and year set forth below.

**Uber Technologies, Inc.**

Date: _____

By: _____

    Name:

    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Unitholder Release Agreement to be duly executed as of the day and year set forth below.

**HOLDER**

Date: _____

By: _____
Name:
Title:

Address:  _____

                   _____

Email: _____

Company Common Units beneficially owned:

_____

Exhibit G

<u>Exhibit H</u>

Commercial Agreement

FINAL FORM

## COMMERCIAL AGREEMENT

This Commercial Agreement is made as of [_____] (the "**Effective Date**") by and between Uber Technologies, Inc., a Delaware corporation (together with its Affiliates, "**Uber**"), and Ottomotto, LLC, a Delaware limited liability company ("**Company**").

**WHEREAS**, Company is in engaged in the business of developing laser-based devices for use in connection with self-driving land vehicles; and

**WHEREAS**, Uber is, among other things, a technology company that is focused on research and development relating to advanced vehicle technologies; and

**WHEREAS**, Company and Uber wish to set forth the terms and conditions with respect to the development, certification and supply of Laser Devices (as defined below) by Company to Uber, as more fully set forth herein and in the applicable Exhibits hereto.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      **Definitions.**  The following capitalized terms have the meanings set forth below:

1.1      "**Affiliate**" means, with respect to a party, any entity that controls, is controlled by or is under common control with that party.  For purposes of this definition, "control" means direct or indirect ownership of fifty percent (50%) or more of the shares of the entity entitled to vote in the election of directors (or, in the case of an entity that is not a corporation, for the election of the corresponding managing authority), whether through ownership of voting securities, by contract or otherwise.

1.2      "**Background IP**" means, with respect to a party, all Intellectual Property Rights (a) owned, made, conceived or reduced to practice by such party prior to the Effective Date or (b) developed by such party during the Term independent of and outside the scope of the development activities contemplated by the Services.

1.3      "**Change of Control**" means (A) a consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the members of the Company immediately prior to such consolidation, merger or reorganization, continue to hold at least a majority of the voting power of the surviving entity (or, if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; (B) any transaction or series of related transactions to which the Company is a party in which in excess of 50% of the Company's voting power is transferred; or (C) the sale or transfer of all or substantially all of the Company's assets, or the exclusive license of all or substantially all of the Company's material intellectual property; provided that a Change of Control shall not include (x) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor, indebtedness of the Company is cancelled, or converted or a combination thereof and (y) any such consolidation, merger, corporate reorganization, transaction, sale or transfer with, into, to or by Uber or any of its Affiliates.

1.4      "**Common Units**" means common membership interests of Company.

1.5      "**Deliverables**" means the specific materials, software, designs, devices, products or other deliverables that are provided by Company to Uber as a result of performing the Services and which are specified in paragraph 1 of Attachment 1 in Exhibit B.

1.6      "**Forecast**" means a rolling forecast on a calendar quarter basis no later than [30] calendar days prior to the commencement of the next calendar quarter of the Term with respect to Uber's antic-

ipated purchases, broken out by calendar month, of production Laser Devices in the immediately follow-
ing calendar year.

 **1.7** "**Intellectual Property Rights**" means all intellectual property rights throughout the
world, whether existing under intellectual property, unfair competition or trade secret laws, or under stat-
ute or at common law or equity, including but not limited to: (a) copyrights, trade secrets, trademarks,
trade names, patents, inventions, designs, logos and trade dress, "moral rights," mask works, rights of
personality, publicity or privacy, and any other intellectual property and proprietary rights; (b) any regis-
tration, application or right to apply for any of the rights referred to in this clause; and (c) any and all re-
newals, extensions and restorations thereof, now or hereafter in force and effect.

 **1.8** "**Laser Devices**" means collectively (i) customized ███████ laser devices meeting the
Specifications applicable thereto ("██████████ **Devices**") and (ii) customized mid-range laser devices
meeting the Specifications applicable thereto (██████████ **Devices**").

 **1.9** "**Lead Time**" means a period of 8 calendar months between the order date of Laser De-
vices and/or related parts or services and the date of the subsequent delivery thereof, provided that Uber
shall get the benefit of shorter time periods to the extent offered to similarly situated Company customers.

 **1.10** "**New IP**" means any Intellectual Property Rights made, conceived or reduced to practice
by the Company within the scope of the Services.

 **1.11** "**Publicly Available Software**" will mean any software that requires as a condition of
use, modification and/or distribution of such software that such software or other software incorporated
into, derived from or distributed with such software (i) be disclosed or distributed in source code form,
(ii) be licensed for the purpose of making derivative works, or (iii) be redistributable at no charge.

 **1.12** "**Qualifying Financing**" means the Company's next sale of Preferred Units in a single
transaction or in a series of related transactions, in each case occurring on or before the Maturity Date, for
an aggregate gross purchase price paid to the Company (whether paid in the form of cash or cancelled
indebtedness or other form of consideration) of no less than ████████████████████████████
████████████████████████████.

 **1.13** "**Preferred Units**" means preferred membership interests of Company that are converti-
ble into Common Units.

 **1.14** "**Services**" means the services described in Exhibit A and the SOW.

 **1.15** "**Specifications**" means the quality, technical, environmental and other requirements set
forth in Exhibit B, and in Attachment 2 to Exhibit B, as applicable to one or both Laser Devices.

 **1.16** "**Statement of Work**" or "**SOW**" means the description of the Services, including but
not limited to, the Deliverables, project schedule, payment schedule, acceptance criteria, and other infor-
mation set forth in the SOW attached as **Attachment A-1** to Exhibit A, incorporated herein by reference.

 **1.17** "**Uber Fleet**" means the autonomous or semi-autonomous vehicles that utilize ████████
or ████████ laser devices similar to the Laser Devices that (a) are owned, controlled or operated by Ub-
er or its Affiliates except to the extent such laser devices on such vehicles are not being utilized by the
autonomous vehicle technology of Uber and its Affiliates (e.g., factory-installed laser devices), or (b) are
licensed to be operated under any trademark or service mark of Uber or its Affiliates to the extent such
laser devices on such vehicles are provided by Uber or its Affiliates or are installed or selected by Uber or
its Affiliates.

 **1.18** "**Use Data**" means certain data related to the output of the Laser Devices that is collected
by Uber from its owned data collection vehicles that employ Laser Devices (and for clarity, Use Data ex-
cludes data with respect to Uber's specific implementation of the Laser Devices).

**1.19** "**Warrant**" means a warrant to purchase Preferred Units in (at Uber's discretion) either a Qualifying Financing or the first preferred equity financing of the Company: (i) in a form as mutually agreed upon in good faith between Uber and the Company, and (ii) which contains the following material terms: (A) the purchase price of the Preferred Units shall be ███████████████████████████████████████████████████████████████ (as applicable) ("**Purchase Price**"); (B) exercisable in whole or in part for ███████ after the issuance date of the Warrant; (C) for the right to purchase a number of such Preferred Units equal to ████████████████ ████████████████████████████████████████████████████████████ ) containing customary adjustments of the warrant price and number of Preferred Units subject to the warrant for unit splits, unit dividends, recapitalizations and the like; and (E) providing that in ██████████████████ ████████████████████████████████████

**2.     Structure of Agreement**.  This Agreement together with its Exhibits (and schedules or attachments to such Exhibits) (individually, an "**Exhibit**") will collectively be referred to as the "**Agreement**". Each Exhibit is incorporated into this Agreement by reference.  In the event of a conflict, terms contained in an Exhibit will supersede conflicting terms contained in the body of this Agreement (other than under Section 9 hereof, which shall take precedence over any Exhibit), but only with respect to the activities designated in such Exhibit.

**3.     Development of Laser Devices; Exclusive Purchase Rights; Purchase Commitments; Duration of Purchase Rights; Specific Terms and Conditions of Purchase**.  The parties agree to develop, certify, sell and purchase the sample and production versions of the Laser Devices, as more fully set forth below in this Section 3.  Except as may be set forth in an Exhibit, each party will be responsible for its own costs and expenses required to conduct and provide its respective services and perform its other obligations hereunder.

**3.1     Development Activities**.  Company covenants to perform the development and certification work on the Laser Devices and other Services, and Uber will perform acceptance testing on the Laser Devices in accordance with such **Exhibit A**, in each case subject to the additional terms and conditions set forth in such **Exhibit A**.

**3.2     Exclusive Purchase Rights**.  Subject to Uber's continued compliance with the Purchase Commitment in Section 3.3 below and with the Prepayment obligations set forth in **Exhibit A** hereto, starting on the Effective Date, Uber has the exclusive right to purchase the Laser Devices from Company for use in Class 1 through Class 5 vehicles (as defined by gross vehicle weight rating) in the transportation-as-a-service industry for both people and delivery of goods until the later of (i) the delivery of all Laser Devices provided for in the Purchase Commitment (as defined below) and (ii) such date that is ████ ████ after the delivery of the Deliverables associated with milestones 5 and 11 of Attachment 1 to Exhibit B (i.e., both the C-samples of the ███████████ Device and the C-samples of the ███████████ Device) that are accepted by Uber ("**C-Sample Delivery Date**") (the "**Initial Exclusive Period**").  Thereafter, the Initial Exclusive Period shall be extended for ongoing additional ████████████ periods if (i) Uber commits to purchase at least ███████ Laser Devices in such ████████ period and (ii) Uber is utilizing Laser Devices on ████████████████████ (the Initial Exclusive Period, together with any extensions thereof, the "**Exclusive Period**"), provided that in no event shall the Exclusive Period exceed ████████ from the Effective Date.  Company shall use commercially reasonable efforts to cause its Affiliates, distributors, resellers and sub-licensees to adhere to the negative covenants in this Section 3.2. Company shall bind such parties to such covenants in Company's contracts with such parties involving the Laser Devices, and shall use commercially reasonable efforts to enforce such covenants.

**3.3    Purchase Commitment**.  Subject to the production versions of the Laser Devices meeting all Specifications, Uber commits to purchase ███████ units of production ████████ Devices and ████████ units of production ████████ Devices before the end of the Exclusive Period ("**Purchase Commitment**"); provided, however, that Uber shall be relieved of any outstanding Purchase Commitment if Company fails to ████████████████████████████████████████████████████████████████ ████████████████████████████████ (each, a "**Relief Event**").  In addition, upon the occurrence of a Relief Event, Uber shall be entitled to terminate this Agreement upon written notice to Company.

**3.4    Duration of Purchase Rights**.  Uber has the right to buy Laser Devices until ████ from the end of the Exclusive Period ("**Purchase Period**"), provided that Uber shall lose such right with respect to a given Laser Device type (i.e. ████████ Device or ████████ Device) if Uber does not submit Purchase Orders (as defined in Exhibit B) for at leas ████ of such Laser Device type per year of the Purchase Period.  During the Purchase Period, Uber's Purchase Orders for Laser Devices shall be given the same or higher priority as compared to other Company customers.  This right will survive any Company Change of Control event.  During the Purchase Period, Uber shall submit Forecasts consistent with the Lead Times of the Laser Devices.

**3.5    Terms and Conditions of Production Laser Devices**.  Commencing from and after the date on which all milestones applicable to the Services have been met, Company will offer to sell and Uber or its Affiliates may purchase generally commercially available production Laser Devices, and Company shall sell such Laser Devices to Uber, pursuant to Purchase Orders and in accordance with the additional terms and conditions set forth in **Exhibit B**.  Company shall use commercially reasonable efforts to meet any reasonable lead times requested in any Purchase Order that are shorter than the Lead Times, and will notify Uber in a timely manner of any issues that prevent the achievement of any such shorter lead times. Company shall use commercially reasonable efforts to fulfill any Purchase Orders in excess of the Forecasts described in Section 3.4 provided that Company shall have no obligation to fulfill such Purchase Orders.  Prior to the commencement of purchases of production Laser Device Units, the parties in good faith will incorporate the pricing in Attachment 1 to Exhibit B into a formal price list with SKUs for each Laser Device and related parts and services (e.g., extended warranty), as well as Lead Times ("**Price List**"); the Price List shall be deemed incorporated by reference into this Agreement after its mutual written approval by the Parties.  The Price List will indicate which of the SKUs are to be invoiced on a Dual Invoice basis or Single Invoice basis.  "**Dual Invoice**" means that Company may deliver an invoice with respect to (i) 25% of the Purchase Order amount at Purchase Order acceptance and (ii) 75% of the Purchase Amount no earlier than 30 days prior to delivery.  "**Single Invoice**" means that Company may deliver an invoice with respect to the Purchase Order amount only on or after the date of delivery of the entire Purchase Order.

**4.    Payment Terms**.

**4.1    Prices**. Prices under this Agreement are set forth in the applicable Exhibit, and, unless stated otherwise in such Exhibit, include all applicable duties and taxes other than sales or value added taxes.  Company may not modify prices or issue surcharges without Uber's prior written consent.

**4.2    Invoices**. Company may invoice Uber for Services, Deliverables, Prepayment amounts, and for purchases of production units of Laser Devices in accordance with Exhibits A and B, as applicable and, if and when adopted, as set out in the Price List. Each invoice will be supported by an itemized description of the applicable charges and the applicable amounts due (and shall reflect, where appropriate, offsets of amounts otherwise owed against the Prepayment amounts).  Invoices will reference this Agreement. All payments will be made in US dollars, unless otherwise specified in the Exhibit.  Late

payments hereunder will accrue interest at a rate of 1.5% per month, or the highest rate allowed by applicable law, whichever is lower.

      **4.3**      **Payment**. Unless otherwise set forth in an Exhibit, Uber will pay all undisputed amounts set forth in proper Company invoices (subject to applicable withholding taxes, if any) within 30 calendar days of Uber's receipt of the applicable invoice.

**5.**      **Representations and Warranties; Disclaimer**.

      **5.1**      **Mutual Representations and Warranties**.  Company makes additional express warranties to Uber with respect to Services in Exhibit A, and with respect to production versions of the Laser Devices in Exhibit B.  In addition, each party represents, covenants and warrants to the other party that: (a) it is duly organized, validly existing, and has full and adequate power and authority to enter into this Agreement, to grant the rights granted to the other party hereunder and in any Exhibit and to perform its obligations hereunder and in any Exhibit; (b) the execution, delivery, and performance of this Agreement by such party and the performance by such party of the transactions contemplated in this Agreement have been duly and validly authorized by all necessary action, corporate or otherwise, on its part, and this Agreement constitutes the valid, legal, and binding obligation of such party; and (c) such party is not and will not be subject to any agreement or other constraint that does, would, or with the passage of time would prohibit or restrict such party's right or ability to enter into or carry out its obligations hereunder.

      **5.2**      **DISCLAIMER**.  EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, IN THE EXHIBITS HERETO, NEITHER PARTY MAKES ANY WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THIS AGREEMENT OR WITH RESPECT TO THE LASER DEVICES, AND WITHOUT LIMITING THE FOREGOING, EACH PARTY EXPRESSLY DISCLAIMS THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**6.**      **Intellectual Property**.

      **6.1**      **All Rights Reserved**. Except as may be otherwise set forth in an Exhibit, the parties acknowledge that each of them is the sole and exclusive owner of and will retain all right, title and interest in and to all Intellectual Property Rights which are owned by it or have been or are created, invented or conceived by or on its behalf both prior to or during the Term.  All rights not expressly granted by either party to the other party hereunder are expressly reserved by the party holding such rights.

      **6.2**      **Limited License to Use Data.**  Subject to applicable law and to Uber's ability to obtain any required third party contractual consents (which Uber shall use its commercially reasonable efforts to obtain), and to the balance of this Section, Uber hereby grants to Company, only during the Exclusive Period, a non-exclusive, term-limited, fully-paid up and royalty-free, non-transferable, non-sub-licensable, limited right and license to use the Use Data, only in fully aggregated, anonymized and segmented form, and only for internal development purposes with respect to the Laser Devices.  Uber shall provide the Use Data only during the Exclusive Period only in fully aggregated, anonymized and segmented form, but if any other form of Use Data is inadvertently provided, Company will inform Uber and at Uber's instruction immediately will destroy such data.  Breach of this Section shall be deemed a material breach.  Company agrees that Use Data is Uber's Confidential Information and that Company shall not share any Use Data with any third party (other than in connection with a Change of Control of Company).  The Use Data will be provided by Uber in a form (subject to the restrictions above) and format, and at a frequency, to be reasonably agreed by the parties.

**6.3**     **Rights in Deliverables**.  Intellectual Property Rights with respect to the Deliverables are set forth in Exhibit A.

**6.4**     **Supply Continuity**.      The parties acknowledge and agree that Uber would be substantially harmed in the event of a Trigger Event (as defined below).  As a result, within thirty (30) calendar days after the Effective Date, Uber and the Company will establish a technology escrow account with an agreed upon third-party escrow provider (Iron Mountain or similar), with respect to which Uber will pay all escrow services fees. The Company will deposit into the escrow account copies of the product design documents and other proprietary documentation and materials used by Company to manufacture, test and support the Laser Devices, including without limitation materials lists, supplier lists, and identification of any third-party licenses required ("**Deposited Materials**"). The Company will promptly supplement Deposited Materials, no less than on a quarterly basis, with all updates, corrections, enhancements, changes, and revisions to the Deposited Materials that correspond to those used to manufacture the Laser Devices and will provide Uber with a report summarizing each such update.  The escrow provider will be instructed to release the Deposited Materials to Uber upon (i) a Company bankruptcy that is not dismissed for 90 days, or a liquidation, or dissolution of the Company, (ii) Company's material failure to deliver Laser Devices to Uber as required under this Agreement that is not cured within three months of notice of such failure with respect to production units or within six months of notice of such failure with respect to the samples identified in the milestones listed in paragraph 1 of Attachment 1 to Exhibit B, provided Company has commenced cure within such applicable period and diligently pursues such cure, or (iii) any termination of this Agreement by Company under Section 8.2 (each, a "**Trigger Event**"); provided, however, that the Trigger Event described in the foregoing subsection (ii) shall be deemed retracted, and Uber will have no right to continue to use the Deposit Materials as provided herein, if Company cures the material failure to deliver within six months of the initial Trigger Event described in the foregoing subsection (ii) ("**Failure Cure Period**"). Company will have no further obligations under this Agreement (a) upon a release under subsection (i) or (iii) above, or (b) if Company does not cure the material failure during the Failure Cure Period after a release under subsection (ii) above.  Subject to the occurrence of a Trigger Event, the Company hereby grants to Uber and Uber's Affiliates a license, during the Purchase Period (or such longer period as may be agreed upon in writing by the parties), under all of the Intellectual Property Rights Company owns or controls (other than trademarks), including without limitation those that are embodied in or that read on the Deposited Materials, to make, have made, use, reproduce, modify, perform and support Laser Devices solely for Uber's and its Affiliates' own internal business purposes (including without limitation to effect bug-fixes, correct errors and maintain compatibility with other systems), but excluding the right to sell, lease or otherwise provide to unaffiliated third parties or to grant sub-licenses (other than as needed to exercise the have-made rights above or facilitate the development, testing or assembly of products and services for Uber's and its Affiliates' benefit and internal business purposes), provided that all disclosures of the Deposited Materials to such sublicensees shall be made under written obligations of non-use and non-disclosure that are consistent with this Agreement and at least as protective as the confidentiality provisions of Section 7. The Company's escrow obligation shall survive any Change of Control of Company in which Uber does not become the controlling shareholder.  Company's obligation to maintain the technology escrow shall terminate upon the expiration of the Purchase Period, or any earlier expiration or termination of this Agreement; provided, however, that the foregoing license shall survive any expiration or termination of this Agreement with respect to any Deposited Materials released during the Term for the remainder of the Purchase Period, or such longer time as may be agreed upon in writing by the parties.

**7.**     **Confidential Information**.

**7.1**     **Confidential Information**.  Each party (the "**Receiving Party**") undertakes to retain in confidence the terms of this Agreement and all other non-public information, technology, materials and

know-how of the other party (the "**Disclosing Party**") disclosed to or acquired by the Receiving Party pursuant to or in connection with this Agreement that is either designated as proprietary or confidential or, by the nature of the circumstances surrounding disclosure, ought in good faith to be treated as proprietary or confidential ("**Confidential Information**"); provided that each party may disclose the terms and conditions of this Agreement to its immediate legal and financial consultants in the ordinary course of its business.  Receiving Party will not use any Confidential Information of the Disclosing Party for any purpose other than to carry out the activities contemplated by this Agreement.  Receiving Party will use commercially reasonable efforts to protect Confidential Information of the Disclosing Party, and in any event, take precautions at least as great as those taken to protect its own confidential information of a similar nature.  Receiving Party will also notify the Disclosing Party promptly in writing in the event Receiving Party learns of any unauthorized use or disclosure of any of the Disclosing Party's Confidential Information, and Receiving Party will cooperate in good faith to remedy such occurrence to the extent reasonably possible.  Upon request of the Disclosing Party, Receiving Party will return to the Disclosing Party all materials, in any medium, that contain or reveal all or any part of any of the Disclosing Party's Confidential Information.

