# EXHIBIT 1

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**EXECUTION**

**AGREEMENT AND PLAN OF MERGER**

**by and among**

**Ottomotto LLC, a Delaware limited liability company;**

**Uber Technologies, Inc., a Delaware corporation;**

███████████████████████████████

**Zing Merger Sub I, LLC, a Delaware limited liability company; and**

**the Company Unitholder Representative**

**Dated as of April 11, 2016**

TABLE OF CONTENTS

SECTION 1.          DESCRIPTION OF TRANSACTION ..................................................................2

      1.1       Purchaser Call Option ........................................................................................2

      1.2       Company Put Option ..........................................................................................2

      1.3       The Merger; Effect of the Merger ....................................................................3

      1.4       Closing; Effective Time ....................................................................................4

      1.5       Organizational Documents of the Surviving Company; Managers and Officers ..............................................................................................................4

      1.6       Conversion of Company Common Units ..........................................................4

      1.7       Further Proceeding ............................................................................................5

      1.8       Exchange/Payment ............................................................................................5

      1.9       Appraisal and Dissenters' Rights .....................................................................6

      1.10     No Interest .........................................................................................................6

      1.11     Company Restricted Units .................................................................................6

SECTION 2.          REPRESENTATIONS AND WARRANTIES OF THE COMPANY ....................6

      2.1       Due Formation...................................................................................................6

      2.2       Organizational Documents ................................................................................7

      2.3       Capitalization, Etc ............................................................................................7

      2.4       Subsidiaries .......................................................................................................7

      2.5       Absence of Certain Changes .............................................................................7

      2.6       Assets ................................................................................................................8

      2.7       Real Property; Leasehold .................................................................................8

      2.8       Intellectual Property .........................................................................................8

      2.9       Export Control Legal Requirements................................................................12

      2.10     Material Contracts ...........................................................................................12

      2.11     Liabilities ........................................................................................................13

      2.12     Compliance with Laws ...................................................................................13

      2.13     Certain Business Practices ..............................................................................13

      2.14     Tax Matters .....................................................................................................13

      2.15     Employee Benefit Plans and Employee Matters ............................................15

      2.16     Litigation ........................................................................................................17

      2.17     Authority; Binding Nature of Agreement.......................................................17

      2.18     Vote Required .................................................................................................18

      2.19     Non-Contravention; Consents ........................................................................18

**TABLE OF CONTENTS**
(CONTINUED)

| | | | |
|---|---|---|---|
| 2.20 | Financial Advisor | | 18 |
| 2.21 | Related Party Transactions | | 18 |
| 2.22 | Reliance | | 18 |
| 2.23 | Exclusivity of Representations and Warranties | | 18 |
| SECTION 3. | REPRESENTATIONS AND WARRANTIES OF PARENT, PURCHASER AND MERGER SUB | | 19 |
| 3.1 | Due Incorporation | | 19 |
| 3.2 | Authority; Binding Nature of Agreement | | 19 |
| 3.3 | Non-Contravention; Consents | | 19 |
| 3.4 | Merger Sub | | 19 |
| 3.5 | Reliance | | 19 |
| 3.6 | Exclusivity of Representations and Warranties | | 19 |
| SECTION 4. | CERTAIN COVENANTS OF THE COMPANY | | 19 |
| 4.1 | Access | | 20 |
| 4.2 | Conduct of the Business of the Company | | 20 |
| 4.3 | Restrictions on Conduct of the Business | | 20 |
| 4.4 | No Solicitation | | 22 |
| 4.5 | Notifications | | 23 |
| 4.6 | Company Unitholder Consent | | 24 |
| 4.7 | Company Financial Statements; Books and Records | | 24 |
| 4.8 | Company Employee Plans and Employees | | 25 |
| SECTION 5. | ADDITIONAL COVENANTS OF THE PARTIES | | 25 |
| 5.1 | Further Proceedings | | 25 |
| 5.2 | Regulatory Filings | | 26 |
| 5.3 | Company Returns; Transfer Taxes | | 27 |
| 5.4 | ██████████ Company Funding | | 27 |
| 5.5 | Parent Employment Package Documents | | 28 |
| 5.6 | Post-Signing Specified Bad Acts | | 29 |
| 5.7 | New Employees; Employee Communication | | 30 |
| 5.8 | ██████████ | | 31 |
| 5.9 | Director and Officer Liability | | 31 |
| 5.10 | Press Releases and Third Party Communications | | 32 |

**TABLE OF CONTENTS**

(CONTINUED)

**PAGE**

| | | | |
|---|---|---|---|
| SECTION 6. | | CONDITIONS PRECEDENT TO OBLIGATIONS OF PARENT, PURCHASER AND MERGER SUB | 32 |
| | 6.1 | Accuracy of Representations and Warranties | 32 |
| | 6.2 | Performance of Covenants | 33 |
| | 6.3 | Company Unitholder Approval | 33 |
| | 6.4 | Regulatory Approvals | 33 |
| | 6.5 | No Restraints | 33 |
| | 6.6 | No Litigation | 33 |
| | 6.7 | Employees | 34 |
| | 6.8 | No Post-Signing Specified Bad Acts | 34 |
| | 6.9 | ██████████████ | 34 |
| | 6.10 | Closing Date Allocation Schedule | 34 |
| | 6.11 | Exercise Notice | 34 |
| | 6.12 | No Company Material Adverse Effect | 34 |
| | 6.13 | Trucking Company Conditions | 34 |
| | 6.14 | Deliveries | 34 |
| SECTION 7. | | CONDITIONS PRECEDENT TO OBLIGATION OF THE COMPANY | 35 |
| | 7.1 | Accuracy of Representations | 35 |
| | 7.2 | Performance of Covenants | 35 |
| | 7.3 | Regulatory Approvals | 35 |
| | 7.4 | No Restraints | 35 |
| | 7.5 | Exercise Notice | 35 |
| | 7.6 | Required Unitholder Approval | 35 |
| | 7.7 | Trucking Company Conditions | 35 |
| | 7.8 | Deliveries | 35 |
| SECTION 8. | | TERMINATION | 36 |
| | 8.1 | Termination | 36 |
| | 8.2 | Effect of Termination | 38 |
| | 8.3 | Commercial Agreement | 38 |
| SECTION 9. | | MISCELLANEOUS PROVISIONS | 38 |
| | 9.1 | Amendment | 38 |
| | 9.2 | ██████ | 38 |
| | 9.3 | Waiver | 39 |

## TABLE OF CONTENTS
(CONTINUED)

**PAGE**

| | | | |
|---|---|---|---|
| 9.4 | Entire Agreement; Counterparts | | 39 |
| 9.5 | Applicable Law | | 39 |
| 9.6 | WAIVER OF JURY TRIAL | | 39 |
| 9.7 | Assignability | | 39 |
| 9.8 | Third Party Beneficiaries | | 40 |
| 9.9 | Notices | | 40 |
| 9.10 | Severability | | 41 |
| 9.11 | Specific Performance | | 41 |
| 9.12 | Construction | | 42 |
| 9.13 | Company Disclosure Schedules | | 43 |
| 9.14 | Limited Guarantee | | 44 |

LIST OF EXHIBITS

Exhibit A          Definitions
Exhibit B          Form of Company Unitholders' Written Consent
Exhibit C          Form of Certificate of Merger
Exhibit D          Letter of Transmittal
Exhibit E          ████████████████████
Exhibit F          Form of Unitholder Release Agreement
Exhibit G          ████████████████████████████████████████
Exhibit H          Commercial Agreement
Exhibit I          Reserved
Exhibit J          Company Operating Plan
Exhibit K          Form of Employment Package Documents
Exhibit L          Form of Purchaser Note
Exhibit M          Form of New Employee Attestation
Exhibit N          Post-Signing Specified Bad Acts
Exhibit O          Specified Claims
Exhibit P          ████████████████████████

## AGREEMENT AND PLAN OF MERGER

**THIS AGREEMENT AND PLAN OF MERGER** (as may be amended from time to time, this "**Agreement**") is made and entered into as of April 11, 2016 (the "**Agreement Date**"), by and among: Uber Technologies, Inc., a Delaware corporation ("**Parent**"); ███████████████████████████████ ("**Purchaser**"); Zing Merger Sub I, LLC, a Delaware limited liability company and a wholly-owned Subsidiary of Purchaser ("**Merger Sub**"); Ottomotto LLC, a Delaware limited liability company (the "**Company**"); and, Lior Ron (the "**Company Unitholder Representative**"), solely in his capacity as the Company Unitholder Representative.  Certain capitalized terms used in this Agreement are defined in Exhibit A.

**RECITALS**

A.      The Company was incorporated as a corporation pursuant to the General Corporation Law of the State of Delaware on January 15, 2016.

B.      Prior to the Agreement Date, the Company filed with the Secretary of State of the State of Delaware (i) a Certificate of Conversion from a Delaware corporation to a Delaware limited liability company and (ii) a Certificate of Formation under the Delaware Limited Liability Company Act (as amended, the "**Delaware LLC Act**").

C.      Contemporaneously with the execution of this Agreement, Parent and Purchaser have entered into that certain Agreement and Plan of Merger, dated of even date herewith (as amended or otherwise modified from time to time, the "**Trucking Merger Agreement**"), by and among Parent, Purchaser, Otto Trucking LLC, a Delaware limited liability company (the "**Trucking Company**"), and certain other parties signatory thereto, pursuant to which, among other things, Purchaser has agreed, subject to the terms and conditions of the Trucking Merger Agreement, to acquire (pursuant to a merger) all of the issued and outstanding equity interests of the Trucking Company.

D.      At such time, if any, that (i) Purchaser delivers a valid Call Exercise Notice during the Call Option Period or (ii) the Company delivers a valid Put Exercise Notice during the Put Option Period, as the case may be, Merger Sub will merge with and into the Company (the "**Merger**") in accordance with this Agreement and the Delaware LLC Act.  Upon consummation of the Merger, Merger Sub will cease to exist as a separate entity, and the Company will become a wholly-owned Subsidiary of Purchaser.

E.      The board of managers of Merger Sub and each of the board of directors (or an appropriate committee thereof) of Parent and Purchaser have approved this Agreement and approved the Merger.

F.      The board of managers of the Company (the "**Company Board**") has unanimously (i) determined that the Merger is advisable and fair to and in the best interests of the Company and the Company Unitholders, (ii) authorized and approved the execution, delivery and performance of this Agreement by the Company and approved the Merger, (iii) recommended the adoption of this Agreement and approval of the principal terms of the Merger by the Company Unitholders and (iv) directed that this Agreement be submitted for consideration by the Company Unitholders by written consent.

G.      Immediately following the execution and delivery of this Agreement, the Company will deliver to Purchaser a written consent in the form of Exhibit B attached hereto duly executed and delivered by holders of Company Common Units sufficient to constitute the Required Company Unitholder Vote (the "**Company Unitholders' Written Consent**").

AGREEMENT

The Parties to this Agreement, intending to be legally bound, agree as follows:

**SECTION 1.   DESCRIPTION OF TRANSACTION**

**1.1     Purchaser Call Option.**

**(a)**     Upon the terms and subject to the conditions set forth in this Agreement, the Company hereby grants to Purchaser the right, but in no circumstance the obligation (except in accordance with the Company's exercise of the Company Put Option pursuant to Section 1.2), to acquire all of the outstanding membership interests of the Company through the consummation of the Merger at any time during the Call Option Period (the "**Purchaser Call Option**").

**(b)**     From time to time during the Call Option Period, Purchaser may (in its sole discretion), but shall not be obligated to, exercise the Purchaser Call Option to cause the Merger to be consummated in accordance with the terms of this Agreement.  Such exercise of the Purchaser Call Option shall be made by Purchaser delivering to the Company (i) written notice of such exercise and (ii) a certificate executed by an officer of Purchaser to the effect that each of the conditions specified in Sections 7.1, 7.2 and 7.4 (solely to the extent that the condition set forth in Section 7.4 relates to Parent and its Affiliates) have been satisfied as of the date of such notice (as though the date of such notice was substituted for the Closing Date for each of such conditions) (collectively, a "**Call Exercise Notice**"). Promptly after, but in any event within five (5) Business Days of, Purchaser delivering the Call Exercise Notice, the Company shall deliver to Purchaser a certificate executed by an officer of the Company to the effect that each of the conditions specified in Sections 6.1, 6.2, 6.3, 6.5 (solely to the extent that the condition set forth in Section 6.5 relates to the Company and its Affiliates), 6.6(b), 6.6(c), 6.8, 6.9 and 6.12 have been satisfied as of the date of such certificate (as though the date of such certificate was substituted for the Closing Date for each of such conditions) (the "**Company Call Certificate**"). During the period from and after delivery of a Call Exercise Notice through the earlier of the Closing or withdrawal of such Call Exercise Notice in accordance with Section 1.1(c), the Company and Purchaser shall each use its commercially reasonable efforts to cause the Closing to occur as soon as reasonably practicable.

**(c)**     If, and only if, the Company Call Certificate has not been delivered within five (5) Business Days following Purchaser's delivery of the Call Exercise Notice to the Company pursuant to Section 1.1(b), Purchaser may withdraw such Call Exercise Notice at any time prior to the Closing (which, if withdrawn, shall cancel and nullify Purchaser's exercise of the Purchaser Call Option pursuant to any such Call Exercise Notice).  Purchaser's withdrawal of a Call Exercise Notice shall in no event (i) prevent Purchaser from delivering a subsequent Call Exercise Notice during the Call Option Period or (ii) result in any Liability to Parent, Purchaser, Merger Sub or any of their respective Affiliates or give rise to any claims by the Company or the Company Unitholders against Parent, Purchaser, Merger Sub or any of their respective Affiliates, for any reason.  For the avoidance of doubt, so long as Purchaser has delivered a Call Exercise Notice during the Call Option Period, the Closing may occur after the expiration of the Call Option Period in accordance with the terms of this Agreement, subject to Purchaser's right to withdraw such Call Exercise Notice before the Closing in accordance with this Section 1.1(c) and each Party's right to terminate this Agreement pursuant to Section 8.1(g).

**1.2     Company Put Option.**

**(a)**         Upon the terms and subject to the conditions set forth in this Agreement, Purchaser and Merger Sub hereby grant to the Company the right, but in no circumstance the obligation,

to cause Purchaser and Merger Sub to acquire all of the outstanding membership interests of the Company through the consummation of the Merger at any time during the Put Option Period (the "**Company Put Option**").

(b)      From time to time during the Put Option Period, the Company may (in its sole discretion), but shall not be obligated to, exercise the Company Put Option to cause the Merger to be consummated in accordance with the terms of this Agreement.  Such exercise shall be made by the Company delivering to Purchaser (i) written notice of such exercise and (ii) a certificate executed by an officer of the Company to the effect that each of the conditions specified in Sections 6.1, 6.2, 6.3, 6.5 (solely to the extent that the condition set forth in Section 6.5 relates to the Company and its Affiliates), 6.6(b), 6.6(c), 6.8, 6.9 and 6.12 have been satisfied as of the date of such notice (as though the date of such notice was substituted for the Closing Date for each of such conditions) (collectively, a "**Put Exercise Notice**").  Promptly after, but in any event within five (5) Business Days of, the Company delivering the Put Exercise Notice, Purchaser shall deliver to the Company a certificate executed by an officer of the Purchaser to the effect that each of the conditions specified in Sections 7.1, 7.2 and 7.4 (solely to the extent that the condition set forth in Section 7.4 relates to Parent and its Affiliates) have been satisfied as of the date of such notice (as though the date of such notice was substituted for the Closing Date for each of such conditions) (the "**Purchaser Put Certificate**").  During the period from and after delivery of a Put Exercise Notice through the earlier of the Closing or withdrawal of such Put Exercise Notice in accordance with Section 1.2(c), the Company and Purchaser shall each use its commercially reasonable efforts to cause the Closing to occur as soon as reasonably practicable.

(c)      If, and only if, the Purchaser Put Certificate has not been delivered within five (5) Business Days following the Company's delivery of the Put Exercise Notice to Purchaser pursuant to Section 1.2(b), the Company may withdraw such Put Exercise Notice at any time prior to the Closing (which, if withdrawn, shall cancel and nullify the Company's exercise of the Company Put Option pursuant to any such Put Exercise Notice).  The Company's withdrawal of a Put Exercise Notice shall in no event (i) prevent the Company from delivering a subsequent Put Exercise Notice during the Put Option Period or (ii) result in any Liability to the Company or give rise to any claims by Purchaser or Merger Sub against the Company, for any reason.  For the avoidance of doubt, so long as the Company has delivered a Put Exercise Notice during the Put Option Period, the Closing may occur after the expiration of the Put Option Period in accordance with the terms of this Agreement, subject to the Company's right to withdraw such Put Exercise Notice before the Closing in accordance with this Section 1.2(c) and each Party's right to terminate this Agreement pursuant to Section 8.1(g).

**1.3      The Merger; Effect of the Merger.**

(a)      In the event that (i) Purchaser exercises (and does not withdraw in accordance with Section 1.1(c)) the Purchaser Call Option or (ii) the Company exercises (and does not withdraw in accordance with Section 1.2(c)) the Company Put Option, in each case, upon the terms and subject to the conditions set forth in this Agreement (including Sections 6 and 7), at the Effective Time, the Merger Sub shall merge with and into the Company in accordance with the Delaware LLC Act, whereupon the separate existence of the Merger Sub shall cease and the Company shall continue as the surviving company in the Merger (the "**Surviving Company**") and as a wholly owned subsidiary of Purchaser.

(b)      At the Closing, subject to the provisions of this Agreement, the Company and the Merger Sub shall cause a certificate of merger substantially in the form of <u>Exhibit C</u> attached hereto (the "**Certificate of Merger**") to be executed, acknowledged and filed with the Secretary of State of the State of Delaware and shall make all other filings or recordings required by the Delaware LLC Act in connection with the Merger.  The Merger shall become effective at such time (the "**Effective Time**") as the Certificate of Merger is duly filed with the Secretary of State of the State of Delaware in accordance

with the Delaware LLC Act or at such later time as Purchaser and the Company mutually agree and specify in the Certificate of Merger.

(c)     From and after the Effective Time, the Surviving Company shall succeed to all the assets, rights, privileges, powers and franchises and be subject to all of the liabilities, restrictions, disabilities and duties of the Company and the Merger Sub, all as provided under the Delaware LLC Act.

1.4     **Closing; Effective Time.**  The consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place (a) at the San Francisco offices of Cooley LLP, at 10:00 a.m. local time on a date to be mutually agreed by the Parties (the "**Closing Date**"), which shall be no later than the third Business Day after the satisfaction or waiver of the last to be satisfied or waived of the conditions set forth in Section 6 and Section 7 (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) or (b) at such other date, time or place as may be mutually agreed by the Parties in writing.

1.5     **Organizational Documents of the Surviving Company; Managers and Officers**.

(a)     Unless otherwise determined by Purchaser prior to the Effective Time, to the extent permissible under applicable Law, the certificate of formation and the limited liability company agreement of the Surviving Company shall be amended and restated as of the Effective Time to be identical to the certificate of formation and the limited liability company agreement of the Merger Sub as in effect immediately prior to the Effective Time, as applicable, until thereafter amended in accordance with applicable Law and as provided in such certificate of formation and limited liability company agreement; *provided,* that at the Effective Time, the certificate of formation and the limited liability company agreement of the Surviving Company shall be amended to change the name of the Surviving Company to "Ottomotto LLC".

(b)     At the Effective Time, each member of the Company Board shall resign and the managers of the Merger Sub immediately prior to the Effective Time shall become the managers of the Surviving Company and shall hold office subject to the applicable provisions of the limited liability company agreement of the Surviving Company.

(c)     At the Effective Time, the Company's officers shall resign and the officers of the Merger Sub (if any) immediately prior to the Effective Time shall become the officers of the Surviving Company and shall hold office subject to the applicable provisions of the limited liability company agreement of the Surviving Company.

1.6     **Conversion of Company Common Units.**  Subject to the terms and conditions of this Agreement (including Section 1.8), at the Effective Time, by virtue of the Merger and without any further action on the part of Purchaser, Merger Sub, the Company or any Company Unitholder:

(a)     any Company Common Units then held by the Company prior to the Effective Time shall be canceled and extinguished and shall cease to exist, and no consideration shall be delivered in exchange therefor;

(b)     each Company Common Unit (and the membership interests represented thereby) issued and outstanding immediately prior to the Effective Time (including each Company Restricted Unit, which vesting shall be accelerated in full by the Company Board as of immediately prior to the Effective Time in accordance with Section 1.11) and all rights in respect thereof shall, by virtue of the Merger and without any action on the part of the holder thereof, cease to exist and shall be automatically converted

4

into and represent solely the right to receive an amount of cash equal to the Per Unit Merger Consideration in accordance with Section 1.8; and

(c)      each membership interest of the Merger Sub (a "**Merger Sub Interest**") issued and outstanding immediately prior to the Effective Time shall be converted into membership interests in the Surviving Company, as such membership interests are provided for by the limited liability company agreement of the Surviving Company.  As of the Effective Time, the Merger Sub Interests shall no longer be outstanding and shall automatically be canceled and shall cease to exist, and the holder of such membership interests shall cease to have any rights with respect thereto, except the right to receive membership interests in the Surviving Company to be issued in consideration therefor as provided herein, without interest.  As of the Effective Time, Purchaser shall be the holder of all the issued and outstanding membership interests of the Surviving Company.

