QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David A. Perlson (Bar No. 209502)
  davidperlson@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  John Neukom (Bar No. 275887)
  johnneukom@quinnemanuel.com
  Jordan Jaffe (Bar No. 254886)
  jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>            Plaintiff,<br><br>     vs.<br><br>UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>            Defendants. | CASE NO. 3:17-cv-00939<br><br>**PLAINTIFF WAYMO LLC'S MEMORANDUM IN RESPONSE TO THE COURT'S ORDER OF CONFERENCE TO FRAME *IN LIMINE* MOTIONS (Dkt. 664)**<br><br>**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

Plaintiff Waymo LLC respectfully files this Memorandum in response to the Court's Order of June 20, 2017 (Dkt. 664), responding to the questions that the Court posed in its June 20 Order. The Court's questions are reproduced in bold, followed by Waymo's responses.

**1) At trial, won't both sides wish to affirmatively address the following question: "What, if any, precautions did Uber take to make sure that Levandowski didn't use Waymo trade secrets at Uber?" Isn't this a legitimate question that the jury is likely to consider, even on its own, and also a question likely to be asked by counsel for both sides of individual fact witnesses, maybe even of experts as well?**

Yes. Waymo agrees that the jury is likely to consider what (if any) precautions Uber, Ottomotto and Otto Trucking (collectively, "Defendants") took to make sure Levandowski did not use Waymo trade secrets. Given the relevant legal issues in this case and Levandowski's undisputed theft of Waymo's files, it would be quite surprising if the jury did *not* consider this question, whether or not this question is raised by the parties. In addition, counsel for Waymo will likely argue and produce evidence and testimony to show that Defendants failed to take reasonable precautions, to the extent they took any precautions at all.

This is a relevant and important issue, and thus presents a legitimate question for the jury to consider, for several reasons. First, if Defendants failed to take reasonable (or any) precautions, the jury could surmise that Levandowski in fact used trade secrets for Defendants' benefit. Second, if Defendants failed to take reasonable (or any) precautions, the jury could surmise that people other than Levandowski had access to the trade secrets, and thus that other people used the trade secrets on Defendants' behalf. Finally, if Defendants failed to take reasonable (or any) precautions, the jury could surmise that Defendants intended to use the trade secrets; if Defendants knew about the theft of trade secrets (as is now clear, *see infra* at Response to Question 8) and failed to take reasonable precautions, the only logical explanation for that choice is that Defendants wanted to use those trade secrets—and, in fact, did so.

Additionally, the Stroz due diligence report has still not been produced. Once Defendants produce the report, underlying documents and related communications to Waymo, the production of these materials will likely impact Waymo's answer to this question as well as Waymo's answers to the Court's remaining questions.

**2) In addressing this question, should Uber be barred from referencing any precaution it undertook on which it has refused to reveal evidence, even if the refusal was based on a sustained claim of privilege and even if Uber otherwise has made a full disclosure on the subject? If Uber is barred from any such reference, under what circumstances could Waymo open the door?**

Yes. Defendants have elected to cloak thousands of documents and communications under claims of privilege. To the extent those privilege claims are sustained, Defendants should be barred from referencing any precaution for which it has refused to reveal evidence on privilege grounds as of, at minimum, June 1, 2017, the date by which the Court ordered Defendants to submit a written statement "setting forth any waiver of privilege on pain of preclusion thereafter." (Dkt. 438.) "The privilege which protects attorney-client communications may not be used both as a sword and a shield." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992). If Defendants have invoked privilege as a shield in relation to evidence of certain precautions, they cannot use those same precautions as an evidentiary sword at trial. To the extent Defendants are permitted to introduce any such precautions, the result should be subject matter waiver as to all other communications relating to the same subject matter. "This broad scope [of waiver] is grounded in principles of fairness and serves to prevent a party from simultaneously using the privilege as both a sword and a shield; that is, it prevents the inequitable result of a party disclosing favorable communications while asserting the privilege as to less favorable ones." *In re Seagate Tech.*, LLC, 497 F. 3d 1360, 1372 (Fed. Cir. 2007), *abrogated on other grounds by Halo Elec., Inc. v. Pulse Elec., Inc.,* 136 S. Ct. 1923, 1928 (U.S. 2016).

