MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzalez@mofo.com
ERIC A. TATE (CA SBN 178719)
ETate@mofo.com
RUDY Y. KIM (CA SBN 199426)
RudyKim@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:     415.268.7000
Facsimile:     415.268.7522

KAREN L. DUNN (*Pro Hac Vice*)
kdunn@bsfllp.com
HAMISH P.M. HUME (*Pro Hac Vice*)
hhume@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington DC 20005
Telephone:     202.237.2727
Facsimile:     202.237.6131

Attorneys for Defendants
UBER TECHNOLOGIES, INC.
and OTTOMOTTO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.,<br>OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>Defendant. | Case No.     3:17-cv-00939-WHA<br><br>**DEFENDANTS UBER TECHNOLOGIES, INC. AND OTTOMOTTO LLC'S OPPOSITION TO WAYMO'S MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT**<br><br>Date:     July 26, 2017<br>Time:     8:00 a.m.<br>Ctrm:     8, 19th Floor<br>Judge:    The Honorable William Alsup<br><br>Trial Date: October 10, 2017 |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 4

    A.    Uber Devoted Enormous Resources to Comply with the Court's March 16 Order. ......................................................................................................................... 4

    B.    Uber Devoted Enormous Resources to Comply with the Court's May 11 PI Order. ...................................................................................................................... 6

    C.    The Contract Between Mr. Levandowski and Stroz Makes Clear that Uber Does Not Have Access to or Control of Materials Mr. Levandowski Provided to Stroz. ............................................................................................... 6

    D.    Waymo Has Known for Months that MoFo Has the Stroz Report and Exhibits from MoFo's Representation of Uber During the Ottomotto Acquisition. ............................................................................................................ 7

    E.    Waymo Has Repeatedly Rejected Uber's Offers to Share Information About the Stroz Report. ......................................................................................... 8

    F.    Magistrate Judge Corley Has Rejected Waymo's Assertions that the Stroz Diligence Process Was Part of a Crime or Fraud. ................................................. 9

LEGAL STANDARD ................................................................................................................ 9

ARGUMENT ........................................................................................................................... 11

I.      THERE IS NO BASIS FOR CONTEMPT BASED ON UBER'S LACK OF CONTROL OVER LEVANDOWSKI MATERIALS HELD BY STROZ AND UBER'S EXTENSIVE GOOD FAITH EFFORTS TO COMPLY WITH THE COURT'S ORDER. ............................................................................................... 11

    A.    Uber Did Not Violate the Court's Order Because It Has No Authority to Compel Stroz to Produce Any Levandowski Material to Waymo. ....................... 11

    B.    Uber Substantially Complied with the Court's Orders, Acted in Good Faith, and Waymo Has Suffered No Injury. ......................................................... 12

II.     THERE IS NO BASIS FOR CONTEMPT BASED ON MOFO'S POSSESSION OF THE STROZ REPORT AND MATERIALS. ............................................................... 13

III.    THERE IS NO BASIS FOR CONTEMPT BASED ON UBER'S RESPONSE TO WAYMO'S EXPEDITED INTERROGATORY NO. 1. ................................................ 14

    A.    Uber Substantially Complied with the Court's Order. ......................................... 15

    B.    There Are Good Faith Reasons the Description of the Five Discs Was Not Provided Until June 5. ............................................................................................ 16

C.      Waymo Was Not Injured as a Result of the June 5 Disclosure. ............................ 17

CONCLUSION ...................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aspen Grove Owners Ass'n v. Park Promenade Apts., LLC,*
    No. C09-1110-JCC, 2010 WL 3431155 (D. Wash. Aug. 13, 2010)...............................15 fn. 7

*Cherry v. City College of S.F.,*
    No. C 04-04981 WHA, 2007 WL 2904188 (N.D. Cal. Oct. 1, 2007) ......................................10

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.,*
    10 F.3d 693 (9th Cir. 1993)...............................................................................10, 12

*Gen. Signal Corp. v. Donallco, Inc.,*
    787 F.2d 1376 (9th Cir. 1986)............................................................10, 12, 14, 15, 17

*Imageware, Inc. v. U.S. W. Commc'ns,*
    219 F.3d 793 (8th Cir. 2000)...............................................................................10

*M Seven Sys. Ltd. v. Leap Wireless Int'l, Inc.*
    No. 12cv01424 CAB, 2014 WL 3942200 (S.D. Cal. Aug. 11, 2014) ....................................10

*Perez v. i2a Techs., Inc.,*
    No. C 15-04963 WHA, 2015 WL 7753330 (N.D. Cal. Dec. 2, 2015)....................................10

*PG&E v. Bear Stearns & Co.,*
    50 Cal. 3d 1118 (1990) ...................................................................................12

*Reno Air Racing Ass'n, Inc. v. McCord,*
    452 F.3d 1126 (9th Cir. 2006).......................................................................10, 12, 14

*Scruggs v. Vance,*
    No. 2:06-cv-0633 KJM, 2012 WL 423486 (E.D. Cal. Feb. 8, 2012) .............................16 fn. 7

*U.S. v. Ayres,*
    166 F.3d 991 (9th Cir. 1999)......................................................................10, 11, 14

*U.S. v. Geary,*
    C.V. No. 05-00135, 2007 U.S. Dist. LEXIS 31604 (D. Haw. Apr. 30, 2007) ...............15 fn. 7

*Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.,*
    689 F.2d 885 (9th Cir. 1982).........................................................................10, 15

**INTRODUCTION**

Waymo LLC has not met its burden to show that sanctions are warranted.  Waymo's motion is based on the premise that Uber Technologies, Inc. and Ottomotto LLC ("Otto") (collectively, "Uber") have possession of the "downloaded materials" (as defined in this Court's Orders) but have refused to return them.  That premise is wrong.  Uber does not possess or control the materials at issue and therefore cannot return them.  It cannot be held in contempt for failing to do so.

