1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Charles K. Verhoeven (Bar No. 170151)
2     charlesverhoeven@quinnemanuel.com
      David A. Perlson (Bar No. 209502)
3     davidperlson@quinnemanuel.com
      Melissa Baily (Bar No. 237649)
4     melissabaily@quinnemanuel.com
      John Neukom (Bar No. 275887)
5     johnneukom@quinnemanuel.com
      Jordan Jaffe (Bar No. 254886)
6     jordanjaffe@quinnemanuel.com
    50 California Street, 22nd Floor
7   San Francisco, California 94111-4788
    Telephone:    (415) 875-6600
8   Facsimile:    (415) 875-6700

9   Attorneys for WAYMO LLC

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13   WAYMO LLC,                        CASE NO. 3:17-cv-00939

14              Plaintiff,             **PLAINTIFF WAYMO LLC'S
                                       STATEMENT REGARDING QUESTIONS
15      vs.                            IT INTENDS TO ASK ANTHONY
                                       LEVANDOWSKI AT TRIAL**
16   UBER TECHNOLOGIES, INC.;
     OTTOMOTTO LLC; OTTO TRUCKING LLC,  Judge: The Honorable William Alsup
17
                Defendants.            Trial Date: October 10, 2017
18

19
                                       **PUBLIC REDACTED VERSION OF
20                                     DOCUMENT SOUGHT TO BE SEALED**

21

22

23

24

25

26

27

28

The statement below identifies questions that Waymo currently intends to ask Levandowski at trial and describes circumstances and evidence in the record regarding the subject matter of those questions. Waymo's position regarding adverse inferences is stated in its memorandum submitted herewith.

Waymo is awaiting further production of documents from Defendants and third parties and is conducting numerous depositions this month in advance of its August 1 deadline to elect trade secrets for presentation at trial.

Waymo has not yet taken specific discovery (including depositions) based on Defendants' log listing oral and written communications wherein Mr. Levandowski mentioned LiDAR to any officer, director, employee, agent, supplier, or consultant of defendants. Defendants produced that log on June 23, substantially updated it on June 27, June 30, and July 3, and have represented that they plan to update it further.

Waymo is awaiting production of the due diligence report and related correspondence currently listed on Defendants' privilege logs and intends to take specific discovery regarding those documents. Waymo is also awaiting production of underlying due diligence investigation materials (including forensics information) held at Stroz. Waymo expects that its review of these materials will influence its trial strategy and its questions for Mr. Levandowski.

For all of these reasons, the list of questions below is necessarily incomplete and subject to substantial revision. Waymo reserves its rights to make changes to these questions as discovery proceeds and its trial strategy evolves (even with respect to information already in the record). To the extent necessary to further crystallize issues related to adverse inferences for purposes of motion practice, Waymo proposes that the parties submit lists of questions they intend to ask Anhony Levandowski at trial as of August 7, after the substantial completion of fact discovery, resolution of appeals regarding the production of materials currently withheld as privileged, and Waymo's election of trade secrets, but substantially in advance of the pretrial conference.

A.   <u>Work For Google/Waymo</u>

    1.      When were you employed by Google?

    2.      You were employed by Google from 2007 until early 2016, correct?

3.      You were paid more than $100 million during your employment at Google, right?

4.      You were paid approximately $120 million by Google in late 2015 and mid 2016?

5.      What were your responsibilities during your employment at Google?

6.      Did you have responsibilities related to Google's self-driving car program?

7.      What were those responsibilities?

8.      Did you have responsibilities related to the development of LiDAR for self-driving cars?

9.      What were those responsibilities?

10.     You were involved in developing Google's technology for self-driving cars, correct?

11.     You were involved in developing Google's software for self-driving cars, correct?

12.     You were involved in developing Google's LiDAR technology, correct?

13.     You oversaw aspects of Google's development of self-driving car technology over several years, correct?

14.     You agree Google's self-driving car technology required years of research and development?

15.     You agree that, in part, Google's self-driving car technology has been the result of trial and error with respect to implementation details, manufacturing details, and the like?

16.     You agree Google invested significant resources into developing self-driving car technology?

17.     You were familiar with Google's self-driving car technology at the time you left Google, correct?

18.     You were familiar with how Google documented its self-driving car technology at the time you left Google, correct?

19.     You knew how to access the details of Google's self-driving car technology and documentation at the time you left Google, correct?

20.     You understand that the self-driving car program at Google was ultimately spun off into a separate corporate entity called Waymo, right?

Description Of Corroborating Circumstances and Evidence:  Waymo expects that Mr. Levandowski will

1    invoke his Fifth Amendment privilege against self-incrimination in response to most if not all of these

2    questions.  Evidence of the answers to the questions above regarding Waymo's development of self-

3    driving cars and Mr. Levandowski's participation will be offered through at least testimony of Waymo

4    witnesses, such as Pierre-Yves Droz and others.  (*See, e.g.*, Dkt. 25-31.)

5    B.    Competition In The Self-Driving Car Market

6          21.   Based on your experience at Waymo, you would agree with the statement that there is

7                an ongoing race to be the first to successfully commercialize self-driving cars, right?

8          22.   Based on your experience at Waymo, about how many competitors are engaged in that

9                race?

10         23.   Based on your experience at Waymo, what are some factors for success in

11               commercializing self-driving cars?

12         24.   Technology with a proven safety record is a factor, right?

13         25.   Technology that drives down cost is a factor, right?

14         26.   The performance of a self-driving car's LiDAR system affects safety, right?

15         27.   The costs associated with LiDAR are a significant contributor to the overall cost of

16               commercializing self-driving cars, right?

17   Description Of Corroborating Circumstances and Evidence:  Waymo expects that Mr. Levandowski will

18   invoke his Fifth Amendment privilege against self-incrimination in response to most if not all of these

19   questions.  The answers to these questions will be corroborated by Waymo witnesses, such as Pierre-Yves

20   Droz (*see, e.g.,* Dkt. 25-31), Ron Medford, Daniel Chu and others, documentary evidence from

21   Google/Waymo (*see, e.g.,* Dkt. 27-2 - 27-14), documentary evidence from Uber (*see, e.g.,* Dkt. 27-15)

22   including text messages between Travis Kalinick and Anthony Levandowski (*e.g.*, LEV_002083;

23   LEV_002088-90; LEV_002091; LEV_002094; LEV_002106; LEV_002017; LEV_002160 ), and/or

24   expert opinion.

25   C.    Confidentiality

26         28.   From your experience at Waymo, you understand that competitors in the self-driving

27               car space do not freely share all of their technological developments with each other,

28               right?

29.     You were aware that Waymo considered certain of its technical information with respect to self-driving cars to be highly confidential, right?

30.     You were aware that Waymo took steps to prevent the disclosure of confidential technical information related to their self-driving car program, right?

31.     You are aware that Waymo required employees to password protect their computers and other hardware, correct?

32.     You are aware that Waymo's networks and other digital storage repositories were password protected, correct?

33.     You understand that Waymo monitored use and access to its devices/networks for security purposes, correct?

34.     You understand that Waymo  maintained security software to prevent unauthorized access, correct?

35.     You are aware that Waymo provided network security training to employees with access to its networks, correct?

36.     You are aware that Waymo limited application access and network access containing sensitive material to users with "need to know," right?

37.     You are aware that Waymo had a policy requiring its employees to safeguard its computer networks and digital information, right?

38.     You are aware that Waymo had a policy against its employees accessing its digital information for reasons unrelated to business activities, right?

39.     You know that Google's SVN sever was password protected, right?

40.     You know that Google's SVN server was limited to only certain Google employees, right?

41.     The SVN server required specialized software to access, right?

42.     As part of your work at Waymo, you had access to information that you understood to be confidential, right?

43.     You were aware that you had a duty to Waymo to maintain the confidentiality of competitively sensitive information, correct?

44.     From your time at Waymo, you understood why the disclosure of Waymo's

        confidential information to competitors is harmful to Waymo right?

45.     And that is in part because Waymo invests heavily in research and development, right?

46.     And the learning derived from that research and development is a valuable asset,

        correct?

Description Of Corroborating Circumstances and Evidence:  Waymo expects that Mr. Levandowski will invoke his Fifth Amendment privilege against self-incrimination in response to all of these questions.  Evidence regarding Waymo's measures for protection of confidential information and employees' awareness of  such measures will be offered through Waymo witnesses, such as Pierre-Yves Droz (*see, e.g.,* Dkt. 25-31), Michael Janosko (*see, e.g.,* Dkt. 25-47), and others, as well as documentary evidence from Google/Waymo regarding security measures and policies, including the code of conduct (*e.g.* WAYMO-UBER-00000584, WAYMO-UBER-00000600, WAYMO-UBER-00000945-62; WAYMO-UBER-00006331).  This evidence, along with testimony from other former Waymo employees now in Defendants' employ (including G. Pennecot and D. Gruver), will also tend to show that Mr. Levandowski knew that he had a duty to maintain the confidentiality of competitively sensitive information, that the disclosure of such information to competitors would harm Google/Waymo's business, and that Google/Waymo took significant steps to protect that information.  Adverse inferences on these issues would supplement this evidentiary record.

D.      Google/Waymo LiDAR Development Efforts

47.     Given your responsibilities at Waymo, you are aware of the role that LiDAR has

        played in Waymo's development of self-driving cars, right?

48.     Waymo has developed its own LiDAR technology that enables their self-driving cars

        to identify objects in the road, correct?

49.     Waymo has developed its own LiDAR technology that enables their self-driving cars

        to predict the movement of other cars and objects, correct?

50.     Waymo has developed its own systems to collect data from its LiDAR technology to

        help self-driving cars make driving decisions, correct?

51.     You were aware of all of those aspects of LiDAR development at Waymo, correct?

52. Google and Waymo have spent at least seven years developing proprietary LiDAR systems, right?

53. Waymo's proprietary LiDAR systems improve the ability of self-driving cars to navigate safely, correct?

54. And that would include in city environments?

55. City environments are the most difficult for self-driving cars to navigate, correct?

56. By designing its own LiDAR systems, Waymo has driven down its cost to commercialize self-driving cars, you would agree with that?

