1   MICHAEL A. JACOBS (CA SBN 111664)
    MJacobs@mofo.com
2   ARTURO J. GONZÁLEZ (CA SBN 121490)
    AGonzalez@mofo.com
3   ERIC A. TATE (CA SBN 178719)
    ETate@mofo.com
4   MORRISON & FOERSTER LLP
    425 Market Street
5   San Francisco, California  94105-2482
    Telephone:     415.268.7000
6   Facsimile:     415.268.7522

7   KAREN L. DUNN (*Pro Hac Vice*)
    kdunn@bsfllp.com
8   HAMISH P.M. HUME (*Pro Hac Vice*)
    hhume@bsfllp.com
9   BOIES SCHILLER FLEXNER LLP
    1401 New York Avenue, N.W.
10  Washington DC  20005
    Telephone:     202.237.2727
11  Facsimile:     202.237.6131

12  Attorneys for Defendants
    UBER TECHNOLOGIES, INC.
13  and OTTOMOTTO LLC

14                  UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                   SAN FRANCISCO DIVISION

| | |
|---|---|
| 17  WAYMO LLC, | Case No.      3:17-cv-00939-WHA |
| 18             Plaintiff, | **DEFENDANT UBER TECHNOLOGIES, INC. AND OTTOMOTTO, LLC'S  RESPONSE TO COURT'S REQUESTS FOR LIST OF FACTS OCCURRING AFTER COMMENCEMENT OF THE ACTION THAT UBER PLANS TO PRESENT TO THE JURY (DKT 784, ¶ 1)** |
| 19        v. | |
| 20  UBER TECHNOLOGIES, INC., OTTOMOTTO LLC; OTTO TRUCKING LLC, | |
| 21             Defendants. | |
| 22 | Judge:   The Honorable William Alsup |
| 23 | Trial Date: October 10, 2017 |
| 24 | |

26              **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

27

28

Uber Technologies, Inc. and Ottomotto LLC (collectively "Uber") submit this response to the Court's requests at the June 29, 2017 Hearing and the June 30, 2017 Order (Dkt. 784, ¶ 1) for the following lists:

- A list identifying all orders that Uber intends to affirmatively rely on at trial before the jury, and the relevance of that order (6/29/2017 Hrg. Tr. 4:23–5:16, 91:23–25) (the **"List of Court Orders"**),

- A list identifying all admissions by Waymo's counsel in briefs, during oral argument, or during colloquy at a deposition that Uber intends to affirmatively rely on at trial before the jury, and the relevance of that admission (*id.* 5:17–6:8, 92:1–3, 93:8–18) (the "**List of Party Admissions through Statements or Filings**"), and

- A list of all events occurring after the commencement of this civil action that it plans to present in its case in chief at trial (Dkt. 784, ¶ 1) (the **"List of Post-Complaint Facts"**).

## PRELIMINARY STATEMENT

As the Court directed, Uber intends to "prove [its] case through the facts."  (6/29/17 Hr'g Tr. at 94:4–5.)  In general, as explained below, the facts presented to the jury should be those that prove the truth or falsity of the underlying claims and defenses, rather than statements made during the course of the pretrial proceedings by the Court or the parties.  Uber therefore presents limited lists in response to the Court's Order, and does so mindful of whether it is appropriate to present something that occurred in the pretrial proceedings merely to show the existence of that adjudicative fact, versus the relatively rare instance where it may be appropriate to present a pretrial statement by the Court or the parties to try to prove the truth of the underlying assertion it contains.  These governing principles are briefly summarized below.

Under certain narrow circumstances, the <u>existence</u> (but not the truth of the contents) of the court's public records—including orders, hearing transcripts, and briefs, and attorneys' statements therein—are adjudicative facts, such that reference to them is appropriate before the jury under Federal Rules of Evidence 201 and 801.  These facts would likely come into evidence through a neutral instruction from the Court (as the Court would do for stipulated facts).

Prior court proceedings are matters of public record. *See United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 973–74 (E.D. Cal. 2004). The <u>existence</u> of a court order is an adjudicative fact that is "not subject to reasonable dispute." FED. R. EVID. 201(b); *see also Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1034 (C.D. Cal. 2015) ("It is well established that a court can take judicial notice of its own files and records under Rule 201 of the Federal Rules of Evidence.") (collecting cases). Where judicial notice is appropriate, a court "must instruct the jury to accept the noticed fact as conclusive." FED. R. EVID 201(f).

