## Appendix A

**BRIEFING AND PLEADINGS**

Notice of Appearance of Eric A. Tate, Dkt. 35 **[A, B, H]**
- *Entire document*

Notice of Appearance of Rudolph Kim, Dkt. 36 **[A, B, H]**
- *Entire document*

Certificate of Interested Entities by Otto Trucking LLC, Ottomotto LLC, Uber Technologies, Inc., Dkt. 76 **[A, B, H]**
- *Entire document*

Otto Trucking LLC's Amended Certificate of Interested Entities or Person, Dkt. 480 **[A, B, H]**
- *Entire document*

Uber's Request For In-Chambers Conference To Discuss Confidential Matter, Dkt. 122 **[A, B, C, F, G, H]**
- Uber has a confidential matter (unrelated to redacting) that we believe needs to be addressed in chambers to protect legitimate privacy concerns. The Court will understand the need for this matter to be raised in confidence. Uber requests a short in-chambers conference on Wednesday afternoon, March 29, 2017, or as soon thereafter as is convenient for the Court. Counsel for Uber is not available after 11:00 a.m. on Thursday.

Defendants' Response to Waymo's Discovery Letter Brief Regarding Violation of the Court's March 16 Expedited Discovery Order, Dkt. 161 **[F, G]**
- Uber interviewed 85 Uber employees who worked at Google previously in order to identify *any* Waymo or Google documents. Uber also searched the company data for all three of the employees (one a former employee) mentioned in the complaint and motion for injunction. In addition, Uber searched the personal mobile phone of one of those employees and searched the computers of seven other randomly-selected employees who work on autonomous vehicles and who formerly worked on LiDAR or Project Chauffeur while at Google. Further, we also searched the entire Git repository (Uber's engineering and source code repository) for filenames and hash values. In addition, we used 120 additional search terms (which have been provided to Google) in an effort to identify responsive documents.
- We performed all of the work described above in an effort to be as diligent as possible within the time available to fulfill the terms of paragraph 4 of the Court's March 15 Order.

APPENDIX A—Waymo LLC's List of Orders and Admissions (Dkts. 775 and 784)

- Uber cannot compel any employee to produce personal records, and Uber does not have "control" over any such records.

Defendants' Uber Technologies, Inc., Ottomotto LLC, and Otto Trucking LLC's Opposition to Plaintiff Waymo LLC's Motion for Preliminary Injunction, Dkt. 177 **[D]**
- [*Page 2, lines 6-7; Page 5, lines 21-22, statement about the timing and development of its in-house LiDAR technology, under seal*]
- The impetus for Defendants to develop an in-house customized LiDAR was, in part, due to the difficulty in obtaining LiDAR sensors in sufficient quantities from commercial sources.

Defendants' Uber Technologies, Inc., Ottomotto LLC, and Otto Trucking LLC's Opposition to Plaintiff Waymo LLC's Motion for Preliminary Injunction, Dkt. 177 **[H]**
- By late 2015, Uber had decided to develop a customized LiDAR in partnership with Velodyne—long before Uber's acquisition of Mr. Levandowski's company.

Defendants' Uber Technologies, Inc., Ottomotto LLC, and Otto Trucking LLC's Opposition to Plaintiff Waymo LLC's Motion for Preliminary Injunction, Dkt. 177 **[F, G]**
- Uber searched data belonging to Messrs. Levandowski, Kshirsagar, and Raduta, as well as that of seven other former Waymo employees who worked on Chauffeur or LiDAR sensors, for the approximately 14,000 filenames and hash values identified by Waymo as corresponding to allegedly downloaded files, as well as the filenames included in Waymo's preliminary injunction papers.

Letter Brief in Response to Waymo Discovery Letter Brief Regarding LiDAR Device Inspection, Dkt. 216 **[G, H]**
- Uber has one LiDAR prototype; it is called "Fuji."
- No Uber device has been disclosed to Nevada regulators.
- The only other LiDAR prototype that might be responsive is a prior Tyto LiDAR prototype called "OWL" that is no longer in development.
- As we have told Waymo's counsel, they will have an opportunity to confirm all of these facts in the upcoming depositions.

Gonzalez Dec. ISO Reply Brief Re Motion To Compel Arbitration, Dkt. 243-1 **[A, B]**
- I, along with others at Morrison & Foerster, serve as counsel for respondents in two pending JAMS arbitrations that Google Inc. initiated on October 28, 2016 (the "Google initiated arbitrations"). One of those arbitrations names Anthony Levandowski as the only respondent; the other names as respondents both Levandowski and one other current Uber employee who also formerly worked for Google.

Levandowski's Court Ordered Fifth Amendment Submission, Dkt. 244 **[A, B, C, G]**
- Mr. Levandowski has asserted that the compelled production of certain records may implicate his Fifth Amendment privilege against self-incrimination.

Notice of Appearance and Notice of Withdrawal For Goodwin re Levandowski, Dkt. 251-53, 261 **[A, B]**
- *Entire documents*

Defendants Uber Technologies, Inc., Ottomotto LLC and Otto Trucking LLC's Responses To Court-Ordered Interrogatories to Assist Court In Supervising Case Management and Expedited Discovery, and Exhibit A and verification, Dkt. 264-4, 264-5 (sealed), Dkt. 265 (public) **[A, B, C, F]**
- *Entire documents*

Uber and Ottomotto's Opposition to Motion to Compel (re Stroz), Dkt. 369 **[A, B, C, E, G]**
- On February 22, 2016, Uber Technologies, LLC ("Uber") executed a term sheet in anticipation of an acquisition of two newly-formed companies, Ottomotto LLC ("Ottomotto") and Otto Trucking LLC ("Otto Trucking") (collectively "Otto"). Two of Otto's co-founders, Anthony Levandowski and Lior Ron, were ex-Google employees. And competition within the autonomous vehicle space was intense. Litigation was a distinct possibility.
- Consistent with the belief that there was a possibility of litigation by Google, Uber agreed to indemnify certain employees under certain circumstances regardless of whether the deal closed.
- Regardless, the facts in the record establish that Uber and Otto reasonably anticipated litigation would be commenced by Google.
- MoFo was retained in January 2016 specifically to analyze litigation risk
- Uber and Otto reasonably anticipated litigation in early 2016.
- Here, the Report and several of its exhibits reflect information provided in confidence to an agent of counsel [Stroz], at the direction of counsel, for the purpose of obtaining legal advice from OMM and MoFo and is therefore covered by the privilege.

Declaration of Tate, Baker, Bentley, Suhr, Friedberg, Gardner, Leigh, in support of Uber and Ottomotto's Opposition to Motion to Compel, Dkt. 370, 375-76, 378, 380-81, 383 **[A, B, C, E, G]**
- *Entire documents*

Levandowski's Opposition to Waymo's motion to compel (re Stroz), Dkt. 379 **[A, B, C, E]**
- Bracing themselves for potential litigation with Google and/or Waymo, the parties hired litigation counsel to help them prepare a future defense.

- The parties recognized that the threat was common to all of them.

Levandowski's Motion to make *in camera* submission in support of opposition to Waymo's motion to compel (re Stroz), Dkt. 382 **[A, B, C, E, G]**
- Mr. Levandowski cannot fully explain to the Court the basis for the application of the common interest, attorney-client, or work product privileges to the communications at issue without risking a waiver of his Fifth Amendment privilege against self-incrimination.
- In January 2016, prior to the creation of the Stroz Friedberg report and the execution of the Joint Defense Agreement, Mr. Levandowski consulted with Mr. Gardner to receive personal counsel *regarding his departure* from Google and his joining Uber as part of the Uber-Ottomotto acquisition. From the outset, Mr. Levandowski recognized —as did the Defendants—that Google might initiate litigation *following Uber's acquisition of Ottomotto*.
- Moreover, when it became clear that Uber would acquire Ottomotto and Otto Trucking, Mr. Levandowski took reasonable steps to preserve that privilege throughout the entirety of the acquisition process.

Levandowski's Motion for Intervention and Modification of May 11, 2017 Order Granting In Part and Denying In Part Plaintiff's Motion for Provisional Relief, Dkt. 466 **[A, B, C, E, G]**
- As this litigation has proceeded, Mr. Levandowski has consistently asserted his Fifth Amendment privilege to avoid being forced to answer questions or produce documents relating to any materials he allegedly misappropriated from Waymo. *See, e.g.,* Docket Nos. 131, 147, 169, 230, 244, and 382.
- Throughout this litigation, Mr. Levandowski has remained an employee of Uber, and Uber has not previously threatened to terminate him based on his decision to preserve his constitutional rights or attorney-client privileges. To the contrary, Uber has respected Mr. Levandowski's rights and privileges.

Uber's Response to Court's Questions re AL's Motion for Intervention and Modification of Court's Preliminary Injunction Order, Dkt. 514 **[A, B, C, E, G]**
- Even though the Fifth Amendment does not, strictly speaking, prevent a private employer like Uber from terminating an employee for invoking his Fifth Amendment rights, that employer may still exercise the discretionary judgment to respect the employee's invocation of his Fifth Amendment rights
- Uber submits that the Fifth Amendment is violated by a court order requiring an employer to terminate an employee for asserting his Fifth Amendment rights. Uber chose not to appeal or seek reconsideration of the order on that basis.

