

July 11, 2017

Honorable Jacqueline Scott Corley
U.S. Magistrate Judge
U.S. District Court, Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

       Re:    *Waymo LLC v. Uber Technologies, Inc., et al.*, Case No. 3:17-cv-00939

Dear Judge Corley:

Uber moves to compel Waymo to produce documents critical to Uber's defenses and its ability to proceed with depositions that are scheduled in rapid succession starting *tomorrow*. The Special Master agreed the parties are at an impasse and authorized this motion.

Despite seeking and obtaining massive amounts of discovery from Uber, and despite Judge Alsup's admonition to Waymo not to stonewall in advance of depositions, Waymo has refused to produce documents that Uber is entitled to receive to develop its defenses and material facts during depositions. Specifically, Waymo refuses to (1) produce documents regarding its trade secret safeguards, which are relevant to an essential element of Waymo's claims; (2) produce documents related to its investigation of Anthony Levandowski, who Waymo has placed at the center of its case; and (3) search for and produce responsive documents that are located at Google or Alphabet, even though Waymo admits those documents are in its possession, custody, or control, and even though counsel for Waymo *repeatedly* represented to Uber *and the Court* that Waymo would not withhold responsive documents on the grounds that they were located at Google or Alphabet. Uber has already been prejudiced by Waymo's deliberate stonewalling, and will be further prejudiced unless the Court orders immediate relief.

For these and other reasons detailed below, Uber respectfully requests that the Court: (1) order Waymo to produce all documents responsive to Uber's Requests for Production ("RFPs") Nos. 46, 53, 63, 66, 119, 121, and 122; and (2) order Waymo to produce responsive documents regardless of whether they are located at Google or Alphabet, which Uber just learned *yesterday* that Waymo has not done for more than *73* RFPs.[1]

---

[1] RFPs 3, 4, 5-20, 22-35, 38-43, 61-62, 77, 79-80, 89-95, 98-104, 114, 119, 125-128, 147-156, and 157.



## Background

After Waymo responded to Uber's first and second sets of document requests on June 12 and 16, 2017, respectively, Uber met and conferred with Waymo and the Special Master regarding Waymo's objections to certain document requests, while reserving its rights to address any other deficiencies with Waymo's responses at a later date. Waymo and Uber reached an impasse over several issues, and Uber filed a motion to compel on June 21, 2017.

Waymo's production of just 4,925 documents (compared to Uber's 29,405 documents) and Uber's further review of Waymo's responses have revealed additional deficiencies in Waymo's responses to Uber's document requests. During a number of meet-and-confers facilitated by the Special Master, Uber agreed to compromise on several issues it originally raised concerning Waymo's responses, but the parties have reached an impasse on the issues in this motion. (*See* Pritt Decl., ¶ 14; *see also* Exs. 7-8, 7/7 Pritt Emails.)

## Argument

**1. Waymo Trade Secret Safeguards:** Uber seeks critical information concerning Waymo's policies, procedures, and practices related to its efforts to safeguard its asserted trade secrets, an essential element of Waymo's trade secret claims. Cal. Civ. Code § 3426.1 (an actionable "trade secret" is one that, *inter alia*, "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy"); 18 U.S.C. § 1839. If Uber can show Waymo did not take reasonable measures to maintain secrecy, Waymo's trade secret claims fall, which may be why Waymo is so resistant to adequate discovery on this subject.

