HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**quinn emanuel** trial lawyers | san francisco

50 California Street, 22nd Floor, San Francisco, California 94111-4788 | TEL (415) 875-6600 FAX (415) 875-6700

July 11, 2017

<u>VIA ECF</u>

Magistrate Judge Jacqueline Scott Corley  
USDC, Northern District of California  
San Francisco Courthouse Courtroom F - 15th Floor  
450 Golden Gate Avenue, San Francisco, CA 94102

**[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]**

Re:   <u>Waymo LLC v. Uber Technologies, Inc., et al.</u>, N.D. Cal. Case No. 3:17-cv-00939-WHA

Dear Magistrate Judge Corley:

Plaintiff Waymo LLC submits the attached letter brief in support of Waymo's motion to compel Defendants Uber Technologies, Inc. and Ottomotto LLC (collectively, "Uber") to (1) provide a complete response to Expedited Interrogatory Nos. 24, 25, and 26, and (2) produce documents withheld in response to Requests for Production Nos. 1, 30, 42, 74, 85, 91, 98, 99, 110, 117, and 145.

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

01980-00104/9415738.1

Facts About Diligenced Employees' "Pre-Signing Bad Acts". Waymo's Expedited Interrogatory No. 26 asks Uber to "Describe all 'Pre-Signing Bad Acts' as defined in the ACQUISITION DOCUMENTS, and identify, by Bates Number, the documents evidencing or describing the same." (Ex. 1.) Uber has refused to provide a substantive response, arguing that any responsive information is privileged. (Ex. 2.) But the interrogatory seeks **facts,** which are not privileged or work product protected. *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981) ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."). The interrogatory asks for the "underlying facts" about actions committed by former Waymo employees. Those facts do not become privileged or work product protected simply because they were subsequently discussed by attorneys or included in a due diligence report.[1] Even Uber, with its extremely broad privilege assertions in this litigation, admits that documents or information that are not itself privileged cannot be withheld simply because they were subsequently included in attorney-client privileged communications. (*See, e.g.*, Dkt. 734 at 24:7-15 ("**THE COURT:** Okay. Are you going to be withholding anything that is itself not privileged merely because it was forwarded to an attorney even if you can't find an earlier -- **MS. RIVERA:** If it has not been produced previously, Your Honor, then, yes, we would need to produce it in the state in which it's in. Even though if it was attached to an e-mail between, you know, Uber and MoFo, we would need to produce that document if it hasn't already been produced from the pre-April 11th period if it's a nonprivileged document.").)

Uber has also objected that the interrogatory calls for a legal conclusion because it incorporates by reference the definition of "Pre-Signing Bad Acts" used in the acquisition agreements. As an initial matter, Uber cannot refuse to answer this interrogatory simply because "Pre-Signing Bad Acts" are a defined term in an agreement, even if the meaning and application of that term were a legal conclusion. "[A]n interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact[.]" Fed.R.Civ.P. 33(a)(2); *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-CV-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("Generally, the fact that an interrogatory calls for a legal conclusion is not grounds for an objection") (quoting *Thomas v. Cate*, 715 F.Supp.2d 1012, 1029 (E.D. Cal. 2010) order clarified, No. 05–01198, 2010 WL 797019 (E.D. Cal. Mar. 5, 2010). Nor should there be any reason why Uber cannot easily answer the question through the definition indicated in its own agreement defining Pre-Signing Bad Acts as including: "misappropriation by an Employee or any member of the Company Group of any patents, copyrights, trademarks or trade secrets of such Employer's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by such Employee's Former Employer" that was "committed prior to the Agreement Date [April 11, 2016]." (Dkt. 790-2 at 2 and 3) And, in any event, to the extent any contract interpretation was even necessary, Uber has already made that determination as one of the "Conditions for Closing." (*See* Dkt. 748-4 at Document/Action No. 9 ("Employees' Diligence Review process" that includes written conformation that each Diligenced Employee "has completed a Diligence Review conducted by the Outside Expert at Unicon's expense to determine whether such individual has committed any Bad Acts").[2]

---

[1]  Moreover, because "Pre-Signing Bad Acts" necessarily pre-date the signing of the Put Call Agreement, there is no possible argument that such actions could be subject to a claim of privilege or work product protection.

