# EXHIBIT 8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
2                       SAN FRANCISCO DIVISION

3

4    _____
                                     )
5    WAYMO LLC,                      )
                                     )
6                    Plaintiff,      )
                                     )
7            vs.                     )   Case No.
                                     )   3:17-cv-00939-WHA
8    UBER TECHNOLOGIES, INC.,        )
     OTTOMOTTO LLC; Otto             )
9    Trucking LLC,                   )
                                     )
10                   Defendants.     )
     _____)

11

12

13

14

15        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
16          VIDEOTAPED DEPOSITION OF NINGJUN QI
17               San Francisco, California
18             Thursday, June 22, 2017
19                    Volume I
20

21

22

     Reported by:   SUZANNE F. GUDELJ
23   CSR No. 5111
24   Job No. 2644340
25   PAGES 1 - 320


                                              Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 Uber is the buyer and Otto is the seller, correct?
2    A    Yes.
3    Q    And so you're saying it is not typical for
4 the buyer, in this case Uber, to indemnify the
5 seller, in this case Otto?                          11:43:34
6    A    Yes.
7    Q    And that is, in fact, what the term is in
8 the -- this particular deal, correct?
9    A    Yes, in certain circum- -- circumstances.
10   Q    What do you mean by "in certain          11:43:44
11 circumstances"?
12   A    I just wanted to clarify this is not a
13 blanket indemnification of the buyer for -- to the
14 seller.
15   Q    In what circumstances is Otto indemnified   11:43:54
16 by Uber?
17       MR. JACOBS:  Objection.  Calls for a legal
18 conclusion.
19       THE WITNESS:  I --
20       MR. JACOBS:  You can answer to your       11:44:04
21 understanding.
22       THE WITNESS:  -- don't -- I mean, I don't
23 think I can give a good summary of that.
24 BY MS. ROBERTS:
25   Q    In all of the deals that you've worked on   11:44:16

Page 118

1 in your whole career, not -- not limited to Uber,
2 have you seen any other deal in which the buyer
3 indemnified the seller?
4    A    Not that I can remember.  But when I was
5 very junior, we were always -- we were not always   11:44:32
6 privy to the actual merger document negotiations.
7    Q    But in all of your experience in which you
8 are aware of any terms of an agreement that you were
9 working on, you've never been involved in an
10 agree- -- in a deal in which the buyer agreed to   11:44:47
11 indemnify the seller?
12   A    Yes, as aware -- as far as I'm aware.
13   Q    So that was a term of this particular deal
14 that was complicated and different from your prior
15 experience?                                      11:45:04
16   A    Yes.
17   Q    And you mentioned that the indemnification
18 does not apply in all circumstances; is that right?
19   A    That is my understanding.
20   Q    Okay.  But you aren't in a position to   11:45:14
21 explain what those circumstances are in which it
22 does or does not apply?
23   A    Only at a high level.
24   Q    Can you explain that at a high level?
25   A    There are certain acts that if they were to   11:45:29

Page 119

1 do would lead the indemnification to fall away.
2    Q    Why was the indemnification provision
3 included in the agreement?
4       MR. JACOBS:  You can answer that to the
5 extent you are basing your answer on information   11:45:53
6 other than specific advice of Uber's counsel.
7       THE WITNESS:  It was a negotiated term.
8 BY MS. ROBERTS:
9    Q    Who proposed the indemnification term?
10       MR. JACOBS:  You can answer that.        11:46:09
11       THE WITNESS:  Anthony and Lior proposed the
12 concept.  I would not say they proposed the
13 indemnification term itself.
14 BY MS. ROBERTS:
15   Q    So Anthony and Lior proposed the concept of 11:46:23
16 Otto being indemnified by Uber?
17   A    Yes.
18   Q    When Anthony and Lior proposed the concept
19 of indemnification, what exactly did they say to
20 Uber?                                        11:46:39
21   A    They were concerned that regardless of
22 anything they've done, even if they've taken every
23 necessary precaution, that by the mere nature of the
24 fact that they are getting acquired by Uber, that
25 Google would sue regardless of the merit of the case 11:46:58

Page 120

1 itself.
2    Q    Did they say anything else?
3    A    They felt that if they were a small
4 startup, that Google would not come after them.  So
5 they felt that this acquisition could potentially   11:47:18
6 put them under increased scrutiny, whether it was
7 deserved or not.
8    Q    Did they say anything else?
9    A    Not that I can remember.
10   Q    You said that Anthony and Lior were       11:47:37
11 concerned that regardless of anything they've done,
12 even if they've taken every necessary precaution,
13 Google would sue regardless of the merit of the --
14 merits of the case; is that right?
15   A    Yes.                                    11:47:54
16   Q    Did they discuss any particular issues that
17 they were concerned about?
18   A    No.  Or -- or not that I can recall.
19   Q    Did they express to Uber any concerns
20 that -- concerns relating to use of Google's trade   11:48:23
21 secrets?
22   A    Not that I recall.
23   Q    Did Anthony or Lior express to Uber any
24 concerns relating to taking Google confidential
25 information before they left Google?              11:48:42

