QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David A. Perlson (Bar No. 209502)
  davidperlson@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  John Neukom (Bar No. 275887)
  johnneukom@quinnemanuel.com
  Jordan Jaffe (Bar No. 254886)
  jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| WAYMO LLC, | CASE NO. 3:17-cv-00939 |
|---|---|
| Plaintiff, | **PLAINTIFF WAYMO LLC'S REPLY IN SUPPORT OF ITS MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT OF THE PRELIMINARY INJUNCTION ORDER (Dkt. 426) AND EXPEDITED DISCOVERY ORDER (Dkt. 61)** |
| vs. | |
| UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC, | |
| Defendants. | **PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |
| | Date:       August 16, 2017 |
| | Time:       8:00 a.m. |
| | Ctrm:       8, 19th Floor |
| | Judge:      Honorable William H. Alsup |
| | Trial Date: October 10, 2017 |

# I.    <u>INTRODUCTION</u>

It is now ***months*** after the PI Order and Expedited Discovery Order required Defendants and their agents to return the downloaded materials that Anthony Levandowski stole from Waymo.  Yet to date, not a single page of these materials has been returned.  Defendants and their agents have instead put forth a never-ending series of inconsistent excuses, evasions, and stonewalls to defy the Court's orders and deny Waymo the right to have its property returned to it.

The Court has already issued an Order to Show Cause why Defendants' agents Stroz Friedberg ("Stroz") and Morrison & Foerster ("MoFo") are not in violation of the Court's orders for failing to return the downloaded materials.  Dkt. 795.  Defendants themselves are equally in violation of the Court's orders, and an Order to Show Cause should issue against Defendants as well.  Indeed, as discussed below, there is no merit to any of the latest arguments that Defendants proffer in their Opposition Briefs in an effort to excuse their violations of the Court's Orders.

Moreover, information has emerged since the filing of Defendants' Opposition Briefs that shows even more egregious conduct by Defendants.  Specifically, just today MoFo filed its response to the prior Order to Show Cause (Dkt. 795).  Dkt. 883 ("MoFo Response").  In this response, MoFo now admits that they have had electronic copies of the downloaded materials since at least March 2017.  *Id.* at ¶¶ 6-7.  This is completely contradictory to the Declaration that MoFo partner Wendy Ray submitted last week in the present briefing, which stated: "After further investigation, including checking with an attorney on maternity leave, ***MoFo has determined that it does not have any such material in its possession***."  Dkt. 806-3 at ¶ 8 (emphasis added).

To reiterate: by its own admission, Defendants' counsel MoFo has possessed the downloaded materials since March 2017.  In that time period, there have been two orders (the Expedited Discovery Order and PI Order) ordering Defendants and their agents to return these materials, on the ground that these materials are Waymo's stolen property.  Yet MoFo has made no move to return these materials.  Defendants have made no move to require MoFo to return these materials.  Defendants' violations are now even more clear.  Waymo's motion should be granted.

## II.   UBER AND OTTO ARE IN CONTEMPT FOR FAILING TO TAKE ALL STEPS TO CAUSE MOFO TO RETURN THE DOWNLOADED MATERIALS

As explained in Waymo's Motion, the PI Order required Defendants to "exercise the full extent of their corporate, employment, contractual, and other authority" to cause their "officers, directors, employees, and agents" to "return the downloaded materials and all copies, excerpts, and summaries thereof to Waymo (or the Court) by **MAY 31 AT NOON**."  Dkt. 426 at 23 ¶ 2. The Expedited Discovery Order had previously required Defendants to produce these materials by March 31.  Dkt. 61 at 2 ¶ 4.

Regarding whether MoFo has the downloaded materials, Defendants' Opposition to this Motion says that the only downloaded materials MoFo possesses are attachments to the Stroz Report.  Uber-Otto Opp. at 2:2-14; 8:5-15; 13:12-14:9.  Defendants admit that this position is inconsistent with what Boies Schiller told Waymo on June 12, which was that MoFo had additional downloaded materials *besides* attachments to the Stroz Report.  Dkt. 677-8 at 1. Defendants' position is also inconsistent with public statements that MoFo has made to the press, such as MoFo attorney Arturo Gonzalez's recent, broad statement that MoFo "still has the files in question":

> In a court filing Wednesday evening, Waymo's attorneys at Quinn Emanuel Urquhart & Sullivan claim Uber's attorneys at Morrison & Foerster failed to disclose they had access to part of a trove of stolen Waymo files.
>
> \* \* \*
>
> MoFo partner Arturo Gonzalez, one of Uber's lead attorneys, said that the firm still has the files in question. But he also said that fact was disclosed to Waymo's attorneys early on in the case when MoFo handed over a list of roughly 3,500 privileged documents. The court ordered Uber's lawyers to hand over an unredacted privilege log on April 10.

