QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David A. Perlson (Bar No. 209502)
  davidperlson@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  John Neukom (Bar No. 275887)
  johnneukom@quinnemanuel.com
  Jordan Jaffe (Bar No. 254886)
  jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>　　　　Defendants. | CASE NO. 3:17-cv-00939<br><br>**PLAINTIFF WAYMO LLC'S MEMORANDUM IN RESPONSE TO PARAGRAPH 6 OF THE COURT'S JUNE 30, 2017 ORDER (DKT. 784)** |

## I.    INTRODUCTION

Plaintiff Waymo LLC respectfully files this Memorandum in response to Paragraph 6 the Court's Order of June 30, 2017 (Dkt. 784), regarding the imputation of Morrison & Foerster's ("MoFo's") and Stroz Frieberg's ("Stroz's") trade secret misappropriation to Defendants.  This Memorandum also responds to the July 7 Memorandum that Defendants filed on the same subject (Dkt. 824) ("Def. Memo.").

As outlined in prior submissions, there is compelling evidence that both MoFo and Stroz acquired the 14,000 files that Anthony Levandowski stole from Waymo, in their capacity as agents for Defendants.  Indeed, MoFo's recently-filed response to the Court's Order to Show Cause expressly admits that MoFo received a copy of these materials from Stroz. (Dkt. 883 at ¶¶ 6-7.)  Moreover, both MoFo and Stroz had ample reason to know that these files contained Waymo's trade secrets when they acquired them.  *See* Section II(A), *infra.*  By willfully acquiring these files, despite knowing or having reason to know that they contained Waymo's trade secrets, MoFo and Stroz misappropriated the Waymo trade secrets contained therein.  *See* Cal. Civ. Code § 3426.1(b)(1) ("Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" constitutes misappropriation); 18 U.S.C. § 1839(5)(A) ("the term 'misappropriation' means— (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means").

The June 30 Order asked the parties to address three procedural questions about how to decide whether MoFo's and Stroz's actions are imputable to Defendants. (Dkt. 784 at ¶ 6.)  But rather than focusing on the three procedural questions asked by the Court, Defendants' responsive Memorandum spends the bulk of its space arguing that MoFo's and Stroz's actions cannot be imputable to Defendants at all. (Def. Memo. at 1-8.)  Therefore, this Memorandum will first

explain why MoFo's and Stroz's actions *are* imputable to Defendants and will then address the three procedural questions from the Court's Order.[1]

## II. THE TRADE SECRET MISAPPROPRIATION COMMITTED BY MOFO AND STROZ IS IMPUTABLE TO DEFENDANTS

### A. MoFo's or Stroz's Trade Secret Misappropriation Is Imputable to Defendants Under Settled Vicarious Liability Principles

If MoFo or Stroz — in their capacity as Defendants' agents — misappropriated the trade secrets contained in the 14,000 stolen files, then this misappropriation is imputable to Defendants under settled vicarious liability principles. This is true whether one considers the question under California law or general common law.

For example, California law holds that "vicarious liability for torts is imposed by operation of law upon employers for acts of their employees within the course and scope of employment, ***or upon principals for the acts of their agents***." *Chee v. Amanda Goldt Prop. Mgmt.*, 143 Cal. App. 4th 1360, 1375 (2006) (emphasis added); *accord Debbie Reynolds Prof. Rehearsal Studios v. Superior Court*, 25 Cal. App. 4th 222, 226 (1994) ("Under the doctrine of *respondeat superior,* the innocent principal or employer is liable for the torts of the agent or employee committed while acting within the scope of his employment."); Cal. Civ. Code § 2330 ("An agent represents his principal for all purposes within the scope of his actual or ostensible authority, and all the rights

