**quinn emanuel** trial lawyers | san francisco

50 California Street, 22nd Floor, San Francisco, California 94101 | TEL (415) 875-6600

July 14, 2017

Magistrate Judge Jacqueline Scott Corley

Re:   *Waymo LLC v. Uber Technologies, Inc., et al.*, N.D. Cal., Case 3:17-cv-00939-WHA
       **Uber's Second Motion to Compel Production of Documents**

Dear Judge Corley:

Plaintiff Waymo LLC ("Waymo") files this brief in opposition to Uber's second motion to compel Waymo to produce documents (Dkt. 868).

Sincerely,

*/s/ Charles K. Verhoeven*

Charles K. Verhoeven

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

As demonstrated below, Uber fails to meet its burden to show that it is entitled to the discovery it now seeks. Uber cries that Waymo is "stonewalling," but the fact of the matter is that Waymo has amply produced documents in response to Uber's requests, resisting only to the extent that Uber seeks information that is not relevant, Uber does not need, Uber did not ask for, and/or Uber is not entitled to. Uber seems to think that merely throwing out a comparison of the number of documents produced by Uber to the number of documents produced by Waymo justifies obtaining discovery Uber is not entitled to. It does not.[1] Uber did not make a showing that it is entitled to the discovery it now seeks and its motion should be denied.

### 1. Waymo Agreed to Produce Documents Relating to the Safeguards for its Trade Secrets.

Uber argues that Waymo is improperly withholding documents relating to Waymo's "robust" protections for its trade secrets. Not so. Waymo agreed to produce such documents, and the requests that are the subject of Uber's motion to compel either are not relevant to this issue or the case generally, or are not necessary in addition to the documents Waymo already agreed to produce.

Request Nos. 63, 66, 121, and 122 do not seek information that is relevant to this action. Request No. 63 seeks documents relating to complaints by or dissatisfaction from Waymo employees regarding Waymo's performance; Request No. 66 seeks documents relating to the reason(s) for departure of any Waymo employee who thereafter became an employee of Defendants; Request No. 121 seeks documents relating to analyses of Waymo's loss of employees since 2009; and Request No. 122 seeks a copy of the personnel files of each former Waymo employee who was subsequently employed by Defendants. (Dkt. 868-2.) In response to each of these Requests, Waymo agreed to produce the requested documents for Messrs. Levandowski, Kshirsagar, and Raduta. Anything further is irrelevant. Specifically, it does not matter why anyone else departed Waymo. Documents reflecting such information have no bearing on whether Defendants Uber, Ottomotto, and Otto Trucking misappropriated Waymo's trade secrets. Unsurprisingly, Uber does not explain how such documents are relevant. (Dkt. 868, 3-4.) As for personnel files of other employees who later went to work for Defendants, Uber again does not explain how such information bears at all on the issues in this case. The Court should deny Uber's request for documents responsive to these Requests.

---

[1] It is worth noting that at the June 7 CMC, Judge Alsup described to Defendants the discovery they should be seeking: "On the other side, what you should be looking at and – but you don't need – *you don't need discovery*, really, is to show that these alleged trade secrets are in the public domain. And – And you, know get out there and show that some of these things – all of these things that are alleged trade secrets are not – are – you know, any good engineer would know them anyway, so that is where I think you should be headed. *You don't need much discovery from the other side to do that*, though you – some would help you. That's going to be out there in the literature and the – maybe you need to go do some discovery from other car companies, driverless car companies in order to see how they do it to, see if they already have discovered the same trade – alleged trade secret." (6/7/17 CMC Hearing Tr., 49:23-50:12) (emphasis added). Waymo further notes that because the Court granted Waymo expedited discovery in its May 11 Preliminary Injunction Order, Waymo was entitled to and got a "head start" in receiving document discovery from Defendants.

