MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzalez@mofo.com
ERIC A. TATE (CA SBN 178719)
ETate@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:   415.268.7000
Facsimile:    415.268.7522

KAREN L. DUNN (Pro Hac Vice)
kdunn@bsfllp.com
HAMISH P.M. HUME (Pro Hac Vice)
hhume@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:   202.237.2727
Facsimile:    202.237.6131

Attorneys for Defendants
UBER TECHNOLOGIES, INC.
and OTTOMOTTO LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| WAYMO LLC, <br><br> Plaintiff, <br><br> v. <br><br> UBER TECHNOLOGIES, INC., OTTOMOTTO LLC; OTTO TRUCKING LLC, <br><br> Defendants. | Case No.        3:17-cv-00939-WHA <br><br> **DEFENDANTS UBER TECHNOLOGIES, INC.'S AND OTTOMOTTO, LLC'S BRIEF IN RESPONSE TO WAYMO'S MEMORANDUM REGARDING ADVERSE INFERENCES TO BE DRAWN FROM ANTHONY LEVANDOWSKI'S ASSERTION OF THE FIFTH AMENDMENT** <br><br> Judge:  The Honorable William Alsup <br><br> Trial Date: October 10, 2017 |

**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Pursuant to the Court's request (Dkt. 784, ¶ 4), Uber Technologies, Inc. and Ottomotto LLC (together, "Uber") submit this response to Waymo's July 7, 2017 adverse inference memorandum. (Dkt. 819.)

**INTRODUCTION**

In order for Waymo to be permitted to ask the jury to draw an adverse inference against Uber from Anthony Levandowski's invocation of the Fifth Amendment, Waymo must show at least two things: (1) it must show independent probative evidence that corroborates each adverse inference it wants to ask the jury to draw, and (2) it must show that, in light of all the facts and circumstances, it is trustworthy and will advance the search for truth to permit the jury to draw each adverse inference sought against Uber (a party) based on the invocation of the Fifth Amendment by Levandowski (a nonparty whom Uber has fired for cause, including because of his Fifth Amendment invocation). Waymo cannot pass either of these tests.

First, the Supreme Court has held that adverse inferences are appropriate where a party fails to testify in response to "probative evidence" against him, *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976), and the Ninth Circuit has firmly required "independent evidence" of the fact for which an adverse inference is sought. *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000). Here, despite months of intensive discovery, Waymo has failed to uncover independent corroborating evidence showing that Uber acquired, used, or disclosed any Waymo trade secrets. That is why it recently resorted to the novel theory of "imputed" misappropriation. (Dkt. 756 at 6–7.) That is also why it is so eager to use Levandowski's Fifth Amendment invocation as the vehicle for proving its case. But it cannot do this. It is required to have independent corroborating evidence. It does not have such evidence, especially not for the innumerable inferences it seeks based on the 461 questions it seeks to ask Levandowski. (Dkt. 835.) Waymo's supposed "corroboration" for those inferences is inadequate. If anything, the breadth of unsupported inferences Waymo seeks confirms that Waymo is attempting to fill its evidentiary holes with Levandowski's invocation—as Waymo has all but conceded. (5/3/2017 Hr'g Tr. (Public Session) at 28:2–4 (when seeking a preliminary injunction, Waymo's counsel stated that without an adverse inference, Uber would "get away with it"); 6/29/2017 Hr'g Tr. at

43:2–13 (when asked for evidence of use at Uber, Waymo's counsel immediately cited Levandowski's invocation).) The law of adverse inferences does not permit this.

Second, even if Waymo had independent corroborating evidence for some (or even all) of the adverse inferences it seeks, it still would have to show that it is appropriate to ask the jury to draw an adverse inference against **Uber** based on the Fifth Amendment invocation **by Levandowski**. On this question, the parties agree there is no "bright line rule." (Dkt. 819 at 5; Dkt. 821 at 6.) Instead, whether it is appropriate to allow an adverse inference against one party based on another person's invocation of the Fifth depends on all the facts and circumstances. The essential inquiry is whether the parties are so closely aligned that it is trustworthy and advances the search for the truth to allow such an inference. Here, the facts and circumstances show that Waymo's adverse inferences will undermine, not advance, the search for truth.

