MORRISON | FOERSTER

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA  94105-2482

TELEPHONE: 415.268.7000
FACSIMILE: 415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

BEIJING, BERLIN, BRUSSELS,
DENVER, HONG KONG, LONDON,
LOS ANGELES, NEW YORK,
NORTHERN VIRGINIA, PALO ALTO,
SAN DIEGO, SAN FRANCISCO, SHANGHAI,
SINGAPORE, TOKYO, WASHINGTON, D.C.

July 14, 2017

Writer's Direct Contact
+1 (415) 268.7020
AGonzalez@mofo.com

The Honorable Jacqueline Scott Corley
USDC, Northern District of California
San Francisco Courthouse
Courtroom F - 15th Floor
450 Golden Gate Avenue
San Francisco, CA  94102

Re:   *Waymo LLC v. Uber Technologies, Inc. et al.,* Case No. 3:17-cv-00939

Dear Magistrate Judge Corley:

Defendants Uber Technologies, Inc. and Ottomotto LLC ("Uber") submit the attached response to Waymo's letter brief in support of its motion to compel Uber to (1) provide a further response to Expedited Interrogatory Nos. 24, 25, and 26, and (2) produce additional documents in response to Requests for Production Nos. 1, 30, 42, 74, 85, 91, 98, 99, 110, 117, and 145 (Waymo's July 12, 2017, Discovery Letter Brief (hereinafter "Mot."), Dkt. No. 879).

***Interrogatory No. 26 (Describe Pre-Signing Bad Acts)***

Through the parties' ongoing meet and confer efforts, Uber agreed to supplement its response to this Interrogatory and has agreed to produce non-privileged documents in response to this request.  Uber's supplementation satisfies its obligations under the federal rules, and to date Waymo has not objected to the sufficiency of Uber's proposed supplementation.

***RFP No. 30 (Consulting Work by Levandowski), 98, 99 (Levandowski Input Into Any Component, Testing, Assembly, Tuning, Calibration), 110 (Documents Brought by Former Waymo Employees to Defendants), 145 (Documents Regarding Design or Development that Reference Waymo); Expedited Interrogs. 24 and 25 (Components that Levandowski Did and Did Not Contribute To) – Alleged Non-LiDAR Trade Secrets***

To date, Waymo's case against Uber has focused entirely on alleged misappropriation of LiDAR-related trade secrets.  In its amended complaint, Waymo alleged that:
- "Waymo experimented with, and ultimately developed, a number of different cost-effective and high-performing laser sensors known as LiDAR."  (Dkt. No. 23 ¶ 2.)

1

sf-3805247

**MORRISON | FOERSTER**

Hon. Jacqueline Scott Corley
July 14, 2017
Page Two

- "Otto and Uber are currently building and deploying (or intending to deploy) LiDAR systems (or system components) using Waymo's trade secret designs." (*Id.* ¶ 3.)
- "[Mr. Levandowski] . . . attempt[ed] to erase any forensic fingerprints that would show what he did with Waymo's valuable LiDAR designs once they had been downloaded to his computer." (*Id.* ¶ 4.)
- "In light of Defendants' misappropriation and infringement of Waymo's LiDAR technology, Waymo brings this Complaint . . . ." (*Id.* ¶ 11.)

Waymo did not raise any non-LiDAR trade secrets in its preliminary injunction motion. (*See* Dkt. 24.) And the time for Waymo to amend its pleadings has passed. (*See* Dkt. No. 563 ¶ 2.) Waymo has conducted extensive discovery in this case, including depositions, inspections of Uber's facilities, and the production of documents, all of which focused on Uber's LiDAR technology. In its interrogatory responses, Waymo likewise focused its contentions on LiDAR technology, and did not identify *any* evidence of use by Uber of non-LiDAR trade secrets, aside from a blanket allegation that Uber received the 14,000 files. (*See* Declaration of Sylvia Rivera in Support of Defendants Uber Technologies, Inc. and Ottomoto LLC's Opposition to Waymo's Motion to Compel Further Discovery Responses ("Rivera Decl."), Ex. 1 at 5-11 (Waymo's Supplemental Resp. to Uber's Interrog. No. 1).)

