# EXHIBIT 1

1        MS. ROBERTS:  I've never seen it, so --        15:19

2        THE WITNESS:  I haven't seen it, either, as I   15:19

3   said; right?                                          15:19

4        I had discussions with the attorneys about      15:19

5   the report or some of the work Stroz was doing prior  15:19

6   to signing.  I wouldn't want to characterize that as  15:19

7   the conclusions because I never saw the report.       15:19

8        MS. ROBERTS:  Q.  And, when you say "prior to    15:19

9   signing," is that the April 11th, 2016, agreement?    15:19

10     A   Uh-huh, correct.                              15:20

11     Q   Is there somebody at Uber that had final      15:20

12   signoff on entering into the agreement with -- to    15:20

13   acquire Otto?                                         15:20

14        MR. JACOBS:  You mean the April 11th           15:20

15   agreement?                                            15:20

16        MS. ROBERTS:  Yes.                              15:20

17        THE WITNESS:  The board.                        15:20

18        MS. ROBERTS:  Q.  The Uber board?              15:20

19     A   Uh-huh.                                        15:20

20     Q   And, same question with respect to closing in 15:20

21   August of 2016.  Is there somebody at Uber that had  15:20

22   final signoff on closing?                            15:20

23     A   Well, closing was more of an automatic thing  15:20

24   that followed; right?  Unless there was one other -- 15:20

25   you know, an out in the agreement was invoked, it was 15:20

Page 279

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | going to close anyway. | 15:20 |
| 2 | There was some leeway as to timing under the | 15:20 |
| 3 | quit call structure.  But there wasn't -- it wasn't so | 15:20 |
| 4 | much of a signoff in the same way that pre-signing | 15:20 |
| 5 | approval was with the board. | 15:20 |
| 6 | Q   And earlier we talked about Mr. Levandowski | 15:20 |
| 7 | providing an attestation, swearing that he wasn't | 15:20 |
| 8 | going to bring third-party IP to Uber.  And I | 15:20 |
| 9 | mentioned that we haven't seen that document, as it | 15:21 |
| 10 | were.  And, if it's on a privilege log, we don't know | 15:21 |
| 11 | which entry it is. | 15:21 |
| 12 | If -- if Uber didn't receive an attestation | 15:21 |
| 13 | from Mr. Levandowski, was there somebody at Uber who | 15:21 |
| 14 | could say, We're going to go ahead with the deal | 15:21 |
| 15 | anyway? | 15:21 |
| 16 | A   I can't answer that hypothetical question.  I | 15:21 |
| 17 | just don't know the answer to that. | 15:21 |
| 18 | MS. ROBERTS:  Okay.  I'm going to hand you | 15:21 |
| 19 | what we will mark as Exhibit 281, which begins with | 15:21 |
| 20 | Bates No. UBER00060643. | 15:22 |
| 21 | (Document marked Exhibit 281 | 15:22 |
| 22 | for identification.) | 15:22 |
| 23 | MS. ROBERTS:  Q.  Have you had a chance to | 15:22 |
| 24 | review the e-mail? | 15:22 |
| 25 | A   Yes. | 15:22 |

Veritext Legal Solutions
866 299-5127