# EXHIBIT 1

*REDACTED VERSION*
*OF DOCUMENT(S)*
*SOUGHT TO BE SEALED*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN FRANCISCO DIVISION

 4

 5    WAYMO LLC,

 6           Plaintiff,

 7    vs.                        No. 3:17-cv-00939-WHA

 8    UBER TECHNOLOGIES, INC.;

 9    OTTOMOTTO LLC; OTTO TRUCKING,

10    INC.,

11           Defendants.

      _____/

12

13       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15          VIDEOTAPED DEPOSITION OF LARRY PAGE

16                 PALO ALTO, CALIFORNIA

17                 MONDAY, JULY 17, 2017

18

19

20

21    BY:  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

22    CSR LICENSE NO. 9830

23    JOB NO. 2658732

24

25    PAGES 1 - 219
```

                                              Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4

 5   WAYMO LLC,

 6          Plaintiff,

 7   vs.                          No. 3:17-cv-00939-WHA

 8   UBER TECHNOLOGIES, INC.;

 9   OTTOMOTTO LLC; OTTO TRUCKING,

10   INC.,

11          Defendants.

12   _____/

13

14

15      Videotaped Deposition of Larry Page, taken

16   on behalf of the Defendants, on July 17, 2017, at

17   Wilson Sonsini Goodrich & Rosati, 601 California

18   Avenue, Palo Alto, California, beginning

19   12:06 a.m., and commencing at 4:54 p.m., Pursuant

20   to Notice, and before me, ANDREA M. IGNACIO, CSR,

21   RPR, CRR, CLR ~ License No. 9830.

22

23

24

25

                                           Page  2
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    A P P E A R A N C E S :

2

3     FOR THE PLAINTIFFS:

4

5          QUINN EMANUEL URQUHART & SULLIVAN LLP

6          By:  JEFFREY W. NARDINELLI, Esq.

7               DAVID PERLSON, Esq.

8          50 California Street, Suite 2200

9          San Francisco, California 94111

10         Phone:  415.875.6600

11         david.perlson@quinnemanuel.com

12         jeffnardinelli@quinnemanuel.com

13

14    FOR THE DEFENDANTS UBER TECHNOLOGIES INC.:

15

16         MORRISON & FOERSTER LLP

17         By:  ARTURO GONZALEZ, Esq.

18         425 Market Street

19         San Francisco, California 94105-2482

20         Phone:  415.268.7562

21         agonzalez@mofo.com

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    A P P E A R A N C E S:   (Cont.)

 2

 3    FOR THE DEFENDANTS UBER TECHNOLOGIES INC.:

 4

 5         BOIES SCHILLER FLEXNER LLP

 6         By:  CAIN NORRIS, Esq.

 7         1401 New York Avenue, NW

 8         Washington, D.C. 20005

 9         Phone:  202.274.1135

10         cnorris@bsfllp.com

11

12    FOR THE DEFENDANTS OTTO TRUCKING, INC.:

13

14         GOODWIN & PROCTER LLP

15         By:  I. NEEL CHATTERJEE, Esq.

16         155 Commonwealth Drive

17         Menlo Park, California 94025

18         Phone:  650.752.3256

19         nchatterjee@goodwinlaw.com

20

21

22

23

24

25
```

Page  4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    A P P E A R A N C E S: (Cont.)

 2

 3    FOR ALPHABET AND THE WITNESS:

 4

 5         KEKER VAN NEST & PETERS

 6         By:  ROBERT VAN NEST, Esq.

 7              JENNIFER HUBER, Esq.

 8         633 Battery Street

 9         San Francisco, California 94111

10         Phone:  415.391.5400

11         rvannest@keker.com

12

13    ALSO PRESENT:

14         Ramon Perraza, Videographer

15         Nicole T. Bartow, Uber

16         Aaron Bergstrom, Uber

17         Nora Puckett, Alphabet

18         Katherine Oacavera, Alphabet

19

20

21

22

23

24

25
```

Page 5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                   I N D E X

 2

 3    WITNESS:  Larry Page

 4    EXAMINATION                              PAGE

 5    Mr. Rodriguez                         12, 195

 6    Mr. Chatterjee                            160

 7

 8

 9                 E X H I B I T S

10    EXHIBIT                                   PAGE

11    Exhibit 1085  6-17-15 Project Chauffeur Bonus   16

12                  Statement, Bates

13                  WAYMO-UBER-00014504 - '05

14    Exhibit 1086  Dec 2015 Project Chauffeur Bonus   16

15                  Statement, Bates

16                  WAYMO-UBER-00013908

17    Exhibit 1087  Project Chauffeur Execution      64

18                  Version, Bates

19                  WAYMO-UBER-00026147 - '140

20    Exhibit 1088  5-25-11 E-mail, Subject: Chauffeur  80

21                  compensation, Bates

22                  WAYMO-UBER-00026142 - '43

23    Exhibit 1089  7-9-11 E-mail, Subject: Chauffeur   90

24                  +hanke, Bates WAYMO-UBER-00026144

25                  - '46
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              E X H I B I T S   (Cont.)

 2    EXHIBIT                                      PAGE

 3

 4    Exhibit 1090  1-27-16 E-mail, Subject:         99

 5                  Chauffeur; It's time for me to

 6                  move on, Bates WAYMO-UBER-00011799

 7    Exhibit 1091  1-27-16 E-mail, Subject: It's   102

 8                  time for me to move on, Bates

 9                  WAYMO-UBER-00011799

10    Exhibit 1092  3-16-11 E-mail, Subject: Chauffeur 110

11                  Quick Sync, Bates

12                  WAYMO-UBER-00026141

13    Exhibit 1093  1-9-16 E-mail, Subject: Chauffeur 113

14                  ███████  urgently needed, Bates

15                  WAYMO-UBER-00006311 - '12

16    Exhibit 1094  1-25-16 E-mail, Subject:        122

17                  Chauffeur: Plan of action for

18                  next 342 days, Bates

19                  WAYMO-UBER-00011779

20    Exhibit 1095  3-8-16 E-mail, Subject: Anthony, 127

21                  Bates WAYMO-UBER-00022505

22    Exhibit 1096  4-11-5 E-mail, Subject: ██████    ███

██                  ██████  Bates WAYMO-UBER-00026174

24    Exhibit 1097  12-6-13 E-mail, Subject: █████    ███

██                  ████████, Bates WAYMO-UBER-00026168

                                              Page  7
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              E X H I B I T S   (Cont.)

2     EXHIBIT                                           PAGE

3

4     Exhibit 1098  2-7-14 E-mail, Subject: Catch up,  148

5                   Bates WAYMO-UBER-00029264

6     Exhibit 1099  11-12-14 E-mail, Subject: Update,  151

7                   Bates, WAYMO-UBER-00029346

8     Exhibit 1100  3-29-15 E-mail, Subject: █████, 157

9                   Bates WAYMO-UBER-00029349

10    Exhibit 1101  3-1-15 E-mail, Subject: █████,  158

11                  Bates WAYMO-UBER-00029352

12    Exhibit 1102  9-23-15 Letter Chris Urmson,      163

13                  Bates WAYMO-UBER-00014482 - 88

14    Exhibit 1103  10-24-14 E-mail, Subject: Anthony, 168

15                  Bates WAYMO-UBER-00009502

16    Exhibit 1104  3-11-15 E-mail, Subject: █████   ████

██                ████, Bates WAYMO-UBER-00026174

18    Exhibit 1105  8-4-15 E-mail, Subject:           175

19                  Confidential, Bates

20                  WAYMO-UBER-00006309

21    Exhibit 1106  1-27-16 E-mail, Subject: Anthony, 180

22                  Bates WAYMO-UBER-00011805

23    Exhibit 1107  2004 Founders' IPO Letter         197

24    Exhibit 1108  1-23-16 E-mail, Subject: Role on  195

25                  Chauffeur, Bates WAYMO-UBER-00011773

                                              Page  8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                   E X H I B I T S    (Cont.)

2     EXHIBIT                                          PAGE

3

4     Exhibit 1109  1-13-16 E-mail, Subject:            213

5                   Chauffeur ███████ urgently

6                   needed, Bates WAYMO-UBER-00011746

7     Exhibit 1110  2-18-16 E-mail, Subject: Chauffeur  186

8                   Plan payments for former employees,

9                   Bates WAYMO-UBER-00012019

10    Exhibit 1111 4-1-16 E-mail, Subject: Quick        185

11                   follow-up, Bates WAYMO-UBER-00012097

12

13

14

15      P R E V I O U S L Y   M A R K E D   E X H I B I T S

16    Exhibit 1031  ████████████████████████

17

18

19

20

21

22

23

24

25

                                              Page  9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | PALO ALTO, CALIFORNIA | 10:47 |
| 2 | MONDAY, JULY 17, 2017 | 10:49 |
| 3 | 12:06 P.M. | 10:49 |
| 4 | | 10:49 |
| 5 | | 10:49 |
| 6 | | 10:49 |
| 7 | THE VIDEOGRAPHER:  Good afternoon.  We are on | 10:54 |
| 8 | the record at 12:06 p.m. on July 17th, 2017.  This is | 12:06 |
| 9 | the videotaped deposition of Mr. Larry Page. | 12:06 |
| 10 | My name is Ramon Perraza, here with our court | 12:06 |
| 11 | reporter, Andrea Ignacio.  We are here from Veritext | 12:06 |
| 12 | Legal Solutions at the request of counsel for the | 12:06 |
| 13 | defendant. | 12:06 |
| 14 | This deposition is being held at Wilson | 12:06 |
| 15 | Sonsini in Palo Alto. | 12:06 |
| 16 | The caption of this case is Waymo, LLC | 12:06 |
| 17 | versus Uber Technologies, Inc., et al.  Case | 12:06 |
| 18 | No. 3:17-CV-00939-WHA. | 12:06 |
| 19 | Please note that audio and video recording | 12:06 |
| 20 | will take place unless all parties have agreed to go | 12:06 |
| 21 | off the record.  Microphones are sensitive and may | 12:07 |
| 22 | pick up whispers or private conversations. | 12:07 |
| 23 | At this time, Counsel, please identify | 12:07 |
| 24 | yourselves for the record and state whom you | 12:07 |
| 25 | represent. | 12:07 |

Page 10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. GONZALEZ:  Arturo Gonzalez from | 12:07 |
| 2 | Morrison & Foerster, on behalf of Uber. | 12:07 |
| 3 | MS. BARTOW:  Nicole Bartow, in-house counsel | 12:07 |
| 4 | at Uber. | 12:07 |
| 5 | MR. BERGSTROM:  Aaron Bergstrom, in-house | 12:07 |
| 6 | counsel at Uber. | 12:07 |
| 7 | MR. NORRIS:  Ken Norris, Boies, Schiller & | 12:07 |
| 8 | Flexner, on behalf of Uber. | 12:07 |
| 9 | MR. CHATTERJEE:  Neel Chatterjee, on behalf | 12:07 |
| 10 | of Otto Trucking. | 12:07 |
| 11 | MR. NARDINELLI:  Jeff Nardinelli of Quinn | 12:07 |
| 12 | Emanuel, on behalf of Waymo. | 12:07 |
| 13 | MS. HUBER:  Jennifer Huber, Keker, Van Nest & | 12:07 |
| 14 | Peters, on behalf of Alphabet and Mr. Page. | 12:07 |
| 15 | MS. PUCKETT:  Nora Puckett, Alphabet. | 12:07 |
| 16 | MS. OACAVERA:  Katherine Oacavera, Alphabet. | 12:07 |
| 17 | MR. PERLSON:  David Perlson, Quinn Emanuel, | 12:07 |
| 18 | for Waymo. | 12:07 |
| 19 | MR. VAN NEST:  And Bob Van Nest, Keker, | 12:07 |
| 20 | Van Nest & Peters, for Alphabet and Mr. Page. | 12:07 |
| 21 | THE VIDEOGRAPHER:  The court reporter may now | 12:07 |
| 22 | swear in the witness. | |
| 23 | /// | |
| 24 | /// | |
| 25 | /// | |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                        LARRY PAGE,

 2              having been sworn as a witness

 3           by the Certified Shorthand Reporter,

 4                 testified as follows:

 5

 6                       EXAMINATION

 7   BY MR. GONZALEZ:

 8      Q   Sir, you are one of the founders of Google;    12:08

 9   correct?                                              12:08

10      A   Yes.                                           12:08

11      Q   And you're currently the CEO of Alphabet?      12:08

12      A   That's correct.                                12:08

13      Q   Alphabet is the parent company of both Google  12:08

14   and Waymo; is that right?                             12:08

15      A   That's right.                                  12:08

16      Q   Sir, I'd like to start by asking you some      12:08

17   questions about the bonus that was paid to Anthony    12:08

18   Levandowski.  He received a bonus that was in excess  12:08

19   of $120 million; is that right?                       12:08

20      A   I'm not familiar with the exact amount, but    12:08

21   that sounds correct.                                  12:08

22      Q   You recall it was over 100 million?            12:08

23      A   I recall it was large.                         12:08

24      Q   Did you approve that bonus?                    12:08

25      A   I was definitely aware of it.  I'm not sure    12:08
```

Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    of the process for granting him the bonus.          12:08

 2        Q    Did you agree with the amount of the bonus?   12:08

 3        A    There was some process during the            12:08

 4    compensation that arrived at that, and I don't think I  12:08

 5    participated in that.                                 12:08

 6        Q    You did not participate in it?               12:08

 7        A    I did not participate in the process of that.  12:08

 8        Q    Who did?                                     12:08

 9        A    There was a -- I know there was a, you know,  12:09

10    process by which they decided what the bonus payouts  12:09

11    were.                                                 12:09

12        Q    Do you know of anybody in Project Chauffeur  12:09

13    who received a bonus that was higher, greater, than   12:09

14    Anthony Levandowski?                                  12:09

15        A    I don't recall the amounts, but I think it   12:09

16    was ███████████████.                                  12:09

17        Q    Did you think it was appropriate for          12:09

18    Mr. Levandowski to receive ██████████████?             12:09

19        A    Not sure I considered that question.         12:09

20        Q    Well, thinking back on it today, do you think  12:09

21    it's appropriate for Mr. Levandowski to have received  12:09

22    ██████████████████████████████████████████████████?   12:09

23        A    I think that we did -- we built a program     12:09

24    that generated a lot of success for the Chauffeur     12:09

25    program that was start-up-like, and I think we got --  12:09
```

                                                    Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | we got a good -- good outcome of that. | 12:09 |
| 2 | Q   Do you believe that Mr. Levandowski | 12:09 |
| 3 | contributed to the positive outcome? | 12:09 |
| 4 | A   I'm still learning about that, I feel. | 12:10 |
| 5 | Q   You said that it was start-up-like. | 12:10 |
| 6 | By that, do you mean that the bonus system | 12:10 |
| 7 | was set up in order to encourage employees to stay as | 12:10 |
| 8 | though it were a start-up? | 12:10 |
| 9 | A   I don't think that was the main point of it, | 12:10 |
| 10 | I think, in my mind.  Really, to incentivize really | 12:10 |
| 11 | good outcomes, and really focus on achieving those | 12:10 |
| 12 | outcomes. | 12:10 |
| 13 | Q   Do you recall that there was concern that, | 12:10 |
| 14 | without a bonus program, some of the Project Chauffeur | 12:10 |
| 15 | people would leave and set up their own start-up? | 12:10 |
| 16 | A   I don't recall that exact concern.  But, in | 12:10 |
| 17 | any effort, retention is always something that you | 12:10 |
| 18 | would focus on. | 12:10 |
| 19 | Q   At Google, do you have something that you | 12:10 |
| 20 | call autonomous units? | 12:10 |
| 21 | A   I think at some points we did. | 12:10 |
| 22 | Q   And autonomous -- | 12:10 |
| 23 | A   That's not -- that's not typically what we | 12:10 |
| 24 | would do today, I think. | 12:10 |
| 25 | Q   Understood. | 12:11 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          But, at least back at the time that Project          12:11

2     Chauffeur was started, was Project Chauffeur          12:11

3     considered an autonomous unit at Google?          12:11

4          A    I don't recall exactly how it got started.          12:11

5     It was also part of kind of ac- -- X's Genesis, I          12:11

6     believe, but that was quite a while ago.          12:11

7          ████ ████████████████████████████          ████

    ████  ████████████████████████████          ████

    ████  ██████████████████████████          ████

    ████  ████████████████████████████          ████

    ████  ███████████          ████

    ████      ████  ███████████████          ████

    ████      ████  ██████████████████████          ████

    ████  ██████████████████████████████          ████

    ████  ████████████          ████

    ████      ████  ██████████████████████████          ████

    ████  ████████████████████████████          ████

    ████  ██████████████████████          ████

    ████      ████████          ████

    ████      ████  ██████████████████████          ████

    ████  ██████████████████████████████          ████

    ████      ████  ████████████████          12:12

23          MR. GONZALEZ:  Let me show you a document          12:12

24     that we've marked as Exhibit 1085.          12:12

25     ///          12:12

                                                    Page 15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1            (Document marked Exhibit 1085 - 1086        12:12
2             for identification.)                       12:12
3         MR. VAN NEST:  Thank you.                       12:12
4         MR. GONZALEZ:  1085, for the record, is a       12:12
5    document produced by Waymo in this litigation with   12:12
6    Bates stamp No. '14504.                              12:12
7
```



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1        ███  ████████████████████████         ████████

    █   ████████████████████████████████        ████████

    █   ████████████████████████████████        ████████

    █   ██████                                   ████████

    █      █   ██████████████████                ████████

    █      █   ████████████████████████          ████████

    █   ██████████████████  ████████████████     ████████

    █   ████████████████████████████████████     ████████

    █   █████████████████████                     ████████

    █      █   ██████████████████████             ████████

    █      █   ████████████████████████████       ████████

    █   ██████████████████████                           12:14

13        Q    All right.                                12:14

14             MR. GONZALEZ:  Let me show you Exhibit 1086,   12:14

15   which is six months later,   ███████████████████   ████████

    █   █████████████████  ██████████████████████     ████████

    █   ████████████████████                           ████████

    █      █   █████████████████  ████████████████     ████████

    █   ██████████████████████████████████████████    ████████

    █      █   █████  ███████████████████  ███████████   ████████

    █   ████████████                                    12:14

22        Q    Now, this is at around the time that you came   12:14

23   up with the big payout numbers for the group; is that   12:14

24   right?                                              12:14

25        A    I don't remember when that happened, either.   12:14
```

                                                    Page 17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1                                                    12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
                                                      12:15
23       Q   I don't know.                            12:15
24       A   Is that what you're asking me?  No, I don't   12:15
25   think there is.                                  12:16
```

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1       Q    That's what I'm trying to figure out.        12:16

2       A    I don't think there is.                      12:16
```



```
                                                          12:16
```

Page 19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      ████  ████████████████████████████████     ████
 █   ████████████████                              ████
 █      ████  ████████████████████████████         ████
 █   █████████████████████████████████████         ████
 █   ███████████████████████████████████         12:17
 6           MR. VAN NEST:  I'll object to the extent the   12:17
 7   question may call for privileged information.          12:17
 8           Don't disclose the content of any discussion   12:17
 9   you had with Mr. Drummond.                             12:17
10           MR. GONZALEZ:  At this point --                12:17
11           MR. VAN NEST:  But otherwise, you may answer.  12:17
12           MR. GONZALEZ:  -- at this point, I'm just      12:17
13   asking yes or no.                                      12:17
14       Q   Do you remember anything?                      12:17
15       A   Sorry.  Can you -- can you restate it --       12:17
16       Q   Sure.                                          12:17
17       A   -- or state it again?                          12:17
18      ████  ██████                                        ████
 █          ███████████████████████████████               ████
 █   ██████████████████████████████████████               ████
 █   ███████████████████████████████████████              ████
 █   ████████████                                        12:17
23       A   No, I don't recall that.                       12:17
24       Q   Even generally?                                12:17
25       A   No.                                            12:17
```

Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q   And, sitting here today, you believe it was | 12:17 |
| 2 | likely that Mr. Drummond was involved. | 12:17 |
| 3 | Do you know for sure one way or the other? | 12:17 |
| 4 | A   I mean, I don't recall.  It would be highly | 12:17 |
| 5 | unusual for us not to review this, you know, as part | 12:17 |
| 6 | of our management. | 12:18 |
| 7 | Q   Did you believe, in December of 2015, that | 12:18 |
| 8 | Anthony Levandowski had made significant contributions | 12:18 |
| 9 | to Project Chauffeur? | 12:18 |
| 10 | A   I'm just trying to get the time frame | 12:18 |
| 11 | straight in my head.  December of 2015 -- when did he | 12:18 |
| 12 | leave? | 12:18 |
| 13 | Q   He left the following month. | 12:18 |
| 14 | A   Okay. | 12:18 |
| 15 | Q   So, in December of 2015, before he left | 12:18 |
| 16 | Google's employment, did you believe at that time that | 12:18 |
| 17 | he had made significant contributions to Project | 12:18 |
| 18 | Chauffeur? | 12:18 |
| 19 | A   I mean, I think he's definitely been a | 12:18 |
| 20 | significant person in the history of the project. | 12:18 |
| 21 | Q   And tell me why you believe that.  If you can | 12:18 |
| 22 | elaborate. | 12:18 |
| 23 | What is it that he did that, in your mind, | 12:18 |
| 24 | makes his contribution significant? | 12:18 |
| 25 | A   Well, I didn't say that.  I said he's been a | 12:18 |

Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | significant person.  I think it has yet to be | 12:18 |
| 2 | determined whether it's a positive or negative | 12:18 |
| 3 | contribution. | 12:18 |
| 4 | Q   All right. | 12:18 |
| 5 | What do you mean by "a significant person"? | 12:19 |
| 6 | A   Well, he was one of the leaders on the team | 12:19 |
| 7 | for most of his history and had a significant kind of | 12:19 |
| 8 | role as a result of that. | 12:19 |
| 9 | Q   You would not have approved of a bonus of | 12:19 |
| 10 | over $100 million if he hadn't made a significant | 12:19 |
| 11 | contribution. | 12:19 |
| 12 | Can we agree on that? | 12:19 |
| 13 | A   I guess I'm questioning -- what is the | 12:19 |
| 14 | purpose of that question? | 12:19 |
| 15 | No one decided to pay me billions of dollars. | 12:19 |
| 16 | Q   No, but -- | 12:19 |
| 17 | A   So -- | 12:19 |
| 18 | Q   -- you were the CEO at the time that he got | 12:19 |
| 19 | the bonus; right? | 12:19 |
| 20 | A   I did not have discretion not to pay the | 12:19 |
| 21 | bonus, as far as I could tell. | 12:19 |
| 22 | Q   Per the contract, that was your | 12:19 |
| 23 | understanding? | 12:19 |
| 24 | A   Yes. | 12:19 |
| 25 | Q   Did you ever express concern to anyone that | 12:19 |

Page 22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    the bonus was too high that was being paid to          12:19
 2    Mr. Levandowski?                                        12:19
 3        A    Well, as I kind of just stated, I think       12:19
 4    that's -- I've stated we were focused on getting a      12:19
 5    start-up-like compensation system.  And start-ups pay   12:19
 6    people a lot of money if they do something              12:19
 7    significant -- if the start-up does something           12:20
 8    significant.                                            12:20
 9             And, I'm sure many people would argue those    12:20
10    numbers are too big, but that system seems to work      12:20
11    pretty well.                                            12:20
12    ████  ████████████████████████████████     ████
      █████ █████████████████████████████████████   █████
      █████ ██████████████████████████████████
      ████  ████  ████████████████████████████████    12:20
16        Q    Can you think of any other Google employee,   12:20
17    during your entire tenure, who has received a bonus in  12:20
18    excess of $100 million for anything?                    12:20
19        A    I mean, we've paid a number of Google          12:20
20    employees a lot of money.  You know, I don't recall     12:20
21    the exact amounts.  But people have made a lot more     12:20
22    money than that as part of Google, including myself.    12:20
23             I think the terminology of "bonus" is a        12:20
24    little bit strange, because we were working -- this is  12:20
25    an early version of a program to offer people           12:20
```

Page 23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   start-up-like compensation.  So, I think that was sort    12:21
 2   of working as intended.                                   12:21
 3       Q   All right.                                        12:21
 4           Setting aside the time that Google went           12:21
 5   public, and when people received whatever they            12:21
 6   received, setting that aside, was there any other         12:21
 7   occasion where any employee received more than            12:21
 8   $100 million for what you described as "start-up-like     12:21
 9   compensation"?                                            12:21
10       A   I mean, I don't recall exactly.  I'm sure         12:21
11   there is someone who can answer that question             12:21
12   accurately.                                               12:21
13       Q   Okay.                                             12:21
14       A   But again, this was one of our early programs     12:21
15   like that.  So, it wouldn't surprise me if this was       12:21
16   one of the earlier ones that we had done.                 12:21
17       Q   Sitting here today, can you recall of any         12:21
18   other employee who received more than $100 million in     12:21
19   what you've described as start-up compensation at         12:21
20   Google?                                                   12:21
21       A   Well, I've already stated this is one of our      12:21
22   earlier programs.  So no, I can't think of one.  But      12:21
23   nor do I think that's, like, so unusual, as you're --     12:22
24   as you're implying.                                       12:22
25       Q   You're saying it's not unusual to pay             12:22
```

Page 24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    somebody a bonus of over $100 million?                    12:22

2        A    I don't -- I don't think characterizing it as    12:22

3    a bonus is correct.  I think it's more like a start-up     12:22

4    compensation, which would be more like equity.  We         12:22

5    have executives that are well compensated and              12:22

6    certainly make a lot of money and so on.                   12:22

7             So anyway, I don't think that it's so far         12:22

8    outside of the norm for Silicon Valley compensation.       12:22

9        Q    Can you tell me what, in your mind, did           12:22

10   Anthony Levandowski contribute to Project Chauffeur?       12:22

11       A    I mean, again, I'm, you know, CEO of the          12:22

12   parent company of the company there, so I think I have     12:22

13   limited ability to answer that question.                   12:22

14           My impression of Anthony is that he was, you       12:22

15   know, an early pioneer in the self-driving space, and      12:23

16   was pretty interested in a lot of the technology           12:23

17   aspects.                                                   12:23

18           His specialty seemed to be -- he certainly         12:23

19   had a lot of knowledge of LiDAR, but I'm not -- and        12:23

20   hardware in general, maybe, but I'm not really expert      12:23

21   on those points.                                           12:23

22       Q    When he worked at Google, you had a number of     12:23

23   conversations yourself with Mr. Levandowski over the       12:23

24   years; correct?                                            12:23

25       A    Yeah, I mean, I've certainly talked with him      12:23

Page 25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    from time to time, usually with other people, I think.   12:23

 2        Q    There were times when he visited your home;      12:23

 3    is that right?                                            12:23

 4        A    I don't recall that, but I'm -- it's             12:23

 5    possible.                                                 12:23

 6        Q    Do you also have a ranch property?               12:23

 7        A    Yes.                                             12:23

 8        Q    What is it called?                               12:23

 9        A    I'm not sure which one you mean or -- or --      12:24

10    so maybe you can give me more context.                    12:24

11        Q    Is there one called ███████?                      12:24

12        A    No.                                              12:24

13        Q    What are your ranches called?                    12:24

14        A    ████████ is a project that I believe Anthony     12:24

15    was working on.  I don't think that's the name of a       12:24

16    ranch.                                                    12:24

17        Q    What are your ranches called?                    12:24

18        A    I mean, there's one maybe they're referring      12:24

19    to where some testing has happened.                       12:24

20             Is that what you're talking about?               12:24

21        Q    Yes.                                             12:24

22        A    What is the context here?                        12:24

23        Q    I just want to know what it's called, so we      12:24

24    at least are communicating about the same location.       12:24

25        A    Well, maybe you can tell me which location       12:24
```

Page 26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    you're talking about.                              12:24

 2       Q   It's -- it's your ranch where the testing   12:24

 3    took place.                                         12:24

 4       A   Well, that's called ██████████.             12:24

 5       Q   ██████████                                   12:24

 6       A   But I don't know which --                    12:24

 7       Q   All right.                                    12:24

 8       A   -- name you would have.                       12:24

 9       Q   Has Anthony been to your property at ██████  ██████

██   ██████                                               12:24

11       A   I assume so, but I'm not, I guess, familiar  12:24

12    with all of his whereabouts.                         12:25

13       Q   Just generally, where is ██████████           12:25

14    located?                                              12:25

15       A   It's ████████████████████████████████        ██████

██    ██████████                                          ██████

██       ██  ██████████                                   ██████

██       ██  ██████████                                   ██████

██       ██  ████████                                     ██████

██           ██████████████████████, it seems            12:25

21    like, but -- okay.  All right.  So --                12:25

22           MR. VAN NEST:  It depends on the time of day, 12:25

23    Counsel.                                              12:25

24           MR. GONZALEZ:  Q.  So, do you recall that you  12:25

25    would brainstorm with Anthony Levandowski about ideas 12:25
```

Page 27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    that you'd come up with, including ████████?        12:25

2        A    I mean, I don't recall that, but I know he   12:25

3    was involved in that later.                          12:25

4        Q    When you say "he was involved in that later," 12:25

5    what do you mean by "later"?                         12:25

6        A    Well, I mean, after the initial            12:25

7    brainstorming.                                       12:25
```

Page 28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1



Page 29

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1   ████████

 ██      ██    █████████████

 ██      ██    ██████████████████████

 ██    █████████████████████

 ██    ████████████████████████████

 ██    ████████

 ██      ██    █████████████████████

 ██    ██████████████

 ██      ██    █████████

 ██      ██    ██████████████████

 ██    ███████      ████████████        12:28

12   Q    And I appreciate that, and it can be     12:28

13   designated attorneys' eyes only.              12:28

14         I'm just trying to make the point that you're  12:28

15   working on ██████████████████████              ████

 ██      ██    ████████████████████████      ████

 ██    ██████████████████████████████████    ████

 ██    █████████████                           ████

 ██      ██    █████████████                   ████

 ██      ██    ████████████████████  ██        ████

 ██    ████████████████████                    ████

 ██      ██    ███████████████████             ████

 ██    ███████████████████                     ████

 ██    ████████                                ████

 ██      ██    ██████████████████   ██         12:28
```

Page 30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1  ████████████████████████████████████████    ████
    ██  ████████████                             ████
    ██    ██  ████████████████████████████████   ████
    ██  ██████████████████████████████           ████
    ██    ██  ████  ██████████████████████████    ████
    ██  ████████████████████████████████████      ████
    ██  ████████                                 12:29
 8      Q   I -- I appreciate that.  And again, this can    12:29
 9  be designated attorneys' eyes only.  It's not going to  12:29
10  be released publicly, but -- and -- and I actually      12:29
11  think some of it may already be public.                 12:29
12              ████████████████████████████████  ████
    ██  █████████████████████████████████████     ████
    ██  █████████████████████████████████████     ████
    ██  ██████████████████████  ██████████████    ████
    ██    ██  ██████████████████████████████████  ████
    ██  ████████████████████████████████          ████
    ██  ████████████████████                      ████
    ██    ██  ██████████████████████████████      ████
    ██  ████████████████████                      ████
    ██    ██  ██████████████████                  ████
    ██    ██  ████████████████████████████████    ████
    ██  █████████████████████████████████████     ████
    ██  ████████████████████████                  ████
    ██    ██  ████████████████████████████████    12:29
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1    ███████████████                                    ████

