**quinn emanuel** trial lawyers | san francisco

50 California Street, 22nd Floor, San Francisco, California 94101 | TEL (415) 875-6600

August 5, 2017

Magistrate Judge Jacqueline Scott Corley

Re:  *Waymo LLC v. Uber Technologies, Inc., et al.*, N.D. Cal., Case 3:17-cv-00939-WHA
<u>**Waymo's Opposition to Uber's Motion to Compel**</u>

Dear Judge Corley:

Please find below Waymo's opposition to Uber's motion to compel Waymo to run additional search terms (Dkts. 1080, 1081).

Sincerely,

<u>*/s/ Charles K. Verhoeven*</u>

Charles K. Verhoeven

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

This Court should deny Uber's request that Waymo be compelled to run two extremely overbroad electronic search terms. Uber has "failed to articulate search parameters that will not result in thousands of unresponsive emails; that is, that make the likely value from what is discovered by the search worthwhile." (Dkt. 1051, at 2-3.) Uber's request should be denied.[1]

I.  **Background**

Uber's motion omits an important piece of the history of the parties' search term negotiations. After the parties served their first sets of RFPs, on May 30, Waymo sent Defendants a proposed ESI Order. (Roberts Dec., Ex. 1.) Waymo's proposal included a provision under which the parties could propose search terms to the opposing side, and that the parties would meet and confer about the proposed terms. (*Id.*, ¶ 5(b)(i).) Waymo followed up on the May 30 proposal on June 2, June 7, June 8, and June 14 to inquire whether any of the Defendants had any comments. (Exs. 2-5.) With the exception of a June 2 email from Uber's counsel saying they would follow up "early next week," none of the Defendants provided any response to Waymo's proposal. In the meantime, Waymo searched custodial and non-custodial documents both with search terms and without to locate documents responsive to Defendants' then-served RFPs.

A month and a day after Waymo made its May 30 proposal, on Saturday, July 1, Uber insisted that it urgently needed to know the search protocols Waymo used to locate responsive documents and insisted that the parties exchange their search protocols. Waymo disclosed its search protocols as of that date on July 3. Over the last month, the parties met and conferred regarding search terms Uber asked Waymo to run and search terms Waymo asked Uber to run. On July 11, Uber asked Waymo to run what it listed as ▮ "technical" search terms and ▮ "business" search terms. In reality, because of Uber's liberal use of the word OR in its search strings, Uber proposed that Waymo run ▮ discrete searches. The "business" terms in particular were vastly overbroad. For one custodian, they hit on over ▮▮▮▮ documents, including families. Nevertheless, Waymo diligently met and conferred with Uber, and tested and re-tested many rounds of proposed modifications to reach an agreed set of terms. Waymo tested 107 iterations of Uber's original "business" terms. And, Waymo continued to conduct its own searches to identify and produce relevant documents, including those responsive to later-served RFPs. From the original ▮ terms Uber proposed, the parties agreed on all but two. In addition to the documents located in its own searches, Waymo is reviewing over ▮▮▮▮ documents located using the agreed terms. Adding the two terms at issue here would more than double that count.

II.  **Argument**

   A.   

Uber asks this Court to compel Waymo to run the search ▮▮▮▮  across the emails of ▮▮▮ custodians—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—from January 1, 2014-present. The Court should

---

[1] The parties and the Special Master agreed to a four-page limit for briefs. Uber included argument about Waymo's search terms in its declaration, exceeding the page limit.

1

deny Uber's motion because "Uber has failed to articulate search parameters that will not result in thousands of unresponsive emails; that is, that make the likely value from what is discovered by the search worthwhile." (Dkt. 1051, at 2-3.) Uber's proposed term hit on over ▮ documents. Even when narrowed to ▮▮, the count was still over ▮ documents. This is not an effective search parameter.

Initially, Waymo already conducted reasonable searches to try to locate responsive documents—which Uber ignores in its motion. For example, for several custodians, Waymo searched their emails using the terms ▮▮. These terms picked up emails about Levandowski having founded or worked for Otto, and his deal and employment with Uber. Further, prior to Mr. ▮ deposition (and after the July 3 search protocol exchange), Waymo reviewed (among other things) ▮ from August 1, 2012 through the date of the Complaint that (i) contained the word "▮" or (ii) were sent to/from/cc ▮.

