# Exhibit 6

1              UNITED  STATES  DISTRICT  COURT

2            NORTHERN  DISTRICT  OF  CALIFORNIA

3                 SAN  FRANCISCO  DIVISION

4

5    WAYMO LLC

6          Plaintiff,

7              vs.              Case No.

8    UBER TECHNOLOGIES,INC.;    17-cv-00939-WHA

9    OTTOMOTTO, LLC; OTTO

10   TRUCKING LLC,

11         Defendants.

12   _____

13

14

15        VIDEOTAPED DEPOSITION OF EMIL MICHAEL

16            San Francisco, California

17            Friday, July 28, 2017

18                  Volume I

19

20

21   REPORTED BY:

22   REBECCA L. ROMANO, RPR, CSR No. 12546

23   JOB NO. 2666869

24

25   PAGES 1 - 158

                                        Page 1

1          MS. RAY:  Object.                          09:45:04

2          I'm going to instruct you not to answer

3     on attorney-client privileged grounds --

4          THE DEPONENT:  Yeah.

5          MS. RAY:  Because the board discussion is  09:45:09

6     privileged in the context of privilege.

7          Q.   (By Mr. Perlson)  In the meeting in which

8     you were consulted in the decision to fire

9     Mr. Levandowski, were their attorneys present?

10         A.   Yes.                                    09:45:35

11         Q.   Who -- who were they?

12         A.   The general counsel and outside company

13    counsel.

14         Q.   Okay.  And does Uber's general counsel

15    attend the board meetings, generally?             09:45:55

16         A.   Yes.

17         Q.   And is Uber's general counsel in those

18    meetings for only part or most of them, usually?

19         MS. RAY:  Objection.  Form.

20         THE DEPONENT:  She's in for the whole        09:46:17

21    time.

22         Q.   (By Mr. Perlson)  And that's generally

23    true for every board meeting that you have been

24    involved in?

25         A.   Yes.                                    09:46:23

                                                  Page 32

```
 1        Q.   And in this conversation which you -- you    09:46:31

 2   were -- in this meeting in which you were consulted

 3   in relation to the firing of Mr. Levandowski, you

 4   mentioned that there was outside counsel present.

 5             Do you recall who that outside counsel       09:46:43

 6   was?

 7        A.   Gordy Davidson from Fenwick & West.

 8        Q.   And what's his role?

 9        A.   He's the company's primary outside

10   counsel.                                               09:46:55

11        Q.   And were there any other outside counsel?

12        A.   Not that I recall, no.

13        Q.   And what is Mr. -- and so, I'm sorry,

14   it's Gordy Davis, you said?

15        A.   Davidson.  Davidson.                         09:47:21

16        Q.   Davidson.

17        A.   Yes.

18        Q.   And does Mr. Davidson generally sit in on

19   board meetings as well?

20        A.   He --                                        09:47:27

21             MS. RAY:  Objection.  Form.

22             THE DEPONENT:  He's generally present,

23   yes.

24        Q.   (By Mr. Perlson)  In the same manner that

25   the general counsel is?                                09:47:34
```

Page 33

```
1              MS. RAY:  Objection to form.              09:47:36

2              THE DEPONENT:  I mean, under the same

3    form.  I don't know how to answer that.  But -- but

4    he's -- he's there physically, yes --

5         Q.   (By Mr. Perlson)  Right.                  09:47:44

6         A.   -- for the same amount of time.  Okay.

7         Q.   That's what I meant.

8              MR. PERLSON:  So given what we've just

9    heard, are you going to stand by your instruction

10   that he can't answer this question?              09:47:56

11             MS. RAY:  I believe it was an

12   attorney-client privileged context.  If you want to

13   let us take a break so I can discuss the context of

14   the meeting further with Mr. Michael, to confirm,

15   I'm happy to do that.                           09:48:05

16             MR. PERLSON:  Sure.

17             MS. RAY:  Let's go off the record.

18             THE VIDEOGRAPHER:  We are off the record

19   at 9:48 a.m.

20             (Recess taken.)                        09:48:26

21             THE VIDEOGRAPHER:  We are back on the

22   record at 9:51 a.m.

23             MR. PERLSON:  I think before the break I

24   had asked whether you wanted to stand by your

25   instruction.                                     09:52:09
```

