# EXHIBIT 8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

______________________________
WAYMO LLC, )
Plaintiff, )
vs. ) Case No.
UBER TECHNOLOGIES, INC., ) 3:17-cv-00939-WHA
OTTOMOTTO LLC; OTTO )
TRUCKING LLC, )
Defendants. )
______________________________)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF SCOTT BOEHMKE
San Francisco, California
Monday, April 17, 2017
Volume I

Reported by:
SUZANNE F. GUDELJ, CSR No. 5111
Job No. 2596382

PAGES 1 - 79

BY MR. JAFFE:

Q Mr. Boehmke, you were interested in talking with Mr. Levandowski because he was going to provide Uber with custom LiDAR technology, right?

A He was going to provide a sensor for our cars. 02:16:06

Q What kind of a sensor?

A A laser sensor -- LiDAR sensor.

Q A custom LiDAR sensor?

A Correct. 02:16:17

Q So again, you'd agree with me, then, that you were interested in talking with Mr. Levandowski because he was going to provide a custom LiDAR solution for Uber, right?

A Yes. 02:16:27

Q And this was three months, or actually February, March, two and a half to three months since he left at the time Google, right?

MR. KIM: Objection to the extent it calls for speculation. 02:16:37

THE WITNESS: I don't know when he left Google.

BY MR. JAFFE:

Q Did you ask him?

A No. 02:16:41

solution that Fuji solves?

A [redacted]

Q [redacted] 02:23:13

A [redacted] --

(Reporter clarification.)

[redacted]

Q Does Uber have any custom LiDAR technology 02:23:26
related to [redacted]?

MR. KIM: Objection. Vague.

THE WITNESS: We have demonstrated [redacted], yes.

BY MR. JAFFE: 02:23:42

Q What's the name of the [redacted]?

A It's in-house.

Q What's the name of it?

A I don't have -- don't have a project name.

Q When was the first time that it was 02:23:49
demonstrated?

A [redacted]

Q Okay. So you said you don't have a project name. When you want to refer to this to your -- to your colleagues, what -- how do you do it? 02:24:06

surprise you?

A No, it made sense.

Q I'm not asking if it made sense. Sorry, my question was a little bit unclear.

When you heard about the acquisition, were 02:25:43 you surprised because you hadn't found out about it before it was publicly announced?

A No.

Q Did you know about it in June?

A I don't recall. 02:25:54

Q What about May?

A I couldn't tell you the date we acquired them. I don't recall.

Q Sure. I'm asking something a little bit different, which is: When is your first 02:26:01 recollection of having an understanding that Uber was in potential discussions to acquire Otto?

MR. KIM: Objection. Asked and answered.

THE WITNESS: I don't know.

BY MR. JAFFE: 02:26:13

Q Okay. Are you aware that Uber has claimed in this case that it was having discussions with Mr. Levandowski and Otto about a potential acquisition as early as January 2016?

MR. KIM: Objection. Assumes facts not in 02:26:36

evidence. Lacks foundation.

THE WITNESS: I wouldn't know.

BY MR. JAFFE:

Q Does that surprise you?

A No. 02:26:44

Q Why not?

MR. KIM: Same objections. Lacks foundation, and to the extent it calls for speculation.

MR. JAFFE: Mr. Kim, this is almost 02:26:54 expressly what his order prohibits. You're -- you're coaching the witness on the record.

MR. KIM: I disagree with your characterization.

BY MR. JAFFE: 02:27:04

Q Go ahead.

A Could you repeat the question?

Q You said it didn't surprise you that Uber was in discussions with Mr. Levandowski and his company about a potential acquisition in 02:27:18 January 2016, right?

A I don't know when the discussions happened. I don't know who has said that the '16 -- January of '16 there were talks of that.

Q My question is you said it didn't surprise 02:27:30

the sensor that was being developed was not going to solve our problems in the near term and found that the Fuji configuration minimized negative risks that we were having with other suppliers and would make more sense for us. 02:29:01

Q Who had these discussions?

A James Haslim, Eric Meyhofer and myself.

Q Was Mr. Levandowski involved in these discussions?

A No, he was not in the room. 02:29:10

Q That's not my question. I'm not asking whether he was in the room. Was he involved in these discussions?

A Not to my knowledge. He wasn't on the phone, he wasn't in the room, no. 02:29:19

Q So you're referring to a particular one discussion; is that right?

A No. James came to Pittsburgh after -- I was asking him several times. He came to Pittsburgh and was there for several days during which we had 02:29:33 discussions, and he left with the intent to pivot.

Q Just so I want to make this clear, your testimony is that Mr. Levandowski had nothing to do with the change from V1 to V2; is that right?

MR. KIM: Objection. Mischaracterizes his 02:29:53

testimony.

THE WITNESS: I'm not aware of other conversations that had Anthony involved. I don't know.

BY MR. JAFFE: 02:30:02

Q Okay. So that's helpful. So you don't know whether Mr. Levandowski was involved in the transition from V1 to V2, true?

A I received no input from Mr. Levandowski that we should or should not pivot. 02:30:15

Q Okay. So I'm going to ask my question again because I don't think that was quite responsive.

Do you know whether Mr. Levandowski was or was not involved in the transition from V1 to V2? 02:30:24

MR. KIM: Objection. Asked and answered.

THE WITNESS: To my knowledge, he was not. I do not know.

BY MR. JAFFE:

Q You don't know? 02:30:39

A I do not know.

Q Okay. Why was the Version 1 sensor insufficient for Uber's purposes?

A Otto was making trucks. They could handle a larger sensor. It was not feasible to put that on 02:31:01

building a medium range LiDAR sensor?

A We were building the pieces to make a LiDAR sensor, yes.

Q So the intent at that time was you were going to build a medium range LiDAR sensor; is that right? 02:36:54

A No, my intent was to test these technologies.

Q Okay. So if I had time traveled back to talk to you, Mr. Boehmke, and I said are you building a medium range LiDAR sensor in December 2015, your testimony is you would say oh, yeah, yeah, we're totally doing that right now; is that right? 02:37:02

MR. KIM: Objection. Vague. Improper hypothetical. Incomplete. 02:37:14

THE WITNESS: We were making progress towards a sensor, developing the pieces that would be used.

BY MR. JAFFE: 02:37:28

Q Okay. But at the time in December 2015, you weren't personally contemplating a particular medium range LiDAR sensor, right?

A No, in 2015, we were working on [REDACTED] [REDACTED]. 02:37:42