# EXHIBIT 10

1  UNITED STATES DISTRICT COURT
2  NORTHERN DISTRICT OF CALIFORNIA
3  SAN FRANCISCO DIVISION
4
5  WAYMO LLC
6      Plaintiff,
7         vs.            Case No.
8  UBER TECHNOLOGIES, INC.;   17-cv-00939-WHA
9  OTTOMOTTO, LLC; OTTO
10 TRUCKING LLC,
11     Defendants.
12 _____
13
14        **ATTORNEYS' EYES ONLY**
15
16    VIDEOTAPED DEPOSITION OF TRAVIS KALANICK
17         San Francisco, California
18         Thursday, July 27, 2017
19              Volume I
20
21 REPORTED BY:
22 REBECCA L. ROMANO, RPR, CSR No. 12546
23 JOB NO. 2665725
24
25 PAGES 1 - 329

| | | |
|---|---|---|
| 1 | We wanted to give the employees the | 08:25:27 |
| 2 | confidence that we had that the technology was | |
| 3 | built from the ground up. | |
| 4 | Q. Was the meeting called in connection with | |
| 5 | the filing of the lawsuit? | 08:25:36 |
| 6 | A. Yes. | |
| 7 | Q. Okay. And who spoke on that subject? | |
| 8 | A. So I spoke for part of it. Anthony spoke | |
| 9 | for part of it. A large portion of the speaking | |
| 10 | time was taken by James Haslam, who was the head of | 08:26:00 |
| 11 | the laser effort at ATG. | |
| 12 | Angela spoke. And, I mean, other people | |
| 13 | may have, but I don't remember. | |
| 14 | Q. Did you have a discussion with | |
| 15 | Mr. Levandowski before the meeting started to | 08:26:25 |
| 16 | discuss what he was going to speak about and what | |
| 17 | you were going to speak about? | |
| 18 | A. I don't recall specific discussion, but I | |
| 19 | may have. | |
| 20 | Q. Would you expect that you would have? | 08:26:37 |
| 21 | A. I -- I certainly would have liked to. | |
| 22 | Q. Do you have any reason to believe you did | |
| 23 | not? | |
| 24 | A. I just don't remember specific | |
| 25 | discussion. Doesn't mean I didn't have it, I | 08:26:51 |

| | | |
|---|---|---|
| 1 | just -- I don't remember. | 08:26:54 |
| 2 | You know, the -- I had my -- my meetings. | |
| 3 | My days are just scheduled sort of -- they're very | |
| 4 | full.  They start early in the morning and they go | |
| 5 | sometimes till 11:00 p.m. or midnight.  And | 08:27:04 |
| 6 | sometimes it could be, you know, just I talked to | |
| 7 | somebody in the minutes between meetings. | |
| 8 | Sometimes the meetings just keep rolling. | |
| 9 | Sometimes they go long. | |
| 10 | Q.   But you -- you saw him and you interacted | 08:27:16 |
| 11 | with him at this all-hands meeting, correct? | |
| 12 | A.   Correct.  Yes. | |
| 13 | Q.   Did you ask him, What's the deal with | |
| 14 | these allegations about downloading documents? | |
| 15 | A.   I don't remember specifically saying | 08:27:27 |
| 16 | that, but that feels, of course, like something | |
| 17 | that I would want to know. | |
| 18 | Q.   What did you -- what do you remember | |
| 19 | saying? | |
| 20 | A.   I -- I don't remember that -- like that | 08:27:34 |
| 21 | kind of interaction specifically.  But he certainly | |
| 22 | explained himself during that -- during that | |
| 23 | meeting. | |
| 24 | Q.   Wouldn't you expect that you would ask | |
| 25 | him that question personally? | 08:27:51 |

