Pages 1 - 45

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE

WAYMO LLC,                        )
                                  )
            Plaintiff,            )
                                  )
    VS.                           )   **No. C 17-0939 WHA**
                                  )
UBER TECHNOLOGIES, INC.;          )
OTTOMOTTO LLC; OTTO TRUCKING      )
LLC,                              )
                                  )
            Defendants.           )
_____)       San Francisco, California
                                       Wednesday, August 9, 2017


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                        50 California Street, 22nd Floor
                        San Francisco, California  94111
                   BY:  **CHARLES K. VERHOEVEN, ESQUIRE**
                        **JAMES D. JUDAH, ESQUIRE**


For Defendants Uber Technologies, Inc. and Ottomotto LLC:
                        BOIES SCHILLER FLEXNER LLP
                        1401 New York Avenue, N.W.
                        Washington DC 20005
                   BY:  **KAREN L. DUNN, ESQUIRE**


(Appearances continued on next page)




Reported By:   Katherine Powell Sullivan, CSR #5812, RPR, CRR
               Official Reporter - U.S. District Court

```
 1   APPEARANCES (CONTINUED):

 2   For Defendants Uber Technologies, Inc. and Ottomotto LLC:
                         BOIES SCHILLER FLEXNER LLP
 3                       401 Wilshire Boulevard, Suite 850
                         Santa Monica, California  90401
 4                 BY:   EDWARD H. TAKASHIMA, ESQUIRE

 5   For Defendant Otto Trucking LLC:
                         GOODWIN PROCTER LLP
 6                       Three Embarcadero Center
                         San Francisco, California 94111
 7                 BY:   RACHEL M. WALSH, ESQUIRE

 8   Also present, on behalf of Lior Ron:
                         Taylor & Patchen, LLP
 9                       One Ferry Building, Suite 355
                         San Francisco, California 94111
10                 BY:   JONATHAN ALAN PATCHEN, ESQUIRE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   Wednesday, August 9, 2017                      9:10 a.m.

 2                   P-R-O-C-E-E-D-I-N-G-S

 3                        ---oOo---

 4        THE CLERK:  Calling Civil 17-939 WHA, Waymo versus

 5   Uber Technology.

 6      Counsel, please state your appearances.

 7        MR. VERHOEVEN:  Good morning, Your Honor.  Charles

 8   Verhoeven, and with me is James Judah, on behalf of Waymo.

 9        THE COURT:  Good morning.

10        MS. DUNN:  Good morning, Your Honor.  Karen Dunn and

11   Ed Takashima for Uber and Ottomotto.

12        THE COURT:  Good morning.

13        MS. WALSH:  Rachel Walsh on behalf of defendant Otto

14   Trucking.

15        THE COURT:  All right.  But I don't have an Otto

16   Trucking motion pending.

17        MS. WALSH:  That's correct.

18        MR. PATCHEN:  Good morning, Your Honor.  Jonathan

19   Patchen, of Taylor & Patchen, on behalf of non-party Lior Ron.

20        THE COURT:  And I don't have a Ron motion pending.

21        MR. PATCHEN:  I believe you do, Your Honor.

22        THE COURT:  What motion would that be?

23        MS. DUNN:  Mr. Ron's motion to quash portions of the

24   Stroz subpoena.

25        THE COURT:  Right.  But I spoke to Mr. Cooper about
```

```
 1   that.  It was just there.  There's no opposition.
 2       Have you met and conferred with Mr. Cooper?
 3           MR. PATCHEN:  We have not.
 4           THE COURT:  Okay.  So that's what you need to do.
 5           MR. PATCHEN:  There has been an opposition filed
 6   though, as well, Your Honor.
 7           THE COURT:  Well, when?
 8           MR. PATCHEN:  It was filed --
 9           THE COURT:  I'm not prepared to address it.
10           MR. PATCHEN:  Okay.
11           THE COURT:  It wasn't done through Mr. Cooper.
12           MR. PATCHEN:  The opposition was filed on July 13th.
13           THE COURT:  Yeah.  You see I address things, like,
14   right away.
15           MR. PATCHEN:  Okay.
16           THE COURT:  So it needs to go through Mr. Cooper.
17   That's obviously a matter that can get resolved through
18   Mr. Cooper.
19           MR. PATCHEN:  I hope so, Your Honor.
20           THE COURT:  Is Mr. Cooper here?  Oh, he's not here.
21       In any event, what I'd like you to do is, after court
22   today contact Mr. Cooper.
23           MR. PATCHEN:  Sure.
24           THE COURT:  And I'm sure that it can be worked out.
25   That's a matter that can be worked out.
```

1        **MR. PATCHEN:**  I hope so, Your Honor.  Thank you.

2        **THE COURT:**  Okay.  All right.  You can come forward.

3   And Ms. Dunn.

4      So I guess my first -- this is the motion with respect to

5   Mr. Kalanick's deposition.  And my question to Waymo -- so,

6   really, we're talking about this conversation between

7   Ms. Padilla, the head of litigation, Mr. Levandowski and

8   Mr. Kalanick.

9      Is it Waymo's position that that conversation was

10  privileged or not privileged?

11       **MR. VERHOEVEN:**  The -- the -- they previously asserted

12  it was privileged, and then they selectively waived it.

13       **THE COURT:**  I understand that.

14       **MR. VERHOEVEN:**  Okay.

15       **THE COURT:**  So is it your position, though, that that

16  conversation is privileged?

17       **MR. VERHOEVEN:**  Before it was waived, yes.

18       **THE COURT:**  Is privileged.  Okay.

19     All right.  So, Ms. Dunn.

20       **MS. DUNN:**  Yes.

21       **THE COURT:**  Why is it not privileged?

22       **MS. DUNN:**  It's not privileged because the only

23  testimony about this meeting is what Mr. Kalanick said

24  Mr. Levandowski --

25       **THE COURT:**  No, no, not what the testimony was.  Why

1    is the conversation -- Ms. Padilla, the head of litigation, has

2    a meeting with Mr. Levandowski and Mr. Kalanick in which

3    they're discussing the facts relevant to and about the

4    litigation.

5        If Mr. Levandowski had said, "I took that information to

6    Uber," you would be arguing in a heartbeat that that

7    conversation was privileged.  And don't even try to tell me

8    that you would not.

9        The fact that you're now claiming it was never privileged

10    is, I'm just going to tell you candidly, astounding.

11        What was Ms. Padilla doing there?

12        **MS. DUNN:**  Ms. Padilla explains this in her

13    declaration.

14        **THE COURT:**  She doesn't say anything about what she

15    was doing there.  Why was she in that conversation?

16        **MS. DUNN:**  She was present for the conversation.

17        **THE COURT:**  Why?  Why?  She's the head of litigation.

18    They're having all these meetings because they have learned

19    now, they knew that Judge Alsup is going to make the fact that

20    Mr. Levandowski is pleading the Fifth public.  What are the

21    implications, she says, for the litigation.

