Pages 1 - 90

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

WAYMO, LLC,                        )
                                   )
          Plaintiff,               )
                                   )
  VS.                              )    No. C 17-00939 WHA
                                   )
UBER TECHNOLOGIES, INC.,           )
et al.,                            )
                                   )
          Defendants.              )
_____)    San Francisco, California
                                    Wednesday, August 16, 2017

          <u>TRANSCRIPT OF UNSEALED PORTION OF PROCEEDINGS</u>

APPEARANCES:

For Plaintiff:
                    QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                    50 California Street
                    22nd Floor
                    San Francisco, California  94111
               BY:  CHARLES K. VERHOEVEN, ESQ.
                    JORDAN R. JAFFE, ESQ.
                    MELISSA J. BAILY, ESQ.
                    JAMES D. JUDAH, ESQ.


For Defendants Uber Technologies, Inc., Ottomotto LLC, and Otto
Trucking LLC:
                    MORRISON & FOERSTER, LLP
                    425 Market Street
                    San Francisco, California  94105
               BY:  ARTURO J. GONZÁLEZ, ESQ.
                    ESTHER KIM CHANG, ESQ.


Reported By:  BELLE BALL, CSR 8785, CRR, RDR
              Official Reporter, U.S. District Court

(Appearances continued, next page)

APPEARANCES, CONTINUED:

For Defendants Uber and Ottomotto:
                          BOIES SCHILLER FLEXNER LLP
                          1401 New York Avenue NW
                          Washington, D.C.  20005
                BY:  KAREN L. DUNN, ESQ.

                          BOIES SCHILLER FLEXNER LLP
                          435 Tasso Street
                          Suite 205
                          Palo Alto, California  94301
                BY:  MEREDITH R. DEARBORN, ESQ.


For Defendant Otto Trucking LLC:
                          GOODWIN PROCTER LLP
                          135 Commonwealth Drive
                          Menlo Park, California  94025
                BY:  I. NEEL CHATTERJEE, ESQ.


For Non-Party Stroz Friedberg:
                          LATHAM & WATKINS LLP
                          505 Montgomery Street
                          Suite 2000
                          San Francisco, California  94111-6538
                BY:  MELANIE M. BLUNSCHI, ESQ.


Also Present:             NICOLE T. BARTOW, ESQ.
                          Uber Director II, Litigation
                          CHRISTINA SEKI
                          JOHN L. COOPER, SPECIAL MASTER

```
 1  Wednesday, August 16, 2017                        8:00 a.m.

 2                     UNSEALED PROCEEDINGS

 3      THE CLERK:  Calling Civil Action 17-939 WHA, it's Waymo LLC

 4  versus Uber Technologies Inc., et al.  It's on for motions.

 5      Counsel, can you please come forward, state your appearances

 6  for the record.

 7      MR. VERHOEVEN:  Good morning, Your Honor.  Charles Verhoeven

 8  on behalf of Waymo.  And with me are my colleagues James Judah,

 9  Jordan Jaffe and Melissa Baily.

10      THE COURT:  Great.  Welcome to you.

11      MR. GONZÁLEZ:  Good morning, Your Honor.  Arturo González

12  from Morrison & Foerster.  Also, Esther Chang and Michelle Yang.

13      THE COURT:  Welcome.

14      MS. DUNN:  Good morning, Your Honor.  Karen Dunn for from

15  Boies Schiller Flexner for Uber and Ottomotto.  And with me is

16  Meredith Dearborn.

17      THE COURT:  Welcome.

18      MR. CHATTERJEE:  Good morning, Your Honor, Neel Chatterjee

19  of the Goodwin Procter law firm for Otto Trucking.  And I'm

20  flying solo.

21      THE COURT:  Thank you.

22      MS. BLUNSCHI:  Good morning, Your Honor.  Melanie Blunschi

23  from Latham & Watkins, on behalf of non-party Stroz Friedberg.

24      THE COURT:  Thank you.

25      MR. COOPER:  Good morning, Your Honor.  John Cooper, special
```

1    master.

2        **THE COURT:**  Good morning.  Welcome to everybody, again.

3        So, we've got several motions here.  The one that deals with

4    the trade secrets and knocking out all the trade secrets, we'll

5    do that last because I suspect we'll have to close the

6    courtroom.  We have other business we'll take up first.

7        There is a series of orders to show cause.  And then there's

8    a motion to strike damages.  So we will deal with the order to

9    show cause first.

10       Okay.  Let's start.

11       **MR. VERHOEVEN:**  Good morning, Your Honor.  Charles Verhoeven

12   on behalf of Waymo.

13       There are a number of submissions, Your Honor, that have

14   been made in connection with our motion.  The Court issued a OSC

15   to Morrison & Foerster, to Stroz.

16       I want to deal with all those in one argument, unless the

17   Court wants me to separate those out.

18       **THE COURT:**  Let's start that way.  Although I do have some

19   specific questions, I can propound those in due course.  Go

20   ahead.

21       **MR. VERHOEVEN:**  Okay.  So first I want to address Uber and

22   Morrison & Foerster's obligations and our contention that they

23   are in contempt for violating two of the Court's orders.

24       It is undisputed here that -- I'm going to refer to Morrison

25   & Foerster as "MoFo" just for the sake of brevity.

1          It's undisputed here that MoFo is Uber's agent.  And that

2      under Rule 65 of the Federal Rules of Civil Procedure, it's

3      clear that injunctive orders against a party apply to that

4      party's agents.  The facts here show that MoFo has violated each

5      of these two court orders.

6          Initially, and as Your Honor knows, the order dated March 16

7      ordered production of documents, all documents -- all of the

8      downloaded documents, which -- I'll just use the shorthand, the

9      Levandowski-downloaded documents, and documents related thereto,

10     by March 31.

11         And the Court's May  preliminary injunction order ordered

12     the same documents to be produced immediately.

13         MoFo has represented to this Court repeatedly that it did

14     not have or that Uber didn't have any of the downloaded

15     documents.  Over and over, they represented that to the Court.

16         On June 2, we had a meet-and-confer testing that and probing

17     that in front of the special master.  And at that June 2

18     meet-and-confer, Uber's counsel confirmed that Morrison &

19     Foerster, in addition to the Uber, did not have any downloaded

20     documents.  We sent them a letter confirming that on June 2.

21         On June 5, Ms. Kim of MoFo submitted a declaration in

22     opposition to this motion, stating, quote:

23              "MoFo does not have any downloaded materials or

24              copies of experts or summaries thereof except to the

25              extent that any such material may appear excerpted or

1              as an exhibit to the Stroz report, which is explained

2              above as listed in our logs."

3      However, we learned on June 12th, from the Boies firm, from

4   an email sending certain, quote, caveats and clarifications to

5   the representation, that MoFo is now taking the position that in

6   addition to the statement by Ms. Kim, they had documents -- they

7   don't have documents, quote (As read):

8              "...except to the extent that such material may

9              appear in certain materials Levandowski and other

10             persons provided to Stroz, to which MoFo was given

11             limited access during the Stroz investigation."

12     So now we're learning a little bit more.

13     **THE COURT:**  Help me understand how that differed from the

14   statement about:  Had no documents, except as per Stroz report.

15     **MR. VERHOEVEN:**  I'll read you the whole quote.  Quote --

16   this is from the email sent from the Boies firm on June 2nd.

17   And it is Paragraph No. 2.

18     Quote (As read):

19             "MoFo does not have any downloaded materials or any

20             copies, excerpts or summaries thereof, except to the

21             extent that any such material may appear, 1,

22             excerpted in or as an exhibit to the Stroz report..."

23     That is what they previous referenced.

24             "... and 2, in certain materials Levandowski and

25             other persons provided to Stroz, to which MoFo was

1              given limited access during the Stroz investigation."

2         And it goes on.

3         So, not only did they have the report and exhibits, but

4    they're saying they have additional materials that was given to

5    them.

6         Then, Your Honor -- and these are more important facts -- on

7    June 28th -- so the order of March 16th ordered downloaded

8    materials.  The May 11th preliminary injunction order, immediate

9    production of downloaded material.

10        On June 28th, much later, Uber revealed for the first time

11   that its litigation support vendor, a company called Epiq, had

12   received a complete copy of the forensic images of Levandowski's

13   devices.

14        So Stroz imaged Levandowski's devices, and on March 22,

15   2016, sent to MoFo's and Uber's litigation vendor a complete

16   copy of those forensic images.

17        **THE COURT:**  What was the name of that vendor?

18        **MR. VERHOEVEN:**  Epiq, E-P-I-Q.  And I can read you the

19   quote, if you want.

20        **THE COURT:**  What are you reading from?

21        **MR. VERHOEVEN:**  I'm reading from the Docket 762,

22   supplemental accounting provided in response to the preliminary

23   injunction order, at Paragraph 4, and Pages 6 through 7.

24        Shall I read it?

25        **THE COURT:**  Please.  But what was the date of that, the

1    report?

2          MR. VERHOEVEN:   The date of the report?

3          THE COURT:   The June report that you are reading from.

4          MR. VERHOEVEN:   Yes.   That was June 28th, I believe.   I have

5    a copy, if Your Honor would like it.

6          THE COURT:   I -- maybe, in a minute.   But just go ahead.

7          MR. VERHOEVEN:   Okay.

8          THE COURT:   I want you to read it exactly.

9          MR. VERHOEVEN:   Quote -- this is from Paragraph 4, 6 through

10   7, quote:

11               "Stroz Friedberg received Anthony Levandowski's

12               devices from Anthony Levandowski and imaged them on

13               March 22, 2016, as part of the due diligence project.

14               Stroz retained all personal devices except for

15               Mr. Levandowski's phone.   Stroz made and retained two

16               copies of the forensic image.   User-generated content

17               was extracted and processed into a Relativity server

18               for review, and the remaining content was evaluated

19               by Stroz Friedberg's forensic teams.   Two copies of

20               the Relativity data were created:   one was sent to

21               John Gardner as counsel for Mr. Levandowski and the

22               other was sent to Epiq at the request of Morrison &

23               Foerster in its capacity as counsel for

24               Mr. Levandowski in the *Google versus Levandowski and*

25               *Ron* arbitrations and is currently being stored at

1        Epiq."

2        So we learned on June 28th, for the very first time, that

3    MoFo's litigation vendor and Uber's litigation vendor, both

4    agents of Uber, had a complete copy of the forensic image from

5    all of Levandowski's devices, Your Honor.  We have been trying

6    to get these documents since the very outset of this case.  We

7    still don't have them.

8        So this is an admission by Uber --

9        **THE COURT:**  Wait.  I want you to continue on, but explain

10   how the issue in the Federal Circuit on -- that we've already

11   decided here, and that is something on appeal, about the

12   privilege, how that ties in to what Epiq was holding in its

13   hands.

14       **MR. VERHOEVEN:**  So there's two appeals.  One's on the

15   arbitration.  The other one is on the diligence report and the

16   Stroz subpoena.

17       And as Your Honor knows, both the Magistrate Judge and

18   Your Honor ordered -- compelled production of the documents

19   related to the diligence report, and the diligence report,

20   itself.

21       Mr. Levandowski took an appeal, and the Federal Circuit

22   ordered expedited discovery and stayed -- continued the stay

23   Your Honor put in place on the effective -- effectiveness of

24   those orders.

25       There was a hearing last Friday before the Federal Circuit

1    that I argued.  And so we're hoping to get a ruling at any -- at

2    any point in time.  But --

3        **THE COURT:**  So let's say that the Federal Circuit affirms,

4    in all respects.  What will then happen with those Epiq

5    documents?

6        **MR. VERHOEVEN:**  Well, first, first let me say this,

7    Your Honor.

8        This all -- this -- this privilege argument that's going to

9    up to the Federal Circuit is irrelevant.  Because what we're

10   asking for is the Google documents that Mr. Levandowski took.

11   And Uber and MoFo have never taken the position that those

12   documents are protected by any privilege.

13       So the privilege issues go to the report, because they say

14   the report is work product that was created.  And that's what's

15   going up.  But the underlying documents that Mr. Levandowski

16   gave to Stroz that are Google documents, that MoFo, Uber have

17   never taken the position that those documents, themselves, are

18   privileged.  Nor could they.

19       So my first point, Your Honor, is they -- this privilege --

20   you know, any privilege argument doesn't cover what we're --

21   what the subject of this motion is, which is the Google

22   documents.

23       **THE COURT:**  Okay.  Wait.  I want you to -- if you go through

24   everything, and then I give the other side a chance to talk,

25   we'll never get back to the details.

1      **MR. VERHOEVEN:**  Okay.

2      **THE COURT:**  So you just stand right there.

3      I would like for somebody to answer this point about Epiq.

4      **MR. GONZÁLEZ:**  So Your Honor, the answer to your question is

5      that if the Federal Circuit affirms your ruling, they will get

6      the documents that are at Epiq.

7      The documents that are at Stroz should be identical.  It's

8      basically an image of what Stroz had that was given to Epiq for

9      purposes of litigation.  They're a litigation vendor.

10     And the appeal will -- in fact, I should tell you this.

11     We've already started to confer, which I think the Court will

12     appreciate, about:  What are we going to do if the Federal

13     Circuit affirms?  Because it's not just going to be a huge dump.

14     There is some private information in there from Mr. Levandowski,

15     photos of the kids, et cetera.

16     And so, how are we going to go through all of this

17     information?  We've already started those discussions.

18     But the answer to your question is:  The Federal Circuit's

19     ruling will make this moot.  And counsel is wrong when he says

20     there is no privilege at stake.  Absolutely, there is.  That is

21     the whole point of the appeal.

