# EXHIBIT 3

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5   WAYMO, LLC,                    )

 6            Plaintiffs,           )

 7            - vs -                ) Case  No.

 8   UBER TECHNOLOGIES, INC.,  ) 3:17-cv-00939

 9   OTTOMOTTO LLC; OTTO           )

10   TRUCKING, LLC,                 )

11            Defendants.           )

12   _____

13

14

15        VIDEOTAPED DEPOSITION OF JOHN BARES,

16   a witness, called by the Plaintiff for examination,

17   in accordance with the Federal Rules of Civil

18   Procedure, taken by and before Tammie Elias, RPR and

19   Notary Public in and for the Commonwealth of

20   Pennsylvania, at the office of Reed Smith, 225 Fifth

21   Avenue, Suite 1200, Pittsburgh, Pennsylvania, on

22   Friday, June 16, 2017, commencing at 9:05 a.m.

23

24   JOB No. 2640097

25   PAGES 1 - 317
```

                                           Page 1

| | | | |
|---|---|---|---|
| 1 | Q. | You have discussed Lidar with Anthony | 09:49a |
| 2 | | Levandowski; correct? | 09:49a |
| 3 | A. | Yes. | 09:49a |
| 4 | Q. | Many times? | 09:49a |
| 5 | A. | A fair number of times. | 09:49a |
| 6 | Q. | Roughly how many times have you had | 09:49a |
| 7 | | discussions with Mr. Levandowski related to | 09:49a |
| 8 | | Lidar? | 09:49a |
| 9 | A. | 10 to 15. | 09:49a |
| 10 | Q. | You have had phone calls with Mr. Levandowski | 09:49a |
| 11 | | about Lidar? | 09:49a |
| 12 | A. | Uh-huh. | 09:49a |
| 13 | Q. | You have talked to him in person about Lidar? | 09:49a |
| 14 | A. | Yes. | 09:49a |
| 15 | Q. | Now, you participated in jams with him about | 09:49a |
| 16 | | Lidar? | 09:49a |
| 17 | | MR. BRILLE:  Objection, form. | 09:50a |
| 18 | A. | Not really, no. | 09:50a |
| 19 | BY MR. JUDAH: | | 09:50a |
| 20 | Q. | What is a jam in the context of Uber's | 09:50a |
| 21 | | business? | 09:50a |
| 22 | A. | Putting a set of people related to a topic in | 09:50a |
| 23 | | a room and working very hard on that problem | 09:50a |
| 24 | | with sort of no time bound to try to get to a | 09:50a |
| 25 | | solution. | 09:50a |

Page 37

| | | |
|---|---|---|
| 1 | Q. How many jams have you participated in with | 09:50a |
| 2 | Mr. Levandowski? | 09:50a |
| 3 | A. One that I know of. | 09:50a |
| 4 | Q. To the best of your recollection, you have | 09:50a |
| 5 | only participated in one jam with | 09:50a |
| 6 | Mr. Levandowski? | 09:50a |
| 7 | A. Uh-huh, yes. | 09:50a |
| 8 | Q. To be clear, that's not just a one-on-one, | 09:50a |
| 9 | that would include any jam that both you and | 09:50a |
| 10 | he had attended or participated in? | 09:50a |
| 11 | A. Well, the one-on-one wouldn't constitute a jam | 09:50a |
| 12 | in my view.  The only one that I'm aware of. | 09:50a |
| 13 | Q. Have you ever participated in a technical dive | 09:50a |
| 14 | with Mr. Levandowski? | 09:51a |
| 15 | MR. BRILLE:  Objection, form. | 09:51a |
| 16 | A. I guess I -- yes.  Fair to say yes. | 09:51a |
| 17 | BY MR. JUDAH: | 09:51a |
| 18 | Q. How many technical dives have you participated | 09:51a |
| 19 | in with Mr. Levandowski? | 09:51a |
| 20 | A. Well, developing the laser requirements that | 09:51a |
| 21 | we talked about earlier, that milestones | 09:51a |
| 22 | requirements document he and I had, those 10 | 09:51a |
| 23 | or 15 discussions.  I don't -- professionally | 09:51a |
| 24 | I'm not sure if any of those constitute a | 09:51a |
| 25 | dive, but they were a detailed technical | 09:51a |

Page 38

| | | |
|---|---|---|
| 1 | discussion that expanded half an hour to an | 09:51a |
| 2 | hour maybe. | 09:51a |
| 3 | Q.   Is your testimony that other than those | 09:51a |
| 4 | discussions with Mr. Levandowski specific to | 09:51a |
| 5 | the milestones, you have never had any | 09:51a |
| 6 | discussions with Mr. Levandowski in a letter? | 09:51a |
| 7 | MR. BRILLE:  Objection, form. | 09:51a |
| 8 | A.   I have never had, correct, yes, I have never | 09:51a |
| 9 | had discussions with him about the design or | 09:52a |
| 10 | requirements of Lidar documents -- Lidar | 09:52a |
| 11 | devices subsequent to that period, that string | 09:52a |
| 12 | of discussions. | 09:52a |
| 13 | BY MR. JUDAH: | 09:52a |
| 14 | Q.   Other than those 10 to 15 discussions about | 09:52a |
| 15 | the milestones in connection with the -- is it | 09:52a |
| 16 | fair to say it was in connection with a term | 09:52a |
| 17 | sheet, is that what the milestones were in | 09:52a |
| 18 | relation to? | 09:52a |
| 19 | A.   Yeah, uh-huh. | 09:52a |
| 20 | Q.   So other than those 10 to 15 discussions with | 09:52a |
| 21 | Mr. Levandowski about the milestones in | 09:52a |
| 22 | connection with the term sheet, you have never | 09:52a |
| 23 | discussed lasers with Mr. Levandowski? | 09:52a |
| 24 | A.   Well, are we talking about the design of laser | 09:52a |
| 25 | devices or laser datas that might be used to | 09:52a |

Page 39

| | | | |
|---|---|---|---|
| 1 | | detect a car or something? | 09:52a |
| 2 | Q. | I'm asking anything related to Lidar or | 09:52a |
| 3 | | lasers? | 09:53a |
| 4 | A. | Okay, then yes, I have talked to him | 09:53a |
| 5 | | subsequent to that. | 09:53a |
| 6 | Q. | How many times have you had discussions with | 09:53a |
| 7 | | Mr. Levandowski related to lasers or Lidar | 09:53a |
| 8 | | other than those 10 to 15 milestone | 09:53a |
| 9 | | discussions? | 09:53a |
| 10 | A. | With regard to use of laser data in software, | 09:53a |
| 11 | | dozens, probably 30. | 09:53a |
| 12 | Q. | You have discussed Lidar with Mr. Levandowski | 09:53a |
| 13 | | in person? | 09:53a |
| 14 | A. | Uh-huh. | 09:53a |
| 15 | Q. | You have discussed it with him over the phone? | 09:53a |
| 16 | A. | Yes. | 09:53a |
| 17 | Q. | Have you e-mailed with Mr. Levandowski about | 09:53a |
| 18 | | Lidar? | 09:53a |
| 19 | A. | Occasionally not several times perhaps, not | 09:53a |
| 20 | | much. | 09:53a |
| 21 | Q. | Have you ever texted with Mr. Levandowski | 09:53a |
| 22 | | about Lidar? | 09:54a |
| 23 | A. | Is this subsequent to that milestone period or | 09:54a |
| 24 | | -- | 09:54a |
| 25 | Q. | Let's start -- | 09:54a |

Page 40

```
 1    A.    Yes, we were.                              11:35a

 2    Q.    And who was working on that effort?        11:35a

 3    A.    So we started that effort around July of 2015   11:35a

 4          and that would have been led by Scott Boehmke,  11:35a

 5          with two other key people would have been Jim   11:35a

 6          Gasbarro and Rob Doll, D-O-L-L.            11:35a

 7    Q.    Are you familiar with different ranges of  11:35a

 8          Lidar?                                     11:35a

 9    A.    What do you mean by range?                 11:35a

10    Q.    Mid range, long range, short range, is that a   11:35a

11          term that you have ever used?              11:35a

12    A.    I have.  Not at that time.                 11:35a

13    Q.    When did you start using terms like mid range   11:35a

14          or long range Lidar?                       11:35a

15    A.    More in discussions with Anthony Levandowski    11:35a

16          in January of 2016 where we were to start to    11:35a

17          talk about how we were separating up the   11:36a

18          problem space.                             11:36a

19    Q.    So focusing on the time period before you  11:36a

20          started discussing the problem space with  11:36a

21          Anthony Levandowski, how was Uber approaching    11:36a

22          the Lidar issue with respect to range?     11:36a

23                MR. BRILLE:  Objection to form.      11:36a

24    A.    It's not a clear question.  How were we -- 11:36a

25                MR. BRILLE:  If you don't understand  11:36a
```

Page 99

| | | |
|---|---|---|
| 1 | prepared.  So I thought maybe I'll be able to | 03:09p |
| 2 | meet with him and I want to have my thoughts | 03:09p |
| 3 | straight in case I do. | 03:09p |
| 4 | Q. Do you have any recollection as to who told | 03:09p |
| 5 | you that you may have the opportunity to meet | 03:09p |
| 6 | Mr. Levandowski in San Francisco on that trip? | 03:09p |
| 7 | A. I might have asked Brian McClendon hey, is it | 03:09p |
| 8 | possible, I'm coming out anyway for a | 03:10p |
| 9 | different meeting.  I had another good -- | 03:10p |
| 10 | another solid reason to be there, so I might | 03:10p |
| 11 | have asked Brian, hey, is it possible I can | 03:10p |
| 12 | get some time with Anthony.  I recall Brian | 03:10p |
| 13 | was trying to not be connected to Anthony, so | 03:10p |
| 14 | I might have asked hey, can I talk to him | 03:10p |
| 15 | because I had no reasons to not talk to him. | 03:10p |
| 16 | Q. Do you have any recollection as to how those | 03:10p |
| 17 | communications that Mr. McClendon would have | 03:10p |
| 18 | taken place, would they have been over the | 03:10p |
| 19 | phone, would they have been over e-mail? | 03:10p |
| 20 | A. Probably over the phone. | 03:10p |
| 21 | Q. So -- | 03:10p |
| 22 | A. I talk to him weekly, he was my boss, so -- | 03:10p |
| 23 | Q. So directing your attention then to this first | 03:10p |
| 24 | section, the part that you said were notes | 03:10p |
| 25 | sort of in anticipation of possibly speaking | 03:10p |

Page 212

| | | | |
|---|---|---|---|
| 1 | | still go off and build their product. | 05:14p |
| 2 | Q. | So -- | 05:14p |
| 3 | A. | And this is them saying we're not in | 05:14p |
| 4 | | agreement, they didn't want to do that | 05:14p |
| 5 | | evidently or something. | 05:14p |
| 6 | Q. | So skipping down to the February 26th call, | 05:14p |
| 7 | | there's the bullet current thinking, do you | 05:14p |
| 8 | | see that? | 05:14p |
| 9 | A. | Yes. | 05:14p |
| 10 | Q. | Current thinking for MS number one for mid and | 05:14p |
| 11 | | long range (dates)? | 05:14p |
| 12 | A. | Yes. | 05:14p |
| 13 | Q. | What does MS refer to? | 05:14p |
| 14 | A. | Milestone. | 05:14p |
| 15 | Q. | So this refers to the milestone? | 05:14p |
| 16 | A. | Yes, the milestones.  And these first eight or | 05:14p |
| 17 | | ten bullets, those are my notes to myself | 05:14p |
| 18 | | going into the meeting, questions for him. | 05:14p |
| 19 | | And then the meeting starts where it says IP | 05:15p |
| 20 | | infringement. | 05:15p |
| 21 | Q. | And so there's a bullet here IP infringement, | 05:15p |
| 22 | | do you see that? | 05:15p |
| 23 | A. | Uh-huh. | 05:15p |
| 24 | Q. | We're to provide a list of patents that we are | 05:15p |
| 25 | | worried about.  Did you work on assembling | 05:15p |

Page 293

```
 1   COMMONWEALTH OF PENNSYLVANIA)       CERTIFICATE

 2   COUNTY OF INDIANA           )      SS:

 3       I, Tammie Elias, RPR and Notary Public in and

 4   for the Commonwealth of Pennsylvania, do hereby

 5   certify that the witness, JOHN BARES, was by me

 6   first duly sworn to testify to the truth; that the

 7   foregoing deposition was taken at the time and place

 8   stated herein; and that the said deposition was

 9   recorded stenographically by me and then reduced to

10   printing under my direction, and constitutes a true

11   record of the testimony given by said witness.

12       I further certify that the inspection, reading

13   and signing of said deposition were NOT waived by

14   counsel for the respective parties and by the

15   witness.

16       I further certify that I am not a relative or

17   employee of any of the parties, or a relative or

18   employee of either counsel, and that I am in no way

19   interested directly or indirectly in this action.

20       IN WITNESS WHEREOF, I have hereunto set my

21   hand and affixed my seal of office this 19th day of

22   June, 2017.

23

24             <%signature%>

               _____

25             Notary Public
```

                                        Page 317

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                   UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                    SAN FRANCISCO DIVISION

4

      _____

5     WAYMO LLC,                        )

6                    Plaintiff,         )

7           vs.                         )   Case No.

8     UBER TECHNOLOGIES, INC.,          )   3:17-cv-00939-WHA

9     OTTOMOTTO LLC; OTTO               )

10    TRUCKING LLC,                     )

11                   Defendants.        )

      _____)

12

13         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15         VIDEOTAPED DEPOSITION OF SCOTT BOEHMKE

16              San Francisco, California

17              Monday, April 17, 2017

18                    Volume I

19

20

21    Reported by:

22    SUZANNE F. GUDELJ, CSR No. 5111

23    Job No. 2596382

24

25    PAGES 1 - 79

                                              Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q    Okay.  So you started talking with Mr.

2  Levandowski about LiDAR sensors for Uber's

3  self-driving cars in April of 2016, correct?

4    A    Yes.

5    Q    And you were interested in talking to him    02:14:52

6  because he was going to provide custom LiDAR

7  technology for Uber, right?

8         MR. KIM:  Objection.  Vague.

9         THE WITNESS:  Could you be more specific?

10        MR. JAFFE:  So Mr. Kim, I don't know if    02:15:06

11  you've read Judge Alsup's standing order recently,

12  but he has very specific guidance about the type of

13  objections, and so at this point, I would just

14  suggest to you that what you're doing is a little

15  bit farther out of bounds than what has been done in    02:15:23

16  this case so far.  But --

17        MR. KIM:  So I'll --

18        MR. JAFFE:  So putting that aside --

19        MR. KIM:  I've read Judge Alsup's standing

20  order, and I disagree with that characterization.    02:15:33

21  My objection was just as to the improper form of the

22  question.  It's also consistent with the objections

23  we made in depositions taken by yourself and

24  Mr. Perlson for both Mr. Levandowski and also others

25  in this case.    02:15:52

Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. JAFFE:

2        Q    Mr. Boehmke, you were interested in talking

3    with Mr. Levandowski because he was going to provide

4    Uber with custom LiDAR technology, right?

5        A    He was going to provide a sensor for our          02:16:06

6    cars.

7        Q    What kind of a sensor?

8        A    A laser sensor -- LiDAR sensor.

9        Q    A custom LiDAR sensor?

10       A    Correct.                                          02:16:17

11       Q    So again, you'd agree with me, then, that

12   you were interested in talking with Mr. Levandowski

13   because he was going to provide a custom LiDAR

14   solution for Uber, right?

15       A    Yes.                                              02:16:27

16       Q    And this was three months, or actually

17   February, March, two and a half to three months

18   since he left at the time Google, right?

19           MR. KIM:  Objection to the extent it calls

20   for speculation.                                          02:16:37

21           THE WITNESS:  I don't know when he left

22   Google.

23   BY MR. JAFFE:

24       Q    Did you ask him?

25       A    No.                                               02:16:41

                                                    Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q    Were you surprised that Mr. Levandowski and

2    his company could develop a custom LiDAR solution in

3    two and a half months?

4    A    He wasn't developing it in two and a half

5    months.                                          02:16:54

6    Q    Can you explain?

7    A    You just said it was two and a half months

8    after he left Google.

9    Q    Mm-hmm.

10   A    He wasn't coming to me with a sensor.        02:17:00

11   Q    What was he coming to you with?

12   A    He was coming to me asking what we wanted.

13   Q    And what did you want?

14   A    I wanted a sensor that could meet a set of

15   criteria so that we could drive our cars.        02:17:12

16   Q    And did he say that he could implement

17   that?

18   A    At the time, the discussions were more

19   configuration.  I was explaining to him what we were

20   looking for.  There were discussions later with    02:17:28

21   others where I elaborated further on our approach.

22   So in April did he say he could do it?  No.

23   Q    So your testimony is that you and Anthony

24   started speaking, and you communicated requirements

25   to him in kind of a vendor relationship; is that    02:17:46

Page 14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    right?

2        A    Yes.

3        Q    He didn't come to you with any sort of

4    technology proposal; is that right?

5        A    Yes.                                    02:17:54

6        Q    Okay.  So you communicated these

7    requirements to Mr. Levandowski.  What happened

8    next?

9        A    So I met with him on -- in the end of

10   April.  I went out to the Otto facility in the    02:18:07

11   beginning of May and furthered discussions with

12   others at Otto.

13       Q    Who were these others?

14       A    Most primarily Daniel Gruver.

15       Q    Anyone else?                            02:18:23

16       A    There were a number of other minor players

17   that I was introduced to.  Didn't have as many

18   technical conversations with them.

19       Q    What are their names?

20       A    There was a Rattner.  The names escape me.  02:18:34

21       Q    So the only two people that you can

22   remember speaking with at Otto were Mr. Levandowski,

23   Mr. Gruver and a Mr. Rattner; is that right?

24       A    And there was a Nancy who let me in the

25   door.                                            02:18:55

                                              Page 15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. JAFFE:

 2        Q    It was?

 3        A    Yes.  It just happened to be cut in half

 4    among two sensors.

 5        Q    Okay.  And your -- your testimony is that    02:40:42

 6    you came up with that ███████████ design for use with

 7    the█████████, right?

 8        A    Yes.

 9        Q    Okay.  When did you come up with that?

10        A    Over the period from December to March      02:40:53

11    of -- December 2015 to March of 2016.

12             MR. JAFFE:  Let's mark as Exhibit 53 a

13    document Bates labeled UBER 495.

14             (Deposition Exhibit 53 marked by the court

15             reporter.)                                  02:42:02

16    BY MR. JAFFE:

17        Q    Mr. Boehmke, can you please turn to the

18    last email in this thread here?

19        A    Last meaning the most recent, the oldest?

20        Q    The oldest --                              02:42:12

21        A    Okay.

22        Q    -- in time.  You see there's an email from

23    Mr. Levandowski to yourself dated June 9, 2016?

24        A    Yep.

25        Q    And do you see he asks you to prepare a     02:42:22
```

Page 34

1    list of angles for the beams under two different

2    scenarios.  Do you see that?

3        A    Yes.

4        Q    One would be the ████████████████████

     ████████████████ that's A.  Do you see that?    02:42:35

6        A    Yes.

7        Q    So that corresponds to kind of the ██████

8    architecture, right?

9        A    The █████████████████████████████████

     ████████████ but yes.                            02:42:44

11       Q    And then the second one, B, is you have ██

     ██████████████████████████████████████

     ██████████████████████████████████████

     ██████████████ Do you see that?

15       A    Yes.                                     02:42:57

16       Q    So this was Mr. Levandowski directing you

17   on how to prepare the ███████████████ right?

18            MR. KIM:  Objection.  Mischaracterizes

19   evidence.

20            THE WITNESS:  This was a configuration that 02:43:06

21   I had talked with the guys out West about ahead of

22   time, and he was asking for an assignment.

23   BY MR. JAFFE:

24       Q    Where is the evidence that you -- you spoke

25   with Mr. Levandowski about this configuration before 02:43:19

                                                    Page 35

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    he sent you this email?

2        A    I'm not saying I spoke with him.  I'm

3    saying I spoke with these guys.  They're cc'd on the

4    mail.

5        Q    Fair.  Where is the evidence that you spoke    02:43:29

6    with anyone about this particular beam spacing

7    design before Mr. Levandowski asked you to prepare

8    it here in June 9th, 2016?

9        A    I do not have that with me.

10       Q    Are you aware of it at all?                     02:43:45

11       A    I can't -- I can't point to anything right

12   now.  I would need to go look.

13       Q    Okay.  So sitting here today, you're not

14   aware of any evidence that supports that you were --

15   that you came up with this ████████████████            02:44:00

16   before Mr. Levandowski directed you to do so in

17   June 9th, 2016; fair?

18       A    No, wait.  You're saying that he was

19   telling me to make ████████████████████, and

20   that was the first I heard of this?                     02:44:13

21       Q    No, sorry.

22       A    I'm not sure what you're saying for

23   evidence.

24       Q    Sorry.  I'll come back to that.

25            Moving forward here in time, there's a long    02:44:28

Page 36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     ███████████████████████████████
 2            MR. KIM:  Objection.  Vague.
 3            THE WITNESS:  ██████████████████████████
 4     ██████████████████████████████
 5     BY MR. JAFFE:                              02:50:00
 6         Q    Right.  ████████████████████████████
 7     ████████████████████████████████████████████
 8     ███████████  right?
 9         A    Yes.
10         Q    Okay.                              02:50:07
11            MR. JAFFE:  This is going to be
12     Exhibit 53 -- excuse me, 54, UBER 00008493.
13            (Deposition Exhibit 54 marked by the court
14            reporter.)
15     BY MR. JAFFE:                              02:50:56
16         Q    Mr. Boehmke, do you recognize the email I
17     placed in front of you as Exhibit 54?
18         A    Yes.
19         Q    It's an email that you wrote, right?
20         A    Yes.                              02:51:05
21         Q    In June 2016?
22         A    Yes.
23         Q    And it's to Mr. Levandowski, Mr. Meyhofer,
24     Mr. Rice and James Haslim, right?
25         A    Yes.                              02:51:17
```

Page 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q     And then you say -- first line is, quote:

 2            "James, FYI, today we discussed the

 3      parameters driving our beam spacing."

 4            Do you see that?

 5      A     Mm-hmm.                                   02:51:24

 6      Q     Who did you discuss "the parameters driving

 7   our beam spacing with"?

 8      A     I don't recall.

 9      Q     Did you discuss them with Mr. Levandowski?

10      A     I said I don't recall.                    02:51:38

11      Q     Do you think that's a reasonable assumption

12   from looking at this email where he's on the "to"

13   line?

14            MR. KIM:  Objection.  Calls for

15   speculation.                                       02:52:04

16            THE WITNESS:  Yeah, I -- I don't recall.

17   BY MR. JAFFE:

18      Q     All right.  You can put that aside.

19            MR. JAFFE:  This is going to be Exhibit 55.

20   It's UBER 8592.                                    02:52:23

21            (Deposition Exhibit 55 marked by the court

22            reporter.)

23   BY MR. JAFFE:

24      Q     Mr. Boehmke, have you seen Exhibit 55

25   before?                                            02:52:40
```

Page 41

1        A     Yes.

2        Q     Okay.  It's an email that you received in

3    December of 20- -- excuse me, October 2016, right?

4        A     Yes.

5        Q     ████████████████████████                02:52:55

6              THE WITNESS:  We're -- we're closed book

7    here, right?

8              MR. KIM:  Do you have a privilege issue --

9              THE WITNESS:  Yeah.

10             MR. KIM:  -- that you want to talk about?   02:53:13

11             THE WITNESS:  Yeah, I need to understand.

12   BY MR. JAFFE:

13        Q     If it's confidentiality issues, we're under

14   the protective order here.  The only thing we can

15   break for is attorney-client issues.             02:53:21

16        A     No.  ████████████████████████████████

17        Q     And what is ████████████

   ██  ██  ████████████████████████████████████████████

   ██  ████████

20        Q     I see.  So the first email in this chain   02:53:35

21   from Mr. Haslim is talking about transitioning to

22   V2, which is Fuji, right?

23        A     Yes.

24        Q     And it's saying:

25             ██████████████████████████  ████████████   02:53:52

                                            Page 42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    ████████████   ███████████████████████████

2        Right?

3        A     That's what it says.

4        Q     So Mr. Haslim is proposing transitioning to

5    this Fuji project in October -- on October 26th,        02:54:04

6    2016, right?

7        A     Yes.

8        Q     So you hadn't really started transitioning

9    to Fuji before this email, right?

10       A     This email was days after his meeting with   02:54:16

11   us in Pittsburgh, yes.

12       Q     When you say "us," who are you referring

13   to?

14       A     The meetings with Eric and myself.

15       Q     And your testimony is that Mr. Levandowski   02:54:27

16   was not at that meeting, right?

