**Pages 1 - 88**

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

WAYMO, LLC,                        )
                                   )
            Plaintiff,             )
                                   )
  VS.                              )     **NO. CV 17-00939-WHA**
                                   )
UBER TECHNOLOGIES, INC., ET        )
AL.,                               )
                                   )
            Defendants.            )
_____   )


                              San Francisco, California
                              Monday, August 28, 2017

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                    50 California Street -- 22nd Floor
                    San Francisco, CA  94111
               BY:  **MELISSA J. BAILY, ESQUIRE**
                    **JEFFREY NARDINELLI, ESQUIRE**
                    **DAVID PERLSON, ESQUIRE**
                    **JAMES JUDAH, ESQUIRE**

                    QUINN EMANUEL URQUHART & SULIVAN, LLP
                    51 Madison Avenue
                    New York, NY  10010
               BY:  **JAMES BAKER, ESQUIRE**


        (Appearances continued on the next page)

Reported By:        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    Official Reporter

```
APPEARANCES CONTINUED:

For Plaintiff:
                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                        555 Twin Dolphin Drive -- 5th Floor
                        Redwood Shores, CA  94065
                   BY:  ANDREA PALLIOS ROBERTS, ESQUIRE



For Defendant Uber Technologies, Inc:
                        MORRISON & FOERSTER LLP
                        425 Market Street
                        San Francisco, CA  94105
                   BY:  ARTURO J. GONZALEZ, ESQUIRE
                        ESTHER KIM CHANG, ESQUIRE

                        BOIES, SCHILLER & FLEXNER LLP
                        401 Wilshire Boulevard -- Suite 850
                        Santa Monica, CA  90401
                   BY:  EDWARD H. TAKASHIMA, ESQUIRE



For Defendant Otto Trucking LLC:
                        GOODWIN PROCTER LLP
                        135 Commonwealth Drive
                        Menlo Park, CA  94025
                   BY:  I. NEEL CHATTERJEE, ESUIQRE

Special Master:
                        FARELLA BRAUN & MARTEL LLP
                        235 Montgomery Street -- Suite 1700
                        San Francisco, CA  94104
                   BY:  JOHN L. COOPER, ESQUIRE

For Anthony Levandowski:
                        RAMSEY & EHRLICH LLP
                        803 Hearst Avenue
                        Berkeley, CA  94710
                   BY:  MILES F. EHRLICH, ESQUIRE



For Lior Ron:
                        TAYLOR & PATCHEN, LLP
                        One Ferry Building -- Suite 355
                        San Francisco,CA  94111
                   BY:  JONATHAN A. PATCHEN, ESQUIRE
```

```
APPEARANCES CONTINUED:

For Keker, Van Nest & Peters LLP:
                         KEKER, VAN NEST & PETERS LLP
                         633 Battery Street
                         San Francisco, CA  94111
                BY:  RACHAEL E. MENY, ESQUIRE
                     SUSAN J. HARRIMAN, ESQUIRE

For Colin Sebern:
                         FARMER BROWNSTEIN JAEGER, LLP
                         235 Montgomery Street -- Suite 835
                         San Francisco, CA  94104
                BY:  DAVID BROWNSTEIN, ESQUIRE

For Stroz Friedberg:
                         LATHAM & WATKINS LLP
                         505 Montgomery Street -- Suite 2000
                         San Francisco, CA  94111
                BY:  MELANIE M. BLUNSCHI, ESQUIRE
```

```
 1   Monday - August 28, 2017                        1:30 p.m.

 2                      P R O C E E D I N G S

 3                          ---oOo---

 4        THE CLERK:  Calling CV 17-939, Waymo LLC vs. Uber.

 5        THE COURT:  So if I can have counsel for the parties

 6   state their appearances, and then when the time comes, if a

 7   nonparty's counsel wants to be heard on a particular motion,

 8   then the nonparty can make their appearance at that time.

 9        MS. BAILY:  Good afternoon, Your Honor.  Melissa Baily

10   for Plaintiff Waymo.  With me is Jim Baker, Jeff Nardinelli,

11   Andrea Pallios Roberts, David Perlson, and James Judah.

12        THE COURT:  Good afternoon.

13        MR. CHATTERJEE:  Good afternoon, Your Honor.  Neel

14   Chatterjee for Otto Trucking.

15        THE COURT:  Good afternoon.

16        MR. GONZALEZ:  Good afternoon, Your Honor.  Art

17   Gonzalez, Esther Kim Chang, from Morrison & Foerster for Uber.

18        THE COURT:  All right.  Good afternoon.

19        MR. TAKASHIMA:  Good afternoon, Your Honor.  Ed

20   Takashima -- Boies Schiller Flexner -- for Uber.

21        MR. COOPER:  And John Cooper, Special Master.

22        THE COURT:  Good afternoon, John Cooper.

23       All right.  So we have a number of motions, and I thought

24   it might be easier, given they all came in at the same time, if

25   I just had this hearing and tried to address them orally.
```

1     And what I actually wanted to start with is Uber's --

2 Uber's -- Waymo's objection to Judge Alsup, which essentially

3 asks for clarification from me, and I understand why you didn't

4 seek it because given our time frame, but I think perhaps I can

5 obviate some of that request.

6     So this would be my view, and you can be heard,

7 Mr. Gonzalez, since you probably won't like it.

8     But in any event, with respect to the Interrogatory No. 25

9 and No. 1, all I meant to say -- in my defense, this was a

10 Saturday that I wrote it and filed it.

11     What I meant to say was look, Waymo answered them.  They

12 answered their interrogatories.  They are what they are.  To

13 the extent that Uber wants to argue that something that they

14 bring up in trial or maybe in an offer of proof -- I don't know

15 what you're going to say -- wasn't sufficiently disclosed in

16 that interrogatory, you can make that argument.  Okay.

17     And then with respect to the emails regarding any

18 conflicts, I thought it was sort of without saying, of course

19 only if those emails raised something that a further

20 deposition -- not a seven-hour deposition -- a further

21 deposition on those issues necessitates something, then of

22 course it could go forward; not just anything.  But I think

23 that goes without saying, and I would bet that Mr. Gonzalez

24 wouldn't disagree with that either.

25          **MR. GONZALEZ:**  Your Honor, we have bigger fish to fry

1    today.

2                    **THE COURT:**  Okay.

3                    **MR. GONZALEZ:**  I'll let that one rest.

4                    **THE COURT:**  Excellent.

5         So I think there's still one issue for Judge Alsup I think

6    in that objection that I'm not going to weigh in on.  All

7    right.

8         So let's then go to -- I want to leave the Stroz protocol

9    to the end because, heck, maybe while we're sitting here, the

10   Federal Circuit will rule, so I'll just leave it until the end.

11   I have no inside information.  I'm just saying *maybe*.

12        Let's start with Otto Trucking's subpoena to Keker.  I

13   believe I have someone from Keker here who can now come forward

14   and make their appearance.

15                   **MS MENY:**  Your Honor, Rachael Meny of Keker, Van Nest

16   & Peters and for nonparty Keker, Van Nest & Peters.

17                   **THE COURT:**  Good afternoon.

18        And good afternoon, Mr. Chatterjee.

19        So this is my tentative view, is that the subpoena on

20   Keker sort of comes too late.  There was a reason there was a

21   waiver of work product because of course the investigation was

22   directed by counsel.  That was not a secret.  That's why there

23   had to be a waiver and that counsel was involved.  That's why

24   there had to be a waiver in the first place.

25        And so Otto Trucking certainly could have subpoenaed Keker

1    a long time ago, but four days before the close of discovery I

2    don't think is a reasonable amount of time.

3         Even putting that aside, though, what I would normally do

4    is say the information that the Court compelled had to do with

5    Waymo, what was communicated to Mr. Brown, and I believe there

6    were at least two other individuals involved with that

7    investigation.

8         Waymo was in possession of all those communications, and

9    so always you would get from that first.  And particularly

10   here, it's sensitive because of course Keker represents Waymo

11   in the arbitration, and so whenever you're subpoenaing counsel,

12   we always have to be particularly sensitive as well.

13        But the order was -- and, again, my words were probably

14   not precise.  I wasn't thinking about it.  When I said any

15   communications that counsel had -- I think I said with everyone

16   or anyone, something broadly -- I had in my mind the people who

17   conducted the investigation, the non-attorneys.  So that's my

18   view.

19        To the extent there is a dispute of some redactions,

20   perhaps I can help the parties with that now.  I'll let you be

21   heard.

22            **MR. CHATTERJEE:**  Sure, Your Honor.

23        First thing is there have been no documents produced by

24   Keker so far, so as far as the issues of redactions, I think

25   those are going to be --

1        **THE COURT:**  No, no.  With respect to Waymo.  There

2   have been no documents produced by them because you didn't

3   serve them with anything until the subpoena, so they weren't

4   supposed to.

5        Now, in response to my order, which was a Motion to Compel

6   to Waymo, Waymo has produced documents, my understanding is,

7   and that --

8        **MR. CHATTERJEE:**  And we will discuss those.

9        **THE COURT:**  -- there are redactions in those.

10       **MR. CHATTERJEE:**  Yes, but just because Keker is on

11  this one standing at the podium, it seems to me that's what we

12  will deal with with respect to Waymo.

13       Your Honor, to your point on the waiver issue, just what

14  the documents, as limited as they have been and as heavily

15  redacted as they have been, which were given at 8:54 on

16  April -- on the 24th, last Thursday, at the close of discovery,

17  it's very clear that Keker was actually driving the

18  investigation of Anthony Levandowski and --

19       **THE COURT:**  That's why it's work product.

20       **MR. CHATTERJEE:**  Okay, Your Honor.  But there's times

21  there is not even an in-house lawyer involved.  And --

22       **THE COURT:**  It's still work product.  It doesn't have

23  to be an in-house lawyer to be work product.

24       If Uber's in-house was never involved, it's still work

25  product, but what they waived was the investigation done by

```
1   Mr. Brown and those other people.  Directed by Keker.  Got it.
2       So all of Keker's communications with Mr. Brown -- and I
3   think it was -- was it two women?  Two other people or three.
4   I don't know how many people.
5          MR. CHATTERJEE:  It was Mr. Gorman and Ms. Meny.
6          THE COURT:  No, no, not the attorneys; the people at
7   Waymo.  Right?  Mr. Brown did the investigation along with some
8   other non-attorneys.  That's the investigation that they're
9   relying on.
10      Attorneys may have also done another investigation.  They
11  haven't waived the privilege with respect to that
12  investigation.  They're not relying on it.
13      What they're relying on is the investigation that
14  Mr. Brown and his cohorts did, and that's where the waiver
15  applies to.
16         MR. CHATTERJEE:  Your Honor, but there's
17  communications between the Keker firm and these individuals.
18  We have zero confidence that Waymo is producing everything in
19  response to that.
20         THE COURT:  Why?
21         MR. CHATTERJEE:  Because if you look at the redactions
22  and you look at the documents, there's examples.  There are
23  emails that were produced last Thursday that in the string
24  there will say there is an email from, you know, Sasha Zbrozek
25  to Tom Gorman with an attachment.  We don't have that email.
```

1        **THE COURT:**  Have you talked to Waymo about that?

2        **MR. CHATTERJEE:**  We have.  And on many of the

3    instances -- we had a meet and confer with them today.  On many

4    of the instances, they would not commit as to what they were

5    going to do, and they said, *We'll wait until after the hearing*

6    *and we'll meet and confer with you on it.*

7        **THE COURT:**  Let me hear from Waymo.  Is that

8    Mr. Baker?

9        **MR. BAKER:**  Yes, Your Honor.  Thank you.

10        **THE COURT:**  Welcome, Mr. Baker.

11        **MR. BAKER:**  Thank you, Your Honor.

12        So just to address Mr. Chatterjee's comment about the meet

13    and confer this morning, we did have a meet and confer this

14    morning, and I think we are going to have another one with the

15    Special Master after this hearing now that we have some

16    clarification on the scope of the order.

17        Our view was exactly what Your Honor said -- was that the

18    order meant communications between Mr. Brown and the folks on

19    his team, one of which was Kristenn Gudjonsson, I think might

20    have been the name that you were much searching for, and

21    counsel.

22        We conveyed that to counsel for Otto Trucking at the meet

23    and confer this morning.  And it was not our intent -- it is

24    not our intent to withhold communications between Mr. Brown and

25    his team and counsel for Keker that concerned the investigation

1  that Your Honor was referring to, if such communications exist.

2  And if they think that we have or have improperly redacted,

3  we're happy to address that.

4      But our view of the world was that the scope of the waiver

5  was exactly how Your Honor just articulated and that's what we

6  were producing.

7          MR. CHATTERJEE:  Your Honor, can I give you a couple

8  examples?

9          THE COURT:  Sure.

10          MR. CHATTERJEE:  If I may, I'll give these to opposing

11  counsel.

12      Your Honor, I put together a couple slides here.  If you

13  go to Slide 3, what this is -- and this is Exhibit 14 to Hayes

14  Hyde.  This is an email from Keker & Van Nest to two in-house

15  lawyers at Google, and the *Re* line says "Chauffeur Forensic

16  Investigation."

17      I have given a sample of the document.  You can actually

18  look at the whole document, Exhibit 14.  They have heavily

19  redacted everything about the custodians and about emails

20  associated with the forensic --

21          THE COURT:  You said it went to Uber in-house counsel.

22  Did it also go to --

23          MR. CHATTERJEE:  Not Uber.  It went to Google.

24          THE COURT:  I mean Google.

25      Did it also go to Mr. Brown and the other people, or did

1   it only go to attorneys?

