1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Charles K. Verhoeven (Bar No. 170151)
2    charlesverhoeven@quinnemanuel.com
     David A. Perlson (Bar No. 209502)
3    davidperlson@quinnemanuel.com
     Melissa Baily (Bar No. 237649)
4    melissabaily@quinnemanuel.com
     John Neukom (Bar No. 275887)
5    johnneukom@quinnemanuel.com
     Jordan Jaffe (Bar No. 254886)
6    jordanjaffe@quinnemanuel.com
   50 California Street, 22nd Floor
7  San Francisco, California 94111-4788
   Telephone:     (415) 875-6600
8  Facsimile:     (415) 875-6700

9  Attorneys for WAYMO LLC

10                UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13 | WAYMO LLC,                          | CASE NO. 3:17-cv-00939
14 |         Plaintiff,                  |
15 |     vs.                             | **PLAINTIFF WAYMO LLC'S CORRECTED SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT OF THE PRELIMINARY INJUNCTION ORDER (Dkt. 426) AND EXPEDITED DISCOVERY ORDER (Dkt. 61)**
16 | UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC, |
17 |                                     |
18 |         Defendants.                 |
19 |                                     | **REDACTED VERSION OF DOCUMENT SUBMITTED UNDER SEAL**

01980-00104/9540884.1

# TABLE OF CONTENTS

**Page**

I.  WAYMO DISCOVERS ADDITIONAL HIDDEN DEVICES THAT SHOULD HAVE BEEN DISCLOSED IN RESPONSE TO THE COURT'S MARCH 16 AND MAY 11 ORDERS ................................................................................................ 2

II. DEFENDANTS HAVE REPEATEDLY VIOLATED PARAGRAPH 5 OF THE COURT'S MAY 11 ORDER ........................................................................................ 4

III. DEFENDANTS HAVE CONTINUED TO IMPROPERLY AND SELECTIVELY USE MR. LEVANDOWSKI'S ASSERTION OF THE FIFTH AMENDMENT PRIVILEGE AND THE COMMON INTEREST PRIVILEGE AS BOTH A SWORD AND SHIELD ................................................................................................ 11

IV. DEFENDANTS SHOULD BE SANCTIONED WITH AN ADVERSE INFERENCE AS WELL AS A REMEDIAL JURY INSTRUCTION .............................. 14

# TABLE OF AUTHORITIES

**Page**

**Rule**

Fed. R. Civ. P. 26(b)(6)(B)...............................................................................................................2

Waymo brings this supplemental brief to notify the Court of additional violations of the Court's March 16 Expedited Discovery Order and May 11 Preliminary Injunction Order that have come to light since the August 16 hearing. First, Waymo has discovered that Defendants' agent Stroz Friedberg possesses devices received from Anthony Levandowski in connection with the due diligence investigation – specifically, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ – that that have never been disclosed by Defendants, in violation of both the Court's March 16 and May 11 Orders. Second, hundreds of LiDAR-related text messages between Mr. Levandowski and Uber executives and engineers – including Travis Kalanick (former CEO), Eric Meyhofer (current head of Uber's self-driving car program), James Haslim (Fuji hardware lead), and Daniel Gruver (Fuji Program Manager), were produced late in the discovery period and never disclosed on Defendants' Paragraph 5 logs prior to close of fact discovery, in violation of the PI Order. As just one example, on the final day of fact discovery, Defendants produced notes from a late-night, January 3, 2016 white board meeting between Travis Kalanick and Anthony Levandowski in which Uber's then-CEO discussed with the then-Waymo employee "▓▓▓▓▓▓▓▓▓▓▓▓▓▓" LiDAR sensors as part of a compensation arrangement in which "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." Neither these notes, nor the January 3 meeting – where LiDAR was extensively discussed – is disclosed on Defendants' Paragraph 5 logs. Third, Defendants have continued to misuse the Fifth Amendment and common interest privileges, resisting discovery and Court Orders based on Mr. Levandowski's purported non-cooperation, while simultaneously coordinating strategy and discovery with Mr. Levandowski. For example, as set forth below, Otto Trucking received from Mr. Levandowski physical evidence (that it contends is relevant), then attempted to surprise Waymo's main technical witness by producing that physical evidence without prior notice at his August 22 deposition, while refusing – on grounds of privilege – to provide any information about how it was obtained. Defendants' continuing misconduct has severely prejudiced Waymo. Accordingly, in addition to the proposed jury instruction submitted herewith, Waymo requests as an additional sanction that the Court extend the adverse inference the Court previously ruled may be drawn against Mr. Levandowski to include Defendants.

