# EXHIBIT 1

Pages 1 - 88

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

WAYMO, LLC,                          )
                                     )
              Plaintiff,             )
                                     )
    VS.                              )   NO. CV 17-00939-WHA
                                     )
UBER TECHNOLOGIES, INC., ET          )
AL.,                                 )
                                     )
              Defendants.            )
_____)

San Francisco, California
Monday, August 28, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                    50 California Street -- 22nd Floor
                    San Francisco, CA  94111
              BY:   **MELISSA J. BAILY, ESQUIRE**
                    **JEFFREY NARDINELLI, ESQUIRE**
                    **DAVID PERLSON, ESQUIRE**
                    **JAMES JUDAH, ESQUIRE**

                    QUINN EMANUEL URQUHART & SULIVAN, LLP
                    51 Madison Avenue
                    New York, NY  10010
              BY:   **JAMES BAKER, ESQUIRE**

              (Appearances continued on the next page)

Reported By:        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    Official Reporter

---

APPEARANCES CONTINUED:

For Plaintiff:
                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                    555 Twin Dolphin Drive -- 5th Floor
                    Redwood Shores, CA  94065
              BY:   **ANDREA PALLIOS ROBERTS, ESQUIRE**

For Defendant Uber Technologies, Inc:
                    MORRISON & FOERSTER LLP
                    425 Market Street
                    San Francisco, CA  94105
              BY:   **ARTURO J. GONZALEZ, ESQUIRE**
                    **ESTHER KIM CHANG, ESQUIRE**

                    BOIES, SCHILLER & FLEXNER LLP
                    401 Wilshire Boulevard -- Suite 850
                    Santa Monica, CA  90401
              BY:   **EDWARD H. TAKASHIMA, ESQUIRE**

For Defendant Otto Trucking LLC:
                    GOODWIN PROCTER LLP
                    135 Commonwealth Drive
                    Menlo Park, CA  94025
              BY:   **I. NEEL CHATTERJEE, ESUIQRE**

Special Master:
                    FARELLA BRAUN & MARTEL LLP
                    235 Montgomery Street -- Suite 1700
                    San Francisco, CA  94104
              BY:   **JOHN L. COOPER, ESQUIRE**

For Anthony Levandowski:
                    RAMSEY & EHRLICH LLP
                    803 Hearst Avenue
                    Berkeley, CA  94710
              BY:   **MILES F. EHRLICH, ESQUIRE**

For Lior Ron:
                    TAYLOR & PATCHEN, LLP
                    One Ferry Building -- Suite 355
                    San Francisco,CA  94111
              BY:   **JONATHAN A. PATCHEN, ESQUIRE**

---

APPEARANCES CONTINUED:

For Keker, Van Nest & Peters LLP:
                    KEKER, VAN NEST & PETERS LLP
                    633 Battery Street
                    San Francisco, CA  94111
              BY:   **RACHAEL E. MENY, ESQUIRE**
                    **SUSAN J. HARRIMAN, ESQUIRE**

For Colin Sebern:
                    FARMER BROWNSTEIN JAEGER, LLP
                    235 Montgomery Street -- Suite 835
                    San Francisco, CA  94104
              BY:   **DAVID BROWNSTEIN, ESQUIRE**

For Stroz Friedberg:
                    LATHAM & WATKINS LLP
                    505 Montgomery Street -- Suite 2000
                    San Francisco, CA  94111
              BY:   **MELANIE M. BLUNSCHI, ESQUIRE**

---

4

1    **Monday - August 28, 2017**                        **1:30 p.m.**

2                     P R O C E E D I N G S

3                          ---oOo---

4         THE CLERK:  Calling CV 17-939, Waymo LLC vs. Uber.

5         THE COURT:  So if I can have counsel for the parties

6    state their appearances, and then when the time comes, if a

7    nonparty's counsel wants to be heard on a particular motion,

8    then the nonparty can make their appearance at that time.

9         MS. BAILY:  Good afternoon, Your Honor.  Melissa Baily

10   for Plaintiff Waymo.  With me is Jim Baker, Jeff Nardinelli,

11   Andrea Pallios Roberts, David Perlson, and James Judah.

12        THE COURT:  Good afternoon.

13        MR. CHATTERJEE:  Good afternoon, Your Honor.  Neel

14   Chatterjee for Otto Trucking.

15        THE COURT:  Good afternoon.

16        MR. GONZALEZ:  Good afternoon, Your Honor.  Art

17   Gonzalez, Esther Kim Chang, from Morrison & Foerster for Uber.

18        THE COURT:  All right.  Good afternoon.

19        MR. TAKASHIMA:  Good afternoon, Your Honor.  Ed

20   Takashima -- Boies Schiller Flexner -- for Uber.

21        MR. COOPER:  And John Cooper, Special Master.

22        THE COURT:  Good afternoon, John Cooper.

23        All right.  So we have a number of motions, and I thought

24   it might be easier, given they all came in at the same time, if

25   I just had this hearing and tried to address them orally.

```
1        And what I actually wanted to start with is Uber's --
2   Uber's -- Waymo's objection to Judge Alsup, which essentially
3   asks for clarification from me, and I understand why you didn't
4   seek it because given our time frame, but I think perhaps I can
5   obviate some of that request.
6        So this was my view, and you can be heard,
7   Mr. Gonzalez, since you probably won't like it.
8        But in any event, with respect to the Interrogatory No. 25
9   and No. 1, all I meant to say -- in my defense, this was a
10  Saturday that I wrote it and filed it.
11       What I meant to say was look, Waymo answered them.  They
12  answered their interrogatories.  They are what they are.  To
13  the extent that Uber wants to argue that something that they
14  bring up in trial or maybe in an offer of proof -- I don't know
15  what you're going to say -- wasn't sufficiently disclosed in
16  that interrogatory, you can make that argument.  Okay.
17       And then with respect to the emails regarding any
18  conflicts, I thought it was sort of without saying, of course
19  only if those emails raised something that a further
20  deposition -- not a seven-hour deposition -- a further
21  deposition on those issues necessitates something, then of
22  course it could go forward; not just anything.  But I think
23  that goes without saying, and I would bet that Mr. Gonzalez
24  wouldn't disagree with that either.
25           MR. GONZALEZ:  Your Honor, we have bigger fish to fry
```

```
1   today.
2            THE COURT:  Okay.
3            MR. GONZALEZ:  I'll let that one rest.
4            THE COURT:  Excellent.
5        So I think there's still one issue for Judge Alsup I think
6   in that objection that I'm not going to weigh in on.  All
7   right.
8        So let's then go to -- I want to leave the Stroz protocol
9   to the end because, heck, maybe while we're sitting here, the
10  Federal Circuit will rule, so I'll just leave it until the end.
11  I have no inside information.  I'm just saying maybe.
12       Let's start with Otto Trucking's subpoena to Keker.  I
13  believe I have someone from Keker here who can now come forward
14  and make their appearance.
15           MS MENY:  Your Honor, Rachael Meny of Keker, Van Nest
16  & Peters and for nonparty Keker, Van Nest & Peters.
17           THE COURT:  Good afternoon.
18       And good afternoon, Mr. Chatterjee.
19       So this is my tentative view, is that the subpoena to
20  Keker sort of comes too late.  There was a reason there was a
21  waiver of work product because of course the investigation was
22  directed by counsel.  That was not a secret.  That's why there
23  had to be a waiver and that counsel was involved.  That's why
24  there had to be a waiver in the first place.
25       And so Otto Trucking certainly could have subpoenaed Keker
```

```
1   a long time ago, but four days before the close of discovery I
2   don't think is a reasonable amount of time.
3        Even putting that aside, though, what I would normally do
4   is say the information that the Court compelled had to do with
5   Waymo, what was communicated to Mr. Brown, and I believe there
6   were at least two other individuals involved with that
7   investigation.
8        Waymo was in possession of all those communications, and
9   so always you would get from that first.  And particularly
10  here, it's sensitive because of course Keker represents Waymo
11  in the arbitration, and so whenever you're subpoenaing counsel,
12  we always have to be particularly sensitive as well.
13       But the order was -- and, again, my words were probably
14  not precise.  I wasn't thinking about it.  When I said any
15  communications that counsel had -- I think I said with everyone
16  or anyone, something broadly -- I had in my mind the people who
17  conducted the investigation, the non-attorneys.  So that's my
18  view.
19       To the extent there is a dispute of some redactions,
20  perhaps I can help the parties with that now.  I'll let you be
21  heard.
22           MR. CHATTERJEE:  Sure, Your Honor.
23       First thing is there have been no documents produced by
24  Keker so far, so as far as the issues of redactions, I think
25  those are going to be --
```

```
1            THE COURT:  No, no.  With respect to Waymo.  There
2   have been no documents produced by them because you didn't
3   serve them with anything until the subpoena, so they weren't
4   supposed to.
5        Now, in response to my order, which was a Motion to Compel
6   to Waymo, Waymo has produced documents, my understanding is,
7   and that --
8            MR. CHATTERJEE:  And we will discuss those.
9            THE COURT:  -- there are redactions in those.
10           MR. CHATTERJEE:  Yes, but just because Keker is on
11  this one standing at the podium, it seems to me that's what we
12  will deal with with respect to Waymo.
13       Your Honor, to your point on the waiver issue, just what
14  the documents, as limited as they have been and as heavily
15  redacted as they have been, which were given at 8:54 on
16  April -- on the 24th, last Thursday, at the close of discovery,
17  it's very clear that Keker was actually driving the
18  investigation of Anthony Levandowski and --
19           THE COURT:  That's why it's work product.
20           MR. CHATTERJEE:  Okay, Your Honor.  But there's times
21  there is not even an in-house lawyer involved.  And --
22           THE COURT:  It's still work product.  It doesn't have
23  to be an in-house lawyer to be work product.
24       If Uber's in-house was never involved, it's still work
25  product, but what they waived was the investigation done by
```

1  Mr. Brown and those other people.  Directed by Keker.  Got it.

2      So all of Keker's communications with Mr. Brown -- and I

3  think it was -- was it two women?  Two other people or three.

4  I don't know how many people.

5          MR. CHATTERJEE:  It was Mr. Gorman and Ms. Meny.

6          THE COURT:  No, no, not the attorneys; the people at

7  Waymo.  Right?  Mr. Brown did the investigation along with some

8  other non-attorneys.  That's the investigation that they're

9  relying on.

10      Attorneys may have also done another investigation.  They

11  haven't waived the privilege with respect to that

12  investigation.  They're not relying on it.

13      What they're relying on is the investigation that

14  Mr. Brown and his cohorts did, and that's where the waiver

15  applies to.

16          MR. CHATTERJEE:  Your Honor, but there's

17  communications between the Keker firm and these individuals.

18  We have zero confidence that Waymo is producing everything in

19  response to that.

20          THE COURT:  Why?

21          MR. CHATTERJEE:  Because if you look at the redactions

22  and you look at the documents, there's examples.  There are

23  emails that were produced last Thursday that in the string

24  there will say there is an email from, you know, Sasha Zbrozek

25  to Tom Gorman with an attachment.  We don't have that email.

1          THE COURT:  Have you talked to Waymo about that?

2          MR. CHATTERJEE:  We have.  And on many of the

3  instances -- we had a meet and confer with them today.  On many

4  of the instances, they would not commit as to what they were

5  going to do, and they said, *We'll wait until after the hearing*

6  *and we'll meet and confer with you on it.*

7          THE COURT:  Let me hear from Waymo.  Is that

8  Mr. Baker?

9          MR. BAKER:  Yes, Your Honor.  Thank you.

10          THE COURT:  Welcome, Mr. Baker.

11          MR. BAKER:  Thank you, Your Honor.

12      So just to address Mr. Chatterjee's comment about the meet

13  and confer this morning, we did have a meet and confer this

14  morning, and I think we are going to have another one with the

15  Special Master after this hearing now that we have some

16  clarification on the scope of the order.

17      Our view was exactly what Your Honor said -- was that the

18  order meant communications between Mr. Brown and the folks on

19  his team, one of which was Kristenn Gudjonsson, I think might

20  have been the name that you were much searching for, and

21  counsel.

22      We conveyed that to counsel for Otto Trucking at the meet

23  and confer this morning.  And it was not our intent -- it is

24  not our intent to withhold communications between Mr. Brown and

25  his team and counsel for Keker that concerned the investigation

1  that Your Honor was referring to, if such communications exist.

2  And if they think that we have or have improperly redacted,

3  we're happy to address that.

4      But our view of the world was that the scope of the waiver

5  was exactly how Your Honor just articulated and that's what we

6  were producing.

7          MR. CHATTERJEE:  Your Honor, can I give you a couple

8  examples?

9          THE COURT:  Sure.

10          MR. CHATTERJEE:  If I may, I'll give these to opposing

11  counsel.

12      Your Honor, I put together a couple slides here.  If you

13  go to Slide 3, what this is -- and this is Exhibit 14 to Hayes

14  Hyde.  This is an email from Keker & Van Nest to two in-house

15  lawyers at Google, and the *Re* line says "Chauffeur Forensic

16  Investigation."

17      I have given a sample of the document.  You can actually

18  look at the whole document, Exhibit 14.  They have heavily

19  redacted everything about the custodians and about emails

20  associated with the forensic --

21          THE COURT:  You said it went to Uber in-house counsel.

22  Did it also go to --

23          MR. CHATTERJEE:  Not Uber.  It went to Google.

24          THE COURT:  I mean Google.

25      Did it also go to Mr. Brown and the other people, or did

1  it only go to attorneys?

2          MR. CHATTERJEE:  There are -- we don't have all the

3  metadata on all of these.  This particular document, there was

4  no metadata provided, but most of these documents that have

5  been -- that we submitted were things that went to Mr. Brown.

6      And this was their forensic investigation strategy that

7  they used.

8          THE COURT:  Okay.  Wait.  Let me stop.

9      Mr. Baker, why are things -- if they went to Mr. Brown,

10  why are they being redacted?

11          MR. BAKER:  Well, I don't think that it went to

12  Mr. Brown.  I think this document is on our Privilege Log, and

13  I think it shows, though, that it did go to Mr. Gudjonsson.

14      But there are -- there are things that are redacted in

15  here, Your Honor, that we believe are outside of the scope of

16  Your Honor's order, including investigation of other employees,

17  so there are parts where the memo talks about that

18  investigation.  So not the investigation of Mr. Levandowski,

19  Mr. Kshrisagar, or Mr. Raduta.

20      And there are also portions of this email that talk about

21  an investigation that Keker Van Nest was conducting other than

22  the forensic investigation that we are relying on in this case.

23          THE COURT:  Well, some of it I think I'm going to have

24  to review in camera because this is always the thing.  It's

25  hard to slice and dice, and sometimes -- and you see this come

13

```
1   up in patent cases, right, where they'll rely on
2   advice-of-counsel defense with respect to invalidity, but
3   they'll hire someone to do a search, and the general search
4   will involve lots of things, even things that maybe aren't
5   waived, and you can't really slice it out; right?
6        So your slicing has to weigh in favor of disclosure rather
7   than nondisclosure.  It wouldn't necessarily be a waiver of
8   everything else.  In other words, you may have to disclose some
9   things relevant to the investigation of the other employees to
10  the extent it was wrapped up within the investigation of the
11  former employees.
12       MR. BAKER:  Understood, Your Honor.
13       MR. CHATTERJEE:  Your Honor, let me just give you
14  another example.  If you go to the next page -- and this is
15  Hayes Exhibit 6.  If you look at this email, and we can -- I
16  can give you the full one -- there is no question on this one
17  that Mr. Gudjonsson is on the email string; that Ms. Meny is
18  the one who sent it; and they've -- once again, if you look at
19  the email, they've redacted it extensively.
20       The issue here, Your Honor, is we're at the close of
21  discovery --
22       THE COURT:  But, Mr. Chatterjee, the reason we are is
23  because you didn't bring this motion to my attention until
24  later, so that I don't want to hear.  I'll deal with it and
25  we'll deal with it and I'll deal with it again next week if I
```

14

```
1   have to deal with it, but --
2        MR. CHATTERJEE:  Your Honor, they didn't produce the
3   machine forensic record until late in the proceedings.
4        THE COURT:  So bring it to my attention before.
5        I have been, as you know, doing things really quickly.
6   We've all been working on this very challenging deadline.
7   So --
8        MR. CHATTERJEE:  I understand that, Your Honor.  But
9   they didn't even tell us it existed.  And so how -- I don't
10  even know how we could have brought a motion earlier.
11       MR. BAKER:  Your Honor, I don't think that's correct.
12  But to address --
13       THE COURT:  Well, then you knew about Mr. Brown's
14  investigation.
15       MR. CHATTERJEE:  He had been deposed earlier, and
16  we --
17       THE COURT:  And you knew that -- and that he
18  refused -- they asserted the privilege and wouldn't allow him
19  to testify as to what Keker told him.
20       MR. CHATTERJEE:  We filed that motion within a week of
21  having deposed him where they made all those objections.
22       THE COURT:  Okay.  All right.  Well, you need to go
23  back and look at this and look at your redactions.  As I said,
24  you need to waive in favor of disclosure.
25       It's a big deal when you waive the privilege with respect
```

15

```
1   to an investigation.  You've done that.  It's actually the
2   centerpiece of your case.
3        So that waiver needs to encompass all the communications
4   to Mr. Brown.  That's out.  That's out.  Or Ms. Johnson or
5   whoever it is as well.
6        And if there are other things in there, well, if you're
7   going -- I think you should meet and confer.  I think you
8   should err on the side of disclosure.  It doesn't mean it's
9   relevant.  It doesn't mean whatever.
10       And then if you have to bring it to me, I will review them
11  in camera, and I will do it quickly.  But some things just
12  can't be sliced out.  And if it was there -- especially, I
13  think -- and I understand what their argument is.  If it's the
14  same thing -- if it's something different that's being
15  communicated about the -- actually, if it's something different
16  that's being communicated about the forensic investigation of
17  these other employees, I think they're entitled to know that
18  because that goes to the investigation that was done of
19  Mr. Levandowski and the other two.
20       So I guess what I'm saying is I haven't seen and I don't
21  know.  I really think probably you should be disclosing, to the
22  extent it's in the same communication, rather than redacting.
23       MR. BAKER:  Understood, Your Honor.  We will attempt
24  to work it out with Mr. Chatterjee and bring any outstanding
25  issues to Your Honor or the Special Master.
```

16

```
1        THE COURT:  And what we could do, because I know we're
2   on a tight timeline here, is rather than briefing, we could
3   just set a hearing and you can bring the documents here and we
4   can sit here and talk about them and do it in realtime that
5   way.
6        MR. CHATTERJEE:  That's fine with me, Your Honor.
7        THE COURT:  Okay.  So I'll quash the Keker subpoena
8   for now.  I understand what you may see.  Something may come
9   up.  But for now -- well, it's quashed --
10       MR. CHATTERJEE:  We would like to have a 30(b)(6) of
11  Mr. Gorman testifying about his conversations because he was
12  talking to numerous different people involved with this
13  investigation.
14       THE COURT:  At Waymo?
15       MR. CHATTERJEE:  At Waymo.
16       THE COURT:  Yeah.  So talk to the people at Waymo.
17  I anticipated with my order that Mr. Brown would be
18  redeposed because they -- Waymo instructed him not to answer.
19       MR. CHATTERJEE:  And, Your Honor, if you -- in the
20  investigation of the documents that have been produced, it's
21  not just Mr. Brown; it's numerous people that Mr. Gorman was
22  regularly interacting with, some of which is completely
23  exonerated in this entire 14,000 file issue they have been
24  pounding so hard on.
25       THE COURT:  Where is that, because I don't see that in
```

## 17

```
1   front of me?
2        MR. CHATTERJEE:  Sure, Your Honor.  If you go to the
3   slide from Sasha Zborzek to Tom Gorman -- it's the next slide.
4   I think it's No. 6 --
5        THE COURT:  It's Exhibit --
6        MR. CHATTERJEE:  I want to be mindful here,
7   Your Honor, they have designated this as confidential.  I don't
8   want to discuss it in an open courtroom absent an objection,
9   but given that they've have placed this at issue, I don't think
10  it's appropriate to close the courtroom.
11       THE COURT:  So what is the exhibit number?
12       MR. CHATTERJEE:  This is Hayes Exhibit No. 10.
13       MR. BAKER:  Just to be clear, Your Honor, this is a
14  document I think that you just put together for today's
15  hearing.  It's not the exhibits --
16       MR. CHATTERJEE:  The exhibit is listed at the bottom.
17       THE COURT:  No, no.  I understand.
18       MR. BAKER:  We have never seen this before -- that's
19  my only point -- this actual slide presentation.  The documents
20  we've seen, of course --
21       THE COURT:  No, no, no.  I understand.  It wasn't
22  attached to their letter brief.
23       MR. BAKER:  Correct.
24       THE COURT:  Right, right, right.  Okay.
25       I will give you some advice because maybe this will help.
```

## 18

```
1   I don't see why any of this is confidential, but I understand.
2   Everything is designated confidential --
3        MR. CHATTERJEE:  I just don't want to be accused of
4   violating the protective order.  I don't think this is a
5   confidential document, especially given what they've placed at
6   issue.
7        MR. BAKER:  I don't think that I can agree, you know,
8   to --
9        THE COURT:  No, no, no.  We don't have to talk about
10  it.
11       Who is Sasha Zbrozek?
12       MR. CHATTERJEE:  So Sasha Zbrozek is an engineer that
13  works in the Chauffeur Project and he was also in charge of
14  administering the SVN server.  That's the server where they
15  claim 14,000 files were downloaded from.
16       MR. BAKER:  He has been deposed, Your Honor.
17       MR. CHATTERJEE:  And these documents were produced
18  after his deposition.
19       THE COURT:  Okay.  But were they -- produced in
20  response to what?
21       MR. CHATTERJEE:  The privilege waiver.
22       THE COURT:  Oh, the privilege waiver.
23       MR. CHATTERJEE:  This was produced as part of what
24  Your Honor found --
25       THE COURT:  Okay.  So they're producing.
```

## 19

```
1        MR. CHATTERJEE:  I understand, but Your Honor was
2   asking me about the --
3        THE COURT:  No.  So take Mr. Zbrozek's deposition.
4        MR. CHATTERJEE:  Right.  We have a number of people,
5   but the issue is, is that Mr. Gorman was the fulcrum of all the
6   communications with different people at Waymo.  And it's still
7   not clear to me who everyone is.  We are talking potentially 10
8   or 12 different people that he was the fulcrum of getting the
9   information and figuring out what to do.
10       And so it strikes me, Your Honor, that if we weren't at
11  the close of discovery -- and I recognize that we are -- that
12  we would get to depose him for all the information he gathered
13  in his various communications on this investigation, and we
14  would also get to depose the people at Waymo.
15       And I think we're entitled to be able to get his
16  deposition on all of the information that he gathered.
17       MR. BAKER:  Your Honor, if I could just respond to
18  that, Mr. Brown, Mr. Gudjonsson, and Mr. Zbrozek have all been
19  deposed and have all explained exactly what the extent of their
20  communications with Mr. Gorman were.
21       THE COURT:  Yeah.  But they explained it before they
22  had the benefit of those communications.
23       MR. GONZALEZ:  Right.
24       MR. CHATTERJEE:  Not only that, but they instructed
25  not to answer on privilege over and over and over again.
```

## 20

```
1        MR. BAKER:  That's not --
2        THE COURT:  Wait.  Just -- just -- wasn't it before
3   they had these communications?
4        Waymo has taken the position that they get to take --
5   retake depositions after documents and things are produced.
6        MR. BAKER:  Sure.
7        THE COURT:  If you want to go back on that, then we
8   can do that.
9        MR. BAKER:  No.  What I have suggested to counsel for
10  Otto Trucking -- we intend to put Mr. Brown back up for a
11  second deposition.  He is available on Thursday for his
12  deposition.
13       What we have suggested is that they take his deposition.
14  I think that he can provide most, if not all, of the
15  information that was protected by privilege for all of these
16  other witnesses.  And he was a 30(b)(6) witness.  We can prep
17  him on the information to the extent it's not his.
18       And if they need a further deposition after Mr. Brown --
19       THE COURT:  I think they probably want Mr. Zbrozek.
20       MR. BAKER:  Well, they want -- they have asked for ten
21  additional witnesses.
22       THE COURT:  Well, I would think they would get this
23  one.
24       MR. BAKER:  Understood.
25       Our suggestion has been that we put up Mr. Brown first.
```

1    THE COURT:  Yeah.  But apart from Mr. Brown, this one
2  is relevant.
3    MR. BAKER:  Okay.  Understood, Your Honor.
4    But we haven't said no, you know, that we're not amenable
5  to putting up additional witnesses.  We just thought the best,
6  most reasonable procedure would be to take one deposition at a
7  time.
8    MR. CHATTERJEE:  So, Your Honor, this gatekeeper
9  function that they're trying to put in place like *Just take*
10 *Mr. Brown and see what else you need,* at this stage in the
11 proceedings doesn't make sense because what's going to happen
12 is we take his deposition, they will say, *Well, you don't need*
13 *any more.*
14    We had that issue before where they said, *Well, Mr. Brown*
15 *had his investigation of this little narrow category of stuff*
16 *and you don't need anymore stuff.*
17    Well, you know, these documents have Mr. Krafcik's name on
18 conversations associated with the investigation.  They have
19 someone named Chin, who is an HR executive.  The general
20 counsel of Waymo.  And there were -- Nathaniel Fairfield,
21 someone I have never even heard of before, that were involved
22 in these activities.
23    And, you know, we're -- we should be able to seek the
24 discovery around the scope of their waiver and what these
25 people actually knew and did.

