1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Charles K. Verhoeven (Bar No. 170151)
2  charlesverhoeven@quinnemanuel.com
   David A. Perlson (Bar No. 209502)
3  davidperlson@quinnemanuel.com
   Melissa Baily (Bar No. 237649)
4  melissabaily@quinnemanuel.com
   John Neukom (Bar No. 275887)
5  johnneukom@quinnemanuel.com
   Jordan Jaffe (Bar No. 254886)
6  jordanjaffe@quinnemanuel.com
   50 California Street, 22nd Floor
7  San Francisco, California 94111-4788
   Telephone:    (415) 875-6600
8  Facsimile:    (415) 875-6700

9  Attorneys for WAYMO LLC

10                  UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13 WAYMO LLC,                          CASE NO. 3:17-cv-00939

14            Plaintiff,               **PLAINTIFF WAYMO LLC'S**
                                       **OPPOSITION TO DEFENDANTS'**
15     vs.                             **MOTION FOR SUMMARY JUDGMENT**
                                       **(DKT. 1423)**
16 UBER TECHNOLOGIES, INC.;
   OTTOMOTTO LLC; OTTO TRUCKING         Date: September 20, 2017
17 LLC,
                                        Time: 8:00 a.m.
18            Defendants.
                                        Courtroom: 8, 19th Floor
19
                                        Judge: The Honorable William Alsup
20
                                        Trial Date: October 10, 2017
21
                                        **REDACTED VERSION OF DOCUMENT**
22                                      **SOUGHT TO BE FILED UNDER SEAL**

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abba Rubber Co. v. Seaquist*,
    286 Cal. Rptr. 518 (Cal. Ct. App. 1991) ........................................................................ 20

*Ajaxo Inc. v. E\*Trade Group Inc.*,
    135 Cal. App. 4th 21 (2005) .............................................................................. 21, 25

*AquaTex Indus., Inc. v. Techniche Sols.*,
    479 F.3d 1320 (Fed. Cir. 2007) ........................................................................... 5

*Beaulieu Group, LLC v. Bates*,
    2016 WL 7626471 (C.D. Cal. Oct. 18 2016) .................................................... 22

*Brilliant Instruments, Inc. v. Guidetech, LLC*,
    707 F. 3d 1342 (Fed. Cir. 2013) ........................................................................... 6

*Coleco Industries, Inc. v. U.S. Int'l Trade Comm'n*,
    573 F.2d 1247 (C.C.P.A. 1978) ........................................................................... 6

*Competitive Techs. v. Fujitsu Ltd.*,
    286 F. Supp. 2d 1118 (N.D. Cal. 2003) ........................................................ 22, 25

*Contemporary Servs. Corp. v. Landmark Event Staffing Servs., Inc.*,
    677 F. App'x 314 (9th Cir. 2017) ................................................................... 19, 25

*Crown Packaging Tech., Inc. v. Rexam Bev. Can Co.*,
    559 F. 3d 1308 (Fed. Cir. 2012) ...................................................................... 1, 2

*Extreme Reach, Inc. v. Spotgenie Partners, LLC*,
    2013 WL 12081182 (C.D. Cal. Nov. 22, 2013) ............................................... 22

*He Nam You v. Japan*,
    150 F. Supp. 3d 1140 (N.D. Cal. 2015) .......................................................... 24

*JW Pharm. Corp. v. Michael Kahn & Prism Pharma Co.*,
    2013 WL 12125751 (C.D. Cal. Mar. 11, 2013) ............................................... 25

*Language Line Servs., Inc. v. Language Servs. Assocs., LLC*,
    2010 WL 2764714 (N.D. Cal. July 13, 2010) .................................................. 22

*Nemours & Co. v. United States*,
    288 F.2d 904 (Ct. Cl. 1961) ............................................................................ 19

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
    420 F. Supp. 2d 1070 (N.D.Cal. 2006) ........................................................... 15

*Postal Instant Press, Inc. v. Kaswa Corp.*,
    162 Cal. App. 4th 1510 (2008) ........................................................................ 24

*SkinMedica, Inc. v. Histogen, Inc.*,
    869 F. Supp. 2d 1176 (S.D. Cal. 2012) .......................................................... 8, 15

*Whyte v. Schlage Lock Co.*,
    125 Cal. Rptr. 2d 277 (Cal. Ct. App. 2002) ................................................... 20

**Statutory Authorities**
Cal. Civ. Code § 2310 .................................................................................................... 25

**Additional Authorities**
U.S. Patent No. 5,420,722 ...............................................................................................16

Waymo hereby responds to Defendants' partial motion for summary judgment. Dkt. 1423. Waymo previously moved this Court for a preliminary injunction. The Court granted in part Waymo's request for provisional relief, finding, amongst other things, that there are serious questions whether Uber's incorporation of two of the nine elected trade secrets "resulted from old-fashioned, all-American misappropriation of trade secrets." Dkt. 433 at 15. These same two trade secrets are contained in the 14,000+ files that Anthony Levandowski, the now former head of Uber's self-driving program, downloaded before leaving Waymo. Since the Court's order in May, Uber has fired Mr. Levandowski for cause and Mr. Kalanick is no longer Uber's CEO.

Rather than face Waymo's allegations in front of a jury where they are properly resolved, Defendants seek to avoid the factfinder even hearing the relevant facts. Indeed, Defendants' summary judgment motions are contrary to what the Court expressly sought to avoid—wading into highly disputed issues of facts mere weeks before trial is set to begin. *See* 8/16/17 Hearing Tr. at 107:9-12; *see also* 8/16/17 Hearing Tr. at 80:13-15 . For each issue identified by the Defendants—patent infringement, trade secret status, and liability for Otto Trucking—there are significant issues of fact that cannot be resolved on summary judgment.

## I.     UBER INFRINGES THE '936 PATENT

Uber's argument that it does not infringe the asserted claims of the '936 Patent under the doctrine of equivalents presents a clear factual dispute that cannot be resolved on summary judgment. *See Crown Packaging Tech., Inc. v. Rexam Bev. Can Co.*, 559 F. 3d 1308, 1312-16 (Fed. Cir. 2012) ("[A] determination of noninfringement, either literal or under the doctrine of equivalents, is a question of fact.") (reversing summary judgment of non-infringement under the doctrine of equivalents).

