# EXHIBIT 54

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

WAYMO LLC, )
)
Plaintiff )
)
vs. ) 3:17-cv-00939-WHA
)
UBER TECHNOLOGIES, INC.; )
OTTOMOTTO LLC; OTTO TRUCKING )
INC. )
)
Defendants )
_____________________________)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Videotaped Deposition of Michael Epstein
San Francisco, California
Tuesday, August 22, 2017
Pages 1 - 119

Reported by:
JOANNE M. FARRELL, RPR, CRR
CSR Nos. 4838(CA) 506(HI) 507(NM)
Job No. 2684995

Pages 1 - 118

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

WAYMO LLC, )
)
Plaintiff )
)
vs. ) 3:17-cv-00939-WHA
)
UBER TECHNOLOGIES, INC.; )
OTTOMOTTO LLC; OTTO TRUCKING )
INC. )
)
Defendants )
______________________________)

Videotaped Deposition of Michael Epstein, taken on behalf of Defendants, at 425 Market Street, Suite 3400, San Francisco, California 94105, beginning at 9:14 a.m., on Tuesday, August 22, 2017, before Joanne M. Farrell, Certified Shorthand Reporter No. 4838.

technology capabilities were going, where they could be going, where we thought they could go, and where we would plan. 9:44:22AM

Q. When you made your more formal presentations to people like Sebastian Thrun, did your group make a recommendation with respect to tasks? 9:44:33AM

A. So from my recollection, I mean, there was a decision made by the entire team to perceive tasks. I don't recall exactly, you know, was that a recommendation from our team independently or was it, sort of, throughout the course of discussions. I don't recall. 9:44:52AM

Q. So focusing first on the four of you that were doing the underlying work, did the four of you have discussions amongst yourselves as to whether you thought it was a good idea to enter the [redacted] [redacted] with autonomous vehicles? 9:45:04AM

A. I don't recall, like, specific ones but almost certainly if we were doing our job right we did have discussions like that, yes. 9:45:19AM

Q. Because you would have expected to have those discussions before you made your presentation to the other folks?

A. Certainly in the course of doing our work 9:45:29AM

we would, the four of us, discuss all the different possibilities amongst ourselves and with the folks from the project that I mentioned as well. 9:45:32AM

Q. When during that time period -- you said the fall of 2012 until January of 2013. When during that window was a decision made that yes, we should look at definitely pursuing [redacted] as an opportunity for autonomous vehicles? 9:45:43AM

A. I don't recall an exact date. I don't recall an exact date. 9:46:04AM

Q. Was it towards the beginning, the middle, or the end of that time period?

A. I don't recall exactly.

Q. Do you have a general recollection?

A. And are you asking, like, when did we decide as a group to investigate [redacted] or [redacted] [redacted] [redacted] 9:46:18AM

Q. Why don't you give me both, if you can. I assume you decided to look into it fairly early on in the course of your project. Would that be fair? 9:46:32AM

A. Yes, that would likely be fair.

Q. And so when was the latter decision made that it would be [redacted] [redacted] 9:46:44AM

A. Got you. Got it. 9:46:45AM

Yeah. Again, I don't recall that specific -- a date. And I don't recall -- I don't recall a specific date. I mean, one thing I do recall is certainly -- I don't know that it would 9:46:59AM be -- I wouldn't paint it as a decision. The way these things typically are is there's a lot of discussion, people form ideas, beliefs along the way; and when that exact final decision was hey, we are doing this, I'm struggling to recall. I don't 9:47:15AM recall.

Q. Would it have been at some point before you ended your work on that project?

A. I believe yes, I believe that was correct.

Q. How did your work on the project end? 9:47:28AM

A. How did it end? That's a good question.

How did it end? Well, I think the group reached a decision on a technology and a [redacted] path which was the "ask" for our group, so that was the natural end of it. 9:47:49AM

Q. So once a decision had been made that they were going to pursue [redacted] with autonomous vehicles, there was nothing else for the four of you to do?

A. I wouldn't -- that's not how I would say 9:48:05AM

it. I mean, I think, generally, on the projects like that, you don't end that day. You know, they are sort of -- you know, they are still hand off of materials or, you know, making sure other things get documented or understanding, if there are loose ends, what those loose ends could be and if they need to be pursued. So I don't think I'd ever been on a project where it ended right on the date of a presentation. 9:48:07AM 9:48:22AM

Q. Right. Fair enough. 9:48:34AM

Who made the decision to pursue [REDACTED] with your autonomous vehicles?

