# EXHIBIT 53

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3             SAN FRANCISCO DIVISION
4
5   WAYMO LLC,
6        Plaintiff,
7           vs.                   Case No.
8   UBER TECHNOLOGIES, INC.;      17-cv-00939-WHA
9   OTTOMOTTO, LLC; OTTO
10  TRUCKING LLC,
11       Defendants.
12  _____
13
14     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
15
16      VIDEOTAPED DEPOSITION OF DAVID DRUMMOND
17              Palo Alto, California
18             Monday, August 21, 2017
19                  Volume I
20
21  REPORTED BY:
22  REBECCA L. ROMANO, RPR, CSR No. 12546
23  JOB NO. 2677782
24
25  PAGES 1 - 172

Page 1

```
 1      A.   I understand that Waymo ▮▮▮▮▮▮▮▮▮▮▮)           ▮▮▮▮▮)
 2   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  yes.
 3      Q.   And when you say --
 4           (Brief interruption.)
 5      Q.   (By Mr. Gonzalez)  Sir, when you say that     01:10:37
 6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
 7 ▮) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
 8 ▮) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
 9      A.   Yes, they are -- my understanding is that
10   they are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)     ▮▮▮▮▮)
11 ▮) ▮▮▮▮▮▮▮▮▮▮▮)
12      Q.   And -- and wouldn't you agree that ▮▮)
13 ▮) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
14 ▮) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
15 ▮) ▮▮▮▮▮▮▮)                                           01:11:09
16      A.   I -- I don't know if that's true.
17      Q.   Why do you say that?
18      A.   It -- it -- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
19 ▮) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  so I'm not sure it's in
20   direct competition, among other things.               01:11:22
21      Q.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
22 ▮) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
23 ▮) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
24      A.   I don't know.
25      Q.   Do you recall that the issue of Google        01:11:38
```

1   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓) came up during the                01:11:41

2   time that you served on Uber's board?

3       A.   Yes, I recall that that topic came up.

4       Q.   And when it came up, did it cause you

5   concern (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓), given that                  01:11:55

6   you were the top legal officer for Google and at

7   the same time a board member for Uber?

8       A.   It caused me to -- it caused us to have

9   discussions about it at -- at some point in time,

10  yes.                                                        01:12:09

11      Q.   And when you say "discussions,"

12  discussions with who?

13      A.   Principally, with Travis Kalanick.

14      Q.   When did you first inform Mr. Kalanick

15  that (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓)   (▓▓▓▓▓▓)

16  (▓▓) (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓)

17      A.   I can't recall exactly when the two of us

18  had conversations about it.

19      Q.   Do you recall generally?

20      A.   I know that -- oh, the topic came up         01:12:34

21  sometime around -- there was a conference in

22  Southern California, the Code Conference, I believe

23  it's called -- and the topic of that came up, I

24  think, in -- in connection with remarks that

25  Sergey Brin gave at the con- -- at the conference,   01:12:50

Page 17

```
 1   and Travis and I had a conversation about that          01:12:52

 2   then.

 3        Q.   Did you and Mr. Kalanick have

 4   conversations about Mr. Brin's remarks before or

 5   after he made his remarks?                              01:13:05

 6        A.   I don't -- I don't recall whether there

 7   was any conversation before.  I do remember there

 8   was a conversation after, I believe.

 9        Q.   And how did it come up?

10        A.   Travis raised the issue with me.              01:13:15

11        Q.   Mr. Kalanick expressed concern to you

12   about what Mr. Brin had said publicly?

13        A.   Yes.

14        Q.   Do you remember where that conference

15   was?                                                    01:13:26

16        A.   It was in Southern California, I believe,

17   at the Terranea Resort.

18        Q.   Was that Rancho Palos Verdes?

19        A.   That's -- that's correct.

20        Q.   I even pronounced it right, too.              01:13:38

21        A.   Impressed.

22        Q.   Okay.  I want to make sure we're talking

23   about the same conference.

24             Okay?

25        A.   Sure.                                         01:13:44
```

