# EXHIBIT 7

EFiled: Aug 10 2017 01:00PM EDT
Transaction ID 60966121
Case No. 2017-0575-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

BENCHMARK CAPITAL PARTNERS VII, L.P.,
a Delaware limited partnership,

        Plaintiff,

        v.

TRAVIS KALANICK,

        Defendant,

   and

UBER TECHNOLOGIES, INC., a Delaware
corporation,

        Nominal Defendant.

C.A. NO. _____

### VERIFIED COMPLAINT

Plaintiff Benchmark Capital Partners VII, L.P. ("Benchmark"), by its

undersigned attorneys, hereby alleges against defendant Travis Kalanick

("Kalanick") and nominal defendant Uber Technologies, Inc., a Delaware

corporation ("Uber"), which is named as a party for the sole purpose of ensuring

that the Court can grant appropriate relief, as follows:

### NATURE OF THE ACTION

1.    Plaintiff Benchmark brings this action to redress the fraud,

breaches of fiduciary duty, and breaches of contractual obligations perpetrated by

Kalanick, the former CEO of Uber, to entrench himself on Uber's Board of

Plf EXHIBIT 9/8
WITNESS: Gurley
DATE: 8-24-19
Anrae Wimberley, CSR 7778

Directors and increase his power over Uber for his own selfish ends. Kalanick's

overarching objective is to pack Uber's Board with loyal allies in an effort to

insulate his prior conduct from scrutiny and clear the path for his eventual return as

CEO—all to the detriment of Uber's stockholders, employees, driver-partners, and

customers.

2.      As explained in detail below, in 2016, Kalanick fraudulently

obtained control of three newly created seats on Uber's Board by his material

misstatements and fraudulent concealment from Benchmark of material

information that would have led Benchmark to reject the creation of the seats, and

by his intentional failure to disclose to Benchmark and other stockholders adequate

information for them to evaluate the requested stockholder consent to create the

Board seats. After resigning as CEO, Kalanick purported to appoint himself to one

of these fraudulently procured seats.

3.      Uber is one of the largest private companies in the world.

Kalanick was Uber's CEO until June 20, 2017, and a director on its Board until

approximately June 22, 2017, when he resigned from the Board seat reserved for

Uber's current CEO and purported to re-appoint himself to a different, fraudulently

procured Board seat (as explained below). Benchmark is a substantial investor in

Uber, and, with other large investors, entered into a voting agreement with

Kalanick and certain other key shareholders concerning how the parties would vote their Uber stock to elect directors. Uber is also a party to the voting agreement.

4.     On or around June 1, 2016, Kalanick induced Benchmark to (a) execute a stockholder consent approving an amendment to Uber's Certificate of Incorporation, and (b) execute an amended voting agreement (the "Voting Agreement"). Among the various changes made by these amendments, upon information and belief, Kalanick caused the insertion of provisions purporting to grant him the absolute right to designate directors to occupy three newly created Board seats. Uber's Board had been comprised of eight voting directors. The June 2016 amendments purportedly expanded the Board to eleven voting directors, with the three new seats expressly reserved for directors to be designated by Kalanick.

5.     Unknown to Benchmark at the time, in obtaining control over the three new Board seats for his personal benefit, Kalanick intentionally concealed and failed to disclose his gross mismanagement and other misconduct at Uber. These matters included, among others, Kalanick's personal involvement in causing Uber to acquire a self-driving vehicle start-up that, according to a confidential report not disclosed to Benchmark at the time (the "Stroz Report"), allegedly harbored trade secrets stolen from a competitor; an Uber executive's alleged theft of the medical records of a woman who was raped by her Uber driver in India; a pervasive culture of gender discrimination and sexual harassment that

ultimately prompted an investigation by the former U.S. Attorney General Eric Holder; and a host of other inappropriate and unethical directives issued by Kalanick.

      6.    Upon information and belief, Kalanick knew Benchmark never would have approved the amended Certificate of Incorporation or the Voting Agreement as to the three new Board seats if Benchmark had known the truth about Kalanick's prior conduct. Kalanick also understood that these matters, once revealed, would likely force him to resign as Uber's CEO, and thus sought to grant himself a way to play an ongoing leadership role at Uber once the truth came out. Kalanick therefore knowingly concealed these matters from Benchmark and Uber's Board to obtain, for his personal benefit, the unilateral right to pack the Board with three additional directors of his choosing. In doing so, Kalanick acquired a disproportionate level of influence over the Board, ensuring that he would continue to have an outsized role in Uber's strategic direction even if forced to resign as CEO.

      7.    When Kalanick's mismanagement and related issues were revealed in 2017, Kalanick was quickly forced to resign as CEO, in significant part due to the efforts of Benchmark and other investors. In resigning, Kalanick expressly committed to Uber and Benchmark in a signed letter dated June 20, 2017 (attached as Exhibit A), that any individuals he appoints to two of the three vacant

4

Board seats he purports to control will be independent, experienced, unbiased, and diverse—which Uber sorely needs. Further, these two directors are not to be designated by Kalanick alone, but instead are subject to the approval of all then-current directors other than one. Importantly, Kalanick expressly committed in his letter to vote "as a director and stockholder" in accordance with these commitments, as well as make "conforming amendments to the Voting Agreement as soon as possible." In reliance upon these commitments, Benchmark refrained from bringing a fraud action against Kalanick and joining with other large stockholders in taking action publicly to remove Kalanick as CEO.

