# EXHIBIT 16

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| BENCHMARK CAPITAL PARTNERS VII, L.P., a Delaware limited partnership,<br><br>Plaintiff,<br><br>v.<br><br>TRAVIS KALANICK,<br><br>Defendant,<br><br>and<br><br>UBER TECHNOLOGIES, INC., a Delaware corporation,<br><br>Nominal Defendant. | C.A. No. 2017-0575-SG |

**SOFREH LP AND STEPHEN RUSSELL'S MOTION TO INTERVENE**


OF COUNSEL:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Michael B. Carlinsky
Joshua S. Margolin
Kimberly E. Carson
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

PRICKETT, JONES & ELLIOTT, P.A.

Michael Hanrahan (DE Bar No. 941)
Corinne Elise Amato (DE Bar No. 4982)
Eric J. Juray (DE Bar No. 5765)
1310 N. King Street
Wilmington, Delaware 19801
(302) 888-6500

*Attorneys for Intervenors Sofreh LP and Stephen Russell*

Sofreh LP and Stephen Russell (collectively, "Intervenors") respectfully submit this motion to intervene (the "Motion") pursuant to Court of Chancery Rule 24 ("Rule 24").[1]

**PRELIMINARY STATEMENT**

Intervenors, substantial investors in Uber Technologies, Inc. ("Uber" or the "Company"), seek to intervene for the purpose of protecting their rights and interests from the transparent efforts of Benchmark Capital Partners VII, L.P. ("Benchmark"), a preferred stockholder of Uber entitled to designate one director, to unscrupulously gain control of Uber's board of directors (the "Board") and the Company at the expense of other investors for little more than the cost of a lawsuit. A clear and unambiguous arbitration clause in the June 1, 2016 Uber Amended and Restated Voting Agreement (the "Voting Agreement") requires that any unresolved controversy or claim arising out of or relating to the Voting Agreement be submitted to arbitration, where it can be resolved privately to avoid reputational damage to the Company. Instead, Benchmark, without warning or explanation,

---

[1] As discussed below, Intervenors do not believe that this Court has subject matter jurisdiction over this litigation, including the issue of whether Benchmark's claims are arbitrable, and Intervenors are only conditionally appearing now to protect their rights. Accordingly, neither this Motion nor the accompanying complaint should be considered a concession by Intervenors that the Court has such jurisdiction. Additionally, Intervenors understand that the Court has already set a hearing date to address Kalanick's motion to dismiss for lack of subject matter jurisdiction, and this Motion in no way seeks to interfere with the current schedule. Indeed, the granting of Kalanick's motion to dismiss may moot this Motion.

filed its inflammatory lawsuit publicly maligning Uber's founder, Travis Kalanick, in an attempt to eliminate three Board seats it agreed the Class B stockholders could elect and Kalanick could designate.

This blatant disregard of its contractual obligations is only the latest gambit in Benchmark's efforts to gain control of Uber. Benchmark has benefited spectacularly from its investment in Uber under Kalanick's leadership. With Kalanick as CEO, Benchmark's $27 million investment has increased in value to some $8.4 billion. But greedily, Benchmark wanted more. Without notice to the Board, in June of this year, just days after Kalanick's mother was killed in a tragic boating accident, which also critically injured his father, Benchmark capitalized on grieving Kalanick's vulnerability by ambushing him alone at a hotel room in Chicago and demanding that he resign as CEO and agree to restrictions on his Board seats. Benchmark threatened that if he did not, Benchmark (and other investors whom Benchmark enlisted in its efforts) would begin a public campaign against him, the obvious effect of which would be not only to smear his reputation, but to harm the Company that he founded and built. Although Kalanick resigned as CEO, Benchmark, through its trumped-up lawsuit, has launched the public smear campaign anyway, ignoring the arbitration clause that requires such a dispute to be pursued privately so as to avoid the harm that Benchmark has—and will continue to—inflict on the Company. Benchmark's dirty tactics and strong

arming extend even beyond this lawsuit; for example, in a carefully orchestrated charade, Benchmark is currently trying to cram down, on its own arbitrary timetable, its own preferred CEO candidate, Meg Whitman, with inaccurate denials that she is a candidate.

