# EXHIBIT 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                                              Page 1
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4   _____
 5   WAYMO LLC,                        )
 6         Plaintiff,                  )
 7   vs.                               ) Case No.
 8   UBER TECHNOLOGIES, INC.;          ) 3:17-CV-00939-WHA
 9   OTTOMOTTO LLC; OTTO TRUCKING      )
10   LLC,                              )
11         Defendants.                 )
     _____)
12       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
13
14   OTTO TRUCKING LLC'S VIDEOTAPED 30(b)(6) DEPOSITION OF
15                  PIERRE-YVES DROZ
16               Palo Alto, California
17             Tuesday, August 22, 2017
18                    Volume I
19
20   Reported by:
21   CATHERINE A. RYAN
22   CMR, CRR, CSR No. 8239
23   Job No. 2685937
24
25   PAGES 1 - 92
```

**Page 30**

1   Q   At these -- at these open garages was   14:43:52
2   there someone available to answer questions about
3   how the LiDAR devices worked?
4   A   There was.
5   Q   And who were those people?   14:43:59
6   A   So in -- I'm sorry.  In Mountain View
7   there was me.
8   Q   And what about in Austin and Phoenix?
9   A   And I think Gill was one of them for --
10  one of the achievements, I think, was the Phoenix   14:44:11
11  event, but I'm not sure, and I'm not sure who was
12  there for the Austin event.
13  Q   Anyone else?
14  A   Not that I know of.
15  Q   Did GBr2 have [redacted]?   14:44:23
16      MR. JAFFE:  Objection.  Beyond the scope.
17      THE WITNESS:  GBr2 has [redacted]
18  not anything you can see from looking at the
19  outside, though.  That's for sure.
20  BY MR. CHATTERJEE:   14:44:39
21  Q   Are you aware of any public disclosures of
22  the printed circuit boards for any of the LiDAR
23  devices used by Waymo or Google?
24      MR. JAFFE:  Object to form.
25      THE WITNESS:  I'm not aware of any public   14:44:52

**Page 31**

1   disclosure.   14:44:53
2   BY MR. CHATTERJEE:
3   Q   Are you aware of anybody keeping printed
4   circuit boards as momentos when they've either left
5   Waymo or Google or just even as they've continued as   14:45:06
6   employees?
7   A   I'm aware of a few instances there.  None
8   of these were GBr circuit boards, just to make sure.
9   Q   So tell me what those instances are.
10  A   So the -- I know that Gaetan had kept, I   14:45:20
11  guess, a PBR5, and I brought home, like, a PBR5 and
12  a TBR, which had been brought back to -- to Google a
13  few months later.
14  Q   When did you take that momento?
15  A   I think that was -- Anthony was still   14:45:46
16  around because he was the one who told us we could
17  do that.  So it was probably -- I mean, I guess a
18  year and -- two years ago maybe.
19  Q   And why did you bring the TBR board back?
20  A   So that was a -- that was [redacted]
21  [redacted].  The -- you know, after
22  Anthony left and things got a bit complicated -- not
23  complicated -- sorry -- that things got -- there was
24  a lot of -- there was a lot of information that
25  Anthony, like, had fed me that I thought was -- that   14:46:27

**Page 32**

1   I reconsidered at the time, and then having those   14:46:32
2   devices home was more information that I considered
3   as probably not being a good idea.
4   Q   Other than Mr. Levandowski, was anyone
5   else aware of the fact that you had a TBR device at   14:46:47
6   home?
7   A   I'm not sure.  Maybe.  I'm not sure,
8   actually.
9   Q   Would Mr. Urmson have known?
10  A   I don't think he knew.   14:46:59
11  Q   Or Mr. Salesky?
12  A   I don't think he knew.
13  Q   Other than Mr. Pennecot and you, are you
14  aware of anyone else keeping any momentos, printed
15  circuit boards associated with Google's LiDAR   14:47:11
16  devices?
17      MR. JAFFE:  Object to form.
18      THE WITNESS:  I remember I got Laila maybe
19  at some point, like -- I know she had one at her
20  desk.  I don't know if it ever left Google, though.   14:47:27
21  BY MR. CHATTERJEE:
22  Q   Who is Laila?
23  A   Laila Mattos.
24  Q   And who -- what was her role?
25  A   Project manager.  I think it stayed on her   14:47:36

**Page 33**

1   desk, but --   14:47:39
2   Q   And what -- what device was on her desk?
3   A   A PBR5.
4   Q   Is PBR5 in use today?
5   A   No.   14:47:50
6   Q   Why not?
7   A   It was --
8       MR. JAFFE:  Object to form --
9       THE WITNESS:  Sorry.
10      MR. JAFFE:  -- and outside the scope.   14:47:53
11      THE WITNESS:  PBR5 is the much earlier
12  version to the PBR we use today.  It's a very
13  different -- very different capabilities, very
14  different technology, and I think we -- we stopped
15  using it probably, like, three years ago-ish.   14:48:08
16  Something like that.
17      MR. CHATTERJEE:  I'm going to mark this as
18  1826.
19      (Exhibit 1826 was marked for
20      identification by the court reporter.)   14:48:32
21  BY MR. CHATTERJEE:
22  Q   I've marked the document as 1826.  I'm
23  going to give you the physical specimens in a
24  minute.  I just want to have a record of what it is
25  I'm giving you.  These are pictures of each side of   14:48:44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 34**

