# EXHIBIT A
# REDACTED

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4                       ---oOo---
 5
 6   WAYMO LLC,
 7         Plaintiff,
 8   vs.                          No. 3:17-cv-00939-WHA
 9   UBER TECHNOLOGIES, INC.;
     OTTOMOTTO LLC; OTTO TRUCKING,
10   INC.,
11         Defendants.
     _____/
12
13      WAYMO & UBER CONFIDENTIAL ATTORNEYS' EYES ONLY
14
15       VIDEOTAPED DEPOSITION OF CAMERON POETZSCHER
16                SAN FRANCISCO, CALIFORNIA
17                  MONDAY, JUNE 19, 2017
18
19
20   BY:  ANDREA M. IGNACIO,
21   CSR, RPR, CRR, CCRR, CLR
22   CSR LICENSE NO. 9830
23   JOB NO. 2642012
24
25   Pages 1 - 374
```

Page 1

| | | |
|---|---|---|
| 1 | MS. ROBERTS:  Q.  Did they disclose what | 10:50 |
| 2 | Google's approach was that they were going to try to | 10:51 |
| 3 | improve upon? | 10:51 |
| 4 |     A    No. | 10:51 |
| 5 |     Q    So, sitting here today, and during the | 10:51 |
| 6 | negotiations, you didn't know how their plans differed | 10:51 |
| 7 | from what Waymo was already doing? | 10:51 |
| 8 |         MR. JACOBS:  Objection; form. | 10:51 |
| 9 |         THE WITNESS:  No, nor did I want to have any | 10:51 |
| 10 | knowledge whatsoever of what Waymo was doing.  We were | 10:51 |
| 11 | very careful to make sure they weren't disclosing | 10:51 |
| 12 | anything about Waymo to us. | 10:51 |
| 13 |         MS. ROBERTS:  Q.  And so, if their plans on | 10:51 |
| 14 | these improvements, on what Waymo was doing were | 10:51 |
| 15 | actually what Waymo was already doing, you would -- | 10:51 |
| 16 | you would have no way of knowing that; right? | 10:51 |
| 17 |         MR. JACOBS:  Objection; form. | 10:51 |
| 18 |         THE WITNESS:  Well, again, we took safeguards | 10:51 |
| 19 | to ensure that they didn't bring any IP they -- we did | 10:51 |
| 20 | a -- and I'm not aware of everything we did, but I | 10:51 |
| 21 | know that, at minimum, we did extensive -- internal | 10:51 |
| 22 | and external counsel I know did legal due diligence. | 10:51 |
| 23 | We did forensic due diligence. | 10:51 |
| 24 |         We had them sign attestations that they | 10:51 |
| 25 | weren't going to do that, you know, and our standard | 10:51 |

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   employment agreements saying you wouldn't do that.        10:51
 2   They gave us their word.  They personally assured us.     10:51
 3          So we took many steps to make sure that            10:52
 4   wouldn't happen.                                          10:52
 5          MS. ROBERTS:  Q.  But you don't know -- and I      10:52
 6   realize you're not the engineer -- but you don't know     10:52
 7   what work Waymo is doing on ███████████████████████       10:52
 8   ██████████ at the time; correct?                          10:52
 9          MR. JACOBS:  Objection; asked and answered.        10:52
10          THE WITNESS:  Correct.                             10:52
11          MS. ROBERTS:  Okay.                                10:52
12      Q   And so there would be no way for you to know       10:52
13   if what Mr. Levandowski was pitching to Uber was, in      10:52
14   fact, the same thing that Waymo was doing?                10:52
15          MR. JACOBS:  Objection; form.                      10:52
16          THE WITNESS:  I mean, you keep asking me that      10:52
17   question.  Yes, technically, I wouldn't know.             10:52
18          But again, he gave us several assurances, and      10:52
19   we were comfortable with those.                           10:52
20          MS. ROBERTS:  I'm going to hand you what we        10:52
21   will mark as Exhibit 264, which begins with Bates         10:52
22   No. UBER00060661.                                         10:52
23          (Document marked Exhibit 264                       10:53
24           for identification.)                              10:53
25          THE WITNESS:  Thanks.                              10:53
```

```
 1   record at 11:06.                                         11:06

 2          (Recess taken.)                                   11:06

 3          THE VIDEOGRAPHER:  Okay.  We're back on the       11:07

 4   rec- -- record at 11:19.                                 11:19

 5          MS. ROBERTS:  So, we were previously talking      11:19

 6   about the negotiations after the shift in strategy       11:19

 7   negotiations with Mr. Levandowski, and we were in the    11:19

 8   January of 2016 time frame.                              11:19

 9      Q   You testified that, sometime early on, after      11:19

10   the shift in strategy, Uber told Mr. Levandowski that    11:19

11   Uber did not want him to bring any third-party IP to     11:19

12   Uber; is that correct?                                   11:19

13      A   Correct.                                          11:19

14      Q   Was that ever -- was that request ever made       11:19

15   in writing?                                              11:19

16      A   Essentially, in many different forms.  He had     11:19

17   to attest that he wasn't doing any of those kind of      11:20

18   things.  He had to sign a CIAA, I believe.  I relied     11:20

19   on my lawyers to, you know, craft the exact language.    11:20

20   But, I believe we made that clear in several different   11:20

21   written formats.                                         11:20

22      Q   So, let's go through those written formats.       11:20

23          You said he had to attest that he wasn't          11:20

24   going to bring any third-party IP; is that correct?      11:20

25      A   I believe there was some attestation to that      11:20
```

