# EXHIBIT A
# REDACTED

```
 1                UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3                   SAN FRANCISCO DIVISION
 4                          ---oOo---
 5
 6   WAYMO LLC,
 7          Plaintiff,
 8   vs.                              No. 3:17-cv-00939-WHA
 9   UBER TECHNOLOGIES, INC.;
     OTTOMOTTO LLC; OTTO TRUCKING,
10   INC.,
11          Defendants.
     _____/
12
13       WAYMO & UBER CONFIDENTIAL ATTORNEYS' EYES ONLY
14
15        VIDEOTAPED DEPOSITION OF CAMERON POETZSCHER
16                 SAN FRANCISCO, CALIFORNIA
17                  MONDAY, JUNE 19, 2017
18
19
20   BY:  ANDREA M. IGNACIO,
21   CSR, RPR, CRR, CCRR, CLR
22   CSR LICENSE NO. 9830
23   JOB NO. 2642012
24
25   Pages 1 - 374
```

Page 1

WAYMO & UBER CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MS. ROBERTS:  Q.  Did they disclose what | 10:50 |
| 2 | Google's approach was that they were going to try to | 10:51 |
| 3 | improve upon? | 10:51 |
| 4 |     A   No. | 10:51 |
| 5 |     Q   So, sitting here today, and during the | 10:51 |
| 6 | negotiations, you didn't know how their plans differed | 10:51 |
| 7 | from what Waymo was already doing? | 10:51 |
| 8 | MR. JACOBS:  Objection; form. | 10:51 |
| 9 | THE WITNESS:  No, nor did I want to have any | 10:51 |
| 10 | knowledge whatsoever of what Waymo was doing.  We were | 10:51 |
| 11 | very careful to make sure they weren't disclosing | 10:51 |
| 12 | anything about Waymo to us. | 10:51 |
| 13 | MS. ROBERTS:  Q.  And so, if their plans on | 10:51 |
| 14 | these improvements, on what Waymo was doing were | 10:51 |
| 15 | actually what Waymo was already doing, you would -- | 10:51 |
| 16 | you would have no way of knowing that; right? | 10:51 |
| 17 | MR. JACOBS:  Objection; form. | 10:51 |
| 18 | THE WITNESS:  Well, again, we took safeguards | 10:51 |
| 19 | to ensure that they didn't bring any IP they -- we did | 10:51 |
| 20 | a -- and I'm not aware of everything we did, but I | 10:51 |
| 21 | know that, at minimum, we did extensive -- internal | 10:51 |
| 22 | and external counsel I know did legal due diligence. | 10:51 |
| 23 | We did forensic due diligence. | 10:51 |
| 24 | We had them sign attestations that they | 10:51 |
| 25 | weren't going to do that, you know, and our standard | 10:51 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | employment agreements saying you wouldn't do that. | 10:51 |
| 2 | They gave us their word.  They personally assured us. | 10:51 |
| 3 | So we took many steps to make sure that | 10:52 |
| 4 | wouldn't happen. | 10:52 |
| 5 | MS. ROBERTS:  Q.  But you don't know -- and I | 10:52 |
| 6 | realize you're not the engineer -- but you don't know | 10:52 |
| 7 | what work Waymo is doing on ▇▇▇▇▇▇▇▇▇▇▇ ▇▇ | 10:52 |
| 8 | ▇▇▇▇▇ at the time; correct? | 10:52 |
| 9 | MR. JACOBS:  Objection; asked and answered. | 10:52 |
| 10 | THE WITNESS:  Correct. | 10:52 |
| 11 | MS. ROBERTS:  Okay. | 10:52 |
| 12 | Q   And so there would be no way for you to know | 10:52 |
| 13 | if what Mr. Levandowski was pitching to Uber was, in | 10:52 |
| 14 | fact, the same thing that Waymo was doing? | 10:52 |
| 15 | MR. JACOBS:  Objection; form. | 10:52 |
| 16 | THE WITNESS:  I mean, you keep asking me that | 10:52 |
| 17 | question.  Yes, technically, I wouldn't know. | 10:52 |
| 18 | But again, he gave us several assurances, and | 10:52 |
| 19 | we were comfortable with those. | 10:52 |
| 20 | MS. ROBERTS:  I'm going to hand you what we | 10:52 |
| 21 | will mark as Exhibit 264, which begins with Bates | 10:52 |
| 22 | No. UBER00060661. | 10:52 |
| 23 | (Document marked Exhibit 264 | 10:53 |
| 24 | for identification.) | 10:53 |
| 25 | THE WITNESS:  Thanks. | 10:53 |

```
 1   record at 11:06.                                          11:06
 2          (Recess taken.)                                    11:06
 3          THE VIDEOGRAPHER:  Okay.  We're back on the        11:07
 4   rec- -- record at 11:19.                                  11:19
 5          MS. ROBERTS:  So, we were previously talking       11:19
 6   about the negotiations after the shift in strategy        11:19
 7   negotiations with Mr. Levandowski, and we were in the     11:19
 8   January of 2016 time frame.                               11:19
 9      Q   You testified that, sometime early on, after       11:19
10   the shift in strategy, Uber told Mr. Levandowski that     11:19
11   Uber did not want him to bring any third-party IP to      11:19
12   Uber; is that correct?                                    11:19
13      A   Correct.                                           11:19
14      Q   Was that ever -- was that request ever made        11:19
15   in writing?                                               11:19
16      A   Essentially, in many different forms.  He had      11:19
17   to attest that he wasn't doing any of those kind of       11:20
18   things.  He had to sign a CIAA, I believe.  I relied      11:20
19   on my lawyers to, you know, craft the exact language.     11:20
20   But, I believe we made that clear in several different    11:20
21   written formats.                                          11:20
22      Q   So, let's go through those written formats.        11:20
23          You said he had to attest that he wasn't           11:20
24   going to bring any third-party IP; is that correct?       11:20
25      A   I believe there was some attestation to that       11:20
```

