QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>            Plaintiff,<br><br>       vs.<br><br>UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>            Defendants. | CASE NO. 3:17-cv-00939<br><br>**PLAINTIFF WAYMO LLC'S OPPOSITION TO DEFENDANTS' MOTION IN LIMINE 24**<br><br>Date:        September 27, 2017<br>Time:        8:00 a.m.<br>Ctrm:        8, 19th Floor<br>Judge:      Honorable William H. Alsup<br>Trial Date: October 10, 2017 |

01980-00104/9542017.5

1  Defendants' MIL 24 seeks to exclude three categories of information on the theory that
2  they would "skew the damages horizon for the jury." (Mot. at 3.) Because all three categories of
3  information are relevant to contested issues in this case, Defendants' motion should be denied.

## BACKGROUND

Contrary to Defendants' argument that Waymo's damages theories are "over-the-top" and "wildly speculative" (Mot. at 1), all three of Waymo's damages theories are based on Uber's *own* estimates of how acquiring Otto (and thus, Waymo's trade secrets) would affect the pace of Uber's LiDAR development. As it was considering whether to acquire Otto, Uber estimated that acquiring Otto could ████████████████████████ (Ex. 1.) Putting a dollar figure on this measure of accelerated development, Uber calculated that the ████████████████ ████████████████████████████████████████████ ████████████████████████. (*Id*.) Uber also acknowledged that acquiring Otto could save Uber development expenses because, before acquiring Otto, Uber was "████████████████ ████." (Ex. 2, Bares Tr. at 214:18-215:1.)

Using Uber's own savings estimates as a starting point for his unjust enrichment analysis, Waymo's damages expert Michael Wagner apportioned to a trade secret level based on: (1) how long Uber said it would take to design around Waymo's trade secrets (for Trade Secret Nos. 2, 7, 9, 13, 14 and 96), (2) how long it took Waymo to develop the trade secrets (for Trade Secret Nos. 25 and 111), or (3) how much Uber paid to acquire the trade secrets from Tyto (a Levandowski company) (for Trade Secret 90). Mr. Wagner similarly used Uber's savings estimates as a starting point for his reasonable royalty analysis, from which he proceeded to evaluate a hypothetical negotiation between the parties using the *Georgia-Pacific* factors.

## ARGUMENT

Defendants' MIL 24 seeks to exclude three broad categories of evidence: (1) information regarding Waymo's development expenses for the asserted trade secrets, (2) Waymo's revenue forecasts, and (3) information regarding Uber's financial condition, on the theory that this information will "skew the damages horizon for the jury." (Mot. at 3.) But unlike the entire market value rule cases that Defendants cite in their motion, there is no risk that this information

1  will confuse the issues here.  In an entire market value rule case, information about revenues
2  associated with a "complete product rather than the patented component only" can skew the
3  horizon if there is "no demonstrated correlation to the value of the patented feature alone."
4  *LaserDynamics, Inc. v. Quanta Comp., Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012).  In the hypothetical
5  negotiation in this case, where Waymo and Defendants would have been negotiating a royalty rate
6  related to technology that has not been released yet, information about development expenses and
7  projected revenues is highly relevant.

8      *Waymo's Development Expenses*.  Defendants seek to preclude Waymo from introducing
9  evidence of its development expenses because these expenses "form no part of the damages theory
10 disclosed by Waymo's expert" and are likely to "skew the damages horizon."  (Mot. at 2.)  But
11 this information is relevant – both for damages, and to prove that the information Defendants
12 misappropriated constitutes protectable trade secrets.

13     Waymo's development expenses are relevant to damages because Waymo's damages
14 model measures the degree to which Defendants have been unjustly enriched through *saved*
15 development expenses.  Mr. Wagner uses Uber's documents as a starting point for this calculation,
16 but a logical (and, according to Uber, necessary[1]) check on Uber's estimates is the amount of
17 money Waymo itself spent developing the trade secrets.  For example, the fact that Waymo spent
18 between $[redacted] and [redacted] to develop the individual asserted trade secrets (over the
19 course of 2-7 years) confirms that Uber's [redacted] run rate was reasonable.

20     Waymo's development expenses are also relevant to whether the misappropriated
21 information constitutes protectable trade secrets.  "As a general principle, the more difficult
22 information is to obtain, and the more time and resources expended by an employer in gathering it,
23 the more likely a court will find such information constitutes a trade secret."  *Morlife, Inc. v.*
24 *Perry*, 56 Cal. App. 4th 1514, 1522, 66 Cal. Rptr. 2d 731, 736 (1997) (interpreting UTSA);
25 *Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*, 2013 WL 2151553, at *7 (E.D. Cal. 2013)

---

[1] Uber's damages expert Walter Bratic argues that Mr. Wagner should have "independently tested" the assumptions in Uber's cost savings estimates.  (Ex. 3, Bratic Report ¶¶ 25-26.)

