# EXHIBIT 3

# FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

5    WAYMO LLC,                      )
                                     )
6              Plaintiff,            )
                                     ) Case No.
7                   vs.              ) 3:17-cv-000939-WHA
                                     )
8    UBER TECHNOLOGIES, INC.;        )
     OTTOMOTTO LLC; OTTO TRUCKING,   )
9    INC.,                           )
                                     )
10             Defendants.           )
     _____)

11

12

13    *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

14

15       VIDEOTAPED DEPOSITION OF JAMES HASLIM

16             San Francisco, California

17           Wednesday, August 9, 2017

18                  Volume III

19

20

21   Reported by:

22   CARLA SOARES
     CSR No. 5908
23   Job No. 2675900

24

25   Pages 404 - 724
```

Page 404

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5    WAYMO LLC,                    )
                                   )
6              Plaintiff,          )
                                   ) Case No.
7              vs.                 ) 3:17-cv-000939-WHA
                                   )
8    UBER TECHNOLOGIES, INC.;      )
     OTTOMOTTO LLC; OTTO TRUCKING, )
9    INC.,                         )
                                   )
10             Defendants.         )
     _____)

11

12

13          VIDEOTAPED DEPOSITION OF JAMES HASLIM,

14   Volume III, taken on behalf of Defendants, at 50

15   California Street, San Francisco, California,

16   beginning at 9:36 a.m., and ending at 6:09 p.m., on

17   Wednesday, August 9, 2017, before CARLA SOARES,

18   Certified Shorthand Reporter No. 5908.

19

20

21

22

23

24

25

                                          Page 405

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                    REFERENCED EXHIBITS

 2                      (Not Attached)

 3                      Exhibit/Page

 4                       57    447

 5                      109    472

 6                      161    579

 7                       58    617

 8                      456    624

 9                      457    627

10                      155    639

11                      512    650

12                      157    713

13

14

15      QUESTIONS NOT ANSWERED PER INSTRUCTION OF COUNSEL

16                      Page/Line

17                      426     3

18                      483    20

19                      662    13

20                      663    11

21                      664    12

22

23

24

25

                                        Page  412
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1          A    Page 1, page 64, page 65, page 88.          09:45:07

2          Q    And is there any reason why those

3    particular pages are in front of you today for this

4    deposition?

5          A    Not that I'm aware of.                       09:45:21

6          Q    You have no knowledge of that?

7          A    I don't know why they are attached to this

8    stack, specifically.

9          Q    And what's the date of the deposition

10   transcript that you have in front of you?              09:45:32

11         A    It's dated Tuesday, April 18th, 2017.

12         Q    Do you have any understanding as to

13   whether you are here today testifying on behalf of

14   Uber with regards to certain subjects?

15         MR. KIM:  And I'll just note for the            09:45:59

16   record that Mr. Haslim is here in his personal

17   capacity and has not been designated as a Rule

18   30(b)(6) witness on any topics in this case.

19         MR. SCHMIDT:  I appreciate that

20   representation.                                        09:46:09

21         Q    Can you give your understanding, please?

22         A    My understanding is I'm here today to

23   represent my own personal knowledge and not

24   represent the company I work for.

25         Q    Do you have any understanding of the fact  09:46:21
```

Page 422

```
 1    that you have been identified in certain of Uber's      09:46:23

 2    responses to Waymo's interrogatories as a person

 3    having knowledge on certain subjects?

 4           MR. KIM:  Objection.  Form.

 5           THE WITNESS:  I believe I have seen a            09:46:40

 6    response to an interrogatory where I was named as a

 7    person of -- with knowledge on the subject.

 8    BY MR. SCHMIDT:

 9       Q   And what response -- strike that.

10           What interrogatory was that response in         09:46:49

11    regards to?

12       A   I don't remember which interrogatory.

13       Q   Do you remember the subject matter of the

14    interrogatory?

15       A   The subject matter --                           09:46:59

16           MR. KIM:  And I'm just going to caution

17    you not to divulge any attorney-client privileged

18    communications.  If you can do so, answer the

19    question without doing that, you can answer.

20           THE WITNESS:  The document I saw that           09:47:15

21    listed me as a person of knowledge that I can recall

22    addressed some answers I had provided to counsel.

23           MR. KIM:  And I'm just going to caution

24    you again not to reveal the substance of any

25    communication.                                         09:47:35
```

                                                  Page 423

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1              THE WITNESS:  The document contained        09:47:35

2    information regarding a redesign of certain aspects.

3    BY MR. SCHMIDT:

4         Q    What type of information?

5         A    The document was addressing a redesign of   09:47:47

6    our laser transmit board.

7         Q    And you provided certain information that

8    informed this interrogatory response?

9         A    Yes.

10        Q    What sort of investigation did you do to    09:48:01

11   provide that information?

12             MR. KIM:  Same caution.  If you can answer

13   the question without revealing attorney-client

14   privileged communications, you can do so.

15             THE WITNESS:  Yes.  So investigation would  09:48:11

16   include communicating with co-workers about an

17   intent I had to change the design, how long they

18   thought it would take, and asking them to begin the

19   work.

20   BY MR. SCHMIDT:                                       09:48:31

21        Q    And this was in regards to the redesign of

22   the laser board, you said?

