# EXHIBIT 57

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1            UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3              SAN FRANCISCO DIVISION
 4
 5   WAYMO LLC,
 6           Plaintiff,
 7
         vs.                        No. 3:17-CV-00939-WHA
 8
 9   UBER TECHNOLOGIES, INC.;
10   OTTOMOTTO LLC; OTTO TRUCKING,
11   INC.,
12           Defendants.
13   _____
14
15      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
16       VIDEO-RECORDED DEPOSITION OF CHRIS URMSON
17                 Palo Alto, California
18                  August 24, 2017
19
20   Reported by:
21   KENNETH T. BRILL
22   CSR NO. 12797
23   Job No. 2678939-A
24
25   PAGES 1 - 278
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1   understanding.                                          10:06:24
2   BY MR. HUME:                                            10:06:25
3        Q.   So a person -- does that mean a person        10:06:26
4   could ███████████████████████████████████████           ████████
    ███████████████████████████████████████                 ████████
    ███████████████████████████████████████                 ████████
    ██████████████████████                                  10:06:40
8            MR. NEUKOM:  Objection to form.                10:06:41
9            THE WITNESS:  No.  In signing this             10:06:43
10  agreement, they were foregoing the conventional         10:06:44
11  Google compensation program.                            10:06:47
12  BY MR. HUME:                                            10:06:53
13       Q.   Did -- other than in determining the value    10:06:54
14  of Chauffeur, ████████████████████████████████          ████████
    ████████████████████████████████████████                ████████
    ████████████████████████████████████████                ████████
    ████████████████████?                                   10:07:09
18           MR. NEUKOM:  Objection to form.                10:07:12
19           THE WITNESS:  ██████████████████████           ████████
    ████████████████████████████████████████                ████████
    ████████████████████████████████████████                ████████
    ████████████████████████████████████████                ████████
    ████████████████████████████████████████                ████████
    ████████████████████████████████████████                ████████
    ███████████████████████████                             10:07:37
```

Page 87

```
 1   BY MR. HUME:                                                10:07:39
 2       Q.   I see.  So for any given year, an employee         10:07:40
 3   gets evaluated, and they were -- normally a Google          10:07:42
 4   employee would get a Google performance bonus of            10:07:47
 5   either cash or Google stock, is that correct?               10:07:49
 6       A.   In many cases both cash and Google stock.          10:07:51
 7   They were two separate evaluation points                    10:07:53
 8   historically.                                               10:07:56
 9       Q.   Okay.  But if you were participating in            10:07:57
10   the Chauffeur bonus program, then that same                 10:07:59
11   evaluation would take place, the same determination         10:08:03
12   of your performance bonus, what it would have been          10:08:05
13   takes place, both cash and Google stock, ████████           ████████
     ███████████████████████████████████████████                 ████████
     ███████████████████████████████████████████                 ████████
     ██████████                                                  10:08:19
17       A.   Yes.                                               10:08:25
18       Q.   And so can you -- do you recall what your          10:08:26
19   personal allocation percentage was at the end of            10:08:28
