# EXHIBIT 51

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5    WAYMO LLC

6         Plaintiff,

7              vs.          Case No. 17-cv-00939-WHA

8    UBER TECHNOLOGIES,INC.;

     OTTOMOTTO, LLC; OTTO

9    TRUCKING LLC,

10        Defendants.

     _____

11

12

13

14

15      *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

16         VIDEO DEPOSITION OF DANIEL GRUVER

17           San Francisco, California

18             Friday, August 4, 2017

19                 Volume II

20

21

22   REPORTED BY:

23   REBECCA L. ROMANO, RPR, CSR No. 12546

24   JOB NO. 2671821

25   PAGES 74 - 415

                                        Page 74

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4
 5   WAYMO LLC
 6        Plaintiffs,
 7            vs.           Case No. 17-cv-00939-WHA
 8   UBER TECHNOLOGIES,INC.;
     OTTOMOTTO, LLC; OTTO
 9   TRUCKING LLC,
10        Defendants.
     _____
11
12
13
14
15
16
17            VIDEO DEPOSITION OF DANIEL GRUVER, taken
18   on behalf of the Plaintiffs, at Quinn Emanuel
19   Urquhart & Sullivan, LLP, 50 California Street,
20   22nd Floor, San Francisco, California, commencing
21   at 9:12 Friday, August 4, 2017 before
22   Rebecca L. Romano, Certified Shorthand
23   Reporter No. 12546
24
25
```

Page 75

1    January of 2016.                                    12:18

2         Q.   Early or late January?

3         A.   Probably late, because I -- I think late.

4    I forgot.

5         Q.   Do you remember if you left Google before    12:18

6    or after Mr. Levandowski?

7         A.   I left before him.

8         Q.   Okay.  And I think this was covered in

9    your last, but why did you decide to leave Google?

10        A.   Combination of reasons related to            12:18

11   projects structure, commute, work-life balance, and

23        A.   I don't know if I'd describe it that way,

24   but I was -- I --

25        Q.   That was generally the result of you        12:19

Page 207

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

```
 1    leaving, though, right?                              12:19

 2         A.   That -- correct.

 3         Q.   Okay.  Did you discuss the valuation of

 4    Chauffeur as part of the Chauffeur bonus plan with

 5    Anthony Levandowski?                                 12:19

 6         A.   At any specific time?

 7         Q.   At all.

 8         A.   Probably.

 9         Q.   What did you and Mr. Levandowski discuss

10    about the Chauffeur bonus plan?                      12:20

11         A.   I don't recall specifically.

12         Q.   Can you -- sitting here today, can you

13    tell me anything that you and Anthony Levandowski

14    discussed regarding the Chauffeur bonus plan?

15         A.   No.                                        12:20

16         Q.   Okay.  Sitting here today, did

17    Mr. Levandowski ever tell you that he was concerned

18    he was not going to get his bonus?

19         A.   He expressed concern, after we both left

20    Google, about the delivery of what I'd call the      12:20

21    ██████████████████ ) bonus.

22         Q.   When did he express this concern?

23         A.   Around the time that -- because I left

24    Google before him, and the supposed process was

25    that ███████████████████ ) of our bonus would be     12:21
```

                                            Page 208

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

1    paid post-six months of the end date of employment          12:21

2    at Google; that he was interested in when or if I

3    had -- when and how I had received my second

4    payment.

5            It seemed to me, though, I -- that he was          12:21

6    concerned or uncertain as I was that it -- there

7    was no communication about how this would happen or

8    what the terms were, and so potential uncertainty

9    in that happening or what the process would be.

10       Q.   You mentioned that the process was that          12:21

11   six months from when you had left, you would get

12   your second payment for the Chauffeur bonus plan,

13   right?

14       A.   Yes.  That was the understanding.

15       Q.   In six months after you left, did you get          12:21

16   the second bonus payment?

17       A.   It was longer than six months by some

18   number of weeks.

19       Q.   Did you get the second bonus payment?

20       A.   Yes, I did.                                        12:22

21       Q.   Did you ask them when you would get

22   the -- when you would get the -- the second bonus?

23       A.   I don't recall what my specific

24   communications were after I left.

25       Q.   Okay.  Now, so we have been talking the          12:22

Veritext Legal Solutions
866 299-5127

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*



```
 1    bonus plan --                                            12:22

 2         A.    Uh-huh.

 3         Q.    -- so you are familiar with the Chauffeur

 4    bonus plan then, right?

 5         A.    Yes, I am.                                     12:22

 6         Q.    Okay.   I just want to go over some of the

 7    basics.

 8               There was this idea of ███████████████

 9    in Project Chauffeur, right?

