Pages 1 - 67

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE

| | | |
|---|---|---|
| WAYMO, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. C 17-00939 WHA |
| | ) | |
| UBER TECHNOLOGIES, INC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | San Francisco, California |
| | | Thursday, September 14, 2017 |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:

           QUINN, EMANUEL, URQUHART & SULLIVAN LLP
           50 California Street
           22nd Floor
           San Francisco, California  94111
    BY:  JAMES D. JUDAH, ESQ.
           DAVID A. PERLSON, ESQ.

For Defendants:

           MORRISON & FOERSTER, LLP
           425 Market Street
           San Francisco, California  94105
    BY:  ARTURO J. GONZÁLEZ, ESQ.

Reported By:  BELLE BALL, CSR 8785, CRR, RDR
           Official Reporter, U.S. District Court

(Appearances continued, next page)

APPEARANCES, CONTINUED:

For Defendant Uber:
                         BOIES SCHILLER FLEXNER, LLP
                         435 Tasso Street
                         Suite 205
                         Palo Alto, California  94301
                  BY:  KATHLEEN R. HARTNETT, ESQ.


For Defendant Otto Trucking, LLC:
                         GOODWIN PROCTER, LLC
                         Three Embarcadero Center
                         San Francisco, California  94111
                  BY:  BRETT SCHUMAN, ESQ.


For Non-Party Colin Sebern:
                         FARMER BROWNSTEIN JAEGER, LLP
                         235 Montgomery Street
                         Suite 835
                         San Francisco, California  94104
                  BY:  DAVID BROWNSTEIN, ESQ.


For Non-Party Anthony Levandowski:
                         RAMSEY & EHRLICH LLP
                         803 Hearst Avenue
                         Berkeley, California 94710
                  BY:  MILES F. EHRLICH, ESQ.
                         AMY E. CRAIG, ESQ.

For Non-Party Lior Ron:
                         TAYLOR & PATCHEN, LLP
                         One Ferry Building
                         Suite 355
                         San Francisco, California  94111
                  BY:  JONATHAN A. PATCHEN, ESQ.
                         KARAN SINGH DHADIALLA, ESQ.


(Appearances continued, next page)

```
APPEARANCES, CONTINUED:

For Non-Party Stroz Friedberg:
                    LATHAM & WATKINS
                    505 Montgomery Street
                    Suite 2000
                    San Francisco, California  94111
            BY:  MELANIE M. BLUNSCHI, ESQ.


For Non-Party Don Burnette:
                    MAURIEL KAPOUYTIAN WOODS, LLP
                    275 Battery Street
                    Suite 480
                    San Francisco, California  94111
            BY:  MARC J. PERNICK, ESQ.


Also Present, by Telephone:
                    FARELLA, BRAUN & MARTEL LLP
                    Russ Building
                    235 Montgomery Street
                    30th Floor
                    San Francisco, California  94104
            BY:  JOHN L. COOPER, ESQ., SPECIAL MASTER
                    MATTHEW CATE, ESQ.
```

<u>**Thursday - September 14, 2017**</u>                              **2:02 p.m.**

P R O C E E D I N G S

    **THE CLERK:**  Remain seated and come to order.  Court is now in session.

    **THE COURT:**  All right.  Good afternoon.  Thanks for coming in.

    So I wanted to hold this hearing today because in light of the Federal Circuit's ruling yesterday, I want to make sure we have a plan.  Trial is three and a half weeks away.  Right?  So I want to make sure we have a plan for getting all this additional discovery done.

    And with this caveat, I'm actually out of the country from Tuesday through Monday, the 19th through the 25th, so that is why I wanted to meet today, just so, you know, we can get as much done by Monday as possible.

    **MR. GONZÁLEZ:**  What country will you be in, Your Honor?

    **THE COURT:**  Hong Kong.

    **MR. GONZÁLEZ:**  They have cell phones there.

    **THE COURT:**  Do you know, the time difference -- I looked this up -- is 15 hours.  So that's fine.  I'm happy to speak with you at 8:00 a.m. Hong Kong time.

    **UNIDENTIFIED MAN:**  Nothing for this case.

    **THE COURT:**  That's true.  I know you would be.  All right.

    So let me first hear from Waymo, where things are at, and if there's anything I can do today.

1    And then, I know we never finally resolved the protocol

2    issue, and so we should discuss that as well.

3        **MR. JUDAH:**  Thank Your Honor.  James Judah for Waymo.

4        So in terms of where we are, essentially one document's been

5    produced, which is the Stroz report.  And we don't have any

6    documents at the moment.

7        There -- we received an email this morning, offering to

8    produce from MoFo, I think, 11:13 a.m., a subset of materials in

9    MoFo's possession.  They want to withhold certain materials on

10   Mr. Levandowski's instructions.

11       And so there is an issue, a dispute over whether they are

12   allowed to withhold stuff that has not been reviewed by the

13   special master and approved for screening.  So we are going to

14   be inspecting that after this hearing, hopefully, if that's

15   resolved.

16       **THE COURT:**  All right.

17       So, Mr. González.

18       **MR. GONZÁLEZ:**  Yeah.

19       **THE COURT:**  The privilege log that had been identified,

20   depending on the ruling, why haven't those documents been

21   produced?

22       **MR. GONZÁLEZ:**  So let me give you an update.  First of all,

23   they received not only the Stroz report, but all of the Stroz

24   exhibits, which is voluminous.

25       Second, probably within the next five minutes, they're going

1      to be sending them 572 items from our privilege log.  We started

2      the process as soon as we got the opinion.

3          And tonight, Your Honor, we are going to process an

4      additional 1,177 items, which are the remaining items from the

5      privilege log.

6          **THE COURT:**  All right.  So by tonight we will have

7      everything.  Or by tomorrow.

8          **MR. GONZÁLEZ:**  Barring some technical unexpected thing,

9      that's correct.

10         **THE COURT:**  Okay.

11         **MR. GONZÁLEZ:**  Second, the item that counsel just

12     referenced, as you've known, for some time it's well known that

13     we have a subset of what Stroz has, based on our representation

14     of Mr. Levandowski.

15         **THE COURT:**  From the arbitration.

16         **MR. GONZÁLEZ:**  Correct.  I offered to send those to

17     Mr. Levandowski's counsel.  They didn't wanted to do that.  Then

18     I offered to send Mr. Levandowski's counsel a copy, so that they

19     could meet up in privacy.  They didn't want to do that.

20         So instead what I did, because I wanted to be ready for

21     today, we had Mr. Levandowski, himself, come to our office and

22     look through 60,000 items which are mainly photographs.

23         And out of the 60,000, he picked less than one quarter of

24     1 percent, as I'm told, 200 pictures, which he says are personal

25     photographs.

1        And what I told them is:  Come on over, we'll show you

2    everything else.

3        And I wanted to give those photos to John, but I understand

4    John's not available.  I'd be happy to show them to you if you

5    want to.

6        **THE COURT:**  If you want me to look at them.  But I think

7    you're going to be busy looking at those other ones first.

8        **MR. GONZÁLEZ:**  Yeah.  They reserved their rights.  And I

9    told them that.  And I'm not going to say:  You waived your

10   rights.

11       So I've got 60,000 documents ready as we speak.

12       **THE COURT:**  Mr. Cooper is back -- Mr. Cooper, are you on the

13   phone?

14       **MR. CATE:**  Your Honor, this is Matthew Cate.

15       **THE COURT:**  Oh.

16       **MR. CATE:**  John asked me to call in for him.  He is out of

17   the country in Montreal, and he returns Monday afternoon.

18       **THE COURT:**  Right.  So he'll be available Monday.

19       **MR. JUDAH:**  So Your Honor, I mean, we will review whatever

20   is available.

21       I will note that Your Honor was clear that Mr. Levandowski

22   should have been providing these privacy suggestions.  IN the

23   last two weeks, he sat on his hands, apparently just so that

24   they could --

25       **THE COURT:**  What do you want me to do?  They're there.

1    **MR. GONZÁLEZ:**  They're there.

2    **THE COURT:**  They're there.

3    **MR. GONZÁLEZ:**  Right now.

4    **THE COURT:**  They can go, this afternoon?

5    **MR. GONZÁLEZ:**  They can right now.

6    **MR. JUDAH:**  I'll be going right after this hearing.

7    **THE COURT:**  Okay, great.

8    **MR. GONZÁLEZ:**  And that takes care of everything that I have

9    at MoFo, Your Honor.

10       The only other thing that I will mention, and I mentioned

11   this before, is that when we represented Mr. Levandowski, a copy

12   of the Relativity database that Stroz has was given to Epiq.

13   They were going to be our discovery vendor in the arbitration.

14   They have done nothing with it.  We withdrew from the

15   representation.  And they were never retained for it by the new

16   counsel.  And so they've got that.  It is a complete duplicate

17   of what Stroz has.

18       I think we ought to focus on Stroz.  They reserved their

19   rights.  They can go over there and look at it if they want to.

20   It's the exact same thing.  And they can ask Stroz in your

21   deposition:  What did you get at Epiq?  And I'll represent to

22   you that they will say that we gave them a copy of the database.

23       So I am not here as counsel for Epiq, but we did retain

24   them.  And I expect that they will cooperate, Your Honor.

25    **MR. JUDAH:**  So Your Honor, this is different from what was

1    represented at the August 16th hearing to -- to Judge Alsup,

2    where Judge Alsup "expressly said (As read):

3         "But, but if the Federal Circuit affirms, then I

4         understand Mr. González to say that any and all of the

5         downloaded documents will be turned over by MoFo, Epiq,

6         Stroz, without question, they will be turned over.  You

7         don't have to have another document request.  Am I right

8         about that?

9         "MR. GONZÁLEZ:  Yes.  We made that clear."

10        These Epiq materials need to be produced immediately.  We'll

11   agree to whatever -- the protocol, if they want to pull stuff

12   that's private.

13        **THE COURT:**  Wait.  Epiq has them, and it's for Uber.  Right?

14        **MR. GONZÁLEZ:**  Has it for Mr. Levandowski.

15        **THE COURT:**  They were provided -- who --

16        **MR. EHRLICH:**  Epiq -- Epiq was our consultant in he

17   arbitration.

18        **THE COURT:**  When you were representing Mr. Levandowski.

19        **MR. GONZÁLEZ:**  Correct.

20        **THE COURT:**  Not Uber.

21        **MR. GONZÁLEZ:**  That's correct.  Uber has never had access to

22   these materials.

23        **THE COURT:**  Well, I haven't ordered those documents produced

24   yet, yet.  Correct?

25        **MR. JUDAH:**  Well, there was representation that they would

1   be produced.

