QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David A. Perlson (Bar No. 209502)
  davidperlson@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  John Neukom (Bar No. 275887)
  johnneukom@quinnemanuel.com
  Jordan Jaffe (Bar No. 254886)
  jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC, | CASE NO. 3:17-cv-00939 |
| Plaintiff, | **PLAINTIFF WAYMO LLC'S MOTION FOR CONTINUANCE OF TRIAL DATE** |
| vs. | |
| UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.    A CONTINUANCE IS NECESSARY FOR WAYMO TO PREPARE FOR TRIAL
      BASED ON THE NEWLY AVAILABLE STROZ MATERIALS AND
      RELATED MATERIALS STILL NOT YET PRODUCED ...................................................4

II.   A CONTINUANCE IS NECESSARY BECAUSE WAYMO IS ENTITLED TO
      PROTECT ITS TRADE SECRETS BEYOND THE NINE TRADE SECRETS
      WAYMO IS LIMITED TO LITIGATING AT TRIAL.........................................................15

III.  THE COURT SHOULD NOT APPOINT AN EXPERT PURSUANT TO
      FEDERAL RULE OF EVIDENCE 706 ...............................................................................19

1    On September 8, 2017, this Court ordered that any motion to continue the trial, based on the

2    status of Federal Circuit proceedings or for any other reason, be filed by September 29, 2017.  Dkt.

3    1499.  On September 13, the Federal Circuit issued an opinion affirming this Court's discovery orders

4    regarding the Stroz Report, requiring Defendants and Stroz to produce the report and its exhibits,

5    along with communications, documents, and devices that were withheld on grounds of a supposed

6    common-interest privilege before April 11, 2016.  Defendants and Stroz have so far produced or made

7    available a small portion of the material required, though much remains outstanding.  Based on a

8    review of the material thus far produced, it is clear why Defendants have attempted to shield ███████

9    ███████████████████ evidence.  With so much material only now seeing the light of day, Waymo

10   would be unfairly prejudiced if the trial proceeds as initially scheduled on October 10 without

11   additional time to pursue this mountain of new evidence.

12   *First*, a continuance is necessary because the production and review of the new evidence, the

13   further numerous depositions and other discovery (including third party discovery) to be conducted in

14   light of that evidence, likely discovery disputes regarding continued claims of privilege or other

15   withheld documents, further supplementation of expert reports, and additional motion practice raised

16   by the evidence cannot be completed with sufficient time to prepare for an October 10 trial date.  The

17   required production will include thousands (if not hundreds of thousands) of new documents that are

18   only now being produced or made available for inspection, thousands of documents that are still being

19   withheld as privileged from those same sources, and 150 devices in Stroz's possession, approximately

20   100 of which came from Levandowski.

21   The evidence Uber and Ottomotto attempted to shield from discovery goes to the heart of the

22   case.  As recently as August 16, Uber's counsel represented to the Court, "Your Honor.  When the

23   Federal Circuit makes a ruling, there's a whole lot that Uber's been dying to say that we'll say.  And it

24   will be very clear: There's no 'there' there."  Dkt. 1261 (Aug. 16, 2017 Tr.) at 29:14-17.  Putting aside

25   the fact that Uber fought tooth and nail against the disclosure of the very materials its counsel claimed

26   it wanted to reveal, the Stroz Report unequivocally establishes the facts underlying Waymo's trade

27   secret misappropriation claims: ██████████████████████████████████████████████████

28   ██████████████████████████████████████████████████████████████████████████████

-1-

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The Stroz

3 Report further shows that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5     The report also directly conflicts with testimony from Defendants' officers and highlights

6 documents that Defendants have inexplicably failed to produce.  For example, Defendants have

7 referred to documents on Waymo's trade secrets list as "*allegedly* downloaded." *See, e.g.*, Dkt. 748-

8 13 (emphasis added).  But ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Uber also repeatedly

10 claimed ignorance as to the 14,000 files Levandowski downloaded from Waymo's SVN server.  *See*

11 *e.g.*, Dkt. 502 (May 3, 2017 Tr.) at 58:10-11 (Mr. Gonzalez: "Where is the evidence that we knew that

12 Mr. Levandowski was going to download or that he did download something improperly?  [T]here is

13 no evidence, your Honor."); *id.* at 60:15-17 (Mr. Gonzalez: "And there is no evidence that anybody at

14 Uber knew anything about these 14,000 files before this lawsuit was filed."); Dkt. 160 (Apr. 5, 2017

15 Tr.) at 21:1-4 (Mr. Gonzalez: "The only thing the record shows thus far is that 14,000 files may or

16 may not have been taken by someone. I'm not going to take a position on that.").  However, it appears

17 this ▮▮▮▮▮▮▮▮▮▮▮: the report expressly discusses ▮▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1 (Stroz Report) at 12.  The Stroz Report

19 also  reveals ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮ *Id.* at 8.  It further reveals that ▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮ *Id.* at 11.

