MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzalez@mofo.com
425 Market Street
San Francisco, California  94105-2482
Telephone:     415.268.7000
Facsimile:      415.268.7522

KAREN L. DUNN (*Pro Hac Vice*)
kdunn@bsfllp.com
HAMISH P.M. HUME (*Pro Hac Vice*)
hhume@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington DC  20005
Telephone:     202.237.2727
Facsimile:      202.237.6131

WILLIAM CHRISTOPHER CARMODY (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
SHAWN RABIN (*Pro Hac Vice*)
srabin@SusmanGodfrey.com
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Telephone:     212.336.8330
Facsimile:      202.336.8340

Attorneys for Defendants
UBER TECHNOLOGIES, INC.
and OTTOMOTTO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>Defendant. | Case No.      3:17-cv-00939-WHA<br><br>**DEFENDANTS UBER TECHNOLOGIES, INC. AND OTTOMOTTO, LLC'S MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER** |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## TABLE OF CONTENTS

| | Page |
|---|---|
| ARGUMENTS AND AUTHORITIES | 3 |
| I. WAGNER'S ACCELERATED DEVELOPMENT THEORY IS UNRELIABLE | 3 |
| A. Forecasting Future Profits In a Nascent Industry Is Highly Speculative | 3 |
| B. Wagner Relies On a Speculative Projection of Future Profits | 4 |
| 1. The Qi Slide Was Speculative and Unreliable When Created | 5 |
| 2. Wagner Failed To Consider Significant Intervening Events | 6 |
| C. Wagner Performs No Causation Analysis and His Apportionment Is Nonsensical | 7 |
| II. WAGNER'S SAVED DEVELOPMENT MODEL IS EQUALLY UNRELIABLE | 9 |
| III. WAGNER'S UNJUST ENRICHMENT FOR TRADE SECRET NO. 90 IS BASED ON A FLAWED METHODOLOGY AND IS CONTRADICTORY | 11 |
| IV. WAGNER'S REASONABLE ROYALTY OPINION IS UNRELIABLE | 11 |
| CONCLUSION | 12 |

DEFS.' MOT. TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER
CASE NO. 3:17-CV-00939-WHA
sf-3823864
i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
    977 F.2d 1555 (Fed. Cir. 1992)......................................................................................3, 6

*Bruno v. Bozzuto's, Inc.*,
    311 F.R.D. 124 (M.D. Pa. 2015).............................................................................................5

*In re ConAgra Foods, Inc.*,
    302 F.R.D. 537 (C.D. Cal. 2014).............................................................................................5

*Eagle Harbor Holdings, LLC v. Ford Motor Co.*,
    No. C11-5503 BHS, 2015 WL 12670404 (W.D. Wash. Mar. 9, 2015)....................................2

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
    744 F. Supp. 2d 870 (E.D. Wisc. 2010) ...........................................................................5, 6, 7

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..................................................................................................................3

*Intellectual Ventures I LLC v. Xilinx, Inc.*,
    No. 10-1065-LPS, 2014 WL 1814384 (D. Del. Apr. 14, 2014) ...............................................2

*Legendary Art, LLC v. Godard*,
    No. 11-0674, 2012 WL 3550040 (E.D. Pa. Aug. 17, 2012) .....................................................5

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
    399 F. Supp. 2d 1064 (N.D. Cal. 2005) ..................................................................................10

*Ollier v. Sweetwater Union High Sch. Dist.*,
    768 F.3d 843 (9th Cir. 2014).....................................................................................................3

*Oracle Am., Inc. v. Google Inc.*,
    798 F. Supp. 2d 1111 (N.D. Cal. 2011) ....................................................................................3

*Oracle Am., Inc. v. Google Inc.*,
    No. 3:10-cv-03561-WHA (N.D. Cal. July 22, 2011)..............................................................12

*Sargon Enters., Inc. v. Univ. of S. Cal.*,
    149 Cal. Rptr. 3d 614 (Cal. Ct. App. 2013) ..............................................................................3

*Target Mkt. Publ'g, Inc. v. ADVO, Inc.*,
    136 F.3d 1139 (7th Cir. 1998)...................................................................................................7

