# EXHIBIT 10

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

WAYMO LLC,

       Plaintiff,

vs.                                    Case No. 3:17-cv-00939-WHA

UBER TECHNOLOGIES, INC.;
OTTOMOTTO LLC; OTTO TRUCKING LLC,

       Defendants.

_____/

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF MING SU

WEDNESDAY, AUGUST 23, 2017

Reported by:

Anrae Wimberley

CSR No. 7778

Job No. 2685928

PAGES 1 - 333

Page 74

| | | |
|---|---|---|
| 1 | Q.    The number that they provided. | 10:57:07 |
| 2 | A.    Yes. | 10:57:09 |
| 3 | Q.    And what was the number for ▮▮▮ | 10:57:12 |
| 4 | A.    The number was ▮▮▮▮▮▮▮▮▮ | 10:57:14 |
| 5 | Q.    And ▮▮▮▮▮▮▮▮? | 10:57:20 |
| 6 | A.    So for ▮▮▮ specifically, I don't recall. | 10:57:21 |
| 7 | Q.    How about the internal corporate development? | 10:57:26 |
| 8 | A.    Internal corporate development, they provided | 10:57:30 |
| 9 | several revisions.  The one that is -- that I remember | 10:57:34 |
| 10 | most vividly is ▮▮▮▮▮▮▮▮ | 10:57:42 |
| 11 | Q.    And you found both of those valuations to be | 10:57:45 |
| 12 | reasonable? | 10:57:47 |
| 13 | A.    Yes. | 10:57:47 |
| 14 | Q.    Even though they're -- a difference of ▮▮ ▮▮▮▮▮▮ | |
| | ▮▮ ▮▮▮▮▮▮▮▮▮ valuation? | 10:57:54 |
| 16 | MR. EISEMAN:  Objection as to form. | 10:57:55 |
| 17 | THE WITNESS:  Correct. | 10:57:55 |
| 18 | BY MR. LAFFERTY: | 10:57:55 |
| 19 | Q.    Is that unusual, to arrive at such different | 10:57:59 |
| 20 | amounts of valuations? | 10:58:00 |
| 21 | MR. EISEMAN:  Objection as to form. | 10:58:01 |
| 22 | THE WITNESS:  No. | 10:58:02 |
| 23 | BY MR. LAFFERTY: | 10:58:02 |
| 24 | Q.    So if the valuation came back at ▮▮▮▮▮▮▮ | 10:58:05 |
| 25 | would you have found that reasonable? | 10:58:08 |

```
                                                          Page 75
1        MR. EISEMAN:  Objection as to form.              10:58:09
2        THE WITNESS:  I think depending on the assumptions 10:58:11
3   used by the people performing the valuation, there's  10:58:14
4   definitely a large range of possible outcomes.        10:58:17
5   BY MR. LAFFERTY:                                      10:58:17
6        Q.  What do you think the range of possible      10:58:20
7   outcomes were around this time frame for valuing      10:58:22
8   Waymo?                                                10:58:23
9        MR. EISEMAN:  Objection as to form.              10:58:24
10       THE WITNESS:  That's hard to say.  That's pretty 10:58:25
11  speculative.                                          10:58:28
12  BY MR. LAFFERTY:                                      10:58:28
13       Q.  But ███████████ is not speculative?          10:58:35
14       MR. EISEMAN:  Objection as to form.              10:58:36
15       THE WITNESS:  I'm sorry.  What was the question? 10:58:37
16  BY MR. LAFFERTY:
17       Q.  The range between ████████████████           10:58:44
18  is not speculative?                                   10:58:46
19       MR. EISEMAN:  Objection as to form.              10:58:47
20       THE WITNESS:  I don't know how to answer it.     10:58:49
21  BY MR. LAFFERTY:                                      10:58:49
22       Q.  Do you think it's speculative?               10:58:50
23       MR. EISEMAN:  Objection as to form.              10:58:51
24       THE WITNESS:  I think it's speculative?  In what 10:58:52
25  sense?                                                10:58:52
```

