MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzalez@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

KAREN L. DUNN (*Pro Hac Vice*)
kdunn@bsfllp.com
HAMISH P.M. HUME (*Pro Hac Vice*)
hhume@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington DC 20005
Telephone: 202.237.2727
Facsimile: 202.237.6131

WILLIAM CARMODY (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
SHAWN RABIN (*Pro Hac Vice*)
srabin@SusmanGodfrey.com
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Telephone: 212.336.8330
Facsimile: 202.336.8340

Attorneys for Defendants
UBER TECHNOLOGIES, INC.
and OTTOMOTTO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>UBER TECHNOLOGIES, INC., OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>　　　　　　Defendants. | Case No. 3:17-cv-00939-WHA<br><br>**UBER TECHNOLOGIES, INC. AND OTTOMOTTO LLC'S OPPOSITION TO WAYMO'S MOTION FOR CONTINUANCE OF TRIAL DATE**<br><br>The Honorable William Alsup<br><br>Trial Date: October 10, 2017 |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## I. INTRODUCTION

After claiming for months that it has irrefutable evidence of patent infringement and trade secret theft by Uber, Waymo's case has come to a screeching halt. All four patent claims have been dismissed. Its trade secrets claim has been narrowed to a handful of minor features in one LiDAR component. And the heart of Waymo's case—that Anthony Levandowski supposedly sat at a computer and selected 14,000 important proprietary files to be downloaded—has collapsed like a house of cards. After discovery closed, Waymo finally—and only in response to a court order—produced documents stating that the 14,000 files are actually of "low value" and were ████████████████████████████ someone logged on to that repository. That critical information had never previously been disclosed to Uber, or to this Court.

Waymo's motion for a continuance asks this Court for a do-over after it knowingly made the informed decision in June 2017 to proceed with expedited discovery and a trial in October 2017 despite not having the Stroz report. In its Motion claiming it now wants to change strategy and delay this trial, Waymo fails to point out that the ████████████████ (Dkt. 1603-4 at 2:17) in the Stroz report is evidence that ████████████████████ ████████████████████████████████████████████████████ Until Waymo filed its complaint, no one with access to the Stroz Report could have discerned that a reference to Mr. Levandowski ████████████████████████████████ was evidence that Mr. Levandowski had wrongfully taken those files (or somehow retained them). Having worked at Google for over eight years, it is not surprising that Mr. Levandowski would have had ███ ████████████████████████████████████████████████████ Similarly, it is not surprising that ████████████████████████████ ████████████████████████ especially since Uber made clear that it did not want any Google information brought to Uber.

And the facts show that the due diligence worked. Waymo has conducted a dozen inspections of Uber's LiDAR device, source code, work stations, computers, and facilities, taken over 50 days of depositions, and has found no evidence that the 14,000 files or any other Google

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

1

1   files ever made it to Uber.  That explains why Waymo is in no hurry to try this case, after

2   requesting and getting expedited discovery and an expedited trial date.

3       Waymo now seeks to delay the trial, even though this Court has made it clear that Waymo

4   may not get a trial date for two years.  Waymo claims that it needs a continuance because there

5   are a lot of materials at Stroz.  But the question for the jury is what, if anything, did *Uber*

6   misappropriate.  That ███████████████ only helps Uber—███████████████████████

7   █████████████████ which explains why Waymo walked away from a dozen inspections

8   at Uber empty-handed.

9       Waymo's motion for continuance is motivated—at least in part—by the realization that

10  Waymo's damages expert failed miserably in his effort to concoct a theory to support Waymo's

11  inflated ██████ damages claim.  As the Court knows, none of the parties have ██████

12  ████████████████████████.  Nevertheless, Waymo's damages are based entirely

13  on speculative future profits and cost savings in a nascent market, and Waymo's expert relied on

14  a document that is 18 months old and untested.  Furthermore, Waymo failed to conduct any

15  causation analysis to show that the purported unjust future profits were caused by

16  misappropriation of each trade secret.

17      Waymo should not be allowed to use a continuance as a vehicle for attempting to repair

18  these fatal flaws.  Instead, as described below, the Court should either deny the motion for

19  continuance or, at most, hold a short bench trial in October on the narrowed list of trade secrets

20  and grant a continuance with regard to any others.  If the Court entertains such a limited

21  continuance, Uber believes that it would be helpful to the Court and to the jurors for there to be

22  input from a court-appointed neutral expert.

