QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>            Plaintiff,<br><br>      vs.<br><br>UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>            Defendants. | CASE NO. 3:17-cv-00939-WHA<br><br>**DECLARATION OF JEFF NARDINELLI IN RESPONSE TO COURT ORDER (DKT. 1601)** |

I, Jeffrey W. Nardinelli, hereby declare as follows.

1. I am a member of the bar of the State of California and an attorney with Quinn Emanuel Urquhart & Sullivan, LLP, counsel for Plaintiff Waymo LLC ("Waymo"). I make this declaration of personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently as follows.

2. On September 15, Arturo González filed a declaration. (Dkt. 1586.) The Court ordered Waymo to respond "on a sentence-by-sentence basis, first quoting the sentence and then stating the full extent to which the declarant admits its truth, as well as any contrary or mitigating circumstance." (Dkt. 1601.) I submit this declaration in response. The sentences from Mr. González's declaration are in italics.

3. *In its Complaint in this case, Waymo alleged that Anthony Levandowski misappropriated "14,000 highly confidential and proprietary files." (Dkt. 1 at 3:12.)* True.

4. *Waymo used that allegation in support of its successful effort to obtain preliminary injunctive relief and an expedited discovery and trial schedule.* True.

5. *On the last day of discovery, August 24, 2017, Waymo produced approximately 7,350 documents, which represents roughly 33% of its total document production to date of approximately 22,572 documents.* Approximately correct, but there are mitigating circumstances. As of Mr. González's declaration, Waymo had produced approximately 22,352 documents in this litigation. According to Waymo's records, Waymo produced 7,264 documents on August 24. Much of Waymo's August 24 production came in timely response to 34 RFPs that were not served by Defendants until July 25. Through one of those RFPs, Otto Trucking sought "all communications" between Waymo (defined as Waymo, Google, and Alphabet) and five outside vendors, not limited in time, subject matter, or along any other line. Waymo's production in response to this RFP alone numbered nearly 4,000 documents.

6. *Since the close of fact discovery, Waymo has produced approximately 1,679 documents.* Approximately correct, but there are mitigating circumstances. Between the close of fact discovery and Mr. González's declaration, Waymo produced approximately 1,764 documents, including both M&A-related documents and other documents in response to requests from

Defendants.  The M&A documents are in response to a Court order of August 19.  (Dkt. 1276.)  Specifically, after Uber moved to compel Waymo to produce documents relating to merger transactions unrelated to self-driving technology or LiDAR, the Court ordered Waymo to produce all documents and communications relating to seven separate transactions.  Waymo has been producing responsive documents on a rolling basis, including approximately 734 documents between the close of fact discovery and Mr. González's declaration.  On September 17, Waymo produced an additional 3,416 documents.  Of these, 3,388 are M&A-related documentation.  Waymo's production of M&A documents.  Waymo expects to produce 370 more documents, completing its production, on September 18.  These documents are in Japanese, thus took additional time to review.  Waymo has not deliberately held back any document productions, and Waymo has not deliberately delayed any productions.  The M&A-related documents were a vast set of documents, and required more than the usual time to review because of the significant complexity of the documents and numerous privilege and privacy issues.

7. *These document totals are based on the documents from Waymo's productions uploaded by Uber's discovery vendor.*  I have no knowledge regarding Uber's discovery vendor.

8. *In its August 24, 2017 production, Waymo produced documents that it had previously withheld as privileged.*  True, and there was nothing improper about this production.  As explained in my September 15 declaration, despite being on notice of Waymo's position with respect to its limited waiver as early as March 23, Defendants did not challenge the scope of Waymo's waiver claim until filing a motion to compel on August 11.  (Dkt. 1163.)  Waymo opposed the motion, and Judge Corley granted and denied it in part.  (Dkt. 1272).  Specifically, in her August 18 Order, Judge Corley ruled that "Otto Trucking has not made any showing as to why communications regarding investigations of other employees have been waived and thus the motion is denied to the extent it seeks such relief."  (*Id.*)  Judge Corley also held however that "[w]hile the waiver of work product does not *necessarily* waive attorney-client privileged communications, here the waiver of work product over the investigation did waive the attorney-client privilege as to counsel communications with Mr. Brown and anyone else involved in the investigations at issue as in fairness such communications should be disclosed."  (*Id.* at 2.)  On

