1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Charles K. Verhoeven (Bar No. 170151)
2     charlesverhoeven@quinnemanuel.com
      David A. Perlson (Bar No. 209502)
3     davidperlson@quinnemanuel.com
      Melissa Baily (Bar No. 237649)
4     melissabaily@quinnemanuel.com
      John Neukom (Bar No. 275887)
5     johnneukom@quinnemanuel.com
      Jordan Jaffe (Bar No. 254886)
6     jordanjaffe@quinnemanuel.com
    50 California Street, 22nd Floor
7   San Francisco, California 94111-4788
    Telephone:    (415) 875-6600
8   Facsimile:    (415) 875-6700

9   Attorneys for WAYMO LLC

10                 UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13  WAYMO LLC,                          CASE NO. 3:17-cv-00939

14          Plaintiff,                  **PLAINTIFF WAYMO LLC'S
                                        OPPOSITION TO DEFENDANTS UBER
15      vs.                             TECHNOLOGIES, INC. AND
                                        OTTOMOTTO, LLC' MOTION FOR
16  UBER TECHNOLOGIES, INC.;            SUMMARY JUDGMENT, MOTION TO
    OTTOMOTTO LLC; OTTO TRUCKING        STRIKE TS 96, AND *DAUBERT* MOTION
17  LLC,                                (DKT. 1514)**

18          Defendants.                 Date: September 20, 2017

19                                      Time: 8:00 a.m.

20                                      Courtroom: 8, 19th Floor

21                                      Judge: The Honorable William Alsup

22                                      Trial Date: October 10, 2017

23                                      **REDACTED VERSION OF DOCUMENT
                                        SOUGHT TO BE FILED UNDER SEAL**

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................................1

II. SUMMARY JUDGMENT IS NOT APPROPRIATE .........................................................3

    A. Standard for Trade Secret Misappropriation .............................................................3

    B. Under the Correct Legal Standard, Summary Judgment Should Be Denied .............5

III. THERE ARE NO GROUNDS TO STRIKE TS 96 ...........................................................11

IV. THERE ARE NO GROUNDS TO PRECLUDE PROF. HESSELINK'S
OPINIONS .......................................................................................................................16

    A. Prof. Hesselink Considered All the Relevant Facts, and His Opinion
Remains Admissible ................................................................................................16

    B. Prof. Hesselink's Comparison Is Methodologically Sound ....................................18

V. CONCLUSION ................................................................................................................21

1

# **<u>TABLE OF AUTHORITIES</u>**

2

<u>Page</u>

3

**Cases**

4

*Agency Solutions.com, LLC v. TriZetto Grp., Inc.,*
   819 F. Supp. 2d 1001 (E.D. Cal. 2011) ............................................................. 13

5

*Am. Can Co. v. Mansukhani,*
   742 F.2d 314 (7th Cir. 1984) ................................................................................ 5

6

7

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.,*
   873 F. Supp. 2d 1192 (N.D. Cal. 2012) ............................................................... 4

8

*Children's Broad. Corp. v. Walt Disney Co.,*
   357 F.3d 860 (8th Cir. 2004) .............................................................................. 18

9

*Fortinet, Inc. v. Sophos, Inc.,*
   2015 WL 5971585 (N.D. Cal. Oct. 15, 2015) ............................................... 13, 14

10

*Hangarter v. Provident Life & Accident Ins. Co.,*
   373 F.3d 998 (9th Cir. 2004) .............................................................................. 17

11

*Imax Corp. v. Cinema Techs., Inc.,*
   152 F.3d 1161 (9th Cir. 1998) ............................................................................ 14

12

13

*Internmatch, Inc. v. Nxtbigthing, LLC,*
   2016 WL 1212626 (N.D. Cal. Mar. 28, 2016) ............................................... 17, 18

14

*Integral Dev. Corp. v. Tolat,*
   675 F. App'x 700 (9th Cir. 2017) ................................................................... 10, 11

15

*Lilith Games (Shanghai) Co. v. uCool, Inc.,*
   2015 WL 4149066 (N.D. Cal. July 9, 2015) ................................................. 12, 14

16

17

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.,*
   399 F. Supp. 2d 1064 (N.D. Cal. 2005) ............................................................... 4

18

*PMC, Inc. v. Kadisha,*
   93 Cal. Rptr. 2d 663 (Cal. Ct. App. 2000) ........................................................... 4

19

*Princess Cruises, Inc. v. Amrigon Enterprises, Inc.,*
   51 F. App'x 626 (9th Cir. 2002) ......................................................................... 15

20

21

*SkinMedica, Inc. v. Histogen Inc.,*
   869 F. Supp. 2d 1176 (S.D. Cal. 2012) ................................................................ 4

22

*Speech Tech. Assocs. v. Adaptive Commc'n Sys., Inc.,*
   1994 WL 449032 (N.D. Cal. Aug. 16, 1994) ........................................................ 5

23

*Sterbenz v. Anderson,*
   2012 WL 5387885 (M.D. Fla. Nov. 2, 2012) ..................................................... 16

24

*VasoNova Inc. v. Grunwald,*
   2012 WL 4119970 (N.D. Cal. Sept. 18, 2012) ................................................... 12

25

*Verigy US, Inc. v. Mayder,*
   2008 WL 564634 (N.D. Cal. Feb. 29, 2008) ........................................................ 5

26

*Via Techs., Inc. v. Asus Computer Int'l,*
   2016 WL 1056139 (N.D. Cal. Mar. 17, 2016) ................................................... 12

27

*Westberry v. Gislaved Gummi AB,*
   178 F.3d 257 (4th Cir. 1999) .............................................................................. 16

