Neel Chatterjee (SBN 173985)
*nchatterjee@goodwinlaw.com*
James Lin (SBN 310440)
*jlin@goodwinlaw.com*
**GOODWIN PROCTER** LLP
135 Commonwealth Drive
Menlo Park, California 94025
Tel.: +1 650 752 3100
Fax.: +1 650 853 1038

Brett Schuman (SBN 189247)
*bschuman@goodwinlaw.com*
Shane Brun (SBN 179079)
*sbrun@goodwinlaw.com*
Rachel M. Walsh (SBN 250568)
*rwalsh@goodwinlaw.com*
Hayes P. Hyde (SBN 308031)
*hhyde@goodwinlaw.com*
**GOODWIN PROCTER** LLP
Three Embarcadero Center
San Francisco, California 94111
Tel.: +1 415 733 6000
Fax.: +1 415 677 9041

Hong-An Vu (SBN 266268)
*hvu@goodwinlaw.com*
**GOODWIN PROCTER** LLP
601 S. Figueroa Street, 41st Floor
Los Angeles, California  90017
Tel.: +1 213 426 2500
Fax.: +1 213 623 1673

*Attorneys for Defendant: Otto Trucking LLC*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| Waymo LLC,<br><br>         Plaintiff,<br><br>    v.<br><br>Uber Technologies, Inc.; Ottomotto LLC; Otto Trucking LLC,<br><br>         Defendants. | Case No. 3:17-cv-00939-WHA<br><br>**DEFENDANTS' OPPOSITION TO WAYMO'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:       Thursdays<br>Time:      8:00 a.m.<br>Courtroom:  8<br>Judge:     Hon. William Alsup<br><br>[UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED] |

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ..................................................................................1

II.    UNDISPUTED FACTS ...........................................................................................2

    A.    Waymo Investigates Mr. Levandowski's Activities and Finds No
        Misconduct. ...............................................................................................2

    B.    After Learning about Uber's Acquisition of Ottomotto, Waymo Accelerates
        the Investigation with the Help of Keker Van Nest & Peters. ...................3

    C.    Waymo's SVN Administrator Informs Litigation Counsel that Mr.
        Levandowski's SVN Conduct is Not Suspicious. ......................................4

    D.    Litigation Counsel Influences the Investigation to Find Misconduct by Mr.
        Levandowski. .............................................................................................6

    E.    Waymo's Investigators Pursue Incorrect Theories of Mr. Levandowski's
        Misconduct. ...............................................................................................6

    F.    Waymo Engages in Litigation Misconduct to Obfuscate Disagreement with
        Its Theories. ...............................................................................................7

        1.    Waymo Hid the Identities of Key Witnesses from Discovery. ........7

        2.    Waymo Selectively Waives Privilege to Withhold Damaging
            Communications that Undermine its Conclusions and Violates The
            Court's Orders. ..............................................................................9

III.   ARGUMENT ........................................................................................................11

    A.    The Court Should Deny Waymo's Motion for Summary Judgment as to
        Unclean Hands Based on Its Litigation Misconduct ................................11

    B.    The Court Should Deny Waymo's Motion With Respect to Failure to
        Mitigate Damages. ...................................................................................15

IV.    CONCLUSION .....................................................................................................17

DEFENDANTS' OPPOSITION TO WAYMO'S MOTION
FOR PARTIAL SUMMARY JUDGMENT                          Case No. 3:17-CV-00939-WHA

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Gilead Sciences, Inc. v. Merck & Co, Inc.*,
    13-cv-040570BLF, 2016 WL 3143943 (N.D.Cal. June 6, 2016)...............................2, 12, 13, 15

*GSI Tech., Inc. v. United Memories, Inc.*,
    No. 5:13-CV-01081-PSG, 2015 WL 12942201 (N.D. Cal. Oct. 14, 2015) ..............................17

*Intamin, Ltd v. Magentar Tech., Corp.*,
    623 F. Supp. 2d 1055 (C.D. Cal. 2009).......................................................................11, 13, 14

*McCormick v. Cohn*,
    No. CV 90-0323 H, 1992 WL 687291 (S.D. Cal. July 31, 1992) .......................................13, 14

**California Cases**

*Thrifty-Tel, Inc. v. Bezenek*,
    46 Cal. App. 4th 1559 (1996).................................................................................................16

DEFENDANTS' OPPOSITION TO WAYMO'S MOTION
FOR PARTIAL SUMMARY JUDGMENT                                    Case No. 3:17-CV-00939-WHA

I.     **PRELIMINARY STATEMENT**

Waymo has moved for partial summary judgment on some affirmative defenses alleged by Defendants, on the basis that Defendants purportedly did not *propound* interrogatories relating to them.  This position ignores the fact that Defendants have procured evidence supporting their affirmative defenses.

<u>Unclean Hands</u>: From the beginning, Waymo has made its trade secrets claim about Anthony Levandowski's alleged improper downloading of 14,000 files from Waymo's SVN server.  *See* Compl. at ¶¶4, 44.  It has called them the "crown jewels of the kind of technology that we are talking about [autonomous driving]." Declaration of Hong-An Vu, Ex. 1, 8/16/17 Hr'g at 71:1-12.  This was a lie.

Prior to initiating this action, Sasha Zbrozek, the Chauffeur engineer who set up the SVN server from which Waymo's purported trade secrets were allegedly downloaded, informed counsel for Waymo that  the documents contained on the SVN server were "low-value" and "second class citizens."  *Id.* at Ex. 2.  Mr. Zbrozek's communications led Waymo's outside counsel to state in internal communications that the SVN files "aren't the crown jewels"—the exact opposite of Waymo's representations to the Court.  *Id.* at Ex. 3 at 86898.  In addition, the day before Waymo initiated this lawsuit, when asked to provide the number and size of the files Anthony Levandowski allegedly downloaded from the SVN server, Mr. Zbrozek stated:

> "I'm a little leery because both of those numbers [14,000 files or 9.7 GBs] aren't really meaningful in any narrative .  It also has a chilling effect on being a hardware engineer - we do full checkouts and it makes me uncomfortable to think that lawyers are trying to ascribe suspicion to it." Vu Decl., Ex. 4 at 86936.

