QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:      (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>　　　　　Defendants. | CASE NO. 3:17-cv-00939-WHA<br><br>**DECLARATION OF JEFF NARDINELLI**<br><br>**REDACTED VERSION OF DOCUMENT FILED UNDER SEAL** |

I, Jeffrey W. Nardinelli, hereby declare as follows.

1. I am a member of the bar of the State of California and an attorney with Quinn Emanuel Urquhart & Sullivan, LLP, counsel for Plaintiff Waymo LLC ("Waymo").  I make this declaration of personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently as follows.

2. On July 17, 2017, Waymo filed a motion in limine to preclude any argument, testimony, or evidence about Defendants' efforts taken in response to the Court's Preliminary Injunction Order, including to preclude any reference to the questionnaires and witness interviews Defendants did during the litigation.  (Dkt. 913.)

3. On July 26, 2017, the Court heard argument on the motion.  (Dkt. 1050.)  Counsel for Waymo argued that if the Court allowed Uber to offer evidence that it had searched its servers for the 14,000 files during discovery, Waymo should be permitted to explain what Uber *didn't do* during discovery.  (*Id.* at 61-62.)  The Court ruled that Uber may present the three examples of "good citizenship" outlined in Uber's opposition to Waymo's motion (Dkt. 978 at 2):  (i) searching Uber's servers for the downloaded files; (ii) asking Levandowski to return downloaded materials and firing him when he did not; (iii) allowing Waymo and its attorneys to inspect Uber's premises.  (Dkt. 1050 at 72.)  The Court invited Waymo to present two dozen examples of Defendants' discovery misconduct "to balance the picture."  (*Id.* at 70-72.)

4. Waymo submitted its list of 23 items on August 25.  (Dkt. 1356.)  The Court has not yet ruled on Waymo's request to present evidence to "balance the picture" in light of the Court's directive permitting Uber to rely on its post-complaint discovery and other conduct. Waymo renews its request that, if Uber is permitted to rely on post-complaint Uber conduct it believes supports its case, then in fairness Waymo must be permitted to counter that with post-complaint evidence that shows obfuscation and improper withholding of important information.

5. The Court did not ask for a response from Uber or a counter-list of alleged misconduct in response to the Court's requested list from Waymo.  That likely is because the issue before the Court concerned what post-complaint evidence Waymo was permitted to use  to "balance the picture," given Uber's intent to rely on post-complaint conduct before the jury.

Nevertheless, on September 12, Uber unilaterally filed a "response" in which it self-helped itself to making additional arguments on the merits concerning trade secret "value" and accusations of "stonewalling and gamesmanship" in discovery. (Dkt. 1534 at 1:23 to 2:13.)

6. Initially, Uber's counter-allegations concerning discovery and the trade secret merits are irrelevant to Waymo's motion in limine and the requested list of Uber misconduct. Waymo's motion seeks to preclude Uber from claiming "good citizenship" to the jury, or in the alternative to be allowed to counter Uber's evidence with evidence of Uber's misconduct. Waymo has no intention of presenting or relying on evidence of Waymo's conduct during discovery, and so Waymo has not placed its own discovery conduct at issue to open the door for Uber to present counter-evidence on Waymo's conduct. The issue raised was what Waymo is permitted to present to the jury in light of Uber's representation that it will introduce evidence of its server search, firing of Levandowski, and allowance of on-site inspections.

7. In that regard, Waymo notes that on September 13, 2017, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") affirmed this Court's denial of Defendants' motions for relief from Judge Corley's orders compelling Defendants to produce the report of Stroz Friedberg ("Stroz") and related materials and denying Defendants' and Levandowski's motions to quash the Stroz subpoena. Counsel for Defendants, Levandowski and Stroz have informed counsel for Waymo that in light of the Federal Circuit's ruling, they will be producing thousands of additional documents and materials. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

8. Pursuant to this Court's Order (Dkt. 1536), Waymo specifically addresses below each of Defendants' accusations set forth at pages 1:23 to 2:13 of Defendants' response brief filed September 12 (Dkt. 1534) and statement on page 4 of that brief concerning Waymo's privilege log.

