QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

WAYMO LLC,

Plaintiff,

vs.

UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC,

Defendants.

CASE NO. 3:17-cv-00939-WHA

**DECLARATION OF DAVID PERLSON IN RESPONSE TO COURT ORDER (DKT. 1629)**

I, David A. Perlson, hereby declare as follows.

1. I am a member of the bar of the State of California and an attorney with Quinn Emanuel Urquhart & Sullivan, LLP, counsel for Plaintiff Waymo LLC ("Waymo"). I make this declaration of personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently as follows.

2. On September 18, 2017, the Court directed that plaintiff Waymo LLC's reply in support of its motion to continue the trial date "shall include a sworn declaration by counsel that (1) quotes each of the following statements from defendants' opposition in full, and (2) admits the full extent, if any, to which said statements are correct." I submit this declaration in response. The statements in defendants' Uber and Ottomotto's opposition are in italics followed by any additional direction by the Court in relation to the statements.

3. *"After discovery closed, Waymo finally—and only in response to a court order—produced documents stating that the 14,000 files are actually of "low value" and were automatically downloaded every time someone logged on to that repository. That critical information had never previously been disclosed to Uber, or to this Court*": The "low-value" quotation is accurate, but Mr. Zbrozek has clarified that the term was a relative one and that he has "no idea" of the value of the files on an absolute basis. (Ex. 1[1] at 208:18-209:11.) On October 5, 2016, Keker attorney Tom Gorman asked Mr. Zbrozek: "What, exactly, is in this SVN system." (Dkt. 1586-1, at -886.) Mr. Zbrozek responded: "It was considered low-value enough that we had even considered hosting it off of Google infrastructure." (*Id.*) Mr. Gorman responded by asking where the "high-value stuff" is stored. (*Id.*) In response, Mr. Zbrozek said: "At least historically, high-value has been algorithms and software. The hardware (at all levels) was a second class citizen. Maybe opinions have changed." (*Id.* at -885) Mr. Zbrozek has also testified at deposition that he has "no idea" about the absolute value of the SVN contents, but used the "low-value" phrase to distinguish the SVN contents from source code and user data:

Q. And then you say "it's pretty low value." Do you see that?

[1] Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the September 6, 2017 deposition transcript of Sasha Zbrozek.

A. I do see that.

Q. And that was true, wasn't it?

THE WITNESS: What do you mean?

Q. Do you want me to define "true"?

A. No. I am asking you to define "low value."

Q. Those are your words.

A. So I will say that this is a very relative thing. And Google data policies were designed with code and user data in mind and were perhaps not the greatest fit for the kind of data that we wanted to store and that relative to instantly Google ending data breaches, that the data that was in the Subversion server would be considered of lesser value. But by how much, I don't know; and in absolute terms, I have no idea. (See Dkt. 1589 ¶ 23; Ex. 1 at 208:18-209:11.)

Mr. Zbrozek further testified: "I referred to it as 'low value enough,' which is a relative expression to a threshold and not an absolute statement." (Ex. 1, at 227:25-228:2.) In short, Mr. Zbrozek used the term "low value" as a relative term compared to personal user information that is subject to additional security protections: "[H]ardware designs, at least in the years prior, had not been ascribed that same sort of damage to other people, like customers or existential threat due to loss as things like personally identifiable information." (*Id.* at 308:20-24.)

In a later email chain months later, Mr. Zbrozek confirmed that most of the material on the SVN was Waymo's confidential development work. After being asked by Google counsel: "Sasha, we want to also be able to say that SVN contains only internal confidential stuff, which I understand from Pierre [Droz] is the case" (Dkt. 1586-2 at 86932), Mr. Zbrozek confirmed that, aside from "a bit of boilerplate and low-value stuff" that was "not a large fraction of the total," the SVN contains Google's internal, confidential work.

4. "*In its Motion claiming it now wants to change strategy and delay this trial, Waymo fails to point out that the '[REDACTED]' (Dkt. 1603-4 at 2:17) in the Stroz report is evidence that [REDACTED]*": It is correct that the Stroz Report [REDACTED] (Dkt. 1603-5.) When discussing [REDACTED], however, Waymo pointed

out that Uber and Ottomotto's counsel repeatedly indicated they had no knowledge regarding the "14,000" files, which had been downloaded by Mr. Levandowski from the SVN repository on December 11, 2015, followed by a USB 3card reader being attached to his work laptop for a period of approximately eight hours on December 14. (Dkt. 1603-4 at 2; *see also* Dkt. 502 at 58:10-11 (Mr. Gonzalez: "Where is the evidence that we knew that Mr. Levandowski was going to download or that he did download something improperly? [T]here is no evidence, your Honor."); *id.* at 60:15-17 (Mr. Gonzalez: "And there is no evidence that anybody at Uber knew anything about these 14,000 files before this lawsuit was filed."); Dkt. 160 (Apr. 5, 2017 Tr.) at 21:1-4 (Mr. Gonzalez: "The only thing the record shows thus far is that 14,000 files may or may not have been taken by someone. I'm not going to take a position on that."). The Stroz Report, however, discusses [REDACTED] Dkt. 1603-5 at 12. So Uber knew from the Stroz Report that Levandowski [REDACTED], on the same day that Waymo showed that that Levandowski had a USB drive connected to his work laptop for 8 hours. Notably, elsewhere in its Opposition, Uber and Ottomotto even affirmatively assert that [REDACTED] somehow "proves" the 14,000 files never made it to Uber: "With respect to the 14,000 files, Waymo ignores that the Stroz Report confirms that those files could not have come to Uber because Levandowski [REDACTED]" (Dkt. 1623-4, 4:21-24.)

