Neel Chatterjee (SBN 173985)
nchatterjee@goodwinlaw.com
**GOODWIN PROCTER LLP**
135 Commonwealth Drive
Menlo Park, California 94025
Tel.: +1 650 752 3100
Fax.: +1 650 853 1038

Brett Schuman (SBN 189247)
bschuman@goodwinlaw.com
Shane Brun (SBN 179079)
sbrun@goodwinlaw.com
Rachel M. Walsh (SBN 250568)
rwalsh@goodwinlaw.com
**GOODWIN PROCTER LLP**
Three Embarcadero Center
San Francisco, California 94111
Tel.: +1 415 733 6000
Fax.: +1 415 677 9041

Hong-An Vu (SBN 266268)
hvu@goodwinlaw.com
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, 41st Floor
Los Angeles, California 90017
Tel.: +1 213 426 2500
Fax.: +1 213 623 1673

*Attorneys for Defendant: Otto Trucking LLC*

**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| Waymo LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>Uber Technologies, Inc.; Ottomotto LLC; Otto Trucking LLC,<br><br>        Defendants. | Case No. 3:17-cv-00939-WHA<br><br>**MOTION IN LIMINE TO EXCLUDE TESTIMONY OF GARY BROWN AND KRISTINN GUDJONSSON**<br><br>Date:          September 27, 2017<br>Time:          8:00 a.m.<br>Courtroom:  8 (19th Floor)<br>Judge:         Hon. William Alsup<br><br>Filed/Lodged Concurrently with:<br>  1. Declaration of Hong-An Vu; and<br>  2. [Proposed] Order<br><br>Trial:          October 10, 2017 |

**TABLE OF CONTENTS**

**Page**

I. WAYMO'S INVESTIGATION CONTAINS NUMEROUS INVESTIGATIVE FAILURES. ........................................................................................................................1

    A. Mr. Brown and Mr. Gudjonsson Did Not Investigate All of Mr. Levandowski's Computers........................................................................................2

    B. Mr. Brown and Mr. Gudjonsson Did Not Determine Mr. Levandowski's "Usual" Conduct Before Reaching Their Conclusions.................................................2

    C. Mr. Brown and Mr. Gudjonsson Did Not Investigate the "Usual" Conduct of Engineers on the Chauffeur Team. ........................................................................4

    D. Mr. Brown and Mr. Gudjonsson Lack Knowledge of the SVN Server. ........................5

    E. Mr. Brown and Mr. Gudjonsson Based Their Conclusions on Unreliable Log Data. ........................................................................................................................6

    F. Mr. Brown and Mr. Gudjonsson Only Pursued Theories of Misconduct When Prompted By Attorneys.........................................................................................6

II. THE COURT SHOULD EXCLUDE THE TESTIMONY OF GARY BROWN AND KRISTINN GUDJONSSON.................................................................................................8

    A. Mr. Brown and Mr. Gudjonsson Reached their Conclusions Before Conducting Their Investigation. ................................................................................9

    B. The Conclusions of Mr. Brown and Mr. Gudjonsson Are not Based on Sufficient Methodology. ...........................................................................................10

        1. The investigation into the SVN Server was severely flawed..........................10

        2. Mr. Brown and Mr. Gudjonsson Did Not Consider Reasonable Alternatives. ................................................................................................11

III. CONCLUSION..............................................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Carnegie Mellon Univ. v. Hoffmann–LaRoche, Inc.*,
  55 F. Supp. 2d 1024 (N. D. Cal. 1999) ..........................................................................8, 11

*Claar v. Burlington N. R. Co.*,
  29 F.3d 499 (9th Cir. 1994) ........................................................................................8, 9, 12

*Daubert v. Merrell Dow Pharm., Inc*,
  43 F.3d 1311 (9th Cir. 1995) .............................................................................................9, 10

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .................................................................................................8, 9, 10

*EEOC v. United Parcel Servs.*,
  149 F. Supp. 2d 1115 (N. D. Cal. 2000) .................................................................................10

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ..............................................................................................................11

*Jinro Am. Inc. v. Sec. Invest., Inc.*,
  266 F.3d 993 (9th Cir. 2001) ................................................................................................12

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ..............................................................................................................10

*Lewert v. Boiron, Inc.*,
  212 F. Supp. 3d 917, 936 (C.D. Cal. 2016) ............................................................................12

*Mfg. Admin. and Mgmt. Sys., Inc. v. ICT Group, Inc.*,
  212 F.R.D. 110 (E.D.N.Y. 2002) ..........................................................................................10

*Musselman v. Phillips*,
  176 F.R.D. 194 (D. Md. 1997) ..............................................................................................10

*Ollier v. Sweetwater Union High Sch. Dist.*,
  768 F.3d 843 (9th Cir. 2014) ..............................................................................................8, 9

