Pages 1 - 94

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before the Honorable William H. Alsup, Judge

WAYMO LLC,                          )
                                    )
                                    )    **No. C 17-0939 WHA**
            Plaintiff,              )
                                    )
  VS.                               )    **BOUND SEPARATELY**
                                    )    **PAGES 95 - 145 (UNDER SEAL)**
                                    )
UBER TECHNOLOGIES, INC.;            )
OTTOMOTTO LLC; OTTO TRUCKING        )
                                    )
            Defendants.             )
_____    )    San Francisco, California
                                         Wednesday, September 20, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                    QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                    50 California Street, 22nd Floor
                    San Francisco, California  94111
            BY:     **CHARLES K. VERHOEVEN, ATTORNEY AT LAW**
                    **JORDAN R. JAFFE, ATTORNEY AT LAW**
                    **MELISSA J. BAILY, ATTORNEY AT LAW**
                    **DAVID ANDREW PERLSON, ATTORNEY AT LAW**
                    **JEFFREY W. NARDINELLI, ATTORNEY AT LAW**
                    **FELIPE CORREDOR, ATTORNEY AT LAW**

                    QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                    51 Madison Avenue
                    New York, New York 10010
            BY:     **JAMES E. BAKER, ATTORNEY AT LAW**

 (Appearances continued on next page)

Reported By:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

```
 1   APPEARANCES (CONTINUED):

 2   For Defendant Uber Technologies, Inc. and Ottomotto LLC:
                         MORRISON & FOERSTER LLP
 3                       425 Market Street
                         San Francisco, California 94105-2482
 4                   BY: ARTURO J. GONZÁLEZ, ATTORNEY AT LAW
                         MICHAEL A. JACOBS, ATTORNEY AT LAW
 5                       ESTHER K. CHANG, ATTORNEY AT LAW

 6                       MORRISON & FOERSTER LLP
                         2000 Pennsylvania Ave., N.W. Suite 6000
 7                       Washington, D.C. 20006-1888
                     BY: MICHELLE YANG, ATTORNEY AT LAW
 8
                         SUSMAN GODFREY LLP
 9                       1301 Avenue of the Americas, 32nd Floor
                         New York, New York 10019
10                   BY: WILLIAM C. CARMODY, ATTORNEY AT LAW

11                       BOIES SCHILLER FLEXNER LLP
                         435 Tasso Street, Suite 205
12                       Palo Alto, California  94301
                     BY: KATHLEEN R. HARTNETT, ATTORNEY AT LAW
13
     For Defendant Otto Trucking LLC:
14                       GOODWIN PROCTER LLP
                         135 Commonwealth Drive
15                       Menlo Park, California 94025
                     BY: I. NEEL CHATTERJEE, ATTORNEY AT LAW
16
                         GOODWIN PROCTER LLP
17                       Three Embarcadero Center
                         San Francisco, California 94111
18                   BY: SHANE BRUN, ATTORNEY AT LAW

19   On behalf of nonparty Stroz Friedberg:
                         LATHAM & WATKINS
20                       505 Montgomery Street, Suite 2000
                         San Francisco, California  94111
21                   BY: MELANIE M. BLUNSCHI, ATTORNEY AT LAW

22   Special Master:    FARELLA, BRAUN & MARTEL LLP
                         Russ Building
23                       235 Montgomery Street
                         San Francisco, California  94104
24                   BY: JOHN L. COOPER, ATTORNEY AT LAW

25
```

| | |
|---|---|
| 1 | <u>Wednesday, September 20, 2017</u>                           <u>8:00 a.m.</u> |
| 2 | P-R-O-C-E-E-D-I-N-G-S |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling civil case number 17-2939, Waymo |
| 5 | versus Uber Technologies, et al. |
| 6 |     Will counsel please step forward and state your |
| 7 | appearances for the record. |
| 8 | **MR. VERHOEVEN:**  Good morning, Your Honor. |
| 9 | Charles Verhoeven, from Quinn Emanuel on behalf of Waymo.  And |
| 10 | we also have David Perlson, Melissa Baily, Jim Baker, |
| 11 | Jeff Nardinelli, Felipe Corredor, and Jordan Jaffe. |
| 12 | **MR. GONZÁLEZ:**  Good morning, Your Honor. |
| 13 | Arturo González, Michael Jacobs, Esther Kim Chang, and |
| 14 | Michelle Yang, from Morrison & Foerster, for Uber. |
| 15 | **MR. CARMODY:**  Good morning, Your Honor.  Bill Carmody |
| 16 | here, from Susman Godfrey, on behalf of Uber. |
| 17 | **MS. HARTNETT:**  Good morning, Your Honor.  Kathleen |
| 18 | Hartnett, Boise Schiller Flexner, on behalf of Uber. |
| 19 | **MR. CHATTERJEE:**  Good morning, Your Honor.  Neel |
| 20 | Chatterjee on behalf of Otto Trucking, with Shane Brun. |
| 21 | **MR. BURN:**  Good morning, Your Honor. |
| 22 | **THE COURT:**  Good morning. |
| 23 | **MS. BLUNSCHI:**   Good morning, Your Honor. |
| 24 | Melanie Blunschi, nonparty Stroz Friedberg. |
| 25 | **THE COURT:**  Thank you. |

1    **MR. COOPER:**  Good morning, Your Honor.  John Cooper,

2    Special Master.

3    **THE COURT:**  All right.  Welcome, everyone.

4    We are here on a number of items.  So on the subject of

5    half-truths -- which is what I mentioned last time, I continue

6    to be frustrated by half-truths -- it's important that you be

7    thorough when you say something to the judge or the jury.  It's

8    not enough that everything you say is true.  It has to be not

9    misleading too.  And when you leave out half the story, then it

10   becomes misleading.

11   So I want to begin today by getting to the bottom of

12   understanding this downloading thing.  Is that witness here?

13   **MR. GONZÁLEZ:**  Yes, Your Honor.  He is in the hallway.

14   **THE COURT:**  All right.  Before he comes in -- what do

15   you have to say?

16   **MR. BAKER:**  I'll be addressing that issue, Your Honor.

17   **THE COURT:**  What do you have to say?  He's going to

18   testify if I want him to testify.  Do you understand that?

19   **MR. BAKER:**  I understand.

20   **THE COURT:**  All right.  But, first, I want to see if

21   the lawyers can help me get through this without the necessity

22   of it.

23   What is the difference -- you keep saying there's an

24   automatic download.  That's not the words he uses.  Talking to

25   Uber.  But what he says was -- I have forgotten the phrase now.

1   "Checkout."  Something like "checkout."

2       So I'm going to give each of you a minute or so to give me

3   a complete and accurate and not misleading statement about what

4   happens when somebody accesses the SVN and under what

5   circumstances there's an automatic download.

6       All right.  You get to go first, Mr. González.

7           **MR. GONZÁLEZ:**  One minute will be fine.

8       There are some directions or instructions that

9   Mr. Zbrozek, the witness, created for people to log on to this

10  repository where Mr. Levandowski allegedly downloaded 14,000

11  files.

12      If you follow those instructions, the first thing you do

13  is you download something to your system called Tortoise.  Then

14  following the instructions, you click on something called "SVN

15  checkout."  After that you put in your name and your password.

16  And the minute you put in your name and your password and click

17  *enter* the content of the repository in its entirety is

18  downloaded.

19      That is what happens.  And that is what he said at his

20  deposition the first time we questioned him.  And then, I

21  assume, the lawyers got to him.  And at his second deposition

22  he started using that other word, "checkout."

23      But we've got him under oath -- and we would be happy to

24  question him; take me five minutes -- where he said downloaded

25  is what happens when you follow his directions.

1          **THE COURT:**  All right.  What's your version?

2          **MR. BAKER:**  Your Honor, I think that that is -- that

3    is half true.  It's part of the story.

4          The SVN server, there are two ways to download materials

5    from the SVN server.  One of the ways is to look at these

6    instructions and to copy and paste the link that's in the

7    instructions into a browser or a URL, and hit *return*.

8          And if you do that, it pulls up a tree that has a

9    top-level directory followed by subdirectories, subdirectories,

10   subdirectories.  And the user can go in and select which one of

11   the files they want to use.  So if they want to take home five

12   files because they're going to work from home, they can select

13   those five files.

14         The other way to do this is, as Mr. González pointed out,

15   is to download something called SVN Tortoise software.  If you

16   use that software, then a full download is pushed to your

17   laptop or whatever computer you were using.

18         My understanding is that -- that many of the engineers use

19   the SVN Tortoise software.  Mr. Zbrozek testified that if you

20   do use the SVN Tortoise software, that there is a full

21   download.  And we don't dispute that.  We never have.  This

22   actually came up during the preliminary injunction proceedings.

23   And we've never disputed that point.

24         **THE COURT:**  All right.  So --

25         **MR. GONZÁLEZ:**  Just one thing in response, Your Honor.

1        **THE COURT:**  Yes.

2        **MR. GONZÁLEZ:**  So the very first part of what he said,

3   this whole thing about how this thing comes down and you can

4   click how many files, none of that is in the instructions.

5        What I said was not half true.  What I said was

6   100 percent entirely true, which is that, if you follow the

7   instructions everything is automatically downloaded.

8        Now --

9        **THE COURT:**  Wait a minute.  What do you mean "the

10  instructions"?  Are these the only set of instructions that are

11  possible to be used?  Or is this just one of many possible ways

12  to approach --

13       **MR. GONZÁLEZ:**  I --

14       **MR. BAKER:**  Your Honor --

15       **MR. GONZÁLEZ:**  I can hand it to the Court, Your Honor.

16       **THE COURT:**  Hand me the instruction.  See, you didn't

17  answer my question.

18       **MR. GONZÁLEZ:**  The answer is yes.  The answer is yes.

19       **THE COURT:**  The answer is yes what?

20       **MR. GONZÁLEZ:**  These are the only instructions that

21  were given by Mr. Zbrozek.  No other instructions have been

22  produced.  Let me put it that way.

23       These are the instructions that were created by

24  Mr. Zbrozek, who was the guy who was responsible for setting up

25  this subversion server.  And those are the instructions that

1    have been produced in this case.   No other instructions have

2    been produced.

3        And, for the record, I handed the Court Exhibit 1727.

4        **MR. BAKER:**   Thank you.

5        **MR. GONZÁLEZ:**   You have it.

6        **THE COURT:**   Where does the word "download" appear?

7        **MR. GONZÁLEZ:**   Your Honor, it's not in the

8    instructions.   It's in his testimony about what happens when

9    you follow the instructions.   He said the content and the

10   repository is downloaded when you follow his instructions and

11   you push *enter*.

12       **THE COURT:**   So what is the significance of that if

13   it's true?

14       **MR. GONZÁLEZ:**   The significance of that, Your Honor,

15   is that the Court, I think, drew an inference.   When you issued

16   your preliminary injunction, you issued -- you believed that

17   Anthony Levandowski sat at a computer one day and picked out

18   14,000 really important files and downloaded them so that he

19   could steal them.   Because that's -- that's what they

20   represented to you.

21       They never said to you -- talk about half-truths.   I can

22   show you, if you like, Your Honor, I can show you what they

23   said in their declarations at the motion for preliminary

24   injunction.

25       What they said to you was that Mr. Levandowski downloaded

```
 1   Tortoise and installed it.  And then they say he downloaded
 2   14,000 files, making it seem like he did something
 3   intentionally picking out 14,000 files.  That's not what
 4   happened.  It's --
 5          THE COURT:  But then -- but there was more to it than
 6   that.  Then he attaches a portable thumb drive, or something
 7   like a thumb drive, and transfers those 14,000 files to that.
 8   What's your explanation for that.
 9          MR. GONZÁLEZ:  Your Honor, that is true.  My only
10   point is, a jury can draw multiple inferences here.  And one
11   inference that jumps out at you, when everything is
12   automatically downloaded that's not necessarily somebody --
13          THE COURT:  So there's two.  There's the innocent
14   explanation that would be, like me, he hit the wrong button;
15   suddenly he's downloading 14,000 files.  Then maybe that's
16   innocent.  But then he transfers all of that to a portable disk
17   and takes it with him.  So that doesn't sound so innocent.
18          MR. GONZÁLEZ:  So, Your Honor, we -- we dispute that
19   the evidence was that he took it with him.  But our point is
20   this.
21          THE COURT:  Wait.  Wait.  Wait.  Do you dispute that
22   he transferred it to another device?
23          MR. GONZÁLEZ:  Your Honor, we concede that there's
24   evidence that he plugged in some device afterwards, and it was
25   plugged in for eight hours.
```

1       And I don't mean to sound technical, but this is very

2  important.  There is no evidence that he actually downloaded

3  anything onto that device.  It's very important.

4       All they've been able to prove is that some device was

5  plugged into his computer.  That's the distinction that I'm

6  trying to draw.  So I don't want to make a concession here

7  that's inaccurate.

8       If you want to talk about inferences, we can talk about

9  inferences.  But they have not been able to prove that anything

10 was actually downloaded onto that device.

11      And that's why I'm saying to you, it would have been

12 important for you, as the judge, to know at the preliminary

13 injunction stage that actually downloading Tortoise is not

14 suspicious at all.  It's instruction number one of the document

15 that I just showed you.

16      And downloading 14,000 files, which they pointed out to

17 you how many gigabytes that was, it would have been

18 appropriate, I think, for them to tell you, and, by the way, if

19 you follow instruction number three on the paper I just handed

20 you, that is precisely what would happen.  And --

21           MR. VERHOEVEN:  May I respond?

22           THE COURT:  Does the A team come forward?

23           MR. VERHOEVEN:  No, no.  This is transitioning from

24 the technical to whether this means anything.  And I'd like --

25           THE COURT:  What do you say in response to what I just

1    heard?

2         **MR. VERHOEVEN:**  Well, we, last Thursday, received the

3    Stroz report.  And at page 12 it talks about evidence on

4    Levandowski's personal laptop, of 24,000 files in a folder

5    called "Chauffeur SVN."

6         And just --

7         **MR. GONZÁLEZ:**  Your Honor --

8         **MR. VERHOEVEN:**  This is something they have designated

9    confidential, Your Honor.

10        **MR. GONZÁLEZ:**  I would be happy to respond, but I

11   believe there's an issue and motions for protective order

12   pending, that have been filed by other defendants, with respect

13   to the substance of the report.

