QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:      (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>    Plaintiff,<br><br>    vs.<br><br>UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>    Defendants. | CASE NO. 3:17-cv-00939<br><br>**PLAINTIFF WAYMO LLC'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF WAYMO'S DAMAGES EXPERT MICHAEL WAGNER**<br><br>**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>Date:           September 27, 2017<br>Time:          8:00 a.m.<br>Ctrm:          8, 19th Floor<br>Judge:        Honorable William H. Alsup<br>Trial Date:  October 10, 2017 |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................... 1

LEGAL STANDARD ................................................................................................................ 2

ARGUMENT .............................................................................................................................. 2

I. WAGNER'S ACCELERATED DEVELOPMENT OPINION IS RELIABLE AND SHOULD NOT BE EXCLUDED. ................................................................................ 2

    A. Wagner's Accelerated Development Opinion Is Not "Really A Future Profits Model." .............................................................................................. 2

    B. Wagner's Accelerated Development Opinion Is Not Speculative And Does Not Rely On Calculating Future Profits In A "Nascent Market." ............... 3

    C. Wagner's Reliance On Uber's Own Internal Financial Model For The Otto Acquisition Was Reasonable. ..................................................................... 3

        1. "Qi Slide" Was Not Unreliable. ...................................................... 6

        2. Unjust Enrichment Damages Are Computed As Of The Time The Trade Secrets Were Misappropriated. ............................................. 7

    D. Wagner's Causation Analysis Is Supported By The Evidence. ................... 8

II. WAGNER'S SAVED DEVELOPMENT EXPENSE OPINION IS RELIABLE AND SHOULD NOT BE EXCLUDED. ................................................................................ 9

III. WAGNER'S UNJUST ENRICHMENT FOR TRADE SECRET 90 IS RELIABLE AND SHOULD NOT BE EXCLUDED. ........................................................................ 9

IV. WAGNER'S REASONABLE ROYALTY OPINION IS RELIABLE AND SHOULD NOT BE EXCLUDED. .............................................................................. 10

V. WAGNER'S OPINIONS ARE PROPERLY APPORTIONED. ................................ 11

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Apple v. Motorola*,
  757 F.3d 1286 (Fed. Cir. 2014) ................................................................................................ 2

*Aqua Shield v. Inter Pool*,
  774 F.3d 766 (Fed. Cir. 2014) ................................................................................................ 12

*ATS Prod. v. Ghiorso*,
  2012 WL 253315 (N.D. Cal. Jan. 26, 2012) .......................................................................... 12

*Bianco v. Globus Med.*,
  2014 WL 5462388 (E.D. Tex. Oct. 27, 2014), *aff'd per curiam*, 618 F. App'x 1032
  (Fed. Cir. 2015) ..................................................................................................................... 12

*Brooktree Corp. v. Advanced Micro Devices, Inc*,
  977 F.2d 1555, 1581 (Fed. Cir. 1992) ..................................................................................... 8

*City of Pomona v. SQM N. Am.*,
  750 F.3d 1036 (9th Cir. 2014) ........................................................................................... 6, 10

*Comcast IP Holdings v. Sprint*,
  2015 WL 4730899 (D. Del. Aug. 10, 2015) .......................................................................... 11

*Fresenius v. Baxter Int'l*,
  2006 WL 1390416 (N.D. Cal. May 18, 2006) ........................................................................ 2

*Fujifilm v. Motorola*,
  2015 WL 1737951 (N.D. Cal. Apr. 8, 2015) ......................................................................... 11

*i4i Ltd. P'ship v. Microsoft*,
  598 F.3d 831 (Fed. Cir. 2010) ................................................................................................. 8

*Litton Sys. v. Ssangyong*,
  1993 WL 317266 (N.D. Cal. Aug. 19, 1993) .......................................................................... 8

*Powell v. Home Depot*,
  663 F.3d 1221 (Fed. Cir. 2011) ............................................................................................. 12

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010) ................................................................................................... 2

*RRK Holding Co. v. Sears, Roebuck & Co.*,
  563 F. Supp. 2d 832 (N.D. Ill. 2008) ..................................................................................... 12

