# RAMSEY | EHRLICH LLP

ATTORNEYS AT LAW

September 25, 2017

VIA ECF

Magistrate Judge Jacqueline Scott Corley
U.S. District Court for the Northern District of California
San Francisco Courthouse, Courtroom F - 15th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

Re:  Waymo LLC v. Uber Technologies, Inc., et al., Case No. 3:17-cv-00939-WHA

Dear Magistrate Judge Corley:

Nonparty Anthony Levandowski submits the attached letter brief in response to Waymo's letter brief on the Diligenced Employees' waiver of attorney-client privilege for materails provided to third party Stroz Friedberg, filed under seal.

Respectfully submitted,

*/s/ Miles Ehrlich*
Miles Ehrlich
RAMSEY & EHRLICH LLP
*Counsel for Non-Party Anthony Levandowski*

cc: Counsel of record (via ECF); Special Master John Cooper

Nonparty Anthony Levandowski requests an order holding that he did not waive his attorney-client privilege over thousands of emails and other communications with his personal attorneys—the vast majority of which lack any connection whatsoever to this litigation. The communications at issue reside on digital devices that Mr. Levandowski provided to Stroz Friedberg in late March 2016 as part of a pre-acquisition due diligence review process that has been deemed by this Court to be protected by a common interest privilege as of April 11, 2016 (though not before).

Privilege waiver occurs when the content of privileged communications is voluntarily disclosed to third parties. But contrary to Waymo's suggestion, the contents of these attorney-client privileged communications were never intentionally disclosed by Mr. Levandowski to any third party, including Stroz. Rather, under the terms of a strict written protocol entered into between Mr. Levandowski and Stroz, the native computer devices and other electronic data were subject to examination for "non-privileged, relevant documents or communications," under a set of procedures that were designed specifically to preserve the confidentiality of attorney-client communications and prevent the disclosure of their contents to any third party, including Stroz, Uber, Ottomotto, and their respective counsel. *See* Declaration of John Gardner ("Gardner Decl.") (concurrently filed) at ¶¶ 6-14 and Ex. E.

We believe that the analysis should begin by considering the practicalities of the due diligence procedure that Stroz was asked to perform. In order to perform a competent forensic examination of computers or other digital devices, it is necessary to examine metadata or "digital footprints"–such as file deletion history, last-access logs, file creation dates, and other forms of system activity—in its original, unaltered form. Thus, it would have compromised the integrity of Stroz's investigation if Mr. Levandowski had first scoured his digital devices and deleted all privileged documents, emails, and text messages before delivering the devices for examination. Even if this were possible as a practical matter, such a step would have changed critical metadata on the devices, undermining confidence in the reliability of key forensic findings, and thus defeated the very purpose of the Stroz effort.

As a consequence, it was necessary for Stroz to take possession of the full digital "containers." But at no point, either before April 11, 2016 or after, did Mr. Levandowski abandon the confidentiality of the attorney-client communications contained therein. On the contrary, Mr. Levandowski's counsel took affirmative steps to ensure that his privileged communications would be screened away from any substantive review. Thus, under governing law, because there was no voluntary act of disclosure inconsistent with preserving the confidentiality of the privileged communications, there was no waiver here. And Waymo must not be permitted now to rummage through these pre-existing attorney-client communications in connection with this litigation.

**Factual Background**. As part of the Stroz investigation, Mr. Levandowski was requested to provide all his electronic data, including his physical digital devices. From the start, Mr. Levandowski's transactional attorney, John Gardner of Donahue Fitzgerald, recognized that this large set of electronic data contained Mr. Levandowski's privileged attorney-client communications and sought to protect those privileged materials from disclosure—not just to O'Melveny and Morrison (counsel for Ottomoto and Uber, respectively), but also to Stroz or any

other third parties.  Gardner Decl, ¶ 5.  On March 7, 2016, Mr. Gardner sent a letter to Stroz stating that his firm would not be able to conduct a review of the electronic data for privileged materials before delivery to Stroz.  *Id.* and Ex. C.  The letter instructed Stroz not to review the content of privileged communications but to segregate them and return them to Donahue:  "In the event Stroz discovers Privileged Documents . . . we are instructing Stroz not to review the content of any such Privileged Documents. . . . Stroz is further directed to immediately segregate and return to us any Privileged Documents."  *Id.*

