# EXHIBIT 2

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

-oOo-

```
WAYMO LLC,                      )
                                )
           Plaintiff ,          )
                                )
    vs.                         )  Case No: 3:17-cv-00939-WHA
                                )
UBER TECHNOLOGIES, INC.,        )
OTTOMOTTO LLC, OTTO TRUCKING,   )
LLC,                            )
                                )
           Defendants.          )
_____)
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF DANIEL GRUVER

San Francisco, California

Thursday, April 20, 2017

Reported by:

LISA R. TOW

CSR No. 6629

Job No. 2599857

PAGES 1 - 73

1    MR. PERLSON:  Q.  When you joined 280
2  Systems did you evaluate any type of sensors
3  for self-driving vehicles other than lidar?
4       A.   I was involved with discussions
5  about cameras and radar.
6       Q.   And who were those discussions
7  with?
8       A.   I don't know who.  I mean, I don't
9  recall who.
10      Q.   Like at the time, who would you
11 have been working with?  There weren't that
12 many people.
13      A.   Yeah.  Yeah.  So, engineers.
14      Soren, Claire.  Jur, maybe.  J-U-R.
15      Q.   Soren.  Can you give the last
16 name?
17      A.   Juelsgaard.
18      Q.   And then Claire?
19      A.   Delauney.
20      Q.   And then Jur?
21      A.   Oh, boy.  I can't remember his
22 last name.
23      Q.   Okay.  We won't let him know.
24      The -- so did -- when you joined --
25 let's say in the first month or so at 280

1  Systems, would you say that in relation to
2  evaluating sensors that you spent the
3  majority of your time evaluating lidar
4  sensors as opposed to radar or cameras?
5       A.   I would, yes.
6       Q.   And why is that?
7       A.   My past experience with evaluating
8  lidar.
9       Q.   Okay.  And that's the past
10 experience of Google?
11      A.   Yes, but not exclusively.
12      Q.   Okay.  What other experience with
13 lidar that you had other than your work with
14 Google?
15      A.   At 510 Systems.
16      Q.   And that was acquired buy Google;
17 right?
18      A.   Correct.
19      Q.   So, have you had any experience
20 with lidar outside of either 510 Systems or
21 at Google?
22      A.   Yes, I had done remote sensing
23 work at SRI International.
24      Q.   Okay. And how long were you at
25 SRI?

```
1       A.   Project manager.
2       Q.   Was there a Spider team?
3       A.   There were engineers working on
4  Spider.
5       Q.   Who were the engineers that worked
6  on Spider that you can recall?
7       A.   James Haslim.  Dan Ratner.  Max
8  Levandowski,
9  Tri Long, Florin Ignatescu, George,
10 Caroline, maybe.  Radu, Gaetan, Ben, Mike,
11 Asheem.
12      I might be missing some.
13      Q.   That's a pretty good list.
14      And did Mr. Levandowski do work in
15 relation to lidar?
16      A.   Clarify that.
17      Q.   Fair enough.
18      Did Anthony Levandowski do work in
19 relation to Spider?
20      A.   Can you clarify "work"?
21      Q.   Well, what was -- how was Anthony
22 Levandowski involved in the Spider design?
23      A.   I would describe him as a product
24 manager.
25      Q.   And what does that mean?
```

1      A.    I don't believe there was any --
2  so, no.  I don't believe there was any
3  single person that --
4      Q.    Would Anthony Levandowski have had
5  input into that design?
6      A.    Yes.
7      Q.    Do you know whether the design of
8  Spider was derived from the GBR3 design at
9  Google?
10     A.    I don't believe it was.
11     Q.    Why not?
12     A.    I don't think there was any
13 consideration to that system when building
14 Spider.
15     Q.    But you don't know who,
16 specifically, chose the lens design of
17 Spider; right?
18     A.    So, I think it was a combination
19 of the engineers involved, sort of
20 discussions of optics.  There were, at some
21 point, a handful of different optical
22 designs being considered that involve all
23 the considerations you would make with an
24 optical system.  Focal length, beam
25 divergence, combining emitters and

1  detectors, fields of view --
2      (Whereupon the court reporter could not
3   understand, requested the witness repeat)
4       THE WITNESS:  Emitters and detectors.
5       MR. PERLSON:  Q.  And you can't say
6  that you were involved in all of those
7  discussions; correct?
