# EXHIBIT 11

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

WAYMO LLC,                          )
                                    )
                Plaintiff,          )
                                    )
    vs.                             )  Case No.
                                    )  17-cv-00939-WHA
UBER TECHNOLOGIES, INC.;            )
OTTOMOTTO, LLC; OTTO TRUCKING LLC,  )
                                    )
                Defendants.         )
_____)


   HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY


   VIDEOTAPED 30(b)(6) DEPOSITION of OTTOMOTTO LLC,

     by and through its Designated Representative

                ADAM BENTLEY, ESQ.

            San Francisco, California

            Tuesday, August 22, 2017

                    Volume I




Reported by:
MARY J. GOFF
CSR No. 13427

Job No. 2684904A

PAGES 1 - 147

Page 57

1    a moment to review it and let me know if you          10:19:22

2    recognize it.                                          10:19:25

3         A    Okay.                                        10:23:29

4         Q    So my question was:  Do you recognize this   10:23:30

5    e-mail chain?                                          10:23:32

6         A    I recognize the E-mail chain to the extent   10:23:34

7    that I was a part of this e-mail chain.  There are     10:23:40

8    also e-mails included in this e-mail chain that I      10:23:43

9    was not copied on or e-mails that I did not receive.   10:23:46

10        Q    Focusing on the e-mails that you were not    10:23:50

11   copied on, have you ever seen them before?             10:23:52

12        A    No, I don't believe so.  The e-mails that    10:24:04

13   I was not copied on are redacted here, so I don't      10:24:06

14   see what they say; but I don't recognize or recall     10:24:10

15   ever seeing e-mails from these dates with these        10:24:13

16   people.                                                10:24:17

17        Q    Directing your attention to page 9,          10:24:18

18   there's an e-mail from Andrew Glickman to              10:24:19

19   Mr. Sieben, yourself, Lior Ron, and CC'ing             10:24:26

20   Mr. Poetzscher, Jamie Leigh, and Christian Lymn --     10:24:30

21   Lymn.                                                  10:24:33

22             Do you see that?                             10:24:35

23        A    Yes.                                         10:24:37

24        Q    Who is Andrew Glickman?                      10:24:37

25        A    Andrew Glickman is a corporate attorney      10:24:39

Page 58

1    in-house at Uber.                                    10:24:42

2        Q    And what was his role in the               10:24:46

3    Ottomotto/Uber negotiations?                         10:24:47

4        A    He was working on the transaction as an     10:24:52

5    in-house corporate attorney at Uber.                 10:24:54

6        Q    So Mr. Sieben is -- is addressed here.      10:24:56

7    He's an O'Melveny partner at the time?               10:24:58

8        A    Correct.                                    10:25:02

9        Q    You were on this.  You were an O'Melveny    10:25:02

10   counsel at the time?                                 10:25:05

11       A    Yes.                                        10:25:05

12       Q    Lior Ron is on this.  He was Ottomotto's    10:25:06

13   president at the time, correct?                      10:25:10

14       A    Yes, he was our client and representative   10:25:12

15   of Ottomotto and Otto Trucking.                      10:25:14

16       Q    And then Mr. -- Mr. Poetzscher was CC'd,    10:25:16

17   and he was in the business -- he was in corporate    10:25:18

18   development at Uber at the time, right?              10:25:23

