# ATTACHMENT 1

Shepard's® report available
As of: September 27, 2017 4:30 PM Z

# Intellectual Ventures I LLC v. Xilinx, Inc.

United States District Court for the District of Delaware

April 14, 2014, Decided; April 14, 2014, Filed

C.A. No. 10-1065-LPS

**Reporter**
2014 U.S. Dist. LEXIS 62882 *; 2014 WL 1814384

INTELLECTUAL VENTURES I LLC et al, Plaintiffs, v. XILINX, INC., Defendant.

**Prior History:** *Intellectual Ventures I LLC v. Altera Corp., 842 F. Supp. 2d 744, 2012 U.S. Dist. LEXIS 70653 (D. Del., 2012)*

**Counsel:  [*1]** For Intellectual Ventures I LLC, Plaintiff: Brian E. Farnan, LEAD ATTORNEY, Michael J. Farnan, Farnan LLP, Wilmington, DE; Ameet A. Modi, PRO HAC VICE; Giorgos Stamatopoulos, PRO HAC VICE; John M. Desmarais, PRO HAC VICE; John C Spaccarotella, PRO HAC VICE; Jonas R. McDavit, PRO HAC VICE; Laurie Stempler, PRO HAC VICE; Michael P. Stadnick, PRO HAC VICE.

For Intellectual Ventures II LLC, Plaintiff: Brian E. Farnan, LEAD ATTORNEY, Michael J. Farnan, Farnan LLP, Wilmington, DE; John M. Desmarais, PRO HAC VICE; Michael P. Stadnick, PRO HAC VICE.

For Xilinx, Inc., Defendant: Karen Jacobs, LEAD ATTORNEY, Michael J. Flynn, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Jennifer L. Swize, PRO HAC VICE; Joe C. Liu, PRO HAC VICE; Laurie M. Charrington, PRO HAC VICE; Patrick T. Michael, PRO HAC VICE; Tharan Gregory Lanier, PRO HAC VICE.

For Intellectual Ventures I LLC, Counter Defendant: Brian E. Farnan, LEAD ATTORNEY, Farnan LLP, Wilmington, DE; Ameet A. Modi; John M. Desmarais; Michael P. Stadnick.

For Intellectual Ventures II LLC, Counter Defendant: Brian E. Farnan, LEAD ATTORNEY, Farnan LLP, Wilmington, DE; John M. Desmarais; Michael P. Stadnick.

For Intellectual Ventures I LLC, Counter  **[*2]** Defendant: Brian E. Farnan, LEAD ATTORNEY, Farnan LLP, Wilmington, DE; Ameet A. Modi; John M. Desmarais; Michael P. Stadnick.

For Intellectual Ventures II LLC, Counter Defendant: Brian E. Farnan, LEAD ATTORNEY, Farnan LLP, Wilmington, DE; John M. Desmarais; Michael P. Stadnick.

For Intellectual Ventures I LLC, Counter Defendant: Brian E. Farnan, LEAD ATTORNEY, Farnan LLP, Wilmington, DE; Ameet A. Modi, John M. Desmarais, John C Spaccarotella, Laurie Stempler, Michael P. Stadnick.

**Judges:** LEONARD P. STARK, UNITED STATES DISTRICT JUDGE.

**Opinion by:** LEONARD P. STARK

## Opinion

**UNSEALED ON APRIL 25, 2014**

**MEMORANDUM ORDER**

At Wilmington this **14th** day of **April, 2014**:

1. Pending before the Court is Defendant's Motion to Exclude the Opinions and Testimony of IV's Damages Expert Michael J. Wagner. (D.I. 470) For

the reasons explained below, the Court will GRANT Defendant's motion.

2. This is a patent infringement action originally brought by Intellectual Ventures I and II ("IV") against Xilinx and three other parties. (D.I. 1, 17) All parties except Xilinx have been dismissed. (*See* D.I. 214, 259, 514) IV alleges that certain Xilinx products infringe U.S. Patent Nos. 6,993,669 ("the '669 Patent"), 5,687,325 ("the '325 Patent"), 6,260,087 ("the '087 Patent"), **[*3]** and 6,272,646 ("the '646 Patent") (collectively, "the Patents-in-Suit"). (D.I. 17) Fact and expert discovery are closed. (*See* D.I. 429, 430) The Court issued a claim construction order on July 26, 2013. (D.I. 416) Trial is set for May 12, 2014. (D.I. 111 at 10) The Court heard oral argument on the pending motion on April 2, 2014. (*See* Transcript ("Tr."))

