UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

WAYMO LLC,                          )
                                    )
          Plaintiff,                )
                                    )
    VS.                             )     **NO. C 17-00939 WHA**
                                    )
UBER TECHNOLOGIES, INC.; OTTO       )
TRUCKING LLC; and OTTOMOTTO         )
LLC,                                )
                                    )
          Defendants.               )
_____ )

San Francisco, California
Wednesday, September 27, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

Special Master:

          Farella, Braun & Martel LLP
          235 Montgomery Street, Suite 1700
          San Francisco, CA  94104
          (415) 954-4400
          (415) 954-4480 (fax)
     **BY:  JOHN LEE COOPER**

Reported By:  Lydia Zinn, CSR No. 9223, RMR, FCRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR FCRR
              Official Reporters

**APPEARANCES**:

For Plaintiff Waymo LLC:

                        Quinn, Emanuel, Urquhart & Sullivan LLP
                        50 California Street, 22nd Floor
                        San Francisco, CA  94111
                        (415) 875-6600
                        (415) 875-6700 (fax)
                BY:  **MELISSA J. BAILY**
                     **LINDSAY COOPER**
                     **FELIPE CORREDOR**
                     **DAVID EISEMAN**
                     **ANDREA PALLIOS ROBERTS**
                     **CHARLES KRAMER VERHOEVEN**

For Defendant Uber Technologies, Inc.:

                        Morrison & Foerster LLP
                        425 Market Street
                        San Francisco, CA 94105-2482
                        (415) 268-7000
                        (415) 268-7522 (fax)
                BY:  **ESTHER KIM CHANG**
                     **ARTURO J. GONZÁLEZ**
                     **MICHAEL A. JACOBS**

For Defendant Uber Technologies, Inc.:

                        Boies, Schiller & Flexner LLP
                        435 Tasso Street, Suite 205
                        Palo Alto, CA  94301
                        (650) 445-6400
                        (650) 329-8507 (fax)
                BY:  **MEREDITH RICHARDSON DEARBORN**

For Defendant Uber Technologies, Inc.:

                        Boies, Schiller & Flexner LLP
                        1401 New York Avenue, NW
                        Washington, D.C.  20005
                        (202) 237-5235
                        (202) 237-6131 (fax)
                BY:  **KAREN LEAH DUNN**

For Defendant Uber Technologies, Inc.:

                        Susman Godfrey, LLP
                        1000 Louisiana Street, Suite 5100
                        Houston, TX  77002-5096
                        (713) 651-9366
                        (713) 654-6666 (fax)
                BY:  **JOSEPH S. GRINSTEIN**

**<u>APPEARANCES</u>:**

For Defendant Uber Technologies, Inc.:
                Susman Godfrey LLP
                1301 Avenue of the Americas
                32nd Floor
                New York, NY  10019-6023
                (212) 336-8330
        **BY:**  **CORY S. BULAND**
                **WILLIAM CHRISTOPHER CARMODY**
                **IAN M. GORE**
                **HALLEY W. JOSEPHS**
                **SHAWN J. RABIN**

For Defendants Otto Trucking LLC; Ottomotto LLC:
                Goodwin Procter LLP
                Three Embarcadero Center
                San Francisco, CA  94111
                (415) 733-6000
                (415) 677-9041 (fax)
        **BY:**  **INDRA NEEL CHATTERJEE**
                **BRETT MICHAEL SCHUMAN**

Wednesday - September 27, 2017                    7:59 a.m.

P R O C E E D I N G S

---oOo---

1          THE COURT:  Okay.  Welcome.  Please be seated.  Let's

2   call the case.

3          THE CLERK:  Calling Civil Action 17-939, Waymo, LLC,

4   versus Uber Technologies, Inc., *et al.*  Counsel, please

5   approach the podium and state your appearances.

6          MR. VERHOEVEN:  Good morning, Your Honor.

7   Charles Verhoeven.  And with me is David Perlson,

8   Melissa Baily, Andrea Roberts, Lindsay Cooper, Felipe Corredor,

9   and David Eiseman.  We're ready to go.

10         THE COURT:  Thank you.

11         MR. GONZÁLEZ:  Good morning, Your Honor.

12  Arturo González, Michael Jacobs, from Morrison Foerster, for

13  Uber.

14         MS. DUNN:  Good morning, Your Honor.  Karen Dunn and

15  Meredith Dearborn, from Boies Schiller, for Uber.

16         MR. CARMODY:  Good morning, Your Honor.

17  Bill Carmody, with Susman Godfrey.  And with us I have

18  Joe Grinstein and Shawn Rabin; Cory Buland, Ian Gore, and

19  Halley Josephs.

20         THE COURT:  Good.  Welcome.

21         MR. CHATTERJEE:  Good morning, Your Honor.

22  Neel Chatterjee and my colleague, Brett Schuman, for

 1 | Otto Trucking.

 2 |         **MR. SCHUMAN:**  Good morning, Your Honor.

 3 |         **SPECIAL MASTER J. COOPER:**  Good morning, Your Honor.

 4 | John Cooper, Special Master.

 5 |         **THE COURT:**  Welcome.

 6 |         One preliminary thing for me, and we'll get right into it.

 7 | Last night a motion came in from Waymo, asking that we close

 8 | the courtroom during the trial.  And I want to give members of

 9 | the public as well as the press an opportunity to submit your

10 | brief before the Court rules on this.  If you want to be heard

11 | on this, I invite you to submit a brief; but you need to do it

12 | soon, because the trial is set for October 10th.  So please

13 | keep that deadline in mind.

14 |         We're here for a final pretrial conference.  The lawyers

15 | have filed voluminous and many different motions, so there's

16 | not time to hear every motion.  Some will be submitted on the

17 | papers.  That's just the way it is, because you lawyers cannot

18 | be brief.  Some of these are many thousands of pages long.

19 |         There are some that I want to hear, and I will call those

20 | out.  And if there's one or two that you feel desperate to have

21 | heard, then I will try to work that in today.  So be thinking

22 | about it; but probably one-third to one-half of all of the

23 | pending motions will be submitted on the paperwork.  All right?

24 |         Now let's go to the some of the motions for summary

25 | judgment.  I'm very familiar with most of this, but I'm going

1   to give each side about five minutes to argue your points.

2       One of the motions -- one of the motions is to knock out

3   the Affirmative Defenses.  All right?  The Waymo motion to

4   knock out Affirmative Defenses.  Anything more you want to say?

5           MR. VERHOEVEN:  I believe we argued that already.

6   We'll submit on the papers.

7           THE COURT:  All right.  How about the other side?

8           MR. CHATTERJEE:  Your Honor, same position.  We'll

9   submit on the papers, given the argument last week.

10          THE COURT:  Same?

11          MR. CARMODY:  Yes.

12          THE COURT:  Does Mr. Chatterjee now speak for all of

13  the defendants?

14          MR. GONZÁLEZ:  On that issue, Your Honor, yes.

15          THE COURT:  All right.  Excellent.  Thank you.

16      I have here a Draft Order, which I'm sure you would like

17  to see; but not yet.

18      All right.  The Uber motion to knock out Trade Secret

19  Number 9 -- we already heard that.  Didn't we hear that

20  already?

21          MR. JACOBS:  Yes, Your Honor.

22          MR. VERHOEVEN:  Yes, Your Honor.

23          THE COURT:  Okay.  We're not going to hear that

24  anymore.

25      The Otto Trucking motion to -- I thought it was to get out

1  of the case totally.  Right?

2          MR. CHATTERJEE:  Yes, Your Honor, that was.

3          THE COURT:  All right.  Hadn't you argued that

4  already?

5          MR. CHATTERJEE:  We argued that last week, Your

6  Honor.

7          THE COURT:  Okay.  So good.  All right.  So then we

8  go to Trade Secret Number 96.  And most of this has already

9  been argued, but there is the new piece involving the *Daubert*.

10 Right?

11         MR. JACOBS:  Yes, Your Honor.  We did address the

12 *Daubert* aspect before, Your Honor, last time, as well.

13         MR. VERHOEVEN:  Yeah.  That was argued, as well,

14 Your Honor.

15         THE COURT:  All right.  Okay.  Good.

16     So then I owe you an Order on all of that, which I have a

17 draft of right here.  So that will be coming in due course, I

18 think.  Okay.

19     Now we go to some of your motions *in limine*.  And I would

20 like to start with the damages motion involving Mr. Wagner.  So

21 who wants to start there?

22         MR. CARMODY:  It's our *Daubert* motion, Your Honor.

23     Bill Carmody, for Uber.

24         THE COURT:  All right.  Now, if there's something

25 that is a trade secret, don't bring it up.  However, if it's

1   just supposedly attorneys'-eyes-only proprietary information,

2   we're now at the trial stage, so I give you permission to use

3   your discretion to say whatever you want.  We're not going to

4   exclude the public and the press merely because you lawyers

5   want to fight over somebody's internal profit information.  All

6   right.  So -- but exercise care, and don't bring up something

7   that you don't really need to bring up.

8          All right.  Go ahead.  What was your point?

9              **MR. CARMODY:**  Thank you, Your Honor.

10         To put in context just how speculative and unreliable

11  Mr. Wagner's damages are, we only need to go back to last week

12  in our hearing we had.  And at the end of discussing

13  Trade Secret 9, the Court was kind of guesstimating the value.

14  And I think Your Honor talked about numbers of 15- to $150,000.

15         Mr. Wagner put the value of Trade Secret Number 9 at

16  $283 million.  And, if the Court recalls, Velodyne was also

17  involved in doing the same sort of adjustments.  That

18  $283 million number represents a third of the value of the

19  entirety of Velodyne at that time.

20         It seems, though, Your Honor, since last week the other

21  side has lowered their damages.  In other words, they accused

22  me of kind of falsely characterizing your 2.6 billion.  And now

23  it seems that they're dropping their optimistic case, and

24  they're not going to put that before the jury; but the point

25  is, Your Honor, even if they reduce their damages from 2.6 to

1   $1.85 billion, we are still left with the flawed methodologies

2   of Mr. Wagner.

3        And what I was hoping to briefly do, Your Honor, is walk

4   you through each of his --

5              **THE COURT:**  Well, here's the part --

6              **MR. CARMODY:**  -- models.

7              **THE COURT:**  -- that I want you both to address.

8              **MR. CARMODY:**  Sure.

9              **THE COURT:**  I think I know what his methodology is.

10  He took that memo from Qi.  Is that her name:  Ms. Qi?

11             **MR. CARMODY:**  Qi.  Yes, Your Honor.

12             **THE COURT:**  And it says how much time they would save

13  by acquiring NewCo.  Right?

14             **MR. CARMODY:**  Yes.

15             **THE COURT:**  All right.  NewCo, though, is not the

16  trade secrets.  NewCo is everything:  Trade secrets, and just

17  ordinary skill and expertise.

18       I couldn't find anyplace in that Report where he

19  apportioned that.  In other words, what part of that estimate

20  was attributable to the trade secrets in question, versus just

21  the fact that Levandowski and his team of dozens of engineers

22  were well trained and skilled in the art, which anyone had the

23  right to plunder and to steal away?  That's the American way.

24       So let me ask you, Ms. Baily.  I didn't see anyplace where

25  he apportioned that.  So isn't that a fundamental flaw?

1      MS. BAILY:  Well, Your Honor, Mr. Wagner does

2   apportion per trade secret.  And I'll attempt --

3      THE COURT:  No, no, no, no, no.  I looked at that

4   part.  He only apportions among the trade secrets.  He doesn't

5   say how much was apportioned to the legitimate acquisition;

6   meaning just the skill and intelligence and experience of those

7   at NewCo.

8      MS. BAILY:  Well, I do think, Your Honor, if I may,

9   that in some ways the two are conflated in the way that

10  Mr. Wagner did apportion.

11     THE COURT:  He didn't apportion anything.  He just

12  took it, lock, stock, and barrel, and said her number of

13  $1.6 billion is all trade secrets.

14     MS. BAILY:  Well, what he did, Your Honor, is he took

15  Uber's estimate with respect to most trade secrets; not all

16  trade secrets.  He took Uber's estimate of the time that Uber

17  thought it would take to design around a trade secret.

18     THE COURT:  Yeah.

19     MS. BAILY:  And -- which, of course, is conservative,

20  because designing around a trade secret versus coming up with a

21  trade secret from whole cloth is two totally separate things.

22  And he applied the modeling that underlies that slide, which is

23  more than just a slide.  And I would like to talk about that

24  today, but he basically applies Uber's own model evaluating the

25  accelerated development that they would get from the

1   acquisition of Ottomotto, and applies it only to what Uber says

2   is the time it would take them to design around a trade secret.

3        **THE COURT:**  No.  They -- no.  Mrs. Qi didn't say

4   anything about trade secrets.

5        **MS. BAILY:**  This is how Mr. Wagner apportioned.

6        **THE COURT:**  He didn't apportion any of that

7   1.8 million to anything, other --

8        Everything got apportioned to one trade secret or another.

9        Wait.  Let me just stop.

10       Am I right about that?

11       **MR. CARMODY:**  You're exactly right.  That's --

12       **THE COURT:**  All right.  Tell me.  Is that correct, or

13  not?

14       **MS. BAILY:**  I don't believe that that's correct.

15       **THE COURT:**  All right.  Show me in the Report.  Hand

16  up to me the page where he apportioned any of that money to

17  something other than -- to anything other than trade secrets.

18       **MS. BAILY:**  Okay.  Well --

19       **THE COURT:**  You can't do it.

20       **MS. BAILY:**  Phrased that way, no, I can't do that.

21       **THE COURT:**  Yeah.  Of course, you can't.  Isn't that

22  a fundamental flaw?

23       **MS. BAILY:**  No, it's not.

24       **THE COURT:**  To me, it is hard to understand how

25  somebody could say, *We're acquiring this big NewCo.  And here*

*are some trade secrets we're acquiring. And here is*

*Mr. Levandowski -- the guy in the Smithsonian; and a brilliant*

*man -- and all of his team. And all of that is perfectly*

*legitimate to steal away, as the team. And the only part that*

*you can't steal is the trade secrets.*

And yet you're saying that everything in those trade

secrets, some of which are marginal, amounts to the entire

package.

To me, that can't -- it has to be apportioned.

**MS. BAILY:** So I am sorry, Your Honor. I just

fundamentally disagree. I think there are two --

**THE COURT:** Then the Federal Circuit can sort this

out, maybe, but --

**MS. BAILY:** Can I just state for the record my

disagreement --

**THE COURT:** I want you to state your --

I'll be quiet.

**MS. BAILY:** -- with your characterization, if that's

all right, just for a moment?

**THE COURT:** All right. Go ahead.

**MS. BAILY:** I agree with Your Honor that Mr. Wagner

did not list in his Report values associated with non-trade

secrets.

However, he did take into account, trade secret by trade

secret, the time that Uber said it would take to develop only

1  that trade secret.

2      And so, for example, if Uber said it would take six days

3  to develop only that trade secret, then Mr. Wagner did

4  apportion, because he said, *The development of that trade*

5  *secret, only, would get Uber six additional days; and I'm going*

6  *to take those six days, and look at what Uber values that*

7  *accelerated development to be for only those six days.*

8      And so he is looking only at the trade secret.  He does

9  assume liability.  He assumes that the trade secret was

10  misappropriated.  And so there was not this general expertise

11  being applied in those six days.  He's saying that the trade

12  secret was misappropriated.  He's saying, *Uber said they could*

13  *design around it in six days.*  He's saying, *Okay.  Well, that's*

14  *a conservative estimate of what Uber would say it would take to*

15  *develop only that trade secret.*  And he does assume liability.

16  He does assume that it's misappropriated.

17          **THE COURT:**  It's perfectly okay to assume liability.

18  That's legit.  I don't have a problem with that, because that's

19  what a damages expert does, but all right.

20      He assumes that there's one to two years; that 1.6 billion

21  is the two-year.  That's, to my mind, about 700 days.

22      But you're saying that he apportions, somehow, the total

23  to six days?

24          **MS. BAILY:**  For one trade secret.  So let's just take

25  Trade Secret Number 7.  He apportions to 18 days, because Uber

1  said it would take 18 days to design around that specific trade

2  secret.

3          THE COURT:  All right.  So somewhere he's saying --

4      What I think you're telling me, but maybe I'm wrong, is

5  that he took the $1.8 billion; divided it by about 700 days in

6  a year; and then multiplied it by 18, to apportion it to that

7  particular trade secret?

8          MS. BAILY:  Yes, because Uber said it would take 18

9  days to design around that trade secret.

10         THE COURT:  Hand up to me in the Report where that

11 occurs.

12         MS. BAILY:  Well, so -- I have notes on my copy.

13     On page --

14         THE COURT:  I'd like somebody to hand it up to me.

15 It may be the MoFo people can hand it up to me.

16         MS. BAILY:  These notes are factual.

17     So, looking at page 3, there's a chart.

18 (Whereupon a document was tendered to the Court.)

19         MS. BAILY:  And it shows each trade secret, and the

20 time that Uber said it would take to design around that trade

21 secret; and that trade secret, only.

22         THE COURT:  All right.  Just -- okay.  Number.

23     Where's the one that was the six days, so that I can focus

24 on your example?

25         MS. BAILY:  So 18 days was my example.

1          **THE COURT:**  All right.  Let's take that one.

2     Trade Secret Number 7.  Eighteen days.  So he's saying that

3     that would be $43 million.

4          **MS. BAILY:**  For 18 days that Uber said it would take

5     to design around that trade secret, and only that trade secret.

6     So he's not just taking the full value.

7          And I agree with Your Honor that there's nowhere in the

8     Report where he says, *Let's attribute that amount to non-trade*

9     *secrets*; but he does focus on only on the trade secret, and

10    only on what Uber said the time it would take to design around

11    that trade secret.

12         **THE COURT:**  All right.  So what do you say to that?

13    Let me make sure I've got your name.

14         **MR. CARMODY:**  Bill Carmody, Your Honor.

15         **THE COURT:**  Yes.  Bill Carmody.  Okay.  What do you

16    say to that point?

17         **MR. CARMODY:**  Two things, Your Honor.

18         First of all, you're absolutely correct in understanding

19    that that $1.6 billion has nothing to do with the trade secrets

20    at issue.

21         But secondly, what Counsel is talking about now is she

22    says, *That problem's fixed, because what he does is he*

23    *apportions it on a trade-secret-by-trade-secret basis, by*

24    *looking at the time to independently develop each and every one*

25    *of these trade secrets.*

1     But here's the problem with that, Your Honor.  If you can

2  picture the slide in your head -- and I have a copy, if the

3  Court wants to see the Nina Qi Slide.  That's a slide,

4  Your Honor, of earnings.  It's profits.

5     The only way you get to profits is you've got to

6  commercialize the AV that Uber has.  It doesn't matter that you

7  might develop some trade secrets.  What happens if you kind of

8  hurry up and wait?  You develop the trade secrets, but guess

9  what.  You have a fully autonomous vehicle ready to go, but the

10  regulators aren't ready for you.

11     That's the analytical shortcoming in this second variable.

12  He conflates.  What Wagner does is he conflates independent

13  time to develop, with the AV commercialization time.  And AV

14  commercialization is the only thing that gets you profits.

15  Development doesn't get you profits.  You've got to

16  commercialize to get profits.  That's the problem.

17          **THE COURT:**  All right.  Wait.

18          **MS. BAILY:**  So --

19          **THE COURT:**  I want to --

20     You got off onto a different point.  It's maybe a valid

21  point, but that's not the one I'm focusing on.

22          **MR. CARMODY:**  Okay.

23          **THE COURT:**  All right.  Looking at what Ms. Baily

24  showed me, Number 25 -- Trade Secret Number 25 -- he has it

25  down as $1.69 billion.  So there's no apportionment on that

1   one.

2          **MS. BAILY:**  Right.  And I will explain Trade Secret

3   25.

4      Can I just address this -- something else related to my

5   first point, in terms of just apportionment generally?

6          **THE COURT:**  Mm-hm.

7          **MS. BAILY:**  You know, we started out by saying that

8   there's a slide that values NewCo.  And Your Honor was saying,

9   *Well, where is everything else besides the trade secrets in*

10  *NewCo?*

11     That slide is actually valuing time savings; time savings

12  in development, due to the acquisition.  So it's not as broad

13  as, perhaps, Your Honor had in mind.

14         **THE COURT:**  But the acquisition is trade secrets plus

15  everything else that's legit.

16         **MS. BAILY:**  Agreed.  And so then when you go from the

17  time-savings pie, then Wagner apportions as I've described.

18     Now, with respect to Trade Secret Number 25, it is

19  apportioned.  The reason why two years is applicable to Trade

20  Secret Number 25 is because, in general terms, if you recall

21  Trade Secret 25, it is the specification; the edge cases that

22  Waymo determined it needed to design its LiDAR to.  So it's the

23  test cases, and all of the parameters that govern its design.

24     And how did Waymo get to figure that out?

25     Waymo spent more than two years doing simulated driving

1  and real-world driving.  That's the only way that you can come

2  up with a compilation of these edge cases, the scenarios, and

3  then the parameters that you want to hit, so that you have a

4  safe, cost-effective LiDAR system.  So that trade secret is

5  particularly valuable.

6       And it actually took Waymo way more than two years to

7  develop, because it is determined by iteration upon iteration

8  and learning upon learning of miles driven.

9            **THE COURT:**  Well, I suggest to you that Waymo didn't

10  spend $1.69 billion coming up with that.

11            **MS. BAILY:**  Well, it's pretty close.

12            **THE COURT:**  I don't believe that.  I don't -- is that

13  in this Report somewhere?

14            **MS. BAILY:**  That is in Waymo's interrogatory

15  responses.  I don't know if those responses are cited in this

16  Report.

17            **THE COURT:**  The idea that it would take you that long

18  and that much money to come up with the parameters seems to me

19  to be fantastic.

20            **MS. BAILY:**  It is the core of LiDAR design.  You

21  cannot design a LiDAR system without figuring out what the edge

22  cases are, and how to plan for them.

23            **THE COURT:**  Of course.

24            **MS. BAILY:**  And that --

25            **THE COURT:**  Yeah, but that still doesn't --

1    That's not going to take you $1.69 billion.

2         **MS. BAILY:**  It did, because you have to create the --

3         **THE COURT:**  That 1.69 billion would include a lot of

4    things, too.

5         **MS. BAILY:**  You have to -- it's all necessary to the

6    development of that trade secret.  You have to create the

7    simulations.  You have to create the hardware.  You have to

8    drive the miles.  You have to --

9         **THE COURT:**  All right.  What else would you like to

10   say?

11        **MR. CARMODY:**  Your Honor, I'm here to answer any

12   question you have.

13        **THE COURT:**  All right.  I have no more questions.

14      Do you have anything more, Ms. Baily?

15        **MS. BAILY:**  Well, I would like to address the other

16   point that was raised.

17        **THE COURT:**  Go ahead.

18        **MS. BAILY:**  The point that was raised was -- and the

19   impression created by the briefing was that Ms. Qi's analysis

20   was this one-off by a rogue employee that was never analyzed by

21   anybody.

22        **THE COURT:**  You're right on that.  I mean, it just

23   amazes me that Uber would make such an argument; but no.  She

24   is stuck.  Uber is stuck with -- if it comes down to that, it's

25   a jury question.  And the idea that the Judge is going to save

1   Uber because they've got some employee who put a big number

2   down there -- no.  That doesn't work.

3        You're right about that, Ms. Baily.

4        How many times has this expert been excluded by other

5   Judges?

6             **MR. CARMODY:**  We have found several, Your Honor.

7             **THE COURT:**  Exactly how many?

8             **MR. CARMODY:**  I think we found three on this very

9   issue, which is speculative damages, where he's gotten struck

10  for speculative --

11            **THE COURT:**  Can you tell me who the Judges were who

12  excluded?

13            **MR. CARMODY:**  I can't.

14       What we did do:  We did cite a couple of those,

15  Your Honor, in our brief.  We can certainly get you something

16  today to tell you exactly the Judges.

17            **THE COURT:**  By noon today, would you please give

18  me --

19            **MR. CARMODY:**  Absolutely.

20            **THE COURT:**  I'd like copies of the Orders where he

21  was excluded; every Order of any type where Mr. Wagner was

22  excluded.

23            **MS. BAILY:**  Your Honor, just for the record, he's

24  been admitted to testify in over a hundred cases.

25            **THE COURT:**  Okay.  All right.

1        By the way, is he an economist?

2             **MR. CARMODY:**  He's a lawyer.

3             **THE COURT:**  I know he's a lawyer.

4             **MS. BAILY:**  He's an engineer.

5             **THE COURT:**  And I know he has a CPA.

6        Is he an economist?

7             **MR. CARMODY:**  No.

8             **MS. BAILY:**  Well, I can -- his CV is in the record,

9   so --

10            **THE COURT:**  I don't think he's an economist, but is

11  he?  I want to make sure I'm right about that.

12  (Discussion held off the record.)

13            **MS. BAILY:**  My colleague tells me he's a CPA, a

14  lawyer, and an engineer.

15            **THE COURT:**  All right.  Now -- okay.  Thank you.

16            **MS. BAILY:**  Your Honor, for the record, if you have

17  any other questions about apportionment, I would like the

18  opportunity to address them, because --

19            **THE COURT:**  Time is short, Ms. Baily.  We've got a

20  lot here.  It's a case you want to get to trial, and we've got

21  a lot of other motions to take up.  It's been adequately

22  briefed, in my opinion.

23       All right.  We're going to go to the next motion.

24            **MR. SCHUMAN:**  Your Honor, before we do, may I ask, on

25  behalf of Otto Trucking, just one minute, Your Honor?

1      **THE COURT:**  Yeah.  What do you want to say?

2          **MR. SCHUMAN:**  Well, Your Honor, Otto Trucking joined

3   the motion to exclude Mr. Wagner.

4          We also pointed out that Mr. Wagner's opinions had no

5   applicability to our client, Otto Trucking.  I think the

6   discussion the Court just engaged in with counsel validated

7   that; but the point I want to make is his deposition occurred

8   last Friday.  I participated in that deposition.  And he

9   confirmed that his opinions have no applicability to my client,

10  Otto Trucking, whatsoever.

11         I asked him how many of the 64 hours he spent on his

12  opinions did he focus on Otto Trucking.

13         He said exactly zero.

14         He has three opinions, as the Court knows:  Two

15  unjust-enrichment opinions, and one reasonable-royalty opinion.

16         And I asked him as to each opinion do they have any

17  applicability to Otto Trucking; and he said no.

18         **THE COURT:**  I do have a question about the reasonable

19  royalties.  As I read the Report, his reasonable-royalty number

20  is even higher than the other number.

21         **MR. SCHUMAN:**  That is accurate.

22         **THE COURT:**  Is that true?

23         **MS. BAILY:**  That is true.

24         And my understanding is that's typical; that unjust

25  enrichment is the floor, and that reasonable royalty and lost

1  profits are often higher than an unjust-enrichment analysis.

2        **THE COURT:**  All right.  Thank you for that.

3        **MS. BAILY:**  Should I respond to the point on Otto

4  Trucking?

5        **THE COURT:**  Yes, if you wish.

6        **MS. BAILY:**  Otto Trucking well knows that Waymo has a

7  joint and several liability theory.  They'd like to shortcut

8  that and just say, *Never mind.  You'll just get that money from*

9  *Uber*; but Waymo has a right to try to a jury the joint and

10 several liability piece.

11     And so this notion that Otto Trucking -- a damages

12 expert -- this relates to the *Daubert* on him and Malackowski,

13 as well -- should get up and tell the jury, *Oh, Otto Trucking*

14 *didn't -- there's no liability for Otto Trucking.  There's no*

15 *damages.  And Waymo can just go to Uber*, is completely

16 improper.

17        **MR. SCHUMAN:**  Your Honor, I was only addressing the

18 *Daubert* and Mr. Wagner's opinions, which have no applicability

19 to Otto Trucking.

20     Counsel just raised joint and several liability.  That was

21 briefed and argued in summary judgment last week, so I'm not

22 going to revisit that.

23     On the point, though, about Uber [sic] -- I'm sorry --

24 Waymo wanting to go to a jury on joint and several liability, I

25 would just point out, Your Honor, that is not a jury question.

1  That is a Judge question.  And that's exemplified by the fact

2  that they did not submit any proposed jury instructions on

3  joint and several liability, because there are none.

4          **THE COURT:**  All right.

5          **MR. SCHUMAN:**  So that's a summary-judgment issue.

6          **THE COURT:**  Ms. Baily, you get the last word, and

7  then we're moving on.

8          **MS. BAILY:**  Well, that's just not true about the jury

9  instructions.  There are factual issues underlying the question

10 of joint and several liability, and the jury should be able to

11 determine those.

12         **THE COURT:**  Okay.  All right.  Just a moment.  We'll

13 go to another motion.  On the one -- and I guess it's

14 Motion Number 2 for the Defense.  Motion *in Limine* Number 2.

15 Who's going to argue that?

16         **MS. DEARBORN:**  That's me, Your Honor.

17         **THE COURT:**  All right.  I want to give you a

18 tentative thought, and let both sides respond.  It seems to me

19 that if we allow Waymo to lay before the jury the assertion of

20 privilege over the Due Diligence Report --

21         And, by the way, there came a point where Uber did not

22 oppose producing.  It was Levandowski who was the one who was

23 resisting it.

24         **MS. DEARBORN:**  That's right, Your Honor.

25         **THE COURT:**  He did not appeal to the Federal Circuit

 1  on that.

 2          MS. DEARBORN:  That's correct.

 3          THE COURT:  Anyway -- but if we allow all of that,

 4  which is possibly what we're going to do, then without any

 5  question, in my mind, the other side gets to show how you

 6  stonewalled on this guy who said that your trade secrets were

 7  weak.  What's his name?  Sasha?

 8          MS. DEARBORN:  Zbrozek.  Yes, Your Honor.

 9          THE COURT:  Yeah.  The Waymo guy who was --

10      And then he was saying to your own lawyers that you had a

11  weak case on trade secrets.

12      And you stonewalled, and concealed that.

13          MS. BAILY:  Your Honor --

14          THE COURT:  All right.  Now wait.

15      Now, you have an argument that you acted in good faith.

16  Okay.  But they've got an argument they acted in good faith.

17  Both of you have an argument you acted in good faith.  Though

18  if it's good for the goose, it's good for the gander.  That's

19  kind of where I'm coming out.

20      So you get to go first, Ms. Baily.

21          MS. BAILY:  So first of all, I just have to correct

22  the record, because Sasha did not say what Your Honor said he

23  said.

24          THE COURT:  That's one way to construe it.

25          MS. BAILY:  He did not say that.

1          **THE COURT:**  All right.  What did he say?

2          **MS. BAILY:**  Sasha said that historically software,

3   like Google's core search algorithm, is of the highest priority

4   at Google.

5          **THE COURT:**  Are you going to say that with a --

6      Ms. Baily, I read it, myself.  He said lot more than that.

7      Okay.  Just stop there.

8      Ms. Meredith Dearborn, would you read to me what he

9   actually said, instead of what Ms. Baily claims he said?

10         **MS. DEARBORN:**  I was just looking it up, Your Honor.

11  Just one minute.

12         **THE COURT:**  Now, I don't want the members of the

13  press out there to --

14     This is what we're up against:  Half-truths.

15     Would you please read to me the part that you like?

16         **MS. DEARBORN:**  *It is not particularly surprising*

17  *that* --

18     And I -- this is an e-mail, Your Honor, so there have been

19  some corrections; but I can --

20         **THE COURT:**  Read the original testimony; not the way

21  the lawyers fixed it up.

22         **MS. DEARBORN:**  Okay.  I do -- I have -- I actually do

23  not have that e-mail with me.  I just have the excerpt, but I

24  can read the excerpt.

