Pages 1 - 61

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before the Honorable Jacqueline C. Corley, Magistrate Judge

| | | |
|---|---|---|
| WAYMO LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **No. C 17-0939 WHA (JSC)** |
| | ) | |
| UBER TECHNOLOGIES, INC.; | ) | |
| OTTOMOTTO LLC; OTTO TRUCKING | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Wednesday, September 27, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
        50 California Street, 22nd Floor
        San Francisco, California  94111
    BY:  **DAVID A. PERLSON, ATTORNEY AT LAW**
        **JAMES D. JUDAH, ATTORNEY AT LAW**

        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
        555 Twin Dolphin Drive - 5th Floor
        Redwood Shores, California 94065
    BY:  **LINDA J. BREWER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
        Official Reporter

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant Uber Technologies, Inc.:
                       MORRISON & FOERSTER LLP
3                      425 Market Street
                       San Francisco, California 94105
4                 BY: **ARTURO J. GONZÁLEZ, ATTORNEY AT LAW**
                       **ESTHER K. CHANG, ATTORNEY AT LAW**
5
                       SUSMAN GODFREY LLP
6                      1301 Avenue of the Americas - 32nd Fl.
                       New York, New York 10019
7                 BY:  **CORY BULAND, ATTORNEY AT LAW**

8    For Defendant Otto Trucking LLC:
                       GOODWIN PROCTER LLP
9                      Three Embarcadero Center - 24th Floor
                       San Francisco, California 94111
10                BY:  **RACHEL M. WALSH, ATTORNEY AT LAW**

11   On behalf of nonparty Stroz Friedberg:
                       LATHAM & WATKINS
12                     505 Montgomery Street - Suite 2000
                       San Francisco, California  94111
13                BY:  **MELANIE M. BLUNSCHI, ATTORNEY AT LAW**
                       **WHITNEY M. WEBER, ATTORNEY AT LAW**
14                          **(via CourtCall)**

15   For Intervenor Lior Ron:
                       TAYLOR & PATCHEN LLP
16                     One Ferry Building - Suite 355
                       San Francisco, California  94111
17                BY:  **JONATHAN A. PATCHEN, ATTORNEY AT LAW**

18   For Intervenor Anthony Levandowski:
                       RAMSEY & EHRLICH LLP
19                     803 Hearst Avenue
                       Berkeley, California 94710
20                BY:  **MILES EHRLICH, ATTORNEY AT LAW**

21   For Miscellaneous Colin Sebern:
                       FARMER BROWNSTEIN JAEGER LLP
22                     235 Montgomery Street - Suite 835
                       San Francisco, California  94104
23                BY:  **DAVID C. BROWNSTEIN, ATTORNEY AT LAW**

24

25

**APPEARANCES**:   (CONTINUED)

Special Master:            FARELLA, BRAUN & MARTEL LLP
                           Russ Building
                           235 Montgomery Street
                           San Francisco, California  94104
                      BY:  **JOHN L. COOPER, ATTORNEY AT LAW**

```
 1   Wednesday, September 27, 2017                    2:33 p.m.

 2                   P-R-O-C-E-E-D-I-N-G-S

 3                       ---000---

 4           THE CLERK:  Hello?

 5           MS. BLUNSCHI:  Hello.  Melanie Blunschi and Whitney

 6   Weber of Latham on behalf of Stroz Friedberg.

 7           THE CLERK:  Okay.  Calling Civil Action, C 17-0939,

 8   Waymo versus Uber.

 9           THE COURT:  Plaintiff?

10       MR. PERLSON:  Good afternoon, Your Honor.  David

11   Perlson, Quinn Emmanuel, here with James Judah and Linda

12   Brewer.

13           THE COURT:  Mr. Judah, are you married?

14       MR. JUDAH:  As an officer of the court, I have to be

15   candid, I am enjoying marital bliss.

16           THE COURT:  Excellent.  Excellent.  He should get a

17   copy of that and give it to his wife.

18       MR. GONZALEZ:  Good afternoon, Your Honor.  Arturo

19   Gonzalez, Esther Kim Chang from Morrison & Foerster for Uber.

20           THE COURT:  Good afternoon.

21       MR. BULAND:  Cory Buland from Susman Godfrey for Uber,

22   Your Honor.

23           THE COURT:  Good afternoon and welcome.

24       MR. BULAND:  Thank you.

25       MS. WALSH:  Rachel Walsh from Goodman Procter on
```

1   behalf of Otto Trucking.

2          **THE COURT:**  Good afternoon.

3          **MR. PATCHEN:**  Good afternoon, Your Honor.  Jonathan

4   Patchen, Taylor & Patchen, on behalf of Lior Ron.

5          **THE COURT:**  Good afternoon.

6          **MR. BROWNSTEIN:**  Good afternoon, Your Honor.  David

7   Brownstein on behalf of Colin Sebern.

8          **THE COURT:**  Good afternoon.

9          **MR. COOPER:**  John Cooper, Special Master.

10         **THE COURT:**  Hello, Mr. Cooper.

11         **MR. EHRLICH:**  Miles Ehrlich on behalf of

12   Mr. Levandowski.

13         **THE COURT:**  Good afternoon.

14         **MR. EHRLICH:**  Good afternoon.

15         **THE COURT:**  All right.  And I hear I have counsel for

16   Stroz on the phone, so good afternoon.

17      I know you've all had a very long morning, so we'll try to

18   cut through it and get through it quickly.

19      I want to talk to the parties about the native files and

20   the devices and getting that going.  So let's start with that.

21      As I understand it, you made a proposal, and I couldn't

22   quite -- you can tell me, Mr. Ehrlich, but it looked like maybe

23   there was agreement as to the protocol.

24         **MR. JUDAH:**  Largely.  With respect to the forensic

25   protocol, Ms. Brewer has been on the ground on that, but I

1    think we're -- we either have an agreement or are very close.

2         THE COURT:  All right.  Maybe you, Mr. Ehrlich, can

3    tell me if there's any disagreement.

4         MR. EHRLICH:  I think we're very close.  I think

5    Ms. Brewer maybe wasn't able to answer whether some of the

6    small stipulations that we requested were agreeable, but I

7    can -- I can direct the Court to the conditions that we were

8    requesting to add are on the second page of our short brief

9    that we filed yesterday.

10        MS. BREWER:  I can perhaps clarify.

11        So there is a forensic protocol that's being discussed.

12   That forensic protocol is simply with respect to an ability to

13   look at the forensic footprint of the native devices.  So we

14   proposed to those who were involved and had an interest how

15   that would be done, and I think there's no disagreement with

16   respect to that.

17        THE COURT:  Okay.

18        MS. BREWER:  However, our request is to have an image

19   of the native devices themselves, and I think that is what is

20   in controversy.

21        THE COURT:  Because you want to be able to search

22   those to see if there's anything missing --

23        MS. BREWER:  Correct.

24        THE COURT:  -- from that that was not on Relativity?

25        MS. BREWER:  Correct.  It would be a forensic and a

1   content analysis of those devices.

2        **THE COURT:**  Okay.  I think you understood that but you

3   can tell me.

4        **MR. EHRLICH:**  Yes.  I think there was some splitting

5   between what we're calling forensic review and content review.

6        I do understand that at least as to the devices that have

7   not been reviewed by anyone, we are agreeable, again with a few

8   conditions, to the proposed protocol, which I can discuss.

9        Our concern -- and I think Mr. Patchen shares it -- is to

10  the device that was harvested and imported into Relativity, and

11  we went through the process of screening out privilege and

12  privacy matters.  We don't believe there needs to be any

13  content review of that device at all, but we understand there

14  may need to be some forensic review.

15       And so if we're limiting it to forensic review under the

16  basic terms of the protocol --

17       **THE COURT:**  Okay.

18       **MR. EHRLICH:**  -- that they asked for, we have no

19  objection with the caveat -- the most important caveat -- is

20  that we'd like to be provided with the reports, data, and

21  information extracted from that forensic image and have the

22  standard clawback rights to the extent there is an extraction

23  of anything.

24       **THE COURT:**  So with respect to the devices that have

25  not been -- were not reviewed by Stroz but have been

1  forensically imaged, I assume by now --

2          MR. PERLSON:  I don't think they've all been imaged

3  yet.

4          THE COURT:  Well, they were starting it the last time.

5          MR. EHRLICH:  Maybe Ms. Blunschi --

6          THE COURT:  Yeah, Ms. Blunschi?

7          MS. BLUNSCHI:  I can address that.

8      And just a minor clarification, though, on the distinction

9  between the forensic analysis and the content analysis.  One

10  thing that we've, you know, been clear with the parties and

11  interested parties about is there is a difference between

12  Relativity and the native, particularly with respect to source

13  code.

14          THE COURT:  Right.  And videos --

15          MS. BLUNSCHI:  Source code is not --

16          THE COURT:  -- or at least they can't be accessed.

17          MS. BLUNSCHI:  Yes.

18          THE COURT:  Yeah.  Okay.

19          MR. PERLSON:  It's a significant issue.

20          THE COURT:  Yeah.  No, I understand that.

21          MR. EHRLICH:  And I want to clarify.

22          MS. BLUNSCHI:  Yeah.

23          MR. EHRLICH:  We have no objection to review of the --

24  the device that's already been loaded into Relativity, if

25  there's source code or video files or other files that cannot

1    be reviewed, we have no objection to review for that.

2          THE COURT:  Okay.  So let's start, though, with the

3    devices that were not reviewed by Stroz and which I thought

4    that you were going to start to image.  Have those been imaged?

