# Exhibit 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
 5   WAYMO LLC,
 6        Plaintiff,
 7             vs.                Case No.
 8   UBER TECHNOLOGIES,INC.;   17-cv-00939-WHA
 9   OTTOMOTTO, LLC; OTTO
10   TRUCKING LLC,
11        Defendants.
12   _____
13
14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
15
16         VIDEOTAPED DEPOSITION OF JIM TIMMINS
17              San Francisco, California
18            Tuesday, September 26, 2017
19                      Volume I
20
21   REPORTED BY:
22   REBECCA L. ROMANO, RPR, CSR No. 12546
23   JOB NO. 2715170
24
25   PAGES 1 - 316
```

Page 1

```
1         A.   I want to say early '90s to mid, late           09:35:54
2     '90s, when it was sold to Orbital Sciences.
3         Q.   Any other transportation-focused
4     technology companies that you served on the board
5     of?                                                       09:36:12
6         A.   No.
7         Q.   What did your -- your bachelor's degree,
8     what was that in?
9         A.   History and philosophy.
10        Q.   I understand you do not have a law              09:36:21
11    degree; is that correct?
12        A.   I do not.
13        Q.   Have you done any legal course work?
14        A.   I completed the first year of law school
15    in Canada.                                                09:36:30
16        Q.   Have you ever previously rendered an
17    expert opinion on a question of law?
18        A.   Well, your use of the word "previously"
19    suggests that I am rendering an opinion about a
20    matter of law currently.                                  09:36:50
21        Q.   Let's -- without characterizing what your
22    current opinion is, have you ever, before this
23    case, not characterizing what your opinion is in
24    this case, rendered an opinion on a question of
25    law?                                                      09:37:02
```

```
 1      A.   I'm not an attorney.  And as such, I've              09:37:03
 2   not rendered an opinion about a question of law.
 3      Q.   On paragraph 6, which bridges pages 2 and
 4   3 of your report -- but, actually, the part I'm
 5   going to read from is on page 3.                             09:37:27
 6           You say you have "considerable experience
 7   in private company financing, mergers and
 8   acquisitions ('M&A') and valuations and fairness
 9   opinions."
10           Just taking those categories separately,             09:37:42
11   have you been involved with private company
12   financing concerning autonomous vehicles?
13      A.   Other than the aforementioned experience
14   with Magellan Systems, I have not.
15      Q.   And how about mergers and acquisitions               09:38:05
16   specific to the automotive -- autonomous vehicle
17   industry?
18      A.   Again, excepting Magellan, I've done some
19   work to provide valuation to companies that were in
20   the space, and I believe some of that work may have          09:38:23
21   been used to support transactions, but I was not in
22   the middle of those transactions negotiating them.
23      Q.   And this may overlap with what you just
24   said, but since you had valuations as a separate
25   category, I just wanted to ask whether you had been          09:38:40
```

Page 33

1     Q.   Yeah, I'm just asking if you have a view          04:06:27

2  on that, based on whatever information you have?

3     A.   Based on the information I have, as of

4  this moment, no, I don't have a view.

5     Q.   I mean, the information here says that            04:06:34

6  "In March 2014, Facebook announced its acquisition

7  of Oculus VR."  This is page 67.  "At the time,

8  Oculus VR was less than two years old, had only 75

9  employees, and before the acquisition, had only

10 fundraising-type pre-orders on developmental              04:06:49

11 units."

12    A.   That -- that's an outcome that's

13 substantially different from the norm.

14    Q.   Okay.  Moving on to business in the final

15 opinion in your opening report, so section VII of         04:07:08

16 your report.

17         And I take it your opinion is that

18 "Levandowski Had Control of Bismuth, Sandstone, and

19 Tyto," as the heading indicates; is that correct?

20    A.   He had control of Tyto through Sandstone          04:07:31

21 and he had control of Sandstone through Bismuth.

22 So, yes, by implication he had control of all three

23 entities.

24    Q.   Have you previously opined in litigation

25 about an issue similar to this, about whether an          04:07:44

| | | |
|---|---|---|
| 1 | individual had control of other entities? | 04:07:48 |
| 2 | A.   I've opined about control, the elements | |
| 3 | of control, and whether tests for control in a | |
| 4 | corporation had been met. | |
| 5 | Q.   Can you explain more -- was that more | 04:08:05 |
| 6 | than one occasion or is that one engagement that | |
| 7 | you're thinking of? | |
| 8 | A.   I'm thinking of several engagements, and | |
| 9 | in at least one case, it was about fiduciary duties | |
| 10 | of a control shareholder, and one had to ascertain | 04:08:28 |
| 11 | whether this particular was an individual person | |
| 12 | indeed had control and, therefore, bore the company | |
| 13 | some fiduciary duties as a consequence of that. | |
| 14 | And control frequently comes up in | |
| 15 | evaluation context and as a question of setting | 04:08:52 |
| 16 | appropriate discounts or applying premium. | |
| 17 | Q.   Have you ever provided an opinion before | |
| 18 | on control with respect to a trust arrangement? | |
| 19 | A.   Control through a trust, yes. | |
| 20 | Q.   Can you explain that? | 04:09:18 |
| 21 | A.   A trust owned shares of a company and was | |
| 22 | controlled by an individual and that individual | |
| 23 | also directly owned shares of that same company. | |
| 24 | Q.   And what was your opinion in that matter? | |
| 25 | A.   That the same individual was able to | 04:09:37 |

Page 253

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   direct all of those shares and that, therefore, she      04:09:38

 2   had control.

 3        Q.   Was this a case in which you submitted an

 4   expert report?

 5        A.   No.  I believe it was California Superior      04:09:53

 6   Court, I believe.

 7        Q.   What was the name of the case?

 8        A.   I'm trying to recall.  I knew that would

 9   be your next question and I am struggling to

10   recall.                                                  04:10:05

11        Q.   Any chance it was Quercus v. LiveFuels?

12        A.   That was the earlier one which I

13   mentioned, which was the obligation of a control

14   shareholder and what fiduciary duties he owed.

15   I -- I don't --                                          04:10:39

16        Q.   So that case didn't -- Quercus Trust did

17   not involve the interpretation of a trust

18   instrument; is that fair?

19        A.   I don't recall.  I mean, that was six,

20   seven years ago.  I -- I really don't recall.            04:10:50

21   That might -- that might have been it.  I just

22   don't recall.

23        Q.   Okay.  Was there an objection to your

24   opinion in that case, or did you -- do you recall?

25   The trust case, the one in which you opined about        04:11:03
```

