QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David A. Perlson (Bar No. 209502)
  davidperlson@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  John Neukom (Bar No. 275887)
  johnneukom@quinnemanuel.com
  Jordan Jaffe (Bar No. 254886)
  jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:      (415) 875-6600
Facsimile:      (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>        Plaintiff,<br><br>    vs.<br><br>UBER TECHNOLOGIES, INC.;<br>OTTOMOTTO LLC; OTTO TRUCKING<br>LLC,<br><br>        Defendants. | CASE NO. 3:17-cv-00939<br><br>**PLAINTIFF WAYMO LLC'S SUPPLEMENTAL MOTION FOR CONTINUANCE AND RESPONSE TO REQUEST FOR INPUT ON PENDING MOTION TO CONTINUE TRIAL DATE**<br><br>**REDACTED VERSION OF DOCUMENT TO BE FILED UNDER SEAL** |

# TABLE OF CONTENTS

**Page**

I.    THE NEW EVIDENCE REVIEWED TO DATE ESTABLISHES ITS CRITICAL
      IMPORTANCE AND THE NEED FOR ADEQUATE TIME TO REVIEW ALL
      OF THE MATERIAL JUST PRODUCED AND STILL YET TO BE PRODUCED ..........3

II.   NEWLY PRODUCED OTTOMOTTO MATERIALS ...........................................6

III.  UPDATED NOTICE OF THE CURRENT STATE OF DISCOVERY, WHICH
      PLAINLY ESTABLISHES THE NEED FOR A CONTINUANCE...................................9

IV.   WAYMO IS ENTITLED TO ADEQUATE TIME TO REVIEW THE NEWLY
      AVAILABLE EVIDENCE .................................................17

V.    WAYMO HAS NOT WAIVED, AND HAS A CONSTITUTIONAL RIGHT TO
      NOT BE FORCED TO WAIVE, CLAIMS WHILE DISCOVERY IS ONGOING,
      THUS FURTHER NECESSITATING A CONTINUANCE .............................19

VI.   THE PROPOSED DECEMBER 5 TRIAL DATE NO LONGER APPEARS
      FEASIBLE .................................................................21

1    On September 16, 2017, Waymo moved for a continuance of the October 10 trial date to allow

2    it a meaningful opportunity to review the enormous quantity of new information revealed by the

3    production of the Stroz Report and related materials.  At the September 20 hearing on this motion, the

4    Court indicated it would not rule on the motion before October 3, stating that "if it turns out I

5    genuinely think that even though Waymo has done everything it can possibly do, it genuinely needs

6    more time on account of the other side having stonewalled on the due diligence report, then we're

7    going to give them more time."  (Dkt. 1723 (9/20/17 Hearing Tr.) at 69.)  On September 27, Waymo

8    filed a Notice Regarding Stroz Report Discovery and Tasks (Dkt. 1848) ("Notice") detailing all of the

9    steps it was taking to immediately tackle the new discovery stemming from the Stroz Report.  The

10   following day, the Court ordered Waymo to provide input on the pending motion to continue the trial

11   date (Dkt. 1883) ("Request for Input").  This memorandum details further information gained since

12   Waymo's September 27 Notice, establishing the clear need for a continuance.

13       Waymo has done everything it can possibly do, but Defendants' practice of resisting discovery

14   throughout this case continues even today.  Indeed, the Preliminary Injunction Order focused in large

15   part on directing Defendants to do that which they had been ordered to do by this Court as early as

16   March 31, 2017: search for and return all of Waymo's files.  Defendants have never complied with the

17   Court's Preliminary Injunction Order.  Just days ago, despite repeatedly representing to this Court that

18   they had done a diligent search for Waymo's files and found nothing, Defendants admitted that they in

19   fact had **15,000 emails and 85 GB of Google drive documents** from an Ottomotto domain used by

20   Levandowski.  This is in addition to the 68,000 documents—provided by Levandowski to MoFo after

21   this lawsuit was filed—finally turned over on September 14 and the 1.4 million documents and

22   176,000 source code files that Stroz made available for review as of September 18 and September 28

23   (respectively).  If Defendants are seeking the benefit of the doubt regarding their purported efforts to

24   avoid being tainted by Levandowski's actions, they have done nothing since the start of this litigation

25   consistent with the actions of a responsible party, including the failure to comply with the Preliminary

26   Injunction Order and waiting until May 26 to fire Levandowski.

27       As described in detail below, Waymo has taken extraordinary efforts to review the incoming

28   materials, employing approximately 100 additional attorneys to do so.  Waymo should not be deprived

1   of the ability to try this case in a fair and reasonable way, with a full airing of the facts.  That will

2   occur only if Waymo can meaningfully review and use the materials that Defendants continue to

3   shield from discovery even today.

4       *First*, it is now undeniable that Waymo cannot meaningfully review all of the newly available

5   evidence before the October 10 trial date.  To begin with, separate and apart from the Stroz related

6   productions, Ottomotto just produced an enormous amount of highly relevant material that should

7   have been produced months ago, in compliance with this Court's Preliminary Injunction Order.  On

8   September 29, Defendants produced 15,000 emails and 85 GB of Google drive documents from an

9   Ottomotto domain used by Levandowski while working for defendant Ottomotto that Defendants

10  appear to have possessed since the outset of this case.  When ordered by Judge Corley to explain this

11  late production, Defendants failed to do even that.  Instead, they filed a declaration from a third party

12  that Judge Corley found inadequate, as it makes only a token effort to explain why Defendants failed

13  to produce these materials months ago.  (Dkt. 1903.)  Today they filed two more declarations that

14  even Defendants concede are also incomplete.  (Dkts. 1912, 1913.)

15      Even for the material that Waymo has been diligently reviewing, the volume (over 1.4 million

16  non-source code files and 176,000 source code files)—and the fact that many of the files are not text-

17  searchable—preclude the possibility of a complete review before October 10.  As of today, they have

18  spent 4,450 hours performing the review and have been able to review 576,784 of the over 1.4 million

19  documents.  Indeed, Waymo had no choice but to proceed with 17 depositions without the benefit of a

20  completed review, in order to demonstrate its good faith efforts to this Court.  And with just one week

21  left to prepare for trial, Waymo is not able to focus on trial preparation as it should be able to, with an

22  additional 17 witnesses left to depose.  If the Court will not permit more time to review these

23  materials, Waymo will be unable to pursue any additional fact witness depositions and expert

24  testimony stemming from what it uncovers in the coming days.

