# EXHIBIT 1

```
                                                    Pages 1 - 94

                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

      Before the Honorable William H. Alsup, Judge

      WAYMO LLC,                        )
                                        )   No. C 17-0939 WHA
                Plaintiff,              )
                                        )
       VS.                              )      BOUND SEPARATELY
                                        )   PAGES 95 - 145 (UNDER SEAL)
                                        )
      UBER TECHNOLOGIES, INC.;          )
      OTTOMOTTO LLC; OTTO TRUCKING      )
                                        )
                Defendants.             )
      _____    )   San Francisco, California
                                            Wednesday, September 20, 2017

                       TRANSCRIPT OF PROCEEDINGS

      APPEARANCES:

      For Plaintiff:
                          QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                          50 California Street, 22nd Floor
                          San Francisco, California  94111
                    BY:   CHARLES K. VERHOEVEN, ATTORNEY AT LAW
                          JORDAN R. JAFFE, ATTORNEY AT LAW
                          MELISSA J. BAILY, ATTORNEY AT LAW
                          DAVID ANDREW PERLSON, ATTORNEY AT LAW
                          JEFFREY W. NARDINELLI, ATTORNEY AT LAW
                          FELIPE CORREDOR, ATTORNEY AT LAW

                          QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                          51 Madison Avenue
                          New York, New York 10010
                    BY:   JAMES E. BAKER, ATTORNEY AT LAW

       (Appearances continued on next page)


      Reported By:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
                    Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    Official Reporters
```

1            reflect any other investigation beyond the scope of his
2            declaration, that material has been redacted, withheld as
3            work product."
4       We were very clear with him what our position on the work
5  product and privilege waiver was.
6       And one final point.  With respect to Judge Corley's
7  rulings, she ruled that a lot of these materials were
8  privileged.  She asked us -- ordered us to produce them as a
9  matter of fairness, just because it's hard to slice and dice
10 out some of these waiver issues.
11      So there were certain documents where there were
12 privileged information, and she asked us to unredact it as a
13 matter of fairness because it was wrapped up in what she
14 decided was within the scope of the waiver.
15           **THE COURT:**  All right.  We've got to move to the
16 motion on Otto Trucking.  That's your motion.  So we go to that
17 motion.  Otto Trucking.
18           **MR. CHATTERJEE:**  So I'm going to have Mr. Brun argue
19 that motion.
20           **THE COURT:**  Very well.  Thank you.
21           **MR. BAKER:**  Thank you, Your Honor.
22           **THE COURT:**  All right.
23           **MR. BRUN:**  Good morning, Your Honor.  Shane Brun for
24 Otto Trucking.
25           **THE COURT:**  Please, go ahead on that motion.

1        **MR. BRUN:**  Excuse me, Your Honor.
2        **THE COURT:**  It looks like it's unopposed.
3        **MR. BRUN:**  It should be unopposed.
4        **THE COURT:**  Someone is going to stand up, but you go
5   ahead.
6        **MR. BRUN:**  Thank you, Your Honor.
7      Your Honor, so Waymo's claims in this case have been
8   solely focused on Uber and Ottomotto.  More specifically, they
9   have been focused on the Fuji and the Spider systems.  That's
10  what they claim uses the trade secrets.
11     There's not a single fact to suggest that Otto Trucking
12  uses a trade secret.  There's not -- Otto Trucking, as the
13  facts have shown now that discovery is over, separate company.
14  It's a holding company.  Only holds trucks.  That's all it
15  does.
16       **THE COURT:**  Do these trucks, are they equipped with
17  LiDAR?
18       **MR. BRUN:**  They're equipped with a third-party LiDAR
19  system, Your Honor.  There's not a single fact to suggest --
20  it's undisputed, I don't think they contest the fact that an
21  Otto Trucking truck has never been equipped with either the
22  Fuji or the LiDAR or the Spider system.  And there's no
23  suggestion they have otherwise ever been equipped with any
24  system that uses the trade secrets.
25       **THE COURT:**  All right.  So stay right there and