   **7.2**  **Exceptions**.  The restrictions set forth in this paragraph will not apply to any information, technology, materials or know-how that: (a) was known by the Receiving Party without any obligation of confidentiality prior to disclosure thereof by the Disclosing Party; (b) was in or entered the public domain through no fault of the Receiving Party; (c) is disclosed to the Receiving Party by a third party legally entitled to make such disclosure without violation of any obligation of confidentiality; (d) is independently developed by the Receiving Party without reference to any Confidential Information of the Disclosing Party; or (e) is authorized for disclosure to a third party at the direction of the Disclosing Party, provided that the foregoing exception will only apply to the third party specified by the Disclosing Party for that particular disclosure.  In addition, notwithstanding Section 7.1, a Receiving Party may disclose the Disclosing Party's Confidential Information if such disclosure is required by applicable laws or regulations, provided that the Receiving Party give the Disclosing Party advance written notice of such disclosure (to the extent legally permissible), reasonably cooperates with the Disclosing Party in seeking confidential treatment of such information, and only discloses that portion of information that, based on the reasonable advice of counsel, is legally required to be disclosed.

   **7.3**  **Injunctive Relief**.  Each party acknowledges that breach of this provision by it would result in irreparable harm to the other party, for which money damages would be an insufficient remedy, and therefore that the other party will be entitled to seek injunctive relief to enforce the provisions of this Section 7.

**8.**  **Indemnification; Limitation of Liability**.

   **8.1**  **Uber**.  Uber will indemnify, defend and hold Company, its Affiliates and its and their respective officers, directors, employees and agents harmless from and against any and all damages, liabilities, penalties, interest, fines, losses, costs and expenses, including reasonable outside attorneys' fees (collectively, "**Losses**") resulting from any third party claim arising out of or relating to the gross negligence or willful misconduct of Uber or its Affiliates hereunder, except to the extent such third party claim (i) arises from the gross negligence or willful misconduct of the Company, or (ii) arises from Company's breach of any of its representations, warranties or covenants under this Agreement.

   **8.2**  **Company**.  Company will indemnify, defend and hold Uber, its Affiliates and its and their respective officers, directors, employees and agents harmless from and against any and all Losses (I) as described in Sections 6.3 (Recalls) of Exhibit B and (II) resulting from any third-party claim arising out of or relating to: (a) the infringement, misappropriation or violation of any third-party Intellectual Property Rights by the Laser Devices; or (b) the gross negligence or willful misconduct of Company or its

Affiliates.  Notwithstanding the foregoing, Company shall have no obligation under the foregoing subsection (II)(a) to the extent that any such third-party claim arises from any modification of any Laser Devices by or for Uber or its Affiliates (and provision of the Services by Company and development of the Laser Devices by Company to meet the Specification shall not be deemed to be such a modification) or from any combination of any Laser Devices with any other hardware, software, system or method by or for Uber or its Affiliates (but only if the Laser Device would not have infringed absent such combination).  In the event of a third-party claim under the foregoing subsection (II)(a), Company may: (i) modify the Laser Device to remove the component(s) affected by such third party claim (without material loss of functionality); (ii) procure on Uber's behalf, and at Company's sole expense, a license for the use of the relevant third-party Intellectual Property Rights; or (iii) terminate this Agreement and provide Uber with a refund of all amounts paid with respect to the sample or production Laser Devices affected by the third-party claim that are returned to Company.  Prior to exercising the right in clause (iii) of the preceding sentence, however, Company must use reasonable commercial efforts, for not less than ninety (90) calendar days after notice of the third party claim, to effect one of the remedies in clause (i) or (ii) of the preceding sentence.

      **8.3**    **Procedure**.  Each party will give the other party prompt written notice of any claim subject to indemnification, provided that a party's failure to promptly notify the indemnifying party will not affect such party's indemnification obligations except to the extent that indemnified party's delay prejudices the indemnifying party's ability to defend such claim.  The indemnifying party will defend any claim with counsel of its own choosing and settle it as it deems appropriate, provided that the indemnifying party will not enter into any settlement that adversely affects the other party's rights or requires any admission by the other party without such other party's prior written consent.  At the indemnifying party's expense and request, the other party will reasonably cooperate with the indemnifying party in the defense and settlement of any claim subject to indemnification by the indemnifying party.  At its discretion and expense, the indemnified party may participate in the defense, any appeals, and settlement with counsel of its own choosing.  Each Party shall use reasonable efforts to mitigate any potential Losses arising out of such third party claims.

      **8.4**    **DAMAGES LIMITATIONS**.  EXCEPT FOR LIABILITY ARISING FROM ANY BREACH OF SECTION 7, AND FROM ANY INDEMNIFICATION OBLIGATIONS HEREUNDER OR UNDER ANY EXHIBIT, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES FOR ANY CLAIM ARISING UNDER THIS AGREEMENT, REGARDLESS OF THE CAUSE OF ACTION AND EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**9.**    **Term and Termination**.

      **9.1**    **Term**.  The Agreement will begin on the Effective Date and will continue throughout the Purchase Period (the "**Initial Term**"), automatically renewing for successive one (1) year periods thereafter (each, a "**Renewal Term**"), unless a party provides the other party at least ninety (90) days' written notice prior to the end of the current period of its intention not to renew the Agreement, or as otherwise terminated pursuant to this Section 9 (the Initial Term and any Renewal Term collectively referred to as the "**Term**").

      **9.2**    **Termination for Cause**.  Either party may terminate this Agreement (including all Exhibits) if the other party is in material breach of this Agreement or any Exhibit and has failed to cure that breach within sixty (60) days after the terminating party's written notice thereof.

      **9.3**    **Other Termination**.  In addition to the other termination rights stated herein or in an Exhibit, either party may terminate this Agreement (including all Exhibits) immediately upon written

notice to the other party if the other party:  (a) makes an assignment in violation of this Agreement; (b) ceases to carry on its business, liquidates or dissolves its business, or disposes of a substantial portion of its assets; (c) becomes insolvent or makes an assignment for the benefit of creditors, or fails generally to pay its debts as they become due; or (d) voluntarily or involuntarily becomes the subject of any proceeding relating to bankruptcy, insolvency, receivership, liquidation, or other similar proceeding.  In addition, Uber may terminate this Agreement (including all Exhibits) if Company fails either to close a Qualifying Financing or to issue the Warrant within one hundred eighty (180) calendar days after the Effective Date (and Company shall provide Uber with copies of the documentation confirming the closing of the Qualifying Financing and other reasonable assurances of the sufficiency of such financing); or undergoes a Change of Control transaction (as the case may be) with, to or into any On-Demand Transportation Provider.  As used herein, "On-Demand Transportation Provider" means any person or entity directly or indirectly engaged in the provision or facilitation of on-demand transportation or logistics services, including, without limitation, any of the following companies (and any Affiliate of any of the following companies): ████████████████████████████████████████
████████████████████████████

     **9.4**    **Effect of Termination**.

       **(a)**    **Termination of the Agreement**.  Upon termination or expiration of the Agreement, any outstanding payment obligations will survive such termination or expiration and Sections [COMPLETE PRIOR TO SIGNATURE] of this Agreement will survive any expiration or termination hereunder.  Upon termination or expiration, all licenses granted herein and in the applicable Exhibit will automatically terminate, except as otherwise set forth in the Exhibit or with respect to any licenses that are expressly stated as being perpetual in nature).  In addition, individual Exhibits may have additional survival terms as set forth therein.  Further, after expiration or termination of the Agreement, each party will, within twenty (20) business days, return or destroy (at the election of the other party) all Confidential Information of the other party in its possession at the time of expiration or termination (with such destruction to be certified in writing if requested by the other party).

       **(b)**    **Termination Generally**.  Termination of this Agreement as permitted in this Section 9 will be without prejudice to any other right or remedy of the parties hereto.

**10.**    **Dispute Resolution**.  Before initiating any legal claim or action (except with respect to equitable relief), the parties agree to attempt in good faith to settle any dispute, controversy, or claim arising out of or related to this Agreement (collectively, a "**Dispute**") through discussions which will be initiated upon written notice of a Dispute by either party to the other party. If the parties cannot come to a mutually agreeable resolution of the Dispute within fifteen (15) business days, then such Dispute will be referred to members of the parties' executive management (each such member a "**Representative**") for resolution. If the parties' Representatives have not reached a mutually agreeable resolution of the Dispute within fifteen (15) business days after their initial meeting, then either party may pursue its rights and remedies available at law or in equity.

**11.**    **General.**

**11.1    Independent Contractor**.  The relationship of Uber and Company established by this Agreement is that of independent contractors.  No party has any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement, or undertaking with any third party without the express consent of such other party.

**11.2    Notices**.  All notices, requests, demands, and other communications hereunder will be delivered in writing and will be deemed to have been duly given: (a) on the day of receipt if personally delivered or delivered by courier to such party; or (b) on the third day after mailing if mailed by registered or certified mail.  The Parties will send all notices to the following addresses:

**If to Company**:                           **If to Uber**:

[PROVIDE]                                    [PROVIDE]

With a copy to:                              With a copy to:

The parties may change their addresses by notice to the other party pursuant to this Section 11.2 or by other form of notice agreed to by the parties.

**11.3    Assignment**.  Neither party may assign, transfer, or subcontract this Agreement, in whole or in part, or delegate any of its duties hereunder, without the other party's express, prior written consent, provided, however, that a party may assign, transfer, or subcontract this Agreement, in whole or in part: (a) by Uber, to any Affiliate of Uber; or (b) by either party, upon written notice to the other party, in connection with a Change of Control (subject to Uber's rights with respect to the Deposited Materials).  Any attempted assignment in contravention of this provision will be null and void.  This Agreement will be binding on all permitted assignees and successors in interest.

**11.4    Waiver of Breach**.  The waiver of any breach of any provision of this Agreement will only be effective if it is in writing and signed by the party granting the waiver.  A waiver of any breach will not constitute a waiver of any subsequent breach.  A party's failure to respond or act will not be considered a waiver.

**11.5    Severability**.  If any provision of this Agreement is invalid or unenforceable in any jurisdiction, the other provisions of this Agreement will remain in full force and effect in such jurisdiction and will be liberally construed in order to effectuate the purpose and intent of this Agreement, and the invalidity or unenforceability of any provision of this Agreement in any jurisdiction will not affect the validity or enforceability of any such provision in any other jurisdiction.

**11.6    Force Majeure**.  Neither party will be liable for any default or delay in the performance of its obligations under this Agreement, including its obligations with respect to any Exhibit, if and to the extent: (a) the default or delay is caused, directly or indirectly, by a force majeure event; (b) the non-performing party is without fault; and (c) the default or delay could not have been prevented by reasonable precautions.  In such event, the non-performing party is excused from further performance for as long as such circumstances prevail and the party continues to use its commercially reasonable efforts to recommence performance.  Any party so delayed will notify the party in writing to whom performance is due and describe the circumstances causing the delay.

**11.7     Remedies**.  No remedy conferred by any of the specific provisions of this Agreement or available to a party is intended to be exclusive of any other remedy, and each and every remedy will be cumulative and in addition to every other remedy given hereunder, now or hereafter existing at law or in equity or by statute or otherwise.  The election of one or more remedies by either party will not constitute a waiver of the right to pursue other available remedies.

**11.8     No Publicity or Promotion**.  Except as otherwise set forth in any mutually agreed upon Exhibit hereto, either party will directly or indirectly issue or permit the issuance of any press release, public statement or publicity regarding the other party or the Agreement without prior consideration with and written approval by such other party.

**11.9     No Third Party Beneficiaries**.  The parties hereby disclaim any intent that their obligations under this Agreement or any portion thereof benefit or can be relied upon by any third party.

**11.10    Entire Agreement/Amendments**.  This Agreement contains the entire agreement of the parties regarding the subject matter described herein, and all other promises, representations, understandings, arrangements, and prior agreements related thereto are merged herein and superseded hereby.  The provisions of this Agreement (or of any Exhibit) may not be amended except by an agreement in writing signed by authorized representatives of both parties.

**11.11    Counterparts**.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which taken together will constitute one signed agreement between the parties.  Signatures may be transmitted by facsimile or electronic mail in PDF or other similar format and will be deemed original.

**11.12    Applicable Law**.   This Agreement will not be governed by the United Nations Convention on Contracts for the International Sale of Goods, the application of which is expressly disclaimed.  This Agreement will be governed and construed in all respects in accordance with the laws of the State of California, U.S.A., without reference to conflicts of laws principles, and the parties hereby consent to exclusive jurisdiction and venue in the state and federal courts sitting in San Francisco County, California.   To the extent that changes in applicable law would or could impact the parties' respective obligations hereunder the parties will negotiate in good faith regarding appropriate changes to the Agreement.

**11.13    Audit**. During the term of the Agreement and for not less than two (2) years after its termination or expiration for any reason, Company (i) shall keep and retain books and records relating to its manufacturing, testing and quality control processes for the Laser Devices and (ii) allow Uber, but not more than one (1) time per quarter and during Company's normal business hours, to inspect such books and records to confirm Company's compliance with the Laser Device warranties in Section 6 of Exhibit B. For the avoidance of doubt, Uber shall have no right under this Section 11.13 to inspect or audit any financial books or records of Company.

**12.     Insurance.** Company will obtain and maintain, with insurance companies reasonably acceptable to Uber, the insurance coverage listed below.  Company will furnish to Uber a certificate showing compliance with this requirement or certified copies of all insurance policies within 10 days of Uber's written request. The certificate will provide that Uber will receive 30 days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The existence of insurance does not release Company of its obligations or liabilities under the Agreement or any Purchase Order.  The minimum coverage is as follows:

| COVERAGE | LIMITS OF LIABILITY |
|---|---|
| Workers compensation | Statutory |
| Employer's liability | US$100,000 / each accident, disease policy limit, disease each employee |
| Comprehensive general liability insurance, including contractual liability coverage, general aggregate, products & completed operations aggregate | US$3,000,000 / each occurrence |
| Comprehensive automobile liability insurance | US$1,000,000 / each occurrence combined single limit |

    **IN WITNESS WHEREOF**, Company and Uber have each caused this Agreement to be signed and delivered by its duly authorized officer as of the Effective Date.

**Company**                                        **Uber**

By:_____          By: _____

Printed: _____          Printed: _____

Title: _____          Title: _____

Date: _____          Date: _____

**Exhibit A**

**Development of Laser Devices**

This Exhibit is part of the Commercial Agreement between Uber and Company with an Effective Date of
.

**1.      DEFINITIONS**. Capitalized terms used but not defined in this **Exhibit A** have the meanings assigned to such terms in the body of the Agreement.

**2.      SERVICES**.

2.1      **Description of Services**. Company will perform the Services, including, without limitation, providing Uber with all of the Deliverables, in accordance with the Commercial Agreement and with this Exhibit A.  Each party hereby agrees that, by referencing this Exhibit, each Statement of Work will be understood as implicitly incorporating by reference the terms herein even if the Statement of Work does not expressly do so.  In the event of any inconsistencies between the terms of a Statement of Work and the terms herein, this Exhibit will govern, except for instances where the Statement of Work specifically references a deviation from the Exhibit, in which case the terms set forth in the Statement of Work will prevail for that Statement of Work only.

2.2      **Change Orders**. Uber may, at any time, by written notice to Company, request additional Services or reduce or waive Services covered by the applicable Statement of Work. In such event, a mutually agreed upon adjustment in price and time of performance will be made and a change order issued as appropriate. Upon execution of any such change order by the parties, such change order will modify the applicable Statement of Work.

2.3      **Performance; Personnel; Subcontractors**.      The manner and means by which Company chooses to complete the Services are in the Company's sole discretion and control. Company represents and warrants that Company and its employees are skilled, experienced and fully qualified to perform and deliver the Services. Unless otherwise specified in the applicable Statement of Work, Company will provide all necessary equipment, tools and other material, at Company's own expense, necessary to complete the Services.  Company will at all times provide a sufficient number of qualified and skilled personnel ("**Personnel**") to perform and complete the Services, and Company will take reasonable measures to ensure that all of its Personnel who perform any Services hereunder will comply with the duties and obligations applicable thereto under this Agreement.  Other than permitted subcontractors described below, all Personnel will be employees of Company. Company will be solely responsible for assuring the safety of its Personnel performing any Services. Company will comply with all applicable health and safety laws and regulations. Company will take reasonable measures to ensure that its Personnel performing Services are properly trained in performing their duties.  Company may engage subcontractors to assist with the performance of the Services, provided that Company obtains prior written approval of subcontractors in each instance. Company will be solely responsible for the acts and omissions of all subcontractors engaged by Company and authorized to perform Services hereunder. If approved by Uber, subcontractors performing Services will be deemed Personnel for the purposes of this Exhibit.

**3.      INTELLECTUAL PROPERTY**.

3.1      **Background IP**. Except as may be otherwise set forth in this Exhibit or the SOW, each party is the sole and exclusive owner of, and retains all rights, title and interest in and to, its Background IP.  The Specifications will be treated as Uber's Confidential Information; provided, however, that after the Exclusive Period, Company shall be free to use and disclose in any manner any technical specifica-

tions of the Laser Devices, notwithstanding that such information may be contained within the Specifications.

   3.2 **Ownership of New IP**. The New IP contemplated by the SOW shall be solely owned by Company.

   3.3 **Assistance**. From time to time, during the Term and thereafter, each party will, and will cause its employees and agents to, reasonably assist the other party, at the requesting party's expense, in obtaining registrations for and enforcing Intellectual Property Rights relating to New IP, as further specified in the SOW.

**4.**  **REPRESENTATIONS AND WARRANTIES**. Company hereby represents and warrants that:

   4.1 the Services will be performed in a competent and professional manner by Personnel skilled in the relevant areas of expertise, and the Services and Deliverables will meet the applicable Specifications;

   4.2 the Deliverables are not or will not be subject to any mortgages, liens, pledges, security interests or similar encumbrances; and

   4.3 Company will comply with all applicable state, federal and local laws and regulations in the performance of Services and provision of the Deliverables under this Exhibit, and will notify Uber immediately if Company becomes the subject of a government audit or investigation.

**5.**  **Term; Termination**

   5.1 **Term**. This Exhibit will commence on the Effective Date and continue on a coterminous basis with the Agreement until the Services are completed or unless terminated along with and as set forth in the Agreement.

**Attachment A-1**

**STATEMENT OF WORK**

This SOW is governed by the terms and conditions of Exhibit A to the Commercial Agreement between Uber and Company with an Effective Date of          .

1.      **Summary Description of Services**:

The Services are the completion of the milestones and delivery of the associated Deliverables in paragraph 1 of Attachment 1 to Exhibit B.

2.      **Services Schedule**:

The Services are to be performed in accordance with the schedule set forth in the table in paragraph 1 of Attachment 1 to Exhibit B. Upon the request of either party, the parties shall discuss any requested amendments to such schedule in good faith.  In particular, Uber shall not unreasonably withhold any Company requests to extend schedule dates where such extensions do not have a material adverse impact on Uber's AV program schedule, in Uber's reasonable discretion.

6.      **Deliverables**:

The Deliverables are those set forth in the table in paragraph 1 of Attachment 1 to Exhibit B.

7.      **Acceptance Criteria and Procedures**:

Refer to paragraph 11 of this SOW.

8.      **Location of Performance**:

Services will be primarily performed at Company's facilities located at          .

9.      **Project Managers**:

Uber:
                Name:
                Telephone No:
                Email:
        Address:

Company:
                Name:
                Telephone No:
                Email:
        Address:

10.     **Reporting**:

Company will prepare written reports for Uber on an as requested basis during the course of this SOW. Such reports will be sent to the Uber Project Manager via email, or hardcopy sent to the address in listed in Section 9 of this SOW.

11.   **Fees and Payment Schedule**:

In complete consideration of the Services and the development and delivery of the Deliverables, Uber will make the payments described in clause (i) below for the Deliverables, and make the Prepayment (as described in clause (ii)) toward purchase of production Laser Devices. Company assumes all risks associated with any cost overruns and all costs of performance (including without limitation, costs associated with Personnel and travel, and materials).

(i) Uber will pay to Company, in accordance with this paragraph, the payment amounts specified in paragraph 1 of Attachment 1 to Exhibit B. Company shall deliver the Deliverables to Uber for acceptance testing against the Specifications and additional criteria set forth in in paragraph 1 of Attachment 1 to Exhibit B in the description of such Deliverable. Such acceptance process shall be not less than thirty (30) calendar days in duration and, with Uber's agreement, may be satisfied by delivery of (as applicable) certification and/or test results provided by Company. When Uber has received all Deliverables listed in a line item of paragraph 1 of Attachment 1 to Exhibit B (including where applicable the minimum quantities of prototype Laser Devices) and has confirmed its acceptance thereof in writing, Company may deliver an invoice with respect to such Deliverable(s). The standard for Uber's acceptance shall be conformance to the Specifications and additional criteria set forth in paragraph 1 of Attachment 1 to Exhibit B in the description of such Deliverable, and Uber will not unreasonably withhold or delay any such acceptance. For clarity Uber shall have the right but not the obligation to purchase prototype Laser Device units beyond the required minimum quantities, at the prices stated in in paragraph 1 of Attachment 1 to Exhibit B.