1.7      **Further Proceeding.**  If, at any time after the Effective Time, any further action is necessary or desirable to carry out the purposes of this Agreement and the other agreements contemplated hereby or to vest the Surviving Company with full right, title and possession of and to all rights, property, privileges, power and franchises of Merger Sub and the Company, the officers, directors and managers of the Surviving Company and Purchaser are fully authorized in the name of the Company and Merger Sub to take all such action, so long as such action is not inconsistent with this Agreement.

1.8      **Exchange/Payment.**

(a)      At or promptly after the Closing Date, Purchaser shall pay (or cause to be paid) cash in the amount of the Merger Consideration to the Company Unitholders (which amount shall be payable in accordance with the Closing Date Allocation Schedule to the Company Unit Holders who deliver Executed Letters of Transmittal pursuant to this Section 1.8(a)).  In no event later than one Business Day after the Effective Time, Purchaser or the Company Unitholder Representative shall deliver to each holder of Company Common Units immediately prior to the Effective Time a letter of transmittal substantially in the form attached hereto as Exhibit D.  Upon delivery of a duly executed letter of transmittal that has been completed in accordance with the instructions thereto, and such other customary documents (including certificates evidencing Company Common Units, if any) as may reasonably be required by the Company Unitholder Representative and Purchaser (each, an "**Executed Letter of Transmittal**"), the holder of such Company Common Units shall be entitled to receive in exchange therefor the applicable portion of the Merger Consideration for each Company Common Unit held by such Person as of immediately prior to the Effective Time as set forth on the Closing Date Allocation Schedule.  Promptly, but in no event more than three (3) Business Days, following the receipt by the Company Unitholder Representative of an Executed Letter of Transmittal, the Company Unitholder Representative shall deliver a copy of such Executed Letter of Transmittal to Purchaser.  For the avoidance of doubt, no holder of Company Common Units shall receive such holder's applicable portion of the Merger Consideration until Parent has received from the Company Unitholder Representative a copy of such holder's Executed Letter of Transmittal.

(b)      Any portion of the Merger Consideration payable in accordance with this Agreement that remains undistributed to holders of Company Common Units as of six months after deposit (if any) with the Payment Agent, shall be delivered to Purchaser upon demand, and any holders of Company Common Units who have not theretofore delivered a duly Executed Letter of Transmittal in accordance with this Section 1.8 shall thereafter, subject to the provisions of this Agreement, look only to Purchaser for satisfaction of their claims for the cash amounts payable in accordance with this Agreement. If any Company Common Units shall not have been surrendered immediately prior to such time as such amounts would otherwise escheat to or become property of any Governmental Body, any such portion of the Merger Consideration remaining unclaimed by holders of Company Common Units and all

investment proceeds thereon, if any, shall, to the extent permitted by applicable Law, become the property of the Surviving Company free and clear of any claims or interest of any Person previously entitled thereto.

(c)     Prior to the Closing, Parent may select a reputable bank or trust company to act as payment agent for the distribution of the Merger Consideration to the Company Unitholders in accordance with this Section 1.8 (the "**Payment Agent**").

(d)     None of Parent, Purchaser or the Surviving Company shall be liable to any Company Unitholder with respect to any cash amounts properly delivered to any public official pursuant to any applicable abandoned property, escheat or similar Law.

(e)     Notwithstanding anything to the contrary in this Agreement, Parent, Purchaser, the Payment Agent, the Company, the Surviving Company, the Company Unitholder Representative and each of their respective agents will be entitled to deduct and withhold, or cause to be deducted and withheld, from the consideration otherwise payable under this Agreement to any holder (or former holder) of equity interests in the Company such amounts that it is required to deduct and withhold under the Code or any other Tax Law.  To the extent that amounts are so withheld and properly paid over to the applicable Governmental Body, any withheld amounts will be treated as having been paid to the applicable holder (or former holder) of equity interests in the Company.

**1.9     Appraisal and Dissenters' Rights.**  No holder of equity interests in the Company shall be entitled to any "dissenter's rights," "appraisal rights" or any similar remedies under the Delaware LLC Act or any other applicable Law in connection with the consummation of the transactions contemplated by this Agreement, including the Merger.  Following the Effective Time, each Company Unitholder shall be entitled only to the right to receive the appropriate portion of the Closing Merger Consideration payable in respect of such Company Unitholder's Company Common Units pursuant to the terms and conditions of this Agreement.

**1.10     No Interest**.  All payments made pursuant to this Agreement by or on behalf of Purchaser shall be paid without interest thereon.

**1.11     Company Restricted Units**.  Prior to the Closing, the Company shall take all necessary actions to accelerate the vesting of each Company Restricted Unit outstanding as of immediately prior to the Effective Time so that each such Company Restricted Unit is fully vested as of the Effective Time.

**SECTION 2.     REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

Except as set forth in the disclosure schedules delivered by the Company on the Agreement Date (the "**Company Disclosure Schedules**"), subject to Section 9.13, the Company makes the following representations and warranties to Parent, Purchaser and Merger Sub:

**2.1     Due Formation.**  The Company is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all necessary corporate power and authority to conduct the Business.  The Company is qualified to do business as a foreign company, and is in good standing, under the Laws of each state or other jurisdiction where the nature of its business requires such qualification, except where the failure to be so qualified or in such good standing would not result, or is not reasonably likely to result in material Liability to the Company.  On April 6, 2016, the Company converted from a Delaware corporation to a Delaware limited liability company in accordance with all applicable Laws (including the Delaware LLC Act).

**2.2** **Organizational Documents.** The Company has heretofore made available to the Purchaser complete and correct copies of its Organizational Documents as in effect through and including the date hereof. The Company is not in default under or in violation of any provision of its Organizational Documents. The Company is not a party to, or bound by, any Contract (including any Organizational Document) that entitles any Company Unitholder or other holder of Equity Participations in the Company to any "dissenter's rights," "appraisal rights" or any similar remedies under the Delaware LLC Act or any other applicable Law. Prior to the Agreement Date, the Company has taken all actions required under Section 17711.13(b) of the California Revised Uniform Limited Liability Company Act ("**CRULLCA**") to cause Article 11 of the CRULLCA not to apply to the Company or any of the outstanding membership interests of the Company.

**2.3** **Capitalization, Etc.**

(a)     Section 2.3(a) of the Company Disclosure Schedules accurately sets forth the number and class of Company Common Units that are issued and outstanding as of the Agreement Date. As of the Agreement Date, all such Company Common Units are owned of record by the Company Unitholders in the amounts set forth opposite each Company Unitholder's name on Section 2.3(a) of the Company Disclosure Schedules (on a class by class basis). None of the Company Common Units are represented by certificates or other instruments (other than the Company LLC Agreement), and all of the rights, preferences, privileges and restrictions of each class of Company Common Units are as stated in the Company LLC Agreement. Except for (i) the Company Common Units set forth on Section 2.3(a) of the Company Disclosure Schedules, (ii) the promissory notes set forth on Section 2.3(d) of the Company Disclosure Schedules, and (iii) any Purchaser Notes that may be issued during the Pre-Closing Period pursuant to Section 5.4, the Company does not have any other Equity Participations outstanding as of the Agreement Date. Other than the Company LLC Agreement, there are no voting trusts, proxies or any other agreements or understandings with respect to the voting of the Company Common Units. The Company is not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any Company Common Units.

(b)     All of the outstanding Company Common Units have been duly authorized and validly issued, and are fully paid and nonassessable and have been issued and granted in compliance with all applicable Laws, including securities and "blue sky" Laws, and the Company's Organizational Documents. All holders of Company Common Units are current employees of the Company. To the Company's Knowledge, no holder of Company Restricted Units has failed to timely make an election with the Internal Revenue Service under Section 83(b) of the Code with respect to such Company Restricted Units.

(c)     Except as set forth in the Company LLC Agreement, no Company Common Units are subject to any Liens (other than Permitted Encumbrances), co-sale rights, "drag-along rights", preemptive rights, rights of first refusal or other rights to purchase, register or transfer such securities (whether in favor of the Company or any other Person). The Company has no Liability for dividends accrued or declared but unpaid. As a result of the Merger, upon the Effective Time, Purchaser will be the sole record and beneficial holder of all issued and outstanding Equity Participations of the Company and all rights to acquire or receive any Equity Participations of the Company, whether or not such Equity Participations are outstanding.

(d)     Other than as set forth in Section 2.3(d) of the Company Disclosure Schedules, as of the Agreement Date, there is no Company Debt outstanding.

**2.4     Subsidiaries.**  The Company does not own or hold the right to acquire any stock, partnership interest or joint venture interest or other Equity Participation in any other Person.

**2.5     Absence of Certain Changes.**  During the period beginning on January 15, 2016 and ending on the Agreement Date: (a) there has been no event or series of related events that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect and (b) no event or action has occurred that would constitute a breach of the covenants set forth in Section 4.2 if such event or action occurred during the Pre-Closing Period.

**2.6     Assets.**  The Company has good and valid title to, or, in the case of leased assets, valid leasehold interests in, all of its tangible assets, used or held for use in the Business, free and clear of any Liens, other than Permitted Encumbrances.  Section 2.6 of the Company Disclosure Schedules sets forth a complete and accurate list as of the Agreement Date of all tangible assets owned by the Company with an original purchase price of $50,000 or greater.

**2.7     Real Property; Leasehold**.  The Company does not own, and has never owned, any real property, and the Company does not own any interest in real property, except for the leaseholds created under the real property leases identified in Section 2.7 of the Company Disclosure Schedules.  The Company is in compliance with such real property leases, and has a valid and subsisting leasehold interest in all real property leased by it, in each case free and clear of all Liens, other than Permitted Encumbrances. The Company has not granted any other Person the right to occupy or use any premises which are the subject of such real property leases.

**2.8     Intellectual Property.**

(a)     Section 2.8(a) of the Company Disclosure Schedules sets forth a true and complete list of all (i) Intellectual Property owned by the Company or which the Company purports to own or that is exclusively licensed to the Company that is Registered (including Domain Names) (the **"Registered IP"**), indicating for each such item, as applicable, the application or registration number, date and jurisdiction of filing or issuance, and the identity of the current applicant or registered owner, (ii) unregistered and common law Trademarks owned by the Company or which the Company purports to own and (iii) all material Copyrights and Software owned by the Company or which the Company purports to own.  The Company owns and possesses all Company Intellectual Property, and has sufficient rights to use pursuant to a valid and enforceable written Contract all Licensed Intellectual Property used in the operation of the Business.

(b)     The consummation of the Merger and the other transactions contemplated hereby will not adversely affect any of the Company's rights to any Company Intellectual Property, and all such Intellectual Property will be (as applicable) owned or available for use by the Company on identical terms and conditions immediately subsequent to the consummation of the Merger and other transactions contemplated hereby, without the payment of any additional consideration in connection therewith.

(c)     The Company Intellectual Property, the conduct of the Company's business as currently conducted, and the conduct of the Company's business since the inception thereof, does not and has not infringed upon, misappropriated, or otherwise violated or made unlawful use of (and, when conducted following the Closing in substantially the same manner, will not infringe upon, misappropriate, or otherwise violate or make unlawful use of) any Intellectual Property rights of any Third Party; *provided*, that with respect to Patents, such representation is made only to the Company's Knowledge.  The

8

Company has not received any written charge, complaint, claim, demand, notice or other written communication alleging any such infringement, misappropriation or violation (including any claim that the Company must take a license to or refrain from using any Intellectual Property rights of any Third Party or of the Company Intellectual Property). To the Company's Knowledge, no Third Party has infringed upon, misappropriated, or otherwise violated or made unlawful use of any Company Intellectual Property or Licensed Intellectual Property or is currently doing so.

        **(d)**      With respect only to the Intellectual Property owned by the Company or which it purports to own ("**Company Intellectual Property**"):

        **(i)**      other than as set forth in Section 2.8(d)(i) of the Company Disclosure Schedules, the Company (to its Knowledge) exclusively owns and possesses all right, title and interest in and to the Company Intellectual Property, free and clear of any mortgage, pledge, Lien, or other restriction or limitation regarding use or disclosure, other than Permitted Encumbrances. Section 2.8(d)(i) of the Disclosure Schedules sets forth any and all Contracts pursuant to which any the Company has granted any Third Party licenses or other contractual rights with respect to the Company Intellectual Property;

        **(ii)**      to the Company's Knowledge, the Company Intellectual Property is valid, enforceable and subsisting and currently in material compliance with any and all formal legal requirements necessary to maintain the validity and enforceability thereof;

        **(iii)**      the Company Intellectual Property is not subject to any outstanding Proceeding;

        **(iv)**      all fees, annuities, renewals and other payments due to a Governmental Body with respect to the filing, prosecuting, issuing, recording, registering or maintaining the Company Intellectual Property that is Registered IP that were due prior to the Agreement Date have been paid in full, and Section 2.8(d)(iv) of the Disclosure Schedules sets forth a true and complete list of all applicable filings, recordings and other acts, and all fees, Taxes and other payments, that are required to be made within 180 days after the Agreement Date to maintain the validity and enforceability of such Company Intellectual Property and the Company's interest therein;

        **(v)**      the ownership of the entire right, title and interest in and to all Company Intellectual Property that is Registered IP is properly recorded with the applicable Governmental Body solely in the name of the Company;

        **(vi)**      no action, hearing, charge, complaint, claim or demand is pending or asserted or to the Company's Knowledge, threatened in writing by a Third Party (other than the U.S. Patent and Trademark Office, U.S. Copyright Office, or any foreign equivalent Governmental Body) against the Company which challenges the legality, validity, enforceability, use or ownership of the Company Intellectual Property;

        **(vii)**      no Company Intellectual Property is or has been involved in any interference, opposition, reissue, reexamination, revocation, or equivalent Proceeding before any Governmental Body (including without limitation the U.S. Patent and Trademark Office, U.S. Copyright Office, or any foreign equivalent Governmental Body), in which the scope, validity or enforceability of any such Company Intellectual Property is being or has been contested or challenged, and to the Company's Knowledge, no such Proceeding has been threatened with respect to any Company Intellectual Property, nor is there any reasonable basis for such Proceeding;

**(viii)**      no loss or expiration of the Company Intellectual Property is pending or reasonably foreseeable, except for Patents, Copyrights or Trademarks expiring at the end of their statutory terms (and not as a result of any intentional act or omission by the Company, including, an intentional failure by the Company to pay any required maintenance fees).

**(e)**      With respect to any Intellectual Property that any Third Party owns or purportedly owns and that the Company uses under any Contract to which the Company is a party (the "**Licensed Intellectual Property**"):

**(i)**      Section 2.8(e)(i) of the Disclosure Schedules sets forth, as of the Agreement Dateeach Contract granting or purporting to grant the Company the right to use anyLicensed Intellectual Property, other than licenses to use Commercial Software (the "**IP Agreements**") and specifically identifies the parties thereto and whether such IP Agreement grants exclusive rights (including exclusive rights in any field of use), and each such IP Agreement is legal, valid, binding and enforceable against the Company and, to the Company's Knowledge, all other parties thereto;

**(ii)**      the Company is not and, to the Company's Knowledge, no other party to the IP Agreements is, in breach or default thereof, and no event has occurred which with written notice or lapse of time would reasonably be expected to constitute a breach or default or permit termination or modification thereunder;

**(iii)**      the Company has not and no other party to the IP Agreements has repudiated in writing any provision of any IP Agreement;

**(iv)**      to the Company's Knowledge, all Licensed Intellectual Property is valid, enforceable and subsisting and each of the Company and the licensors thereof are currently in compliance with any and all formal legal requirements necessary to maintain the validity and enforceability thereof;

**(v)**      to the Company's Knowledge, no Licensed Intellectual Property is subject to any outstanding injunction, judgment, order, decree, or ruling;

**(vi)**      no action, hearing, charge, complaint, claim or demand is pending or asserted or threatened against the Company, or, to the Company's Knowledge, any Third Party which challenges the legality, validity, enforceability, use or ownership of the Licensed Intellectual Property or which claims or asserts that the Company's use of the Licensed Intellectual Property is in conflict with the terms of any Third Party license or other Contract;

**(vii)**      the Licensed Intellectual Property that is exclusively licensed to the Company is not, and to the Company's Knowledge, no other Licensed Intellectual Property is or has been involved in any interference, opposition, reissue, reexamination, revocation, or equivalent Proceeding, in which the scope, validity or enforceability of any such Licensed Intellectual Property is being or has been contested or challenged, and to the Company's Knowledge, no such Proceeding has been threatened with respect to any Licensed Intellectual Property; and

**(viii)**      the Company has not granted any sublicense or similar right with respect to the Licensed Intellectual Property, except with respect to Third Parties providing services to the Company.

**(f)**      Except (i) for any fees payable to a Governmental Body to issue, register or maintain any of the Company Intellectual Property, and (ii) for any licensing fees payable in connection with the licensing of the Licensed Intellectual Property in accordance with the terms of the Contracts

therefor, no payment of any kind is required to be made to any Person in connection with the ownership by the Company of the Company Intellectual Property or to any Person in connection with the use or practice by the Company of any Licensed Intellectual Property.

(g)    All past and present officers and employees of the Company and consultants and independent contractors of the Company who have contributed to the creation or development of Intellectual Property for the Company have executed and delivered to the Company written agreements pursuant to which such individuals have assigned to the Company all their rights in and to all Intellectual Property they may conceive, reduce to practice, create or otherwise develop in the course of their employment or engagement with the Company, and, to the Company's Knowledge, no party thereto is in breach or default of any such Contract.  No manager, director, officer, equityholder, employee, consultant, contractor, agent or other representative of the Company owns or, to the Company's Knowledge, claims any rights in (nor has any of them filed an application claiming any rights in) any Company Intellectual Property.

(h)    The Company has taken adequate measures, consistent with commercially reasonable practices in the industry in which the Company operates, to protect the confidential and proprietary nature of all Trade Secrets owned by the Company or by Third Parties and in the Company's possession.  All past and present officers, employees, consultants and independent contractors of the Company with access to the Company's Trade Secrets are parties to written agreements under which each such individual is obligated to maintain the confidentiality of confidential information of the Company. To the Company's Knowledge, none of such individuals are in violation of the agreements described in this Section 2.8(h).

(i)    No Governmental Body, educational institution or non-profit entity has provided any funding to the Company for, or facilities or equipment used by the Company in, the conception, reduction to practice, creation or development of any of the Company Intellectual Property; and, to the Company's Knowledge, no Governmental Body, educational institution or non-profit entity provided any funding for, or facilities or equipment used in, the conception, reduction to practice, creation or development of any of the Licensed Intellectual Property.  No Governmental Body, educational institution or non-profit entity claim or have a right to claim any ownership, right to practice or other interest in any of the Company Intellectual Property or any of the Licensed Intellectual Property under the IP Agreements.  No employee, consultant, contractor, agent or other representative of the Company who was involved in, or who contributed to, the conception, reduction to practice, creation or development of any of the Company Intellectual Property was performing services for any Governmental Body, educational institution or non-profit entity during the time such employee or contractor was providing services on behalf of or to the Company.

(j)    No Software owned or purportedly owned by the Company or, to the Company's Knowledge, owned by a third party and used by the Company in the operation of the Business includes any undisclosed disabling codes or instructions that permit unauthorized access or the unauthorized disruption or disablement of such Software.

(k)    The information technology systems of the Company, including the relevant software and hardware have not suffered any material failure or security breach since inception.

(l)    The Company is and since inception has been in compliance with any applicable Privacy Law and other Laws or regulations relating to personally identifiable information.  The Company has not received any claims from any Person (i) requesting any compensation from the Company for the loss of or unauthorized disclosure or transfer of personal data or information, or (ii) asserting a breach of any Privacy Law or any such procedure or policy.

11

(m)     The Company has made available to Purchaser any written opinion or written evaluation of its intellectual property counsel which has been prepared at the Company's request regarding the potential or actual infringement of Third Party Intellectual Property, or the invalidity or unenforceability of any Intellectual Property.