Defendants should not be allowed to overcome the sword/shield problem by arguing that they should be allowed to disclose *some* evidence of the precaution at issue. This would only encourage and reward Defendants' *modus operandi* to selectively disclose certain facts when it suits their purposes while cloaking unfavorable facts with privilege. For example, in opposition to Waymo's Motion To Compel Due Diligence Materials, Uber submitted declarations that characterized the Uber/Ottomotto acquisition while withholding the actual acquisition documents until Uber was prodded to produce them multiple times by the Court. (*See* Dkt. 444-3 at 7-12.) Even then, Uber selectively redacted information in the acquisition Term Sheet, which Magistrate Judge Corley found improper. (5/25 Hr'g Tr. at 25:4-11 ("So your position is that a Term Sheet negotiated by two arm's

length people, that that Term Sheet is attorney-client? Why isn't the entire Term Sheet then attorney-client? And, by the way, but they shared it with the other side before you told me in your opposition there was any joint legal interest. So how is it attorney-client privilege or, if so, not waived?"); 23:7-13, 25:20-26:10, 28:17-23.)

As another example, Uber initially withheld and logged as privileged a contract governing the disclosure of information from Levandowski to Stroz Friedberg, LLC ("Stroz"). But then, when it viewed it as becoming necessary, Uber reversed course and started relying on the very same withheld contract to support its positions in this case. Specifically, after the Court issued its preliminary injunction ordering Uber to exercise its full authority to return Waymo's stolen materials (Dkt. 433 at 23 ¶ 2(b)), Uber began justifying its refusal to ask Stroz to return stolen materials in its possession based on the Levandowski/Stroz contract, claiming that Levandowski submitted information to Stroz under "very tight restrictions." (*See* Dkt. 545.) Then, less than **two hours** after submitting its statement claiming that it did not intend to waive any privileges, Uber sought to bolster its claims that it lacked the authority to control Stroz by producing a heavily redacted copy of the Levandowski-Stroz contract—a document that it had previously withheld in its entirely as privileged—as evidence of the "tight restrictions." (*Id.*)

This sort of tactical, selective disclosure should not be allowed to continue at trial or otherwise. If Defendants have asserted privilege over a given precaution that they may have taken, then Defendants should not be allowed to use evidence of that precaution to prove their case at trial, regardless of whether they have selectively disclosed certain aspects of that precaution. A contrary ruling would mean that Defendants could benefit from selective disclosure by giving the jury a biased and misleading view of the evidence, which Waymo could not adequately rebut given its lack of access to the privileged material. And as discussed above, it is clear that Defendants are engaging in selective disclosure, rather than simply revealing all non-privileged material. It is also clear that the communications themselves were made with an eye towards keeping certain communications privileged during future litigation. (LEV_002330, text message from Nina Qi, Corporate Development at Uber, to Anthony Levandowski: "Talked to our lawyers, it would be best for you to send the list to [O'Melveny & Meyers], who can send to Mofo. This should alleviate your lawyer's concerns.") Thus, the only means to ensure that the jury is not misled is to prevent Defendants from referencing a precaution on which they have refused to reveal evidence. And

this conclusion applies equally to the Stroz due diligence report: although it now appears that Defendants will have to produce the report to Waymo, Defendants should not be allowed to refer to it to argue that they took precautions recommended by it. The deadline for waiving privilege has passed. (Dkt. 438.)

While Waymo cannot categorically state that there is no way Waymo could *ever* "open the door" to Defendants' discussion of a precluded precaution, Waymo is unsure what such door-opening behavior would look like. Waymo has a right to point out the absence of evidence regarding any precautions that Defendants took, and to explain to the jury (in argument or through witness testimony) that this evidentiary absence is due to Defendants' privilege assertions. Without such an explanation, the jury may well be confused as to why there is a conspicuous lack of evidence on this key issue. This explanation to the jury would not open the door to anything though. Defendants should still be held to their bargain—having asserted privilege over precautions that it may have taken, they cannot use those precautions as affirmative evidence in this case.