Waymo has four arguments, each of which is based on inaccurate information or a mischaracterization of the facts.

First, Waymo claims Uber has failed to cause Stroz Friedberg LLC to return downloaded materials to Waymo.  Waymo's argument seems to be that Uber knows that Stroz has the 14,000 files that Waymo claims Mr. Levandowski took from Google, that Uber has full power to tell Stroz what to do with those files, and that Uber has willfully refused to order Stroz to return those files.  None of these points is correct.  Uber has no knowledge of Stroz possessing the over 14,000 files that Waymo alleges Mr. Levandowski stole from Waymo.  Moreover, as Waymo knows, Mr. Levandowski and Stroz entered into a contract that strictly prohibited Stroz from disclosing any Google-related information he may have provided to Stroz for its due diligence to *any* third parties, including Uber.  That contract shows that Uber does not have the legal power to compel Stroz to provide Waymo with anything Mr. Levandowski gave Stroz.  If Uber had that legal power, it would have exercised it.  Uber sent a letter to Stroz making clear that it wants Stroz to provide any Google-related materials to Waymo.  Uber also sent a letter to Mr. Levandowski telling him he must direct Stroz to do so if he wanted to have any hope of curing the deficiencies that led to his termination.  Mr. Levandowski refused to provide that directive and was terminated, and Stroz did not produce the materials.  Uber has taken all reasonable steps to have the downloaded materials returned to Waymo from Stroz and cannot be held in contempt for failing to do what it is legally foreclosed from doing.

Second, Waymo seeks to hold Uber in contempt for failing to cause its outside counsel, MoFo, to return downloaded materials to Waymo.  But here again, Waymo's argument ignores

1   and distorts the facts.  The Stroz Report and "downloaded materials" are not one and the same.

2   Concerning whether it has access to any "downloaded materials," MoFo explained that it does not

3   "except to the extent that any such material may appear:  (1) excerpted in or as an exhibit to the

4   Stroz Report, which is privileged; and (2) in certain materials AL and other persons provided to

5   Stroz to which MoFo was given limited access during the Stroz investigation pursuant to the

6   terms of the AL-Stroz contract and the protocol governing the investigation, and under strict

7   conditions preventing MoFo from sharing those materials with anyone, including Uber."

8   (Schmidt Decl. Ex. 7, Dkt. No. 676-15.)  The materials referenced in category (1) were listed on a

9   privilege log in a timely fashion and are the subject of a stay of production and pending litigation

10  before the Federal Circuit.  To the extent the privilege claim over those materials is ultimately

11  rejected, those materials will be produced.  Upon further investigation, MoFo has determined that

12  the materials in category (2) are not in MoFo's possession, except to the extent any were included

13  as exhibits to the Stroz Report (and hence covered by the privilege dispute covering category (1)).

14  Uber cannot be held in contempt for not producing materials it does not possess or control.

15          On both of the foregoing points, Waymo expresses incredulity that Uber could take the

16  position that "stolen files" are Mr. Levandowski's "personal property."  That mischaracterizes the

17  facts and is not what we have ever said.  First, Waymo incorrectly equates the broad definition of

18  "downloaded materials" in the Court's Orders with "stolen files."  They are not the same.  In

19  identifying materials for the privilege log and in answering questions about what MoFo may have

20  had access to, both Uber and MoFo read the Court's Orders to refer to any Google materials

21  Mr. Levandowski downloaded before leaving Google and took with him upon leaving—whether

22  they were innocuous or otherwise, whether relating to trade secrets or not, whether taken

23  inadvertently or not.  The Court's Order also required disclosure of any other document that

24  "referred" to such a downloaded file, which thereby triggered a large privilege log based on any

25  due diligence email that may have discussed any Google material of any kind provided or

26  referenced by Mr. Levandowski.  Second, regardless of how the materials are described, Uber is

27  not insisting that everything Mr. Levandowski gave to Stroz is his "personal property," simply

28  that it is not ***Uber's*** property.  The contract between Mr. Levandowski and Stroz does not give

1    Uber possession, custody, or control over any Google materials Mr. Levandowski gave to Stroz,

2    beyond the small number attached to the Stroz Report, all of which have been logged and are the

3    subject of the privilege dispute.

4         Third, Waymo claims that Uber willfully failed to disclose Mr. Levandowski's destruction

5    of five discs of Google material in March 2016, which Uber disclosed in its interrogatory

6    response on June 5, 2017.  Waymo says that Uber should be held in contempt for not disclosing

7    this information on March 31, 2017 in response to this Court's Order dated March 16, 2017.  That

8    does not support a contempt finding in light of Uber's substantial efforts and good-faith

9    undertaking to comply with that Order and lack of willfulness in making the late disclosure of the

10   fact (which is helpful to Uber).  Uber logged documents discussing the five discs and their

11   destruction on its privilege log and then provided information about the five discs after realizing it

12   could do so in a non-privileged form.  Uber regrets not recognizing that it was possible to present

13   non-privileged evidence about this destruction earlier, but that oversight is not a basis for

14   contempt, particularly where Uber has never seen the discs or their contents and cannot verify

15   their existence or whether they in fact contained downloaded materials.  The June 5 disclosure

16   does not change the fact that Uber expended enormous resources to comply with the March 16

17   Order and substantially complied with that Order in good faith.

18        Fourth, Waymo claims that Otto Trucking LLC ("Trucking") has failed to exercise its

19   power to cause Mr. Levandowski to return any downloaded materials.  Trucking will presumably

20   respond to this directly, but Uber notes that this argument is illogical:  Mr. Levandowski is a

21   member and the majority shareholder of Trucking, and controls what it can and cannot do.