57. You understand that Waymo considers cost to be a barrier to commercializing self-driving technology, right?

58. You understand Uber also considers cost to be a barrier to commercializing self-driving technology, right?

59. Waymo's LiDAR systems are made up of thousands of individual hardware and software components that can be configured in millions of combinations and designs, correct?

60. In the course of Waymo's efforts to design its own LiDAR systems, some of Waymo's work was based on trial and error, right?

61. Can you provide some examples?

62. One example is when the Waymo team had to abandon a LiDAR design that was based in part on the use of a ▇▇▇▇▇▇▇▇, right?

63. And that was abandoned because after a lot of effort, the Waymo team decided that it was ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, right?

64. Even though the LiDAR design using the ▇▇▇▇▇▇▇ was not ultimately used, the Waymo team still learned from its work on that design, right?

65. And it utilized that learning in moving forward with different LiDAR designs, right?

<u>Description Of Corroborating Circumstances and Evidence:</u> Waymo expects that Mr. Levandowski will invoke his Fifth Amendment privilege against self-incrimination in response to all of these questions. Waymo will offer evidence regarding the answers to these questions through Waymo

witnesses, such as Pierre-Yves Droz (Dkt. 25-31) and others, documentary evidence from Google/Waymo (*e.g.* Dkt. 25-33 - 25-41), potentially documentary evidence from Uber (e.g., UBER00072238), and expert opinion.

E.      Early Contacts With Uber

66.     At some point, did you begin talking to anyone at Uber regarding self-driving car technology?

67.     When did those conversations begin?

68.     Those conversations began as early as May 2015, right?

69.     That was eight months before you resigned from Waymo, correct?

70.     The discussion in May 2015 was with an executive at Uber, right?

71.     What did you discuss with that Uber executive in May 2015?

72.     You specifically discussed LiDAR technology with that Uber executive in May 2015, correct?

73.     You had access to Waymo's confidential information related to LiDAR at that time, correct?

74.     Because you were still employed at Waymo at that time, correct?

75.     You continued to have discussions with employees at Uber regarding self-driving car technology in the fall and winter of 2015, correct?

76.     You had discussions with Uber executives in the fall and winter of 2015, correct?

77.     You had discussions with Uber engineers in the fall and winter of 2015, correct?

78.     And all of those executives and engineers were involved in Uber's self-driving car program, right?

79.     And you specifically discussed LiDAR with those Uber executives and engineers in the fall and winter of 2015, right?

80.     You had access to Google's confidential information related to LiDAR at the time of those conversations, correct?

81.     You were still employed at Waymo in the fall of 2015, correct?

82.     Beyond discussing LiDAR with Uber employees in the fall of 2015, did you discuss

1   anything else with those employees?

2   83.   You also discussed forming a self-driving vehicle business that Uber could acquire,

3         correct?

4   84.   And you discussed what LiDAR technology could be obtained by Uber in the context

5         of such an acquisition, correct?

6   85.   You continued to have discussions with anyone at Uber regarding self-driving car

7         technology in early January 2016, right?

8   86.   Who did you have those conversations with?

9   87.   Some of those conversations were with Travis Kalanick, Uber's CEO, correct?

10  88.   What did you discuss with Mr. Kalanick in early January 2016?

11  89.   You specifically discussed LiDAR technology with Mr. Kalanick in early January

12        2016, correct?

13  90.   You had access to Google's confidential information related to LiDAR at the time of

14        your early January 2016 conversations with Mr. Kalanick, correct?

15  91.   You were still employed at Waymo in early January 2016, correct?

16  92.   Beyond discussing LiDAR with Mr. Kalanick in early January 2016, did you discuss

17        anything else with him?

18  93.   You discussed forming a self-driving vehicle business that Uber could acquire, correct?

19  94.   And you discussed LiDAR technology that could be obtained by Uber in the context of

20        such an acquisition, right?

21  Description Of Corroborating Circumstances and Evidence:  Waymo expects that Mr. Levandowski will

22  invoke his Fifth Amendment right against self-incrimination in response to these questions.  Waymo will

23  offer evidence regarding the answers to these questions through Defendant's log of all oral and written

24  communications wherein Mr. Levandowski mentioned LiDAR to any officer, director, employee, agent,

25  supplier, or consultant of Defendants and through documentary evidence from Uber (including calendar

26  files, emails, and other documents related to discussions surrounding the formation of "NewCo").  (*See,*

27  *e.g.,* Dkt. 712, Ex. 1; Dkt. 176-3.)  Waymo will also offer evidence regarding the answers to these

28  questions through testimony by those Uber employees who met with Levandowski to discuss Uber's

1  acquisition of "NewCo." (*See, e.g.,* Poetzscher Tr. 35:23-:36:21, 77:21-64:10, 82:16-85:1; Qi Tr. 139:18-

2  141:3, 148:20-149:3.)    Adverse inferences regarding Levandowski's discussions with Uber – during his

3  employment at Google/Waymo – regarding LiDAR and a potential acquisition would supplement this

4  evidentiary record.

5  F.     Theft Of Files

6      95.     On December 11, 2015, you installed software on your laptop to access the Waymo

7             design server, right?

8      96.     That design server holds detailed technical information related to Waymo's LiDAR

9             systems and other technology, right?

10     97.     That design server holds blueprints for the key hardware components of Waymo's

11            LiDAR systems, correct?

12     98.     On December 11, 2015, you downloaded the entirety of that design server, right?

13     99.     You downloaded over 14,000 from Waymo's design server, correct?

14    100.     That was more than 9.7 gigabytes of information?

15    101.     At least 2 gigabytes of that download related to Waymo's LiDAR technology, right?

16    102.     Specifications for each version of every generation of Waymo's LiDAR circuit boards

17            were included in your download, correct?

18    103.     These some examples of the files that you downloaded, right?

19    104.     Before this, you never once installed software for accessing Waymo's design server,

20            right?

21    105.     You never used this software as part of your regular job duties, right?

22    106.     In fact, you had to look up on Google's intranet how to install the software because you

23            had never done it before, right?

24    107.     After downloading the files, on December 14, 2015, you attached an SD Card to the

25            laptop containing the downloaded files, right?

26    108.     You left the SD Card attached to the laptop for approximately 8 hours, correct?

27    109.     You transfer the downloaded files to the SD card, right?

28    110.     After transferring the downloaded files to the SD Card, you reformatted the laptop?

111. You did that in an attempt to erase any evidence of what happened to the downloaded files, right?

112. After reformatting the laptop, did you ever use the laptop again?

113. You used it for a few minutes and then never used it again, right?

114. On January 4 and January 11 of 2016, you used your corporate account credentials to export six LiDAR documents to a personal device, right?

115. These documents included five internal presentations containing proprietary technical details regarding Waymo's LiDAR systems, correct?

116. These are some examples of the presentations you downloaded, right?

117. This presentation contains technical details regarding the manufacture of Waymo's LiDAR sensors, right?

118. This presentation contains technical details regarding the calibration of Waymo's LiDAR sensors, right?

119. This presentation contains technical details regarding the testing of Waymo's LiDAR sensors, right?

120. To your knowledge, at the time you downloaded these presentations in early January 2016, none of Waymo's competitors were aware of these technical details regarding Waymo's LiDAR systems, right?

121. Why did you download Waymo's entire design server and other materials in December 2015 and January 2016?

122. It was because you were about to resign from Waymo to work on Uber's self-driving car program, right?

123. And because you intended to use the 14,000+ files from the design server as a reference for work you and your company would be doing on Uber's self-driving car program, right?

<u>Description Of Corroborating Circumstances and Evidence:</u>  Waymo expects that Mr. Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these questions.  Waymo will offer evidence regarding the answers to questions about the theft through its own witnesses, including

Pierre-Yves Droz and Gary Brown, and through its own documents. Much of this evidence was previewed in connection with Waymo's motion for a preliminary injunction. (*See, e.g.,* Dkt. 25-3, 25-29, 25-31, 25-43, 25-49.) This same evidence, along with the evidence cited in Part E above and Part H below, corroborates adverse inferences with respect to the questions regarding Mr. Levandowski's intent.

G.     Formation of Ottomoto and Resignation From Waymo

124.   Four days after you finished downloading materials from Waymo's servers, you formed a company that you would later call Ottomotto, right?

125.   That was on January 15, 2016?

126.   Your plan was to use your new company to "replicate" Waymo's LiDAR technology, right?

127.   Downloading the contents of Waymo's confidential design server was part of that plan, right?

128.   And using the contents of the downloaded files to advance development of a "replicated" LiDAR system was part of that plan, correct?

129.   You resigned from Waymo on January 27, 2016, correct?

130.   You did not provide any notice to Waymo that you intended to resign, correct?

Description Of Corroborating Circumstances and Evidence: Waymo expects that Mr. Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these questions. Waymo will offer evidence regarding the answers to questions regarding Ottomotto's formation and Mr. Levandowski's resignation through publicly available information and its own witnesses and documents. (*See, e.g.,* Dkt. 27-21.) Corroborating evidence regarding Mr. Levandowski's plan to replicate Waymo's technology will also be offered through Waymo's own witnesses. (Dkt 25-31 (Droz Decl.) ¶ 27.) This evidence, and the evidence cited in Parts F above and H below, corroborate adverse inferences related to questions regarding the use of the stolen files to replicate Waymo's LiDAR technology.

H.     Events Contemporaneous With Theft Of Files And Formation Of Ottomoto

131.   While you were downloading more than 14,000 files from Waymo's design server in December 2015 and January 2016, you were having discussions with executives and engineers and Uber, right?

132.   Including with Mr. Kalinick, Uber's CEO?

133.   You discussed LiDAR technology with those executives and engineers in December 2015 and January 2016, right?

134.   On the evening of December 2, 2015, you met in person for approximately half an hour with Uber executive Brian McClendon at Uber's San Francisco headquarters in San Francisco, correct?