Court orders and their operative terms are judicially noticeable for their existence, but not for the truth of their contents. *E.g.*, *M/V Am. Queen v. San Diego Marine Const. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983) ("a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it"); *S. Cal. Edison Co.*, 300 F. Supp. 2d at 974 (under Rule 201, "a court can only take judicial notice of the ***existence*** of those matters of public record (the existence of a motion or of representations having been made therein) but not of the ***veracity*** of the arguments and disputed facts contained therein.") (emphasis in original).

However, the foregoing principles are limited by the rule precluding the presentation of evidence that is more prejudicial than probative. *See* FED. R. EVID 403. Accordingly, Waymo must not be permitted to refer to the content of the Court's preliminary findings (such as those in the Court's Preliminary Injunction Order) before the jury; to do so would be confusing to the jury and highly prejudicial to Uber. Uber will not refer to such findings either.

These principles likewise permit only limited evidentiary use of the "acts of the parties or other actors in the litigation; e.g., that a complaint was filed," 21B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE EVIDENCE, § 5106.4 (2d ed. 2013); the "existence of a motion or of representations having been made therein," *Cal. Edison*, 300 F. Supp. 2d at 974; and the fact that a party took a position through its attorney in a public hearing, *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1207 n. 2 (N.D. Cal. 2014). For example, if Waymo, through counsel, asserts that a fact is true, under limited circumstances that statement may be imputed to Waymo under Federal Rule of Evidence 801(d)(2). *Compare Totten v. Merkle*, 137

1   F.3d 1172, 1176 (9th Cir. 1998) (considering unsigned attorney declaration; "[u]nder the federal

2   rules, a statement made by an attorney is generally admissible against the client") *with EOTT*

3   *Energy Operating Ltd. P'ship v. Winterthur Swiss Ins. Co*., 257 F.3d 992, 999 (9th Cir. 2001)

4   (citing *Las Vegas Nightlife, Inc. v. Clark County*, 38 F.3d 1100, 1102 (9th Cir.1994)) (counsel's

5   assertions at oral argument are "not part of the factual record").

6           The limited lists below are consistent with these general principles.

7           Uber understands the Court's requests to be directed at evidence that Uber currently plans

8   to show or describe to the <u>jury</u> during trial.  (*See* 6/29/2017 Hr'g Tr. 91:23–25, 92:1–3.)

9   Therefore, Uber has not included in these lists material that it may wish to show the <u>Court</u> in

10  motions in limine, jury instructions, or other briefing.  Uber may wish to explain to the Court that

11  a position Waymo may take in the future contravenes a Court order, has already been considered

12  and rejected by the Court, or represents a new position that Waymo should be judicially estopped

13  from taking because it contradicts a position Waymo previously took in this litigation.  *See, e.g.*,

14  *Marin All. for Med. Marijuana v. Holder*, No. C 11-05349 SBA, 2012 WL 2862608, at *10 (N.D.

15  Cal. July 11, 2012) (reviewing attorney statements in a court hearing transcript to determine

16  whether a party was judicially estopped from asserting a particular claim), *aff'd sub nom.*

17  *Sacramento Nonprofit Collective v. Holder*, 552 F. App'x 680 (9th Cir. 2014); *In re Clawson*, 434

18  B.R. 556, 566 (N.D. Cal. 2010) (if a party's attorney had "previously stated or represented to the

19  court" one position at an on-the-record hearing, "then judicial estoppel would preclude the

20  inconsistent statements to the contrary.").  For example, should Waymo go back on its agreement

21  to dismiss certain patent claims (Dkt. 841), to drop any reference to Sameer Kshirsagar and Radu

22  Raduta's downloads or supplier lists as trade secrets (6/7/2017 Hr'g Tr. 14:13–21), or to refrain

23  from referencing any agreement with Anthony Levandowski containing an arbitration clause for

24  any purpose in the case (4/27/2017 Hr'g Tr. 5:13–15, 5:18–24), Uber would take up those issues

25  with the Court, outside the presence of the jury.  Should Waymo take inconsistent legal positions

26  on the scope of Stroz's agency for MoFo (6/23/17 Hrg. Tr. 42:10–13) or the proper application of

27  the Fifth Amendment privilege (4/6/2017 Hrg. Tr. 12:10–12; 5/3/2017 Hr'g Tr. (Public Session)

28  72:5–7), Uber may point out those inconsistencies to the Court, outside the presence of the jury.