Uber's Statement and Otto's Trucking's Statement Regarding Privilege, Dkt. 531, 532 **[G, H]**

- Defendants do not intend to waive any privileges that they have asserted, or will assert, throughout this litigation.
- Defendants believe it would be appropriate for the Court to require all parties to identify any privilege waivers that they believe any other party has made to date, or believe any other party will make at trial.
- Accordingly, to the extent that the parties subsequently become aware of any putative privilege waivers, the Court can implement a briefing schedule whereby these putative privilege waivers are brought to the Court's attention and resolved immediately
- Otto Trucking does not intend to waive any privileges at this time. However, discovery is not yet complete, and the full scope of all privilege waivers is not presently cognizable.

Uber's Opposition to Waymo's Motion to Compel Production of Letter Agreement (re Stroz), Dkt. 552 **[A, B, G]**
- The limited redactions to the Letter Agreement describe the information being requested by Stroz on behalf of counsel for Uber and Ottomotto in order to render legal advice.
- Those same redactions also reflect attorney work product in directing Stroz with respect to the conduct of the investigation.
- The investigation's scope, including the review protocol, were decided upon and agreed to by all parties and attorneys involved in and directing the Stroz investigation, which included counsel for Uber, Ottomotto, Levandowski, and Lior Ron.
- But the record shows that Gardner (along with MoFo and OMM) directed the scope of the investigation and relied on it in providing his client legal advice.
- Gardner viewed his communications with MoFo, OMM, Uber, and Ottomotto as privileged from the outset of his engagement, and his March 22, 2016 email "confirmed" that understanding.
- The privilege log adequately describes this document as "correspondence between Stroz Friedberg LLC and attorney for A. Levandowski regarding investigation protocol for the Due Diligence Investigation."

Motions for Relief From Magistrate Judge Corley's Order re Stroz (Dkt. 566), Dkt. 572 (OT), 574 (AL), 575 (Uber)
Dkt. 572 **[A, B, C, G]**
- The resulting Stroz Report and its exhibits include Stroz's findings and analysis, including confidential information provided by Otto Trucking's principals, Anthony Levandowski and Lior Ron.
- Stroz's interviewed, and collected information from, Otto's principals, including Mr. Levandowski. Stroz's report and exhibits include the communications and information provided by Otto Trucking's principals to Stroz.
- It is enough that the parties were in the late stages of negotiation when they jointly retained Stroz.

Dkt. 574 **[A, B, G]**
- Mr. Levandowski and Otto both had a "common legal interest"—rather than an adversarial, or purely business, interest—in the "subject matter" of Stroz's investigative work.

Dkt. 575 **[A, B, E, G]**
- The Stroz Report and most Exhibits were not completed and disclosed until August 5, 2016 and August 11, 2016, respectively
- Here, the Report reflects information communicated in confidence to an agent of OMM and MoFo, at the direction of OMM and MoFo, for the purpose of obtaining legal advice from OMM and MoFo.
- Uber, Ottomotto, Levandowski and Ron knew they faced litigation risk from Waymo even prior to the signing of the Put Call Agreement on April 11, 2016

OT's Motion to Quash Stroz Subpoena, Dkt. 580 **[A, B, E, G]**
- Waymo improperly seeks privileged information from non-party Stroz, an investigation firm retained by Defendants in anticipation of litigation.
- Defendants—Uber, OttoMotto, Otto Trucking, Mr. Levandowski, and Mr. Ron—had, from the outset, recognized the real and present risk of litigation in connection with the Uber-Otto acquisition.
- The Defendants knew that they would likely be sued by Waymo if the merger were consummated.

Uber's Motion to Quash Stroz Subpoena, Dkt. 581 **[A, B, C, E, G]**
- The Due Diligence Report reflects information provided in confidence to an agent of OMM and MoFo, at the direction of OMM and MoFo, for the purpose of obtaining legal advice from OMM and MoFo.
- The Joint Defense Group (Uber, Otto, Otto Trucking, Levandowski, and Ron), retained and directed Stroz to conduct the due diligence review specified in the Term Sheet.
- The conversations between Anthony Levandowski and Lior Ron, Otto Trucking's principals, are precisely the type of communications that are protected by the attorney-client privilege under the Supreme Court's decision in *Upjohn*.
- Here, Stroz was acting as an agent, through which its communications are privileged.

Otto Trucking's Reply In Support of Motion for Relief from Magistrate Judge Corley's Order (Dkt. No. 549), Dkt. 609 **[A, B, C, G]**
- Levandowski, a principal at Otto Trucking, communicated confidentially with Stroz, an investigation firm acting as the agent of OMM, Otto Trucking's attorneys.
- That is precisely what Otto Trucking argues here: that Stroz's report and exhibits reflect confidential communication from Otto Trucking's principal to OMM's agent.

- The fact that Otto Trucking is not mentioned by name in Stroz's engagement letter does not diminish Otto Trucking's privilege in its principal's statements.

Stroz Opposition to Motion to Compel, Dkt. 614 **[A, B, G]**
- Stroz is also party to an engagement letter (the "Engagement Letter") with Uber and Ottomotto LLC ("Ottomotto"), which requires Stroz to protect those privileges and forbids the disclosure of materials covered by those asserted privileges without express consent.
- On June 12, 2017, Stroz received a letter from Uber and Ottomotto's counsel stating that Uber and Ottomotto do not want Stroz to retain possession of, destroy, or delete any materials Stroz may have gathered from Mr. Levandowski, and further they want Stroz to produce to Waymo any such materials that constitute Google information. Uber and Ottomotto's counsel also provided a copy of a letter addressed to Mr. Levandowski asking that he instruct Stroz to provide to Waymo any "downloaded material," as that term is defined in the Court's May 11 Order, that may be in Stroz's possession. Counsel for Stroz thereafter received an email from Mr. Levandowski's counsel stating that Mr. Levandowski does not consent to any such production. Stroz therefore remains where it started—contractually prohibited from taking the requested actions absent the requisite consent or a Court order.
- Stroz stands ready to comply with the Subpoena if it receives the requisite permission, or if it is ordered to do so by the Court.

Otto Trucking Response to Waymo Precis On Motions In Limine, Dkt. 649 **[A, D, H]**
- Otto Trucking is merely an entity that owns Otto Transport LLC, an entity that owns trucks.
- It has not been acquired by Uber, although Uber has retained the right to acquire Otto Trucking in the future.

Uber's Notice of Lodgment of Chronological Communications Logs Pursuant to Paragraph 5 of This Court's Order Granting in Part and Denying in Part Plaintiff's Motion for Provisional Relief, and Exhibits 1 to 2 of same, Dkt. 712 **[A, B, C, E, F, G, H]**
- *Entire documents*

Defendant Otto Trucking LLC's Summary of Actions Taken Re: Order Continuing Deadline and Setting Hearing on Motion to Intervene and Modify Provisional Relief, Dkt. 714 **[A, B, C, E, F, G, H]**
- *Entire document*

Defendants Uber Technologies, Inc. and Ottomotto LLC's Accounting Pursuant to Paragraph Four of May 11, 2017 Preliminary Injunction Order, Dkt. 715 **[A, B, C, E, F, G, H]**

- *Entire document*

Defendant Otto Trucking LLC's Summary of Actions Taken Re: Order Continuing Deadline and Setting Hearing on Motion to Intervene and Modify Provisional Relief, Dkt. 717 **[A, B, C, E, F, G, H]**
- *Entire document*

Non-Party Anthony Levandowski's Notice of Motion and Motion for Relief from Non-dispositive Pretrial Order of Magistrate Judge (Dkt. 670), Dkt. 726 **[A, B, G]**
- Stroz was an agent of Uber rather than Mr. Levandowski himself.

Defendants Response to the Court's Ten Questions (Dkts. 664, 693), Dkt. 755 **[A, B, G, H]**
- Rather, Uber believes that the downloading was done in relation to Levandowski's employment at Google, specifically to ensure the expected payment of Levandowski's $120 million bonus from Google. Of that total bonus, approximately $50 million was payable as of October 2015, but was paid in late December 2015, and approximately $70 million was paid in August 2016.

Defendants Uber Technologies, Inc. and Ottomotto LLC's Supplemental Accounting Pursuant to Paragraph Four of May 11, 2017 Preliminary Injunction Order - Dkt. 762 **[A, B, C, E, F, G, H]**
- *Entire document*

Uber's Notice of Lodgment of Supplemental Chronological Communications Log Pursuant to Paragraph 5 of This Court's Order Granting in Part and Denying in Part Plaintiff's Motion for Provisional Relief, and Exhibit 1 to same, Dkt. 792 **[A, B, C, E, F, G, H]**
- *Entire documents*

Defendants Uber Technologies, Inc. and Ottomotto LLC's Opposition to Waymo LLC's Motion for Relief From Non-Dispositive Pretrial Order of Magistrate Judge (Dkt. 731), Dkt. 800 **[A, B, G, H**]
- Uber's belief that Levandowski downloaded the files to ensure payment of his $120 million bonus is beside the point because that belief arose only *after* filing of this litigation, when Levandowski revealed to Uber's then-CEO Travis Kalanick this reason for the downloads.