Waymo improperly limited its response to RFP 119, which requests "confidentiality and/or non-disclosure agreements Waymo has or has had with its vendors, suppliers, and customers, from 2009 to the present." (Ex. 1 at 61.) Waymo originally said it would produce "one or more representative" agreements (*id.*); it produced one. During meet and confers, Waymo also said it had produced "a list of its vendors, suppliers, and customers,"[2] and agreed to produce templates and "a representative sample of vendor and supplier agreements." (Ex. 3, 7/5 Roberts Email, at 1; Ex. 8, 7/10 Roberts Email, at 1.) Waymo's response is wholly inadequate. A "representative" sample and templates will not show whether Waymo in fact *had* confidentiality agreements with all of its vendors and suppliers or whether any agreements expired, which go directly to whether Waymo's alleged trade secrets were subject to reasonable measure to maintain their secrecy. Additionally, because Waymo will not confirm that the "representative" samples it will produce reflect all variations in its agreements, this production is insufficient to show whether any of Waymo's vendor or supplier agreements have inadequate confidentiality

---

[2] Waymo subsequently confirmed that the list does not in fact identify any customers; because it has none.



protections for Waymo's trade secrets. Similarly, the production of a list of vendors and suppliers does not remedy these deficiencies because it does not indicate whether each of those third parties in fact executed a confidentiality agreement, whether an agreement was executed before any trade secret information was disclosed, or the terms of the agreement (if any).

Uber is entitled to probe whether Waymo maintained adequate confidentiality agreements—a basic measure to ensure secrecy—in its dealings with third parties. Waymo's only excuse for not producing all responsive agreements is that they are not maintained in a centralized database, so Waymo would have to collect them individually. (*See* Ex. 4, 7/7 Pritt Email, at 1.) That is no excuse. *See* Suppl. Standing Order (Alsup, J.), ¶ 15 ("A burden or overbreadth or similar objection shall not be a valid reason for withholding requested materials actually known to counsel or a party representative responsible for the conduct of the litigation."). Indeed, keeping track of such agreements itself is relevant to the measures Waymo takes to keep trade secrets secure. If Waymo cannot locate its agreements, did not commit third parties to signing agreements, or if any of the agreements are expired or contain less "robust" protections, that is material to Uber's defense.

Waymo has also rebuffed Uber's request for Waymo's "collection, analysis, review, or findings related to computers" and devices of departing Waymo employees (RFP 46). The documents responsive to this RFP are relevant to show the investigative measures that Waymo took to protect its alleged trade secrets, and are necessary to gauge whether Waymo's belated review of Levandowski's computers, addressed below, is representative of its "robust" practices or whether such reviews generally do not occur.

Waymo limited its response to documents related to the three former employees named in its complaint. (*See* Ex. 1 at 27-28). During the parties' meet and confer, Waymo argued that these three employees are the "only employees at issue in Waymo's complaint," so "[t]o the extent [Uber's] request seeks more, it is irrelevant." (Ex. 3, 7/3 Roberts Email, at 6.) This response is deficient. Waymo must prove it protects each of its alleged trade secrets at issue in this case, not just that it took measures to protect them with respect to three specific employees. *See* Cal. Civ. Code § 3426.1; 18 U.S.C. § 1839. As the Court recently held, "Defendants are entitled to develop their own defense to Plaintiff's claims for relief and need not rely solely on what Plaintiff contends is relevant." Dkt. 832 at 3. If Waymo does not conduct a timely review of departing employees' computers, that goes to show the limitations of Waymo's "robust" security measures. Waymo cannot be allowed to prevent Uber from developing its defenses by limiting production of responsive documents to three employees it unilaterally selected to develop *its* theories.

Waymo's responses to RFPs 63 (complaints and dissatisfaction about Waymo's performance), 66 (reasons for departure of any employee who later became an employee of Defendants), 121 (Waymo employees who resigned), and 122 (personnel files of



employees later who were employed by Defendants) are deficient for these same reasons. Waymo provided essentially the same response for these RFPs—*i.e.*, Waymo limited its productions to the three employees it named in its complaint. (*See* Ex. 3 at 6 (asserting that "documents concerning other employees are irrelevant")). But Uber is entitled to documents concerning employees other than Waymo's chosen three to show that employees were dissatisfied with Waymo (RFP 63) and resigned from Waymo or left to join Uber (RFPs 66, 121, and 122) for reasons that had nothing to do with allegedly stealing trade secrets.