[2]  Earlier this afternoon, Uber indicated it will supplement its response to "state that Uber received a demand for indemnification pursuant to the indemnification agreement entered into in connection with the Uber-Ottomotto acquisition, and we will cite by Bates number the demand and related documents. Uber cannot supplement further because, as reflected in its written response, any additional information would call for a legal conclusion and invade the attorney-client

Waymo's Non-LiDAR Trade Secrets. For certain RFPs (Nos. 30, 98, 99, 110, 145) and Expedited Interrogatories (Nos. 24 and 25) seeking information about Uber's acquisition, disclosure, and/or use of Waymo's trade secrets, Uber has limited its responses to "LiDAR" or "LiDAR systems." (Exs. 2, 3, and 4). Uber's limitation is improper because Waymo's asserted trade secrets are not limited to LiDAR.

For example, of the 9.7 GB of confidential and proprietary electric circuit design files – including electrical schematics, PCB layouts, mechanical drawings, design rules, and component libraries – downloaded by Mr. Levandowksi on December 11, 2015, only 2.0 GB of them related to Waymo's current and historical LiDAR projects. (Dkt. 25-47 ¶¶ 23-24.) Indeed, the substantial majority of the download – i.e., the remaining **7.7 GB** – related to other technology in Waymo's self-driving car program, such as ▇▇▇▇▇▇▇▇▇▇▇▇ (Dkt. 25-31 ¶ 24.) These stolen designs are identified on Waymo's trade secret list as Trade Secret Nos. 108 and 109:



(Dkt. 25-7 at Nos. 108 and 109.) As another example, the "Chauffeur Weekly Update for Q4 2015" spreadsheet, downloaded by Mr. Levandowski to a personal device on January 11, 2016, is a 43 page collection of confidential information from technical leads from the entire self-driving car team – including software and non-LIDAR hardware – detailing what they are doing each week, the problems they are running into and, eventually, the solutions they come up with. (Dkt. 25-31 ¶ 26; Dkt. 25-47 ¶ 23) This stolen document is identified on Waymo's trade secret list as Trade Secret No. 85:



(Dkt. 25-7 at No. 85.) In sum, there is simply no basis for Uber preclude discovery into non-LiDAR subject matter.

Uber's Indemnification of Anthony Levandowski. RFP No. 42 asks for "All DOCUMENTS and COMMUNICATIONS REGARDING the "Indemnification Agreement among Apparate International C.V., Participant, Ottomotto, and the other parties therein entered into as of April 11, 2016' (referred to in UBER00016410), and any amendments thereto."[3] Uber initially refused to produce **any** documents in response to this RFP. Nevertheless, in an effort to compromise, for documents and communications that post-date the execution of the agreement, Waymo agreed to narrow the request to only those that reference

---

privilege." (Ex. 5 [2017/7/11 Rivera email].) Waymo will review that supplementation and promptly notify the Court if it resolves the dispute over this interrogatory.

[3] To the extent indemnification communications between Uber and Mr. Levandowski are based on any other agreements, they would be responsive to (among others) RFP No. 6, which asks for documents and communications 'REGARDING agreements LEVANDOWSKI and any DEFENDANT." (Ex. 2.)

either the agreement or one or more of its terms. So, for example, a document post-dating April 11, 2016 that referred to one of Mr. Levandowski's "Pre-Signing Bad Acts" would only be responsive to the RFP if it actually referenced the indemnification agreement or one of its terms, and not simply if it identified a bad act that would or did incur an indemnification obligation under the agreement. For documents that pre-date the execution of the agreement – *i.e.*, during the period when the agreement was being negotiated, Waymo seeks all responsive documents and communications.