Page 121

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q   In this draft of the term sheet, I haven't
2  seen a reference to the forensic due diligence that
3  was performed prior to the acquisition agreement
4  being signed. Was a forensic due diligence report
5  being discussed as of January 20th, 2016?          03:34:39
6    A   I can't remember.
7    Q   When -- well, first of all, did Uber
8  suggest the forensic due diligence report?
9        THE WITNESS:  Can I answer?
10       MR. JACOBS:  You can answer that -- as      03:34:57
11 between -- in the negotiations between the companies
12 who first suggested a forensic due diligence
13 exercise.
14       THE WITNESS:  Yes, I believe Uber first
15 suggested that to Anthony and Lior.          03:35:09
16 BY MS. ROBERTS:
17   Q   When did Uber suggest the forensic due
18 diligence analysis to Anthony and Lior?
19   A   I don't have a good sense of when.
20   Q   What were Mr. Levandowski and Mr. Ron's      03:35:25
21 responses -- let me break it apart. What was Mr.
22 Levandowski's response to Uber's suggestion to
23 conduct a forensic due diligence?
24   A   Based on my recollection, he was okay with
25 it.          03:35:53

Page 230

1    Q   What was Mr. Ron's reaction to Uber's
2  suggestion to conduct a forensic due diligence?
3    A   Based on my recollection, he was also okay
4  with it.
5    Q   So going back to this draft term sheet,      03:36:05
6  like I said, I don't believe there's a reference to
7  a forensic due diligence report in this version
8  dated January 20th, 2016. Do you recall if Uber's
9  suggestion to conduct a forensic due diligence
10 analysis was after January 20th, 2016?          03:36:25
11       MR. JACOBS:  Objection. Asked and
12 answered.
13       THE WITNESS:  I can't say.
14 BY MS. ROBERTS:
15   Q   If you turn in Exhibit 301 to page 4, a      03:36:35
16 little over halfway down the page, there's the line
17 for Indemnification. Do you see that?
18   A   Yes.
19   Q   It says:
20       "The agreement will contain customary      03:36:54
21   indemnities for a transaction of this
22   nature."
23       What are customary indemnities for a
24 transaction of this nature?
25       MR. JACOBS:  Objection.          03:37:04

Page 231

1        THE WITNESS:  I don't think I'm qualified
2  to answer that.
3  BY MS. ROBERTS:
4    Q   As of the date of this draft term sheet,
5  had Mr. Levandowski and Mr. Ron requested that Uber  03:37:16
6  indemnify them?
7    A   I don't remember.
8    Q   Are you familiar with the use of the term
9  "bad acts" in the context of the negotiations with
10 Mr. Levandowski?          03:37:32
11   A   Yes.
12   Q   What's your understanding of what bad acts
13 refers to?
14   A   That there's a specific list or concepts of
15 actions that would constitute as a bad act,          03:37:46
16 something that we did not want -- "we" as in Uber.
17   Q   And can you describe for me how the
18 discussions about these bad acts came up?
19       MR. JACOBS:  Meaning discussions with --
20 BY MS. ROBERTS:          03:38:10
21   Q   Discussions with Mr. Levandowski and
22 Mr. Ron.
23   A   I'm not really sure.
24   Q   In all of your prior deals that you've
25 worked on in your whole career, have there been      03:38:23

Page 232

1  provisions relating to the bad acts in those
2  agreements that were closed?
3    A   Not that I can remember.
4    Q   So to the best of your recollection, this
5  is the first deal that you've worked on that had      03:38:34
6  provisions relating to bad acts?
7    A   There are usually provisions for calling
8  reps and warranties for not doing certain actions.
9  In the context of bad acts around indemnification,
10 to my best of my knowledge, this is the first time.  03:38:55
11   Q   And sitting here today, you don't recall
12 how, in communications between Uber and Mr.
13 Levandowski and Mr. Ron, the issue of bad acts was
14 first raised?
15   A   I don't remember specifically how it      03:39:11
16 originated.
17   Q   And in the communications between Uber and
18 Mr. Levandowski and Mr. Ron, what was discuss- --
19 discussed about bad acts?
20   A   Given that they wanted some sort of      03:39:26
21 protection by Uber, we also had to make sure that
22 this does not inadvertently incentivize them to do
23 stupid things or things that we deem later -- later
24 deemed bad acts.
25   Q   How would they be inadvertently      03:40:04

Page 233

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    VIDEO OPERATOR:  This concludes today's
2 videotaped deposition of Nina Qi.  We're off the
3 record at 5:45 p.m.
4        (TIME NOTED: 5:45 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 318

1        I, the undersigned, a Certified Shorthand
2 Reporter of the State of California, do hereby
3 certify:
4        That the foregoing proceedings were taken
5 before me at the time and place herein set forth;
6 that any witnesses in the foregoing proceedings,
7 prior to testifying, were duly sworn; that a record
8 of the proceedings was made by me using machine
9 shorthand which was thereafter transcribed under my
10 direction; that the foregoing transcript is a true
11 record of the testimony given.
12        Further, that if the foregoing pertains to
13 the original transcript of a deposition in a Federal
14 Case, before completion of the proceedings, review
15 of the transcript [X] was [ ] was not requested.
16        I further certify I am neither financially
17 interested in the action nor a relative or employee
18 of any attorney or party to this action.
19        IN WITNESS WHEREOF, I have this date
20 subscribed my name.
21 Dated: 6/23/2017
22
23
24    SUZANNE F. GUDELJ
25    CSR No. 5111

Page 320

1
2
3
4
5
6
7
8        I, NINGJUN QI, do hereby declare under
9 penalty of perjury that I have read the foregoing
10 transcript of my deposition; that I have made such
11 corrections as noted herein, in ink, initialed by
12 me, or attached hereto; that my testimony as
13 contained herein, as corrected, is true and correct.
14        EXECUTED this _____ day of _____,
15 2017, at _____, _____.
16        (City)        (State)
17
18        _____
        NINGJUN QI
19        Volume I
20
21
22
23
24
25

Page 319

81 (Pages 318 - 320)