Ben Hancock, "MoFo Withheld Stolen Waymo Files, Quinn Claims," *The Recorder* (June 22, 2017); *available at* http://www.therecorder.com/id=1202790984875/MoFo-Withheld-Stolen-Waymo-Files-Quinn-Claims?slreturn=20170610164851.

But most importantly, *the position that Defendants take in opposing this Motion is contradicted by the later submission that MoFo made just today* (July 12).  In today's

submission, MoFo states that it has had an electronic copy of the downloaded materials since March 2017.  MoFo Response (Dkt. 883) at ¶¶ 6-7.  Yet MoFo has not produced these materials, nor have Defendants directed MoFo to produce these materials.  Notably, MoFo carefully does not specify the precise *date* in March when it received these materials, rendering it ambiguous whether MoFo received these materials before or after the March 16 Expedited Discovery Order.  Either way, of course, MoFo was obliged to produce these materials in response to the Expedited Discovery Order.

To demonstrate MoFo's and Defendants' flagrant inconsistencies on this issue, it is helpful to review their representations in chronological order.  As the contemporaneous email summary of the parties' June 1 telephone conference recounts, "Morrison & Foerster confirmed [on that telephone conference] that it does not have any of the materials that Anthony Levandowski downloaded from Waymo and kept upon leaving Waymo's employment, regardless of how long he kept them for and whether or not any such materials qualify as trade secrets or proprietary or confidential information (the 'downloaded materials'), or any copies, excerpts, or summaries of the downloaded materials."  Dkt. 676-15 at 2.  Boies Schiller then stated on June 12 that MoFo *did* have certain downloaded materials.  *Id.* at 1.  Ms. Ray's July 5 Declaration then said that Boies Schiller's statement was incorrect and that "MoFo has determined that it does not have any such material in its possession."  Dkt. 806-3 at ¶ 8.  Notably, neither Ms. Ray nor anyone else at MoFo had ever previously stated that the email summary of the June 1 teleconference was incorrect.  In other words, on June 12, Boies Schiller sent an email purporting to correct Ms. Ray's representation on June 1 that MoFo did not have any downloaded materials.  Yet in her Declaration, Ms. Ray says she never even made that representation.  But if that were really true, then wouldn't *that* have been what Boies Schiller "corrected" on June 12, as opposed to saying MoFo *did* have downloaded materials?

In any event, MoFo's July 12 submission now states that MoFo does indeed have a copy of the downloaded materials and has had this copy since March 2017.  Notably, before their filing of their Response today, neither MoFo nor Defendants acknowledged that the statements in their July

5 Opp. and Ms. Ray's July 5 Declaration were false, nor have they submitted any errata to those documents, despite knowing that Waymo's Reply to those documents is due tonight.[1]

The bottom line is this: MoFo now admits that it has possessed a copy of the downloaded materials since March 2017. But despite the two Court orders requiring the downloaded materials to be returned, MoFo has not returned these materials, and Defendants Uber and Otto have not ordered (or even asked) MoFo to return these materials either. Contempt is warranted.

## III. UBER AND OTTO ARE IN CONTEMPT FOR FAILING TO TAKE ALL STEPS TO CAUSE STROZ TO RETURN THE DOWNLOADED MATERIALS

Uber and Otto also have not exercised the full extent of their authority to cause Stroz to return the downloaded materials. Thus, Uber and Otto are in contempt of the PI Order and Expedited Discovery Order for this reason as well. None of the arguments in Uber and Otto's Opposition Brief can overcome this simple, dispositive fact.