---

[1] As a preliminary matter, Defendants argue that Waymo has no evidence of trade secret misappropriation by Defendants themselves and therefore must rely on imputation from MoFo or Stroz to salvage its case. (Dkt. 824 at 1.) This is wholly untrue. As the Court recognized in its PI Order, there is compelling evidence that Defendants directly misappropriated Waymo's trade secrets by allowing their former star engineer, Mr. Levandowski, to incorporate these trade secrets into Defendants' self-driving car technologies. (PI Order (Dkt. 426) at 1:20-22 ("Waymo LLC has shown compelling evidence that its former star engineer, Anthony Levandowski, downloaded over 14,000 confidential files from Waymo immediately before leaving his employment there"); 17:24-18:1 ("The bottom line is the evidence indicates that Uber hired Levandowski even though it knew or should have known that he possessed over 14,000 confidential Waymo files likely containing Waymo's intellectual property; that at least some information from those files, if not the files themselves, has seeped into Uber's own LiDAR development efforts; and that at least some of said information likely qualifies for trade secret protection.").)

and liabilities which would accrue to the agent from transactions within such limit, if they had been entered into on his own account, accrue to the principal.").[2]

Similarly, general principles of common law hold that "[p]rincipals are liable for the torts of their agents committed within the scope of their agency." *Holley v. Crank*, 400 F.3d 667, 673 (9th Cir. 2005); *accord* RESTATEMENT (THIRD) OF AGENCY § 7.04 (2006) ("A principal is subject to liability to a third party harmed by an agent's conduct when the agent's conduct is within the scope of the agent's actual authority or ratified by the principal; and (1) the agent's conduct is tortious, or (2) the agent's conduct, if that of the principal, would subject the principal to tort liability.")  Unsurprisingly, these principles of vicarious tort liability apply to the tort of trade secret misappropriation.  *See, e.g., Extreme Reach, Inc. v. Spotgenie Partners, LLC*, No. CV1307563DMGJCGX, 2013 WL 12081182, at *7 (C.D. Cal. Nov. 22, 2013) ("SpotGenie may be liable for the Sales Managers' misappropriation of trade secrets under the doctrine of respondeat superior . . . . California and federal courts have allowed vicarious liability claims under the UTSA.") (citing caselaw); *Language Line Servs., Inc. v. Language Servs. Assocs., LLC*, No. C 10-02605 JW, 2010 WL 2764714, at *4 (N.D. Cal. July 13, 2010) (imputing trade secret misappropriation from employees to employer where employees "acted within the scope of their employment, since an act of this nature was generally foreseeable as part of their duties"); *Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 1147–48 (N.D. Cal. 2003) ("the Court finds that Fujitsu has, nonetheless, stated a claim for misappropriation of trade secrets as to UI by alleging that Competitive was 'acting with and for UI.'  In particular, this allegation may be reasonably construed as an allegation that UI ratified or approved Competitive's conduct."); *Newport News Indus. v. Dynamic Testing, Inc.*, 130 F. Supp. 2d 745, 754 (E.D. Va. 2001) ("logically the theory of vicarious liability would apply to trade secret torts committed by an agent in the course and the scope of the agency.")

---

[2]  Because even an "innocent" principal is subject to vicarious liability, *Debbie Reynolds*, 25 Cal. App. 4th at 226, Judge Corley's ruling declining to apply the crime-fraud exception to the Uber-MoFo relationship (Dkt. 731 at 2) does not relieve Uber of vicarious liability.