1

Request No. 46 seeks documents "sufficient to show any collection, analysis, review, or findings related to Waymo computers, emails, or other devices of current Waymo employees and/or Waymo devices of former employees upon their departure from Waymo LLC or Project Chauffeur since January 2009." Waymo objected to this Request as seeking privileged and work product information, and as irrelevant, overbroad, and not proportional to the needs of the case to the extent it seeks analysis for any employees other than Levandowski, Kshirsagar, and Raduta. Waymo agreed to produce documents underlying its forensic investigation for these three employees. Uber has not shown why it needs this extremely broad information. (Dkt. 868, 3.) Initially, Uber says that this Request relates to departing employees (*id*.), but it is not so limited. "[C]urrent employees" are expressly referenced in the Request. Uber further says that it needs this information "to show the investigative measures that Waymo took to protect its alleged trade secrets, and are necessary to gauge [ ] Waymo's belated review of Levandowski's computer." (*Id.*) But, this Request is so broad that it is not limited to investigations to maintain trade secrets. This Request could cover "collection . . . related to Waymo computers, emails or other devices . . . .," such as document collections for litigation. But, even if Request No. 46 were as narrow as Uber wants the Court to believe, it is still not relevant or proportional to the needs of the case. Waymo does not contend that the forensic investigation it conducted of Levandowski's devices is evidence of Waymo's security measures for its trade secrets. That forensic investigation is evidence of Levandowski's pilfering of Waymo's trade secrets and Defendants' improper acquisition of those trade secrets. Thus, comparing other forensic investigations to those of Levandowski, Kshirsagar, and Raduta has no bearing on whether the trade secrets at issue here qualify as trade secrets. Uber's request for these documents should be denied.

Finally, Request No. 119 seeks "[d]ocuments sufficient to show all confidentiality and/or non-disclosure agreements Waymo has or has had with its vendors, suppliers, and customers, from 2009 to the present." Waymo produced a list of "vendors, suppliers, and customers," and a representative agreement. Uber argued that it needed to know the terms in every agreement as they relate to confidentiality, trade secrets, and non-disclosure. Accordingly, in an effort to resolve the dispute, Waymo subsequently agreed to expand its production to include all templates for the agreements it has with vendors and suppliers going back as early as could be located in a reasonably diligent search, as well as a larger set of sample agreements.[2] Waymo indicated that it would endeavor to collect sample agreements over the years so that if there were any changes to the relevant provisions over the years, the documents would be sufficient to show those changes. Collecting and producing more than a sample of agreements is unduly burdensome because the requested agreements are not maintained in a centralized database, separate and apart from other agreements that may exist with these entities. There are over 150 suppliers and vendors, which whom Waymo or Google may have more than one relevant agreement, that would need to be located. Further, the agreements contain third party confidential information, and so Waymo will need to go through the process of providing notice to those third parties prior to production.

Finally, the notion that Waymo would permit third parties to disseminate Waymo's trade-secret information flies in the face of industry practice, common sense, and the evidence presented thus

---

[2]   To be clear, this search would include templates and sample agreements that Google entered into before Waymo existed and that would continue to cover Waymo.

far in the case.  For example, in a July 13 deposition, former Waymo engineer Radu Raduta testified:

> Q.  When you shared this [Waymo Confidential] document, or a form of this document with outside vendors, did you do so under a nondisclosure agreement?
>
> A.  We had nondisclosure agreements with all the vendors we worked with, as far as I know.
>
> Q So with [vendors], there were nondisclosure agreements in place with each of them?
>
> A I'm pretty sure there -- there must have been, yeah.
>
> Q When you say "there must have been," what do you mean by that?
>
> A I mean, we wouldn't have -- I think if -- we wouldn't have shared any specific -- anything but very general, vague information without a nondisclosure agreement.

(Nardinelli Declaration Ex. 1, at 130:16-131:6.)  Mr. Raduta further testified that he could not recall "any instance" in which "anyone at Waymo shared Waymo confidential information outside of Waymo without a nondisclosure policy in place."  (*Id.*, 131:21-132:1.)

Lacking any basis to believe that Waymo provided confidential information to outside parties without cover of a non-disclosure agreement, Uber nonetheless demands that Waymo undertake an extremely cumbersome search for *every* agreement that Waymo has ever signed with its more than 150 suppliers.  Absent some showing from Uber that any Waymo supplier/vendor agreement does not prohibit disclosure, this request is  not proportional to the needs of the case in light of the burden of collection and production.  Uber's request for these documents should be denied.

**2. Waymo Disclosed *When* It Began Its Levandowski Investigation**.  Waymo forensically investigated Levandowski's work laptop and discovered that he had downloaded software to access Waymo's SVN server, accessed that server, downloaded 14,000 files, plugged a portable memory stick into the laptop, then reformatted that laptop into a different operating system.  This investigation is described in detail in the declaration of Gary Brown in support of Waymo's motion for preliminary injunction.  Gary Brown testified extensively to the timing of his investigation during his PI phase deposition, Defendants requested to depose him a second time, and Waymo offered to make him available on July 25.  Waymo also stated that it first began investigating potential misappropriation by Levandowski on July 29, 2016, and Waymo produced all of the documents relied upon by Mr. Brown's investigation, as well as notes taken by Mr. Brown in the course of his investigation, and further agreed to produce any further documents Waymo located concerning Mr. Brown's investigation.