In addressing this question, we ask the Court to consider the rationale underlying the Supreme Court's decision to allow an adverse inference against a party that chooses to invoke the Fifth Amendment in a civil case in which it is itself a party. *See Baxter*, 425 U.S. at 318. The *Baxter* Court addressed the trade-off faced by a party who wishes to invoke the Fifth Amendment in a civil lawsuit. It recognized that the party would pay a price for invoking the privilege if the invocation were admitted as evidence against that party, but held that this was not "too costly" a price to pay for the benefit of the Fifth Amendment, and therefore did not unconstitutionally burden the Fifth Amendment right. *Id.* at 316–19. Here, the question is totally different: where **the party** is not the one invoking the Fifth Amendment, it is paying a price for a benefit it did not receive. It has no chance to make a choice. It has no opportunity to assess the trade-off between the benefit of invoking the Fifth Amendment and the downside of facing an adverse inference. It is stuck with the decision that **someone else makes**. That is fundamentally suspect. Some judges have concluded that it is wholly unjust ever to allow such an inference. *See, e.g.*, *Lionti v. Lloyd's Ins. Co.*, 709 F.2d 237, 244–45 (3d Cir. 1983) (Stern, J., dissenting); *Brink's Inc. v. City of N.Y.*, 717 F.2d 700, 715 (2d Cir. 1983) (Winter, J., dissenting).

It is not necessary in this case for the Court to decide whether there should be an absolute prohibition against inferences based on another party's invocation. But we do ask the Court to

2

look with great skepticism at Waymo's sweeping requests for such inferences. Uber does not control Levandowski, and was never in a position to force him to testify. Uber urged Levandowski to testify and to cooperate. When he refused, Uber fired him. By his very act of refusing to testify, Levandowski has made himself adverse to Uber. That destroys any alignment of interests or sense of loyalty that might in other circumstances permit an adverse inference to be drawn against an employer by an employee's invocation of the Fifth.

Moreover, before allowing a jury to jump to conclusions that Levandowski's silence is hiding facts adverse to Uber, the Court should scrutinize *why* Levandowski is invoking the Fifth. Uber has presented evidence, and will present more, showing that Levandowski is invoking the Fifth to avoid having to admit that he downloaded files at Google to protect his ability to receive a bonus that turned out to be worth $120 million. ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ Levandowski had good reason to be concerned that his bosses at Google might not adopt a fair valuation, and might therefore significantly undervalue his bonus, or even deny it outright. That gave him every incentive to download files in December 2015, perhaps to protect his bonuses.

This explanation of Levandowski's silence is consistent with the timing of the alleged Levandowski downloads, with Google's statements and actions indicating that it may not believe Levandowski was entitled to his full bonus, with the structure of the Chauffeur Bonus Program (*see infra*), with the huge sum of money Levandowski was looking to be paid, with the fact that none of the 14,000 downloaded files have ever existed at Uber, and with at least one conversation that Levandowski himself had prior to his invocation. By contrast, Waymo's explanation of Levandowski's silence is *inconsistent* with the fact that after months of searching for evidence to support the adverse inference it seeks, Waymo has found no evidence that Uber ever received or used the allegedly stolen files. Moreover, Waymo has built its case around Levandowski receiving a portion of a supposed $680 million purchase price for his company—an amount that was *not* actually ever paid. Uber's explanation, by contrast, is based on a $120 million bonus payment to Levandowski that *was* actually paid.

In short, Uber submits that the facts will strongly support the inference that Levandowski wants to avoid testifying to facts that might expose him *personally* to a civil trade secret claim, and that might give rise to cross examination in civil discovery that could potentially trigger a criminal inquiry or criminal exposure. Those reasons have nothing to do with Uber. To the contrary, Levandowski's testimony that he downloaded files to ensure that his bonus was fairly valued would exonerate Uber. That is the truth. And it would pervert and undermine the search for truth to allow Waymo to seek dozens or hundreds of adverse inferences under which Uber would be tagged with all manner of misconduct based on Levandowski's silence.

## **ARGUMENT**

**I.   Waymo Has Failed to Put Forward Probative and Corroborating Evidence for Each of the Inferences It Seeks.**

Waymo submitted **461** questions that it intends to ask Levandowski at trial, and claims its submission lays out the specific "circumstance[s] or evidence in the record" that "would corroborate the adverse inference sought." (Dkt. 835; Dkt. 784, ¶ 3.) Waymo's submission is inadequate. Uber intends to file a motion in limine at the appropriate time to exclude the specific inferences Waymo has indicated it will seek. That motion will be made on the grounds that Waymo does not have independent corroborating evidence for each question and inference it seeks, and that asking unsupported questions of Levandowski at trial would be unduly prejudicial to Uber. Here, we show generally the inadequacy of Waymo's broad-brush approach.