Now, halfway through fact discovery and a few weeks before its August 1 deadline to *narrow* its claims to the "fewer than ten" trade secrets it will take to trial, Waymo demands to vastly *expand* the scope of this case beyond LiDAR. In particular, Waymo seeks discovery regarding Uber's *non-LIDAR software*, notwithstanding that Waymo's list of 121 trade secrets identified only one software trade secret, which was LiDAR-related (███████ ███████████████████████████████████████████████████████████████████), and Waymo has not identified any evidence that this trade secret is used by Uber. (*See* Rivera Decl. Ex. 2 (Waymo's Trade Secret List).) The software for which Waymo seeks discovery is different from the Otto software modules that the Court found to be discoverable in its July 12, 2017 Order (and which Defendants plan to appeal): unlike the Otto modules, the software Waymo is seeking here was not part of the Otto acquisition and so is lacking even that tenuous connection to the claims in this case.

Waymo tries to support its request for non-LIDAR discovery by pointing to a single document, a project spreadsheet entitled "████████████████████████████" arguing that it details problems and solutions from the entire self-driving team. (Rivera Decl. Ex. 3.) But a closer examination of this ████████████ document shows it includes *no* software algorithms or source code at all. (*Id.*) In its Cal. Civ. Proc. Code § 2019.210 Trade Secrets List, Waymo describes this document as containing ████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████

2

sf-3805247

MORRISON | FOERSTER

Hon. Jacqueline Scott Corley
July 14, 2017
Page Three

(Rivera Decl. Ex. 2 at 49.)  A general goals document, with no actual software or source code, or even a particularized description of the software that Waymo could identify, is not a basis for broadly alleging misappropriation of alleged software trade secrets, and does not justify discovery of Uber's non-LiDAR software.  *See Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1115 (N.D. Cal. 2016) ("[c]atchall" wording such as "Plaintiff's confidential information, including regarding problems experienced with certain tests" was insufficient disclosure of trade secrets); *Computer Economics, Inc. v. Gartner Group, Inc.*, 50 F. Supp. 2d 980, 985 (S.D. Cal. 1999) (purpose of trade secrets disclosure includes "assist[ing] the court in framing the appropriate scope of discovery").

Waymo further seeks discovery into non-LiDAR technology on the basis of Trade Secrets 108 and 109, which are described without particularity as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (TS 108) and for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (TS 109).  *See Loop AI Labs Inc.*, 195 F. Supp. 3d at 1115-1116 (trade secrets disclosure such as "[a]ll information stored in Plaintiff's Apple MacBook computer" or "[a]ll information stored in Plaintiff's data accounts" were "so vague and unspecific as to constitute no disclosure at all").  Again, Waymo has not previously raised alleged misappropriation of radar technology by Uber, did not seek information on this technology during expedited discovery, and has pointed to no evidence of any use by Uber of radar-related trade secrets.  There is no basis for Waymo's attempt to expand discovery into technologies other than LiDAR.

### *RFP No. 42 ("All DOCUMENTS and COMMUNICATIONS REGARDING" the Indemnification Agreement)*

Uber produced the Indemnification Agreement ("Agreement") on May 11, 2017, as part of the acquisition documents.  RFP No. 42 now seeks "All DOCUMENTS and COMMUNICATIONS REGARDING" the Agreement.  In the face of that overbroad Request, Uber agreed to produce all non-privileged documents exchanged between Uber and Ottomotto reflecting the negotiation of the Agreement, any demands for indemnification submitted by Mr. Levandowski to Uber, and any non-privileged communications about those demands.  (Mot., Ex. 5 at 2.)  Purporting to "narrow" the request, Waymo insists on production of "all" documents and communications regarding the Agreement up through the execution date on April 11, 2016, and thereafter "all" documents and communications that "reference either the agreement or one or more of its terms."  (Mot. at 5.)  That does nothing to cure the overbreadth.

The Agreement and its exhibits are 21 pages long, and are referenced 24 times in the merger agreement, exhibits, and disclosures for the acquisition.  Producing all documents "regarding" the Agreement would include at least all documents and communications that include or excerpt in substantial part any of those documents, whether in draft or final form.

3

MORRISON | FOERSTER

Hon. Jacqueline Scott Corley
July 14, 2017
Page Four

A search for "indemnification agreement" in Uber's document review database for this litigation brings back more than 4,000 documents, and that number balloons to more than 8,000 when cover emails and attachments are included.  (Rivera Decl. ¶ 10.)  This Request purports to require the production of the vast majority of those documents.  It also purports to require the production of all documents after April 11, 2016, that in any way refer to even a single term from the 21-page Agreement.  It is not even clear how Uber could possibly ascertain that population of documents.

Moreover, a great many of those documents will be privileged.  Uber's counsel, both in-house and outside, were substantially involved in the negotiation, drafting, and discussion of the indemnity obligation (along with all of the acquisition documents), such that a huge swath of responsive documents will be documents and communications internal to Uber involving legal analysis or advice of counsel.  Waymo is not entitled to those documents in any event, and given the extraordinarily expedited schedule in this litigation, requiring the production of yet another voluminous privilege log serves no productive purpose.[1]

As a result, this Request is not "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).