 █      █   ████████████████████████                     ████

 █    ██████████████████████████████████                 ████

 █    ██████████████████████████████████                 ████

 █    █████████████████████████████                      ████

 █      █   ██████████████████████████████               ████

 █    █████                                               ████

 █      █   ████████████                                  ████

 █      █   █████████████████████████████                ████

 █    ██████████████████████                            12:30

 █      █   █████████████████████████                   12:30

12        Q    Isn't it true that you asked him to be   12:30

13    involved?                                          12:30

14        A    No, I don't think that's a correct        12:30

15    characterization.                                  12:30

16        Q    All right.                                12:30

17             Tell me what is your understanding.  ██    ████

 █    ████████████████████████████████                   ████

 █    ██████████████████████████████                     ████

 █      ██████████████████                               ████

 █      █   ██████████████████████████                   ████

 █    █████████████████████████████                      ████

 █      █   █████████████████████                        ████

 █      █   ██████████████                               ████

 █      █   ████████████████████                        12:30
```

Page 32

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



12:32

25          And you asked another question as well.          12:32

Page 33



12:33

Page 34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1

15    Q    And what was he doing before?                12:33

16    A    He was CEO of Udacity.                        12:33

17

25         MR. GONZALEZ:  Q.  Did somebody approve of   12:34

12:33
12:33
12:34

Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    it?                                              12:34

 2         A    I'm not sure of the legal process that we   12:34

 3    went through there.                               12:34
```



Page 36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



12:36

Page 37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1                                              

                                              

                                              

                                              

                                              

                                              

                                              

                                              

                                              

                                              

                                              

                                              

                                            12:37

14        Q    Aren't you currently testing autonomous    12:37

15   vehicles in Phoenix?                                 12:37

16        A    I believe so, yes.                         12:37

17        Q    And picking up passengers and taking them  12:37

18   from point A to point B in autonomous vehicles?      12:37

19        A    We have a                                  12:37

            , yeah.                                       12:37

21        Q    And, when did Google decide for the first  12:37

22   time to explore the possibility of doing that?       12:37

23        A    Of doing that exact thing?                 12:37

24        Q    No.  Just                          .       12:37

25        A    I don't -- I don't know.                   12:37
```

Page 38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | | |
|---|---|---|---|
| 1 | Q | Google invested in Uber; correct? | 12:38 |
| 2 | A | Yes. | 12:38 |
| 3 | Q | Do you recall when? | 12:38 |
| 4 | A | My answer is yes. | 12:38 |
| 5 | Q | Do you recall when? | 12:38 |
| 6 | A | No, I don't remember when we did that. | 12:38 |
| 7 | Q | And how much did Google invest in Uber? | 12:38 |
| 8 | A | It was a pretty substantial sum.  I mean, | 12:38 |
| 9 | it's ████████████. | | 12:38 |
| 10 | Q | Do you remember ███████████████? | 12:38 |
| 11 | A | I'm trying to remember.  No, I don't remember | 12:38 |
| 12 | ████████████.  A small number, I think. | | 12:38 |
| 13 | Q | Do you recall that Uber appointed David | 12:38 |
| 14 | Drummond to its Board of Directors when you made your | | 12:38 |
| 15 | investment? | | 12:38 |
| 16 | A | I think David was on -- on the board, yes. | 12:38 |
| 17 | Q | He was not on the board? | 12:38 |
| 18 | A | I said David was on the board, yeah. | 12:38 |
| 19 | Q | And, do you recall that he was on the board | 12:38 |
| 20 | at the time that Google made its investment? | | 12:38 |
| 21 | A | I don't recall that. | 12:39 |
| 22 | Q | Was due diligence done by Google before that | 12:39 |
| 23 | investment? | | 12:39 |
| 24 | A | I have no knowledge of that, but I've never | 12:39 |
| 25 | heard of a case where we did not do that. | | 12:39 |

Page 39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q    It's pretty standard to do due diligence      12:39

 2   before you go and make a significant investment; fair?   12:39

 3        A    Yeah.   It was done through Google Ventures.    12:39

 4   That's a little bit different than a corporate           12:39

 5   investment, but yeah.                                    12:39

 6        Q    Different in what way?                         12:39

 7        A    If you're going to buy a company or            12:39

 8   something, you would do more thorough diligence.         12:39

 9        Q    When you say "more thorough diligence," what   12:39

10   do you mean by that?                                     12:39

11        A    I don't know.                                  12:39

12        Q    During the time that you've been president or  12:39

13   CEO of Google, Google has made a number of               12:39

14   acquisitions; correct?                                   12:39

15        A    Yes.                                           12:39

16        Q    And, before you make acquisitions, it's        12:39

17   standard to do due diligence; correct?                   12:39

18        A    Yes.                                           12:40

19        Q    And one thing that sometimes happens is, you   12:40

20   include indemnification provisions when you acquire      12:40

21   companies; correct?                                      12:40

22        A    I'm not familiar with that, but...             12:40

23        Q    Isn't it true that, from time to time, when    12:40

24   Google acquires companies, you agree with the company    12:40

25   that you're purchasing that if they get sued, you will   12:40
```

Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   defend them?                                    12:40

 2         MR. VAN NEST:  Object to form.            12:40

 3         THE WITNESS:  I'm not familiar with all of 12:40

 4   the agreements that we make.                    12:40

 5         MR. GONZALEZ:  Q.  Are you familiar generally 12:40

 6   with that type of provision, where you buy a company, 12:40

 7   and you agree that if they get sued, you will defend 12:40

 8   them?                                           12:40

 9         MR. VAN NEST:  Object to form.            12:40

10         THE WITNESS:  Yeah, I'm not that familiar 12:40

11   with those things.                             12:40

12         MR. GONZALEZ:  Q.  Do you recall the time 12:40

13   period that Mr. Drummond sat on Uber's board?  12:40

14     A   No.  I assume that's public record, though. 12:40

15     Q   Isn't it true that, when Mr. Drummond sat on 12:40

16   Uber's board, Google was making plans to compete with 12:40

17   Uber?                                          12:41

18         MR. VAN NEST:  Object to form.            12:41

19         THE WITNESS:  I mean, I kind of saw it as the 12:41

20   other way around.  Like, when we invested in Uber, 12:41

21   they knew well that we were doing self-driving cars, 12:41

22   and they decided to do that, so...              12:41

23         MR. GONZALEZ:  Q.  What makes you believe 12:41

24   that Uber knew, when you invested in Uber, that Google 12:41

25   was doing self-driving cars?                    12:41
```

Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A   Because it was public information at the time | 12:41 |
| 2 | for a long time. | 12:41 |
| 3 | Q   For how long had that been public information | 12:41 |
| 4 | at the time that Google invested in Uber? | 12:41 |
| 5 | A   I don't know, but for a while; a long time, I | 12:41 |
| 6 | think. | 12:41 |
| 7 | Q   Why did Mr. Drummond step down from the Uber | 12:41 |
| 8 | board? | 12:41 |
| 9 | A   Well -- | 12:41 |
| 10 | MR. VAN NEST:  Object to form of the | 12:41 |
| 11 | question. | 12:41 |
| 12 | You may answer it. | 12:41 |
| 13 | THE WITNESS:  Yeah, I'm not sure what | 12:41 |
| 14 | happened.  He left the board.  I think, you know, | 12:41 |
| 15 | obviously, there was more and more conflict there. | 12:41 |
| 16 | MR. GONZALEZ:  Q.  Did you ever talk to | 12:42 |
| 17 | Mr. Drummond about whether or not he should continue | 12:42 |
| 18 | to serve on the Uber board? | 12:42 |
| 19 | MR. VAN NEST:  I'm going to object.  That | 12:42 |
| 20 | probably calls for privileged information. | 12:42 |
| 21 | Don't disclose the content.  He's just asking | 12:42 |
| 22 | you whether you had a discussion, yes or no. | 12:42 |
| 23 | THE WITNESS:  I mean, I remember being | 12:42 |
| 24 | informed that he was going to step down, and I | 12:42 |
| 25 | certainly didn't object to that. | 12:42 |

Page 42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1           MR. GONZALEZ:  Q.  Informed by who?           12:42

 2      A   I don't recall.                                12:42

 3      Q   You say you didn't object.                     12:42

 4          Did anybody tell you why he was stepping        12:42

 5    down?                                                 12:42

 6      A   Well, I mean, I already testified I think the  12:42

 7    conflict was clearly increasing.  So, my recollection 12:42

 8    of that was just there was more conflict and --      12:42

 9      Q   What was the conflict that was increasing?      12:42

10      A   I think it was clear that Uber was investing    12:42

11    heavily in self-driving technology, which we'd been  12:42

12    doing for a while already, and there was a lot of    12:42

13    conflict there.                                      12:42

14      Q   When did you learn, for the first time, that    12:43

15    Anthony Levandowski was leaving Google?              12:43

16      A   I mean, the first that I became aware of it    12:43

17    was when I got the e-mail from him.  Even then, I was 12:43

18    a bit surprised.                                     12:43

19      Q   Did you talk to him about it?                   12:43

20      A   I don't recall talking to him about it once    12:43

21    I'd gotten that e-mail, no.                          12:43

22      Q   Did you make any effort to retain him?          12:43

23      A   Yeah, I delegated that.                         12:43

24      Q   To who?                                         12:43

25      A   I don't remember exactly, but I'm assuming,    12:43
```

Page 43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | like, John, the CEO of Waymo. | 12:43 |
| 2 | Q    That would be Krafcik? | 12:43 |
| 3 | A    Krafcik. | 12:43 |
| 4 | Q    Did Mr. Krafcik ever report to you on what he | 12:43 |
| 5 | did to follow up on your delegation? | 12:44 |
| 6 | A    I mean, I think definitely he did, yeah.  But | 12:44 |
| 7 | I think -- anyway, my -- my recollection is that, you | 12:44 |
| 8 | know, he had -- he had left basically that day, the | 12:44 |
| 9 | next day. | 12:44 |
| 10 | Q    Do you recall that a year or so before | 12:44 |
| 11 | Mr. Levandowski left, he announced that he was going | 12:44 |
| 12 | to leave? | 12:44 |
| 13 | A    I mean, I wish I had a penny for every time | 12:44 |
| 14 | employees do that and don't go.  It happens pretty | 12:44 |
| 15 | often. | 12:44 |
| 16 | Q    Do you recall that Mr. Levandowski had | 12:44 |
| 17 | announced that he was leaving about a year before he | 12:44 |
| 18 | actually left? | 12:44 |
| 19 | A    No, sorry, I don't recall that. | 12:44 |
| 20 | Q    Do you recall that there was conflict between | 12:44 |
| 21 | Anthony and Chris Urmson? | 12:44 |
| 22 | A    Yes. | 12:44 |
| 23 | Q    What do you recall about that conflict? | 12:45 |
| 24 | A    I mean, it was pretty bad. | 12:45 |
| 25 | Q    Can you elaborate on what you mean by that? | 12:45 |

Page 44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A   I think they had a really hard time getting | 12:45 |
| 2 | along, and yet they worked together for a long time. | 12:45 |
| 3 | And it was a constant -- yeah, constant management | 12:45 |
| 4 | headache to help them get through that. | 12:45 |
| 5 | Q   Do you recall that Anthony Levandowski was | 12:45 |
| 6 | put on a personal improvement plan before he left? | 12:45 |
| 7 | A   I don't recall that. | 12:45 |
| 8 | Q   Do you recall that Mr. Levandowski wanted to | 12:45 |
| 9 | be head of the Project Chauffeur team? | 12:45 |
| 10 | A   I mean, that does not surprise me. | 12:45 |
| 11 | Q   Do you recall having conversations with him, | 12:45 |
| 12 | where he said to you that he wanted to be head of the | 12:45 |
| 13 | team? | 12:45 |
| 14 | A   I don't recall, but it wouldn't be | 12:45 |
| 15 | surprising, you know.  I think he clearly felt things | 12:45 |
| 16 | could be done better. | 12:45 |
| 17 | Q   Is there anybody who worked on Project | 12:46 |
| 18 | Chauffeur that you believe contributed more to that | 12:46 |
| 19 | project than Anthony Levandowski? | 12:46 |
| 20 | MR. VAN NEST:  Objection; form; asked and | 12:46 |
| 21 | answered. | 12:46 |
| 22 | THE WITNESS:  Yeah, I mean, positively or | 12:46 |
| 23 | negatively? | 12:46 |
| 24 | MR. GONZALEZ:  In a positive way. | 12:46 |
| 25 | Q   Did anybody contribute more in a positive way | 12:46 |

Page 45

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | to Project Chauffeur, in your view, than Anthony | 12:46 |
| 2 | Levandowski? | 12:46 |
| 3 | A   I -- | 12:46 |
| 4 | MR. VAN NEST:  Object to form. | 12:46 |
| 5 | THE WITNESS:  All right.  I'm not sure. | 12:46 |
| 6 | I mean, Chris -- Chris, for example, like, | 12:46 |
| 7 | was CEO of the project for a long time, and I think | 12:46 |
| 8 | had various significant contributions as the leader. | 12:46 |
| 9 | There's many technical contributors. | 12:46 |
| 10 | I'm not an expert on that question. | 12:46 |
| 11 | MR. GONZALEZ:  Q.  Do you think that | 12:46 |
| 12 | Mr. Urmson, Chris Urmson, contributed more than | 12:46 |
| 13 | Anthony to Project Chauffeur? | 12:46 |
| 14 | A   I mean, I've already stated I believe | 12:46 |
| 15 | Anthony's contributions are quite possibly negative of | 12:47 |
| 16 | a high amount, so -- | 12:47 |
| 17 | Q   What -- what do you mean by that? | 12:47 |
| 18 | Are you saying that Anthony Levandowski's | 12:47 |
| 19 | contribution to Project Chauffeur was negative? | 12:47 |
| 20 | A   That's quite likely, I think. | 12:47 |
| 21 | Q   And yet the company paid him $120 million for | 12:47 |
| 22 | his negative contribution? | 12:47 |
| 23 | A   No, absolutely not.  I think, you know, not | 12:47 |
| 24 | all compensation you make in a start-up is based on | 12:47 |
| 25 | contribution.  I think it's based on when we put that | 12:47 |

Page 46

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    plan in place, we caused a very good outcome.  It, you    12:47
2    know, more or less revolutionized an industry.            12:47
3        Q   So what -- I'm sorry.  I didn't mean to cut       12:47
4    you off.  Were you --                                     12:47
5        A   So, I think that plan -- you have to think        12:47
6    about the plan when it was put in place, not when it      12:47
7    was awarded.                                              12:47
8        Q   What leads you to believe that Anthony            12:47
9    Levandowski's contribution to Project Chauffeur was       12:47
10   negative?                                                 12:47
11       A   Well, I mean, I think it's quite possible         12:47
12   that he did things that are very bad.  I think he very    12:47
13   negatively affected morale probably as a result, and     12:48
14   many other things.  But I think that's more clear now    12:48
15   than it was then.                                         12:48
16       Q   What about his -- aside from morale of the       12:48
17   employees, what about his contributions just to the      12:48
18   autonomous vehicle that you were trying to develop?      12:48
19       Do you think his contributions to the                12:48
20   autonomous vehicle were positive or negative?           12:48
21       A   You know, again, I'm not an expert on that.      12:48
22   And I imagine it depends on your perspective.            12:48
23       Q   What is your perspective?                        12:48
24       A   I already told you my perspective.  I'm not     12:48
25   sure.  I think it could be significantly negative.      12:48
```

Page 47

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Now, to be -- he also obviously has done | 12:48 |
| 2 | technical work in other things, too.  And I'm not an | 12:48 |
| 3 | expert on that. | 12:48 |
| 4 | Q   When did you learn for the first time that | 12:48 |
| 5 | Mr. Levandowski may have taken Google information with | 12:48 |
| 6 | him when he left? | 12:49 |
| 7 | A   I'm not sure of the exact time I learned | 12:49 |
| 8 | that. | 12:49 |
| 9 | Q   Do you recall generally? | 12:49 |
| 10 | A   I mean, I'm -- if you give me some context, | 12:49 |
| 11 | I'm sure I can figure that out. | 12:49 |
| 12 | Q   Well, he left in January of 2016.  I'm not | 12:49 |
| 13 | sure -- | 12:49 |
| 14 | A   Okay.  I wasn't aware of that when he left, | 12:49 |
| 15 | if that's your question. | 12:49 |
| 16 | Q   At what point did you become aware that he | 12:49 |
| 17 | may have taken information that you believe belonged | 12:49 |
| 18 | to Google? | 12:49 |
| 19 | MR. VAN NEST:  I want to caution you, | 12:49 |
| 20 | Mr. Page, not to disclose privileged communications. | 12:49 |
| 21 | Don't talk about anything you learned from a lawyer. | 12:49 |
| 22 | He's just asking about timing now.  That's | 12:49 |
| 23 | all he wants to know, if you can recall. | 12:49 |
| 24 | THE WITNESS:  Yeah, I don't recall. | 12:49 |
| 25 | MR. GONZALEZ:  Q.  You don't recall even | 12:49 |

Page 48

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | generally the date? | 12:49 |
| 2 | A   No. | 12:49 |
| 3 | Q   Or how you found out? | 12:49 |
| 4 | A   I don't recall. | 12:49 |
| 5 | But, I think it would be very unusual for | 12:49 |
| 6 | that not to happen through a privileged exchange of | 12:49 |
| 7 | some sort. | 12:49 |
| 8 | Q   Okay.  But, sitting here today, you don't | 12:50 |
| 9 | recall the moment when you learned that | 12:50 |
| 10 | Mr. Levandowski may have taken information from | 12:50 |
| 11 | Google; is that right? | 12:50 |
| 12 | A   Yeah, I don't remember when that happened. | 12:50 |
| 13 | Q   Or how? | 12:50 |
| 14 | A   I think I was informed of it somehow by a | 12:50 |
| 15 | person, but I don't -- I don't remember how. | 12:50 |
| 16 | Q   All right. | 12:50 |
| 17 | Do you remember who the person was? | 12:50 |
| 18 | A   No, I don't remember. | 12:50 |
| 19 | Q   What was it that you understood | 12:50 |
| 20 | Mr. Levandowski took? | 12:50 |
| 21 | MR. VAN NEST:  Well, I'll -- I'll object. | 12:50 |
| 22 | Don't disclose the content of any privileged | 12:50 |
| 23 | discussion with a lawyer.  If you learned that from | 12:50 |
| 24 | someone other than a lawyer, you can testify about it. | 12:50 |
| 25 | But otherwise -- | 12:50 |

Page 49

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yeah, I don't remember.  It was | 12:50 |
| 2 | hard to miss some of the headlines, though.  But I | 12:50 |
| 3 | don't know how I learned that, though. | 12:50 |
| 4 | MR. GONZALEZ:  All right. | 12:50 |
| 5 | Q   You've made it clear you don't recall how you | 12:50 |
| 6 | learned it. | 12:50 |
| 7 | My question is:  When you learned that he | 12:50 |
| 8 | took something, allegedly, what is it that you | 12:50 |
| 9 | understood that he took? | 12:51 |
| 10 | A   I don't -- | 12:51 |
| 11 | MR. VAN NEST:  Again, Mr. Page, I'm going | 12:51 |
| 12 | to -- if that information was provided to you by a | 12:51 |
| 13 | lawyer, then I'm instructing you not to answer. | 12:51 |
| 14 | THE WITNESS:  Okay. | 12:51 |
| 15 | Yeah, I don't recall. | 12:51 |
| 16 | MR. GONZALEZ:  Q.  So, sitting here today, | 12:51 |
| 17 | you don't remember when you learned, what you learned, | 12:51 |
| 18 | or from who you learned what Mr. Levandowski allegedly | 12:51 |
| 19 | took from Google; is that right? | 12:51 |
| 20 | A   That's correct. | 12:51 |
| 21 | Q   Were you concerned when you learned that | 12:51 |
| 22 | Mr. Levandowski may have taken Google information? | 12:51 |
| 23 | A   Of course. | 12:51 |
| 24 | Q   Did you ever consider just calling | 12:51 |
| 25 | Mr. Levandowski and asking him whether he took | 12:51 |

Page 50

```
1    anything from Google?                           12:51

2        A   No, I did not consider that.            12:51

3        Q   You -- you had his personal cell phone  12:51

4    number; right?                                  12:51

5        A   I don't -- I don't think so.            12:51

6        Q   You don't remember calling Mr. Levandowski on  12:51

7    his personal cell phone?                        12:51

8        A   No.  It's possible, though.  I don't remember  12:52

9    everyone that I call.                           12:52

10       Q   When did you first learn that Mr. Levandowski  12:52

11   may have solicited people from Google or Waymo?  12:52

12           MR. VAN NEST:  Again, Mr. Page, caution as to  12:52

13   the content of any discussion with lawyers.     12:52

14           You can answer as to time, if you can recall.  12:52

15           THE WITNESS:  Yeah, I can't -- I don't recall  12:52

16   that.                                           12:52

17           MR. GONZALEZ:  Q.  Do you recall how you  12:52

18   found out that Mr. Levandowski may have solicited  12:52

19   Waymo or Google employees?                      12:52

20       A   No, I don't recall.  I think there are  12:52

21   probably some e-mails, but I don't recall them.  12:52

22       Q   Do you recall of any employee that     12:52

23   Mr. Levandowski allegedly solicited?            12:52

24       A   No.                                     12:53

25       Q   When did you first learn that Uber had  12:53
```

Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | allegedly done something wrong in connection with | 12:53 |
| 2 | Google or Waymo? | 12:53 |
| 3 |     A   I don't recall. | 12:53 |
| 4 |     Q   Do you recall how it came to your attention? | 12:53 |
| 5 |     A   No, I don't recall. | 12:53 |
| 6 |     Q   Sitting here today, what is it that you | 12:53 |
| 7 | understand Uber did that led to them being sued by | 12:53 |
| 8 | Waymo? | 12:53 |
| 9 |        MR. VAN NEST:  Again, Mr. Page, don't divulge | 12:53 |
| 10 | the content of any discussion with lawyers. | 12:53 |
| 11 |        If you have information for counsel outside | 12:53 |
| 12 | of that, please provide it. | 12:53 |
| 13 |        THE WITNESS:  I mean, I can read the | 12:53 |
| 14 | progress, I guess, of the court case.  Obviously, | 12:53 |
| 15 | there's trade secret, and there's also a poaching that | 12:53 |
| 16 | went on that's subject to the arbitration.  There's | 12:53 |
| 17 | trade secret and a set of e-mails and so on. | 12:53 |
| 18 |        MR. GONZALEZ:  Q.  Do you understand that | 12:54 |
| 19 | Waymo sued Uber for infringing on patents? | 12:54 |
| 20 |     A   I'm aware that's part of the lawsuit. | 12:54 |
| 21 |     Q   Are you aware of the fact that Waymo has | 12:54 |
| 22 | dismissed three of the four patents? | 12:54 |
| 23 |     A   I mean, I've read that in the press, yes. | 12:54 |
| 24 |     Q   What is the patent that is left in the case, | 12:54 |
| 25 | as you understand it? | 12:54 |

Page 52

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A    I have no idea. | 12:54 |
| 2 | Q    What does the patent cover? | 12:54 |
| 3 | A    I'm not familiar with those details. | 12:54 |
| 4 | Q    What is the most significant trade secret | 12:54 |
| 5 | that you believe Uber has misappropriated from Waymo | 12:54 |
| 6 | or Google? | 12:54 |
| 7 | MR. VAN NEST:  And again, Mr. Page, if this | 12:54 |
| 8 | information was provided in a discussion with one of | 12:54 |
| 9 | your lawyers, I instruct you not to answer it. | 12:54 |
| 10 | You may answer outside of that. | 12:55 |
| 11 | THE WITNESS:  Yeah, I'm not -- I'm not sure. | 12:55 |
| 12 | MR. GONZALEZ:  Q.  You're not familiar with | 12:55 |
| 13 | the details of the trade secrets that are at issue | 12:55 |
| 14 | here? | 12:55 |
| 15 | A    Yes. | 12:55 |
| 16 | Q    You don't know, for example, what the trade | 12:55 |
| 17 | secrets are that Uber allegedly misappropriated? | 12:55 |
| 18 | A    No, I do not. | 12:55 |
| 19 | Q    Whenever it was that you learned -- let me | 12:55 |
| 20 | make sure I'm clear on this. | 12:55 |
| 21 | You don't remember, sitting here today, when | 12:55 |
| 22 | you learned or how you learned that Uber may have | 12:55 |
| 23 | misappropriated Google or Waymo trade secrets; is that | 12:55 |
| 24 | right? | 12:55 |
| 25 | A    That's correct. | 12:55 |

Page 53

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q   And you don't remember how you learned?        12:55

2    A   I mean, that's correct, yes.                   12:55

3    Q   Whenever you learned that Uber may have        12:55

4  done -- well, strike that.                           12:55

5        Did you authorize the filing of the lawsuit    12:55

6  against Uber?                                        12:55

7    A   I mean, I'm certainly aware of it, yeah, and   12:55

8  then allowed it to proceed, I suppose.  I'm not sure I 12:56

9  authorized it.  I'm not sure that's the right word.  12:56

10   Q   Well, could a lawsuit of this magnitude be     12:56

11 filed without your consent and approval?             12:56

12   A   I mean, I guess I'm not -- I'm the CEO of the  12:56

13 company -- parent company of Waymo, and Waymo operates 12:56

14 more or less as an independent company.              12:56

15   Q   Can Way- --- is Waymo authorized to file a     12:56

16 lawsuit like this on its own without even consulting  12:56

17 you?                                                 12:56

18   A   I mean, I don't know all the details of that.  12:56

19   Q   Well, you're the boss.                         12:56

20       What -- what is your state of mind?            12:56

21       Do you believe that Waymo is authorized to    12:56

22 file a lawsuit like this without giving you notice?  12:56

23       MR. VAN NEST:  Object to form.                 12:56

24       THE WITNESS:  I mean --                        12:56

25       MR. GONZALEZ:  I'll restate it.  Let me --     12:56

Page 54

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    let me restate it, sir.                              12:56

 2        Q   Do you believe that Waymo is authorized to   12:56

 3    file a lawsuit like this without giving you notice?  12:56

 4            MR. VAN NEST:  Object to form.               12:56

 5            THE WITNESS:  I mean, I've already testified  12:56

 6    that I was notified.                                 12:56

 7            MR. GONZALEZ:  You were notified, but my     12:56

 8    question is slightly different.                      12:57

 9        Q   Do you believe that Waymo could authorize the 12:57

10    filing of this lawsuit without notifying you?        12:57

11        A   I mean, I don't know the answer to that.     12:57

12        Q   When you learned that a lawsuit was going to  12:57

13    be filed against Uber, did you consider ████████ ███  
```

████ ████████████████████████████████████████ ███

████ ██████████                                  ███

████    █ ███████████████████████████████████    ███

████ ████████████████████ █████████████████████  ███

████ ████████                                    ███

████    █ ████████████████████████               ███

████    █ █ ████████████████████████████████     ███

████ ████                                        ███

████    █ ████████████████████████████████████   ███

████ ██████                                      ███

████    █ ████████████████████████████           ███

████    █ ████████████████████████████████       12:57

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   ███████████████████████████████████   ███████

    ██   ███████████████                                    12:57

3        MR. VAN NEST:  Again, Mr. Page, I want to   12:57

4   caution you not to disclose the content of the   12:57

5   discussions with lawyers.                        12:57

6        THE WITNESS:  Yeah.  Then I guess my        12:58

7   recollection is a little hazy with regards to the  12:58

8   different things.  There's an arbitration and there's  12:58

9   a lawsuit and so on.                             12:58

10       MR. GONZALEZ:  Right.                        12:58

11   Q   So, I'm focusing on the lawsuit against Uber.  12:58

12   A   Well, the -- yeah, I don't even know...      12:58

13       MR. VAN NEST:  Again -- again, don't disclose  12:58

14   the content of an attorney discussion.           12:58

15       THE WITNESS:  Okay.                          12:58

16       MR. GONZALEZ:  It sounds like you may not    12:58

17   remember such a discussion.                      12:58

18   Q   And so I'm just trying to find out --        12:58

19       MR. VAN NEST:  You -- you can answer a       12:58

20   question about your memory, if that's what counsel  12:58

21   wants to ask.                                    12:58

22       MR. GONZALEZ:  Q.  Do you recall ██████████   ███████

    ██   █████████████████████████████████████████   ███████

    ██   █████████████████████████████████?          12:58

25   A   Look, I don't -- like, I don't recollect     12:58

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the -- you know, exactly what happened. ███████████  ███████

                                                          12:59

8         MR. VAN NEST:  Just answer as to your          12:59

9    recollection, not what was said or not said, please.  12:59

10        THE WITNESS:  Yeah, I don't recall that.        12:59

11        MR. GONZALEZ:  Q.  When did Google start        12:59

12   speaking with Lyft about the possibility of having    12:59

13   some kind of a joint venture with them?               12:59

14    A   I mean, I'm not familiar with the details.       12:59

15   You know, I am not sure when we started talking to     12:59

16   them.                                                  12:59

17    Q   You understand that you now have an agreement     12:59

18   with Lyft; correct?                                    12:59

19    A   Yeah, we have an announced agreement with         12:59

20   Lyft.                                                  12:59

21    Q   And who is the person at Google, Alphabet, or     12:59

22   Waymo, whichever entity it was, who was in charge of   12:59

23   those negotiations or discussions with Lyft?           12:59

24    A   Mainly, that fell -- produced squarely under      12:59

25   John Krafcik, CEO of Waymo.  I mean, we may have other 12:59

Page 57

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    deals with Lyft.  The one you're talking about is with    13:00
2    Waymo, not with Google.                                   13:00
3        Q   And what's the general substance, as you          13:00
4    understand it, of that agreement?                         13:00
5        A   I think the agreement basically provides for      13:00
6    some cooperation between Waymo and Lyft.                  13:00
7        Q   What type of -- I'm sorry -- what type of         13:00
8    cooperation?                                              13:00
9        A   ████████████████████████████████████    ██████
     ██████████████████████  ███████████████████    ██████
     ████████████████████████████████                        13:00
12       Q   How long is the agreement for?                    13:00
13       A   Oh, I don't know.  I don't know.                  13:00
14       Q   ████████████████████████████████████    ██████
     ██████████████████████████                              13:00
16       █  ███████████████  ████████████████████    ██████
     ████████████████████████████████████████████    ██████
     ███████████████████████████                             13:00
19           MR. PERLSON:  Let me just note for the record     13:00
20   that there is a pending motion for protective order in    13:00
21   relation to Lyft.  We're not going to cut off             13:00
22   questions now, but there may be further objections in     13:00
23   dealing with what was on the record on that.  But we      13:01
24   can deal with that later.                                 13:01
25           MR. GONZALEZ:  Q.  ████████████████████████       13:01
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1   ████████████████████████████████            13:01