Further, using "▮" as a search term without any narrowing terms is overbroad.[2] As Waymo explained, it would hit on emails in which the sender said he/she is ▮—having nothing to do with the issues in the case. Indeed, Waymo sampled the contents of documents hitting on "▮" and found them non-responsive; things like daily news feeds that mention "▮" make up a large number of the hits, as do emails that mention "▮" but have nothing to do with its self-driving program or relationship with Chauffeur/Waymo. Requiring Waymo to search every email to or from ▮ custodians that mentions "▮" is not an appropriate search parameter. Indeed, Waymo initially proposed that Uber run this same term and Uber refused, calling it "overbroad." Waymo did not push Uber to run it. Further, removing "▮" does not solve the problem, as running ▮ still hits on over ▮ documents. "▮ results in a high number of hits and results in false positives in emails that reference others "▮ There is not an effective way to exclude everyone with the same first name. Excluding them by last name would only have an impact if they are always referenced by first and last name. Waymo confirmed its expectation that Uber's term hits on a disproportionately high number of non-responsive documents, reviewing a random sample of 50 documents hitting on this term. Only 8 (16%) were responsive, and half were news articles.

To resolve the dispute, Waymo offered to run Uber's term, from January 1, 2014-present, but limited to outbound emails from the custodians (emails sent by the identified custodians), which results in a little over ▮ hits. This is a more effective search parameter for locating the documents Uber says it wants: "[d]iscussions of Uber as a competitor, assessments of Uber's business, and monitoring of Waymo or Google employees going to Uber." (Dkt. 1081, at 3.) Waymo's proposed compromise targets emails wherein senior business custodians discuss ▮▮. It will exclude industry emails or daily news feeds that they receive and focus on what they are saying about ▮. This is a more effective way to locate the documents Uber seeks. Uber, however, did not agree.

Uber contends that Waymo should run this overbroad search because it says Waymo's hit count

---

[2] Waymo agreed to run other searches that include "▮ but with narrowing terms.

numbers are misleading because they have not been fully de-duplicated. It is impossible, however, to fully de-duplicate counts before importing the documents into the review database, a process which can take more than a day. Had Waymo added this step every time it tested a new modification from Uber, it would have put the search term negotiations on hold.[3]

Uber further complains that Waymo did not identify any other " ▇▇▇▇ " or other exclusionary terms. But, Waymo tested modification after modification for this term and the other "business" terms. Waymo bent over backwards to test variations of Uber's terms even after Uber delayed a month in engaging in discussions over search terms. Waymo met and conferred in good faith, but the words Uber proposes using here are simply too broad. The Court should deny Uber's demand that Waymo run this term, which would result in tens of thousands of non-responsive emails. If the Court is inclined to order Waymo to run a search that includes these words, Waymo respectfully requests the Court limit it to outbound emails for the identified custodians.

   B.   **Bonus Program Search Term**

Uber asks this Court to order Waymo to run the following search term, which Uber split into two:  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇; and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Uber proposes that it be run against ▇▇ custodians' emails from January 1, 2011-present. The Court should deny Uber's motion because Uber "failed to articulate search parameters that will not result in thousands of unresponsive emails; that is, that make the likely value from what is discovered by the search worthwhile." (Dkt. 1051, at 2-3.) This term hits on over ▇▇ documents. This is not an effective and proportional search parameter for locating documents relating to Uber's "farfetched theory" (7/26/17 Hearing Tr., 84:7-8) that Levandowski stole 14,000+ proprietary files from his employer to ensure he would get a bonus.