Page 34

```
 1              MS. RAY:  So I stand by the instruction.    09:52:10
 2    You are welcome to ask him if it was in the context
 3    of the giving and receiving of legal advice and
 4    whether it was in anticipation of litigation to
 5    confirm those facts, if you want.  But we are going  09:52:18
 6    to stand on those objections.
 7         Q.   (By Mr. Perlson)  Who did you provide
 8    your input to regarding the termination of
 9    Mr. Levandowski?
10              MS. RAY:  Hold on.                          09:52:44
11              Objection.  Form.
12              THE DEPONENT:  In that meeting, I said I
13    provided --
14              MS. RAY:  Wait.  I just don't want you to
15    say what you said.  You can answer the question      09:53:01
16    with who --
17              THE DEPONENT:  Yeah.
18              MS. RAY:  -- if any --
19              THE DEPONENT:  The members of that --
20    people who were in that meeting, generally.          09:53:08
21         Q.   (By Mr. Perlson)  Were -- were you
22    talking to the board or were you talking to the
23    attorneys?
24              MS. TOUGH:  Objection.  Form.
25              MS. RAY:  Objection.  Form.                 09:53:22
```

Page 35

```
 1              THE DEPONENT:  Attorneys were leading the   09:53:25
 2   discussions, so the discussion was with them.
 3        Q.   (By Mr. Perlson)  So it came up in the
 4   context of a discussion that was being led by
 5   attorneys?                                             09:53:36
 6        A.   Yes.
 7        Q.   How long did that discussion last?
 8        A.   My recollection is about 60 minutes.
 9        Q.   Six-zero?
10        A.   Yes.                                         09:53:58
11        Q.   Do you recall discussing the termination
12   of Mr. Levandowski outside of that 60-minute
13   meeting?
14        A.   Yes.
15        Q.   With whom?                                   09:54:33
16        A.   With -- with various board members.
17        Q.   And which board members?
18        A.   David Bonderman and Bill Gurley.
19        Q.   When did you discuss that with
20   Mr. Bonderman?                                         09:55:03
21        A.   I don't remember exactly, but in and
22   around that time.
23        Q.   In and around the same time as that other
24   board meeting.
25        A.   Yes.                                         09:55:13
```

Page 36

1     Q.   And what -- tell me what you remember          09:55:13

2   about your discussions with Mr. Bonderman?

3          MS. RAY:   Wait.   I'm going to instruct

4   you not to answer to the extent that your

5   discussions reveal attorney-client privileged       09:55:21

6   communications.

7          THE DEPONENT:   Yes, there was the --

8   primarily, the discussion was about what the

9   lawyers were advising David, as a board member,

10  about the -- about the Levandowski situation.        09:55:33

11    Q.   (By Mr. Perlson)   Okay.   Well, what did

12  he say?

13         MS. RAY:   Objection.

14         I instruct you not to answer about the

15  contents of what the lawyers conveyed in the         09:55:44

16  attorney-client privileged context.

17         MR. PERLSON:   I'm just asking what they

18  were talking about.

19         MS. RAY:   I just want to make sure he

20  doesn't reveal privileged information.               09:55:53

21         Otherwise, if it's nonprivileged, you can

22  answer.