| | | |
|---|---|---|
| 1 | meeting? | 08:31:28 |
| 2 | A. Cameron. I am trying to think who else. | |
| 3 | Nina. Anthony was there. I was there. | |
| 4 | There may have been others. I don't -- I | |
| 5 | don't remember. | 08:31:47 |
| 6 | Q. This was an in-person meeting? | |
| 7 | A. Yeah. | |
| 8 | Q. Where was it? | |
| 9 | A. It was at Uber HQ, 1455 Market Street. | |
| 10 | Q. Why would Mr. Levandowski tell you at | 08:32:03 |
| 11 | this meeting that he had had five discs of Google | |
| 12 | files? | |
| 13 | MS. DUNN: Objection to form. | |
| 14 | THE DEPONENT: I don't know why he told | |
| 15 | us. But it's important when you do a deal that | 08:32:15 |
| 16 | people sort of disclose if there's any -- any | |
| 17 | things that need to be discussed before a deal is | |
| 18 | consummated. | |
| 19 | Q. (By Mr. Verhoeven) Were there some | |
| 20 | circumstances that made it appropriate at this | 08:32:30 |
| 21 | meeting for him to disclose that, that you're aware | |
| 22 | of? | |
| 23 | A. I don't remember. I don't remember | |
| 24 | anything specific. | |
| 25 | Q. What was the purpose of the meeting? | 08:32:38 |

```
1    A.   You know, I think as we get closer to       08:32:45
2    deals, we have to have discussions about, Okay,
3    what are the things we need to do to get a deal
4    done?
5         I don't -- I don't know the specific        08:32:53
6    purpose though.
7    Q.   You don't remember?
8    A.   No.
9    Q.   Going back to the all-hands meeting --
10   A.   Yeah.                                       08:33:05
11   Q.   -- you don't remember having a discussion
12   with Mr. Levandowski after he made his
13   presentation?
14   A.   I mean, I've had many discussions with
15   Levandowski like over the years.                 08:33:19
16   Q.   I meant -- I meant -- let me --
17   A.   Yeah.
18   Q.   I'm sorry.  The question was vague.
19   A.   Yeah.
20   Q.   You don't remember any conversation         08:33:26
21   during the meeting, after he made the presentation,
22   with Mr. Levandowski?
23   A.   Well, the meeting was -- I mean, the
24   meeting wasn't a discussion between him and me.
25   The meeting was us sort of speaking to the company. 08:33:38
```

Page 25

```
 1        Q.   Did he -- what else did he say when he          08:37:30
 2   spoke at the meeting?
 3        A.   I think that was the majority of it.
 4        Q.   Do you remember anything else that
 5   Mr. Haslam said when he spoke at the meeting?             08:37:40
 6        A.   I do not.
 7        Q.   What about Ms. Padilla?
 8        A.   Ms. Padilla, she spoke about our
 9   confidence that we had built this technology from
10   the ground up, and spoke about, sort of at a high         08:38:01
11   level, sort of the kind of processes we go through
12   to make sure that the technology we build is -- is
13   ours.
14        Q.   And what processes did she talk about?
15        A.   She didn't go into the process -- any           08:38:21
16   processes in detail, but, you know, just our
17   values, you know, and the things we do, just at a
18   high level, to make sure that we built things the
19   right way.
20        Q.   And what things did -- did that -- that         08:38:37
21   Uber does --
22        A.   Yeah.
23        Q.   -- did she mention?
24        A.   I don't remember specifically what those
25   were that she mentioned.                                  08:38:45
```

1     Q.   Okay.                                                  08:47:29

2     A.   So --

3     Q.   Which meeting was that?

4     A.   That was the meeting that had Cameron and

5  Nina and Anthony, and possibly others, I just can't            08:47:37

6  remember.  And this is the meeting we spoke to

7  earlier -- that I spoke to earlier.

8     Q.   Okay.  So this is the meeting about the

9  five discs or that -- in which the five discs came

10 up?                                                            08:47:54

11    A.   Well, I -- I'm not sure how many discs,

12 but it was something like that, yes.

13    Q.   Okay.  And why were you having that

14 meeting?

15    A.   Okay.  We were having that meeting          08:48:06

16 because -- well, I don't remember the exact, like,

17 calendar request or purpose, but we were getting

18 through a deal process and we wanted to sort of get

19 to the -- see if we can get to closure on the deal.

20    Q.   Did someone at the meeting ask             08:48:28

21 Mr. Levandowski whether or not he had any Google

22 documents?

23    A.   I don't remember that.

24    Q.   Do you remember whether he volunteered it

25 or whether it was in response to a question?        08:48:38

```
 1        A.   I don't remember specifically.              08:48:44
 2        Q.   Was anything else discussed at the
 3   meeting?
 4        A.   I think so, yes.
 5        Q.   Can you tell me what you remember.          08:48:50
 6        A.   I don't remember much of it.
 7        Q.   Do you remember anything, though?
 8        A.   Not really.
 9        Q.   Okay.  So the answer is no?
10        A.   The answer is not really.                   08:49:02
11        Q.   But you don't remember -- you can't
12   identify for me anything else that occurred in the
13   meeting, correct?
14             MS. DUNN:  Objection to form.
15             THE DEPONENT:  I'm trying to think if       08:49:13
16   there's anything.  I mean, other than generally
17   just talking about the deal and getting the deal to
18   closure, I -- I don't have more specifics on that.
19        Q.   (By Mr. Verhoeven)  Okay.  Did you have
20   another meeting during the March/April time frame    08:49:36
21   on the subject of Levandowski and Google or Waymo
22   documents?
23        A.   I had at least a couple meetings with my
24   general counsel about diligence, generally.
25        Q.   Was the subject of Google documents         08:50:03
```