22        They have a meeting.  That one is privileged.  She

23    immediately goes into this other meeting with Mr. Levandowski

24    and Mr. Kalanick.  She's there.  Why is the head of Uber's

25    litigation in that meeting?

1      **MS. DUNN:**  She was there not --

2      **THE COURT:**  To do what?

3   You can't answer because, of course, she was there as

4   Uber's in-house counsel.  Of course.  It's okay.  You can't

5   answer.

6   I don't know, have you seen *Flubber*; right?  I think

7   that's Robin Williams' best movie, if you have kids; right?

8   They watch and they laugh hysterically.  And the stretch,

9   right, the Flubber stretches for miles.

10   "This argument is not privileged" is bigger than that

11   stretch.

12      **MS. DUNN:**  Your Honor, respectfully, if I may, I

13   disagree.

14      **THE COURT:**  Give me a case.  Can you even give me a

15   case with facts even remotely close to this, where the head of

16   litigation is sitting there talking to the two parties

17   intimately involved about the facts relevant to the litigation

18   and it's not privileged?  What case?

19      **MS. DUNN:**  The purpose -- the purpose of this meeting

20   was for Mr. Kalanick to ask Mr. Levandowski what had happened.

21      **THE COURT:**  Okay.  Then --

22      **MS. DUNN:**  To press him for information.

23      **THE COURT:**  Why was Ms. Padilla there?

24      **MS. DUNN:**  Ms. Padilla is in many meetings at Uber.

25      **THE COURT:**  You're not answering my question.  Why was

1   she there?

2       **MS. DUNN:**  She -- I can tell you from my own personal

3   knowledge, she is present at many meetings.  Some of them are

4   privileged and some of them are not.

5       **THE COURT:**  Yes.  Whenever you want it to be

6   privileged, it's privileged.  And when you don't, it's not.

7   That's what it looks like, Ms. Dunn.  That's what it looks like

8   in spades.

9       Why was Ms. Padilla at that meeting?  Why was she there?

10  Is she good friends with Mr. Levandowski?  Why was she there?

11      **MS. DUNN:**  Well, one thing is, she is a person of

12  comfort to the CEO, Mr. Kalanick.  So it is -- it makes

13  complete sense to me.  And I understand Your Honor does not

14  like our argument right off the bat --

15      **THE COURT:**  It's not that I don't like it.  And Uber

16  should be very careful because now I think we have to go back

17  and look through that privilege log and see everywhere where

18  Ms. Padilla is there.  Because, apparently, Ms. Padilla, even

19  though she's the head of litigation, often she's in meetings

20  and communicating with people and has nothing to do with her

21  role as litigation counsel.

22      When she said to Mr. Levandowski, "I think you should

23  actually talk," what role was she playing?

24      **MS. DUNN:**  She was very clear that she was not

25  providing legal advice --

```
1            THE COURT:  To Mr. Levandowski.  What role was she
2       playing?
3            MS. DUNN:  She was -- at that meeting, she was just an
4       attendee.
5            THE COURT:  No, you're not --
6            MS. DUNN:  She was there listening -- so, Your
7       Honor --
8            THE COURT:  Ms. Dunn.
9            MS. DUNN:  Okay.
10           THE COURT:  What role was she playing?
11       She's Uber's head of litigation.  She's in that meeting.
12       And she's telling -- Mr. Levandowski is not a stranger.  He is
13       an executive of Uber.  She's sitting in a meeting.  You have
14       the head of litigation with two executives of Uber talking
15       about facts relevant to Uber's litigation implications.  And
16       Uber's argument is that is not a privileged conversation.
17           That is a dangerous argument because Uber is in a lot of
18       litigations.  And now their opposing counsel is going to come
19       in and argue in all these litigations that's not privileged.
20       Uber said it's not privileged.
21           I really wonder if they've thought that argument through.
22           MS. DUNN:  Well, I believe they have thought the
23       argument through.  We've discussed this with Ms. Padilla.  She
24       did not consider her presence there to render the
25       communications privileged.
```

1      **THE COURT:**  What role was she playing when she said

2  that to him?

3      **MS. DUNN:**  So Ms. Padilla was obviously involved in

4  the events of this case as a fact witness.  And, in fact, she's

5  on the list to be deposed as a fact witness.  And the law is

6  clear that when you're talking about in-house counsel,

7  sometimes there are business objectives for a meeting and

8  sometimes the lawyer is being called upon to provide their

9  legal advice.

10      **THE COURT:**  And what was the business objective of

11  this meeting?

12      **MS. DUNN:**  The business objective was for

13  Mr. Kalanick, the CEO, to talk to Mr. Levandowski about what

14  had happened here.

15      **THE COURT:**  And why was that a business objective as

16  opposed to a litigation objective?

17      **MS. DUNN:**  Well, one thing that was happening at the

18  time is that there was an obvious question about what should

19  happen to Mr. Levandowski.  And Mr. Levandowski's decision

20  to -- or impending decision at the time to take the Fifth was

21  considered to have -- and I think this makes sense -- to have

22  business consequences for the company.

23      **THE COURT:**  So is Uber saying that all their

24  conversations, then, within Uber about whether to fire

25  Mr. Levandowski are not privileged?

1          **MS. DUNN:**  We're not saying --

2          **THE COURT:**  Their business judgment, it's not

3  privileged.  That is what you're saying.

4          **MS. DUNN:**  No, that's not what --

5          **THE COURT:**  That's why, Ms. Dunn, the hair splitting

6  you're doing here is just -- it's jaw dropping.  It's jaw -- I

7  just have to tell you, it's jaw dropping.  You're a fine

8  attorney.  I'm shocked.

9          **MS. DUNN:**  I appreciate -- I appreciate what Your

10  Honor is saying.

11          **THE COURT:**  Just to get this statement in -- which, by

12  the way, is classic hearsay to boot and probably wouldn't come

13  in anyway.  Like, to do that, I just don't understand.

14      What is the case?  I know the cases.  I'm very familiar

15  with the cases.  Usually, of course, it's the party that had

16  the conversation that's trying to make it privileged and the

17  business things.

18      I'm not aware of any case, any case where you have the

19  head of litigation, in-house -- this is not a business

20  attorney/transactional attorney -- the head of litigation

21  sitting there and having those facts.

22      So what case would I read?  Because you didn't cite any in

23  your letter brief that have facts similar to this.

24          **MS. DUNN:**  I'd agree that the facts of this case are

25  very unusual.  But the cases are clear that the speaker has to

1   be speaking for the primary purpose of seeking legal advice

2   from the attorney.

3           **THE COURT:**   Okay.  So Ms. Padilla then, so what she

4   learned in that conversation then, right, so -- so then Uber,

5   several months later, has made a big deal of it.   And

6   Ms. Padilla had nothing to do with that?   Had nothing to do

7   with that?

8       She didn't bring it to anyone's attention?   She didn't

9   say, "This is an issue we should raise, it could be relevant"?