22     Uber, to be clear -- I want this to be real clear -- Uber

23     did not appeal Your Honor's ruling.  Mr. Levandowski did.  Under

24     the Fifth Amendment.  That's what was argued in the Federal

25     Circuit.  And it's not, Your Honor, just the Stroz report.

1      Mr. Levandowski's -- the subpoena that was served on Stroz

2   is for all of their documents.  And so that's what was argued in

3   the Federal Circuit.  Not just the Stroz report, but everything

4   Stroz has.

5      And there's been a Fifth Amendment assertion by

6   Mr. Levandowski, who, by the way, Your Honor knows is our former

7   client.  And so we're not in any position to give that stuff up.

8   Just -- neither is Stroz, and neither is Epiq.

9      But when the Federal Circuit rules, we have already started

10   to confer.  They will have everything they have been wanting to

11   see.

12      **THE COURT:**  Now, to be clear, the way you pitched that --

13   let's say there is an affirmance.  Even if it's a copy, the Epiq

14   materials are going to be turned over in addition to whatever

15   Stroz and MoFo have, even if they are duplicates.

16      Correct?

17      **MR. GONZÁLEZ:**  Yes.  The criteria that we agreed to mutually

18   for reviewing this information will be applied to that, as well.

19      **THE COURT:**  But I don't want you to take the position that:

20   Well, these must be duplicates, and therefore you don't have to

21   produce the Epiq things.  I promise you, I have lived too long.

22   I've heard that argument, and there's always some mismatch.

23      So it would have to be you turn over the Epiq materials

24   minus whatever you two have agreed on; you turn over the Stroz

25   materials minus whatever you have agreed on; and you turn over

 1    the MoFo materials minus whatever you have agreed on.  And you

 2    do all three.  You don't -- you don't think and indulge in the

 3    fallacious assumption that they might be identical.  Even though

 4    they might be.

 5        **MR. GONZÁLEZ:**  I agree with that, Your Honor.  Additionally,

 6    I want to make this note for the record:  That we no longer

 7    control Epiq because we are no longer counsel in the

 8    arbitration.

 9        But I will certainly communicate to Mr. Levandowski's

10    counsel in the arbitration that that is your view, so that we

11    can make sure that we apply the criteria to all the documents,

12    including Epiq's.

13        **THE COURT:**  Well, do you have -- well, at the time of these

14    orders, Epiq was your agent.  Right?

15        **MR. GONZÁLEZ:**  Your Honor, I'm not trying to be cute, but

16    I'm not recalling at this point exactly when we substituted out

17    of the arbitration.  It was within that time period.

18        But this is not going to be an issue, Your Honor.  This is

19    not going to be an issue.  We will apply the criteria to Epiq's

20    documents.

21        **THE COURT:**  Okay.  Just stand right there.

22        Now, what's wrong with what I just heard, Mr. Verhoeven?

23        **MR. VERHOEVEN:**  First, Your Honor, Mr. González may say this

24    is attorney argument, but in fact, in the briefings, all the way

25    up to the Federal Circuit, the defendants have never taken the

1    position that the actual documents, the Google documents, the

2    stolen documents, are covered by any privilege.

3        **THE COURT:**  Well, that's not the same thing as disavowing a

4    privilege.  What do you mean?

5        Have they ever conceded that they weren't privileged?

6        **MR. VERHOEVEN:**  They've been ordered to produce those

7    documents, Your Honor.  And they have not.  That's our point.

8    And they haven't claimed privilege on those exact documents.

9        And, and, you know, Your Honor asked in the OSC to MoFo, to,

10   quote:

11               "Explain what controlling authority allows someone to

12               knowingly receive and keep suspected stolen property,

13               despite a demand or order that it be returned to its

14               rightful owner."

15       And Stroz's response to that is, quote:

16               "Stroz has been unable to identify any controlling

17               authority addressing the issues raised in the order

18               to show cause under the facts presented in this

19               case."

20       MoFo's response to that was to fail to show any such

21   controlling authority.  And they made some other arguments that

22   didn't answer Your Honor's question.

23       Clearly, if you're an attorney, and you're aware that you

24   possess or your agent possesses stolen documents, it's your duty

25   to produce those stolen documents, even without a court order.

1          For example, the California Penal Code, Section 496(a),

2     quote:

3                    "Every person who buys or receives any property that

4                    has been stolen..."

5          And then it goes on:

6                    "...or withholds..."

7          And then it goes on:

8                    "... any property from the owner shall be punished by

9                    imprisonment."

10         I mean, everybody should know this.  It is in the ethical

11    rules for lawyers.  If you are aware that you have stolen

12    material, you need to disclose it.  You need to produce it.

13         And we have been asking since the outset of this case for

14    them to produce these stolen documents.  We have been asking:

15    Do you have them?  You need to produce them.

16         I sent a letter to Mr. Jacobs right at the start of the

17    case, specifically asking about just the documents, and saying:

18    You need to produce those because you don't have a right to keep

19    stolen property.  And I asked him specific questions about that.

20    Never even got a response, Your Honor.

21         So, this is what we're complaining about.  And we have been

22    severely prejudiced, because we still don't know the story,

23    because these documents have been withheld, even though they

24    don't claim privilege over them, and even though the Court has

25    repeatedly ordered that they produce the stolen documents.

Otherwise known as "the downloaded materials," Your Honor.

From the very first order in this case that you issued on March 16th, you ordered that the defendants produce the downloaded materials.  And they've had them as of that time, and have not produced them, all the way up to today, Your Honor.

**THE COURT:**  But, why -- why does -- Mr. González made the point that in the Federal Circuit, there's a pending issue of privilege.  So let's take it one step at a time.

As to the documents in MoFo's immediate possession and Stroz's possession -- by "privilege," I mean Fifth-Amendment privilege -- that once that -- if that goes against you, then what's the answer?

If the Federal Circuit holds that those are privileged under the Fifth Amendment and need not be produced, what do you do with that ruling?

**MR. VERHOEVEN:**  Well, I go back and point out to the Court that no privilege has been asserted over the stolen documents.

And the Fifth Amendment is like a footnote that -- that Levandowski urges on the Court.  It was already ruled on by Your Honor.  It already went up on mandamus; it was rejected.

You remember the privilege log identity issue?

**THE COURT:**  Yes, and maybe they're going to affirm.  But let's say they disagree with the judge, and they say:  No, the Fifth Amendment does apply.

What are we going to do then?

1      **MR. VERHOEVEN:**   The Fifth Amendment -- Your Honor, the Fifth

2   Amendment doesn't apply to entities like MoFo over which

3   Levandowski has no control.   It's black --

4      **THE COURT:**   But if the Federal Circuit says it does --

5      **MR. GONZÁLEZ:**   You have addressed the --

6      **MR. VERHOEVEN:**   Theoretically, Your Honor, the Federal

7   Circuit could say that Google's stolen documents are privileged.

8   But they are not going to.   And --

9      **THE COURT:**   Well, I'm so glad that you are confident.

10      **MR. VERHOEVEN:**   Well, I am confident.   Because that's the

11   law.

12      **THE COURT:**   Oh, I -- I think you're right, but I -- I don't

13   know.

14      What were you about to say, Mr. González?

15      **MR. GONZÁLEZ:**   Your Honor, you have already addressed the

16   question of what happens if the Federal Circuit says they are

17   privileged.

18      The answer is that under *Hubbell* and *Fisher*, it would be

19   inappropriate for the lawyer to give up information that the

20   lawyer received from the client for the purpose of representing

21   the client.

22      **THE COURT:**   Well, maybe.   Now, why -- why did you ever

23   identify and assert privilege over the Epiq documents?   How did

24   we get into that mess?

25      **MR. GONZÁLEZ:**   Your Honor, Epiq did not receive the

1    documents until after the arbitration was filed.  Epiq is just a

2    vendor.  It's like -- we're both using vendors right now in this

3    litigation to help us with documents.  Epiq was going to play

4    that role in the arbitration.  That is the only reason they

5    received the information.

6        THE COURT:  Yeah, but why didn't you identify those up

7    front, and then claim privilege over them?

8        Mr. Verhoeven's point is you have waived it by not

9    identifying them and claiming privilege, and you let it slip by

10   until way late in the game.

11       MR. GONZÁLEZ:  So, Your Honor, the documents that we have

12   identified already, this is not a secret.  This is the Stroz

13   information that we've been fighting about from the outset.

14       THE COURT:  But now, now you're going over the -- indulging

15   the assumption that they're the identical documents.

16       MR. GONZÁLEZ:  Counsel, himself, just said, Your Honor, they

17   made two images.

18       THE COURT:  I don't know.  I don't know if they did or not

19   Until you see it and I see it, we don't know that's true.

20   Probably different, in my view.  In some minor ways, they're

21   different.

22       MR. VERHOEVEN:  Your Honor, there's another disclosure in

23   addition to this one that we just learned about, that I think

24   the Court should also know about when ruling on this.

25       And that is -- so the last disclosure was June 28th.  Then

on July 12th, Uber admitted for the first time that MoFo, the

firm -- not Epiq -- MoFo possesses a copy of the downloaded

materials that Stroz sent to it in March 17th.

    This is admitted by MoFo's attorney, Eric Tate, in

Paragraph 6 of MoFo's response to Your Honor's order to show

cause.

    So the very first time they disclosed this was on the due

date of their reply to Your Honor's order to show cause.

**THE COURT:**  Wait a minute.  You're talking, you're saying

that in addition to the Epiq, --

**MR. VERHOEVEN:**  Yes.

**THE COURT:**  -- Eric Tate at MoFo has documents too.

**MR. VERHOEVEN:**  I'll read from his declaration, Your Honor.

**THE COURT:**  Read it to me out loud.

**MR. VERHOEVEN:**  Quote (As read):

      "As part of our representation of Mr. Levandowski in

      those arbitration matters, Mr. Levandowski authorized

      Stroz to release the materials in his possession to

      our firm, to provide them with counsel, and to

      respond to discovery obligations.  In March, 2017, we

      received some materials from Stroz (not all of them),

      and began review of these materials before

      Mr. Levandowski retained separate counsel."

    And I will tell you I looked at the dates there, and this

declaration doesn't specify when in March.  I think that's

 1   notable.  It just says they received them in March.  But MoFo

 2   withdrew from representation in the arbitration on April 25.

 3        So this review that he admits was going on at MoFo of the

 4   downloaded documents was conducted, at least by their own

 5   admission, for over a month.  At the start of this litigation.

 6        There's no excuse for them not telling us about these

 7   documents, if they had them.  They were reviewing them.

 8        This was something that was intentionally withheld,

 9   Your Honor.  Even though there was no claim that the Google

10   documents, themselves, were subject to any sort of privilege.

11        **THE COURT:**  What do you say to that?

12        **MR. GONZÁLEZ:**  So, Your Honor, with respect to that, it's

13   similar to the information about the consultant.  We're talking

14   now about documents that MoFo received during the course of the

15   litigation.

16        Our focus in responding to your order was to try to find

17   everybody who may have had any information about these documents

18   during the entire due diligence period.

19        Remember the issue is substantial compliance.  We

20   interviewed more than 200 people, Your Honor, in order to come

21   up with information that was responsive.

22        What he's talking about right now, to be clear, he says we

23   have the downloaded material and that we reviewed the stuff for

24   a month.  Wrong.  We do not have the downloaded material.  We

25   have some information from Stroz.  We did not review it for a

month.

One associate, Your Honor, one associate reviewed some of this information for a few hours, one day.  And I don't mind telling you that I pulled the plug on that when it became clear that there was a conflict developing, and that Mr. Levandowski was going to have to get separate counsel.  That's all that happened.

During the litigation --

**THE COURT:**  What happened to those documents?

**MR. GONZÁLEZ:**  They're still at MoFo.  They are still at MoFo, Your Honor.

**THE COURT:**  How big a set is that?

**MR. GONZÁLEZ:**  Your Honor, it's -- it's a fraction of what is at Stroz that we started to review.  And I need to be careful on that; I don't want anybody to argue that I'm waiving something here.  There's been a lot of allegations about waiver here.

**THE COURT:**  There's not a waiver.  It won't be a waiver to describe the volume that MoFo has.

**MR. GONZÁLEZ:**  Your Honor, we have tens of thousands of documents.  But I don't even want to use the word "documents" because even that is not accurate.

**THE COURT:**  Tens of thousands of documents that came from Levandowski, that came from Google?

**MR. GONZÁLEZ:**  No.  That's the point, Your Honor.  That's

1   the point.  This is information from Mr. Levandowski that went

2   to Stroz.

3       To be clear, this is what I think the Court maybe doesn't

4   understand.  And he just read it into the record, so I want to

5   repeat it.

6       What happened, Your Honor, is that Stroz took all of

7   Mr. Levandowski's devices, even devices that were very old, and

8   put it all into a vault.  And the only thing he got back was his

9   phone.

10      And this is why I said to you the first day I walked in here

11  that I was confident that this stuff is not at Uber because we

12  vaulted it all.

13      We have a sliver of that information, Your Honor.  And I

14  don't want to get into too many specifics because they'll argue

15  waiver.  And we got that during the course of this litigation.

16      **THE COURT:**  Well, how are you going to get it in front of

17  the jury if you don't want to --

18      **MR. GONZÁLEZ:**  Oh --

19      **THE COURT:**  You're just trying to hide in the weeds.

20      **MR. GONZÁLEZ:**  No.  No, no, no.  Let's be clear, Your Honor.

21      **THE COURT:**  Save it for the jury --

22      **MR. GONZÁLEZ:**  No, no.

23      **THE COURT:**  If you're going to use it at all, you ought to

24  tell me now.

25      **MR. GONZÁLEZ:**  No.  The information that we have, we don't

plan to use at all, is information that we received while we
represented Mr. Levandowski in the arbitration.  And the only
reason we are withholding it, Your Honor, is because -- the same
reason we've already discussed.  Mr. Levandowski has informed us
in writing that he's asserting his rights which you've
acknowledged that he has under *Hubbell* and *Fisher*.

And we've already made it clear that as soon as the Federal
Circuit rules, this information will be reviewed pursuant to
whatever protocol we agree to, and it will be produced.