17       A     No.

18       Q     He didn't come into that meeting at all?

19       A     No.

20       Q     Okay.  Now, later in his email he talks      02:54:36

21   about an optical cavity.  Do you see that?

22       A     Mm-hmm.

23       Q     And it talks about the transmit elements --

24   and I'm paraphrasing here -- are ███████████████████

     ██████████████████████████████████████████            02:54:50

                                               Page 43

```
 1        A    I don't know.  I don't recall.

 2        Q    You don't deny that he said that, right?

 3        A    I -- I don't recall that part of the

 4   conversation.

 5        Q    Okay.  What else do you recall him saying?   03:16:57

 6        A    ███████████████████████████████

     ██████████████████████████████

     ██   ████████████████████████████████

     ██████████████████████████████████████

     ██   ████████████████████                  03:17:21

11        A    I don't recall him saying any of that.

12        Q    He didn't address those allegations, right?

13        A    I don't recall that, no.

14        Q    And have you ever followed up to ask him:

15   Hey, what happened?                          03:17:31

16        A    No.

17        Q    Why not?

18        A    There's no opportunity to do that.  And I

19   know in my heart that we haven't used any of that

20   stuff if it does exist.                       03:17:41

21        Q    So you know in your heart that Mr.

22   Levandowski doesn't have any Waymo files?

23        A    I did not say that.  I said I don't have

24   any of those files.  My coworkers don't have any of

25   those files.                                  03:17:53
```

Page 55

```
 1        Q     What about the folks at Otto, are you -- do

 2   you know in your heart whether they have them?

 3              MR. KIM:  Objection.  Argumentative.

 4              THE WITNESS:  I know that the work they've

 5   done is theirs as I've watched them through the        03:18:06

 6   process, and I've seen no evidence that those files

 7   exist in Otto.

 8   BY MR. JAFFE:

 9        Q     Is there anything else about that all-hands

10   meeting that you recall?                               03:18:41

11        A     It was -- it took place -- it took place at

12   737.

13        Q     And your recollection is that ████

██   ███████████████████████████████████████████

██   ████████████████████████████████████    ████████

██   ██████████████████████████████████

17        A     So I want to make sure it's -- I did not

18   quote him when I used the word ████████  I -- I

19   paraphrased that or interpreted his saying to say

20   that.  So I don't want to get quoted on that.         03:19:31

21         ████████████████████████████████████████

██   ████████████████████████████████████████████

██   █████████████████████

24        Q     I see.  █████████████████████████████████

██   █████████████████████                               03:19:45
```

Page 56

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4          That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were duly sworn; that a record

8    of the proceedings was made by me using machine

9    shorthand which was thereafter transcribed under my

10   direction; that the foregoing transcript is a true

11   record of the testimony given.

12         Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [ ] was [X] was not requested.

16         I further, certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or party to this action.

19         IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21         Dated: 4/18/2017

22

23

24         SUZANNE F. GUDELJ

25         CSR No. 5111

Page 79

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


WAYMO, LLC,                         )

      Plaintiff,              )

       vs.                   ) No. 3:17-CV-00939

UBER TECHNOLOGIES; INC.;            )

OTTOMOTTO, LLC; and OTTO            )

TRUCKING, LLC,                      )

      Defendants.             )

_____


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


Continued Videotaped Deposition of SCOTT BOEHMKE,

Volume II, taken at 435 Sixth Avenue, Pittsburgh,

Pennsylvania  15222, commencing at 9:01 a.m.

Friday, July 28, 2017, before Rebecca L. Schnur,

Notary Public in and for the Commonwealth of

Pennsylvania.


JOB No. 2665736

PAGES 80 - 372

Page 293

```
 1              I'll represent to you that this is a log that    14:59:40
 2   was produced by Uber in response to a court order in        14:59:43
 3   this case.  That order directed Uber to disclose all        14:59:47
 4   oral and written communications between Anthony             14:59:51
 5   Levandowski and any employee of Uber involving lidar.       14:59:53
 6        A.   I'm familiar with that request.                   14:59:59
 7        Q.   And I want to walk through some of the            15:00:02
 8   entries that involve you.                                   15:00:05
 9              If you turn forward to entry number 145 --       15:00:09
10        A.   Okay.                                             15:00:19
11        Q.   -- we see an April 26, 2016 entry at             15:00:19
12   12:51 p.m., a text message from Anthony Levandowski to     15:00:25
13   Scott Boehmke?                                              15:00:28
14        A.   Yes.                                              15:00:31
15        Q.   Do you believe that this was the first           15:00:32
16   communication between yourself and Mr. Levandowski?        15:00:34
17        A.   They would fit the right time frame.  That       15:00:40
18   makes sense.                                                15:00:42
19        Q.   And do you remember what this text message       15:00:43
20   concerned?                                                  15:00:47
21        A.   I recall trying to get in communication with     15:00:51
22   him.  This led to us sitting down in a conference room     15:00:55
23   in doing some brainstorming.  At the time we were          15:01:01
24   talking about fiber lasers.  And I, after that meeting,    15:01:05
25   sent him some simulation results I had done in             15:01:08
```

Page 294

```
 1    December.                                          15:01:14

 2         Q.   If you look forward to the next page, entries   15:01:14

 3    154 through 156, the "Subjects Discussed" state,   15:01:17

 4    "whiteboard photo from 4/27/16 conversation regarding   15:01:23

 5    use of fiber laser for scanning"?                  15:01:28

 6         A.   Yep.                                      15:01:32

 7         Q.   Is that the meeting that you just referenced?   15:01:32

 8         A.   That's correct.                           15:01:35

 9         Q.   And this meeting took place in Pittsburgh at   15:01:35

10    ATC's location?                                     15:01:37

11         A.   That's correct.                           15:01:39

12         Q.   And it says, "whiteboard photo."  Was there a   15:01:39

13    photo taken of a whiteboard?                        15:01:42

14         A.   Yes.                                      15:01:44

15         Q.   Does that photo still exist?              15:01:45

16         A.   Yes.                                      15:01:48

17         Q.   Do you have custody of that photo?        15:01:50

18         A.   Yes.                                      15:01:53

19              MR. SCHMIDT:  Counsel, if that photo hasn't   15:01:55

20         been produced, we ask that you produce it, please.   15:01:57

21              MR. KIM:  I think it has been produced.   15:01:59

22              Did you pick up the documents from reception?   15:02:01

23         MR. SCHMIDT:  I did.                           15:02:03

24              MR. KIM:  Okay.  Are there photos and texts?   15:02:04

25              MR. SCHMIDT:  There are text messages.  I do   15:02:08
```

Page 295

```
1        not see any photos.                              15:02:10

2             And I'll note for the record that these text  15:02:16

3        messages were produced after business hours last  15:02:18

4        night East Coast time.  So I have attempted my   15:02:21

5        best to review them during the breaks, but we will 15:02:27

6        reserve all rights with respect to this witness  15:02:29

7        due to late production.                          15:02:33

8             And I ask, if the photo hasn't been produced, 15:02:36

9        it be produced.                                  15:02:38

10            MR. KIM:  I'm look into it.  But I note your 15:02:40

11       request.                                         15:02:42

12   BY MR. SCHMIDT:                                      15:02:42

13       Q.   If you look down on entries 162 through     15:02:46

14   164 --                                              15:02:49

15       A.   Okay.                                       15:02:52

16       Q.   -- it looks like additional text messages and 15:02:52

17   e-mails.  And on 164, specifically, it looks like Dan 15:02:55

18   Gruver was looped into the communication?            15:03:00

19       A.   Yes.                                        15:03:03

20       Q.   Do you remember Mr. Gruver being brought into 15:03:04

21   the conversation?                                    15:03:07

22       A.   I was heading out West for the meeting on the 15:03:08

23   5th, I believe, and so I was communicating with Dan. 15:03:10

24       Q.   So these communications involved your visit 15:03:13

25   out to Otto, which was reflected in that document we 15:03:16
```

Page 296

```
 1   reviewed earlier, Exhibit 452.  Correct?                    15:03:20
 2       A.   I won't dig up the number, but yeah, that was       15:03:25
 3   my trip out there in early May.                              15:03:28
 4       Q.   And if you look at entries 167 and 168, these       15:03:33
 5   are e-mails involving a combination of yourself,             15:03:38
 6   Mr. Gruver, and Anthony Levandowski that state, "E-mail      15:03:42
 7   discussing meeting with Anthony for lidar discussions        15:03:46
 8   and brainstorming"?                                          15:03:49
 9       A.   Right.                                              15:03:50
10       Q.   Was there a meeting with Anthony for lidar          15:03:51
11   discussions and brainstorming around this time?             15:03:53
12       A.   So I believe I was at Otto on the 5th, and          15:03:56
13   discussion was me asking -- I remember asking where I       15:04:04
14   was going and getting a response of the address and --      15:04:08
15   something of that nature.                                    15:04:18
16           MR. SCHMIDT:  Keep that exhibit in front of         15:04:29
17       you, but I want to mark another one in the               15:04:30
18       meantime.                                                15:04:32
19           (Whereupon, Deposition Exhibit 463 was marked       15:04:33
20       for identification.)                                     15:04:33
21       Q.   What's placed before you is Exhibit 463, and        15:04:54
22   463 is a text message -- I will represent to you that       15:04:59
23   this is -- the "from" line is from Anthony at               15:05:06
24   associated phone number, and the participants line, the     15:05:09
25   person who this text message is being sent to, is           15:05:14
```

Page 372

```
 1              CERTIFICATE

 2  COMMONWEALTH OF PENNSYLVANIA  )
                                  )
 3  COUNTY OF ALLEGHENY           )

 4

 5      I, Rebecca L. Schnur, do hereby certify that
    before me, a Notary Public in and for the Commonwealth
 6  aforesaid, personally appeared SCOTT BOEHMKE, who then

 7  was by me first duly cautioned and sworn to testify the

 8  truth, the whole truth, and nothing but the truth in

 9  the taking of his oral deposition in the cause

10  aforesaid; that the testimony then given by him as

11  above set forth was by me reduced to stenotype in the
    presence of said witness, and afterwards transcribed by
12  means of computer-aided transcription.

13      I do further certify that this deposition was
    taken at the time and place in the foregoing caption
14  specified, and was completed without adjournment.

15      I do further certify that I am not a relative,

16  counsel or attorney of either party or otherwise

17  interested in the event of this action.

18      IN WITNESS WHEREOF, I have hereunto set my hand

19  and affixed my seal of office at Pittsburgh,

20  Pennsylvania, on this 31st of July, 2017.

21

22
        <%signature%>
23      Rebecca L. Schnur, RDR, Notary Public

24      In and for the Commonwealth of Pennsylvania

25      My Commission expires June 16, 2021.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1            UNITED STATES DISTRICT COURT

 2          NORTHERN DISTRICT OF CALIFORNIA

 3             SAN FRANCISCO DIVISION

 4                  ---oOo---

 5

 6   WAYMO LLC,

 7        Plaintiff,

 8   vs.                        No. 3:17-cv-00939-WHA

 9   UBER TECHNOLOGIES, INC.;

     OTTOMOTTO LLC; OTTO TRUCKING,

10   INC.,

11        Defendants.

     _____/

12

13

14      WAYMO HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

15

16        VIDEOTAPED DEPOSITION OF DON BURNETTE

17             SAN FRANCISCO, CALIFORNIA

18              FRIDAY, AUGUST 18, 2017

19

20

21

22   BY:  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

23   CSR LICENSE NO. 9830

24   JOB NO. 2681032

25   PAGES 1 - 168
```

                                              Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | LiDAR; correct? | 12:42 |
| 2 | A   Yes. | 12:42 |
| 3 | Q   What conversations do you remember having | 12:42 |
| 4 | with Anthony Levandowski about LiDAR? | 12:43 |
| 5 | A   I don't remember having any specific | 12:43 |
| 6 | conversations with him about LiDAR. | 12:43 |
| 7 | Q   So you don't remember what he's told you | 12:43 |
| 8 | about LiDAR? | 12:43 |
| 9 | A   Correct. | 12:43 |
| 10 | Q   You don't remember what you've told him about | 12:43 |
| 11 | LiDAR? | 12:43 |
| 12 | A   Correct. | 12:43 |
| 13 | Q   Fair to say that he -- he -- he's worked with | 12:43 |
| 14 | LiDAR more than you have? | 12:43 |
| 15 | A   Very much so. | 12:43 |
| 16 | Q   How much of your work for -- for Uber -- | 12:43 |
| 17 | so -- so Uber -- involves, in your opinion, LiDAR? | 12:43 |
| 18 | MS. HARTNETT:  Objection. | 12:43 |
| 19 | THE WITNESS:  Almost none. | 12:43 |
| 20 | MR. JUDAH:  Q.  What -- what aspect of it | 12:43 |
| 21 | does involve LiDAR? | 12:43 |
| 22 | A   My interaction with LiDAR is to the extent | 12:43 |
| 23 | that, after we've received the data from the sensor as | 12:43 |
| 24 | it's been produced, how to then process the algorithms | 12:43 |
| 25 | to interpret the data. | 12:43 |

Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | | |
|---|---|---|---|
| 1 | Q   Okay.  Directing your attention -- there's a | 12:47 |
| 2 | number of entries here. | 12:47 |
| 3 | Do you see this? | 12:47 |
| 4 | A   There's a number of entries here. | 12:47 |
| 5 | Q   Right. | 12:47 |
| 6 | So it goes up to 1,083. | 12:47 |
| 7 | Do you see that? | 12:47 |
| 8 | A   Yes. | 12:47 |
| 9 | Q   So, I want to direct your attention to -- | 12:47 |
| 10 | your name appears on this in a number of entries, but | 12:47 |
| 11 | I'm just going to focus on entry 866.  If you could | 12:48 |
| 12 | turn to that one. | 12:48 |
| 13 | MS. HARTNETT:  Just for the record, the | 12:48 |
| 14 | number of entries goes up to 1,085. | 12:48 |
| 15 | MR. JUDAH:  Oh, I'm sorry.  What did I say? | 12:48 |
| 16 | MS. HARTNETT:  I think you said 1,083. | 12:48 |
| 17 | MR. JUDAH:  I apologize.  I actually said -- | 12:48 |
| 18 | yeah, I did.  You're right.  You're right.  You're | 12:48 |
| 19 | right.  Oh, yeah.  Okay.  I missed the final page. | 12:48 |
| 20 | Thank you. | 12:48 |
| 21 | MS. HARTNETT:  No problem. | 12:48 |
| 22 | THE WITNESS:  Sorry.  Which number? | 12:48 |
| 23 | MR. JUDAH:  866. | 12:48 |
| 24 | THE WITNESS:  (Complies.) | 12:48 |
| 25 | MR. JUDAH:  Q.  So you see that -- so | 12:48 |

Page 149

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    entry 866, there's a date column that says:          12:48

 2         "Before August 2016."                            12:48

 3     A    Yeah.                                            12:48

 4     Q    The author sent is Anthony Levandowski, and     12:48

 5    the recipient is you; right?                          12:48

 6     A    Uh-huh.                                          12:48

 7     Q    And then the place -- there's three different   12:48

 8    places:  The RLS in Mountain View, Cowper Street in   12:48

 9    Palo Alto, and then 737 Harrison Street.              12:48

10         Do you see that?                                 12:48

11     A    Yes.                                             12:48

12     Q    And then the -- the mode of communication, it   12:48

13    says:                                                 12:48

14         "One-on-one conversations."                      12:48

15         Do you see that?                                 12:48

16     A    Yes.                                             12:48

17     Q    And then "Subjects Discussed," this -- this     12:49

18    entry on the log says:                                12:49

19         ██████████████████████████████          ████
██    ████████████████████████████████████████      ████
██    ██████████████████████████████████████        ████
██    ████████████████████████████████              ████
██    ██████████████████████████████████████        ████
██    ██████████████████████████████████████        ████
██    ██████████████████████████████████████        ████
```

Page 150

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  ███████████████████████                              12:49

2      Do you see that?                                  12:49

3  A   I do.                                             12:49

4  Q   And so that's an accurate description of your     12:49

5  recollection of one-on-one conversations with -- with 12:49

6  Anthony Levandowski pertaining to LiDAR?              12:49

7  A   Yes.                                              12:49

8  Q   So -- and then, directing your attention to       12:49

9  entry No. 906 -- or 905.  Sorry.                      12:49

10 A   (Witness complies.)                               12:49

11     Okay.                                             12:49

12 Q   So 905, the date here is early 2017.  And         12:49

13 again, it's -- the author is Mr. Levandowski, and the 12:49

14 recipient is you.  And then the mode of communication 12:49

15 here is one-on-one conversations.  And then subjects   12:49

16 discussed, it says:                                   12:50

17            ███████████████████████        ██████      

   ██   ██████████████████████████  ████████████████  ██████

   ██   █████████████████████████              12:50

20     Do you see that?                                  12:50

21 A   I do.                                             12:50

22 Q   And is that -- is that accurate that you --        12:50

23 you have no more specific recollection about those     12:50

24 conversations?                                        12:50

25 A   Correct.                                          12:50

Page 151

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1              CERTIFICATE OF REPORTER

2

3         I, ANDREA M. IGNACIO, hereby certify that the

4    witness in the foregoing deposition was by me duly

5    sworn to tell the truth, the whole truth, and nothing

6    but the truth in the within-entitled cause;

          That said deposition was taken in shorthand

7    by me, a disinterested person, at the time and place

8    therein stated, and that the testimony of the said

9    witness was thereafter reduced to typewriting, by

     computer, under my direction and supervision;

10        That before completion of the deposition,

11   review of the transcript [x] was [ ] was not

12   requested.  If requested, any changes made by the

13   deponent (and provided to the reporter) during the

     period allowed are appended hereto.

14        I further certify that I am not of counsel or

15   attorney for either or any of the parties to the said

16   deposition, nor in any way interested in the event of

17   this cause, and that I am not related to any of the

18   parties thereto.

19   Dated: August 18, 2017

20

21

22

23

24        ANDREA M. IGNACIO,

25        RPR, CRR, CCRR, CLR, CSR No. 9830
```

                                        Page 168

Page 74

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


WAYMO LLC

    Plaintiff,

        vs.              Case No. 17-cv-00939-WHA

UBER TECHNOLOGIES,INC.;
OTTOMOTTO, LLC; OTTO
TRUCKING LLC,

    Defendants.
_____




*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

VIDEO DEPOSITION OF DANIEL GRUVER

San Francisco, California

Friday, August 4, 2017

Volume II




REPORTED BY:

REBECCA L. ROMANO, RPR, CSR No. 12546

JOB NO. 2671821

PAGES 74 - 415

Page 224

1      A.   I don't recall.                              01:35

2      Q.   You were talking about the self-driving

3   trucks, though, right?

4      A.   Correct.

5      Q.   What were the sensors that you were          01:35

6   discussing that you were going to use to make these

7   self-driving trucks work?

8      A.   I don't recall discussing the technical

9   details of how a self-driving truck would be

10  executed at the time.  The initial discussions were  01:35

11  the business model, potentially, of the -- of

12  building -- the reasons for building a self-driving

13  truck and the business model for autonomous

14  trucking.

15     Q.   So there no discussions between you and      01:36

16  Mr. Levandowski or Ms. Morgan regarding the

17  technology you would use, including LiDAR

18  technology, for actually buildings these trucks?

19     A.   No.

20     Q.   True?                                         01:36

21     A.   True.

22     Q.   Why did you decide to join this company?

23     A.   The idea --

24     Q.   280 Systems.

25     A.   Yes.  That's fine.                            01:36

Page 250

1 ████ ████████████████████████ ████

████████████████████████████████████

████████████████████████████████████

████████████████████████

████ ████████████████████ ████

████ ██████████████████

████████████████████████████

██████████████████████████████

████████████████████

████ ████ ████████████████████ ████

████████████████████████

12      Q.   Have you ever discussed beam spacing with

13  Anthony Levandowski?

14      A.   Yes.

15      Q.   How many times have you discussed it with      02:08

16  him?

17      A.   I don't recall the number.

18      Q.   When was the first time you discussed

19  beam spacing for LiDAR with Anthony Levandowski?

20      A.   I don't recall the specific discussion or      02:09

21  which would have been a first -- first specific

22  discussion.

23      Q.   Can you tell me information from any of

24  your conversations with Mr. Levandowski related to

25  beam spacing?                                           02:09

Page 251

1        A.   I recall discussions likely involving          02:09

2   Anthony Levandowski about effective beam spacing of

3   the MBR LiDAR system.

4            I also recall discussions of effective

5   beam spacing regarding the PBR LiDAR sensor.          02:09

6            I imagine there were discussions

7   involving the early GBR spacing, but I don't

8   recall -- and I have had discussions at -- while

9   employed at Otto and Uber about effective beam

10  spacing.                                              02:10

11       Q.   Okay.  And when is the first discussion

12  you had, subsequent to your employment at Google,

13  about beam spacing with Anthony Levandowski?

14       A.   Sorry.  Can you rephrase that?

15       Q.   When is the first time you had a           02:10

16  discussion with Mr. Levandowski related to beam

17  spacing after you ceased employment at Google?

18       A.   Sometime probably shortly after I started

19  at 280 Systems.  Possibly about effective -- so I

20  I'll -- I'll clarify that if -- effective beam        02:10

21  spacing, meaning separation of points -- of

22  adjacent points in a pulse LiDAR system.

02:10

Page 290

13     Q.   Does it surprise you that Mr. Levandowski

14  was involved at this level of detail in the beam

15  spacing for a 64-beam sensor that Fuji is also a        03:22

16  64-beam sensor?

17          MR. MUINO:   Objection.   Vague.   Lacks

18  foundation.

19          THE DEPONENT:   Sorry.   Does it surprise

20  that Anthony is involved?                               03:23

21     Q.   (By Mr. Jaffe)   Well, let me -- let me

22  actually ask a better question.

23          Anthony Levandowski, as of late

24  September 2016, he was working with Uber on beam

25  angles for a 64-beam sensor, right?                     03:23

Page 291

```
 1              MR. MUINO:  Objection.  Lacks foundation.      03:23
 2   Calls for speculation.
 3              MS. WALSH:  Objection.  Form.
 4              THE DEPONENT:  From Scott's email, I can
 5   infer that he was talking to Anthony about beam        03:23
 6   spacing.
 7       Q.   (By Mr. Jaffe)  And he was providing
 8   specific input on the specifications for beam
 9   spacing for a self-driving car, right?
10              MR. MUINO:  Objection.  Lacks --            03:23
11       Q.   (By Mr. Jaffe)  For a LiDAR used in a
12   self-driving car, excuse me.
13              MR. MUINO:  Objection.  Lacks foundation.
14   Calls for speculation.
15              MS. WALSH:  Objection.  Form.               03:23
16              THE DEPONENT:  Sorry.  Anthony was having
17   input in LiDAR, so can you repeat the question.
18       Q.   (By Mr. Jaffe)  Yeah.  There was a lot of
19   objections there.
20              Anthony was providing specific input on     03:24
21   the specifications for beam straight- -- beam
22   spacing for LiDAR used in a self-driving car by
23   Uber, right?
24              MR. MUINO:  Objection.  Foundation.
25   Speculation.                                           03:24
```

Page 292

1          MS. WALSH:  Same objection.                    03:24

2          THE DEPONENT:  Anthony was, from this

3     email, suggesting, requesting a elevation

4     separation.

5          Q.   (By Mr. Jaffe)  So the answer to my       03:24

6     question, though, is yes, isn't it?

7          MR. MUINO:  Same objections.

8          THE DEPONENT:  I -- sorry.  Anthony was

9     providing input on specific --

10         Q.   (By Mr. Jaffe)  Specifications for beam    03:24

11    spacing for LiDAR used in a self-driving car by

12    Uber, correct?

13         A.   Yes.

14         MR. MUINO:  Objection.  Foundation and

15    speculation.                                         03:25

16         THE DEPONENT:  That appears to be so.

17         Q.   (By Mr. Jaffe)  Okay.  You can put that

18    aside.

19              Your last day at Google was January 19th,

20    2016, right?                                         03:25

21         A.   That sounds roughly correct.

22         Q.   So if you were -- if you were paid your

23    bonus from the bonus plan on July 20th, 2016, it

24    wasn't late, right?