2        **MR. CHATTERJEE:**  There are -- we don't have all the

3   metadata on all of these.  This particular document, there was

4   no metadata provided, but most of these documents that have

5   been -- that we submitted were things that went to Mr. Brown.

6        And this was their forensic investigation strategy that

7   they used.

8        **THE COURT:**  Okay.  Wait.  Let me stop.

9        Mr. Baker, why are things -- if they went to Mr. Brown,

10  why are they being redacted?

11       **MR. BAKER:**  Well, I don't think that it went to

12  Mr. Brown.  I think this document is on our Privilege Log, and

13  I think it shows, though, that it did go to Mr. Gudjonsson.

14       But there are -- there are things that are redacted in

15  here, Your Honor, that we believe are outside of the scope of

16  Your Honor's order, including investigation of other employees,

17  so there are parts where the memo talks about that

18  investigation.  So not the investigation of Mr. Levandowski,

19  Mr. Kshrisagar, or Mr. Raduta.

20       And there are also portions of this email that talk about

21  an investigation that Keker Van Nest was conducting other than

22  the forensic investigation that we are relying on in this case.

23       **THE COURT:**  Well, some of it I think I'm going to have

24  to review in camera because this is always the thing.  It's

25  hard to slice and dice, and sometimes -- and you see this come

1   up in patent cases, right, where they'll rely on

2   advice-of-counsel defense with respect to invalidity, but

3   they'll hire someone to do a search, and the general search

4   will involve lots of things, even things that maybe aren't

5   waived, and you can't really slice it out; right?

6       So your slicing has to weigh in favor of disclosure rather

7   than nondisclosure.  It wouldn't necessarily be a waiver of

8   everything else.  In other words, you may have to disclose some

9   things relevant to the investigation of the other employees to

10  the extent it was wrapped up within the investigation of the

11  former employees.

12          **MR. BAKER:**  Understood, Your Honor.

13          **MR. CHATTERJEE:**  Your Honor, let me just give you

14  another example.  If you go to the next page -- and this is

15  Hayes Exhibit 6.  If you look at this email, and we can -- I

16  can give you the full one -- there is no question on this one

17  that Mr. Gudjonsson is on the email string; that Ms. Meny is

18  the one who sent it; and they've -- once again, if you look at

19  the email, they've redacted it extensively.

20      The issue here, Your Honor, is we're at the close of

21  discovery --

22          **THE COURT:**  But, Mr. Chatterjee, the reason we are is

23  because you didn't bring this motion to my attention until

24  later, so that I don't want to hear.  I'll deal with it and

25  we'll deal with it and I'll deal with it again next week if I

1   have to deal with it, but --

2         **MR. CHATTERJEE:**  Your Honor, they didn't produce the

3   machine forensic record until late in the proceedings.

4         **THE COURT:**  So bring it to my attention before.

5      I have been, as you know, doing things really quickly.

6   We've all been working on this very challenging deadline.

7   So --

8         **MR. CHATTERJEE:**  I understand that, Your Honor.  But

9   they didn't even tell us it existed.  And so how -- I don't

10  even know how we could have brought a motion earlier.

11        **MR. BAKER:**  Your Honor, I don't think that's correct.

12     But to address --

13        **THE COURT:**  Well, then you knew about Mr. Brown's

14  investigation.

15        **MR. CHATTERJEE:**  He had been deposed earlier, and

16  we --

17        **THE COURT:**  And you knew that -- and that he

18  refused -- they asserted the privilege and wouldn't allow him

19  to testify as to what Keker told him.

20        **MR. CHATTERJEE:**  We filed that motion within a week of

21  having deposed him where they made all those objections.

22        **THE COURT:**  Okay.  All right.  Well, you need to go

23  back and look at this and look at your redactions.  As I said,

24  you need to waive in favor of disclosure.

25     It's a big deal when you waive the privilege with respect

to an investigation.  You've done that.  It's actually the centerpiece of your case.

So that waiver needs to encompass all the communications to Mr. Brown.  That's out.  That's out.  Or Ms. Johnson or whoever it is as well.

And if there are other things in there, well, if you're going -- I think you should meet and confer.  I think you should err on the side of disclosure.  It doesn't mean it's relevant.  It doesn't mean whatever.

And then if you have to bring it to me, I will review them in camera, and I will do it quickly.  But some things just can't be sliced out.  And if it was there -- especially, I think -- and I understand what their argument is.  If it's the same thing -- if it's something different that's being communicated about the -- actually, if it's something different that's being communicated about the forensic investigation of these other employees, I think they're entitled to know that because that goes to the investigation that was done of Mr. Levandowski and the other two.

So I guess what I'm saying is I haven't seen and I don't know.  I really think probably you should be disclosing, to the extent it's in the same communication, rather than redacting.

        **MR. BAKER:**  Understood, Your Honor.  We will attempt to work it out with Mr. Chatterjee and bring any outstanding issues to Your Honor or the Special Master.

1          **THE COURT:**  And what we could do, because I know we're

2     on a tight timeline here, is rather than briefing, we could

3     just set a hearing and you can bring the documents here and we

4     can sit here and talk about them and do it in realtime that

5     way.

6          **MR. CHATTERJEE:**  That's fine with me, Your Honor.

7          **THE COURT:**  Okay.  So I'll quash the Keker subpoena

8     for now.  I understand what you may see.  Something may come

9     up.  But for now -- well, it's quashed --

10         **MR. CHATTERJEE:**  We would like to have a 30(b)(6) of

11    Mr. Gorman testifying about his conversations because he was

12    talking to numerous different people involved with this

13    investigation.

14         **THE COURT:**  At Waymo?

15         **MR. CHATTERJEE:**  At Waymo.

16         **THE COURT:**  Yeah.  So talk to the people at Waymo.

17    I anticipated with my order that Mr. Brown would be

18    redeposed because they -- Waymo instructed him not to answer.

19         **MR. CHATTERJEE:**  And, Your Honor, if you -- in the

20    investigation of the documents that have been produced, it's

21    not just Mr. Brown; it's numerous people that Mr. Gorman was

22    regularly interacting with, some of which is completely

23    exonerated in this entire 14,000 file issue they have been

24    pounding so hard on.

25         **THE COURT:**  Where is that, because I don't see that in

```
1   front of me?
2           MR. CHATTERJEE:  Sure, Your Honor.  If you go to the
3   slide from Sasha Zborzek to Tom Gorman -- it's the next slide.
4   I think it's No. 6 --
5           THE COURT:  It's Exhibit --
6           MR. CHATTERJEE:  I want to be mindful here,
7   Your Honor, they have designated this as confidential.  I don't
8   want to discuss it in an open courtroom absent an objection,
9   but given that they've have placed this at issue, I don't think
10  it's appropriate to close the courtroom.
11          THE COURT:  So what is the exhibit number?
12          MR. CHATTERJEE:  This is Hayes Exhibit No. 10.
13          MR. BAKER:  Just to be clear, Your Honor, this is a
14  document I think that you just put together for today's
15  hearing.  It's not the exhibits --
16          MR. CHATTERJEE:  The exhibit is listed at the bottom.
17          THE COURT:  No, no.  I understand.
18          MR. BAKER:  We have never seen this before -- that's
19  my only point -- this actual slide presentation.  The documents
20  we've seen, of course --
21          THE COURT:  No, no, no.  I understand.  It wasn't
22  attached to their letter brief.
23          MR. BAKER:  Correct.
24          THE COURT:  Right, right, right.  Okay.
25      I will give you some advice because maybe this will help.
```

1   I don't see why any of this is confidential, but I understand.

2   Everything is designated *confidential* --

3          **MR. CHATTERJEE:**  I just don't want to be accused of

4   violating the protective order.  I don't think this is a

5   confidential document, especially given what they've placed at

6   issue.

7          **MR. BAKER:**  I don't think that I can agree, you know,

8   to --

9          **THE COURT:**  No, no, no.  We don't have to talk about

10  it.

11     Who is Sasha Zbrozek?

12         **MR. CHATTERJEE:**  So Sasha Zbrozek is an engineer that

13  works in the Chauffeur Project and he was also in charge of

14  administering the SVN server.  That's the server where they

15  claim 14,000 files were downloaded from.

16         **MR. BAKER:**  He has been deposed, Your Honor.

17         **MR. CHATTERJEE:**  And these documents were produced

18  after his deposition.

19         **THE COURT:**  Okay.  But were they -- produced in

20  response to what?

21         **MR. CHATTERJEE:**  The privilege waiver.

22         **THE COURT:**  Oh, the privilege waiver.

23         **MR. CHATTERJEE:**  This was produced as part of what

24  Your Honor found --

25         **THE COURT:**  Okay.  So they're producing.

1          **MR. CHATTERJEE:**   I understand, but Your Honor was

2     asking me about the --

3          **THE COURT:**   No.   So take Mr. Zbrozek's deposition.

4          **MR. CHATTERJEE:**   Right.   We have a number of people,

5     but the issue is, is that Mr. Gorman was the fulcrum of all the

6     communications with different people at Waymo.   And it's still

7     not clear to me who everyone is.   We are talking potentially 10

8     or 12 different people that he was the fulcrum of getting the

9     information and figuring out what to do.

10         And so it strikes me, Your Honor, that if we weren't at

11    the close of discovery -- and I recognize that we are -- that

12    we would get to depose him for all the information he gathered

13    in his various communications on this investigation, and we

14    would also get to depose the people at Waymo.

15         And I think we're entitled to be able to get his

16    deposition on all of the information that he gathered.

17         **MR. BAKER:**   Your Honor, if I could just respond to

18    that, Mr. Brown, Mr.  Gudjonsson, and Mr. Zbrozek have all been

19    deposed and have all explained exactly what the extent of their

20    communications with Mr. Gorman were.

21         **THE COURT:**   Yeah.   But they explained it before they

22    had the benefit of those communications.

23         **MR. GONZALEZ:**   Right.

24         **MR. CHATTERJEE:**   Not only that, but they instructed

25    not to answer on privilege over and over and over again.

1          **MR. BAKER:**  That's not --

2          **THE COURT:**  Wait.  Just -- just -- wasn't it before

3    they had these communications?

4       Waymo has taken the position that they get to take --

5    retake depositions after documents and things are produced.

6          **MR. BAKER:**  Sure.

7          **THE COURT:**  If you want to go back on that, then we

8    can do that.

9          **MR. BAKER:**  No.  What I have suggested to counsel for

10   Otto Trucking -- we intend to put Mr. Brown back up for a

11   second deposition.  He is available on Thursday for his

12   deposition.

13      What we have suggested is that they take his deposition.

14   I think that he can provide most, if not all, of the

15   information that was protected by privilege for all of these

16   other witnesses.  And he was a 30(b)(6) witness.  We can prep

17   him on the information to the extent it's not his.

18      And if they need a further deposition after Mr. Brown --

19         **THE COURT:**  I think they probably want Mr. Zbrozek.

20         **MR. BAKER:**  Well, they want -- they have asked for ten

21   additional witnesses.

22         **THE COURT:**  Well, I would think they would get this

23   one.

24         **MR. BAKER:**  Understood.

25      Our suggestion has been that we put up Mr. Brown first.

1          **THE COURT:**  Yeah.  But apart from Mr. Brown, this one

2    is relevant.

3          **MR. BAKER:**  Okay.  Understood, Your Honor.

4     But we haven't said no, you know, that we're not amenable

5    to putting up additional witnesses.  We just thought the best,

6    most reasonable procedure would be to take one deposition at a

7    time.

8          **MR. CHATTERJEE:**  So, Your Honor, this gatekeeper

9    function that they're trying to put in place like *Just take*

10   *Mr. Brown and see what else you need,* at this stage in the

11   proceedings doesn't make sense because what's going to happen

12   is we take his deposition, they will say, *Well, you don't need*

13   *any more.*

14    We had that issue before where they said, *Well, Mr. Brown*

15   *had his investigation of this little narrow category of stuff*

16   *and you don't need anymore stuff.*

17    Well, you know, these documents have Mr. Krafcik's name on

18   conversations associated with the investigation.  They have

19   someone named Chin, who is an HR executive.  The general

20   counsel of Waymo.  And there were -- Nathaniel Fairfield,

21   someone I have never even heard of before, that were involved

22   in these activities.

23    And, you know, we're -- we should be able to seek the

24   discovery around the scope of their waiver and what these

25   people actually knew and did.

1      **MR. BAKER:**  Your Honor, just because Mr. Krafcik's

2  name is on a document doesn't mean that he was involved with

3  communications --

4      **THE COURT:**  No, no, no.  I understand that.  But he is

5  making a different argument, which is Mr. Gorman seems to have

6  been the center of this.

7      **MR. BAKER:**  Right.  And I think that Mr. Gorman had

8  communications with Mr. Brown and Mr. Brown's team and -- about

9  the forensic investigation.  Some of those communications have

10  already been disclosed and the witnesses have testified about

11  them.

12      So, you know, they were never the subject of privilege

13  anyway.

14      Mr. Gorman also had communications with other folks at

15  Keker, other --

16      **THE COURT:**  We're not talking about that.

17      **MR. BAKER:**  Exactly.

18      **THE COURT:**  We're just talking about at Waymo; right?

19  At Waymo.  But he seems to be at the center of those

20  conversations with the people at Waymo.

21      **MR. BAKER:**  Right.  And I would dispute that.  I don't

22  think that that's the case.