I. **WAYMO DISCOVERS ADDITIONAL HIDDEN DEVICES THAT SHOULD HAVE BEEN DISCLOSED IN RESPONSE TO THE COURT'S MARCH 16 AND MAY 11 ORDERS**

As set forth in Waymo's initial Motion for an Order to Show Cause (Dkt. 676-4), Defendants have repeatedly and falsely represented to the Court that they had complied with the Court's March 16 and May 11 Orders, which required disclosure of documents related to Waymo files downloaded by Anthony Levandowski, and to the destruction of any such documents. After the August 16 hearing on that Motion, Waymo learned of yet another instance in which Defendants and their agent Stroz Friedberg ("Stroz") violated the Court's Orders. In particular, on August 22, Stroz revealed to Waymo the existence of "█████████████████████████ █████" that had been collected from Mr. Levandowski as part of the Stroz due diligence but never previously disclosed to either Waymo or the Court.[1] (Ex. 1 (emphasis added).) This 11th hour disclosure constitutes yet another, egregious example of Defendant's disregard of this Court's Orders to provide disclosures – to Waymo's severe prejudice.

The Court's March 16 Expedited Discovery Order set a March 31 deadline for Defendants to "produce for inspection all files and documents downloaded by Anthony Levandowski … before leaving plaintiff's payroll and thereafter taken by [him]." (Dkt. 61 at 2 ¶ 4.) The Court's PI Order required Defendants to "immediately and in writing exercise the full extent of their corporate, employment, contractual, and other authority to (a) prevent Anthony Levandowski and all other officers, directors, employees, **and agents** of defendants from consulting, copying, or otherwise using the downloaded materials; and (b) cause them to return the downloaded materials and all copies,

---

[1] After Stroz sent that email, counsel for Mr. Levandowski notified Waymo that "[t]he information in the below email needs to be clawed back." (Ex. 1.) Waymo promptly challenged that attempted claw-back (Dkt. 1329), because the information in the email – identifying "the locations where any purportedly privileged documents were found" – is the same type provided on a privilege log and therefore cannot be protected by the Fifth Amendment or any other privilege. (Dkt. 202 at 3.) At the August 28 hearing on that challenge, Judge Corley ruled that "I'm not clawing it back" because "[i]t's definitely not privileged," but declined to make an advisory opinion in advance of the ruling from the Federal Circuit. (Dkt. 1414 at 87:13-88:2.) Therefore, out of an abundance of caution Waymo attaches the challenged email as a sealed exhibit pursuant to Rule 26(b)(6)(B), and will only serve an unredacted copy of this brief, proposed jury instruction, and Exhibit 1 on recipients of the email at issue.

1 excerpts, and summaries thereof to Waymo (or the Court) by **MAY 31 AT NOON**." (Dkt. 426 at 23 ¶ 2 (emphasis added).)  That May 11 Order also required Defendants to "conduct a thorough investigation and provide a detailed accounting under oath setting forth every person who has seen or heard any part of any downloaded materials, what they saw or heard, when they saw or heard it, and for what purpose," by no later than June 23. (*Id.* at 24 ¶ 4.)  The Order was clear that "[t]he accounting shall **not** be limited to downloaded materials that happened to make their way into some due diligence report but shall cover **any and all** downloaded materials." (*Id.* (emphases added).)  Yet at no time – not on March 31, not on May 31, and not on June 23 – did Defendants disclose the existence of these " ███████████████████████████████ collected from Mr. Levandowski, even though these devices plainly are highly relevant to the search for Waymo's misappropriated trade secret information.  Rather, it was third party **Stroz** – Defendants' agent – who first revealed the existence of these materials, less than 48 hours before the fact discovery cut-off.