1    MR. BAKER:  Your Honor, just because Mr. Krafcik's
2  name is on a document doesn't mean that he was involved with
3  communications --
4    THE COURT:  No, no, no.  I understand that.  But he is
5  making a different argument, which is Mr. Gorman seems to have
6  been the center of this.
7    MR. BAKER:  Right.  And I think that Mr. Gorman had
8  communications with Mr. Brown and Mr. Brown's team and -- about
9  the forensic investigation.  Some of those communications have
10 already been disclosed and the witnesses have testified about
11 them.
12    So, you know, they were never the subject of privilege
13 anyway.
14    Mr. Gorman also had communications with other folks at
15 Keker, other --
16    THE COURT:  We're not talking about that.
17    MR. BAKER:  Exactly.
18    THE COURT:  We're just talking about at Waymo; right?
19 At Waymo.  But he seems to be at the center of those
20 conversations with the people at Waymo.
21    MR. BAKER:  Right.  And I would dispute that.  I don't
22 think that that's the case.
23    I think that his involvement with the Waymo people was,
24 you know, primarily the forensics team.  And we are producing
25 those documents --

1    THE COURT:  That's what he is talking about with the
2  forensic team.  I guess --
3    MR. BAKER:  Mr. Krafcik, though, was not a part --
4    THE COURT:  We're talking about Mr. Gorman I thought.
5    MR. BAKER:  Right.  But he's saying that there are
6  communications between Mr. Gorman where Mr. Krafcik might have
7  been copied, even though he didn't have anything to do with the
8  forensic investigation and therefore he should be brought back
9  for a deposition.  Obviously we disagree with that.
10    THE COURT:  No, no, no.  I know.
11    I guess what I'm saying is why shouldn't you just put up
12 Mr. Gorman.  Maybe that would then eliminate -- then he could
13 answer all those questions.  I didn't --
14    MR. BAKER:  I see.  Instead of the other witnesses,
15 you're suggesting.
16    THE COURT:  Well, do it first.  That's what it seems
17 to be that Mr. Chatterjee is --
18    MR. CHATTERJEE:  Your Honor, we would want Mr. Zbrozek
19 and Mr. Brown and Mr. Gorman.  We would want at least those
20 three as the beginning stage, just because each of these
21 conversations is relevant -- Mr. Zbrozek, by the way, does not
22 work in the security division.  He is an engineer who designs
23 self-driving car features.
24    THE COURT:  Okay.  I said you could have his
25 deposition.

1    MR. CHATTERJEE:  Thank you, Your Honor.
2    MS. HARRIMAN:  Excuse me, Your Honor.  May I have a
3  word as well?
4    THE COURT:  Yes.
5    MS. HARRIMAN:  Susan Harriman of Keker, Van Nest &
6  Peters.  I'm here because I'm general counsel to the firm, and
7  I'm here because if the Court did order a deposition of
8  Mr. Gorman, it would be my responsibility to defend it.
9    It would be a highly unusual move by this Court or any
10 court to order the deposition of an attorney, particularly when
11 that same information can be obtained from non-attorneys, from
12 the parties to the case.
13    THE COURT:  Well, if it can be.
14    MS. HARRIMAN:  And it sounds quite clearly like it
15 can.  It just sounds like counsel would rather cut it short and
16 say, *Okay, it's faster to take the attorney's deposition.*
17    THE COURT:  No.  What Mr. Baker was saying is we're
18 just going to do it one at a time.
19    I think then what you need to do is get them scheduled.
20 Do them in an order that makes sense.  Do them priority; right?
21 Do them priority in an order that makes sense.
22    If at some point you think they have it and it's just
23 harassment, then I can address it at that time, but get them
24 scheduled.
25    I'm excluding Mr. Gorman.  Okay.

1    MS. HARRIMAN:  For now what I understand -- at least
2  for now, is that the subpoena against Keker, Van Nest & Peters
3  has been quashed.
4    THE COURT:  It has.
5    MS. HARRIMAN:  Whether you visit that -- okay.  That's
6  all I need to know.
7    MR. GONZALEZ:  Your Honor, just briefly.  I'm trying
8  not to intervene here.
9    Ms. Kristenn Gudjonsson -- I don't know her name.
10   MR. CHATTERJEE:  It's a *mister*.
11   MR. GONZALEZ:  Oh, thank you.
12   THE COURT:  I think that's what I was getting mixed
13  up, too.  It's our implicit bias.
14   MR. GONZALEZ:  One thing I'm going to strongly
15  encourage you to do, you have got to make these records public.
16   Mr. Chatterjee actually made a mistake.  They're not
17  designated *confidential*.  They are designated *AEO*.  So I have
18  not even been able to tell my client that there are documents
19  that have just been produced that show that these 14,000 files
20  that they've --
21   THE COURT:  Wait.  We're not -- you're doing argument.
22   What I want you to do after today, sit down and go over
23  those designations.
24   MR. BAKER:  We will, Your Honor.
25   THE COURT:  Because I do not know why this -- it's

1  certainly not AEO.
2    MR. BAKER:  Understood.  We will --
3    THE COURT:  Go through all of them.  Sit down
4  together.
5    MR. BAKER:  If I could just ask for a point of
6  clarification on scheduling the deposition, as I say, Gary
7  Brown we have already made -- he is available on Thursday.  I
8  will talk to counsel for Otto Trucking.
9    Mr. Zbrozek, we will get a date for him as well.
10   And for the rest of the witnesses -- they have, I think,
11  five or six additional witnesses.
12   THE COURT:  Well, what about the *mister* that we
13  thought was a *miss*?
14   MR. GONZALEZ:  Kristenn Gudjonsson, Your Honor, is all
15  over these documents.
16   THE COURT:  Yes.  I see him.  He's very involved.
17   MR. BAKER:  He was one of the members of the forensic
18  team, that's true.
19   So we could get a date for him as well.  And then at that
20  point, I mean -- my question is should we get dates for all of
21  the other witnesses that they've asked for, including
22  Mr. Krafcik?
23   THE COURT:  Well, who else is there going to be?
24   MR. CHATTERJEE:  There would be -- let me get my
25  notes, Your Honor.

1    There is Mr. Vosen, who is also very involved in the
2  investigation.  He is the general counsel of Waymo, I believe.
3    THE COURT:  No, no, no.  We're not doing counsel.  We
4  were doing the people that did the investigation, the
5  non-lawyers that did the investigation; right?  These are the
6  people -- I understood that the main people involved in that
7  investigation were Mr. Brown and Mr. Gudjonsson.
8    MR. BAKER:  Gudjonsson, yes.
9    MR. CHATTERJEE:  And then also Mr. Zbrozek.
10   THE COURT:  Mr. Zbrozek; right?
11   MR. CHATTERJEE:  And then there are three other people
12  whose names show up in the records that provide information to
13  help frame search terms and things like that.
14   THE COURT:  Okay.  All right.  But you have those
15  communications of them helping frame it, and who did the
16  search, though, was Mr. Brown, Mr. Zbrozek, and Mr. Gudjonsson.
17   MR. CHATTERJEE:  Correct, Your Honor.  But what this
18  has done is identified that they have factual knowledge that
19  weren't previously in documents, and they are relevant to the
20  investigation.
21   And so, for example, there has been quite a hullabaloo
22  created by Waymo on Odin Wave or Tyto LiDAR.  There is
23  extensive commentary in these documents about those companies
24  and about people who know about them.  And --
25   THE COURT:  What relevance is that?

1    MR. CHATTERJEE:  Because they were -- I'm not sure
2  exactly why they think it's so relevant --
3    THE COURT:  No.  Why do you think it's relevant that
4  you need to depose them?
5    MR. CHATTERJEE:  Because it's relevant to be able to
6  show that -- while they are saying that Mr. Levandowski hid
7  this information from people, it's relevant because it
8  contradicts that.
9    THE COURT:  That's a very different argument than was
10  made with respect to this motion that's in front of me right
11  now.
12   So these three, go ahead and schedule and take.  First,
13  though, you're going to need to sit down and work out the
14  redactions and unredact because you don't want to take their
15  depositions without it all fully unredacted because then we
16  will just have to come back and do it again.
17   MR. BAKER:  Understood.
18   THE COURT:  And also sit down with them today and work
19  on the designations, confidentiality designations.
20   Then you can meet and confer as well, with the assistance
21  of the Special Master, if need be, as to any additional ones.
22   You are going to have to make some showing that they are
23  needed.
24   MR. CHATTERJEE:  We can work on that, Your Honor.
25  These are all documents that just came in Thursday so we

1  will --

2        THE COURT:  No.  I understand.

3        MR. CHATTERJEE:  Your Honor, I would I would like to

4  ask that the depositions occur here in Northern California

5  because Mr. Brown is on the East Coast.  If they are going to

6  make him available on Thursday, I don't know when I'm going to

7  get the unredacted --

8        MR. BAKER:  He was deposed in New York for his last

9  deposition, and we would ask that he be deposed in New York

10  again.  I don't know --

11        THE COURT:  Why?

12        MR. BAKER:  That's where he is located.

13        THE COURT:  I know.  But you can fly him out Thursday

14  morning even or Wednesday night.  He can be back, so it doesn't

15  cut into his personal life, which I understand it only cuts

16  into his work life, which is Waymo's work life, so that's okay.

17  He should have to come out.

18        MR. BAKER:  One other question on the depositions,

19  Your Honor.  In terms of the time limits, I would assume that

20  we're not talking about a full-day deposition just to go back

21  over privileged questions and things that reasonably flow from

22  questions where we privileged up before.

23        THE COURT:  I just don't know how -- I can't say.

24        MR. BAKER:  Understood.

25        THE COURT:  There are documents that have been

1  produced.  Of course it's about what Mr. Brown is essential

2  witness for; right?  It's not a peripheral matter.  His

3  investigation is what he is being offered for.

4        MR. BAKER:  Okay.  Understood, Your Honor.  Thank you.

5        MR. CHATTERJEE:  Your Honor, I want to push back a

6  little bit on that because that machine forensic record, which

7  Your Honor reviewed, it had contributions from multiple people,

8  including Mr. Gudjonsson.

9        THE COURT:  You are pushing back against what?

10        MR. CHATTERJEE:  It sounded like you were just

11  narrowing it to what Mr. Brown knew and what he did, but it's a

12  larger group of people.

13        THE COURT:  No, no, no.  But the deposition of

14  Mr. Brown.

15        MR. CHATTERJEE:  Oh, I see.  I misunderstood you,

16  Your Honor.

17        THE COURT:  Okay.  All right.  Okay?

18        MR. BAKER:  Thank you, Your Honor.

19        THE COURT:  I'm sure you will be back on that.

20        MR. CHATTERJEE:  I think that resolves the Motion for

21  Protective Order and the Motion to Quash?

22        THE COURT:  Yes.

23        MR. CHATTERJEE:  Okay.

24        THE COURT:  Let's talk about Mr. Levandowski's

25  assertion of the attorney-client privilege with respect to, I

1  think it's, the meetings that occurred.

2        And do we have counsel for Mr. Levandowski here?  Oh,

3  there you are, Mr. Ehrlich.

4        And Ms. Baily we have for Waymo.

5        So as I understand it, so we have -- well, Mr. Ehrlich was

6  retained March 19.  As I understand, Waymo's position is that

7  any meetings that Mr. Levandowski had at which his attorneys

8  were not present are not protected by his attorney-client

9  privilege.

10        MS. BAILY:  Right, Your Honor.

11        The basis for that being that the common interest

12  privilege, which is all that we've heard about from

13  Mr. Levandowski, is a non-waiver doctrine, and Mr. Levandowski

14  hasn't pointed to an actual attorney-client privileged

15  communication.

16        THE COURT:  Well, what he pointed to was *United States

17  vs. Austin*.  *United States vs. Austin*.  So what do you do with

18  that?

19        MS. BAILY:  Well, I actually think *Austin* and *Gonzalez*

20  are further afield than *Schwimmer* was.

21        *Austin* was communications between clients outside of

22  counsel's presence.  And I believe the lower court found that

23  there would not be a common interest privilege.

24        THE COURT:  I think what the Ninth Circuit said in

25  there was that a party, once there is a joint defense

1  agreement, they're on the same side, they are co-defendants,

2  which is essentially what we have here for all intents and

3  purposes.  That the client of one attorney could speak to the

4  attorney for a co-defendant and that the privilege applies and

5  there is no waiver.

6        MS. BAILY:  Well, there's a quote.  I mean, first of

7  all, it's not an issue that was actually addressed and decided

8  in Austin.  They actually found that they could not address --

9        THE COURT:  Ms. Baily, I am positive -- I practiced

10  for a long time.  You have, too.  I am positive Quinn

11  Emanuel -- that there are hundreds of lawyers that sit there

12  and they have co-defendants, and that the clients for one

13  lawyer sits there and has conversations with the Quinn lawyer

14  and you would claim that it's privileged.  I'm confident of

15  that.

16        I know I did it.  That's the way we all operate.  That's

17  all that's happening here.

18        Now, the question is did that not start -- that started

19  already April 11th, 2016.  And then we have the deal closes.

20  And did that change, somehow eviscerate that joint defense

21  agreement?  And did it not then coming into being until

22  Mr. Ehrlich got here and he said he had a conversation with

23  Uber's in-house counsel.  I believe you said in your

24  declaration in which you confirmed -- because a joint

25  defense -- that's how I see it; right?

1   So I guess what I'm trying to figure out is, is it really
2   Waymo's position that a co-defendant can't have a conversation
3   with a co-defendant's attorney when there is a joint defense
4   agreement?
5       MS. BAILY:  Well, it -- that might not be our broad
6   position, but I still think you need to point to facts that
7   imply that the common interest was being furthered and that
8   there are privileged communications underlying it.
9       THE COURT:  The common interest of being furthered is
10  that Uber has an indemnification obligation, right, which still
11  existed in April 2017 and March 2017, just as it did in April
12  2016.  So that's still there.
13      MS. BAILY:  Understood, Your Honor.
14      I would like to raise some circumstances here that I think
15  have colored our view about this.  It's just -- it's been a
16  little bit frustrating because Mr. Levandowski was aware that
17  Uber was disclosing the communication that they're now --
18      THE COURT:  Well, that's different.  The March 29th
19  one -- the March 29th; right?  So let's put that to the side.
20      But because what -- but what this motion was about,
21  though -- because you have that information.  They submitted a
22  declaration, Ms. Padilla did.
23      What you have actually now sought, I thought by this, was
24  actually the first meeting that day of March 29th, as well as a
25  meeting that Mr. Bentley had sometime in late February or early

1   March; right?
2       MS. BAILY:  Right.
3       THE COURT:  Okay.
4       MS. BAILY:  Right.  But I think the way that it ties
5   in is that Mr. Levandowski was aware that Uber was putting out
6   this communication as not privileged and sat basically on it,
7   on their hands, to see how the Court would rule and whether the
8   bonus theory would come in because they were aware of the
9   communication by July 7th that Uber was sort of touting this
10  communication as an alternative theory, and then the press is
11  reporting on this.
12      And so the thing that's frustrating is that
13  Mr. Levandowski was basically waiting to see where the chips
14  would fall, and then when they weren't falling in the right
15  direction, they said, *Oh, no.  Actually all of this is*
16  *privileged.*
17      And so in the same way that Uber waived, there is just
18  this tacit waiver also by Mr. Levandowski that's problematic
19  here.  And the reason why it's even more problematic is because
20  in these last few days of discovery, we've seen evidence that
21  Mr. Levandowski's helping the defendants behind the scenes.
22  Right?
23      So what we're told is, *Mr. Levandowski isn't cooperating,*
24  *Mr. Levandowski isn't involved.  We can't get him to cooperate.*
25  And then we see evidence actually he is.  And so this is part

1   and parcel of that.
2       And so from the perspective of waiver, when Uber waived
3   and Mr. Levandowski didn't say a thing about it,
4   Mr. Levandowski waived also.
5       THE COURT:  Okay.
6       MR. EHRLICH:  Just to address the facts on that, my
7   understanding -- I conferred with Mr. Ramsey -- is we were
8   notified -- or the attempt to notify us that this disclosure
9   was going to be made was made about an hour before the actual
10  filing from a call from Martha Goodman to Mr. Ramsey.  They did
11  not actually connect and speak live until, I understand, two
12  hours after the filing had been made, which referenced this
13  comment.
14      Once it became clear that -- I know it was on the 11th I
15  was in Washington, D.C. for the Federal Circuit argument.  Once
16  it became clear that Uber was taking the position that there
17  was a waiver over these conversations, we wrote a letter to
18  Uber's counsel making clear that we believed that --
19      THE COURT:  Not a waiver.  They took the position that
20  it was not a waiver.
21      MR. EHRLICH:  I'm sorry.  That it wasn't privileged.
22  That's correct.  They were taking the position that it wasn't
23  privileged.  We told them we disagreed.  We believed it was
24  privileged.  We wrote a letter to that effect and we said
25  Mr. Levandowski is not waiving.

1       THE COURT:  But you didn't do it before the hearing.
2       MS. BAILY:  Right.
3       THE COURT:  What was represented to me -- no one else
4   raised it.  I raised it.  You weren't here, and I raised that
5   Mr. Levandowski may have an interest.  And what Ms. Dunn told
6   me was that as a courtesy, it was -- the filing was provided to
7   Mr. Levandowski's counsel, creating the implication that there
8   was no objection from -- I know you weren't here, but that was
9   the implication that was created at that hearing because I
10  wouldn't have had to go through all of that if you had been
11  here and objecting.
12      So that's what Ms. Baily is raising.  You were -- the
13  filing was made I don't know how long before the hearing.
14      MS. BAILY:  The filing -- the first filing -- I
15  actually don't have that date in front of me.
16      THE COURT:  The hearing was Wednesday, I think, 11,
17  10, 9 --
18      MR. EHRLICH:  Yes, the 10th.  If the hearing -- I was
19  in Washington, D.C.  Our argument was on the 11th.
20      THE COURT:  Right.  And the hearing was the 9th, but
21  other counsel who were at that hearing on the 11th were here on
22  the 9th.
23      MS. BAILY:  And, Your Honor, the thing that sort of
24  compounds this is on July 7th, Uber filed its proposed trial
25  examination of Mr. Levandowski.  And there is a question in

1   there that says, "You admitted to Travis Kalanick that the
2   reason you downloaded confidential Google files was to protect
3   your ability to receive your bonus."
4         THE COURT:  Yes.  And to that he will take the Fifth.
5         MS. BAILY:  Right.  But the notion -- but that -- the
6   privileged communication is here on July 7th in the trial
7   examination.
8         So Mr. Levandowski knows, I assume, that his counsel read
9   the examinations of Mr. Levandowski that were filed with the
10  Court, and so even then, as of July 7th, Uber is putting forth
11  this communication that Mr. Levandowski now says is privileged,
12  and they didn't say a word about it.
13        MR. EHRLICH:  Maybe this is -- this is the source of
14  the confusion.
15        To the extent there is a communication just between
16  Mr. Levandowski and Mr. Kalanick, without counsel present, we
17  have no basis to say that's privileged.
18        We learned -- I think this is -- this is where we woke up
19  to the problem, is once we learned that the suggestion was that
20  Ms. Padilla was present for a conversation --
21        THE COURT:  I got it.
22        MR. EHRLICH:  -- and where this conversation occurred,
23  then we acted very expeditiously to protect the privilege.
24        THE COURT:  Yeah.  And that's not your fault; frankly,
25  that's Uber's fault, delayed in disclosing that that was the

1   source, because everyone -- I know that that was my impression,
2   was that it was a conversation just between Mr. Levandowski and
3   Mr. Kalanick.
4         MS. BAILY:  I'm still not sure why Mr. Levandowski
5   wouldn't have conveyed to Uber before that hearing that there
6   was a problem here.  But --
7         THE COURT:  Talking about waiting, I thought Waymo
8   didn't want this to come in.
9         MS. BAILY:  Well --
10        THE COURT:  So that's what Judge Alsup ruled; that's
11  what I ruled.  Right?
12        MS. BAILY:  Right.
13        THE COURT:  So what is -- so what are we doing here
14  now?
15        MS. BAILY:  Well, just -- Judge Alsup did say we were
16  entitled to explore the scope of the waiver.
17        THE COURT:  He said you could.
18        MS. BAILY:  And with respect to information about the
19  download of files, we have been kept from learning pretty much
20  any information about it by all of these assertions of common
21  interest privilege and other privileges.
22        THE COURT:  Okay.  So let me stop you.
23        What is your position with respect to, at least once
24  Mr. Ehrlich -- and he put in a declaration that said *I spoke*
25  *to* -- I can't remember who --

1         MR. EHRLICH:  Mr. Gonzalez.
2         THE COURT:  -- *Mr. Gonzalez to confirm that the joint*
3   *defense agreement applies this point.*
4         Is it your position that Mr. Levandowski still does not
5   have an attorney-client privilege with respect to those, like,
6   March 29th conversations?
7         MS. BAILY:  It depends on the subject matter of the
8   communication.
9         THE COURT:  Well, we know what it is.
10        MS. BAILY:  Right.  For that Minneapolis
11  communication.
12        THE COURT:  No.  The one before that; right?
13  Ms. Padilla said there was a meeting before that in which
14  Mr. Levandowski came in halfway through or he left halfway
15  through.  I can't remember.  And there were several attorneys
16  there, and Mr. Kalanick and Mr. Levandowski.  What about that
17  conversation?
18        MS. BAILY:  If there was confirmation that the joint
19  defense agreement should apply and lawyers were there --
20        THE COURT:  Okay.  Good.  I think that's -- I
21  appreciate that.  Okay.
22        So now what we look at then is -- and we -- and I already
23  found -- you disagreed, but that's okay.  Everybody disagrees
24  with me in this case.  I give something to everybody -- that as
25  of April 11th there was -- because they were on the same side

1   at that point.  Uber had the indemnification obligation -- that
2   there was a joint defense agreement, right, at that point?
3         So your argument is then come February when Mr. Bentley
4   has that conversation -- because we're only talking about now
5   one conversation with Mr. Levandowski, that that one is not
6   privileged.  That somehow the joint defense privilege
7   disappeared.
8         Why is that?
9         MS. BAILY:  In the February time frame?
10        THE COURT:  In the February, early March, before --
11  Mr. Ehrlich concedes it's before he was officially retained.
12        MS. BAILY:  Well, I think -- I mean, the same -- there
13  are a couple of things.
14        I think the same strictures would apply.  If there is
15  evidence that everybody understood that there was a common
16  interest and it's stated at the beginning of the meeting and
17  the contents of the meeting further the common interest, then I
18  think we would have to agree that the common interest would
19  apply.
20        It depends on the facts, right, that everybody agrees that
21  there's a privilege and that the contents of the communications
22  actually reflect the common interest.
23        THE COURT:  Well, there is a common interest.  I mean,
24  Uber -- I mean, I assume it had to have occurred after Waymo
25  sued Uber, right, and there is this allegation made, and so

1  what's the first thing you do?  You talk to the person who is
2  being accused, who at that time is employed.  And I understand
3  that doesn't necessarily mean he would have an individual
4  attorney-client privilege.  There is a test the Ninth Circuit
5  sets forward with that.
6      But in this case given that he had had individual counsel,
7  that there is this separate -- I mean, this allegation relates
8  directly to this indemnification, and actually -- has he been
9  sued in arbitration at this point already?
10      MR. EHRLICH:  He had.
11      THE COURT:  Yeah, yeah, yeah.
12      MR. EHRLICH:  And there is a wrinkle.  It's not just
13  that there was this common interest joint defense agreement
14  since April 11, 2016.  They were anticipating the very
15  litigation.  Now --
16      THE COURT:  That we're in.
17      MR. EHRLICH:  -- it's happening.  Yes.  And
18  Mr. Levandowski does still have -- did still, even before we
19  got on the scene, have personal counsel.  He had Mr. Gardner.
20      But equally important, Morrison & Foerster was
21  representing Mr. Levandowski individually in the arbitration,
22  and Eric Tate and the others from MoFo were present for this
23  very conversation.
24      THE COURT:  No, no, no.  Not the one -- I don't think
25  so.  I thought the one that Mr. Bentley talked about -- he was

1  there, another in-house counsel from Uber was there, and
2  Mr. Levandowski, and that's all.
3      MR. EHRLICH:  I believe -- I looked at the transcript.
4  He referenced, I think, Mr. Eric Tate and Rudy Kim.  I don't
5  know if counsel can confirm.
6      THE COURT:  Well, it doesn't matter.
7      MS. BAILY:  There are different communications.
8      THE COURT:  I think it was a little confusing, but I'm
9  satisfied that in the unique situations of this case, that the
10  joint defense agreement still applied and he had -- therefore
11  had a privilege.
12      MS. BAILY:  Understood, Your Honor.
13      I would point out that at the time of the communications
14  when MoFo was present, you know, MoFo was conflicted out of
15  representing Mr. Levandowski --
16      THE COURT:  That's a problem for MoFo, not for
17  Mr. Levandowski.  We wouldn't hold that against
18  Mr. Levandowski.
19      MS. BAILY:  Right.  But they weren't representing him
20  in this case anymore, and of course the 14,000 documents are,
21  you know, at the heart of this case.
22      So we could disagree at the margins.  I understand
23  Your Honor's ruling.
24      THE COURT:  No.  I understand.  I understand.  It's
25  all -- we're all kind of in somewhat uncharted or

1  rarely-explored area here, but that's -- that's my -- I think
2  that's my view here with respect to that.
3      My other ruling still stands.  Because of that, I think
4  they cannot be allowed to put in that March 29 conversation.
5      Now, you had an additional issue, which is you wanted
6  me -- was there something -- the claw back; right?
7      MR. EHRLICH:  I think that relates to the protocol.
8      THE COURT:  Oh, the protocol.  I'm mixing it up.
9      All right.  That takes care of that one, then.
10      MR. EHRLICH:  I will check the email to see if we get
11  a ruling before then.
12      MS. BAILY:  Thank you, Your Honor.
13      THE COURT:  Okay.  How about -- we will have
14  Mr. Chatterjee come back up with Otto Trucking's request for --
15  well, with respect to the documents and what searches that
16  Waymo has done.
17      So that would be Mr. Baker again.
18      MR. BAKER:  Yes, Your Honor.
19      THE COURT:  All right.  So I really think you guys
20  should have been able to figure this out somehow.
21      There is three categories here.  One is Otto Trucking made
22  a request for the SVN log data, and Waymo responded, *We
23  produced two September 2015* -- am I about to say anything that
24  is confidential, like the retention policy?
25      MR. BAKER:  No.  I think it's okay, Your Honor.