### A.     Uber Infringes the Asserted Claims of the '936 Patent

Approximately two months before Waymo filed its original complaint, one of Waymo's engineers was inadvertently copied on an email from one of Waymo's LiDAR component vendors, which attached design drawings and a bill of materials for what later was revealed to be the Fuji device. Dkt. 25-3 at 14. The information demonstrated that the Fuji device uses a firing circuit that is nearly identical to the one disclosed and claimed in the Circuit Patent, including the use of an

1   ████████████████████████████████████████████████████████████████████.

2   Waymo relied on this evidence to assert the Circuit Patent and later prepared detailed infringement

3   contentions and an expert report.  Ex. 1[1] (Wolfe Report).  The figure below provides an overview

4   of the infringing circuit's structure and operation with respect to asserted claim 1:

5

6

7

8

9

10

11

12

13

14

15

16          While the infringing circuit is nearly identical to that described and claimed in the '936

17   patent, it is not literally the same.  The Fuji firing circuit uses a ██████████ in place of a diode in the

18   circuit's charging path.  Ex. 1 ¶¶ 75-103.  Waymo has thus advanced a theory of infringement under

19   the doctrine of equivalents and presented a detailed expert report from Dr. Wolfe explaining why

20   the accused ██████████ performs substantially the same function in substantially the same way to

21   achieve substantially the same result as the claimed diode in the context of the asserted claims.  *Id.*

22   Importantly, Dr. Wolfe analyzed infringement in the context of the asserted claims, including

23   independent claims 1, 9, and 17.  As Dr. Wolfe explained, "[t]he primary function of the diode in

24   the context the independent claims is to allow electrical current to flow through from the voltage

25   source, via the inductor, to the capacitor during a charge cycle."  *Id.* ¶ 80.  He also explained, "[t]he

26   claimed diode does not play a direct role in the claimed discharge operation, however, it does allow

27   ───────────────────────────

28       [1]   Bare exhibit citations refer to the contemporaneously filed Declaration of Jordan Jaffe.

current to begin flowing from the voltage source through the inductor during the latter part of the discharge period.  It also resists any current flow from the capacitor towards the inductor during a discharge cycle."  *Id.* ¶ 81.

### B.    Uber Improperly Reads a "Reverse Biasing" Limitation into the Claimed Function of the Diode

Uber's summary judgment motion is based on an argument that the function of diode recited in the independent claims must include "reverse biasing" during the charging operation.  This is part of a larger effort by Uber to limit the asserted claims to a "step-up circuit"—words that the patent specification and claims never use—that increases the voltage stored on the capacitor to a voltage higher than that of the voltage source.  Uber advanced this argument in its claim construction briefing, arguing that the claimed "charging path" must be "configured to charge the capacitor to a voltage higher than the supply voltage."  Dkt. 1233 at 14.  As Waymo explained in its own claim construction briefing, Uber's argument improperly imports limitations from the specification into the claims, violates the doctrine of claim differentiation, and narrows the plain meaning of the claim language without any lexicography or disavowal to justify the narrowing.  Dkt. 1327 at 6-9.

These same arguments apply to Uber's attempt to read a "reverse bias" requirement into the function of the "diode" recited in the asserted claims.  Ex. 1 ¶ 77.  As Dr. Wolfe explained, the independent claims describe the function of the "diode" as part of the charging path, but they do not require the diode to become reversed biased during the charging operation in order to increase the charge on the capacitor above that of the voltage source.  *Id.*  That requirement is found only in non-asserted claims 4 and 12.  *Id.*  Testimony from Uber's own expert, Dr. Hobbs, supports this conclusion.  He explained that the reverse-bias property of a diode is used only in certain circumstances.  Ex. 2 at 82:22-83:6 ("Q. I think what you just said or what you just suggested is that the reverse-bias property of the diode does not always have to be used.  A.  That's right.  Q.  There's applications where a diode might just be used to send current one direction – A. Yes.  Q. – and the reverse-bias feature doesn't come into play?  A.  That's correct.").  The independent claims of the '936 Patent are examples where the reverse-bias property of the claimed diodes is not used.  The reverse-bias property comes into play only with respect to dependent claims 4 and 12, but those

1    claims are not asserted.

2         The law is clear that an infringement analysis under the doctrine of equivalents must focus

3    on the claims at issue. It is improper to "rely[] on unclaimed features to find a lack of

4    equivalents." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1323 (Fed. Cir.

5    2007). Because the reverse-bias property is not a necessary function of diodes in the asserted claims,

6    Uber cannot credibly argue that the lack of reverse bias in the Fuji ███ renders the Fuji ███

7    distinct from the "diode" of the asserted claims as a matter of law. In a any event, however, the

8    parties' dispute over whether the claimed function includes a reverse-bias requirement creates a

9    factual issue that precludes summary judgment. *See Crown Packaging*, 559 F. 3d at 1315-16

10   (reversing summary judgement of non-infringement where parties' experts disputed the

11   requirements of the claimed function).

12        Uber does not dispute that the plain language of the asserted claims fails to include a reverse-

13   bias requirement. Nor does Uber dispute that the reverse-bias requirement is found ***only*** in non-

14   asserted dependent claims 4 and 12. Instead, Uber imports a reverse-bias requirement from

15   embodiments of the specification under the guise of evaluating the claims in light of the patent

16   specification. This is legally improper. First, the cases that Uber cites stand for the uncontroversial

17   proposition that claim language is evaluated in the context of the patent specification. *See*, *e.g.*,

18   *AuquaTex*, 479 F.3d at 1327. But these cases do not support Uber's argument that the specification

19   can be used to define the claimed function by importing limitations found nowhere in the plain claim

20   language. *Id*. ("We hold that the district court erred … in relying on unclaimed features to find a

21   lack of equivalents.").