A. To my recollection it was the whole team. The team made the decision.

Q. And when you say "the whole team," who are you referring to? 9:48:50AM

A. Mostly the set of folks that I mentioned earlier. So the leadership of Chauffeur.

Q. Sebastian Thrun, Anthony Levandowski, and those other names? 9:49:04AM

A. Yes, that is correct.

Again, I might have been missing a few, but those are the ones that stand out most, that I remember mostly.

Q. Did you agree with the decision that they 9:49:13AM

reached to pursue [redacted] with autonomous vehicles? 9:49:15AM

A. Did I agree with that decision? Yes, I did.

Q. Why? 9:49:23AM

A. So my -- I'm trying to recall my view at the time because it's evolved a little, maybe. But my view at the time was, I think, predicated on a couple of beliefs. [redacted]

[redacted]

9:50:24AM

There's probably other reasons as well. 9:50:29AM
Those were, I think, the ones that stuck out that I recall right now.

Q. And your best recollection sitting here going is that that decision to pursue [redacted] with 9:50:37AM
autonomous vehicles was made at some point before January of 2013?

MS. CANDIDO: Objection.

THE WITNESS: Yeah, again, I don't recall an exact date. 9:50:52AM

BY MR. GONZALEZ:

Q. Well, your work on the project ended when?

A. I think, like I said before, sometime after the New Year's. I can't recall exactly when.

Q. Right. And so that's why -- I'm not trying 9:51:04AM
to, necessarily, trap you; I'm just trying to get an idea of what the timeline is.

A. Sure.

Q. So that certainly by February your work was generally done; is that fair? 9:51:13AM

A. To my recollection around that time is when the project ended, yeah.

Q. All right. So would it be fair to say that at some point before February of 2013 a decision had been made to pursue the [redacted] with autonomous 9:51:28AM

vehicles? 9:51:32AM

A. I believe that would be a fair statement, yeah.

Q. Was there some kind of report prepared for more senior management with that recommendation? 9:51:39AM

A. Well, Chris was the leader of Chauffeur, so there wasn't -- there wasn't anybody more senior than Chris on Project Chauffeur.

Q. Did you ever make any presentations on this topic during that time period to more senior 9:51:52AM executives within Google, such as Mr. Page or Mr. Brin?

A. Oh, I beg your pardon. I thought you were referring to Chauffeur before.

I never made any -- let's see. At that 9:52:05AM time I don't recall making a personal presentation to Larry or Sergey. We did -- my team did make a presentation -- I think I might have been there. Don't recall exactly. Probably -- to Patrick Pichette, who was the CFO at that time, where 9:52:23AM Krystal Gill led our group. Patrick was her boss, so she reported it to him. So as part of his ops team's, kind of, periodically, we would give updates to Patrick. So I know that to be the case.

Q. Would there have been a PowerPoint of some 9:52:39AM

sort presented for that meeting with the CFO? 9:52:42AM

A. Almost certainly we made up a slide presentation. I can't recall how much of it we actually walked Patrick through.

Q. Busy? 9:52:54AM

A. He's a busy man. So sometimes I don't recall if we flipped slides with him, how many of the slides -- or did we, sort of, just give a sit-down in a room like this and have a conversation. I can't recall specifically which of 9:53:03AM those.

Q. Generally speaking, was the point of the slides to explain why the group concluded that [redacted] [redacted] was the preferred approach? 9:53:15AM

A. Um, I believe, yeah, I think -- I believe the point was to share with Patrick the nature of what our project was as generally, kind of, show him a lot of the work product, what we did, how we came to something else as we did, and then, yep, how the 9:53:35AM group came to the decision.

Q. Did the CFO agree with that decision?

MS. CANDIDO: Objection.

THE WITNESS: To my recollection, I believe he did. 9:53:48AM

BY MR. GONZALEZ: 9:53:49AM

Q. What was the next project that you participated in that involved autonomous vehicles after this project ended in January or February of 2013? 9:54:02AM

A. Let's see. When was it? Again, I'm playing back the history books here. So that was February 2013, like you said.

Then I believe the next one was another project for Chauffeur in the spring of 2014. 9:54:25AM

Q. Was there a name for that project?

A. No, we didn't really have a name for it.

Q. And what was it that you were involved in, in the spring of 2014?

A. So at that time Chris was still leading the 9:54:48AM group and Claire Hughes Johnson had recently joined as well to start leading a business team, and so the project there was A, she didn't have a team, so she was just, kind of, generally looking for some support from some business, kind of, books; but then 9:55:07AM B was also helping think about securing the next set of vehicle platform for the team.

Q. What does that mean, "securing the next set of vehicle platforms"?

A. So, as I'm sure you folks are aware, we 9:55:25AM

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings review of the transcript { } was {X} was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: August 22, 2017

Joanne M. Farrell, CSR No. 4838