Page 18

| | | |
|---|---|---|
| 1 | Q.   So what was it that Mr. Kalanick said? | 01:13:44 |
| 2 | Did he call you afterwards or did you meet? | |
| 3 | A.   We were both present at the conference so | |
| 4 | we spoke face-to-face. | |
| 5 | Q.   I see. | 01:13:55 |
| 6 |     And did you speak immediately after the | |
| 7 | presentation? | |
| 8 | A.   I don't remember. | |
| 9 | Q.   Do you remember where the two of you were | |
| 10 | when you spoke?  Was it in the hallway?  Was in a | 01:14:02 |
| 11 | conference room? | |
| 12 | A.   I don't remember.  We -- we may have been | |
| 13 | walking. | |
| 14 | Q.   All right.  Was anybody else present? | |
| 15 | A.   No, it was just the two of us. | 01:14:14 |
| 16 | Q.   So the two of you had a little private | |
| 17 | conversation? | |
| 18 | A.   That's correct. | |
| 19 | Q.   And -- and what did he say? | |
| 20 | A.   I recall him just expressing concern | 01:14:20 |
| 21 | about the possibility that ███████████████████ | |
| 22 | ███████████████████████████████████ | |
| 23 | ███████████████████████████████).  And he had | |
| 24 | concerns about that. | |
| 25 | Q.   What did you say in response? | 01:14:42 |

| | | |
|---|---|---|
| 1 | A. Well, I think I told him that we were | 01:14:46 |
| 2 | one -- well, one of the -- that was -- as Sergey -- | |
| 3 | as I believe Sergey's remarks indicated, that that | |
| 4 | was one of the things that we were considering. | |
| 5 | And that, in any event, any competition was likely | 01:14:55 |
| 6 | quite a ways off and that we -- but we -- that we | |
| 7 | should talk about these things as things developed. | |
| 8 | Q. Is there anything else that was discussed | |
| 9 | during that conversation? | |
| 10 | A. Not that I recall. | 01:15:18 |
| 11 | Q. So your best recollection is the first | |
| 12 | time that you had a conversation with anyone from | |
| 13 | Uber about ██████████████████████████ | |
|  | ██████████████████████████ | |
|  | ██████████████████████████ ███████ | |
|  | ██████████████ | |
| 17 | A. That's a rec- -- I have that | |
| 18 | recollection, yes. | |
| 19 | Q. And when did the topic come up again | |
| 20 | after that? | 01:15:39 |
| 21 | A. I don't recall specifically when the next | |
| 22 | time the topic came up. | |
| 23 | Q. And do you recall that over time | |
| 24 | Mr. Kalanick continued to express concerns about | |
| 25 | ██████████████████████████? | 01:15:50 |

Page 20

| | | |
|---|---|---|
| 1 | A. I remember him expressing concerns after | 01:15:53 |
| 2 | that. | |
| 3 | Q. And what, generally, was your response? | |
| 4 | A. Generally, my response was similar, that | |
| 5 | we were -- we hadn't launched anything. We were | 01:16:01 |
| 6 | still deciding what we were going to do. And in | |
| 7 | the event we did, any competition was a long ways | |
| 8 | off, and we had a good partnership, we should | |
| 9 | continue it. | |
| 10 | Q. What was the good partnership that you | 01:16:17 |
| 11 | had at that time? | |
| 12 | A. Well, we were investors in the company | |
| 13 | and -- through Google Ventures, I should say, which | |
| 14 | is a different entity than Google, although | |
| 15 | owned -- controlled by Google. We had a | 01:16:30 |
| 16 | partnership [redacted]. And those were the main | |
| 17 | partnerships, I believe. | |
| 18 | Q. Let me show a document that we've marked | |
| 19 | as Exhibit 1770. | |
| 20 | (Exhibit 1770 was marked for | 01:16:47 |
| 21 | identification by the court reporter and is | |
| 22 | attached hereto.) | |
| 23 | Q. (By Mr. Gonzalez) Is this an email | |
| 24 | exchange between you and Mr. Kalanick in January | |
| 25 | of 2015? | 01:17:04 |