8.     Kalanick, however, had no intention of fulfilling these commitments. Instead, after resigning as CEO (and departing the Board seat reserved for the CEO, as required), Kalanick immediately purported to re-appoint himself to one of the three vacant Board seats that he had procured through fraud. As to the two remaining seats, Kalanick refused to execute a further amended Voting Agreement consistent with his June 20, 2017 commitment described above. It is apparent that Kalanick has attempted to acquire the power to pack the Board to facilitate his desired re-appointment as Uber's CEO, which would be directly contrary to his prior commitments and not in the best interests of Uber or its stockholders and employees. Kalanick's improper actions, if allowed to continue, would cause irreparable harm to Uber by exposing it to reputational, regulatory and

other risks, and indeed, in his purported Board seat, Kalanick has already interfered with Uber's search for a new CEO.

9.      Accordingly, pursuant to 8 *Del. C.* § 225, Benchmark seeks (a) to invalidate the 2016 stockholder vote and subsequent amendment of the Certificate of Incorporation as to the creation of the three Board seats, which was tainted by Kalanick's fraudulent statements and omissions in connection with the vote, and (b) to invalidate Kalanick's appointment of himself to one of the three seats. Pending these determinations, Benchmark seeks a status quo order declaring that: (i) Kalanick shall not attempt to fill the two disputed Board seats that are currently vacant, or otherwise attempt to change the current size or composition of the Board; (ii) in the event Kalanick resigns from the Board, Kalanick shall not attempt to fill the disputed Board seat he purportedly held immediately before his resignation; (iii) Uber's Board shall not take any action requiring Board approval unless such action is approved by a majority of the remaining directors after excluding the vote of Kalanick (and, for the avoidance of doubt, the votes of any persons occupying any of the three Board seats whose validity is disputed in this action); and (iv) Kalanick shall not take any actions that would have the effect of disrupting the continuing management of the business and affairs of Uber by its current Board in the ordinary course.

10.     In addition, Benchmark seeks an expedited declaratory judgment that the portions of the amended Certificate of Incorporation and Voting Agreement concerning the three Board seats (reflected in Exhibits B and C attached hereto) were fraudulently procured, and that such portions of these amendments are therefore rescinded, void and without effect; a preliminary and permanent injunction enjoining Kalanick from participating in Board meetings and votes, taking any actions with respect to the three Board seats, or otherwise interfering with Uber's management or engaging in further wrongful conduct; and an award of related damages caused by Kalanick's fraud.

11.     These necessary measures will restore Uber to an eight-member Board (with one of the eight seats vacant and reserved for Uber's new CEO, once she or he is appointed).

12.     In the alternative, Benchmark seeks a declaration and injunction that requires Kalanick to comply with his June 20 commitment and execute a conforming amendment to the Voting Agreement as to the two Board seats.

## THE PARTIES

13.     Plaintiff Benchmark is a Delaware limited partnership with its principal place of business at 2965 Woodside Road, Woodside, CA 94062.

14.     Defendant Kalanick is a natural person.  Upon information and belief, Kalanick resides in California, with his last known principal place of business at 1455 Market Street, San Francisco, CA 94103.

15.     Nominal defendant Uber is named as a party for the sole purpose of ensuring that the Court can grant appropriate relief, and Benchmark does not seek any damages from Uber.  Uber is a Delaware corporation with its principal place of business at 1455 Market Street, San Francisco, CA 94103.  Uber is a leading ride-hailing company that operates in more than 600 cities around the world.

## JURISDICTION

16.     This Court has jurisdiction over this action pursuant to 8 *Del. C.* § 225, and in equity pursuant to 10 *Del. C.* § 341.

17.     The Court has personal jurisdiction over Kalanick pursuant to 10 *Del. C.* §§ 3104, 3114(a) and 3114(b), and personal jurisdiction over Uber pursuant to 10 *Del. C.* § 3111.

## THE FACTS

**Uber and Its Board of Directors**

18.     Kalanick became involved with Uber in approximately 2009, and in December 2010, Kalanick became Uber's CEO.  Kalanick joined Uber's Board of Directors prior to Benchmark's initial investment.  Kalanick currently

holds approximately 10% of Uber's stock, including approximately 16% of Uber's voting power and approximately 35% of Uber's Class B common stock.

19.    Benchmark first invested in Uber in February 2011, and at present holds approximately 13% of Uber's stock, including approximately 20% of Uber's voting power, approximately 36% of the preferred stock voting power and approximately 0.5% of Uber's Class B common stock.

20.    As of May 2016, Uber's Certificate of Incorporation provided for a Board of Directors comprised of eight Voting Directors.  At the time, under Section 1.1 of the voting agreement in effect between Kalanick, Benchmark, and other investors, dated December 3, 2015 (the "Prior Voting Agreement"), the parties agreed to vote their Uber shares so as to elect:

- One Voting Director designated by Benchmark (initially Bill Gurley or Matt Cohler);

- One Voting Director designated by TPG Equity Holdings, L.P. (initially David Bonderman);

- One Voting Director designated by Expa-1 (initially Garrett Camp);

- One Voting Director who is Uber's CEO (initially Kalanick); and

- Four Voting Directors designated by the holders of a majority of Uber's Class B common stock (of which two seats were initially held by Ryan Graves and David Drummond, and the remaining two seats were vacant, with one such seat to be filled by an independent director).

21.     In approximately April 2016, Arianna Huffington was appointed to one of the two vacant Board seats, giving Uber a seven-member Board with a vacancy in the eighth authorized seat. In approximately August 2016, David Drummond resigned from the Board. In June 2017, Wan Ling Martello was appointed to the Board seat formerly held by Drummond.

**Kalanick Fraudulently Procures the Stockholder Consent and Voting Agreement Amendment by Concealing Highly Relevant Information from Benchmark**

22.     On or around May 23, 2016, an Uber officer contacted the members of Uber's Board of Directors and certain investors who were parties to the Prior Voting Agreement to seek their approval for certain amendments to the Prior Voting Agreement, Uber's Certificate of Incorporation, and other documents. The recipients of the May 23 request included Bill Gurley, a Benchmark partner who was a Voting Director on Uber's Board.