Intervenors have direct and substantial interests in protecting and enforcing their rights as investors in Uber and as parties to the Voting Agreement, including to ensure Benchmark abides by the arbitration clause to which all parties, including Benchmark, agreed, to avoid Benchmark's brazen effort to deprive Intervenors of their voting rights under that Agreement, and to prevent further harm to Intervenors' substantial investments. Accordingly, Intervenors respectfully request that the Court grant their Motion, make them parties to the litigation, and consider their pleading which seeks to confirm that Benchmark's claims must be arbitrated.

## BACKGROUND

### A. The Voting Agreement and Kalanick's Rights Thereunder

Intervenors are both investors in Uber. Russell is a party to the Voting Agreement. Upon information and belief, Sofreh LP is also a party to the Voting Agreement as the ultimate assignee of shares from another party to the Voting Agreement. Benchmark, Kalanick, and Uber are likewise parties to the Voting Agreement. The Voting Agreement sets forth, among other items, the agreed composition of the Board, voting rights, and the right to fill Board seats.

Benchmark Compl., Ex. C (Voting Agreement) (Trans. I.D. No. 60966121). Section 5.4 of the Voting Agreement requires that certain written consents be obtained for any amendments to the Voting Agreement.

In June 2016, the Saudi Arabian government's Public Investment Fund ("PIF") made a sizeable $3.5 billion investment in Uber. In connection with this investment, the Voting Agreement was amended to give PIF the right to designate a member of Uber's Board and to give the Class B stock the right to elect three additional voting common directors designated by Kalanick. Benchmark Compl., Ex. C § 1.1(e)(ii)-(iii). Uber's principal investors agreed to the latter amendment proposed by Kalanick.[2] At no point prior to this litigation did Benchmark publicly raise any concerns regarding the 2016 amendment to the Voting Agreement, or how the amendment was procured.

**B. Benchmark Coldly Seeks to Capitalize on Kalanick's Personal Tragedy**

Kalanick lost his beloved mother, Bonnie Horowitz Kalanick, last May 27, 2017 in an accident that also critically injured his father. Two weeks later, the

---

[2] Benchmark's Complaint misleadingly omits that this June 2016 amendment took place in the context of this large investment, and instead alleges, without any factual support, that Kalanick "understood that [his alleged 'prior conduct'], once revealed, would likely force him to resign as Uber's CEO, and thus sought to grant himself a way to play an ongoing leadership role at Uber once the truth came out." Benchmark Compl. ¶ 6; *see also id.* ¶ 24.

Board, with the support of Benchmark, approved Kalanick's decision to take a leave of absence from the Company to care for his father and deal with his grief.

Notwithstanding this seeming accord, on June 20, 2017, without notice to the Board, Benchmark representatives flew to Kalanick's hotel in Chicago, accosted the grieving Kalanick alone, and demanded that he sign an agreement resigning as CEO and agree to amendments to the Voting Agreement imposing restrictions that are not contained in the Voting Agreement on his designations of directors. Benchmark threatened that if Kalanick refused those terms, Benchmark and other investors would start a very public campaign to malign him and seek his removal.

Kalanick ultimately provided a signed letter to Benchmark later the same day stating that he would resign as CEO and containing a paragraph stating that he would "agree to vote as a director and stockholder" for "conforming amendments to the Voting Agreement" so that two of the three directors he designates under Section 1.1(e) of the Voting Agreement will be independent directors subject to the approval of all but one director. Benchmark Compl., Ex. A (Trans. I.D. No. 60966121). Prior to signing the letter, Kalanick demanded the removal of a provision that purported to make the document a contractual undertaking. No other party to the Voting Agreement, not even Benchmark, executed Kalanick's letter, and Kalanick received no consideration for signing it.

Following Kalanick's resignation, he appointed himself to one of the three Board seats he controlled. Kalanick was then presented, at Benchmark's request, with a proposed amendment to the Voting Agreement that included a provision that Kalanick could and would appoint himself to the Board, but required that all but one director approve his nominations for his two other Board seats. Kalanick, apparently realizing that Benchmark was attempting to seize control of the Board, rejected the proposed amendment.