```
 1   the device that I'm giving you.           14:48:46
 2       A    Okay.
 3       Q    I'm going to hand you the device here, and
 4   you can open the bag and take it out.
 5       A    Yeah.                             14:48:54
 6       Q    Do you recognize these devices, Mr. Droz?
 7       A    Let me look at the identification number
 8   on it.
 9       Q    I can give you a magnifying glass if it
10   would be helpful.                          14:49:12
11            MR. JAFFE:  Has this been made available
12   in discovery?
13            MR. CHATTERJEE:  It is now.
14            MR. JAFFE:  You're just making available
15   that you had devices in discovery?         14:49:17
16            MR. CHATTERJEE:  I just got them.
17            MR. JAFFE:  From where?
18            MR. CHATTERJEE:  Yesterday.  You'll find
19   out soon enough.
20       Q    Go ahead, Mr. Droz.               14:49:23
21       A    Okay.  So -- sorry.  What is your
22   question?
23       Q    Do you recognize these documents?
24       A    I mean, documents, no, but the boards,
25   yes.                                       14:49:38
```

**Page 35**

```
 1       Q    Okay.  What are those boards?     14:49:38
 2       A    Those boards are early version of the GBr2
 3   transmit boards.
 4       Q    Okay.  If you would look -- you can use
 5   the magnifying glass if it would be helpful.  It's  14:49:47
 6   ▓▓▓▓▓▓▓▓ and then ▓▓▓▓▓▓
 7       Do you see that?
 8       A    Yes, that would be two versions of it.
 9       Q    Now, there's something attached to the
10   side of those.  Do you see those?  Do you know what  14:50:04
11   those are?
12       A    They look like ear- -- like -- I don't
13   know.  I think they look like ear- -- how do you
14   call it?  Like, earring rings.
15       Q    Are you familiar with anyone giving    14:50:16
16   earrings -- giving the printed circuit boards as
17   earrings to someone as a gift?
18       A    No, I'm not.
19       Q    Okay.  And so you're not familiar with
20   Seval Oz?                                  14:50:26
21       A    I'm sorry.  I'm familiar with her, but her
22   having that, I'm totally not familiar with it.
23       Q    So you were not at a -- at a party where
24   they gave these to her as a gift when she left the
25   company?                                   14:50:37
```

**Page 36**

```
 1       A    No, I was not at her goodbye party.    14:50:38
 2       Q    Are you aware of anyone giving her these
 3   as a gift at a going away party?
 4       A    I was totally unaware of that, no.
 5       Q    Okay.  And -- and you were never present  14:50:51
 6   in any of those meetings?
 7       A    The party I was not, no.
 8       Q    You're familiar she left the company?
 9       A    Yeah.
10       Q    Up until today were you aware that Ms. Oz  14:50:58
11   actually had earrings that were the two printed
12   circuit boards of the GBr▓▓▓▓▓?
13       A    No, I just discovered it today.  You just
14   told me, basically.
15       Q    And ▓▓▓▓▓▓                        14:51:12
16       Do you know what the difference is between
17   ▓▓▓▓▓▓▓▓▓
18       A    The exact differences, no.  I mean, it's
19   like, a small improvement, better version, hence the
20   different in the output.                   14:51:31
21       Q    But these ones would have the ▓▓▓▓▓▓▓▓▓
22   ▓▓▓▓▓▓▓ right?
23       A    It actually doesn't because it doesn't
24   have diodes on it.  This is just bare PCB.
25       Q    It would just have the PCB?      14:51:39
```

**Page 37**