Page 122

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | effect.  Again, I'm not the lawyer who drafted that. | 11:20 |
| 2 | You'd have to ask them for the exact details. | 11:20 |
| 3 | Q   And the attestation that you're referring to, | 11:20 |
| 4 | is that in connection with the April 11th, 2016, | 11:20 |
| 5 | agreement employing the merger? | 11:20 |
| 6 | A   As far as I understand, yes. | 11:20 |
| 7 | Q   And, have you seen an attestation signed by | 11:20 |
| 8 | Mr. Levandowski? | 11:20 |
| 9 | A   I recall seeing it, yes. | 11:20 |
| 10 | Q   So, you did see a document that he signed, | 11:20 |
| 11 | attesting that he wasn't going to bring any | 11:20 |
| 12 | third-party IP? | 11:21 |
| 13 | A   I mean, I saw the full set of signed | 11:21 |
| 14 | documents.  I believe his signature was part of there. | 11:21 |
| 15 | I can't recall, you know, every single document that | 11:21 |
| 16 | was signed within that package.  But, I believe the | 11:21 |
| 17 | fully executed documents included that, and I saw the | 11:21 |
| 18 | fully executed document set. | 11:21 |
| 19 | Q   So, you saw a fully executed document set | 11:21 |
| 20 | that included attestations from other employees; | 11:21 |
| 21 | correct? | 11:21 |
| 22 | A   Again, as I recall, they included the | 11:21 |
| 23 | attestations from whoever was attesting.  Anthony was | 11:21 |
| 24 | one of those.  I believe it was in there. | 11:21 |
| 25 | Q   And so you -- you think that | 11:21 |

Veritext Legal Solutions
866 299-5127

```
 1   Mr. Levandowski's was in that stack that you reviewed.    11:21
 2        But you -- do you recall specifically seeing          11:21
 3   an attestation from him?                                   11:21
 4      A   No.  But I know it was a part -- a critical         11:21
 5   part of the deal.  It was a required part of the deal.    11:21
 6   And, I know that our legal group said that we had all     11:21
 7   of the necessary documents and signatures in place.       11:21
 8   So, I was confident we had the attestation from him as    11:21
 9   well.                                                      11:21
10      Q   If you hadn't received an attestation from          11:21
11   him, would you have still gone through with the deal?     11:21
12      A   No.                                                 11:22
13      Q   So, if an attestation wasn't received from          11:22
14   Anthony Levandowski saying that he was not going to       11:22
15   bring any third-party IP to Uber, Uber would not have     11:22
16   gone through with the acquisition, from your point of     11:22
17   view?                                                      11:22
18      A   I would say it slightly differently.                11:22
19        If he hadn't signed the attestation that we          11:22
20   were requiring him to sign, which encompassed numerous    11:22
21   things -- and I can't talk to the exact specifics.        11:22
22   I'd have to review that with my lawyers.                  11:22
23        But, if he didn't sign the attestation that          11:22
24   he was required to sign as part of the deal, we           11:22
25   wouldn't have closed the deal.                             11:22
```

Page 124

```
 1    Q    You mentioned he also had to sign a CIAA?        11:22
 2    A    I believe so.  I know employees generally        11:22
 3  sign that.  I think he also signed that.  I'm not sure  11:22
 4  if it was sort of subsumed into his attestation, or if  11:22
 5  it was also a separate document.                        11:22
 6         But the gist of what's in the CIAA was --        11:22
 7  certainly, he signed that either as part of the         11:22
 8  attestation or separately.                              11:22
 9    Q    And, can you inform the jury:  What is a         11:22
10  CIAA?                                                   11:22
11    A    It's something to the effect of confidential    11:22
12  information and invention assignment agreement,         11:23
13  something like that.  It essentially says -- and        11:23
14  again, I'm not a lawyer.  But it essentially says,      11:23
15  among other things, that you are not bringing           11:23
16  confidential information to your new employer, from a   11:23
17  previous employer or are otherwise in breach of any     11:23
18  obligations.                                            11:23
19    Q    Is that a document that all employees sign       11:23
20  when they begin work at Uber?                           11:23
21    A    You'd have to ask the human resources            11:23
22  department.  But I understand that generally, people    11:23
23  are made to sign that.                                  11:23
24    Q    Do you know for a fact that Mr. Levandowski      11:23
25  signed a CIAA?                                          11:23
```