Page 122

| | | |
|---|---|---|
| 1 | effect.  Again, I'm not the lawyer who drafted that. | 11:20 |
| 2 | You'd have to ask them for the exact details. | 11:20 |
| 3 | Q   And the attestation that you're referring to, | 11:20 |
| 4 | is that in connection with the April 11th, 2016, | 11:20 |
| 5 | agreement employing the merger? | 11:20 |
| 6 | A   As far as I understand, yes. | 11:20 |
| 7 | Q   And, have you seen an attestation signed by | 11:20 |
| 8 | Mr. Levandowski? | 11:20 |
| 9 | A   I recall seeing it, yes. | 11:20 |
| 10 | Q   So, you did see a document that he signed, | 11:20 |
| 11 | attesting that he wasn't going to bring any | 11:20 |
| 12 | third-party IP? | 11:21 |
| 13 | A   I mean, I saw the full set of signed | 11:21 |
| 14 | documents.  I believe his signature was part of there. | 11:21 |
| 15 | I can't recall, you know, every single document that | 11:21 |
| 16 | was signed within that package.  But, I believe the | 11:21 |
| 17 | fully executed documents included that, and I saw the | 11:21 |
| 18 | fully executed document set. | 11:21 |
| 19 | Q   So, you saw a fully executed document set | 11:21 |
| 20 | that included attestations from other employees; | 11:21 |
| 21 | correct? | 11:21 |
| 22 | A   Again, as I recall, they included the | 11:21 |
| 23 | attestations from whoever was attesting.  Anthony was | 11:21 |
| 24 | one of those.  I believe it was in there. | 11:21 |
| 25 | Q   And so you -- you think that | 11:21 |

Veritext Legal Solutions
866 299-5127

```
 1    Mr. Levandowski's was in that stack that you reviewed.    11:21
 2           But you -- do you recall specifically seeing       11:21
 3    an attestation from him?                                  11:21
 4        A   No.  But I know it was a part -- a critical       11:21
 5    part of the deal.  It was a required part of the deal.    11:21
 6    And, I know that our legal group said that we had all     11:21
 7    of the necessary documents and signatures in place.       11:21
 8    So, I was confident we had the attestation from him as    11:21
 9    well.                                                     11:21
10        Q   If you hadn't received an attestation from        11:21
11    him, would you have still gone through with the deal?     11:21
12        A   No.                                               11:22
13        Q   So, if an attestation wasn't received from        11:22
14    Anthony Levandowski saying that he was not going to       11:22
15    bring any third-party IP to Uber, Uber would not have     11:22
16    gone through with the acquisition, from your point of     11:22
17    view?                                                     11:22
18        A   I would say it slightly differently.              11:22
19           If he hadn't signed the attestation that we        11:22
20    were requiring him to sign, which encompassed numerous    11:22
21    things -- and I can't talk to the exact specifics.        11:22
22    I'd have to review that with my lawyers.                  11:22
23           But, if he didn't sign the attestation that        11:22
24    he was required to sign as part of the deal, we           11:22
25    wouldn't have closed the deal.                            11:22
```

Page 124

```
 1     Q   You mentioned he also had to sign a CIAA?          11:22
 2     A   I believe so.  I know employees generally          11:22
 3  sign that.  I think he also signed that.  I'm not sure    11:22
 4  if it was sort of subsumed into his attestation, or if    11:22
 5  it was also a separate document.                          11:22
 6         But the gist of what's in the CIAA was --          11:22
 7  certainly, he signed that either as part of the           11:22
 8  attestation or separately.                                11:22
 9     Q   And, can you inform the jury: What is a            11:22
10  CIAA?                                                     11:22
11     A   It's something to the effect of confidential       11:22
12  information and invention assignment agreement,           11:23
13  something like that.  It essentially says -- and          11:23
14  again, I'm not a lawyer.  But it essentially says,        11:23
15  among other things, that you are not bringing             11:23
16  confidential information to your new employer, from a     11:23
17  previous employer or are otherwise in breach of any       11:23
18  obligations.                                              11:23
19     Q   Is that a document that all employees sign         11:23
20  when they begin work at Uber?                             11:23
21     A   You'd have to ask the human resources              11:23
22  department.  But I understand that generally, people      11:23
23  are made to sign that.                                    11:23
24     Q   Do you know for a fact that Mr. Levandowski        11:23
25  signed a CIAA?                                            11:23
```