1   (information is a protectable trade secret because plaintiff invested "significant time, labor and
2   capital" in compiling it).  Thus, the fact that Waymo spent between $█████ and █████ to
3   develop the individual asserted trade secrets is relevant to the jury's determination of whether
4   Waymo is asserting protectable trade secrets.

5       *Waymo's Revenue Forecasts*.  Uber cannot have it both ways.  On the one hand, Uber
6   argues that Mr. Wagner's unjust enrichment damages analysis is unreliable in part because Mr.
7   Wagner did not "independently test or re-create" Uber's revenue forecasts.  (Ex. 3, Bratic Report ¶¶
8   23, 25-26.)  On the other hand, Uber seeks to preclude Waymo from introducing its own revenue
9   forecasts – the most logical benchmark Mr. Wagner could use to do this very "testing."  The jury
10  should be allowed to hear that Waymo's estimates (████████████████████████
11  ██████████████████████, for example) are in line with Uber's estimates (that the
12  present value of entering the self-driving market ███████████████████████████
13  ██████████████).

14      In addition to being a relevant "check" on Uber's estimates, Waymo's revenue forecasts
15  are also relevant to Mr. Wagner's *Georgia-Pacific* analysis for reasonable royalty damages.
16  Under *Georgia-Pacific* Factor 8, Mr. Wagner considers "the established profitability of the
17  product embodying" the trade secrets by analyzing both sides' revenue projections.  (Ex. 4,
18  Wagner Report ¶¶ 408-418.)  Citing no authority that actually supports their position, Defendants
19  argue that projections are not relevant to the *Georgia-Pacific* analysis because they are
20  "speculative."  (Mot. at 2-3.)  But many courts – including those that Uber cites – have held that
21  projections are relevant inputs under *Georgia-Pacific*. *Interactive Pictures Corp. v. Infinite*
22  *Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001) (affirming reasonable royalty award for
23  patent infringement based on defendants' projection of future sales because "the 1996 business
24  plan and its projections for future sales were prepared by Infinite two months before infringement
25  began" and "those projections would have been available to Infinite at the time of the hypothetical
26  negotiation"); *Snellman v. Ricoh Co., Ltd.*, 862 F.2d 283, 289 (Fed. Cir. 1988) (holding that a
27  "document projecting Ricoh's anticipated sale[s] and expert testimony relating to those
28  calculations, was relevant and proper in determining a reasonable royalty").  The fact that neither

Waymo nor Uber has made a sale does not bar these revenue projections.  Indeed, under CUTSA, a reasonable royalty is explicitly available "[i]f neither damages nor unjust enrichment caused by misappropriation are provable," such as where defendant "made no actual profits." *Ajaxo Inc. v. E*Trade Financial Corp.*, 187 Cal. App. 4th 1295, 1311, 115 Cal. Rptr. 3d 168, 182 (2010).

Contrary to Defendants' position (Mot. at 3), cases allowing projections as part of the *Georgia-Pacific* analysis do not draw a line between the admissibility of plaintiff's projections and the defendants' projections.  Rather, in a hypothetical negotiation where information is equally available to all parties, both sides' projections are relevant. *LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 188–89 (S.D.N.Y. 2002) (projections "are relevant to *the parties'* perceived value of the trade secret") (emphasis added).  This is particularly true where the parties to the hypothetical negotiation are direct competitors and offering the same service.

*Uber's Financial Condition or Resources*.  Defendants seek to preclude information regarding Uber's financial condition because "such information is irrelevant and poses a risk of biasing the jury's award."  (Mot. at 4.)  But information regarding Uber's financial condition and resources *is* relevant to competition between Waymo and Uber, to the likelihood (or not) that Waymo would license its trade secrets to Uber, and to the price Waymo would expect to charge and Uber would expect to pay as a result of a hypothetical negotiation.  For example, Uber's acting CFO testified that, if Uber believed it was in the best interest of the business, it would have the ability to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Ex. 4, Wagner Rep. at ¶ 359.)  And Waymo has in fact considered scenarios in which it would face predatory pricing by Uber as Uber attempts to compete in the TaaS space before it is able to launch self-driving cars.  (*Id.* at ¶ 358.)  This information is highly relevant at least to *Georgia-Pacific* Factor 5 (commercial relationship between licensor and licensee).

## CONCLUSION

For the foregoing reasons, Defendants' MIL 24 should be denied.

DATED: September 13, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By /s/ Charles K. Verhoeven
Charles K. Verhoeven
Attorneys for WAYMO LLC