23        A    Yes.

24        Q    What aspects of the laser board?

25        A    The aspects were to move the ████████       09:48:38
```

Page 424

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  ███████████████████████████████   `09:48:43`

2  █████████████████████████████

3  ████████████████████████

4      Q    Anything else?

5      A    No, that was it.                              09:49:03

6      Q    What about changing ████████████████

7  ████████████████████   Did you have any

8  conversations with your co-workers about that?

9      A    Yes.  I had e-mail communication with

10 co-workers about that design change as well, and I   09:49:17

11 did not see that aspect in the document you

12 originally referred to that listed me as a

13 knowledgeable person.

14     Q    How about any investigation with regards

15 to changing the ██████████████████████████████      09:49:35

16 ████ in the Fuji device?

17     A    Yes.  I e-mail-communicated with a

18 co-worker to find out what it would take to get a

19 ████████████ designed.

20     Q    And your understanding is your            09:49:52

21 investigation with regards to changing ██████████

22 ████████ in Fuji and changing ██████████ did not

23 make it into that interrogatory response, correct?

24     A    When I was shown the interrogatory

25 response, the section I was shown did not make      09:50:10

                                            Page 425

```
1    mention of those other design change aspects.        09:50:16

2    (Question not answered per instruction of counsel):

3        Q    Do you have any understanding why?

4            MR. KIM:  I'm just going to caution you

5    again not to reveal the substance of any              09:50:24

6    attorney-client privileged communications.

7            THE WITNESS:  So I'm reluctant to answer

8    why because I was directly communicating with a

9    lawyer, counsel for us, when he showed me a part of

10   a document.                                           09:50:42

11   BY MR. SCHMIDT:

12       Q    With regards to these two changes that you

13   discussed with co-workers that did not make it into

14   the interrogatory response, was your understanding

15   that these changes were infeasible?                   09:50:56

16           MR. KIM:  Objection.  Form.

17           THE WITNESS:  I want you to remind me.

18   One was ███████████, and the other was which?

19   BY MR. SCHMIDT:

20       Q    Changing ████████████ in the              09:51:07

21   system.

22       A    No.  No.  At no point did we discuss it

23   being infeasible.

24       Q    Was it your conclusion that these changes

25   would be cost-prohibitive?                            09:51:24
```

Page 426

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        A    I did not make any conclusion about        09:51:28

2   something being cost-prohibitive.

3        Q    Was it your conclusion that these changes

4   would result in an unacceptable loss of performance?

5        A    No.                                        09:51:48

6        Q    Was it your conclusion that these changes

7   would result in any loss of performance?

8        A    Yes.

9        Q    In what regards?

10       A    If I had to direct the redesign of the     09:52:01

11   ███████████ in a transmit cavity to increase

12   the ███████████ in the transmit cavity, that

13   would likely cause an █████████████████████

14   ███████████████████ and the lens's central

15   axis.                                               09:52:29

16            When you begin to ████████████████████

17   ███████████████████████████████████████

18   ███████████████████████████████████

19   ████████████████████

20       Q    Do you have any understanding as to        09:52:44

21   whether or not that conclusion that you arrived at

22   is the reason why this ███████████████████

23   ███████████████ was not reflected in Uber's

24   interrogatory response?

25            MR. KIM:  Same caution.                    09:52:56
```

Page 427

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1              THE WITNESS:  No.                        09:53:00

 2      BY MR. SCHMIDT:

 3              Q    ████████████████████████████

 4      █████████████████████████████

 5      ███████████████████████                         09:53:09

 6              MR. KIM:  Objection.  Form.

 7              I caution the witness not to reveal the

 8      substance of any attorney-client privileged

 9      communications?

10              THE WITNESS:  ██████████████████         09:53:20

11      ███████████████████████████████

12      ███████████████.

13      BY MR. SCHMIDT:

14              Q    ███████████████████████

15      ███████████████████████████?                    09:53:30

16              MR. KIM:  Objection.  Form.

17              THE WITNESS:  ████████████████

18      ███████████

19      BY MR. SCHMIDT:

20              Q    ████████████████████████            09:53:38

21      █████████████████████████

22      ████████?

23              MR. KIM:  Objection.  Form.

24              THE WITNESS:  ██████████████████

25      ██████████████████████████                       09:53:48
```

Page 428

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    ████████████████████████████████     ██████████
 2    ██████████████████████████████████
 3    ██████████████
 4    BY MR. SCHMIDT:
 5         Q    ████████████████████████     ██████████
 6    ██████████████████████?
 7              MR. KIM:  Objection.
 8              THE WITNESS:  ████████████████
 9              MR. KIM:  Form.
10              THE WITNESS:  ██████████████████          09:54:11
11    ███████████████████████████████
12    ███████████████████████████.
13    BY MR. SCHMIDT:
14         Q    What additional information does Uber need
15    to make a decision on whether they will implement    09:54:26
16    the change in ██████████████?
17              MR. KIM:  Objection.  Form.
18              THE WITNESS:  Uber is a corporation with a
19    management structure I can't represent.  So I can
20    represent the information that I would need to       09:54:46
21    decide to make that change or propose the change or
22    recommend the change.  And that would be -- I would
23    need to be told that this was something that we
24    needed to do.
25    ///                                                  09:55:03
```

Page 429

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    BY MR. SCHMIDT:                                    09:55:03

 2         Q    And who would you need to be told that by?

 3         A    There are a variety of people that could

 4    tell me to do this and that would cause me to do

 5    this.                                              09:55:21

 6         Q    Identify those people, please.

 7         A    Judge Alsup, Judge Alsup's finding, if it

 8    was conveyed through counsel; Eric Meyhofer; or my

 9    current boss, Brian Zajac.