20   2015?                                                       10:08:31
21       A.   No.                                                10:08:33
22       Q.   Do you recall what Anthony Levandowski's           10:08:34
23   was?                                                        10:08:35
24       A.   Yeah -- no.                                        10:08:37
25       Q.   In terms of ████████████████████                   10:08:41
```

Page 88

```
1    ███████████████████████████████████   ████
     ███████████████████████████████████   ████
     ████████████████████ is that correct?  10:08:50
4        A.   That is correct.              10:08:52
5        Q.   And what did you do to ██████  10:08:53
6        A.   ████████████████████████████   ████
```



Page 90

| | | |
|---|---|---|
| 1 | page, which is describing -- answering the question, | 10:21:50 |
| 2 | overall how has Anthony Levandowski performed in his | 10:21:58 |
| 3 | role since last review? | 10:22:03 |
| 4 | And you wrote, "██████████████████ | ██████ |
|  | ██████████████████████████ █ | ██████ |
|  | ████████████████████████ ████ | ██████ |
|  | ██████████████████████████ | ██████ |
|  | ████████████ ████████████████ | ██████ |
|  | ████████████████████████ | ██████ |
| █ | ██████████████ | 10:22:22 |
| 11 | Do you see that? | 10:22:24 |
| 12 | A.  I do see that. | 10:22:24 |
| 13 | Q.  I think if you compare that, and feel free | 10:22:26 |
| 14 | to do so with the prior two reports for the previous | 10:22:28 |
| 15 | two years, it's significantly more negative. | 10:22:30 |
| 16 | And the question I have for you is what | 10:22:33 |
| 17 | happened in the 2013 to '14 time frame that caused | 10:22:37 |
| 18 | Anthony to start getting negative reviews? | 10:22:45 |
| 19 | MR. SINGER:  Objection, form. | 10:22:49 |
| 20 | THE WITNESS:  I don't recall specifically. | 10:22:52 |
| 21 | BY MR. HUME: | 10:22:54 |
| 22 | Q.  Well, is it possible that this coincided | 10:22:55 |
| 23 | with it becoming more clear to him that you were in | 10:22:58 |
| 24 | charge of the project and he wasn't, and he | 10:23:01 |
| 25 | therefore became less enthusiastic? | 10:23:04 |

| | | |
|---|---|---|
| 1 | MR. NEUKOM: Objection to form. | 10:23:08 |
| 2 | THE WITNESS: That seems like a plausible | 10:23:11 |
| 3 | explanation. | 10:23:14 |
| 4 | BY MR. HUME: | 10:23:14 |
| 5 | Q. What's your recollection of what happened | 10:23:15 |
| 6 | with his performance? | 10:23:16 |
| 7 | A. So the timeline is somewhat unclear to me, | 10:23:22 |
| 8 | but there was a period after it became clear that I | 10:23:24 |
| 9 | was leading Chauffeur and he was not where I worked | 10:23:27 |
| 10 | very hard to kind of mend bridges and bring him, you | 10:23:29 |
| 11 | know, into the fold, so to speak. | 10:23:33 |
| 12 | Over time my patience with his | 10:23:39 |
| 13 | manipulations and lack of enthusiasm and commitment | 10:23:42 |
| 14 | to the project, it became clearer and clearer that | 10:23:45 |
| 15 | this was a lost cause. And so I think what you're | 10:23:49 |
| 16 | seeing is some of that turn in my sentiment towards | 10:23:52 |
| 17 | him. | 10:23:56 |
| 18 | Q. If you go back to this most recent one, | 10:23:57 |
| 19 | Exhibit 1999, and that last page, you say in the | 10:24:00 |
| 20 | last sentence, "Anthony is a starter." | 10:24:05 |
| 21 | What do you -- what did you mean by that? | 10:24:09 |
| 22 | A. I don't know specifically what I | 10:24:13 |
| 23 | referred -- what I mean by that. | 10:24:14 |
| 24 | Q. Did you -- did you have the view that | 10:24:17 |
| 25 | Anthony was better suited to early-stage development | 10:24:21 |

```
 1   work than to the refining and perfectioning --           10:24:26
 2   perfecting work that you were trying to get into?        10:24:29