10         A.    Yes.                                           12:22

11         Q.    And there would be a valuation of Project

12    Chauffeur as if it were a company, right?

13         A.    Yes.

14         Q.    And then the bonuses would be tied to

15    some percentage of that valuation; is that fair?        12:22

16         A.    Correct.
```



12:24

Page 211

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

████████████████████████████████████  ██████

████████████████████████████████████

████████

4        Q.    Okay.   And how did you express to Google

5    your -- your performance for purposes of -- of         12:25

6    input into this plan?

7        A.    There's a process that I believe is

8    referred to as "perf," for performance, I think.

9    And so you would write personal evaluations and

10   solicit evaluations from peers.                          12:25

11       Q.    As part of this process, would you --

12   would you talk to anyone outside of Google?

13       A.    About?

14       Q.    Your performance.

15       A.    In order to have your performance            12:25

16   evaluated?

17       Q.    Right.

18       A.    I believe the performance evaluation was

19   specifically determined by employees of Google.

20       Q.    Okay.   Now, going back to your              12:25

21   discussions with Mr. Levandowski, the discussions

22   you had with him where he was expressing concern,

23   that was after he had left and you had left as

24   well?

25       A.    Correct.                                      12:26

                                                    Page 212

1      Q.   Tell me everything you remember about          12:26

2   these discussions with Mr. Levandowski.

3      A.   I don't remember the origin of the

4   conversation, but it was in line with him asking me

5   if I had received the second distribution, and me     12:26

6   saying that I hadn't.

7           And I believe maybe, you know, after

8   the -- it was like after the six-month date past

9   the end of my employment with Google if --

10  discussing once at least if I had received my         12:26

11  second payment.

12          And then at some point after I had, I had

13  confirmed to him that I had received the second

14  payment.

15     Q.   Have you ever discussed with                   12:27

16  Mr. Levandowski anything else related to the

17  Chauffeur bonus plan?

18     A.   Not that I recall.

████   ████ ██████████████████████████

████  ████████████████████████████████████        ████████

████  ████████████████████████████████████████

████  ██████████

████  ████ ██████

████  ████ ████████████████████████████████████

████  ████████████████████████████████████        12:27

Page 213



12:29

Page 214

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*



06:40

Page 406



06:41

Page 407

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*



06:43

Page 408

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

10      Q.    (By Mr. Muino)  But you're aware that in      06:43

11   this case Waymo alleges that Mr. Levandowski

12   downloaded and stole certain files from Waymo?

13      A.    I'm aware of the allegations.

14          MR. JAFFE:  Objection.  Leading.

15      Q.    (By Mr. Muino)  At any point after the      06:44

16   lawsuit was filed, do you recall a -- a meeting of

17   Uber employees on the subject of the litigation?

18      A.    Yes.

19      Q.    What was the first meeting that you

20   recall of that kind?                                  06:44

21      A.    There was a meeting attended by Anthony,

22   Travis and I believe Angela, the head counsel for

23   Uber, discussing what we could expect next

24   potentially and Uber's stance on it.

25          And there was discussion of our LiDAR        06:44

Page 409

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

```
 1    systems to date that we had developed and kind of        06:44

 2    present them to ATG as sort of a -- a -- a kind of

 3    presentation of what we had done and showing the

 4    expansive of work it had taken us to get to the

 5    progress we made to that point.                          06:44

 6         Q.   At that meeting did Mr. Levandowski

 7    address the allegations that he had taken files?

 8              MR. JAFFE:  Object to form.  And leading.

 9              THE DEPONENT:  I don't recall

10    specifically what he said about -- about addressing      06:45

11    the files or -- about them.

12         Q.   (By Mr. Muino) Okay.  Apart from that

13    meeting, were there any other meetings that you

14    recall at which Mr. Levandowski addressed the

15    subject of the litigation?                               06:45

16         A.   I don't recall specific meetings or

17    subjects of them.

18              MR. MUINO:  Okay.  No further questions.

19              THE VIDEOGRAPHER:  Going off the record.

20    The time is 6:45.                                        06:45

21              (Recess taken.)

22              THE VIDEOGRAPHER:  We are back on the

23    record.  The time is 6:59.

24              MR. MUINO:  Before you start, Counsel, I

25    just want to mark the record highly confidential,       06:59
```

Page 410

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

1    I, Rebecca L. Romano, a Certified Shorthand

2  Reporter of the State of California, do hereby

3  certify:

4    That the foregoing proceedings were taken

5  before me at the time and place herein set forth;

6  that any witnesses in the foregoing proceedings,

7  prior to testifying, were administered an oath;

8  that a record of the proceedings was made by me

9  using machine shorthand which was thereafter

10  transcribed under my direction; that the foregoing

11  transcript is true record of the testimony given.

12    Further, that if the foregoing pertains to the

13  original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript [ ] was [X] was not requested.

16    I further certify I am neither financially

17  interested in the action nor a relative or employee

18  of any attorney or any party to this action.

19    IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21

22  Dated:  August 5, 2017

23

24

     Rebecca L. Romano, RPR,

25    CSR. No 12546

                                        Page 415