2       **THE COURT:**  So, there's only so many.  I know Quinn has a

3   lot of orders, but there is only so many.  So we're going to

4   start with -- we have all this, and let's get to Stroz.  Let's

5   put aside Epiq for the moment.

6       Maybe the thing to do is figure out if the representation

7   that's made is true that's a copy of what you already have.

8       **MR. JUDAH:**  I'll note, Your Honor, that the only way to

9   confirm that is to actually inspect it.

10      And Judge Alsup specifically said at the August 16th hearing

11  that we were entitled not to take anyone's word for it.  We were

12  entitled to verify that, ourselves, because sometimes there are

13  differences.

14      **THE COURT:**  Okay.  Have you -- well, maybe I can hear from

15  Mr. Ehrlich on this.

16      **MR. EHRLICH:**  Mr. Ehrlich, Miles Ehrlich on behalf of

17  Mr. Levandowski.

18      My understanding is that it is an exact duplicate of what

19  Stroz has.

20      **THE COURT:**  No, I understand but --

21      **MR. EHRLICH:**  It has not been reviewed or put into a

22  platform that would even subject it to a review.

23      **THE COURT:**  So will you allow -- because Waymo doesn't want

24  to accept that representation, can they go over to Epiq and just

25  verify -- IT people know how to verify these types of things,

1    right -- that it's an exact duplicate?

2        Is there a way of doing that?

3        **MR. EHRLICH:**  If there is a way of doing that, I certainly

4    have no problem with that.  In fact, if they want to truly

5    duplicate efforts, we would be happy to apply the same protocol

6    to the same documents.

7        **THE COURT:**  Okay.

8        **MR. EHRLICH:**  Which would involve a privacy and a privilege

9    screen.  We can do it twice.  It is a duplicate.

10       But they could also -- I think the suggestion Your Honor

11   made in the last hearing was that they depose someone from Stroz

12   Friedberg to confirm that.  And that's an available avenue as

13   well.

14       **MR. JUDAH:**  Your Honor, we would like to inspect it,

15   ourselves.

16       And any privacy terms that should have been offered --

17       **THE COURT:**  He said you can.

18       **MR. JUDAH:**  Yeah, okay, great.

19       **THE COURT:**  But it's a question of timing, right?  And so

20   that's going to be the cutoff because there's a limited amount

21   of time.

22       **MR. EHRLICH:**  It is a question of:  Inspect for what

23   purpose?

24       **THE COURT:**  I understand.

25       **MR. EHRLICH:**  If it's just to confirm that it's a duplicate,

1    yes.

2         **THE COURT:**  That's what the initial inspection will be.

3         **MR. JUDAH:**  Certainly.  Certainly.

4         (Off-the-Record discussion between counsel)

5         **THE COURT:**  You can speak, you don't --

6         **MR. JUDAH:**  Well, I mean, obviously that's dependent upon

7    once we actually inspect what Stroz has.

8         **THE COURT:**  Of course.  That's what I'm saying.  That has to

9    go first.

10        **MR. JUDAH:**  Right.  But we haven't had an opportunity to do

11   that yet.

12        **THE COURT:**  We'll get to that.

13        **MR. JUDAH:**  Nor do we know where Epiq is going to be making

14   this available, and when.

15        **THE COURT:**  Of course not.  I understand that, yeah.  But

16   what I understand is that Mr. Levandowski is not throwing up a

17   roadblock to you inspecting it to either confirm that it is

18   what -- when you -- Stroz has, or that it's not.

19        And if it's not, you can look through it, subject to those

20   privacy objections.

21        **MR. JUDAH:**  Okay.  I mean, subject to actually getting this

22   to --

23        **MR. PERLSON:**  Yeah.  Your Honor, just to be clear, there's

24   no way that we can go in there and without going with the Stroz

25   documents, matching them all together -- sorry, this is David

1    Perlson -- and confirm whether they are the same or not.

2        The point is that we've had representations up and down from

3    the other side, again and again.  And Judge Alsup specifically

4    said we don't have to take their word for it.  So we want to

5    inspect everything.

6        **THE COURT:**  That's what I just said.

7        **MR. PERLSON:**  Okay.  But it shouldn't be limited to just

8    checking to see whether it's the same.

9        **THE COURT:**  Well, if it is the same, why do you want to sit

10   there and spend time going through it?

11       **MR. PERLSON:**  There is no way we can know it's the same.

12       **THE COURT:**  Well --

13       **MR. PERLSON:**  There have been -- just recently they told us

14   there's hundreds of computers.  We don't know.

15       **THE COURT:**  That's fine.  Obviously, it was premised on

16   you -- on it being the same.  Being the same.  And if it's not

17   the same, then fine, we can have --

18       **MR. EHRLICH:**  And co-counsel just handed me a folder of

19   documents which seem to be the transmittal letters from Stroz to

20   Epiq, which they don't have to take Stroz word for it either.

21   But that's --

22       **THE COURT:**  Can you hand it to them?

23       **MR. EHRLICH:**  I want to make sure that it's just that.

24       **THE COURT:**  Okay.

25       **MR. EHRLICH:**  But yes, we can hand it to them today.

1          **MR. GONZÁLEZ:**  Your Honor, as long as we have a stipulation

2     that we're not waiving any privilege of any kind, then we'll be

3     happy to give to them.

4          **MR. JUDAH:**  Your Honor, this has all been compelled.  And

5     we're entitled to it.  And they're -- they have a document that

6     they are withholding from us that they think is useful for them,

7     and it's because they don't want us to inspect.

8          **THE COURT:**  That is not -- that is not true.  We're not

9     going to do that, okay?  Let's put that aside, because that, I

10    think, actually is the least -- let's go to the Stroz.

11         So we have taken care of MoFo, right, Mr. González?

12         **MR. GONZÁLEZ:**  Oh, yeah.

13         **THE COURT:**  You're going to get everything by tonight from

14    MoFo that MoFo has.  Okay?

15         **MR. JUDAH:**  Okay.

16         **THE COURT:**  All right.

17         **MR. JUDAH:**  So, Your Honor, there are a number of different

18    issues, as you know.

19         **THE COURT:**  Yes.  So now I want to go to the Stroz

20    documents.

21         **MR. JUDAH:**  I'm sorry.

22         **THE COURT:**  That's the next biggest one.

23         **MR. JUDAH:**  Well, I think the next biggest one is actually

24    the Stroz report, itself.  Not only was it produced over four

25    hours after the Federal Circuit ruled, and we had to send, I

1    think, three separate emails, we had -- first they wanted to

2    get -- needed Anthony Levandowski's permission to produce it.

3    Then they said we had to agree it was confidential.

4        **THE COURT:**  Yeah, I'm going to stop you for a second.  I'm

5    going to be like a doctor.  We're going to figure this out like

6    what is -- what changed.  So all you're going to tell me, what

7    are you going to ask me to do?

8        **MR. JUDAH:**  Rule that it is not -- you've seen it.  They say

9    it contains -- the whole thing is Uber confidential information.

10   Which it obviously doesn't.

11       Some of those documents -- I mean, I don't know if I'm

12   allowed to talk about it in open court because they say the

13   whole thing is confidential.

14       **MR. EHRLICH:**  I would object to any disclosure of the

15   substance of the Stroz report in open court.

16       **THE COURT:**  So the Federal Circuit, you read the opinion.

17       **MR. JUDAH:**  Yes.

18       **THE COURT:**  And it did allude to the fact that the Court may

19   have it, subject to a protective order.  Did you not?

20       **MR. JUDAH:**  I did see that.

21       **THE COURT:**  Okay.  So we are going to have to have a

22   proceeding about that.  I'm not going to do it sitting here

23   without anything in front of me, especially when that was made

24   very clear in the Federal Circuit's report.

25       To be candid, I frankly didn't know what they were talking

1   about, or why, but we don't have to decide that today.  We'll

2   address that.  That is something that has to be addressed.  It's

3   not critical.

4        What's critical is that you have the information.  That it

5   be public at this very moment is not critical.  Because we are

6   not playing a PR game.  This is about getting you the

7   information that you need.  Before trial, it needs to be

8   addressed.  Because that's going to be very important.

9        **MR. JUDAH:**  One thing I'll note, Your Honor, is that there

10  -- there's Waymo information, we can't share it with people who

11  need to see it, our client.

12       **THE COURT:**  It's not AEO.

13       **MR. GONZÁLEZ:**  No it's not.  Exactly.  You can share it with

14  your client.  I'll stipulate right now.

15       **THE COURT:**  Not AEO.

16       **MR. JUDAH:**  Well, certainly with the client, but there is

17  limitations.  They have to sign the PO. I mean, I don't know

18  what I can say about it in open court, but there's clearly parts

19  of it that --

20       **MR. GONZÁLEZ:**  Just tell us who you want to share it with.

21  And I'll say yes, right now.

22       **THE COURT:**  Well, you tell me.  The -- you read the Federal

23  Circuit opinion.

24       **MR. PERLSON:**  Your Honor, I think that what we should have

25  is a procedure in place for -- that they need to make a motion,

1    a motion for protective order, and have it dealed.  Because

2    there is not anything in your confidential.  And it's clear --

3        **MR. JUDAH:**  To Uber.

4        **MR. PERLSON:**  It's clear to Uber that they don't like it

5    because of the content that's in here.  That's why they want it

6    confidential.  And having --

7        **THE COURT:**  No, Mr. Perlson, we are not -- I am not going to

8    let this hearing be a PR game.  We're going to stop with that.

9    That's not what this hearing is about, right now.  So no

10   inferences should be drawn one way or the other about what is in

11   that due diligence report.  That is not an appropriate use of

12   this hearing.

13       Now, as I read the opinion, it seemed to me they were

14   suggesting that it was Mr. Levandowski who had the

15   confidentiality, not Uber.  That Uber, by the way, wasn't even a

16   party to that appeal; that it was Mr. Levandowski.

17       We can set a briefing schedule on that.

18       **MR. PERLSON:**  Thank you.

19       **THE COURT:**  And have it done.  In the meantime, though, that

20   is what they indicated.  The Federal Circuit did.  It's in the

21   opinion.  Right?  It's there.  He's not making this up out of

22   whole cloth.  The Federal Circuit put it in the opinion.

23       **MR. EHRLICH:**  And it is tethered -- I mean, the pages of the

24   opinion are Page 6, Page 10, Page 20.  And the Federal Circuit's

25   reasoning is apparently that it needs to be produced now, for

1    purposes of the civil proceeding.

2        But to the extent there are still Fifth Amendment concerns

3    at play, the Court can craft a protective order, to protect from

4    disclosure and use beyond these civil proceedings.

5        And so --

6        **THE COURT:**  To protect from use beyond these civil

7    proceedings.