25     The Stroz Report also reveals ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28 The Stroz Report identifies ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



1 ██████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████████

5 ███████████████████████████████████ The list goes on and on.  The

substantial fact discovery, expert discovery, and motion practice that must be conducted before trial

cannot plausibly be completed in time for a trial on October 10, much less allow Waymo an ability to

prepare for a trial with this trove of new evidence at the same time it is conducting (and likely still

moving to compel) the discovery it was entitled to from the outset of this case.

*Second*, a continuance is necessary because, considering the █████ new disclosures in the

due diligence report and related materials, and other discovery to date, Waymo will not waive claims

for misappropriation of trade secrets other than the nine listed for trial.  Waymo has an extraordinarily

strong interest in protecting its intellectual property and it cannot abandon numerous claims for

misappropriation under these circumstances with such strong evidence.  Because this Court has

recently stated that the consequence of an October 10 trial is the permanent loss of claims for

misappropriation of other trade secrets, Waymo cannot agree to that trial date under those conditions.

That Waymo should not and cannot be forced to waive such an enormous number of claims is

especially clear given the newly available evidence in the Stroz Report and related documents.  For

example, two exhibits to the Stroz Report are █████████████████████████

████████████████ but not included in the nine trade secrets that Waymo designated for trial, as

ordered by the Court, weeks before discovery closed.  And as noted above, and further detailed below,

even the limited documents Waymo has now finally received already show that ██████████████

██████████████████████████████████████████████████████

██████.  Especially in light of the recent, and as of now very partial, production of critical and

relevant information to the theft by Defendants of Waymo's trade secrets, it is even more clear that

Waymo should not be forced to limit its trade secrets to nine to get a trial.

## I.   A CONTINUANCE IS NECESSARY FOR WAYMO TO PREPARE FOR TRIAL BASED ON THE NEWLY AVAILABLE STROZ MATERIALS AND RELATED MATERIALS STILL NOT YET PRODUCED

The volume of material Defendants and Stroz withheld, and Waymo's need to review, address, and take discovery into this critical material, make it impossible for a trial to be appropriately conducted on October 10 that would allow a complete airing of the facts of this case.  The Federal Circuit's decision requires Uber, Otto, and Stroz to produce the Stroz Report and its exhibits, as well as communications, documents, and devices that were withheld on grounds of a supposed common-interest privilege before April 11, 2016.

The importance of these materials cannot be overstated.  They concern an investigation of precisely the conduct at the heart of the trade secret misappropriation at issue here.  And even though the production is far from complete, a review of the materials thus far produced establishes just how relevant and damning the materials are for Uber and Otto.  The Stroz Report states plainly that ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ Ex. 1 at 7.  The report discusses ████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ *Id.* at 12.   In addition, ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ███████████████████████████████████ *Id.* at 17.  The report further establishes ██████████████████████████████████████████████████████████ ████████████████████████ *Id.* at 7-17.  And ██████████████████████, Uber permitted Levandowski to have ongoing access and input on product development without any restriction.

1    In addition, the report shows ████████████████████████████████████████

2  ████████  Uber  and  Ottomotto  claim  to  have  been  anticipating  litigation  with  Google  after

3  Levandowski left Google on January 28, 2016.  For instance:



- ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████ *Ex.* 1 at 10. ██████████
████████████████████

- ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████ *Id.* at 12.

- ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████ *Id.* at 13.

- ████████████████████████████████████████████████
████████████████████ *Id.*

- ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████ *Id.* at 19.

- ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████ *Id.*



1

2

3

4        In particular, the report states

5                                                                    *Id.* at 10-

6   11.  The report explains:

7

8                                                  *Id.* at 10.

9

10

11

12

13                            *Id.* at 10-11.