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F. 3d 1292 (Fed. Cir. 2011)..............................................................................................12

DEFS.' MOT. TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER
CASE NO. 3:17-cv-00939-WHA
sf-3823864

ii

**Statutes**

18 U.S. Code § 1836(b)(i)(II) ...........................................................................................................7

DEFS.' MOT. TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER
CASE NO. 3:17-CV-00939-WHA
sf-3823864

iii

**INTRODUCTION**

Waymo's future damages models are speculative and unreliable, and this case should proceed to trial without any monetary damages expert. Waymo cannot say it was not warned. At the August 16th hearing, this Court cautioned: [1]

> [I]f Waymo has become greedy and we knock out your damages, there won't be a retrial. You just won't have a damages report. We just go to trial without it. There's no God-given right to have a damages report.

Yet Waymo has now put forward damages opinions from Michael Wagner that swing for the fences. The result: claims for future "unjust profits" for each of the nine asserted trade secrets that reach as high as ▮ for a single trade secret. Wagner then arbitrarily increases that figure by ▮ under *Georgia Pacific*, resulting in total damages of ▮ for the alleged misappropriation of a single trade secret. To put that number into context, Uber could have purchased Velodyne for half of the amount that Waymo is seeking for a single trade secret. The only thing more remarkable than the magnitude of this number is how Wagner arrived at it.

The below chart summarizes Wagner's unjust enrichment calculations for each trade secret before applying an across-the-board ▮ reasonable royalty enhancement: [2]



As reflected in the two columns, Wagner opines that Uber will benefit from the asserted trade secrets in two ways: future profits from accelerated commercialization and future saved development costs.

---

[1] 8/16/17 Confidential Hr'g Tr., at 135:6-9; *see also* 6/7/17 Hr'g Tr., at 55:25-56:4 ("I have given up on trying to give you second bites at the apple. So if your expert goes out the door because the methodology sucks, too bad for you. You just don't have the expert at trial.").

[2] *See* Berry Decl. Ex. 1, Wagner Rpt. Figure 13.

DEFS.' MOT. TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER
CASE NO. 3:17-CV-00939-WHA
sf-3823864

1

1    Wagner calculates those astronomical figures using a methodology that is not reliable,
2    inserting variables that he neither derived nor tested, and making assumptions that no reasonable
3    expert would make.  For accelerated development, he takes an 18-month old slide prepared by an
4    Uber corporate development manager that was never used for any purpose, adopts it without
5    testing it, and then opines that the nine discrete trade secrets relating to LiDAR hardware will
6    allow Uber's entire autonomous vehicle ("AV") program to skip ahead ▇▇▇ in all aspects of
7    development and commercialization.  For saved development costs, Wagner assumes the discrete
8    trade secrets will allow Uber to save, for a ▇▇▇ period, the run rate for Uber's entire 1500-
9    person AV unit.  These two theories do not come close to meeting causation and apportionment
10   standards, and the assumptions on which they depend are wholly unreliable and untested.

11   Illustrating just how deficient Wagner's opinions are, he has now submitted a *48-page*
12   reply, with over 1200 pages of exhibits, attempting to retroactively substantiate his flawed
13   assumptions.  Wagner's reply not only fails to do so, but disregards this Court's case management
14   order, which requires "very brief" replies that "should not add new material that should have been
15   placed in the opening report."  (Dkt. 563 at ¶ 5.)

16   Whether Wagner's reply report is considered or not, the fact remains that Wagner's
17   damages opinions and testimony are irredeemably flawed and should be excluded in their
18   entirety, without any opportunity to amend or submit a new report.[3]  The flaws in Wagner's
19   report are glaringly obvious and go to the core of his opinions.  Even setting aside the expedited
20   schedule and the Court's prior warnings, it would be patently unfair to allow Waymo to try to see
21   what it could get away with—only to get a do-over on the eve of trial.