Page 118

| | | |
|---|---|---|
| 1 | was the lead for the self-driving car project.  So it | 11:59:49 |
| 2 | was really anything he needed to know or wanted to | 11:59:53 |
| 3 | see. | 11:59:54 |
| 4 | Q.   Did he ever provide you with information that | 11:59:58 |
| 5 | you used in the P&Ls? | 12:00:00 |
| 6 | A.   I'm sure it's happened.  I think sometimes in | 12:00:06 |
| 7 | forecasting there's -- there's kind of like, you know, | 12:00:10 |
| 8 | best guesses.  Or there's kind of -- in areas where | 12:00:13 |
| 9 | maybe there's no answers.  You know I think as a | 12:00:15 |
| 10 | leader, you have to set a target.  And so you know in | 12:00:20 |
| 11 | those times, you know, maybe he'd step forward and, | 12:00:23 |
| 12 | "Say this is the target that we're going to use." | 12:00:25 |
| 13 | Q.   Do you recall him ever setting a target? | 12:00:29 |
| 14 | A.   He did set a target on the number of cities | 12:00:34 |
| 15 | he wanted to be in. | 12:00:38 |
| 16 | Q.   Do you recall any other targets that | 12:00:40 |
| 17 | Mr. Urmson provided for the P&Ls? | 12:00:46 |
| 18 | A.   That's the main one that comes to my memory. | 12:00:50 |
| 19 | Q.   How is -- how is the number of cities used in | 12:00:52 |
| 20 | the P&L? | 12:00:53 |
| 21 | MR. EISEMAN:  Objection as to form. | 12:00:57 |
| 22 | THE WITNESS:  It's used to determine your -- the | 12:00:59 |
| 23 | size of your potential user base. | 12:01:05 |
| 24 | BY MR. LAFFERTY: | 12:01:05 |
| 25 | Q.   And how can the user base or size of the user | 12:01:08 |

```
                                                            Page 238
 1     either a nonlinear or non-exponential, that you        15:42:32
 2     can't model out using a formula.                       15:42:35
 3             You know an example would be, for instance,    15:42:36
 4     your investment into a hardware -- vehicle hardware    15:42:40
 5     program.  That's going to follow a very specific       15:42:43
 6     cadence that isn't necessarily modeled.  You just --   15:42:47
 7     you just have data as to kind of what curve looks      15:42:50
 8     like.                                                  15:42:51
 9         Q.   And you were responsible for putting this tab 15:42:54
10     together; is that correct?                             15:42:55
11         A.   Correct.                                      15:42:55
12         Q.   And look at Row 20, please, the "Discount     15:43:01
13     Rate."  Do you see that?                               15:43:04
14         A.   Yes.                                          15:43:05
15         Q.   How was that discount rate determined?        15:43:07
16         A.   So this discount rate, from what I recall,    15:43:18
17     was borrowed from one of the analyses that was -- I    15:43:24
18     forgot which one, but it was like -- I think done by   15:43:26
19     one of the -- one of the firms that had been doing,    15:43:28
20     like, these analyses for us, and they had kind of come 15:43:30
21     up with a discount rate that made sense for Waymo.     15:43:35
22     And we said, "Sure, we can use that."                  15:43:37
23         Q.   And this valuation rate here is ████████;     15:43:42
24     is that right?                                         15:43:42
25             Or I'm sorry.  This discount rate is           15:43:44
```