23      **II.   THE STROZ REPORT CONFIRMS THAT THE DUE DILIGENCE
          PREVENTED ANY GOOGLE FILES FROM REACHING UBER**

24

25      While replete with inflammatory rhetoric, glaringly absent from Waymo's description of

26  the diligence that Stroz performed is the irrefutable conclusion that it worked: none of the █████

27  ████████████████████████ after working at Google for several years made

28  its way to Uber or Ottomotto.  There is also not a shred of evidence that Uber knew of or

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

2

1  encouraged any theft.  The Report expressly concludes that Stroz ████████████
2  ████████████████████████████████████████████████████████████████████████████
3  (Dkt. 1603-5, Stroz Rpt. at 17 (emphasis added).)  And the Stroz due diligence process itself was
4  carefully structured so that Uber did not receive any confidential or proprietary Google
5  information identified by Stroz, such as ██████████████ that Waymo makes a centerpiece
6  of its brief.  (*See* Dkt. 824 at 6.)  Waymo does not contend otherwise.

7      This is why, despite a dozen detailed inspections of Uber's facilities poring over Uber's
8  design files and source code, tens of thousands of Uber documents, and more than 45 depositions
9  of Uber engineers and executives, Waymo cannot point to any evidence that the 14,000 files (or
10 any other Google files) are at Uber.  ***They simply are not there.***  Simply repeating the words
11 "stole" and "stolen" is not a substitute for proof.

12     Before Uber acquired Ottomotto, Uber required Levandowski ████████████
13 ████████████████████████████████████████████████████████████████████████████
14 ████████████████████████████████████████████████████████████████████████████
15 ████████████████████████████████████████ (Dkt. 1603-5, Stroz Rpt. at 3.)  This
16 allowed Stroz ██████████████████ and prevent it from coming to Uber.  In exchange, Uber
17 agreed to indemnify them, but only to the extent that their participation in the Stroz investigation
18 was completely truthful.  (Declaration of Arturo J. Gonzalez in Support of Defendants Uber
19 Technologies, Inc. and Ottomotto LLC's Opposition to Waymo's Motion for Continuance of
20 Trial Date ("Gonzalez Decl."), Ex. 1 (Indemnification Agreement) § 2.2(b)(ii) at
21 UBER000098495.)  The Indemnification Agreement also strongly incentivized Levandowski and
22 others not to commit any "post-signing bad acts," which were not covered by the indemnity and
23 which could cause Levandowski to lose indemnification for all claims (including Google's
24 pending arbitration against Levandowski).  (*Id*. § 2.1(b)(iii) at UBER00098496.)  Each diligenced
25 employee attested at the time that they ████████████████████████.  (*Id.* Ex. 2 at
26 UBER00319641 (Maxime Levandowski attestation: ████████████████████████
27 ████████████████████████████████████████████████████████████████████████████
28 ████████████████████████████████████████

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

3

██████ "); *id.* Exs. 3-7 (diligenced employee attestations: ██████

██████

██████ ).)

Uber and Stroz required Levandowski and the other diligenced employees to ██████

██████, and

Levandowski attested that he did so. Then, ██████

██████

██████ Thus, there was no way for him ██████ for

the remainder of his time at Otto or once he joined Uber. (Dkt. 1603-6, Ex. 17 to Stroz Rpt. at 2.)

██████

██████ (Dkt. 1603-5, Stroz Rpt. at 12-13.) This is the exact scenario the Court

recognized as "an innocent explanation." (5/3 Public Hr'g Tr. at 108:14-25 (The Court: "But

let's say for some reason they did the deal, joint defense, and under that scenario Uber would be

saying: We are innocent. We don't know -- we don't want any of those trade secrets. We just

want Levandowski. He's brilliant. He's the man in the Smithsonian with the motorcycle. We

just want him. We don't want his documents. So go put those documents in a vault. Never look

at them. Promise us you're never going to inspect them. Small chance, but some chance that that

happened. So what do we do? What does the system of justice do in a case like this, where

there's an innocent explanation; there's a guilty explanation; neither of them have been proven up

yet.").)