1  this basis, Judge Corley ordered Waymo to produce "communications regarding the investigation
2  of the Former Employees [Levandowski, Raduta and Kshirsagar]." (*Id.*)  Waymo did not seek
3  relief from Judge Corley's order.  Instead, Waymo collected and produced the documents
4  responsive to Judge Corley's August 18 Order concerning waiver on August 24.  Waymo did not
5  produce any other documents previously held back as privileged on that day.

6        9.  *Those documents include emails between Google engineers who were asked to*
7  *assist in the investigation regarding Mr. Levandowski, and lawyers for Google (both in house*
8  *lawyers and lawyers from Keker, Van Nest, & Peters).*  True, but Mr. Zbrozek's role in the
9  investigation was extremely limited.  Mr. Zbrozek was asked only to gather log data relating to
10  Waymo's SVN server and to answer factual questions about that log data.  Mr. Zbrozek was not
11  otherwise involved in the investigation.

12        10.  *In one of the email chains, a Google engineer (Sasha Zbrozek) advises one of the*
13  *Google lawyers from the Keker firm that the 14,000 files that were accessed by Mr. Levandowski*
14  *are "low-value" files. (WAYMOUBER-00086885 at 86.)*  The "low-value" quotation is accurate,
15  but Mr. Zbrozek has clarified that the term was a relative one and that he has "no idea" of the
16  value of the files on an absolute basis.  On October 5, 2016, Keker attorney Tom Gorman asked
17  Mr. Zbrozek:  "What, exactly, is in this SVN system."  (Dkt. 1586-1, at -886.)  Mr. Zbrozek
18  responded:  "It was considered low-value enough that we had even considered hosting it off of
19  Google infrastructure."  (*Id.*)  Mr. Gorman responded by asking where the "high-value stuff" is
20  stored.  (*Id.*)  In response, Mr. Zbrozek said:  "At least historically, high-value has been algorithms
21  and software. The hardware (at all levels) was a second class citizen. Maybe opinions have
22  changed." (*Id.* at -885)  Mr. Zbrozek has also testified at deposition that he has "no idea" about the
23  absolute value of the SVN contents, but used the "low-value" phrase to distinguish the SVN
24  contents from source code and user data:

25        Q.  And then you say "it's pretty low value."  Do you see that?
26        A.  I do see that.
27        Q.  And that was true, wasn't it?
28        THE WITNESS:  What do you mean?

| | |
|---|---|
| 1 | Q. Do you want me to define "true"? |
| 2 | A. No. I am asking you to define "low value." |
| 3 | Q. Those are your words. |
| 4-7 | A. So I will say that this is a very relative thing. And Google data policies were designed with code and user data in mind and were perhaps not the greatest fit for the kind of data that we wanted to store and that relative to instantly Google ending data breaches, that the data that was in the Subversion server would be considered of lesser value. But by how much, I don't know; and in absolute terms, I have no idea. (*See* Dkt. 1589 ¶ 23; Dkt. 1589-3.) |

11. *He goes on to say that it was not "particularly surprising" that Mr. Levandowski may have accessed those files and summarized his views by saying: "Doesn't ring the alarm bells for me." (Id.)* These are accurate quotations but presented in incomplete and misleading fashion. Mr. Zbrozek's full statement confirmed that Mr. Levandowski would not have accessed the SVN as part of his ordinary work: "He was a high-level manager, and not doing any direct technical contribution at this level. It's not particularly surprising that he might check things out once in the misguided dream of maybe making individual contribution or maybe taking a look at the progress of a widget. It clearly wasn't part of his routine. Doesn't ring the alarm bells for me." (Dkt. 1586-1, at -86.) Mr. Zbrozek has since testified that his "alarm bells" statement took no account of the context of Levandowski's actions, but meant only to say that a single bulk download, absent any other factors, was not suspicious to him at the time:

Q. And it didn't ring the alarm bells for you, did it?

A. I will say that, on its own, as a single action in absence of context, pulling the Subversion repository is not suspicious, but that as part of a larger narrative, you know, suspicion may or may not come into play, right. You know, if the logs -- if the logs showed, you know, someone pulling information and putting that information somewhere else and then leaving the company, maybe that's suspicious. Maybe just looking at the log files on their own isn't enough to tell that story. (*See* Dkt. 1589 ¶ 24; Dkt. 1589-3.)

12. *A true and correct copy of this email chain is attached hereto as Exhibit 1 at WAYMO-UBER-00086885.* True. (*See* Dkt. 1586-1.).

13. *We applied redactions to be in compliance with Magistrate Judge Corley's Order denying in part Waymo's sealing motion. (Dkt. 1444.)* True.

14. *The email chain also shows that Google investigated eight former employees who had joined Uber, and that six of them had never accessed the repository where the 14,000 files were allegedly downloaded. (See Ex. 1 at 86888.)* Approximately true. It is true that Google investigated other employees, but Judge Corley specifically ruled that the investigation into other employees did not fall within the scope of her August 18 waiver Order. In this particular email, Mr. Gorman asked Mr. Zbrozek to pull the SVN log data for eight individuals, including Anthony Levandowski. The log data contained no records of access by six of the individuals. The log data showed that one engineer had accessed the SVN on multiple occasions, and accessed fewer than 1,000 files each time. The log data shows that Mr. Levandowski had accessed the SVN only once, and downloaded the full 14,000 file repository.

15. *A second Google engineer on the email chain stated that it "wouldn't be out of normal operation" for the entire folder to be "sync'd" if someone accessed the repository to sync files "locally for work." (Ex. 1 at 86890.)* False. The engineer was referring to a different document repository, not to the SVN. (Dkt. 1586-1, at -890.) The engineer also stated that there were no access logs for that separate repository. (*Id.*)

16. *There is a related email chain that was produced after the close of discovery, on September 2, 2017.* True that Waymo produced this email chain on September 2 in compliance with the Court's rulings, but "related" is a problematic term because this email chain (Dkt. 1586-2) is amongst different people and occurred months after the email at Dkt. 1586-1. Judge Corley did not order the later email chain to be produced until August 31 during the hearing in which Judge Corley and counsel for the parties meticulously reviewed every disputed document and redaction to determine what fell within or outside the scope of the waiver. During this hearing, the Court repeatedly made clear that Waymo's position was reasonable, stating : "I'm not faulting you, at all." (Dkt. 1441, August 31 Hr'g Tr. at 40:16-17.) The Court stated that "I don't fault you at all for the line that we're drawing," recognizing that "it's just very hard to do" and that Waymo was not "trying to hide super-material information." (*Id.* at 9:10-16, 71:13-14.)

17. *A true and correct copy of this email chain, which Google has marked Attorneys' Eyes Only but has been redacted in order to allow for public filing, is attached hereto as Exhibit 2 at WAYMO-UBER-00086932.* True.

18. *That email was written on February 22, 2017, the day before this lawsuit was filed.* True.

19. *In that email, Mr. Zbrozek writes to Shana Stanton, an in-house Google lawyer:*

> *Well, Anthony's log* speaks *to the number of files. It also expresses the (rough) filesize for each transaction. Figuring out the totals for both can be done* by *parsing the log snippet. Do you need assistance with that? I'm a* little *leery because* **both of those numbers aren't really** meaningful **to any narrative**. *It also has a chilling effect on being a hardware engineer -* **we all do full checkouts**, *and* **it makes me** uncomfortable **to think that lawyers are trying to ascribe** suspicion **to it**. *(Exhibit 2 at 86936 (emphasis added).)*