28

**Statutory Authorities**

18 U.S.C. §1836 ........................................................................................................ 3

18 U.S.C. § 1839(5) .................................................................................................. 3

Cal. Civ. Proc. Code §§ 3426.1-.3 ............................................................................ 3

**Rules and Regulations**

Fed. R. Civ. P. 56(d)............................................................................................... 11

# I.      __INTRODUCTION__

Waymo hereby responds to Defendants' Motion for Summary Judgment, Motion to Strike TS 96, and *Daubert* Motion.  (Dkt. 1514 ("Mot.").)  Defendants motion is most notable for what it does not say.  Despite three different hearings and now several briefs, Uber does not challenge Waymo's evidence showing that, contrary to Uber's prior sworn declarations to this Court, Anthony Levandowski provided input into ███████████████████████████████████ ████████████.  Uber does not challenge Waymo's evidence showing that Uber originally had one ███████████████████████████████ and then, upon consulting on ████████████ with Mr. Levandowski, changed the design to mirror Waymo's strategy.  Uber does not challenge that Trade Secret No. 96 ("TS 96") reflects a single PCB that Anthony Levandowski downloaded, and that it reflects Waymo's confidential ████████████████.  Uber does not dispute that both the GBr and Fuji designs are the only designs in the world that reflect this same strategy as embodied in the TS 96 PCB.

This should be the end of the matter for purposes of summary judgment, motions to strike, or *Daubert*.  Rather than address the relevant evidence, Uber retreats to a different argument, arguing that ████████████████ do not exactly "match."  This is an invitation to error.  Trade secret law does not require that a defendant "exactly match" a trade secret design to be liable for trade secret misappropriation.  The question is whether that trade secret was acquired under improper means, used, or disclosed.  Uber does not even address these questions in its Motion.  Moreover, upon production of the Stroz due diligence report, we now know that ████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████.  This ██████████████████████ alone precludes summary judgment.  We also know that ████ ██████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████.  For example, ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ █████████████████████████████████████████████████:

As shown above,

At bottom, Defendants' Motion is yet another attempt to avoid facing Waymo's well-supported allegations of trade secret misappropriation. Once again, Defendants simply seek to avoid the factfinder hearing the relevant facts, this time with respect to Waymo's TS 96. (*See* Dkt. 1526-4 at 1.) Defendants' three-pronged attack fails on all grounds. First, disputed issues of material fact as to misappropriation preclude summary judgment on TS 96. Second, TS 96 is not vague and should not be struck: as evidenced by Defendants' own arguments against the merits of TS 96, Defendants know full well what Waymo is asserting against them with respect to TS 96. Finally, Prof. Hesselink's opinion is not excludable under *Daubert*, as he considered the relevant facts and presented a comparison of the salient features of Fuji's board ▮ against GBr3's board ▮ (embodied in TS 96).

---

[1]   Bare exhibit citations refer to exhibits to the accompanying declaration of Jordan Jaffe.

1    **II.     SUMMARY JUDGMENT IS NOT APPROPRIATE**

2         Entirely absent from the summary judgment section of Defendants' Motion is any citation

3    to case law.   The reason is simple: applying the proper legal standard for trade secret

4    misappropriation shows that disputes of material fact remain as to TS 96 and that summary judgment

5    for Defendants is therefore unwarranted.

6    **A.     Standard for Trade Secret Misappropriation**

7         Defendants' Motion surveys differences between, on the one hand, Waymo's GBr3 board ▮

8    and the GBr3 ▮▮▮▮▮▮▮▮▮▮ and, on the other, Uber's Fuji board ▮ and Fuji's ▮▮▮▮▮

9    ▮▮▮▮ (Mot. at 3-6.)  On the basis of these alleged differences, Defendants argue that "there can

10   be no genuine dispute that Uber does not use Waymo's GBr3 board ▮ implementation."  (Mot. at

11   6.)

12        Defendants' argument, however, completely ignores the governing legal standards for trade

13   secret misappropriation.  In the first instance, liability for trade secret misappropriation can arise not

14   only from *use* of a trade secret, but also from acquisition or disclosure of that trade secret.  *See* CCP

15   §§ 3426.1-.3; 18 U.S.C. §§ 1836, 1839(5).[2]  Yet Defendants' summary judgment argument is

16   focused exclusively on a purported lack of use.  (Mot. at 3-6.)  Defendants' Motion thus provides

17   no evidence with respect to acquisition or disclosure—nor could it have, given the disclosures from

18

19        [2]  Specifically, the California Code of Civil Procedure defines "misappropriation" to mean:

20   (1) Acquisition of a trade secret of another by a person who knows or has reason to know
     that the trade secret was acquired by improper means; or

21   (2) Disclosure or use of a trade secret of another without express or implied consent by a
     person who:

22        (A) Used improper means to acquire knowledge of the trade secret; or

23        (B) At the time of disclosure or use, knew or had reason to know that his or her
          knowledge of the trade secret was:

24             (i) Derived from or through a person who had utilized improper means to acquire
             it;

25             (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or
             limit its use; or

26             (iii) Derived from or through a person who owed a duty to the person seeking relief
             to maintain its secrecy or limit its use; or

27        (C) Before a material change of his or her position, knew or had reason to know that it
          was a trade secret and that knowledge of it had been acquired by accident or mistake.