Despite this cautionary communication, the very next day, Waymo filed its complaint alleging misappropriation of 121 trade secrets based on Mr. Levandowski's Mr. Levandowski's "extraordinary efforts to raid Waymo's [SVN] server" and "downloaded 14,000 files, representing approximately 9.7 GB of highly confidential data," Dkt. 23 at 3.  Although it obtained the information for its claims from Mr. Zbrozek, as part of the preliminary injunction proceedings, Waymo did not submit a declaration from Mr. Zbrozek, instead having witnesses with no personal knowledge of the SVN server submit declarations.  Waymo failed to disclose Mr. Zbrozek in the

three initial disclosures it served.  *Id.* at Ex. 5-7.  Waymo also failed to disclose Tom Gorman, an attorney at Keker, Van Nest & Peters LLP, who played a primary role in developing the theory of liability and misconduct advanced in this case. Waymo selectively waived privilege and withheld damaging documents like the communications with Mr. Zbrozek until Judge Corley ordered their production.  This order came after Otto Trucking repeatedly sought the Court's assistance and Waymo's production of its investigation documents occurred the last day and continued well after the discovery cut-off.  Such litigation misconduct supports an unclean hands defense, and demonstrates that there are disputed facts that undermine Waymo's motion for summary judgment. *Gilead Sciences, Inc. v. Merck & Co, Inc*., 13-cv-040570BLF, 2016 WL 3143943, at *27 (N.D.Cal. June 6, 2016) (denying Merck $200 million award due to its unclean hands based on litigation misconduct).

Failure to Mitigate Damages: The recently produced documents that were improperly withheld as privileged also demonstrate Waymo's failure to seek a preliminary injunction when it believed its trade secrets had been compromised.  The evidence shows that Waymo had discussions in August 2016 about when and whether to reach out to Uber about Waymo's belief that Mr. Levandowski had taken Google trade secrets.  But instead of contacting Uber or moving for an injunction at that time, Waymo waited, not weeks as it contended, but *six months* after its second investigation into Mr. Levandowski and a *year* after its first investigation.  Such delay is not reasonable if the alleged trade secrets truly were as valuable as Waymo now contends.

As to the remaining affirmative defenses addressed in Waymo's motion for summary judgment, Otto Trucking waives its waiver, estoppel, laches, statute of limitations, release, preemption, prosecution history, and res judicata defenses.  Uber also waives its waiver and acquiescence defenses.  Defendants intend to pursue all other remaining affirmative defenses that are not part of Waymo's motion for partial summary judgment

## II.     UNDISPUTED FACTS

### A.     Waymo Investigates Mr. Levandowski's Activities and Finds No Misconduct.

Anthony Levandowski left Google on January 27, 2016. Vu Decl.  at Ex. 8.  Immediately following his departure, Mr. Levandowski's boss, Chris Urmson, ordered an investigation by

1   Human Resources into any possible misconduct by Levandowski, including into whether "he

2   would have looked at files or downloaded things that were inappropriate for him to download."

3   *Id*. at Ex. 22.  Google initiated the investigation on February 3, 2016, which included investigating

4   whether Google's trade secrets had been compromised. *See id*. at Ex. 10; Ex. 11 at 86805.

5        Google's forensic team, Gary Brown and Kristin Gudjonsson, imaged two laptops used by

6   Mr. Levandowski at the time of his departure and analyzed them.  *See id.* at Ex. 22, Gudjonsson

7   Vol. I 198:22-199:9.  A third desktop was not preserved and Google has not offered an

8   explanation for its spoliation.  *See id*. They also reviewed certain log information regarding Mr.

9   Levandowski's activities on the Google network. *See id*. 172:4-178:10.  Gary Brown, who

10  conducted the analysis, testified that he did not find any misappropriation of trade secrets.  *See id.*

11  at Ex. 26, Brown PI Tr. 31:17-24; *see also* Ex. 11.  Consistent with Mr. Brown's testimony, Mr.

12  Urmson also testified that while the investigation identified documents Mr. Levandowski had

13  accessed, "None of them seemed out of the ordinary."  *Id.* at Ex. 21,Urmson Tr. 182:12-16.

14  (emphasis added).  As discussed *infra* , Mr. Urmson's assessment is consistent with a later review

15  by the administrator of the repository from which Waymo now claims its trade secrets were stolen.

16        **B.    After Learning about Uber's Acquisition of Ottomotto, Waymo Accelerates
17               the Investigation with the Help of Keker Van Nest & Peters.**

18        In late July 2016, after a number of employees departed Google for Mr. Levandowski's

19  new company, Ottomotto, Google renewed its investigation.  *Id*. at Ex. 9.  On or about August 4,

20  2016, Keker Van Nest & Peters LLP ("Keker") began running the investigation, and sent a

21  Chauffeur Forensic Investigation Memorandum to Google.  *Id*. at Ex. 12 at 86812.  The scope of

22  the investigation included whether any of the employees who have left Google to join Otto "are

23  unlawfully in possession of Chauffeur Confidential information and/or trade secrets."  *Id.*  As part

24  of this investigation, Keker asked the investigative team to look into any bulk downloads,

25  connecting of any hard drives or removable media to Google devices, and the web browsing and

26  searching history of the departing employees. *Id*.