9. **"Selective waiver of privilege" (1:24-25.)** In support of its motion for a preliminary injunction, Waymo submitted the declaration of Gary Brown, one of the Security

1  Engineers at Google who worked on the forensic investigation into Anthony Levandowski, Radu
2  Raduta and Sameer Kshirsagar.  That investigation – and all such investigations at Google and
3  Waymo – was conducted at the direction of legal counsel and therefore protected as privileged and
4  work product.  (Dkt. 25-29.)  Waymo, in good faith, made the strategic decision to waive work
5  product with respect to the factual information disclosed by Mr. Brown in his declaration as part
6  of its preliminary injunction motion.  Waymo took the position, however, that it had not waived
7  the attorney-client privilege covering Mr. Brown's direct communications with counsel, or work
8  product associated with  other aspects of the investigation not disclosed in the Brown Declaration,
9  such as the investigation into individuals other than Levandowski, Raduta and Kshirsagar.

10      10.    Defendants were on notice of Waymo's position concerning waiver as early as
11 March 23 when counsel for Waymo served a privilege log identifying numerous communications
12 between Mr. Brown and outside counsel.  Counsel for Waymo and Defendants also discussed the
13 waiver issue the next day (March 24) during Mr. Brown's deposition after counsel for Waymo
14 instructed him not to answer several questions that he deemed outside the scope of the waiver on
15 the basis of attorney-client privilege and work product.  Counsel for Waymo explained their
16 position again on an April 10 meet and confer and subsequent April 10 and April 12 emails.  For
17 example, the April 10 email states:

> Per and consistent with our discussion this morning, I have attached
> notes from Mr. Brown as Uber has requested. The production of the
> notes concerns and is limited to the disclosures in his declaration
> regarding the investigations addressed therein. This production is
> without waiver of and without prejudice to any other work product
> protection/privilege. To the extent his notes reflect any other
> investigation beyond the scope of his declaration, that material has
> been redacted/withheld as work product.  (Ex. 1, April 10 email.)[1]

      11.    Despite being on notice of Waymo's position with respect to its limited waiver as
early as March 23, Defendants did not challenge the scope of Waymo's waiver claim until filing a
motion to compel on August 11.  (Dkt. 1163.)  Waymo opposed the motion, and Judge Corley

---

[1]  Attached hereto as Exhibit 1 is a true and correct copy of an April 10 email between counsel.

granted and denied it in part. (Dkt. 1272). Specifically, in her August 18 Order, Judge Corley ruled that "Otto Trucking has not made any showing as to why communications regarding investigations of other employees have been waived and thus the motion is denied to the extent it seeks such relief." (*Id.*) Judge Corley also held however that "[w]hile the waiver of work product does not *necessarily* waive attorney-client privileged communications, here the waiver of work product over the investigation did waive the attorney-client privilege as to counsel communications with Mr. Brown and anyone else involved in the investigations at issue as in fairness such communications should be disclosed." (*Id.* at 2.) On this basis, Judge Corley ordered Waymo to produce "communications regarding the investigation of the Former Employees [Levandowski, Raduta and Kshirsagar]." (*Id.*)

12. Waymo did not seek relief from Judge Corley's order. Instead, Waymo collected the documents referenced by Judge Corley in her Order and produced them on August 24. On that day, Waymo also produced unredacted versions of previously redacted documents in compliance with Judge Corley's Order.

13. On August 28, Judge Corley conducted a hearing at which several outstanding discovery issues were discussed, including the exact scope of the waiver intended by Judge Corley in her August 18 Order. During the hearing, Judge Corley explained that the waiver only covered communications between counsel and the Waymo forensics team about the investigation of Levandowski, Raduta and Kshirsagar, not communications concerning other aspects of the broader investigation or internal work product that never even involved the forensics team. (Dkt. 1414, August 28 Hr'g Tr. at 6-11.) Counsel for Waymo explained that Judge Corley's description of the scope of the waiver was exactly how Waymo had interpreted the Court's August 18 Order *vis a vis* its collection and production of documents on August 24. (*Id.* at 10-11.)

14. During the August 28 hearing, counsel for Defendants stated that they believed Waymo was still withholding and/or redacting certain documents falling within the scope of the waiver as articulated by Judge Corley. In response, Judge Corley generously offered to review the disputed documents *in camera*, rather than waste time on motion practice, if the parties were not able to resolve the remaining issues during subsequent meet and confers. (*Id.* at 16 ("And what

we could do, because I know we're on a tight timeline here, is rather than briefing, we could just set a hearing and you can bring the documents here and we can sit here and talk about them and do it in realtime that way.").)