Uber further states: "**[u]ntil Waymo filed its complaint**, no one with access to the Stroz Report could have discerned that a reference to Mr. Levandowski [REDACTED] was evidence that Mr. Levandowski had wrongfully taken those files (or somehow retained them)." (Dkt. 1623-4 at 1 (italics in original, bold added).) But Uber's statements to the Court that it lacked knowledge were made *after* the Complaint.

5. *"And the Stroz due diligence process itself was carefully structured so that Uber did not receive any confidential or proprietary Google information identified by Stroz, such as t[REDACTED] that Waymo makes a centerpiece of its brief. (See Dkt. 824 at 6.) Waymo does not contend otherwise."* Specifically explain under oath what evidence Waymo has, if any, to show that

said information ever made its way into defendants' LiDAR development efforts: Uber's "never made it to Uber" story once again ignores the facts. Initially, Uber bought Ottomotto and Ottomotto is a defendant in this case. [redacted] made it to *at least* defendant Ottomotto. Indeed, a March 8, 2016 letter from Ottomotto's counsel O'Melveny & Myers to Stroz regarding the Stroz investigation[2]: [redacted] (Ex. 2.) And as detailed in Waymo's Motion to continue, the Stroz Report shows that [redacted]. (Dkt., 1603-4) So even if true, that specific files [redacted] may not have ever existed on an Uber server is not dispositive. In fact, Uber has never shown it did *not* have all t[redacted] by Stroz. This is precisely why a continuance is needed—so Waymo can discover the full scope of what happened with the [redacted] described in the Stroz Report and collected by Stroz and their use by Defendants.

Further, contrary to Uber and Ottomotto's conclusion the Stroz due diligence process was "carefully structured" so that Uber did not receive any confidential or proprietary Google information identified by Stroz, Waymo demonstrated in its Motion to Continue just the opposite. (Dkt. 1603-4.) Instead, it appears Uber forced [redacted] Dkt. 1603-7 at 7; *see also* Dkt. 1603-8 ([redacted]). It

---

[2] Attached hereto as Exhibit 2 is a true and correct copy of the referenced letter, produced by Stroz Friedberg at bates number STROZ_0003840-41.



also appears that Uber also ignored Stroz's admonition that it did not have “[redacted] Dkt. 1603-4 at 17, 24, 27, 30, 32. Even *Levandowski’s* attorney John Gardner noted i[redacted] Dkt. 1603-9.

The Stroz Report reveals that Levandowski [redacted] (Dkt. 1623-4) The Stroz Report also showed that [redacted] *Id.* Yet, Uber went forward with the purchase of Levandowski’s company and put Levandowski in charge of its entire self-driving car program.

6. *“With respect to the 14,000 files, Waymo ignores that the Stroz Report confirms that those files could not have come to Uber because Levandowski* [redacted] *(Dkt. 1603-5, Stroz Rpt. at 12.) Until Waymo filed its complaint, no one with access to the Stroz Report could have discerned that a reference to Levandowski* [redacted] *was evidence that Levandowski had wrongfully taken those files.”*: I direct the Court to my response to the similar assertion from Uber and Ottomotto addressed in paragraph 4 above. As noted above, the Stroz Report does not “confirm” the 14,000 files could not have come to Uber, as Uber and Ottomotto assert, but [redacted] and does not preclude that the files could have been stored somewhere else. Indeed, [redacted]

7. “*Likewise,* [redacted]*t Waymo alleges Levandowski* [redacted]

[redacted] *are not "irrefutable evidence that these two trade secrets were directly communicated to Uber." (Mot. at 17.) To the contrary, they were not communicated to Uber at all, much less directly or irrefutably, for* [redacted] *and no one at Uber ever received access to these* [redacted]*. (Dkt. 823 at 6.)"* As detailed above in relation to the quote in paragraph 5, [redacted] shows that *at least* defendant Ottomotto possessed these files. And the Stroz Report shows that Levandowski [redacted]. And again, given that Waymo never had access to the trove of information in the Stroz Report and related materials during discovery, it has never been able to test Uber's assertion that these [redacted] materials never made it Uber servers. This is precisely why a continuance is needed—so Waymo can discover the full scope of what happened and the use of [redacted] materials described in the Stroz Report and collected by Stroz.