*Pooshs v. Phillip Morris USA, Inc.*,
  287 F.R.D. 543 (N. D. Cal. 2012) ............................................................................................8

**Other Authorities**

Fed. R. Evid. 702 ..................................................................................................1, 8, 9, 12

Lee Mickus, *Discovery of Work Product Disclosed to a Testifying Expert Under the
  1993 Amendments to the Federal Rules of Civil Procedure*, 27 CREIGHTON
  L.REV. 773, 793 n.89 (1994) ..............................................................................................10

The Court should exclude the testimony of Gary Brown and Kristinn Gudjonsson as unreliable under Federal Rule of Evidence 702 because they are not based on sufficient facts or sound methodology.  Mr. Brown and Mr. Gudjonsson should not be permitted to offer opinion testimony about (a) whether behavior was unusual or suspicious and (b) the SVN server and its data.

Mr. Brown and Mr. Gudjonsson concluded that the activities of Mr. Levandowski were unusual or suspicious.  They failed, however, to conduct an objective and reliable investigation.  In fact, they did no investigation to determine what qualifies as normal activity, even though a considerable amount of information was available to them.  Also, neither Mr. Brown nor Mr. Gudjonsson have experience with the SVN server that would enable them to opine on that server and the actions of individuals using that server in the ordinary course of business.  As such their conclusions are unsupported, and as the record shows, were unduly biased by accusations made by Waymo's litigation counsel.

Waymo previously identified Gary Brown and Kristinn Gudjonsson—the individuals who conducted the forensic investigation into Anthony Levandowski—as experts (*see* Vu Decl. Ex. 21). Waymo nrecently has stated that it does not intend to offer "opinion testimony" by these witnesses. Vu Decl. at Exs. 1-4.  Instead of providing a report, Waymo has provided statements from these witnesses about the subject matter of their testimony, including the forensic investigation they conducted and the conclusions they reached "in an abundance of caution" should the Court find these individuals to be experts.  *See id*.  Waymo should not be allowed to offer an expert witness in fact witness clothing.  These witnesses are not qualified and did not engage in an objective or sound methodology.  Their opinions should be excluded.

**I.    WAYMO'S INVESTIGATION CONTAINS INVESTIGATIVE FAILURES.**

Waymo has disclosed that Mr. Brown and Mr. Gudjonsson will testify about the conclusions of their investigation, including that Mr. Levandowski's alleged download of 14,000 files from the SVN server—a repository used to store electrical designs for Project Chauffeur—was "unusual and suspicious."  In reaching this conclusion, Waymo failed to first establish what is considered to be "usual" conduct for Anthony Levandowski and others on the Chauffeur team before concluding that their behavior was "unusual."  In addition, although Mr. Brown and Mr. Gudjonsson intend to opine

-1-

on the SVN server, neither has personal knowledge of this server and neither performed any investigation of the server that provides them with sufficient basis to opine on it and its use.

### A. MR. BROWN AND MR. GUDJONSSON DID NOT INVESTIGATE ALL OF MR. LEVANDOWSKI'S COMPUTERS.

After Anthony Levandowski left Google on January 27, 2016, Google initiated an investigation overseen by Gary Brown and Kristinn Gudjonsson. At the time of his departure, Mr. Levandowski was using three computers—a W laptop (identified as 710739 in the Brown Declaration), a G Laptop, and an HP Workstation. Vu Decl. at Ex. 6. Mr. Gudjonsson imaged the two laptops, and though he requested to image the HP Workstation, he was directed not to analyze it. *Id.* at Ex. 14, 211:4-212:5; Ex. 13, 97:14-98:9; 103:15-104:6. Thus, the investigators never investigated that computer, and by the end of February 2016, had been reimaged and reassigned to another user. *Id.* at Ex. 6; 12 at 468:14-469:24. Waymo failed preserve an image of the HP Workstation and it has provided no explanation for its decision to not analyze the HP Workstation or for its spoliation of evidence. *Id*. at Ex. 13 at 104.

### B. MR. BROWN AND MR. GUDJONSSON DID NOT DETERMINE MR. LEVANDOWSKI'S "USUAL" CONDUCT BEFORE REACHING THEIR CONCLUSIONS.

Mr. Brown and Mr. Gudjonsson's lay belief in unusual behavior is unreliable because they did not consider (a) the SVN server instructions instruct a user to download the entire repository, (b) they concluded Mr. Levandowski only used the SVN repository once even though he had passwords dating back over a year that were issued as part of a restricted "need to access" list, (c) they did not conside the fact that the downloading activity was considered by a user to be typical and not suspicious, and (d) they did not consider data from the other devices that Mr. Levandowski used.