14        I will say one thing --

15        **THE COURT:**  I have said in an order, I thought, -- has

16   that order gone out? -- that we can't go through life in this

17   case on saying that anything that's in the due diligence report

18   is confidential.  So when we have the trial, it's going to be

19   public.  Period.

20        Now, I am going to say that you ought to keep it, quote,

21   at the low-level confidential, among yourselves, and not give

22   it to the *New York Times* and everybody else, at that low level.

23        But when we come to court, we're going to talk openly.

24   This court belongs to the public.  It does not belong to you

25   lawyers or you parties.  And there's nothing in that due

1    diligence report, in my view, that is any worse than the stuff

2    that's already come out.

3        So I'm going to just say you can -- I think I know what

4    you were about to say.  And you go ahead and say it.

5            **MR. VERHOEVEN:**  So this is actually information we

6    learned and put together last night.

7        So -- but on last Thursday, we saw the Stroz report.  On

8    page 12 it said that there were 24,000 files in

9    Mr. Levandowski's personal device.  It also said that they were

10   deleted on December 14th.

11       Now, Your Honor, probably doesn't recall the specifics,

12   but if you match that up against Google's -- or Waymo's

13   analysis of what happened with Levandowski's Google laptop, the

14   evidence shows he downloaded 14,000 files from the SVN server

15   on December 11th.  And on December 14th, same day as these

16   24,000 files were deleted, he put in the card reader, for eight

17   hours, in his Google Waymo laptop and then, we think, copied

18   all of those files.

19       The very same day we have here a statement by Stroz that

20   24,000 files from the same SVN server were deleted off his

21   personal computer.

22       Well, last night we finally got an identification of what

23   those 24,000 files were.  And there's a chunk that's nonsense.

24   But of the 14,000 files that we identified at the beginning of

25   this case, all but seven are in that 24,000 that were deleted.

1    **THE COURT:**  If they were deleted, how do you know what
2  they were?
3    **MR. VERHOEVEN:**  Because Stroz can give us the
4  identification of the file names.  And that's what we got.
5    So through forensic analysis, we know now that there's an
6  overlap of all but seven files between what Levandowski copied
7  off his card reader on the 14th of December, put onto his
8  personal laptop on the 14th of December, and then deleted off
9  of his personal laptop.
10    Your Honor, this is one example of why we need a
11  continuance.  We need to follow this trail.
12    **THE COURT:**  No.  Stop on that right now.  See, you're
13  sliding off on to something else.
14    **MR. VERHOEVEN:**  Sorry.
15    **THE COURT:**  I'm trying to understand the download
16  point first.
17    **MR. VERHOEVEN:**  Just to finish off, we haven't had the
18  opportunity yet to -- although we'll get to it soon -- to
19  examine forensically this laptop on which the 14,000 files were
20  deleted.
21    There could very well be evidence that he copied those --
22    **THE COURT:**  Well, where is that laptop now?
23    **MR. VERHOEVEN:**  It's at Stroz.
24    **THE COURT:**  You mean the Levandowski personal laptop
25  is at Stroz?

1          **MR. VERHOEVEN:**  Yes.

2          **MR. GONZÁLEZ:**  And it's been there, Your Honor, ever

3   since -- it's been there for a long time, in the vault.

4          **MR. VERHOEVEN:**  It's been withheld for a long time.

5   We just got the Stroz report last Thursday, Your Honor.

6       But if we analyze that, there may be evidence there that

7   shows that he actually didn't delete those files, but that he

8   copied them onto something else.

9       You know, is it a coincidence that the exact same files

10  that he downloaded onto his Waymo computer magically appeared

11  on his personal laptop and then were deleted?

12      I mean, that shows guilty knowledge.  That shows a

13  pattern.  That shows somebody knowingly doing something and

14  trying to cover their tracks, Your Honor.

15      So the notion that -- that this automatic download

16  point -- and Mr. Baker can talk about the technical aspects,

17  but the notion that it shows there is total innocence here is

18  rebutted by this Stroz report which clearly shows a very

19  suspicious pattern, Your Honor.

20          **THE COURT:**  All right.  So what do you say to the

21  information that it looks like -- well, first, let me ask this:

22  Is the device to which the download occurred when he was at

23  Waymo, was that a company -- Waymo company device, or was that

24  what you're referring to as his personal laptop?

25          **MR. VERHOEVEN:**  So what we have analyzed was his

1    company device, to answer your question.  What the Stroz report

2    analyzed was his personal device.

3         THE COURT:  All right.  So is this a -- does the

4    evidence -- I'm going to give you A and B.

5         MR. VERHOEVEN:  Okay.

6         THE COURT:  The A possibility is -- we'll take from

7    your point of view -- while at Waymo he downloads the entire

8    SVN, attaches -- what do you call it?

9         MR. VERHOEVEN:  A card reader.

10        THE COURT:  -- a card reader for eight hours and

11   copies that over to the card reader, then deletes the

12   repository from his company laptop, takes the card reader with

13   him, and transfers that to the personal laptop.

14        MR. VERHOEVEN:  On the very same day.

15        THE COURT:  But then in due course deletes it, gives

16   that to Stroz, meaning the laptop, but before giving it to

17   Stroz deletes those files.

18        MR. VERHOEVEN:  Yeah, just --

19        THE COURT:  Is that --

20        MR. VERHOEVEN:  That's what I'm saying.

21        THE COURT:  That's A.

22        MR. VERHOEVEN:  Yeah.

23        THE COURT:  All right.  That may be possible.  Sounds

24   like, if everything you're telling me is true, it's at least a

25   plausible possibility.

B would be that he's sitting at his desk at Waymo and somehow innocently downloads 14,000 files.  He attaches the card reader, but he's not actually -- nothing is being transferred, and he takes no files with him.

But then you'd have to explain, well, then, how did Stroz wind up with finding all but seven of the 14,000 files on his personal laptop?

So what's your answer to that one?

**MR. GONZÁLEZ:**  So two things.

Number one, I don't know how that information got on his personal laptop.  But, number two, what counsel just said is correct.  We agree on something, which is that on December 15th, seven weeks before he resigned, while he was still their employee, he deletes it from his personal computer. So that as of December 15th --

**THE COURT:**  No, no.  He deleted it from --

**MR. GONZÁLEZ:**  His personal computer.

**THE COURT:**  I thought he deleted it from his company computer.

computer.

**MR. VERHOEVEN:**  Your Honor, if I could explain.

On the 11th of December, the evidence shows that Levandowski downloaded those 14,000 files to a Waymo computer.

On the 14th, a couple of days later, December 14th, he did at least two things.  One, put a card reader into that laptop for eight hours; two, put onto his personal laptop all but

1    seven of those 14,000 files; and, three, deleted on the same

2    day those 14,000 files.

3        Why would he do that?  He never used these 14,000 files at

4    Waymo.  He never made any --

5            THE COURT:  But then -- okay.  I admit that doesn't

6    sound logical.  But if he is trying to transport those over to

7    his new company, he would not delete them.  Why would he delete

8    them while he's still at Waymo?

9            MR. VERHOEVEN:  We think he was covering his tracks

10   and he sent them to his personal laptop.  We haven't had a

11   chance to examine that, but we think he made a copy of that and

12   then deleted it off his personal laptop.

13       Your Honor, just this week we've been able to inspect

14   documents at MoFo's offices.  And there's, what, I think,

15   64,000 photographs that Levandowski took, that's in their

16   possession, with pictures that he took of documents and

17   screenshots of Waymo confidential information.

18       Why would you take pictures --

19           THE COURT:  Like an iPhone picture?

20           MR. VERHOEVEN:  We're still figuring out all the

21   facts.  But they have pictures of Google confidential

22   information in their files, photographs of a computer screen

23   with, you know, important confidential information.

24       I could hand up a couple of examples, if you want, Your

25   Honor.

1          THE COURT:  Wait a second.

2          MR. GONZÁLEZ:  We're moving off the topic again.

3          MR. VERHOEVEN:  I'm just saying, the point is --

4          MR. GONZÁLEZ:  I would be happy to address the

5     pictures separately.

6          MR. VERHOEVEN:  -- this fits in with a much larger

7     pattern.  And they can make their argument that he may have

8     accidentally downloaded 14,000 files, but there's other facts

9     that are contrary to that.

10          THE COURT:  What happened to the card reader?

11          MR. VERHOEVEN:  We're still trying to find out.  It

12     might be at Stroz.  We're still looking for that.

13          THE COURT:  Is there a card reader at Stroz?

14          MR. GONZÁLEZ:  I don't know the answer to that, Your

15     Honor.

16     Your Honor, I will say a couple of things very briefly.

17     You asked a very good question.  You're right.  There could

18     actually be an innocent explanation here because all -- the

19     bottom line is that on December 15th, before he leaves their

20     employment, many weeks before, the stuff we've been talking

21     about for seven months was deleted.

22          THE COURT:  Well, it was deleted off of --

23          MR. GONZÁLEZ:  His personal computer.

24          THE COURT:  Personal computer.  But what about the

25     card reader?

```
1          MR. GONZÁLEZ:  Don't know about the card reader.  But
2    here's a question I have for you.  If somebody is doing
3    something suspicious or wrongful, why would they download it
4    onto their personal computer and delete it the same day?  That
5    doesn't make any sense.
6          If they already have the information on a card reader,
7    which is what they are claiming -- think about that.  They're
8    claiming he has the information already on a card reader.  So
9    he doesn't have to download it onto his computer in order to
10   copy it somewhere else.  He has got it already.
11         But the most important point, Your Honor, is this:  When
12   they came in here on their motion for preliminary injunction,
13   they told you two facts that I can show you, if you would like
14   to see them.
15         Number one, they said Mr. Levandowski downloaded Tortoise
16   and then he downloaded 14,000 files.  Those are the facts that
17   they gave you.  They did not tell you that the downloading of
18   Tortoise is step number one of their instructions.  And they
19   did not tell you that if he follows the instructions,
20   downloading the 14,000 files is exactly what they would expect
21   to happen.
22         And one last thing you need to know, because we didn't
23   find this out until recently.  They also didn't tell you that
24   if you look at the records that they're downloading, the actual
25   computer printout, Sasha, who is the guy sitting out in the
```

hallway, has testified that that computer printout is exactly what he would expect to see if somebody followed his instructions.

So there's one fact that's actually going to be undisputed at trial, I think, now, which you didn't even know about, which is that if you follow the instructions everything is downloaded.

And so this thing they've been saying for months, they've been talking about 14,000 files, making it look like he sat there and picked these files, is not true.

**THE COURT:**  Even so, why would he want to download anything?

**MR. GONZÁLEZ:**  Your Honor --

**THE COURT:**  He already knows he's going to leave by this point.

**MR. GONZÁLEZ:**  I'm not even sure --

**THE COURT:**  On the verge of leaving.  Why would he want to be downloading all that material?

**MR. GONZÁLEZ:**  So, Your Honor, a couple of things.

Number one, I don't think it's accurate to say he knew he was leaving.  They were trying to keep him up until the last day that he was there.

But, number two, again, I think you're making an inference that may not be accurate.  The jury may go there, but they may not.  And you're asking, why would he want to download 14,000

1    files?  My point to you is, they're saying he doesn't use this

2    thing.  Somebody who doesn't use this thing doesn't even know

3    there's 14,000 files on there.  And somebody who doesn't use

4    this thing may not even know that when you click *enter*

5    everything is going to come pouring in.

6        The jury can draw multiple inferences here, Your Honor,

7    and they left you with only one.

8        **THE COURT:**  How are you going to prove -- since he has

9    taken the Fifth Amendment, how are you going to be able to

10   prove that he didn't know that he would get a lot of files?

11       **MR. GONZÁLEZ:**  Your Honor, I don't know that I can

12   prove --

13       **THE COURT:**  He's the head guy.  And suddenly he

14   becomes a dumbo and doesn't know how to use the system?

15       **MR. GONZÁLEZ:**  Your Honor, I'm not saying he's a

16   dumbo.  But you must remember that their own expert, in their

17   declaration -- well, an internal forensics guy at Google, in

18   their declaration in support of preliminary injunction, said

19   that he was searching for instructions on how to log-in.

20       So I'm not saying he's a dumbo.  I'm saying he needed

21   instructions for how to log-in.  And they themselves said he

22   was searching for those instructions which you now have in your

23   hand.  And they just didn't tell you.

24       **MR. VERHOEVEN:**  Your Honor --

25       **THE COURT:**  Who is the "they"?  Who said that?

1        **MR. GONZÁLEZ:**  Uhm --

2        **THE COURT:**  I don't remember anyone telling me that.

3        **MR. GONZÁLEZ:**  Would you like me to show it to you?  I

4   can show you the testimony --

5        **THE COURT:**  If you don't have it at your fingertips, I

6   don't want to waste the time.

7        **MR. VERHOEVEN:**  Your Honor, I really feel I need to

8   respond to some misrepresentations about when this was

9   disclosed.

10       **MR. GONZÁLEZ:**  There were two people --

11       **THE COURT:**  Wait.  Wait.

12   It's your turn.  Go ahead.

13       **MR. VERHOEVEN:**  Thank you, Your Honor.

14   Mr. González just accused us of hiding this information,

15   and they didn't know anything about automatic download at the

16   preliminary injunction.

17   For the record, I'd cite to page 10 of the opposition to

18   the preliminary injunction.  Quote:

19       Moreover, while Waymo makes much of the 14,000 files

20       that Mr. Levandowski allegedly downloaded, Waymo admits

21       that this represents the entire Waymo SVN repository,

22       demonstrating that Mr. Levandowski did not pick and choose

23       which files to download.  Moreover, when an employee first

24       accesses the SVN repository on a laptop, the entire

25       repository is replicated by default.  Thus, downloading a

1          local copy of the SVN repository is not something that

2          would be investigated by Google or Waymo security team

3          because it does not indicate nefarious activity.

4          The very same argument that they're saying we hid from

5     them until just now, we did -- we provided the information

6     before the preliminary injunction hearing, and they made their

7     argument in the preliminary injunction hearing.

8          So the notion that we were withholding or misrepresenting

9     how this worked is a gross mischaracterization of what actually

10    happened in the written record.

11          **THE COURT:**  Stop.

12          So is that true, that I was on notice of all that way back

13    then?

14          **MR. GONZÁLEZ:**  So, Your Honor, you missed the very

15    last part of what he said.  It's the automatic part of the

16    downloading and the fact that if you follow the instructions

17    and the directions that were created by Sasha Zbrozek that

18    automatically everything is downloaded.