*University Computing v. Lykes-Youngstown*,
  504 F.2d 518 (5th Cir. 1974) ................................................................................................... 8

*Veritas v. Microsoft*,
  2008 WL 7404617 (W. D. Wash. Feb. 26, 2008) .................................................................. 12

*Versata v. Internet Brands*,
  902 F. Supp. 2d 841 (E.D. Tex. 2012) ................................................................................... 12

*W.L. Gore & Assoc. v. GI Dynamics*,
  872 F. Supp. 2d 883 (2012) ..................................................................................................... 7

**Rules and Regulations**

Fed. R. Evid. 702 ........................................................................................................................... 2

**INTRODUCTION**

In considering whether to go through with a transaction valued internally at ▉▉▉ and rife with legal risks, Uber devoted significant resources to understanding how the proposed technology would accelerate its development efforts, both with respect to Uber's ability to get to market faster, and with respect to decreasing the ongoing development expenses that Uber was then-incurring. Although Defendants now profess surprise at the "magnitude" of Waymo's damages numbers,[1] Waymo's damages numbers are based on Uber's *own* models of how acquiring Otto would affect the pace its *own* LiDAR development.

Uber conducted the relevant analysis at the time of the alleged misappropriation, and in a non-litigation setting. Uber now argues that these estimates were "speculative" and "unreliable" when they were done, but Uber does not cite *any* contemporaneous evidence to support that argument. Instead, all of the contemporaneous evidence indicates that almost everyone involved in analyzing the transaction for Uber believed that acquiring Otto would provide significant value.

Defendants also argue that Wagner is trying to recover "future lost profits" through its unjust enrichment analysis. But Wagner is not quantifying future lost profits to Waymo or anyone else; he is simply looking at Uber's own estimate of how valuable the technology was *to Uber* at the time of acquisition. Ad hoc information about how the parties' timelines have changed is not relevant to what Uber was thinking when the misappropriation occurred.

There is no dispute that Wagner is qualified to present his opinions. And his methodologies are sound. Indeed, all of Defendants' challenges go to the weight of the evidence Wagner relied on, rather than the admissibility of his methodology. Accordingly, Defendants' motion to exclude should be denied.[2]

---

[1] Two days ago, Uber's lead counsel told the Court that Waymo is asking for $2.6 billion in damages for one trade secret. (Dkt. 1723, 9/20/17 Public Hrg. at 73:25-74:10.) That is false. Waymo is asking for $1.859 billion for Trade Secret 25 (*not* $2.6 billion) and less for the remaining trade secrets. Furthermore, Waymo's numbers are not additive; if the jury finds that Defendants misappropriated every asserted trade secret, Waymo still only seeks $1.859 billion.

[2] Notably, although Defendants doved to strike Waymo's damages disclosures earlier in the case, they have not re-urged those arguments here. Because Waymo disclosed the specific bases for its damages in July (Dkt. 933-3), Defendants' motion should now be denied.

## LEGAL STANDARD

An expert witness may render an opinion if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i v. Microsoft*, 598 F.3d 831, 852 (Fed. Cir. 2010). "[T]he gatekeeping role of the judge is limited to excluding testimony based on unreliable principles and methods," and the court must "not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another" because "[t]hese tasks are solely reserved for the fact finder." *Apple v. Motorola,* 757 F.3d 1286, 1314-15 (Fed. Cir. 2014).

The "test of reliability" for a testifying expert "is 'flexible.'" *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010). "When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Id.* at 564. "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Fresenius v. Baxter Int'l*, 2006 WL 1390416, at *3 (N.D. Cal. May 18, 2006).

## ARGUMENT

**I.   WAGNER'S ACCELERATED DEVELOPMENT OPINION IS RELIABLE AND SHOULD NOT BE EXCLUDED.**

### A.   Wagner's Accelerated Development Opinion Is Not "Really A Future Profits Model."

Defendants' motion to exclude Wagner's accelerated development opinion should be rejected because it is based on the false premise that Wagner's opinion "is really a future profits model." (Mot. 3.) It is not. Wagner's accelerated development opinion is an estimate of Uber's *unjust enrichment* from Uber's trade secret misappropriation, *not* Waymo's or anyone else's lost profits. Wagner's analysis is consistent with applicable legal standards regarding unjust enrichment and Defendants' reliance on lost profits case law is misplaced.