Two weeks later, on March 21, 2016, Gardner requested that Eric Friedberg, the founder and co-president of Stroz, enter a letter agreement with an attached "Protocol for Review of Data and Devices."  *Id.* at ¶ 6 and Ex. E.  Mr. Friedberg signed the agreement on March 22, 2016.  *Id.* at ¶6 and Ex. F.  The protocol provided a process by which Stroz would review the electronic data, including the physical electronic devices, to identify documents relevant to the investigation.  To prevent disclosure of attorney-client privileged communications, the protocol also provided a means to cull out and segregate attorney-client privileged documents from potentially relevant documents and place them in a separate folder.  *Id.* at ¶¶ 7, 10.  At footnote 1, the protocol provided:

> O'Melveny [defined to include the separate counsel for the individual diligenced employees][1] has included a list of attorney client names, firms, domains, addresses, and telephone numbers for Stroz Friedberg to use in identifying potentially privileged documents and communications.  Stroz Friedberg will use this list, its own manual review, and its proprietary privilege-identifying algorithms to identify privileged documents and e-mails that relate to the subject matter of the investigation.  Stroz Friedberg will create a folder on Stroz Review that contains such documents and e-mails – whether active, deleted, or fragments – and O'Melveny will create and deliver to Morrison a privilege list relating to those documents.

*Id.* at ¶ 10 and Ex. E.

Further, the protocol provided that potentially relevant ***non-privileged*** documents—i.e., those that were not already culled and segregated into the privileged documents folder—would be placed in a "Proposed Disclosure Folder." As stated in the protocol: "if Stroz Friedberg believes that ***non-privileged***, [footnote 1] relevant documents or communications—whether active, deleted, or fragments—should be shared with O'Melveny and Morrison, it will first place those documents in a folder (the 'Proposed Disclosure Folder') on Stroz Review."  *Id*. at ¶ 11 and Ex. E at 3-4 (emphasis added).  The protocol also provided a further "fail-safe" provision in the event privileged communications came to be located in the Proposed Disclosure Folder.  *Id.* at ¶

---

[1] The protocol defined "O'Melveny" to include separate counsel retained by the individual employees subject to due diligence: "For purposes of this Protocol, the term 'O'Melveny' means O'Melveny & Meyers and if applicable, any separate counsel retained by the Diligenced Employee."  *Id.* at ¶ 8 and  Ex E, p. 4; *see also* p. 3.  ("O'Melveny & Myers and . . . any separate counsel retained by the Diligenced Employee (jointly for all purposes under this protocol, 'O'Melveny')."

12 and Ex. E at 4.

To assure that Mr. Levandowski's privilege was not waived, Mr. Gardner continued to communicate with Stroz to ensure that it strictly adhered to the protocol. On March 23, 2016, he sent a letter to Stroz reiterating that Mr. Levandowski took Stroz's covenants under the March 21, letter and protocol seriously, and expected to enforce those obligations separate and apart from Stroz's representation of its clients under the Engagement Letter. *Id.* at ¶ 9 and Ex. G. The letter reiterates that "[t]he permitted disclosures under the Protocol are subject to the prior approval of Donahue Fitzgerald LLP." *Id*.