8       A.  I can or can't?  Sorry.
9       Q.  You cannot.
10      You were not involved in all of the
11 discussions in relation to the consideration
12 of the Spider lens design; fair?
13      A.  Probably not.
14      Q.  Did you ever ask anyone involved
15 in the design of the Spider lens design
16 whether they had derived it in any way from
17 GBR3 design at Google?
18      A.  I am unaware of the GBR3 design.
19      Q.  Okay.  That's not something you
20 were involved in at Google?
21      A.  No, I believe I left before the
22 work continued on or work started on GBR3.
23      The last I recall, there was a GBR2
24 that we were using.
25      Q.  Do you -- did you ever ask anyone

1    involved in the design of the Spider lens
2    design whether they had derived it in any
3    way from any design at Google?
4        A.   I did not.
5        Q.   Do you know whether Otto or Uber
6    has ever investigated whether the design of
7    the Spider lens design had been derived in
8    any way from any design at Google?
9        A.   I'm sorry.  Repeat the first part.
10       Q.   Sure.
11       Do you know whether Otto or Uber has
12   ever investigated whether the design of the
13   Spider lens had been derived in any way from
14   any design at Google?
15       MR. MUINO:  I would just caution the
16   witness not to reveal anything you may have
17   heard from attorneys with respect to that
18   subject.
19       THE WITNESS:  So I don't know if they
20   have or not.
21       MR. PERLSON:  Q.  There's -- we've been
22   informed in this case through various
23   filings and representations by counsel of
24   both Uber and Mr. Levandowski that there was
25   some sort of due diligence report that was

```
 1   created in connection with the acquisition
 2   of Otto by Uber.
 3          Do you have any knowledge of such
 4   report?
 5          A.   I don't.
 6          MR. MUINO:  Sorry.  Just the same
 7   caution.
 8          MR. PERLSON:  Q.  Were you involved at
 9   all in Otto's -- let me start over again.
10          Were you involved at all in any of the
11   due diligence that Uber did in its
12   acquisition of Otto?
13          A.   No.
14          Q.   Do you know who was?
15          A.   I don't.
16          Q.   How far in advance of the
17   acquisition of Otto by Uber were you aware
18   that Uber was considering acquiring Otto?
19          A.   I think I found out the same time
20   everyone else did.  When it was publically
21   announced by Travis to our team.
22          Q.   So, Mr. Kalanick -- he announced
23   it to your team?
24          A.   It was -- so there was a
25   presentation to our team given by Travis and
```

1  Anthony to the Otto team, announcing the
2  acquisition.
3       Q.   And that was around the same time
4  that it was publically announced?
5       A.   Yeah, I think it was exactly the
6  same time.
7       Q.   And what was communicated in that
8  presentation?
9       A.   That Uber was acquiring Otto.
10      Q.   Did they -- was there any
11 explanation of why or what the plans were
12 going to be going forward?
13      A.   Not in great detail.  But that the
14 two technologies complimented each other.
15 That the trucking -- self-driving trucking
16 market fit well with the work that Uber was
17 doing on transportations of service.
18      Q.   The -- going back to Spider.  Did
19 Spider use eight fiber lasers?
20      A.   Yes.
21      Q.   Who came up with the idea to use
22 eight fiber lasers?
23      A.   A combination of engineers.
24      Q.   Can you name any specific people
25 that you are aware of that were involved in

1  that particular design choice?