19       A    He --                                       10:25:25

20            MR. TAKASHIMA:  Objection.  I'm going to    10:25:26

21   note that this is all beyond the scope of the        10:25:26

22   30(b)(6) designation.                                10:25:28

23       A    Yes.                                        10:25:30

24            MR. TAKASHIMA:  You can answer the          10:25:30

25   question.                                            10:25:30

Page 59

```
 1      A    Yeah.                                    10:25:30

 2      Q    (BY MR. JUDAH) Who is Jamie Leigh?       10:25:32

 3           MR. TAKASHIMA:  Objection, beyond the    10:25:34

 4    scope.                                          10:25:34

 5      A    Jamie Leigh is -- or at the time she was a  10:25:35

 6    corporate partner at Cooley.                    10:25:41

 7      Q    (BY MR. JUDAH) And who is Christian Lymn?  10:25:44

 8           MR. TAKASHIMA:  Objection, beyond the    10:25:47

 9    scope.                                          10:25:47

10      A    Christian Lymn is an in-house corporate  10:25:49

11    attorney at Uber.                               10:25:52

12      Q    (BY MR. JUDAH) So you see the date of this  10:25:55

13    e-mail is February 6, 2016, right?              10:25:57

14           MR. TAKASHIMA:  Objection, beyond the    10:26:00

15    scope.                                          10:26:00

16      A    Yes.                                     10:26:01

17      Q    (BY MR. JUDAH) And it says -- Mr. Glickman  10:26:02

18    writes, We will send you a revised indemnity word  10:26:04

19    version markup incorporating the below and any other  10:26:09

20    Uber positions.  We hope to get to you tomorrow.  10:26:11

21           Do you see that?                         10:26:16

22           MR. TAKASHIMA:  Objection, beyond the    10:26:16

23    scope.                                          10:26:16

24      A    Yes.                                     10:26:18

25      Q    (BY MR. JUDAH) Do you -- do you          10:26:18
```

Page 60

```
 1   remember -- let me ask it this way:  Have you ever      10:26:18

 2   seen an e-mail mentioning indemnity obligations         10:26:23

 3   prior to February 6, 2016.                              10:26:30

 4       A    Do I --                                        10:26:34

 5            MR. TAKASHIMA:  One second.  Objection to      10:26:37

 6   form.  And I'm going to caution you not to divulge      10:26:38

 7   any privileged communications, but you can answer       10:26:42

 8   the question.                                           10:26:46

 9       A    -- I don't recall the dates of all the         10:26:49

10   e-mails that were associated with this deal, so I       10:26:51

11   don't recall if there were e-mails being exchanged      10:26:56

12   between the sides prior to -- you were asking if        10:26:59

13   there were e-mails related to this prior to             10:27:05

14   February 6?                                             10:27:07

15       Q    (BY MR. JUDAH) Yeah, on the topic of           10:27:08

16   indemnification.                                        10:27:10

17       A    So --                                          10:27:11

18            MR. TAKASHIMA:  Objection, form.               10:27:12

19       A    -- there's a February 5 e-mail on this         10:27:13

20   chain relating to indemnification.                      10:27:18

21       Q    (BY MR. JUDAH) Where is that?                  10:27:20

22       A    So on page 9, about in the middle where it     10:27:30

23   says, On February 5, 2016, at 5:30 p.m., Andrew         10:27:33

24   Glickman wrote -- and this are -- this is an e-mail     10:27:37

25   relating to the negotiation of the indemnification      10:27:42
```