3. In March 2005 and March 2008, Xilinx became an investor in two "invention investment funds" that IV created to support its business model — "Fund I" and "Fund II." (*See* D.I. 476 Ex. 7, Ex. 8) The asserted patents are assets in these funds, and each plaintiff is a wholly-owned subsidiary of the correspondingly named fund. (D.I. 11)

As an investor, Xilinx was contractually entitled to obtain licenses to the asserted patents on agreed-upon terms with IV. In particular, after a fund acquires a group of patents and patent applications, called an "IP Group," IV sends an "acquisition notice" that permits investors such as Xilinx to take a license under that IP Group at a pre-negotiated price. (*See* D.I. 476 Ex. 7 at ¶¶ 1.5.2, 1.5.4; Ex. 8 at ¶¶ 1.3, 1.5.2) The price depends on (i) IV's valuation of the patents, known as their "total cost **[*4]** of ownership" ("TCO"), which is based on the price IV paid for them, PTO maintenance fees, and other expenses; and (ii) an agreed-upon percentage to apply to that TCO, which percentage decreases as more investors invest in that IP Group. (*See, e.g., id.* Exs. 9-11) No further negotiations were required for Xilinx to obtain a license to patents acquired by IV after Xilinx first became an IV investor. (*See id.* Ex. 7 at ¶¶ 1.5.2, 1.5.4; Ex. 8 at ¶¶ 1.3, 1.5.2) The method by which IV would calculate the price to Xilinx had previously been agreed-to and once IV determined the specific price, Xilinx had an opportunity to obtain a full, paid-up license by paying the price asked for by IV. (*See id.* Exs. 9-11)

Accordingly, it is undisputed that under the IV-Xilinx agreements, Xilinx was contractually entitled to elect a license to:

> A. the "Web Chang" IP Group, comprised solely of the '325 and '087 patents (the "Web Chang patents"), at a maximum of about $110,000 — i.e., 50% of $220,801 TCO. (*See id.* Ex. 1 at ¶¶ 55, 57, 140; Ex. 10)
>
> b. the "Cypress" IP Group, which contained the '646 patent and ten other patents IV acquired from Cypress Semiconductor Corporation, at a maximum of about $473,000 — **[*5]** i.e., 50% of its $946,186 TCO. (*See id.* at ¶¶ 55, 57, 141; Ex. 11)
>
> C. the "AirIP" IP Group, which contained the '669 patent application, 24 other applications, and 7 patents IV acquired from AirIP, at a maximum of about $1.4 million — i.e., 40% of its $3,620,243 million TCO. (*See id.* at ¶¶ 55, 57, 142; Ex. 9)

Thus, Xilinx was contractually entitled to licenses from IV for the asserted patents, as well as an additional 17 patents and 24 applications, for a maximum price of about $2 million.

4. *Federal Rule of Evidence 702* provides that:
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;

Case 3:17-cv-00939-WHA   Document 1852-1   Filed 09/27/17   Page 4 of 6

Page 3 of 5
2014 U.S. Dist. LEXIS 62882, *5

(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

The Court has a gatekeeping role to ensure that expert testimony is relevant and reliable. *See* [Daubert v. Merrell Dow Pharms., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)]. [*6] In serving this gatekeeping function, courts evaluate "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." [Id. at 592]. The party offering the expert testimony bears the burden of proving that the testimony is admissible, *see* [Withrow v. Spears, 967 F. Supp. 2d 982, 2013 WL 4510305, at *5 (D. Del. 2013)], which requires proof, by a preponderance of the evidence, that the testimony is reliable, *see* [In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1996)].