25         **THE COURT:**  Well, whatever --

1      I want the actual testimony.

2          **MS. DEARBORN:**  Okay.

3          **THE COURT:**  Do you have it?

4          **MS. BAILY:**  Your Honor, while they're finding the

5  actual testimony --

6          **THE COURT:**  No.  I want Ms. Dearborn.

7      You -- you didn't give me the full truth.

8          **MS. BAILY:**  No.  To defend myself, I was responding

9  to the characterization that you made with an equally plausible

10 characterization of the intent of that statement.

11         **THE COURT:**  Yeah.  Okay.  Read it to me, please.

12         **MS. DEARBORN:**  All right.  One portion of this e-mail

13 says, *It's not particularly surprising that he might check*

14 *things out once, in the misguided dream of maybe making*

15 *individual contribution, or maybe taking a look at the process*

16 *of a widget.  It clearly wasn't part of his routine.  Doesn't*

17 *ring alarm bells for me.*

18         **THE COURT:**  What was the thing about "low-grade"?

19 There was some phrase like "low-grade."

20         **MS. DEARBORN:**  *It's all electronic.*

21     I apologize, Your Honor.  I should have started reading

22 the e-mail earlier.

23     *It's all electronics designs, schematics, and PCB layouts,*

24 *and the component library for their creation.  It was*

25 *considered low value enough, that we had even considered*

1   *hosting it off of Google infrastructure.*

2        **THE COURT:**  All right.  Now, okay.  You got a

3   come-back to that.  You can put, Ms. Baily, your -- what he

4   said later on, after the lawyers got to him; but a jury could

5   reasonably conclude from what I just heard from his actual

6   e-mail that you have been blowing this case way out of

7   proportion.  They could also conclude that these are genuine

8   trade secrets.

9        So -- but the fact is that you stonewalled, and didn't

10  turn this information over until very late in the game.  And

11  you claimed that it was because of privilege, which the Judge

12  overruled you on.

13       All right.  Now, maybe you had a good-faith basis; but

14  they had a good faith-basis on the Due Diligence Report.  And

15  if one is going to come in, the other's going to come in.

16       **MS. BAILY:**  Can I just respond quickly for the

17  record?  I apologize.

18       And I apologize also that you felt that I gave a

19  half-truth.  I was responding with respect to equal

20  characterizations --

21       **THE COURT:**  I accept what you're saying.  All right.

22  Fine.

23       **MS. BAILY:**  But with respect to Sasha, just for the

24  record, the privilege claim was raised very early on in this

25  case.  And it wasn't until weeks ago that there was any

1  question as to their privilege.  And so the stonewalling issue

2  is not the same for both sides.

3      **THE COURT:**  It's so close that if one comes in, the

4  other's going to come in.  It's so close that they --

5      You know, this was a busy case.  You're blaming them,

6  because you were moving the case along so fast, they didn't

7  have time to bring this up until later; and when they did bring

8  it up, you lost.  And the privilege was pierced.  No privilege.

9  It never should have been asserted.  And then it -- the fact

10 comes out that we just heard.  So I'm positive that part is

11 right.  So the due diligence.  Sasha.  Stonewalling.

12 Stonewalling.

13     All right.  So I'm going to give you a chance to try to --

14 all right.  You have tried to talk me out of it.

15     All right.  What do you have to say about that?

16     **MS. DEARBORN:**  Your Honor, if this -- if the fact

17 that there have been overruled claims of privilege comes in in

18 this case, we would absolutely agree that what's good for the

19 goose has to be good for the gander.

20     And we would also urge the Court that that -- that that

21 would need to come in in the form of a neutral jury

22 instruction, so as not to waste the jury's time with

23 evidence -- or argument of the lawyers.

24     **THE COURT:**  That could be one thing, but maybe you

25 want to get on the stand.  Both sides want to get on the stand.

 1 | Ms. Baily wants to get on the stand and say how good-faith she

 2 | was.  And maybe you want to do the same thing, if that's the

 3 | way you lawyers want to waste the time that you're going to be

 4 | getting in this case.

 5 | You told me it was a two-week trial.  That's what you told

 6 | me last time.  That translates to, at best, about 15 hours of

 7 | evidence time per side, counting cross.  I know how to do the

 8 | math.  Actually, 15 hours will be a little bit more than two

 9 | weeks.

10 | So if that's the way you want to use some of your time,

11 | with you lawyers on the stand, explaining how you acted in good

12 | faith, I'm okay with that.

13 | **MS. DEARBORN:**  Well, Your Honor --

14 | **THE COURT:**  It's your time.

15 | **MS. DEARBORN:**  You just raised wasting time, which is

16 | precisely the problem, because if Waymo is going to stand up

17 | and say, you know, the Stroz Report was originally -- they

18 | originally exerted privilege over it.  That went up on appeal.

19 | And then we have to rebut that.

20 | **THE COURT:**  If they say the word "they," I'm going to

21 | interrupt and tell the jury that's not a true statement.  It

22 | wasn't "they."  It was Levandowski who appealed.  That's the

23 | way you always present it, is "they."

24 | But I know the truth.  And the truth is that Uber was

25 | willing to turn that over earlier; much earlier.

 1    So if you do present that argument, you've got to say

 2 Levandowski caused the delay; not that Uber did.

 3         **MS. BAILY:**  I do want to say for the record that as

 4 of Monday, we were still receiving documents from Uber's

 5 privilege log that should have been produced the day the

 6 Federal Circuit ruled.  And so the notion that Uber says in its

 7 papers that it was standing by and ready to produce the

 8 materials is not the case.  We're still getting them, and we're

 9 days away from trial.  We've been severely prejudiced.

10    MoFo has had these materials since they created this

11 correspondence, and since they were on this correspondence.

12 And they've had that the entire length of this case.  It's

13 volumes of documents.

14         **THE COURT:**  Is that true, that you're still producing

15 materials?

16         **MS. DEARBORN:**  Unfortunately, I have to let my

17 colleagues address the state of document production.

18         **THE COURT:**  All right.  Let's hear from Mr. González,

19 who's always telling me they're going to produce them the next

20 day.

21         **MR. GONZÁLEZ:**  Your Honor, they've received virtually

22 everything.

23    There were a handful of documents that, because of the

24 type of documents that they were, they were difficult to

25 convert into the appropriate format.

1      And also, there were a few documents that were clawed

2   back -- Privileged Documents that were produced -- and we're

3   producing redacted copies of the same documents.

4      But this is -- this is not even a needle in the haystack.

5   They've got the stuff.  They've had the stuff.

6         **MS. BAILY:**  They should have had it ready to go the

7   day the Federal Circuit ruled, considering we have a trial on

8   October 10th, and that MoFo has had these documents all along.

9         **MS. DEARBORN:**  And, Your Honor, if we were to go

10  there, I would say that Otto Trucking had to file four motions

11  to compel on the issue of Waymo's selective waiver.  We had to

12  take this before Judge Corley multiple times.  And we only got

13  these -- the documents at issue for Uber's -- or sorry -- for

14  Waymo's selective waiver close to the end of the case, as well.

15        **THE COURT:**  All right.  All right.

16        **MS. DEARBORN:**  Your Honor --

17        **THE COURT:**  We've got to move on.

18        **MS. DEARBORN:**  -- I think the right thing to do here

19  would be not to introduce any of this evidence, at all.

20        **THE COURT:**  Well, I'm not sure of that.

21        **MS. DEARBORN:**  Well --

22        **THE COURT:**  I think it's useful for the American

23  juries to see.  See, you lawyers want it all to be that you

24  have halos over your head; but the truth is that litigation is

25  not something so pretty sometimes, and you lawyers are

1   responsible.  And I think it's sometimes useful for the lawyer

2   who has the halo over their head -- the fake halo over their

3   head -- for them to be exposed for what really goes on.

4        So I would kind of welcome a trial where the lawyers have

5   to testify and explain their conduct to a jury sometime.  Maybe

6   this is not the case, but I'm thinking about it.

7        All right.  Looks like the big gun has come forward.

8        **MR. VERHOEVEN:**  Your Honor, I just wanted to tie this

9   in.  As you may recall, earlier when we had our first round of

10  MILs -- our -- the first set, one of them was related to the

11  statement that Uber had made that they intend to present to the

12  jury the steps they took to search their servers after the

13  Complaint was filed --

14       **THE COURT:**  Right.

15       **MR. VERHOEVEN:**  -- and the inspections.

16       **THE COURT:**  And I said that some of that could come

17  in.  Didn't I say that?

18       **MS. DEARBORN:**  I think Your Honor --

19       **MR. VERHOEVEN:**  What I had said to you, Your Honor,

20  is if that comes in, then we should be able to test that, and

21  we should also be able to counter that.  I think that ties

22  right in with what we're talking about here.  And I just wanted

23  to reference it.

24       **THE COURT:**  Oh, okay.  So they get to put in those

25  three things.

 1      You get to put in the due diligence, stonewalling --

 2  except not by Uber.

 3      And then they get to put in the Sasha stonewalling.

 4      To me, that's the way it ought to come out.

 5          **MR. VERHOEVEN:**  Well, but one issue -- and I

 6  apologize if it's not formally up here -- is that we've had

 7  zero discovery on their alleged inspections and whatnot.

 8  They've withheld all of those as privileged.  We've moved to

 9  compel.

10      I don't know the current status is; but you know, we're

11  talking about rulings of waiver.  Using this inspection as a

12  sword --

13          **THE COURT:**  Is that in one of my motions now?  I'm

14  not familiar with any stonewalling on this.

15          **MR. VERHOEVEN:**  I think it was previously briefed.

16  And I just wanted to remind Your Honor.

17          **THE COURT:**  Well, is that true?

18          **MR. GONZÁLEZ:**  I have no clue what he's talking

19  about.

20      There were three points.  One of the three points was the

21  fact that they have come into our house 12 times and found

22  nothing.  I don't know what he's talking about:  Withholding

23  privilege.  They've been to our house --

24          **THE COURT:**  Let's just pause.

25      Are you saying that they've --

1    It is true you've been there many times to conduct --

2    What privilege are they withholding?

3        **MR. VERHOEVEN:**  I'm talking about there --

4    There are three things they wanted to say.

5        **THE COURT:**  Yeah.

6        **MR. VERHOEVEN:**  And he selectively chose that one.

7        **THE COURT:**  Which one is the one that you --

8        **MR. VERHOEVEN:**  I'm talking about his statement to

9    your Court, to Your Honor; his representation that he was going

10   to tell the jury about all of this inspection they did;

11   searching they did.  "Inspection" is the wrong word --

12   searching they did.  I don't know how many servers.  He has

13   this whole spiel he's been repeating all of the time about how

14   many servers they looked at, and how -- what their efforts were

15   to look for the stolen documents.  And they didn't find

16   anything.  He's going to tell that story to the jury.

17       That has been withheld from us as privileged.  And we

18   can't test that, number one.

19       Number two, our argument was:  That opens the door for us

20   to -- to test that, and to counter that.

21       And I just think that ties in.

22       The only reason I'm mentioning it now:  It was argued

23   before.  I don't know that it's been fully resolved.  And I

24   just --

25       **THE COURT:**  Okay.  You raise a good point.

 1          If you are saying that you did these searches on the

 2     servers for certain key words, but you had refused to allow

 3     those people who did the searches to be deposed, then that is a

 4     problem.

 5                **MR. GONZÁLEZ:**  Hold on.

 6                **THE COURT:**  All right.

 7                **MR. GONZÁLEZ:**  I'm still waiting to hear the claim of

 8     privilege that he's talking about.

 9          There are three things.

10          One, their inspection.

11          Two, we fired Levandowski.

12          And, number three, our expert used certain search terms,

13     including search terms that they gave us, and ran those terms.

14          Those are the three things.

15                **THE COURT:**  Who?  What expert?

16                **MR. GONZÁLEZ:**  I don't remember the experts.

17                **THE COURT:**  Is it one of your designated experts?

18                **MR. GONZÁLEZ:**  It's one of our designated experts,

19     Your Honor.

20                **THE COURT:**  Was that expert deposed?

21                **MR. GONZÁLEZ:**  He's going to be deposed, and he's

22     going to testify.

23          There's no --

24          I'm still waiting to hear what the claim of privilege is.

25                **THE COURT:**  Well, what is the claim of privilege?

1          **MR. VERHOEVEN:**  They've claimed privilege over all of

2     their investigation, Your Honor.

3          In fact, the person they've designated to do trial,

4     although we haven't deposed her yet, is an attorney who's going

5     to testify about this inspection they've done.

6          And as to the -- the non-cooperation argument that they're

7     going to make about Mr. Levandowski, they've repeatedly

8     instructed the witnesses not to answer on that subject, on the

9     ground of attorney-client privilege.

10          **THE COURT:**  This is -- you're trying to hijack the

11     whole hearing.

12          **MR. VERHOEVEN:**  I'm sorry.  I just --

13          **THE COURT:**  Go have a seat.

14          **MR. VERHOEVEN:**  Okay.  It's just related to that --

15          **THE COURT:**  This is premature.  The guy hasn't even

16     been deposed yet.

17          **MR. VERHOEVEN:**  Okay.

18          **THE COURT:**  All right.  Okay.

19          **MS. DEARBORN:**  Yeah.  There's a motion *in limine*

20     pending on this Your Honor.  That's Motion *in Limine* Number 14.

21          **THE COURT:**  I'm sorry.  Pending on what?

22          **MS. DEARBORN:**  On the issue that we were just

23     discussing.

24          **THE COURT:**  Number 14?

25          **MS. DEARBORN:**  Yes.

1          **THE COURT:**  Whose motion?

2          **MS. DEARBORN:**  I believe that is -- it's Waymo's

3   motion.

4          **MS. DUNN:**  Waymo brought a motion to exclude our

5   argument -- Uber's argument -- that Levandowski has not

6   cooperated with our investigation.  And so that --

7   Mr. Verhoeven was trying to inject that in the last

8   conversation; but if that needs to be argued, we can certainly

9   argue it.

10         **THE COURT:**  All right.  Number 14 is Waymo wants to

11  preclude defendants from arguing that Levandowski has not

12  cooperated with defendants in this action, on the basis,

13  according to Waymo, that Levandowski clearly has cooperated,

14  although only when it serves him to do so.

15      All right.  So let's go ahead and hear this motion.

16         **MR. PERLSON:**  Good morning, Your Honor.

17      So the issue here is pretty simple.  One of the things

18  that they want to present and tell the jury is that

19  Mr. Levandowski would not cooperate with them in this

20  litigation.

21      I think this relates to their efforts in, you know,

22  complying with the Court's Orders, or lack thereof, and that

23  sort of thing.

24      And this is one of the areas where we've, you know,

25  sought -- that they haven't produced documents, and refused to

1   produce them based on privilege.

2       And even at Mr. Levandowski's deposition, when -- I think

3   that his deposition is sort of emblematic of the problem we

4   have here.  In his deposition Ms. Dunn asked him -- asked

5   Mr. Levandowski, *But you would not cooperate with Uber's*

6   *investigation in this case?*

7       And he pled the Fifth, as he did to most of the questions

8   in his deposition.

9       And then I asked -- on redirect I tried to challenge that,

10  and tried to make my own record.  And I asked, *Was there*

11  *anything that Uber's lawyers asked you to do in relation to*

12  *Uber's investigation in relation to this litigation that you*

13  *actually did?*

14      And he was -- he pled the Fifth.

15      And then I asked him again.  I said -- another time I

16  asked him whether -- was there anything that he refused to do.

17      And there was instruction not to answer.

18      And --

19          THE COURT:  Well, did he plead the Fifth, anyway?

20          MR. PERLSON:  Well, I don't think he answered,

21  because the pled the Fifth.  And --

22          THE COURT:  Well, you don't think, or you know he

23  didn't answer?

24          MR. PERLSON:  Huh?

25          THE COURT:  Did he --

 1          MR. PERLSON:  He wouldn't have answered it, anyway.

 2    I think he would have pled the Fifth either way; but they

 3    instructed him not to answer; but what -- but what I'm --

 4          THE COURT:  Well, what is your point?

 5          MR. PERLSON:  But the point is, Your Honor, is

 6    that -- and I think we'll see it more at Ms. Padilla's

 7    deposition, which is next week.  When we're going to be asking

 8    questions that challenge the assertion that Uber's making that

 9    Mr. Levandowski did not cooperate, they are going to preclude

10    us from asking questions challenging that.

11          So, for example, they're going to say they sent a couple

12    letters to Mr. Levandowski where they said, *Please cooperate.*

13    *Now you're not cooperating.*

14          And then when we want to get discovery into what he

15    actually did discuss with the lawyers before that time, they've

16    refused to produce that discovery to us in document form.

17    They've withheld it as privileged, and they have not allowed us

18    to explore that with their witnesses.

19          So what I fully expect at the deposition coming up --

20          MR. VERHOEVEN:  Just to augment, Your Honor, here's

21    an example.  I took the deposition of Mr. Kalanick.  And he was

22    involved in decisions with respect to what to do with

23    Mr. Levandowski after these Complaints were filed.  And every

24    time I asked him about anything that -- where a lawyer was in

25    the room, which was almost 100 percent of the time, the

 1  witness, Mr. Kalanick -- excuse me -- Mr. Kalanick was

 2  instructed not to answer.  And so I have no discovery about

 3  their claim that he didn't cooperate.

 4          **THE COURT:**  All right.

 5          **MS. DUNN:**  Your Honor, I say that most of that is

 6  incorrect.

 7      First of all, the fact that Mr. Levandowski didn't

 8  cooperate, which is all this MIL is about, is fairly evident

 9  from the fact that he is taking the Fifth, and that he was

10  fired for noncooperation; a letter that has been in the public

11  record on this case for a long time.

12      What Mr. Perlson is talking about are questions that

13  specifically ask a witness, *What did you communicate to*

14  *lawyers?  And what did lawyers communicate to you?*

15      And in that circumstance, it's proper to instruct that to

16  the extent the question asks for privileged information, that

17  the witness should not disclose that privileged information,

18  which was the instruction.

19      I think what is happening here is that counsel is trying

20  to shoehorn into an MIL --

21      This is about a simple thing:  Whether Uber is able to

22  argue that Mr. Levandowski didn't cooperate with Uber, which I

23  am surprised at this point is even controversial, since it's so

24  evident that he did not, and that that was the reason -- one of

25  the reasons he was terminated.

1    At a previous hearing, Your Honor even instructed the

2  parties that we ought to be able to say we went to him; said,

3  *Give us something*.

4    And he said, *No*.

5    And he was fired; in part, as a result.

6    So they have received documents.  And I would suggest this

7  is not the place to fight future fights that will come up at

8  depositions.

9    **MS. DUNN:**  And as a discovery issue, this has been

10  before Judge Corley.  She reviewed the letters, and counsel

11  certainly have the document Judge Corley ordered produced.

12    **THE COURT:**  Help me remember this.  It seems to me

13  that before he was fired, there was an interim step where he

14  recused himself, but stayed on in his job.

15    So what was the level of cooperation in that era?

16    Which leads to the question of:  Should Waymo be allowed

17  to show that there was a period of time when Levandowski was

18  allied with Uber, but you're refusing to allow discovery into

19  what the extent of that alliance was?

20    **MS. DUNN:**  Your Honor, these depositions have not

21  happened yet.

22    The deposition Mr. Verhoeven is talking about came out

23  before the Stroz Report.

24    These are privilege issues that may or may not come up at

25  depositions in the future.

 1      The only thing before Your Honor today -- and I think --

 2          **THE COURT:**  How come you haven't done this before

 3  now?  The depositions.

 4          **MS. DUNN:**  Well, I think that --

 5          **MR. VERHOEVEN:**  The parties agreed to put off some

 6  depositions -- just a few -- because we wanted to be efficient.

 7  And we were waiting for the ruling on the Stroz Report.  So

 8  Ms. Padilla was one of those.  Your Honor, she's scheduled up.

 9  We're going to do it.

10          **THE COURT:**  Why wasn't she deposed last week, after

11  the Stroz Report was produced?  Why are we waiting until after

12  the pretrial conference to take her deposition?

13          **MR. PERLSON:**  Well, Your Honor, we're taking a series

14  of depositions this week because we're trying to evaluate and

15  get the material.  Your Honor, we're still -- as Ms. Baily

16  pointed out, we're still getting documents from Uber; internal

17  documents that came off their privileged log.  We can't take

18  those depositions with -- of the people if we don't have their

19  documents.

20          **THE COURT:**  Mr. González said that you're

21  exaggerating; that you've already got all of the documents;

22  that these are now different copies of the same documents -- I

23  think that's what he said -- and that you're exaggerating.

24      I don't know who to believe anymore in this case.

25          **MR. PERLSON:**  Well, Your Honor --

1        **MR. VERHOEVEN:**  If I can go back to the motion or to

2   this issue, Your Honor, you heard counsel say we asked him to

3   cooperate.  He said no.

4        We have no discovery on that.  When we ask about that, we

5   get an instruction.

6        And the only discovery I've got, Your Honor, was from

7   Mr. Gurley; a director.  And he's from Benchmark.  He's a

8   director -- or was at the relevant time a director at Uber.

9   And he testified that repeatedly he recommended that

10  Mr. Levandowski be fired, at Board meetings.

11       And Mr. Kalanick refused, and fought and fought and

12  fought.

13       So we need -- if they're going to start making an argument

14  that they're -- they're clean, and they never cooperated with

15  this, or he never cooperated with them, and they never stood

16  behind him, and they never ratified his conduct, then we

17  should -- either that should be precluded, or we should get

18  discovery into that.

19       **MS. DUNN:**  Your Honor, I hate to tell you that

20  Mr. Gurley's deposition testimony is now being entirely

21  misrepresented to you.  So that just did not -- that was not

22  said.

23       **THE COURT:**  All right.  Thank you.  Enough on

24  Number 14.

25       All right.  Let's go to one that's probably easier for me

1  to understand:  Number 16, about the earrings.  This is a Waymo

2  argument.  What's the story there?

3      Give me your name again, please.

4          **MS. ROBERTS:**  Andrea Roberts.

5          **THE COURT:**  All right.  What do you want to say

6  there?

7          **MS. ROBERTS:**  Your Honor, I think this one is a

8  pretty straightforward story of discovery being withheld and

9  not produced to us as it should have been earlier in discovery.

10     There was a set of earrings.  They're actual earrings in

11  the shape of boards that Mr. Chatterjee brought out at a

12  deposition of a Waymo witness on August 22nd.  That was two

13  days before the close of fact discovery.

14     The earrings had not been disclosed to us prior to that.

15  Their existence had not been disclosed in any interrogatories,

16  any documents, anything of the sort.

17         **THE COURT:**  How about Rule 26?

18         **MS. ROBERTS:**  Sorry?

19         **THE COURT:**  Rule 26 Initial Disclosures.

20         **MS. ROBERTS:**  No.  No indication of any earrings

21  specifically.

22         **THE COURT:**  Had there been a request for production

23  of materials, that would have covered the earrings?

24         **MS. ROBERTS:**  Your Honor, we have -- we had an

25  Interrogatory Number 6, which, based on the theory that we

1  think that they're going to rely on these earrings for, they --

2  they would have been responsive to that.  That interrogatory

3  asks for identification of each trade secret Otto Trucking

4  contends is not subject to efforts that are reasonable to

5  maintain its secrecy.

6       So if they're going to argue that these earrings are

7  evidence that Waymo did not take reasonable efforts to maintain

8  the secrecy of its trade secrets, they should have been

9  disclosed in response to Interrogatory Number 6.

10      And we also had document requests to Mr. Levandowski,

11 which was Request Number 32, and the subpoenas for

12 Mr. Levandowski.  And the text messages that were produced by

13 Mr. Levandowski on August 24th, the very last day of discovery,

14 would have been responsive to that request.

15      And just to remind Your Honor, those text messages were

16 between Mr. Levandowski and Seval Oz.  In late July

17 Mr. Levandowski reached out to Ms. Oz to ask for these

18 earrings.  And it appears that he received them from Ms. Oz in

19 late July.

20      And yet -- and then we didn't hear about them, at all,

21 until August 22nd.  By that time it was two days until the

22 close of fact discovery.  So we've had no opportunity to take a

23 deposition or learn anything further about these earrings,

24 other than Mr. Chatterjee's own direct-examination questions at

25 deposition.

1      **THE COURT:**  All right.  Mr. Chatterjee.

2      **MR. CHATTERJEE:**  Your Honor, these earrings came from

3  a third party, Seval Oz, who left Waymo a number of years ago.

4  She has been on the Initial Disclosures as a person who would

5  have relevant factual knowledge since the very beginning.  And

6  we -- even when we narrowed the Initial Disclosures lists, we

7  kept her on the list.  And we said, *If you want to get*

8  *documents from her, you'd need to subpoena her directly*.

9      She actually works on Google's facilities today.  And her

10  company has Google investment.  Google is an investor in their

11  company.  They certainly have had access to her.

12      We came into possession of them the day before

13  Pierre Droz's deposition, and we used them.

14      Now, in interrogatory responses we did say that people

15  have kept mementos of Waymo devices throughout.  So we -- and

16  that certainly has been an issue in discovery.  It's come up

17  repeatedly in depositions.

18      **THE COURT:**  When did you receive -- not you,

19  personally, but your law firm or any defense law firm --

20  receive these earrings?

21      **MR. CHATTERJEE:**  The earrings came into our

22  possession the day before Mr. Droz's deposition.  And we

23  gave --

24      **THE COURT:**  The day before who?

25      **MR. CHATTERJEE:**  Mr. Droz's deposition.

It was used the following day.  It was made available to Waymo.  We gave them pictures of it.  And we offered to them to let them inspect it.  And they could have also sought Ms. Oz's deposition.

And they've done nothing.  They've never come and inspected it in the weeks that have followed.  They have never tried to secure Ms. Oz's testimony.

**THE COURT:**  Ms. Cooper says that you got them in July.

**MR. CHATTERJEE:**  I did not.

I think the text messages show that Mr. Levandowski was texting with her.  And I think it was something like he got some of the boards.  And then he later on got the clips, because the clips weren't attached.  That's what the text messages say.

**MS. ROBERTS:**  So Your Honor --

**THE COURT:**  All right.  So the fact that Levandowski gets them -- he's not a party in the case.  So I don't -- what is your point?

**MS. ROBERTS:**  Well, so what I think -- I think Mr. Chatterjee's being kind of clever in saying that he got possession of the earrings the day before the deposition.

What he has not indicated is when Otto Trucking learned about the existence of these earrings.  Mr. Levandowski is a part of Otto Trucking.  It certainly would seem that he -- he

1    procured this evidence from a third party.

2        We had -- while -- although she was identified on Initial

3    Disclosures, there had been no other form of discovery

4    responses that clued us into what it was that they're intending

5    on Ms. Oz to testify about; that these earrings existed.

6        But back to Mr. Levandowski, he clearly received them at

7    the end of July.  There's been no dispute about that.

8        Somehow Mr. Chatterjee got them the day before.

9    Otto Trucking's not telling you when they became aware of those

10   earrings; and they did not disclose them to us prior to

11   deposition.

12        **THE COURT:**  All right.  When did you become aware of

13   the earrings?  Just answer that question.

14        **MR. CHATTERJEE:**  Your Honor, I was aware that the

15   earrings may exist.  I don't know the exact date.  It was for

16   some time.  And I -- but I -- I had not been able to locate

17   where they were.

18        We also submitted a declaration from Daniel Gruver in

19   opposition to this motion that outlines how Waymo, themselves,

20   knew about it, and people at Waymo knew about it.

21        And when we asked them to identify about any public

22   disclosures, they never identified it in their discovery

23   responses.

24        **MS. ROBERTS:**  So, Your Honor, the Declaration of

25   Mr. Gruver does not say that Waymo knew about this.  It says

1   that Mr. Gruver had a conversation with Ms. Oz about these

2   earrings years ago, when she still worked at Google -- what was

3   Google at the time.

4           **THE COURT:**  I thought she was at Google now.

5           **MS. ROBERTS:**  She's a former employee, Your Honor.

6           **THE COURT:**  Where is she now?

7           **MR. CHATTERJEE:**  So, Your Honor, she is the CEO of a

8   company, I believe, called "Aurima Technologies."  And it

9   actually operates out of Google's facilities.

10          **THE COURT:**  Is she a Google employee?

11          **MR. CHATTERJEE:**  No.

12          **THE COURT:**  All right.  So she's not.

13      Okay.  That's enough on Number 16.  We've got to keep

14  moving along.

15      All right.  Number 13, about David Drummond.  Help me

16  understand this a little better.  And this is a motion by

17  Waymo.

18          **MS. L. COOPER:**  Thank you, Your Honor.  This --

19          **THE COURT:**  Your name?

20          **MS. L. COOPER:**  Lindsay Cooper.

21          **THE COURT:**  Who is that?  Weren't you just up here?

22  Who was that, that was just arguing?

23          **MS. L. COOPER:**  That was Andrea Roberts.

24          **THE COURT:**  Who?

25          **MS. L. COOPER:**  Andrea Roberts.

1          THE COURT:  You didn't put Andrea Roberts on this

2     list, Angie.

3          THE CLERK:  She wasn't here.

4          THE COURT:  Did Ms. Roberts just come in late or

5     something?

6          MS. ROBERTS:  No, Your Honor.  I checked in.

7          THE COURT:  All right.  Well, you weren't on my list.

8     And I apologize for getting my name on wrong.

9        You're Ms. Cooper?

10          MS. L. COOPER:  Yes.

11          THE COURT:  All right.  Go ahead, please.

12          MS. L. COOPER:  So with this motion we are -- it's

13     very limited in scope.  As we said in our Opening Brief, we're

14     not challenging the defendants' ability to introduce evidence

15     that Mr. Drummond sat on the Board, that he resigned from the

16     Board, or even his reasons for resigning from the Board.

17          THE COURT:  Which board?  The Uber Board?

18          MS. L. COOPER:  Yes.  Mr. Drummond is a very senior

19     executive at Alphabet; Chief Legal Officer.  He sat on Uber's

20     Board from between 2013 and 2016.

21        We also don't dispute that the parties are competitors,

22     and that probably the cooperation between the parties in the

23     future will grow.

24        What we're trying to exclude is to prevent defendants from

25     taking the next step, and implying that Mr. Drummond did

1  something improper by continuing to sit on Uber's Board through

2  a time when the companies were moving from a partnership to

3  what I would call sort of a "break-up."  And in this time,

4  quite a few things happened.  Anthony Levandowski stole the

5  files.  He left Google.  Uber acquired Anthony Levandowski's

6  company.

7  　　　　　THE COURT:  How much of that did Drummond know?

8  　　　　　MS. L. COOPER:  So Drummond was closed out from Uber

9  Board meetings for two years before he resigned.  He resigned

10  August 2016.  So he was shut out from all Uber Board meetings.

11  And I don't think there's any dispute about that, but what we

12  don't want to do --

13  　　　　　THE COURT:  Wait.  Somebody is hacking and coughing.

14  Would you like a cough drop?

15  　　　　　MR. CHATTERJEE:  I'll get one, Your Honor.

16  　　　　　THE COURT:  Please get one, because it's just like a

17  thunder -- a static crash.  And you can't do that to your

18  opposing counsel.  She deserves the full attention of the

19  Court.  And when you're hacking and coughing, I can't hear what

20  she's saying.  All right?

21  　　　Start over, please, with the last sentence.  I want to

22  hear what you're saying.  He was closed out of the -- what?  I

23  didn't hear, because Mr. Chatterjee was coughing.

24  　　　　　MS. L. COOPER:  So he was closed out from Uber Board

25  meetings, so he didn't have access to Uber Confidential

1  Information.  He didn't have access to Uber's current plans

2  with ride-sharing during that time.