5          MS. BLUNSCHI:  Yes.

6          THE COURT:  Okay.  So those have been.

7          MS. BLUNSCHI:  So those have been, yes.  So those have

8    been imaged, but there is a variety of different kinds of

9    devices.  So with respect to devices that were things like

10   simple desktop machines, those can be loaded up for review.

11   You know, merely imaging them, you know, essentially has them

12   ready to go.

13         Some of the devices turned out to be rather complicated.

14   The pieces are rather complicated homemade servers, so storage

15   arrays that Levandowski had constructed, and so imaging the

16   individual hard drives of those doesn't necessarily allow them

17   to be booted up, particularly not in a forensic software.  So

18   the Stroz folks and the Discovia folks have been talking about

19   that to figure out --

20         THE COURT:  And Discovia is Waymo's folks; is that

21   right?

22         I'm sorry.  Go ahead.

23         MS. BLUNSCHI:  Uh-huh, yes.

24         -- to try to figure out what the best way -- assuming

25   access to those materials is granted, what the best way to

1    stage them for review would be.

2            **THE COURT:**  Okay.

3            **MS. BLUNSCHI:**  So we have complied with imaging them.

4    That is done.  It's just it's a pretty complicated process to

5    reconstruct these, you know, multiterabyte 20-drive servers

6    that were not, you know, constructed when we picked them up.

7            So I'm -- just sort of as an example, it's very important

8    for the drives to be in particular orders.  If they are not,

9    you know, in that order -- and, as I understand it, they

10   weren't in storage -- there are a bunch of -- you know, many,

11   many different configurations that can be loaded and they have

12   to be loaded through forensic software to do that.

13           I know that the tech folks who have a better understanding

14   shared a mutual sigh of "Gosh, that sounds like a big project";

15   but we are optimistic that if access is granted, Discovia and

16   Stroz can cooperate to try to find the best way to make this

17   happen.

18           **THE COURT:**  All right.  So it sounds like they're

19   working on it in any event, but some of them are ready to go.

20           **MS. BLUNSCHI:**  Yes.

21           **THE COURT:**  So given that -- and now I'm just talking

22   to Mr. Ehrlich -- I'm not going to limit them to one terminal

23   at a time.  If Mr. Levandowski has to have you hire other

24   attorneys, then sobeit, but we're not doing that.

25           **MR. PERLSON:**  Well, this isn't a matter of examining

```
1    on a terminal, as I understand it.  I mean, we need -- we get

2    the image and we have to apply things, and we need to get it.

3    We're not -- this isn't an issue of us going to -- like with

4    the database, of us going somewhere and having, you know,

5    attorneys looking through it.

6         And so it's not practical to have someone, you know,

7    hanging over our head while these folks are trying to work

8    through these incredibly complicated, you know, terabytes of

9    data.

10            THE COURT:  Your protocol provides you giving them

11   access, what your --

12            MR. JUDAH:  From the content piece --

13            THE COURT:  Yes.

14            MR. JUDAH:  -- but we also need the forensic metadata,

15   yeah.

16            THE COURT:  Yes, I understand.  The concern is the

17   content; right?

18            MR. EHRLICH:  Yes.

19            THE COURT:  Is that you're going to -- and then we

20   have the clawback issue; right?

21            MR. EHRLICH:  Yes.

22            THE COURT:  Yes.  Okay.  All right.

23            MR. EHRLICH:  And we don't have --

24            THE COURT:  But the only way it can be done is as a

25   clawback.
```

1          **MR. EHRLICH:**  And we're talking about the content

2     here?

3          **THE COURT:**  Yes.

4          **MR. EHRLICH:**  Yes.

5          **THE COURT:**  With respect to these devices.

6          **MR. EHRLICH:**  I think just to clarify, we don't need

7     to be sitting there when they're doing the forensics for the

8     metadata and such.  We understand --

9          **THE COURT:**  No.  We're talking about the content.

10          **MR. EHRLICH:**  The content, that's -- we would like to

11     be there as their protocol suggested.

12          **MR. PERLSON:**  Your Honor, this is not practical.

13     If -- you know, we've waited for all this time.  Trial starts

14     days from now.  How is it that we're going to be able to be

15     limited in reviewing the content of terabytes of data with

16     Mr. Ehrlich or one of his lawyers sitting over our shoulder?

17          **THE COURT:**  But you're not.  That's what I said.

18          There's going to be -- well, we'll talk about that.  My

19     preliminary view is I don't think they've waived the privilege,

20     particularly not with devices that Stroz never reviewed; right?

21          If I -- let me give you an example.  Now I'm switching to

22     the privilege waiver.  If I leave my cell phone at home and I

23     need a contact and I'm bad, I don't back up my phone to the

24     cloud, so I call my house and my son answers the phone.  I say,

25     "Can you get my contact?"  And I give him my password.  So now

```
 1    he has my phone and he has it all day with access to it.  Are
 2    you going to argue that I've waived the privilege as to my
 3    attorney-client privilege documents on my phone?  No.
 4         MR. PERLSON:  I don't think that has anything to do
 5    with the situation here at all.
 6         THE COURT:  Well, we're talking about devices that
 7    they had that they never accessed.  So actually it has less to
 8    do with the situation because in my example --
 9         MR. PERLSON:  I don't agree with that, Your Honor.
10         THE COURT:  -- he accessed it.
11       Why not?
12         MR. PERLSON:  Because they gave them to them for them
13    to look.
14         THE COURT:  I gave my phone to my son to look through
15    it.
16         MR. PERLSON:  You didn't give your phone to your son
17    so that you could get into a transaction because they wanted to
18    look at your stuff in order -- before buying a company for
19    $680 million.  That's just a completely unrelated situation.
20       That actually sounds like something that might be an
21    inadvertent thing because you didn't expect him to go looking
22    around here.  But here, I mean, it's just not even remotely
23    comparable to the situation that we're talking about.
24         THE COURT:  What about, though, what they told him --
25    they told Stroz not to review the privilege and they gave them
```

1   the names of the attorneys and the like, which is just --

2           MR. PERLSON:  So?

3           THE COURT:  -- the *Fishman* [sic] case out of

4   New Jersey.

5           MR. EHRLICH:  *Fishoff*.

6           THE COURT:  *Fishoff*?

7           MR. EHRLICH:  Yeah.

8           THE COURT:  Out of New Jersey.

9           MR. PERLSON:  I thought that the cases that they were

10  citing had to do with a litigation or government investigation.

11          THE COURT:  It was a government, but what's the diff?

12          MR. PERLSON:  Well, the diff is that it's a completely

13  different situation.  You're being forced into doing something.

14  It's just like a litigation.

15          MR. EHRLICH:  No, no.

16          THE COURT:  No, no, no.  There is no force.  There

17  wasn't any subpoena.  It was a voluntary compliance, which, by

18  the way, the Ninth Circuit has made clear there is no common

19  interest privilege with respect to that, which the parties have

20  argued.  There is not.

21      So if it was a selective waiver, they couldn't do it.  You

22  cannot do selective waiver.  I agree with you.  It would be one

23  thing if they reviewed the documents.  Then that's a selective

24  waiver, but here what we have is the evidence before the Court

25  is that they were not reviewed.  They were not reviewed, and

 1   particularly we know that on devices they never looked at.

 2   They handed them the phone.  That's it.  They were not

 3   reviewed.

 4           MR. PERLSON:  Well, they handed them a lot more than a

 5   phone.

 6           THE COURT:  Well, a computer hard drive --

 7           MR. PERLSON:  Well, they handed all the --

 8           THE COURT:  -- but they were not looked at.

 9           MR. PERLSON:  So, you know, it's fine to talk about

10   them differently.  You know, frankly, Your Honor, to us, in a

11   government investigation where there's a policy interest,

12   perhaps like in litigation, to have these things out there and

13   shared, that's the basis, as I understand it, of, you know,

14   allowing the situation.

15       If I enter a situation --

16           THE COURT:  That would be an argument, then, for

17   actually allowing a common interest privilege to extend that

18   far as well if all we were thinking about is, well, we want to

19   encourage that disclosure, would it not?

20       Let's put it this way --

21           MR. PERLSON:  But the point is that it's a third party

22   that they've provided it to.

23           THE COURT:  Yes.

24           MR. PERLSON:  And they've undertook the risk that they

25   were giving it freely and voluntarily to this third party.

1   That's an entirely different situation than a government

2   investigation.   This is a commercial transaction that these

3   people voluntarily gave their stuff over because they want --

4   because it was being asked by the other party and they said,

5   "Okay.   Here you go."

6         And the fact that it was blocked from being transferred to

7   somebody else doesn't make a difference.   They gave it to Stroz

8   and Stroz was able to access any of it.

9         **THE COURT:**  Could but there was the letter from

10  March --

11        **MR. EHRLICH:**  7th.

12        **THE COURT:**  -- 7th saying don't.

13        See, this is the issue.   None of the cases anyone cited,

14  it seems to be it's a unique situation which happens a lot in

15  this case --

16        **MR. PATCHEN:**  Correct, Your Honor.

17        **THE COURT:**  But what you're really arguing is, you

18  argued, well, the attorney-client privilege is strictly

19  construed.   There's no dispute as to the application of the

20  privilege.   We're talking about waiver, and what you're arguing

21  is that waiver should be liberally applied.   I don't know if

22  that's the case.   I don't know what case says that; right?