Veritext Legal Solutions
866 299-5127

```
 1   the --                                              04:11:07
 2        A.   No, there was not.
 3        Q.   Do you remember whether you presented a
 4   deposition on the issue in that case?
 5        A.   Deposition, yes.  I don't recall           04:11:13
 6   testifying about it at trial.
 7        Q.   Is there anything that would refresh your
 8   recollection as to what the name of that case was?
 9        A.   I'm working at looking at that.
10        Q.   Take your time.  This is an important     04:11:33
11   question.
12        A.   My recollection, such as it is, is that
13   Quercus Trust involved some of these questions.
14   And by coincidence, the case immediately above it,
15   Ryan Predictive Diagnostics and Large Scale         04:12:53
16   Biology --
17        Q.   Uh-huh.
18        A.   -- may have been the -- I -- I -- I
19   simply don't recall.
20        Q.   That's okay.                              04:13:01
21        A.   Yeah, but Quercus certainly did.
22        Q.   Okay.  So how does your general work,
23   both litigation and otherwise, relate to trusts?
24   How -- how do they arise in the course of your
25   work?                                               04:13:22
```

```
 1      A.    When we're performing valuation of                04:13:30
 2   securities of companies and then allocating that
 3   down to valuation of securities, we're often
 4   looking at the nature of the shareholder who holds
 5   the securities.  And as you're probably aware, many        04:13:45
 6   times wealthy individuals own securities
 7   individually -- I'm sorry -- indirectly through a
 8   trust, through a limited partnership often called a
 9   family limited partnership, or a FLIP.
10           Those are the primary instances in which           04:14:11
11   it -- in which trusts enter into our work.
12      Q.    And just more specifically, have you, in
13   the litigation context, opined before upon -- on
14   the powers of a settler of a trust?
15      A.    I've not opined about that narrow                 04:14:27
16   subject, no.
17      Q.    How about the powers of a substitutor?
18      A.    Again, no.
19      Q.    Have you personally set up a trust
20   before?                                                    04:14:35
21      A.    Perhaps.  And I say "perhaps" because my
22   brother is an attorney at home in Canada and did
23   some work on some things involving my mother before
24   she passed, and I remember signing some documents.
25   But I remember more being upset about what was             04:15:03
```

```
 1   happening with my mother.                              04:15:09
 2        Q.   And I take it that your work on personal
 3   trust matters did not your affect your opinion in
 4   this case?
 5        A.   It did not.  And furthermore, it's a         04:15:15
 6   different country.
 7        Q.   That, too.
 8             Do you know what state law governs the
 9   trust that's at issue in this case, Bismuth?
10             MR. McCAULEY:  Objection.  Form.             04:15:29
11             THE DEPONENT:  I recall reading the trust
12   document.  I don't recall offhand what it said.
13        Q.   (By Ms. Hartnett)  Does that affect your
14   analysis in this case, what state while either the
15   trust was formed under or what law would govern the    04:15:41
16   interpretation of the trust?
17        A.   It did not on my reading of it.
18        Q.   Was your analysis in this case about the
19   meaning of the trust agreement based on anything
20   beyond reading the trust agreement itself?             04:15:58
21        A.   I refreshed my memory on the term
22   substitutor.
23        Q.   How did you do that?
24        A.   Looked at a legal dictionary.
25        Q.   Did you do any other research related to     04:16:19
```