25      *Second*, Waymo has the right to review the newly available evidence prior to deciding the

26  claims it will bring to trial.  While this Court has suggested the possibility that Waymo has waived

27  claims other than the nine currently designated for trial, the record belies any such suggestion.  This

28  Court ordered Waymo to narrow its claims to less than ten trade secrets without stating that such

narrowing would waive other claims. (Dkt. 563 at 10.) And, when Waymo did narrow its claims, it expressly reserved the right to bring other claims. (Dkt. 1110-1 at 3.) Thus, any supposed waiver here would have been involuntary. As Waymo has explained—and Defendants have not refuted— such an involuntary waiver would be legally baseless, violating Waymo's due process and Seventh Amendment rights. It would also be demonstrably unjust. Indeed, such an involuntary waiver would serve to reward Defendants with a windfall, skating Waymo's claims against them even though Waymo has been precluded from obtaining anything close to a legitimate opportunity to take discovery as to those very claims.

*Third*, in answer to this Court's Request for Input, given the enormous amount of discovery still outstanding, Waymo cannot provide a revised list of trade secrets at this time. But the discovery has already revealed a strong basis to add at least a conversion claim given the Stroz Report shows that Uber, through its agents, including its trial counsel MoFo and Stroz itself, obtained, possessed, and even long kept Waymo's confidential information, source code, and files. Waymo cannot predict, at this point, precisely when a trial could take place with a new list of trade secrets and other claims. But the unanticipated volume and complexity of documents just produced and yet to be produced (along with Defendants' repeated delays) make it doubtful that the proposed schedule for a December 5 trial date would be feasible. Waymo believes it can provide a new proposed schedule by October 27, when it will have reviewed at least a reasonable portion of the newly produced documents and Defendants presumably will have finally completed the required productions.

**I.      THE NEW EVIDENCE REVIEWED TO DATE ESTABLISHES ITS CRITICAL IMPORTANCE AND THE NEED FOR ADEQUATE TIME TO REVIEW ALL OF THE MATERIAL JUST PRODUCED AND STILL YET TO BE PRODUCED**

**A.      New Evidence Related To Eight Of The Nine Trade Secrets Designated For Trial**

While discovery is far from complete and Waymo has had time only to review a fraction of the new evidence, as discussed *infra* Part II, the importance of the new evidence is apparent in the evidence Waymo has already found to further support its claims of misappropriation of the nine trade secrets currently designated for trial. The near-certainty that even more evidence rests in the mountain of documents Defendants have just produced and the many more documents and devices Defendants

1  have yet to produce establishes the need for a reasonable amount of time for Waymo to review all of

2  the newly available evidence.  As discussed below, that cannot happen by October 10.

3         To begin with, the document claimed as TS 90, describing Waymo's proprietary ███████

4  ████████████████, is one of the documents found in Levandowski's devices.  (Ex. 1

5  (STROZ_R_000155689).)  Additional evidence relating to TS 90 includes emails providing additional

6  detail about Waymo's ████████.  (Ex. 1 (STROZ_R_000157815) (email summary of ████████

7  ████████████); Ex. 1 (STROZ_R_000140398) (email detailing ████████████████

8  ██████████████████████); Ex. 1 (STROZ_R_000157928) (email detailing ████████

9  ████████████); Ex. 1 STROZ_R_000165297 (discussing ██████████████████); Ex. 1

10  (STROZ_R_000159308) (██████████████████████████)).  Waymo has also identified

11  a  presentation  outlining  ████████████████████████  (Ex.  1

12  (STROZ_R_000149343)), a detailed standard operating procedure outlining, step by step, how to

13  assemble ██████████████████████████████████████████████

14  ██████████████████████ (Ex. 1 (STROZ_R_000135848)), and a

15  preliminary  design  review  for  the  ████████████████  claimed  as  TS  90  (Ex.  1

16  (STROZ_R_000155697)).  Finally, a document containing the precise specifications for ████████

17  ████████ was also found among the so-called "sliver" of 68,000 documents of Stroz materials in

18  MoFo's possession.  (Ex. 2 (SFM00000011).)

19         Other documents in the 68,000 documents of Stroz materials in MoFo's possession include

20  CAD schematics showing ██████████████████████████████████████

21  ████████████████████████████████████ (Ex. 2 (SFM00000753;

22  SFM00000761;  *see also*  Ex. 2 (SFM00000764) (screenshot of an Altium transmit board

23  schematic).)  An optical simulation output showing ████████████████████████

24  ████████████(*i.e.*, TS 2 and TS 94 to TS 99) was also found among those materials.  (Ex.

25  2 (SFM00000763).)

26         Documents found in Levandowski's computers also include ████████████████

27  ████████████████████████████████████████claimed in this case as TS

28  25, including one of three documents explicitly claimed in TS 25 (the ██████████████████,

-4-

Ex. 1 (STROZ_R_000149315)).  Forensic analysis of this spreadsheet, explicitly claimed in TS 25, shows a "last accessed" date of January 4, 2016, just before Levandowski downloaded numerous additional, highly confidential Waymo documents from Google Drive.  (Ex. 5)  In addition, Waymo has found a presentation outlining ███████████████████████████ (Ex. 1 (STROZ_R_000121935)), and a ████████████████████████████████████████ ███████████████████████████████ (Ex. 1 (STROZ_R_000147171).)

Furthermore, the GBr3 design review that provides a high-level overview of several of Waymo's asserted trade secrets, including TS 2, has been found among Mr. Levandowski's materials.  (Ex. 1 (STROZ_R_000156272).)  Similarly, Waymo has found a document detailing how MBr, to which TS 111 is directed, operated.  (Ex. 1 (STROZ_R_000159448).)  Waymo has also found early MBr engineering drawings, showing ██████████████████████ discussed in TS 111.  (Ex. 1 (STROZ_R_000163819).)

**B.      New Evidence Related To Other Trade Secrets**

In addition to all the documents related to the nine trade secrets designated for trial, Waymo has also found documents cited in its trade secret list with respect to non-elected trade secrets on Levandowski's devices.  For example, Waymo has found in Levandowski's laptop the ██████████ ██████████  document claimed as TS 87 (Ex. 1 (STROZ_R_000149316)), the ██████████ ██████████  document claimed as TS 88 (Ex. 1 (STROZ_R_000122867), the ██████████ ██████████  claimed as TS 15 (Ex. 1 (STROZ_R_000155727), the ██████████ document claimed as TS 75 to TS 80 (Ex. 1 (STROZ_R_000155556)), and the ██████████ document claimed as TS 81 to TS 84 (Ex. 1 (STROZ_R_000155564)  All of these were last accessed on February 24, 2016, after Levandowski had left Google and when he was working on LiDAR at Ottomotto and Otto Trucking.

Moreover, Waymo has found a document from the Stroz production that is the mechanical drawing for ██████████████████.  (Ex. 1 (STROZ_R_000155667).)  Waymo claimed this design in TS 49.  (Dkt. 25-7 at 31.)  And there is evidence that ████████████████████████████████ ████████████████████████████████.  (Ex. 3 (UBER00072241).)