1   let's -- Ms. Baily; right?
2           **MR. BAILY:**  That's correct, Your Honor.
3           **THE COURT:**  Please tell me what you think is the
4   answer.
5           **MR. BAILY:**  Excuse me.
6       First of all, Your Honor, the emphasis on use is
7   misplaced.  Use is not the only way that you can misappropriate
8   a trade secret.
9       And I do want to point out something that was actually
10  very misleading, I believe, in Otto Trucking's briefing on
11  this.  They basically said, look at Waymo, they're only
12  pointing to Spider and Fuji.  Look at their response to
13  Interrogatory No. 9.
14      They didn't attach what the actual interrogatory asked.
15  They just attached a portion of our answer.  The interrogatory
16  only asked about use.  It did not ask about other theories of
17  misappropriation, including acquisition of the trade secrets.
18      And there is a lot of evidence, including the Stroz
19  report -- and we can talk about that -- that Otto Trucking
20  acquired the trade secrets improperly and knowingly
21  improperly --
22          **THE COURT:**  Well, help me understand what that
23  evidence is.  Give me just one item of evidence that Otto
24  Trucking, as opposed to Levandowski, but Otto Trucking ever
25  acquired any of these trade secrets.

1        **MR. BAILY:**  Well, Your Honor, let me just start -- I
2   do need to tell you a few things in order to make those
3   connections.
4        So let me start at the Stroz report, which we just
5   received.  And we did receive it after we filed our opposition
6   to the motion for summary judgment.
7        So I just heard him say that discovery is closed.
8   Discovery is absolutely not closed.  And it was not closed when
9   they said that in their motion or in their reply.
10       So now we have the Stroz report because discovery was not
11  closed.  And the Stroz report, at the bottom of page 11, talks
12  about a very narrow subset of all of the documents that
13  Levandowski was found to have on his devices.
14       So it talks about a narrow subset of 347 files from his
15  self-identified data.  The paragraph on the bottom of page 11
16  describes those files.  And it describes them as containing
17  proprietary information related to Levandowski's work at Google
18  on the Chauffeur project.  And then it lists some examples,
19  including system files, software files, code, confidential
20  presentations, confidential diagrams.
21       Then there is an analysis, in Exhibit 16 to the Stroz
22  report, of access to those files.  More than a third of those
23  files were accessed after Levandowski left Google.  So they
24  were not accessed for Levandowski's work at Google; they were
25  accessed after that.  February, March.  So after he resigned

1    from Google in January.
2         What was Mr. Levandowski doing at that time?  He was
3    talking to Uber and setting up Otto Trucking and Ottomotto.
4         **THE COURT:**  But wasn't Ottomotto already -- I mean,
5    one of their points is that Otto Trucking got set up -- give me
6    the date again.  What's the date of Otto --
7         **MR. BAILY:**  February 1st.
8         **THE COURT:**  February 1st of 2016?
9         **MR. BAILY:**  That's correct.
10        **THE COURT:**  When Ottomotto set up?  Wasn't that
11   earlier?
12        **MR. BAILY:**  It was a few weeks earlier, I believe.
13        **THE COURT:**  All right.  So take the time period after
14   Otto Trucking was set up.
15        **MR. BAILY:**  Exactly.  Taking that time --
16        **THE COURT:**  What is your point?  What does the Stroz
17   report say?
18        **MR. BAILY:**  After February 1st, when Otto Trucking was
19   set up, more than a third of this narrow subset of documents
20   that are described as containing Google proprietary
21   information, Google software files, Google code, Google system
22   files, more than a third of those were accessed after
23   February 1st.
24        So I went through Exhibit 16 --
25        **THE COURT:**  When you say "accessed," accessed by who?

1    **MR. BAILY:** Accessed by Mr. Levandowski.

2    What was Mr. Levandowski doing at that time? He was
3    working on Ottomotto and Otto Trucking. He was no longer at
4    Google.

5    And he accessed more than a third of just even that narrow
6    subset of files after he left Google, while what he was doing
7    was talking to Uber and setting up these entities. Which just
8    weeks after he was accessing these files, there's an agreement
9    about -- you know, about Uber acquiring these companies.

10   So there was the agreement about Uber acquiring Ottomotto.
11   And there's also an agreement -- I think I might be straying
12   into confidential material here about, you know, a potential
13   acquisition of Otto Trucking. I believe that much is public.