(ii) Uber will prepay as an advance and credit against its Purchase Commitment the following amounts ("**Prepayment**") upon the completion of the following milestones (refer to paragraph 1 of Attachment 1 to Exhibit B):



**Devices**

**Devices**

Company may deliver an invoice with respect to the Prepayment tranche along with its invoice for the completed milestone referenced above. All Prepayment amounts are subject to refund if the Agreement is terminated or expires for any reason prior to their having been allocated against delivered Purchase Orders except to the extent such amounts have been expended by Company to fulfill Purchase Orders for goods or services that are not reasonably returnable or reusable. For clarity, Company may deliver invoices with respect to milestones achieved (and with respect to which Uber has accepted) prior to the Effective Date, at any time on or after the Effective Date.

12.     **License to Background IP of Uber**.  N/A

13.     **Intellectual Property**:

The New IP contemplated by this SOW shall be solely owned by Company.  Ownership of other Intellectual Property developed under the Agreement or this SOW shall be determined by applicable law.

**Exhibit B**

**PURCHASE TERMS AND CONDITIONS**

These Purchase Terms and Conditions ("**Terms and Conditions**") are a part of, and are hereby incorporated in, the Commercial Agreement.  Capitalized terms used but not defined in these Terms and Conditions have the meanings given them in the Commercial Agreement.

**1.      Purchase Orders**.

1.1      Purchase Orders.  All purchase orders issued by Uber for Laser Devices and related Services (each, a "**Purchase Order**") shall be governed by the terms and conditions of the Commercial Agreement, including the provisions of this Exhibit B.  No proposal for additional or different terms or any attempt by Company or Uber to vary any of the terms of this Agreement, whether in any request for quotation form, quotation form, acknowledgement form, Purchase Order, invoice, correspondence or otherwise, will not become part of this Agreement unless mutually agreed in writing by the parties.

1.2      Acceptance of Purchase Orders; Termination of Purchase Orders. Company will be deemed to have accepted a Purchase Order that is consistent with the terms of this Agreement (including pricing and Lead Times) as issued (1) if Company fails to object to it in writing within 5 business days after receipt, or (2) Company has begun performance under the Purchase Order, or (3) if Company acknowledges in writing its acceptance of the Purchase Order.  Subject to the terms of Uber's purchase commitment as set forth in Section 3 of the Commercial Agreement, Uber may, at its option, terminate any Purchase Order, in whole or in part, at any time for any reason by giving Company written notice, subject to the payment of a termination fee up to the following percentage of the relevant Purchase Order (or portion thereof), and subject to the balance of this Section 1.2:

| Days After Purchase Order Acceptance | Percentage of Purchase Order Amount (or Partial Amount) Payable as Termination Fee |
| --- | --- |
| 0-30 | 10% |
| 31-60 | 20% |
| 61-90 | 30% |
| 91-above | 100% |

Upon Company's receipt of a notice of termination, Company will undertake reasonable commercial efforts to mitigate the effect of Uber's termination of all or part of a Purchase Order, including by transferring work-in-process and raw materials produced or acquired by Company prior to termination of the Purchase Order toward the production of Laser Devices for other customers.  To the extent that such transfers are possible, Company will reduce or eliminate the termination fee above.

1.3      Changes. Uber may from time to time by notice to Company request reasonable changes to the drawings, Specifications, materials, packaging, testing, quantity, time or method of delivery or shipment, or similar requirements prescribed in the Contract. The parties will agree upon an equitable adjustment to the Contract prices and times for performance as a result of Uber's requested changes; provided that no such changes shall be binding until agreed in writing by the parties.

**2.      Laser Device and Service Requirements**.

2.1      Quantity.

(a)    Unless otherwise stated in the Purchase Order or if the quantity is blank or states the quantity as zero, "as scheduled," "as directed," or something similar, Company will supply Uber's requirements for Laser Devices in such quantities as identified by Uber as firm orders in material authorization releases, manifests, broadcasts or similar releases ("**Material Releases**") that are transmitted to Company during the term of the Purchase Order, and Company will supply all such Laser Devices on such dates and times (to the extent consistent with the Lead Times), at the price and on the other terms specified in the Purchase Order.  Material Releases are part of the Purchase Order, are governed by these Terms and Conditions and are not independent contracts.

(b)    Time and quantities are of the essence under the Purchase Order. Company agrees to 100% on-time delivery of the quantities and at the times specified by Uber, as stated in the Purchase Order and related Material Releases, in each case to the extent consistent with the Lead Times. Uber is not obligated to accept early deliveries, late deliveries, partial deliveries or excess deliveries.

2.2    <u>Service Requirements</u>. Except as otherwise expressly agreed in writing, for a period of 18 months after a system module or specific part concludes production (or if later, after the end of the Purchase Period), Company will supply Uber's written "service parts" orders for the same Laser Devices, component parts and materials at the price(s) set forth in the Purchase Order plus any actual cost differential for special packaging.  If the Laser Devices are systems or modules, Company will sell each component or part at a price that does not, in the aggregate, exceed the system or module price specified in the Purchase Order, less assembly costs, plus any actual cost differential for packaging.

**3.    Shipment and Delivery.**

3.1    <u>Packing and Shipment</u>. Uber may specify the method of transportation and the type and number of packing slips and other documents to be provided with each shipment. Company will pack and ship Laser Devices in accordance with the Specifications. If the Specifications do not include packing or shipping instructions, Company will pack and ship Laser Devices in accordance with sound commercial practices and industry standards. Company agrees to comply with all national, state, provincial, and local laws and regulations applicable to Company pertaining to product content and warning labels.

3.2    <u>Delivery Schedules; Delivery Inspection</u>. Company will deliver Laser Devices in strict accordance with this Agreement. Unless otherwise agreed in writing, Incoterms 2010 will apply to all shipments, and Laser Devices will be shipped FCA at Company's final production location and using Uber's transportation, and risk of loss will transfer from Company to Uber upon delivery to Uber's transportation carrier. If Company has not made Laser Devices ready for delivery in time to meet Uber's delivery schedules that are in accordance with the Lead Times, Company will be responsible for all additional costs of any resulting expedited or other special transportation.  Uber reserves the right to inspect each delivered shipment for compliance with the requirements of this Agreement and within thirty (30) days after delivery, reject such shipment for non-compliance.

3.3    <u>Packing Requirements</u>. Company will reimburse Uber for any liabilities, expenses and costs incurred as a result of improper packing, marking, routing, or shipping or any other noncompliance with the requirements of this Section. In no event will shipping documents attached to or contained in the shipment display pricing information or any of Uber's proprietary information.

**4.    Quality.**

4.1    <u>Quality</u>. Company will comply with the ISO 9001 quality control standard and any other quality control standards and procedures (i) required by any law or regulation applicable to Company as a manufacturer or seller of the Laser Devices, or (ii) mutually agreed upon by the parties in writing.

**5.**     **Prices and Payment**.

5.1     Prices. Prices for the Laser Devices are as set forth in the Agreement, and include all applicable duties and taxes other than sales or value added taxes. Company may not modify prices or issue surcharges without Uber's prior written consent. Company will separately invoice Uber for any sales or value added taxes that Company is required by law to pay or collect from Uber.

5.2     Payment Terms; Invoices.  Uber will pay on a per Laser Unit basis, after first drawing down on Uber's credit balance from the Prepayment to zero.  Each invoice will clearly show the detail on the Purchase Order including as a minimum, Uber's Purchase Order number (and release if applicable), the Purchase Order item number, Uber' part number, quantity of units in shipment, unit price, extended price, shipment date and bill of lading number. All payments will be made in US dollars, unless otherwise specified on the face of the Purchase Order.  Late payments hereunder will accrue interest at a rate of 1.5% per month, or the highest rate allowed by applicable law, whichever is lower.

**6.**     **Laser Device Warranties.**

6.1     Company's Warranties.  Company expressly warrants to Uber, Uber's affiliates, successors and assigns that, during the warranty period specified below, all Laser Devices delivered or provided to Uber will: (i) be free from defects in design, workmanship and materials, (ii) conform to the Specifications, (iii) be free of all liens and similar encumbrances, (iv) conform to all applicable laws, governmental orders and regulations in the U.S. (or any other markets mutually agreed upon by the parties in writing), and (iv) not cause any software with which the Laser Device is integrated for deployment to become Publicly Available Software.  Uber's approval of any design, drawing, material, process or specifications will not relieve Company of these warranties. The foregoing warranties will survive for the longer of: (a) 12 months from the date of delivery of the Laser Devices; or (b) if longer, the warranty period provided by applicable law.  The foregoing warranty will not cover any non-conformity to the extent caused (1) by any abuse, misuse, neglect or damage to the Laser Devices by any party other than Company or its agents, or (2) by any failure to properly mount, calibrate, adjust or maintain the Laser Devices in accordance with their applicable documentation.  For the avoidance of doubt, no design characteristic of the Laser Devices that is specifically required by, and conforms to, the Specifications shall be considered a design defect under this Section 6.1, except if Company knew or should have known (after reasonable diligence) that there was a commercially reasonable method or process to design and/or manufacture the Laser Devices that could have been used to meet such Specifications that would not have led to a design defect.

6.2     Non-Conforming Laser Devices; Return Materials Authorization (RMA). Uber's remedy for Laser Devices that do not conform to the warranties in Section 6.1 of this Exhibit will be to (1) reject the non-conforming Laser Devices, (2) require Company, at Uber's option and at Company's expense (including applicable shipping, administrative and labor costs), to either repair or replace the non-conforming Laser Devices, and/or (3) require Company to implement at its expense containment, inspection, sorting, and other quality assurance procedures if Uber reasonably determines (through statistical sampling or other quality assessments) that a substantial quantity of incoming Laser Devices do not conform to the warranties in Section 6.1 of this Exhibit. To the extent commercially reasonable, Uber will provide Company with access to any available warranty data related to the Laser Devices and any available field-returned Laser Devices. Uber will also provide Company with an opportunity to participate in any root cause analysis performed by Uber concerning the Laser Devices. In effecting warranty claims and warranty performance with respect to non-conforming Laser Devices, the parties shall follow the shipping and other procedures in Company's then-current RMA process as may be communicated in writing to Uber from time to time**.**  Without limiting the indemnification obligations under Section 8 of the Agreement, or Section 6.3 below, the foregoing shall be Uber's sole remedies and Company's sole obligations with respect to non-conforming Laser Devices.

6.3     Recalls. This Section 6.3 applies to any voluntary or government-mandated offer by Company or any government-mandated offer by Uber (or the vehicle manufacturer, as the case may be) to remedy an alleged defect that affects motor vehicle safety or to address an alleged failure of a vehicle to comply with an applicable motor vehicle safety standard or guideline (a "**Recall**").  Company will indemnify Uber from and against Losses resulting from a Recall to the extent the Recall results from a failure of the Laser Devices to conform to the warranties in Section 6.1 of this Exhibit.  The extent of Company's liability for a Recall will be reasonably determined on a case-by-case basis based on a good faith allocation of responsibility for the Recall.

















<u>Exhibit J</u>

Company Operating Plan

**Exhibit G**









<u>Exhibit K</u>

Form of Employment Package Documents

FINAL FORM

# UBER TECHNOLOGIES, INC.

## CONFIDENTIAL INFORMATION AND
## INVENTION ASSIGNMENT AGREEMENT[1]

*Employee Name:* _____

*Effective Date:* _____

This Confidential Information and Invention Assignment Agreement (the "Agreement") is entered into by and between Uber Technologies, Inc., a Delaware corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company") and me. The Company and I are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

WHEREAS, the Parties and Ottomotto LLC have entered into that certain Agreement and Plan of Merger, dated April 11, 2016 (the "Merger Agreement," together with the Exhibits and other agreements contemplated thereunder, the "Transaction Documents");

WHEREAS, the Transaction Documents contemplate that I will enter into employment with the Company upon the closing of the Merger (as defined in the Merger Agreement).

NOW THEREFORE, as a condition of my employment with the Company and me becoming employed (or my employment being continued) by the Company, and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

1.     **Relationship.**   This Agreement will apply to my employment relationship with the Company.  If that relationship ends and the Company, within a year thereafter, either re-employs me or engages me as a consultant, I agree that this Agreement will also apply to such later employment or consulting relationship, unless the Company and I otherwise agree in writing. Any such employment or consulting relationship between the Company and me, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship."

2.     **Duties.**   I will perform for the Company such duties as may be designated by the Company from time to time or that are otherwise within the scope of the Relationship or contemplated under the Transaction Documents and not contrary to instructions from the Company.  During the Relationship, I will devote my entire best business efforts to the interests of the Company and will not engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company.

3.     **Confidential Information.**

(a)     **Protection of Information.**   I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit

---

[1] Form CIAA for Anthony Levandowski and Lior Ron

of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information (as defined below) that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly known or made generally available through no wrongful act of mine or of others reporting directly or indirectly to me who were under confidentiality obligations as to the item or items involved.  I further agree not to make copies of such Confidential Information except as authorized by the Company.

(b)     **Confidential Information.**  I understand that "Confidential Information" means information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties. Confidential Information includes, without limitation:  (i) Company Inventions (as defined below); (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, developments, inventions, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

(c)     **Third Party Information.**  My agreements in this Section 3 are intended to be for the benefit of the Company and any third party that has entrusted information or physical material to the Company in confidence.

(d)     **Other Rights.**  This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

4.     **Ownership of Inventions.**

(a)     **Inventions Retained and Licensed.**  I have attached hereto, as Exhibit A, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date, belong solely to me or belong to me jointly with others, and that relate in any way to any of the Company's proposed businesses, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Inventions at the time of signing this Agreement.

(b)     **Use or Incorporation of Inventions.**  If in the course of the Relationship, I use or incorporate into a product, process or machine any Invention not covered by Section 4(c) of this Agreement in which I have an interest, I will promptly so inform the Company.  Whether or not I give such notice, I hereby irrevocably grant to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute under all applicable intellectual property

laws without restriction of any kind.

(c)     **Inventions.**  I understand that "<u>Inventions</u>" means discoveries, developments, concepts, designs, ideas, know how, improvements, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable.  I understand this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon.  I understand that "<u>Company Inventions</u>" means any and all Inventions that I may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship, except as otherwise provided in Section 4(g) below.

(d)     **Assignment of Company Inventions.**  I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest throughout the world in and to any and all Company Inventions.  I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary.  I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions.

(e)     **Maintenance of Records.**  I agree to keep and maintain adequate and current written records of all Company Inventions made by me (solely or jointly with others) during the term of the Relationship.  The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format.  The records will be available to and remain the sole property of the Company at all times.  I agree not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business.  I agree to deliver all such records (including any copies thereof) to the Company at the time of termination of the Relationship as provided for in Sections 5 and 6.

(f)     **Patent and Copyright Rights.**  I agree to assist the Company, or its designee, at its expense, in every proper way to secure the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, moral rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.  I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any

-3-

country of the world.  I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters of patents, copyright, mask work and other registrations related to such Company Inventions.  This power of attorney is coupled with an interest and shall not be affected by my subsequent incapacity.

(g)     **Exception to Assignments.**  I understand that the Company Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention which qualifies fully for exclusion under the provisions of applicable state law, if any, attached hereto as Exhibit B.  In order to assist in the determination of which inventions qualify for such exclusion, I will advise the Company promptly in writing, during and after the term of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the period of the Relationship.

5.     **Company Property; Returning Company Documents.**  I acknowledge and agree that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, files, e-mail messages, and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored at any time without notice.  I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice.  I agree that, at the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

6.     **Termination Certification**.  In the event of the termination of the Relationship, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit C; however, my failure to sign and deliver the Termination Certification shall in no way diminish my continuing obligations under this Agreement.

7.     **Notice to Third Parties.**  I understand and agree that the Company may, with or without prior notice to me and during or after the term of the Relationship, notify third parties of my agreements and obligations under this Agreement.

8.     **Solicitation of Employees, Consultants and Other Parties.**  I agree that during the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity.  Further, during the Relationship and at any time following the termination of the Relationship for any reason, whether with or without cause, I shall not use any

-4-

Confidential Information of the Company to negatively influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.  Notwithstanding anything in this Section 8 to the contrary, the foregoing provisions shall not (i) limit your specifically enumerated governance rights with respect to the Trucking Company or, if applicable, apply to any actions taken by or on behalf of the New Trucking Company (provided, that for the sake of clarity, during the period between the closing of the Consumer Company and the closing of the Trucking Company, this clause (i) shall not be deemed to enable me to engage in any solicitation activities of the type that is prohibited by this Section 8), or (ii) materially impair my ability to develop and commercialize the Trucking Business (in each case as defined in the Transaction Documents), in each case in accordance with the terms and subject to the limitations and other conditions set forth in the Transaction Documents.

9.     **Representations and Covenants.**

(a)     **Facilitation of Agreement.**  I agree to execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

(b)     **No Conflicts.**  I represent that my performance of all the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship.  I will not disclose to the Company or use any inventions, confidential or non-public proprietary information or material belonging to any previous client, employer or any other party.  I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer or any other party.  I acknowledge and agree that I have listed on Exhibit A all agreements (e.g., non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client, employer, or any other person or entity, entered into during the period between the Agreement Date (as defined in the Merger Agreement) and the date of this Agreement, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company  I agree not to enter into any written or oral agreement that conflicts with the provisions of this Agreement.

(c)     **Voluntary Execution.**  I certify and acknowledge that I have carefully read all of the provisions of this Agreement, that I understand and have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

10.     **General Provisions.**

(a)     **Governing Law.**  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of California, without giving effect to

-5-

the principles of conflict of laws.

(b) **Entire Agreement.**  This Agreement and the Transaction Documents set forth the entire agreement and understanding between the Company and me relating to its subject matter and merges all prior discussions between us.  No amendment to this Agreement will be effective unless in writing signed by both parties to this Agreement.  The Parties shall not be deemed hereby to have waived any rights or remedies they may have under the Transaction Documents, in law or equity, nor to have given any authorizations or waived any of their rights under this Agreement, unless, and only to the extent, either Party does so by a specific writing signed by a duly authorized officer of the Company or me (as applicable), it being understood that, even if I am an officer of the Company, I will not have authority to give any such authorizations or waivers for the Company under this Agreement without specific approval by the Board of Directors.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

(c) **Severability.**  If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected.

(d) **Successors and Assigns.**  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

(e) **Remedies.**  I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, and therefore agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, I agree that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

(f) **ADVICE OF COUNSEL.**  I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT.  THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

The parties have executed this Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

COMPANY:                                    EMPLOYEE:

UBER TECHNOLOGIES, INC.           _____, an Individual

By: _____      _____

(signature)                                    (signature)

Name: Ryan Graves
Title:   Vice President of Operations
                                               Date: _____

Address: 706 Mission Street, 9th Floor    Address: _____
        San Francisco, CA 94103                  _____

## <u>EXHIBIT A</u>

**LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP
EXCLUDED UNDER SECTION 4(a)**

| <u>Title</u> | <u>Date</u> | Identifying Number<br><u>or Brief Description</u> |
| --- | --- | --- |

\_\_\_ No inventions, improvements, or original works of authorship

\_\_\_ Inventions, improvements, or original works of authorship listed above

\_\_\_ Additional sheets attached

Signature of Employee: _____

Print Name of Employee: _____

Date: _____

# EXHIBIT B

Section 2870 of the California Labor Code is as follows:

(a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)    Result from any work performed by the employee for the employer.

(b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

## <u>EXHIBIT C</u>

**TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items belonging to Uber Technologies, Inc., a Delaware corporation, its subsidiaries, affiliates, successors or assigns (collectively, the "<u>Company</u>").

I further certify that I have complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any Inventions (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree to comply with the provisions of Section 8 of the Confidential Information and Invention Assignment Agreement.

Date: _____

_____
(Employee's Signature)

_____
(Print Employee's Name)

# DISPUTE RESOLUTION AGREEMENT

**1.      How This Agreement Applies:**  This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. This Agreement applies to any dispute arising out of or related to your employment with Uber Technologies, Inc. or one of its affiliates, successor, subsidiaries, assigns or parent companies ("Company") or termination of employment and survives after the employment relationship terminates. Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. This Agreement requires all such disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial. Such disputes include without limitation disputes arising out of or relating to interpretation or application of this Agreement, but not as to the enforceability, revocability or validity of the Agreement or any portion of the Agreement. Nothing contained in this Agreement shall be construed to prevent or excuse you (individually or in concert with others) or the Company from utilizing the Company's existing internal procedures for resolution of complaints, and this Agreement is not intended to be a substitute for the utilization of such procedures.