(n)     Neither the execution, delivery or performance of this Agreement nor the consummation of any of the transactions contemplated hereby will, under any Contract to which the Company is a party, result in or give any other Person the right or option to cause: (i) a loss of rights in or the creation of a Lien on any Company Intellectual Property, or Licensed Intellectual Property or, except pursuant to Contracts of the Company in effect as of the Agreement Date that the Company has made available to Purchaser as of the Agreement Date, any Intellectual Property that is owned by or licensed to the Purchaser or any of its Affiliates prior to the Closing; (ii) the release, disclosure or delivery of any Company Intellectual Property or Licensed Intellectual Property by any escrow agent to any other Person; or (iii) the grant, assignment or transfer to any other Person of any license, ownership interest or covenant-not-to-sue under, in or to any of the Company Intellectual Property, Licensed Intellectual Property or, except pursuant to Contracts of the Company in effect as of the Agreement Date that the Company has made available to Purchaser as of the Agreement Date, any Intellectual Property that is owned by or licensed to the Purchaser or any of its Affiliates prior to the Closing.

(o)     Section 2.8(o) of the Disclosure Schedules sets forth, as of the Agreement Date, each item of Public Software that is or was used in any Company Intellectual Property or Company Products. No Company Intellectual Property or Company Product has been or is being distributed, in whole or in part, or was used, or is being used, in conjunction with any Public Software in a manner which may or would require that all or any portion of such Company Intellectual Property or Company Product be disclosed or distributed in source code form and/or made available at no charge.  "**Public Software**" shall mean any software that contains, or is derived in any manner (in whole or in part) from, any software that is distributed as free software, open source software or similar licensing or distribution models, including software licensed or distributed under any of the following licenses or distribution models, or licenses or distribution models similar thereto: (i) GNU's General Public License (GPL) or Lesser/Library GPL (LGPL), (ii) the MIT License, (iii) the Mozilla Public License, (iv) the BSD License, and (v) the Apache License.

2.9     **Export Control Legal Requirements.**  The Company has conducted its export and re-export transactions in accordance with (a) all applicable U.S. export and re-export control Laws, including the Export Administration Regulations maintained by the U.S. Department of Commerce, trade and economic sanctions maintained by the Treasury Department's Office of Foreign Assets Control, and the International Traffic in Arms Regulations maintained by the Department of State and (b) all other applicable import/export controls in other countries in which the Company conducts business.

2.10     **Material Contracts.**  Section 2.10 of the Company Disclosure Schedules lists all of the Material Contracts in effect as of the Agreement Date.  As of the Agreement Date, the Company has delivered or otherwise made available to Purchaser or its counsel a correct and complete copy of each Material Contract, together with all amendments, waivers or other changes thereto. Section 2.10 of the Company Disclosure Schedules contains an accurate and complete description of all material terms of all oral Material Contracts referred to therein.  The Company is not in breach of, or default under, any Material Contract, and no event or circumstance has occurred that, with notice or lapse of time or both, would constitute any event of default under any Material Contract and each Material Contract is valid, binding, enforceable and in full force and effect as it relates to the Company and, to the Company's Knowledge, as it relates to the other parties thereto, in each case, subject to (i) Laws of general application relating to bankruptcy, insolvency and the relief of debtors, and (ii) rules of Law governing specific performance, injunctive relief and other equitable remedies.  No event has occurred that with the

12

passage of time or the giving of notice or both would result in a material default, breach or event of noncompliance by the Company or, to the Company's Knowledge, any other party under any a Material Contract.

**2.11    Liabilities.**  The Company does not have any Liabilities other than: (a) those incurred pursuant to or in connection with the execution, delivery or performance of this Agreement and the transactions contemplated hereby; (b) those relating to the performance of the Material Contracts identified in Section 2.10 of the Company Disclosure Schedules (none of which arose out of, in connection with or as a result of any breach of Contract); (c) those incurred in accordance with the Company Operating Plan (none of which arose out of, in connection with or as a result of any breach of Contract, tort or infringement of Intellectual Property); (d) those Liabilities incurred in the Ordinary Course of Business; or (e) those Liabilities that are set forth on the face of the Company Historical Financial Statements (none of which arose out of, in connection with or as a result of any breach of Contract, tort or infringement of Intellectual Property).

**2.12    Compliance with Laws.**  The Company is in material compliance with all applicable Laws.  The Company is in material compliance with each approval, permit, license, registration, exemption, consent, certificate and authorization of a Governmental Body that the Company has obtained for the operation by the Company of the Business (each, a "**Company Permit**"), and all of such Company Permits are valid and in full force and effect.  No Governmental Body has provided any written notice that it intends to limit, suspend, revoke or modify any such Company Permit.

**2.13    Certain Business Practices.**  The Company, the officers, mangers, directors, Employees, and agents of the Company, and any other Person acting on behalf of the Company (a) has not used and is not using any funds for any unlawful contributions, unlawful gifts, unlawful entertainment or other unlawful expenses; (b) has not made any direct or indirect unlawful payments to any foreign or domestic Government Official or health care professional; (c) has not violated and is not violating any Anti-Corruption Laws; (d) has not established or maintained, and is not maintaining, any unlawful or unrecorded fund of monies or other properties; (e) has not made, and is not making, any false, misleading, or fictitious entries on its accounting books and records; (f) has not made or received, and is not making or receiving, any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of any nature, or paid or paying any fee, commission or other payment that has not been properly recorded on the Company's accounting books and records as required by the Anti-Corruption Laws; and (g) has not otherwise given or received anything of value to or from any Person for the purpose of obtaining or retaining business or to secure an improper advantage.

**2.14    Tax Matters.**

(a)    Each return (including any information return), report, statement, declaration, estimate, schedule, notice, notification, form, election, certificate or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Entity in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Legal Requirement relating to any Tax, including any amendment thereof or attachment thereto (each, a "**Tax Return**") required to be filed by or on behalf of the Company with any Governmental Body on or before the Closing Date (the "**Company Returns**"):  (i) have been filed on or before the applicable due date (including any extensions of such due date); and (ii) have been prepared in all material respects in compliance with all applicable Law.  All Taxes of any the Company that are due and payable have been timely paid.

(b)    The Company will establish reserves adequate for the payment of all Taxes payable by the Company for the period from the date of formation through the Closing Date, and the

Company will disclose the dollar amount of such reserves to Purchaser on or prior to the Closing Date. The Company has not received from any Governmental Body any: (i) written notice indicating an intent to open an audit or other review; (ii) written request for information related to Tax matters; or (iii) notice of deficiency or proposed Tax adjustment. No Proceeding is pending or, to the Knowledge of the Company, threatened against the Company in respect of any Tax. There are no Liens for Taxes upon any of the assets of the Company in respect of any Tax (except for Permitted Encumbrances).

(c)     To the knowledge of the Company, no Person holds shares of Company Common Units that are non-transferable and subject to a substantial risk of forfeiture within the meaning of Section 83 of the Code with respect to which a valid election under Section 83(b) of the Code has not been made.

(d)     The Company has not consummated or participated in any transaction which was or is a "tax shelter" as defined in Section 6662 of the Code or the Treasury Regulations promulgated thereunder. The Company has never participated in, nor is currently participating in, a "Listed Transaction" or a "Reportable Transaction" within the meaning of Section 6707A(c) of the Code or Treasury Regulation Section 1.6011-4(b), or any transaction requiring disclosure under a corresponding or similar provision of state, local, or non-U.S. Legal Requirement.

(e)     There is no agreement, plan, arrangement or other Contract that, considered individually or considered collectively with any other such Contracts (or any other event(s), condition(s) or circumstance(s)), could give rise directly or indirectly to any payment or benefit in connection with the transactions contemplated by this Agreement, all or any portion of which would not be deductible pursuant to Section 280G of the Code (excluding for this purpose the applicability of Section 280G(b)(5) of the Code). The Company is not, nor has it ever, been a party to or bound by any Tax indemnity agreement, sharing agreement, allocation agreement or similar Contract. The Company has no Liability for the Taxes of any Person under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or foreign Law) as a transferee or successor, by Contract or otherwise.

(f)     The Company (i) has complied with all applicable Laws relating to the payment, reporting and withholding of Taxes (including withholding of Taxes pursuant to Sections 1441, 1442, 1445 and 1446 of the Code or similar provisions under any non-U.S. Legal Requirement), (ii) has, within the time and in the manner prescribed by applicable Law, withheld from Employee wages or consulting compensation or other payments to third parties and timely paid over to the proper Governmental Bodies (or is properly holding for such timely payment) all amounts required to be so withheld and paid over under all applicable Laws, including U.S. federal and state income and employment Taxes, Federal Insurance Contribution Act, Medicare, Federal Unemployment Tax Act, and relevant non-U.S. income and employment Tax withholding Laws and (iii) has timely filed all withholding Tax Returns, for all periods.

(g)     The Company has never ever been a member of an affiliated, combined, consolidated or unitary group (including within the meaning of Code §1504(a)) filing a consolidated federal income Tax Return

(h)     The Company does not have any Liability to provide any gross-up of, or any similar payments with respect to, any Tax imposed by Section 409A or Section 4999 of the Code, and each applicable Company Employee Plan is and has been, at all applicable times, in documentary and operational compliance with Section 409A of the Code.

14

**2.15    Employee Benefit Plans and Employee Matters.**

**(a)**    Section 2.15(a) of the Disclosure Schedule sets forth a true and complete list of all Company Employee Plans as of the Agreement Date.  The Company has no written or unwritten legally binding commitment to establish any new Company Employee Plan or modify any existing Company Employee Plan.  No Company Employee Plan is subject to the laws of any jurisdiction outside the United States.

**(b)**    Each Company Employee Plan has been maintained, administered and operated in material compliance with its terms and with all applicable Laws. Each Company Employee Plan that is intended to be qualified under Section 401(a) of the Code either (i) has received a favorable determination letter or opinion letter from the IRS stating that such Company Employee Plan is so qualified, and, to the Company's Knowledge, no fact exists that would prevent continued reliance on any such letter, or (ii) still has a remaining period of time in which to apply for or receive such letter and to make any amendments necessary to obtain a favorable determination, the deadline of which is included in Section 2.15(b) of the Disclosure Schedule.  There has not been any non-exempt prohibited transaction (within the meaning of Sections 406 and 408 of ERISA or Section 4975 of the Code) with respect to any Company Employee Plan.

**(c)**    Neither the Company nor the Company's ERISA Affiliates, maintains, contributes to, is obligated to contribute to, or ever has maintained, contributed to, been obligated to contribute to, or withdrawn from, any employee benefit plan subject to Title IV of ERISA, any pension plan subject to the funding standards of Section 302 of ERISA or Section 412 of the Code, any "multiemployer plan" as defined in Section 3(37) of ERISA or Section 414(f) of the Code, any "multiple employer plan" within the meaning of Section 210(a) of ERISA or Section 413(c) of the Code or any "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.   The obligations of all Company Employee Plans that provide health, welfare or similar insurance are and have always been fully insured by third-party insurers.

**(d)**    Except as required by applicable provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended (and any similar state Laws) or benefits in the nature of severance pay pursuant to one or more employment agreements set forth on Section 2.15(a) of the Disclosure Schedule, the Company is not obligated to, and does not, provide retiree or post-employment welfare benefits (including medical, disability, or life insurance benefits) to any Employee.

**(e)**    Neither the execution and delivery of this Agreement nor the transactions contemplated herein (either alone or in combination with any other event that would not in and of itself trigger such payment or benefit) will (i) result in any payment becoming due to any Employee (including, for the avoidance of doubt, any change of control or other transaction bonus, including any "double-trigger" bonus); (ii) increase any benefits under any Company Employee Plan; (iii) result in acceleration or forgiveness of indebtedness with respect to any Employee; or (iv) result in the acceleration of the time of payment, vesting or funding of any such benefit under any Company Employee Plan; except in each case pursuant to the terms of any Employment Package Document or Parent Restricted Stock Award. The Company is not a party to or otherwise bound by any agreement that provides any Employee with eligibility for severance benefits.  Each Company Employee Plan can be amended, terminated or otherwise discontinued after the Effective Time in accordance with its terms, without material Liability to Parent, Purchaser, the Company or any of their respective ERISA Affiliates (other than ordinary administration expenses and accrued benefits under the plan and subject to, in the case of Company Employee Plans that are contracts between the Company and an individual service-provider, the consent of such service-provider).

15

(f)        There are no pending investigations by any Governmental Body involving the Company Employee Plans, no claims pending or, to the Company's Knowledge, threatened in writing (except for claims for benefits payable in the normal operation of the plans), or Proceedings against any Company Employee Plan or asserting any rights or claims to benefits under any Company Employee Plan which would reasonably be expected to give rise to any Liability.  The Company has in all material respects timely made all required contributions with respect to any such Company Employee Plan.

(g)        The Company is not a party to or otherwise bound by any collective bargaining agreement, Contract, or any labor related agreement with any labor union or labor organization.  As of the Agreement Date: (i) no such agreement or Contract is being negotiated; (ii) no labor union or organization has made a pending demand for recognition or certification; (iii) there are no representation or certification Proceedings or petitions seeking a representation Proceeding presently pending or, to the Knowledge of the Company, threatened in writing to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority; (iv) to the Knowledge of the Company, there are no labor union organizing activities with respect to any employees of the Company; and (v) to the Knowledge of the Company, there are no actual or, to the Knowledge of the Company, threatened in writing unfair labor practice charges, labor strikes, slowdowns, work stoppages, lockouts, or any similar activity, affecting the Company.

(h)        Section 2.15(h) of the Disclosure Schedule sets forth an accurate and complete list as of the Agreement Date of all: (i) employees of the Company, including each employee's name, title or position, present annual or hourly compensation (including bonuses, commissions, deferred compensation or other forms of compensation), designation as exempt or nonexempt, accrued and unused paid vacation or other paid time off, and date of hire; and (ii) individuals who are currently performing services for the Company who are classified as independent contractors, including the respective compensation of each independent contractor.  The Company is not delinquent in payments to any Employee for any wages, salaries, commissions, bonuses, or other compensation for any services performed by any Employee or for any other amounts required to be reimbursed by the Company to any Employee (including vacation, sick leave, other paid time off or severance pay).  All employees of the Company are correctly classified under applicable wage and hour laws or the Laws applicable to the classification of independent contractors, as applicable.  No individual classified as an independent contractor has participated in, or is eligible to participate in, any Company Employee Plan while such person was classified as an independent contractor.

(i)        The Company has made available to Purchaser or its counsel all personnel manuals and handbooks, policy statements and agreements relating to the employment or other relationship of individuals providing services as an employee to the Company, in each case, to the extent such items are in the possession or control of the Company (or its Representatives) as of the Agreement Date.

(j)        All employees of the Company are located in the U.S.  The Company is in compliance in all material respects with all Laws respecting employment and employment practices, including (without limitation) laws concerning harassment, discrimination, retaliation, terms and conditions of employment, immigration, workers' compensation, long term disability, occupational safety, plant closings, compensation and benefits, wages and hours, proper classification of employees and independent contractors, and the payment of social security and other taxes (collectively, "**Employment Practices**").

(k)        Any individual who is performing or has performed services for the Company in the United States is legally authorized to work in the United States.  The Company has completed and retained the necessary employment verification paperwork under the Immigration Reform and Control

Act of 1986 ("**IRCA**") for the employees hired prior to the Agreement Date. The Company is and has been in compliance in all material respects with both the employment verification provisions (including the paperwork and documentation requirements) and the anti-discrimination provisions of IRCA.

(**l**)     There are no claims, grievances, or legal proceedings pending or, to the Knowledge of the Company, threatened in writing involving any Employee or group of Employees. There are no charges, investigations, Proceedings or formal complaints relating to any Employment Practices pending or, to the Knowledge of the Company, threatened in writing before the Equal Employment Opportunity Commission, the National Labor Relations Board, the U.S. Department of Labor, the U.S. Occupational Health and Safety Administration, the Workers Compensation Appeals Board, or any other Governmental Authority against the Company pertaining to any Employee.

(**m**)     The Company does not have any Liability for any payment to any trust or other fund or to any Governmental Body, with respect to unemployment compensation benefits, social security or other benefits or obligations for Employees (other than routine payments to be made in the Ordinary Course of Business).  There are no pending claims against the Company under any workers compensation plan or policy or for long term disability.

(**n**)     All employees of the Company are employed on an "at-will" basis and their employment can be terminated at any time for any reason without any amounts being owed to such individuals other than with respect to wages accrued before the termination.  The relationship between the Company, on the one hand, and all individuals who act on their own as contractors or other service providers to the Company, on the other, can be terminated at any time for any reason without amounts being owed to such individuals, other than with respect to compensation or payments accrued before the termination date.

(**o**)     No Company Founder, or, to the Knowledge of the Company, any other employee is in violation in any material respect of any term of any employment agreement, non-disclosure, confidentiality agreement, or consulting agreement with the Company or non-competition agreement, non-solicitation agreement or any restrictive covenant with a former employer relating to the right of any such employee to be employed by or provide services to the Company because of the nature of the business conducted or presently proposed to be conducted by the Company or to the use of Trade Secrets or proprietary information of others.

**2.16     Litigation.**  There is no lawsuit, claim, hearing, enforcement, audit, lawsuit, arbitration or mediation or other regulatory, quasi-judicial, or judicial proceeding or, to the Company's Knowledge, any investigation (collectively, a "**Proceeding**") pending (or, to the Company's Knowledge, threatened in writing) against or affecting the Company (or against any Employee or agent of the Company in their capacity as such or relating to their employment, services or relationship with the Company) before any Governmental Body.  There is no Proceeding brought by the Company pending or that the Company intends to initiate.  The Company is not a party or subject to the provisions of any material order, writ, injunction, judgment or decree of any Governmental Body.

**2.17     Authority; Binding Nature of Agreement.**  The Company has all necessary corporate power and authority to enter into and to perform its obligations under this Agreement and consummate the Merger and other transactions contemplated hereby, subject to receipt of the Required Company Unitholder Vote.  The Company Board (at a meeting duly called and held) has unanimously (a) determined that the Merger is advisable and fair and in the best interests of the Company and the Company Unitholders, (b) authorized and approved the execution, delivery and performance of this Agreement by the Company and approved the Merger, (c) recommended the adoption of this Agreement and approval of the principal terms of the Merger by the Company Unitholders and (d) directed that this

Agreement be submitted for consideration by the Company Unitholders by written consent.  This Agreement constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to (i) Laws of general application relating to bankruptcy, insolvency and the relief of debtors, and (ii) rules of Law governing specific performance, injunctive relief and other equitable remedies. No takeover statue or similar Law applies or purports to apply to the Company with respect to the Merger, this Agreement or any other agreement delivered pursuant hereto or thereto, or any other transaction contemplated hereby or thereby.

**2.18    Vote Required.**  In accordance with the Company LLC Agreement and applicable Law, the adoption of this Agreement and approval of the Merger requires the affirmative vote (the "**Required Company Unitholder Vote**") of the holders of a majority of the Company Common Units outstanding on the applicable record date, voting together as a single class.  Except for the Required Company Unitholder Vote, there are no other approvals of the Company Unitholders or holders of other Equity Participations necessary under applicable Law, the Company's Organizational Documents or any other Contract to which the Company is a party to adopt this Agreement and approve the transactions contemplated hereby (including the Merger).

**2.19    Non-Contravention; Consents.**  The execution and delivery of this Agreement, and the other agreements contemplated hereby, by the Company and the consummation by the Company of the transactions contemplated by this Agreement will not cause a: (a) violation of any of the provisions of the Organizational Documents of the Company; (b) violation by the Company of any Law; (c) material Lien to be imposed on any assets of the Company; or (d) material violation of, or result in the loss of any material benefit under or constitute a material default (or an event which, with or without notice or lapse of time, or both, would constitute a default) under, result in the termination of or a right of termination or cancelation, require Consent under, or accelerate the performance required by the Company under, any Material Contract or Company Permit.  Except as required by the Delaware LLC Act, the HSR Act or any other Antitrust Law or governmental regulation, the Company is not required to obtain any Consent from any Governmental Body in connection with the execution and delivery by the Company of this Agreement or the consummation by the Company of the Merger.

**2.20    Financial Advisor.**  No broker, finder or investment banker is entitled to any brokerage or finder's fee in connection with the Merger or any of the other transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company or any Employee.

**2.21    Related Party Transactions.**  There are no material obligations of the Company to any officers, directors, managers, equity holders or Employees of the Company other than (a) for payment of salaries and bonuses for services rendered, (b) reimbursement of customary and reasonable expenses incurred on behalf of the Company, and (c) the obligations under the promissory notes set forth in Section 2.3(d) of the Company Disclosure Schedules.  No officer, director, manager or Company Unitholder holds a direct or indirect economic interest in any Material Contract or any other material asset of the Company, other than in respect of its holdings of equity interests in the Company.