**3) In considering the question indented above, isn't it inevitable that the jury will learn that some precautions taken by Uber were taken by its counsel and that those precautions remain secret and privileged?**

No. Waymo does not believe that this is necessarily inevitable, especially since it is unclear what precautions (if any) Defendants took and what communications about precautions (if any) will be considered privileged. And Defendants, as stated both herein and previously (*see e.g.,* Dkt. 444-3 at 2), should be precluded from using privilege as a sword and shield in this manner to put before the jury any alleged "precautions" they have relentlessly sought to cloak in privilege in this case.

**4) If Waymo is precluded by privilege from showing what Uber and its counsel knew and when they knew it, should we tell the jury why Waymo has been precluded, with an appropriate instruction that invocation of privilege is a legitimate right and no adverse inference may be drawn therefrom?**

Yes. If Waymo is not allowed to elicit this evidence due to privilege claims, Waymo should not be prejudiced by the potential perception that pieces of evidence are missing from its case due to lack of evidence when in fact that evidence is missing due to a privilege assertion. This should be explained to the jury. A corresponding instruction stating that invocation of attorney-client privilege is a legitimate right, and that an adverse inference should not be drawn from that alone, could be appropriate, depending on what is precluded or missing, but it would need to be placed and drafted in

-4-

context. The jury should also be instructed that assertion of attorney-client privilege does not suggest reasonable reliance on attorney advice – in other words, the jury should be instructed not to assume that Defendants took proper precautions or otherwise behaved reasonably just because Defendants engaged in numerous privileged communications with attorneys.

Finally, to prevent jury confusion as to when an adverse inference may or may not be drawn, the jury should be contemporaneously informed that invocation of *Fifth Amendment* privilege may justify an adverse inference. *See, e.g.*, *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998).

**5) To what extent may Uber argue to the jury that Waymo has failed to present proof that Uber knew or suspected Levandowski had stolen Waymo trade secrets where Uber has asserted privilege over what it actually knew or suspected? Would such an argument by Uber open the door to an explanation to the jury that Uber has asserted privilege over what it knew or suspected? To avoid this, should Uber be limited to arguing only that within the universe of non-privileged materials produced by Uber, Waymo has failed to find damning evidence?**

If Defendants argue that Waymo has failed to present proof that Defendants knew or suspected that Mr. Levandowski had stolen Waymo trade secrets, then this would open the door to Waymo presenting evidence of Defendants' privilege assertions over this topic. *See Weekley* v. *City of Los Angeles*, 656 Fed. Appx. 824, 826-27 (9th Cir. 2016) ("Under the rule of curative admissibility, or the 'opening the door' doctrine, the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission.") For example, Waymo would be entitled to point to Defendants' privilege log and argue that the large number of entries during the relevant timeframe (together with their subject-matter descriptions) indicates that Defendants knew about Mr. Levandowski's theft but have cloaked it with privilege.

The same result would hold if Defendants "argu[e] only that within the universe of non-privileged materials produced by Uber, Waymo has failed to find damning evidence." This assertion would equally open the door to Waymo arguing that Defendants have cloaked the relevant evidence with privilege. Simply put, Defendants cannot cloak evidence under claim of privilege, argue that the remaining evidence is insufficient to prove Waymo's case, yet prevent Waymo from even mentioning all the relevant evidence that has been cloaked with privilege.

**6) Waymo should not argue or imply that invocation of a privilege was a coverup — except to the extent the Court has overruled the claim of privilege. Agreed?**

-5-

If the Court is asking whether the mere invocation of the attorney-client privilege on its own should not be used to argue to the jury that the specific use of that privilege is a "cover up," then yes. However, given the circumstances of this case, that question cannot be answered in the abstract.