22   Trucking does not have the power to force Mr. Levandowski to do anything that

23   Mr. Levandowski does not agree to do.[1]

24

---

25   [1] Waymo's illogical argument is the byproduct of its strategic decision not to name Levandowski
     as a defendant in this lawsuit.  Waymo chose not to sue Mr. Levandowski for trade secret

26   violations because it knows that would have triggered an arbitration of all such claims, and also
     would have demonstrated the real target of Waymo's claims—Mr. Levandowski, not Uber.

27   Indeed, if Waymo truly wanted the full force of the federal courts to force the return of any stolen
     property, then Waymo should have sued the perpetrator (Levandowski), rather than asking this

28   Court to hold other parties in contempt.

1

## BACKGROUND

2

### A.    Uber Devoted Enormous Resources to Comply with the Court's March 16 Order.

3

4

Among other things, this Court's March 16 Order contained the following requirement:

5

> By March 31, defendants shall produce for inspection all files and
6
> documents downloaded by Anthony Levandowski, Sameer
> Kshirsagar, or Radu Raduta before leaving plaintiff's payroll and
> thereafter taken by them.  Defendants shall also produce for
7
> copying the card reader, thumb drive, or other media used for the
> downloads, as well as all subsequent emails, memoranda,
8
> PowerPoints, text messages, or notes that have forwarded, used, or
> referred to any part of said downloaded material.  If any part of said
9
> downloaded material has been deleted, destroyed, or modified, then
> defendants shall state the extent thereof and produce all documents
10
> bearing on said deletion, destruction, or modification.

11
(Dkt. No. 61 at ¶ 4.)  As it has stated since the beginning of this case, Uber did not and does not

12
believe it ever received any of the 14,000 downloaded files that Waymo's complaint alleges were

13
stolen by Mr. Levandowski.  (*See, e.g.*, Uber's Answer to FAC, Dkt. No. 704, Preliminary Stmt.

14
¶ 14; Defendants' Response to the Court's Ten Questions, Dkt. No. 755 at 9-13.)  Uber likewise

15
did not and does not believe it had any "downloaded material" as described in this paragraph,

16
which is a broader category than the 14,000 files.  Nevertheless, in order to be certain that was the

17
case, Uber undertook enormous efforts to search its electronic systems to confirm that none of the

18
files or documents described in this Order were on its systems.  In order to do so, Uber's vendor,

19
Stroz Friedberg, forensically collected approximately 235 terabytes of data, including data from

20
nine servers and 148 different custodians.  (Ray Decl. ¶ 2.)  The custodian collection included

21
both email and data from 280 different computers.  (*Id.*)  These extensive efforts uncovered no

22
"downloaded material" at Uber.  (*Id.*)

23
In addition, Uber undertook a massive review of privileged material for information

24
covered by the Court's Order.  That was necessary because prior to Uber's acquisition of Otto,

25
the law firms representing the two parties retained the investigative firm Stroz to conduct an

26
investigation in which Stroz would gather all information from five key employees of Otto to

27
determine whether they might have in their possession materials from any of their prior

28
employers.  (*See* Order re: Uber Privilege Log, Dkt. No. 731 at 2.)  This due diligence

investigation generated a large volume of email communications between Stroz and the law firms, between the law firms and their clients, and between the lawyers representing the different parties.  Uber and its counsel in this case took a conservative approach of reviewing all of those email communications to identify any that could be understood to have "forwarded, used, or *referred to* any part of said downloaded material" described in ¶ 4 of the March 16 Order.  Since the Order required production of any document that "referred to any part of said downloaded material," and since "said downloaded material" included "all files and documents downloaded by Anthony Levandowski, Sameer Kshirsagar, or Radu Raduta before leaving plaintiff's payroll and thereafter taken by them," the scope of this review was potentially very broad.  If an email referred even generally or indirectly to a single document that Stroz may have gathered from Mr. Levandowski, or to media obtained from Mr. Levandowski that potentially contained any information from Google, then the email was to be deemed responsive.  (Rivera Decl. ¶ 2.)  Some documents that referred to the process for identifying such documents or media were also marked responsive.  (*Id.*)  It is important to emphasize that such an email was to be deemed responsive to ¶ 4 of the March 16 Order even if it did not actually disclose the contents of the material gathered from Mr. Levandowski, had nothing to do with any Google or Waymo trade secrets (or alleged trade secrets), and even if the file being "referred to" was not one of the 14,000 allegedly stolen files.  (*Id.* ¶ 3.)  Among the items listed on the privilege log were the Stroz Report itself and certain of its exhibits,[2] which were included in the privilege log based on the above review criteria.  (*Id.* ¶ 4.)  Thus, this review of privileged material resulted in a very large number of documents that were listed on a privilege log that was delivered to Waymo in a timely fashion.

The destruction of the five discs that occurred in March 2016 is described in at least one of the documents listed on Uber's privilege log.  (*Id.* ¶ 4.)  In its efforts to comply with the March 16 Order, Uber did not recognize that it had the ability to provide a description of the destruction of the five discs that was based on non-privileged information.

---

[2] Uber initially did not list the name "Stroz" on the privilege log due to Mr. Levandowski's Fifth Amendment privilege claims.  Once those claims had been rejected by the Federal Circuit, additional identifying information was provided.