135.   On the afternoon of December 4, 2015, you met in person for approximately an hour with Uber executive Cameron Poetzscher and Uber employee Nina Qi at Uber's headquarters in San Francisco, correct?

136.   On the afternoon of December 11, 2015, you met in person for approximately an hour with Uber executives Brian McClendon, Cameron Poetzscher, and Emil Michael, and Uber employee Nina Qi, at Uber's headquarters in San Francisco, correct?

137.   And at those meetings, you discussed forming a self-driving vehicle company for Uber to acquire, right?

138.   And it was right after those meetings at Uber – on December 11, 2015 – that you began downloading Waymo's confidential design server and other documents, right?

139.   Because you knew you would be leaving Waymo for Uber, correct?

140.   And you were taking Waymo's confidential materials to assist Uber with the development of its self-driving car program, right?

141.   It was your understanding that Uber expected you to have access to Waymo's confidential information and files, correct?

142.   It was your understanding that Uber was interested in acquiring your self-driving vehicle company because it would be able to leverage Google's confidential information?

Description Of Corroborating Circumstances and Evidence:  Waymo expects that Mr. Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these questions.  Waymo will offer evidence regarding the answers to questions regarding the timing and content of Mr. Levandowski's conversations with Uber executives and employees through Defendants' log of all oral and written

communications wherein Mr. Levandowski mentioned LiDAR to any officer, director, employee, agent, supplier, or consultant of Defendants (Dkt. 712, Ex. 1) and through documentary evidence from Uber (including calendar files and emails and other documents related to discussions surrounding the formation of "NewCo"). (Dkt. 176-3.) Waymo will also offer evidence regarding the answers to these questions through testimony by Uber employees who met with Levandowski to discuss Uber's acquisition of "NewCo." (*See, e.g.,* Poetzscher Tr. 35:23-:36:21, 77:21-64:10, 82:16-85:1; Qi Tr. 139:18-141:3, 148:20-149:3.) This evidence, along with the evidence cited in the preceding Parts, corroborates adverse inferences on questions regarding Mr. Levandowski's intent and his understanding of Uber's intent.

I.      Continuation Of Work Directly With Uber After Resignation From Waymo

143.    By the time you resigned from Waymo, you had had multiple discussions with Uber executives and engineers regarding self-driving car technology, correct?

144.    And by the time you resigned from Waymo, you had had multiple discussions with Uber executives and engineers regarding LiDAR technology, correct?

145.    Did you continue having those conversations with Uber executives and engineers immediately upon your resignation from Waymo?

146.    You met with Uber employees on the very day you resigned from Waymo, correct?

147.    What did you discuss during that meeting?

148.    You discussed LiDAR technology, correct?

149.    And by that time, Waymo's entire design server was in your personal possession, right?

150.    Because you had downloaded it the previous month?

151.    And you had just downloaded the Waymo confidential presentations we saw earlier, right?

152.    Did you refer to those downloaded materials in preparation for your meeting with Uber on the same day you resigned from Waymo?

153.    On February 8, you had a phone conversation with John Bares at Uber, correct?

154.    What was your understanding of Mr. Bares' role at Uber at the time?

155.    Mr. Bares was the Director and Founder of Uber's Advanced Technologies Center,

-13-

1    correct?

2    156.    What was your understanding of Mr. Bares' responsibilities?

3    157.    He had substantial responsibilities for Uber's self-driving car program, correct?

4    158.    You discussed LiDAR technology with Mr. Bares during your February 8 phone

5           conversation, right?

6    159.    You referred to the downloaded materials in preparation for your meeting with Mr.

7           Bares, correct?

8    160.    You continued to have conversations with Uber executives and engineers throughout

9           the period between your resignation from Waymo in January 2016 and Uber's

10         acquisition of Ottomotto in August 2016, correct?

11    161.    These conversations dealt with the terms of Uber's acquisition of Ottomotto, right?

12    162.    But these conversations also included brainstorming sessions on LiDAR development,

13         correct?

14    163.    You discussed LiDAR specifications?

15    164.    You discussed LiDAR simulations?

16    165.    You discussed LiDAR laser design plans?

17    166.    You discussed LiDAR ██████████?

18    167.    During this time frame, after you left Waymo and before Uber acquired Ottomotto,

19         you had Waymo's entire design server in your personal possession, correct?

20    168.    You accessed those materials to assist you in your work on LiDAR for Uber, correct?

21    169.    You performed work for Uber from your home, right?

22    170.    And that's where you had your copy of Waymo's confidential materials, right?

23    171.    Uber knew that you were in possession of Waymo information during this period,

24         correct?

25    172.    On March 11, 2016, you reported to Uber's CEO and other Uber executives that you

26         had five discs in your possession containing Google information, correct?

27    173.    No one at Uber told you to return these discs to Google, did they?

28    174.    At Uber's direction, you then destroyed these five discs, correct?

175.  You destroyed the discs in order to hide the fact that you had taken and were using Google's information for the benefit of Uber, correct?

176.  During this time frame, you instructed Uber employees not to communicate with you by email, correct?

177.  And you instructed Uber employees to destroy text messages received from you, correct?

178.  Why did you instruct Uber employees not to send you emails?

179.  Why did you instruct Uber employees to delete text messages received from you?

180.  It was to hide evidence that you were using Waymo's confidential materials in connection with Uber's self-driving car program, right?

181.  During this period, you were well aware that Waymo might bring a lawsuit regarding the events we have been discussing today, right?

182.  And you personally destroyed documents regarding your use of Waymo's confidential files in anticipation of such a lawsuit, correct?

<u>Description Of Corroborating Circumstances and Evidence:</u>  Waymo expects that Mr. Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these questions.  Waymo will offer evidence regarding the answers to questions  regarding communications with Uber employees through Defendants' log of all oral and written communications wherein Mr. Levandowski mentioned LiDAR to any officer, director, employee, agent, supplier, or consultant of Defendants, documentary evidence from Uber (including calendar files, emails, and other documents) (Dkt. 712, Ex. 1), and admissions by Uber deponents.  (*See, e.g.,* Dkt. 246-14, 246-15, Dkt. 246-16; Pennecot Tr. 42:15-45:10, 71:10-72:5; Linaval Tr.  35:13-14; Boehmke Tr. 12:1-4, 16:18-17:3, 20:11-16; Haslim Tr. 93:24-94:24; Qi Tr. at 177:4-23.) Evidence regarding Mr. Levandowski's instructions regarding emails and texts can be found in documents produced by Uber (including UBER00071620 at UBER00060169-22) and the deposition testimony of Nina Qi and Cameron Poetzscher.  (Qi Tr. at 177:4-23; Poetzscher Tr. at 52:2-19, 152:1-10, 159:2-24.)  Evidence regarding Mr. Levanodwski's possession of 5 discs containing Waymo information, and Uber's knowledge of the same, is corroborated by Uber's responses to Waymo's Interrogatories.  (*See* 6/8/2017 Response to Waymo's First Set of Expedited Interrogatories.)  This

1   evidence, and the relative lack of emails and texts from Mr. Levandowski produced in this case,

2   corroborates Mr. Levandowski's more general practice of destroying documents.  Mr. Levandowski's

3   awareness of the likelihood of litigation is corroborated by Defendants' privilege logs, the February 22

4   Term Sheet (which references super duper litigation), and the Uber / Ottomotto acquisition documents.

5        Generally, at least evidence regarding Mr. Levandowski's download of the 14,000+ files, the

6   timing of that download, the destruction of evidence regarding the download, events contemporaneous to

7   the download (including Mr. Levandowski's discussions with Uber regarding LiDAR technology, the

8   formation of Ottomotto, and Mr. Levandowski's resignation from Waymo), and Mr. Levandowski's

9   efforts to avoid the creation/preservation of documentary evidence regarding his activities vis-a-vis Uber

10  support an adverse inference that Mr. Levandowski referenced the downloaded materials during his work

11  for Uber and Ottomotto between the time of the download and the time of the acquisition of Ottomotto by

12  Uber.  Evidence currently withheld on privilege grounds may provide additional corroboration.  The

13  absence of evidence regarding any precautionary or prophylactic measures taken by Uber to prevent Mr.

14  Levandowski from accessing the stolen files during his work for Uber during this time frame and/or to

15  purge any materials derived from the stolen files from Ottomotto prior to the acquisition further

16  corroborates the adverse inference that Waymo's files were accessed and referenced between between

17  January and August 2016.

18  J.    Acquisition Of Ottomotto

19      183.   Do you recognize this term sheet dated February 22, 2016?

20      184.   You signed it, correct?

21      185.   Is it your understanding that this term sheet relates to the acquisition of your company

22             Ottomotto by Uber?

23      186.   There was less than a month between you resigning from Waymo and Uber entering

24             into this term sheet to acquire Ottomotto, correct?

25      187.   Ottomotto did not develop any of its own, proprietary self-driving car technology in

26             less than a month?

27      188.   Do you recognize this agreement dated April 11, 2016?

28      189.   You signed it, correct?

190. Is it your understanding that this agreement relates to the acquisition of your company Ottomotto by Uber?

191. There was less than three months between you forming Ottomotto on January 15, 2016 and Uber entering into this agreement to acquire Ottomotto, correct?

192. Ottomotto did not develop any of its own, proprietary self-driving car technology in less than three months, right?

193. During these three months, Ottomotto's operations were run out of your home, correct?

194. And that was where you had your copy of Waymo's confidential files, right?

195. And you had been bringing over other former Waymo employees to join you at Ottomotto, correct?

196. And they worked out of your home, right?

197. And you were discussing LiDAR designs, tools, and techniques with them, right?

198. For example, on February 11, 2016, you had a one-on-one meeting with Dan Gruver, right?

199. He was formerly of Waymo, correct?

200. And you two brainstormed LiDAR designs, tools, and techniques during that meeting on February 11, 2016, correct?

201. And that meeting occurred at your home?

202. And you referenced Waymo's confidential files in connection with that meeting, correct?

203. What specifically did you discuss with Mr. Gruver?

204. You discussed issues related to ███████████, right?

205. You discussed issues related to the ████████████████████████████s, right?

206. You discussed ███████████████████, right?

207. And these conversations were for the benefit of developing LiDAR technology for use at Uber, right?

208. Mr. Gruver went on to work at Uber, right?

209. And do you know how many discussions he had with Uber employees regarding LiDAR designs, tools, and techniques?

210. And the guidance you gave Mr. Gruver was incorporated in the development work done at Uber, correct?

211. In connection with Uber's acquisition of Ottomotto, you were to be paid based on ███████ achieved for Uber, correct?