Should Waymo walk back its prior narrowing of certain trade secrets (5/3/2017 Hr'g Tr. (Closed Session) 17:16–21; Dkt. 483), Uber would take up those issues with the Court, outside the presence of the jury.  These actions might result in a curative instruction, at the Court's discretion.  Of course, if the Court concludes that Waymo is permitted to present to the jury statements by Uber or its counsel that are inconsistent with the foregoing principles, then Uber would seek equal treatment.

While the Court has asked us to provide a list of all events occurring after the commencement of this civil action that it plans to present in its case in chief at trial, Uber submits this list without prejudice to supplementation and presentation at trial.  Not only has Uber just begun to receive discovery from Waymo, its trial planning is far from complete.

**LIST OF COURT ORDERS**

1. <u>Order Regarding Expedited Discovery</u> (3/16/2017, Dkt. 61). The existence (though not the contents) of this Order is relevant because it gives context to Uber's efforts to locate any allegedly misappropriated material, to demand Levandowski's cooperation and assistance so that Uber could comply with the Court's directives, and its decision to terminate Levandowski when he did not comply. Thus, the parties should be permitted to refer to the existence of the Order, but the Order itself should not be admitted into evidence.

2. <u>Order Granting in Part and Denying in Part Plaintiff's Motion for Provisional Relief</u> (5/11/2017, Dkt. 426). The prejudice to Uber would outweigh any possible probative value of telling the jury about this Order or presenting it as evidence. It should therefore be excluded, subject only to the following limited exceptions: (a) Uber should be permitted to tell the jury about the searches and accounting it undertook to comply with this Order; and (b) to the extent Uber does so (and only to that extent), Waymo should be permitted to explain to the jury that these actions by Uber were done pursuant to a Court order (without presenting the Order itself). If Uber presented no such evidence, no mention of the Order could be made by either party. Under no circumstances should the Court's preliminary findings in this Order regarding likelihood of success on the merits be presented to the jury. The Order itself should not be admitted into evidence under any circumstances.

3. <u>Order Regarding Dismissal of Patent Claims</u> (7/7/2017, Dkt. 841). Uber may refer to this Order to demonstrate that Waymo has conceded that Uber's Fuji LiDAR does not practice Waymo's single-lens LiDAR design.

LIST OF PARTY ADMISSIONS THROUGH ATTORNEY STATEMENTS OR FILINGS

1. Google's October 2016 Arbitration Demands (*E.g.*, Dkt. 138).

    a.  Like the Complaint, the arbitration demands demonstrate that Waymo strategically chose to sue Uber in the public domain while keeping its complaint against Levandowski in private arbitration, evidencing Waymo's anticompetitive aims.

    b.  The Arbitration Demands also demonstrate that Waymo elected not to sue Levandowski for trade-secret misappropriation in arbitration.

    c.  Waymo admitted in this filing that it was contemporaneously disputing Levandowski's entitlement to his bonus, referencing his "supposed contributions" to Google's self-driving car project.  (Dkt. 138 at 10.)  This is relevant to show that Google challenged Levandowski's entitlement to any bonus.

2. The original February 23 Complaint, as amended March 10, 2017 (Dkts. 1, 23).

    a.  The caption of the Complaint demonstrates Waymo's strategic choice to sue only certain defendants (i.e., not Anthony Levandowkski), as well as its timing.  This tends to show Waymo's motivation to bring this suit strategically against its competitor, and to undercut Waymo's claims about the strength of its allegations against Levandowski.

    b.  Waymo admits that "LiDAR systems are made up of thousands of individual hardware and software components that can be configured in virtually limitless combinations and designs."  (Dkt. 23, ¶ 30.)  This admission confirms that LiDARs have numerous components (including software)—not just the few, relatively minor hardware features that Waymo identifies as trade secrets.

    c.  Waymo admits that "One way that Waymo pioneered LiDAR systems with improved performance at lower cost was by innovating a design that, in part, uses a single lens—rather than multiple sets of lenses—to both transmit and receive the collection of laser beams used to scan the surrounding environment."  (Dkt. 23, ¶ 33.)  This admission is relevant because it confirms that the single-lens design was a key driver of the LiDAR improvements that Waymo claims, and shows that

6

single-lens design is substantially different from multi-lens designs.

    d.  Waymo's allegations in the Complaint also show that what originally claimed occurred here is very different from what it will end up trying to persuade the jury occurred, and shows that Waymo has changed its claims because the facts did not support what it alleged.