Defendants Uber Technologies, Inc. and Ottomotto LLC's Opposition to Waymo's Motion for Order to Show Cause Why Defendants Should Not Be Held in Contempt, Dkt. 806 **[A, B, C, E, F, G, H]**

- Mr. Levandowski and Stroz entered into a contract that strictly prohibited Stroz from disclosing any Google-related information he may have provided to Stroz for its due diligence to *any* third parties, including Uber.
- Concerning whether it has access to any "downloaded materials," MoFo explained that it does not "except to the extent that any such material may appear: (1) excerpted in or as an exhibit to the Stroz Report, which is privileged; and (2) in certain materials AL and other persons provided to Stroz to which MoFo was given limited access during the Stroz investigation pursuant to the terms of the AL-Stroz contract and the protocol governing the investigation, and under strict conditions preventing MoFo from sharing those materials with anyone, including Uber."
- Mr. Levandowski is a member and the majority shareholder of Trucking, and controls what it can and cannot do. Trucking does not have the power to force Mr. Levandowski to do anything that Mr. Levandowski does not agree to do.
- Prior to Uber's acquisition of Otto, the law firms representing the two parties retained the investigative firm Stroz to conduct an investigation in which Stroz would gather all information from five key employees of Otto to determine whether they might have in their possession materials from any of their prior employers.
- The destruction of the five discs that occurred in March 2016 is described in at least one of the documents listed on Uber's privilege log. In its efforts to comply with the March 16 Order, Uber did not recognize that it had the ability to provide a description of the destruction of the five discs that was based on non-privileged information.
- Uber reviewed over 11,000 documents, including emails, Google Drive documents, and calendar invitations for any communications in which Mr. Levandowski mentioned LiDAR.

Statement in Response to Paragraph 7 of Order Re Early Motions in Limine and Related Matters (Dkt. 784) - Dkt. 823 **[A, B, C, F, G, H]**
- *Entire document*

All Privilege Logs served by Defendants **[A, B, C, E, F, G, H]**
- *Entire documents*

Defendants' List of Servers, LiDAR-related personnel, and LiDAR suppliers and consultants - hand-served in Court on April 5, 2017 (in response to Dkt. 144) **[A, B, F, G]**
- *Entire document*

June 12, 2017 email from Jessica Phillips, Dkt. 677-8 **[A, B, G, H]**
- *Entire document*

Uber's 6.27.2017 Working Supplemental Log Pursuant to Orders on Motion for Preliminary Relief [ECF No. 426] and Special Master's Protocol [ECF No. 500] - served by Wendy Ray at 9:04 PM on 6/27/2017 **[A, B, C, F, G, H]**
- *Entire document*

Uber's 6.30.2017 Supplemental Log Pursuant to Orders on Motion for Preliminary Relief [ECF No. 426] and Special Master's Protocol [ECF No. 500] - served by Wendy Ray at 9:24 PM on 6/30/2017 **[A, B, C, F, G, H]**
- Entire document

**HEARING TRANSCRIPTS**

March 29, 2017 Hearing Tr., Dkt. 131 **[A, B, C, F, G, H]**
- Arturo Gonzalez: Before the acquisition some due diligence was done. A third party prepared a report based on that due diligence. We intend to put that report on a privilege log.
  There's a concern that's been raised about whether or not we should identify the party who prepared the report. The concern is that by identifying the party, we are waiving or infringing upon a Fifth Amendment right.
- Arturo Gonazlez: Let me be clear about something. I want you to know, it is important for me that you know this. I would love to put Mr. Levandowski on the stand to explain to you what happened, because I think he has a good story to tell.
- Arturo Gonzalez: Frankly, we obviously have a conflict here. We obviously have a conflict.

April 5, 2017 Hearing Tr., Dkt. 160 **[F, G, H]**
- Arturo Gonzalez: Let me tell you what we've done to comply with your order.
  First, we interviewed 85 people that currently work for Uber, who used to work at Google. Of those people, 42 used to work in their automotive division. Given that we only had a limited amount of time, I wanted to take 25 percent of that 42, essentially ten, and look at all of their computers. So we took the three people who are named in their papers and we selected seven others randomly. And we had a consultant come in and look at all of their computer information at Uber to see if we could find any of these 41,000 (sic) files.
  In addition to that, we looked at the cell phone that Samir has. He let us look at his cell phone, and so we did look at that. We also looked at the entire GIT (Phonetic) repository. That is a repository for Uber's engineers. And we looked at that to see if we could find any hits. We looked for the file names or for hash values. And in addition to that, working with our consultants and with our clients, we came up with 120 additional search terms that we could search to see if we can find any evidence of these files.

In total, Your Honor -- this is important for you to know -- we searched 12 terabytes of data, in just the two weeks or so that we have had. That's the equivalent of 8.3 billion pages of text. So, any suggestion that we are not looking is extremely unfair.

April 5, 2017 Hearing Tr., Dkt. 160 **[G, H]**
- Arturo Gonzalez: So, Your Honor, a couple of things. I'm trying to balance two things. Number one, we have nothing to hide. Number two, this is arguably the most sensitive trade secret we have.

April 6, 2017 Hearing Tr., Dkt. 169 **[A, B, F, G, H]**
- THE COURT: Mr. Gonzalez, so how many documents are we talking about? You led me to believe it was just one, the due diligence report; but on reflection, I'm not sure you actually said that. How many documents are in play?
  MR. GONZALEZ: So, Your Honor, it depends on what the question is. I mean, we've been talking about this due diligence report for, it seems, many multiple days.
  THE COURT: I'll make it very clear to you, and I don't want any evasion. I gave a direct order on March 13th or 16th to produce documents, and I said what they were, what you had to produce. Now, you know what you had to produce. You want to claim privilege at least as to one, but is it more than one?
  MR. GONZALEZ: There is a report. There are, Your Honor, many, many e-mails that talk about the general issue of the report and related issues.
  THE COURT: How many of those would you be putting on the privilege log if you were to claim privilege? That's what I want to know.
  MR. GONZALEZ: So we're being overinclusive,
  Your Honor. Right now the log, we're just about finished with it, is about 300 pages.
  THE COURT: That would be --
  MR. GONZALEZ: It's thousands of e-mails.
  THE COURT: -- under this privilege thing based -- that relate to this problem; is that what you're saying?
  MR. GONZALEZ: Yes.
  THE COURT: You've got 300 items that are hanging fire waiting on the order that I'm going to make on this motion?
  MR. GONZALEZ: To be clear, I believe the log at this point is 300 pages, which it's hundreds -- basically, Your Honor, it's hundreds of e-mails, possibly thousands. I know that we were reviewing at least 7,000 e-mails, Your Honor, and we've got a log --
  THE COURT: All right. So there's more than just one due diligence report?
  MR. GONZALEZ: If you're asking me broadly about the privileges that are at issue, the answer is yes.

**April 6, 2017 Hearing Tr., Dkt. 169 [A, B, G, H]**

- Arturo Gonzalez: This is not someone, in my view, since you asked me to give you my opinion, this is not someone who has to steal anything. He knows this stuff.

  THE COURT: Well, then why did he take the 14,000 documents?

  MR. GONZALEZ: Your Honor, that, I don't have an answer to, but I do think he's got a very good story to tell.

**April 12, 2017 Hearing Tr., Dkt. 230 [C, G, H]**

- MR. JAFFE: Sure. It says (reading): "LiDAR - In-house custom built 64 laser (Class 1) emitting 6.4 million beams a second at 10 Hz."

  THE COURT: All right. So just hold that thought.

  Why can't they see that? First, does that -- what were they referring to whenever they made that representation under oath to the Nevada people?

  MR. GONZALEZ: So, Your Honor, we clarified that on Chang Exhibit 8, which is a letter that we sent to the Nevada Department of Motor Vehicles once they saw that they were making it an issue, clarifying that we are developing but we have not yet deployed any in-house custom-built LADAR. What we --

  THE COURT: Well, whether it was deployed or not, it sounds like somebody was working on it.

  MR. GONZALEZ: Precisely. And, Your Honor --

  THE COURT: That would be an update. Why don't you let them see what they were working on?

  MR. GONZALEZ: Because, Your Honor, we showed it to them yesterday. It's the Fuji.

- Arturo Gonzalez: We're not hiding some device, Your Honor. We've got two devices basically and we showed both of them to them yesterday.

  The Court: Was there something -- are you telling me there was nothing, absolutely nothing other than Fuji was the reference in that Nevada thing?

  MR. GONZALEZ: Your Honor, my understanding is the only other thing that could have been referenced is the commercially available Velodyne that was here on the counter. And there's one other that we did show them yesterday, Your Honor, because we tried to be overinclusive in what we showed them. We brought something that was called the "Owl," which was, I believe, a predecessor to the Fuji, and it's no longer being developed, but we brought that as well.