Accordingly, Waymo's responses to RFPs 46, 63, 66, 119, 121, and 122 are deficient, and the Court should compel Waymo to produce all documents responsive to them.

**2. Levandowski Investigation:** This lawsuit began when Waymo made aggressive allegations against Uber based on the conduct of Anthony Levandowski. Waymo thus made its own investigation of Levandowski a central issue in this case, relevant both to the steps that Waymo took to protect its alleged trade secrets and its motivation for suing Uber, as opposed to Levandowski. Uber's RFP 53 seeks "[a]ll documents relating to when Waymo began investigating the possibility of Anthony Levandowski's retention of Waymo files after his departure from Waymo. . . ." (Ex. 1 at 31.) Waymo responded only that it "served a privilege log disclosing a communication dated July 29, 201[6]," and refused to produce more. (*Id.* at 31-32.) Waymo refused to produce *any* document responsive to this RFP, or to log all but *a single* privileged document. (*See* Ex. 8, 7/10 Roberts Email.)

Waymo has not disputed that additional responsive documents exist and has provided no excuse for withholding them. Those documents would include, for example, non-privileged communications discussing why Waymo did not investigate Levandowski until seven months after his alleged downloads, six months after his departure from Google, and over two months after the *The Wall Street Journal* reported Levandowski had founded Ottomotto and an Alphabet spokesperson "wish[ed] him well with his new endeavors." The initiation of Waymo's investigation, and any delay, is relevant to showing the steps Waymo took to protect its alleged trade secrets, and the adequacy of those steps. The Court should order Waymo to produce and log all responsive documents.

**3. Waymo's Exclusion of Google and Alphabet:** Waymo has selectively withheld responsive documents located at Google and Alphabet (collectively, "Google") and in many instances has not even searched Google for responsive documents. Uber requests that the Court order Waymo to search for and produce responsive Google documents.

Waymo objected generally to Defendants' discovery requests on the ground that they define "You" and "Waymo" to include Google. (*See, e.g.*, Waymo's Objections and Responses to Uber's First Set of RFPs at 2). Because Uber was concerned that Waymo might be withholding responsive documents located at Google, Uber moved to compel



Defendants Uber Technologies Inc.'s and Ottomotto LLC's Motion to Compel Production of Documents
Case No. C 17-00939 WHA

Waymo to produce documents showing its interrelationship with Google. *See* Dkt. 687 at 7. Your Honor denied Uber's request because Waymo represented "it will not object to any discovery request on the grounds that the responsive documents are in the possession, custody or control *of Google or Alphabet*." Dkt. 808 at 3 (emphasis added). In making this representation, Waymo emphasized that "there is no shell game here." Dkt. 746 at 7.

After reviewing Waymo's sparse production, Uber suspected that Waymo reneged on its representations to Uber and the Court. Yesterday, after five meet-and-confers over the course of a week and a half, Waymo finally admitted that it had selectively "limited [its] search[es] to only Waymo personnel and documents" and had not searched for responsive documents at Google or Alphabet for over *73* requests in Uber's first two sets of RFPs. (*See* Ex. 7, 7/7 Nardinelli Email, at 1; Ex. 9, 7/10 Nardinelli Email, at 1-2 (listing RFPs).)

The chain of events leading up to yesterday's disclosure reflects the lengths to which Waymo sought to conceal the inconsistency between its conduct and its representations to Uber and the Court. After Waymo told Uber and the Court that it was *not* withholding responsive documents located at Google, Uber sought to clarify Waymo's separate statement that it had "applie[d] its general objection [to Uber's definition of 'Waymo' to include Google] where sensible." Dkt. 746 at 7. Accordingly, Uber asked Waymo whether it was in fact withholding Google documents based on its general objection. Waymo first said it was not standing on its objection or excluding Google or Alphabet documents (*see* Ex. 3, 7/1 Takashima Email, at 10), but two days later said it had not withdrawn its general objection excluding *Alphabet* (not Google) on the ground that "[i]t would be unreasonable and irrelevant to search all throughout Alphabet." (*Id.*, 7/5 Roberts Email, at 5). To avoid further obfuscation, Uber asked Waymo to identify the RFPs for which it excluded Google or Alphabet employees and documents. (*See id.* at 1.)