Nevertheless, refuses to produce anything other than "documents exchanged between Uber and Ottomotto reflecting the negotiation of the Indemnification Agreement, any demands for indemnification submitted by Mr. Levandowski to Uber, and any non-privileged communications about those demands." (Ex. 5 [7/11/2017 Rivera email].) Beyond boilerplate burden, relevance, and privilege objections, however, Uber has failed to and refused to articulate any **actual** burden. Nor has Uber explained why these documents are not relevant or proportional to the needs of this case.

Documents and communications regarding Uber's indemnification agreement with Mr. Levandowski (and four other former Waymo employees), however, are relevant to Waymo's claims in many respects. First, any documents or communications about indemnification leading up to the signing of the agreement are relevant to what Uber knew about Mr. Levandowski's "Bad Acts" and when they knew it, which the Court has repeatedly recognized is a "key issue" in this case. (*See, e.g.*, Dkt. 625 at 36:3-7.) Indeed, ▓▓▓▓▓ by no later than January 28, 2016 – the day after Mr. Levandowski resigned from Waymo without notice. (Ex. 6, January 28, 2016 email from Cameron Poetzscher to Travis Kalanick, asking ▓▓▓▓▓.") Mr. Poetzscher – Uber's Head of Corporate Development – testified that Uber "▓▓▓▓▓" to any "▓▓▓▓▓" but that Mr. Levandowski and Mr. Ron "▓▓▓▓▓." (Ex. 7 [6/19/2017 Poetzscher Deposition Tr.] at 229:6-24 and 230:7-15.) Nina Qi, an Uber Corporate Development manager involved in the negotiations, testified that the Ottomotto deal was the first one she had ever worked on in which the **buyer** (Uber) agreed to indemnify the **seller** (Ottomotto's principals), as well as the first one that included provisions for "bad acts around indemnification." (Ex. 8 [6/22/2017 Qi Deposition Tr.] at 119:7-12 and 233:4-10.)

Second, documents or communications about indemnification post-dating April 11 are also relevant to what Uber knew and when Uber knew it, because indemnification claims, and Uber's obligations under the agreement to pay them, are fact specific to when the trade secret theft occurred and whether it was disclosed to Stroz as part of the due diligence process. (Dkt. 566 at 3; Dkt. 850-9 at -73-74.)

Third, documents or communications about indemnification post-dating April 11 are relevant to bias and credibility. Mr. Levandowski and Mr. Ron have both retained separate counsel in this action. If Uber is paying their legal bills – which, at least for Mr. Levandowski and his extremely busy criminal counsel, who have intervened on numerous issues and who have brought emergency Federal Circuit appeals on three separate occasions – then that is relevant to Mr. Levandowski and Mr. Ron's bias and the credibility of their testimony (or lack thereof). *See, e.g., Bryant v. Mattel, Inc.*, No. CV 04-09049 SGLRNBX, 2007 WL 5430887, at *1 (C.D. Cal. June 20, 2007) ("[D]ocuments relating to fee or indemnity agreements between [defendant] MGA and [percipient witness and former employee] Bryant are relevant to demonstrate bias and lack of credibility.").

Fourth, documents or communications about indemnification post-dating April 11 are relevant to Uber's possession, custody, and control of the downloaded materials. Uber's Paragraph 4 Accounting

in response to the Court's PI Order states that Stroz collected and imaged Mr. Levandowski's devices on March 22, 2016, and then "made and retained two copies of the forensic image. User-generated content was extracted and processed into a Relativity server for review," and "[t]wo copies of the Relativity data were created: one was sent to John Gardner as counsel for Mr. Levandowski and the other was sent to Epiq [a litigation support vendor] at the request of Morrison & Foerster in its capacity as counsel for Mr. Levandowski in the *Google v. Levandowski and Ron* arbitrations and currently is being stored at Epiq." (Dkt. 762 at 6-7.) In other words, Morrison & Foerster has had custody and/or control of the entirety of the downloaded materials collected by Stroz since the initiation of the arbitrations, where Morrison & Foerster has represented Mr. Levandowski. However, if Uber is indemnifying Mr. Levandowski for that representation, then Uber presumably has access to, and control over, those downloaded materials – a fact that Uber has never denied, focusing exclusively on whether Uber (and Morrison & Foerster) has control over downloaded materials in **Stroz's** possession in connection with the due diligence investigation.