### A. Uber and Otto Could Have Taken Numerous Additional Steps to Cause Stroz to Return the Downloaded Materials

Uber and Otto first argue that they *did* exercise the full extent of their authority on this subject by making "a firm and clear written request to Stroz and to Mr. Levandowski to return to Waymo any downloaded materials that Stroz may have." Uber-Otto Opp. (Dkt. 806) at 11:26-28. This "request" was Uber's June 12 letter to Stroz, which merely states that Stroz "may" return the downloaded materials and that Uber did not "want" Stroz to retain these materials. Dkt. 677-5 at 3-4. Stroz' recent submission to the Court (Dkt. 882) confirms that Uber's June 12 letter was the "first time" Uber invited Stroz to return the downloaded materials. *Id.* at 3:5-8. Moreover, the hedged and equivocal language in Uber's June 12 letter is hardly a "firm and clear written request" for Stroz to return these materials to Waymo. But even if this letter did constitute a "firm and clear written request" for Stroz to return the downloaded materials to Waymo, it does not

---

[1]   In an email received at 6:03 p.m. PDT tonight, the day Waymo's Reply was due and almost six hours after MoFo filed its Court ordered response at noon, MoFo attorney Arturo Gonzalez stated that Defendants would be filing tonight "a corrected response to the order to show cause to the order to show cause that was directed to Uber. The correction will be consistent with today's Declaration from Eric Tate." (Judah Decl., Ex. 1.) Mr. Gonzalez' email also stated "We will not object to your . . . filing a supplement reply brief if you believe that is necessary." (*Id.*) Waymo will analyze Defendants' "corrected response" in due course and will respond as appropriate.

1  constitute substantial compliance with the PI and Expedited Discovery Orders because it does not

2  come close to exhausting the full extent of Uber's and Otto's authority over Stroz.

3        For example, Uber and Otto do not dispute that Stroz is their discovery vendor in this very

4  case, and that they could have threatened to fire Stroz in order to pressure Stroz to return the

5  downloaded materials. Nor do Uber and Otto dispute that they could have threatened to withhold

6  future business from Stroz, as another lever to pressure Stroz to return the downloaded materials.

7  Yet Uber and Otto took neither of these obvious steps. Thus, they did not exercise the full extent

8  of their "contractual" and "other" authority over Stroz, as plainly required by at least the PI Order.

9  Dkt. 426 at 23 ¶ 2. There are also other obvious steps that Defendants could have taken to

10  pressure or persuade Stroz to return the downloaded materials. For example, Defendants could

11  have provided Stroz with a copy of the PI Order and asked that Stroz either produce the

12  downloaded materials or file a motion to intervene — much as Mr. Levandowski repeatedly

13  intervened when Defendants were ordered to produce documents allegedly implicating his

14  privileges. Yet Defendants did not take this step with Stroz either.

15       **B.**    **Uber and Otto Cannot Excuse Their Behavior by Arguing that the Stroz-**

16                  **Levandowski Contract Bars Stroz from Producing the Downloaded Materials**

17        Uber and Otto seek to avoid their failure to pressure Stroz to return the downloaded

18  materials by arguing that the Levandowski-Stroz contract bars Stroz from producing these

19  materials. Uber-Otto Opp. at 11:14-22. From this premise, they argue that "if Uber had

20  threatened Stroz with cutting off all future business, and that had led Stroz to breach its agreement

21  with Mr. Levandowski [by producing the downloaded materials], that would have exposed Uber to

22  tort liability for intentional inducement of breach of contract." *Id.* at 12:9-12.

23        Initially, Uber and Otto should be precluded from making this argument at all. They cite

24  the March 21, 2016 Levandowski-Stroz contract for the proposition that Stroz is contractually

25  barred from producing the downloaded materials. But this is the same contract that Defendants

26  originally redacted on privilege grounds. *Compare* Dkt. 545-8 (redacted version) with Dkt. 806-4

27  (unredacted version). The Court made clear that Defendants had until June 1, 2017 to decide

28  whether to waive any privilege, "on pain of preclusion thereafter." Dkt. 438 at 1:10. In response,

1  Defendants stated that they would not waive any privilege.  Dkt. 531 at 1:9-10 ("Defendants do

2  not intend to waive any privileges that they have asserted, or will assert, throughout this

3  litigation.")  So Waymo had to ***move to compel*** production of an unredacted version of this very

4  document.  Defendants opposed, trying to retain redactions, supposedly based on attorney-client

5  privilege, work-product, and common-interest privilege, over the Stroz-Levandowski contract.