Here, there can be no dispute that Stroz and MoFo were acting within the scope of their agency (as agents for Defendants) when they obtained and viewed the files that Mr. Levandowski stole from Waymo.  Indeed, viewing these files was a central purpose of the "Due Diligence" process for which Stroz and MoFo were specifically retained.  There also is an overwhelming inference that Defendants knew these files contained Waymo's trade secrets.  As Magistrate Judge Corley has explained, Stroz was specifically retained to investigate Mr. Levandowski's "Bad Acts," including "misappropriation of Waymo's . . . trade secrets." (Dkt. 566 at 2-3.)  And this Court has explained, "[t]he bottom line is the evidence indicates that Uber hired Levandowski even though it knew or should have known that he possessed over 14,000 confidential Waymo files likely containing Waymo's intellectual property . . . . and that at least some of said information likely qualifies for trade secret protection." (PI Order at 17:24-18:1.)  Therefore, Defendants authorized Stroz and MoFo — as Defendants' agents — to commit the tort of trade secret misappropriation by acquiring Waymo's trade secrets embodied in the stolen files.  *See* Cal. Civ. Code § 3426.1(b)(1); 18 U.S.C. § 1839(5)(A).  It follows that Defendants are vicariously liable for this tort, under the settled vicarious liability principles recited above.

**B. Defendants Cannot Avoid This Rule By Arguing That MoFo or Stroz Were Contractually Bound Not to Disclose Waymo's Trade Secrets to Defendants**

To avoid this settled rule and support their no-imputation position, Defendants argue that MoFo's and Stroz's acquisition of Waymo's trade secrets cannot be imputed to Defendants because MoFo and Stroz supposedly had a contractual duty to not disclose this information to Defendants.  (Def. Memo. at 1:20-21 ("Irrespective of what MoFo or Stroz may or may not have obtained, they were contractually barred from sharing such information with Uber"); 2:2-6 (same).)  But as explained below, there are multiple reasons — both procedural and substantive — why this argument fails.

*1.     Defendants' Argument is Procedurally Barred Because It Relies on Improper Selective Privilege Waiver*

First, Defendants are procedurally barred from arguing that MoFo or Stroz were contractually prohibited from sharing Waymo's trade secrets with Uber.  In an attempt to prove these supposed contractual restraints, Defendants cite the unredacted version of the March 21,

2016 Levandowski-Stroz contract. (Def. Memo. at 6:21-7:1.) But this is the same contract that Defendants originally redacted on privilege grounds. (*Compare* Dkt. 545-8 (redacted version) with Dkt. 806-4 (unredacted version).) The Court made clear that Defendants had until June 1, 2017 to decide whether to waive any privilege, "on pain of preclusion thereafter." Dkt. 438 at 1:10. In response to this Court order, Defendants stated that they would not waive any privilege. Dkt. 531 at 1:9-10 ("Defendants do not intend to waive any privileges that they have asserted, or will assert, throughout this litigation.") So Waymo had to **move to compel** production of an unredacted version of this very document. Defendants opposed, trying to retain redactions, supposedly based on attorney-client privilege, work-product, and common-interest privilege, over the Stroz-Levandowski contract. (Dkt. 552.) Yet Defendants now rely on a previously unproduced unredacted version of the Levandowski-Stroz contract to support their position that Stroz was not allowed to produce the downloaded materials without Mr. Levandowski's consent. This sort of tactical selective waiver has been Defendants' favored tactic throughout this litigation, but it is forbidden by the Court's Order (Dkt. 438) and by virtue of Defendants' response thereto (Dkt. 531). Thus, Defendants cannot cite the Levandowski-Stroz contract to support their argument that Stroz was barred from disclosing Waymo's trade secrets to Uber.

Defendants also cite the Stroz Engagement Letter (Dkt. 370-3) to argue that Stroz and/or MoFo could not disclose Waymo's trade secrets to Uber. (Def. Memo. at 6:16-21.) But Defendants have an obvious selective waiver problem here as well. The very document that Defendants cite (Dkt. 370-3) is a **redacted** document with numerous privilege redactions. Thus, Defendants are selectively citing favorable portions of this document when keeping other (presumably-unfavorable) portions shielded by privilege. This tactic is forbidden, as "[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992).