Request No. 53 seeks "all documents relating to *when* Waymo began investigating the possibility of Anthony Levandowski's retention of Waymo files after his departure from Waymo as alleged in the Waymo Complaint." (emphasis added).  Waymo provided this information: July 29, 2016.  In its Motion, Uber claims this is insufficient, saying it wants to know *why* Waymo

did not begin its investigation sooner. (Dkt. 868, 4.) But, that is not what the Request asks for—it asks for *when.* If Uber seeks information about why Waymo began investigating the possibility of trade secret theft by Levandowski, it can propound a document request directed at that issue; it cannot expand the scope of Request No. 53.

Further, documents reflecting the timing of Waymo's investigation are privileged. Uber implies that there could be non-privileged responsive documents, but there are not. Nor is there a need for them since Waymo disclosed the date when Waymo began its investigation. Uber's motion to compel production of additional documents responsive to Request No. 53 should be denied.

**3.  Waymo Searched for Responsive Documents in the Locations Most Likely to Contain Responsive Documents—Even at Google.** Uber devotes nearly half of its brief to the fallacy that Waymo did not search the locations where responsive documents would plausibly be found, namely Google and Alphabet. Uber notes in its motion that the parties met and conferred about this issue generally on repeated occasions (Dkt. 868, 5), and despite Waymo's consistent and repeated explanations, Uber still does not understand Waymo's explanation.

As this Court is aware, Waymo was founded as a separate entity in December 2016. Prior to that, it was Google's self-driving car program, known as Project Chauffeur. Indeed, Levandowski was a Google employee in its self-driving car program, and left Google for Otto and Uber before Waymo was its own separate entity. As a result, what is now Waymo's work began at Google. Accordingly, as Waymo explained to Uber, when searching for documents in response to Uber's document requests, Waymo defined "Waymo" to include the separate corporate entity and its predecessor—the self-driving car program at Google. Contrary to Uber's argument in its motion (Dkt. 868, 5), Waymo was not defined to mean Google's self-driving car program *for the first time* the day before Uber filed its motion. Waymo *first* defined "Waymo" as "the self-driving car project from its inception in 2009 to the present" in its Complaint, (Dkt. 1, 7 n.2.), and has not wavered from that stance. Accordingly, in response to Uber's document requests, Waymo searched the locations at Waymo or Google most likely to have responsive documents. By way of example, to locate code-of-conduct policies, Waymo went to a Google-wide repository because that is where they are stored. Waymo did not refuse to search for and collect those policy documents that applied to "Waymo" on the basis that they are stored at Google. Waymo did not use the corporate form as a basis for refusing to search for responsive documents relating to the Google's self-driving car program; it searched the location where it believed those documents to be. Indeed, as this Court recognized in its Order on Uber's first motion to compel, "Waymo has represented that it will not object to any discovery request on the grounds that the responsive documents are in the possession, custody or control of Google or Alphabet." (Dkt. 808, 3.) Waymo stands by and reiterates that representation.

This representation—which was sufficient for this Court—was insufficient to Uber. And so, in an effort to resolve the dispute, Waymo agreed to provide a list of Uber's document requests, in response to which Waymo only searched "Waymo"—with "Waymo" again including Google's self-driving car program. Waymo also provided a brief explanation of why its search for documents in response to those particular requests was limited to "Waymo." Waymo provided that list to Uber on the evening of July 10, and Uber filed the motion the next day. Uber's motion as to this issue should be denied for at least two reasons.

4

First, Uber asks the Court to overrule Waymo's general objection limiting "Waymo" to Google's self-driving car program, and ordering Waymo to search for and produce responsive documents, regardless of whether they are at Waymo, Google, or Alphabet. Waymo, however, already did the latter. If relevant documents responsive to an Uber document request were likely to be stored at Google, then Waymo searched for and produced those documents, such as the policy documents discussed above. For other documents such as documents concerning Waymo's development of self-driving technology, based on Waymo's investigation, Waymo has no reason to believe that responsive documents would plausibly be located at Alphabet entities other than Google and Waymo, and so Waymo did not and should not be required to run broad searches across all of Alphabet. Waymo's obligation was not to, for example, "search every employee email account for documents responsive to every document request propounded in this action; instead it needed to make a reasonable and diligent effort to locate any responsive documents in any place they were likely to be found." *Google Inc. v. American Blind & Wallpaper Factory, Inc.*, 2006 WL 3290402, *3 (N.D. Cal. Nov. 13, 2006). Waymo did just that. Thus, the relief Uber appears to seek is moot, because Waymo already diligently searched the appropriate locations for responsive documents.