*First*, Waymo has failed to adequately identify specific corroborating evidence. Adverse "inferences can only come into play if the specific questions pertaining to such inferences are asked, and met with a Fifth Amendment privilege response, ***and are corroborated by other evidence of the specific fact being questioned.***" *Glanzer*, 232 F.3d at 1266 n.2 (emphasis added). Waymo's 45 pages of "questions it intends to ask Anthony Levandowski at trial" do not identify corroborating evidence for each adverse inference sought. Instead, it identifies **general** sources of discovery, sometimes comprising hundreds of pages in a single citation. (*See* Dkt. 835 at 13 (citing as corroboration all "evidence cited in the preceding Parts").) "But it is not possible to draw a sort of blanket adverse inference on the ground that the witness refused to answer

4

questions on a particular subject matter." *U.S. v. $62,552.00 in U.S. Currency*, No. CIV.A. 03-10153-RBC, 2015 WL 251242, at *8 (D. Mass. Jan. 20, 2015).

***Second***, Waymo's identified evidence simply does not corroborate the inferences sought. Here, the deficiencies in Waymo's chart are dramatic. For example, Waymo asserts that the Ottomotto acquisition documents, and Uber employees' descriptions of those documents, fully corroborate the broad and varied propositions that Levandowski was "providing information to Uber regarding [his] downloading of confidential materials" (# 215), that "Uber was aware that [he] had downloaded Waymo's confidential design server" (# 220), and that "Uber was aware that [he] had those materials at [his] home" while working for Uber (# 221). (Dkt. 835 at 18–19.) Basic deal documents do ***not*** corroborate such sweeping and conspiratorial accusations. Similarly, to support the proposition that Uber wanted to acquire Ottomotto "because it would be able to leverage Google's confidential information" (#142), Waymo cites deposition transcripts that simply describe meetings between Uber executives and Levandowski in the fall of 2015. (*Id.* at 12-13.) Waymo fails to cite the portions of the transcript where witnesses testified that "this was essentially ultimately a talent deal" (Poetzscher Tr. at 88:6–7) centering on the "team of very talented engineers" (Qi Tr. at 104:11–12) that Otto had assembled. These transcripts say nothing whatsoever about Uber acquiring Ottomotto in order to "leverage Google's confidential information." They ***contradict*** that assertion. As a third example, Waymo baldly lists the Fuji device (the device itself, photographs, schematics, and communications describing specifications) as corroboration for the proposition that "Uber knew" (# 302) and "Uber expected" (#303) Levandowski to refer to Waymo schematics during his work on the Fuji design. (Dkt. 835 at 24–25.) But these technical documents say nothing about what Uber "knew" or "expected." Waymo also claims Uber's LiDAR communication logs and Mr. Boehmke's notebook corroborate Levandowski's "understanding that Uber expected [him] to have access to Waymo's confidential information and files" (#141). (*Id.* at 12–13.) They neither say nor suggest any such thing.

Along the same lines, Waymo repeatedly attempts to vaguely rely on the "absence of evidence regarding any precautionary or prophylactic measures taken by Uber to prevent Mr. Levandowski from accessing stolen files during his work" at Uber. (*See, e.g.*, Dkt. 835 at 16.)

1  This is demonstrably false. For example, between Uber and Otto, Levandowski signed *four*
2  agreements promising not to misuse Google confidential information. In his Uber employment
3  agreement, for example, Levandowski promised not to "use or disclose any trade secrets or other
4  proprietary information or intellectual property in which you or any other person has any right,
5  title, or interest and your Employment will not infringe or violate the rights of any other person,"
6  and agreed to "represent and warrant to the Company that you have returned or destroyed all
7  property and confidential information belonging to any prior employer." (Dkt. 661-1 at 3.)

8  In short, Waymo has proffered a script that builds upon itself, creating a chain of
9  inferences that cannot stand on their own. The Ninth Circuit has rejected such efforts to pile one
10 adverse inference upon another to satisfy burdens of proof. *See Glanzer*, 232 F.3d at 1266 n.2
11 (rejecting proposed instruction that would "be constructing an inference on another inference.").