Waymo's "strawman" arguments do not change that conclusion.  *First,* a "document post-dating April 11, 2016 that referred to one of Mr. Levandowski's 'Pre-Signing Bad Acts'" (Mot. at 3), to the extent any exist, would be responsive to Expedited RFP No. 8 and either would be produced or placed on a privilege log.  (Rivera Decl. Ex. 4 (Exp. RFP No. 8) (documents regarding actual "Pre-Signing Bad Acts"); *see* Dkt No. 881 (RFP No. 8).) *Second,* Waymo wrongly contends that all documents "about indemnification leading up to the signing . . . are relevant to what Uber knew about Mr. Levandowski's 'Bad Acts' and when they knew it."  (Mot. at 3.)  Uber already served and the parties have litigated the privilege logs for documents and communications concerning potential downloading by Mr. Levandowski.  "All documents about indemnification" will not yield that information. *Third,* the documents and communications Waymo cites would be produced pursuant to

---

[1] Indeed, with respect to several RFPs for documents related to the merger, at the Special Master's urging the parties agreed to table Uber's obligation to prepare a privilege log, and if it is determined that a log is necessary, the presumption is that it will be a categorical log rather than a document-by-document log, with Waymo needing to show "good cause" for anything more than that.  (Mot., Ex. 5 at 3.)  If the Court concludes that a privilege log is required for the full scope of RFP No. 42, Uber submits that it should be subject to the agreement reached between the parties in consultation with the Special Master.

4

sf-3805247

MORRISON | FOERSTER

Hon. Jacqueline Scott Corley
July 14, 2017
Page Five

Uber's agreement to produce non-privileged communications between Travis Kalanick, Brian McClendon, or John Bares, and any other person regarding Ottomotto, Otto Trucking, or Mr. Levandowski, before August 23, 2016, in response to RFP Nos. 164-166. (*See* Rivera Decl. Ex. 8.)  In fact, the email from Cameron Poetzscher to Travis Kalanick that Waymo cites was indeed already produced by Uber. *Fourth*, Uber has agreed to produce the indemnification demands, responses thereto, and related non-privileged communications, so Waymo will have documents reflecting the terms settled on by the parties. Waymo thus does not need all documents post-dating April 11 that mention the Agreement or any of its terms.

*Fifth*, Waymo's contention that the documents it seeks are relevant to Uber's possession, custody, or control of potential downloaded materials at Epiq makes no sense. Epiq received a copy of the Relativity data from Stroz at the request of Morrison & Foerster in its capacity as counsel for Mr. Levandowski in the arbitrations. (Dkt. No. 762 at 7.)  Uber does not have possession, custody, or control of those materials. *Sixth*, Uber has produced the Agreement, and agreed to produce the indemnification demand, response thereto, and related non-privileged communications, so again, Waymo does not need "all documents" to determine whether Uber had the authority to terminate any indemnity arrangement. The vast production of all documents that mention or refer to the indemnification agreement that Waymo seeks is unwarranted.

### RFP No. 74 (access logs reflecting Mr. Levandowski's access of Uber's servers from a personal devices)

This Request seeks documents sufficient to show how many times Mr. Levandowski accessed Uber's servers "*from a personal device*."  When Uber explained that no responsive documents exist because Uber's records can only identify *users* of its systems, and not the *devices* involved, Waymo demanded all logs reflecting all instances where Mr. Levandowski accessed a server, whether or not they showed access "from a personal device." Waymo made that demand the day before its motion to compel was due. Uber has now had the opportunity to consider that demand, and even though Waymo's demand falls outside the scope of the Request, Uber agrees to produce the demanded logs in the spirit of compromise. The issue is therefore moot.

### RFP No. 91 (all documents regarding Mr. Levandowski's "Authorized Devices")

Uber has no non-privileged documents responsive to Waymo's request for all documents and communications regarding Mr. Levandowski's "'Authorized Devices' (as that term is defined in UBER00006444, Section 7), [including] (without limitation) any request for approval in connection with Section 7.2 or any de-authorization (whether contemplated or effec[tua]ted) under Section 7.3."  (RFP No. 91.)  Mr. Levandowski had one "Authorized Device" (as that term is defined in UBER00006444, Section 7), which Uber identified in its