 2        MR. VAN NEST:  Object to form.          13:01

 3        THE WITNESS:  Again, I'm not, like, expert on  13:01

 4   that. ████████████████████████████████        █████

     ██████████████████████████████████            █████

     ████████████████████████████                  13:01

 7        MR. GONZALEZ:  Q. ███████████████         █████

     ████████████████████████████████              █████

     ███████████████████████████████████           █████

     ███████████                                    █████

         █   ████████████████████████████          █████

     ███████████████                                13:01

13        Q   Can you think of any other component?  13:01

14        A   I mean, there's many other things you could  13:01

15   do. ███████████████████████████████            █████

     ████████████████████████     ███████████████   █████

     ██████████████████████    ████████████████     █████

     █████████████                                   █████

         █   ████████████████████████████           █████

     ████████████████████████████████████████       █████

     █████████████████████████████████████          █████

     ███████████████████████████████                13:02

23        Is that what you meant?                   13:02

24        MR. VAN NEST:  Object to form.            13:02

25        THE WITNESS:  Yeah, I'm not sure what you  13:02
```

Page 59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    mean by that, but...                              13:02
 2          MR. GONZALEZ:  Q.  I was just trying to     13:02
 3    understand what you meant when you said ██████    ████
 █    ██████████████████                                13:02
 5      A   All right.                                  13:02
 6          So the question?                            13:02
 7      Q   What did you mean by that?                  13:02
 8      A   Yeah, like, ████████████████████████        ████
 █    ████████████████████████                          ████
 █    ██  ██████████████████████████████████            ████
 █    ██        ██████████████████████████████          13:02
12          MR. VAN NEST:  Object to form.              13:02
13          THE WITNESS:  Yeah, I'm not sure exactly what  13:02
14    we do in that case.                               13:02
15          MR. GONZALEZ:  Q.  Did you play any role in 13:02
16    the discussions with Lyft?                        13:03
17      A   I mean, I was aware of them.  I'm not sure  13:03
18    what feedback I gave, if any.                     13:03
19      Q   How were you aware of them?                 13:03
20      A   I periodically speak with John Krafcik, who 13:03
21    runs Waymo.                                       13:03
22      Q   Do you remember how many times you spoke to 13:03
23    him about the Lyft agreement?                     13:03
24      A   I do not.                                   13:03
25      Q   Let me ask you a couple of questions about  13:03
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    side businesses.                                  13:03

 2         You understand that there are a number of    13:03

 3    Google employees who have side businesses while   13:03

 4    they're employed by Google; correct?              13:03

 5      A   I mean, I'm not -- I don't, like, get a     13:03

 6    report on that or anything, but --                13:04

 7      Q   But just generally, you're aware of the fact 13:04

 8    that many of your colleagues at Google also have side 13:04

 9    businesses; correct?                              13:04

10         MR. VAN NEST:  Object to form.               13:04

11         THE WITNESS:  I mean, I think that's pretty  13:04

12    unusual.                                          13:04

13         MR. GONZALEZ:  Q.  What is unusual?          13:04

14      A   I mean, side businesses are fairly unusual. 13:04

15    I don't -- I mean, you're saying many of my       13:04

16    colleagues.  I don't -- I object to that, I guess. 13:04

17      Q   Are you aware that some of your colleagues at 13:04

18    Google have side businesses?                      13:04

19         MR. VAN NEST:  Object to form.               13:04

20         THE WITNESS:  I mean, I'm not sure which ones 13:04

21    you mean.  Colleagues -- you mean some employees at 13:04

22    Google?                                           13:04

23         MR. GONZALEZ:  Yes.                          13:04

24         THE WITNESS:  I mean...                      13:04

25         MR. GONZALEZ:  Q.  Can you think of any      13:04
```

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   employees at Google who have side businesses, other      13:04
 2   than ████████████████████████████████████████?          13:04
 3       A    I've already stated it's pretty unusual.  I      13:04
 4   think it's pretty normal for people to invest in other   13:05
 5   companies.  So very many people have investments,        13:05
 6   which I would, you know, characterize those more as      13:05
 7   investments, I guess.                                    13:05
 8            I think -- so I think side businesses           13:05
 9   themselves would be pretty unusual.  I can't think of    13:05
10   a lot of examples of that, or any, actually, at the      13:05
11   moment.                                                  13:05
12       Q    Can you think of any side businesses that       13:05
13   Brian McClendon has?                                     13:05
14       A    No.  He's no longer an employee with us.        13:05
15       Q    Is there any restriction at Google with         13:05
16   respect to where your employees can invest their         13:05
17   money?                                                   13:05
18       A    I mean, there's -- you know, there is a lot     13:05
19   of complex legal concerns and so on.  So, I'm sure       13:05
20   there are some restrictions, yes --                      13:05
21       Q    You don't --                                    13:05
22       A    -- in some reporting.                           13:06
23       Q    Do you know what they are?                      13:06
24       A    I don't know what all of them are, no.          13:06
25       Q    For example, are your employees allowed to      13:06
```

Page 62

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | invest in other companies that are working on | 13:06 |
| 2 | self-driving vehicles? | 13:06 |
| 3 | A   I don't know the answer to that. | 13:06 |
| 4 | Q   You understand that Mr. Levandowski, while he | 13:06 |
| 5 | worked at Google, had side businesses, one called | 13:06 |
| 6 | Anthony's Robots and one called 510 Systems; correct? | 13:06 |
| 7 | A   I mean, I was aware that we bought some | 13:06 |
| 8 | companies from Anthony in the early days. | 13:06 |
| 9 | Q   Did you understand that those companies were | 13:06 |
| 10 | involved with autonomous driving? | 13:06 |
| 11 | A   I don't remember what the companies were | 13:06 |
| 12 | involved in. | 13:06 |
| 13 | Q   You don't remember anything about what the | 13:06 |
| 14 | companies did? | 13:06 |
| 15 | A   No.  I mean, I remember them.  You know, | 13:06 |
| 16 | they're some relation to Anthony, and he had some | 13:06 |
| 17 | companies.  And he generally worked on self-driving, | 13:06 |
| 18 | but I don't know the details of that. | 13:06 |
| 19 | Q   Did you agree with the decision to buy the | 13:07 |
| 20 | companies? | 13:07 |
| 21 | A   I mean, that was a long time ago.  I | 13:07 |
| 22 | certainly think I was somewhat involved in that and, | 13:07 |
| 23 | you know, approved it or whatever. | 13:07 |
| 24 | Q   Do you have any recollection as to what the | 13:07 |
| 25 | purchase price was? | 13:07 |

Page 63

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A    No, I don't remember the purchase price.        13:07
 2        Q    Did you have any concern, at the time, that     13:07
 3   Mr. Levandowski had these side businesses while he was    13:07
 4   an employee of Google?                                    13:07
 5        A    I mean, my recollection was more that we        13:07
 6   purchased something early on from him.                    13:07
 7        Q    Did you have any concern, at the time that      13:07
 8   you made the purchase, that Mr. Levandowski had these     13:07
 9   side businesses while he was an employee of Google?       13:07
10        A    I mean, I remember there being a discussion     13:07
11   about buying the companies, and then that was            13:07
12   resolved.  But I don't -- I don't recall other things    13:07
13   about that.                                               13:07
14             (Document marked Exhibit 1087                   13:08
15              for identification.)                           13:08
16             MR. GONZALEZ:  Let me show you a document       13:08
17   that we've marked as Exhibit 1087.                        13:08
18             MR. VAN NEST:  Thank you.                       13:08
19             MR. GONZALEZ:  This is a multipage document,    13:08
20   with Bates Nos. WAYMO '26147 through '26167.  It's        13:08
21   dated May of 2011, entitled:                              13:08
22             "Project Chauffeur."                            13:08
23        Q    Sir, I'm not going to ask you to review the     13:08
24   entire document, but I just want to ask you -- go         13:08
25   ahead.  Continue flipping through it.                     13:08
```

Page 64

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          Are you generally familiar with this        13:08
 2    document?                                          13:08
 3       A   I mean, I don't recall having seen this     13:08
 4    document.                                          13:08
 5       Q   If you'll look at the page '26164.  It's    13:09
 6    Exhibit A.  I think you're very close to it.       13:09
 7       A   Oh, towards the back, you're saying?        13:09
 8       Q   Yes.  It's Exhibit A, '26164.               13:09
 9          Do you see the numbers on the bottom right   13:09
10    where your hand is, the numbers?                   13:09
11       A   Yep.                                        13:09
12       Q   There you go.                               13:09
13       A   (Witness complies.)                         13:09
14          Okay.                                        13:09
15       Q   Do you recall that ████████████     █████
   █   ███████████████████████████     █████
   █   ████████████████████████████     █████
   █     █ ██████████████████████     █████
   █   ██████████████████████████████     █████
   █     ████████████████████████  I don't know  13:09
21    that I was aware of it then.                       13:09
22       Q   █████████████████████████     █████
   █   █████████████████████████████████     █████
   █     ██████████████████████              13:09
25          MR. VAN NEST:  Object to form.              13:09
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1              THE WITNESS:  Yeah, I don't -- I don't      13:09
 2    recall.                                               13:10
 3              MR. GONZALEZ:  Q.  Do you recall ▮▮▮▮▮       ▮▮▮▮
      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                                      ▮▮▮▮
      ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                                  ▮▮▮▮
      ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                          ▮▮▮▮
      ▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮                                     ▮▮▮▮
      ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                                  ▮▮▮▮
      ▮▮▮▮▮                                                 13:10
10        A   I mean, certainly -- I'm sure we know the     13:10
11    answers to this, so, I mean, I don't --               13:10
12              MR. VAN NEST:  Wait -- wait for --          13:10
13              THE WITNESS:  -- I'm not an expert.         13:10
14              MR. VAN NEST:  -- wait for his question,    13:10
15    Mr. Page.                                             13:10
16              THE WITNESS:  Yeah.                         13:10
17              MR. GONZALEZ:  Q.  Do you recall ▮▮▮        ▮▮▮▮
      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                             ▮▮▮▮
      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                                  ▮▮▮▮
      ▮▮▮▮▮▮▮▮                                              ▮▮▮▮
      ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                                 ▮▮▮▮
      ▮▮▮▮▮▮▮▮▮                                             ▮▮▮▮
      ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                                   ▮▮▮▮
      ▮▮▮▮▮▮▮▮▮▮   My question is somewhat                  13:10
25    different.                                            13:10
```

Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A   I know.  I don't know.                   13:10

 2      Q   Let me try it again, and then you can give  13:10

 3   that answer.                                    13:10

 4          Do you know ██████████████████      ████   

 ██  ████████████████████████████████████████      ████

 ██  ████████████████████████████████████████      ████

 ██  ████████████████████████                     13:10

 8          MR. VAN NEST:  Object to form.          13:10

 9          THE WITNESS:  I don't know.             13:10

10          But honestly, you know, Anthony had a larger  13:11

11   role in 2011 than he did later.  So his payouts may --  13:11

12   under this plan might have been higher than it  13:11

13   otherwise would have been, which happens in start-ups,  13:11

14   too.                                           13:11

15          MR. GONZALEZ:  Q.  What do you mean when you  13:11

16   say he "had a larger role in 2011 than he did later"?  13:11

17          What was the larger role that he had in 2011  13:11

18   that you think he didn't have later?            13:11

19      A   I think he was, like, more in charge of the  13:11

20   project.  Like, I don't remember exactly.  It was a --  13:11

21   I think he had a larger leadership role.        13:11

22      Q   Was there anything in particular that he did  13:11

23   in his leadership role in 2011 that you believe he  13:11

24   didn't do in later years?                       13:11

25      A   I think he probably had greater          13:11
```

Page 67

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    responsibility at that time.                          13:11

2        Q    Is there anything in particular that comes to  13:11

3    mind that he had in terms of a responsibility in 2011  13:11

4    that you believe he didn't have later?                13:11

5        A    I mean, my -- you know, my recollection is    13:11

6    kind of hazy again.  But, you know, at some point --   13:11

7    and I don't know if 2011 -- but, at some point in      13:12

8    time, I think he was, like, more in charge of the      13:12

9    team.                                                  13:12

10       Q    And when you say "more in charge of the       13:12

11   team," is there anything specific that you believe he  13:12

12   was doing in 2011 to be in charge of the team that he  13:12

13   didn't do later?                                       13:12

14       A    He did -- I'm not speaking about what he did.  13:12

15   I'm speaking about his responsibility.                 13:12

16       Q    Is there any particular responsibility that   13:12

17   comes to mind, that he had in 2011, that you believe   13:12

18   he did not have later?                                 13:12

19       A    Well, I've already stated I think he had more  13:12

20   responsibility earlier than he did later, so for more  13:12

21   people or more groups, but I don't remember the detail  13:12

22   of it.                                                 13:12

23       Q    Can you remember any more specifically, than  13:12

24   what you just said, what the additional                13:12

25   responsibilities were that you believe Mr. Levandowski  13:12

                                                    Page 68

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | had in 2011, but that you believe he did not have | 13:12 |
| 2 | later? | 13:12 |
| 3 | A   My understanding in the early days is, he was | 13:12 |
| 4 | responsible for most of the team.  You know, there's | 13:12 |
| 5 | some relationship with Sebastian, too.  He was pretty | 13:12 |
| 6 | expert.  I don't know exactly.  And he, over time, got | 13:12 |
| 7 | more responsibility from more areas.  I don't remember | 13:12 |
| 8 | that exactly. | 13:13 |
| 9 | I think that, over time, he got -- he got | 13:13 |
| 10 | sort of a more limited responsibility with respect to | 13:13 |
| 11 | hardware or -- or LiDAR or so on, and then had a -- as | 13:13 |
| 12 | I already mentioned, a fractious relationship with | 13:13 |
| 13 | Chris, who was then CEO. | 13:13 |
| 14 | Q   Was there anything other than -- | 13:13 |
| 15 | A   I'm not expert on any of that.  There's many | 13:13 |
| 16 | people who understand it better than I do. | 13:13 |
| 17 | Q   Was there anything, other than the | 13:13 |
| 18 | relationship with Chris, that you believe led to | 13:13 |
| 19 | Anthony Levandowski having a lesser role in later | 13:13 |
| 20 | years? | 13:13 |
| 21 | MR. VAN NEST:  Object to form. | 13:13 |
| 22 | THE WITNESS:  Yeah, I don't know.  I don't | 13:13 |
| 23 | know how -- what all happened or whatever.  I'm just | 13:13 |
| 24 | telling you, I think there was more responsibility | 13:13 |
| 25 | early on. | 13:13 |

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1        MR. GONZALEZ:  Q. ████████████████████    ██████
██    ███████████████████                            ██████
██    █    █████████████████████████                 ██████
██         █████████████████████    █████████        ██████
██    █    ████                                       ██████
██    █    ███████████████████████                   ██████
██    █    ██████████████████████████████            ██████
██    █    █████████████                              ██████
██    █    ████████    ████████████████               ██████
██         █████████████████                          ██████
██    █    ██████████████████████████                 ██████
██    █    ███████████████████████████████████████    ██████
██         █████████████████████████████████████████  ██████
██         ███████████████████████████████            ██████
██    █    ███████████████████                        ██████
██    █    █████████████████████████████████          ██████
██         ████████████████████████                   ██████
██    █    █████████████████████████████████████      ██████
██         ██████████████████████                     13:14
20        Q   At some point, did you learn that Anthony   13:14
21   Levandowski was working on self-driving trucks?       13:15
22        A   I mean, at some point I know it became       13:15
23   public, yes.                                          13:15
24        Q   And, do you recall that he spoke to you about 13:15
25   that concept before he left Google?                   13:15
```

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A    Yeah. | 13:15 |
| 2 | Q    And, do you recall that you were not | 13:15 |
| 3 | supportive? | 13:15 |
| 4 | A    Well, no.  I'd say not only was I not | 13:15 |
| 5 | supportive, I felt like he was clearly in competition | 13:15 |
| 6 | with what Google was doing, or Waymo. | 13:15 |
| 7 | Q    Let me make sure you understood my question. | 13:15 |
| 8 | Before Mr. Levandowski left Google -- | 13:15 |
| 9 | A    Yes. | 13:15 |
| 10 | Q    -- do you recall that he asked you whether | 13:15 |
| 11 | you wanted to do autonomous trucks at Google? | 13:15 |
| 12 | A    I don't recall that. | 13:15 |
| 13 | And I remember him talking about being | 13:15 |
| 14 | interested in trucking -- | 13:15 |
| 15 | Q    All right.  That -- | 13:15 |
| 16 | A    -- and implying that he could do a start-up | 13:15 |
| 17 | in that area. | 13:15 |
| 18 | And I told him very, very clearly that I | 13:15 |
| 19 | thought that was highly competitive and not a good | 13:15 |
| 20 | idea. | 13:16 |
| 21 | Q    When you say "implying that he could do a | 13:16 |
| 22 | start-up," what are the words that he used, if you can | 13:16 |
| 23 | recall? | 13:16 |
| 24 | A    Like, "I am sick of all these people."  I | 13:16 |
| 25 | mean, I'm paraphrasing.  But, you know, "I'm tired of | 13:16 |

Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | dealing with all these people who don't like me." | 13:16 |
| 2 | I mean, he's kind of a grumpy person | 13:16 |
| 3 | sometimes.  And, you know, "Why don't I just go do a | 13:16 |
| 4 | company that does trucking?  And everything will be | 13:16 |
| 5 | fine." | 13:16 |
| 6 | I'm, like, No, that's not fine.  Like, that's | 13:16 |
| 7 | the same thing as what you're doing here.  I mean, you | 13:16 |
| 8 | can do that, but we are not going to be happy. | 13:16 |
| 9 | Q   I want to make sure that you finish the | 13:16 |
| 10 | conversation. | 13:16 |
| 11 | Have you now told me everything that you can | 13:16 |
| 12 | recall saying? | 13:16 |
| 13 | A   I don't -- I don't know if that's all I can | 13:16 |
| 14 | recall, but that's the -- the gist of it, in my mind. | 13:16 |
| 15 | Q   Is there anything else that you can recall? | 13:16 |
| 16 | A   I now believe he was trying to get me to say | 13:16 |
| 17 | that it would not be competitive if he did trucking, | 13:16 |
| 18 | because he was already doing it.  That's pretty clear | 13:16 |
| 19 | to me. | 13:17 |
| 20 | Q   When is it that you had this conversation? | 13:17 |
| 21 | A   Soon before he left.  I don't remember | 13:17 |
| 22 | exactly when. | 13:17 |
| 23 | Q   Did you ask him whether Google might be | 13:17 |
| 24 | interested, or did you say to him that Google might be | 13:17 |
| 25 | interested in trucking? | 13:17 |

Page 72

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A    Yeah.  I mean, that's basically what I said. | 13:17 |
| 2 | Like -- but I think he was pretty clear he was just | 13:17 |
| 3 | trying to justify something that he'd already decided | 13:17 |
| 4 | to do. | 13:17 |
| 5 | Q    So, what are the words that you recall saying | 13:17 |
| 6 | to him with respect to Google's interest in autonomous | 13:17 |
| 7 | trucking? | 13:17 |
| 8 | A    Well, I think I don't remember my words.  I | 13:17 |
| 9 | just was clear that we are -- we were obviously | 13:17 |
| 10 | interested in that area because it's the same thing, | 13:17 |
| 11 | basically. | 13:17 |
| 12 | Q    So, Mr. Levandowski said something to you | 13:17 |
| 13 | about starting a new company dealing with autonomous | 13:17 |
| 14 | trucks and -- | 13:17 |
| 15 | A    No.  He speculated that he might do | 13:17 |
| 16 | something, and I was clearly negative on that.  And | 13:17 |
| 17 | then he sort of dropped it at that. | 13:17 |
| 18 | Q    Is there anything in writing about this, that | 13:17 |
| 19 | you are aware of? | 13:18 |
| 20 | A    I'm not aware of anything in writing, but I'm | 13:18 |
| 21 | not sure it's that relevant. | 13:18 |
| 22 | Q    Was anybody else present? | 13:18 |
| 23 | A    I'm not sure. | 13:18 |
| 24 | Q    Did you tell anybody about the conversation? | 13:18 |
| 25 | A    I don't recall.  But, I think it wouldn't | 13:18 |

Page 73

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | surprise me if other people were aware of those | 13:18 |
| 2 | general things. | 13:18 |
| 3 | Q   At any point, did you tell anybody about the | 13:18 |
| 4 | conversation? | 13:18 |
| 5 | A   I mean, I'd be surprised if I didn't, but I | 13:18 |
| 6 | don't recall what I did. | 13:18 |
| 7 | Q   When did you learn that, in fact, | 13:18 |
| 8 | Mr. Levandowski was working on an autonomous trucking | 13:18 |
| 9 | project? | 13:18 |
| 10 | A   I don't recall when I -- when that happened. | 13:18 |
| 11 | I think, you know, I got some e-mail or something, or | 13:18 |
| 12 | read about it in the press or -- | 13:18 |
| 13 | Q   And what was your reaction? | 13:18 |
| 14 | A   I was pretty angry about it or upset with | 13:18 |
| 15 | him. | 13:18 |
| 16 | Q   Did you say anything to the person who | 13:18 |
| 17 | informed you of that? | 13:18 |
| 18 | A   I don't recall. | 13:18 |
| 19 | Q   At that moment, when you learned that | 13:19 |
| 20 | Mr. Levandowski was involved with autonomous trucking, | 13:19 |
| 21 | did you consider calling him and talking to him about | 13:19 |
| 22 | it? | 13:19 |
| 23 | A   No, I didn't really consider that. | 13:19 |
| 24 | Q   Did you think it was inappropriate for him to | 13:19 |
| 25 | do that? | 13:19 |

Page 74

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A    I mean, it's, you know, perfectly reasonable     13:19

 2   for people to start up other competing companies.  I      13:19

 3   think the point he was trying to make to me is that we     13:19

 4   should be happy about that, which is our decision, not     13:19

 5   his.                                                       13:19

 6        Q    So, when you said that you weren't happy --      13:19

 7   actually, you said, I was pretty angry about it.           13:19

 8             Why were you angry?                              13:19

 9        A    Well, I felt like his conversations with me      13:19

10   were disingenuous.                                         13:19

11        Q    But you didn't think it was inappropriate for    13:19

12   him to start up a competing company; did you?             13:19

13             MR. VAN NEST:  Object to form;                   13:19

14   "inappropriate."                                           13:19

15             THE WITNESS:  I don't know all the               13:19

16   restrictions he might be under or the various              13:19

17   contracts and so on.  So, that's a very complex            13:19

18   question.                                                  13:19

19             MR. GONZALEZ:  Q.  In your mind, would it        13:19

20   have been inappropriate for him to have conversations      13:20

21   with General Motors, when he was still a Google            13:20

22   employee, about maybe starting up a trucking company?      13:20

23             MR. VAN NEST:  Objection to form.                13:20

24             THE WITNESS:  I mean, I'm not a lawyer.  I       13:20

25   don't know what all the issues would be with that,         13:20
```

Page 75

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | but -- | 13:20 |
| 2 | MR. GONZALEZ:  Q.  Do you have any issues | 13:20 |
| 3 | with that yourself? | 13:20 |
| 4 | A   I mean, I think it would be pretty unusual | 13:20 |
| 5 | for an employee to start operating on a new business | 13:20 |
| 6 | while they're working on their current business with | 13:20 |
| 7 | their employer, and that sounds highly unusual. | 13:20 |
| 8 | Q   And, to be clear, that's not what I'm asking | 13:20 |
| 9 | about, operating any business. | 13:20 |
| 10 | I'm asking right now just about | 13:20 |
| 11 | communications, conversations. | 13:20 |
| 12 | A   Well, conversations as Waymo, or | 13:20 |
| 13 | conversations as Anthony himself? | 13:20 |
| 14 | Q   As Anthony himself. | 13:20 |
| 15 | Let me rephrase the question. | 13:20 |
| 16 | A   I'm not a lawyer. | 13:20 |
| 17 | Q   I just want to know what you believe.  You're | 13:20 |
| 18 | not -- you're not a lawyer, but you're the CEO of the | 13:20 |
| 19 | company. | 13:20 |
| 20 | In your view, as CEO of the company, are | 13:20 |
| 21 | employees allowed to have conversations with third | 13:20 |
| 22 | parties about start-ups that they might want to form? | 13:21 |
| 23 | MR. VAN NEST:  Objection to form. | 13:21 |
| 24 | THE WITNESS:  If I was asked that question, I | 13:21 |
| 25 | would ask my lawyer, and I'd have them talk to them. | 13:21 |

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. GONZALEZ:  Q.  You don't have an opinion, | 13:21 |
| 2 | one way or the other, sitting here today, as to | 13:21 |
| 3 | whether your employees can do that? | 13:21 |
| 4 | MR. VAN NEST:  Object to form. | 13:21 |
| 5 | THE WITNESS:  So, it sounds to me like a | 13:21 |
| 6 | legal question. | 13:21 |
| 7 | MR. GONZALEZ:  Q.  It may also be a business | 13:21 |
| 8 | question; right? | 13:21 |
| 9 | So, I'm asking you from the business side. | 13:21 |
| 10 | Is there anything at Google, any policy that | 13:21 |
| 11 | you're aware of, that prevents employees from talking | 13:21 |
| 12 | to third parties about the possibility of doing a | 13:21 |
| 13 | start-up? | 13:21 |
| 14 | MR. VAN NEST:  Objection.  It's vague. | 13:21 |
| 15 | THE WITNESS:  I mean, a start-up, that's, you | 13:21 |
| 16 | know, exactly what you're currently doing, or | 13:21 |
| 17 | something else, or depending on whether we bought your | 13:21 |
| 18 | company or not, or many other things. | 13:21 |
| 19 | I don't know.  That's a complicated question, | 13:21 |
| 20 | and I generally would ask my attorney that question to | 13:21 |
| 21 | look at that. | 13:21 |
| 22 | MR. GONZALEZ:  Q.  Are you generally aware of | 13:22 |
| 23 | the policies of Google? | 13:22 |
| 24 | A   I mean, there's a lot of policies. | 13:22 |
| 25 | Q   Understood. | 13:22 |

Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Are you generally aware of the policies at | 13:22 |
| 2 | Google that deal with employees starting up their own | 13:22 |
| 3 | companies? | 13:22 |
| 4 | A   I wouldn't say I'm generally aware of that. | 13:22 |
| 5 | I don't think that comes into practice very often. | 13:22 |
| 6 | Q   Are you aware of any situation where an | 13:22 |
| 7 | employee has wanted to start up a new company, and | 13:22 |
| 8 | Google said to that employee, You can't do it? | 13:22 |
| 9 | A   I mean, those exact quotes? | 13:22 |
| 10 | Q   Or words to that effect. | 13:22 |
| 11 | A   I mean, I'm not aware of that. | 13:22 |
| 12 | Q   So, let me ask you about Anthony. | 13:22 |
| 13 | A   Yeah. | 13:22 |
| 14 | Q   Not a hypothetical, but about -- about | 13:22 |
| 15 | Anthony Levandowski. | 13:22 |
| 16 | If, after having this conversation with you | 13:22 |
| 17 | about trucking -- you say it was shortly before he | 13:22 |
| 18 | left. | 13:23 |
| 19 | If that same day Mr. Levandowski had called | 13:23 |
| 20 | General Motors and said, "Hey, I've got an idea about | 13:23 |
| 21 | autonomous trucking.  Maybe we can ship stuff on | 13:23 |
| 22 | trucks without drivers," in your view, would that have | 13:23 |
| 23 | been a violation of some Google policy? | 13:23 |
| 24 | MR. VAN NEST:  Object to form. | 13:23 |
| 25 | THE WITNESS:  I don't know. | 13:23 |

Page 78

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MR. GONZALEZ:  Q.  There isn't any policy in      13:23

 2   particular that jumps out at you that says, Oh, no,      13:23

 3   you can't do that?                                       13:23

 4      A   I mean, I don't know.  I mean, I think it's a     13:23

 5   complicated area.                                        13:23

 6          MR. VAN NEST:  Counsel, when you get to a         13:23

 7   convenient spot, let's --                                13:23

 8          MR. GONZALEZ:  Let's go off the record.           13:23

 9          MR. VAN NEST:  -- take a short break.             13:23

10          MR. GONZALEZ:  Let's go off the record.           13:23

11          THE VIDEOGRAPHER:  We are off the record at       13:23

12   1:24 p.m.                                                13:23

13          (Recess taken.)                                   13:23

14          THE VIDEOGRAPHER:  We are back on the record      13:38

15   at 1:38 p.m.                                             13:38

16          MR. GONZALEZ:  Q.  Sir, is this litigation        13:38

17   important to you?                                        13:38

18          MR. VAN NEST:  Object to form.                    13:38

19          THE WITNESS:  Yeah, I'm not sure which            13:38

20   litigation you're referring to.  But generally, the     13:38

21   case here -- cases, I suppose.                           13:38

22          MR. GONZALEZ:  I'm asking you specifically        13:38

23   about the litigation that Waymo has brought against      13:38

24   Uber.                                                    13:38

25      Q   Is that litigation important to you?              13:38
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A    I mean, in some ways, I would say yes; in      13:39