Notwithstanding the irrelevance of Uber's bonus theory to whether Defendants misappropriated Waymo's trade secrets, Waymo is searching for and producing documents responsive to Uber's RFPs on the subject, served July 17, 2017. (Dkt. 1081-3.) For example, among other documents, Waymo produced the 2011 Chauffeur Bonus Plan (Ex. 6); a December 5, 2015 email (7 days before Levandowski downloaded 14,000 files on the same day he met with Uber) from Chris Urmson to Levandowski and others on the Plan announcing that the valuation was approved and payment would be made on December 31, 2015 (Ex. 7); Levandowksi's December 2015 bonus statement saying that he would be paid $▇▇▇▇ on December 31 (Ex. 8); Levandowski's pay slip showing he was paid that amount on December 31 (Ex. 9) (5 days before his second download of proprietary files on the same day as a meeting with Uber); and Levandowski's pay slip showing he was paid the remaining $▇▇▇▇ on August 11, 2016, the

---

[3] Waymo's numbers are undercounted because Waymo is still collecting emails for some custodians and date ranges requested by Uber, some requested as recently as a few days ago. Moreover, Waymo questions Uber's claim that Uber's searches are de-duplicated. (Dkt. 1082, at 1, n. 1.) Uber's production includes multiple copies of identical documents. For example, Uber produced 12 identical copies of an email sent at 10:16 a.m. on Jan. 26, 2017. (Ex. 11.)

pay date for the pay period covering his payout date of July 28, 2016 (Ex. 10).[4] Additional documents in the queue for production and expected to be produced early next week include a tracker showing the amounts each Plan participant received and the dates they were paid—none of which were late—and documents reflecting a November 17, 2015 meeting Urmson had with his team (which included Levandowski) to announce and discuss the Chauffeur valuation on which their bonuses were based. Further, among Waymo's bonus-related search terms was ██████████████████████████████████████████████████████████ across Anthony Levandowski's emails from January 1, 2012-May 31, 2016. If he discussed with anyone via email concerns about the amount or timeliness of his bonus, those discussions likely would have been identified by this search. No such emails have been located. Waymo agrees to produce additional documents responsive to Uber's RFPs located in a reasonable search.

Uber's proposed search term, which is disproportionately over-inclusive, is the wrong way to search for these documents. Uber asks Waymo to run terms in 2012-2014 and the first half of 2015, periods unrelated to the original 2011 Plan allocations or the late-2015 valuation that triggered Levandowski's $██ million bonus. Uber asks Waymo to run the same term over HR personnel (who would know of the payments but not about the Plan negotiations) and Plan negotiators (who would know about the negotiations but not the payments). The result of this one-size-fits all approach hits on over ████ documents that do not even capture relevant documents. For instance, the December 5, 2015 email referenced above (Ex. 7) does not hit on Uber's proposed term. Waymo located it by searching Urmson's (the Waymo manager in charge of Plan negotiations) emails across the relevant timeframe.

Uber's arguments in favor of its overbroad term should be rejected. First, Uber repeats its complaint that Waymo's hit counts are not de-duplicated. Second, Uber complains that Waymo did not suggest modifications. But, Waymo tested 17 iterations of this term. Further, Waymo told Uber that "████████" and "█████" were ineffective and agreed to run this search if they were removed. "█████" is ineffective because the majority of the documents that hit on it refer to "█████ as it is used technically to mean numerical values, rather than referring to "████████" in the context of the Chauffeur bonus. This single term triples the number of returned documents. In sampling the "delta" between Uber's proposal and one that omits "█████", the majority of the documents use "████████████████" Fewer than 4% of the documents in the delta contain "████████████" in the document. Thus, "█████" does not effectively locate documents relating to the bonus program. But, Uber refused to omit either "████████" or "█████." Uber now accuses Waymo of "cherry-picking" documents with no support for that accusation. That Waymo has not located and produced documents supporting Uber's theory that Levandowski stole his employer's trade secrets to ensure that employer would pay his bonus does not mean that Waymo is "cherry picking." It means the theory has no evidentiary support.

The Court should deny Uber's demand that Waymo run this term, which would "result in thousands of unresponsive emails." If the Court is inclined to order Waymo to run this search, Waymo respectfully requests the Court either remove "████████" and "█████", or limit the search to outbound emails of the identified custodians.

---

[4] Under the Chauffeur Bonus Plan, participants who left the company would be paid the remainder of their bonus ████████████████████████████████████████████████. (Ex. 6, § 6.4.)

4