23         THE DEPONENT:   Uh-huh.   We were

24  discussing what the -- what the legal opinions were

25  about, what our actions ought to be regarding the    09:56:02

Page 37

```
 1    Levandowski situation.  So I do think it was          09:56:06

 2    privileged.

 3         Q.   (By Mr. Perlson)  Well, what did --

 4    did -- did -- did you discuss whether you agreed or

 5    disagreed with the recommendations that were being    09:56:20

 6    provided by the attorneys?

 7              MS. RAY:  Wait.  Hold on.

 8              You can answer "yes" or "no."

 9              THE DEPONENT:  So can I see the question

10    again.  I'm sorry.                                    09:56:44

11              MS. RAY:  But you can't answer what the

12    recommendation was.  I don't want you to -- I don't

13    want you to reveal what any of the attorney-client

14    privileged communication was.

15              THE DEPONENT:  Actually, at this point I     09:56:58

16    was kind of taking the information in as opposed to

17    expressing my opinion.

18         Q.   (By Mr. Perlson)  Okay.  And is it your

19    testimony that you -- your conversation with

20    Mr. Bonderman consisted of nothing other than         09:57:14

21    repeating back to each other what the lawyers had

22    told you?

23              MS. TOUGH:  Objection to the form of the

24    question.

25              MS. RAY:  Join.                              09:57:27
```

Page 38

```
 1              THE DEPONENT:  It -- it was him telling    09:57:28
 2   me what his opinion -- his -- the legal opinion was
 3   and how strongly he felt and how he agreed with it.
 4        Q.   (By Mr. Perlson)  Okay.  Well -- well,
 5   why -- he said he -- what was it that he felt        09:57:38
 6   strongly about?
 7              MS. RAY:  Objection.
 8              I instruct you not to answer to the
 9   extent it gets into any revelation of
10   attorney-client privileged information.             09:57:55
11              So you've testified he agreed.  If
12   further information would reveal the contents of
13   privileged discussions, you should go no further.
14   If there's further nonprivileged information, you
15   can give that.                                      09:58:05
16              THE DEPONENT:  Okay.  I mean, I think it
17   was -- it was privileged information that he was
18   trying to convey.
19        Q.   (By Mr. Perlson)  But --
20        A.   Convey an opinion on.                      09:58:15
21        Q.   But he was -- but you were in the same
22   board meeting in which the lawyers were conveying
23   their recommendation, right?
24        A.   Yes.
25        Q.   So he didn't -- you didn't need him to    09:58:25
```

Page 39

```
 1   repeat to you what the lawyers had said in a          09:58:27

 2   meeting that you were also in.

 3            MS. RAY:  Objection.  Form.

 4            THE DEPONENT:  I didn't need him to

 5   repeat it.  He might have been doing it for           09:58:40

 6   emphasis.

 7       Q.   (By Mr. Perlson)  So what -- did -- did

 8   you two reach some agreement as to what needed to

 9   be done in relation to Mr. Levandowski?

10       A.   No.                                          09:58:54

11            MS. RAY:  Object -- wait.

12       Q.   (By Mr. Perlson)  Did you have any

13   disagreement on that subject?

14            MS. RAY:  Objection.

15            Can you just hold on and let me object.      09:59:00

16            So you can answer "yes" or "no."

17            MS. TOUGH:  It's, did you have any

18   disagreement on the subject with Mr. Bonderman?

19            THE DEPONENT:  We had neither

20   disagreement nor agreement.                           09:59:18

21       Q.   (By Mr. Perlson)  Okay.  Well, what --

22   what -- what do you recall saying to Mr. Bonderman

23   in that discussion?

24            MS. RAY:  Objection.

25            Instruct you not to answer to the extent     09:59:30
```