Page 40

```
 1   discussed during those meetings?                    08:50:06
 2         MS. DUNN:  Objection.  The content of
 3   those meetings would be privileged.
 4         You're instructed not to answer.
 5      Q.   (By Mr. Verhoeven)  And when you say        08:50:17
 6   "general counsel," who was that at the time?
 7      A.   Salle Yoo.
 8      Q.   Was the subject of diligence concerning
 9   Mr. Levandowski discussed at this meeting?
10         MS. DUNN:  Objection.  Content of the         08:50:38
11   meeting and discussions is privileged.
12         You're instructed not to answer.
13      Q.   (By Mr. Verhoeven)  There was a couple of
14   meetings, correct?
15      A.   I remember -- I remember a couple.  Like    08:50:49
16   it -- it's -- it feels like it was a couple.  I
17   don't know for sure, but something like that.
18      Q.   Who was at the first meeting?
19      A.   I don't know.  I know that our general
20   counsel was.  I'm not sure if there were others     08:51:05
21   there or not.  I can't remember.
22      Q.   Do you remember if there were outside
23   counsel?
24      A.   I can't remember.  I don't think so.
25      Q.   Was anyone from Morrison Foerster there?    08:51:15
```

```
 1        A.    I don't know.                                    08:51:22

 2        Q.    Was anyone from O'Melveny Myers there?

 3        A.    I don't know.

 4        Q.    Same questions for the second meeting.

 5   Do you remember who was there?                              08:51:30

 6        A.    No, not specifically.

 7        Q.    You do remember that general counsel

 8   Salle Yoo was there?

 9        A.    Yes.

10        Q.    Was anyone else from Uber there?                 08:51:39

11        A.    Possibly, but I just -- I just don't

12   remember.

13        Q.    Was anyone from Otto there?

14        A.    I don't know.  I don't think so.

15        Q.    Was Mr. Levandowski there?                       08:51:51

16        A.    I don't think so.

17        Q.    And that goes for the -- the first of

18   those two meetings, too?

19        A.    Yeah.

20        Q.    Did you learn that -- at either of these         08:52:09

21   meetings, did you learn that Mr. Levandowski had

22   taken Google documents when he left?

23              MS. DUNN:  Objection.  Contents of the

24   meeting would be privileged communications.

25              The witness is instructed not to answer.         08:52:23
```

| | | |
|---|---|---|
| 1 |         And then you get a very confirma- -- I | 09:02:34 |
| 2 | got a very confirmatory, Absolutely not. | |
| 3 |         And then my second thing is, We are going | |
| 4 | to make sure that that is the case. We are going | |
| 5 | to have independent investigators look into this | 09:02:44 |
| 6 | and find out whether that is true. And you need to | |
| 7 | make sure that that continues to be true. | |
| 8 |    Q.   (By Mr. Verhoeven) Okay. Do you | |
| 9 | remember what you said to him about having | |
| 10 | independent investigators -- | 09:03:02 |
| 11 |    A.   No. | |
| 12 |    Q.   -- make sure? | |
| 13 |    A.   I don't remember the specifics, but we | |
| 14 | certainly had an investigation that started looking | |
| 15 | through every server forensically, and started | 09:03:15 |
| 16 | interviewing -- started interviewing, you know, | |
| 17 | many engineers, dozen of engineers, to verify that | |
| 18 | they hadn't seen any files, and verify that those | |
| 19 | files never touched us. | |
| 20 |    Q.   Did you direct that specifically to | 09:03:33 |
| 21 | happen? | |
| 22 |    A.   Our chief security officer, Joe Sullivan, | |
| 23 | did. | |
| 24 |    Q.   And how do you know that? | |
| 25 |    A.   At some point I was told that that was | 09:03:42 |