10  She didn't learn anything in that meeting that then had any use

11  in the litigation?   She never gave any advice that had anything

12  to do with what she learned in that conversation?

13      Because, well, she'll have to testify to it at her

14  deposition because that conversation wasn't privileged;

15  therefore, she can testify as to, well, then, did you ever give

16  any advice about that conversation and what you learned in that

17  conversation?

18          **MS. DUNN:**   Your Honor, there's been no waiver of

19  Ms. Padilla's legal advice.   Our position --

20          **THE COURT:**   No, you're saying she was not in that

21  meeting and had no purpose for legal advice.   She wasn't a

22  lawyer, she was not a lawyer in that meeting.   She was -- I

23  don't know what she was.

24      And when she said to Mr. Levandowski, I think you should,

25  you know, answer the questions or testify, that had nothing to

do with Uber and its case with Waymo even though, of course,

it's completely in Uber's interest, she wasn't saying that as

Uber's lawyer and head of litigation?  She wasn't advising the

executive of Uber, This is what I think you should do on behalf

of Uber?  That was not any legal advice whatsoever?

**MS. DUNN:**  Well, she specifically said she was not

providing legal advice.

**THE COURT:**  To Mr. Levandowski in his personal

capacity.  That's what she says.  "In his personal capacity."

**MS. DUNN:**  On this issue.

**THE COURT:**  Yes.

**MS. DUNN:**  That he was counseled.

**THE COURT:**  Is it your position, then, that the

only -- that a corporation doesn't have a privilege with

respect to its advice that it gives its own executives as to

what it believes its executives to do?

**MS. DUNN:**  My position --

**THE COURT:**  He was an executive at the time.  No, no,

no.  Is that your position, that a corporation does not -- its

conversations, its in-house lawyer's conversations with

executives giving advice for the corporation's benefit is not

privileged?

**MS. DUNN:**  Our position is that you have to look at

the specific circumstances.  And that's what the case law says,

that -- and obviously the Court has a lot of discretion here,

but to take into account the facts and circumstances of the specific communication.

And to be fair to us, this is what we have done throughout.  There are documents produced in this case where Ms. Padilla is on them, where Ms. Yoo is on them, and they're not considered to be privileged communications because the communication is not for the purpose of asking for legal advice.

**THE COURT:**  Okay.  So let me ask again.  So Ms. Padilla, when she's deposed and is asked then, what you learned in that conversation played no role, you played no role, so she had no role involved in, hey, you know, Levandowski said -- by the way, do Mr. Levandowski's attorneys agree that that conversation was not privileged?

**MS. DUNN:**  The conversation between Ms. Padilla, Mr. Kalanick, and Mr. Levandowski?

**THE COURT:**  Yes.

**MS. DUNN:**  I have not asked them that question.

**THE COURT:**  So don't you think that's an issue?

**MS. DUNN:**  Well, it may be an issue for them because one thing that's possible is that Mr. Levandowski chose to waive the privilege he had with his lawyers.

The question is different as to whether --

**THE COURT:**  He hasn't chosen to waive anything.

**MS. DUNN:**  That's also very fair in the context.

1    **THE COURT:**  He hasn't chosen to waive anything.  And I

2    would guess that he won't.  And I would wonder how his

3    attorneys feel about -- in any event, I think that's an issue

4    because when we look at -- well, in any event.

5    **MS. DUNN:**  As a matter of professional courtesy, we

6    did call their attention to the filing, of course.  But from --

7    Mr. Levandowski's privilege with his counsel does not equate to

8    Uber's privilege with their counsel.

9    **THE COURT:**  Yes.  You can waive it.  You can waive it.

10    **MS. DUNN:**  We can waive Mr. Levandowski's privilege.

11    **THE COURT:**  No, you can waive your privilege; right?

12    Uber's in-house head of litigation had a conversation with

13    Mr. Kalanick and Mr. Levandowski immediately after -- Ms. Dunn,

14    you must know how this looks.  You can't -- you can't be

15    surprised, right, that that's the Court's reaction.

16    **MS. DUNN:**  I do respect the Court's reaction, Your

17    Honor, obviously.  This is a position that is consistent with

18    how we would look at all communications because the purpose of

19    this meeting was a conversation between the CEO and an

20    executive.

21    **THE COURT:**  Then why was Ms. Padilla there?

22    **MS. DUNN:**  And what I'm telling you is that

23    Ms. Padilla is in, as she says in her declaration, tons of

24    meetings at Uber.  Not all of them are meetings that she would

25    consider privileged just based on her presence.

1    **THE COURT:**  Yes, but this was a meeting about the

2    litigation.  This was a meeting that was generated by something

3    that happened in the litigation.  This is not unrelated.  This

4    is completely intertwined with the litigation.  And, in fact,

5    Uber is now trying to use the meeting in the litigation.

6    **MS. DUNN:**  I understand.  I understand that, Your

7    Honor.  I think that, as are reflected in other documents that

8    have been produced in this case -- and when Waymo wants to

9    argue for production of these documents this is what it says,

10   so we should all recognize that -- that there are

11   communications where an attorney is present, and maybe even

12   will have a comment, that their presence does not render it

13   attorney-client privileged unless the speaker of the statements

14   is seeking legal advice from the lawyer.

15   And that is -- that's the law in Waymo's brief.  That's

16   the law -- we don't object that that's the law.

17   **THE COURT:**  So Mr. Kalanick wasn't seeking -- so

18   Ms. Padilla wasn't there to provide any legal advice

19   whatsoever?  Like, what she learned, go in and out because her

20   role wasn't there for the purpose of any -- why was she there?

21   What was the role that she was playing?  You still have not

22   answered that question.

23   **MS. DUNN:**  Well, I have -- I have answered -- I will

24   try again to answer that question.

25   **THE COURT:**  No, you haven't.  You said she goes to

1    lots of meetings.

2              **MS. DUNN:**  She does.

3              **THE COURT:**  Why was she at this meeting?  Why?

4              **MS. DUNN:**  Well, one reason, which is what I believe

5    to be the case -- and she can be deposed on this -- is that she

6    is a person of comfort generally to the CEO.  And she is

7    present at meetings that are -- the purpose of which is not to

8    seek her advice as legal counsel and her position as legal

9    counsel.  They were not asking her advice.  This meeting really

10   wasn't about her or her presence.

11             **THE COURT:**  A lawyer at a meeting in which they don't

12   give advice but they are learning information which they will

13   then use to give advice is not privileged?  Not privileged

14   because she's not actually given advice at that moment.  Not

15   privileged?

16             **MS. DUNN:**  I believe that that's the case because the

17   speaker -- the case law is entirely clear.

18             **THE COURT:**  Okay.  We'll have to revisit a lot of

19   stuff, then, in this case.  Not privileged.  Not privileged.

20   Not privileged.

21        So the lawyer's there gathering information.  So --

22             **MS. DUNN:**  Well, then how --

23             **THE COURT:**  So all conversations that she's had with

24   Mr. Kalanick, gathering facts, not to give advice about it,

25   she's just gathering the facts, not privileged.  So when she's

1    deposed, she can talk about it?