But to be clear, we're talking about Mr. Levandowski's
information that he gave us when we were his lawyers in the
arbitration to represent him.  And he is the person who is
objecting to their production.

And you probably don't need to hear from him, Your Honor,
but I brought the general counsel from our firm to make that
point, if need be.

**MR. VERHOEVEN:**  May I respond, Your Honor?

**THE COURT:**  Sure.

**MR. VERHOEVEN:**  First of all, what we're -- we have
repeatedly asked specifically for the Google documents.  Not all
the Stroz documents -- we've asked for that, too.  But, the
Google documents that Mr. Levandowski has.  We've said:  Do you
have it?  Do you have it?  And they've refused to even answer
the question.

And when they did answer the question, all the way up until

June, they said they didn't have it.  They said MoFo didn't have

it.  That was false.  And that's not a Fifth Amendment issue.

That is not protected by the Fifth Amendment, whether or not

MoFo has the Google stolen documents.

They did, and they didn't tell us, intentionally, until they

were forced to.  When we finally battered them down after, you

know, a dozen motions, and then they had to respond to the

preliminary injunction order, they finally admitted it.  And

then, in response to Your Honor's order to show cause, they did

it some more.

This stuff, they had a duty to disclose under Your Honor's

March 16th order, and they did not do that.  They didn't even

identify whether they had any.

So --

**THE COURT:**  So let's say there's -- what would -- what good

would holding somebody in contempt do?

**MR. VERHOEVEN:**  Well, first of all, we were prejudiced

because we didn't know anything about this for the preliminary

injunction order.  They remained completely silent, and did not

disclose to the Court that they had Google's stolen documents,

in response to our preliminary injunction motion.

We first learned about it late in the discovery period.  On

the -- for example, on the July 28th -- I think that was the

date -- disclosure, we were talking about 20 days until the

discovery cutoff.  We can't even serve document requests.  It's

1    too late for that.

2         I mean, there's some severe prejudice to Waymo from their

3    gamesmanship of hiding behind --

4         **THE COURT:**  But, but if the Federal Circuit affirms, then I

5    understand Mr. González to say that any and all of the

6    downloaded documents will be turned over by MoFo, Epiq, Stroz,

7    and without question, they will be turned over.  You don't have

8    to have another document request.

9         Am I right about that?

10        **MR. GONZÁLEZ:**  Yes.  We made that clear.

11        **THE COURT:**  So what --

12        **MR. VERHOEVEN:**  They have represented that they will produce

13   things, and have not produced them, repeatedly in this case

14   Your Honor, number one.

15        Number two, next week is the last week until the discovery

16   cutoff.

17        **THE COURT:**  Well, okay, but I also said that if any new

18   documents get produced, you get to go back and depose -- within

19   reason, you get to get back and depose everyone in sight, and do

20   it all over again, because it was their fault.  They wrongly hid

21   behind some privilege.  And you get to go and redepose people on

22   those documents.  Even though it's after the cutoff.

23        **MR. VERHOEVEN:**  So say there's -- I think 20 percent of

24   their privilege log is implicated.  Their privilege log is 3,500

25   items.  As well as the Stroz production, as well as the

1    documents that were hidden by the Morrison & Foerster firm.

2    That's going to be thousands and thousands of documents.  We're

3    going to have to do probably a dozen depositions.

4         **THE COURT:**  Good.

5         **MR. VERHOEVEN:**  We've got an October trial date, Your Honor.

6    And that gets in peril.  We'll have to make a Hobson's choice:

7    Do we keep the trial date?  Or do we pursue this discovery that

8    was withheld, under significant prejudice to us, in this

9    gamesmanship of not even telling us about these documents?

10        And by the way, the identity of the people holding the

11   stolen documents went up to the Federal Circuit.  That was the

12   idea about the privilege log where Levandowski was saying he

13   shouldn't even have to identify Stroz.  The person who had the

14   documents.

15        And Your Honor said:  Yes, you do.  And it went up on the

16   Federal Circuit.  And the Federal Circuit rejected that,

17   already.

18        So the notion that they didn't have an obligation to

19   disclose that Morrison & Foerster had the downloaded documents,

20   that Stroz had the downloaded documents --

21        **THE COURT:**  Okay.  One possibility -- I'm not ruling this

22   yet.  But one possibility that I found in other cases is

23   efficacious for the good of the system is -- I am concerned that

24   Mr. González failed to disclose that he had the documents.  And

25   it took a long time to come clean.  Maybe he can get on the

1   stand and explain it away.

2       But I am inclined -- but I won't rule that yet -- to tell

3   the jury exactly this scenario.  That he was ordered to come

4   clean, did not come clean.  Ordered to come clean again, did not

5   come clean.  And finally, in June and July, comes clean.

6       These big firms, these big companies, they -- I can't

7   regulate everything, but I can do this.  I can tell the jury

8   what they're up against, what we're up against in this -- this

9   -- where people hide the ball.

10      I don't know if Mr. González -- I know Mr. González.  He is

11  an honorable guy.  Maybe his firm did this; maybe Uber did it.

12  I don't know.

13      But I'm inclined to let the jury know what happened here.

14  And they can take this into account in evaluating the bona fides

15  of both sides here.

16      **MR. VERHOEVEN:**  Your Honor, that would be --

17      **THE COURT:**  I'm not saying I'm going to do that yet, but

18  that's the relief that I think is more likely to do some good

19  than just saying somebody's in contempt.

20      **MR. VERHOEVEN:**  Your Honor, that would be acceptable to

21  Waymo.

22      **THE COURT:**  What's wrong with that, Mr. Gonzalez?

23      **MR. GONZÁLEZ:**  Well, Your Honor, I've just been standing

24  here listening.  And now you've bought into a completely false

25  premise.

1      **THE COURT:**  No --

2      **MR. GONZÁLEZ:**  No, no.

3      **THE COURT:**  It's true that you misled the Court.

4      **MR. GONZÁLEZ:**  No, Your Honor --

5      **THE COURT:**  You misled the judge time and time again.  And

6  it wasn't until I sent out that order directly to MoFo that you

7  came clean.  That's true.

8      **MR. GONZÁLEZ:**  Your Honor, the notion that Morrison &

9  Foerster has the stolen documents or ever had the stolen

10  documents is completely baseless.

11     You, right now, believe in your heart that we've got this

12  vault of the 14,000 documents.  Now, I am limited in what I can

13  tell you, by Mr. Levandowski's assertion of *Hubbell* and *Fisher*.

14     But here's what I want you to know:  There will never be a

15  day, never, no matter what the Federal Circuit rules, when

16  anybody proves that MoFo was hiding, or for that matter, that

17  Uber was hiding the 14,000 documents.

18     This is much ado about nothing --

19      **THE COURT:**  You had something.  You, yourself, came clean

20  and said you had something.

21      **MR. GONZÁLEZ:**  Sure, we have something that came from all of

22  these devices that Mr. Levandowski has had for probably more

23  than a decade.

24      **THE COURT:**  And that fact was hidden from the judge, despite

25  many inquiries.

1    **MR. GONZÁLEZ:**  Well, Your Honor, we're talking about

2    information that we received during the course of this

3    litigation.  There is no reason for us to hide that.  We're not

4    trying to -- this is not gamesmanship.  This is -- this is a

5    small sliver.

6    **THE COURT:**  You will be a good witness.  You'll be right up

7    there explaining to the jury this story.

8    **MR. GONZÁLEZ:**  Your Honor --

9    **THE COURT:**  And then Mr. Verhoeven will get to cross-examine

10   you, and show that the judge ordered you to come clean, and you

11   didn't.

12   What are you going to say?  You going to give me that --

13   give the jury that kind of a speech?

14   **MR. GONZÁLEZ:**  Oh no, Your Honor.  When the Federal Circuit

15   makes a ruling, there's a whole lot that Uber's been dying to

16   say that we'll say.  And it will be very clear:  There's no

17   "there" there.

18   **THE COURT:**  So the scales are going to fall from our eyes

19   and -- but it does seem to me that you were ordered twice, once

20   in March and once at a later date, to produce the downloaded

21   materials in your possession, and if they had been destroyed, to

22   explain it.

23   Silence from MoFo and Uber, until we get to the month of

24   June.  And then, then it starts to dribble out that you, in

25   fact, had copies of what had come from -- from Mr. Levandowski.

1      So, I have a feeling that Mr. Verhoeven is going to be able

2   to show -- maybe not, but he's going to be able to show that

3   some of those files are the same ones that were downloaded, and

4   that certainly they came from Google.  And that the first time

5   that I learned about that was in June.

6      And on a case -- so, so, yeah, you could get on the stand,

7   and put your assistants on the stand, and explain to the jury

8   how come that wasn't revealed until much later.

9      But, I'm not ruling this yet.  I'm just saying that's the

10  way I'm inclined.  And I think it's best to wait until the

11  Federal Circuit rules, and maybe we'll see what these documents

12  are.

13     And, you know, conceivably, Mr. González is going to -- it's

14  going to look -- it's going to be amazing.  We're going to find

15  out maybe that what he's been trying to hide from us is not the

16  downloaded documents.  He's been trying to hide something else.

17  And so that this will all be moot.

18     **MR. GONZÁLEZ:**  And it's not even, Your Honor, a matter of

19  hiding anything.  Two things -- two things, Your Honor, that you

20  need to know.

21     Number one, this trial is going to be against Uber.  Uber,

22  to be clear, didn't even know that MoFo had these documents

23  until the day before we filed that declaration.  Uber didn't

24  even know.  Because again, Your Honor, you have got to put this

25  in context.  We received some documents during the arbitration,

1    way back in March.  One associate spends a few hours reviewing

2    them, and then I pull the plug.

3        And by the way, I've stated, but I want to say it again,

4    because I heard you again say Your Honor, "downloaded

5    materials."  When the light shines, the Federal Circuit rules,

6    and we're no longer concerned about being sued for something,

7    now we can disclose the fact those downloaded materials are not

8    at MoFo.  All I'm going to say.

9        The downloaded materials are not at MoFo, and Uber never

10   even knew we had these documents.  So we're jumping way far

11   afield.

12       **THE COURT:**  Well, what documents did you -- I know from the

13   record that MoFo, back when the deal was being done, reviewed

14   something.

15       **MR. GONZÁLEZ:**  Yes.

16       **THE COURT:**  And the something came from Levandowski.

17       **MR. GONZÁLEZ:**  Yes.

18       **THE COURT:**  And there's strong suggestions that they were

19   Google documents.

20       **MR. GONZÁLEZ:**  So, Your Honor, that is the Stroz report and

21   the Stroz exhibits that we've already discussed many, many

22   times.

23       I've said it before, but I need to say it again:  When you

24   ruled that that information should be disclosed, Uber did not

25   appeal that ruling.

1          So Uber stands ready to produce that information.  And they

2     have been ready for a long time, because at the end of the day,

3     Uber believes strongly that that information is going to help

4     us.

5          **MR. VERHOEVEN:**  May I respond, Your Honor, briefly?

6          **THE COURT:**  Yes, but we've got to move on.

7          **MR. VERHOEVEN:**  Yes.

8          **THE COURT:**  You --

9          **MR. VERHOEVEN:**  So, very briefly, this is a complete

10    violation of the sword and shield doctrine.  Counsel is

11    representing what these documents say, while at the same time

12    withholding them as privileged, Your Honor.  That's totally

13    inappropriate argument.  If you're going to make representations

14    about these documents, then produce them.  But they've withheld

15    them.

16         And the Court shouldn't even consider arguments about what

17    they say, because they have been's withheld, and considering it

18    would be a violation of the sword and shield doctrine.

19         Second, we're not just talking about the Stroz report and

20    exhibits.  What I read to you shows, by their own admission,

21    their own documents, and their own declarations, that they have

22    an image of the forensic -- a forensic image of all of

23    Levandowski's devices, his personal devices.  They have a copy

24    in a database called "Relativity database."  And they can use a

25    client Relativity viewer to look at all of those documents.

1          Today, someone at MoFo can goon to the Relativity

2     application that Epiq has for them, and search the forensic

3     images of Levandowski's files.  So they -- and that's been the

4     case since the outset of this litigation, Your Honor.

5          And so the representation that they're not hiding something,

6     MoFo didn't fail to disclose something important, is without

7     merit.

8          **THE COURT:**  Here's one thing that would be useful to me.

9     After the hearing, I would like for Waymo to write out a

10    proposed jury instruction that would say in non-argumentative

11    terms what happened on this whole sequence in chronological

12    order, so that we can begin the process of considering whether

13    to give such an instruction to the jury.  And then give that to

14    the other side.

15         And in due course, the judge is going to decide whether to

16    give some instruction along those lines.  I have not decided

17    that yet.  But that does seem to be the most likely, if any,

18    relief.  I have not decided that yet.

19         I would like for whoever it is that represents Stroz to come

20    forward, please.  I have a related question.  And, please state

21    your name again.

22         **MS. BLUNSCHI:**  Good morning, Your Honor.  Melanie Blunschi

23    on behalf of Stroz.

24         **THE COURT:**  Going by my list here -- oh, yes, you say

25    Melanie?

1    **MS. BLUNSCHI:**  That's me yes.  We recently substituted.

2    **THE COURT:**  Blunschi, Blunschi?

3    **MS. BLUNSCHI:**  Yeah.

4    **THE COURT:**  Okay.  All right.  Here's my question:  If the

5    Federal Circuit affirms, is Stroz going to turn over any and

6    everything that it received from Levandowski and that it has in

7    its possession?

8    Or are you going to further litigate over some contractual

9    duty that you've referenced in your paperwork?

10   So, I want to -- your paperwork is not clear.  I understand

11   that you're relying on privilege, the Fifth Amendment thing.

12   But let's assume for the sake of argument that the Federal

13   Circuit affirms in total.  So tell me what your position is

14   going to be then.