25         A.   That sounds right.                         03:25

Page 351

1          MR. JAFFE:  You -- you don't know?          05:08

2          MR. MUINO:  I'm not aware of it.  Yeah,

3    I'm not saying we didn't.  That may be the case.

4    I'm just not sure.

5          MR. JAFFE:  Okay.  All right.  Let's mark    05:08

6    as Exhibit -- Exhibit 518 a document Bates-labeled

7    UBER00177353.

8          (Exhibit 518 was marked for

9    identification by the court reporter and is

10   attached hereto.)                                  05:09

11       Q.   (By Mr. Jaffe)  The -- Mr. Gruver,

12   looking at Exhibit 518 --

13       A.   Uh-huh.

14       Q.   -- the first time stamp on here is

15   January 13th, 2017.                                05:09

16            Do you see that?

17       A.   Yes.

18       Q.   And at that point Uber had acquired Otto,

19   and Anthony Levandowski was head of Uber

20   self-driving program, right?                       05:09

21       A.   Right.

22       Q.   And at this point you were texting

23   Anthony Levandowski information about the die/wire

24   bonded -- well, let me ask you.

25            Is the first text here dated             05:10

Page 352

1    January 13th, 1 -- 2017, is that about Fuji?                05:10

2         A.   Yes.

3         Q.   Why were you providing

4    Anthony Levandowski an update as to the TX board in

5    Fuji on January 13th, 2017?                                 05:10

6         A.   He had expressed interest in our

7    progress.  It was -- it was, to my understanding, a

8    common thing for teams to report to him progress

9    and things just as a -- to keep him up -- aware, up

10   to date on the general progress of the self-driving        05:10

11   program.

12        Q.   So Mr. Levandowski was interested in the

13   progress of Fuji.

14        A.   Yes.

15        Q.   And so you were texting him information        05:10

16   about how you had a full TX board that works well,

17   here in January 13th, 2017.

18        A.   That is what the text says.

19        Q.   And if you continue through the thread or

20   the next page, he asks to send a picture, right?        05:11

21        A.   Yes.

22        Q.   Why did Mr. Levandowski want a picture of

23   the TX board in Fuji in January of 2017?

24        A.   So I'm -- I'm unclear what he meant by

25   "Send me a pic."  He doesn't reference which           05:11

Page 356

1    A.   That -- I -- I -- I don't recall what I        05:16

2  understood from that text message in January.

3    Q.   Okay.  But the two interpretations you

4  have sitting here today is he's either talking

5  about watching you and the LiDAR team test all the    05:16

6  pieces of Fuji or seeing Fuji actually work; is

7  that fair?

8    A.   It could reference either of them.

9    Q.   Is there any third thing that it could

10 reference?                                             05:16

11   A.   I -- let's see.

12        My inference is he's referring to one of

13 my previous text messages that we -- something will

14 work and that we'll have pieces to test.

15        MR. JAFFE:  All right.  This will be          05:17

16 Exhibit 519.  It's UBER00177373.

17        (Exhibit 519 was marked for

18 identification by the court reporter and is

19 attached hereto.)

20   Q.   (By Mr. Jaffe)  Mr. Gruver, Exhibit 519        05:17

21 is a text that you sent Mr. Levandowski on

22 January 27th, 2017, right?

23   A.   Yes.

24   Q.   And you said, "Lunch laser meeting?"

25   A.   Yes.                                           05:17

Page 357

1       Q.   Why did you text Anthony Levandowski, the        05:17
2   head of Uber self-driving program at the time, and
3   request a lunch laser meeting?
4       A.   I -- I believe we had a scheduled
5   something like biweekly team meeting with Anthony.        05:18
6   And so I believe asking if he was going to attend
7   said meeting.
8       Q.   And why were you texting him this instead
9   of Mr. Haslim, who was kind of in between you two
10  in the reporting structure?                               05:18
11      A.   I don't know if I was the only one
12  texting him, but I was -- hm.
13           So if I recall, the meeting was scheduled
14  by -- these meetings were put together by another
15  engineer, a mechanical engineer.  But he was              05:18
16  potentially not yet at the meeting, and it may have
17  come up that someone was asking where he was.  And
18  if we were all together, someone may have
19  volunteered or I may have volunteered to text him.
20      Q.   What -- what are these meetings called,         05:18
21  that you mentioned?
22      A.   I don't remember the name of them.
23      Q.   But is it biweekly?
24      A.   I think it was in -- it was possibly in
25  every other week.                                         05:19

Page 359

```
 1        Q.   It's about, what, six -- excuse me --        05:20
 2   four hours later?
 3        A.   Yes.
```

■        ■        ████████████████████████████

■   ████████████████████████████        ████

■   █████████████████████████████████

■        ████████████████████

■        ■   ███████████

■        ■   ███████████████████████

■   █████████████████████████████████████        ████

■   ████████████

■        ■   ████████████████████████████

■   ██████████████████████████████████████████

■   ████████████████████████████████████

■   ██████████████        05:21

```
16        Q.   But why send this to -- to Anthony?
17        A.   Because he was interested in the progress
18   of our LiDAR R & D.
19        Q.   I see.  So this is you -- Exhibit 520 is
20   you updating Anthony Levandowski on the -- the         05:21
21   progress of the Fuji LiDAR.
22        A.   Yes.
```

■        ■   ███████████████████████████████████

■   ███████████████████████████████████████████

■   ██████████████        05:21

Page 362

1      Q.    (By Mr. Jaffe)   Exhibit 521, this is a        05:24

2    text message from you to Mr. Levandowski, dated

3    March 10th, 2017.

4      A.    Uh-huh.

5      Q.    And it says, "We have a point cloud."          05:24

6            Do you see that?

7      A.    I do.

8      Q.    What are you referring to there?

9      A.    Referring to -- well, data -- some amount

10   of timing data on -- on a prototype Fuji system.       05:25

11   So transmit, receive, and some amount of clocking

12   of that.

13           And, in general, a point cloud is a

14   description of -- commonly used description of data

15   from a LiDAR system.                                    05:25

16     Q.    And the next -- on the next page,

17   Mr. Levandowski responds, "Yesssss," with about

18   five Ss.

19     A.    Yeah, that is correct.

20     Q.    And he then further responds, "That's          05:25

21   amazing timing."

22           Do you see that?

23     A.    I see that.

24     Q.    Do you know what he's referring to with

25   "amazing timing"?                                       05:25

Page 371

1    the same time.                                              05:39

2         So I will say that my answer for 541

3    would be the same as line 540, that I don't recall

4    what, if any, information Anthony provided to the

5    meeting on 541.                                             05:39

6    Q.   And then looking at 542 and 543, do you

7    have any opinion whether those are duplicates?

8    A.   LiDAR standup meeting -- those appear to

9    be, yeah, both duplicates of 540 and 541.

10   Q.   550 --                                                 05:39

11   A.   550.

12   Q.   -- this is November 3rd, 2016.  What, if

13   any, information did Anthony Levandowski provide

14   about LiDAR?

15   A.   Meeting with third-party ████ at             05:40

16   7:00 p.m.

17        I believe 550 was an initial meeting with

18   ████ which is a third-party LiDAR vendor, to

19   gain information about capabilities of their system

20   and its possible use to aid our self-driving car         05:40

21   program.

22   Q.   Okay.  Let's go to -- well, did -- did

23   Anthony disclose any design feedback or LiDAR

24   design techniques at that meeting?

25   A.   I don't recall him disclosing any design        05:40

Page 374

1    line 837.                                                      05:44

2         MR. MUINO:  What's the total time on the

3    record at this point?

4         THE VIDEOGRAPHER:  Six hours and 32

5    minutes.                                                       05:44

6    Q.   (By Mr. Jaffe)  877.

7    A.   877, this is the line, early May -- early

8    May 2016 meeting with Anthony Levandowski regarding

9    development of LiDAR sensor.

10   Q.   What happened at the meeting described          05:45

11   here in that entry 877?

12   A.   I believe this is near or about the -- my

13   introduction to Scott Boehmke and some of the

14   previously discussed maybe ways or means or

15   features desired from Uber in a LiDAR system for     05:45

16   their self-driving vehicle.

17   Q.   What information regarding LiDAR

18   technology did Anthony Levandowski provide in this

19   meeting reflected as entry 877?

20   A.   I don't recall specifics of information         05:46

21   that Anthony might have provided about LiDAR

22   technology in the meeting on line 877.

23   Q.   Sitting here today, can you provide me

24   any more details about Anthony Levandowski's

25   contribution to the meeting described here at        05:46

Page 409

[REDACTED]

10      Q.    (By Mr. Muino)  But you're aware that in       06:43

11  this case Waymo alleges that Mr. Levandowski

12  downloaded and stole certain files from Waymo?

13      A.    I'm aware of the allegations.

14          MR. JAFFE:  Objection.  Leading.

15      Q.    (By Mr. Muino)  At any point after the       06:44

16  lawsuit was filed, do you recall a -- a meeting of

17  Uber employees on the subject of the litigation?

18      A.    Yes.

19      Q.    What was the first meeting that you

20  recall of that kind?                                   06:44

21      A.    There was a meeting attended by Anthony,

22  Travis and I believe Angela, the head counsel for

23  Uber, discussing what we could expect next

24  potentially and Uber's stance on it.

25          And there was discussion of our LiDAR         06:44

Page 410

```
 1    systems to date that we had developed and kind of        06:44
 2    present them to ATG as sort of a -- a -- a kind of
 3    presentation of what we had done and showing the
 4    expansive of work it had taken us to get to the
 5    progress we made to that point.                           06:44
 6        Q.   At that meeting did Mr. Levandowski
 7    address the allegations that he had taken files?
 8             MR. JAFFE:  Object to form.  And leading.
 9             THE DEPONENT:  I don't recall
10    specifically what he said about -- about addressing       06:45
11    the files or -- about them.
12        Q.   (By Mr. Muino)  Okay.  Apart from that
13    meeting, were there any other meetings that you
14    recall at which Mr. Levandowski addressed the
15    subject of the litigation?                                06:45
16        A.   I don't recall specific meetings or
17    subjects of them.
18             MR. MUINO:  Okay.  No further questions.
19             THE VIDEOGRAPHER:  Going off the record.
20    The time is 6:45.                                         06:45
21             (Recess taken.)
22             THE VIDEOGRAPHER:  We are back on the
23    record.  The time is 6:59.
24             MR. MUINO:  Before you start, Counsel, I
25    just want to mark the record highly confidential,        06:59
```

1      I, Rebecca L. Romano, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4      That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that any witnesses in the foregoing proceedings,

7   prior to testifying, were administered an oath;

8   that a record of the proceedings was made by me

9   using machine shorthand which was thereafter

10  transcribed under my direction; that the foregoing

11  transcript is true record of the testimony given.

12     Further, that if the foregoing pertains to the

13  original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript [ ] was [X] was not requested.

16     I further certify I am neither financially

17  interested in the action nor a relative or employee

18  of any attorney or any party to this action.

19     IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21

22  Dated:  August 5, 2017

23

24

        Rebecca L. Romano, RPR,

25      CSR. No 12546

                                    Page 415

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                   UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4

    WAYMO LLC,

5

                        Plaintiff,

6                                           Case

    vs.                                     No. 3:17-cv-00939-WHA

7

    UBER TECHNOLOGIES, INC.;

8   OTTOMOTTO LLC; OTTO TRUCKING LLC,

9                   Defendants,

    _____/

10

11

12

13

14

15        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16          VIDEOTAPED DEPOSITION OF JAMES HASLIM

17                   VOLUME II

18              THURSDAY, MAY 4, 2017

19

20

21

22  Reported by:

23  Anrae Wimberley

24  CSR No. 7778

25  Job No.  2610396

                                            Page 113

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          Q.   Do you remember anything else from          10:45:41
 2   Mr. Levandowski in that conversation, anything else he  10:45:44
 3   said about LiDAR or anything?                            10:45:47
 4          A.   No.  No.                                     10:45:48
 5          Q.   When is the next conversation you had?       10:45:50
 6          A.   I have no recollection of what the next      10:45:56
 7   conversation was.                                        10:45:57
 8          Q.   When is the next conversation that you       10:45:59
 9   recall?                                                  10:46:03
10          MR. KIM:  Objection; form.                        10:46:03
11          THE WITNESS:  I can't recall when these           10:46:05
12   conversations took place.  I would say we had dinner     10:46:10
13   occasionally, and he would generally just ask how        10:46:14
14   we're doing.                                             10:46:15
15   BY MR. JAFFE:                                            10:46:15
16          Q.   When is the next conversation that you can   10:46:21
17   recall with Mr. Levandowski where you talked about       10:46:25
18   LiDAR techniques?                                        10:46:28
19          MR. KIM:  Objection; form.                        10:46:42
20          THE WITNESS:  At this point, I'm leaning towards  10:46:44
21   saying when I joined Otto.                                10:46:46
22   BY MR. JAFFE:                                            10:46:46
23          Q.   Okay.  So after you joined Otto, what was the 10:46:50
24   first conversation you had with Mr. Levandowski about    10:46:53
25   LiDAR?                                                   10:46:54
```

Page 139

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    It would have been something to the nature | 10:47:01 |
| 2 | that we need to take -- possibly take the Owl design | 10:47:09 |
| 3 | and convert that into a multichannel LiDAR sensor that | 10:47:16 |
| 4 | could be used on autonomous vehicles. | 10:47:18 |
| 5 | Q.    And what did Mr. Levandowski say? | 10:47:23 |
| 6 | A.    I think he wanted to know what the plan would | 10:47:27 |
| 7 | be.  I had started -- had sometime in that time frame | 10:47:33 |
| 8 | started working on a CAD model for a design I was | 10:47:36 |
| 9 | going to propose.  And at that time or at a later | 10:47:45 |
| 10 | time, we started to discuss two different design | 10:47:49 |
| 11 | approaches that looked promising to take. | 10:47:53 |
| 12 | Q.    What were those two approaches? | 10:47:55 |
| 13 | A.    One approach was to take the Owl and somehow | 10:48:00 |
| 14 | multiply the channels to get a multichannel LiDAR that | 10:48:07 |
| 15 | could be used on a truck.  The other approach was to | 10:48:10 |
| 16 | basically take the Velodyne style of design and build | 10:48:14 |
| 17 | a sensor in that approach. | 10:48:19 |
| 18 | Q.    Before we move forward with those two, you | 10:48:25 |
| 19 | said you had built a CAD design for something that you | 10:48:29 |
| 20 | were going to propose. | 10:48:30 |
| 21 | A.    Yes. | 10:48:30 |
| 22 | Q.    What was the name of that, just for purposes | 10:48:34 |
| 23 | of our conversation? | 10:48:35 |
| 24 | A.    It had no name.  Perhaps if I described it. | 10:48:39 |
| 25 | Q.    Sure. | 10:48:40 |

Page 140

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   It was -- I intended to design a LiDAR sensor | 10:48:47 |
| 2 | similar to the Owl, based on the design of the Owl | 10:48:51 |
| 3 | optical cavity.  It was a bistatic LiDAR design.  It | 10:48:57 |
| 4 | would incorporate eight laser sources that would | 10:49:00 |
| 5 | transmit out a transmit lens. | 10:49:03 |
| 6 | It would have eight avalanche photodiodes | 10:49:08 |
| 7 | that would receive through the receive lines.  That | 10:49:14 |
| 8 | would project onto a mirror that could spin that could | 10:49:18 |
| 9 | help scan those beams.  It was intended in my mind to | 10:49:26 |
| 10 | augment something like a Velodyne sensor to provide a | 10:49:29 |
| 11 | longer range, tighter packed field of view. | 10:49:32 |
| 12 | Q.   So what you were coming up with was a | 10:49:36 |
| 13 | long-range sensor that would supplement a mid-range | 10:49:42 |
| 14 | sensor on a self-driving car; is that fair? | 10:49:46 |
| 15 | MR. KIM:  Objection; form. | 10:49:47 |
| 16 | THE WITNESS:  It was meant to supplement the | 10:49:49 |
| 17 | Velodyne-type sensor, yes. | 10:49:53 |
| 18 | BY MR. JAFFE: | 10:49:53 |
| 19 | Q.   Did you have any discussions with | 10:49:54 |
| 20 | Mr. Levandowski in coming up with that design? | 10:49:59 |
| 21 | A.   I don't recall having any discussion with | 10:50:08 |
| 22 | Anthony Levandowski regarding this design.  I want to | 10:50:11 |
| 23 | say that idea came from earlier talks with Eric | 10:50:15 |
| 24 | Meyhofer and Scott Boehmke when they visited.  At that | 10:50:20 |
| 25 | time, Brent Schwarz was proposing to them that we had | 10:50:28 |

Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | a sensor that was capable of long-range performance | 10:50:31 |
| 2 | and that they would need a sensor for long-range | 10:50:35 |
| 3 | viewing on an autonomous vehicle. | 10:50:40 |
| 4 | And so our angle with Uber at the time was we | 10:50:44 |
| 5 | think we can build such a sensor, but we're not | 10:50:47 |
| 6 | working on it right now.  Our company is open for | 10:50:51 |
| 7 | acquisition. | 10:50:55 |
| 8 | Q.   So the sensor that you were coming up with, | 10:51:00 |
| 9 | that was going to be a bistatic design; right? | 10:51:03 |
| 10 | A.   Yes. | 10:51:05 |
| 11 | Q.   At some point, Spider came about and | 10:51:12 |
| 12 | transformed it to a monostatic design; right? | 10:51:15 |
| 13 | A.   True. | 10:51:17 |
| 14 | Q.   Do you know who was responsible for the | 10:51:19 |
| 15 | change from what you were coming up with, which was a | 10:51:22 |
| 16 | bistatic design, to the monostatic design in Spider? | 10:51:26 |
| 17 | A.   I don't recall who among the team was | 10:51:34 |
| 18 | involved in our conversations first to move away from | 10:51:39 |
| 19 | supplemental design to one design that would cover all | 10:51:44 |
| 20 | the way from directly in front of the vehicle out to | 10:51:47 |
| 21 | long range.  But that was a decision that was made | 10:51:50 |
| 22 | that pretty much negated the proposal I had made of | 10:51:56 |
| 23 | using a tight-packed purely long-range sensor. | 10:52:00 |
| 24 | Q.   So you shifted into the passive voice there. | 10:52:05 |
| 25 | You're talking about -- who is making these | 10:52:07 |

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | decisions? | 10:52:08 |
| 2 | A.    Exactly.  I'm trying to recall.  I don't | 10:52:10 |
| 3 | know, of all the people that were involved, who was in | 10:52:14 |
| 4 | those conversations.  So it would include me.  It | 10:52:17 |
| 5 | would include most likely Anthony Levandowski.  I | 10:52:23 |
| 6 | believe it would also include Daniel Gruver.  And I'm | 10:52:28 |
| 7 | not sure if there's anyone else. | 10:52:30 |
| 8 | Q.    And do you know, in the context of those | 10:52:35 |
| 9 | communications, who just said, Hey, James, your design | 10:52:44 |
| 10 | looks great, but we're going to go with the monostatic | 10:52:46 |
| 11 | design and we think it's better? | 10:52:50 |
| 12 | MR. KIM:  Objection; form. | 10:52:50 |
| 13 | THE WITNESS:  The monostatic design that uses one | 10:52:56 |
| 14 | lens for transmit and receive, I don't know who came | 10:52:59 |
| 15 | up with that.  At some point I saw it, seemed okay to | 10:53:05 |
| 16 | me, it seemed compact, let's use it. | 10:53:09 |
| 17 | BY MR. JAFFE: | 10:53:09 |
| 18 | Q.    So you don't know -- you have no information | 10:53:12 |
| 19 | of who came up with the monostatic design in Spider? | 10:53:15 |
| 20 | A.    True. | 10:53:16 |
| 21 | Q.    Okay.  So we were still -- going back to our | 10:53:25 |
| 22 | chron of conversations with Mr. Levandowski, when is | 10:53:28 |
| 23 | the next conversation that you had with | 10:53:31 |
| 24 | Mr. Levandowski about LiDAR that you can recall? | 10:53:34 |
| 25 | A.    It's very hard for me to recall specific | 10:53:43 |

Page 143

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | conversations, especially in sequence.  At this point, | 10:53:47 |
| 2 | I report to Anthony Levandowski. | 10:53:50 |
| 3 | Q.   And just for purposes of the record, when | 10:53:52 |
| 4 | you're talking about "this point," what date are you | 10:53:54 |
| 5 | talking about? | 10:53:55 |
| 6 | A.   I'm talking about immediately following | 10:53:56 |
| 7 | Tyto's acquisition by Otto -- or I should say Otto's | 10:54:03 |
| 8 | acquisition of Tyto.  We joined -- at that time, I | 10:54:08 |
| 9 | reported to Anthony Levandowski.  There would be | 10:54:12 |
| 10 | regular staff meetings.  Since my team is working on | 10:54:19 |
| 11 | LiDAR, LiDAR would definitely come up in conversations | 10:54:22 |
| 12 | with him, at that point, on a probably fairly routine | 10:54:25 |
| 13 | basis, like weekly basis. | 10:54:28 |
| 14 | Q.   And what did you and Mr. Levandowski discuss? | 10:54:31 |
| 15 | A.   Progress, approach, schedule or timing, | 10:54:39 |
| 16 | volumes. | 10:54:41 |
| 17 | Q.   Can you tell me any more specifics about the | 10:54:44 |
| 18 | routine and regular conversations you were having with | 10:54:48 |
| 19 | Mr. Levandowski about LiDAR? | 10:54:49 |
| 20 | A.   He would ask about what the design was | 10:54:56 |
| 21 | looking like, how we were approaching it.  Beyond | 10:55:00 |
| 22 | that, I don't recall specifics of our conversations. | 10:55:03 |
| 23 | Q.   So sitting here today, in this time period | 10:55:06 |
| 24 | that you're talking about, after you joined Otto in | 10:55:10 |
| 25 | May of 2016, you would have regular conversations with | 10:55:15 |

Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Mr. Levandowski about LiDAR, but you can't recall any | 10:55:18 |
| 2 | specifics of those conversations; is that fair? | 10:55:21 |
| 3 | A.   That's fair to say I cannot recall beyond the | 10:55:26 |
| 4 | details I already told you. | 10:55:28 |
| 5 | Q.   I see. | 10:55:29 |
| 6 | When is the next -- moving forward in time | 10:55:34 |
| 7 | here, when is the next substantive conversation with | 10:55:38 |
| 8 | Mr. Levandowski about LiDAR that you recall? | 10:55:40 |
| 9 | A.   I don't know. | 10:55:56 |
| 10 | Q.   You don't know? | 10:55:57 |
| 11 | A.   I don't know. | 10:55:57 |
| 12 | Q.   I'm not trying to do a memory test here.  If | 10:56:02 |
| 13 | there's just too many conversations for you to recall, | 10:56:05 |
| 14 | that's fine, and you can just tell me that.  But | 10:56:08 |
| 15 | otherwise I'm just going to keep asking. | 10:56:10 |
| 16 | MR. KIM:  Objection; form. | 10:56:10 |
| 17 | THE WITNESS:  Most of our conversations, that is | 10:56:21 |
| 18 | between me and Anthony Levandowski, were not | 10:56:24 |
| 19 | substantive in LiDAR design per se.  So I'm having a | 10:56:30 |
| 20 | hard time remembering further conversations or | 10:56:35 |
| 21 | specifics. | 10:56:35 |
| 22 | Most of the time, he wanted to know where | 10:56:38 |
| 23 | we were in our progress, and he may have asked | 10:56:41 |
| 24 | what the design was shaping up like. | 10:56:44 |
| 25 | I do recall one more. | 10:56:49 |

Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | He was visiting Uber.  He got me on the phone | 10:56:56 |
| 2 | and was starting to describe using eight fiber | 10:57:02 |
| 3 | lasers -- that's right -- eight fiber lasers, | 10:57:08 |
| 4 | splitting their outputs to multiply the number of | 10:57:12 |
| 5 | channels and then routing a fiber from each fiber | 10:57:17 |
| 6 | laser into a number of optical cavities. | 10:57:24 |
| 7 | There was also, at that time frame, a | 10:57:26 |
| 8 | document published or shared with the team.  I think | 10:57:31 |
| 9 | that came from Scott Boehmke.  So this would be | 10:57:38 |
| 10 | substantive in terms of shaping up what Spider would | 10:57:43 |
| 11 | eventually become. | 10:57:44 |
| 12 | BY MR. JAFFE: | 10:57:44 |
| 13 | Q.   And you said Mr. Levandowski called you from | 10:57:48 |
| 14 | Uber in Pittsburgh; is that right? | 10:57:53 |
| 15 | A.   My understanding he was either at Uber or in | 10:57:55 |
| 16 | transit to or from Uber in Pittsburgh. | 10:57:58 |
| 17 | Q.   Approximately what time period was this? | 10:58:01 |
| 18 | A.   This would be relatively early in the | 10:58:04 |
| 19 | development of the Spider.  Beyond that, I would defer | 10:58:08 |
| 20 | to e-mails.  I don't remember. | 10:58:10 |
| 21 | Q.   When you say you would "defer to e-mails," | 10:58:12 |
| 22 | are there e-mails about this conversation? | 10:58:15 |
| 23 | A.   There were e-mails -- I should say there was | 10:58:19 |
| 24 | an e-mail with a document that was published that | 10:58:24 |
| 25 | contained the substance of what he was describing. | 10:58:27 |

Page 146

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | All right.  Are there any other substantive | 11:02:40 |
| 2 | conversations regarding LiDAR with Mr. Levandowski | 11:02:43 |
| 3 | that you can recall? | 11:02:47 |
| 4 | MR. KIM:  Objection; form. | 11:02:50 |
| 5 | THE WITNESS:  I'm not sure I would consider the | 11:03:11 |
| 6 | pivot to Fuji a conversation that was substantive, but | 11:03:18 |
| 7 | he did provide input into the Fuji and that he wanted | 11:03:26 |
| 8 | to make sure it first operated as well or better than | 11:03:33 |
| 9 | Velodyne and suggested that we ignore concerns from | 11:03:38 |
| 10 | the Pittsburgh office regarding size and weight and | 11:03:41 |
| 11 | not to be constrained by that. | 11:03:43 |
| 12 | BY MR. JAFFE: | 11:03:43 |
| 13 | Q.   Anything else? | 11:03:44 |
| 14 | A.   I don't recall. | 11:03:52 |
| 15 | Q.   Just to be clear, is there any other | 11:04:00 |
| 16 | conversation that you had with Mr. Levandowski about | 11:04:04 |
| 17 | LiDAR design that you can recall, sitting here today? | 11:04:10 |
| 18 | MR. KIM:  Objection; form. | 11:04:11 |
| 19 | THE WITNESS:  I don't recall any more. | 11:04:48 |
| 20 | BY MR. JAFFE: | 11:04:48 |
| 21 | Q.   No more? | 11:04:53 |
| 22 | A.   I don't recall any more.  I'm sorry. | 11:04:56 |
| 23 | Q.   And this is apart from the regular | 11:04:58 |
| 24 | conversations that you had with Mr. Levandowski | 11:05:00 |
| 25 | regarding status and updates; right? | 11:05:03 |

Page 150

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    153.                                      15:10:47

 2            Probably would have included Florin         15:10:59

 3  Ignatescu.  I don't recall if Adam had joined by then. 15:11:08

 4  Would have included Asheem Linaval, Tri Luong, Nancy   15:11:25

 5  Sun.  I think that would be it.  And like I said,      15:11:36

 6  possibly Anthony.  This is best of my recollection who 15:11:40

 7  should have been or could have been on that list.      15:11:42

 8      Q.    So Exhibit 159 here is an e-mail from        15:11:45

 9  Mr. Levandowski to Mr. Boehmke.  And it says --        15:11:47

10  Mr. Levandowski says, "███████████████    ████████    15:11:47

█   ████████

12            Do you see that?                            15:11:55

13      A.    I see that.                                 15:11:56

14      Q.    Do you know what that refers to?            15:11:57

15      A.    ████████████████████████████    ████████  15:11:...

█   ████████████████████                                  15:12:06

17      Q.    What does ████████████ refer to, though?    15:12:10

18      A.    It's a wavelength of light for a laser diode. 15:12:14

19      Q.    So Mr. Levandowski is referring to a         15:12:16

20  diode-based LiDAR design here; right?                  15:12:18

21      A.    Yes.                                         15:12:20

22      Q.    And one of the parts of that design was going 15:12:22

23  to be Gaetan Pennecot's FAC lens; right?               15:12:27

24      A.    Yes.                                         15:12:27

25      Q.    And he was already working with Mr. Boehmke  15:12:34
```