23      I think that his involvement with the Waymo people was,

24  you know, primarily the forensics team.  And we are producing

25  those documents --

1        **THE COURT:**  That's what he is talking about with the

2   forensic team.  I guess --

3        **MR. BAKER:**  Mr. Krafcik, though, was not a part --

4        **THE COURT:**  We're talking about Mr. Gorman I thought.

5        **MR. BAKER:**  Right.  But he's saying that there are

6   communications between Mr. Gorman where Mr. Krafcik might have

7   been copied, even though he didn't have anything to do with the

8   forensic investigation and therefore he should be brought back

9   for a deposition.  Obviously we disagree with that.

10        **THE COURT:**  No, no, no.  I know.

11     I guess what I'm saying is why shouldn't you just put up

12   Mr. Gorman.  Maybe that would then eliminate -- then he could

13   answer all those questions.  I didn't --

14        **MR. BAKER:**  I see.  Instead of the other witnesses,

15   you're suggesting.

16        **THE COURT:**  Well, do it first.  That's what it seems

17   to be that Mr. Chatterjee is --

18        **MR. CHATTERJEE:**  Your Honor, we would want Mr. Zbrozek

19   and Mr. Brown and Mr. Gorman.  We would want at least those

20   three as the beginning stage, just because each of these

21   conversations is relevant -- Mr. Zbrozek, by the way, does not

22   work in the security division.  He is an engineer who designs

23   self-driving car features.

24        **THE COURT:**  Okay.  I said you could have his

25   deposition.

1          **MR. CHATTERJEE:**  Thank you, Your Honor.

2          **MS. HARRIMAN:**  Excuse me, Your Honor.  May I have a

3   word as well?

4          **THE COURT:**  Yes.

5          **MS. HARRIMAN:**  Susan Harriman of Keker, Van Nest &

6   Peters.  I'm here because I'm general counsel to the firm, and

7   I'm here because if the Court did order a deposition of

8   Mr. Gorman, it would be my responsibility to defend it.

9      It would be a highly unusual move by this Court or any

10  court to order the deposition of an attorney, particularly when

11  that same information can be obtained from non-attorneys, from

12  the parties to the case.

13         **THE COURT:**  Well, if it can be.

14         **MS. HARRIMAN:**  And it sounds quite clearly like it

15  can.  It just sounds like counsel would rather cut it short and

16  say, *Okay, it's faster to take the attorney's deposition.*

17         **THE COURT:**  No.  What Mr. Baker was saying is we're

18  just going to do it one at a time.

19     I think then what you need to do is get them scheduled.

20  Do them in an order that makes sense.  Do them priority; right?

21  Do them priority in an order that makes sense.

22     If at some point you think they have it and it's just

23  harassment, then I can address it at that time, but get them

24  scheduled.

25     I'm excluding Mr. Gorman.  Okay.

```
1          MS. HARRIMAN:  For now what I understand -- at least
2     for now, is that the subpoena against Keker, Van Nest & Peters
3     has been quashed.
4          THE COURT:  It has.
5          MS. HARRIMAN:  Whether you visit that -- okay.  That's
6     all I need to know.
7          MR. GONZALEZ:  Your Honor, just briefly.  I'm trying
8     not to intervene here.
9        Ms. Kristenn Gudjonsson -- I don't know her name.
10         MR. CHATTERJEE:  It's a mister.
11         MR. GONZALEZ:  Oh, thank you.
12         THE COURT:  I think that's what I was getting mixed
13    up, too.  It's our implicit bias.
14         MR. GONZALEZ:  One thing I'm going to strongly
15    encourage you to do, you have got to make these records public.
16       Mr. Chatterjee actually made a mistake.  They're not
17    designated confidential.  They are designated AEO.  So I have
18    not even been able to tell my client that there are documents
19    that have just been produced that show that these 14,000 files
20    that they've --
21         THE COURT:  Wait.  We're not -- you're doing argument.
22       What I want you to do after today, sit down and go over
23    those designations.
24         MR. BAKER:  We will, Your Honor.
25         THE COURT:  Because I do not know why this -- it's
```

1    certainly not AEO.

2          **MR. BAKER:**  Understood.  We will --

3          **THE COURT:**  Go through all of them.  Sit down

4    together.

5          **MR. BAKER:**  If I could just ask for a point of

6    clarification on scheduling the deposition, as I say, Gary

7    Brown we have already made -- he is available on Thursday.  I

8    will talk to counsel for Otto Trucking.

9       Mr. Zbrozek, we will get a date for him as well.

10      And for the rest of the witnesses -- they have, I think,

11   five or six additional witnesses.

12         **THE COURT:**  Well, what about the *mister* that we

13   thought was a *miss*?

14         **MR. GONZALEZ:**  Kristenn Gudjonsson, Your Honor, is all

15   over these documents.

16         **THE COURT:**  Yes.  I see him.  He's very involved.

17         **MR. BAKER:**  He was one of the members of the forensic

18   team, that's true.

19      So we could get a date for him as well.  And then at that

20   point, I mean -- my question is should we get dates for all of

21   the other witnesses that they've asked for, including

22   Mr. Krafcik?

23         **THE COURT:**  Well, who else is there going to be?

24         **MR. CHATTERJEE:**  There would be -- let me get my

25   notes, Your Honor.

1    There is Mr. Vosen, who is also very involved in the

2    investigation.  He is the general counsel of Waymo, I believe.

3        **THE COURT:**  No, no, no.  We're not doing counsel.  We

4    were doing the people that did the investigation, the

5    non-lawyers that did the investigation; right?  These are the

6    people -- I understood that the main people involved in that

7    investigation were Mr. Brown and Mr. Gudjonsson.

8        **MR. BAKER:**  Gudjonsson, yes.

9        **MR. CHATTERJEE:**  And then also Mr. Zbrozek.

10       **THE COURT:**  Mr. Zbrozek; right?

11       **MR. CHATTERJEE:**  And then there are three other people

12   whose names show up in the records that provide information to

13   help frame search terms and things like that.

14       **THE COURT:**  Okay.  All right.  But you have those

15   communications of them helping frame it, and who did the

16   search, though, was Mr. Brown, Mr. Zbrozek, and Mr. Gudjonsson.

17       **MR. CHATTERJEE:**  Correct, Your Honor.  But what this

18   has done is identified that they have factual knowledge that

19   weren't previously in documents, and they are relevant to the

20   investigation.

21       And so, for example, there has been quite a hullabaloo

22   created by Waymo on Odin Wave or Tyto LiDAR.  There is

23   extensive commentary in these documents about those companies

24   and about people who know about them.  And --

25       **THE COURT:**  What relevance is that?

1    **MR. CHATTERJEE:**  Because they were -- I'm not sure

2    exactly why they think it's so relevant --

3        **THE COURT:**  No.  Why do you think it's relevant that

4    you need to depose them?

5        **MR. CHATTERJEE:**  Because it's relevant to be able to

6    show that -- while they are saying that Mr. Levandowski hid

7    this information from people, it's relevant because it

8    contradicts that.

9        **THE COURT:**  That's a very different argument than was

10   made with respect to this motion that's in front of me right

11   now.

12       So these three, go ahead and schedule and take.  First,

13   though, you're going to need to sit down and work out the

14   redactions and unredact because you don't want to take their

15   depositions without it all fully unredacted because then we

16   will just have to come back and do it again.

17       **MR. BAKER:**  Understood.

18       **THE COURT:**  And also sit down with them today and work

19   on the designations, confidentiality designations.

20       Then you can meet and confer as well, with the assistance

21   of the Special Master, if need be, as to any additional ones.

22       You are going to have to make some showing that they are

23   needed.

24       **MR. CHATTERJEE:**  We can work on that, Your Honor.

25   These are all documents that just came in Thursday so we

```
 1   will --
 2            THE COURT:  No.  I understand.
 3            MR. CHATTERJEE:  Your Honor, I would I would like to
 4   ask that the depositions occur here in Northern California
 5   because Mr. Brown is on the East Coast.  If they are going to
 6   make him available on Thursday, I don't know when I'm going to
 7   get the unredacted --
 8            MR. BAKER:  He was deposed in New York for his last
 9   deposition, and we would ask that he be deposed in New York
10   again.  I don't know --
11            THE COURT:  Why?
12            MR. BAKER:  That's where he is located.
13            THE COURT:  I know.  But you can fly him out Thursday
14   morning even or Wednesday night.  He can be back, so it doesn't
15   cut into his personal life, which I understand it only cuts
16   into his work life, which is Waymo's work life, so that's okay.
17   He should have to come out.
18            MR. BAKER:  One other question on the depositions,
19   Your Honor.  In terms of the time limits, I would assume that
20   we're not talking about a full-day deposition just to go back
21   over privileged questions and things that reasonably flow from
22   questions where we privileged up before.
23            THE COURT:  I just don't know how -- I can't say.
24            MR. BAKER:  Understood.
25            THE COURT:  There are documents that have been
```

1  produced.  Of course it's about what Mr. Brown is essential

2  witness for; right?  It's not a peripheral matter.  His

3  investigation is what he is being offered for.

4          **MR. BAKER:**  Okay.  Understood, Your Honor.  Thank you.

5          **MR. CHATTERJEE:**  Your Honor, I want to push back a

6  little bit on that because that machine forensic record, which

7  Your Honor reviewed, it had contributions from multiple people,

8  including Mr. Gudjonsson.

9          **THE COURT:**  You are pushing back against what?

10         **MR. CHATTERJEE:**  It sounded like you were just

11  narrowing it to what Mr. Brown knew and what he did, but it's a

12  larger group of people.

13         **THE COURT:**  No, no, no.  But the deposition of

14  Mr. Brown.

15         **MR. CHATTERJEE:**  Oh, I see.  I misunderstood you,

16  Your Honor.

17         **THE COURT:**  Okay.  All right.  Okay?

18         **MR. BAKER:**  Thank you, Your Honor.

19         **THE COURT:**  I'm sure you will be back on that.

20         **MR. CHATTERJEE:**  I think that resolves the Motion for

21  Protective Order and the Motion to Quash?

22         **THE COURT:**  Yes.

23         **MR. CHATTERJEE:**  Okay.

24         **THE COURT:**  Let's talk about Mr. Levandowski's

25  assertion of the attorney-client privilege with respect to, I

1    think it's, the meetings that occurred.

2        And do we have counsel for Mr. Levandowski here?  Oh,

3    there you are, Mr. Ehrlich.

4        And Ms. Baily we have for Waymo.

5        So as I understand it, so we have -- well, Mr. Ehrlich was

6    retained March 19.  As I understand, Waymo's position is that

7    any meetings that Mr. Levandowski had at which his attorneys

8    were not present are not protected by his attorney-client

9    privilege.

10        **MS. BAILY:**  Right, Your Honor.

11        The basis for that being that the common interest

12    privilege, which is all that we've heard about from

13    Mr. Levandowski, is a non-waiver doctrine, and Mr. Levandowski

14    hasn't pointed to an actual attorney-client privileged

15    communication.

16        **THE COURT:**  Well, what he pointed to was *United States*

17    *vs. Austin*.  *United States vs. Austin*.  So what do you do with

18    that?

19        **MS. BAILY:**  Well, I actually think *Austin* and *Gonzalez*

20    are further afield than *Schwimmer* was.

21        *Austin* was communications between clients outside of

22    counsel's presence.  And I believe the lower court found that

23    there would not be a common interest privilege.

24        **THE COURT:**  I think what the Ninth Circuit said in

25    there was that a party, once there is a joint defense

1   agreement, they're on the same side, they are co-defendants,

2   which is essentially what we have here for all intents and

3   purposes.  That the client of one attorney could speak to the

4   attorney for a co-defendant and that the privilege applies and

5   there is no waiver.

6           **MS. BAILY:**  Well, there's a quote.  I mean, first of

7   all, it's not an issue that was actually addressed and decided

8   in Austin.  They actually found that they could not address --

9           **THE COURT:**  Ms. Baily, I am positive -- I practiced

10  for a long time.  You have, too.  I am positive Quinn

11  Emanuel -- that there are hundreds of lawyers that sit there

12  and they have co-defendants, and that the clients for one

13  lawyer sits there and has conversations with the Quinn lawyer

14  and you would claim that it's privileged.  I'm confident of

15  that.

16      I know I did it.  That's the way we all operate.  That's

17  all that's happening here.

18      Now, the question is did that not start -- that started

19  already April 11th, 2016.  And then we have the deal closes.

20  And did that change, somehow eviscerate that joint defense

21  agreement?  And did it not then come into being until

22  Mr. Ehrlich got here and he said he had a conversation with

23  Uber's in-house counsel.  I believe you said in your

24  declaration in which you confirmed -- because a joint

25  defense -- that's how I see it; right?

1    So I guess what I'm trying to figure out is, is it really

2   Waymo's position that a co-defendant can't have a conversation

3   with a co-defendant's attorney when there is a joint defense

4   agreement?

5        **MS. BAILY:**  Well, it -- that might not be our broad

6   position, but I still think you need to point to facts that

7   imply that the common interest was being furthered and that

8   there are privileged communications underlying it.

9        **THE COURT:**  The common interest of being furthered is

10  that Uber has an indemnification obligation, right, which still

11  existed in April 2017 and March 2017, just as it did in April

12  2016.  So that's still there.

13       **MS. BAILY:**  Understood, Your Honor.

14   I would like to raise some circumstances here that I think

15  have colored our view about this.  It's just -- it's been a

16  little bit frustrating because Mr. Levandowski was aware that

17  Uber was disclosing the communication that they're now --

18       **THE COURT:**  Well, that's different.  The March 29th

19  one -- the March 29th; right?  So let's put that to the side.