Defendants' Paragraph 4 accountings, and other statements to the Court about downloaded materials, are replete with misrepresentations that conceal the existence of these devices.  For example, Uber's June 23 Accounting Pursuant to Paragraph Four of May 11, 2017 Preliminary Injunction Order states – under oath – that "Stroz Friedberg collected and imaged Anthony Levandowski's personal devices for the purpose of preparing a due diligence report." (Dkt. 715 at 2; *see also id.* at 5 ("Stroz Friedberg imaged Anthony Levandowski's personal devices on March 22, 2016, as part of the due diligence project.").)  Similar representations were made in the three supplemental accountings provided on June 28, July 20, and August 13. (*See* Dkt. 762 at 2 and 6; Dkt. 967 at 2 and 7; Dkt. 1170 at 2 and 7.)  But Stroz's August 22 email shows that these statements are intentionally misleading, because Uber knew or should have known that Stroz had ███ of Mr. Levandowski's hard drives that apparently Stroz never even reviewed, much less imaged.  Uber never revealed the existence of these devices to either the Court or to Waymo, despite claiming that "Uber devoted enormous resources to comply with the Court's May 11 provisional relief order" including "interview[ing] 60 individuals at Stroz" about the location of potentially downloaded materials. (Dkt. 885 at 6; *see also* Dkt. 806-5 [Declaration of Sylvia Rivera] at 2 ¶ 7, 10.)

The fact that these devices were never imaged or analyzed by Stroz does not absolve Defendants from accounting for them. The PI Order, for example, is unambiguous that the accounting and investigation would **not** be limited to the downloaded materials that were discussed in the Stroz due diligence report. (Dkt. 426 at 24 ¶ 4.) Indeed, the contents of devices that were never imaged by Stroz are particularly important. For these devices, Defendants apparently conducted no analysis of whether they contained downloaded material (such as the 14,000 files stolen from the SVN repository) or whether Mr. Levandowski made and retained back-up copies of such materials immediately before turning the devices over to Stroz. In turn, answers to these questions loom large in view of Uber and MoFo's (still hidden) arrangement with Stroz that specifically **excluded** these devices from analysis,[2] and Uber and Ottomotto's policy of giving Mr. Levandowski free reign to use personal computers while designing LiDAR systems for Uber and while running Uber's entire self-driving car program.[3] The truth about downloaded material on these devices and their forensic history is therefore critical in assessing the veracity of claims frequently trumpeted by Uber's lawyers that **all** of Mr. Levandowksi's devices were analyzed and then "put in a vault" to ensure that none of the stolen files on those devices "made it to Uber."

Defendants' concealment of these devices – which have never been identified on a privilege log, interrogatory response, sworn pleading, or Paragraph 4 accounting, let alone searched for stolen Waymo files – is yet another blatant violation of this Court's Orders.

## II.  DEFENDANTS HAVE REPEATEDLY VIOLATED PARAGRAPH 5 OF THE COURT'S MAY 11 ORDER

Subsequent to filing its Motions for an Order to Show Cause, Waymo also has uncovered dozens of violations of Paragraph 5 of the Court's Preliminary Injunction Order. That Order required

---

[2]  *See*, *e.g.*, Dkt. 380 (Declaration of Eric M. Friedberg in Support of Defendants' Opposition to Waymo's Motion to Compel at 1), ¶ 4 ("Stroz's investigative work was guided by directives from MoFo and OMM regarding what topics to investigate and how Stroz should investigate these topics. MoFo provided these directives to Stroz.").

[3]  *See*, *e.g.*, Dkt. 502 at 54:4-10 (THE COURT: "What prevented him from bringing a laptop to work every day at Uber and consulting the 14,000 files as needed, and then having conversations with people where he never mentioned Waymo, but simply says: Why don't we try it this way? What prevented that from happening? MR. GONZALEZ: Your honor, nothing prevented that from happening.").

Defendants to "provide Waymo's counsel and the Court with a complete and chronologically organized log of all oral and written communications – including, without limitation, conferences, meetings, phone calls, one-on-one conversations, texts, emails, letters, memos, and voicemails – wherein Anthony Levandowski mentioned LiDAR to any officer, director, employee, agent, supplier, or consultant of defendants" by no later than June 23. (Dkt. 426 at 25 ¶ 5.) Defendants' June 23 logs did not comply with that Order. Initially, Defendants have cavalierly "interpreted" the Court's June 23 deadline as a suggestion rather than a requirement, making significant additions to their logs on June 27, then again on June 30, again on July 3, again on July 19, again (by Otto Trucking) on August 18 and – most recently – yet again just days ago, on September 5. In other words, instead of preparing a complete log at the **outset** of discovery, as ordered by the Court, Defendants waited until 12 days **after** the fact discovery **cut-off** to provide their log.