1      THE COURT:  That they have a retention policy of one
2  year.  They looked on September 26, 2015, so that they went
3  back one year.  And they actually kept that retention policy
4  going until March of 2017, in which case it was stopped; right?
5      MR. BAKER:  Correct.
6      MR. CHATTERJEE:  Yes and no, Your Honor.  They did it
7  as -- they held on to the data as to Anthony Levandowski, but
8  not as to others.  But they held on to certain pieces of
9  information and then later on they did a full-on hold.
10      THE COURT:  Okay.  So you know all that.  They said
11  it.  So what is it that you want?
12      MR. CHATTERJEE:  So, Your Honor, with respect to that
13  specific issue, the issue is this:  Is they did a number of
14  representations in -- in meet and confers --
15      THE COURT:  I want you to separate two, because I
16  think there is two categories.  One is when they said, *We can't
17  produce something because it doesn't exist* and the second is *We
18  won't produce it because it's not proportional.*
19      Let's talk first about the category *we can't produce.*
20      MR. CHATTERJEE:  We'll start with the SVN.
21      When they made that representation on those facts, what we
22  wanted to do is have it in a way that it would be admissible at
23  trial so we could raise that issue, and we actually gave the
24  email from Jeff Nardinelli as a 30(b)(6) topic where they
25  designated Mr. Brown.

1    When I deposed Mr. Brown --
2        THE COURT:  I read it.  He couldn't answer it.  Okay?
3    That was wrong.  He should have been able to and he might.
4        MR. CHATTERJEE:  So then we did something really
5    simple.  We said let's do it as a stipulation that is
6    admissible at trial, and they wouldn't do that either.
7        And --
8        THE COURT:  Let me stop you.  Let's look at that
9    stipulation and just on the retention of the SVN logs.
10       So, Mr. Baker, is there anything there in paragraph 3, 4,
11   5, or 6 that is inaccurate?
12       MR. BAKER:  Can you --
13       THE COURT:  It's Exhibit 11 to their motion.
14       Mr. Chatterjee, if I can remind you, the way it works is
15   when you file a motion, you keep all the papers and then
16   deliver them in a binder to me with everything together.
17       MR. CHATTERJEE:  My apologies, Your Honor.
18       MR. BAKER:  Your Honor, we are looking at which
19   paragraphs again?
20       THE COURT:  3, 4, 5, and 6.
21       MR. BAKER:  No. 5 is certainly wrong.  I mean, the
22   data that we have, Your Honor, is -- for Anthony Levandowski is
23   from September 2015 to September 2016.  And the data that we
24   have for all of the other engineers is from, I believe, March
25   of 2016 to March of 2017.

1        That's the data that exists, and all of that data has been
2    produced.
3        MR. CHATTERJEE:  That isn't true, Your Honor.  They
4    haven't produced data for other years.  They did a sampling of
5    data for other years.
6        MR. BAKER:  That's incorrect, Your Honor.
7        THE COURT:  Well -- so wait.  So paragraphs 3, 4, and
8    6 are accurate.
9        MR. BAKER:  The wording of 4 -- and this is part of
10   the problem with the way that it's been presented.  I'm not
11   comfortable with 4 --
12       THE COURT:  So this is the answer then:  Mr. Brown was
13   designated as a 30(b)(6).  He is going to be redeposed on
14   Thursday.  Ask away.
15       As to his retention, this time have him prepared because
16   he wasn't prepared.
17       MR. BAKER:  Understood, Your Honor.
18       THE COURT:  He wasn't prepared.  What he says -- you
19   know, he should know.  He needs to sit down with
20   Mr. Nardinelli.  He's the one who did -- that's not you?
21       MR. NARDINELLI:  It is me.
22       THE COURT:  Oh, it is you?
23       MR. NARDINELLI:  But I wasn't the one who did that
24   part.
25       THE COURT:  You can speak.  You can speak.  Oh, that

1    is you.  Okay.  The mysterious Mr. Naridnelli.
2        MR. BAKER:  Let me introduce you to Mr. Nardinelli.
3        THE COURT:  So then you have it under oath there, the
4    explanation that they have now given in writing many times.
5    Okay?  So he can do that then.  Right?  That will take care of
6    that.
7        MR. CHATTERJEE:  Sure.  Presuming he is prepared,
8    Your Honor, it will.
9        THE COURT:  He will be prepared.  This time he will
10   be.
11       MR. BAKER:  Yes, Your Honor.
12       THE COURT:  Mr. Baker promises.
13       So now as to the work station, my understanding what
14   happened here is he had a work station.  It was assigned to
15   him.  When he left, it was assigned to somebody else.  No
16   forensic image was taken of it so there is no forensic image
17   available because it was assigned to a new employee; right?
18       MR. BAKER:  Correct.
19       THE COURT:  So can Mr. Brown testify -- he testified
20   to it somewhat in his deposition.  He did say that it wasn't
21   available.  What's missing from what he testified to?
22       MR. CHATTERJEE:  Many of the things, Your Honor.  And
23   the issue is, is he was not a designated 30(b)(6) for this
24   topic.  And we had given a topic on really the forensic -- the
25   log data, and that's what he had been designated for.

1        He did testify that they didn't check to see if a card
2    reader had been attached to the work station, which was
3    paragraph 9 that's on here.
4        I think -- I don't know if there's anything here that they
5    really dispute.
6        THE COURT:  So could you -- Mr. Baker, could Mr. Brown
7    be prepared to testify to these things as well?
8        MR. BAKER:  Well, he can be.  The only other thing I
9    would add, Your Honor, is that Mr. Gudjonsson also testified
10   about the work station.  That was really his part --
11       THE COURT:  Whichever of the two, because he is going
12   to be deposed in any event.  In other words, I'm figuring the
13   way that they can get this information in admissible form is to
14   have whoever testify to it since they are going to be deposed
15   in any event.
16       MR. BAKER:  We can do that, Your Honor.
17       THE COURT:  So now as to the production of the log
18   information, here's the rub:  You didn't move to compel it.
19       MR. CHATTERJEE:  Your Honor, we didn't move to compel
20   it.  We can still do that.
21       THE COURT:  No, you can't.  No, you can't.  You made a
22   strategic choice, which was *instead of moving to compel, we're*
23   *going to try to get some fact out there that they refused to*
24   *produce it.*
25       That's not the way it works.  If they don't produce it

49

```
1   because they don't have it, fair enough.  Let's get that under
2   oath.
3        Here they're not saying they don't have it.  They're
4   saying it's disproportional, it's not relevant.
5        That is an issue you bring to me.  That is not an issue
6   that you then say I'm going to get a stipulation from them that
7   they refused to produce it.
8        MR. CHATTERJEE:  We were trying to obviate the need
9   because they had actually made these representations, and the
10  Special Master had said that when they make those
11  representations, those are binding upon them.
12       THE COURT:  And you have their emails?
13       MR. CHATTERJEE:  They're not admissible at trial, Your
14  Honor; they're counsel argument.
15       We want a sworn statement as to it being overly
16  burdensome.
17       The other concern I have, Your Honor, is we did do a
18  30(b)(6) on this topic, and Mr. Brown was the same person.  He
19  testified that this information is kept indefinitely.  And he
20  also said that about the SVN data.
21       THE COURT:  They're not saying that they don't have it
22  with respect to this other log data.
23       MR. CHATTERJEE:  I don't know whether they do or not,
24  Your Honor, because Mr. Brown wasn't prepared on the SVN log
25  data.  I don't know if he was prepared on this or not.
```

50

```
1        MR. BAKER:  Your Honor is correct.  We are saying it's
2   overly burdensome.
3        THE COURT:  Well, do you have it?
4        MR. BAKER:  We have -- for the Armada, Camp, and Bit9,
5   data, we have it, and Mr. Brown has explained -- he's explained
6   this to counsel for Otto Trucking -- that it could take him a
7   full week's work of worth to pull the data that they are asking
8   for, and it has no relevance to the case.
9        And to the point about the Motion to Compel, we had
10  several meet and confers about this data.  We explained in --
11  both on the phone and in subsequent emails exactly what our
12  position was, and counsel for Otto Trucking came back and said,
13  We're evaluating your position and we will let you know if we
14  want to move to compel, and they never did.  So that's --
15       THE COURT:  Okay.  All right.  Well, Mr. Brown or
16  Mr. Gudjonsson will testify as to those first two things.  I'm
17  not going to require them to testify -- you should have brought
18  a Motion to Compel if it's important information.
19       MR. BAKER:  Thank you, Your Honor.
20       MR. CHATTERJEE:  Your Honor, we are still within the
21  10-day window.  I would like to bring a Motion to Compel.
22       THE COURT:  10 day.  What 10 day?
23       MR. CHATTERJEE:  I thought the rule was 10 days after
24  close of discovery.
25       THE COURT:  I think it's seven.
```

51

```
1        MR. CHATTERJEE:  Seven?  We can still bring it.
2        THE COURT:  You can.  And I will rule.  But you are
3   going to have to show relevance and proportionality.  And I
4   tell you, in this case, it's not so much the case, but I will
5   just give you advice for your other cases out there.
6        Always at the end of the discovery at that seven days, we
7   get the motions, and the magistrate judges or the district
8   court judges, we all know it's what was left at the end and so
9   it's not as important.
10       So you are going to have to dispel -- I'm just being
11  candid with you -- dispel that assumption that is already out
12  there.
13       MR. CHATTERJEE:  There is actually an important issue
14  here because on those documents that they produced on Thursday
15  night, there is actually emails from Mr. Brown saying that
16  their log data is unreliable.
17       THE COURT:  Okay.  Well, then you can do that,
18  incorporate that and bring that.  It's just seven days; right?
19       MR. BAKER:  I think that is correct.
20       THE COURT:  I was counting the 31st as being the last
21  day.
22       MR. CHATTERJEE:  I might have been thinking business
23  days, Your Honor.
24       THE COURT:  Believe me, I understand that probably
25  we'll be doing discovery up through trial.  I understand that.
```

52

```
1   I'm hoping it will slow down.  Okay.
2        MR. BAKER:  Thank you, Your Honor.
3        MR. CHATTERJEE:  Thank you, Your Honor.
4        THE COURT:  Let's see.  So I think we're left with,
5   right, the Stroz protocol; is that right?  So let me have
6   everybody who's here for anybody, and I think -- for
7   Mr. Lior -- I always want to call him Mr. Ron.
8        MR. PATCHEN:  Mr. Ron.
9        THE COURT:  It is Mr. Ron.  We have Mr. Patchen --
10  everybody should state their name for the court reporter.
11       MR. PATCHEN:  Good afternoon, Your Honor.  Jonathan
12  Patchen on behalf of non-party Lior Ron.
13       MR. BROWNSTEIN:  Good afternoon, Your Honor.  David
14  Brownstein on behalf of Colin Sebern.
15       MR. EHRLICH:  Good afternoon, Your Honor.  Miles
16  Ehrlich on behalf of Mr. Levandowski.
17       MR. JUDAH:  James Judah on behalf of Waymo.
18       MS. BLUNSCHI:  Good afternoon.  Melanie Blunschi on
19  behalf of nonparty Stroz Friedberg.
20       THE COURT:  Good afternoon.
21       This is sort of -- when I was thinking about this --
22  everyone is on the same page in the sense that Waymo does not
23  want photos -- all that personnel information they don't want.
24  They don't need.  They get that.
25       And what I understood Mr. Levandowski's primary objection
```

53

```
1   to be was attorney-client privilege and that his claim was he
2   didn't waive that because Stroz did not provide -- because of
3   the protocol, did not provide those privileged documents to
4   Uber; right?
5          MR. EHRLICH:  Correct.  They were intentionally
6   screened out so there was no intentional disclosure.
7          THE COURT:  That is an interesting argument.  I don't
8   know what the answer is.  You will argue that it's -- I don't
9   know.
10         What I do know is the heart -- the heart here is that due
11  diligence report; right?  Because Stroz did this forensic
12  investigation to find out about the pre-signing bad acts and
13  the like, which is what your case is about.  So that's the main
14  thing.
15         And when the Federal Circuit rules, you either get it or
16  you don't get it.  That's your number one priority.
17         This other stuff, which will not be included in the due
18  diligent report because Stroz, for whatever reason, did not,
19  may be relevant, I'm not disagreeing, but it's certainly the
20  icing.  It's less important.
21         MR. JUDAH:  It is and it isn't, Your Honor.  You've
22  seen the Stroz due diligence report.  Some people standing up
23  here have as well.  Waymo hasn't.  We don't know what's in
24  there.
25         We also don't know what's in the devices and the
```

54

```
1   information that was not ever even searched by Stroz.
2          What is in there, the fact -- it may not be a coincidence
3   that somehow the protocol that Mr. Levandowski and Uber agreed
4   to excluded --
5          THE COURT:  No, no, no.  I get you.
6          MR. JUDAH:  So for that reason, it might be the most
7   important.
8          THE COURT:  Maybe.  Maybe.  Maybe.  Don't know.
9   Nobody knows.
10         Well -- so but what I was going to say is what you said,
11  Mr. Ehrlich, was that what Mr. Levandowski did was he gave the
12  name of his personal attorneys to Stroz and that they screened
13  that out; right?
14         MR. EHRLICH:  That's right.
15         THE COURT:  So presumably they've already identified
16  all those files.
17         MR. EHRLICH:  Well, certainly as to privilege.  And
18  can I just pick up from what you're saying?
19         We think that -- that the protocol we're suggesting,
20  which, frankly, I think we've lost two weeks that we could have
21  been working on this because --
22         THE COURT:  I'm going to stop you.  I'm not going to
23  order that.  Mr.-- first of all, your letter says that he --
24  that Mr. Levandowski was required to turn over his devices.
25  That is completely false.  Neither the government nor Uber nor
```

55

```
1   a court nor Waymo required him to turn over those devices.
2          Mr. Levandowski, Mr. Ron, Mr. Brownstein's client, they
3   all turned over those devices voluntarily.  No one forced them
4   to.
5          So we start with that, number one.  So that takes -- now,
6   I'm sensitive -- and they didn't have to; right?  Why was
7   the -- why was the due diligence done that way?  Why did Uber
8   insist that the entire devices be turned over?  I don't know.
9   I don't know.
10         But what I'm saying is that makes it relevant now.  So I
11  think the protocol that Waymo proposed makes sense because it
12  protects their privacy interest.  It allows you in the room to
13  stop.
14         Now, to the extent your client knows or Mr. Patchen's or
15  Mr. Brownstein's client knows in advance there are particular
16  files that have nothing to do with this case, are sensitive,
17  private, identify them now with Stroz.  Okay?  Show them to the
18  Special Master so he can confirm, yeah, those are just photos
19  or bank statements from 1999 or whatever.
20         Let's get started and start doing that now and get that
21  stuff all sort of -- what I'm -- I guess what I'm saying is
22  let's do it exactly the same way your client did with Stroz,
23  exactly the same way, which was you gave it to Stroz and then
24  they identified what was to be separated out.
25         MR. EHRLICH:  And I -- just for clarification, are we
```

56

```
1   talking about the actual underlying devices, many of which were
2   never looked at?
3          THE COURT:  No, no.  Let's separate those two things
4   out.
5          MR. EHRLICH:  That doesn't even relate to the due
6   diligence report.
7          THE COURT:  Let's separate those two things out.
8   Let's start with the ones that they subpoenaed, as you pointed
9   out, the ones that they did their forensic investigation of.
10         MR. EHRLICH:  My understanding is Stroz has created a
11  database that has harvested the documents that allows for
12  searching.  Okay.
13         I think the concern we have is even when the government is
14  standing before the -- the prosecutors are standing before the
15  Court and saying, Don't worry, Judge, we're not interested in
16  that; we're not going to violate -- we're not going to go
17  beyond the terms of the warrant, we're not interested in that,
18  that's an inadequate explanation.
19         THE COURT:  But, Mr. Ehrlich, what's different about
20  this than the search warrant -- and that's the way search
21  warrants are done, as you well know -- is the agents go in and
22  they take the whole file and then they separate out.
23         Their protocol -- correct me if I'm wrong -- allows you
24  to be there.  Allows you to be there realtime.
25         MR. EHRLICH:  But the issue is different.  What they
```

57

```
1   are essentially -- let's get to the criminal analogue here.
2        They are essentially asking for the Court to give them
3   authorization to conduct a general warrant without subject
4   matter limitation, without --
5        THE COURT:  You know --
6        MR. EHRLICH:  -- without time limitation, without any
7   tainting --
8        THE COURT:  Mr. Ehrlich, this is why it is different.
9   That's what I said.  Is because your client provided the device
10  to Stroz in exchange to allow it to be searched for Uber's
11  benefit.  That's what makes it different.
12       I agree with you.  If they hadn't provided it, then that
13  would be way too broad.  Way too broad.  You couldn't -- I
14  wouldn't -- no way I would order them -- I couldn't order them
15  anyway because of the Fifth Amendment.  But that's -- right?
16  That's why we are here, because he provided it to this third
17  party.  That's the difference.
18       And he provided it to the third party in connection with
19  what this whole case is about.  And that's what makes it
20  relevant.
21       Now, it may in fact have irrelevant and private things and
22  that's why their protocol, I think, takes care of that.  But to
23  the extent you can identify those irrelevant and private things
24  in advance, do so now.  Separate them out.  Have Mr. Cooper
25  look at them, because I understand you don't want to trust them
```

58

```
1   when they say This is private.  Have Mr. Cooper look at it and
2   he can say, Yeah, these are just photos or Yeah, these are just
3   his bank records or Yeah, these are his communications with
4   lawyers that have nothing to do with this case.
5        I understand that with respect to attorney-client
6   privileged stuff, you may disagree that some of it should be
7   produced.  And what I'm saying is okay and I'll adjudicate
8   that.  I'm going to have to adjudicate that on a full record at
9   some point with some showing.  I can't do that now.  And so
10  separate it out.  That's what I've been saying in terms of
11  importance.
12       What you want really is Waymo's stuff, first and foremost.
13  Let's get that moving and get that going, and then I can
14  adjudicate the attorney-client privileged stuff as need be.
15       MR. EHRLICH:  But there are -- maybe Ms. Blunschi
16  could help us with the volume.
17       It seems to me step one is that we should have some
18  guidance as to relevance so we can focus on, okay, we will run
19  the search terms, the same search terms that Uber has had to
20  run --
21       THE COURT:  Mr. Ehrlich, I understand what you are
22  saying.  I read your paper.  I disagree.  We are not doing it
23  that way.  We are doing it exactly the way your client did with
24  Stroz, which to a third party he sat there and he handed
25  voluntarily -- handed over his device, and instead what he did
```

59

```
1   was he identified to Stroz what to pull.
2        I'm saying do the same thing now.  Do it exactly the same
3   way.  I just -- I understand -- noted.  Objection noted.  I
4   disagree.  I'm not going to do that.
5        MR. EHRLICH:  So to go through the -- what we are
6   talking about, just for clarity, is to go through the Stroz
7   database and the entirety of it as to Mr. Levandowski, mark
8   those documents that we contend are either separately
9   preexisting privilege or raise the privacy concerns or
10  relevance concerns, extreme relevance concerns.
11       THE COURT:  Extreme relevance.
12       MR. EHRLICH:  And to work with Stroz now to wall that
13  off.  And I don't know the volume that they'll be, but we can
14  report that to the Special Master and take it from there.
15       And then -- and then it seems that perhaps -- if this is
16  possible, if we wall that off, then Waymo sitting at the
17  console running searches would not have any hits on those
18  documents.
19       THE COURT:  Maybe.  I mean, they may come up with
20  hits.  For example, if something is private, they may come up
21  and they see it, but they don't want it and you say, Oh, no.
22  Okay.  That's fine.
23       I mean, I guess there's less of a privacy interest here
24  because they handed the devices over, and therefore some third
25  party, they had decided, was okay to search through their
```

60

```
1   devices.
2        So they have a privacy interest, but that has to be
3   weighed.  Some of that is mitigated by how they treated their
4   devices; right?  How they treated their devices.  So the
5   fact -- so I guess what I'm saying is it's not that -- they get
6   to run their searches.
7        MR. EHRLICH:  Do we have a time limitation?  They have
8   talked about the seven-day limit that you put on depositions
9   that would flow from Your Honor's ruling.  Or are we going to
10  be doing this 24/7 for days on end?
11       THE COURT:  I don't know.
12       MR. EHRLICH:  We know they are interested and we'll
13  commit the resources to it, but it seems that there should be a
14  time limitation.  We are at the close of fact discovery.  They
15  could certainly give the -- the search terms that they would
16  use sitting there --
17       THE COURT:  Nope.  Nope.  I just said --
18       MR. EHRLICH:  No, no, no.  I'm just saying that --
19       THE COURT:  I just said we're not doing it that way.
20       MR. EHRLICH:  -- do we have a time limitation on this
21  ongoing, never-ending inspection process, if that's the Court
22  order?
23       THE COURT:  Not sitting here because I don't know what
24  it involves.  I don't even know if we're going to get there;
25  right?  I don't know if we're going to get there or when we're
```

61

```
1    going to get there.  So, no, I'm not going to say that.
2         And it's fluid; right?  The seven-day deposition thing --
3    I'll tell you what I was thinking about.  October 10th is trial
4    date.  My one job is to make sure none of this discovery stuff
5    jeopardizes that trial date.  So I'm willing to work with you
6    all as long as we don't jeopardize that trial date.  Okay.
7         There is flexibility even there with that, not that anyone
8    should take a day off; right?  Because it's coming up really
9    quick.
10        So I don't know.  Mr. Ehrlich, I understand that, but it's
11   just the nature of the beast, and let's just see what happens
12   with it.  They're just consequences.
13        MR. EHRLICH:  So this doesn't apply to the devices,
14   because the devices you can't --
15        THE COURT:  Don't they have the devices back?
16        MR. EHRLICH:  No.  My understanding is they are
17   sitting with Stroz.
18        THE COURT:  They actually turned over their devices
19   forever?
20        MS. BLUNSCHI:  I'm happy --
21        MR. EHRLICH:  They were supposed to be destroyed or
22   returned, but they weren't.
23        THE COURT:  Okay.
24        MS. BLUNSCHI:  Litigation ensued before any devices
25   were returned or remediated, with the exception of, I believe,
```

62

```
1    Mr. Levandowski's phone.
2         But Stroz does have both the original devices and forensic
3    images of the devices.  And what Waymo has requested is the
4    opportunity to review those devices essentially in native form.
5    So we are already producing decrypted versions of these devices
6    that can be loaded for an essentially native review.
7         That is separate from the relativity database that was
8    created, including all of the information from these various
9    devices.
10        So just as a point of clarification as to how the
11   employees' counsel would look at the devices to sort of find
12   what is private or privileged, it's not as easy as running
13   search terms across the whole universe because Waymo has asked
14   to look at these devices one by one, but we can certainly
15   coordinate with Mr. Ehrlich and Mr. Patchen and the other
16   employees' counsel to find the best way to help them identify
17   where private documents are once they are decrypted.
18        THE COURT:  Let me hear from Waymo.
19        MR. JUDAN:  Thank you, Your Honor.
20        A couple issues with this sort of privacy search term
21   screening thing.
22        I think as a practical matter in terms of timing, I see
23   substantial issues that prevent it from being implemented.  I
24   don't know exactly what they're going to say is -- of these --
25   the privacy concerns or whatnot or the privilege concerns, but
```

63

```
1    I anticipate that given the volume of data that is being handed
2    over, it could be -- even if Mr. Levandowski's attorneys could
3    review it in time, I don't think the Special Master can
4    realistically review 200,000 documents in a timely manner.
5         THE COURT:  Well, let me just say what -- because let
6    me clarify.  I was saying at the moment we have time.  Check
7    your emails.  I don't think the Federal Circuit has ruled.
8         MR. JUDAN:  I did just check.  No, not yet.
9         THE COURT:  We don't know how much time we have.  We
10   could have weeks, for all we know.  We could have days.  I'm
11   not at all suggesting that your review is delayed by that.
12        I'm suggesting that while we have time right now, they
13   apparently had identified documents as privileged or private
14   before to Stroz; right?
15        I'm mispronouncing it.  Stroz.
16        MS. BLUNSCHI:  Stroz.
17        THE COURT:  To Stroz; right?
18        MS. BLUNSCHI:  So, yes.  Although the way those were
19   sorted out was on the relativity database.  So when we restore
20   the native images, those won't be readily flagged as privileged
21   or private anymore.
22        THE COURT:  I see.  Is there a reason why you can't
23   just start with the relativity database?
24        MR. JUDAN:  Well, so there is multiple relativity
25   databases.  We would like to start with the one that is
```