22        Second, the '936 patent specification confirms that the reverse-bias requirement is an

23   optional embodiment of the claimed invention—not an embodiment that must be read into every

24   claim. The specification repeatedly explains that it is optional to use the reverse-bias feature of the

25   diode to increase the voltage the capacitor to a voltage higher than the supply voltage. Dkt. 23-3 at

26   19:26-31 ("A voltage that exceeds $V_1$ ***may be held on the capacitor 516 after the diode 514 is***

27   ***reverse biased*** to terminate a charging operation.") (emphasis added); *see also id*. at 18:52-56,

28   19:31-33. Uber's expert, Dr. Hobbs agreed that these examples use permissive language that

-4-

indicates the reverse-bias property may or may not be used to charge the capacitor to a voltage that exceeds that of the voltage source.  Ex. 2 at 153:4-155:6.  Thus, they should not be used to limit the claimed function of the "diode."  *Hill-Rom Servs.*, 755 F.3d at 1371 ("While we read claims in view of the specification, of which they are a part, we do not read limitations from the embodiments in the specification into the claims.").

### C.    Additional Disputes of Fact Preclude Summary Judgment

Setting aside Uber's improper claim construction arguments, factual disputes exist under each prong of the doctrine of equivalents analysis.  Dr. Wolfe provided expert testimony supported to show that the ▮▮▮ in the accused Fuji device performs the same or substantially same function in the same or substantially same way to achieve the same or substantially same result as the claimed diode, citing extensive factual evidence for each prong of the analysis.  Ex. 1 ¶¶ 77-103.  The factual evidence that Dr. Wolfe presented includes detailed simulations and analysis of the accused circuit using Uber's SPICE models.  *Id.*  Uber, not surprisingly, disputes these facts and submitted its own testimony and circuit simulations from Dr. Hobbs.  The question of whether one element is an equivalent of another is highly factual and not suitable for resolution on summary judgment.  *See Crown Packaging*, 559 F. 3d at 1315-16;  *Brilliant Instruments, Inc. v. Guidetech, LLC*, 707 F. 3d 1342, 1348 (Fed. Cir. 2013) (reversing grant of summary judgment because patentee had created genuine issue of material fact whether a "whether Brilliant's capacitor, located within the first current circuit, performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed capacitor, which is operatively disposed in parallel to the shunt").  The parties should be permitted to present the evidence at trial and the disputes should be resolved by the factfinder.[2]

---

[2]    Uber does not provide any factual evidence to support its argument that the asserted claims describe a "simple circuit."  Dkt. 1419-4 at 8.  Moreover, there is no blanket rule that the doctrine of equivalents should not apply to a "simple" claim element.  *See Brilliant Instruments*, 707 F.3d at 1348 (finding genuine dispute of material fact regarding capacitor element of circuit claim); *see also Coleco Industries, Inc. v. U.S. Int'l Trade Comm'n*, 573 F.2d 1247, 1255 (C.C.P.A. 1978) (finding function, way, result test met when comparing claimed tabs to accused screws).

**D.    Uber Has Not Implemented Its Design Around**

Uber's damages argument is based on the uncorroborated testimony from one of its engineers that Uber ████████████████████████████████████████████ ████████████████████████████████████████ Dkt. 1419-4 at 9-10.  Uber initially ███████████████████████████████████████████████████████████ ██████████████████████████ Ex. 3.  During his August 4, 2017 deposition, Mr. Haslim testified that he █████████████████████████████████████████ Ex. 28 at 691:6-23. ████████████████████████████████████ ███ Waymo is not obligated to take Uber at its word ██████████████████████████████████████████████████████ Ex. 1 ¶¶ 215-217.  Unlike the Spider design that was purportedly abandoned before Waymo filed suit, Uber continued using the infringing Fuji design throughout this case.  If Uber wanted summary judgment based on ███████████████████████████████████████████ ███████.  With open questions concerning ████████████████████████████ ███████████, Waymo is entitled to pursue its claim for injunctive relief.

**II.    WHETHER TRADE SECRET NO. 9 IS "GENERALLY KNOWN" IS A DISPUTED ISSUE OF MATERIAL FACT FOR THE JURY**

The evidence developed through discovery shows that only two systems meet the specific requirements of Trade Secret No. 9 ("TS 9")[4]:  Waymo's GBr system and Uber's Fuji system.  This is not a coincidence.  The state of the art shows that what was "generally known" in the field of LiDAR was collimating fibers that were as small as a human hair and positioned to produce parallel, horizontal beam emission.  Waymo took a fundamentally different approach, developing for its

███ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████

---

[4]  Trade Secret No. 9 ("TS 9") recites ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████ Dkt. 25-7 at 8.

1  LiDAR systems ███████████████████████████████████████████████

2  ██████████████████████████████████. The Fuji lens design—developed in a matter

3  of months by former Waymo engineers—████████████████████████████████████████

4  ██████████████████████████. Not surprisingly, entirely absent from Uber's

5  motion is *any* argument it does not use Trade Secret No. 9, or that it independently developed its

6  copycat ██████████████████.

7       Seeking to avoid airing these highly relevant facts before the jury, Uber puts forth a

8  hodgepodge of unrelated prior art references and out-of-context deposition testimony to

9  manufacture an argument that Trade Secret No. 9 is "Optics 101." This argument ignores the actual

10 evidence in the record and fails to address the entirety of the claimed trade secret. In light of these

11 failures, the question of whether Trade Secret No. 9 is "generally known" is a highly and legitimately

12 disputed question of fact that must be resolved by the jury. *See SkinMedica, Inc. v. Histogen, Inc.*,

13 869 F. Supp. 2d 1176, 1195 (S.D. Cal. 2012) ("Thus, it remains for the jury to decide the fact-

14 intensive question of whether these patent applications, or the referenced prior art, made the Hair

15 Growth Project—all elements in combination—generally known.").

16      **A.    TS 9 Background**

17      Some vendors may use laser diodes and glass microrod pre-collimating lenses, sometimes

18 known as fast-axis collimation ("FAC") lenses, to pre-collimate light from a laser diode. In its

19 motion, the only commercially available LiDAR system with ████████████████████████