Page 21

| | | |
|---|---|---|
| 1 | A.   That's what it appears to be. | 01:17:10 |
| 2 | Q.   You'll see that the email string starts | |
| 3 | at the bottom with Mr. Kalanick writing to you | |
| 4 | about the Detroit auto show.  And he says ▉▉▉) | |
| 5 | ▉) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉) ▉▉▉) | |
| 6 | ▉) ▉▉▉▉▉▉▉▉▉) ▉▉▉▉▉) | |
| 7 | ▉) ▉▉▉▉▉▉▉▉▉▉▉▉" | |
| 8 | Do you see that? | |
| 9 | A.   Yes, I do. | |
| 10 | Q.   And then you respond on the 18th.  He | 01:17:36 |
| 11 | writes back to you.  And then you write to him on | |
| 12 | the 22nd, basically, saying -- agreeing with him | |
| 13 | that you need to have a talk; is that right? | |
| 14 | A.   Well, to the extent you're referring | |
| 15 | to -- yes, I think it's time for a chat, too. | 01:17:56 |
| 16 | That's what the email says. | |
| 17 | Q.   Let me show you 1771. | |
| 18 | (Exhibit 1771 was marked for | |
| 19 | identification by the court reporter and is | |
| 20 | attached hereto.) | 01:18:05 |
| 21 | Q.   (By Mr. Gonzalez)  For the record, 1771 | |
| 22 | is another email exchange between you and | |
| 23 | Mr. Kalanick; is that right? | |
| 24 | A.   Yes, that's what it appears to be. | |
| 25 | Q.   And Mr. Kalanick is forwarding to you, on | 01:18:29 |

Page 22

| | | |
|---|---|---|
| 1 | March 7, 2015, an email that he received from | 01:18:32 |
| 2 | someone saying ███████████████████████ | |
| 3 | ███████████████████████████████ | |
| 4 | Is that right? | |
| 5 | A.   That's what the email seems to say. | 01:18:48 |
| 6 | Q.   And he is, once again, requesting a | |
| 7 | meeting with Larry to talk about this issue which | |
| 8 | is causing him additional concern. | |
| 9 | Would that be fair? | |
| 10 | A.   That's what he seems to be asking about. | 01:18:59 |
| 11 | Q.   And then you write back and say ██ | |
| 12 | ███████████████████████████████ | |
| 13 | ████████████████████████ | |
| 14 | ██████ | |
| 15 | Do you see that? | 01:19:12 |
| 16 | A.   Yes, I do. | |
| 17 | Q.   And you also said to him, ████████ | |
| 18 | ██████████████████████████ | |
| 19 | ███████████████ | |
| 20 | So you had already spoken to Mr. Page | 01:19:22 |
| 21 | about the concerns that were being expressed by | |
| 22 | Mr. Kalanick during this time period; is that | |
| 23 | right? | |
| 24 | A.   Well, I don't -- I don't recall when and | |
| 25 | whether I spoke to Larry during this time period. | 01:19:32 |

Page 23

```
 1   I -- I will agree with you that the email says         01:19:36
 2   that -- that I -- I -- I said that in the meeting.
 3        Q.   And so the email at least suggests that
 4   you had already had at least one conversation with
 5   Mr. Page about this.                                   01:19:47
 6             Would that be fair?
 7        A.   Well, again, the email says that -- that
 8   I wrote to Travis saying that I'll speak to Larry
 9   again, yeah.
10        Q.   Do you recall speaking to Mr. Page about     01:19:58
11   the concerns that were being expressed by
12   Mr. Kalanick?
13        A.   I don't -- I don't recall speaking to him
14   in any particular time, certainly during this
15   period.  But I recall having a -- a conversation       01:20:08
16   with him about it.
17        Q.   And what was Mr. Page's message that he
18   asked you to deliver back to Mr. Kalanick?
19        A.   I can't recall that he gave me any
20   message to deliver back.                               01:20:22
21        Q.   What was his response to the concerns
22   being expressed by Mr. Kalanick?
23        A.   ████████████████████████████████████
     ██████████████████████████████████████████████
     ████████████████████████████████████d          01:20:39
```