23.     Among other things, the amendments would increase the number of Voting Directors from eight to eleven, with the three new seats initially

10

vacant. Specifically, Article IV(B)(5)(b) of the amended Certificate of Incorporation added three additional Voting Directors designated by the holders of a majority of Uber's Class B common stock, and Section 1.1(e)(iii) of the Voting Agreement, as amended, required the parties to vote their Uber shares to fill these three new Board seats with individuals "designated by Travis Kalanick."

24.     Upon information and belief, Kalanick specifically requested the above amendments to the Certificate of Incorporation and Prior Voting Agreement. Kalanick stood to gain a direct personal benefit from Benchmark's approval of the amendments to the Certificate of Incorporation and Prior Voting Agreement related to the three new Board seats. As explained below, Kalanick knew he would likely be forced to resign as CEO once his prior conduct was discovered. These amendments would dramatically increase Kalanick's power over Uber's Board, even after resigning or being terminated as CEO, by giving him the ability to appoint hand-picked directors to three new Board seats. Kalanick owed fiduciary duties to Benchmark and other Uber stockholders in his capacity as Uber's CEO and a director on Uber's Board, including duties of loyalty and care, and because Kalanick stood to gain a direct personal benefit from the amendments as to the three Board seats, Kalanick had a fiduciary duty to disclose all relevant facts to Benchmark and other Uber stockholders. In addition, as a matter of

11

Delaware law, for a stockholder consent to be valid, the stockholder must be provided with all material information relevant to the decision to consent.

25.     In May 2016, when the amendments were presented, Kalanick was in regular contact with Gurley and other representatives of Benchmark with respect to his management of Uber.  In discussions with Gurley, Kalanick repeatedly touted his abilities and management of Uber and Uber's achievements to date.  At no time prior to Benchmark's execution of the Voting Agreement and stockholder consent approving the amended Certificate of Incorporation did Kalanick disclose any matters that would have caused Gurley or Benchmark to question the appropriateness of Kalanick obtaining three additional Board seats.

26.     Thus, at the time, Benchmark and Gurley reasonably believed that Kalanick was acting responsibly as Uber's CEO, that authorizing the three new Board seats (and Kalanick's right to fill them) was fair and in the best interests of Uber and its stockholders, and that Benchmark had all material information necessary to evaluate the proposed changes.

27.     On or around June 1, 2016, in reliance on Kalanick's material misstatements and omissions, (1) Benchmark executed a stockholder consent to the amendment of Uber's Certificate of Incorporation, (2) Benchmark executed the Voting Agreement, and (3) Gurley, in his capacity as an Uber director, executed a

board consent to the amendment of Uber's Certificate of Incorporation and the Prior Voting Agreement.

28.   As noted above, Benchmark holds approximately 20% of Uber's voting power, and held substantially the same voting power at the time of the June 2016 amendment to the Certificate of Incorporation.  Upon information and belief, if Benchmark had not consented to the June 2016 amendment of Uber's Certificate of Incorporation, the amended Certificate of Incorporation would have received less than 50% stockholder support and would not have passed.

29.   Benchmark holds approximately 36% of Uber's preferred voting power, and held substantially the same voting power at the time of the June 2016 amendment to the Voting Agreement.  Section 5.4 of the Prior Voting Agreement provided that any amendments required the written consent of (a) Uber, (b) the holders of at least a majority of Uber's stock (on an as-converted basis) held by the Key Holders (as defined therein) then providing service to Uber as officers, employees, consultants, or advisors, and (c) the holders of at least a majority of Uber's then-outstanding common stock issuable or issued upon conversion of preferred stock held by the Investors (as defined therein), voting together as a single class on an as-converted basis.  Upon information and belief, if Benchmark had not exercised its approximately 36% of preferred voting power in favor of the

amended Voting Agreement, the proposal would have received less than 50% of the preferred votes and would not have passed.

**Kalanick's Gross Mismanagement of Uber Is Revealed**

30.     Starting in 2017, a series of lawsuits and media reports revealed Kalanick's gross mismanagement of Uber and several other significant matters that Kalanick had concealed from Benchmark and Uber's Board at the time Benchmark, reasonably relying on Kalanick's misstatements and omissions, authorized the provisions of the Voting Agreement and amended Certificate of Incorporation concerning the three new Board seats.  Certain of these matters are described below.

<u>Waymo Litigation</u>

31.     Uber has recently entered the race to develop and commercialize self-driving vehicles, which Kalanick has publicly stated is "existential" for Uber.[1]

32.     To improve Uber's capabilities with respect to self-driving vehicles, in 2016, Kalanick caused Uber to acquire Ottomotto LLC and Otto Trucking LLC (together, "Otto"), two recently formed start-ups.  Otto's founder

---

[1] Biz Carson, *Travis Kalanick on Uber's bet on self-driving cars: 'I can't be wrong'*; BUSINESS INSIDER (Aug. 18, 2016), *available at* http://www.businessinsider.com/travis-kalanick-interview-on-self-driving-cars-future-driver-jobs-2016-8.

was Anthony Levandowski, an engineer who had recently resigned from Google's self-driving car division (now known as Waymo).

33.   The Otto acquisition was presented to Uber's Board in April 2016 and memorialized in two merger agreements dated as of April 11, 2016. When the Otto acquisition—which had an estimated cost to Uber of $680 million—was publicly announced in August 2016, Kalanick praised Levandowski as "one of the world's leading autonomous engineers" and an entrepreneur with "a real sense of urgency."[2]   Kalanick further described Levandowski as his "brother from another mother."[3]   In discussing the Otto transaction in 2016, Kalanick repeatedly emphasized to Gurley and other Board members that Uber's acquisition of Otto and employment of Anthony Levandowski would be transformative for Uber's business.