**C. Benchmark Improperly Commences Suit**

Rather than raising its concerns within the Board, as it should have, or filing a complaint in arbitration, as it was required to do, Benchmark brought this lawsuit without warning, knowing that it would garner enormous publicity and vilify Kalanick. All Benchmark's claims arise out of or relate to the Voting Agreement. Specifically, Benchmark seeks, among other things, to either eliminate the three additional directors the Voting Agreement provides that Kalanick is to designate at his sole discretion, or to impose restrictions as to whom Kalanick may designate for directorships.

Benchmark bases its demands for relief on Kalanick's June 20, 2017 letter discussed above, along with allegations that Kalanick obtained the creation of and the right to designate three new Board seats in June 2016 due to "material misstatements and fraudulent concealment from Benchmark of material

information that would have led Benchmark to reject the creation of the seats, and by his intentional failure to disclose to Benchmark and other stockholders adequate information for them to evaluate the requested stockholder consent to create the Board seats." Benchmark Compl. ¶ 2. Benchmark does not have grounds to remove the three Board seats, and Intervenors will set forth their position on these issues in the arbitration, in accordance with the Voting Agreement. Suffice it to say for the limited purpose of this Motion, for a year after the June 2016 amendments to the Voting Agreement, Benchmark made no public complaints about any alleged misstatements, concealment, or fraudulent conduct by Kalanick. This was so, even though matters that Benchmark now complains were concealed were, by Benchmark's own admissions, publicly reported on and/or litigated.[3]

Putting aside that Benchmark is, by way of this litigation, attempting to unilaterally amend the Voting Agreement and change the entire structure of the Board without obtaining the required votes and consents, the Voting Agreement

---

[3] *See, e.g.*, Benchmark Compl. ¶¶ 34 (alleging that "[i]n ***February 2017***, Waymo sued Uber for theft of trade secrets . . . ."), ¶ 44 (alleging that "in ***June 2017***, various publications first reported that Eric Alexander, the then-president of Uber's Asia operations, had obtained the passenger's medical records shortly after the rape"), ¶ 47 (alleging that "[o]n ***February 19, 2017***, a former Uber engineer named Susan Fowler wrote a blog post describing a pervasive culture of sexism, discrimination and harassment at Uber . . . ."), ¶ 54 (alleging that "[i]n ***March 2017***, a New York Times article reported that Uber had 'for years engaged in a worldwide program,' using a tool known as 'Greyball,' to 'deceive' the authorities in markets where law enforcement had banned or resisted Uber's service") (all emphases added).

has a mandatory arbitration clause which requires that "[a]ny unresolved controversy or claim arising out of or relating to this Agreement . . . shall be submitted to arbitration." Benchmark Compl., Ex. C § 5.18. Benchmark blatantly ignored this provision in an attempt to take its war with Kalanick public, exactly what it threatened Kalanick with in June of 2017.[4] There is no question that this dispute should be before an arbitrator rather than this Court.

## ARGUMENT

### A. Intervenors Should Be Permitted to Intervene as of Right

Intervenors should be permitted to intervene in this action as of right. "Delaware courts embrace a liberal policy of allowing intervention." *Franklin Balance Sheet Inv. Fund v. Crowley*, 2006WL 4782314, at *3 (Del. Ch. Oct. 19, 2006). Under Rule 24(a)(2), upon a timely application, a party may intervene as of right "when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's

---

[4] In response to this lawsuit, a group of Uber shareholders, including Shervin Pishevar, the Manager of Sofreh LLC, which is the General Partner of Intervenor Sofreh LP, sent Benchmark an email asking Benchmark to "allow[] the necessary work to be done in the Board Room rather than the Courtroom," and noting that it was not "prudent or necessary from the standpoint of shareholder value, to hold the company hostage to a public relations disaster by demanding Mr. Kalanick's resignation, along with other concessions, on a few hours' notice and within weeks of a personal tragedy, under threat of public scandal" or to escalate the matter with its lawsuit that could "cost the company public goodwill, interfere with fundraising and impede the critical search for a new, world-class Chief Executive Officer."

ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Del. Ch. Ct. R. 24(a)(2).[5]

As investors in Uber and as parties to the Voting Agreement at the heart of Benchmark's complaint (the "Complaint"), Intervenors have direct and substantial interests relating to the transaction that is the subject of this action (*i.e.*, the Voting Agreement) and to how and in what forum Benchmark's demands to amend the Voting Agreement are resolved. *See Rainbow Nav., Inc. v. Yonge*, 1988 WL 909327, at *1 (Del. Ch. Feb. 23, 1988) (a party to a shareholder agreement has an interest when the agreement is subject to dispute). The disposition of this action may as a practical matter impair or impede Intervenors' rights to protect their interests under the Voting Agreement and in the control over Uber and its Board. Moreover, the forum in which this dispute ultimately proceeds may have negative impacts on Uber itself. Arbitration proceedings are private, and Benchmark's allegations can be dealt with in arbitration outside the public eye. Intervenors have much at stake in this litigation, which ties back to the Voting Agreement.

Further, Intervenors' interests are not adequately represented by the existing parties, as Intervenors have interests concerning their investments in Uber

[5] Intervenors seek to be made parties to this action for the additional reason that it will facilitate their participation in the arbitration proceeding that will follow if, as requested, the matter is compelled to arbitration. For the reasons stated above, Intervenors intend to protect their rights and interests in the Voting Agreement and their investments in Uber by participating as parties in any arbitration proceeding that follows from this action.

separate from any interests of Benchmark, Kalanick, or Uber. As Benchmark's Complaint (¶19) admits, Benchmark's primary interest in Uber is as a preferred stockholder entitled to designate one director. Elimination of three voting common directors increases Benchmark's Board influence and reduces the influence of other investors. To be clear, Intervenors do not support Benchmark's attempted power grab or illegitimate claims, and Intervenors object to any attempt to change the rights under the Voting Agreement absent the written consents required by Section 5.4. Intervenors believe Section 5.18 of the Voting Agreement requires that the arbitrability of Benchmark's claims be determined by the arbitrator and that such claims are subject to mandatory arbitration. However, if the fundamental power structure of Uber's Board is to be litigated in this Court, Intervenors' voices need to be heard.[6]

### B. Alternatively, the Court Should Permit Intervenors to Intervene as a Matter of Discretion

To the extent that Intervenors are not permitted to intervene in this action as of right, they should be permitted to intervene as a matter of discretion. Even if a party is not entitled to intervene as of right, under "the less exacting standard of Rule 24(b)," the Court may grant a permissive motion to intervene. *See In re*

---

[6] This Motion is timely. Benchmark filed its Complaint just two weeks ago. The litigation is in its preliminary stage, no discovery has commenced, and no substantive issues have been resolved by the Court. As such, intervention would not cause prejudice to any party.

*Interstate Gen. Media Holdings, LLC*, 2014 WL 1364938, at *3 (Del. Ch. Apr. 7, 2014). Under Rule 24(b), "[u]pon timely application anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common." Del. Ch. Ct. R. 24(b). In considering whether to grant a permissive intervention, Rule 24(b) provides that "the Court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.*

In compliance with Rule 24(c), this Motion is accompanied by a pleading in the form of Intervenors' complaint (attached hereto as Exhibit A), which seeks a declaratory judgment that this Court lacks subject matter jurisdiction over Benchmark's Complaint because of the mandatory arbitration provision in the Voting Agreement, and that, therefore, this litigation must be either dismissed or stayed in favor of arbitration.

Accordingly, Intervenors' claim clearly has common questions of both law and fact with the main action. Further, as discussed above, Intervenors' proposed intervention will not cause any undue delay or prejudice to the adjudication of the existing parties' rights because this litigation is in its preliminary phases.

## CONCLUSION

For the foregoing reasons, Intervenors respectfully request that their Motion to intervene be granted.

Dated: August 24, 2017

WORDS: 2,772

OF COUNSEL:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Michael B. Carlinsky
Joshua S. Margolin
Kimberly E. Carson
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

PRICKETT, JONES & ELLIOTT, P.A.

*/s/ Corinne Elise Amato*
Michael Hanrahan (#941)
Corinne Elise Amato (#4982)
Eric J. Juray (#5765)
1310 N. King Street
Wilmington, Delaware 19801
(302) 888-6500

*Attorneys for Intervenors Sofreh LP and Stephen Russell*