```
 1       A    Yeah, this is just bare PCB.      14:51:40
 2       Q    Now, when I look at those, can I tell that
 3   there are ▓▓▓▓▓▓▓▓▓▓▓ on it?
 4       A    Actually, let me rephrase what I just
 5   said.  This one doesn't have diodes.  The left one  14:51:49
 6   does have diodes.
 7       Q    But you can actually see them on there,
 8   right?
 9       A    Yeah.  Can I see?
10       Q    This is the ▓▓▓▓ version, correct?  14:51:56
11       A    Corrected.  Yes.  It does have lasers.
12       Q    And it also has the ▓▓▓▓▓▓▓▓▓▓▓,
13   right?
14       A    Yes, I couldn't tell you if they're --
15   what size they are, what --                14:52:18
16       Q    Do you know if the size for those ▓▓▓▓
17   ▓▓▓▓▓▓ changed from GBr2 to GBr3?
18       A    I am not sure.  I don't know.  That I
19   don't know.  I know that the ▓▓▓▓▓▓▓▓▓▓▓
20   changed a little bit.  So it's possible that they  14:52:30
21   changed the --
22       Q    Would you be concerned at all that someone
23   gave these to Ms. Oz as a gift when she was leaving
24   her employment --
25       A    Yeah.                             14:52:42
```

Veritext Legal Solutions
866 299-5127

```
 1      Q  -- with Google?              14:52:42
 2      A  Yes.
 3      Q  Why?
 4      A  Because this is -- this is confidential
 5   information.  This is our designs.  That's not   14:52:47
 6   something we should give to someone, especially if
 7   someone is leaving the company.
 8      Q  Would it surprise you that these earrings
 9   were given to her on the Google facilities as a gift
10   before she left?                    14:53:00
11         MR. JAFFE:  Object to form.
12         THE WITNESS:  So let me put it this way:
13   It would surprise me.  If Anthony had done this, it
14   would surprise me less, but that's more just from my
15   knowledge of what --                14:53:16
16   BY MR. CHATTERJEE:
17      Q  If he hadn't given it to her but someone
18   else had, would that surprise you?
19      A  It would, yes, probably.
20      Q  Where does Ms. Oz work now?   14:53:27
21      A  I'm not sure.  I know she was even like --
22   when she left Google, she was getting pretty -- an
23   executive role, maybe CEO of some -- I don't know
24   exactly -- I didn't know Seval that well.
25      Q  Do you know if she's working on   14:53:45
```

Page 38

```
 1   self-driving car technologies?       14:53:47
 2      A  I don't -- I don't know if she is.
 3      Q  Okay.  I can take the earrings back.
 4      A  Sure.
 5         MR. CHATTERJEE:  We'll make them available  14:53:55
 6   for inspection whenever you want, Jordan.  We'll
 7   keep the pictures of the record just so it's clear
 8   what it was.
 9         THE WITNESS:  Sorry.
10         MR. JAFFE:  Thank you.        14:54:05
11   BY MR. CHATTERJEE:
12      Q  Are you aware --
13      A  I'm sorry.
14      Q  No.  You can hold on to that.
15         Are you aware of any vendors publishing  14:54:12
16   pictures of printed circuit boards made --
17      A  I mean of our circuit boards?
18      Q  Let me ask it more precisely.  That's a
19   fair point.
20         Are you aware of any vendors publishing  14:54:27
21   pictures of the printed circuit boards or designs of
22   Google?
23         MR. JAFFE:  Object to form.
24   BY MR. CHATTERJEE:
25      Q  For LiDAR devices?            14:54:36
```

Page 39

```
 1         MR. JAFFE:  Same objection.   14:54:36
 2         THE WITNESS:  I'm not aware of that.
 3   BY MR. CHATTERJEE:
 4      Q  You're not aware of any instance where a
 5   picture of a Google printed circuit board for LiDAR  14:54:41
 6   was published in a catalog?
 7      A  A picture of -- no.
 8      Q  Do you know why Anthony Levandowski was
 9   not sued for trade secret misappropriation?
10         MR. JAFFE:  Object to form.  And   14:55:12
11   objection.  Beyond the scope.
12         What topic are we on here?
13         MR. CHATTERJEE:  "All measures taken by
14   Google and/or Waymo to protect trade secrets Waymo
15   claims was misappropriated by Otto Trucking."   14:55:21
16   Whether you sued him or not and why falls within
17   that.
18         MR. JAFFE:  That is not a question for a
19   fact witness.  Is -- that is not within the scope --
20         MR. CHATTERJEE:  He's a 30(b)(6) witness.  14:55:30
21   He can answer it.  If he doesn't know, he can say he
22   doesn't know.
23         MR. JAFFE:  Objection.  Beyond the scope.
24   And I'm going to object to form.
25         THE WITNESS:  I don't know why.   14:55:38
```

Page 40