10         Q    Are you able to quantify the degradation  09:55:50

11    in performance of the Fuji device if this change in

12    the ▇▇▇▇▇▇▇▇ were implemented?

13         A    I believe it is possible to quantify the

14    degradation.

15         Q    Have you quantified the degradation?      09:56:06

16         A    No.

17         Q    You say it's possible.  What further

18    analysis would you have to do to provide that

19    quantification?

20         A    It would require optical simulations.     09:56:17

21         Q    Do you have any current plans to perform

22    those optical simulations?

23         MR. KIM:  And I'll just caution you not to

24    reveal the substance of any attorney-client

25    privileged communications.                         09:56:29
```

Page 430

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              THE WITNESS:  Okay.  I do not, at this      09:56:30

 2   time, have a plan to do that quantification.

 3   BY MR. SCHMIDT:

 4        Q   Do you expect to do that quantification

 5   between now and trial in this case?                   09:56:40

 6              MR. KIM:  Same caution.

 7              THE WITNESS:  I don't know.

 8   BY MR. SCHMIDT:

 9        Q   Do you have any projection as to what that

10   quantification analysis might reveal?                09:56:56

11              MR. KIM:  Objection.  Form.  Calls for

12   speculation.

13              THE WITNESS:  I cannot estimate, sitting

14   here, the quantity of degradation.  But I can only

15   characterize the qualitative nature of what it might  09:57:18

16   include.

17   BY MR. SCHMIDT:

18        Q   And what might it include?

19        A   It might include a beam whose projected

20   spot shape is larger than it was previous to the      09:57:29

21   change.

22        Q   Anything else?

23        A   I think that would be sufficient.

24              Correction.  I think that, with a

25   simulation of the return path into the sensor's       09:57:47
```

Page 431

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  detector, together, those two would be sufficient to          09:57:54

2  measure the degradation in performance.

3      Q    And a beam whose projected spot shape is

4  larger than it was previous to the change, what

5  impact does that have on the performance of the               09:58:12

6  device?

7      A    If the projected spot shape is

8  considerably larger by some amount I'm not going to

9  try to quantify right now, it's possible that the

10  amount of light collected from that beam back onto          09:58:31

11  the detector that it's associated with could be less

12  than the full beam energy received by the sensor.

13      Q    And this would result in the device not

14  perceiving certain obstacles that it would otherwise

15  be able to perceive?                                         09:58:53

16          MR. KIM:  Objection.  Form.  Calls for

17  speculation.

18          MR. SCHMIDT:  Counsel, I'd ask to avoid

19  the speaking objections.

20          MR. KIM:  I've got a list here of speaking          09:59:02

21  objections made by Quinn attorneys in other

22  depositions, including the last one taken of

23  Mr. Droz.

24          And as I understand it from Mr. Jaffe, the

25  parties do not have a stipulation about the form of         09:59:16

Page 432

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    objections.                                       09:59:18

 2            MR. SCHMIDT:  All right.  Well, it's not a

 3    tit for tat.  So I think the objection for calls for

 4    speculation is improper.

 5            MR. KIM:  Well, I'll note that that exact   09:59:28

 6    objection was made multiple times by Quinn attorneys

 7    in this case, and I'll continue to make objections

 8    that I deem to be appropriate.

 9            And again, we'll note that there's no

10    stipulation, and the party has made it abundantly    09:59:43

11    clear by Mr. Jaffe.

12    BY MR. SCHMIDT:

13       Q   Do you need the question read back for the

14    record?

15       A   No, I believe I can answer the question.     09:59:52

16       Q   Please do.

17       A   So I can testify from my engineering

18    understanding, it's my belief, if that was the case,

19    that the light collected by the detector was less

20    than the full energy, that it would provide -- be    10:00:05

21    provided with -- in the previous design, the net

22    result to the sensor would be that it would have

23    less sensitivity in detecting objects at a further

24    distance or of a darker surface color.

25       Q   And why is this a problem?                   10:00:24
```

Page 433

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1            MR. KIM:  Objection.  Form.                10:00:30

 2            THE WITNESS:  This would be a problem for

 3    the sensor we're developing because the sensor we're

 4    developing is meant to detect obstacles around a

 5    vehicle, and this would limit the ability of our      10:00:45

 6    vehicle to sense objects of darker color at farther

 7    distance.

 8    BY MR. SCHMIDT:

 9        Q   We've been speaking about changing the

10    ███████████  in the Fuji device.  I would like now     10:00:57

11    to move to the redesign proposed of ███████████

12    ██████████.

13            Did Uber come to the conclusion that the

14    proposed redesign for the ██████████████████

15    was infeasible?                                        10:01:14

16            MR. KIM:  Objection.  Form.

17            THE WITNESS:  I can't speak for Uber.

18    BY MR. SCHMIDT:

19        Q   Did you come to the conclusion that this

20    design change would be infeasible?                     10:01:21

21        A   I want to testify that the investigation I

22    did regarding the redesign of the █████ was in

23    response to an interrogatory request of a vague

24    nature that didn't specify a specific design aspect

25    to be redesigned.                                      10:01:43
```

Page 434

1          So I did an investigation to determine          10:01:46

2     time and cost associated with a generic change to

3     ███████████.  But without knowing what the change

4     would be, I cannot answer whether I believe it's

5     feasible.                                              10:02:02

6          Q    The investigation that you conducted

7     associated with the generic change to ███████████,

8     could you provide me more information on the

9     specific changes that were considered?