 3       A.   Yes, I do have that opinion.                    10:24:33
 4       Q.   Anthony doesn't know how to use the             10:24:38
 5   software for electrical design; correct?                 10:24:40
 6           MR. SINGER:  Objection, form.                    10:24:44
 7           THE WITNESS:  I don't know that for a            10:24:45
 8   fact, but I believe it, yes.                             10:24:46
 9   BY MR. HUME:                                             10:24:48
10       Q.   And Anthony is not a computer software          10:24:48
11   coder; correct?                                          10:24:51
12       A.   No, I don't believe he is.                      10:24:54
13       Q.   So what is it that Anthony can do?              10:24:56
14       A.   He's a smart guy, and he has the ability        10:25:01
15   to pull together interesting ideas and form theses,      10:25:04
16   and he has a gift for motivating people over short       10:25:16
17   periods of time, and he has a gift for telling           10:25:20
18   people what they want to hear that enables him to be     10:25:23
19   an exceptional salesman and showman.                     10:25:26
20       Q.   Let me refer you to the middle document,        10:25:32
21   Exhibit 1998.  Towards the bottom, or at the bottom      10:25:34
22   of that page, in response to the question, what's        10:25:44
23   one thing you do really well that you plan to            10:25:47
24   continue doing -- this is about Anthony -- your          10:25:49
25   answer is, ████████████████████████████                  10:25:53
```

Page 102

| | | |
|---|---|---|
| 1 | project since the founding, and that we should make | 11:01:27 |
| 2 | sure to provide him a generous exit despite my | 11:01:31 |
| 3 | personal differences with him. | 11:01:35 |
| 4 | Q.  So at this time, is it fair to say that | 11:01:37 |
| 5 | you didn't have an expectation that by October 2015, | 11:01:39 |
| 6 | the date of the first valuation event for the first | 11:01:43 |
| 7 | bonus tranche and the Chauffeur plan, that the value | 11:01:47 |
| 8 | of the Chauffeur business would be so high that it | 11:01:51 |
| 9 | would lead to bonuses significantly larger than what | 11:01:54 |
| 10 | was contemplated here? | 11:01:58 |
| 11 | MR. NEUKOM:  Objection to form. | 11:02:00 |
| 12 | THE WITNESS:  I think that's fair. | 11:02:02 |
| 13 | BY MR. HUME: | 11:02:05 |
| 14 | Q.  So for example, when you got your bonus of | 11:02:06 |
| 15 | approximately ████████) for the first installment | 11:02:10 |
| 16 | of your Chauffeur plan, was that much higher than | 11:02:13 |
| 17 | you had been expecting prior to the latter half of | 11:02:16 |
| 18 | 2015? | 11:02:21 |
| 19 | A.  Yes.  Yeah, I -- I can't remember exactly | 11:02:26 |
| 20 | when we started to really think hard about the | 11:02:29 |
| 21 | valuation process, but around the time frame of | 11:02:33 |
| 22 | this, we did not anticipate a valuation as large as | 11:02:36 |
| 23 | the one we achieved. | 11:02:42 |
| 24 | Q.  Given the difficulties that were in your | 11:02:48 |
| 25 | relationship with Anthony and his performance | 11:02:51 |

Page 131

| | | |
|---|---|---|
| 1 | incentive program -- improvement program, excuse me, | 11:02:54 |
| 2 | did you have an understanding that Anthony was | 11:02:59 |
| 3 | concerned about whether he would get his full bonus | 11:03:04 |
| 4 | under the Chauffeur bonus program? | 11:03:07 |
| 5 |       MR. NEUKOM:  Objection to form. | 11:03:10 |
| 6 |       THE WITNESS:  At what time? | 11:03:13 |
| 7 | BY MR. HUME: | 11:03:14 |
| 8 |    Q.   2015.  So during -- let me rephrase the | 11:03:15 |
| 9 | question. | 11:03:18 |
| 10 |       During 2015 and through to the time that | 11:03:18 |
| 11 | he left on January 27, 2016, did you have an | 11:03:22 |