8        **MR. GONZÁLEZ:**  Uh-huh.

9        **MR. EHRLICH:**  We are going to try to make sense of it,

10   Your Honor.  But let me just say, it is what the Federal Circuit

11   ordered.

12       **THE COURT:**  No, no, no.

13       **MR. EHRLICH:**  And I think the logic is because this was

14   mandamus, the appeal was based on mandamus, which is a very high

15   standard.  It's not --

16       **THE COURT:**  I understand.  They did go quite deeply into the

17   merits.

18       **MR. EHRLICH:**  You should feel very vindicated.

19       **THE COURT:**  I just do my best, that's all.

20       **MR. EHRLICH:**  But we don't have -- we don't have a final

21   ruling, which means we don't have a final determination as to

22   whether the Fifth Amendment argument or the -- his

23   Fifth-Amendment privilege is valid or not.

24       Until that time, I think the Federal Circuit is saying it

25   would be wise to make sure that this not be used potentially in

1    other proceedings.  Criminal investigation, arbitration,

2    et cetera.

3        **THE COURT:**  Okay.  So that being -- I think that is what

4    they're saying; it was Mr. Levandowski, not Uber.  I don't know

5    why, then, Waymo can't share those documents within Waymo.

6    Without having to go through somebody signing the protective

7    order and the like.

8        **MR. GONZÁLEZ:**  Yeah, Your Honor.  This -- the -- this

9    Court's protective order allows them to share that information

10   with anybody at their employer that they feel they need to, in

11   order to represent their client.  Signing the protective order

12   is not burdensome.  Just saying that we'll honor the protective

13   order in the case.

14       **THE COURT:**  I guess that's fine.  I assume you have a lot of

15   people signing it anyway.  But anyone who's seen anything in the

16   past would have already signed it, then, anyway.  Right?

17       **MR. PERLSON:**  It would be helpful to know whose confidential

18   information we are dealing with here.  I mean, is it

19   Levandowski's, only?  Is that what --

20       **THE COURT:**  That was my understanding from reading the

21   order.

22       **MR. PERLSON:**  And I think that clarification would be

23   helpful.  I don't know.  We asked Mr. González squarely last

24   night whether there was any Uber confidential information.  He

25   refused to respond.

1    So I think it would be nice to know before sharing with the

2    client, and their signing, whose confidential information they

3    are seeing.  I think it's a fair question to ask.

4         **MR. GONZÁLEZ:**  I'm not sure whether it matters.  All the

5    order says is that this information is being used for purposes

6    of this litigation, and you can't run to the *New York Times* and

7    share with them what you just read.  That's what the order's

8    intended to protect.

9         Who cares if it's mine or theirs?  If you want to --

10        **MR. PERLSON:**  It has nothing to do with that.

11        **MR. GONZÁLEZ:**  If we're going to have a briefing schedule,

12   we'll have a briefing schedule.  And I'll let my clients know:

13   If there's anything there you all think is confidential, we've

14   got to tell the Magistrate.  And we'll tell you.

15        **MR. PERLSON:**  Your Honor, they designated it confidential.

16   Uber did.  Not Mr. Levandowski.  They never said that they were

17   designating it for Mr. Levandowski.

18        **THE COURT:**  Well, of course they designated it confidential

19   because it was attorney work product and all that.  And that's

20   all --

21        **MR. EHRLICH:**  And the Ninth Circuit's opinion made it clear.

22   So I thought --

23        **THE COURT:**  For some people, that's by the bye now.  Not

24   all, I understand.

25        **MR. PERLSON:**  I think it was in relation to the

```
 1   Fifth-Amendment privilege.  I'm not sure that it made a lot of
 2   sense in that context.
 3       THE COURT:  This is what we're going to do.  You can share
 4   it with any -- it's not AEO, so there's no limitation within
 5   Waymo, your experts and the like, who you can share it with.
 6       This is an issue I'm going to need to address.  And frankly,
 7   with Judge Alsup.  Because it impacts greatly the trial which is
 8   coming right up.  So it's something that I'm also going to need
 9   to confer with him.
10       And he may, in fact, be the best person to decide it.
11   Because it's not really a discovery issue.  It's really a trial
12   issue.
13       MR. EHRLICH:  And I think the confidentiality interest comes
14   from the Fifth Amendment.  Which, which -- so, on behalf of
15   Mr. Levandowski, I would not consent to them showing it to
16   potential witnesses against Mr. Levandowski in the context of a
17   criminal investigation.
18       THE COURT:  It's not --
19       MR. EHRLICH:  If there were a criminal investigation, and
20   this is Fifth-Amendment privilege --
21       THE COURT:  This is for their use in the civil case.
22       MR. EHRLICH:  I understand.  But I need to make clear that
23   until there's a final ruling on the Fifth Amendment, we have a
24   situation where potentially immunized testimony or active
25   production would be exposed to witnesses.
```

1    **THE COURT:**  Perhaps, but I -- I rejected that argument.  I

2    found he didn't find a Fifth-Amendment privilege.

3    **MR. EHRLICH:**  Correct.

4    **THE COURT:**  So they get to use -- so -- and, and the report

5    now.  And you had an appeal, and it was rejected.  And so

6    whatever arguments you have with respect to a criminal

7    prosecution, if any, you have, I'm not going to inhibit their

8    ability to prepare their civil case.

9    **MR. EHRLICH:**  I understand that.

10   **THE COURT:**  Yeah, okay.

11   **MR. EHRLICH:**  I think it's been compelled, and we accept

12   that.  The only wrinkle is that the Court, in its order -- but

13   the Fed Circuit in its opinion made clear that we are free to

14   appeal, post-verdict.

15   **THE COURT:**  Of course.

16   **MR. EHRLICH:**  Okay.  So it may be --

17   **THE COURT:**  But your appeal would be relevant to any

18   criminal prosecution.

19   **MR. EHRLICH:**  Correct.

20   **THE COURT:**  It wouldn't have any impact on the result in

21   this case.

22   **MR. EHRLICH:**  That's correct.  But I want to make sure that

23   I'm raising the issue now.

24   **THE COURT:**  Okay.

25   **MR. EHRLICH:**  Because it could cause many witnesses to be

```
 1   exposed to immunized testimony.  So it is my obligation to stand

 2   up and say this -- we object.

 3       THE COURT:  Okay.  All right.

 4       MR. EHRLICH:  Thank you.

 5       THE COURT:  Noted.

 6       MR. EHRLICH:  Thank you.

 7       MR. PERLSON:  Your Honor, can we set up a briefing schedule?

 8   Should we do that afterwards?

 9       THE COURT:  No, we should do that now.  I mean, Judge

10   Alsup's clerk isn't here.  But we should do it, in any event.

11   So you should file your motion for a protective order by -- I

12   mean, soon.

13       MR. EHRLICH:  Soon.  Can we address that at the end of the

14   hearing?

15       THE COURT:  Sure.  Yeah, that's fine.  All right.  Okay?

16   All right.

17       MR. JUDAH:  So the next issue is the Stroz materials.

18       THE COURT:  Yeah.

19       MR. JUDAH:  Well, actually, let me first --

20       THE COURT:  I always mispronounce it.  And you corrected me

21   last time.  "Stroz."

22       MS. BLUNSCHI:  We get it both ways.

23       MR. JUDAH:  Actually, let me first address Otto Trucking

24   materials which have also not been produced.

25       THE COURT:  Okay.
```

1      **MR. JUDAH:**  We've been told they'll be produced -- I think

2   everything out of the privilege log we've been told will be

3   produced by tonight or tomorrow morning.  I don't know if

4   there's materials that aren't in the privilege log.  And so they

5   also need to be produced.

6      **THE COURT:**  Is anyone here from Otto Trucking?

7      **MR. SCHUMAN:**  Yes, Your Honor.  Brett Schuman from Goodwin,

8   for Otto Trucking.

9      Your Honor, I was in a different court on something related

10  to this, this morning, I wasn't on the call with Mr. Judah.  My

11  understanding is that we have a subset of materials that are

12  being produced today.  They are not actually Otto Trucking

13  materials.  They are materials that were in our possession

14  because they came over, as you know, at a fair time Otto

15  Trucking was represented by the same counsel as Otto Moto.  So

16  we have some materials.  They were withheld pending the Federal

17  Circuit's ruling.  They are being processed now, and being

18  produced today.

19      **THE COURT:**  Okay.

20      **MR. JUDAH:**  And Your Honor, I think that would include the

21  Stroz report, itself, but I'm not sure.

22      **MR. SCHUMAN:**  Otto Trucking has never had possession of the

23  Stroz report.  It is not being used.  We don't have it.  Otto

24  Trucking.

25      **MR. JUDAH:**  Okay.  So, and then -- so now we can turn to the

1    Stroz materials.

2        **THE COURT:**  Thank you.

3        **MR. SCHUMAN:**  Thank Your Honor.

4        **MR. JUDAH:**  So for the Stroz materials, there's sort of

5    three different categories.  The -- well, there's four different

6    categories.

7        The first is the documents, non-device stuff, documents

8    responsive to the subpoena.  We had a conference this morning,

9    and my understanding is those are being produced tomorrow or

10   Saturday.

11       **MS. BLUNSCHI:**  Uh-huh, yes, so --

12       **THE COURT:**  You should tell, for the court reporter.

13       **MS. BLUNSCHI:**  Melanie Blunschi, Latham & Watkins, for Stroz

14   Friedberg.

15       Those materials are in final QC.  We expect to have those

16   produced by either Friday night or this weekend.  The Stroz

17   privilege log --

18       **THE COURT:**  I'm -- I'm going to say Friday night or

19   Saturday.  Okay?

20       **MS. BLUNSCHI:**  Yes.  The Stroz privilege log will accompany

21   those.  There's a very small handful of materials that are

22   withheld, based on Stroz' privilege.

23       There are also materials that are being withheld, based on

24   Uber's review of the documents, that are subject to the

25   common-interest privilege after -- April 11th.

1      **THE COURT:**  So they are dated after April 11th.

2      **MS. BLUNSCHI:**  Yes.  So Uber is preparing that privilege

3   log, so I can't speak  to when that will be provided.  But, so

4   those are the only materials that are being --

5      **THE COURT:**  Mr. González?  You're back.

6      **MR. GONZÁLEZ:**  What happened?  I wasn't paying attention.

7      **THE COURT:**  When is the privilege log for the Stroz

8   documents going to be produced?

9      **MR. GONZÁLEZ:**  That is a question I'm not prepared to

10   answer.  But I'll get the answer, I assume very soon.

11      **THE COURT:**  By Saturday as well?

12      **MR. GONZÁLEZ:**  Yeah.