14                            *Id.*

15      In addition, the evidence produced thus far demonstrates that

16                                              As Stroz explained,

17

18

19

20

21                                                          Ex. 4 (Stroz Report Ex. 22)

22   at 7; *see also* Ex. 5 (

23

24                                                  The report itself repeatedly

25   notes that

26                                          Ex. 1 at 17, 24, 27, 30, 32.  Yet, there is no

27   indication  that                                        In  addition,  as

28   Levandowski's attorney John Gardner noted



1 

2 

3 Ex. 6.

4 The sham nature of the "due diligence" is further shown by the fact that 

5 

6 

7 Ex. 1 at 11.  In particular, 

8 *Id.*  As 

9 the report states:

10 

11 

12 

13 

14 *Id.* at 8.  As Stroz found:

15 

16 *Id.*  at 11.

17 In addition 

18 *Id.* at

19 11-12.  Thus, 

20 *See id.* at 12 

21 

22 

23 

24 

25 including the following:

26 • 

27 *id.* at 11;

28 • *id.*;



1    • ███████████████████████████████████ *id.*;

2    • ███████████████████████████ *id.*;

3    • ██████████████████████████████████████████

4    ████████████████████ *id.*

5    • ████████████████████████████████████████ *id.* at

6    14;

7    • ██████████████████████████████████████████

8    ██████████ *id.*;

9    • ████████████████ *id.*;

10   • ██████████████████████████████████████████

11   ████████████ *id.*;

12   • ████████████████████ *id.*; and

13   • ████████████████████ *id.*

14   Notwithstanding ██████████████████████████████

15   ████████████████████████████Uber went forward with the purchase

16   of Levandowski's company and, incredibly, put Levandowski in charge of its entire self-driving car

17   program.  Uber's decision to move forward with the acquisition in spite of █████████████

18   ██████████████████████████████████████████████

19   ████████████████████████████████████

20          The Stroz Report and exhibits also highlight key inconsistencies and gaps in the testimony

21   Uber and Ottomotto officials provided at depositions.  For example, Kalanick testified that he told

22   Levandowski to talk to his attorneys to determine what to do with the Google material he possessed.

23   Ex. 7 (Kalanick Dep.) at 23.  Similarly, Cameron Poetzscher, vice president of corporate development

24   at Uber, testified that he told Levandowski to get rid of any material from Google, but that Kalanick

25   told Levandowski to talk to his lawyer, and then Poetzscher agreed with that advice.  Ex. 8

26   (Poetzscher Dep.) at 254-55.  ████████ the Stroz Report states ███████████████

27   ██████████████████████████████████████████████

28   ████████████████Ex. 1 at 10.  For another example, Rhian Morgan, the head of human

-8-

resources at Ottomotto, testified at her deposition that she had no involvement in and never even heard of the Stroz investigation. Ex. 9 (Morgan Dep.) at 17:2-7, 18:10-16.  Yet ███████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████ Ex. 1 at 13.

Moreover, beyond these particular examples, the Stroz Report refutes many of the claims Uber has made before this Court.  Uber has represented:  "[T]he notion that Morrison & Foerster has the stolen documents or ever had the stolen documents is completely baseless."  Dkt. 1261 (Aug. 16, 2017 Tr.) at 28:8-17; *id.* at 29:14-17 ("When the Federal Circuit makes a ruling, there's a whole lot that Uber's been dying to say that we'll say.  And it will be very clear: There's no 'there' there."); *id.* at 31:3-8 ("When the light shines, the Federal Circuit rules, and we're no longer concerned about being sued for something, now we can disclose the fact those downloaded materials are not at MoFo."). There is no way to square these representations with ████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ █████████  *See supra* at 2.  The representations are also inconsistent with ███████████████████ ████████████████████████████████████████████████████████████████████████████ █████████████████████████████████ *See supra* at 2.

The report also ████████████████████████████████████████████████████████ █████. As the report itself explains, ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████ Ex. 1 at 3, 5.  That is, Stroz identified ████████████████████████

to Waymo's claims in this case.[1]  To Waymo's knowledge, and despite several orders from the Court to do so, ████████ have not been produced to date.  To put this number in context, Uber produced fewer than 98,100 documents prior to the Federal Circuit's decision on the Stroz orders.  Uber has thus been hiding under bogus claims of privilege at least ████████████████████████ ███████████████

The Stroz Report therefore goes to the heart of this case.  It establishes ███████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████ Uber then knowingly acquired Levandowski's company. All of these facts are critical to the disputes that will be tried before the jury. Levandowski's decision to invoke his Fifth Amendment rights rather than testify further heightens the importance of these materials.