22                                    **LEGAL STANDARD**

23   As this Court has recognized, an expert witness may provide opinion testimony "if (1) the
24   testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

---

[3] Perhaps not surprisingly, courts have excluded Wagner's opinions as too speculative and not reliable several times.  *See*, *e.g.*, *Eagle Harbor Holdings, LLC v. Ford Motor Co.*, No. C11-5503 BHS, 2015 WL 12670404, at *2 (W.D. Wash. Mar. 9, 2015) (excluding opinion for being based on "pure speculation"); *Intellectual Ventures I LLC v. Xilinx, Inc.*, No. 10-1065-LPS, 2014 WL 1814384, at *4 (D. Del. Apr. 14, 2014) (excluding Wagner's opinion for failing to consider "highly relevant" evidence, rendering his entire opinion "unreliable and irrelevant.").

1   principles and methods, and (3) the witness has applied the principles and methods reliably to the
2   facts of the case." *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1114 (N.D. Cal. 2011).
3   District courts are thus charged with a gatekeeping role, and should exclude evidence that is
4   "based on mere 'subjective belief or unsupported speculation'" or is "inherently unreliable and
5   unsupported by the facts." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th
6   Cir. 2014) (citation omitted).  Further, courts should exclude testimony if "there is simply too
7   great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522
8   U.S. 136, 146 (1997).

## ARGUMENTS AND AUTHORITIES

**I.  WAGNER'S ACCELERATED DEVELOPMENT THEORY IS UNRELIABLE**

Wagner's accelerated commercialization opinion is really a future profits model because it attempts to calculate Uber's incremental future profits from accelerating its AV program, and it fails for three reasons.  First, forecasting profits in the nascent autonomous vehicle industry that has not yet been commercialized is inherently speculative.  Second, the model relies on a highly speculative and outdated projection of future profits that was never used or relied on by Uber and that Wagner does not test.  Finally, Wagner fails to establish a causal link between the purported future profits and the specific trade secrets or to apportion among them in any reliable manner.

**A.  Forecasting Future Profits In a Nascent Industry Is Highly Speculative**

Any attempt to calculate future profits in a nascent industry, like using autonomous vehicles to transport passengers, is based on many levels of speculation.  *See, e.g.*, *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1581 (Fed. Cir. 1992) ("The burden of proving future injury is commensurately greater than that for damages already incurred, for the future always harbors unknowns" and affirming exclusion of damages as too speculative given the "uncertainties of future pricing, future competition, and future markets, in this fast-moving field, as well as the requirements of proof of future losses."); *Sargon Enters., Inc. v. Univ. of S. Cal.*, 149 Cal.Rptr.3d 614, 634 (Cal. Ct. App. 2013) (noting that predicting future profits for an unestablished business is generally "uncertain, contingent, and speculative" and only proper where the predicate future events "can be shown by evidence of reasonable reliability."). Rather

DEFS.' MOT. TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER
CASE NO. 3:17-CV-00939-WHA
sf-3823864

3

than addressing these challenges and explaining how he accounted for them, Wagner's analysis simply glosses over them. To the extent it would be possible at all to project future profits in the nascent self-driving car industry, Wagner provides no reliable analytical framework to do so.

The degree of speculation involved in forecasting profits in an industry that does not yet exist (and may never exist) cannot be emphasized enough. And the layers of speculation are compounded by the fact that Wagner is attempting to forecast profits through 2022—five years into the future. No transportation as a service ("TaaS") company has ever earned revenue (let alone profits) from transporting passengers in an autonomous vehicle with no safety driver; no fleet of autonomous vehicles currently exist that are ready for commercializing the TaaS business model; the future competitive landscape is highly unpredictable and unknowable; and federal, state, and local laws are a complex and often conflicting web of regulations that do not expressly permit, and in many states expressly prohibit, fully autonomous vehicles transporting passengers.[4]

### B.   Wagner Relies On a Speculative Projection of Future Profits

Wagner does not perform any independent analysis and instead purports to calculate Uber's future profits by relying on a single slide from January 2016 prepared by Nina Qi, a new corporate development manager at Uber (the "Qi Slide"). (Berry Decl. Ex. 5 at UBER00069033.) In this slide, Qi attempted to quantify the present value of "incremental EBIT" (i.e., future profits) that Uber could potentially realize if it were able to accelerate commercialization of Uber's AV program by ▮▮▮. (*Id.*)