Page 239

```
 1            █████████  correct?                              15:43:45
 2       A.   Correct.                                         15:43:45
 3       Q.   And it came from one of the Waymo valuations;    15:43:49
 4  is that correct?                                           15:43:50
 5       MR. EISEMAN:  Objection as to form.                   15:43:51
 6       THE WITNESS:  From what I recall, yes.                15:43:53
 7  BY MR. LAFFERTY:                                           15:43:53
 8       Q.   Okay.  But you don't recall which one?           15:43:55
 9       A.   No.                                              15:43:55
10       Q.   So you don't know -- strike that.                15:43:58
11            Do you know how they calculated that             15:44:00
12  40 percent in those valuation reports?                     15:44:03
13       A.   I don't recall.                                  15:44:05
14       Q.   Is ████████████████████████████████              15:44:12
15       MR. EISEMAN:  Objection as to form.                   15:44:15
16       THE WITNESS:  ████████████████████████████            15:44:18
17  BY MR. LAFFERTY:                                           15:44:18
18       Q.   What is a typical discount rate?                 15:44:20
19       MR. EISEMAN:  Objection as to form.                   15:44:25
20       THE WITNESS:  I think -- typical for what kind of     15:44:28
21  company, right?                                            15:44:28
22  BY MR. LAFFERTY:                                           15:44:28
23       Q.   How about automotive companies?                  15:44:31
24       A.   ██████████████████████████████████  ████████
         ████████████████████████████████████████             15:44:41
```

```
                                                              Page 240
1        Q.   How about an immature market --              15:44:45
2        MR. EISEMAN:  Objection as to form.               15:44:49
3   BY MR. LAFFERTY:                                       15:44:49
4        Q.   -- that's not mature?                        15:44:49
5        MR. EISEMAN:  Objection as to form.               15:44:49
6        THE WITNESS:  ███████████████████████████
███████████████████████████████                            15:44:55
8   BY MR. LAFFERTY:                                       15:44:55
9        Q.   ████████████████████████████████████
████████████
     ██      ████                                          ██
     ██      ██████                                        ██
     ██      ██████                                        ██
14       Q.   Was it when you were in business school?     15:45:13
15       A.   No.  When we were studying comparables at    15:45:19
16  Intel, or looking at very nascent projects, a project  15:45:23
17  that may not exist in a year because it's too          15:45:26
18  speculative, it might have a very high discount        15:45:30
19  rate -- or should have a very high discount rate.      15:45:35
20       Q.   And so you said something that's nascent or  15:45:38
21  speculative.                                           15:45:38
22            What would the discount rate be for          15:45:40
23  something that may not be around in a year?            15:45:43
24       MR. EISEMAN:  Objection as to form.               15:45:44
25       THE WITNESS:  It's hard to say.  There's a lot of 15:45:46
```

```
                                                          Page 241
 1    other factors besides just -- besides those.         15:45:51
 2    BY MR. LAFFERTY:                                     15:45:51
 3        Q.   Would it be over 50 percent?                15:45:54
 4        A.   It's possible.                              15:45:56
 5        MR. EISEMAN:   Objection as to form.             15:45:56
 6        THE WITNESS:   Sure, it's possible.              15:45:58
 7    BY MR. LAFFERTY:                                     15:45:58
 8        Q.   And what is this particular discount rate?  15:46:00
 9    What is that measuring?                              15:46:02
10        A.   It's measuring the -- essentially the       15:46:08
11    riskiness or -- of the future cash flows as projected 15:46:11
12    in this view of Waymo's business.                    15:46:15
13        Q.   What do you mean by "this view"?            15:46:17
14        A.   So in particular, this -- this current      15:46:20
15    financial projection, if you were to -- if you desired 15:46:24
16    to take the financial projection as calculated, take 15:46:28
17    the future cash flows and you wanted them -- and you 15:46:30
18    wanted to discount them into kind of present value   15:46:33
19    dollars, our estimation is that you would need to    15:46:37
20    apply a discount rate of ████████ in order to do so. 15:46:43
21        Q.   Did that discount rate change at all in the 15:46:45
22    P&Ls over your time at Waymo?                        15:46:49
23        A.   I'm sure that it did.  To be totally honest, 15:46:54
24    this -- trying to find the present value was not a key 15:46:57
25    objective on this P&L.  We predominantly kept the    15:47:01
```

```
 1            FEDERAL CERTIFICATE OF DEPOSITION OFFICER
 2        I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby
    declare:
 3        That, prior to being examined, the witness named
    in the foregoing deposition was by me duly sworn
 4  pursuant to Section 30(f)(1) of the Federal Rules of
    Civil Procedure and the deposition is a true record of
 5  the testimony given by the witness;
 6        That said deposition was taken down by me in
    shorthand at the time and place therein named and
 7  thereafter reduced to text under my direction;
 8        --X---   That the witness was requested to
    review the transcript and make any changes to the
 9  transcript as a result of that review pursuant to
    Section 30(e) of the Federal Rules of Civil Procedure;
10        -----    No changes have been provided by the
11  witness during the period allowed;
12        -----    The changes made by the witness are
    appended to the transcript;
13        -----    No request was made that the transcript
14  be reviewed pursuant to Section 30(e) of the Federal
    Rules of Civil Procedure.
15        I further declare that I have no interest in the
16  event of the action.
17        I declare under penalty of perjury under the laws
    of the United States of America that the foregoing is
18  true and correct.
19        WITNESS my hand this 24th day of August, 2017.
20
21
22
23            [signature: Anrae Wimberley]
24
25       ANRAE WIMBERLEY, CSR NO. 7778
```

Page 333