With respect to the 14,000 files, Waymo ignores that the Stroz Report confirms that those

files could not have come to Uber because Levandowski ██████

██████

██████. (Dkt. 1603-5, Stroz Rpt. at 12.) Until Waymo filed its complaint, no one with

access to the Stroz Report could have discerned that a reference to Levandowski ██████

██████ was evidence that Levandowski had *wrongfully* taken those

files. Likewise, ██████ that Waymo alleges

Levandowski ██████

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

4

1  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ are not "irrefutable evidence that these two trade secrets
2  were directly communicated to Uber." (Mot. at 17.) To the contrary, they were not
3  communicated to Uber at all, much less directly or irrefutably, for ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and no one at Uber ever received access to these
5  ▓▓▓▓▓▓▓▓▓▓▓▓. (Dkt. 823 at 6.)

6       Waymo's assertion that "Uber knew about and encouraged the destruction of evidence" is
7  baseless and supported by nothing in the Report, including Waymo's selective quotation of the
8  underlying deposition testimony and of the Report. Contrary to Waymo's assertions (Mot. at 2,
9  8-9), Messrs. Kalanick's and Poetzscher's deposition testimony on this topic is completely
10 consistent with the Report and shows they directed Levandowski not to bring any Google
11 information into Uber. When Levandowski disclosed his possession of five disks containing
12 Google information, the Report says ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" (Dkt. 1603-5,
15 Stroz Rpt. at 10.) Waymo's motion selectively omitted the first part of Mr. Kalanick's instruction
16 to Levandowski during that meeting. Waymo also incorrectly claims that Rhian Morgan
17 "testified at her deposition that she had no involvement in and never even heard of the Stroz
18 investigation." (Mot. at 9 (citing April deposition).) In an intervening portion of her April
19 deposition that Waymo omits, Ms. Morgan stated (amidst objections) that she did "remember
20 there being some interviews that happened for some of our early employees. I'm not sure if that
21 counts under due diligence – or not." (Gonzalez Decl. Ex. 8, 4/14/17 Morgan Dep. 17:8-17.) In
22 an additional deposition, she stated that Levandowski and others were being interviewed by a
23 forensic investigation firm, and that she was responsible for filing documents relating to the
24 investigation, but had no further substantive knowledge of the process. (Gonzalez Decl. Ex. 9,
25 8/18/17 Morgan Dep. at 143:2-14, 147:2-148:5.)

26      Having worked at Google for over seven years, it is not surprising that Levandowski
27 would have ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
28 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Dkt. 1603-5, Stroz Rpt. at 12.) Using a

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

5

personal device for work purposes is not evidence of theft; indeed, Waymo's policies expressly ███████ (Gonzalez Decl. Ex. 10 (Waymo personal device policy).) Similarly, it is not surprising that ███████████████████████████████████████████████ ███████, especially since Uber made it clear throughout the deal negotiations that it did not want any Google information brought to Uber.

In sum, and contrary to Waymo's misleading claims, the Stroz Report confirms that no Google material came into Uber. Contrary to Waymo's misleading arguments, the Report:

- ███████████████████████████████████████████████████████████ ███████, contrary to Waymo's assertion that the "Report states plainly that Levandowski took trade-secret information from Waymo." (Mot. at 4 (citing Stroz Rpt. at 12).)

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████ (Dkt. 1603-5, Stroz Rpt. at 12-13.)

### III.  UBER DID NOTHING IMPROPER WITH RESPECT TO THE STROZ REPORT

The parties to the Stroz Report legitimately believed that a common interest privilege applied. Uber could not decide unilaterally to waive that privilege. After this Court decided that the common interest privilege did not exist until the term sheet was signed, Uber did not appeal this Court's decision to the Federal Circuit; Mr. Levandowski did.

Once the Federal Circuit issued its decision, Uber promptly produced the Stroz Report and its exhibits within hours. (Gonzalez Decl. ¶ 3.) Uber produced its Stroz-related documents the next day. (Gonzalez Decl. ¶ 4.) MoFo also made the ███████ from the Stroz database that are in

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

6

its files—which MoFo received on behalf of Mr. Levandowski *after* Google filed its arbitrations against him and are the only Stroz materials MoFo has other than the Stroz Report and its exhibits—available for review promptly.

Since the Federal Circuit's decision, Uber has provided deposition dates for five deponents. (Gonzalez Decl. ¶ 2.) Waymo has rejected these dates. (*Id.*) Uber understands that Stroz has provided a date for its deponents. Waymo has not responded to Stroz's proposal.

### IV. WAYMO IS SEEKING A CONTINUANCE SO IT CAN SHORE UP ITS SHAKY CASE

#### A. All of Waymo's Patent Claims Have Been Dismissed

Waymo's patent claims were a complete misfire. Waymo's claims based on all four patents have been dismissed.