Although this is an accurate quotation, I do not agree with the characterization ascribed to it by Defendants.  In this email chain, Google counsel had initially asked Mr. Zbrozek to confirm the number of files and the number of gigabytes that Mr. Levandowski had downloaded.  Mr. Zbrozek responded as quoted above.  Google counsel first replied:  "Sasha: the issue here is that this particular user had not done this before, at least as far as our logs records show (~5 months I think) and the timing of this action 6 weeks prior to departure is suspicious."  (*Id.*)  She also stated later on the same email thread:  "Sasha, this exercise has no relevance to the normal day to day actions taken by engineers.  Tom Lue and I will be happy to explain further, but in short we are looking at suspicious actions taken immediately prior to departure. This is a very sensitive matter so please do not share outside of the group on this thread.  Thank you!"  (*Id.* at -935.)

20. *In response to Mr. Zbrozek's reservations and concerns about what the lawyers were saying, and his statement that the files that were downloaded by Anthony Levandowski were "low value," one of the Google in-house lawyers wrote to him and said: "Sasha,* **we want to also be able to say that SVN contains only internal confidential stuff***, which I understand from Pierre is the case." (Ex. 2 at 86932 (emphasis added).)*  Although this is an accurate quotation, I do not agree with the characterization ascribed to it by Defendants.  Counsel for Google was separately seeking to re-confirm a statement from lead hardware engineer Pierre Droz that the SVN

-7-

repository stores Google's internal, confidential work.  Mr. Zbrozek confirmed that, aside from "a bit of boilerplate and low-value stuff" that was "not a large fraction of the total," the SVN indeed contains Google's internal, confidential work.

21. *SVN is the repository that contained the 14,000 files that were allegedly misappropriated.*  True.

22. *It was only after this prodding from Google's lawyer that Mr. Zbrozek modified his position: "Mostly. There's a bit of boilerplate and low-value stuff." (Id.)*  False.  In response to a question from Google's counsel regarding where the SVN server contained Waymo's confidential material, Mr. Zbrozek confirmed that the Waymo SVN repository "[m]ostly" contains Waymo's internal, confidential material.  Mr. Zbrozek had never denied this fact and therefore did not change his position.  There was no "prodding from Google's lawyer."

23. *Having circled the wagons, Google filed this lawsuit the next day.*  True, Google filed the lawsuit the next day (February 23, 2017) after carefully confirming certain key facts.  I deny the insinuation that Google lawyers "circled the wagons" or coerced Waymo engineers to agree to those facts.

24. *After these documents were produced, I took Mr. Zbrozek's deposition.*  True.

25. *He had been deposed previously, but at his first deposition, he made no mention of these emails, or of his strong concerns pertaining to Google's investigation.*  It is true that Mr. Zbrozek's first deposition took place on August 18, 2017, before Judge Corley issued her waiver order later that day.  As explained in my August 15 declaration, Waymo later produced privileged documents in compliance with the Court's order.  Accordingly Mr. Zbrozek was not questioned on those documents, but sat for a second deposition following their production.  Further, I disagree that Mr. Zbrozek had "strong concerns" about Waymo's investigation of Mr. Levandowski.  Mr. Zbrozek testified:  "I was expressing concern that I didn't want to make doing a normal part of our job functions seem suspicious."  (Ex. 1, Zbrozek deposition at 234:10-17.)[1]  But as Mr. Zbrozek's

---

[1]  Attached hereto as Exhibit 1 is a true and correct copy of excerpts of the deposition of Sasha Zbrozek, dated September 6, 2017.

email stated, accessing the SVN "clearly wasn't part of [Mr. Levandowski's] routine," and Mr. Levandowski was "not doing any direct technical contribution" that would have involved accessing the SVN. (Dkt. 1586-1, at -886.) When questioned at his deposition about his concerns, Mr. Zbrozek testified that he was unaware of the other circumstances surrounding Mr. Levandowski's download:

> Q. And then after -- you say, "We all do full checkouts and it makes me uncomfortable to think that lawyers are trying to ascribe suspicion to it." Do you see that?
>
> A. I do see that.
>
> Q. Those words are pretty self-explanatory, but what you meant there was that you don't want lawyers saying that just because somebody downloaded the entire database, that means that there's something fishy going on; right?
>
> THE WITNESS: So, clearly, the lawyers had quite a bit more context than I had at this point in the investigation.
>
> Q. Right. But regardless of whatever they knew, your state of mind, when you wrote this e-mail, was that you didn't want lawyers suggesting to anyone that it was suspicious to download the entire database because you knew that that's how you programmed the instructions to operate; correct?
>
> THE WITNESS: That was long. Could you repeat that, please.
>
> BY MR. GONZALEZ: Q. Yeah. The reason why it was making you uncomfortable that lawyers would ascribe suspicion to downloading the entire repository is because you knew that anybody who followed your instructions would automatically download the entire repository; true?
>
> THE WITNESS: I was concerned about setting a precedent for that one action in isolation being in and of itself a marker of suspicion.

(Dkt. 1589-3, Zbrozek deposition at 238-39 (objections omitted).)

26. *In his second deposition, I asked him about the statement in his email that "we all do full checkouts." (Ex. 2 at 86936.)* True.

27. *He testified that he wrote the instructions for logging into the repository where Mr. Levandowski allegedly downloaded the 14,000 files, and that anyone who followed those instructions would automatically download the entire repository:*

> *Q: And generally what you're saying is, look, if somebody had followed my instructions, they would have done a full checkout of the entire database, correct?*
>
> *Plaintiff's Counsel: Objection to form.*
>
> *A: I'm saying that if someone had followed my instructions, that they would have checked out the full present-day snapshot of the Subversion repository.*

False because there is no "automatic download" of the SVN repository. Mr. Zbrozek testified that he "wrote some general instructions for getting started" with the SVN. (Ex. 1, Zbrozek deposition at 196:18-21.) He testified further that the directions are not intended to tell engineers how to use the SVN in the course of their regular work, but rather that "the directions assume a starting from scratch. They're a getting started guide." (*Id.* at 260.) Those instructions are at WAYMO-UBER-00086940. (Dkt. 1586-2, at -940.) Further, Mr. Zbrozek testified that there is "no such thing as automatic" with respect to the SVN; to download the entire contents of the SVN, a user must specifically and deliberately request to download the entire contents. (Ex. 1, Zbrozek deposition at 196:9-17.)

28. *A true and correct copy of Sasha Zbrozek's deposition testimony from September 6, 2017, which Google has designated Attorneys' Eyes Only, is attached hereto as Exhibit 3. (See Ex. 3 at Zbrozek Dep. 235:2-9.)* True. As to the designations, for all depositions taken in this case, the parties initially have designated the entire transcript Attorneys' Eyes Only, and later exchanged versions of the transcript with specific portions designated either Confidential or Highly Confidential – Attorneys' Eyes Only.

29. *Mr. Zbrozek knows this is how the repository works because he is the engineer who wrote the directions for logging on to the repository.* (*Id.* at 196:18-21.) False, in that "this is how the repository works" refers back to Mr. González's statement that it is possible to "automatically download" the entire SVN, a falsehood I've explained above. Mr. Zbrozek testified that he "wrote some general instructions for getting started" with the SVN. (Ex. 1, Zbrozek deposition at 196:18-21.) He testified further that the directions are not intended to tell engineers how to use the SVN in the course of their regular work, but rather that "the directions assume a starting from scratch. They're a getting started guide." (*Id.* at 260.) Those instructions are at WAYMO-UBER-

00086940.  (Dkt. 1586-2, at -940.)  Further, Mr. Zbrozek testified that there is "no such thing as automatic" with respect to the SVN; to download the entire contents of the SVN, a user must specifically and deliberately request to download the entire contents.  (Ex. 1, Zbrozek deposition at 196:9-17.)