28   CCP § 3426.1(b); *see also* 18 U.S.C. § 1839(5) (similar).

1   and attachments to the Stroz due diligence report that have recently come to light.  For example,

2   according to the Stroz report itself, ████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████████████████████

4   ████████████.  (Dkt. 1603-5 at UBER00312461.)  Waymo suspects that ████████████████

5   ████████████████████████████████.  That is, ███████████████████████████████████████

6   ████████████████████████████████████████.  For this reason alone,

7   summary judgment should be denied.  *See, e.g.*, *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,

8   873 F. Supp. 2d 1192, 1216 (N.D. Cal. 2012) (denying summary judgment:  "A10 has not asserted

9   that there is an absence of material fact as to whether Defendants 'acquired' or 'disclosed' Brocade's

10  trade secrets through improper means.  Thus, even if, as A10 argues, Brocade were required to

11  adduce evidence that A10 did not independently derive the trade secret information to show

12  "improper use," Brocade would still survive summary judgment because there are other ways of

13  misappropriating a trade secret.").

14          In addition, even with respect to trade secret misappropriation through *use*, Defendants again

15  completely ignore the governing legal standards.  Specifically, misappropriation through use occurs

16  if Defendants employed trade secret information as part of their research and development, even if

17  such work did not result in a final product exactly matching the claimed trade secret.  *See, e.g.*,

18  *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1197 (S.D. Cal. 2012) (denying defendant's

19  summary judgment motion and holding that, "[i]n the context of trade secret misappropriation,

20  information may be improperly 'used' in that it is unlawfully acquired and then built upon or

21  modified before being disclosed or benefit derived."); *O2 Micro Int'l Ltd. v. Monolithic Power Sys.*,

22  *Inc.*, 399 F. Supp. 2d 1064, 1072 (N.D. Cal. 2005) ("'Employing the confidential information in

23  manufacturing, production, research or development, marketing goods that embody the trade secret,

24  or soliciting customers through the use of trade secret information, all constitute use.' . . . Use for

25  research and development constitutes use." (quoting *PMC, Inc. v. Kadisha*, 93 Cal. Rptr. 2d 663,

26  673 (Cal. Ct. App. 2000))).

27          Accordingly, misappropriation through use of a trade secret can occur even if Defendants'

28  product differs in some respects from the trade secret.  *See, e.g.*, *SkinMedica*, 869 F. Supp. 2d at

-4-

1197 ("Histogen argues it has not misappropriated the Bioreactor Method or Concentration System trade secrets because it does not use several of the claimed elements.  However, this argument misunderstands the law on this point. . . . [T]his scattershot attempt to disclaim use of various elements of the claimed trade secrets does not foreclose the possibility that Histogen's process was not [sic] substantially derived from the claimed trade secrets, even if it differed in specifics from the process described therein." (internal citation omitted)); *Speech Tech. Assocs. v. Adaptive Commc'n Sys., Inc.*, No. C-88-2392, 1994 WL 449032, at *10 (N.D. Cal. Aug. 16, 1994) (holding defendants liable on trade secrets misappropriation:   "Defendants contend they are not liable for misappropriation of trade secrets because Alltalk v. and its successors are technologically different from Prototype # 1. . . . Although some of the technology used in the new products was different, many of the technical aspects, and most of the functional aspects of Prototype # 1 were incorporated into the revised Alltalks.  The incidental differences between Prototype # 1 and the redesigned Alltalks do not absolve defendants from liability for misappropriation of trade secrets."); *Verigy US, Inc. v. Mayder*, No. C-07-4330, 2008 WL 564634, at *7 (N.D. Cal. Feb. 29, 2008) (granting preliminary injunction on trade secret misappropriation claim and noting that, "[u]nder California law, minor variations in a product do not negate a claim for misappropriation of trade secrets.").

As succinctly summarized by the Seventh Circuit, it is well-established that "a party may not use another's trade secret, even with independent improvements or modifications, so long as the product or process is substantially derived from the trade secret.  If the law were not flexible enough to reach such modifications, trade secret protection would be quite hollow."  *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 328 (7th Cir. 1984).

**B.     Under the Correct Legal Standard, Summary Judgment Should Be Denied**

Focusing on use as Defendants' Motion does, but applying the correct legal standard, it is clear that there are disputed issues of material fact that preclude summary judgment.

Specifically, Waymo's technical expert, Prof. Hesselink, provided a detailed analysis outlining Anthony Levandowski's involvement in ████████████████ ████████ and several striking similarities in the final design of the GBr3 board █ and the Fuji board █ (*See* Chang Ex. 1 (Dkt. 1513) ("Hesselink Opening Report")

-5-

¶¶ 421-49; Dkt. 1456-3 ("Hesselink Decl.") ¶¶ 16-24; Ex. 3 ("Hesselink Reply Report") ¶¶ 235-54.) In brief, the evidence cited by Prof. Hesselink (and outlined below) establishes, among other things, that both GBr3 and Fuji ███████████████████████████████████████████████ ███████████████████████████████ (*See, e.g.*, *id.* ¶ 239.)

This design is contrary to Uber's early ideas for a LiDAR device, which followed the standard approach in the field.  Prior to Anthony Levandowski's involvement, Uber's early designs (developed by engineer Scott Boehmke) "████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████." (Hesselink Reply Report ¶ 250; Hesselink Opening Report ¶¶ 405-09; *see, e.g.*, Dkt. 176-3 at 10 (Boehmke's LADAR Design Notebook showing ███████████ ████████████████); Dkt. 176-1 ("Boehmke PI Decl.") ¶ 8 (discussing the approach outlined in his LADAR Design Notebook).)  For example, as late as March 2016, Mr. Boehmke was working with ████████████████████████████████████████████████:



(Hesselink Opening Report ¶ 409; Hesselink Reply Report ¶ 251; *see* Boehmke PI Decl. ¶ 9 (explaining work on ███████████████████, involving custom beam patterns and parameters); Dkt. 176-7 (showing ████████████████████████ ████████).)