27        Waymo accelerated the investigation after Uber announced on August 18, 2016 that it was

28  going to acquire Ottomotto.  *See id*. at Ex. 13, Ex. 14.  Uber was "generally considered to be

1  chauffeur's main competitor" and Mr. Urmson had previously written to Larry Page and Sergey

2  Brin, the founders of Google, that Uber had become a huge competitive threat through its earlier

3  acquisition of talented engineers from Carnegie Mellon University. *Id.*; *see also id.* at Ex. 15.

4        On August 23, 2016, after discussing accelerating the investigation with David

5  Drummond, Google's chief legal counsel at that time (and former Uber board member), the

6  investigators communicated to the others that, "We also need to decide when and whether to

7  notify Uber of our concerns or potential concerns. Time is of the essence since the Otto deal likely

8  has not closed yet." *Id.* at Ex. 16.   That same day, the investigator's notes about the investigation

9  state, "Timing is important, since we have to decide whether we need to take some action, before

10  the transaction closes." *Id.* at Ex. 12. Notably, the discussion with Mr. Drummond took place the

11  same morning he tendered his resignation from Uber's Board of Directors to then-Uber CEO

12  Travis Kalanick. *Id.* at Ex. 29 at UBER00077201.

13        From August 23-29, 2016, Google security personnel worked round the clock investigating

14  at least ten Otto employees. *Id.* at Ex. 23,  Gudjonsson 9/8 Tr. at 322:8-323:8.

15       **C.**    **Waymo's SVN Administrator Informs Litigation Counsel that Mr.**
16              **Levandowski's SVN Conduct is Not Suspicious.**

17        On September 19, 2016, Tom Gorman, an attorney at Keker, contacted Mr. Zbrozek, the

18  engineer who set up the SVN server containing materials relating to the Chauffeur circuit boards,

19  to inquire about large downloads from the SVN server.  Mr. Gorman also contacted Nick Vines,

20  an engineer on Chauffeur, to inquire about downloading activity on Google's Enterprise Product

21  Data Management ("EPDM") service. *Id.* at Ex. 2.  Both responded that large downloads of data

22  off of these repositories was normal practice.

23        On September 20, 2016, Mr. Vines informed Mr. Gorman, "EPDM is similar to SVN in

24  that it syncs files locally for work, so even if someone sync'd the entire folder that wouldn't be out

25  of normal operation." *Id.*

26        On October 5, 2016, Mr. Gorman received a log of Mr. Levandowski's activities on the

27  SVN. *Id.*  After analyzing it, he concluded that Mr. Levandowski accessed the SVN server on

28  December 11, 2015 and downloaded a large amount of data from the server, which he found to  be

anomalous and suspicious.  *See id.* Mr. Zbrozek repeatedly rejected Mr. Gorman's interpretation. For example:

- Mr. Gorman asked Mr. Zbrozek, "[Mr. Levandowski] only accessed the SVN the one time on 12/11/2015? That's a little strange isn't it?"  Mr. Zbrozek responded, "It's not particularly surprising that he might check things out once . . . It clearly wasn't part of his routine. **Doesn't ring alarm bells for me**." *Id.* (emphasis added).  Indeed, Mr. Zbrozek had issued Mr. Levandowski passwords to the SVN server in March 2015.  *Id.* at Ex. 25, Zbrozek 9/6/17 Tr. 287:23-289:18.

- Mr. Gorman asked whether the one access that Google had on record was "truly out of character" or "whether we only have a short window of logs (and therefor no idea what his normal work pattern was.)."  *Id.*at Ex. 2.  Mr. Zbrozek responded that the logs only dated back to September or October 2015—just **four months** of activity relating to Mr. Levandowski.  *See id.* (emphasis added).

- Mr. Gorman also asked what materials were contained on the SVN server, to which Mr. Zbrozek responded, "It's all electronics designs – schematics and PCB layouts, and the component library for their creation. It was considered **low-value** enough that we even considered hosting it **off of Google infrastructure"** and indeed was hosted off Google security infrastructures. *See id.* at Ex. 2 (emphasis added); *see also* Ex. 24, Janosko 8/25/17 Tr. 19:3-10 (none of the ███ members of Google's security team are responsible for the SVN server); 27:1-10).

- Mr. Gorman then asked, "If these schematics are considered low-value, then where is the high-value stuff stored? Sensor designs, etc."  Mr. Zbrozek responded that historically, "high-value has been algorithms and software. The hardware (at all levels) was a second class citizen." *Id.* at Ex. 2.

Based on his discussions with Mr. Zbrozek, Mr. Gorman acknowledged on October 5, 2016 that the materials allegedly downloaded by Mr. Levandowski and that are the basis of Waymo's claims in this case, "aren't the crown jewels." *Id.* at Ex. 3 at 86898.

**D.     Litigation Counsel Influences the Investigation to Find Misconduct by Mr. Levandowski.**

Mr. Gorman ignored  Mr. Vines and Mr. Zbrozek's comments.  He emailed the investigators, Gary Brown, Kristinn Gudjonsson, and others telling them that Mr. Levandowski syncing his computer to the SVN server to download the entire repository a week before reformatting his computer was "fishy."  *Id.*  Mr. Brown and Mr. Gudjonsson had no personal knowledge of the SVN server.  Mr. Gorman repeated this theory again in the same communication, this time adding that he found it unusual that Mr. Levandowski would reformat to install a Linux operating system when he had another laptop running Linux.  *See id.*  "That's pretty suspicious, right?", he concluded.  *Id.*

When asked for the source supporting his conclusions, Mr. Gorman provided Mr. Brown the SVN log created by Mr. Zbrozek.  *Id.*  Mr. Brown testified that he then worked to "confirm" Mr. Gorman's conclusions, but he admittedly disregarded information that was "not explicitly relevant for what [they] were **trying to prove**" such as the limited data preserved related to Mr. Levandowski's SVN activities.  *Id.* at Ex. 26 Brown PI Tr. at 36:9-24; Ex. 27 Brown 30(b)(6) Tr. 229:3-231:8 (emphasis added).  Similarly, Mr. Gudjonsson, concluded that Mr. Levandowski "hadn't visited the SVN site before, and this [the December 11 activity] was the first sync as you [Tom Gorman] suggested from looking at the SVN log."  *Id.* at Ex. 3.  To reach this conclusion, Mr. Gudjonsson did not take into account the limited data available for SVN activity, and either did not investigate or ignored that Mr. Levandowski had been given two SVN passwords by Mr. Zbrozek in March 2015.  *See id.*; *see also id.* at Ex. 25 Zbrozek 9/6/17 Tr. 287:23-289:18. .