15. Over the next two days, counsel for the parties conducted several meet and confers with the Special Master but could not resolve the outstanding issues. On August 30, Judge Corley held a short teleconference and ordered Waymo to bring the documents to Court the next day for an *in camera* inspection.

16. On August 31, counsel for Waymo brought the documents in question to Court, and Judge Corley and counsel for the parties meticulously reviewed every disputed document and redaction to determine what fell within or outside the scope of the waiver. Judge Corley ruled on every document, and for those that needed to be produced or unredacted ordered Waymo to do so by Saturday, September 2. Further, during the August 31 hearing, the Court repeatedly made clear that Waymo's position was reasonable: "I'm not faulting you, at all." (Dkt. 1441, August 31 Hr'g Tr. at 40:16-17.) The Court stated that "I don't fault you at all for the line that we're drawing," recognizing that "it's just very hard to do" and that Waymo was not "trying to hide super-material information." (*Id.* at 9:10-16, 71:13-14.)

17. Pursuant to Judge Corley's order at the August 31 hearing, Waymo produced the documents in question on September 2. In addition, Waymo made three witnesses from the forensics team (Gary Brown, Kristin Gudjonsson and Sasha Zbrozek) available for a second round of depositions on September 6 and 8.

18. None of the conduct described above constitutes "stonewalling" or "gamesmanship" on the part of Waymo or its counsel, as stated in Uber's September 12 response brief. (Dkt. 1534.) Waymo disclosed its understanding of the scope of the waiver as early as March 2017. Ultimately, Judge Corley ruled that the waiver encompassed not only work product but also attorney-client privileged communications between counsel and the Waymo forensics team concerning the forensic investigation of Levandowski, Raduta and Kshirsagar. Following the Court's order on August 18 and rulings at the August 28 and 31 hearings, Waymo completely and timely complied. As noted by Judge Corley at the August 28 hearing, the only reason for any

-6-  Case No. 3:17-cv-00939-WHA
DECLARATION OF JEFF NARDINELLI

1  delay concerning the scope of the waiver was because Defendants waited until August 11 to bring
2  their motion.  (Dkt. 1414, August 28 Hr'g Tr. at 13-14 ("the reason we are [at the close of
3  discovery] is because you [counsel for Otto Trucking] didn't bring this motion to my attention
4  until later, so that I don't want to hear.").)  On this record, Defendants should not be heard to
5  accuse Waymo or its counsel of "stonewalling" or gamesmanship."

6          19.     **"Did not reach his conclusion independently."  (1:26-2:1.)**  Uber's charge that
7  Waymo forensics investigator Gary Brown "did not reach his conclusion independently," but
8  rather "concluded that Mr. Levandowski did not improperly download any files" and then changed
9  his mind after being so instructed by litigation counsel, is entirely false.  The only purported
10 support that Defendants cite for this proposition is their own brief, namely Otto Trucking's August
11 11 motion to compel referenced above.  In that brief (Dkt. 1161-3 at 2), Otto Trucking argues that
12 "in March 2016, Mr. Brown performed a forensic review of log data associated with Mr.
13 Levandowski" and that "[a]t that time, Mr. Brown did not discover that Mr. Levandowski
14 improperly downloaded any files."  As Defendants have known since they took his deposition six
15 months ago, Mr. Brown did not review any log data in March 2016, and thus could not possibly
16 have concluded that there had been no download.  (Ex. 2, Brown PI Dep. at 22:15-19 ["Q
17 Approximately how many hours did you spend in March of 2016 working on this event pertaining
18 to Mr. Levandowski.  A Zero hours."].)[2]  In fact, Mr. Brown did not learn of Levandowski's
19 download until October 2016, when attorney Tom Gorman emailed Mr. Brown and others
20 explaining what he had recently learned from Sasha Zbrozek (the Google engineer who provided
21 the log data from the SVN server showing Levandowski's download) and asking for additional
22 help investigating:

> The goal, ultimately, is to figure out why he was doing whatever he was doing in December 2015 and January 2016.
>
> Specifically, we recently learned that on 12/11/2015, anthonyl used a Windows machine (@ 216.239.45.222) to sync all of Chauffeur's

---

[2] Attached hereto as Exhibit 2 is a true and correct copy of excerpts of Gary Brown's deposition, dated March 24, 2017.