8. *"Waymo's assertion that "Uber knew about and encouraged the destruction of evidence" is baseless and supported by nothing in the Report, including Waymo's selective quotation of the underlying deposition testimony and of the Report. Contrary to Waymo's assertions (Mot. at 2, 8-9), Messrs. Kalanick's and Poetzscher's deposition testimony on this topic is completely consistent with the Report and shows they directed Levandowski not to bring any Google information into Uber. When Levandowski disclosed his possession of five disks containing Google information, the Report says "*[redacted]*'" (Dkt. 1603-5, Stroz Rpt. at 10.) Waymo's motion selectively omitted the first part of Mr. Kalanick's instruction to Levandowski during that meeting.*

Initially, that Kalanick said he wanted [redacted] That the CEO of Uber [redacted] is not surprising. That he just told Levandowski [redacted] without any other specific direction to, for example return the materials to their rightful owner—Waymo, is.

The Stroz report is also inconsistent with the testimony in this case. According to Poetzscher, *he* is the one who told Levandowski to destroy the disks (Dkt. 1604-9 at 254:20-22 ("So I then said, Yeah, get rid of it"), not Kalanick. And according to Poetzscher and Kalanick, Kalanick is the one who told Levandowski *not* to destroy the disks, and instead speak to counsel. (*Id.* at 254:20-5; Dkt. 1604-8 at 11-16.) Of course having all the evidence available, including a complete review of the newly produced materials is vital to Waymo's case.

*Waymo also incorrectly claims that Rhian Morgan "testified at her deposition that she had no involvement in and never even heard of the Stroz investigation." (Mot. at 9 (citing April deposition).) In an intervening portion of her April deposition that Waymo omits, Ms. Morgan stated (amidst objections) that she did "remember there being some interviews that happened for some of our early employees. I'm not sure if that counts under due diligence – or not." (Gonzalez Decl. Ex. 8, 4/14/17 Morgan Dep. 17:8-17.) In an additional deposition, she stated that Levandowski and others were being interviewed by a forensic investigation firm, and that she was responsible for filing documents relating to the investigation, but had no further substantive knowledge of the process. (Gonzalez Decl. Ex. 9, 8/18/17 Morgan Dep. at 143:2-14, 147:2-148:5.)":* Ms. Morgan did initially deny involvement with the due diligence investigation (Dkt. 1604-10 at 17:5-7), and Ms. Morgan later unequivocally confirmed that she "wasn't involved in the due diligence process." (*Id.* at 18:15-16.) The Stroz report suggests, however, that [redacted] as part of the due diligence process. (Dkt. 1603-5 at 13)

9. [redacted] *contrary to Waymo's assertion that the "Report states plainly that Levandowski took trade-secret information from Waymo." (Mot. at 4 (citing Stroz Rpt. at 12).)* Please explain under oath where the due diligence report states that the information in question qualifies as trade secret(s):

Waymo did not intend to convey that the "due diligence report states that the information in question qualifies as trade secret(s)" as a legal matter. The full context of the statement is as follows:

The Stroz Report states plainly that [redacted]



[redacted] Dkt. 1603-5 at 7. The report discusses [redacted] *Id.* at 12. In addition, [redacted] *Id.* at 16. And [redacted] *Id.* at 17. The report further establishes [redacted] *Id.* at 7-17. And [redacted] Uber permitted Levandowski to have ongoing access and input on product development without any restriction.

The confidential documents such as [redacted] is what Waymo referred to as "trade secret information."

10. *"Since the Federal Circuit's decision, Uber has provided deposition dates for five deponents. (Gonzalez Decl. ¶ 2.) Waymo has rejected these dates. (Id.) Uber understands that Stroz has provided a date for its deponents. Waymo has not responded to Stroz's proposal:"*

As noted in Waymo's Motion to continue, Uber had suggested conducting the depositions of Eric Tate, Rudy Kim, Travis Kalanick, and Angela Padilla on September 19-20. Ex. 3.[3] However, this would have been prior to Waymo even receiving and/or having time to review all of the newly available evidence. Per Judge Corley's instruction at the September 19 hearing, Waymo will be taking Eric Friedberg's deposition next week and will confirm the date today.

---

[3] Attached hereto as Exhibit 3 is a true and correct copy of an email exchange between counsel for Defendants and counsel for Waymo regarding deposition scheduling.

11. *"It is obvious that Waymo cannot possibly try 120+ trade secrets at once. Such a trial would be unmanageable and take years."* Waymo has never suggested that all 121 trade secrets would go to trial. Rather, Waymo would narrow the case after having adequate opportunity to review the newly available evidence, fairly assess the degree to which its trade secrets were available to Defendants, and analyze Defendants' LiDAR development work for additional evidence of use.

12. Attached hereto as Exhibit 4 is an email from counsel for Stroz Friedberg detailing the number of Diligenced Employee documents that are available for review and the number of Diligenced Employee documents that were screened for privilege and privacy.

13. Attached hereto as Exhibit 5 is a true and correct copy of correspondence produced by Uber at UBER00318814 related to the due diligence process.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: September 19, 2017

*/s David Perlson*
David Perlson

**SIGNATURE ATTESTATION**

Pursuant to Local Rule 5-1(i)(3), I attest under penalty of perjury that concurrence in the filing of this document has been obtained from David Perlson.

*/s/ Charles K. Verhoeven*
Charles K. Verhoeven