Mr. Brown and Mr. Gudjonsson's conclusion that Levandowski's access to the SVN server and download of the entire repository consisting of 14,000 files or 9.7 Gigabytes was unusual and suspicious was actually based on only four months of data relating to Mr. Levandowski and that data was limited to just the single W laptop and not the other devices Mr. Levandowski used. When Waymo began its investigation of Mr. Levandowski, it did not suspend the SVN server's policy that destroys activity logs older than 52 weeks. *Id.* at Ex.12 at 323:14-324:16. As such, when Mr.

-2-

1  Brown viewed the SVN log in October 2016, the log only contained information relating to Mr.
2  Levandowski between September 19, 2015 and January 27, 2016.  *Id.*

3  Mr. Brown and Mr. Gudjonsson ignored that Mr. Zbrozek, the engineer who set up and
4  administrated the SVN server, had provided Mr. Levandowski with credentials to access the SVN
5  server sometime in March 2015.  *Id*. at Ex. 16 at 287:23-289:18.  These credentials were given
6  because Mr. Levandowski had access to the previous server that housed the same type of
7  information.  *Id*.  In fact, Mr. Zbrozek issued Mr. Levandowski a second password because the first
8  password did not work.  Mr. Brown and Gudjonsson never investigated any of these issues.

9  When asked by Waymo's outside counsel, Tom Gorman, whether Mr. Levandowski's only
10 access to the SVN that they had in the logs was "a little strange," Mr. Zbrozek, responded, "It's not
11 particularly surprising that he might check things out once . . . It clearly wasn't part of his routine.
12 Doesn't ring alarm bells for me." *Id.* at Ex. 9.  Mr. Gorman did not include Mr. Brown or Mr.
13 Gudjonsson in this email.  However, as Waymo was preparing to file its complaint based on Mr.
14 Levandowski's alleged downloading of all the documents from the SVN server, Mr. Zbrozek
15 informed Waymo's counsel and Mr. Brown and Mr. Gudjonsson that he was uncomfortable with
16 their narrative:

17
18 "I'm a little leery because both of those numbers [14,000 files or 9.7 GBs] aren't really meaningful in any narrative.  It also has a chilling effect on being a hardware engineer—we do full checkouts and it makes me uncomfortable to think that lawyers are trying to ascribe
19 suspicion to it."

20 Vu Decl., Ex. 10.  In that same email chain, Mr. Zbrozek included a copy of the instructions for how
21 to download from the SVN, which directs the user to download the entire repository.  *See id*.  Mr.
22 Brown and Mr. Gudjonsson did not appear to consider Mr. Zbrozek's statements and these download
23 instructions in reaching their faulty conclusions. *Id.* atEx. 12 at 414:8-19.

24 Finally, although Mr. Brown and Mr. Gudjonsson's conclusions are based on various types
25 of log data associated with the "W Laptop,"  they did not review or consider *any* log data associated
26 with Mr. Levandowski's activities using the G Laptop or the HP Workstation.   Dkt 24-2
27 (Declaration of Gary Brown only attesting to the W laptop); Vu Decl. at Ex. 12 at 437:15-24
28 (reviewing other log data only after he was deposed in August 2017).  Mr. Brown's declaration only

-3-

1  discusses the log data for the W Laptop and Waymo has refused to provide log data related to the G
2  Laptop or the HP Work station because it was only willing to produce "log data underlying the
3  declaration" of Gary Brown. *See id.*; *see also* Dkt. 1367.   As such, the conclusions regarding Mr.
4  Levandowski's behavior were based on his activities on only one of the three laptops he was using at
5  the time of his departure.

### C. MR. BROWN AND MR. GUDJONSSON DID NOT INVESTIGATE THE "USUAL" CONDUCT OF ENGINEERS ON THE CHAUFFEUR TEAM.

Michael Janosko, one of Waymo's security engineers, testified on how to determine anomalous conduct when investigating breaches of Google's security system:

> Q.  How do you know something is anomalous?
> A.  Anomaly detection kind of starts with the identification of what is normal, and when things fall outside the bounds of that they can be considered anomalous.  Additionally if we have, through our experience and security and within the industry and within our threatened intelligence groups, a good idea of what is malicious, and what activities are malicious, and we can monitor an alert for those.
> Q.  How do you come to an understanding of what is a normal activity?
> A.  You collect a lot of data and measure whether that is appropriate access or not.

Vu Decl. at Ex. 17 at 38:25-39:13.  Mr. Brown agreed that in conducting an investigation, "all feasible rocks should be turned over" and "the more information, the better." *Id*. at Ex. 13 at 99:11-100:7.  And yet, Mr. Brown and Mr. Gudjonsson failed to even review the information available regarding the ordinary practices of Chauffeur engineers to first establish a baseline for normal activity before determining that Mr. Levandowski's conduct was suspicious and unusual.