19          It is true that we may have known that 14,000,

20    apparently -- I frankly don't remember that fact.  But if we

21    knew that 14,000 was the entire repository, that's fine.

22          But I think the key point is that they have directions and

23    instructions, and that if you follow those directions and

24    instructions it tells you to download Tortoise and tells you

25    what to checkout.

1          **MR. VERHOEVEN:**  Your Honor --

2          **THE COURT:**  No.  Wait.  Wait.  Wait.

3      Mr. Verhoeven's point is that back at -- Mr. Verhoeven's

4  point is, a minute ago you said that I got misled on the

5  preliminary injunction by not being told that there was an

6  automatic download if you accessed the SVN.  But it turns out,

7  from what he read, that I was told that.  Admittedly by you;

8  not by them.  But you told me that, according to what he read

9  from the brief.

10      So is that -- isn't that a good point?

11          **MR. GONZÁLEZ:**  So, Your Honor, I'm sorry, because I

12  was getting the names that you wanted and I didn't hear the

13  last part of his --

14          **MR. VERHOEVEN:**  I can quote it again, Your Honor.

15          **THE COURT:**  Read it again.

16          **MR. GONZÁLEZ:**  The last part.

17          **MR. VERHOEVEN:**  Page 10 of the opposition to our

18  preliminary injunction motion.  I won't read as much as I read

19  before.  I'll just read the issue about automatic download.

20  Quote:

21          Moreover, when an employee first accesses the SVN

22      repository on a laptop, the entire repository is

23      replicated locally by default.  Closed quote.

24          **MR. GONZÁLEZ:**  And, Your Honor --

25          **MR. VERHOEVEN:**  Now they're saying that there's some

1    surprise.

2         By the way, the instructions that he keeps waiving around

3    were produced on June 26th.  So, you know, this notion --

4              **MR. GONZÁLEZ:**  Well --

5              **MR. VERHOEVEN:**  -- that he's making is completely

6    inconsistent with their own written record.

7              **MR. GONZÁLEZ:**  So, Your Honor --

8              **THE COURT:**  All right.  Make one last point on this.

9              **MR. GONZÁLEZ:**  My last point is, as he just said, the

10   instructions were not produced until after the motion for

11   preliminary injunction.  These were all contested --

12             **THE COURT:**  What does this instruction add that was

13   not already stated in your own brief to me before?

14             **MR. GONZÁLEZ:**  What the instructions add is that if

15   somebody follows those instructions, which they themselves

16   created, and which they told you in their declaration that

17   Mr. Levandowski was looking for, it would be automatically

18   downloaded.

19        And that's a key fact because what they -- what they said

20   to you -- and, again, I can show it to you -- is that he

21   downloaded Tortoise, and then he downloaded 14,000 files.

22   Without saying, and, by the way Judge, if he follows our

23   instructions, that's exactly what we expect would have

24   happened.

25             **THE COURT:**  But you told me that by default that's

1    what does happen.  So why would I need --

2          MR. GONZÁLEZ:  Your Honor, we told you that's what

3    happened by default.  And the Court, I don't believe, made any

4    reference to that in the order.  And I don't believe they

5    admitted that.  So what you had in front of you, I think, was a

6    disputed factual issue that should not have been disputed.  If

7    we had had those instructions, we could have handed you those

8    instructions.

9          MR. VERHOEVEN:  Your Honor, I have to respond.

10         THE COURT:  Wait.  Wait.  Wait.  Wait.

11      Do these instructions say that everything will be

12   downloaded?

13         MR. GONZÁLEZ:  I don't believe that they do, Your

14   Honor.

15         THE COURT:  All right.  What were you about to say?

16         MR. VERHOEVEN:  Well, they say we contest it, but in

17   this very same paragraph they cite to the evidence which is our

18   deposition testimony, one of our employees that was truthful

19   under oath.  We're not contesting that deposition testimony.

20   This is all made up.

21      And by the way, the instructions, if anything, show that

22   it doesn't just accidentally happen.  You have to seek out, get

23   these instructions.  You have to download special software in

24   order to get access to the server, and follow specific steps.

25         And the evidence shows that that was done by Levandowski.

1    Downloaded this stuff, never used it for any work, two days

2    later puts in the card reader, copies it to his personal

3    laptop, and immediately -- or the same day deletes it from his

4    personal laptop.

5        Why?  Why did he do that?  Because he brought his personal

6    laptop in, copied -- to work, copied on his Waymo, put the card

7    reader into his personal laptop, copied it, took it back home,

8    and probably copied it somewhere else.  We have to follow the

9    trail.

10       But the point is, none of this is new about this automatic

11   download.  And the written record shows it.  And counsel's

12   standing up here making misrepresentations about what it knew

13   and when it knew it.

14          MR. GONZÁLEZ:  So, again, I can show you the

15   declaration of the two declarants that they put forth.  And

16   they indicated that he downloaded -- he downloaded the Tortoise

17   and he downloaded 14,000 files.

18       They did not say that that was what you would do if you

19   were following the instructions that you're holding, and that

20   if you follow the instructions everything would come in.  And I

21   think that would have been an important fact for the Court to

22   know.

23          THE COURT:  Maybe.  But, nevertheless, he did do it.

24          MR. GONZÁLEZ:  What we know, Your Honor, is that he

25   deleted on December 15th -- whatever -- whatever was downloaded

1  at the time, he deleted it on December 15th, seven weeks before

2  he left their employment.

3          THE COURT:  Yeah, but on the 11th he downloaded it,

4  and deleted it four days later; right?

5          MR. GONZÁLEZ:  That's correct.

6          THE COURT:  All right.  And then in between there's

7  the card reader.

8          MR. GONZÁLEZ:  That's correct.

9          THE COURT:  And, also, in between somehow it gets onto

10  his personal laptop.

11          MR. GONZÁLEZ:  I'm not even sure, Your Honor -- not to

12  be technical, but just to be accurate, I'm not even sure that

13  it was in between.  It may be that there's something in the

14  Stroz report that I'm not remembering.  In any event, generally

15  that's right.

16          THE COURT:  Well, how did it get onto his personal

17  laptop?

18          MR. GONZÁLEZ:  I don't know the answer to that, Your

19  Honor.

20          THE COURT:  Probably he put it on there.  At least the

21  jury could decide that.  And how did it get on there?  It had

22  to come through that card reader.

23          MR. GONZÁLEZ:  And delete it the same day seems

24  unusual, if somebody is engaged in wrongdoing, to delete it the

25  same day.  But --

1          **THE COURT:**  Well, I'm just here to try to understand

2     the case.  But to me it doesn't sound -- it sounds like a jury

3     could say he -- could accept the Waymo view that this was all

4     sinister and maybe accept your view that it was all a

5     monumental accident; that somehow it got onto his personal

6     computer, somehow it got onto his company computer; and he was

7     stamping out fires left and right trying to delete everything.

8     I don't know.  That doesn't seem too plausible to me, but maybe

9     a jury would buy it.

10         And remember, he's taking the Fifth Amendment.

11         **MR. GONZÁLEZ:**  Sure.

12         **THE COURT:**  If this was so innocent, how come he

13    didn't come in here and tell us?

14         **MR. GONZÁLEZ:**  All I know is the facts, Your Honor,

15    that seven weeks before he ever leaves Google, he's deleted

16    these files.  And those files, those 14,000 files, as I said

17    repeatedly, there's no evidence --

18         **THE COURT:**  He deleted it from two devices.  But

19    there's the card reader.

20         Where is the card reader?

21         **MR. GONZÁLEZ:**  I don't know the answer to that, Your

22    Honor.

23         **THE COURT:**  You don't know.

24         **MR. GONZÁLEZ:**  I don't know.

25         **THE COURT:**  That's right.

```
1        So Mr. Verhoeven will be standing in front of the jury and
2   saying, Mr. González keeps talking about those deletions, but
3   where does Mr. González say the card reader went?
4        MR. GONZÁLEZ:  That's a fair point.  We don't know
5   where it's at.
6        And, Your Honor, they can always make arguments about it
7   could have been downloaded here, it could have been downloaded
8   there.  All we can do is what we've tried to do, which is, it's
9   not at Uber.  And they haven't found these 14,000 files at
10  Uber.
11       THE COURT:  All right.  I have a different question.
12  And I don't want that witness leaving yet because I'm not done
13  with this probably.  But I've got a different question for you.
14       You made a big deal, Mr. Verhoeven, out of you found two
15  exact copies of one of your -- two of your trade secrets
16  supposedly on the due diligence report.  But the thing is, you
17  haven't found those in the Uber system.
18       And even though it's true you just recently got the due
19  diligence report, I have made sure and Magistrate Judge Corley
20  has made sure and the special master has made sure that you
21  have had more access to the Uber system than probably the Uber
22  engineers themselves.  And you are coming up pretty short on
23  finding anything in there that looks like your system.
24       So, okay, you found two documents in the due diligence
25  report that were in the vault at Stroz, but they weren't at
```

1    Uber and they weren't in the system.

2        So where is your proof that those were actually used by

3    engineers at Uber, or even by Levandowski at Uber, to somehow

4    get put into the Uber system?

5            MR. VERHOEVEN:  From the Stroz report?

6            THE COURT:  No, no.  I'm saying you have gone and

7    personally inspected the system at Uber.  Where is your proof

8    that it was actually -- that those trade secrets were actually

9    put to use by Uber?  I'm talking about the two that you

10   found --

11           MR. VERHOEVEN:  Right.

12       First of all -- and Mr. Jaffe can speak to the details.

13   But, first of all, the evidence from the Stroz report shows at

14   least one of those -- I think maybe both -- were used by

15   Ottomotto.  Ottomotto was purchased by Uber.  And so there's

16   use by a company that Uber purchased and assumed all of its

17   intellectual property.  We need to follow that trail, Your

18   Honor.

19       But that shows -- first of all, the Stroz report itself --

20           THE COURT:  Wait.  All right.  That's a point I hadn't

21   thought of.  But help me understand it.

22       What do you mean that there's proof that Ottomotto used

23   it?  Just give me --

24           MR. VERHOEVEN:  Mr. Jaffe has the details.

25           THE COURT:  What is the number of the trade secret

1  that you're referring to?  Is it 25?  27?  I have forgotten the
2  number.
3          MR. JAFFE:  It's Trade Secret 85.
4          THE COURT:  85.  What is the general topic of 85?
5  Just very generally.
6          MR. JAFFE:  So very generally, Trade Secret 85 is a
7  document that records what the entire self-driving-car team is
8  doing on a weekly basis.  It's called a Weekly Update document.
9  It was what are they doing, what are they working on, what
10  problems are they solving.
11          THE COURT:  Okay.  Now, so what's your proof that
12  Ottomotto even used that?
13          MR. JAFFE:  Can I read from the Stroz report?
14          THE COURT:  Yes.
15          MR. JAFFE:  Okay.  So I'll just quote from it right
16  now.  It says:
17          "Stroz Friedberg also identified access by Levandowski
18      to several cloud storage repositories" --
19          THE COURT:  You've got to read slower.
20          MR. JAFFE:  Sorry.
21          THE COURT:  Read at a normal pace so I can understand
22  and the court reporter can get it.
23      Start over.
24          MR. JAFFE:  This is at page 12, by the way.
25          THE COURT:  All right.

1          MR. JAFFE:   (Reading)

2              "Stroz Friedberg also identified access by Levandowski

3      to several cloud storage repositories.  A review of the

4      Internet history shows access to Google Docs on

5      January 26, 2016, the day of Levandowski's resignation.

6      In particular, he accessed a filed named Chauffeur TL

7      Weekly Updates Q4 2015 Google sheets.

8              "Future review of the laptop identified a file with

9      the same name in Levandowski's download folder, which is

10     attached as Exhibit 27.  This file was created on

11     January 1st, 2016, and last accessed on February 24th,

12     2016 (about a month after his departure from Google)."

13         THE COURT:  So how does that tie into Ottomotto?

14         MR. JAFFE:  Well, he was already CEO and working at

15 Ottomotto at that time.  He started the company in

16 mid-January -- the company was formed, I think, in mid-January.

17 And then he left on the 26th and immediately started working on

18 his new company.

19         THE COURT:  So how does that prove that he did that

20 for Ottomotto though?

21         MR. JAFFE:  So --

22         THE COURT:  Is that just an inference that because he

23 was working at Ottomotto by then he must have done it in

24 connection with his work?

25         MR. JAFFE:  There's no other reason to access this

```
1   file.  He wouldn't have any -- it would be a breach of his
2   duties of secrecy back to the company to be accessing and even
3   having it.  And the only reason anyone would even look at this
4   is to develop self-driving, which his new competing company was
5   doing.
6       So we need to follow up.  I mean, we just got this.  We're
7   just trying to get the arms around the evidence.  But the Stroz
8   report itself says he accessed it in February, after he left
9   Google and while he was working on his new company, Otto.
10          THE COURT:  What is your answer to that, Mr. González?
11          MR. GONZÁLEZ:  So, Your Honor, there are a bunch of
12  bumps they've got to get by.  It's not even clear that this
13  information is a trade secret.
14      It's not clear why he accessed it or what he did with it.
15  And whatever was done on February 24th, that was seven months
16  before he joined Uber.
17      And so what you're seeing now, for the first time -- and I
18  think this is clear -- is a massive shift.  They've realized
19  that after 12 inspections and 50 days of depositions -- I think
20  it's more than 50 now -- they haven't found the stuff at Uber.
21  So now they're going to a new plan -- which I don't even know
22  if it's in their complaint -- which is, well, okay, maybe Uber
23  didn't use it, but maybe Ottomotto did.
24      And so now they point to this thing on February 24th, of
25  2016, that he apparently accessed this one document that we
```

```
 1   will probably ultimately argue isn't even trade secret.  And
 2   what evidence is there that anybody, including Ottomotto, ever
 3   used whatever secret you're now claiming is in this one
 4   document that he accessed on this one date?
 5           THE COURT:  Can I ask?  Right now I have to assume --
 6   we haven't litigated whether or not it's a trade secret.
 7   They've alleged it's a trade secret.  They've got it on their
 8   list.  So for present purposes, I'm going to assume it is a
 9   trade secret, subject to proof later.
10       Now, with that having been said, though, what -- was
11   Ottomotto acquired as a stock purchase?  Was it an assets
12   purchase?  How did that part work?
13       Was it a merger?  Was it a merger such that Uber becomes
14   responsible for all of the -- Ottomotto -- Ottomotto is not a
15   defendant in the case, is it?
16           MR. VERHOEVEN:  Yes, it is, Your Honor.
17           THE COURT:  It is?  I thought it was Otto Trucking
18   that was a defendant.
19           MR. VERHOEVEN:  Both.
20           MR. GONZÁLEZ:  And it's a separate --
21           MR. VERHOEVEN:  Ottomotto has been acquired by Uber --
22   I'm not positive.  I think it was a stock transaction.  I do
23   know, because I double-checked, that as part of the transaction
24   they -- all of the intellectual property of Ottomotto to the --
25   was transferred to Uber.
```

1    And so to the extent that that technology incorporates

2    proprietary information from Waymo, by contract Uber owns it

3    and Uber bought it.  And we have to figure out how they're

4    using it, Your Honor.  And Uber is a defendant.