**B.   Wagner's Accelerated Development Opinion Is Not Speculative And Does Not Rely On Calculating Future Profits In A "Nascent Market."**

Having incorrectly characterized Wagner's opinion as a "future profits model," Defendants first seek to exclude Wagner's opinion because "forecasting profits in the nascent autonomous vehicle industry that has not yet been commercialized is inherently speculative." (Mot. 3.) Defendants repeatedly argue that it is "impossible" to calculate damages because the autonomous vehicle ("AV") industry "does not yet exist" and "may never exist." (*Id.* 4.) This argument misses the mark, however, because Wagner's opinions do not involve *forecasting profits for the AV industry*. Rather, Wagner's opinions are based on Uber's own forecasts of its expected profitability deploying AVs in the well-established, highly sophisticated *ride-sharing market*. This is because both Waymo and Uber agree that ride-sharing is the best way to deploy AVs, and both companies are planning to deploy AVs as part of ride-sharing fleets. (Dkt. 1615 at 153-54 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮")

Not only is the ride-sharing market *not* a nascent market, Uber is the dominant player in that market and there is likely no one in the world with more information about the ride-sharing market and its future profitability than Uber. As described in more detail below, the basis for Wagner's calculations is Uber's *own* estimates of the value associated with adding AVs to its ride-sharing fleet – that is, Uber believes it can save costs and increase revenue by: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[3]

**C.   Wagner's Reliance On Uber's Own Internal Financial Model For The Otto Acquisition Was Reasonable.**

Defendants misleadingly argue that Wagner bases his entire model on a "single slide" that

---

[3] *See* Ex. 1 at 122:1-123:1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

1  was "never used or relied upon for any purpose."  (Mot. 4.)  To the contrary, Wagner's analysis is
2  based on Uber's *own* substantial efforts to value the very same technology that is at the heart of
3  this case.  This is not a case where the plaintiff's expert has pieced together disparate information
4  to come up with numerical values; Wagner's entire "model" comes directly from Uber.  The *only*
5  calculation Wagner undertakes is apportioning Uber's estimates to a trade secret level, and even
6  this apportionment is based on Uber's information, where available.
7  　　　　As Uber was evaluating whether to acquire Otto (and thus, Waymo's trade secrets), Uber
8  ████████████████████████████████████████████████████████
9  ████████████████████████████████████  (Ex. 2 at 26:12-21.)
10 ████████████████████████  (*id.* 27:23-28:6), ████████████
11 ████████████████████████████████████████████████████████
12 ████ (Ex. 3 at 100:5-101:14.) ████████████████████████████
13 ████████████████████████████████████████████████████████
14 ████████████████████████████████████████████████
15 (Ex. 4.)  In the months leading up to Uber's acquisition of Otto, ████████
16 ████████████████████████████████  As part of this work, ████████
17 ████████████████████████████████████████████████
18 ████████████████████████████████████████████████
19 ████████████████████████████████████████████████
20 ████████████████████████████████████████████████
21 ████ (Ex. 4; Dkt. 1615-5 at 5; Ex. 5.) ████████████████████
22 ████████████████████████████████████████████████
23 ████████████████████████████████████████████████
24 ████████████████████████████████ as reflected in the following:
25
26
27
28



(Dkt. 1615-5 at 5.)

(Dkt. 1616; 1616-4; Ex. 7.)  Although Uber has tried to walk away from Qi's analysis as part of this litigation (*see* Mot. 4, arguing that Qi's analysis was "never used or relied on for any purpose"), Qi

.[4]

In fact, all of the contemporaneous evidence indicates that

John Bares and Brian McClendon, key executives on Uber's AV team who were working on

---

[4] Defendants argue that the                    underlying Qi's analysis are speculative because they are                              ."  (Mot. 5 n.6.)  But Uber's own documents directly contradict this assertion.  For example,

                    (Ex. 7.)