Following this protocol, Mr. Gardner provided a list of attorneys and law firms to Stroz for use in identifying privileged materials. *Id.* at ¶ 14 and Exh. I. Mr. Gardner understood that Stroz used this list of attorneys to develop search terms and conduct computer-based searches to cull and isolate potentially privileged communications in a privilege folder. *Id*. at ¶ 14. Based on the protocol and his other communications with Stroz, Mr. Gardner understood and expected that Stroz would not review the content of attorney-client communications contained in Mr. Levandowski's electronic devices, but that any such privileged communications would be segregated into a privilege folder and subject to a privilege log later prepared by Donahue. *Id.* at ¶¶ 13-14.

Further, based on the protocol and his communications with Stroz, Mr. Gardner is informed and believes that Stroz followed the process as set forth in the protocol and described in Mr. Gardner's declaration and did, in fact, isolate potentially attorney-client privileged communications in a privilege folder and did not review them. *Id.* at ¶ 14. Moreover, prior to April 11, 2016, Stroz never sought permission from Mr. Gardner to review or disclose any potentially privileged communications. *Id.* at ¶ 15.

**The Privileged Records Were Not Disclosed and the Privilege Was Not Waived**. Whether a communication is protected by the attorney-client privilege is governed by an eight-part test: "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived." *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992) (quoting *United States v. Margolis (In re Fischel)*, 557 F.2d 209, 211 (9th Cir. 1977)). Here, there is no dispute about any of the factors except the eighth: waiver.

"[I]t has been widely held that *voluntary* disclosure of the content of a privileged attorney communication constitutes waiver of the privilege." *Weil*, 647 F.2d at 24 (emphasis added); *FSP Stallion 1, LLC v. Luce*, No. 2:08-cv-01155-PMP-PAL, 2010 U.S. Dist. LEXIS 110617 at *50 (D. Nev. Sept. 30, 2010). But for two important reasons, there was no such voluntary disclosure here.

First, the content of the privileged communications was not meaningfully disclosed to Stroz or anyone else. While Mr. Levandowski did provide digital devices and other electronic data to Stroz, he did so with the express condition, to which Stroz's co-founder and president agreed in writing, that Stroz would screen out all of Mr. Levandowski's attorney-client privileged

communications, would not review them, and would not produce them to Uber or other third parties. Gardner Decl., ¶¶5-7, 9-13, Ex. C, E. and G. And the record demonstrates that, before April 11, 2016–which is the critical period, since thereafter the non-waiver protections of the common interest privilege clearly apply under this Court's ruling—no privileged communications were apparently reviewed by Stroz nor produced to Uber or other third parties. *Id.* at ¶ ¶13-15.

As is commonplace in the modern world of electronic discovery, Mr. Levandowski provided a list of his personal attorneys to Stroz, and Stroz used those terms to electronically isolate any potentially privileged conversations from its substantive review—and ultimately, to prevent their disclosure to Uber or its counsel, Morrison. *Id.* at ¶ 14. Thus, as a result of the steps Mr. Levandowski's counsel took to safeguard his privilege, the contents of Mr. Levandowski's attorney-client communications were not in fact disclosed, and the privilege remains intact. *See, e.g., Oakley, Inc. v. Bugaboos Eyewear Corp.*, No. 09-CV-2037-JLS (JMA), 2010 U.S. Dist. LEXIS 110337 at *11-12 (S.D. Cal. Oct. 15, 2010) (finding no waiver from the disclosure of the fact that communications occurred, but no disclosure of the actual contents of the communications); *Quiksilver, Inc. v. Kymsta Corp.*, 247 F.R.D. 579, 584 (C.D. Cal. 2007) (same); *United States v. Fishoff*, No. 15-586 (MAS), 2016 U.S. Dist. LEXIS 108301 at *5-11 (D.N.J. Aug. 16, 2016) (finding no waiver where a cooperating defendant produced to the government the entire contents of an email account with an agreement that communications with attorneys, once identified, would be segregated and not reviewed).[2]