2       A.   James Haslim, Max Levandowski,
3  Anthony Levandowski, Tom Smith, myself.
4  There might be other ones.
5       Q.   And is it true that each of those
6  eight fiber lasers would be split eight
7  ways?
8       A.   That was one proposal.  I think
9  that was the final, but yeah.
10      Q.   So that would result in 64 total
11 beams?
12      A.   Correct.
13      Q.   And who came up with the idea for
14 each laser to be split eight ways?  Was it
15 the same group of people you think, that you
16 just mentioned?
17      A.   Yeah, possibly.
18      Q.   And did you ever inquire from any
19 one of those people whether the -- that
20 eight fiber laser design had been derived
21 from any work any of those people had done
22 at Google?
23      A.   No.
24      Q.   Was there any system that preceded
25 the Spider at Otto?

1      I, the undersigned, a Certified Shorthand Reporter of
2 the State of California, do hereby certify:
3      That the foregoing proceedings were taken before me
4 at the time and place herein set forth; that any witnesses in
5 the foregoing proceedings, prior to testifying, were
6 administered an oath; that a record of the proceedings was
7 made by me using machine shorthand which was thereafter
8 transcribed under my direction; that the foregoing transcript
9 is a true record of the testimony given.
10      Further, that if the foregoing pertains to the
11 original transcript of a deposition in a Federal Case, before
12 completion of the proceedings, review of the transcript [ ]
13 was [ ] was not requested.
14      I further certify I am neither financially interested
15 in the action nor a relative or employee of any attorney or
16 any party to this action.
17      IN WITNESS WHEREOF, I have this date subscribed my
18 name.
19
20      Dated: 4/20/17
21
22
23           *Lisa R. Tow* (signature)
24           LISA R. TOW
25           CSR No. 6629

Page 73

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

WAYMO LLC

    Plaintiff,

        vs.              Case No. 17-cv-00939-WHA

UBER TECHNOLOGIES,INC.;
OTTOMOTTO, LLC; OTTO
TRUCKING LLC,

    Defendants.
_____

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

VIDEO DEPOSITION OF DANIEL GRUVER

San Francisco, California

Friday, August 4, 2017

Volume II

REPORTED BY:

REBECCA L. ROMANO, RPR, CSR No. 12546

JOB NO. 2671821

PAGES 74 - 415

```
                                                              Page 251
 1       A.   I recall discussions likely involving           02:09
 2  Anthony Levandowski about ███████████████████
    ███████████████
    █          ██████████████████████████
    █             ███████████████████████████         ████
    █             ███████████████████████
    █   ██████████████████████████████████
    █   ██████████████████████████████████████
    █   █████████████████████████████████
   ██ ██████                                                  02:10
 11      Q.   Okay.  And when is the first discussion
 12 you had, subsequent to your employment at Google,
 13 about ████████████ with Anthony Levandowski?
 14      A.   Sorry.  Can you rephrase that?
 15      Q.   When is the first time you had a               02:10
 16 discussion with Mr. Levandowski related to █████
    █  █████████ after you ceased employment at Google?
 18      A.   Sometime probably shortly after I started
 19 at 280 Systems.  Possibly about ████████ -- so I
 20 I'll -- I'll clarify that if -- █████████████     ████
    █ █████████████████████████████████
    █ ███████████████████████████████
    █    █ ██████████████████████████████
    █ ████████████████████████████████████████
    █ ██████████████████████████                              02:10
```

Page 252

1  █ ███████████████████████████████████ █

2 █ ████████████████████████████████████

3 █ ██████████████████████████████

4 █ ██████████████████████████ that you would have

5 separation of adjacent points. 02:11

6     Q.   Okay. Sorry I interrupted. Go --

7     A.   No.

8     Q.   -- so ahead.

9     A.   So I -- probably, at some point in the

10 first month at 280, in discussions of ways to 02:11

11 assemble LiDAR systems, he would have been present

12 for a conversation about ██████████.