Page 61

1    terms.                                                    10:27:44

2         Q    Got it.  So how about prior to February 5?       10:27:46

3    Can you recall seeing any e-mails prior to that date       10:27:50

4    of February 5 relating to the subject matter of Uber       10:27:54

5    indemnification of Ottomotto?                              10:27:59

6              MR. TAKASHIMA:  Again, I caution you not         10:28:03

7    to divulge any privileged communications.                  10:28:04

8         A    So I don't recall the dates of all the           10:28:06

9    e-mails in this transaction, so I can't tell you           10:28:09

10   right now whether there were e-mails going across          10:28:11

11   the table relating to indemnity prior to February 5.       10:28:14

12             But I can tell you that based on the             10:28:18

13   content of this February 5 e-mail, it's clear to me        10:28:22

14   there had already been substantive discussion on the       10:28:25

15   indemnification construct and terms, given the             10:28:28

16   detail and the terms set forth in -- in this               10:28:33

17   February 5 e-mail from Andrew Glickman.                    10:28:35

18        Q    (BY MR. JUDAH) The term -- the term -- do        10:28:48

19   you see there's a -- the second kind of underlined         10:28:53

20   section, the February 5 e-mail from Mr. Glickman           10:28:56

21   says, List of Specified Bad Acts."                         10:29:00

22             Do you see that?                                 10:29:04

23        A    Yes.                                             10:29:04

24        Q    Do you remember the origin of that term --       10:29:06

25             MR. TAKASHIMA:  Objection.                       10:29:10

Page 62

1   Q     (BY MR. JUDAH) -- specifically bad acts?          10:29:10

2         MR. TAKASHIMA:  Objection, beyond the            10:29:12

3   scope.                                                  10:29:12

4   A     Is -- is your question:  What is the              10:29:15

5   origin of the defined term, "specified bad act"?        10:29:18

6   Q     (BY MR. JUDAH) Yeah.                              10:29:23

7         MR. TAKASHIMA:  Objection, beyond the            10:29:25

8   scope; and objection, form.                             10:29:25

9   A     My recollection is that -- that defined          10:29:30

10  term came into being just because corporate lawyers    10:29:32

11  who were discussing the construct of the                10:29:36

12  Indemnification Agreement were using kind of common     10:29:39

13  vernacular, which then became a defined term.           10:29:43

14  Q     (BY MR. JUDAH) Have you ever worked on any       10:29:46

15  merger and/or acquisition agreements, other than the    10:29:49

16  one that was used in this Ottomotto and Uber deal?      10:29:54

17        MR. TAKASHIMA:  Objection, form; and            10:30:02

18  objection, beyond the scope.                            10:30:03

19  A     So I'm trying to understand your question,       10:30:05

20  so let me make sure I have it right.                    10:30:10

21        Is your question whether I worked on other       10:30:11

22  merger transactions other than this -- the Ottomotto   10:30:13

23  and Otto Trucking transaction with Uber?                10:30:15

24  Q     (BY MR. JUDAH) Yes.                              10:30:17

25  A     Yes.                                              10:30:18

Page 63

```
 1            MR. TAKASHIMA:  Objection to form; and        10:30:18
 2     objection, beyond the scope.  Give me second to      10:30:19
 3     object --                                            10:30:21
 4        A     Okay.                                       10:30:21
 5            MR. TAKASHIMA:  -- before you answer.          10:30:22
 6        Q     (BY MR. JUDAH) How many other mergers and   10:30:23
 7     core acquisition transactions have you worked on?    10:30:25
 8            MR. TAKASHIMA:  Objection, form;              10:30:28
 9     objection, beyond the scope.                         10:30:28
10        A     I don't know the number offhand.  But over  10:30:32
11     nine years, the majority of which were spent working 10:30:37
12     on M&A transactions and probably worked on at least  10:30:41
13     a handful each year.                                 10:30:45
14        Q     (BY MR. JUDAH) Did -- have any of the       10:30:48
15     other merger and acquisition transactions you have   10:30:50
16     ever worked on included a provision with a defined   10:30:52
17     term for "bad acts"?                                 10:30:57
18            MR. TAKASHIMA:  Objection, beyond the         10:31:00
19     scope.                                               10:31:00
20        A     I don't recall if that specific defined     10:31:09
21     term was used in any other transactions I worked on. 10:31:13
22     But every M&A transaction has indemnification        10:31:17
23     obligations of some kind, so it's possible.          10:31:22
24        Q     (BY MR. JUDAH) But the answer to my         10:31:26
25     question is:  No, you can't think of any other       10:31:28
```

Page 64

```
1    merger and/or acquisition transactions you have          10:31:32

2    worked on that had a defined term for bad acts?          10:31:33

3           MR. TAKASHIMA:  Objection, form;                  10:31:38

4    objection, beyond the scope.                             10:31:38

5      A    My answer is that I cannot recall whether         10:31:42

6    any other merger transactions I worked on in the         10:31:44

7    past may have included a specific defined term or         10:31:48

8    not.  I don't recall one that did offhand, but that      10:31:53

9    doesn't mean none did.                                   10:31:56

10     Q    (BY MR. JUDAH) You just can't think of any         10:31:59

11   others sitting here today?                               10:32:01

12          MR. TAKASHIMA:  Objection, form;                  10:32:03

13   objection, beyond the scope.                             10:32:03

14     A    Sitting here today, it would be difficult         10:32:06

15   for me to recall specific and deal-specific defined      10:32:07

16   terms that were in past merger agreements or merger      10:32:12

17   transactions that I worked on, so I don't recall         10:32:16

18   any.                                                     10:32:19

19     Q    (BY MR. JUDAH) So directing your attention        10:32:19

20   to Mr. Glickman's February 5 e-mail, beneath the         10:32:20

21   section here that says "List of Specified Bad            10:32:25

22   Acts," it says, Specified bad acts will be defined       10:32:29

23   to mean the following:  [Actual exhaustive list to       10:32:33

24   be provided by Unicorn by Monday].                       10:32:37

25          Do you see that?                                  10:32:40
```