5. Pursuant to [35 U.S.C. § 284], "[a] patentee is entitled to no less than a reasonable royalty on an infringer's sales for which the patentee has not established entitlement to lost profits." [Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1554 (Fed. Cir. 1995)]. If an established royalty exists, it "is usually the best measure of a 'reasonable' royalty for a given use of an invention because it removes the need to guess at the terms to which parties would hypothetically agree." [Monsanto Co. v. McFarling, 488 F.3d 973, 978-79 (Fed. Cir. 2007)]. Typically, an established royalty results from licenses the patentee has entered into with third [*7] parties that are sufficiently uniform and widespread and have been executed outside of a litigation context. *See* [Rude v. Westcott, 130 U.S. 152, 165, 9 S. Ct. 463, 32 L. Ed. 888, 1889 Dec. Comm'r Pat. 543 (1889)]; [Sun Studs, Inc. v. ATA Equip. Leasing, Inc., 872 F.2d 978, 993 (Fed. Cir. 1989)]. An established royalty can arise from a prior agreement between just the patentee and the accused infringer. *See, e.g.,* [Seymour v. McCormick, 57 U.S. 480, 14 L. Ed. 1024 (1854)].

However, an "actual license rate does not necessarily constitute a reasonable royalty." [Trio Process Corp. v. L. Goldstein's Sons, Inc., 612 F.2d 1353, 1358 (3d Cir. 1980)]. For example, the value of an existing license may be dramatically reduced if it was negotiated against a backdrop of industry-wide infringement. *See, e.g.,* [Tights, Inc. v. Kayser-Roth Corp., 442 F.Supp. 159 (M.D.N.C. 1977)]. In other situations, "patentees could artificially inflate the royalty rate by making outrageous offers." [Whitserve, LLC v. Computer Packages, Inc., 694 F.3d 10, 29-30 (Fed. Cir. 2012)]. However, absent such extenuating circumstances, "the actual license rate [between the patentee and alleged infringer] is an important factor in the determination of a reasonable royalty," especially when the "license [*8] rate agreed upon . . . was arrived at in free and open negotiations and conducted prior to any infringing activity." [Trio Process Corp., 612 F.2d at 1358-59].[1]

6. By contrast, in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, the Court of Appeals for the Sixth Circuit stated that:

> On the date a patent issues, a competitor which made no investment in research and development of the invention, [*9] has four options: (1) it can make and sell a non-infringing substitute product, and refrain from making, using, or selling a product incorporating the patented invention; (2) it can make and sell the patented product, if the patent owner be willing, negotiating a license and paying a reasonable (negotiated) royalty;

---

[1] *See also* [Deere & Co. v. Int'l Harvester Co., 710 F.2d 1551, 1560 (Fed. Cir. 1983)] (Davis, J., dissenting) ("The District Court's error in failing to consider [Deere's offer to license the defendant] was not insignificant. These were the only offers or licenses by Deere (with respect to this patent) that were before the court below. They clearly had a substantial bearing on the reasonable compensation to which Deere was entitled for infringing use of the invention. I do not say that they demonstrated the upper limit of Deere's recovery, or that Deere was restricted to the specific rate provided in that offer and license. I do say that that evidence was pertinent and should have formed an important basic factor in the trial court's evaluation of the proper compensation.") (internal citations omitted).

(3) it can simply take the invention, running the risk that litigation will ensue and that the patent will be found valid and infringed, or (4) it can take a license under option (2) and thereafter repudiate its contract, challenging the validity of the patent. Determination of a reasonable royalty, after election of option (3), cannot, without injustice, be treated as though the infringer had elected option (2) in the first place.

*575 F.2d 1152, 1158-59 (6th Cir. 1978)*. Contrary to IV's contention, however, *Panduit* does not mean that any time there is patent infringement, the damages must be higher than any negotiated but unaccepted reasonable royalty between the parties. *See generally Mobil Oil Corp. v. Amoco Chemicals Corp., 915 F. Supp. 1333, 1348 (D. Del. 1994)* ("[I]f *Panduit* were read as Mobil contends, a court could never find a patentee's established rates to be [*10] the damages which an infringer should pay."). Instead, *Panduit* focuses on an infringer who is "a **competitor** which made **no investment** in research and development of the invention." *Id.* (emphasis added). IV and Xilinx are **not** competitors, and Xilinx **has** invested in research and development of the invention. Finally, while *Panduit* holds that a prior license does not necessarily create an established royalty, it does not hold that such prior licensing agreements are irrelevant to a reliable damages analysis.