3       What we're trying to avoid with this motion, however, is

4  an insinuation from defendants that Mr. Drummond acted

5  improperly; that he breached ethical duties to the Uber Board;

6  he breached fiduciary duties and, you know, was sitting on the

7  Board to collect competitive intelligence for Waymo.  That's

8  not true, at all.

9       But to go through the entire story, and to explain how he

10  was shut out, you know; how the shut-out worked in practice;

11  whether it was effective; how long it lasted -- that -- it's

12  going to be a huge waste of time.

13           **THE COURT:**  Okay.  Thank you.  Hang on a minute.

14       What do you say to that?

15       First of all, what is your offer of proof as to why

16  Drummond has anything to do with our case?

17           **MS. JOSEPHS:**  Halley Josephs, with Susman Godfrey,

18  for Uber.

19           **THE COURT:**  Got you.  You are on the list.  Okay.

20  Thank you.

21           **MS. JOSEPHS:**  So you asked what Drummond has to do --

22           **THE COURT:**  Yeah.  What is your offer of proof of why

23  this has got anything to do with our case?

24           **MS. JOSEPHS:**  Sure.  Well, Mr. Drummond maintained a

25  relationship with Mr. Kalanick and other Uber executives from

1    2013 to 2016.  And Ms. Cooper is insinuating what we may or may

2    not argue as far as the story, but we think there are two sides

3    to every relationship.  Whether or not Mr. Drummond attended

4    Board meetings or was not permitted to attend Board meetings

5    for a certain period of time doesn't change the fact that he

6    was still a Board member.  He had this relationship.  Google

7    and Waymo misled Uber about their competitive intentions with

8    Uber, and about the overall nature of what Uber thought was a

9    partnership for quite some time.

10        So we think --

11            THE COURT:  What do you mean, a partnership?  You're

12   saying Waymo and Uber had a partnership?

13            MS. JOSEPHS:  There were discussions, Your Honor.

14   And these are the exhibits to our Opposition Brief that show

15   the parties had ongoing discussions about ways they could

16   potentially partner, although, unbeknownst to Uber, as early as

17   2013 Google had already decided it was interested in entering

18   the transportation-as-a-service market; and by -- I believe

19   it's November 2014 -- had already decided that it was going to

20   compete with Uber; that it was not going to partner.

21        None of this information was made public to us.  And

22   communications between the two parties suggests that that

23   partnership was possible.

24            THE COURT:  How would that excuse stealing away

25   Mr. Levandowski and all of his team?  I don't get it.

1    How could that -- how could Drummond possibly help Uber in

2 this case?

3       **MS. JOSEPHS:**  Well, Mr. Drummond's misleading of Uber

4 and his failure to, you know, pick up the phone and tell

5 Mr. Kalanick about the concerns that Waymo had --

6       **THE COURT:**  About what?  What concerns did Waymo

7 have?

8       **MS. JOSEPHS:**  Well, just as an example, Your Honor,

9 the same day that Mr. Drummond submitted his resignation letter

10 to Mr. Kalanick, there's an e-mail.  And it's Exhibit 2 to --

11 to Waymo's Motion in Limine Number 15.  There's some crossover

12 with that one.  And in that exhibit there's an e-mail where --

13 a recounting that Mr. Drummond had directed the forensic

14 investigation to pick up the pace directly as a result of the

15 Otto acquisition being announced.  And --

16       **THE COURT:**  He did what?

17       **MS. JOSEPHS:**  So the same day --

18    Well, let me back up for a minute, Your Honor, to be

19 clear.  So we believe the case law shows that all of this

20 information is relevant to Waymo's motives for filing suit.

21    Judge Corley has already said that's a relevant argument.

22 It's relevant to bad faith, which we've asserted in our Answer.

23 It's relevant to witness-credibility issues, as well as

24 damages-related issues.

25    So we think this is about attorney argument.  Waymo's not

 1 | trying to exclude any of this evidence.  They just don't like
 2 | what we're trying to --
 3 |         **THE COURT:**  I don't see how Drummond possibly -- did
 4 | he know?  Did he have information about the acquisition of
 5 | Levandowski and his team?
 6 |         **MS. JOSEPHS:**  I don't believe so, Your Honor; but I
 7 | don't think that's the only -- I don't think that's the only
 8 | argument that one can draw from these facts.
 9 |     I think for bad faith, for modus for filing suit, for
10 | witness credibility, and damages, it doesn't -- it's not all
11 | based on whether he had access to our Confidential Information.
12 | It's about the overall relationship/partnership.
13 |         **THE COURT:**  All right.  Anything more on your side?
14 |         **MS. L. COOPER:**  Yes, Your Honor.
15 |     I disagree with almost all of the factual
16 | characterizations there.  The evidence shows that Google was
17 | really up front about its plans to go into the ride-share
18 | industry.
19 |     In its Opposition, Uber admits that it knew about Uber --
20 | about Waymo trying to go into the ride-sharing industry as
21 | early as 2014.  Again, in 2015, Travis Kalanick and Larry Page
22 | sat down, and Larry Page confirmed Google is going into the
23 | ride-sharing industry; but the import of that conversation is,
24 | you know, Google was actually worried about Uber competing with
25 | it, because Uber was aggressively entering the

1 self-driving-car-technology field, which had traditionally been

2 Google's.

3      In any event, we're not trying to exclude any of that

4 evidence.  The history between the parties and how we got to

5 this lawsuit, I understand, is the subject of another motion *in*

6 *limine*; but pending ruling on that -- we're not trying to

7 exclude those facts.

8      What we're trying to prevent is them from taking the next

9 step, which is to insinuate, as they did during Mr. Drummond's

10 deposition, that Mr. Drummond owed a fiduciary duty to Uber,

11 and should have told them specifically about all of Google's

12 plans.  And that's just not true that they've never made that

13 claim outside of this litigation.  And, you know, Google,

14 Alphabet, Mr. Drummond --

15           **THE COURT:**  All right.  All right.  Are you arguing

16 Number 15, as well?

17           **MS. L. COOPER:**  Mr. Eiseman is.

18           **THE COURT:**  Okay.  We're going to go to that one now.

19           **MS. JOSEPHS:**  Thank you, Your Honor.

20           **MR. EISEMAN:**  Good morning, Your Honor.

21 David Eiseman, on behalf of Waymo.

22      Two issues.  Two components to our motion, MIL 15.  One is

23 that we think that the defendants should be precluded from

24 saying that this lawsuit is somehow an attempt to slow down

25 Uber as a competitor.  That's number one.

 1        And, number two, they shouldn't be able to introduce

 2   evidence or argument that Waymo should have included

 3   Mr. Levandowski as a party in the lawsuit.

 4        I think that -- let me take the second one first, because

 5   I think that's easy.  Your Honor has already ruled in -- during

 6   a hearing earlier that we didn't have an option to include

 7   Mr. Levandowski in this lawsuit because of the Arbitration

 8   Agreement, and that it was proper for us to proceed against

 9   Uber here and the other defendants, and to pursue

10   Mr. Levandowski in arbitration.

11        So for them to -- for the defendants --

12        **THE COURT:**  What do you think we should tell the jury

13   on that point?  Don't you think the jury's going to wonder:

14   Where is Levandowski?

15        **MR. EISEMAN:**  Well, they may, but they shouldn't be

16   able to point at an empty chair; kind of make an empty-chair

17   kind of argument here that somehow we are singling out Uber to

18   try to stop them from competing, and what we really should have

19   done is to sue Mr. Levandowski, because we have sued

20   Mr. Levandowski; it's just in a separate proceeding.

21        And so the two issues sort of come together, in that

22   they're arguing or trying to argue that somehow this lawsuit's

23   not motivated by a good-faith effort to enforce Waymo's trade

24   secrets.  We, of course, dispute that.  We think this argument

25   or this lawsuit's in perfectly good faith, and that, yeah,

1  there's competition between the two companies, but this is not

2  some sort of effort to wrongfully compete against Uber.

3       And, you know, I heard Ms. Josephs stand up earlier and

4  say that they pleaded bad faith in their Answer.  I don't

5  believe that they've pleaded bad faith in their Answer.  There

6  is an unclean-hands defense in Otto Trucking's Answer, but Uber

7  and Ottomotto have not pleaded any kind of unclean-hands

8  defense, to my knowledge.  That's number one.

9       And then number two is that they haven't asserted an

10 unfair-competition claim in this case.  And that's when

11 motivations for filing lawsuits get into evidence, is when

12 there's an unfair-competition claim.  And we don't have that

13 here.

14       **THE COURT:**  Okay.  What does Uber say?

15       **MS. DUNN:**  Thank you, Your Honor.

16       Your Honor, first of all, just to be clear about what this

17 motion is trying exclude, it is -- this is relevant to Uber's

18 entire defense in this case.

19       So Waymo is saying that they brought this case because

20 14,000 files were downloaded from their server.  And their

21 motion here is the flip side of what happened when they did not

22 want to disclose to us the documents discussed earlier, where

23 the early forensics investigation showed that these were

24 low-value documents, and that no alarm bells were ringing.

25       The documents are the same.  These are the documents with

1  the lawyers discussing that there is management concern about

2  this, and discussing that they are concerned

3  Anthony Levandowski is going to start a competitive venture.

4       This is all tied together with their forensic analysis in

5  the first instance that showed that there was not the concern

6  that motivated this.  There are e-mails where internally at

7  Google they are saying that they are thinking about taking

8  action to stop the acquisition.  And this involves lawyers and

9  executives.

10      So what they are trying to do is take the references to

11  competition, which is the backdrop to the parties' relationship

12  in this case.

13      You cannot take this little piece out, without

14  understanding the relationship between these people that

15  Mr. Page has already testified to in deposition; his concerns

16  about Mr. Levandowski; that he didn't think it was a good idea

17  for him to start a competitive venture; and what Mr. Kalanick

18  has said about trying to partner with Google in the early days,

19  and thinking that Uber, having cars, and Google, having started

20  self-driving technology, would be a good match.  So this is --

21  this is directly relevant to the centerpiece of their case.

22      Also, under the case law it is relevant.  And this is the

23  *Carville* case.  Judge Grewal applied this in *GSI*.  This is

24  relevant to witness credibility; the motivation of the lawsuit.

25  It's also relevant to failure to mitigate damages.  And nobody

1    can argue that those things are not in this case.

2         So they're focused on bad faith.  We have included a jury

3    instruction on the jury form, on the Verdict Form -- bad

4    faith -- that we would like to present.

5         But whether or not Your Honor agrees with us -- and we

6    will argue that separately -- this is relevant both to the

7    facts that are already in this case, and it is absolutely

8    intertwined with something very important that is happening in

9    this case that they want to make sure to keep out, which is the

10   lawyer-driven and competitive nature of what drove this company

11   to say, *You know, this first investigation is not good enough.*

12   *Please go back, because we might need to act before this*

13   *acquisition closes*.

14        So they want to put on evidence of our reaction to their

15   Complaint, but they want to make sure nobody knows why they

16   filed it.  And that doesn't make any sense.

17             **THE COURT:**  What do you say to the Levandowski point

18   that --

19             **MS. DUNN:**  Oh.

20             **THE COURT:**  -- as to the empty chair, and so forth?

21             **MS. DUNN:**  Well, first I want to correct something.

22        While, you know, Waymo says we didn't sue, we did sue

23   Levandowski, but they have not sued Levandowski for

24   trade-secret theft.  And a brick is not a wall.  But once you

25   get a number of bricks, which we now have, because of these

Sasha Zbrozek documents, because of the intertwined-competition theme, and because they didn't sue Anthony Levandowski for trade secrets anywhere, even though they clearly sued him somewhere for something, just not this, it starts to resemble a wall.

THE COURT:  What do you mean:  A wall?

MS. DUNN:  Which is that there is -- this is a -- a lawsuit that at least in substantial part was motivated by the competitive relationships between these companies, and Google's decision that they were going to compete with Uber, and not partner with Uber.  And it is part and parcel of the documents that we've already seen that Waymo tried to keep from us.

But this is a very important part of the presentation of this case.  And if they can come in --

THE COURT:  I don't understand.  I asked you about Levandowski, and you veered off on competition again.

MS. DUNN:  I apologize.

THE COURT:  They don't want the fact that -- they don't want you saying, *Hey, they didn't sue Levandowski. Levandowski is the bad guy. They should have sued him. We're innocent.*

So what do you say to that?

MS. DUNN:  That -- I don't see the problem with that. They didn't sue him for trade-secrets theft.  They've made this person's conduct the centerpiece of their entire case.  He's --

 1  Your Honor has ruled that he might come to court, and take the

 2  Fifth.  So the jury is going to have questions about this.  And

 3  it is absolutely germane to everything that's going on here for

 4  the jury to know that Mr. Levandowski has not been sued for

 5  Mr. Levandowski's conduct, at all; and instead, Uber has been

 6  sued, which -- you know, even though nothing has been found at

 7  Uber.

 8        So you have to wonder.  And the jury will wonder, *Huh.*

 9  *What's that about?*

10        And so, yes, we do think that that's relevant.

11              **THE COURT:**  Okay.

12          **MR. EISEMAN:**  Can I briefly respond, Your Honor?

13              **THE COURT:**  Please respond.

14          **MR. EISEMAN:**  First of all, with respect to not suing

15  Mr. Levandowski for trade-secret misappropriation, we have the

16  right to sue Uber and the other defendants in this court -- in

17  federal court -- for trade-secret misappropriation.  And we

18  made the decision not to include Mr. Levandowski under that

19  claim, because we wanted to stay in federal court.  There's

20  nothing improper about that.  There's nothing improper about

21  enforcing our intellectual-property rights.

22        And so for them to try to turn documents relating to the

23  concerns that Waymo had and Google had about Mr. Levandowski's

24  departure into some argument that we've brought this lawsuit in

25  bad faith, when they aren't alleging an antitrust claim, some

 1  sort of sham-litigation claim --

 2          **THE COURT:**  But you know, in every patent case --

 3       This is no longer a patent case, but in every patent

 4  case -- I bet I could go find ten examples where you've done

 5  it, yourself -- the defendant always argues, *Hey, this is not*

 6  *about patents.  This is not about IP.  This is simply one*

 7  *competitor trying to put the other one out of business.*  That

 8  happens all of the time.  Right?

 9          **MR. EISEMAN:**  But in --

10       **THE COURT:**  Have you ever made that argument?  I bet

11  you have.

12          **MR. EISEMAN:**  No.  I've --

13       **THE COURT:**  So why shouldn't they get to make this

14  very argument that, *Hey, it isn't about trade secrets.  This is*

15  *about trying to put Uber out of the business, so you and Lyft*

16  *can take it over*?

17          **MR. EISEMAN:**  Well, because the documents they cite

18  in their motion --

19       For example, Exhibit 37 is an e-mail recounting a

20  conversation that Mr. Page had, where he expressed concern; but

21  the concern that was expressed was that Mr. Levandowski was

22  leaving Waymo, and soliciting employees from Waymo.

23       And that's a legitimate concern.  That's not some sort of

24  anticompetitive purpose.  So that it's true that in general in

25  cases like this, Your Honor, that people talk about fierce

1  competition.  And we're not suggesting that both sides won't do

2  that in this case; but they shouldn't be allowed to use

3  documents out of context.  It's a classic 403, where we're

4  going to end up litigating a bunch of side issues.

5         **THE COURT:**  Well, maybe there's some specific

6  documents where I could say, *Yeah, that's too far.  And that's*

7  *misuse*; but just on general-themes point --

8         **MR. EISEMAN:**  Well, Your Honor --

9         **THE COURT:**  -- I'm having some trouble with your

10  point.

11        **MR. EISEMAN:**  If Your Honor's taking this under

12  submission -- and it sounds like you are -- we'd ask you to

13  look at Exhibit 37 and Exhibit 43.

14        **THE COURT:**  Wait a minute.  Let me write those down.

15  Exhibit 37 and 43.  Okay.

16        **MR. EISEMAN:**  And we'd ask you to look at those --

17  they're attached to the opposition; the defendants' opposition

18  to our motion -- because those are the kinds of documents we're

19  concerned about.

20     And then lastly, Your Honor, on the -- again, going back

21  to the empty-chair argument that we feel very strongly about,

22  for the reasons we've put in our papers and for the reasons

23  we've mentioned.  And we'd ask you to not let them make that

24  argument, because we have a legitimate reason --

25        **THE COURT:**  Are you going to make the empty-chair

1  argument?  If you are, I think you would wind up regretting it,
2  because I would interrupt, and say to the jury, *Okay.*
3  *Mr. Levandowski is not here.  That's true.  He's not a*
4  *defendant.  However, they have the right to sue Uber for*
5  *whatever wrongs it did, if any.  And if you find, ladies and*
6  *gentlemen of the jury, that Uber did something wrong, then*
7  *they're liable for that, even if Levandowski would also be*
8  *liable for that.  And this argument about the empty chair is*
9  *bogus.*  Then I will spell it.  B-o-g-u-s.
10      So I have a feeling I'm putting you on notice I would not
11  allow that argument.
12           **MS. DUNN:**  We have heard you.
13           **THE COURT:**  If you even go close to it, I would
14  interrupt.  Without further consultation, I would tell the jury
15  just what I said.  So that part, I agree with you on, but --
16  but --
17           **MR. GONZÁLEZ:**  Your Honor, on the empty chair --
18           **THE COURT:**  No.  You're not going to get to do this,
19  Mr. González.  That would just be a litigation trick.
20           **MR. GONZÁLEZ:**  No, no.  No.  This not a trick.
21      If they, in their Opening Statement, spend two hours
22  talking about Anthony Levandowski, I assume we can say,
23  *Anthony Levandowski is not the defendant here.  Uber is.*
24           **THE COURT:**  Of course, you can say that.
25           **MR. GONZÁLEZ:**  Okay.

1          **THE COURT:**  What you can say is --

2      You can't imply that they don't have the right to sue you.

3      What you can say is that you're the defendant, and they've

4  got to prove the case again you.

5          **MR. GONZÁLEZ:**  Exactly.

6          **MS. DUNN:**  Right.

7          **THE COURT:**  That's fair.  You can say that.

8          **MS. DUNN:**  Your Honor, as to the first point --

9          **THE COURT:**  But I want to come back.  We've got to

10  tell the jury something about Levandowski and his role.  They

11  will be bothered about this from the very get-go.  And I deal

12  with juries all of the time, and I know how they think.  They

13  are going to --

14      I'm going to tell them something.  If you-all lawyers

15  don't give me help, I'm going to make up my own instruction.

16  And I'll just tell them *sua sponte* that there's another

17  arbitration going against Levandowski.  So if you don't come up

18  with something cogent to tell them, I'm going to do it on my

19  own.

20          **MR. EISEMAN:**  We'll work with opposing counsel to

21  come up with an instruction.

22          **THE COURT:**  All right.  Please do.  All right.

23          **MS. DUNN:**  Your Honor, just on the first point, very

24  quickly, the documents are attached to our motion, but this is

25  what we're talking about:  Their meeting notes from August of

1  2016, where it says Uber is generally considered to be

2  Chauffeur's main competitor, which contradicts what they

3  learned from Anthony, with his intent to not be in the same

4  space and compete against Google.

5        **THE COURT:**  Whose is this?  Is this a Waymo document?

6        **MS. DUNN:**  Waymo meeting notes from August of 2016.

7     It goes on to say, *If Google were to take actions on*

8  *preventing the acquisition, we need to move as quickly as*

9  *possible.  Look at prior to Anthony's departure and course of*

10 *his employment whether or not they took with them Confidential*

11 *Information or trade secrets of the business.  Timing here is*

12 *important, since we have to decide whether we need to take some*

13 *action before the Transaction closes.*

14    Okay?  So --

15       **THE COURT:**  Okay.  So, so what?

16       **MS. DUNN:**  So the point is that their investigation

17 into Anthony was tied and in the same documents as their

18 discussion of competing with Uber, and wanting to prevent the

19 acquisition, which is a rather major point.

20       **MR. EISEMAN:**  But Your Honor, in fact, the

21 acquisition went forward.  And it closed.  And Google and Waymo

22 didn't take the action that is suggested in this memo.

23       **THE COURT:**  Well, I know.  I'm not --

24    When we get to the issue of the mitigation thing, I am

25 leaning against Uber on that, and in your favor on that.

1    I think that, however, this -- what I just heard, though,

2  is relevant to something else.  It's not just --

3    You know, just because you might win on mitigation of

4  damages, that e-mail would tend to show that Waymo felt some --

5  knew that if they were going to try to block the acquisition,

6  they ought to be looking into where these trade secrets --

7    And a jury might conclude from the time that it took, even

8  though it might not be enough to knock out the case as a matter

9  of law -- but from the time it took you to eventually get your

10 act together and bring a lawsuit, that maybe Sasha was correct,

11 and these were low-grade trade secrets, and that that was the

12 -- so that it reflects on the --

13    In other words, if these were the Crown Jewels, you would

14 have been in court the next day; but since they weren't the

15 Crown Jewels and they were low-grade, it took a long time to

16 get this lawsuit together.

17    Now, I'm not saying I buy the argument.  I'm just saying a

18 reasonable jury could buy the argument, based on what I just

19 heard.

20    **MR. EISEMAN:**  Your Honor, obviously, we disagree with

21 the concept that any --

22    **THE COURT:**  This is just a jury argument they can

23 make.

24    **MR. EISEMAN:**  It would be a jury argument that they

25 could make if they had an antitrust sham-litigation claim, or

1  some sort of unfair-competition claim.

2      But the fact is this is an affirmative trade-secret claim

3  we're bringing.  And it's just --

4          THE COURT:  It's same as the patent cases.  They want

5  to say, *This is just one competitor trying to stymie the next*

6  *competitor.*  That's a fair argument.  They make it in every one

7  of these patent cases.  I know you've made that argument.  I

8  could go back and find it.  So I think that's okay.  You can

9  make the argument:  Just trying to stamp out competition.

10 That's okay.  You're going to have to suffer that -- that

11 thing.

12     And on Levandowski, they cannot make the empty-chair

13 argument.  That's clear.

14     But we have to explain.  Levandowski's name's going to be

15 all over this case.  We have to explain that he is being sued

16 in some arbitration.  And you lawyers figure out how to word

17 that.

18          MR. EISEMAN:  We will, Your Honor.  Thank you.

19          MS. DUNN:  Thank you, Your Honor.

20          THE COURT:  All right.  Hang on a minute.

21     We're not even halfway through this hearing.

22     So okay.  While we're on that subject, Motion *in Limine*

23 Number 1, Waymo wants to preclude defendants from presenting

24 their bonus theory about 14,000.

25     Now, can I just give you my main concern?

1    I don't quite see how any of what you have come up with

2  gets admitted into evidence, because --

3    I'm talking now to Uber.

4    -- because it's hearsay.  So how do you get around the

5  fact that Kalanick is willing to come in and say that

6  Levandowski told him?  This is Hearsay 101.  So I don't see how

7  you get around that.

8         **MS. DEARBORN:**  Well, so, Your Honor, this -- this is

9  a fundamental point for this motion, which is that we accept

10  Your Honor's -- although we disagree with it, we accept Your

11  Honor's ruling that the March 29th, 2017, conversation between

12  Mr. Levandowski and Mr. Kalanick is excluded from evidence.

13  That is not what this motion is about.

14    This motion is about Uber's other evidence; other

15  nonprivileged evidence.

16         **THE COURT:**  Good.  Give me one admissible piece of

17  evidence that would support the theory that he did this for

18  bonus reasons.

19         **MS. DEARBORN:**  So the timing of Mr. Levandowski's

20  downloads in relation to the timing of his bonus payments is

21  one.

22    The structure of the Chauffeur Bonus Plan, which created

23  perverse incentives, is another.

24    The structure of the Bonus Plan that created incentives

25  for Google to undervalue the project -- Project Chauffeur -- is

 1 | another.

 2 |     Testimony from Google's witnesses that they were -- that

 3 | they were nervous about receiving their bonus payments in

 4 | December of 2015; that negotiations were contentious; that they

 5 | were being conducted by people with -- with no -- with poor

 6 | communication between the parties; that -- or between --

 7 | between the members of the team and those who were conducting

 8 | the negotiation.

 9 |     All of that is circumstantial evidence, Your Honor.  We

10 | acknowledge that.

11 |     But there is no privilege issue here, and there's no

12 | hearsay issue here.

13 |     There -- these are -- it is circumstantial evidence that

14 | the timing of -- that the timing of all of this lines up.

15 |     And, Your Honor, I want to be very clear.  Waymo is going

16 | to marshal its own circumstantial evidence in service of its

17 | own preferred theory as to why Mr. Levandowski may have done

18 | what he did.  They are going to say, *Well, the timing of his*

19 | *downloads lines up with meetings with Uber executives*.

20 |     All we ask is exactly the same opportunity:  The

21 | opportunity to marshal circumstantial evidence of the timing of

22 | the downloads, and other evidence from Google's own files, from

23 | Google's own witnesses, from our own witnesses who were there

24 | at the time, to talk about the issue.

25 |     **THE COURT:**  Let me ask you about the March

1  conversation first.  What was it that he --

2      What would be the offer of proof that Kalanick would

3  testify to as to what Levandowski said?

4          **MS. DEARBORN:**  If this were to come in -- oh, so he

5  would say that Mr. Levandowski told him that he downloaded the

6  files in service of his bonus, in order to protect his bonus.

7  And I can --

8          **THE COURT:**  Read it to me.  You said it so fast, I

9  didn't catch it all.  I want you to say it slowly, and read --

10 you read it to me, actually.

11         **MS. DEARBORN:**  You know, this is actually in a

12 declaration from Ms. Padilla, who --

13     And I don't want to misconstrue her words, so I'm

14 reluctant to do that without it right in front of me,

15 Your Honor, but I can pull it up.

16         **THE COURT:**  Does somebody have that?

17     Was she at the deposition?

18         **MS. DEARBORN:**  Was she at the deposition of

19 Mr. Kalanick?

20         **THE COURT:**  Well, where does this come from?

21         **MR. VERHOEVEN:**  This has been precluded already.

22         **THE COURT:**  Well, wait a minute.  I don't remember

23 precluding it.  If I did, I'm sorry.

24     But I want to hear about the -- I want to understand it

25 again.

1    **MS. DEARBORN:**  Sure.  So Mr. Verhoeven is correct.

2  This has been precluded.  This is testimony about what happened

3  in a March 29th, 2017, conversation between Mr. Levandowski and

4  Mr. Kalanick at which Ms. Padilla was present.

5    The -- Mr. Levandowski said that he downloaded the files,

6  having -- and it had nothing to do with his employment at Uber;

7  and instead, it had to do with his bonus.

8    **THE COURT:**  Oh, this is the one where there was a

9  selective waiver?

10    **MR. VERHOEVEN:**  Yes.

11    **THE COURT:**  Oh, okay.  I thought you --

12    **MS. DEARBORN:**  It has been excluded.

13    **THE COURT:**  I thought you meant I excluded it on

14  hearsay grounds.

15    **MS. DEARBORN:**  No, no.  This has been excluded on

16  privilege grounds.

17    **THE COURT:**  This was the slick move.  Now it's coming

18  back to me.  Yeah.  It's going to stay excluded.  That was the

19  slick move, where you selectively, in my view --

20    Padilla was there.  She's a lawyer.  And you said, *Oh,*

21  *This helps us.  So okay.  We're going to* --

22    No.  I stand by that ruling 100 percent.

23    **MS. DEARBORN:**  And that is not the subject --

24    **THE COURT:**  I thought we were talking hearsay.  All

25  right.  Never mind.

1      Okay.  So your point is, okay, you've got other possible

2  evidence that you think would support the inference that he did

3  it for some reason.  He did it protect his bonus.

4          **MR. VERHOEVEN:**  Your Honor, may I respond?

5          **THE COURT:**  Yes.  Go ahead.

6          **MR. VERHOEVEN:**  So first of all, the only evidence

7  that they had when they invented this theory was their

8  selective waiver of this conversation, which they decided to do

9  later in the case as a strategic move after they decided to

10  throw Levandowski under the bus and fire him.

11      That was precluded by both Judge Corley and Your Honor.

12      And now -- and we simply wanted to make sure that argument

13  wasn't going to be made.  And it's a good thing we did, because

14  they're saying they're going to still try to make it.  And

15  there's simply zero evidence beyond that precluded testimony

16  that would even get close to supporting this -- this silly

17  notion that he would download all these documents to either

18  blackmail Google, or try to show Google that he should get paid

19  more.  *Here.  Look at my stolen documents.  I should get paid*

20  *more.*  It doesn't even make any sense.  There's no evidence for

21  it.

22      You asked about hearsay.  And their -- their argument on

23  this is that it's a party admission; but it's their own party.

24  You can't use the party admission for yourself.  You use it

25  against the other side.  And clearly they're using it for the

1  truth, Your Honor.

2      Counsel talked about timing, and said timing shows

3  circumstantial evidence of this.  The facts on timing are that

4  Mr. Levandowski was informed on December 5th that he would

5  receive payment; and they downloaded the files after that.

6          **THE COURT:**  I'm sorry.  He would receive payment of

7  what?

8          **MR. VERHOEVEN:**  Of his initial bonus.

9          **THE COURT:**  Wait a minute.  Say that again.  You mean

10  on December 5, 2015.  Right?

11          **MR. VERHOEVEN:**  Yes.

12          **THE COURT:**  All right.  2015.  December 5.  There's

13  something in writing that says --

14          **MR. VERHOEVEN:**  There are two -- yes.  I think my

15  co-counsel is getting it; but he was informed that he was going

16  to receive the first payment.  And --

17          **THE COURT:**  The first payment; but wasn't he worried

18  about the later payment, allegedly?

19          **MR. VERHOEVEN:**  There's no evidence of that.  Zero.

20      And I went through all of their exhibits, citing.  And

21  there's no evidence.  And I'd like to go through them,

22  Your Honor, if you want.  I don't know if you have time, but --

23          **THE COURT:**  We don't have time.

24          **MR. VERHOEVEN:**  Well, there's not a single piece of

25  evidence here that supports --

1      They cite --

2      I'll just summarize.  They cite to, in their Exhibit 34 --

3  to an e-mail.  Levandowski's not an addressee.  He's not

4  mentioned in the e-mail.  They say that this supports that

5  there was confusing, contradictory, misleading information

6  about the bonus.

7      Well, this -- this e-mail is about tax treatment.  And

8  it's about the Tax Department giving confusing information

9  about what you need to withhold on the bonus.  It has nothing

10 to do with whether the bonus is getting paid.  It's complete

11 half-truth, as Your Honor said.

12     They cite to texts that Mr. Levandowski had; but the text

13 is actually dated the day he received his bonus on August 12th.

14 And the text is --

15     The first text is from Mr. Don Burnette, who was a former

16 co-worker:  Dollar sign, dollar sign, dollar sign, question

17 mark.

18     Mr. Levandowski responds, "Booooom," with five "o"s,

19 meaning he got paid.

20     And then there's -- so, you know, they -- then they cite

21 to deposition testimony that doesn't say anything.  There's one

22 deposition where one person says that he thought that

23 Levandowski said something; that he was concerned.  That's it.

24 And that's hearsay.

25          **THE COURT:**  How many -- that's Kalanick?

1        **MS. DEARBORN:**  No.

2        **MR. VERHOEVEN:**  No.  That's another person.

3        **THE COURT:**  All right.  Who was that?

4        **MR. VERHOEVEN:**  Well, let me see.  That was -- so

5   they cite to Pennecot.  And he says nothing about Levandowski

6   saying he was concerned.

7        They cite to Gruver.  And that's the one.  He says, *He*

8   *expressed concern after we both left Google about the delivery*

9   *of what he called the second part of the bonus.*

10       *When did he express this concern?*

11       *Around the time that -- because I left Google before him,*

12  *a supposed process, that the remaining 60 percent of the bonus*

13  *would be paid post six months, at the end of the employment at*

14  *Google.  And he was interested in when or if I had -- when I*

15  *and how I received my second payment.*

16       This is the only thing, out of all of the evidence they

17  have, where they're talking about Levandowski even expressing a

18  concern.