23        **MR. PERLSON:**  The general proposition is that when you

24  give your stuff to a third party, you waive it.

25        **THE COURT:**  Yes, but every case you cited involved the

1   third party reviewing the documents and not one of the cases

2   involved what we have here, which says "I'm giving you" -- see,

3   this is a digital world that we live in.  It's a different

4   time -- "I'm giving you access to my e-mail" -- that's

5   *Fishoff* -- "I'm giving you access to my e-mail because it's too

6   hard and too difficult and too time-consuming and too expensive

7   to go through and actually pull the stuff out.  So here,

8   Government, I'm giving it to you voluntarily because I don't

9   want you to prosecute me and you want to see it."  It's

10  similar.  The only difference is it's the government.  That's

11  all.

12          **MR. PERLSON:**  That's a pretty big difference,

13  Your Honor, frankly.

14      I mean, what's the policy interest in allowing

15  Levandowski, Ron, and all these other individuals to hand over

16  their things so that another commercial entity can review them

17  to decide whether they've stolen enough stuff so that they

18  don't want to buy them?

19          **THE COURT:**  No.  The question is if they handed over

20  their privilege materials, if they allowed them to review it,

21  then you're right.  Waiver.  They can't do that.  There's no

22  selective waiver.

23          **MR. PERLSON:**  But they asked them -- they asked them

24  not to do it, but --

25          **MR. JUDAH:**  Yeah.  I mean, Your Honor, admittedly we

```
 1   don't know exactly what was touched by Stroz at any point, but
 2   the March 21st protocol expressly provides that Stroz is
 3   allowed to include privilege communications in the final report
 4   if they deem it relevant.
 5       So what happened in the March 7th letter, which I don't
 6   believe is even referenced in the Stroz report, I don't
 7   understand it to have any operative agreement with respect to
 8   what Stroz was doing with its clients, which were not
 9   Mr. Levandowski --
10           THE COURT:  What did they say at their deposition?
11           MR. EHRLICH:  Stroz?
12           MR. PATCHEN:  It's scheduled for tomorrow.
13           MR. JUDAH:  It's tomorrow.
14           THE COURT:  Well, maybe it's just that it's premature
15   because as the record looks now, but I did look at the protocol
16   and it didn't seem to necessarily follow what was in that
17   March 7th letter.
18           MR. EHRLICH:  So --
19           MR. PATCHEN:  Your Honor, it very clearly did not.
20           MR. EHRLICH:  -- there is some ambiguity; and as
21   Mr. Gardner in his declaration explained, he took great pains
22   to ask -- to ensure that privilege materials were segregated.
23   And under page 1 of the protocol at Footnote 1 it says, "Stroz
24   will use its own algorithms and the names you provided,"
25   O'Melveny is referenced as the group including the individual
```

diligence employees' counsel, "to segregate."

      **THE COURT:**  But it's in the -- it is in the protocol then.

      **MR. EHRLICH:**  It is in the protocol, and I think Mr. Judah is pointing out there's some ambiguity about what happens if despite best efforts, privilege material makes it into the proposed disclosure folder.  Then there is provision for, you know, maybe the sides can take different views about whether it's actually privilege.

    But it is very clear that step one, and I can point you to the page if --

      **THE COURT:**  Yeah.

      **MR. EHRLICH:**  -- is to call out potentially privilege materials that then would be submitted to counsel for review and the preparation of what is termed a privilege list.

    And I think it's also important that the very last communication on the point that Mr. Gardner got from Stroz was the April 1st e-mail, which is Exhibit H to his declaration, from Hanley Chew, one of my former colleagues at the U.S. Attorney's Office, saying, "We are preparing to segregate potentially privileged documents," and asking for some clarity on other attorneys they should add to the list.

    That's April 1.  By April 11, the Court has held there's clearly a common interest privilege.  So there, I think, everything April 1 forward --

1              **THE COURT:**  I wouldn't say "clearly."  It was a

2     difficult division.

3              **MR. EHRLICH:**  I'm sorry.  It's definitively.

4         But there you, I think, would clearly then invoke the

5     nonwaiver doctrine of the common interest privilege.  So

6     disclosing -- even intentionally disclosing privilege to a

7     common interest party is not a waiver.

8         So it's -- the point is:  What was done between late March

9     when Mr. Levandowski provided the devices and April 11th?  Was

10    there not the possibility that somebody could look at something

11    but an actual intentional voluntary disclosure of content?

12    That is the key, and the *Fishoff* case is absolutely on all

13    fours.

14             **THE COURT:**  Well, the key in this last question

15    creates an ambiguity that they were being permitted to actually

16    review -- different from the March 7th letter -- to actually

17    review to determine if it was relevant or not.

18             **MR. PERLSON:**  Exactly.  There is --

19             **THE COURT:**  That, I think, would be a waiver.

20             **MR. EHRLICH:**  There is ambiguity.  I think that what

21    we're talking about are steps taken by counsel; that, you know,

22    there are times where there's ambiguity in agreements,

23    understood.

24        I think Ms. Baker on behalf of Mr. Ron had the same

25    understanding, that this was a process first of culling out,

1  segregating; and the fair inference before April 11th, if Stroz

2  doesn't come back and say, "Here are some documents you need to

3  review for privilege," the inference is there were no hits.

4      **THE COURT:**  Well, I'm not going to draw an inference.

5  You're going to take Mr. Friedberg's or somebody's deposition

6  tomorrow and you can ask him and find out because there is an

7  ambiguity.

8      My holding is based on my belief that they didn't review

9  them.  For example, in litigation all the time, all the time I

10  tell parties "Just disclose it and do a clawback."  That's what

11  we have to do.  And I don't agree with you.  And that's what

12  they did in *Fishoff*.  If that's the case, then I'm not going to

13  find a waiver; but if that's not what was done, then I'm likely

14  to find a waiver.

15      **MR. PERLSON:**  Can I just say that -- can I just

16  read -- I, frankly, don't see there to be any ambiguity here.

17  What it says in the agreement is (reading):

18          "Notwithstanding the foregoing but subject to the

19      examination protocol, nothing in this letter prohibits

20      Stroz from reporting to its clients, if applicable, at the

21      end of the Stroz examination any portion of the Aspen

22      information which Stroz, in the opinion of Stroz," totally

23      in their own discretion, "believes" -- I actually added

24      the "totally in its own discretion," that was my

25      embellishment, sorry -- "believes constitutes factual

 1          information which may relate to or be relevant to a

 2          potential breach, any fiduciary duty, duty of loyalty, or

 3          other confidentiality, nonsolicitation, noncompetition, or

 4          other obligations based in contract, statute, or otherwise

 5          as defined by the clients."

 6          And I think it's very important to remember the context of

 7   what this investigation is all about.  You know, they're trying

 8   to investigate purportedly what was actually going on and

 9   whether these people were, you know, committing bad acts or,

10   you know, whether they had Waymo confidential information and

11   the like.

12          And so this provision is specifically in there so that

13   they can use factual information if it's in these materials.

14   And what -- you know, frankly it seems that's precisely what

15   they're trying seemingly, or perhaps, to protect is those very

16   things and which is exactly the relevance here.

17          And then, additionally --

18          **MR. PATCHEN:**  If I could add --

19          **MR. PERLSON:**  Let me just finish my points.  I have a

20   couple more points.

21          Also, I think it's very important to recognize here too

22   that it's not just a blanket privilege across the board.  There

23   is an Otto privilege.

24          **THE COURT:**  No, we'll get to that.  We'll get to that.

25          **MR. PERLSON:**  Okay.

 1              **THE COURT:**  Because I didn't see any opposition from

 2  Otto; is that right?

 3       Yeah, we'll get to that, what Mr. Ron asserted the

 4  privilege on behalf of Otto, which I don't believe he can do.

 5              **MR. JUDAH:**  If I can just make one other point, which

 6  is there was a discussion of revising that March 21st protocol

 7  that Uber wanted to do, and John Gardner rejected that.  That

 8  happened after April 1st.  I was just deposing Ottomotto's

 9  30(b)(6) witness on the Stroz investigation this morning.

10       So March 21st is the operative agreement, and there's no

11  evidence that any privilege pulls were ever done.

12              **THE COURT:**  I don't know what Stroz reviewed.  You're

13  going to take their deposition tomorrow.  Ask them.

14              **MR. EHRLICH:**  Can I call attention to one critical

15  sentence?

16              **THE COURT:**  Yes.

17              **MR. EHRLICH:**  Page 1 at the very bottom of the

18  protocol it says -- and this is attached as Exhibit F -- it

19  says (reading):

20              "At the end of its investigation, if Stroz Friedberg

21       believes that nonprivileged relevant documents or

22       communications should be shared with O'Melveny," which is

23       then Uber's counsel, "it will first place those documents

24       in a proposed disclosure folder."

25              **MR. PERLSON:**  O'Melveny was not -- I don't think you

1   meant to say that, but I don't think O'Melveny was Uber's

2   counsel.  It was Otto's counsel.

3           **MR. EHRLICH:**  I didn't.  I misspoke.

4       To O'Melveny and Morrison.  So it included Uber's counsel

5   there.

6       But the point is I do recognize there's possible ambiguity

7   in whether Stroz could ever look at a document that is later

8   claimed to be privilege.

9       But the clear effort, and certainly in the lead-up to this

10  protocol, the clear effort repeated instruction and apparent

11  acceptance by Stroz is they are going to segregate privilege

12  documents and allow them to be reviewed.