Page 257

```
 1   your opinion on the Bismuth, Sandstone, Tyto issue,        04:16:21
 2   aside from that, consulting a legal dictionary and
 3   reviewing the documents that you cited in this
 4   section?
 5        A.   You caught the other part of it,                 04:16:32
 6   reviewing the documents.
 7        Q.   Did you do any research of case law in
 8   conjunction with your opinion?
 9        A.   I did not.
10        Q.   Did you look at any state statutes or            04:16:39
11   other state law documents?
12        A.   I did not.
13        Q.   In your past work, have you ever given
14   opinion on the validity of a trust?
15        A.   I have not.                                      04:16:53
16        Q.   Have you advised someone to set up a
17   trust before?
18        A.   That would be outside the purview of what
19   we do.
20        Q.   What, if any, role would you have with           04:17:07
21   respect to forming a trust in your work?
22        A.   Well, we -- we wouldn't be advising
23   people about the formation of trusts.  We would
24   conduct valuations of entities and securities in
25   relation to that, but the actual formation of the          04:17:26
```

```
 1   trust would -- would be done by an attorney         04:17:29
 2   experienced in that area.
 3       Q.  Do you know whether there are certain
 4   aspects of trusts and trust law that vary from
 5   state to state?                                     04:17:40
 6       A.  Yes --
 7           MR. McCAULEY:  Objection.  Form.
 8           THE DEPONENT:  -- that there -- there
 9   are.
10       Q.  (By Ms. Hartnett)  What aspects?            04:17:44
11       A.  I don't know.
12       Q.  How do you know that there are
13   differences?
14       A.  I just recall hearing that.
15       Q.  Do you know whether the meaning of          04:17:50
16   certain terms in a trust agreement differs from
17   state to state?
18           MR. McCAULEY:  Objection to form --
19           THE DEPONENT:  I don't recall offhand.
20       Q.  (By Ms. Hartnett)  Was it relevant to       04:18:02
21   your opinion about the meaning of the Bismuth --
22   Bismuth trust, what state it was established in?
23       A.  I looked to that when I read the
24   document, but -- and I don't recall what state it
25   was organized in, but I -- I didn't give it any     04:18:18
```

Page 259

```
1    further thought beyond that.                           04:18:26
2         Q.   Do you have any view about whether the
3    Bismuth truth document is customary and usual or --
4    or not?
5              MR. McCAULEY:  Objection to form.            04:18:37
6              THE DEPONENT:  In -- in what regard?
7         Q.   (By Ms. Hartnett)  Any regard.
8              MR. McCAULEY:  Objection.
9         Q.   (By Ms. Hartnett)  Are you providing any
10   opinion about the validity of the document             04:18:42
11   itself --
12        A.   No.
13        Q.   -- or whether deviates from any normal
14   practice?
15        A.   No, I am not.                                04:18:50
16        Q.   You're providing an interpretation of the
17   document.
18             Is that fair?
19        A.   As to control.
20        Q.   And so what methodology did you use to       04:18:57
21   determine control under the Bismuth document?
22        A.   I looked at the wording.
23        Q.   Can you walk me through it?
24        A.   Do you wish to put the document in front
25   of me.                                                 04:19:15
```