Waymo needs more time to review the new evidence, including the evidence not yet produced, to confirm the misappropriation of these other trade secrets and quite possibly other trade secrets as well.  But even the limited review Waymo has conducted establishes good cause to allow for other trade secrets to be added to this case, once discovery is complete.

**C.      New Evidence Related To Proprietary Information Not On Waymo's List Of Trade Secrets**

Even beyond the trade secrets Waymo listed at the outset of this case, the new evidence indicates that there is other proprietary information, contained in the new documents, that made its way to Defendants.  The investigation of this material has only just begun, and Waymo is entitled to the time and full discovery necessary to confirm exactly what proprietary information Defendants gained from Levandowski and Ottomotto.  The attached Exhibit 6 demonstrates why this investigation is so crucial and requires more time.  This exhibit is a list of files in the "chauffeur" folder of Mr. Levandowski's Dropbox/Gmail account.  That folder alone contains thousands of files, covering confidential and proprietary information describing Waymo's LiDAR systems and numerous other aspects of its self-driving car technology, including but not limited to the following: ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████  Waymo has not had sufficient time to inspect these files, let alone determine the extent to which Mr. Levandowski used them to influence the development of Uber and Ottomotto's self-driving car technology.

## II.      NEWLY PRODUCED OTTOMOTTO MATERIALS

Completely separate from the ongoing production of Stroz materials and related documents, Defendants just produced an enormous cache of highly relevant Ottomotto documents that should have been produced months ago, an egregious and still unexplained failure to comply with the requirements of discovery as well as this Court's clear directive in the Preliminary Injunction Order. On September 20, 2017, counsel for Uber and Ottomotto represented that any relevant Ottomotto documents had been produced:

1   **THE COURT:** Has Ottomotto LLC produced documents?

2   **MR. GONZÁLEZ:** Your Honor, there's been extensive discovery by the plaintiffs on
    both Ottomotto and Uber both.

3

4   **THE COURT:** So has Ottomotto LLC produced documents?

5   **MR. GONZÁLEZ:** I need to confer with my team, Your Honor, but I'm almost
    certain the answer is yes.

6   **THE COURT:** Be certain. Come on.

7   **MR. GONZÁLEZ:** Yeah.

8   **THE COURT:** Help me out here.

9   (Counsel confer off the record.)

10  **MR. GONZÁLEZ:** Your Honor, my understanding is that the Ottomotto documents
    were migrated onto the Uber computer system at the time that it was acquired. And,

11  therefore, when we searched for documents in response to document requests we
    would have searched not only Uber but anything that may have migrated over from

12  Ottomotto. And Ottomotto witnesses have been produced for deposition and deposed
    multiple times.

13  (Dkt. 1723, 37:17-38:4-17.)

14       But seven days later, counsel for Uber and Ottomotto notified Waymo that counsel "learned a

15  few hours ago that there may be emails and documents from an Ottomotto account that was not

16  migrated over to Uber" and "any documents that required further production" would be produced

17  "asap." (Ex. 4 [9/27/17 Rivera Email].) The next day, Waymo learned that this new cache of

18  unsearched documents includes at least *16,000 emails and 85 GB of Google drive documents* from an

19  Ottomotto domain used by Levandowski. (*Id.*) This failure occurred even though every set of

20  Waymo document requests had required productions from both Uber *and* Ottomotto (each entity is a

21  Defendant in this case). In addition, ███████████████████████████████

22  ███████████████, as it was stated in the Stroz Report. (Ex. 7 [Ex. 5 to Stroz Report] at 18.) It

23  was also known to Defendants because it was stated in an expert report. (Ex. 8 [French Rebuttal

24  Report] at 10.) There is no justification for Defendants' failure to produce these documents until a

25  few days ago. In fact, Defendants' failure here demonstrates that they have never complied with this

26  Court's Preliminary Injunction Order and that their repeated representations regarding a diligent

27  search for Waymo's files are not credible. Waymo finally received the 16,000 emails on the night of

28

-7-

September 28 and received the 85 GB of Google drive documents on September 29, less than two weeks before the trial date.

Defendants' failure to produce these documents in a timely fashion further establishes that Waymo will be seriously prejudiced if the trial occurs on October 10.  The 85 GB of documents comprises Ottomotto files of all different types, including source code, specifications, technical literature, and videos.  Specifically, there are over 1.2 million documents, and even after de-duplicating, there are 5,716 files needing review by attorneys as well as source code files.  A full review of these documents will take at least several weeks.  But even a cursory look at a small number of the documents shows that some directly concern the subject matter of asserted trade secret numbers, including at least number 7 and 90, and thus may have great importance in determining whether Ottomotto retained trade secrets taken from Waymo.

In addition, Uber has not adequately explained how this failure occurred and has not provided assurances that there are no other Ottomotto documents yet to be produced.  At a hearing on September 28, Judge Corley ordered Uber to file by noon on September 29, a declaration that details how the emails and documents were found, where they were found, and why Uber did not find them earlier.  (Dkt. 1890 at 7.)  A few hours after the deadline,[1] Uber filed a declaration from their paid expert Kevin Faulkner of Stroz Friedberg.  Shortly after the filing, Judge Corley issued an order noting the late filing and stating:

> Faulkner's declaration is inadequate. It is replete with hearsay regarding what unidentified Uber people supposedly said or did. (*See, e.g., id.* ¶¶ 4, 8, 10, 13, 14.) Even that hearsay, however, does not explain what information Uber had regarding the Levandowski Otto Accounts.  Accordingly, Uber is ordered to submit a declaration or declarations from in-house and/or litigation attorneys that address in detail how and why the Levandowski Otto Accounts did not get produced until less than two weeks before trial despite their significance to this case.  **These declarations shall be filed on or before 10:00 a.m. on Monday, October 2, 2017.**

(Dkt. 1903.)  The lack of detail in the declaration—failing to provide the name of the "vendor" that migrated certain files from Ottomotto to Uber in connection with the acquisition and failing to identify who did what at Uber with respect to that migration and with respect to the search for Ottomotto

---

[1]   Counsel for Uber and Ottomotto told Special Master Cooper that the late filing was because "[w]e have five depos going today."  (Ex. 9.)

documents in this litigation—seemed designed to delay discovery into the issue in the short time before trial.  And in addition to the deficiencies in meeting Judge Corley's instructions, neither the declaration nor Defendants' comments at the hearing have provided any clear assurances that there are no other Ottomotto "domains" omitted from Defendants' productions.