14   **THE COURT:** Can you tell, from what you have, which
15   particular files were accessed?

16   **MR. BAILY:** So that's exactly the problem. And this,
17   of course, dovetails with the continuance motion.

18   I can show you the exhibit that we have attached to the
19   Stroz report, which lists out the files. But it actually
20   doesn't tie together. We need more discovery. It lists out
21   the file types, and there's this general description.

22   But we don't have yet the dots to connect -- but we know
23   that we can get them, now, from the materials that are being
24   produced -- to connect the documents listed that are just
25   listed by file type and for which there's this general

1  description that confirms that these are all confidential
2  Google materials to the actual documents and files and source
3  code that they actually are.
4       **THE COURT:** Well, see, where I'm heading was, can you
5  trace one of those to one of the many trade secrets that you
6  listed?
7       **MR. BAILY:** And that is what we need to do.  We need
8  to actually draw the dots from -- you know, so we've obviously
9  had some time to process the Stroz report that was produced
10 late last week.  So there's -- I forget how many exhibits.  I
11 think Your Honor has seen it.  There's lots of exhibits.  We've
12 been through those.
13      Exhibit 16 is this analysis of access that proves that
14 Levandowski was accessing what Stroz describes as our
15 confidential materials after he left Google, while he was
16 focused on Ottomotto and Otto Trucking.
17      Exhibit 16 lists these files in a generic way.  And I
18 don't have the file names; right.  We need to get this
19 discovery to map the file names.
20      Well, what exactly was Levandowski looking at?  Which
21 pieces of source code was he looking at?  Which files was he
22 looking at on March 22nd, 2016, while he's talking to Uber
23 about acquiring his Ottomotto and Otto Trucking companies.
24 And, you know, why else is he looking at these files on
25 March 22nd, 2016?

```
 1            We need the time to actually connect the dots because
 2   they're not connected in the Stroz report themselves.  There's
 3   the general description that all of this is confidential to
 4   Waymo and that it was accessed on specific dates after
 5   February 1st --
 6            THE COURT:  All right.
 7            MR. BAILY:  -- but we now need to connect the further
 8   dots.
 9            THE COURT:  Hold that very thought.
10       What's your answer to what I just heard about confidential
11   Waymo information was accessed by Mr. Levandowski after Otto
12   Trucking was formed?
13            MR. BRUN:  Well, with respect to the Stroz report,
14   Your Honor, there's nothing in the Stroz report that changes
15   the facts with respect to Otto Trucking.
16       Otto Trucking is separate from Ottomotto.  Otto Trucking
17   is just a holding company that holds trucks.  Doesn't have any
18   engineers.  Doesn't do any R&D.
19            THE COURT:  Why was Levandowski accessing that
20   information?  Was he doing it for his personal account?  Was he
21   doing it for Otto Trucking?  Was he doing it for Ottomotto?
22   What's the answer to that?
23            MR. BRUN:  Well, he wouldn't be doing it for Otto
24   Trucking, Your Honor.
25            THE COURT:  How do we know that though?
```

```
1            MR. BRUN:  Otto Trucking, all it does --
2            THE COURT:  You're using the present tense.  What was
3    it doing back then?  What was its possible plans back then?
4            MR. BRUN:  I can't speak as to what Mr. Levandowski
5    was doing as described in the Stroz report.  But, again, it
6    doesn't have any impact at all on our motion with respect to
7    Otto Trucking.
8            THE COURT:  Well, but conceivably -- conceivably, he
9    was sitting there wearing his hat as Otto Trucking, thinking
10   that he was going to sell Otto Trucking to Uber, and that he
11   was accessing these files for the purpose of -- maybe he was
12   just doing it for himself, Otto Trucking, Ottomotto.
13        And how do we sort all that out at this point?  I
14   appreciate the way Otto Trucking has developed Velodyne LiDAR
15   Plus trucks has almost nothing to do with this case.  But, on
16   the other hand, back then, when things were still in flux and
17   in play, maybe they did, maybe Otto Trucking did access and
18   acquire these files.
19           MR. BRUN:  Again, Your Honor, Otto Trucking -- let's
20   talk about the two companies that Mr. Levandowski formed.
21   Ottomotto, which is an operational company, that was the entity
22   that was going to be developing lasers or LiDAR systems.  That
23   was that aspect of the company.
24        Mr. Levandowski, as you'll recall from throughout this
25   case, he left Google to set up a trucking company, Your Honor.
```