Except where this Agreement otherwise provides, this Agreement also applies, without limitation, to disputes with any entity or individual arising out of or related to the application for employment, background checks, privacy, the employment relationship or the termination of that relationship (including without limitation post-employment defamation or retaliation), trade secrets, unfair competition, compensation, breaks and rest periods, harassment, retaliation and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), and state statutes, if any, addressing the same or similar subject matters, and all other federal and state statutory and common law claims.

Regardless of any other terms of this Agreement, a claim may be brought before and remedies awarded by an administrative agency if applicable law permits the agency to prosecute or adjudicate the claim notwithstanding the existence of an agreement to arbitrate governed by the Federal Arbitration Act. Such administrative claims include without limitation claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov), the U.S. Department of Labor (www.dol.gov), the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

**2.      How Arbitration Proceedings Are Conducted:**  Except as provided in this Agreement, any controversy or claim covered by this Agreement shall be settled by

arbitration in accordance with the Employment Arbitration Rules of the American Arbitration Association ("AAA") then in effect unless otherwise agreed to by the parties. These rules are available at www.adr.org, or you can ask Human Resources for a copy. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period.

In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator. Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. However, in all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

**3.     Class Action Waiver:**  You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative basis. There will be no right or authority for any dispute to be brought, heard or arbitrated as a class, collective, representative or private attorney general action, or as a member in any purported class, collective, representative or private attorney general proceeding, including without limitation pending but not certified class actions ("Class Action Waiver"). Disputes regarding the validity and enforceability of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which (1) the dispute is filed as a class, collective, representative or private attorney general action and (2) a civil court of competent jurisdiction finds all or part of the Class Action Waiver unenforceable, the class, collective, representative and/or private attorney general action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration.

Although you will not be retaliated against, disciplined or threatened with discipline as a result of exercising your rights under Section 7 of the National Labor Relations Act by the filing of or participation in a class, collective or representative action in any forum, the Company may lawfully seek enforcement of this Agreement and the Class Action Waiver under the Federal Arbitration Act and seek dismissal of such class, collective or representative actions or claims.

The Class Action Waiver shall be severable in any case in which the dispute is filed as an individual action and severance is necessary to ensure that the individual action proceeds in arbitration.

**4.      Enforcement Of This Agreement:**  This Agreement is the full and complete agreement relating to the formal resolution of employment-related disputes. Except as otherwise expressly stated, in the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable. If the Class Action Waiver is deemed to be unenforceable, the parties agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration.

**AGREED:**                                    **AGREED:**

Dated: _____

**Employee**                                   **Uber Technologies, Inc.**

_____        By: _____

[Signature]                                    Ryan Graves
                                               VP, Worldwide Operations

_____

[Name Printed]

Firmwide:132385278.1 073208.1000
3/19/15

FINAL FORM

**Uber Technologies, Inc.**
1455 Market Street, 4th Floor
San Francisco, CA 94103


Today's Date


Person: Full Name: First Last



Re: **EMPLOYMENT AGREEMENT**

Dear Person: First Name

      I am pleased to offer you the position of [XXXX].  Your employment by Uber Technologies, Inc., a Delaware corporation (the "Company" or "Uber") shall be governed by the following terms and conditions (this "Agreement"):

      1.    **Duties and Scope of Employment.**

          a.    **Position.** During your employment under this Agreement (your "Employment"), the Company agrees to employ you in the position of Job Title, or in such other position as the Company subsequently may assign to you. You will report to the Company's Hiring Manager External Job Title, Hiring Manager: Full Name: First Last, or to such other person as the Company subsequently may determine. You will begin your Employment working out of the Company's office in Location. You will perform the duties and have the responsibilities and authority customarily performed and held by an employee in your position or as otherwise may be assigned or delegated to you by your supervisor.

          b.    **Obligations to the Company.**  During your Employment, you shall devote your full business efforts and time to the Company or one of its subsidiaries.  During your Employment, without express written permission from the Chief Executive Officer or one of his direct reports, you shall not render services in any capacity to any other person or entity and shall not act as a sole proprietor or partner of any other person or entity or own more than five percent of the stock of any other corporation; provided, however, that such limitation shall not apply to any equity securities you hold in Otto Trucking LLC, a Delaware limited liability company. Notwithstanding the foregoing, you may serve on corporate, civic or charitable boards or committees, deliver lectures, fulfill speaking engagements, teach at educational institutions, or manage personal investments without such advance written consent, provided that such activities do not individually or in the aggregate interfere with the performance of your duties under this

1

Agreement.  You shall comply with the Company's policies and rules, as they may be in effect from time to time during your Employment.

        c.    **No Conflicting Obligations.**  You represent and warrant to the Company that you are under no obligations or commitments, whether contractual or otherwise, that are inconsistent with your obligations under this Agreement.  In connection with your Employment, you shall not use or disclose any trade secrets or other proprietary information or intellectual property in which you or any other person has any right, title or interest and your Employment will not infringe or violate the rights of any other person.  You represent and warrant to the Company that you have not taken, and have returned, all property and confidential information belonging to any prior employer.

        d.    **Commencement Date.**  You shall commence full-time Employment on the date of the closing (the "Closing") of that certain transaction contemplated by the Agreement and Plan of Merger (the "Merger Agreement") entered into among the Company, Ottomotto LLC and the other signatories thereto, dated as of April [    ], 2016 (the "Start Date"). For the avoidance of doubt, if the Closing does not occur, this Agreement shall automatically be null and void and have no further force and effect.

    2.    **Cash and Incentive Compensation.**
        a.    **Salary.**  The Company shall pay you as compensation for your services an initial base salary at a gross annual rate of $XX,XXX.  Such salary shall be payable in accordance with the Company's standard payroll procedures.  The annual compensation specified in this subsection (a), together with any modifications in such compensation that the Company may make from time to time, is referred to in this Agreement as "Base Salary."

        b.    **Performance Bonus** As an Uber employee, you will be eligible to participate in Uber's Performance Bonus Program. Uber aims to reward high performance and thus compensates the highest performers accordingly. In that context, for bonus year 2015, using a price per share based on the price at which we sold Series G preferred stock, those in the top 25th percentile of performance in a comparable role were eligible to receive bonuses valued up ███████████████ and the highest performers were eligible to receive bonuses valued up ████████████████ This value was delivered mostly in equity.  Participation in this program does not guarantee that you will receive a bonus, e.g. the lowest 20% of performers should not expect to receive a bonus. The issuance and amount of a bonus is in management's discretion, may be based upon individual and company performance, and will be prorated if you were in your position for less than the full year.

        c.    **Restricted Stock.**

            i.    Subject to the approval of the Company's Board of Directors (the "Board"), the Company shall grant you XXX,XXX restricted shares of the Company's Common Stock (the "Shares").  The Shares shall be granted as soon as reasonably practicable after the date of this Agreement or, if later, the Start Date. The Shares will be subject to a time-based vesting condition, a liquidity event-based vesting condition, and a milestone-based vesting condition, as well as to other terms and conditions set forth in the Company's 2013

Stock Plan (the "Stock Plan") and in the form of Restricted Stock Award Agreement (attached hereto as Attachment D).

    ii.    [In the event that at any time during your Employment (x) you are required by the Company or an Affiliate of the Company to no longer report (directly or indirectly) to Anthony Levandowski (or some other person designated by Anthony Levandowski) or (y) you are required by the Company or an Affiliate of the Company to relocate outside of the San Francisco Bay Area (each of clauses, (x) and (y), an "Additional Share Trigger"), the Company shall grant you XXX,XXX[1] additional shares of the Company's Common Stock (the "Additional Shares"). The Additional Shares shall be granted as soon as reasonably practicable after the date of the Additional Share Trigger. The Additional Shares will have the same Vesting Commencement Date (as defined in the Restricted Stock Award), and be subject to the same time-based vesting condition, the same performance-based vesting condition, and the same milestone-based vesting condition, as well as the same other terms and conditions set forth in the Stock Plan and in the form of Restricted Stock Award Agreement (attached hereto as *Attachment D*) as the Shares (and, if granted, shall be considered Shares for all purposes hereunder).][2]

    iii.    For further information about the vesting conditions applicable to the Shares, please see the Restricted Stock Vesting Summary (attached hereto as *Attachment C*). By executing this Agreement, you and the Company each acknowledge and agree that the milestone-based vesting conditions set forth in Exhibit A to the Restricted Stock Award Agreement may be amended or modified at any time as mutually agreed between the Company, on the one hand, and you and Anthony Levandowski, on the other hand (subject to each of your continued employment with the Company or an affiliate as of the date of such modification or amendment). If any milestone-based vesting condition is so amended or modified, the Company will promptly notify you of such amendments or modifications and provide you with an updated Exhibit A to the Restricted Stock Award Agreement.

    iv.



---

[1] Note to Draft: To be 10% of the number of the Shares subject to the initial grant.

[2] This severance provision would be included for two of the three Select Key Employees (as defined in the Merger Agreement. Newco may offer this severance provision for up to three additional employees who currently have double-trigger protection in their employment agreements with the company provided that Newco, first consults with the Company in good faith regarding the necessity of including this provision and the importance of securing such employee's entering into this letter, and the Company agrees to include such provision.



      d.    **Vacation/PTO and Employee Benefits.**  During your Employment, you shall be eligible for paid vacation / paid time off, in accordance with the Company's vacation / paid time off policy, as it may be amended from time to time.  During your Employment, you shall be eligible to participate in the employee benefit plans maintained by the Company and generally available to similarly situated employees of the Company, subject in each case to the generally applicable terms and conditions of the plan in question and to the determinations of any person or committee administering such plan.

      3.    **Business Expenses.**  The Company will reimburse you for your necessary and reasonable business expenses incurred in connection with your duties hereunder upon presentation of an itemized account and appropriate supporting documentation, all in accordance with the Company's generally applicable policies.

      4.    **Termination.**

      a.    **Employment at Will.**  Your Employment shall be "at will," meaning that either you or the Company shall be entitled to terminate your Employment at any time and for any reason, with or without Cause.  Any contrary representations that may have been made to you shall be superseded by this Agreement.  This Agreement shall constitute the full and complete agreement between you and the Company on the "at-will" nature of your Employment, which may only be changed in an express written agreement signed by you (or your authorized representative) and a duly authorized officer of the Company.

      b.    **Rights Upon Termination.**  Except as expressly provided herein and in the Restricted Stock Award Agreement, upon the termination of your Employment, you shall only be entitled to the compensation and benefits earned and the reimbursements described in this Agreement for the period preceding the effective date of the termination.

---

[3] Note to Draft: To list all other employees who will have this provision.
[4] Note to Draft: Provision to be included in the offer letters for up to three (3) employees of Ottomotto LLC in total, which three employees may include any of the Select Key Employees or any other substantial similar employees of Ottomotto LLC (based on title and/or experience).

5.      **Pre-Employment Conditions.**

a.      **Confidentiality Agreement.**    Your acceptance of this offer and commencement of employment with the Company is contingent upon the execution, and delivery to an officer of the Company, of the Company's Confidential Information and Invention Assignment Agreement, a copy of which is enclosed as *Attachment A* for your review and execution (the "Confidentiality Agreement"), prior to or on your Start Date and continued compliance with the Confidentiality Agreement thereafter.

b.      **Right to Work.**   For purposes of federal immigration law, you will be required to provide to the Company documentary evidence of your identity and eligibility for employment in the United States.  Such documentation must be provided to us within three (3) business days of your Start Date, or our employment relationship with you may be terminated. This offer may be rescinded if you are unable to begin work at Uber within a reasonable amount of time due to work eligibility issues or export control licensure requirements.

c.      **Alternate Dispute Resolution Agreement**. Your acceptance of this offer and commencement of employment with the Company is contingent upon the execution (the "Alternate Dispute Resolution Agreement"), and delivery to an officer of the Company, of the Alternate Dispute Resolution Agreement, a copy of which is enclosed as *Attachment B* for your review and execution, prior to or on your Start Date.

6.      **Successors.**

a.      **Company's Successors.**   This Agreement shall be binding upon any successor (whether direct or indirect and whether by purchase, lease, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and/or assets.  For all purposes under this Agreement, the term "Company" or "Uber" shall include any successor to the Company's business or assets that becomes bound by this Agreement.

b.      **Your Successors.**   This Agreement and all of your rights hereunder shall inure to the benefit of, and be enforceable by, your personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

7.      **Miscellaneous Provisions.**

a.      **Notice.**    Notices and all other communications contemplated by this Agreement shall be in writing and shall be deemed to have been duly given when personally delivered or when mailed by U.S. registered or certified mail, return receipt requested and postage prepaid.  In your case, mailed notices shall be addressed to you at the home address that you most recently communicated to the Company in writing.  In the case of the Company, mailed notices shall be addressed to its corporate headquarters, and all notices shall be directed to the attention of its General Counsel.

b.      **Modifications and Waivers.**   No provision of this Agreement shall be modified, waived or discharged unless the modification, waiver or discharge is agreed to in

writing and signed by you (or your authorized representative) and by an authorized officer of the Company (other than you).  No waiver by either party of any breach of, or of compliance with, any condition or provision of this Agreement by the other party shall be considered a waiver of any other condition or provision or of the same condition or provision at another time.

        c.    **Whole Agreement.**    No other agreements, representations or understandings (whether oral or written and whether express or implied) which are not expressly set forth in this Agreement have been made or entered into by either party with respect to the subject matter hereof.  This Agreement, the Confidentiality Agreement and the Alternate Dispute Resolution Agreement contain the entire understanding of the parties with respect to the subject matter hereof.

        d.    **Withholding Taxes.**  All payments made under this Agreement shall be subject to reduction to reflect taxes or other charges required to be withheld by law.

        e.    **Choice of Law and Severability.**  This Agreement shall be interpreted in accordance with the laws of the State in which you work/last worked without giving effect to provisions governing the choice of law.  If any provision of this Agreement becomes or is deemed invalid, illegal or unenforceable in any applicable jurisdiction by reason of the scope, extent or duration of its coverage, then such provision shall be deemed amended to the minimum extent necessary to conform to applicable law so as to be valid and enforceable or, if such provision cannot be so amended without materially altering the intention of the parties, then such provision shall be stricken and the remainder of this Agreement shall continue in full force and effect.  If any provision of this Agreement is rendered illegal by any present or future statute, law, ordinance or regulation (collectively, the "Law") then that provision shall be curtailed or limited only to the minimum extent necessary to bring the provision into compliance with the Law.  All the other terms and provisions of this Agreement shall continue in full force and effect without impairment or limitation.

        f.    **Arbitration.**  As set forth in more detail in the Alternate Dispute Resolution Agreement (attached hereto as *Attachment B* and incorporated by reference as part of this offer of employment), you and the Company agree to submit to mandatory binding arbitration any and all claims arising out of or related to your employment with the Company and your termination thereof, including but not limited to, claims for unpaid wages, wrongful terminations, torts, stock or restricted stock units or other ownership interest in the Company and/or discrimination (including harassment) based upon any federal, state or local ordinance, statute, regulation or constitutional provision, except that each party may, at its, his or her option, seek temporary or preliminary injunctive relief in court in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such relief. Arbitration under the Alternate Dispute Resolution Agreement is on an individual basis only, and class, collective and representative actions are not permitted. All arbitration hearings shall be conducted within 50 miles of the Uber office you work(ed) in or report(ed) to or at any other location mutually agreed to. THE PARTIES HEREBY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN REGARD TO SUCH CLAIMS. This Agreement is governed by the Federal Arbitration Act (9 U.S.C. 1 et seq.) and does not restrict your right to file administrative claims you may bring before any

FINAL FORM

government agency where, as a matter of law, the parties may not restrict the employee's ability to file such claims (including, but not limited to, the National Labor Relations Board, the Equal Employment Opportunity Commission and the Department of Labor).

        g.    **No Assignment.**  This Agreement and all of your rights and obligations hereunder are personal to you and may not be transferred or assigned by you at any time.  The Company may assign its rights under this Agreement to any entity that assumes the Company's obligations hereunder in connection with any sale or transfer of all or a substantial portion of the Company's assets to such entity.

        h.    **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Signature Page Follows]*

7

FINAL FORM

We are all delighted to be able to extend you this offer and look forward to working with you.   Please understand that this offer is contingent upon successful completion of your background check investigation.   To indicate your acceptance of the Company's offer, please sign and date this letter in the space provided below and return it to me, along with a signed and dated original copy of the Confidentiality Agreement and the Alternate Dispute Resolution Agreement. The Company requests that you begin work in this new position on or before Start Date.   This offer must be accepted on or before Expiration.   Please indicate the date (either on or before the aforementioned date) on which you expect to begin work in the space provided below (the "Start Date").

Very truly yours,

Uber Technologies, Inc.

By: _____

Name: Supervisor's Name

Title: Supervisor's Title

ACCEPTED AND AGREED:

Name

_____

Date_____

Attachment A:  Confidential Information and Invention Assignment Agreement

Attachment B: Alternate Dispute Resolution Agreement

Attachment C: Restricted Stock Vesting Summary

Attachment D: Form of Restricted Stock Award Agreement

FINAL FORM

## ATTACHMENT A

## CONFIDENTIAL INFORMATION AND
## INVENTION ASSIGNMENT AGREEMENT

*(See Attached)*

FINAL FORM

**<u>ATTACHMENT B</u>**

**ALTERNATE DISPUTE RESOLUTION AGREEMENT**

*(See Attached)*

## ATTACHMENT C

### RESTRICTED STOCK VESTING SUMMARY

The restricted stock ("Shares") will have a milestone-based condition, a time-based condition, and a performance-based condition, all of which must be met in order for the Shares to vest.

- The milestone-based condition will be based on the milestones listed in Exhibit A of the Restricted Stock Agreement (each a "**Milestone Achievement**" and collectively, the "**Milestone Achievements**"). The milestone-based condition will be met with respect to the Shares associated with each Milestone Achievement as follows:
  - o Such Milestone Achievement is completed by or before ███████████ and
  - o You (i) were hired by Uber prior to such Milestone Achievement and (ii) (x) in



- The time-based condition will be met as follows: 12/48 of the Shares on the one year anniversary of the "vesting commencement date" (which date is set out in the Restricted Stock grant notice) and 1/48 of the Shares on each monthly anniversary thereafter, if and to the extent you continue employment through such dates.

- The performance-based condition will be met on the earlier to occur of: (i) an initial public offering ("**IPO**") of Uber Technologies, Inc. stock or (ii) a liquidation transaction,

which includes customary liquidation, dissolution or winding up of the Company (each of clause (i) and (ii), a "**Liquidity Event**").

- The Shares will be subject to customary limitations on transfer, including, but not limited to, a six-month lock-up period following an IPO and a one-year holding period from the date the Shares meet the time-based condition.

- If your employment is terminated prior to the occurrence of a Liquidity Event and if, and to the extent, the Shares have not met the time-based condition as of the date of such termination, the Shares that have not met the time-based condition will be forfeited.



The Shares will be subject to customary limitations on transfer, including, but not limited to, a six-month lock-up period following an IPO and a one-year holding period from the date the Shares meet the time-based condition.

For purposes of this Agreement, "Cause" shall mean the termination of your employment by Uber or any affiliate of Uber (or a successor, if appropriate) based on one or more of the following events having occurred during your employment with Uber or any affiliate of Uber (or a successor, if appropriate)



. For the avoidance of doubt, the inclusion of the definition of "Cause" in this Agreement or in any other agreement will not, in any manner, modify the "at-will" nature of this Agreement.

FINAL FORM

## **ATTACHMENT D**

**FORM OF RESTRICTED STOCK AWARD AGREEMENT**

*(See Attached)*

FINAL FORM

# UBER TECHNOLOGIES, INC.
## 2013 EQUITY INCENTIVE PLAN
### NOTICE OF RESTRICTED STOCK AWARD

**Name:**

You ("***Participant***") have been granted the number of shares (the "***Shares***") of the Class A Common Stock of Uber Technologies, Inc., a Delaware corporation (the "***Company***"), subject to the terms and conditions of the Uber Technologies, Inc. 2013 Equity Incentive Plan (the "***Plan***"), this Notice of Restricted Stock Award (the "***Notice***") and the attached Restricted Stock Award Agreement, including any and all exhibits and appendices thereto (the "***Restricted Stock Award Agreement***" and together with the Notice, the "***Award***"), as set forth below.  Unless otherwise defined in this Notice or the Restricted Stock Award Agreement, the terms used herein shall have the meanings defined in the Plan.

**Total Number of Shares:**         _____

**Grant Date:**         _____

**Vesting Commencement Date:**[1]         _____

**Vesting Schedule:** The Shares are subject to a (1) a time-based vesting condition (the "***Time Condition***") described in paragraph (a) below, (2) a performance-based vesting condition related to a liquidity event of the Company (the "***Liquidity Condition***") described in paragraph (b) below, and (3) certain milestone-based vesting conditions described in paragraph (c) below and Exhibit A to this Notice (the "***Milestone Conditions***"), all of which must be satisfied before the Shares will be deemed "***Vested Shares***". Until all three conditions have been satisfied, the Shares shall be "***Unvested Shares***."