**2.22    Reliance.**  The Company has not relied on and is not relying on any representations or warranties regarding Parent, Purchaser or Merger Sub or their respective businesses other than those representations and warranties expressly set forth in this Agreement and in any other agreements or certificates contemplated to be furnished hereby.

**2.23    Exclusivity of Representations and Warranties.**  The representations and warranties made by the Company in this Agreement and in any other agreements or certificates contemplated to be furnished hereby are the exclusive representations and warranties made by the Company in this

Agreement.  The Company hereby disclaims any other express or implied representations or warranties with respect to such matters.

**SECTION 3.    REPRESENTATIONS AND WARRANTIES OF PARENT, PURCHASER AND MERGER SUB**

Parent, Purchaser and Merger Sub represent and warrant to the Company as follows:

**3.1    Due Incorporation.**  Parent is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware.  Purchaser is a  duly organized, validly existing, and in good standing under the laws of the ▮▮▮▮▮▮▮  Merger Sub is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

**3.2    Authority; Binding Nature of Agreement.**  Parent, Purchaser and Merger Sub have all necessary corporate power and authority to perform their obligations under this Agreement, as applicable, and the execution, delivery and performance by Parent, Purchaser and Merger Sub of this Agreement have been duly authorized by all necessary action on the part of Parent, Purchaser, Merger Sub and their respective boards of directors (or equivalent governing body or appropriate committee thereof).  This Agreement constitutes the legal, valid and binding obligation of Parent, Purchaser and Merger Sub, enforceable against them in accordance with its terms, subject to (a) Laws of general application relating to bankruptcy, insolvency and the relief of debtors, and (b) rules of Law governing specific performance, injunctive relief and other equitable remedies.

**3.3    Non-Contravention; Consents.**  The execution and delivery of this Agreement by Parent, Purchaser and Merger Sub and the consummation by Parent, Purchaser and Merger Sub of the transactions contemplated by this Agreement will not: (a) cause a violation of any of the Organizational Documents of Parent, Purchaser or Merger Sub or (b) so long as all Consents required by the HSR Act and any other Antitrust Laws are obtained, cause a violation by Parent, Purchaser or Merger Sub of any Law applicable to Parent, Purchaser or Merger Sub, except, in the case of clause (b), for any such violations or occurrences, if any, that would not reasonably be expected to have a material adverse effect on the ability of Parent, Purchaser or Merger Sub to consummate the Merger or other transactions contemplated hereby (each such material adverse effect, a "**Purchaser Material Adverse Effect**").  Except as may be required by the Delaware LLC Act, the HSR Act or any other Antitrust Law or governmental regulation and any Consent, the absence of which would not reasonably be expected to have a Purchaser Material Adverse Effect, none of Parent, Purchaser or Merger Sub is required to obtain any Consent from any Governmental Body at any time prior to the Closing in connection with the execution and delivery of this Agreement or the consummation of the Merger.

**3.4    Merger Sub.**  Merger Sub was formed solely for the purpose of engaging in the transactions contemplated by this Agreement and has engaged in no other business activities.

**3.5    Reliance.**  Purchaser has not relied on and is not relying on any representations or warranties regarding the Company or its business other than those representations and warranties expressly set forth in this Agreement and in any other agreements or certificates contemplated to be furnished hereby.

**3.6    Exclusivity of Representations and Warranties.**  The representations and warranties made by Parent, Purchaser and Merger Sub in this Agreement and in any other agreements or certificates contemplated to be furnished hereby are the exclusive representations and warranties made by Parent, Purchaser and Merger Sub in this Agreement, including with respect to Parent, Purchaser and Merger

Sub. Parent, Purchaser and Merger Sub each hereby disclaim any other express or implied representations or warranties with respect to such matters.

**SECTION 4.  CERTAIN COVENANTS OF THE COMPANY**

4.1 **Access.** During the period from the Agreement Date and continuing until the earliest to occur of (a) the Effective Time and (b) the termination of this Agreement pursuant to Section 8.1 (the "**Pre-Closing Period**"), and upon reasonable advance written notice to the Company Founders, the Company shall provide Purchaser and Purchaser's Representatives with reasonable access to the Company's existing books and records, properties, business and operations for the purpose of inspecting the same, and to the Company's officers, Employees and Representatives, Contracts and other assets, and shall furnish Purchaser and its Representatives in a timely manner, upon reasonable written notice, all financial, operating and other data and information regarding the assets, properties and business of the Company as Purchaser or its Affiliates and Representatives may reasonably request; *provided*, that, (i) without the prior written consent of the Company Founders (which shall be provided in the Company Founders' sole discretion), none of Parent, Purchaser or any of their Affiliates or their respective Representatives (A) may contact or initiate communication with any Employee, officer, director, consultant of the Company, other than the Company Founders or any Employee who the Company Founders have approved in writing in advance as permissible for such contact and communication, or (B) have access to, or inspect, the properties of the Company, (ii) any such access, if granted pursuant to sub-clause (i)(A) shall be under the supervision of the Company Founders and in such a manner as to maintain the confidentiality of this Agreement and the transactions contemplated hereby in accordance with the terms hereof and (iii) that such access does not unreasonably interfere with the business operations of the Company.

4.2 **Conduct of the Business of the Company.** During the Pre-Closing Period, the Company shall pay its debts and Taxes when due (subject to Purchaser's review and consent to the filing of any Tax Return) and use commercially reasonable efforts to (a) pay or perform all other obligations when due, (b) preserve intact the present business organizations of the Company, (c) keep available the services of the present officers and key employees of the Company and (d) preserve the beneficial relationships of the Company with suppliers, distributors, licensors, licensees and others having business dealings with them, all with the goal of preserving unimpaired the goodwill and ongoing business of the Company at the Effective Time.

4.3 **Restrictions on Conduct of the Business**. During the Pre-Closing Period, except as (i) set forth in Section 4.3 of the Disclosure Schedule as of the Agreement Date, (ii) expressly contemplated by the terms of this Agreement or (iii) ███████████████████████████████████████████████ ████████████████████████████ the Company shall not, without the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned, *provided* that Purchaser can withhold, delay or condition such consent in its sole discretion in the cases of clauses (a), (c), (f), (g), (i), (j), (l), (m), (o), (p), (q), (r) and (s) of this Section 4.3, but with respect to clause (s), solely to the extent related to the foregoing clauses set forth in this proviso); *provided*, that such consent shall not be required if being required to obtain such consent would violate applicable Law:

(a) amend its Organizational Documents (whether by merger, consolidation or otherwise);

(b) grant or permit any Lien on any of its properties or assets (whether tangible or intangible), other than Permitted Encumbrances;

(c)     sell, transfer, assign, convey, lease, license or otherwise dispose of any material portion of its assets (it being understood that this clause shall not apply to any non-exclusive licenses of intellectual property and sales to customers in the Ordinary Course of Business);

(d)     enter into, amend, waive any rights under or terminate any Material Contract or any Contract that would be a Material Contract had it been in effect on the Agreement Date; *provided*, that the exception set forth above in clause (iii) of this Section 4.3 shall not apply to the following sub-clauses of the definition of Material Contract: (d), (f), (k), (l), (m), (n), (o) and (p);

(e)     waive or release any material right or claim of the Company;

(f)     transfer any Company Source Code to any Person or provide a copy of any Source Code to any Person that is not an employee, officer, director, consultant or independent contractor of the Company; *provided*, for the avoidance of doubt, that the exception set forth above in clause (iii) of this Section 4.3 shall not apply to this sub-clause (f);

(g)     other than the issuance of a Purchaser Note in accordance with Section 5.4, borrow money or incur or guarantee any indebtedness or otherwise enter into or incur any obligation that would constitute Company Debt; *provided* that this sub-clause (g) shall not apply to the Company (i) financing in any manner the acquisition or procurement of any asset, facility or service reasonably contemplated by and within the scope of any line-item of the Company Operating Plan so long as the aggregate amount of such financing (including all Liabilities of the Company relating to such financing) does not exceed the aggregate amount budgeted for such line-item (after taking into account all prior expenses relating to such line-item) or (ii) entering into any bona fide commercial agreement in the Ordinary Course of Business with any customer, strategic partner or vendor that does not involve the Company becoming obligated for borrowed money indebtedness;

(h)     use the proceeds of any Purchaser Note for any purpose other than (A) funding the operations of the Business in accordance with the terms of the Company Operating Plan or (B) in a manner expressly agreed to by Purchaser in writing;

(i)     (i) form a Subsidiary (other than a wholly-owned Subsidiary) or (ii) make any capital contribution to, or investments in (whether debt or equity), any other Person other than in connection with a commercial or strategic transaction with such person;

(j)     acquire or agree to acquire by merging with, or by purchasing a material portion of the equity or assets of, or by any other manner, any Person;

(k)     make or change any Tax election, adopt or change any Tax accounting method, enter into any Tax allocation agreement, Tax sharing agreement, Tax indemnity agreement or any closing agreement or Tax ruling, settle or compromise any Tax claim or assessment, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment, or file any income or other material Tax Return or amend any Tax Return unless such income or other material Tax Return or amended Tax Return has been made available to Purchaser for review within a reasonable period prior to the due date for filing and Purchaser has consented to such filing;

(l)     effect any recapitalization, reclassification, dividend, equity split or like change in its capitalization or establish a record date for, declare, accrue, set aside or pay any dividend, make or pay any dividend or other distribution (whether in cash, stock, property or otherwise) in respect of its equity securities or pay any dividends, or authorize or make any distribution upon or with respect to any equity interest in the Company;

(m)     other than Company Common Units issued to Employees or consultants hired by the Company in accordance with Section 5.7, issue, deliver, grant, or sell, or authorize the issuance, delivery, grant, or sale of any Equity Participations in the Company;

(n)     liquidate, dissolve or effect a recapitalization or reorganization in any form of transaction;

(o)     grant any right to any severance or termination payment to any Employee;

(p)     (i) grant any cash bonus, incentive, performance or other incentive compensation, in each case in any manner that is applicable to all Employees, or (ii) accelerate the vesting (other than as set forth in Section 1.6(b) and Section 1.11) or payment of, or funding or in any other way securing the payment of, compensation or benefits under any Company Employee Plan, (other than as specifically required by the express provisions of a Company Employee Plan as in effect on the Agreement Date, which has been disclosed in Section 2.15(a) of the Company Disclosure Schedule, and a copy of which has been provided to Parent at least two business days prior to the Agreement Date);

(q)     waive, release, assign, compromise, commence, settle or agree to settle any material Proceeding (including any such Proceeding relating to this Agreement or the transactions contemplated hereby);

(r)     ███████████████████████████ (i) hire any Employee or (ii) terminate any Key Employee; or

(s)     agree or commit to take any of the actions described in clauses "(a)" through "(r)" of this Section 4.3.

**4.4     No Solicitation.**

(a)     During the Pre-Closing Period, the Company shall not (nor shall any of the Company's managers, officers or other Employees, equityholders, agents, Representatives or Affiliates) directly or indirectly: (i) solicit, seek, initiate, encourage or facilitate the making of any inquiry, expression of interest, proposal or offer that constitutes, or would reasonably be expected to lead to, an Alternative Proposal; (ii) disclose to any person any nonpublic information relating to Company in connection with, or enter into, participate in, maintain or continue any discussions or negotiations regarding, any inquiry, expression of interest, proposal or offer that constitutes, or would reasonably be expected to lead to, an Alternative Proposal; or (iii) agree to accept, recommend or endorse (or publicly propose or announce any intention or desire to agree to, accept, recommend or endorse), or enter into any agreement, letter of intent, memorandum of understanding or other instrument, arrangement or understanding (whether binding or non-binding, written or oral) in connection with, any Alternative Proposal.

(b)     During the Pre-Closing Period, the Company shall immediately cease and cause to be terminated (and will not resume or otherwise continue) any and all existing activities, discussions and negotiations with any Persons (other than with Purchaser or any of its Affiliates) conducted heretofore with respect to, or that could reasonably be expected to lead to, any Alternative Proposal.

(c)     During the Pre-Closing Period, in the event that the Company or any of its respective managers, officers or other Employees, equityholders, agents, Representatives or Affiliates receives an Alternative Proposal, or any request for disclosure as referenced in clause (ii) of Section 4.4(a) hereof, the Company shall (i) not engage in, and immediately suspend, any discussions with such

offeror or party with regard to such Alternative Proposal or requests and (ii) promptly thereafter (and in any event not later than 48 hours after receipt of such Alternative Proposal or request), notify Purchaser thereof, which notice shall contain the pricing, terms, conditions and other material provisions of such Alternative Proposal, any material modifications thereto and such other information related thereto as Purchaser may reasonably request; *provided* that the notification obligation provided in clause (ii) of this Section 4.4(c) shall apply only to any such Alternative Proposal that (i) is in the form of a written term sheet, letter of intent, indication of interest letter or similar written document and/or (ii) relates to a possible acquisition of more than 20% of the equity interests (including via convertible debt) of the Company.

(d)     The parties hereto agree that irreparable damage would occur in the event that the provisions of this Section 4.4 were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed by the parties hereto that Purchaser shall be entitled to an immediate injunction or injunctions, without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting any bond or other security, to prevent breaches of the provisions of this Section 4.4 and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other remedy to which Purchaser may be entitled at law or in equity.  Without limiting the foregoing, it is understood that any violation of the restrictions set forth above by the Company or any officer, manager, director, agent, Representative or Affiliate of the Company shall be deemed to be a material breach of this Agreement by the Company.

(e)     

**4.5     Notifications.**  During the Pre-Closing Period, the Company shall give prompt notice to Purchaser of (a) the occurrence or non-occurrence of any event, circumstance or effect, the occurrence or non-occurrence of which could cause, or is reasonably expected to cause, the failure of any of the conditions set forth in Section 6 and (b) any failure of the Company to comply with or satisfy in any material respect any covenant or agreement to be complied with or satisfied by it hereunder; *provided*, that the delivery of any notice pursuant to this Section 4.5 shall not (i) relieve the Company of any of its other obligations under this Agreement, or (ii) limit or otherwise affect any remedies available to Purchaser under this Agreement.

**4.6     Company Unitholder Consent.**

(a)     Promptly (but in no event more than 24 hours) following the execution and delivery of this Agreement by the Parties, the Company shall, in accordance with the Company's Organizational Documents and the applicable requirements of the Delaware LLC Act solicit the Company Unitholders' Written Consent from Company Unitholders holding such number of Company Units sufficient to constitute the Requisite Company Unitholder Vote and shall deliver a copy of the Company Unitholders' Written Consent executed by holders of Company Common Units sufficient to constitute the Required Company Unitholder Vote, to Purchaser.  Within five (5) Business Days of the Company Call Certificate or the Purchaser Put Certificate being delivered in accordance with the terms of this Agreement, or as otherwise agreed by the Parties, the Company shall provide written notice to each Company Unitholder (other than any Company Unitholder that has theretofore delivered a signature to the Company Unitholder Written Consent to the Company), in accordance with the requirements of the Delaware LLC Act, informing such Company Unitholder that this Agreement has been adopted by the Company Unitholders constituting the Required Company Unitholder Vote, that the Merger and the other transactions contemplated hereby were approved, adopted and ratified by the Company Unitholders constituting the Required Company Unitholder Vote.

(b)     Any documents related to the Merger distributed by the Company or any of its Representatives to Company Unitholders, including any information statement or similar disclosure document, shall be subject to the prior approval of Parent, which approval shall not be unreasonably withheld, conditioned or delayed.

**4.7     Company Financial Statements; Books and Records**.

(a)     During the Pre-Closing Period, the Company shall deliver to Purchaser (i) within three (3) Business Days of the end of each full calendar quarter, monthly unaudited consolidated financial information regarding the Company for each month in such calendar quarter, including a balance sheet, profit and loss statement and cash flow statement for each such month, and (ii) at least three (3) Business Days prior to the Closing, monthly unaudited consolidated financial information regarding the Company for each full month in the then current calendar quarter, including a balance sheet, profit and loss statement and cash flow statement for each such month (such financial statements being collectively referred to herein as the "**Company Historical Financial Statements**").  The Company Historical Financial Statements (i) shall be true and correct in all material respects, (ii) shall have been prepared in accordance with GAAP consistently applied through the periods indicated (but may be subject to normal and customary year-end audit adjustments none of which are material in amount and the absence of footnote disclosures) and (iii) present fairly in all material respects the financial condition of the Company at the date therein indicated and the results of operations and cash flows for the period therein specified.

(b)     At least five (5) Business Days prior to the Closing, the Company shall deliver to Purchaser a good faith estimate of the consolidated unaudited balance sheet of the Company as of

opening of business on the Closing Date and the related consolidated unaudited profit and loss statement and cash flow statement for the period beginning on January 15, 2016 and ending on the Closing Date, which financial statements shall have been prepared in good faith and in accordance with GAAP consistently applied through the period indicated (but may be subject to normal and customary year-end audit adjustments none of which are material in amount and the absence of footnote disclosures).

(c)     During the Pre-Closing Period, the Company shall maintain accurate business records, financial books and records, personnel records, ledgers, sales accounting records, tax records and related work papers and other books and records (the "**Books and Records**") reflecting in all material respects the assets and liabilities of the Company, and shall maintain internal accounting controls suitable for companies of their respective size and years of existence providing reasonable assurances that (i) transactions are executed with management's authorization, (ii) transactions are recorded as necessary to permit preparation of its financial statements and to maintain accountability of its assets and (iii) inventory, accounts, notes and other receivables are recorded accurately and proper procedures are implemented to effect the collection thereof on a timely basis.

**4.8     Company Employee Plans and Employees.**  Within three (3) Business Days prior to the Closing, the Company will provide to Purchaser the following, which shall be accurate and complete as of the Closing:

(a)     an updated list of all Company Employee Plans;

(b)     an updated list of all employees of the Company, including each employee's name, title or position, present annual or hourly compensation (including bonuses, commissions, deferred compensation or other forms of compensation), designation as exempt or nonexempt, accrued and unused paid vacation or other paid leave, and date of hire;

(c)     a list of individuals who are currently performing services for the Company who are classified as independent contractors, including the respective compensation of each independent contractor;

(d)     a list of all Employees whose employment has been terminated by the Company since the Agreement Date; and

(e)     unless directed to do otherwise by Purchaser within five Business Days prior to the prior to the Closing, the Company shall take all actions necessary to terminate all Company Employee Plans that contain a cash or deferred arrangement intended to qualify under Section 401(a) of the Code (the "**401(k) Plans**"), with such termination of the 401(k) Plans to be effective no later than the day immediately preceding the Closing Date but contingent on the Closing.

**SECTION 5.   ADDITIONAL COVENANTS OF THE PARTIES**

**5.1     Further Proceedings.**  Upon the terms and subject to the conditions of this Agreement, each of the Company and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate and make effective the Merger and the other transactions contemplated hereby, subject in each case to the valid exercise of the Purchaser Call Option or the Company Put Option, including using commercially reasonable efforts to, as promptly as practicable, obtain all permits, consents, approvals, authorizations, qualifications, expirations or terminations of applicable waiting periods and orders of Governmental Bodies as are necessary for the consummation of the Merger and to take such other actions to cause all of the conditions of the other Party hereto to

25

consummate the Merger set forth in Section 6 or Section 7, as the case may be, to be satisfied promptly following the delivery of a Call Exercise Notice or a Put Exercise Notice, as applicable.

**5.2     Regulatory Filings.**

(a)     Unless this Agreement shall have been validly terminated in accordance with Section 8.1, within 10 Business Days following (i) the earlier of (A) Purchaser's delivery of a Call Exercise Notice with respect to the Purchaser Call Option (that has not been validly withdrawn) and (B) the Company's delivery of a Put Exercise Notice with respect to the Company Put Option (that has not been validly withdrawn) or (ii) Purchaser's written request, the Company and Purchaser each shall make all appropriate filings and submissions under the HSR Act and, as promptly as practicable, any filings and submissions required or considered by Purchaser to be advisable with any other Governmental Authority pursuant to any other applicable Antitrust Law or otherwise as determined by Purchaser.  The Company and Purchaser each shall cooperate and consult with each other in (x) determining which filings under the HSR Act or any other Antitrust Law are required to be made and which Consents are required to be obtained from any Governmental Authority and (y) timely making all such filings and timely seeking all Consents, which are required or advisable, including by promptly supplying Purchaser with any information which may be required in order to effectuate such filings and Consents.  The Company and Purchaser shall each use commercially reasonable efforts promptly to obtain any Consent required under any Antitrust Law, including by promptly supplying any additional information and documentary material which reasonably may be requested formally or informally pursuant to the HSR Act or any other applicable Antitrust Law, and assisting and cooperating with the other in doing, all things, necessary, proper or advisable to make effective as promptly as practicable, the Merger and other transactions contemplated hereby in accordance with the terms hereto; provided, that notwithstanding the foregoing, in no event shall the Parties request "early termination" under the HSR Act without the prior mutual written consent of Purchaser and the Company.