There is overwhelming evidence of a coverup in this case. (*See infra* at Response to Question 8.) There is also evidence that Defendants are using their privilege assertions to further that coverup. Defendants went to great lengths to shroud the acquisition and the due diligence process in secrecy: days after Levandowski resigned from Google, he signed a non-disclosure agreement with Uber to "pursue a mutually beneficial potential business opportunity, including Uber's potential investment in or acquisition of [Otto]." (UBER00016752, February 1 Non-Disclosure Agreement between Uber, Levandowski and Lior Ron.) Later, the same parties entered into a joint defense agreement to protect communications regarding "potential investigations, litigation, and/or other proceedings relating to the proposed transactions between Ottomotto, Otto Trucking and Uber and/or any affiliates of Uber." (Dkt. No. 370-2 at 2.) Particularly because the Court has since overruled Defendants' assertions of a common interest privilege before April 11, 2016, Waymo intends to explain these actions to the jury. Among other things, the timing of these various agreements is relevant to the critical question of "what Uber knew and when they knew it."

Moreover, as noted above, the analysis would be quite different regarding any invocation of *Fifth Amendment* privilege. Invocation of the Fifth Amendment privilege can justify an adverse inference, and thus it would be appropriate for Waymo to argue that the privilege is being asserted to "cover up" a bad act.

Finally, as suggested by the "overruled" clause of the Court's question, Waymo may fairly argue that Defendants are trying to "cover up" relevant evidence to the extent that Defendants fail to timely produce all evidence withheld based on privilege assertions that are overruled by the Court.

**7)  Under what circumstances, if any, would possession by Morrison & Foerster or Stroz Friedberg of any downloads in question be admissible (if true) to show unlawful acquisition or use by Uber, assuming the downloaded information qualifies as trade secrets?**

There can be no question that Morrison & Foerster ("MoFo") and Stroz are Defendants' agents in this case; indeed, Defendants have referred to Stroz as their "agent" on numerous occasions before the Court. (5/25/17 Hearing Tr. at 24:6-7; 38:5-12; 53:4-9; Dkt. 572 at 1-2.) That being the case,

possession of the downloaded materials by MoFo or Stroz would suffice to show that Defendants possessed the downloaded materials. RESTATEMENT (SECOND) OF AGENCY § 274 (1958) ("The knowledge of an agent who acquires property for his principal affects the interests of his principal in the subject matter to the same extent as if the principal had acquired it with the same knowledge, except where the agent is privileged not to disclose or to act upon the knowledge, or a change in conditions makes it inequitable thus to affect the principal.") As shown by the various privilege orders in this case, the downloaded materials are not privileged. (*See, e.g.*, Dkt. 670 at 5 ("In sum, Levandowski has not met his burden of showing that his statements to Stroz or his production of documents or devices to Stroz are protected by an attorney-client privilege. It follows, then, that an order compelling Stroz to produce these materials does not violate Levandowski's Fifth Amendment privilege against compelled self-incrimination.").) Thus, neither MoFo, Stroz, nor Defendants could avail themselves of the "privilege" exception recited in the Restatement section above. Instead, the usual Restatement rule applies, in which MoFo's or Stroz's possession of the downloaded materials as Defendants' agents should be imputed to Defendants.

MoFo's and Stroz's possession of the downloaded materials is fully sufficient to show "misappropriation," even without any other "use" of those materials. *See* 18 U.S.C. § 1839 (stating that trade secret "misappropriation" includes both "acquisition" and "use" of the trade secret). Finally, MoFo's and Stroz's possession of Waymo's files must be understood in the broader context of this case. Waymo has been trying to obtain the prompt return of its files since March 2017; Defendants never complied with the Court's first order on this subject, dated March 16, 2017; and after Uber repeatedly obfuscated on this issue, this Court then issued a PI Order again requiring the return of these files. Apart from the fact that the law permits the court to impute MoFo's/Stroz's possession of the files to Defendants, there has been a concerted effort to avoid acknowledging that these parties indeed possess these materials and to avoid returning them to Waymo as ordered. Waymo should be free to argue, and the jury should be free to infer from Defendants' and their agents' actions, *at least* that Uber unlawfully acquired these files, and possibly that they used them as well.