1

2

**B.    Uber Devoted Enormous Resources to Comply with the Court's May 11 PI Order.**

3      Uber devoted enormous resources to comply with the Court's May 11 provisional relief

4   order.  (Dkt. No. 426.)  First, Uber sent a survey to each of its employees via its  "Global Uber

5   Team" email listserv and conducted interviews of over 160 employees, including any who

6   responded that they had had communications with Anthony Levandowski in which he mentioned

7   LiDAR.  (Rivera Decl. ¶ 7.)  Not one of the employees interviewed had seen or heard

8   downloaded materials.  (*Id.*)  Second, Uber reviewed over 11,000 documents, including emails,

9   Google Drive documents, and calendar invitations for any communications in which

10  Mr. Levandowski mentioned LiDAR.  None of these revealed downloaded materials.  (*Id.* ¶ 8.)

11  Third, Uber sent a survey to its LiDAR-related suppliers and followed up by phone and in writing

12  with the suppliers who responded that they had had communications with Anthony Levandowski

13  in which he mentioned LiDAR.  None of these suppliers had seen or heard downloaded materials.

14  (*Id.* ¶ 9.)  Fourth, Uber interviewed 60 individuals at Stroz to document which of them may have

15  seen potentially downloaded materials and to confirm none of them had sent downloaded

16  materials to Uber.  (*Id.* ¶ 10.)  Finally, Uber conducted interviews of individuals known to have

17  received the Stroz Report, including Uber board members and Uber's outside counsel, to verify

18  the chain of custody and confirm none of them had forwarded any potentially downloaded

19  materials to Uber.  (*Id.* ¶ 11.)

20      In addition, Uber underwent 56 hours of inspection by Waymo, over the course of 10

21  separate inspection days.  (*Id.* ¶ 12.)  The inspections included thousands of technical files, source

22  code and emails.  This also uncovered no downloaded materials at Uber.

23

24

**C.    The Contract Between Mr. Levandowski and Stroz Makes Clear that Uber Does Not Have Access to or Control of Materials Mr. Levandowski Provided to Stroz.**

25      Mr. Levandowski's provision of materials to Stroz for the investigation was governed by a

26  letter agreement between Mr. Levandowski and Stroz dated March 21, 2016 ("Levandowski-

27  Stroz Agreement").  (Dkt. 545-8.)  The Levandowski-Stroz Agreement prohibits Stroz from

28  disclosing information provided by Mr. Levandowski except as permitted in an examination

1   protocol.[3]  The agreement allows for return or destruction of the materials provided by

2   Mr. Levandowski to Stroz only **upon Mr. Levandowski's written request**.  (*Id.*)  The agreement

3   does not allow Stroz to independently transfer any materials provided by Mr. Levandowski to a

4   third party, even to Uber.  (*Id.*)  Due to these contractual limitations, Uber has no corporate,

5   employment, contractual, or other authority to demand or compel Stroz to return any potentially

6   downloaded materials in its possession to Waymo.  Uber knew, based on Mr. Levandowski's

7   assertion of his Fifth Amendment rights, that he would not consent to Stroz's transfer of any

8   diligence materials to Waymo.  Thus, any requests for Stroz to return these materials would have

9   been futile.[4]

10   Following the May 31, 2017 deadline in the May 11 Order (Dkt. No. 426 ¶ 2 at 23), Uber

11   met and conferred with Waymo about its compliance.  (Ray Decl. ¶ 3; Schmidt Decl. Ex. 7, Dkt.

12   No. 676-15.)  Despite its lack of authority to demand or compel return of any downloaded

13   materials, Uber responded to those meet-and-confer efforts on June 12, 2017 by asking Stroz to

14   return any downloaded materials it might have to Waymo and by simultaneously telling

15   Mr. Levandowski that he was required to direct Stroz to return any such materials to Waymo.

16   (Schmidt Decl. Ex. 4, Dkt. No. 676-10.)  Neither Stroz nor Mr. Levandowski has responded to

17   Uber's June 12 requests.  (Ray Decl. ¶¶ 9-10.)

18
19   **D.      Waymo Has Known for Months that MoFo Has the Stroz Report and Exhibits from MoFo's Representation of Uber During the Ottomotto Acquisition.**

20   Waymo has known for months that MoFo provided legal advice to Uber pertaining to the

21   Otto acquisition.  Uber's lengthy privilege log consists mainly of its communications with MoFo

22   during the acquisition.  (Order re Uber's Privilege Log, Dkt. No. 731 at 2.)  Waymo's counsel has

23   waved that log in court, proclaiming that he has never seen such a long log.  Judge Corley has

24

25   [3] An unredacted version of the agreement (and the protocol) was provided to the Court as Exhibit C to the June 28, 2017 letter from Uber to the Court and was produced today with the consent of Mr. Levandowski's counsel.  (Ray Decl. ¶ 12; *Id.* Ex. A.)

26

27   [4] Notably, Uber **did** "exercise the full extent" of its authority, where it existed, to try to cause the return of downloaded material to Waymo.  On May 26, 2017, Uber terminated Mr. Levandowski for, among other reasons, his refusal to return downloaded material to Waymo, including by failing to order Stroz to return any downloaded material that Stroz has.  (Dkt. No. 519-2.)

28

1    held that the vast majority of the log entries are privileged communications.  (Order, Dkt. No. 731

2    at 1.)