212. Do you recognize this statement of those ████████?

213. Several of these █████████ relate to LiDAR development, correct?

214. Was it your understanding that if you reached these ████████ on the dates specified, you and the other founders at Ottomotto would receive up to $680 million?

215. At the same time you were negotiating these ████████, you were providing information to Uber regarding your downloading of confidential materials from Waymo, right?

216. Do you recognize these provisions of the acquisition agreements?

217. They refer to "Bad Acts"?

218. Do you understand that "Bad Acts" are specifically defined to include the misappropriation of trade secrets from Waymo?

219. And you provided information regarding those Bad Acts to Uber in connection with the acquisition, right?

220. So, again, Uber was aware that you had downloaded Waymo's confidential design server and other confidential materials, right?

221. And Uber was aware that you had those materials at your home while you were working with Uber on their self-driving car technology, right?

222. And Uber was aware that Ottomotto was operating out of your home prior to the acquisition, right?

223. Ottomotto was created to transition information derived from Waymo's confidential files to Uber, right?

224. Ottomotto could use the downloaded files to guide its brainstorming efforts on LiDAR

1          technology for the ultimate benefit of Uber, correct?

2     225.   Otherwise, there was no reason at all for the formation of Ottomotto, correct?

3     226.   Uber could have just hired you, right?

4     227.   There was no need for Ottomotto to exist for just over a month before Uber agreed to

5            acquire it except to filter Waymo's confidential information, right?

6     228.   Because you and Uber were well aware that litigation was a distinct possibility, right?

7     229.   You and Uber were discussing that very possibility leading up to the signing of the

8            February 22, Term Sheet, right?

9  <u>Description Of Corroborating Circumstances and Evidence:</u> Waymo expects that Mr. Levandowski will

10 invoke his Fifth Amendment right against self-incrimination in response to these questions.  Waymo will

11 offer evidence regarding the answers to questions regarding Mr. Levandowski's communications with

12 employees at Uber through the testimony of Uber witnesses (*see* Poetzscher Tr. at 333:17-337:21; Ron Tr.

13 at 138:2-139:18, 141:7-18; Bares Tr. at  21:5-24:10), the answers to questions regarding the acquisition of

14 Ottomotto through documentary evidence (including the Term Sheet, Put/Call Agreement, and Exhibits)

15 (Dkt. No. 515-11, 510-3), and the answers to questions about Ottomotto's activities through, for example,

16 documentary evidence (or the lack thereof) regarding proprietary technology developed by Ottomotto

17 between January and April 2016 (as well as the timing of the acquisition discussions).  Evidence regarding

18 awareness of litigation includes Defendants' privilege logs and the acquisition documents.  All of this

19 evidence supports adverse inferences with respect to the purpose for the formation of Ottomotto.

20 K.    <u>Work At Uber</u>

21    230.   After Ottomotto was acquired by Uber, you became an Uber employee, correct?

22    231.   What was your title?

23    232.   Was it Vice President of Engineering?

24    233.   What were your responsibilities?

25    234.   You were in charge of Uber's self-driving car program, right?

26    235.   You were involved in the development of LiDAR technology at Uber, right?

27    236.   You had a workspace at Uber's offices in San Francisco, right?

28    237.   You brought a personal computer with you to Uber's offices while you were working

1      there, correct?

2   238.   You used that computer to access the files you downloaded from Waymo while you

3      were working at Uber's offices, correct?

4   239.   You also worked from home from time to time during your employment at Uber,

5      right?

6   240.   You accessed the files you downloaded from Waymo while you were working on

7      Uber's self-driving car technology from home, right?*

8   <u>Description Of Corroborating Circumstances and Evidence:</u> Waymo expects that Mr. Levandowski will

9   invoke his Fifth Amendment right against self-incrimination in response to these questions.  Evidence

10  regarding the answers to these questions will be offered through testimony and documentary evidence

11  from Uber in addition to testimony from Waymo witnesses, such as Pierre-Yves Droz, regarding Mr.

12  Levandowski's practices with respect to personal computers and working from home.  (*See, e.g.,* Dkt. 682-

13  3; Haslim Tr. 157:18-158:22; Feldman Tr. 135:21-136:6, 136:25-137:13; Ron Tr. 157:2-158).)

14      With respect to Mr. Levandowski's access of the stolen documents, at least evidence regarding Mr.

15  Levandowski's download of the 14,000+ files, the timing of that download, the destruction of evidence

16  regarding the download, events contemporaneous to the download (including Mr. Levandowski's

17  discussions with Uber regarding LiDAR technology, the formation of Ottomotto, and Mr. Levandowski's

18  resignation from Waymo), and Mr. Levandowski's efforts to avoid the creation/preservation of

19  documentary evidence regarding his activities vis-a-vis Uber support an adverse inference that Mr.

20  Levandowski referenced the downloaded materials during his employment by Uber.  Evidence currently

21  withheld on privilege grounds may provide additional corroboration.  The absence of evidence regarding

22  any precautionary or prophylactic measures taken by Uber to prevent Mr. Levandowski from accessing the

23  stolen files during his work at Uber further corroborates the adverse inference that those files were

24  accessed and referenced in the post-acquisition time period.

25  L.   <u>Circuit Board Designs</u>

26  241.   Please take a look at this file, named " ███████████████ ."

27  242.   This is one of the files that you downloaded from Waymo's design server in December

28      2015, right?

243.    What does this file show?

244.    This is a schematic of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ used in Waymo's
        proprietary mid-range LiDAR system, GBR3, right?

245.    This file shows the ▮▮▮▮▮▮▮▮▮▮?

246.    The circuit board has a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

247.    This is what Waymo refers to as Circuit Board ▮ in the ▮▮▮▮▮▮ of its GBR3
        LiDAR system, right?

248.    This shows the ▮▮▮▮▮▮▮▮▮ on Waymo's Circuit Board ▮

249.    ▮▮▮▮▮▮▮▮▮▮▮▮▮?

250.    This shows that there are ▮▮▮▮▮ on Waymo's Circuit Board ▮

251.    This shows that the lasers ▮▮▮▮ the circuit board ▮▮▮▮▮?

252.    This shows show that the lasers are ▮▮▮▮▮▮ specifically for self-driving car
        applications?

253.    This shows that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
        ▮▮▮▮▮▮▮▮▮▮▮?

254.    The ▮▮▮▮▮▮▮ in this GBR3 design were specifically modified from the
        prior GB2 design based on Waymo's data to improve self-driving car perception, right?

255.    That improvement was done using Waymo's unparalleled self-driving car data to
        determine the ▮▮▮▮▮▮▮ for self driving car for mid-range LIDAR, right.

256.    No one else in the industry had or has this ▮▮▮▮▮▮▮ for self-driving,
        right?

257.    When you spoke with Uber in Jan. 2016, you specifically offered to build them a mid-
        range LIDAR design with ▮▮▮▮▮▮▮ for self-driving cars, right?

258.    When you communicated to Uber that you would build a mid-range LIDAR with
        "▮▮▮▮▮▮▮▮▮" you were offering and intending to use the ▮▮▮▮▮
        ▮▮▮▮▮ in GBR3 as shown in this file to build a mid-range LIDAR that also
        had ▮▮▮▮▮▮▮ for self driving cars, right?

259.   After Uber agreed to buy Otto for millions of dollars, you then communicated how to ▮▮▮▮▮▮▮▮▮ for self driving to Scott Boemkhe at Uber, right?

260.   At your direction, Uber then built a mid-range LIDAR, Fuji, with the same kind of ▮▮▮▮▮▮▮▮▮ as shown in this file you took from Waymo, right?

261.   Let's look at ▮▮ more files.

262.   These are files that you downloaded from Waymo's design server in December 2015, right?

263.   These are schematics of Circuit Boards ▮▮▮▮▮▮ in Waymo's LiDAR system, right?

264.   ▮▮ of Waymo's circuit boards contain ▮ lasers, right?  The boards labeled ▮▮▮▮▮ ▮▮?

265.   And ▮▮ of Waymo's circuit boards contain ▮ lasers, right?  The boards labeled ▮▮▮ ▮?

266.   You were working at Waymo when these ▮▮▮▮▮▮▮▮▮ were designed?

267.   It took Waymo approximately six months to develop the ▮▮▮▮▮▮▮▮▮▮ and arrangement of lasers?

268.   From your time at Waymo, are you aware that Waymo considered all ▮ of these schematics to be confidential?

269.   When you first began working for Uber, you helped designed a long-range LiDAR system called Spider, correct?

270.   The work on Spider continued through October 2016?

271.   In late October 2016, you and Uber decided to pivot to development of a new LiDAR system?

272.   That new LiDAR system was called "Fuji"?

273.   Did you personally come up with the name Fuji for Uber's new LiDAR design?

274.   The name Fuji for Uber's LiDAR design was named after Mt. Fuji, correct?

275.   The convention for using names of mountains for LiDAR designs was something you

1        continued from your time at Google, correct?

2    276.    Google also names its LiDAR designs after mountains, correct?

3    277.    Do you recognize these CAD drawings?

4    278.    Are they schematics of ██████████████ that are used in Uber's Fuji

5        LiDAR design?

6    279.    There are ████████████████ used in Uber's Fuji LiDAR system, right?

7    280.    The ████████████████ are designated ████████ in Uber's Fuji LiDAR

8        system?