3. <u>Waymo's March 10, 2017 Motion for a Preliminary Injunction</u> (Dkt. 24).

    a.  Waymo made numerous claims about its single-lens design, including that it was a "game-changer," and reduced the size, complexity, and cost of Waymo's technology. (Dkt. 24 at 4.) These admissions confirm that the single-lens design was a key driver of the LiDAR improvements that Waymo claims, and not Waymo's trade secrets. Waymo also admitted that a single-lens design is "vastly different" from multi-lens designs.

    b.  Waymo admitted that the patents at issue in the motion—the '922 and '464 patents—covered "core technical features that enable a LiDAR system to meet the challenges of the self-driving environment," including advantages in "size, cost, and complexity." (Dkt. 24 at 22–23.) Waymo claimed that it "would be much more difficult to successfully launch a self-driving car without this patented technology." (*Id.* at 23.) These admissions tend to show that Waymo's alleged improvements in size, cost, and complexity are the result of a design in now-dismissed patent claims, and not any other alleged improvements, patents, or trade secrets.

4. <u>Waymo's initial list of 121 supposed trade secrets, submitted on March 10, 2017</u> (Dkt. 25-7 (Declaration of Jordan Jaffe In Support Of Waymo's Motion for a Preliminary Injunction, Exhibit A)). Uber may make limited reference to the 121 claimed trade secrets in order to explain and contextualize its efforts to find evidence of those claimed secrets within Uber.

5. <u>Waymo's April 10, 2017, Opposition to Uber's Motion to Compel Arbitration</u>. (Dkt. 204.) In this filing, Waymo confirmed that it did not assert trade-secret claims against

Levandowski in arbitration.  (Dkt. 204 at 2, 7–8, 13, 22.)  The fact that Waymo has elected not to sue Levandowski for trade-secret misappropriation in any forum is relevant because it demonstrates Waymo's anticompetitive aims and tends to undercut its claims against Levandowski.

6.  Anthony Levandowski's counsel's instructions regarding the scope of his Fifth Amendment invocation during his April 14, 2017, deposition (*E.g.*, Dkt. 273 (A. Levandowski 4/14/2017 Dep. Tr. 85:8–11, (instructing Levandowski "not to answer in any way about matters that occurred after the date you began employment with Google"), 86:3–5)).  During his deposition, Levandowski was instructed to, and did, take the Fifth in response to every question relating to his employment both at Google and at Uber—more than 400 invocations in total.  He is likely to receive and follow the same instruction at trial.  Uber plans to move in limine to exclude Levandowski's testimony and any inferences from it.  Should that motion be granted, Uber would not present evidence of these instructions.  Should that motion be denied and those Levandowski Fifth Amendment invocations be admitted, however, Uber may reference Levandowski's counsel's instructions in order to explain to the jury that there is no probative value to Levandowski's invocations.

7.  Jordan Jaffe, at the May 3, 2017, closed session of the Court's Preliminary Injunction hearing, stated, in response to questions from the Court: "THE COURT: But you did not claim ▮▮▮▮▮▮  You just claimed ▮▮▮▮▮▮▮.  MR. JAFFE: ▮▮▮▮▮▮▮▮▮▮ that's correct, your Honor. THE COURT: And you think that's a trade secret? MR. JAFFE: Yes, your Honor."  (5/3/2017 Hr'g Tr. (Closed Session) 17:16–21.)  This admission is relevant because it demonstrates that Waymo is defining its trade secrets broadly to cover all ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8.  Waymo's Notice Clarifying Vertical Resolution (Dkt. 483).  In this submission, Waymo confirmed that not all forms of ▮▮▮▮▮▮▮ are covered by Waymo's alleged trade secret.  Specifically, the ▮▮▮▮▮▮▮▮ described in the Court's question (▮▮▮▮▮▮▮ where the beams hit the road at even intervals) is not a trade secret.

1    (Dkt. 483-3 at 2–3.)  This admission is relevant because Uber will demonstrate that any

2    ███████████████████ in its design is different from Waymo's implementation and is not

3    a trade secret.

**LIST OF POST-COMPLAINT EVENTS**

1. With the filing of this lawsuit on February 23, 2017, Uber first learned that Waymo believed and was alleging that Anthony Levandowski had improperly downloaded Google proprietary information ("Downloaded Files") with the intent to take it with him, and that Levandowski deliberately took that information with him when he left Google.