  THE COURT: Were there any other things that were just on the drawing boards or in schematics? Any other work on laser that never got to the stage of a prototype or even close to a prototype but, nevertheless, represented work and thought and planning?

  MR. GONZALEZ: That, I don't know, Your Honor. I was focused on their request was about Nevada; and what I can tell you is that with respect to Nevada, there was the Fuji and there was the Velodyne.

- THE COURT: When did the correction get sent into the Nevada people?

MR. GONZALEZ: March 15th, 2017.

THE COURT: Well, what took them so long? March 15th, 2017, is when this litigation was underway.

MR. GONZALEZ: That's correct, Your Honor.

THE COURT: That sounds like somebody's fixing the record.

MR. GONZALEZ: Well, that -- I'm not going to deny that, Your Honor. In their papers they cited this letter to Nevada. We looked at the letter. We discussed it with our client. The letter wasn't clear, so we submitted a clarification.

April 12, 2017 Hearing Tr., Dkt. 230 **[F, G, H]**

- Arturo Gonzalez: So, Your Honor, we have 42 contract lawyers who have been working around the clock since Friday afternoon. We also have 11 Morrison & Foerster lawyers who have been contributing to this effort. So it's not just Stroz. And then with respect to Stroz, Your Honor, it's not just one guy. We have 39 people at Stroz.
  So we're throwing a ton of resources at this. And as it turns out, Your Honor, it's just impossible to do what you've asked us to do in the limited amount of time, and we wanted to raise that with you.

April 25, 2017 Hearing Tr., Dkt. 277 **[A, B, C, G, H]**

- The Court: But let me ask you about that, Mr. Gonzalez, though. That is -- normally, we don't allow a party -- and Mr. Levandowski is still employed by Uber?
  MR. GONZALEZ: Yes.
- MR. GONZALEZ: So, first, Uber has not asserted any Fifth Amendment privilege. Mr. Levandowski has separate counsel for criminal and civil for asserting that privilege. That's exactly why Neel is here, because of this argument they keep making that Uber is asserting the Fifth. Uber is not. Uber is doing everything it can to open its doors to allow an inspection of its files to show that there's nothing there.
  THE COURT: Yes, but Mr. Levandowski's still employed by Uber.
  MR. GONZALEZ: He is. He is, your Honor, he is.
- The Court: I would think, if he truly is a third party at that point, but now he's -- he's an officer or...?
  MR. GONZALEZ: Your Honor, I don't even know if he's an officer, but he's…
  THE COURT: He's a high-ranking --
  MR. GONZALEZ: He's a high-ranking employee.

May 3, 2017 Hearing Tr., Dkt. 354, Dkt. 503 **[A, B, C]**

- THE COURT: You said that -- I thought you just said that your own employee used to work at Waymo, knew that they used [*redacted, under seal*] and so he decided to use [*redacted, under seal*] at Uber.

MR. KIM: Right. And to be clear, we're not arguing an independent development here [for Trade Secret No. 7]

May 3, 2017 Hearing Tr., Dkt. 354, Dkt. 503 **[F, G, H]**
- Arturo Gonzalez: If the question is to Mister -- you asked about our CEO.   We'll produce our CEO for deposition. Nobody is hiding at Uber.  We'll produce him.

May 3, 2017 Hearing Tr., Dkt. 354, Dkt. 503 **[A, B, C, F, H]**
- Arturo Gonzalez: We will just put him on the sidelines. No more LiDAR for you until this trial is done. Hopefully, he can live with that, your Honor.

May 25, 2017 Hearing Tr., Dkt. 516 **[A, B, E, H]**
- Karen Dunn: All we need to show, which I think we've amply showed -- and I don't even think that Waymo continues to contest -- is that the parties at this time were anticipating litigation.  And whether that's in the context of a merger or there is an indemnity agreement, which, in fact, on its own just underscores that the parties were anticipating a possible litigation, none of that detracts from the fact that there was a litigation purpose.
- Karen Dunn: And that isn't even before you yet to how this report itself was treated. The fact that it was run only by litigation counsel, distributed only to litigation counsel. They had deal counsel before. They hired MoFo to be litigation counsel and MoFo and O'Melveny hired Stroz to be their agents.
- MS. DUNN: Your Honor, the Term Sheet itself, in our view, reflects an anticipation of litigation in this circumstance. And, also, it was -- it was created at a time when lawyers were already retained.
- Karen Dunn: The second thing, just so there's an understanding of everybody's relationship here, is with regard to Mr. Ron, he was a member of Ottomotto. So we represent Ottomotto and the Bentley declaration goes to Ottomotto.  So I just -- I know that this -- there's a lot of confusion, so I just want to clarify, in case there is any confusion about Mr. Ron, that he was interviewed as a member of Ottomotto, who was represented.
  THE COURT: You mean, Ottomotto was like an LLC and he was a member?
  MS. DUNN: Correct.
- Karen Dunn: And then the only other thing I'll say on the Levandowski interview memo from the point of view of Uber is that from Uber's perspective it's pretty clear what happened. They anticipated the possibility of litigation. They hired litigation counsel, who hired very -- which is very typical, an agent to help them do an investigation for that litigation.  And in the course of doing that investigation for the litigation, one of the things that they had to do was interview Mr. Levandowski.

May 25, 2017 Hearing Tr., Dkt. 516 **[F, G]**
- THE COURT: So by the end of the day today the Term 4 Sheet needs to be produced in unredacted form in its entirety.

June 6, 2017 Hearing Tr., Dkt. 625 **[A, B, F, H]**
- Karen Dunn: As to your question about the May 26th letter which terminated Mr. Levandowski, that was on Uber's own initiative. And as you stated, it referred to the court's order, but also referred to independent reasons for termination. For some time -- and an email went out to the company about this explaining -- Uber had been trying get Mr. Levandowski to cooperate.
  And so what happened is that on the May 15th letter -- I do think it's fair to say the court's order was an impetus to send the May 15th letter. But in the May 15th letter, Uber set its own deadline, and the court did not order to us set our own internal deadline.
  And when that internal deadline came and went, Uber made the decision to terminate Mr. Levandowski subject, as Your Honor recognized, to the contractual provision that he is given 20 days to cure, a period that we're still in.
- THE COURT: So what you seem to be telling me is the termination of Mr. Levandowski by Uber, you would have done on your own anyway without regard to the part of the preliminary injunction that ordered you to use your full employment powers over him to cause him to cooperate.
  MS. DUNN: So I think it is very hard to look at this entire situation and pretend the court order doesn't exist. I would say that as a company, Uber was struggling with some of the same issues as have been played out in court, which is that we were urging compliance and cooperation from Mr. Levandowski. And so the court's order certainly provided additional -- substantial additional heft to what we had been urging and the -- the letters make clear that this has to do with our urging in addition to the court's order.


**COURT ORDERS**

Tentative Order Re Expedited Discovery (To Be Discussed at the Conference on March 16), Dkt 54 **[A, B, C, F, G]**
- By March 31, defendants shall produce for inspection all files and documents downloaded by Anthony Levandowski, Sameer Kshirsagar, or Radu Raduta before leaving plaintiff's payroll and thereafter taken by them. Defendants shall also produce for copying the card reader, thumb drive, or other media used for the downloads, as well as all subsequent emails, memoranda, PowerPoints, text messages, or notes that have forwarded, used, or referred to any part of said downloaded material. If any part of said downloaded material has been deleted, destroyed, or modified, then defendants shall state

the extent thereof and produce all documents bearing on said deletion, destruction, or modification.

Order Re Expedited Discovery and Related Matters, Dkt. 61 [**A, B, C, F, G**]
- By March 31, defendants shall produce for inspection all files and documents downloaded by Anthony Levandowski, Sameer Kshirsagar, or Radu Raduta before leaving plaintiff's payroll and thereafter taken by them. Defendants shall also produce for copying the card reader, thumb drive, or other media used for the downloads, as well as all subsequent emails, memoranda, PowerPoints, text messages, or notes that have forwarded, used, or referred to any part of said downloaded material. If any part of said downloaded material has been deleted, destroyed, or modified, then defendants shall state the extent thereof and produce all documents bearing on said deletion, destruction, or modification.

Order Re In-Chambers Conference, Dkt. 123 [**A, B, C, F, G, H**]
- The Court has reviewed defendants' request for a short in-chambers conference to address a confidential matter (Dkt. No. 122). A conference is hereby set for MARCH 29 AT 2:00 P.M. Counsel for both sides should attend. A court reporter will be present unless both sides stipulate otherwise in advance by 10:00 A.M.