Uber raised this request again on two subsequent met-and-confers. During those calls, Waymo again represented that it had not refused to produce responsive documents at Google, but then acknowledged that was false when Uber pointed out that Waymo had stated in its written response to RFP 95 (seeking documents about Google's acquisition of Waze) that "Waymo" did not have any responsive documents, despite acknowledging that Google had such documents. (*See* Ex. 1 at 51; Ex. 3, 7/5 Roberts Email, at 1 ("Waymo did not acquire Waze; Google did. Accordingly, Waymo does not have documents relating to financial analyses and projections of the Waze acquisition").) Waymo then argued that it had applied its general objection and refused to produce responsive Google documents on grounds of relevance, burden, overbreadth, or similar objections. But none of Waymo's specific responses state, let alone suggest, that Waymo was refusing to search for or produce documents from Google on any of those grounds.

Yesterday, almost a month after it originally responded to Uber's first and second sets of RFPs, Waymo stated for *the first time* that it defined the term "Waymo" in its responses to include "Google's self-driving car program." (Pritt Decl., ¶ 14.) Later that day,

5

Waymo claimed "Waymo" and "Google's self-driving car program" are *synonymous*, and identified more than ***73*** requests to which Waymo had excluded searching for or producing responsive documents located at Google. (*See* Ex. 9, 7/10 Nardinelli Email.)

In other words, Waymo's "general" objection to defining "Waymo" as including Google and Alphabet was a *specific* objection that Waymo selectively applied to escape its obligation to search for and produce responsive information at Google and Alphabet. Because Waymo did not explain this selective limitation in its "general" objection, let alone its written responses to any specific request, Waymo has waived it. *See, e.g., Evans v. Baxter Healthcare Corp.*, No. CV 12-4919-WHO (KAW), 2013 WL 3786313, at *3 (N.D. Cal. July 17, 2013) (specific objections not raised in written response are waived); *Io Group, Inc. v. Veoh Networks, Inc.*, No. C06-3926 HRL, 2007 WL 1113800, at *1 (N.D. Cal. 2007) (overruling general objections that were "implicitly asserted by incorporation to a specific request" because such a "practice obscures the extent to which [the responding party] is withholding information"). And to the extent Waymo relies on its burden and overbreadth objections to support limiting its responses to Waymo documents and excluding Google documents, "such unexplained and unsupported boilerplate objections are improper." *E.g.*, *Duran v. Cisco Systems, Inc.*, 258 F.R.D. 375, 379 (C.D. Cal. 2009) (collecting caselaw); *see* Suppl. Standing Order (Alsup, J.), ¶ 15.

In addition, Waymo belatedly claims that it refused to search for or produce responsive Google documents by unilaterally deciding, *without* explaining in its discovery responses, that such documents would be "less probative" (*see* Ex. 9, 7/7 Nardinelli Email, at 1 (RFPs 3 and 4) (employee downloads)), or "irrelevant" (*id.* at 1-2 (RFP Nos. 5-20, 22-30, 33-34, 77, 79-80, 98-104, 114, and 119 (technical features, development, value of alleged trade secrets); 31, 32, and 35 (public filings); 38-43 and 125-128 (side businesses), 61-62 (Waymo finances and performance), 89-95 and 157 (ride-sharing market and competition); and 147-156 (Lyft).) Waymo has waived these objections by not including them in its responses.[3] Even if that were not the case, Waymo does not get to withhold responsive documents by unilaterally asserting they are "less probative" or irrelevant. *See* Dkt. 832 at 3 ("Defendants are entitled to develop their own defense to Plaintiff's claims for relief and need not rely solely on what Plaintiff contends is relevant."). In any event, they are probative and relevant. For example, Waymo contends producing documents showing how often Google engineers downloaded documents (RFP 3) and downloaded more than 10,000 files at once (RFP 4) "would be far less probative than the download patterns" of Waymo engineers. (Ex. 9, 7/10 Nardinelli Email, at 1). But Uber is entitled to discover the extent to which Google engineers were able to download and