Finally, documents or communications about indemnification post-dating April 11 are relevant to Uber's ratification of Mr. Levandowski's conduct and Uber's compliance with the Court's PI Orders. If Uber has had this leverage since Mr. Levandowski began invoking the Fifth Amendment in late March, but has nevertheless continued to indemnify Mr. Levandowski, then that would be material to Uber's ratification of Mr. Levandowski's trade secret theft and the appropriateness of an adverse inference against Uber. (*See, e.g.*, Dkt. 818-4 at 4-10.) And if Uber has been paying Mr. Levandowski's legal bills in either this case or the arbitrations, but has the corporate, contractual or other authority to terminate that indemnification if Mr. Levandowski refuses to comply with Uber's directives and/or the Court's Orders, then Uber would be in violation of the Court's PI Order. (Dkt. 426 at 23 ("Defendants must immediately and in writing exercise the full extent of their corporate, employment, contractual, and other authority to … cause [Anthony Levandowski] to return the downloaded materials and all copies, excerpts, and summaries thereof to Waymo (or the Court) by **MAY 31 AT NOON**.").)

To the extent Uber asserts privilege over any of these indemnification-related communications or documents, it should be required to provide a privilege log – including for those that post-date the filing of the Complaint in this action.

<u>Levandowski's Use of a Personal Laptop</u>. Uber has made a focal point of its defense to Waymo's trade secret claims the assertion that "there is no evidence that any downloaded files ever made it onto Uber's systems." (*See, e.g.*, Dkt. 177 at 2.) But this entire line of defense is predicated on Uber's (and Mr. Levandowski's) ability to prevent Waymo from obtaining discovery into what downloaded files were on Mr. Levandowski's personal devices, and into what Mr. Levandowski was doing with those personal devices in connection with over fifteen months of work on Ottomotto and Uber's self-driving car and LiDAR projects. During that time, Mr. Levandowski was the CEO of Ottomotto, a consultant for Uber, and then Uber's Vice President of Engineering and head of its self-driving car program. For the first few months of Ottomotto's existence – and while he was in active negotiations with Uber – Mr. Levandowski was exclusively using personal devices while running the company out of his home. (Ex. 10 [6/19/2017 Lior Ron Deposition Tr.] at 157:2-158:1.) Once Ottomotto moved its operations to San Francisco, at which point Mr. Levandowski was not only negotiating with Uber but also consulting for them and visiting its San Francisco and Pittsburgh facilities, Mr. Levandowksi continued to exclusively use personal devices for work. Even for the first month or so of his time as a full-time Uber officer, Mr. Levandowski was exclusively using personal devices. And after he was issued an Uber laptop, Mr. Levandowski continued to use personal devices in his work for Uber. Yet neither Uber nor Ottomotto has ever searched a single one of the personal devices it allowed Mr. Levandowski to bring onto their premises or use while

working to advance their autonomous vehicle efforts.

Waymo has served numerous RFPs seeking information about Mr. Levandowski's access to Uber's systems and networks via his personal computers – computers which no one has ever denied have had, and continue to this day to have, stolen Waymo files. Yet Uber has steadfastly refused to produce these documents, arguing alternatively that no non-privileged documents exist, that responsive documents are irrelevant, or that producing the documents would be unduly burdensome.