6  Dkt. 552.  Yet Defendants now rely on a previously unproduced unredacted version of the

7  Levandowski-Stroz contract to support their position that Stroz was not allowed to produce the

8  downloaded materials without Mr. Levandowski's consent.  This sort of tactical selective waiver

9  has been Defendants' favored tactic throughout this litigation, but it is forbidden by the Court's

10  Order (Dkt. 438) and by virtue of Defendants' response thereto (Dkt. 531).[2]

11         In an apparent attempt to avoid the selective waiver problem, Defendants' Opp. attaches

12  and cites the July 5 Declaration from MoFo attorney Wendy Ray stating: "Uber received Mr.

13  Levandowski's permission, through counsel, to produce the unredacted protocol attached to the

14  March 21, 2016 Levandowski-Stroz Agreement ***today***."  Dkt. 806-3 at ¶ 12 (emphasis added);

15  Uber-Otto Opp. at 13 fn. 5.  By this statement, Ms. Ray seems to imply that Uber could not have

16  produced the unredacted Levandowski-Stroz contract (together with its attached protocol) earlier.

17  But Ms. Ray's statement that Uber had only received consent "today" (*i.e.* July 5) is false.  In

18  actuality, as Waymo noted in its Motion to Compel, Mr. Levandowski's attorney stated on ***June 1***

19  that Mr. Levandowski had "no objection" to producing the Levandowski-Stroz contract or any

20  other contract surrounding Stroz's Due Diligence.  Dkt. 546-2 (citing Ex. 2 (Dkt. 564-2).)

21

22

23         [2] If allowed at all (which it should not be), Defendants' attempt at selective waiver of
   privilege to rely on the Stroz-Levandowski contract would also waive privilege over all other
24  documents on the same subject-matter.  *Phoenix Sols. Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D.
   568, 576 (N.D. Cal. 2008) ("Wells Fargo argues that Phoenix has attempted to use the disclosed
25  drafts and other documents as both a shield and a sword, that is, to reveal a limited aspect of
   privileged communications in order to gain a tactical advantage in litigation.  ***If this were the case,***
26  ***Phoenix would have broadly waived the privilege as to all other communications relating to the***
27  ***same subject.***") (emphasis added).

28

1    In any event, even if Defendants were allowed to argue that Stroz could not produce the

2 downloaded materials without breaching the Stroz-Levandowski contract, Uber is not entitled to

3 disobey the PI Order merely by reasoning that obeying the PI Order would cause a contractual

4 breach and thus render Uber liable for intentional interference with contractual relations. This sort

5 of "self help" in defiance of a court order is forbidden. *Harris v. United States*, No. CIV.S03878,

6 2003 WL 23332985, at *4 fn. 10 (E.D. Cal. Aug. 5, 2003) ("Obviously, this court has an

7 immediate ability to respond to plaintiff's resort to self-help in defiance of a court order.") Rather,

8 to the extent it was necessary or appropriate, the proper recourse would have been for Uber to go

9 to the Court and seek a modification of the PI Order to avoid the supposed tort-liability problem.[3]

10    Uber's professed fear of tort liability also cannot justify its conduct because Uber's

11 professed fear is wholly unrealistic (which is likely why Uber has never expressed such fear

12 before now). In reality, Uber could not possibly be liable for intentional interference with

13 contractual relations merely by pressuring Stroz to produce the downloaded materials. This is

14 because any Uber communications pressuring Stroz to take this step would be communications

15 that Uber made in order to comply with the PI Order. Thus, these communications would be

16 privileged communications under Cal. Civ. Code § 47(b)(2), such that these communications

17 could not impose tort liability on Uber as a matter of law. *Asset Mgmt. Sys., Inc. v. White,*

18 *Zuckerman, Warsavsky & Luna*, No. B143168, 2002 WL 724925, at *4 (Cal. Ct. App. Apr. 25,

19 2002) (holding that statements made pursuant to court order are privileged under Section 47(b)(2)

20 and cannot give rise to liability for intentional interference with contractual relations); *Flannery v.*

21 *Tepper*, No. B268576, 2016 WL 3679801, at *3 (Cal. Ct. App. July 6, 2016) (affirming trial court

22 ruling that "there can be no claim of wrongdoing [for intentional interference with contractual

23 relations] when an attorney simply recognizes a court order [and] attempts to comply with it.").[4]

24 ───────────────

25    [3]  By way of illustration, Mr. Levandowski moved to modify the PI Order when he believed
that it impinged on his rights (Dkt. 466), and the Court stayed compliance of the PI Order in
26 relation thereto in order to allow time for that issue to be briefed. Dkt. 471.