### 2. *Defendants' Argument Is Unavailing Because the Evidence Indicates That Waymo's Trade Secrets Were Shared with Uber*

Even if not procedurally barred, Defendants' argument — *i.e.,* that Stroz and/or MoFo were contractually barred from sharing Waymo's trade secrets with Uber — is unavailing under

1  the facts of this case because the evidence indicates that these entities ***did*** share Waymo's trade

2  secrets with Uber.  For example, in response to the Expedited Discovery Order (Dkt. 61) that

3  required Defendants to produce the stolen files, Defendants produced a massive, 3,000-entry

4  privilege log.  (Dkts. 636-5; 636-7; 636-9.)  This raises an inescapable inference that Defendants

5  obtained the stolen files, given that the stolen files were the very subject of the Expedited

6  Discovery Order.  Either Defendants obtained these files directly from Mr. Levandowski (which

7  Defendants have steadfastly denied) or Defendants obtained these files from the intermediary

8  agents who had obtained them from Mr. Levandowski — namely, MoFo and/or Stroz.

9  Furthermore, Defendants' Paragraph Four Accounting under the PI Order (Dkt. 762)

10 discloses several Uber employees who received the Due Diligence Report from Stroz.  (*Id.* at 7-8.)

11 While Defendants have thus far stalled Waymo's ability to receive this Due Diligence Report, it is

12 highly likely that the Due Diligence Report discloses at least some of the trade secrets embodied

13 in the stolen files.  After all, a central purpose of the Due Diligence process was to assess Mr.

14 Levandowski's theft of Waymo's trade secrets.  It would be difficult if not impossible for Stroz to

15 convey its analysis of this issue without discussing at least some specifics of the trade secrets at

16 issue.

17          **3.     *Defendants' Argument Is Unavailing Because the Law Does Not Support
                       Their Position that Contractual Restrictions Can Prevent a Tort From***
18                     ***Being Imputed from Agent to Principal***

19 Finally, even if there were contractual restrictions that prevented MoFo and/or Stroz from

20 disclosing Waymo's trade secrets to Uber — and even if Defendants were procedurally allowed to

21 rely on such contractual restrictions — Defendants' no-imputation position is incorrect under the

22 law.  Defendants cite the Restatement (Third) of Agency § 5.03 for the proposition that "an

23 agent's knowledge cannot be imputed to a principal where the agent 'is subject to a duty to

24 another not to disclose the fact to the principal.'"  (Def. Memo. at 4:27-5:1 (quoting

25 RESTATEMENT (THIRD) OF AGENCY § 5.03).)  But there is no indication that this proposition holds

26 when the agent's acquisition of knowledge is itself a tort.  Indeed, the very Restatement section

27 that Defendants rely on — Section 5.03 — states: "If an agent's action interferes with the legally

28 protected interests of other persons, the action may constitute a tort.  An actor's knowledge and

intention often determine whether an act is tortious. ***In this context, imputing notice to the principal of facts that an agent knows or has reason to know underlies the principal's vicarious liability for action by the agent that constitutes a tort***." RESTATEMENT (THIRD) OF AGENCY § 5.03, cmt. (d)(2) (emphasis added).

Moreover, it makes perfect sense that if a principal authorizes an agent to commit a tort — as is the case here — then the principal cannot be absolved of vicarious liability just because some contractual restriction prevents the agent from conveying the fruits of the tort to the principal. The fact that the principal authorized the tort is alone sufficient to subject the principal to vicarious liability, regardless of any separate information "firewalls" that might exist between the principal and the agent. Section 5.03 expresses this basic point through an illustration:

> P wants to sell goods to the government of country X but is concerned that payoffs may be necessary to effect such a sale. P employs A in country X and advises A that P does not wish to know of any commissions or other payments A may need to pay to effect the sale of P's goods. P may nonetheless be subject to liability for violations of anti-bribery laws. Notice may be imputed to P of A's knowledge of payments made by A.

RESTATEMENT (THIRD) OF AGENCY § 5.03, cmt. (b), Illustration 1.