Second, Uber takes issue with some specific Requests in its motion, which are addressed below. Uber did not meet and confer with Waymo about some of these Requests prior to filing its motion, and Uber's motion should be denied on that basis. Moreover, Waymo's searches in response to each of these Requests were appropriate.

*Engineer Downloads (RFP 3-4).* Through these Requests, Uber sought information about how often Waymo personnel download documents, including how often they (as Levandowski did) download more than 10,000 files at a time. In response, Waymo produced logs of Drive downloads from roughly 20 members of Project Chauffeur, designed as a statistically-representative sample of Waymo download behavior. (Dkt. 868-10.) Uber did not complain when Waymo advised Uber's counsel of this. Now, for the first time Uber claims to want more, saying that "it is entitled to discover the extent to which Google engineers retain documents and alleged trade secrets." (Dkt. 868, 6-7.) If Uber wants to crawl through sample download data from all of Google, which would include Gmail engineers, Search engineers, Human Resources, Finance, etc., to test Uber's theory that there was rampant downloading of trade secrets, it must ask Waymo for that data in the normal discovery process and not for the first time in a motion to compel. Even if Uber had done so, however, Uber does not need this information. How those working on Google's self-driving car program treat Waymo confidential information and trade secrets is far more relevant to Waymo's claims and Uber's defenses than how often Google employees working in unrelated areas and with access to different proprietary information and trade secrets treat that information. Waymo produced the former, and Uber does not need more to develop its defense.

*The 37 Technical RFPs.* Uber previously complained about Waymo's responses to these Requests, which relate to the technical development, features, and value of trade secrets at issue. (Dkt. 687, 2-3.) In response, Waymo explained that it already agreed "to search for and produce documents covering the full gamut of its trade secret development." (Dkt. 746, 2.) In a supporting declaration, Waymo explained that it collected documents from Waymo's LiDAR Google Drive repository as well as from several LiDAR engineers." (Dkt. 746-1, 2.) And,

5

again, this included documents from Waymo and Google's self-driving car program. This is sufficient. If Waymo has no reason to believe that some other department within Google or Alphabet has documents relating to the trade secrets at issue—and it doesn't—Waymo is not required to search such locations. Uber responds that it is entitled to discover the extent to which Waymo's alleged trade secrets are not confined or safeguarded within Waymo. Uber seems to be taking the position that Waymo should search *all* of Alphabet to see if any Waymo trade secrets pop up anywhere else. It is not practicable to search Alphabet's non-custodial files and the custodial files of tens of thousands of Alphabet employees, particularly where, again, Uber has shown absolutely no basis to believe that documents concerning Waymo's technical development would exist in locations other than those that Waymo has already searched.

*Ride-Sharing Market and Business (RFP 90-94, 157).* Again, Uber uses this motion to complain for the first time about these Requests. In any event, in response to these Requests, Waymo searched the repositories where it expected to locate responsive documents, and those were limited to "Waymo." Based on its investigation, Waymo does not believe that responsive documents are located in some other far corners of Alphabet and, thus, Waymo is not obligated to search for them there.

*Waze (RFP 95).* Uber seeks documents relating to the acquisition of Waze. As Waymo previously told Uber, Waymo did not acquire Waze and thus has no such documents. Waymo appropriately did not expand its search beyond "Waymo" for this Request because documents relating to *Google's* acquisition of Waze have no bearing on this litigation. Uber provides no explanation as to why they are relevant.

*Finances and Viability (RFP 61-62).* Uber seeks documents relating to Waymo's financial viability, including business plans, estimates, and future projections (No. 61), and documents relating to Waymo's performance (No. 62.) Waymo already produced responsive documents, and pointed to them by Bates number in its response, and further agreed to produce additional documents located in a reasonably diligent search. Again, Waymo searched the locations where it believed responsive documents would be located. There is no basis for demanding that Waymo search all across Alphabet for such documents if there is no reason to believe that such documents exist elsewhere.

Uber's motion with respect to the scope of Waymo's searches for responsive documents should be denied.