12 Waymo generally relies on conspiracy theories about Uber's role in any alleged
13 misappropriation, citing the Ninth Circuit's opinion in *Nationwide* as support for the proposition
14 that this identification of "circumstantial evidence" satisfies its burden. (Dkt. 819 at 3–4 (citing
15 *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 913 (9th Cir. 2008)).) *Nationwide* stands for
16 no such thing. In *Nationwide*, there was both "direct and circumstantial evidence" of the conduct
17 underlying that invocation. 541 F.3d at 913. More importantly, to the extent circumstantial
18 evidence is permissible, it must still be probative of the adverse fact that would be inferred. *See*
19 *Baxter*, 425 U.S. at 318. Waymo's evidence is not.

20 **II.   An Adverse Inference Against Uber Based On Non-Party Levandowski's Invocations Would Not Advance The Search For Truth In This Case.**
21

22 Even if Waymo had independent corroborating evidence for the laundry list of adverse
23 inferences it seeks (which it does not), it still would have to show it is appropriate for a non-
24 party's invocation of the Fifth to be the basis for an adverse inference against a party who is *not*
25 invoking the Fifth. That should be presumptively disfavored as it is fundamentally unfair. Even in
26 the context of addressing whether a party's invocation can result in an inference against *that*
27 *party*, the Ninth Circuit has stated that courts must analyze "each instance where the adverse
28 inference was drawn, or not drawn, on a case-by-case basis under the microscope of the

1  circumstances of that particular civil litigation." *Glanzer*, 232 F.3d at 1265. This reasoning
2  applies with even stronger force where a non-party invokes. The facts and circumstances of this
3  case weigh heavily against allowing Waymo to use Levandowski's silence as evidence of
4  misconduct by Uber. This is true both of Levandowski's silence now and his silence during his
5  prior deposition.

6  **Reason for the invocation.** "The potential prejudice in revealing the invocation of the
7  Fifth Amendment is high, because the jury may attach undue weight to it, or misunderstand [the
8  individual's] decision to invoke his constitutional privilege." *Harrell v. DCS Equipment Leasing
9  Corp.*, 951 F.2d 1453, 1465 (5th Cir. 1992); *see also Veranda Beach Club v. Western Surety Co.*,
10  936 F.2d 1364, 1374 (1st Cir. 1991). Here, there is substantial evidence that Levandowski
11  invoked the Fifth related to his bonus from Google—having nothing to do with Uber at all.

12  In October 2011, having just recently acquired Levandowski's side business in which he
13  was developing self-driving technology (510 Systems and Anthony's Robots), Google agreed to a
14  "Chauffeur Bonus Plan" for Levandowski and some other employees that was designed to mimic
15  a start-up environment and its financial incentives to rapidly grow the value of the project.
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
26  By this time, there had been significant tension and disagreements between Levandowski
27  and senior managers at Google and Chauffeur. Levandowski was worried that
28  s

7

1  ▇
2  ▇
3  ▇
4  ▇
5  ▇
6  ▇
7  ▇ This is a credible
8  explanation for what happened, and we believe the evidence will support it.
9  ▇
10 ▇
11 ▇
12 ▇
13 ▇
14 ▇
15 ▇
16 ▇
17 ▇
18 ▇
19 ▇
20 ▇
21 ▇
22 ▇
23 ▇ This explanation is
24 consistent with the facts Waymo has presented, and we believe will be corroborated by witness
25 testimony at trial. (Indeed, in its October 2016 arbitration demand, Google noted that it had paid
26 Levandowski his sizable bonus for his "supposed contributions" to the self-driving car project—
27 confirming Google's grudging attitude toward the bonus, and omitting that it reflected ▇
28 ▇ (Dkt. 138 at 10, ¶ 3.)).

1    Levandowski's anxiety regarding Google's evaluation of the performance of his project,
2    ███████████████████████████████████████████████ provide an explanation
3    for the alleged downloads that is at least as plausible as Waymo's—and form the basis for the
4    "criminal anxiety" that Levandowksi now may bear. *See In re: TFT-LCD (Flat Panel) Antitrust*
5    *Litig.*, Case No. 07-md-01827, Dkt. No. 5536, at 88:9-19 (N.D. Cal. Apr. 25, 2012) (denying
6    adverse inference of former employee where it was unclear why employee was invoking). This
7    alternative explanation undermines any notion that "the adverse inference is trustworthy under all
8    of the circumstances." *Coquina Investments v. TD Bank, N.A*., 760 F.3d 1300, 1311 (11th Cir.
9    2014); *see also In re Urethane Antitrust Litigation*, No. 04–1616–JWL, 2013 WL 100250, *3 (D.
10   Kan. Jan. 8, 2013) (denying adverse inferences where "witnesses could reasonably have based
11   their decisions to invoke the privilege on any number of factors other than" the inference sought).