5

sf-3805247

MORRISON | FOERSTER

Hon. Jacqueline Scott Corley
July 14, 2017
Page Six

Response to Expedited Interrogatory No. 3.  (Rivera Decl. Ex. 5.)  This fact is supported by paragraph 5 of the Faulkner Declaration.  (*See* Dkt. No. 749-8 ¶ 5, discussing computer with serial number C02SX6KRGTFL.)  Mr. Levandowski did not have any Non-Uber Devices (as that term is used in UBER00006444, Section 7).  This fact is supported by paragraph 7 of the Faulkner Declaration.  (Dkt. No. 749-8 ¶ 7.)  Uber does not maintain documents about what is or is not an Uber Device or Non-Uber Device, nor does Uber have any records regarding approval or de-authorization (as those terms are used in UBER00006444, Section 7).

*RFP No. 85 (All documents and communications regarding Mr. Levandowski's compensation-related agreements)*

It is undisputed that Uber has already produced Mr. Levandowski's compensation-related agreements with Ottomotto and Uber.  In response to this Request, Uber agreed "to produce non-privileged documents exchanged between Uber and Ottomotto (or individually with Mr. Levandowski) regarding the negotiation of Mr. Levandowski's salary, bonus, and stock awards."  (Mot., Ex. 5 at 2.)  Uber has also described in an interrogatory response the salary and bonus payments Mr. Levandowski actually received, as well as the fact that none of his stock had vested when he was terminated.  It will be further supplementing that response pursuant to this Court's July 12 order.  (*See* Rivera Decl. Ex. 6 (2017.06.22 Uber's Resp. to Expedited ROGs 5&8).)  In light of that, the Court should reject as overbroad and unduly burdensome Waymo's further demand for "[*a*]*ll* [*documents*] *and* [*communications* regarding] any compensation-related agreements."  (RFP No. 85 (emphasis added).)  Waymo's demand would require producing – without time limitation – every piece of paper that merely refers to Mr. Levandowski's compensation terms, including ministerial records like payroll stubs.  Waymo's highly attenuated explanation of relevance — that Waymo might learn from "all" these documents "what Uber knew and when Uber knew it, as well as . . . disclosure and use of Waymo's trade secrets" — is based on sheer speculation.  This is clearly a fishing expedition.

*RFP No. 1 (E-Discovery Vendor Agreement with Stroz)*

The Court should reject Waymo's demand for Uber's e-discovery vendor agreement for this litigation with its vendor, Stroz.  The e-discovery agreement is irrelevant to the parties' claims and defenses and contains competitively sensitive information about Stroz's pricing that Quinn Emanuel as a purchaser in the e-discovery marketplace should not see.  Waymo's sole assertion of relevance is based on the erroneous premise that all Stroz witnesses have a personal financial stake in any money that Uber pays to Stroz, the firm, in its capacity as an e-discovery vendor.  That premise simply isn't true.  Uber's forensic expert, Mr. Faulkner, for example, is a Stroz employee whose compensation is unaffected by Uber's e-discovery relationship with Stroz—a fact Waymo is free to explore with Mr. Faulkner in deposition.  Moreover, Waymo's argument that Uber was free to use any e-discovery vendor in the

6

sf-3805247

MORRISON | FOERSTER

Hon. Jacqueline Scott Corley
July 14, 2017
Page Seven

marketplace is without merit. In part due to Waymo's overbroad search demands, Uber collected and processed 235 TBs of data. Transferring that data to another vendor while meeting extremely short deadlines simply would have been unworkable.

*RFP No. 117 ("DOCUMENTS sufficient to show all author(s) of and contributor(s) to the letter to Nevada authorities, 'RE: Clarification to Autonomous Technology Certification Submission,' dated on or around March 15, 2017.")*

Because of space limitations, Uber will not respond to Waymo's rhetoric about the Nevada letter, nor to Waymo's conclusory assertion that Uber has stonewalled as to matters that do not fall within the narrow confines of RFP No. 117. The issue on RFP No. 117 is this: based on the parties' meet and confer, Uber understands that Waymo wants to know which Uber personnel contributed to the letter. Uber informed Waymo that there are no non-privileged documents that reflect that information. In particular, if Waymo wants to know which non-lawyers at Uber contributed, Uber would simply identify those persons for Waymo, and in exchange Uber would not have to prepare a privilege log. (Rivera Decl. Ex. 7 (Rivera Email 7/14/17).) Given that Waymo did not agree to that compromise, Uber agrees to prepare a privilege log for its privileged, responsive documents for this Request. This Request is therefore resolved.

Respectfully submitted,

*/s/ Arturo J. González*

Arturo J. González

cc: Counsel of Record
    Special Master John Cooper