 2    some ways, no.                                          13:39

 3           I mean, I think however many years we've been    13:39

 4    running Google/Alphabet, we've never had to bring a     13:39

 5    case like this before, which is, you know, a lot of     13:39

 6    years and a lot of employees.                           13:39

 7           On the other hand, the scale of our business,    13:39

 8    it's not -- you know, we have a very large business.    13:39

 9        Q    So, when you say in some ways, yes, it's       13:39

10    important, what do you mean by that?                    13:39

11        A    Well, I think if somebody has likely done      13:39

12    something wrong, that it's probably important to --     13:39

13    to -- to pay attention to that.                         13:39

14        Q    And what is it that makes you think that Uber  13:39

15    may have done something wrong?                          13:39

16           MR. VAN NEST:  Again, object to any              13:39

17    discussion of communications you've had with lawyers.   13:39

18           If you have some information outside of that,    13:40

19    you may answer.                                         13:40

20           THE WITNESS:  I mean, I think we're still in     13:40

21    the early stages of that -- of knowing the answers to   13:40

22    those questions, and I expect we'll get much better     13:40

23    ones.                                                   13:40

24           MR. GONZALEZ:  Q.  Well, sitting here today,     13:40

25    separate and apart from what your lawyers may have      13:40
```

Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | told you, what is your understanding of what Uber did | 13:40 |
| 2 | that led to them being sued? | 13:40 |
| 3 | A   Well, I mean, I think that Otto, the company, | 13:40 |
| 4 | obviously, in my understanding, there is a poaching | 13:40 |
| 5 | claim.  There is a trade secret claim.  There's files | 13:40 |
| 6 | that are at issue.  There's knowledge of that | 13:40 |
| 7 | potentially by Uber at a pretty early stage.  And then | 13:40 |
| 8 | there's a very large price paid to a company that | 13:40 |
| 9 | existed for a very short time in combination with | 13:41 |
| 10 | that. | 13:41 |
| 11 | That's, you know, I think the basic summary | 13:41 |
| 12 | people would give of the -- of the proceedings here. | 13:41 |
| 13 | Q   You used the word "potentially," which is an | 13:41 |
| 14 | important word, at least in my mind. | 13:41 |
| 15 | When you say that, potentially, Uber knew at | 13:41 |
| 16 | a pretty early stage of some wrongdoing, what is the | 13:41 |
| 17 | specific wrongdoing that you believe Uber knew about? | 13:41 |
| 18 | MR. VAN NEST:  Again, Mr. Page, do not | 13:41 |
| 19 | provide any communications you had with lawyers. | 13:41 |
| 20 | If you can answer outside that -- that's all | 13:41 |
| 21 | counsel is asking for -- you may answer him. | 13:41 |
| 22 | THE WITNESS:  I mean, I can provide, like, a | 13:41 |
| 23 | summary of some of the press articles that I read, | 13:41 |
| 24 | which is probably not that interesting, as it's public | 13:41 |
| 25 | knowledge. | 13:41 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. GONZALEZ:  And you read about that.  I | 13:41 |
| 2 | mean, we all can read the papers.  I -- and if you | 13:41 |
| 3 | don't know anything, that's fine. | 13:41 |
| 4 | Q   I just need to know:  Other than what your | 13:41 |
| 5 | lawyers may have told you, do you have any factual | 13:41 |
| 6 | basis for believing that, at an early point, Uber knew | 13:42 |
| 7 | there was something wrong? | 13:42 |
| 8 | A   I mean, I guess the thing I'm referring to is | 13:42 |
| 9 | just some public information around the time in which | 13:42 |
| 10 | they knew maybe there was copied files, but I'm not an | 13:42 |
| 11 | expert on that.  I just have seen some comments to | 13:42 |
| 12 | that effect. | 13:42 |
| 13 | I'm not talking a privileged communication | 13:42 |
| 14 | there. | 13:42 |
| 15 | Q   Understood. | 13:42 |
| 16 | You're just talking about what you read in | 13:42 |
| 17 | the papers? | 13:42 |
| 18 | A   Yeah. | 13:42 |
| 19 | Q   Okay.  Other than what you read in the | 13:42 |
| 20 | papers, you don't have any personal knowledge; is that | 13:42 |
| 21 | fair? | 13:42 |
| 22 | A   No. | 13:42 |
| 23 | Q   "No" meaning it is fair? | 13:42 |
| 24 | A   I'd say other than that and privileged | 13:42 |
| 25 | communication. | 13:42 |

Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. GONZALEZ:  Let me show you a document | 13:42 |
| 2 | that we've marked as Exhibit 1088. | 13:42 |
| 3 | (Document marked Exhibit 1088 | 13:42 |
| 4 | for identification.) | 13:42 |
| 5 | MR. VAN NEST:  Thank you. | 13:42 |
| 6 | MR. GONZALEZ:  For the record, this is an | 13:42 |
| 7 | e-mail chain.  The top of the first page is an e-mail | 13:42 |
| 8 | from Mr. Page, dated December 6th, 2010.  It has Bates | 13:43 |
| 9 | stamp Nos. '26138 through '140. | 13:43 |
| 10 | Q   I'm going to show you a series of documents. | 13:43 |
| 11 | And you obviously can read whatever you feel like you | 13:43 |
| 12 | need to read, but I'm going to ask you only some very | 13:43 |
| 13 | specific questions.  And so, what I suggest is that | 13:43 |
| 14 | you look at what I'm asking you.  And, if you feel you | 13:43 |
| 15 | need to read more, you can read as much as you feel. | 13:43 |
| 16 | A   Okay. | 13:43 |
| 17 | Q   This is an e-mail from you to David Lawee. | 13:43 |
| 18 | Did I pronounce that correctly? | 13:43 |
| 19 | A   Yes. | 13:43 |
| 20 | Q   Is Mr. Lawee still with your company? | 13:43 |
| 21 | A   He is. | 13:43 |
| 22 | Q   And what was his position at this time in | 13:43 |
| 23 | 2010? | 13:43 |
| 24 | A   I mean, I think in the context, I don't know | 13:43 |
| 25 | his exact position.  But, ██████████████████ | 13:43 |

Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    ███████████████████████████████████     ███████

█     ████████████████                        13:43

3         And he went on to be business development and   13:43

4    investments.                             13:43

5         Q   The discussion in this e-mail is about ████   ███████

█    ███████████████████████████████████████   ███████

█    █████████████████.                        13:44

8         Is that generally fair?             13:44

9    A    I mean, I can look through it, if you'd like.   13:44

10   Q    Sure.                               13:44

11        And particularly, I'd call your attention to   13:44

12   the first page past the halfway point, the e-mail from   13:44

13   Mr. Lawee to you.  He's talking about ████████████   ███████

█    █████████████████████████████.           13:44

15        Do you see that?                     13:44

16   A    Yeah.                               13:44

17   Q    Does that refresh your recollection that ████   ███████

█    █████████████████████████████████         ███████

█    ██████████████████████████████            ███████

█    ███████████████████████████████████       ███████

█    ███████?                                 13:44

22   A    I mean, I guess I can read the e-mail.  I'm   13:44

23   not sure that's -- are you saying that was our intent   13:44

24   or --                                     13:45

25   Q    Does that refresh your recollection that   13:45

                                        Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    that's where you ended up?                          13:45
2        A    No.                                        13:45
3        Q    And then you wrote back and you said:      13:45
4            ████████████████████████████████      ███  13:45
█    ████████████                                        13:45
6            Do you see that?                             13:45
7        A    Yeah.                                       13:45
8        Q    What do you mean by that, ██████████   ███ 13:45
█    ████████████████?                                   13:45
10       A    I mean, we wanted to probably approximate  13:45
11   the -- what a start-up would do for some of the key 13:45
12   people.                                             13:45
13       Q    And that was, in part, to encourage them to 13:45
14   stay; right?                                        13:45
15       A    I mean, I've already testified that I think 13:45
16   you're getting them to stay, but also getting them to 13:45
17   really be vested in the outcome is maybe the more   13:45
18   important question.                                 13:45
19       Q    And then you said, at the top e-mail ████  ███ 13:45
█    ██████████████████████████   ████████████     ███
█    █████████████████████████████████████████     ███
█    ████████████████████████████████               13:45
23           Do you see that?                             13:45
24       A    Yeah, I saw that at the top.                13:45
25       Q    █████████████████████████████████████      13:45
```

Page 85

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1     ████████████████████████████████████  ████████
 █        ██  ███████████████████              ████████
 █        ██  █████████████████████████████     ████████
 █     ███████████████████████████              ████████
 █        ██  ████████████████████████████████  ████  ████████
 █     █████████████████                          13:46
 7     Q    Right.                                 13:46
 8          And the passengers that you're currently  13:46
 9     giving rides to in Phoenix, ██████████████   ████████
██     ████?                                        13:46
11     A    ████████████████████████████████████    ████████
██     ███████                                       13:46
13     Q    Fair enough.                             13:46
14          ██████████████████████████████████████  ████████
██     ████████████████████████████████████████     ████████
██     ██████████                                    ████████
██     ██  █████████████████████████████████████     ████████
██     ███████████████████████                        13:46
19     Q    You tell me.  You're the CEO.  My        13:46
20     understanding is that ███████████.  If I'm wrong, I'm  13:46
21     wrong.                                        13:46
22     A    I'm not the CEO of Waymo.  I'm the CEO of  13:46
23     Alphabet.                                     13:46
24     Q    Fair enough.  We'll -- we'll find out from  13:46
25     somebody else, but I think they're free.     13:46
```

Page 86

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1       A    Okay.                                          13:46

 2       Q    When you say ████████████████████     ██████

 █       ████████████████████████████████████     ██████

 █       █████████████████████████████████████     ██████

 █       █████████████████████████████?                     13:47

 6       A    I guess I'm confused about the context of      13:47

 7   that -- of this statement.  Is that just -- I mean, it  13:47

 8   has nothing to do with this document; no?               13:47

 9       Q    Tell me why you're separating the two.  I --   13:47

10   I thought that this document was a discussion that led   13:47

11   to --                                                    13:47

12       A    Oh, I see what you're saying.  I think they     13:47

13   just didn't do that.                                     13:47

14       Q    ███████████████████████████████     ██████

 █       ████████                                     ██████

 █       █ ████████████████████  ████████     ██████

 █       ████████████  ████████████████████     ██████

 █       ████████                                     ██████

 █       █ ██████  ████████████████████     ██████

 █       ████████████████████████████████████     ██████

 █       ████████████████████████████████████     ██████

 █       ██████████████████████                             13:47

23            MR. VAN NEST:  Object to form.                 13:47

24            THE WITNESS:  I don't know what happens.  I    13:47

25   mean, reading this, it's an interesting history.  I     13:47
```

Page 87

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1    mean, maybe it would have -- it would have been good      13:47

 2    if we did that.  Who knows?                               13:48

 3          MR. GONZALEZ:  All right.                           13:48

 4      Q   It's your recollection, looking at this            13:48

 5    document, that at some point,                             13:48
```

```
19      A   I don't -- I don't recall saying that.            13:48

20      Q   Do you recall that Sebastian Thrun was            13:48

21    involved in the discussions about
```

```
                                                               13:49

25      Q   Yes.                                               13:49
```

Page 88

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A    Yeah, I mean, it says it's, like -- his name    13:49

 2  is on here, and I think he was involved in that, yeah.    13:49

 3      Q    Do you recall what role he played?              13:49

 4      A    I mean, he was definitely one of the people     13:49

 5  reviewing it and kind of in charge.  I don't know the     13:49

 6  exact role he played.                                     13:49

 7      Q    Do you recall telling Sebastian, ███████████     ███████

 ▮  █████████████████████████████████████████████            ███████

 ▮  ████████████████████████████████████████████████         ███████

 ▮  ██████████████████████████████████████?                  13:49

11      A    I don't recall that, no.                         13:49

12      Q    Do you recall telling him that, ██████████       ███████

 ▮  ████████████████████████████████████████                 ███████

 ▮  ████████████████████                                      ███████

 ▮  █ ██████████████████████████████████                      ███████

 ▮  ███████████████ ████████████████████████████████         ███████

 ▮  ██████████████████████████████████                        ███████

 ▮  ████████ ██████████████████████████████████████          ███████

 ▮  █████████                                                 ███████

 ▮  ████████████████████████████████████████████████         ███████

 ▮  ██████████████████████████████████████████               ███████

 ▮  ████████████████████████ ██████████████                  ███████

 ▮  ████████████████████████████████████████████████         13:50

 ▮  ████████████████████                                      

25           MR. GONZALEZ:  Let me show you Exhibit 1089.     13:50
```

Page 89

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            (Document marked Exhibit 1089          13:50

 2             for identification.)                  13:50

 3            MR. GONZALEZ:  For the record, this is a   13:50

 4    two-page e-mail with Bates stamp WAYMO '26142 and   13:50

 5    '143.                                          13:50

 6       Q   Sir, you are not part of this e-mail chain,   13:50

 7    but I believe there's a reference in the chain to you   13:50

 8    in the second e-mail from the top.             13:50

 9       A   Okay.                                   13:51

10       Q   Actually, with re- -- with respect to the one   13:51

11    I just showed you, 1088, I forgot to ask you   13:51

12    something.                                     13:51

13            When is the last time that you've seen this   13:51

14    e-mail, 1088?                                  13:51

15            It's dated December 6th, 2010.         13:51

16            Have you seen it since then?           13:51

17       A   I'm not sure how to answer that question.   13:51

18            MR. VAN NEST:  Don't provide the information   13:51

19    about discussions with your lawyers.           13:51

20            He's asking about, have you seen it in the   13:51

21    course of business since that time?            13:51

22            THE WITNESS:  I don't think so, no.    13:51

23            MR. GONZALEZ:  Q.  In preparing for your   13:51

24    deposition, did you review documents?          13:51

25       A   Yeah.                                   13:51
```

Page 90

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q   And did those documents help refresh your | 13:51 |
| 2 | recollection about events that occurred many years | 13:51 |
| 3 | ago? | 13:51 |
| 4 | MR. VAN NEST:  That's overbroad.  I'll object | 13:51 |
| 5 | to the form of the question. | 13:51 |
| 6 | THE WITNESS:  I mean, I'm sure that they | 13:52 |
| 7 | helped my recollection somewhat. | 13:52 |
| 8 | MR. GONZALEZ:  Q.  They helped refresh it | 13:52 |
| 9 | because these events are events that took place a long | 13:52 |
| 10 | time ago? | 13:52 |
| 11 | A   Yeah. | 13:52 |
| 12 | Q   And what specific documents helped refresh | 13:52 |
| 13 | your recollection? | 13:52 |
| 14 | A   I don't recall. | 13:52 |
| 15 | Q   Are these documents that were shown to you in | 13:52 |
| 16 | preparation for your deposition? | 13:52 |
| 17 | A   Certainly not -- yes. | 13:52 |
| 18 | Q   All right. | 13:52 |
| 19 | MR. GONZALEZ:  Counsel, I think per | 13:52 |
| 20 | Judge Alsup's standing order, we're entitled to see | 13:52 |
| 21 | those documents. | 13:52 |
| 22 | MR. VAN NEST:  I don't think so, Counsel, but | 13:52 |
| 23 | we can debate that at a later time. | 13:52 |
| 24 | MR. GONZALEZ:  Okay.  Fine.  Fair enough. | 13:52 |
| 25 | Just so the record is clear. | 13:52 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. VAN NEST:  I disagree, but -- | 13:52 |
| 2 | MR. GONZALEZ:  So that the record is clear, | 13:52 |
| 3 | we're -- we're asking for them, and Counsel is | 13:52 |
| 4 | declining to provide them. | 13:52 |
| 5 | And I agree with you.  We don't need to | 13:52 |
| 6 | debate the point now. | 13:52 |
| 7 | All right.  Let me come back to my question. | 13:52 |
| 8 | Q   I -- I -- is there any particular document | 13:52 |
| 9 | that comes to mind in terms of refreshing your | 13:52 |
| 10 | recollection? | 13:52 |
| 11 | Or, is it just the documents in general | 13:53 |
| 12 | refreshed your recollection? | 13:53 |
| 13 | MR. VAN NEST:  Objection to form. | 13:53 |
| 14 | THE WITNESS:  Nothing in particular. | 13:53 |
| 15 | MR. GONZALEZ:  Q.  This Document 1088, is | 13:53 |
| 16 | this one that refreshed your recollection in preparing | 13:53 |
| 17 | for the deposition? | 13:53 |
| 18 | A   I mean, I think so.  It's a long e-mail | 13:53 |
| 19 | thread, so I'm not sure. | 13:53 |
| 20 | Q   Understood. | 13:53 |
| 21 | Before seeing this e-mail recently, did you | 13:53 |
| 22 | remember that you had suggested ███████████████  ██████ | 13:53 |
| | ███  ███████████████████? | 13:53 |
| 24 | A   No, I did not remember that. | 13:53 |
| 25 | Q   All right. | 13:53 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Now, if we can please go to 1089. | 13:53 |
| 2 | A    (Witness complies.) | 13:53 |
| 3 | Q    First, you'll notice the e-mail from | 13:53 |
| 4 | Sebastian right about the halfway point of the first | 13:53 |
| 5 | page from 11:11 p.m. | 13:53 |
| 6 | Do you see that? | 13:54 |
| 7 | A    Yes. | 13:54 |
| 8 | MR. VAN NEST:  Take your time and review the | 13:54 |
| 9 | document, Mr. Page. | 13:54 |
| 10 | MR. GONZALEZ:  It's actually right above the | 13:54 |
| 11 | redaction.  There's one part of the document that's | 13:54 |
| 12 | redacted, that little black box. | 13:54 |
| 13 | Q    Do you notice that right above that, it says: | 13:54 |
| 14 | "Anthony, ███████████." | 13:54 |
| 15 | Do you see that? | 13:54 |
| 16 | A    Yeah. | 13:54 |
| 17 | Q    Does this refresh your recollection that, | 13:54 |
| 18 | ████████████████████████████████  ████ | |
| ██ | ████████████████████████████████  ████ | |
| ██ | ██████████? | 13:54 |
| 21 | A    I mean, I don't recall that. | 13:54 |
| 22 | Q    And then it says -- right below the | 13:54 |
| 23 | redaction, it says: | 13:54 |
| 24 | ███████████████████████████████  ████ | |
| ██ | ████████████████████████ | 13:54 |

Page 93

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1            Do you see that?                          13:54

2       A   Yeah.                                      13:54

3       Q   Does that refresh your recollection --     13:54

4   recollection at all that ████████████████████      ████

█   ██████████████████████████████████████████        ████

█   ██████████████?                                    13:55

7       A   I mean, I don't recall it.  I'm sure it's, 13:55

8   like, an actual document somewhere.                13:55

9       Q   And then, if you go up the chain, is it    13:55

10  Sergey?  Is that how you pronounce his name?       13:55

11      A   Sergey.                                     13:55

12      Q   Okay.  Sergey writes -- he's your co-founder; 13:55

13  is that right?                                     13:55

14      A   Yes.                                        13:55

15      Q   You're good friends?                        13:55

16      A   Yes.                                        13:55

17      Q   Sergey writes:                              13:55

18          ████████████████████████████████████       ████

█   ██████████████████████████████████████████        ████

█   ████████████████                                   13:55

21          Do you see that?                            13:55

22      A   Yeah.                                       13:55

23      Q   He's basically asking, ████████████████████ ████

█   ████████████████████████████?                      13:55

25      A   Is he -- is he asking me?                   13:55
```

                                                    Page 94

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q   No, he's not asking you.  I just want you to    13:55
 2   follow the e-mail.                                      13:55
 3      A   Okay.                                            13:55
 4      Q   Is that your understanding, that he's asking,   13:55
 5   ██████████████████████████████?                        13:55
 6          MR. VAN NEST:  I'll object to the form.          13:55
 7          THE WITNESS:  The question --                    13:55
 8          MR. VAN NEST:  He -- he's never seen this.       13:55
 9          MR. GONZALEZ:  All right.                        13:55
10      Q   Let's go up the e-mail chain and get to the     13:55
11   part with your name.                                    13:56
12          Sebastian responds -- I just want to put the    13:56
13   context in.  He responds to Mr. Brin, and it says, in  13:56
14   part:                                                   13:56
15              ████████████████████████████████  ████     
██   ██████████████████████████████████████  ████          
██   ████████████████                                       13:56
18          Do you see that?                                 13:56
19      A   Yeah.                                            13:56
20      Q   Do you agree that that's the directive that     13:56
21   you gave?                                               13:56
22      A   I mean, I can't -- I wouldn't say it in that    13:56
23   way.  But I think at the time, like, ████████████  ████ 
██   ████████████████████████████████████████  ████         
██   ████████████████████████████████████████             13:56
```

Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    ██████████████████                                    13:56

2        Q    And, by the way, it says:                    13:56

3             ████████████████████████████████████████    13:56

4             Do you believe that Chauffeur has succeeded?  13:56

5        A    I mean, I think it's accomplished a lot.  I   13:56

6    mean, I think, you know, that there's no doubt that   13:56

7    the whole industry has changed as a result, a large   13:56

8    industry.                                             13:56

9        Q    As of the date that Mr. Levandowski left your  13:57

10   company in January of 2016, as of that date, did you  13:57

11   think that Chauffeur had succeeded?  Would you agree  13:57

12   that it had?                                          13:57

13       A    In the context of this document, which is    13:57

14   about ██████████████████████████████        ████████

     ████████████████████████████████████        ████████

     ████████████████████████████████████████    ████████

     ████████████████████                        ████████

     ██    ████████████████████████████████      ████████

     ████████████████████████████                ████████

     ██    ██████████████████████████████████████  ████████

     ████████████████████████████████████        ████████

     ████████████████████████████████            ████████

     ██████████████████████████                  ████████

     ██    ██████████████████████████████████    ████████

     ████████████████████████████████            13:57

                                                 Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
1       A   As I already stated, I think there are some      13:57

2   complicated things around that.                          13:57

3       Q   What is it that you're referring to when you     13:58

4   say -- I didn't intend to say anything controversial.    13:58

5
```

13:58

Page 97

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



13:59

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     ▇▇▇▇▇▇     ▇▇

▇    ▇    ▇▇▇▇▇▇▇▇▇   ▇▇    ▇▇

▇   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇    ▇▇

▇   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇    ▇▇

▇    ▇    ▇▇▇▇        ▇▇

▇     ▇▇▇▇▇▇▇▇     ▇▇

▇   ▇▇▇▇▇▇▇▇▇      ▇▇

▇   ▇▇▇▇▇▇        ▇▇

9     ▇   ▇▇▇▇▇▇           14:00

10      Q   I'm sorry.  I think I've asked you this, but    14:00

11   is David Lawee still with you?                   14:00

12      A   Yes, he is.  He runs a different area now.    14:00

13         (Document marked Exhibit 1090             14:00

14          for identification.)                   14:00

15         MR. GONZALEZ:  Sir, let me show you a     14:00

16   document that we've marked as Exhibit 1090.      14:00

17         MR. VAN NEST:  I got it.  Thank you.      14:01

18         MR. GONZALEZ:  For the record, it is a     14:01

19   two-page e-mail, with Bates stamp No. WAYMO '26144 and   14:01

20   '45.                                              14:01

21      Q   Sir, this is an e-mail chain.  The top e-mail   14:01

22   was sent to you by Laszlo Bock on July 9, 2011;      14:01

23   correct?                                        14:01

24      A   Uh-huh.                               14:01

25      Q   Yes?                                  14:01

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A   Yes.  Sorry.                              14:01

 2      Q   Okay.  And I just want to show you a couple  14:01

 3   of parts of this.  First, if you look at the bottom of  14:01

 4   the second page, you start this chain by asking for a  14:01

 5   ███████████████████████████████████  ████  

     █ ████████████████████                      14:02

 7      Do you see that at the very bottom of that  14:02

 8   second page?                                   14:02

 9      A   Okay.                                   14:02

10      Q   Is Laszlo Bock still with Google?       14:02

11      A   He is not.                              14:02

12      Q   Do you know where Mr. Bock is today?    14:02

13      A   No.                                     14:02

14      Q   And do you -- does this refresh your    14:02

15   recollection that ████████████████████████  ████  

     █ ████████████████████████████████████  ████  

     █ ████████████████████████?                  14:03

18      A   I can read through it, if you'd like.  I  14:03

19   don't know that --                            14:03

20      Q   No, no, no.  I'm simply asking whether  14:03

21   looking at it today refreshes your recollection that,  14:03

22   back in July of 2011, ██████████████████████  ████  

     █ ██████████████████████?                    14:03

24      A   Yeah, I think that's correct.          14:03

25      Q   And, on the first page, point No. 2, does  14:03
```

Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    that refresh your recollection that ███████     ████

█    ██████████████████████████████████     ████

█    ██████?                                        14:03

4         MR. VAN NEST:  He's asking whether you now  14:03

5    remember that, after reviewing this.           14:03

6         THE WITNESS:  No, I don't remember that.  I  14:03

7    mean, I don't know if this is, like, the complete  14:03

8    thing also.  I mean, this is --                14:03

9         MR. GONZALEZ:  I understand.  This may simply  14:03

10   be a snapshot in time.  I get that.  I'm just trying  14:03

11   to see if it sparks a memory.                  14:03

12        Q   Right above that, it talks about ██████  ████

█    █████  █████                                   ████

█              ████████████████████              ████

█    ██████████████████████                        14:04

16        Do you see that?                           14:04

17        A   Yeah.                                  14:04

18        Q   Does that refresh your recollection that  14:04

19   ████████████████████████████                   ████

█    ██████████████████                             ████

█       █  ███  ████████████████████████           ████

█    ████████████  ██████████████████              ████

█    ██████   I just don't know myself.            14:04

24        Q   All right.                             14:04

25            The point of this e-mail is simply to show  14:04

                                        Page 101

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    that, even though you may not remember today, you were    14:04
 2    involved in communications in 2011 about ████████    ██████
 █        ██████████████████████; is that fair?    14:04
 4         MR. VAN NEST:  Object to form.    14:04
 5         THE WITNESS:  I'm not sure how involved I am.    14:04
 6    It seems like ███████████████████, and    14:04
 7    I'm being informed.    14:04
 8         MR. GONZALEZ:  Q.  Do you recall -- does this    14:04
 9    refresh your recollection that, in 2011, ██████    ██████
 █    ████████████████████████████████    ██████
 █    ███████████████████████?    14:04
12         MR. VAN NEST:  He wants to know if you now    14:05
13    remember that.    14:05
14         THE WITNESS:  No.    14:05
15         MR. VAN NEST:  That's what he's asking.    14:05
16         THE WITNESS:  I don't now remember that.  I    14:05
17    believe I was on this e-mail.    14:05
18         MR. GONZALEZ:  Whoops.  Wrong one.    14:05
19         (Document marked Exhibit 1091    14:05
20          for identification.)    14:05
21         MR. GONZALEZ:  Sir, let me show you a    14:05
22    document that we've marked as Exhibit 1091.  It's a    14:05
23    one-page e-mail from Waymo with the Bates stamp    14:05
24    '11799.    14:05
25         MR. VAN NEST:  Thank you.    14:05
```

Page 102

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MR. GONZALEZ:  Q.  Do you recall receiving     14:06
 2   this e-mail from Mr. Levandowski on January 27, 2016?  14:06
 3      A   I mean, I think I clearly did receive this      14:06
 4   e-mail, yes.                                           14:06
 5      Q   I'm sorry?                                      14:06
 6      A   I clearly received this e-mail, yes.            14:06
 7      Q   Do you remember it?                             14:06
 8      A   I remember getting an e-mail like this, yes.    14:06
 9      Q   He says that he bumped into Sebastian, and      14:06
10   he's super happy at Udacity and kitty hawk.            14:06
11   ████████████████████████████████████████    ████████
     ██   ███████████                             ████████
     ██   █  ████████████████████   ████████████████████  ████████
     ██   ████████████████████████████                    14:06
15      Q   Then he says:                                   14:06
16          "There's just too much BS with Chris."          14:06
17          That's Mr. Urmson?                              14:06
18      A   Yes.                                            14:06
19      Q   "JK, Brian."                                    14:06
20          Who did you understand that was referring to?   14:06
21      A   That's John Krafcik and Bryan Salesky, I        14:06
22   assume.                                                14:07
23      Q   You said earlier that, when you received the    14:07
24   e-mail, you don't recall responding to                 14:07
25   Mr. Levandowski; is that right?                         14:07
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A    Yeah, I don't recall responding.           14:07

 2        Q    You delegated that task to someone else.   14:07

 3             What was your understanding as to what     14:07

 4   Mr. Levandowski's relationship was -- was with John or  14:07

 5   Bryan?  Did you have an understanding?               14:07

 6             MR. VAN NEST:  Objection; form.  It's      14:07

 7   compound.                                            14:07

 8             THE WITNESS:  Sorry.  Can you repeat it?   14:07

 9   Sorry.                                               14:07

10             MR. GONZALEZ:  Yeah.                       14:07

11        Q    You -- you indicated earlier that you were  14:07

12   aware that there was some tension between Anthony and  14:07

13   Chris.                                               14:07

14             Were you aware of any tension between Anthony  14:07

15   and Bryan?                                           14:07

16        A    Anthony and Bryan.  I'm just trying to think  14:07

17   about that.                                          14:07

18             I mean, yeah, I can't really recall.  It   14:07

19   wouldn't be surprising, I think, but...              14:08

20        Q    What about Anthony and John?               14:08

21        A    There was definitely tension between Anthony  14:08

22   and John.                                            14:08

23        Q    And -- and explain to me what you base that  14:08

24   on.                                                  14:08

25        A    Well, I mean, a couple of things.  I mean, I  14:08
```

Page 104

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    think it's hard to hire a new person and put them in     14:08

2    charge and have the previous people who were in charge    14:08

3    be there.  So, I think they actually did a pretty good    14:08

4    job of that, but there was a lot of tension.              14:08

5        Q    John was hired to be in charge of the group      14:08

6    at a time when you understood that Anthony wanted to      14:08

7    be in charge.                                             14:08

8            Is that what you're referencing?                  14:08

9        A    I don't know that Anthony wanted to be in        14:08

10   charge.  But he was a significant person on the team,     14:08

11   obviously.  You know, somewhat as -- you know, when       14:08

12   you hire a new person, it's just hard to retain the       14:08

13   old people.  That's pretty unusual.  And, we do it        14:08

14   better than most, I think.                                14:08

15       Q    Who made the decision to hire John as the        14:09

16   head of the project?                                      14:09

17       A    I mean, I think probably --                      ████

                                                               14:09
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1

14:09

 9    Q    Did you consider appointing Mr. Levandowski    14:09

10    to the position that John got?    14:09

11    A    I mean, I don't -- I don't remember seriously    14:10

12    considering that.    14:10

13    Q    And why didn't you?    14:10

14    A    I mean, I was, as I said,    14:10

Page 106

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    ███████████████████████████████████     14:10

 2        Q    Why did you think it made a lot of sense for     14:10

 3    Mr. Levandowski to have a role around the hardware?     14:10

 4        A    I just think he had a lot of passion around     14:10

 5    it and, you know, would probably move things forward.     14:10

 6    But that was hardware, specifically build of a car --     14:10

 7    build of cars, which I felt like was an easier thing     14:11

 8    to do maybe than the team thought, and I think Anthony     14:11

 9    agreed with me about that.     14:11

10        Q    What is it that made you believe that     14:11

11    Mr. Levandowski would be good at building the car?     14:11

12        A    Well, I think he just had done that before.     14:11

13    So he built the -- not the car, but really, the     14:11

14    integration with the car.  Building the car is not     14:11

15    really correct; taking a car that exists and     14:11

16    integrating the self-driving systems with it.  He did     14:11

17    that before for us, so it was not a stretch.  He was     14:11

18    involved in it.     14:11

19        Q    Are autonomous vehicles important to Google?     14:11

20        A    Well, I --     14:11

21            MR. VAN NEST:  Objection; form.     14:11

22            THE WITNESS:  -- yeah, I guess --     14:12

23            MR. VAN NEST:  You may answer.     14:12

24            THE WITNESS:  -- they're part of Alphabet,     14:12

25    not Google.     14:12
```

Page 107

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MR. GONZALEZ:  All right.                    14:12