Page 40

```
1   it reveals any attorney-client privileged          09:59:31

2   information.

3            And to the extent you're having this

4   discussion at the direction of lawyers, you know,

5   keep that in mind, too.                             09:59:42

6            So you should only reveal anything that's

7   not privileged.

8            THE DEPONENT:  I was just listening.

9       Q.   (By Mr. Perlson)  You didn't say

10  anything?                                           09:59:50

11      A.   Not of substance.

12      Q.   Did Mr. Bonderman say anything to you

13  that wasn't repeating what the lawyers had -- had

14  said?

15      A.   Not substantively, no.                     10:00:08

16      Q.   And how long did that discussion last?

17      A.   A few minutes.

18      Q.   The -- okay.  So you said that you had

19  also discussed the termination of Mr. Levandowski

20  with Mr. Gurley.                                    10:00:27

21           When did that happen?

22      A.   Same time frame.

23      Q.   And what did you discuss with Mr. Gurley?

24           MS. RAY:  Objection.

25           I instruct you not to answer to the        10:00:38
```

Page 41

```
 1    extent it discloses any attorney-client privileged      10:00:39

 2    information.  You may otherwise answer.

 3              THE DEPONENT:  We would discuss his --

 4    his -- his interpretation or his sort of the

 5    conveyance of what the legal advice was he was          10:00:51

 6    getting.

 7         Q.   (By Mr. Perlson)  Well, you started to

 8    say what his interpretation was.

 9              What did you mean by that?

10              MS. RAY:  You can answer without            10:00:59

11    revealing any attorney-client privileged

12    information, so without revealing the specifics of

13    what he told you about the attorney information.

14              THE DEPONENT:  Just his agreement with

15    the attorneys' recommendations.                         10:01:12

16         Q.   (By Mr. Perlson)  Did you talk about

17    anything else?

18         A.   Similar-type conversation as with

19    Bonderman.

20         Q.   How long was the conversation?             10:01:23

21         A.   A few minutes.

22              MR. PERLSON:  I'll just state for the

23    record and move on that I don't think it's

24    appropriate for me to be shut off from asking

25    questions about two nonlawyers talking about their    10:01:42
```

Page 42

1    view of -- of -- of what happened in a -- in a          10:01:46

2    board meeting, but we can deal with that later if

3    we need to.

4         Q.   (By Mr. Perlson)  Other than the

5    conversation with Mr. Bonderman and Mr. Gurley,          10:02:02

6    were there -- did you discuss with anyone else the

7    termination of Mr. Levandowski, other than that

8    other board meeting?

9         A.   Not that I recall.

10        Q.   Did you ever discuss it with                   10:02:20

11   Mr. Kalanick?

12        A.   Only with -- with counsel around.

13        Q.   Did you agree with the decision to

14   terminate Mr. Levandowski?

15        A.   Ultimately, yes.                               10:02:42

16        Q.   Why?

17        A.   Because of the -- I thought it was -- I

18   thought that -- I think that it was hurting the

19   company.

20        Q.   And how was it hurting the company?           10:03:23

21        A.   Well, the judge in the case is -- was,

22   clearly in his rulings, making it clear that --

23   that this was a move that had to get made.

24             That was hurting our public perception.

25   It was hurting Travis' stature in the company with      10:03:37

                                                        Page 43

```
 1    the board.                                           10:03:41
 2         Q.   How was it hurting the public perception?
 3         A.   Well, when the judge refers to -- refers
 4    it to the U.S. attorney and does those things to
 5    ensure that -- that Anthony is not part of certain   10:03:57
 6    technology efforts in the company, it's sort of
 7    obvious.
 8         Q.   And how was Travis' -- I'm sorry.
 9              How was -- why was Mr. Levandowski
10    hurting Mr. Kalanick's stature in the company with   10:04:32
11    the board?
12              MS. TOUGH:  Objection to the form of the
13    question.
14              THE DEPONENT:  Just that it was -- it had
15    been a long time since it had been proposed that,    10:04:47
16    you know, someone makes a move to get Anthony out
17    of the way for purposes of this technology
18    development, and it looked indecisive.
19         Q.   (By Mr. Perlson)  Oh, because someone on
20    the board had suggested that Levandowski get fired   10:05:10
21    long before he actually did?
22              MS. TOUGH:  Objection to the form of the
23    question.
24              MS. RAY:  Objection.  Form.
25              And I also instruct you not to answer to   10:05:19
```

Page 44

1    the extent that you would be revealing any                10:05:20

2    attorney-client privileged information.