| | | |
|---|---|---|
| 1 | going on. | 09:03:45 |
| 2 |     Q.   By whom? | |
| 3 |     A.   I don't remember. | |
| 4 |     Q.   You don't remember? | |
| 5 |     A.   No. | 09:03:48 |
| 6 |     Q.   What conversations did you have within | |
| 7 | Uber about this investigation that you referred to? | |
| 8 |     MS. DUNN: I will just caution the | |
| 9 | witness to only answer to the extent that it | |
| 10 | doesn't involve conversations with counsel. | 09:04:02 |
| 11 |     THE DEPONENT: Yeah. | |
| 12 |     MR. VERHOEVEN: So just for the record, | |
| 13 | Counsel, you're instructing the witness not to | |
| 14 | answer any conversations he had with counsel about | |
| 15 | the subject of any investigations that were done | 09:04:10 |
| 16 | after the filing of the complaint? | |
| 17 |     MS. DUNN: I am -- I am instructing the | |
| 18 | witness to answer your question only to the extent | |
| 19 | that it doesn't involve privileged communications | |
| 20 | with counsel. That's my instruction. | 09:04:21 |
| 21 |     MR. VERHOEVEN: Including conversations | |
| 22 | on the subject of investigations done after the | |
| 23 | complaint? | |
| 24 |     MS. DUNN: Charlie, your responsibility | |
| 25 | is to ask the question. | 09:04:29 |

```
 1        Q.   Who did you learn -- where did that --        10:07:24
 2   withdrawn.  Sorry.
 3             That recollection you are talking about,
 4   did somebody say something that gave you that
 5   recollection or gave you the information that you       10:07:32
 6   are recalling?
 7             MS. DUNN:  Objection to form.
 8             THE DEPONENT:  I feel like that was part
 9   of the conversation, but I can't specifically
10   pinpoint who said what.                                 10:07:43
11        Q.   (By Mr. Verhoeven)  What did Levandowski
12   say about whether he had the files or not?
13        A.   I don't -- I don't remember.
14        Q.   Did it seem strange to you, this story he
15   was telling about wanting to have the files to show     10:08:00
16   this contribution?
17             MS. DUNN:  Objection to form.
18             THE DEPONENT:  It seemed unfortunate.
19   Whether it was strange or not, I don't know, but it
20   was certainly unfortunate.                              10:08:16
21        Q.   (By Mr. Verhoeven)  Why would -- why
22   would it make sense for an employee to steal
23   corporate files for the purpose of showing that
24   they are entitled to a bonus?
25             MS. DUNN:  Objection to form.                 10:08:28
```

```
 1  repeat the question.                                      10:53:20
 2          Was there a recommendation made to fire
 3  Mr. Levandowski at that point in time?
 4          MS. DUNN:  Same objection.  You are
 5  instructed not to answer if you can only answer           10:53:29
 6  based on what your conversations were with counsel.
 7          THE DEPONENT:  I cannot answer that
 8  question.
 9      Q.  (By Mr. Verhoeven)  Was the
10  recommendation that you referred to about removing        10:53:39
11  him from LiDAR based on a conversation with
12  attorneys?
13      A.  It was based on a bunch of conversations,
14  some of which were with attorneys.
15      Q.  Okay.  Which ones weren't with attorneys?         10:53:55
16      A.  I can't remember specific --
17  specifically.  Just knowing that that kind of
18  conversation happened, sometimes with attorneys;
19  sometimes without.
20      Q.  Okay.  What do you remember about the             10:54:07
21  conversations without attorneys?
22      A.  That having him work outside of the area
23  of this specific technology, which was where the
24  complaint was mostly focused, was probably a good
25  idea.                                                     10:54:35
```

| | | |
|---|---|---|
| 1 | Q. And what was your understanding of what | 10:54:37 |
| 2 | was the reason for that conversation to occur at | |
| 3 | that time? | |
| 4 | MS. DUNN: Form. | |
| 5 | THE DEPONENT: I don't remember. I don't | 10:54:45 |
| 6 | remember the specifics. | |
| 7 | Q. (By Mr. Verhoeven) Was there some event | |
| 8 | that occurred that resulted in this conversation? | |
| 9 | MS. DUNN: Form. | |
| 10 | THE DEPONENT: This was before the | 10:54:58 |
| 11 | preliminary injunction order? | |
| 12 | Q. (By Mr. Verhoeven) Yes, it was before | |
| 13 | the preliminary injunction. | |
| 14 | A. So it's just -- look, I mean, there's not | |
| 15 | a lot of days between the complaint and the PI | 10:55:08 |
| 16 | order. It wasn't a long period of time. So I | |
| 17 | think we are learning as we go, and we are trying | |
| 18 | to figure out what is the right thing to do, given | |
| 19 | the facts we know and what we are learning as we | |
| 20 | go. | 10:55:25 |
| 21 | Q. Okay. I understand that. But I am just | |
| 22 | trying to probe your recollection of conversations. | |
| 23 | And you've testified that you had some | |
| 24 | conversations about removing from Mr. Levandowski | |
| 25 | from his work on LiDAR that were with others that | 10:55:36 |

Page 125