2         **MS. DUNN:**  You have to look -- as the case law says,

3    you do have to look at the facts and circumstances of the

4    specific communication.  That's why every document in the case

5    is looked at to figure out is it privileged.

6         There are documents that include lawyers, or lawyers, in

7    fact, have something to say, but they're not -- nobody is

8    seeking their legal advice and they're not offering legal

9    advice.  That's the thing that we're supposed to specifically

10   look at.

11        And drilling down on this conversation, that is what was

12   going on is, she was present.  But if all we have is her

13   presence, it does not --

14        **THE COURT:**  We don't have her presence.  Her presence

15   was for a purpose.  What was the purpose of her presence?  To

16   give comfort to Mr. Kalanick.  How was she giving comfort to

17   Mr. Kalanick when she told Mr. Levandowski, purportedly, that

18   he should actually testify?

19        **MS. DUNN:**  Well, the question really is, is that -- is

20   she offering legal advice when she says that?

21        **THE COURT:**  Is she offering --

22        **MS. DUNN:**  And our position is she's not.

23        **THE COURT:**  -- legal advice on behalf of Uber?  She's

24   not.  That was not Uber's position?

25        **MS. DUNN:**  She says, I'm not in a position -- yes,

1   obviously, it's Uber's position.  And, in fact, it was --

2           **THE COURT:**  She said, "I cannot provide him any legal

3   advice" --

4           **MS. DUNN:**  Right.

5           **THE COURT:**  -- "personally."  Right.

6       So you're saying that Uber's in-house counsel can't give

7   advice to their -- to their executives as to what they should

8   do?  That Uber couldn't say to Mr. Levandowski, "You know what?

9   On behalf of Uber, we'd like you to testify."

10          **MS. DUNN:**  She specifically communicated, more than

11  once in that meeting, to Mr. Levandowski that she is not

12  providing him legal advice.

13          **THE COURT:**  Personally, because she knew he had

14  lawyers, because -- personal lawyers.  But that when she said

15  that, what was her role?

16          **MS. DUNN:**  Her role --

17          **THE COURT:**  What was her role when she said to

18  Mr. Levandowski that, while I could not provide -- "I agreed he

19  should just tell the Court what he did," why did she say that?

20          **MS. DUNN:**  Because that's what she believed.  And she

21  said, I can't --

22          **THE COURT:**  She believed that as what?  As Uber's head

23  of litigation.  Because that was in the interest of Uber for

24  the litigation.

25      I don't know how I could even -- I don't even know how I

1  could write it and say that's not privileged.  I don't even

2  know where I would begin.

3       So let me ask where I begin at the beginning.  Give me the

4  case that I should read that would support your position.

5  Because I'm not aware of it.

6       **MS. DUNN:**  I do not have a specific case where the

7  facts are precisely like this.

8       **THE COURT:**  Not precisely.  Give me something even

9  close.

10       **MS. DUNN:**  All of the cases cited in the briefs.

11       **THE COURT:**  Okay.  That's what I'll look at then.

12  Those are the ones you say that support that position.

13       **MS. DUNN:**  Your Honor, that is our position, that that

14  is, that -- I guess the other thing I would point out, Your

15  Honor, is that what Ms. Padilla said when she says, "You should

16  tell the truth," is something that Uber had by that point said

17  publicly that was not a communication, a confidential

18  communication.  And that also would further support the premise

19  that it is not --

20       **THE COURT:**  No, it wasn't.

21       **MS. DUNN:**  -- a privileged communication.

22       **THE COURT:**  It's a waiver.  It's a limited waiver.

23  Uber is just trying to thread the needle here.  And they want

24  to be able to get out what they want at a meeting because

25  Mr. Levandowski won't testify.  Get out what they think would

1  be helpful, but keep everything else privileged.

2      That's all it is.  It's very transparent.  That's okay.

3  That's a litigation strategy I understand.  I don't think it's

4  going to be successful in the end.  I'm not at all persuaded.

5  It's not persuasive at all, in any event.  If she was really

6  just there for nothing, she would say nothing.

7      But, again, I don't know why the head of litigation, who

8  immediately goes into this other meeting, why she's there.  And

9  why she's there is clearly because if Mr. Levandowski had said

10 something that you didn't want disclosed, then you would make

11 the opposite argument.  And you would win.  You would win

12 because it is so classic attorney-client privilege.

13     But let me hear from Mr. Verhoeven.

14         **MR. VERHOEVEN:**  I have nothing to add, Your Honor,

15 unless you have some questions.

16         **THE COURT:**  No.

17     So I'll go back and I'll look.  I think it's probably -- I

18 mean, it's a unique situation.  I've never been confronted with

19 it.

20     Whose burden is it, by the way, to show that it's

21 privileged?  I think it's probably yours.

22         **MR. VERHOEVEN:**  No.  It's the person asserting the

23 privilege.

24         **THE COURT:**  But they say it's not; right?  So if

25 that's it, then they haven't met their burden because they say

it's not.  So it has to be your burden.  Otherwise, they --

**MR. VERHOEVEN:**  I'd have to go look at the specifics.
Generally, the person asserting privilege has to --

**THE COURT:**  I understand.  That's why I'm saying it's
a unique situation.  Normally they're not the ones sitting
there saying it's not privileged.

They're saying it's not privileged.  And so it's their
burden.  They haven't met it.  Therefore, it's not privileged.
So it would have to be yours.

**MR. VERHOEVEN:**  If you want us to submit a brief that
outlines the principles you're talking about, we'd be happy to
do that.

**THE COURT:**  I mean, Ms. Dunn says the cases that they
cited are the ones.  So I think I can look at them and see then
if they're privileged or not.

What I'm more interested -- and this is actually where I
think the rub is -- is the scope of the waiver.  So what is
your position?

**MR. VERHOEVEN:**  Two things.  I think the scope is
Mr. Levandowski's reasons for downloading the files.

**THE COURT:**  That he ever said?

**MR. VERHOEVEN:**  Yes.

**THE COURT:**  Even in the meetings where his counsel was
there?

**MR. VERHOEVEN:**  That's right.

1    **THE COURT:**  Okay.  So here's the problem.  I think

2    you're probably right that that would be within the scope of

3    the waiver.  But the problem we have is that at this point in

4    time there is clearly a common interest.  Mr. Levandowski is in

5    some meetings and his counsel are present as well as

6    Ms. Padilla.  Only this time she's actually playing the role of

7    in-house counsel.  I'm sorry, I just -- I just am

8    flabbergasted.

9    In any event, Uber, I don't believe, can waive

10   Mr. Levandowski's privilege.  So what I think that means though

11   is there can be no waiver in fairness.  That -- that Uber is

12   not allowed to waive the privilege and, therefore, that

13   conversation with Ms. Padilla and Mr. Levandowski and

14   Mr. Kalanick cannot come in at all.  In fairness.  Because if

15   you can't do the full scope of the waiver then it's being used

16   as a sword and a shield at the same time.