15   **MS. BLUNSCHI:**  If the Federal Circuit affirms, Stroz will

16   produce all of the materials that were provided to it in the

17   course of the due-diligence investigation.  As well as other

18   responsive materials to the subpoena.

19   We have been working with the special master and the parties

20   and the intervenors to figure out the best protocol for handing

21   over such a large volume of material.

22   But, we are not going to further litigate any contractual

23   obligations.

24   **THE COURT:**  All right.  That helps me understand that.

25   Thank you.  All right.  That's all, the only question I had for

 1    you.

 2        **MS. BLUNSCHI:**  All right.  Anything further on the OSC to us

 3    this morning?

 4        **THE COURT:**  Nothing further now.  But please don't go away.

 5    Stay for the rest of the hearing.

 6        **MS. BLUNSCHI:**  Absolutely.

 7        **THE COURT:**  Okay.  Thank you.

 8        Now, let's -- there's a piece of this OSC that I want to

 9    make sure I have in mind.  That is the destruction of five

10    disks, and the disclosure of that.

11        So tell me your -- you summarize that position.

12        **MR. VERHOEVEN:**  Sure.  There's two -- there's two things

13    that were withheld regarding the destruction of documents.

14    First, the destruction of five disks that contained Google

15    material.

16        But secondly, a March 29 deposition admission and August 4th

17    declaration admission that Uber, including Uber's CEO and senior

18    vice-president and the in-house counsel responsible for this

19    case were made aware in March that Mr. Levandowski allegedly

20    destroyed -- allegedly admitted that he downloaded materials,

21    but then represented that he destroyed them.  So that's the

22    second, a second piece of the puzzle.  So let me go in more

23    detail.

24        The Court's order stated -- and I'll just summarize, I won't

25    take the time to read it -- the defendant needed to report any

destruction of downloaded materials by March 31st.  The Court's

very first order on March 16th.  Nothing was reported.  Zero.

It wasn't until June 8th, in an interrogatory response, that

Uber belatedly disclosed the destruction of five disks.

And I would like to read into the record the disclosure, if

that's okay, Your Honor.

**THE COURT:**  Sure.

**MR. VERHOEVEN:**  Quote (As read):

"On or about March 11, 2016, Mr. Levandowski reported

to Mr. Kalanick, Nita Key (Phonetic) and Cameron

Poetzsher at Uber, as well as Lior Ron, that he had

identified five disks in his possession containing

Google information.  Mr. Kalanick conveyed to

Mr. Levandowski in response that Mr. Levandowski

should not bring any Google information into Uber,

and that Uber did not want any Google information.

Shortly thereafter, Mr. Levandowski communicated to

Uber that he had destroyed the disks.  Uber never

used those disks, and does not know whether those

disks contained any of the downloaded material."

That is the entirety of their response on that.

**THE COURT:**  And the date was what, of that answer?

**MR. VERHOEVEN:**  This is June 8, 2017.  This was due

March 31st.  We're on an expedited discovery schedule.

This information would have been very, very useful in the

1    preliminary-injunction hearing; it would have been useful for us

2    in document requests and targeting our discovery.  We didn't get

3    it.

4        THE COURT:  Which part of that would have been useful to

5    you?

6        MR. VERHOEVEN:  Well, to talk to these people about it, to

7    -- in the preliminary injunction, we could have taken expedited

8    discovery.  Mr. Kalanick, who received this information on

9    March 11, 2016, was then the CEO of Uber.  So -- and

10   Mr. Poetzsher was senior vice-president.

11       And Ms. Padilla -- I need to tell you that -- well, she

12   wasn't in this one, she was in the second one.  But those two --

13   you know, Mr. Poetzsher testified at deposition he was very

14   concerned about this.  This was not something that was

15   inadvertently left out.  They claim it was inadvertent.

16       But if you match up the dates, Your Honor, it's a real

17   interesting coincidence that this information came out after

18   they fired Mr. Levandowski.  After they had cut ties, they

19   decided to disclose this information which was previously

20   withheld as privileged, Your Honor.

21       And you said the word this morning, asking about where that

22   was disclosed in the privilege log.

23       Right?

24       THE COURT:  Yeah, I want to come back to that.

25       MR. VERHOEVEN:  Yeah.  But they previously said it's

1    privileged.  Levandowski gets fired, and all of a sudden they

2    don't care about him anymore, and they disclosed this

3    information, and also disclosed another conversation that he had

4    which I'll get into.

5         THE COURT:  Wait.  Somebody come answer the -- I was trying

6    to figure this out.  And I'd like to see in the privilege log

7    where it is that you had revealed some item of privilege that

8    supposedly put anybody on notice of this conversation.

9         MR. GONZÁLEZ:  So, so, Your Honor, I have the log.  There

10   isn't anything in the log, in fact, about this specific

11   conversation.  There are log entries of communications between

12   legal counsel.

13        THE COURT:  But your paperwork -- can I see the order that I

14   signed?

15        Your paperwork made it sound like you had made some error,

16   and that it was never privileged to begin with, and you realized

17   that eventually, but that no harm was done because your

18   privilege log had basically disclosed, I thought you said,

19   this -- this conversation.

20        But --

21        MR. GONZÁLEZ:  No, it doesn't disclose the conversation,

22   Your Honor.  The privilege log doesn't get into the substance of

23   what the communication is about.

24        I could just --

25        THE COURT:  Can my law clerk bring up to me -- I think there

1    was something misleading in your response.  I'd like to see it

2    again.  Where they say that the privilege log put people on

3    notice.

4          (Request complied with by the law clerk)

5          **THE COURT:**  All right.  So what you said in your brief was

6    that the privilege log -- that Uber logged documents discussing

7    the five disks, and their destruction.

8          All right, so that's what I want you to show me.

9          **MR. VERHOEVEN:**  Correct.  So there are documents that

10   discuss that information on our privilege log.  The privilege

11   log does not contain the substance of the communication, because

12   that would ultimately be a waiver.  Especially the way they're

13   reading waiver here.

14         What we are saying there to Your Honor is:  We're not trying

15   to hide anything.  In fact, there were communications between

16   counsel, and those are logged.  And they are.

17         **THE COURT:**  Can I see the document -- my law clerk, bring to

18   me the document where Mr. González -- it will be Document 806 at

19   Page 3.  I want to see how it came up in the brief.

20         (Request complied with by the law clerk)

21         **THE COURT:**  Right.  Okay, so here is what you say.  This is

22   Page 7 of 23, but down at the bottom for some reason it says 3.

23   I don't understand that.  But, all right.

24              "Third, Waymo claims Uber willfully failed to

25              disclose Mr. Levandowski's destruction of five discs

1          of Google material in March, 2016, which Uber

2          disclosed in its interrogatory response on June 5,

3          2017.  Waymo says that Uber should be held in

4          contempt for not disclosing this information on

5          March 31, 2017 in response to this Court's order

6          dated March 16, 2017.  That does not support a

7          contempt finding in light of Uber's substantial

8          efforts and good-faith undertaking to comply with

9          that Order and lack of willfulness in making the late

10         disclosure of the fact (which is helpful to Uber)."

11    And here is the key sentence:

12         "Uber logged documents discussing the five discs and

13         their destruction on its privilege log and then

14         provided information about the five discs after

15         realizing it could do so in a non-privileged form.

16         Uber regrets not recognizing that it was possible to

17         present non-privileged evidence about this

18         destruction earlier, but that oversight is not a

19         basis for contempt."

20    Et cetera, et cetera.

21    So what I had thought you were trying to say here is that

22 somehow you put people on notice there had been a destruction of

23 the five disks, if somebody had carefully read the privilege

24 log.

25    **MR. GONZÁLEZ:**  No.

1     **THE COURT:**  But now what I hear you saying -- so this is a

2     meaningless point.  This is a -- in no way did you put Waymo on

3     notice about the five disks and their destruction, through

4     anything having to do with the privilege log.

5     **MR. GONZÁLEZ:**  We don't contend that, Your Honor.  Our only

6     point is that we logged information that discussed the items.

7     And we made that point so that you could see that we're not

8     trying to hide anything.  We had some privileged communications,

9     and we logged those.

10    And Your Honor, it was --

11    **THE COURT:**  Well, why didn't you disclose, as you were

12    ordered to, that you -- you knew good and well that the five

13    disks existed, and they had been destroyed, and I had ordered

14    you to make -- to say so.  And, and that's not privileged

15    information.

16    So what could have possibly possessed a good lawyer like you

17    to think that you could claim privilege over that information?

18    **MR. GONZÁLEZ:**  So, Your Honor, there are a substantial

19    number of very complicated privilege issues in this case.  And

20    as you know, one of the privilege issues that we have been

21    discussing with the Magistrate and that she has upheld is the

22    joint interest -- joint defense privilege regarding

23    communications involving the due-diligence process.

24    We ultimately determined -- we ultimately determined that

25    that communication is likely not privileged, and that's why we

1   disclosed it in the interrogatory response.

2       I don't mind telling you, again, it's easy four months later

3   to say:  Why didn't you give them this one little piece of

4   information?  It's important, Your Honor, to keep in mind and

5   remember what we did do.

6       We interviewed more than 200 people.  We went to 280 --

7   280 -- different computers to try to get information about the

8   downloaded material.  That was always our focus, Your Honor, is

9   trying to find out:  Is this downloaded information over at

10  Uber?  And it isn't.

11      Now, again, these are not easy calls on privilege when

12  you're talking about a joint interest privilege and discussions

13  that took place right in the middle of the due -- diligence

14  period.

15      In fact, if Mr. Levandowski's lawyers were standing here

16  today, they would probably argue to you that it is privileged,

17  and that it shouldn't have been disclosed.  Which is exactly

18  what they're arguing now in front of the Magistrate on the other

19  issue they raised.

20      **THE COURT:**  Well, then, why did you disclose it later?

21      **MR. GONZÁLEZ:**  Because, Your Honor, we're looking at these

22  issues, trying to decide in good faith what is privileged, what

23  isn't.

24      And ultimately, we decided, as you just said, although it's

25  not quite as easy a call, that, you know what, this conversation

1    between these four individuals that did not involve a lawyer is

2    probably not privileged, and we should disclose it.

3        And we did, two months ago.  And they've now taken the

4    deposition of every single person in that conversation.

5        **THE COURT:**  But how could -- there was no one who was a

6    lawyer in that -- he reported to your CEO -- Levandowski

7    reported to your CEO that he had the five disks, and had

8    destroyed them, and no lawyer was in that communication.

9        Right?

10       **MR. GONZÁLEZ:**  That's correct.

11       **THE COURT:**  Then how could you have even thought for a

12   second that that was privileged?

13       **MR. GONZÁLEZ:**  Because, Your Honor, under the joint-interest

14   privilege, it's not necessary that a lawyer be present for every

15   discussion in order for the joint-interest privilege to apply.

16   And that's what makes it a challenge in this case.

17       It's not an easy thing to do, Your Honor.  It's a minefield.

18   And we're trying to walk through it in good faith.  And when we

19   find facts that we believe are not privileged, we disclose them.

20       **THE COURT:**  But you know this minefield of the joint defense

21   thing was just a gimmick.  This was an ordinary acquisition

22   transaction.

23       **MR. GONZÁLEZ:**  Your Honor, Magistrate --

24       **THE COURT:**  Wait a minute.  I want to say something here --

25       **MR. GONZÁLEZ:**  Yeah.

1      **THE COURT:**  -- that I think I've said before, but it's been

2   on my mind.

3      I have never seen a corporate acquisition, Company A

4   acquires Company B, and the lawyers get involved and say:  Well,

5   we don't want the world to know what's really going on here, so

6   let's claim that this is some kind of a joint defense against

7   Waymo.  So we will claim...

8      So that's -- you -- this was a mess of your own making.  I'm

9   not saying you, personally, but somebody there made a -- created

10   this minefield.  If you hadn't had that joint defense thing, you

11   would have turned that over without -- and I don't even think --

12      **MR. GONZÁLEZ:**  Your Honor --

13      **THE COURT:**  Look, what this also leads to is the same thing

14   that Judge Corley got onto your case about -- Ms. Dunn about.

15      This selective decision-making, you're now going back

16   through the records and saying:  Oh, we need that, we need that

17   conversation.  Oh, that's not privileged anymore, let's not

18   claim privilege, that's not privileged.

19      And yet, you've claimed privilege on 35,000 documents -- or

20   3,500 documents.  And now you're going back through trying to

21   figure out:  Oh, my God, we made a mistake; we've got to have

22   that for trial.

23      And, and you decided on balance it helps you, not hurts you.

24      I see right through it.  You're not fooling me for a second.

25   I know what's going on.  So this falls in that category.  This

```
 1    falls in that category.  Somebody decided after the fact:  Oh,
 2    we need that conversation.  Oh, we're going to disclose it now.
 3         That's the way it looks.  That's how slick it looks.
 4         MR. GONZÁLEZ:  Your Honor --
 5         THE COURT:  You should add this into your proposed jury
 6    instruction, on this order to disclose, they didn't disclose.
 7    Put that in there, that it came out after the fact.  And whether
 8    we're going use it or not, I don't know.  But I -- it concerns
 9    me that we have this going on here.
10         All right, I need to move on.  We've spent an hour on this.
11    We've got to go on to other -- we have many motions today.
12         So, next motion deals with damages.  Who is going to argue
13    this?
14         MS. DUNN:  I am, Your Honor.
15         (Reporter interruption)
16         MS. DUNN:  Dunn, D-U-N-N.
17         THE COURT:  Oh, wait a minute.  Wait.
18         MS. DUNN:  Oh.
19         THE COURT:  Mr. Chatterjee rose, and I want to just say
20    something, Mr. Chatterjee.
21         You -- you, under the order, were supposed to go to
22    everybody in your company, and make a complete log of every
23    communication with Mr. Levandowski on the subject of LiDAR.
24         Did you do that?
25         MR. CHATTERJEE:  We went to everyone, and asked them.  The
```

```
1    one person that did not give us a response was Anthony
2    Levandowski, and he asserted his Fifth-Amendment rights.
3        But there are four members of the LLC.  They're not
4    employees, but they are members.  We went to all four.  We
5    interviewed them.  We submitted the disclosure.  And
6    Mr. Levandowski asserted his Fifth-Amendment rights, and didn't
7    provide an answer.
8        THE COURT:  But as to the other three, they were supposed to
9    tell you about their conversations with Levandowski, emails,
10   verbal, and everything.  And you're telling me you did do that.
11       MR. CHATTERJEE:  We did do that, Your Honor.
12       THE COURT:  The other side said you did not do that.
13       MR. CHATTERJEE:  We did; we submitted the disclosure,
14   Your Honor, to the Court.  And it was fairly cursory, because
15   none of them had talked to him about LiDAR issues.
16       THE COURT:  What?  None of them had talked to Levandowski
17   about LiDAR?
18       MR. CHATTERJEE:  They had not.  And I can give you the
19   reasons why, Your Honor.
20       THE COURT:  Yeah, I would like to know that.  That is hard
21   to believe, too.
22       Go ahead.
23       MR. CHATTERJEE:  One of them is Adam Bentley, who is the
24   legal counsel.  And he was the person that was facilitating the
25   transaction.
```

1          The second person was Lior Ron, who primarily had a business

2     role.