Page 266

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Let me ask a different question.                15:30:07

2          If you wanted to have a point on the road       15:30:09

3    every 10 feet going out to 150 feet, is that an idea  15:30:13

4    that you guys came up with at Velodyne?               15:30:17

5    A.    That -- I don't recall that idea at Velodyne,   15:30:20

6    no.                                                    15:30:20

7    Q.    Even though you guys were designing LiDARs       15:30:24

8    for self-driving cars?                                15:30:26

9    A.    We were designing LiDARs for mapping,           15:30:29

10   self-driving cars, robots.  So, yes.                  15:30:34

11   Q.    And when you came to Otto, who came up with      15:30:40

12   the idea of wanting to get -- hit a point every 10    15:30:49

13   feet on the road for every 150 feet?  Or that concept,15:30:53

14   where did that come from?                             15:30:55

15   A.    The vertical angles and the concepts behind     15:31:01

16   them I believe, my understanding was, came through    15:31:04

17   Scott Boehmke.                                         15:31:05

18   Q.    Anyone else?                                     15:31:06

19   A.    I'm not aware of anyone else.                    15:31:08

20   Q.    And you know that Scott Boehmke was talking      15:31:11

21   with Anthony Levandowski about LiDAR design when you  15:31:15

22   were joining; right?                                   15:31:16

23   A.    Shortly after I joined, we have e-mails that     15:31:18

24   show that they were talking about LiDAR, yes.         15:31:21

25   Q.    And, in particular, the e-mail that we were      15:31:26

Page 279

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | just looking at, for example, shows that | 15:31:30 |
| 2 | Mr. Levandowski and Mr. Boehmke were talking about how | 15:31:35 |
| 3 | to implement 64 beams and the angles for each of | 15:31:39 |
| 4 | those; right? | 15:31:40 |
| 5 | A.   They were talking about that topic, yes. | 15:31:45 |
| 6 | Q.   And they were talking about that because | 15:31:47 |
| 7 | Mr. Levandowski was working with Mr. Boehmke on the | 15:31:50 |
| 8 | beam angles; right? | 15:31:52 |
| 9 | A.   Well, you're making it sound like Anthony was | 15:31:57 |
| 10 | working on the beam angles.  So I want to just be | 15:32:01 |
| 11 | clear.  I don't know that he actually worked on beam | 15:32:04 |
| 12 | angles, but it does seem that he was asking Scott | 15:32:07 |
| 13 | Boehmke to design angles based on certain | 15:32:10 |
| 14 | manufacturing restrictions. | 15:32:12 |
| 15 | Q.   And where do those manufacturing restrictions | 15:32:14 |
| 16 | come from? | 15:32:17 |
| 17 | A.   It could have involved a discussion with | 15:32:22 |
| 18 | Anthony Levandowski, but it also included Dan Gruver | 15:32:27 |
| 19 | and myself.  Maybe Gaetan Pennecot; I'm not sure. | 15:32:32 |
| 20 | Q.   So going back to Mr. Levandowski's e-mail. | 15:32:42 |
| 21 | A.   Yes. | 15:32:43 |
| 22 | Q.   Gives Option A and Option B. | 15:32:48 |
| 23 | A.   Yes. | 15:32:48 |
| 24 | Q.   Option A, ███████████████████████     ████████ | |
| ██ | ████████████████ | 15:32:54 |

Page 280

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              CERTIFICATE OF DEPOSITION OFFICER

2      I, ANRAE WIMBERLEY, CSR NO. 7778, duly authorized

3  to administer oaths pursuant to Section 8211 of the

4  California Code of Civil Procedure, hereby certify

5  that the witness in the foregoing deposition was by me

6  sworn to testify to the truth, the whole truth and

7  nothing but the truth in the within-entitled cause;

8  that said deposition was taken at the time and place

9  therein stated; that the testimony of said witness was

10  reported by me and was thereafter transcribed by me or

11  under my direction by means of computer-aided

12  transcription; that the foregoing is a full, complete

13  and true record of said testimony; and that the

14  witness was given an opportunity to read and correct

15  said deposition and to subscribe same.

16      I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any way

19  interested in the outcome of the cause named in said

20  caption.

21      IN WITNESS WHEREOF, I have hereunto subscribed by

22  my hand this 5th day of May, 2017.

23

24

        ANRAE WIMBERLEY, CSR NO. 7778

25

                                        Page 403

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
 4
 5   WAYMO LLC,                    )
                                   )
 6              Plaintiff,         )
                                   ) Case No.
 7              vs.                ) 3:17-cv-000939-WHA
                                   )
 8   UBER TECHNOLOGIES, INC.;      )
     OTTOMOTTO LLC; OTTO TRUCKING, )
 9   INC.,                         )
                                   )
10              Defendants.        )
     _____)
11
12
13    *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
14
15        VIDEOTAPED DEPOSITION OF JAMES HASLIM
16              San Francisco, California
17             Wednesday, August 9, 2017
18                    Volume III
19
20
21   Reported by:
22   CARLA SOARES
     CSR No. 5908
23   Job No. 2675900
24
25   Pages 404 - 724
```

Page 404

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    general technical input, did you ever get into the      12:36:51

 2    specifics of design features?

 3         A    No, not that I recall.

 4         Q    And how were these communications --

 5    strike that.                                             12:37:09

 6              What form did these communications with

 7    Mr. Levandowski take?

 8         A    Verbal communication, maybe a white

 9    board.

10         Q    E-mails?                                       12:37:25

11         A    I don't recall that, no.

12         Q    Text messages?

13         A    I don't recall that.

14              MR. SCHMIDT:  I'll mark the next exhibit

15    in order.  This is going to be Exhibit 570.              12:37:43

16              (Exhibit 570 was marked for identification

17         and is attached hereto.)

18    BY MR. SCHMIDT:

19         Q    Mr. Haslim, I've placed before you the

20    next exhibit in order.  This is marked as                12:38:02

21    Exhibit 570, and this looks to be a text message

22    from you sent to Anthony Levandowski on

23    September 10th, 2012.

24              Do you see that?

25         A    Yes.                                           12:38:17
```

Page 512

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1     Q    And then the subsequent conversations --     12:38:17

2     the subsequent text messages look like they might be

3     the next in a series on the same date.

4          Do you see that?

5     A    Yeah, I guess I see the times look -- the     12:38:35

6     same day.

7     Q    And focusing your attention on the

8     document ending in Bates No. 199104, the first

9     page --

10    A    Okay.     12:38:53

11    Q    -- you say to Mr. Levandowski, "Good

12    shape," and then you recite a series of what look to

13    be technical parameters.

14         Do you see that?

15    A    Yes.     12:39:03

16    Q    Do you know what you were referencing

17    here?

18    A    I vaguely recall I was referencing a

19    performance of some avalanche photodiode output

20    between shade and sunlight.     12:39:21

21    Q    And what device was this in relation to?

22    A    What do you mean by "device"?

23    Q    Was this conversation relating to the

24    development of a LiDAR device?

25    A    Yeah.  This would be early in the     12:39:37

Page 513

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4          That the foregoing proceedings were taken

     before me at the time and place herein set forth;

5    that any witnesses in the foregoing proceedings,

6    prior to testifying, were administered an oath; that

7    a record of the proceedings was made by me using

8    machine shorthand which was thereafter transcribed

     under my direction; that the foregoing transcript is

9    a true record of the testimony given.

10         Further, that if the foregoing pertains to

11   the original transcript of a deposition in a Federal

12   Case, before completion of the proceedings, review

     of the transcript [X] was [ ] was not requested.

13         I further certify I am neither financially

14   interested in the action nor a relative or employee

15   of any attorney or any party to this action.

          IN WITNESS WHEREOF, I have this date

16   subscribed my name.

17

18   Dated: August 10, 2017

19

20

21

22

23   _Carla Soares_

24        CARLA SOARES

25        CSR No. 5908

                                    Page  724

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4

 5   WAYMO LLC,

 6            Plaintiff,

 7   vs.                         Case No.

 8   UBER TECHNOLOGIES, INC.;      3:17-cv-00939-WHA

 9   OTTOMOTTO LLC; OTTO TRUCKING,

10   INC.,

11            Defendants.

12   _____/

13

14       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

16        VIDEOTAPED DEPOSITION OF JEFF HOLDEN

17             SAN FRANCISCO, CALIFORNIA

18            TUESDAY, AUGUST 15, 2017

19

20

21   BY:  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

22   CSR LICENSE NO. 9830

23   JOB NO. 2660984

24

25   PAGES 1 - 341

                                        Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MS. ROBERTS:  Q.  My first question, I don't | 10:00 |
| 2 | think you need to read before -- beyond the -- the | 10:00 |
| 3 | first page. | 10:00 |
| 4 | A   Okay. | 10:00 |
| 5 | Q   So I will represent to you that this is a | 10:00 |
| 6 | document that your counsel created and put together | 10:00 |
| 7 | and produced to us for the litigation, that lists | 10:00 |
| 8 | communications with Mr. Levandowski. | 10:00 |
| 9 | And I want to point you to the -- the | 10:00 |
| 10 | first -- Nos. 1 through 7, there are all | 10:00 |
| 11 | communications that you were involved in. | 10:00 |
| 12 | Do you see that? | 10:00 |
| 13 | A   I do. | 10:00 |
| 14 | Q   And so, if you look at 1 through 6, they | 10:00 |
| 15 | refer to ███████████████████████████ | ████ |
| | ██████ | ████ |
| | Do you see that? | 10:01 |
| 18 | A   Let's see.  Yes.  I see the date. ████ | ████ |
| | ████████████ | 10:01 |
| 20 | Q   Right. | 10:01 |
| 21 | And then, on the far right column, it says | 10:01 |
| 22 | "Subjects Discussed." ████████████████ | ████ |
| | ██████████████████ | 10:01 |
| 24 | A   Yes. | 10:01 |
| 25 | Q   Do you see that? | 10:01 |

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    ordinary course of business?                    10:22

 2        A    I believe so.                           10:22

 3        Q    And the subject line is:                10:22

 4             ████████████                            10:22

 5        A    Yes.                                     10:22

 6        Q    ███████████████████████                 ████

 █        ██   ████████████████████████████████        ████

 █   ████████████████████                              10:22

 9        Q    Okay.                                    10:22

10        A    Yeah.                                    10:22

11        Q    ████████████████████████████████        ████

 █   ██████████████████████                            10:22

13             Do you see that?                         10:22

14        A    Uh-huh.                                  10:22

15        Q    ███████████████████████████             ████

 █        ██   ████████████████████████████████        10:22

17        Q    What was the purpose of this e-mail?     10:22

18        A    Well, I don't remember the exact e-mail.  But  10:22

19   again, the -- the -- what I -- just reading it here,  10:22

20   and familiarizing myself with it again, █████████     ████

 █   ████████████████████████████████████              ████

 █   █████████████████████████                         10:23

23        Q    And in the -- this is dated August 18th,  10:23

24   2015.                                              10:23

25             ████████████████████████████████        10:23
```

Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1 ████████████████████████████████                          10:23

2    A   Well, it's in -- there is a -- you know, at        10:23

3 some point the -- ███████████████████████                 10:23

████████████████████████████████████████████

███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████                                                    10:23

15        I thought it would be -- I said -- and what I     10:23

16 said was, ███████████████████████████████████            10:23

███████████████████████████████████████████               10:23

18 And that -- █████████████████████████████                10:23

██████████████████████████████████                         10:23

███████████████████████████████████████████               10:23

███████████████████████████ ██████████████████            10:24

██████████████                                              10:24

23        And -- and so there was a -- so there was          10:24

24 that discussion.                                          10:24

25         ███████████████████████████████                  10:24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ████████████████████████████████████████  ████████
     ███████████████████████████  ████████████  ████████
     ███████████████████████████                10:24
 4         But if -- if we are --  ██████████████  ████████
     ██████████████████████████████████████     ████████
     ████████████████████████████████████████   ████████
     ████████████████████████████████████████   ████████
     ███████████████████████████████            10:24
 9   Q    Okay.  So we're going to take a look at    10:24
10   ████████████████████████████              10:24
11         But if you could turn -- I think it was   10:24
12   Exhibit 804.  It was the really lengthy one.    10:24
13   A    (Witness complies.)                    10:24
14         Yes.                                  10:24
15   Q    And so I pointed you to -- to the -- the   10:24
16   first seven rows there before.              10:25
17   A    Yes.                                    10:25
18   Q    And, if you see -- and -- and I'll -- I'll   10:25
19   represent to you that this is organized in   10:25
20   chronological order.                         10:25
21   A    Okay.                                   10:25
22   Q    So those are the earliest discussions on the   10:25
23   first page.                                  10:25
24              ████████████████████████████████  ████████
     ██████████████████████████████             10:25
```

Page 68

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A    Uh-huh.                                    10:25

 2      Q    And then row 7 references a ███████        ███████

        ███████████████████████████████               ███████

        ██████████████                                 10:25

 5      A    Okay.                                      10:25

 6      Q    Between May of 2015 and September 23rd, 2015,   10:25

 7   were you having discussions with Mr. Levandowski?  10:25

 8      A    I do not remember.                         10:25

 9      Q    If you'd turn back to Exhibit 806, which is    10:25

10   the e-mail from Brian McClendon, ████████████████  ███████

        ████████████████████                           10:25

12      A    (Witness complies.)                        10:25

13      Q    Is it -- is it your understanding that you    10:25

14   received this e-mail at a time period when you were  10:25

15   having ongoing discussions with Mr. Levandowski?   10:25

16      A    Yeah.  I don't -- I just don't remember    10:26

17   the -- the timing of the -- the context.  It could  10:26

18   have been, this is the only contact I had or -- you  10:26

19   know, during that period, or it could be the --████  ███████

        ████████████████████████████████████  I        10:26

21   definitely had more conversations with Anthony.  I   10:26

22   just don't know when they were relative to these time  10:26

23   frames.                                            10:26

24      Q    Did you ask for this information from      10:26

25   Mr. Bares ███████████████████████                  10:26
```

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      Q    Can you turn back to Exhibit 804, which is      15:41

 2   the big log in front of you.                             15:41

 3      A    Uh-huh.                                          15:41

 4      Q    And if you'd turn to page 19.                    15:41

 5      A    (Witness complies.)                              15:41

 6           Okay.                                            15:42

 7      Q    Entry 434 has the date September 2nd, 2016,      15:42

 8   and your name, and then the subject is:                  15:42

 9           ████████████████████████████████████      ██████

 ██          ███████████████████████████████                 15:42

11      A    Okay.                                            15:42

12      Q    Do you see that?                                 15:42

13      A    Yep.                                             15:42

14      Q    ██████████████████████████████████████          15:42

15   on that date?                                            15:42

16      A    Yes.  Well, I don't know if I remember the       15:42

17   date, but ████████████████████████████████       ██████

 ██          ████████                                        15:42

19      Q    Okay.                                            15:42

20      A    Yeah.                                            15:42

21      Q    ████████████████████████                  ██████

 ██          █  ████████████████████████████████      ██████

 ██          █████████████████                               15:42

24      Q    What -- what do you recall ██████████      ██████

 ██          ██████████████████████████                      15:42
```

Page 267

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A   ██████████████████████████████     ██████

█   ██████████████   It was -- it was kind of lightweight.   15:42

3   I mean, it was -- we looked -- we -- I remember him   15:42

4   describing the fact that the trucks that were parked   15:43

5   in there were causing the structure to crumble.  And   15:43

6   so we went downstairs and looked at the fact that that   15:43

7   was actually happening.  It made me really kind of   15:43

8   nervous.   15:43

9        And then we looked at ██████████     ██████

█   ████████████████████████████████   15:43

11   had, you know, ██████████████████████████     ██████   15:43

█   ████████████   Looked at some of the testing   15:43

13   that -- sort of test benches they had built for --   ████     ██████   15:43

█   ████████████   Looked at the team and, like, how   15:43

15   the team was organized and, you know, looked at his   15:43

16   company values.   15:43

17        ██████████████████████   ██████     ██████

█   ████████████████████████████   15:43

19      Q   And this was -- we previously talked about   15:43

20   Mr. Levandowski taking tours of Uber.   15:43

21        ██████████████████████████     ██████

█   ██████████████     ██████

█     ██   ██████████████   15:43

24      Q   Okay.  And ██████████████████████████     ██████

█   ████████████████   15:43

                                 Page 268

1       Q    It lists you as a recipient of an e-mail, and        15:46

2    the "Subject Discussed" is:                                  15:46

3    ███████████████████████████████████████        ████████

     ████████████████████████████████                            15:46

5         Do you see that?                                        15:46

6    A    I do.                                                   15:46

7       Q    Do you remember attending ████████████        ████████

     ████████████████████████████████████████████████        ████████

     ███████████                                                 15:46

10   A    Not in a -- not in a particular meeting.               15:46

11      Q    Do you recall anything specific that was            15:46

12   discussed with Mr. Levandowski regarding ████████        ████████

     ████████████████████████                                   15:46

14   A    There is the one -- there's the one e-mail            15:46

15   that I sent that summarized the meeting.  This is --        15:46

16   this is based on what you showed me, so I don't -- I        15:46

17   mean, it's just that this is the only thing I               15:46

18   remember, which, you know, said that I had laid out         15:46

19   some initial high-level milestones.  But that's the         15:46

20   only -- I only remember that because you showed it to       15:46

21   me.  I don't remember anything else specific.               15:46

22      Q    Other than what's summarized in the e-mail,         15:46

23   do you have any independent recollection of                 15:46

24   discussions of those milestones?                            15:46

25   A    No, I don't.                                           15:46

                                              Page 271

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              CERTIFICATE OF REPORTER

2

3        I, ANDREA M. IGNACIO, hereby certify that the

4   witness in the foregoing deposition was by me duly

5   sworn to tell the truth, the whole truth, and nothing

6   but the truth in the within-entitled cause;

7        That said deposition was taken in shorthand

8   by me, a disinterested person, at the time and place

9   therein stated, and that the testimony of the said

10  witness was thereafter reduced to typewriting, by

11  computer, under my direction and supervision;

12       That before completion of the deposition,

13  review of the transcript [x] was [ ] was not

14  requested.  If requested, any changes made by the

15  deponent (and provided to the reporter) during the

16  period allowed are appended hereto.

17       I further certify that I am not of counsel or

18  attorney for either or any of the parties to the said

19  deposition, nor in any way interested in the event of

20  this cause, and that I am not related to any of the

21  parties thereto.

22       Dated: 8/16/2017

23

24       ANDREA M. IGNACIO,

25       RPR, CRR, CCRR, CLR, CSR No. 9830
```

Page 341

ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3           SAN FRANCISCO DIVISION

4

5    WAYMO LLC

6         Plaintiff,

7            vs.          Case No.

8    UBER TECHNOLOGIES,INC.;   17-cv-00939-WHA

9    OTTOMOTTO, LLC; OTTO

10   TRUCKING LLC,

11        Defendants.

12   _____

13

14          **ATTORNEYS' EYES ONLY**

15

16      VIDEOTAPED DEPOSITION OF TRAVIS KALANICK

17          San Francisco, California

18          Thursday, July 27, 2017

19               Volume I

20

21   REPORTED BY:

22   REBECCA L. ROMANO, RPR, CSR No. 12546

23   JOB NO. 2665725

24

25   PAGES 1 - 329

                                    Page 1

1    Google.  It was about great talent in the space,        12:01:25

2    period, coming from all the companies that are

3    working on it.

4         Q.   (By Mr. Verhoeven)  But you don't

5    remember having discussions about Mr. Levandowski      12:01:32

6    hiring as many people as he could from Google's AV

7    space after he came over?

8              MS. DUNN:  Objection to form.

9              MR. CHATTERJEE:  Join.

10             THE DEPONENT:  Generally, we wanted to        12:01:47

11   recruit as many great Google employees as we

12   possibly could.

13             We needed to figure out what were the

14   right processes to do that, but we were very

15   excited about somebody -- having somebody on our       12:02:00

16   team who was a visionary in the space who could

17   attract that great talent.

18        Q.   (By Mr. Verhoeven)  Okay.  But do you

19   remember having any -- my question was, do you

20   remember having any conversations about it?            12:02:15

21        A.   I would say -- I don't remember any

22   specific conversations, but I would generally say

23   that -- I would acknowledge that conversations like

24   that occurred.

25        Q.   I direct your attention to -- back to the    12:02:32

```
1    document, Exhibit 366, and to the same page we were      12:02:33

2    looking at.

3         A.   336?

4         Q.   366.  This is just the exhibit number of

5    the document you're looking at.                          12:02:48

6         A.   Okay.  Sorry.  I was looking for the

7    right page.

8         Q.   The same page.

9         A.   Okay.  Yeah.

10        Q.   And then the second-to-last line on the        12:02:54

11   page says, quote, If the sensor idea is so good,

12   why limiting scope to trucking?  Close quote.

13             Do you see that?

14        A.   Yeah.

15        Q.   And that's talking about a LiDAR sensor?        12:03:07

16             MS. DUNN:  Form.

17             MR. CHATTERJEE:  Join.

18             THE DEPONENT:  I -- I don't know what

19   that's about.

20        Q.   (By Mr. Verhoeven)  Do you remember             12:03:18

21   having discussions about Mr. Levandowski's idea

22   about a LiDAR sensor?