20   But because what -- but what this motion was about,

21  though -- because you have that information.  They submitted a

22  declaration, Ms. Padilla did.

23   What you have actually now sought, I thought by this, was

24  actually the first meeting that day of March 29th, as well as a

25  meeting that Mr. Bentley had sometime in late February or early

1   March; right?

2            **MS. BAILY:**  Right.

3            **THE COURT:**  Okay.

4            **MS. BAILY:**  Right.  But I think the way that it ties

5   in is that Mr. Levandowski was aware that Uber was putting out

6   this communication as not privileged and sat basically on it,

7   on their hands, to see how the Court would rule and whether the

8   bonus theory would come in because they were aware of the

9   communication by July 7th that Uber was sort of touting this

10  communication as an alternative theory, and then the press is

11  reporting on this.

12       And so the thing that's frustrating is that

13  Mr. Levandowski was basically waiting to see where the chips

14  would fall, and then when they weren't falling in the right

15  direction, they said, *Oh, no*.  *Actually all of this is*

16  *privileged*.

17       And so in the same way that Uber waived, there is just

18  this tacit waiver also by Mr. Levandowski that's problematic

19  here.  And the reason why it's even more problematic is because

20  in these last few days of discovery, we've seen evidence that

21  Mr. Levandowski's helping the defendants behind the scenes.

22  Right?

23       So what we're told is, *Mr. Levandowski isn't cooperating,*

24  *Mr. Levandowski isn't involved*.  *We can't get him to cooperate*.

25  And then we see evidence actually he is.  And so this is part

1   and parcel of that.

2        And so from the perspective of waiver, when Uber waived

3   and Mr. Levandowski didn't say a thing about it,

4   Mr. Levandowski waived also.

5        **THE COURT:**  Okay.

6        **MR. EHRLICH:**  Just to address the facts on that, my

7   understanding -- I conferred with Mr. Ramsey -- is we were

8   notified -- or the attempt to notify us that this disclosure

9   was going to be made was made about an hour before the actual

10  filing from a call from Martha Goodman to Mr. Ramsey.  They did

11  not actually connect and speak live until, I understand, two

12  hours after the filing had been made, which referenced this

13  comment.

14       Once it became clear that -- I know it was on the 11th I

15  was in Washington, D.C. for the Federal Circuit argument.  Once

16  it became clear that Uber was taking the position that there

17  was a waiver over these conversations, we wrote a letter to

18  Uber's counsel making clear that we believed that --

19       **THE COURT:**  Not a waiver.  They took the position that

20  it was not a waiver.

21       **MR. EHRLICH:**  I'm sorry.  That it wasn't privileged.

22  That's correct.  They were taking the position that it wasn't

23  privileged.  We told them we disagreed.  We believed it was

24  privileged.  We wrote a letter to that effect and we said

25  Mr. Levandowski is not waiving.

1      THE COURT:  But you didn't do it before the hearing.

2      MS. BAILY:  Right.

3      THE COURT:  What was represented to me -- no one else

4   raised it.  I raised it.  You weren't here, and I raised that

5   Mr. Levandowski may have an interest.  And what Ms. Dunn told

6   me was that as a courtesy, it was -- the filing was provided to

7   Mr. Levandowski's counsel, creating the implication that there

8   was no objection from -- I know you weren't here, but that was

9   the implication that was created at that hearing because I

10  wouldn't have had to go through all of that if you had been

11  here and objecting.

12      So that's what Ms. Baily is raising.  You were -- the

13  filing was made I don't know how long before the hearing.

14      MS. BAILY:  The filing -- the first filing -- I

15  actually don't have that date in front of me.

16      THE COURT:  The hearing was Wednesday, I think, 11,

17  10, 9 --

18      MR. EHRLICH:  Yes, the 10th.  If the hearing -- I was

19  in Washington, D.C.  Our argument was on the 11th.

20      THE COURT:  Right.  And the hearing was the 9th, but

21  other counsel who were at that hearing on the 11th were here on

22  the 9th.

23      MS. BAILY:  And, Your Honor, the thing that sort of

24  compounds this is on July 7th, Uber filed its proposed trial

25  examination of Mr. Levandowski.  And there is a question in

there that says, "You admitted to Travis Kalanick that the

reason you downloaded confidential Google files was to protect

your ability to receive your bonus."

        **THE COURT:**  Yes.  And to that he will take the Fifth.

        **MS. BAILY:**  Right.  But the notion -- but that -- the

privileged communication is here on July 7th in the trial

examination.

    So Mr. Levandowski knows, I assume, that his counsel read

the examinations of Mr. Levandowski that were filed with the

Court, and so even then, as of July 7th, Uber is putting forth

this communication that Mr. Levandowski now says is privileged,

and they didn't say a word about it.

        **MR. EHRLICH:**  Maybe this is -- this is the source of

the confusion.

    To the extent there is a communication just between

Mr. Levandowski and Mr. Kalanick, without counsel present, we

have no basis to say that's privileged.

    We learned -- I think this is -- this is where we woke up

to the problem, is once we learned that the suggestion was that

Ms. Padilla was present for a conversation --

        **THE COURT:**  I got it.

        **MR. EHRLICH:**  -- and where this conversation occurred,

then we acted very expeditiously to protect the privilege.

        **THE COURT:**  Yeah.  And that's not your fault; frankly,

that's Uber's fault, delayed in disclosing that that was the

```
1    source, because everyone -- I know that that was my impression,

2    was that it was a conversation just between Mr. Levandowski and

3    Mr. Kalanick.

4         MS. BAILY:  I'm still not sure why Mr. Levandowski

5    wouldn't have conveyed to Uber before that hearing that there

6    was a problem here.  But --

7         THE COURT:  Talking about waiting, I thought Waymo

8    didn't want this to come in.

9         MS. BAILY:  Well --

10        THE COURT:  So that's what Judge Alsup ruled; that's

11   what I ruled.  Right?

12        MS. BAILY:  Right.

13        THE COURT:  So what is -- so what are we doing here

14   now?

15        MS. BAILY:  Well, just -- Judge Alsup did say we were

16   entitled to explore the scope of the waiver.

17        THE COURT:  He said you could.

18        MS. BAILY:  And with respect to information about the

19   download of files, we have been kept from learning pretty much

20   any information about it by all of these assertions of common

21   interest privilege and other privileges.

22        THE COURT:  Okay.  So let me stop you.

23        What is your position with respect to, at least once

24   Mr. Ehrlich -- and he put in a declaration that said *I spoke*

25   *to* -- I can't remember who --
```

1    **MR. EHRLICH:**  Mr. Gonzalez.

2    **THE COURT:**  -- *Mr. Gonzalez to confirm that the joint*

3    *defense agreement applies this point.*

4    Is it your position that Mr. Levandowski still does not

5    have an attorney-client privilege with respect to those, like,

6    March 29th conversations?

7    **MS. BAILY:**  It depends on the subject matter of the

8    communication.

9    **THE COURT:**  Well, we know what it is.

10   **MS. BAILY:**  Right.  For that Minneapolis

11   communication.

12   **THE COURT:**  No.  The one before that; right?

13   Ms. Padilla said there was a meeting before that in which

14   Mr. Levandowski came in halfway through or he left halfway

15   through.  I can't remember.  And there were several attorneys

16   there, and Mr. Kalanick and Mr. Levandowski.  What about that

17   conversation?

18   **MS. BAILY:**  If there was confirmation that the joint

19   defense agreement should apply and lawyers were there --

20   **THE COURT:**  Okay.  Good.  I think that's -- I

21   appreciate that.  Okay.

22   So now what we look at then is -- and we -- and I already

23   found -- you disagreed, but that's okay.  Everybody disagrees

24   with me in this case.  I give something to everybody -- that as

25   of April 11th there was -- because they were on the same side

1    at that point.  Uber had the indemnification obligation -- that

2    there was a joint defense agreement, right, at that point?

3        So your argument is then come February when Mr. Bentley

4    has that conversation -- because we're only talking about now

5    one conversation with Mr. Levandowski, that that one is not

6    privileged.  That somehow the joint defense privilege

7    disappeared.

8        Why is that?

9            MS. BAILY:  In the February time frame?

10           THE COURT:  In the February, early March, before --

11   Mr. Ehrlich concedes it's before he was officially retained.

12           MS. BAILY:  Well, I think -- I mean, the same -- there

13   are a couple of things.

14       I think the same strictures would apply.  If there is

15   evidence that everybody understood that there was a common

16   interest and it's stated at the beginning of the meeting and

17   the contents of the meeting further the common interest, then I

18   think we would have to agree that the common interest would

19   apply.

20       It depends on the facts, right, that everybody agrees that

21   there's a privilege and that the contents of the communications

22   actually reflect the common interest.

23           THE COURT:  Well, there is a common interest.  I mean,

24   Uber -- I mean, I assume it had to have occurred after Waymo

25   sued Uber, right, and there is this allegation made, and so

1    what's the first thing you do?  You talk to the person who is

2    being accused, who at that time is employed.  And I understand

3    that doesn't necessarily mean he would have an individual

4    attorney-client privilege.  There is a test the Ninth Circuit

5    sets forward with that.

6         But in this case given that he had had individual counsel,

7    that there is this separate -- I mean, this allegation relates

8    directly to this indemnification, and actually -- has he been

9    sued in arbitration at this point already?

10        **MR. EHRLICH:**  He had.

11        **THE COURT:**  Yeah, yeah, yeah.

12        **MR. EHRLICH:**  And there is a wrinkle.  It's not just

13   that there was this common interest joint defense agreement

14   since April 11, 2016.  They were anticipating the very

15   litigation.  Now --

16        **THE COURT:**  That we're in.

17        **MR. EHRLICH:**  -- it's happening.  Yes.  And

18   Mr. Levandowski does still have -- did still, even before we

19   got on the scene, have personal counsel.  He had Mr. Gardner.

20        But equally important, Morrison & Foerster was

21   representing Mr. Levandowski individually in the arbitration,

22   and Eric Tate and the others from MoFo were present for this

23   very conversation.

24        **THE COURT:**  No, no, no.  Not the one -- I don't think

25   so.  I thought the one that Mr. Bentley talked about -- he was

1   there, another in-house counsel from Uber was there, and

2   Mr. Levandowski, and that's all.

3           **MR. EHRLICH:**  I believe -- I looked at the transcript.

4   He referenced, I think, Mr. Eric Tate and Rudy Kim.  I don't

5   know if counsel can confirm.

6           **THE COURT:**  Well, it doesn't matter.

7           **MS. BAILY:**  There are different communications.

8           **THE COURT:**  I think it was a little confusing, but I'm

9   satisfied that in the unique situations of this case, that the

10  joint defense agreement still applied and he had -- therefore

11  had a privilege.

12          **MS. BAILY:**  Understood, Your Honor.

13      I would point out that at the time of the communications

14  when MoFo was present, you know, MoFo was conflicted out of

15  representing Mr. Levandowski --

16          **THE COURT:**  That's a problem for MoFo, not for

17  Mr. Levandowski.  We wouldn't hold that against

18  Mr. Levandowski.

19          **MS. BAILY:**  Right.  But they weren't representing him

20  in this case anymore, and of course the 14,000 documents are,

21  you know, at the heart of this case.

22      So we could disagree at the margins.  I understand

23  Your Honor's ruling.

24          **THE COURT:**  No.  I understand.  I understand.  It's

25  all -- we're all kind of in somewhat uncharted or

1    rarely-explored area here, but that's -- that's my -- I think

2    that's my view here with respect to that.

3        My other ruling still stands.  Because of that, I think

4    they cannot be allowed to put in that March 29 conversation.

5        Now, you had an additional issue, which is you wanted

6    me -- was there something -- the claw back; right?

7            **MR. EHRLICH:**  I think that relates to the protocol.

8            **THE COURT:**  Oh, the protocol.  I'm mixing it up.

9        All right.  That takes care of that one, then.

10           **MR. EHRLICH:**  I will check the email to see if we get

11   a ruling before then.

12           **MS. BAILY:**  Thank you, Your Honor.

13           **THE COURT:**  Okay.  How about -- we will have

14   Mr. Chatterjee come back up with Otto Trucking's request for --

15   well, with respect to the documents and what searches that

16   Waymo has done.

17       So that would be Mr. Baker again.

18           **MR. BAKER:**  Yes, Your Honor.

19           **THE COURT:**  All right.  So I really think you guys

20   should have been able to figure this out somehow.

21       There is three categories here.  One is Otto Trucking made

22   a request for the SVN log data, and Waymo responded, *We*

23   *produced two September 2015* -- am I about to say anything that

24   is confidential, like the retention policy?

25           **MR. BAKER:**  No.  I think it's okay, Your Honor.

1    **THE COURT:**  That they have a retention policy of one

2    year.  They looked on September 26, 2015, so that they went

3    back one year.  And they actually kept that retention policy

4    going until March of 2017, in which case it was stopped; right?

5    **MR. BAKER:**  Correct.

6    **MR. CHATTERJEE:**  Yes and no, Your Honor.  They did it

7    as -- they held on to the data as to Anthony Levandowski, but

8    not as to others.  But they held on to certain pieces of

9    information and then later on they did a full-on hold.

10   **THE COURT:**  Okay.  So you know all that.  They said

11   it.  So what is it that you want?

12   **MR. CHATTERJEE:**  So, Your Honor, with respect to that

13   specific issue, the issue is this:  Is they did a number of

14   representations in -- in meet and confers --

15   **THE COURT:**  I want you to separate two, because I

16   think there is two categories.  One is when they said, *We can't

17   produce something because it doesn't exist* and the second is *We

18   won't produce it because it's not proportional.*

19   Let's talk first about the category *we can't produce*.

20   **MR. CHATTERJEE:**  We'll start with the SVN.