However, even Defendants' most recent "supplementation" fails to comply with Paragraph 5 of the Court's Order. Since the filing of its motion for an Order to Show Cause, Waymo has discovered dozens of highly relevant LiDAR communications from Mr. Levandowski that were not only withheld until the final days of discovery, but have never been disclosed on any of Defendants' Paragraph 5 logs.

For example, Defendants concealed until August 24 – the final day of fact discovery – notes from a January 3, 2016 evening white-boarding session between Mr. Levandowski, Uber's Chief Product Officer Jeff Holden, and then-CEO Travis Kalanick ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (Ex. 2 [UBER00311294].) The evidence shows that LiDAR was discussed extensively at this meeting. For example, under the bullet "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬," sub-bullets state that "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬" and ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬[.]" (*Id.*). Yet neither these notes nor the January 3 meeting were disclosed on any iteration of Defendants' Paragraph 5 LiDAR log. (*See*, *e.g.*, Dkt. 1469 Ex. 1.)

As another example, Defendants' logs exclude LiDAR-related communications between Mr. Levandowski and LiDAR engineer James Haslim. Mr. Haslim is a central witness in this case. He

helped develop Defendants' Spider LiDAR design, and is currently the lead hardware engineer for Fuji. Before working for Defendants, Mr. Haslim was an engineer at Tyto LiDAR LLC ("Tyto").[4] Tyto is a LiDAR company that was "acquired" by Ottomotto in May 2016 – between the signing of the Put Call Agreement with Uber (April 11) and the date that the acquisition closed (August 23). ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (*See*, *e.g.*, Ex. 3 [UBER00109892; UBER00109893; UBER00109919].)

Waymo discovered on August 21 that Mr. Levandowski personally owned and controlled Tyto.[5] Defendants failed to disclose Mr. Levandowski's ownership of Tyto at any point during the discovery period (*see*, *e.g.*, Ex. 9 [Uber's Responses to Waymo's First Set of Expedited Interrogatories] at 6), even though several of Defendants' employees and shareholders knew of Mr. Levandowski's relationship to Tyto and the related shell entities.[6] Consistent with their pattern of

---

[4] Tyto was originally named "Odin Wave." Waymo refers to the entity as "Tyto" herein regardless of which name it was using at the time.

[5] Waymo did not uncover this key fact until the final week of discovery, and only in response to a third party subpoena. Due to the elaborate series of shell companies and trusts Mr. Levandowski set up to conceal his involvement in Tyto, Waymo was forced to serve more than a dozen subpoenas on a variety of entities – lawyers (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇), accountants (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.), holding companies (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, trustees ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and trusts (▇▇▇▇▇▇▇▇▇▇▇)) – to identify Mr. Levandowski at the center of Tyto's "Russian nesting doll" ownership structure. (*See*, *e.g.*, Ex. 4 [8/22/2017 A. Levandowski Depo. Tr.] at 138:18-162:1); Ex. 5 [UBER00047823] (Tyto-Ottomotto Asset Purchase Agreement); Ex. 6 [UBER00047857] (Operating Agreement of Tyto LiDAR, LLC); Ex. 7 [▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇).)

[6] For example, Ognen Stojanovski (Uber ATG's Head of Policy and Government Relations) was the manager of both Tyto and ▇▇▇▇▇▇▇▇▇▇▇▇, the Sandstone Group; Max Levandowksi (Mechanical Engineer at Uber ATG) is ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇; Brent Schwartz (Business Operations at Uber ATG) was the CEO of Tyto; and Mr. Haslim (Senior Manager, Engineering at Uber ATG) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Ex. 10 [TYTO-001598] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇; Ex. 11 [TYTO-001599] (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇); Ex. 12 [TYTO-001600] (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. However, once Waymo independently confirmed that Mr. Levandowski was Tyto's owner, Uber switched gears and tried to use these facts as a basis to obtain adverse inferences **for Uber** at Mr.

1 obfuscation, Defendants withheld production of Mr. Levandowski and Mr. Haslim's text messages
2 (Mr. Levandowski's preferred means of communication) until August 8, the day before Mr. Haslim's
3 August 9 deposition. Communications from Mr. Levandowski to Mr. Haslim that should have been
4 logged on June 23, but which were withheld from Waymo until the August 8 production, and which
5 have never been logged on any of Defendants' Paragraph 5 logs, include:

- "███████████████████████████████████████████████████████" (Ex. 13 [UBER00199147-UBER00199156], dated March 26, 2015);
- "███████████████████████████████████████████████████████" (*Id.* [UBER00199172], dated March 1, 2016).