64

```
1    complete of all the devices.  It would be one universe if Waymo
2    knew which search terms were applied and we had any
3    confidence that they -- what Uber and Mr. Levandowski and
4    attorneys came up with that they deemed sufficient for this
5    review process to identify trade secrets was actually
6    sufficient, but we don't.
7         So I'm not comfortable saying offhand *Oh, yeah, sure that
8    seems like it would capture pretty much everything we need.*  We
9    have no idea.
10        THE COURT:  No.  I understand that.
11        But if you're getting to this point, you're going to see
12   the due diligence report, right, at this point.  And then
13   they're going to know exactly and be able to ask Stroz exactly
14   what they did do; right?
15        MR. JUDAN:  We will be able to, and hopefully we'll
16   have the documents which show which search terms were applied,
17   why they were applied, what the negotiations were.
18        The concern at that point then largely becomes timing
19   because we will have -- I don't know -- I believe Uber has said
20   that with respect to -- the diligence report will be produced
21   immediately.
22        With respect to the 800 documents that are currently on
23   the Privilege Log, that will be produced if the Federal Circuit
24   affirms.
25        With respect to the other documents which they haven't
```

```
1   even logged yet, that could take up to three or four days.  So
2   if we don't even -- and then -- until we depose people,
3   including perhaps the Stroz Friedberg gentleman, we are not
4   even going to know necessarily what oral communications there
5   were.
6       So by the time we know the full universe of what really
7   happened with respect to those search terms, it may -- a week
8   may already have passed.
9       THE COURT:  Don't worry about that week deadline.  I
10  wasn't even thinking about it.
11      Now that we have it all out there, it almost seems like
12  the first thing that should happen, as soon as the Federal
13  Circuit rules -- unless we're reversed and then it's easy -- is
14  that you -- that you get the report and you take Stroz
15  deposition; right?
16      I mean, in a way we're trying to figure stuff out in the
17  dark right now, and that sort of doesn't make sense, and
18  that -- and then we go from there, maybe.  In other words, it
19  seems premature for me to adopt a protocol now when you're in
20  the dark.
21      MR. JUDAH:  Well, I would say a couple things in
22  response to that.
23      The first is that the protocol that Waymo proposed and
24  that Mr. Ron had agreed to and Stroz had agreed to I think
25  is -- would completely satisfy Waymo, so we're not going to be
```

```
1   complaining about anything on that.
2       And then that puts the work on Waymo, and Waymo looks at
3   the stuff.  We search.  You know, there's a lot of things we're
4   going to be looking for off the bat, I can tell you, that
5   wasn't covered by Stroz.
6       You know, Mr. Kalanick had deleted all the text messages
7   of Mr. Levandowski.  Any of the text messages on
8   Mr. Levandowski's devices to Mr. Kalanick, Ms. Qi, who also
9   deleted text messages at Mr. Levandowski's instruction,
10  multiple other highly-relevant witnesses that Mr. Levandowski
11  was communicating with from Uber in this pre-March -- whatever
12  date exactly he handed over the devices, we're going to be
13  looking for all that stuff.  We are going to be looking for
14  stuff about Tyto.  We're going to be looking for stuff related
15  to shell companies in the trust related to Tyto.  For
16  confidentiality reasons, I can't go into details.
17      A lot of this stuff I don't think is going to be covered
18  by the Stroz protocol.  I don't think the Stroz protocol agreed
19  to is going to encapture the text messages.
20      THE COURT:  We're not saying that you don't get to do
21  your search.  What I'm saying is they pull out the private
22  stuff that they pulled out before.
23      MR. JUDAH:  But that's going to include, I'm afraid,
24  all the text messages.
25      THE COURT:  Well, I don't know.  I don't know.  I
```

```
1   mean, I guess what I'm saying is why don't we at least get
2   started on that now.  That they identify that; right?  Because
3   right now we can't do anything.
4       MR. JUDAH:  Sure, Your Honor.  And so getting to that,
5   so we have this universe of the relativity database which --
6   before search terms were applied by Stroz, which has everything
7   from the forensic images, other than native versions to some of
8   the photo files and such.
9       MS. BLUNSCHI:  And video, yeah.
10      MR. JUDAH:  So they can make those natives available
11  upon request.
12      THE COURT:  Okay.
13      MR. JUDAH:  So if Mr. Levandowski and the other
14  diligence employees -- Mr. Sebern's counsel is here, Mr. Ron's
15  counsel -- if they want to provide privacy-type search terms,
16  that's fine.  I -- you know, as long as whatever starts
17  happening with that isn't going to impede Waymo's ability to
18  the extent that's not fully resolved --
19      THE COURT:  No, no, no.  That's what I said.  That
20  shouldn't hold it up at all.  And, quite honestly, what I think
21  should happen is the Federal Circuit rules.  And let's
22  assume -- I don't know, but let's assume that you have to
23  disclose the due diligence report.  That should be like boom,
24  right, transferred.  You'll stay up all night reading it, I'm
25  sure.  Boom.
```

```
1       And then let's, if we need to, then talk and figure out
2   where you are or then come back or whatever.
3       But in the meantime, we don't know what they're going to
4   do, and they may -- so it sounds like the relativity database,
5   the one that includes everyone, before any search terms were
6   applied, may work for you.
7       MR. JUDAH:  Absolutely, and that's part of our
8   protocol.
9       Now, the two other things I would note, one is that with
10  respect to the diligence employees, Mr. Levandowski, provide,
11  you know, areas of privacy -- I mean, that the Special Master
12  would then review -- I think -- look, there is obviously
13  personal issues, personal communications with, you know -- that
14  are obviously going to be completely personal, nothing to do
15  with anything.
16      Once you start getting into anything involving, for
17  example, financial records -- Mr. Levandowski's shell
18  investments in Tyto go back to 2012 --
19      THE COURT:  No, no.  Mr. Ehrlich said extreme
20  relevancy; right?  We are talking about private stuff like -- I
21  don't know -- kids' birthdays --
22      MR. PATCHEN:  Speaking with his wife.
23      THE COURT:  Or speaking with your wife.
24      MR. JUDAH:  So I cannot go into the contents of some
25  of these shell company documents, but they -- suffice it to say
```

69

```
 1    they may involve --
 2         THE COURT:  So they all are well aware of them and
 3    they know that those should not be withheld on privacy grounds,
 4    as does the Special Master, but -- right?  You know that,
 5    right, Mr. Ehrlich?
 6         When you said extreme privacy -- no.  You said extreme
 7    relevancy.  Privacy -- I also mean extreme privacy; right?
 8    It's totally irrelevant.  You --
 9         MR. EHRLICH:  The most important screen is relevance
10    to the claims at issue or defenses at issue.
11         THE COURT:  No, no, no.  Not your screen.  Now you got
12    it backwards.  You keep going backwards.
13         MR. EHRLICH:  I'm not rearguing that.
14         THE COURT:  I'm sorry.  I'm going to stand.  I hurt my
15    back.  Nothing do with this case.
16         MR. EHRLICH:  We understand that there are things that
17    could be argued to be private that are relevant to the case, of
18    course.
19         THE COURT:  Okay.
20         MR. EHRLICH:  We are talking about things that are not
21    relevant --
22         THE COURT:  And private.
23         MR. EHRLICH:  -- as to which there are important
24    privacy concerns at stake.  And we understand if we lose, we
25    don't have the Fifth Amendment, we don't have the common
```

70

```
 1    interest privilege.
 2         We do, however -- Mr. Levandowski had other attorneys for
 3    personal matters.  That privilege wasn't -- those
 4    communications weren't disclosed.  So there is a number of
 5    those sort of attorney-client privilege matters which --
 6         MR. JUDAH:  I would dispute, though -- they were
 7    disclosed.
 8         THE COURT:  But that's what I said I will address.  I
 9    understand that you may want them and it's an interesting
10    argument that is more nuanced than what could be dealt with in
11    those Letter Briefs and will probably require a Privilege Log;
12    right?  Because at that point, he won't have any Fifth
13    Amendment objection.  He would have to produce a Privilege Log
14    and disclose it to you.
15         The log in itself may provide you what you need and it
16    still may be privileged and not waived and the like.
17         I understand we are going to have a lot to do, and we'll
18    just do it, and I'll endeavor to do hearings like this in the
19    afternoons or something or in the mornings early.  You guys are
20    used to early morning hearings so we could do it then, too, to
21    get it in.
22         So I think with the protocol, what I would say starting
23    now, because we don't know when they're going to rule, is with
24    the relativity database, they had already identified certain --
25    I thought there would be files or things that they had
```

71

```
 1    identified as private; right?  Or as privileged.
 2         MS. BLUNSCHI:  They provided certain search terms in
 3    order to identify materials that would not be shared with Uber
 4    and MoFo.
 5         THE COURT:  Okay.  All right.  And so you can -- you
 6    can begin -- well, let's see.  How should that work?  Is there
 7    any reason why -- well, there is a reason because not until the
 8    Federal Circuit rules can I say provide those search terms to
 9    Waymo.  I got it.
10         But you will get to see them if you get to see them.  And
11    go ahead and maybe start segregating that somehow.  I mean,
12    maybe it's already segregated in relativity --
13         MS. BLUNSCHI:  So it is not segregated in the version
14    of the database they have asked for access to.  Perhaps not
15    surprisingly, Stroz gradually culled down the universe of data
16    that Stroz was going to look at, not purely because of privacy
17    considerations obviously.
18         And Waymo has asked for access to the most comprehensive
19    database, which does not have private materials segregated.
20         THE COURT:  I see.
21         MS. BLUNSCHI:  That said, we can certainly work with
22    counsel for the diligenced employees to identify privileged or
23    otherwise private material in the relativity database.
24         THE COURT:  That they have asked to review.
25         MS. BLUNSCHI:  Yes.  So it's just another step which
```

72

```
 1    we can certainly do, however long it takes to get guidance from
 2    them and then a day or two to restrict.
 3         The question mark I think for us would be the access to
 4    the native versions of the devices, that sort of matching
 5    process as to what's private in the native versions of the
 6    devices which we can't just search all across them because they
 7    are talking about having them loaded and mounted for individual
 8    searches.  That is a little bit more of a difficult process.
 9         THE COURT:  I suppose if you're able to disclose what
10    those search terms were and that's disclosed to Waymo, you can
11    take steps to avoid it.  Or I'm not even sure it would come up.
12         Maybe what I'm thinking is that the protocol that they --
13    I mean, you'll be there and you can jump in; right?
14         MR. JUDAH:  And so, Your Honor, so I think with
15    respect to the native devices -- and, again, we're in the dark
16    here so we -- but the main reason we would like those as a
17    backup to the relativity collection is, one, we don't have
18    evidence yet that it's in fact a one-to-one, so we would want
19    some assurance on that.
20         And, two, is the folder structure of how things are
21    arranged on those devices may lead us to the relevant documents
22    faster than doing searches of items that may not be searchable.
23    A lot of these SVN database documents, the Altium files, are
24    not searchable in the ordinary course.  I don't know if they
25    are going to be searchable in relativity.
```

73

```
 1        If we go in and there is a folder that says Chauffeur
 2   Files, then we know exactly where to look.
 3        So I would propose, consistent with earlier protocol, that
 4   maybe we can just inspect those, but any printing that would be
 5   done or anything would be off of the other -- off of the
 6   relativity database which would have the privacy stuff flagged
 7   or whatever.
 8        THE COURT:  I think what I'm going to do -- you won't
 9   be happy -- is I'm not going to do anything right now because I
10   think we need to see that report and then sit down and then --
11   but what I am going to say is I understand about the
12   attorney-client privilege.  You may need to do a Privilege Log
13   in terms of segregating.
14        The private stuff I -- you know, I know this private
15   stuff, they don't want it if it's not relevant.  They don't
16   want it.  And so I think the protocol that Mr. Ron agreed to
17   before may work best for that.
18        MR. JUDAH:  Right.  And that's what -- I mean, I can
19   understand why Mr. Levandowski would try to restrict what we
20   can see as much as possible.
21        But I think -- the reason I think the protocol that Waymo
22   had proposed and Mr. Ron agreed to is sufficient is, you know,
23   we obviously don't want that stuff -- we are going to look like
24   idiots if we try to print a personal photo or something and
25   then they object and bring it to your attention.  We're -- I
```

74

```
 1   mean, there is no way we're going to do that.
 2        THE COURT:  Right.  I will sanction you.
 3        MR. JUDAH:  It could be, if we ask for something that
 4   was completely -- that's why I think it's enough of a check and
 5   balance.
 6        THE COURT:  All right.  And so -- so -- but the
 7   privileged stuff -- and maybe there is a way of searching for
 8   it when they do it that you stay away from it or you do a
 9   search and the name comes up, you can really -- I don't know.
10   We can figure something out.  I think we just need to wait and
11   take it in steps.
12        To the extent you need to get me on the phone with
13   Mr. Cooper, you're welcome to do that.  Basically whenever the
14   Federal -- even if it's the weekend, when the Federal Circuit
15   rules, I can make myself available because we have that -- we
16   all have that October 10 trial date that we're working to make.
17        MR. JUDAH:  Your Honor, if I could bring up two other
18   points.
19        The first is that some of the individuals that
20   Mr. Levandowski was going to be communicating with related to
21   the Tyto structure are attorneys -- but were also acting in
22   business capacities for some of the shell companies.
23        THE COURT:  Yes.  So they can start now; right?  So
24   they're on notice now.  To the extent you are going to withhold
25   as attorney-client privilege any communications involving any
```

75

```
 1   of those entities -- we know who they are -- that Waymo has
 2   read, you should start creating your Privilege Log now so that
 3   can be produced immediately, so I can figure that out; right?
 4   The first thing we need is the log.  So start creating it,
 5   start working on it now.
 6        MR. JUDAH:  Then the second thing, Your Honor, is I
 7   would like to discuss the devices that Stroz never searched.
 8        The first thing I would like to say is -- they were
 9   provided to Stroz.  Stroz may not have searched them under
10   something that Mr. Levandowski got them to agree to, but they
11   were provided to Stroz, and two of our document requests that
12   were compelled by your order and then affirmed by Judge Alsup,
13   No. 9, "All documents provided to you by defendants
14   Levandowski, Lior Ron, etc., related to Levandowski,
15   Otto Trucking" --
16        THE COURT:  This is what you should do.  You should
17   take Stroz deposition, Why did you search those devices?  Maybe
18   they will give you an answer that will say -- because you're
19   going to have limited time and -- despite all the pro hoc vices
20   that have been allowed -- limited person power even to search;
21   right?  You're going to have to make a decision.
22        Take the deposition and find out why they didn't search
23   them, find out what they are; right?  What are the devices,
24   what are they, from what period, dah-dah-dah, and then tell me
25   which ones you want and why.  You just don't know.  I get that
```

76

```
 1   it may be relevant and it may be discoverable.
 2        MR. JUDAH:  I don't think Stroz necessarily knows, so
 3   the other thing I would note is that No. 16 is all
 4   communications between Stroz and Levandowski.  This is
 5   obviously something that was provided from one side to the
 6   other.  That is a communication.
 7        THE COURT:  I don't accept that as obviously.  I don't
 8   agree with that, your characterization as obviously.
 9        This is what I'm saying is we know very little about them
10   and they can't say anything more about it now until the Federal
11   Circuit rules.
12        MR. JUDAH:  Subject to the claw-back issue, which we
13   still need to discuss.
14        THE COURT:  Yes.  So we'll deal with it then.  I just
15   can't rule sort of in this vacuum, I think, as to what's there.
16        You are going just going to have to make choices as to
17   what is priority.  It may very well be that this is a device
18   that should be produced.  It may be.  I just don't know.
19        MR. PATCHEN:  Two quick things, Your Honor.  We put
20   this in our letter.  The first of which is we understand the
21   time pressure and the inspection and that even with extreme
22   privacy and extreme relevance standards, stuff is going to get
23   through that would not normally be discovered.
24        We would request that whatever protocols eventually enter,
25   that it not constitute a general waiver of those other
```

77

```
 1   objections.
 2            THE COURT:  No, no.  This is like a Rule 502, Rule of
 3   Evidence 502.  They may see things that that's not going to be
 4   a waiver.  You're not going to argue that that's an intentional
 5   waiver.  It's not intentional.  You are here objecting.
 6        And the same with the privacy thing.  Because of the time
 7   pressure, stuff is going to get through.  We are all going to
 8   behave like the professionals that everyone has been behaving
 9   like and we are going to deal with it like professionals.
10        What I have heard Waymo say is they acknowledge that there
11   are going to be privacy issues.  They don't want that.
12            MR. PATCHEN:  We agree with that.
13        The only other thing -- I think Mr. Sebern's counsel
14   brought this up and it's a good one.  We would request that the
15   attorney who is reviewing the documents is not the same one who
16   takes the deposition of, say, Mr. Ron because they will see
17   things, and that's one way to safeguard the privacy.
18        For example, let's say he has marital troubles.  Not
19   saying he did, but hypothetical scenario.  You see some of
20   those documents that suggest that maybe he was.  He was talking
21   with his friends about problems with his wife, whatever.
22        I wouldn't want that same person who is deposing Mr. Ron
23   to have known stuff that they never would have seen.
24            THE COURT:  Why?  They wouldn't ask about it.
25            MR. PATCHEN:  Perhaps.
```

78

```
 1            THE COURT:  Not perhaps.  Because if they do ask about
 2   it -- I'm not the trial judge.  Judge Alsup; right?  Really
 3   they're going to ask about it?  I don't think so.
 4        I don't know what your theory is.
 5            MR. JUDAH:  It depends on the deposition.  I mean,
 6   Mr. Perlson took Mr. Ron's deposition the first time.
 7        David, do you think you're going to be doing a lot of
 8   first-level doc review on devices?
 9            MR. PERLSON:  I don't know.  Maybe.
10            MR. JUDAH:  It depends.
11            THE COURT:  I think there will probably be shifts.
12   This is going to be 24/7.
13            MR. JUDAH:  Certainly.  So it depends on the
14   deposition.
15            THE COURT:  We can --
16            MR. PATCHEN:  Deal with that.
17            THE COURT:  No one will do that.  Waymo has made that
18   representation.  I accept it.  I accept it.  And that is of
19   course the order of the Court.
20        This is a dispute.  It's a business dispute.  I understand
21   it's about a lot of money.  Let's keep it at that.
22            MR. PATCHEN:  We respect that and agree, Your Honor.
23            THE COURT:  Now, the last thing --
24            MS. BLUNSCHI:  Just two points of clarification for
25   Stroz.
```

79

```
 1        I understand we're not going hammer out the details of the
 2   protocol until after the Federal Circuit rules.  Restoring all
 3   those devices, of which there are quite a lot, takes about a
 4   week.
 5            THE COURT:  Which devices are we talking about?
 6            MS. BLUNSCHI:  The devices that were actually reviewed
 7   as part of the diligence process.  It would take even longer to
 8   restore the ones that were not reviewed.
 9            THE COURT:  Yeah.
10            MS. BLUNSCHI:  We have begun the process of restoring
11   the ones that were reviewed, and I assume we should go forward
12   with completing that.
13            THE COURT:  Correct.
14            MS. BLUNSCHI:  Shall we hold off, I assume, on the
15   ones that weren't reviewed then for now?
16            THE COURT:  What do you mean -- I'm sorry.  I don't
17   know what you mean by restored.
18            MS. BLUNSCHI:  No problem.
19        So the devices -- we have the original devices.  For a
20   number of reasons, it wouldn't be appropriate to have the
21   parties just review the actual original devices.  It will
22   change access dates, things like that.
23        So Stroz also has encrypted forensic images of each
24   device, but those aren't ready to just be mounted on your USB
25   port.  They have to be decrypted and prepared to appear as a
```

80

```
 1   native device.
 2            THE COURT:  And how quickly could you get that done?
 3            MS. BLUNSCHI:  So for the ones that were actually
 4   reviewed --
 5            THE COURT:  No.  Those you are going to keep doing.
 6        The ones that were not reviewed.
 7            MS. BLUNSCHI:  So Mr. Levandowski has asserted an
 8   objection to discussion, I think, of the volume of those
 9   devices.
10            MR. EHRLICH:  You can speak to the amount of time,
11   though.
12            MS. BLUNSCHI:  Probably another week or so.
13            THE COURT:  I think that would probably work; right?
14   Because you're going to begin with what they did review, and
15   then if immediately then they started --
16            MR. JUDAH:  I mean, we would like to immediately, but
17   if that's Your Honor's ruling --
18            THE COURT:  I'm just trying to be somewhat reasonable
19   here.  I mean, I know money is no object, but anyway . . .
20        Let's just wait and see.  I just think you're not going to
21   have lawyer -- enough power to review all this stuff, and you
22   are going to have to make some decisions.
23            MS. BLUNSCHI:  Sounds like a challenge.
24            MR. JUDAH:  We will be making decisions, but obviously
25   we have a priority to find Waymo documents, and so if they're
```

81

```
1    on those devices, we intend to find them.
2           THE COURT:  That's true.  I guess what I would say is
3    just be prepared to do forthwith, within a week, whatever it
4    takes.
5           MS. BLUNSCHI:  Okay.  Absolutely.
6           THE COURT:  Okay.
7           MS. BLUNSCHI:  The only other issue we wanted to get a
8    bit of guidance on is they have subpoenaed for deposition
9    Stroz's CEO, and we are absolutely going to cooperate in making
10   him available promptly for that deposition, but we assume it
11   would just be the one deposition, not one when the report comes
12   out and yet another one after they review documents.
13          MR. JUDAH:  So this is part of the issue.  We were
14   hoping on conducting kind of review of the documents before we
15   took the deposition of the Stroz witness.  Your Honor, makes a
16   good point, which is that he may be able to help us understand,
17   so I don't necessarily have the solution to that.
18          THE COURT:  I don't know.  He may have to sit more
19   than twice.
20          MS. BLUNSCHI:  More than once?
21          THE COURT:  What did I say?
22          MS. BLUNSCHI:  More than twice.
23          THE COURT:  Not more than twice.  He was just in the
24   middle of it, you know.  He can just thank Uber for that.  Or
25   MoPo.  Sorry.  Mr. Gonzalez for that.  Sorry.
```

82

```
1           MS. BLUNSCHI:  We will absolutely work on that, but we
2    would ask them to work with him as the CEO of their company --
3           THE COURT:  I understand.  But this case -- they took
4    it on.  It's in the middle of it.  As Uber has told me, since
5    January 2016, they thought this litigation would be coming so
6    everybody knew this litigation would be coming, and sure
7    enough, here it is.
8        So I -- it makes sense for him to be -- or whoever knows
9    the information to be deposed right away because it can really
10   shed light on those devices, why they weren't reviewed, what
11   they did, what search terms, and so I do think it probably is
12   going to have to be done -- maybe in two points.  Maybe that's
13   all they'll need, and once they review the documents, they
14   don't need them again, but I don't know that at all.
15       But I do think even before they review documents, it makes
16   sense to depose Mr.-- I'll call him Mr. Stroz.
17          MS. BLUNSCHI:  Mr. Friedberg.
18          THE COURT:  Mr. Friedberg.  Okay.
19          MR. GONZALEZ:  Two related points, briefly.
20       One is, as you know, a sliver of the Stroz material is
21   sitting at MoFo.
22          THE COURT:  Yes.
23          MR. GONZALEZ:  That we got as part of our
24   representation of Mr. Levandowski.  What I would like to do is
25   just give that sliver to Mr. Levandowski's counsel so they can
```

83

```
1    begin the process you just described of going through it to
2    identify anything that is personal or whatever.  That's what I
3    would like to do.
4           THE COURT:  That's sort of up to Waymo, and that's a
5    matter with Judge Alsup, and if Waymo agrees, fine, but that's
6    not going to be my order because that is a matter that was
7    argued to Judge Alsup.
8           MR. GONZALEZ:  I'm not sure I ever raised that with
9    him.  But in any event --
10          THE COURT:  You know, the issue of having it.
11          MR. JUDAH:  We haven't met and conferred yet on this
12   so I would need to talk to people.
13          THE COURT:  He would like to get it out of his hands.
14          MR. GONZALEZ:  I would.
15       The second thing is, Your Honor, is Epic.  We haven't
16   talked about Epic, and Epic --
17          THE COURT:  You mean Epic has something separate from
18   this litigation?
19          MR. GONZALEZ:  Well, actually, yeah, it could be.
20       Epic, Your Honor -- these things that we're talking about,
21   we have got two buckets, the database, which is relativity, and
22   then we have these images of devices that they never looked at.
23       Epic has that as part of our representation --
24          THE COURT:  Oh.
25          MR. GONZALEZ:  -- of Mr. Levandowski.
```

84

```
1        My understanding is they haven't done anything with it.  I
2    don't know if they want to review everything twice.  I don't
3    represent Epic, but I just want you to be aware of it.
4           THE COURT:  Okay.
5           MR. GONZALEZ:  They need some guidance on what to do
6    as well.
7           THE COURT:  I don't think they will do anything right
8    now.  I don't have any discovery pending in front of me that
9    has anything to do with Epic.
10          MR. GONZALEZ:  I just want it out there they have this
11   stuff and we should figure out how to efficiently address it
12   and hopefully not even have to bother you.
13          MR. JUDAH:  I actually thought this was somewhat
14   addressed because I thought at the last hearing before Judge
15   Alsup, I thought it was represented they would hand over those
16   materials if the Federal Circuit affirmed.  Was that not right?
17          MR. GONZALEZ:  Well, there you go.  We're not just
18   going to hand over a copy of everything that you've just been
19   discussing.  That's exactly why I'm raising it.  I didn't want
20   to hear that.  This is why I'm raising it.
21       My point is Morrison & Foerster and Uber have no interest
22   in withholding any of that stuff.  Mr. Levandowski does.
23          THE COURT:  We are talking about -- you mean when the
24   Federal Circuit rules, he is saying hand it over?
25          MR. JUDAH:  It's specifically Epic.  I thought Epic
```

85

```
1    was addressed when Judge Alsup asked that question.
2         MR. GONZALEZ:  Yes.  But the question is what do you
3    hand over?  It's the same issue that you've been discussing for
4    the last 30 minutes.  It's Epic has a copy of what they have.
5         THE COURT:  Well, if it's the same thing.
6         MR. GONZALEZ:  And so it would have to be -- I'm
7    assuming that it would be addressed in the same manner that you
8    work out with the other stuff.
9         THE COURT:  If they even want to look at it.  Again, I
10   mean, in terms of importance, if it's the copy of what they
11   already have --
12        MR. GONZALEZ:  Understood.  I'm just raising it, Your
13   Honor, because I want you to be aware that that's there.
14        MR. JUDAH:  The specific point -- I think part of the
15   reason Judge Alsup raised this is that he said we don't have to
16   take anyone's word for it, that it is, in fact, identical.
17   That's, I think, the main reason we would want to see it.  If
18   it is the same --
19        THE COURT:  We'll deal with it when we deal with it
20   and you can tell me if that's what you want to spend your time
21   dealing with.
22        The last thing we have is the claw back, and I don't
23   understand the claw back.  I mean, to claw back, it's there.
24   We now all know about the devices, so -- Mr. Levandowski's not
25   a defendant in this case.  No one is using it against him.  The
```