20 ███████████████ mentioned by Uber is the Velodyne HDL64. Veldoyne's HDL64, like all of

21 Velodyne's LiDAR systems, ██████████████████████████████████████████████████

22 ███████████████:

23

24

25

26

27

28



Velodyne's HDL64 ████████████████████████████████████████████

██████████████████████████████████████. Dkt. 1421-13, at 8 (████████

███████████████████████████████████). ████████████

████████████████████████████████████████████. The

end result of Velodyne's process is █████████████████████████████

████████████████████████████:

The Velodyne design is consistent with the prevailing wisdom in the field—that ████████

should be ████████████████████████████. Ex. 7 at 230:8-231:19.   As

Waymo engineer Pierre-Yvez Droz explained, "████████████████████████

1 ████████████████████████████████████████████████████████████████████

2 ███████████████████████████████████████████.″ *Id.*

3    In contrast, as part of its development of its mid-range GBR LIDAR design, Waymo

4 engineers created a new ████████████ for LIDAR applications that allowed them ████████

5 ████████████████████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████████████████████

7 ████████████████, an important factor for self-driving.  To accomplish this, Waymo created

8 ████████████████████████████ unlike anything in the field, claimed in TS 9.

9 Waymo's trade secret list explains:



24    As shown above, the ████████████ designed by Waymo allows for

25 ███████████████████████████████████████████████.Ex. 8.  As

26 explained in Waymo's documentation: ████████████████████████████████

27 ████████████████████████████████████. *Id.*  ████████████

28 ████████████████████████████████████████████████████████████████████████



The ███████ embodied in Trade Secret No. 9 thus uses ██████████████████

██████████████████████████████████████████████████████████████████████████

████████████. Dkt. 25-7 at 8.  This design stems in part from the fact that Waymo, unlike

Velodyne, ████████████████████████████████████████████████████████████████.

Ex. 7 at 228:17-230:7. ███████████████████████████████████████████████████████

██████████████████████████. *Id.*  Thus, unlike others building LiDARs ████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████. *Id.*

**B.**     **Waymo's Unique Design and Uber's Misappropriation**

To implement the TS 9 design outlined above, Waymo developed a ████████████

██████████████████████████████████. *Id.* ████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

█████████████:

1
2
3
4
5
6
7
8
9
10
11
12



13    By comparison, as discussed above, the Velodyne ▮▮▮▮▮▮▮▮▮▮

14    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—▮▮▮▮▮▮▮▮▮▮▮▮

15    ▮▮▮▮▮. The ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 11 at 32564, 32574. The Velodyne ▮▮▮

17    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, has no need for ▮▮▮▮▮▮▮▮▮▮▮

18    ▮▮▮▮.

19    Other than Waymo's GBr system, the only LiDAR that uses the ▮▮▮▮ design described

20    in Trade Secret No. 9 is Uber's Fuij system.  Both GBr and Fuji are LiDAR systems that include ▮

21    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In both designs, each laser diode has ▮▮▮▮

23    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

25    A comparison of the design of specifications for the GBr and Fuji FAC lenses shows that

26    they have nearly identical ▮▮▮▮▮▮▮▮▮▮▮:

27

28



(Exs. 10, 13.)

The unusual ███████████████ is the same in both designs. ███████

---

[5]  As explained by current Uber engineer and former Waymo engineer Gaetan Pennecot: "Q Okay. All right. Well, let's just talk about some of these. The -- the ██████████ do you see that? A Yes, I see that. Q Is -- this surface, is it ███████████████? A I mean, there's a confusion around the term for ██████████. So it could be an ████████ -- you know, like, a -- you heard about, like, ██████ and ████████████? Q Um-hum. A So there's a confusion for ██████. Q So you can refer to it as ████████████? A Pretty much. What matters is the ██████ at the end." Ex. 14 at 590:16-591:6.  *See also* Ex. 15 at 252:15-23 ("Q -- right? So if someone described the Fuji ████████████, you wouldn't really argue with that, would you? A I would not argue, but if it comes to comparing surfaces, I would argue that you want to look at the ██████████████.")

1     ████████████████████████████████████████████████████████████. Ex. 12.

2     Uber's design and Waymo's design are also used in the same way in their respective LiDAR

3 systems, ████████████████████████████████████████████████████████████████

4 ████████████████████████:

5                                     **FUJI**

6

7

8

9

10

11

12

13

14

15

16

17     The Uber engineers who purportedly developed the Fuji ███████—both of whom are

18 former Waymo engineers—admitted that these similarities are not a coincidence. Ex. 16 at 641:6-

19 643:7 ("Q. … [T]he fact that these shapes look alike, is not a coincidence, is it?  … A. I mean, in

20 some ways, yeah, it's – it's in my head.  I have, like, some experience from before, and I -- and you

21 know -- like, you're always impacted by your previous experience."); Ex. 17 at 274:22-25 ("Q.

22 Okay. You designed the ████████████, in part, based on your knowledge of the ███████ that

23 was designed at Google, right? A. Yes."); 275:5-8 ("Q. You used the knowledge from your work

24 on ████████ at Google to help [design the] ████████ that we are talking about here in March

25 2016, right? A. Yes."); 280:9-13 ("Q. Okay. You selected ██████ as the vendor  for your ███████

26 in March 2016, in part, because of your work on the ███████ for GBR. Knew they could do it,

27 right?  A. In part, yes.").  Indeed, the vendor itself ███████████████████████████████████.

28 Ex. 18 ("█████████████████████████████████████████████████████████").

1      Notably, Uber has never claimed that the Fuji ███████ design was based on prior art or

2  information "generally known" in the field.  The significant differences between Waymo's custom

3  design (and Uber's copycat design) and the state of the art confirm that Trade Secret No. 9 was not

4  "generally known."

5      **C.     Uber's Evidence Fails to Show Trade Secret No. 9 was "Generally Known"**

6      Uber's summary judgment arguments ignore the full requirements of Trade Secret No. 9 and

7  improperly piece together disparate teachings from prior art references outside the field of LiDAR

8  and out-of-context deposition testimony from Waymo's engineers.  This evidence hardly eliminates

9  any dispute of material fact about whether Trade Secret No. 9 was "generally known."