Page 24

1    ████████████████████████████████                                01:20:42
2        Q.   And what do you mean by ████████████
████?
4        A.   Well, ████████████████████████████████
████████████████████████████████████████    ████████
████████).   So that it was -- these were -- this
7    is a technology that was still in development.
8        Q.   Do you recall having a lunch meeting with
9    Mr. Page and Mr. Kalanick shortly after the date of
10   this email to discuss the concerns being expressed?   01:21:11
11       A.   I remember a meeting with Larry and
12   Travis.  I don't recall when it took place.
13       Q.   (By Mr. Gonzalez)  Let me show you
14   Exhibit 417.
15            This is a meeting invite for a lunch on      01:21:38
16   March 10, 2015, three days after the email exchange
17   I just showed you.
18            Does that sound about right with respect
19   to the date that you would have had this lunch that
20   you're referring to?                                  01:21:49
21       A.   I have no reason to -- to doubt it.
22       Q.   It references the location,
23   1900 Charleston Road, Mountain View.
24            Is that your headquarters?
25       A.   That's on the Google campus, yes.            01:22:00

```
 1        Q.   And --                                        01:22:03

 2        A.   And that's where I recall the meeting

 3   take place.

 4        Q.   Right.

 5             Now -- now, I don't want to get lawyer         01:22:07

 6   technical, but you're saying meeting.  This is

 7   saying lunch.

 8             Doesn't really matter to me, but was it a

 9   lunch meeting or just a regular meeting?

10        A.   I don't remember if there was food            01:22:14

11   present.

12        Q.   All right.  And --

13        A.   At -- at Google -- at Google, there's

14   always food present.

15        Q.   Yeah.  Fair enough.                           01:22:18

16             So other than you and Mr. Page and

17   Mr. Kalanick, do you recall if anyone else

18   attended?

19             This indicates an Emil Michael was

20   invited.                                                01:22:26

21        A.   I -- I recall Emil being there.  I'm

22   fairly certain he was there.

23        Q.   Other than the four of you, anybody else

24   attend?

25        A.   I don't recall anyone else attending, no.     01:22:34
```

```
 1   know that we talked from time to time.                01:53:16
 2        Q.   Was there ever an instance where you
 3   reached out to him that you can recall where he
 4   failed to respond?
 5        A.   I can't think of an -- such an instance.    01:53:24
 6        Q.   Why, in this instance, when you have
 7   someone who allegedly took 14,000 files, why didn't
 8   you reach out to Mr. Kalanick and just say to him,
 9   "Hey, Travis, one of our former employees took a
10   bunch files.  I'm concerned.  I want to make sure     01:53:36
11   they're not at Uber"?
12             MR. VERHOEVEN:  Well, again, to the
13   extent this "why" question calls for
14   attorney-client privileged communications or work
15   product communications, you should exclude those      01:53:51
16   from your answer.
17             THE DEPONENT:  Well, I don't -- I -- I
18   can't think of an answer why to the -- to your why
19   question that would -- that wouldn't involve,
20   you know, something that's privileged.                01:54:01
21        Q.   (By Mr. Gonzalez)  Did you -- outside of
22   communications with lawyers, did you yourself
23   consider the possibility that you might be able to
24   just call Travis and tell him, "I understand
25   Anthony Levandowski may have taken some files.  I     01:54:14
```