34.   In February 2017, Waymo sued Uber for theft of trade secrets, alleging that Levandowski had downloaded 14,000 highly confidential Waymo files, including Waymo's proprietary circuit board designs, before resigning to join Otto.   (*Waymo LLC* v. *Uber Technologies, Inc.*, No. 3:17-cv-00393-WHA (N.D.

---

[2] Mike Isaac and Daisuke Wakabayashi, *Uber Fires Former Google Engineer at Heart of Self-Driving Dispute*, THE NEW YORK TIMES (May 30, 2017), *available at* https://www.nytimes.com/2017/05/30/technology/uber-anthony-levandowski.html.

[3] Mark Bergen, *Ambitious Engineer at Center of Colossal Fight Between Google and Uber*, BLOOMBERG (Feb. 24, 2017), *available at* https://www.bloomberg.com/news/articles/2017-02-24/ambitious-engineer-at-center-of-colossal-fight-between-google-and-uber.

Cal.), Dkt. No. 24 at 8.)  Waymo further alleges that Levandowski used the stolen files to develop Uber's self-driving vehicle efforts.  Among other relief, Waymo seeks damages and an injunction preventing Uber "accessing, using, imitating, copying, disclosing, or making available to any person or entity" Waymo's asserted trade secrets.  (*Id.* at 25.)

35.     Discovery in the lawsuit is ongoing, and appears to suggest that Levandowski had a long relationship with Uber—and with Kalanick in particular. Recent public filings suggest that Uber and Levandowski began discussing certain technical matters as early as May 20, 2015; that Levandowski met with Uber representatives five times between October 2015 and December 11, 2015; that, after a one-on-one meeting between them, Kalanick personally suggested that Levandowski should create a company for Uber to acquire; and that Kalanick was anticipating litigation with Waymo by January 2016.  (*Id.* Dkt. No. 756 at 8-10.)

36.     As recently publicly disclosed, as part of the due diligence with respect to the Otto acquisition,  Uber commissioned Stroz Friedberg, a forensic consultant, to prepare a report on whether there were any documents or information in Otto's or Levandowski's possession which properly belonged to Waymo.  Specifically, in early March 2016, Uber retained Stroz to investigate whether Levandowski and four other Otto personnel who had formerly worked for Waymo had taken or retained intellectual property and other proprietary

16

information from their former employer. Stroz interviewed the five individuals and conducted an extensive review of their computers and other devices for evidence of Google or Waymo proprietary information. Waymo alleges that "the existence and sheer scope of this investigation is proof enough that Uber knew Levandowski had Waymo materials" (*id.* at 11), and indeed, Levandowski is attempting to block Uber's production of the Stroz Report in the litigation.

37.   Benchmark was not informed of Stroz's April 2016 interim findings when the Voting Agreement and amended Certificate of Incorporation were approved in June 2016. Upon information and belief, Kalanick was aware of Stroz's interim findings when the Voting Agreement and amended Certificate of Incorporation were approved, and also aware of the findings of the final Stroz Report (dated August 5, 2016) before the first stage of the Otto acquisition closed, but Kalanick unilaterally decided not to disclose these findings to the Board, Benchmark or others. Upon information and belief, if the contents of Stroz's interim findings and the Stroz Report had been disclosed to Benchmark at the time, they would have had a material impact on Benchmark's decision to authorize the creation of the three new Board seats and grant control over them to Kalanick.

38.   Indeed, recent public disclosures suggest that Kalanick apparently knew before the Voting Agreement and amended Certificate of Incorporation were approved that Levandowski had improperly taken information

from Waymo. In a recent discovery response that was publicly filed in the Waymo litigation, Uber stated that on or around March 11, 2016—after Stroz was retained—Levandowski "reported to Kalanick, Nina Qi and Cameron Poetzscher at Uber as well as Lior Ron that he had identified five discs in his possession containing Google information." (*Id.* Dkt. No. 695 at 4.) Waymo alleges that Qi, Poetzscher and Ron have each "confirmed that Levandowski did indeed reveal that he had Google 'stuff' in his possession during an in-person meeting with Uber on March 11, 2016." (*Id.* Dkt. No. 756 at 12.) Kalanick never disclosed the March 11 meeting or Levandowski's alleged statement about the five discs to the Board or Benchmark at the time the Voting Agreement and amended Certificate of Incorporation were approved. Nor did Kalanick give Gurley or others at Benchmark any reason to believe Levandowski might have taken files from his former employer, even as Kalanick repeatedly praised the Otto transaction and Levandowski to Gurley and others.

  39. In addition to the recently revealed information about Kalanick's prior interactions with Levandowski and apparent knowledge that Levandowski had taken information from Waymo, Uber refused to terminate Levandowski's employment for months after Waymo sued—even after Levandowski invoked the Fifth Amendment and refused to answer questions about his conduct. Upon information and belief, these efforts were personally directed

by Kalanick, who aggressively tried to block any efforts to terminate Levandowski.
Levandowski was finally fired on May 26, 2017 (*id.* Dkt. No. 755 at 13), after a
May 15, 2017 Court order had directed Uber to obtain Levandowski's cooperation,
terminate his employment, or face contempt of court.  (*Id.* Dkt. No. 433 at 23.)
The Court has also referred the Waymo matter to the United States Attorney for
the Northern District of California "for investigation of possible theft of trade
secrets based on the evidentiary record supplied thus far."  (*Id.* Dkt. No. 428.)

40.    In sum, the Waymo lawsuit presents significant legal, financial,
and reputational risks to Uber—risks that could have been reduced or avoided if
Kalanick had disclosed crucial facts about his own apparent knowledge at the time
of the Otto acquisition.  Instead, as noted above, Kalanick repeatedly emphasized
to Gurley and others at the time that Uber's acquisition of Otto and employment of
Levandowski—who appears to have taken information from Waymo—would be
transformative for Uber's business.