```
 1         MR. JAFFE:  Oh, and -- I don't think it's  14:55:40
 2   problematic given your answer, but I also just want
 3   to caution you not to reveal any attorney-client
 4   communications.
 5   BY MR. CHATTERJEE:                  14:55:48
 6      Q  Do you know if Google does anything to
 7   ensure compliance by vendors with respect to
 8   Google's confidential information associated with
 9   its printed circuit boards?
10         MR. JAFFE:  Objection.  Beyond the scope.  14:56:01
11         THE WITNESS:  So I know that we -- you
12   know, from a -- from talking with Tim Willis and
13   seeing how the DSM team works, I know they do
14   inspect the counter facilities.  I think one of the
15   thing they check is how the information there is  14:56:17
16   segmented into -- between different projects.  I
17   know we have NDAs put in place with vendors and, you
18   know, subcontractors as well.
19   BY MR. CHATTERJEE:
20      Q  Do you know if they do any proactive   14:56:33
21   monitoring to make sure that vendors aren't using
22   the information incorrectly?
23         MR. JAFFE:  Objection.  Beyond the scope.
24   Form.
25         THE WITNESS:  I know we do site visits.  14:56:42
```

Page 41

Pages 38 to 41

```
 1   BY MR. CHATTERJEE:                    15:48:44
 2      Q   All right.  Do you design printed circuit
 3   boards?
 4      A   I do design PCBs, yes.
 5      Q   And when you design PCBs, do you refer to   15:48:55
 6   parts libraries at all?
 7          MR. JAFFE:  Objection.  Beyond the scope.
 8          THE WITNESS:  Do you mean, like, do I use
 9   the parts libraries that --
10   BY MR. CHATTERJEE:                    15:49:04
11      Q   Correct.
12      A   I do use the -- the Google or Waymo parts
13   libraries.
14      Q   And where do those parts of the parts
15   libraries come from?                  15:49:13
16      A   We make them.  Either I or some -- some
17   other people on the team.
18      Q   And is that information discerned from
19   third-party sources that supply the parts?
20          MR. JAFFE:  Object to form.        15:49:23
21          THE WITNESS:  I mean, the libraries -- we
22   make them.  Like, it's not -- they don't come from
23   third parties.
24   BY MR. CHATTERJEE:
25      Q   So none of the parts that are in that   15:49:29
```

Page 86

```
 1   parts library are based upon data sheets or       15:49:31
 2   references from a third party?
 3          MR. JAFFE:  Object to form.
 4          THE WITNESS:  They are based on data
 5   sheets, but the actual layouts and the       15:49:37
 6   implementation in the database -- we usually do it
 7   ourselves.
 8   BY MR. CHATTERJEE:
 9      Q   And they're deriven [sic] from the data
10   sheets?                                 15:49:51
11          MR. JAFFE:  Object to form.
12          THE WITNESS:  They usually take the -- you
13   know, if data sheets give a specific footprint to
14   use, then we would use it; otherwise, we come up
15   with our own footprint.                 15:49:58
16   BY MR. CHATTERJEE:
17      Q   If I were to look at a print circuit
18   board, how would I know what originated with a
19   third-party data sheet versus an original design
20   from Google or Waymo?                   15:50:18
21          MR. JAFFE:  Object to form.
22          THE WITNESS:  We don't have specifically a
23   footprint here.  It usually are -- you know, like,
24   most vendors would, you know, like, give you --
25   like, in the data sheet, will give you specific   15:50:27
```

Page 87