10         A    Rather than considering a specific design   10:02:21

11    change, we engaged with a third-party vendor, gave

12    them basic requirements for ███████████, and asked

13    them to estimate time and cost to design ███████████

14    with no other information than the requirements we

15    provided.                                              10:02:46

16         Q    And where did the requirements that you

17    provide derive from?

18         A    Those derived from my understanding of the

19    minimum requirements for ███████████ in our system.

20         Q    And where did you obtain that               10:03:01

21    understanding of the minimum requirements for ██████

22    ██████ in your system?

23         A    I obtained that from prior knowledge of

24    what ███████████ does for a laser diode, and from my

25    knowledge of the equipment we were using to place     10:03:19

                                                            Page 435

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    ███████████ onto the laser board.                    10:03:23

2         Q    So if I understand correctly, the

3    requirements were driven in part by the placement

4    technique that Uber was using for the prior ████

5    ██████ correct?                                       10:03:38

6              MR. KIM:  Objection.  Form.

7    Mischaracterizes testimony.

8              THE WITNESS:  Could you repeat the

9    question?

10   BY MR. SCHMIDT:                                       10:03:50

11        Q    The requirements for the redesigned ████

12   █████ were driven in part by the placement technique

13   that Uber was using for the prior FAC lens, correct?

14             MR. KIM:  Same objection.

15             THE WITNESS:  I would say that's correct.   10:04:05

16   BY MR. SCHMIDT:

17        Q    And the requirements for the redesigned

18   ██████████ were driven in part by the performance that

19   Uber had obtained for the prior ████████, correct?

20             MR. KIM:  Objection.  Form.                 10:04:18

21             THE WITNESS:  No, I did not consider the

22   performance, as I understand the word to mean, but

23   rather the function of the ████████.

24   BY MR. SCHMIDT:

25        Q    So if I understand your testimony, the      10:04:34

Page 436

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   requirements for the redesigned ████ were driven          10:04:36

2   in part by the function of the prior ████ that

3   Uber was using, correct?

4        A    I believe I answered this more accurately

5   previously when I said the requirements were driven        10:04:54

6   by the function of ████ from my prior

7   knowledge of what ████ do for laser diodes.

8        Q    Was your knowledge of how ████

9   perform informed in any way by the prior ████

10  that Uber was using?                                        10:05:13

11            MR. KIM:  Objection.  Form.

12            THE WITNESS:  Not significantly.  I would

13  say when I was exposed to the ████ and saw its

14  performance, perhaps I had one more data point of

15  how this specific lens performed, but I did not            10:05:30

16  learn anything about the function of an ████

17  from the ████ we previously had.

18  BY MR. SCHMIDT:

19       Q    Your answer to my previous question was

20  "Not significantly."                                       10:05:43

21            Are you leaving open the possibility that

22  your knowledge of ████ was informed by the ████

23  ████ that Uber was previously using in a

24  nonsignificant manner?

25            MR. KIM:  Objection.  Form.                      10:05:57

                                              Page 437

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          THE WITNESS:  I would say yes.  Simply to          10:06:01

2     know that this ████████ projects a beam of a certain

3     size at distance is one more piece of information

4     that I didn't have before I came into contact with

5     this ████████.                                          10:06:17

6     BY MR. SCHMIDT:

7          Q    And that exposure to the ████████ that

8     Uber was previously using was part of the

9     consideration you made in obtaining a quote for a

10    redesigned ████████, correct?                          10:06:39

11         MR. KIM:  Objection.  Form.

12    Mischaracterizes testimony.

13         THE WITNESS:  No, I disagree with that.  I

14    would say I was able to create a list of

15    requirements, being careful to specify just a          10:06:51

16    minimum set of functionality that this would

17    provide.

18         However, to clarify, my exposure to the

19    ████████ currently used at Uber did inform a

20    requirement to be able to manipulate this with the     10:07:19

21    equipment we were currently using.

22    BY MR. SCHMIDT:

23         Q    Did Uber consider the quote that it

24    obtained for the redesigned ████████

25    cost-prohibitive?                                       10:07:33

                                              Page 438

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1              MR. KIM:  Objection.  Form.            10:07:35

2              THE WITNESS:  Again, I can't answer for

3     Uber.  I did not make any consideration myself as to

4     whether it was cost-prohibitive.  I only reported

5     the cost.                                        10:07:42

6     BY MR. SCHMIDT:

7         Q   When you reported the cost, did you think

8     it was high?

9              MR. KIM:  Objection.  Form.

10             THE WITNESS:  I don't have a strong gauge  10:07:52

11    for what I consider high.  I thought it was in line

12    with this type of work.

13    BY MR. SCHMIDT:

14        Q   What was the cost for the redesigned ███

15    ███                                              10:08:06

16        A   I don't remember.

17        Q   Did Uber conclude that the redesigned ███

18    ███ would result in performance degradation for the

19    overall Fuji device?