| 12 | understanding that Anthony Levandowski was concerned | 11:03:26 |
| 13 | that he wouldn't get paid his full bonus under the | 11:03:30 |
| 14 | Chauffeur bonus program? | 11:03:33 |
| 15 |    A.   He never expressed that to me. | 11:03:35 |
| 16 |    Q.   Did anyone else ever express that to you? | 11:03:37 |
| 17 |       MR. SINGER:  Object to form. | 11:03:40 |
| 18 | BY MR. HUME: | 11:03:41 |
| 19 |    Q.   Did anyone else ever express to you that | 11:03:41 |
| 20 | Mr. Levandowski was concerned about his bonus? | 11:03:43 |
| 21 |    A.   No. | 11:03:46 |
| 22 |    Q.   Did anyone else ever express to you that | 11:03:47 |
| 23 | they were concerned about whether they would receive | 11:03:49 |
| 24 | the full bonus under the Chauffeur program? | 11:03:52 |
| 25 |    A.   The only real concern that I heard was | 11:03:56 |

Page 132

```
 1   whether we would be able to ███████████████             11:03:59
 2          I think that given the amount of money           11:04:04
 3   involved, I think there was the same level of           11:04:07
 4   concern someone would have if, you know, they order     11:04:12
 5   something expensive from Amazon, and will it be         11:04:15
 6   there when I get home when I expect it, but not a       11:04:18
 7   particular concern that Google would renege on the      11:04:21
 8   contract that was in place.                             11:04:24
 9       Q.  Did you have other concerns about the           11:04:28
10   Chauffeur prog- -- bonus program ████████████
     ██████████████████████████████████████
     ████████████████████████████████████?                   11:04:36
13       A.  I did, yes.                                     11:04:39
14           MR. NEUKOM:  Objection to form.                 11:04:40
15   BY MR. HUME:                                            11:04:41
16       Q.  Can you explain what those were?                11:04:42
17       A.  ████████████████████████████
     ███████████████████████████████████
     ████████████████████████ ██████████
     ███████████████████████
     ███████████████████████████████
     ██████████████████████████████
     ████████████████████████████████
     ██████████████████████████████
     ████████████████████████████████
```

Page 133



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | ██████████████████████████████ ███████ | |
| 2 | ██████████████████████ | 11:06:20 |
| 3 | BY MR. HUME: | 11:06:24 |
| 4 | Q.  Who was the ultimate decision-maker on | 11:06:25 |
| 5 | that? | 11:06:27 |
| 6 | MR. SINGER:  Object to form. | 11:06:28 |
| 7 | THE WITNESS:  I don't know. | 11:06:29 |
| 8 | BY MR. HUME: | 11:06:29 |
| 9 | Q.  Okay.  I'd like to show you Exhibit 2016. | 11:06:33 |
| 10 | - - - | 11:06:36 |
| 11 | (Whereupon the document was marked, | 11:06:36 |
| 12 | for identification purposes, as  Urmson | 11:06:36 |
| 13 | Exhibit 2016.) | 11:06:36 |
| 14 | - - - | 11:06:37 |
| 15 | THE WITNESS:  Thank you. | 11:06:47 |
| 16 | I get straight to it, don't I? | 11:06:55 |
| 17 | BY MR. HUME: | 11:06:59 |
| 18 | Q.  Exhibit 2016 -- where is my copy? -- is | 11:07:00 |
| 19 | an -- is an e-mail dated August 4th, 2015, that | 11:07:07 |
| 20 | you sent, and the first sentence of which says, "We | 11:07:10 |
| 21 | need to fire Anthony Levandowski." | 11:07:13 |
| 22 | Do you see that? | 11:07:15 |
| 23 | A.  I do. | 11:07:16 |
| 24 | Q.  You go on to say -- and you're sending | 11:07:20 |
| 25 | this to Chelsea Bailey and Stacy Sullivan. | 11:07:22 |

Page 135

| | | |
|---|---|---|
| 1 | You go on to say, "I have just heard today | 11:07:25 |
| 2 | from two different sources that Anthony is | 11:07:28 |
| 3 | approaching members of their team attempting to set | 11:07:31 |
| 4 | up a package deal of people that he could sell en | 11:07:33 |
| 5 | masse to Uber." | 11:07:36 |