13      **THE COURT:**  Okay.

14      (Reporter interruption)

15      **MS. BLUNSCHI:**  B-L-U-N-S-C-H-I.

16      **THE COURT:**  You say that like you do it all the time.

17      **MS. BLUNSCHI:**  Occasionally.  My married name is actually

18   Smith.  Possibly should have had chosen that one.  So.

19      **THE COURT:**  Okay.  All right.  So --

20      **MR. PERLSON:**  That is the first category.

21      **THE COURT:**  Yeah.

22      **MR. JUDAH:**  The second category is the Relativity database.

23   So my understanding is that that can be made available for

24   inspection on Monday.

25      **MS. BLUNSCHI:**  So I would clarify.  So we actually have the

1    native devices ready to go for inspection.  The Relativity

2    database could be available as early as Monday, except that that

3    is the place where we have some complications around the

4    protocol of what's private and what's not.

5        **THE COURT:**  Yeah, we'll get to that.  But just putting that

6    aside --

7        **MS. BLUNSCHI:**  Yes.

8        **THE COURT:**  Putting that aside, that's available for Waymo

9    to come over to your -- not -- is it at --

10       **MS. BLUNSCHI:**  Well, so, we need to know what we're

11   screening out of that database in order to make it available to

12   Waymo.

13       **THE COURT:**  Well, I think the proposal was from Waymo --

14       **MS. BLUNSCHI:**  Uh-huh.

15       **THE COURT:**  -- is that they are going to go over, they're

16   going to look at it, right?

17       And if there is something that you want, you can say:  I

18   want this.

19       And then you can be there or somebody from your office who

20   can say:  No, this is one of those 200 photos, or whatever it

21   was.  It doesn't sound like there's very much there.

22       **MS. BLUNSCHI:**  So the Relativity database is actually a

23   complete duplicate of all of the native devices that Waymo will

24   also be reviewing.

25       And so as soon as we have direction on what goes in it, it

1    will take, you know, about 48 hours to make it --

2         **THE COURT:**  Why doesn't everything go in it?

3         **MS. BLUNSCHI:**  That --

4         **MR. EHRLICH:**  I can address that.

5         **THE COURT:**  Yeah.

6         **MR. EHRLICH:**  So, I -- and I have a very large objection to

7    the idea that they're just going to get all of the native

8    devices, and then we're going to screen out from the Relativity

9    database, because that would defeat the whole purpose.  On an

10   actual computer you can't screen it out with -- while preserving

11   its integrity.

12        The point about the Stroz database is that they went through

13   the process of harvesting all of the documents so they can be

14   reviewed on the platform, and tagged and marked, et cetera.

15        So I don't think it's appropriate, at least for

16   Mr. Levandowski, for the native devices to be searched, because

17   then the whole point of screening out preexisting privilege or

18   very private matters would be moot.  Because you're just giving

19   the computer over.  Which has everything.

20        **THE COURT:**  Which is what he did to Stroz.  He just gave it

21   over.

22        **MR. EHRLICH:**  I understand that.

23        **THE COURT:**  He just handed over --

24        **MR. EHRLICH:**  Not exactly.  With an understanding that there

25   was a screen that was going to be applied, the privileged

1    materials.

2    **THE COURT:**  That they could claw it back.

3    **MR. EHRLICH:**  Not claw it back; that it would not be shared

4    with Uber.

5    **THE COURT:**  Exactly.

6    **MR. EHRLICH:**  And Otto.

7    **THE COURT:**  So the same thing could apply here under Rule of

8    Evidence 502.  There is no waiver or anything like that.  If

9    they actually say:  I want to print this -- and they can, or you

10    could be standing over their shoulder, right?

11    **MR. JUDAH:**  Right.

12    **THE COURT:**  You can be standing over their shoulder.  That's

13    why I said before when we had their hearing:  If there are

14    particular files or areas, identify them now.

15    **MR. EHRLICH:**  But we have.  And I -- so just to that point,

16    we understood the hearing, the last hearing, for you to be

17    rejecting the idea that they would give us search terms, and

18    then we produce.

19    And so instead, we had to look at all -- we had to basically

20    take a look at all half a million items that -- we didn't have

21    to eyeball each one.  And we identified those that are

22    privileged.  We have a privilege log ready to hand to them

23    today.

24    These is privileged because these are prior communications

25    between Mr. Levandowski and his family law attorney,

1    Mr. Gardner.  Other attorneys that are not implicated by the

2    Federal Circuit ruling.

3        **THE COURT:**  Well, Mr. Gardner is complicated.

4        **MR. EHRLICH:**  Well, and they can challenge any that they

5    would like to challenge.  It's more than a hundred pages.

6        **THE COURT:**  Well, Mr. Gardner, Mr. Levandowski, Mister --

7    that's right.  We haven't -- I haven't ruled any of those

8    communications as --

9        **MR. EHRLICH:**  No, no.  So we have the privilege log.  And

10   what seems to me to be the most sensible way to go, before I

11   turn to the privacy, is for these documents -- we've been

12   working for weeks with Stroz to identify these documents.  They

13   can very easily be taken out of the universe of millions of

14   documents.  They can start searching.

15       We will provide this privilege log; it can be tested.  If

16   there's anything that needs to be reviewed in camera by the

17   Court or by Mr. Cooper, we can deal with that.  But they won't

18   be running hits and landing on privileged material.  That seems

19   to be appropriate, because it was not disclosed fully.

20       As to the private matters, we have identified

21   Mr. Levandowski's family, his, you know, his former domestic

22   partner, the mother of his children, girlfriends, very close

23   personal relationships.  And we separately have those tagged.

24   My proposal -- there's about 7,000 documents there.  We could

25   make those available for review to -- by Mr. Cooper.  But that

1  is very onerous.

2    What I would suggest instead for this narrow, very limited

3  subset -- and we'll give Mr. Cooper the names of the search

4  terms that we called them up with -- that, that in that instance

5  they give us as many search terms as they want.  We will run the

6  search terms.  If there are hits, and it's not extremely

7  private, we have no objection.

8    But -- so we have been working very hard to get that ready

9  to go, so they can start searching under the protocol.

10    **UNIDENTIFIED MAN:**  Your Honor, on behalf of Mr. Lior --

11  Jonathan Patchen, on behalf of Lior Ron.

12    We have engaged in that same process.  It's about 650

13  privileged documents.  Mister (Inaudible) --

14    (Reporter interruption)

15    **MR. PATCHEN:**  About 650 documents that implicate privilege

16  that are not part of the Federal Circuit ruling.  We have also

17  done similar search terms for Mr. Ron's wife; for his daughter's

18  name; for, you know, personal bank account information; his

19  Social Security number; doctors' names; dentist names; things

20  like that that we would be happy to share as well.  And do the

21  exact same protocol.

22    If there's any search terms they want to run on that subset,

23  unless it's talking about some specific doctor's diagnosis or

24  something that we're particularly sensitive about, which we'd

25  share with Mr. Cooper, we'd be happy to turn those over as well.

1      **MR. JUDAH:**  So Your Honor, a few issues here.

2      The first is:  I've never heard any of this before.  I've

3  never seen these privilege logs.  We need to inspect the native

4  devices in order to run our own forensic determination as to

5  what happened.  I can't go into details of the Stroz report, but

6  that may not have been a complete examination.

7      With respect to the privilege, first off, we dispute that

8  there has been a waiver.

9      **THE COURT:**  Well, but I -- I said last week, I wasn't sure,

10  I -- I don't believe that I have found that there's been a

11  waiver of that privilege.

12      **MR. JUDAH:**  Everything --

13      **THE COURT:**  So we could have a debate about that, I

14  understand.  But as least as we stand, I haven't ruled on that.

15      **MR. JUDAH:**  Sure.  I know.  I just want to make it clear

16  that we dispute it categorically.

17      **THE COURT:**  I understand.

18      **MR. JUDAH:**  Secondly, and again, I haven't seen the

19  privilege log.  I'm hearing a lot about documents that people

20  say they're willing to hand -- you know, that exist, and they

21  want to hand over to us, but no one's given to us yet.

22      But a lot of these people -- John Gardner, Ognen Stojanovski

23  is also an attorney who could claim privilege over

24  communications with him.  All of these attorneys are -- and

25  family members, too, I might add -- are tightly connected to the

1    shell companies through which Mr. Levandowski --

2         **THE COURT:**  No, no, no, no. no.  What Mr. Ehrlich said was

3    they'll run search terms.

4         So for example, if -- I think I can say this, this isn't in

5    confidence, right -- Tyto or Odin (Phinetic) used to be

6    confidential.  And things tend to --

7         **UNIDENTIFIED MAN:**  Slip out.

8         **THE COURT:**  I don't know; they tend to not be after a while.

9    They'll run that.  If it hits, you get it.  Of course, there's

10   also spousal -- well--

11        **UNIDENTIFIED MAN:**  Spousal privilege is an issue.

12        **THE COURT:**  I know, it is an issue.  Anyway, but they'll run

13   those hits.  They will run those.

14        They are not saying -- what they're saying is it's a way of

15   initially screening out things that probably have nothing to do

16   with it.  And they'll run those.  And then they'll either turn

17   them over.

18        Or if they are still withholding it on some privilege

19   ground, then we'll adjudicate that.

20        **MR. EHRLICH:**  (Inaudible)

21        **MR. JUDAH:**  Your Honor, if we had the privilege logs and if

22   I had a list of whatever these private things were and how many

23   there were, I could maybe evaluate this.  But I'm really not in

24   a position do so.

25        **THE COURT:**  I know.  Well, right now I'm not saying you have

1    to evaluate.  If we need to come back tomorrow, we'll come back

2    tomorrow.

3        **MR. EHRLICH:**  Just for the record, I'm handing him the

4    attorney/client privilege log.

5        (Document tendered)

6        **MR. EHRLICH:**  I'm not handing him the list of private

7    people.  I don't have that with me now.

8        **THE COURT:**  When will you give it to him?

9        **MR. EHRLICH:**  We can give that to him tomorrow.

10       A little bit of my concern is that -- the -- to say that

11   something is -- is completely irrelevant and private, my concern

12   is then giving a list to Waymo --

13       **THE COURT:**  One way --

14       **MR. EHRLICH:**  Yeah, I know.

15       **THE COURT:**  You know what?  He's handed it all over to

16   Stroz; that's just where he finds himself.

17       **MR. EHRLICH:**  So the request is to get a list of the search

18   terms that were used to segregate the private material.

19       **THE COURT:**  Yeah.

20       **MR. EHRLICH:**  Is the way I understand it.

21       **THE COURT:**  But you need to tell them who --

22       **MR. EHRLICH:**  Which names.