Furthermore, the Stroz Report is just the tip of the iceberg.  The production as it stands now is as follows:

- Uber has produced the Stroz Report itself and its exhibits.  There are ████ exhibits that are cumulatively over ████ pages and contain ██ native files.  Uber has additionally produced thousands of previously withheld documents.

- Uber has made available for inspection over ████ documents they have identified as falling within the order regarding Stroz materials.  The documents are ████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████

---

[1]  Still unknown are the amount of documents Uber has been hiding that Stroz did not or was not able to review sufficiently to identify as "potentially relevant."

1      █████████████████ These documents belie Uber's prior representation

2 that they had no such Stroz materials in its possession. *Supra*, at 2.

3    •   Stroz will be making available on Monday, September 18, part of a database that has

4      the images of the computers and devices it imaged as part of its investigation. Waymo

5      does not know the volume of materials, but expects, given the materials MoFo has

6      produced (which MoFo represented was a "sliver" of the Stroz materials), that it is at

7      least tens of thousands, if not hundreds of thousands, of files. Dkt. 1260 (Aug. 16,

8      2017 Tr.) at 22:10-15, 29:1-5; Dkt. 1414 (Aug. 28, 2017 Tr.) at 82:19-21. But Waymo

9      will not be able to review all of the materials on this database Monday. Each of the

10     diligenced employees—Levandowski, Ron, Burnette, Sebern, and Juelsgaard—

11     provided a list of terms for a screen for "private" documents and a log of supposedly

12     privileged documents, that Waymo has only recently received. Of course, given that

13     these diligenced employees handed their devices over to Stroz, any privilege would be

14     waived altogether. And Waymo's initial review shows the privacy screen seeks to

15     exclude Waymo from reviewing obviously relevant materials.

16    •   Stroz has indicated it will be producing approximately 5,000 internal documents

17      regarding its investigation. Dkt. 1594 (Sept. 14, 2017 Tr.) at 47:25-48:4.

18    •   MoFo was ordered by Magistrate Judge Corley to provide a privilege log today for the

19      almost 2,000 Stroz documents that are still being withheld as privileged or work

20      product. Id. at 6.

21    •   Stroz has stated that it can make some of the approximately 150 devices it possesses—

22      approximately 100 from Levandowski—available for inspection on September 18, but

23      100 hard drives will not be imaged until September 20. *Id.* at 46.

24    •   Ottomotto has produced approximately 1,000 previously withheld documents.

25     As a result of the scope and importance of the newly available evidence, the parties and the

26 Court will have to undertake numerous steps in advance of trial. In particular, at least the following

27 document production and review will occur:

28    •   Complete review of the Stroz Report and its ███ exhibits.

- Complete production and review of thousands of documents from Uber and Ottomotto. There are a great number of redactions in the documents Waymo has seen thus far, likely necessitating motion practice on this issue.

- Complete production and review of approximately 1,000 documents from Otto Trucking. Waymo anticipates there will be a great number of redactions, likely necessitating motion practice on this issue.

- Inspect devices provided to Stroz, including 100 hard drives, which have not yet been made available to Waymo.  There are materials that will be available Monday, September 18, another set that requires imaging and processing that will not be available until Friday, September 22, and all of this material is subject to ongoing privacy screenings and restrictions that Waymo contends are inappropriate and will likely require court intervention to resolve.

- Obtain and review documents previously withheld by Ron and Gardner based on the privilege now rejected by the Federal Circuit.[2]

- Review thousands of potentially relevant files, ██████████████████ ████████████████████████████. Ex. 1 at 26-30.

- Request and obtain documents based on information gained from the Stroz Report. ███ ████████████████████████████████████████ ████████████████████████████████████ Ex. 1 at 9. Kalanick, supported by Uber, claimed that these text messages were deleted in light of an auto-delete setting and "the volume of texts" he received, but both he and Uber ████████

---

[2] As the report states: ██████████████████████████ ████████████████████████████ Ex. 1 at 19; *see also id.* at 24 ██████████████████████████████ ██████████████████████████████ █████████████; *id.* █████████████████ ██████████████████████████████ █████████████████████████████.

1  ███████████████████████████████  Dkt. 1154, 1155.  In addition, Waymo has

2  requested drafts of the Stroz Report.