This single slide is the entire basis of Wagner's unjust profits damages model. Yet it is from a four-slide PowerPoint that Ms. Qi didn't even consider a presentation and was never used or relied upon for any purpose. In Ms. Qi's words, "[a]fter I completed the exercise it was never talked about again." (Berry Decl. Ex. 6, 6/22/17 Qi Dep. at 217:3-17, 222:1-223:22).[5] Wagner's wholesale reliance on the Qi Slide without conducting any independent tests of its underlying

---

[4] Berry Decl. Ex. 2, Bratic Rebuttal Rpt. ¶¶ 45-69; Ex. 3, 8/2/17 Krafcik Dep. at 131:4-132:1; Ex. 4, 7/28/17 Michael Dep. at 138:25-139:3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[5] *Id.* at 217:2-218:12 (it was only shown to two people and "was not a presentation") and 223:1-5 ("Again, this is my own assessment and ultimately was not used in any forum.").

DEFS.' MOT. TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER
CASE NO. 3:17-cv-00939-WHA
sf-3823864

4

models and assumptions renders his opinions unreliable. *See*, *e.g.*, *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 886 (E.D. Wisc. 2010) (striking plaintiff's expert report that relied on data provided by the defendant regarding market share, projected sales, and market adoption, without independently verifying the data or assumptions); *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 144 (M.D. Pa. 2015) (excluding plaintiff's expert report that relied on defendant's projections because "the expert must conduct some sort of independent investigation or verification to ensure that the data he or she plans to use is both accurate and helpful to the court in light of the disputed issues"); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014) (expert may only rely on opinion of others if "the record demonstrates that the expert conducted an independent evaluation of that evidence); *Legendary Art, LLC v. Godard*, No. 11-0674, 2012 WL 3550040, at *5 (E.D. Pa. Aug. 17, 2012) ("Unverified profit and loss projections cannot be the type of evidence '*reasonably* relied upon by experts' as required by *Daubert* and the Federal Rules of Evidence." (emphasis in original)).

### 1. The Qi Slide Was Speculative and Unreliable When Created

The Qi Slide is derived from Uber's ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[6] Had Wagner conducted a proper test, he would have immediately seen the following warning in a red box on the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" (*Id.* Ex. 8 at UBER00232490.) For example, the Qi Slide assumes that Uber will have ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. But Wagner failed to test that assumption, and did not even identify the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

---

[6] *Id.* Ex. 7, 8/18/17 Uber Corp. Rep. (Meyhofer) Dep. at 82:4-86:6 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and you see different data.… ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

DEFS.' MOT. TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER
CASE NO. 3:17-cv-00939-WHA
sf-3823864

5

Uber is not alone in characterizing future profits from AV as speculative.[7] Waymo has identified numerous "███████" that "████████████████████████ ███████████████." (*Id.* Ex. 9 at WAYMO-UBER-00046625.) Uber faces these same risks. Yet Wagner failed to assess whether and how the Qi Slide reliably accounts for any of these risks, or how a discount rate of 15% could possibly be reasonable in light of these risks. Both Waymo and industry analysts have used a ███ discount rate for their own projections. (*Id.* Ex. 2 ¶ 36; Ex. 10 at 238:12-241:20 (discussing Waymo's consistent use of a ███ discount rate and stating that, for immature markets, "████████████████████████████ and "possible" that it was higher than 50%); *see also Fail-Safe L.L.C*, 744 F. Supp. 2d at 894 (noting "extreme importance in using an accurate discount rate when calculating damages" and finding expert's suggested rate unreliable) (citation omitted).)

### 2. Wagner Failed To Consider Significant Intervening Events

Even if it were proper to rely on the Qi Slide when it was created, which it was not, intervening events made it unreasonable for Wagner to rely on it in his report eighteen months later. When attempting to forecast future profits in any industry, it is imperative to use the most recent and accurate data and assumptions. *See Brooktree Corp.*, 977 F.2d at 1581. That is especially true in a nascent industry. Despite Uber producing recent financial data and forecasts, Wagner chose instead to rely on the stale Qi Slide.