#### B. Waymo's Nine Asserted Trade Secrets Are Weak

As the Court recognized at a recent hearing, this is ▓▓▓▓▓▓▓▓▓▓▓▓▓ for Waymo. (9/6/17 Sealed Hr'g Tr. 106:9-11.) Waymo started the case by accusing Uber of copying Waymo's entire single-lens LiDAR design, but is now reduced to asserting misappropriation of a handful of minor features in one LiDAR component—▓▓▓▓▓▓▓▓▓ Waymo's nine remaining trade secret claims have numerous defects: the purported evidence of misappropriation is thin to non-existent, with only a very strained connection to the 14,000 files Waymo alleges Levandowski wrongfully downloaded; the accused features in Uber's Fuji LiDAR were independently developed with no specific design input from Mr. Levandowski; and most of the claimed trade secrets are broad, generally-known concepts that are within the intellectual "toolbox" of LiDAR engineers.

The following is a brief summary of the state of play for each of Waymo's nine alleged trade secrets:

- **TS 96 (GBr3** ▓▓▓▓▓**):** This trade secret covers the specific ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓ of Waymo's GBr3 LiDAR. As detailed in Uber's summary judgment motion on TS 96 (Dkt. 1514), Waymo's technical expert, Dr. Hesselink, confirms that Uber does not use the specific implementation of GBr3 ▓▓▓▓. The ▓▓▓▓▓▓▓▓▓▓▓▓ do not

1   match, even when the differing focal lengths are (improperly) factored out. (Dkt. 1512-4

2   at 3-6.) Further, Dr. Hesselink acknowledges that the ▮▮▮▮▮

3   ▮▮▮▮▮

4   ▮▮▮▮▮

5   • **TS 9 (**▮▮▮**)**: This broadly-defined trade secret boils down to a fundamental optics

6   principle—i.e., ▮▮▮▮▮. As

7   explained in Uber's summary judgment motion on TS 9 (Dkt. 1419), Waymo concedes

8   that its own '922 patent discloses all elements of TS 9 except for ▮▮▮▮▮

9   ▮▮▮▮▮ Yet, Waymo's engineers admitted that ▮▮▮▮▮ is a

10  well-known concept in optics. (Dkt. 1419-4 at 11-12.) Moreover, public literature

11  discloses ▮▮▮▮▮, and the concept has been used in commercially-

12  available LiDARs for years (including Velodyne's HDL-64, used by both Google and

13  Uber in their self-driving vehicles). (*Id.* at 13-15.)

14  • **TS 2 (**▮▮ **transmit block)**: Waymo's misappropriation theory for TS 2 is that the

15  two separate ▮▮ transmit blocks in Uber's Fuji LiDAR are the same as the single

16  ▮▮ transmit block in GBr3, because ▮▮. That simplistic notion ignores Fuji's

17  2-cavity LiDAR design (hence, its two transmit blocks), which is fundamentally different

18  than GBr3's single-cavity, single-lens design with a single block. Waymo has presented

19  no evidence that Uber embraced ▮▮ as a magic number; rather, Uber chose ▮▮

20  to distribute the 32 diodes in each of Fuji's 2 cavities, because that configuration provided

21  enough physical space for mounting the diodes. Uber is currently ▮▮▮▮▮

22  ▮▮▮▮▮.

23  • **TS 7 (**▮▮▮**)**: Waymo initially claimed that having a laser diode ▮▮▮

24  ▮▮▮ was a trade secret, but retreated when faced with the numerous public

25  disclosures of that concept. Now Waymo claims that a ▮▮▮▮▮ is its trade

26  secret. But internal Waymo emails and testimony show that ▮▮▮▮▮ was an arbitrary

27  number ▮▮▮▮▮, and was not the result of any testing or lengthy

28  development. (*See, e.g.*, Gonzalez Decl. Ex. 12 at WAYMO-UBER-00022197-198

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

8

1  (vendor writing in response to Waymo statement that "▮▮▮▮▮▮
2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").)  It was
5  also shared with vendors apparently without any NDA.  (*See, e.g.*, Gonzalez Decl. Ex. 13
6  at WAYMO-UBER-00022246 (2/4/2016 Email to third-party ▮▮▮), attaching, *inter*
7  *alia*, *id.* Ex. 14 at WAYMO-UBER-00022288 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮"); *see also* Dkt. 923 at 1 (granting Uber motion to compel all vendors NDAs);
9  Gonzalez Decl. Ex. 15 (Email from Uber counsel stating that Uber had not located an
10 NDA for ▮▮▮ in Waymo's productions).)  Uber has already ▮▮▮▮▮▮▮▮▮▮
11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- **TS 13** (▮▮▮▮▮▮▮▮):  Waymo claims that the general concept of using ▮▮▮
13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Numerous vendor websites reveal, however,
15 that using ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is well known.  Indeed,
16 vendors sell ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for this very purpose.
17 Moreover, Uber is currently ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