30.  *Mr. Zbrozek confirmed that if Anthony Levandowski followed the instructions that Mr. Zbrozek created for logging onto the SVN repository, the entire database would have automatically been downloaded:*

> *Q: So to be real specific, if Anthony Levandowski on December 11th, 2015 had followed the instructions that you wrote out for the engineers, then he would have downloaded the entire present-day repository; correct?*
>
> *Plaintiff's Counsel: Objection to form.*
>
> *A: Anybody following my instructions verbatim, Anthony included, would have checked out the entire present day repository.*
>
> *(Id. at 236:3-11.)*

Although this is an accurate quotation from Mr. Zbrozek's deposition, I do not agree with the characterization ascribed to it by Defendants.  Mr. Zbrozek's sample instructions explain to users how to sync the SVN repository.  Engineers do not always download the full repository, but often download only portions.  As Mr. Zbrozek explained at his deposition, there is "no such thing as automatic" with respect to the SVN; to download the entire contents of the SVN, a user must specifically and deliberately request to download the entire contents.

31.  *Finally, Mr. Zbrozek confirmed that after reviewing the records of Mr. Levandowski's alleged downloading, the records are consistent with what he would expect to see if an engineer followed his directions for logging on to the system. (Id. at 253:5-7, 255:22-256:6.)*
True, but Mr. Zbrozek also testified that engineers who use the SVN as part of their job are "not likely" to reference the getting-started guide for logging onto the SVN.  (Ex. 1, Zbrozek deposition at 259-60.)  Furthermore, Mr. Zbrozek testified that Mr. Levandowski's logs, unlike other logs, indicated that Mr. Levandowski had not previously accessed the SVN.  For example, log data for engineer Gaetan Pennecot indicated that Mr. Pennecot was updating select files (under 1,000, far less than the full 14,000) that he had previously checked out, whereas Mr.

1  Levandowski's log appeared to be a "fresh checkout" of the entire repository. (Ex. 1, Zbrozek
2  deposition at 259-60.)

3      32. *That explains why he was so adamant the day before this lawsuit was filed about*
4  *"lawyers . . . trying to ascribe suspicion" to what Mr. Levandowski had done. (Ex. 2 at 86936.)*
5  False. As explained above, Mr. Zbrozek was not "adamant" about Mr. Levandowski's download,
6  and testified that "[a]scribing importance or guiding the investigation were outside of my
7  purview." (Ex. 1, Zbrozek deposition at 246:13-18.) Mr. Zbrozek testified that he did not have
8  any context relating to Mr. Levandowski's download, and meant only to state that a download,
9  taken without any context, is not necessarily suspicious. (*See supra ¶¶* 18-20.)

10      33. *On September 9, over two weeks after fact discovery closed, Waymo produced*
11  *1,257 documents, subsequently explaining: "We produced additional M&A-related documents on*
12  *Saturday via PROD061 and PROD063."* Approximately true. Waymo's records show that
13  Waymo produced three volumes of productions (61, 62, and 63) totaling approximately 1,326
14  documents on September 9. Each of these productions contained documents concerning Google's
15  M&A transactions.

16      34. *After an inquiry from Uber's counsel, Waymo also stated: "PROD062 is also M&A*
17  *related."* True.

18      35. *Attached as Exhibits 4 and 5 are true and correct copies of Waymo counsel's*
19  *emails with a link to these productions and responses that they contained additional M&A-related*
20  *documents.* True. (*See* Dkts. 1586-4, 1586-5.)

21      36. *Uber has conducted a preliminary review of the 1,257 documents Waymo produced*
22  *on September 9, and it appears that the majority of these documents—more than 800—are not*
23  *M&A-related or responsive to any Order requiring production after the close of discovery.* False.
24  My records indicate that of the 1,326 documents, 734 are M&A-related. The other 592 are
25  documents identified during Waymo's document review towards the close of fact discovery, but
26  withheld from production until they were cleared under NDA provisions. Specifically, on May
27  30, Waymo proposed that the parties meet and confer regarding a proposed ESI Order, which
28  would allow each side to propose electronic search terms to the other side in addition to the