Only after Mr. Levandowski began working with Mr. Boehmke and ████████ ████████████████████████████████████████████████ ████████████████████████████████—resulting in ████████████ on a board substantially similar to Waymo's. As explained by Prof. Hesselink, Mr. Boehmke told another Uber engineer (James Haslim) that ████████████████ ████████████████ (*See, e.g.*, Hesselink Opening Report ¶ 448, quoting Ex. 4 at UBER00060113 (email from Mr. Boehmke to Mr. Haslim: ████████████ ████████████████████); *see also, e.g.*, Ex. 5 at UBER00018016 (emails from James Haslim and Dan Gruver explaining Uber's ████████, with Mr. Gruver emphasizing that "██████████████████ ████████████"); Ex. 6 at UBER00199243 (Mr. Levandowski text to Mr. Haslim informing the latter that "████████████████████████████").) The evidence also shows that Mr. Levandowski was ████████████████████ ████████, exchanging numerous texts about the subject with Uber (and former Waymo) engineer Dan Gruver. (Ex. 13 (text exchange between Mr. Levandowski and Mr. Gruver in which Mr. Levandowski ████████████████████).) And, since the beginning of the

1   Fuji project, evidence shows that Mr. Haslim looked to Mr. Gruver for ███████████

2   █████—again via text.  (Ex. 14 (text from Mr. Haslim to Mr. Gruver: "████████

3   ███████").)  At the same time, Mr. Levandowski ██████████████ Eric Meyhofer, then in

4   charge of Uber's self-driving car hardware development, ████████████████████████

5   ████████████████████████████████.  (Ex. 15 at UBER00236495

6   (text from Mr. Levandowski to Mr. Meyhofer: "████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████").)

9        A side-by-side comparison of Mr. Levandowski's input and Waymo's

10  (embodied in TS 96) shows Mr. Levandowski's disclosure and use of TS 96 at Uber, even going so

11  far as to use code words like "state of the art" to refer to Waymo's designs (*see* Ex. 7 at WAYMO-

12  UBER-00085727):



| Waymo (Ex. 8 (8/16/17 Ben Ingram Depo.) at 80:4-81:9 (emphasis added).) | Uber (Ex. 4 at UBER00060113 (emails between Boehmke and Haslim) (emphases added).) |
|---|---|

1  ██████████████████████████████████████████████

2  ██████████████████████████████████████████████

3

4           As also explained by Prof. Hesselink (and as outlined in Waymo's Offer of Proof (Dkt. 1357-

5  1 at 18)), the ████████████████ approach taken by Waymo to design the GBr3 ████████████

6  ████████████████ on its transmit boards involved ███████████████████████████████████

7  ██████████████████████—similar to Uber's ████████████████████████████████████████████

8  ████████████████████—and markedly different from Uber's pre-Levandowski approach.  (Hesselink

9  Decl. ¶¶ 5-12, 24; *compare, e.g.*, Boehmke PI Decl. ¶¶ 8-9 (explaining Uber's approach prior to Mr.

10 Levandowski's involvement), *with* Ex. 4 at UBER00060113 (Mr. Boehmke explaining in email ██

11 ██████████████████████████████████████).)

12          Defendants' Motion takes issue with Waymo's references to ████████████████████.  (Mot.

13 at 6-8.)  However, Defendants do not dispute that ████████████████████████████████████████

14 ██████████████████████████████████████.  (*See* Hesselink Decl. ¶¶ 5-12.)

15 Accordingly, because ███████████████████████████████████████████████████████████████████

16 ██████████████████████████████████████████████, such that Waymo's

17 TS 96 in fact embodies a specific ████████████████████.  That Uber adopted a substantially similar

18 ████████████████████ that led to a substantially similar ████████████████ only serves as further

19 proof of Defendants' misappropriation of TS 96.  That Waymo also claims the broader concepts of

20 its overall ██████████████████████████████████ as separate trade secrets does not

21 detract from the fact that the specific implementation of one transmit board claimed in TS 96 reflects

22 and embodies the fruits of those design choices.  Waymo was under Court order to narrow its trade

23 secrets (Dkt. 563 ¶ 10; Dkt. 647) and, given the restriction to less than ten trade secrets, Waymo did

24 not select more than one trade secret covering similar subject matter.  This narrowing is no reason

25 to grant summary judgment, and Defendants never explain why it should be.

26          Above and beyond all of the evidence of use outlined above, Prof. Hesselink's analysis

27 further shows that the actual ████████████████ of the GBr3 and Fuji boards ██ match very closely (once the

28

1   difference in focal length is accounted for, as discussed below) and that many of the ████████

2   also match very closely and, in a few cases, almost directly overlap:



13   These comparisons further preclude summary judgment.  Based on these comparisons, Prof.

14   Hesselink  has  provided  an  opinion  that  "███████████████████████████████████████

15   █████████████████████████████████████" and that his analysis confirms that "the ████████

16   ██████████  in the Waymo and Uber designs are similar to each other within a very small tolerance."

17   (Opening Hesselink Report ¶ 432.)  Regardless of whether Waymo's GBr3 board █ and Uber's Fuji

18   board █  and  their  respective  ████████████  are  identical  or  not,  summary  judgment  is  not

19   appropriate, because Prof. Hesselink's analysis establishes the clear inference that Defendants relied

20   on █████████████████████████████████████████████████████████████████████████████████

21   █████████████████.  Based on these disputed material facts, it is the job of the factfinder to

22   decide whether the evidence relied on by Prof. Hesselink is sufficient to establish Defendants' trade

23   secret misappropriation through use of TS 96.  *See, e.g.*, *Integral Dev. Corp. v. Tolat*, 675 F. App'x

24   700, 703 (9th Cir. 2017) ("[T]here is enough evidence in the record to raise a question of material

25   fact as to whether Tolat misappropriated those portions of Integral's source code that qualify for

26   trade secret protection.  There is evidence that Tolat copied the source code shortly before he

27   planned to leave Integral and join EBS.  There is also evidence that, after Tolat joined EBS, EBS

28   released a product—EBS Direct—that competed directly with some of Integral's products.  A fact

1   finder must determine whether Tolat actually gave Integral's source code to EBS and whether EBS

2   used the source code to develop EBS Direct." (internal citation omitted)).