**E.     Waymo's Investigators Pursue Incorrect Theories of Mr. Levandowski's Misconduct.**

With the seed of misconduct planted by Mr. Gorman, the investigators continued their investigation, hoping to find some misconduct by Mr. Levandowski.  Indeed, in emailing with Waymo's counsel regarding discrepancies and inconsistencies regarding log data about the internal searches conducted by Mr. Levandowski, Mr. Brown stated that "flakiness and errors in this kind of log diving is very common . . . I always operate under the assumption that if I had

DEFENDANTS' OPPOSITION TO WAYMO'S MOTION
FOR PARTIAL SUMMARY JUDGMENT                                           Case No. 3:17-CV-00939-WHA

ACTIVE/92539348.4

1  results, they were authoritative, but clearly that's not the case." *Id*. at Ex. 17.  In addition, Mr.

2  Gudjonsson testified that on two separate occasions he had developed theories that Mr.

3  Levandowski suspiciously reformatted one of his laptops the day before he left the company and

4  that he had arranged for someone to swap the hard drives out of one of his laptops *after* of his

5  departure date.  *Id*. at Ex. 23, Gudjonsson 9/8, Tr.460:12-461:6; *see also id*. at Ex. 18 at 84575 ("a

6  mixture of failures in our inventory system/key escrow system and bad configuration of the host

7  (using desktop role) that lead to these discrepancies and not a disk swapping").  Both of these

8  unreasonable theories were ultimately proven wrong.  *Id., see also* 460:12-461:6.

9  Additionally, Google investigators failed to review log information from Mr.

10  Levandowski's G Laptop or his work station computer or log information relating to prior

11  downloading activity by Mr. Levandowski that may have provided  exculpating theories for Mr.

12  Levandowski's December 11, 2015 alleged downloading.  *See also id*. at Ex. 22, Gudjonsson Vol.

13  I 198:22-199:5; *id*. at Ex. 27, Brown 30(b)(6) Tr. 58:3-16; 247:19-4; 98:3-101:19.

14
15  **F.    Waymo Engages in Litigation Misconduct to Obfuscate Disagreement with Its Theories.**

16  **1.    Waymo Hid the Identities of Key Witnesses from Discovery.**

17  On February 22, 2017, counsel for Google emailed Mr. Zbrozek asking for information

18  regarding the number and size of the files Mr. Levandowski allegedly downloaded to be used as

19  part of the Complaint.  *Id*. at Ex. 4 at 86940.  In response, in an email including attorneys from

20  Quinn Emanuel, Waymo's current litigation counsel, Mr. Zbrozek expressed his concerns

21  regarding Waymo's theories:

22
23  "I'm a little leery because both of those numbers aren't really meaningful in any narrative. It also has a chilling effect on being a hardware engineer – we do full checkouts and it makes me uncomfortable to think that lawyers are trying to ascribe suspicion to it."

24
25  *Id.*  That same day, he sent counsel the SVN instructions that direct a user to download the entire

26  repository.  *Id.* Despite this communication and Mr. Zbrozek's prior communications about the

27  low-value of the SVN materials and the regular practice of downloading the repository, Waymo

28  filed its complaint the following day alleging that Defendants misappropriated its trade secrets

1   based on Mr. Levandowski's alleged downloading of 14,000 files from the SVN server, the very

2   documents that Mr. Zbrozek had said were "low-value" and that Mr. Gorman had concluded were

3   "not the crown jewels."  *See* Dkt. 1.   At his deposition after the February 22 communication was

4   produced, Mr. Zbrozek confirmed his concerns that "one action in isolation being in and of itself a

5   marker of suspicion" and that the attorneys he was working with were "not that interested in [his]

6   opinions; they were just interested in information."  *Id.*at Ex. 25, Zbrozek 9/6 Tr. 239:17-25;

7   261:3-18.

8       In order to file its complaint, Waymo had to mischaracterized the downloading and

9   the14,000 files at issue as trade secrets, even calling them the "crown jewels." *See* Ex. 1, 8/16/17

10   Hr'g at 71:1-12.  Waymo's media-driven in-court statements are directly contrary to Mr.

11   Zbrozek's statements and Mr. Gorman's conclusions during the investigation.

12       In moving for a preliminary injunction, despite asking Mr. Zbrozek whether he could

13   provide testimony if necessary (Vu Decl. at Ex. 4), Waymo did not submit a declaration from Mr.

14   Zbrozek.  Instead, Waymo submitted declarations from Gary Brown and Michael Janosko—both

15   of whom lacked knowledge of how the SVN worked  and its security systems.  *Id*. at Ex. 27,

16   Brown 30(b)(6) Tr. at 48:9-49:19; Ex. 24, Janosko 8/25/17 Tr. 60:19-23.

17       In his first deposition, Mr. Brown demonstrated that he had little knowledge of the SVN

18   server's contents and was instead provided logs by Mr. Gorman to analyze and to corroborate Mr.