>schematics for electronics and printed-circuit boards from a Chauffeur system. We don't have a host name for that machine, but If I'm understanding your emails, the only Windows machine assigned to Anthony on 12/11 was anthonyl0-w. Ten days later, Anthony wiped that machine and reformatted with the Goobuntu OS, which doesn't make a ton of sense because Anthony already had a Goobuntu workstation and a Goobuntu laptop. He never used anthonyl0-w again. And then the day before he quit, he wiped his other Goobuntu laptop.
>
>That's pretty suspicious, right?

(Dkt. 1433-13, at 5.)

20. Contrary to Defendants' suggestion, Mr. Brown did not follow any "instruction" from Mr. Gorman other than to take up Mr. Gorman's invitation to help figure out what Levandowski had been doing. Specifically, Mr. Brown asked Mr. Gorman – not the other way around – for additional information concerning Levandowski's download, such as how Mr. Gorman had learned of the download and the IP address that Levandowski used and the domain address of the SVN server. (*Id.*) After Mr. Gorman provided that information, Mr. Brown independently conducted additional research, and determined (using multiple, corroborating data sources) that a computer registered to Levandowski accessed the SVN from a WiFi connection inside a Waymo building on December 11, just minutes after downloading TortoiseSVN software. (*Id.*) Mr. Brown gathered this information independently, and at no prior point had he ever reached a contrary conclusion.

21. **"Waymo withheld information…" (2:1-4.)** I understand this passage to be a reiteration of Uber's prior charges concerning Waymo's waiver of privilege, which I have addressed above. For example, the scope of the investigation, communications with attorneys, and keywords provided by attorneys relating to the search were all subject to good-faith privilege claims and have since been produced. By "information the employee was told to ignore" I gather Uber is repeating its false charge that Gary Brown analyzed data in March but was told to ignore that analysis.

22. **"Only after it was compelled to do so…" (2:4-10.)** I understand this passage to again rehash Uber's charge concerning Waymo's waiver of privilege, but the passage also contains two substantive allegations that I now address.

23. *"Emails that confirm that the 14,000 files are not valuable trade secrets."* Uber points to an email from Sasha Zbrozek that refers to the content of the SVN as "low-value." Waymo did not "withhold" this email, but timely produced it on August 24 after Otto Trucking moved to compel privileged documents, and after the Court ordered its production, along with other documents that were the subject of the Court's order. Further, one person's out-of-context email excerpt does not itself "confirm" that all of Waymo's documents and testimony proving that the 14,000 files contain valuable trade secrets are false. Mr. Zbrozek has confirmed at deposition that he meant only to say that the 14,000 files are considered less critical to Google than Google's top-security items, such as personal user data and the source code behind Google's search algorithm:

> Q. And then you say "it's pretty low value." Do you see that?
>
> A. I do see that.
>
> Q. And that was true, wasn't it?
>
> THE WITNESS: What do you mean?
>
> Q. Do you want me to define "true"?
>
> A. No. I am asking you to define "low value."
>
> Q. Those are your words.
>
> A. So I will say that this is a very relative thing. And Google data policies were designed with code and user data in mind and were perhaps not the greatest fit for the kind of data that we wanted to store and that relative to instantly Google ending data breaches, that the data that was in the Subversion server would be considered of lesser value. But by how much, I don't know; and in absolute terms, I have no idea. (Ex. 3, Zbrozek deposition at 208:18-209:11.)[3]

24. *"Downloads of this nature are not so exceptional."* Uber again points to Mr. Zbrozek's email, which states that Mr. Levandowski's download "[d]oesn't ring the alarm bells for me," as confirmation that Levandowski's download was unexceptional. The email itself contradicts Uber's reading: it states that for Levandowski, such a download "clearly wasn't part

---

[3] Attached hereto as Exhibit 3 is a true and correct copy of excerpts of Sasha Zbrozek's deposition, dated September 6, 2017.

of his routine." And again, Mr. Zbrozek clarified that his "alarm bells" statement took no account of the context of Levandowski's actions, but meant only to say that a single bulk download, absent any other factors, is not suspicious:

> Q. And it didn't ring the alarm bells for you, did it?
>
> A. I will say that, on its own, as a single action in absence of context, pulling the Subversion repository is not suspicious, but that as part of a larger narrative, you know, suspicion may or may not come into play, right. You know, if the logs -- if the logs showed, you know, someone pulling information and putting that information somewhere else and then leaving the company, maybe that's suspicious. Maybe just looking at the log files on their own isn't enough to tell that story. (Ex. 3, Zbrozek Dep. at 230:5-16.)