Mr. Brown and Mr. Gudjonsson did not review or even consider the activities of other engineers on the Chauffeur team to determine whether downloading large amounts of data was common practice.  *Id*. at Ex. 12 at 414:8-19.  Indeed, although requested, Waymo has refused to provide similar log data that Mr. Brown and Mr. Gudjonsson reviewed for Mr. Levandowski for a sampling of other individuals because those logs were apparently not relevant and according to Waymo, too burdensome to produce.  *See* Dkt. 1367.

Based on the SVN data produced in this case for other engineers on Chauffeur (from after May 2016, because no earlier data was preserved), had Mr. Brown and Mr. Gudjonsson looked, they would have discovered that many of the Chauffeur engineers have downloaded over 9 Gigabytes of

-4-

1  data in one sitting.

| Username | Session Start | Session End | Session Duration | size(Bytes) | size (GB) |
|---|---|---|---|---|---|
| | 6/18/2016 0:04 | 6/18/2016 0:24 | 0:19:38 | 11313275634 | 10.5GB |
| | 6/2/2016 19:01 | 6/2/2016 19:12 | 0:11:10 | 10644134885 | 9.9GB |
| | 3/11/2017 0:33 | 3/11/2017 0:47 | 0:13:48 | 11805105562 | 11.0GB |
| | 5/25/2016 6:12 | 5/25/2016 6:18 | 0:05:40 | 10330272711 | 9.6GB |
| | 9/8/2016 7:55 | 9/8/2016 8:10 | 0:15:08 | 10482255874 | 9.8GB |
| | 3/1/2017 8:39 | 3/1/2017 8:45 | 0:06:10 | 11883755910 | 11.1GB |
| | 7/13/2016 16:46 | 7/13/2016 16:58 | 0:12:26 | 11383379896 | 10.6GB |
| | 2/24/2017 20:19 | 2/24/2017 20:32 | 0:13:33 | 11635270922 | 10.8GB |
| | 2/6/2017 18:12 | 2/6/2017 18:22 | 0:09:51 | 10233417287 | 9.5GB |
| | 1/27/2017 23:02 | 1/27/2017 23:17 | 0:14:57 | 12267256209 | 11.4GB |
| | 10/27/2016 21:02 | 10/27/2016 21:08 | 0:06:07 | 10113953737 | 9.4GB |
| | 6/3/2016 16:26 | 6/3/2016 16:40 | 0:14:20 | 11206241839 | 10.4GB |
| | 6/29/2016 10:54 | 6/29/2016 11:00 | 0:05:14 | 10619061614 | 9.9GB |
| | 7/14/2016 2:31 | 7/14/2016 2:47 | 0:15:34 | 9824389818 | 9.1GB |
| | 7/20/2016 18:04 | 7/20/2016 18:21 | 0:17:52 | 10073181381 | 9.4GB |
| | 8/20/2016 1:05 | 8/20/2016 1:18 | 0:13:23 | 10268630411 | 9.6GB |
| | 9/12/2016 19:02 | 9/12/2016 19:11 | 0:09:02 | 10489797175 | 9.8GB |
| | 10/20/2016 13:31 | 10/20/2016 13:41 | 0:09:35 | 11112386841 | 10.3GB |

FIGURE 4 - SECOND QUERY RESULTS

Vu Decl. at Ex. 5, Report of Erik Laykin, at 31.

**D.  MR. BROWN AND MR. GUDJONSSON LACK KNOWLEDGE OF THE SVN SERVER.**

As testimony reveals, Mr. Brown and Mr. Gudjonsson did not have any personal knowledge about the SVN server let alone how the server works. When asked about downloading documents from the SVN server, Mr. Gudjonsson explains that the server was "maintained by Waymo, so you would have to ask somebody that maintains that. I would not know." Ex. 14 at 219:10-20. In response to a question about whether it was unusual for a Google engineer to download 14,000 files from an SVN repository, Mr. Gudjonsson responds: "I wouldn't know." *Id.* at 184:24-185:3. Mr. Gudjonsson admits that he simply had no personal knowledge, and that "Gary Brown completely took care of that himself." *Id.* at 413:19-413:25.

Mr. Brownwas equally clueless. When asked whether he worked with the SVN repository before, Mr. Brown simply responded "no." Ex. 13 at 281:16-18. In fact, Mr. Brown admits that he never received special certification training about the SVN server and never set one up, reviewed SVN log files, or even had access to the SVN website himself prior to this case. *See id*. at 281:19-283:17; 287:6-10. He went so far as to explain that never had "a business need to access those files." *Id.* When asked about retention of the SVN log data provided by Waymo's attorneys, which Mr. Brown had been ordered to be prepared to testify about, he again re-affirmed his lack of experience with the SVN server, "As I've said multiple times before, I do not have access to the

-5-

1  Subversion server. I did none of the pulls in question. So it would not be reasonably feasible for me
2  to investigate and confirm the veracity of this e-mail, but I trust our lawyers." *Id.* Ex. 12, 532:4-11.