5        At this time in February, Mr. Levandowski was the head of

6    Uber and he was operating the business out of his house.  And

7    he had recruited a team of people from Waymo as part of his

8    plan.  And the Stroz report, at page 12, for example, says:

9            "Evidence also indicated that Levandowski accessed,

10       along with other Ottomotto employees, an Ottomotto team

11       slide on the Slack collaboration platform.  Our review

12       indicates that he accessed Slack twice on January 12th,

13       and again on March 10, 2016."

14       THE COURT:  Is that the document you were calling a

15   trade secret?

16       MR. VERHOEVEN:  No, no.  This is the Stroz report

17   summarizing what they found.

18       THE COURT:  I thought -- what do you mean "Slack"?

19       MR. VERHOEVEN:  That is another -- another piece of

20   evidence, in addition to these trade secrets, showing that

21   Ottomotto is accessing, and Levandowski, and his employees at

22   Ottomotto at least -- you know, March 10 is basically when they

23   did their report.  March is when they concluded their report.

24   And they have evidence that Levandowski was accessing it and so

25   were Ottomotto employees.  Just to finish the thought.

```
 1            "This site included confidential business
 2       presentations regarding the self-driving car, marketing
 3       business plans, videos of test drives, pictures of the
 4       components of self-driving cars, diagrams of vehicle
 5       components marked confidential, system software and code
 6       regarding self-driving cars."
 7            THE COURT:  Wait.  You're off on something else.
 8       I was trying to stick with that timeline.
 9            MR. VERHOEVEN:  I'm sorry.  I'm just trying to address
10  the notion that this doesn't tie into Uber.
11       I mean, this information that we're getting now, this huge
12  number of documents we have to look at, is showing directly a
13  trail leading to Uber.
14       Right now we see it going to Ottomotto.  That's because
15  the report was done in March and the transaction occurred
16  later.  But we -- we need to follow the trail --
17            THE COURT:  Didn't you take discovery from Ottomotto
18  all during this case?
19            MR. VERHOEVEN:  We've tried to -- tried to follow
20  the -- figure out what's going on.  But -- can I --
21            THE COURT:  Who represents Ottomotto LLC?
22            MR. GONZÁLEZ:  We do, Your Honor.
23            THE COURT:  Has Ottomotto LLC produced documents?
24            MR. GONZÁLEZ:  Your Honor, there's been extensive
25  discovery by the plaintiffs on both Ottomotto and Uber both.
```

```
 1              THE COURT:  Ottomotto LLC.
 2              MR. GONZÁLEZ:  Yes.  As distinguished from Otto
 3    Trucking represented by Mr. Chatterjee.
 4              THE COURT:  So has Ottomotto LLC produced documents?
 5              MR. GONZÁLEZ:  I need to confer with my team, Your
 6    Honor, but I'm almost certain the answer is yes.
 7              THE COURT:  Be certain.  Come on.
 8              MR. GONZÁLEZ:  Yeah.
 9              THE COURT:  Help me out here.
10         (Counsel confer off the record.)
11              MR. GONZÁLEZ:  Your Honor, my understanding is that
12    the Ottomotto documents were migrated onto the Uber computer
13    system at the time that it was acquired.  And, therefore, when
14    we searched for documents in response to document requests we
15    would have searched not only Uber but anything that may have
16    migrated over from Ottomotto.  And Ottomotto witnesses have
17    been produced for deposition and deposed multiple times.
18              MR. VERHOEVEN:  Your Honor, really brief --
19              THE COURT:  What good would that timeline have done
20    to -- let's say it was consulted, the trade secret document.
21         I did look at that, by the way.  I think I know what it
22    is.
23         So let's say it was consulted.  What good would that have
24    done Ottomotto or Uber to have looked at that?
25              MR. VERHOEVEN:  Well, I'm going to let Mr. Jaffe.  He
```

1    has the details.  Generally, it has all their plans, what

2    they're doing, their strategy, the whole thing.

3              MR. JAFFE:  So in our -- Mr. Droz, who is one of the

4    engineers on the Waymo self-driving team, in our preliminary

5    injunction he put in a declaration.  One of the paragraphs -- I

6    didn't have a chance to grab it before I stood up, but he

7    explains how this describes the problems that they're facing,

8    how they're solving them, and does so at a fairly detailed

9    manner.

10        And it also says, you know, How do you want to divide your

11   team up?  Who do you want to have working on what?  How long

12   things take.

13        There's a number of different pieces of information.  It's

14   a giant spreadsheet.  So there's a lot of information in there.

15   But it describes, We hit this problem on this date, and here's

16   what we did to solve it.  Those are all proprietary nonpublic

17   informations that have economic value.

18              THE COURT:  Proprietary is not the same as trade

19   secret.

20              MR. JAFFE:  Right.  Excuse me.  I was trying to get --

21   to recite the elements of a trade secret there.  But this is

22   information that is not public and has economic value by virtue

23   of not being public.  And other people do not know it.  This is

24   trade secret information.

25              MR. GONZÁLEZ:  So, Your Honor, they --

1          **THE COURT:**  What do you say to that?

2          **MR. GONZÁLEZ:**  They took extensive discovery on all of

3     their trade secrets, including Trade Secret Number 85.  And I'm

4     confirming with my team, but I believe that they questioned a

5     lot of our witnesses about Trade Secret 85.

6          So this is not a secret document.  They questioned people

7     about it.  What more would they have to do now that they

8     haven't already done?  Sure, Mr. Levandowski may have accessed

9     it at one point.  He's asserting the Fifth Amendment, so we

10    know they're not going to get anything there.

11         I don't think there's any evidence -- and correct me if

12    I'm wrong.  I don't think there's any evidence that anybody

13    else accessed it.  They've got Mr. Levandowski one day

14    accessing this one document, seven months before he comes to

15    Uber.

16         **MR. JAFFE:**  Your Honor, if I may briefly add one point

17    here.

18         So I think there's one point that's -- to add here, that's

19    relevant, which is, the Chauffeur Weekly Update document refers

20    to and what Mr. Droz actually speaks to is a particular

21    software problem that they were dealing with.  What we have not

22    had an opportunity to look at is all the various software.

23         One of the other things that came out of the Stroz report

24    is that Mr. Levandowski and others had thousands and thousands

25    of source code files.  Thousands.

1          **THE COURT:**  Wait.  Say that again.

2          **MR. JAFFE:**  Thousands of source code files.  We don't

3   know what those source code files --

4          **THE COURT:**  He had them after he left Waymo?

5          **MR. JAFFE:**  We don't know.  We just know that they're

6   referenced in the report.  We don't know the whole history

7   there.  We haven't been able to look at their source code

8   files.  And so to do a proper comparison for Trade Secret 85,

9   what we need to do is go and look at their code and do this

10  comparison.

11       Now, relevant here, we moved to compel based on Trade

12  Secret 85.  In response, they said "the allegedly downloaded

13  file."  "Allegedly downloaded," while they were sitting on it

14  the entire time.

15       So they're trying to say, We don't know anything about

16  this file; we've been giving discovery.  They opposed our

17  motion to compel about this allegedly downloaded file.

18         **MR. JACOBS:**  Your Honor, another incomplete

19  representation to Your Honor.

20       Judge Corley ordered, and you confirmed her order based on

21  a Chauffeur Weekly Update -- I'm checking to see whether it's

22  the exact same one that has been referenced here -- ordered the

23  production of source code files from Uber.

24       They have had those source code files, now, I believe, for

25  six weeks.  There may be a partial truth in there, which is

```
 1    that they haven't turned to it yet.  But you and Judge Corley
 2    ordered the production of the source code based on, again at
 3    least, a Chauffeur Weekly Update.
 4        We're checking to see whether it's the very same one
 5    they're pointing to now.
 6        MR. JAFFE:  The timing here is important.  The
 7    production of these files were almost right before we had to
 8    elect our nine trade secrets.  There was no way for us to do
 9    that analysis under this schedule.
10        THE COURT:  All right.  We're going to turn to
11    something else for a while and maybe come back to this.  I
12    still want that witness to stay here.
13        We're going to turn to one of the summary judgment motions
14    on failure to mitigate, Waymo motion to knock out the failure
15    to mitigate.
16        I'm not demanding that you even argue this.  I'm willing
17    to decide it all on the paperwork.  But this is the time and
18    place to make any more arguments that you want to make.
19        MR. BAKER:  Sure, Your Honor.  If you'll permit me, I
20    just want to make a couple of points on the summary judgment
21    motion for failure to mitigate.
22        THE COURT:  We've moved on to something else.
23        MR. CHATTERJEE:  I'm sorry, Your Honor?
24        THE COURT:  Why are you standing up?
25        MR. CHATTERJEE:  I was going to argue it, but
```

1    Mr. González said --

2              MR. GONZÁLEZ:  Go ahead.

3              THE COURT:  You get to argue it.  I want to hear from

4    Waymo first.  It's their motion.

5         Go ahead.

6              MR. BAKER:  Thank you, Your Honor.

7         So during briefing, defendants waived all of their

8    affirmative defenses except for failure to mitigate and unclean

9    hands.

10         With respect to failure to mitigate, the first point I

11   want to make is that there are no factual disputes here.  In

12   their opposition, they argue that Waymo delayed in bringing

13   suit.  But they don't point to any specific facts that are in

14   dispute.  So this is ripe for summary judgment.

15         Their argument is that Waymo should have brought suit back

16   in July or August of 2016, and that Waymo failed to mitigate

17   its damages by not doing so.

18         At that time, Your Honor, Waymo was in the middle of its

19   investigation, the forensic investigation.  We did not have the

20   full knowledge of everything that was going on here and did not

21   learn until December of 2016, when Waymo received an

22   inadvertent email from Uber's vendor showing the printed

23   circuit board that uses Waymo trade secrets.  That's the first

24   time that we learned of that fact.

25         We quickly put together a complaint.  Completed the

investigation, put together a complaint and motion for a

preliminary injunction, and filed that within nine weeks of

receiving that inadvertent email.  And I would just

respectfully submit that that's hardly delay or a failure to

mitigate anything.

    The other point I want to make is that, in their brief,

Otto Trucking argues that the email from the vendor in December

did not add anything to what Waymo already knew, and that,

therefore, we could have sued Otto Trucking earlier.  But

that's not true either.

    Back in July or August of 2016, Waymo of course didn't

know what exactly the role of Otto Trucking was or was not.

    When we received the email in December of 2016, and saw

the printed circuit board, of course that implicated Uber.  It

also implicated Ottomotto and Otto Trucking, Anthony

Levandowski as the CEO of Otto Trucking.

    So at that point we -- all three entities at that point

were our focus, but not until December of 2016.

    **THE COURT:**  All right.  Mr. Chatterjee.

    **MR. CHATTERJEE:**  Your Honor, I'll be brief on this,

focusing on the issue of the failure to mitigate, which I think

was what Your Honor's questions were about.

    One of the cases that we cited in our papers was

*Thrifty-Tel v. Bezenek*.  And in that case, there were -- the

California Court of Appeals denied damages when the

1    defendants -- when the plaintiff did not contact the

2    defendants, and was aware that maybe they should, and delayed

3    five months.

4        Here we have those exact same facts.  We have a detailed

5    investigation of Anthony Levandowski, and others, that started

6    in February of 2015 -- 2016, excuse me, in August through

7    October of 2016, those 14,000-file issue that you had an

8    extensive colloquy about, a number of other investigations of

9    every single person who was leaving Otto -- leaving Waymo or

10   Project Chauffeur for Otto Trucking underway, an investigation

11   of all of the Google drive devices.

12       And all that information was known.  In fact, they

13   initiated litigation in an arbitration proceeding against

14   Mr. Levandowski.  Yet -- and there's even email correspondence

15   that Google considered contacting Uber about that information.

16   And they did nothing.  They just sat on their hands knowing all

17   this information and did nothing.

18       At a minimum, if you look at how much paperwork they put

19   in their opposition, and how much factual testimony they put

20   in, there's a triable issue of fact here as to:  Why did they

21   delay?  What did they know?  And why didn't they act?  That is

22   a quintessential reason to deny summary judgment.

23       **MR. BAKER:**  And again, Your Honor, I would just say

24   that they have not pointed to any specific facts that are in

25   dispute.  Only that we've attached a lot of exhibits.  But

1    there is no facts.  And it's in dispute here.

2         The case that Mr. Chatterjee refers to is a case where the

3    delay was five months.  What we're talking about here, from the

4    time that we found the email from the vendor, that was in

5    December of 2016, Waymo filed suit in February, nine weeks

6    later.  That is not a delay.

7         And the investigation was not complete back in July of

8    2016.  It was -- we were in the middle of the investigation at

9    that time.

10        The download was not discovered until September or October

11   of 2016.  And then over the course of the next several months,

12   Waymo continued its investigation.  They had other forensic

13   investigators looking into log files showing the various

14   activity of Mr. Levandowski, showing that he had plugged in the

15   card reader, showing that he had wiped his computers after --

16        **THE COURT:**  When did Waymo learn about the card

17   reader?

18        **MR. BAKER:**  I believe -- I believe that was in

19   February, right before we filed the complaint in February of

20   2017, I believe.

21        **THE COURT:**  Well, Mr. Chatterjee, you said a moment

22   ago that in February of 2016 they knew everything.

23        **MR. CHATTERJEE:**  So, Your Honor, the --

24        **THE COURT:**  They did not know everything.  They had

25   begun to learn things, but they didn't know everything.