1   ███████████████████████████████████████████████████████ (Ex. 6
2   at 4.)  In a separate email, ███████████████████████████████████
3   ████████████████████████████████████████████████████████████████
4   █████████████████████████████████ (*Id.*)  Contrary to Defendants' implications, this
5   was not some low-level employee running back-of-the-envelope numbers in isolation.
6         Nevertheless, Defendants argue that Wagner's analysis should be excluded because he did
7   not "conduct[] any independent tests" of the models and assumptions underlying Qi's analysis.
8   (Mot. 4-5.)  But Defendants fail to disclose that Wagner did not have the underlying ███████
9   ███████ to test because Defendants did not produce it until <u>yesterday</u> – five days after they filed
10  their motion and almost a month after Wagner's report was due – even though Waymo specifically
11  *asked* Defendants to produce the ███████████████████ during fact discovery.  (Ex. 8.)
12        In any event, as discussed above, Wagner *did* review additional, related evidence which
13  corroborated Qi's cost savings estimates.  As well as the █████████████████████████████
14  ███████████████████████████████████ Wagner reviewed corroborating
15  testimony from Uber leaders like Bares and McClendon, as well as a series of Uber presentations
16  summarizing the outputs of the ██████████ (Dkt. 1615 at 149-150.)  Wagner also reviewed
17  comparable modeling from Waymo to confirm that Uber's █████████████████
18  were sensible.  (*Id.* at 125-127, 150.)  Otherwise, to the extent Defendants have factual criticisms
19  of Wagner's interpretation of this evidence, they are free to present those arguments to the jury via
20  cross-examination at trial.  *City of Pomona v. SQM N. Am.*, 750 F.3d 1036, 1044 (9th Cir. 2014)
21  ("Challenges that go to the weight of the evidence are within the province of a fact finder, not a
22  trial court judge.").  But given their failure to produce the underlying ██████████ in a timely
23  fashion, Defendants cannot seriously argue that Wagner's testimony should be excluded for failure
24  to "test" Uber's assumptions.
25              1.      <u>"Qi Slide" Was Not Unreliable.</u>
26        Defendants argue Wagner's opinions must be excluded because certain presentations
27  summarizing outputs from the ██████████████████████████████████████████
28  (Mot. 5.)  But Qi -- and by extension Wagner -- took this into account as she was modeling the

1  expected value to Otto.  In putting together her estimates, Qi ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Dkt. 1615-5 at 5.)[5]

4  The misguided nature of Defendants' attacks are demonstrated by comparison to *W.L.*

5  *Gore & Assoc. v. GI Dynamics*, 872 F. Supp. 2d 883 (2012), where the court allowed an almost

6  identical damages model to go the jury.  In that case, the counterclaim-plaintiff, GID, accused

7  Gore of misappropriating trade secrets and calculated unjust enrichment based on the fact that

8  Gore had used the trade secrets to save research and development costs and to get to market

9  sooner.  *Id.* at 890-91.  Even over Gore's objection that GID's damages were "based on

10 speculation, guesswork, or pure fantasy" because "neither company [had] brought a product to

11 market yet," the court let GID proceed because its expert used Gore's own models, and because

12 Gore had already accounted for future risk by applying its own discount rate in its own models:

> GID and Dr. Ugone include a number of internal Gore documents demonstrating that, as of 2006, Gore itself placed substantial value on the technology, and properly discounted it based on the risk that a product may never reach the market. . . . . From Gore's sophisticated method for calculating the value of bringing a product to market and Dr. Ugone's report, a reasonable jury could conclude that GID was damaged or Gore was unjustly enriched by the misappropriation of GID's trade secrets.

*Id.* at 891.  The Court should allow Wagner's opinion for the same reasons here.

### 2. *Unjust Enrichment Damages Are Computed As Of The Time The Trade Secrets Were Misappropriated.*

Defendants argue that it was unreasonable for Wagner to rely on the Qi Slide because events in the eighteen months after its creation impacted its underlying assumptions and results.