Waymo hypothesizes, based on a selective reading of Stroz's review protocols, that Stroz accessed and reviewed Mr. Levandowski's privileged communications. Dkt. 1746 at 4-5. But, as demonstrated above and in the accompanying declaration of counsel, in fact the record indicates that Stroz did *not* substantively review any privileged communications, at least not before April 11, 2016. Gardner Decl. at ¶¶ 13-15. It is true that Stroz retained possession of Mr. Levandowski's devices and electronic data, some of which contained the privileged communications. But Stroz's mere retention of a container in which the privileged items reside should not be dispositive. As the discovery process in this case has capably demonstrated, in the electronic age, it can be complicated, expensive and time-consuming for parties to provide fulsome digital disclosures while also protecting against the revelation of privileged communications.

Here, part of Stroz's task was to forensically analyze the diligenced employees' electronic devices to determine whether improprieties had been committed and whether the devices contained Google information at the time, or in the past. That process necessarily involved analysis of metadata and other such information, and therefore required forensic analysis of the devices themselves. The parties faced the difficult issue of how to provide the necessary access to the devices while also protecting any privileged materials on those devices. Their solution was eminently reasonable—indeed, there was no other realistic option: as described above, the parties developed a protocol under which potentially privileged materials would be identified and

---

[2] Waymo cites various cases for the proposition that "the disclosure to third party Stroz alone results in a waiver as to all other third parties." Dkt. 1746 at 5. But none of Waymo's cases address the scenario before the Court, in which Stroz had possession of records but the parties agreed that neither Stroz nor anyone else would review or disclose the *substance* of the communications in question.

isolated from the review process by Stroz, and would not be substantively reviewed by Stroz or disclosed to other parties unless Stroz first identified the communications as potentially relevant and received permission from individual counsel to review and/or disclose them.  It would be an unfortunate and perverse result if this litigation ended up standing for the proposition that prospective business partners may not take such an effective and reasonable approach to preventing trade secret theft without risking broad and indiscriminate privilege waivers.

Second, even if the content of some privileged communications was in fact reviewed by Stroz, "a disclosure of confidential material constitutes a waiver of the attorney-client privilege *only if it is voluntary*."  *Transamerica Computer Co. v. IBM Corp.*, 573 F.2d 646, 651 (9th Cir. 1978) (emphasis added).  Generally, whether a disclosure was sufficiently voluntary to work a waiver is a fact-intensive inquiry.  *Alldread v. City of Grenada*, 988 F.2d 1425, 1434 (5th Cir. 1993); *United States v. de la Jara*, 973 F.2d 746, 749 (9th Cir. 1992); *Weil*, 647 F.2d at 24-25; *Transamerica Computer*, 573 F.2d at 650-52; *FSP Stallion*, 2010 U.S. Dist. LEXIS 110617 at *40.

Most commonly, courts that confront questions about the voluntariness of disclosure are asked to determine whether privileged records were inadvertently disclosed.  Until recently, the courts were "in conflict over whether an inadvertent disclosure of a communication or information protected as privileged or work product constitutes a waiver."  Fed. R. Evid. 502, *committee note to subd. (b)*.  In 2008, Congress resolved these conflicts by adopting a rule under which "inadvertent disclosure of protected communications or information in connection with a federal proceeding or to a federal office or agency *does not constitute a waiver* if the holder took reasonable steps to prevent disclosure and also promptly took reasonable steps to rectify the error."  *Id*. (emphasis added); *see also* Fed. R. Evid. 502(b); *United States v. Zolin*, 809 F.2d 1411, 1417 (9th Cir. 1987) (finding no waiver because the disclosure of certain audiotapes was "sufficiently involuntary and inadvertent as to be inconsistent with a theory of waiver"), *vacated in part on other grounds*, 491 U.S. 554 (1989).