13     Q.   You said he would have been present

14 for -- what -- what do you mean by that?

15     A.   If I was having a discussion with another 02:11

16 engineer, he may have been there. I don't know --

17 I don't recall specific discussions, but he could

18 have been involved in one.

19     Q.   And who were you discussing ████████

20 with that you -- that Mr. Levandowski may have been 02:11

21 present for?

22     A.   Max Levandowski and possibly Daniel

23 Ratner.

24     Q.   And this was at Mr. Levandowski's house?

25     A.   Yes. 02:12

Page 253

1  Q. So February 2016, you, 02:12
2  Anthony Levandowski, Max Levandowski and Dan Ratner
3  are discussing ▮▮▮▮▮ for LiDAR at Anthony's
4  house, right?
5  A. Maybe February. I don't recall when 02:12
6  Dan Ratner started working with us.
7  Q. So it might have been March?
8  A. Yes.
9  Q. But what I said is otherwise accurate?
10 A. Yes. Correct. 02:12
11 Q. And -- and were you talking about ▮▮
12 ▮▮▮▮ for a diode-based LiDAR or a fiber --
13 fiber-laser-based LiDAR?
14 A. I believe the fiber-based, but I believe
15 the discussions were on sort of how ▮▮▮▮▮ 02:12
16 came about in terms of if pulse rates and ▮▮
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18 ▮▮▮▮
19 Q. And who was kind of explaining the ▮▮
20 ▮▮▮▮? Who was the source of the information 02:12
21 here?
22 A. I was describing how sort of mirrors and
23 optics might work to project light.
24 Q. So you were describing ▮▮▮▮▮▮ to
25 Max Levandowski and Dan Ratner; is that right? 02:13

Page 254

1  A.  I believe so, yeah.                                02:13

2  Q.  And Anthony may have been present?

3  A.  Yes.

4  Q.  Okay.  So when was the first time you and

5  Anthony discussed ██████████ subsequent to your          02:13

6  employment at Google?

7  A.  The specific discussions I can remember

8  were discussions with an Uber employee in the May

9  to June time frame about, you know, if we were to

10 build LiDAR systems, the Uber employee was              02:13

11 explaining what his thoughts on useful, helpful

12 ██████████ would be for a sensor for a

13 self-driving system.

14 Q.  Who is the Uber employee you are

15 referring to?                                            02:13

16 A.  Scott Boehmke.

17 Q.  So just -- my question was, when was the

18 first time you and Anthony discussed ██████████,

19 and then you referred to discussions with an Uber

20 employee, so I'm a little bit confused.                  02:14

21 A.  So I recall Anthony being involved in

22 those discussions, but I -- I don't remember -- I

23 happened to remember those specifically than any

24 discussions I may have had previous about how to

25 assemble a LiDAR or what ██████████ might be.            02:14

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

```
 1        I, Rebecca L. Romano, a Certified Shorthand
 2   Reporter of the State of California, do hereby
 3   certify:
 4        That the foregoing proceedings were taken
 5   before me at the time and place herein set forth;
 6   that any witnesses in the foregoing proceedings,
 7   prior to testifying, were administered an oath;
 8   that a record of the proceedings was made by me
 9   using machine shorthand which was thereafter
10   transcribed under my direction; that the foregoing
11   transcript is true record of the testimony given.
12        Further, that if the foregoing pertains to the
13   original transcript of a deposition in a Federal
14   Case, before completion of the proceedings, review
15   of the transcript [ ] was [X] was not requested.
16        I further certify I am neither financially
17   interested in the action nor a relative or employee
18   of any attorney or any party to this action.
19        IN WITNESS WHEREOF, I have this date
20   subscribed my name.
21
22   Dated:   August 5, 2017
23
24                    _____
                      Rebecca L. Romano, RPR,
25                    CSR. No 12546
```

Page 415