Page 65

```
 1    A    Yes.                                          10:32:40

 2    Q    "Unicorn" refers to Uber; is that right?     10:32:41

 3         MR. TAKASHIMA:  Objection, beyond the        10:32:44

 4  scope.                                              10:32:44

 5    A    Yes.                                          10:32:46

 6    Q    (BY MR. JUDAH) So according to               10:32:47

 7  Mr. Glickman's February 5 e-mail, the origin of the 10:32:48

 8  "Exhaustive List of Specified Bad Acts" was going to 10:32:51

 9  come from Uber?                                     10:32:55

10         MR. TAKASHIMA:  Objection to form;           10:32:58

11  objection, beyond the scope.                        10:32:58

12    A    So when you're negotiating an M&A            10:33:00

13  transaction, the initial draft of any document will 10:33:02

14  come from one party or the other.  And based on this 10:33:06

15  e-mail, Andrew is indicating that Uber was providing 10:33:10

16  the initial draft.                                  10:33:14

17    Q    (BY MR. JUDAH) And -- and that would         10:33:18

18  include the initial draft of the "Exhaustive List of 10:33:19

19  the Specified Bad Acts"?                            10:33:23

20         MR. TAKASHIMA:  Objection, beyond the        10:33:25

21  scope.                                              10:33:25

22    A    Based on --                                   10:33:28

23         MS. EWINS:  Objection, form.                 10:33:30

24    A    -- based on this agreement, Andrew was       10:33:31

25  indicating that the initial draft of the "specified 10:33:35
```

Page 66

```
 1   bad acts" defined term definition would be provided      10:33:41

 2   by Uber.                                                 10:33:46

 3       Q    (BY MR. JUDAH) I direct your attention          10:33:47

 4   further down the e-mail.  Mr. Glickman writes            10:33:49

 5   "Example list of Specified Bad Acts."                    10:33:50

 6            And then there's a section with some            10:33:53

 7   bullets.  The section is called "IP."                    10:33:56

 8            Do you see that?                                10:33:58

 9       A    Yes.                                            10:34:00

10       Q    So the first -- the bullets are indicated       10:34:01

11   by question marks, but I -- I suspect that's a           10:34:04

12   formating issue.                                         10:34:07

13            But -- so the first of these bullets says       10:34:08

14   "Taking of hardware of ACME."                            10:34:10

15            Do you see that?                                10:34:14

16       A    Yes.                                            10:34:14

17       Q    "ACME" refers to Google, correct?              10:34:14

18            MR. TAKASHIMA:  Objection, beyond the           10:34:17

19   scope.                                                   10:34:17

20       A    ACME would have referred to any former          10:34:21

21   employer of any of the diligenced employees, which      10:34:24

22   could be Google, in the case of people who had          10:34:28

23   worked at Google.                                        10:34:31

24       Q    (BY MR. JUDAH) Other than Google, what          10:34:33

25   were the former employers of the diligenced              10:34:35
```

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

1    I, MARY J. GOFF, CSR No. 13427, Certified

2  Shorthand Reporter of the State of California,

3  certify;

4    That the foregoing proceedings were taken

5  before me at the time and place herein set forth, at
   which time the witness declared under penalty of

6  perjury; that the testimony of the witness and all

7  objections made at the time of the examination were

8  recorded stenographically by me and were thereafter

9  transcribed under my direction and supervision; that

10 the foregoing is a full, true, and correct
   transcript of my shorthand notes so taken and of the

11 testimony so given;

12    That before completion of the deposition,

13 review of the transcript (  ) was (XX) was not

14 requested:    (   ) that the witness has failed or
   refused to approve the transcript.

15    I further certify that I am not financially

16 interested in the action, and I am not a relative or
   employee of any attorney of the parties, nor of any

17 of the parties.

18    I declare under penalty of perjury under the

19 laws of California that the foregoing is true and

20 correct, dated this 24th day of August 2017.

21

22

23
   _____
24

25    MARY J. GOFF, CSR No. 13427

                                    Page 147