7. In his expert report, IV's damages expert, Michael Wagner, calculated a reasonable royalty of 1% per patent (of the revenue Xilinx gained from sales of the accused products) based on a hypothetical negotiation between IV and Xilinx. (*See id.* Ex. 1 at ¶ 296) In coming to this royalty rate, Mr. Wagner did not consider Xilinx's contractual right to license the patents-in-suit for a maximum of around $2 million. (*See id.* Ex. 1 at ¶ 155; Ex. 3 at 188:2-18) In his reply report, Mr. Wagner explained that he found the IV-Xilinx agreements to be irrelevant because Xilinx did not actually license the patents-in-suit and that considering the agreements would run afoul of "a sense of fairness" [*11] that he discerns in the caselaw. (*See id.* Ex. 4 at ¶ 52; Ex. 3 at 197:5-198:5)

8. In the Court's view, Mr. Wagner's understanding of the law is incorrect. His failure even to consider the IV-Xilinx agreements based on his "sense of fairness" renders his opinion unreliable. Under the facts presented here, the IV-Xilinx agreements and Xilinx's right to license the patents-in-suit were all "arrived at in free and open negotiations and conducted prior to any infringing activity." *Trio Process Corp., 612 F.2d at 1358-59*. Although these agreements do not necessarily "demonstrate[] the upper limit" of IV's recovery, "[t]hey clearly ha[ve] a substantial bearing on the reasonable compensation to which [the patentee] was entitled for infringing use of the invention." *Deere & Co., 710 F.2d at 1560* (Davis, J., dissenting). Nothing in the record indicates that there was either widespread infringement of the patents-in-suit that may have artificially reduced the licensing rate or that IV artificially inflated the royalty rate by making an outrageous offer.

9. Of crucial importance here is the fact that Xilinx had an offer from IV for a license to the patents-in-suit for a maximum of about $2 million. [*12] That is, Xilinx could have elected to eliminate any chance of liability for the patent infringement that is the basis of the instant lawsuit for a payment of no more than about $2 million. (*See* D.I. 476 Ex. 9-11; Tr. at 88-89) Xilinx rejected IV's offer — and IV was free, therefore, to sue Xilinx and seek to recover whatever amount of damages it believes it can prove. However, given these facts, Mr. Wagner's failure even to account for the reality that at one point IV was willing to license **all** of Xilinx's alleged infringement — and obviate this litigation — for a cap of about $2 million, and the absence of any reasonable explanation for why this reality is irrelevant, renders his analysis unreliable. *See Whitserve, 694 F.3d 10, 12-13*.

10. In short, the evidence of the IV-Xilinx agreements "was pertinent and should have formed

an important basic factor" in IV's assessment of damages in this case. *Deere & Co., 710 F.2d at 1560* (Davis, J., dissenting). Because of his failure to consider the highly relevant IV-Xilinx agreements when making his reasonable royalty determinations, the Court finds that the entirety of Mr. Wagner's expert opinion as it relates to Xilinx's damages is unreliable **[*13]** and irrelevant. Mr. Wagner's opinion is not based on sufficient facts or data and he has not reliably applied the principles and methods to the facts of this case. *See Fed. R. Evid. 702(b)*. Therefore, the Court will grant Xilinx's motion and will strike Mr. Wagner's opinion on IV's damages.

11. Given the pendency of other motions before the Court, as well as the imminence of trial and the lack of clarity as to the parties' positions with respect to whether Mr. Wagner wants to and/or can perform a "do over" damages analysis, especially in the limited time between now and trial, the parties shall meet and confer and advise the Court, within two (2) days of the date of this Order, of their position(s) as to how the case should proceed in light of today's ruling. At the same time the parties shall also provide the Court a proposed redacted version of today's Order, which has been issued under seal.

/s/ Leonard P. Stark

UNITED STATES DISTRICT JUDGE

**End of Document**