19       It's hearsay.  It's talking about what -- it's one of

20  their employees talking about what another of their employees

21  said, and offering it for the truth.  And it has absolutely

22  nothing to do with downloading.  It has absolutely no statement

23  about tying the concern on bonus to downloading.

24       **THE COURT:**  What was the time period of that

25  statement that the deponent says; when it occurred?

1  (Pause in proceedings.)

2          **MS. DEARBORN:**  That was later, Your Honor.  It was in

3  August of 2016, as I recall, or around that time.

4      But Your Honor, that is not hearsay because --

5          **THE COURT:**  By that point he had already been paid;

6  hadn't he?

7          **MR. VERHOEVEN:**  He got paid on August 12th.

8          **MS. DEARBORN:**  No.  The testimony was regarding

9  before he got paid, and that he was concerned that he would get

10  paid, Your Honor.  And that is admissible under the hearsay

11  exception for state of mind.

12          **MR. VERHOEVEN:**  You know, they say "state of mind,"

13  Your Honor, but they cite to a document that proves that that's

14  ridiculous:  Their Exhibit 28.

15      They say, *Oh, well, you know, we -- based on all of this*

16  *circumstantial evidence, we had a state of mind that we thought*

17  *that, even though there's no evidence of it -- that Levandowski*

18  *down -- did this illegal downloading for bonus purposes, and*

19  *not to help us.*  And they cite to Exhibit 28.

20      And Exhibit 28, in itself, shows that Uber knew, for

21  example, on the first payment, when it would be paid.  And they

22  say, *Oh, it was delayed.*  And Uber knew.  This is on the bottom

23  line of this exhibit.  And it's an exhibit they don't

24  authenticate.  It's actually electronic notes of John Bares, if

25  Your Honor's interested.  He was the head of the ATC, which is

1    their -- at the time, their AV program.

2         And there's a cite to Levandowski.  It says nothing about

3    concern about a bonus.  In fact, what it shows is he's

4    telling -- in September of 2015 he's telling the head of Uber's

5    program, while he's still an employee of Waymo, that he wants

6    to do a start-up, and wants to take a group with him.  Lots of

7    laser experts in the group.  Worried about Google finding out.

8         There's nothing in there about:  I'm worried about my

9    bonus, and not getting paid.

10        And then the next entry in the notes, another individual

11   informs Bares that -- they're talking about:  What's the

12   magnitude of the pay-out?  Because they're negotiating about

13   the magnitude of the pay-out globally for all employees.

14        And he says it won't be known until the valuation is

15   fixed.  Might take another six weeks after October 13th.

16        So they knew.  Uber had inside information from Urmson and

17   Levandowski, who were both working at Waymo, that the bonus was

18   going to be, although it was notionally -- and in the

19   contract -- in October, that it was going to be delayed until

20   December.  And that's exactly when they got paid.

21        So this notion that they had some state of mind because of

22   representations by Levandowski, which was precluded -- or -- or

23   any other basis --

24        **THE COURT:**  Well, is there --

25        **MR. VERHOEVEN:**  Just nothing there.

```
 1          THE COURT:  Is there internal Waymo evidence from the
 2   higher-ups, say, at Waymo, where somebody writes an e-mail to
 3   someone else that says something like, *Maybe we're not going to*
 4   *pay Levandowski his second half of his bonus.  He's in trouble*
 5   *on that*; something like that?  Do you have anything like that?
 6          MR. VERHOEVEN:  Zero.
 7          MS. DEARBORN:  I'm not aware of anything like that,
 8   Your Honor, but that --
 9          MR. VERHOEVEN:  The opposite.
10          MS. DEARBORN:  But again, you know, what I heard
11   Mr. Verhoeven do is he just went through piece of evidence,
12   after evidence, after evidence; testimony from Waymo's own
13   witnesses; documents; et cetera.  That is all circumstantial
14   evidence that Mr. Levandowski, along with many other members of
15   the Chauffeur team, was concerned about his bonus in December
16   of 2015, and was also concerned about it in August of 2016.
17      Your Honor, this -- what I hear Mr. Verhoeven doing is
18   he's attempting to exclude --
19          THE COURT:  Yes, but where is the proof that connects
20   the dots that his concern got translated into, *I'd better*
21   *commit a federal crime, and download all of this information,*
22   *so that I can hold them hostage*?  Where is that step?
23          MS. DEARBORN:  That is for the jury to decide,
24   Your Honor.  That is the import of the circumstantial evidence.
25      And I would point out that Waymo has no direct evidence,
```

themselves, that Mr. Levandowski downloaded these files in

order to steal them and use them at Uber, either.

Both parties are going to be marshaling circumstantial

evidence in order to try to explain why Mr. Levandowski may

have done what he did.

There's -- and it is simply -- it is completely uneven and

completely unwarranted to exclude circumstantial evidence, and

Uber's theory or Uber's explanation, and admit Waymo's, when's

there's no -- there's no direct evidence on either side,

Your Honor.

**THE COURT:** Isn't there -- my memory is that way back

when the case started, and before he took the Fifth Amendment,

Mr. Levandowski told the people at Uber that he did it so he

could work at home.

**MS. DEARBORN:** Yes, Your Honor. He did say that.

**THE COURT:** Is that true?

**MR. VERHOEVEN:** Yes.

**THE COURT:** Okay. So he didn't say, *I did it so that*

*I could hold them hostage on my bonus*.

**MS. DEARBORN:** Your Honor, the fact of the matter is

Mr. Levandowski is taking the Fifth. We don't know why he may

have done what he did. We don't know.

**THE COURT:** Right.

**MS. DEARBORN:** And so all we have -- both parties are

in the same boat here. All we have is we have pieces of

1 circumstantial evidence that we can try to use.

2      And again, Waymo is going to try to use their own

3 evidence.  They're going to try to tell their own story.

4      And all we are asking is the chance to rebut it.

5           **THE COURT:**  Yes, but their story is more direct.

6 Their story is he downloaded 14,000.  Very shortly thereafter,

7 he left.  He went and formed a company, which he sold to Uber

8 for $680 million.  And then he got in charge of that program.

9 And they claim that they can now trace several of the trade

10 secrets directly into the Uber design.

11      That's not circumstantial evidence.  That's direct

12 evidence that the trade secrets were taken and then used by

13 Uber.

14      And the motive is irrelevant.  You don't even have to

15 prove motive -- do you? -- as long as he takes them.

16           **MR. VERHOEVEN:**  No.

17           **THE COURT:**  So I think these are not analogous

18 circumstances, in my view; that your attempt to prove that he

19 did it for some other reason -- there's direct proof of what he

20 actually did do.

21           **MR. VERHOEVEN:**  Your Honor, may I respond real

22 briefly?  I have three points to make.

23      One.  The answer to your question -- how the dots get

24 connected -- they don't.  Zero evidence.  Number one.

25      Number two, Counsel says that things I went through are

 1  circumstantial evidence; that he was concerned.  Doesn't say

 2  there's circumstantial evidence that he downloaded because of

 3  his bonus; but that he was concerned.

 4      If you look through this, every single -- none of these

 5  pieces of evidence show that Levandowski was concerned.  They

 6  aren't even circumstantial evidence that he was concerned, with

 7  the sole exception of the Gruver transcript, which I

 8  forthrightly read to you.  And that sole piece of evidence is

 9  hearsay.

10      So they have zero evidence -- even circumstantial

11  evidence -- to support this theory.

12      And then finally they say we don't have direct evidence.

13      We have the download testimony we just got, the

14  Stroz Report, in which they've -- Stroz identified 24,000 files

15  from the same server.  And we -- we've been working with Stroz,

16  and we've identified those files; and all but 7 of those files,

17  of the 14,000 downloaded, are found in Levandowski's personal

18  computer in that grouping of 24,000 files.

19      And to say that's circumstantial evidence -- that's silly.

20      And we have more and more and more.

21      So it's apples and oranges here.

22      That we have some circumstantial evidence combined with

23  direct evidence doesn't mean that they get to make up a theory,

24  and say that the jury can just rely on circumstances and

25  timing, and -- when it can't even point Your Honor to a single

 1  piece of admissible evidence.

 2          **MS. DEARBORN:**  I would be very surprised if

 3  Mr. Verhoeven, in Opening Statement, did not tell the jury that

 4  Mr. Levandowski downloaded these files in order to use them at

 5  Uber.  I would be shocked if he didn't say that.

 6      And he has no evidence of that.  There's no evidence that

 7  that is why Mr. Levandowski did what he did.

 8          **THE COURT:**  But there is the follow-on evidence that

 9  he had files; that some of them evidently got used at Uber.  At

10  least, that's the allegation.  I'm not -- that's for the jury

11  to decide.

12          **MS. DEARBORN:**  Yes.

13          **THE COURT:**  And that's direct proof that -- and the

14  timing of it is that he does it right before he leaves, and

15  right when he's setting up a company that he sells for

16  $680 million to Uber.

17      To me, that's pretty strong evidence.

18      And -- but what you have on this alternative theory is

19  exceedingly weak.  It's -- I'm not even sure a rational jury

20  could draw that inference.

21          **MS. DEARBORN:**  So, Your Honor, I actually need to

22  make a very important point right here, which is that what

23  Mr. Verhoeven is doing and what I hear the Court doing is

24  evaluating the strength of the evidence.  And --

25          **THE COURT:**  Under Rule 403, I get to do that.  I do.

1      **MS. DEARBORN:**  Actually, Your Honor, under

2   *United States versus Evans*, which is a Ninth Circuit case that

3   we cited in our papers, the Ninth Circuit held that it is the

4   proper analysis under Rule 402, is to understand the evidence;

5   is to evaluate the probativeness of the evidence, if it is

6   believed, if it is credited.

7      **THE COURT:**  Of course.

8      **MS. DEARBORN:**  So the proper analysis is whether this

9   evidence, if believed, is relevant.  And of course it is,

10  Your Honor.

11     **THE COURT:**  But we don't have a single piece of

12  evidence that says he did it for that reason.  You have

13  evidence about the timing of the bonus; things that are not in

14  controversy.  And then you want to draw a far-fetched,

15  fantastic inference from that, that that's where the probative

16  value comes in.

17     Yeah.  I accept that I have to believe in it, but that --

18  I have to believe the underlying evidence, but not the

19  inference.  The question for the Judge is:  Is that inference

20  probative?

21     All right.  Ms. Dearborn, you get to say one last thing,

22  and then it's time for our break.  So we're going to take a

23  break for 15 minutes.  Go ahead.  One last thing.

24     **MS. DEARBORN:**  Yeah.  Yes, Your Honor.

25     I again reemphasize that both parties are marshaling

 1  circumstantial evidence; that the probativeness of the evidence

 2  is for the jury to decide.

 3       And we have laid out on multiple occasions the

 4  circumstantial evidence that we -- that we have, in addition

 5  to -- on this theory, we have laid out on June 28th, and we

 6  laid it out in June 29th in a hearing.  We have -- we offered

 7  up proof.  We submitted an offer of proof on corroborating

 8  evidence.  That's Docket 829.  And we responded to it in

 9  response to Waymo's Interrogatory Number 9.

10       This has been part of the case for a long time.  If they

11  want to argue that our inferences are unreasonable, they get to

12  argue that before the jury, Your Honor; but we would submit

13  that we get to submit this.

14       **THE COURT:**  All right.  Under submission.

15       Let me leave for the 15-minute break with one last thing

16  that I always want to make sure I say at the final pre-trial

17  conference; and that is sometimes a party wins a motion *in*

18  *limine*, and items get excluded.  And then when we get to the

19  trial, they wind up opening the door, by making some argument

20  that takes unfair advantage of the exclusion.  Then I just open

21  the door, and let it back in.

22       So both sides are in this position where -- I promise

23  you -- it's just not right to take advantage of -- make an

24  unfair argument based upon an exclusion.  So that goes for both

25  of you.  And just keep that in mind.

1     All right.  We'll take a 15-minute break.  Thank you.

2  (Recess taken from 9:45 a.m. until     .m.)

3              (Proceedings resumed at 10:01 a.m.)

4        **THE COURT:**  All right.  Be seated, please.  Thank

5  you.

6     Back to work.

7     Okay.  Let's see if we can work on some more

8  *motions in limine*.

9     If I understand this one, Otto Trucking wants to exclude

10  any reference to Levandowski's downloading of 14,000 files on

11  account of Sasha saying they were low value and that this was

12  not suspicious.

13     Okay.  I'm missing something, but to me this is a

14  nonstarter.  I don't know why you would even make this motion.

15        **MR. CHATTERJEE:**  Your Honor, what we're talking about

16  here is really about an argument that they want to make about

17  anomalous behavior.

18     And the reason why is because we have tried to probe into

19  the metadata and the log data that Google has associated with

20  activities of Mr. Levandowski and other Chauffeur members and

21  to see is this downloading activity typical or atypical.

22     We know now that when you follow the instructions, that

23  there's a full checkout that occurs.  We know that now.  I

24  don't think that's really in dispute.

25     But when we tried to probe into the discovery around all

 1   the logs for Mr. Levandowski's activities -- for example, had

 2   he used card readers before -- there's evidence from other

 3   people that they did use card readers on the floor of Google's

 4   research projects, that those are things that they did there.

 5        And for Waymo or Google to preclude us from having that

 6   discovery but then to suggest that this is anomalous behavior

 7   where we can't test it is not a fair thing to do.

 8        **THE COURT:**  What do you mean they precluded you from

 9   having discovery?

10        **MR. CHATTERJEE:**  So we asked for all the log data

11   associated with Mr. Levandowski and other Chauffeur members.

12   That was the same thing that Mr. Brown used to triangulate on

13   the specific downloading activity, but we asked for a longer

14   time period looking for information about that.  They said it's

15   too difficult and they wouldn't give it to us.

16        **THE COURT:**  Well, what did the magistrate judge say?

17        **MR. CHATTERJEE:**  We went to the magistrate judge when

18   they said it was too difficult.  We asked for a set of

19   stipulations on those issues, and the magistrate judge said

20   that we could not get that stipulation from them.

21        **THE COURT:**  If she's ruled against you, maybe you had

22   asked for the wrong thing, and now you want me to bail you out.

23        **MR. CHATTERJEE:**  Your Honor, all we're asking for is

24   that they can't come in and say that there was unusual behavior

25   but then preclude us.  That's submission of an item that

 1  they're trying to make -- inference to make to the jury but

 2  refusing to produce it on the grounds of burden and letting us

 3  test that.  They shouldn't be allowed to do that, Your Honor.

 4          **THE COURT:**  All right.  Let me hear from the other

 5  side.

 6          **MR. PERLSON:**  Your Honor, this is -- most of the

 7  motion, frankly, is about the statements about low value and

 8  things that we spent all that time on last week.  There's one

 9  small portion of it that deals with what he says, but we've

10  produced logs -- all sorts of logs in this case.  They've asked

11  witnesses about this issue, several witnesses about this issue;

12  and then --

13          **THE COURT:**  Well, what is it you did not produce so

14  that I can --

15          **MR. PERLSON:**  I don't know what he's talking about.

16          **THE COURT:**  He said you produced zero logs other than

17  Levandowski.

18      Is that true?  Is that what you're saying?

19          **MR. CHATTERJEE:**  Your Honor, I can tell you exactly

20  what they did produce.  With the SVN system, they produced I

21  think 20 sample logs associated with other users' behavior.

22  Almost all of them showed that there were full checkouts from

23  the different users at --

24          **THE COURT:**  Why can't you, then, use that evidence to

25  make your point?

 1          **MR. CHATTERJEE:**  Because the suggestion that Waymo is

 2   trying to make in this case is that this was an unusual

 3   activity by Mr. Levandowski.

 4          There are other units of data, such as the Uber proxy

 5   logs, the MoMA logs, and other logs that are internal to Google

 6   that they did not produce us -- produce information on except

 7   for the isolated incident of Mr. Levandowski's so-called

 8   downloading in December of 2014.

 9          **THE COURT:**  Say that last part again.  You're saying

10   there's some kind of log that they only produced on Levandowski

11   but nobody else?

12          **MR. CHATTERJEE:**  Correct.  And they --

13          **THE COURT:**  What's the name of that kind of log?

14          **MR. CHATTERJEE:**  One of them is called the Uber Proxy

15   Log.

16          **THE COURT:**  All right.  Let's stop there.

17       Is that true?  Uber Proxy Log?

18          **MR. PERLSON:**  Your Honor, this isn't -- the specifics

19   that he's talking about isn't in his motion.  I don't know

20   every single log that's been produced, but we've produced logs

21   far beyond Levandowski as he acknowledges.

22       We produced logs for -- like full SVN log data, not just

23   for Levandowski but every individual who accessed the SVN

24   server.  We produced that in June of this year.

25       And we did object to other log data, but the Court said,

1   "If you want other log data, you should move to compel," and

2   they didn't.

3        **THE COURT:**  I don't get this part right here.

4        Look, your company -- maybe it's not your company, but

5   it's the Uber company -- has now hired away all these engineers

6   from Waymo.  You've got ready-made dozens of engineers who

7   could come in and say just what you're saying, "Yeah, I've used

8   that SVN system and what you're describing there is not

9   unusual."

10       You've got plenty of people who could debunk the theory if

11  it's -- but now instead of doing that and going to your own

12  people, you're blaming them for not turning over evidence.

13       **MR. CHATTERJEE:**  Your Honor, they're going to use --

14  they're going to have two forensic people come in, and this is

15  tied at some level to the *Daubert* motions we filed on Gary

16  Brown and Kristinn Gudjonsson who are going to try and suggest

17  that the activity was unusual, but they didn't look at any of

18  that other data and they wouldn't let us test those opinions.

19       That is different than the users saying they did it

20  because the metadata will say whether it happened or not.

21       **THE COURT:**  Look, I'm denying this motion.  This is a

22  half-baked motion, and the evidence is quite strong that

23  Levandowski downloaded these, then left, sold the company for

24  $680 million.  That's what the whole due diligence thing was

25  about.

1   And to suggest that he -- that everybody else in the

2   company did the same thing he did, there's probably zero people

3   who did what he did.  And you have total access to lots of them

4   that work for your own company; and if they think it was so

5   innocent, they can come in and say so.

6        So this motion is D-E-N-Y, denied.  Thank you.

7             **MR. PERLSON:**  Thank you.

8             **MR. CHATTERJEE:**  Thank you, Your Honor.

9             **THE COURT:**  All right.  Now we go to Number 2.

10   No.  That gives me a headache to think about Number 2.

11   We're not going to go to Number 2 right now.

12        One thing I want to be clear again, I want to say this.

13   Waymo should not say to the jury that Uber tried to withhold

14   the Uber due diligence report after they changed their

15   position.  Now, it's true they did that up to a point, but it

16   was Levandowski that took that appeal.

17        So you must be honest with the jury about that.  If you're

18   not, I'm going to interrupt your argument, even your opening

19   statement, and correct it.

20        Okay.  Now we go to the Benchmark lawsuit.  To me, all of

21   this should be excluded.  I should grant Number 22.  So let's

22   hear from Waymo as to why this should come into evidence but

23   the stuff you're trying to keep out that's of equivalent low

24   value should be excluded.

25             **MR. VERHOEVEN:**  Your Honor, first point, there's two

1    issues that they're combining in this *motion in limine*.  One is

2    reference to this lawsuit -- to the Benchmark lawsuit.

3              **THE COURT:**  Benchmark.

4              **MR. VERHOEVEN:**  Right.

5              **THE COURT:**  Correct.

6              **MR. VERHOEVEN:**  The other is the testimony from a

7    percipient witness, Mr. Gurley, about his knowledge at the

8    time, his conversations as a board member of Uber with

9    Mr. Kalanick and with the other board members, and that

10   testimony is highly, highly relevant.

11             **THE COURT:**  Read it to me.  Tell me what he said that

12   was so fantastic.

13             **MR. VERHOEVEN:**  Well, he said that -- I'll paraphrase

14   in the interest of time, and if you want to actually see it --

15             **THE COURT:**  All right.

16             **MR. VERHOEVEN:**  He said that he was involved in the

17   decision of whether or not to make the acquisition, that was a

18   board-level decision of Ottomotto; that Mr. Kalanick made a

19   presentation to the board.  There's a document that's in

20   evidence -- that's been produced of that presentation.

21   I asked him questions about what was said about the

22   various parts of the document.  He told me what was said.  He's

23   told me that Mr. Kalanick said -- there's a lot of references

24   in the document to due diligence.  There's a reference to the

25   due diligence report.  There's a reference to indemnity.

1    I asked him about these things.  He said that Mr. Kalanick

2 told the board that the Stroz report of that investigation came

3 up clean is what he said.

4    He testified that he obtained the Stroz report later and

5 that he read it for the first time later, and that he was -- I

6 can't remember his exact words, but he was very angry; and he

7 testified that if he had known what the Stroz report actually

8 said at the time that they were making the decision on the

9 acquisition, he would have voted no.

10    So that's one series of very important --

11           THE COURT:  All right.  Let's just hold that one.

12           MR. VERHOEVEN:  Okay.

13           THE COURT:  Okay.  What do you say to the testimony

14 of Gurley on the point that I just heard?

15        MS. DUNN:  The first thing I would say, Your Honor,

16 is this is present-day testimony of someone who is suing

17 Mr. Kalanick in a separate lawsuit.

18           THE COURT:  Gurley is?

19        MS. DUNN:  Correct.  Benchmark is.

20    And Mr. Gurley was deposed under oath knowing full well

21 that his under-oath testimony would impact this new lawsuit

22 that Benchmark has brought against Mr. Kalanick, and so his

23 testimony must be looked at through that prism.

24    And I will incidentally say that that lawsuit was even

25 characterized by Mr. Verhoeven's firm, who represented a

different shareholder in it, as being inflammatory and having a

goal of vilifying Mr. Kalanick and getting press attention.  So

that's the first thing I would say.

The second thing I would say, as to present-day

speculative comments about what Mr. Gurley might have thought

in April of 2016 is that the Stroz report was not even done

until August.  So he can't even -- it's like speculation on top

of speculation, what he might have thought in April about a

report in August that he is saying in the present day.

**THE COURT:**  All right.  Some of that's a good point,

but there was not -- the thing about Kalanick said it was clean

is not a present-day deal.  That's a historical fact if it

occurred, and why wouldn't that be admissible?

**MS. DUNN:**  Well, this was to my first point, which is

that I think Mr. Gurley's entire testimony needs to be looked

at by Your Honor as somebody who is testifying with the

knowledge that he is separately suing Mr. Kalanick.

**THE COURT:**  All right.

**MS. DUNN:**  But --

**THE COURT:**  I have that in mind.

**MS. DUNN:**  Okay.

**THE COURT:**  But that doesn't automatically exclude

somebody.

**MS. DUNN:**  I understand that.

And I think that in our motion we allow for the fact that

1  Mr. Gurley has very limited firsthand knowledge about the

2  events here; and if he is allowed to come to court and says

3  what Mr. Verhoeven just says he said, he will be vigorously

4  cross-examined as to that.

5          **THE COURT:**  Well, I mean, is your view that Kalanick

6  did not say to the board that the Stroz report came up clean?

7          **MS. DUNN:**  Your Honor, Mr. Kalanick is set to be

8  deposed, presumably by Mr. Verhoeven, several days from now,

9  and I don't wish to --

10         **THE COURT:**  All right.  So --

11         **MR. VERHOEVEN:**  So they instructed us not to -- they

12  instructed the witness not to answer those questions,

13  Your Honor.

14         **MS. DUNN:**  Your Honor, his last deposition, just to

15  be clear about this again, happened before the Federal Circuit

16  ruled on Stroz.  So that is precisely why Mr. Verhoeven gets

17  to --

18         **THE COURT:**  All right.

19         **MS. DUNN:**  -- redepose.

20         **THE COURT:**  All right.  When is his deposition?

21         **MS. DUNN:**  October 2nd.

22         **THE COURT:**  All right.  I understand enough about

23  that.

24         **MR. VERHOEVEN:**  Your Honor, may I respond briefly?

25         **THE COURT:**  Wait a minute.

1                    (Pause in proceedings.)

2          **THE COURT:**  Okay.  Yes, please.

3          **MR. VERHOEVEN:**  First of all, we noticed Gurley's

4    deposition before there was any lawsuit.  We noticed it six

5    weeks.  We had to move to compel it, and Judge Corley granted

6    that motion.  Obviously the magistrate judge thought his

7    testimony was relevant.

8          Just so you know, that Uber would refuse -- or the notion

9    that Uber isn't working with Benchmark is silly.  I took the

10   deposition.  They were all lined up on the -- all the counsel

11   for everybody was lined up on the table on the other side.

12   They all agreed that objection for one will be objection for

13   all of them.  It was like me against a field of 20 people.  So

14   the notion that they aren't still cooperating as with respect

15   to this lawsuit is silly.

16         Two, the only thing I've heard is, "Hey, he is biased

17   because his company filed a lawsuit."  But under that

18   reasoning, Your Honor, there wouldn't be any witnesses in this

19   case because all of the percipient witnesses are a part of a

20   company that is involved in this case, and you can make

21   arguments about bias as to any of them.  That doesn't support

22   excluding important detailed testimony.

23         Gurley testified under oath as to percipient events as a

24   percipient witness, and I just gave you one example of his

25   testimony that's relevant.

1      He also --

2           **THE COURT:**  The part about what he would have done is

3    not so relevant.  That's just hindsight with the benefit of

4    somebody who is suing him --

5           **MR. VERHOEVEN:**  Well, Your Honor --

6           **THE COURT:**  -- but the percipient testimony that he

7    said clean, okay, I think you've got a stronger point there.

8      What else did he say on a percipient basis?

9           **MR. VERHOEVEN:**  Well, he said -- before I go to the

10   other thing, just one sentence on that.  No one else can say

11   what he would have done if he'd known about it.  It's about

12   what he would have done back then.  It's not about his opinion

13   today.

14     If we can't ask him that --

15          **THE COURT:**  The way to get at it is a different way.

16   The way to ask that question is:  Was that a material point to

17   you that they said it was clean?

18          **MR. VERHOEVEN:**  I did ask that.

19          **THE COURT:**  All right.  Well, then --

20          **MR. VERHOEVEN:**  And he said it was --

21          **THE COURT:**  -- he can explain why it was material.

22          **MR. VERHOEVEN:**  He said it was critical.

23          **THE COURT:**  All right.  But then you don't get to ask

24   the question, over objection anyway, "Would you have done it?"

25   I know that people get away with that all the time, but that

 1  technically is -- it's not worth much at this stage.

 2          **MR. VERHOEVEN:**  In any event, moving on, he also was

 3  personally present at board meetings.  You've heard that

 4  Mr. Gonzalez has told you vehemently that Uber intends to

 5  present to the jury this story that Levandowski wasn't

 6  cooperating and the whole thing about Uber being different than

 7  Levandowski.

 8      Well, this testimony is highly relevant to that.  He

 9  testified that he was -- as to his statements at board meetings

10  where Mr. Kalanick was present, where he recommended, based on

11  what he called best practices, that Mr. Levandowski be fired,

12  repeatedly he did this.

13          **THE COURT:**  Who is the "he" you're talking about?

14          **MR. VERHOEVEN:**  Mr. Gurley, a board member of Uber.

15      And that Mr. Kalanick solely voted not to do it several

16  times.  He testified that they had to set up a special

17  committee to try and deal with the resistance from Kalanick.

18          **THE COURT:**  Well, are you going to get -- I mean, why

19  wouldn't that part be relevant?  Since Uber itself is going to

20  place in evidence the fact that they fired Levandowski, why

21  can't the other side get into the history that led up to that

22  decision?

23          **MS. DUNN:**  Your Honor, first of all, I think this is

24  why it is best to not paraphrase from deposition testimony,

25  because this is not a precise characterization of what

1  Mr. Gurley said about Mr. Kalanick's decision to fire

2  Mr. Levandowski.

3          **THE COURT:**  What did he say?

4          **MS. DUNN:**  It's also not germane to Your Honor's

5  decision, but I think it's important that we're clear.

6      Mr. Gurley also talks about a board meeting where before

7  it even starts, Mr. Kalanick comes in and announces his

8  decision to terminate Mr. Levandowski, which he did make.

9      I think that there are a couple things I want to just

10  aggregate.  The first thing is testimony that is entirely

11  speculative, as Your Honor says, which is what Bill Gurley or

12  Benchmark would have thought in April based on information that

13  they couldn't have even had in April and only have now when

14  they're suing.

15          **THE COURT:**  When you say they could not have had it

16  in April, wasn't in April -- didn't Morrison & Foerster have

17  the preliminary version of the due diligence report by then?

18          **MS. DUNN:**  There was no written report in April.

19  They had an oral.

20          **THE COURT:**  All right.  So maybe that's what they

21  were referring to when they said it was clean.

22          **MS. DUNN:**  I don't think we should take on faith that

23  that was said.

24          **THE COURT:**  Yes, but -- I'm not --

25          **MS. DUNN:**  Right.

1          **THE COURT:** -- but your point about timing is April

2    versus August, and I'm saying to you there were two steps in

3    the due diligence; one was preliminary, one was final.

4          **MS. DUNN:** Correct.

5          **THE COURT:** As far as I can tell, nobody ever looked

6    at the final. Nobody. They did the deal already, and I don't

7    know if anybody ever looked at the final, but that preliminary

8    report was very important. Maybe that's -- conceivably it fits

9    with the timing.

10         **MS. DUNN:** Well, the topic of due diligence was

11   discussed at the board meeting, that is true.

12         The statement at issue by Mr. Gurley is, sitting here now,

13   he says, "Well, if I had seen this report."

14         **THE COURT:** I'm telling you that that would not be

15   permissible --

16         **MS. DUNN:** Right. Great.

17         **THE COURT:** -- but he would be able to say, "In my

18   view, this was a material representation that it was clean."

19   Because if that, in fact, was true and actually in his mind at

20   the time, that's legitimate to put before the jury.

21         **MS. DUNN:** I think the difficulty here -- Your Honor,

22   ordinarily I would agree with that. Obviously as a percipient

23   witness, even somebody who has -- he has extremely limited

24   firsthand knowledge of events, but there were board meetings he

25   was at where he could testify to his own -- you know, what he

 1 | thought and his statements.

 2 |     The issue that we have now is really the problem that the

 3 | Benchmark lawsuit discusses the Stroz report.  So you have

 4 | Mr. Gurley being deposed now having several weeks ago filed a

 5 | lawsuit; and when he comes in and says something now, it is

 6 | very likely with full cognizance in service of Benchmark's

 7 | lawsuit.

 8 |     So I don't know how valuable that testimony could possibly

 9 | be given that now there's this other lawsuit messing things up.

10 |     **THE COURT:**  Yeah, it messes it up, but everyone in

11 | this lawsuit has some axe to grind already by virtue of this

12 | lawsuit.  So --

13 |     **MS. DUNN:**  Well, I think it's different to be in

14 | active litigation against somebody and then say, "Oh, well,

15 | they said X or Y, you know, two years ago that implicates my

16 | present-day lawsuit."

17 |     And Uber's position, and I think the Court understands, is

18 | that that lawsuit should not come in and shouldn't be an issue

19 | at this trial; but then we have --

20 |     **THE COURT:**  It shouldn't come in unless this:

21 | Unless, let's say, Waymo puts him on the stand to say, "I was

22 | at the board meeting.  He said it was clean.  That was

23 | material."  End of testimony.

24 |     And then you want to cross-examine.  Well, then maybe

25 | you're the one that wants to put in the fact that he's got his

1  own lawsuit going.

2          **MS. DUNN:**  But I think --

3          **THE COURT:**  So I could see it coming up that way.