13          **THE COURT:**  I'm not going to guess.  They're taking

14  their deposition tomorrow.

15          **MR. EHRLICH:**  But --

16          **THE COURT:**  We can find out what they say and what

17  they did.

18          **MR. EHRLICH:**  But --

19          **THE COURT:**  No, because I do think it matters.  They

20  can clear up the ambiguity and they can say what they were told

21  and what they thought, and all that.

22          **MR. EHRLICH:**  Can I just say, the *Fishoff* case, it

23  doesn't turn on whether somebody, contrary to your expectation,

24  whether somebody happens to look at privilege documents.  The

25  issue is whether the privilege holder or their proxy, here the

 1   counsel, takes an affirmative step to knowingly and

 2   intentionally reveal content.

 3        **THE COURT:**  Yes, but let me tell you what I think.  I

 4   understand that, but here's why there's an ambiguity.

 5        There was on March 7th a very clear direction.  I don't

 6   see that direction repeated.  And the March 7th letter said,

 7   "You are not to review that.  You identify it.  You segregate

 8   it.  You don't review it."  That is never repeated in any of

 9   the exhibits that I've seen to your exhibit.  That's where --

10   so I don't know what happened in the interim.  I don't know.

11   That's what Mr. Friedberg can say.

12        Mr. Gardner doesn't say here, "I repeated."  He wrote

13   those letters saying, "I want to make sure you're complying

14   with the protocol," but the protocol itself doesn't say, does

15   it, "You are not to review documents that you identify as

16   privileged"?  It doesn't say that.

17        **MR. EHRLICH:**  It doesn't say it as crisply as you just

18   said it, but --

19        **THE COURT:**  As crisply as Mr. Gardner said it on

20   March 7th.  He knew how to say it, and Ms. Baker used the exact

21   same words so they were talking, I think.

22        **MR. PATCHEN:**  No comment.

23        **THE COURT:**  So it's not that he didn't know how to say

24   it because he said it crystal clear, I agree with you, exactly

25   like *Fishoff*, on March 7th.  The protocol itself doesn't say

1    that.  I don't know why and Mr. Friedberg can answer why.

2         MR. EHRLICH:  And in fairness, I don't think *Fishoff*

3    is quite so strong.  *Fishoff* is just an attorney handing over

4    e-mails saying, "We do not intend to preclude our ability to

5    object on attorney-client privilege grounds.

6         THE COURT:  No, no, no.  I don't think so.  There was

7    an agreement with the government that they would return, if I

8    understand, that they would return -- not review and return

9    privilege documents.

10        MR. EHRLICH:  I was not able to tell that from the

11   case itself.

12        THE COURT:  All right.

13        MR. EHRLICH:  Maybe that's in the record below, but

14   what I -- from the case as I read it, there is a -- both the

15   government and this individual were saying that the company,

16   the delivery of a hard drive and the entire contents of e-mail

17   accounts, there was an e-mail from counsel saying -- stating

18   (reading):

19          "By correspondence dated June 25, 2015, counsel for

20       Petrello expressly stated that," quote, "'Petrello is not

21       waiving any rights he has to preclude the DOJ from

22       reviewing or utilizing any privilege communications,

23       including communications subject to the attorney-client

24       privilege.'"

25       And then it provided names.  And so I don't -- it's framed

```
 1   as a clawback agreement, but I don't actually see any direct
 2   instruction like you're suggesting that "You, U.S. Attorney's
 3   Office, may not lay human eyes on a privileged communication."
 4   It's saying "I'm not waiving it."
 5           THE COURT:  Well, you have to lay eyes on it to
 6   identify its privilege.
 7           MR. EHRLICH:  Right.
 8           THE COURT:  And there's a difference between that and
 9   saying "You're not" -- there's a difference between saying
10   "Don't lay eyes on it if it's privileged" and saying "You can
11   review it to determine if it's relevant and then we'll put it
12   on a privilege log."
13           MR. EHRLICH:  Right.
14           THE COURT:  I don't know how Stroz can place something
15   on a privilege log without reviewing it.  So that's your,
16   quote, "ambiguity."
17           MR. EHRLICH:  But they're not doing the privilege log.
18   They're doing --
19           THE COURT:  What does the protocol say?
20           MR. EHRLICH:  The protocol says they will use the list
21   of names.  It's Footnote 1.
22           THE COURT:  Uh-huh.
23           MR. EHRLICH:  After they -- it's after explaining that
24   we're just going to be putting nonprivilege documents in a
25   proposed disclosure folder.  It says "We will use the list of
```

1   names provided, our own algorithms..."

2          THE COURT:  Oh, and then O'Melveny will create.

3          MR. EHRLICH:  And O'Melveny, which was defined to

4   include our individual counsel, and O'Melveny will then come

5   back with a privilege list.

6          THE COURT:  Ah.

7          MR. EHRLICH:  So Stroz is not doing that.

8          THE COURT:  I thought Stroz was.  I misread it.

9          MR. EHRLICH:  And Mr. Gardner and presumably Ms. Baker

10  are sitting there waiting, "I guess there's nothing privilege

11  that we need to worry about.  Phew."

12     Then April 11th happens.  So it doesn't matter what Stroz

13  did if they weren't given permission ever to go to privilege

14  communications.

15         THE COURT:  Let's find out.  What I'm saying is this

16  today, I don't see enough here to find a waiver.  Let's see

17  what Stroz says.  You haven't deposed him yet.  I assume you

18  haven't deposed Mr. Gardner yet.

19         MR. JUDAH:  Mr. Gardner is on Friday, I think, and

20  we're also seeking the depositions of two additional Stroz who

21  are --

22         THE COURT:  I'm not in a position -- I only briefly --

23  I can't discuss that, but I will rule on it imminently, but I

24  can't -- the motion for the additional depos I can't hear right

25  now.

```
 1        All right.  So --
 2             MR. JUDAH:  If I can just make one other point --
 3             THE COURT:  You may.
 4             MR. JUDAH:  -- which is, it seems, based on what Waymo
 5   has been able to gather so far, that a lot of what was supposed
 6   to be done was not necessarily done due to the speed and the
 7   rushed deadlines and the underlying data.
 8        So I would say even if -- even to the extent there was
 9   supposed to be this foldering and then the privilege review
10   from O'Melveny, just because Stroz didn't provide something to
11   O'Melveny doesn't mean they weren't looking at things and, in
12   fact, had the ability to do so the whole time.
13             THE COURT:  Take the deposition and we'll find out
14   what they say they did.  Okay?
15        But to your argument, I guess I'm prepared to say -- to
16   extend Fishoff to sort of just the general situation.  I
17   actually do think in the digital world that we should be
18   mindful of the incredible cost and expense that digitizing
19   everything has created and that there are ways of getting
20   around that.  Whether it be to facilitate a transaction, I
21   think that's okay.  There's nothing right on point.  That's
22   just my judgment, I guess, but there we are, especially in the
23   absence of any case that waiver should be construed liberally.
24        We're not talking about the privilege.  We all agree that
25   these documents are privileged, at least generally.  The
```

1   question is waiver.  Waiver and how liberally, how easily do

2   you find a waiver.  That's really the question here, I guess.

3        Because there's no question -- and if you think about the

4   purpose behind waiver is -- or the reasoning behind it is if

5   they were willing to show it to this person, then they would

6   have gotten that legal advice to begin with, notwithstanding

7   the protection.

8        There's no way I would find that on this record.  There's

9   no way I would find that on the record.  At the time whatever

10  these communications are that we're talking about, I mean,

11  Mr. Gardner and Ms. Baker clearly were trying to segregate out

12  the privilege.  So I couldn't find that.  So the whole reason

13  for waiver doesn't really apply here.

14       Anyway, anyway, but I'll -- I'm not going to find a waiver

15  now.  It's without prejudice to whatever you discover.

16       It's all collateral, though, in any event; right?  It's

17  all collateral.  Getting the privilege stuff is collateral to

18  proving your case; but, nonetheless, you have the right, if

19  they did waive it, to get it.

20            **MR. PATCHEN:**  And, Your Honor --

21            **THE COURT:**  So -- oh, but let's address something

22  else, though, with Mr. Ron, which is the vast majority of the

23  documents on your privilege log you say is a privilege that

24  belonged to Otto, and I assume by that that meant Ottomotto.

25            **MR. PATCHEN:**  I think the Inc. before there was the

```
 1   LLC.  So the defunct corporation Ottomotto, Inc.  It was

 2   eventually converted into an LLC when it was part of the merger

 3   agreement, but the defunct corporation at the time it was

 4   handed over was Inc., and so Mr. Ron, as an executive of Inc.,

 5   has standing to make that privilege claim considering --

 6           THE COURT:  Well, Ottomotto was incorporated when?

 7           MR. PATCHEN:  I believe in January --

 8           THE COURT:  2016.

 9           MR. PATCHEN:  Yes.  Two days after Mr. Ron left.

10           THE COURT:  Okay.  So but there are entries on the

11   privilege log that are for, like, corporate advice that are in

12   2015.

13           MR. PATCHEN:  Yes.  They would be sort of

14   promoter-type.  It hadn't been formed yet, but it was for the

15   intent of forming the corporation.  You go to a corporate --

16   you know, you go to corporate counsel, "I want you to form this

17   corporation."  It doesn't exist yet, but it's -- obviously

18   that's the point of why you're having those conversations.

19           THE COURT:  All right.  I don't know about that, but I

20   think the stuff, once it's incorporated, it then got merged or

21   purchased by Uber, and even the case that you cited says that

22   the privilege goes with the company.  That privilege is now

23   held by Uber.

24           MR. PERLSON:  Right.

25           THE COURT:  Mr. Ron doesn't have any standing to
```

1    assert it.