Page 260

```
 1      Q.  I'm happy to.  You have your report as          04:19:16
 2   well, so if you'd like to --
 3      A.  Yes.
 4      Q.  I don't think we have a copy of that.  So
 5   we'll go with your report, and if you can't answer     04:19:21
 6   based on that, that's fine.
 7      A.  Well, Levandowski was in the wording of
 8   the document appointed as its settler.  And as the
 9   settler, he had the power to appoint himself as
10   substitutor.  And Bismuth was directed to purchase     04:19:41
11   an ownership interest in Sandstone.
12      Q.  And as far as the i.e. in the first
13   sentence -- you say "as its settler," and then you
14   say "(i.e., the person who bestowed assets on the
15   trust)."                                                04:19:59
16          Was that your own definition of
17   "settler"?
18      A.  That's my understanding of it.
19      Q.  And then as far as the next sentence,
20   where you say "substitutor (i.e., the person with      04:20:05
21   the power to substitute assets)," is that your --
22   a definition that you're providing?
23      A.  That's -- it's not word for word from the
24   legal def- -- def- -- dictionary, which I refer to
25   earlier, but it is my understanding of that.          04:20:19
```

Page 261

| | | |
|---|---|---|
| 1 | Q.  Okay.  And then on page -- turning | 04:20:24 |
| 2 | between page 27 and 28 -- this is in your | |
| 3 | paragraph 67 -- you say that Bismuth became -- this | |
| 4 | is the second sentence -- the sole member of | |
| 5 | Sandstone, and then you say and "(i.e., the only | 04:20:41 |
| 6 | owner and the holder of the power to control)." | |
| 7 | In that sentence, the "(i.e., the only | |
| 8 | owner and the holder of the power to control)," | |
| 9 | where does that understanding of what sole member | |
| 10 | means come from? | 04:20:58 |
| 11 | A.  My understanding of how limited liability | |
| 12 | companies are organized and operate. | |
| 13 | Q.  So that was based on a review of the | |
| 14 | Sandstone operating agreement? | |
| 15 | A.  And my understanding of LLCs, more | 04:21:11 |
| 16 | generally. | |
| 17 | Q.  Did you consultant any dictionary or | |
| 18 | other reference source, other than the footnote of | |
| 19 | documents, to determine what sole member means? | |
| 20 | A.  In this context, no.  Previously, I have. | 04:21:25 |
| 21 | Q.  And then just to finish this paragraph, | |
| 22 | the first sentence you -- starts on page 27, where | |
| 23 | you note that "Sandstone was formed on | |
| 24 | October 29, 2012, by Alaska Trust, as 'trustee.'" | |
| 25 | And then you have in parentheses, "(i.e., the | 04:21:41 |

```
 1   entity with power to administer property of the        04:21:43
 2   trust) of Bismuth."
 3           For that definition of trustee, where did
 4   you get that from?
 5       A.   That's from my understanding.                 04:21:52
 6       Q.   Did you consultant any reference books
 7   in -- or other reference sources in conjunction
 8   with this definition in this report?
 9       A.   I did not.
10       Q.   In your experience, is the sole member of    04:22:06
11   an LLC the only entity with power to control the
12   LLC?
13       A.   A --
14           MR. McCAULEY:  Objection to form.
15           THE DEPONENT:  A duly organized LLC and       04:22:22
16   one that is not in violation of some agreement, or
17   something of that sort, then yes.
18       Q.   (By Ms. Hartnett)  Can the sole member of
19   an LLC choose to vest the power of control in
20   another person or entity?                             04:22:34
21       A.   That is within his or her power, yes.
22       Q.   How do they do that?  How does a sole
23   member vest their power in another person or
24   entity?
25       A.   For instance, creating an operating          04:22:47
```

Page 263

```
 1   committee, a management committee.  They go by        04:22:48

 2   various names.

 3        Q.   And then page -- paragraph 69, you say

 4   that "Sandstone was controlled by its sole member,

 5   Bismuth."                                              04:23:02

 6             What is the basis for the conclusion that

 7   Sandstone was controlled by its sole member,

 8   Bismuth?

 9        A.   The earlier work in paragraph 66 and 67.

10        Q.   So you're basing that on the fact that --   04:23:22

11   because Bismuth is the sole member, your conclusion

12   is that it -- that controlled Sandstone?

13        A.   Yes.

14        Q.   Let me hand you this document.

15             MS. HARTNETT:  If you could mark this,      04:23:35

16   please.

17             THE DEPONENT:  Thank you.

18             (Exhibit 2785 was marked for

19   identification by the court reporter and is

20   attached hereto.)                                      04:23:35

21        Q.   (By Ms. Hartnett)  I'm handing you a

22   document marked 2785, which is Bates-labeled

23   Sandstone 00 -- five zeros and a 1 through five

24   zeros and a 7, and it says Secretary of Cal- --

25   Secretary of State, State of California, LLC          04:24:13
```

Page 264