Today Defendants filed two additional declarations in an attempt to explain their untimely production of the Ottomotto material.  (Dkts. 1912, 1913.)  But these declarations too are inadequate, as Defendants in fact concede.  (Dkt. 1912 at 1 ("We could not reach all of the relevant individuals needed to provide more complete information in sufficient time over the weekend. With some additional time, we could present additional information.").)  The first declaration, from Sylvia Rivera, of MoFo, simply states that she relied on the expertise of others and did not know about the documents until September 27.  (*Id.* at 2.)  She further states that since some emails sent to or from "a@ot.to" or "a@ottomotto.com" were produced, she assumed all were produced.  (*Id.*)  Similarly, the declaration from Jesse Murray, Senior eDiscovery Manager at Uber, states that he relied on others' statements that all email and Google Drive data from the ot.to domain was migrated successfully to Uber's domain in November 2016, and that he did not know about the unproduced documents until September 27, 2017.  (Dkt. 1913 at 1-2.)  Thus, neither of these declarations actually explain why the files were not migrated to Uber and produced in the first place.  Nor do they detail any efforts after September 27 to ensure that there are no further missing documents not successfully migrated from Ottomotto to Uber and then produced to Waymo.

## III. UPDATED NOTICE OF THE CURRENT STATE OF DISCOVERY, WHICH PLAINLY ESTABLISHES THE NEED FOR A CONTINUANCE

Waymo has done everything reasonably possible in the last three weeks to compel Defendants and third parties to produce the Stroz materials and related documents and to review and evaluate the over 1.4 million documents from Stroz, 16,000 emails and 85 GB of data from Ottomotto, and hundreds of terabytes of data from devices that have been and still are being produced.  Events in the last several days, since Waymo filed the Notice, have only confirmed the impossibility of Waymo reviewing all of the new evidence before the current trial date of October 10.

### A. The Production And Review Of Stroz Material And Related Documents By Defendants, Stroz, And Others

-9-

Below Waymo provides a detailed update of its efforts to date and the extensive amount of work that still needs to be done below.

**Stroz Relativity Database** – As explained in the Notice at 3-5, on September 18, Stroz made available for inspection (and on September 21 Stroz began producing) over 1.4 million documents, images, and other files collected by Stroz from the five "Diligenced Employees":  Anthony Levandowski, Lior Ron, Don Burnette, Soren Juelsgaard, and Colin Sebern.  Because many of these files are "screen shots" of Waymo documents or emails, and therefore not text searchable, Waymo must conduct a manual, document-by-document review.  On September 18, Waymo began reviewing these materials directly on the Stroz-hosted platform after determining that it would be impossible to obtain a separate database for Waymo's use.[2]  Waymo has employed 85 attorneys, working full-time and overtime, to review these documents.  As of today, they have spent 4,450 hours performing the review and have been able to review 576,784 of the over 1.4 million documents.  And after this preliminary review, there still must be a further review to determine the relevance to Waymo's claims and how to incorporate the documents into Waymo's presentation at trial.

**Native Devices Still Not Produced By Stroz In A Useable Format** – In addition to the dozens of devices Stroz has only recently produced, discussed below, Stroz possesses 118 hard drives from Levandowski that Stroz never reviewed, and these hard drives still have not been provided to Waymo in a manner that can be reviewed.  The 118 devices contain between one and thirty-four terabytes of data on each device.  This batch of approximately 118 hard drives is notably distinct and more difficult to image and analyze than ordinary laptops or other devices because these drives are apparently configured in what are called "arrays," which are essentially multiple hard drives configured to function as one larger drive via the use of either, or both, hardware and software.  (Crain Decl. at 3.)  This technology is known in computer forensics as "RAID" (redundant array of inexpensive disks).  (Crain Decl. at 3.)  The Stroz team, in preparing these drives for review by

---

[2]  Waymo is in the unusual position of having to rely on Defendants' own discovery database.

Waymo's forensics team, stated that a good number of these particular drives and arrays are of a non-typical[3] variety, having presumably been configured by Mr. Levandowski himself. (Crain Decl. at 3.)

In order to perform forensic analysis on hard drives contained in an array, it is necessary to first "reconstruct" or "rebuild" the array such that its file system and substantive contents can be logically read and understood. (*Id.*) The computer forensics team has provided that this type of RAID reconstruction can often become very difficult and quite time consuming. (*Id.*).

As of today, Stroz is planning to turn over smaller and less complicated servers once they are reassembled adequately and then move on to the larger and more complex servers. Even then, it will take many hundreds of hours to review and analyze these hard drives, as detailed in the attached declaration. (*Id.* at 3, 5.). In short, only one week before the trial is set to begin, Waymo still has not been provided in a usable form over 100 terabytes of data on over 100 highly-unusual devices from a principal actor in the case. These devices may well have nothing to do with the case, Waymo needs the opportunity to determine that for itself, especially since Stroz did not find Levandowski to be totally forthcoming.

**Native Devices Produced By Stroz** – As explained in Waymo's Notice at 5-6, Stroz possesses images of dozens of devices from the Diligenced Employees that were the source of—but also include many files in addition to—the 1.4 million documents discussed above. The forensic examination of these device images is critical because it may reveal how Waymo's documents and source code got onto the devices, whether and when the Diligenced Employees accessed Waymo's documents and source code (including the 24,000 files in a folder called "…./chauffeursvn/" on one of Mr. Levandowski's personal devices), and whether these materials were copied to additional devices that contain Waymo's documents and source code. (Dkt. 1603-5 at 12.)

On September 28, after a fifteen-day delay since the Federal Circuit's decision, 35 devices and 21 cloud-based repositories of data belonging to the Diligenced Employees were finally turned over to Waymo. These devices consist of approximately 8.5 terabytes of data, broken down by custodian as

---

[3]   Stroz clarified that some of Mr. Levandowski's servers that are still being worked on contain between 24 – 32 terabytes of storage, which is a highly unusual type of computer in today's civil litigation and forensic discovery. (Crain Decl. at 3).

follows:  Levandowski (1.49TB), Burnett (5TB+), Juelsgaard (617GB), Sebern (567GB), and Ron (859GB).  Although comparisons between terabytes of data storage and things like documents or printed pages are by definition only rough measures, it should be stressed that 8.5 terabytes is a huge volume to try to process and analyze.  For example, a single terabyte of storage is the mathematical equivalent of nearly 1,500 CD-ROM discs, meaning the data received from Stroz on September 28, 2017 would equal approximately 12,700 CD-ROMs full of information.  (Crain Decl. at 4.)  As detailed in the attached declaration, it will take *hundreds* of hours of human and machine time to review this material.  This cannot be done prior to October 10—and certainly not before the depositions of the Diligenced Employees in the next week. (*Id.*)

To give just one example of the complexity involved, Levandowski's laptop itself contains a virtual machine, essentially a computer within the computer, which is not mentioned in the Stroz Report and requires extra steps to analyze.  (Crain Decl. at 6.)  This Windows XP Virtual Machine ("WVM"), only just discovered by the team at Discovia Forensics, indicates that Mr. Levandowski was using the WVM most recently on the same day his MacBook was imaged by Stroz.  (Crain Decl. at 6.)  Only with sufficient time can the forensics team penetrate this complex operating system and determine why the WVM would have been active on that day and prepare file listings for this virtual computer.  In part due to Mr. Levandowski's unique device configurations of a non-typical variety, the forensics team has emphasized the need for additional time to analyze these devices to formulate conclusions central to this case.  (Crain Decl. at 4.)