1  He wanted to focus on trucks.  Otto Trucking itself was set up
2  just as holding company, to hold the assets for that trucking
3  business.
4      It's been established through -- even though the Stroz
5  report just came out and they want to say they need more
6  discovery on the Stroz report, doesn't change that structure of
7  Otto Trucking and what Otto Trucking's business is.  It's just
8  to hold trucks.  And that's all it does.  And they can't
9  dispute that.
10         **THE COURT:**  Why did Levandowski access that material?
11 And how can we be a hundred percent positive he didn't do it
12 for purposes of Otto Trucking?
13         **MR. BRUN:**  Again, if you look at the -- what they're
14 trying to do -- so there's no evidence that any trade secret
15 ever got to Otto Trucking.  There's no claims of direct
16 misappropriation in this case.
17         **THE COURT:**  Well, that's possibly right.  But,
18 nevertheless, if somebody at Otto Trucking is there reading the
19 trade secrets, wearing their hat as Otto Trucking, that's
20 acquisition.
21         **MR. BRUN:**  But the issue isn't he couldn't have been
22 wearing his hat as Otto Trucking, given what Otto Trucking's
23 business is.  If they wanted to hold Otto Trucking vicariously
24 liable for Mr. Levandowski's supposed use of the trade secrets,
25 it has to be within the scope of Otto Trucking's business.

```
 1              THE COURT:  Where does that rule come from?
 2              MR. BRUN:  We cite it in several cases, Your Honor.
 3              THE COURT:  What if there's a plumber's unit that goes
 4     and steals trade secrets, and they're not in the business of
 5     that trade secret, but they're being used as a conduit somehow?
 6     Maybe that acquisition for that sinister purpose is enough.
 7         I don't know.  I question the proposition that you have to
 8     be in the business of the trade secret in order to be guilty of
 9     stealing trade secrets.
10              MR. BAILY:  Your Honor, if I may, Otto Trucking was in
11     the business of the trade secret, regardless of that question,
12     which I also --
13              THE COURT:  But that's not right because they just
14     hold trucks.
15              MR. BAILY:  But that's not right.  So the evidence
16     that Otto Trucking submitted includes a framework agreement.
17     It was submitted under seal.  I'd like to read from it.
18              THE COURT:  Go ahead.
19         You lawyers put so much stuff under seal and abuse the
20     process.  Go ahead.  Read it.
21              MR. BAILY:  So part of the framework agreement between
22     Uber and Otto Trucking and Uber Freight concerns the trucking
23     AV business.  Trucking --
24              THE COURT:  Say that again.
25              MR. BAILY:  Trucking AV business.
```

1	**THE COURT:** Like audiovisual? What do you mean AV?
2	**MR. BAILY:** Autonomous vehicle.
3	**THE COURT:** Autonomous vehicle. All right.
4	**MR. BAILY:** And here we have Otto Trucking renting the sensors and related hardware that are owned by the division at Uber that does autonomous vehicles and related to the trucking AV business. So we're -- we're not just holding trucks here. We are renting from Uber the sensors that are related to autonomous driving.

The notion that Otto Trucking was set up not for autonomous trucking is laughable. I mean, we just heard Otto Trucking's counsel say, Levandowski set up the company to do autonomous trucking. And here we have an agreement where they are renting from Uber the sensors for autonomous trucking.

The notion that Levandowski, sitting with his Otto Trucking hat on -- and, by the way, Otto Trucking can't do anything without Levandowski's consent; right.

The notion that Levandowski is, you know, separate from Otto Trucking is in some ways laughable in and of itself. Even more laughable is Otto Trucking has nothing to do with autonomous trucking.