(a) **Time Condition.**  So long as your employment with the Company or an Affiliate does not terminate, the Time Condition shall be satisfied in accordance with the following schedule: 12/48ths of the Total Number of Shares shall satisfy the Time Condition on the one year anniversary of the Vesting Commencement Date and thereafter 1/48th of the Total Number of Shares shall satisfy the Time Condition on the monthly anniversary of the Vesting Commencement Date (each such date, a "***Time-Based Vesting Date***").

(b) **Liquidity Condition.**  The Liquidity Condition shall be satisfied on the earlier to occur of (i) the closing of a Liquidation Transaction or (ii) the effective date of an IPO (as defined in Section 3 of the Restricted

---

[1] Note to Draft: This will be the individual's start date with the Company or Ottomotto, whichever is earlier.

Stock Award Agreement) (the date on which the first such event occurs, a "***Liquidity-Based Vesting Date***").  "***Liquidation Transaction***" means an event that constitutes a liquidation, dissolution, or winding up of the Company for purposes of the Company's Restated Certificate of Incorporation, as amended or restated from time to time.  Notwithstanding any other provision herein, if a Liquidity-Based Vesting Date does not occur on or before the tenth (10th) anniversary of [*TO INSERT DATE OF MERGER AGREEMENT CLOSING*], the Liquidity Condition will not be met as to any Shares, and the Shares will not vest and will be forfeited as provided in Section 6 of the Restricted Stock Award Agreement attached hereto.

(c)     **Milestone Conditions.**   The milestone-based vesting conditions will be based on the milestones listed in Exhibit A to this Notice (each a "***Milestone Achievement***" and collectively, the "***Milestone Achievements***"); provided, that the Milestone Achievements (and Exhibit A) may be amended or modified at any time as mutually agreed between the Company, on the one hand, and Anthony Levandowski and Lior Ron, on the other hand (subject to their continued employment with the Company or an Affiliate as of the date of such modification or amendment, and that such amendments or modifications to the Milestone Achievements will not require your prior consent. If any Milestone Achievement is so amended or modified, the Company will promptly notify you of such amendments or modifications and provide you with an updated Exhibit A. The number of Shares that will have satisfied the Milestone Condition upon the achievement of each Milestone Achievement (the "***Milestone Shares***") shall be as set forth in Exhibit A to this Notice. A sample calculation of vesting is included in Exhibit B to this Notice.

The Milestone Condition will be met with respect to the Milestone Shares associated with each Milestone Achievement as follows:

- Such Milestone Achievement is completed by or before ▮▮▮▮▮▮ ▮▮▮▮▮▮

- You were hired by the Company or Ottomotto LLC ("***Ottomotto***") prior to such Milestone Achievement;

- 



(d)      **Vesting Date.**   The first date as of which all of the Time Condition, the Liquidity Condition and the associated Milestone Condition described in paragraphs (a), (b) and (c) above have been satisfied with respect to any Shares shall be referred to as a "***Vesting Date***" of such Shares.

**By signing this Notice, you acknowledge that the vesting of the Shares granted pursuant to this Award is conditioned on the satisfaction of the Time Condition, the Liquidity Condition and the applicable Milestone Conditions.**

(e)      **Fractional Shares.**   If application of the Vesting Schedule set forth above would cause vesting of a fractional Share, then such vesting shall be rounded down to the nearest whole Share and such fractional Share shall cumulate with any other fractional Shares and such fractions shall vest as they aggregate into a whole Share.

(f)      **No Section 83(b) Election.**   As a material inducement to the Company to grant this Award, you agree not to make an election under Section 83(b) of the Code covering the Unvested Shares.

**Termination Prior**

**to Vesting**:   If your employment terminates for any reason following the satisfaction of both the Time Condition and the applicable Milestone Condition, but prior to the satisfaction of the Liquidity Condition (after taking into account the provisions respecting certain terminations of employment during the applicable "achievement periods" set forth above under "*Milestone Conditions*"), then the Milestone Shares associated with the applicable Milestone Conditions that have been satisfied will remain outstanding following the date of such termination and, if the Liquidity Condition is satisfied following your termination of employment, will not be subject to the Unvested Share Forfeiture Condition contained in Section 6 of the Restricted Stock Award Agreement.



**[Other Forfeiture Conditions:**   Your Shares (including Vested Shares) will also be subject to forfeiture pursuant to the terms of (i) the Purchaser Note and (ii) the Indemnification Agreement, in each case, as provided in Section 6 of the Restricted Stock Award Agreement.][2]

**Definition of Cause:**   "**Cause**" shall mean the termination of your employment by the Company or any Affiliate (or a successor, if appropriate) based on one or more of the following events having occurred during your employment with the Company or any Affiliate (or a successor, if appropriate),



---

[2] Note to Draft: Clause (i) regarding the Purchaser Note will be included in the founders' award agreements only. Clause (ii) will be included only if the Participant is party to the Indemnification Agreement.



For the avoidance of doubt, the inclusion of the definition of "Cause" in this Award or in any other agreement will not, in any manner, modify the "at-will" nature of your employment contract with the Company.

**Acknowledgment:**   By your acceptance of this Notice through the Company's online acceptance procedure (or by your signature and the signature of the Company's representative on this Notice), you and the Company agree that the Shares are granted under and governed by the terms and conditions of this Notice, the Restricted Stock Award Agreement and the Plan.  You acknowledge that you have received a copy of the Restricted Stock Award Agreement and the Plan and have read this Notice, the Restricted Stock Award Agreement and the Plan in their entirety.

**PARTICIPANT**                         **UBER TECHNOLOGIES, INC.**

_____         _____

**EXHIBIT A**
**TO NOTICE OF RESTRICTED STOCK AWARD**

**Milestones**

[***To insert Schedule A-1 from Term Sheet and Number of Shares Allocated to Each Milestone***]

FINAL FORM

**EXHIBIT B**
**TO NOTICE OF RESTRICTED STOCK AWARD**

**Example of Vesting**

*Assumptions:*

- Participant is employed by the Company or an Affiliate beginning on January 1, 2017
- Participant receives an Award for 100 Shares
- Milestone 1 was allocated 10% of the total Shares, or 10 Shares
- Milestone 1 was achieved on January 1, 2018
- The Participant was (x) still employed by the Company or an Affiliate on ▮▮▮▮▮▮▮▮ or (y) was terminated (other than for Cause) after ▮▮▮▮▮▮▮▮ (note that for the avoidance of doubt, such ▮▮▮▮▮▮ would not be required in the case of Milestone 7)

*Result:*

(1) The Milestone Condition would be satisfied with respect to such 10 Shares.

(2) The Time Condition would be satisfied with respect to 5 out of such 10 Shares.

(3) If a Liquidity Event occurred prior to ▮▮▮▮▮▮▮▮ then with respect to the 5 Shares for which the Milestone Condition and Time Condition have been satisfied in accordance with clauses (1) and (2) above, such 5 Shares would become fully vested on the Liquidity Event.

(4) The remaining 5 Shares for which the Time Condition has not yet been satisfied as of ▮▮▮▮▮▮▮▮ ▮▮ of such 5 remaining Shares would be become fully vested over each of the nex ▮▮ months so long as Participant remains employed by the Company or an Affiliate.

(5) The other 90 Shares shall vest similarly based on achievement of the Milestones with which they are associated.

FINAL FORM

## UBER TECHNOLOGIES, INC.
## 2013 EQUITY INCENTIVE PLAN

### RESTRICTED STOCK AWARD AGREEMENT

Pursuant to the Notice of Restricted Stock Award (the "***Notice***") and this Restricted Stock Award Agreement (the "***Agreement***" and together with the Notice, the "***Award***") and its 2013 Equity Incentive Plan (the "***Plan***"), Uber Technologies, Inc., a Delaware corporation (the "***Company***") has awarded to Participant, in exchange for Participant's services to the Company, the number of shares of the Company's Class A Common Stock subject to the Award as indicated in the Notice. Capitalized terms not explicitly defined in this Agreement but defined in the Plan will have the same definitions as in the Plan.  If there is any conflict between the terms in this Agreement and the Plan, the terms of this Agreement will control.

1.     **Effect of Capitalization Adjustments on Shares.**  The term "***Shares***" refers to the Shares set forth in the Notice and all securities received as stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or any other capitalization adjustment described in Section 2.2 of the Plan (a "***Capitalization Adjustment***"), and all new, substituted or additional securities or other property to which Participant is entitled by reason of Participant's ownership of the Shares, including for purposes of the transfer restrictions contained in Section 3, the Right of First Refusal contained in Section 4, the Forfeiture Condition contained in Section 6, and the Lock-Up Agreement contained in Section 10.

2.     **Vesting; No Section 83(b) Election.**  The Unvested Shares (as defined in the Notice) subject to this Award will vest, and the Unvested Share Forfeiture Condition set forth in Section 6 of this Agreement shall lapse, subject to the Vesting Schedule provided in the Notice. Participant represents and warrants that Participant shall not make an election pursuant to Section 83(b) of the Code covering the Unvested Shares.

3.     **Restrictions and Limitations on Transfer.**  In addition to any other limitation on transfer created by applicable securities laws, Participant shall not assign, encumber or dispose of any interest in the Shares except in compliance with the provisions below and applicable securities laws.

(a)     The holder of any security of the Company (a "***Security Holder***"), including Participant, shall not, directly or indirectly, transfer, assign, pledge, encumber, hypothecate or otherwise dispose of or encumber (including any conveyance of any economic or pecuniary interest in) any security of the Company (a "***Security***"), other than by means of a Permitted Transfer (as defined below), without the prior written consent of the Board (or an authorized committee of the Board), which consent may be withheld in its sole discretion.  If any provision(s) of any agreement(s) currently in effect by and between the Company and any Security Holder (the "***Security Holder Agreement(s)***") conflicts with Section 8.12 of the Company's bylaws, Section 8.12 shall govern, and the non-conflicting remainder of the Security Holder Agreement(s) shall continue in full force and effect; provided that Section 3(b) shall be deemed not to conflict with Section 8.12 of the Company's bylaws.

(b)     For purposes of the transfer restrictions set forth herein, a Security shall be deemed to be "***Transferred***" in (a) any sale, assignment, transfer, conveyance, hypothecation or

1

other transfer or disposition of a share of any security of the Company or any legal or beneficial interest in such security, whether or not for value and whether voluntary or involuntary or by operation of law, including, without limitation, a transfer of a share of any security to a broker or other nominee (regardless of whether there is a corresponding change in beneficial ownership), or the transfer of, or entering into a binding agreement with respect to, voting control over such security by proxy or otherwise, (b) any hedging or other transaction which is designed to or which reasonably could be expected to lead to or result in a sale or disposition of any security of the Company, even if any security of the Company would be disposed of by someone other than the Security Holder, (c) any transaction involving any short sale or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to any security of the Company or with respect to any security that includes, relates to, or derives any significant part of its value from any security of the Company, or (d) any other transaction by Participant related to or affecting the ownership, possession or other rights (voting, economic or otherwise) of a security that the Board, in good faith, deems Transferred.

(c)        A "*Permitted Transfer*" as used in this Section 3 shall be defined as:

(i)        any repurchase of a Security by the Company:  (i) at cost, upon the occurrence of certain events, such as the termination of employment or services; or (ii) at any price pursuant to the Company's exercise of a right of first refusal to repurchase such shares;

(ii)        the transfer of any or all of the Securities held by a Security Holder to a single trust for the benefit of the Security Holder or the Security Holder's Immediate Family;

(iii)        any transfer effected pursuant to the Security Holder's will or the laws of intestate succession;

(iv)        any transfer of any or all of the Securities held by a Security Holder in connection with a Secondary Offering as provided in the Notice;

(v)        if the Security Holder is a partnership, limited liability company or a corporation, no more than five (5) transfers to an Affiliate (as defined below) of such partnership, limited liability company or corporation; and/or

(vi)        the transfer by a Major Investor (as defined in the Amended and Restated Right of First Refusal and Co-Sale Agreement dated August 1, 2013, as amended from time to time, or any successor agreement (the "*Co-Sale Agreement*")) exercising such Major Investor's Co-Sale Right (as defined in the Co-Sale Agreement).

(d)        In the case of any transfer consented to by the Company or described in subsection (c) above, the transferee, assignee, or other recipient shall receive and hold the Securities subject to the provisions of this Section 3, and there shall be no further transfer of such stock except in accordance with this Section 3.

(e)        The restrictions in this Section 3 shall terminate upon the earlier to occur of (i) the closing of a Liquidation Transaction (as such term is defined in the Company's Restated Certificate of Incorporation, as amended or restated from time to time) (a "*Liquidation Transaction*") or (ii) immediately prior to an initial public offering under the Securities Act of

1933, as amended, and the rules and regulations promulgated thereunder (the "*Securities Act*") pursuant to which all outstanding shares of the Company's preferred stock convert to common stock (an "*IPO*").  Upon termination of such restrictions, if certificates are issued, a new certificate or certificates representing the outstanding Shares shall be issued, on request, without the legend referred to in subsection 8(a)(iv) below and delivered to Participant.

(f)       Participant shall comply with the Company's insider trading policy and code of conduct (or related policies) as may be adopted or amended from time to time by the Board (the "*Policies*").  To the extent Participant is not an employee of the Company, Participant shall comply with the Policies in the same manner as-if Participant were deemed an employee of the Company as defined in the Policies.

(g)



4.      **Right of First Refusal.**

(a)      **Right of First Refusal.**  Subject to the limitations set forth in Section 3 above, before any Shares held by Participant or any transferee of Participant (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section 4(a) (the "Right of First Refusal").

(i)      **Notice of Proposed Transfer.**  The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating:  (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed Participant or other transferee ("Proposed Transferee"); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the terms and conditions of each proposed sale or transfer.  The Holder shall offer the Shares at the same price (the "Purchase Price") and upon the same terms (or terms as similar as reasonably possible) to the Company or its assignee(s).

(ii)      **Exercise of Right of First Refusal.**  At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the Purchase Price.  If the Purchase Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board in good faith.

(iii)      **Payment.**  Payment of the Purchase Price shall be made, at the election of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness, or by any combination thereof within sixty (60) days after receipt of the Notice or in the manner and at the times set forth in the Notice.

---
[3] Note to Draft: To be included if Participant is party to the Indemnification Agreement.

(iv)    **Holder's Right to Transfer.**  If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section 4(a), then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Purchase Price or at a higher price, provided that such sale or other transfer is consummated within one hundred twenty (120) days after the date of the Notice and provided further that any such sale or other transfer is effected in accordance with any applicable securities laws and the Proposed Transferee agrees in writing that the provisions of Section 3 and this Section 4 shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(v)    **Exception for Certain Family Transfers.**    Anything to the contrary contained in this Section 4(a) notwithstanding, and provided that such transfer complies with Section 3 and applicable securities laws, the transfer of any or all of the Shares during Participant's lifetime or on Participant's death by will or intestacy to Participant's Immediate Family or a single trust for the benefit of the Participant or the Participant's Immediate Family shall be exempt from the provisions of this Section 4(a).

(b)    **Company's Right to Purchase upon Involuntary Transfer.**    In the event of any transfer by operation of law or other involuntary transfer (including death or divorce, but excluding a transfer to Immediate Family as set forth in Section 4(a)(v) above) of all or a portion of the Shares by the record holder thereof, the Company shall have an option to purchase all of the Shares transferred at the greater of the purchase price paid by Participant pursuant to this Agreement or the Fair Market Value of the Shares on the date of transfer (as determined by the Board).  Upon such a transfer, the person acquiring the Shares shall promptly notify the Secretary of the Company of such transfer.  The right to purchase such Shares shall be provided to the Company for a period of thirty (30) days following receipt by the Company of written notice by the person acquiring the Shares.

(c)    **Assignment.**  The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any holder or holders of capital stock of the Company or other persons or organizations.

(d)    **Restrictions Binding on Transferees.**  All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the provisions of this Agreement.  Any sale or transfer of the Company's Shares shall be void unless the provisions of this Agreement are satisfied.

(e)    **Termination of Rights.**  The right of first refusal granted the Company by Section 4(a) above and the option to repurchase the Shares in the event of an involuntary transfer granted the Company by Section 4(b) above shall terminate upon the earlier to occur of (i) the closing of a Liquidation Transaction or (ii) immediately prior to an IPO.  Upon termination of the right of first refusal described in Section 4(a) above pursuant to this paragraph (e), the Company will remove any stop-transfer notices referred to in Section 8(b) below and related to the restrictions in this Section 4 and, if certificates are issued, a new certificate or certificates

representing the Shares not repurchased shall be issued, on request, without the legend referred to in Section 8(a)(ii) below and delivered to Participant.

5. **Investment and Taxation Representations.**  In connection with the purchase of the Shares, Participant represents to the Company the following:

(a)    Participant is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares.  Participant is purchasing these securities for investment for his or her own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law.  Participant does not have any present intention to transfer the Shares to any person or entity.

(b)    Participant understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Participant's investment intent as expressed herein.

(c)    Participant further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.  Participant further acknowledges and understands that the Company is under no obligation to register the securities.  Participant understands that the transfer of the securities is prohibited unless they are registered or such registration is not required in the opinion of counsel for the Company, which opinion is in a form satisfactory to the Company, and that the certificate(s) evidencing the securities will be imprinted with a legend providing for the foregoing.

(d)    Participant is familiar with the provisions of Rules 144 and 701, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Participant understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144 or Rule 701, which rules require, among other things, that the Company be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions.  Notwithstanding this paragraph (d), Participant acknowledges and agrees to the restrictions set forth in paragraph (e) below.

(e)    Participant further understands that in the event all of the applicable requirements of Rule 144 or 701 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 or 701 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

(f)     Participant understands that Participant may suffer adverse tax consequences as a result of Participant's purchase or disposition of the Shares.  Participant represents that Participant has consulted any tax consultants Participant deems advisable in connection with the purchase or disposition of the Shares and that Participant is not relying on the Company for any tax advice.

(g)     Participant hereby acknowledges that Participant has been informed that as a result of not filing an election with the Internal Revenue Service covering the Unvested Shares pursuant to Section 83(b) of the Code, there may be a recognition of taxable income to the Participant, measured by the excess, if any, of the Fair Market Value of the Unvested Shares at the time they cease to be Unvested Shares, over the purchase price of the Unvested Shares, if any.

6.     **Forfeiture of Shares**.

(a)     <u>Forfeiture Conditions</u>.   Shares shall automatically be reacquired by the Company without payment therefor and without further action by the Company or Participant, and Participant's rights in any such Shares shall thereupon terminate and expire (each a "<u>Forfeiture Condition</u>"), in connection with any of the following events:

(i)     <u>Forfeiture of Unvested Shares on Termination of Employment</u>. The termination of Participant's employment for any reason (after taking into consideration any accelerated vesting that may occur in connection with such termination, if any) if either the Time Condition or the applicable Milestone Condition have not been satisfied as of the date of such termination, in which case only the Unvested Shares which have not satisfied both such conditions shall be subject to forfeiture (the "***Unvested Share Forfeiture Condition***") as of such termination date.

(ii)     <u>Forfeiture of Unvested Shares if Liquidity Condition Not Met</u>.  In the event a Liquidity-Based Vesting Date does not occur on or before the tenth (10th) anniversary of [*TO INSERT DATE OF MERGER AGREEMENT CLOSING*], the Shares shall be forfeited.

(iii)     [<u>Forfeiture under Indemnification Agreement</u>.  In the event of a Forfeiture Claim (as defined in the Indemnification Agreement) against Participant, then a number of Shares (including any Vested Shares) as determined in accordance with Section 2.5 of the Indemnification Agreement shall be forfeited in accordance with the terms thereof.][4]

(iv)     [<u>Forfeiture under Purchaser Note</u>.  In the event any portion of the proceeds of the Purchaser Note (as defined in the that certain merger agreement entered into among Ottomotto, the Company and certain other parties thereto as of March __, 2016) are not used by Ottomotto for the Authorized Purpose (as defined in the Purchaser Note), if the Company (or its designated Affiliate) elects to cause Participant to forfeit Shares in accordance with Section 3(b) of the Purchaser Note, then a number of Shares (including any Vested Shares) as determined in accordance with Section 3(b) of the Purchaser Note shall be forfeited in accordance with the terms thereof.][5]

---

[4] Note to Draft: To be included if Participant is party to the Indemnification Agreement.
[5] Note to Draft: To be included in the founders' award agreements only.

(b)      <u>Corporate Transactions</u>.  To the extent a Forfeiture Condition remains in effect following an Acquisition or Other Transaction (each as defined in the Plan), unless otherwise provided by the Board pursuant to the terms of the Plan, it will apply to the new capital stock, cash or other property received in exchange for the Shares in consummation of the Acquisition or Other Transaction, as applicable, but only to the extent the Shares were at the time covered by such right.