(b)     Subject to applicable Laws relating to the exchange of information and an appropriate agreement to limit disclosure to outside counsel and consultants retained by such counsel and preserve the attorney-client or other legal privileges, the Company and Purchaser each agrees to use commercially reasonable efforts to (i) give the other party reasonable advance notice of all meetings with any Governmental Entity relating to the Antitrust Laws, (ii) to the extent not prohibited by such Governmental Entity, not participate independently in any such meeting without first giving the other party (or its outside counsel) an opportunity to attend and participate in such meeting, (iii) to the extent practicable, give the other party reasonable advance notice of all oral communications with any Governmental Entity relating to Antitrust Laws, (iv) if any Governmental Entity initiates any communication regarding the Antitrust Laws, promptly notify the other party of the substance of such communication, (v) provide the other party with a reasonable advance opportunity to review and comment upon and consider in good faith its views in connection with all written communications (including any analyses, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to Proceedings under the Antitrust Laws) with a Governmental Entity regarding the Antitrust Laws, (vi) promptly provide the other party with copies of all written communications and documentary materials to or from any Governmental Entity relating to the Antitrust Laws and (vii) give the other party prompt notice of the commencement or known threat of commencement of any Proceeding by or before any Governmental Body with respect to the Merger or any of the other transactions contemplated by this Agreement, and keep the other party informed as to the status of any such Proceeding.

(c)     Notwithstanding the foregoing, neither Purchaser nor any of its Affiliates nor the Company nor any of its Affiliates shall be obligated to agree to the sale, divestiture or disposition of any assets or businesses or otherwise take any action that limits its freedom of action with respect to, or its

ability to retain, any of its businesses, product lines, or assets. Without receiving Purchaser's prior consent the Company Shall not (i) commit to any Governmental Body any action or agreement that would in any way limit Purchaser's ability to receive the full benefits of this Agreement or (ii) commit to or agree not to consummate any transaction contemplated under this Section 5.2(c).

**(d)**      Notwithstanding anything in this Agreement to the contrary, Purchaser shall, on behalf of the Parties, control and lead all communications and strategy relating to the Antitrust Laws and litigation matters relating to the Antitrust Laws (provided that the Company is not prohibited from complying with applicable Law), subject to good faith consultations with the Company and the inclusion of the Company at meetings with Governmental Entities with respect to any discussion related to the transactions contemplated hereby under the Antitrust Laws.

**5.3      Company Returns; Transfer Taxes.**

**(a)**      Prior to the Closing Date, the Company shall prepare and timely file all Company Returns that are due on or before the Closing Date and shall pay all Company Taxes due with respect thereto. The Company shall provide Purchaser with a copy of each such proposed Company Return (and such additional information regarding such Company Return as may reasonably be requested by Purchaser) for review and comment for a reasonable period prior to the filing of such Company Return. The Company shall make all reasonable comments of Purchaser with respect to Company Returns for the Pre-Closing Tax Period. All Tax Returns due after the Closing Date will be prepared and filed by Purchaser or its Affiliates.

**(b)**      Notwithstanding anything to the contrary in this Agreement, any documentary, sales, use or other similar transfer Taxes ("**Transfer Taxes**"), if any, assessed upon or incurred in connection with the transactions contemplated by this Agreement will be borne solely and timely paid by Purchaser (or one of its Affiliates). Each of the Company Unitholders Representative and Purchaser shall use commercially reasonable efforts to cooperate with one another to minimize any such Transfer Taxes and to prepare any Company Returns required to be filed in respect of such Transfer Taxes. The Person(s) required by applicable Law to file any necessary Tax Returns and other documentation with respect to Transfer Taxes shall file such Tax Returns and documentation.

**(c)**



**5.4      Company Operating Plan; Company Funding**.

**(a)**      During the Pre-Closing Period, the Company shall operate the Business in a manner consistent in all material respects with the terms of the Company Operating Plan. Within five (5) Business Days following the Agreement Date, Purchaser shall wire to an account designated by the Company an amount equal to Purchaser's funding obligation for the period beginning on January 15, 2016 and ending on the last day of the then-current calendar quarter under the Company Operating Plan

(*less*, the Agreement Date Non-Reimbursable Company Expense Amount), such amount to be funded in exchange for, and subject to, the Company's execution and delivery to Purchaser of a Purchaser Note in the initial principal amount of such amount.  Prior to the start of the next calendar quarter and each subsequent calendar quarter during the Pre-Closing Period, provided that, prior to such date (i) the Company has operated its business in a manner consistent in all material respects with the terms of the Company Operating Plan or as otherwise agreed in writing by Parent and the Company (and an officer of the Company has executed and delivered a certificate to Purchaser on behalf of the Company certifying the same) and (ii) the Company has provided Purchaser with reasonable documentation (e.g. management accounts) evidencing the Company's compliance with its obligations under the first sentence of this Section 5.4(a), Purchaser shall wire to an account designated by the Company an amount equal to Purchaser's funding obligation for such calendar quarter under the Company Operating Plan in exchange for, and subject to, the Company's execution and delivery to Purchaser of a Purchaser Note in the initial principal amount of such cash funding obligation for such calendar quarter as set forth in the Company Operating Plan. It is understood that any breach of Purchaser's obligation to fund the Company in accordance with this Section 5.4(a) shall be deemed to be a material breach of this Agreement by Purchaser.

> **(b)**     No later than ten Business Days following the Agreement Date, the Company shall, subject to Purchaser's satisfaction of its obligations under Section 5.4(a), fully repay each Repayment Employee Note in accordance with its terms.

> **(c)**     The Company shall obtain and deliver to Purchaser, on the Agreement Date, an accurate and complete copy of an invoice from each advisor or other service provider to the Company (other than any employee, director or officer of the Company), dated no more than one (1) Business Day prior to the Agreement Date, with respect to all Agreement Date Transaction Expenses estimated to be due and payable to such advisor or other service provider, as the case may be, as of the Agreement Date (each, an "***Agreement Date Invoice***").

> **(d)**     The Company shall obtain and deliver to Purchaser no later than three (3) Business Days prior to the Closing Date, an accurate and complete copy of an invoice from each advisor or other service provider to the Company (other than any employee, director or officer of the Company), dated no more than three (3) Business Day prior to the Closing Date, with respect to all Closing Date Transaction Expenses estimated to be due and payable to such advisor or other service provider, as the case may be, as of the Closing Date (each, a "***Closing Date Invoice***").

> **5.5**     **Parent Employment Package Documents.**

> **(a)**     Parent shall offer to each Person that is an employee of the Company as of the date that is no later than three (3) Business Days prior to the Closing an opportunity of employment with Parent (or one of its Affiliates, as applicable) following the Closing.  Prior to the Closing, Parent shall deliver to each such Person, or shall deliver to the Company and the Company shall deliver to each such Person, the Employment Package Documents that such Person must execute and deliver to Parent in order for such Person (a) to be employed by Parent (or one of its Affiliates, as applicable) following the Closing and (b) to receive his or her Parent Restricted Stock Award (the effective grant date of which shall be the later of the Closing Date and such Person's employment start date with Parent).  Included in such Employment Package Documents will be a Parent Restricted Stock Award that offers each such Person the number of shares of Parent's common stock represented by his or her Applicable Restricted Stock Percentage of the Total Parent Restricted Stock Pool, subject to the terms and conditions of such Parent Restricted Stock Award. The compensation packages offered by Parent shall be substantially comparable in the aggregate (taking into account base salary and target bonus, but excluding equity incentives) to such Person's compensation packages (excluding equity incentives) provided by the Company

immediately prior to the Closing.  For the avoidance of doubt, the Company shall be entitled to reserve a portion of the Applicable Restricted Stock Percentage for (A) consultants or independent contractors that are hired by the Company prior to the Effective Time or (B) employees to be hired by Parent (or its Affiliates) after the Closing, in which case such reserved portion of the Applicable Restricted Stock Percentage shall be allocated after the Closing only with the prior written consent of the Company Founders, on the one hand, and Parent or any of its Affiliates, on the other hand. The number of shares of Parent common stock represented by the Applicable Restricted Stock Percentage for each Employee shall be set forth in such Employee's Employment Package Documents. For the avoidance of doubt, any acceleration of vesting by the Company Board of all Company Restricted Units pursuant to Section 1.11 shall not have any impact on the service credit with the Company that any Employee shall be entitled to in respect of the time-based vesting conditions with Parent set forth in any Parent Restricted Stock Award.

       **(b)**      Promptly upon the delivery of the Put Exercise Notice or the Call Exercise Notice, as applicable, but in any event within three (3) Business Days, Parent, on the one hand, and each of the Key Employees on the other hand, shall execute the Employment Package Documents with respect to each such Key Employee, in each case to be effective at or after the Closing.

       **(c)**      Parent shall ensure that, as of the Closing Date, each Company employee who continues employment with Parent or any of its Affiliates after the Closing (a "**Continuing Employee**") receives full credit (for purposes of eligibility to participate and vesting, but excluding vacation entitlement, benefit accrual and severance benefits) for service with the Company under each of the comparable employee benefit plans, programs and policies of Parent, the Surviving Company or the relevant Parent Affiliate, as applicable, in which the Continuing Employee becomes a participant; provided, however, that no such service recognition shall result in any duplication of benefits.  Prior to the Closing Date, the Company shall pay out all accrued vacation balances (if any).  With respect to each health or welfare benefit plan maintained by Parent, the Surviving Company or the relevant Affiliate for the benefit of any Continuing Employees, Parent shall take such reasonable actions, to the extent permitted by Parent's benefits programs, to (i) cause to be waived any eligibility waiting periods, any evidence of insurability requirements and the application of any pre-existing condition limitations under such plan, and (ii) cause each Continuing Employee to be given credit under such plan for all amounts paid by such Continuing Employee under any similar Company Employee Plan for the plan year that includes the Closing Date for purposes of applying deductibles, co-payments and out-of-pocket maximums as though such amounts had been paid in accordance with the terms and conditions of the applicable plan maintained by Parent, the Surviving Company or the relevant Affiliate, as applicable, for the plan year in which the Closing Date occurs.

       **(d)**      Notwithstanding anything to the contrary set forth in this Agreement, nothing in this Agreement shall be construed as requiring Parent, the Surviving Corporation or any of their respective Affiliates to employ any Continuing Employee for any length of time following the Closing Date.  Except as otherwise provided in this Section 5.5, nothing in this Section 5.5 is intended to prevent Parent from amending or terminating any of its benefit plans from time to time or changing the form of benefits provided to the Continuing Employees after the Closing Date.  No Person is an intended third party beneficiary of this Section 5.5 and no provision of this Section 5.5 constitutes an amendment to any benefit plan of Parent.

    **5.6**    **Post-Signing Specified Bad Acts.**

       **(a)**

**(b)**



**(c)**



 **New Employees; Employee Communication.**

 **(a)** During the Pre-Closing Period, without the prior written consent of Parent, the Company shall only hire new Employees in material compliance with the Company Operating Plan (including with respect to base salary bands as set forth in the Company Operating Plan).

**(b)**

**(c)**



**(d)**

**(e)**

**5.8**

**5.9    Director and Officer Liability.**

      **(a)**     Parent, Purchaser and Merger Sub agree that all rights to indemnification for acts or omissions occurring prior to the Effective Time in favor of the current or former directors, managers, officers and employees of the Company (the "**Covered Persons**") as provided in the Organizational

Documents of the Company in effect as of the date of this Agreement and any indemnification agreements between the Company, on the one hand, and its officers and directors, on the other hand, in each case, set forth on Schedule 5.9 of the Company Disclosure Schedule, shall survive the Merger and shall continue in full force and effect in accordance with their terms for at least six years following the Effective Time, and Parent and Purchaser shall cause the Company following the Closing to fulfill and honor such obligations, subject to the terms and limitations thereof, to the maximum extent permitted by applicable law.  Notwithstanding the foregoing, the covenants under this Section 5.8(a) shall not apply to any claim or matter that relates to a willful or intentional breach of a representation, warranty or covenant made by the Company under this Agreement or in connection with the transactions contemplated hereby.

**(b)**     The Company shall have, prior to the Effective Time, obtained at its expense a fully prepaid "tail" directors' and officers' liability insurance policy, which (i) has an effective term of six (6) years from the Effective Time, (ii) covers the Covered Persons for matters occurring at or prior to the Effective Time, and (iii) contains coverage terms reasonably acceptable to the Company and Purchaser (the "**D&O Tail Policy**") (which acceptance shall not be unreasonably withheld) and Parent shall, or shall cause the Company after the Closing to, take such actions as may be required to maintain such D&O Tail Policy.  The D&O Tail Policy will be the primary obligor for any claims by the Covered Persons under this Section 5.9, and the Covered Persons shall cooperate with Parent and the Surviving Company in seeking recovery from the D&O Tail Policy (if and to the extent available) prior to seeking recourse from Parent, Purchaser, the Surviving Company or any of their respective Affiliates for any indemnified claim.

**(c)**     The obligations of Parent and the Company after the Closing under this Section 5.9 shall not be terminated or modified in such a manner as to adversely affect any Covered Person to whom this Section 5.9 applies without the written consent of each affected Covered Person.

**(d)**     The provisions of this Section 5.9 shall be in addition to any other rights available to the Covered Persons, shall survive the Effective Time in accordance with their terms and are expressly intended for the benefit of the Covered Persons.

**5.10     Press Releases and Third Party Communications.**  No press release or public announcement related to this Agreement, the Trucking Merger Agreement or the transactions contemplated herein or therein, shall be issued or made by any Party hereto (or any Affiliate to a party hereto, including the Company Founders) without the joint approval of Parent and the Company Unitholder Representative, unless required by Law (in the reasonable advice of counsel), court order or by obligations pursuant to any listing agreement with or rules of any securities exchange or trading market on which securities of the Parent or any of their Affiliates are listed.

**SECTION 6.     CONDITIONS PRECEDENT TO OBLIGATIONS OF PARENT, PURCHASER AND MERGER SUB**

The obligations of Parent, Purchaser and Merger Sub to effect the Merger and otherwise consummate the transactions contemplated by this Agreement are subject to the satisfaction (or, to the extent permitted, waiver by Purchaser), at or prior to the Closing, of each of the following conditions; *provided*, that any Pre-Signing Bad Act (whether or not the subject of a Specified Claim) shall be disregarded in determining whether any of the conditions set forth in this Section 6 have been satisfied:

**6.1     Accuracy of Representations and Warranties.**  (a) The Company Fundamental Representations (i) other than those Company Fundamental Representations that address matters as of particular dates, shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality, Company Material Adverse Effect or similar phrases) or in all material respects (in the case of any representation or warranty not qualified by materiality, Company Material Adverse

Effect or similar phrases), in each case, when taken as a whole, as of the date of this Agreement and as of the Closing Date as though then made and as though the Closing Date was substituted for the date of this Agreement throughout such representations and warranties, and (ii) that address matters as of particular dates shall be true and correct in all material respects (when taken as a whole) as of such dates and (b) the other representations and warranties of the Company (i) other than those representations and warranties that address matters as of particular dates, shall be true and correct as of the date of this Agreement and as of the Closing Date as though then made and as though the Closing Date was substituted for the date of this Agreement throughout such representations and warranties (without giving effect to materiality, Material Adverse Effect or similar phrases in the representations and warranties), and (ii) that address matters as of particular dates shall be true and correct as of such dates (without regard to materiality, Material Adverse Effect or similar phrases in the representations and warranties), except where the failure of such representations and warranties referenced in the immediately preceding clauses (b)(i) and (b)(ii) to be so true and correct would not, in the aggregate, have a Company Material Adverse Effect; *provided*, that the condition set forth in this Section 6.1 shall not be deemed not to have been satisfied as a result of a Specified Claim unless such Specified Claim is a Material Adverse Claim.

6.2    **Performance of Covenants.**  The Company shall have performed and complied with, in all material respects, all of its covenants, obligations and agreements required hereby to be performed by it at or before the Closing (to the extent that such covenants and obligations require performance by the Company at or before the Closing); *provided*, that the condition set forth in this Section 6.2 shall not be deemed not to have been satisfied as a result of a Specified Claim unless such Specified Claim is a Material Adverse Claim.

6.3    **Company Unitholder Approval.**  This Agreement and the Merger shall have been duly adopted and approved by the Required Company Unitholder Vote.

6.4    **Regulatory Approvals.**  Any Consent applicable to the consummation of the transactions contemplated by this Agreement required under the HSR Act and required or advisable under any other Antitrust Law shall have been obtained and not expired or revoked.

6.5    **No Restraints.**  No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the Merger or any of the other transactions contemplated under this Agreement shall have been issued by any court of competent jurisdiction or other Governmental Body and remain in effect, and no Law shall have been enacted since the Agreement Date that makes consummation of the Merger or any of the other transactions contemplated under this Agreement by Parent, Purchaser or Merger Sub illegal.

6.6    **No Litigation**.  There shall not be pending or threatened in writing before any court of competent jurisdiction or other Governmental Body (a) any Proceeding (including any Proceedings brought against any Key Employees) that would reasonably be expected to (i) restrain, enjoin, prevent, prohibit or make illegal the consummation of the Merger, (ii) impose limitations on the ability of Purchaser (or its Affiliates, as applicable) to effectively exercise full rights of ownership of all assets and equity interests of the Surviving Company, (iii) prohibit Purchaser (or its Affiliates, as applicable) from effectively controlling in any material respect the business or operations of the Company (including the Company Intellectual Property), or (iv) prohibit or limit the ownership or operation by Purchaser (or its Affiliates, including the Company following the Closing), or to compel Purchaser (or its Affiliates, including Company following the Closing) to dispose of, hold separate or license any material portion of the business or assets of Purchaser (or its Affiliates, including Company following the Closing) (including the Company Intellectual Property), (b) any material Proceeding (including any Proceedings brought against any Key Employees) that relates to or arises out of any Company Intellectual Property (including the claims of infringement or misappropriation of any Intellectual Property of any third party or any

claims seeking to prohibit or otherwise limit the use of any Company Intellectual Property by the Company) or (c) any material Proceeding that relates to any Key Employee (including any claims seeking to prohibit or otherwise limit the ability of Parent or any of its Affiliates to freely hire any Key Employee); *provided*, that the condition set forth in this Section 6.6 shall not be deemed not to have been satisfied as a result of a Specified Claim unless such Specified Claim is a Material Adverse Claim.

6.7 **Employees.** No less than ███████████████████████ (including the Company Founders and not less than ████ of the Select Key Employees) shall have accepted employment offers from Parent (or one of its Affiliates, as applicable) and each of the Employment Package Documents executed by such number of Employees shall be in full force and effect and shall not have been revoked, rescinded or otherwise repudiated by the respective signatories thereto. The employment of each of the Employees that have declined such employment offers from Parent, in each case, shall have been terminated no later than immediately prior to the Closing.

6.8 **No Post-Signing Specified Bad Acts.** No Post-Signing Specified Bad Act of a Diligenced Employee shall have been committed by or on behalf of the Company by a Diligenced Employee and/or shall have been committed by a Diligenced Employee. The determination of whether any such Post-Signing Specified Bad Act has been committed shall be determined solely by either (i) the mutual written agreement of the Company and Purchaser or (ii) a Final Judgment.

6.9 ████████████████████████████████████████████████████████
████████████████

6.10 **Closing Date Allocation Schedule.** Purchaser shall have received the Closing Date Allocation Schedule from the Company and the Closing Date Allocation Schedule shall be true, complete and accurate and the payments to the Company Unitholders described therein shall be the correct payments to be made to the Company Unitholders in accordance with the Company's Organizational Documents, applicable Law and this Agreement.

6.11 **Exercise Notice.** Purchaser shall have delivered (and not withdrawn in accordance with Section 1.1(c)) a Call Exercise Notice to the Company or the Company shall have delivered (and not withdrawn in accordance with Section 1.2(c)) a Put Exercise Notice to Purchaser, in each case, in accordance with the terms of this Agreement.

6.12 **No Company Material Adverse Effect.** Since the Agreement Date, there shall have been no Company Material Adverse Effect; *provided*, that the condition set forth in this Section 6.12 shall not be deemed not to have been satisfied as a result of a Specified Claim unless such Specified Claim is a Material Adverse Claim.

6.13 **Trucking Company Conditions.** Each of the conditions set forth in Section 6 of the Trucking Merger Agreement (other than Sections 6.10, 6.11 and 6.13) shall be satisfied as of the Closing as though the Closing Date (as defined in this Agreement) was substituted for the "Closing Date" (as defined in the Trucking Merger Agreement) for each of such conditions.