**8) Both sides should lay out their affirmative evidentiary case on what Uber or its counsel knew and when they knew it, so that we can evaluate which actual items of proof ought to be challenged *in limine*. (This should be at least three of your fifteen pages.)**

While discovery is not complete, the evidence to date indicates that Uber and Anthony Levandowski were in league with one another to port Waymo's trade secrets to Uber going as far back as May 2015. On June 23, Uber and Ottomotto lodged and served logs purporting to be in response to Paragraph 5 of the Court's May 11, 2017 Preliminary Injunction Order. Paragraph 5 required Defendants to provide "a complete and chronologically organized log of all oral and written communications — including, without limitation, conferences, meetings, phone calls, one-on-one conversations, texts, emails, letters, memos, and voicemails — wherein Anthony Levandowski mentioned LiDAR to any officer, director, employee, agent, supplier, or consultant of defendants." (Dkt. 426 at 25.) The earliest entries Uber and Ottomotto disclosed on that log are for communications beginning on May 20, 2015—nearly eight months before Levandowski left Google. (Dkt. 712, Ex. 1.)

By October 2015 (still three months before Levandowski's exit), one of Uber's LIDAR engineers had in his "LIDAR notebook" as a potential LIDAR supplier "NewCo"—which discovery now shows was Uber's code name for what became Otto. (Dkt. 176-3 at 23.) The only "Pro" listed was "Experience w/ automotive efforts of competitors." (*Id.*) During the same time, Uber had at least five meetings with Levandowski regarding LiDAR between October 2015 and December 11, 2015. (Dkt. 712, Ex. 1.) Uber witnesses have already testified that Uber was negotiating a potential deal with Levandowski in which a new company to be founded by Levandowski would sell LIDAR devices to Uber, *i.e.* a vendor relationship. (Poetzscher Tr. 35:23-:36:21; Qi Rough Tr. at 133:13-134:5.) But Uber was negotiating a vendor relationship with a company that did not exist, and did not have any products. (Qi Rough Tr. 132:20-133:12.) Ms. Qi testified that in all of her experience negotiating vendor deals, she has never negotiated a vendor relationship with a company that did not exist and did not have any products. (*Id.*, 141:22-142:5.)

In parallel, Mr. Levandowski was illicitly downloading Waymo's trade secrets for use at Uber. According to Uber's own Paragraph 5 log, Mr. Levandowski and Lior Ron were meeting on December 11, 2015 with Uber executives and discussing LIDAR. (Dkt. 712, Ex. 1 at Nos. 21-27.)

-8-

*Later that same day*, the undisputed evidence of record indicates that Mr. Levandowksi downloaded 14,000 proprietary files from Waymo servers. (Dkt. 23, ¶ 44.)

In late December 2015, Uber deepened its relationship with Levandowski. It began discussing acquiring a company to be founded by Levandowski, rather than a vendor relationship. (Poetzscher Tr. 63:12-64:10; Qi Rough Tr., 162:8-14.) This strategy change was suggested by Uber's then-CEO Travis Kalanick, and appears to have followed a one-on-one meeting between Kalanick and Levandowski that no one else attended. (Poetzscher Tr. 82:16-85:1, Ex. 260; Qi Rough Tr., 162:8-21.) Uber produced a Calendar invite for a meeting with Levandowski—which also appears on Uber's Paragraph 5 log—on January 4, 2016. (Ex. 263.) According to that Calendar invite, the entry on the log, and an email from the following day, it appears that this meeting lasted well past midnight. (*Id.*) (showing a 5 pm start time and 1:31 a.m. time stamp the following day to change the meeting location). Levandowski downloaded additional confidential Waymo materials to a personal device on January 4, 2016—again, the *same day* that he met with Uber for what appears to have been a very lengthy meeting. (Dkt. 24-2 ¶ 22.)