3         As discussed above, all parties to the Stroz investigation were bound by contractual

4    restrictions on distribution or transfer of any materials provided by Mr. Levandowski.  MoFo

5    previously represented that it does not have any downloaded materials (or any copies, excerpts or

6    summaries thereof), except to the extent that any such material may appear:  (1) excerpted in or as

7    an exhibit to the Stroz Report, which as explained above, is listed on the logs and is the subject of

8    on an ongoing privilege dispute; and (2) in certain materials Mr. Levandowski and other persons

9    provided to Stroz to which MoFo was given limited access during the investigation under the

10   terms of the Levandowski-Stroz Agreement and the investigation protocol—which included strict

11   prohibitions on sharing those materials with anyone, including Uber.  (Ray Decl. ¶¶ 7-8.)  In an

12   abundance of caution, MoFo could not previously rule out that it may still today have documents

13   in category (2) in its possession.  (*Id.* ¶ 8.)  After further investigation, including checking with an

14   attorney on maternity leave, MoFo has determined that it does not have any such materials in its

15   possession.  (*Id.*)

**E.    Waymo Has Repeatedly Rejected Uber's Offers to Share Information About the Stroz Report.**

18        Uber advised Waymo, through counsel, on at least three occasions that it would provide

19   information pertaining to the Stroz Report, on the condition that Waymo agree that such a

20   disclosure would not amount to a subject-matter waiver.  (González Decl. ¶ 2.)  Waymo has

21   categorically refused each time.  (*Id.*)

22        First, before the parties' first meeting with the Special Master, Uber told Waymo that it

23   wanted both sides to be able to engage in ex parte communications with the Special Master

24   because Uber wanted his guidance on difficult privilege issues.  (*Id.* ¶ 3.)  Waymo declined.  (*Id.*)

25   Uber then said it wanted to disclose information about which it thought Waymo should be aware

26   regarding the due diligence process without effecting a subject-matter waiver; Waymo's lead trial

27   counsel, Charles Verhoeven, refused, saying that Uber could not use the privilege as a sword and

28   a shield.  (*Id.*)

1    Then, during the parties' first conference with Magistrate Judge Corley, Uber again

2    offered to share information regarding the due diligence process (this time with either the Special

3    Master or Judge Corley), but Waymo again refused to allow any ex parte communications and

4    argued that voluntary statements about the due diligence process would be a waiver.  (*Id.* ¶ 4.)

5    Finally, at a May 3, 2017 hearing, this Court asked a question about the content of the due

6    diligence report.  Uber's counsel, Arturo González, noted that he would answer the question as

7    long as there was a stipulation that by answering, Uber was not waiving the privilege.  (*Id.* ¶ 5; *Id.*

8    Ex. A, May 3, 2017 H'rg. Tr. at 47:5-21.)  Again, Waymo would not agree.  (González Decl. ¶ 5.)

9         **F.    Magistrate Judge Corley Has Rejected Waymo's Assertions that the
                    Stroz Diligence Process Was Part of a Crime or Fraud.**

10

11   The Stroz investigation and report underlie much of Waymo's motion.  Waymo has

12   argued that the Stroz investigation was an illegitimate scheme.  Judge Corley has rejected that

13   argument, concluding:  "[B]ased on the Court's review of the entire record in this case, including

14   the in camera Stroz Report, the Court found that Uber retained MoFo to conduct an investigation

15   into Levandowski and Otto and to create an evidentiary record that would govern Uber's

16   obligation to indemnify Levandowski and Otto in any lawsuit brought by Waymo."  (Order on

17   Uber's Privilege Log, Dkt. 731 at 2.)  Judge Corley further stated:  "Waymo contends (1) Uber

18   was engaged in or planning the crime of receipt of Waymo's stolen property; and (2) that its

19   communications with MoFo were in furtherance of that scheme.  It cites the evidence that

20   Levandowski took 14,000 of Waymo's files and that Uber knew that Levandowski took some

21   material as evidence that satisfies its burden.  The Court is not persuaded."  (*Id.*)

22   There is an ongoing privilege dispute about the Stroz investigation and report, which

23   Mr. Levandowski has appealed to the Federal Circuit.  The order requiring production of those

24   materials has been stayed by the Federal Circuit pending appeal.

25                              **LEGAL STANDARD**

26   A party may not be held in civil contempt for violating a court order unless the moving

27   party establishes that the party accused of contempt (1) "violated the court order, (2) beyond

28   substantial compliance, (3) not based on a good faith and reasonable interpretation of the order,

1    (4) by clear and convincing evidence." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,

2    10 F.3d 693, 695 (9th Cir. 1993).  There can be no contempt when the order is "ambiguous" or

3    when there is "doubt or uncertainty in the minds of those to whom it is addressed."  *Vertex*

4    *Distrib., Inc. v. Falcon Foam Plastics, Inc.,* 689 F.2d 885, 889, 891 (9th Cir. 1982).

5            A party may not be held in contempt if the party has substantially complied with the court

6    order:  "[i]f a violating party has taken 'all reasonable steps' to comply with the court order,

7    technical or inadvertent violations of the order will not support a finding of civil contempt."  *Gen.*

8    *Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986) (internal citation omitted);

9    *see Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) (contempt

10   requires violation of "a specific and definite court order by failure to take all reasonable steps

11   within the party's power to comply").  Nor may a party be held in contempt if compliance with

12   the court order is impossible.  *See, e.g.*, *U.S. v. Ayres*, 166 F.3d 991, 994 (9th Cir. 1999) ("An

13   alleged contemnor may defend against a finding of contempt by demonstrating a present inability

14   to comply." (citing *U.S. v. Rylander*, 460 U.S. 752, 757 (1983) ("Where compliance is

15   impossible, neither the moving party nor the court has any reason to proceed with the civil

16   contempt action."))).

17           As this Court has recognized:  "The purpose of civil contempt is to coerce compliance

18   with the court's order rather than punish disobedience."  *Perez v. i2a Techs., Inc.*, No. C 15-

19   04963 WHA, 2015 WL 7753330, at *4 (N.D. Cal. Dec. 2, 2015).  Thus, if a party has fully

20   complied before the contempt motion is filed, there is no basis for contempt.  *Vertex,* 689 F.2d at

21   892.