9    281.    ███ of them contain ██ lasers, right?

10    282.    ███ of them contain ██ lasers, right?

11    283.    The lasers are shown to ████████ the circuit board ████████, correct?

12    284.    The lasers on each printed circuit board ██████████████████████

13    ███████████████████████████████████████████████████

14    ████████████████████████, correct?

15    285.    For example, if we start with the ████████████████, we see that it

16        is ████████████████, correct?

17    286.    Moving down to the next diode, we see that it is the ████████████████?

18    287.    The diodes generally are ████████████████ as you continue moving down the

19        printed circuit board?

20    288.    The ████████ between diodes is ██████████████████████?

21    289.    The ████████ between diodes is ████████

22    290.    And there is a ████████ between the next two diodes?

23    291.    So, ████████████████████ as the ██████████████████

24        ████████

25    292.    The diodes are more ████████████████████?

26    293.    The Fuji printed circuit board schematics show that each board contains a ██████ or

27        ████████?

28    294.    What are the ████████ used for?

295.   Isn't it true that these ████████ are used to ██████████████████

296.   Isn't it true that these ████████ provide a ████████████████████ so
       that ████████████████████?

297.   Isn't it true that this ████████████ is critical to design performance?

298.   You were working at Uber when these ████████████████ were designed?

299.   You supervised the development of these ████████████?

300.   You accessed the schematics of Waymo's LiDAR circuit boards during your work on
       Fuji at Uber, right?

301.   You referred to the schematics of Waymo's ████████████████ to help you
       guide Uber to the design of its circuit boards for Fuji, right?

302.   Uber knew that you were referring to schematics of Waymo's ████████████
       ████ to help you guide Uber to the design of its circuit boards for Fuji?

303.   Uber expected you to refer to schematics of Waymo's ████████████████ to
       help you guide Uber to the design of its circuit boards for Fuji?

304.   Uber's design for the Fuji ████████████████ could not have been
       accomplished without your reference to schematics for Waymo's circuit boards?

305.   Uber knew that the design for Fuji's ████████████████ could not have been
       developed without you accessing the schematics for Waymo's circuit boards?

306.   The circuit board layout and configuration for Fuji was developed by December 2016,
       correct?

307.   That is just weeks after the pivot from Spider, correct?

<u>Description Of Corroborating Circumstances and Evidence:</u> Waymo expects that Mr. Levandowski will
invoke his Fifth Amendment right against self-incrimination in response to these questions.  Waymo will
offer evidence regarding the answers to these  through testimony and documentary evidence from Waymo
and Uber in addition to testimony from Waymo and Uber witnesses and expert witnesses.  (*See, e.g.,*
Haslim Decl. Ex. B; WAYMO-UBER00000635; Fuji device produced for inspection; photographs of the
Fuji device, including UBER00006244-254, 272-274, 289-296; SolidWorks Part and Assembly Files for
the Fuji device, and Altium electrical schematics for the Fuji device, including UBER00011690-708; third

party Document Production of Gorilla Circuits, including GOR 000001-174; SVN schematic repository folder ███████████████████████████; Linaval Tr. 34:13-14; Dkt. 246-17; Dkt 25-31 (Droz Decl.) ¶ 22; UBER00076110; UBER00008543; UBER00008494; UBER00071508.) Evidence regarding the questions pertaining to the configuration of and arrangement of components on Uber's Fuji ████████████████ is located in produced design documents from Uber as well as from the testimony of Uber engineers. (*See, e.g.*, WAYMO-UBER00000635; Fuji device produced for inspection; photographs of the Fuji device, including UBER00006244-254, 272-274, 289-296; CAD drawings of the Fuji device, including UBER00011690-708; Document Production of Gorilla Circuits, including GOR 000001-174; Boehmke Decl. IOT Prelim. Inj.; Haslim Decl. IOT Prelim Inj. ¶¶ 13, 15 & Ex. B; May 4, 2017 Haslim Tr. at 70:16-71:9, 89:5-17, 125:19-126:1, 174:4-10; Apr. 18, 2017 Haslim Tr. at 60:18-62:6, 76:9-12; Linaval Tr. at 60:1-9; Apr. 17, 2017 Boehmke Tr. at 65:14-66:25; Apr. 20, 2017 Gruver Tr. at 52:14-54:5.)

With respect to questions regarding Mr. Levandowski's access to the stolen files, at least evidence regarding Mr. Levandowski's download of the 14,000+ files, the timing of that download, the destruction of evidence regarding the download, events contemporaneous to the download (including Mr. Levandowski's discussions with Uber regarding LiDAR technology, the formation of Ottomotto, and Mr. Levandowski's resignation from Waymo), and Mr. Levandowski's efforts to avoid the creation/preservation of documentary evidence regarding his activities vis-a-vis Uber further corroborate an adverse inference that Mr. Levandowski referenced the downloaded materials during his work on Fuji. Evidence regarding Uber's pivot to Fuji after Levandowski provided input on LiDAR design and the speed with which the ████████████ for the Fuji design were developed are additional corroborating evidence. Evidence currently withheld on privilege grounds may provide additional corroboration. The absence of evidence regarding any precautionary or prophylactic measures taken by Uber to prevent Mr. Levandowski from accessing the stolen files during his work on Fuji further corroborates the adverse inference that those files were accessed and referenced in the post-acquisition time period.

**M.    Uber's Use of Waymo's Trade Secret No. 1 & 4**

308.    As discussed you took 14,000 files from Waymo, which include Waymo's highly proprietary information concerning its LIDAR designs, right?

309.   You then went to Uber and used those files to build additional LIDAR designs that include information contained in and derived from Waymo's trade secrets, right?

310.   The files you improperly retained from your employ at Waymo described lasers on each printed circuit board ███████████████████████████████ ███████████████████████████████████████████ ████████████████████████████, correct?

311.   You communicated this confidential and proprietary design technique to the other LIDAR engineers at Uber, right?*

312.   This confidential and proprietary design technique is now used in Uber's Fuji LIDAR that you were in charge of creating at Uber, right?**

313.   The files you improperly retained from your employ at Waymo described lasers on each printed circuit board ███████████████████████ ██████████████████████, correct?

314.   You communicated this confidential and proprietary design technique to the other LIDAR engineers at Uber, right?*

315.   This confidential and proprietary design technique is now used in Uber's Fuji LIDAR that you were in charge of creating at Uber, right?**

316.   This confidential and proprietary design technique improves ████████████ ██████████, right?

317.   ██████████████████████████ improves long-range resolution, correct?

318.   So, ███████████████████████████████████ ███████, right?

319.   This design technique is a better solution than ████████████, right?

320.   Because ███████████████ would lead to more complexity, right?

321.   ███████████████████████████████████?

322.   ██████████████████?

323.   ███████████████████?

324. ▮▮▮▮▮▮▮▮▮ increase cost?

325. So you agree that GBr3 derives technical benefit from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮?

326. And you agree that Google did not publicly reveal this design feature of GBr3?

327. And you agree that the secrecy of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ derives economic value?

**Description Of Corroborating Circumstances and Evidence:** Waymo expects that Mr. Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these questions. Corroborating evidence for the questions describing Waymo's design includes the content of the 14,000 files themselves and testimony from Waymo's engineers as well as Uber engineers formerly at Waymo. Corroborating evidence for the starred questions is found in Uber's LIDAR log, showing a large number of communications between Mr. Levandowski and the engineers implementing his direction to create Uber's LIDAR designs, including the Fuji LIDAR. With regard to the double starred questions, corroborating evidence is available through testimony and documentary evidence from Uber in addition to testimony from Waymo and Uber witnesses and expert witnesses. (*See, e.g.,* Boehmke Decl.; Haslim Decl. Ex. B; May 4, 2017 Haslim Tr. at 125:19-126:1; WAYMO-UBER00000635; Fuji device produced for inspection; photographs of the Fuji device, including UBER00006244-254, 272-274, 289-296; CAD drawings of the Fuji device, including UBER00011690-708; Document Production of Gorilla Circuits, including GOR 000001-174.) Corroborating evidence for the remaining questions is available through testimony from Waymo and Uber witnesses who formerly worked at Waymo, as well as expert witnesses. (*See, e.g.*, Droz Decl.)

Evidence currently withheld on privilege grounds may provide additional corroboration. The absence of evidence regarding any precautionary or prophylactic measures taken by Uber to prevent Mr. Levandowski from accessing the stolen files during his work on Fuji further corroborates the adverse inference that those files were accessed and referenced in the post-acquisition time period.

**N.    Uber's Use of Waymo's Trade Secret No. 2, 3, & 6**

328. As discussed you took 14,000 files from Waymo, which include Waymo's highly proprietary information concerning its LIDAR designs, right?

329.   You then went to Uber and used those files to build additional LIDAR designs that include information contained in and derived from Waymo's trade secrets, right?

330.   The files you improperly retained from your employ at Waymo described ████████ ████████████████████████████, right?

331.   And the ████████████████████████, right?

332.   And there were ██████████████████, right?

333.   And ████████████████████, right?

334.   You communicated this confidential and proprietary design to the other LIDAR engineers at Uber, right?*

335.   This confidential and proprietary design is now used in Uber's Fuji LIDAR that you were in charge of creating at Uber, right?**

336.   The files you improperly retained from your employ at Waymo described ████████ ████████████████████████████ right?

337.   And the ████████████████████████, right?

338.   And there were ████████████████████████, right?

339.   And ██████████████████████, right?

340.   You communicated this confidential and proprietary design technique to the other LIDAR engineers at Uber, right?*

341.   At most, a minor modification of this confidential and proprietary design technique is now used in Uber's Fuji LIDAR that you were in charge of creating at Uber, right?**

342.   The files you improperly retained from your employ at Waymo described ████████ ██████████████████████████, right?

343.   And the ████████████████████████, right?

344.   And there were ████████████████████████, right?

345.   And ██████████████████████, right?

346.   ████████████████████████████████████████████████████████ ████████████████, right?