2. Waymo's allegations in this lawsuit, and subsequent presentation of evidence of Levandowski's downloading, was the first time that anyone at Uber learned that Levandowski may have improperly downloaded and deliberately kept Google information as alleged by Waymo.

3. After the filing of this lawsuit, Uber learned that the alleged downloading may have been done in relation to Levandowski's employment at Google, specifically to ensure the expected payment of the bonus owed to him from Google.  For example, after the allegations in this case arose, but before he took the Fifth, Levandowski told Travis Kalanick (and perhaps others) that he downloaded files in relation to the payment of his bonus from Google (a bonus that was ultimately worth $120 million).

4. After the filing of this lawsuit, Uber also learned that the timing of the Levandowski bonus corroborates that Levandowski likely downloaded and retained Google information in relation to that bonus.  Of that total bonus, approximately $50 million was payable as of October 2015, but was paid on December 31, 2015, and approximately $70 million was paid in August 2016.  Uber also learned after the filing of this lawsuit that Google said in arbitration papers that it paid Levandowski a bonus for what it called his "supposed contributions."  (Dkt. 138 at 10, ¶ 3.)  While these facts arose before the lawsuit was filed, Uber only learned of them later.

5. After the filing of this lawsuit, Levandowski also told Uber and others that he downloaded the files in order to work from home, including at an all-hands meeting.  This was either not a true explanation or not a complete explanation.  Uber's trial presentation will depend on this continued investigation.

6. Uber never used any Google trade secrets or patented technology in the development of its

technology.  As Uber's witnesses will testify at trial (and have testified in deposition), no Uber employee is aware of Levandowski ever using any Google proprietary information in the performance of his duties at Uber.  Uber engineers will testify that this was true both before and after the filing of Waymo's Complaint.

7.  Uber engineers will testify about how they independently developed Uber's technology, including any independent development happening after the filing of this lawsuit and before the time of trial.

8.  In March 2017, within approximately a month of the filing of this lawsuit, Levandowski asserted his Fifth Amendment right against self-incrimination.  Uber would seek to present this fact to the jury only to the extent its motion in limine on Levandowski's invocation is denied.

9.  In Spring 2017, Uber made formal demands of Levandowski, including specifically that he cooperate in Uber's investigation, fact gathering, and defense of the lawsuit, and in particular demanded that Levandowski return anything belonging to Waymo that he might still have in his possession or control.  Among other evidence of Uber's demands that Levandowski testify and cooperate, Uber will introduce non-privileged correspondence with Levandowksi on this topic, as well as testimony from those involved.

10. After Levandowski failed to cooperate as directed, Uber terminated his employment by letter dated May 26, 2017.  (*E.g.*, Dkt. 519-2 (5/26/2017 Ltr. from S. Yoo to A. Levandowski (terminating Levandowski's employment, subject to his ability to cure by timely cooperating)).)

11. Uber engaged in extensive efforts after Waymo filed this lawsuit to locate, sequester, and remediate any of the Downloaded Files and did not identify any such files.  Uber intends to introduce evidence of its extensive and comprehensive efforts, after this litigation commenced, to locate in Uber's files any copies of the Downloaded Files, including percipient and expert testimony about the searches Uber performed, the inspections of Uber facilities by Waymo, interviews of Uber employees, and expert testimony regarding the adequacy of Uber's efforts to locate any of the allegedly downloaded materials.  These

efforts include:

- As of April 7, 2017, Uber's vendor Stroz Friedberg imaged the workstations of 87 Uber employees, consisting of all former Google employees who were employed by Uber and working on Uber's autonomous vehicle technology as of April 2017. Stroz Friedberg also worked with Uber to preserve and collect data from the company's G Suite applications, including Gmail email and Google Drive file server storage. Stroz Friedberg collected a total of approximately 106.5 terabytes of data. Stroz Friedberg then examined the data from Levandowski, Sameer Kshirsagar and Radu Raduta, as well as seven additional former Google employees who worked on Chauffeur or LiDAR at Google (i.e., Asheem Linaval, Daniel Gruver, George Lagui, Jur van den Berg, Michael Tocce, Nikko Alcantara, and Rudy Sevile). In addition, Stroz Friedberg searched Uber's Git version-control system software repositories and Kshirsagar's personal phone and email.