Order Re Due Diligence Report, Dkt. 132 [**A, B, C, F, G, H**]
- At the conference on March 29, defense counsel indicated that, prior to the acquisition of Otto Trucking LLC and Ottomotto LLC, Uber Technologies, Inc., obtained a due diligence report prepared by a third party that may (or may not) have referenced the collection of allegedly downloaded documents. Uber intends to put that report on a privilege log. Unless privileged, the aforementioned due diligence report should be produced to plaintiff Waymo LLC. If a claim of privilege is asserted, it should be very promptly claimed with all of the required details disclosed. Any motion under the Fifth Amendment to suspend the production or privilege log requirement must be brought by APRIL 4 AT NOON, if at all, so as to avoid delay leading up to the hearing on May 3. Defense counsel shall immediately notify separate counsel for Anthony Levandowski of this deadline

Order Re Discovery Hearing Tomorrow, Dkt. 144 [**F, G, H**]
- Defendants shall please bring to the discovery hearing tomorrow:
  1. A list of all servers (and their locations) used at any time in any way for defendants' LiDAR-related activities. Do not leave anything off the list merely because some other server supposedly houses the same materials.
  2. A list of all of defendants' officers, directors, and employees, past and present, who have had LiDAR-related responsibilities or projects, and their locations.

16

3. A list of all of defendants' suppliers and consultants, past and present, who have had LiDAR-related responsibilities or projects, and their locations. 4. The fully completed privilege log.

Order Re Discovery Hearing Tomorrow, Dkt. 144 [**A, B, C, F, G, H**]
- Defendants must also explain why they told the Court that Anthony Levandowski "has a good story to tell" (Dkt. No. 131 at 16:10) and were able to obtain signed versions of Mr. Levandowski's employment agreements with plaintiff Waymo LLC, but did not review his files and documents to retrieve the 14,000-plus allegedly downloaded from Waymo.

Order After Hearing Re Discovery Letter Dated April 3, 2017, Dkt. 163 [**F, G, H**]
- As stated on the record at the hearing yesterday concerning plaintiff Waymo LLC's discovery letter dated April 3, 2017 (Dkt. No. 135), defendants shall use Waymo's 15 search terms to again search all officers, directors, employees, and servers that have already been searched using defendants' 120 search terms. Defendants shall then use both Waymo's 15 search terms and defendants' 120 search terms to search ten additional officers, directors, or employees of Waymo's choosing. Finally, defendants shall use both Waymo's 15 search terms and defendants' 120 search terms to search the remainder of defendants' servers and any officers, directors, or employees that have anything to do with defendants' LiDAR technology. The aforementioned searches shall first prioritize the top 50 most important files and documents identified by Waymo from among the 14,000-plus allegedly downloaded by Anthony Levandowski. After searching for those 50 files and documents, defendants shall repeat the aforementioned searches for the remainder of the 14,000-plus.
  The foregoing discovery shall be completed by APRIL 14 AT 5:00 P.M.

Order Denying Motion to Modify Privilege Log Requirements Based on Fifth Amendment, Dkt. 202 [**F, G, H**]
- In this action for trade secret misappropriation, patent infringement, and unfair competition, a non-party moves to prevent defendants from providing a conventional privilege log based on Fifth Amendment and attorney-client grounds. The motion is DENIED.
- Waymo opposes the motion. Defendants — despite defense counsel's insistence that he "would love to put Mr. Levandowski on the stand" and asides that Levandowski's silence has had an "adverse impact" on defendants (e.g., Dkt. No. 131 at 16:3–16:11) — do not oppose Levandowski's motion.
- 1. By 11:00 P.M. TODAY, defendants shall serve a privilege log complete as to all items unaffected by this motion.
  2. By APRIL 13 AT 5:00 P.M., defendants shall serve a privilege log complete as to all items affected by this motion unless the court of appeals extends the deadline.

Order Setting Hearing Re Discovery Letter Dated April 11, 2017,  Dkt. 211 [**A, F, G, H**]
- Plaintiff Waymo LLC shall respond to defendants' discovery letter brief dated April 11 (Dkt. No. 210) by 5:00 P.M. TODAY. The matter will be heard at the end of the technology tutorial tomorrow, time permitting.  The Court will want to know why Stroz Friedberg is involved, rather than cadres from counsel of record, to find relevant material. The Court will further want to know the number of personnel who have been dedicated to the searches and the hours they have worked.

  Nothing in this order in any way extends the earlier deadline for defendants to turn over a privilege log complete as to all items unaffected by Anthony Levandowski's Fifth Amendment argument, which deadline passed at 11:00 p.m. yesterday (see Dkt. No. 202 at 12).

Order to Bring Privilege Log to Hearing, Dkt. 223 [**A, F, G, H**]
- Defense counsel shall bring to the discovery hearings today the privilege log that was due on April 10 at 11:00 p.m. (Dkt. No. 202 at 12). That log should have had no redactions because it was to cover only items unaffected by the Fifth Amendment motion, the remainder being due later. Waymo says in its discovery letter brief dated yesterday that the log provided had redactions (Dkt. No. 218 at 1–2). If true, then defense counsel shall bring to the hearings today both a version of the log that has no redactions and covers all materials unaffected by the Fifth Amendment motion, and whatever version of the log was provided to Waymo on Monday.

Court-Ordered Interrogatories to Defendants to Assist Court in Supervising Case Management and Expedited Discovery, Dkt. 225 [**A, B, C, F, G, H**]
- COURT INTERROGATORY NO. 1 TO DEFENDANTS

  Identify by name and position each present and former officer, director, or employee of defendant Uber Technologies, Inc. (including attorneys), who received prior to the acquisition of Ottomotto LLC and Otto Trucking LLC any electronic or paper material or communication regarding LiDAR or any aspect thereof from:

  (i) Anthony Levandowski or his representatives, or

  (ii) Anyone else advising that the material came from Anthony Levandowski or his Representatives.

  Any name or communication already disclosed on a privilege log may be omitted.
- COURT INTERROGATORY NO. 2 TO DEFENDANTS

  For each such person, identify and describe the material or communication received with sufficient detail to establish any privilege from production, or simply produce the material or communication received to plaintiff's counsel by APRIL 25.  Any name or communication already disclosed on a privilege log may be omitted.
- COURT INTERROGATORY NO. 3 TO DEFENDANTS

18

Identify and describe in approximate chronological sequence all LiDAR-related work Anthony Levandowski has done since leaving Waymo, including whether or not that work led to or related to any prototype or device, and describe how and where that work is reflected.

Order re Defendants' Privilege Log and Due Diligence Report, Dkt. 271 [**A, B, C, F, G, H**]
- A prior order dated April 10 set certain deadlines pertaining to defendants' privilege log and briefing concerning the production of a due diligence report (Dkt. No. 202 at 12–13). After non-party Anthony Levandowski appealed from that order, the Federal Circuit temporarily stayed those portions of the April 10 order pending consideration of the appeal. Today, the Federal Circuit denied Levandowski's petition for writ of mandamus and lifted the temporary stay. Accordingly, this order SETS the following revised deadlines:
- 1. By APRIL 27 AT NOON, defendants shall serve a privilege log complete as to all items, including those affected by Levandowski's Fifth Amendment motion (Dkt. No. 147).
- 2. By MAY 1 AT NOON, plaintiff shall move, if it wishes to do so at all, to compel production of the due diligence report that was the subject of Levandowski's motion. Defendants and Levandowski shall have until MAY 8 AT NOON to oppose, shall submit a proper sworn record as to all necessary predicates, and shall submit the full report (with attachments) for in camera review. Plaintiff may reply by MAY 12 AT NOON. The briefs should address the possibility that discovery into the predicates for any privilege may be allowed.

Order on Petition for Writ of Mandamus, Dkt. 351 [**A, B, C, F, G, H**]
- Mr. Levandowski argues that he is entitled to relief under the Fifth Amendment because production of the unredacted privilege log could potentially incriminate him. We are not persuaded that the district court erred in its ruling requiring defendants to produce an unredacted privilege log. Mr. Levandowski has therefore failed to establish that he has a "clear and indisputable" right to the issuance of a writ of mandamus.
  Accordingly,
  IT IS ORDERED THAT:
  (1) The petition for writ of mandamus is denied.
  (2) The motion for stay is moot.
  (3) The court's April 13, 2017 order is vacated. The temporary stay of the district court's order is lifted.

Notice of Change of Counsel for Defendant Otto Trucking LLC and Order, Dkt. 347 [**A, B, H**]
- PLEASE TAKE NOTICE that, pursuant to Civil Local Rule 5-1 and 11-5, Defendant Otto Trucking LLC makes the following substitution of counsel. Arturo J. Gonzalez,

Daniel Pierre Muino, Eric Akira Tate, Esther Kim Chang, Matthew I. Kreeger, Michael A. Jacobs, Michelle C.Y. Yang, Rudy Y. Kim, and Wendy J. Ray of Morrison & Foerster LLP will no longer be representing Defendant Otto Trucking LLC in this matter.
Defendant Otto Trucking LLC, shall be represented by I. Neel Chatterjee, Brett M. Schuman, and Rachel M. Walsh of Goodwin Procter LLP.
Defendant Otto Trucking LLC has been informed of this substitution and consents to the substitution of firm representation.

Order Denying Motion to Compel Arbitration, Dkt. 425 [**G**]
- Even though he is not a defendant here, moreover, Levandowski's assertion of his Fifth Amendment privilege has obstructed and continues to obstruct both discovery and defendants' ability to construct a complete narrative as to the fate of Waymo's purloined files.