[3] Based on Waymo's assertion that "Waymo" and "Google's self-driving car program" are one and the same, Uber respectfully requests that the Court reconsider its July 6 order limiting Uber's requests seeking information concerning Waymo's and Google's practices and policies concerning employees' side businesses (RFPs 37-43 and 125-128) "to employees in Google/Waymo's self-driving car *business*." Dkt. 808 at 2 (emphasis added). Waymo should produce responsive documents at Google and Alphabet too.



retain documents and alleged trade secrets, and whether they did so in "violation" of Google policies, regardless of whether those engineers were part of the self-driving car program. These facts go directly to the measures taken to protect the alleged trade secrets, which were allegedly downloaded by Levandowski when he was a Google employee.

Uber also is not required to blindly accept Waymo's self-serving representation that there "is no good reason to search Alphabet" for documents responsive to any of Uber's 37 RFPs relating to the technical features, development, and value of Waymo's alleged trade secrets. (Ex. 9, 7/10 Nardinelli Email, at 1.) Uber is entitled to discover the extent to which Waymo's alleged trade secrets were not confined or safeguarded within Waymo.

Waymo likewise cannot limit Uber from discovering the extent to which "areas of Alphabet" other than Waymo compete with Uber in the ride-sharing market (RFPs 90-95, 157) by unilaterally deciding it is "irrelevant." It is not. For example, Uber is entitled to know if "other areas of Alphabet" have different estimates or forecasts of the ridesharing market than Waymo (RFPs 90-92). Uber is also entitled to know what business and financial plans "other areas of Alphabet" have for the ridesharing business and the extent to which those plans differ from Waymo's (RFP 93), and whether Google began discussing entering the ridesharing market before Waymo (RFP 157). And Uber is also entitled to documents relating to Google's acquisition of Waze (RFP 95), which Waymo admits exist but continues to withhold. (*See* Ex. 3, 7/5 Roberts Email, at 1 ("Waymo did not acquire Waze; Google did. Accordingly, Waymo does not have documents relating to financial analyses and projections of the Waze acquisition").) All of this discovery concerns the extent of competition with Uber in the ridesharing space and is directly relevant to Uber's defense that this lawsuit is being used to undercut a key competitor.

Finally, Waymo objects to having to produce Google documents relating to Waymo's financial and viability performance (RFPs 61, 62) because that "would mean searching for documents concerning the performance of . . . other Alphabet entities with nothing to do with this case." (Ex. 9, 7/10 Nardinelli Email, at 1-2.) Not at all. It means searching for and producing documents about Waymo's performance that are located at Google, not just Waymo.

Waymo admits that Google documents are in its possession, custody or control, and that there are responsive documents at Google, not just Waymo (*i.e.*, Google's self-driving car program). And Waymo represented to Uber and the Court that it was not playing a shell game. Yet that is exactly what it has been playing for weeks by selectively excluding Google documents from over 70 RFPs, all without identifying that it was doing so in its written responses. The Court should overrule Waymo's "general" objection limiting "Waymo" to "Google's self-driving car program," and order Waymo to search for and produce all responsive documents regardless of whether they are at Waymo, Google, or Alphabet.



                    Respectfully submitted,

                    /s/ Karen L. Dunn

                    *Counsel for Uber Technologies, Inc. and Ottomotto LLC*

cc:    All Counsel of Record
        Special Master John Cooper