RFP No. 74 seeks "DOCUMENTS sufficient to show the number of times LEVANDOWSKI has accessed any of DEFENDANTS' servers or networks (INCLUDING but not limited to ███████ ███████████████████████████████████████████████████████████████ and any Wi-Fi network provided by DEFENDANTS at any of their offices) from a personal device." According to Uber, it tracks who accesses these servers and when, but does not have logs indicating whether in any given instance the person was accessing Uber's server from a personal, as opposed to an Uber-issued, device. (Ex. 5 [7/11/2017 Rivera email].) In order words, Uber has complete records of when Mr. Levandowski accessed each of its servers, and for all Uber knows every single time Mr. Levandowski went into Uber's ███████████████████████████ server it was from a personal device – making these records directly responsive to the RFP. However, Uber is refusing to produce the logs for any time period after Mr. Levandowski was issued an Uber computer (which Waymo believes was September 2016). There is no basis to withhold the complete logs. The additional burden in pulling the more recent logs as well as the earlier logs is marginal. And because those logs may show hundreds, if not thousands, of instances in which Mr. Levandowski accessed Uber's LiDAR-related and other servers from a personal device (one that retained copies of Waymo's downloaded materials), they are highly relevant. Uber will be free to argue to the jury that some or all of the logs show access from an Uber-issued device, or that its network policies that allowed Mr. Levandowski to access the technical servers from his personal devices (and did not even register whether that access was from a personal versus work device) was justifiable in these circumstances. But those are not legitimate arguments against the discoverability of these records of Mr. Levandowski's access to Uber's servers and networks.

RFP No. 91 seeks "All DOCUMENTS AND COMMUNICATIONS REGARDING any of LEVANDOWSKI's past and present 'Authorized Devices' (as that term is defined in UBER00006444, Section 7), INCLUDING (without limitation) any request for approval in connection with Section 7.2 or any de-authorization (whether contemplated or effec[tua]ted) under Section 7.3." UBER00006444 (Ex. 11) is Uber's ████████████████████████████████ which provides that ████████████████████ ████████████████████████████████████████████████ (Id. at 48.) Uber has responded that there are no non-privileged documents responsive to this RFP, but has refused to explain how it arrived at this determination or provide a privilege log (to date). Any communications concerning which of Mr. Levandowski's devices were – or were not – authorized to access Uber's "████████" are highly relevant to issues of Uber's knowledge, as well as its Vice President of Engineering's disclosure and use of Waymo's trade secrets.

<u>Levandowski's Compensation-Related Agreements</u>. Waymo's RFP No. 85 seeks "All DOCUMENTS and COMMUNICATIONS REGARDING any compensation-related agreements between any DEFENDANT and any founder of OTTOMOTTO, including any amendment thereto." Waymo has agreed to narrow this RFP, such that the only dispute involves Mr. Levandowski's compensation-related agreements. Specifically, as with RFP No. 42, for documents and communications that post-date the execution of any compensation-related agreement, Waymo has agreed to narrow the request to only those that reference either the agreement or one or more of its terms. (As before, for documents that pre-date

the execution of the agreement – *i.e.*, during the period when the agreement was being negotiated, Waymo seeks all responsive documents.) Yet, Uber will only produce "non-privileged documents exchanged between Uber and Ottomotto (or individually with Mr. Levandowski) regarding the negotiation of Mr. Levandowski's salary, bonus, and stock awards, to the extent such documents are located." (Ex. 5 [7/11/2017 Rivera email].) This limitation is without merit.

Uber promised Mr. Levandowski literally hundreds of millions of dollars to guide its custom LiDAR project and to run its entire self-driving car program, including payments pegged to detailed "Milestones" for medium-range and long-range LiDAR requirements – while simultaneously knowing that he had downloaded Waymo trade secret files and allowing him to retain copies of those files. John Bares, who founded Uber's autonomous vehicle program, testified to the obvious:

> Q. Putting ethics aside, do you think it would be useful for someone trying to build a medium range Lidar for Uber to have a spare copy of Waymo's specifications for medium range Lidar handy to consult?
>
> A. Of course. I mean they are eight years ahead, they had custom lasers. It would be useful to anybody to have that information, totally unethical and illegal, but certainly useful.

(Ex. 12 [6/16/2016 Bares Deposition T.] at 179:19-180:3 (objections omitted).) Documents and communications about Mr. Levandowski's compensation-related agreements, such as discussions (whether internal to Uber or with Mr. Levandowski) about incentives Uber gave him to advance the program as quickly as possible, are relevant to what Uber knew and when Uber knew it, as well as to disclosure and use of Waymo's trade secrets by Uber's Vice President of Engineering and head of its self-driving car program. Uber has no basis to withhold them.