27    [4]  Unpublished California decisions, such as *Assert Mgmt.* and *Flannery*, are citeable in
Federal court as illustrative and persuasive authority on California law. *Cole v. Doe 1 thru 2*
28 *Officers of City of Emeryville Police Dep't*, 387 F. Supp. 2d 1084, 1103 fn. 7 (N.D. Cal. 2005).

1    Indeed, the lone case that Defendants cite on this point — the California Supreme Court's

2  decision in *PG&E v. Bear Stearns & Co.*, 50 Cal. 3d 1118 (1990) — actually ***rejected*** liability for

3  intentional interference with contractual relations based on litigation-related behavior.  In so

4  doing, *PG&E* held that "[o]ur concern with assuring free access to the courts has extended to the

5  privilege for statements made in the course of litigation . . . The policy of encouraging free access

6  to the courts is so important that the litigation privilege extends beyond claims of defamation to

7  claims of abuse of process, intentional infliction of emotional distress, negligent

8  misrepresentation, invasion of privacy, fraud, ***and to the torts alleged here: interference with***

9  ***contract and prospective economic advantage***."  *PG&E*, 50 Cal. 3d at 1132 (emphasis added).

10  Given this guidance from the California Supreme Court, there is no chance that Uber could be

11  liable for intentional interference with contractual relations merely by obeying this Court's PI

12  Order to use all available levers to pressure Stroz to divulge the downloaded materials.

13    In short, Defendants' argument that they could not pressure Stroz to divulge the

14  downloaded materials for fear of tort liability is a pretext.  The unrealistic fear of such liability

15  cannot excuse Defendants' refusal to use the full extent of their authority to pressure Stroz to

16  return Waymo's stolen property.

17    Defendants next argue that it would have been "fruitless" for them to pressure Stroz to

18  return the downloaded materials because such pressuring "could not change the valid contract

19  between Stroz and Mr. Levandowski preventing Stroz from producing the documents without Mr.

20  Levandowski's written consent."  Uber-Otto Opp. at 12:7-9.  Initially, as noted above, this

21  argument is procedurally barred.  But more fundamentally, Defendants' "fruitlessness" argument

22  is also irrelevant.  Defendants' compliance with the Court's orders is not judged by whether the

23  downloaded materials are actually produced.  It is instead judged by whether Defendants actually

24  exercised the full scope of their authority to get these materials produced.  Had Defendants

25  ***complied*** with the Court's orders but been unsuccessful in causing Stroz to produce the

26  downloaded materials, there would be no grounds for contempt.  But here, Defendants plainly did

27  not exercise the full scope of their authority and power.  Contempt is therefore warranted.

28

1    Finally, backtracking from their prior position that Defendants could not order Stroz to

2  return the downloaded materials because they were Mr. Levandowski's "personal property,"

3  Defendants now say that "regardless of how the materials are described, Uber is not insisting that

4  everything Mr. Levandowski gave to Stroz is his 'personal property,' simply that it is not **Uber's**

5  property.  The contract between Mr. Levandowski and Stroz does not give Uber possession,

6  custody, or control over any Google materials Mr. Levandowski gave to Stroz, beyond the small

7  number attached to the Stroz Report, all of which have been logged and are the subject of the

8  privilege dispute."  Uber-Otto Opp. at 2:26-3:3 (emphasis in original).  But this explanation is

9  self-contradictory: if Defendants contend that the Stroz-Levandowski contract forbade Stroz from

10 producing the downloaded materials to Uber, that would have to be because these materials were

11 somehow Mr. Levandowski's property.  Defendants never articulate any other reason why Mr.

12 Levandowski could supposedly control the distribution and circulation of these materials.

13 **IV.    *ALL* DEFENDANTS ARE IN CONTEMPT FOR FAILING TO TIMELY
         DISCLOSE THE DESTRUCTION OF FIVE DISCS OF DOWNLOADED
14       MATERIALS**

15   As explained in Waymo's Motion, Defendants did not disclose the destruction of five discs

16 of downloaded materials until June 8, 2017 — even though Defendants had an obligation to report

17 any such destruction by March 31, 2017, and even though Defendants knew about this destruction

18 since March **2016**.  Defendants dispute none of this.  Instead, Defendants express "regret" for not

19 disclosing this destruction in a timely fashion (Uber-Otto Opp. at 3:12), call their tardiness an

20 "oversight" (*id.* at 3:13), and say that there was a "lack of willfulness in late-disclosing th[is] fact."