None of Defendants' cited California authority suggests a different outcome, as none of this authority holds that a principal may ever be insulated from vicarious liability for a tort that it authorized its agent to carry out. If anything, Defendants' cited authority further supports the conclusion that Stroz's and MoFo's misappropriation *is* imputable to Defendants. For example, Defendants' cited case of *Triple A Mgmt. Co. v. Frisone*, 69 Cal. App. 4th 520 (1999) held that "it is correct to impute to the Frisones knowledge of the two critical facts we have identified above" because the Frisones' agent "obtained that knowledge in the course of the agency for which the Frisones had employed it." *Id.* at 535. The same is true here — Stroz and MoFo acquired knowledge of Waymo's trade secrets in the course of the agency for which Defendants engaged them, and thus their knowledge is imputable to Defendants.

The case that Defendants rely on most heavily is *Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790 (9th Cir. 1976). But in *Droeger*, the principal never authorized its agent to engage in trade secret misappropriation. In fact, the agent in *Droeger* acquired the trade secret through

wholly legitimate means — namely, by communications with the inventor and trade secret holder. *Id.* at 791. Thus, *Droeger* certainly does not hold that when a principal authorizes an agent to engage in trade secret misappropriation, the principal may be insulated from vicarious liability.[3]

  Defendants also argue that allowing imputation would "undermine routine due diligence," on the theory that companies would be "chilled" from retaining a due diligence agent to investigate trade secret misappropriation if doing so could impute liability back to the company. (Def. Memo. at 7:18-8:7.) This argument makes little sense. If a principal company knows or seriously suspects that one of its prospective employees has engaged in trade secret misappropriation, then the proper course of conduct is to stay away from that individual — not retain an agent to further view and disseminate the trade secrets. If a principal company does engage a due diligence agent to investigate a prospective employee's trade secret misappropriation and the agent discovers that the employee has stolen a massive amount of trade secret documents, the proper course is to terminate that employee and report the crime to the former employer. Applying standard principles of imputation and vicarious liability would not chill ***legitimate*** due diligence efforts — only those followed up by tortious conduct. But here, Defendants and their agents have tenaciously held on to Waymo's trade secret documents for nearly a year, despite numerous demands ***and Court orders*** to return them. It is perverse and hypocritical for Defendants to argue that this flagrant conduct should be condoned in order to prevent "chilling" of legitimate due diligence efforts.

  Equally meritless is Defendants' argument that allowing imputation "would amount to an end-run around CUTSA's and DTSA's rejection of the 'inevitable disclosure' theory of trade secret misappropriation." (Def. Memo. at 8:8-9.) The inevitable disclosure theory was a way of presuming that future misappropriation would occur even when no misappropriation had actually occurred. *See, e.g., Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1458-59 (2002). But here,

---

[3] *Droeger* is also distinguishable on other grounds as well. For example, the agent's mere **knowledge** of the trade secret in *Droeger* could not impose vicarious liability on the principal because trade secret misappropriation at the time of *Droeger* required **use** of a trade secret. *Id.* at 792-93. Now, however, trade secret misappropriation can be shown by mere acquisition of a trade secret, even absent any use. *See* Cal. Civ. Code § 3426.1(b)(1); 18 U.S.C. § 1839(5)(A).

trade secret misappropriation by MoFo and Stroz has in fact occurred, with the authorization and of Defendants. There is nothing inequitable about holding Defendants vicariously liable for this misappropriation that they authorized.

### III. COURT QUESTION #1: "WHETHER THE JUDGE VERSUS THE JURY SHOULD DECIDE WHETHER AND TO WHAT EXTENT THE EXCEPTION TO IMPUTATION APPLIES"

As explained above, the "exception" to imputation that Defendants advocate for — *i.e.*, Defendants' position that there is no imputation if the agent has a contractual duty not to disclose information to the principal — does not apply at all. The relevant question is simply whether MoFo and/or Stroz were acting in the scope of their agency when they committed the tort of trade secret misappropriation. If so, then Defendants (as principals) are vicariously liable for this tort.