**Ability of Uber to rebut.** To rebut the inferences Waymo seeks, Uber must "prove a negative"—i.e., that it never received the allegedly stolen files. Uber has shown that its systems never had any of the files, and its witnesses never saw, used, or possessed the files. But proving a negative creates a challenge, and Uber is therefore prejudiced in its ability to fully rebut the inferences Waymo seeks to draw from Levandowski's silence.

**Nature of relationship.** That Uber fired Levandowski in part because he took the Fifth demonstrates that this lawsuit created adversity between Levandowski and Uber. Uber wanted Levandowski to testify and to cooperate. Levandowski did not. That caused harm to Uber. Uber then fired Levandowski. Waymo relies on Levandowski's meetings with former Uber CEO Travis Kalanick nearly two years ago, but that says nothing about the adversity created between Uber and Levandowski by this lawsuit and by Levandowski's refusal to testify.

Waymo points to Uber's indemnification of Levandowski, (Dkt. 819 at 7), but those contractual obligations are set, and do not depend on Levandowski's loyalty. And Waymo's attempt to tie Levandowski's hypothetical ability to ███████████████████████
███████████████████████████████████████████████████████████████████
█████████████████████████████ Indeed, it may be better for Levandowski █
█████████████████████████████████████ (Ron Tr. at 102:15–24.) Also, Uber's

9

1  termination of Levandowski ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Degree of control.** Uber does not control Levandowski, and did not control his decision to invoke the Fifth at his deposition. Uber took every step it could to cajole Levandowski into cooperating, and he nonetheless refused to testify. (*See* Dkt. 821 at 4–5.) "[T]he logic" of the "suggestion that assertions of the privilege by an employee are admissible against the employer is well taken only where the employer can in fact control the employee." *See Brink's*, 717 F.2d at 718 n.3 (Winter, J., dissenting). That is not the case here.

**Compatibility of interests.** Uber believes that Levandowski's testimony would exculpate Uber, yet Levandowski refuses to testify in order to protect himself. Thus, Levandowski's and Uber's interests are not aligned, as illustrated by Uber's firing Levandowski. (*See* Dkt. 821 at 5.) Contrary to Waymo's assertion, the mere fact that Uber has invoked a "common legal interest" for privilege purposes does not demonstrate that Uber and Levandowski have "compatible interests" that support an adverse inference. (Dkt. 819 at 9.) Parties whose interests are not aligned can share a "common legal interest" for privilege purposes. *Matter of Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974*, 406 F. Supp. 381, 392 (S.D.N.Y. 1975). Moreover, the common legal interest to which Waymo points relates to events well before the filing of this lawsuit and Levandowski's invocation of the Fifth. A common legal interest for privilege purposes may still exist in light of the litigation, but that is not what Waymo points to. Further, by pointing to the common-interest privilege, Waymo seeks a Fifth Amendment adverse inference based on the *attorney-client* privilege. As the Court already held, that is improper. (Dkt. 874.)

**Role of the non-party.** Uber is being harmed at least as much as Waymo by Levandowski's refusal to testify—we believe more so. No court has concluded that an invoking witness's central role alone justifies an adverse inference, and several courts have declined to apply such an inference *despite* a witness's central role. *See, e.g.*, *Cotton v. City of Eureka*, No. C–08–04386 SBA (EDL), 2010 WL 2889498, at *4 (N.D. Cal. July 22, 2010); *see also Progressive Casualty Ins. Co. v. Monaco*, No. 16-CV-823 (VAB), 2017 WL 2873051, *11 (D. Conn. July 5, 2017).

10

Dated: July 14, 2017

MORRISON & FOERSTER LLP
BOIES SCHILLER FLEXNER LLP

By: */s/ Karen L. Dunn*
    KAREN L. DUNN

Attorneys for Defendants
UBER TECHNOLOGIES, INC. and
OTTOMOTTO LLC