 2     Q    Are autonomous vehicles important to         14:12

 3  Alphabet?                                            14:12

 4     A    I mean, I think it's a scenario where, you   14:12

 5  know, we're obviously investing a lot in.  And then, 14:12

 6  you know, it's one of the things we work pretty hard 14:12

 7  on.                                                  14:12

 8     Q    Why?                                         14:12

 9     A    I think a lot of people die on highways, and 14:12

10  I think people spend a lot of time driving.  I think 14:12

11  it's an important area.                              14:12

12     Q    ████████████████████████████████          ████
   ██       ████████████████████████████████          ████
   ██       ██████████████████████████                ████
   ██    █  ████████████  ████████████████             ████
   ██       ███████████████████████████                ████
   ██       ████████████████████                       ████
   ██    █  ██████████████████████████                 ████
   ██       █████████████████████████                  ████
   ██       ████████  ████████  ██████                 ████
   ██       ████████  ██████████████                   ████
   ██       █████████████████  ████████                ████
   ██       ████████  █  ████████████                  ████
   ██       ██████████████████████████                 ████
   ██       █████████████████████              14:13
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      A    ████████████████████████████████      ████████
     ████████████████████████████████████████     ████████
     ██████████████████████                         14:13
4      Q    Is Uber a competitor?                    14:13
5      A    I think it's pretty clear that Uber is a 14:13
6    competitor in the self-driving space.          14:13
7      Q    When was that made clear to you?         14:13
8      A    Well, I think just Travis started talking 14:13
9    about it, you know, like --                    14:13
10     Q    When?                                    14:13
11     A    I don't know.  Whenever he started talking 14:13
12   about it in public, I think it was pretty clear.  He 14:13
13   said, like, "We must do this, or our company will not 14:13
14   succeed."  I think it's pretty foolish to assume 14:13
15   they're not a competitor at that point.        14:14
16     Q    Did you ever have any discussions with   14:14
17   Mr. Kalanick about them being a competitor?     14:14
18     A    I mean, I think from time to time we     14:14
19   discussed some things.  ████████████████████    ████████
     ████████████████████████████████████████████   ████████
     ██████████████████████████████████████          ████████
     ████████████████████████████████████            ████████
     ████████████████████████████████████████████    ████████
     ██████████    ██████████████████████████████    ████████
     ████████████████    ████████████████████████     14:14
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    ████████                                        14:14

 2    Q   Do you remember when you told him that?     14:14

 3    A   No.  I mean, I've had a few conversations    14:14

 4  over the years.  I don't...                        14:14

 5        MR. GONZALEZ:  Let me show you a document    14:14

 6  that we've marked as Exhibit 1092.                 14:14

 7        (Document marked Exhibit 1092                14:14

 8         for identification.)                        14:15

 9        MR. GONZALEZ:  Sorry.  Before I get to 1092, 14:15

10  I forgot to ask one question about what you just said 14:15

11  about Travis.                                       14:15

12    Q   You didn't recall when you had the           14:15

13  conversation.                                       14:15

14        Do you recall where you were?                14:15

15        Were you having lunch somewhere?             14:15

16    A   No, I don't really recall.  We had various   14:15

17  contact at conferences and things.  So, I don't    14:15

18  think -- we generally didn't have scheduled meetings, 14:15

19  but we'd kind of bump into each other.             14:15

20    Q   All right.  Fair enough.                     14:15

21        Exhibit 1092 is an e-mail chain involving    14:15

22  Mr. Page.  It's a one-page document, WAYMO '26141. 14:15

23        Mr. Page, do you recall receiving the bottom 14:15

24  e-mail from Mr. Levandowski on May 16, 2011?       14:15

25    A   I'm sure I received it.  Let me just take a  14:15
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    look at it.                                      14:15

 2        Q   Sure.                                    14:15

 3        A   (Witness reading document.)              14:15

 4            Okay.                                    14:16

 5        Q   When Mr. Levandowski refers to           14:16

 6    ███████████████████████████████████     ██████  14:16

 ▌    ████████████████████████████████████?           14:16

 8        A   Yeah, I think that's correct.            14:16

 9        Q   And why is it that you forwarded this to 14:16

10    Sebastian?                                       14:16

11        A   I mean, this is a long time ago, in 2011.14:16

12    But, I mean, it looks to me like, you know, I told14:16

13    him, "Can you handle this?"  So, I'm just saying, 14:16

14    like, I don't want to deal with this.            14:16

15            And then Sebastian confirms that it's an 14:16

16    issue; like, there's some sort of management issue.14:16

17        Q   "Anthony threatens to leave the team if he14:17

18    isn't the single leader."                        14:17

19            Do you see that?                          14:17

20        A   Yeah.                                     14:17

21        Q   Is that kind of what you were thinking at the14:17

22    time, that Anthony himself wants to be the leader of14:17

23    this team?                                        14:17

24        A   Well, I told you I think he was, like, a 14:17

25    significant leader or the main leader of the team 14:17
```

Page 111

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    early on, and at some point that kind of transitioned.    14:17
2    And that's probably what this is about.                   14:17
3        Q    If you can recall, when is it that it            14:17
4    transitioned, in your mind?                               14:17
5            Is it when you hired John as the CEO or the       14:17
6    leader of that group?                                     14:17
7        A    No.  I mean, that was much, much later.  That    14:17
8    was recently.                                             14:17
9        Q    Right.                                           14:17
10           So what -- what was the trigger, if you can       14:17
11   recall, that led to the transition?                       14:17
12       A    I don't know.  I'm not that expert on that       14:17
13   question.  I mean, I assume it has something to do        14:17
14   with Chris, who was in the -- running it.                 14:17
15       Q    Sebastian says:                                  14:17
16           "If he is the single leader, a good number of     14:17
17   team members will leave."                                 14:17
18           Do you see that?                                  14:17
19       A    Yeah.                                            14:18
20       Q    Did you ever talk to Sebastian about that?       14:18
21       A    I mean, I don't recall.                          14:18
22       Q    The conversation that you had with TK, where     14:18
23   ████████████████████████████████████████████   █████
     █████  ████████████████████████, was that before this lawsuit was    14:18
25   filed?                                                    14:18
```

                                                    Page 112

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A    Yes. | 14:18 |
| 2 | Q    Do you remember how long before the lawsuit | 14:18 |
| 3 | was filed? | 14:18 |
| 4 | A    No. | 14:18 |
| 5 | Q    Do you recall that, from time to time, | 14:18 |
| 6 | Mr. Levandowski would send you fairly lengthy e-mails | 14:18 |
| 7 | with his ideas and thoughts about the autonomous | 14:18 |
| 8 | driving unit, Project Chauffeur? | 14:18 |
| 9 | MR. VAN NEST:  Object to form. | 14:18 |
| 10 | THE WITNESS:  Yeah, I don't recall that. | 14:18 |
| 11 | (Document marked Exhibit 1093 | 14:18 |
| 12 | for identification.) | 14:18 |
| 13 | MR. GONZALEZ:  Let me show you a document | 14:18 |
| 14 | that we've marked as Exhibit 1093. | 14:19 |
| 15 | THE WITNESS:  Okay. | 14:19 |
| 16 | MR. GONZALEZ:  This is a two-page e-mail | 14:19 |
| 17 | chain, with Bates stamp Nos. '6311 and '6312. | 14:19 |
| 18 | Q    Is this an e-mail, sir, that you received at | 14:19 |
| 19 | the bottom of the first page from Mr. Levandowski on | 14:19 |
| 20 | January 9th, 2016? | 14:19 |
| 21 | A    I mean, I think so, yes. | 14:19 |
| 22 | Q    If you'll look at the bottom of that first | 14:20 |
| 23 | page, he says: | 14:20 |
| 24 | ███████████████████████████████████ | 14:20 |
| 25 | Do you see that? | 14:20 |

Page 113

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A    Yeah.  I mean, that's sort of self-serving,    14:20

2    ████████████████████████████████████████████████ .    14:20

3        Q    Did you agree with his statement?             14:20

4        A    No, I don't think so.                         14:20

5        Q    Why not?                                       14:20

6        A    I mean, for the reason I just said.  I think, 14:20

7    like -- I mean, for what I just -- the reasons I just  14:20

8    said.  He's -- he's focused on what he's doing, which  14:20

9    he's arguing is going fine.                            14:20

10       But I think that's -- even his own statement       14:20

11   is, like -- then he says:                              14:20

12            █████████████████████████████    ████         14:20

█    ██████████████████                                     14:20

14       So, I mean, it's, like, even                       14:20

15   self-contradictory, I think.                           14:20

16       Q    So, other than it being self-serving and      14:20

17   possibly self-contradicting, as you just noted, was    14:20

18   there anything at the time that led you to believe     14:20

19   that ███████████████████████████████    ████           14:20

█    █████████████                           ████           14:20

█        █    ████████████████████████████   ████           14:20

█    ████████████████████████████████████    ████           14:20

█    ████████████████████████████████████    ████           14:20

█    ████████████████████████████████████    ████           14:20

█    ██████████████████    █████████████████            14:21
```

Page 114

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ████████████████████████████████████████      14:21

 2      Q   All right.                              14:21

 3          And then, if you'd go to the top of the 14:21

 4   second page.                                   14:21

 5      A   (Witness complies.)                     14:21

 6      Q   It says on the second line:             14:21

 7              ███████████████████████████    ██████  14:21

 █   ██████████████████                            14:21

 9          Do you see that at the end of the second 14:21

10   line?                                          14:21

11      A   Yeah.                                   14:21

12      Q   Do you agree with that?                 14:21

13      A   I mean, in general, I would agree with the 14:21

14   sentiment of that. ████████████████████    ██████

 █   ██████████████████████████████████████    ██████

 █   ██████████                                    14:21

17      Q   Then he says in the next paragraph:     14:22

18              ███████████████████████████████  ██████

 █   ████████████████████████████████████      ██████

 █   ██████████████████████████                    14:22

21          Do you see that?                        14:22

22      A   Yeah.                                   14:22

23      Q   Would you agree with that?              14:22

24      A   Let me read through this.               14:22

25          MR. VAN NEST:  You should read the paragraph. 14:22
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            THE WITNESS:   (Reading document.)        14:22
 2            Sorry.  Can you state the question again?  14:22
 3            MR. GONZALEZ:  Yes.                         14:22
 4        Q   Did you agree with this statement that he's  14:22
 5    making here about ███████████████████████      ████  
 ▮    ████████████████████████████?                  14:22
 7        A   I don't think that's the greatest plan at   14:23
 8    this time.                                          14:23
 9        Q   Why not?                                    14:23
10        A   I██████████████████████████████      ████
 ▮    ███████████████████    ████████████████████    ████
 ▮    ████████████████████████████████████████       ████
 ▮    ██████████                                      14:23
14        Q   Then he says in the next line:             14:23
15            ████████████████████████████████      ████
 ▮    ████████████████████████████████████████████  ████
 ▮    ██████████                                      ████
 ▮            █████████████████████████████████████? 14:23
19        A   Yeah, I would think so.                    14:23
20        Q   Do you recall that █████████████████████  ████
 ▮    ████████████████████?                           14:23
22        A   I don't recall it, but, I mean, it seems   14:23
23    pretty clear from the e-mail.                       14:23
24        Q   Do you recall that that was part of the    14:23
25    tension between him and John?                       14:23
```

```
 1      A    That I'm a bit -- I ▮▮▮▮▮▮▮▮▮▮▮    ▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮    ▮▮▮▮▮▮▮▮▮▮▮          ▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮        ▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮                     ▮▮▮

▮     ▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮               ▮▮▮

▮  ▮▮▮▮▮▮▮▮                           ▮▮▮

▮     ▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮               ▮▮▮

▮  ▮▮▮▮▮                              ▮▮▮

▮     ▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮                ▮▮▮

▮  ▮▮▮▮▮▮                         14:24
```

11              MR. VAN NEST:  Objection; form.        14:24

12              THE WITNESS:  Yeah, I'm not aware of any.  14:24

13              MR. GONZALEZ:  Q.  You mentioned earlier that  14:25

14   Mr. Levandowski had a negative impact on the  14:25

15   autonomous driving?  14:25

16      A    I said may have had a negative impact.  14:25

17      Q    You said "may have"?  14:25

18      A    (Witness nods head.)  14:25

19      Q    All right.  Well, then let me clarify.  14:25

20              Sitting here today, is it your view that  14:25

21   Mr. Levandowski had a negative impact on Project  14:25

22   Chauffeur, or are you not sure?  14:25

23      A    I already testified I think it could be -- go  14:25

24   either way.  Could be either way, and that we'll learn  14:25

25   more, I expect.  14:25

                                        Page 117

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q   Before, you said "and I will learn more"? | 14:25 |
| 2 | A   I said we will learn more. | 14:25 |
| 3 | Q   Before this lawsuit was filed -- or actually, | 14:25 |
| 4 | back up even more. | 14:25 |
| 5 |     Before Mr. Levandowski left Google, as of | 14:26 |
| 6 | that point, January 2016, did you think that he had | 14:26 |
| 7 | had a negative impact on the company? | 14:26 |
| 8 | A   I mean, I think there's a variety of opinions | 14:26 |
| 9 | on that point, and I tried to listen to all of them. | 14:26 |
| 10 | Q   What -- what was your opinion? | 14:26 |
| 11 | A   Well, I usually try to average them.  And so | 14:26 |
| 12 | they averaged to roughly 0, I think. | 14:26 |
| 13 | Q   All right. | 14:26 |
| 14 |     So, you didn't have an opinion one way or the | 14:26 |
| 15 | other? | 14:26 |
| 16 | A   Well, I told you I already -- I testified | 14:26 |
| 17 | already that I was supportive of having him work on | 14:26 |
| 18 | ██████████████████████████████████████ | ██████ |
| | ██████████████████████████████████████ | ██████ |
| | ██████████████████████████████████████ | ██████ |
| | ████████████████████████████ | 14:26 |
| 22 | Q   Do you recall that Mr. Levandowski -- in | 14:27 |
| 23 | addition to ██████████████████████████ | ██████ |
| | ████████████████████████████████████████ | ██████ |
| | ██████████████████████████? | 14:27 |

Page 118

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            MR. VAN NEST:  Objection to the form of the      14:27

 2    question.                                                14:27

 3            THE WITNESS:  Yes.  Sorry.  ████████████         ██████

 ██   ███████████████████████████   █████████████             ██████

 ██          █████████████   █   ██████████████████           ██████

 ██   ████████████████████████████████████████                ██████

 ██   ██████                                                   ██████

 ██      ███   █████   ████████████████████████                ██████

 ██   ███████████████                                          14:27

10            Your question included a lot of things.          14:27

11    Maybe you can just state it again.                       14:27

12       Q   Yes.                                              14:27

13            I'm wondering:  ████████████████████             ██████

 ██   █████████████████████████████████████████               ██████

 ██   ████████████████████████████████████████                ██████

 ██   ██████████████████████████████████████████              ██████

 ██   ██████                                                   14:27

18       A   I don't recall.                                   14:28

19       Q   Do you recall Mr. Levandowski  ████████           ██████

 ██   ████████████████████?                                    14:28

21            MR. VAN NEST:  Object to form as to who          14:28

22    you -- who is "you."  Is it Google or --                 14:28

23            THE WITNESS:  Yeah.                               14:28

24            MR. GONZALEZ:  Q.  The "you" would be you.        14:28

25            MR. VAN NEST:  I mean, it's still ambiguous,      14:28
```

Page 119

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    Counsel.                                        14:28

2            MR. GONZALEZ:  Mr. Page.                14:28

3            MR. VAN NEST:  As opposed to Google?    14:28

4            MR. GONZALEZ:  Correct.                 14:28

5            THE WITNESS:  Oh, I see.                14:28

6            MR. VAN NEST:  That's what he's asking. 14:28

7            THE WITNESS:  Yeah, I certainly don't recall  14:28

8    that.                                           14:28

9            MR. GONZALEZ:  Q.  ███████████████      ████

     ██ ███████████████████████████████████████     ████

     ██ ███████████████████████████████████████     ████

     ██ ███████████████████████████████████████     ████

     ██ ███████████████████████████                 ████

     ██    ██ ████████████████████████████████      ████

     ██ ██████                                       ████

     ██    ██ ████████████████████████████████████  ████

     ██ ████████████████████████████                14:29

18   A    For Google?                                14:29

19   Q    Yes, for you.                              14:29

20   A    That's not something --                    14:29

21           MR. VAN NEST:  Well, again, Counsel --  14:29

22           MR. GONZALEZ:  Q.  Well, for -- for Google --  14:29

23           MR. VAN NEST:  -- in fairness --        14:29

24           MR. GONZALEZ:  Q.  -- for Google or for you  14:29

25   personally?                                     14:29
```

Page 120

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A    That's not --                              14:29

 2            MR. VAN NEST:  -- that -- that is compound.  14:29

 3    I think you need to break those up, Counsel.        14:29

 4    Otherwise --                                        14:29

 5            MR. GONZALEZ:  Q.  The question is:  Do you  14:29

 6    remember?                                           14:29

 7            If you don't remember, it doesn't matter.  If  14:29

 8    you remember, I'll ask you what you remember.       14:29

 9            MR. VAN NEST:  So, this is for either        14:29

10    Mr. Page or Google?                                 14:29

11            MR. GONZALEZ:  Yes.                          14:29

12            MR. VAN NEST:  Either one.                   14:29

13            THE WITNESS:  Okay.  I don't remember        14:29

14    anything for me personally, which I think would be  14:29

15    highly unusual.                                     14:29

16            You know, ████████████████████████          ████

███   ████████████████████████████████████  ████████████  ████

███   ████████████████████████████████  ██████████  ████

███   ██████████████████████████████  ████

███   ██████████████  ██  ████████████████████████  ████

███   ████████████████████████████████████  ████

███   ████████████  ████

███   ████  ██  ████████████████████  ██████████████████  ████

███   ████████████████████████████████████████  ████

███   ████████                                             14:30
```

Page 121

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



14:30

14:31

22          (Document marked Exhibit 1094          14:31

23           for identification.)          14:31

24          MR. GONZALEZ:  Let me show you an exhibit          14:31

25     that we've marked as 1094.          14:31

Page 122

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              MR. VAN NEST:  Thank you.                   14:31

2              MR. GONZALEZ:  For the record, it's a       14:31

3      two-page e-mail string, with Bates stamp '11779 and  14:31

4      '80.                                                 14:31

5         Q    Sir, is this an e-mail communication between 14:31

6      you and Mr. Levandowski, dated January 25, 2016?     14:31

7         A    Yes, from Anthony to me.                     14:31

8         Q    And then you write back to him:              14:31

9              "Thanks.  Looks like a very good start.  I'm 14:31

10     seeing him at 3:30.  Will try to call you before     14:31

11     that."                                               14:31

12        A    Yeah.                                        14:31

13        Q    Then he says:                                14:32

14             "Sweet.  I'll be nearby.  Thanks."           14:32

15             Right?                                       14:32

16        A    Yeah.                                        14:32

17        Q    When Mr. Levandowski, at the bottom of the   14:32

18     first page, has a number of different steps -- do you 14:32

19     see that?                                            14:32

20        A    Yeah, I see the long list of numbered steps. 14:32

21        Q    What is your recollection as to what these   14:32

22     steps were for?                                      14:32

23        A    I mean, I don't recall this very well, but I 14:32

24     can read the document, if you'd like.                14:32

25        Q    Well, when you write and say "looks like a   14:32
```

Page 123

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   very good start," what were you referring to there?    14:32
 2   Start to what?                                         14:32
 3       A   Well, I think this is what I've already        14:32
 4   testified about, that ██████████████████████   ██████
     ██ ████████████████████████████████████████   ██████
     ██ ███████████████████████████                        14:32
 7       Q   So that, at least as of January 25, 2016, you 14:33
 8   had a positive view of Mr. Levandowski's contribution  14:33
 9   to Project Chauffeur; is that fair?                    14:33
10           MR. VAN NEST:  Object to the form of the       14:33
11   question.                                              14:33
12           THE WITNESS:  Yeah, I was going to say,        14:33
13   object to logic, too.  I think I was trying to --      14:33
14           MR. GONZALEZ:  That part is not allowed.       14:33
15       Q   Go ahead.                                      14:33
16       A   I -- I was trying hard to get him to           14:33
17   contribute positively to the team.                     14:33
18       Q   Okay.  And you said -- let me just read to     14:33
19   you what you said.                                      14:33
20       A   Okay.                                          14:33
21       Q   Then I'm going to follow up.  I'll use your    14:33
22   words --                                                14:33
23       A   Okay.                                          14:33
24       Q   -- so that I don't use poor logic.            14:33
25           You say, ██████████████████████████           14:33
```

Page 124

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   ███████████████████████████████████   ██████

    ██████████████████   14:33

3        If you thought he was bad for the company,   14:33

4   you would not have been doing that; isn't that fair?   14:33

5   A    Well, I mean, you don't know the -- whether   14:34

6   something is going to work or not.  You just know you   14:34

7   have an expectation.  And I think this was a case   14:34

8   where I thought it could work pretty well, and I   14:34

9   thought it could not work well at all.  I think it's   14:34

10  pretty clear it didn't work well at all, so --   14:34

11  Q    You say, It didn't work well at all.   14:34

12       What makes you say that?   14:34

13       Because he left shortly after this e-mail?   14:34

14  A    Yeah, so -- and now I'm being deposed about   14:34

15  it, so that's probably enough outcomes.   14:34

16  Q    All right.  I get that.   14:34

17       On January 25, 2016, it was your state of   14:34

18  mind that Anthony Levandowski would be a good   14:34

19  candidate to ██████████████████████   ██████

    ██████████; is that right?   14:34

21       MR. VAN NEST:  Object to the form.   14:34

22       THE WITNESS:  Sorry.  I guess, can you -- can   14:34

23  you just -- can we state the question again?   14:35

24       MR. GONZALEZ:  Yes.   14:35

25  Q    Just going back to your earlier testimony, as   14:35

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    of January 25, 2016, it was your state of mind that    14:35

 2    Anthony Levandowski ████████████████████████    ████

 ▮    ████████████████████████; true?                       14:35

 4         A   I mean, I've already testified ████████    ████

 ▮    ████████████████████████████████ ▮               ████

 ▮    ████████████████████████████████████████    ████

 ▮    ███████████████████                                    14:35

 8         But I think the risk in this was him getting    14:35

 9    along with the rest of the team --                     14:35

10         Q   But you were --                               14:35

11         A   -- as I've already stated.                    14:35

12         Q   I'm sorry.  Were you finished?                14:35

13         A   Yeah.  I mean, the risk of it was him getting 14:35

14    along with the other -- rest of the team and being    14:35

15    able to work productively with other people, which he  14:36

16    had a mixed reputation about.                          14:36

17         Q   And, you were willing to assume that risk     14:36

18    because of his particular skill set; true?             14:36

19         A   I mean, a combination, I guess, of a lot of   14:36

20    factors.  I mean, I was advising the team on this.     14:36

21         Like, if, you know, John Krafcik came to me       14:36

22    and said, like, "There is no way this is going to      14:36

23    work," I probably would have said, "Okay."             14:36

24         Like, I mean, I was trying to help and not        14:36

25    making decisions necessarily.                          14:36
```

Page 126

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q   But John never came to you and said that; did | 14:36 |
| 2 | he? | 14:36 |
| 3 | A   I don't know that he particularly got a | 14:36 |
| 4 | chance, because I think this was somewhat underway, | 14:36 |
| 5 | and then Anthony kind of went out the door.  But, I | 14:36 |
| 6 | don't remember the exact timing. | 14:36 |
| 7 | (Document marked Exhibit 1095 | 14:36 |
| 8 | for identification.) | 14:36 |
| 9 | MR. GONZALEZ:  I'm handing you a document | 14:36 |
| 10 | marked as Exhibit 1095.  It's a one-page e-mail, dated | 14:37 |
| 11 | March 8, 2016, WAYMO '22505. | 14:37 |
| 12 | Q   Is this an e-mail that you received from | 14:37 |
| 13 | Mr. Teller? | 14:37 |
| 14 | A   I mean, undoubtedly, yeah. | 14:37 |
| 15 | Q   Is this when you first found out that | 14:37 |
| 16 | Mr. Levandowski was working on self-driving trucks, or | 14:37 |
| 17 | did you already know? | 14:37 |
| 18 | A   I don't recall. | 14:37 |
| 19 | Q   As of March 8, 2016, when you received this | 14:37 |
| 20 | e-mail that Anthony is working on self-driving trucks, | 14:37 |
| 21 | did you take any steps to protect the rights of | 14:37 |
| 22 | Alphabet, Google, or Waymo at that time? | 14:37 |
| 23 | A   I don't recall. | 14:37 |
| 24 | Q   Were you concerned, when you learned that | 14:37 |
| 25 | Anthony was working on self-driving trucks? | 14:38 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A   I don't recall.  I mean, you know, there's -- | 14:38 |
| 2 | he's probably -- you know, probably first we learned | 14:38 |
| 3 | he was making a company, I don't know.  Like, I mean, | 14:38 |
| 4 | there's probably a lot of different information you | 14:38 |
| 5 | get.  So, I have limited recollection of it. | 14:38 |
| 6 | Q   You don't recall directing anybody to take | 14:38 |
| 7 | any action; do you? | 14:38 |
| 8 | A   I don't recall, and I don't know why I would. | 14:38 |
| 9 | I mean, that in itself might not be an issue; right? | 14:38 |
| 10 | It may or may not be. | 14:38 |
| 11 | Q   You didn't think it was? | 14:38 |
| 12 | A   I don't know what my state of mind was.  I | 14:38 |
| 13 | don't recall. | 14:38 |
| 14 | Q   Well, if you thought it was an issue, you | 14:38 |
| 15 | would have done something about it; right? | 14:38 |
| 16 | MR. VAN NEST:  Object to form. | 14:38 |
| 17 | THE WITNESS:  I've already said I didn't | 14:38 |
| 18 | recall what I did or didn't do, based on this e-mail. | 14:38 |
| 19 | MR. GONZALEZ:  Q.  Sitting here today, you | 14:38 |
| 20 | don't recall taking any steps after learning that | 14:38 |
| 21 | Anthony was working on self-driving trucks; is that | 14:38 |
| 22 | right? | 14:38 |
| 23 | A   Based on this e-mail? | 14:38 |
| 24 | Q   Yes. | 14:39 |
| 25 | I mean, the e-mail clearly reflects that, as | 14:39 |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | of March 8th, 2016, if you didn't know before, you | 14:39 |
| 2 | certainly know then that Anthony is working on | 14:39 |
| 3 | self-driving trucks; right? | 14:39 |
| 4 | A    Yeah. | 14:39 |
| 5 | Q    And, sitting here today, you don't recall | 14:39 |
| 6 | taking any steps to protect the rights of Alphabet in | 14:39 |
| 7 | connection with learning that fact? | 14:39 |
| 8 | A    But I don't know -- I guess I'm objecting to | 14:39 |
| 9 | the implication that I should take action based on | 14:39 |
| 10 | that. | 14:39 |
| 11 | Q    I want to be real clear.  I'm not implying | 14:39 |
| 12 | that at all. | 14:39 |
| 13 | A    All right. | 14:39 |
| 14 | Q    I'm just trying to find out what you did and | 14:39 |
| 15 | didn't do. | 14:39 |
| 16 | A    I don't -- I mean, I don't remember what I | 14:39 |
| 17 | didn't do -- did or did not do, based on that. | 14:39 |
| 18 | MR. GONZALEZ:  Let's go off record. | 14:39 |
| 19 | THE VIDEOGRAPHER:  We are off the record at | 14:39 |
| 20 | 2:40 p.m. | 14:39 |
| 21 | (Recess taken.) | 14:39 |
| 22 | THE VIDEOGRAPHER:  We are back on the record | 14:42 |
| 23 | at 2:56 p.m. | 14:55 |
| 24 | MR. GONZALEZ:  Q.  Sir, do you recall having | 14:55 |
| 25 | conversations with Sebastian Thrun about the | 14:56 |

Page 129

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1  ████████████████████████████████████  ████
    ██  ██████████?                                    14:56

 3      A   I mean, I don't remember having a          14:56

 4  conversation, but I've seen an e-mail.             14:56

 5      Q   All right.                                 14:56

 6          When did you last see that e-mail?         14:56

 7      A   Very recently.                             14:56

 8      Q   Okay.  And, did you remember it?           14:56

 9      A   No, I did not remember until I saw it.     14:56

10      Q   All right.                                 14:56

11          Let me show you the e-mail that you're     14:56

12  referring to.                                      14:56

13          (Document marked Exhibit 1096              14:56

14           for identification.)                      14:56

15          MR. GONZALEZ:  Q.  1096, is that the e-mail 14:56

16  that you're referencing?                           14:56

17      A   Yes, I think so.                           14:56

18      Q   Do you remember responding?                14:56

19      A   I mean, I don't know that I responded.  I  14:56

20  mean, this is clearly not a good idea, so --       14:56

21      Q   Did you write back to him, telling him that? 14:56

22      A   I don't remember.  But, it obviously did not 14:57

23  happen, so --                                      14:57

24      Q   Is there any reason why you didn't respond, 14:57

25  telling him it's clearly not a good idea?          14:57
```

Page 130

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A   Well, there are many ways of doing          14:57

 2  management.  I'm not sure which technique I used     14:57

 3  there, or if I had to or not.                        14:57

 4      Q   What did you understand him to mean when he  14:57

 5  says:                                                14:57

 6          ███████████████████████████████             14:57

 7      A   I mean, Sebastian, at that time, was running 14:57

 8  Udacity, so -- I think 2015, ███████████     ███████

    ███████████████████████████████████  ████   ███████

    ████████████████████████████████████████    ███████

    ███████████████████████████████████████████ ███████

    ██████████████   ██████████████████████████  ███████

    █████████████████  ██████████   ████████████████████

    █████████████████████                       14:58

15      Q   By the way, how many documents did you look  14:58

16  at in preparing for your deposition?                 14:58

17      A   I mean, I don't recall the number, but some  14:58

18  fairly limited amount of time.                       14:58

19      Q   Okay.  What amount of time?                  14:58

20      A   I don't recall.  A couple of hours.          14:58

21      Q   Before today's deposition?                   14:58

22      A   Yeah.                                         14:58

23          MR. GONZALEZ:  Let me show you a document    14:58

24  that we've marked as 1097.                           14:58

25  ///                                                  14:58
```

                                        Page 131

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              (Document marked Exhibit 1097          14:58

 2               for identification.)                  14:58

 3         MR. GONZALEZ:  This is a one-page e-mail,    14:58

 4   with Bates stamp WAYMO '26168.                     14:58

 5       Q   Sir, is this an e-mail chain, dated        14:58

 6   December 6, 2013?                                  14:59

 7       A   Yeah.                                      14:59

 8       Q   And you'll see here that there is a        14:59

 9   discussion about ████████?                         14:59

10       A   Yeah.                                      14:59

11       Q   Do you recall █████████████████     ████

██  ██████████████████████████████           ████

██     ██  ████████████████████████████      ████

██     ██  ████████████████████████████      ████

██  ████████████████████████████████████     ████

██  ████████████                              ████

██     ██  ████████████████████████████      ████

██  ████████████████                          ████

██     ██  ████████████████████████████████   ████

██     ██  ██████████████████████████████     ████

██  ████████████  ██████████████████████████  ████

██  ████████  ████████████████████            14:59

23       Q   Well, let me be -- let me ask you to be more  15:00

24   specific.                                         15:00

25               ██████████████████████████████      15:00
```

                                          Page 132

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1     A    ████████████████████████████    ████
 █          ██████████████████                    15:00
 3     Q    All right.                             15:00
 4          When you say ████████████████████    ████
 █          ██████████████████████████████████?   15:00
 6          MR. VAN NEST:  Objection to the form.  15:00
 7          MR. GONZALEZ:  Q. ████████████████    ████
 █          █████████████████                      ████
 █          ████████████████████████████           ████
 █          ████████████                            ████
 █          █  ████████████████████████            15:00
12     Q    Do you recall any?                      15:00
13     A    Sure.                                   15:00
14     Q    ████████████████████████              ████
 █          █  ██████████████████████████████    ████
 █          ████████████                            ████
 █          █  █████████████████████                ████
 █          █  █████████████████████████           ████
 █          ████████████████████████               ████
 █          █  █████████████████████████           ████
 █          ████████████████                        ████
 █          █  ███  ██████████████████████          ████
 █          ████████████████████  ███████           ████
 █          ████████████████████████████            ████
 █          █  █████████████████████████           15:01
```