3            THE DEPONENT:  No.  Since the -- since

4    the judge had sort of, in his rulings, appeared to

5    be bearing down on ensuring that Anthony wasn't --       10:05:31

6    was removed from this area.

7        Q.   (By Mr. Perlson)  What does that have to

8    do with Mr. Kalanick?

9        A.   Well, he runs the company that this

10   lawsuit was against.                                      10:05:42

11       Q.   Okay.  And so the board thought that

12   Mr. Kalanick should do something about

13   Mr. Levandowski?

14           MS. TOUGH:  Objection to the form of the

15   question.                                                 10:05:53

16           THE DEPONENT:  No.  I was saying -- I

17   didn't say the board.  I said the -- the perception

18   that -- from the rulings, that had seemed to

19   indicate that Anthony Levandowski should be removed

20   from this area, were a long time -- had been going        10:06:09

21   on for a while.

22       Q.   (By Mr. Perlson)  Okay.  Well, the -- in

23   your answer -- previous answer, you had said, "That

24   was hurting our public perception.  That was

25   hurting Travis' stature in the company with the           10:06:27

Page 45

```
 1   board."                                        10:06:31

 2            Was -- did -- was that a misstatement

 3   or --

 4        A.    Stature with the board about decisiveness

 5   and, you know, trying to take the guidance from the   10:06:40

 6   judge.

 7        Q.    But what do you mean about -- so what was

 8   said regarding the lack of decisiveness, that you

 9   remember?

10            MS. TOUGH:  Objection to the form of the   10:06:54

11   question.

12            THE DEPONENT:  What was -- let me see.

13   What...

14            (Discussion off the stenographic record.)

15            THE DEPONENT:  Nothing was said.  It was   10:06:58

16   an impression that I had.

17        Q.    (By Mr. Perlson)  I see.  That -- that

18   was an impression that you had based on statements

19   made by board members?

20        A.    The statement based on -- it was my       10:07:26

21   impression based on what I was observing from a PR

22   standpoint, internally discussions all over the

23   place, that we were not making fast enough

24   decisions on this matter relative to what the judge

25   seemed to want.                                   10:07:45
```

Page 46

1          Q.   And was that a frustration that was                10:07:46

2    expressed by the board?

3               MS. RAY:  Objection.  I instruct you not

4    to answer to the extent that it would reveal

5    discussions in the context of the attorney-client          10:07:54

6    privilege and the context of any meetings where

7    there is giving and taking of legal advice.

8               THE DEPONENT:  Uh-huh.  Yeah, I shouldn't

9    answer then.

10          Q.   (By Mr. Perlson)  Okay.  So you're taking       10:08:04

11    counsel's instruction not to answer that?

12          A.   I am.

13               MR. PERLSON:  That seems to be a quite

14    overly aggressive assertion of privilege.  But,

15    once again, I guess we can deal with that later.           10:08:20

16          Q.   (By Mr. Perlson)  Do you recall any --

17    anyone on the board expressing frustration or

18    disappointment with how Mr. Kalanick handled the

19    acquisition of Otto?