17   Do you see what I'm saying?

18   **MR. VERHOEVEN:**  Oh, you're saying you would exclude

19   the entire conversation?

20   **THE COURT:**  Yes.  Because it's only fair, right, if

21   they're allowed to put in -- waive and put in what

22   Mr. Levandowski said in that one meeting about why he

23   downloaded, it's only fair, right, that the waiver extend to

24   everything he said to Uber about why he downloaded the files.

25   The problem is, some of those statements were done in the

```
1    context of -- where his own attorneys, personal attorneys were
2    present, were done in the context of the litigation, again,
3    were privileged.
4         And I don't believe that Uber can waive Mr. Levandowski's
5    personal privilege.  So that's the problem that we have.  And
6    so we'd have to hear from Mr. Levandowski's counsel.  As
7    Ms. Dunn said, he may waive.  Unlikely.  But he may not.
8         Why isn't that the result?  Certainly, it's not fair that
9    this one narrow thing gets to come in, which may not come in
10   anyway because it's hearsay.  But putting that aside --
11            MR. VERHOEVEN:  May I answer?  Formulating my answer.
12        So what they said, basically, in the declaration and in
13   the argument is there is no common interest.  They've said that
14   they said to him, "We're not giving you legal advice."  And
15   there's no privilege between Mr. Levandowski --
16            THE COURT:  So in that meeting I'm talking about -- so
17   obviously that conversation, they waived.
18            MR. VERHOEVEN:  Right.
19            THE COURT:  Right?  You get all the testimony.  Nobody
20   can object.  What Mr. Kalanick said, what Mr. Levandowski said,
21   what Ms. Padilla said, it all comes in.  They said that
22   conversation is not privileged.
23        What I'm talking about are the other conversations.  We
24   know from Ms. Padilla's declaration, and we think from maybe
25   Mr. Kalanick's, that Mr. Levandowski's personal attorneys then
```

1    showed up.

2              **MR. VERHOEVEN:**  Right.

3              **THE COURT:**  Right?

4              **MR. VERHOEVEN:**  Yes.

5              **THE COURT:**  That evening.  And there were more

6    meetings.

7              **MR. VERHOEVEN:**  Right.

8              **THE COURT:**  Again, in the same continuum, only this

9    one wasn't privileged.  But more meetings.

10        I don't believe that Uber can waive Mr. Levandowski's

11   privilege with respect to those meetings.

12             **MR. VERHOEVEN:**  Well --

13             **THE COURT:**  As to what he said.

14             **MR. VERHOEVEN:**  A couple of points.  The point I was

15   trying to make was -- just talking about this meeting; I'll get

16   to the other meetings -- that their position is there was no

17   common interest at that meeting.  So what Levandowski said

18   would necessarily be a waiver of the privilege under their

19   argument.  In other words --

20             **THE COURT:**  A waiver of whose privilege?

21             **MR. VERHOEVEN:**  Of his privilege.

22             **THE COURT:**  Well, I can't adjudicate that without

23   having his lawyers.

24             **MR. VERHOEVEN:**  Okay.  So our position is, anything on

25   those subject matters that he talked about, there's two things.

1   There's why he downloaded the files and what -- whether or not

2   they should be taking the Fifth Amendment, and their attempt to

3   persuade him not to, according to them.

4       And those are the two subjects that -- we're not asking

5   for everything in the world.

6           THE COURT:  Yeah.

7           MR. VERHOEVEN:  Just those two narrow subjects that

8   they've -- I mean, they've already put it out into the media

9   repeatedly.  It's obviously some PR campaign they have as well

10  as a defense.  And, you know, I'm not sure that they can take

11  that back.

12      So Your Honor was suggesting that the ruling would be no

13  discussion about those subjects --

14          THE COURT:  I'm just playing it out.  I agree, I

15  think -- I'll hear from Ms. Dunn why the waiver wouldn't extend

16  just to those two areas.  That's what the conversation was

17  about.

18      I know you disagree it's privileged, but --

19          MS. DUNN:  Can I go back half a step?

20          THE COURT:  Yes.

21          MS. DUNN:  So one thing I want to address, Your Honor

22  is asking about the cases.  The cases also say that the

23  communications have to be for the primary purpose -- not just

24  the purpose, the primary purpose of seeking legal advice from

25  the lawyer.

```
 1        And even if Your Honor disagrees with us, which is a
 2   position that we maintain, that nobody in that room was seeking
 3   legal advice from Ms. Padilla --
 4        THE COURT:  And you're welcome to make that argument
 5   to Judge Alsup.
 6        MS. DUNN:  Right.  I think there's no question that --
 7   or at least we would argue that there's no question that the
 8   primary purpose of this meeting was not to seek legal advice
 9   from Ms. Padilla.  The primary purpose of this meeting was a
10   conversation between Travis Kalanick and Anthony Levandowski.
11        And, incidentally, the only communications that have been
12   testified to by Mr. Kalanick, that Mr. Verhoeven says is a
13   waiver, are communications Mr. Kalanick made to Mr. Levandowski
14   and Mr. Levandowski made to Mr. Kalanick.  So --
15        THE COURT:  So what --
16        MS. DUNN:  So that's what Mr. -- that is -- that was
17   the purpose of the meeting, as Mr. Kalanick testified and is
18   supported by what actually happened at the meeting.
19        So I would like to just point Your Honor's attention to
20   the cases which do definitively say the primary purpose of the
21   meeting has to be seeking legal advice from the lawyer.
22        So even if Your Honor rejects our position in the first
23   instance, which seems very likely --
24        THE COURT:  You're good at reading people.
25        MS. DUNN:  I get that a lot.
```

```
 1        This is a meeting that was not -- the primary purpose of

 2   which was not to seek legal advice from Ms. Padilla.

 3        THE COURT:  But it had nothing to do with the

 4   litigation.  I find that incredible.

 5        It was completely related to the litigation.  It was -- it

 6   was instigated by the litigation.  It resulted from the

 7   litigation.  It was to learn facts.  It was to learn facts

 8   related to the litigation so that Mr. Kalanick could get advice

 9   from his lawyers about how to proceed in the litigation,

10   including whether we fire Mr. Levandowski.  What do we do with

11   Mr. Levandowski?  Including trying to convince Mr. Levandowski

12   to testify because that will help us in the litigation.

13        MS. DUNN:  I'm not taking the position that it had

14   nothing in the world to do with litigation.  I'm not taking

15   that position.

16        I'm taking the position, supported by the case law, that

17   the presence of the lawyer does not equal privileged

18   communication.  And the speakers of the statements would have

19   to be making them for the primary purpose of seeking her legal

20   advice, which they were not in this circumstance.

21        THE COURT:  Okay.

22        MS. DUNN:  On the question at hand, on the issue of

23   scope, first of all, we would argue that there has been no

24   purposeful waiver here.  If there is any waiver, it's

25   inadvertent.  So under 502, waiver --
```

1    **THE COURT:**  How is it inadvertent?  I mean, it may

2    be -- you know, maybe -- how is it inadvertent?