3          The last one is Rhian Morgan, who was really in charge of

4     hiring people and helping -- and they're actually Uber

5     employees.

6          **THE COURT:**  Did Mr. Verhoeven get that disclosure list?

7          **MR. CHATTERJEE:**  Yes, Your Honor.  We submitted it to them;

8     we submitted it to the court.

9          **THE COURT:**  Okay.  Mr. Verhoeven, I had understood your

10    paperwork to say that they had done zero.  But now my -- do I

11    stand corrected that he did do it, and it's just a short

12    document?

13         **MR. VERHOEVEN:**  Your Honor, my colleague, Mr. Judah, has

14    been allocated the OT issues, so I'll allow him to answer your

15    question if that's okay.

16         **THE COURT:**  Fine.  I just really need a yes or no.  Did you

17    get that document, or not?

18         **MR. JUDAH:**  Well, we got a five-line response with respect

19    to the LiDAR log that said there's no evidence in the record

20    that they ever interviewed Mr. Ron about any of the LiDAR

21    communications.

22         **THE COURT:**  He just told me that he did.

23         **MR. JUDAH:**  There's a five-line --

24         **THE COURT:**  Can I see the five-line thing?  It will be

25    easier if you let me look at it.

1          MR. JUDAH:  Yes, Your Honor.  One moment; let me just find

2     it.

3          (A pause in the proceedings)

4          MR. CHATTERJEE:  Your Honor, the disclosure is Docket Entry

5     714.  I am happy to read it.

6          THE COURT:  Read it to me verbatim.

7          MR. CHATTERJEE:  Okay, this is on Docket Entry 714.  This is

8     romanette (III), under "DEFENDANTS' DETAILED ACCOUNTING":

9               "Mr. Ron, Ms. Morgan, and Mr. Bentley are employees

10              of Uber Technologies, and as such all three of them

11              have been interviewed for Defendants' detailed

12              accounting."

13         So we are incorporating that --

14         THE COURT:  That's no good.  Come on, don't do that to me.

15    They wear two hats.  I want them interviewed on both hats.

16         MR. CHATTERJEE:  Right.  So let me read you what was said in

17    addition:

18              "Consequently, their information is included in the

19              accounting filed by Uber."

20         And then we also added:

21              "Ms. Morgan has not seen or heard of the contents of

22              the downloaded materials.  Mr. Ron also has not seen

23              or heard any part of the downloaded materials."

24         THE COURT:  That wasn't what I asked you to do.  You were

25    supposed to go to your people, and interview them, and make a

1   log of every single conversation or communication they had had

2   with Levandowski on the subject of LiDAR.  You didn't do that.

3        **MR. CHATTERJEE:**  Let me read romanette (iv) for you,

4   Your Honor.  This is the detailed log of Mr. Levandowski's

5   communications regarding LiDAR:

6             "Ms. Morgan has never discussed LiDAR with

7             Mr. Levandowski.  Mr. Ron is not involved in the

8             development..."

9        **THE COURT:**  "Discussed" is not good enough.  Did she get an

10  email?

11       **MR. CHATTERJEE:**  She has not.  If you want us to amend this

12  and add that, we can do that.

13       **THE COURT:**  You know, I have learned -- so, this is so full

14  of weasel words.  "Discussed" is not good enough.  It's got to

15  cover everything that I had said in the order.  Somebody may

16  have had the emails, but they didn't discuss.

17       You know, some people on TV said "We had no meetings.  Well,

18  okay.  Maybe they didn't have meetings, but maybe they had

19  communications.  I am -- you can't slide these weasel words by

20  me.

21       I'm going to give you until Friday at noon to file something

22  that is in full conformance with the Court's order.  And that

23  means you have got to go to those people, and interview them,

24  and look at their emails, look at their text messages, look at

25  their voicemails, look at their -- interview them again, see if

1    they have got anything in writing, any notes, whether they

2    remember any conversations.

3        And if it had anything to do with LiDAR, wearing their hat

4    as an OT person, then they have to -- it's got to go on that

5    log.

6        Now, I'm assuming that, wearing that Uber hat, that it was

7    done right.

8        **MR. CHATTERJEE:**  Your Honor, we did not mean to be putting

9    weasel words in.  When we were saying "has never discussed," we

10   did mean in writing or otherwise.  But if you want us to flesh

11   that out, we'll do that.

12       **THE COURT:**  I want you to do that.  I don't want it left to

13   some verbal transcript.  It should have been done right the

14   first time.  So you go back and do it by Friday.

15       And, and listen:  It better be right, because if it turns

16   out there was some conversation -- I know how it'll come out.

17   The way it's going to come out is at trial, you're going to be

18   desperate to use some conversation that's not on your log.

19       **MR. CHATTERJEE:**  We will not, Your Honor.

20       **THE COURT:**  Oh, yes, you will.  That's just what happened to

21   Mr. González.  He's desperate to use conversations that he

22   claimed privilege on.  You're going to be in the same boat.  And

23   then you'll have this disclosure where you say nothing like that

24   ever occurred.

25       **MR. CHATTERJEE:**  Your Honor, Otto Trucking does not develop

1    LiDAR technologies.  Never has.

2       **THE COURT:**  Doesn't matter.  If they had conversations -- I

3    promise you, they had conversations about it.  There's too much

4    money involved.

5       By Friday at noon, you've got to update it, and make sure

6    it's right.

7       **MR. CHATTERJEE:**  We'll do that.  Yes, thank you.

8       **MR. JUDAH:**  Your Honor, can I briefly respond?

9       **THE COURT:**  No.  What do you need?  I've ordered him to do

10   something.

11      **MR. JUDAH:**  I was going to point out that the representation

12   that Ms. Morgan has never discussed LiDAR or received an email

13   from Anthony Levandowski about LiDAR is patently false.

14      **THE COURT:**  Give me an example.

15      **MR. JUDAH:**  Well, Uber prepared over 1,000 entries of

16   Mr. Levandowski's discussions about LiDAR (Indicating).

17   Ms. Rhian Morgan, for example, received an email -- this is

18   entry No. 95 on Uber's log.  On March 6, 2016, author Anthony

19   Levandowski, recipient Rhian Morgan --

20      **THE COURT:**  Well, if it's already on that log, I'm not

21   demanding that it be done again.  I'm worried that that log is

22   the Uber log.  And I'm -- but that they have somehow hidden in

23   the weeds on the OT log.  I want there to be both hats covered.

24   The OT hat and the Uber hat.

25      **MR. JUDAH:**  I understand that, Your Honor.  I'm just saying

1    this accounting says Ms. Morgan has never discussed LiDAR with

2    Mr. Levandowski.  That's not true.

3        **THE COURT:**  Well, all right.  What do you say to that?

4        **MR. CHATTERJEE:**  Your Honor, as I understood what we are

5    doing here, we incorporated by reference the log.  And what we

6    were talking about is in her capacity as an OT member.

7        **THE COURT:**  Well, all right.  But next time, wouldn't it be

8    better to say -- to incorporate the Uber log?  Except as

9    provided in the Uber log, she's never had any conversations?  If

10   that's true -- I'm not saying that's true.  In fact, I suspect

11   that's not true.  But I think you ought to verify that.  And

12   I'll give you until Friday at noon to do it right.

13       **MR. CHATTERJEE:**  We will do that, Your Honor.

14       **THE COURT:**  Thank you very much.

15       All right, Ms. Dunn, let's go back to you.  We'll get

16   started on the motion on damages.

17       **MS. DUNN:**  Thank you, Your Honor.

18       **THE COURT:**  Stay at a high level first, and tell me at a

19   high level what the problem is, and then we'll get into the

20   details.

21       **MS. DUNN:**  At a very high level, Your Honor, the problem is

22   that Rule 26 requires that a party provide computation of each

23   category of damages claimed, first, and then second, to make

24   available for inspection and copying the documents or other

25   evidentiary material on which each computation is based.

1          The Court's June 7th case management order specifically

2     cited this damages section of Rule 26, in ordering that the

3     plaintiffs provide both that computation for each category, and

4     to make available for inspection and copying the documents on

5     which they rely.

6          Your Honor has written an opinion called *Brandywine*.   And

7     *Brandywine* takes this rule incredibly seriously.   So *Brandywine*,

8     as Your Honor undoubtedly knows, does not require the plaintiffs

9     to disclose things that they don't know.   But it certainly

10    requires initial computation and disclosure of the evidence that

11    will be relied upon to the full extent that the plaintiff should

12    know it.   And if the plaintiff doesn't have that information,

13    they're supposed to be specific about that.

14         *Brandywine* says essentially:   Plaintiff, do the best you

15    have, and disclose something.

16         In this case, the plaintiffs have disclosed absolutely

17    nothing.   Their disclosure has no computation of each category

18    of damages claimed.   Not a single document is identified, much

19    less made available to us.

20         And there is no identification, specific or otherwise, of

21    what they could not get.   There are two brief paragraphs which,

22    like a law school textbook, just say catchphrases like "unjust

23    enrichment" and "lost profits" and "reasonable royalty."

24         That's four months after they filed the suit at a time when,

25    under Rule 11, they have to have a good-faith basis for even

1  claiming damages in this case.

2      And then, to make matters worse, they had several times to

3  amend.  The date was extended from the original date.  This was

4  one of the first times that you and I had a conversation, where

5  I asked you if you would extend the date for initial disclosures

6  to June 21st.  And you granted that.  And you said:  But if

7  you're going to supplement, you're going to have throw yourself

8  on the mercy of this Court.

9      The only amended disclosures to date that have been filed by

10  Waymo were filed the day after June 21st, on June 22nd.  And

11  that was to disclose 14 late-disclosed witnesses.  Not to fix

12  the damages problem in their original disclosures.

13      We are 55 days to trial, which is heart-stopping to probably

14  everyone in this courtroom.  Uber does not have second amended

15  complaint calculations, the basis for them, the theories, the

16  methodology, or any documents identified that they're

17  specifically going to rely on.  And this includes things that

18  are in their own control.  They have preserved every angle of

19  their own flexibility.

20      And so the question at this point is what to do about it.

21  And Your Honor has already said what the remedy would be.  So

22  does Rule 37.  It says that they must be precluded from

23  presenting their damages case.

24      And here, they haven't just violated Rule 26; they've

25  violated the Court's own order and the Court's own previous

1    decision in this court.

2        So, fact discovery is nearly over.  We have been unable to

3    ask financial witnesses from Waymo, including their -- the CEO,

4    the head of marketing, the head of business ops, any questions

5    that would have come from knowing what their documents are or

6    what their theories are.

7        Expert discovery is two weeks long.  So, they had seven

8    months to do this.  Seven months to develop their damages case.

9    And we are going to have two weeks, with no initial disclosures

10   from them.

11       And so they're going to come up here, I anticipate, and

12   they're going to blame us for this.  And they are going to say:

13   Well, we didn't have things from Uber.

14       But what's required under Rule 26, under the Court's order

15   and under *Brandywine* is you disclose in your initial disclosures

16   what you do know.  And Your Honor has said:  You can't -- can't

17   just disclose things later in interrogatories, and dump

18   documents on the party.

19       This is a disclosure issue, not a discovery issue.  So in

20   case they come up here and say:  Well, we disclosed a bunch of

21   stuff in the interrogatories, that is not sufficient to cure the

22   problem.

23       And also, by the way, even despite trickling out vague

24   information and theories in their interrogatories, we still, to

25   this day, don't have the two things mandated under Rule, 26 and

under *Brandywine*, and under this Court's order.

So I know a lot of times lawyers come up here and we say: We're prejudiced, we're prejudiced.  We are prejudiced.  I mean, this is severe prejudice on something that they could be claiming billions of dollars on.  We don't even know this.

So, you know, Waymo has intimated itself in its briefing. This is not a money case for Google, for Waymo.  This is -- they want an injunction.  And it may be time to just face up to the fact that they want an injunction.  Because either they are purposely withholding from us what we need to prepare, what we need to depose their witnesses, what we need to respond to expert reports, or they don't have a damages case at all. Because it's an entirely non-commercialized market.  And Judge Corley has recognized it's very speculative.

So, they've put forward basically nothing for us to work with.  It's already a speculative question, what damages could even be.  And now we're speculating on top of speculation, and headed into expert discovery, which is just going to be completely, completely prejudicial to Uber.