23             MS. DUNN:  Form.

24             MR. CHATTERJEE:  Form.

25             THE DEPONENT:  ███████████████████)             12:03:28
```



1                                                    12:03:29

2

3

4

5      Q.   (By Mr. Verhoeven)   Okay.              12:03:46

6      A.   I don't know if that's referring to this

7  or not.

8      Q.   Okay.  And what do you remember about the

9  discussion?

10          I mean, what was -- what was being         12:03:54

11  pitched to you?

12     A.

13

14

15                                                   12:04:05

16

17

18

19

20                                                   12:04:21

21

22

23

24

25                                                   12:04:40

179

1        Q.   Okay.  You see at the top, on the left,        12:21:43

2   it says, "TK, 4 January 2016."

3        A.   Yeah.

4        Q.   And TK is -- is yourself, right?

5        A.   I -- I didn't write this, but I would          12:21:56

6   assume so.

7        Q.   Yeah.

8             And AL would refer to Levandowski, right?

9        A.   Yeah.

10       Q.   And if you look down below the AL, to the      12:22:08

11  rite of it, there's a number of sentences there.

12            Do you see those?

13            First one says, quote, TK met up with him

14  over the weekend and is a big fan.

15       A.   Okay.                                           12:22:25

16       Q.   Do you see that?

17       A.   Yeah.

18       Q.   Do you remember what that's referring to,

19  meeting up with Mr. Levandowski over the weekend --

20       A.   I mean, I don't --                              12:22:31

21       Q.   -- in January?

22       A.   Yeah, I mean, I don't know specifics, but

23  I don't do a deal until I'm a big fan of what --

24  who somebody is and what they're doing.

25       Q.   You met up with -- with Mr. Levandowski?        12:22:42

                                                        195

1    documents related to the transaction.                    02:58:03

2        Q.    Do you have any recollection of signing

3    an indemnification agreement in connection with the

4    transaction?

5        A.    I do not.                                       02:58:10

6            (Exhibit 383 was marked for

7    identification by the court reporter and is

8    attached hereto.)

9        Q.    (By Mr. Verhoeven)  Let's mark as

10   Exhibit 383 a document.  It looks like a text         02:58:30

11   message from Anthony Levandowski, bearing Control

12   Number Uber 73820.

13           Do you see your phone number on there?

14       A.    Yes, I do.

15       Q.    This is a text from Mr. Levandowski to       02:59:06

16   you, time-stamped May 5th, 2016?

17       A.    Correct.

18       Q.    And Mr. Levandowski texts you saying,

19   "Driving to SF to meet with Scott, ATC, laser guy

20   and guide the team."                                    02:59:22

21           Do you see that?

22       A.    I do.

23       Q.    Who is Scott?

24       A.    I am not sure.  I think maybe is the guy

25   at ATC that works on lasers, maybe.                      02:59:31

                                                            278

```
 1   just read this real quick.  But it's not clear.       03:09:31
 2   Because the first bullet was Drew, and the second
 3   bullet was Anthony, but let me just read it and --
 4   just give me a second.
 5       Q.   (By Mr. Verhoeven)  Okay.                      03:09:40
 6       A.   Yes, I have read.
 7       Q.   Now, directing your attention to the
 8   third bullet --
 9       A.   Yeah.
10       Q.   -- the solid bullet down --                    03:11:32
11       A.   Yeah.
12       Q.   -- of Mr. Holden's May 13th, 2016
13   email --
14       A.   Yeah.  Yeah, yeah, yeah.
15       Q.   -- where it says, "We also discussed the      03:11:41
16   laser plan."
17            That was a discussion with
18   Mr. Levandowski, right?
19       A.   I think it's a fair assumption.
20       Q.   And then it says, "███████████              03:11:48
21   ███████████████████████████████████████
22            Do you see that?
23       A.   Yeah.
24       Q.   What's that a reference to?
25       A.   Sounds like something to do with lasers.     03:11:59
```

287

1          I, Rebecca L. Romano, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4          That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath;

8    that a record of the proceedings was made by me

9    using machine shorthand which was thereafter

10   transcribed under my direction; that the foregoing

11   transcript is true record of the testimony given.

12         Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [ ] was [x] was not requested.

16         I further certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or any party to this action.

19         IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated:  July 27, 2017

23

24                    <%signature%>
                      Rebecca L. Romano, RPR,
25                    CSR. No 12546

                                                330

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


WAYMO LLC,                           )

        Plaintiff,           )

          vs.                ) Case No.

UBER TECHNOLOGIES, INC.;        ) 3:17-cv-000939-WHA

OTTOMOTTO LLC; OTTO TRUCKING, )

INC.,                                )

        Defendants.          )

_____)


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEOTAPED DEPOSITION OF ADAM KENVARG
San Francisco, California

Tuesday, August 15, 2017

Volume I


Reported by:

CARLA SOARES

CSR No. 5908

JOB No. 2680990


PAGES 1 - 149

Page 83

```
 1        A    I don't even need to flip through it.  I          11:50:22
 2   have no idea what this is.
 3        Q    Okay.  So I'll represent this is a
 4   document that's been provided by Uber as part of the
 5   requirements in this case set out from one of the        11:50:33
 6   Court's orders.
 7        A    Okay.
 8        Q    And since you've never seen it before, I
 9   assume you've also not had any input into the
10   contents of this document.                              11:50:47
11        A    Right.  I don't know how I would.
12        Q    Okay.
13        A    No.
14        Q    If you could turn to entry 206, please.
15        A    UBER0 -- blah, blah, blah, blah, blah --       11:51:03
16   429, is that the one?
17        Q    That's correct, yeah.
18        A    Um-hum.
19        Q    So we're going to be running through
20   different instances where your name shows up in         11:51:15
21   here.
22        A    Okay.
23        Q    So each time, I'll point you to an entry,
24   and then I'll just have one or two questions about
25   it, and we'll just kind of get through this as          11:51:26
```

Page 84

1    quickly as possible, all right?                              11:51:28

2         A    Okay.

3         Q    So in this entry 206, it's from May 19th,

4    2016.  Do you see your name listed in the

5    "Recipient" column?                                          11:51:40

6         A    Yes.

7         Q    And this is the calendar invitation at the

8    very far right for weekly LiDAR stand-up meeting,

9    10:30 to 11:00.

10             Do you see that?                                   11:51:57

11        A    Um-hum.

12        Q    Do you recall the substance of this

13   meeting?

14        A    No.

15        Q    Okay.  Do you recall whether or not         11:52:03

16   Mr. Levandowski provided any input in this meeting?

17        A    No.

18        Q    The upstairs fishbowl, is that just a

19   meeting room?

20        A    Yes.                                               11:52:23

21        Q    All right.  The next one is 269.  It's a

22   couple pages down.

23        A    Same thing, different date?

24        Q    That's correct.

25             And again, do you recall the substance of  11:52:44

Page 85

1    this meeting?                                            11:52:45

2         A   No.  I can give you a heads up for all the

3    rest of the calendar invites for LiDAR stand-up

4    meetings.  I do not recall the substance of the

5    meeting and I do not recall Anthony Levandowski even    11:52:54

6    being there.

7         Q   Okay.  That will help us get through this

8    a little bit quicker, I think.  Malware and that's

9    true for any of the LiDAR stand-ups; is that what

10   you're saying?                                           11:53:04

11        A   Yes.  I don't ever recall him attending a

12   LiDAR stand-up, and I don't recall any of the

13   specific details of any particular meeting.

14        Q   What was, I guess, the general nature of a

15   LiDAR stand-up meeting?  What would be discussed?        11:53:14

16        A   An update on what people are working on.

17        Q   And it looks like it's only a half-hour

18   entry.  So is it a pretty quick in-and-out-type

19   meeting?

20        A   Yes.                                            11:53:24

21        Q   And it's just sort of a check-in to see

22   what people are doing; is that right?

23        A   Yes.

24        Q   So you're not generally discussing

25   substance of any one person's particular project; is    11:53:31

Page 93

```
 1    which is a little bit further back in the lineup.        12:02:42

 2         A    Yep.

 3         Q    This is February 2017, text message

 4    between Mr. Levandowski and yourself.  The

 5    description says, "Anthony Levandowski states he          12:03:11

 6    will be attending LiDAR lunch meeting and cannot

 7    wait to see point cloud on personal cell phone."

 8              Do you see that description?

 9         A    Yes.

10         Q    Do you recall getting that text message?        12:03:27

11         A    I have seen that text message.

12         Q    What was the point cloud that he was

13    referencing in the text, do you recall?

14         A    I had mentioned that we had a point cloud.

15         Q    Did you text with Mr. Levandowski               12:03:53

16    regularly?

17         A    No, I would not say regularly.

18         Q    How often would you say?

19         A    I mean, you have the history of my text

20    messages, so you can see specifically, but I don't       12:04:09

21    want to characterize it one way or another.

22              MR. McCAULEY:  Do we have his text

23    messages?

24              MS. CHANG:  You do.

25              MR. McCAULEY:  Okay.  Just making sure.         12:04:22
```

Page 124

1    Mr. Levandowski about LiDAR that informs your          13:47:19

2    opinion as to the fact that it was only a unilateral

3    conversation?

4              MS. CHANG:  Objection.  Vague and

5    ambiguous.                                             13:47:27

6              THE WITNESS:  I guess I'm trying to

7    understand how -- what specifically you mean.

8    BY MR. McCAULEY:

9         Q    You said in your view, the conversations

10   only went in one direction.  I just want to know how   13:47:41

11   your view has been formed.  Is it from a direct

12   interaction with Mr. Levandowski, is it just an

13   opinion generally, or is it something else?

14        A    I've had conversations with him about

15   LiDAR, and he has never given me any specific input    13:47:53

16   as to how it should be made.

17        Q    Okay.  But your opinion isn't formed by

18   anyone else's interactions with Mr. Levandowski;

19   it's yours specifically, correct?

20        A    I can't speculate on other people's          13:48:08

21   interactions.

22        Q    Okay.  And you've never had a conversation

23   with anybody else --

24        A    In which they -- no.

25        Q    Okay.  Sorry.  Just to clean that up, you    13:48:16

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4          That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath; that

8    a record of the proceedings was made by me using

9    machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing transcript is

11   a true record of the testimony given.

12         Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [ ] was [x] was not requested.

16         I further certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or any party to this action.

19         IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21              Dated: 8/16/2017

22

23

          _Carla Soares_

24        CARLA SOARES

25        CSR No. 5908

                                        Page 149

ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4   _____
 5   WAYMO LLC,                          )
                                         )
 6              Plaintiff,               )
        vs.                              )  Case No.
 7                                       )  17-cv-00939-WHA
     UBER TECHNOLOGIES, INC.;            )
 8   OTTOMOTTO, LLC; OTTO TRUCKING LLC,  )
                                         )
 9              Defendants.              )
     _____)
10
11
12                 ATTORNEYS' EYES ONLY
13
14             VIDEOTAPED DEPOSITION OF
15                SAMEER KSHIRSAGAR
16             San Francisco, California
17              Friday, April 14, 2017
18                    Volume I
19
20
21
22   Reported by:
     MARY J. GOFF
23   CSR No. 13427
24   Job No. 2594019
25   PAGES 1 - 49
```

Page 1

YELLOW = CONFIDENTIAL
RED = HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q     They report directly to you?              09:24

 2        A     Yes, they do.  Well, Steven reports to

 3    Prashant.  Prashant reports to me, yes.

 4              (Exhibit 11 was marked for identification

 5    and is attached to the transcript.)               09:24

 6        Q     I'm going to show you a document marked

 7    Exhibit 11.

 8        A     Um-hum.

 9              MS. BAILY:  I can only give you one this

10    time.                                              09:24

11        Q     (BY MS. BAILY) This is E-mail

12    correspondence among you, Mr. Levandowski, and

13    others.  Do you see that?

14        A     Yes.

15        Q     This cor -- excuse me.                   09:25

16              This correspondence took place while you

17    and Mr. Levandowski were working at Otto, correct?

18        A     That's correct.

19        Q     The E-mails relate to purchases being made

20    for a custom LiDAR system being developed at Otto;  09:25

21    is that correct?

22              MR. PUNZALAN:  Objection, form.

23        A     Yes.

24        Q     What was the name of that system?

25        A     I believe it was ███████              09:25
```

Page 33

YELLOW = CONFIDENTIAL
RED = HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q    Mr. Levandowski writes, Let's make sure we      09:25
 2   get the good concentrations of erbium and ytterbium
 3   from ███
 4            Do you see that?
 5        A    Yes.                                             09:25
 6        Q    Did you understand Mr. Levandowski to be
 7   referring to levels of ion doping of the optical
 8   fiber to be used with the lasers?
 9            MR. PUNZALAN:  Objection --
10            MS. PHILLIPS:  Objection --                       09:25
11            MR. PUNZALAN:  -- form.
12            MS. PHILLIPS:  -- form.
13        A    I believe that comment was for -- for
14   James.  I'm not sure what those things are, but...
15        Q    You're not sure what erbium and ytterbium       09:25
16   are?
17        A    Correct.  That -- that's not normal.  I'm
18   -- I'm sure I would have -- I -- I -- I don't know
19   who that comment was directed to.  James is on this
20   as well.                                                  09:26
21        Q    Are you aware whether, as part of the
22   Spider LiDAR system, there were ion doped optical
23   fibers used with the lasers?
24            MR. PUNZALAN:  Objection, form.
25            MS. PHILLIPS:  Objection, form.                   09:26
```

Page 34

YELLOW = CONFIDENTIAL
RED = HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A    I -- yes.  Yeah.                          09:26

 2        Q    (BY MS. BAILY) Do you understand what

 3   concentrations of ion doping Otto wanted for those

 4   fibers?

 5             MR. PUNZALAN:  Objection, form.           09:26

 6             MS. PHILLIPS:  Objection, form.

 7        A    No.

 8        Q    Who would know that?

 9        A    James.

10        Q    James who?                                09:26

11        A    Haslim.

12             (Exhibit 12 was marked for identification

13   and is attached to the transcript.)

14        Q    I'm showing you Exhibit 12.  This is

15   E-mail correspondence between you and               09:27

16   Mr. Levandowski and others.  Do you see that?

17        A    Yes.

18        Q    You forwarded a data sheet for an ███████

19   micro EDFA to Mr. Levandowski for his review and

20   comment; is that a fair characterization of this    09:27

21   document?

22             MR. PUNZALAN:  Objection, form.

23        A    Is -- is this what you're referencing?

24        Q    I'm representing -- I'm referencing you

25   forwarding what appears to be a spec sheet for the   09:27
```

Page 35

YELLOW = CONFIDENTIAL
RED = HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ATTORNEYS EYES ONLY

```
1      ███████ micro EDFA.                                    09:27

2            MR. PUNZALAN:  Objection, form.  Is that

3      --

4            MS. PHILLIPS:  Objection, form.

5            MR. PUNZALAN:  -- a question?                    09:28

6      A    I am not sure this is a spec sheet for

7      something they have.  I think this was a spec sheet

8      for something he was looking for.

9      Q    Understood.  An EDFA is an Erbium Doped

10     Fiber Amplifier; is that correct?                     09:28

11           MR. PUNZALAN:  Objection, form.

12     A    I don't know how to answer that when you

13     say it.  And I can read the initials.  And I would

14     say yes, I would not know how to describe that

15     before.                                               09:28

16     Q    Was the interest in an EDFA -- strike

17     that.

18           Were you corresponding with

19     Mr. Levandowski about an EDFA for use in the LiDAR

20     spider system?                                        09:28

21     A    I don't know what he wanted it for.

22     Q    Were you aware that Otto was interested in

23     an EDFA for LiDAR purposes?

24           MS. PHILLIPS:  Objection, form.

25           MR. PUNZALAN:  Objection, form.                 09:29
```

Page 36

YELLOW = CONFIDENTIAL
RED = HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ATTORNEYS EYES ONLY

1        I, MARY J. GOFF, CSR No. 13427, Certified

2   Shorthand Reporter of the State of California,

3   certify;

         That the foregoing proceedings were taken

4   before me at the time and place herein set forth, at

5   which time the witness declared under penalty of

6   perjury; that the testimony of the witness and all

    objections made at the time of the examination were

7   recorded stenographically by me and were thereafter

8   transcribed under my direction and supervision; that

    the foregoing is a full, true, and correct

9   transcript of my shorthand notes so taken and of the

10  testimony so given;

11       That before completion of the deposition,

12  review of the transcript (XX) was (   ) was not

    requested:   (   ) that the witness has failed or

13  refused to approve the transcript.

14       I further certify that I am not financially

15  interested in the action, and I am not a relative or

16  employee of any attorney of the parties, nor of any

    of the parties.

17       I declare under penalty of perjury under the

18  laws of California that the foregoing is true and

19  correct, dated this 14th day of April, 2017.

20

21

22

23  _____

24

25       MARY J. GOFF, CSR No. 13427

                                        Page 49

YELLOW = CONFIDENTIAL
RED = HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---


WAYMO LLC,

       Plaintiff,

vs.                                No. 3:17-cv-00939-WHA

UBER TECHNOLOGIES, INC.;
OTTOMOTTO LLC; OTTO TRUCKING,
INC.,

       Defendants.
_____/



HIGHLY CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER


VIDEOTAPED DEPOSITION OF MAXIME LEVANDOWSKI

SAN FRANCISCO, CALIFORNIA

TUESDAY, JULY 18, 2017




BY:  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

CSR LICENSE NO. 9830

JOB NO. 2661102

Page 63

1          "July 3, 2017, Supplemental Log Pursuant to    10:27

2     Orders on Motion for Preliminary Relief and Special   10:27

3     Masters Protocol."                                     10:27

4          Q    Do you see that?                             10:27

5          A    I see it.                                    10:27

6          Q    All right.                                   10:27

7               Have you seen the document that I've labeled  10:27

8     as Exhibit 310 before?                                 10:27

9          A    I think I did.                               10:28

10         Q    When have -- when have you seen this?         10:28

11         A    Yesterday.                                   10:28

12         Q    Before yesterday, have you seen this         10:28

13    document?                                              10:28

14         A    No.                                          10:28

15         Q    Okay.  Were you involved in the preparation  10:28

16    of this document, as far as you know?                  10:28

17         A    No.                                          10:28

18         Q    We talked earlier about how you were not     10:28

19    aware that Anthony Levandowski was speaking with Uber  10:28

20    when he talked with you in January 2017 -- 2016 about  10:28

21    his new self-driving truck company; right?             10:28

22         A    That's correct.                              10:28

23         Q    Now, I want to look at this document and just  10:28

24    go through a couple of entries.  I mean, you can see    10:28

25    that they start in May 2015; right?                     10:28

Page 64

1      A    I see that.                                        10:29

2      Q    And, it describes meetings between                10:29

3   individuals from Uber and your brother, Anthony           10:29

4   Levandowski, starting in May 2015.  And there's some      10:29

5   -- some number of them well before you started at --      10:29

6   at the company and you had that discussion with           10:29

7   Anthony in January 2016.                                  10:29

8           Do you see that?                                  10:29

9      A    Sounds correct.                                   10:29

10     Q    So, in light of -- of Exhibit 301 [sic] here,     10:29

11  this -- this supplemental log provided by Uber's          10:29

12  lawyers, does it surprise you that Anthony didn't tell     10:29

13  you about Uber's involvement in his new venture?          10:29

14     A    It does not.                                      10:29

15     Q    Why doesn't it surprise you?                      10:29

16     A    Because we don't really talk work, first.         10:29

17  Also, even at Otto, like, when the company was            10:29

18  founded, 280 or whatever, I was not involved in the       10:29

19  organization of Otto.  I was a junior entry-level         10:29

20  mechanical engineer, not, like, an executive,            10:30

21  whatever, management role.  So no, I'm not surprised.    10:30

22     Q    But, don't you think that he wasn't telling       10:30

23  you the whole truth when he was saying that "I was        10:30

24  setting up some start-up company," when really he was     10:30

25  talking with Uber in the background?                      10:30

Page 87

| | | | |
|---|---|---|---|
| 1 | | either; right? | 11:00 |
| 2 | A | That's fair. | 11:00 |
| 3 | Q | He's not an optical engineer; right? | 11:00 |
| 4 | A | That's correct. | 11:00 |
| 5 | Q | Does Anthony know how to use SolidWorks? | 11:00 |
| 6 | A | I don't know. | 11:00 |
| 7 | Q | You never talked about that? | 11:00 |
| 8 | A | Never -- I never saw him using it. | 11:00 |
| 9 | Q | You've never seen him use SolidWorks? | 11:00 |
| 10 | A | No. | 11:00 |
| 11 | Q | What about Altium?  Have you ever seen him | 11:00 |
| 12 | | use that? | 11:00 |
| 13 | A | No. | 11:00 |
| 14 | Q | You referenced before that you and Anthony | 11:00 |
| 15 | | Levandowski spoke about LiDAR. | 11:01 |
| 16 | | When was the first time that you and Anthony | 11:01 |
| 17 | | Levandowski spoke about LiDAR? | 11:01 |
| 18 | A | So, I personally asked him multiple times, | 11:01 |
| 19 | | "Hey, can you" -- so I was -- at the time, I had zero | 11:01 |
| 20 | | knowledge about LiDAR.  So, I was trying to, like, | 11:01 |
| 21 | | look at some video and understand the concept, but | 11:01 |
| 22 | | even the concept was difficult for me. | 11:01 |
| 23 | | So, I asked him about the concept.  We talked | 11:01 |
| 24 | | about it, I would say, in the first month, like, | 11:01 |
| 25 | | shortly after. | 11:01 |

1  Levandowski has a personal laptop that he uses; right?   11:48

2      A   I don't know.   11:48

3      Q   You don't know?   11:48

4      A   (Witness shakes head.)   11:48

5      Q   You have no knowledge whether he has a   11:48

6  personal laptop or not?   11:48

7      A   I know -- I know he has a computer.  I don't   11:48

8  know if it's a work computer only, or if he also has a   11:48

9  personal computer.  I do not know.   11:48

10     Q   So the -- the one computer that you know   11:48

11  about, what kind of computer is that?   11:48

12     A   It's a Mac.   11:48

13     Q   And how long has he had that one for?   11:48

14     A   I don't know.   11:49

15     Q   Years?  Weeks?  Days?   11:49

16     A   I don't know.   11:49

17     Q   You can't say?   11:49

18     A   I can't say.   11:49

19     Q   You have no idea whether Mr. Levandowski --   11:49

20  Anthony Levandowski has had the one computer that you   11:49

21  know about for weeks, days, or years; is that right?   11:49

22     A   Correct.   11:49

23     Q   When was the first time, after you joined   11:49

24  Otto, that you spoke with Anthony Levandowski about   11:49

25  LiDAR?   11:49

Page 112

| | | | |
|---|---|---|---|
| 1 | A | I would say the first week. | 11:49 |
| 2 | Q | Okay.  And what did you guys discuss? | 11:49 |
| 3 | A | The concept of LiDARs. | 11:49 |
| 4 | Q | Where did you discuss that? | 11:49 |
| 5 | A | I believe it was at the house where Otto | 11:50 |
| 6 | | started. | 11:50 |
| 7 | Q | Who else was there? | 11:50 |
| 8 | A | It was Rhian Morgan.  It was Colin Sebern, | 11:50 |
| 9 | | Dan -- not Dan Gruver.  I -- I don't remember exactly. | 11:50 |
| 10 | Q | Was Dan Ratner there? | 11:50 |
| 11 | A | I don't remember exactly. | 11:50 |
| 12 | Q | So, let's go back to Exhibit 310 here.  And, | 11:50 |
| 13 | | can you look at entry 89.  They're numbered on the | 11:50 |
| 14 | | left-hand side. | 11:50 |
| 15 | A | 3 -- what's the entry? | 11:50 |
| 16 | Q | Eight-nine, 89. | 11:50 |
| 17 | A | (Witness complies.) | 11:50 |
| 18 | | Yes. | 11:50 |
| 19 | Q | Do you see your name there as a -- as the | 11:50 |
| 20 | | recipient, presumably an attendee at this meeting? | 11:51 |
| 21 | A | Yes, I do. | 11:51 |
| 22 | Q | And, do you see in the description, it says: | 11:51 |
| 23 | | "New hire meeting, including discussion of | 11:51 |
| 24 | | lasers." | 11:51 |
| 25 | | Do you see that? | 11:51 |

Page 246

1   Levandowski was head of Uber ATG; right?                    16:21

2       A    If I remember correctly, yes.                       16:21

3       Q    And what did you send Anthony Levandowski in        16:21

4   January 2017?  These pictures?                               16:21

5       A    ███████████████████████████████████   ██████       16:22
    ██████████████████████████████████████████   ██████
    ██  ███████████                                            16:22

8       Q    Why did you send these pictures to Anthony of       16:22

9   Fuji?                                                        16:22

10      A    ████████████████████████████████████   ██████      16:22
    ██  ████████████████████████████████████████               16:22

12      Q    And did you think Anthony would be interested       16:22

13  in this information?                                         16:22

14      A    Yeah.                                               16:22

15      Q    Why?                                                16:22

16      A    To see that we are making progress.                 16:22

17      Q    So Anthony -- even in January 2017, he was          16:22

18  interested in the progress of Fuji; right?                  16:22

19      A    Correct.                                            16:22

20      Q    All right.                                          16:22

21           Turning to '87024.                                  16:22

22      A    (Witness complies.)                                 16:22

23      Q    This is another text message, it looks like,        16:22

24  that you sent to him at the same time.                      16:22

25           What was -- what's depicted here, reflected         16:22

Page 247

1    at '87025?                                              16:22

2        A    So this is a zoom of the first cavity I       16:22

3    designed, and I believe that was from two different    16:22

4    vendors.                                                16:22

5        Q    These are the Fuji cavities?                  16:23

6        A    Correct.                                       16:23

7        Q    So, you're sending Anthony Levandowski, in    16:23

8    January 2017, detailed pictures of the Fuji cavity;    16:23

9    right?                                                  16:23

10       A    Correct.                                       16:23

11       Q    Let's look at the next one, so here on        16:23

12   page '87026.                                            16:23

13       A    (Witness complies.)                            16:23

14       Q    This is another message that you texted to    16:23

15   Anthony Levandowski.  This one is March 10th, 2017; is 16:23

16   that right?                                             16:23

17       A    It looks correct.                              16:23

18       Q    And what did you send Anthony Levandowski on  16:23

19   March 10th, 2017?                                       16:23

20       A    So this is, I believe, ███████████      ██████

         █████████████████████████████████████          16:23

22       Q    Why were you sending this to Anthony          16:23

23   Levandowski, this here at pages '87026?                16:23

24       A    Again, just happy to show him the progression 16:23

25   on Fuji.                                                16:23

Page 249