21   When they made that representation on those facts, what we

22   wanted to do is have it in a way that it would be admissible at

23   trial so we could raise that issue, and we actually gave the

24   email from Jeff Nardinelli as a 30(b)(6) topic where they

25   designated Mr. Brown.

1     When I deposed Mr. Brown --

2          **THE COURT:**  I read it.  He couldn't answer it.  Okay?

3     That was wrong.  He should have been able to and he didn't.

4          **MR. CHATTERJEE:**  So then we did something really

5     simple.  We said let's do it as a stipulation that is

6     admissible at trial, and they wouldn't do that either.

7          And --

8          **THE COURT:**  Let me stop you.  Let's look at that

9     stipulation and just on the retention of the SVN logs.

10          So, Mr. Baker, is there anything there in paragraph 3, 4,

11     5, or 6 that is inaccurate?

12          **MR. BAKER:**  Can you --

13          **THE COURT:**  It's Exhibit 11 to their motion.

14          Mr. Chatterjee, if I can remind you, the way it works is

15     when you file a motion, you keep all the papers and then

16     deliver them in a binder to me with everything together.

17          **MR. CHATTERJEE:**  My apologies, Your Honor.

18          **MR. BAKER:**  Your Honor, we are looking at which

19     paragraphs again?

20          **THE COURT:**  3, 4, 5, and 6.

21          **MR. BAKER:**  No. 5 is certainly wrong.  I mean, the

22     data that we have, Your Honor, is -- for Anthony Levandowski is

23     from September 2015 to September 2016.  And the data that we

24     have for all of the other engineers is from, I believe, March

25     of 2016 to March of 2017.

```
 1        That's the data that exists, and all of that data has been
 2    produced.
 3            MR. CHATTERJEE:  That isn't true, Your Honor.  They
 4    haven't produced data for other years.  They did a sampling of
 5    data for other years.
 6            MR. BAKER:  That's incorrect, Your Honor.
 7            THE COURT:  Well -- so wait.  So paragraphs 3, 4, and
 8    6 are accurate.
 9            MR. BAKER:  The wording of 4 -- and this is part of
10    the problem with the way that it's been presented.  I'm not
11    comfortable with 4 --
12            THE COURT:  So this is the answer then:  Mr. Brown was
13    designated as a 30(b)(6).  He is going to be redeposed on
14    Thursday.  Ask away.
15        As to his retention, this time have him prepared because
16    he wasn't prepared.
17            MR. BAKER:  Understood, Your Honor.
18            THE COURT:  He wasn't prepared.  What he says -- you
19    know, he should know.  He needs to sit down with
20    Mr. Nardinelli.  He's the one who did -- that's not you?
21            MR. NARDINELLI:  It is me.
22            THE COURT:  Oh, it is you?
23            MR. NARDINELLI:  But I wasn't the one who did that
24    part.
25            THE COURT:  You can speak.  You can speak.  Oh, that
```

1    is you.  Okay.  The mysterious Mr. Naridnelli.

2              **MR. BAKER:**  Let me introduce you to Mr. Nardinelli.

3              **THE COURT:**  So then you have it under oath there, the

4    explanation that they have now given in writing many times.

5    Okay?  So he can do that then.  Right?  That will take care of

6    that.

7              **MR. CHATTERJEE:**  Sure.  Presuming he is prepared,

8    Your Honor, it will.

9              **THE COURT:**  He will be prepared.  This time he will

10   be.

11             **MR. BAKER:**  Yes, Your Honor.

12             **THE COURT:**  Mr. Baker promises.

13        So now as to the work station, my understanding what

14   happened here is he had a work station.  It was assigned to

15   him.  When he left, it was assigned to somebody else.  No

16   forensic image was taken of it so there is no forensic image

17   available because it was assigned to a new employee; right?

18             **MR. BAKER:**  Correct.

19             **THE COURT:**  So can Mr. Brown testify -- he testified

20   to it somewhat in his deposition.  He did say that it wasn't

21   available.  What's missing from what he testified to?

22             **MR. CHATTERJEE:**  Many of the things, Your Honor.  And

23   the issue is, is he was not a designated 30(b)(6) for this

24   topic.  And we had given a topic on really the forensic -- the

25   log data, and that's what he had been designated for.

1      He did testify that they didn't check to see if a card

2   reader had been attached to the work station, which was

3   paragraph 9 that's on here.

4      I think -- I don't know if there's anything here that they

5   really dispute.

6          **THE COURT:**  So could you -- Mr. Baker, could Mr. Brown

7   be prepared to testify to these things as well?

8          **MR. BAKER:**  Well, he can be.  The only other thing I

9   would add, Your Honor, is that Mr. Gudjonsson also testified

10  about the work station.  That was really his part --

11         **THE COURT:**  Whichever of the two, because he is going

12  to be deposed in any event.  In other words, I'm figuring the

13  way that they can get this information in admissible form is to

14  have whoever testify to it since they are going to be deposed

15  in any event.

16         **MR. BAKER:**  We can do that, Your Honor.

17         **THE COURT:**  So now as to the production of the log

18  information, here's the rub:  You didn't move to compel it.

19         **MR. CHATTERJEE:**  Your Honor, we didn't move to compel

20  it.  We can still do that.

21         **THE COURT:**  No, you can't.  No, you can't.  You made a

22  strategic choice, which was *instead of moving to compel, we're*

23  *going to try to get some fact out there that they refused to*

24  *produce it.*

25      That's not the way it works.  If they don't produce it

because they don't have it, fair enough.  Let's get that under

oath.

Here they're not saying they don't have it.  They're

saying it's disproportional, it's not relevant.

That is an issue you bring to me.  That is not an issue

that you then say *I'm going to get a stipulation from them that*

*they refused to produce it.*

**MR. CHATTERJEE:**  We were trying to obviate the need

because they had actually made these representations, and the

Special Master had said that when they make those

representations, those are binding upon them.

**THE COURT:**  And you have their emails?

**MR. CHATTERJEE:**  They're not admissible at trial, Your

Honor; they're counsel argument.

We want a sworn statement as to it being overly

burdensome.

The other concern I have, Your Honor, is we did do a

30(b)(6) on this topic, and Mr. Brown was the same person.  He

testified that this information is kept indefinitely.  And he

also said that about the SVN data.

**THE COURT:**  They're not saying that they don't have it

with respect to this other log data.

**MR. CHATTERJEE:**  I don't know whether they do or not,

Your Honor, because Mr. Brown wasn't prepared on the SVN log

data.  I don't know if he was prepared on this or not.

```
 1          MR. BAKER:  Your Honor is correct.  We are saying it's
 2   overly burdensome.
 3          THE COURT:  Well, do you have it?
 4          MR. BAKER:  We have -- for the Armada, Camp, and Bit9,
 5   data, we have it, and Mr. Brown has explained -- he's explained
 6   this to counsel for Otto Trucking -- that it could take him a
 7   full week's work of worth to pull the data that they are asking
 8   for, and it has no relevance to the case.
 9          And to the point about the Motion to Compel, we had
10   several meet and confers about this data.  We explained in --
11   both on the phone and in subsequent emails exactly what our
12   position was, and counsel for Otto Trucking came back and said,
13   *We're evaluating your position and we will let you know if we*
14   *want to move to compel*, and they never did.  So that's --
15          THE COURT:  Okay.  All right.  Well, Mr. Brown or
16   Mr. Gudjonsson will testify as to those first two things.  I'm
17   not going to require them to testify -- you should have brought
18   a Motion to Compel if it's important information.
19          MR. BAKER:  Thank you, Your Honor.
20          MR. CHATTERJEE:  Your Honor, we are still within the
21   10-day window.  I would like to bring a Motion to Compel.
22          THE COURT:  10 day.  What 10 day?
23          MR. CHATTERJEE:  I thought the rule was 10 days after
24   close of discovery.
25          THE COURT:  I think it's seven.
```

1          **MR. CHATTERJEE:**  Seven?  We can still bring it.

2          **THE COURT:**  You can.  And I will rule.  But you are

3    going to have to show relevance and proportionality.  And I

4    tell you, in this case, it's not so much the case, but I will

5    just give you advice for your other cases out there.

6        Always at the end of the discovery at that seven days, we

7    get the motions, and the magistrate judges or the district

8    court judges, we all know it's what was left at the end and so

9    it's not as important.

10       So you are going to have to dispel -- I'm just being

11   candid with you -- dispel that assumption that is already out

12   there.

13         **MR. CHATTERJEE:**  There is actually an important issue

14   here because on those documents that they produced on Thursday

15   night, there is actually emails from Mr. Brown saying that

16   their log data is unreliable.

17         **THE COURT:**  Okay.  Well, then you can do that,

18   incorporate that and bring that.  It's just seven days; right?

19         **MR. BAKER:**  I think that is correct.

20         **THE COURT:**  I was counting the 31st as being the last

21   day.

22         **MR. CHATTERJEE:**  I might have been thinking business

23   days, Your Honor.

24         **THE COURT:**  Believe me, I understand that probably

25   we'll be doing discovery up through trial.  I understand that.

1    I'm hoping it will slow down.  Okay.

2              **MR. BAKER:**  Thank you, Your Honor.

3              **MR. CHATTERJEE:**  Thank you, Your Honor.

4              **THE COURT:**  Let's see.  So I think we're left with,

5    right, the Stroz protocol; is that right?  So let me have

6    everybody who's here for anybody, and I think -- for

7    Mr. Lior -- I always want to call him Mr. Ron.

8              **MR. PATCHEN:**  Mr. Ron.

9              **THE COURT:**  It is Mr. Ron.  We have Mr. Patchen --

10   everybody should state their name for the court reporter.

11             **MR. PATCHEN:**  Good afternoon, Your Honor.  Jonathan

12   Patchen on behalf of non-party Lior Ron.

13             **MR. BROWNSTEIN:**  Good afternoon, Your Honor.  David

14   Brownstein on behalf of Colin Sebern.

15             **MR. EHRLICH:**  Good afternoon, Your Honor.  Miles

16   Ehrlich on behalf of Mr. Levandowski.

17             **MR. JUDAH:**  James Judah on behalf of Waymo.

18             **MS. BLUNSCHI:**  Good afternoon.  Melanie Blunschi on

19   behalf of nonparty Stroz Friedberg.

20             **THE COURT:**  Good afternoon.

21        This is sort of -- when I was thinking about this --

22   everyone is on the same page in the sense that Waymo does not

23   want photos -- all that personnel information they don't want.

24   They don't need.  They get that.

25        And what I understood Mr. Levandowski's primary objection

1    to be was attorney-client privilege and that his claim was he

2    didn't waive that because Stroz did not provide -- because of

3    the protocol, did not provide those privileged documents to

4    Uber; right?

5            MR. EHRLICH:  Correct.  They were intentionally

6    screened out so there was no intentional disclosure.

7            THE COURT:  That is an interesting argument.  I don't

8    know what the answer is.  You will argue that it's -- I don't

9    know.

10       What I do know is the heart -- the heart here is that due

11   diligence report; right?  Because Stroz did this forensic

12   investigation to find out about the pre-signing bad acts and

13   the like, which is what your case is about.  So that's the main

14   thing.

15       And when the Federal Circuit rules, you either get it or

16   you don't get it.  That's your number one priority.

17       This other stuff, which will not be included in the due

18   diligent report because Stroz, for whatever reason, did not,

19   may be relevant, I'm not disagreeing, but it's certainly the

20   icing.  It's less important.

21           MR. JUDAH:  It is and it isn't, Your Honor.  You've

22   seen the Stroz due diligence report.  Some people standing up

23   here have as well.  Waymo hasn't.  We don't know what's in

24   there.

25       We also don't know what's in the devices and the

1   information that was not ever even searched by Stroz.

2          What is in there, the fact -- it may not be a coincidence

3   that somehow the protocol that Mr. Levandowski and Uber agreed

4   to excluded --

5          **THE COURT:**  No, no, no.  I get you.

6          **MR. JUDAH:**  So for that reason, it might be the most

7   important.

8          **THE COURT:**  Maybe.  Maybe.  Maybe.  Don't know.

9   Nobody knows.

10         Well -- so but what I was going to say is what you said,

11  Mr. Ehrlich, was that what Mr. Levandowski did was he gave the

12  name of his personal attorneys to Stroz and that they screened

13  that out; right?

14         **MR. EHRLICH:**  That's right.

15         **THE COURT:**  So presumably they've already identified

16  all those files.

17         **MR. EHRLICH:**  Well, certainly as to privilege.  And

18  can I just pick up from what you're saying?

19         We think that -- that the protocol we're suggesting,

20  which, frankly, I think we've lost two weeks that we could have

21  been working on this because --

22         **THE COURT:**  I'm going to stop you.  I'm not going to

23  order that.  Mr.-- first of all, your letter says that he --

24  that Mr. Levandowski was required to turn over his devices.

25  That is completely false.  Neither the government nor Uber nor

1    a court nor Waymo required him to turn over those devices.

2         Mr. Levandowski, Mr. Ron, Mr. Brownstein's client, they

3    all turned over those devices voluntarily.  No one forced them

4    to.

5         So we start with that, number one.  So that takes -- now,

6    I'm sensitive -- and they didn't have to; right?  Why was

7    the -- why was the due diligence done that way?  Why did Uber

8    insist that the entire devices be turned over?  I don't know.