Other text messages to Mr. Haslim were first logged in June, but with no Bates numbers for Waymo to find them. (*See* Ex. 25 [6.30.2017 Supplemental Log].) There were no Bates numbers because Defendants withheld the text messages from production for almost six weeks until the day before Mr. Haslim's deposition. Even after (belated) production of the text messages, Defendants continued to obscure their presence on the log by selectively omitting the applicable Bates numbers from the "Bates Number (as applicable)" column. (*See*, *e.g.* Dkt. 1469 Ex. 1 at Entry No. 206.) Such late-produced, and incompletely logged messages from Mr. Levandowski to Mr. Haslim include:

- "████████" (*Id.* [UBER00199181], dated May 17, 2016);
- "████████████████████████████████████████████████████████████" (*Id.* [UBER00199190-UBER00199210], dated May 26, 2016);
- "████████████████████████████████████████████████████████

---

Levandowski's August 22 deposition. (*See*, *e.g.*, Ex. 4 [8/22/2017 A. Levandowski Depo. Tr.] at 251:24-254:24).

████████████████████████████████████████

████████████████████████████" (*Id.* [UBER00199211-UBER00199224], dated May 28, 2016);

- ████████████████████████████████████████ (*Id.* [UBER00199243], dated June 29, 2016);

- ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████" (*Id.* [UBER00199248-UBER00199263], dated June 30, 2016).

As yet another example, Defendants have never logged dozens of LiDAR communications between Mr. Levandowski and Daniel Gruver (Program Manager for Fuji), and waited to produce them until August 3 – the day before Mr. Gruver's deposition – as part of a document dump of over **three thousand** Gruver custodial documents produced that day. These LiDAR communications include updates from Mr. Gruver on the development of Fuji and Spider, and text messages from Mr. Levandowski such as:

- "████████████████████████████ (Ex. 14 [UBER00177240], dated July 28, 2016);

- "████████████████████████████████████" (*Id.* [UBER00177259], dated September 15, 2016).

Defendants engaged in a similar practice with respect to LiDAR text messages between Mr. Levandowski and Scott Boehmke (Uber LiDAR engineer) as they did with many of Mr. Haslim's text messages. Defendants first logged Mr. Boehmke's text messages (without Bates numbers) in June (*see* Ex. 25), but then waited to produce them (along with over 800 Boehmke custodial documents) until July 27, the day before Mr. Boehmke's July 28 deposition in Pittsburgh. These communications are not disclosed on Defendants' Paragraph 5 logs by Bates number, and include the following text messages from Mr. Levandowski sent before the Ottomotto acquisition closed in 2016:

- "████████████████████████████." (Ex. 15 [UBER00115396], dated April 26, 2016);

- █████████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████████
  ██████████████████████████████████████████" (*Id.* [UBER00115397], dated April 28, 2016);

- █████████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████████
  ████████████████████" (*Id.* [UBER00115431], dated April 28, 2016);

- █████████████████████████████████████████████████████████████████
  ██████████████████████████" (*Id.* [UBER00115433], dated May 2, 2016).

Other highly relevant LiDAR communications were also concealed until the end of fact discovery, and then only added to Defendants' Paragraph 5 logs on September 5 – *i.e.*, almost two weeks after fact discovery closed. For example, on August 17 – the day before Eric Meyhofer's deposition – Defendants produced hundreds of text messages between Mr. Levandowski and Mr. Meyhofer, who succeeded Mr. Levandowski as head of Uber's self-driving car program. These text messages include communications wherein Mr. Levandowski not only mentioned LiDAR, but was actively directing the design approach for Fuji. For example:

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

(Ex. 16 [UBER00236495].) This communication should have been disclosed in chronological order at the outset of discovery, on June 23, not buried in a production of over 1100 documents the day before Mr. Meyhofer's deposition in Pittsburgh, and then belatedly logged on September 5.