86

```
1    government's not here.  So I don't quite know.
2         I mean, the government, I suppose, to the extent -- I
3    don't know why they would -- would use that email, it would be
4    at their risk.
5         MR. EHRLICH:  It would be at their risk in the sense
6    that it would be a potential breach of an attorney-client
7    privilege.
8         THE COURT:  Well, I'm assuming if the Fifth
9    Amendment -- you know, I don't know -- was, because what the
10   email did was it described something that occurred that's
11   encompassed by my order that's up on appeal; right?
12        So if the Federal Circuit -- if that order is affirmed --
13   or at least what's more likely to happen rather than affirmed
14   is not reversed; right?  There is unlikely to be maybe a merits
15   determination, more a punt, but there you are.  Same result.
16        Then there was no -- then my finding that Stroz was not an
17   agent of Mr. Levandowski -- essentially what my finding was on
18   Mr. Gardner -- stands and that would stand to providing of the
19   devices and therefore there wouldn't be any privilege that was
20   breached.
21        MR. EHRLICH:  Correct.  We just pointed out that the
22   Federal Circuit hadn't yet ruled, and we've made the point,
23   perhaps ad nauseam, that even the act of producing tangible
24   items to counsel, if it's within a privileged relationship,
25   could raise Fifth Amendment concerns under *Hubbell* and *Fisher*.
```

87

```
1         THE COURT:  Could.  I don't know that this particular
2    one did.  This one is not obvious to me; in particular, what
3    was disclosed, which is that they were devices then that were
4    not even reviewed.
5         MR. EHRLICH:  And the number of -- I think that's
6    fair.  This was -- on the scale of potential problems, this was
7    minor, but we need to be vigilant in protecting the privileges.
8         THE COURT:  You are being a vigorous advocate for your
9    client.  I appreciate that.
10        MR. EHRLICH:  Thank you.
11        THE COURT:  Is there anything else I can help you with
12   today?
13        MR. JUDAH:  Your Honor, so I guess my question is we
14   think it may be helpful to have the information that describes
15   the location and volume of the documents, to have a ruling that
16   that's not privileged.
17        THE COURT:  That --
18        MR. JUDAH:  That the clawed-back emails in fact
19   are not privileged --
20        THE COURT:  I'm not clawing it back.  How's that?
21        MR. JUDAH:  Okay.
22        THE COURT:  It's definitely not privileged.  If the
23   Federal Circuit punts, as I -- right?  Or affirms; right?
24        MR. JUDAH:  Right.
25        THE COURT:  So I don't need to make an advisory
```