10      ***First***, Uber has not presented a single reference that discloses all of the requirements of

11  Trade Secret No. 9.  Uber cites a single reference as disclosing ██████████████████

12  ████████████████████████████████████████████████████████████████

13  █████████████—Waymo's U.S. Patent No. '922 Patent—but this patent does not describe the

14  specifics of Waymo's ████████ or its use █████████████████████████████

15  ███████ as recited in Trade Secret No. 9.  *See* Dkt. 25-7 at 8.

16      The other references that Uber relies on all fail to disclose LiDAR systems with ████████

17  ████████████████████████.  This is a critical failure on Uber's part because Waymo's

18  ████████████████ LiDAR design led to the development of an ██████████████████

19  ████████████████████████████.  Outside of this

20  LiDAR design, there is no reason to ██████████████████; instead, the prevailing

21  wisdom dictated ██████████████████.  Ex. 7 at 230:8-231:19.

22      Simply identifying individual aspects of a trade secret in disparate public references is not

23  enough to show that the trade secret is "generally known."  *O2 Micro Int'l Ltd. v. Monolithic Power*

24  *Sys., Inc.,* 420 F. Supp. 2d 1070, 1089-1090 (N.D.Cal. 2006) ("It does not matter if a portion of the

25  trade secret is generally known, or even that every individual portion of the trade secret is generally

26  known, so long as the combination of all such information is not generally known.").  Instead, this

27  approach—at best—creates a material dispute of fact suitable for the jury.  *SkinMedica, Inc. v.*

28  *Histogen, Inc.*, 869 F. Supp. 2d 1176, 1195 (S.D. Cal. 2012) ("Thus, it remains for the jury to decide

the fact-intensive question of whether these patent applications, or the referenced prior art, made the Hair Growth Project—all elements in combination—generally known.").

**Second**, Uber's remaining evidence does not disclose or teach Trade Secret No. 9, and instead confirms that it was not "generally known."  The Hamamatsu datasheet Uber relies on is unrelated to LiDAR, fails to disclose ███████████████████████████████████, and shows ███████████████████████████████████████████████████████████████:



(Ex. 19)

Likewise, U.S. Patent No. 5,420,722 is unrelated to LiDAR, fails to disclose ███████████ ███████████████████████, and shows an ███████████████████████████ ███████████████████████████. Ex. 20.

Uber tries to gloss over the deficiencies in its public domain evidence with out-of-context deposition testimony from Waymo's engineers.  According to Uber, the deposition testimony "admitted that ██████████████████████████████████████████████" and therefore demonstrates that Trade Secret No. 9 was "generally known."  The deposition testimony in context shows the opposite.  For example, Uber relies on the following testimony from Mr. Droz:

> So I mean, ████████████████████████████████████████, and that's during – you know, is – is not fundamental, but it's something that's known in optics.

Ex. 7 at 230:8-20.

But Uber omits his additional testimony in response to the same question, where he explained that ████████████████████████████████████████ was ***not*** generally known or intuitive in the context of ████████████████████ for LiDAR systems:

> But here, it's – it's done in the specific context of the ██████████████████. Usually, for most laser systems, the ████████████████████████████████████

1 ████████████████████████████. … You don't want to ███████████████

2 ███████████████████████.

3 *Id*. at 230:8-231:19.

4       Likewise, Uber relies on testimony from Waymo engineer William McCann, who stated,

5 "████████████████████████████" is among the "fundamentals of optics." Ex. 21 at

6 217:16-218:1.  But Uber omits the rest of Mr. McCann's explanation about Waymo's ████████,

7 that it "is a very specific – like, it's not really the same thing here; okay?"  *Id*. at 218:3-4.  Mr.

8 McCann testified that prior to his work at Waymo he was not aware of anyone using an █████████

9 to ███████████████████████████—another point that Uber omits from its motion.

10 *Id*. at 217:5-14.

11       This testimony presents yet another genuine dispute of material fact.  Uber argues

12 (incorrectly) that the testimony shows Trade Secret No. 9 was "generally known."  Waymo contends

13 that it shows the opposite—that Waymo's ██████ design was a significant departure from the

14 state of the art.  Resolution of this dispute is for the jury, not summary judgment.

15      **Third**, the evidence that Uber cites from Velodyne confirms that Trade Secret No. 9 is not

16 "generally known."  As discussed above, the documentary evidence shows that Velodyne's design

17 is ██████████████████████.

18-25 ████████████████████████████████████████████████████████████

26 Velodyne's ███████████████████████████████████████████.

27 However, its documentation shows that ████████████████████████████

28 ████████████████████████████████████████████████████████████

1  ██████████████████████████████████████  Ex. 22.  This is depicted below:



10  ██████████████████████. *See* Ex. 4 at 38 (██████████████████

12  ███████████████████).  In some models, Velodyne ████████████████

13  ██████████████████.  Ex. 23 at 19 ("█████████████████████

14  ██████████████████████").

15      The Velodyne deposition testimony does not contradict these disclosures.  It explains that

17  ██████████████████████████.  Ex. 24 at 68:5-69:2.  As discussed above, however, this is

18  in the context of ███████████████████, not ██████████████████

19  ████████████████ as allowed by the use of Trade Secret No. 9.  In any event, this information

20  from Velodyne is not publicly known.  Velodyne considers the information to be ***its own*** trade

21  secret.  Dkt. 1455 ("The Velodyne information subject to Defendants' Motion to Seal has significant

22  economic value from not being generally known and has been subject to reasonable efforts to

23  maintain its secrecy.  The information has been designated Highly Confidential — Attorney's Eyes

24  Only pursuant to the operable Protective Order.  It is an important Velodyne trade secret.

25  Specifically, the identity, characteristics, use, supplier and configuration of the referenced

26  components gives Velodyne a competitive advantage in terms of the system's performance and other

27  material characteristics over its competitors.  Public disclosure would harm Velodyne's competitive

28  position in the marketplace and would have adverse effects on the Company generally.").