Page 53

```
 1    want to make sure they're not at Uber"?                    01:54:15
 2            MR. VERHOEVEN:  For the record,
 3    Mr. Drummond is a lawyer himself --
 4            MR. GONZALEZ:  Understood.
 5            MR. VERHOEVEN:  -- so to the extent you             01:54:25
 6    can answer that without revealing confidential
 7    attorney-client privileged information or work
 8    product information, you can answer.
 9        Q.   (By Mr. Gonzalez)  No, no.  To be clear,
10    the question is separate and apart from any                01:54:35
11    conversations you may have had with lawyers, did
12    you yourself ever consider the possibility of just
13    calling Travis to tell him that "Hey, this guy may
14    have taken some files and I want to make sure
15    they're not at Uber"?                                       01:54:47
16            MR. VERHOEVEN:  Same instruction.
17            THE DEPONENT:  I don't believe I
18    considered that possibility at the time.
19        Q.   (By Mr. Gonzalez)  Why not?
20            MR. VERHOEVEN:  Same instruction.                   01:54:58
21            THE DEPONENT:  I don't think I can answer
22    that without revealing something privileged.
23        Q.   (By Mr. Gonzalez)  If somebody has 14,000
24    of your client's files and you think those are
25    important, don't you think, generally speaking,             01:55:20
```

Page 54

| | | |
|---|---|---|
| 1 | it's a fair thing to give them notice that "Hey, | 01:55:23 |
| 2 | one of our employees took your files"? | |
| 3 |       MR. VERHOEVEN:  Object to the form. | |
| 4 |       THE DEPONENT:  I don't know that I can | |
| 5 | answer your hypothetical. | 01:55:32 |
| 6 |    Q.  (By Mr. Gonzalez)  In this situation -- | |
| 7 | forget the hypothetical -- regardless of what your | |
| 8 | lawyers may or may not have said -- | |
| 9 |    A.  Uh-huh. | |
| 10 |    Q.  -- I'm not interested in that. | 01:55:41 |
| 11 |       You had a personal relationship with | |
| 12 | Mr. Kalanick.  Didn't you think that it would be | |
| 13 | reasonable to give him notice that the guy you just | |
| 14 | hired has a bunch of our files? | |
| 15 |       MR. VERHOEVEN:  Object to form.  Same | 01:55:50 |
| 16 | instruction on privilege and -- | |
| 17 |       THE DEPONENT:  Again, there are a variety | |
| 18 | of responses that you might have.  But our | |
| 19 | response, in this particular situation, I don't | |
| 20 | think I can reveal to you, or how I was thinking | 01:56:03 |
| 21 | about it, without revealing to you privileged | |
| 22 | information. | |
| 23 |    Q.  (By Mr. Gonzalez)  Did you do anything, | |
| 24 | as the chief legal officer for Google, when you | |
| 25 | learned that these files might have downloaded, to | 01:56:13 |