<u>India Rape Incident</u>

41.    Another recently disclosed matter that caused Benchmark and
others to question Kalanick's role as CEO relates to the rape of an Uber passenger

19

by a driver in India in 2014.  The driver was convicted of rape and sentenced to life imprisonment in India.[4]

42.    In January 2015, the rape victim sued Uber in the United States, alleging that Uber failed to maintain basic safety procedures.  *Doe* v. *Uber Technologies, Inc.*, No. 3:15-cv-00424 (N.D. Cal.).  The victim voluntarily dismissed the lawsuit in September 2015; according to public reports, Uber had settled the lawsuit for "at least $3 million."[5]

43.    However, it recently emerged that Uber's senior executives—including Kalanick—had allegedly obtained and reviewed a medical report of the rape victim in an effort to discredit her claims, which Kalanick and others apparently posited were fabricated by Ola Cabs, one of Uber's competitors in India.

44.    Specifically, in June 2017, various publications first reported that Eric Alexander, the then-president of Uber's Asia operations, had obtained the passenger's medical records shortly after the rape.[6]  In the wake of these reports,

---

[4] Kara Swisher and Johana Bhuiyan, *A Top Uber Executive, Who Obtained the Medical Records of a Customer Who Was a Rape Victim, Has Been Fired*, RECODE (Jun. 7, 2017), *available at* https://www.recode.net/2017/6/7/15754316 /uber-executive-india-assault-rape-medical-records.

[5] Eric Newcomer, *Uber Workplace Probe Extends to Handling of India Rape Case*, BLOOMBERG (Jun. 7, 2017), *available at* https://www.bloomberg.com/news /articles/2017-06-07/uber-workplace-probe-extends-to-handling-of-india-rape-case.

[6] Swisher and Bhuiyan, *supra* note 4.

the victim has again sued Uber (and Kalanick, as well as Alexander and former

Uber executive Emil Michael).  (*Doe* v. *Uber Technologies, Inc.*, No. 3:17-cv-

03470 (N.D. Cal.), Dkt. No. 1.)

45.   According to the victim's complaint, on or about December 13,

2014, Alexander went "directly to Delhi where he managed to obtain Plaintiff's

confidential, private medical records generated by physicians who examined her

after the brutal rape."  (*Id.* Dkt. No. 1, at 3.)   The victim alleges that Alexander

"examined the records closely and showed them to Kalanick and Michael" and that

they "discussed the records among themselves and with other staff at Uber,

speculating that Plaintiff had made up the brutal rape in collusion with a rival of

Uber in India in order to undermine Uber's business."  (*Id.* at 4, 11.)   Kalanick,

Alexander and Michael allegedly "made numerous statements to . . . other

employees at Uber that [Doe] was fraudulently claiming that she had been raped in

collusion with a rival of Uber."  (*Id.* at 16.)   The victim further alleges that

Alexander "carried around [Doe's] medical records in a brief case" and "continued

to retain Plaintiff's records until he was forced to turn them over in or around

December 2015," nearly one year later.  (*Id.* at 5, 11.)   It has been reported that,

even after the driver's criminal conviction, Kalanick "continued to express doubts

to friends and colleagues about whether the woman had been raped."[7]

_____

[7] Newcomer, *supra* note 5.

46.     Again, the alleged mishandling of the India rape victim's medical records—which has since understandably received significant press coverage and criticism[8]—was known to Kalanick at the time of the amendments to the Certificate of Incorporation and the Prior Voting Agreement, but not disclosed to Uber's Board or Benchmark at the time.

<u>Sexual Harassment and Gender Discrimination</u>

47.     On February 19, 2017, a former Uber engineer named Susan Fowler wrote a blog post describing a pervasive culture of sexism, discrimination and harassment at Uber, which she had allegedly experienced while working at Uber from being sexually harassed by her manager, with Uber's Human Resources department and others expressing indifference about, or even retaliating against, her complaints.[9]

48.     Fowler's blog post quickly went viral.  Her allegations led Uber to retain Eric Holder and his law firm, Covington & Burling LLP, to conduct an internal investigation of Uber's workplace culture.

---

[8] *See, e.g.*, Swisher and Bhuiyan, *supra* note 4; *see also* Mike Isaac, *Uber Is Sued by Woman Who Was Raped by One of Its Drivers in India*, THE NEW YORK TIMES (Jun. 15, 2017), *available at* https://www.nytimes.com/2017/06/15/technology/uber-india-rape-lawsuit.html.

[9] Susan J. Fowler, *Reflecting On One Very, Very Strange Year At Uber* (Feb. 19, 2017), *available at* https://www.susanjfowler.com/blog/2017/2/19/reflecting-on-one-very-strange-year-at-uber.

49.     Various information came to light over the course of Covington's investigation, which spanned more than three months and involved more than 200 interviews with current and former Uber employees and the collection of more than 3 million documents.[10]

50.     For example, it has been publicly reported that in mid-2014, Kalanick and other Uber executives, as well as Kalanick's then-girlfriend, visited a karaoke and escort bar in South Korea where women wore tags with numbers to facilitate their selection by customers.[11]   A female Uber marketing manager who attended the outing recalled feeling uncomfortable and leaving shortly after arrival. She subsequently complained to Uber's HR department and discussed the issue with Kalanick's then-girlfriend, who raised it with Kalanick.[12]   Following Fowler's blog post in February 2017, Uber executive and Kalanick lieutenant Emil Michael contacted Kalanick's former girlfriend to ask whether, if questioned by reporters, she would confirm the story that "they had just gone for karaoke, and that they had a good time."[13]

---

[10] Uber Newsroom, Statement on Covington & Burling Recommendations (June 13, 2017), *available at* https://newsroom.uber.com/covington-recommendations/.