```
 1   footprints for -- as a recommendation for -- for   15:50:29
 2   implementation.  In this case, you know, we -- we
 3   use the recommendation.  It's something that they
 4   give to us.
 5          MR. CHATTERJEE:  I think I'm done with the   15:50:42
 6   30(b)(6).  So we can move to the individual
 7   deposition unless you guys have questions.
 8          MR. JAFFE:  I -- I didn't want to ruin
 9   your flow here, but I need to go back to the little
10   earrings that you put in front of Mr. Droz.   15:50:55
11          Because Mr. Levandowski's deposition is
12   happening right now, did he give you those earrings?
13          MR. CHATTERJEE:  I -- I obtained the
14   earrings.  I don't have to disclose how I got them.
15   I did an investigation.                 15:51:11
16          MR. JAFFE:  Did he point you to the
17   earrings?
18          MR. CHATTERJEE:  I'm not putting this on
19   the record.  We're not discussing this.
20          MR. JAFFE:  He's being deposed right now.   15:51:16
21          MR. CHATTERJEE:  That's fine.
22          MR. JAFFE:  We --
23          MR. CHATTERJEE:  You can do whatever you
24   want.
25          MR. JAFFE:  I'm entitled to the       15:51:20
```

Page 88

```
 1   opportunity --                          15:51:22
 2          MR. CHATTERJEE:  We're going off the
 3   record.  When I -- I don't have to disclose my work
 4   product or my investigations.
 5          MR. JAFFE:  Where did they come from?  We   15:51:25
 6   want to depose where they came from.  Tell me --
 7          MR. CHATTERJEE:  They came from Seval Oz.
 8          MR. JAFFE:  And how did you get them so we
 9   can depose that person?
10          MR. CHATTERJEE:  You can talk to Seval Oz.   15:51:33
11          MR. JAFFE:  So you're refusing to tell me
12   how you got them?
13          MR. CHATTERJEE:  It's my work product.  I
14   don't have to disclose how I do my investigations.
15   You want to disclose all your investigations?   15:51:43
16   Because you've waived privilege, and you're still
17   stiffing us on it.
18          MR. JAFFE:  That -- these are completely
19   separate issues.  I'm trying to find out --
20          MR. CHATTERJEE:  They're not separate       15:51:47
21   issues at all.
22          MR. JAFFE:  -- where these came from.
23          Who is the custodian of these?
24          MR. CHATTERJEE:  The custodian of these is
25   Seval Oz.                               15:51:54
```

Page 89

Case 3:17-cv-00939-WHA   Document 1552-3   Filed 09/13/17   Page 7 of 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 90**

```
 1        MR. JAFFE:  Okay.  And --              15:51:55
 2        MR. CHATTERJEE:  And now I am because I
 3   have them.
 4        We're going off the record.  Let's take a
 5   break.                                        15:52:01
 6        MR. JAFFE:  That's fine.  We can go off
 7   the record.
 8        THE VIDEOGRAPHER:  Okay.  We're going off
 9   the record.  The time is 3:52 p.m., and this
10   concludes today's testimony given by Pierre-Yves  15:52:07
11   Droz.  The total number of media used was one and
12   will be retained by Veritext Legal Solutions.
13        (TIME NOTED:  3:52 p.m.)
```

**Page 91**

```
 1        I, PIERRE-YVES DROZ, do hereby declare
 2   under penalty of perjury that I have read the
 3   foreging transcript; that I have made any
 4   corrections as appear noted, in ink, initialed by
 5   me, or attached hereto; that my testimony as
 6   contained herein, as corrected, is true and correct.
 7        EXECUTED this _____ day of _____,
 8   2017, at _____, _____.
 9        (City)         (State)

13        _____
14             PIERRE-YVES DROZ
15               VOLUME I
```

**Page 92**

```
 1        I, the undersigned, a Certified Shorthand
 2   Reporter of the State of California, do hereby
 3   certify:
 4        That the foregoing proceedings were taken
 5   before me at the time and place herein set forth;
 6   that any witnesses in the foregoing proceedings,
 7   prior to testifying, were administered an oath; that
 8   a record of the proceedings was made by me using
 9   machine shorthand which was thereafter transcribed
10   under my direction; that the foregoing is a true
11   record of the testimony given.
12        Further, that if the foregoing pertains to the
13   original transcript of a deposition in a Federal
14   Case, before completion of the proceedings, review
15   of the transcript [ ] was [ ] was not requested.
16        I further certify that I am neither
17   financially interested in the action nor a relative
18   or employee of any attorney or any party to this
19   action.
20        IN WITNESS WHEREOF, I have this date
21   subscribed my name.
22        Dated:  8/23/17

            <%signature%>
24          Catherine A. Ryan, RMR, CRR
25          CSR No. 8239
```