20             MR. KIM:  Objection.  Form.             10:08:21

21             THE WITNESS:  Not answering for Uber but

22    only for myself, I made no consideration for

23    potential performance change because we didn't have

24    specific design change parameters other than basic

25    functionality.                                   10:08:36
```

Page 439

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              I would have expected a redesigned ███        10:08:38

 2     ███ to function more or less similarly to the ███

 3     ███ we currently have.

 4     BY MR. SCHMIDT:

 5          Q    Have you done any analysis to prove that   10:08:48

 6     conclusion out?

 7          A    No.

 8          Q    Do you plan to do any such analysis?

 9              MR. KIM:  I'll just caution you not to

10     reveal the substance of any attorney-client          10:09:03

11     privileged communications.

12              THE WITNESS:  I don't have any current

13     plans to do such an analysis.

14     BY MR. SCHMIDT:

15          Q    ████████████████████████████████           10:09:14

16     █████████████████████████████

17     ██████████████

18              MR. KIM:  Objection.  Form.

19              THE WITNESS: █████████████████████

20     ███████████████████████████████████                  10:09:28

21     ████████████████████████████

22     BY MR. SCHMIDT:

23          Q    ████████████████████████████

24              MR. KIM:  And again, I'll caution you not

25     to reveal the substance of any attorney-client       10:09:46
```

Page 440

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



1    privileged communications.                              10:09:49

2            THE WITNESS:

3

4

5

6

7

8    BY MR. SCHMIDT:

9            Q

10                                                            10:10:25

11

12

13

14            MR. KIM:  Same caution.

15            THE WITNESS:                                    10:10:40

16

17

18    BY MR. SCHMIDT:

19            Q

20                                                            10:10:57

21

22

23            MR. KIM:  Objection.  Form.  I'll caution

24    the witness not to reveal any attorney-client

25    privileged communication.                              10:11:12

                                                 Page 441

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          THE WITNESS:  Yes.  Yes.                    10:11:13

 2   BY MR. SCHMIDT:

 3      Q   You mentioned that there was a long lead

 4   time for the redesigned ██████   What was the lead

 5   time?                                               10:11:28

 6      A   I don't recall.  It's available in

 7   documents, but I don't recall the time.

 8      Q   Was it a matter of months?

 9      A   It may have been on the order of a month,

10   but I don't remember.                               10:11:45

11      Q   And why would a lead time of a month be

12   problematic for Uber?

13          MR. KIM:  Objection.  Form.

14          THE WITNESS:  It wouldn't necessarily be a

15   problem for Uber.  I thought it might be a good     10:11:59

16   thing to get ahead of.

17   BY MR. SCHMIDT:

18      Q   What impact would losing a month of

19   development have on the overall Fuji program?

20          MR. KIM:  Objection.  Form.                  10:12:14

21          THE WITNESS:  About a month.

22   BY MR. SCHMIDT:

23      Q   What impact would it have for Uber's

24   overall product development plan?

25          MR. KIM:  Objection.  Form.                  10:12:33
```

Page 442

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1            THE WITNESS:  What product development          10:12:34

 2    plan do you refer to?

 3    BY MR. SCHMIDT:

 4        Q   The plan to use sensors for self-driving

 5    cars.                                                   10:12:46

 6            MR. KIM:  Objection.  Form.

 7            THE WITNESS:  Its impact on the

 8    development of a sensor would be about a month.  Its

 9    impact on the self-driving car, I can't answer.

10    BY MR. SCHMIDT:                                         10:13:00

11        Q   Are you aware of any testing programs or

12    initiatives that would be adversely affected by a

13    month schedule slip?

14            MR. KIM:  Objection.  Form.

15            THE WITNESS:  ████████████████████████          10:13:17

16    ████████████████████████████████████████

17    ████████████████████████    █████████████████████t

18    █████████████████████████████

19    ████████████████████

20        Q   Is it your understanding that time is of        10:13:29

21    the essence for Uber's development of the Fuji

22    sensor?

23            MR. KIM:  Objection.  Form.

24            THE WITNESS:  I don't know.

25    ///                                                     10:13:36
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          and is attached hereto.)                    16:37:01

 2   BY MR. SCHMIDT:

 3       Q   Sir, I've placed before you the next

 4   exhibit in order, Exhibit 580.

 5          Do you recognize this document?             16:37:23

 6       A   Yes.

 7       Q   What is this document?

 8       A   This is an e-mail chain that I started

 9   with Will Treichler to investigate what it would

10   take to make a certain set of design changes to the   16:37:40

11   Fuji LiDAR sensor.

12   (Question not answered per instruction of counsel):

13       Q   And why did you ask these questions of

14   Will at this time?

15          MR. KIM:  I'll just caution you not to      16:37:58

16   reveal any attorney-client privileged

17   communications.

18          THE WITNESS:  I don't think I can answer

19   that without referring to an attorney-client

20   privileged communication.                          16:38:13

21   BY MR. SCHMIDT:

22       Q   Can you characterize the design change

23   that you were asking Will to estimate the time

24   needed to accomplish?

25       A   Yes.  I was asking Will to evaluate the    16:38:30
```

Page 662

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    time to change two different design aspects.       16:38:35

2           The first was to modify the outline of the

3    PCB so that ██████████████████████████

4    ████████████████████████████████

5    ████████████████████████                          16:38:54

6           The second would be to make some arbitrary

7    unspecified change to ███████████████████████

8    ████████████████, as well as the ████████████

9    █████████████████████████

10   (Question not answered per instruction of counsel): 16:39:17

11        Q   And are you able to tell me what your

12   understanding is as to why this design change was

13   being made?