| 6 | Do you see that? | 11:07:38 |
| 7 | A.   Yes, I do. | 11:07:40 |
| 8 | Q.   By all means take a moment to read the | 11:07:41 |
| 9 | whole e-mail, and then I'll ask you a few questions | 11:07:43 |
| 10 | about it. | 11:07:46 |
| 11 | A.   Thank you. | 11:07:46 |
| 12 | Okay. | 11:08:37 |
| 13 | Q.   Mr. Urmson, you may have testified to this | 11:08:48 |
| 14 | earlier because you did talk about Mr. Levandowski, | 11:08:50 |
| 15 | rumors of him potentially trying to negotiate a deal | 11:08:53 |
| 16 | that would take members of the team away. | 11:08:56 |
| 17 | Is this -- is this what you were referring | 11:08:58 |
| 18 | to when you made that testimony earlier? | 11:09:00 |
| 19 | A.   Yes. | 11:09:03 |
| 20 | Q.   And does seeing this e-mail refresh your | 11:09:06 |
| 21 | recollection in any way of who the two different | 11:09:10 |
| 22 | sources were who told you that Anthony was doing | 11:09:12 |
| 23 | this? | 11:09:15 |
| 24 | A.   No, it does not. | 11:09:15 |
| 25 | Q.   And so is it your recollection that you | 11:09:28 |

Page 136

| | | |
|---|---|---|
| 1 | never learned much more about this than what's in | 11:09:32 |
| 2 | this e-mail? | 11:09:35 |
| 3 |     MR. SINGER:  Object to form. | 11:09:37 |
| 4 |     THE WITNESS:  So at this time, I don't | 11:09:43 |
| 5 | remember learning much more about this, no. | 11:09:44 |
| 6 | BY MR. HUME: | 11:09:48 |
| 7 |     Q.  Well, I'd like to know everything you've | 11:09:48 |
| 8 | learned about this subject of Mr. Levandowski | 11:09:51 |
| 9 | approaching members of the team attempting to set up | 11:09:53 |
| 10 | a package deal that he could sell to Uber.  What | 11:09:59 |
| 11 | else do you know about that? | 11:10:02 |
| 12 |     MR. SINGER:  Object to form. | 11:10:04 |
| 13 |     MR. PFEFFER:  I'll object on privilege | 11:10:05 |
| 14 | grounds.  Mr. Urmson, I don't know what your | 11:10:06 |
| 15 | participation was or wasn't, but to the extent that | 11:10:10 |
| 16 | you have responsive information which is based on or | 11:10:12 |
| 17 | reflects communications that you had with Google's | 11:10:14 |
| 18 | attorneys, in-house counsel or outside counsel, I | 11:10:17 |
| 19 | would instruct you not to provide any testimony that | 11:10:20 |
| 20 | reflects or discloses or is based on those | 11:10:22 |
| 21 | attorney-client privileged communications. | 11:10:26 |
| 22 | Otherwise, you should answer to the best of your | 11:10:27 |
| 23 | ability. | 11:10:30 |
| 24 |     THE WITNESS:  Is the HR team part of the | 11:10:31 |
| 25 | internal legal counsel? | 11:10:33 |

Veritext Legal Solutions
866 299-5127

```
 1                CERTIFICATE OF REPORTER
 2
 3          I, the undersigned, a Certified Shorthand
 4   Reporter of the State of California, do hereby
     certify:
 5          That the foregoing proceedings were taken
 6   before me at the time and place herein set forth;
     that any witnesses in the foregoing proceedings,
 7   prior to testifying, were administered an oath; that
 8   a record of the proceedings was made by me using
     machine shorthand which was thereafter transcribed
 9   under my direction; that the foregoing transcript is
10   a true record of the testimony given.
            Further, that if the foregoing pertains to the
11   original transcript of a deposition in a Federal
     Case, before completion of the proceedings, review
12   of the transcript [ ] was [ ] was not requested.
            I further certify I am neither financially
13   interested in the action nor a relative or employee
14   of any attorney or any party to this action.
15          IN WITNESS WHEREOF, I have this date
16   subscribed my name.
17
18          Dated: Augsut 25, 2017
19
20
21
22
23          _____
24              KENNETH T. BRILL
25              CSR No. 12797
```

Page 278