23       **THE COURT:**  Which names.

24       **MR. EHRLICH:**  Which individuals.  I understand.

25       **THE COURT:**  Yeah.  I mean --

1        **MR. EHRLICH:**  I don't have that today, but we can certainly

2   get that after the hearing.

3        **THE COURT:**  Okay.

4        **MR. EHRLICH:**  By tomorrow.

5        **THE COURT:**  I want that to them by 10:00 a.m. tomorrow.

6        **MR. EHRLICH:**  10:00 a.m. tomorrow.

7        **THE COURT:**  I'm sorry, but we're just on rocket speed.

8        **MR. JUDAH:**  Your Honor, we need an electronic version of the

9   privilege log as well.

10       **MR. EHRLICH:**  We can --

11       **THE COURT:**  That you can have tonight.

12       **MR. EHRLICH:**  Yes.

13       **THE COURT:**  That you can have by 5:00 p.m.

14       **MR. EHRLICH:**  5:00 p.m.

15       **THE COURT:**  You can just e-mail somebody at your office by

16   5:00 p.m.

17       **MR. EHRLICH:**  Yes.

18       **MR. JUDAH:**  And I think Mr. Patchen said that there was

19   similar --

20       **MR. PATCHEN:**  We haven't created a log.  We will do so, and

21   turn everything over by tomorrow morning.

22       **THE COURT:**  You're going to have a long night, right?

23   You're going to have that logged in by 10:00 a.m. tomorrow

24   morning.

25       **MR. PATCHEN:**  We shall do so.

1      **MR. BROWNSTEIN:**  Your Honor, David Brownstein for Colin

2  Sebern.

3      We have a log of private materials, some of which are simply

4  his fiancée's files.  And we have that explanatory material.

5  And we're prepared to turn it over this afternoon.

6      I do want to touch on the native devices, because I -- I'm

7  not clear here.  I thought we had gone through this privacy

8  screen, so that in fact those materials wouldn't be reviewed.

9  And now it sounds like there's some debate about whether

10  counsel's going to want to go through that material anyway.

11      **THE COURT:**  Well, originally, last -- you were first going

12  to go through the Relativity, right?  And all that stuff.

13      **MR. JUDAH:**  Well, we also were going to use the natives in

14  order to determine copy history, transfer history, deletion

15  history, and also file structure, which might help us identify

16  documents.  And also to confirm that everything on the

17  Relativity database, actually it is a complete set of everything

18  on the native images.

19      **MS. BLUNSCHI:**  It is not.  So --

20      **MR. JUDAH:**  Yeah, and it isn't.  So that's an issue.  I

21  think, as you said, I think the way to proceed with the forensic

22  images, the natives, is counsel for, you know, Mr. Levandowski

23  can be there.  And it's a 502 situation.  There's no waiver,

24  there's no privilege.  You know, there's no privacy waiver.

25      If we see something and then they say:  Wait a second,

1    that's going to be -- you know, we object, don't do anything

2    with that, then we can address it then.  But, I mean, I can tell

3    you, we're going to be using the Relativity database for most of

4    our primary review just because it's more easily searchable.

5         But I just --

6         **THE COURT:**  So why can't they remove that, then, from the

7    Relativity database, that stuff, which is a very small

8    percentage of it, that they just described?

9         **MR. JUDAH:**  Well, I mean, you mean completely remove it?  Or

10   just screen it --

11        **THE COURT:**  Or screen it, whatever.  What would you do with

12   it?

13        **MS. BLUNSCHI:**  We would screen it so that it would still be

14   in the database, but only if you're in searches that were run by

15   an administrator.

16        So for the purpose, for example, of the private material,

17   you know, we would still know if Waymo's search terms --

18        **THE COURT:**  And if that was done, then would you,

19   Mr. Ehrlich, not need to be standing over their shoulder, then,

20   while they're doing the search?

21        **MR. EHRLICH:**  If, if that was done, I would want -- I think

22   so.  I think it would be -- be best if we started together, and

23   maybe saw how the process was going to work.

24        I would think -- you know, we're concerned that this be

25   focused on the claims in this case.  And not for some other

1    case.  Not for the arbitration.  Not for any other purposes.  So

2    I think that if we could get a log of the -- after they have run

3    them, the searches they have run --

4       THE COURT:  No, no, no, because what they are concerned is

5    they think stuff is being hidden.  And I'm sorry, I just --

6    Mr. Levandowski doesn't have -- he turned over the entire device

7    to Stroz.  He just turned it over.  The whole thing.

8       MR. EHRLICH:  Are you talking about the native devices?  I

9    may have misunderstood.

10      THE COURT:  I think -- well --

11      MR. JUDAH:  I mean, he turned over all the devices, yes.

12      THE COURT:  Yeah.

13      MR. JUDAH:  And, Your Honor, I think I will just note, we

14   would be entitled, I think, to ask for the production of

15   everything.

16      And I think we are being very accommodating in even

17   suggesting, you know, a protocol that we had discussed that

18   involved Mr. Cooper reviewing things.  And he hasn't been

19   offered anything to review.

20      And so before we can evaluate --

21      THE COURT:  Well, he will.  He will.  It's just a

22   chicken-and-egg problem.

23      MR. EHRLICH:  Well, I don't --

24      MR. COOPER:  I'm on the phone, and I'm prepared to review

25   anything you send me.

1     **THE COURT:**  Hi, Mr. Cooper.

2      **MR. EHRLICH:**   The native devices present a more complicated

3    problem.  And I'll just be very brief here.

4      Some of the devices, there was no review at all.  That was

5    well understood by Stroz, by Uber, by Mr. Levandowski.  So, yes,

6    he turned them over.  They're sitting in the quarantine, in the

7    possession of Stroz, presumably.

8      **MS. BLUNSCHI:**  Uh-huh.

9      **MR. EHRLICH:**  We have not been allowed to get access to

10   them, so I have no idea what is on them.  But I don't think -- I

11   understand he turned over and made them available for

12   inspection.  But I don't think that upends the entire legal

13   rules of discovery.

14     There's a relevance issue.  There's a scope that still

15   should guide what is accessed.  And if you're looking at native

16   devices, they're going to get access to privileged material.

17   And I have no way of predicting where it is, whether it's

18   privileged.  It's very hard to sit on somebody's shoulder and

19   make a lightning-quick decision like that.  So I think it's

20   overkill.

21     I think the relevant materials were pulled; they're in the

22   database.  We have a pretty good platform to be able to address

23   that.  And maybe once they have a showing of need, we can then

24   take the next step.

25     **MR. JUDAH:**  Your Honor, all these materials provided to

1   Stroz, we subpoenaed Stroz.  We got an order compelling it.  Any

2   arguments about relevance should be made before.

3       Two, we don't have to take attorney argument for what is on

4   those devices, whether they're the relevant ones.  We need to

5   inspect them, ourselves, to see what's supposedly in quarantine.

6   Were copies made of every single one of those immediately before

7   they were handed over to Stroz?

8       I also feel like I'm somewhat prejudiced in my ability to

9   effectively discuss any of these issues because, you know,

10  Mr. Levandowski's counsel can mention things about what was done

11  with the devices, but I can't talk about stuff that is very

12  relevant to all these conversations from the report.

13      So, you know, I just can't emphasize enough the need to --

14  actually, Waymo -- I mean, there's -- there's clawback rights,

15  even if you produce a document to the other side that happens to

16  be privileged.

17      Our ability to go in and look at the native devices, to do

18  necessary review on the ones that both have an image and the

19  ones that haven't been imaged.  I think there's remedies that

20  are already available under the civil rules of federal procedure

21  and the rules of evidence that allow them to protect themselves

22  from any inadvertent privilege waiver if they contend, as they

23  do, that any of these materials are privileged.

24      **THE COURT:**  I think he's right, that they were subpoenaed.

25  It was the issue that was up on appeal.  I think that ship has

1   sailed in that sense as to -- but I think as to privacy, we

2   always acknowledged -- and Waymo doesn't want the private stuff.

3   They may want to litigate the privileged stuff.  I haven't ruled

4   yet on -- I haven't ruled that they waived privilege.  So that

5   is a different issue.  I think relevance is sort of -- that ship

6   has sailed.

7       So with respect to privacy, though, or privilege, at least

8   with the Relativity, let's start with that.  You have to start

9   somewhere.  And I assume that's where you are going to start.  I

10  mean, you're going to get from Mr. González tonight this bolus

11  of all these emails.  Right?

12      And now you have the report, now you can share the report,

13  you understand, you can share the report with the others.  The

14  plan was you're going to reread that.  That's going to guide you

15  in some extent as to what you're going to do.

16      The reason I was pushing Mr. Ehrlich a little bit on -- I

17  think if we do this where they block -- I think that's what you

18  said, they block these things, I don't know why you need to be

19  standing over their shoulders at that point.  Now we've blocked

20  everything that you said is private or privileged.  And then I

21  think they should be able to do their search without you

22  standing there, quite honestly.

23      **MR. EHRLICH:**  I think that's fine, if we're talking about

24  the Relativity database.

25      **THE COURT:**  Yes.  Right?  So -- which I think you would

1    prefer.

2        **MR. JUDAH:**  Well, sure, I don't -- that's fine with me if

3    Miles wants to watch me run searches on a computer for eight

4    hours.

5        But the issue is without knowing what is in this privacy

6    list and what's on the privilege log which we literally got, you

7    know, ten minutes ago, I don't -- I don't -- I mean, in theory,

8    yeah, this could be appropriate.  But we don't know --

9        **THE COURT:**  Doesn't mean that you're never going to get it,

10   by the way.  It's just we're taking it in an iterative process.

11   We'll start with let's let them -- they can easily unblock it,

12   right?

13       **MS. BLUNSCHI:**  They can easily unblock it.

14       **THE COURT:**  And that doesn't take 48 hours.

15       **MS. BLUNSCHI:**  That will not.  So -- although as I'm

16   learning about the expanding lists and different people's search

17   terms, all of these things have to be applied to the database.

18   Right?

19       So if you wanted an unrestricted database, I probably can

20   get that to you this weekend.  We two need to figure out what

21   all of these private materials are to pull out.  And it seems

22   like that's growing so, I'm --

23       **THE COURT:**  Well, there's just not time.  We may just be in

24   a time thing.  That's just not going to work, then, Mr. Ehrlich.

25       **MR. EHRLICH:**  I think we -- we've worked with the Stroz

1    technician who is ready to go on our search terms.

2         **MS. BLUNSCHI:**  Uh-huh.

3         **THE COURT:**  I mean, I want it ready to go on one Monday.  I

4    want Waymo to be there on Monday.