3  Moreover, at least the following depositions will occur:

4  • 12 depositions that were delayed pending resolution of the appeal: Nina Qi, Cameron

5  Poetzcher, Don Burnette, Colin Sebern, Soren Juelsgaard, Eric Tate, Rudy Kim, Anthony

6  Levandowski, Lior Ron, Angela Padilla, Eric Friedberg, and Travis Kalanick, and others

7  were left open because Waymo did not yet have the Stroz report.

8  • Further depositions of Kalanick, Poetzscher, Morgan, Ron, and others based on the new

9  information that conflicts with or (at a minimum) reveals gaps in their prior testimony.

10  In addition, at least the following additional expert analysis will occur:

11  • Waymo's technical experts will need to analyze the hundreds of thousands of new

12  technical documents now available and ████████████████ to assess the further

13  evidence of Defendants' trade secret misappropriation.  For the ████████ files

14  identified, even just looking at the files is a massive undertaking.

15  • The experts will further have to assess the other resulting discovery, including additional

16  depositions, inspections of relevant devices, and forensic images and other documents.

17  • Waymo's experts will then need to supplement their expert reports as necessary, including

18  quantifying damages from misappropriation of any additional trade secrets Waymo may

19  seek to assert at trial.

20  Finally, at least the following briefing will occur:

21  • Briefing regarding a protocol for Levandowski's private information, given that the

22  privacy screening Defendants are implementing is overbroad and improperly attempts to

23  withhold relevant information.  Ex. 13 ████████████████████████████████████

24  ████████████████████████████.

25  • Review documents and conduct briefing to account for ████████████████████████

26  ████████████████████████████████████

27

28

- Revise or supplement motions in limine, summary judgment briefing, and trial strategy in light of information gained from the Stroz Report, exhibits, communications, and depositions described above.

- Briefing to compel production of any of the thousands of emails and documents from Uber and Ottomotto's privilege logs for which Uber and Ottomotto may continue to treat as privileged notwithstanding the Federal Circuit's decision. Ex. 12.

- Potential further supplementation of Waymo's Motion for an Order to Show Cause.

There is no schedule that will make it possible to complete these tasks prior to the current trial date of October 10. For instance, Uber has suggested conducting the depositions of Eric Tate, Rudy Kim, Travis Kalanick, and Angela Padilla on September 19-20. Ex. 11. However, this is prior to Waymo even receiving and/or having time to review all of the newly available evidence. It would therefore be highly prejudicial to conduct these depositions as Uber proposes. More generally, the result of the Federal Circuit's decision means that substantial fact discovery will continue for some time, given the need for depositions and document production, along with briefing regarding the already commenced and further expected efforts by Defendants and the various third parties involved to prevent a complete production. The information gained from the production will also likely lead to the need for further discovery.

Waymo is not to blame for this late production of material evidence. Indeed, Waymo vigorously pursued the Stroz report and associated documentation from the outset. As the Court will recall, just to obtain the *name* of the entity that conducted the diligence report, Waymo was forced to litigate all the way up to the Federal Circuit. And then, Defendants started the process all over again by objecting to the production of the Stroz report and any associated documents on a baseless assertion of privilege. Again, Waymo was forced to litigate the issue all the way up to the Federal Circuit.[3]

---

[3]  To the extent Defendants argue that Levandowski, not Defendants, appealed to the Federal Circuit, this argument is disingenuous. ███████████████████████████████████████ ████████; they are both represented by Goodwin Procter LLP, and even now Levandowski and Otto Trucking are working hand in glove. *See* Dkt. 1493-3 at 15.

1    Waymo is entitled to adequate time to prepare for trial with newly available evidence, and it

2    should not be penalized by Defendants', Levandowski's, and other third parties' delay in providing

3    the material at issue.  This Court set the close of fact discovery as August 24 to give the parties

4    reasonable time after fact discovery to prepare for trial.  This schedule reflected the undeniable point

5    that there must be time for experts to form well-considered opinions and to prepare for trial after the

6    facts are fully disclosed.  Due to Defendants' flawed assertions of privilege and the timing of the

7    Federal Circuit's decision, that now cannot happen before October 10.

8        Thus, Waymo finds itself—through no fault of its own—in a position where it will be unfairly

9    and extensively prejudiced if the trial were to proceed as initially scheduled on October 10.  Absent a

10   continuance, Defendants would obtain a substantial and unwarranted benefit from hiding stolen

11   documents and other material evidence behind a claim of privilege despite the fact that this privilege

12   has been definitively rejected as unsupported by the facts and law.  In contrast, Waymo would be

13   severely prejudiced because it has been blocked until after the close of discovery from obtaining

14   hundreds of thousands of documents that are highly material to its claims.  Of course, this prejudice

15   does not apply to Defendants, whose counsel, officers, employees, and owners were integrally

16   involved in the very facts that have only now been revealed to Waymo, less than a month before trial.