Wagner failed to assess how events that occurred in the eighteen months since the Qi Slide was created impacted its underlying assumptions and results. For example, the Qi Slide assumes that the Otto acquisition will advance Uber's AV program by ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

---

[7] Berry Decl. Ex. 10, 8/23/17 Su Dep. (former Waymo financial manager) at 75:6-75:11 (testifying that identifying a range of possible valuation outcomes for Waymo was "pretty speculative"); *id.* at 118:4-12.

[8] For example, a May 2016 ███████████ presentation that Wagner relied on forecasts that Uber AV will ██████████████████████████████████████. *See* Berry Decl. Ex. 11 at UBER00232620. ████████████████████████████. *Id.* Ex. 12, 6/16/17 Bares Dep. at 96:11-97:13; Ex. 13, 8/11/17 Bares Dep. at 363:2-10.

DEFS.' MOT. TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER
CASE NO. 3:17-cv-00939-WHA
sf-3823864

6

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.[9]  Meanwhile, competition has dramatically increased, with Uber's primary competitor Lyft partnering with Waymo,[10] Ford announcing plans to introduce self-driving cars by 2021,[11] and GM acquiring Cruise Automation.[12]  And the regulatory process has moved more slowly than expected, with Wagner failing to identify a single state that expressly permits the transport of passengers in a fully AV.  The Qi Slide does not (and cannot) take into account the impact of these later events, yet Wagner made no attempt to assess how these recent events impact the assumptions and methodology underlying the Qi Slide or his ultimate opinions.  As a result, Wagner's opinions are not reliable and should be excluded.  *See, e.g.*, *Fail-Safe, L.L.C.*, 744 F. Supp. 2d at 888 ("Use of outdated or suspect data as the base of an expert's testimony are proper grounds to exclude that testimony."); *Target Mkt. Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1145 (7th Cir. 1998) (affirming exclusion of plaintiff's expert report that relied on defendant's own projections where such projections were made on assumptions that "had yet, and might never, come to pass" and had been undermined by later developments).

### C. Wagner Performs No Causation Analysis and His Apportionment Is Nonsensical

Even if Wagner had properly calculated Uber's incremental future profits from accelerated commercialization, his unjust profits analysis would still fail because he did not establish any causal link between those future profits and the specific trade secrets at issue.  It is black letter law that Waymo can recover only those "damages for unjust enrichment *caused* by the misappropriation of the trade secret."  18 U.S. Code § 1836(b)(i)(II) (emphasis added).  Wagner failed to do *any* causation analysis, and his attempt to apportion lacks any sound

---

[9] *See id.* Ex. 14 at UBER00016463-16464 (Ottomotto Merger Agreement §1.8); *id.* Ex. 15, 9/2/17 van den Berg Dep. at 172:4-172:6 (■■■■■■■■■■■■■■■■■■■■■■■■■■■■).
[10] *Id.* Ex. 16, https://www.nytimes.com/2017/05/14/technology/lyft-waymo-self-driving-cars.html; Ex.3, 8/2/17 Krafcik Dep. at 83:11-84:19.
[11] *Id.* Ex. 17, https://media.ford.com/content/fordmedia/fna/us/en/news/2016/08/16/ford-targets-fully-autonomous-vehicle-for-ride-sharing-in-2021.html.
[12] *Id.* Ex. 18, http://media.gm.com/media/us/en/gm/home.detail.html/content/Pages/news/us/en/2017/ apr/0413-cruise.html.

1  methodology.