- **TS 14** ▮▮▮▮▮▮:  TS 14 is the concept of having ▮▮▮▮ in PCBs to align the PCBs to
19 each other and to be used as reference points for ▮▮▮▮▮▮.  Waymo's own
20 '922 patent discloses the ▮▮▮▮ in Waymo's LiDAR boards, and public references
21 disclose ▮▮▮▮ for aligning PCBs and used as reference points for ▮▮▮▮▮▮▮▮.
22 Moreover, Uber is currently ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ from the boards.

- **TS 90** ▮▮▮▮▮▮▮▮▮▮▮▮▮:  This alleged trade secret does not pertain to Fuji at all,
24 but only to Uber's abandoned Spider LiDAR design.  Waymo asserts that
25 Mr. Levandowski disclosed Waymo's ▮▮▮▮▮▮▮▮▮▮▮ method to Uber engineer
26 James Haslim, who purportedly implemented that method in Spider.  The evidence shows,
27 however, that Spider's ▮▮▮▮▮▮ method (and the rough sketch that Mr. Levandowski
28 provided) was a publicly-known technique.  Mr. Haslim consulted public references to

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

9

1  develop his method.  Moreover, Waymo's allegedly proprietary method is also disclosed
2  in public references, and is not a trade secret.

3  • **TS 25** ▉▉▉▉▉▉▉▉▉▉▉: Waymo accuses Uber of having misappropriated
4  Waymo's ▉▉▉▉▉▉▉▉▉▉, but has no evidence to support this.  Waymo relies
5  exclusively on a handful of notes and an email from the former head of Uber's Pittsburgh
6  research facility (who was not working on Uber's LiDARs) recording a few vague
7  references to ▉▉▉▉▉▉▉▉▉ during conversations with Mr. Levandowski.  There is
8  no mention in these scant materials of any specific Waymo ▉▉▉▉▉▉▉▉▉▉ and
9  no evidence that any Waymo ▉▉▉▉▉▉ were adopted by Uber or used to develop
10 Uber's LiDARs.  Uber has its own ▉▉▉▉▉, which Waymo's technical expert admits
11 do not contain any of Waymo's ▉▉▉▉.

12 • **TS 111** (▉▉▉▉▉▉▉▉▉▉▉▉):  Waymo contends that Mr. Levandowski steered
13 Uber away from a ▉▉▉▉▉▉▉▉ based on his prior negative experience with
14 Waymo's ▉▉▉▉▉▉ design.  Yet, Waymo has proffered no evidence that Mr.
15 Levandowski ever once mentioned the ▉▉ experience or discussed the drawbacks of
16 ▉▉▉▉▉▉▉▉ with anyone at Uber.  Waymo's sole evidence is that
17 Mr. Levandowski preferred to implement a spinning-head LiDAR (like the Velodyne
18 HDL-64) rather than a ▉▉▉▉▉▉ LiDAR.  That is not evidence of misappropriation of
19 negative know-how.

### C. Waymo's Allegations About the 14,000 Files Have Been Undercut by the Evidence It Sought to Hide

Waymo hid crucial information about the 14,000 files.  Information Waymo was compelled to produce reveals that those files were "low value," that the entire set is ▉▉▉▉▉▉▉▉, and that the download did not raise any red flags.  (Dkt. 1584-4, Gonzalez Decl. at 1-3.)  Moreover, the 14,000 files have almost no connection to the asserted trade secrets.