searches for responsive documents the parties ran on their own.  Defendants did not respond.  Waymo followed up multiple times without a response.  Uber waited until June 30 to propose that the parties negotiate electronic search terms.  On July 11, Uber asked Waymo to run what it listed as 23 "technical" search terms and 13 "business" search terms.  In reality, because of Uber's liberal use of the word OR in its search strings, Uber proposed that Waymo run 475 discrete searches.  The "business" terms in particular were vastly overbroad.  For one custodian they hit on over 280,000 documents, including families.  Nevertheless, Waymo diligently met and conferred with Uber, and tested and re-tested many rounds of proposed modifications to reach an agreed set of terms.  Waymo tested 107 iterations of Uber's original "business" terms.  And, Waymo continued to conduct its own searches to identify and produce relevant documents, including those responsive to later-served RFPs.   After four weeks of negotiations, including with the assistance of Special Master Cooper, from the original 36 terms Uber proposed, the parties agreed on all but two terms.  Agreement was reached in the first week of August.  For the two terms that the parties did not agree on, Uber filed a motion to compel, and Judge Corley issued an order on August 7 agreeing to the limitations on the terms at issue proposed by Waymo.  (Dkt. 1094.)  The search terms that resulted from these negotiations and Court order  were run against the emails of more than two dozen custodians.  During review of the hits, the reviewing attorneys marked certain documents as being subject to non-party NDAs.  In accordance with the protective order, Waymo provided these non-parties with notice and allowed 14 days to object before Waymo produced the documents.

37.     *Instead, Waymo's September 9 productions include hundreds of documents and communications relating to LiDAR and Waymo's purported trade secrets, including communications to and from Anthony Levandowski and other witnesses deposed in this litigation.*  Please see paragraph 36, explaining the additional 592 documents.  Further, because Waymo had already produced all communications relating to Waymo's development of self-driving technology as located through a diligent search, I consider it very unlikely that any of these 592 documents contain material, non-duplicative information.

38. *These documents appear to be responsive to numerous document requests. (E.g., Attached as Exhibit 6 is a true and correct copy of Defendant Uber and Ottomotto's First Set of Requests for Production of Documents Nos. 21, 23, 98-104, 114, dated May 12, 2017.)* Please see paragraph 36, explaining the additional 592 documents. Further, I disagree that these documents were produced in response to "numerous document requests." Rather, they were produced in response to additional, specific requests made by Uber as part of the meet and confer process.

39. *Attached as Exhibit 7 is a true and correct copy of an email from Uber counsel to Waymo counsel on September 13, 2017 inquiring why Waymo had produced these documents several weeks after the close of fact discovery and after the parties had exchanged motions in limine.* True. (*See* Dkt. 1586-7.)

40. *Thus far, we have not received a response.* True.

41. *Of the documents produced by Waymo in this case, over 2,200 did not properly identify a custodian.* False. As of my September 15 declaration (Dkt. 1589), Waymo had produced 22,352 documents. For every one of these documents, Waymo provided Defendants with one or more associated custodians. Below is a screenshot from Waymo's document-hosting database. It indicates that for the "Custodian" filed, all 22,352 documents have a custodian. If there were any documents that did not have a custodian, there would be a "No Value" field with the number of documents that lack a custodian. Because there is no "No Value" field, I conclude that Waymo provided a custodian for all 22,352 documents.

```
Storage Properties / Custodian
Search for more values
☐ ▼                                    Count ▲
    Any Value                          (22352) ▲
```

42. *Of these, about 600 identified no custodian at all, and the rest merely referred to "Google" as the custodian.* False. For 4,053 documents, the listed custodian is "Google." This is

because many documents are not associated with an individual custodian, such as Google policy documents or documents maintained in central Google repositories rather than individual accounts. If Uber points to a specific document or documents that they allege to lack a custodian, I will happily investigate.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:  September 18, 2017               */s Jeff Nardinelli*
                                         Jeff Nardinelli

## SIGNATURE ATTESTATION

Pursuant to Local Rule 5-1(i)(3), I attest under penalty of perjury that concurrence in the filing of this document has been obtained from Jeff Nardinelli.

                                         */s/ Charles K. Verhoeven*
                                         Charles K. Verhoeven