3        Ignoring the substantial similarities between the ██████████████ outlined in Prof.

4   Hesselink's analysis, Defendants' Motion emphasizes only that the overlap of ████████████

5   is not perfect.  But this argument ignores the legal standard for misappropriation through use and

6   seeks instead to render Waymo's protection over TS 96 extremely hollow, by allowing for

7   differences in some aspects of the claimed trade secret to defeat all the countervailing evidence of

8   use and thereby allowing Defendants to avoid liability by relying on Mr. Levandowski's avoidance

9   of straight copying.

10       In sum, disputed issues of material fact as to whether the substantial similarities in the two

11  designs reflect use of TS 96 remain, and summary judgment is not appropriate.  The numerous

12  commonalities between the ████████████████ on the respective PCBs (with ██████████

13  ████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████),

15  contrasted with earlier approaches (████████████████████████████████

16  ████████████████████████████████████████████), form a strong basis

17  for Waymo's case for misappropriation of TS 96, which Defendants' Motion all but ignores.  This

18  is especially so when the driving force for Defendants' change from their earlier approaches to the

19  approaches embodied in TS 96 was Anthony Levandowski.  Whose version of the facts is the correct

20  one is for the jury to decide.  *See, e.g.*, *Integral*, 675 F. App'x at 703.

21       Finally, given the voluminous new evidence available in the recent production of the Stroz

22  report and related materials—most of which Waymo has not even had the opportunity to look at, let

23  alone analyze, at a minimum Defendants' Motion should be denied to allow Waymo to review the

24  newly produced documents.  Fed. R. Civ. P. 56(d); *see* Jaffe Declaration ¶¶ 2-6.

25  **III.    THERE ARE NO GROUNDS TO STRIKE TS 96**

26       Defendants' Motion rehashes arguments to strike TS 96 it has previously made in three briefs

27  (Dkt. 1107-4, 1174-4, 1399-4) and at three hearings (on August 16, August 23, and September 6)

28

1   and that have been implicitly rejected by the Court.  (Mot. at 8-10.)  Despite numerous tries, it is

2   now abundantly clear that Defendants' arguments for striking TS 96 lack merit.

3          Defendants first point to Waymo's comparison of both the specific ███████████ and

4   the broader ████████████ that underlies those ███████ in GBr3 and Fuji as support for

5   their argument that "TS 96 is not a properly identified trade secret."  (Mot. at 8-9.)  But, as explained

6   above, it is undisputed that ████████████████████████████████████████████

7   ███████████.  Accordingly, it is not surprising that Waymo's proof of misappropriation of TS 96

8   relies on both a direct comparison of the ███████████████ on the boards and on a comparison

9   of the underlying ████████████.  Because the ███████████ depends on ███████

10  ███████████, both of these comparisons are fully consistent with Waymo's Section 2019.210

11  formulation of TS 96 (███████████████████████████████████████████

12  ███████████████████████)—a formulation that, in additional explanatory language, also

13  specifically called out "unique and unknown design characteristics such as ███████████

14  ███████████████." (Dkt. 25-7 at 55.)

15         As explained in Waymo's prior briefs on this issue, the specific ███████████████

16  ██████ as implemented by Waymo and identified with respect to a single transmit board in TS 96

17  provides sufficient particularity for purposes of Section 2019.210.  *See VasoNova Inc. v. Grunwald*,

18  No. C 12-02422, 2012 WL 4119970, at *3 (N.D. Cal. Sept. 18, 2012) (Alsup, J.); *Via Techs., Inc.*

19  *v. Asus Computer Int'l*, No. 14-cv-3586, 2016 WL 1056139 (N.D. Cal. Mar. 17, 2016); *Lilith Games*

20  *(Shanghai) Co. v. uCool, Inc.*, No. 15-CV-01267, 2015 WL 4149066, at *4-5 (N.D. Cal. July 9,

21  2015).  (*See generally* Dkt. 1449-4 at 3-6.)

22         Defendants nevertheless argue that "TS 96 should be stricken for vagueness" because other

23  components and values are included in the schematics for a single one of Waymo's transmit boards.

24  (Mot. at 9.)   But, as Defendants themselves acknowledge, Waymo is not accusing them of

25  misappropriating those aspects of the TS 96 schematics.  Defendants' complaint about the purported

26  "vagueness" of TS 96 thus rings hollow.

27         Indeed, Defendants' assertions that TS 96's purported vagueness is preventing them from

28  adequately defending themselves and from forming complete and well-reasoned defenses (Mot. at

-12-

10) are belied by Defendants' detailed discussion of the very specific aspects of TS 96 Waymo accuses them of using (Mot. at 2-6).  Defendants' implication that TS 96 is so vague that they cannot present a complete and adequate defense is not well taken in light of their simultaneous argument for summary judgment, which sets out their detailed explanation for why they do not use TS 96.  In brief, Defendants' summary judgment argument shows that they know exactly the case that Waymo will present at trial with respect to TS 96 and that they have already formed defenses they will present at trial.