19   Gorman's conclusions.  *Id*. at Ex. 27, Brown 30(b)(6) Tr. at 48:9-49:19; 229:3-231:8; Ex. 26,

20   Brown PI Tr. at 36:9-24.

21       Mr. Janosko's declaration attests to the advanced Google security infrastructure in an effort

22   to convince the Court that Waymo had protected its trade secrets, when in fact, the SVN server is

23   outside Google's security network.  *See Ex. 19*, Janosko Dec. at ¶ 25.

24   Q.  Sure.  So your declaration here has several pages where you talk about this
25   multilayered Google infrastructure, but then you also say that Subversion is
     not on this network?
     A.  Correct.
26   Q.  Are you aware of at any point Subversion being on the Google network
27   such that it would be protected in the - by the tools that are described in the
     first - pages 2 to 5 of your declaration?
28   A.  I am not aware of any time when it was internal.

DEFENDANTS' OPPOSITION TO WAYMO'S MOTION
FOR PARTIAL SUMMARY JUDGMENT                                    Case No. 3:17-CV-00939-WHA

1  *Id.* at Ex. 24, Janosko 8/25/17 Tr. 28:1-10.  The significance of the SVN server being outside

2  Google's infrastructure is underscored by the fact that Defendants' forensic expert, Erik Laykin,

3  was able to find on a third party website, user name and passwords for several Waymo engineers

4  and was able to reach the login screen to access the SVN server through a web browser.  *See id.* at

5  Ex. 28. He encountered no obstacles and was presented with a screen that would allow him to

6  enter the username and passwords he found on the internet.  *See id.*  To be clear, Mr. Laykin did

7  not test any of the passwords he had found or attempt to access the SVN server.  However, there

8  were no security protections in place preventing him from doing so.

9  When asked about the security systems that specifically applied to the SVN server, Mr.

10  Janosko had limited knowledge and testified that he had never accessed the SVN and what he

11  knew about it was provided by Mr. Zbrozek.  *See id.* at 20:2-5; 60:19-23 ("Q.   Sure.  Basically

12  what I'm trying to get out is the information that you provided here in paragraph 24, that was

13  entirely provided to you by Sasha Zbrozek, is that correct? A.   Yes.").

14  Waymo also failed to identify Mr. Zbrozek in its initial disclosures, first served on April 3,

15  2017, and amended twice by June 22, 2017.  *Id.* at Exs. 5-7.  Waymo also did not disclose Nick

16  Vines who had explained to Waymo's counsel how downloading the entire SVN folder was

17  normal operation.  *See id.*  Nor did Waymo disclose Tom Gorman who was heavily involved in

18  the investigation.  *See id.*  Waymo also did not include Mr. Zbrozek, Mr. Vines, or Mr. Gorman as

19  custodians and did not collect or produce their documents.  *Id.* at ¶30.

20  ### 2.   Waymo Selectively Waives Privilege to Withhold Damaging
21  Communications that Undermine its Conclusions and Violates The Court's Orders.

22  Waymo also used the attorney-client privilege as a sword and shield to disclose self-

23  serving aspects of its forensic investigation, while hiding damaging communications, like those

24  with Mr. Zbrozek and Mr. Gorman, from discovery.  *See* Dkt. 1272.  Defendants did not receive

25  unredacted versions of many critical documents regarding Waymo's investigation until September

26  2, 2017 (*i.e.* Vu Decl. Exhibits 2-4), after the fact discovery and motion to compel cut-off, after

27  key depositions had been taken, and after several rounds of motion practice.  *Id.* at ¶ 40.  After

28  Judge Corley found Waymo had waived this privilege on August 18, 2017, Otto Trucking has had

1  to request the Court's assistance in forcing Waymo to comply with the Court's order four

2  additional times, the most recent on September 6, when Waymo improperly continued to shield

3  communications that were part of its privilege waiver.  Dkt. 1479.

4         After the Court's August 18 waiver order, Waymo produced additional documents that

5  were subject to the waiver on August 24 at 8:54 p.m., about three hours before the close of fact

6  discovery.  Vu Decl. at ¶ 32.  Waymo continued to withhold information subject to the waiver

7  through redactions, which  forced Otto Trucking to address the issue at an August 28 hearing

8  before Judge Corley.  On August 30, Otto Trucking again appeared before Judge Corley to address

9  Waymo's privilege logs, which included documents that were subject to the waiver.  Judge Corley

10 ordered the parties to return the next day for an in camera review of the redacted documents.  *Id*. at

11 ¶ 36; Dkt. 1412.  At that hearing on August 31, Judge Corley reviewed the redactions on the

12 documents that were produced post-waiver, as well as the privilege logs, and ordered additional

13 documents produced.  Vu Decl. at ¶ 37. On September 1, 2017, however, *the day after Judge*

14 *Corley reviewed Waymo's privilege* logs, Waymo produced an extensive and additional privilege

15 log referencing more than 1,300 documents, some of which related to the forensic investigation.

16 *Id*. at 38.  On September 8, 2017, Otto Trucking sought a meet and confer and potentially court

17 intervention regarding Waymo's September 1 privilege log, but Waymo produced additional

18 documents that same day.  *Id*. at ¶ 42

19        In short, every time that Otto Trucking has asked the Court to intervene and order the

20 production of more documents subject to the waiver order, the Court has ordered more documents

21 produced.  Notably, each time Waymo has made another production, the documents have revealed

22 more important information that has weakened its claims against Defendants.  *Id*. at ¶ 43.  Waymo

23 has not voluntarily complied with the Court's orders, producing documents only when repeatedly

24 compelled by the Court.  The disputes and Waymo's stone walling continue.  Since discovery

25 closed, Waymo has produced over 1,600 additional documents, some of which relate to Waymo's

26 investigation and other discovery issues the parties have been discussing.  Vu Decl. at ¶ 44.