25. In a separate email thread, Mr. Zbrozek stated that it "makes me uncomfortable to think that lawyers are trying to ascribe suspicion" to Levandowski's bulk download. Again, Mr. Zbrozek clarified at his deposition that he lacked the context surrounding the download, and was concerned only "about setting a precedent for that one action in isolation being in and of itself a marker of suspicion." (Ex. 3, Zbrozek Dep. at 238:12-239:25.)

26. Further, Levandowski's SVN log showed that only once between September 2015 and January 2016 did Levandowski access the SVN, and there is ample testimony in this case that Levandowski did not know how to use Altium, which is the software required to work with files stored on the SVN. It is true that other engineers at Waymo download files from the SVN, including bulk downloads. That is their job. That is the reason that the SVN contents are so valuable – because it is the confidential work product of Waymo's engineers and the repository of Waymo's proprietary, industry-leading designs. The fact that others access the SVN for valid reasons does not mean Levandowski's access was valid.

27. **"Waymo also failed to produce…" (2:10-13.)** Uber charges that Waymo produced one third of its production on the last day of discovery. This accusation is highly misleading. Much of Waymo's August 24 production came in timely response to 34 RFPs that were not served by Defendants until July 25. Through one of those RFPs, Otto Trucking sought "all communications" between Waymo (defined as Waymo, Google, and Alphabet) and five outside vendors, not limited in time, subject matter, or along any other line. Waymo's production

in response to this RFP alone numbered nearly 4,000 documents. The production may not have been particularly useful, and likely had nothing to do with any of the witnesses who had already been deposed, but it was exactly what Otto Trucking asked for in its broad RFP.

28. Further, Uber's allegation does not identify a single witness for whom Waymo failed to timely produce relevant documents. This is likely because Waymo took extraordinary efforts to produce documents prior to depositions, including hiring an offsite team of dozens of reviewers specifically to review documents in order to produce them in advance of depositions. The result was continuous document production for several weeks leading up to the end of fact discovery:

| Date | Volume | Bates Start | Bates End |
|---|---|---|---|
| 7/6 | PROD016 | WAYMO-UBER-00016963 | WAYMO-UBER-00020815 |
| 7/7 | PROD017 | WAYMO-UBER-00020816 | WAYMO-UBER-00026134 |
| 7/12 | PROD018 | WAYMO-UBER-00026135 | WAYMO-UBER-00026476 |
| 7/13 | PROD019 | WAYMO-UBER-00026477 | WAYMO-UBER-00026477 |
| 7/13 | PROD020 | WAYMO-UBER-00026478 | WAYMO-UBER-00027046 |
| 7/14 | PROD021 | WAYMO-UBER-00027047 | WAYMO-UBER-00029263 |
| 7/14 | PROD022 | WAYMO-UBER-00029264 | WAYMO-UBER-00029265 |
| 7/15 | PROD023 | WAYMO-UBER-00029266 | WAYMO-UBER-00029354 |
| 7/21 | PROD024 | WAYMO-UBER-00029355 | WAYMO-UBER-00031413 |
| 7/21 | PROD024A | WAYMO-UBER-00031414 | WAYMO-UBER-00031430 |
| 7/24 | PROD025 | WAYMO-UBER-00031431 | WAYMO-UBER-00032540 |
| 7/25 | PROD026 | WAYMO-UBER-00032541 | WAYMO-UBER-00032541 |
| 7/27 | PROD027 | WAYMO-UBER-00032542 | WAYMO-UBER-00032559 |
| 7/27 | PROD028 | WAYMO-UBER-00032560 | WAYMO-UBER-00032573 |
| 7/28 | PROD029 | WAYMO-UBER-00032574 | WAYMO-UBER-00032588 |