3        **E.**    **MR. BROWN AND MR. GUDJONSSON RELIED ON UNRELIABLE LOG DATA.**

4        Mr. Brown admits that there are discrepancies in the log data that he reviewed that call into
5  question the reliability of his conclusions. In emails with the forensic investigation team about
6  discrepancies in the moma search log data, Mr. Brown said that he had received different results 1/3
7  times for one search and errors 3/8 times in other queries he had conducted. Vu Decl. at Ex. 7. Mr.
8  Brown stated that "Flakiness and errors in this kind of log diving is very common . . . I always
9  operate under the assumption that if I had results, they were authoritative, but clearly that's not the
10  case." *Id*. Mr. Brown also emailed about Armada, one of the types of logs he and Mr. Gudjonsson
11  reviewed, stating, "I deeply distrust Armada" because there were discrepancies in time stamps for
12  events based on this log. *Id.* at Ex. 8. In another update email to Mr. Gorman and Mr. Gudjonsson
13  about access logs, Mr. Brown states that the server access data found from Codesearch was "not
14  perfect, not always there in the logs" and was "for use in providing context only." Ex. 18. This data
15  apparently dated back to only "August of 2015." *Id.*

16        In addition, Waymo produced a Bit9 data log allegedly pertaining to Anthony Levandowski's
17  activities in Excel format. When Mr. Brown saw this data, he had a visceral reaction, stating "I
18  should note, I absolutely positively distrust all Excel formatting." *Id.* at Ex. 13 at 252:1-253:11.

19        **F.**    **MR. BROWN AND MR. GUDJONSSON ONLY PURSUED THEORIES OF MISCONDUCT**
20              **WHEN PROMPTED BY ATTORNEYS.**

21        Although Mr. Brown and Mr. Gudjonsson investigated Mr. Levandowski's activities in
22  February to March 2016, including reviewing his computer and log data, they did not find any trade
23  secret compromise at that time. *See* Vu Decl. at Ex. 11 at 31:17-24; Ex. 13 at 232:17-19; 235:17-20;
24  Ex. 14 at 198:22-199:9; 203:15-204:9; 209:23-210:9; Ex. 20, 22. They only found misconduct after an
25  attorney from Keker directed them to reach those conclusions.

26        On September 19, 2016, Tom Gorman, an attorney at Keker, told Mr. Brown, Mr.
27  Gudjonsson that Mr. Levandowski syncing his computer to the SVN server to download the entire
28  repository a week before reformatting his computer was "fishy." *Id.* at Ex. 23  As demonstrated

-6-

1  above, however, Mr. Brown and Mr. Gudjonsson had no personal knowledge of the SVN server.
2  Mr. Gorman repeated this theory again in the same communication, this time adding that he found it
3  unusual that Mr. Levandowski would reformat to install a Linux operating system when he had
4  another laptop running Linux.  *See id.*  "That's pretty suspicious, right?," he concluded.  *Id.*
5     When asked for the source supporting his conclusions, Mr. Gorman provided Mr. Brown an
6  SVN log.  *Id.*  Mr. Brown testified that he then worked to "confirm" Mr. Gorman's conclusions, but
7  he admittedly disregarded information that was "not explicitly relevant for what [they] were **trying**
8  **to prove**."  *Id.* at Ex. 11 at 36:9-24; Ex. 12 at Tr. 229:3-231:8 (emphasis added).  When asked
9  whether anyone had told him that Mr. Levandowski downloaded 14,000 files on December 11, 2015,
10 Mr. Brown answered in the affirmative and identified "Tom Gorman."  *Id.* Ex. 12 at 132:4-11.
11 Similarly, Mr. Gudjonsson, concluded that Mr. Levandowski "hadn't visited the SVN site before,
12 and this [the December 11 activity] was the first sync as you [Tom Gorman] suggested from looking
13 at the SVN log." *Id.* at Ex. 23.
14     With the seed of misconduct planted by Mr. Gorman, the investigators focused significant
15 energy to enforce this crafted theory.  Mr. Gudjonsson testified that on two separate occasions he
16 had mistakenly developed theories that Mr. Levandowski suspiciously reformatted one of his laptops
17 the day before he left the company and that he had arranged for someone to swap the hard drives out
18 of one of his laptops *after* his departure date.  *Id.* at Ex.15, 460:12-461:6; *see also id.* at Ex. 19 at
19 84575 ("a mixture of failures in our inventory system/key escrow system and bad configuration of
20 the host (using desktop role) that lead to these discrepancies and not a disk swapping").  Both of
21 these unreasonable theories were  proven wrong.  *Id., see also* 460:12-461:6.
22     However, there is no evidence that Mr. Brown or Mr. Gudjonsson ever looked to see whether
23 Mr. Levandowski's conduct was *not* suspicious.  They determined that Mr. Levandowski
24 downloading the SVN repository was suspicious because they apparently did not have a record of
25 him accessing the SVN repository at any other time in Google's narrow set of preserved data .  In so
26 doing, they disregarded alternative explanations.  For example, since Google instructed users to
27 download the entire SVN repository upon installation, it is equally likely that Mr. Levandowski did
28 not need to access the SVN server prior to December 11, 2015 because he already had the files he