1          **MR. CHATTERJEE:**  I disagree with that

2   characterization.  That is a disputed issue of fact, Your

3   Honor.  Because Mr. Brown, who was doing the investigation,

4   searched the log files, and the card reader data is in Google's

5   log files.  That is where they determined that that card reader

6   was attached.

7       So this was information that was in Google's possession.

8   He said he reviewed them.  And then when they say that they

9   learned of it just days before they filed the lawsuit, they had

10  it in their hands.  And their own people said they reviewed it.

11  A jury is allowed to infer that they knew about that --

12         **MR. BAKER:**  Your Honor --

13         **MR. CHATTERJEE:**  -- because it was in there.

14         **THE COURT:**  Wait.  Wait.

15      So does this go to equitable relief only, or does this go

16  to damages?

17         **MR. CHATTERJEE:**  So -- pardon me, Your Honor.

18      I think it goes to damages.  And it could also go to

19  whether one could seek unjust enrichment.  And I think there's

20  an open question there as to whether that would be considered

21  equitable or not.

22         **THE COURT:**  All right.  Yes, you had a comment.

23         **MR. BAKER:**  Yeah, just one point, Your Honor.

24      What was just said about Mr. Brown knowing about the card

25  reader is not true.

```
1          In February of 2016, Mr. Brown was contacted about the
2    investigation.  He didn't do any forensic analysis at that
3    point.  They asked him at his deposition how many hours he
4    spent.  He said zero.  He did not -- neither he nor anyone else
5    found out about the card reader until February of 2017, right
6    before we filed --
7          THE COURT:  Mr. Chatterjee is referring to something
8    that some kind of information was in their possession.  What's
9    he referring to?
10         MR. BAKER:  I do not know, Your Honor.
11         THE COURT:  What are you referring to?
12         MR. CHATTERJEE:  Sure, Your Honor.
13         The card reader information that Mr. Brown based it on is
14   based upon log data from something called Bit9, which is a log
15   that is maintained by Google and reviewed by the security
16   department.
17         The card reader information and that Bit9 log data is all
18   information that Google maintains inside its network security
19   system.  That is the information he relied upon in order to
20   determine that there was a card reader.
21         THE COURT:  You're saying that whoever was in the
22   security department, eating doughnuts or something, should have
23   picked up on this back in February of 2016?  Is that it?
24         MR. CHATTERJEE:  Your Honor --
25         THE COURT:  That's what you mean when you say they
```

1    knew about it?

2        **MR. CHATTERJEE:**  There's two points, Your Honor.

3        One, that I think they did know about it because they did

4    review this information.  And we believe we'll be able to

5    discredit Mr. Brown's testimony at trial.  But, in addition, if

6    they didn't know about it, they should have because they looked

7    at this data and they were looking at this data to understand

8    Mr. Levandowski's behavior.

9        **THE COURT:**  All right.  You get the last word and then

10   we're moving on.

11       **MR. BAKER:**  Thank you, Your Honor.

12       I believe Mr. Brown has testified that he did not begin

13   his analysis until late summer or early fall of 2016.  He began

14   looking at a number of different log data, from which he

15   concluded that Mr. Levandowski had wiped his computer, et

16   cetera, et cetera.  This particular set of log data was not

17   analyzed until February of 2017.  And that's when we discovered

18   the card reader.

19       **THE COURT:**  All right.  Next thing, unclean hands.

20   Isn't that an equitable issue?

21       **MR. CHATTERJEE:**  Yes, Your Honor.

22       **THE COURT:**  Why do I need to decide it now then?  Why

23   don't I wait and see how the trial comes out, and then if

24   there's a proceeding for equitable relief that's when unclean

25   hands would come into play.

1    **MR. BAKER:**  Sure, Your Honor.  If I could address

2    that.  That's our motion as well.

3       The reason we think this is ripe for summary judgment is,

4    once again, there is no factual issue in dispute here.  They

5    have changed their unclean hands defense.

6       Originally, this was based on an argument that Waymo had

7    copied certain information from some other third party.

8    They've now completely abandoned that.  And they're now going

9    with the theory that Waymo and its counsel have engaged in

10   discovery misconduct.

11      I think, as Mr. Verhoeven has already explained to you,

12   that's entirely false.  The kinds of arguments that they're

13   making now they're based on facts that they had at the very

14   beginning of this case.

15      And the emails that they're talking about -- for instance,

16   that we supposedly withheld -- those emails were on our

17   privilege log since March 23rd.  Those emails were held --

18      **THE COURT:**  But what if they were bogus privilege

19   claims?

20      **MR. BAKER:**  Well, so -- and I'll explain what happened

21   there.

22      So since the beginning of this case, Waymo made the

23   decision, strategic decision, to waive work product with

24   respect to the aspects of the forensic investigation outlined

25   in the declaration of Gary Brown, who, Your Honor will probably

1   recall, is one of the forensic investigators.

2        We did not, however, waive attorney-client privilege with

3   respect to that subject matter.  And we did not waive work

4   product or attorney-client privilege with respect to other

5   aspects of the investigation.

6        That was our position.  And they knew that that was our

7   position when we served the privilege log on March 23rd and

8   also when they took the deposition of Gary Brown on March 24th.

9        And then there was other correspondence in the beginning

10  of April, where we laid out our position in detail, okay.

11       Now, they waited until August 11th, I believe, to file a

12  motion to compel, arguing that the waiver should be broader and

13  that we should be compelled to produce certain documents that

14  we held back as privilege and work product.

15       Ultimately, Judge Corley agreed with them that the waiver

16  should be somewhat broader.  She issued that order on

17  August 18th.  And we complied and produced documents in

18  response to that order quickly thereafter.  But nowhere in her

19  order did she say that -- that Waymo or its counsel had done

20  anything wrong.

21       We had a subsequent hearing where she reviewed documents

22  in camera, one by one, to see if we were holding anything back

23  that needed to be produced.  She ordered us to produce many of

24  those documents but specifically stated that there was no

25  fault -- it was -- on the part of Waymo, that we had acted

1  reasonably and not held back any documents that were, you know,

2  material to the litigation.

3      So she's already made a finding that there's been no

4  misconduct on the part of -- yeah, and she also found some of

5  the documents privileged.  And we were allowed to continue to

6  hold those back.  But the point is that she has already made a

7  finding that there has been no misconduct on the part of Waymo

8  or its counsel.

9      In order for them to prevail on their unclean hands

10 defense, they have to show some sort of misconduct.  And Judge

11 Corley has already said there wasn't any.  So that's why we

12 think this is ripe for summary judgment.

13          THE COURT:  All right.  You get the last word,

14 Mr. Chatterjee.

15          MR. CHATTERJEE:  Your Honor, they took Sasha Zbrozek

16 and they put him in a submarine, and they put him in the bottom

17 of the ocean and hid his identity.  They never disclosed him.

18     He was talking to them the day before they filed the

19 lawsuit.  They never disclosed the fact that anyone had any

20 questions about the relative value of information on the SVN

21 server.  They actively opposed it.

22     We put in a declaration in response to Your Honor's order

23 on Monday, a 33-page declaration --

24          THE COURT:  But they say that they had a good-faith

25 belief that that was privileged, that that email was

1   privileged.  And it was to a lawyer; right?

2          **MR. CHATTERJEE:**  Your Honor, they shouldn't have

3   hidden Sasha Zbrozek, whether or not it was privileged or not.

4          **THE COURT:**  How did they hide him?

5          **MR. CHATTERJEE:**  They didn't put him on a Rule 26.

6   And he was at the center.

7          **THE COURT:**  They don't have to put him on Rule 26

8   unless they are going to call him as a witness.

9          **MR. CHATTERJEE:**  Your Honor, even with the preliminary

10  injunction witnesses that they identified, when those witnesses

11  were asked about what did they actually know about the SVN

12  server, they actually had no knowledge.  It was Mr. Zbrozek

13  that had all the knowledge.

14      And the documents that are the key documents that we're

15  moving on, none of those were on the privilege log in March.

16  There was one document that was produced, associated with this

17  investigation, that was produced on that March 23rd log.

18      The first record we have of them saying they're waiving

19  privilege was August 8th to 10th, sometime in that time period.

20  And Sasha Zbrozek -- not Sasha Zbrozek.  And Mr. Brown, when he

21  was deposed, there were extensive privilege objections.

22      At the end of the day, Your Honor, I agree with you that

23  this is something that can be resolved after trial because

24  there is an equitable issue.  But there is extensive evidence

25  here that they tried to hide the ball and hide the evidence

1    that was relevant in this case.

2         And they also were making statements to the Court about

3    the importance of this material, about Mr. Levandowski's

4    actions, what certain search results showed that now are shown

5    to be inaccurate based upon communications with the lawyers.

6         **MR. BAKER:**  Your Honor, if I could make a couple of

7    points, because I think there have been a couple of

8    misrepresentations.

9         Number one, we were not hiding Sasha Zbrozek.  Mr. Zbrozek

10   was discussed in the declaration of Mr. Janosko, in the context

11   of the preliminary injunction proceeding.  Also, Mr. Chatterjee

12   said -- I'm sorry, in the deposition, in his deposition.

13        Mr. Chatterjee said that the first indication they had of

14   our position on waiver was August 10th.  I'll just read you an

15   email that we sent on, I believe, April 10th, shortly after

16   Mr. Brown's deposition.  It says:

17             "Per and consistent with our discussion this

18        morning" -- and I believe this was an email to

19        Mr. González -- "I have attached notes from Mr. Brown as

20        Uber has requested.

21             "The production of the notes concerns and is limited

22        to the disclosures in his declaration regarding the

23        investigation addressed therein.  This production is

24        without waiver of and without prejudice to any other work

25        product protection privilege.  To the extent his notes

1    reflect any other investigation beyond the scope of his

2    declaration, that material has been redacted, withheld as

3    work product."

4        We were very clear with him what our position on the work

5    product and privilege waiver was.

6        And one final point.  With respect to Judge Corley's

7    rulings, she ruled that a lot of these materials were

8    privileged.  She asked us -- ordered us to produce them as a

9    matter of fairness, just because it's hard to slice and dice

10    out some of these waiver issues.

11        So there were certain documents where there were

12    privileged information, and she asked us to unredact it as a

13    matter of fairness because it was wrapped up in what she

14    decided was within the scope of the waiver.

15        **THE COURT:**  All right.  We've got to move to the

16    motion on Otto Trucking.  That's your motion.  So we go to that

17    motion.  Otto Trucking.

18        **MR. CHATTERJEE:**  So I'm going to have Mr. Brun argue

19    that motion.

20        **THE COURT:**  Very well.  Thank you.

21        **MR. BAKER:**  Thank you, Your Honor.

22        **THE COURT:**  All right.

23        **MR. BRUN:**  Good morning, Your Honor.  Shane Brun for

24    Otto Trucking.

25        **THE COURT:**  Please, go ahead on that motion.

1          MR. BRUN:  Excuse me, Your Honor.

2          THE COURT:  It looks like it's unopposed.

3          MR. BRUN:  It should be unopposed.

4          THE COURT:  Someone is going to stand up, but you go

5     ahead.

6          MR. BRUN:  Thank you, Your Honor.

7      Your Honor, so Waymo's claims in this case have been

8     solely focused on Uber and Ottomotto.  More specifically, they

9     have been focused on the Fuji and the Spider systems.  That's

10    what they claim uses the trade secrets.

11      There's not a single fact to suggest that Otto Trucking

12    uses a trade secret.  There's not -- Otto Trucking, as the

13    facts have shown now that discovery is over, separate company.

14    It's a holding company.  Only holds trucks.  That's all it

15    does.

16          THE COURT:  Do these trucks, are they equipped with

17    LiDAR?

18          MR. BRUN:  They're equipped with a third-party LiDAR

19    system, Your Honor.  There's not a single fact to suggest --

20    it's undisputed, I don't think they contest the fact that an

21    Otto Trucking truck has never been equipped with either the

22    Fuji or the LiDAR or the Spider system.  And there's no

23    suggestion they have otherwise ever been equipped with any

24    system that uses the trade secrets.

25          THE COURT:  All right.  So stay right there and

```
 1    let's -- Ms. Baily; right?
 2              MR. BAILY:  That's correct, Your Honor.
 3              THE COURT:  Please tell me what you think is the
 4    answer.
 5              MR. BAILY:  Excuse me.
 6         First of all, Your Honor, the emphasis on use is
 7    misplaced.  Use is not the only way that you can misappropriate
 8    a trade secret.
 9         And I do want to point out something that was actually
10    very misleading, I believe, in Otto Trucking's briefing on
11    this.  They basically said, look at Waymo, they're only
12    pointing to Spider and Fuji.  Look at their response to
13    Interrogatory No. 9.
14         They didn't attach what the actual interrogatory asked.
15    They just attached a portion of our answer.  The interrogatory
16    only asked about use.  It did not ask about other theories of
17    misappropriation, including acquisition of the trade secrets.
18         And there is a lot of evidence, including the Stroz
19    report -- and we can talk about that -- that Otto Trucking
20    acquired the trade secrets improperly and knowingly
21    improperly --
22              THE COURT:  Well, help me understand what that
23    evidence is.  Give me just one item of evidence that Otto
24    Trucking, as opposed to Levandowski, but Otto Trucking ever
25    acquired any of these trade secrets.
```

1   **MR. BAILY:**  Well, Your Honor, let me just start -- I

2   do need to tell you a few things in order to make those

3   connections.

4       So let me start at the Stroz report, which we just

5   received.  And we did receive it after we filed our opposition

6   to the motion for summary judgment.

7       So I just heard him say that discovery is closed.

8   Discovery is absolutely not closed.  And it was not closed when

9   they said that in their motion or in their reply.

10      So now we have the Stroz report because discovery was not

11  closed.  And the Stroz report, at the bottom of page 11, talks

12  about a very narrow subset of all of the documents that

13  Levandowski was found to have on his devices.

14      So it talks about a narrow subset of 347 files from his

15  self-identified data.  The paragraph on the bottom of page 11

16  describes those files.  And it describes them as containing

17  proprietary information related to Levandowski's work at Google

18  on the Chauffeur project.  And then it lists some examples,

19  including system files, software files, code, confidential

20  presentations, confidential diagrams.