---

[5] Defendants say that it was unreasonable for Qi to use a ▓▓▓▓▓▓ at the time, and point to a series of discount rates that Waymo has used over time as alleged proof of this. (Mot. 6.)  Wagner explained, however, that there are a number of reasons why ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Ex. 6 at 11.)  For example, because ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*Id.*)  Uber, on the other hand, is the clear leader in ride-sharing, and already has a dominant position in the market.  (*Id.*)  Moreover, as Wagner explained in his reply report, Uber ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ which is further proof that ▓▓▓ is reasonable.  (*Id.* 11-12.)

(Mot. 6.) But Wagner's opinion is based on Uber's own evaluation of how much the technology was worth (appropriately discounted at a █████████ as of the date the misappropriation occurred. It is black letter law that an expert is to evaluate unjust enrichment damages *as of the date of the misappropriation* rather than on an ad hoc basis. *See, e.g., University Computing v. Lykes-Youngstown*, 504 F.2d 518, 536 (5th Cir. 1974). The fact that Uber's projections may have changed slightly in the last year and a half does not render them "unreliable."[6] Moreover, even if intervening events *have* occurred (a point which Waymo disputes and a jury should decide), a defendant is not insulated from liability for unjust enrichment damages simply because it failed to profit off the trade secret. *Id.* "[T]he risk of defendants' venture, using the misappropriated secret, should not be placed on the injured plaintiff, but rather the defendants must bear the risk of failure themselves." *Id.*; *see also Litton Sys. v. Ssangyong*, 1993 WL 317266, at *4 (N.D. Cal. Aug. 19, 1993) (noting that unjust enrichment would be based on defendants' expected gain from the trade secret theft, rather than their realized profit because "predicating damages upon a trade secret thief's realized gain would substantially reduce the deterrent effect of trade secret liability . . . . an ex post remedy simply does not punish failed attempts at trade secret theft.").

### D. Wagner's Causation Analysis Is Supported By The Evidence.

Wagner's causation analysis is well-supported by record evidence. Although Defendants contend Wagner "falsely assumes that each trade secret is a bottleneck in the AV program" (Mot. 8), the evidence to support this assumption comes directly from Uber. Jeff Holden, Uber's Chief Product Officer, testified that ████████████████████████████████████████ ████████████████████████████ (Ex. 6 at 26.) Wagner also relies on the overwhelming evidence that Uber acquired Otto because ████████████████████████ (Dkt. 1615 at 53, 63 ████████████████████████████████████████████ The

---

[6] Defendants' cases are not to the contrary. *Brooktree*, 977 F.2d at 1581, did not address whether it is "imperative to use the most recent and accurate data and assumptions," as Defendants contend. (Mot. 6.) *Fail-Safe* and *Target* found that plaintiff's experts relied on "unreliable" and "inaccurate" data because the plaintiffs' expert had relied on *defendants'* projections to calculate lost profits *to the plaintiff*. Here, in contrast, Wagner relies on *Uber's* projections to calculate *Uber's* unjust enrichment.

1  very slide Wagner uses for his accelerated development theory confirms that ▮▮▮

2  ▮▮▮" (Ex. 9.)  Indeed, it is undisputed that ▮▮▮

3  ▮▮▮

4  ▮▮▮

5  ▮▮▮ (Dkt. 1615 at 62.)

6  Evaluating Waymo's trade secrets as part of the Otto acquisition, Uber estimated that ▮▮▮

7  ▮▮▮ (Dkt. 1615-5 at 5.)

## II. WAGNER'S SAVED DEVELOPMENT EXPENSE OPINION IS RELIABLE AND SHOULD NOT BE EXCLUDED.

Wagner's saved development expense theory is another way of measuring unjust enrichment.  The starting point for Wagner's theory is Bares' conclusion that ▮▮▮ ▮▮▮ ▮▮▮ (Dkt. 1615 at 110.)  Like Qi, Bares was a key member of the deal team for Uber and one of the key people overseeing Uber's technical progress at the time.  He made this statement *in the context of the acquisition* (and re-confirmed it during his deposition).  (*Id.*)  In addition to Bares' estimate, Wagner reviewed additional evidence confirming that Uber believed acquiring Waymo's trade secrets would indeed advance its efforts.  Supra at I.C.