This case involves a less common, but nonetheless related, voluntariness question—and the Court should apply a similar rule.  Although Mr. Levandowski's physical production of the electronic data  and digital devices themselves was not "inadvertent"—this production was made with the express, memorialized understandings, negotiated by Mr. Levandowski's personal counsel, John Gardner (1) that Stroz would not substantively review or produce potentially attorney-client privileged material on Mr. Levandowski's devices, Gardner Decl. at ¶¶ 5-7, 9-14, 17, and (2) that his production of the devices and data to Stroz was governed as well by a common interest agreement that would (his counsel believed at the time) further preserve Mr. Levandowski's privileges against waiver.  *Id.* at ¶ 4, and Docket 381.

It is only as a result of this Court's recent orders that Mr. Levandowski's counsel has learned that his understanding at the time about the validity of the common interest privilege during the first couple of weeks of the Stroz investigation (i.e., before April 11, 2016) was incorrect.[3]  But  Mr.

---

[3] In its order, the Federal Circuit did not finally decide the issue, but applied the heightened mandamus standard of review and emphasized that Mr. Levandowski may still seek appellate review of the

Levandowski's counsel reasonably relied at the time on his good-faith legal understanding that there was a valid joint defense agreement and that Mr. Levandowski's data and documents would not be revealed outside the privileged joint-defense group.[4]  More importantly, as set forth above, Mr. Levandowski, through his counsel took rigorous steps to preserve the confidentiality of privileged records contained on the devices even with respect to the members of the putative joint-defense group.  Under the circumstances, we submit that any revelation of the substance of privileged materials was "sufficiently involuntary and inadvertent as to be inconsistent with a theory of waiver."  *Zolin*, 809 F.2d at 1417.

As the Ninth Circuit recognized in *de la Jara*, "[i]n determining whether the privilege should be deemed to be waived, the circumstances surrounding the disclosure are to be considered . . . . When the disclosure is involuntary, [the courts] will find the privilege preserved if the privilege holder has made efforts 'reasonably designed' to protect and preserve the privilege."  *Id*. at 749-50; *see also Gomez v. Vernon*, 255 F.3d 1118, 1131-32 (9th Cir. 2001) (same); J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE, ¶ 503(a)(4)[01] at 503-31 (1982 ed.) ("Communications which were intended to be confidential but are intercepted despite reasonable precautions remain privileged.").

In some cases, disclosure is deemed involuntary not because the physical act was accidental or coerced but because—as in this case—the litigant in question did not intend his otherwise-reasonable actions to reveal privileged matters.  *See Gomez*, 255 F.3d at 1133 (prisoner plaintiffs, "by marking [legal file material] with the name of the case, placing it on a restricted-access shelf [in the prison library], and requiring a sign-out procedure for use of the file," undertook sufficiently reasonable efforts to preserve their privilege, even though the material was nonetheless accessible to prison employees); *Zolin*, 809 F.2d at 1417 (finding no waiver where an entity delivered an audiotape to a third party thinking it was empty, when in fact it contained recordings of privileged conversations); *United States v. Salyer*, No. CR. S-10-061 LKK, 2011 U.S. Dist. LEXIS 22072 at *9-11 (E.D. Cal. Feb. 17, 2011) (finding that, where a prison inmate and his attorneys had a reasonable, though erroneous, belief that their phone calls were confidential, Rule 502's protection against inadvertent disclosure applied to preclude waiver of attorney-client privilege even though the calls in fact were recorded); *United States v. Fishoff*, No. 15-586 (MAS), 2016 U.S. Dist. LEXIS 108301 at *5-11 (D.N.J. Aug. 16, 2016) (finding no waiver where a cooperating defendant produced to the government the entire contents of an email account with an agreement that communications with attorneys, once identified, would be segregated and not reviewed); *Advertising to Women, Inc v. Gianni Versace S.p.A*, No. 98 C 1553, 1999 U.S. Dist. LEXIS 12263 at *15-17  (N.D. Ill. Aug. 4, 1999) (holding that, where defendant erroneously believed two cover letters were not privileged, the defendant's production of the letters to plaintiff was "inadvertent" because defendant had a "good faith basis to believe

---

compulsion orders under the ordinary standards of review by means of a post-judgment challenge.  Fed. Cir. No. 17-2235, Dkt. No. 62-2.