4  That would be legitimate cross-examination.

5          **MS. DUNN:**  But that puts Uber in a position that it

6  should not be put in, which is that in order to expose

7  Mr. Gurley's evident bias, we have to now introduce the subject

8  of this lawsuit.

9          **THE COURT:**  Well, that happens all the time.  There's

10  nothing -- I mean, there's no God-given right to not be put in

11  that position.

12          **MS. DUNN:**  I was hoping there was a court-given

13  right.

14          **THE COURT:**  No, there's not even a court-given right.

15  So I --

16          **MS. DUNN:**  I understand.  I understand, Your Honor.

17  I think this is -- because of this Benchmark lawsuit, it has

18  complicated the situation unnecessarily.

19          **THE COURT:**  But that would be your decision.  I mean,

20  you could just say, "We'll take our lumps.  We're not even

21  going to get into it," and go to the next witness.

22      I mean, are you really going to quarrel with the fact that

23  the clean due diligence report was a material factor?  Why

24  would you even do the due diligence report if it wasn't going

25  to be a material factor?  Of course, it was material, and it

1  seems to me you would just wave that off and say, "No

2  cross-examination."

3          **MR. VERHOEVEN:**  Your Honor, may I briefly respond?

4      **THE COURT:**  You're not -- you can't put the question:

5  What would you have done?  Over objection, you cannot do that.

6  What would you have done?

7      Now, if the other side starts doing it on all their

8  witnesses, maybe I'll let you get away with it; but that is

9  not -- that does call for a lay opinion, and I think in this

10  case I would not allow that lay opinion.  I think he should

11  just stick to the historical facts, that it was a material fact

12  at the time and he thought it was at the time and here's why he

13  thought it was a material fact at the time.  That would be good

14  enough.

15          **MR. VERHOEVEN:**  Okay.  I mean, I remember hearing

16  Your Honor's discussion about opinion testimony from percipient

17  witnesses earlier, and I remember clearly you said if it's an

18  opinion today and it hasn't been disclosed under Rule 26, then

19  I'm not going to let it happen; but if it relates to that

20  period in time when the witness is a percipient, and so that's

21  all I'm getting at.

22          **THE COURT:**  No, that's not what I said.

23          **MR. VERHOEVEN:**  All right.

24          **THE COURT:**  You're saying if it relates to -- no.  If

25  he had that opinion back then, then it is different from an

opinion that he's recently formed today to comment as in

commentary on the past events; but if he actually had the

opinion back at the time in question that if the report was not

clean, that he would have voted the other way, maybe I would

allow that.

      **MR. VERHOEVEN:** That's what he testified.

      **THE COURT:** You know --

      **MS. DUNN:** Right.

      **THE COURT:** No. Did he? Did he say that or did he

say -- if the question was "What would you have done if you had

known," that's a present-day deal, that would not be allowed.

    But if you were to say, "Okay. Mr. Gurley, back then did

you actually have in mind what you would have done back then if

it had been a nonclean report?"

    He says, "Yes, I actually thought about it and back then I

had such an opinion."

    "Okay. What was it?" Maybe I would allow that, but in

any circumstances I would be highly suspect --

      **MR. VERHOEVEN:** Okay.

      **THE COURT:** -- that he has been primed to say that

and I might not allow that. We might even have to have a

little evidentiary hearing to get to the bottom of that.

      **MR. VERHOEVEN:** Okay. I read you loud and clear.

    Can I just briefly respond?

    It sounds like from what counsel said that there's now an

1  agreement that we can call him and testify about what he has

2  percipient knowledge of.  Maybe I misread that.

3      Secondly --

4          **THE COURT:**  Well, that's what I'm saying.  He's on

5  the board.  He's dealing with the acquisition.  I think, of

6  course, he can do that --

7          **MR. VERHOEVEN:**  Right.

8          **THE COURT:**  -- subject to, you know, something

9  inflammatory that shouldn't come in evidence.  So, yes, what

10 you told me about the due diligence report, I would allow that

11 all day long; that it's clean --

12         **MR. VERHOEVEN:**  Right.

13         **THE COURT:**  -- and that was material, "I voted to

14 approve," those are percipient facts.

15         **MR. VERHOEVEN:**  Right.

16         **MS. DUNN:**  Right.  But just to be --

17         **MR. VERHOEVEN:**  Can I finish, please?

18         **MS. DUNN:**  Just to be clear --

19         **THE COURT:**  Wait.  One of you at a time.

20     Finish your point.

21         **MR. VERHOEVEN:**  I'm just going to finish real

22 briefly.

23     With respect to what counsel says about bias, I mean,

24 she's trying to have her cake and eat it too.  She's trying to

25 exclude this witness because of the complaint for the reason

1   that this witness is biased, but she doesn't want to have to

2   tell the jury why the witness is biased.  That's -- you know,

3   that's --

4            **THE COURT:**  I don't -- look, you win on that point.

5   I'm not going to exclude the witness --

6            **MR. VERHOEVEN:**  Okay.

7            **THE COURT:**  -- on that.

8            **MR. VERHOEVEN:**  And then --

9            **THE COURT:**  For goodness sakes, it's their own board

10  member.  Come on.

11           **MR. VERHOEVEN:**  And then just briefly on the lawsuit

12  part, because I said there are two parts of this.

13           **THE COURT:**  Yeah.

14           **MR. VERHOEVEN:**  On the lawsuit part, we wouldn't be

15  asking to put in, like, the full-on complaint or anything, but

16  this witness testified that he personally reviewed the

17  complaint and that, you know, it has factual allegations in it.

18           **THE COURT:**  You're talking about your complaint or

19  the Benchmark?

20           **MR. VERHOEVEN:**  No, no.  The Benchmark complaint.

21           **THE COURT:**  Look, I'm not going to let you bring out

22  the Benchmark case.  No.  That's too far afield.  You can bring

23  out the things I told you.  If the other side wants to do it

24  for purposes of bias, okay.  I can see that.  But you shouldn't

25  be allowed to front that.

1          **MR. VERHOEVEN:**  Okay.  Understood, Your Honor.

2          **THE COURT:**  All right.

3          **MS. DUNN:**  Your Honor, just a couple very quick

4     points.

5          First of all, we are verifying but do not know whether

6     Mr. -- he was not.  He was never disclosed on their Rule 26

7     disclosures.  So in considering our motion, which we hope

8     you'll take under submission, we ask you to please consider the

9     fact that this individual was never disclosed in the

10    disclosures.

11         The second thing is, as you can --

12         **THE COURT:**  Let's pause on that a minute.  I am

13    strict.  You know, I am pretty strict when it comes to

14    disclosures; but, after all, he was a board member of yours at

15    the time and -- I don't know.  It seems like that would have

16    been an obvious person to think of as a potential witness as to

17    what happened at these board meetings, so I'm not -- I don't

18    know.  Maybe I would forgive that one in this case.

19         **MR. VERHOEVEN:**  In addition, Your Honor, his

20    relevance became clear once we learned some facts about the

21    Stroz report; to wit, that he read it and we became -- it

22    became clear that he had important knowledge.  We noticed it

23    promptly.  They fought it.  Judge Corley said we're entitled to

24    it.  The idea they're being surprised is silly.

25         **MS. DUNN:**  Actually, wait a second, because that's

1  exactly the point.  He read it in the course of this

2  litigation.

3      This is a case about misappropriation of trade secrets.

4  It's not a case about what this board member thinks today about

5  the Stroz report.  Mr. Verhoeven just made my point better than

6  I can, but he was not disclosed.

7          **THE COURT:**  But, still, he was your board member.

8  He's not like some secret witness that somebody -- it's

9  somebody who is a player on the field who helped to prove this

10 deal.  I --

11         **MS. DUNN:**  Your Honor, there are numerous people on

12 the board at Uber and these people had very little firsthand

13 interaction with the facts of this case.  There are many

14 obvious fact witnesses.  I would say he is not one of them.

15     And as you consider this, Your Honor, in addition to lack

16 of disclosure --

17         **THE COURT:**  All right.  I'm going to consider -- all

18 right.  I will.

19     All right.  We've got to move on.

20         **MR. VERHOEVEN:**  Okay.  One -- can I just for one

21 response?

22         **THE COURT:**  Hold on.

23         **MR. VERHOEVEN:**  They fought successfully to prevent

24 us from deposing those other board members with the exception

25 of Kalanick.

1          **THE COURT:**  All right.  Here we go.  Now we go to

2    one.  Defendants want to preclude Waymo from simply tallying up

3    the entries of defendants' LiDAR communications log to suggest

4    the extent of Levandowski's involvement with the Uber in-house

5    program.

6          Well, why shouldn't they be allowed to do that?  Who's

7    going to argue this?

8          Here comes somebody.

9          It seems to me that if there are 42,012 times that

10   Levandowski had something to do with LiDAR, that that's a

11   probative fact that shows that he was definitely in a position

12   to influence the course and direction of the Uber program, and

13   that that's a fact that the jury can consider.  It won't take

14   much time to present that, and so why isn't that a legitimate

15   thing for the other side to use?

16         **MR. BULAND:**  Your Honor, Cory Buland for Uber.

17         The answer is that adding up the entries on this log is

18   not probative of Mr. Levandowski's involvement with Uber's

19   in-house LiDAR, the specifications to design that are at issue

20   in this case.

21         What was ordered to be put on that log is extremely broad.

22         **THE COURT:**  Well, what did -- remind me what I

23   ordered.  I thought it had to do with LiDAR.  Didn't I use the

24   word "LiDAR" in there?

25         **MR. BULAND:**  Yes, Your Honor, you did, but I think

1  the point is that LiDAR is much broader than Uber's in-house

2  LiDAR.  And in this case everything was logged where the

3  concept of lasers or laser manufacturers, even third parties

4  who had nothing to do with Waymo's product, were mentioned.

5      For example, there's entries on this log where

6  Mr. Levandowski's old boss at Google e-mails him and says,

7  "Hey, I want you to meet this guy who works in lasers.  He

8  might have a product you might be interested in."  That's on

9  the log.  Not probative to the point they're trying to make.

10     So that's --

11         **THE COURT:**  All right.  Hold that thought.

12     What do you say to the fact that the log -- first, how are

13  you going to put this into evidence?  What's going to be the

14  vehicle for getting this into evidence?  A witness?  I mean,

15  who's the witness?

16         **MS. ROBERTS:**  Yes, Your Honor.  It may be any number

17  of witnesses whose communications are listed on the log.

18     And so just to refresh Your Honor's memory --

19         **THE COURT:**  It would have to be somebody who's

20  actually counted them.  So who is that going to be?

21         **MS. ROBERTS:**  And, Your Honor, I think the experts

22  who have reviewed the log have done the counting, and then we

23  also have the percipient witnesses, who were senders or

24  recipients of these communications or participants of these

25  communications, that we can ask about specific communications

1    but the log compiles everything.

2            **THE COURT:**  Somebody's going to have to be able to be

3    cross-examined by the other side to say, "Yeah, those 42,012

4    entries, that includes these silly things too"; right?  That's

5    what they -- they get to make that cross-examination; and if

6    your witness is not willing to admit that, then there will be

7    some trouble with me because they've got to be honest with the

8    jury about what's in there.

9            **MS. ROBERTS:**  So, Your Honor, so, first of all, I

10   just kind of want to revert back to what the log is supposed to

11   be since you asked for a recollection.

12          So your preliminary injunction order, paragraph 5, says

13   (reading):

14          "By June 23rd at noon, Waymo's counsel" -- "Uber is

15          supposed to provide Waymo's counsel and the Court

16          with a complete and chronologically organized log of

17          all oral and written communications, including

18          without limitation conferences, meetings, phone

19          calls, one-on-one conversations, texts, e-mails,

20          letters, memos, and voice mails, wherein Anthony

21          Levandowski mentioned LiDAR to any officer, director,

22          employee, agent, supplier, or consultant of

23          defendants."

24          So, Your Honor, if the log includes communications with

25   vendors, for example, that would fall squarely within what you

1 asked for, and we would like to use it in the way that you

2 asked for it.  Those are all opportunities for Mr. Levandowski

3 to discuss Waymo's trade secrets.

4      In terms of a witness who will get it in, like I said, we

5 have an expert who has reviewed the log, we have the percipient

6 witnesses who communicated, and --

7           **THE COURT:**  Who is that expert?

8           **MS. ROBERTS:**  I believe Dr. Hesselink testified.

9           **THE COURT:**  What if he gets excluded?  What's next

10 then?

11           **MS. ROBERTS:**  I believe Ms. Padilla also is a fact

12 witness --

13           **THE COURT:**  All right.

14           **MS. ROBERTS:**  -- and is likely we would certainly ask

15 her about that.

16           **THE COURT:**  She's going to be able to say that, "Yes,

17 this includes some silly items too"; right?

18      Just to move this along, here's what I think.  I've got to

19 make a ruling.  You get to use the number and you will read or

20 the witness will read what the description was that was in that

21 order -- I'm not sure you get to say it was an order, but maybe

22 you do -- and then say whatever the number was and that Uber

23 reported that number back.

24      And then if the other side wants to bring out that, yes,

25 there were some silly things in there too that have nothing to

1  do with trade secrets, then they get the right to do that, and

2  the witness should be prepared to forthrightly answer those

3  points.

4      This one will -- this is not a major point.  You've got

5  to -- so, please, please, that's it.  Okay?  No more on that

6  one.

7      Now, we go to defendants want to exclude as unduly

8  prejudicial certain financial information that relates to

9  Waymo's damages theory.  This relates to Wagner.

10      All right.  I'll deal with that in the Wagner order.

11      All right.  Next, defendants want to exclude evidence of

12  Levandowski's downloading of 14,000 files.  I've already ruled

13  on that.  We're not going to -- that comes into evidence.

14      Next, *Daubert* motion re Hesselink.  All right.  This one

15  we may need to spend some time on.

16      Who's going to argue this?

17      So help me understand your main points.  And, please, I've

18  got to stress to both sides -- both sides -- please don't give

19  me a half-truth.  I need to understand the whole truth.  So

20  help me understand why Hesselink should be excluded here or not

21  excluded.

22      Please go ahead.

23          **MR. CHATTERJEE:**  Okay, Your Honor.

24      With Dr. Hesselink, this is the expert that Your Honor

25  previously described at the summary judgment hearing before and

1  had serious questions as to his methodologies.  I won't restate

2  the verbiage Your Honor used, but we have a narrow *Daubert* here

3  on paragraphs 65 to 72 of his expert report.

4       And what Dr. Hesselink is talking about there is

5  essentially the trade secret level protections around the SVN

6  server, and he basically parrots the language of a witness on

7  the preliminary injunction, Michael Janosko, and he also talks

8  about protections that are unrelated to the SVN server in

9  trying to pursue his theory of why there are substantial

10 protections around the SVN server.

11      He never tried to access it himself.  He never tried to

12 use it.  He never looked at an access log.  He never

13 independently tried to verify how it worked.

14      And, in fact, Mr. Janosko, when he was deposed about it,

15 he pointed the finger back at Mr. Zbrozek.  Dr. Hesselink never

16 talked to Mr. Zbrozek.  He never talked to an SVN

17 administrator.

18           **THE COURT:**  Wait a minute.  Is that Sasha?

19           **MR. CHATTERJEE:**  Sasha, yes.

20           **THE COURT:**  All right.  So what did Janosko say in

21 his original declaration?  Help me out.  Let's go back to that

22 point.

23           **MR. CHATTERJEE:**  What Mr. Janosko said in his

24 original declaration was, he said that there were substantial

25 protections associated with the SVN server; such as,

1  communications to and from the server are encrypted.  He said

2  that the access controls were regularly monitored and purged

3  for people who no longer should have access to it, and

4  information such as that.

5      When he was questioned in deposition about those issues,

6  he actually disclaimed any knowledge of that.  He said, "Well,

7  I learned of anything that I said in my declaration from

8  Mr. Sasha Zbrozek."

9           **THE COURT:**  And he put something into the

10  U.S. District Court under oath saying he had personal knowledge

11  but he did not have personal knowledge?

12           **MR. CHATTERJEE:**  Yes, Your Honor, that's a very

13  significant issue from our perspective, and we learned that in

14  his deposition.

15           **THE COURT:**  Did he say in his declaration that it was

16  on information and belief or --

17           **MR. CHATTERJEE:**  My recollection, Your Honor, is that

18  he put it in based on his personal knowledge, but I cannot say

19  that for certain because I didn't review the declaration.

20           **THE COURT:**  Can somebody show me that declaration?

21  Well, maybe --

22           **MR. PERLSON:**  I have a copy of it, Your Honor.

23           **THE COURT:**  -- you know the answer.

24      Did he qualify it with information and belief?

25           **MR. PERLSON:**  It doesn't say on information and

1  belief, Your Honor.  This was the --

2          **THE COURT:**  Well, is it true, then, that it was on

3  information and belief?

4          **MR. PERLSON:**  Well, it is from the communications he

5  had with Mr. Zbrozek, that's true.

6          **THE COURT:**  That's hearsay, isn't it?

7          **MR. PERLSON:**  Well, he also went and they deposed him

8  on -- back in March, and he said then, as he repeated in his

9  recent deposition, that he also went and personally looked at,

10 you know, the screen shots from the SVN server to verify these

11 statements.

12     So, for example, in his deposition, this was recently on

13 August 25th, said (reading):

14          **"QUESTION:**  Did you have any independent

15          knowledge of your own aside from what he told

16          you?

17          **"ANSWER:**    No.  I'm sorry.  I verified his

18          information.

19          **"QUESTION:**  What did you do to verify his

20          information?

21          **"ANSWER:**    I looked at change logs for

22          reviewing active users.  So one of the

23          controls is that they review the user list

24          for appropriateness and I saw the process in

25          action.

1    "I also saw the configuration of a client's service

2    for subversion where you actually -- where you have

3    to enter the user name and password, and that

4    actually is encrypted.

5    "And I am also aware that users that don't have

6    authorized access to the service are not permitted to

7    access it."

8    And this is on -- I think this was cited in our brief, but

9  it's on page 17 of that deposition.

10    And I don't think it's in the papers, but I think he

11  said -- Mr. Janosko said something similar at his deposition

12  when they asked him these same sorts of questions.  And it

13  was -- and also in that deposition, when they asked who is the

14  administrator, he pointed back to Mr. Zbrozek.

15    So he had discussions with -- and the issue here really

16  should be whether the information that's being relied upon is

17  reliable.  And the declaration, you know, notes that -- none of

18  the facts that are actually in the declaration are disputed.

19  They don't dispute any of those facts, and they're just saying

20  that he was told those facts by someone else, which he then

21  later verified.

22    And so there's no dispute that what we're actually talking

23  about is the correct manner in which the SVN server works.  So

24  this really -- there's no legitimate reliability issue here.

25    And I'll also note just -- and just so that it doesn't get

1  lost here, because I think it does get lost in their motion, is

2  that he didn't only rely on, first of all, on Mr. Janosko in

3  relation to the SVN server.  He also cited Mr. Droz's

4  declaration.

5           **THE COURT:**  Why does he even get into this anyway?

6  Why is the expert Hesselink getting into this?

7           **MR. PERLSON:**  Well, this is -- and this is -- and as

8  Mr. Chatterjee said, this is a pretty narrow aspect of his

9  report, but one of the things that he goes into in his report

10 is, you know, that Waymo takes reasonable measures to ensure

11 people protect its trade secrets.

12          **THE COURT:**  But he doesn't have any firsthand

13 knowledge.  He's just basing it upon something that's hearsay

14 from Janosko.

15          **MR. PERLSON:**  Well, but that's what, I mean, experts

16 do based on their --

17          **THE COURT:**  No, they don't.

18          **MR. PERLSON:**  Well, it's not just hearsay.

19          **THE COURT:**  Not in this court.  Not in this court.

20 Here's what happens in this court.

21      Well, first, I want to back up.  I practiced for 25 years

22 and over those 25 years before I got this job, lawyers realized

23 it was easier to go pay some expert to say anything that you

24 thought could fly than it was to go out and find a fact witness

25 who would actually testify to it.

1    So instead of bringing in Sasha to testify to this, now

2  you want to pay some expert to glide over all that and to say

3  it.  Well, I don't buy that.

4    I think it's in the Court's discretion whether to let an

5  expert or any opinion under Rule 702/703 to be -- rely upon

6  hearsay.  And sometimes I allow it when I think it's not in

7  controversy.  Sometimes I don't allow it when I think we ought

8  to hear the actual firsthand fact witnesses and let them.

9    So maybe one solution here seems to be is you call

10 Sasha -- you -- to testify about how this SVN got protected up

11 and down and left and right; and then whenever Mr. Hesselink

12 comes along, all he's got to do is say, "I listened to what

13 Sasha said and based on that, I think they took reasonable

14 procedures."

15    To me, that would be fine if you were going to do that.

16 If what you're trying to do is because Sasha won't support you

17 and Sasha has gone off the reservation and Sasha is now

18 stabbing you in the back and you don't want to call him anymore

19 and you're trying to get the expert to paper over it, no.  I

20 don't like that.

21    So can't you just call Sasha and fix this problem?

22    **MR. PERLSON:**  I understand, Your Honor, and I take

23 that under advisement and understand.

24    And just to be clear, I mean, that's essentially what

25 we're trying to accomplish here is saying that this is what

1  they've done and this is reasonable.

2      And I also want to say just two things -- or another thing

3  first.

4      The SVN server is just one portion of the reasonable

5  measures opinion that Mr. Hesselink has brought.  There's --

6  additionally he goes into other measures taken, such as, you

7  know, other places at Google.

8      The SVN server is obviously just one place where this

9  stuff was, but there's all sorts of Waymo confidential

10  information that people use on a day-to-day basis, and so he

11  also addresses some of that stuff; and that is what the

12  majority of Mr. Janosko's deposition is -- or, I mean,

13  declaration is, and they have challenged none of that as

14  hearsay.

15      So the notion that, you know, it's all about the SVN

16  server and that's the only thing that's relevant here

17  misrepresents both Mr. Hesselink's opinion, as well as

18  Mr. Janosko's deposition -- declaration.

19          **THE COURT:**  All right.  Let me ask the other side.

20      Mr. Chatterjee, what do you think about my approach that

21  Sasha comes in, testifies about the SVN and all the safeguards,

22  and then Hesselink can come in and say, "Well, that all is

23  reasonable and that's why it's a trade secret"?

24          **MR. CHATTERJEE:**  So, Your Honor, I think that there

25  are two issues there.  One, even today they have not put Sasha

1  Zbrozek on their Rule 26 disclosure.

2          **THE COURT:**  Yeah, but you know all about him so

3  that's fine.

4          **MR. CHATTERJEE:**  We do.

5          **THE COURT:**  And you were complaining a minute ago,

6  they didn't -- see, you were -- oh, God.

7      Who was it was complaining that you didn't know about the

8  board?  You.  Okay.

9          **MR. CHATTERJEE:**  The second issue is what Mr. Zbrozek

10  said or didn't say is not what he's relying upon in the

11  foundations for his opinions here.

12          **THE COURT:**  This one -- I don't like letting -- major

13  fixes are out of the question but minor fixes like this, minor

14  fixes, it's okay to get -- let Sasha come in and supply if he's

15  the one that knows the real facts; and then he can give the

16  real facts and then the expert can say, "That's safe enough."

17      All right.

18          **MR. CHATTERJEE:**  There are inconsistencies,

19  Your Honor.

20          **MR. PERLSON:**  I will note that they have an expert on

21  the same issue, too, so --

22          **THE COURT:**  I'm sure they do the same thing.  I need

23  to move on.  That's going to be the ruling.  Sasha first.

24  Sasha lays the foundation and then Hesselink, if he's allowed

25  at all, can testify.

1          **MR. CHATTERJEE:**  Thank you, Your Honor.

2          **THE COURT:**  Thank you.

3      Okay.  Next we go to Timmins, something about Tyco [sic].

4   What is this all about?  Tyto?  Who's going to argue this?

5          So you're really the one on the Waymo side who has the --

6   what is the offer of proof on what you're trying to prove up

7   here, and why does Tyto have anything to do with our case?

8          **MS. L. COOPER:**  So Tyto is another one of Anthony

9   Levandowski's companies.

10         **THE COURT:**  I'm sorry.  Please use the microphone a

11  little bit more.

12         **MS. L. COOPER:**  Tyto is another one of Anthony

13  Levandowski's companies.  He owned the company through a series

14  of shell companies.  The identities of those shell companies

15  are currently confidential.  It's third-party information so

16  I'm not going to name them.  But Tyto is a company that Uber

17  eventually acquired as part of the Uber/Otto acquisition.

18      We have quite a bit of evidence that Anthony had been

19  siphoning off Google trade secrets to Tyto for several years,

20  even before he left Google.

21         **THE COURT:**  Is there one that you can vaguely name so

22  that I could -- is it one of the nine that we have in this

23  case?

24         **MS. L. COOPER:**  It is.  Trade Secret 90.

25         **THE COURT:**  Okay.  So you say Number 90 got sent to

1  Tyto, which eventually Uber acquired?

2         **MS. L. COOPER:**  Correct.

3         **THE COURT:**  Really?  I don't think I ever knew that

4  fact before.  Have you really got proof of that or is that just

5  more speculation?

6         **MS. L. COOPER:**  We really have proof of that.

7         **THE COURT:**  All right.

8         **MS. L. COOPER:**  Even more importantly for the case is

9  Uber has pinned quite a bit of its independent development

10 story on the lead hardware engineer for Fuji.  His name is

11 James Haslim.  He's one of the few people that did not come via

12 Google, and they're pointing to him for independent

13 development, for example, of Trade Secret 2.

14     The fact that James Haslim came from Tyto, another Anthony

15 Levandowski company, destroys his credibility in a way because

16 he's not as clean as Uber has been arguing.

17        **THE COURT:**  So remind me.  Go back over the Haslim

18 résumé so that I can understand his step-by-step of how he was

19 interconnected with Levandowski.  Go over that.

20        **MS. L. COOPER:**  So he worked at Tyto.  Through the

21 course of this case, we've learned that Anthony Levandowski

22 owned Tyto; but when Uber was acquiring Otto, Uber claims they

23 didn't know that Tyto was owned by Levandowski.

24     So from Uber's perspective, they thought they had this

25 great little LiDAR company named Tyto.  There were, I think,

1  between six and eight engineers, one of whom was James Haslim.

2  He was the head LiDAR engineer.  And by acquiring Tyto, they

3  got all of the technology that Tyto had.

4          **THE COURT:**  Where was Tyto even located?

5          **MS. L. COOPER:**  In the Bay Area somewhere.

6          **THE COURT:**  In the Bay Area.  Okay.

7      All right.  So did it have more than one employee?

8          **MS. L. COOPER:**  Six employees but the lead engineer

9  was this guy James Haslim.

10          **THE COURT:**  All right.  Now, did Haslim have any

11  prior contact with Levandowski?

12          **MS. L. COOPER:**  Yes, he did.

13          **THE COURT:**  What was that contact?

14          **MS. L. COOPER:**  He -- I think he testified that

15  Levandowski was around all the time.  He was giving him tech

16  briefings on the technology that Tyto was building.  He didn't

17  actually know that Levandowski was connected to the company

18  through the shell companies, but he said and a number of other

19  Tyto employees said that, you know, Levandowski was around all

20  the time.

21          **THE COURT:**  So prior to Haslim going to Tyto, did

22  those two know each other?

23          **MS. L. COOPER:**  I don't think they did.

24          **THE COURT:**  Okay.  So what year was Tyto formed?

25          **MS. L. COOPER:**  2012.

 1          THE COURT:  When was Haslim hired?

 2          MS. L. COOPER:  I'm told that it's 2012 as well.

 3          THE COURT:  All right.  And who was the person that

 4   he interviewed with at Tyto?

 5          MS. L. COOPER:  Mr. Corredor tells me that one of the

 6   people he interviewed with was Anthony, and this is while

 7   Anthony was working at Google.

 8          THE COURT:  All right.  Then, so you're saying that

 9   Number 90 went to Tyto.

10      Okay.  And then -- all right.  So when did that company

11   get acquired by Uber?

12          MS. L. COOPER:  So -- and some of this has been

13   designated by Uber, but given your advice earlier this morning,

14   I think I can --

15          THE COURT:  Well, wait a minute.  Just a second.

16      I'm going to let -- I don't think any of this deserves to

17   be under seal.  This is a U.S. District Court.  It's a public

18   thing.  I don't see how any of this should be under seal except

19   for what the actual trade secret is, so I'm going to give you

20   permission to go ahead unless somebody wants to throw

21   themselves in front of the train.

22          MS. L. COOPER:  So as part of Uber acquiring Otto,

23   Anthony negotiated for the acquisition of Tyto as well.  So

24   when Uber agreed to acquire Otto, Uber also agreed to acquire

25   Tyto.  What actually happened is before the transaction closed,

 1  Otto acquired Tyto and then Uber acquired Otto and Tyto

 2  together.

 3          THE COURT:  But did Uber know that this was the way

 4  it was being set up?

 5          MS. L. COOPER:  That is a very good question.  So far

 6  they've said that they don't; but very, very senior Uber

 7  executives, including Mr. Kalanick and Mr. Poetzscher, the head

 8  of their corporate development department, reviewed the Tyto

 9  acquisition materials and signed off on them before the

10  acquisition closed.

11          THE COURT:  I'm sorry.  Who were those people?

12          MS. L. COOPER:  Travis Kalanick, CEO, and Cameron

13  Poetzscher.  He's the head -- he's a VP in Uber's corporate

14  development department.  And aside from those two, Anthony

15  Levandowski, of course, also knew.

16          THE COURT:  But that was before he -- he was on the

17  other side of the transaction when it was being done.  In other

18  words, it was Uber negotiating with Levandowski who in turn is

19  folding in Tyto to the deal it sounds like.

20          MS. L. COOPER:  But it was after they signed the term

21  sheet.

22          THE COURT:  All right.  So -- okay.  I have the

23  general picture.

24      So let me hear the other side's view of what the Tyto

25  story is.

1       **MS. DUNN:**  Well, just to clear up a couple things,

2    Mr. Poetzscher will likely testify that they thought Otto was

3    going to acquire Tyto and they also were interested in

4    separately in acquiring Tyto.  Ultimately Otto acquired Tyto

5    and Uber acquired Otto.

6            **THE COURT:**  Who is this?  Poetzscher?

7            **MS. DUNN:**  Yeah.

8            **THE COURT:**  Who is that?

9            **MS. DUNN:**  He is the head of corporate development at

10   Uber.

11           **THE COURT:**  All right.

12           **MS. DUNN:**  And so to Your Honor's question, they

13   didn't know about the relationship of Anthony Levandowski to

14   this company; but what I want to make sure to be incredibly

15   clear with the Court, that this motion isn't about actually any

16   of that.  This is a motion having to do with Waymo's M&A

17   expert, a gentleman by the name of Jim Timmins, who is in his

18   report offering an impermissible legal opinion.  So this is

19   actually quite a narrow motion.

20       I understand the desire to tell the story, but it would

21   require discussing how Trade Secret 90 is actually in Spider,

22   which was discontinued, and more of the tech story than I

23   really --

24           **THE COURT:**  What is the legal opinion?  What is the

25   legal opinion that -- can you at least say that much?

1      **MS. DUNN:**  Yes, I can.

2      So Mr. Timmins wants to be able to testify -- Waymo wants

3   him to be able to testify that Mr. Levandowski through a trust

4   called Bismuth Trust ultimately had control over Tyto.

5      So what we have moved to do is to exclude that opinion

6   from Mr. Timmins, who is not a lawyer and has no expertise in

7   trusts at all, because, first of all, it's an impermissible

8   legal conclusion that an expert should not be offering and then

9   also because Mr. Timmins is not qualified to give it.