2          **MR. PERLSON:**  That was our point, that there's no --

3    yeah, that he has no standing to assert the privilege; and

4    Uber, while we have fought about many things, this is not a

5    privilege for this log being asserted by Uber.

6          **THE COURT:**  So with respect to his assertions on

7    behalf of Otto, I don't know about the pre-incorporation.   I

8    don't know about that.  I don't know that it matters.

9          **MR. PATCHEN:**  I don't think --

10         **THE COURT:**  It matters; right?

11         **MR. PATCHEN:**  It's actually a difficult question.   I

12   didn't see the standing issue particularly briefed in this, and

13   I would be happy to submit supplemental authority, but I think

14   it's a tricky issue when you have corporate documents that are

15   in Mr. Ron's personal gmail.  This is not his Otto account that

16   was transferred over.  This is in his gmail.

17         **THE COURT:**  I've already addressed that issue.

18         **MR. PATCHEN:**  I understand.

19         **THE COURT:**  I think it's absolutely preposterous --

20   well, that was Otto Trucking.

21         **MR. PATCHEN:**  I'm not saying that it's not being

22   produced.  What I'm saying is that in terms of when things were

23   collected and otherwise, I think it's appropriate for him to

24   assert that privilege.

25         **THE COURT:**  It is not.  He is not -- he has no

1   standing whatsoever.  Otto's privilege went with Otto to Uber.

2   Only Uber.  That's not a tricky question.  That's well

3   established that the privilege doesn't -- you even say -- is he

4   an officer of Ottomotto today?

5          **MR. PATCHEN:**  I don't believe -- I don't believe so,

6   Your Honor.

7          **THE COURT:**  No.  So he can't waive Ottomotto's

8   privilege.  He can't assert Ottomotto's privilege.  Under that

9   reasoning, anybody who was at the company before it got

10  acquired by someone else could assert the privilege on behalf

11  of that company because at the time the document was created,

12  they were an officer at the time.  That doesn't make any sense.

13  It goes with the company and Uber would have the right.

14      So I don't think it applies to any of those documents as

15  opposed to his personal privilege is another matter.  So I'm

16  not saying that he waived.  I'm saying he had no right to waive

17  or not waive --

18         **MR. PATCHEN:**  Okay.

19         **THE COURT:**  -- with respect to Otto's privilege, but

20  his personal I'm not holding that he waived for the same reason

21  as Mr. Levandowski.

22         **MR. PATCHEN:**  Understood, Your Honor.

23         **THE COURT:**  Okay.  Now, there was another issue,

24  though, that was raised with respect to privacy objections but

25  hits coming up on those things.

1              **MR. PERLSON:**  Yeah.  And I'm still, frankly, not

2    entirely sure where we've settled on that in between.  Now, we

3    were talking about the devices that had not been imaged, and

4    I'm still confused.  I'm not certain whether we finished on

5    that.

6              **THE COURT:**  I got it.  So, anyway, so now we

7    understand the privilege issue, but it all has to be a clawback

8    because you have to review them.  You, then, under your

9    protocol are sharing what you're identifying -- right? -- as

10   relevant.

11       At the end of the case you're returning everything to them

12   so they don't get to keep it, anything you're not identifying,

13   in other words.  You don't get to keep the image of the devices

14   forever.

15             **MR. PERLSON:**  Okay.

16             **THE COURT:**  Yeah.  Right.  So you get it back.

17       And they identify anything they say is relevant, and then

18   you have the opportunity to say, "No, it's not relevant," or,

19   B, "It's private or it's privileged."

20             **MR. EHRLICH:**  Right.

21             **THE COURT:**  Yeah.

22             **MR. EHRLICH:**  This is for we're talking about the

23   devices never reviewed?

24             **THE COURT:**  Correct.

25             **MR. EHRLICH:**  Correct.  So we would -- we would want

1    to get anything they extract or effectively print from these

2    devices in sufficient time so we can raise those objections,

3    and I think the issue that was causing concern was whether we

4    could be there next to them as they're reviewing for content to

5    ensure, as they suggested, that they're only looking at

6    appropriate materials.

7         There had been an unfortunate incident early on in the

8    review here, and we just want to avoid that, but we also think

9    it's appropriate that they not use this as *carte blanche* to

10   just look at privilege communications between Levandowski and

11   Gardner and other attorneys.

12        **THE COURT:**  Well, let me ask you in *Fishoff*, how was

13   that taken care of?  It wasn't; right?

14        **MR. EHRLICH:**  I don't think it was.  I mean, I think

15   what happened is that you have a defendant who was charged by

16   criminal complaint who wanted to cooperate and as part of that

17   cooperation, handed over devices and the entire contents of

18   e-mail accounts, which, frankly, e-mail accounts are easier to

19   rifle through and get rid of privilege.

20        But it was handed over to the government.  There's no

21   selective waiver doctrine.  The government turned it over to

22   the SEC and it got produced to another defendant.  And so then

23   the argument became:  Was that wholesale waiver?

24        But as far as I could tell from the opinion, maybe

25   there's -- in the court record there's more clarity, there was

1   no effort to actually physically prevent review of privilege.

2   It was just a statement.

3        THE COURT:  No, no.  I'm saying these are documents we

4   know Stroz did not review --

5        MR. EHRLICH:  Correct.

6        THE COURT:  -- anyway, but you still -- we know that.

7        MR. EHRLICH:  Except to the extent they're duplicates,

8   but I don't know what's in there at all, yes.

9        THE COURT:  Yeah.  But I guess what I'm saying is, I

10  understand.  Too bad.  We just don't have time.  They'll

11  provide it to you.  You can claw it back, but sort of this

12  metaphysical thing we don't want them to review, see, they

13  can't use, they recognize that.  It's not the government.  So

14  that -- you know, and it can't be turned over to the government

15  because they won't ever possess --

16       MR. EHRLICH:  So could we have -- we have to have an

17  accurate record of everything they pull.

18       THE COURT:  That's what I understand that they're

19  agreeing to.

20       MR. EHRLICH:  And maybe this is something that we

21  can --

22       THE COURT:  Mr. Judah, maybe you can say that.

23       MR. PERLSON:  Well, so there's two things.  One, so to

24  the -- for example, to the extent that we're looking at content

25  and we find something that's relevant, you know, you've got to

1    put a Bates number on it or something or else we're not going

2    to be able to use it.  And so to the extent that that's what

3    we're talking about, fine.

4         But, you know, when someone is looking at a forensic

5    examination and looking at things and trying to figure out, if

6    they can figure out, you know, what was sent where or what was

7    deleted when or that sort of thing, that's not something that

8    you can, like, put a Bates number on.

9              **THE COURT:**  No.  We're talking about the content

10   review.

11             **MR. EHRLICH:**  Of course, we're talking about the

12   content review, and I understand eventually it would have to

13   get a Bates number to be used.

14        But I'm not only here to -- I'm not only concerned with

15   what gets used in this case, as the Court knows.  We expect

16   there's communications with investigating authorities.

17   Judge Alsup referred the matter for a criminal investigation.

18   I'm concerned with what is taken that we have an opportunity to

19   know about it and claw it back because I know that the courts

20   have ruled against us thus far, but there's no final decision

21   on the Fifth Amendment.

22             **THE COURT:**  No, no, no, I understand.  I understand.

23        So maybe, Mr. Judah, you can explain on the record what

24   the protocol is and what Waymo will do.

25             **MR. JUDAH:**  So for the devices that have not been

1   reviewed by Stroz, Waymo receives the forensic images.  Our

2   Discovia personnel can work with Stroz as appropriate to

3   determine whatever forensic analysis data we need.  Discovia

4   will conduct its own analysis too.  And then our reviewers will

5   review it; and then to the extent there is anything on it that

6   we want to use the content of that's relevant content, then we

7   produce it to the other side.

8        **THE COURT:**  Okay.  Anything that you keep.

9        **MR. JUDAH:**  Right.

10        **THE COURT:**  So, in other words, what Mr. Ehrlich is

11  concerned about is that Waymo keeps in its possession anything

12  or shares with anyone.  So anything like that.  So the

13  representation is to the Court that anything that you would

14  ever have in your possession, whether you use it in the case or

15  not, you will share it with the other side.

16        **MR. EHRLICH:**  Anything extracted from these devices.

17        **THE COURT:**  Right.

18        **MR. JUDAH:**  Yeah, anything extracted, and so --

19        **MR. EHRLICH:**  Not just kept, which can mean a lot of

20  things, but extracted now.