**Locating Source Code within the 56 Recently Produced Devices** – The native image files, only recently turned over to Waymo for review, are critical because they could contain the 176,000 source code files the Stroz Report identified as potentially relevant to the trade secret analysis.  (*See* Dkt. 1603-5 at 5.)  Until now, these native image files have not been available for Waymo to forensically analyze them with the specific goal of locating and reading source code.  (*See* Dkt. 1603-5 at 5.)  Given the large volume of data, Waymo has proceeded by examining indices listing the contents of various imaged devices to determine which specific folders and files are most likely to contain the identified source code, and downloading the corresponding files for review.  This is a

time-consuming,[4] largely manual review process, and as yet, Waymo has not been able to locate and identify the source code files referenced in the Stroz Report.  However, Waymo has located at least one PowerPoint presentation within these native image files that makes reference to source code that was identified in Exhibit 37 of the Stroz Report, which suggests the pursuit of this process may be fruitful.  Waymo has also requested that Stroz make available the source code files Stroz segregated during its due diligence process, but Waymo does not yet have access to those.  Of course, the review of the source code cannot even begin until the files have been located and assembled.  It is premature to attempt to predict how long source code review will take, before even identifying what the source code contains.

**Stroz Production** – On September 16, Stroz produced over 5,000 previously unproduced documents; on September 22, Stroz produced an additional 611 documents; and on September 25, Stroz produced an additional document.  (Notice at 6-7.)  Defendants' counsel claimed that the withholding of the documents in the September 22 and 25 productions was inadvertent.  (*See* Dkt. 1848 at 6-7.)

**Epiq Materials –** Defendants waited until September 27, two weeks after the Federal Circuit decision and after repeated requests by Waymo, to provide documents sent to Epiq Systems, Inc. (Notice at 7.)

**"Sliver" of documents at MoFo** – On September 14, Uber made available for inspection (and on September 22, Uber produced) relevant documents in MoFo's possession, which turned out to be 68,000 non-text-searchable documents, including photographs of Google's confidential files.  (Notice at 7-8.)  This includes dozens of photographs of confidential Google emails and presentations related to, among other things, ████████████████████ (*e.g.* Dkt. 1566-16, Dkt. 1566-18) as well as screen captures of relevant text messages and of ████████████████████ ████████████████.  These are documents that MoFo admitted to the Court they have had since March 2017.  (Dkt. 1170 at 3.)

---

[4]    To illustrate the volume, Waymo estimates that in this process, it has downloaded approximately 50 GB of selected data from its vendor, which took over two hours to download, and which represents only about 0.5% of the total 8.5 TB.  This represents only the time to transmit the data, and does not include the time for review, which is likely much longer.

**Uber's Production of Previously Logged Documents** – As detailed in the Notice at 8-9, rather than simply producing all of the withheld Stroz-related communications immediately, Defendants have dragged out the process over the course of weeks.  In particular, Uber produced the Stroz Report and appendices on the afternoon of September 13.  Then Uber produced 500 additional documents on September 14; 1,100 more documents on September 15; 23 more documents on September 18 (with metadata provided, after repeated requests, only on September 27); 24 more documents on September 21; further sets of documents on September 22 and 25; and finally 14 additional documents on September 27.  This slow-rolling production creates clear prejudice to Waymo given the October 10 trial date.

**Lior Ron and John Gardner documents** – Ron has gradually produced over 1,000 documents in response to the subpoena Waymo served in June.  He has continued to assert privilege over approximately 200 documents and Waymo is challenging some of those assertions.  In addition, Gardner—Levandowski's personal attorney—has produced over 1,800 previously withheld documents.  (Notice at 10.)

**Slack** – The Stroz Report refers to Levandowski and other Ottomotto employees accessing an Ottomotto team site on the Slack collaboration platform (www.slack.com), starting when they were still at Google and still accessing the site as late as March 10, 2016.  *See* Dkt. 1603-5 (Stroz Report) at 12, 19, 24, 32.  Stroz has no record of anything it reviewed on Slack and claims to have no documents on Slack.  (Ex. 10 [Friedberg Depo].)  When Defendants were asked about documents related to Slack, they claimed they were looking into it, but as yet they have produced nothing.  (Ex. 13.)

**B.      Defendants' Stonewalling**

Waymo has to review this incredible quantity of material in the face of Defendants' repeated delays and stonewalling.  The egregious and still unexplained delay in providing 16,000 emails and 85 GB of data from Levandowski's Ottomotto domain, which should have been produced in compliance with this court's discovery orders as early as March 31 2017, is but one example.  To highlight another example here, Exhibit 16 of the Stroz Report contains "last accessed" data for a small subset of information that Levandowski "self-identified" to Stroz and that Stroz describes as Google proprietary information.  (Ex. 22 (Stroz Report) at 11).  Indeed, more than one-third of the documents

listed on Exhibit 16 were accessed after February 1, 2016, after Levandowski left Google and formed both Otto entities, and began working on Uber's self-driving cars.  (Ex. 21 (Stroz Report Ex. 16).) But the information in Exhibit 16 is insufficient to identify the files it describes, which were accessed by Levandowski while he was working for the Otto entities.  Waymo has asked Stroz repeatedly to identify these files, as it is apparent that at one time they had identified them.  But Stroz has not yet provided this information, telling Waymo that it must effectively recreate the work done by Stroz in order to determine which among Levandowski's self-identified files on his native devices were accessed while he was working at Ottomotto and Otto Trucking.  (Exs. 14.)

As another example, Uber is refusing to supplement its interrogatory responses on the theory that "discovery is closed" and it is "one week before trial" (Ex. 12), further demonstrating the prejudice caused by having discovery run up to the eve of trial.  Thus, Defendants are clearly using the imminent trial date as a tool for obstruction.[5]  As another, although Stroz made its 1.4 million documents available for review on September 18, Stroz provided only six workstations.  Not until September 22 was Waymo able to grant review access to its 85 review attorneys, and even then, there were additional delays while the parties negotiated important issues surrounding privilege and waiver.

Continued assertions of privilege have created further delays.  In particular, the Diligenced Employees broadly asserted privilege over a total of 22,000 documents, including hundreds of documents over which the Diligenced Employees purported to assert Ottomotto's privilege, notwithstanding that Ottomotto and Uber (the parties with standing to actually assert that privilege) have never claimed these documents to be privileged.  Waymo moved to compel, and Judge Corley ordered that hundreds of these withheld communications must be produced to Waymo.  (Dkt. 1872 at 33 ("He can't assert Ottomotto's privilege.  Under that reasoning, anybody who was at the company before it got acquired by someone else could assert the privilege on behalf of that company because at the time the document was created, they were an officer at the time.  That doesn't make any sense.  It goes with the company and Uber would have the right.  So I don't think it applies to any of those

---

[5]  Defendants even attempted to delay the Kalanick deposition that occurred today, before backing down at the insistence of Special Master Cooper, further wasting the time of the Waymo team by raising this on Sunday night and insisting on a late night hearing with Mr. Cooper. (Ex. 17.) And just today, Ms. Fulgitini stated that she cannot be deposed this week at all.