**THE COURT:** But I thought he said that they did. Now I'm getting confused.

**MR. BAILY:** Well, if he did, then we agree.

**THE COURT:** Isn't that true, that it was autonomous

1   trucking, that they would drive themselves with LiDAR?
2           **MR. BRUN:**  Again, Counsel is confusing and sort of
3   misstating what Otto Trucking is and what is going on.  So let
4   me try to explain, Your Honor.
5           So Otto Trucking, again, was set up as a holding company
6   to hold the assets that Ottomotto and then ultimately Uber are
7   using to develop a trucking business.
8           Otto Trucking doesn't have any employees.  The LiDAR
9   systems that are put onto Otto Trucking's trucks are put on
10  there by Uber employees.  And they're running tests, and there
11  are other operations done with those trucks by Uber employees
12  and Uber's development of its trucking business.
13          Otto Trucking does not have any development, does not have
14  any employees that work on LiDAR systems.  Again, it's simply a
15  holding company.  And there is no evidence in the record, no
16  evidence to be had, that they ever had access to any of the
17  trade secrets, that they ever used any of the trade secrets.
18          **THE COURT:**  There is access -- there is this evidence
19  that Levandowski downloaded a lot of files at a time period
20  that Otto Trucking existed.  And, for all we know, he was
21  wearing his Otto Trucking hat when he downloaded those.
22          **MR. BRUN:**  I think it goes to the point of exactly
23  what they're really trying to do here, Your Honor, is, they're
24  trying to hold Otto Trucking liable simply because
25  Mr. Levandowski was the founder of Otto Trucking and the

1   majority shareholder.
2        But you can't impute the knowledge, his knowledge.  And
3   you shouldn't -- we cited the *Drager* case, Your Honor, in our
4   papers.  And just so I get it exactly accurate, let me read
5   this, because this is exactly what they're trying to do here,
6   Your Honor.  In *Drager* the Ninth Circuit said:
7            "It is generally not appropriate to direct a jury to
8        impute an agent's knowledge of a secret to the principal.
9        Such an instruction would permit recovery even when the
10       trade secret was not actually communicated to or used by
11       the principal."
12       That's what they're trying to do, Your Honor.  Otto
13  Trucking -- there's not a single piece of evidence to suggest
14  that Otto Trucking has ever used the trade secret or that the
15  trade secret was actually communicated to Otto Trucking as the
16  principal.
17       They're trying to say Otto Trucking is, in fact,
18  Mr. Levandowski.  And they're wanting to hold Otto Trucking
19  liable just based on that.
20       **THE COURT:**  All right.  We need to let our court
21  reporter rest her fingers for a bit.
22       We also have a motion on Trade Secret Number 9.  I guess
23  we have to do that in an empty courtroom.  Also, Trade Secret
24  96 we've got to deal with.  That's, likewise, going to be in an
25  empty courtroom.  Then we may have more to say on the issue of

```
 1   continuing the trial date.
 2         Now, we're going to come back to the continuing the trial
 3   date point after the break.  And I'm not making a ruling now.
 4   And I am not going to make a ruling today because I want you
 5   lawyers to try hard to keep the October 10th date and do
 6   whatever you have got to do to get the discovery done.
 7         But I also am going to monitor this very carefully.  And
 8   if it turns out I genuinely think that even though Waymo has
 9   done everything it can possibly do, it genuinely needs more
10   time on account of the other side having stonewalled on the due
11   diligence report, then we're going to give them more time.
12         But we're not there yet.  And I sometimes think that Waymo
13   is exaggerating this because they have ulterior motives to try
14   to fix up other parts of their case.
15         I don't know.  I am not making a ruling now.  But here's
16   why I'm bringing this up:  I want you to tell me after the
17   break what specific schedule, as prompt as possible, would
18   work, taking into account whatever else it is -- so, in other
19   words, if Waymo says, okay, we want to change our list of trade
20   secrets because we realize we've got some losers in there, and
21   we want to go with a different group of trade secrets, and we
22   want to take more discovery from Stroz, and we want to take --
23   adjust our expert reports, in 15 minutes or so you need to give
24   me a specific schedule that would work.
25         And I will not consider one that puts this way out there.
```

**CERTIFICATE OF REPORTERS**

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Wednesday, September 20, 2017

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter

_____

Jo Ann Bryce, CSR #3321, RMR, CRR
U.S. Court Reporter