(c)      <u>Right of Termination Unaffected</u>.  Nothing in this Agreement shall be construed to limit or otherwise affect in any manner whatsoever the right or power of the Company to terminate Participant's employment at any time, for any reason or no reason, with or without Cause.  For purposes of this Agreement, Participant shall be considered to be employed by the Company if Participant is an officer, director or full-time employee of the Company or any Parent, Subsidiary or Affiliate of the Company.  The Committee of the Company shall have discretion to determine whether Participant's employment with the Company or any Parent, Subsidiary or Affiliate of the Company has Terminated and the date of such Termination, and such determination shall be binding on Participant.

7.      **Escrow of Unvested Shares.**  The Shares may be certificated or uncertificated and held in book-entry form.  For purposes of facilitating the enforcement of the provisions of Section 3 and 6 above, Participant agrees, immediately upon receipt of the certificate(s) for the Shares or, in the case of uncertificated securities, notice of issuance, to deliver any such certificate(s) (if applicable) and a Stock Power in the form attached to this Agreement as <u>Attachment A</u> executed by Participant and by Participant's spouse (if required for transfer), in blank, to the Secretary of the Company, or the Secretary's designee, to hold such Shares (and stock certificate(s), if any) and Stock Power in escrow and to take all such actions and to effectuate all such transfers and/or releases as are in accordance with the terms of this Agreement.  Participant hereby acknowledges that the Secretary of the Company, or the Secretary's designee, is so appointed as the escrow holder with the foregoing authorities as a material inducement to make this Agreement and that said appointment is coupled with an interest and is accordingly irrevocable.  Participant agrees that said escrow holder shall not be liable to any party hereof (or to any other party).  The escrow holder may rely upon any letter, notice or other document executed by any signature purported to be genuine and may resign at any time.  Participant agrees that if the Secretary of the Company, or the Secretary's designee, resigns as escrow holder for any or no reason, the Board shall have the power to appoint a successor to serve as escrow holder pursuant to the terms of this Agreement.

8.      **Restrictive Legends and Stop-Transfer Orders.**

(a)      **Legends.**  The certificate or certificates representing the Shares shall bear the following legends (as well as any legends required by applicable state and federal corporate and securities laws):

(i)      THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF

COUNSEL FOR THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

(ii)  THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE HOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

(iii)  THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON PUBLIC RESALE AND TRANSFER, INCLUDING THE FORFEITURE CONDITION AND RIGHT OF FIRST REFUSAL HELD BY THE ISSUER AND/OR ITS ASSIGNEE(S), AND A LOCK-UP AGREEMENT AS SET FORTH IN A RESTRICTED STOCK AWARD AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.  SUCH PUBLIC SALE AND TRANSFER RESTRICTIONS INCLUDING THE RIGHT OF REPURCHASE, RIGHT OF FIRST REFUSAL AND THE MARKET STANDOFF ARE BINDING ON TRANSFEREES OF THESE SHARES.

(iv)  THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER CONTAINED IN THE BYLAWS OF THE COMPANY.

(b)  **Stop-Transfer Notices.**  Participant agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)  **Refusal to Transfer.**  The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

9.  **No Employment Rights.**  Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent or subsidiary of the Company, to terminate Participant's employment or consulting relationship, for any reason, with or without cause.

10.  **Lock-Up Agreement.**  In connection with the IPO and upon request of the Company or the underwriters managing any underwritten offering of the Company's securities, Participant agrees not to sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (other than those included in the registration) without the prior written consent of the Company or such underwriters, as the case may be, for such period of time (not to exceed one hundred eighty (180) days) from the effective date of such registration as may be requested by the Company or such managing underwriters and to execute an agreement reflecting the foregoing as may be requested

by the underwriters at the time of the public offering; provided however that, if during the last 17 days of the restricted period the Company issues an earnings release or material news or a material event relating to the Company occurs, or prior to the expiration of the restricted period the Company announces that it will release earnings results during the 16-day period beginning on the last day of the restricted period, then, upon the request of the managing underwriter, to the extent required by any FINRA rules, the restrictions imposed by this Section 10 shall continue to apply until the end of the third trading day following the expiration of the 15-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event (such period, the "Lock-Up Period").  In no event will the Lock-Up Period extend beyond 216 days after the effective date of the registration statement.

11.     **Tax Withholding.**  Upon any vesting of the Shares, Participant may[6] (prior to the Vesting Date) instruct the Company to withhold and reacquire the appropriate number of whole Shares, valued at their then Fair Market Value, to satisfy any withholding obligations of the Company or its subsidiaries with respect to such vesting at the minimum applicable withholding rates.  In the event that Participant does not instruct the Company to reacquire Shares to satisfy such tax withholding obligations, the Company (or a subsidiary) shall be entitled to require a cash payment by or on behalf of the Participant and/or to deduct from other compensation payable to the Participant any sums required by federal, state or local tax law to be withheld with respect to such vesting of Shares.

12.     **Miscellaneous.**

(a)     **Governing Law.**  This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of California, without giving effect to principles of conflicts of law.

(b)     **Entire Agreement; Enforcement of Rights.**  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement.  The failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of any rights of such party.

(c)     **Severability.**  If one or more provisions of this Agreement are held to be unenforceable under Applicable Laws, the parties agree to renegotiate such provision in good faith.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(d)     **Notices.**  Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient when delivered personally or at time of transmission if sent by telegram or fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, or at the time an electronic confirmation of

---

[6] Note to Draft: Subject to confirmation with Unicorn treasury

receipt is received if delivery is by email, and addressed to the party to be notified at such party's address as set forth below or as subsequently modified by written notice.

      (e)    **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

      (f)    **Successors and Assigns.**  The rights and benefits of this Agreement shall inure to the benefit of, and be enforceable by the Company's successors and assigns.  The rights and obligations of Participant under this Agreement may only be assigned with the prior written consent of the Company.

      (g)    **California Corporate Securities Law.**  THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE.  THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

*[Signature Page Follows]*

The parties have executed this Restricted Stock Award Agreement as of the date first set forth above.

**THE COMPANY:**

**UBER TECHNOLOGIES, INC.**

By: _____
     (signature)

Name:

Title:

Address:

**PARTICIPANT:**

«Employee»

_____
(signature)

I, _____, spouse of «Employee», have read and hereby approve the foregoing Agreement.  In consideration of the Company's granting my spouse the right to purchase the Shares as set forth in the Agreement, I hereby agree to be irrevocably bound by the Agreement and further agree that any community property or other such interest shall hereby by similarly bound by the Agreement.  I hereby appoint my spouse as my attorney-in-fact with respect to any amendment or exercise of any rights under the Agreement.

_____
Spouse of «Employee» (if applicable)

FINAL FORM

**ATTACHMENT A TO**
**RESTRICTED STOCK AWARD AGREEMENT**

**STOCK POWER**

   **FOR VALUE RECEIVED** and pursuant to that certain Notice of Restricted Stock Award and Restricted Stock Award Agreement dated _____ (the "Award"), «Employee» hereby sells, assigns and transfers unto Uber Technologies, Inc., a Delaware corporation (the "Company") _____ (_____) shares of the Class A Common Stock of the Company, standing in the undersigned's name on the books of the Company represented by Certificate No(s). _____, whether held in certificated or uncertificated form, and does hereby irrevocably constitute and appoint the Company's Secretary as attorney-in-fact to transfer the said Common Stock on the books of the Company with full power of substitution in the premises. This Stock Power may be used only in accordance with and subject to the terms and conditions of the Award.

Dated: _____   HOLDER

_____
(Signature)

_____
(Print Name)

**[INSTRUCTIONS:** Please do not fill in any blanks other than the "Signature" line and the "Print Name" line.  The purpose of this Stock Power is to enable to Company to exercise its reacquisition rights set forth in the Award without requiring additional signatures on the part of the Holder.**]**

**Uber Technologies, Inc.**

1455 Market Street, 4th Floor

San Francisco, CA 94103

Today's Date

Anthony Levandowski

Re: **EMPLOYMENT AGREEMENT**

Dear Anthony:

I am pleased to offer you the position of [XXXX].  Your employment by Uber Technologies, Inc., a Delaware corporation (the "Company" or "Uber") shall be governed by the following terms and conditions (this "Agreement"):

1.     **Duties and Scope of Employment.**

a.     **Position.** During your employment under this Agreement (your "Employment"), the Company agrees to employ you in the position of Job Title, or in such other position as the Company subsequently may assign to you. You will initially report directly to Jeff Holden, or thereafter to the then-existing Chief Executive Officer, Chief Product Officer, or other direct reports of the Chief Executive Officer (the "Reporting Requirement").  During your Employment, you will work out of the Company's office in the San Francisco Bay Area (the "Geographic Requirement"). You will perform the duties and have the responsibilities and authority customarily performed and held by an employee in your position or as otherwise may be assigned or delegated to you by your supervisor.

b.     **Obligations to the Company.**   During your Employment, you shall devote your full business efforts and time to the Company or one of its affiliates or subsidiaries. During your Employment, without express written permission from the Chief Executive Officer or one of his direct reports, you shall not render services in any capacity to any other person or entity and shall not act as a sole proprietor or partner of any other person or entity or own more than five percent of the stock of any other corporation; provided, however, that such limitation shall not apply to any equity securities you hold in Otto Trucking LLC, a Delaware limited liability company (the "Trucking Company").  Notwithstanding the foregoing, you may serve on corporate, civic or charitable boards or committees, deliver lectures, fulfill speaking engagements, teach at educational institutions, or manage personal investments without such

advance written consent, provided that such activities do not individually or in the aggregate interfere with the performance of your duties under this Agreement. You shall comply with the Company's policies and rules, to the extent not inconsistent with this letter, as they may be in effect from time to time during your Employment.

    c. **No Conflicting Obligations.** You represent and warrant to the Company that you are under no obligations or commitments, whether contractual or otherwise, that are inconsistent with your obligations under this Agreement. In connection with your Employment, you shall not use or disclose any trade secrets or other proprietary information or intellectual property in which you or any other person has any right, title or interest and your Employment will not infringe or violate the rights of any other person. You represent and warrant to the Company that you have returned or destroyed all property and confidential information belonging to any prior employer.

    d. **Commencement Date.** You shall commence full-time Employment on the date of the closing (the "Closing") of that certain transaction contemplated by the Agreement and Plan of Merger entered into among the Company, Ottomotto LLC and the other signatories thereto, dated as of April [ ], 2016 (the "Start Date"). For the avoidance of doubt, if the Closing does not occur, this Agreement shall automatically be null and void and have no further force and effect.

   2. **Cash and Incentive Compensation.**

    a. **Salary.** The Company shall pay you as compensation for your services an initial base salary at a gross annual rate of $XX,XXX. Such salary shall be payable in accordance with the Company's standard payroll procedures. The annual compensation specified in this subsection (a), together with any modifications in such compensation that the Company may make from time to time, is referred to in this Agreement as "Base Salary."

    b. **Performance Bonus** As an Uber employee, you will be eligible to participate in Uber's Performance Bonus Program. Uber aims to reward high performance and thus compensates the highest performers accordingly. In that context, for bonus year 2015, using a price per share based on the price at which we sold Series G preferred stock, those in the top 25th percentile of performance in a comparable role were eligible to receive bonuses valued up ██████████████████ and the highest performers were eligible to receive bonuses valued up ██████████████████ This value was delivered mostly in equity. Participation in this program does not guarantee that you will receive a bonus, e.g. the lowest 20% of performers should not expect to receive a bonus. The issuance and amount of a bonus is in management's discretion, may be based upon individual and company performance, and will be prorated if you were in your position for less than the full year.

    c. **Restricted Stock**.

     i. Subject to the approval of the Company's Board of Directors (the "Board"), the Company shall grant you XXX,XXX restricted shares of the Company's Common Stock (the "Original Shares"). The Original Shares shall be granted as soon as reasonably practicable after the Start Date. The Original Shares will be subject to a time-

based vesting condition, a performance-based vesting condition, and a milestone-based vesting condition, as well as to other terms and conditions set forth in the Company's 2013 Stock Plan (the "Stock Plan") and in the form of Restricted Stock Award Agreement (attached hereto as *Attachment D*).

      ii.    In the event that any time during your Employment (x) the Company breaches the Reporting Requirement, (y) the Company breaches the Geographic Requirement or (z) at least fifty percent (50%) of the total number of your direct or indirect reports (calculated as the greater of the number of your direct or indirect reports on the closing of the Company's acquisition of the Trucking Company, or, the highest number of such reports at any time following such closing), as a result of the Company's actions (excluding your actions or any actions taken at your direction), (1) no longer directly or indirectly report to you or (2) relocate outside of the San Francisco Bay Area (each of clauses, (x), (y) and (z), an "Additional Share Trigger"), and, in each case, you continue your Employment with the Company or one of its affiliates, subject to the approval of the Board, the Company shall grant you XXX,XXX[1] additional shares of the Company's Common Stock (the "Additional Shares", and collectively with the Original Shares, the "Shares"). For the sake of clarity, there will not be an Additional Share Trigger pursuant to clause (z) if at least fifty percent of your direct or indirect reports (as calculated above) no longer directly or indirectly report to you or relocate outside of the San Francisco Bay Area as a result of their own volition, request or act (each, a "Voluntary Employee Separation") and not as a result of any actions of the Company (excluding your actions or any actions taken at your direction) that would reasonably be expected to result in such Voluntary Employee Separation. The Additional Shares shall be granted as soon as reasonably practicable after the date of the Additional Share Trigger. The Additional Shares will have the same Vesting Commencement Date (as defined in the Restricted Stock Award), and be subject to the same time-based vesting condition, the same performance-based vesting condition, and the same milestone-based vesting condition, as well as the same other terms and conditions set forth in the Stock Plan and in the form of Restricted Stock Award Agreement (attached hereto as *Attachment D*) as the Original Shares.

      iii.    For further information about the vesting conditions applicable to the Shares, please see the Restricted Stock Vesting Summary (attached hereto as *Attachment C*). By executing this Agreement, you and the Company each acknowledge and agree that the milestone-based vesting conditions set forth in Exhibit A to the Restricted Stock Award Agreement may be amended or modified at any time as mutually agreed between the Company, on the one hand, and you and Lior Ron, on the other hand (subject to each of your continued employment with the Company or an affiliate as of the date of such modification or amendment). If any milestone-based vesting condition is so amended or modified, the Company will promptly notify you of such amendments or modifications and provide you with an updated Exhibit A to the Restricted Stock Award Agreement.

      d.

---

[1] Note to Draft: To be 10% of the number of the Original Shares.



3.      **Vacation/PTO and Employee Benefits.**  During your Employment, you shall be eligible for paid vacation / paid time off, in accordance with the Company's vacation / paid time off policy, as it may be amended from time to time.  During your Employment, you shall be eligible to participate in the employee benefit plans maintained by the Company and generally available to similarly situated employees of the Company, subject in each case to the generally applicable terms and conditions of the plan in question and to the determinations of any person or committee administering such plan.

4.      **Business Expenses.**  The Company will reimburse you for your necessary and reasonable business expenses incurred in connection with your duties hereunder upon presentation of an itemized account and appropriate supporting documentation, all in accordance with the Company's generally applicable policies.

5.      **Termination.**

a.      **Employment at Will.**  Your Employment shall be "at will," meaning that either you or the Company shall be entitled to terminate your Employment at any time and for any reason, with or without Cause.  Any contrary representations that may have been made to you shall be superseded by this Agreement.  This Agreement shall constitute the full and complete agreement between you and the Company on the "at-will" nature of your Employment,

---

[2] Note to Draft: To list all other employees who will have this provision.
[3] Note to Draft: Provision to be included in the offer letters for up to three (3) employees of Ottomotto LLC in total, which three employees may include any of the Select Key Employees or any other substantial similar employees of Ottomotto LLC (based on title and/or experience).

which may only be changed in an express written agreement signed by you (or your authorized representative) and a duly authorized officer of the Company.

        b.    **Rights Upon Termination.**  Except as expressly provided herein and in the Restricted Stock Award Agreement, upon the termination of your Employment, you shall only be entitled to the compensation and benefits earned and the reimbursements described in this Agreement for the period preceding the effective date of the termination.

      6.    **Pre-Employment Conditions.**

        a.    **Confidentiality Agreement.**  Your acceptance of this offer and commencement of employment with the Company is contingent upon the execution, and delivery to an officer of the Company, of the Company's Confidential Information and Invention Assignment Agreement, a copy of which is enclosed for your review and execution (the "Confidentiality Agreement"), prior to or on your Start Date and continued compliance with the Confidentiality Agreement thereafter.

        b.    **Right to Work.**  For purposes of federal immigration law, you will be required to provide to the Company documentary evidence of your identity and eligibility for employment in the United States.  Such documentation must be provided to us within three (3) business days of your Start Date, or our employment relationship with you may be terminated.  This offer may be rescinded if you are unable to begin work at Uber within a reasonable amount of time due to work eligibility issues or export control licensure requirements.

        c.    **Alternate Dispute Resolution Agreement**. Your acceptance of this offer and commencement of employment with the Company is contingent upon the execution, and delivery to an officer of the Company, of the Alternate Dispute Resolution Agreement, a copy of which is enclosed as *Attachment B* for your review and execution, prior to or on your Start Date.

      7.    **Successors.**

        a.    **Company's Successors.**  This Agreement shall be binding upon any successor (whether direct or indirect and whether by purchase, lease, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and/or assets.  For all purposes under this Agreement, the term "Company" shall include any successor to the Company's business or assets that becomes bound by this Agreement.

        b.    **Your Successors.**  This Agreement and all of your rights hereunder shall inure to the benefit of, and be enforceable by, your personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

      8.    **Miscellaneous Provisions.**

        a.    **Notice.**  Notices and all other communications contemplated by this Agreement shall be in writing and shall be deemed to have been duly given when personally delivered or when mailed by U.S. registered or certified mail, return receipt requested and postage prepaid.  In your case, mailed notices shall be addressed to you at the home address that you most recently communicated to the Company in writing.  In the case of the Company,

mailed notices shall be addressed to its corporate headquarters, and all notices shall be directed to the attention of its General Counsel.

b.   **Modifications and Waivers.**   No provision of this Agreement shall be modified, waived or discharged unless the modification, waiver or discharge is agreed to in writing and signed by you (or your authorized representative) and by an authorized officer of the Company (other than you).  No waiver by either party of any breach of, or of compliance with, any condition or provision of this Agreement by the other party shall be considered a waiver of any other condition or provision or of the same condition or provision at another time.

c.   **Whole Agreement.**   No other agreements, representations or understandings (whether oral or written and whether express or implied) which are not expressly set forth in (or incorporated by reference into) this Agreement have been made or entered into by either party with respect to the subject matter hereof.  This Agreement and the Confidentiality Agreement contain the entire understanding of the parties with respect to the subject matter hereof.

d.   **Withholding Taxes.**   All payments made under this Agreement shall be subject to reduction to reflect taxes or other charges required to be withheld by law.

e.   **Choice of Law and Severability.**   This Agreement shall be interpreted in accordance with the laws of the State in which you work/last worked without giving effect to provisions governing the choice of law.  If any provision of this Agreement becomes or is deemed invalid, illegal or unenforceable in any applicable jurisdiction by reason of the scope, extent or duration of its coverage, then such provision shall be deemed amended to the minimum extent necessary to conform to applicable law so as to be valid and enforceable or, if such provision cannot be so amended without materially altering the intention of the parties, then such provision shall be stricken and the remainder of this Agreement shall continue in full force and effect.  If any provision of this Agreement is rendered illegal by any present or future statute, law, ordinance or regulation (collectively, the "Law") then that provision shall be curtailed or limited only to the minimum extent necessary to bring the provision into compliance with the Law.  All the other terms and provisions of this Agreement shall continue in full force and effect without impairment or limitation.

f.   **Arbitration.**   As set forth in more detail in the Alternate Dispute Resolution Agreement (attached hereto as *Attachment B* and incorporated by reference as part of this offer of employment), You and the company agree to submit to mandatory binding arbitration any and all claims arising out of or related to your employment with the Company and your termination thereof, including but not limited to, claims for unpaid wages, wrongful terminations, torts, stock or RSUs or other ownership interest in the Company and/or discrimination (including harassment) based upon any federal, state or local ordinance, statute, regulation or constitutional provision, except that each party may, at its, his or her option, seek temporary or preliminary injunctive relief in court in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such relief. Arbitration under the Alternate Dispute Resolution Agreement is on an individual basis only, and class, collective and representative actions are not permitted. All arbitration hearings shall be conducted within 50 miles of the Uber office you work(ed) in or

report(ed) to or at any other location mutually agreed to. THE PARTIES HEREBY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN REGARD TO SUCH CLAIMS. This Agreement is governed by the Federal Arbitration Act (9 U.S.C. 1 et seq.) and does not restrict your right to file administrative claims you may bring before any government agency where, as a matter of law, the parties may not restrict the employee's ability to file such claims (including, but not limited to, the National Labor Relations Board, the Equal Employment Opportunity Commission and the Department of Labor).

g.    **No Assignment.**    This Agreement and all of your rights and obligations hereunder are personal to you and may not be transferred or assigned by you at any time.  The Company may assign its rights under this Agreement to any entity that assumes the Company's obligations hereunder in connection with any sale or transfer of all or a substantial portion of the Company's assets to such entity.

h.    **Counterparts.**    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Signature Page Follows]*

We are all delighted to be able to extend you this offer and look forward to working with you.   Please understand that this offer is contingent upon successful completion of your background check investigation.   To indicate your acceptance of the Company's offer, please sign and date this letter in the space provided below and return it to me, along with a signed and dated original copy of the Confidentiality Agreement and the Alternate Dispute Resolution Agreement. The Company requests that you begin work in this new position on or before Start Date.  This offer must be accepted on or before Expiration.  Please indicate the date (either on or before the aforementioned date) on which you expect to begin work in the space provided below (the "Start Date").