6.14 **Deliveries.** Purchaser shall have received the following:

(a) a certificate, dated as of the Closing Date, (i) executed by an officer of the Company to the effect that each of the conditions specified in Sections 6.1, 6.2, 6.3, 6.5 (solely to the extent that the condition set forth in Section 6.5 relates to the Company and its Affiliates), 6.6(b), 6.6(c), 6.8, 6.9 and 6.12 is satisfied as of such date, and (ii) an officer of the Trucking Company to the effect that

each of the conditions specified in Sections 6.1, 6.2, 6.3, 6.5 (solely to the extent that the condition set forth in Section 6.5 relates to the Trucking Company and its Affiliates), 6.6(b), 6.6(c), 6.8, 6.9 and 6.12 set forth in the Trucking Merger Agreement is satisfied as of the such date (as though the date of such certificate was substituted for the "Closing Date" for each of such conditions);

(b)      a properly executed statement, dated as of the Closing Date, in accordance with Treasury Regulation Sections 1.897-2(h) and 1.1445-2(c)(3) and in a form reasonably acceptable to Purchaser, certifying that an interest in the Company is not a U.S. real property interest within the meaning of Code Section 897(c), together with the required notice to the IRS and written authorization for Purchaser to deliver such statement and notice to the IRS on behalf of the Company upon the Closing;

(c)      a long-form certificate of good standing from the Secretary of State of the State of Delaware which is dated within five (5) Business Days prior to Closing with respect to the Company;

(d)      written resignations of all officers and managers of the Company, to be effective as of the Effective Time;

(e)      the Employment Package Documents executed by at leas ███████████ Employees (including the Company Founders and not less than ███ of the Select Key Employees);

(f)      an executed release agreement in the form attached hereto as <u>Exhibit F</u> from Company Unitholders holding at least ███ percent ███ of the Company Units outstanding as of immediately prior to the Effective Time; and

(g)      evidence of termination of all 401(k) Plans (if applicable), to be effective as of the day immediately preceding the Closing Date.

## SECTION 7.   CONDITIONS PRECEDENT TO OBLIGATION OF THE COMPANY

The obligation of the Company to effect the Merger and otherwise consummate the transactions contemplated by this Agreement is subject to the satisfaction (or, to the extent permitted, waiver by the Company), at or prior to the Closing, of the following conditions:

**7.1      Accuracy of Representations.**  The representations and warranties of Parent, Purchaser and Merger Sub set forth in Section 3 that are qualified as to materiality shall be true and correct, and all other representations and warranties of Parent, Purchaser and Merger Sub set forth in this Agreement that are not so qualified shall be true and correct in all material respects, in each case as of the Agreement Date and as of the Closing Date, with the same effect as though made as of the Closing Date, except that the accuracy of representations and warranties that by their terms speak as of a specified date will be determined as of such date.

**7.2      Performance of Covenants.**  Each of Parent, Purchaser and Merger Sub shall have performed and complied with, in all material respects, all of their agreements, obligations and covenants required hereby to be performed by it at or before the Closing (to the extent that such covenants require performance by Parent, Purchaser or Merger Sub at or before the Closing).

**7.3      Regulatory Approvals.**  Any Consent applicable to the consummation of the transactions contemplated by this Agreement required under the HSR Act and required or advisable under any other Antitrust Law shall have been obtained and not expired or revoked.

**7.4    No Restraints.**  No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the Merger or any of the other transactions contemplated under this Agreement shall have been issued by any court of competent jurisdiction or other Governmental Body and remain in effect, and no Law shall have been enacted since the Agreement Date that makes consummation of the Merger or any of the other transactions contemplated under this Agreement by the Company illegal.

**7.5    Exercise Notice.**  Purchaser shall have delivered (and not withdrawn in accordance with Section 1.1(c)) a Call Exercise Notice to the Company or the Company shall have delivered (and not withdrawn in accordance with Section 1.2(c)) a Put Exercise Notice to Purchaser, in each case, in accordance with the terms of this Agreement.

**7.6    Required Unitholder Approval.**  This Agreement and the Merger shall have been duly adopted and approved by the Required Company Unitholder Vote.

**7.7    Trucking Company Conditions.**  Each of the conditions set forth in Section 7 of the Trucking Merger Agreement (other than Sections 7.5 and 7.7) shall be satisfied as of the Closing as though the Closing Date (as defined in this Agreement) was substituted for the "Closing Date" (as defined in the Trucking Merger Agreement) for each of such conditions.

**7.8    Deliveries.**  Company shall have received the following:

**(a)**    a certificate, dated as of the Closing Date, of Parent, Purchaser and Merger Sub, executed by an officer of each, certifying that the conditions set forth in (i) Sections 7.1, Section 7.2 and 7.4 (solely to the extent that the condition set forth in Section 7.4 relates to Parent and its Affiliates) have been duly satisfied as of such date and (ii) Sections 7.1, Section 7.2 and 7.4 (solely to the extent that the condition set forth in Section 7.4 relates to Parent and its Affiliates) of the Trucking Merger Agreement have been duly satisfied as of such date (as though the date of such certificate was substituted for the "Closing Date" for each of such conditions); and

**(b)**    a certificate of Parent, executed by an officer of Parent, certifying that the Total Parent Restricted Stock Pool represents, in the aggregate, not less than ▉▉▉▉▉▉▉▉▉ of the issued and outstanding shares of Parent's capital stock (on a fully diluted basis) as of ▉▉▉▉▉▉▉▉▉▉

**SECTION 8.   TERMINATION.**

**8.1    Termination.**  Notwithstanding anything to the contrary herein, this Agreement may be terminated, and the Merger may be abandoned, prior to the Effective Time (whether before or after the adoption of this Agreement by the Required Company Unitholder Vote):

**(a)**    by mutual written consent of Purchaser and the Company;

**(b)**    by the Company if Purchaser has not delivered a Call Exercise Notice in accordance with Section 1.2 exercising the Purchaser Call Option on or prior to the end of the Call Option Period and the Company has not delivered the Company Put Option Notice during the Put Option Period;

**(c)**    by Purchaser if the Company has not delivered a Put Exercise Notice in accordance with Section 1.3 exercising the Company Put Option on or prior to the end of the Put Option Period and Purchaser has not delivered the Purchaser Call Option Notice during the Call Option Period;

(d)    by either Purchaser or the Company if (i) a court of competent jurisdiction or a Governmental Body shall have issued a final and non-appealable permanent injunction or order having the effect of restraining, enjoining or otherwise prohibiting the Merger or (ii) any Law is enacted or deemed applicable to the Merger that makes consummation of the Merger illegal;

(e)    by Purchaser (*provided* that neither it nor Merger Sub is then in material breach of any of their respective representations, warranties, covenants, obligations or other agreements contained in this Agreement) in the event of a breach by the Company of any of its representations, warranties, covenants, obligations or other agreements contained in this Agreement that (i) would give rise to the failure of a condition set forth in Section 6.1 or Section 6.2, respectively, to be satisfied and (ii) cannot be or has not been cured within 15 days after the delivery of written notice to the Company of such breach;

(f)    by the Company (*provided* that it is not then in material breach of any of its representations, warranties, covenants or other agreements contained in this Agreement) in the event of a breach by Parent, Merger Sub or Purchaser of any of their respective representations, warranties, covenants, obligations or other agreements contained in this Agreement that (i) would give rise to the failure of a condition set forth in Section 7.1 or Section 7.2 to be satisfied and (ii) cannot be or has not been cured within 15 days after the delivery of written notice to Purchaser of such breach;

(g)    by either Purchaser or the Company by providing written notice to the other if either (i) (A) Purchaser has delivered (and not withdrawn) a Call Exercise Notice in accordance with Section 1.1 with respect to the Purchaser Call Option or (B) the Company has delivered (and not withdrawn) a Put Exercise Notice in accordance with Section 1.2 with respect to the Company Put Option and (ii) the Closing has not occurred within forty-five (45) days after the delivery of such notice (the "**Initial End Date**"), but only if such terminating Party is not then in material breach of its respective representations, warranties, covenants, obligations or other agreements contained in this Agreement, considered collectively, *provided, however,* that if any waiting period applicable to the consummation of Merger under the HSR Act and any applicable foreign antitrust Laws shall not have expired or been terminated by the Initial End Date but all other conditions to Closing of such terminating party have been satisfied as of the Initial End Date (other than conditions pertaining to covenants as part of effectuating the Closing), the Initial End Date shall be extended until the date that is six (6) months after the date of the delivery of the Call Exercise Notice or the Put Exercise Notice, as the case may be;

(h)    by Purchaser, if no later than 24 hours following the execution and delivery of this Agreement by the Parties, the Company shall not have delivered to Parent a copy of the Company Unitholders' Written Consent executed by holders of Company Common Units sufficient to constitute the Required Company Unitholder Vote; *provided* that if Purchaser has the right to terminate this Agreement under this Section 8.1(h) but does not effect such termination within five (5) Business Days following the Agreement Date, then Purchaser shall be deemed to have irrevocably waived its right to terminate this Agreement pursuant to this Section 8.1(h);

(i)    by Purchaser, if at any time prior to the Closing any event has occurred or any circumstance exists which, alone or together with any one or more other events or circumstances has had, is having or would reasonably be expected to have a Company Material Adverse Effect; ███████████ ████████████████████████████████████████████████████████████████████████ or

(j)    by either Purchaser or the Company by providing written notice to the other if the Trucking Merger Agreement is terminated in accordance with its terms.

        **8.2**     **Effect of Termination.**  In the event this Agreement is terminated pursuant to Section 8.1:

             **(a)**     this Agreement shall forthwith become void and of no further force or effect; *provided,* that this Section 8.2, Section 8.3 and Section 9 of this Agreement shall survive the termination of this Agreement and shall remain in full force and effect; and

             **(b)**     each of the Company, Parent, Purchaser and Merger Sub shall continue to have Liability arising out of or resulting from:

             **(i)**     any Fraud of the Company, Parent, Purchaser or Merger Sub set forth in this Agreement, which Liability shall not be limited; and

             **(ii)**     any willful breach by the Company, Parent, Purchaser or Merger Sub of any agreement, obligation or covenant of such Party in this Agreement prior to the date of such termination of this Agreement, including such Party's obligations under Section 8.3 of this Agreement, which Liability shall not be limited.

Except as provided for in this Section 8.2(b), no Party shall have any Liability with respect to this Agreement or the transactions contemplated by this Agreement in the event this Agreement is terminated.

        **8.3**     **Commercial Agreement.**



## SECTION 9.   Miscellaneous Provisions

        **9.1**     **Amendment.**  This Agreement may not be amended (a) prior to the Effective Time, without the written approval of Purchaser and the Company; and (b) after the Effective Time, without the written approval of Purchaser and each of the Company Founders.

        **9.2**     **Expenses.**  Except as otherwise specifically provided herein, including Section 5.3(b) and as set forth on Schedule 9.2 attached hereto, all fees and expenses incurred in connection with this Agreement and the Merger shall be paid by the Party incurring such expenses, whether or not the Merger is consummated.

9.3     **Waiver.**

(a)     No failure on the part of any Party to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Party in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

(b)     No Party shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Party; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

9.4     **Entire Agreement; Counterparts.**  This Agreement and the documents and instruments and other agreements specifically referred to herein, including the Company Disclosure Schedules and the Exhibits attached hereto, constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among or between any of the Parties with respect to the subject matter hereof and thereof.  This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which constitute one and the same instrument.  Any such counterpart, to the extent delivered by means of a fax machine or by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail (any such delivery, an "**Electronic Delivery**") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No Party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a Contract, and each such Party forever waives any such defense, except to the extent that such defense relates to lack of authenticity.

9.5     **Applicable Law.**  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the Laws that might otherwise govern under applicable principles of conflicts of laws thereof.  Each of the Parties hereto irrevocably consents to the exclusive jurisdiction and venue of the Court of Chancery of the State of Delaware (or, in the case of a federal claim as to which federal courts have exclusive jurisdiction, the Federal Court of the United States of America) in connection with any matter based upon or arising out of this Agreement or the matters contemplated herein, agrees that process may be served upon them in any manner authorized by the laws of the State of Delaware for such persons and waives and covenants not to assert or plead any objection which they might otherwise have to such jurisdiction, venue and such process.  Each Party agrees not to commence any legal Proceedings related hereto except in such courts.

9.6     **WAIVER OF JURY TRIAL.**  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY HERETO IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

9.7     **Assignability**.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of Law or otherwise by any of the Parties hereto without the prior written consent of the other Parties hereto, and any such assignment without such prior written consent shall be null and void.  Notwithstanding the foregoing, (a) Purchaser may assign this Agreement and any of its rights, interests or obligations hereunder, in

connection with a merger, acquisition, sale of all or substantially all of its assets or other change in control transaction, and (b) Purchaser may assign its rights and delegate its obligations hereunder to its Affiliates as long as Purchaser remains ultimately liable for all of Purchaser's obligations hereunder.

      **9.8    Third Party Beneficiaries.**  Except as specifically provided in Section 5.8, nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (other than the Parties) any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.  No covenant or other undertaking in this Agreement shall constitute an amendment to any employee benefit plan, program, policy or arrangement, and any covenant or undertaking that suggests that an employee benefit plan, program, policy or arrangement will be amended shall be effective only upon the adoption of a written amendment in accordance with the amendment procedures of such plan, program, policy or arrangement.

      **9.9    Notices.**  Any notice or other communication required or permitted to be delivered to any Party under this Agreement shall be in writing and shall be deemed properly delivered, given and received (a) upon receipt when delivered by hand, (b) upon transmission, if sent by facsimile or electronic transmission (in each case with receipt verified by electronic mail or telephone confirmation), or (c) one Business Day after being sent by overnight courier or express delivery service (with proof of delivery), *provided* that in each case the notice or other communication is sent to the address or facsimile telephone number set forth beneath the name of such Party below (or to such other address or facsimile telephone number as such Party shall have specified in a written notice given to the other Parties):

      (a)      **if to Parent, Purchaser or Merger Subs, to:**

           Uber Technologies, Inc.
           1455 Market Street, 4th Floor
           San Francisco, CA 94103
           Attn: General Counsel
           with a copy (which shall not constitute notice) to:

           Cooley LLP
           101 California Street, 5th Floor
           San Francisco, CA 94111-5800
           Attn:  Jamie Leigh
           Facsimile No.: 1.415.693.2222
           Telephone No.: 1.415.693.2190
           Email: jleigh@cooley.com

      (b)      **if to the Company Founders, or, prior to the Closing, the Company, to:**

           Ottomotto LLC



           with a copy (which shall not constitute notice) to:

           O'Melveny & Myers LLP
           2765 Sand Hill Road

Menlo Park, CA 94025
Attn: Paul Sieben
Facsimile No.: 1.650.473.2601
Telephone No.: 1. 650.473.2613
Email: psieben@omm.com

with a copy (which shall not constitute notice) to:

Donahue Fitzgerald LLP
1646 N. California Boulevard, Suite 250
Walnut Creek, CA 94596
Attn: John F. Gardner
Facsimile No.: (925) 746-7776
Telephone No.: (925) 746-7770
Email: JGardner@Donahue.com

    **(c)**    **If to the Company Unitholder Representative, to:**

Lior Ron



with a copy (which shall not constitute notice) to:



with a copy (which shall not constitute notice) to:



    **9.10**    **Severability.**  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction or other Governmental Body declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court or other Governmental Body making such determination shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term

or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.  In the event such court or other Governmental Body does not exercise the power granted to it in the prior sentence, the Parties shall use commercially reasonable efforts to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

**9.11    Specific Performance.**  Except as set forth in this Agreement, the rights and remedies of the Parties specified shall be cumulative (and not alternative).  Each of the Parties agrees that this Agreement is intended to be legally binding and specifically enforceable pursuant to its terms and that Purchaser and the Company would be irreparably harmed if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide adequate remedy in such event.  Accordingly, in addition to any other remedy to which a Party may be entitled at law, each Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which such Party is entitled at law or in equity, and the Parties hereby waive the requirement of any posting of a bond in connection with the remedies described herein.

**9.12    Construction.**

(a)    For purposes of this Agreement, whenever the context requires: the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders, and "or" is not exclusive.

(b)    The Parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be applied in the construction or interpretation of this Agreement.

(c)    As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

(d)    Except as otherwise indicated, all references in this Agreement to "Sections," "Exhibits" and "Schedules" are intended to refer to Sections of this Agreement and Exhibits or Schedules to this Agreement and such Exhibits and Schedules (including the Company Disclosure Schedules) annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

(e)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(f)    In this Agreement, unless the context otherwise requires, references to (i) any agreement (including this Agreement), Contract or Law are to the agreement, Contract or Law as amended, modified, supplemented or replaced from time to time, and to any section of any statute or regulation are to any successor to the section; and (ii) any Person include any successor to that Person or permitted successors and assigns of that Person.

(g)     The word (i) "will" shall be construed to have the same meaning and effect as the word "shall", (ii) "any" shall mean "any and all" unless otherwise clearly indicated by context and (iii) "or" is disjunctive but not mutually exclusive.

(h)     Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(i)     No prior draft of this Agreement nor any course of performance or course of dealing shall be used in the interpretation or construction of this Agreement.  No parole evidence shall be introduced in the construction or interpretation of this Agreement unless the ambiguity or uncertainty in issue is plainly discernable from a reading of this Agreement without consideration of any extrinsic evidence.

(j)     Although the same or similar subject matters may be addressed in different provisions of this Agreement, the Parties intend that, except as reasonably apparent on the face of the Agreement or as expressly provided in this Agreement, each such provision shall be read separately, be given independent significance and not be construed as limiting any other provision of this Agreement (whether or not more general or more specific in scope, substance or content).

(k)     The table of contents, captions and headings contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

(l)     All references in this Agreement (i) to "U.S." are references to the United States of America and (ii) to dollar amounts or "$" are references to U.S. dollars, and all payments hereunder shall be made in U.S. dollars.

(m)     All references in this Agreement to the "Company" shall mean and refer to the Company and all of its predecessors, including Ottomotto Inc., a Delaware corporation.

(n)     The word "willful" shall not be construed as to require any malicious intent.

9.13    **Company Disclosure Schedules.**    The Company Disclosure Schedules have been arranged into separate parts corresponding to the subsections of Section 2 and Section 4.3.  Information set forth in a part of the Company Disclosure Schedules shall be deemed to be disclosed for purposes of the corresponding Section or subsection of this Agreement and no disclosure made in any particular part of the Company Disclosure Schedules shall be deemed made in any other part unless (a) expressly made therein (by cross-reference or otherwise) or (b) it is readily apparent on the face of such disclosure that such disclosure applies to such other representations and warranties.  For purposes of this Agreement, each statement or other item of information set forth in the Company Disclosure Schedules shall be deemed to be a representation and warranty made by the Company in the corresponding Section of this Agreement.  No reference to or disclosure of any item or other matter in the Company Disclosure Schedules shall be construed as an admission or indication that such item or other matter is material (nor shall it establish a standard of materiality for any purpose whatsoever) or that such item or other matter is required to be referred to or disclosed in the Company Disclosure Schedules.  The information set forth in the Company Disclosure Schedules is disclosed solely for the purposes of this Agreement, and no information set forth therein shall be deemed to be an admission by any Party hereto to any Third Party of any matter whatsoever, including of any violation of Law or breach of any Contract.

**9.14    Limited Guarantee**.  Parent agrees to take all action necessary to cause Purchaser and Merger Sub, as applicable, to perform all of their respective agreements, covenants and obligations under this Agreement, the Exhibits hereto, and the other agreements contemplated hereunder to which Purchaser and/or Merger Sub is party (subject, in each case, to the terms and limitations set forth in this Agreement, the Exhibits hereto and such other agreements, as applicable, the "**Guaranteed Obligations**"). Parent unconditionally and irrevocably guarantees to the Company the full and complete performance by Purchaser and Merger Sub, as applicable, of the Guaranteed Obligations and shall be liable for any breach of any representation, warranty, covenant or obligation of Purchaser or Merger Sub, as applicable, under the Guaranteed Obligations.  This is a guarantee of payment and performance and not of collection. Parent hereby waives diligence, presentment, demand of performance, filing of any claim, any right to require any proceeding first against Purchaser or Merger Sub, as applicable, protest, notice and all demands whatsoever in connection with the performance of its obligations set forth in this Section 9.14.

[signature page follows]

IN WITNESS WHEREOF, the Parties have caused this Agreement and Plan of Merger to be executed and delivered as of the Agreement Date.

**UBER TECHNOLOGIES, INC.**



By: _____

Name: Travis Kalanick

Title:  President, Chief Executive Officer and
        Secretary

**ZING MERGER SUB I, LLC**

By: _____

Name: Gautam Gupta

Title:  Manager

[SIGNATURE PAGE TO NEWCO AGREEMENT AND PLAN OF MERGER]

IN WITNESS WHEREOF, the Parties have caused this Agreement and Plan of Merger to be executed and delivered as of the Agreement Date.