Contemporaneous commentary from Uber's own executives make clear the perceived benefit of acquiring a company that did not yet exist and whose only asset was ███████████████ ████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████

(Ex. 271 at 1.) While Mr. Bares refers to the "team" that Levandowski was going to bring to his new company, there was no team in place other than Mr. Levandowski and Mr. Ron at the time of this email. The value that Bares attributes to the "close team" that "knows the tech" and has the "know how" (which is distinguishable from "███████████████" from "███████████████") is a clear reference to Waymo's trade secrets.

Given Uber's scheme to buy Waymo's "tech" and "know how" through Mr. Levandowski, Uber began anticipating litigation with Waymo almost immediately. The day after Mr. Levanowski resigned from Waymo, Uber was already discussing indemnity with Levandowski and Lior Ron. (Ex. 277, January 28, 2016 email from Cameron Poetzscher asking Travis Kalanick, "[d]id you tell Anthony that you would indemnify them if they get sued by G as part of or after the deal? They're under that impression.") While January 28, 2016 is the earliest reference to indemnity that Waymo has seen, even this January 28 email references an earlier conversation regarding indemnity (*id.*), and Waymo has every reason to believe the conversation did indeed begin much earlier. From Cameron Poetzscher's January 28 email, it is clear that Travis Kalanick is the one who agreed to indemnify Levandowski in the first place, and there is evidence that Kalanick and Levandowski began meeting one-on-one as early as May 2015. (*See* UBER00071544, Email introducing Anthony Levandowski to Travis Kalanick and setting up a meeting.)

Moreover, the fact that Waymo has not found documentary evidence memorializing the beginning of the indemnity discussion is not surprising: multiple Uber witnesses have testified that Levandowski preferred to communicate via phone, text message, or in person only. (*See* Poetzscher Tr. at 52:2-19; Qi Rough Tr. at 170:13-17, 171:5-9.) And the Uber witnesses who negotiated the indemnity agreement on Uber's behalf testified that Levandowski was worried about exchanging drafts of documents via email; instead they exchanged drafts in person, via courier, or by taking photographs of drafts and sending them via text message. (Qi Rough Tr. at 171:5-9, 176:1-177:4; Poetzscher Tr. at 152:1-10, 159:2-24.) Although Waymo has requested the production of text messages with Levandowski, Waymo has had a hard time obtaining them: to begin with, Uber has not produced text messages with Levandowski for every witness. Moreover, Ms. Qi testified that Levandowski asked her to delete her text messages with him, and she did. (Qi Rough Tr. at 171:10-173:13.) Uber also hasn't been able to locate text messages from Travis Kalanick to Levandowski, even though it could locate text messages from Levandowski to Kalanick, suggesting that the former were deleted.

As Uber's Head of Corporate Development explained, indemnity was not something that Uber took on lightly. (Poetzscher Tr. at 229:6-24.) When Levandowski and Lior Ron initially asked to be

indemnified (and even after Kalanick agreed to it), Uber was reluctant to take on that "liability." (*Id.* at 229:2-24.) Uber would not have taken on such a "liability" without asking some obvious questions ("indemnity for what?"), and there is evidence that Uber did indeed ask these questions: as early as February 5, 2016, the parties were specifically discussing indemnity for "Bad Acts," *including* "downloading of files of [Google]." (UBER00017265 at -73, Email between Uber representatives and Lior Ron discussing "Timing of Indemnity / Closing Conditions," and an "Example list of Specified Bad Acts," which included "downloading of files of [Google]".)  Thus, Uber either knew or should have known that Levandowski had Waymo materials in his possession at least as of the beginning of the parties' discussions regarding indemnity.