22           Contempt must "be clear and certain."  *Imageware, Inc. v. U.S. W. Commc'ns*, 219 F.3d

23   793, 797 (8th Cir. 2000). "Any doubts" whether the requirements are "met in a particular case

24   must be resolved in favor of the party accused of civil contempt."  *M Seven Sys. Ltd. v. Leap*

25   *Wireless Int'l, Inc.*, No. 12cv01424 CAB (RBB), 2014 WL 3942200, at *4 (S.D. Cal. Aug. 11,

26   2014) (quoting 7 James Wm. Moore et al., *Moore's Federal Practice* § 37.51[7][b], at 37-109

27   (3d ed. 2013)).  As this Court has explained, "[b]ecause of their very potency, inherent powers

28   must be exercised with restraint and discretion."  *Cherry v. City College of S.F.*, No. C 04-04981

WHA, 2007 WL 2904188, at *3 (N.D. Cal. Oct. 1, 2007) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)).

# ARGUMENT

**I.**    **THERE IS NO BASIS FOR CONTEMPT BASED ON UBER'S LACK OF CONTROL OVER LEVANDOWSKI MATERIALS HELD BY STROZ AND UBER'S EXTENSIVE GOOD FAITH EFFORTS TO COMPLY WITH THE COURT'S ORDER.**

   **A.**    **Uber Did Not Violate the Court's Order Because It Has No Authority to Compel Stroz to Produce Any Levandowski Material to Waymo.**

The Court ordered Uber to "exercise the full extent" of its "corporate, employment, contractual, and other authority" to effect the return of downloaded materials to Waymo. (May 11 Order, Dkt. No. 426 at 23.) Uber did just that. Uber directed Mr. Levandowski—its employee at the time—to return or cause the return of any downloaded material to Waymo (or certify its destruction), on pain of termination. (*See* Dkt. No. 466-2.) When Levandowski failed to comply, Uber terminated his employment. (*See* Dkt. No. 519-2.)

Waymo now seeks to hold Uber in contempt for failing to compel Stroz to provide Waymo with any downloaded materials it may have received from Mr. Levandowski. But Uber did not and does not have any authority, whether corporate, employment, contractual, or other, to compel Stroz to return or produce any such materials to Waymo. The Levandowski-Stroz Agreement prohibits Stroz from providing any such materials to Waymo (or anyone else) absent Mr. Levandowski's written consent. (*See* AL-Stroz Agreement, Dkt. No. 545-8 (providing only that "Stroz will promptly return or destroy" documents and files on Mr. Levandowski's written request).) Uber also had no independent contractual agreement with Stroz, or any other authority over Stroz, that would have overridden the Levandowski-Stroz agreement. A party may not be subject to contempt for actions beyond its power and control. *See Ayres*, 166 F.3d at 994 ("a present inability to comply" is a defense to contempt).

Despite these clear limits of its authority, Uber made a firm and clear written request to Stroz and to Mr. Levandowski to return to Waymo any downloaded materials that Stroz may have. (Schmidt Decl. Ex. 4, Dkt. No. 676-10.) Levandowski apparently refused to give Stroz

permission, and Stroz has not produced the materials.  There is nothing more that Uber can legally do to compel Stroz to return the materials.

Waymo seeks to hold Uber in contempt for matters that are ***beyond*** Uber's authority—which is not what this Court's Order required.  Waymo argues that Uber should have "threaten[ed] to cut off business ties with Stroz should Stroz refuse to [return the materials.]" (Mtn., Dkt. No. 676-4 at 12.)  In Waymo's own words, Uber should have tried "to pressure Stroz."  (*Id.*)  But such "pressure" tactics would have been fruitless, as they could not change the valid contract between Stroz and Mr. Levandowski preventing Stroz from producing the documents without Mr. Levandowski's written consent.  Moreover, if Uber had threatened Stroz with cutting off all future business, and that had led Stroz to breach its agreement with Mr. Levandowski, that would have exposed Uber to tort liability for intentional inducement of breach of contract.  *See PG&E v. Bear Stearns & Co.*, 50 Cal. 3d 1118 (1990).  Uber was not obligated to act outside its authority or unlawfully, particularly given that the Order did not unambiguously require such actions, *see Reno Air Racing Ass'n*, 452 F.3d at 1130 (requiring a violation of a "specific and definite" requirement of a court order for contempt).

## B. Uber Substantially Complied with the Court's Orders, Acted in Good Faith, and Waymo Has Suffered No Injury.

Even if the Court believes that Uber should have done something more to "pressure" Stroz to produce documents, it should still recognize that, at an absolute minimum, Uber "substantially complied" with the Court's existing Orders and therefore cannot be held in contempt.  *In re Dual-Deck*, 10 F.3d at 695-96.  As shown in Fact Sections A & B, above, Uber expended enormous resources complying with both the March 16 and May 11 Orders.  Those efforts constitute substantial compliance with the Court's Orders, because Uber has taken "'all reasonable steps' to comply."  *Gen. Signal Corp.*, 787 F.2d at 1379.