347.   You communicated this confidential and proprietary design technique to the other

1    LIDAR engineers at Uber, right?*

2    348.   This confidential and proprietary design technique is now used in Uber's Fuji LIDAR

3    that you were in charge of creating at Uber, right?**

4    349.   This design was selected in order to ███████████████████████████████████,

5    right?

6    350.   This design was developed after ██████████████████████████████

7    ████████, correct?

8    351.   So you agree that Google invested time, effort, and money into arriving at ████████

9    ████████████, right?

10   352.   And you agree that GBr3 derives technical benefits from ██████████████████████

11   ███████████████████████?

12   353.   And you agree that Google did not publically reveal this design feature of GBr3?

13   354.   And you agree that the secrecy of ████████████████████████████████████████

14   ████████████ derives independent economic value?

15   **<u>Description Of Corroborating Circumstances and Evidence:</u>** Waymo expects that Mr.

16   Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these

17   questions. Corroborating evidence for these questions describing Waymo's design includes the content of

18   the 14,000 files themselves and testimony from Waymo's engineers as well as Uber engineers formerly at

19   Waymo. Corroborating evidence for the starred questions is found in Uber's LIDAR log, showing a large

20   number of communications between Mr. Levandowski and the engineers implementing his direction to

21   create Uber's LIDAR designs, including the Fuji LIDAR. With regard to the double starred questions,

22   corroborating evidence is available through testimony and documentary evidence from Uber in addition to

23   testimony from Waymo and Uber witnesses and expert witnesses. (*See, e.g.,* Haslim Decl. & Ex. B;

24   WAYMO-UBER00000635; Apr. 13, 2017 Linaval Tr. at 60:1-9; Apr. 17, 2017 Boehmke Tr. at 65:14-

25   66:25; Apr. 18, 2017 Haslim Tr. at 60:18-62:6, 76:9-12; Apr. 20, 2017 Gruver Tr. at 52:14-54:5; May

26   4, 2017 Haslim Tr. at 70:16-71:9, 89:5-17, 174:4-10; WAYMO-UBER00000635; Fuji device

27   produced for inspection; photographs of the Fuji device, including UBER00006244-254, 272-274,

28   289-296; CAD drawings of the Fuji device, including UBER00011690-708; Document Production of

1  Gorilla Circuits, including GOR 000001-174.)  Corroborating evidence for the remaining questions is

2  available through testimony from Waymo and Uber witnesses who formerly worked at Waymo, as well as

3  expert witnesses.  (*See, e.g.*, Droz Decl.)

4          Evidence currently withheld on privilege grounds may provide additional corroboration.  The

5  absence of evidence regarding any precautionary or prophylactic measures taken by Uber to prevent Mr.

6  Levandowski from accessing the stolen files during his work on Fuji further corroborates the adverse

7  inference that those files were accessed and referenced in the post-acquisition time period.

8  **O.**     **Uber's Use of Waymo's Trade Secret No. 5**

9       355.   As discussed you took 14,000 files from Waymo, which include Waymo's highly

10              proprietary information concerning its LIDAR designs, right?

11      356.   You then went to Uber and used those files to build additional LIDAR designs that

12              include information contained in and derived from Waymo's trade secrets, right?

13      357.   The files you improperly retained from your employ at Waymo described LIDAR

14              ███████████████████████████████████████████

15              ██████, right?

16      358.   You communicated this confidential and proprietary design technique to the other

17              LIDAR engineers at Uber, right?*

18      359.   This confidential and proprietary design technique is now used in Uber's Fuji LIDAR

19              that you were in charge of creating at Uber, right?

20      **Description Of Corroborating Circumstances and Evidence:** Waymo expects that Mr.

21  Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these

22  questions.  Corroborating evidence for these questions describing Waymo's design includes the content of

23  the 14,000 files themselves and testimony from Waymo's engineers as well as Uber engineers formerly at

24  Waymo.  Corroborating evidence for the starred question is found in Uber's LIDAR log, showing a large

25  number of communications between Mr. Levandowski and the engineers implementing his direction to

26  create Uber's LIDAR designs, including the Fuji LIDAR.  With regard to the last question, corroborating

27  evidence is available through testimony and documentary evidence from Uber in addition to testimony

28  from Waymo and Uber witnesses and expert witnesses.  (*See, e.g.,* Haslim Decl. Ex. B; WAYMO-

1   UBER00000635; Fuji device produced for inspection; photographs of the Fuji device, including
2   UBER00006244-254, 272-274, 289-296; SolidWorks Part and Assembly Files for the Fuji device, and
3   Altium electrical schematics for the Fuji device, including UBER00011690-708; third party Document
4   Production of Gorilla Circuits, including GOR 000001-174).

5        Evidence currently withheld on privilege grounds may provide additional corroboration.  The
6   absence of evidence regarding any precautionary or prophylactic measures taken by Uber to prevent Mr.
7   Levandowski from accessing the stolen files during his work on Fuji further corroborates the adverse
8   inference that those files were accessed and referenced in the post-acquisition time period.

9   **P.**   **Uber's Use of Waymo's Trade Secret No. 7**

10       360.   As discussed you took 14,000 files from Waymo, which include Waymo's highly
11           proprietary information concerning its LIDAR designs, right?

12       361.   You then went to Uber and used those files to build additional LIDAR designs that
13           include information contained in and derived from Waymo's trade secrets, right?

14       362.   The files you improperly retained from your employ at Waymo described LIDAR
15           ████████████████████████████████████████
16           ████, right?

17       363.   The files you improperly retained from your employ at Waymo described that the
18           diodes ██████████████████████, right?

19       364.   You communicated this confidential and proprietary design technique to the other
20           LIDAR engineers at Uber, right?*

21       365.   Then you supervised Uber building LiDAR devices that used this trade secret
22           information, right?

23       366.   This confidential and proprietary design technique is now used in Uber's Fuji LIDAR
24           that you were in charge of creating at Uber, right?

25   **Description Of Corroborating Circumstances and Evidence:** Waymo expects that Mr.
26   Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these
27   questions.  Corroborating evidence for these questions describing Waymo's design includes the content of
28   the 14,000 files themselves and testimony from Waymo's engineers as well as Uber engineers formerly at

1    Waymo.  Corroborating evidence for Mr. Levandowski's theft of Waymo's trade secrets, which Uber does

2    not dispute, can be obtained from testimony of Waymo's witnesses, including Gary Brown and Waymo's

3    documents, including the stolen files.  Corroborating evidence for the starred question is found in Uber's

4    LIDAR log, showing a large number of communications between Mr. Levandowski and the engineers

5    implementing his direction to create Uber's LIDAR designs, including the Fuji LIDAR.  With regard to

6    the last question, corroborating evidence is available through testimony and documentary evidence from

7    Uber in addition to testimony from Waymo and Uber witnesses and expert witnesses.  (*See, e.g.,* SVN

8    schematic repository folders █████████████████████████████████████████

9    █████████████████████████████████████████████████████████████████

10   █████████████████████████████████████████████████████████████████

11   ████████████████████; GBr3 design review 2015/11/02 presentation (WAYMO-UBER-00003341);

12   Haslim Tr. (Vol. 1) 62:8-20, 64:49; Linaval Tr. 55:11-17; Pennecot Tr. (Vol. 1) 21:12-22:1, 24:2-15, (Vol.

13   2) 214:5-19); Fuji device produced for inspection; photographs of the Fuji device, including

14   UBER00006244-254, 272-274, 289-296; SolidWorks Part and Assembly Files for the Fuji device, and

15   Altium electrical schematics of the Fuji device, including UBER00011690-708).

16           Evidence currently withheld on privilege grounds may provide additional corroboration.  The

17   absence of evidence regarding any precautionary or prophylactic measures taken by Uber to prevent Mr.

18   Levandowski from accessing the stolen files during his work on Fuji further corroborates the adverse

19   inference that those files were accessed and referenced in the post-acquisition time period.

20   **Q.    Uber's Use of Waymo's Trade Secret No. 8**

21           367.    As discussed you took 14,000 files from Waymo, which include Waymo's highly

22                   proprietary information concerning its LIDAR designs, right?

23           368.    You then went to Uber and used those files to build additional LIDAR designs that

24                   include information contained in and derived from Waymo's trade secrets, right?

25           369.    The files you improperly retained from your employ at Waymo described LIDAR

26                   ██████████████████████████████████████████████, right?

27           370.    The files you improperly retained from your employ at Waymo described that the ████

28                   ████████████████████████, right?

371.    You communicated this confidential and proprietary design technique to the other LIDAR engineers at Uber, right?*

372.    Then you supervised Uber building LiDAR devices that used this trade secret information, right?

373.    This confidential and proprietary design technique is now used in Uber's Fuji LIDAR that you were in charge of creating at Uber, right?

**Description Of Corroborating Circumstances and Evidence:** Waymo expects that Mr. Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these questions. Corroborating evidence for these questions describing Waymo's design includes the content of the 14,000 files themselves and testimony from Waymo's engineers as well as Uber engineers formerly at Waymo. Corroborating evidence for Mr. Levandowski's theft of Waymo's trade secrets, which Uber does not dispute, can be obtained from testimony of Waymo's witnesses, including Gary Brown and Waymo's documents, including the stolen files. Corroborating evidence for the starred question is found in Uber's LIDAR log, showing a large number of communications between Mr. Levandowski and the engineers implementing his direction to create Uber's LIDAR designs, including the Fuji LIDAR. With regard to the last question, corroborating evidence is available through testimony and documentary evidence from Uber in addition to testimony from Waymo and Uber witnesses and expert witnesses. (*See, e.g.,* SVN schematic repository folders ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ GBr3 design review 2015/11/02 presentation (WAYMO-UBER-00003341); WAYMO-UBER00000635; Fuji device produced for inspection; photographs of the Fuji device, , including UBER00006244-254, 272-274, 289-296; SolidWorks Part and Assembly Files for the Fuji device, and Altium electrical schematics of the Fuji device, including UBER00011690-708); Document Production of Gorilla Circuits, including GOR 000001-174.