- Stroz Friedberg also forensically collected approximately 235 terabytes of data, including data from nine servers and 148 different custodians, including every person on the list Uber provided to the Court of "individuals with LiDAR responsibilities." The custodian collection included email and other data from 280 different computers. These efforts are detailed in part in the Declarations of Kevin Faulkner and Asheem Linaval in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction and in Support of Defendants' Sur-Reply. (Dkts. 175-1, 177-5, 303, and 304.) These efforts uncovered no Downloaded Files at Uber.

- In response to the Court's May 11, 2017 Order, Uber took the following steps, among others. First, Uber sent a survey to each of its employees via its "Global Uber Team" email listserv and conducted interviews of over 160 employees, including those employees who responded that they had had communications with Levandowski mentioning LiDAR. None of the employees interviewed indicated he had seen or heard of the Downloaded Files, outside of allegations in this case or

12

press reports.

- Uber reviewed over 11,000 documents, including emails, Google Drive documents, and calendar invitations for any communications in which Levandowski mentioned LiDAR.  None of this review uncovered any Downloaded Files.

- Uber sent a survey to its LiDAR-related suppliers, following up by phone and in writing with those suppliers that responded that they had had communications with Levandowski mentioning LiDAR.  None of these suppliers indicated that it had seen or heard of the Downloaded Files, outside of allegations in this case or press reports.

- Uber interviewed 60 individuals at Stroz Friedberg to document which of them may have seen potentially Downloaded Files and to confirm none of them had sent any of the Downloaded Files to Uber.  No one indicated that she or he had sent any Downloaded Files to Uber.

- Uber conducted interviews of individuals known to have received the Stroz Report, including Uber board members and Uber's outside counsel, to verify the chain of custody and to confirm that none of them had forwarded any files that were potentially Downloaded Files to Uber.  No one indicated that she or he had sent any potentially Downloaded Files to Uber.

12. Waymo has inspected all four of Uber's facilities where LiDAR work is ongoing.  It has inspected Levandowski's workstation and Uber-issued phone and computers, along with the devices of Uber engineers involved in LiDAR.  These inspections have spanned ten days and more than 56 hours and are ongoing.  With all of these extraordinary efforts, Waymo has still found no evidence at Uber of the Downloaded Files that Waymo says Levandowski downloaded before leaving Waymo.

13. Should Waymo introduce evidence regarding the Stroz Report if the privilege claims over that report are ultimately rejected, and should Waymo be permitted to introduce argument regarding individuals' receipt of the Stroz Report, Uber may introduce evidence about

13

who received the Stroz Report, what they received, when they received it, and for what purpose.  Several of the individuals who received the report received it after the filing of the Complaint.  Uber does not believe these facts are relevant, and has no plans to introduce them unless Waymo makes these actions necessary to contextualize and explain.

14. Should Waymo be permitted to put in evidence of its damages despite its inadequate Rule 26 disclosures (*see* Dkt. 797), Uber will offer evidence that will demonstrate that Waymo has suffered no damages.  This evidence will include expert and fact-witness testimony about the currently non-existent market for self-driving vehicles, projections regarding that future market, and Uber's capacity to compete in that market, up to and after the time of trial.  For example, Uber will put on fact and expert witness testimony to show that (1) the "market" for self-driving cars does not yet exist, and therefore Waymo has suffered no cognizable competitive harm, even if it succeeds in showing that Uber possessed or used any Waymo trade secrets (which it did not), and (2) Uber has not yet commercialized any of its LiDAR technology. █████████████████████████████████

15. Waymo originally accused Uber's current LiDAR design of infringing single-lens patents (the '922, '464, and '273 patents), but was forced to drop those claims when it learned that Uber does not use a single-lens design.

16. Waymo's technical expert, Gregory Kintz, opined that Fuji infringed the single-lens patents, but was forced to withdraw those opinions.

1

2    Dated:  July 10, 2017

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORRISON & FOERSTER LLP
BOIES SCHILLER FLEXNER LLP


By:  /s/ Arturo J. Gonzalez
        ARTURO J. GONZALEZ

Attorneys for Defendants
UBER TECHNOLOGIES, INC. and
OTTOMOTTO LLC

DEFENDANTS' RESPONSE TO COURT'S REQUESTS FOR LISTS (DKT. 784, ¶ 1)
CASE NO. 3:17-CV-00939-WHA