Order Granting in Part and Denying in Part Plaintiff's Motion for Provisional Relief, Dkt. 426 [**A, B, C, F, G, H**]
- SCOPE OF RELIEF GRANTED.
Having considered the foregoing, the Court ORDERS as follows:
- 1. The term "downloaded materials," as used in this provisional order, means any and all materials that Anthony Levandowski downloaded from Waymo and kept upon leaving Waymo's employment, regardless of how long he kept them for and whether or not any such materials qualify as trade secrets or proprietary or confidential information.
- 2. Defendants must immediately and in writing exercise the full extent of their corporate, employment, contractual, and other authority to (a) prevent Anthony Levandowski and all other officers, directors, employees, and agents of defendants from consulting, copying, or otherwise using the downloaded materials; and (b) cause them to return the downloaded materials and all copies, excerpts, and summaries thereof to Waymo (or the Court) by MAY 31 AT NOON. Copies essential for counsel of record and their litigation experts to use in defending this civil action are exempted from the foregoing requirement.
- 3. With respect to Anthony Levandowski, defendants shall immediately (a) remove him from any role or responsibility pertaining to LiDAR; (b) take all steps in their power to prevent him from having any communication on the subject of LiDAR with any officer, director, employee, agent, supplier, consultant, or customer of defendants; and (c) prohibit him from consulting, copying, or otherwise using the downloaded materials in any way. Defendants shall instruct all their officers, directors, employees agents, suppliers, consultants, and customers in writing of this prohibition, and further instruct them in writing to immediately report any suspected breaches thereof to the special master (or to the Court).
- 4. With respect to all other persons, including those with Stroz Friedberg, defendants shall conduct a thorough investigation and provide a detailed accounting under oath

setting forth every person who has seen or heard any part of any downloaded materials, what they saw or heard, when they saw or heard it, and for what purpose. In their investigation, defendants must do more than query servers with term searches. For example, they must interview personnel with particular focus on anyone who has communicated with Anthony Levandowski on the subject of LiDAR. Defendants' accounting shall not be limited to Uber but shall include all persons who fit the foregoing description, including Levandowski and his separate counsel. The accounting may exclude, for only the time period after the commencement of this civil action, the attorneys of record and their staff and experts employed for this litigation. The accounting shall not be limited to downloaded materials that happened to make their way into some due diligence report but shall cover any and all downloaded materials. The accounting shall also identify the complete chains of custodians for every copy of any downloaded materials or due diligence report referencing downloaded materials. Defendants must also use the full extent of their authority and influence to obtain cooperation with the foregoing procedure from all involved.  For example, if a potential custodian refuses to cooperate, then defendants' accounting shall set forth the particulars, including all efforts made to obtain cooperation. The accounting must be filed and served by JUNE 23 AT NOON. The accounting may be filed under seal only to the extent that it quotes or appends downloaded materials.

- 5. Also by JUNE 23 AT NOON, defendants shall provide Waymo's counsel and the Court with a complete and chronologically organized log of all oral and written communications — including, without limitation, conferences, meetings, phone calls, one-on-one conversations, texts, emails, letters, memos, and voicemails — wherein Anthony Levandowski mentioned LiDAR to any officer, director, employee, agent, supplier, or consultant of defendants. The log shall identify for each such communication the time, place (if applicable), mode, all persons involved, and subjects discussed, as well as any and all notes or records referencing the communication.

- 6. Waymo is hereby granted further expedited discovery in aid of possible further provisional relief. Subject to the protective order, and upon reasonable notice, Waymo's counsel and one expert may inspect any and all aspects of defendants' ongoing work involving LiDAR — including, without limitation, schematics, work orders, source code, notes, and emails — whether or not said work resulted in any prototype or device.

- 7. Defendants shall keep complete and accurate records of their compliance with all of the foregoing requirements, including directives given to Anthony Levandowski and others. The special master shall monitor and verify said compliance. To that end, the special master shall promptly develop proposed monitoring and verification protocols with the parties' input and then submit the proposed protocols to the Court for approval. The protocols shall provide for the special master to visit defendants' facilities and monitor communications as necessary to ensure that Anthony Levandowski remains sealed off from LiDAR activities.

Order re Case Management Conference, Dkt. 438 [**F, G, H**]

- The Court is concerned that defendants may eventually wish to waive some claims of privilege in order to bolster their defense — for example, by explaining precautions they may have taken at the time of Otto's acquisition to prevent Waymo's confidential files from influencing defendants' LiDAR research and development. To prevent discovery prejudice and waste of resources, defendants shall file a written statement by JUNE 1 AT NOON setting forth any waiver of privilege on pain of preclusion thereafter. Waymo may file a response by JUNE 5 AT NOON. This issue shall be discussed at the case management conference, which remains set for June 7 at 8:00 a.m. This is without prejudice to any argument that certain waivers of privilege are already too late to avoid discovery prejudice, or that certain claims of privilege should never have been asserted in the first place

Order re Meet and Confer on Special Master's Protocol, Dkt. 482 [**F, G**]

- The special master and counsel for both sides shall please meet and confer and submit an agreed-upon revised version of the special master's proposed monitoring and verification protocol (Dkt. No. 462) by MAY 23 AT NOON. The revised version should make clear that any action taken by the special master pursuant to the protocol is not subject to any promise of confidentiality. For example, if the special master interviews an employee of defendants, he must disclose the contents of that interview as needed or as the Court requires.

Order Granting in Part and Denying in Part Motion to Reinstate Provisional Relief Deadline - Dkt. 499 [**F, G**]

- The Court has considered plaintiff Waymo LLC's motion to reinstate the May 31 deadline for defendants to comply with the second item of the May 11 provisional relief order (Dkt. No. 485) and defendants' partial opposition thereto (Dkt. No. 494). The motion is GRANTED IN PART and DENIED IN PART.
  Defendants shall comply with the second item of provisional relief by the original deadline of MAY 31 AT NOON except insofar as compliance would implicate either issues raised by non-party Anthony Levandowski's motion to modify the May 11 provisional relief order (Dkt. No. 466) or privilege disputes currently pending before Judge Corley, in which case the deadline remains JUNE 23 AT NOON. This order supersedes and partially vacates the prior order continuing the provisional relief deadline (Dkt. No. 471).

Order re Special Master's Monitoring and Verification Protocol, Dkt. 500 [**G, H**]

- *Entire document*

Notice Re Anthony Levandowski's In Camera Submission on April 19, 2017, Dkt. 501 [**A, B, C, F, G**]
- The "privilege log" he submitted in camera contained over one thousand pages, over twenty thousand entries, and appeared to be two spreadsheets generated by automated data compilation with no intelligent review or analysis involved. To list every deficiency in that "privilege log" would be repetitive and unnecessary. To give just one example, entire pages of the spreadsheet in response to RFP No. 3 consisted of line items that identified "document type" as "loose e-mail attachment" and were otherwise blank. Similarly, dozens of pages of the spreadsheet in response to RFP No. 1 appeared dedicated to email attachments identified only by email account, time stamp, and otherwise wholly non-descriptive information.

Order by Magistrate Judge Jacqueline Scott Corley, Dkt. 509 [**A, B, C, F, G, H**]
- Uber is ordered to file an unredacted version of the February 22, 2016 Term Sheet with the Court by 10:00 a.m. May 26, 2017. They may do so under seal.

Order Denying Motion to Intervene and Modify Provisional Relief, Dkt. 565 [**F, G**]
- For the reasons stated on the record at the hearing today, non-party Anthony Levandowski's motion to intervene and modify the provisional relief order dated May 11, 2017 (Dkt. No. 466) is DENIED.

Order Re: Waymo's Motion to Compel, Dkt. 566 [**A, B, C, F, G, H**]
- Neither Uber nor Levandowski has met their burden to show that the Report and any of its exhibits are protected by the attorney-client privilege and Uber has waived any claim of attorney work-product.
- Stroz interviewed Levandowski, without counsel present, at Stroz's office on March 22 and 23, 2016 and conducted a follow up telephone interview on April 1, 2016. (Stroz Report, Exh. 5.) Prior to the interviews, on March 18, he provided certain information to Stroz via a written questionnaire. Stroz interviewed Ron on March 22, 2016, also without any counsel present, and on April 11 Stroz conducted a follow-up telephone interview. (Stroz Report, Exh. 6.) Stroz interviewed other Otto employees on March 23 and 24, 2016. (Stroz Report, Exhs. 7 & 8.) Stroz also collected and analyzed the interviewees' devices and cloud-based storage. Prior to the commencement of the interviews, Stroz adopted a protocol for its investigation which gave OMM the right to require Stroz to withhold from disclosure to MoFo documents that OMM contends are protected by a privilege from disclosure to MoFo. (Stroz Report, Exh. 1.)
- In early April 2016, prior to the execution of the Put Call Agreement, and at MoFo's request, Stroz provided MoFo with an interim report; in particular, it provided MoFo with its memos of its interviews of Levandowski, Ron and the diligenced employees; data regarding information found on the diligenced employees' devices; and an oral report

23

regarding certain Stroz fact finding. (Stroz Report at 3-4.)  The interview memos were redacted as requested by OMM and Gardner. In August 2016, counsel for the diligenced employees consented to Stroz producing its Report to MoFo, OMM, Gardner and Ron's counsel, Levine & Baker LLP, as well as in-house counsel at Uber and Otto. (Stroz Report at 5.)