<u>Uber's Agreements with Stroz Friedberg</u>. Waymo's RFP No. 1 seeks "All agreements between STROZ and any DEFENDANT REGARDING LEVANDOWSKI, Lior Ron, OTTO, OTTOMOTTO, GOOGLE, WAYMO, or the MISAPPROPRIATED MATERIALS." (Ex. 2.) Uber has refused to produce all of its agreements with Stroz, on the grounds that some of these agreements, such as its e-discovery vendor agreement with Stroz, are not relevant. (Ex. 5 [7/11/2017 Rivera email].) As the Court is aware, however, Stroz is a highly relevant percipient witness in this case. Both Waymo and Uber identify Stroz and/or Stroz employees as fact witnesses in their Initial Disclosures. (Ex. 9 and Dkt. 797-3.) What agreements Uber has with Stroz, and the amount of money that has been promised and paid by Uber to Stroz, is relevant to Stroz's bias and credibility. *See, e.g., Finmeccanica S.P.A., et al., v. General Motors Corporation*, 2008 WL 11340285, at *3 (C.D. Cal. Dec. 22, 2008) (compelling production of side agreements with a percipient witness because "[a] witness's bias is always relevant. The ultimate outcome of this case may turn on the witnesses' credibility. Alleged biases are key to that determination."). The fact that Stroz is, in addition to a percipient witness, also a litigation consultant and expert in this case does not change that analysis – if anything, it reinforces the relevance of these agreements. *S.E.C. v. Sabhlok*, No. C 08-4238 CRB (JL), 2010 WL 211326, at *2 (N.D. Cal. Jan. 13, 2010) ("The amount an expert witness is being paid for his services is discoverable and must be disclosed, for precisely this reason.") There are many e-discovery vendors in the marketplace. It was Uber's decision to retain a percipient witness as an e-discovery vendor in the same litigation, and Uber's decision to agree to pay them presumably hundreds of thousands (if not millions) of dollars in connection with that retention. Uber cannot shield relevant discovery simply by retaining the employer of relevant witnesses. Uber should be compelled to produce all agreements responsive to the RFP.

<u>Uber's March 15, 2017 "Clarification" Letter to Nevada Authorities</u>.  One of the key pieces of evidence of Uber's use of Waymo's trade secrets before the filing of the Complaint was Uber's September 15, 2016 submission to the Nevada DMV (obtained by Waymo through a public records request in February 2017), stating under oath that Uber had "developed in-house and/or currently deployed" an "In-house custom built 64-laser (Class 1) emitting 6.4 million beams a second at 10Hz." (Dkt. 27-32 at 59-60.)  Since this action was brought, Uber has variously argued that the submission was erroneous, that it referred to Velodyne (which is not custom or in-house), and that it referred to the Fuji LiDAR project (which Uber's declarants admit was not even launched until October – *i.e.*, over a month after the September submission).  Uber submitted a "Clarification" letter to the Nevada authorities on March 15, 2017 (Dkt. 186-8), that attempted to retract some of the representations made in the September submission.  But when Waymo has sought discovery into these various submissions, Uber has stonewalled, refusing to provide discovery into either the "Clarification" or how the purportedly erroneous statements from the September submission made it into the attested document in the first place.

Waymo's RFP No. 117 asks for "DOCUMENTS sufficient to show all author(s) of and contributor(s) to the letter to Nevada authorities, 'RE: Clarification to Autonomous Technology Certification Submission,' dated on or around March 15, 2017." (Ex. 3.)  Uber first responded that it would produce documents sufficient to show the authors, but subsequently has stated that because only lawyers worked on the letter, no non-privileged documents exist.  Waymo would be satisfied with a privilege log providing this information, but Uber has refused to produce even that.  Uber should be compelled to provide, at minimum, a privilege log sufficient to show all authors and contributors to the March 15, 2017 letter.

Respectfully,

*/s/ Charles K. Verhoeven*
Charles K. Verhoeven
cc:      All counsel of record; Special Master John Cooper

01980-00104/9415738.1