21 *Id.* at 14:24-15:1.  But this is all irrelevant.  "The absence of willfulness does not relieve from civil

22 contempt."  *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949).  Thus, it does not

23 matter whether Defendants' late disclosure was willful as opposed to an "oversight."  It matters

24 even less whether Defendants now express "regret" for their behavior.

25   Defendants' belated disclosure is particularly egregious given their discussion of the

26 "enormous resources" that they supposedly expended to comply with the Court's Orders.  Uber-

27 Otto Opp. at 4:2-3 ("Uber Devoted Enormous Resources to Comply with the Court's March 16

28 Order"); 6:1-2 ("Uber Devoted Enormous Resources to Comply with the Court's May 11 PI

1  Order").  Defendants wax on for pages about the number of documents they reviewed, servers

2  they searched, and employees they interviewed.  *See id.* at 4-6.  Yet Defendants never disclosed a

3  critical document destruction that several of Defendants' highest-ranking officers — including Mr.

4  Kalanick — have known about **for over a year**, even though the Expedited Discovery Order

5  specifically required that such destruction be disclosed.  Even if lack of willfulness **were** a defense

6  to civil contempt — which it is not — this series of events strongly suggests that Defendants have

7  not been trying in good faith to fully comply with the Court's orders.

8        Defendants argue that they showed "substantial compliance" with the Expedited Discovery

9  Order notwithstanding their belated disclosure of the five discs of downloaded materials.  Uber-

10  Otto Opp. at 15.  However, as stated by the very case that Defendants cite, a predicate requirement

11  for "substantial compliance" is that the violating party "has taken 'all reasonable steps' to comply

12  with the court order . . ."  *Gen. Signal Corp. v. Donallco, Inc.,* 787 F.2d 1376, 1379 (9th Cir.

13  1986).  Defendants do not dispute that they reasonably could have disclosed the five-disc

14  destruction by the March 31 deadline in the Expedited Discovery Order.  Thus, as a matter of law,

15  their failure do so cannot be deemed "substantial compliance."

16        Defendants also argue that "Uber logged documents discussing the five discs and their

17  destruction on its privilege log" before "realizing . . . . that is was possible to provide non-

18  privileged evidence about this destruction . . . ."  Uber-Otto Opp. at 3:10-13.  Defendants do not

19  explain what caused their sudden "realization" that they could provide non-privileged information

20  about the five-disc destruction or why they did not have this same "realization" during the time

21  when they were **required** to disclose such destruction under the Expedited Discovery Order.

22        Defendants also provide no citation or support for their statement that "Uber logged

23  documents discussing the five discs and their destruction on its privilege log."  *Id.* at 3:10-11.

24  Thus, there is no way to know what privilege log entries Defendants are even referring to, much

25  less whether the entries have descriptions that would correspond to Defendants' representations.

26  In fact, Defendants' failure to cite anything suggests that there is no on-point privilege log entry to

27  cite at all.  And as detailed in the Waymo Motion for Relief currently pending before the Court

28  (Dkt. 779 at 1-3), Defendants' privilege logs are exceedingly vague and boilerplate.  This is

1    another reason why the alleged reference to the five-disc destruction on Defendants' privilege logs

2    could not constitute substantial compliance with the Expedited Discovery Order.

3         Defendants finally argue that their behavior does not warrant contempt because their

4    belated June 8 disclosure of the five-disc destruction supposedly cured or corrected the earlier

5    violation, such that Waymo allegedly was not prejudiced by Defendants' failure to disclose this

6    destruction by the March 31 deadline in the Expedited Discovery Order.  Uber-Otto Opp. at 15-16.

7    But Waymo *was* prejudiced by the belated disclosure.  After all, the purpose of the Expedited

8    Discovery Order was to force expedited discovery that could be used in the PI proceedings.  *See*

9    Expedited Discovery Order (Dkt. 61) at 1 ("this order sets forth a plan for expedited discovery for

10   both sides leading up to a hearing on plaintiff's motion for provisional relief . . .").  The fact that

11   Mr. Levandowski apparently destroyed five discs of downloaded materials in 2016 — and that

12   certain Uber officers were aware of this destruction — is an important fact that Waymo should

13   have been apprised of during the expedited discovery period, so that Waymo could have cited this

14   fact in its PI papers or used it as a jumping-off point for additional expedited discovery.