The question of whether MoFo and/or Stroz were acting within the scope of their agency is a question of fact, and thus should be decided by the jury *if* there are any genuinely-disputed facts or inferences bearing on this question. *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 213 (1991) ("Ordinarily, the determination whether an employee has acted within the scope of employment presents a question of fact; it becomes a question of law, however, when 'the facts are undisputed and no conflicting inferences are possible.'"); *Elias v. McJab, Inc.*, No. D068119, 2016 WL 5224378, at *9 (Cal. Ct. App. Sept. 22, 2016) ("As a threshold matter, we conclude the determination whether Mullaney was acting within the scope of his agency when he assisted plaintiffs with the sale of the Spain property was a question for the jury.")

### IV. COURT QUESTION #2: "IF THE JUDGE [DECIDES THE ISSUE], WHETHER THE ISSUE CAN BE DECIDED BASED ON THE IN CAMERA REVIEW OF PRIVILEGED INFORMATION"

As noted above, the dispositive question for whether MoFo's and Stroz's trade secret misappropriation can be imputed to Defendants is whether MoFo and Stroz were acting within the scope of their agency when they committed this tort. Because this is a question of fact that is to be presumptively made by the factfinder, it must be decided based on the admissible, non-privileged evidence of record. Even if there are no disputed issues of fact or competing inferences — such that this question could be decided by the Court at summary judgment or JMOL — the Court must rely on the non-privileged evidentiary record to decide this issue and cannot rely on *ex parte, in*

*camera* submissions. *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995) ("It is therefore the firmly held main rule that a court may not dispose of the merits of a case on the basis of *ex parte, in camera* submissions.") (quoting *Anti–Fascist Committee v. McGrath*, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring)).

## V. COURT QUESTION #3: "WHETHER AND TO WHAT EXTENT DEFENDANTS CAN RELY ON THE EXCEPTION WITHOUT WAIVING PRIVILEGE OVER DOCUMENTS BEARING ON SUCH OBLIGATIONS – INCLUDING AS TO *EVERY* VERSION OF ANY AND ALL PROTOCOLS PUT IN PLACE FOR THE DUE DILIGENCE INVESTIGATION – THAT HAVE THUS FAR BEEN WITHHELD FROM PRODUCTION"

The Court's May 15 privilege order was clear and unambiguous: Defendants had until June 1, 2017 to decide whether to waive any privilege, "on pain of preclusion thereafter." (Dkt. 438 at 1:10.) In response to this Court order, Defendants stated that they would not waive any privilege. (Dkt. 531 at 1:9-10 ("Defendants do not intend to waive any privileges that they have asserted, or will assert, throughout this litigation.")) Thus, it is far too late for Defendants to waive privilege and rely on any newly-disclosed versions of due diligence protocols in an attempt to show that MoFo's or Stroz's trade secret theft was outside the scope of their agency.

Nonetheless, if Defendants *were* allowed to waive privilege and rely on newly-disclosed protocols (which would be contrary to the Court's May 15 privilege order), Defendants would thereby waive privilege over the entire subject-matter, including all other versions of such protocols and any communications about disclosure under those protocols. *Phoenix Sols. Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568, 576 (N.D. Cal. 2008) ("Wells Fargo argues that Phoenix has attempted to use the disclosed drafts and other documents as both a shield and a sword, that is, to reveal a limited aspect of privileged communications in order to gain a tactical advantage in litigation. ***If this were the case, Phoenix would have broadly waived the privilege as to all other communications relating to the same subject.***") (emphasis added).

-10-
WAYMO'S MEMORANDUM IN RESPONSE TO PARAGRAPH 6 OF DKT. 784

| | | |
|---|---|---|
| DATED: July 14, 2017 | | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| | By | _/s/ Charles K. Verhoeven_ |
| | | Charles K. Verhoeven |
| | | Attorneys for WAYMO LLC |