15:02

Page 134



15:03

Page 135

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



15:04

16      Q   And, what is it that leads you to believe --      15:04

17   I'm not disagreeing with you.  I'm just trying to see      15:04

18   what your knowledge is.      15:04

19           What -- what is it that you base that      15:04

20   statement on, that Mr. Levandowski made it happen?      15:04

21           MR. VAN NEST:  Objection to the form of the      15:04

22   question.      15:04

23           THE WITNESS:  I think I said helped make it      15:04

24   happen.      15:04

25           MR. GONZALEZ:  Q.  Well, you said getting it      15:04

Page 136

1    to happen.  I'm reading your words.                    15:04

2          Let me rephrase it using your words.  I'm not    15:04

3    trying to --                                           15:04

4      A   I'm not --                                        15:04

5      Q   -- trick you.                                     15:04

6          On what do you base your statement that          15:04

7    Mr. Levandowski participated in getting it to happen?  15:04

8      A   Just my general recollection.  I don't, like,    15:04

9    have a citation for that.                              15:05

10     Q                                                     15:05

15:05

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1    ████████████                                         ████
 █    ██  ████████████████████████████████████            ████
 █    ██████████                                           ████
 █         ████████████  ████████████████                 ████
 █         ████████████  ████████████████                 ████
 █         ████████████  ██████████████████               ████
 █    ████████████                                         ████
 █         ████████████  ████████                        15:06
 9         MR. GONZALEZ:  Let me -- let me ask you then   15:06
10    a more general question.                            15:06
11        Q    When you say Mr. Levandowski was involved, 15:06
12    what was his involvement?                           15:06
13         MR. VAN NEST:  Asked and answered.             15:06
14         MR. GONZALEZ:  And --                          15:06
15         MR. VAN NEST:  Oh.                             15:06
16         MR. GONZALEZ:  -- let me be more clear.        15:06
17        Q    What was Mr. Levandowski's involvement in  15:06
18    ████████████████████████                            ████
 █    ██  ████████████████████████████                    ████
 █    ████████████████████████████████████████████        ████
 █    ████████████████████████████████                    ████
 █    ██  ████████████████████████████                    ████
 █    ██  ████████████████████████████████                ████
 █    ████████████████████  ████████████████████          ████
 █    ██████████████████████████████████████             15:06
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1   ███████████████   ██████████████████   ███████
█   █████████████████████████████████              15:06
3       Q   When is the last time that you spoke to   15:06
4   Travis Kalanick?                                  15:07
5       A   When was the last time?  I'd have to think 15:07
6   about that.                                       15:07
7           I'm not exactly sure.  I think it may have 15:07
8   been a conversation we had that was ostensibly about 15:07
9   ████████   but I don't remember for sure.         15:07
10      Q   Have you spoken to him since the lawsuit was 15:07
11  filed?                                            15:07
12      A   I don't think so, no.                     15:07
13      Q   So how many -- well, you said you had a    15:07
14  conversation ostensibly about ██████████          15:07
15          Can you tell me what you meant by that     15:07
16  phrase?  What is it that --                       15:07
17      A   He -- he -- he kind of put in a request    15:07
18  saying, ████████████████████████████████  But I   15:07
19  don't think that was his actual purpose, but --   15:07
20      Q   All right.                                 15:07
21          He put in a request to who?                15:07
22      A   To me.                                     15:07
23      Q   All right.                                 15:07
24          He sent you a text or something or --      15:07
25      A   I don't know.  My assistant just said, Travis 15:07
```

Page 139

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    wants to call you, or something like that, and talk to      15:08

 2    you about ████████.                                         15:08

 3            I'm, like, Oh, okay, or whatever.                    15:08

 4            So, I had to take the call.                          15:08

 5      Q   So, you agreed to take a call from                     15:08

 6    Mr. Kalanick to talk about ███████                           15:08

 7      A   Yes.                                                   15:08

 8      Q   And when was it?                                       15:08

 9      A   I don't remember the day, but it was fairly           15:08

10    recently.  I mean, before all this stuff blew up.          15:08

11      Q   Right.  That's my understanding, too.                 15:08

12            But what's your recollection of -- of a date?       15:08

13            For example, was it this year, or was it last       15:08

14    year?                                                        15:08

15      A   I don't remember the date.  I'm sorry.               15:08

16      Q   Okay.  Was it a phone call with just the two          15:08

17    of you?                                                      15:08

18      A   Yes.                                                   15:08

19      Q   How long did the phone call last?                     15:08

20      A   I don't know.  Maybe, like, 30 minutes or             15:08

21    something like that.                                         15:08

22      Q   And, just generally, what did you talk about          15:08

23    in approximately 30 minutes?                                 15:08

24      A   Well, the first part of the call, you know,           15:08

25    was about basically, ███████████████████                    15:08
```

Page 140

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



15:10

Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



15:11

Page 142



15:13

Page 143

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



24   Q   I get it.  I don't want to cut you off.   15:14

25   A   No, it's fine.   15:14

Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q   Having now discussed this conversation a        15:14

 2   couple of times today, do you believe that you've now  15:14

 3   told me everything you can remember that either one of 15:14

 4   you said?                                               15:14

 5      A   I mean, for the moment, yeah.                    15:14

 6      Q   Is there anything in writing that reflects      15:14

 7   any of the conversation?                                15:14

 8      A   I can't think of anything offhand.              15:14

 9      Q   Did you talk to anybody about the               15:14

10   conversation after you got off the phone?               15:14

11      A   I don't remember.  I think probably would       15:14

12   have updated people, you know, on my team, but I don't  15:14

13   remember.                                               15:15

14      Q   Do you still have -- does your company still    15:15

15   have the investment in Uber?                            15:15

16      A   Yes.                                             15:15

17      Q   Having thought about it maybe a little bit,     15:15

18   any idea what the amount of the investment is today?    15:15

19      A   It's a big number. ████████████████   ████      15:15

██   ████████████                                            15:15

21      Q   Why was Waymo spun out as a separate company?   15:15

22      A   I mean, I'm not sure I'd say it's a spinout.    15:15

23   But I think it was kind of birthed as a separate        15:15

24   company within Alphabet.  But, it's not been spun out   15:16

25   of Alphabet or anything.                                15:16
```

                                                    Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1     Q   All right.                                  15:16

 2         Why was it created as a separate company    15:16

 3   under the umbrella of Alphabet?                   15:16

 4     A   ██████████████████████████████████          ████

 ▮   ████████████████████████████████████████████      ████

 ▮   ████████████████████████████████████████████      ████

 ▮   █████████████████████████   ████████████████████   ████

 ▮   ████████████████████████████                       15:16

 9     Q   At the time that it was spun out as a        15:16

10   separate company, was there a valuation done of Waymo? 15:16

11     A   Sorry.  Again, the spinout I wouldn't say.  15:16

12     Q   Well, I don't mean to suggest or imply      15:16

13   anything by it.                                    15:16

14         At the time that Waymo was set up as a       15:16

15   separate company under the umbrella of Alphabet, was 15:16

16   there a valuation done of the company at that time?  15:16

17     A   ███████████████████████████████             ████

 ▮   ███████████████████████   ████████████████████    ████

 ▮   ████████████████████████████████████████████      ████

 ▮   ███████████████████                                ████

 ▮   █   ███████████████████████████████               ████

 ▮   ██████████████████████████████████████            ████

 ▮   ████████████████████████████████████              ████

 ▮   ████████████████████████████                      15:17

25     A   I mean, I don't recall.                      15:17
```

Page 146

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1    Q

10    Q  What is Waymo worth today?      15:18

11          MR. VAN NEST:  Object to the form.      15:18

12          THE WITNESS:  Yeah, I don't know the answer      15:18

13  to that.      15:18

14          MR. GONZALEZ:  Q.  Who would you ask?      15:18

15    A

                  15:18

17    Q  Well, isn't one of the things that you expect      15:18

18  your team to do within Alphabet, is to know the value      15:18

19  of each of your subsidiaries?      15:18

20    A  Yeah, I guess in that sense, I guess      15:18

21  somewhat.      15:18

22    Q  So, who is the person who is responsible for      15:18

23  setting up the value of what is now Waymo?      15:18

24    A  I mean, a little bit depends on the process.      15:18

25  And, I'm not sure of the exact process we use for that      15:18

Page 147

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    nowadays.                                          15:18

 2        Q   So, other than the Waymo CEO, who else would   15:19

 3    you ask, Hey, what's our valuation of Waymo today?    15:19

 4        A   Well, I'd probably ask David that question.   15:19

 5        Q   Drummond?                                  15:19

 6        A   Yes.  I mean, he wouldn't do it, but he would  15:19

 7    figure out how to do it.                           15:19

 8        Q   He would know who to ask?                   15:19

 9        A   Yeah.                                      15:19

10            MR. GONZALEZ:  Let me show you a document   15:19

11    we've marked as 1098.                              15:19

12            (Document marked Exhibit 1098              15:19

13             for identification.)                      15:19

14            MR. GONZALEZ:  This is a one-page document,  15:19

15    WAYMO '29264.                                      15:19

16        Q   Is this an e-mail that you received from    15:19

17    Mr. Kalanick on February 7, 2014?                  15:19

18        A   Sure.                                      15:19

19        Q   And he's basically asking to catch up?      15:19

20        A   Yeah.                                      15:19

21        Q   Do you recall that you've had lunch with    15:19

22    Mr. Kalanick?                                      15:19

23        A   I mean, I don't recall.  But, I mean, it's  15:19

24    possible, yeah.                                    15:20

25        Q   Do you recall getting together with         15:20
```

Page 148

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   Mr. Kalanick, after you received this e-mail, to talk     15:20
 2   about Uber, your investment in the company?               15:20
 3        A    Yeah, I guess my recollection around -- in      15:20
 4   the early days of our relationship, the main issue we     15:20
 5   had was, ███████████████████████████████████████    ██████ 15:20
     ██████████████    So, I'm not really remembering this     15:20
 7   e-mail.  Like, I sort of assume it's actually about       15:20
 8   that.                                                     15:20
 9        Q    Other --                                        15:20
10        A    My involvement with him was around that.        15:20
11   ████████████████████████████████████████    ██████
     ██████████████████████████████████    ██████
     ████████████████████    ██████
     ███    ███████████████████████████    ██████
     ██████████████████    ██████
     ███    ████    ███████    █████████    █████████    ██████
     █████████████████████████████████████    ██████
     ███    ████████████████████    ██████
     ███    ████████████                                      15:21
20        Q    Is there anything else you've discussed with    15:21
21   Mr. Kalanick, with respect to ██████████████    ██████     15:21
     ████████████████████?                                    15:21
23        A    I mean, I don't -- I don't recall any other     15:21
24   major kind of conversations we had.                       15:21
25        Q    Do you recall a meeting that you had with        15:21
```

Page 149

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Mr. Kalanick and Mr. Drummond?                        15:21

2          A    I mean, maybe.  Do you have more context?    15:21

3          Q    A lunch meeting to discuss the ▮▮▮▮▮▮▮        ▮▮▮▮
       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.                                    15:21

5          A    Oh, I don't recall that offhand, no.         15:21

6          Q    To your knowledge, has there ever been any   15:22

7      change in projections, for what is now Waymo, as a    15:22

8      result of different people leaving the company?       15:22

9          A    Sorry.  Projections of what?                 15:22

10         Q    Projections or benchmarks of how the company 15:22

11     might do in the future.                               15:22

12             MR. VAN NEST:  I'll object to the form.        15:22

13             THE WITNESS:  Yeah, I'm not aware of such      15:22

14     things.  I mean, it's...                              15:22

15             MR. GONZALEZ:  Q.  Other than whatever may     15:22

16     have been said in the phone call that you've testified 15:22

17     about with Mr. Kalanick, did you ever express concern  15:22

18     to anyone at Uber about possible misconduct that was   15:22

19     somehow related to Anthony Levandowski?                15:22

20         A    Well, I'm not sure I stated that to Travis,   15:22

21     first of all.                                          15:23

22         Q    I'm not saying you did, either.               15:23

23         A    Okay.                                         15:23

24         Q    That's why I'm just trying to set aside that  15:23

25     conversation.                                          15:23

                                                    Page 150

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A    Okay.                                    15:23

 2      Q    Did you ever express a concern to anyone at   15:23

 3  Uber that there was potential misconduct involving     15:23

 4  Anthony Levandowski?                                    15:23

 5      A    I don't think so.                          15:23

 6      Q    Why not?  Why didn't you?                   15:23

 7      A    I mean, I don't think that's my job,        15:23

 8  probably.                                              15:23

 9      Q    Well, you're a significant investor in Uber;   15:23

10  right?                                                 15:23

11      A    Yeah, but I don't manage that relationship.   15:23

12  We have people who -- you know, like David, who are on   15:23

13  the board and such.                                     15:23

14      Q    Precisely.                                   15:23

15      A    My job is delegation, you know, and so I       15:23

16  delegate.                                              15:23

17      Q    Why didn't you delegate to anyone the task of   15:23

18  talking to Uber to see if you can work out whatever      15:23

19  concerns you had about Anthony Levandowski?             15:23

20          MR. VAN NEST:  Objection to form.             15:23

21          THE WITNESS:  Yeah, I mean, you're -- I've     15:23

22  already testified on this point, and I already          15:23

23  testified ███████████████████████████.               15:24

24          But, I guess I'm confused as to the question.   15:24

25          MR. GONZALEZ:  I don't think that you          15:24
```

Page 151

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    recalled anything specific earlier.                  15:24

 2        Q   Is there something that you're recalling now  15:24

 3    that's specific about having delegated a task to     15:24

 4    someone specific?                                    15:24

 5        A   If you'll look in my testimony, I believe    15:24

 6    I -- I stated that it's likely I delegated to someone, 15:24

 7    probably David.                                      15:24

 8        Q   But, you don't have any specific recollection 15:24

 9    of having done so, and you don't recall them coming  15:24

10    back and reporting on anything; is that right?       15:24

11            MR. VAN NEST:  Objection.  That's compound.  15:24

12            He has testified about this earlier, Counsel. 15:24

13            MR. GONZALEZ:  Yeah, but I want to make sure  15:24

14    that we're not miscommunicating here.                15:24

15        Q   You --                                       15:24

16        A   I have none -- no reason to believe that we  15:24

17    did anything unreasonable with respect to our legal  15:24

18    proceedings against --                               15:24

19            MR. VAN NEST:  That's not what he asked.     15:25

20            He did testify previously that he thought    15:25

21    ██████████████████ --                                15:25

22            THE WITNESS:  I think --                      15:25

23            MR. VAN NEST:  -- ███████████.                15:25

24            THE WITNESS:  -- I think we went above and   15:25

25    beyond during normal course of business to be friendly 15:25
```

Page 152

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
  1     to them.                                              15:25

  2            MR. VAN NEST:  Yeah.                            15:25

  3            MR. GONZALEZ:  All right.                       15:25

  4       Q   But to be clear, sitting here today, you        15:25

  5     don't recall ██████████████████████████████████       15:25

  ██     █████████████████                                    █████

  ██        ██ ███████████████████████████████████████       █████

  ██     ████████████████████████████████████████████████    █████

  ██     ████████████████████████████████████████            █████

  ██        ██ ███████████████████████████████████████       █████

  ██     ████████████████████████████████████████            █████

  ██        ██ █████████████████████████████████             █████

  ██     ████████████████████████████████████████            █████

  ██        ██ ███████████████████████████████████████       █████

  ██     ██████████████████████████████                      15:25

 16       A   No.                                             15:25

 17            MR. GONZALEZ:  Let me hand you a document       15:26

 18     that we've marked as Exhibit 1099.                    15:26

 19            (Document marked Exhibit 1099                   15:26

 20             for identification.)                          15:26

 21            MR. GONZALEZ:  For the record, this is a       15:26

 22     two-page document, WAYMO '29346 and '47.              15:26

 23       Q   Sir, is this an e-mail that you received from   15:26

 24     Mr. Thrun on November 12, 2014?                       15:26

 25       A   Yes.                                            15:27
```

                                           Page 153

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q   And, as of this point, he's reporting to you    15:27

 2   on a variety of issues involving ███████████; is that    15:27

 3   right?                                                   15:27

 4           MR. VAN NEST:   Take your time and review the   15:27

 5   memo.                                                    15:27

 6           THE WITNESS:   Looks like a number of things.   15:27

 7           MR. GONZALEZ:   Q.  If you look in the middle,  15:27

 8   there's a reference to ████████                          15:27

 9           Do you see that?                                 15:27

10      A   Yes, I see that.                                  15:27

11      Q   What is that?                                     15:27

12      A   That's just █████████████████████████.            15:27

13      Q   And, ███████████████████████           ██
```

███  ████████████████████████████████████████   ██

███  ████████████████████████████              ██

███     █      ███   ████████████████████████████  ██

███     █      ██████████████████████            ██

███  ███████████████████████                      ██

███     █      ████                               ██

███     █      ████████████████████████████████   ██

███  ██████████████████████████████████         ██

███     █      █████████████████████████████     ██

███     █      █████████████████████████         ██

███             ███████                          ██

███             ████████████████████████         15:27



15:29

Page 155



15:30

Page 156

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A    ████████████████████████████████              15:30

 2           (Document marked Exhibit 1100                  15:30

 3            for identification.)                          15:30

 4           MR. GONZALEZ:  Let me show you a document      15:30

 5      that we've marked as Exhibit 1100.                  15:30

 6      Q    Is this an e-mail to you from ████████         15:30

 █      ████, dated March 29, 2015?                         15:31

 8      A    It looks like it, yeah.                        15:31

 9      Q    ██████████████████████████████████ ██████     15:31

 █      ███████████████████████████████████?               15:31

11           MR. VAN NEST:  Take a moment to review it,     15:31

12      please.                                             15:31

13           THE WITNESS:  Okay.                            15:31

14           (Reading document.)                            15:31

15           Okay.                                          15:31

16           MR. GONZALEZ:  Q.  Is this an e-mail that you  15:31

17      received from █████████ March 29, 2015, involving   15:31

18      ███████?                                            15:31

19      A    It looks like it, yes.                         15:31

20      Q    ████████████████████████████████ █████        15:31

 █      ███████████████████████                █████

 █      ████ ███████████ ███████████████████   █████

 █      ████████████ █████████████ ███████████ █████

 █      ██████████████████████████████████     █████

 █      ██████                                             15:32
```

Page 157

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q    And you'll note it says March 29.  Let me      15:32

 2   show you an e-mail from a couple of days later, 1101.    15:32

 3             (Document marked Exhibit 1101                  15:32

 4              for identification.)                          15:32

 5             MR. VAN NEST:  Thank you.                      15:32

 6             MR. GONZALEZ:  Q.                              
```



```
                                                             15:33
```

Page 158

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A    ███████████    █████████████████████████      ████████

        ████████████                                       ████████

        ██  ████████████                                   ████████

             ████████████████████████████                 ████████

        ████████████████████████████████████████          ████████

        ███████████████████████████████████████           ████████

        ██████                                             ████████

        ██  ███████████████████████████████████           ████████

        █████████████████████████████                        15:33
```

10      Q    Exhibit 1100?                                    15:33

11      A    Yeah, I think -- yes, 1100.                      15:33

12           MR. GONZALEZ:  Okay.  Counsel, Mr. Chatterjee    15:34

13      wants to ask some questions.  I obviously have a lot  15:34

14      more questions for this witness.  And I realize the   15:34

15      Court has limited us to four hours.  So, I'm going to, 15:34

16      as a courtesy, pass the baton over to Mr. Chatterjee. 15:34

17      We reserve our rights.  I'll look at my notes and may 15:34

18      have a few more questions when he's done.             15:34

19           But for now, I want to go off the record so I    15:34

20      don't use up time while we're switching.              15:34

21           THE VIDEOGRAPHER:  We are off the record at      15:34

22      3:34 p.m.                                             15:34

23           (Recess taken.)                                  15:34

24           THE VIDEOGRAPHER:  We are back on the record     15:35

25      at 3:36 p.m.                                          15:35

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                                                    15:35

 2                    EXAMINATION                     15:35

 3   BY MR. CHATTERJEE:                               15:35

 4       Q   Hi, Mr. Brin.  We haven't met before.  My    15:36

 5   name is Neel Chatterjee.  I represent an entity called  15:36

 6   Otto Trucking.                                   15:36

 7           MR. VAN NEST:  Mr. Page.                 15:36

 8           MR. CHATTERJEE:  Mr. Page.  It's -- the names  15:36

 9   are used so interchangeably in the market.  Mr. Page.  15:36

10       Q   Have you ever heard of Otto Trucking?    15:36

11       A   I mean, I've heard of Otto.              15:36

12       Q   Have you ever heard of Otto Trucking, that  15:36

13   company specifically?                            15:36

14       A   I'm not sure.  Is there a difference between  15:36

15   Otto and Otto Trucking?                          15:36

16       Q   Well, what do you understand Otto to be?  15:36

17       A   Sorry.  Today I see it as part of Uber, I  15:36

18   suppose.                                         15:36

19       Q   Okay.  Would it surprise you to learn that  15:36

20   Otto Trucking today is not part of Uber?         15:36

21       A   I don't know.                            15:36

22       Q   Would it surprise you?                   15:36

23       A   Depends what Otto Trucking is, I suppose.  15:36

24       Q   Do you know what Otto Trucking is?       15:36

25       A   Apparently not, I guess.                 15:36
```

Page 160

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q   Are you aware of any wrongful acts that Otto | 15:36 |
| 2 | Trucking has engaged in? | 15:37 |
| 3 | MR. VAN NEST:  Objection. | 15:37 |
| 4 | And I'll instruct you, Mr. Page, to the | 15:37 |
| 5 | extent you have information provided by one of the | 15:37 |
| 6 | lawyers for Waymo or Alphabet, do not answer. | 15:37 |
| 7 | If you have any independent information, you | 15:37 |
| 8 | may answer. | 15:37 |
| 9 | THE WITNESS:  I mean, I'm not sure. | 15:37 |
| 10 | MR. CHATTERJEE:  Q.  So is that a "no"? | 15:37 |
| 11 | A   State the question again, please. | 15:37 |
| 12 | Q   Other than any conversations you've had with | 15:37 |
| 13 | your lawyers, are you aware of any wrongful acts that | 15:37 |
| 14 | Otto Trucking has engaged in associated with this | 15:37 |
| 15 | lawsuit? | 15:37 |
| 16 | A   Seems like a very strange line of | 15:37 |
| 17 | questioning, because I'm not sure about the entity | 15:37 |
| 18 | with which I'm replying. | 15:37 |
| 19 | Q   So, you don't know what it is; right? | 15:37 |
| 20 | A   I mean, I'm not sure whether I know what it | 15:37 |
| 21 | is or not, since I don't -- | 15:37 |
| 22 | Q   Well, you either know what it is or it isn't. | 15:38 |
| 23 | Do you know what Otto Trucking is? | 15:38 |
| 24 | A   I suppose I do not. | 15:38 |
| 25 | Q   Do you know what the business of Otto | 15:38 |

Page 161

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1   Trucking is?                                    15:38

2       A   I suppose I do not.                      15:38

3       Q   Okay.  Do you -- did you know that Otto  15:38

4   Trucking is an entity that is completely separate from 15:38

5   Uber?                                            15:38

6       A   I did not know that until you stated that. 15:38

7       Q   Did you know that Uber has no ownership  15:38

8   interests in Otto Trucking?                      15:38

9           MR. VAN NEST:  I'll object to the form.  Did 15:38

10  you say "an" or "no"?                            15:38

11          MR. CHATTERJEE:  Q.  Did you know that Uber 15:38

12  has no ownership interest in Otto Trucking?      15:38

13          MR. VAN NEST:  Object to form.           15:38

14          THE WITNESS:  All right.  This seems like 15:38

15  something complicated that I don't know anything 15:38

16  about.                                           15:38

17          MR. CHATTERJEE:  Okay.                   15:38

18      Q   Do you know why Otto Trucking is named as a 15:38

19  defendant in this case?                          15:38

20          MR. VAN NEST:  Again, anything you learned 15:38

21  from lawyers is off limits.  Don't answer.       15:38

22          If you have some independent knowledge,  15:38

23  Mr. Page, go ahead and provide it.               15:38

24          THE WITNESS:  All right.  I don't know.  15:38

25          MR. CHATTERJEE:  Q.  Did Anthony Levandowski 15:39
```

Page 162

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    ever express concerns to you about the valuation of    15:39

 2    Project Chauffeur?                                      15:39

 3        A   I don't recall.                                 15:39

 4        Q   You were aware that ████████████████    ███       

 ▮    ████████████████████; correct?                          15:39

 6        A   I mean, ████████████████████            ███

 ▮    ████████████  ██████████████████████████        ███

 ▮    ██████████████                                          15:39

 9            MR. CHATTERJEE:  Let's mark this as             15:39

10    Exhibit 1102.                                           15:39

11            (Document marked Exhibit 1102                   15:39

12             for identification.)                           15:39

13            MR. CHATTERJEE:  Can you pass these down?       15:39

14        Q   Mr. Page, what I've handed you, that's been     15:40

15    marked as Exhibit 1102, is a document dated             15:40

16    September 23rd, 2015.                                   15:40

17            Have you ever seen this document before?        15:40

18        A   I mean, I don't -- I don't think so.            15:40

19        Q   Okay.  All right.                               15:40

20            Who is Don Harrison?                            15:40

21        A   I mean, it says right here he's vice            15:40

22    president of corporate development.                     15:40

23        Q   Do you know who he is?                          15:40

24        A   He is -- yeah, he's an executive for the        15:40

25    company.                                                15:40
```

Page 163

1    Q    Okay.  Well, previously, I -- if I remember    15:40

2  correctly, you couldn't recall who was involved in ████    ████

█      ██████████████████████████████.                      15:40

4        Does this refresh your recollection at all as    15:40

5  to whether Mr. Harrison was involved?                    15:40

6    A    I mean, I don't recall.                          15:40

7    Q    Do you remember if ███████████████████████    ████

█  ████████████████████████████████████    ████

█  ██████████████████████                              ████

█  ██  ██████████████████████████████████    ████

█  ██████████████████████████████████████    ████

█  ██  █  ████████████████  █████████████████    ████

█  █████████████████                                  ████

█  ██  █  ███████████████████████████████  █    ████

█  █████████████████████████  ███████████████████    ████

█  ██████████████████████                              15:41

17       MR. VAN NEST:  He's asking for your            15:41

18  recollection --                                       15:41

19       THE WITNESS:  No, I don't --                    15:41

20       MR. VAN NEST:  -- not what the document says.    15:41

21       THE WITNESS:  Yeah, I don't -- I don't          15:41

22  recall.                                               15:41

23       MR. CHATTERJEE:  Okay.                           15:41

24    Q    Do you remember anyone expressing concern      15:41

25  that ██████████████████████████████████?            15:41

                                        Page 164

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1      A  ████████████████████████     ████

 █    ████████████████   █████████████████████     ████

 █    ██████████████          I mean, I don't...        15:41

 4      Q   My question is a little different then.  Let  15:41

 5  me ask it a little more precisely.                    15:41

 6          Do you remember ████████████████████    ████

 █  ██████████████████████████████████████    ████

 █  ██████████████████████████████████████    ████

 █  ██████████████████                         ████

 █    █   ██████████████████████               ████

 █    █   ██   ████████████████████████        ████

 █   ███                                        ████

 █    █   ████   ████████████████████████       ████

 █    █   ██████████████████                    ████

 █    █   ████████████████████████████          ████

 █  ████████████████████████████████████        ████

 █  ████████████                                 ████

 █    █   █   ██████████████████████████         ████

 █  ████████████████████                          ████

 █       █████████████████████████████            ████

 █  ████████████████████                          ████

 █    █   ████████████████████████████            ████

 █  ████   ██████████   ████████████████          ████

 █  ████████████████████████████   ████           ████

 █  ██████████████████████                         15:42
```



15:43

Page 166

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A   Don't recall.                           15:43

 2      Q   Do you know if anyone took over for     15:43

 3   Mr. Harrison on ████████████████████           ████

 █   ██   ████████████████   ████████  █████████   ████

 █   ██████████████████                            ████

 █   ██   ████████████████████████████             ████

 █   ████████████████████████████████████████████  ████

 █   ██████?                                        15:44

 9      A   I don't recall.                         15:44

10      Q   So, is that a "no," or you just don't know?  15:44

11      A   I don't recall.                         15:44

12          MR. VAN NEST:  He said he didn't recall.   15:44

13   That was his answer.                           15:44

14          MR. CHATTERJEE:  Q.  Are you aware that    15:44

15   Google asked Anthony Levandowski to sign a noncompete  15:44

16   agreement in 2014?                             15:44

17      A   No, I'm not aware of that or I don't recall  15:44

18   it.                                            15:45

19      Q   Who is Astro Teller?                    15:45

20      A   Astro is in charge of X.                15:45

21      Q   And what does that mean, to be in charge of  15:45

22   X?                                             15:45

23      A   Well, X is our -- kind of our division that  15:45

24   does various kinds of moonshot projects.  That's  15:45

25   widely known.                                  15:45
```