20               MS. RAY:  Objection.                            10:08:55

21               You may answer to the extent that there

22    were discussions outside of the context of the

23    attorney-client privilege, outside of the giving

24    and taking of legal advice, but otherwise I

25    instruct you not to answer.                                10:09:06

                                                    Page 47

```
 1              THE DEPONENT:  I mean, the board approved   10:09:09
 2     the deal.
 3         Q.   (By Mr. Perlson)  Okay.  But after the
 4     lawsuit was -- was filed and the -- Waymo --
 5     Waymo's allegations were made public, did the --   10:09:26
 6     the board -- anyone on the board, after that,
 7     express frustration or disappointment with the way
 8     that Mr. Kalanick had handled the Otto acquisition?
 9         A.   Not that I recall.
10              MS. RAY:  Objection.  Attorney-client    10:09:44
11     privilege.
12              I instruct you to answer only with
13     respect to discussions that were outside the
14     privileged context.
15              THE DEPONENT:  Okay.  Not that I recall.  10:09:51
16         Q.   (By Mr. Perlson)  Had -- did anyone on
17     the board request to see the due diligence report
18     that Stroz had prepared in connection with the Otto
19     acquisition?
20              MS. TOUGH:  Objection to form.           10:10:22
21              MS. RAY:  Objection.  Form.
22              And you may answer outside the context of
23     attorney-client privileged discussions, but
24     otherwise I instruct you not to answer.
25              THE DEPONENT:  I don't know.             10:10:33
```

Page 48

```
 1        Q.    (By Mr. Perlson)  Do you know whether      10:10:35
 2   anyone on the board saw the due diligence report?
 3        A.    I don't know.
 4        Q.    Do you know what the due diligence report
 5   is?                                                   10:10:41
 6        A.    I don't know exactly what it is, no.
 7        Q.    Okay.  You haven't seen it.
 8        A.    No.
 9        Q.    You haven't asked to see it.
10        A.    No.                                        10:10:49
11        Q.    When's the last conversation that you
12   personally have had with Mr. Levandowski?
13        A.    We were working on a deal, before he was
14   terminated, to hire a scientist in Canada.
15        Q.    So you had discussions with him in         10:11:53
16   relation to that?
17        A.    Yes.
18        Q.    Other than the conversation prompted from
19   the meeting in the hallway that we talked about
20   earlier, had you had any other conversations with     10:12:12
21   Mr. Levandowski regarding the allegations in this
22   case?
23        A.    I don't think I have.
24        Q.    Have you had discussions with
25   Mr. Kalanick regarding the allegations in this        10:12:29
```

Page 49

```
 1   stack?                                        01:22:18

 2        A.   No.

 3        Q.   Do you recall it at all?

 4        A.   No.

 5        Q.   Were you at a board meeting where this  01:22:42

 6   was presented?

 7        A.   I might have been.  I just don't

 8   remember.

 9        Q.   Okay.  So you don't remember this Project

10   Zing Review being presented to the board one way or  01:22:54

11   the other?

12        A.   I don't remember one way or the other.

13        Q.   And you are not familiar at all with the

14   contents of the deck?

15        A.   I am not.                            01:23:05

16             (Exhibit 408 was marked for

17   identification by the court reporter and is

18   attached hereto.)

19        Q.   (By Mr. Perlson)  You have been handed

20   what's been marked as Exhibit 408, 101482 through  01:24:47

21   101498.

22        A.   Right.

23        Q.   So these are -- are minutes of a board of

24   directors meeting, April 11th, 2016?

25        A.   Uh-huh.                              01:25:03
```

Page 108

```
 1        Q.    "Yes"?                                    01:25:03

 2        A.    Yes.  Sorry.

 3        Q.    If you look in the second paragraph, you

 4   are -- it indicates that you are an attendee by

 5   telephone?                                           01:25:15

 6        A.    Yes.

 7        Q.    Does that refresh your recollection at

 8   all as to whether you were at a board meeting where

 9   this -- where this presentation was discussed?

10        A.    Assuming this is correct, yeah.           01:25:26

11        Q.    Okay.  But does that make you remember

12   the meeting at all any more?

13        A.    I mean, I can flip through this.

14        Q.    Why don't you look at the minutes.

15        A.    I mean, if I could see the non- -- the    01:26:10

16   redacted portions, I might have remembered it.

17        Q.    Well, if you look in -- in, like, 101485,

18   there's -- there's proposed resolutions.

19        A.    This is all about the Otto acquisition.

20        Q.    You have been handed Exhibit 285,         01:27:45

21   agreement to plan a merger between Ottomotto and

22   others.

23              You ever -- did you ever see this -- this

24   agreement?

25        A.    No.                                       01:27:59
```

                                                    Page 109

1    don't see how you can now be instructing him to          02:16:11

2    answer -- not to answer regarding what is disclosed

3    and not withheld as privileged?