3        There was clearly -- clearly, in advance of that

4    deposition a strategic decision was made that Mr. Kalanick

5    would be allowed to testify as to that conversation and no

6    other.

7        **MS. DUNN:**  Because we --

8        **THE COURT:**  So it wasn't inadvertent.  It may have

9    been incorrect in terms of -- or it was a strategic decision

10   because Uber believed that it could convince the Court that

11   that conversation was not privileged.  But it wasn't

12   inadvertent.  It was intentional.

13       I read -- I read, in fact, the entire transcript from the

14   beginning to the end because I had a long plane flight.  And so

15   it wasn't inadvertent.  I mean, you were clearly prepared.

16       **MS. DUNN:**  It was inadvertent because we had a

17   good-faith basis to believe that this was not a privileged

18   conversation.

19       And in anticipation of Your Honor asking this question, we

20   did look up and find a case which is basically -- obviously,

21   nothing is exactly similar facts, but very similar

22   circumstances, where the Court held -- this case is out of the

23   Northern District of Illinois.  I can get you the cite.  Where

24   the Court held that because there was a good-faith belief that

25   it was a not-privileged conversation, as we do have, and

1    Ms. Padilla's declaration reflects this, that that does not --

2    that means that any waiver was inadvertent and doesn't fall

3    under 502.

4         **THE COURT:**  Do you want to take the waiver back then?

5         Take it back then.  You now know that I think it was

6    privileged.  They don't want it to come in anyway.  Just take

7    it back.  I'll give you that choice.

8         You can't have it both ways.  You can't get the waiver and

9    say, oop, it was a mistake, but I still get the statement out

10   there.

11        So right now you can take it back.  Assert the privilege,

12   and then these statements won't come in.

13        **MS. DUNN:**  Your Honor, I'm not --

14        **THE COURT:**  If you can't do that, that means it's an

15   intentional waiver because I have now given you that

16   opportunity.  It's not inadvertent.

17        I've given you my ruling.  I'm giving you the opportunity

18   to take it back.  Say, no, we assert the privilege.

19        No, you're not.  I understand it's an intentional waiver.

20        Okay.  So now let's talk about the scope.

21        **MS. DUNN:**  Okay.  So as to scope, it sounded actually

22   like this may be an area where we are in alignment with the

23   Court.

24        I'm not completely sure, so let me see if that's true,

25   which is that any scope would be limited to Mr. Levandowski's

1   statements about what he did and why he took the Fifth as

2   opposed to any communications within Uber between -- among

3   counsel discussing the general issue of --

4          **THE COURT:**  No, I think it's why.  I think that's what

5   Mr. Verhoeven said.  What he said about why he downloaded the

6   files, about why he's pleading the Fifth, and whatever was said

7   back to him about that.

8          **MS. DUNN:**  Right.  Mr. Levandowski's statements and

9   responses to Mr. Levandowski's statements.

10          **THE COURT:**  Correct.

11          **MS. DUNN:**  Yes.

12          **THE COURT:**  All right.

13          **MS. DUNN:**  I agree with the Court.

14          **THE COURT:**  Okay.

15          **MS. DUNN:**  I don't know that -- that's not what I'm

16   hearing Mr. Verhoeven say.

17          **THE COURT:**  I don't know.

18      Isn't that what you just said?

19          **MR. VERHOEVEN:**  Pardon?

20          **MS. DUNN:**  It was unclear from the briefing, in my

21   view.

22          **MR. VERHOEVEN:**  Our position, Your Honor, is there's a

23   subject matter waiver as to those items.  So they've -- they

24   picked what they like and they've proffered that.  And I

25   disagree that it was unintentional.  And they're hiding behind

```
 1   the privilege as to other privileged communications on that

 2   subject.

 3            THE COURT:  Like?

 4            MR. VERHOEVEN:  Like maybe they had something they're

 5   hiding behind the privilege that's inconsistent with what

 6   Mr. Kalanick says.

 7            THE COURT:  No.  No.  Anything that Mr. Levandowski

 8   said is waived.

 9            MR. VERHOEVEN:  Exactly.  So --

10            THE COURT:  So they can't hide behind the privilege on

11   that.

12            MR. VERHOEVEN:  You're right.  Anything he said.

13            THE COURT:  Yes.

14            MR. VERHOEVEN:  But if they're claiming privilege on

15   things that reflect what he said, the reasons why he downloaded

16   it --

17            THE COURT:  Yes.

18            MR. VERHOEVEN:  -- then that's waived.

19            THE COURT:  No -- yes, they agree.

20            MR. VERHOEVEN:  It's not just the meeting.  It's the

21   subject.

22            THE COURT:  No, no, no, it's not just the meeting.

23            MR. VERHOEVEN:  Right.

24            THE COURT:  They agree.

25            MR. VERHOEVEN:  And the same thing with the Fifth
```

```
 1    Amendment.
 2              THE COURT:  They agree.
 3              MS. DUNN:  Here's the point, potentially, of
 4    disagreement.  If Mr. Levandowski goes to another meeting and
 5    says, "Here's why I did this" --
 6              THE COURT:  Yes.
 7              MS. DUNN:  -- that would be within the scope.
 8              THE COURT:  Yes.
 9              MS. DUNN:  If an Uber lawyer emails outside counsel,
10    says, "I want to discuss this in the context of the
11    litigation," that would not be within the scope.
12              THE COURT:  I think that's right.
13              MS. DUNN:  Okay.  I just want to be completely clear
14    about that.
15              THE COURT:  Yeah.  But what's in the scope is
16    everything that Mr. Levandowski said at any time.
17         Now, here's the rub.  We have to have Mr. Levandowski's
18    attorneys here because I would guess that they're going to
19    object that Uber can't waive his privilege.
20         And then what we have is then, I think -- I'll allow you
21    guys to submit further submissions on it -- is that then,
22    therefore, as a matter of fairness, that conversation that
23    Mr. Kalanick testified, and Ms. Padilla, does not come in.
24              MS. DUNN:  Why would that be?
25              THE COURT:  Because then it's being used as a sword
```

```
 1   and a shield.  It's not -- it's not fair.
 2        Uber is trying to essentially limit the subject matter
 3   away.  Not trying, but Mr. Levandowski is preventing the full
 4   subject matter waiver.
 5        What you're basically doing then is cherrypicking.  Well,
 6   he said this, and this can come in, and this other stuff can't
 7   come in.
 8        And that's not fair.  That's not getting to the truth.
 9   Either you get it all or you get it none.
10        MS. DUNN:  First of all, we are not trying not to get
11   to the truth.  I think I -- I think Uber has an interest, I
12   would think we all would have an interest in hearing what
13   Mr. Levandowski said.
14        THE COURT:  No, that's exactly why Ms. Padilla said
15   that, because it was in Uber's interest.
16        MS. DUNN:  Waymo, by the way, is fighting tooth and
17   nail to keep out an explanation that there is evidence to
18   support and that Mr. Levandowski said he did what he did.
19        And I think that they stand hear saying, We're in search
20   of truth --
21        THE COURT:  Can you tell me why it comes in?  Like,
22   why isn't it hearsay?  Because it's clearly being offered for
23   the truth of the matter.
24        MS. DUNN:  We have strong hearsay arguments that we
25   would like to separately brief rather than have me do it
```

1   ad hoc --

2        (Unreportable simultaneous colloquy.)