So I know we're the defendant.  I know we're the defendant. And so, there's -- you know, and we have a lot of --

**THE COURT:**  What is wrong with that?  What do you mean?

**MS. DUNN:**  Nothing.  We love being the defendant.

**THE COURT:**  But you say:  We know we're a defendant.

**MS. DUNN:**  The plaintiffs have the information here.  The

1   plaintiffs have the information here.  And they, they push for

2   this expedited schedule.  This is what they wanted.  They got

3   it.  And they are taking --

4       **THE COURT:**  You agreed to it.

5       **MS. DUNN:**  -- advantage.  They are taking --

6       **THE COURT:**  You agreed to it.  Both of you agreed to the

7   same trial date.  Right?

8       **MS. DUNN:**  Your Honor, we also agreed to abide by Rule 26.

9       **THE COURT:**  Yeah.

10      **MS. DUNN:**  And they have seven months, and we have two

11  weeks.  In an incredibly, as they say, incredibly -- they

12  present -- they said -- their excuse for not putting this in the

13  disclosures originally was:  It's complicated.

14      Well, first of all, damages in an ordinary case are

15  complicated.  And damages in this case, when you're concocting

16  some theory no one's even heard of for a non-commercialized

17  market, are going to be incredibly complicated.  We have two

18  weeks to deal with that.

19      But the point is, Your Honor, the rules have already laid

20  out what is supposed to happen here.  And so we're not asking

21  for anything extraordinary.  We're just saying:  Enforce the

22  order.

23      **THE COURT:**  All right.  I've got to give my court reporter a

24  chance to rest her fingers.  So we will take a 15-minute break,

25  and we will resume right there.  And we will hear from the other

1    side when we come back.

2        (Recess taken from 9:18 a.m. to 9:41 p.m.)

3        **THE CLERK:**  Please come to order.  Court's now in session,

4    Honorable William Alsup presiding.

5        **THE COURT:**  Welcome, again.  Please be seated.  Let's go

6    back to work, and hear from Ms. Baily.

7        **MS. BAILY:**  Thank Your Honor.

8        So before the break, we heard defendants say that they

9    essentially have no information about our damages allegations.

10   And they haven't had an opportunity to ask our witnesses about

11   damages-related information.  That is not true.

12       Before defendants took a single deposition of a Waymo

13   businessperson, they had a 24-page narrative related to damages

14   theories, unjust enrichment and reasonable royalty -- two

15   damages theories.  Reasonable royalty, unjust enrichment.

16       They had most, if not all, of the documents that Waymo has

17   that are relevant to those theories.  They had historical cost

18   information.  They had forward-looking P&Ls.  They had strategy

19   documents that were shared with Alphabet executives.  They had

20   the business plan of record.  They had all of this before they

21   took a single deposition of a Waymo businessperson.  They have

22   had this information for more than a month, so it was a little

23   bit of a misleading picture that was painted here.

24       **THE COURT:**  Have I seen that document?  What is that

25   document, that 24-page narrative?

1      **MS. BAILY:**  That I can give you --

2      **MR. VERHOEVEN:**  If you are talking about your Rule 26

3  disclosure, I do have that.

4      **MS. BAILY:**  This was an interrogatory response on damages.

5  That was provided more than a month ago.

6      **THE COURT:**  Let me ask my law clerk, do we have that?

7      **THE LAW CLERK:**  (Inaudible)

8      **THE COURT:**  She says no.  So somebody ought to hand that up

9  to me.

10     **MS. BAILY:**  Sure.  I can give you the document number as

11  well.  It is Docket No. 933-3, it's Exhibit 6.

12     Would you like me to hand up the copy that I have?

13     **THE COURT:**  Yeah, that would be good.

14     **MS. BAILY:**  It might have some of my notes on it, so -- just

15  don't --

16     **THE COURT:**  Does it say something like:  This theory is no

17  good?

18     **MS. BAILY:**  It says:  This theory is awesome.

19     (Document handed up to the Court)

20     **THE COURT:**  Just because there are a lot of young people out

21  there, you know, let me just say, you start off by saying

22  "Plaintiff's objections and responses."  You know, your

23  inclination is go with objections first.

24     It really should be the other way.  You should be giving the

25  image that you're responding.  Ought to say "Plaintiff's

1    responses and objections."  Put it in reverse order, so it makes

2    it looks like you're doing something other than just objecting.

3           **MS. BAILY:**  That's a good point.

4           **THE COURT:**  All right.  What do I want to look at?

5           **MS. BAILY:**  Well, sorry, I don't have it in front of me, but

6    I believe most of that is actually our response to a contention

7    'rog on damages.  And it does set forth the two theories that

8    we're planning to put forward.  The unjust-enrichment theory and

9    the reasonable royalty theory.  It does cite documents.

10          It does provide some amount of detail, based on the

11   information that Waymo has that are inputs to those types of

12   damages theories.

13          **THE COURT:**  Give me those again.  Unjust enrichment and

14   what?

15          **MS. BAILY:**  And reasonable royalty.

16          **THE COURT:**  Where can I find the reasonable royalty part?

17          **MS. BAILY:**  So there should be two bolded headings in the

18   response.  Of course, the objections come first.  Maybe they

19   should come after the response.

20          But the response has -- should have a bolded heading, if I

21   recall correctly.  The first one is "Unjust Enrichment" and

22   that's several pages.  And then we move on to reasonable

23   royalty.

24          **THE COURT:**  Having not seen this before, I can't find where

25   the reasonable -- what page numbers do I look for?

1          **MS. BAILY:**  I apologize, I handed up my copy.  I'm sorry,

2     Your Honor.

3          **THE COURT:**  Do you know, Ms. Dunn?

4          **MS. BAILY:**  If you don't have notes on yours and you want me

5     to look, I can.

6          **MS. DUNN:**  I have some notes.

7          **MS. BAILY:**  If you want me to take a quick look at your

8     copy, Your Honor, I might be able to just give you the page

9     number.

10          **THE COURT:**  I do see where it says:  Damages for

11     infringement of Patent 936.  Is that what you're talking about?

12          **MS. DUNN:**  Your Honor, on Page 14.

13          **MS. BAILY:**  There should be multiple sections.  We deal with

14     the trade secrets first.  And we put forward an unjust

15     enrichment and reasonable royalty theory for the trade secrets.

16     And then we moved --

17          **THE COURT:**  I see, all right, "Reasonable Royalty."

18          **MS. BAILY:**  And then we move on to the patent at the back.

19          So we have our unjust-enrichment theory, and then we have a

20     reasonable royalty theory.  The trade secret statutes provide

21     for both an unjust-enrichment theory and a reasonable royalty

22     theory.  They also provide for lost profits.  But we're not

23     asserting lost profits as a stand-alone theory in the case.

24          And I do think, because of the nature of the theories we do

25     incorporate our analysis under unjust enrichment, some of those

1   factors would also come into play with a reasonable royalty.  We

2   do not repeat those.

3        **THE COURT:**  I'm going to need to see this document, but how

4   do I get my hands on a copy of this?  Is this in the court file

5   somewhere?

6        **MS. BAILY:**  It is in the record.  I'll tell you, the

7   document number is 933-3.

8        **THE COURT:**  All right.  I'm going to hand your copy back.

9        (Document handed down)

10       **THE COURT:**  At least I know what you're talking about.

11       **MS. BAILY:**  So I do want to make the point that -- that this

12  was served again before any depositions of our business people.

13  And so defendants had it.  And they've asked questions about the

14  subject matter that was disclosed in interrogatory response.

15       And again, they also had -- you know, documents are cited in

16  this interrogatory response.  Again, before they took a single

17  deposition of a Waymo businessperson, they had the documents

18  that Waymo has that are important to these kinds of analyses.

19  The P&L going forward, historical costs broken down, to the

20  extent that we have historical costs that are broken down in as

21  much detail as we can provide, going backwards.  Our future

22  estimates of revenues, profits, cash flows; our business plan of

23  record; our strategy documents; this was all produced and

24  provided.  And a lot of it was referenced in our response before

25  depositions went forward of Waymo's business people.

1     The problem is that Waymo's information, alone, is obviously

2  not sufficient for us to develop the full-fledged damages

3  models.  This is somewhat of an unusual case.  It does relate to

4  a nascent market.  We need to understand Uber's side of the

5  ledger -- what information do they have, how robust is it, what

6  was their business record, and business plan before and after

7  the Otto acquisition, et cetera.

8     And when did we get that information from Uber?  We got it

9  yesterday.  We had to go to the special master seven times to

10  get any information produced to us related to these damages

11  theories.  We got it yesterday.  We have nine days now with it.

12     So, we have already been through all of these depositions.

13  We have another week and a half only remaining in fact

14  discovery.  We have expert reports due on the 24th, and we got

15  Uber's side of the ledger yesterday.  So we have nine days to

16  take that into account, and to use it as we need to do, as

17  inputs to these models.

18     We can't do a complete computation and a complete analysis

19  without that information.  We got it yesterday.  They've had our

20  information for more than a month.  We got theirs yesterday.  We

21  have nine days with it now before our expert reports are due.

22     So when you look at the situation globally, the prejudice is

23  actually lying here with us.  Not with defendants.

24     So, again, we provided our information early in the case,

25  before the relevant depositions.  They have had every

opportunity.  We have not.  Defendants fought us every step of the way.

It was previewed, right?  They knew I would get up here and say that, because it's true.  They say:  You have to wait to serve your damages discovery.  Then they said:  Actually, no, you shouldn't be able to serve any damages discovery.

We had to go to Special Cooper on that.

Then we finally are able to serve our damages discovery.  The deadline comes for their responses.  We get nothing.  We don't get a document.  We have to go back to the special master.  So this has been going on and on and on.  And we finally got the materials yesterday.

So, we're going to look at those materials now.  We're going to finish our depositions.  And we are going to, you know, supplement our interrogatory response, as we can, with that information.

THE COURT:  When you say about reasonable royalty that you would know what your own trade secrets are, you ought to have some idea, dollar amount as to what the royalty would be for a willing buyer, a willing seller, and for that particular trade secret.

For example, if you had ever licensed any of that technology to some other company, you could refer to that document and make that available, and refer to that percentage rate or dollar amount.  But none of that ever happened.

1          So what do you say to that argument?

2      **MS. BAILY:**  Well, what I would say is that this is not that

3  case where we have comparable licenses.  We don't.  We don't

4  license little bits, you know, of our LiDAR technology.  We made

5  that clear.  And they have known that from the beginning.

6          What we were interested in knowing, you know, as part of our

7  analysis is, you know, what -- does Uber have any licenses?  We

8  found -- you know, we find wouldn't that out until yesterday.

9  So this is something --

10      **THE COURT:**  Well, what is the answer?  Do they have any?

11      **MS. BAILY:**  You know, I haven't had a chance since yesterday

12  at noon, when they made this dump, to go through all of that

13  information before the hearing today.

14          This is really a case where, you know, we have an

15  unjust-enrichment theory, we have a reasonable-royalty theory.

16  We did provide them our response.  And we would have handed them

17  over when we handed over the other information that is relevant

18  to these theories that we do have, which is our P&Ls going

19  forward, our revenues, profits and cash flow projections, our

20  historical cost information, and all of our business-related

21  documents, which they've had for more than a month.  And now we

22  get theirs for nine days.

23          So we -- you just -- we can't put together, especially in

24  this case, any robust damages model with only our pieces of the

25  puzzle.  And with respect to our pieces of the puzzle, we

1    provided it, in a long narrative and in documents.  And they've

2    been asking questions about it.

3        So this notion, you know, that they've been prejudiced in

4    some way, it's just not true.  Waymo actually is the one that's

5    been prejudiced.  And they've done it all along, in refusing to

6    provide the relevant information to us so that we could finish

7    determining the best way to quantify the damages that we can

8    quantify.

9        **THE COURT:**  Okay.

10       Ms. Dunn, what do you say to that?

11       **MS. DUNN:**  Well, first of all, none of this discussion about

12   what happened in discovery is relevant to the question of

13   disclosure.  So the rules, the Court's order, and the law all

14   say that what plaintiff knew at the time of the initial

15   disclosures has to be told to the defendant.  Otherwise, the

16   remedy is preclusion.

17       **THE COURT:**  Well, it may be preclusion.  There are other

18   possible remedies.  But flesh that out.  Just take reasonable

19   royalties.  What more -- you heard what the answer was, asked.

20   What more could Ms. Baily have said to you, since they don't

21   have any comparable licenses?

22       **MS. DUNN:**  Your Honor --

23       **THE COURT:**  What more can they say?

24       **MS. DUNN:**  So we don't have any knowledge about a royalty

25   base.  We don't have a royalty rate.  We don't have a term of

infringement.   I made myself a chart of all the things we don't

know, because there are a lot.

We don't know if there is a lump sum versus a running

royalty, if that's what they are going to pursue.   We don't even

know if they're claiming for each trade secret.   These are

things all within their knowledge.

And the reason these rules exist this way is because the

plaintiff is supposed to disclose.   And dumping a lot of

information on defendants without saying what your methodology,

what your rate, what your -- specifically how you're going to

use the documents without offering a number, we don't even have

a number at this point.   That is the purpose of these disclosure

rules.   And that is precisely what's not allowed.

For unjust enrichment, they put forth four possible

theories.   And their filing that they pointed you to starts out

by saying several measures that can be used.   Are they using all

these measures?   I don't think these measures are potentially

co-existent.

So they say this, but we don't have their own calculations

about their cost savings, about developing their own trade

secrets.   This should be knowable.   They have not given us any

clear figures.   We don't know if the trade secret numbers

overlap.   It is not an answer to say:   We handed over a bunch of

documents.

And I'm glad that counsel raised the issue of the P&Ls.   So

 1   yes, we received some P&Ls.  And the P&L are similar in

 2   structure, but they use different numbers.  So we don't even

 3   know which is the operative P&L.  We don't know what the expert

 4   is going to rely on, which is what Rule 26 itself says we're

 5   supposed to have.

 6        And then, when we're trying to figure something out from the

 7   witnesses, they can't even tell which is the operative P&L.