```
 1     Q    This is another picture that you were sending    16:24

 2  Anthony Levandowski on March 10th, 2017?                  16:25

 3     A    That's correct.                                   16:25

 4     Q    ███████████████████████████████████    ███████   16:25

    █  ███████████████████████████████; is that right?       16:25

 6     A    Correct.  This is a zoom of the first --          16:25

 7  previous picture we talked about.                         16:25

 8     Q    And then the next page, '87031, is another        16:25

 9  picture of the same thing?                                16:25

10     A    '87 --                                            16:25

11     Q    '87030.                                           16:25

12     A    (Witness complies.)                               16:25

13          Yes, yes, it will be the same.                    16:25

14     Q    And did you discuss with Anthony the              16:25

15     ████████pictures you sent him in March 2017?          16:25

16     A    No.  It was just to show the ████████████  ██████ 16:25

    █  █████████████████████████████████████████              16:25

18     Q    So, looking at page '87031.                       16:25

19     A    (Witness complies.)                               16:25

20          Yep.                                              16:25

21     Q    There is a text from a Philipp Haban?  Haban?     16:25

22     A    Correct.                                          16:25

23     Q    How do you pronounce it?                          16:25

24     A    Haban.                                            16:25

25     Q    Haban.                                            16:25
```

Page 265

| | | | |
|---|---|---|---|
| 1 | | talked to him, but I see who he is. | 16:43 |
| 2 | Q | And did Mr. Ulrich -- did he end up being | 16:43 |
| 3 | | your -- the lead mechanical engineer in San Francisco? | 16:43 |
| 4 | A | He did not. | 16:43 |
| 5 | Q | Okay.  Do you know why that happened? | 16:43 |
| 6 | A | He declined the offer. | 16:43 |
| 7 | Q | Do you know why he declined the offer? | 16:43 |
| 8 | A | I'm not sure. | 16:43 |
| 9 | Q | Have you heard any information why he | 16:43 |
| 10 | | declined the offer? | 16:43 |
| 11 | A | No. | 16:44 |
| 12 | Q | You've never heard any reason? | 16:44 |
| 13 | A | Not that I remember. | 16:44 |
| 14 | Q | Did you ask anyone about it? | 16:44 |
| 15 | A | No. | 16:44 |
| 16 | | We found another ME lead, and so -- | 16:44 |
| 17 | Q | Who did you end up hiring as the ME lead? | 16:44 |
| 18 | A | I was not the one hiring.  But the ME lead | 16:44 |
| 19 | | now was-- is Gorah Wyer, my direct manager. | 16:44 |
| 20 | Q | Can you spell that, please? | 16:44 |
| 21 | A | So G-O-R-A-H, Wyer, W-Y-E-R. | 16:44 |
| 22 | Q | So, on the next page, there is a text from | 16:44 |
| 23 | | you, same date, February 10th, 2017.  We're on page | 16:44 |
| 24 | | '87055. | 16:44 |
| 25 | A | (Witness complies.) | 16:44 |

Page 266

1    Q    You say:                                      16:44

2         "I think I remember him.  Name is familiar.   16:44

3    510?"                                              16:44

4    A    Correct.                                      16:44

5    Q    Do you -- what happened after you sent this   16:44

6    message to Anthony?                                16:45

7    A    He told me yes, that was someone that was at  16:45

8    510 years ago.                                     16:45

9    Q    And then, did you have any further            16:45

10   conversations with Anthony about this?             16:45

11   A    Not that I remember.                           16:45

12   Q    Let's keep going here.  '87056.  It's a text  16:45

13   from you to Anthony, dated March 2nd, 2017.        16:45

14        Do you see that?                              16:45

15   A    '87056?                                       16:45

16   Q    Uh-huh.                                        16:45

17   A    (Witness complies.)                            16:45

18        Correct, yes.                                  16:45

19   Q    And the first part of this text is:            16:45

20        "Why do you want to take cavities to Pitt?"   16:45

21        Do you see that?                              16:45

22   A    I do see it.                                   16:45

23   Q    What prompted this text message from you to   16:45

24   Anthony in March 2017?                              16:45

25   A    He -- he told me that he wanted to -- he      16:45

Page 267

1   wanted me to send a cavity to Pittsburgh, so I was        16:45

2   asking him why.                                           16:46

3       Q   How did he communicate that he wanted you to     16:46

4   send a cavity to Pittsburgh?                              16:46

5       A   I think he was running through the office and     16:46

6   asked me to, like, send a cavity, and then left, like     16:46

7   he usually do.  And then I wanted more information, so     16:46

8   I text him.                                               16:46

9       Q   And the next page here, '87057.                   16:46

10      A    (Witness complies.)                               16:46

11      Q   Anthony responds and he says:                     16:46

12          "I want to show how our tech compares to          16:46

13  Velodyne and publicly available Google stuff."            16:46

14          Do you see that?                                   16:46

15      A   Correct.                                           16:46

16      Q   What was your understanding when you received     16:46

17  this?                                                      16:46

18      A   So, I think the lawsuit was already -- the        16:46

19  lawsuit already happened.  And so I didn't follow up      16:46

20  on that.  I was not the one comparing.  But I think he    16:46

21  wanted to compare Fuji, Velodyne, and what was           16:46

22  publicly available online or whatever were from          16:46

23  Google.                                                   16:46

24      Q   Why did he want to compare the Fuji to           16:46

25  Google's LiDAR?                                           16:47

HIGHLY CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              CERTIFICATE OF REPORTER
 2          I, ANDREA M. IGNACIO, hereby certify that the
 3   witness in the foregoing deposition was by me duly
 4   sworn to tell the truth, the whole truth, and nothing
 5   but the truth in the within-entitled cause;
 6          That said deposition was taken in shorthand
 7   by me, a disinterested person, at the time and place
 8   therein stated, and that the testimony of the said
 9   witness was thereafter reduced to typewriting, by
10   computer, under my direction and supervision;
11          That before completion of the deposition,
12   review of the transcript [x] was [ ] was not
13   requested.  If requested, any changes made by the
14   deponent (and provided to the reporter) during the
15   period allowed are appended hereto.
16          I further certify that I am not of counsel or
17   attorney for either or any of the parties to the said
18   deposition, nor in any way interested in the event of
19   this cause, and that I am not related to any of the
20   parties thereto.
21   Dated: 7/21/2017
22
23
24    ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830
25

                                           Page 313
```

Page 93

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

WAYMO LLC,                          )

       Plaintiff,                )

       vs.                       ) Case No.

UBER TECHNOLOGIES, INC.,            ) 3:17-cv-00939-WHA

OTTOMOTTO LLC; OTTO TRUCKING        )

LLC,                                )

       Defendants.               )

_____ )


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


CONTINUED VIDEOTAPED DEPOSITION OF ASHEEM LINAVAL

Volume 2

San Francisco, California

Tuesday, August 15, 2017


REPORTED BY:

JOHNNA PIPER

CSR 11268

JOB No. 2680991


PAGES 93 - 257

Page 219

1    about these meetings.                                 12:05:46

2          If you could go first to entry Number 206.      12:05:48

3    A.   Sorry, I'm just going to take a moment here      12:05:55

4    and --                                                12:05:57

5    Q.   Take all the time you need.                      12:05:57

6    A.   Okay.                                            12:07:09

7    Q.   Okay.  So looking at entry 206, the second       12:07:09

8    column over is labeled Bates Number.  That means      12:07:24

9    that Uber has produced a document to us that          12:07:27

10   provides evidence of this meeting and that's the      12:07:31

11   number that is on that document.  Then you've got     12:07:32

12   the date, which will be the date on that document.    12:07:35

13   The time, which is blank here, but if it were on      12:07:37

14   that document, would presumably be in this field.     12:07:40

15   Author sent, I think you understand that field.       12:07:43

16   Recipients, and there's a CC, BCC, place, mode of     12:07:45

17   communication, and subjects discussed.  Okay.  So     12:07:51

18   that is how this log is laid out.                     12:07:53

19          Do you see that?                               12:07:55

20   A.   Uh-huh.                                          12:07:55

21   Q.   So entry 206 is dated May 19th, 2016.  It's      12:07:56

22   a calendar invitation for a weekly LiDAR stand-up     12:08:04

23   meeting on May 19th, 2016.                            12:08:08

24          Do you see that?                               12:08:11

25   A.   Uh-huh.                                          12:08:11

Page 220

```
1        Q.  And in the recipients field, it's about        12:08:11
2   60 percent of the way down, and your name breaks        12:08:15
3   over two lines.                                          12:08:18
4        Do you see your name there?                         12:08:19
5        A.  I see it.                                       12:08:20
6        Q.  Do you recall this weekly LiDAR stand-up        12:08:20
7   meeting on May 19th, 2016?                               12:08:24
8        A.  I remember stand-up meetings from about        12:08:25
9   that era.  Oh.  I don't know if I can recall that        12:08:31
10  specific one, but I remember meetings like it.          12:08:39
11       Q.  To the best of your recollection, you don't     12:08:41
12  remember specifically the meeting on May 19th, 2016?    12:08:47
13       A.  Correct.                                        12:08:50
14       Q.  Do you remember specifically any               12:08:52
15  contribution that Mr. Levandowski made to that          12:08:55
16  meeting on May 19th, 2016?                               12:08:57
17       A.  I do not.                                       12:09:00
18       Q.  Can we move to Number 269?                      12:09:01
19       A.  269, found it.                                  12:09:18
20       Q.  This is a calendar invitation to a LiDAR        12:09:19
21  stand-up meeting dated June 9th, 2016.                   12:09:23
22       Do you see that?                                    12:09:26
23       A.  Uh-huh.                                         12:09:27
24       Q.  Do you see your name in the recipient          12:09:27
25  field?                                                   12:09:29
```

Page 222

1      A.  On 299.                                          12:10:39

2      Q.  Did you regularly attend these weekly LiDAR      12:10:40

3  stand-up meetings?                                       12:10:44

4      A.  Yeah, to -- to the degree that I was             12:10:45

5  available for them, yes.                                 12:10:50

6      Q.  Were you generally available for them?           12:10:51

7      A.  Generally.                                        12:10:53

8      Q.  Okay.  This entry 299 corresponds to a           12:10:54

9  June 23rd, 2016, LiDAR stand-up meeting.                 12:10:59

10         Do you see that?                                 12:11:02

11     A.  I do.                                            12:11:02

12     Q.  And you see your name listed as a                12:11:03

13  recipient?                                              12:11:05

14     A.  I do.                                            12:11:05

15     Q.  Do you recall a June 23rd, 2016, LiDAR           12:11:06

16  stand-up meeting?                                       12:11:11

17     A.  Not specifically.                                12:11:11

18     Q.  Do you recall specifically any                   12:11:13

19  contributions that Anthony Levandowski made at that     12:11:15

20  meeting?                                                12:11:17

21     A.  I don't.                                         12:11:17

22     Q.  Can we move to Number 363, please?               12:11:18

23         This corresponds to a July 21st, 2016,           12:11:22

24  LiDAR stand-up meeting.                                 12:11:32

25         Do you see that?                                 12:11:33

Page 224

1    September 15th, 2016, stand-up meeting.                    12:12:30

2         Do you see that?                                      12:12:33

3    A.   September 15th, I see that.                           12:12:33

4    Q.   Do you recall attending a September 20 --            12:12:36

5    excuse me, September 15th, 2016, LiDAR stand-up           12:12:40

6    meeting?                                                   12:12:46

7    A.   I don't remember the specific meeting.               12:12:46

8    Q.   Do you recall whether Anthony Levandowski            12:12:48

9    provided any input at this meeting?                       12:12:51

10   A.   I do not.                                             12:12:52

11   Q.   Can we move to 491?                                   12:12:53

12        491 corresponds to a LiDAR stand-up meeting          12:12:56

13   on September 29th, 2016.                                   12:13:03

14        Do you see that?                                      12:13:05

15   A.   September -- September 29th, I see that.             12:13:06

16   Q.   Do you recall attending the September 29th,          12:13:09

17   2016, LiDAR stand-up meeting?                             12:13:13

18   A.   I remember attending meetings like it.  I           12:13:15

19   don't remember if I attended this specific one.          12:13:19

20   Q.   Do you recall what, if any, contribution            12:13:21

21   Anthony Levandowski made during this meeting?            12:13:23

22   A.   I can't recall if -- if Anthony had any             12:13:26

23   contribution to this meeting.                             12:13:30

24   Q.   Can we go to entry Number 500, please?              12:13:31

25   A.   Okay.                                                12:13:38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1         CERTIFICATE OF REPORTER

2             I, JOHNNA PIPER, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition was by me duly sworn to tell

5    the truth, the whole truth, and nothing but the

6    truth in the within-entitled cause;

7             That said deposition was taken in shorthand

8    by me, a disinterested person, at the time and place

9    therein stated, and that the testimony of the said

10   witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12            That before completion of the deposition,

13   review of the transcript [ ]was [X]was not

14   requested.  If requested, any changes made by the

15   deponent (and provided to the reporter) during the

16   period allowed are appended hereto.

17            I further certify that I am not of counsel

18   or attorney for either or any of the parties to the

19   said deposition, nor in any way interested in the

20   event of this cause, and that I am not related to

21   any of the parties thereto.

22            DATED: 8/16/2017

23

24

25   JOHNNA PIPER, CSR NO. 11268

                                        Page 257

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5   WAYMO LLC

 6        Plaintiff,

 7            vs.           Case No. 17-cv-00939-WHA

 8   UBER TECHNOLOGIES,INC.;

     OTTOMOTTO, LLC; OTTO

 9   TRUCKING LLC,

10        Defendants.

     _____

11

12     **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

13

14          VIDEO DEPOSITION OF BRIAN McCLENDON

15                Palo Alto, California

16               Tuesday, August 1, 2017

17                     Volume I

18

19

20

21   REPORTED BY:

22   REBECCA L. ROMANO, RPR, CSR No. 12546

23   JOB NO. 2668964

24

25   PAGES 1 - 217
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q.   He was tasked not to?                    05:07:30

 2        A.   He was told not to set -- I mean, the

 3   goal was to merge the teams and produce one great

 4   autonomy, products, software, development,

 5   environment, and everything.  And -- and that was   05:07:44

 6   his goal.  That's what he was asked to do by

 7   Travis, as far as I understand.

 8             And some of his actions did not do that.

 9   And some of his team eventually forked off and kind

10   of worked on their own thing.  But other parts of    05:07:55

11   his team worked much more closely with Pittsburgh.

12             So the split sort of happened more on

13   his -- on the Otto side than anywhere else.

14             (Exhibit 444 was marked for

15   identification by the court reporter and is          05:08:09

16   attached hereto.)

17        Q.   (By Mr. Perlson)  You have been handed

18   what's been marked as Exhibit 444, Uber 69083 to

19   84.  It's an email string with yourself,

20   Mr. Levandowski and others.  It refers to Bluenote.  05:09:21

21   What -- what is that?

22        A.   Bluenote is the name of Uber's equivalent

23   of Street View, if you know what Google Street View

24   cameras are like.  So driving around a relatively

25   cheap camera system to collect data for map making.  05:09:34
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              And -- and it -- we had acquired a              05:09:38

 2    company.  We had acquired a group from Microsoft,

 3    including all of the technology and all of the

 4    hardware.  And they had, not Bluenote, but some

 5    very expensive to operate and to -- to run system      05:09:53

 6    that we replaced with a much lower cost system

 7    called Bluenote.

 8              But we also inherited all of the lasers

 9    from that system, which is what -- what are the 100

10    Velodyne 32 beam lasers that are referred to in        05:10:08

11    that first line at the bottom.

12        Q.   Got it.

13              (Exhibit 445 was marked for

14    identification by the court reporter and is

15    attached hereto.)                                      05:10:15

16              (Exhibit 446 was marked for

17    identification by the court reporter and is

18    attached hereto.)

19        Q.   (By Mr. Perlson)  All right, so these are

20    two emails, Exhibit 445 and 446.  The first one        05:12:09

21    is -- Exhibit 445 is an email from yourself to

22    Mr. Levandowski on October 1st, 2016.  It says,

23    "Talk with Raffi."

24              Do you see that?

25        A.   Yes.                                          05:12:33
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       I, Rebecca L. Romano, a Certified Shorthand
2   Reporter of the State of California, do hereby
3   certify:
4       That the foregoing proceedings were taken
    before me at the time and place herein set forth;
5   that any witnesses in the foregoing proceedings,
6   prior to testifying, were administered an oath;
7   that a record of the proceedings was made by me
8   using machine shorthand which was thereafter
    transcribed under my direction; that the foregoing
9   transcript is true record of the testimony given.
10      Further, that if the foregoing pertains to the
11  original transcript of a deposition in a Federal
12  Case, before completion of the proceedings, review
13  of the transcript [ ] was [X] was not requested.
14      I further certify I am neither financially
    interested in the action nor a relative or employee
15  of any attorney or any party to this action.
16      IN WITNESS WHEREOF, I have this date
17  subscribed my name.
18
19  Dated:  August 2, 2017
20
21
22
23
24
        Rebecca L. Romano, RPR,
25          CSR. No 12546

                                    Page 217

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN FRANCISCO DIVISION

 4

 5   WAYMO LLC

 6        Plaintiff,

 7             vs.              Case No.

 8   UBER TECHNOLOGIES,INC.;    17-cv-00939-WHA

 9   OTTOMOTTO, LLC; OTTO

10   TRUCKING LLC,

11        Defendants.

12   _____

13

14

15        VIDEOTAPED DEPOSITION OF EMIL MICHAEL

16             San Francisco, California

17              Friday, July 28, 2017

18                  Volume I

19

20

21   REPORTED BY:

22   REBECCA L. ROMANO, RPR, CSR No. 12546

23   JOB NO. 2666869

24

25   PAGES 1 - 158
```

Page 1

```
 1              Do you recall talking about the meeting      10:28:15
 2    that they had that's referred to here?
 3         A.   I don't.
 4         Q.   Do you recall whether as of
 5    October 5th, 2015, that Mr. Kalanick was -- was he     10:28:37
 6    involved in -- in the discussions regarding
 7    Mr. Levandowski's future company at that point?
 8         A.   I don't believe he was involved that
 9    early on, no.
10         Q.   Do you recall when he got involved?         10:29:02
11         A.   I don't exactly, but it was -- it was
12    later in the -- later in the winter -- fall/winter
13    of that year.  At least another month or two beyond
14    this date.
15         Q.   Handing you what's been previously marked    10:30:35
16    as Exhibit 252.  It's a -- another meeting invite
17    regarding Newco.
18              Do you see that this one is dated
19    October 23rd and you are on the list?
20              Do you see that?                             10:30:50
21         A.   Yes.
22         Q.   Do you recall what was discussed at this
23    meeting?
24              MS. RAY:  Objection.
25              You may answer to the extent that it's       10:30:55
```

Page 59

```
 1    not privileged, but there are attorneys that were      10:30:58

 2    present at this meeting.  So don't answer as to

 3    anything that was privileged.

 4             MS. TOUGH:  Also, objection to the form.

 5             MS. RAY:  Join.                                 10:31:07

 6             THE DEPONENT:  I don't recall.

 7        Q.   (By Mr. Perlson)  Do you recall what the

 8    state of the negotiations with

 9    Anthony Levandowski's potential new company were at

10    this time?                                               10:31:23

11        A.   I believe we were still in discussions

12    about purchasing laser -- prepurchasing lasers.

13        Q.   Do you know when the focus of the

14    discussions shifted from prepurchasing lasers to an

15    acquisition of the whole company?                        10:32:13

16             MS. TOUGH:  Objection to the form.

17             MS. RAY:  Join.

18             THE DEPONENT:  I'm not sure exactly.

19        Q.   (By Mr. Perlson)  Do you recall how long

20    into the discussion with Mr. Levandowski,              10:32:27

21    generally?

22             I mean, was it halfway through?

23    three-fourths through?

24             MS. RAY:  Objection.  Form.

25             THE DEPONENT:  It was later that year,        10:32:40
```

Page 60

1        I, Rebecca L. Romano, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4        That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that any witnesses in the foregoing proceedings,

7   prior to testifying, were administered an oath;

8   that a record of the proceedings was made by me

9   using machine shorthand which was thereafter

10  transcribed under my direction; that the foregoing

11  transcript is true record of the testimony given.

12       Further, that if the foregoing pertains to the

13  original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript [ ] was [X] was not requested.

16       I further certify I am neither financially

17  interested in the action nor a relative or employee

18  of any attorney or any party to this action.

19       IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21       Dated:  July 29, 2017

22

23

24       Rebecca L. Romano, RPR,

25       CSR. No 12546

                                        Page 158

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4

5    WAYMO LLC,                      )

6            Plaintiff,             )

7            vs.                    ) Case No.

8    UBER TECHNOLOGIES, INC.,       ) 3:17-cv-00939-WHA

9    OTTOMOTTO LLC; OTTO TRUCKING   )

10   LLC,                           )

11           Defendants.            )

12   _____)

13

14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

16      VIDEOTAPED DEPOSITION OF MATTHEW PALOMAR

17             San Francisco, California

18              Friday, August 18, 2017

19

20   REPORTED BY:

21   JOHNNA PIPER

22   CSR 11268

23   JOB No. 2681036

24

25   PAGES 1 - 184

                                        Page 1



Page 151



Page 152

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 154



Page 155

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              CERTIFICATE OF REPORTER

2          I, JOHNNA PIPER, a Certified Shorthand

3     Reporter, hereby certify that the witness in the

4     foregoing deposition was by me duly sworn to tell

5     the truth, the whole truth, and nothing but the

6     truth in the within-entitled cause;

7          That said deposition was taken in shorthand

8     by me, a disinterested person, at the time and place

9     therein stated, and that the testimony of the said

10    witness was thereafter reduced to typewriting, by

11    computer, under my direction and supervision;

12         That before completion of the deposition,

13    review of the transcript [ ]was [ ]was not

14    requested.  If requested, any changes made by the

15    deponent (and provided to the reporter) during the

16    period allowed are appended hereto.

17         I further certify that I am not of counsel

18    or attorney for either or any of the parties to the

19    said deposition, nor in any way interested in the

20    event of this cause, and that I am not related to

21    any of the parties thereto.

22         DATED: 8/21/2017

23

24

25         JOHNNA PIPER, CSR NO. 11268

                                        Page 184

CONFIDENTIAL - ATTORNEYS EYES ONLY

1                 UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4

5     WAYMO LLC,                        )
                                        )
6                 Plaintiff,            )
                                        )  Case No.
7          vs.                          )  3:17-cv-00939-WHA
                                        )
8     UBER TECHNOLOGIES, INC.,          )
      OTTOMOTTO LLC; OTTO TRUCKING      )
9     LLC,                              )
                                        )
10                Defendants.           )
      _____)

11

12      *** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

13

14       VIDEOTAPED DEPOSITION OF GAETAN PENNECOT

15              San Francisco, California

16              Thursday, April 20, 2017

17                    Volume I

18

19

20    Reported by:

21    CARLA SOARES

22    CSR No. 5908

23    Job No. 2599854

24

25    Pages 1 - 95

                                           Page 1

CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              THE WITNESS:  Yes.                    10:13:53

 2    BY MR. JAFFE:

 3        Q    Why?

 4        A    Because I thought he was going to work on

 5    trucks.                                         10:14:17

 6        Q    Is that what he told you when you were

 7    talking about joining the company?

 8        A    We were, and we are still, working on

 9    trucks.

10              MR. JAFFE:  Let's mark as Exhibit 102 a   10:14:40

11    document Bates-labeled UBER11465.

12              (Exhibit 102 was marked for identification

13         and is attached hereto.)

14    BY MR. JAFFE:

15        Q    Mr. Pennecot, this is an e-mail that you   10:15:01

16    sent to Mr. Levandowski in February 2017, correct?

17        A    This is correct.  Let me -- this is

18    correct.

19        Q    And the subject line is ██████████████

      ██████████████████████████████                  10:15:39

21         Do you see that?

22        A    I see it.

23        Q    Fuji, that refers to one of Uber's LiDAR

24    projects, right?

25        A    This is correct.                        10:15:48
```

                                              Page 42



1      Q

4      Q   So -- and just going by the names of the

5   attachment,

10:16:58

Page 43

CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    speculation.                                    10:18:43

2          THE WITNESS:  I don't know.

3    BY MR. JAFFE:

4          Q    He just walked up to you and said, "Can

5    you send me these very specific things?"         10:18:52

6          A    I guess he called me.

7          Q    And what did he say?

8          A    What did he say?  He asked me to send him,

9    like, some ████████████, like, describing my

10   job, what I was doing.                           10:19:14

11         Q    And did you have any understanding of why

12   he was asking you to send him this material?