9    I don't know.

10        But what I'm saying is that makes it relevant now.  So I

11   think the protocol that Waymo proposed makes sense because it

12   protects their privacy interest.  It allows you in the room to

13   stop.

14        Now, to the extent your client knows or Mr. Patchen's or

15   Mr. Brownstein's client knows in advance there are particular

16   files that have nothing to do with this case, are sensitive,

17   private, identify them now with Stroz.  Okay?  Show them to the

18   Special Master so he can confirm, yeah, those are just photos

19   or bank statements from 1999 or whatever.

20        Let's get started and start doing that now and get that

21   stuff all sort of -- what I'm -- I guess what I'm saying is

22   let's do it exactly the same way your client did with Stroz,

23   exactly the same way, which was you gave it to Stroz and then

24   they identified what was to be separated out.

25        **MR. EHRLICH:**  And I -- just for clarification, are we

1    talking about the actual underlying devices, many of which were

2    never looked at?

3               THE COURT:  No, no.  Let's separate those two things

4    out.

5          MR. EHRLICH:  That doesn't even relate to the due

6    diligence report.

7               THE COURT:  Let's separate those two things out.

8    Let's start with the ones that they subpoenaed, as you pointed

9    out, the ones that they did their forensic investigation of.

10         MR. EHRLICH:  My understanding is Stroz has created a

11   database that has harvested the documents that allows for

12   searching.  Okay.

13        I think the concern we have is even when the government is

14   standing before the -- the prosecutors are standing before the

15   Court and saying, *Don't worry, Judge, we're not interested in*

16   *that; we're not going to violate -- we're not going to go*

17   *beyond the terms of the warrant, we're not interested in that,*

18   that's an inadequate explanation.

19              THE COURT:  But, Mr. Ehrlich, what's different about

20   this than the search warrant -- and that's the way search

21   warrants are done, as you well know -- is the agents go in and

22   they take the whole file and then they separate out.

23        Their protocol -- correct me if I'm wrong -- allows you to

24   be there.  Allows you to be there realtime.

25              MR. EHRLICH:  But the issue is different.  What they

1    are essentially -- let's get to the criminal analogue here.

2        They are essentially asking for the Court to give them

3    authorization to conduct a general warrant without subject

4    matter limitation, without --

5            **THE COURT:**  You know --

6            **MR. EHRLICH:**  -- without time limitation, without any

7    tainting --

8            **THE COURT:**  Mr. Ehrlich, this is why it is different.

9    That's what I said.  Is because your client provided the device

10   to Stroz in exchange to allow it to be searched for Uber's

11   benefit.  That's what makes it different.

12       I agree with you.  If they hadn't provided it, then that

13   would be way too broad.  Way too broad.  You couldn't -- I

14   wouldn't -- no way I would order them -- I couldn't order them

15   anyway because of the Fifth Amendment.  But that's -- right?

16   That's why we are here, because he provided it to this third

17   party.  That's the difference.

18       And he provided it to the third party in connection with

19   what this whole case is about.  And that's what makes it

20   relevant.

21       Now, it may in fact have irrelevant and private things and

22   that's why their protocol, I think, takes care of that.  But to

23   the extent you can identify those irrelevant and private things

24   in advance, do so now.  Separate them out.  Have Mr. Cooper

25   look at them, because I understand you don't want to trust them

1   when they say *This is private*.   Have Mr. Cooper look at it and

2   he can say, *Yeah, these are just photos* or *Yeah, these are just*

3   *his bank records* or *Yeah, these are his communications with*

4   *lawyers that have nothing to do with this case*.

5       I understand that with respect to attorney-client

6   privileged stuff, you may disagree that some of it should be

7   produced.   And what I'm saying is okay and I'll adjudicate

8   that.   I'm going to have to adjudicate that on a full record at

9   some point with some showing.   I can't do that now.   And so

10  separate it out.   That's what I've been saying in terms of

11  importance.

12      What you want really is Waymo's stuff, first and foremost.

13  Let's get that moving and get that going, and then I can

14  adjudicate the attorney-client privileged stuff as need be.

15          **MR. EHRLICH:**  But there are -- maybe Ms. Blunschi

16  could help us with the volume.

17      It seems to me step one is that we should have some

18  guidance as to relevance so we can focus on, okay, we will run

19  the search terms, the same search terms that Uber has had to

20  run --

21          **THE COURT:**  Mr. Ehrlich, I understand what you are

22  saying.   I read your paper.   I disagree.   We are not doing it

23  that way.   We are doing it exactly the way your client did with

24  Stroz, which to a third party he sat there and he handed

25  voluntarily -- handed over his device, and instead what he did

1    was he identified to Stroz what to pull.

2         I'm saying do the same thing now.  Do it exactly the same

3    way.  I just -- I understand -- noted.  Objection noted.  I

4    disagree.  I'm not going to do that.

5         **MR. EHRLICH:**  So to go through the -- what we are

6    talking about, just for clarity, is to go through the Stroz

7    database and the entirety of it as to Mr. Levandowski, mark

8    those documents that we contend are either separately

9    preexisting privilege or raise the privacy concerns or

10   relevance concerns, extreme relevance concerns.

11        **THE COURT:**  Extreme relevance.

12        **MR. EHRLICH:**  And to work with Stroz now to wall that

13   off.  And I don't know the volume that they'll be, but we can

14   report that to the Special Master and take it from there.

15        And then -- and then it seems that perhaps -- if this is

16   possible, if we wall that off, then Waymo sitting at the

17   console running searches would not have any hits on those

18   documents.

19        **THE COURT:**  Maybe.  I mean, they may come up with

20   hits.  For example, if something is private, they may come up

21   and they see it, but they don't want it and you say, *Oh, no*.

22   Okay.  That's fine.

23        I mean, I guess there's less of a privacy interest here

24   because they handed the devices over, and therefore some third

25   party, they had decided, was okay to search through their

1    devices.

2        So they have a privacy interest, but that has to be

3    weighed.  Some of that is mitigated by how they treated their

4    devices; right?  How they treated their devices.  So the

5    fact -- so I guess what I'm saying is it's not that -- they get

6    to run their searches.

7             MR. EHRLICH:  Do we have a time limitation?  They have

8    talked about the seven-day limit that you put on depositions

9    that would flow from Your Honor's ruling.  Or are we going to

10   be doing this 24/7 for days on end?

11            THE COURT:  I don't know.

12            MR. EHRLICH:  We know they are interested and we'll

13   commit the resources to it, but it seems that there should be a

14   time limitation.  We are at the close of fact discovery.  They

15   could certainly give the -- the search terms that they would

16   use sitting there --

17            THE COURT:  Nope.  Nope.  I just said --

18            MR. EHRLICH:  No, no, no.  I'm just saying that --

19            THE COURT:  I just said we're not doing it that way.

20            MR. EHRLICH:  -- do we have a time limitation on this

21   ongoing, never-ending inspection process, if that's the Court

22   order?

23            THE COURT:  Not sitting here because I don't know what

24   it involves.  I don't even know if we're going to get there;

25   right?  I don't know if we're going to get there or when we're

1    going to get there.  So, no, I'm not going to say that.

2         And it's fluid; right?  The seven-day deposition thing --

3    I'll tell you what I was thinking about.  October 10th is trial

4    date.  My one job is to make sure none of this discovery stuff

5    jeopardizes that trial date.  So I'm willing to work with you

6    all as long as we don't jeopardize that trial date.  Okay.

7         There is flexibility even there with that, not that anyone

8    should take a day off; right?  Because it's coming up really

9    quick.

10        So I don't know.  Mr. Ehrlich, I understand that, but it's

11   just the nature of the beast, and let's just see what happens

12   with it.  They're just consequences.

13        MR. EHRLICH:  So this doesn't apply to the devices,

14   because the devices you can't --

15        THE COURT:  Don't they have the devices back?

16        MR. EHRLICH:  No.  My understanding is they are

17   sitting with Stroz.

18        THE COURT:  They actually turned over their devices

19   forever?

20        MS. BLUNSCHI:  I'm happy --

21        MR. EHRLICH:  They were supposed to be destroyed or

22   returned, but they weren't.

23        THE COURT:  Okay.

24        MS. BLUNSCHI:  Litigation ensued before any devices

25   were returned or remediated, with the exception of, I believe,

1    Mr. Levandowski's phone.

2         But Stroz does have both the original devices and forensic

3    images of the devices.  And what Waymo has requested is the

4    opportunity to review those devices essentially in native form.

5    So we are already producing decrypted versions of these devices

6    that can be loaded for an essentially native review.

7         That is separate from the relativity database that was

8    created, including all of the information from these various

9    devices.

10        So just as a point of clarification as to how the

11   employees' counsel would look at the devices to sort of find

12   what is private or privileged, it's not as easy as running

13   search terms across the whole universe because Waymo has asked

14   to look at these devices one by one, but we can certainly

15   coordinate with Mr. Ehrlich and Mr. Patchen and the other

16   employees' counsel to find the best way to help them identify

17   where private documents are once they are decrypted.

18             **THE COURT:**  Let me hear from Waymo.

19             **MR. JUDAH:**  Thank you, Your Honor.

20        A couple issues with this sort of privacy search term

21   screening thing.

22        I think as a practical matter in terms of timing, I see

23   substantial issues that prevent it from being implemented.  I

24   don't know exactly what they're going to say is -- of these --

25   the privacy concerns or whatnot or the privilege concerns, but

1   I anticipate that given the volume of data that is being handed

2   over, it could be -- even if Mr. Levandowski's attorneys could

3   review it in time, I don't think the Special Master can

4   realistically review 200,000 documents in a timely manner.

5           THE COURT:  Well, let me just say what -- because let

6   me clarify.  I was saying at the moment we have time.  Check

7   your emails.  I don't think the Federal Circuit has ruled.

8           MR. JUDAH:  I did just check.  No, not yet.

9           THE COURT:  We don't know how much time we have.  We

10  could have weeks, for all we know.  We could have days.  I'm

11  not at all suggesting that your review is delayed by that.

12      I'm suggesting that while we have time right now, they

13  apparently had identified documents as privileged or private

14  before to Stroz; right?

15      I'm mispronouncing it.  Stroz.

16          MS. BLUNSCHI:  Stroz.

17          THE COURT:  To Stroz; right?

18          MS. BLUNSCHI:  So, yes.  Although the way those were

19  sorted out was on the relativity database.  So when we restore

20  the native images, those won't be readily flagged as privileged

21  or private anymore.

22          THE COURT:  I see.  Is there a reason why you can't

23  just start with the relativity database?

24          MR. JUDAH:  Well, so there is multiple relativity

25  databases.  We would like to start with the one that is

1    complete of all the devices.  It would be one universe if Waymo

2    knew which search terms were applied and we had any

3    confidence that they -- what Uber and Mr. Levandowski and

4    attorneys came up with that they deemed sufficient for this

5    review process to identify trade secrets was actually

6    sufficient, but we don't.

7        So I'm not comfortable saying offhand *Oh, yeah, sure that*

8    *seems like it would capture pretty much everything we need.*  We

9    have no idea.

10           **THE COURT:**  No.  I understand that.

11        But if you're getting to this point, you're going to see

12    the due diligence report, right, at this point.  And then

13    they're going to know exactly and be able to ask Stroz exactly

14    what they did do; right?

15           **MR. JUDAH:**  We will be able to, and hopefully we'll

16    have the documents which show which search terms were applied,

17    why they were applied, what the negotiations were.

18        The concern at that point then largely becomes timing

19    because we will have -- I don't know -- I believe Uber has said

20    that with respect to -- the diligence report will be produced

21    immediately.

22        With respect to the 800 documents that are currently on

23    the Privilege Log, that will be produced if the Federal Circuit

24    affirms.

25        With respect to the other documents which they haven't

1    even logged yet, that could take up to three or four days.  So

2    if we don't even -- and then -- until we depose people,

3    including perhaps the Stroz Friedberg gentleman, we are not

4    even going to know necessarily what oral communications there

5    were.

6         So by the time we know the full universe of what really

7    happened with respect to those search terms, it may -- a week

8    may already have passed.

9         **THE COURT:**  Don't worry about that week deadline.  I

10   wasn't even thinking about it.

11        Now that we have it all out there, it almost seems like

12   the first thing that should happen, as soon as the Federal

13   Circuit rules -- unless we're reversed and then it's easy -- is

14   that you -- that you get the report and you take Stroz

15   deposition; right?

16        I mean, in a way we're trying to figure stuff out in the

17   dark right now, and that sort of doesn't make sense, and

18   that -- and then we go from there, maybe.  In other words, it

19   seems premature for me to adopt a protocol now when you're in

20   the dark.

21        **MR. JUDAH:**  Well, I would say a couple things in

22   response to that.

23        The first is that the protocol that Waymo proposed and

24   that Mr. Ron had agreed to and Stroz had agreed to I think

25   is -- would completely satisfy Waymo, so we're not going to be

1   complaining about anything on that.

2        And then that puts the work on Waymo, and Waymo looks at

3   the stuff.  We search.  You know, there's a lot of things we're

4   going to be looking for off the bat, I can tell you, that

5   wasn't covered by Stroz.

6        You know, Mr. Kalanick had deleted all the text messages

7   of Mr. Levandowski.  Any of the text messages on

8   Mr. Levandowski's devices to Mr. Kalanick, Ms. Qi, who also

9   deleted text messages at Mr. Levandowski's instruction,

10  multiple other highly-relevant witnesses that Mr. Levandowski

11  was communicating with from Uber in this pre-March -- whatever

12  date exactly he handed over the devices, we're going to be

13  looking for all that stuff.  We are going to be looking for

14  stuff about Tyto.  We're going to be looking for stuff related

15  to shell companies in the trust related to Tyto.  For

16  confidentiality reasons, I can't go into details.