As another example, Defendants waited until August 23 – the day before the close of fact discovery – to produce dozens of text messages between Mr. Levandowski, Mr. Meyhofer, Nick Letwin (Uber ATC electrical engineer), and Don Burnette (Ottomotto/Uber software engineer) relating to Uber's LiDAR systems. (*See*, *e.g.*, Ex. 17 [UBER00301109-UBER00301127]. In a series of text messages from September 2016, Mr. Letwin and Mr. Burnette sought advice about LiDAR sensors ("████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████), in response to which

1  Mr. Levandowski provided guidance (█████████████████████████████████████████

2  ████████████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████████████

5  █████████████████████████████████████████), and which Mr. Letwin and Mr. Burnette

6  acknowledged in turn as useful (██████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████████████

8  ████████████). (*Id.*)

9       Similarly, on August 23 – the day before the close of fact discovery -- Uber produced dozens

10 of text messages from Mr. Levandowski to Mr. Burnette relating to Owl (Tyto), Spider, Fuji,

11 Velodyne, and Waymo's GBr3 LiDAR systems, including:

12 - ████████████████████████████████████████████████████████████████████

13   ██████████████████████████████████████" (Ex. 18 [UBER00301139], dated March 4, 2016);

14 - "███████████████████████████████████████████" (*Id.* [UBER00301233], dated May

15   23, 2016);

16 - "██████████████████████████████████████████████████████████████████████" (*Id.*

17   [UBER00301268], dated June 21, 2016);

18 - "██████████████████████████████████████████████████████████████████

19   ███████████████████" (*Id.* [UBER00301271], dated June 21, 2016);

20 - █████████████████████████████████████████████████████████████████████

21   ███████████████████████████████████████████████████ (*Id.* [UBER00301300-

22   UBER00301307], dated July 9, 2016);

23 - █████████████████████████████████████████████████████████████████████

24   █████████████████████████████████████████████████████████████████████

25   ████████████████████ (*Id.* [UBER00301508-UBER00301538], dated February 16,

26   2017).

27      These communications should have been disclosed two months earlier on Defendants'

28 Paragraph 5 logs, not five days **after** Mr. Meyhofer and Mr. Burnette's depositions (both of which

occurred on August 18). The fact that Defendants belatedly included these Meyhofer and Burnette text messages on their September 5 "supplementation" does not cure their non-compliance, or the prejudice to Waymo.

### III. DEFENDANTS HAVE CONTINUED TO IMPROPERLY AND SELECTIVELY USE MR. LEVANDOWSKI'S ASSERTION OF THE FIFTH AMENDMENT PRIVILEGE AND THE COMMON INTEREST PRIVILEGE AS BOTH A SWORD AND SHIELD

Waymo's initial Motion for an Order to Show Cause set forth how Defendants were misusing the privilege by tactically asserting common interest protection (where doing so could conceal unhelpful discovery) while disclaiming a common interest (where doing so could would be helpful to Defendants' case). The Court recognized an example of Defendants' gamesmanship at the August 16 hearing on Waymo's motion, related to Defendants' belated disclosure of Mr. Levandowski's purported destruction of the five discs of downloaded Waymo files in March 2016:

> **THE COURT:** Look, what this also leads to is the same thing that Judge Corley got onto your case about -- Ms. Dunn about. This selective decision-making, you're now going back through the records and saying: Oh, we need that, we need that conversation. Oh, that's not privileged anymore, let's not claim privilege, that's not privileged.
>
> And yet, you've claimed privilege on 35,000 documents – or 3,500 documents. And now you're going back through trying to figure out: Oh, my God, we made a mistake; we've got to have that for trial. And, and you decided on balance it helps you, not hurts you.
>
> I see right through it. You're not fooling me for a second. I know what's going on. So this falls in that category. This falls in that category. Somebody decided after the fact: Oh, we need that conversation. Oh, we're going to disclose it now. That's the way it looks. That's how slick it looks.

(Dkt. 1261 at 44:13-45:3.) Since the hearing, Defendants have continued this improper practice – selectively relying on helpful communications with Mr. Levandowski, while concealing those they decide would hurt their litigation position.

A recent example occurred at the August 22 deposition of Waymo LiDAR engineer Pierre-Yves Droz. At that deposition, counsel for Otto Trucking Neel Chatterjee introduced as exhibits a set of earrings (apparently derived from printed circuit boards of an early version of GBr2) that had never been produced in discovery. (Ex. 19 [8/22/2017 P. Droz Deposition Tr.] at 33:17-41:39:4.) These earrings purportedly had been given as a farewell gift by Anthony Levandowski to Seval Oz (a former Waymo employee) when she left Waymo. (*Id.*) When asked how he had come into possession of these earrings – let alone learned of their existence in the first place – Mr. Chatterjee refused to answer on grounds of attorney-client privilege and/or work product. (*Id.* at 88:8-90:3.)