88

```
1    opinion today.  How's that?
2         MR. JUDAH:  Okay.  All right.
3         THE COURT:  Great.  Thanks everybody.
4             (Proceedings adjourned at 3:08 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, August 29, 2017

Pamela A. Batalo

Pamela A. Batalo, CSR No. 3593, RMR, FCRR
U.S. Court Reporter

**MR. BAKER: [56]** 10/8 10/10 12/10 13/11 14/10 15/22 17/12 17/17 17/22 18/6 18/15 19/16 19/25 20/5 20/8 20/19 20/23 21/2 21/25 22/6 22/16 22/20 23/2 23/4 23/13 25/23 26/1 26/4 26/16 27/7 28/16 29/7 29/11 29/17 29/23 30/3 30/17 43/17 43/24 44/4 45/11 45/17 45/20 46/5 46/8 46/16 47/1 47/10 47/17 48/7 48/15 49/25 50/3 50/18 51/18 52/1
**MR. BROWNSTEIN: [1]** 52/12
**MR. CHATTERJEE: [69]** 4/12 7/21 8/7 8/9 8/19 9/4 9/15 9/20 10/1 11/6 11/9 11/22 12/1 13/12 14/1 14/7 14/14 14/19 16/5 16/9 16/14 16/18 17/1 17/5 17/11 17/15 18/2 18/11 18/16 18/20 18/22 18/25 19/3 19/23 21/7 23/17 23/25 25/9 26/23 27/8 27/10 27/16 27/25 28/4 28/23 29/2 30/4 30/9 30/14 30/19 30/22 44/5 44/11 44/19 45/3 45/16 46/2 47/6 47/21 48/18 49/7 49/12 49/22 50/19 50/22 50/25 51/12 51/21 52/2
**MR. COOPER: [1]** 4/20
**MR. EHRLICH: [41]** 35/5 35/20 36/17 37/12 37/21 38/25 41/9 41/11 41/16 42/2 43/6 43/9 52/14 53/4 54/13 54/16 55/24 56/4 56/9 56/24 57/5 58/14 59/4 59/11 60/6 60/11 60/17 60/19 61/12 61/15 61/20 69/8 69/12 69/15 69/19 69/22 80/9 86/4 86/20 87/4 87/9
**MR. GONZALEZ: [20]** 4/15 5/24 6/2 19/22 25/6 25/10 25/13 26/13 82/18 82/22 83/7 83/13 83/18 83/24 84/4 84/9 84/16 85/1 85/5 85/11
**MR. JUDAH: [37]** 52/16 53/20 54/5 62/18 63/7 63/23 64/14 65/20 66/22 67/3 67/9 67/12 68/6 68/23 70/5 72/13 73/17 74/2 74/16 75/5 76/1 76/11 78/4 78/9 78/12 80/15 80/23 81/12 83/10 84/12 84/24 85/13 87/12 87/17 87/20 87/23 88/1
**MR. NARDINELLI: [2]** 46/20 46/22
**MR. PATCHEN: [8]** 52/7 52/10 68/21 76/18 77/11 77/24 78/15 78/21
**MR. PERLSON: [1]** 78/8
**MR. TAKASHIMA: [1]** 4/18
**MS MENY: [1]** 6/14
**MS. BAILY: [26]** 4/8 31/9 31/18 32/5 33/4 33/12 34/1 34/3 36/1 36/13 36/22 37/4 38/3 38/8 38/11 38/14 38/17 39/6 39/9 39/17 40/8 40/11 42/6 42/11 42/18 43/11
**MS. BLUNSCHI: [25]** 52/17 61/19 61/23 63/15 63/17 67/8 71/1 71/12 71/20 71/24 78/23 79/5 79/9 79/13 79/17 80/2 80/6 80/11 80/22 81/4 81/6 81/19 81/21 81/25 82/16
**MS. HARRIMAN: [5]** 24/1 24/4 24/13 24/25 25/4
**THE CLERK: [1]** 4/3
**THE COURT: [247]**

**-**

**---000 [1]** 4/3

**0**

**000 [1]** 4/3

**1**

**10 [7]** 17/12 19/7 36/17 50/22 50/22 50/23 74/16
**10-day [1]** 50/21
**10010 [1]** 1/20
**10th [2]** 36/18 61/3
**11 [3]** 36/16 41/14 45/13
**11th [5]** 32/19 35/14 36/19 36/21 39/25
**12 [1]** 19/8
**135 [1]** 2/13
**14 [2]** 11/13 11/18
**14,000 [4]** 16/23 18/15 25/19 42/20
**16 [1]** 76/3
**17-00939-WHA [1]** 1/7
**17-939 [1]** 4/4
**1700 [1]** 2/16
**19 [1]** 31/6
**1999 [1]** 55/19
**1:30 [1]** 4/1

**2**

**200,000 [1]** 63/4
**2000 [1]** 3/9
**2012 [1]** 68/18
**2015 [3]** 43/23 44/2 45/23
**2016 [6]** 32/19 33/12 41/14 45/23 45/25 82/5
**2017 [7]** 1/11 4/1 33/11 33/11 44/4 45/25 89/7
**22nd [1]** 1/15
**235 [2]** 2/16 3/6
**24/7 [2]** 60/10 78/12
**24th [1]** 8/16
**25 [1]** 5/8
**26 [1]** 44/2
**28 [2]** 1/11 4/1
**29 [2]** 43/4 89/7
**29th [4]** 33/18 33/19 33/24 39/6

**3**

**30 [7]** 16/10 20/16 44/24 46/13 47/23 49/18 85/4
**31st [1]** 51/20
**355 [1]** 2/23
**3593 [2]** 1/23 89/10
**3:08 [1]** 88/4

**4**

**401 [1]** 2/10
**425 [1]** 2/7

**5**

**50 [1]** 1/15
**502 [2]** 77/2 77/3
**505 [1]** 3/9
**51 [1]** 1/19
**555 [1]** 2/3
**5th [1]** 2/3

**6**

**633 [1]** 3/3

**7**

**7th [4]** 34/9 36/24 37/6 37/10

**8**

**800 [1]** 64/22
**803 [1]** 2/19
**835 [1]** 3/6
**850 [1]** 2/10
**88 [1]** 1/1
**8:54 [1]** 8/15

**9**

**90401 [1]** 2/10
**939 [1]** 4/4
**94025 [1]** 2/14
**94065 [1]** 2/3
**94104 [2]** 2/17 3/7
**94105 [1]** 2/7
**94111 [4]** 1/16 2/23 3/3 3/10
**94710 [1]** 2/20
**9th [2]** 36/20 36/22

**A**

**ability [2]** 37/3 67/17
**able [10]** 19/15 21/23 25/18 28/5 43/20 45/3 64/13 64/15 72/9 81/16
**about [76]** 7/14 10/1 10/12 11/19 11/19 12/17 12/20 14/13 15/15 15/16 16/4 16/11 18/9 19/2 22/8 22/10 22/16 22/18 23/1 23/4 26/12 27/23 27/24 27/24 29/20 30/1 30/24 31/12 33/15 33/20 35/3 35/9 37/12 38/7 38/18 38/20 39/16 40/4 41/25 43/13 43/23 44/19 48/10 49/20 50/9 50/10 52/21 53/12 53/13 56/1 56/19 57/19 59/6 60/8 61/3 65/9 65/10 66/1 66/14 68/20 69/20 72/7 73/11 76/9 76/10 77/21 77/24 78/1 78/3 78/21 79/3 79/5 83/16 83/20 84/23 85/24
**above [1]** 89/5
**above-entitled [1]** 89/5
**absent [1]** 17/8
**absolutely [4]** 68/7 81/5 81/9 82/1
**accept [3]** 76/7 78/18 78/18
**access [4]** 71/14 71/18 72/3 79/22
**accurate [1]** 46/8
**accused [2]** 18/3 41/2
**acknowledge [1]** 77/10
**across [2]** 62/13 72/6
**act [1]** 86/23
**acted [1]** 37/23
**acting [1]** 74/21
**activities [1]** 21/22
**acts [1]** 53/12
**actual [5]** 17/19 31/14 35/9 56/1 79/21
**actually [29]** 5/1 8/17 11/17 15/1 15/15 21/25 25/16 31/19 32/7 32/8 33/23 33/24 34/15 34/25 35/11 36/15 40/22 41/8 44/3 44/23 49/9 51/13 51/15 61/18 64/5 79/6 80/3 83/19 84/13
**ad [1]** 86/23
**ad nauseam [1]** 86/23
**add [1]** 48/9
**additional [5]** 20/21 21/5 26/11 28/21 43/5
**address [9]** 4/25 10/12 11/3 14/12 24/23 32/8 35/6 70/8 84/11
**addressed [4]** 32/7 84/14 85/1 85/7
**adjourned [1]** 88/4
**adjudicate [3]** 58/7 58/8 58/14
**administering [1]** 18/14
**admissible [4]** 44/22 45/6 48/13 49/13
**admitted [1]** 37/1
**adopt [1]** 65/19
**advance [2]** 55/15 57/24
**advice [3]** 13/2 17/25 51/5
**advice-of-counsel [1]** 13/2
**advisory [1]** 87/25
**advocate [1]** 87/8
**AEO [2]** 25/17 26/1
**affirmed [4]** 75/12 84/16 86/12 86/13
**affirms [2]** 64/24 87/23
**afield [1]** 31/20

**A**

**afraid [1]** 66/23
**after [11]** 10/5 10/15 18/18 20/5 20/18 25/22 35/12 40/24 50/23 79/2 81/12
**afternoon [15]** 4/9 4/12 4/13 4/15 4/16 4/18 4/19 4/22 6/17 6/18 52/11 52/13 52/15 52/18 52/20
**afternoons [1]** 70/19
**again [11]** 7/13 13/18 13/25 19/25 28/16 29/10 43/17 45/19 72/15 82/14 85/9
**against [4]** 25/2 30/9 42/17 85/25
**agent [1]** 86/17
**agents [1]** 56/21
**ago [1]** 7/1
**agree [7]** 18/7 40/18 57/12 75/10 76/8 77/12 78/22
**agreed [6]** 54/3 65/24 65/24 66/18 73/16 73/22
**agreement [8]** 32/1 32/21 33/4 39/3 39/19 40/2 41/13 42/10
**agrees [2]** 40/20 83/5
**ahead [2]** 28/12 71/11
**AL [1]** 1/8
**all [79]** 4/18 4/23 4/24 5/9 6/6 7/8 9/2 12/2 12/3 14/6 14/21 14/22 15/3 19/5 19/12 19/16 19/18 19/19 20/14 20/15 23/13 25/6 26/3 26/14 26/20 27/14 28/15 28/25 30/17 31/12 32/2 32/7 32/16 32/17 34/15 36/10 38/20 42/2 42/25 42/25 43/9 43/19 44/10 45/15 45/24 46/1 50/15 51/8 52/23 54/16 54/23 55/3 55/21 61/6 62/8 63/10 63/11 64/1 65/11 66/6 66/13 66/24 67/20 67/24 69/2 71/5 72/6 74/6 74/16 75/13 75/19 76/3 77/7 79/2 80/21 82/13 82/14 85/24 88/2
**allegation [2]** 40/25 41/7
**allow [2]** 14/18 57/10
**allowed [2]** 43/4 75/20
**allows [4]** 55/12 56/11 56/23 56/24
**almost [1]** 65/11
**along [1]** 9/7
**already [12]** 22/10 26/7 32/19 39/22 41/9 51/11 54/15 62/5 65/8 70/24 71/12 85/11
**already made [1]** 26/7
**also [19]** 9/10 11/22 11/25 12/20 18/13 19/14 22/14 27/1 27/9 28/18 34/18 35/4 48/9 49/20 53/25 66/8 69/7 74/21 79/23
**Alsup [11]** 5/2 6/5 38/10 38/15 75/12 78/2 83/5 83/7 84/15 85/1 85/15
**alternative [1]** 34/10
**Although [1]** 63/18
**Altium [1]** 72/23
**always [5]** 7/9 7/12 12/24 51/6 52/7
**am [4]** 32/9 32/10 43/23 73/11
**amenable [1]** 21/4
**Amendment [5]** 57/15 69/25 70/13 86/9 86/25
**amount [2]** 7/2 80/10
**analogue [1]** 57/1
**ANDREA [2]** 2/4 4/11
**another [7]** 9/10 10/14 13/14 42/1 71/25 80/12 81/12
**answer [7]** 16/18 19/25 23/13 45/2 46/12 53/8 75/18
**answered [2]** 5/11 5/12
**Anthony [4]** 2/18 8/18 44/7 45/22
**anticipate [1]** 63/1
**anticipated [1]** 16/17
**anticipating [1]** 41/14
**any [27]** 5/8 5/17 7/14 15/24 18/1 21/13 24/9 28/21 31/7 38/20 48/12 48/15 57/6 59/17 61/24 64/2 66/7 68/5 70/12 71/7 73/4 74/25 74/25 83/9 84/8 84/22 86/19
**anybody [1]** 52/6
**anymore [3]** 21/16 42/20 63/21
**anyone [2]** 7/16 61/7
**anyone's [1]** 85/16
**anything [18]** 5/22 8/3 23/7 43/23 45/10 48/4 66/1 67/3 68/15 68/16 73/5 73/9 76/10 83/2 84/1 84/7 84/9 87/11
**anyway [3]** 22/13 57/15 80/19
**apart [1]** 21/1
**apologies [1]** 45/17
**apparently [1]** 63/13
**appeal [1]** 86/11
**appear [1]** 79/25
**appearance [2]** 4/8 6/14
**appearances [5]** 1/13 1/22 2/1 3/1 4/6
**applied [6]** 42/10 64/2 64/16 64/17 67/6 68/6
**applies [3]** 9/15 32/4 39/3
**apply [4]** 39/19 40/14 40/19 61/13
**appreciate [2]** 39/21 87/9
**appropriate [2]** 17/10 79/20
**April [6]** 8/16 32/19 33/11 33/11 39/25 41/14
**arbitration [3]** 7/11 41/9 41/21
**are [118]**
**are not [1]** 87/19
**area [1]** 43/1
**areas [1]** 68/11
**aren't [2]** 13/4 79/24
**argue [3]** 5/13 53/8 77/4
**argued [2]** 69/17 83/7
**argument [11]** 5/16 15/13 22/5 25/21 28/9 35/15 36/19 40/3 49/14 53/7 70/10
**Armada [1]** 50/4
**around [1]** 21/24
**arranged [1]** 72/21
**Art [1]** 4/16
**articulated [1]** 11/5
**ARTURO [1]** 2/8
**as [87]** 7/12 7/24 7/24 8/14 8/14 8/14 8/15 10/4 14/5 14/19 14/23 15/5 17/7 18/23 23/20 24/3 26/6 26/9 26/19 28/20 28/21 31/5 31/6 33/11 33/24 33/24 34/6 34/10 36/6 37/10 39/24 44/7 44/7 44/8 44/24 45/5 46/13 46/15 47/13 48/7 48/17 49/15 50/16 51/9 51/20 53/23 54/17 56/8 56/21 58/14 58/18 59/7 61/6 61/6 62/10 62/10 62/12 62/12 62/22 63/13 63/20 65/12 65/12 67/16 67/16 69/4 69/23 71/1 71/1 72/5 72/16 73/20 73/20 74/25 76/7 76/8 76/15 76/16 79/7 79/25 82/2 82/4 82/20 82/23 83/23 84/6 87/23
**aside [1]** 7/3
**ask [10]** 26/5 29/4 29/9 46/14 64/13 74/3 77/24 78/1 78/3 82/2
**asked [7]** 20/20 26/21 62/13 71/14 71/18 71/24 85/1
**asking [3]** 19/2 50/7 57/2
**asks [1]** 5/3
**asserted [2]** 14/18 80/7
**assertion [1]** 30/25
**assertions [1]** 38/20
**assigned [3]** 47/14 47/15 47/17
**assistance [1]** 28/20
**associated [2]** 11/20 21/18
**assume [8]** 29/19 37/8 40/24 67/22 67/22 79/11 79/14 81/10
**assuming [2]** 85/7 86/8
**assumption [1]** 51/11
**assurance [1]** 72/19
**attached [2]** 17/22 48/2
**attachment [1]** 9/25
**attempt [2]** 15/23 35/8
**attention [3]** 13/23 14/4 73/25
**attorney [17]** 24/10 30/25 31/8 31/14 32/3 32/4 33/3 39/5 41/4 53/1 58/5 58/14 70/5 73/12 74/25 77/15 86/6
**attorney's [1]** 24/16
**attorney-client [12]** 30/25 31/8 31/14 39/5 41/4 53/1 58/5 58/14 70/5 73/12 74/25 86/6
**attorneys [13]** 7/17 9/6 9/8 9/10 12/1 24/11 31/7 39/15 54/12 63/2 64/4 70/2 74/21
**August [3]** 1/11 4/1 89/7
**Austin [5]** 31/17 31/17 31/19 31/21 32/8
**authorization [1]** 57/3
**available [8]** 20/11 26/7 29/6 47/17 47/21 67/10 74/15 81/10
**Avenue [2]** 1/19 2/19
**avoid [1]** 72/11
**aware [6]** 33/16 34/5 34/8 69/2 84/3 85/13
**away [3]** 46/14 74/8 82/9

**B**

**back [24]** 14/23 20/7 20/10 23/8 28/16 29/14 29/20 30/5 30/9 30/19 43/6 43/14 44/3 50/12 61/15 68/2 68/18 69/15 76/12 85/22 85/23 85/23 87/18 87/20
**backup [1]** 72/17
**backwards [2]** 69/12 69/12
**bad [1]** 53/12
**BAILY [5]** 1/16 4/9 31/4 32/9 36/12
**BAKER [10]** 1/20 4/10 10/8 10/10 12/9 24/17 43/17 45/10 47/12 48/6
**balance [1]** 74/5
**bank [2]** 55/19 58/3
**basically [3]** 34/6 34/13 74/13
**basis [2]** 31/11 37/17
**bat [1]** 66/4
**Batalo [2]** 1/23 89/10
**Battery [1]** 3/3
**be [137]**
**beast [1]** 61/11
**became [2]** 35/14 35/16
**because [84]** 5/4 6/9 6/21 7/10 8/2 8/10 9/21 12/24 13/23 15/18 16/1 16/11 16/18 16/25 17/25 21/11 22/1 23/20 24/6 24/7 25/25 28/1 28/5 28/7 28/14 28/15 29/5 30/6 32/24 33/16 33/20 33/21 34/8 34/19 36/9 38/1 39/25 40/4 43/3 44/15 44/17 44/18 46/15 47/17 48/11 49/1 49/9 49/24 51/14 53/2 53/2 53/11 53/18 54/21 55/11 57/9 57/15 57/16 57/25 59/24 60/23 61/8 61/14 62/13 63/5 64/19 67/2 70/12 70/23 71/7 71/16 72/6 73/9 74/15 75/18 77/6 77/16 78/1 80/14 82/9 83/6 84/14 85/13 86/9
**becomes [1]** 64/18
**been [40]** 7/23 8/2 8/14 8/15 10/20 12/5 14/5 14/6 14/15 16/20 16/23 18/16 19/18 20/25 22/6 22/10 23/7 25/3 25/18 25/19 27/21 29/25 33/15 35/12 36/10 38/19 41/8 43/20 45/3 46/1 46/10 47/25 48/2 51/22 54/21 58/10 75/20 77/8 84/18 85/3
**before [30]** 1/4 7/1 14/4 17/18 19/21 20/2 21/14 21/21 29/22 35/9 36/1 36/13 38/5 39/12 39/13 40/10 40/11 41/18 43/11 56/14

**B**

**before... [10]** 56/14 61/24 63/14 66/22 67/6 68/5 73/17 81/14 82/15 84/14
**begin [3]** 71/6 80/14 83/1
**beginning [2]** 23/20 40/16
**begun [1]** 79/10
**behalf [5]** 52/12 52/14 52/16 52/17 52/19
**behave [1]** 77/8
**behaving [1]** 77/8
**behind [1]** 34/21
**being [15]** 12/10 15/14 15/16 30/3 31/11 32/21 33/7 33/9 41/2 49/15 51/10 51/20 62/23 63/1 87/8
**believe [11]** 6/13 7/5 12/15 27/2 31/22 32/23 42/3 45/24 51/24 61/25 64/19
**believed [2]** 35/18 35/23
**benefit [2]** 19/22 57/11
**Bentley [3]** 33/25 40/3 41/25
**Berkeley [1]** 2/20
**best [3]** 21/5 62/16 73/17
**bet [1]** 5/23
**between [8]** 9/17 10/18 10/24 23/6 31/21 37/15 38/2 76/4
**beyond [1]** 56/17
**bias [1]** 25/13
**big [1]** 14/25
**bigger [1]** 5/25
**binder [1]** 45/16
**binding [1]** 49/11
**birthdays [1]** 68/21
**bit [4]** 30/6 33/16 72/8 81/8
**Bit9 [1]** 50/4
**BLUNSCHI [3]** 3/10 52/18 58/15
**BOIES [2]** 2/9 4/20
**bonus [2]** 34/8 37/3
**boom [2]** 67/23 67/25
**both [2]** 50/11 62/2
**both on [1]** 50/11
**bother [1]** 84/12
**bottom [1]** 17/16
**Boulevard [1]** 2/10
**BRAUN [1]** 2/16
**breach [1]** 86/6
**breached [1]** 86/20
**brief [1]** 17/22
**briefing [1]** 16/2
**briefly [2]** 25/7 82/19
**Briefs [1]** 70/11
**bring [12]** 5/14 13/23 14/4 15/10 15/24 16/3 49/5 50/21 51/1 51/18 73/25 74/17
**broad [3]** 33/5 57/13 57/13
**broadly [1]** 7/16
**brought [4]** 14/10 23/8 50/17 77/14
**Brown [40]** 7/5 9/1 9/2 9/7 9/14 10/18 10/24 11/25 12/5 12/9 12/12 15/4 16/17 16/21 19/18 20/10 20/18 20/25 21/1 21/10 21/14 22/8 23/19 26/7 27/7 27/16 29/5 30/1 30/11 30/14 44/25 45/1 46/12 47/19 48/6 49/18 49/24 50/5 50/15 51/15
**Brown's [2]** 14/13 22/8
**BROWNSTEIN [3]** 3/6 3/7 52/14
**Brownstein's [2]** 55/2 55/15
**buckets [1]** 83/21
**Building [1]** 2/23
**burdensome [2]** 49/16 50/2
**business [3]** 51/22 74/22 78/20

**C**

**CA [10]** 1/16 2/3 2/7 2/10 2/14 2/17 2/20 3/3 3/7 3/10
**CALIFORNIA [4]** 1/3 1/11 1/15 29/4
**call [3]** 35/10 52/7 82/16
**Calling [1]** 4/4
**came [5]** 4/24 28/25 39/14 50/12 64/4
**camera [2]** 12/24 15/11
**Camp [1]** 50/4
**can [74]** 4/5 4/8 5/4 5/6 5/16 6/13 7/20 11/7 11/17 13/15 13/16 16/3 16/4 18/7 20/8 20/14 20/16 24/11 24/13 24/15 24/23 28/20 28/24 29/13 29/14 42/5 45/12 45/14 46/25 46/25 47/5 47/19 48/8 48/13 48/16 48/20 51/1 51/2 51/17 54/18 55/18 57/23 58/2 58/13 58/18 59/13 62/6 62/14 63/3 66/4 67/10 71/5 71/6 71/8 71/21 72/1 72/10 72/13 73/4 73/18 73/20 74/9 74/10 74/15 74/23 75/3 75/3 78/15 80/10 81/24 82/9 82/25 85/20 87/11
**can't [19]** 13/5 15/12 29/23 33/2 34/24 38/25 39/15 44/16 44/19 48/21 48/21 58/9 61/14 63/22 66/16 67/3 72/6 76/10 76/15
**candid [1]** 51/11
**cannot [2]** 43/4 68/24
**capacities [1]** 74/22
**capture [1]** 64/8
**car [1]** 23/23
**card [1]** 48/1
**care [3]** 43/9 47/5 57/22
**case [21]** 12/22 15/2 22/22 24/12 39/24 41/6 42/9 42/20 42/21 44/4 50/8 51/4 51/4 53/13 55/16 57/19 58/4 69/15 69/17 82/3 85/25
**cases [2]** 13/1 51/5
**categories [2]** 43/21 44/16
**category [2]** 21/15 44/19
**center [2]** 22/6 22/19
**centerpiece [1]** 15/2
**CEO [2]** 81/9 82/2
**certain [3]** 44/8 70/24 71/2
**certainly [10]** 6/25 26/1 45/21 53/19 54/17 60/15 62/14 71/21 72/1 78/13
**CERTIFICATE [1]** 89/3
**certify [1]** 89/4
**challenge [1]** 80/23
**challenging [1]** 14/6
**CHANG [2]** 2/8 4/17
**change [2]** 32/20 79/22
**characterization [1]** 76/8
**charge [1]** 18/13
**CHATTERJEE [9]** 2/14 4/14 6/18 13/22 15/24 23/17 25/16 43/14 45/14
**Chatterjee's [1]** 10/12
**Chauffeur [3]** 11/15 18/13 73/1
**check [5]** 43/10 48/1 63/6 63/8 74/4
**Chin [1]** 21/19
**chips [1]** 34/13
**choice [1]** 48/22
**choices [1]** 76/16
**Circuit [18]** 6/10 31/24 35/15 41/4 53/15 63/7 64/23 65/13 67/21 71/8 74/14 76/11 79/2 84/16 84/24 86/12 86/22 87/23
**circumstances [1]** 33/14
**claim [3]** 18/15 32/14 53/1
**claims [1]** 69/10
**clarification [6]** 5/3 10/16 26/6 55/25 62/10 78/24
**clarify [1]** 63/6
**clarity [1]** 59/6
**claw [5]** 43/6 76/12 85/22 85/23 85/23
**claw-back [1]** 76/12
**clawed [1]** 87/18
**clawed-back [1]** 87/18
**clawing [1]** 87/20
**clear [6]** 8/17 17/13 19/7 35/14 35/16 35/18
**clearly [1]** 24/14
**client [21]** 25/18 30/25 31/8 31/14 32/3 39/5 41/4 53/1 55/2 55/14 55/15 55/22 57/9 58/5 58/14 58/23 70/5 73/12 74/25 86/6 87/9
**clients [2]** 31/21 32/12
**close [7]** 7/1 8/16 13/20 17/10 19/11 50/24 60/14
**closes [1]** 32/19
**co [5]** 32/1 32/4 32/12 33/2 33/3
**co-defendant [2]** 32/4 33/2
**co-defendant's [1]** 33/3
**co-defendants [2]** 32/1 32/12
**Coast [1]** 29/5
**cohorts [1]** 9/14
**coincidence [1]** 54/2
**Colin [2]** 3/5 52/14
**collection [1]** 72/17
**colored [1]** 33/15
**come [14]** 6/13 12/25 16/8 28/16 29/17 32/21 34/8 38/8 40/3 43/14 59/19 59/20 68/2 72/11
**comes [4]** 4/6 6/20 74/9 81/11
**comfortable [2]** 46/11 64/7
**coming [3]** 61/8 82/5 82/6
**comment [2]** 10/12 35/13
**commentary [1]** 27/23
**commit [2]** 10/4 60/13
**common [12]** 31/11 31/23 33/7 33/9 38/20 40/15 40/17 40/18 40/22 40/23 41/13 69/25
**Commonwealth [1]** 2/13
**communicated [3]** 7/5 15/15 15/16
**communicating [2]** 66/11 74/20
**communication [12]** 15/22 31/15 33/17 34/6 34/9 34/10 37/6 37/11 37/15 39/8 39/11 76/6
**communications [30]** 7/8 7/15 9/2 9/17 10/18 10/24 11/1 15/3 19/6 19/13 19/20 19/22 20/3 22/3 22/8 22/9 22/14 23/6 27/15 31/21 33/8 40/21 42/7 42/13 58/3 65/4 68/13 70/4 74/25 76/4
**companies [3]** 27/23 66/15 74/22
**company [2]** 68/25 82/2
**compel [8]** 8/5 48/18 48/19 48/22 50/9 50/14 50/18 50/21
**compelled [2]** 7/4 75/12
**complaining [1]** 66/1
**complete [1]** 64/1
**completely [5]** 16/22 54/25 65/25 68/14 74/4
**completing [1]** 79/12
**compounds [1]** 36/24
**comprehensive [1]** 71/18
**concedes [1]** 40/11
**concern [3]** 49/17 56/13 64/18
**concerned [1]** 10/25
**concerns [7]** 59/9 59/10 59/10 62/25 62/25 69/24 86/25
**conduct [1]** 57/3
**conducted [1]** 7/17
**conducting [2]** 12/21 81/14
**confer [7]** 10/3 10/6 10/13 10/13 10/23 15/7 28/20
**conferred [2]** 35/7 83/11
**confers [2]** 44/14 50/10

**C**
confidence [2] 9/18 64/3
confidence that [1] 44/3
confident [1] 32/14
confidential [1] 17/7 18/1 18/2 18/5 25/17 37/2 43/24
confidentiality [2] 26/19 66/16
confirm [3] 39/2 42/5 55/18
confirmation [1] 39/18
confirmed [1] 32/24
conflicted [1] 42/14
conflicts [1] 5/18
confusing [1] 42/8
confusion [1] 37/14
connect [1] 35/11
connection [1] 57/18
consequences [1] 61/12
considerations [1] 7/17
consistent [1] 73/3
consists [1] 59/17
constitute [1] 76/25
contend [1] 59/8
contents [3] 40/17 40/21 68/24
continued [3] 1/22 2/1 3/1
contradicts [1] 28/8
contributions [1] 30/7
conversation [10] 32/22 33/2 37/20 37/22 38/2 39/17 40/4 40/5 41/23 43/4
conversations [7] 16/11 21/18 22/20 23/21 32/13 35/17 39/6
conveyed [2] 10/2 26/9
COOPER [6] 2/17 4/21 4/22 57/24 58/1 74/13
cooperate [2] 14/24 81/9
cooperating [1] 34/23
coordinate [1] 62/15
copied [1] 23/7
copy [3] 84/18 85/4 85/10
Corley [1] 1/4
correct [13] 14/11 17/23 27/17 35/22 44/5 47/18 50/1 51/19 53/5 56/23 79/13 66/21 89/4
could [35] 5/22 6/25 14/10 16/1 16/2 19/17 23/12 23/24 26/5 26/19 32/3 32/8 38/25 42/22 44/23 48/6 50/6 51/16 60/15 63/2 63/10 63/16 65/1 69/17 70/10 70/20 74/7 74/17 80/2 80/10 81/8 81/25 87/5 87/9 87/21
couldn't [3] 2/17 42/1 57/24
counsel [1] 31/22
counting [1] 51/20
couple [5] 11/7 11/12 40/13 62/20 65/21
course [10] 5/18 5/22 6/21 7/10 17/20 30/1 42/20 60/18 72/24 78/19
court [16] 1/2 3/4 24/7 24/9 34/7 34/7 37/10 51/8 52/8 52/9 52/11 52/25 56/15 57/2 60/21 78/19 89/10
courtesy [1] 36/6
courtroom [2] 17/8 17/10
covered [2] 66/5 66/17
created [4] 27/22 36/9 56/10 62/8
creating [3] 36/7 75/2 75/4

**D**
D.C [2] 35/13 36/19
dah [3] 75/24 75/24 75/24
dah-dah-dah [1] 75/24
dark [3] 65/17 65/20 72/15
data [18] 43/22 44/7 45/22 45/23 46/1 46/1 46/4 46/5 47/25 49/19 49/22 49/25 50/5 50/7 50/10 51/16 63/1 71/15
database [14] 56/11 59/7 62/7 63/19 63/23 67/5 68/4 70/24 71/14 71/19 71/23 72/22 73/6 83/21
databases [1] 63/25
date [9] 26/9 26/19 36/15 61/4 61/5 61/6 66/12 74/16 89/17
dates [2] 26/20 70/22
DAVID [5] 1/17 3/7 4/11 52/13 78/7
day [10] 29/20 33/24 50/21 50/22 50/22 51/25 60/8 61/21 61/8 72/2
days [9] 7/1 34/20 50/23 51/6 51/18 51/23 51/25 60/10 60/11
deadline [2] 14/6 65/9
deal [12] 8/12 13/24 13/25 13/25 14/1 14/25 32/19 76/14 77/9 78/16 81/9 85/19
dealing [1] 85/21
dealt [1] 70/10
decided [2] 32/7 90/25
decision [1] 75/21
decisions [2] 80/22 80/24
declaration [3] 32/24 33/22 38/24
decrypted [3] 62/5 62/17 79/25
deemed [1] 64/4
defend [1] 24/8
defendant [5] 2/6 2/12 32/4 33/2 87/25
defendant's [1] 33/3
defendants [5] 1/9 32/1 32/12 34/21 75/13
defense [12] 5/9 13/2 31/25 32/20 32/23 33/3 39/3 39/19 40/2 40/5 41/3 42/10