1    Uber has not come forward with any evidence to show that Velodyne's ███████████

2  is generally known to the public or its competitors.  Indeed, the Velodyne witness explained that he

3  ████████████████████. Ex. 24 Nestinger Dep. at 69:20-22. And, since that aspect of

4  Velodyne's design is claimed as its own trade secret, it does not meet the "generally known"

5  standard for trade secret protection. *See E.I. DuPont de Nemours & Co. v. United States*, 288 F.2d

6  904, 911 (Ct. Cl. 1961) ("A plurality of individual discoverers may have protectable, wholly

7  separate rights in the same trade secret.").

8    In any event, as stated above, Velodyne's use of ███████ is different from that at Waymo

9  and copied by Defendants.  Former Velodyne and current Uber engineer James Haslim testified that

10  the ████████████████████████████████. Ex. 25 at

11  30:6-21 ("It was different from the one that was being developed at Otto. It was one of a couple

12  approaches that I've seen, you know, in -- in public or publicly disclosed Internet sources.").  Gaetan

13  Pennecot, a former Waymo and current Uber engineer further confirmed that Velodyne's ███████

14  design is different from that created at Waymo and subsequently copied by Uber: "Q. What's the

15  difference between the ███████ in the Velodyne HDL-64 and the ███████ that are in GBR

16  and Fuji? A. I believe ███████ in the HDL-64 is ███████. Q. As opposed to GBR and

17  Fuji, which have a ███████; right? A. This is correct. Q. Are you aware of any

18  other LiDARs, other than Fuji and GBR, that have ███████ that you worked on? A.

19  No." Ex. 16 at 471:9-20.

20    Waymo has also put in expert testimony from Prof. Hesselink analyzing the materials

21  identified by Defendants, including from Velodyne, and opining how Trade Secret No. 9 is not

22  generally known in the field or readily ascertainable.  Ex. 27 at ¶¶ 248-298  (stating, for example,

23  "[k]ey aspects that make this trade secret valuable apart from the design process that led to that trade

24  secret is that the design reflects a unique optical arrangement that solves the problem of ███

25  ████████████████████████████. This novel design allows

26  for a much more compact and lower cost design than what is generally known.").

27    In view of the documentary, fact witness and expert witness testimony put forth by Waymo,

28  there are highly disputed issues of fact that preclude summary judgment.  *Contemporary Servs.*

1   *Corp. v. Landmark Event Staffing Servs., Inc.,* 677 F. App'x 314, 315 (9th Cir. 2017), *as amended*

2   *on denial of reh'g* (Mar. 30, 2017) ("Here, CSC raised material triable issues as to whether its

3   customer lists (CSC California #17-18), its deployment workbook (CSC California #12), and its

4   PowerPoint disclosing financial information (CSC California #2) qualify as trade secrets. *See Abba*

5   *Rubber Co. v. Seaquist*, 286 Cal. Rptr. 518, 526 (Cal. Ct. App. 1991) (where a customer list qualified

6   as a trade secret); *id.* at 529 n.9 (noting that "ease of ascertainability is irrelevant to the definition of

7   a trade secret"); *Whyte v. Schlage Lock Co.*, 125 Cal. Rptr. 2d 277, 287-88 (Cal. Ct. App. 2002)

8   (where specific and unique financial information qualified as a trade secret)." (footnote omitted))

9   ## III.   THERE IS A GENUINE DISPUTE OF FACT CONCERNING OTTO TRUCKING'S INFRINGEMENT AND MISAPPROPRIATION

10

11        Otto Trucking claims that it "has never used or had access to the accused products, it is not

12   possible, as a matter of law, for Otto Trucking to infringe the '936 patent or to have misappropriated

13   any Waymo trade secret."  This argument seeks to distract the Court from Otto Trucking's role in

14   the misappropriation of Waymo's trade secrets.  As set forth in Waymo's Opposition to Otto

15   Trucking's summary judgment précis letter (Dkt. 1403), a central figure in the misappropriation of

16   Waymo's trade secrets—Anthony Levandowski—is Otto Trucking's Executive Chairman, co-

17   Managing Member, ██████████████.  As the Court has already noted, "[a]ll guilty knowledge

18   attributable to Levandowski is attributable to Otto Trucking . . . . it's his company, for goodness'

19   sakes."  Dkt. 775 at 65:18-24.  The Court likewise stated that Otto Trucking is "soaked" with

20   liability.  *Id.*  The Court's view is correct; Otto Trucking has failed to come forward with any

21   credible evidence to absolve itself of liability, let alone evidence that eliminates any dispute of

22   material fact.

23        Otto Trucking's lengthy recitation of its purported separation from Uber is neither complete

24   nor sufficient to justify judgment in their favor.  In particular, Otto Trucking omits mention of the

25   close relationship between the two companies, including the fact that virtually all Otto Trucking

26   "members" are Uber employees and that Otto Trucking and Uber are collaborating on the ██████

27   ████████████████████████████████████████████"  Ex. 29 at 117:19-

28   129:14.  Otto Trucking does not need any employees of its own because it has outsourced all of its

1   autonomous vehicle work to Uber, 

2   Ex. 29 at

3   117:19-129:14 (

4

5   ); *see also* Ex. 31 at 1-3.   Otto Trucking

6

7   *Id.* ("

8

9   "); Ex. 30 at 24:20-25:9 ("Q.

10   ").   Moreover,

11

12

13

14   . Ex. 30 at 14:2-12; 23:2-16; 84:17-85:3.  At

15   bottom, the division described in Otto Trucking's motion for summary judgment – even if true – a

16   merely serves to highlight the degree to which Otto Trucking has outsourced this development work

17   to Uber while retaining the ability to reap the benefits when the two companies merge.  That Otto

18   Trucking has purportedly stood separate from the development of the Spider and Fuji systems (but

19   stands to benefit from their development later) mandates their inclusion not exclusion.