Page 55

| | | |
|---|---|---|
| 1 | make sure that somebody gave notice to Uber about | 01:56:16 |
| 2 | these files? | |
| 3 |       MR. VERHOEVEN:  Objection. | |
| 4 |       To the extent that your answer would not | |
| 5 | involve attorney-client communications or work | 01:56:24 |
| 6 | product communications, you may answer.  Otherwise, | |
| 7 | you may not. | |
| 8 |       THE DEPONENT:  I -- I think -- thank you. | |
| 9 | Sorry.  Microphone disconnection. | |
| 10 |       I think all of the discussions around | 01:56:53 |
| 11 | finding out about the files involved sort -- | |
| 12 | you know, were -- involved our sort of legal | |
| 13 | response, something illegal had been done.  So I | |
| 14 | think as the chief of -- you know, Alph- -- legal | |
| 15 | officer of Alphabet, which is the owner of Waymo, I | 01:57:13 |
| 16 | think are -- you know, all of those conversations | |
| 17 | were privileged. | |
| 18 |   Q.  (By Mr. Gonzalez)  All right.  And I'm | |
| 19 | setting aside all of those conversations. | |
| 20 |   A.  Uh-huh. | 01:57:25 |
| 21 |   Q.  And I'm simply asking you, you get | |
| 22 | involved in a lot of business discussions, right? | |
| 23 |   A.  I do get involved in business | |
| 24 | discussions, yes. | |
| 25 |   Q.  And you have a lot of business | 01:57:31 |

```
 1   discussions with companies that Google does            01:57:33

 2   business with, correct?

 3       A.   That's correct.

 4       Q.   And I'm just asking you, generally

 5   speaking, when you found out that these files had      01:57:38

 6   been taken, didn't you personally think that it

 7   would be fair to give notice to Mr. Kalanick that

 8   Mr. Levandowski may have taken some files?

 9           MR. VERHOEVEN:  Object to form.

10           Same instruction on attorney-client            01:57:49

11   privilege and work product doctrine.

12           THE DEPONENT:  I personally did not think

13   that.  The reasons I did not think that are

14   privileged.

15       Q.   (By Mr. Gonzalez)  Did you take any           01:58:02

16   steps, at that point, to make sure that somebody

17   gave notice to Uber so that they wouldn't use these

18   files that were taken?

19           MR. VERHOEVEN:  Objection.

20           Same instruction.  Attorney-client            01:58:14

21   privilege.  Work product doctrine.

22           THE DEPONENT:  I took no steps to tell

23   anyone to do that, and the reasons for that, again,

24   are privileged.

25       Q.   (By Mr. Gonzalez)  By the way, if those      01:58:33
```

Page 57

| | | |
|---|---|---|
| 1 | files are important, why didn't you sue the guy who | 01:58:35 |
| 2 | took them? | |
| 3 |     MR. VERHOEVEN:  Objection. | |
| 4 |     Instruct you not to answer under the | |
| 5 | grounds of attorney-client privilege and work | 01:58:45 |
| 6 | doc- -- work product doctrine. | |
| 7 |   Q.   (By Mr. Gonzalez)  Did you consider suing | |
| 8 | the guy who took the files? | |
| 9 |     MR. VERHOEVEN:  Same instruction. | |
| 10 | Instruct you not to answer for the same basis. | 01:58:56 |
| 11 |   Q.   (By Mr. Gonzalez)  When did you learn | |
| 12 | that there were some email that came to your | |
| 13 | company inadvertently from Gorilla? | |
| 14 |   A.   I don't recall exactly when I -- when I | |
| 15 | heard about that.  Again, sometime toward the end | 01:59:15 |
| 16 | of 2016, something -- somewhere around that time. | |
| 17 |   Q.   Do you recall that it came to your | |
| 18 | attention at around the time that the email was | |
| 19 | received? | |
| 20 |   A.   Yes, I think it was, all right, you know, | 01:59:38 |
| 21 | some -- somewhere around that time. | |
| 22 |   Q.   When you saw that email, did it cause you | |
| 23 | any concern? | |
| 24 |     MR. VERHOEVEN:  Same instruction.  To the | |
| 25 | extent that the question -- the response to that | 01:59:45 |

Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       I, Rebecca L. Romano, a Certified Shorthand
2   Reporter of the State of California, do hereby
3   certify:
4       That the foregoing proceedings were taken
5   before me at the time and place herein set forth;
6   that any witnesses in the foregoing proceedings,
7   prior to testifying, were administered an oath;
8   that a record of the proceedings was made by me
9   using machine shorthand which was thereafter
10  transcribed under my direction; that the foregoing
11  transcript is true record of the testimony given.
12      Further, that if the foregoing pertains to the
13  original transcript of a deposition in a Federal
14  Case, before completion of the proceedings, review
15  of the transcript [ ] was [X] was not requested.
16      I further certify I am neither financially
17  interested in the action nor a relative or employee
18  of any attorney or any party to this action.
19      IN WITNESS WHEREOF, I have this date
20  subscribed my name.
21      Dated: August 22, 2017
22
23
24      Rebecca L. Romano, RPR,
25      CSR. No 12546

Page 172