[11] Amir Efrati, *Uber Group's Visit to Seoul Escort Bar Sparked HR Complaint*, THE INFORMATION (Mar. 24, 2017), *available at* https://www.theinformation.com/uber-groups-visit-to-seoul-escort-bar-sparked-hr-complaint.

[12] *Id.*

[13] *Id.*

51.     Shortly before Covington's recommendations were publicly announced, Emil Michael resigned and Eric Alexander was fired.  An additional 20 employees were fired for "harassment, discrimination and inappropriate behavior."[14]

52.     At the conclusion of its investigation, Covington issued 12 pages of detailed recommendations, which Uber publicly released on June 13, 2017.  The first recommendation was to "review and reallocate the responsibilities of Travis Kalanick."[15]  Covington also issued five recommendations intended to "Enhance Board Oversight," which included restructuring the Board "to include additional independent Board seats," appointing an independent Board chairperson "to serve as an independent check on Uber's management," and creating an Oversight Committee of the Board.[16]

53.     The pervasive cultural issues explored in Covington's investigation were known to and facilitated by Kalanick at the time of the amendments to the Certificate of Incorporation and the Prior Voting Agreement, but Kalanick did not disclose these matters to Uber's Board or Benchmark at the time.

---

[14] Mike Isaac, *Uber Fires 20 Amid Investigation Into Workplace Culture*, THE NEW YORK TIMES (Jun. 6, 2017), *available at* https://www.nytimes.com/2017/06/06/technology/uber-fired.html.

[15] *Supra* note 10.

[16] *Id.*

Greyball

54.     In March 2017, a New York Times article reported that Uber had "for years engaged in a worldwide program," using a tool known as "Greyball," to "deceive" the authorities in markets where law enforcement had banned or resisted Uber's service.[17]

55.     The article stated that Greyball—which was used as early as 2014 and was still used in certain markets upon the article's publication—involved various techniques to determine whether users of Uber's app were private customers or instead linked to law enforcement or city officials.[18]   Uber reportedly provided these tagged (or "Greyballed") users with "ghost cars in a fake version of the app," or simply showed no cars available, preventing them from getting rides or issuing tickets to Uber drivers.[19]

56.     Uber now faces numerous Greyball-related regulatory matters in multiple jurisdictions, including a review by Portland, Oregon, subpoenas from U.S. Attorney's Offices in California and New York, various other city and state inquiries, and an inquiry from the European Parliament.

---

[17] Mike Isaac, *How Uber Deceives the Authorities Worldwide*, THE NEW YORK TIMES (Mar. 3, 2017), *available at* https://www.nytimes.com/2017/03/03/technology/uber-greyball-program-evade-authorities.html.

[18] *Id.*

[19] *Id.*

57.     Upon information and belief, Kalanick was aware of the

Greyball program at the time of the amendments to the Certificate of Incorporation

and the Prior Voting Agreement, but Kalanick did not disclose these matters to

Uber's Board or Benchmark at the time.

**Kalanick Resigns as CEO and Commits to Improved Standards and
Additional Approvals for Two of the Board Seats He Purportedly Controls**

58.     After learning in 2017 of Kalanick's pervasive management

failures and the misconduct that occurred during his tenure as CEO, as described

above, Benchmark and other substantial investors realized that Kalanick was no

longer an appropriate individual to lead Uber.  Thus, on June 20, 2017, Benchmark

and other investors representing approximately 40% of Uber's voting power and

28% of the economic interest in Uber submitted a letter to Kalanick requesting that

he resign as Uber's CEO and take other crucial steps that are necessary for Uber to

move forward.

59.     On the evening of June 20, 2017, Kalanick signed a letter

(attached as Exhibit A) to Uber, its Board, and Benchmark in which Kalanick

resigned as Uber's CEO, effective immediately.  In the same letter, Kalanick

agreed that any individuals he appoints to two of the three Board seats he

purportedly controls pursuant to the Voting Agreement will be independent,

experienced, unbiased, and diverse, consistent with the Holder Report's

recommendations with respect to Uber's Board, and be subject to the approval of

26

all then-current directors other than one.  Kalanick also expressly committed to voting "as a director and stockholder" in accordance with these commitments, as well as making "conforming amendments to the Voting Agreement as soon as possible."

**Kalanick Immediately Purports to Re-Appoint Himself to the Board and Refuses to Sign an Amended Voting Agreement**

60.   The ink was barely dry on Kalanick's resignation letter when, on or around June 22, 2017, he resigned from the Board seat reserved for Uber's CEO (as required, since Kalanick was no longer CEO) and immediately purported to re-appoint himself to one of the three Board seats he fraudulently acquired.

61.   Further confirming Kalanick's fraud in connection with portions of the Certificate of Incorporation and Voting Agreement, Kalanick has refused to execute a further amended Voting Agreement consistent with his June 20, 2017 commitment that any individuals he appoints to the two remaining Board seats will be independent, experienced, unbiased, and diverse and be subject to the approval of all then-current directors other than one.  An amended Voting Agreement with this revision (attached as Exhibit D) was sent to Kalanick on or around June 27, 2017.  To date, Kalanick's only response has been an email (sent on or around June 30, 2017) that he is "not ready to sign" the amended Voting Agreement, and other statements to that effect.  Kalanick has offered no explanation for breaching his prior commitment.