14          MR. KIM:  Objection.  Form.

15          And again, I caution you not to reveal any  16:39:37

16   attorney-client privileged communications.

17          THE WITNESS:  I cannot, without violating

18   attorney-client privileged conversation, reveal why.

19   But I do want to clarify that not necessarily all of

20   these changes were, in fact, being made.            16:39:55

21   BY MR. SCHMIDT:

22        Q   Which of these changes that are being

23   referenced in this document were not made?

24        A   Design Change No. 2 was not made.

25        Q   And was there a reason why Design Change   16:40:10
```

Page 663

1     No. 2 was not made?                                16:40:13

2           MR. KIM:  Same caution.

3           THE WITNESS:  I can simply say that I lack

4     a reason to make that change.

5     BY MR. SCHMIDT:                                     16:40:24

6           Q    What do you mean when you say you lack a

7     reason to make that change?

8           A    I have no reason to change ██████████████

9     ████████████████████████████████████████████████

10    ████████████████████████████.                      16:40:40

11    (Question not answered per instruction of counsel):

12          Q    Well, then why were you asking this

13    question?

14          MR. KIM:  Same caution.

15          THE WITNESS:  I can't answer that without      16:40:57

16    violating attorney-client privilege.

17    BY MR. SCHMIDT:

18          Q    How did the information that Will provided

19    you inform your decision as to whether or not to

20    make these changes?                                 16:41:11

21          A    I will say that the information Will

22    provided did not significantly inform my decision

23    whether or not to make these changes.

24          Q    And why is that?

25          A    Well, in the second aspect, if I had no    16:41:37

                                                          Page 664

```
 1    reason to make the change, the time it takes to make      16:41:39

 2    the change would have been irrelevant.

 3            In the case of first change, if I had in

 4    mind to already make the change, his estimation did

 5    not bear any change to that decision.                      16:41:53

 6        Q   Did you have in mind to already make this

 7    change at the time you were e-mailing Will on

 8    July 19, 2017?

 9        A   Yes.  Regarding the first change, I did.

10        Q   And you can't tell me why it was you were       16:42:08

11    making that change?

12        A   I cannot tell you why I was asking Will

13    for the duration, but I can talk to why I was

14    intending to make the first change.

15        Q   Why were you intending to make the first        16:42:25

16    change?

17        A   Earlier in my depositions for this case, I

18    had been asked about this █████████ so I was aware

19    that there was some point of contention about this

20    ████████                                                   16:42:38

21            I suspected that this █████████ was not

22    necessary.  I found out confirmation that this

23    change could be made, that the █████████ was not

24    necessary, and so I deemed it best to bring the

25    board ████████████████████████████████████████           16:42:59
```

Page 665

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    because there would be no negative impact and only          16:43:01

2    potential improvement.

3         Q    What improvement is there by bringing the

4    ███████████████████████████████?

5         A    It has the potential for ███████████          16:43:12

6    ████████████████████████████.

7         Q    Are there any disadvantages that you can

8    think of by bringing the ██████████████████

9    ██████████████████████.

10        A    As long as we can maintain the same          16:43:33

11   quality of boards that we receive and our placement,

12   I see no disadvantage.

13        Q    What about ████████████████████

14   █████████████████████████ in the

15   first place?  Does that remain an issue?          16:43:51

16        A    What I found out was that ███████████

17   ████████████████████████

18   ████████████████████████████████

19   ████████

20        Q    ██████████████████████████          16:44:16

21   █████████████████████████

22   ████████████ with that design approach?

23             MR. KIM:  Objection.  Form.

24             THE WITNESS:  I see ████████████████

25   ████████, provided we continue to receive laser          16:44:32

Page 666

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    boards to the quality that we've been receiving.         16:44:35

2          I suppose you could say there could be an

3    issue if somehow the quality of our laser printed

4    circuit boards were to degrade possibly through a

5    different vendor or some other change.                    16:44:47

6    BY MR. SCHMIDT:

7          Q   What's the ████████████ with respect

8    to the laser boards that you're receiving from your

9    vendor today?

10         A   I have a report on that.  I don't know if     16:45:01

11   it was produced, and I'm having trouble remembering.

12   It's ████████████████████████████████████████

13   ████████████████████████████████

14         Q   Okay.  So once you bring the ████████████

15   ████████ -- strike that.                                 16:45:16

16         Once you request a PCB board that's

17   intended to have its ████████████████████████████

18   ████████████, you would agree that ████████████████

19   ████████████████████████████████████████

20   ████████████████████████████████████████             16:45:34

21   correct?

22         MR. KIM:  Objection.  Form.

23         THE WITNESS:  Yes, that is my expectation,

24   that even -- let me make that more clear.

25         Any time we spec a design where ████             16:45:48

Page 667

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  ████████████████████████████████████  16:45:51

2  ████████████████████████████████████

3  ████████████████████████████

4       And in the case of this PCB, if my

5  recollection serves correctly, I think it might be   16:46:05

6  ████████████████████████████

7  BY MR. SCHMIDT:

8       Q   And what would the effect on performance

9  be if, ██████████████████████████████

10 ████████████████████████████████████  16:46:20

11 ███████████████████

12       MR. KIM:  Objection.  Form.

13       THE WITNESS:  I'm not aware or

14  anticipating any -- what did you say -- design or

15  performance degradation if the laser diode were to   16:46:34

16  ████████████████████████

17  BY MR. SCHMIDT:

18       Q   Have you implemented this change?

19       A   This change has begun implementation but

20  is still in process.  It's not complete.   16:46:54

21       Q   When will you know whether or not the

22  implementation of this change has resulted in a

23  degradation of performance with respect to those

24  diodes that ████████████████████████████████

25  ████████████████   16:47:11

Page 668

```
 1          A   I don't know when.  I would expect          16:47:14

 2    sometime perhaps later this month.  We might know as

 3    early as then.