5         **MS. BLUNSCHI:**  There is no way that we can have all of the

6    private and privileged things pulled out, and the database

7    produced on Monday.  That I know.

8         **MR. JUDAH:**  And Your Honor, until we see the privacy list, I

9    just don't -- I really am unable to comment on whether -- I

10   mean, family members are relevant to some issues in this case.

11        **THE COURT:**  They very well have been.

12        **MR. PERLSON:**  And so, you know, if there's going to be any

13   -- I mean, so, I'm just very prejudiced because no one's been

14   giving us any information even though --

15        **THE COURT:**  Are you the one that's going to be doing the

16   search?

17        **MR. JUDAH:**  Not on Monday, because I'm getting married this

18   weekend.  But I will --

19        **THE COURT:**  That's terrible planning.

20        **MR. JUDAH:**  But -- well, I planned the wedding before this

21   case existed.

22        **THE COURT:**  You should get, when this case is over, like, a

23   huge bonus and a month honeymoon.  That's going to be an order.

24        **MR. PERLSON:**  Duly noted, Your Honor.

25        **THE COURT:**  Oh, my gosh.

1      **MR. JUDAH:**  So I will not be reviewing on Monday or Tuesday,

2   but I will be back later on in the week.

3      **MR. GONZÁLEZ:**  (Inaudible)

4      **THE COURT:**  My condolences to your future spouse.

5      **MR. JUDAH:**  Duly noted as well.

6      **THE COURT:**  Oh, wow.  Okay.

7      **MR. EHRLICH:**  Can I suggest, if there's -- I am guessing

8   that the materials that are most interesting are

9   Mr. Levandowski's, to Waymo.  So if there is a way to take that

10   database, and have it just be Levandowski's, in Relativity with

11   the screen applied, and they want to get started there, and it's

12   doable, we have no objection to that.

13      **THE COURT:**  No, I know Mister --

14      **MR. EHRLICH:**  Because I feel like we really have teed it up

15   so they can push buttons and populate the database.

16      **THE COURT:**  If it's just screening them, are you ready to go

17   Monday?

18      **MS. BLUNSCHI:**  If it's just Levandowski, I still have to go

19   back and ask my guys who have been fielding requests from all of

20   these folks, and need to produce our materials this weekend.

21      **THE COURT:**  Uh-huh.

22      **MS. BLUNSCHI:**  If it is just Levandowski --

23      **THE COURT:**  I have to tell you, everybody knew this.  It

24   should have actually been ready to go.  And I realize that the

25   work could have been for naught.  Could have.  But it should

```
 1    have been ready to go and teed up there.  So I'm sorry, I'm just
 2    not that sympathetic to that.
 3        I want there to be a Relativity database that Waymo can
 4    start reviewing on Monday.
 5        MS. BLUNSCHI:  Uh-huh.
 6        THE COURT:  If there is some screen in place --
 7        MS. BLUNSCHI:  Uh-huh.
 8        THE COURT:  -- then whatever you can get in place by Monday.
 9    And if you can't get it all in there, too bad.  Right?
10        MS. BLUNSCHI:  Okay.
11        THE COURT:  So Monday morning, Waymo's there.  They need to
12    know exactly what's been screened.  You already have the
13    privilege log and all that.
14        MS. BLUNSCHI:  Uh-huh.
15        THE COURT:  Now, you can have -- not you (Indicating),
16    somebody else in your office will review it.  And then if there
17    are documents that there's issues about, show them first to
18    Mr. Cooper.  He can just look at everything, right, and he can
19    say.
20        MR. JUDAH:  And so, Your Honor, one thing I'll note is the
21    other diligenced employees also -- without going into confidence
22    in the Stroz report, we're also interested in a lot of that
23    content.
24        THE COURT:  No, of course.  I understand.
25        MS. BLUNSCHI:  Uh-huh.
```

1      **THE COURT:**  But now with this time limit, we're just going

2  to be limited, in any event, because the Relativity is going to

3  be ready for you -- not you, somebody else -- Monday morning.

4      **MR. JUDAH:**  Your Honor, so, with respect to, then, the

5  native images, what do you want -- for the Relativity database,

6  how do you want to proceed on that?

7      **THE COURT:**  So, I don't quite understand, like -- when are

8  you -- first you're going to look at Relativity, right?

9      **MR. JUDAH:**  Well, I mean, I would actually -- I mean,

10  someone would look at that.  We've requested -- we've discussed

11  this with Stroz, we've requested six review journals.  So we're

12  going to have multiple people reviewing.  And people are going

13  to be reviewing Relativity.

14      And we would like people reviewing everything because, you

15  know, the -- obviously this is highly important discovery that

16  we requested in May.

17      **MS. BLUNSCHI:**  And Stroz has prioritized getting the native

18  devices ready.  It was a tremendous amount of effort.  And that

19  is ready to go on Monday.

20      The Relativity would have been ready to go, but we were just

21  our getting search terms from some of the --

22      **THE COURT:**  No, no, no, that's not you.  That's not on you.

23      **MS. BLUNSCHI:**  -- this morning.  So --

24      **MR. PERLSON:**  And Your Honor, with respect to the unimaged

25  devices, the -- you know, we would -- because it takes us seven

 1   days to get those images loaded for review, we would request

 2   that they get loaded now.

 3      **THE COURT:**  Who does that?

 4      **MR. JUDAH:**  That would be Stroz.

 5      **MS. BLUNSCHI:**  So we discussed at the last hearing that

 6   there was an universe of unimaged, unreviewed, primarily

 7   Levandowski materials.

 8      We can start imaging those.  It will take --

 9      **THE COURT:**  When are you going to take Mr. Friedman's --

10      **MS. BLUNSCHI:**  Friedberg.

11      **THE COURT:**  -- Friedberg's deposition?

12      **MR. JUDAH:**  That's a good question, Your Honor.  We don't

13   have any -- we need to look at the documents to decide that.

14   Because we don't have any production from Stroz.  We don't --

15   other than the report, itself.

16      And so I know you had suggested possibly breaking it up in

17   two.  But I don't think we can -- we can even schedule the first

18   one until we've actually looked in the documents and known, you

19   know, how much time do we need to prepare for a first

20   deposition?  Do we feel comfortable just going with this, just

21   doing the deposition all at once a little bit later?  I don't

22   know.

23      Again, at this point, literally all we have is the Stroz

24   report and the exhibits.

25      **MR. PERLSON:**  Yeah.  And sorry to interject, but I think, as

1    I understood it, there were about 5,000 or so internal Stroz,

2    Stroz documents that were -- that are going to be made

3    available.

4         **MS. BLUNSCHI:**  Uh-huh.

5         **MR. PERLSON:**  We have no idea, obviously, what's in those.

6    None of us -- you know, I guess some of the stuff got produced

7    while we were in the hearing.  But other than the report and the

8    exhibits, we haven't seen any of the documents that came off the

9    privilege log.  We just have no idea what specifically we are

10   going to need before we take that deposition.  So that is really

11   an unanswerable question right now, I think.

12        **MR. JUDAH:**  And I guess one other thing I would note is

13   they're -- I can already tell you that you Waymo's going to be

14   requesting some additional depositions, reviewing Mr. Gurley's,

15   Mr. Adam Bentley.

16        And as we are reviewing these materials, there's probably

17   going to be more.  So that's also -- there could be other people

18   from Stroz that we would want to depose.

19        **THE COURT:**  And you also need to schedule your MoFo, right,

20   depositions also.

21        **MR. JUDAH:**  Absolutely, Your Honor.

22        **THE COURT:**  I think we should probably set the hearing for

23   Monday afternoon, because I know we need to make sure those

24   depos are on course.

25        **MR. GONZÁLEZ:**  I think Monday afternoon we have a hearing

1    with Judge Alsup at 2:00.

2        **MS. BLUNSCHI:**  At 1:00.

3        **THE COURT:**  Why don't you just come down here when you're

4    done.

5        **MR. GONZÁLEZ:**  We will be happy to.  See you around 7:00.

6        **THE COURT:**  Let Ms. Means know.  But -- yeah, hopefully, it

7    won't go too long.  Although your hearings with him are

8    sometimes quite long, I don't think this -- I think he said it

9    would be brief.

10        **MR. JUDAH:**  Okay.  So one thing, I want to make clear

11    that -- what exactly is going to be available in the Relativity

12    database on Monday, so that we can start reviewing.

13        **THE COURT:**  Everything, other than as much of the privilege

14    log that you've been given and the privacy names that you'll be

15    given they say by 10:00 tomorrow, as much as they can get done.

16    And they don't believe they're going to be able to get it done.

17    May have Mr. Ron's, it may have some of Mister --

18        **MR. PATCHEN:**  Sebern's.

19        **THE COURT:**  -- Sebern's as well.  May not, because they

20    don't think they're going to have time to get it all done.  But

21    you will have a list of that.  That's it.  So it will be

22    everything other than what they've blocked.  You'll have a list

23    of what they've blocked.

24        And then to the extent there's anything blocked from the log

25    that you think is -- you can give them, then, search terms.

 1   That'll probably -- first I want you to get that database to

 2   them, ready to go, Monday.

 3       Can you do that simultaneously, then, the stuff that you've

 4   blocked?

 5       **MS. BLUNSCHI:**  Uh-huh.

 6       **THE COURT:**  Are you able to search?  In other words, I don't

 7   want to delay -- are you able to search -- they're going to give

 8   you search terms.  Are you able to search that at the same time

 9   they're doing their work?

10       **MS. BLUNSCHI:**  I'm not sure I understand the question.  I

11   think James was planning to run the searches directly in the

12   Relativity database.

13       **THE COURT:**  No, no, no, but some of it is blocked.

14       **MS. BLUNSCHI:**  Oh, yes.  Yes.

15       **THE COURT:**  And those searches need to be run on the blocked

16   part.

17       **MS. BLUNSCHI:**  Yes.  We can do that essentially

18   simultaneously.

19       **MR. PERLSON:**  I guess what I don't fully understand is that

20   there was some -- you know, I understand there could be a lot of

21   work, that Stroz was not able to actually do all this blocking

22   for all of the files --

23       **THE COURT:**  Exactly.

24       **MR. PERLSON:**  -- by Monday.  So is it going to -- going to

25   be some of them?

1        **THE COURT:**  Exactly.

2      **MR. PERLSON:**  And if so, that's -- that's what -- I think

3    that's what we're not clear about.

4        **THE COURT:**  They'll tell you which ones have been blocked on

5    Monday.  Only as much as they can get done.

6      **MR. PERLSON:**  So, like, if they only get through half of

7    Levandowski, then we don't get any of the others.  Like, we

8    don't get Ron's files, and -- that's what I don't understand.