17   Defendants should not be permitted to benefit from their relentless claims of privilege in this case in

18   such a manner.

19   **II.    A CONTINUANCE IS NECESSARY BECAUSE WAYMO IS ENTITLED TO
         PROTECT ITS TRADE SECRETS BEYOND THE NINE TRADE SECRETS
20       WAYMO IS LIMITED TO LITIGATING AT TRIAL**

21       A continuance is necessary for the additional reason that, especially in light of the Stroz report

22   and additional discovery to be taken, Waymo cannot agree to limit its misappropriation claims to nine

23   trade secrets.  Waymo should not and cannot be forced to waive claims for misappropriation of trade

24   secrets in addition to the nine trade secrets Waymo has designated for trial.  In its June 7 case

25   management order, this Court limited Waymo to less than ten trade secrets for trial.  Dkt. 563 at 10.

26   The order did not address the issue of whether there would be a waiver of additional trade secret

27   claims.  Waymo complied with the Court's order on August 1, 2017 by designating nine trade secrets

28

for trial on misappropriation. *See* Dkt. 1159-4 at 3.  However, at no time has Waymo indicated that it was abandoning its claims for misappropriation of other trade secrets.

On August 16, in an abundance of caution, Waymo made clear to the Court that its designation of nine trade secrets for trial was not a waiver of trade secrets other than the nine that Waymo identified.  Dkt. 1261 (Aug. 16, 2017 Tr.) at 84.  This Court then stated for the first time that if Waymo decides to go forward with the current trial date, then it would be treated as a waiver with respect to the other trade secrets not tried. *Id.* at 84-85.  The Court further stated that Waymo could have a trial on more trade secrets than the nine designated, but it would delay the trial date for some period of time. *Id.* at 85.

On September 6, the Court further explained that Waymo had a choice to make:  (1) litigate nine trade secrets with the current trial date and waive the other trade secrets, or (2) litigate more trade secrets with a trial at a later date.  Dkt. 1490 (Sept. 6, 2017 Tr.) at 51.  The Court then invited Waymo to make a motion for a continuance if it wanted to litigate more trade secrets than the nine listed, stating:  "I don't want you claiming later to the Federal Circuit that the judge cut you off.  I will give fair consideration to postponing the trial, giving you an opportunity to possibly make more -- put more trade secrets before the jury. … [I]f you do feel you're being coerced in some way, then make your motion for continuance." *Id.*

On September 8, the Court then issued an order allowing the parties to file a motion to continue on or before September 29.  Dkt. 1499.  In this order, the Court expressly stated that *if* Waymo did not move for a continuance, then waiver would occur:  "[T]he Court understands that plaintiff Waymo LLC already agreed to limit its trade secrets case to nine asserted claims.  Any motion to continue the trial date so that more asserted trade secret claims may be included in the trial will be subject to the foregoing schedule, and failure to so move will constitute consent to trying only those claims currently selected for trial." *Id.* at 1.

Under the circumstances described above, ███████████████████████████ ██████████████████████████, and given the choice that the Court has given Waymo and Waymo's paramount interest in protecting its intellectual property, Waymo cannot

agree to limit its claims for misappropriation to only nine of its asserted trade secrets.  Waymo's choice should—and as a legal matter must—be accepted here for several reasons.

*First*, Waymo was required to list nine trade secrets for trial *before* it had all of the necessary information about which trade secrets presented the strongest basis for claims of misappropriation.  As discussed above, the Stroz Report and exhibits provide ████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ The further discovery yet to come from and related to ████████████ will likely shed even more light on the nature and scope of the misappropriation.

Indeed, ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████.  Waymo did not elect those trade secrets to be in the list of nine designated for trial.  But quite obviously, Waymo did not and does not waive claims for misappropriation of those trade secrets.  And it would be absurd to find such a waiver ████████████████████████ ████████████████████████████████████ Simply put, a party cannot be forced to waive claims prior to receiving discovery about those claims.