2  The deficiencies in Wagner's causation analysis are glaring—he assumes that each trade
3  secret would advance not just the development but also the *commercialization* of Uber's *entire*
4  AV program by the exact amount of time that it would take to independently develop the trade
5  secret. This serial process assumption is not reliable. It falsely assumes that each trade secret is a
6  bottleneck in the AV program, and that Uber's entire AV program would (i) screech to a halt if
7  Uber had to independently develop the trade secret and (ii) jump ahead in all aspects if Uber
8  already had the trade secret. For example, according to Wagner, having ██████████████
9  in Trade Secret 25 would allow Uber to jump ahead in the accelerated development model and
10 bypass ███████ of development in entirely separate areas such as software, cameras, other
11 LiDAR components, and radar.[13]

12 Even setting aside the speculative nature of future commercialization, Wagner's
13 assumptions ignore the small part LiDAR plays in AV development and the even smaller part
14 these specific trade secrets play. According to Waymo, LiDAR is only one of ████████
15 ████████████████████████████. (Berry Decl. Ex. 19 at WAYMO-UBER-
16 00001363-R.) Uber has only 155 employees in its AV hardware department, compared to 405
17 employees in its AV software department. Tellingly, Waymo's own hardware engineer, Sasha
18 Zbrozek, highlighted the low value Waymo places on hardware: "At least historically, high-value
19 [information] has been algorithms and software. The hardware (at all levels) was a second class
20 citizen." (*Id.* Ex. 20 at WAYMO-UBER-00086885; *id.* at 86886 (stating that electronics designs,
21 including schematics and PCB layouts, were "low-value enough that we had even considered
22 hosting it off of Google infrastructure").) Wagner's notion that each trade secret related to "low-
23 value" LiDAR hardware designs will allow Uber to bypass months or years of software, camera,
24 regulatory and customer adoption hurdles has no evidentiary basis.

25 The illogic of Wagner's methodology is highlighted by the way he aggregates damages

---

[13] As Bratic explains, Waymo's technical expert's report, upon which Wagner relied, identified evidence that Uber allegedly misappropriated at most ████████████████ present in the document on which Waymo bases Trade Secret 25. Berry Decl. Ex. 2 ¶ 83.

DEFS.' MOT. TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER
CASE NO. 3:17-CV-00939-WHA
sf-3823864

8

1  for the trade secrets.  Apparently to avoid presenting too high of a damage figure, Wagner
2  "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and that "▮▮▮▮▮▮▮▮
3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4  ▮▮▮▮▮▮▮▮▮."  So, according to Wagner, Waymo should be awarded ▮▮▮▮▮ whether
5  Uber misappropriated all trade secrets or only Trade Secret 25.  This assumption contradicts his
6  entire methodology, which assumes that all work has to be performed in a serial process.
7      Finally, the redesign timelines that underpin Wagner's calculations are unreliable.  For
8  Trade Secrets 25 and 111, Wagner relies upon the opinions of Waymo's technical expert,
9  Lambertus Hesselink, that it would take ▮▮▮▮▮▮▮▮▮, respectively, for Uber to
10 independently develop those trade secrets.  (Berry Decl. Ex. 1 ¶ 284.)  But Trade Secret 25 is
11 comprised of ▮▮▮▮▮▮▮ and Waymo has alleged misappropriation of, at most, ▮▮▮▮,
12 yet Wagner has not undertaken any apportionment analysis.  (*Id.* Ex. 21, Hesselink Rpt. at 38-43.)
13 For the remainder of the trade secrets, Wagner uses the independent design timelines from Uber's
14 interrogatory response, but ignores that "*[t]he Schedule times identified for the redesigns below*
15 *would not significantly or materially impact the timeline for commercialization and rollout of*
16 *Uber's fully-autonomous self-driving technology to the general public.*"  (Ex. 2 ¶ 76 (emphasis in
17 original); Ex. 22, Uber's 2d Supp. Resp. to Common Rog. No. 1, at 4.)  That means Wagner is
18 relying on certain parts of Uber's interrogatory response while at the same time rejecting other
19 parts of the same response.