### D. Waymo Has No Basis for Damages

Waymo's only evidence of damages is based on the opinions of its expert, Michael Wagner.  Despite this Court's repeated warnings for Waymo not to get greedy with its damages

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

10

1  claim, Waymo did exactly that—Mr. Wagner's report purports to calculate future "unjust profits"
2  for each of the nine asserted trade secrets that reach as high as ▇▇▇▇. Mr. Wagner then
3  uses those figures as the baseline royalty before arbitrarily applying a ▇▇ across the board
4  increase under *Georgia Pacific*, resulting in total damages of ▇▇▇▇ for the alleged
5  misappropriation of a single trade secret.  On Saturday, Defendants filed a motion to exclude all
6  of Mr. Wagner's opinions as speculative and not reliable.  (Dkt. 1614-4.)
7         As explained in that motion, Mr. Wagner calculates those astronomical figures using a
8  methodology that is not reliable, inserting variables that he neither derived nor tested, and making
9  assumptions that no reasonable expert would make.  For the future unjust profits analysis, he
10 takes an 18-month old slide prepared by an Uber corporate development manager that was never
11 used for any purpose, adopts it without testing it, and then opines that the nine discrete trade
12 secrets relating to LiDAR hardware will allow Uber's entire autonomous vehicle ("AV") program
13 to skip ahead in all aspects of development and commercialization.  For saved development costs,
14 Mr. Wagner assumes the discrete trade secrets will allow Uber to save the cash burn rate for
15 Uber's entire ▇▇▇▇ AV unit for the amount of time that it would have taken Uber to
16 independently develop each trade secret.  And for his reasonable royalty opinion, Mr. Wagner
17 uses his future unjust profits figures as the baseline royalty, and then applies an arbitrary ▇▇
18 across the board increase purportedly based on the *Georgia Pacific* factors, though the ▇▇
19 increase is neither calculated nor tied to any specific factor.  Mr. Wagner's opinions do not come
20 close to meeting causation and apportionment standards, and the assumptions on which they
21 depend are wholly unreliable and untested.

### V. THE COURT SHOULD PROCEED IN A MANNER THAT WILL RESOLVE THIS DISPUTE EFFICIENTLY WHILE HOLDING WAYMO TO ACCOUNT FOR ITS INFORMED CHOICE TO SEEK AN EXPEDITED TRIAL DATE.

The Court has three options in moving this case forward to a resolution.  The first is to maintain the current trial date, recognizing that the expedited trial schedule was implemented at Waymo's request and it made an informed choice despite the risks to push forward at significant

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

11

expense and time to the parties and the Court. The second—granting the continuance and permitting Waymo to bog the Court and the parties down with its bloated list of 121 trade secrets *plus more to come* and years of additional discovery—is the most unwieldy and inefficient. And after consuming tremendous public and private resources, the parties will find themselves back in this exact same position in one or two years—on the eve of trial with a brand-new list of proposed trade secrets to try.  Lastly, if the Court strikes the plaintiff's speculative and unreliable damages model, it could try an equitable bench trial starting on October 10th.  An equitable bench trial would resolve the plaintiff's best nine trade secrets quickly and serve as a bellwether to provide the parties information for resolving this dispute.

### A.    Denying the Continuance

The best option for the Court is to deny the continuance and proceed to trial on the current schedule. The expedited trial schedule was imposed on the parties and the Court at Waymo's request, and the parties have invested considerable resources preparing for an October trial as a result of that request.  Thousands of documents have been produced between the parties and 69 depositions have been taken, with 12 witnesses being deposed multiple times to date.  Waymo understood the risks of pursuing an expedited October 2017 trial date, including the risks that it would need to narrow the issues for trial and that it might not obtain every conceivable piece of discovery it might want. The Court has addressed these risks at numerous points, such as on June 6, 2017 when discussing Waymo's meritless patent claims:

> I want to give a lecture to Waymo. You're the plaintiff. You're the one that wants to get to trial. You're a big firm. You big firms always think you can hold on to every issue and have it both ways, but at some point you got to cut loose and decide, do you really think these patent claims are worth the salt. In my view, they're not.

(6/7/17 Hr'g Tr. 47:23-48:3.)  If Waymo was concerned that the Court's suggestion to narrow the list of trade secrets would be deemed a waiver of the others, then it should have sought clarification from the Court and decided whether to continue on an expedited calendar or not.

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

12

1  Instead, Waymo waited over two months after the case management order—and more than two
2  weeks after narrowing its list of trade secrets—before seeking that clarification. And when told at
3  the August 16 hearing that they would be waiving their other trade secrets if they pushed forward
4  with the current trial date, Waymo continued to proceed for another month despite knowing it did
5  not have the Stroz report. Waymo made a deliberate and informed choice in asking to proceed at
6  breakneck speed, imposing a significant burden on the Court and the parties. Waymo's relentless
7  push for an October trial date—knowing full well the consequences it may have and the burdens
8  it placed on the parties and the Court—should have consequences. The Court has discretion to
9  hold Waymo to their informed choice. Waymo should therefore be compelled to stick with the
10 trial date it sought and waive any trade secret other than those currently scheduled to be tried.