None of Defendants' cited cases support their position that a trade secret such as TS 96, which claims schematics and layouts for a single component, should be struck by the Court for vagueness, especially where the plaintiff has already crystallized the specific aspects of the specific schematics claimed by the trade secret.  First, *Agency Solutions.com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001 (E.D. Cal. 2011), involved trade secrets that were nowhere near as particularly described as TS 96: for example, the court described one set of trade secrets there as "know-how and proprietary understanding directly related to [topics discussed at a meeting], including process flows and interfaces that would be needed to be built" and "insights."  *Id.* at 1018-19.  Moreover, the court's emphasis on the particularized description being a "duty owed to the court" was consistent with the preliminary injunction stage of the proceedings in that case.  *Id.* at 1017.

Second, far from supporting Defendants' position regarding TS 96, *Fortinet, Inc. v. Sophos, Inc.*, No. 13-cv-5831, 2015 WL 5971585 (N.D. Cal. Oct. 15, 2015), instead supports Waymo.  In that case, the defendant had previously accepted Fortinet's formulation for purposes of discovery and was seeking summary judgment on the ground that "Fortinet ha[d] not identified any information that constitutes a legally protectable trade secret."  *Id.* at *2.  Declining to adopt another court's rejection of similar formulations of the same trade secrets in a related case, the court emphasized that the importance of the "reasonable particularity" requirement once discovery is over lies in ensuring that "the trade secret disclosure is sufficiently specific such that [the defendant] can adequately defend itself."  *Id.* & n.2.  To that end, the court "pressed Fortinet, at the hearing, as to how exactly it intended to try its trade secret misappropriation claim.  Fortinet explained that it would identify specific documents as trade secrets for the jury's consideration."  *Id.* at *3.  The

-13-

result of the motion in *Fortinet* was identifying specific documents Fortinet contended were trade secrets. That is, Fortinet was agreeing to resolve a summary motion by doing what Waymo already did at the beginning of fact discovery in this case (identify a single schematic as its trade secret). Because Fortinet's agreed to identify certain documents as trade secrets, the court denied the defendant's motion for summary judgment. *Id.* Waymo has already identified a specific PCB as its trade secret and the parties have further crystallized (as part of the parties' extensive briefing and argument regarding TS 96 and as part of the exchange of expert reports) exactly which aspects of TS 96 it intends to present at trial. Under the logic of *Fortinet*, there is no remaining issue with respect to the specificity of TS 96, and the parties can proceed to trial on that trade secret. *See also Lilith Games (Shanghai) Co. v. uCool, Inc.*, No. 15-CV-1267, 2015 WL 4149066, at * (N.D. Cal. July 9, 2015) (articulating the same concern about the particularity of trade secret disclosures as *Fortinet*, and finding that plaintiff claiming as trade secret the "specific way" that it authored and structured source code and that the disclosure was "more than enough information" to meet the particularity requirement of Section 2019.210).

Aside from (erroneously) implying that Defendants are not in a position to mount adequate defenses against TS 96 at trial, Defendants also suggest that they cannot even figure out how to distinguish TS 96 from the "general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." (Mot. at 8 (quoting *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161 (9th Cir. 1998)).) But Defendants have never argued any difficulty in determining if Waymo's specific PCB schematics for GBr3 transmit board █ (and the specific ██████████████ therein) are within the "general [or special] knowledge" in the field. Indeed, given the high degree of particularity of those schematics, this failure is not surprising: these same specific schematics cannot possibly be a matter of general knowledge in the field. *Imax* only supports Waymo's position: In that case, Imax was attempting to claim as a trade secret the "dimensions and tolerances" of components of a projector system without identifying *what* those dimensions and tolerances were. 152 F.3d at 1166. Here, by contrast, Waymo has identified specific schematics in a specific folder, and reference to that folder reveals the precise ████████████████████, which constitute the key aspect of TS 96 Waymo intends to present at trial. The specificity of Waymo's TS 96

disclosure also distinguishes Defendants' citation to *Princess Cruises, Inc. v. Amrigon Enterprises, Inc.*, 51 F. App'x 626 (9th Cir. 2002).   There, the court faulted plaintiff's disclosure of "generalizations concerning its database components," which meant that plaintiff had "failed to provide specific evidence that its alleged trade secrets were not common or obvious concepts in the database industry."   *Id.* at 628.   Here, Defendants have never argued that the █████████████ ██████████ on the transmit board, and the specific ████████████████ underlying █████ ██████, are generally known in the field.

Indeed, the Court has already recognized that Waymo's specific implementations of its LiDAR designs are its trade secrets.   (*See, e.g.*, 5/3/17 AM Sealed Hr'g Tr. at 14:23-25 ("[T]here is no doubt in my mind that your specific [███████████] configuration, very specific configuration, would be a trade secret."); *id.* at 15:21-22 ("[Y]our specific implementation, I think, would be a trade secret.").)   And the Court has also repeatedly declined to strike TS 96 for lacking reasonable particularity, instead opting to grant leave to Defendants to file a combination motion for summary judgment and *Daubert* motion regarding TS 96.   (9/6/2017 Sealed Hr'g Tr. at 104:14-23.) Defendants' presentation of specific technical arguments to show non-use of TS 96 in the context of summary judgment only further confirms that TS 96 is in fact disclosed with sufficient particularity to enable Defendants to adequately defend themselves.

More telling is that, though Defendants argue TS 96 is not sufficiently specific to enable them to develop their claims and defenses for trial, any specific arguments about how Defendants were prejudiced in discovery are entirely absent from the Motion.   There is not a single deposition, subpoena, request for production, or interrogatory identified in Defendants' Motion that they argue they would have propounded.   Defendants identify literally nothing that, but for a more specific formulation of TS 96, they would have been able to present at trial.   As stated above, Defendants know exactly the content of the trade secret, as shown by the voluminous briefing and argument on this subject.   The serial post-fact-discovery motions to strike remain an exercise in litigation gamesmanship and an improper use of Section 2019.210.   Defendants' motion to strike TS 96 should be denied.