27

28

### III.   ARGUMENT

Otto Trucking and Uber deny that Waymo has established any claim against them.  Indeed, as set out in Otto Trucking's motion for summary judgment, Waymo has *no evidence* that Otto Trucking has ever used any of the alleged trade secrets or any of the accused Uber systems that allegedly make use of Waymo's alleged trade secrets.  Dkt 1597.  Uber has moved for summary judgment on two of Waymo's trade secrets as well as Waymo's sole remaining patent claim and denies that Waymo has established any other claim against Uber.  Dkt 1423, 1514, 1518.  However, to the extent that Waymo is able to prove any of its claims, any relief obtained is barred by Defendants' affirmative defenses (including those not challenged by Waymo).  There is evidence sufficient to create a dispute of material fact as to each element of Defendants' unclean hands and mitigation of damages defenses.  Thus, the Court should deny Waymo's motion for summary judgment as to these defenses.

### A.   The Court Should Deny Waymo's Motion for Summary Judgment as to Unclean Hands Based on Its Litigation Misconduct

"He who comes into equity must come with clean hands. . . .Under this doctrine, plaintiffs seeking equitable relief must have acted fairly and without fraud or deceit as to the controversy at issue."  *Intamin, Ltd v. Magentar Tech., Corp.*, 623 F. Supp. 2d 1055, 1074 (C.D. Cal. 2009) aff'd, 404 F. App'x 496 (Fed. Cir. 2010) (internal citations and quotations omitted); *see also id.* at 1076-77 (holding that the Ninth Circuit allows a litigant to bring an affirmative defense at the summary judgment stage whether or not it was specifically pled as an affirmative defense, and explaining that a plaintiff "is not prejudiced by [the defendant] bringing to the Court's attention [the plaintiff's] own misconduct").  As shown above, there is more than enough evidence establishing an unclean hands defense and Waymo's motion for summary judgment should therefore be denied.[1]

---

[1] To the extent that Waymo may claim that Otto Trucking's arguments in this motion regarding unclean hands is different from what it provided in its opposition to Waymo's precis, such argument would be disingenuous.  Otto Trucking filed its opposition before noon on August 24, 2017, the day Waymo produced previously withheld communications with its investigators buried in the over 7,200 other documents it produced on the last day of discovery.  Waymo has since produced more than 1,600 additional documents, as recent as September 8, 2017.  Otto Trucking

The doctrine of unclean hands can be and has been used to deny plaintiffs relief where they have engaged in litigation misconduct such as misrepresenting facts and hiding evidence of their misrepresentations in discovery. *See Merck*, 2016 WL 3143943 at * 29. Recently, a court in the Northern District of California denied plaintiff a $200 million judgment in a patent infringement action where plaintiff misled defendant and the court. *Id*. In *Merck & Co*, Merck sued Gilead for patent infringement based on information Merck improperly obtained by allowing one of its patent prosecutors, Dr. Durrette, to sit in on a call where Gilead's affiliate revealed its confidential information about its developments as part of a discussion to collaborate with Merck. *See id*. at *8-10. Mr. Durette's participation in the call was in violation of an agreement with Gilead that only allowed a "firewalled" individual—someone not involved in the development of any related products or prosecuting claims—could assess the merits of the potential collaboration. *See id*. Mr. Durette not only was an attorney prosecuting patents, he was at the time of the call in the process of applying for approval of the patent that Merck later claims Gilead infringed. *See id*. at *9.

To obfuscate that he had obtained the basis for claims against Gilead, Dr. Durette waited to file claims against Gilead before the PTO until Gilead released its product. *See id*. at 11. In the litigation, Merck made Mr. Durette's prosecution of claims against Gilead's product central to its patent infringement claim. *See id*. at *32. With Merck's approval, Mr. Durette then proceeded to provide false testimony that he did not participate in the collaboration call and only recanted when discovery revealed that he had participated in that call. *See id*. 31-32.

The court found such conduct reprehensible and that Merck and Dr. Durette had misled the court and Gilead. *See id*. at *29. The Court further held that Dr. Durette's misrepresentations related directly to Merck's patent validity arguments. *Id*. at *32. The court held, "It is overwhelmingly clear to the Court that Dr. Durette sought at every turn to create the false impression that Merck's conduct was above board." *Id*. at *31. In reversing the $200 million

did not have knowledge of Waymo's litigation misconduct on the day that it filed its response. Vu Decl. at ¶ 32.

DEFENDANTS' OPPOSITION TO WAYMO'S MOTION
FOR PARTIAL SUMMARY JUDGMENT                                    Case No. 3:17-CV-00939-WHA

1    judgment in favor of Merck for Gilead's infringement, the Court held that by making Dr. Durette

2    the "centerpiece of its case . . .Merck's litigation misconduct infects the entire lawsuit." *Id*. at *32.

3        Other courts have barred plaintiffs' relief where they withheld the documents from

4    discovery that revealed plaintiffs' misrepresentations.  In *McCormick v. Cohn*, affirmed by the

5    Ninth Circuit, the district court denied plaintiffs relief because they had misrepresented that they

6    were 100% owners of a copyright and engaged in discovery abuse by "violating a court order

7    requiring the plaintiffs to produce documents which would have had an impact on the defense of

8    the copyright claims."  *Id*., No. CV 90-0323 H, 1992 WL 687291, at * 4–5 (S.D. Cal. July 31,

9    1992), aff'd, 17 F.3d 395 (9th Cir. 1994).  Similarly, in *Intamin, Ltd v. Magnetar Techs. Corp*.,

10   affirmed by the Federal Circuit, the district court granted summary judgment to defendant where

11   plaintiff had forged an assignment supporting its rights to a patent and did not disclose the

12   existence of this assignment during the course of discovery.  623 F. Supp. 2d at 1055, 1059-60.