| | | | |
|---|---|---|---|
| 7/31 | PROD030 | WAYMO-UBER-00032589 | WAYMO-UBER-00033600 |
| 8/1 | PROD031 | WAYMO-UBER-00033601 | WAYMO-UBER-00033608 |
| 8/2 | PROD032 | WAYMO-UBER-00033609 | WAYMO-UBER-00033949 |
| 8/3 | PROD033 | WAYMO-UBER-00033950 | WAYMO-UBER-00034195 |
| 8/3 | PROD034 | WAYMO-UBER-00011762.R | WAYMO-UBER-00011762.R |
| 8/7 | PROD035 | WAYMO-UBER-00034071.C | WAYMO-UBER-00034073.C |
| 8/7 | PROD036 | WAYMO-UBER-00034196 | WAYMO-UBER-00036457 |
| 8/8 | PROD037 | WAYMO-UBER-00036458 | WAYMO-UBER-00038840 |
| 8/8 | PROD038 | WAYMO-UBER-00038841 | WAYMO-UBER-00039432 |
| 8/8 | PROD039 | WAYMO-UBER-00029365.C | WAYMO-UBER-00029378.C |
| 8/8 | PROD040 | WAYMO-UBER-00039433 | WAYMO-UBER-00039433 |
| 8/10 | PROD041 | WAYMO-UBER-00039434 | WAYMO-UBER-00040170 |
| 8/11 | PROD042 | WAYMO-UBER-00040171 | WAYMO-UBER-00040332 |
| 8/14 | PROD043 | WAYMO-UBER-00040333 | WAYMO-UBER-00041661 |
| 8/15 | PROD044 | WAYMO-UBER-00041662 | WAYMO-UBER-00045057 |
| 8/16 | PROD045 | WAYMO-UBER-00045058 | WAYMO-UBER-00047267 |
| 8/17 | PROD046 | WAYMO-UBER-00047268 | WAYMO-UBER-00047645 |
| 8/17 | PROD047 | WAYMO-UBER-00047646 | WAYMO-UBER-00048065 |
| 8/18 | PROD048 | WAYMO-UBER-00048066 | WAYMO-UBER-00049929 |
| 8/22 | PROD049 | WAYMO-UBER-00004093 | WAYMO-UBER-00029329.R |
| 8/21 | PROD050 | WAYMO-UBER-00049930 | WAYMO-UBER-00050420 |
| 8/23 | PROD051 | WAYMO-UBER-00050421 | WAYMO-UBER-00056921 |
| 8/22 | PROD051A | WAYMO-UBER-00056922 | WAYMO-UBER-00056922 |
| 8/24 | PROD053 | WAYMO-UBER-00056923 | WAYMO-UBER-00083634 |

| 8/24 | PROD054 | WAYMO-UBER-00083635 | WAYMO-UBER-00085007 |
| 8/24 | PROD055 | WAYMO-UBER-00029412.R | WAYMO-UBER-00032383.C |
| 8/24 | PROD056 | WAYMO-UBER-00085008 | WAYMO-UBER-00085778 |

29. **"Waymo also failed to include custodian information in thousands…" (2:12-13.)** This charge is also false. To date Waymo has produced 22,352 documents. For every one of these documents, Waymo provided Defendants with one or more associated custodians. The highest-volume individual custodian is Waymo lead hardware engineer and 30(b)(6) witness Pierre Droz, with 3,344 documents.

30. For 4,053 documents, the listed custodian is "Google." This is because many documents are not associated with an individual custodian, such as Google policy documents or documents maintained in central Google repositories rather than individual accounts. On the very infrequent occasions Defendants have asked Waymo to provide additional metadata, Waymo has manually examined the documents to provide it. Uber does not identify any specific deposition preparation that was hindered.

31. **"Still has not produced a privilege log…" (4:26-27.)** This allegation is false. On September 7 and 8, Waymo produced four sets of documents responsive to the acquisitions covered by the Court's order (volumes 60-63). Waymo served its privilege log covering those sets on September 11, the day before Defendants filed its brief accusing Waymo of failing to provide one. Since the original filing of that brief, Defendants have filed an "errata" admitting that in fact their charge was false. (Dkt. 1580.)

32. In summary, Uber's "response" brief is irrelevant to Waymo's MIL and the list of Defendants' post-complaint misconduct requested by the Court. Uber should not be allowed to transform the issue of Waymo's MIL into a he-said-she-said argument before the jury concerning Waymo's discovery conduct. The proper issue before the court is what post-complaint conduct by Defendants Waymo is permitted to put before the jury to "balance the picture" in light of the Court's ruling that Uber may rely on certain post-complaint discovery conduct. Moreover, the

accusations and merits-based arguments contained in Uber's "response" brief are wholly without support.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: September 15, 2017                     */s Jeff Nardinelli*
                                                           Jeff Nardinelli

**SIGNATURE ATTESTATION**

Pursuant to Local Rule 5-1(i)(3), I attest under penalty of perjury that concurrence in the filing of this document has been obtained from Jeff Nardinelli.

                                           */s/ Charles K. Verhoeven*
                                            Charles K. Verhoeven