-7-

1  needed before he reformatted his computer on November 26, 2015.  Based on the facts revealed in
2  this case, it is plausible that Mr. Levandowski simply he needed to download the repository again
3  because of that reformatting.  Vu decl. at 5.

4  **II.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF GARY BROWN AND
5          KRISTINN GUDJONSSON.**

6      In their statements regarding the testimony of Mr. Brown and Mr. Gudjonsson, Waymo
7  acknowledges that neither witness is providing opinion testimony.  *See* Vu Decl. Exs. 1-4. However,
8  Waymo also appears to avoid outright designating these witnesses as experts.  This is because the
9  investigations conducted by Mr. Brown and Mr. Gudjonsson cannot meet the *Daubert* standard for a
10 litany of reasons: their investigation was not based on a sufficient methodology, they did not
11 consider any reasonable alternative and disregarded relevant facts, and signed onto conclusions
12 provided to them by an attorney before they reviewed the underlying data.  Waymo cannot have it
13 both ways, Mr. Brown and Mr. Gudjonsson are either testifying to specialized knowledge and
14 subject to Rule 702, or their opinion testimony is inadmissible.  *See Ollier v. Sweetwater Union High*
15 *Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) ("personal opinion testimony is inadmissible as a
16 matter of law under Rule 702 . . . and speculative testimony is inherently unreliable").

17     The Court should exclude Mr. Brown and Mr. Gudjonsson's testimony under *Daubert* and
18 Rule 702, which requires district courts to act as a gatekeeper to "ensure that any and all scientific
19 testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm.,*
20 *Inc.*, 509 U.S. 579, 589 (1993).  Courts must assess "whether the reasoning or methodology
21 underlying the testimony is scientifically valid and of whether that reasoning or methodology
22 properly can be applied to the facts in issue."  *Claar v. Burlington N. R. Co.*, 29 F.3d 499, 501 (9th
23 Cir. 1994) (emphasis in original), citing *Daubert* at 592-93.  Importantly, courts must "ensure the
24 expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice
25 of an expert in the relevant field.'"  *Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D. 543, 547 (N. D.
26 Cal. 2012), citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  Furthermore, a
27 methodology may not be reliable if an expert "fail[s] to address and exclude alternative explanations
28 for the data on which he bases his findings."  *Carnegie Mellon Univ. v. Hoffmann–LaRoche, Inc.,* 55

-8-

F. Supp. 2d 1024, 1034-35 (N. D. Cal. 1999); *see also Claar* at 502 (expert must adequately account for obvious alternative explanations).

### A. MR. BROWN AND MR. GUDJONSSON REACHED THEIR CONCLUSIONS BEFORE CONDUCTING THEIR INVESTIGATION.

Rule 702 is unambiguous: expert testimony may only be admitted if it "is based upon sufficient facts or data" and "is the product of reliable principles and methods." *See also Daubert*, 509 U.S. at 596. Neither Mr. Brown's nor Mr. Gudjonsson's testimony pass muster.

Mr. Brown and Mr. Gudjonsson's testimonies are not reliable because they were fed a conclusion by Keker attorney Tom Gorman—that Mr. Levandowski's download of 14,000 files was anomalous—*before* they conducted any investigation. "Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method." *Claar*, 29 F.3d at 502 (citations removed); *see also Daubert*, 509 U.S. at 590 ("in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method."). Indeed, both witnesses testified that because they had no experience working with the SVN server and never performed an independent investigation of the SVN server prior to the case, they did not understand the nature of Mr. Levandowski's actions on the SVN server prior receiving Mr. Gorman's conclusions. *Claar* is on point. Like the investigators here, the expert witness in *Claar* provided an opinion about the causation of the harm at issue before reviewing the relevant materials. The Ninth Circuit's admonishing is clear:"[S]cientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method." *Claar*, 29 F.3d at 502-3; *see also Daubert v. Merrell Dow Pharm., Inc*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*") ("That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science."), *Ollier*, 768 F.3d at 860 (affirming the exclusion of the testimony of an expert who submitted a report prior to an "in-person investigation").