21      Then there is an analysis, in Exhibit 16 to the Stroz

22  report, of access to those files.  More than a third of those

23  files were accessed after Levandowski left Google.  So they

24  were not accessed for Levandowski's work at Google; they were

25  accessed after that.  February, March.  So after he resigned

```
 1    from Google in January.
 2        What was Mr. Levandowski doing at that time?  He was
 3    talking to Uber and setting up Otto Trucking and Ottomotto.
 4            THE COURT:  But wasn't Ottomotto already -- I mean,
 5    one of their points is that Otto Trucking got set up -- give me
 6    the date again.  What's the date of Otto --
 7            MR. BAILY:  February 1st.
 8            THE COURT:  February 1st of 2016?
 9            MR. BAILY:  That's correct.
10            THE COURT:  When Ottomotto set up?  Wasn't that
11    earlier?
12            MR. BAILY:  It was a few weeks earlier, I believe.
13            THE COURT:  All right.  So take the time period after
14    Otto Trucking was set up.
15            MR. BAILY:  Exactly.  Taking that time --
16            THE COURT:  What is your point?  What does the Stroz
17    report say?
18            MR. BAILY:  After February 1st, when Otto Trucking was
19    set up, more than a third of this narrow subset of documents
20    that are described as containing Google proprietary
21    information, Google software files, Google code, Google system
22    files, more than a third of those were accessed after
23    February 1st.
24        So I went through Exhibit 16 --
25            THE COURT:  When you say "accessed," accessed by who?
```

**MR. BAILY:**  Accessed by Mr. Levandowski.

What was Mr. Levandowski doing at that time?  He was working on Ottomotto and Otto Trucking.  He was no longer at Google.

And he accessed more than a third of just even that narrow subset of files after he left Google, while what he was doing was talking to Uber and setting up these entities.  Which just weeks after he was accessing these files, there's an agreement about -- you know, about Uber acquiring these companies.

So there was the agreement about Uber acquiring Ottomotto.  And there's also an agreement -- I think I might be straying into confidential material here about, you know, a potential acquisition of Otto Trucking.  I believe that much is public.

**THE COURT:**  Can you tell, from what you have, which particular files were accessed?

**MR. BAILY:**  So that's exactly the problem.  And this, of course, dovetails with the continuance motion.

I can show you the exhibit that we have attached to the Stroz report, which lists out the files.  But it actually doesn't tie together.  We need more discovery.  It lists out the file types, and there's this general description.

But we don't have yet the dots to connect -- but we know that we can get them, now, from the materials that are being produced -- to connect the documents listed that are just listed by file type and for which there's this general

1    description that confirms that these are all confidential

2    Google materials to the actual documents and files and source

3    code that they actually are.

4         **THE COURT:**  Well, see, where I'm heading was, can you

5    trace one of those to one of the many trade secrets that you

6    listed?

7         **MR. BAILY:**  And that is what we need to do.  We need

8    to actually draw the dots from -- you know, so we've obviously

9    had some time to process the Stroz report that was produced

10   late last week.  So there's -- I forget how many exhibits.  I

11   think Your Honor has seen it.  There's lots of exhibits.  We've

12   been through those.

13        Exhibit 16 is this analysis of access that proves that

14   Levandowski was accessing what Stroz describes as our

15   confidential materials after he left Google, while he was

16   focused on Ottomotto and Otto Trucking.

17        Exhibit 16 lists these files in a generic way.  And I

18   don't have the file names; right.  We need to get this

19   discovery to map the file names.

20        Well, what exactly was Levandowski looking at?  Which

21   pieces of source code was he looking at?  Which files was he

22   looking at on March 22nd, 2016, while he's talking to Uber

23   about acquiring his Ottomotto and Otto Trucking companies.

24   And, you know, why else is he looking at these files on

25   March 22nd, 2016?

```
 1            We need the time to actually connect the dots because
 2     they're not connected in the Stroz report themselves.  There's
 3     the general description that all of this is confidential to
 4     Waymo and that it was accessed on specific dates after
 5     February 1st --
 6            THE COURT:  All right.
 7            MR. BAILY:  -- but we now need to connect the further
 8     dots.
 9            THE COURT:  Hold that very thought.
10         What's your answer to what I just heard about confidential
11     Waymo information was accessed by Mr. Levandowski after Otto
12     Trucking was formed?
13         MR. BRUN:  Well, with respect to the Stroz report,
14     Your Honor, there's nothing in the Stroz report that changes
15     the facts with respect to Otto Trucking.
16         Otto Trucking is separate from Ottomotto.  Otto Trucking
17     is just a holding company that holds trucks.  Doesn't have any
18     engineers.  Doesn't do any R&D.
19            THE COURT:  Why was Levandowski accessing that
20     information?  Was he doing it for his personal account?  Was he
21     doing it for Otto Trucking?  Was he doing it for Ottomotto?
22     What's the answer to that?
23         MR. BRUN:  Well, he wouldn't be doing it for Otto
24     Trucking, Your Honor.
25            THE COURT:  How do we know that though?
```

1       **MR. BRUN:**  Otto Trucking, all it does --

2       **THE COURT:**  You're using the present tense.  What was

3   it doing back then?  What was its possible plans back then?

4       **MR. BRUN:**  I can't speak as to what Mr. Levandowski

5   was doing as described in the Stroz report.  But, again, it

6   doesn't have any impact at all on our motion with respect to

7   Otto Trucking.

8       **THE COURT:**  Well, but conceivably -- conceivably, he

9   was sitting there wearing his hat as Otto Trucking, thinking

10  that he was going to sell Otto Trucking to Uber, and that he

11  was accessing these files for the purpose of -- maybe he was

12  just doing it for himself, Otto Trucking, Ottomotto.

13      And how do we sort all that out at this point?  I

14  appreciate the way Otto Trucking has developed Velodyne LiDAR

15  Plus trucks has almost nothing to do with this case.  But, on

16  the other hand, back then, when things were still in flux and

17  in play, maybe they did, maybe Otto Trucking did access and

18  acquire these files.

19      **MR. BRUN:**  Again, Your Honor, Otto Trucking -- let's

20  talk about the two companies that Mr. Levandowski formed.

21  Ottomotto, which is an operational company, that was the entity

22  that was going to be developing lasers or LiDAR systems.  That

23  was that aspect of the company.

24      Mr. Levandowski, as you'll recall from throughout this

25  case, he left Google to set up a trucking company, Your Honor.

1    He wanted to focus on trucks.  Otto Trucking itself was set up

2    just as holding company, to hold the assets for that trucking

3    business.

4        It's been established through -- even though the Stroz

5    report just came out and they want to say they need more

6    discovery on the Stroz report, doesn't change that structure of

7    Otto Trucking and what Otto Trucking's business is.  It's just

8    to hold trucks.  And that's all it does.  And they can't

9    dispute that.

10       **THE COURT:**  Why did Levandowski access that material?

11   And how can we be a hundred percent positive he didn't do it

12   for purposes of Otto Trucking?

13       **MR. BRUN:**  Again, if you look at the -- what they're

14   trying to do -- so there's no evidence that any trade secret

15   ever got to Otto Trucking.  There's no claims of direct

16   misappropriation in this case.

17       **THE COURT:**  Well, that's possibly right.  But,

18   nevertheless, if somebody at Otto Trucking is there reading the

19   trade secrets, wearing their hat as Otto Trucking, that's

20   acquisition.

21       **MR. BRUN:**  But the issue isn't he couldn't have been

22   wearing his hat as Otto Trucking, given what Otto Trucking's

23   business is.  If they wanted to hold Otto Trucking vicariously

24   liable for Mr. Levandowski's supposed use of the trade secrets,

25   it has to be within the scope of Otto Trucking's business.

```
1              THE COURT:  Where does that rule come from?

2              MR. BRUN:  We cite it in several cases, Your Honor.

3              THE COURT:  What if there's a plumber's unit that goes

4   and steals trade secrets, and they're not in the business of

5   that trade secret, but they're being used as a conduit somehow?

6   Maybe that acquisition for that sinister purpose is enough.

7        I don't know.  I question the proposition that you have to

8   be in the business of the trade secret in order to be guilty of

9   stealing trade secrets.

10             MR. BAILY:  Your Honor, if I may, Otto Trucking was in

11  the business of the trade secret, regardless of that question,

12  which I also --

13             THE COURT:  But that's not right because they just

14  hold trucks.

15             MR. BAILY:  But that's not right.  So the evidence

16  that Otto Trucking submitted includes a framework agreement.

17  It was submitted under seal.  I'd like to read from it.

18             THE COURT:  Go ahead.

19       You lawyers put so much stuff under seal and abuse the

20  process.  Go ahead.  Read it.

21             MR. BAILY:  So part of the framework agreement between

22  Uber and Otto Trucking and Uber Freight concerns the trucking

23  AV business.  Trucking --

24             THE COURT:  Say that again.

25             MR. BAILY:  Trucking AV business.
```

1        THE COURT:  Like audiovisual?  What do you mean AV?

2        MR. BAILY:  Autonomous vehicle.

3        THE COURT:  Autonomous vehicle.  All right.

4        MR. BAILY:  And here we have Otto Trucking renting the

5   sensors and related hardware that are owned by the division at

6   Uber that does autonomous vehicles and related to the trucking

7   AV business.  So we're -- we're not just holding trucks here.

8   We are renting from Uber the sensors that are related to

9   autonomous driving.

10       The notion that Otto Trucking was set up not for

11   autonomous trucking is laughable.  I mean, we just heard Otto

12   Trucking's counsel say, Levandowski set up the company to do

13   autonomous trucking.  And here we have an agreement where they

14   are renting from Uber the sensors for autonomous trucking.

15       The notion that Levandowski, sitting with his Otto

16   Trucking hat on -- and, by the way, Otto Trucking can't do

17   anything without Levandowski's consent; right.

18       The notion that Levandowski is, you know, separate from

19   Otto Trucking is in some ways laughable in and of itself.  Even

20   more laughable is Otto Trucking has nothing to do with

21   autonomous trucking.

22       THE COURT:  But I thought he said that they did.  Now

23   I'm getting confused.

24       MR. BAILY:  Well, if he did, then we agree.

25       THE COURT:  Isn't that true, that it was autonomous

1    trucking, that they would drive themselves with LiDAR?

2        **MR. BRUN:**  Again, Counsel is confusing and sort of

3    misstating what Otto Trucking is and what is going on.  So let

4    me try to explain, Your Honor.

5        So Otto Trucking, again, was set up as a holding company

6    to hold the assets that Ottomotto and then ultimately Uber are

7    using to develop a trucking business.

8        Otto Trucking doesn't have any employees.  The LiDAR

9    systems that are put onto Otto Trucking's trucks are put on

10   there by Uber employees.  And they're running tests, and there

11   are other operations done with those trucks by Uber employees

12   and Uber's development of its trucking business.

13       Otto Trucking does not have any development, does not have

14   any employees that work on LiDAR systems.  Again, it's simply a

15   holding company.  And there is no evidence in the record, no

16   evidence to be had, that they ever had access to any of the

17   trade secrets, that they ever used any of the trade secrets.

18       **THE COURT:**  There is access -- there is this evidence

19   that Levandowski downloaded a lot of files at a time period

20   that Otto Trucking existed.  And, for all we know, he was

21   wearing his Otto Trucking hat when he downloaded those.

22       **MR. BRUN:**  I think it goes to the point of exactly

23   what they're really trying to do here, Your Honor, is, they're

24   trying to hold Otto Trucking liable simply because

25   Mr. Levandowski was the founder of Otto Trucking and the

1    majority shareholder.

2         But you can't impute the knowledge, his knowledge.  And

3    you shouldn't -- we cited the *Drager* case, Your Honor, in our

4    papers.  And just so I get it exactly accurate, let me read

5    this, because this is exactly what they're trying to do here,

6    Your Honor.  In *Drager* the Ninth Circuit said:

7              "It is generally not appropriate to direct a jury to

8         impute an agent's knowledge of a secret to the principal.

9         Such an instruction would permit recovery even when the

10        trade secret was not actually communicated to or used by

11        the principal."

12        That's what they're trying to do, Your Honor.  Otto

13   Trucking -- there's not a single piece of evidence to suggest

14   that Otto Trucking has ever used the trade secret or that the

15   trade secret was actually communicated to Otto Trucking as the

16   principal.

17        They're trying to say Otto Trucking is, in fact,

18   Mr. Levandowski.  And they're wanting to hold Otto Trucking

19   liable just based on that.

20        **THE COURT:**  All right.  We need to let our court

21   reporter rest her fingers for a bit.

22        We also have a motion on Trade Secret Number 9.  I guess

23   we have to do that in an empty courtroom.  Also, Trade Secret

24   96 we've got to deal with.  That's, likewise, going to be in an

25   empty courtroom.  Then we may have more to say on the issue of

1    continuing the trial date.

2        Now, we're going to come back to the continuing the trial

3    date point after the break.  And I'm not making a ruling now.

4    And I am not going to make a ruling today because I want you

5    lawyers to try hard to keep the October 10th date and do

6    whatever you have got to do to get the discovery done.

7        But I also am going to monitor this very carefully.  And

8    if it turns out I genuinely think that even though Waymo has

9    done everything it can possibly do, it genuinely needs more

10   time on account of the other side having stonewalled on the due

11   diligence report, then we're going to give them more time.

12       But we're not there yet.  And I sometimes think that Waymo

13   is exaggerating this because they have ulterior motives to try

14   to fix up other parts of their case.

15       I don't know.  I am not making a ruling now.  But here's

16   why I'm bringing this up:  I want you to tell me after the

17   break what specific schedule, as prompt as possible, would

18   work, taking into account whatever else it is -- so, in other

19   words, if Waymo says, okay, we want to change our list of trade

20   secrets because we realize we've got some losers in there, and

21   we want to go with a different group of trade secrets, and we

22   want to take more discovery from Stroz, and we want to take --

23   adjust our expert reports, in 15 minutes or so you need to give

24   me a specific schedule that would work.

25       And I will not consider one that puts this way out there.

1    It would have to be a short continuance to be even considered,

2    for a lot of reasons that have to do with the calendar of this

3    court and other cases.  You are not the only case on the

4    docket.  And I've given you a lot of time.  So I have other

5    cases that need attention.

6         So when we come back, I want to hear what your proposal

7    is.  And if it's crazy, it will be denied.  So think about

8    that.

9         And I want to be clear.  Even if it's what some other

10   people my think is plausible, I still might deny it because

11   there has been vast discovery in this case already.  And I need

12   to weigh how much Waymo is exaggerating with alligator tears or

13   crocodile tears, whatever they are, how much it's exaggerating

14   its predicament.