Defendants' primary criticism is that Wagner failed to '▮▮▮ on which he relies. (Mot. 10.)  But, as discussed above, Wagner considered testimony from Uber's own witnesses confirming that ▮▮▮ ▮▮▮ as well as the opinion of Waymo's technical expert Dr. Lambertus Hesselink.  (Ex. 6 at 26; Dkt. 1615 at 53, 63.)  To the extent Defendants take issue with Wagner's alleged failure to account for *other* expenses (such as ▮▮▮, *see* Mot. 10), those criticisms go to weight, not admissibility.  *See City of Pomona*, 750 F.3d at 1044; *i4i*, 598 F.3d at 852.

## III. WAGNER'S UNJUST ENRICHMENT FOR TRADE SECRET 90 IS RELIABLE AND SHOULD NOT BE EXCLUDED.

Trade Secret 90 is unique because Uber is no longer making the Spider device that

1  incorporates Waymo's ███████, and is not planning to go to market with it at this time.
2  (Dkt. 1615 at 112.)  Trade Secret 90 is also unique because there is a company called Tyto (owned
3  by Levandowski through a series of shell companies) that has dedicated close to 100% of its
4  development work to the ███████ that Waymo claims as part of this trade secret.  For
5  years before he left Waymo for Otto and eventually Uber, Levandowski had been siphoning off
6  Google trade secrets to Tyto.  As part of the acquisition of Otto, Uber ███████
7  ███████ (*Id.* 113)  Wagner uses the ███████ cash consideration as an
8  estimate of the value of Waymo's Trade Secret 90.  (*Id.* 115)

9       Defendants argue that Wagner failed to account for other real and intangible assets that
10 Tyto may have had, but Wagner *did* account for other intangibles.  In addition to the ███████ in
11 cash consideration that Uber and Otto paid for Tyto, Uber also gave the Tyto employees a ███████
12 ███████ (*Id.* 113-14.)  This
13 is a significant amount of money (approximately ███████) that Wagner did *not* attribute to
14 Trade Secret 90 to account for Tyto's other assets.  (*Id.* 113-115.)

15 **IV.  WAGNER'S REASONABLE ROYALTY OPINION IS RELIABLE AND SHOULD NOT BE EXCLUDED.**
16
17      Defendants seek to exclude Wagner's reasonable royalty opinion for three reasons in
18 addition to the fact that it is based, in part, on his accelerated development model.  None has any
19 merit.  *First*, Defendants argue that Wagner's conclusion that the baseline should be increased by
20 10% is "akin to a '25% rule of thumb' and should be excluded."  (Mot. 12.)  That is wrong.
21 Wagner's analysis is based on a variety of case-specific factors.  For example, Wagner finds that,
22 while several *Georgia-Pacific* factors are neutral, a number mandate a significant increase,
23 including Factors 4 and 5.  (Dkt. 1615 at 157.)  Such an analysis, clearly set forth in his expert
24 report, is all that was required.  *See, e.g., Comcast v. Sprint*, 2015 WL 4730899, at *6–7 (D. Del.
25 Aug. 10, 2015) (the "lack of a mathematical formula, when there is other analysis, cannot, alone,
26 be grounds for exclu[sion]"); *Fujifilm v. Motorola*, 2015 WL 1737951, at *10 (N.D. Cal. Apr. 8,
27 2015) (denying *Daubert* motion where expert "specifically describe[d] in his report" the factors
28 considered, rendering his opinion "sufficiently transparent for cross examination").

1   *Second*, Defendants contend that Wagner's opinion is flawed because it results in a royalty
2   that exceeds what it would cost Uber to design-around the trade secrets. (Mot. 12.) But it is the
3   jury that must ultimately decide what the result of the hypothetical negotiation would have been.
4   It is indisputable that Uber's own estimates of its potential future profits are relevant to a
5   hypothetical negotiation. *See Aqua Shield v. Inter Pool*, 774 F.3d 766, 770 (Fed. Cir. 2014);
6   *Powell v. Home Depot*, 663 F.3d 1221, 1238 (Fed. Cir. 2011).