[4] Counsel had a reasonable basis for his expectation that Mr. Levandowski's productions to Stroz would be protected from disclosure pursuant to the common-interest privilege.  Although in the end this Court disagreed with counsel's determination in some ways, it is worth recalling that (a) the privilege questions before the Court were issues of "first impression and complicated," Dkt. 734 (6/23/2017 Tr.) at 40:11-12, and (b) the Court has agreed that the common interest privilege validly applied to communications after April 11, 2016, Dkt. 731 at 3-4.

that the cover letters were not privileged" and therefore "fairness would be ill-served by applying waiver simply because a court later found that [defendant] erred in its assessment. Accordingly, even if the documents were found to be privileged, the Court would not find waiver based on their production because, given the circumstances surrounding the disclosure, the production was inadvertent"); *Resolution Trust Corp. v. Dean*, 813 F. Supp. 1426, 1429 (D. Ariz. 1993) (holding that the unexplained disclosure of a corporation's internal memo, which had been protected by strict confidentiality restrictions, did not waive the attorney-client privilege); *In re Dayco Corp. Derivative Sec. Litig.*, 102 F.R.D. 468, 470 (S.D. Ohio 1984) (holding that the privilege was not waived by the unauthorized disclosure of an employee's diary maintained at the direction of outside counsel when the employer limited access to the diary to senior executives, counsel and accountants).

Here, it cannot rationally be disputed that Mr. Levandowski "made efforts 'reasonably designed' to protect and preserve the privilege." *de la Jara*, 973 F.2d at 751. His counsel entered express agreements intended to protect the confidentiality and the privileged nature of the records contained on his devices and other electronic data sources, Gardner Decl. at ¶¶ 5-7, 9-14, and recently Mr. Levandowski has litigated the privilege issues to the fullest extent possible. The Court should therefore find that Mr. Levandowski did not voluntarily disclose privileged matters and that there was no waiver of the attorney-client privilege.

**Mr. Levandowski's Privilege Assertions are Timely**. Finally, Waymo's cynical argument that Mr. Levandowski's privilege claims are "untimely," Dkt. 1746 at 5-6, must be rejected. As discussed, Mr. Levandowski has asserted that records and materials possessed by Stroz are protected from disclosure by Mr. Levandowski's Fifth Amendment privilege against self-incrimination. *See generally* Dkt. 583. As this Court has previously recognized, such a privilege claim seeks to protect from revelation the very existence of the subject records—and thus producing a log detailing the records in question would "violate [the] Fifth Amendment privilege for the same reasons producing the communications would." Dkt. 802 at 4; *see also id.* at 3; Dkt. 1364. In Mr. Levandowski's briefing on the Fifth Amendment question, we noted generally that the Stroz materials would include some "attorney-client confidential communications," and asserted that, "[i]f any responsive devices exist, and the Court orders them produced, a protocol would be necessary to protect Mr. Levandowski's legitimate privacy interests and personal privileges." Dkt. 583 at 8. And this Court recognized that such particularized issues would have to be resolved once the general Fifth Amendment and common interest privilege issues were "finally resolved." Dkt. 690 at 9. Mr. Levandowski's Fifth Amendment claims over the Stroz materials were exhausted (at least for now) when the Federal Circuit declined to issue a writ of mandamus on September 13, 2017, and, as Waymo concedes, Mr. Levandowski produced a detailed privilege log the next day. Dkt. 1746 at 6. Mr. Levandowski plainly raised in a timely manner the privilege assertions now before the Court.

Respectfully submitted,

*/s/ Miles Ehrlich*
Miles Ehrlich, RAMSEY & EHRLICH LLP, *Counsel for Non-Party Anthony Levandowski*
cc: Counsel of record (via ECF); Special Master John Cooper