10      I heard Your Honor at the beginning of the hearing say

11   that now we can maybe use AEO material.  The transcript of

12   Mr. Timmins' deposition has been designated AEO, which is what

13   the parties have just been doing.  It was taken yesterday.  So

14   I will tell you that the deposition of Mr. Timmins strongly

15   supports our motion because he makes clear that he has no

16   experience at all in interpreting trust documents and simply

17   looked at a document about this trust and then consulted a

18   legal dictionary, and that's how he came up with his opinion.

19      So this motion is not to get into the merits of the Tyto

20   story.  And to the extent the Tyto story is relevant, the issue

21   is that Waymo deposed Uber witnesses who were not aware of the

22   relationship between Mr. Levandowski and this trust to Tyto,

23   and they are concerned that that's a deficiency in their

24   evidence.  So they're looking for this expert, clearly somebody

25   gave him this legal stuff to say, and then he put it in his

report, but it is very clear he's not an expert in this.  He

admitted this is not what his firm does.

**THE COURT:**  What is the -- help me understand.  What

is the chain of ownership?  Does it trace back to Levandowski?

What's the story there?

**MS. DUNN:**  Mr. Levandowski is the settlor of a trust

but he is not the trustee of the trust, and so the trustee of

the trust, who's a different individual, who --

**THE COURT:**  A relative?

**MS. DUNN:**  No, not related.

-- is the trustee of the trust.

So nobody's disputing that if they choose to put on the

fact witnesses that they've deposed, that they can elicit that

testimony.  The only issue that we are bringing, and we brought

it -- you know, frankly, Wagner is our main *Daubert* and we only

brought this because it seems so facially evident that this

expert, this M&A expert should not be allowed to offer this

legal opinion at all.

I think this is a minor issue in the trial potentially,

but as an expert opinion, this just seemed too improper to

not -- to not raise it.

**THE COURT:**  All right.  What do you say -- all right.

I understand the general Tyto story, but they're not trying to

knock that story out.  They're trying to knock out a legal

opinion that he had control over Tyto.  So what do you say to

1  that?

2        **MS. L. COOPER:**  So a couple of things, Your Honor.  I

3  think they are trying to knock the story out because they're

4  trying to prevent this story from getting to the jury in a

5  coherent way.

6     Anthony Levandowski set this chain of trusts up to be as

7  complex and as indecipherable as possible, which is not to

8  say --

9        **THE COURT:**  Well, explain how it was set up.

10        **MS. L. COOPER:**  So --

11        **THE COURT:**  And, again, you need to move the

12  microphone closer to your voice.

13        **MS. L. COOPER:**  I apologize.

14     Ms. Dunn just mentioned that Bismuth Trust is the sort of

15  top trust in the tree.  The one below that is Sandstone.

16        **THE COURT:**  Is what?

17        **MS. L. COOPER:**  Sandstone.

18        **THE COURT:**  Standstone?

19        **MS. L. COOPER:**  Sandstone, S-A-N-D.

20        **THE COURT:**  Sandstone.  That's like what?  Another

21  trust or what?

22        **MS. L. COOPER:**  It's an LLC.

23        **THE COURT:**  LLC.  Okay.

24        **MS. L. COOPER:**  Sandstone owns Tyto.  So this is

25  not -- you know, Mr. Timmins is not opining on the ins and outs

1  of an extremely complex trust and talking about, like, how a

2  trust is administered on a daily basis.  What he's doing is

3  following a pretty simple chain of documents.  We submitted all

4  of the documents with our motion.

5       **THE COURT:**  Well, why doesn't he just recite what the

6  chain of ownership is and leave out the conclusion about

7  control?

8       **MS. L. COOPER:**  He can recite what the chain of

9  ownership is, but the jury is going to need help understanding

10  just some of the basic legal terms.

11       So, for example, the fact that Sandstone is the sole

12  member of Tyto means that Sandstone controls Tyto.  That's what

13  that means.  That's the level of testimony we're expecting from

14  Mr. Timmins.

15       The fact that Anthony Levandowski is the settlor of

16  Bismuth, which is sort of the top trust in the tree, means that

17  he has the power to control what goes on in the entities below.

18       **THE COURT:**  A settlor, is that really true?  I

19  thought the settlor does not get to control.  They're just the

20  person who puts in the money, and it's the trustee that

21  controls.

22       **MS. L. COOPER:**  He's settlor and substituter, which

23  means he can move assets in and out and swap them for equal

24  value.

25       **THE COURT:**  Yeah, but that's still not the same thing

 1  as being the trustee.

 2          **MS. L. COOPER:**  As substituter, you can direct the

 3  trustee.  The trustee is a different trust called the Alaska

 4  Trust Company, and he -- I know he can direct them because he

 5  has done it.  He directed Sandstone to acquire Tyto.

 6          **THE COURT:**  Have you seen that paperwork?

 7          **MS. L. COOPER:**  Yep.  We attached it to our

 8  opposition.

 9          **THE COURT:**  So is that true, that Levandowski

10  directed the trustee to acquire Tyto?

11          **MS. DUNN:**  Your Honor, I don't know the answer to

12  that question.  I know that this is a *Daubert* motion, and the

13  standard for the *Daubert* is not what Anthony Levandowski did.

14  The standard is whether Mr. Timmins, who's not a lawyer, has no

15  experience in trusts, whose firm doesn't do anything with

16  trusts, read these documents and consulted a legal dictionary

17  is a competent expert to testify on this and he isn't.

18      And Ms. Cooper just said, the jury needs help with legal

19  conclusions.  He's just not allowed to do that.

20      If she has these documents into evidence, they're

21  perfectly able to show those documents to the jury, but an

22  M & A expert who has no experience in trusts and admitted as

23  much in deposition really should not be permitted to help the

24  jury analyze them from a legal perspective.

25          **MS. L. COOPER:**  If I could respond to that.

1    So all of the cases defendant cited about experts opining

2  on ultimate legal conclusions, they were cases like, for

3  example, a breach of contract case where somebody called an

4  expert to talk about the interpretation of the contract where

5  that was the ultimate legal issue in the case.

6    This is the complete opposite.  This is not the ultimate

7  legal issue in the case.  It's, like, an adjacent fact and no

8  one even disputes it.  They don't claim that Mr. Timmins'

9  interpretation of these documents is wrong.  They just want to

10 prevent him from explaining them to the jury.

11         **THE COURT:**  What is it -- but what is his

12 qualification to analyze these documents?

13         **MS. L. COOPER:**  He's spent 35 years working on M & A

14 deals.  He works on corporate formation documents, corporate

15 control documents, all the time.  In every --

16         **THE COURT:**  A corporation is not the same as a trust.

17         **MS. L. COOPER:**  But, again, he's not opining on the

18 administration of a trust or how it works, or anything like

19 that.  What he's doing is looking at a chain of control and

20 seeing where it ends, and in his work he does that every day.

21 In any deal you want to know who has the ultimate authority in

22 this company or, as part of this transaction, who am I working

23 with.

24         **THE COURT:**  When was this deposition taken?

25         **MS. DUNN:**  It was yesterday, Your Honor, and we'd be

1   happy to submit as a supplement the relevant excerpts of his

2   deposition.  I think it makes very clear that his involvement

3   with trusts is pretty much limited to personal experience where

4   his brother asked him to perhaps sign some paperwork for a

5   Canadian trust, his brother being an attorney having to do with

6   his family.  Other than that --

7        **THE COURT:**  All right.  Both sides can submit by

8   tomorrow -- is that enough time?  Tomorrow?

9        **MS. L. COOPER:**  Sure.  Yeah.

10       **THE COURT:**  By tomorrow submit any supplement,

11  including any supplemental brief, you want on Mr. Timmins.

12       **MS. DUNN:**  I assume Your Honor wants a page limit on

13  that.

14       **THE COURT:**  Five pages.

15       **MS. DUNN:**  Wow.

16       **THE COURT:**  Okay.  But is Haslim going to be a

17  witness?

18       **MS. L. COOPER:**  Yes, almost undoubtedly, but Ms. Dunn

19  can confirm.

20       **MR. JACOBS:**  Yes, that's correct.

21       **MS. DUNN:**  Yes, he is going to be a witness and these

22  documents will be in evidence, so to have --

23       **THE COURT:**  I want to make it very clear, it would be

24  fair game when he's on the stand to bring out this relationship

25  and the fact that he did not disclose it whenever he submitted

1  his declaration.

2        **MS. L. COOPER:**  Your Honor, just to add to that,

3  Mr. Haslim is not the only one at Uber who should have known

4  about it.  A number of the administrators of Levandowski's

5  trust companies currently work at Uber; and, as I said before,

6  the Tyto acquisition --

7        **THE COURT:**  But did they submit declarations?

8        **MS. L. COOPER:**  Not that I know of, but --

9        **THE COURT:**  I don't know.  I'm not going to get into

10 other people.  I'm just going to say I placed a lot of weight

11 on Haslim's testimony before, and I might not have if I had --

12 to violate my own rule -- if I had known that he was a

13 long-time buddy of Levandowski.

14       **MS. DUNN:**  So because we've gotten into the facts, my

15 understanding is Haslim got to Tyto through a different person

16 named Brent Schwartz.  We can talk about that, but --

17       **THE COURT:**  Well, if he didn't know, he didn't

18 know --

19       **MS. DUNN:**  Right.  But I think --

20       **THE COURT:**  -- but the other side says he knew good

21 and well that Levandowski was behind the scheme.

22       **MS. DUNN:**  Well, let me -- then if that's the

23 take-away, then I should be incredibly clear that the reason

24 they want this expert, who's totally unqualified to say this,

25 is because at Uber people did not know.  And they have deposed

1 all the witnesses they could find on this, and the problem is

2 they did not know.

3    **THE COURT:** But Haslim knew.

4    **MS. DUNN:** I don't -- that is not the case.

5    **THE COURT:** Well --

6    **MS. DUNN:** So --

7    **THE COURT:** They say he knew.

8    **MS. DUNN:** I understand what they say, and Mr. Jacobs

9 has been working closely with Mr. Haslim so should say that,

10 but --

11    **THE COURT:** All right.

12    **MR. JACOBS:** I just wouldn't prejudge this,

13 Your Honor. The Tyto story has emerged in the course of the

14 litigation. Facts have emerged that have been new facts for a

15 lot of people in this case, both lawyers who worked on

16 acquisitions. I just wouldn't prejudge it and let's see what

17 happens.

18    **THE COURT:** I'm not. I'm not. But they are saying

19 they can show that Levandowski was the one that interviewed him

20 for the job.

21   Now, are you really sure of that fact? Now you're looking

22 back --

23    **MS. L. COOPER:** Mr. Corredor is going to come and

24 confirm.

25    **MR. CORREDOR:** Your Honor, Mr. Haslim --

1          THE COURT:  Your name again.

2          MR. CORREDOR:  I'm Mr. Corredor.

3          THE COURT:  Yes.

4          MR. CORREDOR:  Your Honor, Mr. Haslim was very

5   reluctant to use the word "interview" when he was testifying

6   about these facts; but he said that when he was looking for a

7   job at Tyto, Levandowski happened to be there and asked him

8   some questions and talked to him, among other people.

9          THE COURT:  He happened to be at Tyto?

10         MR. CORREDOR:  Yes.

11         THE COURT:  On the premises?

12         MR. CORREDOR:  Yes, when Haslim was interviewing

13  there.

14         THE COURT:  And asked him some questions?

15         MR. CORREDOR:  Yes.

16         THE COURT:  Well, was it under circumstances that

17  would suggest that Levandowski was connected with management of

18  Tyto?

19         MR. CORREDOR:  Yes.  Haslim was interviewing with

20  other people as well, with Brent Schwartz, I believe, perhaps

21  others.

22         THE COURT:  All right.

23         MS. DUNN:  Your Honor, in the interest of judicial

24  efficiency, my question about the supplement that we will

25  submit, our recommendation or thought would be that it be

 1  actually targeted to this *Daubert* issue, which is what our

 2  original motion is about, as opposed to a broad adjudication of

 3  the Tyto story.

 4       **THE COURT:**  It should be targeted, but I won't limit

 5  people to other things -- I mean, exclude other possibilities;

 6  but that is the main issue, you're right.

 7       **MS. DUNN:**  Thank you, Your Honor.

 8       **THE COURT:**  Okay.  The issue on Wagner we've already

 9  addressed.  So now we're going to move to the -- let's go to

10  social media for a minute.

11       What I plan to say to the jury based on your -- to the

12  *venire*, not to the jury -- to the jury of course, but to the

13  broader *venire*, is that these excellent lawyers -- well, first

14  I'll start by saying how important it is that they not Google

15  the case or the lawyers or do any homework of that type.  I'll

16  say that repeatedly through the trial.

17       But when I say it at the initial stage, I will say and

18  just to underscore that the lawyers have agreed that they will

19  not Google information about the potential members of the jury

20  out of respect for their privacy and in order to encourage them

21  to abide by the admonition not to -- the jury not to Google

22  anything about the case.

23       And I understand that both sides now are in total

24  agreement with that.  Am I correct?

25       **MR. GONZALEZ:**  Yes.

 1      **MR. EISEMAN:**  Yes, Your Honor.  We filed a joint

 2  submission.

 3      **THE COURT:**  Yes, I saw that.  Okay.  So that part's

 4  good.

 5      Now, you wanted -- I don't know if you each get an hour

 6  for *voir dire*, but I will give each side 45 minutes for

 7  *voir dire*; and if you need it, and I can tell when you really

 8  need it, I'll give you more.  I might even give you more than

 9  an hour, like if circumstances warranted it, but 45 minutes I

10  think will be enough.

11      I will ask questions myself.  I just want -- I don't know.

12  All the people out there, any members of the press out there or

13  public, or is everybody connected with the case?  So we've got

14  a few people.

15      It will be an interesting thing for the public to

16  observe -- and I'm not preguessing this -- which side knocks

17  off the potential jurors who have any technical engineering or

18  scientific ability.  Pay attention to that.  I find -- I've

19  seen over 18 years, it's usually one side or the other does not

20  want anyone who could have an easy way to understand the case.

21      So, please -- it's okay.  It's your God-given right in

22  this country to do exactly that when you're picking a jury, but

23  I find it to be one of the more interesting features of jury

24  trials and one that's often and almost always overlooked by the

25  press.  So think about that as you hear the *voir dire*.

1      I will conduct most of the *voir dire*, but I am going to

2   give you at least 45 minutes per side.  What you cannot do is

3   try to condition the jury.  If you do that, I'm going to

4   interrupt.  Please don't do that.

5      The purpose of *voir dire* is to find out if there are any

6   life experiences that might prejudice them against you, like,

7   for example, if somebody had come up with a trade secret and

8   somebody stole it from them and they had to go sue and they

9   went through the -- you know, that person might be -- not

10  automatically but they might be biased in this case.

11     So that would be -- you know, that's the kind of thing you

12  want to be trying to get at and not say, "Well, if we in this

13  case prove that Mr. Levandowski did A and did B and then C,

14  would you rule for us?"  No, you can't do that.  That's not

15  proper.

16     Okay.  We wanted -- did we need to have a discussion on

17  the ground rules -- oh, on the ground rules for Levandowski?  I

18  am not going to let you call Levandowski -- this is a close

19  call whether to let him be examined under -- in front of the

20  jury and have him invoke the Fifth Amendment anyway.

21     Does he have a lawyer here today?  He may want to be heard

22  on this.  I guess not.

23     So I am not going to let you call him early in the case

24  until I hear that the jury has already heard corroborating

25  evidence.  The jury has heard it.  So you need to have that in

1  mind.

2      Now, you don't have to call him as your absolute last

3  witness, but you need to call him toward the end so that you

4  could lay the corroborating evidence.

5      All right.  Go ahead.

6          **MR. VERHOEVEN:**  Your Honor, we submitted a submission

7  on that, but just to quickly cover it, there is no

8  corroboration requirement for eliciting testimony where the

9  witness takes the Fifth.  The corroboration requirement is only

10 relevant to whether the Court instructs the jury with respect

11 to the inference.

12     And so corroboration evidence could come --

13         **THE COURT:**  Well, but isn't that the whole point?  I

14 mean, the inference?

15         **MR. VERHOEVEN:**  No.  I mean, we could call him

16 without the Court instructing the jury about the inference, and

17 we'd have every right to call him just like any other witness,

18 so --

19         **THE COURT:**  No, you don't.  You don't have a right to

20 do that.  That's not true.  It's a waste of time to call him

21 unless the jury can draw an adverse inference.  I don't see

22 that.

23         **MR. VERHOEVEN:**  Well, I think -- I'd have to go back

24 and look at the case law, Your Honor, but I think that there's

25 a distinction between drawing an adverse inference and having a

1  witness testify who takes the Fifth.

2      The inference would be something that the Court would do

3  in addition to that, telling the jury they could infer that --

4  from that testimony that -- whatever the Court decides to say

5  in the instruction; whereas, the testimony itself would just be

6  similar to calling somebody else.

7      And in addition to that, Your Honor --

8          **THE COURT:**  Yeah, but what's the point?  You know

9  he's going to take the Fifth Amendment.  You know he's going to

10 take the Fifth Amendment.

11          **MR. VERHOEVEN:**  He's a witness.

12          **THE COURT:**  It's just to make him look bad.

13          **MR. VERHOEVEN:**  He's here.  He's available.  We would

14 call him just like we call any other witness, Your Honor.

15          **THE COURT:**  No, you can't.  I think there are lots of

16 cases where the decisions say in those circumstances the judge

17 can just exclude that witness totally and the jury never sees

18 him at all.  So I don't agree with your legal theory.

19     All right.  Is that it?

20          **MR. VERHOEVEN:**  That's it.  In the interest of time,

21 I won't bother the Court anymore.

22          **THE COURT:**  All right.  Good.

23          **MR. VERHOEVEN:**  Well, so on the opening, maybe we can

24 get some guidance.  So we're not allowed -- we can obviously

25 refer to Mr. Levandowski in our opening statements; correct?

1          THE COURT:  Just a second.

2                    (Pause in proceedings.)

3          THE COURT:  I'm sorry.

4          MR. VERHOEVEN:  I think the order says --

5          THE COURT:  Of course, you have to refer to

6   Levandowski.  He's the guy who allegedly stole everything, but

7   do you need to refer to the fact that you're going to call him

8   and he's going to take the Fifth Amendment?

9          MR. VERHOEVEN:  I think we should be able to.

10          THE COURT:  I don't know.  I think we should wait on

11   that.  I think there's no prejudice to you really, or minor

12   prejudice, in waiting.  I think you just lay out your case.

13          MR. VERHOEVEN:  Well, perhaps -- what we're concerned

14   about in addition to case management and explaining the whole

15   story to the jury in the opening of what we're going to

16   present, in addition to those things, we're concerned -- he's a

17   big witness in this case and we're concerned that the jury is

18   going to be, like, "What's going on?"  The same thing we talked

19   about about them arguing there's an empty seat.

20          THE COURT:  But you're not going to be giving a

21   preview of every witness that you're going to call.  You're

22   going to be laying out here's the story of what happened, and

23   it will just pass right over their heads that you're not

24   calling him out as a particular witness.

25          MR. VERHOEVEN:  Well, the point of the opening is to

1  tell what evidence is going to come in and what it's going to

2  show as a summary for the jury so they understand what's coming

3  in.

4      **THE COURT:**  Yeah, but the way you're going to tell

5  the story, you're not going to say "Witness X is going to say

6  Y.  Witness A is going to say B."  I mean, you can do it that

7  way.  That is a permissible way to do it, but that's not the

8  way you lawyers typically do it.  You come in with a dramatic

9  story on the day he's about to leave his employment, you paint

10  this picture of him downloading, pushing the buttons, the card

11  reader is buzzing, and you don't even mention that he's going

12  to testify or not testify.  It's "This is the story we're going

13  to prove to you," and so I don't think you're very prejudiced

14  by --

15      **MR. VERHOEVEN:**  Your Honor --

16      **THE COURT:**  Let me hear from the other side first.

17      Do you care whether they get to say that he's going to

18  come and take the Fifth Amendment?

19      **MS. DUNN:**  Yes, we care very much.

20      **THE COURT:**  Why is that?  That's probably going to

21  happen, so why not just go ahead and let the jury know?

22      **MS. DUNN:**  Well, first of all, as Your Honor just

23  said, it is a fairly hard call and a big decision for the Court

24  to decide that he is coming to court to invoke, and there are,

25  you know, many decisions where courts struggle with that very

1  decision.

2      And as you just said, he probably will, but that will

3  depend on Your Honor's decision, and the questions he is asked

4  will depend on whether there's independent corroborating

5  evidence for those questions to be asked.

6      And so Your Honor has already stated what I would have

7  stated, which is that this is -- with such a -- such a big

8  thing happen in this case, it is prudent and consistent with

9  the case law to proceed as Your Honor has already ordered you

10  will proceed, and we think that's right.  We think it's

11  consistent with the law, and we think that we need to see the

12  evidence that comes out in this trial before we know what

13  questions will be posed to Mr. Levandowski and whether the

14  Court, in fact, will allow him to come.

15          **THE COURT:**  Well, that's all true, but the -- I'm not

16  talking about giving the other side permission to say the

17  specific questions that would be asked but, rather, to say --

18  Mr. Verhoeven wants to say, "And, yes, we're going to bring him

19  in here.  Yes, we're going to bring him in.  We're going to put

20  him right up here on this stand.  And you know what?  He's

21  going to take the Fifth Amendment."  Then he'll say the

22  Fifth Amendment, that that's a dirty word, and that's what's

23  going to happen.

24          **MS. DUNN:**  Yes.  Well, we think that's

25  extraordinarily prejudicial to us --

1          THE COURT:  Well, I don't know.

2          MS. DUNN:  -- and it's not --

3          THE COURT:  It's 99 percent likely to happen.

4          MR. VERHOEVEN:  It's a fact.

5          THE COURT:  Why is that so prejudicial to say it's

6    going to happen in the opening?

7          MR. VERHOEVEN:  I just add, Your Honor, I'm going off

8    my recollection, but my recollection is that Uber itself

9    proposed addressing the Fifth Amendment in their *voir dire*.  So

10   I don't understand why suddenly they --

11         THE COURT:  That's a good point.  Are you going to do

12   that?

13         MS. DUNN:  I'm sorry.  I did not hear.

14         THE COURT:  In your *voir dire* to the jury, are we

15   supposed to cover how they're going to react to the

16   Fifth Amendment and all that?  I think you've got that in your

17   *voir dire*.

18         MR. VERHOEVEN:  I've got their supplemental proposed

19   *voir dire*.

20         MR. GONZALEZ:  Your Honor, it's all going to be

21   dependent on what the Court decides.  Obviously if

22   Mr. Levandowski never testified, there would be no such

23   question, but --

24         THE COURT:  Wait.  But how are you going to know that

25   at the time of *voir dire*?

1          **MR. GONZALEZ:**  Well, at the time --

2          **THE COURT:**  Do you have a crystal ball that --

3          **MR. GONZALEZ:**  At the time of *voir dire*, Your Honor,

4     we may have an idea as to whether the Court is inclined to have

5     him come in at all.

6          **THE COURT:**  No, that's not true.  Right now it's

7     99 percent yes, but I've got to hear the foundation for the

8     corroboration before I let somebody ask questions that would be

9     unfair.

10         **MR. GONZALEZ:**  And so there's nothing wrong with the

11    *voir dire*.  The *voir dire* wouldn't refer to him at all.  It

12    would just say "If a witness should invoke the Fifth Amendment,

13    do you have any views on that?"

14         Generally speaking, that's information we should be

15    entitled to know.  If there's somebody in that box that

16    believes that, you know, invoking the Fifth Amendment means

17    you're guilty and don't believe anything the person says and

18    everybody's a crook who's connected to that person, we need to

19    know that.

20         **THE COURT:**  Well, but -- no, that's in a criminal

21    case.  In a civil case they are entitled to draw an adverse

22    inference, so it would be wrong to say to them that they can't

23    do that.

24         **MR. GONZALEZ:**  I'm not going to suggest one way or

25    the other, Your Honor, whether they can do it.  It's just

1   understanding the way they think.  There are some people who

2   think the minute they walk into a criminal case "What did the

3   guy do?  He must have done something or he wouldn't be here."

4       This is the mentality that some people bring into a civil

5   case as well when there's an invocation of the Fifth Amendment.

6   "Boy, they must have done something really bad, otherwise they

7   wouldn't be asserting the Fifth Amendment."

8       **THE COURT:**  Here's what we're going to do.  We're

9   going to see how -- I'm not going to give you an answer now.

10  We're going to see how the lawyers handle the *voir dire* and

11  what comes out on *voir dire*; and by that point it just may be a

12  foregone conclusion that you get to bring it up and name him by

13  name.  Maybe not, though.  We'll see.

14      Right now I'm not going to decide how you treat it in the

15  opening statements, but remind me that we have this hanging

16  issue.  Okay?

17      **MR. VERHOEVEN:**  Yes, Your Honor.

18      **THE COURT:**  All right.  So I don't have anything more

19  on *motions in limine*.

20      **MR. VERHOEVEN:**  I apologize, Your Honor.  Did you

21  give us a time for -- time period for opening statements?  You

22  may have.

23      **THE COURT:**  I'm going to give you all that in a

24  minute.

25      **MR. VERHOEVEN:**  Okay.

1          **THE COURT:**  We've got more to do, but we -- okay.  I

2    read your joint proposed pretrial order.

3          **MR. VERHOEVEN:**  I'm sorry, Your Honor.  I apologize.

4      We wanted to advise the Court we're dropping one of our

5    *motions in limine* so you don't have to work on it.

6          **THE COURT:**  Which one is that?

7          **MR. VERHOEVEN:**  *Motion in Limine* Number 17.

8          **THE COURT:**  All right.  Most excellent.  Thank you.

9      Which one are you going to drop over there?

10                         (Laughter)

11         **MR. GONZALEZ:**  We'll drop the one Mr. Chatterjee

12   lost, Your Honor.

13                         (Laughter)

14         **THE COURT:**  Sometimes you lawyers have redeeming

15   features.

16     All right.  I have a question about -- I know it's a

17   public thing, so I can't read it out loud because it's a trade

18   secret it says, but look on page 2 of the -- do you have the

19   joint statement? -- where you have Trade Secret Number 7, and

20   my question concerns the brackets.

21     I am suspicious about those brackets.  So where basically

22   what you've done is substitute "manufacturing tolerances" and

23   make it look like it's a design specification.  So I just want

24   you to know we're going to have a discussion about that because

25   I do know the difference between a manufacturing tolerance and

 1   a design -- what you design to versus whether or not something

 2   falls within it, and I don't -- I didn't -- my antenna went up

 3   when I read that, but we've got the public here now.  We won't

 4   go through that.  We'll do that at some other time.

 5       Okay.  On page 4 Uber says -- this is not secret; I can

 6   read this out loud -- this is around line 8 (reading):

 7       "Waymo did not plead a claim based on disclosure of

 8       the alleged trade secrets and should not be permitted

 9       to advance such a claim at trial."

10       So let's hear -- who's going to argue?  I want to hear --

11   I may not decide this now, but I would like to understand this

12   better.  So let's have -- first I want to hear from Uber.

13       Somebody over there needs to help me understand what

14   you're saying here.  Are you focusing on the word "disclosure"?

15   And what was -- and I do -- by the way, I think I have the

16   complaint here somewhere so I can actually look back and see

17   what was pled.

18       Ms. Dunn, are you going to argue this?

19                   (Counsel conferring.)

20       **THE COURT:**  I didn't mean to catch you unaware.  I

21   could pass it if you are not ready.

22       **MR. GONZALEZ:**  Your Honor, I believe that their case

23   is based on use by Uber.

24       **THE COURT:**  Well, do you believe or do you know?  I

25   can't go with "believe."  So I got the first amended complaint

 1  here, and I'd prefer to get to the bottom of it, but let me

 2  just start with the other side then.

 3      Do you -- they're saying that you did not make a claim

 4  based on disclosure.

 5          **MR. EISEMAN:**  Your Honor, looking at both the first

 6  and second causes of action, our first one under the DTSA and

 7  our second one under the California Uniform Trade Secret Act,

 8  we allege misappropriation but we're not specific.  The statute

 9  covers both wrongful acquisition, wrongful use, and wrongful

10  disclosure, and so disclosure would fall within the ambit of

11  our pleading.

12          **THE COURT:**  Is "misappropriation" defined to mean any

13  of those three?

14          **MR. EISEMAN:**  It is, Your Honor.

15          **THE COURT:**  All right.  So is that true?  And if

16  that's true, why are you making this point?

17          **MR. GONZALEZ:**  Your Honor, I believe that the

18  interrogatory responses and everything else we've gotten from

19  them, including their original Rule 26 disclosure, talked about

20  use.  The case has not been about Uber received a secret and

21  then disclosed it to some third party.  That has not been their

22  case.

23          **MR. EISEMAN:**  Your Honor, I'm sure that Mr. Gonzalez

24  will correct me if I'm wrong, but I believe that all of their

25  interrogatories in this case were directed to use.  They didn't

1   ever ask us about disclosure.  And so to the extent that

2   they're focusing on our interrogatory responses, we truthfully

3   answered those because they were focused on use.

4        **THE COURT:**  Who is your -- okay.  So you're saying

5   Uber disclosed to somebody?

6        **MR. EISEMAN:**  We have several theories of disclosure,

7   and part of this is --

8        **THE COURT:**  Well, give me one.  Just give me one, so

9   that I can --

10        **MR. EISEMAN:**  One is that Mr. Levandowski, who was an

11   agent of Otto Trucking, disclosed trade secrets to Uber; and so

12   Otto Trucking --

13        **THE COURT:**  All right.  Well, that's clearly in the

14   case.

15      All right.  What's your next theory?

16        **MR. EISEMAN:**  Well, also Mr. Levandowski in the

17   course and scope of his employment by Ottomotto or his

18   relationship with Ottomotto disclosed to Uber.  So that would

19   be another example.

20        **THE COURT:**  To Uber?

21        **MR. EISEMAN:**  Yes.

22        **THE COURT:**  But is there a to somebody else?  You

23   know, like --

24        **MR. EISEMAN:**  Sitting here --

25        **THE COURT:**  -- Gorilla Company?

1    **MR. EISEMAN:**  Sitting here right now, we don't have

2  any allegations.  But, as Your Honor knows, there are

3  depositions still going on in the case based on the Stroz

4  report, and so I would ask Your Honor not to prejudge that

5  issue and we can decide it once discovery is done.  We're happy

6  to make an offer of proof, and we can make that decision at

7  that point.

8         **THE COURT:**  All right.  Okay.  I'm not going to rule

9  on this.  I was just trying to understand what the issue was.

10    All right.  Down at the bottom of that page it says the

11  following (reading):

12      "Waymo is not entitled to present any reasonable

13       royalty evidence to the jury because a reasonable

14       royalty, if any, should be determined by the Court."

15      Now, in the patent cases at least the jury determines

16  reasonable royalty all the time.  So I don't get it.  Where

17  does this law come from that the judge is supposed to determine

18  that versus the jury?

19         **MR. GONZALEZ:**  Your Honor, it's right out of the

20  California Trade Secrets Act, that reasonable royalty, if it's

21  to be awarded at all, is to be awarded by the Court.

22         **THE COURT:**  Is that the same under the federal act

23  too?

24         **MR. EISEMAN:**  It's not, Your Honor.

25         **THE COURT:**  Okay.  Wait.  Hang on.  Finish your

 1  point.

 2          **MR. GONZALEZ:**  Your Honor, I believe that the law is

 3  not as clear under federal law, and we have some jury

 4  instructions on this point that address the issue; but under

 5  federal law, my understanding is that a reasonable royalty can

 6  be in lieu of unjust enrichment.