21        **MR. JUDAH:**  And the only sort of caveat I want to make

22  is that because I don't know exactly what the format is and we

23  don't know -- it's difficult for me to say "'Extraction' means

24  X, 'extraction' means it comes off of this onto a hard drive as

25  a JPEG versus" -- we don't know what the content is so it's

```
 1   difficult to say; but we can make the representation that
 2   anything extracted -- basically there's going to be a native
 3   image and there will be an analysis of the native image.  And
 4   then things will be extracted from what can we just return or
 5   destroy in the native image and take it off that and put it
 6   somewhere else, and that is the stuff that we will disclose.
 7            MR. EHRLICH:  If it's done timely, I accept that.
 8            THE COURT:  Okay.  All right.  I assume Mr. Patchen
 9   does too.
10            MR. PATCHEN:  That's fantastic.
11            MS. BLUNSCHI:  And just to clarify on behalf of Stroz
12   then, we will go ahead and provide the native images directly
13   to Waymo and Discovia without having to stage a review room, or
14   something like that.
15            THE COURT:  Correct.  Correct.  And that should be
16   done ASAP.
17            MR. EHRLICH:  And I just want clarity on the
18   representation that this extraction -- that we get anything
19   that is extracted includes the forensic information, the
20   metadata that you're pulling off of the machines.
21            MR. JUDAH:  Yes.  Yes.
22            MR. EHRLICH:  Okay.  And --
23            MR. PERLSON:  To the extent it's something that you
24   could even -- I mean --
25            MR. JUDAH:  Right.
```

1    **MR. PERLSON:**  -- I'm not sure that that's really

2    viable necessarily.

3         **THE COURT:**  Well, let's let Ms. Brewer speak.

4         **MS. BREWER:**  I think, if I'm interpreting your comment

5    or question correctly, the artifacts that were in the forensic

6    protocol that we proposed and discussed in the call yesterday

7    is what you're asking --

8         **MR. EHRLICH:**  Correct.

9         **MS. BREWER:**  -- for.

10   Okay.  And the complication we had yesterday is that

11   Stroz's counsel interpreted that as something they would have

12   to provide at the same time as the native image, which is a

13   burden to them.

14        But as I understand it, it was decided today is that the

15   native image would be provided to us, and your request is that

16   the artifacts from that native image be provided to you.

17        **MR. EHRLICH:**  Yes.

18        **THE COURT:**  I hope you understand what she's talking

19   about because I don't.

20        **MS. BREWER:**  I hope I understood it too.

21        **MR. PATCHEN:**  Your Honor, for example, things like the

22   registry file and the log files for when devices were plugged

23   in or not are not technically like native content files but

24   those are also files that can be provided.

25        **THE COURT:**  I see.

1          **MR. PATCHEN:**  Those are the artifacts.

2          **THE COURT:**  Okay.

3          **MS. BREWER:**  It is like a Table of Contents for the

4     device, and it's about two pages long or I would articulate it

5     better.

6          And I am honest that I'm not the best to articulate what

7     all of those things on the several-page document is but we have

8     disclosed it, discussed it with Stroz's counsel, so that the

9     forensic consultants on both sides involved are in agreement

10    that they understand what those artifacts are.

11         And, as I understand it, you're interested in receiving

12    those, so...

13         **MR. PATCHEN:**  Yes.

14         **MR. EHRLICH:**  Yes.

15         **MS. BLUNSCHI:**  And this is Melanie on behalf of Stroz.

16         I can confirm that Linda and I had a call with Stroz and

17    Discovia in which -- the sort of experienced forensic

18    examiners -- we both agreed that the list of information that

19    Waymo was requesting was very industry standard.

20         And as she alluded to, the only concern we had was whether

21    Stroz would be running these additional forensic analyses for

22    Waymo or whether Discovia would go ahead and run them

23    themselves; and where, I think, we landed was that Discovia

24    would do that work themselves.

25         **MS. BREWER:**  I don't know that we did land there, but

1    if that is how we can move forward, I think that we don't

2    object to doing that.

3        My understanding is it's not instantaneous.  It is -- and

4    that is what --

5              MS. BLUNSCHI:  It is not, yes.

6              MS. BREWER:  Yeah.

7              THE COURT:  All right.  So my understanding is Waymo

8    is willing to share with you whatever they can.  They're not

9    willing to do it necessarily in a way that's going to slow them

10   down.

11             MR. EHRLICH:  Right.  But the understanding is that

12   all of the forensic listing of information is going to be

13   provided to us at the same time as it's prepared by Discovia.

14             MR. PATCHEN:  Well, in the sense that it won't be slow

15   rolled.  They have it for a day and then turn it over.

16             MR. EHRLICH:  Can I give an example?

17       One of the artifacts on a four-page list is a listing of

18   every single file on every computer.  Perhaps that doesn't

19   disclose any content.  They've also asked for the entire Web

20   search history on every possible browser.

21       So there may be things that are off limits potentially,

22   hopefully not, and it is Mr. Levandowski's information that

23   they're extracting and we just want to get the same report that

24   Waymo is getting around the same time.  It doesn't need to be

25   instantaneous.  Just so the clawback rights, if they need to be

 1    employed, are meaningful.

 2         **MR. PERLSON:**  Your Honor, we'll try to find a

 3    practical way to do that; but, you know, yeah, it's -- it's a

 4    very short amount of time, and we're only going to be able to

 5    spend a limited amount of time putting -- depending on the size

 6    of the data, importing it to somewhere else, but we'll do the

 7    best we can.

 8         **THE COURT:**  Yeah.  I mean, you offered to do it as

 9    part of the protocol, so --

10         **MR. JUDAH:**  Right.  And the other -- I don't know

11    what -- I mean, it depends when Quinn Emmanuel gets it as

12    opposed to Discovia.  I don't -- so, you know, we will promptly

13    provide it and we will not be slow rolling.

14         **THE COURT:**  I mean, perhaps Discovia at the same time

15    they provide it to you, they can provide it to Mr. Ehrlich.

16         **MR. EHRLICH:**  That would be my request.

17         **MR. JUDAH:**  The only reason I don't know about that is

18    I don't know who's interfacing, and we may want to keep e-mail

19    chain things, but it will be promptly.

20         **THE COURT:**  Mr. Ehrlich should be on your speed dial.

21                        (Laughter)

22         **THE COURT:**  Okay.

23         **MR. EHRLICH:**  Thank you.

24         **THE COURT:**  All right.  So that takes care of the

25    device -- those hundred or so devices that have never been

1    reviewed.

2        Now we have the native files that the Relativity database

3    was made from, although we do know the source code files and

4    the video files could not be reviewed in Relativity, so those

5    are going to be reviewed and we don't have any concerns about

6    content there.

7        **MR. JUDAH:**  The issue with that is that I've seen in

8    the oppositions that were filed to our motion nonobjection to

9    reviewing that.  But then my understanding is the only way to

10   review that is to actually look at the native images.  So I

11   don't -- I don't -- it seems like we need access to the native

12   images just to do that.

13       **MR. EHRLICH:**  Sure.  We don't have an objection to

14   that.  I think here we're talking about a very small number of

15   devices, and there's -- we know what we're looking for, source

16   code and video files.  There is possible sensitivity to video

17   files, of course, but that I could be there and sit next to

18   you.

19       **MR. PATCHEN:**  I think, Your Honor, just the concern we

20   had is just we have no problem with the native devices being

21   made available, that there's a look for the source code, look

22   for video files, inspect those; right?  They have the right to

23   do so.

24       But the order limited to that because there's this whole

25   second, "Well, we need to verify it is complete," which to us

```
 1   sounded like a backdoor to look at the things that have been
 2   screened out.  How else do they verify it's complete?
 3           THE COURT:  Well, I don't know.  How are you going to
 4   verify it's complete?
 5           MR. JUDAH:  That's a good question, and we'll have a
 6   better answer to that once we actually look at the native
 7   device.
 8           THE COURT:  Okay.
 9           MR. JUDAH:  I mean, I can tell you it might be as
10   simple as compare the number of files that are nonsource -- you
11   know, nonsource code viewable to what's on Relativity and
12   literally, hopefully, that's all we have to do, but it's
13   difficult to say without that.
14           THE COURT:  Okay.  All right.  They need to get the
15   access to the native files.
16           MR. PATCHEN:  And that's what we said, Your Honor.  If
17   there's some mechanistic, you know, metadata way just to verify
18   that, no problem.  It's just we just want to make sure that
19   there's that protection.
20           THE COURT:  But if there isn't --
21           MR. PATCHEN:  We'll deal with that.
22           THE COURT:  Well, then I think you deal with it the
23   same way as you do the other devices.
24           MR. PATCHEN:  I understand.
25           THE COURT:  You'll get your clawback, but I guess we
```

```
 1   don't have time just as Mr. Levandowski did not have time to
 2   extract it before he handed it over to Stroz.  We don't have
 3   time.  We're doing the same thing now.
 4            MR. PATCHEN:  I appreciate that.
 5            MR. PERLSON:  Yeah.  Your Honor, I think with these
 6   really we should follow the same procedure as we are with the
 7   unreviewed devices.
 8            THE COURT:  That's what I said.  To the extent you
 9   need to.  You have a lot to do, and I assume that you're not
10   going to be rifling through information which is on Relativity
11   just for the purpose of doing that because they don't have
12   time.
13            MR. PERLSON:  Well, right, but we need to look at the
14   devices because we don't even know what's on the devices.  We
15   can't look at the source code on the devices.  We need to see
16   the images to actually see the source code.  That's the only
17   way.
18            THE COURT:  I think that's what we're talking about.
19            MR. EHRLICH:  We agree you can do that.  I just am
20   asking for these few devices that have been harvested and have
21   been screened, that you give an opportunity for
22   Mr. Levandowski's counsel to be there to monitor, and we're
23   talking about just a couple.  That's not going to slow you
24   down.
25            MR. PERLSON:  Well, I don't know which ones you're
```

```
 1   talking about.
 2           MR. EHRLICH:  The ones that Stroz actually reviewed
 3   and harvested and put into the Relativity database.
 4           MR. PERLSON:  I thought there was about 50 of them.
 5           MR. EHRLICH:  No.
 6           MR. JUDAH:  Well, I don't know how many actually are
 7   Mr. Levandowski's but there's over 30 total for the diligence
 8   employees.
 9           THE COURT:  First you're going to be looking at the --
10   well, you're going to hopefully just be able to compare the
11   metadata and figure out if it's the same as what you already
12   had in Relativity; right?
13           MR. JUDAH:  Sure.  I think first we'll be looking at
14   the source code.
15           THE COURT:  Okay.  They're going to be looking at the
16   source code.  You don't want to be standing there when they're
17   looking at the source code.  No.
18           MR. EHRLICH:  No need.
19           THE COURT:  Or I don't know about the videos.
20           MR. EHRLICH:  That might be necessary, but --
21           MR. JUDAH:  Well, the --
22           MR. EHRLICH:  -- this is --
23           THE COURT:  I don't know why the same thing can't
24   apply to the videos as to the other thing if there's something
25   that they think is relevant.  It's not going to be his family
```

 1  because it's not relevant.  So --

 2      **MR. EHRLICH:**  But, Your Honor, there was a lot of

 3  tagging of family photos on day one in this Relativity process.