1   documents."). A subset of these documents was produced on Friday, September 29, but Ron and

2   Levandowski are now asserting an individual (in addition to the previously identified Ottomotto)

3   privilege over a substantial portion (at least 200) of these documents. Moreover, in the recent

4   depositions of Uber's outside and in-house counsel, Defendants' counsel has repeatedly instructed

5   witnesses not to answer as to their knowledge on "privilege" grounds despite Defendants' producing

6   materials on the very subject matter of the questions, which will also require further motion practice

7   and this Court's intervention.

8         Defendants have also withheld over 83,000 documents based on supposed privacy interests.

9   After Waymo challenged the privacy designation of over 1,000 of these documents, Defendants

10   agreed that the vast majority in this subset should never have been screened from Waymo in the first

11   place. (Ex. 15.) Special Master Cooper is currently reviewing the remaining documents in the subset

12   being withheld on privacy grounds. (Ex. 16.)

13         Furthermore, rather than cooperate with Waymo to enable Waymo to do what it can in the

14   limited time it has to take discovery into the newly produced source code, Defendants throw

15   roadblocks. For example, Waymo needs to review Ottomotto and Uber source code in light of the

16   thousands of source code files found to have been on the Diligenced Employees' computers at the

17   same time they were working at Ottomotto. (Ex. 22 (Stroz Report) at 3.) Ottomotto and Uber have

18   made the source code available through a browser interface, which allowed fetching and display of

19   only one file at a time, rather than locally, as would be typical in a source code inspection. Waymo

20   asked, given the short time frame available for review, that the source code files be provided on the

21   local hard drive, so that they can be reviewed efficiently using source code review tools. Waymo also

22   requested relevant code that Ottomotto and Uber had not yet made available. Ottomotto and Uber

23   responded as follows: "Your consultants have reviewed the code for what, four days? Or is it more

24   than that? Have you found anything? At some point very soon, the drawbridge will come up. You

25   don't have unlimited access to our clients' code and we need to prepare for trial." (Ex. 18.) This only

26   serves to highlight the extreme prejudice to Waymo of the situation. Furthermore, based on Waymo's

27   review of source code to date, Uber has not provided the latest version of its source code. This is

28   critical because as Uber's witnesses have testified, ███████████████████████

1 ████████████████████████████████████ (Ex. 19 (Van den Berg Depo. Tr.) at 157:10-

2 25)), and Uber then engaged in ████████████████████████████

3 ██████ (*id.* at 158:7-24; 159:22-160:6).   Waymo needs to review the version of the code that

4 incorporates all of the patches, and not an earlier version that does not.  Not only are Defendants not

5 providing Waymo discovery to which it is entitled, but they are seeking to take advantage of the

6 crunch before trial as an excuse not to do so.

7         Finally, for the 68,000 documents from MoFo, Waymo has repeatedly asked Uber for the

8 metadata for these files.  The metadata is critical in revealing when and how the files were obtained

9 and whether and when Ottomotto and/or Uber had them.  Uber has still not provided that material.

10 (Ex. 20.)

11 **IV.     WAYMO IS ENTITLED TO ADEQUATE TIME TO REVIEW THE NEWLY**
    **AVAILABLE EVIDENCE**

12

13         Waymo has a legal right, as a matter of due process and basic fairness, to review the evidence

14 that has just been made available, as well as the evidence still yet to be produced, prior to trying this

15 case.  We are aware of no case, ever, that has required a party to go to trial a few weeks after receiving

16 anything close to the millions of new documents and files and over a hundred devices with many

17 terabytes of data from the principal actors and witnesses in the case where, as here, the party diligently

18 sought the documents at the outset of the case.  Indeed, it is undisputed that Waymo is not to blame

19 for this late production of evidence and that Waymo vigorously pursued the Stroz report and

20 associated documentation from the outset.  (Dkt. 1603-4 ("Motion for Continuance") at 14.)  The right

21 to discovery is meaningless if material can be dropped on the eve of trial such that it is impossible to

22 review the material before trial, let alone prior to depositions, as required in the normal course.  This is

23 particularly troubling given that Waymo has sought return of its confidential materials from the outset

24 of the case.  Yet they were never produced, logged, or even identified to Waymo, despite Court

25 Orders, until after the Federal Circuit affirmed this Court's Orders regarding the Stroz subpoena and

26 Stroz due diligence report.

27

28

It is beyond question that Waymo cannot review all of the material before trial, and certainly cannot review it in any meaningful way that would allow for the lawyers and experts to augment and refine their theories of liability and damages.  The newly available evidence includes:

- over one million files to review in the Stroz Relativity database,

- 35 devices and 21 cloud-based repositories of data with approximately 8.5 terabytes of data,

- 118 hard drives used by Levandowski with complex formatting and all still yet to be produced,

- over 68,000 documents (the so-called "sliver" from Mofo), none text-searchable and the metadata still yet to be produced,

- over 176,000 source code files (presumably included in September 28 production, but not yet identified), and

- 16,000 emails and 85 GB of documents from Levandowski's Ottomotto domain (just produced on September 28-29).

Waymo has gone to extraordinary efforts to review this material as quickly as possible, employing 85 additional attorneys and numerous e-discovery consultants to deal with the flood of material.  But despite Waymo's best efforts, the review attorneys have yet to finalize their first-pass review of these documents, which includes marking documents as potentially relevant and tagging the documents with issue codes corresponding to subjects of interest.  All documents that have been marked must then be analyzed by Quinn Emanuel and incorporated as appropriate into the litigation.  It is simply not possible to complete these steps before October 10.  Much of this material, including all of the 68,000 photographs from MoFo, must be reviewed manually on a document-by-document basis.  Similarly, the source code files must be individually reviewed by experts.  Even for the material that can be examined with text searches, the sheer quantity belies the possibility of an effective review in the time remaining.  It is obvious that meaningful review of the material cannot occur in the eight days before the current trial date.  Indeed, Stroz itself—after three weeks of

1    reviewing the material—claimed ███████████████████████████████████

2    █████████████████████████████████████. (Dkt. 1603-8 at 2.)[6]

3          Moreover, in this last week before trial, there are still 15 scheduled fact depositions, two

4    scheduled expert depositions, and further motion practice to complete.  The remaining fact depositions

5    may also show the need for additional discovery, which there is no allowance for under the current

6    schedule.  Simply put, if the trial goes forward on October 10, Defendants would be rewarded for

7    withholding materials relevant to this case only recently made available to Waymo (but long known

8    and available to Defendants).  Indeed, while Waymo is forced to frantically to what it can to review

9    whatever small portion of the mountain of previously withheld material that continues to be made

10   available to it, take depositions on a still incomplete record, it must also prepare for trial—now just

11   eight days away.  There is simply no way that Waymo can effectively discover, examine, and use all

12   of this material in a trial commencing October 10.  Defendants have never disputed this.  A

13   continuance is necessary to avoid this injustice.