Very truly yours,

Uber Technologies, Inc.

By: _____

Name: Supervisor's Name

Title: Supervisor's Title

ACCEPTED AND AGREED:

Name

_____

Date_____

Attachment A:  Confidential Information and Invention Assignment Agreement

Attachment B: Alternate Dispute Resolution Agreement

Attachment C: Restricted Stock Vesting Summary

Attachment D: Form of Restricted Stock Award Agreement

## ATTACHMENT A

## CONFIDENTIAL INFORMATION AND

## INVENTION ASSIGNMENT AGREEMENT

*(See Attached)*

## ATTACHMENT B

**ALTERNATE DISPUTE RESOLUTION AGREEMENT**

*(See Attached)*

**ATTACHMENT C**

**RESTRICTED STOCK VESTING SUMMARY**

The Shares will have a milestone-based condition, a time-based condition, and a performance-based condition, all of which must be met in order for the Shares to vest.

- The milestone-based condition will be based on the milestones listed in Exhibit A of the Restricted Stock Agreement (each a "**Milestone Achievement**" and collectively, the "**Milestone Achievements**"). The milestone-based condition will be met with respect to the Shares associated with each Milestone Achievement as follows:

  o Such Milestone Achievement is completed by or before ██████████████ and

  o You (i) were hired by Uber prior to such Milestone Achievement and (ii) (x) in the case of



- The time-based condition will be met as follows: 12/48 of the Shares on the one year anniversary of the "vesting commencement date" (which date is set out in the Restricted Stock grant notice) and 1/48 of the Shares on each monthly anniversary thereafter, if and to the extent you continue employment through such dates.

- The performance-based condition will be met on the earlier to occur of: (i) an initial public offering ("**IPO**") of Uber Technologies, Inc. stock or (ii) a liquidation transaction, which includes customary liquidation, dissolution or winding up of the Company (each of clause (i) and (ii), a "**Liquidity Event**").

- The Shares will be subject to customary limitations on transfer, including, but not limited to, a six-month lock-up period following an IPO and a one-year holding period from the date the Shares meet the time-based condition.

- If your employment is terminated prior to the occurrence of a Liquidity Event and if, and to the extent, the Shares have not met the time-based condition as of the date of such termination, the Shares that have not met the time-based condition will be forfeited.

By way of example, if, (i) you were employed by Uber beginning on January 1, 2017, (ii) the total number of Shares granted to you was 100, (iii) Milestone A was allocated 10% of the total Shares (i.e., you were granted 10 Shares that were associated with Milestone A), and (iv) Milestone A was achieved on January 1, 2018, if you were (x) still employed by Uber on ▇▇▇▇ or (y) were terminated by Uber (other than for Cause) after ▇▇▇▇▇▇▇▇ (provided, that, for the avoidance of doubt, such ▇▇▇▇▇▇ would not be required in the case of Milestone 7), then on such date:

(1) the milestone-based condition would be satisfied with respect to such 10 Shares;

(2) the time-based condition would be satisfied with respect to 5 out of such 10 Shares;

(3) if a Liquidity Event occurred prior to January 1, 2019, then with respect to the 5 Shares for which the milestone-based condition and time-based condition have been satisfied in accordance with clauses (1) and (2) above, such 5 Shares would be fully vested;

(4) the remaining 5 Shares for which the time-based condition has not yet been satisfied as of such ▇▇▇▇▇▇▇▇▇▇▇ such 5 remaining Shares would become fully vested over each of the next ▇▇ months so long as you remain employed by Uber; and

(5) the other 90 Shares shall vest similarly based on achievement of the Milestones with which they are associated.

The Shares will be subject to customary limitations on transfer, including, but not limited to, a six-month lock-up period following an IPO and a one-year holding period from the date the Shares meet the time-based condition.

For purposes of this Agreement, "Cause" shall mean the termination of your employment by Uber or any affiliate of Uber (or a successor, if appropriate) based on one or more of the following events having occurred during your employment with Uber or any affiliate of Uber (or a successor, if appropriate), For the avoidance of doubt, the inclusion of the definition of "Cause" in this Agreement or in any other agreement will not, in any manner, modify the "at-will" nature of this Agreement.

## ATTACHMENT D

## FORM OF RESTRICTED STOCK AWARD AGREEMENT

*(See Attached)*

FINAL FORM













- ████ returns from ████ reflectivity target with accuracy ████████ Measured on calibrated range with laser mounted statically and aimed at a target at fixed distance



FINAL FORM



FINAL FORM



FINAL FORM



8









FINAL FORM

11





FINAL FORM





14



FINAL FORM





FINAL FORM



<u>Exhibit L</u>

Form of Purchaser Note

FINAL FORM

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "***ACT***"), OR UNDER THE SECURITIES LAWS OF ANY STATES IN THE UNITED STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

███████████████████████

Date of Note: _____

Principal Amount of Note:  $ _____

Note No.: _____

For value received Ottomotto LLC, a Delaware limited liability company (the "***Company***"), promises to pay to the undersigned holder or such party's assigns (the "***Holder***") the principal amount set forth above with simple interest on the outstanding principal amount at the rate of [____]%[1] per annum. Interest shall commence with the date hereof and shall continue on the outstanding principal until paid in full or converted.  Interest shall be computed on the basis of a year of 365 or 366 days, as applicable, for the actual number of days elapsed.   All unpaid interest and principal, to the extent not otherwise converted or setoff in accordance with the terms hereof, shall be due and payable on the Maturity Date (as defined below).

1.      **DEFINITIONS**.  Capitalized terms used herein and not otherwise defined shall have the meanings set forth below.

"***Act***" has the meaning set forth in the legend.

"***Affiliate***" of a person means any other person which, directly or indirectly, controls, is controlled by, or is under common control with, such person.  The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract or otherwise.

"***Authorized Purpose***" has the meaning set forth in <u>Section 5(a)(ix)</u>.

"***Business Day***" means a weekday on which banks are open for general banking business in San Francisco, California.

"***Change of Control***" has the meaning set forth in <u>Section 4(d)</u>.

---
[1] NTD: Insert ████████████████████████████

"*Closing*" means the consummation of the transactions contemplated by the Merger Agreement.

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

"*Common Units*" means common membership units of the Company.

"*Company*" has the meaning set forth in the preamble.

"*Company 409A Valuation Report*" means the formal report issued by a third-party valuation firm setting forth the valuation of the Company's Common Units pursuant to Section 409A of the Internal Revenue Code of 1986, as amended, which valuation of such Common Units shall be approved by the Company Managers.

"*Company Covered Persons*" has the meaning set forth in Section 5(a)(vii).

"*Company Managers*" has the meaning set forth in Section 5(a)(ii).

"*Company Unitholder Representative*" means the Company Unitholder Representative appointed from time to time in accordance with the terms of the Merger Agreement.

"*Continuing Employees*" means the employees of the Company who accept offers of continued employment with Parent (or any of its Affiliates) from and after the Closing.

"*Conversion Amount*" has the meaning set forth in Section 4(b).

"*Conversion Securities*" has the meaning set forth in Section 5(a)(iii).

"*Disqualification Events*" has the meaning set forth in Section 5(a)(vii).

"*Employee Note*" has the meaning set forth in Section 8(s).

"*Event of Default*" has the meaning set forth in Section 7(a).

"*Forfeiture Share Price*" means ███████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

"*Founder Notes*" means the convertible promissory notes issued by the Company to each Anthony Levandowski or Lior Ron.

"*Holder*" has the meaning set forth in the preamble.

"*Maturity Date*" means the earliest of (a) the date of the occurrence of any Event of Default, unless waived by Holder in writing, (b) the date of the Closing and (c) the date that is two (2) years from the date on which the Merger Agreement is executed and delivered.

"***Merger Agreement***" means that certain Agreement and Plan of Merger by and among the Company, Parent, the Holder, Zing Merger Sub I, LLC and the Company Unitholder Representative, dated as of April 11, 2016.

"***Noncompliant Amount***" has the meaning set forth in <u>Section 3(b)</u>.

"***Note***" has the meaning set forth in <u>Section 2(a)</u>.

"***Notes***" has the meaning set forth in <u>Section 2(a)</u>.

"***Operating Plan***" means the Operating Plan delivered by the Company to the Holder in the form attached to the Merger Agreement as Exhibit J.

"***Paid Company Transaction Expenses***" means, without duplication, (a) (i) the aggregate out-of-pocket expenses, costs, fees and disbursements (including fees and expenses payable to all attorneys, accountants, investment bankers and other advisers of the Company) that are paid by the Company in connection with the negotiation, execution, delivery and performance of the Merger Agreement, the Merger (as defined in the Merger Agreement) or any of the other transactions and matters contemplated in connection therewith pursuant to arrangements entered into by the Company prior to the Closing, and (b) all other miscellaneous expenses or costs paid by the Company in connection with the transactions contemplated by the Merger Agreement (including the cost of the "D&O Tail Policy" referenced in Section 5.9(b) of the Merger Agreement), in each case pursuant to arrangements entered into by the Company prior to the Closing and to the extent that such fees, expenses and disbursements have been paid by the Company as of immediately prior to the Closing *minus* (b) the amount of Reimbursable Company Transaction Expenses relating to the expenses, costs, fees and disbursements referenced in the foregoing clause (a) of this definition, and *minus* (c) the aggregate Note Forfeiture Amounts (as such term is defined in the Founder Notes) under the Founder Notes.

"***Parent***" means Uber Technologies, Inc., a Delaware corporation.

"***Parent 409A Valuation Report***" means the formal report issued by a third-party valuation firm setting forth the valuation of Parent's Class A common stock pursuant to Section 409A of the Internal Revenue Code of 1986, as amended, which valuation of Parent's Class A common stock shall be approved by the board of directors of Parent (or a committee thereof).

"***Parent Restricted Stock***" means the aggregate amount of restricted stock in respect to shares of Parent's Class A common stock to be granted to the Continuing Employees in connection with the Closing.

"***Preferred Units***" means preferred membership interests of the Company that are convertible into Common Units.

"***Pro Rata Share***" means, with respect to either Anthony Levandowski or Lior Ron, a fraction, the numerator of which is the number of shares of Parent Restricted Stock owned by Anthony Levandowski or Lior Ron, as applicable, and the denominator of which is the aggregate number of shares of Parent Restricted Stock owned by both of them.

"***Qualified Financing***" means the Company's next sale of Preferred Units in a single transaction or in a series of related transactions, in each case occurring on or before the Maturity Date, for an aggregate gross purchase price paid to the Company (whether paid in the form of cash or cancelled indebtedness or other form of consideration) of no less than ████████████████████████

███████████████████████████████████████████████████

"*Reimbursable Company Transaction Expenses*" means ████

███████████████████████████████████████████████████

"*Restricted Indebtedness*" has the meaning set forth in <u>Section 6</u>.

"*Securities*" has the meaning set forth in <u>Section 5(b)(i)</u>.

"*Setoff Amount*" has the meaning set forth in <u>Section 4(a)</u>.

"*Unpaid Company Transaction Expenses*" means the Closing Date Transaction Expenses (as defined in the Merger Agreement) *minus* the Reimbursable Company Transaction Expenses relating to such Closing Date Transaction Expenses.

2.      **BASIC TERMS**.

(a)      **The Notes**.  This convertible promissory note (this "*Note*") is issued as part of a series of convertible promissory notes being executed and delivered by the Company to the Holder for the purpose of financing the Company in accordance with the Operating Plan, all upon the terms and subject to the conditions set forth in the Merger Agreement (collectively, the "*Notes*").

(b)      **Payments**.  All payments of interest and principal shall be in lawful money of the United States of America and shall be made to the Holder. All payments shall be applied first to accrued interest, and thereafter to principal.

(c)      **Prepayment**.  The Company may not prepay this Note prior to the Maturity Date without the consent of the Holder.

3.      **REPAYMENT UPON CLOSING**.

(a)      If and only if the Closing occurs, notwithstanding anything to the contrary contained herein (except for and subject to <u>Section 3(b)</u>), the Holder and the Company hereby agree that as of the date of Closing the sum of all then outstanding principal and unpaid accrued interest shall be deemed to be repaid in full, but only to the extent that the proceeds of this Note have been used by the Company for the Authorized Purpose and subject to compliance by the Company Founders of their obligations under <u>Section 3(b)</u>.

(b)      No later than thirty (30) days following the Closing, Holder shall deliver a written notice (the "*Noncompliant Amount Notice*") to the Company Unitholder Representative stating with reasonable specificity Holder's calculation, without duplication, of (i) the Paid Company Transaction Expenses, (ii) the Unpaid Company Transaction Expenses and (iii) in the event that the Holder believes any portion of the proceeds of this Note are not used by the Company for the Authorized Purpose (plus accrued interest on such portion) (collectively, such aggregate amount under the foregoing clauses (i), (ii) and (iii), the "*Noncompliant Amount*").  If the Company Unitholder Representative does not agree with the calculation of the Noncompliant Amount set forth in the Noncompliant Amount Notice, the Company

4.

Unitholder Representative shall deliver, no later than thirty (30) days following receipt of the Noncompliant Amount Notice, a written notice to the Holder stating with reasonable specificity the basis for such dispute.  If the Company Unitholder Representative timely notifies the Holder of such dispute, and if the Holder and the Company Unitholder Representative are unable to resolve such dispute through good faith negotiations within thirty (30) days after delivery of such notice, then such determination shall be made by an Arbitration Decision (as defined in the Merger Agreement). If there is finally determined to be a Noncompliant Amount pursuant to the procedure set forth above, then



4.     CONVERSION AND REPAYMENT IF THE CLOSING DOES NOT OCCUR.

(a)



**(b)      Conversion upon a Qualified Financing**.  In the event of a Qualified Financing on or before the Maturity Date, so long as any portion this Note remains outstanding immediately prior to the closing of such Qualified Financing, the then outstanding principal amount of this Note and any unpaid accrued interest thereon (the "***Conversion Amount***") shall automatically convert in whole without any further action by the Holder or the Company into a number of Preferred Units sold in the Qualified Financing equal to the quotient obtained by ███████████████████████████████████ ████████████████████████████████████  The issuance of Preferred Units to Holder pursuant to the conversion of this Note shall be upon and subject to the same terms and conditions applicable to the other Preferred Units sold in the Qualified Financing, including that the Holder shall execute any limited liability company agreement, equityholders', registration rights or any similar agreement entered into by all of the investors in the Qualified Financing in connection with the Qualified Financing.

**(c)      Maturity Date**.  In the event that any portion of this Note remains outstanding on the Maturity Date, subject to the Holder's election pursuant to Section 4(a), upon election of the Holder given to the Company prior to the Maturity Date: (i) the Company shall repay the Holder an aggregate amount of cash equal to the outstanding principal amount of this Note plus any unpaid accrued interest on the unpaid principal or (ii) the outstanding principal balance of this Note and any unpaid accrued interest shall convert as of the Maturity Date into Common Units at a conversion price equal to ███████████████████████████████████████████████████

**(d)      Change of Control**.  If the Company consummates a Change of Control and this Note remains outstanding immediately prior to the consummation of such Change of Control, the Holder may elect that either: (i) the Company repay the Holder an aggregate amount of cash equal to the outstanding principal amount of this Note plus any unpaid accrued interest on the unpaid principal or (ii) the outstanding principal amount of this Note and any unpaid accrued interest shall convert immediately prior to the closing of such Change of Control into Common Units at a conversion price equal to █████ ██████████████████████████████████  For purposes of this Note, a "***Change of Control***" means (A) a consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the members of the Company immediately prior to such consolidation, merger or reorganization, continue to hold at least a majority of the voting power of the surviving entity (or, if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; (B) any transaction or series of related transactions to which the Company is a party in which in excess of 50% of the Company's voting power is transferred; or (C) the sale or transfer of all or substantially all of the Company's assets, or the exclusive license of all or substantially all of the Company's material intellectual property; *provided* that a Change of Control shall not include (x) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor, indebtedness of the Company is cancelled, or converted or a combination thereof and (y) any such consolidation, merger, corporate reorganization, transaction, sale or transfer with, into, to or by Parent or any of its Affiliates. The Company shall give the Holder notice of a Change of Control not less than ten (10) days prior to the anticipated date of consummation of the Change of Control.

**(e)      Procedure for Conversion**.  In connection with any conversion of this Note into Common Units or Preferred Units, the Holder shall surrender this Note to the Company and deliver to the Company any documentation reasonably required by the Company (including, in the case of a Qualified Financing, all financing documents executed by other investors in connection with such Qualified Financing).  The Company shall not be required to issue or deliver Common Units or Preferred Units into which this Note may convert until the Holder has surrendered this Note to the Company (or, if this Note

6.

shall have been lost, stolen or destroyed, the Company may, as a condition to such issuance, require the Holder to provide a reasonably appropriate affidavit to the Company). As soon as practicable after conversion of this Note pursuant to this Section 4(e), a certificate or certificates for the number of units of Conversion Securities to which Holder shall be entitled upon such conversion (bearing such legends as may be required by applicable state and federal securities laws in the opinion of legal counsel of the Company, or by the Company's organizational documents (including certificate of formation, limited liability company agreement or similar governing documents), in each case as then in effect, and by any agreement between the Company and Holder), together with any other securities and property to which Holder is entitled upon such conversion under the terms of this Note. Upon the conversion of this Note into Common Units or Preferred Units pursuant to the terms hereof, in lieu of any fractional units to which the Holder would otherwise be entitled, the Company shall pay the Holder cash equal to such fraction multiplied by the price at which this Note converts.

5. **REPRESENTATIONS AND WARRANTIES**.

(a) **Representations and Warranties of the Company**. The Company hereby represents and warrants to the Holder as of the date hereof as follows:

(i) **Organization, Good Standing and Qualification**. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has the requisite limited liability company power to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted. The Company is duly qualified and is authorized to do business and is in good standing as a foreign limited liability company in all jurisdictions in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on the Company or its business.

(ii) **Limited Liability Company Power**. The Company has all requisite limited liability company power to issue this Note and to carry out and perform its obligations under this Note. The Company's managing members have (the "*Company Managers*") have approved the issuance of this Note based upon a reasonable belief that the issuance of this Note is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation.

(iii) **Authorization**. All action on the part of the Company, the Company Managers and the Company's members necessary for the issuance and delivery of this Note has been taken. This Note constitutes a valid and binding obligation of the Company enforceable in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and, with respect to rights to indemnity, subject to federal and state securities laws. Any securities issued upon conversion of this Note (the "*Conversion Securities*"), when issued in compliance with the provisions of this Note, will be validly issued, fully paid, nonassessable, free of any liens or encumbrances and issued in compliance with all applicable federal and securities laws.

(iv) **Governmental Consents**. All consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings with, any governmental authority required on the part of the Company in connection with issuance of this Note have been obtained.

(v) **Compliance with Laws**. The Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its

7.

properties, which violation of which would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of the Company.

**(vi)** **Compliance with Other Instruments**.  The Company is not in violation or default of any term of its organizational documents (including certificate of formation and limited liability company agreement). The execution, delivery and performance of this Note will not result in any material violation of any mortgage, indenture, contract, judgment, decree, order or writ or be in material conflict with any mortgage, indenture, contract, judgment, decree, order or writ or constitute, with or without the passage of time and giving of notice, either a material default under any such mortgage, indenture, contract, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties.  Without limiting the foregoing, the Company has obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for the Company to consummate the transactions contemplated hereunder without any third party obtaining any rights to cause the Company to offer or issue any securities of the Company as a result of the consummation of the transactions contemplated hereunder.

**(vii)** **No "Bad Actor" Disqualification**.  The Company has exercised reasonable care to determine whether any Company Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii), as modified by Rules 506(d)(2) and (d)(3), under the Act ("*Disqualification Events*").  To the Company's knowledge, no Company Covered Person is subject to a Disqualification Event.  The Company has complied, to the extent required, with any disclosure obligations under Rule 506(e) under the Act.  For purposes of this Note, "*Company Covered Persons*" are those persons specified in Rule 506(d)(1) under the Act; *provided*, however, that Company Covered Persons do not include (a) the Holder, or (b) any person or entity that is deemed to be an affiliated issuer of the Company solely as a result of the relationship between the Company and the Holder.