**UBER TECHNOLOGIES, INC.**

By: _____
Name: Travis Kalanick
Title:  President, Chief Executive Officer and
Secretary



**ZING MERGER SUB I, LLC**

By: _____
Name: Gautam Gupta
Title:  Manager

[SIGNATURE PAGE TO NEWCO AGREEMENT AND PLAN OF MERGER]

IN WITNESS WHEREOF, the Parties have caused this Agreement and Plan of Merger to be executed and delivered as of the Agreement Date.

**UBER TECHNOLOGIES, INC.**

By: _____
Name: Travis Kalanick
Title:  President, Chief Executive Officer and
      Secretary

By: _____
Name:
Title:  Authorized Signatory

**ZING MERGER SUB I, LLC**

By: _____
Name: Gautam Gupta
Title:  Manager

[SIGNATURE PAGE TO NEWCO AGREEMENT AND PLAN OF MERGER]

IN WITNESS WHEREOF, the Parties have caused this Agreement and Plan of Merger to be executed and delivered as of the Agreement Date.

**OTTOMOTTO LLC**

By: _____

Name: Lior Ron
Title: President

**LIOR RON, SOLELY IN HIS CAPACITY AS THE COMPANY UNITHOLDER REPRESENTATIVE**

By: _____

Name: Lior Ron
Title: Company Unitholder Representative

[SIGNATURE PAGE TO NEWCO AGREEMENT AND PLAN OF MERGER]

## EXHIBIT A

### CERTAIN DEFINITIONS

For purposes of the Agreement (including this Exhibit A):

**401(k) Plans**. "401(k) Plans" shall have the meaning set forth in Section 4.8(e).

**Affiliate.** "Affiliate" of a Person means any other Person which, directly or indirectly, controls, is controlled by, or is under common control with, such Person. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

**Agreement.** "Agreement" shall have the meaning set forth in the preamble to this Agreement.

**Agreement Date.** "Agreement Date" shall have the meaning set forth in the preamble to this Agreement.

**Agreement Date Invoice.** "Agreement Date Invoice" shall have the meaning set forth in Section 5.4(c).

███████████████████████████████████████████████████

**Agreement Date Transaction Expenses.** "Agreement Date Transaction Expenses" shall mean, without duplication, (a) the aggregate out-of-pocket expenses, costs, fees and disbursements (including fees and expenses payable to all attorneys, accountants, investment bankers and other advisers of the Company) that are payable by the Company in connection with the negotiation, execution, delivery and performance of this Agreement, the Merger or any of the other transactions and matters contemplated in connection therewith pursuant to arrangements entered into by the Company prior to the Agreement Date, and (b) all other miscellaneous expenses or costs incurred by the Company in connection with the transactions contemplated by this Agreement, in each case pursuant to arrangements entered into by the Company prior to the Agreement Date and to the extent that such fees, expenses and disbursements have not been fully satisfied and paid by the Company as of immediately prior to the Agreement Date.

**Alternative Proposal.** "Alternative Proposal" shall mean any proposal or offer from any Person (other than the Purchaser, its Affiliates or their respective representatives or any then current Employee of the Company), but including, for the avoidance of doubt from any Competitor, for (a) any acquisition by such Person (whether by merger, recapitalization, consolidation, arrangement, amalgamation, purchase of capital stock or other equity securities, purchase of assets, takeover bid or otherwise) of (i) all or a substantial amount of the assets of the Company, (ii) any of the Company Intellectual Property, or (iii) any interest in the Equity Participations of the Company or any tender offer or exchange offer that if consummated would result in any Person beneficially owning any class of equity securities of the Company or any merger, consolidation, or business combination of the Company with any unaffiliated third party, other than the transactions contemplated by this Agreement or (b) any commercial arrangement between the Company, on the one hand, and a Competitor, on the other hand, that cannot be unilaterally terminated by the Company on less than fifteen (15) days notice without any Liability to (or

any ongoing obligations on the part of) the Company, Parent or any of their respective Affiliates; *provided*, for the avoidance of doubt and solely with respect to this clause (b), the sale by the Company of products or services to any Person other than a Competitor in connection with the operation of its business in the Ordinary Course of Business shall not constitute an Alternative Proposal.

**Anti-Corruption Laws.**  "Anti-Corruption Laws" shall mean the Foreign Corrupt Practices Act of 1977, as amended, the Anti-Kickback Act of 1986 or any applicable Laws of similar effect, and the related regulations and published interpretations thereunder.

**Antitrust Law**.  "Antitrust Law" shall mean the HSR Act and any other Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening competition through merger or acquisition.

**Applicable Restricted Stock Percentage.**  "Applicable Restricted Stock Percentage" shall mean, with respect to each Employee, the percentage set forth opposite such Employee's name on Exhibit G attached hereto; *provided*, that (a) up to the date that is five (5) Business Days prior to the Closing, the Company may amend or otherwise revise such Exhibit (provided that any aggregate decrease to the percentage set forth opposite an Employee's name on the Agreement Date that is in excess of (x) 1% of the aggregate 100% or (y) 33.33% of such Employee's percentage as of the Agreement Date shall require, in each case, the prior written approval of Parent (which approval shall not be unreasonably withheld, conditioned or delayed)) and (ii) in no event shall the Applicable Restricted Stock Percentage in the aggregate exceed 100%. For the avoidance of doubt, the Company shall be entitled to reserve a portion of the Applicable Restricted Stock Percentage for employees to be hired by Parent (or its Affiliates) after the Closing. The number of shares of Parent's common stock represented by the Applicable Restricted Stock Percentage for each Employee shall be set forth in such Employee's Employment Package Documents.

███████████████████████████████████████

**Arbitration Decision.**  "Arbitration Decision" means, with respect to any matter, the final non-appealable decision of the arbitrator(s) as set forth in clause (b) of the definition of Final Judgment.

**Bad Acts.**  "Bad Acts" shall mean (a) fraud committed by or on behalf of the Company and/or committed by any Employee, (b) willful, intentional or deliberate conduct by an Employee or the Company that constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee or the Company of any Patents, Copyrights, Trademarks or Trade Secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by such Employee's Former Employer, (c) willful and/or intentional breach by the Company or any Employee of any fiduciary duty or duty of loyalty to such Former Employer and/or (d) willful and/or intentional breach by the Company or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Employee and such Employee's Former Employer.

**Bad Act Notice**. "Bad Act Notice" shall have the meaning set forth in Section 5.6(b).

**Books and Records**. "Books and Records" shall have the meaning set forth in Section 4.7(c).

**Business.**  "Business" shall mean the Consumer Business.

**Business Day.**  "Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in San Francisco, California.

**Call Exercise Notice**. "Call Exercise Notice" shall have the meaning set forth in Section 1.1(b).

**Call Option Period.** "Call Option Period" shall mean the period beginning on August 1, 2016 and ending on March 31, 2017.

**Certificate of Merger**. "Certificate of Merger" shall have the meaning set forth in Section 1.3(b).

**Class A Common Units.** "Class A Common Units" shall mean the Class A Common Units of the Company, as described in more detail in the Company LLC Agreement.

**Class B Common Units.** "Class B Common Units" shall mean the Class B Common Units of the Company, as described in more detail in the Company LLC Agreement.

**Closing.** "Closing" shall have the meaning set forth in Section 1.4.

**Closing Date.** "Closing Date" shall have the meaning set forth in Section 1.4.

**Closing Date Invoice.** "Closing Date Invoice" shall have the meaning set forth in Section 5.4(d).

**Closing Date Allocation Schedule**. "Closing Date Allocation Schedule" shall mean a schedule, prepared and executed by the Company, setting forth, as of the immediately prior to the Effective Time, for each Company Unitholder:  (a) such Company Unitholder's name and address of record; (b) the number of Company Common Units held by such Company Unitholder (on a class by class basis); and (c) the portion of the Merger Consideration (before any applicable Tax withholding) to be paid to such Company Unitholder at the Closing (which amount shall be calculated in accordance with the provisions of the Organizational Documents of the Company, applicable Law and the terms and conditions of this Agreement in respect of the Company Common Units held by such Company Unitholder as of immediate prior to the Effective Time (on a class by class basis)).

**Closing Date Transaction Expenses**. "Closing Date Transaction Expenses" shall mean, without duplication, (a) the aggregate out-of-pocket expenses, costs, fees and disbursements (including fees and expenses payable to all attorneys, accountants, investment bankers and other advisers of the Company) that are payable by the Company in connection with the negotiation, execution, delivery and performance of this Agreement, the Merger or any of the other transactions and matters contemplated in connection therewith pursuant to arrangements entered into by the Company prior to the Closing, and (b) all other miscellaneous expenses or costs incurred by the Company in connection with the transactions contemplated by this Agreement (including the cost of the D&O Tail Policy referenced in Section 5.9(b)), in each case pursuant to arrangements entered into by the Company prior to the Closing and to the extent that such fees, expenses and disbursements have not been fully satisfied and paid by the Company as of immediately prior to the Closing.

**Code.** "Code" shall mean the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

**Commercial Agreement.** "Commercial Agreement" shall mean the Commercial Agreement attached hereto as Exhibit H.

**Commercial Software.** "Commercial Software" shall mean Software that (i) is commercially available off-the-shelf Software licensed to the Company on standard terms that have not been negotiated, (ii) is not material to the Company or to the Business, (iii) has not been modified or customized for the Company and (iv) is licensed to the Company for a one-time or annual fee of $10,000 or less.

**Company.**  "Company" shall have the meaning set forth in the preamble to this Agreement.

**Company Board.**  "Company Board" shall have the meaning set forth in the recitals to this Agreement.

**Company Call Certificate**. "Company Call Certificate" shall have the meaning set forth in Section 1.1(b).

**Company Common Units.**  "Company Common Units" shall mean, collectively, the Class A Common Units and the Class B Common Units.

**Company Debt.** "Company Debt" shall mean the outstanding principal amount of, and all interest and other amounts accrued (including prepayment penalties) in respect of, (a) any indebtedness for borrowed money, extensions of credit, purchase money financing and capitalized lease obligations or for the deferred purchase price of property or services, in each case, of the Company, whether or not recourse to the Company, (b) any obligation of the Company evidenced by bonds, debentures, notes or other similar instruments, (c) any reimbursement obligation of the Company with respect to letters of credit (including standby letters of credit), bankers' acceptances or similar facilities issued for the account of the Company, (d) any obligation of the Company under any interest rate and currency protection agreement (including any swaps, forward contracts, caps, floors, collars and similar agreements) and commodity swaps, forward contracts and similar agreements, and (e) any obligation of the type referred to in clauses (a) through (d) of any Person the payment of which the Company has guaranteed or for which the Company is responsible or liable, directly or indirectly, jointly or severally, as obligor or guarantor.

**Company Disclosure Schedules.**  "Company Disclosure Schedules" shall have the meaning set forth in Section 2.

**Company Historical Financial Statements**. "Company Historical Financial Statements" shall have the meaning set forth in Section 4.7(a).

**Company Employee Plan.**  "Company Employee Plan" means each "employee benefit plan" as defined in Section 3(3) of ERISA and any other plan, policy, program, practice, agreement, understanding, or arrangement (whether or not subject to ERISA) providing compensation or benefits to any current or former director, manager, officer, employee or consultant (or to any dependent or beneficiary thereof) of the Company or any ERISA Affiliate which (a) is maintained, sponsored, contributed to, or required to be contributed to by the Company or any ERISA Affiliate, or (b) under which the Company or any ERISA Affiliate has or may have any Liability, including all employment or consulting agreements, incentive, bonus, retirement, compensation, fringe benefit, deferred compensation, vacation, holiday, cafeteria, medical, disability, sick leave, workers' compensation, life insurance, stock purchase, stock option, stock appreciation, phantom stock, restricted stock, restricted stock unit or other stock-based compensation plans, change of control, retention, transaction or severance or any other similar policies, programs, practices or arrangements (whether written or oral, qualified or nonqualified, funded or unfunded) and any trust, escrow or similar arrangement related thereto.

**Company Founders.**  "Company Founders" shall mean Anthony Levandowski and Lior Ron.

**Company Fundamental Representations.**  "Company Fundamental Representations" shall mean the representations and warranties set forth in Section 2.1 (Due Incorporation), 2.2 (Organizational Documents), Section 2.3 (Capitalization, Etc.), Section 2.4 (No Subsidiaries), Section 2.14 (Tax Matters),

Section 2.17 (Authority; Binding Nature of Agreement), Section 2.18 (Vote Required), Sections 2.19(a) and 2.19(b) (Non-Contravention) and Section 2.20 (Financial Advisor).

**Company LLC Agreement.** "Company LLC Agreement" shall mean the limited liability company agreement of the Company as in effect through (and including) the Agreement Date, a copy of which was made available to Purchaser prior to the Agreement Date.

**Company Intellectual Property.** "Company Intellectual Property" shall have the meaning set forth in Section 2.8(d).

**Company Material Adverse Effect.** "Company Material Adverse Effect" shall mean any change, development, event, occurrence, fact or effect that, individually or in the aggregate with any one or more other changes, developments, occurrences, facts or effects, (a) is, or would reasonably be expected to be, materially adverse to the operations, assets (including Company Intellectual Property), liabilities, condition (financial or otherwise), results of operation or business of the Company, taken as a whole, or (b) would reasonably be expected to prevent or materially impede, interfere with, hinder or delay the ability of the Company to perform its obligations under this Agreement or consummate the Merger; *provided,* that none of the following (individually or in combination) shall be deemed to constitute, or shall be taken into account in determining whether there has been, a Company Material Adverse Effect:  (i) any adverse effect resulting from or relating to changes in general business or economic conditions, except to the extent such general business or economic conditions have a disproportionate effect on the Company as compared to any of the other companies in the industry in which the Company operates or competes; (ii) any adverse effect resulting directly or indirectly from or relating to any change in accounting requirements or principles or any change in applicable Laws or the interpretation thereof after the Agreement Date, except to the extent such adverse effect has a disproportionate effect on the Company as compared to any of the other companies in such industry or industry sector; (iii) any adverse effect resulting from any action taken (or omitted to be taken) by the Company at Purchaser's (or any of its Affiliates') written direction; (iv) any adverse effect resulting from any act of terrorism, sabotage, military action or war (whether or not declared), any natural disaster (including any earthquake, flood or fire) or comparable event, in each case including any escalation or worsening thereof, except to the extent such event has a disproportionate effect on the Company as compared to any of the other companies in the industry in which the Company operates or competes; (v) other than a Specified Claim that is a Material Adverse Claim, any adverse effect resulting from the pendency of the Merger, (vi) any adverse effect resulting from any action taken by a Party that is expressly required by the terms of this Agreement; and (vii) any adverse effect relating to any failure of the Company to meet financial or other projections for any period ending after the date of this Agreement (provided, that this clause (vii) shall not prevent a determination that any change or effect underlying such failure to meet projections or forecasts has resulted in a Company Material Adverse Effect).

**Company Operating Plan.** "Company Operating Plan" shall mean the Company Operating Plan attached hereto as Exhibit J (as the same may be amended from time to time after the Agreement Date by the mutual written consent of the Company and Purchaser).

**Company Permit.** "Company Permit" shall have the meaning set forth in Section 2.12.

**Company Products.** "Company Products" means all products and services licensed, sold, distributed or performed by or on behalf of the Company.

**Company Put Option**. "Company Put Option" shall have the meaning set forth in Section 1.2(a).

**Company Restricted Units**. "Company Restricted Units" shall mean any Company Common Units owned by Employees that are issued and outstanding immediately prior to the Effective Time and that are subject to a repurchase option at less than the fair market value of such stock, risk of forfeiture or other vesting condition under any applicable stock restriction agreement or other agreement with the Company.  For clarity, Company Restricted Units that are no longer subject to a repurchase option because of the lapse of a substantial risk of forfeiture or satisfaction of a vesting condition or other contingency shall be treated as Company Common Units for purposes of this Agreement.

**Company Return.** "Company Return" shall have the meaning set forth in Section 2.14.

**Company Source Code.**  "Company Source Code" shall mean, collectively, any software source code or database specifications or designs, or any proprietary information, build scripts, test scripts, documentation, instructions or algorithms contained in any software included in the Company Intellectual Property or Company Products.

**Company Unitholder.**  "Company Unitholder" shall mean a holder of Company Units.

**Company Unitholder Representative.** "Company Unitholder Representative" shall have the meaning set forth in the preamble to this Agreement.

**Company Unitholders' Written Consent**. "Company Unitholders' Written Consent" shall have the meaning set forth in the recitals to this Agreement.

**Competitor.** "Competitor" means any Person who operates in the transportation-as-a-service industry (whether direct or indirect), including, (a) on-demand ridesharing and car rental services, including, without limitation, Lyft, Didi Kuaidi, OlaCabs, GrabTaxi and any of their respective Affiliates and/or successors, and (b) local or short-haul delivery logistics.

**Consent.**  "Consent" shall mean any consent, approval, notice, waiver, or expiration or termination of any waiting period (and any extensions thereof) under the HSR Act or any other Antitrust Law.

**Consumer Business.**  "Consumer Business" means the business of developing or commercializing consumer autonomous vehicles and related services.

**Continuing Employee.**  "Continuing Employee" shall have the meaning set forth in Section 5.5(c).

**Contract.**  "Contract" shall mean, with respect to any Person, any legally binding agreement, understanding, contract, note, bond, deed, mortgage, lease, sublease, license, sublicense, instrument, commitment, promise, undertaking or other arrangement, whether written or oral: (a) to which such Person is a party; (b) by which such Person or any of its assets is bound or under which such Person has any obligation; or (c) under which such Person has any right or interest.

**Copyrights.**  "Copyrights" means all works of authorship and copyrights, whether in published or unpublished works, rights in databases and data collections, mask work rights, moral rights, rights in Software and web site content, rights to compilations and collective works, rights to derivative works of any of the foregoing, registrations and applications for registration for any of the foregoing and renewals or extensions thereof.

**Covered Persons**. "Covered Persons" shall have the meaning set forth in Section 5.9(a).

A-6

**CRULLCA**.  "CRULLCA" shall have the meaning set forth in Section 2.2.

**D&O Tail Policy.** "D&O Tail Policy" shall have the meaning set forth in Section 5.9(b)

**Delaware LLC Act.** "Delaware LLC Act" shall have the meaning set forth in the recitals of this Agreement.

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

**Domain Names.** "Domain Names" shall mean Internet electronic addresses, uniform resource locators and alphanumeric designations associated therewith registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic address on the Internet and all applications for any of the foregoing.

**Effective Time.**  "Effective Time" shall have the meaning set forth in Section 1.3(b).

**Electronic Delivery.** "Electronic Delivery" shall have the meaning set forth in Section 9.4.

**Employee.**  "Employee" shall mean any current or former employee, individual engaged through a third party agency, consultant, independent contractor, manager or director of the Company.

**Employee Transaction Communications.** "Employee Transaction Communications" shall have the meaning set forth in Section 5.7(e).

**Employment Package Documents.** "Employment Package Documents" shall mean Parent's (or its Affiliate, as applicable) employment offer letter, confidentiality and invention assignment agreement, Parent Restricted Stock Award and any other documents required by Parent (or its Affiliate, as applicable), in each case in the form attached hereto as Exhibit K.

**Employment Practices.** "Employment Practices" shall have the meaning set forth in Section 2.15(j).

**Entity.**  "Entity" shall mean any corporation (including any nonprofit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

**Equity Participations.**  "Equity Participations" shall mean any (a) share, security, equity participation right and any other present or future right entitling the holder, absolutely or contingently (through the exercise of any subscription, conversion, exchange, option or similar right), to participate in the equity ownership, dividends or equity appreciation of another Person, including capital stock, membership interests, units, performance units, options, warrants, company appreciation rights, interests in "phantom" stock plans, restricted or contingent stock or profits interests, voting securities, stock appreciation rights or equivalents, convertible debentures or stock bonus plans and (b) commitments to issue any of the foregoing.

**ERISA.** "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

**ERISA Affiliate.** "ERISA Affiliate" shall mean any entity which is (or at any relevant time was) a member of a controlled group of corporations with, under common control with, a member of an affiliated service group with, or otherwise required to be aggregated with, the Company as set forth in Section 414(b), (c), (m) or (o) of the Code.

**Executed Letter of Transmittal**. "Executed Letter of Transmittal" shall have the meaning set forth in Section 1.8(a).

"**Expenses**" means the reasonable out-of-pocket and documented expenses incurred by a party in connection with seeking a Final Judgement.