Having agreed to indemnify Levandowski for "downloading of files of [Google]," Uber then moved to set up a forensic due diligence investigation designed specifically to uncover – or confirm – the downloaded Waymo files in Otto's or Levandowski's possession.  The existence and sheer scope of this investigation is proof enough that Uber knew Levandowski had Waymo materials:  it was, and remains, a process that was unprecedented for Uber. (Poetzscher Tr. at 128:11-25; Qi Rough Tr. at 243:17-244:3.)  As part of the investigation, Stroz took and analyzed the electronic devices of five different Otto employees, including both their personal and work devices. (*See* Ron Tr. at 96:3-19.) The process was so invasive that one of the diligenced employees is moving to intervene in order to obtain a protective order to prevent the production of "personal financial [information], medical [information], and . . . [information regarding] the private details of his and his family's lives," all of which is evidently in Stroz's possession as a result of the investigation. (Dkt. 729 at 1.)  Despite this, the Uber witnesses responsible for overseeing the investigation testified that the diligenced employees did not seem upset by the scope of the investigation that Uber requested; instead, they were "okay with it." (Qi Rough Tr. at 223:22-224:6.)  The most likely explanation for that is, of course, that all parties already knew what Uber was looking for—stolen Waymo files.

Although Uber must have known about the downloaded files when it agreed to indemnify Levandowski and set up the forensic investigation, Uber almost certainly found out that Levandowski had downloaded materials when the diligence process got underway.  To motivate Levandowski to disclose *all* of his "Bad Acts" to Stroz, Uber created an elaborate incentive structure:  as long as

Levandowski disclosed his "Bad Acts" (including "downloading of files of [Google]") to Stroz, Uber would indemnify him.  (UBER00017265 at -73-74; Dkt. 566 at 3.)  If Levandowski did not disclose "Bad Acts" to Stroz, Levandowski could not seek indemnification from Uber for those "Bad Acts" later.  (*Id.*)  Although Waymo has still not seen the due diligence report that Stroz produced, all evidence indicates that Levandowski accepted this offer and disclosed the existence of the stolen files to Uber and Stroz.  Defendants have never disputed that Stroz has some of the stolen files in its possession as a result of the due diligence process, and Uber recently admitted that its lawyers have also possessed the stolen files for over a year by virtue of their involvement in the due diligence process.  (Dkt. 677-8.)

*At the very latest*, Uber learned that Levandowski had downloaded Waymo materials in his possession on March 11, 2016 when Levandowski told Uber outright.  As Uber has explained: "On or about March 11, 2016, Mr. Levandowski reported to [Travis] Kalanick, Nina Qi and Cameron Poetzscher at Uber as well as Lior Ron that he had identified five discs in his possession containing Google information."  (Dkt. 695 at 4.)  Uber's accounting indicates that Mr. Levandowski and Mr. Kalanick had a meeting to discuss LIDAR on the same day.  (Dkt. 712, Ex. 1 at No. 63.)  Since receiving this interrogatory response, Waymo has deposed three of the four individuals to whom Levandowski made this admission, and all three confirmed that Levandowski did indeed reveal that he had Google "stuff" in his possession during an in-person meeting with Uber on March 11, 2016.  (Ron Tr., 25:23-26:18; Poetzscher Tr., 249:3-250:9; Qi Rough Tr., 271:11-273:20.)  Uber now insists that Levandowski subsequently destroyed the materials (raising other serious concerns, including concerns regarding the integrity of Stroz's investigation), but the point remains:  Uber was aware of Mr. Levandowski taking confidential Waymo information files as of March 11, 2016.  And even after finding out that he had Waymo materials in his possession on March 11, 2016, Uber *never* took *any* steps to prohibit Levandowski from using his "treasure trove of files" in his work at Uber.

Stroz delivered an "Interim Report" to Uber on April 2, 2016, before Uber signed the Put-Call agreement on April 11, 2016.  (6/23 H'rg Tr. at 44:2-9.)  Stroz also presented a final version of the report to Uber on August 5, 2016, before the final deal closed.  (Dkt. 566 at 5-6.)  Although Waymo has not seen either version of the report, Waymo has reason to believe that the April 2 Interim Report

revealed that Levandowski had downloaded materials, since the whole purpose of the due diligence process was for Uber to evaluate the liabilities that would come with the transaction before signing the Put-Call agreement.