Moreover, the Court's Orders contain no "specific and definite" requirement that Uber use "pressure" tactics against Stroz that would expose Uber to various other legal liabilities.  Absent a violation of an unambiguous order, there can be no contempt.  *In re Dual-Deck*, 10 F.3d at 695. Uber's understanding that the Court's Orders did not require it to somehow try to force Stroz to

1   breach its contract with Mr. Levandowski was also a good-faith understanding of the Order—

2   providing yet another reason why contempt is inappropriate.  *Id.*

3        Waymo also has suffered no discovery prejudice.  Even if Uber had sent the June 12 letter

4   earlier, or had used more "pressure" tactics as Waymo insists it should have, Waymo would not

5   have received the materials from Stroz.  Mr. Levandowski continues to refuse to give Stroz

6   permission to turn over his materials, and he has appealed the Court's orders compelling Uber

7   and Stroz to produce the Stroz Report and exhibits (which orders are stayed pending appeal).  A

8   contempt finding against Uber would not only be legally and factually unfounded, but it would

9   not change Uber's lack of authority to compel Stroz to produce Mr. Levandowski's materials.

10        **II.**    **THERE IS NO BASIS FOR CONTEMPT BASED ON MOFO'S**
            **POSSESSION OF THE STROZ REPORT AND MATERIALS.**

11

12        Waymo also seeks contempt because Uber has not caused MoFo to return two categories

13   of material that may fall within the broad definition of "downloaded materials" in the Court's

14   Orders:  (1) materials excerpted in the Stroz Report or attached as an exhibit to that report; and

15   (2) materials Mr. Levandowski and other persons provided to Stroz to which MoFo was given

16   limited access ***during the Stroz investigation*** under the terms of the Levandowski-Stroz

17   Agreement–which included strict prohibitions on sharing those materials with anyone, including

18   Uber.[5]

19        As to the second category, MoFo has confirmed that it does not have any such materials in

20   its possession or control other than as included as exhibits to the Stroz Report, which already is

21   covered by the first category.  In response to Waymo's motion, MoFo conducted further

22   investigation, including checking with an attorney on maternity leave, to reach this confirmation.

23

24

---

25   [5] Waymo misrepresents the meet-and-confer process following the Court's May 31, 2017
deadline.  (Mtn., Dkt. No. 676-4 at 7.)  During that conference, Uber's counsel made ***no***

26   representations about whether MoFo had any "copies, excerpts, or summaries of the downloaded
materials" in its possession in view of the privilege concerns with respect to the Stroz

27   investigation.  (Ray Decl. ¶ 6.)  Waymo suggests that MoFo attempted to misrepresent this fact,
even though Uber had already served a privilege log disclosing MoFo as one of the recipients of

28   the Stroz Report.  (Rivera Decl. ¶ 6; *Id.* Ex. A.)

1    As to the first category, those materials were all listed on the privilege logs provided to

2  Waymo in a timely fashion.  Those logs and the underlying materials are part of the privilege

3  disputes in this matter that are currently on appeal to the Federal Circuit, which has stayed the

4  orders requiring production pending appeal.  In these circumstances, there can be no issue of

5  contempt because Uber and MoFo complied with the Court's Orders:  the privilege was timely

6  asserted, the logs containing material responsive to the Court's Order were provided, and the

7  production of the privileged material has been stayed pending the Federal Circuit's appeal.  Until

8  that stay is lifted and the privilege issues resolved on appeal, Uber and MoFo can do no more

9  with respect to category (1).[6]

10    Contempt cannot be based on actions that are beyond a party's authority or control.  *See*

11  *Ayres*, 166 F.3d at 994.  Because Uber has taken "'all reasonable steps' to comply" with respect

12  to the materials at MoFo, *Gen. Signal Corp.*, 787 F.2d at 1379, and because Uber's actions were

13  and are "based on a good faith and reasonable interpretation of the [C]ourt's order," *Reno Air*,

14  452 F.3d at 1130, there cannot be a finding of civil contempt.

15    **III.    THERE IS NO BASIS FOR CONTEMPT BASED ON UBER'S RESPONSE
     TO WAYMO'S EXPEDITED INTERROGATORY NO. 1.**

16

17    Contempt is not warranted based on Uber's June 5, 2017 disclosure of the destruction of

18  the five discs.  Waymo argues that Uber should be held in contempt for failing to disclose that

19  fact sooner, but that is not a basis for contempt.  First, Uber substantially complied with the

20  Court's March 16 Order based on an enormous, good-faith undertaking, which precludes a

21  finding of contempt.  Second, Uber provided the information about the five discs once it

22  determined it could do so in a non-privileged manner, and before contempt was sought.  Uber's

23  substantial compliance and reasonable steps to comply with the Court's Orders in good faith are

24  sufficient to preclude a finding of contempt.  Additionally, the Court should consider Uber's lack

25

26  [6] Uber has repeatedly sought a stipulation from Waymo that no waiver will result from disclosure
    of any parts of the Stroz investigation or report.  (*See* Background Section E, *supra*; González

27  Decl. ¶¶ 2-4.)  Waymo has refused.  In light of those rebuffs, Uber has reasonably concluded that
    there is a significant risk of waiver if MoFo turns over the Stroz report or exhibits prior to a final

28  appellate decision on the privilege issue.

1   of willfulness in late-disclosing the fact (helpful to Uber) about the destruction of the discs, as

2   well as Waymo's lack of injury by the belated disclosure, both of which weigh against a finding

3   of contempt.

### A.     Uber Substantially Complied with the Court's Order.

5          In response to the Court's March 16, 2017 Order, Uber conducted a massive investigation

6   to confirm that it did not have any downloaded materials.  In two weeks of intensive efforts with

7   its outside counsel and forensic experts, Uber searched 9 servers and 148 custodian computers

8   and emails, totaling 235 terabytes of data.  This extensive search turned up no sign of the

9   downloaded materials.  In addition, Uber's counsel reviewed thousands of pages of emails to

10  identify anything that could potentially be read to "refer" to something within the meaning of

11  "downloaded material," and then assembled a very substantial privilege log.