Evidence currently withheld on privilege grounds may provide additional corroboration. The absence of evidence regarding any precautionary or prophylactic measures taken by Uber to prevent Mr.

1    Levandowski from accessing the stolen files during his work on Fuji further corroborates the adverse

2    inference that those files were accessed and referenced in the post-acquisition time period.

3    **R.**     **Uber's Use of Waymo's Trade Secret No. 9-10**

4          374.   You and others left Waymo with the intent of replicating Waymo's LIDAR

5                technology, including ███████████████████████████████████████

6          ███████████████████████████████████████████████████████████

7          █████████████████ right?

8          375.   You communicated this confidential and proprietary design technique to the other

9                LIDAR engineers at Uber, right?*

10         376.   This confidential and proprietary design technique is now used in Uber's Fuji LIDAR

11               that you were in charge of creating at Uber, right?**

12         377.   You and others left Waymo with the intent of replicating Waymo's LIDAR

13               technology, including ████████████████████████████████████

14         ████████████████████████████████████████████████████████████

15         ██████████████, right?

16         378.   And this ████████████████████████████████████████████

17         █████████, right?

18         379.   You communicated this confidential and proprietary design technique to the other

19               LIDAR engineers at Uber, right?*

20         380.   This confidential and proprietary design technique is now used in Uber's Fuji LIDAR

21               that you were in charge of creating at Uber, right?**

22         381.   You and others who left Waymo selected and engaged the same ████████████

23               ██████, at Uber as you used at Waymo in order to facilitate replication of this

24               confidential and proprietary design technique at Uber, right?**

25         **Description Of Corroborating Circumstances and Evidence:** Waymo expects that Mr.

26    Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these

27    questions.  Corroborating evidence for these questions describing Waymo's design includes testimony

28    from Waymo's engineers as well as Uber engineers formerly at Waymo.  Corroborating evidence for the

1   starred questions is found in Uber's LIDAR log, showing a large number of communications between Mr.

2   Levandowski and the engineers implementing his direction to create Uber's LIDAR designs, including the

3   Fuji LIDAR.  With regard to the double starred questions, corroborating evidence is available through

4   testimony and documentary evidence from Uber in addition to testimony from Waymo and Uber witnesses

5   and expert witnesses.  (*See, e.g.,* Haslim Supp. Decl.; Lebby Supp. Decl., including cited CAD drawing

6   and Zemax simulation; Apr. 18, 2017 Haslim Tr. at 161:8-165:14, 194:6-17; May 4, 2017 Haslim Tr.

7   at 49:16-51:20; June 14, 2017 Pennecot Tr. at 201:6-206:18, 213:21-214:4; 246:19-247:14, 254:17-

8   256:8; UBER00006248; UBER00006251; UBER00011317; UBER00011473; UBER00011612;

9   UBER00011613; UBER00011263; Fuji device produced for inspection; photographs of the Fuji

10  device, including UBER00006244-254, 272-274, 289-296; CAD drawings of the Fuji device,

11  including UBER00011690-708; Uber's Responses to Waymo's Second Set of Expedited Interrogatory

12  Nos. 10 and 11.)

13          Evidence currently withheld on privilege grounds may provide additional corroboration.  The

14  absence of evidence regarding any precautionary or prophylactic measures taken by Uber to prevent Mr.

15  Levandowski from accessing the stolen files during his work on Fuji further corroborates the adverse

16  inference that those files were accessed and referenced in the post-acquisition time period.

17  **S.      Uber's Use of Waymo's Trade Secret No. 13**

18          382.    As discussed you took 14,000 files from Waymo, which include Waymo's highly

19                  proprietary information concerning its LIDAR designs, right?

20          383.    You then went to Uber and used those files to build additional LIDAR designs that

21                  include information contained in and derived from Waymo's trade secrets, right?

22          384.    The files you improperly retained from your employ at Waymo described LIDAR

23                  ███████████████████████████ in a LiDAR system, right?

24          385.    The files you improperly retained from your employ at Waymo described a technique

25                  that used ███████████████████, right?

26          386.    The files you improperly retained from your employ at Waymo described that the

27                  ███████████████████would be configured to ███████████████

28                  ███████████████ of the PCBs, right?

387.   You communicated this confidential and proprietary design technique to the other LIDAR engineers at Uber, right?*

388.   Then you supervised Uber building LiDAR devices that used this trade secret information, right?

389.   This confidential and proprietary design technique is now used in Uber's Fuji LIDAR that you were in charge of creating at Uber, right?

**Description Of Corroborating Circumstances and Evidence:** Waymo expects that Mr. Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these questions. Corroborating evidence for these questions describing Waymo's design includes the content of the 14,000 files themselves and testimony from Waymo's engineers as well as Uber engineers formerly at Waymo. Corroborating evidence for Mr. Levandowski's theft of Waymo's trade secrets, which Uber does not dispute, can be obtained from testimony of Waymo's witnesses, including Gary Brown and Waymo's documents, including the stolen files. Corroborating evidence for the starred question is found in Uber's LIDAR log, showing a large number of communications between Mr. Levandowski and the engineers implementing his direction to create Uber's LIDAR designs, including the Fuji LIDAR. With regard to the last question, corroborating evidence is available through testimony and documentary evidence from Uber in addition to testimony from Waymo and Uber witnesses and expert witnesses. (*See, e.g.,* SVN schematic repository folders ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ; GBr3 design review 2015/11/02 presentation (WAYMO-UBER-00003341); WAYMO-UBER00000635; UBER00006246; WAYMO-UBER00000635; Fuji device produced for inspection; photographs of the Fuji device, including UBER00006244-254, 272-274, 289-296; SolidWorks Part and Assembly Files for the Fuji device, and Altium electrical schematics of the Fuji device, including UBER00011690-708; Document Production of Gorilla Circuits, including GOR 000001-174; Pennecot (Vol. 2) 261:19-265:11; Depo Exhibit 106 (UBER0059852).

Evidence currently withheld on privilege grounds may provide additional corroboration. The absence of evidence regarding any precautionary or prophylactic measures taken by Uber to prevent Mr.

1  Levandowski from accessing the stolen files during his work on Fuji further corroborates the adverse

2  inference that those files were accessed and referenced in the post-acquisition time period.

3  **T.**     **Uber's Use of Waymo's Trade Secret No. 14**

4       390.   As discussed you took 14,000 files from Waymo, which include Waymo's highly

5              proprietary information concerning its LIDAR designs, right?

6       391.   You then went to Uber and used those files to build additional LIDAR designs that

7              include information contained in and derived from Waymo's trade secrets, right?

8       392.   The files you improperly retained from your employ at Waymo described LIDAR

9              ████████████████████████████████████████████, right?

10      393.   It is important for ███████████████████████████████████

11             ████████████████████, correct?

12      394.   The files you improperly retained from your employ at Waymo described a technique

13             that ███████████████████████████████████████,

14             right?

15      395.   The files you improperly retained from your employ at Waymo described that the

16             diodes would be ███████████████████████, right?

17      396.   The files you improperly retained from your employ at Waymo described ██████████

18             ██████████████████████, right?

19      397.   You communicated this confidential and proprietary design technique to the other

20             LIDAR engineers at Uber, right?*

21      398.   Then you supervised Uber building LiDAR devices that used this trade secret

22             information, right?

23      399.   This confidential and proprietary design technique is now used in Uber's Fuji LIDAR

24             that you were in charge of creating at Uber, right?

25      **Description Of Corroborating Circumstances and Evidence:** Waymo expects that Mr.

26  Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these

27  questions.  Corroborating evidence for these questions describing Waymo's design includes the content of

28  the 14,000 files themselves and testimony from Waymo's engineers as well as Uber engineers formerly at

1   Waymo. Corroborating evidence for Mr. Levandowski's theft of Waymo's trade secrets, which Uber does

2   not dispute, can be obtained from testimony of Waymo's witnesses, including Gary Brown and Waymo's

3   documents, including the stolen files.  Corroborating evidence for the starred question is found in Uber's

4   LIDAR log, showing a large number of communications between Mr. Levandowski and the engineers

5   implementing his direction to create Uber's LIDAR designs, including the Fuji LIDAR.  With regard to

6   the last question, corroborating evidence is available through testimony and documentary evidence from

7   Uber in addition to testimony from Waymo and Uber witnesses and expert witnesses.  (*See, e.g.,* SVN

8   schematic repository folders ███████

9   ██████████████████████████████████

10  ██████████████████████████████████

11  ████████████████ GBr3 design review 2015/11/02 presentation (WAYMO-UBER-00003341);

12  WAYMO-UBER00000635; emails from Uber engineers to vendors; Haslim Decl. Ex. B; May 4, 2017

13  Haslim Tr. at 114:4-115:23; WAYMO-UBER00000635; Fuji device produced for inspection; photographs

14  of the Fuji device, including UBER00006244-254, 272-274, 289-296; SolidWorks Part and Assembly

15  Files for the Fuji device, and Altium electrical schematics of the Fuji device, including UBER00011690-

16  708; Document Production of Gorilla Circuits, including GOR 000001-174; ; Linaval Tr. 59:4-23;

17  UBER00000727.

18      Evidence currently withheld on privilege grounds may provide additional corroboration.  The

19  absence of evidence regarding any precautionary or prophylactic measures taken by Uber to prevent Mr.

20  Levandowski from accessing the stolen files during his work on Fuji further corroborates the adverse

21  inference that those files were accessed and referenced in the post-acquisition time period.

22  **U.**    **Uber's Use of Waymo's Trade Secret No. 19**

23      400.    As discussed you took 14,000 files from Waymo, which include Waymo's highly

24          proprietary information concerning its LIDAR designs, right?

25      401.    You then went to Uber and used those files to build additional LIDAR designs that

26          include information contained in and derived from Waymo's trade secrets, right?

27      402.    The files you improperly retained from your employ at Waymo described ███████

28          ██████████████████████████████

1 ████████████████████████████████████████████████████

2 ████████████████████████████, right?