- Uber contends that the Stroz Report and all of its exhibits are protected from disclosure as attorney work-product. It also contends that six of the documents comprising the Report and its exhibits are protected by the attorney-client privilege: (1) the Stroz Report itself, (2) Stroz's protocol for review of data and devices, (3) Levandowski's side letter agreement with Stroz dated March 14, 2016, (4) Levandowski's side letter agreement with Stroz dated March 21, 2016, (5) Stroz's memorandum of its interview of Levandowski, and (6) Stroz's memorandum of its interview with Ron.

- As requested by the district court, the undersigned has reviewed the Stroz Report and its exhibits in camera. (Dkt. No. 271 at 2; Dkt. No. 350.)

- Here, in contrast, the Court's review of the Term Sheet, the Stroz Report, and its exhibits confirms the opposite: Uber and Otto's interests were not aligned. The interviewees were required to "attest" to the truth of what they reported to Stroz and to "certify" that they had complied with Uber's due diligence in good faith. The protocol set up an elaborate process to ensure that Stroz did not share Otto's attorney-client privileged communications with Uber. And, most significantly, whether Uber decided to go forward with the acquisition depended in part on what it learned from the Stroz pre-signing due diligence.

- Instead, the Stroz investigation was a process designed to allow Uber to discover facts relevant to its acquisition decision and to create a record to control reimbursement of indemnification expenses to Uber.

- The engagement letter attached to Uber's opposition (and provided with its in camera submission) is not evidence of the parties' intent when MoFo and OMM engaged Stroz. The engagement letter does not appear to be the version that was operative when Stroz began its investigation and, specifically, when it interviewed Levandowski and Ron and received their devices in March 2016 and when it provided its interim report to MoFo in early April 2016. Instead, there appears to be an earlier version of the letter which Uber has not produced. Although the version Uber produced is dated "as of March 4, 2016," Uber's authenticating witness does not provide any evidence as to when that version of the letter was created. (Dkt. 370 ¶ 12.) The objective evidence suggests it was not created on March 4, and was instead drafted or modified around the time of the April 11 execution of the Put Call Agreement and Joint Defense Common Interest and Confidentiality Agreement.

- Finally, the Court's in camera review of the Stroz Report reveals that the Stroz investigation protocol was revised on April 11, 2016, but then given the date of "as of March 4, 2016." (Stroz Report at 4.) The protocol is an exhibit to the engagement letter,

24

and both are attached as Exhibit 4 to the Stroz Report and both dated "as of March 4, 2016." The Court thus finds that the engagement letter, like the protocol, was most likely revised on April 11, 2016 and then given the date "as of March 4, 2016."

- The memo is nearly a verbatim recitation of what Levandowski told Stroz and in the end he even attests to the truth of what he reported. Levandowski, or at least his counsel, also reviewed the memo before Stroz disclosed it to OMM and MoFo. (Stroz Report at 5.)
- Any party wishing to file an objection to this Order with the district court in accordance with N.D. Cal. Civil L.R. 72-2 must file its objection on or before Thursday, June 8, 2017. In the meantime, the Court STAYS this Order until further order of the district court or unless or until no objection is filed.

**Order Regarding Uber's Privilege Log, Dkt. 567 [A, B, C, F, G, H]**
- At the May 25, 2017 hearing on Waymo's Motion to Compel, the Court ordered Uber to revise its privilege log and produce by June 1, 2017 previously withheld documents in light of its representation that before February 22, 2016 it had not shared any privileged or confidential information with any party. (Dkt. No. 516 at 12-13.) As to the remaining privilege log entries, Uber and Waymo are directed to meet and confer, with the assistance of the Special Master if needed, and propose a process for promptly resolving any further privilege log disputes. The jointly proposed process shall be filed with the Court by close of business on Monday, June 12, 2017.

**Order Re: Discovery Letter Regarding Agreement Between Levandowski's Attorney and Stroz, Dkt. 568 [F, G, H]**
- Waymo seeks production of letter agreements between Levandowski's counsel and Uber's third-party forensic expert Stroz Friedberg. In consultation with the Special Master, the parties agreed to present their positions to the Court by 4:00 p.m. on June 5, 2017. Waymo filed its letter brief, but before Uber did so the Court issued its order granting Waymo's Motion to Compel. (Dkt. Nos. 549, 566.) The Order quoted from the letters which Waymo seeks and ultimately ordered their production. Rather than filing an opposition to Waymo's letter brief, Uber notified the Court that in light of the intervening order it was evaluating its position. (Dkt. No. 552.) Uber shall file an opposition to Waymo's letter brief by noon on Friday, June 9, 2017 or produce the two Levandowski/Stroz letter agreements in full to Uber by the same deadline and file notice with the Court that it has done so.

**Order Granting Motion to Compel Stroz Documents and Denying Motions to Quash, Dkt. 670 [A, B, C, F, G, H]**
- Uber objects to Stroz's production of the Stroz Due Diligence Report, its exhibits, and any communications regarding the Report on the basis of the attorney-client and attorney work- product privilege.

- As set forth in this Order, Waymo's motion to compel is GRANTED and the motions to quash are DENIED. Any objections to this Order must be filed with the district court by Friday, June 23, 2017.

Order Denying Motions for Relief from Judge Corley's Nondispositive Pretrial Order Re Due Diligence Report, Dkt. 685 [**A, B, C, F, G, H**]
- The magistrate judge overseeing discovery in this action granted plaintiff's motion to compel and ordered production of a due diligence report previously withheld under claims of privilege. Defendants and a non-party move for relief from the order pursuant to Civil Local Rule 72. The motions are DENIED.
- For the foregoing reasons, all motions for relief from Judge Corley's order granting Waymo's motion to compel production of Stroz Friedberg's due diligence report are DENIED. All stated objections to Judge Corley's order are OVERRULED.
- Judge Corley had stayed her order pending resolution of these motions for relief (Dkt. No. 566 at 24). This order continues that stay until JUNE 30 AT NOON to give defendants and Levandowski an opportunity to seek emergency relief from the Federal Circuit. In light of the pressing need for discovery based on the due diligence report to be provided to meet the agreed upon trial date of October 10, 2017, any further stay must be requested from the Federal Circuit.

Order Re: Uber Privilege Log, Dkt. 731 [**F, G, H**]
- As stated at oral argument, Uber shall produce to Judge Alsup for his in camera review any Stroz protocols other than the one previously produced. This production shall occur by Wednesday, June 28, 2017.
- Also, at oral argument Uber represented that the Put Call Agreement was signed late in the day on April 11, 2016. Yet some of the April 11, 2016 entries are designated as "privileged" following the Court's MTC Order even when they show on their face that they were shared with Levandowski or Ron. See, e.g., No. 1102, 1103, 1106. Accordingly, Uber is directed to provide to the Court for in camera review all of the documents logged on April 11, 2016 that were shared with or authored by a party other than Uber/MoFo/Cooley. Before it provides the documents, it should review all of the entries to determine if they correctly identify with whom the document was shared in light of the concern as to entry No. 107 discussed above. These documents must be provided to the Court for in camera review by June 28, 2017 so the Court can confirm whether they have been properly designated.

Order Denying Motions for Relief from Judge Corley's Nondispositive Pretrial Order Re Subpoena to Stroz Friedberg, Dkt. 745 [**A, B, C, F, G, H**]
- The magistrate judge overseeing discovery in this action granted plaintiff's motion to compel compliance with its subpoena to a third-party forensics firm and denied motions

to quash said subpoena. Two defendants, the third-party forensics firm, and two non-parties move for relief from the order pursuant to Civil Local Rule 72. The motions are DENIED.

- For the foregoing reasons, all motions for relief from Judge Corley's order granting Waymo's motion to compel compliance with its subpoena to Stroz Friedberg are DENIED. All stated objections to Judge Corley's order are OVERRULED.  Judge Corley had required Stroz Friedberg to comply with her order by today. This order STAYS her order until JULY 5 AT NOON to give defendants and Levandowski an opportunity to seek emergency relief from the Federal Circuit. Again, in light of the pressing need for discovery to proceed in order to meet the agreed-upon trial date of October 10, 2017, any further stay must be requested from the Federal Circuit.