15        For example, Waymo did not include Uber CEO Travis Kalanick among the three

16   non-declarant deponents it was allowed in the initial round of expedited discovery.  Had Uber

17   timely disclosed on March 31, as ordered, that Mr. Kalanick was personally involved in Mr.

18   Levandowski's decision to destroy the five discs at issue (as Uber revealed over two months later

19   in its belated interrogatory response), then Waymo may have pushed for and obtained a deposition

20   of Mr. Kalanick that could have been used in the PI proceedings.  After all, Mr. Kalanick's

21   knowledge of the five-disc destruction is highly relevant to "what Uber knew and when they knew

22   it," which the Court stated is "one of the key issues in the case."  6.14.17 Hearing Tr. at 40:10-11.

23        In sum, the Expedited Discovery Order required certain key information to be disclosed

24   *during the expedited discovery period* so that it could be used in the PI proceedings.  Defendants'

25   failure to disclose the five-disc destruction during the expedited discovery period caused great

26   prejudice to Waymo, by preventing Waymo from using this information in the PI proceedings.

27   Defendants' belated disclosure on June 8 does not cure this prejudice.  Thus, Defendants' "no

28   prejudice" argument fails.  Contempt is warranted.

1    This finding of contempt is equally proper as to Uber, Otto, and Otto Trucking.  Otto

2    Trucking argues that it did not have knowledge about the five-disc destruction.  Otto Trucking

3    Opp. (Dkt. 804) at 5:6-7.  However, Otto Trucking Managing Member Lior Ron was apprised of

4    these five discs and inferred from his conversations with Otto Trucking Executive Chairman and

5    Managing Member Mr. Levandowski that Mr. Levandowski had destroyed them.  Dkt. 676-12,

6    Ex. 5 at 266:4-14.  Thus, Otto Trucking was obliged to disclose this fact.

7    There also is no merit to Otto Trucking's argument that it had no disclosure obligations

8    regarding the five-disc destruction because these five discs were never in Otto Trucking's

9    possession or control.  *See* Otto Trucking Opp. at 4:26-28.  The Expedited Discovery Order

10   plainly states: "If any part of said downloaded material has been deleted, destroyed, or modified,

11   then defendants shall state the extent thereof and produce all documents bearing on said deletion,

12   destruction, or modification."  Expedited Discovery Order at 2:9-12.  By its plain terms, this

13   disclosure obligation is not limited to downloaded materials within the possession or control of

14   any given Defendant.  But in any event, the five discs *were* in the constructive possession or

15   control of Otto Trucking, since they were in the possession and control of Mr. Levandowski and

16   Mr. Levandowski is Otto Trucking's lead Managing Member.  As the Court recently noted, "[a]ll

17   guilty knowledge attributable to Levandowski is attributable to Otto Trucking . . . . it's his

18   company, for goodness' sake."  6.29.17 Hearing Tr. at 65:19-24.

19   **V.    OTTO TRUCKING IS IN CONTEMPT FOR FAILING TO TAKE ALL STEPS TO**
     **PRESSURE MR. LEVANDOWSKI TO RETURN THE DOWNLOADED**
20   **MATERIALS**

21   As explained in Waymo's Motion, Otto Trucking has not exercised the full scope of its

22   authority to pressure Mr. Levandowski to return his copies of the downloaded materials to

23   Waymo.  Specifically, Otto Trucking has not threatened to ██████████████████████

24   ████████████████████████████████████████████████████████) should he

25   fail to turn over the downloaded materials.[5]

26

27   ──────────────

     [5]   Otto Trucking has violated the PI Order in other ways as well, which are detailed in
28   Waymo's separate Order to Show Cause against Otto Trucking alone (Dkt. 847).

1     In response, Otto Trucking argues that it cannot ███████████████ without Mr.

2     Levandowski's consent, which he will not give.  Otto Trucking Opp. at 3:1-5.  Initially, it is

3     fundamentally perverse for Otto Trucking to argue that it should be excused from complying with

4     the PI Order because its lead Managing Member (Mr. Levandowski) does not wish to comply.  If

5     this position were accepted, then any corporation could excuse non-compliance with a court order

6     be simply stating that whoever is in charge would not "allow" it to comply.  Needless to say, this

7     is not the law.  Otto Trucking cannot justify its refusal to comply with the Court's Orders simply

8     because the individual in charge causes that non-compliance.