Page 167

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q   And one other question:  Did you ever talk to    15:45
 2   Sergey Brin about Anthony Levandowski?  Do you know if   15:45
 3   you ever did that?                                       15:45
 4      A   I mean, I imagine we discussed it at some         15:45
 5   point.                                                   15:45
 6      Q   Would you have exchanged e-mails or text          15:45
 7   messages or instant messages?                            15:45
 8      A   Unlikely.  We generally just discuss.             15:45
 9      Q   Let's mark --                                     15:45
10      A   I guess we might e-mail also.                     15:45
11      Q   Did you search for those e-mails?                 15:45
12      A   I mean --                                         15:45
13          MR. VAN NEST:  Objection to form.                 15:45
14          THE WITNESS:  -- I mean, I have -- I assume       15:45
15   that there was a lot of discovery done.                  15:45
16          MR. CHATTERJEE:  Let's --                         15:46
17          THE WITNESS:  I think that's the job.             15:46
18          MR. CHATTERJEE:  Okay.  I didn't mean to          15:46
19   interrupt.                                               15:46
20          Let's mark this as 1103.                          15:46
21          (Document marked Exhibit 1103                     15:46
22           for identification.)                             15:46
23          MR. CHATTERJEE:  Can you pass this around?        15:46
24          MR. VAN NEST:  Counsel, can I get a --            15:46
25          MR. CHATTERJEE:  Oh, I'm sorry.                   15:46
```

Page 168

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            MR. VAN NEST:  Yeah.  Thank you.          15:46

 2            MR. CHATTERJEE:  I thought I had an extra  15:46

 3    copy.                                             15:46

 4       Q   The document I've handed you, marked as    15:46

 5    Exhibit 1103, is an e-mail from Chris Urmson to Sergey  15:46

 6    Brin and Astro Teller, dated October 24th, 2014.  15:46

 7            Do you see that?                           15:46

 8       A   Yep.                                        15:46

 9       Q   I asked you before if you were aware of any  15:46

10    discussions in October of 2014, with Mr. Levandowski,  15:46

11    about  ████████████████████                 ████     

█     ████████████████████████████████████████    ████

█     ████████████████████████████████████        ████

█     ████████████████████████████████████████     ████

█     ███████████████████████                       15:46

16            Do you see that?                           15:46

17       A   Yep.                                        15:46

18       Q   Were you involved in any discussions in    15:46

19    October of 2014 about having Anthony leave the company  15:47

20    with  ██████████████████████████████ ?            15:47

21       A   I mean, I don't recall.  And I'm not -- you  15:47

22    know, I'm not on this e-mail.  It doesn't really  15:47

23    trigger any additional recollection there.        15:47

24       Q   So, to the best of your recollection, you  15:47

25    weren't involved in that at all?                  15:47
```

                                            Page 169

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A   I said I don't recall.                      15:47

 2      Q   Yeah.                                       15:47

 3          Do you have any understanding as to why     15:47

 4   ████████████████████████████████████ ████████     15:47

 █   ███████████████████████?                          15:47

 6          MR. VAN NEST:  Objection to form.           15:47

 7          THE WITNESS:  Yeah, I don't -- I don't recall  15:47

 8   anything about that.                               15:47

 9          MR. CHATTERJEE:  Q.  Do you remember any    15:47

10   ██████████████████████?                           15:47

11      A   I don't recall.  But, I mean, it's -- as I've  15:47

12   already testified, I mean, Chris and Anthony did not  15:47

13   get along well.                                    15:47

14      Q   And, why didn't they get along well?        15:47

15          MR. VAN NEST:  Objection to the form.       15:47

16          THE WITNESS:  I don't know.  I wish I knew  15:47

17   that question.                                     15:48

18          MR. CHATTERJEE:  Q.  Did Mr. Urmson trust   15:48

19   Mr. Levandowski?                                   15:48

20          MR. VAN NEST:  Again, objection to the form.  15:48

21          MR. CHATTERJEE:  Q.  Did you have any       15:48

22   understanding as to -- let me place it this way:  Did  15:48

23   Mr. Urmson ever express concerns to you that he didn't  15:48

24   trust Anthony Levandowski?                         15:48

25      A   I don't think so.                           15:48
```

Page 170

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q    Did anyone else at Waymo or Google express      15:48
 2   concerns to you that they could not trust Anthony         15:48
 3   Levandowski?                                              15:48
 4        A    Yeah, sorry.   Let me -- let me go back to the  15:48
 5   previous one.                                             15:48
 6             I mean, I think there were generally a lot of   15:48
 7   concerns about Anthony, and people's -- people were       15:48
 8   definitely concerned about trusting him.   I don't        15:48
 9   think Chris expressed that to me directly, but I think    15:48
10   I was aware of that generally.                            15:48
11        Q    Who were the people that did?                   15:48
12        A    I can't recall.                                 15:48
13        Q    Was Mr. Thrun one of them?                      15:48
14        A    I can't recall.                                 15:48
15        Q    Was Mr. Salesky one of them?                    15:48
16        A    You know, I -- I don't recall.   I didn't have 15:49
17   that much contact with Mr. Salesky.                       15:49
18        Q    Do you remember referring to something as      15:49
19   ██████████████████████████?                               15:49
20        A    I mean, I don't remember that in the context   15:49
21   of this particularly.  █████████████████████ ████████     15:49
██  ████████████████████████████████████████                  15:49
23             MR. CHATTERJEE:   There is a -- a document.     15:49
24   I'm going to -- I'm going to mark it as a new             15:49
25   document, because I don't want to hunt through all the    15:49
```

Page 171

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    old ones.  In the interest of time, I'm going to mark      15:49
 2    this as 1104.                                              15:49
 3              (Document marked Exhibit 1104                     15:49
 4               for identification.)                            15:49
 5          MR. CHATTERJEE:  This is a document that              15:49
 6    Mr. Gonzalez gave you before.                              15:49
 7          THE WITNESS:  This is one I saw already.              15:49
 8          MR. CHATTERJEE:  Q.  And, in this document,           15:49
 9    ███████████████████████████████████████████   ███████
      ███████████████████████████████████████████   ███████
      █████████████████████████.                                 15:50
12          Do you see that?                                     15:50
13      A   Yeah.                                                15:50
14      Q   Do you see how it says at the end ███████   ███████
      ████████████████████?                                      15:50
16          Any idea what he's referring to there?               15:50
17      A   I mean, I think that's just generally the            15:50
18    ████████████████████████████████, in Valley terminology.   15:50
19      Q   So, it wasn't referring to any specific              15:50
20    nomenclature like that that was being used inside of       15:50
21    the Project Chauffeur team?                                15:50
22      A   I mean, I don't know.  You're asking me to           15:50
23    interpret what I think.  I don't really know.  And I       15:50
24    was generally -- this e-mail is kind of crazy, I           15:50
25    think.                                                     15:50
```

Page 172

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1       Q    Were -- were you ever aware of people      15:50

2   referring to ███████████████████████████       ██████

    ██████████████████████████████████████           ██████

    ████████████████████████?                         15:50

5       A    Oh, I see.  I mean, I don't recall, but that    15:50

6   seems plausible.                                  15:50

7       Q    You don't recall anyone ever saying that?    15:50

8       A    Yeah, I don't know.  It's really hard to keep    15:50

9   thousands of code names straight also across lots of    15:51

10  companies.                                        15:51

11      Q    Did you ever have a conversation with Astro    15:51

12  Teller expressing concerns about Anthony Levandowski    15:51

13  leaving and helping the competition?              15:51

14      A    I mean, I remember, like, you know, thinking    15:51

15  Anthony is a significant person and, like, we should    15:51

16  try to -- try to retain him and make him productive,    15:51

17  if we can.                                        15:51

18      Q    That was a different question than I asked.    15:51

19           Did you ever have a conversation with Astro    15:51

20  Teller expressing concern about Anthony Levandowski    15:51

21  leaving Google and helping the competition?       15:51

22      A    I mean, I don't recall that.  But I'm -- I    15:51

23  mean, that's consistent with what I said before, what    15:51

24  I just said.                                      15:51

25      Q    Do you remember having that --             15:51
```

                                                Page 173

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1       A   It sounds consistent.                        15:51

2       Q   Okay.  Did you ever have that kind of        15:52

3    conversation in November of 2015?                   15:52

4       A   I mean, it seems plausible.                  15:52

5       Q   When was the first time you recall Anthony   15:52

6    Levandowski talking to you about potentially leaving 15:52

7    Google?                                             15:52

8       A   I mean, I don't think -- Anthony did not,    15:52

9    like, go and say, "Hi.  I'm going to leave Google.  15:52

10   See you later."  I mean, he was just always a bit   15:52

11   unhappy.  And generally, we can retain those people 15:52

12   for a while.                                        15:52

13          But I also had very limited contact with him. 15:52

14   Like, you know, he's not a report of mine.  Generally, 15:52

15   advocating for him.                                 15:52

16      Q   Did you ever get him involved in other       15:52

17   projects, other than Project Chauffeur at Google?   15:52

18      A   I mean, I don't recall that.                 15:52

19      Q   So, you may or may not have.  You just don't 15:52

20   remember?                                           15:52

21      A   Yeah.  I mean, I didn't spend a lot of time  15:52

22   with him or anything.                               15:52

23      Q   Do you ever remember getting him involved in 15:52

24   meetings with other groups to help them getting     15:52

25   products done?                                      15:52
```

Page 174

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A    That sounds very implausible.                 15:52

 2      Q    Okay.  Why is it implausible?                 15:53

 3      A    Well, I just testified, I had very limited    15:53

 4   contact with him, and I just don't remember anything  15:53

 5   like that.                                             15:53

 6      Q    Do you remember Chris Urmson ever saying to   15:53

 7   people at Google that Anthony Levandowski needed to be 15:53

 8   fired because he was trying to sell a group en masse   15:53

 9   to Uber?                                               15:53

10      A    No, I do not remember that.                    15:53

11           MR. CHATTERJEE:  Okay.  So, let's mark this    15:53

12   as 1105.                                               15:53

13           (Document marked Exhibit 1105                  15:53

14            for identification.)                          15:53

15           MR. CHATTERJEE:  Mr. Page, the document I've   15:53

16   handed you is Document 1105.  It's a string of         15:53

17   e-mails.                                               15:53

18      Q    But, there's an e-mail from Chris Urmson in    15:53

19   the middle, dated August 4th, 2015.  You see how it    15:54

20   starts:                                                15:54

21   ███████████████████████████    ████      ████

███  ███████████████████████████████████         ████

███  █████████████████████████████████          ████

███  ██████████████████████████████████████████  ████

███  ███████████████████████                      15:54
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              Do you see that?                          15:54
2      A    Yeah.  And I'm not on this e-mail.           15:54
3      Q    Do you have any reason to dispute that?      15:54
4           MR. VAN NEST:  Objection to the form of the  15:54
5  question.                                             15:54
6           To dispute what?                             15:54
7           MR. CHATTERJEE:  To dispute what Mr. Urmson  15:54
8  is saying in this e-mail.                             15:54
9           MR. VAN NEST:  Object to the form.           15:54
10          THE WITNESS:  I mean, I believe this is an   15:54
11  e-mail that Chris wrote that I'm not copied on.      15:54
12          MR. CHATTERJEE:  Right.                      15:54
13      Q    ████████████████████████████████████       ████
    ████  ██████████████████████████████████████████    ████
    ████  ██████████████████████████████████████████    ████
    ████  ████████████████████████████████████████      ████
    ████  █████████████████                              15:54
18      A    I mean, I don't remember when this happened 15:54
19  as compared to when -- when did he actually leave?   15:54
20      Q    This is August 4th, 2015, according to the  15:54
21  e-mail, if you look at it.                           15:55
22      A    Yeah.  What date did he actually leave?     15:55
23      Q    He left in January of 2016.                 15:55
24      A    This was a long time before then.           15:55
25           I remember there was -- you know, there was 15:55
```

Page 176

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    some concern.  I remember percolating up to me that      15:55
 2    there was some concern about him doing some things,       15:55
 3    and then I think it then wasn't substantiated.  That's    15:55
 4    what I remember.                                          15:55
 5        Q   And what was the concern expressed about him      15:55
 6    doing some things?  What were those things?               15:55
 7        A   I mean, something like this, but I don't          15:55
 8    remember the detail of that as it percolated up to me.    15:55
 9        Q   Well, just to make sure, because you said you     15:55
10    hadn't seen this e-mail before, tell me what was told     15:55
11    to you as what the concern was.                           15:55
12        A   I mean, so this is not sort of something new.     15:55
13    There was always concern.  You know, people would say,    15:55
14    Oh, Anthony is doing this.  Anthony is doing that.        15:55
15        Q   What is the "this" and "that"?                    15:55
16        A   Something they didn't like.                       15:55
17            But remember, these people also didn't like       15:55
18    each other very well, and so they tended to say that a    15:56
19    lot.  This had been going on for a while.  So, that's     15:56
20    kind of my level of recollection about this.             15:56
21            That's -- that's kind of -- Hanke was there       15:56
22    and, you know, maybe it turned out to be more true,       15:56
23    but we didn't know that at the time.  At least, I         15:56
24    didn't know that at the time.                             15:56
25        Q   I just want to get a little more granular.        15:56
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    When you used the word "this" and "that," I'm trying      15:56

2    to understand:  What were the complaints that people      15:56

3    were raising specifically, as best you know?             15:56

4         A   I can't recollect that.  But, I mean...          15:56

5         Q   But you were aware sometime in -- in 2015,       15:56

6    that people were complaining that Anthony might be        15:56

7    trying to take a group of people to Uber?                15:56

8         A   No, no.                                          15:56

9         MR. VAN NEST:  Object to the form of the             15:56

10   question.                                                15:56

11        THE WITNESS:  Again, as I've already stated,        15:56

12   I wasn't aware of, like -- definitely was not aware       15:56

13   that that was a significantly likely thing in August      15:56

14   of 2015.                                                 15:56

15        MR. CHATTERJEE:  Q.  Were you aware of people        15:56

16   making those kinds, of accusations?                      15:56

17        A   Not those kind of accusations, but general       15:57

18   accusations about his character and his general           15:57

19   ethics.                                                  15:57

20        Q   And what were the accusation about his          15:57

21   general ethics?                                          15:57

22        A   I don't remember the details of it, but more     15:57

23   of those kind of flavor.                                 15:57

24        Q   Did you trust him?                              15:57

25        A   Oh, I mean, obviously, too much, I guess.        15:57

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q   Well, did you trust him?                    15:57

 2        A   To an extent.  I think, like, he was -- to  15:57

 3   me, he seemed like he was likely to be somewhat      15:57

 4   trustworthy as long as he felt he was getting what he 15:57

 5   needed.  But, I think in retrospect, that was not    15:57

 6   correct.                                             15:57

 7        Q   But many people had told you that they didn't 15:57

 8   think he was trustworthy; right?                     15:57

 9        A   Yeah.  I guess I should have listened to    15:57

10   those people.                                        15:57

11        Q   And, was part of the reason that his role in 15:57

12   Project Chauffeur was reduced over time was because of 15:57

13   those issues?                                        15:57

14        A   I don't know.  That's hard to know, I guess. 15:57

15   I -- you know, I wasn't involved in that directly.   15:58

16        Q   Who would know?                             15:58

17        A   I assume people who have had more contact   15:58

18   with him.                                            15:58

19        Q   Can you give me some names?                 15:58

20        A   Chris is probably who had the most contact  15:58

21   with him.                                            15:58

22        Q   What about Mr. Thrun or Mr. Salesky?        15:58

23        A   Yeah, I mean, I'd probably say Chris had by  15:58

24   far the most contact with him during recent history. 15:58

25            MR. CHATTERJEE:  I do need to take a break   15:58
```

Page 179

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   after this because I'm out of little stickers.        15:58

 2           Oh, good.                                      15:58

 3           MR. VAN NEST:  Problem solved.                 15:58

 4           MR. CHATTERJEE:  Problem solved.  They're      15:58

 5   always a step ahead of me.                             15:59

 6           (Document marked Exhibit 1106                  15:59

 7            for identification.)                          15:59

 8           MR. CHATTERJEE:  This is a document that's     15:59

 9   been marked as 1106.                                   15:59

10      Q   So, Mr. Page, what I've handed you as           15:59

11   document number -- Exhibit 1106 -- this is an e-mail   15:59

12   that's dated January 27th, 2016.                       15:59

13           And, I'll represent to you that the previous  15:59

14   day is the day that Anthony Levandowski had told you   15:59

15   he was resigning.  If you actually look at the bottom  15:59

16   of the e-mail, you say:                                15:59

17           ████████████████████████████████              15:59

18           Do you see that?                               15:59

19      A   Yep.                                            15:59

20      Q   Okay.  Now, in the -- have you seen this        15:59

21   e-mail before?                                         15:59

22      A   I mean, I'm CCed on this e-mail.                15:59

23      Q   Okay.  How recently have you seen this          15:59

24   e-mail?                                                15:59

25      A   Very, very recently, and not since then.        15:59
```

Page 180

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q    Okay.  If you look on this e-mail, in the    15:59

 2   second, I'll call it, cell of the string, there is an   16:00

 3   e-mail from John Krafcik.                               16:00

 4        Do you see that?                                   16:00

 5      A    Yep.                                            16:00

 6      Q    And, you were on this string; right?           16:00

 7      A    It's kind of hard to --                        16:00

 8      Q    You can see at the top that you're CCed on     16:00

 9   it?                                                     16:00

10      A    Yeah.                                           16:00

11      Q    And you see on that paragraph, he says:        16:00

12        "We believe" --                                   16:00

13        The very last paragraph says:                     16:00

14        ███████████████████████████████        █████

███  ███████████████████████████████████████    █████

███  ████████████████████████████████              16:00

17        Do you see that?                                  16:00

18      A    Yeah.                                          16:00

19      Q    Do you remember reading that statement?        16:00

20      A    I don't remember reading that statement.       16:00

21   But, I mean...                                         16:00

22      Q    Do you remember being concerned about that at  16:00

23   all?                                                    16:00

24      A    I mean, I don't think it's, like, a great      16:00

25   thing, but it also is not inherently illegal           16:00
```

Page 181

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    necessarily.                                         16:01

 2        Q    Are you aware that Google's accusation today  16:01

 3    is that six weeks before this e-mail, before        16:01

 4    Mr. Levandowski resigned, he's accused of having    16:01

 5    downloaded an extensive volume of information from  16:01

 6    Google?                                             16:01

 7            MR. VAN NEST:  To the extent he's asking     16:01

 8    about allegations, to the extent you learned them from 16:01

 9    a lawyer --                                          16:01

10            THE WITNESS:  Yeah.                           16:01

11            MR. VAN NEST:  -- I'm instructing you not to  16:01

12    answer.                                             16:01

13            THE WITNESS:  I mean --                       16:01

14            MR. VAN NEST:  If you have independent        16:01

15    knowledge, you can state it.                        16:01

16            THE WITNESS:  Yeah, I don't have any          16:01

17    independent knowledge.  I've read that in the press, 16:01

18    certainly.                                          16:01

19            MR. CHATTERJEE:  All right.                   16:01

20        Q    Did you -- were you aware of it at the time?  16:01

21        A    No, I was not aware of it at the time.       16:01

22        Q    Were -- were you aware that there were       16:01

23    concerns that Mr. Levandowski was trying to recruit  16:01

24    people to go to this new entity from Google?        16:01

25        A    I mean, again, I sort of -- I testified     16:01
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    already I was kind of aware of general concerns about        16:01

2    these kind of things.  I don't think I was, like --         16:01

3    certainly not aware of all the detail around that           16:02

4    that's come out in the press and so on.                     16:02

5        Q   And, if you'd go to one paragraph earlier           16:02

6    than the line I just read you.  It says:                    16:02

7    ████████████████████████████████████    ████               

     ████████████████████████████████    ██████    ████         

     ████████████████████████████████████████    ████           

     ██████████████████████████    ██████████████████    ████   

     ██    ████████████████████████████                         16:02

12       Do you see that?                                        16:02

13       A   Yeah, sure.                                         16:02

14       Q   Did you make retention calls to try and make        16:02

15   sure people stayed at Project Chauffeur?                    16:02

16       A   I don't think so.  But, I mean, I don't             16:02

17   routinely do that, so --                                    16:02

18       Q   But you were aware, as of January 27th, 2016,       16:02

19   that people at -- on the Chauffeur team believed that       16:02

20   Anthony Levandowski was trying to recruit as many as        16:02

21   dozens of people from the team; right?                      16:02

22       A   I don't know.  I mean, I got this e-mail.           16:03

23   Like, I don't know that that means it's all true.  And      16:03

24   there was a lot of emotion around, like, the day after      16:03

25   he left.                                                    16:03

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q   You're aware that -- that the head of the | 16:03 |
| 2 | group was telling you this; right? | 16:03 |
| 3 | A   I mean, I got this e-mail, yeah. | 16:03 |
| 4 | Q   Did you express any concern in response to | 16:03 |
| 5 | it? | 16:03 |
| 6 | A   I mean, we were obviously concerned about | 16:03 |
| 7 | this.  I mean, that's resulted in these proceedings. | 16:03 |
| 8 | Q   Do you recall being concerned about it? | 16:03 |
| 9 | A   Yeah, I was pretty concerned about all this. | 16:03 |
| 10 | Q   Okay.  What did you do? | 16:03 |
| 11 | A   Well, I delegated it to people to look at it. | 16:03 |
| 12 | Q   Who? | 16:03 |
| 13 | A   John. | 16:03 |
| 14 | Q   Anyone else? | 16:03 |
| 15 | A   Don't recall. | 16:03 |
| 16 | Q   Did you take any action yourself? | 16:03 |
| 17 | A   I just told you what action I took. | 16:03 |
| 18 | Q   Other than delegating? | 16:03 |
| 19 | A   Don't think so. | 16:03 |
| 20 | Q   Were you aware that the day Anthony | 16:04 |
| 21 | Levandowski left Google, he said he was going to | 16:04 |
| 22 | either join Kitty Hawk or form an autonomous trucking | 16:04 |
| 23 | company? | 16:04 |
| 24 | A   No, I'm not aware of that. | 16:04 |
| 25 | Q   Okay.  Are you aware that he told that to | 16:04 |

Page 184

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    your HR group?                                    16:04

 2        A   I don't think so.                         16:04

 3        Q   Would it have been an important thing for you   16:04

 4    to know?                                          16:04

 5            MR. VAN NEST:  Object to the form of the   16:04

 6    question.                                         16:04

 7            THE WITNESS:  I mean, I don't know.        16:04

 8            MR. CHATTERJEE:  Q.  Who is Chelsea Bailey?  16:05

 9        A   I don't know.                             16:05

10            (Document marked Exhibit 1111             16:05

11             for identification.)                     16:05

12            MR. CHATTERJEE:  Document marked as        16:05

13    Exhibit 1111.  This is a document -- Exhibit 1111 is a   16:05

14    document, dated April 1st, 2016.                  16:05

15        Q   Do you see that?                          16:05

16        A   Yeah.                                     16:05

17        Q   And -- and do you see in the second line, it   16:05

18    says:                                             16:06

19    ████████████████████████████████  ███   16:06

██ ████████                                           16:06

21        A   Sorry, I don't see that.  Oh, on the top;  16:06

22    okay.                                             16:06

23        Q   Second line.                              16:06

24        A   Okay.                                     16:06

25        Q   Do you see that?                          16:06
```

                                              Page 185

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Are you aware, after Anthony Levandowski left        16:06

2    and up through, let's say, the middle of April of        16:06

3    2016, ███████████████████████████████        ██████    16:06

     █ ████████████████████████████████?                      16:06

5        MR. VAN NEST:  Again, exclude from your              16:06

6    answer, Mr. Page, anything you learned from a lawyer.    16:06

7        Other than that, you can answer.                     16:06

8        THE WITNESS:  Yeah, I don't have any                 16:06

9    particular knowledge about that.                         16:06

10       MR. CHATTERJEE:  Q.  Did Mr. Krafcik ever            16:06

11   talk to you about ████████████████████        ██████    16:06

     ██ ████████████████████████████████        ██████

     ██ ███████████?                                          16:06

14   A    Don't recall anything like that.                    16:06

15   Q    Do you know when the second bonus payment was       16:07

16   paid to Anthony Levandowski?                             16:07

17   A    No, I don't recall.                                 16:07

18       (Document marked Exhibit 1110                         16:07

19        for identification.)                                 16:07

20       MR. CHATTERJEE:  I'll mark this as 1110.             16:07

21       THE WITNESS:  Thanks.                                 16:07

22       MR. VAN NEST:  Big table.                            16:07

23       MR. CHATTERJEE:  What I've handed you,               16:07

24   Mr. Page, is a -- is a document, dated February 18th,   16:07

25   2016, from Chelsea Bailey to Ming Su and David Jen.     16:07

Page 186

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1       Q    Who is Ming Su?  Do you know?               16:07

 2       A    I don't -- I don't know.                     16:07

 3       Q    Do you know who David Jen is?               16:07

 4       A    David Jen?                                    16:08

 5       Q    David Jen.  My apologies.                    16:08

 6       A    No, I don't know who that is.                16:08

 7       Q    If you notice, there are three bullet points 16:08

 8  on there.  And it says:                                16:08

 9       "Anthony Levandowski:    ██████████."             16:08

10       Do you see that?                                  16:08

11       A    Yeah, sure.                                  16:08

12       Q    And the payment date is 7/28/2016.           16:08

13       Do you see that?                                  16:08

14       A    Okay.                                        16:08

15       Q    Okay.  So, do you know if that payment was   16:08

16  made on 7/28/2016?                                     16:08

17       A    No, I don't know.  I do not know.            16:08

18       Q    I'll represent to you that it was.  And that 16:08

19  was after Mr. Krafcik said ████████████████    ██████  16:08

██   ██████ and after people had expressed to you he had  16:08

21  tried to recruit a whole bunch of people; right?       16:08

22       MR. VAN NEST:  Objection to the form of the       16:08

23  question.                                              16:08

24       THE WITNESS:  I mean, I believe that was done     16:08

25  on July 28th.                                          16:08
```

Page 187

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. CHATTERJEE:  Q.  And -- well, it was | 16:08 |
| 2 | after those other concerns were expressed; right? | 16:08 |
| 3 | A   What's -- what's your question? | 16:09 |
| 4 | Q   Did you ever try and stop that payment from | 16:09 |
| 5 | happening? | 16:09 |
| 6 | A   Well, I mean, I'm not listed on any of this | 16:09 |
| 7 | information. | 16:09 |
| 8 | Q   But you -- | 16:09 |
| 9 | A   So it seems like it might have been a little | 16:09 |
| 10 | difficult. | 16:09 |
| 11 | Q   So, you -- | 16:09 |
| 12 | A   I have no -- no knowledge of whether that | 16:09 |
| 13 | payment was required anyways or -- I don't know. | 16:09 |
| 14 | Q   Well -- | 16:09 |
| 15 | A   Why would I stop the payment, I guess? | 16:09 |
| 16 | Q   Did -- did you ever see a need to try and | 16:09 |
| 17 | stop the payment? | 16:09 |
| 18 | A   I guess -- | 16:09 |
| 19 | MR. VAN NEST:  Object to the form. | 16:09 |
| 20 | You may answer. | 16:09 |
| 21 | THE WITNESS:  Did I ever see a need?  I | 16:09 |
| 22 | wasn't just thinking about this particular issue in | 16:09 |
| 23 | the context of running a pretty large company. | 16:09 |
| 24 | But I -- I guess if I had known about it, I | 16:09 |
| 25 | might have considered stopping it if that were | 16:09 |

Page 188

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   possible, which I have no knowledge of whether that's    16:09

 2   possible or not.                                         16:09

 3         MR. CHATTERJEE:  Q.  Do you know who              16:09

 4   authorized the payment of ████████ in July 28, 2016?    16:09

 5     A   I mean, I've already testified, I have no          16:10

 6   knowledge of this.                                       16:10

 7     Q   No, I'm wondering if you know who authorized       16:10

 8   it.                                                      16:10

 9         If it wasn't you, who would have made that         16:10

10   decision?                                                16:10

11     A   No, I did not know.                                16:10

12     Q   Do you know why Anthony Levandowski was not        16:10

13   sued for trade secret misappropriation?                 16:10

14         MR. VAN NEST:  Objection.                          16:10

15         To the extent your knowledge comes from a          16:10

16   lawyer, don't answer the question.                       16:10

17         If you have some independent knowledge, you        16:10

18   can provide it.                                          16:10

19         THE WITNESS:  Yeah, I don't have any               16:10

20   independent knowledge of that.                           16:10

21         MR. CHATTERJEE:  Q.  Did you know that he          16:10

22   wasn't sued for trade secret misappropriation?           16:10

23     A   No.  I'm afraid I don't know the details of        16:10

24   all that.                                                16:10

25     Q   So, you don't know one way or another whether      16:10
```

Page 189

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   he's been sued for trade secret misappropriation?    16:10
 2           MR. VAN NEST:  Object to the form of the      16:10
 3   question.  It's argumentative.                        16:10
 4           THE WITNESS:  I mean, I've already testified   16:10
 5   I didn't know.                                         16:10
 6           MR. CHATTERJEE:  Your answer was actually      16:10
 7   unclear.                                               16:10
 8       Q   You don't know one way or the other whether   16:10
 9   Mr. Levandowski has been sued for trade secret        16:10
10   misappropriation; right?                              16:10
11       A   Yeah, that seems like that means I don't      16:11
12   know.                                                  16:11
13       Q   So, you don't know?                           16:11
14       A   I already stated that twice.                  16:11
15       Q   Well, the way you answered the question, it's 16:11
16   not clear whether you don't understand my question.   16:11
17       A   Okay.                                          16:11
18           MR. VAN NEST:  Counsel, this is far afield    16:11
19   from anything that Judge Alsup authorized.  You have  16:11
20   my CEO here.  Let's stick with knowledge and facts and 16:11
21   not argument, please.                                 16:11
22           MR. CHATTERJEE:  I'm just trying to           16:11
23   understand his answer, Mr. Van Nest.                  16:11
24           MR. VAN NEST:  No.  This is an argumentative  16:11
25   line.  You have the CEO here.  You have limited time. 16:11
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MR. CHATTERJEE:  I do.  Stop -- you can stop    16:11
 2    using it up, Mr. Van Nest.                            16:11
 3       Q   Do you know, one way or another, whether       16:11
 4    Mr. Levandowski has been sued for trade secret        16:11
 5    misappropriation?                                     16:11
 6          MR. VAN NEST:  Again, objection.  That has      16:11
 7    nothing to do with anything you are authorized to ask 16:11
 8    about.  I'll object to the form.  He's answered it    16:11
 9    three times now.                                      16:11
10          THE WITNESS:  No, I said I don't know.          16:11
11          MR. CHATTERJEE:  Q.  Do you know why ███████    ██████
      ████  █████████████████████████████████████████████  ██████
      ██    ███████████  ?                                  16:11
14          MR. VAN NEST:  Again, if any information you    16:11
15    have comes from a lawyer, don't provide it.           16:12
16          THE WITNESS:  I don't know.                     16:12
17          MR. CHATTERJEE:  Q.  You don't know?            16:12
18       A   (Witness shakes head.)                         16:12
19       Q   Do you know the way that Google typically      16:12
20    retains things, like source code materials and design 16:12
21    specifications, and things like that?                 16:12
22          MR. VAN NEST:  I'll object to the form.         16:12
23          But you may answer.                             16:12
24          THE WITNESS:  Yeah, I'm not that familiar       16:12
25    with how we do that.                                  16:12
```

Page 191

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. CHATTERJEE:  Q.  Is there an online | 16:12 |
| 2 | repository, or do -- do you even know that? | 16:12 |
| 3 | A   I mean, there's some code-based repository | 16:12 |
| 4 | thingy. | 16:12 |
| 5 | Q   And, is it a Google specially designed | 16:12 |
| 6 | repository, or is it some other industry standard one? | 16:12 |
| 7 | A   I mean, that is -- that -- I mean, we use | 16:12 |
| 8 | many different things. | 16:12 |
| 9 | Q   Right. | 16:12 |
| 10 | I'm just asking if you know? | 16:12 |
| 11 | A   We use many different things.  I guess you | 16:12 |
| 12 | need a more specific -- | 16:12 |
| 13 | Q   Do you know if Google uses Subversion, | 16:12 |
| 14 | typically? | 16:13 |
| 15 | A   I don't know. | 16:13 |
| 16 | Q   Are you familiar with how Subversion works? | 16:13 |
| 17 | A   No, I'm not that familiar with it. | 16:13 |
| 18 | Q   Okay.  Do you know how many people have made | 16:13 |
| 19 | $100 million from work they've done at Google? | 16:13 |
| 20 | A   No, I don't know. | 16:13 |
| 21 | Q   Can you give me an estimate? | 16:13 |
| 22 | A   I might say, you know, a fairly significant | 16:13 |
| 23 | number of people. | 16:13 |
| 24 | MR. CHATTERJEE:  How are we doing on time? | 16:13 |
| 25 | THE VIDEOGRAPHER:  3 hours and 34 minutes on | 16:13 |

Page 192

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   the record, Counsel.                                16:13

 2        MR. CHATTERJEE:  Q.  Do you know how many      16:13

 3   people reported to Anthony Levandowski?             16:13

 4        A   No, I don't know.                          16:13

 5        Q   Are you happy that Anthony Levandowski was 16:14

 6   fired by Uber?                                      16:14

 7        MR. VAN NEST:  Objection to the form of the    16:14

 8   question.                                           16:14

 9        THE WITNESS:  Am I happy?                       16:14

10        MR. VAN NEST:  It's got absolutely no          16:14

11   relevance.  Counsel, again, you're wasting our time. 16:14

12   We have four hours.  I object to the form of the    16:14

13   question.                                           16:14

14        If you have an opinion, you can answer.        16:14

15        THE WITNESS:  I mean, I'm generally pretty     16:14

16   sad about the situation.                            16:14

17        MR. CHATTERJEE:  Q.  Why?                      16:14

18        MR. VAN NEST:  Again, object to the form.      16:14

19   These aren't fact questions that are likely to lead to 16:14

20   anything discoverable whatsoever.                   16:14

21        MR. CHATTERJEE:  Q.  So, go ahead and answer.  16:14

22   He didn't instruct you not to answer.               16:14

23        A   Sorry?                                     16:14

24        Q   You said you're pretty sad about the       16:14

25   situation.  I asked why.  He made an objection.  So go 16:14
```