4           MS. RAY:  So let me clarify.

5           MR. PERLSON:  Are you clawing this back          02:16:25

6    or?

7           MS. RAY:  No, no.

8           You may answer with respect to the impact

9    on the company of -- you know, the impact of the

10   company of continuing to employ Mr. Levandowski, to     02:16:31

11   the extent you recall any discussions about that

12   impact, but I don't want you to get into legal

13   advice in that regard.

14          So I think there was already earlier

15   testimony on this point.                                02:16:46

16          THE DEPONENT:  Okay.

17          MS. RAY:  I think it was about the same

18   discussion, so you can do as you did before.

19          THE DEPONENT:  Okay.  I mean, we

20   discussed the reputational impact to the company,       02:16:57

21   to Travis, and to what -- what signal that might

22   mean to the judge.

23     Q.   (By Mr. Perlson)  So this was in

24   reference to the discussion earlier in your

25   deposition where you had indicated that there was a     02:17:27

                                               Page 132

```
 1    concern regarding the continuing employment of        02:17:33

 2    Mr. Levandowski would have on the company itself

 3    and Travis?

 4         A.   That's right.

 5         Q.   And did the board make any specific         02:17:51

 6    decision regarding the continued employment of

 7    Mr. Levandowski at this meeting?

 8         A.   I don't believe so, no.

 9         Q.   Was it ultimately the board that decided

10    to terminate Mr. Levandowski?                         02:18:11

11         A.   My recollection is that Mr. Levandowski

12    was given an -- a request to comply with the

13    company's request -- reasonable request for him

14    to -- to do something, and he didn't comply, so, in

15    that way, he chose, I guess, to not be employed.      02:18:38

16         Q.   Do you have views on the size of the

17    autonomous vehicle market over the next five years?

18         A.   Five years?  I think it will be smaller

19    than the most optimistic experts think.

20         Q.   How about in the next 10 or 15 years?       02:19:34

21         A.   I think it will be probably bigger than

22    most experts think.  It's going to just take

23    longer.

24         Q.   You think it's going to take longer, but

25    eventually grow faster?                               02:19:46
```

Page 133

```
 1        A.    Yeah.                                  02:19:48

 2        Q.    Did Uber conduct any analysis on the size

 3   of the autonomous vehicle market in connection with

 4   its acquisition of Otto?

 5        A.    I don't recall, but that would be       02:20:06

 6   standard practice.

 7        Q.    You weren't involved in any such --

 8        A.    No.

 9        Q.    Who would have been knowledgeable of

10   that?                                              02:20:16

11        A.    Cameron.

12        Q.    In connection with the Otto transaction,

13   did Uber analyze how much of its current business

14   could be supplanted by autonomous vehicles in

15   connection with the acquisition?                   02:20:34

16        A.    I don't know the answer to that.

17        Q.    What was the state of Uber's autonomous

18   vehicle technology in December of 2015?

19              MS. RAY:  Objection.  Form.

20              THE DEPONENT:  It was less than a year   02:20:55

21   old, so it was fairly young.

22        Q.    (By Mr. Perlson)  Do you know how many

23   miles had been driven?

24        A.    I don't.

25        Q.    Do you know how far away Uber was from a  02:21:06
```

Page 134

1          THE VIDEOGRAPHER:  This is the end of

2    today's deposition of Mr. Emil Michael.  We are off

3    the record at 3:28 p.m.  The total number of media

4    used was seven and will be retained by Veritext.      03:28:40

5    Thank you.                                            03:28:44

6          (TIME NOTED:  3:28 p.m.)

7

8

9

10

11          _____

12                EMIL MICHAEL

13

14

15

16

17

18

19

20

21

22

23

24

25