3        **MS. DUNN:**  -- at this hearing.

4        **THE COURT:**  It seems like it could all be much ado

5   about nothing because it wouldn't come in anyway.

6        **MS. DUNN:**  But to your question, which is --

7   Mr. Levandowski's position, or his lawyer's position on his

8   privilege is not the same as Uber's position.

9        So if Your Honor finds that Uber has waived, then Uber

10  witnesses can testify as to what Mr. Levandowski said and what

11  they said back.  And that's what --

12       **THE COURT:**  But what if Mr. Levandowski objects?

13  We've had that.  In fact, we have it in spades at the moment.

14       **MS. DUNN:**  I agree.

15       **THE COURT:**  So they couldn't; right?  Because, as I

16  know now, because I've spent a lot of time on this, that when

17  you're parties to a common-interest agreement, one party can't

18  waive the privilege of the other.

19       You can't waive Mr. Levandowski's privilege.  So if he

20  says he's had meetings with his -- at least with his personal

21  counsel present, I imagine his counsel would say even in other

22  meetings when they weren't present but with Uber's lawyers,

23  whether it be inside or outside counsel, that Uber can't waive

24  it.

25       **MS. DUNN:**  I don't see how that would prevent Uber

1   from -- understanding our position is, it's not privileged.

2   But if Your Honor says it is, I don't understand how that would

3   prevent Uber from waiving its own privilege over what it knows

4   because Mr. Levandowski told us.

5           THE COURT:  Okay.  If --

6           MS. DUNN:  There's a separate issue --

7           THE COURT:  Okay.  We'll have briefing on that.  And

8   if everything that Mr. Levandowski told Uber comes in then,

9   fine, then there isn't a problem.

10      I guess what I'm saying is, I don't think I can make that

11  ruling without having given Mr. Levandowski's attorneys the

12  ability to weigh in, in making that decision.

13          MS. DUNN:  And what I would say, at least at this

14  point, before we know what is going to happen, is that there is

15  a difference between a meeting that Mr. Levandowski's attorneys

16  asked to be covered by a common-interest privilege and a

17  meeting that did not contain those attorneys, where

18  Mr. Levandowski told Ms. Padilla and Mr. Kalanick what he did.

19  And --

20          THE COURT:  No, I understand that.  The question is,

21  as a matter of fairness, --

22          MS. DUNN:  Right.

23          THE COURT:  -- the subject matter waiver goes beyond

24  that meeting.  Right?  It's not fair.

25      You'd have to agree for the evidence to be only what

1   Mr. Levandowski said in that one meeting, but what he said in

2   all the other meetings can't come in, that's not fair.  That's

3   a limited waiver; right?

4           **MS. DUNN:**  Why would -- why would the Uber employees

5   not be able to testify?

6           **THE COURT:**  Because --

7           **MS. DUNN:**  They should be able to testify as to that

8   subject matter.

9           **THE COURT:**  If they can, great.  What I'm saying is,

10  my understanding is that Mr. Levandowski may be able to come in

11  and say, "You can't because you're waiving my privilege."

12  That's what I'm saying.

13      Because my understanding is -- and I know this was quoted

14  to me at length in earlier briefing -- was that one party can't

15  waive another party's privilege when they have a

16  common-interest agreement.  At least as to that party's

17  communications.

18          **MS. DUNN:**  That party's communications.

19          **THE COURT:**  Right.

20          **MS. DUNN:**  I mean, but the Uber witnesses would be

21  free to testify to what they knew and what they said.

22          **THE COURT:**  But maybe not to what Mr. Levandowski

23  said.  That's what we have to figure out.

24      And what I'm alerting you to is, if that's the case, that

25  creates a problem in which I think the result may be that then

```
 1    the earlier waiver can't happen as a matter of fairness.  I
 2    don't know.
 3              MS. DUNN:  We have to brief it.
 4              THE COURT:  Yeah.
 5              MS. DUNN:  I would find it surprising that that would
 6    mean that you couldn't have a waiver over a separate
 7    conversation.
 8         That would -- I would be very surprised if a party that
 9    says we have a common-interest agreement over a particular
10    discussion can prevent the other party from testifying to a
11    different conversation because they say that there's a common
12    interest when, incidentally, even the topic is not -- they're
13    not aligned on the specific subject matter.
14              THE COURT:  What do you mean?
15              MS. DUNN:  So if the subject matter is Anthony
16    Levandowski taking the Fifth Amendment --
17              THE COURT:  Yeah.
18              MS. DUNN:  -- there's not specific alignment on the
19    subject matter.
20              THE COURT:  You're not saying there's not a
21    common-interest privilege?
22              MS. DUNN:  No, I'm not saying that.
23              THE COURT:  There's a long privilege log.
24              MS. DUNN:  I know.  We've definitely been down that
25    road.
```

1          THE COURT:  Okay.

2          MS. DUNN:  I'm not saying that.

3          THE COURT:  Well, in any event, I need -- I think what

4    we need to do -- and I don't believe that Mr. Levandowski's

5    attorneys are available at the moment, but what we're going to

6    need to do is have -- I need to have Mr. Levandowski's

7    attorneys weigh in.

8        So first what I'll do is I'll do an order addressing

9    whether I believe there's a waiver or not.  I'll go back and

10   look at those cases again.  But I'm unlikely to change my mind.

11   I do think that it was privileged and it was --

12          MS. DUNN:  Can I say one other thing on this topic?

13          THE COURT:  Yeah.

14          MS. DUNN:  I mean, you -- I have correctly picked up

15   on Your Honor's views.

16       There was discussion also in this -- in this deposition

17   and in general throughout this litigation of the all-hands

18   meeting where Angela, head of litigation, or Ms. Padilla, head

19   of litigation, was going to come and, in fact, she was going to

20   speak.  And there's discussion about that.  And nobody

21   questions that we consider that to not be a privileged meeting

22   and communication.  And there are emails that have been

23   produced about the all hands.

24       And I really would encourage Your Honor, because I know

25   that -- I know what you've said.  But from our point of view,

1   we have a very good-faith basis for believing this is not a

2   privileged communication based on the fact -- and Your Honor's

3   own orders have talked about we have to look narrowly at the

4   privilege, it has to be a primary purpose, people have to be in

5   the communication, it is the communication that is at issue,

6   specifically seeking legal advice from this person in her

7   capacity.