 8   They say it's impossible to tell when these things are created.

 9        **THE COURT:**  Whose P&L, and why does it matter?

10        **MS. DUNN:**  It's their P&L.  And the reason you want to know

11   the P&L is because you're trying to figure out how much -- what

12   the costs were.  Because they're going to say that this is

13   relevant to the cost savings that Uber had.  So, what Waymo

14   spent to develop the trade secrets is going to be relevant.

15        **THE COURT:**  Okay, let's just stop for a second.  This is

16   helpful, but I want to pursue this point.

17        So let's take -- I have to do this in vague terms because I

18   guess this is a trade secret, but the trade secret that involves

19   overhang or underhang, or right, no hang -- okay, that's not a

20   trade secret, what I'm saying.  All right.

21        So are you going to have a theory that that could have been

22   licensed to Uber because they allegedly violated it, and here's

23   -- what is your theory, just on that?

24        **MS. BAILY:**  It will be first an unjust-enrichment theory.

25   And then potentially a reasonable-royalty theory as well.

1      **THE COURT:**  All right.  So the unjust-enrichment theory will

2    be something like this, I guess:  Imagine your ordinary -- no,

3    no.  Figure out how much money Uber saved by avoiding the

4    experimentation to come to that conclusion.

5      Is that right?

6    **MS. BAILY:**  I think it's a little bit more complicated, but

7    you're right to point out the fact that it actually depends a

8    lot on Uber's side of the ledger.  Because it can't just be

9    that, you know, Waymo spent all of this money developing these

10   trade secrets.  There are a lot of predicates to -- you know, I

11   don't want to step into confidential information.

12     But you can't just look and defendants would cry foul if we

13   just looked at how much it cost for us to develop these trade

14   secrets.

15     Where was Uber in the process?  What resources do they have?

16   What investment did they make?

17     **THE COURT:**  So let's say that it would have taken somebody a

18   week -- an engineer one week to figure that one out.

19     **MS. BAILY:**  So it's more complicated than that, Your Honor.

20     **THE COURT:**  Maybe not.  Maybe it would be less complicated

21   than that.

22     All right, let's say two weeks.  How much money can that

23   possibly be?  That's not very much money.  That's $30,000.

24     **MS. BAILY:**  I'll say that these -- the trade secrets that

25   were elected for trial now, many of them are not susceptible to

1    that kind of analysis.

2        THE COURT:  Well, what -- tell me how -- give me an example

3    of one where this is going to get you into the stratosphere.

4        MS. BAILY:  Sure.  There is one trade secret that has a

5    variety of specification that could only be and were only

6    arrived at because of the number of miles that Waymo has driven

7    on real roads, and in simulated driving, over many years, based

8    on iterations of hardware.

9        And there is no way that these specifications could have

10   been -- and these specific cases that are involved in these

11   specifications could have been determined in the robust way that

12   is now allowing Waymo to commercialize, based on them, in a safe

13   way, without doing --

14       THE COURT:  Is this a scenario --

15       MS. BAILY:  -- all of that work.

16       THE COURT:  Is this a scenario trade secret with the ways to

17   guard against that scenario?  Is that the one?

18       MS. BAILY:  It sounds like it, Your Honor.  I could get you

19   the number of the trade secret.

20       THE COURT:  And are you going to be able to prove that they

21   used the exact same set of precautions and LiDAR -- LiDAR

22   signals to -- seems unlikely that you are, but maybe, maybe they

23   copied that exactly.  Did they?

24       MS. BAILY:  We have evidence of use, Your Honor.

25       MR. CHATTERJEE:  (Nods head)

1      **THE COURT:**  Of use?  So, are you going to be able to show

2      that there was some point in time where that exact set of LiDAR

3      signals was used to sort of jump-start their program?  Even if

4      they're not using it now, they used it at one point in their

5      development?

6      **MS. BAILY:**  Well, I would say, Your Honor, having that

7      information that resulted from seven years of iterations and

8      driving miles, it's in some ways the crown jewels of the kind of

9      technology that we are talking about.

10     So I would say that having access to that and having -- and

11     evidence of use with respect to that, that's a big damages

12     number.

13     **THE COURT:**  All right.  So, but I -- maybe we'll hear more

14     about this, in this closed session.  But I think I know the

15     trade secret you are talking about.

16     And are you going to be able to show that that document is

17     in the files of Uber?  I don't think so.

18     **MS. BAILY:**  We have evidence of the use of the information.

19     **THE COURT:**  I'm going to just leave it there.

20     Do you know which one she's talking about?

21     **MS. DUNN:**  I do know.  I --

22     **THE COURT:**  Well, all right.  Well, that one, if it was in

23     fact used and consulted, that would be some valuable

24     information.  I think that's correct.  I don't know what the

25     dollar amounts would come to.

1        But on the other hand, I am surprised to hear you think that

2   you're going to be able to prove they used it.  But I -- I'm

3   learning as I go.  I didn't know about the interrogatory answer

4   either, so maybe you do have that proof.

5        **MS. BAILY:**  Your Honor, I would say two additional things,

6   if -- if allowed.

7        **THE COURT:**  All right.

8        **MS. BAILY:**  Obviously, I mean, this is an attempt to take

9   damages out of the case.  Both our damages and punitive damages.

10  And the Ninth Circuit has said that before you can do that, you

11  actually have to show bad faith and willfulness.

12       We have provided, again, information in advance of their

13  depositions, just so they can do the discovery that they need

14  and want to do on damages.  There is no willfulness or bad faith

15  in here.  We cite to the *R&R* case in our opposition.  And they

16  haven't even attempted to say that there is.

17       We're providing all of the information that we have.  Again,

18  we're the ones being prejudiced because we don't get the

19  information that they have until yesterday.

20       And I do just want to remind the Court that setting aside

21  the OSC issues, even, the defendants have had opportunity after

22  opportunity after opportunity to fail to provide information, to

23  amend information, on and on and on.  Right?

24       So, even Uber's LiDAR log was ordered to be provided on a

25  certain day.  They provided about half of what the

1    communications were, because they just apparently didn't have

2    enough time to pull it together.  Nothing happens.  Right?

3         So we're prejudiced.  We get more information, supplement,

4    supplement, supplement.  Depositions are ongoing.  There's

5    prejudice there.

6         Their privilege logs are meaningless.  You cannot tell one

7    entry from another.  And this isn't, you know, that they need to

8    disclose the privileged communication in a log.  This is:  Every

9    description is the same.  3,500 times.  Right?

10        Judge Corley has found it insufficient.  They're ordered to

11   amend.  They amend, they amend, they amend.  Right?

12        So the notion that they are seeking to strike our damages

13   when we provided information in advance of any depositions that

14   were taken, and they've had the full opportunity of discovery

15   where we haven't, it's just -- it strikes a level to me of

16   unfairness.

17        And I raise it, because you mentioned at an earlier hearing

18   that you would take fairness into account here.  And I think

19   it's important do that.

20        **THE COURT:**  Well, that's a good point.

21        Ms. Dunn, I'm going to take judicial notice of how many

22   times your side has violated scheduling orders, and been late,

23   and taken it upon yourself to do things after the fact.  And

24   that's true.  You have done that, and you have gotten away with

25   a lot of it.

1          So now you are insisting on a Rule 26 disclosure deadline,

2     which is a legitimate point.  But nevertheless, what do you say

3     to the unfairness of me holding Waymo to all the deadlines, but

4     you get to skate by with blowing off the deadlines?

5          **MS. DUNN:**  So Your Honor, I think that these things are not

6     on the order of being remotely the same.  There are certain

7     things that are rolling responsibilities that we have.  The

8     accounting, for example, logs, et cetera.

9          The law could not be more clear here.  And Your Honor's own

10    decision in *Brandywine* says what they have to disclose.  And it

11    accounts for the idea that defendants may have to produce

12    information as the case goes on, and that not everything will be

13    known at the time of the disclosures.

14         Their disclosures here could not be more obviously violative

15    of the rules, and of the order, and of the case law that has

16    been followed in this district.  And we are talking about a

17    potentially, you know, multi-billion-dollar claim.

18         And even this colloquy that counsel has had with you here,

19    she says:  Well, we might -- we're going to do unjust enrichment

20    for the trade secret, and we might do reasonable royalty.  We

21    don't know.  We still don't know.  These are the things that we

22    are supposed to be told to litigate the entire damages case.

23         This isn't about one fact here or there.  This is about the

24    entire damages case in this -- in this case.

25         And so we're dealing with a situation where there is law

1   here that specifically says what's supposed to happen.  So I

2   want to address just one example, which is, you asked counsel

3   about TS 7.  I know them by number, so I'll just call by the

4   number.  So, and how much does it cost.

5       Well, Waymo has said that for TS 7, 8, 16, 19, 20, and 43,

6   they're all in the range of -- and I'll just say "big number"

7   because I don't think I'm supposed to say what the number is.

8   But all of those trade secrets are in the range of big number,

9   without taking into account any bonus expense paid at the end of

10  2015.

11      Then, one of their responses says that just for TS 7, alone,

12  is that same big number.  So, how is that even possible?  TS 7

13  is that number, but all these trade secrets are that number.  We

14  don't know.

15      And the problem is, and the cases are really clear, you

16  cannot just dump out information, or even in good faith, dribble

17  out information in discovery, without being clear about what you

18  are doing, without putting forth the computation, and without

19  making available to us specifically what you are relying on in

20  saying you're going to rely on it.  And they have not done that.

21  These interrogatories do not change that, even a little bit.

22      And the -- you know, they say that we haven't produced --

23  their RFPs were served to us later than ours were served.  And

24  you know, they say they have had motions to compel, we have had

25  motions to compel, everyone has motions to compel.  The point of

the rule is that none -- these discovery disputes are not germane.

So I think it's important for you to know, Your Honor, that as we stand here, we still do not have a supplemental disclosure.  We still do not have the things that we would need to know to prepare a summons to their potentially multi-billion-dollar -- we don't know -- damages case.  But the truth is it doesn't matter.  That is the point of Rule 26.  And Your Honor put them on notice when you said they need to do it.  And those two paragraphs that say absolutely nothing in their disclosures shouldn't -- should not just be let go.

So I don't want to litigate all the privilege logs and all the accounting, because that would take a very long time.  But I do not think it's true that we are disregarding the Court's deadlines.

But this is -- you know, this is very serious.  I also think the fact that even at this hearing, no damages theory can really be articulated, it just suggests that the reason this is so difficult -- and I appreciate that it's so difficult -- is because these damages theories are an ill fit.  This is a case about an injunction.  It's a case about an injunction.

**MS. BAILY:**  Your Honor --

**THE COURT:**  Wait, no.  They want an injunction, but they also want damages.

**MS. DUNN:**  Well, then, they should have in their disclosures

1   said what they were doing.  They, under Rule 11, had to have

2   known that at the time of this complaint.  And they still

3   haven't said.

4        **THE COURT:**  What were you going to say?

5        **MS. BAILY:**  Look, Your Honor, first of all, Ms. Dunn does

6   not dispute that we need information from Uber to come up with a

7   number.  So this notion that she keeps saying that we should

8   provide an actual computation before we get damages information

9   from Uber, she's not disputing that that is just not something

10  that we can do.  We need information from Uber.

11       What we've done is exactly what we're required to do, which

12  is we provided a narrative of our -- regarding our damages

13  theories, and we've provided the information that Waymo has that

14  is relevant to it.  And we have identified that.  And they have

15  had the opportunity to ask our witnesses about that information.

16       And the notion that your court order providing a June 23rd

17  deadline for a log of communications permits them to roll out

18  amendments as they see fit -- most recently, I think, last

19  week -- is just preposterous to me, that that's a rolling

20  deadline.  That was a deadline in your court order that said

21  that the accounting had to be provided by June 23rd.  They saw

22  fit to provide what they could at that time, and have continued

23  to roll out information to us as the discovery period ends.

24       That's a rolling deadline?  I did not think that your order

25  said that there was a rolling deadline with no finality to it.

1    That's surprising to me.

2        So, so, sorry to sound a little bit incensed here, but it is

3    a little bit of a ridiculous double standard, when we have

4    actually provided the information that they're claiming that

5    they haven't -- that we haven't provided.

6        **THE COURT:**  All right.  Here's the answer.  I'm not going to

7    rule on this today.  I think the best thing to do is to see what

8    your damages theories actually turn out to be.  And maybe then,

9    it will be clearer how fair or unfair the process has been.

10       So, you may wind up still getting dinged on this, Ms. Baily,

11   but it may be that -- it may be that when I see the actual

12   damages theories, I will think that prejudice has been slight,

13   and therefore, overlook this.  I don't know.  It's hard to know

14   until I see the damages theory.

15       So, this piece of the controversy will be held in abeyance

16   for a while.  I thank you both.

17       **MS. BAILY:**  Thank Your Honor.

18       **MS. DUNN:**  Thank you, Your Honor.

19       **THE COURT:**  While I have you here, this is a somewhat

20   related thing.  I got a letter about a précis request from MoFo,

21   I think, that you wanted to file a summary-judgment motion.

22       **MR. GONZÁLEZ:**  That's correct, Your Honor.

23       **THE COURT:**  And I'm not going to rule on that now, because I

24   haven't even gotten your response yet to this.

25       Have you seen what I'm talking about?

1    **MS. BAILY:**  Yes.

2    **THE COURT:**  Ms. Baily.

3    **MS. BAILY:**  Well, to be clear, I haven't actually --

4    **THE COURT:**  The one thing that confuses me is talking about

5    a work-around or not -- a redesign, redesign.  So what I take

6    from that -- but it doesn't say it because it's cleverly

7    worded -- is that Fuji's redesign, you got some redesign, and

8    you seem to ignore the fact that there must have been a prior

9    design.

10   So are you -- so you want me to bless on summary judgment

11   the redesign and say that doesn't infringe, but then where would

12   that leave us for purposes of trial?  Would the re- -- would the

13   original design still be in play for the jury to assess?

14   What's going on there?

15   **MR. GONZÁLEZ:**  So Your Honor, because it is a product that

16   we've never sold, we don't believe that there are any damages.

17   And to be clear, the redesign is absolutely not a concession

18   that there was anything wrong with our design in the first

19   place.

20   You used an example earlier in court -- that's all I'm going

21   to refer to -- that we don't think is a trade secret to begin

22   with.  But if they claim that, you know:  X is a secret, and we

23   can very easily change it to Y and render it moot, that is what

24   the issue is, with respect to that one item.

25   There are others, Your Honor -- and none of this is secret.

1   There are --

2      **THE COURT:**  Well, these are concerning patents.  So this

3   can't be a trade secret.  This is -- this is about the inductor.

4   And so this is not the trade secrets at all, is it?

5      **MR. GONZÁLEZ:**  Well, it's both, Your Honor.  There were

6   issues on both.  So we want to move on the patent claim and on

7   the trade secret claims.

8      The issue that you just identified is only one of the

9   issues, but there are other reasons why we believe we are

10  entitled to summary judgment, including there's a lot of prior

11  art for some of these alleged trade secrets.  They're not secret

12  at all.

13     **THE COURT:**  Why can't you just present that to the jury?  We

14  don't have time for a bunch of summary judgment motions.  Why

15  are you doing this to me?

16     **MR. GONZÁLEZ:**  Your Honor, we're just -- you know, they just

17  identified -- what was it, ten days ago?  I've lost track of the

18  days now, frankly -- their nine secrets.

19     Remember, they stood here the last time we were in court,

20  and you asked them:  Do you have any information that they're

21  using your secrets?  And they rattled off, like, nine things,

22  confidently?  They've dumped eight of them.

23     **THE COURT:**  They what?

24     **MR. GONZÁLEZ:**  They've dumped eight of them.

25     **THE COURT:**  What do you mean, "dumped eight of them"?

1          **MR. GONZÁLEZ:**  When they picked the actual nine, only one of

2     the ones that they uttered to the Court is included.  Because

3     they realized the other ones were no good.  And so we're just

4     now learning, Your Honor, what ones they want to try.  So it's

5     not our fault.

6          They're the ones that said this was an emergency, and we've

7     got to have this trial.  That shouldn't deprive our client --

8          **THE COURT:**  You were the one that wanted the early trial

9     date, too, before you found out what the ruling was on

10    preliminary injunction.  Then you changed your tune.

11         **MR. GONZÁLEZ:**  Not really, Your Honor.  No, no.  To be

12    clear, to be clear, our client still wants an early trial.  We

13    want to get this thing resolved.  If there's a problem with a

14    widget, we'd like to know about it.  We don't think there's a

15    problem.

16         **THE COURT:**  All right.  But to come back to my only question

17    on this, you say "redesign."  But if I were to hear this, it

18    would still be the old design that we would still have to

19    litigate.  Right?

20         **MR. GONZÁLEZ:**  Your Honor, we believe that there are legal

21    reasons why they would not have to litigate the old design.

22         **THE COURT:**  Usually you get to the redesign after you get --

23    you're found to have infringed.  And then you come back to me

24    and say:  Judge, will this redesign work?  And then I say yes or

25    no.  But the jury gets to decide whether the original design was

1    bad or not.

2        I think you're trying to get me to rule in advance that

3    there are some kind of -- this redesign, it's going to -- you

4    don't even have it in a product yet.

5        You're just saying:  Judge, will this work?

6        I don't know.

7        **MR. GONZÁLEZ:**  It's not asking for an advisory opinion,

8    Your Honor.

9        **THE COURT:**  I think it is.

10       **MR. GONZÁLEZ:**  We will establish -- we will establish that

11   there's been a change in the device, such that the device, as it

12   exists today, even if they're right that it's a secret or -- or

13   on the patent issue, it doesn't infringe, either way.

14       **THE COURT:**  Okay.  Did you want to say something on this?

15       **MR. JAFFE:**  I just want to respond briefly to Mr. González's

16   misstatement about something that I said in court a couple of

17   weeks ago, which was about the list of trade secrets.

18       **THE COURT:**  I do remember you rattling off a list of

19   numbers.

20       **MR. JAFFE:**  Yes.  And as I mentioned at the time, it was off

21   the top of my head.

22       But the point of the colloquy that we were having, as I

23   understood it, was you were asking what evidence of trade

24   secrets do we have.  And I rattled off a list.

25       **THE COURT:**  No, I said trade secrets that were violated.

1      **MR. JAFFE:**  That's right.  And I guess Mr. González and Uber

2   has now taken it to this idea that we've identified other ones,

3   all of which have been identified in discovery.  But the point

4   is:  We have more that they are using than we can try under your

5   order.  That that -- there are more than nine that they are

6   using that --

7      **THE COURT:**  No, wait a minute, wait a minute.  You agreed to

8   the order.

9      **MR. JAFFE:**  We're not disputing the order.  I'm just saying

10   that --

11      **THE COURT:**  I don't want you saying that I'm somehow

12   compelling you to give up on -- let's be clear.  You -- didn't

13   you agree that you would reduce it down to -- I think it was

14   ten, wasn't it?  Or was it nine?

15      **MR. GONZÁLEZ:**  Less than ten.

16      **THE COURT:**  Less than ten.  All right, nine.  Did you agree

17   to that?

18      **MR. JAFFE:**  The point that I'm making, Your Honor --

19      **THE COURT:**  Say yes or no.

20      **MR. JAFFE:**   We did agree to that, to get the trial date.

21      **THE COURT:**  Okay.

22      **MR. JAFFE:**   That's right.  The point is there is no

23   misstatement because I identified more trade secrets that

24   they're using, and we had to narrow down to nine.  There's just

25   no misstatements there.

1      **THE COURT:**  So there you go.  He could have proven 20, I

2   guess, if he had the chance.  So there you go, Mr. González.

3   Actually, live to -- you got rid of nine just by agreeing to an

4   early trial date.

5      **MR. GONZÁLEZ:**  Yeah.  And Your Honor, by the way, maybe

6   we're about to roll into it.  But with respect to our motion to

7   strike four of the nine, I believe we can argue that in public.

8   I'm not going to say anything confidential.  I'm going to say

9   vague terms, like, like, like "sheets."  "Drawings."

10      **THE COURT:**  Well, I'm not going to rule on your letter brief

11   right now, that asks for permission for a summary judgment.  I

12   had that point of clarification that I wanted, and that's it.

13   And you need to get in your response to that précis --

14      **MR. JUDAH:**  I do.  I also want to clarify one point, that we

15   are not agreeing to waive our rights to the other trade secrets.

16   That is -- that is not what I intended to say, and that's not

17   what we are saying, in terms of the other 121 trade secrets that

18   we identified.  I want to just make that --

19      **THE COURT:**  I think you have.  This is important to me.

20      **MR. JAFFE:**  I understand that.

21      **THE COURT:**  This is very important.  If you want to have a

22   trial on 121 trade secrets, it might be about 12 months from

23   now.

24      **MR. JAFFE:**  (Nods head)

25      **THE COURT:**  You agreed to an early trial date, and agreed to

1    reduce it to nine in order to get there.  And at least for

2    purposes of this case, if you go forward, and win or lose, it

3    doesn't matter, you're not going to come back and re-litigate it

4    on Trade Secrets 10, 11, 12 and so forth.

5        Now, if we have a disagreement on that, then we have a

6    serious problem.

7        **MR. JAFFE:**  Understood.  So the point I was making is we are

8    under a court order to narrow to nine.  I didn't want to make

9    any sort of statement that we were waiving any sort of rights as

10   to those other trade secrets.

11       **THE COURT:**  You have waived those rights, to get this trial.

12   In other words, the trial date that you want, the injunction

13   that you want, we -- you can't have everything.

14       If you want 121, okay I'll give you that.  We'll push this

15   case out for a couple of years.  They'll have their cars running

16   on the street before you get to your trial date, because you're

17   being greedy.

18       **MR. JAFFE:**   One second, Your Honor.

19       (Off-the-Record discussion between counsel)

20       **MR. JAFFE:**  We understand.

21       **THE COURT:**  All right.  We're going to need to go to the

22   next item of business, which is motion to strike trade secret

23   claims.  But I guess this one we need to have the courtroom

24   cleared.  Is that right?

25       **MR. GONZÁLEZ:**  I don't think so, Your Honor.  I can argue

1    this without talking about any -- I intend to use words like

2    "technical information" and "design schematics" in my argument,

3    and the number of the secret.

4        THE COURT:  Well, we'll see if we can do it that way.

5    Mr. Chatterjee, though, has arisen to say something.

6        MR. CHATTERJEE:  Your Honor, just because we do have

7    separate interests here, Otto Trucking, we also filed a motion

8    to strike.  I understand Your Honor's order on holding the

9    damages disclosures in abeyance.  There are some additional

10   points I would like to raise.  But I also recognize Your Honor

11   has a finite schedule.

12       THE COURT:  Give me an example of something you want to

13   raise.

14       MR. CHATTERJEE:  Sure.  There are a couple of things,

15   Your Honor.

16       One of the things that I wanted to raise is in our separate

17   motion to strike, we identified their Rule 26 disclosures.  One

18   of the things that they identified in the Rule 26 disclosure

19   when they talk about unjust enrichment is that all they're

20   asking for is disgorgement of profits from unjust enrichment.

21       As to Otto Trucking, Otto Trucking has never made a profit.

22   And if you look at what their interrogatory response is, they

23   don't even talk about any of Otto Trucking's financials.

24       In addition to that, when they talk about reasonable

25   royalty, in the initial disclosures, they agreed to assert

 1    originally 122 trade secrets and I think they had three or four

 2    patent claims.

 3         Rule 26, as Your Honor knows, requires a computation.  What

 4    I would have expected in an appropriate Rule 26 disclosure is

 5    they would have identified each one of those trade secrets and

 6    each one of those patents, and provided what they thought it was

 7    worth, in a lost profits or reasonable royalty number.  They

 8    didn't do that.  Even today, they're not doing that.

 9         **THE COURT:**  You're rehashing what we have already went

10    through.  And I said I'm going to wait and see what the reports

11    actually claim.  And then all of these points that you want to

12    make, we'll come back to them.

13         **MR. CHATTERJEE:**  And that's fine, Your Honor.  The one issue

14    I did want to raise, and this is in our filing 942-1, with

15    respect to Otto Trucking, there's one statement on Page 154, and

16    this is the sum total of what they say specifically about Otto

17    Trucking, although they kind of do some hand-waving about joint

18    and several liability, separately (As read):

19              "Otto Trucking is separately liable for damages with

20              respect to its own use of Waymo's trade secrets,

21              including through its subsidiary, Otto Transport,

22              which currently operates trucks for the benefit of

23              Uber's freight program."

24         That is the sum total of their damages disclosure with

25    respect to Otto Trucking, specifically.  That is not a

1    disclosure at all, Your Honor.  That's just saying:  We think we

2    should get some damages.

3        **MS. BAILY:**  Your Honor, that's just incorrect.  Because we

4    have a joint-and-several-liability theory.  And so what Otto

5    Trucking is trying to do again is basically trying to have a

6    summary-judgment motion that they're not liable, they think that

7    they're not liable.  This is not summary-judgment briefing.  It

8    was a disguised summary-judgment motion, but we shouldn't get to

9    this issue now.

10       **THE COURT:**  All right.  I'm going to postpone everything

11   having to do with this until I see the damages reports.  And so,

12   all right.  So, let's now go to the --

13       **MS. DUNN:**  Your Honor --

14       **THE COURT:**  -- motion regarding the trade secrets.

15   Yes.

16       **MS. DUNN:**  I apologize.  Ms. Dearborn raised one thing that

17   we should put on the record that's relevant to the damages

18   argument.

19   Do you want to do that?

20       **MS DEARBORN:**  Yes.

21       **THE COURT:**  Good morning, Ms. Dearborn.

22       **MS DEARBORN:**  Good morning, Your Honor, Meredith Dearborn on

23   behalf of Ottomoto.

24   Ms. Baily referred several times to a contention

25   interrogatory.  That's their response to Interrogatory No. 13.

1   I just want to make clear for the record when that was first

2   served.

3        That was served on July 17, which is the day that their

4   opposition to this motion was due.  And it's obviously weeks

5   after the June 21st deadline.

6        **THE COURT:**  Is that the 24-page thing?

7        **MS DEARBORN:**  Yes.

8        **THE COURT:**  What day, again?

9        **MS DEARBORN:**  July 17th.

10       **THE COURT:**  Today is No. 16, so -- so that was a month ago.

11       **MS DEARBORN:**  Yes.

12       **THE COURT:**  Okay.

13       **MS. BAILY:**  And before any businesspeople were deposed.

14       **THE COURT:**  Great.

15       Now, okay, Mr. González, you get to argue in code words,

16   trade secret motion.

17       **MR. JAFFE:**   Your Honor, we would ask that this be done in

18   closed session.  This would be highly prejudicial, to be able to

19   argue about the substance of these trade secrets in open court.

20       We think there's an extremely high risk that there could be

21   some confidential information that could come out.  And just to

22   be able to respond and quote our trade secret list, without

23   being able to do that, would be highly prejudicial to arguments.

24       **THE COURT:**  Is this the last item on the agenda?  I think it

25   is.

1      **MR. GONZÁLEZ:**  I believe so.

2      **THE COURT:**  All right.  I'm going to go with Waymo on this,

3  and ask anyone -- everyone to leave the courtroom, please,

4  unless you are lawyers, or unless you are signed on to the

5  protective order.

6      And I hate to do this to you, but I have to do it.

7      (The courtroom was closed and sealed proceedings were held

8  on the record, not included in this transcript)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of unsealed proceedings in the above-entitled matter.

_Belle Ball_

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Friday, August 18, 2017