13         A    No.

14         Q    Did you ask?

15         A    I don't remember.                      10:19:33

16         Q    Did you get any further information

17   afterwards on why he asked you to send this material

18   about Fuji?

19         A    No, I didn't.

20         Q    Why -- do you have any understanding of   10:19:46

21   why Mr. Levandowski would ask you to send these

22   detailed -- this detailed information about the Fuji

23   project to him?

24         MR. KIM:  Objection.  Calls for

25   speculation, asked and answered.                 10:19:55
```

Page 45

CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    designed around what he provided you, and you          10:52:15

 2    resulted in Exhibit 101?

 3              MR. KIM:  Objection.  Vague.

 4              THE WITNESS:  I used it as a first spec,

 5    you know.  Like, you need to start somewhere.          10:52:26

 6              MR. JAFFE:  Why don't we take a quick

 7    break.

 8              THE VIDEO OPERATOR:  The time is

 9    10:52 a.m.  We're off the record.

10              (Recess, 10:52 a.m. - 11:09 a.m.)            10:52:44

11              THE VIDEO OPERATOR:  The time is 11:09

12    a.m.  We are back on the record.

13              MR. JAFFE:  I'm going to mark as

14    Exhibit 103 a document Bates-labeled UBER11588.

15              (Exhibit 103 was marked for identification   11:09:51

16         and is attached hereto.)

17    BY MR. JAFFE:

18         Q   Mr. Pennecot, this is an e-mail that you

19    wrote, right?  Exhibit 103?

20         A   Yes, this is correct.                         11:10:49

21         Q   You said you guess this is correct?

22         A   No, this is correct.  This is correct.

23    This is this page.

24         Q   And going back to the first page, the

25    subject line is "██████████████████████               11:11:01
```

                                             Page 72

```
 1    like, with some friends, too.                    11:14:18

 2         Q   You don't take vacation days to go there,

 3    right?

 4         A   It's in San Francisco.  It's really easy

 5    to get there.                                     11:14:24

 6         Q   Right.  But you don't take time, like

 7    vacation time, to go there.  You go there as part of

 8    your job?

 9         A   I -- I've been there, also, on my own.

10    Like, I took some friends that were working on some  11:14:33

11    projects to Photonics West to take a look.

12         Q   Who did you take?

13         A   I took my friend Florian that was working

14    on optical LED projects over there.

15              MR. JAFFE:  So I'm going to mark as        11:14:47

16    Exhibit 104 a document entitled "UBER8562."

17              (Exhibit 104 was marked for identification

18         and is attached hereto.)

19    BY MR. JAFFE:

20         Q   So Exhibit 104, this is Mr. Levandowski    11:15:07

21    forwarding an e-mail that you wrote in June of 2016,

22    right?

23         A   Um-hum.

24         Q   So this is referring to -- well, let me

25    start with, do you see Mr. Levandowski, his e-mail,  11:15:19
```

Page 76

CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1   referring to ████████████████████          11:15:22

 2        A    Yes.

 3        Q    Do you know what that refers to?

 4        A    ████████████████████████████████

 █   ████████████████████████                    11:15:38

 6        Q    So Otto was working on a diode-based

 7   design as early as June 2016, right?

 8        A    This is correct.

 9        Q    What was the name of the project at this

10   time?                                       11:15:53

11        A    At this time, there was no generic

12   project.  It was ████████████ at that time.

13        Q    So this project was known generally as

14   ██████████████

15        A    ██████████████████████ ████████ ████████

 █   ██████████████████ ██████████████████████

 █   ████████████████

18        Q    So was there any sort of ████████████████

 █   ████████████████████████████

 █   ████ ████                              ████████████

 █   ██ ████████████████████████████████

 █   ██████████████████████████████████████████

23             MR. KIM:  Objection.  Calls for

24   speculation.

25             THE WITNESS:  I don't think so.    11:16:31

                                              Page 77
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

           That the foregoing proceedings were taken

4     before me at the time and place herein set forth;

5     that any witnesses in the foregoing proceedings,

6     prior to testifying, were administered an oath; that

7     a record of the proceedings was made by me using

      machine shorthand which was thereafter transcribed

8     under my direction; that the foregoing transcript is

9     a true record of the testimony given.

10          Further, that if the foregoing pertains to

11    the original transcript of a deposition in a Federal

12    Case, before completion of the proceedings, review

      of the transcript [ ] was [x] was not requested

13          I further certify I am neither financially

14    interested in the action nor a relative or employee

15    of any attorney or any party to this action.

16          IN WITNESS WHEREOF, I have this date

17    subscribed my name.

18

19    Dated: April 20, 2017

20

21

22

23          _Carla Soares_

24          CARLA SOARES

25          CSR No. 5908

                                        Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5   WAYMO LLC,

 6                  Plaintiff,

                                     Case

 7   vs.                             No. 3:17-cv-00939-WHA

 8   UBER TECHNOLOGIES, INC.;

     OTTOMOTTO LLC; OTTO TRUCKING LLC,

 9

                    Defendants.

10   _____/

11

12

13       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14        VIDEOTAPED DEPOSITION OF GAETAN PENNECOT

15            VOLUME III (PAGES 275 to 478)

16               FRIDAY, JUNE 16, 2017

17

18

19

20

21

22   Reported by:

23   Anrae Wimberley

24   CSR No. 7778

25   Job No.  2641228
```

Page 275

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        MR. JAFFE:  Let's mark as Exhibit 108 a document   10:34:39

 2   entitled, "Off axis fiber study - TX," Bates label      10:34:45

 3   UBER00072137.                                            10:34:48

 4        (Plaintiff's Exhibit 108 was marked.)              10:35:09

 5   BY MR. JAFFE:                                            10:35:09

 6        Q.   Mr. Pennecot, do you recognize the document   10:35:11

 7   I've put in front of you as Exhibit 108?                 10:35:14

 8        (Witness reviews document.)                         10:35:14

 9        A.   I do.                                          10:35:46

10        Q.   What is Exhibit 108?                           10:35:49

11        A.   This is a proposal for a transmit lens for    10:36:06

12   Spider.                                                  10:36:07

13        Q.   When did you create Exhibit 108?              10:36:11

14        A.   So that I don't remember.                      10:36:15

15        Q.   Can you tell me approximately when you        10:36:18

16   created Exhibit 108?                                     10:36:20

17        A.   Let me check if there's a date in here.       10:36:31

18        (Witness reviews document.)                         10:36:39

19        A.   Yes, I can.  And I would say after June 9th,  10:36:48

20   2016.                                                    10:36:49

21        Q.   And why do you say after June 9th?            10:36:52

22        A.   Because if you look at these pages, they come 10:36:58

23   with a date.                                             10:36:59

24        Q.   Why did you create Exhibit 108?               10:37:02

25        A.   To talk about possible lenses for Spider.     10:37:19
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   With who? | 10:37:20 |
| 2 | A.   This would be with James and Anthony. | 10:37:26 |
| 3 | Q.   Anthony Levandowski? | 10:37:28 |
| 4 | A.   Yes. | 10:37:28 |
| 5 | Q.   Why would you be discussing the transmit lens | 10:37:32 |
| 6 | for Spider with Mr. Haslim and Mr. Levandowski? | 10:37:38 |
| 7 | A.   Because I wanted to justify the fact that I | 10:37:47 |
| 8 | wanted two lens elements in the system and not only | 10:37:54 |
| 9 | one. | 10:37:54 |
| 10 | Q.   Why did you want two lens elements in the | 10:37:57 |
| 11 | Spider design? | 10:37:59 |
| 12 | A.   Because making a diffraction-limited spot | 10:38:07 |
| 13 | using only one lens at an angle of axis is very hard | 10:38:19 |
| 14 | with a single element. | 10:38:22 |
| 15 | Q.   And why were you talking with Mr. Haslim and | 10:38:28 |
| 16 | Mr. Levandowski specifically about the issues here in | 10:38:31 |
| 17 | Exhibit 108? | 10:38:33 |
| 18 | A.   Because we were designing LiDAR. | 10:38:46 |
| 19 | Q.   Mr. Haslim, you and Mr. Levandowski were | 10:38:53 |
| 20 | designing a LiDAR; is that right? | 10:38:55 |
| 21 | A.   This is correct. | 10:38:56 |
| 22 | Q.   So you were talking to Mr. Levandowski about | 10:38:58 |
| 23 | Exhibit 108 because he was working with you on | 10:39:01 |
| 24 | designing a LiDAR? | 10:39:04 |
| 25 | A.   At that time, he was following what I was | 10:39:09 |

Page 295

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A.   This is correct. | 10:42:12 |
| 2 | Q.   Did you discuss this presentation with | 10:42:27 |
| 3 | Mr. Levandowski and Mr. Haslim? | 10:42:32 |
| 4 | A.   Yes, I did. | 10:42:32 |
| 5 | Q.   What did you discuss? | 10:42:35 |
| 6 | A.   I said -- I believe they were pushing on a | 10:42:48 |
| 7 | single-lens design, and I was pushing on a two-lens | 10:42:53 |
| 8 | element design.  And one of the big question was | 10:43:01 |
| 9 | tolerances on the second element, how to align the | 10:43:05 |
| 10 | second element, would that impact the optical | 10:43:09 |
| 11 | performances.  And most of the simulation were around | 10:43:14 |
| 12 | these tolerances. | 10:43:15 |
| 13 | So I did a lot of moving, deforming.  And | 10:43:19 |
| 14 | that's what you see on the last page, which is the | 10:43:24 |
| 15 | bulk of the work.  That's a rough tolerance analysis. | 10:43:29 |
| 16 | And I'd been moving the lens in every directions to | 10:43:36 |
| 17 | see if it had an impact on the design. | 10:43:39 |
| 18 | Q.   In looking at the last page, which is, for | 10:43:41 |
| 19 | the record, Exhibit 108 at page 142, there are two | 10:43:45 |
| 20 | lens elements there? | 10:43:47 |
| 21 | A.   This is correct. | 10:43:48 |
| 22 | Q.   What is the function of what's labeled as | 10:43:50 |
| 23 | "Element 2"? | 10:43:51 |
| 24 | A.   So in order to make a lens that has less | 10:44:02 |
| 25 | aberrations, spherical aberrations, or if you need a | 10:44:10 |

Page 298

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1            CERTIFICATE OF DEPOSITION OFFICER

 2        I, ANRAE WIMBERLEY, CSR NO. 7778, duly authorized

 3   to administer oaths pursuant to Section 8211 of the

 4   California Code of Civil Procedure, hereby certify

 5   that the witness in the foregoing deposition was by me

 6   sworn to testify to the truth, the whole truth and

 7   nothing but the truth in the within-entitled cause;

 8   that said deposition was taken at the time and place

 9   therein stated; that the testimony of said witness was

10   reported by me and was thereafter transcribed by me or

11   under my direction by means of computer-aided

12   transcription; that the foregoing is a full, complete

13   and true record of said testimony; and that the

14   witness was given an opportunity to read and correct

15   said deposition and to subscribe same.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21        IN WITNESS WHEREOF, I have hereunto subscribed by

22   my hand this 18th day of June, 2017.

23

24

               ANRAE WIMBERLEY, CSR NO. 7778

25

                                          Page 478
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

   _____

5   WAYMO LLC,                    )

6               Plaintiff,        )

7          vs.                    ) Case No.

8   UBER TECHNOLOGIES, INC.,      ) 3:17-cv-00939-WHA

9   OTTOMOTTO LLC; OTTO           )

10  TRUCKING LLC,                 )

11              Defendants.       )

   _____)

12

13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15  CONTINUED VIDEOTAPED DEPOSITION OF GAETAN PENNECOT

16             San Francisco, California

17             Wednesday, June 14, 2017

18                  Volume II

19

20

21  Reported by:

22  SUZANNE F. GUDELJ, CSR No. 5111

23  Job No. 2638084

24

25  PAGES 96 - 274

                                      Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    it was about putting like -- like the way I

2    understood it, it was about like solving the

3    self-driving problem as a whole.

4           (Reporter clarification.)

5           Solving the self-driving car problem, like    02:09:01

6    the self-driving car technology, so very -- how you

7    say -- very bold milestones.

8       Q    Did you discuss the LiDAR-related

9    milestones with anyone?

10      A    I don't remember.                             02:09:24

11      Q    Did you ever discuss the milestones with

12   Anthony Levandowski?

13      A    I don't remember.  So maybe, you know, All

14   Hands, like maybe there were like questions to

15   Anthony, but I'm -- I'm not sure now.  Don't         02:09:44

16   remember.

17      Q    You discussed these milestones at All Hands

18   meetings; is that right?

19      A    I think they were exposed to the employees

20   when they announced the acquisition.                 02:10:14

21      Q    What do you mean they were exposed to the

22   milestones in your equity agreement?

23      A    So they were exposing the presentation.

24      Q    And then what -- what did -- what did you

25   all discuss?                                         02:10:32

                                              Page 197

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A    I don't remember.  Like, you know, like --

2   I don't remember.

3     Q    When's the last time you had a conversation

4   with Anthony Levandowski related to LiDAR?

5     A    I think it's when we started the Fuji     02:11:07

6   project.

7     Q    Approximately when was that?

8     A    October or November 2016.

9     Q    Okay.  So between October, November 2016

10  and now, you haven't had any conversations with Mr.   02:11:33

11  Levandowski regarding LiDAR; is that correct?

12    A    No, this is not correct.  I don't recall

13  any conversations.

14    Q    I see.  So you could have had conversations

15  with him regarding LiDAR; you just don't remember?   02:11:46

16    A    I don't remember.

17    Q    Okay.  The last conversation that you

18  recall with Mr. Levandowski regarding LiDAR was in

19  October, November 2016; is that right?

20    A    That I recall, yes.                        02:12:03

21    Q    What did you and Mr. Levandowski discuss?

22    A    It was like all the team, all the LiDAR

23  team, and I think we were expressing disagreement

24  against Spider, and we wanted to drop the project.

25    Q    And who's the "we" you're referring to?   02:12:25

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    cover -- to take over.

2        Q    So you joined Otto in April 2016, and

3    Anthony directed you to take over the FAC lens

4    project which was for a diode-based LiDAR; is that

5    right?                                          02:18:19

6        A    This is correct.

7        Q    Okay.  And what did Anthony tell you when

8    you -- when you joined about this FAC lens project?

9        A    So he told me that it went through a round

10   of DSM, design from manufacturing through ███ and 02:18:35

11   that he had -- like Gruver had like some files he

12   could show me.

13       Q    And did you know what you were designing

14   towards with this FAC lens, like what LiDAR it was

15   going to go in?                                 02:18:56

16       A    No, so that I didn't know.

17       Q    Did Anthony know?

18       A    I don't know.

19       Q    So you weren't given any sort of parameters

20   for what type of LiDAR this FAC lens would work in? 02:19:06

21       A    Not at that time.

22       Q    When were you given those parameters?

23       A    So the design parameters came later that

24   year.  When we decided to go on Fuji, I received

25   like the beam angles, parameters, which is like the 02:19:33

                                            Page 202

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    hard parameters, like the, you know, design spec
 2    from James.  I don't -- I don't remember when but
 3    like around October or November.  Like it was like
 4    the first things that came.
 5        Q    So you received some beam angles from James  02:19:50
 6    Haslim in October or November; is that right?
 7        A    This is correct.
 8        Q    Before that time, that is in between April
 9    and October, November, you were designing an FAC
10    lens but you didn't know what type of diode-based    02:20:10
11    LiDAR it would go in, you had no information --
12        A    No information.
13        Q    -- is that right?
14        A    This is correct.
15        Q    Is that -- is that typical for your          02:20:19
16    engineering work?
17        A    So when I've done an FAC lens at Google, we
18    ████████████████████████████        So like that
19    was  ████████████████  FAC lens, fast axis collimation.
20        Q    Okay.  Did you discuss other than that       02:20:42
21    first time when -- when Mr. Levandowski directed you
22    to work on the FAC lens project, did you discuss the
23    FAC lens project with Mr. Levandowski any other
24    time?
25        A    Maybe when we received the first FAC         02:21:15
```

                                          Page 203

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    lenses.

 2        Q    When was that?

 3        A    At the end of the summer, maybe in

 4    September.

 5        Q    And what did you and Mr. Levandowski     02:21:33

 6    discuss?

 7        A    It was not a discussion, it was more like

 8    me informing him that we have like FAC lenses.

 9        Q    What did he say?

10        A    I don't know.  Like he was happy; like he  02:21:48

11    was oh, great.

12        Q    That's it.  That was the sum of the

13    interaction?

14        A    I don't know.  I cannot remember.

15        Q    Okay.  So that was in September?         02:22:02

16        A    I'm not super clear on the dates here.

17        Q    Other than that conversation, did you have

18    any other conversations with Mr. Levandowski about

19    the FAC lens project?

20        A    Not that I recall.                       02:22:25

21        Q    The FAC lens, the design was done before

22    that meeting you were referring to where you decided

23    to scrap the Spider project; is that right?

24        A    This is correct.

25        Q    So after you finished the FAC lens, but  02:22:43
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4          That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were duly sworn; that a record

8    of the proceedings was made by me using machine

9    shorthand which was thereafter transcribed under my

10   direction; that the foregoing transcript is a true

11   record of the testimony given.

12         Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [ ] was [x] was not requested.

16         I further, certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or party to this action.

19         IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21         Dated: 6/19/2017

22

23

24         SUZANNE F. GUDELJ

25         CSR No. 5111

                                          Page  274

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

WAYMO LLC,                           )
                                     )
              Plaintiff,             )
     vs.                             )   Case No.
                                     )   17-cv-00939-WHA
UBER TECHNOLOGIES, INC.;             )
OTTOMOTTO, LLC; OTTO TRUCKING LLC,   )
                                     )
              Defendants.            )
                                     )
                                     )
_____)


HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY


UNDER THE PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF

GAETAN PENNECOT

San Francisco, California

Thursday, August 9, 2017

Volume IV




Reported by:
MARY J. GOFF
CSR No. 13427

Job No. 2675906

PAGES 479 - 763

Page 716

| | | | |
|---|---|---|---|
| 1 | A | -- okay.  I have got it.  Yeah. | 05:24:45 |
| 2 | Q | And do you see your name? | 05:24:49 |
| 3 | A | Yes, I do. | 05:24:54 |
| 4 | Q | In the "Recipients" column? | 05:24:56 |
| 5 | A | Yes. | 05:24:58 |

6    Q    And immediately previous to yours, there's          05:24:58

7 Anthony Levandowksi's name?                                05:25:00

8    A    Yes.                                                05:25:02

9    Q    Okay.  What did Anthony Levandowksi                 05:25:03

10 contribute to the weekly LiDAR stand-up meeting?          05:25:06

11    A    I'm not even sure he was showing up to it.         05:25:17

12 So -- and I -- I don't remember, like, any, like,         05:25:22

13 specific contribution.  But I --                          05:25:25

14    Q    Can you --                                         05:25:29

15    A    -- I also remember that he was not showing         05:25:29

16 up usually.                                                05:25:32

17    Q    Okay.  Sitting here today, can you tell me         05:25:34

18 any information that Anthony Levandowksi provided at       05:25:36

19 the meeting that's reflected here as Entry 206 on          05:25:42

20 this document we have marked as Exhibit 544?               05:25:45

21    A    I don't remember anything significant.            05:25:55

22    Q    Do you remember anything?                          05:25:58

23    A    Sorry.  Mostly I remember, like, meetings          05:26:11

24 with our company.  But -- so he may have showed up,        05:26:13

25 like, sometimes and talked about team changes or          05:26:18

Page 717

```
 1   whatever.  Like, I -- I'm not -- no, I don't -- I        05:26:21
 2   don't remember anything specific.                        05:26:24
 3       Q    Okay.  Just to -- I'm not sure --               05:26:27
 4       A    Do you have --                                  05:26:47
 5       Q    -- I'm not sure I understood that answer.       05:26:47
 6   So sitting here today, can you tell me any               05:26:49
 7   information that Anthony Levandowksi provided at the     05:26:51
 8   meeting that's -- that's reflected here as               05:26:54
 9   Exhibit -- or as Entry 206 in Exhibit 5 --               05:26:56
10       A    So --                                           05:27:00
11       Q    -- 44?                                          05:27:00
12       A    -- not that I recall.  Like, if you have        05:27:01
13   any specific examples, I may be able to say:  True,      05:27:03
14   not true.  But I don't -- I don't remember.  He --       05:27:08
15   he was not showing up usually so...                      05:27:10
16       Q    Okay.  So going to 269.  Entry 269,             05:27:19
17   there's another entry for this "LiDAR stand-up"?         05:27:22
18       A    Yes.                                            05:27:30
19       Q    And you're, again, listed as attending?        05:27:31
20       A    Um-hum.                                         05:27:36
21       Q    And Anthony is also listed as attending?       05:27:36
22       A    Yes.                                            05:27:47
23       Q    What information did Anthony Levandowksi        05:27:48
24   provide at this meeting labeled as -- as --              05:27:49
25       A    Is --                                           05:27:53
```

Page 723

| | | |
|---|---|---|
| 1 | Q -- entries 540 and 541? | 05:35:27 |
| 2 | A October 28 -- 34 -- but they're all at the | 05:35:30 |
| 3 | same time, so it looks like there's a problem | 05:35:35 |
| 4 | somewhere. | 05:35:37 |
| 5 | Q There's -- these are duplicates? | 05:35:37 |
| 6 | A That looks like it. | 05:35:39 |
| 7 | Q Okay. All right. 876. Do you see | 05:35:40 |
| 8 | Entry 876? | 05:36:24 |
| 9 | A Yes, I see that. | 05:36:26 |
| 10 | Q Okay. What did you and Anthony | 05:36:26 |
| 11 | Levandowksi discuss regarding leadership over | 05:36:29 |
| 12 | FAC lens project in April 2016, reflected here as | 05:36:32 |
| 13 | Entry 876? | 05:36:35 |
| 14 | A So I believe that was my first meeting, | 05:36:37 |
| 15 | like, about work about what I should do next, and | 05:36:38 |
| 16 | that's when he told me: Work on the FAC lens. | 05:36:46 |
| 17 | Q Anything else? | 05:36:51 |
| 18 | A No, I don't remember. | 05:36:52 |
| 19 | Q All right. Let's go to 882. There's a | 05:37:06 |
| 20 | reference to "weekly LiDAR team meetings"? | 05:37:22 |
| 21 | A Um-hum. | 05:37:24 |
| 22 | Q What information did Anthony Levandowksi | 05:37:26 |
| 23 | provide during the meetings that are described at | 05:37:29 |
| 24 | Entry 822 -- 882? | 05:37:32 |
| 25 | A I -- I don't even know which one that | 05:37:38 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      I, MARY J. GOFF, CSR No. 13427, Certified

2   Shorthand Reporter of the State of California,

3   certify;

4      That the foregoing proceedings were taken

5   before me at the time and place herein set forth, at

    which time the witness declared under penalty of

6   perjury; that the testimony of the witness and all

7   objections made at the time of the examination were

8   recorded stenographically by me and were thereafter

9   transcribed under my direction and supervision; that

    the foregoing is a full, true, and correct

10  transcript of my shorthand notes so taken and of the

11  testimony so given;

12     That before completion of the deposition,

13  review of the transcript () was (XX) was not

14  requested:   (   ) that the witness has failed or

    refused to approve the transcript.

15     I further certify that I am not financially

16  interested in the action, and I am not a relative or

17  employee of any attorney of the parties, nor of any

18  of the parties.

19     I declare under penalty of perjury under the

20  laws of California that the foregoing is true and

21  correct, dated this 11th day of August 2017.

22

23

24   _____

25      MARY J. GOFF, CSR No. 13427

                                            Page 763

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4                    ---oOo---

5

6    WAYMO LLC,

7          Plaintiff,

8    vs.                        No. 3:17-cv-00939-WHA

9    UBER TECHNOLOGIES, INC.;

     OTTOMOTTO LLC; OTTO TRUCKING,

10   INC.,

11         Defendants.

     _____/

12

13      WAYMO & UBER CONFIDENTIAL ATTORNEYS' EYES ONLY

14

15       VIDEOTAPED DEPOSITION OF CAMERON POETZSCHER

16             SAN FRANCISCO, CALIFORNIA

17              MONDAY, JUNE 19, 2017

18

19

20   BY:  ANDREA M. IGNACIO,

21   CSR, RPR, CRR, CCRR, CLR

22   CSR LICENSE NO. 9830

23   JOB NO. 2642012

24

25   Pages 1 - 374

                                        Page 1

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | So, I can't pinpoint them to exactly that | 10:49 |
| 2 | time frame; right?  So, just to clarify that. | 10:49 |
| 3 | Q   Okay.  So then we'll broaden it. | 10:49 |
| 4 | From -- from your earliest discussions from | 10:49 |
| 5 | Anthony in September of 2015 until, we'll say, the -- | 10:49 |
| 6 | the April 11th, 2016, agreement, what were Anthony and | 10:49 |
| 7 | Lior telling you they were going to develop that was | 10:49 |
| 8 | better or different than what Google and Waymo were | 10:49 |
| 9 | doing? | 10:49 |
| 10 | A   Sure. | 10:49 |
| 11 | I mean, obviously, I'm not the technical | 10:49 |
| 12 | person, so I imagine they would have had more detailed | 10:49 |
| 13 | discussion with others.  What they told me is they had | 10:49 |
| 14 | new ways of doing lasers, in particular, ███████ ████ | |
| ██ | ████, that no one else was doing. | 10:49 |
| 16 | Q   Do you know if Waymo was developing | 10:49 |
| 17 | ██████████████████ at the time? | 10:49 |
| 18 | A   I don't know. | 10:49 |
| 19 | Q   Was Uber? | 10:49 |
| 20 | A   I don't know. | 10:49 |
| 21 | Q   And what about ████████████████ Did | 10:50 |
| 22 | they discuss that with you at all? | 10:50 |
| 23 | A   Yes, we discussed ██████████ ████ | 10:50 |
| ██ | ██████████████ | 10:50 |
| 25 | Q   And, was Waymo or Google developing ████████ | 10:50 |

Page 106

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                 CERTIFICATE OF REPORTER

 2

 3          I, ANDREA M. IGNACIO, hereby certify that the

    witness in the foregoing deposition was by me duly

 4  sworn to tell the truth, the whole truth, and nothing

 5  but the truth in the within-entitled cause;

 6          That said deposition was taken in shorthand

 7  by me, a disinterested person, at the time and place

 8  therein stated, and that the testimony of the said

    witness was thereafter reduced to typewriting, by

 9  computer, under my direction and supervision;

10          That before completion of the deposition,

11  review of the transcript [x] was [ ] was not

12  requested.  If requested, any changes made by the

13  deponent (and provided to the reporter) during the

14  period allowed are appended hereto.

            I further certify that I am not of counsel or

15  attorney for either or any of the parties to the said

16  deposition, nor in any way interested in the event of

17  this cause, and that I am not related to any of the

18  parties thereto.

19  Dated: June 20, 2017

20

21

22

23

24          ANDREA M. IGNACIO,

25       RPR, CRR, CCRR, CLR, CSR No. 9830
```

Page 374



VIDEOTAPED DEPOSITION OF BRENT SCHWARZ

TUESDAY, AUGUST 15, 2017

Reported by:

Anrae Wimberley

CSR No. 7778

Job No. 2680988

PAGES 1 - 296

Page 1



Page 174



Veritext Legal Solutions
866 299-5127



Page 176



Page 178



Page 179



Page 181



Page 182



Page 183

866 299-5127

```
1              FEDERAL CERTIFICATE OF DEPOSITION OFFICER
2
               I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby
3      declare:
4              That prior to being examined, the witness
       named in the foregoing deposition was by me duly sworn
5      pursuant to Section 30(f)(1) of the Federal Rules of
6      Civil Procedure and the deposition is a true record of
7      the testimony given by the witness;
               That said deposition was taken down by me in
8      shorthand at the time and place therein named and
9      thereafter reduced to text under my direction;
               That the witness was requested to review the
10     transcript and make any changes to the transcript as a
11     result of that review pursuant to Section 30(e) of the
       Federal Rules of Procedure;
12             No changes have been provided by the witness
13     during the period allowed;
14             The changes made by the witness are appended
       to the transcript;
15             No request was made that the transcript be
16     reviewed pursuant to Section 30(e) of the Federal
       Rules of Civil Procedure.
17             I further declare that I have no interest in
18     the event of the action.
               I declare under penalty f perjury under the
19     laws of the United States of America that the
20     foregoing is true and correct.
21             WITNESS my hand this 16th day of August 2017.
22
23
24         <%signature%>
25         ANRAE WIMBERLEY, CSR NO. 7778
```

Page 296

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4

5    WAYMO LLC,                     )

6              Plaintiff,           )

7                  vs.              ) Case No.

8    UBER TECHNOLOGIES, INC.;       ) 3:17-cv-000939-WHA

9    OTTOMOTTO LLC; OTTO TRUCKING,  )

10   INC.,                          )

11             Defendants.          )

12   _____)

13

14

15        VIDEOTAPED DEPOSITION OF COLIN SEBERN

16             San Francisco, California

17             Tuesday, August 22, 2017

18                   Volume I

19

20   Reported by:

21   CARLA SOARES

22   CSR No. 5908

23   JOB No. 2686011

24

25   PAGES 1 - 106

                                        Page 1



09:49:42

Page 31



09:50:52

Page 32



09:52:07

Page 33



09:53:17

Page 34

```
1              I, the undersigned, a Certified Shorthand
2    Reporter of the State of California, do hereby
3    certify:
4              That the foregoing proceedings were taken
5    before me at the time and place herein set forth;
6    that any witnesses in the foregoing proceedings,
7    prior to testifying, were administered an oath; that
8    a record of the proceedings was made by me using
9    machine shorthand which was thereafter transcribed
10   under my direction; that the foregoing transcript is
11   a true record of the testimony given.
12             Further, that if the foregoing pertains to
13   the original transcript of a deposition in a Federal
14   Case, before completion of the proceedings, review
15   of the transcript [ ] was [X] was not requested.
16             I further certify I am neither financially
17   interested in the action nor a relative or employee
18   of any attorney or any party to this action.
19             IN WITNESS WHEREOF, I have this date
20   subscribed my name.
21             Dated: 8/23/2017
22
23
               Carla Soares
24             CARLA SOARES
25             CSR No. 5908
```

Page 106

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4    _____

5    WAYMO LLC,                         )
                                        )
6                 Plaintiff,            )
           vs.                          )   Case No.
7                                       )   17-cv-00939-WHA
     UBER TECHNOLOGIES, INC.;           )
8    OTTOMOTTO, LLC; OTTO TRUCKING LLC, )
                                        )
9                 Defendants.           )
                                        )
10                                      )
     _____)

11

12

13    HIGHLY CONFIDENTIAL--OUTSIDE COUNSEL'S EYES ONLY

14              VIDEOTAPED DEPOSITION OF

15              OGNEN STOJANOVSKI, ESQ.

16              San Francisco, California

17              Thursday, July 20, 2017

18                    Volume I

19

20

21

22   Reported by:
     MARY J. GOFF
23   CSR No. 13427
24   Job No. 2663397
25   PAGES 1-321

                                              Page 1

| | | |
|---|---|---|
| 1 | invoices whereby Ottomotto was -- was -- was buying | 05:53:27 |
| 2 | multiple products from Tyto LiDAR or is it -- is it | 05:53:33 |
| 3 | just sort of an internal invoice number thing? | 05:53:36 |
| 4 | A    I don't know what it refers to. | 05:53:40 |
| 5 | Q    And this is dated February 25, 2016, | 05:53:43 |
| 6 | right? | 05:53:47 |
| 7 | A    It's dated February 25, 2016, yes. | 05:53:48 |
| 8 | Q    And so presumably by that date you knew | 05:53:52 |
| 9 | that Mr. Levandowski had started his own company | 05:53:58 |
| 10 | called Ottomotto, right? | 05:54:01 |
| 11 | A    Yes, I would think so.  Yes. | 05:54:03 |
| 12 | Q    Do you -- do you remember how far in | 05:54:05 |
| 13 | advance of Ottomotto's ordering of this Owl 1.0 | 05:54:07 |
| 14 | LiDAR sensor your -- your conversation with | 05:54:15 |
| 15 | Mr. Levandowski was at ramen where he told you | 05:54:17 |
| 16 | he was -- he was founding Ottomotto? | 05:54:20 |
| 17 | A    Probably not too far in advance.  I -- I | 05:54:22 |
| 18 | don't know. | 05:54:25 |
| 19 | Q    When did -- | 05:54:28 |
| 20 | A    I think, yeah, within two weeks for sure, | 05:54:29 |
| 21 | I would say but... | 05:54:31 |
| 22 | Q    Did you personally talk to Mr. Ron about | 05:54:35 |
| 23 | the ordering of this Owl 1.0 LiDAR sensor? | 05:54:38 |
| 24 | A    I did not personally talk to Mr. Ron about | 05:54:44 |
| 25 | ordering this LiDAR sensor. | 05:54:47 |

Page 290

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

1      I, MARY J. GOFF, CSR No. 13427, Certified

2   Shorthand Reporter of the State of California,

3   certify;

4      That the foregoing proceedings were taken

5   before me at the time and place herein set forth, at

6   which time the witness declared under penalty of

7   perjury; that the testimony of the witness and all

8   objections made at the time of the examination were

9   recorded stenographically by me and were thereafter

10   transcribed under my direction and supervision; that

11   the foregoing is a full, true, and correct

     transcript of my shorthand notes so taken and of the

12   testimony so given;

     That before completion of the deposition,

13   review of the transcript (XX) was (  ) was not

     requested:   (   ) that the witness has failed or

14   refused to approve the transcript.

15      I further certify that I am not financially

     interested in the action, and I am not a relative or

16   employee of any attorney of the parties, nor of any

17   of the parties.

     I declare under penalty of perjury under the

18   laws of California that the foregoing is true and

19   correct, dated this 21st day of July 2017.

20

21

22

23

24        _____

           MARY J. GOFF

25

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4    _____

 5    WAYMO LLC,                        )

 6                  Plaintiff,          )

 7       vs.                            )  Case No.

 8    UBER TECHNOLOGIES, INC.;          )  17-cv-00939-WHA

 9    OTTOMOTTO, LLC; OTTO TRUCKING LLC, )

10                  Defendants.         )

11    _____)

12

13     HIGHLY CONFIDENTIAL--OUTSIDE COUNSEL'S EYES ONLY

14

15               VIDEOTAPED DEPOSITION OF

16                 WILLIAM TREICHLER

17              San Francisco, California

18               Monday, August 14, 2017

19                      Volume I

20

21    Reported by:

22    MARY J. GOFF

23    CSR No. 13427

      Job No. 2674484

24

25    PAGES 1 - 276
```

Page 1

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

| | | | |
|---|---|---|---|
| 1 | | Otto concerning LiDAR technology.  I want -- | 04:27:49 |
| 2 | A | Okay. | 04:27:54 |
| 3 | Q | -- to go through some of the entries with | 04:27:54 |
| 4 | you. | | 04:27:56 |
| 5 | A | Okay. | 04:27:57 |
| 6 | Q | Let's start with Entry No. 206. | 04:27:57 |
| 7 | A | Okay. | 04:28:23 |
| 8 | Q | Do you see the date is May 19, 2016? | 04:28:23 |
| 9 | A | Yes. | 04:28:30 |
| 10 | Q | And there's a number of recipients, and | 04:28:31 |
| 11 | you're listed as a recipient about two-thirds of the | | 04:28:33 |
| 12 | way down? | | 04:28:35 |
| 13 | A | Yes. | 04:28:37 |
| 14 | Q | And you can see that the "BCC" is | 04:28:38 |
| 15 | "Upstairs Fishbowl." | | 04:28:41 |
| 16 | | Is that a mechanism that your schedulers | 04:28:43 |
| 17 | used to denote the location of a meeting? | | 04:28:46 |
| 18 | A | That's a conference room, yeah. | 04:28:49 |
| 19 | Q | Upstairs Fishbowl is a conference room? | 04:28:50 |
| 20 | A | Um-hum. | 04:28:54 |
| 21 | Q | At 30 -- 737 Harrison -- Harrison Street? | 04:28:54 |
| 22 | A | Yes. | 04:28:57 |
| 23 | Q | Okay.  And the subject discussed there | 04:28:58 |
| 24 | says "Calendar Invention for Weekly LiDAR Stand-up | | 04:29:00 |
| 25 | Meeting." | | 04:29:05 |

Page 264

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

```
 1              Do you see that?                    04:29:06

 2      A     Um-hum.                               04:29:06

 3      Q     Do you remember these weekly LiDAR    04:29:06

 4   stand-up meetings, generally?                  04:29:08

 5      A     Generally, yes.                        04:29:10

 6      Q     If you are listed as a recipient on the  04:29:11

 7   May 19, 2016 Fishbowl invite, does that indicate to  04:29:14

 8   you that you were working at Otto as of May 19,  04:29:20

 9   2016?                                          04:29:23

10      A     I don't know when I was added to -- when  04:29:25

11   my e-mail was generated, so that doesn't        04:29:31

12   necessarily -- it should be around that time.  I  04:29:35

13   would say that -- I would either -- I must have been  04:29:39

14   hired by that time.  I think that's fair to assume.  04:29:41

15      Q     Do you remember this May 19 meeting?   04:29:46

16      A     No.                                    04:29:49

17      Q     So you don't have any recollection as to  04:29:52

18   what Anthony Levandowksi said at this May 19    04:29:53

19   meeting?                                        04:29:59

20              MR. KIM:  Objection, form.           04:29:59

21              MS. HYDE:  Join.                      04:30:00

22      A     I don't remember this specific meeting, so  04:30:02

23   no.                                            04:30:04

24      Q     (BY MR. NARDINELLI) Let's go to Entry  04:30:05

25   No. 269.                                       04:30:08
```

Page 265

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

1     I, MARY J. GOFF, CSR No. 13427, Certified

2  Shorthand Reporter of the State of California,

3  certify;

4     That the foregoing proceedings were taken

before me at the time and place herein set forth, at

5  which time the witness declared under penalty of

6  perjury; that the testimony of the witness and all

7  objections made at the time of the examination were

8  recorded stenographically by me and were thereafter

transcribed under my direction and supervision; that

9  the foregoing is a full, true, and correct

10  transcript of my shorthand notes so taken and of the

11  testimony so given;

12     That before completion of the deposition,

13  review of the transcript (XX) was ( ) was not

14  requested:  (   ) that the witness has failed or

15  refused to approve the transcript.

     I further certify that I am not financially

16  interested in the action, and I am not a relative or

17  employee of any attorney of the parties, nor of any

18  of the parties.

19     I declare under penalty of perjury under the

20  laws of California that the foregoing is true and

correct, dated this 15th day of August 2017.

21

22

23

24     MARY J. GOFF

25     CSR No. 13427

Page 276

ATTORNEYS EYES ONLY

1                 UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4

5    WAYMO LLC

6          Plaintiff,

7

                 vs.              Case No. 17-cv-00939-WHA

8

9    UBER TECHNOLOGIES,INC.;

10   OTTOMOTTO, LLC; OTTO

     TRUCKING LLC,

11         Defendants.

12   _____

13

14               **ATTORNEYS' EYES ONLY**

15         VIDEO DEPOSITION OF JUR VAN DEN BERG

16              San Francisco, California

17             Wednesday, August 2, 2017

18                    Volume I

19

20

21   REPORTED BY:

22   REBECCA L. ROMANO, RPR, CSR No. 12546

23   JOB NO. 2671707

24

25   PAGES 1 - 387

                                        Page 1

```
 1    call right now.  That -- that kind of logistic        12:29:23

 2    stuff, yeah.

 3         Q.   Is your phone being collected by Uber

 4    for -- in order to produce any response to text

 5    messages?                                             12:29:30

 6         A.   No, it has not been.

 7              MR. LIN:  Objection to form.

 8         Q.   (By Mr. Judah)  No one has asked you

 9    to -- to -- about collecting text messages from

10    you --                                                12:29:43

11         A.   No.

12         Q.   -- for this case?

13         A.   No.

14         Q.   Have you -- have you ever used a

15    Telegram, an app called Telegram?                     12:29:46

16         A.   No, never used it.

17         Q.   Do you -- have you ever had -- now kind

18    of zooming out for any type of communication --

19    have you ever discussed LiDAR with Mr. Levandowski?

20         A.   No, not in a technical sense at least.      12:30:03

21         Q.   Not -- when you say "not in a technical

22    sense," have -- have you -- is there another sense

23    where you have discussed lasers or LiDAR with

24    Anthony Levandowski?

25         A.   Yeah, I think so.  I think I have when --    12:30:15
```

ATTORNEYS EYES ONLY

```
 1    when I joined Otto, he mentioned that -- that        12:30:16

 2    the -- that the -- the team was strong in -- in

 3    the -- in the -- in the -- in the -- in the LiDAR

 4    competency so that that would be a strong suit of

 5    our -- of our startup in that sense that would be    12:30:32

 6    -- that -- that I can remember having discussed --

 7    in that sense, like, hey, we are strong on LiDAR.

 8         Q.   And was that at the -- do you -- was

 9    that -- did he mention that at this lunch meeting

10    or -- or as a phone call or a different              12:30:46

11    conversation?

12         A.   Yeah, I think at the lunch meeting it may

13    have come up, or like when we had this conversation

14    about the people joining, that we have a lot of

15    people with expertise in LiDAR.                      12:30:57

16         Q.   In the phone call?

17         A.   This phone call about the -- the names of

18    people that would be joining.  I don't know exactly

19    in what conversation that's come up, but that

20    was -- I -- I -- I had an understanding when I       12:31:07

21    joined Otto that we were -- that -- that -- that we

22    had lot of expertise in -- in LiDAR so that that

23    would also be one of the goals of the company to

24    develop a LiDAR, yeah.

25         Q.   Mr. Levandowski, you knew, had -- had      12:31:19
```

Page 176

ATTORNEYS EYES ONLY

```
 1        Q.   This is an email sent from              03:30:48

 2   Anthony Levandowski at his Otto email address,

 3   right?  On May 30th, 2016 to -- the "to" is to

 4   everyone.

 5             Was that a company-wide Otto email alias?  03:30:58

 6        A.   Not 100 percent sure.

 7        Q.   Do you think you received this email?

 8        A.   No, I think I did receive it.  I -- I

 9   just don't think I read it.

10        Q.   My understanding -- or let me ask you     03:31:20

11   this:  Did Mr. Levandowski send a lot of email

12   updates to the whole team?

13        A.   No, but it doesn't completely strike me

14   as outlandish either.  Yeah, this is way too long

15   an email for me to read, if I just see that, so     03:31:33

16   I -- I don't -- I -- I have not read this.

17        Q.   But your name is mentioned in it?

18        A.   Yeah, I know.  I see that now.  Yeah.

19        Q.   Wouldn't you want to read that part?

20        A.   Yeah, of course.  That's super cool,      03:31:44

21   yeah.  But, yeah, no, I probably did not read this.

22   I probably was working on something else.

23        Q.   To the best of your recollection, as of

24   late May 2016, was Otto in the 737 Harrison space

25   yet?                                                03:31:59
```

Page 289

```
 1        Q.    (By Mr. Judah)  What would make a road        03:37:41

 2   really hard versus not really hard?

 3        A.    Straight.  Flat is easy for us.

 4   Planning.  Also, I guess, for perception.  Windy

 5   and -- and up and down would be hard.                    03:37:53

 6        Q.    So the second numbered item of this email

 7   from Mr. Levandowski is titled "Lasers in

 8   Pittsburgh."

 9             Do you see that?

10        A.    Uh-huh.                                        03:38:07

11        Q.    So he starts by saying, "James was badass

12   this weekend and showed that we can range on the

13   target at around 140 meters with 1/4W laser."

14             Do you see that?

15        A.    Yup.                                           03:38:18

16        Q.    Do you know what that refers to?

17        A.    No, not -- I think -- well, he can see

18   something at 140 meters.  That's what I take out of

19   it.

20             The other 1/4W, I don't know what that         03:38:28

21   stands for, but...

22        Q.    Who is James?

23        A.    I don't know.

24        Q.    Is that James Haslim?

25        A.    I don't -- I don't know.                       03:38:36
```

Page 296

ATTORNEYS EYES ONLY

```
 1     than -- I don't want to grow as fast as people want        05:18:16

 2     me to grow.

 3            The person I -- I -- I would have to ask

 4     about that would be my direct manager, the one I

 5     report to.  And that would be -- I'm blanking on           05:18:25

 6     his name, my own manager.  I mentioned his name

 7     earlier today.  Brandon Basso.  Sorry.

 8         Q.   Uber has a CFO, right?  A chief financial

 9     officer.

10         A.   I -- I'm sure Uber -- I -- I don't know.          05:18:42

11         Q.   The way it's structured, does -- does ATG

12     have its own sort of chief financial person for

13     their group?

14            MS. HARTNETT:  Objection.

15            MR. LIN:  Objection to form.                        05:18:52

16            THE DEPONENT:  I don't know.

17            MR. JUDAH:  Let's mark as Exhibit 492 an

18     email bearing Bates stamp -- strike that -- a

19     document bearing Bates Stamp UBER00086538.

20            (Exhibit 492 was marked for                         05:19:11

21     identification by the court reporter and is

22     attached hereto.)

23         Q.   (By Mr. Judah)  Do you recognize

24     Exhibit 492?

25         A.   No.                                               05:19:51
```

Page 372

ATTORNEYS EYES ONLY

1     Q.   This is a -- this is a calendar       05:19:55

2  invitation that you received, though, right?

3     A.   Uh-huh.  Well, I mean, I infer from the

4  fact that I was on the invitees list that I

5  received it.                      05:20:00

6     Q.   It says that you're optional in that

7  invite, right?

8     A.   Yeah.  What does that mean?

9     Q.   Well, you probably received something

10  like this.  Do you know what that refers to?    05:20:10

11     A.   I -- I don't.

12     Q.   You don't remember attending this

13  meeting?

14     A.   I -- I -- I'm -- I'm sure I did not

15  attend this meeting.                  05:20:18

16     Q.   Why are you sure you didn't attend it?

17     A.   I -- I -- I skip as many meetings as I

18  possibly can, and this is definitely a meeting I

19  would never attend because I have nothing to do

20  with these -- with the topic of the meeting.    05:20:29

21     Q.   With the "Fuji Laser Program Status and

22  Timeline Presentation"?

23     A.   Right.

24        MR. JUDAH:  I mark as Exhibit 493 a

25  document bearing Bates Stamp UBER000866.      05:20:40

Veritext Legal Solutions
866 299-5127

ATTORNEYS EYES ONLY

1      I, Rebecca L. Romano, a Certified Shorthand

2  Reporter of the State of California, do hereby

3  certify:

4      That the foregoing proceedings were taken

before me at the time and place herein set forth;

5  that any witnesses in the foregoing proceedings,

6  prior to testifying, were administered an oath;

7  that a record of the proceedings was made by me

8  using machine shorthand which was thereafter

9  transcribed under my direction; that the foregoing

transcript is true record of the testimony given.

10      Further, that if the foregoing pertains to the

11  original transcript of a deposition in a Federal

12  Case, before completion of the proceedings, review

13  of the transcript [ ] was [x] was not requested.

14      I further certify I am neither financially

15  interested in the action nor a relative or employee

of any attorney or any party to this action.

16      IN WITNESS WHEREOF, I have this date

17  subscribed my name.

18

19  Dated:  August 3, 2017

20

21

22

23

24

        Rebecca L. Romano, RPR,

25         CSR. No 12546

                    Page 387