17       A lot of this stuff I don't think is going to be covered

18  by the Stroz protocol.  I don't think the Stroz protocol agreed

19  to is going to encapture the text messages.

20       **THE COURT:**  We're not saying that you don't get to do

21  your search.  What I'm saying is they pull out the private

22  stuff that they pulled out before.

23       **MR. JUDAH:**  But that's going to include, I'm afraid,

24  all the text messages.

25       **THE COURT:**  Well, I don't know.  I don't know.  I

```
1    mean, I guess what I'm saying is why don't we at least get

2    started on that now.  That they identify that; right?  Because

3    right now we can't do anything.

4         MR. JUDAH:  Sure, Your Honor.  And so getting to that,

5    so we have this universe of the relativity database which --

6    before search terms were applied by Stroz, which has everything

7    from the forensic images, other than native versions to some of

8    the photo files and such.

9         MS. BLUNSCHI:  And video, yeah.

10        MR. JUDAH:  So they can make those natives available

11   upon request.

12        THE COURT:  Okay.

13        MR. JUDAH:  So if Mr. Levandowski and the other

14   diligence employees -- Mr. Sebern's counsel is here, Mr. Ron's

15   counsel -- if they want to provide privacy-type search terms,

16   that's fine.  I -- you know, as long as whatever starts

17   happening with that isn't going to impede Waymo's ability to

18   the extent that's not fully resolved --

19        THE COURT:  No, no, no.  That's what I said.  That

20   shouldn't hold it up at all.  And, quite honestly, what I think

21   should happen is the Federal Circuit rules.  And let's

22   assume -- I don't know, but let's assume that you have to

23   disclose the due diligence report.  That should be like boom,

24   right, transferred.  You'll stay up all night reading it, I'm

25   sure.  Boom.
```

1    And then let's, if we need to, then talk and figure out

2    where you are or then come back or whatever.

3         But in the meantime, we don't know what they're going to

4    do, and they may -- so it sounds like the relativity database,

5    the one that includes everyone, before any search terms were

6    applied, may work for you.

7         **MR. JUDAH:**  Absolutely, and that's part of our

8    protocol.

9         Now, the two other things I would note, one is that with

10   respect to the diligence employees, Mr. Levandowski, provide,

11   you know, areas of privacy -- I mean, that the Special Master

12   would then review -- I think -- look, there is obviously

13   personal issues, personal communications with, you know -- that

14   are obviously going to be completely personal, nothing to do

15   with anything.

16        Once you start getting into anything involving, for

17   example, financial records -- Mr. Levandowski's shell

18   investments in Tyto go back to 2012 --

19        **THE COURT:**  No, no.  Mr. Ehrlich said *extreme*

20   *relevancy*; right?  We are talking about private stuff like -- I

21   don't know -- kids' birthdays --

22        **MR. PATCHEN:**  Speaking with his wife.

23        **THE COURT:**  Or speaking with your wife.

24        **MR. JUDAH:**  So I cannot go into the contents of some

25   of these shell company documents, but they -- suffice it to say

1  they may involve --

2       **THE COURT:**  So they all are well aware of them and

3  they know that those should not be withheld on privacy grounds,

4  as does the Special Master, but -- right?  You know that,

5  right, Mr. Ehrlich?

6      When you said *extreme privacy* -- no.  You said *extreme*

7  *relevancy*.  Privacy -- I also mean extreme privacy; right?

8  It's totally irrelevant.  You --

9       **MR. EHRLICH:**  The most important screen is relevance

10  to the claims at issue or defenses at issue.

11       **THE COURT:**  No, no, no.  Not your screen.  Now you got

12  it backwards.  You keep going backwards.

13       **MR. EHRLICH:**  I'm not rearguing that.

14       **THE COURT:**  I'm sorry.  I'm going to stand.  I hurt my

15  back.  Nothing do with this case.

16       **MR. EHRLICH:**  We understand that there are things that

17  could be argued to be private that are relevant to the case, of

18  course.

19       **THE COURT:**  Okay.

20       **MR. EHRLICH:**  We are talking about things that are not

21  relevant --

22       **THE COURT:**  And private.

23       **MR. EHRLICH:**  -- as to which there are important

24  privacy concerns at stake.  And we understand if we lose, we

25  don't have the Fifth Amendment, we don't have the common

1   interest privilege.

2       We do, however -- Mr. Levandowski had other attorneys for

3   personal matters.  That privilege wasn't -- those

4   communications weren't disclosed.  So there is a number of

5   those sort of attorney-client privilege matters which --

6       **MR. JUDAH:**  I would dispute, though -- they were

7   disclosed.

8       **THE COURT:**  But that's what I said I will address.  I

9   understand that you may want them and it's an interesting

10  argument that is more nuanced than what could be dealt with in

11  those Letter Briefs and will probably require a Privilege Log;

12  right?  Because at that point, he won't have any Fifth

13  Amendment objection.  He would have to produce a Privilege Log

14  and disclose it to you.

15      The log in itself may provide you what you need and it

16  still may be privileged and not waived and the like.

17      I understand we are going to have a lot to do, and we'll

18  just do it, and I'll endeavor to do hearings like this in the

19  afternoons or something or in the mornings early.  You guys are

20  used to early morning hearings so we could do it then, too, to

21  get it in.

22      So I think with the protocol, what I would say starting

23  now, because we don't know when they're going to rule, is with

24  the relativity database, they had already identified certain --

25  I thought there would be files or things that they had

identified as private; right?  Or as privileged.

       **MS. BLUNSCHI:**  They provided certain search terms in order to identify materials that would not be shared with Uber and MoFo.

       **THE COURT:**  Okay.  All right.  And so you can -- you can begin -- well, let's see.  How should that work?  Is there any reason why -- well, there is a reason because not until the Federal Circuit rules can I say provide those search terms to Waymo.  I got it.

    But you will get to see them if you get to see them.  And go ahead and maybe start segregating that somehow.  I mean, maybe it's already segregated in relativity --

       **MS. BLUNSCHI:**  So it is not segregated in the version of the database they have asked for access to.  Perhaps not surprisingly, Stroz gradually culled down the universe of data that Stroz was going to look at, not purely because of privacy considerations obviously.

    And Waymo has asked for access to the most comprehensive database, which does not have private materials segregated.

       **THE COURT:**  I see.

       **MS. BLUNSCHI:**  That said, we can certainly work with counsel for the diligenced employees to identify privileged or otherwise private material in the relativity database.

       **THE COURT:**  That they have asked to review.

       **MS. BLUNSCHI:**  Yes.  So it's just another step which

1   we can certainly do, however long it takes to get guidance from

2   them and then a day or two to restrict.

3        The question mark I think for us would be the access to

4   the native versions of the devices, that sort of matching

5   process as to what's private in the native versions of the

6   devices which we can't just search all across them because they

7   are talking about having them loaded and mounted for individual

8   searches.  That is a little bit more of a difficult process.

9        **THE COURT:**  I suppose if you're able to disclose what

10  those search terms were and that's disclosed to Waymo, you can

11  take steps to avoid it.  Or I'm not even sure it would come up.

12       Maybe what I'm thinking is that the protocol that they --

13  I mean, you'll be there and you can jump in; right?

14       **MR. JUDAH:**  And so, Your Honor, so I think with

15  respect to the native devices -- and, again, we're in the dark

16  here so we -- but the main reason we would like those as a

17  backup to the relativity collection is, one, we don't have

18  evidence yet that it's in fact a one-to-one, so we would want

19  some assurance on that.

20       And, two, is the folder structure of how things are

21  arranged on those devices may lead us to the relevant documents

22  faster than doing searches of items that may not be searchable.

23  A lot of these SVN database documents, the Altium files, are

24  not searchable in the ordinary course.  I don't know if they

25  are going to be searchable in relativity.

1      If we go in and there is a folder that says *Chauffeur*

2  *Files*, then we know exactly where to look.

3      So I would propose, consistent with earlier protocol, that

4  maybe we can just inspect those, but any printing that would be

5  done or anything would be off of the other -- off of the

6  relativity database which would have the privacy stuff flagged

7  or whatever.

8      **THE COURT:**  I think what I'm going to do -- you won't

9  be happy -- is I'm not going to do anything right now because I

10  think we need to see that report and then sit down and then --

11  but what I am going to say is I understand about the

12  attorney-client privilege.  You may need to do a Privilege Log

13  in terms of segregating.

14      The private stuff I -- you know, I know this private

15  stuff, they don't want it if it's not relevant.  They don't

16  want it.  And so I think the protocol that Mr. Ron agreed to

17  before may work best for that.

18      **MR. JUDAH:**  Right.  And that's what -- I mean, I can

19  understand why Mr. Levandowski would try to restrict what we

20  can see as much as possible.

21      But I think -- the reason I think the protocol that Waymo

22  had proposed and Mr. Ron agreed to is sufficient is, you know,

23  we obviously don't want that stuff -- we are going to look like

24  idiots if we try to print a personal photo or something and

25  then they object and bring it to your attention.  We're -- I

1    mean, there is no way we're going to do that.

2            **THE COURT:**  Right.  I will sanction you.

3            **MR. JUDAH:**  It could be, if we ask for something that

4    was completely -- that's why I think it's enough of a check and

5    balance.

6            **THE COURT:**  All right.  And so -- so -- but the

7    privileged stuff -- and maybe there is a way of searching for

8    it when they do it that you stay away from it or you do a

9    search and the name comes up, you can really -- I don't know.

10   We can figure something out.  I think we just need to wait and

11   take it in steps.

12       To the extent you need to get me on the phone with

13   Mr. Cooper, you're welcome to do that.  Basically whenever the

14   Federal -- even if it's the weekend, when the Federal Circuit

15   rules, I can make myself available because we have that -- we

16   all have that October 10 trial date that we're working to make.

17           **MR. JUDAH:**  Your Honor, if I could bring up two other

18   points.

19       The first is that some of the individuals that

20   Mr. Levandowski was going to be communicating with related to

21   the Tyto structure are attorneys and -- but were also acting in

22   business capacities for some of the shell companies.

23           **THE COURT:**  Yes.  So they can start now; right?  So

24   they're on notice now.  To the extent you are going to withhold

25   as attorney-client privilege any communications involving any

of those entities -- we know who they are -- that Waymo has
read, you should start creating your Privilege Log now so that
can be produced immediately, so I can figure that out; right?
The first thing we need is the log.  So start creating it,
start working on it now.

          **MR. JUDAH:**  Then the second thing, Your Honor, is I
would like to discuss the devices that Stroz never searched.

          The first thing I would like to say is -- they were
provided to Stroz.  Stroz may not have searched them under
something that Mr. Levandowski got them to agree to, but they
were provided to Stroz, and two of our document requests that
were compelled by your order and then affirmed by Judge Alsup,
No. 9, "All documents provided to you by defendants
Levandowski, Lior Ron, etc., related to Levandowski,
Otto Trucking" --

          **THE COURT:**  This is what you should do.  You should
take Stroz deposition, *Why did you search those devices*?  Maybe
they will give you an answer that will say -- because you're
going to have limited time and -- despite all the pro hoc vices
that have been allowed -- limited person power even to search;
right?  You're going to have to make a decision.

          Take the deposition and find out why they didn't search
them, find out what they are; right?  What are the devices,
what are they, from what period, dah-dah-dah, and then tell me
which ones you want and why.  You just don't know.  I get that

1    it may be relevant and it may be discoverable.

2         **MR. JUDAH:**  I don't think Stroz necessarily knows, so

3    the other thing I would note is that No. 16 is all

4    communications between Stroz and Levandowski.  This is

5    obviously something that was provided from one side to the

6    other.  That is a communication.

7         **THE COURT:**  I don't accept that as obviously.  I don't

8    agree with that, your characterization as obviously.

9         This is what I'm saying is we know very little about them

10   and they can't say anything more about it now until the Federal

11   Circuit rules.

12        **MR. JUDAH:**  Subject to the claw-back issue, which we

13   still need to discuss.

14        **THE COURT:**  Yes.  So we'll deal with it then.  I just

15   can't rule sort of in this vacuum, I think, as to what's there.

16        You are going just going to have to make choices as to

17   what is priority.  It may very well be that this is a device

18   that should be produced.  It may be.  I just don't know.

19        **MR. PATCHEN:**  Two quick things, Your Honor.  We put

20   this in our letter.  The first of which is we understand the

21   time pressure and the inspection and that even with extreme

22   privacy and extreme relevance standards, stuff is going to get

23   through that would not normally be discovered.

24        We would request that whatever protocols eventually enter,

25   that it not constitute a general waiver of those other

1    objections.

2         **THE COURT:**  No, no.  This is like a Rule 502, Rule of

3    Evidence 502.  They may see things that that's not going to be

4    a waiver.  You're not going to argue that that's an intentional

5    waiver.  It's not intentional.  You are here objecting.

6         And the same with the privacy thing.  Because of the time

7    pressure, stuff is going to get through.  We are all going to

8    behave like the professionals that everyone has been behaving

9    like and we are going to deal with it like professionals.

10        What I have heard Waymo say is they acknowledge that there

11   are going to be privacy issues.  They don't want that.

12        **MR. PATCHEN:**  We agree with that.

13        The only other thing -- I think Mr. Sebern's counsel

14   brought this up and it's a good one.  We would request that the

15   attorney who is reviewing the documents is not the same one who

16   takes the deposition of, say, Mr. Ron because they will see

17   things, and that's one way to safeguard the privacy.

18        For example, let's say he has marital troubles.  Not

19   saying he did, but hypothetical scenario.  You see some of

20   those documents that suggest that maybe he was.  He was talking

21   with his friends about problems with his wife, whatever.

22        I wouldn't want that same person who is deposing Mr. Ron

23   to have known stuff that they never would have seen.

24        **THE COURT:**  Why?  They wouldn't ask about it.

25        **MR. PATCHEN:**  Perhaps.

1    **THE COURT:**  Not perhaps.  Because if they do ask about

2    it -- I'm not the trial judge.  Judge Alsup; right?  Really

3    they're going to ask about it?  I don't think so.

4        I don't know what your theory is.

5        **MR. JUDAH:**  It depends on the deposition.  I mean,

6    Mr. Perlson took Mr. Ron's deposition the first time.

7        David, do you think you're going to be doing a lot of

8    first-level doc review on devices?

9        **MR. PERLSON:**  I don't know.  Maybe.

10       **MR. JUDAH:**  It depends.

11       **THE COURT:**  I think there will probably be shifts.

12   This is going to be 24/7.

13       **MR. JUDAH:**  Certainly.  So it depends on the

14   deposition.

15       **THE COURT:**  We can --

16       **MR. PATCHEN:**  Deal with that.

17       **THE COURT:**  No one will do that.  Waymo has made that

18   representation.  I accept it.  I accept it.  And that is of

19   course the order of the Court.

20       This is a dispute.  It's a business dispute.  I understand

21   it's about a lot of money.  Let's keep it at that.

22       **MR. PATCHEN:**  We respect that and agree, Your Honor.

23       **THE COURT:**  Now, the last thing --

24       **MS. BLUNSCHI:**  Just two points of clarification for

25   Stroz.

1          I understand we're not going hammer out the details of the

2    protocol until after the Federal Circuit rules.  Restoring all

3    those devices, of which there are quite a lot, takes about a

4    week.

5          **THE COURT:**  Which devices are we talking about?

6          **MS. BLUNSCHI:**  The devices that were actually reviewed

7    as part of the diligence process.  It would take even longer to

8    restore the ones that were not reviewed.

9          **THE COURT:**  Yeah.

10         **MS. BLUNSCHI:**  We have begun the process of restoring

11   the ones that were reviewed, and I assume we should go forward

12   with completing that.

13         **THE COURT:**  Correct.

14         **MS. BLUNSCHI:**  Shall we hold off, I assume, on the

15   ones that weren't reviewed then for now?

16         **THE COURT:**  What do you mean -- I'm sorry.  I don't

17   know what you mean by *restored*.

18         **MS. BLUNSCHI:**  No problem.

19         So the devices -- we have the original devices.  For a

20   number of reasons, it wouldn't be appropriate to have the

21   parties just review the actual original devices.  It will

22   change access dates, things like that.

23         So Stroz also has encrypted forensic images of each

24   device, but those aren't ready to just be mounted on your USB

25   port.  They have to be decrypted and prepared to appear as a

1    native device.

2             **THE COURT:**  And how quickly could you get that done?

3             **MS. BLUNSCHI:**  So for the ones that were actually

4    reviewed --

5             **THE COURT:**  No.  Those you are going to keep doing.

6        The ones that were not reviewed.

7             **MS. BLUNSCHI:**  So Mr. Levandowski has asserted an

8    objection to discussion, I think, of the volume of those

9    devices.

10            **MR. EHRLICH:**  You can speak to the amount of time,

11   though.

12            **MS. BLUNSCHI:**  Probably another week or so.

13            **THE COURT:**  I think that would probably work; right?

14   Because you're going to begin with what they did review, and

15   then if immediately then they started --

16            **MR. JUDAH:**  I mean, we would like to immediately, but

17   if that's Your Honor's ruling --

18            **THE COURT:**  I'm just trying to be somewhat reasonable

19   here.  I mean, I know money is no object, but anyway . . .

20       Let's just wait and see.  I just think you're not going to

21   have lawyer -- enough power to review all this stuff, and you

22   are going to have to make some decisions.

23            **MS. BLUNSCHI:**  Sounds like a challenge.

24            **MR. JUDAH:**  We will be making decisions, but obviously

25   we have a priority to find Waymo documents, and so if they're

1    on those devices, we intend to find them.

2    THE COURT:  That's true.  I guess what I would say is

3    just be prepared to do forthwith, within a week, whatever it

4    takes.

5    MS. BLUNSCHI:  Okay.  Absolutely.

6    THE COURT:  Okay.

7    MS. BLUNSCHI:  The only other issue we wanted to get a

8    bit of guidance on is they have subpoenaed for deposition

9    Stroz's CEO, and we are absolutely going to cooperate in making

10   him available promptly for that deposition, but we assume it

11   would just be the one deposition, not one when the report comes

12   out and yet another one after they review documents.

13   MR. JUDAH:  So this is part of the issue.  We were

14   hoping on conducting kind of review of the documents before we

15   took the deposition of the Stroz witness.  Your Honor, makes a

16   good point, which is that he may be able to help us understand,

17   so I don't necessarily have the solution to that.

18   THE COURT:  I don't know.  He may have to sit more

19   than twice --

20   MS. BLUNSCHI:  More than once?

21   THE COURT:  What did I say?

22   MS. BLUNSCHI:  More than twice.

23   THE COURT:  Not more than twice.  He was just in the

24   middle of it, you know.  He can just thank Uber for that.  Or

25   MoFo.  Sorry.  Mr. Gonzalez for that.  Sorry.

1    **MS. BLUNSCHI:**  We will absolutely work on that, but we

2    would ask them to work with him as the CEO of their company --

3         **THE COURT:**  I understand.  But this case -- they took

4    it on.  It's in the middle of it.  As Uber has told me, since

5    January 2016, they thought this litigation would be coming so

6    everybody knew this litigation would be coming, and sure

7    enough, here it is.

8         So I -- it makes sense for him to be -- or whoever knows

9    the information to be deposed right away because it can really

10   shed light on those devices, why they weren't reviewed, what

11   they did, what search terms, and so I do think it probably is

12   going to have to be done -- maybe in two points.  Maybe that's

13   all they'll need, and once they review the documents, they

14   don't need them again, but I don't know that at all.

15        But I do think even before they review documents, it makes

16   sense to depose Mr.-- I'll call him Mr. Stroz.

17        **MS. BLUNSCHI:**  Mr. Friedberg.

18        **THE COURT:**  Mr. Friedberg.  Okay.

19        **MR. GONZALEZ:**  Two related points, briefly.

20        One is, as you know, a sliver of the Stroz material is

21   sitting at MoFo.

22        **THE COURT:**  Yes.

23        **MR. GONZALEZ:**  That we got as part of our

24   representation of Mr. Levandowski.  What I would like to do is

25   just give that sliver to Mr. Levandowski's counsel so they can

```
1    begin the process you just described of going through it to
2    identify anything that is personal or whatever.  That's what I
3    would like to do.
4         THE COURT:  That's sort of up to Waymo, and that's a
5    matter with Judge Alsup, and if Waymo agrees, fine, but that's
6    not going to be my order because that is a matter that was
7    argued to Judge Alsup.
8         MR. GONZALEZ:  I'm not sure I ever raised that with
9    him.  But in any event --
10        THE COURT:  You know, the issue of having it.
11        MR. JUDAH:  We haven't met and conferred yet on this
12   so I would need to talk to people.
13        THE COURT:  He would like to get it out of his hands.
14        MR. GONZALEZ:  I would.
15      The second thing is, Your Honor, is Epic.  We haven't
16   talked about Epic, and Epic --
17        THE COURT:  You mean Epic has something separate from
18   this litigation?
19        MR. GONZALEZ:  Well, actually, yeah, it could be.
20      Epic, Your Honor -- these things that we're talking about,
21   we have got two buckets, the database, which is relativity, and
22   then we have these images of devices that they never looked at.
23      Epic has that as part of our representation --
24        THE COURT:  Oh.
25        MR. GONZALEZ:  -- of Mr. Levandowski.
```

1    My understanding is they haven't done anything with it.  I

2  don't know if they want to review everything twice.  I don't

3  represent Epic, but I just want you to be aware of it.

4        **THE COURT:**  Okay.

5        **MR. GONZALEZ:**  They need some guidance on what to do

6  as well.

7        **THE COURT:**  I don't think they will do anything right

8  now.  I don't have any discovery pending in front of me that

9  has anything to do with Epic.

10       **MR. GONZALEZ:**  I just want it out there they have this

11  stuff and we should figure out how to efficiently address it

12  and hopefully not even have to bother you.

13       **MR. JUDAH:**  I actually thought this was somewhat

14  addressed because I thought at the last hearing before Judge

15  Alsup, I thought it was represented they would hand over those

16  materials if the Federal Circuit affirmed.  Was that not right?

17       **MR. GONZALEZ:**  Well, there you go.  We're not just

18  going to hand over a copy of everything that you've just been

19  discussing.  That's exactly why I'm raising it.  I didn't want

20  to hear that.  This is why I'm raising it.

21    My point is Morrison & Foerster and Uber have no interest

22  in withholding any of that stuff.  Mr. Levandowski does.

23       **THE COURT:**  We are talking about -- you mean when the

24  Federal Circuit rules, he is saying hand it over?

25       **MR. JUDAH:**  It's specifically Epic.  I thought Epic

was addressed when Judge Alsup asked that question.

**MR. GONZALEZ:**  Yes.  But the question is what do you
hand over?  It's the same issue that you've been discussing for
the last 30 minutes.  It's Epic has a copy of what they have.

**THE COURT:**  Well, if it's the same thing.

**MR. GONZALEZ:**  And so it would have to be -- I'm
assuming that it would be addressed in the same manner that you
work out with the other stuff.

**THE COURT:**  If they even want to look at it.  Again, I
mean, in terms of importance, if it's the copy of what they
already have --

**MR. GONZALEZ:**  Understood.  I'm just raising it, Your
Honor, because I want you to be aware that that's there.

**MR. JUDAH:**  The specific point -- I think part of the
reason Judge Alsup raised this is that he said we don't have to
take anyone's word for it, that it is, in fact, identical.
That's, I think, the main reason we would want to see it.  If
it is the same --

**THE COURT:**  We'll deal with it when we deal with it
and you can tell me if that's what you want to spend your time
dealing with.

The last thing we have is the claw back, and I don't
understand the claw back.  I mean, to claw back, it's there.
We now all know about the devices, so -- Mr. Levandowski's not
a defendant in this case.  No one is using it against him.  The

1   government's not here.  So I don't quite know.

2       I mean, the government, I suppose, to the extent -- I

3   don't know why they would -- would use that email, it would be

4   at their risk.

5       **MR. EHRLICH:**  It would be at their risk in the sense

6   that it would be a potential breach of an attorney-client

7   privilege.

8       **THE COURT:**  Well, I'm assuming if the Fifth

9   Amendment -- you know, I don't know -- see, because what the

10  email did was it described something that occurred that's

11  encompassed by my order that's up on appeal; right?

12      So if the Federal Circuit -- if that order is affirmed --

13  or at least what's more likely to happen rather than affirmed

14  is not reversed; right?  There is unlikely to be maybe a merits

15  determination, more a punt, but there you are.  Same result.

16      Then there was no -- then my finding that Stroz was not an

17  agent of Mr. Levandowski -- essentially what my finding was on

18  Mr. Gardner -- stands and that would stand to providing of the

19  devices and therefore there wouldn't be any privilege that was

20  breached.

21      **MR. EHRLICH:**  Correct.  We just pointed out that the

22  Federal Circuit hadn't yet ruled, and we've made the point,

23  perhaps ad nauseam, that even the act of producing tangible

24  items to counsel, if it's within a privileged relationship,

25  could raise Fifth Amendment concerns under *Hubbell* and *Fisher*.

1    **THE COURT:**  Could.  I don't know that this particular

2    one did.  This one is not obvious to me; in particular, what

3    was disclosed, which is that they were devices then that were

4    not even reviewed.

5        **MR. EHRLICH:**  And the number of -- I think that's

6    fair.  This was -- on the scale of potential problems, this was

7    minor, but we need to be vigilant in protecting the privileges.

8        **THE COURT:**  You are being a vigorous advocate for your

9    client.  I appreciate that.

10       **MR. EHRLICH:**  Thank you.

11       **THE COURT:**  Is there anything else I can help you with

12   today?

13       **MR. JUDAH:**  Your Honor, so I guess my question is we

14   think it may be helpful to have the information that describes

15   the location and volume of the documents, to have a ruling that

16   that's not privileged.

17       **THE COURT:**  That --

18       **MR. JUDAH:**  That the clawed-back emails in fact

19   are not privileged --

20       **THE COURT:**  I'm not clawing it back.  How's that?

21       **MR. JUDAH:**  Okay.

22       **THE COURT:**  It's definitely not privileged.  If the

23   Federal Circuit punts, as I -- right?  Or affirms; right?

24       **MR. JUDAH:**  Right.

25       **THE COURT:**  So I don't need to make an advisory

1    opinion today.  How's that?

2            **MR. JUDAH:**  Okay.  All right.

3            **THE COURT:**  Great.  Thanks everybody.

4                 (Proceedings adjourned at 3:08 p.m.)

1

2

3                     <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Tuesday, August 29, 2017

8

9    *Pamela A. Batalo*

10   _____
     Pamela A. Batalo, CSR No. 3593, RMR, FCRR
     U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25