The next day, Waymo asked Otto Trucking to produce the documents relating to its procurement of these earrings. (Ex. 20 [8/23/2017 A. Roberts email]). However, instead of receiving a production from Otto Trucking, the responsive text messages were produced just hours before the close of fact discovery by **Mr. Levandowski**, the witness who has resisted virtually all discovery on grounds of the Fifth Amendment privilege against self-incrimination. (Ex. 21 [LEV_005019-LEV_005017].) These text messages reveal that Mr. Levandowski was personally coordinating collection of the earrings from Ms. Oz, and that he had possessed the earrings since July 31.[7] Moreover, because Ms. Oz was identified on Otto Trucking's Initial Disclosures (Ex. 22 [June 21 Initial Disclosures]), it is clear that Mr. Levandowski had been collaborating with Otto Trucking on this plan – to sandbag Waymo's lead GBr3 engineer at deposition with the earrings – since at least June. To date, while Otto Trucking is affirmatively using and asking Waymo witnesses about what the earrings disclose, it has refused to answer any questions about the circumstances under which it obtained the earrings or about its communications with Managing Member and ▇▇▇▇▇▇▇▇ Mr. Levandowski, on grounds of privilege and/or work product protection – as it has in response to all inquiries into the scope of Mr. Levandowski's involvement with its defense. (*See*, *e.g.*, Ex. 23 [9/5/2017 email from H. Vu] (refusing to answer the question, "please confirm that you did not consult with Mr. Levandowski in any way relating to" Otto Trucking's efforts to decrypt images of

---

[7] Based on subsequent text messages also produced on August 24, it appears that Mr. Levandowski arranged for a follow-up rendezvous to obtain the "ring clips" used with the earrings on August 17. (Ex. 21 [LEV_005019-LEV_005017].)

1 Mr. Levandowski's Google computers, because "we are not going to share our privileged
2 communications or work product with you.").)

3       Nor is Otto Trucking the only Defendant who has coordinated with Mr. Levandowski when
4 cooperation would help, rather than hurt, its defenses, but who has relied upon privilege assertions to
5 avoid revealing discovery into the nature or scope of that cooperation.  For example, calendar
6 invitations produced by Uber show that Mr. Levandowski was participating in meetings with Uber
7 executives and attorneys – including Salle Yoo, Angela Padilla, Arturo Gonzalez, Karen Dunn, Nicole
8 Bartow, and Aaron Bergstrom – to discuss litigation strategy as late as May 3, 2017 – more than a
9 month after he plead the Fifth Amendment and purportedly refused to cooperate with Uber's
10 investigation. (*See*, *e.g.*, Ex. 24 [UBER00065191 and UBER00065527] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).)
12 Yet while Uber has claimed that Mr. Levandowski has been refusing to cooperate with its defense of
13 the litigation, Uber has also consistently maintained that all of its communications with Mr.
14 Levandowski are protected from discovery by the common interest and/or attorney-client privilege.
15 For example, at Mr. Levandowski's August 22 deposition, counsel for Uber asked Mr. Levandowski
16 questions purporting to demonstrate his refusal to cooperate.  (*E.g.*, Ex. 4 [8/22/2017 A. Levandowski
17 Depo. Tr.] at 271:13-272:18 ("MS. DUNN: Q. But you would not cooperate with Uber's investigation
18 in this case, right?" A: invocation of the Fifth Amendment.).  But when **Waymo** asked questions
19 about this purported non-cooperation (*e,g.*, "Q Was -- what specifically did you tell Uber you would
20 not do in relation to Uber's investigation in relation to this litigation?"; "what specifically did Uber's
21 lawyers tell you to do in relation to Uber's investigation, in relation to this litigation, that you refused
22 to do?"), Uber instructed Mr. Levandowski not to answer on grounds of attorney-client privilege.  (*Id.*
23 [8/22/2017 A. Levandowski Depo. Tr.] at 296:11-299:10.)

24       Defendants cannot have it both ways, picking and choosing when their communications with
25 Mr. Levandowski are protected by common interest privileges (such as hard drives collected from Mr.
26 Levandowski by Defendants' due diligence investigator), and when those communications can be
27 used against Waymo in discovery (such as earrings collected from Mr. Levandowski by Defendants'
28 attorneys).  Defendants' selective reliance on a purported common interest privilege with Mr.

Levandowski set forth above adds to the pattern of intentional non-compliance with this Court's orders.

## IV. DEFENDANTS SHOULD BE SANCTIONED WITH AN ADVERSE INFERENCE AS WELL AS A REMEDIAL JURY INSTRUCTION

As explained above, even after the Court plainly told Defendants that "You misled the judge time and time again" (Dkt. 1261 at 28:5) and suggested that a jury instruction may be the appropriate remedy, Defendants have continued their discovery misconduct and ongoing violations of the Court's Orders. Waymo has been severely prejudiced, both by Defendants' cavalier approach to the Court's unambiguous deadlines, and by Defendants' willful misuse of the Fifth Amendment and common interest privileges. A jury instruction is certainly an appropriate remedy. In light of these continuing violations and the full scope of Defendants' misconduct, however, Waymo suggests that the additional sanction of an adverse inference is required.

This is especially appropriate because, after the PI Order and the limitation of the adverse inference to Mr. Levandowski, Uber cynically has reversed its story of the case – now throwing Mr. Levandowski under the bus. Before, Uber claimed Mr. Levandowski had done nothing wrong and stood behind him – improperly withholding documents and information to the contrary under "privilege" claims. (*See*, *e.g.*, Dkt. 131 at 11:24-13:7; Dkt. 369 at 4-17.) But now – after the PI ruling and Defendants' success in limiting any adverse inference to Mr. Levandowski – Uber has belatedly produced documents and testimony, previously withheld under "privilege," which show destruction of five discs of Waymo documents, and which show Mr. Levandowski admitted to them he improperly downloaded the 14,000 Waymo files, and Uber argues that Mr. Levandowski is the bad actor and claims that they did not have anything to do with any of his misconduct.

As part of this misuse of the privilege to wrongfully withhold, and then selectively produce, discovery in support of their new, contradictory story, Uber now intends to use the adverse inference against Mr. Levandowski in their favor. For example, at Mr. Levandowki's second deposition on August 22, Ms. Dunn (knowing he would assert the Fifth), asked numerous questions designed to turn the adverse inference against Mr. Levandowski into a vehicle supporting Defendants new theory of the case. For example:

- "Q You did -- you did not tell Uber complete and truthful information about several bad acts that you had done; isn't that right?" (Ex. 4 [8/22/2017 A. Levandowski Depo. Tr.] at 256:7-16).
- "Q In fact, prior to filing -- prior to Waymo's filing the complaint in this case, you didn't tell anyone at Uber that you intentionally downloaded and retained Google files in December of 2015 and December -- and January of 2016?" (*Id.* at 264:3-11);
- "Q. And you also didn't tell anyone at Otto about any intentionally downloaded Google files before the complaint was filed by Waymo in this case; isn't that right?" (*Id.* at 265:4-11);
- "Q. And you did not download these files to use at Otto or Uber; isn't that right?" (*Id.* at 262:10-16);
- "Q. Mr. Levandowski, after you told Uber employees on March 11, 2016, that you had inadvertently retained some Google materials on five discs, the CEO of Uber made very clear to you that you were not to bring those materials to Uber; isn't that right?" (*Id.* at 266:22-267:6);
- "Q And you told Uber you would not bring any proprietary or confidential information with you to Uber from a former employer; isn't that right?" (*Id.* at 267:20-268:1).

Undoubtedly, Defendants intend to seek an adverse inference on these questions to support their new, contradictory theory of the case – once again misusing the Fifth Amendment privilege and the adverse inference ruling previously made by the Court.

Defendants have violated Court Orders to produce – and have misused claims of "privilege," to hide – material information. A jury instruction plainly is appropriate. However, it does not go far enough to sanction Defendants for their misconduct. The Court has previously ruled that it will instruct the jury that they are entitled to draw an adverse inference against Mr. Levandowski. (*See* Dkt. 1050 at 99:8-13.) Waymo requests as an additional sanction that this adverse inference should also apply to Defendants. Waymo has already provided sufficient evidence to support an adverse inference against Defendants, and would be happy to supplement that briefing if requested. (Dkt. 818-4 and Dkt. 896-4.) Given Defendants' post-hearing, continuing pattern of misconduct, and the full

scope of Defendants' misconduct in this case, an additional adverse inference sanction is not only appropriate, but necessary in these circumstances.

DATED: September 7, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ Charles K. Verhoeven*
Charles K. Verhoeven
Attorneys for WAYMO LLC