defenses [1] 69/10
definitely [1] 87/22
delayed [2] 37/25 63/11
deleted [2] 66/6 66/9
deliver [1] 45/16
depends [5] 39/7 40/20 78/5 78/10 78/13
depose [5] 19/12 19/14 26/4 65/2 82/16
deposed [10] 14/15 14/21 16/16 19/19 29/9 29/9 45/1 48/12 48/14 82/9
deposing [1] 77/22
deposition [34] 5/20 5/20 5/21 18/18 19/5 19/16 20/11 20/12 20/13 20/16 21/18 23/9 23/25 24/7 24/10 24/16 26/6 29/9 29/20 30/13 42/20 44/25 65/15 75/17 75/22 77/16 78/5 78/6 78/14 81/8 81/10 81/15
depositions [5] 20/5 28/15 29/4 29/18 60/8
described [2] 83/1 86/10
describes [1] 87/14
designated [8] 17/7 18/2 25/17 25/17 44/3 43/23 47/23 47/25
designations [3] 25/23 28/19 28/19

criminal [1] 5/7
CSR [2] 1/23 89/10
culled [1] 71/15
currently [1] 64/22
custodians [1] 11/19
cut [2] 24/15 29/15
cuts [1] 29/15
CV [2] 1/7 4/4

despite [1] 19/19
destroyed [1] 62/23
details [2] 66/16 79/1
determination [1] 80/15
device [5] 57/9 58/25 76/17 79/24 80/1
devices [46] 53/25 54/24 55/1 55/5 55/6 56/1 59/24 60/1 60/4 60/4 61/3 61/14 61/15 61/18 61/22 62/2 62/23 62/24 62/5 62/9 62/11 62/13 62/14 64/5 66/4 66/5 66/14 67/8 72/15 72/21 78/17 78/17 79/2 79/22 79/3 79/9 79/9 79/19 79/19 80/9 81/11 83/11 86/10 87/3
dice [1] 12/25
did [52] 9/7 9/14 10/13 11/22 11/25 11/25 12/13 21/25 24/7 27/4 27/5 27/15 30/11 32/16 32/18 32/20 33/21 33/11 33/22 33/10 38/15 41/18 44/6 44/9 44/17 50/14 53/2 53/5 53/5 53/11 53/18 54/11 55/22 58/23 58/25 58/9 64/14 75/17 77/19 80/14 81/21 82/11 86/14 87/2
didn't [19] 5/5 6/2 13/25 14/2 14/9 23/7 25/13 30/1 32/3 38/4 46/6 48/2 49/21 53/5 54/17 58/25 60/13 62/16 77/20
difficult [1] 72/8
diligence [10] 55/11 53/22 55/7 56/6 64/12 64/20 67/14 67/23 68/10 79/7
diligent [1] 71/12
diligent [1] 53/18
directed [2] 6/22 90/1
direction [1] 34/15
directly [1] 41/8
disagree [6] 5/24 23/9 42/22 58/6 58/22 59/4
disagreed [2] 35/23 39/23
disagreeing [1] 53/19
disagrees [1] 39/23
disappeared [1] 40/7
disclose [4] 13/8 67/23 70/14 72/9
disclosed [6] 5/15 22/10 70/4 70/7 72/10 87/3
disclosing [3] 15/21 33/17 37/25
disclosure [1] 54/20
disclosures [1] 15/24 15/8 55/6
discoverable [1] 76/11
discovered [1] 76/23
discovery [12] 7/1 8/16 13/21 19/11 21/24 74/20 50/34 51/6 51/25 60/14 61/4 84/8
discuss [4] 8/8 17/8 75/7 75/13
discussing [2] 84/19 8/13
discussion [1] 80/8
dispel [2] 51/10 51/11
disproportional [1] 49/4
dispute [6] 7/19 22/21 48/5 70/6 78/20 79/20
district [3] 1/2 1/3 51/7
division [1] 23/22
do [80] 7/3 7/4 10/5 13/5 15/11 16/1 16/4 19/19 20/8 23/7 23/16 24/8 24/9 24/20 24/20 26/21 29/25 31/4 31/2 31/7 31/17 31/17 40/1 40/1 44/22 45/5 45/6 47/10 48/8 49/4 50/14 50/20 54/5 54/11 55/4 55/9 56/25 57/1 61/8 62/25 66/18 73/1 73/4 73/19 74/5 75/2 76/6 79/4 82/1 82/19 83/15 83/17 84/6 85/14 86/8 86/25 87/13 88/1
doc [1] 76/8
docs [2] 36/5 36/20
doctrine [1] 31/13
document [8] 11/17 11/18 12/3 12/12 17/14 18/5 22/2 75/11
documents [44] 7/25 8/2 8/6 8/14 9/22 12/9 16/3 16/20 17/19 18/17 20/5 21/17 22/25 25/18 26/15 27/19 27/25 28/25 29/20 43/15 51/24 53/3 56/1 59/8 63/6 63/24 64/3 64/6 64/12 64/22 65/10 68/12 68/25 72/21 73/13 74/17 82/13 83/23 84/9 85/4
does [8] 23/21 39/4 48/5 52/14 52/22 68/2 71/19 84/22
doesn't [12] 8/22 15/8 15/9 21/11 22/2 29/14 41/3 42/6 44/17 56/5 61/13 65/17 73/10
doing [14] 14/5 25/21 27/3 28/14 51/25 55/20 58/22 58/23 68/10 68/19 72/2
Dolphin [1] 2/3
don't [109]
done [12] 8/25 9/10 15/1 15/18 27/18 43/24 57/7 57/20 57/21 59/1 62/3 62/16 73/16
downhill [1] 38/19
download [2] 18/15 37/2
Drive [2] 2/7 2/13
due [7] 53/22 55/7 53/22 55/7 56/6 64/12 64/20 67/23
Dunn [1] 36/5

**E**
each [2] 23/20 79/23
earlier [3] 14/10 14/15 71/3
early [6] 13/24 60/10 60/19 70/20
easier [1] 47/24
East [1] 29/5
easy [2] 62/12 65/11
Ed [1] 64/19
EDWARD [1] 2/11
effect [3] 35/24
efficiently [1] 84/11
EHRLICH [16] 2/19 2/20 31/3 31/5 31/22 48/24 58/1 52/16 56/18 56/19 59/18 60/17 61/23 62/5 63/8 66/19 68/9
either [4] 25/24 45/8 53/8 60/3
eliminate [1] 23/12
else [6] 33/22 33/22 38/6 47/15 87/11
email [13] 27/16 36/16 37/1 37/6 37/7 37/8 37/14 37/17 37/20 37/20 37/23 38/3 38/25
ENANCE [1] 84/4
encrypt [2] 12/16 13/9 13/11 13/17 17/12 63/10 63/14 63/22
employed [1] 41/2
employee [1] 67/1
employer [2] 62/16 62/17
encapture [1] 66/19
encompass [1] 15/8
encompassed [1] 90/13
encourage [1] 65/8
encrypt [2] 86/10 86/10
encrypted [1] 79/2
end [5] 6/9 6/10 55/16 55/18 60/10
endeavor [1] 70/18

ending [1] 6/21
engineer [2] 18/12 22/22
engineers [1] 45/24
enough [4] 49/1 74/4 80/21 82/7
ensued [1] 61/24
enter [1] 76/24
entire [2] 16/23 55/8
entirely [1] 90/7
entitled [4] 5/9 12/2 24/15 62/14 90/1
entity [1] 67/18
enough [6] 49/1 55/16 53/22 55/7
equally [1] 41/20
Eric [2] 41/20 82/4
Erie [1] 15/8
especially [2] 15/12 18/5
ESQUIRE [16] 1/16 1/17 1/18 1/20 2/6 2/11 2/12 2/17 2/18 2/20 2/24 3/4 3/7 3/10
essential [1] 30/1
essentially [7] 9/23 32/17 55/4 62/24 62/6 70/6
ESTHER [2] 2/8 4/7
ESTIQRIE [1] 2/14
ET [1] 1/8
etc [1] 75/14
evaluating [1] 50/13
even [17] 7/13 7/16 9/19 20/3 23/9 26/24 29/24 30/9 34/19 40/16 54/9 65/10 68/25 71/8 72/17 79/20 80/8 87/11
event [4] 5/8 48/12 48/15 83/9
eventually [1] 76/24
ever [22] 54/1 83/8
everybody [8] 39/23 39/24 40/5 40/20 52/6 72/10 82/6 83/10
everyone [6] 7/15 19/7 38/1 52/22 56/5 72/24
everything [9] 9/18 11/9 16/25 18/2 23/25 30/8 58/5 64/22 86/3
evidence [5] 34/20 34/25 40/14 72/25 77/23
execute [2] 35/24
exactly [16] 10/17 11/5 19/19 22/17 28/2 46/13 66/12 77/6 84/20
examination [2] 36/25 37/7
examinations [1] 37/9
example [5] 13/14 27/21 59/20 68/17 77/18
examples [2] 9/22 11/6
Excellent [1] 6/4
exception [1] 61/14
exchange [1] 57/10
excluded [1] 54/6
excluding [1] 24/25
Excuse [1] 24/2
executive [1] 21/19
exhibit [8] 11/13 11/18 13/15 17/15 17/11 17/12 17/16 45/13
exhibits [1] 17/15
exist [1] 46/11
existed [1] 11/9
exonerated [1] 16/23
expeditiously [1] 37/23
explained [5] 19/19 19/21 50/5 50/9 50/10
explanation [2] 47/4 56/18
explore [1] 31/16
explored [1] 43/1

extensive [2] 17/21
extensively [1] 13/19
extent [13] 5/13 7/19 13/10 15/22 19/9 20/17 37/13 55/14 57/23 67/12 74/12 74/24 86/2
extreme [3] 59/10 59/11 68/19 69/6 69/6
extreme [1] 69/7
extreme privacy [1] 69/6

**F**
fact [8] 48/23 54/2 57/21 60/5 60/4 72/8 85/16 87/18
facts [4] 33/6 35/9 60/20 84/21
factual [1] 27/18
fair [2] 49/1 87/6
Fairfield [1] 29/1
fall [1] 34/14
falling [1] 34/14
false [1] 54/25
far [2] 72/4 75/24
FARRELLA [1] 2/16
FARMER [1] 3/6
faster [2] 24/16 71/22
fault [2] 33/17 35/4
FARRE [1] 36/13
favor [2] 54/20 54/20
FCRR [2] 1/23 89/10
features [1] 20/23
February [4] 33/25 40/3 40/9 40/10
Federal [17] 6/10 6/12 55/5 55/7 55/13 64/15 64/17 65/12 71/9 71/11 71/14 76/5 84/16 84/22 84/25 84/23 87/23
Ferry [1] 2/8
few [1] 34/20
Fifteen [4] 57/5 57/6 57/14 69/23 69/25 70/1 86/8
figure [7] 33/1 43/20 65/16 65/21 70/7 74/10 75/1
figuring [2] 19/9 48/12
file [3] 16/23 45/15 56/21
filed [4] 3/13 5/3 14/23 77/23
files [10] 16/15 17/13 18/12 18/14 18/16 18/19 18/22 62/7 71/24
filing [3] 33/13 33/13 67/4
finding [2] 36/16 36/17
fine [4] 16/6 16/6 59/20 59/23 83/10
firm [2] 9/17 24/6
first [22] 6/24 7/8 7/23 21/16 23/4 29/11 32/3 33/4 45/14 60/9 69/25 74/9 82/7 82/8 82/12 83/1
fish [1] 5/25
Fisher [1] 46/25
fits [2] 16/11
Five [3] 29/24 69/19
flexibility [1] 61/7
FLEXNER [2] 2/9 4/20
Floor [2] 1/18 2/3
flow [1] 29/21
fly [1] 29/13
focus [1] 67/14 80/23
focused [2] 67/14
FOERSTER [4] 2/6 4/7 47/4 47/21
folder [2] 72/20 73/1
folks [2] 10/18 22/14
forced [1] 55/3

forgoing [1] 89/4
foremost [1] 58/12
forensic [19] 11/15 11/20 12/6 12/22 14/2 15/16 22/9 22/23 22/6 67/1 30/6 43/3 47/16 47/24 54/1 54/3 56/1 56/9 62/9 62/11 67/7 79/23
forensics [1] 22/23
forever [1] 61/19
form [2] 40/13 6/24
former [1] 13/11
forth [1] 77/10
forthwith [1] 81/3
forward [4] 5/22 6/13 41/5 79/11
found [4] 18/24 31/22 36/9 36/21
four [2] 7/1 65/1
frame [4] 23/8 29/7 40/9
Francisco [7] 1/11 1/16 2/7 2/17 3/3 3/7 3/10
FranciscoCA [1] 2/23
frankly [2] 37/24 54/20
Friedberg [3] 5/8 52/19 65/3 82/17 82/18
friends [1] 77/21
front [4] 17/1 22/10 36/15 84/8
frustrating [2] 33/16 34/12
fry [1] 5/25
fulcrum [2] 19/5 19/8
full [6] 13/16 29/20 44/9 50/7 58/8 65/6
full-day [1] 29/20
full-on [1] 44/9
fully [2] 26/15 67/18
function [1] 21/9
further [3] 5/9 58/20 31/20 40/17
furthered [2] 33/7 33/9

**G**
Gardner [2] 41/19 86/18
gain [1] 26/6
gatekeeper [1] 21/8
gathered [2] 19/12 19/16
gave [3] 44/23 54/11 55/23
general [6] 13/5 13/19 34/6 61/16 70/25 72/13
gentleman [1] 65/7
get [47] 7/9 19/12 19/16 19/22 24/19 24/20 26/3 29/9 30/6 29/22
general [2] 34/6 34/18 84/15
genuine [3] 60/5 60/25 61/18 67/14 69/7
genuinely [1] 15/10
getting [4] 30/8 31/11 32/1 33/5
give [11] 11/7 11/10 13/13 15/19 39/24 54/5 56/19 56/22 59/20 56/24
given [10] 42/4 54 61/5 11/17 19/9 18/5 41/9 43/8 47/4 61/14
go [28] 5/22 6/8 11/13 12/2 12/10 12/13 13/14 13/22 13/21 17/8 22/1 23/24 33/1 33/17 50/2 51/24 54/5 54/5 54/25 65/10 65/10 66/9 70/21 72/1 76/15 76/5 81/1 85/12
goes [5] 6/8 5/1 42/2 54/17 72/10 74/6 77/15 90/7
going [90]
GONZALEZ [3] 2/8 4/7 5/7 52/2 31/19 39/1 52/13 87/3
good [18] 4/9 4/12 4/13 4/15 4/16 4/18 4/19 4/22 4/23 6/3 8/8 72/11 22/23 32/13 52/13 52/15 73/5
Goodman [1] 35/18
GOODWIN [1] 2/16
Google [4] 11/15 11/23 11/24 19/20

helpful [1] 87/14
helping [2] 17/15 34/6
her [1] 25/9
here [48] 6/9 6/13 7/10 11/12 13/12 16/2 16/3 16/4 17/6 24/6 24/7 29/8 29/4 31/22 32/17 32/22 33/14 34/19 36/14 36/8 36/13 40/4 41/1 47/23 48/8 49/1 49/4 51/14 51/22 52/6 53/16 53/21 54/11 57/2 59/1 59/8 60/3 60/13 60/20 62/1 62/11 65/1 65/25 69/21
here's [1] 48/18
hey [2] 26/25 30/8
hid [1] 26/6
high [6] 69/3
highly [2] 64/10
highly-relevant [1] 66/10
him [24] 14/18 14/19 14/21 19/10 19/12 20/9 26/16 26/19 26/22 36/16 36/20 37/10 39/19 39/4 41/5 45/13 45/16 65/3 69/9 77/2 81/15 81/10 82/8
himself [1] 39/3
hired [1] 14/2
his [16] 19/4 14/12 22/5 26/19 37/9 39/3 39/7 41/2 47/11 60/19 65/2 65/7 65/8 77/1 81/15 81/16
Honor [101]
Honor's [4] 12/16 42/23 60/9 80/17
Honorable [1] 1/4
hopefully [2] 64/15 84/12
hoping [2] 52/1 81/8
hour [2] 29/16
hours [1] 39/12
house [6] 17/3 17/3 17/5 17/20 83/12 85/15 88/23
how [19] 9/4 11/5 14/9 14/10 28/23 32/2 34/7 34/13 34/15 35/5 35/21 45/3 48/3 51/4 52/12 54/5 60/13 82/3 87/4 87/16
HR [1] 21/19
Hubbell [1] 86/25
hullabaloo [1] 47/21
humans [1] 62/11
hurry [1] 60/14
Hyde [1] 11/14
hypothetical [1] 77/19

**I**
I'd [6] 6/10 7/20 11/10 11/13 14/24 13/25
I'll [45]
I'm [97]
I've [34]
Idaho [1] 29/3
idea [1] 64/9
identical [1] 85/16
identified [4] 27/18 54/15 55/24 59/1 63/13 70/23 71/1

**I** (cont.)
identify [8] 55/17 57/23 62/16 64/5 67/2 71/3 71/22 83/2
involvement [1] 22/22
involves [1] 42/23
involves [1] 60/24 74/23
involving [2] 66/16 74/25
impede [1] 67/17
implemented [1] 62/23
implication [2] 56/7 73/14
implicit [3] 23/1
imply [1] 33/9
importance [2] 58/17 60/18
important [3] 58/19 58/24 58/25 67/1 76/12 81/17 81/3 82/13 83/13
impossible [1] 51/4
improperly [1] 11/2
in-depth [1] 36/4
in-house [7] 8/21 8/23 8/24 11/18 14/1 32/23 42/1
incentive [2] 45/11 45/11
inclined [1] 49/1
include [1] 86/23
included [1] 57/3 53/17
includes [1] 59/12
including [5] 12/16 26/21 30/8 62/8 65/9
incorporate [1] 51/18
incorrect [1] 46/6
indefinitely [1] 49/10
indefinitely [1] 49/19
indemnification [3] 33/10 40/1 41/8
individual [2] 11/17 12/7
individuals [3] 7/6 56/17 74/19
information [24] 6/22 15/21 15/23 17/7 17/12 17/13 18/1 18/2 18/5 27/16 30/4 37/13 39/20 43/13 43/22 43/23 43/25 44/6 51/20 54/16 67/10 67/11 69/7 80/19 82/18
inside [1] 6/11
insisted [1] 31/10
instance [1] 19/3
instead [3] 48/3 48/25 67/18
instruction [1] 34/2
intend [2] 20/10 81/1
intention [1] 75/25
intentionally [1] 62/24
intents [1] 33/14
interacting [1] 16/2
interest [17] 54/20 54/20
interesting [7] 70/13 70/15 71/17 72/21 73/16 74/1 78/7 80/6
interrogatories [1] 65/12
intersentence [2] 58/25 59/5
involved [11] 6/23 7/8 8/21 8/24 16/12 21/21 22/24 22/25 27/16 29/4 29/20 34/24
James [3] 9/14 37/16 45/13
JAEGER [1] 3/6
JAMES [4] 1/18 3/20 4/11 52/17
January [1] 82/5
Jeff [2] 4/10 44/24
JEFFREY [1] 1/17
jeopardize [1] 41/6
jeopardizes [1] 37/25
Jim [1] 4/11
job [1] 67/4
John [2] 4/18 42/4 52/17
Johnson [1] 15/17
joint [10] 31/25 32/18 32/24 33/2 39/18 40/2 41/3 42/10
Jonathan [2] 2/24 52/11
Jordan [2] 1/18 4/11
JUDAH [1] 1/18 52/17
judge [14] 1/4 3/3 3/20 34/24 37/25 45/23 75/2 78/2 78/20 82/16 83/17 86/25
judges [2] 52/7 87/16
July [4] 33/25 34/1 36/24 37/14
jump [1] 72/13
just [92]

**K**
Kalanick [6] 30/1 37/16 38/3 39/16 45/23 45/24 60/19 60/25 61/1 61/6 61/11 65/7 77/1 86/18 87/6 87/13
keep [4] 45/15 45/17 62/23 63/21
Keker [22] 3/2 3/5 5/16 6/1 6/2 6/3 6/9 6/11 6/15 6/20 6/21 6/24 7/3 8/5 12/14 12/21 14/5 14/9 14/14 15/1 16/3 16/5 16/10 16/16 16/23 21/24
Keker's [1] 6/22
kept [2] 61/22 63/15
kind [8] 8/5 11/7 12/4 12/25 13/13 14/1 20/22 26/6
Kiwi's [1] 11/6
KL [1] 1/15
knew [6] 6/3 6/4 14/7 26/5 60/16
know [103]
knowing [1] 36/4
known [1] 22/21
Kratcik [3] 2/23 23/6 26/16
Kratcik's [2] 6/17 23/6
Kristof [2] 2/24 23/6
Kohrisagar [1] 12/19

**L**
largely [1] 64/18
large [2] 59/11 60/11
last [7] 9/14 11/23 19/4 29/9 34/20 50/23 78/23
late [3] 6/20 14/6 53/25
later [4] 23/11 29/4 37/24 63/14
lawn [2] 63/9 63/18
lawyers [5] 11/15 21/25 32/13 39/1 55/20
lay [1] 82/15
layers [1] 72/19
lead [1] 34/7
least [4] 10/13 43/15 72/21 80/18
leave [1] 54/23
led [1] 82/14
left [2] 6/22 72/14 72/23
legal [2] 30/14 36/23
less [3] 67/7 69/20 69/23
let [16] 7/13 14/17 17/6 23/22 23/25 34/17 37/18 43/11 47/11 52/25 57/1 61/2 66/8 72/18 80/17 84/18
let's [9] 6/8 12/4 14/17 22/15 36/14 57/25 58/5 81/1 84/17
letter [6] 17/22 33/17 53/24 54/1 54/23 78/24 78/25 79/20 79/24
Levandowski [48] 2/18 8/13 12/18 19/10 23/11 26/5 26/22 28/22 29/14 31/10 33/22 34/13 34/17 34/23 35/14 37/16 37/17 38/3 38/24 40/17 41/5 43/3 45/3 45/8 45/13 45/16 45/23 46/4 46/6 47/11 60/19 60/25 61/11 62/16 65/1 65/2 65/3 65/7 65/8 77/1 77/2 81/10 81/15 82/3 82/8
Levandowski's [13] 30/24 34/21 37/9 38/23 39/3 39/7 40/19 41/2 65/7 77/1 82/3 83/4 87/6
liberally [1] 84/24
LIDAR [1] 27/22
life [3] 29/15 29/16 29/16
light [1] 61/13
like [17] 6/7 6/10 7/20 11/13 24/8 29/8 47/8 50/13 56/8 56/8 64/10 65/13 75/6 82/6 83/17 86/8 87/14
likely [1] 80/13
limitation [5] 55/12 55/13 55/14 69/4 70/8
limited [1] 58/17 59/5
line [2] 5/12 6/22
lists [1] 71/16
litigate [1] 21/15
litigation [8] 7/8 21/19 21/20 22/25 29/25 30/3 30/14 33/25 67/4
little [9] 19/7 24/15 41/19 42/18 42/19 54/24 63/24 83/18 83/19
LLC [2] 1/5 2/12 4/4
LLP [10] 2/6 2/16 2/22 3/2 3/5 3/9
long [5] 29/16 51/4 72/15 82/12 84/19
longer [1] 30/13 71/16 71/18
look [27] 7/16 12/6 13/14 16/9 17/2 18/3 26/6 40/25 50/12 52/3 68/19 72/19 73/5
looked [4] 22/5 22/6 28/12 54/16
looking [10] 12/6 17/19 18/3 33/6 36/23 46/14 54/22 67/17 73/7 73/16
looks [2] 55/16 36/9
lose [1] 60/13
lot [6] 22/6 29/21 34/6 36/4 58/16 58/24
love [2] 51/8 75/6
low [1] 76/19

**G** (cont.)
Gorman [3] 9/5 9/25 16/11 16/21 17/3 19/5 19/20 22/5 22/7 22/14 23/4 23/6 23/17 23/19 24/8 24/25
got [10] 9/1 25/15 32/22 37/21 41/19 69/11 71/9 75/10 82/23 83/21
gotten [2] 54/25 56/13 86/3
government's [1] 36/7
gradually [1] 71/15
Great [1] 88/3
grounds [1] 69/5
group [1] 30/12
Gudjonsson [12] 10/19 12/3 13/17 19/18 23/11 23/14 26/17 27/8 27/16 30/16 30/8 34/21 32/11 32/12
guess [10] 15/20 23/2 23/11 33/1 55/21 65/13 72/21 72/24 76/15
guidance [4] 18/18 72/1 81/13 84/5
guys [2] 43/19 70/19

had [48] 4/23 6/24 9/24 7/4 7/15 7/16 14/5 14/15 19/22 20/8 21/14 21/15 21/16 23/8 24/9 24/11 24/12 27/2 30/3 30/5 30/7 32/22 34/18 40/4 40/17 41/3 41/4 42/6 42/18 42/21 42/25 43/20 44/22 49/10 49/15 49/19 49/20 49/25 50/9 51/2 51/24 53/3 53/5 67/14 74/20 81/15 84/8 85/15 86/16
hadn't [2] 57/17 86/2
half-way [2] 38/14 38/14
hammer [1] 79/18
hand [4] 84/15 84/18 84/24 85/3
handed [3] 58/23 84/15 84/17
hands [2] 34/7 83/23
happen [14] 7/15 11/4 34/20 42/2 44/23 46/14 64/19 65/6 65/6 69/17 69/21 70/9 77/13 78/13 81/19
happened [2] 47/14 63/17
happens [1] 61/11
happy [3] 11/13 42/8 50/23
harassed [1] 56/11
harassment [1] 24/21
HARRISMAN [1] 3/4 24/5
harvested [1] 56/11
has [38] 8/14 16/2 16/8 16/9 16/18 20/21 25/5 25/12 26/6 27/16 27/19 28/14 32/20 32/21 34/13 39/1 43/6 51/19 51/22 55/9 66/3 67/6 67/8 71/2 71/2 71/3 72/4 72/11 77/25 78/23 81/19 81/25 83/25 84/8 84/8 85/11 85/13 88/1
hasn't [1] 73/5
hasn't [2] 31/14 53/23
have [90]
haven't [8] 9/11 15/20 21/4 46/6 64/25 83/11 83/15 84/1
having [3] 14/21 72/8 83/10
he [91]
he [97]
he'll [2] 37/6 81/10
he's [9] 39/7 60/19 77/1 81/15 82/9 82/8 86/18
head [4] 14/21 48/24 58/20
hear [4] 24/5 51/7 57/16 82/16
heard [3] 38/13 69/14 71/2
hearing [2] 78/25 90/1
hearings [3] 70/20 70/21
Hearst [1] 2/18
heart [1] 30/6
held [2] 35/23 35/24
help [2] 24/17 65/8 69/8
helicopter [2] 65/6
held [1] 85/19

**L**

located [1] 29/12
location [1] 87/15
log [14] 12/12 43/22 47/25 48/17 49/22 49/24 51/16 64/3 70/11 70/13 70/15 73/12 75/2 75/4
logged [1] 65/1
logs [1] 45/9
long [6] 7/1 32/10 36/13 61/6 67/16 72/1
longer [1] 39/7
look [19] 5/11 9/21 9/22 11/18 13/15 13/18 14/23 14/23 39/22 45/8 57/25 58/1 62/11 62/14 66/12 71/16 73/2 73/23 85/9
looked [4] 42/3 44/2 56/2 83/22
looking [5] 45/18 66/4 66/13 66/13 66/14
looks [1] 60/2
lose [1] 69/24
lost [1] 54/20
lot [7] 66/3 66/17 70/17 72/23 78/7 78/21
79/3

**M**

machine [2] 14/3 30/6
made [15] 14/21 25/16 26/7 28/10 35/9 35/9 35/12 36/13 40/25 43/21 44/21 48/21 49/9 78/17 80/22
Madison [1] 1/19
magistrate [1] 51/17
main [4] 27/6 53/13 72/16 85/17
make [17] 4/8 5/16 6/14 21/11 25/15 28/23 29/6 49/10 61/4 65/17 67/10 74/16 74/16 75/21 76/16 80/22 87/25
makes [9] 24/20 24/21 55/10 55/11 57/11 57/19 61/15 82/8 82/15
making [4] 22/5 35/18 80/2 84/5
manner [2] 43/4 85/7
many [6] 9/4 10/2 10/3 47/4 47/22 56/1
March [13] 31/6 33/11 33/18 33/19 33/22 34/1 39/6 40/10 43/4 44/4 45/24 45/25 66/11
margins [1] 42/22
marital [1] 77/18
mark [2] 59/7 72/3
Market [1] 2/7
MARTEL [1] 2/16
Martha [1] 35/10
Master [11] 2/15 4/21 10/15 15/25 28/21 49/10 55/18 59/14 63/3 68/11 69/4
matching [1] 72/4
material [2] 71/23 82/20
materials [3] 71/5 71/19 84/16
matter [8] 30/2 39/7 42/6 57/4 62/22 83/5 83/6 89/5
matters [2] 70/3 70/5
may [34] 9/10 11/10 13/8 16/8 16/8 24/2 36/5 53/19 54/2 57/21 58/6 59/19 59/20 65/7 65/8 68/4 68/6 69/1 70/16 70/16 72/21 72/22 73/13 73/17 75/9 76/1 76/1 76/17 76/19 78/13 81/6 81/18 85/22 86/10
maybe [24] 6/3 6/4 6/7 16/7 19/16 23/7 23/23 37/13 54/8 54/8 55/9 59/19 65/18 71/11 71/12 72/12 73/4 74/7 75/17 75/20 78/9 82/12 82/12 88/24
me [40] 4/10 5/5 8/11 10/7 12/8 13/13 15/10 16/6 17/1 19/7 19/7 19/10 24/2 26/24 28/10 36/3 36/5 38/3 39/22 42/3 43/15 45/5 50/16 51/13 53/16 55/5 59/11 64/7 70/7 70/2 73/6 73/25 75/12 75/22 75/25 78/21 79/6 81/20 84/22 85/1
mean [32] 11/24 15/8 15/9 22/2 26/20 32/6 40/12 40/23 40/24 41/3 41/7 45/21 59/19 59/23 65/16 67/5 70/7 71/11 72/5 72/13 73/18 74/1 78/5 79/6 79/17 80/3 81/6 83/19 83/22 83/25 85/5 86/22
meaning [1] 68/1
meant [9] 33/9 34/4 34/25 34/25 73/13 74/1 74/5 76/1 76/9 79/4 86/13 87/15 87/23
meet [9] 10/5 10/6 10/12 10/13 10/22 15/7 28/20 64/14 50/10
meeting [8] 33/24 33/25 39/3 40/16 40/17
meetings [2] 31/1 31/7
MELANIE [2] 3/10 52/18
MELISSA [2] 11/6 4/9
members [1] 26/17
memo [1] 12/17
Menlo [1] 2/14
MENY [4] 3/4 6/15 9/5 13/17
merits [1] 86/14
messages [5] 66/6 66/7 66/9 66/19 66/24
met [3] 83/11
metadata [2] 12/3 12/4
middle [2] 81/24 82/4
might [6] 4/24 10/19 23/6 33/5 51/22 54/6
MILES [2] 2/20 52/15
mind [1] 7/16
mindful [1] 17/6
Minneapolis [1] 19/10
minor [1] 87/7
minutes [1] 85/4
mispronouncing [1] 63/15
miss [1] 26/13
missing [1] 47/21
mistake [1] 25/16
mister [2] 25/10 26/12
mister that [1] 26/12
misunderstood [1] 30/15
mitigated [1] 60/5
mixed [1] 25/12
mixing [1] 43/8
MoFo [7] 41/22 42/14 42/14 42/16 71/4 81/25 82/21
moment [1] 63/6
Monday [2] 1/11 4/1
money [2] 76/21 80/19
Monica [1] 2/10
Montgomery [3] 2/16 3/6 3/9
more [11] 21/13 34/19 70/10 72/6 78/10 81/18 81/20 81/22 81/23 86/13 86/15
morning [5] 9/23 10/14 10/23 29/14 70/20
MORRISON [4] 2/6 4/17 41/20 84/21
most [6] 12/6 20/14 21/6 54/6 69/9 71/18
motion [14] 4/7 8/5 13/23 14/10 14/20 20/10 30/20 30/21 33/20 45/15 45/15 50/9 50/18 50/21
motions [2] 4/25 5/17
mounted [2] 72/7 79/24
move [4] 24/9 48/18 48/19 50/14
moving [2] 48/20 58/1
Mr [25] 6/18 10/12 19/3 19/19 23/5 23/6 23/6 23/24 31/5 38/2 40/1 41/1 88/4 88/9 49/18 50/15 52/7 52/9 54/23 55/2 62/1 67/14 74/20 82/1 83/8 84/22
Mr. [198]
Mr. Baker [8] 10/8 10/10 12/9 24/17 43/7 45/10 47/12 48/6
Mr. Bentley [3] 32/25 40/3 41/25

Mr. Brown [37] 7/5 9/ 16/2 9/ 9/14 10/18 10/24 11/25 12/5 12/9 12/24 13/4 14/8 16/21 19/18 20/11 20/18 20/25 21/1 21/10 21/14 22/8 23/19 27/7 27/16 29/5 30/1 30/11 30/14 44/25 45/1 46/1 48/2 49/24 50/5 51/15
Mr. Brown's [2] 14/13 22/6
Mr. Brownstein's [1] 51/1
Mr. Chatterjee [5] 13/22 15/24 25/16 43/14 43/14
Mr. Chatterjee is [1] 23/17
Mr. Cooper [3] 57/24 58/1 74/13
Mr. Ehrlich [11] 31/5 32/22 38/24 54/11 54/19 57/8 58/21 61/10 62/19 53/18 64/1
Mr. Ehrlich's [1] 61/18
Mr. Eric [1] 42/4
Mr. Friedberg [2] 82/17 82/18
Mr. Gonzalez [5] 5/7 52/3 39/1 39/2 81/25
Mr. Gorman [13] 9/5 16/11 16/21 19/5 19/20 22/5 22/7 22/14 23/4 23/12 23/19 24/8 24/25
Mr. Gudjonsson [7] 12/13 13/17 27/7 27/16 30/8 40/9 50/16
Mr. Kalanick [8] 37/16 38/3 39/16 66/6 66/8
Mr. Krafcik [1] 26/22
Mr. Krafcik's [2] 21/17 22/1
Mr. Kshrisagar [1] 12/19
Mr. Levandowski [50] 12/18 19/25 28/6 31/2 31/17 31/13 31/13 33/16 34/5 34/13 34/18 34/21 34/24 35/3 35/4 35/8 35/13 36/25 37/8 37/9 37/11 37/16 38/4 39/4 39/14 39/16 40/5 41/18 43/22 43/23 42/13 43/20 42/18 50/5 54/1 54/2 54/7 54/24 55/7 69/17 69/25 70/10 72/25 73/10 77/10 75/10 80/7 82/24 84/16
Mr. Levandowski's [18] 30/24 34/21 36/7 52/25 63/2 66/8 66/9 68/17 82/25 85/24
Mr. Nardinelli [2] 46/20 47/2
Mr. Nardinelli [1] 47/1
Mr. Patchen [2] 52/9 62/15
Mr. Patchen's [1] 55/14
Mr. Perloon [1] 78/6
Mr. Radford [1] 31/12
Mr. Ramsey [2] 35/7 35/10
Mr. Ron [3] 53/7 52/6 53/6 73/16
Mr. Ron's [2] 67/14 74/6
Mr. Schenk [1] 19/19
Mr. Schenk's [1] 77/13
Mr. Stroz [1] 82/16
Mr. Voonn [1] 27/1
Mr. Zbrozek [7] 9/18 20/19 23/21 26/9 27/9 27/10 27/16
Ms [2] 25/9 66/8
Ms. [11] 9/5 10/19 14/16 43/6 43/22 52/18 53/4 54/11
Ms. Baily [3] 10/4 32/9 56/12
Ms. Bleuschi [1] 56/15
Ms. Dunn [1] 36/5
Ms. Johnson [1] 15/4
Ms. Meny [2] 9/5 13/17
Ms. Padilla [2] 13/22 37/20
Ms. Padilla said [1] 39/13
much [6] 10/20 38/19 54/6 69/8 73/20
multiple [3] 30/7 63/24 66/10

**N**

myself [1] 74/15
mysterious [1] 67/15

**N**

name [7] 19/20 21/17 22/2 55/9 52/10 54/12 74/9
named [1] 21/19
names [1] 27/12
NARDINELLI [5] 3/7 4/10 44/24 46/20 47/2
Nardinelli [1] 47/1
narrow [1] 21/15
narrowing [1] 30/11
Nathaniel [1] 21/20
nature [8] 62/4 62/8 63/20 67/7 72/4 72/5 72/15 80/1
natives [1] 67/10
nature [1] 61/11
nauseam [1] 86/23
necessarily [5] 13/7 41/3 65/4 76/2 81/17
necessities [1] 5/2
need [30] 14/22 14/24 21/18 21/10 21/12 21/16 23/3 28/23 24/10 44/5 45/6 49/8 52/24 56/24 64/8 68/1 70/15 73/10 73/17 73/20 74/10 79/13 82/4 82/8 83/12 84/5 87/3 87/7
need [2] 15/3 64/19
needs [2] 15/5 46/19
NEEL [2] 3/14 4/13
negotiations [1] 64/17
Neither [1] 54/25
Next [9] 3/2 6/15 6/16 11/14 12/21 24/5 25/2
never [10] 8/24 17/18 21/23 22/12 50/14 56/2 60/21 70/7 77/5 83/22
never-ending [1] 60/21
new [4] 1/20 29/6 29/9 47/17
New [5] 1/20 2/8 3/7 59/17
new York [2] 1/20 2/8
next [4] 1/22 13/4 13/25 17/3
night [2] 39/14 51/15 67/24
Ninth [2] 31/24 41/4
no [96]
Nobody [1] 54/9
non [6] 7/17 9/8 24/11 27/5 31/3 52/12
non-attorney [3] 24/11 27/5 53/9
non-lawyers [1] 27/5
non-merits [1] 31/3
non-waiver [1] 31/1/3
nonchalance [1] 13/7
none [1] 61/4
nonparty [1] 48/6 61/9 52/9
nonparty's [4] 67
Nope [2] 60/17 60/17
normally [2] 17/5 77/2
NORTHERN [2] 1/3 29/4
not [148]
note [2] 68/9 76/3
noted [2] 59/3 59/3
notes [1] 26/25
nothing [4] 53/15 54/4 60/14 69/15
notice [1] 74/24
notified [1] 59/8
nothing [1] 76/18
novel [1] 13/11
now [50] 6/13 6/25 8/15 10/15 16/8 16/9 25/1 25/2 26/11 32/19 33/7 33/25 33/11 38/14 39/22 41/21 44/23 45/24 46/19 47/14 47/19 48/15 55/15 55/14 55/25 55/17 58/19 57/20 57/25
NV [1] 1/20

**O**

oath [2] 47/3 49/2
object [2] 73/25 80/19
objecting [2] 36/11 77/8
objection [3] 5/2 6/6 17/8 36/8 52/25 59/3 70/21 80/8
objections [2] 14/21 77/1
obligation [2] 33/10 40/1
obtained [1] 24/16
obviate [2] 5/5 69/8
obvious [1] 87/5
obviously [9] 13/9 13/14 13/15 14/18 16/13 27/20 39/5 46/14 69/18 78/7
occur [1] 29/4
occurred [4] 31/1 37/22 40/24 86/10
October [2] 61/3 74/16
Odin [1] 27/22
off [7] 59/13 59/16 61/8 66/4 73/5 73/5 78/14
offer [1] 5/14
offered [1] 30/3
offhand [1] 6/24
Official [1] 1/23
officially [1] 49/11
Oh [11] 18/22 25/11 30/15 31/2 34/15 43/6 46/22 46/25 48/3 73/3 80/24 86/23
okay [52] 5/10 6/17 8/20 12/24 16/7 17/24 18/16 18/23 21/5 22/14 26/18 27/6 27/19 30/14 36/13 37/7 38/21 42/7 44/11 44/13 45/16 46/20 46/23 51/9 55/5 55/7 60/18 61/4 63/23 63/23 67/3 68/15 68/20 68/25 71/3 72/18 76/5 77/14 77/17 80/23 80/25 82/7 82/12 84/16 85/5 85/13 85/15 86/17 88/22 86/21 86/25
on [189]
once [3] 26/21 56/8 56/9 75/8 79/9 79/10
one-to-one [1] 72/18
ones [5] 44/1 56/6 59/25 76/9 79/1 79/15 83/1 83/6
ongoing [1] 60/21
only [9] 5/19 13/1 17/19 19/24 29/15 40/4 48/8 77/13 81/5
onto [1] 67/18
operate [1] 72/16
opinion [1] 88/1
opportunity [1] 62/4
opposing [1] 11/10
oral [1] 5/14
orally [1] 5/15
order [22] 7/13 8/5 10/16 10/18 12/16 13/11

**O**

ruled [4] 38/10 38/11 63/7 86/22
rules [8] 53/15 65/13 65/21 66/8 74/15 76/11 79/2 84/24
ruling [6] 42/23 43/3 44/11 60/9 80/7 87/15
run [3] 56/18 56/20 60/6
running [2] 59/17 62/12

**S**

safeguard [1] 77/17
said [35] 7/10 7/15 10/5 10/7 11/21 14/23 21/4 21/14 22/24 32/22 32/24 32/25 33/7 35/24 38/13 39/13 39/13 39/18 40/14 40/15 40/23 40/24 45/23 49/9 57/20 60/9 60/15 67/1 69/19 72/8 74/9 76/13 81/21 84/2 85/24
said [1] 32/22
Sandy [3] 2/6 4/17
scale [1] 81/6
scan [1] 70/7
scenario [1] 71/19
scenarios [1] 71/19
scene [2] 14/23 30/15
schedule [1] 26/12
scheduled [1] 26/19
scheduling [1] 26/8
SCHENK [3] 2/13 4/9 19/19
Schenk [3] 19/19 68/6 77/13
Schenk's [1] 77/13
Schimmel [2] 74/4 74/5
scienter [1] 84/4
scope [1] 60/5
screwed [2] 64/6 76/17
scroll [1] 52/16
se [1] 72/6
search [29] 6/23 8/16 9/4 11/13 24/4 24/7 36/22 41/17 43/24 43/24 44/11 44/24 44/25 45/1 45/3 45/4 45/13 45/13 53/11 56/24 57/4 57/19 66/12 66/17 66/18 67/9 67/10 74/11
searchable [3] 72/22 72/24
searched [6] 54/1 57/10 73/5 73/6 73/7 73/10
searches [5] 6/23 57/3 66/11 72/25 73/10
searching [3] 10/22 36/22 57/9
Sebero [2] 3/5 52/14
Sebero's [2] 67/14 77/13
second [4] 28/6 12/19 31/22 39/2 52/20

**S** (continued right column)

secret [1] 62/12
secrets [1] 64/5
security [1] 29/2
see [29] 12/21 14/8 16/2 18/1 19/6 21/5 21/23 26/16 30/15 32/25 34/7 34/13 34/25 43/10 47/17 52/13 53/22 55/21 60/23 63/3 71/6 71/10 75/10 77/16 77/19 77/20 80/4 81/25 83/8 84/17
see [24]
seem [10] 9/11 22/5 22/19 23/16 58/17 81/5 65/3 65/4 65/9 81/13
seemingly [1] 65/2
seems [5] 9/2 18/6 55/16 60/13
segregated [3] 71/12 71/13 71/18
segregating [1] 71/11
self [1] 86/22
self-driving [1] 86/22
send [6] 39/20 74/2 74/7 76/8 76/16 84/3
sending [3] 77/9 77/9 77/9
sends [1] 69/18
sense [16] 9/11 22/25 23/23 54/4 55/10 57/12 57/14 57/19 57/20 58/13 58/18 61/15 62/16 76/17 82/8 82/15
sent [7] 66/21 66/22 75/25 76/14 80/1 80/23
sentence [1] 86/22
sentenced [2] 19/7 52/16
September [4] 43/3 44/4 45/25 60/3
serve [1] 8/17
server [2] 14/3 14/16
set [5] 44/15 56/22 84/9 85/7 86/17
seven-item [1] 44/3
several [1] 34/25
shaking [1] 75/18
shall [1] 88/14
shared [1] 73/25
sharing [2] 66/7 66/8
sharp [2] 76/2 86/17
she [14] 10/4 10/6 10/7 10/8 32/9 52/18 56/12 56/14 56/15 56/16 56/18 56/22 57/2 57/4
shifting [1] 21/14
shop [3] 37/3 52/4 73/6
short [1] 55/8
should [40] 15/7 35/11 35/13 35/14 37/16 55/12 56/5 56/7 56/12 56/24 56/25 56/25 57/1 57/2 57/4 57/6 72/19 72/22 73/6 73/7 73/10 73/20 73/24 74/18 74/19 74/20 75/1 75/20 75/22 79/10 79/11 79/19 80/12 80/22 84/15 85/14 86/25 87/9 88/1
show [2] 25/19 39/21 68/15
shouldn't [1] 88/1
showed [1] 23/24
showing [2] 26/22 58/9
shows [1] 43/11
side [3] 14/3 16/9 54/3 71/11 76/4
sign [2] 49/3 49/11
signed [1] 52/21
signing [1] 76/2
similar [2] 68/6 68/8

**S**

so [169]
So In [1] 59/5
solution [1] 81/17
some [29] 5/5 7/19 9/7 10/15 12/23 13/8 15/11 16/22 17/25 22/9 24/22 28/22 33/4 48/23 53/22 58/6 58/9 58/17 59/24 60/3 67/7 68/24 72/19 74/19 74/22 77/19 80/22 84/5
somebody [4] 47/15
somehow [5] 32/20 40/6 43/20 54/3 71/11
someone [4] 6/13 13/1 21/9 21/21
something [20] 5/13 5/19 5/21 7/16 15/14 15/15 16/8 39/24 43/6 44/17 45/4 59/20 70/19 73/24 74/5 74/10 75/10 76/5 83/17 86/10
sometime [1] 33/25
sometimes [1] 12/25
somewhat [4] 42/25 47/20 80/18 84/13
son [1] 65/12
sorry [5] 35/21 69/14 79/16 81/25 81/25
sort [13] 5/18 6/20 34/9 36/23 52/23 55/21 62/11 62/20 65/17 70/5 72/4 76/15 83/4
sorted [1] 63/19
sought [1] 33/23
sounded [1] 30/10
sounds [4] 24/14 24/15 68/4 80/23
source [2] 37/13 38/1
speak [5] 32/3 35/11 46/25 46/25 60/10
speaking [2] 68/22 68/21
Special [11] 21/5 4/21 10/15 15/25 28/21 49/10 55/18 59/14 63/3 68/11 69/4
specific [2] 44/13 85/14
specifically [1] 84/25
speed [1] 85/20
spike [1] 36/24
stage [2] 21/10 23/20
state [1] 69/24
stand [2] 69/14 86/18
standards [1] 76/22
standing [4] 8/11 53/22 56/14 56/14
stands [2] 43/3 86/18
start [15] 5/1 6/12 32/18 44/20 55/5 55/20 56/8 63/23 63/25 68/16 71/11 74/25 75/2 75/4 75/5
started [4] 32/18 55/20 67/2 80/15
starting [1] 70/22
starts [1] 67/16
state [2] 4/6 52/10
stated [1] 40/16
statement [1] 49/15
statements [1] 55/19
STATES [3] 1/2 31/16 31/17
station [4] 47/13 47/14 48/2 48/10
stay [2] 6/7/24 74/8
step [2] 58/17 71/25
steps [2] 72/11 74/11
still [18] 6/5 8/22 8/24 19/6 33/6 33/10 33/12 38/4 39/4 41/18 41/18 42/10 43/3 48/20 50/20 51/1 70/16 74/6/11
stipulation [3] 45/5 45/9 49/6
stop [5] 12/8 38/22 45/8 54/22 55/13
stopped [1] 44/4
strategic [1] 48/22
strategy [1] 12/6
Street [6] 1/15 2/7 2/16 3/3 3/6 3/9
strictures [1] 40/14
strikes [1] 19/10
string [2] 9/23 13/17

strongly [1] 5/14
Struz [48] 3/8 6/8 52/5 52/19 53/2 53/11 53/18 53/22 54/1 54/1 54/21 55/22 55/23 56/10 57/10 58/24 59/1 59/6 59/12 61/17 62/2 63/14 63/15 65/16 65/17 64/13 65/3 65/14 65/24 66/5 66/18 66/18 67/6 71/15 71/15 75/7 75/9 75/9 75/11 75/17 76/2 76/4 78/25 79/23 81/15 82/16 82/20 82/4
Struz's [1] 8/19
structure [2] 72/20 74/21
stuff [28] 21/15 21/16 53/17 55/21 58/6 58/12 58/14 61/4 65/16 66/5 66/13 66/14 66/14 66/17 66/22 68/20 73/6 73/9 73/15 73/23 74/7 76/22 77/7 80/21 84/14 81/12 81/13 84/22 85/8
subject [4] 22/12 39/7 57/3 76/12
submitted [2] 12/5 33/21
subpoena [5] 6/12 6/19 8/3 16/7 25/2
subpoenaed [3] 6/25 56/8 81/8
subpoenaing [1] 7/11
subsequent [1] 50/11
substantial [1] 62/23
such [2] 11/1 67/8
sued [2] 40/25 41/9
suffice [1] 68/25
sufficient [3] 64/4 64/6 73/22
sufficiently [1] 51/5
suggest [1] 77/20
suggested [2] 20/9 20/13
suggesting [4] 23/15 54/19 63/11 63/12
suggestion [2] 20/25 37/19
Suite [5] 2/10 2/16 2/23 3/6 3/9
SULLIVAN [1] 1/19
SULLIVAN [2] 1/15 2/2
suppose [2] 72/9 86/2
supposed [2] 8/4 61/21
sure [15] 7/22 11/9 20/6 23/8 30/19 38/4 47/7 61/4 64/7 67/4 67/25 72/11 82/6 84/23 85/1 85/17 85/21 86/1 86/14 66/9 66/13 66/20
surprisingly [1] 71/15
SUSAN [2] 3/4 24/5
SVN [7] 18/14 43/22 44/20 45/9 49/20 49/24 72/23
sworn [1] 49/15

**T**

tacit [1] 34/18
tainting [1] 57/7
TAKASHIMA [2] 2/11 4/20
take [23] 19/3 20/4 20/13 21/6 21/9 21/12 24/16 28/12 28/14 37/4 47/5 50/6 56/22 59/14 61/8 63/11 65/3 72/14 73/7 74/11 75/17 75/22 79/7 85/16
taken [2] 20/4 47/16
takes [7] 43/9 55/5 57/22 72/1 77/16 79/3 81/4
taking [2] 35/16 35/22
talk [10] 12/20 14/6 16/10 52/5 58/20 61/1 66/6 81/13 84/13
talked [4] 10/1 41/25 60/8 83/16
talking [10] 16/12 19/7 22/16 22/18 23/1 23/4 29/20 34/7 40/4 56/3 56/6 68/20 69/20 72/7 72/20 79/8 83/22 84/23
talks [1] 12/17
tangible [1] 86/23
Tate [2] 41/22 42/4
TAYLOR [1] 2/22
team [6] 10/19 19/25 22/8 22/24 23/2 24/8 14/5 15/6 15/1 20/5 27/21 29/21 40/13
TECHNOLOGIES [2] 1/8 2/6

tell [7] 14/9 21/18 51/4 61/3 80/9 79/24 76/20
ten [1] 20/20
tentative [1] 6/19
term [1] 62/20
terms [21] 27/13 29/19 56/17 58/10 58/19 56/19 60/5 62/13 62/22 64/2 64/16 65/7 67/6 67/15 68/5 7/12 71/8 72/10 73/13 82/11 85/10
test [1] 41/4
testified [5] 22/10 47/19 47/21 48/9 49/19
testify [7] 14/19 47/19 48/1 48/7 48/14 50/16 50/17
testifying [1] 16/11
tests [6] 66/5 66/7 66/9 66/19 66/24
than [15] 12/21 13/7 15/22 16/2 26/9 31/20 56/20 67/7 70/10 72/22 81/19 81/20 81/22 81/23 81/13
then [71] 4/6 4/8 5/17 5/21 6/8 14/13 15/10 20/7 23/2 23/12 23/17 24/19 24/23 24/24 24/20 24/21 24/23 31/5 34/25 37/10 37/13 39/22 40/3 40/17 43/9 43/11 44/9 45/4 45/15 46/17 46/19 47/1 47/3 47/5 48/6 49/6 49/10 49/25 51/17 55/25 62/16 69/2 70/9 71/10 71/10 72/2 72/6 72/7 72/9 73/10 73/22 73/23 73/25 75/6 75/11 77/21 78/9 78/19 80/2 80/2 80/5 80/8 81/12 81/17 84/15
theory [3] 34/8 34/10 78/4
there [127]
there's [9] 6/5 8/20 9/16 9/22 32/6 40/21 48/4 59/23 66/3
therefore [4] 23/8 42/10 59/24 86/19
these [35] 9/17 11/10 12/3 12/4 13/17 20/3 20/5 21/17 21/22 21/24 23/20 25/13 25/19 26/17 27/8 27/12 29/17 31/4 35/15 35/17 36/20 41/18 49/6 58/22 65/2 68/9 62/8 62/14 62/24 68/25 72/23 83/9 80/20
they [8] [4] 13/1 13/3 59/13 82/13
they're [22] 10/8 14/21 15/17 16/5 16/7 18/21 18/25 21/9 25/16 32/11 33/17 40/18 40/22 40/23 41/12 42/14 54/4 58/9 58/11 69/25 70/24 70/23 80/25
they'll [4] 13/25 61/4 59/12
they'd [2] 81/22 82/18
thing [15] 12/5 12/24 15/14 26/14 32/21 33/5 33/5 35/23 43/4 48/8 53/14 59/21 62/2 66/11 69/3 78/8 78/5 79/17 81/25 82/19 83/15 85/5 85/22
things [32] 12/5 12/24 15/4 24/14 14/25 15/9 15/6 15/15 20/5 28/13 29/23 37/18 43/8 40/25 42/1 53/4 54/1 54/25 55/7 58/19 64/6 64/19 66/11 71/3 81/24 82/6 82/13 85/11 84/11 85/6 82/20 83/15 85/12
think [185]
thinking [6] 7/14 51/22 52/21 61/3 65/10 72/12

thus [1] 29/16
two [24] 7/8 9/3 9/3 11/14 15/19 35/1 43/23 44/15 44/16 48/11 50/6 56/6 56/7 60/9 62/4 68/9 68/23 72/3 72/20 73/19 78/24 82/12 82/19 83/21
type [1] 67/15
Tyto [5] 27/22 66/14 66/15 66/18 74/21

**U**

U.S [1] 89/10
UBER [31] 1/8 2/6 4/4 4/17 4/20 5/13 11/21 11/23 11/24 13/3 14/5 34/9 34/17 35/2 35/16 36/24 37/10 38/5 40/1 40/24 40/25 42/4 53/4 54/3 54/23 55/2 55/4 56/7 56/7 57/21 59/8 59/7 59/10 60/4 64/19 66/11 71/3 82/24 82/24 82/25 57/10
uncharted [1] 42/25
under [4] 47/3 49/1 75/9 86/25
underlying [2] 33/8 56/1
understand [39] 5/3 14/5 16/8 17/7 17/21 18/1 19/1 22/6 23/1 29/2 29/3 31/6 35/11 41/2 42/22 42/24 42/24 51/24 51/25 57/25 58/5 59/21 59/3 61/10 61/10 69/16 69/24 70/9 71/3 73/1 73/6 78/20 79/1 81/16 82/5 85/23
understanding [6] 3/6 35/7 47/13 56/10 61/16 84/1
understood [15] 13/12 15/23 20/24 21/3 26/2 27/6 38/17 40/22 41/4 41/20 42/22 42/12 46/17 52/23 58/12
unique [1] 42/9
UNITED [3] 1/2 31/16 31/17
United States [2] 31/16 31/17
universe [5] 62/13 64/1 65/6 67/5 71/15
unless [1] 65/13
unlikely [1] 86/14
unredact [1] 28/14
unredacted [2] 28/13 29/7
unreliable [1] 51/16
until [12] 6/10 8/6 10/5 13/23 14/3 32/21 35/11 44/4 65/2 71/7 76/10 79/2
unusual [1] 24/8
up [30] 5/14 13/1 13/10 16/9 20/10 20/25 21/5 25/8 32/8 43/8 43/14 44/17 43/20 43/24 51/25 53/22 54/8 59/19 59/20 61/8 64/4 65/1 65/10 65/24 72/6 72/12 72/14 73/24 72/21 74/4 77/14 77/14 83/4 86/1
upon [2] 49/11 67/11
URQUHART [1] 1/15 1/19 2/2
us [6] 14/9 35/6 58/16 72/3 72/21 81/16
USB [1] 74/24
use [2] 60/16 86/3
used [2] 12/7 70/20
using [1] 65/25

**V**

vacuum [1] 76/15
Van [8] 3/2 62/3 6/16 11/14 12/21 24/5 25/2
various [2] 19/13 62/8
version [1] 7/1/13
versions [4] 62/5 67/7 72/4 72/5
very [10] 6/17 14/6 26/19 27/1 28/9 37/23 41/14 41/23 76/9 76/17
vice [1] 75/19
video [1] 47/9
view [7] 5/6 6/19 7/18 10/17 11/4 33/15 43/2

vigilant [1] 67/4
vigorous [1] 87/8
violate [1] 66/14
violated [1] 18/4
visit [1] 25/5
volume [5] 58/16 59/13 63/1 80/8 87/15
voluntarily [2] 55/3 58/25
vs [1] 1/7

**W**

wait [7] 10/5 12/8 20/2 25/1 46/7 74/10 80/20
waiting [2] 34/13 38/7
waive [3] 14/24 14/25 53/2
waived [7] 8/25 9/11 13/5 34/17 35/2 35/6 70/16
waiver [12] 6/21 6/23 6/24 8/13 9/14 11/4 13/7 15/3 18/21 18/22 21/24 33/13 35/25 33/16 52/1 59/10 59/16 59/20 59/23 87/20
waiving [1] 35/25
wall [2] 59/12 59/16
want [41] 6/8 13/24 17/8 17/8 18/3 20/7 20/19 20/20 23/18 23/19 23/22 26/14 30/5 38/8 44/1 44/15 44/17 49/3 49/13 50/1 52/23 57/25 58/12 59/7 61/21 61/23 62/1 63/3 63/4 63/19 63/7 65/8 85/13 85/13 85/19 85/20 86/2 86/22
understanding [6] 3/6 35/7 47/13 56/10 61/16 84/1
wants [2] 6/4 57/7 57/13
warrant [3] 36/7 56/20 57/3
warrants [1] 56/22
was [168]
Washington [2] 3/5 3/9
wasn't [14] 51/5 7/14 17/21 20/2 31/5 35/22 46/16 46/18 46/23 47/20 49/24 65/10 66/5 70/3
WATKINS [1] 3/9
Wave [1] 27/22
way [27] 16/5 23/1 32/16 34/4 34/17 44/22 45/14 46/10 48/13 48/25 50/12 52/25 56/20 57/23 57/13 60/3 59/23 62/9 64/3 66/14 68/9 74/7 77/17
WAYMO [58] 1/5 4/4 4/10 5/11 7/5 7/8 7/10 7/13 8/6 8/6 8/12 9/7 9/18 10/1 16/14 16/15 16/16 16/18 19/6 19/14 20/4 21/20 21/24 22/16 24/23 27/23 33/7 33/11 34/5 34/7 40/22 40/24 42/4 42/6 43/22 52/8 53/2 53/23 55/1 55/11 59/6 60/23 62/5 62/6 62/9 62/11 64/5 65/3 65/21 66/17 70/13 72/13 73/25 74/1 74/16 78/4 79/2
we [382]
we'd [10] 5/9 10/5 13/25 44/20 51/25 60/12 64/9 57/16 79/10 81/5
we're [14] 6/9 11/1 13/24 14/5 17/1 18/1 21/21 22/16 22/21 23/4 24/7 25/2 27/21 29/20 34/10 39/7 40/2 40/24 40/25 42/1 50/9 56/12 66/14 66/19 70/4 71/8 71/25 73/23 77/14 79/8 80/14 83/21
we've [6] 14/6 17/20 31/12 34/20 54/20 86/22
Wednesday [2] 29/14 36/16
week [7] 13/25 14/20 65/7 65/9 79/4 80/22

week... [1] 81/3
week's [1] 50/7
weekend [1] 74/14
weeks [2] 34/20 63/10
weigh [2] 6/6 13/6
weighed [1] 60/3
welcome [2] 10/10 74/13
well [58] 7/12 12/11 12/22 14/13 14/22 15/8 15/6 16/9 20/20 20/22 21/12 21/14 21/17 23/16 24/3 24/3 26/9 26/12 26/19 32/6 32/8 33/18 38/20 31/5 31/16 33/19 33/6 33/20 34/5 35/6 35/8 39/9 40/12 40/23 42/6 43/5 46/7 48/7 48/8 53/6 53/17 53/23 56/18 54/17 56/21 60/5 60/4 63/5 66/25 69/2 71/6 71/6 77/6 77/13 77/25 84/17 85/5 86/8
were [60] 11/21 11/23 12/5 12/9 13/1 14/2 was [60] 7/6 7/15 8/15 9/23 10/4 10/20 11/5 11/25 13/8 13/17 18/19 19/20 21/20 21/21 22/12 27/24 27/25 28/1 30/6 34/18 38/15 39/19 39/25 41/14 41/22 49/6 53/8 54/24 55/9 69/2 70/6 74/22 74/25 74/21 75/20 76/12 76/16 76/24 77/21 81/3 83/2 80/6 80/13 83/5 83/15
weren't [11] 8/3 19/10 27/19 34/14 36/4 36/8 42/19 61/22 70/4 79/15 82/10
WHA [1] 1/7
what [154]
what's [9] 21/11 41/1 47/21 53/23 52/5 56/18 72/5 76/15 86/13
whatever [11] 15/9 53/18 55/19 66/11 74/19 75/7 76/24 77/21 81/3 83/2
whatnot [1] 62/25
when [31] 4/6 7/14 14/25 24/10 29/6 33/1 34/6 35/2 40/3 42/14 44/16 44/21 45/1 45/15 47/15 49/10 52/21 53/1 54/1 55/7 60/23 63/19 63/19 63/22 66/25 66/25 70/24 71/14 72/2 72/11 80/3 80/6 81/13 83/15 85/15
whenever [2] 7/11 74/13
where [17] 9/14 12/7 13/1 14/21 16/25 18/14 21/14 23/6 29/12 29/22 34/13 37/18 37/22 44/24 62/17 68/2 72/2
whether [3] 39/5 34/7 40/23
which [47] 5/2 8/5 8/15 10/19 16/22 22/25 29/15 29/16 30/6 31/7 31/12 32/2 32/24 29/15 29/16 30/6 31/7 39/9 44/3 45/17 45/18 48/22 48/22 53/13 53/17 54/20 55/2 55/3 56/1 56/24 64/2 64/16 64/16 64/25 64/75 65/6 68/4 70/5 71/19 71/5 76/17 76/17 83/16 84/4 84/20 86/4
while [5] 9/1 7/16 31/18 38/11 19/7 21/19 23/23 26/23 27/1 27/15 27/24 36/21 36/23 38/25 41/1 41/2 46/20 46/23 66/8 75/1 77/15 77/15 77/22
who [36] 6/3 7/16 13/18 18/11 19/7 21/19 23/22 26/23 27/1 27/15 27/24 28/13 54/18 64/11 64/11 65/19 72/19 75/18 75/17 75/15 80/14 80/9
who'd [2] 38/3 47/18 52/2 57/19 63/23 58/6 42/11 38/4 38/5 58/8 57/16 77/12 58/21 72/25 77/25 82/10 84/14 84/20 86/3

wife [3] 48/22 68/23 77/21
will [50] 6/10 8/9 8/12 9/24 13/4 15/10 15/11 15/23 17/25 17/25 21/12 25/24 26/2 26/8 26/9 26/18 29/1 30/19 37/4 43/10 43/13 47/15 47/8 47/9 50/13 50/16 51/2 51/6 54/23 56/23 57/16 64/20 64/23 70/9 70/11 72/12 74/22 75/3 82/11 83/16 84/7
willing [1] 61/5
Wilshire [1] 2/10
window [1] 50/21
withheld [1] 69/3
withhold [2] 10/24 74/24
withholding [1] 84/22
witness [3] 20/16 30/2 81/15
witnesses [9] 20/16 20/21 21/5 22/10 23/14 26/10 26/11 26/21 66/10
woke [1] 37/18
women [1] 91/3
won't [5] 5/7 44/18 63/20 70/12 73/8
word [3] 24/3 57/12 83/16
wording [1] 46/9
words [4] 7/13 13/8 48/12 65/18
work [24] 6/21 6/19 8/22 8/23 6/24 12/1 23/22 23/13 28/18 41/24 29/16 47/13 47/14 48/2 50/7 50/8 59/12 61/5 66/2 68/6 71/6 71/7 76/17 76/19 84/5 84/6
working [4] 14/6 36/22 74/5
works [3] 18/13 43/14 48/25
world [1] 11/4
worry [2] 56/15 69/5
worth [1] 50/7
would [96]
would order [1] 57/14
Wright [3] 32/4 13/7 14/18 36/10 38/5 42/17 45/8 52/14 77/22 79/20 86/19
wrapped [1] 13/10
wrinkle [1] 41/12
writing [1] 47/4
wrong [3] 45/1 45/21 56/23
wrote [3] 5/10 35/17 36/24

**Y**

yeah [15] 16/16 19/21 21/1 37/24 41/1 41/11 41/11 55/18 59/2 59/13 63/4 67/9 79/9 83/19
year [2] 44/2 44/3
years [2] 46/4 46/5
yes [18] 8/10 10/9 24/6 26/16 27/8 30/22 30/18 37/4 41/17 43/18 44/6 47/11 63/18 71/25 74/23 76/14 82/8 84/8
yesterday [4] 47/3 71/8 80/4
yet [6] 43/8 65/1 72/18 81/2 81/11 86/21
you [240]
you'll [2] 67/24 72/13
you're [18] 8/15 7/11 15/6 23/15 25/21 28/13 54/18 64/11 64/11 65/19 72/19 75/18 75/17 75/15 80/14 80/9
you'd [3] 5/5 60/14 63/18
you've [4] 18/11 39/5 80/18 86/20
Your [4] 44/23 44/6 45/25 45/8 57/5 57/9 58/12 68/1 73/1 85/16 79/1 70/4
Your Honor [85] 4/9 4/13 4/16 5/25 6/20 9/16 10/9 10/11 10/17 11/1 11/5 12/12 13/20 13/21 14/2 15/23 17/20 17/22 18/16 18/21 19/1 19/11 19/17 21/3 21/8

23/18 23/7 25/24 26/14 26/25 27/17 28/24 28/4 28/5 30/7 30/16 30/18 31/10 33/3 36/23 42/12 43/12 43/18 43/25 44/6 44/12 45/17 45/18 48/23 46/5 46/8 47/9 47/11 47/22 48/9 48/16 48/19 49/18 49/17 49/24 64/20 64/21 70/9 70/11 72/2 74/4 75/10 78/11 78/17 78/17 78/24 79/13 80/11 83/23 83/21 83/22
Your Honor's [4] 12/5 2/4 23/6 60/9 80/17

**Z**

Zborzek [1] 17/3
Zbrozek [11] 9/24 18/11 18/12 19/18 29/19 23/18 23/21 26/9 27/19 27/20 27/16
Zbrozek's [1] 19/3
zero [1] 9/18