20        Otto Trucking contends that it has not misappropriated any Waymo trade secret, but in doing

21   so it misstates both the law and Waymo's theories of liability.  As an initial matter, Otto Trucking's

22   reliance on *Ajaxo Inc. v. E*Trade Group Inc.*, 135 Cal.App.4th 21, 66 (2005) and California Civil

23   Jury Instructions ("CACI") No. 4401 does not advance its cause.  In describing each, Otto Trucking

24   omits the fact that acquisition of a trade secret gives rise to direct liability for trade secret

25   misappropriation.  *Ajaxo*, 135 Cal. App. 4th at 66 ("A trade secret is misappropriated if a person (1)

26   acquires a trade secret knowing or having reason to know that the trade secret has been acquired by

27   "improper means[.]"); CACI No. 4401 ("That [name of defendant] improperly [acquired/used/ [or]

28   disclosed] the trade secret[s]").  Contrary to Otto Trucking's assertion that Waymo's claim for trade

secret misappropriation "is based solely on Ottomotto's and Uber's development and use of the Spider and Fuji LiDAR systems," Waymo's claims clearly encompass Otto Trucking's acquisition—by way of Mr. Levandowski's theft—of the asserted trade secrets.  Otto Trucking cannot escape liability simply because it has allegedly segregated itself from Uber and Ottomoto's development efforts that made further use of Waymo's trade secrets.

*Beaulieu Group, LLC v. Bates*, 2016 WL 7626471 (C.D. Cal. Oct. 18 2016) is not to the contrary.  There, the plaintiff's theories rested on "access to and knowledge of" certain confidential information.  *Id.* at *12.  Here, Mr. Levandowski—and Otto Trucking as a result of Mr. Levandowski's actions—improperly acquired Waymo's trade secrets.  The court's reluctance in *Beaulieu Group* to find liability based on generalized knowledge of "pricing information" and "financial forecasts" absent evidence of a specific disclosure is wholly inapposite to Mr. Levandowski's downloading and use of these trade secrets both in relation to development work at Uber and in the increase in the value of Otto Trucking to Uber.

Even assuming that liability for trade secret misappropriation is as narrowly prescribed as Otto Trucking claims, Otto Trucking is vicariously liable for the trade secret misappropriation of its Executive Chairman and Managing Member, Mr. Levandowski.  *See, e.g., Extreme Reach, Inc. v. Spotgenie Partners, LLC*, No. CV1307563DMGJCGX, 2013 WL 12081182, at *7 (C.D. Cal. Nov. 22, 2013) ("SpotGenie may be liable for the Sales Managers' misappropriation of trade secrets under the doctrine of respondent superior . . . . California and federal courts have allowed vicarious liability claims under the UTSA.") (citing caselaw); *Language Line Servs., Inc. v. Language Servs. Assocs., LLC*, No. C 10-02605 JW, 2010 WL 2764714, at *4 (N.D. Cal. July 13, 2010) (imputing trade secret misappropriation from employees to employer); *Competitive Techs. v. Fujitsu Ltd*., 286 F. Supp. 2d 1118, 1147–48 (N.D. Cal. 2003) ("the Court finds that Fujitsu has, nonetheless, stated a claim for misappropriation of trade secrets as to UI by alleging that Competitive was 'acting with and for UI.' In particular, this allegation may be reasonably construed as an allegation that UI ratified or approved Competitive's conduct.").  Mr. Levandowski unquestionably acquired Waymo's trade secrets through improper means and, as described in detail above, disclosed and used those trade secrets in connection with his work at Uber and Ottomotto.  Mr. Levandowski will take the witness

1  stand at trial, where the factfinder will assess his testimony, and, by extension, Otto Trucking's

2  vicarious liability.

3      Otto Trucking tries to avoid vicarious liability by arguing that Mr. Levandowski originally

4  acquired Waymo's trade secrets before Otto Trucking was incorporated.  Dkt. 1419-4 at 20 ("Here,

5  Mr. Levandowski's alleged taking of Waymo's trade secrets occurred before Otto Trucking even

6  existed, and thus such actions plainly could not be within Mr. Levandowski's authority as a

7  Managing Member of Otto Trucking.").  Otto Trucking's contention is incorrect.  Mr. Levandowski

8  **continued and continues** to possess these trade secrets during the time when he is an Otto Trucking

9  executive, and Otto Trucking has ratified this misappropriation by failing to take any adverse actions

10  against Levandowski during that time.  Indeed, in order to conceal discovery into the Stroz report

11  and materials, Otto Trucking has previously argued that Stroz's investigation into Mr.

12  Levandowski's prior "Bad Acts" (including downloading files from Waymo) was done in Mr.

13  Levandowski's capacity as an Otto Trucking principal – not in his individual capacity.  *See, e.g.*,

14  Dkt. 572 at 2 ("Judge Corley concluded (at 10), with almost no reasoning, that the Stroz Report and

15  exhibits are not protected by the attorney-client privilege because 'Stroz's interview of Levandowski

16  was performed in Levandowski's individual capacity, and not as an Otto executive.'  But Judge

17  Corley failed to explain this largely unsupported statement, and it is wrong.") and Dkt. 617 at 2

18  ("The conversations between Stroz on the one hand, and Otto Trucking's principals, Anthony

19  Levandowski and Lior Ron on the other, are precisely the type of communications that are protected

20  by the attorney-client privilege under the Supreme Court's decision in *Upjohn Co. v. United States*,

21  449 U.S. 383, 390–91 (1981).").  Otto Trucking is only now trying to separate itself from Mr.

22  Levandowski's acquisition and retention of Waymo files in order to advance its latest litigation

23  position.

24      Otto Trucking's argument simply ignores the fact that Mr. Levandowski has continued to

25  possess Waymo's trade secrets in his capacity as an Otto Trucking executive, even if also he

26  possessed them in his capacity as an Uber executive.  ███████████████████████

27  Dkt. 515-13 at -7487, ████████████████████████████.  Ex. 26

28  48:17-49:7.  As described above, the current relationship between Otto Trucking and Uber is one

where Otto Trucking has effectively outsourced its development work to Uber.  The continued possession of Waymo's trade secrets by Mr. Levandowski, as an Otto Trucking executive, Levandowski effectively increases the value that Otto Trucking would have as an acquisition target to Uber.  Both Mr. Levandowski in his role as Managing Member and ███████████ and Otto Trucking stand to benefit from the increased value of Otto Trucking There is a highly-reasonable inference that this is at least one of the reasons why Levandowski has tenaciously held on to Waymo's trade secrets, given that money that he stands to earn if the Uber-Otto Trucking acquisition is consummated.  This is a direct accepted and retained benefit by Otto Trucking, even assuming that "Otto Trucking is simply a holding company."

Relatedly, Otto Trucking is also a proper Defendant in this case even if Waymo could not show any past misappropriation against Otto Trucking (which it can, for the reasons stated above). This is because ███████████████████████████ create a concrete and imminent threat that Otto Trucking would begin using Waymo's trade secrets following █████ ████████████████████████████████.  Thus, it is important for Otto Trucking to remain a Defendant in this case so that, when Waymo proves that Uber's technology uses Waymo's trade secrets, the Court could fashion a use injunction that includes Otto Trucking as well as Uber.  This issue presents additional questions of fact that cannot be resolved on summary judgment.

Otto Trucking's argument that Waymo's claims would constitute an improper reverse corporate veil piercing ignores both the reality of the formation of Otto Trucking as well as the law. Given that Otto Trucking was formed by Mr. Levandowski as a vehicle by which to reap the benefits of his misappropriation, the claim that his "actions plainly could not be within Mr. Levandowski's authority as a Managing Member of Otto Trucking" are not well-founded.  Regardless of whether Otto Trucking has ███████████, Otto Trucking admits ███████████████ ███████████.  Simply, Otto Trucking's very existence as Mr. Levandowski's company, and its acceptance and ratification of Mr. Levandowski's actions render irrelevant any claim that it did not formally provide authority for Mr. Levandowski's theft in advance.

Otto Trucking's reliance on *He Nam You v. Japan*, 150 F. Supp. 3d 1140, 1150 (N.D. Cal.

1   2015) is inapposite.  The outside reverse veil-piercing doctrine applies "when a third party outsider

2   seeks to reach corporate assets to satisfy claims against an individual shareholder."  *Postal Instant*

3   *Press, Inc. v. Kaswa Corp.*, 162 Cal. App. 4th 1510, 1518 (2008); *see also id*. at 1523 ("the issue

4   addressed by outside reverse piercing is the shareholder's transfer of personal assets to the

5   corporation to shield the assets from collection by a creditor of the shareholder.  In other words,

6   outside reverse piercing seeks to protect the judgment creditor from the shareholder's fraudulent

7   transfer of assets to the corporation.").  Here, Waymo is not seeking to seize Otto Trucking assets

8   to satisfy a judgment against Mr. Levandowski.  Instead, Waymo is simply holding Otto Trucking

9   liable for Mr. Levandowski's misappropriation in the first instance, under the doctrines of vicarious

10   liability and ratification.  Otto Trucking does not and cannot argue that California law has abolished

11   these doctrines.  Thus, Otto Trucking's argument fails.

12          There should be no question that Otto Trucking ratified Mr. Levandowski's actions.  *Fujitsu*,

13   286 F. Supp. 2d at 1148.  Despite Mr. Levandowski's continued possession of Waymo's trade

14   secrets, Otto Trucking refuses to take any remedial actions against him.  This alone shows Otto

15   Trucking's ratification of Mr. Levandowski's misappropriation, thereby subjecting Otto Trucking

16   to liability.  Cal. Civ. Code § 2310 ("A ratification can be made . . . by accepting or retaining the

17   benefit of the act, with notice thereof."); *Contemporary Servs. Corp. v. Landmark Event Staffing*

18   *Servs., Inc.*, 677 Fed. Appx. 314, 315 (9th Cir. 2017) ("CSC raised a triable issue as to whether

19   Landmark unlawfully ratified employee Grant Haskell's misappropriation of CSC trade secrets

20   when Landmark failed to cease the use of CSC documents, disavow Haskell's conduct, or terminate

21   Haskell's employment after Landmark 'had reason to know' of Haskell's misappropriation."); *Ajaxo*

22   *Inc. v. E*Trade Grp., Inc.*, 135 Cal. App. 4th 21, 67-68 (2005).

23          Otto Trucking does not contest its failure to take any action against Mr. Levandowski; rather,

24   it contends that it "cannot be found to have ratified Mr. Levandowski's alleged taking of those trade

25   secrets" because it is "is simply a holding company that never accepted, or retained any benefit

26   from, Waymo's allegedly stolen trade secrets."  As discussed above, this is factually disputed.  Otto

27   Trucking directly benefits from Mr. Levandowski's retention of Waymo's trade secrets, both

28   through its increase in value as an acquisition target and its potential use of those trade secrets in

future development.  At no point has it disavowed or attempted to disassociate itself from either Mr. Levandowski's conduct or the fruits of his theft.

Finally, Otto Trucking provides no support for its argument that it cannot be held jointly and severally liable for Waymo's patent infringement and trade secret misappropriation claims.  Despite being formed as a legal entity after Mr. Levandowski's theft, it has participated in and continued to benefit from Mr. Levandowski's actions.  The misappropriation of Waymo's trade secrets did not stop at the conclusion of Mr. Levandowski's downloading and, given Mr. Levandowski's present role at Otto Trucking, continues at Otto Trucking to this day.  Contrary to Otto Trucking's implication, the court in *JW Pharm. Corp. v. Michael Kahn & Prism Pharma Co.*, did not dismiss a party because it could not be jointly and severally liable.  No. CV1201006JGBRZX, 2013 WL 12125751, at *6 (C.D. Cal. Mar. 11, 2013).  Rather, it dismissed a dispensable party, to preserve jurisdiction, ***because*** the parties were jointly and severally liable.  Otto Trucking has raised no such jurisdictional defect that would give rise to dismissal here.

For all these reasons, Waymo respectfully requests that the Court deny Otto Trucking's motion for summary judgment.

DATED:  September 12, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ Charles K. Verhoeven*
    Charles K. Verhoeven
    Attorneys for WAYMO LLC