62.     If Kalanick is allowed to continue occupying his fraudulently procured Board seat and breaching his June 20 commitment as to the two remaining seats, Uber will suffer irreparable harm and needlessly face considerable reputational, regulatory and other risks.  Uber and its Board are at a critical juncture, faced with the need to select a new CEO and make other material decisions.  Kalanick's improper role on the Board threatens the sound management of Uber during this critical period.  In fact, it has been publicly reported that Kalanick's behavior has already interfered with Uber's CEO search:  various potential candidates have withdrawn from consideration because of Kalanick's continued participation in the search and his efforts to re-assert influence over the company.[20]

## CLAIMS AND RELIEF SOUGHT

### FIRST CLAIM
**Against Kalanick, and Against Uber as Nominal Defendant**
**(Invalidation of Stockholder Vote Pursuant to 8 *Del. C.* § 225(b))**

63.     Benchmark repeats and realleges the allegations of paragraphs 1 through 62 above.

64.     Pursuant to 8 *Del. C.* § 225(b), this Court has the power to determine the validity and result of any stockholder vote.

---

[20] *See* Mike Isaac, *Uber's Search for New C.E.O. Hampered by Deep Split on Board*, N.Y. TIMES (July 30, 2017), https://www.nytimes.com/2017/07/30/technology/uber-search-for-new-ceo-kalanick-huffington-whitman.html.

65.     The 2016 stockholder vote that amended Article IV(B)(5)(b) of the Certificate of Incorporation to add three additional Voting Directors designated by the holders of a majority of Uber's Class B common stock was procured by Kalanick's fraudulent statements and intentional concealment of material information.  As explained above, Kalanick owed fiduciary duties to Benchmark and other Uber stockholders in his capacity as Uber's CEO and a director on Uber's Board, including duties of loyalty, care, good faith and disclosure. Kalanick also stood to gain a direct personal benefit from the creation of three new Board seats for directors to be elected by a majority of Uber's Class B common stock, which Kalanick and his allies controlled at the time.  Kalanick thus had a fiduciary duty to disclose all relevant facts to Benchmark and other Uber stockholders.  And as a matter of Delaware law, for a stockholder consent to be valid, stockholders must be provided with all material information relevant to the decision to consent.

66.     In contravention of Delaware law, stockholders were not provided with all material information relevant to the decision to consent to the three additional Board seats, including information concerning Kalanick's gross mismanagement and other misconduct, as described above, which has significant consequences for Uber's governance.  Had such information been disclosed to stockholders at the time, Benchmark and other stockholders would not have voted

in favor of the amendment to Uber's Certificate of Incorporation, and upon information and belief, the amendment would not have passed.

67.     Kalanick's fraudulent statements and omissions breached his fiduciary duties, including his duties of loyalty, good faith and disclosure, and inequitably tainted the voting process with respect to the 2016 amendment to Article IV(B)(5)(b) of Uber's Certificate of Incorporation adding three additional Voting Directors. The determination of Kalanick's fraud is necessary to determine whether the three Board seats were validly obtained and the proper composition of Uber's Board.

68.     The 2016 stockholder vote amending Article IV(B)(5)(b) of the Certificate of Incorporation was therefore improper and inequitable, and should be invalidated.

69.     Benchmark has no adequate remedy at law.

### SECOND CLAIM
**Against Kalanick, and Against Uber as Nominal Defendant**
**(Invalidation of Director Appointment Pursuant to 8 *Del. C.* § 225(a))**

70.     Benchmark repeats and realleges the allegations of paragraphs 1 through 62 above.

71.     Pursuant to 8 *Del. C.* § 225(a), this Court has the power to determine the validity of any purported appointment of any director and the right of any person to hold or continue to hold such office.

72.     Benchmark is entitled to a declaration that Kalanick's June 22, 2017 appointment of himself to Uber's Board is invalid, and that Kalanick does not have the right to hold any seat on Uber's Board, because the Board seat to which Kalanick purportedly appointed himself was obtained through a stockholder vote tainted by Kalanick's fraud.

73.     Kalanick's purported appointment of himself to Uber's Board is thus improper and inequitable, and should be invalidated.

74.     Benchmark has no adequate remedy at law.

### THIRD CLAIM
**Against Kalanick**
**(Fraudulent Inducement)**

75.     Benchmark repeats and realleges the allegations of paragraphs 1 through 62 above.

76.     Kalanick fraudulently induced Benchmark's consent to the portions of the amended Certificate of Incorporation and Voting Agreement related to the three additional Board seats by intentionally failing to disclose his pervasive mismanagement, the facts disclosed in the Stroz Report, and the other issues described above. When the consents were presented to and executed by Benchmark, Kalanick—a fiduciary who owed Benchmark duties of loyalty, care, good faith, and disclosure—understood that if Benchmark had known the truth about his pervasive mismanagement of Uber, Benchmark would never have

authorized Kalanick's effort to increase his power over Uber's Board by creating and acquiring the unilateral right to appoint directors to the three new seats. Kalanick knew his material misstatements and omissions were false and misleading and expressly intended for his material omissions to induce Benchmark's consent to the amendments as to the three seats.

77.    In consenting to the amendments related to the three Board seats, Benchmark reasonably relied on Kalanick's material misstatements and omissions.  At the time, Benchmark could not have known of the matters Kalanick intentionally concealed, many of which were within Kalanick's exclusive knowledge, or only known to Kalanick and an "inner circle" of Uber executives loyal to him (many of whom have since been terminated or forced to resign due to the misconduct described above), and these matters were also concealed from the Board.

78.    Benchmark was significantly injured as a direct and proximate result of its reliance on Kalanick's fraudulent misstatements and omissions. Among other things, under the Prior Voting Agreement and Certificate of Incorporation, Benchmark had the express contractual right to appoint one Voting Director to a Board comprised of up to eight Voting Directors.  After Kalanick fraudulently induced Benchmark to approve amendments as to the three new seats, Benchmark was left with the right to appoint one Voting Director to a Board

comprised of up to eleven Voting Directors, of which three Voting Directors could
be unilaterally appointed by Kalanick. This dilution of Benchmark's express
contractual right is a direct injury to Benchmark.

79.     In addition, if not for the fraudulently procured Board seats,
Kalanick would not have been able to purportedly re-appoint himself to Uber's
Board after resigning as CEO. Kalanick's purported re-appointment of himself to
Uber's Board is a further injury directly and proximately caused by his fraudulent
conduct.

80.     Moreover, the value of Benchmark's investment in Uber is
significantly threatened by Kalanick's continued presence on the Board and
potential exercise of his claimed right to further pack the Board with two additional
directors of his choosing. Upon information and belief, Kalanick's continuing
efforts to insert himself into Uber's Board and business, even after embroiling
Uber in multiple scandals and being forced to resign as CEO, have further
depressed the value of Uber stock on the secondary market.

81.     Kalanick's conduct was fraudulent, intentional, willful, and
malicious, and undertaken in bad faith.

82.     Benchmark will suffer irreparable harm if Kalanick is allowed
to continue exercising his claimed powers over the fraudulently procured Board

seats, thereby exerting an inappropriate and unwarranted level of influence over Uber's Board.

## FOURTH CLAIM
### Against Kalanick
### (Declaratory Judgment)

83.    Benchmark repeats and realleges the allegations of paragraphs 1 through 62 above.

84.    In the alternative, the parties' disagreement over the status of the two Board seats Kalanick purports to control gives rise to an actual controversy that is ripe for judicial determination and requires expedited declaratory relief. As explained above, Kalanick expressly agreed on June 20, 2017 that any individuals he appoints to these two Board seats will be independent, experienced, unbiased, and diverse, and subject to the approval of all then-current directors other than one (and to apply the same standards to any future appointments to those seats). To date, however, Kalanick has refused to sign a further amendment to the Voting Agreement to implement his binding commitment.

85.    By reason of the foregoing, Benchmark is entitled to a declaration and permanent injunction requiring Kalanick to honor his June 20, 2017 commitment and execute a further amendment to the Voting Agreement implementing the standards described in his June 20, 2017 letter (and in paragraph 84 above) as to the two Board seats.

WHEREFORE, Benchmark requests the following relief from the Court:

1.   On the first and second causes of action:

a.   An order declaring that the 2016 stockholder vote on the amendment to Article IV(B)(5)(b) of Uber's Certificate of Incorporation adding three additional Voting Directors is invalid, and therefore that (i) these three Board seats do not exist, and (ii) Kalanick was not validly appointed to Uber's Board, has no right to hold any Board seat, and is removed from the Board effective immediately;

b.   A status quo order that, during the pendency of this action, (i) Kalanick shall not attempt to fill the two disputed Board seats that are currently vacant, or otherwise attempt to change the current size or composition of the Board; (ii) in the event Kalanick resigns from the Board, Kalanick shall not attempt to fill the disputed Board seat he purportedly held immediately before his resignation; (iii) Uber's Board shall not take any action requiring Board approval unless such action is approved by a majority of the remaining directors after excluding the vote of Kalanick (and, for the avoidance of doubt, the votes of any persons occupying any of the three Board seats whose validity is disputed in this action); and (iv) Kalanick shall not take any actions that would have the effect of

35

disrupting the continuing management of the business and affairs of Uber by its current Board in the ordinary course.

      2.     On the third cause of action:

      a.     An expedited declaratory judgment that (i) Article IV(B)(5)(b) of the amended Certificate of Incorporation (highlighted in Exhibit B hereto), which purported to create Board seats for three additional voting directors to be elected by the holders of Class B common stock, is void and without effect; (ii) the Voting Agreement's amendments to Sections 1.1(e)(iii) and 5.4 of the Prior Voting Agreement (highlighted in Exhibit C hereto), which purportedly granted Kalanick the sole right to designate three directors to fill the three newly created Board seats, are void and without effect; and (iii) Kalanick's purported re-appointment of himself to the third Board seat on or around June 22, 2017 is void and without effect, since the portions of the Certificate of Incorporation and Voting Agreement that purportedly created such Board seat (highlighted in Exhibits B and C hereto) were procured through Kalanick's fraud;

      b.     A preliminary and permanent injunction enjoining Kalanick from (i) participating in any meetings, votes or other activities of Uber's Board, (ii) replacing himself as a purported director on the Board, or otherwise filling or taking any actions with respect to any of the three disputed Board seats; and (iii) taking any actions that would have the effect of disrupting the continuing

management of the business and affairs of Uber in the ordinary course, or otherwise taking any further wrongful actions in connection with Uber and its current Board (excluding Kalanick); and

                c.      An award to Benchmark from Kalanick only of damages, and pre- and post-judgment interest thereon.

              3.      In the alternative, on the fourth cause of action, an expedited declaratory judgment and permanent injunction providing that (a) any individuals Kalanick may appoint to two of the Board seats he purportedly controls pursuant to the Voting Agreement must be independent, experienced, unbiased, and diverse individuals, and must be made on notice to all then-current Uber directors, and subject to the approval of all then-current directors other than one; (b) Kalanick must apply the same standards to all future appointments to those seats; and (c) Kalanick must immediately execute a conforming amendment to the Voting Agreement in the form attached as Exhibit D hereto;

              4.      An award to Benchmark from Kalanick only of Benchmark's reasonable attorneys' fees and its costs and disbursements in this matter; and

              5.      An award to Benchmark of such other and further relief as is just and proper.

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

OF COUNSEL:

By:   /s/ Daniel A. Mason
       Stephen P. Lamb (#2053)

Martin Flumenbaum
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

       Daniel A. Mason (#5206)
       500 Delaware Ave. Suite 200
       P.O. Box 32
       Wilmington, Delaware 19899-0032
       Telephone:  (302) 655-4411
       Facsimile:  (302) 655-4420

Dated:  August 10, 2017

*Attorneys for Plaintiff*
*Benchmark Capital Partners VII, L.P.*

38