 4          But again, I want to say that from the

 5    measurements we've taken, I do not anticipate a         16:47:27

 6    degradation or a problem from that.

 7          Q   But as an engineer, you know that you

 8    can't draw any conclusions regarding a potential

 9    degradation in performance until you actually test

10    the design as implemented, correct?                     16:47:42

11          MR. KIM:  Objection.  Form.

12          THE WITNESS:  I'm not -- no, I'm going to

13    disagree with that and suggest that the prior data

14    we took that informed ██████████ we were

15    achieving on this board should still be applicable       16:48:00

16    to ██████████ we should achieve on the new

17    boards.

18          Of course, we have to do an actual test

19    for gross errors and problems.  Perhaps it wasn't

20    implemented correctly.  But it's fair to have a high     16:48:13

21    level of confidence that there will not be a

22    problem.

23    BY MR. SCHMIDT:

24          Q   To be clear, I wasn't asking about the

25    ██████████   I was asking about the effect of a          16:48:24
```

Page 669

```
 1   diode ████████████████████████████████                16:48:29

 2          You understand the distinction that I'm

 3   making?

 4       A   I understand the distinction you're

 5   making.                                                16:48:43

 6          It's fair to say this should be tested to

 7   have complete certainty that it's not going to cause

 8   a degradation.  But if you account for ████

 9   ███████████████████████████████████████████

10   ███████████████████████████, it's pretty             16:49:01

11   unlikely that something else would be causing a

12   degradation.

13       Q   But it's something that you would want to

14   test before stating anything definitive under oath,

15   correct?                                               16:49:16

16          MR. KIM:  Objection.  Form.

17          THE WITNESS:  Yes.

18   BY MR. SCHMIDT:

19       Q   And just as the diodes may ████████████

20   █████████████████████████████████, you would          16:49:29

21   agree that it's possible that the diodes will

22   ████████████████████████████even after this change

23   is implemented, correct?

24       A   Correct.  And that's assuming I have the

25   ████████████number correct.  But whatever it         16:49:46
```

Page 670

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1           THE WITNESS:  When I did the breakdown, I        17:29:45

2   made the assumption that the necessary employee

3   would be available and not constrained by any other

4   projects.

5           I did my best to consider what job            17:29:58

6   functions could be done in parallel with each other

7   so that the calendar time would reflect a more

8   accurate representation of an organization that was

9   working efficiently, but that salary time took

10  employee time and continued to add them together.     17:30:21

11  BY MR. SCHMIDT:

12      Q    And I just want to make clear, and make

13  sure that you understand, that when I'm asking these

14  methodology questions, I'm not limiting it to one

15  particular feature.  So these questions should be     17:30:35

16  global across your entire analysis.

17          Do you understand?

18          MR. KIM:  Objection.  Form.

19          THE WITNESS:  I believe I understand.  I

20  took the same assumptions and method, to the best of  17:30:45

21  my ability, for all the analyses I did for the

22  various redesign considerations.

23  BY MR. SCHMIDT:

24      Q    When you were considering redesign, did

25  you assume that the engineers would know exactly      17:31:02

                                                Page 699

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    what they were required to do to accomplish the        17:31:07

 2    redesigned system?

 3              MR. KIM:  Objection.  Form.

 4              THE WITNESS:  I assumed the engineers

 5    would have enough direction to make a straight path    17:31:18

 6    design.

 7    BY MR. SCHMIDT:

 8         Q    You did --

 9         A    I did not include any potential -- what

10    shall we say -- research and development or            17:31:31

11    investigation.

12         Q    And you also did not include any trial and

13    error time?

14              MR. KIM:  Objection.  Form.

15              THE WITNESS:  I believe I did not include    17:31:46

16    multiple iterations in the design time, to my

17    recollection.

18    BY MR. SCHMIDT:

19         Q    And when you were considering hardware

20    costs, did you consider the cost associated with any   17:31:57

21    new tooling that would be required as applicable on

22    a feature-by-feature basis?

23              MR. KIM:  Objection.  Form.

24              THE WITNESS:  Yes, I recall specifically

25    for ████████ analysis, I included a price quotation    17:32:18
```

Page 700

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   for new tooling to ███████████████.                17:32:23

2   BY MR. SCHMIDT:

3       Q    When you took into account hardware costs,

4   did you take into -- strike that.

5            When you accounted for hardware costs, did    17:32:38

6   you do so on a unit-by-unit basis?

7       A    I don't understand the question.

8       Q    When you estimated hardware costs, did you

9   assume a single cost for retrofitting every sensor

10  that Uber has previously built, or were you just      17:32:55

11  providing the hardware costs for a single unit?

12      A    I understand.

13           When I did the analysis for the various

14  redesign projects, I considered the hardware cost

15  for changing at least ten LiDAR sensors, which would  17:33:15

16  cover all current prototype requirements.

17      Q    And that hardware cost factor was applied

18  for every design feature that you considered to be

19  changed?

20      A    Yes, except in the case of an ███████  I     17:33:41

21  believe I may have considered a higher volume that

22  would be consistent with a minimum order quantity

23  for ████████████.

24           And the analysis of the hardware cost to

25  retrofit ten systems, again, did not consider         17:34:00

                                              Page 701

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1    multiple design iterations.                          17:34:05

2         Q    For each of these changes to features that

3    you considered, did you consider the time and

4    hardware costs associated with correcting other

5    features to account for performance degradations?    17:34:34

6              MR. KIM:  Objection.  Form.

7              THE WITNESS:  I don't know what other

8    performance degradations you would refer to, so I

9    don't know that I did any such analysis.

10   BY MR. SCHMIDT:                                       17:34:50

11        Q    For example, we discussed a degradation to

12   performance that would result from changing the

13   ███████████████████████████████████████████

14   ████████████

15             Do you recall that?                         17:35:07

16        A    Yes.

17        Q    And when you provided the number of days

18   and hardware costs associated with that change, did

19   you include in your analysis the cost of addressing

20   those performance degradations?                       17:35:29

21        A    No.  Specifically with that design change,

22   I made the assumption in my analysis that the group

23   collimation lens for each optical cavity would

24   continue to function adequately, or in other words,

25   that the degradation would have been acceptable.      17:35:51
```

Page 702

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Q   But you agree that for that design change        17:35:54

2    specifically, there would be a degradation, correct?

3      A   I agree there would be a degradation, but

4    it's entirely unclear to me whether the degradation

5    would be acceptable or not.                            17:36:04

6      Q   And that degradation -- strike that.

7          The cost or potential cost of that

8    degradation is not reflected in the information you

9    provided as part of this analysis, correct?

10     A   To be clear, the cost of correcting such a       17:36:23

11   degradation was not accounted for in my cost

12   analysis of the hardware change for that design

13   feature.

14     Q   And also, you made no effort to capture a

15   performance loss in terms of time or money, correct?  17:36:42

16     A   Correct.  Likewise, when I did the

17   calendar time or salary time estimates for that

18   design change, I did not consider the schedule

19   changes based on accommodating or correcting for

20   such a degradation in performance.                    17:37:05

21     Q   With respect to the changes you considered

22   in regards to ████████████████████████████████

23   ████████████████████████████████████████████

24   ███████████████████████ -- well, strike that.

25         You did provide information regarding a         17:37:30

                                                    Page 703

1    design-around relating to ████████████████        17:37:35

2    █████████████████████████████████████████

3    ████████████████████████████ correct?

4         A    Correct.

5         Q    And when you did that analysis, did you        17:37:47

6    consider any potential performance degradations in

7    the system as a result of the design-around?

8         A    No.

9         Q    Do you believe that this potential

10   design-around would result in performance        17:38:03

11   degradation?

12        A    I don't believe it will.  And I would

13   suggest if it did, my course of action would not be

14   to make a design change to accommodate it but to

15   make a design iteration to drive out that        17:38:18

16   performance degradation to an acceptable degree.

17        Q    What are you basing your testimony that

18   you do not believe that this design-around -- strike

19   that.

20             What is the basis for you testifying that        17:38:33

21   this design-around would not result in a performance

22   degradation?

23        A    My basis for this is knowing that our

24   study of the current laser boards, as it regarded

25   our earlier discussion of ████████████████        17:38:52

                                                  Page 704

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



```
 1  ████████████████████████████████      ███████████
 2  ████████████████████████████████████
 3  ███████████████████  I don't recall the exact value.
 4              But given that I could expect ████████
 5  ████████████████████████████████            17:39:11
 6  ████████████████████████
 7  ██████████████████████████████████
 8  ███████████████████████████████
 9  ████████████████████████
10  ████████████████████████████████            17:39:31
11  ████████████████████████████████
12  ██████████████████████████████
13  ███████████████████
14       ████████████████████████████
15  ████████████████████████████████████        17:39:54
16  █████████████████████████████████
17  ████████████████████████████████████
18  ████████████████████████████████████
19  ████████████████
20       Q  █████████████████████████████        17:40:11
21  ███████████████████████████████
22       ████████████████████████████████
23  ████████████████████████████████
24  ██████████  that would result from this design-around?
25          MR. KIM:  Objection.  Form.          17:40:37

                                              Page 705
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1            THE WITNESS:  No.  Gaetan and I, I think,      17:40:45

2    both agree that it's somewhere beginning from a

3    ███████████████████████████, simply based on

4    the sizes of the features.

5            But, in fact, ██████████████████         17:41:01

6    ███████████████.  I don't know whether Gaetan

7    did any more detailed analysis to find out what the

8    actual requirement would be.

9            And yet sitting here today, as an

10   engineer, I would be comfortable recommending a     17:41:19

11   change given the wide difference between a starting

12   point of ████████████████████████████████

13   ████████████

14   BY MR. SCHMIDT:

15       Q   But to be clear, you haven't done any     17:41:32

16   analysis to prove out ████████████████,

17   correct?

18       A   I haven't, and I'm not aware whether

19   Gaetan has.

20       Q   In regards to designing around the     17:41:55

21   ████████████████████ did you do an analysis

22   regarding the time and schedule required to revert

23   to the ████████████████ developed by Scott

24   Boehmke for the customized Velodyne dual-stack LiDAR

25   sensor?                                             17:42:13
```

Page 706