9        **THE COURT:**  No, you get them.  No, you get them.  They don't

10    get to block them.

11      **MR. GONZÁLEZ:**  It's the reverse.

12      **MS. BLUNSCHI:**  So the diligenced employees have to negotiate

13    amongst themselves as to who goes first?

14        **THE COURT:**  Whatever.

15      **MS. BLUNSCHI:**  We'll certainly do all that we can.  But we

16    had been prioritizing the native review.  So we need to shift

17    gears on that.

18      **MR. JUDAH:**  And so the -- so I understand it's going to be

19    made available on Monday.

20        With respect to restoring or creating forensic images of the

21    unimaged devices, is that something that can proceed

22    immediately?

23      **MS. BLUNSCHI:**  Stroz certainly has no objection to that.

24      **THE COURT:**  Okay.

25      **MR. JUDAH:**  Waymo would request it.

 1         THE COURT:  All right.

 2      MR. JUDAH:  And my understanding is that should take about

 3   seven days.

 4         THE COURT:  Okay.

 5      MS. BLUNSCHI:  Yeah, I'll get with the folks to figure out

 6   exactly how long, but that was their initial estimate.

 7         THE COURT:  Might as well get started on that.  I understand

 8   there may be some objections, but we may as well get started on

 9   that so it's not delayed because it's not there.

10      MS. BLUNSCHI:  If there's something surprising in the

11   storage locker that's a little more challenging, we'll let you

12   know.  But we think it will take about a week.

13         THE COURT:  Okay.

14      Yes.

15      MR. EHRLICH:  Can I just say, because there was discussion

16   about whether I'd be sitting next to Mr. Judah or whoever is

17   going to be there, at least in the beginning, we do want to be

18   there.

19         THE COURT:  It sounds like not everything is going to be

20   blocked.

21      MR. EHRLICH:  Yeah.

22      MR. PATCHEN:  Yeah.

23      MR. JUDAH:  You're invited, Miles.

24      MR. EHRLICH:  Thank you.

25         THE COURT:  He enjoys your company, that's why -- I try --

1      **MR. EHRLICH:**  Well, so, and I heard reference to six

2  terminals.  We don't have six people in our firm.  And so I

3  don't know; I'm hoping that it can just be one for

4  Mr. Levandowski at a time, so either Ms. Craig or I could be

5  there.

6      I don't know if --

7      **THE COURT:**  Well, you sort of like said, like, you were

8  going to print something out?  Is that what you said?  That

9  seemed old-fashioned.

10     **MR. JUDAH:**  When we are reviewing things, I think we would

11  print to PDF and/or native if it's something that will be native

12  file.

13     **THE COURT:**  So there'll be six terminals going.  And if

14  you're going to print in PDF, you'll notify Ms. Craig or

15  Mr. Ehrlich.

16     Where's Mr. Ramsey?

17     **MR. EHRLICH:**  Well, we have a trial coming up.

18     **THE COURT:**  You have other cases.

19     So that they can run over and say -- you know, I mean, most

20  of it shouldn't -- is not going to be, I would think.  Because

21  they don't want to waste their time with that.

22     **MR. EHRLICH:**  I understand.

23     **MR. JUDAH:**  And Your Honor, the other aspect is the protocol

24  that Waymo had envisioned.  You know, we would -- you know, both

25  the diligenced employee and defendants would also be emailed

1    that production copy kind of at the same time, so that they can

2    then also immediately know if there is an issue.  So they don't

3    even need to be there.

4        **THE COURT:**  Oh.  That's pretty generous.

5        **MS. BLUNSCHI:**  Fancy.

6        **MR. EHRLICH:**  So my -- but I want to make sure we are clear

7    on the protocol.  This is AEO until a document is identified

8    that they want that we have no objection to.  Then it's

9    produced.

10      So, so -- you're looking at me funny.  I may be missing

11    something here.  So my understanding is they cannot walk away

12    with a document.

13        **THE COURT:**  Unless they run it by you.

14        **MR. EHRLICH:**  They tag it.  We then either have an objection

15    or we don't.  And we have very few objections left.

16        **THE COURT:**  It would only be on attorney/client privilege

17    that hasn't already been deemed waived in this action.

18        **MR. EHRLICH:**  Correct.

19        **THE COURT:**  Or very private.

20        **MR. EHRLICH:**  Very private.

21        **THE COURT:**  I think -- what was the term used?

22        **MR. EHRLICH:**  "Extreme" --

23        **THE COURT:**  "Extreme privacy."

24        **MR. EHRLICH:**  But that has to happen before any document can

25    leave the Stroz database.

1      But, given the Federal Circuit ruling which we're going to

2  talk about in the briefing, I also think we're talking about

3  documents that were produced potentially Fifth-Amendment

4  privileged, until we have a final ruling.

5      There's also going to be -- need to be some designation of

6  some of the documents.

7      **THE COURT:**  Right.

8      **MR. EHRLICH:**  Yes.  So --

9      **THE COURT:**  They should all be -- there are going to be too

10  busy to be running off to be -- you should be -- they should be

11  treated as confidential.  Not AEO.  Right?  Confidential.

12      **MR. JUDAH:**  So, two things, Your Honor.  One, yeah, we're

13  fine, to do something like depositions --

14      **THE COURT:**  Unless, I suppose -- well, I guess you would say

15  even -- I think we just have to adjudicate this wrench that the

16  Federal Circuit threw in there.

17      **MR. JUDAH:**  Right.  For depositions, there's, like, a

18  standard amount of time to do something like -- you know,

19  there's three days to designate it provisionally confidential,

20  and then parties can designate beyond that.

21      So with respect, though, to when the document gets produced,

22  when it leaves the Stroz database, see, this is -- I want to be

23  very clear about this, because this is exactly -- Waymo's

24  proposal, which is the document gets -- because what we don't

25  want to have is delay.  And I understand everyone says:  Oh,

we're going to try to move quickly.

But the Waymo proposal we think resolves concerns, but also keeps things fast.  Because we see something, it gets produced, you know, Miles can claw it back immediately, if he says:  Oh, wait a second, this is problematic.

If we had to wait for his clearance before things actually get produced, you know, then --

THE COURT:  What do you mean by "produced"?  Made into a PDF?

MR. JUDAH:  Yeah.  And actually, something that Waymo can start, you know, using to prepare for depositions and use as exhibits and whatnot.

THE COURT:  Well, it's instantaneous, really.

MR. EHRLICH:  No, that's not what the protocol was agreed to.  It was:  You can view it; you identify what you want to take.  There's an opportunity to object.  And if, if -- and there are very narrow grounds of objection.  It can be done quite quickly.

THE COURT:  It has to be done at the moment, because you're going to be there.

MR. EHRLICH:  Well, unless we're not there.  But -- but --

THE COURT:  No.  If you're not there, that's because she will have blocked everything, and all of your objections would have been taken care of.  If you want to -- but as I understand it, they may not be able to block everything that you've

1    identified.  In which case, then you have to be there.  It has

2    to be real time.  There's no delay.  They're there.

3        **MR. JUDAH:**  Look, I think either one is fine.  Either it

4    gets produced immediately, you know, to us, and then they have

5    an opportunity after it's already produced to say:  Well, wait a

6    second, we want to use clawback rights or whatever to try -- you

7    know.  Or they have to object immediately at the -- there.

8    Either one is --

9        **THE COURT:**  Yes.  No, I agree.

10       **MR. PERLSON:**  Your Honor, it's not going to be practical to

11   have, on the fly -- what's going to happen is that -- and,

12   hopefully, it wouldn't happen a lot, but it could -- is that

13   there's going to be a situation where we have reviewers saying:

14   I want to review this.

15       They say:  Okay, look at it.

16       And then the reviewer is sitting there, waiting there.  And

17   then they're going to be looking.  And then it's going to be ten

18   to 15 minutes for every document, and we're only going to be

19   looking at four documents in an hour.  So that's not practical,

20   and it's completely unfair.

21       **THE COURT:**  It's not looking at them.  It's not looking at

22   them.  It's the ones that you are taking with you.  Right?

23       **MR. PERLSON:**  Right.  But if we're saying:  We want to take

24   this one -- I mean we want to review this stuff fast and

25   efficiently.

```
 1        But if we're there and we want to click things, and then we

 2   have to wait for someone to rule, and then if there's a dispute

 3   we have to get to Mr. Cooper and do that, that's going to be an

 4   extremely laborious process.

 5        THE COURT:  No, no, no, I think the dispute is it's yours,

 6   and then -- I don't know.

 7        MR. PERLSON:  Because he's saying that before it even gets

 8   produced to us and not be clawed back, that -- that he can be a

 9   screen to us even getting it.

10        THE COURT:  Yeah.  So this is the thing.  I'm allowing you

11   to do the block.  I'm allowing you to do the block, which

12   they're never going to see it.  That takes care of that.  I

13   don't think you get both.  We're on a time crunch.  That's just

14   the way it is.  That's just too bad.  I'm allowing you to do the

15   block.

16        Other than, that I think his proposal, you can be there but

17   it -- also email it to you.  But I don't think -- you know, they

18   get it, you can try to claw it back.

19        I mean, what I'm envisioning is they don't want extreme

20   private stuff.  And I know you, Mr. Ehrlich, and I don't think

21   that you're going to be clawing back something that's not

22   extreme private just because it's bad.  I mean, you're a

23   vigorous advocate, but you understand the rulings are what the

24   rulings are.  So I do think that shouldn't -- it shouldn't be an

25   issue.
```

1        But I think that's right, is you don't get both to place the

2   block, and to have this sort of second-level block as well.

3        **MR. EHRLICH:**  So, so, I guess the question is we believe

4   that it's still valid to present a relevance -- an extreme

5   relevance objection.

6        We don't -- we don't -- they say they don't want to be

7   rooting around in other matters, but these cases have a way of

8   morphing.  There are -- this is his digital life for --

9        **THE COURT:**  Mr. Ehrlich, we've been there.  I understand.  I

10  understand.  That's why I would never hand over my phone to a

11  third-party forensic investigator.  So, that ship has sailed.

12  We're done.  I'm trying to accommodate it to some extent, but I

13  only can so much.  Because, the fact of the matter is the reason

14  we are having this conversation is because they turned it over.

15       **MR. EHRLICH:**  I understand.

16       **THE COURT:**  Okay?  So, that's so done.  I'm allowing you to

17  put that block in.  Whatever Stroz can get in between now and

18  Monday morning is there.  It's blocked; they won't see it.

19  It'll have to be on your log.  Stroz will have to identify

20  precisely what files were blocked, so they know.  Okay.  They

21  can then run their search terms on the blocked files so you can

22  be satisfied that none of that actually has relevant information

23  in it.

24       To the extent there's anything that they didn't have time to

25  block, you can be there.  But I'm not going to put any other

1    parameters.  You can be there, so you will know, so you can

2    raise whatever objection you want at whatever time.  But they're

3    allowed to do their -- we're just three and a half weeks from

4    trial.  They're allowed to do their search.

5         I'm allowing you to put the blocks in.

6         **MR. PATCHEN:**  Just to clarify, Your Honor, if there is

7    something that is produced that, for example, a cholesterol

8    screening or whatever that didn't hit the block, they want it

9    produced, we can then object to that.  And there's going to be a

10   procedure by which --

11        **THE COURT:**  They don't want his cholesterol screen.  They

12   will say:  Oops, didn't -- misread it.  We don't want it.

13        **MR. PATCHEN:**  I would hope.

14        **THE COURT:**  And if it is produced, of course, there's a

15   clawback.  We're doing Rule 502 here.

16        **MR. PATCHEN:**  Perfect.

17        **THE COURT:**  No waivers, whatsoever.  There's a clawback.

18        **MR. JUDAH:**  Your Honor, that's acceptable to Waymo.

19        **THE COURT:**  All right.  So I think we have a plan.

20        **MS. BLUNSCHI:**  We have a plan.

21        **THE COURT:**  You will do as much as you can do by Monday

22   morning.  By Monday, what time will your team be there without

23   you?

24        **MR. JUDAH:**  9:00 a.m.

25        **THE COURT:**  9:00 a.m.  Okay.

1      **MS. BLUNSCHI:**  I think that will work.

2      **THE COURT:**  9:00 a.m., they'll be ready to go with six

3    terminals.  And any other diligenced employees who want to have

4    their counsel there, Mr. Judah said they're welcome to be there.

5      **MS. BLUNSCHI:**  So at that time, we're making the Relativity

6    materials available online.  We do have the native devices, and

7    we are ready within a reasonable time frame to make those

8    available, if that's the Court's desire.

9      **MR. JUDAH:**  And Your Honor, yeah, I mean, I understand you

10   don't want to make -- you don't want to do a definitive ruling

11   on them today, but we will need the decision on them.  And Waymo

12   wants to be able to check --

13     **THE COURT:**  These are the devices that --

14     **MR. JUDAH:**  The Relativity database has some -- you know,

15   has a lot of files, but not all of them.  And so we need our

16   experts, and we need, you know, our attorneys to be able to look

17   at those, and see what's on them.

18     **THE COURT:**  These are the other native files that you said

19   are ready to go now.

20     **MS. BLUNSCHI:**  We were planning to make all those available

21   on Monday.

22     **THE COURT:**  Oh, on Monday, as well.

23     **MR. JUDAH:**  Yeah.

24     **MS. BLUNSCHI:**  We were, however, planning that based on the

25   assumption that we wouldn't be doing Relativity --

1          **THE COURT:**  I think the priority would be having the

2     Relativity database ready.  Correct?

3         **MR. JUDAH:**  We have a lot of priorities, but -- so, so,

4     Your Honor, if you're saying that -- I understand those issues

5     with the natives because, you know, there's been --

6         **THE COURT:**  I just want to talk to Judge Alsup, to be

7     honest.  It's his case; it's his trial.  He's not here today or

8     tomorrow.  He's here Monday.  I just want to talk to Judge Alsup

9     about that.

10        **MR. JUDAH:**  Okay.

11        **THE COURT:**  I think that's better than doing something, him

12    overruling.  Might as well do it all at one time.  We don't have

13    a lot of time.

14        **MR. JUDAH:**  Okay, so that would be something we can talk

15    about on Monday?

16        **THE COURT:**  On Monday, after you see him.  And who knows?

17    Maybe he will preempt me on that.

18        **MS. BLUNSCHI:**  And just logistically -- and I think this is

19    the concern that the diligenced employees counsel would raise --

20    the native devices, we can't block materials.

21        **THE COURT:**  No, I understand that.  Otherwise we'd have a

22    protocol.

23        **MS. BLUNSCHI:**  We'd have no problem.

24        **THE COURT:**  No, I understand that that's the rub.  That's

25    the rub.

1      MS. BLUNSCHI:  Uh-huh.

2      THE COURT:  So you're producing documents by Saturday.

3      MS. BLUNSCHI:  (Nods head)

4      THE COURT:  And the Relativity will be ready to go by Monday

5  with whatever block is there.

6      MS. BLUNSCHI:  Uh-huh.

7      THE COURT:  You'll have the log.  You'll provide yours

8  (Indicating) and you'll provide yours today (Indicating); is

9  that what we just said?

10     MR. BROWNSTEIN:  Yes, that's correct.

11     THE COURT:  By tomorrow morning.  And you will tell them on

12  Monday what it is that you have blocked.

13     MS. BLUNSCHI:  Yes.  We will do that.

14     THE COURT:  Okay.  You can have another team reviewing that,

15  come up with search terms that they'll run.

16     MR. JUDAH:  Well, we run them, ourselves.

17     THE COURT:  Oh, you do.  Oh, on the block --

18     MR. JUDAH:  On the blocked materials.

19     MS. BLUNSCHI:  We'll have someone from Stroz available to

20  run them through the blocked materials, yes.

21     THE COURT:  All right.  And then -- great.  Okay.  And then

22  to the extent we have any disputes, Mr. Cooper is available to

23  review -- sorry, Mr. Cooper -- but to review any actual document

24  that there is a dispute about.

25     I actually doubt -- I do, I doubt very much that there will

1   be a dispute about that.  The time I have --

2       **MR. JUDAH:**  Not from Waymo's end, there's not going to be a

3   dispute.

4       **THE COURT:**  Limited time has a way of pushing the cream to

5   the top.  So I doubt very much there will be.

6       Yes, Mr. Brownstein.

7       **MR. BROWNSTEIN:**  One more question about logistics --

8       **THE COURT:**  Yes.

9       **MR. BROWNSTEIN:**  -- since our law firm couldn't even staff

10  six terminals if we wanted to --

11      **THE COURT:**  Yes.

12      **MR. BROWNSTEIN:**  -- is, as documents are selected, I heard

13  counsel say that they would simply e-mail them around.  If

14  that's part of the protocol, I think it's going to make

15  everything go faster.  We can look at, you know, batches of

16  documents and get back to them quickly, even if we can't staff

17  the room full-time.

18      **MR. JUDAH:**  And that's exactly why we think it's a good

19  idea.  And we can -- I think we're envisioning that the

20  documents would only go to the diligenced employee, not to all

21  the diligenced employees.

22      So for example --

23      **THE COURT:**  Of course, and I don't think they want them to.

24      **MS. BLUNSCHI:**  Yeah.

25      **MR. JUDAH:**  Right, exactly.

1    THE COURT:  Okay.

2    MR. PATCHEN:  Just to clarify, you'd be looking on a

3  custodian-by-custodian basis?

4    MR. JUDAH:  I think all the Relativity stuff is all in one

5  computer.

6    MS. BLUNSCHI:  It's all in one.

7    MR. PATCHEN:  Okay.  So you'd identify by custodian who the

8  document was from and (Inaudible)...

9    MR. JUDAH:  Right.

10   (Reporter interruption)

11   MR. PATCHEN:  So you would identify who the custodian was,

12  and email it to that person's counsel.

13   MR. JUDAH:  Right.

14   THE COURT:  Okay.  So then what I want to do on Monday, not

15  from you (Indicating), is now somebody else will have read

16  through everything that's going to be produced this weekend, and

17  we'll have a better idea about scheduling depositions.

18   Because on Monday, I can tell you Judge Alsup's probably

19  going to ask you anyway:  When are they scheduled for?  Right?

20   And people are going to have to make themselves -- I know

21  not your client -- well, maybe it is, but I know what he's going

22  to say.  Might have to make themselves available again.

23  Everybody understood that.

24   MR. PATCHEN:  We understand that, Your Honor.

25   THE COURT:  Yeah.  And then Mr. González will have to work

1    with making his colleagues -- some of your colleagues, but also

2    -- or maybe even you, too --

3        **MR. GONZÁLEZ:**  Oh, no, not me.  I'll admit --

4        **THE COURT:**  -- available for deposition.  They're just going

5    to have to be --

6        **MR. GONZÁLEZ:**  We are ready --

7        **THE COURT:**  -- quadruple-set, day and night --

8        **MR. GONZÁLEZ:**  Ready to go.

9        **THE COURT:**  -- all hours of the day to try to get this in on

10   this schedule.

11       So I'll see you Monday afternoon, and we'll, hopefully, have

12   an idea of how things are going -- not from you (Indicating).

13   I shouldn't even be looking at you since you will be nowhere

14   near here.

15       Mr. Perlson, somebody else will be here, should have an idea

16   how, hopefully, smoothly things are going on Monday.

17       **MR. PERLSON:**  Yes, we will -- your brother is available.

18       He has a twin brother.

19       **MR. JUDAH:**  I have a identical twin brother, Your Honor.

20   I'm thinking he can show up.

21       **MS. BLUNSCHI:**  Can't the identical twin just go to the

22   wedding?

23       **MR. JUDAH:**  That was also discussed.

24       **THE COURT:**  Your bonus just went up.

25       **MR. PERLSON:**  Turned down on that.

1          **THE COURT:**  Okay.  Thanks so much.  I will see you Monday

2     afternoon.

3          If something does come up, my clerk's going to, like, shoot

4     me for saying this, but just have Mr. Cooper contact me

5     tomorrow.  Okay?

6          All right.  And congratulations.

7          **MR. JUDAH:**  Thank you.

8          **THE COURT:**  Have a really wonderful week, weekend.  There's

9     -- work is great, but nothing -- life is really all about these

10    relationships.  And in the end, you will never regret having

11    missed this document review this weekend.

12         Thank you.

13         **MR. JUDAH:**  Thank you, Your Honor.

14         **MR. EHRLICH:**  Thank you, Your Honor.

15         **MR. GONZÁLEZ:**  Thank you.

16         **MR. COOPER:**  Congratulations.

17         **MR. JUDAH:**  Thanks, John.

18         (Proceedings concluded)

19

20

21

22

23

24

25

1

2

3

4                    **<u>CERTIFICATE OF REPORTER</u>**

5          I, BELLE BALL, Official Reporter for the United States

6    Court, Northern District of California, hereby certify that the

7    foregoing is a correct transcript from the record of proceedings

8    in the above-entitled matter.

9

10

11                  _____/s/ Belle Ball_____

12              Belle Ball, CSR 8785, CRR, RDR

13               Friday, September 15, 2017

14

15

16

17

18

19

20

21

22

23

24

25