*Second*, there is no legal basis in the Federal Rules of Civil Procedure for this Court to require Waymo to waive trade-secret claims.  To be sure, a district court can dismiss claims under Rule 12 or Rule 56 where they are substantively deficient in some way.  But this Court has made no such ruling.  Rather, this Court acted pursuant to Rule 16 in issuing its order requiring Waymo to limit its claims for trial to nine trade secrets. Dkt. 563.  While Rule 16 allows courts to narrow issues for trial, there is nothing in the rule to suggest that a court can unilaterally force a party to waive some number of claims.  Rather, such a waiver can occur only if the party consents to the waiver.  *See, e.g.*, Wright & Miller, Federal Practice § 1527 (3d ed.) ("Courts generally hold *stipulations, agreements, or statements of counsel* made at the pretrial conference binding for purposes of the trial. This practice furthers the Rule 16 policy of limiting the trial to those issues that are actually in dispute *without impairing the basic rights of the litigants*." (emphases added)); *Padovani v. Bruchhausen*, 293 F.2d 546, 548 (2d Cir. 1961) ("Nothing in the rule affords basis for clubbing the parties into admissions

they do not willingly make; but it is a way of advancing the trial ultimately to be had by setting forth the points on which the parties are agreed after a conference directed by a trained judge." ).  As discussed above, Waymo never consented to such a waiver here.

*Third*, requiring Waymo to waive trade-secret claims would violate Waymo's due process rights and Seventh Amendment right to a jury trial.  In the patent context, while the Federal Circuit has held that a district court can limit the number of claims to be tried, it also held that this power is limited by due process considerations.  In particular, due process is violated if the "district court's claim selection procedure risked erroneously depriving [the plaintiff] of its rights and that the risk outweighed the added costs associated with a substitute procedure."  *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1311 (Fed. Cir. 2011)); *see also id.* at 1312-13 ("Katz could have sought to demonstrate that some of its unselected claims presented unique issues as to liability or damages.  If, notwithstanding such a showing, the district court had refused to permit Katz to add those specified claims, that decision would be subject to review and reversal.").

Here, the risk of depriving Waymo of its rights is great because Waymo was limited to trying a small fraction of the trade secrets at issue, and (unlike in *Katz*) there was no showing that many of the claims were duplicative.  Moreover, the deprivation of rights would be especially unjustified here because, as discussed above, the narrowing of claims occurred prior to Waymo receiving critical information in discovery.  As *Katz* explained, "a claim selection order could come too early in the discovery process," *id.* at 1313 n.9, and that is precisely what happened here—if the claim selection were treated as a waiver.  Indeed, a district court recently held that it would not narrow claims prior to the end of discovery because of potential due process concerns.  *See Regents of the Univ. of Minnesota v. AT&T Mobility LLC*, No. 14-CV-4666 (JRT/TNL), 2016 WL 7670604, at *2 (D. Minn. Dec. 13, 2016), *report and recommendation adopted*, 2017 WL 102962 (D. Minn. Jan. 10, 2017) ("Without better understanding which of the University's claims are viable and which are not—an understanding that will only be gained through further fact discovery that is far from being concluded—the Court has a paucity of information against which to gauge what an appropriate number of claims should be in this case.").  Likewise, here, narrowing of claims and barring all other claims before the close of fact discovery would be improper.  And just as it would violate due process, the forced waiver of claims

-18-

1    without any evaluation of their merit would violate Waymo's right to a jury trial under the Seventh

2    Amendment.

3          In sum, while this Court had discretion to put Waymo to a choice between an October 10 trial

4    date for nine trade secrets and a later date for more trade secrets, it has no discretion to force Waymo

5    to take the first option.  And even if this Court had such discretion, it should not be exercised here

6    given the myriad reasons for Waymo to choose to protect more than nine of its trade secrets, including

7    the newly available evidence (much not yet produced), a preliminary review of which shows ███████

8    new evidence related to the misappropriation of additional trade secrets.

9    **III.    THE COURT SHOULD NOT APPOINT AN EXPERT PURSUANT TO FEDERAL
          RULE OF EVIDENCE 706**

10

11          In its September 8 Order (Dkt. 1499 at 2), the Court directed a party seeking to continue the

      trial to discuss the advisability of using a court-appointed trial expert to address the technical issues

12    underlying Waymo's asserted trade secret claims pursuant to Federal Rule of Evidence 706.  Such a

13    court-appointed expert is not necessary or appropriate in this case and would instead be highly

14    prejudicial to the parties' ability to present their case to the jury.

15          As the Federal Circuit has recognized in analyzing Rule 706, although the appointment of an

16    independent expert is within the district court's discretion, "[t]he predicaments inherent in court

17    appointment of an independent expert and revelations to the jury about the expert's neutral status

18    trouble this court to some extent.  Courts and commentators alike have remarked that Rule 706 should

19    be invoked only in rare and compelling circumstances."  *Monolithic Power Systems, Inc. v. O2 Micro*

20    *Intern. Ltd.*, 558 F.3d 1341, 1348 (2009); *see also Womack v. GEO Grp., Inc.*, No. CV-12-1524-PHX-

21    SRB, 2013 WL 2422691, at *2 (D. Ariz. June 3, 2013) ("District courts do not commonly appoint an

22    expert pursuant to Rule 706 and usually do so only in exceptional cases.").

23          This case does not present the "rare and compelling circumstances" justifying the appointment

24    of a court-appointed expert.  The parties have already served trade secret-related expert reports from

25    four different technical experts (one for Waymo, two for Uber/Ottomotto, and one for Otto

26    Trucking).  Waymo intends to have its technical experts testify at trial regarding the technical issues

27    relevant to its trade secrets; Uber/Ottomotto and Otto Trucking have submitted expert reports

28

demonstrating their intent to have their technical experts testify on those issues as well.  Waymo's expert will clearly explain to the jury the underlying technology and asserted trade secrets.  Presumably Defendants' experts will do the same, though with differing conclusions.  It will then be the jury's duty to decide who is right.  If the jury also hears testimony from a fifth, neutral expert, that testimony will complicate the jury's ability to reach a decision on the parties' trade secret claims and defenses.

Moreover, if the jury is aware that the Court appointed its own expert and that expert is not a representative of the parties, the Court's expert will have a powerful endorsement from the Court that will lend a disproportionate weight to that expert's opinions and testimony.  It is therefore likely that the jury will substitute its duty to independently examine the evidence and simply rely on the court-appointed expert's opinions and testimony; since the court-appointed expert will opine one way or the other, the expert's testimony will diminish the adversary nature of the system of judicial resolution.  Instead of Waymo and Defendants putting on their competing cases, with the jury deciding which party is correct, the parties' experts will be diminished as "partisan" and the jury will naturally go with the "independent" court appointed expert every time.  It is for this reason that Rule 706 is very rarely invoked and, under the circumstances of this case, will result in the denial of Waymo's Seventh Amendment right to a jury trial.  *See Kian v. Mirro Aluminum Co.*, 88 F.R.D. 351, 356 (E.D. Mich. 1980) ("The presence of a court-sponsored witness, who would most certainly create a strong, if not overwhelming, impression of 'impartiality' and 'objectivity,' could potentially transform a trial by jury into a trial by witness.  Under the circumstances of the present case, where the issues are within the grasp of the jury, appointment of an expert should and can be avoided."); Ellen Relkin, *Some Implications of Daubert and Its Potential for Misuse: Misapplication to Environmental Tort Cases and Abuse of Rule 706(a) Court-Appointed Experts*, 15 CARDOZO L. REV. 2255, 2264 (1994) (undue reliance on Rule 706 experts could ultimately abrogate Seventh Amendment right to trial by jury); Karen Butler Reisinger, *Court-Appointed Expert Panels:  A Comparison of Two Models*, 32 IND. L. REV. 225, 236 (1998) ("Closely related to this concern is the additional weight a jury may give to the court-appointed expert's testimony.  When the court announces the expert is 'neutral' a jury likely will believe that opinion.  The problem is twofold.  First, a 'neutral' expert may not always

-20-

be right.  Second, a 'neutral' expert may be biased by the school of thought under which he trained.  If a jury follows the 'neutral' opinion, the court-appointed expert has interfered with the deliberative process of the jury.") (footnotes omitted).

Finally, if the Court were to conclude that this case is sufficiently complex to justify the appointment of an independent expert—given that autonomous vehicle technology is very new and there are only a small number of companies working on developing the technology—Waymo believes it will be extremely difficult, if not impossible, to identify an individual with the correct background and expertise who does not have a prior association with one of the parties in this case, while having the time and ability to absorb the already voluminous record in this matter.

***

For the foregoing reasons, Waymo respectfully requests that the Court grant Waymo's motion for a continuance of the October 10 trial date.  In addition, Waymo submits that the Court should not appoint an expert pursuant to Federal Rule of Evidence 706.


DATED:  September 16, 2017         QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ Charles K. Verhoeven*
    Charles K. Verhoeven
    Attorneys for WAYMO LLC