20 **II.   WAGNER'S SAVED DEVELOPMENT MODEL IS EQUALLY UNRELIABLE**

21     Like his accelerated development model, the mistakes in Wagner's saved development
22 model are blatant.  He takes a ▮▮▮▮▮▮▮ cash burn rate from John Bares' January 2016
23 notes for the *entire* AV program and then assumes that each trade secret saved Uber the entire
24 ▮▮▮▮▮▮▮ for the time that it would have taken Uber to independently develop the nine
25 discrete trade secrets.  (*Id.* Ex. 23 at UBER00060321; Ex. 12 at 214:18-215:1.)
26     This is merely the flip-side of Wagner's flawed accelerated commercialization model:
27 rather than assuming each trade secret allowed Uber to jump ahead by ▮▮▮▮, he assumes that
28 independent development of any single trade secret would cause all other work to grind to a halt

1  for ▇▇ and that Uber's entire burn rate for that period would be wasted. This methodology
2  is unreliable for the same reasons as his accelerated commercialization model.
3      It also defies logic that misappropriating one or more of the trade secrets that are limited
4  to a specific LiDAR feature could save Uber the expenses of the entire AV program. For
5  example, Wagner concludes that Trade Secret 25 would save Uber ▇▇▇▇ in development
6  costs because it would have taken Uber ▇▇▇▇ to independently develop that trade secret.
7  Putting aside the fact that Waymo's ▇▇▇▇ would have no value for Uber's AV, it
8  completely defies logic to say that ▇▇▇▇ could save Uber the cost of running its entire
9  AV program, including software, cameras, and radar, ▇▇▇▇. It further defies logic that
10 Uber would continue to employ 716 employees[14] for ▇▇▇▇ when, according to Wagner, no
11 one is performing work of value beyond the small team doing the independent development work.
12     Further, Wagner does nothing to test the burn rate on which he relies. The burn rate he
13 uses is from John Bares' January 2016 notes, and therefore was 18 months old by the time
14 Wagner relied on it. (*Id.* Ex. 23 at UBER00060321.) Yet Wagner failed to analyze what this
15 includes (e.g., personnel, cap ex, overhead), what Uber's actual burn rate was, and what it would
16 be over time. Wagner's report identifies that he considered this material, but he simply decided
17 not to use it without explanation. (*See id.* Ex. 24 at UBER00231732 (August 2017 presentation
18 entitled "Financial Management Strategy Advanced Technologies Group" showing that Uber had
19 a headcount of 155 people in the Uber hardware department with aggregate monthly salaries of
20 ▇▇▇▇).)
21     Finally, as with his accelerated development model, Wagner again contradicts himself by
22 assuming that the saved development costs are not additive. That is, Wagner assumes that Uber's
23 saved development costs remain exactly the same whether Uber misappropriated only Trade
24 Secret 25 or if Uber misappropriated all of the asserted trade secrets. Such an absurd result is the
25 hallmark of a flawed model and a failure to apportion. *See O2 Micro Int'l v. Monolithic Power*

---

[14] This headcount of 716 does not even include all ATG employees, which exceeds 1,500. (*Id.* Ex. 7 at 12:2-25 ("So ATG is a pretty large entity. It's about 1,550 people fully devoted to developing autonomous ride-sharing technology.").)

DEFS.' MOT. TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER
CASE NO. 3:17-cv-00939-WHA
sf-3823864

10

1  *Sys., Inc.*, 399 F. Supp. 2d 1064, 1077 (N.D. Cal. 2005) (holding that an expert's testimony "does
2  not provide a reasonable basis for the jury to apportion damages" and that the unjust enrichment
3  damages award based thereon "was based on speculation and guesswork, not on evidence" where
4  the expert opined on a value for all trade secrets but did not provide sufficient information for the
5  jury to determine how much of the value each individual secret contributed to the total).

### III. WAGNER'S UNJUST ENRICHMENT FOR TRADE SECRET NO. 90 IS BASED ON A FLAWED METHODOLOGY AND IS CONTRADICTORY

Wagner excluded Trade Secret 90 from his accelerated development and saved development expenses models, presumably because the purported ██████ independent development time results in a nonsensical ██████ royalty for a concept that Uber does not even use. So Wagner instead took the entire ██████ price that Uber paid for Tyto and simply assigned that full amount to Trade Secret 90. This methodology is not based on sound assumptions and further demonstrates that Wagner's models are result-oriented and contradictory.

To begin with, Wagner's opinion that Trade Secret 90 comprised the entire value of Tyto is not reliable because the Tyto acquisition included much more. The Tyto acquisition included ████████████████████████████████████████████████████████████████████ (*See* Ex. 1 ¶¶ 301-303.) Wagner discounts the value of the employees by assuming that the equity consideration to those employees reflected the full consideration, but he provides no analysis to substantiate this assumption. He further fails to analyze the assets of Tyto and substantiate his conclusion that they are entirely worthless except for Trade Secret 90.

Moreover, Wagner fails to explain how Uber was unjustly enriched by *paying* ██████ for a trade secret that it does not use. Uber already paid ██████ for Tyto and, according to Wagner, Trade Secret 90. Wagner fails to explain why Uber must pay another ██████ to Waymo for something it does not use.

### IV. WAGNER'S REASONABLE ROYALTY OPINION IS UNRELIABLE

Wagner's reasonable royalty opinion is based entirely on his accelerated development model, and therefore fails for the same reasons. In addition, Wagner improperly applied the

DEFS.' MOT. TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER
CASE NO. 3:17-cv-00939-WHA
sf-3823864

11

*Georgia Pacific* factors to conclude that the baseline future profits should be increased by [REDACTED].

First, Wagner's conclusion that the baseline royalty should be increased by [REDACTED] is devoid of any analysis. He walks through each of the *Georgia Pacific* factors, concludes that most are neutral, and then opines without any analysis that the baseline royalty should be increased by [REDACTED], a number that does not appear anywhere else in his report, or in any evidence he cites. (*See* Ex. 1 ¶ 439.) That is akin to a "25% rule of thumb" and should be excluded for the same reason. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F. 3d 1292, 1318 (Fed. Cir. 2011).

Second, a [REDACTED] enhancement of Wagner's unjust profits model is illogical. In a hypothetical negotiation, a purchaser would pay only an amount that would permit it to earn a reasonable return on its investment. Wagner fails to show how Uber would profit from paying [REDACTED] of future AV profits to license these discreet trade secrets. It never would, and no rational company would pay more to license the technology than what it would cost to design around, which both Wagner and Bratic assume is possible. Further, the [REDACTED] reasonable royalty for Trade Secret 25 alone is [REDACTED] of the value of Google's entire AV program in late 2015, according to the Qi Slide upon which Wagner relies. (Berry Decl. Ex. 5 at UBER00069032; *id.* Ex. 10 at 74:7-10 (discussing [REDACTED]).)

Third, Wagner fails to apply the *Georgia Pacific* analysis trade secret by trade secret. He also only opined as to lump sum royalties instead of running royalties, which is illogical in a trade secret case like this where Waymo must account for the possibility of an injunction on one or more of the trade secrets,[15] and there are numerous contingencies/risk factors for development, let alone commercialization.

## CONCLUSION

For the above reasons, Uber respectfully requests that the Court exclude the monetary damages opinions and testimony of Michael Wagner as not reliable under *Daubert*.

---

[15] *See, e.g., Oracle Am., Inc. v. Google Inc.*, No. 3:10-cv-03561-WHA (ECF No. 230 at 11) (N.D. Cal. July 22, 2011) ("[A]ny damages report should address both the assumption that an injunction will be granted and the assumption that an injunction will not be granted.").

DEFS.' MOT. TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER
CASE NO. 3:17-cv-00939-WHA
sf-3823864

12

Dated: September 16, 2017               SUSMAN GODFREY LLP

                                        By:   */s/ William Christopher Carmody*
                                              William Christopher Carmody

                                        Attorneys for Defendants
                                        UBER TECHNOLOGIES, INC.
                                        and OTTOMOTTO LLC

**ATTESTATION OF E-FILED SIGNATURE**

I, Arturo J. González, am the ECF User whose ID and password are being used to file this Motion. In compliance with General Order 45, X.B., I hereby attest that William Christopher Carmody has concurred in this filing.

Dated:  September 16, 2017                     */s/ Arturo J. González*
                                               ARTURO J. GONZÁLEZ

DEFS.' MOT. TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER
CASE NO. 3:17-CV-00939-WHA
sf-3823864

13