### B. Granting the Continuance

Granting a continuance without limiting Waymo on the number of trade secrets it can pursue is not a cost-effective or realistic option. At the start of this litigation, Waymo pursued claims on 121 alleged trade secrets. (Dkt. 25-7, Jaffe Decl. Ex. 1.) That long list allowed Waymo to begin a fishing expedition in hopes of finding something—anything—in Uber's LiDAR systems that might match one of their trade secrets. Waymo extensively investigated every aspect of Uber's LiDAR systems and knew the Stroz report was not yet produced, but made an informed choice to proceed with an October trial. Disappointed that the best it could find was the current nine trade secrets—all of which are easily shown to be without merit—Waymo now wants to go back to the drawing board by resurrecting its first list of trade secrets and apparently attempt to add even more.

It is obvious that Waymo cannot possibly try 120+ trade secrets at once. Such a trial would be unmanageable and take years. *See AMEC Env't & Infrastructure, Inc. v. Geosyntec Consultants Inc.*, No. C 12-02973, 2013 WL 3923459, at *3 (N.D. Cal. July 26, 2013) (stating plaintiff's pursuit of several hundred trade secrets "implicates significant case management issues" and that a trial on so many trade secrets "likely would be unmanageable"). If a continuance is granted, Waymo will again have to narrow its list of trade secrets to proceed to trial, and when it does everybody involved will suffer from a serious case of déjà vu as we all

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

13

return to the present state of affairs—a short list of dubious trade secrets chosen only with the benefit of hindsight after yet another incredibly-burdensome fishing expedition. Granting the continuance will only serve to re-open discovery for another year or two, impose significant burdens on the parties and case management burdens on the Court, and likely push the parties further away from resolving their dispute.

### C. Equitable Bench Trial

Between these extremes, the Court could hold a short bench trial in October on the narrowed list of trade secrets and grant a continuance with regard to any others. On Saturday, Defendants filed a *Daubert* motion to exclude testimony from Michael Wagner, Waymo's damages expert. (Dkt. 1614-4.) Despite this Court's repeated warning not to be greedy, Waymo does exactly that—Mr. Wagner's report applies a model and assumptions that he neither created nor tested to "calculate" the future unjust profits that Uber supposedly will realize one day far in the future from a head start. That exercise resulted in absurd damages numbers, including a claim for ▆▆▆▆▆ for a single trade secret. Even worse, Mr. Wagner's reasonable royalty analysis uses the future profits figure and then applies a ▆▆ across the board increase to arrive at a lump sum reasonable royalty up to ▆▆▆▆▆ for that single trade secret. (Gonzalez Decl. Ex. 11 ¶ 440.) Mr. Wagner's opinions are so unfounded and unreliable that the Court should reach the only possible conclusion—that Mr. Wagner must be excluded. Because Waymo has no other disclosed evidence of monetary damages, Waymo will be left only with a claim for injunctive relief that can be resolved through an equitable bench trial where the Court decides the scope of a permanent injunction, if any.

A bench trial now could be completed in less than half the time of the currently-scheduled trial given the Court's familiarity with the technology underlying the nine purported trade secrets, and could be limited to a discrete set of issues unaffected by the Stroz report. The Stroz report

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

14

does not address whether the nine trade secrets are valid trade secrets, does not address whether the asserted trade secrets are used in Uber's LiDAR systems, and does not address whether Uber independently developed the trade secrets. That is especially so where Waymo's motion for a continuance makes no mention of any additional information regarding the current nine trade secrets.

Not only would the bench trial not involve evidence of damages and the Stroz report, it also would not call for live testimony from Anthony Levandowski and many other fact witnesses because it would be primarily focused on technical issues. Finally, this trial would inform any settlement discussions and likely push the parties toward resolving the entire litigation, which would save the Court and the parties significant time and expense.

## VI.     UBER REQUESTS A COURT-APPOINTED NEUTRAL EXPERT

If the Court is inclined to grant a continuance, a Court-appointed neutral expert is appropriate in this case, where the evidence is "confusing and conflicting" and an independent expert could "assist the court in evaluating contradictory evidence." *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999). In *McKinney*, the Ninth Circuit remanded the case and recommended that the district court consider appointing an expert because of the "complexity of the scientific evidence." *McKinney v. Anderson*, 924 F.2d 1500, 1511 (9th Cir. 1991), vacated on other grounds by *Helling v. McKinney*, 502 U.S. 903 (1991). The Federal Circuit, applying Ninth Circuit law, has upheld the appointment of an expert "where the district court was confronted by what it viewed as an unusually complex case and what appeared to be starkly conflicting expert testimony." *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 558 F.3d 1341, 1348 (Fed. Cir. 2009). This Court, for example, has appointed a neutral expert where there are "extremely divergent views on damages" and given "the unusual complexity of the damages aspect of this case." *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2015 WL 7429277, at *1 (N.D. Cal. Nov. 23, 2015).

This case is likewise complex, involves starkly conflicting expert testimony, and requires

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

15

the factfinder to evaluate confusing and contradictory evidence. Waymo's trade secrets have been and continue to be a moving target. (*See* Dkt. 426, PI Order at 21 ("it has become clear that Waymo has both overreached in defining its trade secrets and made moving targets out of its asserted trade secrets to evade defensive arguments".) For example, Waymo has retreated from claiming ████████ under TS 7 to claiming ████ ████, or a range of ████. (*Id.* at 13; Dkt. 335-4 at 4.) In response to a Waymo email stating that "████████████████" Waymo's expert now opines that ████████████ (Gonzalez Decl. Ex. 12, WAYMO-UBER-00022196 at 22197; *Id.* Ex. 16, Hesselink Reply Rpt. ¶ 97.) In light of Waymo's repeated attempts to make moving targets out of its alleged trade secrets, a neutral expert would be valuable in helping the factfinders to understand the technical merits of the case.

Moreover, even now, the number of trade secrets Waymo will pursue remains uncertain, with the possibility remaining that Waymo will assert dozens more trade secret claims, many involving general principles and approaches in the field. (Mot. at 15-19 (seeking to add trade secrets; *see also* Dkt. 426, PI Order at 16 ("Waymo has overreached in attempting to claim ownership over general principles and approaches in the field.")). A neutral expert would be valuable in assisting the factfinders with sorting through a large number of complex claims and understanding what is in the public domain.

Waymo argues against a neutral expert because the parties have already submitted reports from four different technical experts. (Mot. at 19.) The Ninth Circuit rejected this argument in *Walker*, where defendant contended that a neutral expert was unnecessary because "record was sufficiently developed." *Walker*, 180 F.3d at 1071. The Ninth Circuit found that the appointment was warranted, notwithstanding the existing record, because the evidence was "confusing and conflicting." *Id.* The same considerations apply here.

Waymo also argues that the appointment of a neutral expert will cause the jury to simply rely on the expert's opinions and result in a denial of the Seventh Amendment right to a jury trial. (Mot. at 20-21.) This argument was rejected in the *Monolithic Power Systems* case that Waymo cites in its motion. In *Monolithic Power Systems*, the Federal Circuit found that:

> Ultimately, [defendant's] arguments that [the neutral expert's] testimony relieved the jury of its tasks are policy arguments against Rule 706. However, Congress entertained and rejected these arguments during the framing of Rule 706…. Furthermore, the Supreme Court has long recognized the constitutionality of court-appointed experts."

*Monolithic Power Sys.*, 558 F.3d at 1348 (citations omitted). The *Monolithic Power Systems* court notes that the district court took care to instruct the jury that "it should not assign [the expert's] opinion greater inherent weight on accord of his independent status," and the jury's verdict did not track the expert's opinions. *Id.* at 1347. The same jury instruction can be provided here to alleviate Waymo's concerns.

## VII. CONCLUSION

Waymo insisted on an extremely expedited discovery schedule and made the knowing strategic decision to proceed on the expedited schedule without having the Stroz report. The parties have worked very hard to meet that schedule and to be ready for trial on nine trade secrets. That plan should not be derailed. The Court should resolve Uber's motion in limine on damages and try the nine trade secrets.

Dated: September 18, 2017                MORRISON & FOERSTER LLP

By: _____*/s/ Arturo J. González*_____
        ARTURO J. GONZÁLEZ

Attorneys for Defendants
UBER TECHNOLOGIES, INC.
and OTTOMOTTO LLC

DEFS. UBER TECHS., INC. & OTTOMOTTO LLC'S OPP'N TO WAYMO'S MOT. FOR CONTINUANCE OF TRIAL DATE
Case No. 3:17-cv-00939-WHA
sf-3823902

17