## IV.    <u>THERE ARE NO GROUNDS TO PRECLUDE PROF. HESSELINK'S OPINIONS</u>

Defendants' *Daubert* motion is a total retreat.  Despite an invitation by the Court, Defendants do not argue that Prof. Hesselink's scaling of X and Y axes was improper.  Defendants' Motion does not challenge the math Prof. Hesselink relies on to generate his comparisons at all.  In the end, Defendants' Motion argues only that Prof. Hesselink's opinions should be excluded because he purportedly "disregards alternative explanations" for the similarities between Waymo's GBr3 board ▆ and Fuji's board ▆ and because his comparison is "methodologically unsound."  (Mot. at 10-14.) Neither of Defendants' arguments justifies excluding Prof. Hesselink's opinions regarding TS 96.

### A.    Prof. Hesselink Considered All the Relevant Facts, and His Opinion Remains Admissible

Defendants' first argument for excluding Prof. Hesselink's opinions on TS 96 is that he failed to consider a hypothetical alternative explanation neither party has advocated as the explanation for Fuji's (or Waymo's) design.  (Mot. at 11-13.)  But "an expert's conclusions 'should not be excluded because he or she has failed to rule out every possible alternative cause.'"  *Sterbenz v. Anderson*, No. 8:11-cv-1159, 2012 WL 5387885, at *3 (M.D. Fla. Nov. 2, 2012) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999)).

Specifically, Defendants argue that an alternative explanation for the similarities is that the beam angles could have been designed to "illuminat[e] evenly-spaced points on a road farther and farther from the lens" as suggested in a hypothetical design approach outlined by the Court during the preliminary injunction proceedings in this case.  (*Id.* at 12.)  Defendants admit, however, that neither Fuji nor GBr3 were "designed to have beams landing at evenly-spaced points on the ground." (Mot. at 12.)  Thus, even Defendants admit that this alternative explanation is not relevant here. Instead, as discussed above, Waymo (and, later, Uber) were focused on achieving ▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆, while Uber was originally focused on achieving ▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.  Accordingly, Defendants' cited hypothetical bears no relation to the specific implementation of Waymo's GBr3 transmit board ▆ design claimed in TS 96 or to the

1   misappropriated design implemented in Fuji's transmit board ▉▉  Prof. Hesselink was thus fully

2   justified in declining to consider this hypothetical alternative explanation.

3       Defendants also present a strawman of Prof. Hesselink's opinions in an attempt to make

4   them fit into the hypothetical alternative explanation and into a cramped comparison to the Velodyne

5   HDL-64.  (Mot. at 12.)  Defendants characterize the similarity examined by Prof. Hesselink as a

6   "similarity in the '▉▉▉▉▉▉▉▉▉▉' spacing of diodes between GBr3 and Fuji" and argue

7   that this "simply reflects the similar goals of maintaining adequate resolution in the far field."  (*Id.*)

8   But this argument ignores that Prof. Hesselink's opinion is not limited to comparing the

9   "▉▉▉▉▉▉▉▉▉" spacing of diodes in the two LiDAR transmit boards.  As discussed

10  above, Prof. Hesselink also focused on the similarity in the ▉▉▉▉▉▉▉▉▉▉▉▉▉▉

11  ▉▉▉▉▉▉▉▉  for both Waymo and Uber as well as the similarity in ▉▉▉▉▉▉▉▉▉

12  ▉▉▉▉▉▉▉▉▉ (scaled to account for the two systems' differing focal

13  lengths).  Velodyne's approach is drastically different, as explained by Prof. Hesselink, and follows

14  a zone-based approach resulting in clusters of evenly spaced beams (in the case of the HDL-64, two

15  clusters).  (*See, e.g.*, Hesselink Opening Report ¶ 408; Ex. 9 at 53 (Velodyne HDL-64 user manual

16  specifying 1/3 degree spacing for part of the field of view and 1/2 degree spacing for the remainder).)

17  And Velodyne's design for the positioning of its laser diodes is also drastically different, with

18  numerous PCBs each holding a single laser diode.  (*See, e.g.*, *id.* ¶ 403; Ex. 10 at 32-34 (Velodyne

19  HDL-64 resource manual depicting 16-PCB assembly comprising one of four assemblies that make

20  up the 64 laser sources).)  By presenting their strawman, Defendants conveniently ignore all these

21  facts in their Motion.

22      Moreover, even assuming *arguendo* that Prof. Hesselink did not consider all possible

23  hypothetical explanations for the similarities between the two boards, Defendants' "arguments go

24  to the weight, not the admissibility" of Prof. Hesselink's opinions.  *Internmatch, Inc. v. Nxtbigthing,*

25  *LLC*, No. 14-cv-5438, 2016 WL 1212626, at*4 (N.D. Cal. Mar. 28, 2016) (denying motion to

26  exclude expert testimony); *see also, e.g.*, *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d

27  998, 1017 n.14 (9th Cir. 2004) ("[Q]uestions regarding the nature of [the expert's] evidence went

28  more to the 'weight' of his testimony—an issue properly explored during direct and cross-

1    examination."); *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004)

2    ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the

3    admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-

4    examination.").  Defendants remain free to cross-examine Prof. Hesselink at trial regarding these

5    hypothetical "alternative explanations" and present the arguments they present in their Motion to

6    the jury.  Indeed, an expert's purported failure to consider relevant facts does not render his opinion

7    inadmissible under *Daubert*; instead, cross-examination is the proper method for addressing such

8    fact-laden disputes.  *See, e.g.*, *Internmatch*, 2016 WL 1212626, at*4.

9           **B.      Prof. Hesselink's Comparison Is Methodologically Sound**

10          Defendants' last argument is that Prof. Hesselink's analysis is "methodologically unsound"

11   because he purportedly "ignores the actual diode positions . . . in favor of imaginary curves drawn

12   to fit the ███████████████ of the diodes." (Mot. at 13-14.)  This argument is wrong.

13          Contrary to Defendants' assertion, the curves presented by Prof. Hesselink are not

14   "imaginary curves," but are instead the best fit to the precise ████████████████████

15   on each respective board.  (*See, e.g.*, Opening Hesselink Report ¶ 432; Hesselink Decl. ¶¶ 16-24.)

16   It is undisputed that the two curves correspond to the Petzval surfaces of each transmit lens.  (*See,*

17   *e.g.*, Opening Hesselink Report ¶¶ 388-90; Hesselink Decl. ¶ 18; Dkt. 1461-3 at 1 (Uber's answer

18   to Court's Question 1 regarding TS 96, discussing placement of laser diodes on the Petzval curve).)

19          Indeed, as Defendants note in their Motion, "the Petzval curve is defined by the focal length,

20   refractive index (based on lens material), and lens shape of each lens."  (Mot. at 13 (citing Hesselink

21   Decl. ¶ 12).)  Prof. Hesselink's comparison takes into account these parameters but only factors out

22   the focal length.  (*See* Hesselink Decl. ¶¶ 16-24; *see also* Hesselink Opening Report ¶ 432.)

23   Contrary to Defendants' suggestion that this analysis "is merely showing that Petzval curves of the

24   same focal length will be the same" (Mot. at 13), Prof. Hesselink's analysis shows that the lens

25   material and lens shape do not meaningfully contribute to the shape of the Petzval surface in the

26   case of the two transmit boards under comparison.  In other words, his analysis shows that the

27   transmit lenses in Fuji and GBr3 are so substantially similar in terms of their overall optical

28   properties that the Petzval surfaces of each are virtually the same once the difference in focal lengths

1  is accounted for.  Rather than rendering Prof. Hesselink's comparison "methodologically unsound,"

2  the alignment of the curves after only factoring out the focal length is instead further compelling

3  evidence in support of his opinions on the use of TS 96 to generate the Fuji board design.

4       The similarity between the optical properties of the two lenses is not a coincidence either,

5  for a reason Defendants omit from their Motion.  Former Waymo engineer (now at Uber) Gaetan

6  Pennecot testified that the design of the Fuji transmit lens started with a "benchmark" design with

7  the same optical properties as the main lens for GBr2 and GBr3:

8       Q. . . . Do you see there's something called a Benchmark 1 design?
        A. Yes.
9       Q. What does that refer to?
        A. This is a lens I had experience with—it's a lens design that I've already worked
10      on.
        Q. When you say "already worked on," what do you mean by that?
11      A. I worked on a similar lens at Google.
        Q. Is this the GBR3 lens?
12      A. This is the GBR lens, so GBR2, GBR3.
        Q. And so the information here describing this lens is really describing Waymo's
13      GBR lens design; is that right?
        A. This is not correct.
14      Q. How is that incorrect?
        A. So material is the same, aspheric front surface.  So there's—we use an aspheric
15      surface in front, toroidal surface in the back.  And I believe this is the same
        dimensions, aperture, same focal, however, it's not the same equation.
16      Q. How do you know it's not the same equation?
        A. Because it's impossible to go back to the same equation.  I didn't—you would
17      have to remember exactly the merit function to end up on the same equation.
        Q. And you didn't remember the merit function for the GBR lens?
18      A. No.
        Q. Was the Benchmark 1 design lens your best approximation of the merit function
19      in the GBR design?
        A. Yes.
20
   (Ex. 11 (6/16/2017 Gaetan Pennecot Depo.) at 287:2-288:8; *see also id.* at 285:14-24 (testifying that
21
   the "Benchmark 1 design" was prepared for James Haslim).)  This "benchmark" design is depicted
22
   below:
23

24

25

26

27

28



Mr. Pennecot's testimony regarding the genesis of the Fuji transmit lens design helps to explain the almost complete overlap of the two optical systems' Petzval surfaces (once focal length differences are accounted for), further supporting Prof. Hesselink's opinions.

Finally, contrary to Defendants' cursory assertions to the contrary (Mot. at 14), Prof. Hesselink *did* provide a comparison of ▮▮▮▮▮▮▮▮▮▮▮ themselves. (*See, e.g.*, Opening Hesselink Report ¶ 432 (opining that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and that "the ▮▮▮▮▮▮▮▮ in the Waymo and Uber designs are similar to each other within a very small tolerance").) The ▮▮▮▮▮▮ ▮▮▮▮▮▮, however, is best understood in the context of the Petzval curves. Prof. Hesselink's presentation of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is thus highly probative, contrary to Defendants' assertions to the contrary. (Mot. at 14.) Accordingly, his comparison of the two sets of ▮▮▮▮▮▮▮▮▮ is not something that should be excluded from trial.

1 **V.    <u>CONCLUSION</u>**

2        For  all  the  reasons  stated  above,  Waymo  respectfully  requests  that  the  Court  deny

3 Defendants' Motion.

4

5 DATED:  September 18, 2017          QUINN EMANUEL URQUHART & SULLIVAN,
                                     LLP
6
                                  By  */s/ Charles K. Verhoeven*
7                                     _____
                                     Charles K. Verhoeven
8                                     Attorneys for WAYMO LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28