13       Like the plaintiffs in the above cases, Waymo has engaged in misconduct in this litigation

14   that directly relates to issues central to its claims—in particular, that the 14,000 SVN files contain

15   trade secrets and that their alleged downloading by Mr. Levandowski was unlawful.  Like Merck,

16   Waymo has "sought at every turn to create the false impression" that its forensic investigation

17   proved that Mr. Levandowski had stolen valuable trade secrets from Waymo by downloading

18   14,000 files—the entire repository—from Waymo's SVN server.  But discovery has revealed

19   otherwise.

20       •  Waymo's own counsel acknowledged that the SVN files "aren't the crown jewels"

21          after being told by Mr. Zbrozek that they were "low-value" and "second-class."

22       •  Mr. Zbrozek also informed Waymo counsel that the SVN files were not treated by

23          Google as highly sensitive materials as Google hosted them on the SVN server outside

24          of Google's security infrastructure.

25       •  Mr. Zbrozek told Waymo's counsel multiple times that downloading the entire SVN

26          repository did not concern him and that it was regular practice for engineers on

27          Chauffeur to do so.

28

- Mr. Brown, one of the investigators, alerted counsel to discrepancies in the log files on which they were basing their conclusions and told them that "log diving" often led to "flakiness and errors."

- The day before Waymo filed its lawsuit, Mr. Zbrozek told Waymo's attorneys, including attorneys from Quinn Emanual, that he was "uncomfortable to think that lawyers were trying to ascribe suspicion to [downloading the full SVN repository]."

Waymo ignored the information provided by knowledgeable witnesses, and filed its misappropriation claim based on the downloading of the 14,000 files the following day. Indeed, Mr. Zbrozek testified that he felt that the Waymo attorneys ignored his opinions. In the litigation, Waymo emphasized the value of the 14,000 documents and how anomalous Mr. Levandowski's downloading of files was, securing a preliminary injunction on these misrepresentations. It provided irrelevant testimony from a security engineer about the advanced protections of Google's security infrastructure—which do not apply to the SVN server. The only purpose of providing four pages of irrelevant facts was to create the false impression that Waymo's SVN server was being protected by the Google infrastructure. Waymo's presentation of its case contrary to facts provided to it is sufficient evidence of litigation misconduct to support Otto Trucking's unclean hands defense and warrant denial of Waymo's motion for summary judgment.

In addition, like the plaintiffs in *Intamin* and *McCormick*, Waymo sought to hide the evidence of its misrepresentations. Waymo hid Mr. Zbrozek's identity from disclosure, finding instead witnesses to attest to aspects of the SVN server of which they have no personal knowledge other than what was provided by Mr. Zbrozek. Waymo also failed to disclose Nick Vines and Tom Gorman. Waymo withheld from production the damaging communications with Mr. Zbrozek, while selectively producing privileged materials that advanced its false narrative. Only after being compelled to produce its privileged materials regarding the investigation did the damaging documents come to light. Even then Waymo violated the Court's order to produce all documents relating to its investigation as Otto Trucking had to seek Judge Corley's assistance four additional times, which resulted in the further production of documents or testimony from Waymo, up to and including a production of two additional documents on September 8.

Finally, the Court should consider that Waymo's attorneys had advanced the false impression of the value of 14,000 files and the suspiciousness of their downloading by Mr. Levandowski.  In *Merck*, the court found Dr. Durrette's conduct especially egregious because he was an attorney with a duty of candor to the court.  *See Merck*, 2016 WL 3143943 at *32.  Here, Waymo's outside litigators influenced the investigation by providing conclusions for the investigators to corroborate.  Its counsel represented to the Court that the downloaded files were the "crown jewels" of self-driving technology—the exact opposite of what Mr. Gorman concluded in internal communications.  Waymo's counsel has directed the litigation misconduct in this case.

Defendants have adduced more than enough evidence demonstrating Waymo's litigation misconduct.  The Court should deny Waymo's motion as it relates to the unclean hands defense.

**B.    The Court Should Deny Waymo's Motion With Respect to Failure to Mitigate Damages.**

As Waymo stated in its precis (Dkt. 1592), failure to mitigate damages in the  trade secrets context refers to, *inter alia*, a plaintiff's duty to seek a preliminary injunction rather than letting damages accrue unchecked.  *See* Vu Decl. Ex. 22 HANDBOOK OF INTELL. PROP. CLAIMS & REMEDIES § 5.03 (2017 Supp.).  Notably, Waymo has dropped this citation from its motion for summary judgment and has not cited to any cases or authority relating to mitigation of damages.  This is because Waymo has failed to meet its duty to mitigate by delaying in seeking injunctive relief as to Otto Trucking.

Waymo's contention that it delayed a mere nine weeks after it inadvertently received a communication allegedly showing that Uber was using Waymo's alleged trade secrets is irrelevant to Otto Trucking and inaccurate as to Uber.  As Waymo admits in its opposition to Otto Trucking's precis requesting leave to file summary judgment, Waymo has no evidence that Otto Trucking is involved in the development of LiDAR or that it has used the purported trade secrets.  Dkt. 1499 and1502.  Thus, Waymo did not gain any information that would add to its claim against Otto Trucking.  As to Uber, as discussed supra, Waymo deliberately did not inform Uber about its trade secret concerns in August 2016 when Uber acquired Otto, and Waymo's Offer of

1    Proof confirms that Waymo stakes its case on the 14,000 files, which Waymo also knew about

2    months earlier yet continued to withhold its concerns from Uber.

3            Instead, as of at least October 5, 2016, Waymo was aware of its allegations that Mr.

4    Levandowski had downloaded the entire SVN server.  Vu Decl. at Ex.2.  But Waymo did not

5    notify Uber, Mr. Levandowski's new employer, of its concerns. Nor did it file a claim for

6    misappropriation of trade secrets against Mr. Levandowski at that time—or ever as Waymo has

7    repeatedly stated that it is not seeking misappropriation of trade secrets as to Mr. Levandowski in

8    the arbitration.  *See* Dkt. 204 at 1-2. 7-8, 13, 22.  Rather, Waymo waited until February 23, 2017

9    to initiate this action and March 11 to seek a preliminary injunction. Dkt. 1.  This delay of *six*

10   *months* was not reasonable and creates a triable issue of fact regarding Waymo's compliance with

11   the duty to mitigate damages.   *See Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1568–69

12   (1996) (denying some damages where plaintiff did not call defendants about an alleged hacking

13   and delayed five months in bringing a lawsuit).

14           The record further shows that Wamo did not care about Mr. Levandowski or his

15   companies.  It accelerated its investigation into the alleged compromise of its trade secrets after it

16   learned about Uber's acquisition of Ottomotto.  Waymo made the strategic choice to delay in

17   suing Otto Trucking until it could cobble together a way to sue Uber.  *See Thrifty-Tel*, 46 Cal.

18   App. 4th at 1568–69.  The Court should deny Waymo's motion as to Otto Trucking.

19           With respect to Uber, the timeline Waymo presented to the Court does not square with

20   reality.  Waymo claims it filed suit weeks after inadvertently receiving a vendor email meant for

21   Uber.  What Waymo fails to mention is that months prior to receiving the vendor email it began

22   investigating a compromise of its alleged trade secrets.  By the end of July and early August 2016,

23   the investigation involved outside counsel from Keker.  Vu Decl. at 9, Ex. 12.  Waymo accelerated

24   its investigation after learning about Uber's imminent  acquisition of Ottomotto.  *Id.* at Ex. 14.  On

25   August 23, 2016, internal discussions at Waymo revealed that ▮Waymo was considering reaching

26   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ("▮▮▮▮▮

27   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").  Top Google

28   lawyer David Drummond was involved in these discussions the same day he submitted his Uber

board resignation to Travis Kalanick.  Vu Decl. at Ex. 15; Ex. 29.  These discussions, and others

only produced after Otto Trucking moved to compel selectively withheld documents regarding

Waymo's investigation of Mr. Levandowski, create a dispute of fact as to whether Waymo only

waited weeks to seek injunctive relief as to Uber.

Major inconsistencies have emerged in Waymo's timeline.  These inconsistencies create an

issue of fact as to Waymo's motive in filing this lawsuit, which Judge Grewal concluded is

relevant to a failure to mitigate defense.  *See GSI Tech., Inc. v. United Memories, Inc.*, No. 5:13-

CV-01081-PSG, 2015 WL 12942201, at *2, 6 (N.D. Cal. Oct. 14, 2015) (denying motion in limine

to exclude evidence of motive for filing suit because such evidence is relevant to, *inter alia*,

affirmative defense of failure to mitigate damages).

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Waymo's

motion as to the unclean hands and failure to mitigate affirmative defenses.


Dated:   September 12, 2017              Respectfully submitted,

                                        By:   */s/Neel Chatterjee*
                                              Neel Chatterjee
                                              *nchatterjee@goodwinlaw.com*
                                              Brett Schuman
                                              *bschuman@goodwinlaw.com*
                                              Shane Brun
                                              *sbrun@goodwinlaw.com*
                                              Rachel M. Walsh
                                              *rwalsh@goodwinlaw.com*
                                              Hong-An Vu
                                              *hvu@goodwinlaw.com*
                                              Hayes P. Hyde
                                              *hhyde@goodwinlaw.com*
                                              James Lin
                                              *jlin@goodwinlaw.com*
                                              **GOODWIN PROCTER LLP**

                                        *Attorneys for Defendant: Otto Trucking LLC*


Dated:   September 12, 2017              Respectfully submitted,

                                        By:   */s/Bill Carmody*
                                              MICHAEL A. JACOBS (SBN 111664)
                                              *MJacobs@mofo.com*

ACTIVE/92539348.4

DEFENDANTS' OPPOSITION TO WAYMO'S MOTION
FOR PARTIAL SUMMARY JUDGMENT                          Case No. 3:17-CV-00939-WHA

ARTURO J. GONZÁLEZ (SBN 121490)
*AGonzalez@mofo.com*
**MORRISON FOERSTER**
425 Market Street
San Francisco, California  94105-2482
Telephone:  415.268.7000
Facsimile:  415.268.7522

KAREN L. DUNN (Pro Hac Vice)
*kdunn@bsfllp.com*
HAMISH P.M. HUME (Pro Hac Vice)
*hhume@bsfllp.com*
**BOIES SCHILLER FLEXNER LLP**
1401 New York Avenue, N.W.
Washington DC 20005
Telephone:  202.237.2727
Facsimile:   202.237.6131

WILLIAM CARMODY (Pro Hac Vice)
*bcarmody@susmangodfrey.com*
SHAWN RABIN (Pro Hac Vice)
*srabin@SusmanGodfrey.com*
**SUSMAN GODFREY LLP**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Telephone: 212.336.8330

*Attorneys for Defendant: Uber Technologies, Inc. and Ottomotto LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing  document including all of its attachments with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on **September 12, 2017**.  I further certify that all participants in the case are registered CM/ECF users and that service of the publicly filed documents will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on **September 12, 2017**.

/s/*Neel Chatterjee*
NEEL CHATTERJEE

DEFENDANTS' OPPOSITION TO WAYMO'S MOTION
FOR PARTIAL SUMMARY JUDGMENT                     Case No. 3:17-CV-00939-WHA