Courts have cautioned litigants on risks inherent in the attorney-expert relationship, and have excluded experts where attorneys have improperly influenced the conclusions of such experts. *See*

-9-

1   *EEOC v. United Parcel Servs.*, 149 F. Supp. 2d 1115, 1139 (N. D. Cal. 2000), aff'd in part, rev'd in
2   part on other grounds, 306 F.3d 794 (9th Cir. 2002) ("In context, it seems clear that [the expert] lost
3   his independence and objectivity. He simply became part of the UPS advocacy team"); *Mfg. Admin.*
4   *and Mgmt. Sys., Inc. v. ICT Group, Inc.*, 212 F.R.D. 110, 116 (E.D.N.Y. 2002) (stating that "[t]he
5   modern attorney-expert relationship provides fertile ground for improper influence"); *Musselman v.*
6   *Phillips*, 176 F.R.D. 194, 200 (D. Md. 1997) (finding it "essential" to discover the manner in which
7   experts arrived at opinions and whether "done as a result of an objective consideration of the facts,
8   or directed by an attorney advocating a particular position"); Lee Mickus, *Discovery of Work*
9   *Product Disclosed to a Testifying Expert Under the 1993 Amendments to the Federal Rules of Civil*
10  *Procedure*, 27 CREIGHTON L.REV. 773, 793 n.89 (1994) (stating that a "showing that counsel
11  manipulated the expert's analysis and ultimate findings pushes the expert's testimony from the realm
12  of sloppy science into that of biased science").  The conduct of Tom Gorman in directing the
13  conclusions of Mr. Brown and Mr. Gudjonsson on what to "prove" impacted their ability to perform
14  an unbiased and methodologically sound investigation.  The Court should exclude their testimony.

15  **B.  THE CONCLUSIONS OF MR. BROWN AND MR. GUDJONSSON ARE NOT BASED ON**
16  **SOUND METHODOLOGY.**

17  The Ninth Circuit holds that litigant's experts whose testimony is not based on pre-suit
18  research or investigation on specialized issues must submit affirmative proof of "objective, verifiable
19  evidence" that the testimony is based on valid scientific principles.  *Daubert II*, 43 F.3d at 1317.
20  Waymo, however, cannot provide such proof.

21  **1.  The investigation into the SVN Server was severely flawed.**

22  The investigation into Mr. Levandowski's access was littered with methodological errors that
23  cannot meet the level of "intellectual rigor" contemplated in *Daubert*, *Kumho* and their progeny.  For
24  example, Mr. Brown and Mr. Gudjonsson's failure to investigate all of Mr. Levandowski's
25  computers disqualified their investigation from the outset.  Not only did the investigators have an
26  incomplete set of Mr. Levandowski's computers, but a large chunk of SVN log data was also not
27  preserved, despite the fact that Waymo had initiated an investigation and had a duty to preserve
28  relevant evidence.  The log data that both investigators used only contained information relating to

-10-

1  Mr. Levandowski between September 19, 2015 and January 27, 2016, a small fraction of Mr.
2  Levandowski's employment on the Chauffeur team.  Furthermore, no investigator bothered to even
3  look at Mr. Levandowski's activities on his G Laptop or his HP Workstation.  Worse, Mr. Brown
4  and Mr. Gudjonsson did not investigate or even consider the activities of everyone else on the
5  Chauffeur team to determine whether downloading significant amounts of data was standard
6  practice.  Indeed, Waymo went to great lengths to shield such information from discovery under the
7  guise of irrelevance and production burden.  [cite Dkt].  Thus, Mr. Brown and Mr. Gudjonsson's
8  conclusions that Mr. Levandowski's conduct was unusual or suspicious are unsupported as they do
9  not even know what normal or non-suspicious behavior is in this context.  Collectively, Waymo and
10 the investigators have embarked on a type of selective examination that clearly "departs from
11 scientific standards." *Carnegie*, 55 F. Supp.at 1034.

12 Furthermore, Mr. Brown admits to serious flaws with the underlying log data that formed
13 both his and Mr. Gudjonsson's conclusions. These are the sorts of flaws that courts have routinely
14 cited to as grounds for excluding expert testimony. *See Id.* at 1040 (finding an expert's conclusions
15 to be unreliable due to errors and manipulations in the data underlying his research), *Gen. Elec. Co.*
16 *v. Joiner,* 522 U.S. 136 (1997) (finding that an expert who reinterpreted data that was not his own to
17 be unreliable).  Mr. Brown states on multiple occasions that there are errors in the various SVN logs
18 they reviewed, and that such errors were simply not sufficiently authoritative.

19 Finally, Mr. Janosko and Mr. Brown's testimony on what they consider to be the proper way
20 to investigate breaches of Google's security system exacerbate the flaws cited above.  Mr. Janosko
21 testified that to find anomalous conduct, you would need to collect a large amount of data in order to
22 measure and decide what access was appropriate.  Mr. Brown agreed and unequivocally stated that
23 "all feasible rocks should be turned over" and "the more information, the better."  Vu Decl., Ex. XX
24 at 99:11-100:7.  As Mr. Brown and Mr. Gudjonsson have proved, they failed to review a host of
25 relevant data and by Waymo's admission, their investigation was lacking.

26 **2.    The Investigators Did Not Consider Reasonable Alternatives.**

27 Moreover, neither expert made any effort to "adequately account[] for obvious alternative
28 explanations" by looking to see whether Mr. Levandowski's conduct was in fact innocent.  *See*

-11-

1  *Claar*, 29 F.3d at 502 (expert testimony was not admitted in part because they did not make an effort
2  to rule out other possible causes for plaintiffs' injuries "even though they admitted that this step
3  would be standard procedure"). Like in *Claar*, Mr. Brown testified that "all feasible rocks should be
4  turned over" and "the more information, the better." *Id*. at Ex. 13 at 99:11-100:7. But instead, both
5  witnesses pre-determined that Mr. Levandowski downloading the SVN repository was suspicious
6  based on the comments of Mr. Gorman, while completely disregarding any alternative explanations.
7  One explanation is equally plausible under these facts: Mr. Levandowski may have downloaded the
8  same files prior to reformatting his computer on November 26, 2015, and he may have needed to
9  download the repository again because of that reformatting. Google never bothered to keep
10 complete records of the SVN access logs and even failed to image some of his computers.

11  Without a full picture of all of Mr. Levandowski's habits and practices as an engineer at
12 Google, as well as the habits and practices of his peers at Chauffeur, any conclusion that Mr.
13 Levandowski's December 2015 download from the SVN server was anomalous is speculative at best
14 and certainly prejudicial. There is now clear proof that downloads of 9GB of data or more from the
15 SVN server were and continued to be common at Google and Waymo.

16  **C.  MR. BROWN AND MR. GUDJONSSON DO NOT HAVE THE REQUISITE EXPERTISE**
17  **REGARDING THE SVN SERVER TO TESTIFY AS EXPERTS.**

18  Finally, Mr. Brown and Mr. Gudjonsson are not qualified to testify as experts as neither have
19 used the SVN and were unable to answer basic questions about the SVN server. Nothing in their
20 background evidences sufficient experience or training to testify about this system. Indeed, they
21 admit their lack of knowledge. Accordingly, the Court should exclude their testimony as
22 inadmissible personal opinion testimony as they do not qualify as experts. Fed.R. Evid. 702; *Jinro*
23 *Am. Inc. v. Sec. Invest., Inc*., 266 F.3d 993, 1006 (9th Cir. 2001) (excluding unqualified investigator
24 as expertwitness); *Lewert v. Boiron, Inc*., 212 F. Supp. 3d 917, 936 (C.D. Cal. 2016) (excluding
25 expert testimony where witness admitted to having no expertise or experience on subject matter).

26 **III.  CONCLUSION**
27  For the foregoing reasons, Otto Trucking respectfully requests that the Court grant its motion
28 to exclude the testimony of Gary Brown and Kristinn Gudjonsson.

-12-

MOTION IN LIMINE TO EXCLUDE TESTIMONY
OF GARY BROWN AND KRISTINN GUDJONSSON                            Case No. 3:17-cv-00939-WHA

Dated: September 16, 2017         Respectfully submitted,

By:   */s/   Neel Chatterjee*
         Neel Chatterjee
         *nchatterjee@goodwinlaw.com*
         Brett Schuman
         *bschuman@goodwinlaw.com*
         Shane Brun
         *sbrun@goodwinlaw.com*
         Rachel M. Walsh
         *rwalsh@goodwinlaw.com*
         Hong-An Vu
         *hvu@goodwinlaw.com*
         Hayes P. Hyde
         *hhyde@goodwinlaw.com*
         James Lin
         *jlin@goodwinlaw.com*
         **GOODWIN PROCTER LLP**

*Attorneys for Defendant: Otto Trucking LLC*

-13-

MOTION IN LIMINE TO EXCLUDE TESTIMONY
OF GARY BROWN AND KRISTINN GUDJONSSON         Case No. 3:17-cv-00939-WHA

# CERTIFICATE OF SERVICE

1  I hereby certify that I electronically filed the foregoing document including all of its attachments with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on **September 16, 2017**. I further certify that all participants in the case are registered CM/ECF users and that service of the publicly filed documents will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on **September 16, 2017**.

*/s/   Neel Chatterjee*
NEEL CHATTERJEE