15        Okay.  Fifteen minutes and we will resume.

16        Let me just say to the members of the public.  We're going

17   to start with the public portion, but eventually I've got to

18   get into the part where I have to ask you to leave because of

19   these alleged trade secrets will not be secret anymore if you

20   get to stay here.  So I apologize for that in advance.  But

21   we're not quite to that point yet.

22        All right.  Fifteen minutes.

23             **MR. BRUN:**  Thank you, Your Honor.

24                  (Recess taken at 9:32 a.m.)

25                  (Proceedings resumed at 9:55 a.m.)

1     **THE COURT:**  Back to work.  Have a seat, please.  Thank

2  you.

3     So let's turn to what your proposed revised schedule would

4  be if we went there.

5     **MR. VERHOEVEN:**  Your Honor, we have no intention of

6  trying to move this out more than it needs to be.  We've

7  scribbled out the fastest we think we could get everything done

8  and marshaled in a fair way, and I'll start with the endpoint;

9  and Mr. Perlson, who's more involved in the discovery, will

10  explain the rest of the schedule.

11     But we would propose a trial on December 5th, and

12  Mr. Perlson can talk about --

13     **MR. PERLSON:**  Yeah.  So then before that, the pretrial

14  conference, we'd propose November 28th; expert discovery would

15  close two weeks before that, November 14th; reply expert

16  reports would be October 31st and the response reports would be

17  October 27th and the opening reports would be October 20th.

18     **THE COURT:**  Well, now, December 5 -- how long a trial

19  do you think this would be?

20     **MR. PERLSON:**  Well, I think it's currently calendared

21  for three weeks and, you know, we thought that that was

22  sufficient time.  I haven't looked into specifically whether

23  that could be shorter, but --

24     **MR. VERHOEVEN:**  I think that would be shorter because

25  we've narrowed our case.  I would say two weeks.

1          **THE COURT:**  It's ever-expanding.  I don't see how
2    you've narrowed anything.
3          **MR. VERHOEVEN:**  Well, we're no longer asserting patent
4    claims, for example.
5          **THE COURT:**  You're no longer what?
6          **MR. VERHOEVEN:**  Asserting patent claims.
7          **THE COURT:**  That's true.
8          **MR. VERHOEVEN:**  I think we could do it in two weeks,
9    Your Honor.
10          **THE COURT:**  You can do your part in two weeks or --
11          **MR. VERHOEVEN:**  No.  The whole trial.
12          **THE COURT:**  What does this side say would be the
13    length of the trial?
14          **MR. CARMODY:**  Good morning, Your Honor.  Bill Carmody.
15        We all agreed, one of the few things we did agree on, was
16    this expedited October setting to try nine trade secrets.  What
17    was not said to you just now is that they want to talk about
18    reshuffling and redoing those nine trade secrets, doing brand
19    new expert reports.  In effect, trying a brand new lawsuit, and
20    one which we haven't even yet discovered, to be tried in two
21    months from today.
22        I think the way we can break this impasse, Your Honor, is
23    if you take a look at our *Daubert* motion on their damages
24    expert, I think what the Court is going to find is they did
25    just what you admonished them not to do, which is become

```
 1   greedy.  In other words, I can't talk about the number they're
 2   seeking for their actual damages, but it's fair to say --
 3          THE COURT:  Why not?  Why not?  Is somebody claiming
 4   that that's a trade secret?
 5          MR. CARMODY:  Yeah.  I think it's --
 6          THE COURT:  Is that under confidential?
 7          MR. CARMODY:  It's AEO.  They marked their entire
 8   expert report AEO.
 9          THE COURT:  Okay.  Wait.  I disagree that that could
10   possibly be confidential in any respect.
11       Somebody on the Waymo side stand up and tell me if you
12   really want to argue with me on that because I'm on the verge
13   of letting them blurt out your number.
14          MR. VERHOEVEN:  Your Honor, may I just quickly confer
15   with my clients?
16          THE COURT:  Yeah, please.
17                   (Pause in proceedings.)
18          MR. VERHOEVEN:  Your Honor, the report was -- the
19   number is based on both Waymo and Uber documents that have been
20   marked AEO.  We don't have any problem talking about the
21   bottom-line numbers.
22          THE COURT:  All right.  Well, then, the bottom-line
23   number can be used.  Go ahead if you wish to use the
24   bottom-line number.
25          MR. CARMODY:  The bottom-line number, Your Honor, says
```

```
1    $2.6 billion --
2              THE COURT:  Is that with a B or an M?
3              MR. CARMODY:  With a B.
4         -- for a single trade secret.  Okay?
5         So --
6              THE COURT:  What do you mean "a single"?  I thought
7    they were suing on nine.
8              MR. CARMODY:  Well, they say their damages are not
9    additive, and one of the trade secrets alone they say is
10   $2.6 billion.
11        Here's the problem, though, Your Honor:  The problem is
12   the expert didn't do any independent analysis whatsoever.  He
13   didn't do any verification of the methodology of the
14   assumptions used by the data he relies on that's produced by
15   Uber.
16        So what we have, Your Honor, is an expert that shouldn't
17   get by Daubert in this case.
18             THE COURT:  All right.  Look --
19             MR. CARMODY:  And if that happens --
20             THE COURT:  -- I'm not going to rule on that now.
21             MR. CARMODY:  Exactly.
22             THE COURT:  I haven't even looked at that motion.
23             MR. CARMODY:  But if that happens, Your Honor, what
24   we're left with is a bench trial because the damages they
25   seek --
```

1      **THE COURT:**  Why is that?  Why can't they try to prove

2 damages through fact witnesses?  It might be $14.10, but maybe

3 a fact witness could prove up some damages.

4      **MR. CARMODY:**  The answer is a simple one, Your Honor.

5 They've only disclosed under Rule 26 one fact witness that even

6 mentions the word "damages."  His name is Daniel Chu, but

7 this -- and the only thing he could possibly testify on,

8 according to them, is unjust enrichment damages.

9      But the bottom line is, he has no firsthand knowledge of

10 how, if at all, these alleged trade secrets were used by Uber.

11 He has no basis whatsoever -- he has never looked at the Uber

12 documents.  He has no basis whatsoever to somehow opine as a

13 fact witness on damages.

14      So the bottom line is --

15      **THE COURT:**  But, see, you're being so unhelpful to me.

16      **MR. CARMODY:**  Okay.

17      **THE COURT:**  I asked you could you try the case in two

18 weeks, and now --

19      **MR. CARMODY:**  We could --

20      **THE COURT:**  -- 15 minutes later I don't have an

21 answer.

22      **MR. CARMODY:**  We can try their nine trade secrets in

23 two weeks -- with their expert reports in two weeks; but if

24 they want to change up nine new trade secrets with brand new

25 expert reports, we can't try that in two weeks.

1        **THE COURT:**  All right.  That's a decent point.

2      All right.  What is your plan for -- are we going to get a

3  revised list of trade secrets that you want to use at trial?

4        **MR. VERHOEVEN:**  Your Honor, first let me say the

5  notion that we're changing our case or we're trying to rejigger

6  our case is the latest in -- this is the third story that

7  they're telling now.

8      And what is going on here is we have our case ready, but

9  we've gotten -- they tried to block it all the way to trial;

10 but after the close of discovery, the Federal Circuit affirmed

11 and we've got this new evidence that is highly critical.  It's

12 an investigation that was done on the very subject matter of

13 this lawsuit by a purported independent third party, and the

14 evidence shows that this third party looked at a huge number of

15 documents that were withheld from us.

16     Just the last few days we went over to MoFo's office, and

17 there's 64,000 pictures that so far it looks like were pictures

18 that Levandowski took of our proprietary information, so I

19 guess potentially so that there wouldn't be any trail.  So

20 instead of taking documents, he took pictures, and he took the

21 pictures of those documents.

22     This is stuff we --

23        **THE COURT:**  Why is it that you can't answer the

24 question?  Right now you've given us -- in order to get the

25 case to trial on October 10, you agreed to a list of nine trade

1    secrets.   And the other side is raising a fair question, which

2    is:  Okay.  Are we now going to see a revised list -- a

3    different list, or how different will it be if we move the

4    trial?  So what is your proposal on that?

5               **MR. VERHOEVEN:**  Yes, Your Honor.  Sorry.  I got off

6    track.

7         We don't intend -- currently intend to change the nine,

8    but we need to take this discovery.  If discovery turns up

9    something that we hadn't found -- for example, we made our list

10   on hardware LiDAR but, you know, the download from Levandowski

11   included much more than that.  And the Stroz report for the

12   very first time shows he took a bunch of software, hundreds of

13   software files.

14        Now, suppose we look at those and we can tie those back

15   into the software they provided so there's absolutely no

16   question that he took some software and copied it and put it

17   in.  We might bring that up to the Court and we might say we

18   want to add that claim.

19        So we presently intend to stick with what we've got, but

20   we haven't had this discovery and the only reason we're asking

21   for this extension is so that we can fairly take the discovery

22   that should have been provided at the outset of this case,

23   marshal that evidence, put it into the trial.

24        We don't presently intend to change any claims.  But, for

25   example --

1    **THE COURT:**  Let's say the Court allowed you to go down

2   that path and do just what you're talking about.  I had

3   understood you earlier to have agreed that the nine that you

4   went to trial on would be it.  There would be nothing -- all

5   the rest would be gone once we went to trial.

6        All right.  So let's say you get a chance to do some

7   modifications based on discovery and we go to trial.  Are you

8   then going to say, "Oh, wait, Judge.  We still have the

9   other -- we still have others.  We haven't waived those other

10   trade secrets"?  Where are we going to be on that?

11       Maybe I didn't ask my questions clearly enough before, but

12   now that I'm on notice of the problem, I want to understand

13   what your view of that would be.

14       **MR. VERHOEVEN:**  Well, currently we don't want to waive

15   anything because this discovery hasn't been taken, and --

16       **THE COURT:**  All right.  Let's say that I give you the

17   discovery, then I give you a chance to modify if you find

18   something, and then let's say you put in one more trade secret.

19   Okay?  Let's say we do that.

20       Let's say you go to trial and win on one or lose on

21   everything, win on one.  I don't know what the verdict would

22   be, but then whatever it is, am I going to hear you say, "Okay,

23   Judge.  It's now time to go to the next round of trade

24   secrets"?  Or is it -- my view of it would be that ought to be

25   it and you get one trial, and that ought to be it.

1    So what's the answer?

2        MR. VERHOEVEN:  If I could, Your Honor, because that's

3    a weighted question that my client is going to have a view on,

4    could I provide a written answer later this afternoon on that?

5        THE COURT:  All right.

6        MR. VERHOEVEN:  Thank you, Your Honor.

7        THE COURT:  Take it up with your client.

8        MR. VERHOEVEN:  But our current intention is simply to

9    get the discovery taken in a way that allows us to marshal

10   evidence.

11       THE COURT:  Here's a view -- a different view of this.

12   If you're holding onto 100 trade secrets, we can't try all that

13   in one case anyway.

14       MR. VERHOEVEN:  I know.

15       THE COURT:  We're going to have to have three or four

16   or five trials.

17       MR. VERHOEVEN:  I know.

18       THE COURT:  So we might as well just go ahead with the

19   one in October and get those out of the way.

20       MR. VERHOEVEN:  The problem --

21       THE COURT:  And then maybe early next year we'll go to

22   the next round because you won't trim down your case to a

23   triable case.

24   So I thought you had agreed that you would get discovery,

25   select your nine, then go to trial on those nine, and that

```
 1   would be it.
 2             MR. VERHOEVEN:  Well, but --
 3             THE COURT:  But you should --
 4             MR. VERHOEVEN:  Go ahead.
 5             THE COURT:  -- talk to your client and let me know
 6   this afternoon.
 7             MR. VERHOEVEN:  Yeah.  But just to answer the first
 8   part of that, this evidence is going not only to possible
 9   additional secrets but it's also evidence of intent.  It's new
10   evidence showing -- for example, the 14,000 files.  Before we
11   got this, they were spouting there's no evidence that anybody
12   had the 14 -- there's no evidence it was even downloaded.  They
13   haven't proved it was even downloaded.  Mr. Gonzalez said that.
14   We've quoted it in our briefs.
15        Well, now we know that they knew all along that there were
16   24,000 files downloaded.
17             THE COURT:  When you say "they," who do you mean?  Do
18   you mean --
19             MR. VERHOEVEN:  Stroz and --
20             THE COURT:  Stroz.  Okay.  But did Uber know that?
21             MR. VERHOEVEN:  Well, it's in the report, and I
22   believe that we received --
23             THE COURT:  When did they get that report?  Wasn't it
24   after the fact that Uber got this report.
25             MR. VERHOEVEN:  Well, they got preliminary reports
```

1   repeatedly.

2          THE COURT:  "They" meaning MoFo?

3          MR. VERHOEVEN:  I think Uber.

4          THE COURT:  I don't think Uber got any of it.  My view

5   of it is possibly wrong, but I thought it wasn't until this

6   litigation that anybody at Uber got anything.

7          MR. VERHOEVEN:  No, that's not correct, Your Honor.

8          THE COURT:  All right.  Okay.  Let's pause on that

9   because I may be confused.

10      Is that -- what is true?  Did anybody, even a lawyer at

11  Uber, receive any piece of the due diligence report or some

12  summary thereof?

13         MR. CARMODY:  Your Honor, they received the -- there

14  were three in-house lawyers that received the report itself,

15  not the appendices but the report itself.

16         THE COURT:  Before the deal closed or as part of the

17  deal closing?

18         MR. CARMODY:  Yes, Your Honor.

19         THE COURT:  All right.  So three in-house lawyers.  So

20  they received the report.

21      All right.  Well, that's a good point for you then.  That

22  means that somebody at Uber was on notice of some information

23  that's not so good in that report.

24         MR. VERHOEVEN:  And this is my point, which is we need

25  to take -- this was withheld from us.  We didn't have the

1    opportunity to explore it, and we need to take a short period

2    of time to get this discovery done.

3        It's -- I mean, Stroz just told us yesterday that they

4    have 1.47 million documents to review.  We can't review that in

5    a short amount of time.  We're going to have to come up with a

6    strategy to do searches of it, but this is the problem we're

7    facing.  And these are documents that were provided by the

8    diligence employees to them for their review.

9        **THE COURT:**  All right.  But help me on this part of

10   understanding the case.

11       Their spin -- I mean Uber's spin -- on the due diligence

12   is that this helps them by showing the lengths to which they

13   went to try and quarantine any Waymo trade secrets so that they

14   would never get seen over at Uber, and that they did this whole

15   thing so that the -- with Stroz and MoFo so that there would

16   be, like, an ethical wall that kept that material from coming

17   over to Uber.

18       And, in addition, you have had a lot of access and

19   inspections of their whole system, their LiDAR system, at Uber

20   and they say that you found zero in their Uber system.  They

21   say it's even -- it's light-years ahead of your antiquated

22   system -- and they've got two cavities, you've got one, and all

23   those things -- that they've got a better system, and there's

24   no way they would have wanted to use those old trade secrets.

25       And it is true you've had all that discovery, and nothing

1    in the Stroz report is going to bear on that part because you

2    have the most up-to-date of what Uber is -- so how does the

3    Stroz thing help you on that problem of trying to show usage by

4    Uber?

5            MR. VERHOEVEN:  We don't know.  We haven't seen it,

6    but there might be additional evidence relating to the nine

7    trade secrets, for example, that shows that the source

8    indisputably -- like, they're saying, for example, "Oh, we came

9    up with this independently."  Well, what if the documents that

10   we haven't seen yet match exactly with -- and tie exactly to

11   our trade secrets?  We haven't seen them.

12           THE COURT:  But let's say that that's true, that the

13   Stroz -- let's say that they've got documents at Stroz that

14   match exactly but they didn't get to Uber.  How do you --

15           MR. VERHOEVEN:  We don't know that.  What if they got

16   to Ottomotto?

17           THE COURT:  What?

18           MR. VERHOEVEN:  What if they got to Ottomotto?  Then

19   we've got to follow that trail, Your Honor.

20      So I think in fairness --

21           THE COURT:  They said that they looked for those, that

22   the Ottomotto ones went onto the server and they looked.

23           MR. VERHOEVEN:  Your Honor, they told this Court

24   repeatedly that, for example MoFo does not have any of the

25   documents that were taken.  We went and looked last week.

There's 64,000 photos that were taken of Google -- pictures of Google proprietary information in MoFo's files.

They said that there's no evidence that there's 14,000 downloads, and this new discovery that they tried to block and successfully prevented us from getting until the close of discovery now is showing irrefutably that those 14,000 files match up to the 20 -- are included in the 24,000 files that we talked about earlier today with the suspicious circumstances surrounding it.

You know, these are things that they have represented that are false, and we haven't found out about them until after the close of discovery, and we should be entitled to investigate what the truth is.

**THE COURT:**  May I ask a question, then you can respond to it?

**MR. CARMODY:**  Yes, of course, Your Honor.

**THE COURT:**  Is it true that MoFo has had photographs of documents and has been telling me that they didn't have the files but they've actually had photographs of the files?  I mean, what's the truth behind that point?

**MR. GONZALEZ:**  So, Your Honor, the answer is that after Mr. Levandowski was sued in the arbitration, MoFo received some documents from Stroz in our capacity as prior counsel for Mr. Levandowski.

What I have said to this Court before and I'll say it

1    again, we do not have the 14,000 files that they say were

2    downloaded.  We don't have -- we've never had them.  To my

3    knowledge, neither has Uber.

4         **THE COURT:**  Well, what is it he's referring to about

5    you have some photographs?

6         **MR. GONZALEZ:**  What he's talking about now,

7    Your Honor, is that sliver of documents that we received after

8    Mr. Levandowski was sued in our capacity as his counsel.  We

9    were going to review the Stroz materials.  We received some of

10   them, and there's a declaration we've submitted on this point.

11   We had one associate review them for, like, three hours, and

12   then I pulled the plug when it became clear that

13   Mr. Levandowski was going to obtain -- retain separate counsel.

14        **THE COURT:**  All right.  Hold that.

15      Is that right?  Is that your view of it?

16        **MR. VERHOEVEN:**  We've been blocked from taking

17   discovery on what he's representing the entire case.  Now we

18   can take --

19        **THE COURT:**  I have heard this before, and so this

20   piece of it is not new news.  I've heard exactly this before.

21        **MR. VERHOEVEN:**  We would have to -- I'm sorry.  Go

22   ahead.

23        **THE COURT:**  Why is it you haven't taken discovery on

24   it then?

25        **MR. VERHOEVEN:**  Because they wouldn't let us take

1    discovery of their attorneys.

2         And, by the way, the parties agreed to put off that

3    discovery until after the resolution of the Stroz report by

4    agreement because we wanted to be efficient and not have to

5    take those depositions twice.

6         But this sliver that's being talked about, 69,000 photos

7    that Levandowski took, in their possession, 67 source code

8    files in their possession.

9              THE COURT:  When you say "photographs," what do you

10   mean "photographs"?  Mr. Gonzalez, why would --

11             MR. GONZALEZ:  Let's see, let me hand some up,

12   Your Honor.

13             THE COURT:  -- why would this be in photograph form?

14             MR. VERHOEVEN:  Because he's trying to cover his

15   tracks.

16             MR. GONZALEZ:  So you're asking me a question,

17   Your Honor, that I cannot answer.  All I can tell you is, among

18   the materials that were at Stroz were a bunch of photographs.

19   Some of those photographs were family photographs.  They

20   designated over a hundred -- and John can tell you, Mr. Cooper

21   has reviewed them -- they designated over a hundred for

22   production that were family photographs of the family in

23   Hawaii -- okay? -- of a trip to Hawaii.

24        Now, the point is this --

25             THE COURT:  But are any of them photographs of

proprietary information?

      **MR. GONZALEZ:**  Your Honor, I do not know the answer to that question.  What I can tell you is --

      **THE COURT:**  How do you know that some of them were photographs of vacation but you don't know about the proprietary?

      **MR. GONZALEZ:**  Because, Your Honor, they started to review these documents on Monday, and an issue was brought to my attention about the fact that one of their lawyers was tagging personal photographs for production; and I raised it with Mr. Cooper, and I asked Mr. Cooper to review them.  I, frankly, have not seen them but Mr. Cooper has and confirmed that they're family, inappropriate for production in the case, and told them they can't have those.

    The point is this --

      **THE COURT:**  I can't believe that you would have allowed something to be examined without having a sense of what's in there.  Are you telling me you don't know that they're Waymo documents, that there are photographs of Waymo documents?

      **MR. GONZALEZ:**  Your Honor, what I can tell you now today is that yesterday they tagged approximately 300 documents and, sure, I asked what are the documents that they tagged and I got some preliminary report that there were some photographs, photographs of information that they obviously consider

1   proprietary.

2       But the point is this, two things briefly:  One is, MoFo

3   didn't get these until after this litigation began.

4       But, more importantly, look, if there are a couple of

5   photographs that they claim are relevant -- they have not

6   identified any that are relevant that --

7           THE COURT:  No, no.  You got them after the

8   arbitration began.

9           MR. GONZALEZ:  That's right.

10          THE COURT:  Not this litigation.

11          MR. GONZALEZ:  The arbitration.

12          THE COURT:  The arbitration.

13          MR. GONZALEZ:  That is correct.  I stand corrected.

14   That's correct.

15       If there's a photo that they think is relevant to the

16   trade secrets, fine.  To my knowledge, they haven't identified

17   any photo that's relevant to the nine trade secrets at issue.

18       Now, they may correct me and say, "Ah ha, we found a

19   photo."  Fine.  They have the photo.  They have the evidence.

20   Let's go on the 10th.

21          MR. VERHOEVEN:  Your Honor, can I hand up a sampling

22   of the photos that we found just yesterday --

23          THE COURT:  Sure.

24          MR. VERHOEVEN:  -- and earlier?

25       For the record, this is SFM 39, 15, 22 --

1          **THE COURT:**  Show counsel, please.

2          **MR. VERHOEVEN:**  Yeah.  These are proprietary,

3    Your Honor, so I don't want to go into the detail.  I just want

4    you to see them.

5          To continue, 11, 15, 763, 753, 44, and 764.  If I could

6    hand that up.

7          **THE COURT:**  Make sure counsel knows what you're

8    handing me.

9          **MR. VERHOEVEN:**  Go ahead and look at them.

10          **MR. CARMODY:**  And, Your Honor, can I ask a quick

11    question?

12          Do these have anything to do with the nine trade secrets

13    about to be tried on the 10th?

14          **MR. VERHOEVEN:**  We just saw them yesterday,

15    Your Honor.

16          But the point I'm addressing is that these were in MoFo's

17    files at the same time they were representing to this Court --

18    and I can go back and get the transcript cites if you want --

19    that they didn't have any of Google's documents, and a lot of

20    those are -- they're photographs but they look like actual

21    documents.  But they're -- I think that first one might be a

22    screen shot, Your Honor.

23          Can I have those back?

24          **MR. CARMODY:**  The Court has them.

25          **MR. GONZALEZ:**  You didn't give us a copy.

```
 1              MR. VERHOEVEN:  Oh.  I'm sorry.
 2              THE COURT:  You gave them to me.  I'll give them back
 3    in just a second.
 4              MR. VERHOEVEN:  Okay.
 5              THE COURT:  All right.  So these do look like
 6    photographs taken, I'm going to guess, with an iPhone but
 7    could have been with some other phone.
 8                         (Pause in proceedings.)
 9              THE COURT:  I wonder if there's a way to see a date on
10    here.
11              MR. VERHOEVEN:  Well, as I said, we just discovered
12    these yesterday, most of them.
13              THE COURT:  Up in the upper right corner it says
14    "anthony@google.com."
15              MR. JAFFE:  Your Honor, if I may.
16              THE COURT:  Go ahead.  Yeah, go ahead.
17              MR. JAFFE:  Oh.  I was just going to add that some of
18    these -- to clarify, so some of these do relate to the trade
19    secrets that are within the election -- and I expect we're
20    going to get to this later when we come to the two summary
21    judgment motions -- including those two specific trade secrets,
22    and there's some specific disclosures in there that relate to
23    that.  But we've only had a very, very small amount of time
24    with these documents.
25                         (Pause in proceedings.)
```

1      **MR. JAFFE:**  If you look at 764 -- I don't know if you

2   have that one in front of you.

3      **THE COURT:**  Yeah, I see that.

4      **MR. JAFFE:**  If you remember the color scheme, this is

5   likely an output from the same file that we showed you when you

6   looked at Trade Secret 96.  If you kind of recognize, this is

7   much more close up, but it looks like it's an output from the

8   same system that we were looking at before.

9      We don't know the source file from this because we don't

10  have the whole history here, and we don't know which particular

11  schematic this is from, but this is, it looks like, an output

12  from that same SVN server software.

13                  (Pause in proceedings.)

14      **THE COURT:**  All right.  I'm going to hand these back.

15      **MR. VERHOEVEN:**  So this shows -- we're just learning

16  yesterday, for example, that some of this stuff relates to our

17  nine, Your Honor.  And all we're asking for is a fair ability

18  to review these materials, incorporate -- marshal the evidence,

19  incorporate it so we can present it at trial.

20      If there's something that comes up where we have to say,

21  "Look, we discovered something we didn't anticipate," like in

22  the software, we'll address it at that time; but we're not --

23  we're not trying to rejigger anything.  We're just trying to

24  get discovery we're entitled to that was blocked from us until

25  weeks after the close of fact discovery.

1    **THE COURT:**  All right.  We're going to move to a

2    different thing now.  Are you ready?

3       We're going to go to -- we have two more things I want to

4    give you a chance to be heard on today, Trade Secret 96 and

5    then Trade Secret Number 9, and then that's it for today, I

6    think.

7       So let's -- I think we have to clear the courtroom because

8    we'll be talking a lot about these two trade secrets, and

9    that's all that's left.  So I hate to do it.  I hate -- I think

10   this is a public thing, but I'm duty bound to exclude anyone

11   who is not associated with the two parties because we're going

12   to be talking about alleged trade secrets.

13      So stay tuned.  More later, but for today I have to ask

14   you to leave.  Thank you.

15      **MR. VERHOEVEN:**  Your Honor, just one more sentence on

16   this, please.

17      **THE COURT:**  Yes.

18      **MR. VERHOEVEN:**  We believe that the evidence shows and

19   the evidence today shows that we're entitled to take this

20   discovery and would request the Court to rule as soon as it can

21   because otherwise we're going to be doing --

22      **THE COURT:**  I have -- no.  Listen, I have said go

23   huckley-buckle on all the discovery like we're going forward to

24   trial on October 10, and I told the magistrate judge to help

25   you get all that done.  So right now you're going to trial on

1  the 10th and you should be trying to get that discovery done

2  between now and then.

3      But what I have a feeling is you're trying to sabotage

4  there and you're trying to prevent or come up with excuses why

5  you can't go to trial on October 10.  We ought to make a good

6  college try and see if we can't make that date.

7          MR. VERHOEVEN:  That's fine, Your Honor.

8          THE COURT:  All right.  Then if I think you've really

9  tried and that you deserve more discovery on account of their

10  stonewalling, then I will give you more time.  That would be

11  the just thing to do, but we aren't there -- we're not there

12  yet.

13      You know, when I was a trial lawyer, I was in this

14  position lots because I always was turning over the documents

15  and the other side was stonewalling; and then I found out that

16  I had to take last-minute discovery when they, quote,

17  "discovered" something at the last minute, but I got my act

18  together and I got it done in time and kept the trial date.

19      So maybe you can do that being the good trial lawyer that

20  you are, but I recognize maybe I'm being too unrealistic in

21  thinking it can be done.  That's why we had this hearing.  But

22  you've got to try.  You have to try and we'll make a final

23  decision on October 3rd.

24          MR. VERHOEVEN:  Understood, Your Honor.

25          THE COURT:  All right.  Thank you.

1          All right.  Let's, everyone, please exit stage left.

2              **MR. VERHOEVEN:**  Oh.  Is it okay if Sasha --

3              **THE COURT:**  Yeah, he can leave now.

4              **MR. VERHOEVEN:**  Okay.

5          **(Pages 95 through 145 were placed under seal by Order of**

6      **the Court.)**

7                              -   -   -   -

## CERTIFICATE OF REPORTERS

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Wednesday, September 20, 2017




_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter



_____

Jo Ann Bryce, CSR #3321, RMR, CRR
U.S. Court Reporter