7   *Third*, Defendants complain that Wagner failed to perform a *Georgia-Pacific* analysis on a
8   trade secret-by-trade secret basis, but that is *not* required. *ATS Prod. v. Ghiorso*, 2012 WL
9   253315, at *1 (N.D. Cal. Jan. 26, 2012) ("[i]n trade secrets claims, however, damages need not be
10  calculated with absolute precision."). Defendants did not cite any authority to the contrary.

11  **V.   WAGNER'S OPINIONS ARE PROPERLY APPORTIONED.**

12  In trade secret cases, apportionment is not always required. *See, e.g., Versata v. Internet*
13  *Brands*, 902 F. Supp. 2d 841, 856 (E.D. Tex. 2012), *aff'd*, 550 F. App'x 897 (Fed. Cir. 2014); *see*
14  *also Bianco v. Globus Med.*, 2014 WL 5462388, at *19-20 (E.D. Tex. Oct. 27, 2014) (rejecting
15  motion to set aside jury award of reasonable royalties on trade secret claim due to plaintiff's
16  failure to apportion), *aff'd per curiam*, 618 F. App'x 1032 (Fed. Cir. 2015); *RRK Holding Co. v.*
17  *Sears, Roebuck & Co.*, 563 F. Supp. 2d 832, 836 (N.D. Ill. 2008).

18  Nonetheless, both of Wagner's unjust enrichment opinions include an apportionment
19  analysis. Both of Wagner's unjust enrichment models are based on Uber's savings resulting from
20  its trade secret misappropriation, whether it be saved time to market or avoided development
21  expenses. Wagner's reasonable royalty opinion similarly uses Uber's saved time estimates as a
22  starting point. Using Waymo's own estimates of how long it took to develop the trade secrets (for
23  25 and 111), or how long it would take to design around the trade secrets (9, 96, 2, 13, 14 and 7),
24  Wagner divided Uber's cost savings and apportioned accordingly. For example, in an
25  interrogatory response, Defendants estimated that it would take between ███████ to design
26  around each of Trade Secrets 9, 96, 2, 13, 14 and 7. With that information, Wagner measured the
27  present value to Uber based on Uber's own estimates. (Dkt. 1615 at 106-107 (using Uber's
28  estimates, ███████████████████████

████████████████████████████) Because Defendants did not disclose design around estimates for Trade Secret Nos. 25 or 111, Wagner used the time it took Waymo to develop the trade secrets itself, which Waymo's technical expert Dr. Hesselink independently verified. (*Id.* at 106.) The development times for these two trade secrets are noticeably longer than Uber's own estimates—likely because it is much harder to develop a trade secret from the ground up than it is to design around it once you have access to it already. (*Id.*) But Trade Secrets 25 and 111 are also the most valuable. Having access to Trade Secret 25, ████████ ████████████████████████████ would allow Uber to save years of development work. (Dkt. 1615 at 21.) And knowing ████████████████████████████ (Trade Secret 111), ████████████████████████████ ████████████████████████████. (*Id.* at 26.) Because Wagner understands that at least some LiDAR development could proceed in parallel, he assumes that these damages numbers are not additive. (*Id.* at 122.)[7]

Defendants argue that Wagner's analysis fails to account for other hardware aspects of a autonomous vehicle technology, such as "cameras, other LiDAR components, and radar." (Mot. at 8.) But once again, Wagner's analysis is focused on Uber's time and cost savings estimates as of the date the misappropriation occurred. As Uber was structuring the Otto acquisition, ████ ████████████████████████████ (Dkt. 1615 at 52, 66-67.) Every ████████████████████████████ ████████████████████████████. (*Id.*). And to the ████████████████████████████

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion to exclude the testimony of Waymo's damages expert Michael Wagner.

---

[7] Uber makes much of the fact that Waymo's technical expert has only identified evidence that Uber has used ████████████ listed in Trade Secret 25. But that does not undercut their value; Waymo had to drive millions of miles to develop the ██████████ that is has. The fact that Uber is not using every one of them does not make them any less valuable.

DATED:  September 22, 2017         QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  /s/ Charles K. Verhoeven
    Charles K. Verhoeven
    Attorneys for WAYMO LLC