 7          **THE COURT:**  But who decides that?  The jury or the

 8  judge under federal law?

 9          **MR. GONZALEZ:**  I think, Your Honor, that's the

10  uncertainty, is that the federal law --

11          **THE COURT:**  So you say it's uncertain.

12      What do you say?

13          **MR. EISEMAN:**  The one case tried to a jury under the

14  DTSA, it's an Eastern District of Pennsylvania case, the jury

15  decided reasonable royalty in that case.

16          **THE COURT:**  Well, it might have been by consent

17  there.  Both sides might have consented to that.

18          **MR. EISEMAN:**  Well, the legislative history of the

19  statute, Your Honor, we believe supports a jury trial.

20      And what we think ought to happen here is they're right in

21  terms of the California statute, but the jury should hear the

22  reasonable royalty issue under the DTSA; and we think that it

23  makes sense to have the jury then render a decision on royalty

24  under the California statute and it can be advisory to

25  Your Honor, and then you'll take it from there.

1      **THE COURT:**  All right.  I now understand that better.

2      Okay.  Let's go over the number of jurors.  I'm

3  thinking -- now, the other day -- I want -- the other day,

4  Mr. Verhoeven, you said that this was a two-week trial.  That's

5  what you said.

6      **MR. VERHOEVEN:**  I said I could do a trial in December

7  in two weeks if you'll give it to me.  I could still do it in

8  two weeks if you order me to.

9      **THE COURT:**  Well, no.  But, see, then you'll go to

10  the Court of Appeals and say that I ordered you to do

11  something.

12      **MR. VERHOEVEN:**  No, I would not do that, Your Honor.

13      **THE COURT:**  Yes, you would.  And so I -- but --

14      **MR. VERHOEVEN:**  They wouldn't pay any attention if I

15  did.  That's your discretion, Your Honor.

16      **THE COURT:**  Well, here's what I -- my own view --

17  look it, do you know how many witnesses you-all listed and how

18  many documents you listed?  And even if only 10 percent gets

19  into evidence, it's more than a two-week trial for both sides,

20  in my view.

21      **MR. VERHOEVEN:**  That's fine with me, Your Honor.

22      **THE COURT:**  Now, I want to make sure you understand

23  we start here at 7:30 a.m., and I come out and I ask the

24  lawyers, I say, "How can I help the lawyers?"

25      At 7:45 while we're out here droning on, the jury is

accumulating in the jury room, and by 8:00 a.m. we start with

the evidence every day.  Even if you have something more you're

dying to say, too bad.  You get 30 minutes with me to clear up

problems, and then we can clear up.  But then we go to

1:00 o'clock; two breaks, 15 minutes each; and we go to

1:00 o'clock and there's no lunch break.

So then the jury gets to go home.  They're not -- the

juries love this system, and it's only 45 minutes to 60 minutes

shorter than a 9:00 to 5:00 day if you do the math because

there's no lunch break and we start with the evidence at

8:00 o'clock.  So 8:00 to 1:00 is five hours, minus 30 minutes

is four and a half hours a day.  If you do the math on a

9:00 to 5:00 schedule with an hour and 15 minutes for lunch,

it's about an hour, maybe 45 minutes longer if you really did

go all the way to 5:00 o'clock.

You don't have jurors going to sleep like they might in

the afternoon.  So it gives you the afternoon to get prepared.

So this is almost a full day, but it would not be -- I

wouldn't claim it to be a full day, but I think it is an almost

full day and it is very efficient.

So in my view, I'm just going to give you a number that I

think is higher than two weeks and it would be in the 16-hour

range per side.  So that would be 32 hours of evidence plus

opening, which would be in addition; plus closing, which would

be in addition; and then of course there's deliberations.

1      But for evidence time -- and that counts your cross.  You

2   know, some lawyers think they're great on cross, so they leave

3   more time for cross.  Others like to do it through direct.

4   It's up to you.  You know, that's your call.

5      So 16 hours per side, then openings and then closing.  I

6   promise you I don't think we could even do that in three weeks,

7   but it might be.  If everything went right, we could do that in

8   three weeks from my own experience in how the lawyers use time.

9      So I'm here to hear you out on what you think the time

10   limits ought to be.

11            **MR. VERHOEVEN:**  What you've suggested is fine with

12   Waymo.

13            **MR. CARMODY:**  It's fine with us too, Your Honor.

14            **THE COURT:**  All right.  16 hours per side.

15      How about 10 jurors?  Does that work for you?

16            **MR. GONZALEZ:**  That's fine, Your Honor.

17            **MR. VERHOEVEN:**  Yes, Your Honor.

18            **THE COURT:**  Okay.

19      All right.  So --

20            **MR. CARMODY:**  Your Honor, does that include two

21   alternates?

22            **THE COURT:**  Well, the 10 would be -- we don't have --

23   on the civil side we don't have alternates anymore.  We just

24   start with 10.  If we get down to 6, then that's the minimum.

25   So we hope we don't get down to -- once we get down to 6, we're

 1  in trouble.  We can't lose another one, but if we -- let's say

 2  we kept all 10 or we had 9, then all of them would deliberate.

 3  They don't get sent home.  They all deliberate.

 4      You should show each other the slides that you plan to use

 5  on your opening statements so that I can resolve any problems

 6  up front.

 7      Have you gone through -- have you seen those guidelines

 8  that I use for jury trials?  Have you looked at them?  Do you

 9  know what I'm talking about?

10      When I first got this job, the lawyers would say at these

11  conferences, "Well, Judge, how do you handle this?  How do you

12  handle that?"  They would ask me a dozen questions.  Well, I

13  just wrote it out.  So this is the way.

14      And I have procedures in there for you that help smooth

15  things out so that you know who the witnesses are that are

16  coming up, and you also -- now, there's a trick that sometimes

17  lawyers use, which is they say, "Oh, the next witnesses are

18  going to be A, B, C, and D," and then they don't call A, B, C,

19  and D -- maybe they call D, and then meanwhile the other side

20  has wasted hours of time with A, B, and C getting ready for the

21  cross.

22      So if that gets to be a problem, I may have to impose some

23  limits on you, so please don't do that trick.

24      I don't remember how I did it in the Oracle case.  I might

25  have -- sometimes I put in a requirement that you have a

1  rolling list of witnesses and you -- let's say five or six, and

2  you always have to call your next witnesses from that rolling

3  list and you can't skip ahead.

4      I don't remember if I did that in the Oracle case or not,

5  but I have done it in some cases.  So things like that, I'm

6  open to imposing those if you both agree.  Even if you don't

7  agree, if it becomes a problem, I might do it.

8          **MR. VERHOEVEN:**  Well, I think we could take a first

9  stab at negotiating things.

10     The way I've done it is very similar to what you're

11 talking about, Your Honor, with the caveat that both sides are

12 reasonable.  If, for example -- we're under time limits, so if

13 one side has to cut a witness to make their time limit, then

14 that's something that happens.

15     But as long as the parties act in good faith -- and, for

16 example, for the direct examination exhibits, we may send those

17 over, but something may happen the next day so that we want to

18 add something to deal with it.  As long as we can be flexible

19 on that, the disclosure requirements I think we can easily work

20 out.

21         **MR. GONZALEZ:**  I agree with that, Your Honor.

22     There's one thing that I would suggest given that they're

23 going first, they're the plaintiff, and that is to help us

24 avoid unnecessary work, is that they give us a realistic

25 witness list.  You've now told us 16 hours per side.  Well,

1  they have 86 witnesses.

2          **THE COURT:**  Well, you agreed to that.

3          **MR. GONZALEZ:**  Oh, no, no.  We agree.

4          **THE COURT:**  You make it sound like you're going to

5  appeal on the ground --

6          **MR. GONZALEZ:**  No, no, no, no.  I'm making the point

7  that now that we understand that we have 16 hours, I would

8  think that they would be able to cut their witness list from 86

9  to something more realistic so that we can realistically

10  prepare instead of doing what you just said, which is wasting

11  our time putting together witness files for 86 people.

12          **THE COURT:**  Well, see, I'm not going to order -- yes,

13  that's a good point; but then if they cut it down to 15

14  witnesses and then there are two others they want to call,

15  you'll be on their case.

16      So I think it's more important that you know who the

17  initial witnesses are going to be in this rolling group so that

18  you can always be prepared for the ones that are going to come

19  up in the next two days.  I think that's a reasonable -- I'm

20  not ordering that yet.  I think you should meet and confer and

21  come up on a system because you're both going to have to live

22  with it.

23          **MR. GONZALEZ:**  Understood.

24          **THE COURT:**  And you ought to both -- all right.

25          **MR. GONZALEZ:**  Your Honor, may I --

 1      **THE COURT:**  I'm not going to make them cut back their

 2  witness list unless you both were to agree.  If you both were

 3  to agree you'll do that, you'll each cut it by half right now,

 4  okay.

 5      **MR. GONZALEZ:**  Your Honor, a couple of things.

 6      **MR. VERHOEVEN:**  We'll -- excuse me.

 7   We'll meet and confer on that issue, Your Honor.  I

 8  believe if you add up the numbers for defendants' witnesses,

 9  it's relatively the same number.

10      **THE COURT:**  Yeah.  It's a big list.

11      **MR. VERHOEVEN:**  So we'll -- you know, it may be in

12  both parties' interest to narrow it down, and we'll see if we

13  can't work that stuff out.

14      **MR. GONZALEZ:**  Your Honor, especially given the time

15  constraints, we'd like to only call our witnesses once.  If

16  they call a witness, may we examine that witness when they're

17  finished?

18      **THE COURT:**  It depends.  See, sometimes if it's a

19  very short excursion into something else, okay; but if you're

20  going to hijack their case, no, because the plaintiff has a

21  right to put on their case.  And so it depends.  It depends.

22   If it's a short excursion into some sideshow, okay -- not

23  sideshow, but new topic, yes, I'd let you do that; but, on the

24  other hand, if they call a witness for, say, 30 minutes and you

25  want to do them a two-hour examination, most of which is on

1  something else, probably the answer is no.

2          **MR. GONZALEZ:**  Second question, just on procedures,

3  is:  Our expert witness who will respond to their expert

4  witness, can that expert witness be in the court?

5          **THE COURT:**  Yes.

6          **MR. GONZALEZ:**  Thank you.

7          **THE COURT:**  That can happen.  I assume you both want

8  that.

9          **MR. VERHOEVEN:**  Yes, Your Honor.

10          **THE COURT:**  The experts can hear the experts.

11          **MR. VERHOEVEN:**  Yes.

12          **THE COURT:**  Now --

13          **MR. VERHOEVEN:**  Does Your Honor sequester?

14          **THE COURT:**  All the other witnesses ought to be

15  sequestered, yes --

16          **MR. VERHOEVEN:**  Okay.

17          **THE COURT:**  -- unless they're a party representative.

18          **MR. VERHOEVEN:**  Yes, and the corporate rep not.

19          **THE COURT:**  Who's going to be the corporate reps

20  here?

21                  (Counsel conferring.)

22          **MR. CARMODY:**  I don't think we've made a decision yet

23  on our side, Your Honor.  We're working on it.

24          **THE COURT:**  Well, okay.  You can work on it too then.

25          **MR. VERHOEVEN:**  Okay.

1     **THE COURT:**  So each of you get -- each corporation

2   gets one.

3      All right.  I need to go over a topic on exhibits, which

4   is first you need to vet -- each side needs to vet the exhibits

5   that are given to the deputy courtroom clerk with the actual

6   tag because that's what goes to the Court of Appeals.

7      So I've got to repeat that.  You have to vet, look at,

8   physically look at what my deputy has.  So let's say Exhibit 17

9   turns out to be something that you thought was a different

10   document or had an attachment that's not there, it doesn't

11   matter.  You're not going to be allowed to fix it up after the

12   fact because it's going to go to the Court of Appeals as we

13   have it.

14      And the fact that you thought it was something else

15   because you were relying on a database that your law firm

16   prepared and you thought it was a different document, I'm

17   sorry, I cannot accept that excuse.  It has -- you've got --

18   it's easy to check what's in our record.

19      And when you're showing a document to the witness, you've

20   got to use the official version and not a copy.  The reason is

21   that about 5 percent of the time the document that you want to

22   show the witness of some copy is not exactly the real document.

23   It doesn't have the attachment maybe or it's missing a page or

24   something's goofy with it.

25      One short war story.  We had a jury trial in here once

1  where -- long ago but it still happened -- where the defense

2  lawyer in the closing argument to the jury put something up on

3  the screen that I didn't think was in evidence.  So at the

4  break I said, "Is that in evidence?"  It turns out it was not

5  in evidence.

6      The defense lawyer had been relying on something the legal

7  assistant had given him thinking that that was what was in

8  evidence but it was actually not what was in evidence.  So we

9  had to explain to the jury the mistake.  It was really pretty

10 catastrophic for that side because they should never have made

11 that error.  They should have checked what was actually in

12 evidence as opposed to not.

13     So it's important to put the burden on you to use the real

14 exhibit, the one that's going to go to the Court of Appeals and

15 the one that goes into the jury room.

16         **MR. VERHOEVEN:**  Your Honor, can I ask some

17 clarification on that?

18         **THE COURT:**  Yeah.  Sure.

19         **MR. VERHOEVEN:**  Oftentimes it's sufficient in trials

20 this size to show the witnesses the exhibits on the screen as

21 well as their having a physical copy.

22         **THE COURT:**  I'll allow that.  I will allow that.

23 That's so the jury can follow it.  But then the other side has

24 got to exactly jump up if what's on the screen is not part of

25 that document.

1          **MR. VERHOEVEN:**  Thank you, Your Honor.

2          **THE COURT:**  Okay.  Here's a completely different

3    thing.  There is no law on this, it's up to the discretion of

4    the judge, but especially back East -- how many of you lawyers

5    are from back East someplace?  Anybody?  One, two?

6          Well, back there on the East Coast they have a very almost

7    ironclad rule -- it's not as prevalent out here, but I like to

8    use it -- which is that while a witness is on cross-examination

9    or adverse examination -- it could be called on direct but an

10   adverse examination -- while they're actually on, they cannot

11   talk to the lawyer, the other lawyer.  No lawyer can talk to

12   them.  Even if it's your own client and your client is going

13   down for the third or fourth time because the other side is

14   beating them up, while they're still on cross-examination, no

15   talking to them.

16         I recommend that rule.  Now, it doesn't apply on direct.

17   It's just pointless really.  It's just while the other side has

18   got your witness or somebody you brought in, and I recommend

19   that rule and I think you ought to both stipulate to that.  So

20   what do you say?

21         **MR. VERHOEVEN:**  First, I have a clarification if I

22   might.

23         What about on redirect?  In other words, you can't talk to

24   the witness on cross, then you take a break, and is the counsel

25   going to be able to then talk to the witness about all the

1   things they're going to fix from the cross and then do the

2   redirect?  Is that what you're suggesting?

3           **THE COURT:**  Yes, I would allow them -- I would allow

4   you to have a conference after the cross-examination is

5   concluded so that you could try to fix it up, but we will not

6   take a break to allow you to do that.  It might be that you

7   have to do a cold redirect.  But if it was overnight and it

8   just happened to fall that way, okay, I can let you -- I'd be

9   okay with that caveat.  You could fix it up, woodshed them

10  overnight before the redirect the next morning if the cross is

11  actually completed.

12      But usually it doesn't work out that way because a good

13  lawyer is going to say, "Judge, it's time to quit for today,

14  but I may have a few questions in the morning, so I'm not going

15  to close my cross-examination yet," and, you know, that's not

16  unheard of.

17          **MR. VERHOEVEN:**  So I'm good -- as long as it goes

18  both ways, we have no problem.

19          **THE COURT:**  Both ways.  It goes both ways.  All

20  right.

21          **MR. CARMODY:**  That's fine.

22          **THE COURT:**  Agreed?

23          **MR. CARMODY:**  Yes.

24          **THE COURT:**  All right.  So you both agree.  Great.

25  Good for you.

1    Okay.  You need to give me a one-page statement that I

2  could read to the jury so I can explain what this case is

3  about.

4    I've already told you we'll be in session five days a

5  week.  Now, if we make progress to the point that I think we

6  could safely take off a day, like a Friday -- just once

7  probably -- then we will do that; but otherwise if I think

8  we're in trouble or even just on course, I'm going to -- we're

9  going to go five days a week.

10    I would say your opening statements -- how long do you

11  want for your opening statements?

12          **MR. CARMODY:**  An hour.

13          **MR. VERHOEVEN:**  I agree, an hour.

14          **THE COURT:**  All right.  One hour per side.

15    Now, when you are doing a witness, you should fish out the

16  trial exhibits in advance so that you don't have to ask for

17  them.  You know, occasionally you'll have to ask for one, but

18  you ought to have your five documents you're going to use, 10

19  documents you're going to use, right there ready to go, hand

20  them up to the witness, or sometimes just put them right there

21  on the witness bench so that the witness has them.  But have it

22  ready to go click, click, click.  All right?

23          **MR. VERHOEVEN:**  I have --

24          **THE COURT:**  Oh, I didn't ask Mr. Chatterjee.

25    Do you agree to the rule about while you're on

1  cross-examination, no talking to the witness?

2          **MR. CHATTERJEE:**  Yes, Your Honor.  I had one small

3  question about that, but I think you answered it, which is --

4          **THE COURT:**  By the way, the 16 hours you split

5  between you.  It's not -- you each don't get 16 hours.  You

6  understand that on the defense side?

7          **MR. CARMODY:**  Yes.

8          **MR. VERHOEVEN:**  And the same is true for the opening;

9  right?  One hour for both of them?

10          **THE COURT:**  I think that's right.  You've got to

11  split the one hour too unless you convince me otherwise.

12      But let's stick to the 16 first.  You understand it's 16

13  for the both of you?

14          **MR. CHATTERJEE:**  Yes, Your Honor.  We have -- we did

15  file a motion to sever given that their theory now is purely

16  acquisition, and it's really an issue completely disconnected

17  from --

18          **THE COURT:**  I have that in mind, but I am not ruling

19  on that.  Now, if you go to trial together, it's 16 hours

20  between you.  Okay?

21          **MR. CARMODY:**  That part we understand.  It would be

22  opening statement I would like to talk about.

23          **THE COURT:**  All right.  Tell me if you think you need

24  more time.  Should I -- why don't I give them 15 additional

25  minutes.  So you get one hour and they get an hour and 15

minutes because you're suing two of them and it's just one of

you.

     **MR. VERHOEVEN:** Well, Your Honor, every trial I've

done, no matter how many defendants there are, it's equal time.

     **THE COURT:** I know. Usually that's right.

     **MR. VERHOEVEN:** So this would be giving them an

advantage to have more time than we do.

     **THE COURT:** Yes.

     **MR. VERHOEVEN:** We have to also address the two

different defendants.

     **THE COURT:** All right. What do you say to that

point? They've got to address both of you.

     **MR. CARMODY:** I think 15 minutes, Your Honor, is

fair. I mean, the bottom line is we're not completely --

     **THE COURT:** I'm going to give each of you an hour and

15 minutes. I don't want to give you each an hour and 15

minutes. It's way too much.

     **MR. CARMODY:** The reason why I think 15 minutes

additional works for us, Your Honor, is we're not completely

aligned on all issues.

     **THE COURT:** Of course not, but they've got to

cover -- he's got to cover -- Mr. Verhoeven has got to cover

both of you too. I'm giving you, both sides, an hour and 10

minutes, and you have got to use your hour and 10 minutes,

split it any way you want; and then, Mr. Verhoeven, you get an

1  hour and 10 minutes too on opening statement.

2         **MS. BAILY:**  Your Honor, there's a related issue if I

3  may just --

4         **THE COURT:**  Of course.

5         **MS. BAILY:**  So it was raised just briefly in the

6  pretrial filings, but one issue with respect to the damages

7  experts is there's a lot of overlap between the damages

8  experts.  Uber and Ottomotto have one, Otto Trucking has

9  another, and they offer essentially the same critiques of

10  Wagner and it has the effect, of course, of ganging up on one

11  witness.

12       And so I just wanted to --

13         **THE COURT:**  If they want to waste their 16 hours by

14  putting in duplicative testimony, why do you care?

15         **MS. BAILY:**  Understood.

16         **THE COURT:**  That means that something else is going

17  to go skate by.  See, they probably know that I'll knock out

18  one of their experts as a *Daubert* challenge, so they're worried

19  that they need two.

20         **MR. CHATTERJEE:**  Your Honor, it's because we --

21         **THE COURT:**  If you win your severance motion and I

22  knock out, then they've got zero.

23         **MR. CHATTERJEE:**  Or the summary judgment, Your Honor.

24       There's one other issue associated with openings.  Because

25  Otto Trucking is -- we view ourselves somewhat as a niche

1  player in this case, we would prefer to give our opening

2  statement before we start our case-in-chief rather than at the

3  beginning of the case.

4      **THE COURT:**  Yeah, you can do that.

5      **MR. CHATTERJEE:**  Thank you, Your Honor.

6      **MR. VERHOEVEN:**  Your Honor, I object to that.

7      **THE COURT:**  Wait.  Wait.  Wait.  No, they've got the

8  right to do that.  You can do that, but then it's still going

9  to come out of the time.  So if you use 50 minutes and you only

10 have 20 minutes, but you can reserve your opening statement.

11 What's wrong with that?

12     **MR. VERHOEVEN:**  I've never done a trial where halfway

13 through the case one of the parties gets to make a big argument

14 like that.

15     **THE COURT:**  Well, it goes back to the common law.

16 This is a time-honored right to reserve your opening statement.

17     **MR. CARMODY:**  Absolutely.

18     **THE COURT:**  Yeah.

19     **MR. VERHOEVEN:**  Well, it's got to come out of the

20 hour and 10 minutes.

21     **THE COURT:**  It will.

22     **MR. CARMODY:**  We agree.

23     **MR. VERHOEVEN:**  And then, you know, I think they need

24 at least in fairness disclose to us how much time they're going

25 to use this advance so that we can, if we need to, reserve time

 1 | as well.

 2 |          **THE COURT:**  You don't get to reserve time.

 3 |          **MR. CARMODY:**  You don't get it.

 4 |          **THE COURT:**  I think you just get one opening

 5 | statement.

 6 |          **MR. CARMODY:**  That's exactly right.

 7 |          **MR. VERHOEVEN:**  So they get two -- they get to argue

 8 | to the jury twice?

 9 |          **THE COURT:**  Correct.

10 |          **MR. VERHOEVEN:**  That's simply inequitable.

11 |          **THE COURT:**  It's not that bad.  It's not inequitable.

12 |          **MR. VERHOEVEN:**  Yeah, it is.

13 |          **THE COURT:**  This will work.  Please, come on.  You

14 | will have had your opening statement.  You get the benefit of

15 | primacy.  They get the benefit of having get to see your case,

16 | and then they get to make -- but, no, I'm pretty confident

17 | that's --

18 |          **MR. VERHOEVEN:**  For the record, I think that's

19 | incredibly prejudicial.  We can't even address what they say in

20 | the middle of the case at the end of our case and the beginning

21 | of their case.

22 |          **THE COURT:**  No, because there is a thing that I do

23 | which -- but I'm overruling that objection because I don't

24 | think that is a fair criticism; but, nevertheless, there is

25 | something that I do occasionally in cases, which is, as the

1  case goes along, I will say, "Before we end today at maybe near

2  the end of today I want each of you to give a" -- and I'll make

3  you share time on the defense side -- "a five-minute statement

4  to the jury of where we are in the evidence, where we are in

5  the case, what more you expect to prove."

6      You know, minor argument is okay, but it helps the jury

7  keep a good comprehension of where we are on the timeline of

8  the evidence.  So every now and then I'm going to do that.  I

9  will do it when I think it would help the jury's understanding

10 of the case.

11     So possibly you will get an opportunity after

12 Mr. Chatterjee has come out of left field and given his

13 reserved opening statement and you're sitting over there all

14 antsy because you want to respond, that's just the way the

15 system works.  But, yeah, but maybe you'll get a five-minute

16 opportunity to say something.

17         **MR. VERHOEVEN:**  Thank you for that, Your Honor, but

18 why do we not get to reserve but they get to reserve?  I don't

19 understand that principle.  If the basis is they want to save

20 their opening statement for when they start their

21 case-in-chief --

22         **THE COURT:**  Because the opening statement is what you

23 are about to prove and you are the one that goes first.

24         **MR. VERHOEVEN:**  But they get to respond.

25         **THE COURT:**  Yeah, they get to respond because they're

putting on their case later and they want to have a coherent

statement of what they're about to bring in and prove.

     If you find some decision in the history of the universe

that says that's wrong, I will look at it, but I'm pretty sure

I'm right that there's a time-honored right for a defendant to

reserve their opening statement.

          **MR. VERHOEVEN:**  Well, we'll look into that,

Your Honor.  If we have leave to make a submission, I'd

appreciate that.

          **THE COURT:**  Of course.

     Okay.  But otherwise that's the way it's going to be.

     Okay.

          **MR. CHATTERJEE:**  Your Honor --

          **THE COURT:**  Wait a minute.

                    (Pause in proceedings.)

          **THE COURT:**  Okay.  Yes, please.

          **MR. CHATTERJEE:**  There were two other things just

associated with kind of the mini argument Your Honor suggested.

One of the things --

          **THE COURT:**  Mini statement slash argument.  I don't

like much argument, but I do like explaining to the jury where

we are and what you think has been proven and what -- yeah.  It

helps the jury.

          **MR. CHATTERJEE:**  One of the things that some of the

other judges I've been in front of have liked doing -- well,

1  there's two things.  One was to give -- to allow the parties to

2  make a very short introduction of the witness, "This witness is

3  this person and this is their role," to give the jury context

4  when the person is talking.  I don't know what Your Honor's

5  view on that is.

6      And the second is jury questions.  Do you allow the jury

7  to ask questions?

8      **THE COURT:**  Okay.  Those are totally different things

9  and remind me to come back to that in a second.  I want to

10  finish with my list for a second.

11      I want you to come up with a big poster board that is

12  readable from the jury box that will be over there, and it will

13  be a timeline and it will have the most important -- I'll leave

14  it to your discretion -- seven, eight, or nine dates, like

15  acquisition date or download date.  You know, actually -- if

16  it's even controversial, you can't use the word.  You certainly

17  couldn't say "Fraud begins here."  That's no good.  But words

18  that are nonargumentative.

19      Here's why that's so important.  When the witnesses are on

20  the stand, even when the judge is listening to the evidence and

21  some witness says, "I went to the March 13th meeting," they can

22  glance over and see where that fits on the timeline, the basic

23  timeline, and they comprehend where that testimony fits better

24  in the case.

25      In addition, I want you to give them an 8-by-10 copy so

1  they can keep it in the back of their steno pad and they can

2  make notes on their own version of it.  But just seeing it up

3  there on the wall, it helps them place the testimony in

4  context, and I want you to agree.  If you don't agree, I'm

5  going to work it up myself and put it over there.

6      So every lawyer has agreed to this in the past, and I want

7  you to do that.

8      All right.  Enough on that.  Any problem with that or any

9  questions?

10         **MR. VERHOEVEN:**  No, Your Honor.

11         **THE COURT:**  Okay.  Good.

12     Sidebars.  I don't like sidebars.  I think when the jury

13  is here, they should be hearing evidence.  And lawyers like to

14  call a sidebar because they're deathly afraid the jury is going

15  to hear the judge overrule their objection, so they want to do

16  it in private.  Too bad.  Too bad.  The jury is going to hear

17  me say "Objection overruled, Mr. Chatterjee," or, "You win,

18  Mr. Chatterjee."  So it just --

19         **MR. CHATTERJEE:**  I prefer the latter.

20         **THE COURT:**  I know.  You'll get your share of those.

21     But I'm telling you, we can't just come running over here

22  like -- so I'm going to say maybe one sidebar a day on average

23  that lasts three minutes, and even that the jury hates.  So I

24  want you to know if you ask for a sidebar, I'm likely to say

25  no.

1     Now, sometimes we'll get into a fix where I can see that

2   we have a problem and I'll ask you to work around it and go to

3   something else and at the break we'll take it up, and we will

4   at the break.

5     But one of the guiding principles of me running a trial is

6   that while the jury is here, they're hearing evidence and their

7   convenience and understanding and comprehension of the case is

8   paramount.  So I will be taking that into account.

9     Okay.  The next thing that comes up in trials that people

10  aren't ready for, deposition for impeachment.

11       **MR. VERHOEVEN:**  Your Honor, I just wanted to, please,

12  so we don't have to do it at trial.

13       **THE COURT:**  Yes, go ahead.

14       **MR. VERHOEVEN:**  So in my experience with the no

15  sidebars and the preference against sidebars, the only times it

16  would come up for me personally is if -- and obviously it goes

17  without saying you try to address this at 7:30 -- but if, for

18  example, because of a cross-examination you want to ask a

19  question because of a certain answer but you feel that it might

20  be close to a *motion in limine* or something like that, that

21  would be the time that I would ask for a sidebar so that I

22  didn't violate a rule.

23       **THE COURT:**  Well, the way I would urge you to do that

24  is to say, "Your Honor, that implicates or that would violate

25  your ruling on *Motion in Limine* Number 14."

1          **MR. VERHOEVEN:**  Okay.

2          **THE COURT:**  You can just say that, and then I

3    would -- if I remembered it well enough, I would either -- I

4    would rule on it.  If I didn't remember it, I might ask then

5    for a sidebar or ask you to postpone it till the break.

6          **MR. VERHOEVEN:**  So I was asking just a slightly

7    different question, which is I haven't asked it.  I don't want

8    to violate the *motion in limine*.  It came up because of cross

9    answers.  And so it's not I'm objecting because the other side

10   violated the *motion in limine*.  It's just me trying to not get

11   in trouble.

12         **THE COURT:**  Yeah, you can ask for it at the break or

13   that would be a legitimate case for a sidebar.

14         **MR. VERHOEVEN:**  Yeah.  That's what I would envision.

15         **THE COURT:**  All right.  Next, the use of depositions

16   for impeachment.  You've got to have the deposition right there

17   and you read it exactly and you don't paraphrase and you've got

18   to read the whole answer.

19      Okay.  First, let me stop there.  Do you understand what

20   I'm saying there?

21         **MR. VERHOEVEN:**  Yes, Your Honor.

22         **THE COURT:**  Now, here's what lawyers like to do and

23   that I don't like to see because it gets abused all the time.

24   You'll say, "In your deposition didn't you say X."  Instead of

25   getting the deposition out and reading it to see what they say,

 1 you want to fix it up.  And you didn't ask the right question

 2 in the deposition, you ask a related question but you didn't

 3 ask the right question.  So you didn't ask about X.  You asked

 4 about X prime.

 5      So the answer is not on point in the deposition, but how

 6 are they supposed to know without -- so it's unfair to the

 7 witness.  It's asking the witness to have -- under the stress

 8 of being on the stand to try to remember what in the world they

 9 said in the deposition.  So you can't do that to them.  You

10 can't say, "In your deposition didn't you say X?"  You just

11 say:

12      "Your Honor, I want to read from page 32 of the

13      witness' testimony:

14      "Question:  What color was the light?

15      "Answer:  The light was red."

16      You don't have to say, then, "Didn't you say that in your

17 deposition?"  No.  I will just tell the jury, "That's the sworn

18 testimony of this same witness in the deposition on such and

19 such a date, and you may consider that in evaluating the

20 witness' testimony."Then we go on.

21      And then you don't get to say, "In your deposition didn't

22 you say X," because I'll promise you, half the time they didn't

23 say X and the witness doesn't -- it's not fair to the witness.

24 It's not fair to -- everybody understand that?

25           **MR. VERHOEVEN:**  I do, but I just wanted a

1  clarification on that as well.

2          **THE COURT:**  Yeah.

3          **MR. VERHOEVEN:**  I mean, we shouldn't be able to just

4  point the witness to his testimony and have him read it in the

5  first instance.  We have to ask him the question, and the

6  deposition is used if, for example, it's inconsistent or --

7          **THE COURT:**  Well, if it's a party witness, an adverse

8  party, you can use it for any purpose.  You don't have to have

9  it be inconsistent.  But if it is -- so you can -- you have a

10 lot of flexibility there.

11         But if it is a genuine third party or -- yes, let's say

12 genuine third party and someone other than an adverse nonparty,

13 then you have to first do what you say, lay the foundation.

14 You say, "What" -- you just ask without reference to the

15 deposition, "Okay.  Mr. Witness, what color was the light?"

16         **MR. VERHOEVEN:**  Right.

17         **THE COURT:**  They say, "Oh.  Oh.  I think the light

18 was green."

19         And then you say, "your Honor, I'm going to read from the

20 deposition, page 32."

21         **MR. VERHOEVEN:**  Exactly.

22         **THE COURT:**  Or I even -- when they say "I don't

23 remember" and at trial they say "I don't remember," all day

24 long I'll allow you to impeach that with an answer.

25         Or the vice versa.  If at the depo they said "I don't

1  remember" and now they suddenly have a sudden burst of

2  recollection because some lawyer has gotten to them, then you

3  get to impeach them with that.

4        **MR. VERHOEVEN:**  That's exactly it.  Thanks for the

5  clarification.

6     One other question on this is my practice, if allowed to,

7  is to use actual videotape from the deposition that has the

8  words below, but it has --

9        **THE COURT:**  Yeah, you can do that.  That's fine, but

10  there's a glitch on that, which is that the court reporter --

11  we have the best court reporters in the United States here.  I

12  want you to know that.  This court reporter, she's won national

13  competitions.  I think she was the fastest court reporter in

14  history one day.

15        **MR. VERHOEVEN:**  Wow.

16        **THE COURT:**  Something like that.

17     Anyway --

18        **MR. VERHOEVEN:**  So we can talk fast.

19        **THE COURT:**  No, no.

20     But here's the thing, they don't take down video.  A lot

21  of lawyers don't know that.  Recordings and video do not get

22  taken down by the court reporter.  So if you use it, you have

23  to then -- if you use a clip, you've got to give a CD to the

24  courtroom deputy and say, "This is the CD that was used," and

25  only the clip.

1          **MR. VERHOEVEN:**  Right.

2          **THE COURT:**  You've got to be -- and then the other

3    side has got to agree that that was the one that was used.

4          **MR. VERHOEVEN:**  We did -- I'm very familiar with that

5    procedure, but we don't usually do a CD.  We usually just do a

6    hard copy of --

7          **THE COURT:**  Okay.  You can do it that way.

8          **MR. VERHOEVEN:**  But we clear it.

9          **THE COURT:**  But there's got to be a record --

10          **MR. VERHOEVEN:**  Exactly.

11          **THE COURT:**  -- otherwise there won't be a record of

12    what was shown.

13          Now, the reason to show the CD, it may be at the Court of

14    Appeals level you want to make the point that, "Oh, look, how

15    evasive they looked on the video."

16          **MR. VERHOEVEN:**  I see, the video.

17          **THE COURT:**  It looked like they were looking at the

18    ceiling, they took a long time to answer, the pauses and all

19    that.  So it's up to you, but you both have to agree on the

20    record that's going to go to the Court of Appeals.

21          Okay.

22          **MR. CARMODY:**  Your Honor, I had one question on the

23    party witness.

24          **THE COURT:**  Please, go ahead.

25          **MR. CARMODY:**  When you talk about with a third party

obviously laying a foundation before the impeachment and you said with a party witness you can play it at any time, I understood at first --

**THE COURT:** Well, with an adverse party.

**MR. CARMODY:** I thought at first, though, you were talking about a 30(b)(6) witness, you can play at any time for any reason.

**THE COURT:** Not just 30(b)(6). With a party witness let's say -- let's say that -- let's see, you're Uber, so who would be Mr. Big at Waymo? Name somebody.

**MR. CHATTERJEE:** Larry Page.

**THE COURT:** Larry Page, okay.

So Larry Page. You have a deposition of Larry Page. You can just read any part of it anytime you want. You can interrupt your examination of a witness and say, "I want to read you, to the jury, a page from Larry Page to set the stage for some more questions I have for you." And since it's an adverse party witness, the Rule 32 just says flat out you can use it.

Now, you can't use your own side's because that's self-serving, but you can use the other side's. They have to be a managing agent, director, or officer, I think, to use it but he would qualify in that case.

**MR. CARMODY:** That was the --

**THE COURT:** And if it's 30(b)(6), of course, you can

1  use 30(b)(6) in the same way.

2         **MR. CARMODY:**  See, that was the question I had.

3  Obviously Larry Page would qualify as a managing agent for

4  Google or Waymo here, but I'm talking about other, you know,

5  adverse witnesses, Waymo employees, but not managing agents.

6         **THE COURT:**  Well, an adverse employee may or may not

7  qualify as a Rule 32 adverse party.  Like this guy Sasha, is he

8  still -- where does he work now?

9         **MR. CHATTERJEE:**  Waymo.

10         **THE COURT:**  Is he at your company?

11         **MR. CHATTERJEE:**  He's at Waymo.

12         **THE COURT:**  No, he's over there, that's right.

13      Well, I don't know if he qualifies as a managing agent,

14  officer, or something.  We'd have to fight over that.  You two

15  would have to fight over it.  I don't know the answer to that.

16  See, he may not be high enough.  So he might be somebody where

17  you could not do that.  You could use it to impeach him, but

18  you could not use it necessarily to -- and I'm not making a

19  ruling on this -- just to read it, use it to quote any purpose

20  within the meaning of Rule 32.

21         **MR. CARMODY:**  That was the reason I asked the

22  question, because it seems to me there's a pretty limited

23  universe of people who are managing agents, but most people on

24  the other side are adverse witnesses and it seems like you need

25  to lay a foundation.

1       **THE COURT:**  Yeah, it's probably 50-50 whether or not

2   I think you have to show that they qualify within the meaning

3   of the rule.

4       **MR. CARMODY:**  Yeah.

5       **THE COURT:**  Okay.  Next, we will -- I want you -- I'm

6   not saying we'll get there, but on the first day you should at

7   least have one witness ready to go in case we get to the

8   witnesses.

9       I don't need a copy of all the trial exhibits myself.  I

10  think, in my view, if each of you pick out the top 20 and give

11  it to me in a notebook, that's all I want.  I promise you the

12  top 20 will cover 80 percent of the trial.  So that's all I

13  need.

14      Okay.  I want to come back to no coughing.  I know people

15  make fun of me on this, but I want to explain why I have this

16  rule.  No coughing and no paper shuffling.

17      When Mr. Verhoeven is standing there and he's got the

18  witness on the stand and the witness is going down for the

19  third time, Trick Number 48 is start coughing on the other side

20  so that the jury will be distracted and won't hear it.

21      When I was a practicing lawyer, I tried a number of cases

22  and I came to realize that when I -- in the rare occasions I

23  had them on the ropes, that was what happened.

24      And the other thing is to shuffle a lot of papers, make

25  noise and shuffle papers and move around.  Don't do that.

 1     If you start hacking and coughing, I hold this up here, I

 2 say, "Mr. So-and-So, do you need a cough drop?"  Then I

 3 explain, "I can't hear up here whenever you're coughing."  And

 4 so then I let the other side go back over all of the bad

 5 testimony again because I didn't hear it.

 6     So those of you who've tried cases here know this, that if

 7 you have the floor, you have the floor here and no one is going

 8 to be distracting you and you get to be an advocate.  And an

 9 advocate, if you frame the right question, that witness is

10 going to go down for the third time.  That's great.  That's the

11 American way.

12     So I believe in advocacy, and that is the real reason I

13 don't like the coughing.  Even though the lawyers like to make

14 fun of me about it, okay.  But I believe in advocacy and I want

15 you to have the undivided attention of the jury.

16     So I believe very strongly in that, so please honor the

17 right.  They are going to honor your right to make their

18 witnesses go down for the third time too.

19        **MR. VERHOEVEN:**  Your Honor, that doesn't apply to

20 squeaky chairs, does it?

21        **THE COURT:**  Yes, it does.

22        **MR. VERHOEVEN:**  I got in trouble for a squeaky chair.

23        **THE COURT:**  No squeaky chairs.

24        **MR. VERHOEVEN:**  Okay.  We'll bring our WD-40.

25        **THE COURT:**  Yeah.  Get WD-40 in here; or you identify

1   the squeaky chairs, I'll get it fixed.

2          **MR. VERHOEVEN:**  Okay.

3          **THE COURT:**  All right.  You know, for you members of

4   the public, I can't stop you but I tell you this, I don't even

5   like people -- if you're associated with one of the law firms

6   here, no going in and out of the door while the witness is on

7   the stand because it's the same problem.  The jury will look

8   out and see, "Who's that coming?  Who's that going?"  No, we

9   want the jury -- this is a hard case to understand and I want

10  to jury to understand it.

11     Okay.  Occasionally we're going to have -- a new subject

12  here.

13     Occasionally we're going to have fights over something

14  that happened in discovery and you're going to say, "That's so

15  unfair.  They should not be allowed to do that.  We asked him

16  that question in Interrogatory 89 and they dodged it."  Okay.

17  I've learned the hard way you've got to have your discovery

18  records here in court.  I will not take your word for it.

19     So if you tell me they didn't -- it's got to be proven up

20  chapter and verse or you're not going -- you know, life is too

21  short.

22     Sometimes a lawyer can convince me with chapter and verse

23  that, yes, this is very unfair what they're trying to do, but

24  you've got to have it in writing.  You can't -- it's got to be

25  clear-cut and no "I believe," no verbal representations.  It's

1  got to be -- so have your material here in court.

2      Stipulations.  If you want a stipulation to be in the

3  record, it's got to be read to the jury.  You don't get to put

4  it in writing and it goes in.  That just gives it too much

5  weight.

6      So what you do is you take up part of your time.  You say,

7  "Judge, we'd like to read Stipulation Number 8."  So

8  Mr. Verhoeven reads it to the jury exactly slowly.  And then I

9  ask the other side, "Do you so stipulate?"  They will say,

10  "Yes."  And I then tell the jury, "That's now evidence in the

11  case."  So then it is evidence in the case, but that's the way

12  we do stipulations.

13      We have an electronic jury evidence cart that is explained

14  on the Court's website so that the jury during their

15  deliberations can see things that are electronic that are in

16  evidence, only things that are actually in evidence, like in a

17  criminal case you might have a recording of a drug deal, or in

18  this case it may be a recording of something else, or a video

19  maybe.

20      All right.  Those are the things I've got on my list, but

21  you had a couple more, Mr. Chatterjee, and I cut you off, so

22  please go back to those.

23          **MR. CHATTERJEE:**  Yeah, they were two fairly small

24  issues, Your Honor.

25      One thing that I had was in some other judges' courtrooms

1   in this district the judges have said it's been helpful to the

2   jury to give a very short introduction of who the witness is

3   when they take the stand.  And I don't know if Your Honor

4   has --

5            **THE COURT:**  Well, give me an example of -- I mean,

6   usually the witness is introduced who they are anyway.

7            **MR. CHATTERJEE:**  It would be something, like we

8   talked about Mr. Haslim, Mr. Haslim is a senior engineer at

9   Uber.  That would be an example because it gives them a context

10  for who they're listening to.

11           **THE COURT:**  But why -- you mean I would do that or

12  you would do that?

13           **MR. CHATTERJEE:**  The lawyer taking the direct

14  examination.

15           **THE COURT:**  All right.  But when they testify,

16  they're going to say, "Who are you?"  "I'm a senior engineer at

17  Uber."

18           **MR. CHATTERJEE:**  I understand, Your Honor.  I'm just

19  saying a lot of judges have found that helpful.

20           **THE COURT:**  If you-all want, both sides, do it, fine.

21           **MR. VERHOEVEN:**  I would object to that.  I would

22  negotiate with the other side and see if we can reach agreement

23  on if we stipulate to call a witness by video, allowing the

24  attorney to introduce who the witness is before the video gets

25  played because --

1              THE COURT:  Otherwise the jury -- it may not be so

2       clear.

3              MR. VERHOEVEN:  Yes, exactly.

4              THE COURT:  All right.  I'm inclined in the direction

5       of Mr. Verhoeven on that one; but if you two stipulated to it,

6       I don't see a problem, but I also think it's easy to fix by

7       asking that as the first question.

8              MR. CHATTERJEE:  And then the second question,

9       Your Honor, was juror questions.  What's your practice on that?

10             THE COURT:  Okay.  That's a different thing.  I allow

11      the jury to submit written questions all through the trial, and

12      I will tell them that they're free to submit them and they

13      don't have to, and I explain how it works.

14         And the way it would work is that I get a question at a

15      break -- well, first, if I get a question, I may -- if it's a

16      straightforward one, I may deal with it immediately and just

17      give it to the lawyers.

18         But I usually would wait until the next break and then

19      give it to the lawyers, and then you decide how you're going to

20      address it if at all, and I'll leave it to your discretion

21      whether to address it.

22         And I tell the jury that's the way I'm going to deal with

23      it, is that sometimes -- I would say 90 percent of the time the

24      lawyers find a way to address it.  So I think it's a good thing

25      to let the jury be engaged and to ask questions.

1      Any objections?

2          **MR. VERHOEVEN:**  Just, again, clarification.  I mean,

3   from my experience -- I've never done that before, Your Honor,

4   but in my experience, the closest thing is questions from the

5   jurors when they're deliberating, and oftentimes there's an

6   argument between counsel about what's permitted to say or not.

7          **THE COURT:**  Once they're in deliberations, it's a

8   different story because then we've got to be very careful on

9   what we say in response to a question.  That, I -- I'm talking

10  about questions as the evidence comes in.  I thought that's

11  what you were talking about.

12         **MR. CHATTERJEE:**  Yes, Your Honor, that is what I'm

13  talking about.

14         **THE COURT:**  As the evidence goes along, and then I

15  think it's good for the jury to be allowed to ask those

16  questions.  And if they -- sometimes they come up with great

17  things like, you know, "What day did you even start working at

18  the company?"  You know, they don't ask questions -- like, they

19  know enough not to ask questions like "Is there insurance in

20  this case?"

21         **MR. VERHOEVEN:**  All I'm saying is before one side or

22  the other goes off answering the question, I think that each

23  side should have an opportunity to know what they're going to

24  say and whether it's inappropriate or not.

25         **THE COURT:**  I don't agree with that.  If it's a

problem -- let's say that you are examining a witness and then
we have a break and I hand you a note from a juror when they're
in the break room saying, "When did so-and-so start with the
company?  When did the witness start with the company?"  I'm
not going to let you-all have an argument, a minitrial with me
over whether you get to answer that.

     That will be the very next question that you ask whenever
they come out probably, and I'm not going to let them try to
sabotage your ability to answer that question and like you
can't sabotage their ability.

     Now, if it's something that could get into dangerous
territory, okay, then we may have -- and it may be that I order
you-all to ignore the question.

          **MR. VERHOEVEN:**  Exactly.  And that's all I'm
referring to.  So, for example --

          **THE COURT:**  In that case, we would have a discussion
among all of the lawyers.

          **MR. VERHOEVEN:**  Okay.  Thank you, Your Honor.

          **MR. CHATTERJEE:**  So, Your Honor, I do have one
additional question about that and it's purely a logistical
one, which is:  How do you go about soliciting the questions?
It sounded like you might take questions in the middle of
examination.

          **THE COURT:**  Yeah.

          **MR. CHATTERJEE:**  And so --

1          **THE COURT:**  I just let them submit it to me anytime.

2     Usually they give it to the clerk when they're walking out to

3     the jury room or when they come back from a break.  Yeah, and

4     then I get them up here and I -- as soon as is practical, I

5     give it to the lawyers -- so you can see what's on the mind of

6     Juror Number 10.

7          **MR. CHATTERJEE:**  Okay.

8          **MR. VERHOEVEN:**  I think that's a terrific practice.

9          **THE COURT:**  I tell them up front they can ask

10    questions in writing and give it to the clerk.

11         **MR. CHATTERJEE:**  The reason I was asking, Judge, is

12    some judges wait until the end of the examination and solicit

13    questions and then they do it, but this is fine too.

14         **THE COURT:**  Then it may be too late.  I think it's

15    better to -- then you've got to go back.

16         **MR. CHATTERJEE:**  That's fine.

17         **THE COURT:**  No, I think it's better to just give it

18    to you as it comes up.  And that may mean that the lawyer who

19    has the stand at the moment, the lectern at the moment, is the

20    one that gets to clarify it.

21         And, believe me, that's not going to win the case for

22    somebody, you know, the fact that Mr. Verhoeven was the one

23    that helped that juror out by clearing that point up.  Just I

24    don't even think they remember who helped them out.

25         So, okay.  Any other questions you got for me?

1          **MR. VERHOEVEN:**  I have three.

2          **THE COURT:**  Yep.

3          **MR. VERHOEVEN:**  First, maybe you covered this, but I

4    didn't write it down, the subject of peremptories.

5          **THE COURT:**  Each side gets -- what? -- three.  Your

6    side gets three total.  So you have to agree on how you're

7    going to exercise your three.

8          **MR. VERHOEVEN:**  I wonder if with a 10-person jury

9    that's --

10         **THE COURT:**  That's perfectly enough.  It's too many.

11         **MR. VERHOEVEN:**  Okay.

12         **THE COURT:**  Because we're going -- in addition, you

13   get for-cause challenges, so three's plenty.

14         **MR. VERHOEVEN:**  Okay.  Thank you.

15      And second question is, inevitably in these technology

16   trials there's objections about an expert testifying beyond the

17   scope of his report.  Does Your Honor have a practice on that?

18         **THE COURT:**  Yes, I do.  On direct examination they've

19   got to stick to the report and if there's an objection that

20   it's not in the report, then I ask you to tell me where it is

21   in the report; and if it's not there, then I tell the jury to

22   disregard what the witness said.  It's got to be in the report.

23         **MR. VERHOEVEN:**  And that's all done live in front of

24   the jury?

25         **THE COURT:**  For both sides.

1    Now, but, but, here's a very important thing, let's say

2    that you're the proponent of the witness, so you've got to

3    stick to the report, exactly what's in the report.  You can

4    omit things.

5        **MR. VERHOEVEN:**  Right.

6        **THE COURT:**  That's okay.  If they've got five

7    opinions, you just want one, you can -- all right.  But now

8    it's the other side's turn.  They're not stuck with the four

9    corners of the report.  So they may want to get into things

10    that go beyond the four corners of the report, especially

11    things to impeach them.

12    And I promise you it happens all the time, then they open

13    the door for you on redirect to go into things that were never

14    in the report; and they're jumping up and down saying, "It was

15    not in the report."  I say, "Too bad.  Too bad.  You opened the

16    door because of your cross-examination."

17    So be aware.  This works both ways.  It happens a lot.

18    You're not limited to the four corners of the report if the

19    other side on cross opens the door.

20        **MR. VERHOEVEN:**  And then one follow-up on that.  I

21    understand everything you just said, but the experts are going

22    to be sitting here at trial.  Is it impermissible for them to

23    allude back to testimony that they heard?

24        **THE COURT:**  Correct.  That's one of the great ironies

25    and paradoxes, I think, of the -- unless you both want -- if

1  you both stipulated to let them to do that, I would say fine.

2  If you both stipulated to a rule that they can comment on what

3  the other side said even though it's not in their report, I

4  would be okay with that; but, you see, the -- this is a

5  historical thing.

6      The rule says you're stuck with what's in the report.

7  Stick to the four corners of the report.  That rule is more

8  recent than the ancient practice of having the experts in the

9  courtroom to hear what the other side says.  What's the point

10 of having them in here to hear what the other side says if

11 they're stuck with the four corners of the report?  I've often

12 wondered that.

13     Well, it does come up occasionally.  It could come up on

14 cross-examination, so let's say your expert sticks to the four

15 corners, and then you get to say on cross, "Well, you were

16 here.  You heard what my expert said.  Isn't he right about A

17 and isn't he right about B?"  That would be perfectly

18 legitimate because you're not stuck with the four corners of

19 the report on cross-examination.

20     So there is a role for having them in the courtroom even

21 though they can't -- on direct they cannot exceed the four

22 corners unless you two stipulate -- you three.  I would be

23 happy to have you do that, but I'm also -- I doubt that you

24 will, so I will just leave it to your discretion.

25          **MR. VERHOEVEN:**  Thanks for those clarifications.

1   It's very helpful, Your Honor.

2       The last question I have is I heard what you said about

3   only using the tabbed original exhibits with the witnesses.

4           **THE COURT:**  Well, not tabbed.  Just the marked.

5           **MR. VERHOEVEN:**  Marked.

6           **THE COURT:**  The ones that are labeled.

7           **MR. VERHOEVEN:**  Right.  Yeah.  So what we often do is

8   have a binder for the witness of the exhibits to make it go

9   fast.

10          **THE COURT:**  Yeah, but then it turns out the exhibit

11  binder has got a mistake in it.  So I would rather you give

12  them the original.

13          **MR. VERHOEVEN:**  Okay.

14          **THE COURT:**  If both sides would stipulate to some

15  alternative that allowed the witnesses to see these big

16  binders, I would be open to listening to you on that; but in

17  the absence of an agreement, I'm going to stick to my

18  tried-and-true method that you've got to use the ones that go

19  into the jury room and to the Court of Appeals.

20          **MR. VERHOEVEN:**  All right.  We'll discuss with the

21  other side.  Maybe we can have a procedure where they inspect

22  the exhibits binder before the witness gets on the stand or

23  something.

24          **THE COURT:**  Maybe.  Maybe.

25          **MR. CARMODY:**  I mean, it seems like you could just

 1  hand me -- if you're going to use five exhibits with the

 2  witness, you could go get the official exhibits, set them

 3  there, the witness has them, and then you can use the big

 4  screen to move along.

 5          **THE COURT:**  That's the way I make the lawyers do it

 6  even in big cases; but if you agree to something else and you

 7  both stipulated, then -- but the thing is you've got to

 8  stipulate to what happens when there's a mismatch and it's not

 9  the original, it's not the actual exhibit because of some

10  clerical error but the clerical errors could be exceedingly

11  important.  If there's no -- for example, if the exhibit is

12  missing a page, wow, that could be important.

13      Okay.  You had three things.  What's your other one?

14          **MR. VERHOEVEN:**  I think that was all three,

15  Your Honor.

16          **THE COURT:**  Okay.

17          **MR. CARMODY:**  I had one thing, Your Honor.

18          **THE COURT:**  Please, go ahead.

19          **MR. CARMODY:**  When you talked about the witness

20  making sure they stick by their report, I'm trusting you mean

21  their opening report; in other words, they can't cure something

22  in rebuttal.

23          **THE COURT:**  Right.  Here's the way it works.  Opening

24  report, you're stuck with what's in the opening report.  You

25  cannot jump forward to the reply.

1        **MR. CARMODY:**  That's what I thought.

2        **THE COURT:**  Mr. Verhoeven, do you understand?  I want

3   to make sure you understand this.  You cannot jump forward to

4   what's in the reply report.  You have to stick with the opening

5   report.

6        And then we hear the other side and their expert maybe

7   comes in, maybe not; and then on your rebuttal case you get to

8   bring your original guy back to put in the reply.

9        Now, why is this?  There's several reasons.  Abuse

10  Number 89 is that the opening report is not so good, not a good

11  workmanlike job, and the lawyer realizes that after they see

12  the other side's.  And so then they try to fix it up in the

13  reply and it's very unfair.

14       Well, it could be that the way this could easily happen

15  that that expert on direct then gets on cross and is blown out

16  of the water so that you don't even have to bring in the other

17  expert, and so the reply never sees the light of day.  That

18  could happen.

19       So to make the system work more honestly, you've got to --

20  you don't get to advance forward anything in the reply until on

21  your direct testimony.

22       Now, on the other hand, if on cross-examination the door

23  is open to that -- on your case-in-chief, I'm using you as an

24  example, you've got to stick to the four corners but then the

25  cross-examination opens the door to all kinds of things.  Well,

1  of course, even if it's in the reply, it gets to come in

2  because you opened the door.

3     But if you stick -- if you don't open the door, then the

4  reply never sees the light of day until the rebuttal case.

5           **MR. CARMODY:** Okay.

6           **THE COURT:** All right. And for you the surrebuttal

7  case.

8     Okay. I see two more lawyers who have questions.

9                     (Counsel conferring.)

10           **THE COURT:** Help me understand something here.

11  Mr. Carmody, are you going to be the lead lawyer?

12           **MR. CARMODY:** Yes, sir.

13           **THE COURT:** Okay. So is MoFo going to have a role in

14  the trial? What is --

15           **MR. CARMODY:** Oh, yeah. We're all together. A happy

16  family.

17           **THE COURT:** All right. In other words, I ask that

18  because MoFo is a potential witness in the case, so didn't we

19  deal with that in an earlier hearing and I said that we were

20  not going to identify what law firms we were with?

21           **MR. GONZALEZ:** Correct.

22           **MR. CHATTERJEE:** Correct.

23           **THE COURT:** All right. So -- okay. That's what I

24  want to do unless -- all right. That's what we're going to do.

25  Okay.

1          **MS. DUNN:**  Can I clarify one thing on the experts?

2          **THE COURT:**  Sure.

3          **MS. DUNN:**  So let's say your cross-examination of the

4     expert is, "Sir, you didn't address X in your report; right?"

5     And the answer is, "No."  So then my understanding is that they

6     can't then come back on redirect and say, "Oh, in your reply

7     you put this in," because the whole point is you didn't do it

8     in your opening report and that needs to be saved for rebuttal.

9          **THE COURT:**  I usually would agree with you.  I can't

10    say every time but, yeah, that criticism that "You didn't

11    consider X in your opening report -- you didn't consider X, did

12    you," they've got to say, "Yeah, that's true, I didn't consider

13    X," I don't think that opens the door to what's in the reply;

14    but there could be circumstances where the way it comes out it

15    does open the door, and I don't want to be locked into that.

16         **MS. DUNN:**  I understand.  It's different than a

17    methodological cross but saying "You didn't put X, so I

18    appreciate Your Honor's clarification.

19         **THE COURT:**  But let's say the next question was

20    something like, "Well, if you had to know that kind of an

21    analysis, what do you think it would have shown?"  They could

22    say, "Well, I did that exact thing in the reply report and

23    here's what it shows."

24         **MS. DUNN:**  That makes sense.  We understand and

25    appreciate the clarification.

1          **THE COURT:**  All right.  Mr. Gonzalez?

2          **MR. GONZALEZ:**  Your Honor, two very quick things.

3       One is jury questionnaire.  We submitted a proposal to the

4    Court.  We need to finalize it so we need to get your blessing.

5    It was a stipulated questionnaire, so I don't think there

6    should be an issue.

7          **THE COURT:**  I know that you -- I asked you to comment

8    on Question 9, and I think we adopted that; right?  So we did.

9       And then you gave us an incredibly long list of witnesses

10   that we'll have to put in microscopic print on the back to

11   circle the names of anybody.  We'll have to give special

12   glasses to the *venire* to be able to read it.  But, yeah, I'm

13   planning on handing that out.

14         **MR. GONZALEZ:**  All right.  So you're going to take

15   care of that?

16         **THE COURT:**  Aren't we going to take care of that?

17      Yeah.  We'll take care of that, I think.

18         **MR. GONZALEZ:**  All right.  And then the second issue

19   is challenges for cause.

20         **THE COURT:**  Yes.

21         **MR. GONZALEZ:**  What is your -- I read your order and

22   your order doesn't address it.

23         **THE COURT:**  What do you mean?

24         **MR. GONZALEZ:**  How do you do them?

25         **THE COURT:**  Well, usually they're done out of the

1  presence of the jury unless it's so obvious that I might say,

2  "Can I have a stipulation to excuse Mr. So-and-So?"

3      But most of the time if I think it's even arguable one way

4  or the other, I would wait till the next break and then I would

5  say, "Okay.  Any challenges for cause?"  Then you would say,

6  "Yeah, we want to challenge 1 and 2."  Then I would hear you

7  out on that, hear the other side out.

8          **MR. GONZALEZ:**  Thank you, Your Honor.

9          **THE COURT:**  That's the way it works.

10          **MR. EISEMAN:**  Your Honor -- oh, Mr. Carmody?

11          **MR. CARMODY:**  No, I'm fine.

12          **MR. EISEMAN:**  One clarification, on the juror

13  questionnaire, Question 9, we had understood that the Court was

14  going to mail that questionnaire out.

15          **THE COURT:**  No.  No, no, no.  They're going to fill

16  it in when they get here in the courtroom, and you will not get

17  the answers until that person is called forward.

18          **MR. EISEMAN:**  Understood, Your Honor.

19          **THE COURT:**  I don't want anybody -- I know you

20  promised me you won't do that, but I don't want any possible

21  jury consultant or somebody sneaking that and invading the

22  privacy of those jurors, but I will give it to you when they

23  show up.

24      The one thing that we ought to discuss is if there is an

25  obvious question like "I hate Uber."  Let's say they said, "I

 1  hate Uber and I wouldn't use Uber if it was the last cab on

 2  earth."  I would just excuse that person.  You're not going to

 3  get a chance to rehabilitate them.

 4      So you will get -- we'll get a few of those on both sides.

 5  They could say the same thing about Google.  So I think that's

 6  a small problem that I think you will both agree to and we'll

 7  solve that later.

 8          **MR. EISEMAN:**  Thank you, Your Honor.

 9          **THE COURT:**  Here's another problem we need to

10  address.  You know how I feel.  I feel the public should hear

11  as much of the evidence as possible, so I want the parts that

12  have to be on a closed courtroom -- right now I'm just talking

13  trade secrets.  I think we ought to try to segregate that to a

14  given day or you come up with a practical way so that we don't

15  have the problem of having to send witnesses -- I'm sorry --

16  the public in and out of the courtroom.

17      So think about that in your organization of witnesses,

18  that we have a segment where the courtroom's cleared, the jury

19  can hear it; but what we don't have is in, out, in, out, over

20  the course of a day.  It just is not good for the -- it's not

21  good for the jury because there's all that disruption, but at

22  the same time the public has a right to hear what goes on in

23  their District Court.

24      I think I've run out of questions.  Do you have anything

25  that I forgot?  She says no.

1    I will see you again what day?  Next week on the motion

2    for continuance.  I still am trying my best to keep the trial

3    date on October 10th.  It would be a major disruption in my

4    calendar to move it, but I am going to be fair to both sides,

5    and I want to see you back here on the 3rd?

6              **THE CLERK:**  Yes.  At 10:30.

7              **THE COURT:**  What day is it?

8              **MR. VERHOEVEN:**  It's October 3rd.

9              **THE COURT:**  The 3rd?

10             **MR. VERHOEVEN:**  Yes.

11             **THE COURT:**  And what time will you be here?  Do we

12   have a time?

13             **THE CLERK:**  8:00 o'clock.

14             **THE COURT:**  8:00 o'clock.  Okay.

15    So unless you have more, it's now almost 1:00 o'clock, we

16   will break for now, and then I will see you on October 3rd.

17   All right?

18             **MR. VERHOEVEN:**  Thank you, Your Honor.

19             **MR. CARMODY:**  Thank you, Your Honor.

20             **THE COURT:**  All right.  Good luck to both sides.

21             (Proceedings adjourned at 12:39 p.m.)

22                  ---oOo---

23

24

25

**CERTIFICATE OF REPORTER**

      I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Wednesday, September 27, 2017


_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR
U.S. Court Reporter


_____

Lydia Zinn, CSR No. 9223, FCRR
U.S. Court Reporter