 4  It was, we're told, in error but it was quite inconsistent with

 5  this idea that they're not interested in looking at that.

 6  Somebody was interested who was an attorney employed by Waymo.

 7      **MR. PERLSON:**  If you want to hear the explanation of

 8  what happened --

 9      **THE COURT:**  I don't.  I'm sure it was an accident

10  because nobody has time.  It doesn't make any sense.

11      **MR. EHRLICH:**  Right.  But, again, we're retreating a

12  little bit from a protocol they proposed just a few days ago.

13  So it's not like we suddenly don't have time.

14      **MR. JUDAH:**  Right.  Well, I mean --

15      **MR. PERLSON:**  Suddenly don't have time.

16      **MR. JUDAH:**  The difference is that we suddenly don't

17  have time because we still don't have access.

18      **THE COURT:**  Well, I think if you -- do you object --

19  you can do it at whatever time you want -- sorry,

20  Mr. Ehrlich -- to telling Mr. Ehrlich so if he wants to be

21  there in realtime with the videos.  He doesn't care about the

22  source code.

23      **MR. JUDAH:**  It depends, I guess, how many videos there

24  are, and I don't know the answer to that.  I mean, if we're

25  talking about -- if there's 100 videos on Mr. Levandowski's

```
 1   devices, and I don't know how many there are, then that

 2   probably wouldn't be a problem; but I don't -- I just don't

 3   know -- I don't know -- we don't have any information, so it's

 4   difficult to say.

 5            MR. PERLSON:  How about I suggest this?  So, first of

 6   all, I don't know about the videos, but the devices -- I mean,

 7   the photographs we've seen so far have been, like, literally

 8   screen shots of Waymo confidential information.  So I don't

 9   know if there's a corollary to that of a video.  It could be

10   that, you know, he's going around taking images of a car.

11            THE COURT:  Okay.  Nobody is saying you can't look at

12   the videos.

13            MR. PERLSON:  Okay.  So I guess what we should -- I

14   mean, we could say is once we get the images and if there's,

15   like, a time in which we're saying, "Okay, we're going to start

16   looking at the videos," you know, we can let Mr. Ehrlich know

17   and we'll try to work it out.

18            MR. EHRLICH:  We'll work it out.

19            THE COURT:  Please.

20            MR. PERLSON:  How's that?

21            MR. EHRLICH:  We'll work it out.

22            THE COURT:  Please, yes.  And I'm not saying you have

23   to do it at his convenience.

24            MR. PERLSON:  I wasn't offering to.

25            THE COURT:  I'm saying but he has the opportunity at
```

```
 1    whatever time it may be, he or his colleagues or the new

 2    colleagues he may need to acquire to do that.

 3        Okay.

 4            MR. EHRLICH:  Understood.  We'll try to work it out.

 5            THE COURT:  So have we taken care of that, then, and

 6    the Relativity review is going forward?

 7            MR. JUDAH:  Yes.

 8            THE COURT:  Now, have all the depositions been

 9    scheduled?

10            MR. JUDAH:  No.

11            THE COURT:  Well, other than the additional ones that

12    you've asked for.

13            MR. JUDAH:  No, because -- I mean -- you mean that

14    we've asked for in motion practice?

15            THE COURT:  Yes.

16            MR. PERLSON:  Other than the ones that were -- I think

17    everything other than the ones that we have disputes over and

18    the couple additional Stroz depositions that we've asked for

19    that we still need to go through the meet-and-confer process,

20    we do have dates for and they're scheduled presently.

21            MR. GONZALEZ:  The answer to your question is yes.

22            THE COURT:  Oh, I didn't even see you, Mr. Gonzalez.

23    Were you here?

24            MR. GONZALEZ:  I've just been hiding the whole time.

25    Yeah, Your Honor, I was waiting for that one question, and then
```

1    I'll leave.  No.

2        The answer is yes.  There are 23 depositions scheduled

3    beginning today.

4            **THE COURT:**  Okay.  All right.  Good.

5        Oh, the last thing was -- we didn't figure out is when

6    they ran your search terms in the Relativity database and at

7    least from Mr. Ron there were 84 hits, or something like that.

8    Did I see something like that?  Right?

9            **MR. JUDAH:**  There were -- there were --

10           **THE COURT:**  No.  A thousand hits.

11           **MR. JUDAH:**  There was over a thousand total.  Not just

12   for Mr. Ron, but for all the --

13           **THE COURT:**  Right.  This is what I think you should

14   do.

15           **MR. PATCHEN:**  Your Honor --

16           **THE COURT:**  You've worked it out?

17           **MR. PATCHEN:**  There's already a protocol that's worked

18   out, I believe, with respect to that.  Those have been -- those

19   hits have been reviewed.  Those that there's no objection to

20   rolls right through to production.  If there is an objection to

21   it, it's promoted to Mr. Cooper.  Mr. Cooper has looked at them

22   or is in the process of looking at them for that.  So there is

23   a protocol that's going forward.  I don't think there's any

24   disputes over that.

25           **THE COURT:**  Great.

1          **MR. JUDAH:**  I mean, I guess based on what we're seeing

2   with respect to the ones that were withheld on the report of

3   privacy grounds, we do object to this slowing us down because

4   we have to wait -- I think there's still disputed ones that

5   have not been reviewed -- days, and this is only ones that are

6   actually hitting on the search terms.

7      If it's a picture or something that isn't -- or if it

8   doesn't hit on a search term, it happens to use a codeword but

9   it still happens to have the information, we have absolutely no

10  way to see what it is.

11         **THE COURT:**  Well, how much -- I mean, how much privacy

12  stuff has been withheld, for example, from Mr. Ron?

13         **MR. PATCHEN:**  I believe there was 17,000 that was all

14  done by search terms.  So it wouldn't have even caught any

15  photos.  The photos are not part of what was excluded on those

16  grounds --

17         **THE COURT:**  Okay.

18         **MR. PATCHEN:**  -- given the speed with which we were

19  working.

20         **THE COURT:**  Yes, Mr. Cooper?

21         **MR. COOPER:**  I have to say there were some items

22  elevated to me and I have looked at them, and I entered some

23  rulings last night; but then in light of what was said in court

24  this morning before Judge Alsup and what I'm hearing you say, I

25  have redesignated those to discussion among the counsel, and

1    there are about, I think, eight or ten of them is all.

2            THE COURT:  Okay.

3            MR. COOPER:  And I'm happy to talk about that in a

4    meet-and-confer.

5            THE COURT:  Okay.

6        All right.  So your photo problem, not a problem.

7            MR. JUDAH:  Well, that's for Mr. Ron.  I don't --

8    standing here right now, I don't know that the search terms

9    were used by every diligence employee for Stroz.

10           THE COURT:  Well, we have Mr. Ehrlich here.

11           MR. EHRLICH:  I want to -- I'm not absolutely certain

12   and I'm happy to follow-up; but we -- on a privacy screen we

13   disclosed to you the search terms we used -- it was

14   girlfriends, family -- and I don't believe that any photos were

15   captured using those search terms.  They are still -- they're

16   in the Relativity database unscreened is my understanding, but

17   I can confirm that.

18           MR. JUDAH:  So with respect to Mr. Levandowski, there

19   is an issue with respect to Max Levandowski is identified as a

20   privacy screen even though he --

21           THE COURT:  I was wondering.  Related?

22           MR. JUDAH:  Right.  They're brothers.

23           THE COURT:  Brothers?  Oh.

24           MR. JUDAH:  And I don't know what I'm allowed to say

25   in open --

1           **THE COURT:**  He worked -- where did he work?

2           **MR. JUDAH:**  He worked at Ottomotto.

3           **THE COURT:**  Yeah.  All right.

4           **MR. JUDAH:**  And so he worked -- he works at Uber.

5           **THE COURT:**  He can't use that as a privacy screen --

6    sorry -- when you work with your brother and then you get

7    involved with this.

8           **MR. JUDAH:**  There's other relevance too that I don't

9    think I'm allowed to go into.

10          **THE COURT:**  Sorry.  Unscreen it.

11          **MR. EHRLICH:**  Unscreen all communications with

12   Mr. Levandowski between the brothers?

13          **THE COURT:**  With Max.  Look --

14          **MR. EHRLICH:**  We've run all the search terms and we've

15   produced immediately --

16          **THE COURT:**  But he was a name that you ran?

17          **MR. EHRLICH:**  There were family members that were

18   screened for the privacy screen; and then like normal, they

19   produced a long list of search terms, they were immediately

20   run, and we turned around those in a couple of hours.

21          **THE COURT:**  So you produced everything that hit?  No

22   hit involving Max Levandowski has been withheld?

23          **MR. EHRLICH:**  I can't represent to the Court on that

24   point.

25          **THE COURT:**  Any hit, any hit involving Max Levandowski

 1    should be produced.

 2              **MR. EHRLICH:**  Gets immediately produced.

 3              **MR. JUDAH:**  Well, Your Honor, we did some basic search

 4    terms.  We could do another, you know, 100 easily.  We only

 5    submitted about 20.

 6        What I would suggest --

 7              **THE COURT:**  That was your choice.

 8              **MR. EHRLICH:**  I welcome that.

 9              **MR. JUDAH:**  Well, just to see what was going on.

10        But, look, what I would suggest with Max Levandowski, who

11    is an Ottomotto employee -- he joined, I think, in February.

12    He was one of the early employees.  He has other relevance to

13    the case.  He's an Uber employee now.  The other privacy

14    screens they ran, if there's other family members on those

15    e-mails, that's fine.

16        They can just do what we had initially talked about for

17    privacy, which is they can look and if they are specific ones

18    that they think should be screened, they can elevate those to

19    Mr. Cooper and then they can be pulled.

20              **MR. EHRLICH:**  That's an enormous -- because we're

21    starting with the premise that we didn't get -- I asked for

22    weeks for search terms so we could be doing this while we were

23    waiting for the Fed. Circuit.  Instead, we had to go through

24    this screening process.

25        So I'm happy to focus on Mr. -- on Max Levandowski if this

1   is a concern.  I don't know the volume, but -- and I think any

2   additional search terms you want to provide would be helpful,

3   and we'll get right on it and turn it around and elevate it to

4   Mr. Cooper to the extent there's any issues.

5           THE COURT:  Okay.  I understand why he would be a

6   special case, so give them more terms.

7           MR. JUDAH:  The issue is, I mean, we didn't include,

8   for example, because we were just trying to see what was going

9   on the privacy screens, you know, Google.  Google can hit on a

10  lot of things like gmail and whatnot.  We were trying to kind

11  of keep it pretty narrow; but if we have to go and just try to

12  see anything that might hit on something, I mean, it's just --

13  then we're going to get a lot of false hits from everybody, and

14  I just don't think that's the most efficient way.

15      Because, basically, if we throw in a term like "lens" and

16  just start going down into very specific components of the cars

17  or the devices, you're going to increase the number of false

18  hits that aren't relevant.

19          THE COURT:  So what's your proposal?

20          MR. EHRLICH:  You get false hits.  As long as they

21  don't raise privacy concerns, that's my point.

22          MR. JUDAH:  Okay.  But I -- I mean, my proposal is

23  Max Levandowski is not a privacy screen.  That's my proposal.

24          THE COURT:  So that you get all his documents, which

25  are then false hits.

1          **MR. JUDAH:**  No, no.  Just that they're made available

2     on the Relativity database and our people can do our normal

3     searches to see what we want to find.

4          **THE COURT:**  I see.  I see what you're saying.

5          **MR. JUDAH:**  Because they're invisible to us now, the

6     Max Levandowski documents.  We can't see them on Relativity.

7     It's the same protocol that happens with everything else.

8          **THE COURT:**  I mean, it seems to me -- I don't know.  I

9     don't know Mr. Max, but it seems to me there are only going to

10    be a few things that are truly private.  For example, one

11    example in the papers was escrow documents.  Those aren't truly

12    private; right?  That's not -- what did you talk about? --

13    extreme privacy.  That is not extreme privacy.  There is no

14    harm in them reviewing.  It's a false hit.  It's irrelevant but

15    it's not extreme privacy.

16         **MR. EHRLICH:**  Right.

17         **MR. PATCHEN:**  What it was was an escrow document that

18    was exchanged with his wife.  So it was an attachment on a

19    spousal privilege that had the name as the counterparty on the

20    escrow as a Mr. Otto hit on the search term "Otto."  We

21    promoted the attachment.  We didn't say we objected to the

22    attachment.  It was promoted, but there's a reason why it was

23    in the screen and it wasn't because of an "Otto" search.

24         **MR. EHRLICH:**  And the system is really working.  The

25    diligence counsel, we're turning it around immediately and then

 1 | if there are any issues, Special Master Cooper rules.

 2 |       **THE COURT:**   Okay.   What I want you to do is for Max

 3 | provide all the terms you want.   Essentially do the same search

 4 | you would do in Relativity.

 5 |       **MR. JUDAH:**   Well, we are doing a linear review in

 6 | Relativity; but if that's what you want us to do, we can do

 7 | that.

 8 |       **THE COURT:**   Just do that.   You know what?   Discovery

 9 | is not perfect; right?   It's not perfect.

10 |       **MR. JUDAH:**   We hired over 85 conduct attorneys to do

11 | it.

12 |       **THE COURT:**   It's still not going to be perfect.   It's

13 | just not perfect.   In any case when you have three years, five

14 | years, it's not perfect.   And, in fact, when you get to trial,

15 | as you know, the amount of documents that will actually be used

16 | compared to what's produced in this case will be infinitesimal;

17 | right?   Infinitesimal.

18 | So -- but go ahead.   Provide them all the terms you want,

19 | all the terms you want.

20 |       **MR. JUDAH:**   Okay.   But we --

21 |       **THE COURT:**   If you get hits, unless it's truly

22 | private, just give it to them.

23 |       **MR. EHRLICH:**   Absolutely.

24 |       **THE COURT:**   Yeah.

25 |       **MR. PATCHEN:**   That's what we've been doing,

1   Your Honor.

2           **THE COURT:** Unless it's extremely private.

3           **MR. EHRLICH:** Yes.

4           **MR. JUDAH:** And also you're saying we should provide

5   more search terms for all the privacy screens?

6           **THE COURT:** Well, Max was the one that you brought up.

7           **MR. JUDAH:** Well, that's why I think he shouldn't

8   apply at all but, okay.  Well, I understand.

9           **THE COURT:** Work something out.  They're willing to

10  work with you on that.

11          **MR. EHRLICH:** When I'm not sitting next to you at

12  3:00 a.m.

13          **THE COURT:** Okay.  So is there anything else that we

14  should discuss?

15          **MR. JUDAH:** I would love to discuss the motion to

16  compel the depositions.

17          **THE COURT:** You know, I just -- I haven't read it, so

18  not helpful.

19      What I will do is I'm going to go through and read through

20  it and I'm going to figure out if you've shown good cause;

21  right?  Discovery is closed.  You have to show that what was

22  produced after is good cause to take those depositions.

23          **MR. JUDAH:** One -- and I think we've made that

24  showing, but I will note that even the hearing this morning has

25  shown additional relevance.  Apparently there's going to be a

1   dispute about whether -- what exactly was said at that board

2   meeting.  It sounds like Mr. Kalanick, who wasn't allowed to

3   testify in his first deposition --

4         **THE COURT:**  But he is being deposed again.

5         **MR. JUDAH:**  He is being deposed again, but he's

6   apparently going to say, "No, I didn't say that the diligence

7   came back clean."  But then Mr. Gurley, who will also be

8   deposed again, said the opposite thing at his deposition.

9   Ms. Yu attended that board meeting.

10       And I'll note Mr. Kalanick didn't even remember making

11  that presentation in the first place, so I'm going to be very

12  surprised to see what he suddenly remembers about it now.

13       But I think the fact that she was a witness who attended

14  that board meeting is just something that we didn't have -- I

15  didn't realize it was going to be a disputed issue until this

16  morning, so that was not in our papers, but we think you should

17  be aware.

18        **THE COURT:**  Okay.  That's fair enough.  Would anyone

19  like to respond to that?

20        **MR. GONZALEZ:**  Just briefly, Your Honor.

21       There are 15 depositions that they're going to take on

22  Stroz.  15.

23        **THE COURT:**  Right.  Right.  But, no, he's talking very

24  particularly about -- all I want to hear about is the board

25  meeting.

1          **MR. GONZALEZ:**  So I didn't hear anything about that

2    till just now, Your Honor, so I'm not in a position to tell

3    you.  I don't want to represent to you because I don't even

4    know standing here right now who was at the board hearing in

5    order to testify.

6          **THE COURT:**  So if you could just by the end of the

7    day -- that meaning midnight -- just respond to that; right?

8         So my understanding is one reason you want Ms. Yu -- I

9    will note that you did take Mr. Drummond; right?

10         **MR. GONZALEZ:**  We did.

11         **THE COURT:**  Yeah.  But one reason you want Ms. Yu is

12   because you want to find out at this board meeting what was

13   said about the results of the due diligence report?

14         **MR. JUDAH:**  Right.

15         **THE COURT:**  Okay.  All right.  So you can respond to

16   that.

17         **MR. GONZALEZ:**  We'll address that, Your Honor.

18         **THE COURT:**  Okay.

19         **MR. GONZALEZ:**  Thank you.

20         **THE COURT:**  Okay.

21                    (Counsel conferring.)

22         **THE COURT:**  Okay?  Okay.  Thank you very much.  Thank

23   you, Mr. Cooper.

24                (Proceedings adjourned at 3:38 p.m.)

25                    ---oOo---

1

2

3                    __CERTIFICATE OF REPORTER__

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Thursday, September 28, 2017

8

9

10

11    _____

12         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25