14   **V.      WAYMO HAS NOT WAIVED, AND HAS A CONSTITUTIONAL RIGHT TO NOT
            BE FORCED TO WAIVE, CLAIMS WHILE DISCOVERY IS ONGOING, THUS
15           FURTHER NECESSITATING A CONTINUANCE**

16         A continuance is also necessary because while discovery is ongoing, Waymo retains the right

17   to designate for trial additional claims against Defendants.  Waymo has not waived any such claims.

18   Nor can Waymo be forced to do so prior to the completion of discovery.

19         This Court has indicated that Waymo might have already waived all claims except for the

20   claims for misappropriation of the nine trade secrets identified for trial.  (Request for Input at 2 ("All

21   of the above is without prejudice to the Court's view that Waymo previously agreed to limit its trade

22   secret claims to only the nine already selected for trial.").)  But no such waiver occurred.  A waiver of

23   a claim can occur only if a party intentionally and voluntarily makes the choice to waive.  *See, e.g.*,

24   *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004) ("[W]aiver is the intentional relinquishment or

25   abandonment of a known right.") (internal quotation marks omitted).

26

27   _____

28       [6]  This additional month does not even include the numerous files Stroz identified as requiring
     further analysis beyond Stroz's technical expertise.  (Dkt. 1603-5 at 17, 24, 27, 30, 32.)

1    Waymo never made any such choice, as is clear in tracing the history here.  This Court stated

2   in its June 7 case management order that Waymo was limited to less than ten trade secrets for trial.

3   (Dkt. 563 at 10.)  The order did not address the issue of whether there would be a waiver of additional

4   trade secret claims.  It certainly did not indicate there would be.  Waymo complied with the Court's

5   order on August 1, 2017 by designating nine trade secrets for trial on misappropriation.  (Dkt. 1110-

6   1.)  That designation not only refused to waive other claims, but it expressly reserved the right to bring

7   those claims:  "*Waymo identifies the foregoing list notwithstanding the fact that discovery in this*

8   *action is ongoing, and Waymo reserves the right to modify its narrowed list of trade secrets based on*

9   *additional information*. Waymo's reservation of rights is particularly warranted in light of Defendants'

10   concealment of evidence by asserting a web of inapplicable privileges with respect to the Stroz

11   Friedberg due diligence investigation, which has hindered Waymo's efforts to discover relevant

12   evidence." (*Id.* at 3 (emphasis added).)  Moreover, on August 16, in an abundance of caution, Waymo

13   made clear to the Court that its designation of nine trade secrets for trial was not a waiver of trade

14   secrets other than the nine that Waymo identified.  (Dkt. 1261 (Aug. 16, 2017 Tr.) at 84.)  In short,

15   Waymo made no voluntary action or statement that demonstrated even the slightest suggestion that it

16   was waiving claims.

17    Thus, the waiver idea can rest only on the theory that this Court either did or can somehow

18   now force Waymo to waive claims, notwithstanding Waymo's protestations to the contrary.  As

19   explained in Waymo's Motion for Continuance at 17-19, there is no legal basis in the Federal Rules of

20   Civil Procedure for this Court to require Waymo to waive trade-secret claims, and doing so would

21   violate Waymo's due process and Seventh Amendment rights.  Uber and Ottomotto have not even

22   attempted to refute these points or provide contrary authority.

23    Moreover, the Federal Circuit has held even after claims are narrowed, additional claims must

24   be allowed where good cause is shown. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d

25   1303, 1311-13 (Fed. Cir. 2011).  That good cause is apparent here given all of the evidence discussed

26   above, and the near-certainty of finding yet more evidence as discovery continues, supporting

27   additional claims.

28

Indeed, there is no plausible basis to dismiss claims without consideration of the merits, while an enormous amount of discovery is ongoing, especially given Defendants' intransigence and delays. The Federal Circuit has made clear that "a claim selection order could come too early in the discovery process," *In re Katz*, 639 F.3d at 1313 n.9, and due process is violated if the "district court's claim selection procedure risked erroneously depriving [the plaintiff] of its rights and that the risk outweighed the added costs associated with a substitute procedure," *id.* at 1311; *see also Regents of the Univ. of Minnesota v. AT&T Mobility LLC*, No. 14-CV-4666 (JRT/TNL), 2016 WL 7670604, at *2 (D. Minn. Dec. 13, 2016), *report and recommendation adopted*, 2017 WL 102962 (D. Minn. Jan. 10, 2017) ("Without better understanding which of the University's claims are viable and which are not— an understanding that will only be gained through further fact discovery that is far from being concluded—the Court has a paucity of information against which to gauge what an appropriate number of claims should be in this case."); *Fleming v. Cobra Elecs. Corp.*, 2013 WL 1760273, at *3 (D. Idaho Apr. 24, 2013) ("Katz's concern about employing the process too early applies here— discovery has just begun, and it would be unfair to require [the plaintiff] to choose representative claims at this stage of the litigation .... the Court will deny the motion without prejudice to the right of the defendants to raise the motion again when [the plaintiff] would be in a better position to select representative claims."); *Adobe Sys. Inc. v. Wowza Media Sys. LLC*, 2013 WL 9541126, at *1 (N.D. Cal. May 6, 2013) ("The parties have completed discovery, and Adobe is now in a position to determine its strongest claims.").  While trial may be only days away, given that the relevant material Waymo has gotten in the few weeks leading up to trial is exponentially larger than all the material it obtained throughout the previous months of discovery, it is hard to imagine a more striking case of claim selection occurring too early and risking deprivation of rights than where, as here, a party was forced to designate claims for trial prior to the production of an enormous amount of discovery of such obvious importance.

## VI.   THE PROPOSED DECEMBER 5 TRIAL DATE NO LONGER APPEARS FEASIBLE

In the Request for Input, this Court asked for:

1. Waymo's new, revised list (if such a revision were allowed) of all asserted trade secrets (all to be drawn from its disclosure dated March 10 (Dkt. No. 25-7)) that it now

-21-

1    proposes to present at trial, keeping in mind that, even if a continuance were granted,
2    there would be only one trial and any trade secret claims not on the list would be
     waived for the time period covered by this litigation as to defendants herein.

3    Given that there is an enormous amount of discovery still yet to be produced and Waymo has

4    had time to review a small fraction of the new Stroz and Ottomotto material that has been produced,

5    Waymo cannot now provide a revised list of trade secret claims for trial.  The Court's question posits

6    that any claims not tried will be waived.  As discussed above and in the Motion for Continuance, there

7    is no legal or reasonable basis to force such a waiver prior to Waymo receiving all relevant discovery

8    and having adequate time to review it.  It is very possible, if not likely, that the discovery remaining

9    will shed light on exactly what confidential Waymo information Levandowski and other Ottomotto

10   executives and engineers retained and when they accessed that material.  If Waymo is unable to revise

11   its trade secret list based on this new information, Defendants will gain a substantial advantage as a

12   result of a meritless assertion of privilege and an unexplained failure to provide crucial documents

13   from Levandowski's Ottomotto drive until a few days ago.  The desire for speed in this matter cannot

14   prevent Waymo from bringing strong claims for misappropriation based on new evidence.

15   Moreover, while Waymo needs all of the discovery to finalize a list of trade secrets for trial,

16   the newly revealed massive number of stolen documents reveals facts to support additional claims that

17   Waymo will seek to bring:  conversion.  As part of Uber's acquisition of Otto, Uber hired Stroz to

18   collect and examine all the electronic devices owned by Levandowski, Ron, and other Waymo

19   employees who fled Waymo for Otto.  As the Stroz Report makes clear, those devices contained a

20   treasure trove of Waymo's sensitive and confidential information.  Instead of promptly returning that

21   information to Waymo, Defendants wrongfully retained the information and suppressed its possession

22   of the same.  This conduct constitutes conversion of Waymo's property.

23   To state a claim for conversion, Waymo must allege: (1) it owned or had a right to possess an

24   item of property, (2) Defendants wrongfully dispossessed it of that property, and (3) it suffered

25   damages as a result.  *G.S. Rasmussen & Associates v. Kalitta Flying Services, Inc.*, 958 F.2d 896, 906

26   (9th Cir. 1992).  As the Stroz Report found, it is undisputable that (1) Waymo was the rightful owner

27   of the information that (2) Defendants possessed and retained.  As a result of this conduct, (3) Waymo

28   suffered damages in an amount to be determined at trial.

1    The conversion of Waymo's sensitive information constitutes a tort that is distinct from the

2    trade secret claims Waymo has already asserted.  As the Ninth Circuit recently held, a state law tort

3    claim is not preempted by California's Uniform Trade Secret Act when that tort involves "confidential

4    information [that does not] qualify as a 'trade secret.'"  *Integral Dev. Corp. v. Tolat*, 675 F. App'x

5    700, 704 (9th Cir. 2017) (finding that claim for breach of fiduciary duty was not preempted by

6    CUTSA).  Here, Defendants retained thousands of confidential Waymo files, including sensitive

7    software files that are wholly distinct from the trade secrets already at issue.  Given that these files

8    constitute "confidential information [that do not] qualify as [] trade secret[s]."  *Integral Development*

9    *Corp.* compels the conclusion that Defendants' conversion is unaffected by CUTSA's preemptive

10   force.  *Id.*  Additional discovery will only further elucidate the exact scope of Defendants' wrongful

11   conduct, but Waymo's preliminary analysis has already revealed that the wrongdoing runs deeper than

12   previously believed.  In light of the above, a continuance should be granted so as to permit a full

13   investigation of Defendants' conduct.

14   The Court's next questions were:

15   2. When Waymo would be ready to try the case based on the aforementioned list.

16   3. How the time limits that Waymo agreed to at the final pretrial conference
     yesterday would have to be adjusted, if at all, to accommodate its new list if permitted.

17

18   4. How much time, in Waymo's view, defendants should have to take discovery and to
     present dispositive motions on Waymo's new, revised list.

19   Just as Waymo cannot provide a revised list of trade secrets for trial at this time, Waymo also

20   cannot provide a precise answer to what the schedule would have to be to accommodate the new

21   claims.  At the September 20 hearing, Waymo proposed a schedule whereby trial would begin on

22   December 5.  (Dkt. 1723 (9/20/17 Hearing Tr.) at 71.)  But the volume and complexity of Stroz

23   materials and related documents, along with Defendants' repeated delays, are far greater than Waymo

24   could possibly have anticipated.  And the enormous amount of Ottomotto documents just produced

25   obviously could not have been anticipated at all, as this production should have happened months ago.

26   Accordingly, Waymo no longer believes that a December 5 trial date is feasible.

27   Waymo cannot make an informed judgment as to how long it will take to review all of the

28   materials—and their impact on the claims already listed for trial, as well as additional claims—until

Waymo finally receives all of the material from Defendants and has the opportunity to review at least a reasonable portion of the new evidence. Accordingly, Waymo believes that it can provide a new proposed schedule for trial by October 27.

The Court's final question was:

5. How much additional delay, if any, would flow were the Court to appoint an expert witness pursuant to Federal Rule of Evidence 706 on the "validity" of Waymo's asserted trade secrets.

For the reasons stated in the Motion for Continuance at 19-21, this case does not present the "rare and compelling circumstances" justifying the appointment of a court-appointed expert under Rule 706 of the Federal Rules of Evidence. *Monolithic Power Systems, Inc. v. O2 Micro Intern. Ltd.*, 558 F.3d 1341, 1348 (Fed. Cir. 2009). Rather, the appointment of a Rule 706 expert would unduly influence the jury and improperly diminish the parties' experts.

Nonetheless, if this Court were inclined to appoint such an expert, it would entail significant delay of the trial. As Waymo has noted, it will be extremely difficult, if not impossible, to identify an individual with the correct background and expertise who does not have a prior association with one of the parties in this case, while having the time and ability to absorb the already voluminous record in this matter. Even if an appropriate expert could be found, it would take that person weeks or (more likely) months to review the record sufficiently and provide a complete report.

Moreover, such a report would have to come after the parties' experts provide their own reports. The reason is clear: the Rule 706 expert would need to review and respond to the parties' own expert analysis in forming his or her opinion. In addition, the parties' experts would then need the opportunity to provide responses to the Rule 706 experts' report. The appointment of a Rule 706 expert would therefore further delay the trial. The delay would be at least an additional month, but given the difficulty in finding a Rule 706 expert and the inevitable difficulty in identifying a time for the trial that works for all parties and the Court, the delay would likely be much greater than a month.

\*\*\*

For the foregoing reasons, Waymo respectfully requests that the Court grant Waymo's motion for a continuance of the October 10 trial date.

-24-

1    DATED:  October 2, 2017                QUINN EMANUEL URQUHART & SULLIVAN,
                                            LLP
2

3                                           By */s/ Charles K. Verhoeven*
                                               Charles K. Verhoeven
4                                              Attorneys for WAYMO LLC