**(viii)** **Offering**.  Assuming the accuracy of the representations and warranties of the Holder contained in subsection (b) below, the offer, issue, and sale of this Note and any Conversion Securities are and will be exempt from the registration and prospectus delivery requirements of the Act, and have been registered or qualified (or are exempt from registration and qualification) under the registration, permit or qualification requirements of all applicable state securities laws.

**(ix)** **Use of Proceeds**.  The Company shall use the proceeds of this Note (x) in accordance with the Operating Plan in all material respects and (y) with Holder's consent, solely for the other operations of its business, but in no event for any personal, family or household purpose (collectively, the "*Authorized Purpose*").

**(b)** **Representations and Warranties of the Holder**.  The Holder hereby represents and warrants to the Company as of the date hereof as follows:

**(i)** **Purchase for Own Account**.  The Holder is acquiring this Note and the Conversion Securities (collectively, the "*Securities*") solely for the Holder's own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

8.

(ii) **Information and Sophistication**.  Without lessening or obviating the representations and warranties of the Company set forth in subsection (a) above, the Holder hereby: (A) acknowledges that the Holder has received all the information the Holder has requested from the Company and the Holder considers necessary or appropriate for deciding whether to acquire the Securities, (B) represents that the Holder has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities and to obtain any additional information necessary to verify the accuracy of the information given the Holder and (C) further represents that the Holder has such knowledge and experience in financial and business matters that the Holder is capable of evaluating the merits and risk of this investment.

(iii) **Ability to Bear Economic Risk**.  The Holder acknowledges that investment in the Securities involves a high degree of risk, and represents that the Holder is able, without materially impairing the Holder's financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of the Holder's investment.

(iv) **Further Limitations on Disposition**.  Without in any way limiting the representations set forth above, the Holder further agrees not to make any disposition of all or any portion of the Securities unless and until:

(1)  There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(2)  The Holder shall have notified the Company of the proposed disposition and furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, the Holder shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws, *provided* that no such opinion shall be required for dispositions in compliance with Rule 144 under the Act, except in unusual circumstances.

(3)  Notwithstanding the provisions of paragraphs (1) and (2) above, no such registration statement or opinion of counsel shall be necessary for a transfer by the Holder to a partner (or retired partner) or member (or retired member) of the Holder in accordance with partnership or limited liability company interests, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were the Holder hereunder.

(v) **Accredited Investor Status**.  The Holder is an "accredited investor" as such term is defined in Rule 501 under the Act.

6. **RESTRICTIONS ON INDEBTEDNESS.**

So long as (i) any amount or any obligation of the Company shall remain outstanding under this Note or (ii) the potential Setoff Amount is greater than zero ($0), the Company shall not, and shall cause its Affiliates to not, create, incur, issue, assume or suffer to exist any Restricted Indebtedness, other than the Notes and the Employee Notes (as defined below).  "***Restricted Indebtedness***" shall mean, unless expressly subordinated to the amounts due under this Note, all amounts due in connection with indebtedness of the Company in respect of borrowed money and any such indebtedness evidenced by bonds, notes, or debentures.

7.    **EVENTS OF DEFAULT.**

(a)    If there shall be any Event of Default hereunder, subject to the Holder's election pursuant to Section 4(a), at the option and upon the declaration of the Holder and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under subsection (ii) or (iii) below), the Holder may elect that either: (x) this Note shall accelerate and all principal and unpaid accrued interest shall become due and payable or (y) the then outstanding principal balance of this Note and any unpaid accrued interest shall convert into Common Units at a conversion price equal ██████████    The occurrence of any one or more of the following, as agreed to in writing by the Company or as determined by an Arbitration Decision (as defined in the Merger Agreement) with respect thereto, shall constitute an "*Event of Default*":

(i)    The Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any unpaid accrued interest or other amounts due under this Note on the date the same becomes due and payable; *provided* that this clause (i) shall only constitute an Event of Default if the Company does not make any such payment within five (5) Business Days after written notice thereof has been given by or on behalf of the Holder to the Company;

(ii)    The Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing;

(iii)    An involuntary petition is filed against the Company (unless such petition is dismissed or discharged within sixty (60) days) under any bankruptcy statute now or hereafter in effect, or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company;

(iv)    The Company breaches in any material respect any other obligation to the Holder under this Note and does not cure such breach within ten (10) days after written notice thereof has been given by or on behalf of the Holder to the Company; or

(v)    The Company Managers or members adopt a resolution for the liquidation, dissolution or winding up of the Company.

(b)    In the event of any Event of Default hereunder, the Company shall pay all reasonable and documented out-of-pocket attorneys' fees of one counsel to Holder and all court costs incurred by the Holder in enforcing and collecting this Note.

8.    **MISCELLANEOUS PROVISIONS.**

(a)    **Waivers.**  Company hereby waives demand, notice, presentment, protest and notice of dishonor.

(b)    **Further Assurances**.  The Holder agrees and covenants that at any time and from time to time the Holder will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Note and to comply with state or federal securities laws or other regulatory approvals.  The Company agrees and covenants that at any time and from time to time the Company will promptly execute and deliver to the Holder such further instruments and documents and

take such further action as the Holder may reasonably require in order to carry out the full intent and purpose of this Note.

**(c)      Transfers of Notes**.  This Note may only be transferred as follows (and notice must be provided to the Company): (i) at any time, the Holder may transfer this Note, and assign its rights and delegate its obligations hereunder, to its Affiliates without the consent of the Company and (ii) for so long as an Event of Default exists, the Holder may transfer this Note, and assign its rights and delegate its obligations hereunder, to any person without the consent of the Company.  This Note may be transferred only in accordance with the preceding sentence and only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form reasonably satisfactory to the Company (or, if this Note shall have been lost, stolen or destroyed, the Company may, as a condition to such transfer, require the Holder to provide a reasonably appropriate affidavit to the Company). Thereupon, subject to compliance with the restrictions on transfer set forth in this Note, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee.  Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.  The Company may not transfer, pledge or assign this Note without the written consent of the Holder.  Subject to the foregoing, the rights and obligations of the Company and Holder under this Note shall be binding upon and benefit their respective permitted successors, assigns, heirs, administrators and transferees.

**(d)      Market Standoff**.  The Holder hereby agrees that the Holder shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale of, any shares of common stock (or other securities) of the Company held by the Holder (other than those included in the registration) during the 180-day period following the effective date of the initial public offering of the Company.  The Holder agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the managing underwriters that are consistent with the foregoing or that are necessary to give further effect thereto.  In addition, if requested by the Company or the representative of the underwriters of common stock (or other securities of the Company), the Holder shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Act.  The obligations described in this paragraph shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future.  In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to such common stock (or other securities of the Company) until the end of such period.  The Holder agrees that any transferee of any of the Securities (or other securities of the Company) held by the Holder shall be bound by this paragraph. The underwriters of the Company's stock are intended third-party beneficiaries of this paragraph and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto.

**(e)      Amendment and Waiver**.  Any term of this Note may be amended or waived with the written consent of the Company and the Holder.  Any amendment or waiver effected in accordance with this Section 8(e) shall be binding upon each holder of this Note at the time outstanding, each future holder of this Note and the Company.

**(f)      Company 409A Valuation Report**. At least once during each calendar year following the execution of this Note, including the calendar year in which this Note was executed, the Company shall obtain a Company 409A Valuation Report; *provided,* that such obligation shall terminate following the Company's repayment of all outstanding amounts owed to Holder under this Agreement

(including after taking into account any conversion or setoff of amounts owed under the terms of this Agreement).

        **(g)**    **Company Conversion**.  In the event that the Company converts from a limited liability company to a corporation at any time that (i) this Note or any obligations of the Company hereunder shall remain outstanding or (ii) ████████████████████████████ (x) the Company shall cause any then outstanding Common Units and Preferred Units to convert, on a one-for-one basis, into shares of common stock and preferred stock of the Company, as applicable, with substantially the same rights and preferences as the then outstanding Common Units and Preferred Units and (y) the terms of this Note relating to Common Units and the Preferred Units shall apply, *mutatis mutandis*, to the shares of common stock and preferred stock of the Company following such conversion, as applicable.

        **(h)**    **Governing Law**.  This Note shall be governed by and construed under the laws of the State of California, as applied to agreements among California residents, made and to be performed entirely within the State of California, without giving effect to conflicts of laws principles.  The exclusive venue for any dispute shall be in the courts in the State of California, County of San Francisco, or if it has or can acquire jurisdiction, in the United States District Court for the Northern District of California, and each of the parties irrevocably submits to each such court in any such dispute and waives any objection it may now or hereafter have to venue or inconvenience of forum.

        **(i)**    **Binding Agreement**.  The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Note, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Note, except as expressly provided in this Note.

        **(j)**    **Counterparts**.  This Note may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Note may also be executed and delivered by facsimile signature, PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (*e.g.*, www.docusign.com).

        **(k)**    **Titles and Subtitles**. The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

        **(l)**    **Notices**.  All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications to a party shall be sent to the party's address set forth on the signature page hereto or at such other address(es) as such party may designate by ten (10) days advance written notice to the other party hereto.

        **(m)**    **Expenses**.  The Company and the Holder shall each bear its respective expenses and legal fees incurred with respect to the negotiation, execution and delivery of this Note and the transactions contemplated herein.

        **(n)**    **Attorneys' Fees**.  If any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party will be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

**(o)      Delays or Omissions**.  It is agreed that no delay or omission to exercise any right, power or remedy accruing to the Holder, upon any breach or default of the Company under this Note shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  It is further agreed that any waiver, permit, consent or approval of any kind or character by the Holder of any breach or default under this Note, or any waiver by the Holder of any provisions or conditions of this Note, must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Note, or by law or otherwise afforded to the Holder, shall be cumulative and not alternative.

**(p)      Entire Agreement**.  This Note constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

**(q)      Broker's Fees**. Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this Section 8(q) being untrue.

**(r)      Acknowledgment**.  For the avoidance of doubt, it is acknowledged that the Holder will be entitled to the benefit of all adjustments in the number of the Company's equity securities as a result of any splits, recapitalizations, combinations or other similar transactions affecting the Company's equity securities underlying the Conversion Securities that occur prior to the conversion of this Note.

**(s)      Pari Passu Notes**.  Except as otherwise agreed by the Holder, the Holder acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest herein shall be pari passu in right of payment and in all other respects to any other Notes and any convertible promissory notes issued by the Company to any employee of the Company in connection with the financing of the Operating Plan prior to the Maturity Date (the "***Employee Note***").

**(t)      Specific Performance**. The Company acknowledges and agrees that the remedies at law of the Holder in the event of any default by the Company in the performance of or compliance with any of the terms of this Note are not adequate and may be enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any of the terms hereof or otherwise.

**(u)      Severability**.  If one or more provisions of this Note are held to be unenforceable under applicable law, then such provision(s) shall be excluded from this Note to the extent they are held to be unenforceable and the remainder of this Note shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

*[Signature pages follow]*

13.

The parties have executed this **CONVERTIBLE PROMISSORY NOTE** as of the date first noted above.

**COMPANY:**

**OTTOMOTTO LLC**

By:  _____

    Name:
    Title:

<u>Address</u>:    [_____]

The parties have executed this **CONVERTIBLE PROMISSORY NOTE** as of the date first noted above.

**HOLDER (if an entity):**

Name of Holder: ██████████████

By: _____

    Name: _____
    Title: _____

Address:

The parties have executed this **Convertible Promissory Note** as of the date first noted above.

**Anthony Levandowski, in his individual capacity, solely for purposes of Section 3(b)**

By: _____

Title: _____

Address:

**Lior Ron, in his individual capacity, solely for purposes of Section 3(b)**

By: _____

Title: _____

Address:

**Lior Ron, in his capacity as the Company Unitholder Representative, solely for purposes of Section 3(b)**

By: _____

Title: _____

Address:

<u>Exhibit M</u>

Form of New Employee Attestation

FINAL FORM

## **Ottomotto LLC**

### **Employee Attestation**

I, the undersigned [_____], an [employee] [potential employee] [contractor or other service provider] of Ottomotto LLC, a Delaware limited liability company ("Ottomotto"), hereby certify and declare to Ottomotto that to my knowledge I have not committed any of the following acts:

- fraud in connection with me becoming employed by Ottomoto;

- willful, intentional or deliberate conduct that constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation of any patents, copyrights, trademarks or trade secrets of my prior employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by my prior employer;

- willful and/or intentional breach by me of any fiduciary duty or duty of loyalty to my prior employer; and/or

- willful and/or intentional breach by me of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between me and my prior employer.


_____

Name:

Date:

<u>Exhibit N</u>

Post-Signing Specified Bad Acts

FINAL FORM

## EXHIBIT N

### Post-Signing Specified Bad Acts

Capitalized terms used in this Exhibit N and not otherwise defined herein shall have the meanings ascribed to such terms in the Merger Agreement to which this Exhibit is appended.

"Post-Signing Specified Bad Acts" means any of the Acts set forth in Section 2 and/or Section 3 of this Exhibit A by any Employee or the Company after the Agreement Date and prior to the Closing; *provided*, that if such Employee and/or the Company, as applicable, obtains the express prior written consent of Parent to engage in any such Act, then such Act shall not be deemed by any Party for purposes of this Agreement to be a Post-Signing Specified Bad Act.

## SECTION 1.    Certain Definitions

"Act" means, with respect to any Employee or the Company, (i) any act or action of such Person, (ii) any act or action that such Person has directed, caused, induced, knowingly contributed to, or knowingly permitted someone else to take or (iii) any failure by such Person who is a Diligenced Employee (once such Person becomes a Diligenced Employee in accordance with the terms of the Merger Agreement) to disclose to Parent actual knowledge that such Diligenced Employee has that an Employee or Non-Employee Service Provider of the Company Group engaged or is engaging in any Post-Signing Specified Bad Act.

"Company Group" means the Company and/or the Consumer Company, as the context so requires.

"Former Employer Materials" means, with respect to any Employee, copyrightable material or materials embodying trade secrets or other confidential information of such Employee's Former Employer(s), including copies of Software, product plans, or invention disclosures, in electronic or tangible form.

"Non-Employee Service Provider" means a natural person in her or his capacity as a consultant or contractor.

"Residual Information" means, with respect to any Employee, the information, skills, knowledge, or know-how of general application in the trade of such Employee that is retained in the unaided memory of such Employee and that is not recollected by such Employee with reference to any copies of any Former Employer Materials in written, electronic, or other form; *provided*, that Residual Information shall not include any trade secret or other confidential information memorized by such Employee for the purpose of retaining and subsequently using or disclosing such information for any purpose outside the scope of such Employee's employment with his or her Former Employer(s).

"Software" means Software, including, but not limited to, system software, applications, application program interfaces, firmware, source code, machine or object code, computer programs, program instructions, and any associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe the algorithms or structure of software or hardware designs.

## SECTION 2.    IP/TRADE SECRETS MISAPPROPRIATION

A.      The Act of taking, retaining, not returning, transferring, accessing, or possessing any hardware, computers, electronic devices, memory chip, machine readable storage media, transmission media, equipment, tools, jigs, templates, molds, models, samples, mock ups, prototypes, or any

other tangible articles of manufacture, machines, or physical materials similar to the foregoing of any Former Employer without the express written consent of such Former Employer.

B.      The Act of disclosing, downloading, uploading, copying, re-writing from memory, taking, retaining, storing, not returning, transferring, accessing, or possessing any confidential or proprietary Software of any Former Employer without the express written consent of, or an appropriate license from, such Former Employer.

C.      The Act of disclosing, downloading, uploading, copying, re-writing from memory, taking, retaining, storing, not returning, transferring, accessing, or possessing any hard copy, electronic copy, or any other form of confidential document, file, data or information of any Former Employer (in any medium or form) without the express written consent of such Former Employer, with the exception of retaining data or information solely in the memory of an Employee; *provided*, (a) such data or information was not memorized for the purpose of retaining and subsequently using or disclosing such data or information for any purpose outside the scope of such Employee's employment with his or her Former Employer and (b) such data or information is not used or disclosed in a manner that is otherwise a Post-Signing Specified Bad Act.

D.      The Act of loading, installing, and/or running data erasing, data wiping or any other specialized or permanent file deletion Software (other than that which runs by default on any operating system, provided that such operating system Software is not used to intentionally render any files or data permanently unrecoverable) on:  (a) any Former Employer computer or other electronic device without the express prior written consent of such Former Employer; (b) any computer or other electronic device of the Company Group without the express prior written consent of the Company; or (3) any personal computer or other device, to the extent such computer or device is or was used for work related to any member of the Company Group or any Former Employer, without the express written consent of the Company, but only with respect to use of such data erasing, data wiping or other file deletion Software on any documents, files, data, or information of the Company Group or such Former Employer.

E.      The Act, without the express written consent of a Former Employer, of accessing remotely or otherwise, (a) other than by express prior invitation of a principal or senior executive of such Former Employer, any secured, restricted or non-public facilities or physical premises, or (b) electronic, computer, or cloud systems of such Former Employer (other than cloud systems designed for non-employee access, provided such cloud systems are accessed pursuant to a valid user license), including but not limited to by using codes or other access information that were issued during a period of employment or service as a Non-Employee Service Provider with such Former Employer or by using access information of another current or former employee or Non-Employee Service Provider of such Former Employer.

F.      The Act of taking, copying, retaining, disclosing, making, using, selling, offering for sale, or importing into the United States, any confidential information, technology or invention that is a material trade secret of any Former Employer or is known by an Employee the Company to be protected by a Former Employer's patent or material copyright, without the express written consent or an appropriate license of such Former Employer, with the exception of retaining confidential information solely in the memory of an Employee; *provided*, (a) such information was not memorized for the purpose of retaining and subsequently using or disclosing such information for any purpose outside the scope of such Employee's employment with his or her Former Employer and (b) such information is not used or disclosed in a manner that is otherwise a Post-Signing Specified Bad Act.

FINAL FORM

Notwithstanding anything herein to the contrary, the Post-Signing Specified Bad Acts set forth in Section 2 above shall not include the use of Residual Information by the Company and/or any Employee, provided such use shall be deemed a Post-Signing Specified Bad Act hereunder to the extent it involves knowingly or intentionally using or disclosing a material trade secret of a Former Employer, or using any technology known by any Employee or the Company to be protected by a Former Employer's patent or material copyright, without the express written consent of, or an appropriate license of, such Former Employer.

**SECTION 3.   SOLICITATION / CONFIDENTIALITY / HIRING**

A.       The Act, without the express prior written consent of a Former Employer, in any way to benefit any member of the Company Group, Parent or any of Parent's Affiliates, of (a) initiating communications (including by arranging a communication) with (i) any then current employee of such Former Employer or (ii) any then current Non-Employee Service Provider of such Former Employer (in the case of clause (ii), solely to the extent that the non-solicitation provisions of an Employee's or Non-Employee Service Provider's contractual obligations with such Former Employer, as applicable, apply to solicitation of Non-Employee Service Providers) regarding (A) whether such individual should leave such Former Employer and/or join any member of the Company Group, Parent or any of Parent's Affiliates, and/or (B) the possibility of working for any member of the Company Group, Parent or any of Parent's Affiliates, including but not limited to an offer to employ or retain his or her services; or (b) disclosing to any member of the Company Group, Parent or any of Parent's Affiliates confidential non-public information learned during employment or service with such Former Employer regarding the specific skills, experience, or competencies obtained while working for such Former Employer or compensation from such Former Employer of any then current employee or Non-Employee Service Provider of such Former Employer (provided that general responses to communications initiated by persons other than Employees or Non-Employee Service Providers of the Company Group of whether any such individual is a good candidate that does not reveal such confidential non-public information shall not violate this provision).

B.       The Act, without the express prior written consent of Parent, of hiring any Employee that is not a Diligenced Employee who does not, prior to being hired by the Company, execute and deliver to the Company a New Employee Attestation.

C.       The Act of hiring any Diligenced Employee without the express prior written consent of Parent.

3

<u>Exhibit O</u>

Specified Claims

FINAL FORM

**Exhibit O**

<u>Specified Claims</u>

"**Specified Claim**" shall mean any claim brought or threatened in writing by any Former Employer of a Diligenced Employee against any member of the Company or Otto Trucking LLC or such Diligenced Employee, as applicable, arising out of or alleged to arise out of: (i) the infringement (direct or indirect) or misappropriation by such Diligenced Employee or any member of the Company or Otto Trucking LLC of any intellectual property, including any patents, copyrights, trademarks or trade secrets, of such Diligenced Employee's Former Employer, (ii) breach by such Diligenced Employee of such Diligenced Employee's fiduciary duty or duty of loyalty to such Diligenced Employee's Former Employer, and/or (iii) breach by such Diligenced Employee of any non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between such Diligenced Employee and such Diligenced Employee's Former Employer.