**Final Judgment.** "Final Judgment" means, with respect to any matter, (a) the final non-appealable judgment of a court of competent jurisdiction with respect to such matter or, (b) the final non-appealable decision of the arbitrator(s), if the Company and Purchaser elect to pursue arbitration to adjudicate such matter in accordance with the following sentences of this definition. Any such arbitration shall be held in San Francisco, California, under the Comprehensive Arbitration Rules and Procedures of JAMS ("**JAMS**") and each of Parent, on the one hand, and the Company Unitholder Representative, on the other hand, agree to appear at such arbitration Proceeding. With respect to any matter submitted to arbitration, such arbitration shall be settled by an arbitration conducted by one arbitrator mutually agreeable to both Parent and the Company Unitholder Representative. In the event that, within fifteen (15) days after submission of any dispute to arbitration, Parent and the Company Unitholder Representative cannot mutually agree on one arbitrator, then, within ten (10) days after the end of such fifteen (15) day period, Parent, on the one hand, and the Company Unitholder Representative, on the other hand, shall each select one independent arbitrator. The two arbitrators so selected shall select a third independent arbitrator. The arbitrator(s) shall determine how all Expenses relating to the arbitration shall be paid, including the respective Expenses of each party, the fees of each arbitrator and the administrative fee of JAMS. The arbitrator or arbitrators, as the case may be, shall set a limited time period that shall exceed no more than 75 days after the demand for arbitration is filed and establish procedures designed to reduce the cost and time for discovery while allowing the parties an opportunity, adequate in the sole judgment of the arbitrator or majority of the three arbitrators, as the case may be, to discover relevant information from the opposing parties about the subject matter of the dispute. The arbitrator, or a majority of the three arbitrators, as the case may be, shall rule upon motions to compel or limit discovery and shall have the authority to impose sanctions, including attorneys' fees and costs, to the same extent as a competent court of law or equity, should the arbitrators or a majority of the three arbitrators, as the case may be, determine that discovery was sought without substantial justification or that discovery was refused or objected to without substantial justification. The decision of the arbitrator or a majority of the three arbitrators, as the case may be, as to the validity and amount of any claim submitted to arbitration shall, subject to any appeal permitted under the Federal Arbitration Act ("**FAA**"), be final, binding, and conclusive upon the Parties to this Agreement. Such decision shall be written and shall be supported by written findings of fact and conclusions which shall set forth the award, judgment, decree or order awarded by the arbitrator(s).

**Former Employer.** "Former Employer" shall mean, with respect to any employee or non-employee service provider of the Company, any former employer of such employee or non-employee service provider of the Company, together with any of such former employer's Affiliates.

**Fraud.** "Fraud" with respect to a Person shall mean actual fraud of such Person with intent to deceive.

**GAAP.** "GAAP" shall mean United States generally accepted accounting principles.



**Governmental Body.** "Governmental Body" shall mean any national, federal, regional, state, provincial, local, or foreign or other governmental authority or instrumentality, legislative body, court, administrative agency, regulatory body, commission or instrumentality, including any multinational authority having governmental or quasi-governmental powers, or any other industry self-regulatory authority.

**Guaranteed Obligations.** "Guaranteed Obligations" shall have the meaning set forth in Section 9.14.

**HSR Act.** "HSR Act" shall mean the Hart-Scott-Rodino Anti-Trust Improvements Act of 1976, as amended.

**Initial End Date.** "Initial End Date" shall have the meaning set forth in Section 8.1(g).

**Intellectual Property.** "Intellectual Property" shall mean any and all Patents, Trademarks (including Domain Names), Copyrights, Trade Secrets, Software and other intellectual property rights under patent, copyright, trade secret or trademark Law or rights under any other intellectual property statutory provision or intellectual property common law doctrine in the United States or anywhere else in the world.

**IP Agreements**. "IP Agreements" shall have the meaning set forth in Section 2.8(f)(i).

**IRCA**. "IRCA" shall have the meaning set forth in Section 2.15(k).

**IRS.** "IRS" shall mean the Internal Revenue Service.

**Key Employees.** "Key Employees" shall mean (a) each of the Employees set forth on Schedule A of the Company Disclosure Schedules (such employees, the "**Select Key Employees**") and (b) Anthony Levandowski and Lior Ron.

**Knowledge**. "Knowledge" shall mean, with respect to the Company, the knowledge of a fact or other matter, after reasonable inquiry, of the Company Founders.

**Law.** "Law" shall mean any federal, state, local, municipal, foreign or other law, statute, constitution, principle of common law, rule, regulation, ruling, requirement, guidance or guideline issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

**Liability.** "Liability" shall mean with respect to any Person any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by such Person of any type, whether accrued, absolute, contingent, matured, unmatured, liquidated, unliquidated,

known or unknown, or whether or not required by GAAP to be reflected on a balance sheet, or in the footnotes to a balance sheet, of the Company.

**Licensed Intellectual Property.**  "Licensed Intellectual Property" shall have the meaning set forth in Section 2.8(e).

**Lien.**  "Lien" shall mean any security interest, pledge, mortgage, lien, charge, covenant, equitable interest, option, preference, priority, right of first refusal, adverse claim of ownership or use, restriction on transfer (such as a right of first refusal or other similar rights), servitude, easement, right of way, defect of title or other similar encumbrance of any nature whatsoever (whether absolute or contingent).

**"made available".**  "made available" with respect to documents and other diligence materials made available to Purchaser or Parent, means delivered to Purchaser, Parent or their counsel no later than two (2) Business Days prior to the Agreement Date.

**Material Adverse Claim.**  "Material Adverse Claim" shall mean a Specified Claim that alleges facts, that if true, would reasonably result in a judgment by a Governmental Body that (i) substantially restricts the Company from developing, making, selling, using or importing the Company Intellectual Property in a durationally significant manner (provided, that, for clarity, a preliminary injunction or a temporary restraining order shall not constitute a substantial restriction on the ability of the Company from developing, making, selling, using or importing the Company Intellectual Property in a durationally significant manner), (ii) prohibits the Company from hiring either (x) Anthony Levandowski or (y) a majority of the Key Employees, or (iii) enforces a claim for damages in excess of $100,000,000 in damages.

**Material Contract.**  "Material Contract" shall mean any Contract in the following categories that is binding on the Company (other than the Company Employee Plans set forth on Section 2.15(a) of the Disclosure Schedule):

(a)  any Contract (or group of related Contracts) that require payments by or to the Company in excess of $200,000 in any current or future calendar year, including any Contract (or group of related Contracts) for the purchase or sale of real property, raw materials, goods, commodities, utilities, equipment, supplies, products or other personal property, or for the provision or receipt of services;

(b)  (i) any Contract relating to the acquisition or disposition by the Company of any operating business or assets (tangible or intangible); or (ii) any Contract relating to the acquisition or disposition by the Company of any operating business or assets (tangible or intangible) under which the Company has any executory covenants or indemnification or other obligations or rights (including put or call options);

(c)  (i) any guaranty, surety or performance bond or letter of credit issued or posted, as applicable, by the Company; (ii) any Contract evidencing Company Debt or providing for the creation of or granting any Lien upon any of the property or assets of the Company (excluding Permitted Encumbrances); (iii) any Contract (A) relating to any loan or advance to any Person (other than advances to Employees for business related expenses in the Ordinary Course of Business) or (B) obligating or committing the Company to make any such loans or advances; and (iv) any currency, commodity or other hedging or swap Contract;

(d)  (i) creating or purporting to create any partnership or joint venture or any sharing of profits or losses by the Company with any Third Party; or (ii) any Contract that provides for "earn-outs" or other contingent payments by or to the Company;

(e)      under which any Governmental Body has any material rights or that requires consent, approval or waiver, or notice to, a Governmental Body;

(f)      any Contract (i) containing covenants restricting or purporting to restrict competition which, in either case, have, would have or purport to have the effect of prohibiting the Company or any of its Affiliates (including Parent, Purchaser, the Surviving Company and their respective Affiliates after the Closing) from engaging in any business or activity in any geographic area or other jurisdiction; (ii) any Contract in which the Company has granted "exclusivity" or that requires the Company to deal exclusively with, or grant exclusive rights or rights of first refusal to, any customer, vendor, supplier, distributor, contractor or other Person; (iii) any Contract that includes any minimum purchase conditions; or (iv) any Contract containing a "most-favored-nation", best pricing or other similar term or provision by which another party to such Contract or any other Person is, or could become, entitled to any benefit, right or privilege which, under the terms of such Contract, must be at least as favorable to such party or Person as those offered to another Person;

(g)      any Contract involving a sales agent, representative, distributor, reseller, middleman, marketer, broker, franchisor or similar Person who is entitled to receive commissions, fees or markups related to the provision or resale of goods or services of the Company, in each case, that is not unilaterally terminable by the Company on thirty days or less notice without penalty to the Company.

(h)      any Contract involving commitments to make capital expenditures or to contract, purchase or sell assets involving $200,000 or more individually;

(i)      any lease, sublease, rental or occupancy agreement, license, installment, and conditional sale agreement or agreement under which the Company is lessee or lessor of, or owns, uses or operates any leasehold or other interest in any (i) real property or (ii) tangible personal property, in which (in any such case) the annual aggregate payment that the Company is required to make after the Agreement Date exceeds $200,000;

(j)      any power of attorney granted by the Company;

(k)      (i) under which the Company is expressly granted any license, covenant not to sue or immunity from suit under any Intellectual Property (other than (A) Commercial Software or (B) any such license entered into in the Ordinary Course of Business), or (ii) under which the Company expressly grants any license, covenant not to sue or immunity from suit under, or grants any Person any Lien with respect to, any Company Intellectual Property (except for any Contract granting a limited, revocable, non-exclusive license to a Third Party contract research, development, or manufacturing organization in the ordinary course of business as necessary for such organization to perform services for the Company under such Contract);

(l)      providing for royalty or other similar contingent payments by the Company, in each case, that is not unilaterally terminable by the Company on thirty days or less notice without penalty to the Company;

(m)      between the Company, on the one hand, and any current or former manager, director, officer, employee, advisor, consultant or Affiliate of the Company, on the other (including employment, severance, retention, bonus, indemnification or other Contracts), that is currently in effect and pursuant to which the Company would reasonably be expected to have any current or future Liability (other than (i) offer letters that provide for at-will employment, (ii) confidentiality and invention assignment agreements, in each case, in substantially the form made available to Purchaser prior to the Agreement Date, and (iii) any other agreements entered into with Employees and advisors in the Ordinary

Course of Business who are hired or engaged following the Agreement Date provided that such Employees or Advisors, as applicable, can be terminated at any time for any reason without amounts being owed to such Persons, other than with respect to compensation or payments accrued before the date of such termination);

        **(n)**    containing an option or grants any right of first refusal or right of first offer, right of first negotiation or similar right in favor of a Person other than the Company or that limits or purports to limit the ability of the Company to own, operate, sell, transfer, pledge or otherwise dispose of any material amount of its assets or business;

        **(o)**    involving a standstill or similar obligation of the Company to a Third Party or of a Third Party to the Company; and

        **(p)**    any Contract with any Competitor.

**Merger.** "Merger" shall have the meaning set forth in the recitals of this Agreement.

**Merger Consideration.** "Merger Consideration" shall mean cash in an aggregate amount equal to ▮▮▮▮▮

**Merger Sub.** "Merger Sub" shall have the meaning set forth in the preamble of this Agreement.

**Merger Sub Interest.** "Merger Sub Interest" shall have the meaning set forth in Section 1.6(c).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Ordinary Course of Business.** "Ordinary Course of Business" shall mean the ordinary course of business of the Company consistent with past practice and custom.

**Organizational Documents.** "Organizational Documents" shall mean with respect to any particular entity, (i) if a corporation, the articles or certificate of incorporation and the bylaws (or similar organizational documents for any entity organized or existing in any non-U.S. jurisdiction), (ii) if a limited partnership, the limited partnership agreement and the articles or certificate of limited partnership (or similar organizational documents for any entity organized or existing in any non-U.S. jurisdiction), (iii) if a limited liability company, the articles of organization or certificate of formation and the limited liability company agreement or operating agreement (or similar organizational documents for any entity organized or existing in any non-U.S. jurisdiction), (iv) if any other type of entity (including any non-U.S. entity), the formation or organizational documents and the governing documents, (v) all equityholders' agreements, voting agreements, voting trust agreements, joint venture agreements, or registration rights agreements, and (vi) any amendment or supplement to any of the foregoing.

**Outside Expert.** "Outside Expert" means Stroz Friedberg, LLC or such other vendor as mutually agreed to by the Company and Parent in writing.

**Parent.** "Parent" shall have the meaning set forth in the preamble of this Agreement.

**Parent Restricted Stock Award.** "Parent Restricted Stock Award" shall mean a restricted stock award for shares of Parent's Class A Common Stock granted pursuant to the terms of the Uber Technologies Inc. 2013 Equity Incentive Plan and included in (i) the Employment Package Documents or

(ii) in a form of consulting or independent contractor agreement as mutually agreed to by Parent and the consultant or independent contractor, as applicable, party thereto prior to the Effective Time.

**Parties**. "Parties" shall mean the Company Unitholder Representative (solely with respect to Section 1.8 and Section 5.3), Parent, Purchaser, Merger Sub and the Company.

**Patents.** "Patents" shall mean (a) patents and patent applications (provisional and non-provisional) anywhere in the world, (b) all divisionals, continuations, continuations in-part thereof, or any other patent application claiming priority, or entitled to claim priority, to (i) any such patents or patent applications or (ii) any patent or patent application from which such patents or patent applications claim, or is entitled to claim, priority, and (c) all patents issuing on any of the foregoing anywhere in the world, together with all registrations, reissues, substitutions, re-examinations, patents of addition, renewals, patent term extensions, supplemental protection certificates, or extensions of any of the foregoing anywhere in the world.

**Per Unit Merger Consideration.** "Per Unit Merger Consideration" shall mean an amount equal to (a) the Merger Consideration *divided by* (b) the number of Company Common Units outstanding as of immediately Prior to the Effective Time, rounded down to the nearest whole cent.

**Permitted Encumbrances.** "Permitted Encumbrances" mean: (a) Liens for current Taxes, assessments and other governmental charges not yet due and payable or that are being contested in good faith by appropriate Proceedings and with respect to which adequate reserves for payment have been established in accordance with GAAP; (b) statutory or common law Liens to secure obligations to landlords, lessors or renters under leases or rental agreements incurred in the ordinary course of business; (c) deposits or pledges made in connection with, or to secure payment of, workers' compensation, unemployment insurance, old age pension or other social security programs mandated under applicable Laws; (d) statutory or common law Liens in favor of carriers, warehousemen, mechanics and materialmen, to secure claims for labor, materials or supplies, and other like Liens incurred in the ordinary course of business; (e) restrictions on transfer of securities imposed by applicable state and federal securities Laws; and (f) easements, reservations, rights-of-way, restrictions, minor defects or irregularities in title and other similar Liens affecting real property not interfering in any material respect with the ordinary conduct of the business of the Company or materially detracting from the value of the property upon which such encumbrance exists.

**Person.** "Person" shall mean any individual, Entity or Governmental Body.

**Post-Signing Specified Bad Acts.** "Post-Signing Specified Bad Acts" shall have the meaning set forth on Exhibit N attached hereto.

**Pre-Closing Period.** "Pre-Closing Period" shall have the meaning set forth in Section 4.1.

**Pre-Closing Tax Period.** "Pre-Closing Tax Period" shall mean any period ending on or prior to the Closing Date, including the portion of any Straddle Period ending on the Closing Date.

**Pre-Signing Bad Act.** "Pre-Signing Bad Acts" means any Bad Act committed prior to the Agreement Date.

**Privacy Laws.** "Privacy Laws" shall mean all Laws governing the use and disclosure of individually identifiable health information, including the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, the regulations promulgated thereunder, state Laws and the European Union Data Protection

Directive 95/46/EC, the regulations promulgated thereunder and the Laws of the European Union member states promulgated pursuant thereto.

**Proceeding.** "Proceeding" shall have the meaning set forth in Section 2.16.

**Public Software.** "Public Software" shall have the meaning set forth in Section 2.8(o).

**Purchaser.** "Purchaser" shall have the meaning set forth in the preamble of this Agreement.

**Purchaser Call Option.** "Purchaser Call Option" shall have the meaning set forth in Section 1.1(a).

**Purchaser Material Adverse Effect.** "Purchaser Material Adverse Effect" shall have the meaning set forth in Section 3.3.

**Purchaser Note.** "Purchaser Note" shall mean a promissory note from the Company to Purchaser in the form attached hereto as Exhibit L.

**Purchaser Put Certificate**. "Purchaser Put Certificate" shall have the meaning set forth in Section 1.2(b)

**Put Exercise Notice.** "Put Exercise Notice" shall have the meaning set forth in Section 1.2(b).

**Put Option Period.** "Put Option Period" shall mean the period beginning on August 1, 2016 and ending on March 31, 2017.

**Registered.** "Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Body or Internet domain name registrar.

**Registered IP.** "Registered IP" shall have the meaning set forth in Section 2.8(a).

**Repayment Employee Note.** "Repayment Employee Note" shall mean (a) each promissory note set forth in Section 2.3(d) of the Company Disclosure Schedules between the Company and a Company Founder and (b) each promissory note set forth in Section 2.3(d) of the Company Disclosure Schedules the holder of which has delivered written notice to the Company prior to the Closing (the date of such notice, the "**Elective Note Repayment Date**") electing to have such note repaid at or promptly following the Elective Note Repayment Date.

**Representatives**. "Representatives" shall mean officers, managers, directors, employees, agents, attorneys, accountants and advisors.

**Required Company Unitholder Vote.** "Required Company Unitholder Vote" shall have the meaning set forth in Section 2.18.

**Software.** "Software" shall mean computer software in any form, including object code, source code and code development tools, and regardless of the method stored or the media upon which it resides.

**Specified Claim.** "Specified Claim" shall have the meaning set forth on Exhibit O attached hereto.

**Straddle Period.** "Straddle Period" shall mean any Tax period beginning before the Closing Date and ending after the Closing Date.

**Subsidiary.**  "Subsidiary" when used with respect to any Person, means any entity, corporation or other organization, whether incorporated or unincorporated, at least a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors (or equivalent governing body) or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries, or of which such Person is a managing member or general partner.

**Surviving Company.**  "Surviving Company" shall have the meaning set forth in Section 1.3(a).

**Tax or Taxes.**  "Tax" or "Taxes" means any net income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, value added tax, ad valorem, transfer, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, municipal tax, municipal surcharge premium, property, environmental or windfall profit tax, social security contribution or other tax of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount in the nature of a tax imposed by any Governmental Body responsible for the imposition of any such Tax (domestic or foreign), whether disputed or not and including (a) the Tax Liability of any other Person imposed pursuant to Treasury Regulations Section 1.1052-6 or any similar provision of other Tax Law, and (b) the obligation to indemnify or assume or otherwise succeed to the Tax Liability of any other Person, by Contract or pursuant to any Law.

**Tax Return**. "Tax Return" shall have the meaning set forth in Section 2.14.


, the Company or any of their respective Affiliates.

**Total Parent Restricted Stock Pool.**  "Total Parent Restricted Stock Pool" shall mean [REDACTED] shares of restricted stock in respect of Parent's Class A Common Stock.

**Trademarks.**  "Trademarks" shall mean common law trademarks and service marks, fictional business names, trade names, certification marks, collective marks, Domain Names, trademark and service mark registrations, renewals, applications for registration, and foreign equivalents of the foregoing; and the goodwill of service, product or business associated with each of the foregoing.

**Trade Secrets**.  "Trade Secrets" shall mean any information, including any know-how, formula, pattern, compilation, program, device, method, technique, or process, that (a) derives independent economic value, actual or potential, from not being generally known to the public or to other Persons who can obtain economic value from its disclosure or use and (b) is the subject of efforts to maintain its secrecy.

**Transaction Employees**. "Transaction Employees" shall have the meaning set forth in Section 4.4(e).

**Transfer Taxes**. "Transfer Taxes" shall have the meaning set forth in Section 5.3(b).

A-15

**Trucking Company**. "Trucking Company" shall have the meaning set forth in the recitals of this Agreement.

**Trucking Merger Agreement**. "Trucking Merger Agreement" shall have the meaning set forth in the recitals of this Agreement.

**United States Person**. "United States Person" shall mean (a) an individual citizen or resident of the United States (for tax purposes); (b) a corporation or other entity taxable as a corporation created or organized in the United States or under the laws of the United States or any political subdivision thereof; (c) an estate whose income is subject to U.S. federal income tax regardless of its source; or (d) a trust (i) whose administration is subject to the primary supervision of a United States court and which has one or more United States persons (within the meaning of Section 7701(a)(3) of the Code) who have the authority to control all substantial decisions of the trust or (ii) which has made a valid election to be treated as a United States person.