Uber's response to the March 16, 2017 Expedited Discovery Order in this case removes all doubt as to whether the due diligence report evidences Uber and its counsel's knowledge as to Mr. Levandowski's "Bad Acts." The Court's March 16 order set a March 31 deadline for Defendants to "produce for inspection all files and documents downloaded by Anthony Levandowski, Sameer Kshirsagar, or Radu Raduta before leaving plaintiff's payroll and thereafter taken by them." (Dkt. 61 at ¶ 4.) Defendants did not produce any documents in response to this Court's order. Instead they produced voluminous redacted privilege logs supposedly responsive to the Court's Order—all regarding the "due diligence" of Otto. (Dkt. 658 at 2.)

**9) At trial, will either side introduce summary evidence or present results of internal investigations? If so, what specifically? For example, does either side expect to present a witness to testify that many employees were interviewed and none of them ever received any information about Waymo, or that many gigabytes of Uber emails were searched for keywords and none showed traces of Waymo trade secrets? If so, make your specific offer of proof and explain how it would avoid hearsay problems and why it would be admissible.**

Waymo will likely present evidence of its internal forensic investigation into Mr. Levandowski's theft of Waymo's files, similar to the forensic evidence that Waymo presented in its PI papers. More specifically, Waymo will present this evidence to the jury through the very individuals who conducted the forensic investigation, thereby avoiding any hearsay problems.

With discovery still underway, and given Uber's privilege assertions over various aspects of its internal investigations, Waymo does not yet know whether Waymo will present evidence of *Uber's* internal investigations at trial. It follows that Waymo cannot yet detail the metes and bounds of what internal investigation evidence it might introduce. The full facts and details of Uber's internal investigations are currently in the hands of Uber, not Waymo.

If Waymo does introduce evidence of Uber internal investigations, there likely would be no hearsay problem. This evidence would almost certainly come from employees or agents of Uber, and thus would be exempt from hearsay concerns under Fed. R. Evid. 801(d)(2).

On the other hand, it would be inappropriate for *Uber* (or other Defendants) to try to use evidence or results of internal investigations conducted during this litigation. Waymo would object on hearsay and improper summary grounds, and likely other grounds, depending on the circumstances. *See* Fed. R. Evid. 802; 1006. In addition, any attempt by Defendants to rely on such internal investigations would open the door, such that Waymo should in fairness be permitted to show how Defendants have tried to block discovery at every turn, and Waymo likewise should be permitted to go through the total inadequacy of any purported investigation. Finally, any such evidence proffered by Defendants would clearly constitute a waiver of privilege, which is precluded at this point under the Court's May 15 Order. (Dkt. 438.)

Even if not precluded, admission of such evidence plainly would entitle Waymo to take further discovery regarding the same subject matter. *In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1299 (Fed. Cir. 2006) ("The widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to all other communications relating to the same subject matter.") In order for this to happen, Defendants should be required to disclose now – during the discovery period – whether they intend to try and use any such evidence, at trial, so that additional discovery concerning the waived subject matter could be taken in a timely manner.

**10) At trial, will either side introduce in evidence the privilege logs or information gleaned therefrom? If so, what information will be presented, by which sponsoring witness, and for what purpose?**

As Waymo noted in its response to Defendants' précis (Dkt. 650), Waymo expects to introduce evidence of Defendants' privilege logs to dispel jury confusion about key pieces of evidence that are missing from this case. As the Court itself has noted, some of the "key issues" in this case involve Uber's acquisition of Otto and "what Uber knew and when they knew it" about Levandowski's downloading of Waymo's confidential files. (Dkt. 625 at 40:6-11.) And Defendants recognize this: Uber and Ottomotto disclosed three Morrison & Foerster lawyers as having knowledge regarding the "Stroz due diligence for the Uber/Ottomotto acquisition" in their Rule 26 disclosures, and the Court has already ordered the deposition of at least one of them. (Dkt. 725.) Waymo expects to present evidence regarding the privilege descriptions in Uber's logs, and the extent

of Uber's privilege assertions in the logs, through these witnesses and any other witnesses who may have been involved in the underlying communications.

DATED: June 28, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ Charles K. Verhoeven*
Charles K. Verhoeven
Attorneys for WAYMO LLC