12         All of the foregoing work was done to ensure compliance with paragraph 4 of the

13  March 16 Order.  These efforts on their own constitute "substantial compliance" with that

14  provision of the Order, and therefore preclude a finding of contempt.  *See Gen. Signal Corp.*,

15  787 F.2d at 1379 (contempt may not be imposed where a "party has taken 'all reasonable steps' to

16  comply with the court order," and any violations are "technical or inadvertent").

17         In addition, and as further evidence of its substantial compliance, Uber has provided the

18  very information at issue:  a non-privileged description of what it knows about the destruction of

19  the five discs.  On June 5, 2017, in its response to expedited Interrogatory No. 1, Uber provided a

20  description of Mr. Levandowski's March 11, 2016 meeting with three Uber executives, where he

21  identified the five discs.  (Schmidt Decl. Ex. 1, Dkt. No. 694.)  Uber's response explains the

22  conversations that followed and explains that Mr. Levandowski communicated that the discs had

23  been destroyed.  (*Id.*)  Contempt is unwarranted due to Uber's substantial compliance and

24  because it "introduced evidence that [its] violation had been discovered and steps taken to correct

25  it" before the contempt motion was filed.  *Vertex,* 689 F.2d at 892.[7]

26  ---------------------

27  [7]  *See also U.S. v. Geary*, C.V. No. 05-00135 DAE-BMK, 2007 U.S. Dist. LEXIS 31604, at *10-13 (D. Haw. Apr. 30, 2007) (upholding decision by Magistrate not to impose sanctions where respondents were not in compliance with Order when contempt filed but subsequently complied);

28  *Aspen Grove Owners Ass'n v. Park Promenade Apts., LLC*, No. C09-1110-JCC, 2010 WL

1   Even if the Court concludes that this description of the destruction of the five discs should

2   have been provided earlier, it should nonetheless conclude that Uber has substantially complied

3   with paragraph 4 of the Court's Order.  Uber has searched high and low for the files.  Uber has

4   produced a privilege log identifying the emails referencing any possible downloaded material.

5   Uber has provided a description of what Mr. Levandowski told Uber about the five discs and their

6   subsequent destruction.  Uber is not aware of anything more it can do to comply with paragraph 4

7   of the March 16 Order, and no purpose would be served by imposing contempt.

8                **B.      There Are Good Faith Reasons the Description of the Five Discs Was
                          Not Provided Until June 5.**

9

10   While recognizing that "good faith" in the abstract is not a defense to a charge of

11   contempt, Uber submits that the following context is relevant to assessing Uber's substantial

12   compliance and how to dispose of this motion.

13   First, Uber did not deliberately seek to hide the information about the destruction of the

14   discs.  That information is helpful to Uber in confirming that it never wanted any Google

15   information, and never received any.

16   Second, the description of the five discs and their destruction is contained in at least one

17   of the documents on the privilege log timely submitted in response to the March 16 Order.  Thus,

18   the information about the five discs was not withheld, but rather initially was part of the

19   information that Uber believed to be privileged.  After this Court issued an Order requiring Uber

20   to state whether it was waiving any privileges by June 1, Uber closely analyzed the difficult

21   privilege issues raised in this case, and concluded that its privileged documents contained

22   descriptions of non-privileged facts that could be proven with non-privileged evidence.  The

23   discussions between Mr. Levandowski and the three non-lawyer Uber executives about the five

24   discs and their destruction was one such fact, and was therefore included in the interrogatory

25   response on June 5.

26

27   3431155, at *3-4 (D. Wash. Aug. 13, 2010) (no contempt for delayed compliance); *Scruggs v.
     Vance*, No. 2:06-cv-0633 KJM KJNP, 2012 WL 423486, at *3 (E.D. Cal. Feb. 8, 2012) (no

28   contempt where documents produced after the hearing on contempt).

1    Third, there is a limit to what Uber knows.  Uber has never seen the five discs that

2  Mr. Levandowski said he found, let alone their contents.  Uber cannot certify that these discs

3  contained some or all of the 14,000 allegedly stolen files, and cannot even be 100% certain that

4  the discs existed.  What Uber knows about the discs comes from Mr. Levandowski, prior to his

5  invocation of the Fifth Amendment.

6          **C.      Waymo Was Not Injured as a Result of the June 5 Disclosure.**

7    Waymo has suffered no injury or prejudice as a result of Uber's June 5 response to

8  expedited Interrogatory No. 1.  All relevant depositions took place after that response was served;

9  indeed, Waymo has questioned Lior Ron, Cameron Poetzscher, and Nina Qi about the five discs

10  and the March 11 meeting in their depositions.  (Mtn., Dkt. No. 676-4 at 6; Ray Decl. ¶ 11.)

11  Thus, neither a contempt finding nor sanctions would be appropriate here, where Uber

12  substantially complied and there was no injury.  *See Gen. Signal Corp.*, 787 F.2d at 1380 (civil

13  contempt sanctions may be coercive or compensatory but not punitive).

14                                **CONCLUSION**

15    Waymo has failed to establish by clear and convincing evidence that Uber is in civil

16  contempt of the Court's March 16, 2017 or May 11, 2017 Orders.  Uber respectfully requests that

17  the Court deny Waymo's motion.

18

19  Dated: July 5, 2017                    MORRISON & FOERSTER LLP

20

21                              By:   */s/ Arturo J. González*
                                     ARTURO J. GONZÁLEZ

22                                   Attorneys for Defendants
                                     UBER TECHNOLOGIES, INC.
23                                   and OTTOMOTTO LLC

24

25

26

27

28