403. You communicated this confidential and proprietary design technique to the other

LIDAR engineers at Uber, right?*

404. This confidential and proprietary design technique is now used in Uber's Fuji LIDAR

that you were in charge of creating at Uber, right?**

**Description Of Corroborating Circumstances and Evidence:** Waymo expects that Mr.

Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these

questions. Corroborating evidence for the questions describing Waymo's design includes the content of

the 14,000 files themselves and testimony from Waymo's engineers as well as Uber engineers formerly at

Waymo. Corroborating evidence for the starred questions is found in Uber's LIDAR log, showing a large

number of communications between Mr. Levandowski and the engineers implementing his direction to

create Uber's LIDAR designs, including the Fuji LIDAR. With regard to the double starred questions,

corroborating evidence is available through testimony and documentary evidence from Uber in addition to

testimony from Waymo and Uber witnesses and expert witnesses. (*See, e.g.,* UBER00011242; Fuji

device produced for inspection; photographs of the Fuji device, including UBER00006261-264, 275,

277, 279-258; CAD drawings of the Fuji device produced for inspection.)

Evidence currently withheld on privilege grounds may provide additional corroboration. The

absence of evidence regarding any precautionary or prophylactic measures taken by Uber to prevent Mr.

Levandowski from accessing the stolen files during his work on Fuji further corroborates the adverse

inference that those files were accessed and referenced in the post-acquisition time period.

**V. Uber's Use of Waymo's Trade Secret No. 48 & 90**

405. As discussed you took 14,000 files from Waymo, which include Waymo's highly

proprietary information concerning its LIDAR designs, right?

406. One of the files you also improperly retained from your employ at Waymo included a

████████████████████████████████████████████████████

████████████████████████, right?

407. You then went to Uber and used those files to build additional LIDAR designs that

include information contained in and derived from Waymo's trade secrets, right?

408. The files you improperly retained from your employ at Waymo described a long-range LiDAR system comprising ████████████████████ ███ right?

409. ████████████████████████████████████████ ████████████████████████████, right?

410. You communicated this confidential and proprietary design technique to the other LIDAR engineers at Uber, right?*

411. Specifically, you communicated this design technique to James Haslim while he was at Tyto LiDAR, right?**

412. By personally sketching it out for him?**

413. This confidential and proprietary design technique was used in Uber's Spider LIDAR that you were in charge of creating at Uber, right?**

**Description Of Corroborating Circumstances and Evidence:** Waymo expects that Mr. Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these questions. Corroborating evidence for the questions describing Waymo's design includes the content of the 14,000 files themselves and testimony from Waymo's engineers as well as Uber engineers formerly at Waymo. Corroborating evidence for the starred questions is found in Uber's LIDAR log, showing a large number of communications between Mr. Levandowski and the engineers implementing his direction to create Uber's LIDAR designs, including the Spider LIDAR. With regard to the double starred questions, corroborating evidence is available through testimony and documentary evidence from Uber in addition to testimony from Waymo and Uber witnesses and expert witnesses. (*See, e.g.*, UBER00005076; UBER00005076; UBER00005077; UBER00011676; UBER00011678; UBER00016399; UBER00017389; UBER00017831-38; UBER00017839-51; UBER00017854-55; UBER00017856-57; UBER00017858-76; UBER00017877-89; UBER00017890; UBER00017891; UBER00017892; Kshirsagar Tr. at 34:6-37:4; Haslim Supp. Decl.; May 4, 2017 Haslim Tr. at 17:24-24:24 & Ex. 150; Spider device produced for inspection; photographs of the Spider device, including UBER00006265-71; SVN schematic repository folder ██████████████

1       Evidence currently withheld on privilege grounds may provide additional corroboration.  The

2   absence of evidence regarding any precautionary or prophylactic measures taken by Uber to prevent Mr.

3   Levandowski from accessing the stolen files during his work on Fuji further corroborates the adverse

4   inference that those files were accessed and referenced in the post-acquisition time period.

5   **W.**      **Uber's Use of Additional Waymo's Trade Secret Information**

6       414.    During your time at Waymo, you developed know-how regarding the risks and costs of a

7               ████████████████████████?

8       415.    One LiDAR design Waymo explored but ultimately discarded in light of significant risks

9               and costs was a ████████████████████?

10      416.    You went to Uber and used this know-how to decide which LiDAR devices not to

11              develop?

12      417.    You used this know-how to save Uber time and money by not focusing on a risky and

13              costly ████████████████?

14      418.    During your time at Waymo, you developed know-how regarding the risks and costs of a

15              ████████████████████████?

16      419.    Another LiDAR design Waymo explored but ultimately discarded in light of significant

17              risks and costs was a ████████████████████████?

18      420.    You went to Uber and used this know-how to decide which LiDAR devices not to

19              develop?

20      421.    You used this know-how to save Uber time and money by not focusing on a risky and

21              costly ████████████████?

22      422.    During your time at Waymo, you developed know-how regarding the risks and costs of a

23              ████████████████████████?

24      423.    Another LiDAR design Waymo explored but ultimately discarded in light of significant

25              risks and costs was a ████████████████████████?

26      424.    You went to Uber and used this know-how to decide which LiDAR devices not to

27              develop?

28

425.   You used this know-how to save Uber time and money by not focusing on a risky and costly ████████████████████████████████?

426.   During your time at Waymo, you developed know-how regarding the risks and costs of a ████████████████████████████████?

427.   Another LiDAR design Waymo explored but ultimately discarded in light of significant risks and costs was a ████████████████████████████████?

428.   You went to Uber and used this know-how to decide which LiDAR devices not to develop?

429.   You used this know-how to save Uber time and money by not focusing on a risky and costly ████████████████████████████████?

430.   During your time at Waymo, you developed know-how regarding the risks and costs of a ████████████████████████████████████████████████ ████████████████?

431.   Another LiDAR design Waymo explored but ultimately discarded in light of significant risks and costs employed a ████████████████████████ ████████████████?

432.   You went to Uber and used this know-how to decide which LiDAR devices not to develop?

433.   You used this know-how to save Uber time and money by not focusing on a risky and costly LiDAR system that employed ████████████████████ ████████████████?

434.   During your time at Waymo, you developed know-how regarding the risks and costs of a ████████████████████████████████████████████████ ████?

435.   Another LiDAR design Waymo explored but ultimately discarded in light of significant risks and costs was a ████████████████████████████████ ████?

436. You went to Uber and used this know-how to decide which LiDAR devices not to develop?

437. You used this know-how to save Uber time and money by not focusing on a risky and costly ████████████████████████████████?

438. During your time at Waymo, you developed know-how regarding the risks and costs of a ████████████████████████████████████████████ ████████?

439. Another LiDAR design Waymo explored but ultimately discarded in light of significant risks and costs was a design in which ██████████████████████ ████████?

440. You went to Uber and used this know-how to decide which LiDAR devices not to develop?

441. You used this know-how to save Uber time and money by not focusing on a risky and costly LiDAR ████████████████████████ ████████?

442. During your time at Waymo, you developed know-how regarding the risks and costs of ████████████████████████████████ ████?

443. Another LiDAR design Waymo explored but ultimately discarded in light of significant risks and costs was a design in which ██████████████████████ ██████████████?

444. You went to Uber and used this know-how to decide which LiDAR devices not to develop?

445. You used this know-how to save Uber time and money by not focusing on a risky and costly ██████████████████████████████████?

446. During your time at Waymo, you developed know-how regarding the risks and costs of a using a ██████████████?

447. Another LiDAR design Waymo explored but ultimately discarded in light of significant risks and costs was using a ███████████████████?

448. You went to Uber and used this know-how to decide which LiDAR devices not to develop?

449. You used this know-how to save Uber time and money by not focusing on a risky and costly ████████████████?

450. During your time at Waymo, you developed know-how regarding the risks and costs of a ███████████████████?

451. Another LiDAR design Waymo explored but ultimately discarded in light of significant risks and costs was a ████████████████████?

452. You went to Uber and used this know-how to decide which LiDAR devices not to develop?

453. You used this know-how to save Uber time and money by not focusing on a risky and costly █████████████████?

454. During your time at Waymo, you developed know-how regarding the risks and costs of a ██████████████████████?

455. Another LiDAR design Waymo explored but ultimately discarded in light of significant risks and costs was a ██████████████████████████?

456. You went to Uber and used this know-how to decide which LiDAR devices not to develop?

457. You used this know-how to save Uber time and money by not focusing on a risky and costly ███████████████████████?

458. During your time at Waymo, you developed know-how regarding the risks and costs of a ██████████████?

459. Another LiDAR design Waymo explored but ultimately discarded in light of significant risks and costs was a █████████████████?

460. You went to Uber and used this know-how to decide which LiDAR devices not to develop?

461.   You used this know-how to save Uber time and money by not focusing on a risky and costly ███████████████████████?

**Description Of Corroborating Circumstances and Evidence:** Waymo expects that Mr. Levandowski will invoke his Fifth Amendment right against self-incrimination in response to these questions.  Corroborating evidence for the questions describing Waymo's design includes the content of the 14,000 files themselves and testimony from Waymo's engineers as well as Uber engineers formerly at Waymo. (*See, e.g.*, Droz Decl.) Corroborating evidence for the questions is also found in Uber's LIDAR log, showing a large number of communications between Mr. Levandowski and the engineers implementing his direction to create Uber's LIDAR designs, including the Fuji and Spider LIDARs. Public statements made by Anthony Levandowski further corroborate these questions. (*See, e.g.*, Dkt. 27-33.)

Evidence currently withheld on privilege grounds may provide additional corroboration.  The absence of evidence regarding any precautionary or prophylactic measures taken by Uber to prevent Mr. Levandowski from accessing the stolen files during his work on Fuji and Spider further corroborates the adverse inference that those files were accessed and referenced in the post-acquisition time period.

DATED:  July 7, 2017                    QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ Charles K. Verhoeven*
                                        Charles K. Verhoeven
                                        Attorneys for WAYMO LLC