Order to Show Cause, Dkt. 795 [**A, B, C, F, G, H**]
- *Entire document*


# DEPOSITION TRANSCRIPTS

April 14, 2017 Anthony Levandowski Deposition Transcript [**A, B, C, G, H**]
- Q Uber developed a plan in which a joint defense agreement would be entered for the sole purpose of hiding the fact that you had taken 14,000 confidential documents from Google?
MS. RAY: I instruct you not to answer on the  basis of attorney-client privilege.
- MR. PERLSON: Q. Are you aware that the basis for nearly every single assertion of privilege in this document is based on communications made at least in part by you?
MS. RAY: Objection.   instruct you not to answer to the extent it calls for attorney-client privileged information.  The only information he would know is from attorneys.  I instruct you not to answer.
MR. EHRLICH: And I will instruct you to  follow that instruction.
THE WITNESS: On the advice and direction of my counsel --
MR. EHRLICH: Well, so you're not going to answer.
THE WITNESS: I'm not going to answer? Okay.
MR. EHRLICH: You're not going to answer on the instruction of counsel for Uber.
THE WITNESS: I will follow advice from counsel.
MR. PERLSON: Understood.  I -- the premise that the only way that he could know that information is from counsel is  demonstrably false. But, if you want to make that instruction, you can go right ahead.
MS. RAY: Looking at the question, I don't believe that's true.
MR. PERLSON: You can make your instruction and live with the consequences of it.

- Q Are you aware that there are entries on the privilege log that defendants have served in this case as early as January 29th, 2016?

  MS. RAY: Objection. I instruct you not to answer on the basis of attorney-client privilege.

  MR. EHRLICH: Let me just read this. Excuse me. And, to the extent it does not call for privileged information, I'm going to instruct you to assert your rights.

  MR. PERLSON: Well, she instructed him not to answer. So, are you following that instruction?

  MR. EHRLICH: I'm going to ask you to follow that instruction.

  THE WITNESS: Okay.

  MR. EHRLICH: But to be safe and so the record is clear, in case there is information that he may know that is not from a privi- -- privileged source, I think it's best that he provide an answer for the record.

  MR. PERLSON: Okay. I mean, I understand why you're saying that, but that's not how it works. You either answer the question or you don't. So, if you want to take a break to figure out what the appropriate thing to do is, that's fine. But we don't want to -- we're not going to waste time.

  MS. RAY: Let's go off the record.

  MR. EHRLICH: It's -- just for the record, so the only -- I respect that Uber is making a privileged objection. I want to make sure that nothing Mr. Levandowski does undermines the privilege that Uber is asserting. If -- to the extent it's a common interest privilege, I would be advising Mr. Levandowski to assert it as well. But I just want -- I just want to be clear. I'm not -- I think if there is an answer that's required, I'm going to instruct him to assert his rights.

  MR. PERLSON: Okay. I think -- once again, I think the objection is improper.

  Q But, are you going to follow -- are you going to follow Uber's instructions --

  A I'm going to follow --

  Q -- not to answer the question?

  A I'm going to follow Miles' instructions.

  20 MR. EHRLICH: And I'm going to ask him to follow that instruction.

  MR. PERLSON: Okay.

  THE WITNESS: So that means I follow --

  MR. EHRLICH: So we can move on.

  MR. PERLSON: Okay.

- Q What common interest do you have with Uber regarding a potential acquisition of Otto?

  MS. RAY: I instruct you not to answer on the basis of attorney-client privilege.

  MR. PERLSON: Again, I don't think that's a proper instruction.

  Q But, do you want to -- are you following Uber's advice or instruction?

  MR. EHRLICH: Let me look at the question. I'm sorry.

28

THE VIDEOGRAPHER: Just cover your mic.

(Soto-voce discussion.)

MR. EHRLICH: Okay. I'm going to accept that instruction and -- and advise you to follow it and decline to answer.

THE WITNESS: I'm going to follow the advice

- David Perlson: What -- what common interest did Otto have with Uber regarding a potential acquisition of Otto?

  MS. RAY: I instruct you not to answer on the basis of attorney-client privilege and common interest privilege.

  MR. EHRLICH: And same instruction from me to follow that advice.

  THE WITNESS: Okay. I will follow that advice.

- Q Isn't it correct that the common interest that Otto and Uber had, in anticipation of litigation regarding the Otto acquisition was concealing the fact that you had taken 14,000 confidential documents from Google?

  On the advice and --

  MS. RAY: Objection; form.

  MR. EHRLICH: You can go ahead and answer.

  MS. RAY: Hold on. I instruct you not to answer on the basis of attorney-client privilege.

  MR. EHRLICH: One second.

  MR. PERLSON: Do you want to go off therecord?

  THE WITNESS: Yeah, why don't we do that.

  THE VIDEOGRAPHER: Going off the record. The time is 9:44.

  (Recess taken.)

  THE VIDEOGRAPHER: We are back on the record.

  The time is 9:53.

  MR. PERLSON: Q. Are you going to follow your counsel's instruction?

  THE WITNESS: Do we have any question?

  MR. EHRLICH: Let me -- let me go back.

  MS. RAY: I instructed him not to answer.

  MR. EHRLICH: Okay. Ms. Ray instructed him not to answer.

  And I will now instruct you to follow that instruction from Ms. Ray on the basis of attorney-client privilege.

  THE WITNESS: I'll follow that instruction.

- MR. PERLSON: Q. Isn't it correct that the common interest that Otto and Uber had in anticipation of litigation regarding the Otto acquisition was exploiting the confidential information you had taken -- in the 14,000 documents you had taken from Google?

  MS. RAY: Objection; form.  I instruct you not to answer on the basis of attorney-client and common interest privilege.

  MR. EHRLICH: And the same instruction from me to follow that instruction.

  THE WITNESS: I will follow that instruction.

29

- MR. PERLSON: Q. Otto's common interest with Uber was to prevent the detection of your scheme to funnel Waymo's technology to Uber via Otto?

  MS. RAY: Objection to form. I instruct you not to answer on the basis of attorney-client and common interest privilege.

  MR. EHRLICH: And I'll advise you to follow that instruction from Counsel.

  MR. PERLSON: And whose -- who are the -- what common interest are you asserting then? Between who is it with? And who is the attorney and the client in your instruction?

  MS. RAY: Your question is about Otto's interests with Uber. And so, at the time, I believe Otto's attorneys were O'Melveny & Myers, and Uber's counsel was Morrison & Foerster. And you're making an assertion about the common interest, so we wouldn't agree with that.

  MR. PERLSON: Well, that's not a basis for an attorney-client privilege instruction, so --

  MS. RAY: You're asking him what the interest is. And one, he doesn't know because he doesn't -- he's not a lawyer. He doesn't --

  MR. PERLSON: Hey, hey, enough of the coaching.

  MS. RAY: I'm not coaching.

  MR. PERLSON: If you want to make an -- an --  I am -- I am asking a very specific question.

  MS. RAY: You asked me a question --

  MR. PERLSON: You instructed him not to answer on the basis of attorney-client privilege. You don't need to get into speculation or anything about that.

  Answer my question: What is the common interest you're identifying? And who are the attorneys? And who is the client?

  MS. RAY: I'm not being deposed here. We can discuss that at --

  MR. PERLSON: Are you refusing to provide this information now? This is a very serious issue, and I need an answer.

  MS. RAY: We can go -- if you want, we can go off the record.

  MR. PERLSON: No. I want you to put this on the record.

  MS. RAY: All right. Well, I need to take a look at your question.

  MR. PERLSON: Take -- take the time you need.

  MS. RAY: So, you have asked the witness a question about the common interest; right? You're saying --

  MR. PERLSON: You -- you made the instruction.

  MS. RAY: I understand.

  MR. PERLSON: You need to know what it is. If you -- if we want to stop, get off the record, so you can figure out why you made your attorney-client privilege instruction, then you can do that.

  But, I would suspect that, when you made the instruction, that you know --

  MS. RAY: I do know.

MR. PERLSON: -- the answer to the question. So answer me, please.

MS. RAY: I'm happy to answer you.

MR. PERLSON: Okay.

MS. RAY: You want to be taught.

MR. PERLSON: Go.

MS. RAY: You were asking him about what the common interest is. The only way he would know that is from an attorney discussion. And so, that is attorney-client privilege, and I'm not going to let him answer the question.

MR. PERLSON: Who is the attorney? Who is the client?

MS. RAY: I already identified that to you.

MR. PERLSON: When? In this question --

MS. RAY: Do you want me to ask the reporter to read it back? I'm happy to repeat it. Otto's attorneys were O'Melveny & Myers, and Uber's counsel was Morrison & Foerster. Those are the attorneys.

MR. PERLSON: Okay. And what's the common interest, and who is it between?

MS. RAY: The common interest was between Otto and Uber, at least as to your question, and it was in anticipation of litigation.

- Q As part of the due diligence report in connection with the Otto acquisition, it was determined that the 14,000 files that you had taken from Google did exist on Otto's servers; correct?

MS. RAY: Same -- same instruction.

MR. EHRLICH: And same instruction from me.

THE WITNESS: And I'm following.

- Q Are you aware that, in a hearing before the judge in this case, Uber's lawyer, Arturo Gonzalez, said that he would love to put you on the witness stand to explain what happened, because he thinks you have a good story to tell?

MS. RAY: I instruct you not to answer to the  extent that what you know is as the result of

attorney-client privileged communications. But you may otherwise answer.

MR. EHRLICH: I join in that instruction.  But, to the extent it goes beyond that, I instruct you to assert your rights.

THE WITNESS: On the advice and direction of my counsel, I respectfully decline to answer. And I assert the rights guaranteed to me under the Fifth Amendment of the Constitution of the United States.