9         Otto Trucking further reasons that ordering it to ████████████ "results in the Court

10    forcing Mr. Levandowski to either take punitive action against himself or waive his Fifth

11    Amendment rights.  Such coercive state action is prohibited by the Fifth Amendment." *Id.* at

12    3:10-12.  But the Court rejected a similar argument just last month, holding: "A district court has

13    the authority to order as part of provisional relief a private company to do something that it would

14    have the authority to do, meaning the company, on its own.  And if in this case, Uber would have

15    the authority to -- to put Mr. Levandowski to a choice between his Fifth Amendment and his job

16    without any problem at all . . . then the district court can say to Uber, you have to do that to satisfy

17    the equities of this situation as part of the provisional relief that the court is granting."  6.7.17

18    Hearing Tr. at 93:8-18.  Substitute "Otto Trucking" for "Uber," and the Court's ruling applies

19    fully to the situation at bar.  Otto Trucking has the power ████████████████████████

20    whether or not Mr. Levandowski had to consent to this action in his capacity as an Otto Trucking

21    officer.  Thus, by failing to ██████████████████, Otto Trucking violated the PI Order.

22    It makes no difference whether Mr. Levandowski's recalcitrance is the ***reason*** why Otto Trucking

23    is in violation of the PI Order.  The dispositive fact is simply that Otto Trucking is in violation.

24        Otto Trucking next argues that it is "unfounded speculation" to surmise that ████████

25    ████████████ would cause Mr. Levandowski to return the downloaded materials.  Otto

26    Trucking Opp. at 3:19-22.  To the contrary, it is perfectly logical that ███████████████

27    ██████████████████████████ for failure to return the downloaded materials would

28    encourage or pressure him to return these materials in order to ████████████  There may be no

1   *guarantee* Mr. Levandowski would return the downloaded materials in response to this pressure.

2   But again, the PI Order merely requires Defendants to use the full extent of their authority to

3   pressure their officers, employees, and agents to return the downloaded materials.  For Otto

4   Trucking, the full extent of its authority includes ███████████████████.

5        Otto Trucking next argues that it cannot be faulted for failing to ██████████████

6   because the PI Order did not *specifically* mention this step.  Otto Trucking Opp. at 3:23-26

7   ("although the Court ordered Defendants to 'exercise the full extent of their corporate,

8   employment, contractual, and other authority' to cause Mr. Levandowski to return downloaded

9   materials, the Order does not specifically and definitively direct Otto Trucking to █████████

10  ██████████████████████") (internal citation omitted).  This argument is absurd.  The

11  PI Order ordered Defendants to exercise the full scope of their authority to pressure their officers,

12  agents, etc. to return the downloaded materials.  The PI Order did not require need to specifically

13  itemize what steps would be encompassed within the full scope of Defendants' authority.  Indeed,

14  unless the district court had encyclopedic knowledge of every type of authority that Defendants

15  possessed over their agents and employees, it would be impossible for the district court to provide

16  such an exhaustive itemization.  Moreover, the documents disclosing Otto Trucking's █████████

17  were not even produced until after the PI Order was issued, meaning that it would have been

18  impossible for the PI Order to specifically discuss the █████████

19       Finally, Otto Trucking expresses confusion as to whether it should have merely ***threatened***

20  to ██████████████ or whether it should have gone ahead and ████████████████.  Otto

21  Trucking Opp. at 4:9-15.  The answer is simple: a threat is toothless unless the party issuing the

22  threat is prepared to carry it out.  Thus, Otto Trucking had an obligation to threaten █████████ if

23  Mr. Levandowski does not return the downloaded materials ***and*** to carry out this threat should Mr.

24  Levandowski resist it.  This would constitute the full extent of Otto Trucking's authority.  The PI

25  Order demands no less.

26

27

28

1

## **<u>CONCLUSION</u>**

2        For the foregoing reasons, Waymo respectfully requests that the Court issue an Order to

3    Show Cause why Defendants are not in contempt of the PI Order and Expedited Discovery Order.

4

5    DATED:  July 12, 2017                  QUINN EMANUEL URQUHART & SULLIVAN,
                                            LLP
6
                                        By  */s/ Charles K. Verhoeven*
7                                           Charles K. Verhoeven
8                                           Attorneys for WAYMO LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-15-