Page 193

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    ahead and answer.                                        16:15

 2        A   I mean, I think it's a tough situation.  It's    16:15

 3    been, I don't know, 18 years or something we've had      16:15

 4    the company, and this is the first time we're in a       16:15

 5    situation like this.                                     16:15

 6        Q   Can you identify a single trade secret that      16:15

 7    Anthony Levandowski took?                                16:15

 8            MR. VAN NEST:  Again, to the extent your         16:15

 9    answer would depend on a communication with a lawyer,    16:15

10    I instruct you not to answer it.                         16:15

11            If you have some independent knowledge, you      16:15

12    may provide it.                                          16:15

13            THE WITNESS:  Yeah, I mean, I think there's a    16:15

14    number of things at issue.  I'm not familiar with the    16:15

15    details of it.                                           16:15

16            MR. CHATTERJEE:  Q.  Have you reviewed the       16:15

17    trade secret disclosure at all?                          16:15

18        A   I don't think so.                                16:15

19        Q   Was your phone imaged for this case?            16:15

20        A   I'm not sure.                                    16:15

21            MR. CHATTERJEE:  All right.  Let's take a        16:15

22    quick break.                                             16:15

23            THE VIDEOGRAPHER:  We are off the record at      16:15

24    4:16 p.m.                                                16:15

25            (Recess taken.)                                  16:15
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              THE VIDEOGRAPHER:  We are back on the record    16:17

 2     at 4:28 p.m.                                             16:28

 3                                                              16:28

 4                   FURTHER EXAMINATION                        16:28

 5     BY MR. GONZALEZ:                                         16:28

 6        Q   Mr. Page, let me show you a document that         16:28

 7     we've marked as Exhibit 1108.                            16:28

 8        A   Thank you.                                        16:28

 9            (Document marked Exhibit 1108                      16:28

10             for identification.)                             16:28

11            MR. GONZALEZ:  For the record, 1108 is a          16:28

12     one-page e-mail, WAYMO '11773.  This is an e-mail from   16:28

13     Mr. Salesky to Mr. Levandowski, January 23, 2016.       16:28

14        Q   And he says:                                      16:28

15            "Chris and I think would be great roles for       16:28

16     you."                                                    16:28

17            And he lists three things.  I just want you      16:28

18     to look at those three things, 1, 2, 3.  And I want      16:28

19     your opinion as to whether or not you agree that, at     16:29

20     the time, that would have been a great role for          16:29

21     Anthony Levandowski?                                     16:29

22            MR. VAN NEST:  Take a moment to review the        16:29

23     document.                                                16:29

24            THE WITNESS:  This is, like, right before he      16:29

25     left?                                                    16:29
```

Page 195

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. GONZALEZ:  Correct. | 16:29 |
| 2 | THE WITNESS:  All right. | 16:29 |
| 3 | (Reading document.) | 16:29 |
| 4 | Sorry.  I forget the question now, now that | 16:29 |
| 5 | I've read it. | 16:29 |
| 6 | MR. GONZALEZ:  Q.  The question is whether | 16:29 |
| 7 | you agree with Chris and Mr. Salesky, that these three | 16:29 |
| 8 | items would have been good for assignments for | 16:29 |
| 9 | Mr. Levandowski? | 16:29 |
| 10 | MR. VAN NEST:  Object to the form of the | 16:29 |
| 11 | question. | 16:29 |
| 12 | You can answer it. | 16:29 |
| 13 | MR. GONZALEZ:  Let me rephrase it. | 16:29 |
| 14 | Q   Looking at points 1, 2, and 3, do you believe | 16:29 |
| 15 | that, in January of 2016, these would have been good | 16:29 |
| 16 | assignments for Mr. Levandowski? | 16:29 |
| 17 | A   I guess in what context?  For him or for us | 16:30 |
| 18 | or for... | 16:30 |
| 19 | Q   For him to do within Project Chauffeur. | 16:30 |
| 20 | A   I guess my analysis of this having -- this is | 16:30 |
| 21 | not exactly answering your question.  But my analysis | 16:30 |
| 22 | of this, understanding the dynamics, is they're trying | 16:30 |
| 23 | to get him to do something that he's not likely going | 16:30 |
| 24 | to want to do.  And, I'm sure if he were excited about | 16:30 |
| 25 | this, it would be helpful. | 16:30 |

Page 196

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q   Do you think that Mr. Levandowski's skill set | 16:30 |
| 2 | would have made him a good candidate for these | 16:30 |
| 3 | three items? | 16:30 |
| 4 | A   I mean, these are all, you know, somewhat | 16:30 |
| 5 | related to things he knows about.  So, I think if he | 16:30 |
| 6 | were excited about it, he could do -- if he were | 16:30 |
| 7 | excited about it, I'm sure he could do a good job on | 16:31 |
| 8 | those kind of things, probably.  But I doubt he would | 16:31 |
| 9 | be excited about it. | 16:31 |
| 10 | (Document marked Exhibit 1107 | 16:31 |
| 11 | for identification.) | 16:31 |
| 12 | MR. GONZALEZ:  Let me show you a document | 16:31 |
| 13 | that we marked as Exhibit 1107. | 16:31 |
| 14 | Q   You're familiar with the letter that you | 16:31 |
| 15 | issued in connection with your IPO? | 16:31 |
| 16 | A   The 2004 founders letter? | 16:31 |
| 17 | Q   Yes. | 16:31 |
| 18 | A   (Witness nods head.) | 16:31 |
| 19 | Q   And that's what this is? | 16:31 |
| 20 | A   I haven't read the whole thing, but I assume | 16:31 |
| 21 | it is, if you're representing that. | 16:31 |
| 22 | Q   Right. | 16:31 |
| 23 | Is that your electronic signature there? | 16:31 |
| 24 | A   It looks like it, yeah.  Thank you. | 16:31 |
| 25 | Q   And, if you'll look at the fourth page. | 16:31 |

Page 197

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              MR. VAN NEST:  What's it say at the top,      16:32

 2    Counsel?                                               16:32

 3              THE WITNESS:  It says page --                16:32

 4              MR. GONZALEZ:  Page '414.                    16:32

 5              THE WITNESS:  (Complies.)                    16:32

 6         Okay.                                             16:32

 7              MR. VAN NEST:  Okay.  Thank you.             16:32

 8              MR. GONZALEZ:  Q.  It says in part, second   16:32

 9    paragraph from the bottom:                             16:32

10         "We encourage our employees, in addition to      16:32

11    their regular projects, to spend 20 percent of their  16:32

12    time working on what they think will most benefit      16:32

13    Google."                                               16:32

14         Do you see that?                                  16:32

15      A   Yeah, sure.                                      16:32

16      Q   That was intended to get people to be            16:32

17    creative in what they were doing?                      16:32

18      A   Yeah, and work on things that can help the       16:32

19    company.                                               16:32

20      Q   And that's something that's been the policy      16:32

21    of the company ever since it was formed?              16:32

22      A   I mean, there's -- in varying ways, I think,     16:32

23    like, people get upset about it sometimes when         16:32

24    managers do different things.  But I think in general, 16:32

25    we like this idea still.                               16:32
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        Q   The idea is to get people to think outside of   16:32
2    the box?                                                 16:32
3        A   To work on things they're passionate about      16:32
4    that can help the company.                               16:33
5        Q   Do you think Anthony did that?                   16:33
6            MR. VAN NEST:  Objection to the form of the      16:33
7    question.                                                16:33
8            THE WITNESS:  Yeah, in what sense?               16:33
9            MR. GONZALEZ:  Q.  Do you think that he          16:33
10   worked on projects, such as yours, because he was --     16:33
11       A   Well, that's not the point of the 20 percent.    16:33
12   The 20 percent -- it says to benefit Google.  So, I      16:33
13   mean, that's just a different thing.                     16:33
14       Q   Did you think that his work on ████████████  █████
     ███   ██████████████████████████████████████████     █████
     ███     ██  ██████████████████████████████████████████  █████
     ███   ███████████████████████████████████████████      16:33
18       Q   You said that some people don't like the        16:33
19   policy.                                                  16:33
20           What do you mean by that?                        16:33
21       A   I mean, sometimes -- but, I mean, the            16:33
22   managers and stuff obviously sometimes get upset about   16:33
23   this.  But I think in general, it's a good thing.        16:33
24       Q   When you say "the managers get upset," that's    16:33
25   because they want 100 percent of their employees'        16:33
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   time?                                              16:33

 2        A    Yeah.                                     16:33

 3        Q    Have you personally conducted any search for   16:33

 4   documents that might be relevant in this litigation?   16:33

 5        A    I mean, generally, we have people that do   16:34

 6   discovery.  I was asked about phone records.  And I --   16:34

 7   you know, I represented I don't recall any text   16:34

 8   messages with certain people.                     16:34

 9        Q    How often do you delete text messages from   16:34

10   your phone?                                        16:34

11        A    I don't recall having deleted any.        16:34

12        Q    What forms of communication do you use, other   16:34

13   than standard e-mail and text messages?           16:34

14        MR. VAN NEST:  Objection to the form of the    16:34

15   question; assumes facts not in evidence.          16:34

16        THE WITNESS:  I mean, I typically talk to      16:34

17   people and e-mail them, text them.  So, I think that   16:34

18   was well covered in discovery.  I don't think there   16:34

19   are other methods.                                 16:34

20        MR. GONZALEZ:  Q.  In the Silicon Valley,      16:34

21   would you agree that it's common to recruit employees   16:34

22   from other companies?                              16:34

23        A    I mean, normally, you hire people who are   16:34

24   working somewhere else.                            16:34

25        Q    And that includes hiring people from       16:34
```

Page 200

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    competitors; true?                                 16:34

 2         A    Yes.                                      16:34

 3         Q    That's something that Google does on a    16:35

 4    regular basis; correct?                            16:35

 5              MR. VAN NEST:  Objection to the form.     16:35

 6              THE WITNESS:  I mean, we definitely hire  16:35

 7    people from other companies who may or may not be  16:35

 8    competitors.                                        16:35

 9              MR. GONZALEZ:  Q.  And you've approved of the  16:35

10    hiring of people from your competitors; true?      16:35

11         A    I don't recall particularly.             16:35

12         Q    But you've hired some people from Uber;   16:35

13    haven't you?                                        16:35

14         A    I mean, me personally or the company?     16:35

15         Q    The company.                              16:35

16         A    I assume the company has hired a number of  16:35

17    people from Uber.                                   16:35

18         Q    And the company has hired people from Tesla?  16:35

19         A    I assume so, yeah.                        16:35

20         Q    Let me show you a document that was       16:35

21    previously marked as Exhibit 1031.  1031, for the  16:35

22    record, has Bates stamp Nos. WAYMO '4175 through   16:36

23    '4193.                                              16:36

24              Sir, I note you're flipping through the   16:36

25    document, which is fine.                            16:36
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1            Have you seen Exhibit 1031 before?        16:36

 2      A    I'm not sure.                              16:36

 3      Q    It says ████████████████████.             16:36

 4            What -- what is your understanding of what  16:36

 5      ███████████████  is?                           16:36

 6      A    I think ████████████████████████          ███
```

```
23      Q    Do you know who prepared Exhibit 1031?     16:37

24      A    No, I don't have a -- I don't know.        16:37

25      Q    Are these types of documents, when you're  16:37
```

Page 202

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



14      Q    If you'll turn to page 12 of the PowerPoint.    16:38

15   It has page '186 in the little numbers on the bottom    16:38

16   right.                                                  16:38

17      A    (Witness complies.)                             16:38

18           Okay.                                           16:38

19      Q    It says -- the heading is:                      16:39

20                                                           16:39

                                                             16:39

22           Then it has a subheading that says:             16:39

23                                                           16:39

                                                             16:39

25           Do you see that?                                16:39

Page 203

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A    I mean, I can read the slides, yeah.                16:39

2        Q    Is that the plan?                                   16:39

3        A    No, I don't think so.  But, I mean, I               16:39

4    didn't -- I mean, I've already said I'm not really           16:39

5    familiar with this document.  I can read the whole           16:39

6    document if you'd like.  But you're taking --                16:39

7        Q    Well --                                             16:39

8        A    -- one page out of context, potentially.            16:39

9        Q    -- I -- I don't want to kill all my time.  On       16:39

10   the other hand, I'd like to know whether you read it.        16:39

11   So, if it would help you to look through the rest of         16:39

12   the document, please take a moment and flip through          16:39

13   the rest of the document to see if it refreshes your         16:39

14   recollection of whether you have reviewed this before        16:39

15   I showed it to you today.                                    16:39

16       A    I mean, you know, my interpretation of this,        16:39

17   with limited context, they're just saying that ████          ████

     █ ████████████████████████████████████████                  ████

     █ ████   ████████████████████████████████                   ████

     █ ███████████████   ██████████████████████                  ████

     █ █████████                                                  16:40

22       MR. VAN NEST:  Mr. Page, he asked you whether            16:40

23   you thought you had read this back in the day.  Do you       16:40

24   know?                                                        16:40

25       THE WITNESS:  No, I don't know whether I read            16:40

                                                 Page 204

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    it or not.                                        16:40

 2         MR. GONZALEZ:  All right.                    16:40

 3     Q    Looking at the document today, when you see 16:40

 4    the phrase ████████████████████████████    ████   16:40

 █    ███████████████████████████     what do you       16:40

 6    understand that to mean?                          16:40

 7     A    Well, I mean, they're saying, like -- ██     ████

 █    ███████████████████████████████████       ████

 █    █████████████████████████████████████     ████

 █    ████████████████████    ████████████████  ████

 █    ████████████████████████   ███████████████ ████

 █    █████████████████████████████████         16:40

13     Q    By the way, there isn't any question in your 16:41

14    mind that at least as of this date when this document 16:41

15    is being prepared and circulated within Google, that 16:41

16    you are now competing with Uber; is that right?   16:41

17     A    I'm not -- I mean, I think -- I think Uber is 16:41

18    definitely a competitor of -- for self-driving cars. 16:41

19    I think they have very big business, which is     16:41

20    different than what we do.  And, I think history will 16:41

21    tell.  I don't -- I don't fully know the answer to 16:41

22    that question.                                     16:41

23     Q    In your mind, when did Uber become your     16:41

24    competitor for self-driving cars?                  16:41

25         When did -- when did the two of you become   16:41
```

Page 205

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    competitors in that field?                        16:41

 2          MR. VAN NEST:  I think it was asked and     16:41

 3    answered --                                       16:41

 4          THE WITNESS:  Yeah, I was going to say --    16:41

 5          MR. VAN NEST:  -- earlier today.  So, I'll  16:41

 6    object to the form.                               16:41

 7          I -- I think you can answer it again,       16:41

 8    Mr. Page, if you have a different answer.         16:41

 9          MR. GONZALEZ:  Well --                      16:41

10          THE WITNESS:  Yeah, and I already kind of   16:41

11    just said the opposite.  It's that I'm not sure.  I  16:41

12    mean, I think it's a complicated set of issues.   16:41

13          MR. GONZALEZ:  Right.                       16:42

14     Q    You said Uber started competing with you?   16:42

15     A    Yeah.                                        16:42

16     Q    All right.                                   16:42

17          When it talks here about ████████████       ████

████  ████████████████████████████████████████████     ████

████  ████████████████                                 ████

████      █████████████████████                        ████

████   █  ███████████████████████████████████          ████

████  █████████████████████████████████████            ████

████  ██████████████████████████████████  █████        ████

████  ██████████████████████████████████████           ████

████  ██████████████████████████████████               16:42
```

Page 206

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1    ██████████████████████                        16:42

 2        Q    Right.                                16:42

 3        A    So --                                 16:42

 4        Q    Can you and I agree that, when they're 16:42

 5    talking here about ████████████████████████    ███

 ██   ████████████████████████████                   ███

 ██      ██  ████████████████████████                ███

 ██   ████████████████████████                       ███

 ██      ██  ██████████████████████████████          ███

 ██   ████████████████████████████████████           ███

 ██   ████████████████                               ███

 ██      ██  █████████████████████████████           ███

 ██      ███                                         ███

 ██         ██████████   ██████████████████          ███

 ██   █████    ██████████                            ███

 ██      ██  █████████████████████████████           ███

 ██   █████████████████████████████████              ███

 ██   ███████████████████████████████                ███

 ██   ████████████                                   16:43

20              MR. VAN NEST:  I'm going to object to the  16:43

21    form of the question, Counsel.  He doesn't believe   16:43

22    he's seen this before.  He didn't author it.  And    16:43

23    you're spending a lot of time on something that the  16:43

24    witness has not seen before, as far as he knows, so -- 16:43

25              MR. GONZALEZ:  Well, he said he doesn't     16:43
```

Page 207

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    remember.                                        16:43

 2          MR. VAN NEST:  I'll object to the form.    16:43

 3          Huh?                                       16:43

 4          MR. GONZALEZ:  He doesn't -- he doesn't    16:43

 5    remember if he has seen it.                      16:43

 6          MR. VAN NEST:  Do you have any different   16:43

 7    answer, Mr. Page?                                16:43

 8          THE WITNESS:  I mean, I already kind of gave  16:43

 9    my interpretation of that.  But I can spend more time  16:43

10    on the document, if you'd like.                  16:43

11          MR. GONZALEZ:  Here's the distinction that 16:43

12    I'm trying to draw.                              16:43

13     Q    You said that, at some point, Uber became a  16:43

14    competitor because of something that Uber did in 16:43

15    investing in autonomous vehicles.                16:43

16          Do you recall that?                        16:43

17     A    Yeah.                                       16:43

18     Q    Okay.  I'd like to ask you about a different  16:43

19    type of competition.                             16:43

20          Setting aside autonomous vehicles, would you  16:44

21    agree that, as of the date of this document, March 19,  16:44

22    2015, you were competing with Uber ████████████  ████   16:44

      ████?                                            16:44

24     A    I mean, not in a significant way, I think. 16:44

25     Q    But, █████████████████████████████████████ 16:44
```

                                            Page 208



16:45

Page 209

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MR. VAN NEST:  Object to the form of the      16:45
 2    question.                                            16:45
 3          THE WITNESS:  I mean, I believe they think     16:45
 4    that.  I'm not sure I think that.                    16:45
 5          MR. GONZALEZ:  Q.  You don't think that?       16:45
 6      A   I think it's possible, and possible not.  I    16:45
 7    mean, it's still early.  But, I do think it's somewhat 16:45
 8    likely that there is an impact.  I mean, that's not -- 16:45
 9      Q   ████████████████████████████████████  ██████
      ███████████████████████████████████████████  ██████
      ████████████████████████████████████████      ██████
      ████████████████████████████████████████      ██████
      ████████████████████████████████████████████  ██████
      ████████████████                              ██████
      ███████████████████  ████████████████████      ██████
      ████████████                                  ██████
      ███████████████████  █████████████████          ██████
      ████████████████████████████████████████████  ██████
      █████████                                      16:46
20          MR. GONZALEZ:  Q.  What did you mean when you  16:46
21    said it's somewhat likely?                           16:46
22      A   Well, I don't think you can predict things     16:46
23    with 100 percent likelihood.                         16:46
24          So, I mean, I've already testified that I      16:46
25    thought █████████████████████████████████████       16:46
```

Page 210

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    I believe that's good advice, actually.  So yeah, I      16:46

 2    think we should focus on things we do well.  That        16:46

 3    doesn't mean that our businesses end up being the         16:46

 4    same.                                                      16:46

 5         Q   The date of this document, March of 2015,        16:46

 6    when somebody is preparing a page that talks about        16:46
```



16:47

Page 211

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   ███████████████████████████████████   ████

▮   ██████████████████████████████                16:47

3        MR. GONZALEZ:  Q.  Is that what makes you say   16:47

4   that it's being taken out of context, ████████   ████

▮   ██████?                                        16:47

6      A   I don't know.  I mean, I don't know to -- I'm   16:47

7   happy to spend -- given the amount of time we're   16:47

8   spending questioning, I think I should spend more time   16:47

9   on the document itself, because I don't think I'm   16:47

10  giving that much insight into this versus just reading   16:48

11  the slide.                                      16:48

12     Q   We have 20 minutes left?                16:48

13        MR. VAN NEST:  You know I'd give it to you if   16:48

14  I could, Mr. Gonzalez.  You know that.          16:48

15        MR. GONZALEZ:  I even marked my copy, but   16:48

16  that's okay.                                    16:48

17        THE WITNESS:  The whole point of this --   16:48

18  like, one of their main points here is, ██████████   ████

▮   ████████████████████   ███████████████████████   ████

▮   █████████████████████████████                  ████

▮      ██████████████ █ ██████████████             ████

▮   ████████████████████████████████████████████   ████

▮   ██████████████████████████████████████         ████

▮   ██████████                                      ████

▮      █ ████████████████████████████████          16:49

Page 212

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1    ████████████    ██████████████████████         ███
 ■    ████████████████████      █████████████████████     ███
 ■    ████████████████                                    ███
 ■      ██  ████████████                                  ███
 ■         ██████████████████████████████                ███
 ■    ████████████████████████████████████████           ███
 ■    ████████████████████████████                        ███
 ■      ██  █████████████████████████████                 ███
 ■    ████████████████████   ██████████████               ███
 ■    ████████████                                    16:49
11    Q    All right.                                  16:49
12         Let me, at the risk of greatly disappointing 16:49
13    you, show you the last document --               16:49
14    A    Okay.                                       16:49
15    Q    -- that we're going to use, which is        16:49
16    Exhibit 1109.                                    16:49
17         (Document marked Exhibit 1109               16:49
18          for identification.)                       16:49
19         MR. GONZALEZ:  Q.  Is this an e-mail chain   16:49
20    between you and Mr. Levandowski?                  16:49
21    A    It looks like it, yeah.                     16:49
22    Q    And, you'll notice that, after saying that  16:49
23    ████████████████████, Mr. Levandowski says:       16:50
24              ██████████████████                     16:50
25         Do you see that?                            16:50
```

Page 213

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      A    Sure.                                          16:50

2      Q    Do you agree with that?                        16:50

3      A    I mean, ██████████████████████████       ██████

       ████████████████   ███████████████   ████████████████   ██████

       ██████████████████                                   16:50

6      Q    All right.                                     16:50

7           He also says:                                  16:50

8                    ████████████████████████████████████   ██████

       ████████                                             16:50

10          Do you see that?                               16:50

11     A    Sure.                                          16:50

12     Q    Do you agree with that?                        16:50

13     A    I mean, ██████████████████████████       ██████

       ████████████████   ███████████████   ████████████████████   ██████

       ████████████████   ████████████████████████       ██████

       ███   ██████████████████████████████       16:51

17     Q    And, when he says ████████████████       ██████

       ██████████████████████   do you agree with that?   16:51

19     A    Yes, somewhat.  There's some subtlety, I       16:51

20     think, in this.  But, ████████████████████████   ██████

       ██████████████   ██████████████████████       16:51

22     Q    Sir, let me ask you just a few last            16:51

23     questions.                                          16:51

24          Did ████████████████████████████       ██████

       ██████████████████████?                             16:51
```

Page 214

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          MR. VAN NEST:  Object to the form --      16:51

 2          THE WITNESS:  What is that?               16:51

 3          MR. VAN NEST:  Object to the form of the  16:51

 4   question.                                        16:51

 5          MR. GONZALEZ:  Q.  To your knowledge, did 16:51

 6   ████████████████████████████████████████████?   16:51

 7      A   I'm not sure what that is.                16:51

 8      Q   You've never heard of that company?       16:52

 9      A   Don't remember hearing of it.             16:52

10      Q   Have you heard of a company called Odin Wave? 16:52

11      A   Maybe very recently.                      16:52

12      Q   During the course of the litigation?      16:52

13      A   (Witness nods head.)                      16:52

14      Q   Other than conversations in connection with 16:52

15   the litigation, were you familiar with Odin Wave? 16:52

16      A   No, I don't recall that.                  16:52

17      Q   With respect to Mr. Levandowski, do you   16:52

18   believe that Mr. Levandowski should be able to work in 16:52

19   the autonomous vehicle space going forward?      16:52

20          MR. VAN NEST:  Object to the form of the  16:52

21   question; calls for a legal conclusion.          16:52

22          THE WITNESS:  Yeah.  I mean, I'm not a    16:52

23   lawyer.                                          16:52

24          MR. GONZALEZ:  Setting aside the lawyer   16:52

25   point, I'm not asking legally.                   16:52
```

Page 215

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q    I just want your opinion as an individual.    16:52
 2   You know Mr. Levandowski.  You know what the            16:52
 3   allegations are in this case.                           16:52
 4        A    Well, there's information that's not come out 16:52
 5   yet.  The proceeding is not done.  I generally believe  16:52
 6   in the U.S. system and the process we're all            16:53
 7   undergoing here, and I'd like to see the results of     16:53
 8   that.                                                   16:53
 9        Q    Sitting here today, do you have an opinion,   16:53
10   one way or the other, as to whether Mr. Levandowski     16:53
11   should be allowed to work with autonomous vehicles?     16:53
12           MR. VAN NEST:  Again, I object to the form.     16:53
13   It's not a fact question that --                        16:53
14           THE WITNESS:  I mean --                         16:53
15           MR. VAN NEST:  -- will lead to --               16:53
16           THE WITNESS:  -- I don't know the answer to     16:53
17   that.                                                   16:53
18           MR. GONZALEZ:  Q.  And then maybe my final      16:53
19   question:  The bonus that Mr. Levandowski received,     16:53
20   120 million, whatever it was, do you believe, or do     16:53
21   you have an opinion, as to whether that needs to be     16:53
22   paid back?                                              16:53
23           MR. VAN NEST:  Again, objection to the form     16:53
24   of the question.  It calls for a legal conclusion.      16:53
25           THE WITNESS:  Yeah, I have no -- no knowledge    16:53
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | or no answer to that. | 16:53 |
| 2 | MR. GONZALEZ:  All right. | 16:53 |
| 3 | Thank you, sir.  That's all I have. | 16:53 |
| 4 | THE VIDEOGRAPHER:  This is the end of today's | 16:53 |
| 5 | deposition of Mr. Larry Page.  We are off the record | 16:53 |
| 6 | at 4:54 p.m. | 16:53 |
| 7 | The total number of media used was five. | 16:53 |
| 8 | They will be retained by Veritext. | 16:54 |
| 9 | Thank you. | 16:54 |
| 10 | MR. VAN NEST:  Before we go off the record, | 16:54 |
| 11 | we want to designate the transcript as "Attorneys' | 16:54 |
| 12 | Eyes Only, Highly Confidential, Per the Protective | 16:54 |
| 13 | Order." | 16:54 |
| 14 | MR. GONZALEZ:  All right.  And then I'll just | 16:54 |
| 15 | note that there's an issue that we had to confer about | 16:54 |
| 16 | documents that the witness saw before his deposition | 16:54 |
| 17 | to refresh recollection. | 16:54 |
| 18 | MR. VAN NEST:  Thank you. | 16:54 |
| 19 | (WHEREUPON, the deposition ended | 16:54 |
| 20 | at 4:54 p.m.) | 16:54 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                    J U R A T

 2

 3          I, Larry Page, do hereby certify under

 4     penalty of perjury, that I have read the foregoing

 5     transcript of my deposition in the matter of Waymo LLC

 6     vs. Uber Technologies, Inc., et al., taken on July 17,

 7     2017, that I have made such corrections as appear

 8     noted herein in ink, initialed by me; that my

 9     testimony as contained herein, as corrected, is true

10     and correct.

11

12          DATED this ____ day of _____, 2017,

13     at _____.

14

15

16

17          _____

18                  SIGNATURE OF WITNESS

19

20

21

22

23

24

25

                                              Page  218
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              CERTIFICATE OF REPORTER

2

3         I, ANDREA M. IGNACIO, hereby certify that the

4    witness in the foregoing deposition was by me duly

5    sworn to tell the truth, the whole truth, and nothing

6    but the truth in the within-entitled cause;

7         That said deposition was taken in shorthand

8    by me, a disinterested person, at the time and place

9    therein stated, and that the testimony of the said

10   witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12        That before completion of the deposition,

13   review of the transcript [x] was [ ] was not

14   requested.  If requested, any changes made by the

15   deponent (and provided to the reporter) during the

16   period allowed are appended hereto.

17        I further certify that I am not of counsel or

18   attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of

20   this cause, and that I am not related to any of the

21   parties thereto.

22        Dated: 7/18/2017

23

24        ANDREA M. IGNACIO,

25        RPR, CRR, CCRR, CLR, CSR No. 9830

                                          Page 219