8        So we are not -- let me tell you that all hands

9   explanation about he worked from home, we didn't selectively

10  waive that.  That -- we looked at that and said it's not

11  privileged.  It's not privileged.  Nobody is seeking her legal

12  advice in this circumstance.

13       We did the same thing here.  Now, yes, we do believe

14  people should know the truth about what Anthony Levandowski

15  said.  And given the aggregation of evidence, this explanation

16  has the ring of truth to it.  So, yes, we do want the jury to

17  hear that he said this because we believe it's supported by

18  many other things and that it's true.

19       But we have looked at a whole raft of communications in

20  this case, document by document, and looked at these meetings

21  and assessed the nature and the circumstances of the event,

22  which obviously Your Honor gets to do as the arbiter.

23       But, you know, the primary argument that we have heard

24  from the other side and the only thing they adduced at the

25  deposition is just an attorney was in the room.  And the case

1   law is really clear about that.

2           **THE COURT:**  No, but she submitted --

3           **MS. DUNN:**  Right.

4           **THE COURT:**  -- a declaration.  And I just -- I mean,

5   her telling him that he should testify had nothing to do with

6   the litigation.  It wasn't giving -- it wasn't any legal

7   advice.  It had nothing to do with her role as litigation

8   counsel.  She wasn't there in her role as litigation counsel.

9   She never used any of the information that she gathered at that

10  meeting as litigation counsel.  Her purpose wasn't there to

11  learn facts she would then use to give advice as litigation

12  counsel.  I can't draw any of those inferences?

13          When you say to look at the circumstances, and the

14  circumstances point absolutely to it being for the purpose --

15  maybe not that very minute to give legal advice, although she

16  was, in fact, giving legal advice when she said to him, "You

17  should testify," that was legal advice.  Not to him personally,

18  but on behalf of Uber, as Uber's in-house counsel, "You should

19  testify" because that is in Uber's interest.

20          **MS. DUNN:**  What Your Honor is then saying, just to --

21  you may disagree, but what it sounds to me like what Your Honor

22  would then be saying is that actually no waiver occurred at

23  Mr. Kalanick's deposition.

24          The point at which you would believe that we waived is

25  when Ms. Padilla submitted her declaration saying, "I think you

1   should testify."

2          **THE COURT:**  No, it's not when she submitted her

3   declaration.  It was at the deposition when you allowed

4   Mr. Kalanick to testify to it.  It's not when, "I've learned

5   the facts of the meeting."

6          **MS. DUNN:**  Well, he didn't -- but he didn't testify to

7   anything that Ms. Padilla said.  So if what we're talking

8   about --

9          **THE COURT:**  No, but the question is whether the

10  meeting itself is privileged.  What was the purpose of the

11  meeting; right?

12      And the purpose of the -- and what I'm finding is the

13  purpose of the meeting was to gather facts that then would be

14  used in litigation.  And that's why Ms. Padilla was there.

15      And, frankly, there's nothing in here, nothing in here

16  that says why she was there.  It very astuciously avoids saying

17  why she was there, why the head of litigation was there.  And

18  of course that's why she was there.  Of course that's why, so

19  she could learn the facts.

20      What is Mr. Levandowski going to say?  Because all this

21  has implications for the litigation, which is why we then,

22  immediately then, had all these meetings all night with all

23  these different people that were going on.

24          **MS. DUNN:**  I guess my question is what is -- whether

25  we're supposed to assess privilege based on a

1    meeting-by-meeting metric --

2         **THE COURT:**  Yes.

3         **MS. DUNN:**  -- or if we're supposed to look at the

4    communications.

5         And the communications here, that we have, are

6    Mr. Levandowski saying what happened, Mr. Kalanick reacting to

7    that and pressing him, and then a statement by Ms. Padilla.

8         And I don't know -- if the -- if what the Court is saying

9    is that Ms. Padilla's statement about her view that that is a

10   non- -- that that's a nonprivileged communication --

11        **THE COURT:**  No.  What I'm saying is it's evidence.

12   It's evidence of the circumstances of the meeting of why she

13   was there.  She didn't say why she was there.  That is evidence

14   of it.  That's all.  It's not some triggering device.  It's

15   simply evidence.

16        **MS. DUNN:**  And I guess then our position is under the

17   case law very clear her primary purpose would have to be to be

18   providing legal advice.  And I think there's --

19        **THE COURT:**  And I can't think of any other purpose for

20   her to be there as head of litigation.

21        I know what you said.  It's not in her declaration.  And

22   it doesn't make any sense to me either.

23        **MS. DUNN:**  Right.  But then why would she be on any

24   email or in any meeting?

25        I mean, equally -- there has been plenty of emails

1    produced in this litigation that obviously have to do with

2    litigation because they've been produced through the

3    litigation, and she is on them or Salle Yoo is on them.  And

4    then why -- we don't just look at that and say, well, the

5    primary purpose of this must be seeking legal advice.

6         So it can't be that Angela Padilla encases everything in

7    privilege.  That can't be.  Then -- then we have disclosed

8    countless privileged communications in this case.  And I don't

9    think that's true.  I don't think Waymo would say that's true

10   either.

11        **THE COURT:**  Okay.  All right.  So I'll do that.  And

12   then I'll do the order on that because that's the first

13   question.

14        And then when that order comes out, then maybe the parties

15   with Mr. Cooper can work out, you know, a briefing schedule on

16   the scope of the waiver and then include Mr. Levandowski's

17   attorneys in that as well.  Because I imagine that they --

18   well, they do need to be heard on that since it involves --

19        **MR. VERHOEVEN:**  Your Honor, so just so we don't have

20   to brief it, I would -- I'm assuming you will treat this issue

21   the same as your prior order yesterday.

22        We have 15 business days until the cutoff.  If this

23   process doesn't get completed, if there's another appeal to the

24   Federal Circuit that, notwithstanding the cutoff, we would be

25   entitled to take the discovery if it's affirmed or if -- if the

1   end result is that there's a waiver of documents to be

2   produced --

3           **THE COURT:**  Yeah.  So that's Judge Alsup discovery

4   cutoff.  So I can't purport to do anything with that.  So I

5   work as fast as I can.  I'm working with the parties in that

6   way.

7       I would be surprised, because something was up on appeal

8   and if it ultimately was affirmed, that you wouldn't get the

9   discovery.  For example, if the Federal Circuit rules after

10  August 24th, which is quite possible, I would be surprised if

11  the discovery cutoff is gone.  But it's not my problem.

12          **MR. VERHOEVEN:**  Got it.

13          **THE COURT:**  All right.  Thank you.

14          **MR. VERHOEVEN:**  Thank you, Your Honor.

15      (At 10:00 a.m. the proceedings were adjourned.)

16                      -  -  -  -

17              **CERTIFICATE OF REPORTER**

18      I certify that the foregoing is a correct transcript

19  from the record of proceedings in the above-entitled matter.

20  DATE:   Wednesday, August 9, 2017

21

22                  *Katherine Sullivan*

23

24  _____

25      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter