Pages 1 - 51

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

WAYMO LLC,                          )
                                    )
          Plaintiff,                )
                                    )
   VS.                              )    NO. C 17-00939 WHA
                                    )
UBER TECHNOLOGIES, INC; OTTO        )
TRUCKING LLC; and OTTOMOTTO         )
LLC,                                )
                                    )
          Defendants.               )
_____)

San Francisco, California
Tuesday, October 3, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
        50 California Street - 22nd Floor
        San Francisco, California  94111
  BY:  **CHARLES K. VERHOEVEN**
      **DAVID A. PERLSON**
      **JORDAN ROSS JAFFE**
      **MELISSA J. BAILY**
      **ANDREA ROBERTS**
      **JEFFREY W. NARDINELLI**
      **ATTORNEYS AT LAW**

For Defendant Uber:

        MORRISON & FOERSTER LLP
        425 Market Street
        San Francisco, CA 94105
  BY:  **ARTURO J. GONZALEZ**
      **MICHAEL A. JACOBS**
      **ESTHER KIM CHANG**
      **ATTORNEYS AT LAW**

Reported By:    Rhonda L. Aquilina, CSR #9956, RMR, CRR
               Official Court Reporter

**APPEARANCES:   (CONTINUED)**

For Defendant Uber:

             MORRISON & FOERSTER LLP
             707 Wilshire Blvd
             Los Angeles, California  90017-3543
      BY:  **SYLVIA RIVERA**
           **ATTORNEY AT LAW**

             BOIES, SCHILLER & FLEXNER, LLP
             1401 New York Avenue NW
             Washington, D.C. 20005
      BY:  **KAREN L. DUNN**
           **ATTORNEY AT LAW**

For Defendant Otto Trucking LLC:

             GOODWIN PROCTER LLP
             135 Commonwealth Drive
             Menlo Park, CA 94025
      BY:  **BRETT SCHUMAN**
           **ATTORNEY AT LAW**

For Defendant Uber:

             SUSMAN GODFREY LLP
             1000 Louisiana Street - Suite 5100
             Houston, Texas  77002
      BY:  **WILLIAM CARMODY**
           **JOSEPH S. GRINSTEIN**
           **SHAWN RABIN**

Special Master:

             FARELLA, BRAUN & MARTEL LLP
             Russ Building
             235 Montgomery Street, 18th Flr
             San Francisco, California  94104
      BY:  **JOHN L. COOPER**

<u>**Tuesday - October 3, 2017**</u>                    <u>**11:00 a.m.**</u>

P R O C E E D I N G S

---000---

**THE CLERK:**  Calling civil action 17-939, Waymo LLC
versus Uber Technologies Inc., et al.

Counsel, please step forward to the podium and state your
appearances for the record.

**MR. PERLSON:**  Good morning, Your Honor.  David Perlson
from Quinn, Emanuel on behalf of Plaintiff Waymo.  With me is
Charlie Verhoeven, Jordan Jaffe, Jeff Nardinelli, Andrea
Roberts and Melissa Bailey.

**THE COURT:**  Thank you.

**MR. GONZALEZ:**  Good morning, Your Honor.  Arturo
Gonzalez, Michael Jacobs, Sylvia Rivera, Esther Kim Chang, from
Morrison & Foerster for Uber.

**MS. DUNN:**  Good morning, Your Honor.  Karen Dunn from
Boies, Schiller for Uber.

**MR. CARMODY:**  Good morning, Your Honor.  Bill Carmody
for Uber, and with me I have Joe Grinstein and Shawn Rabin from
Susman and Godfrey.

**MR. SCHUMAN:**  Good morning, Your Honor.  Brett Schuman
from Goodwin Procter on behalf of Defendant Otto Trucking.

**MR. COOPER:**  Good morning, Your Honor.  John Cooper,
Special Master.

**THE COURT:**  Thank you.  All right.  Do we have any

```
 1   members of the press represented here today.

 2                        (Show of hands.)

 3            THE COURT:  But I mean with lawyers.

 4                         (Laughter)

 5            THE COURT:  Because you were going to submit briefs

 6   and try to intervene and all that.

 7        Is there any lawyers here on that?  I guess not.

 8        All right.  Okay.  We're here mainly on the motion to

 9   continue the trial, and also doesn't your client have a motion

10   to sever?

11            MR. SCHUMAN:  Yes, Your Honor.

12            THE COURT:  Is that on for today too.

13            MR. SCHUMAN:  It is, Your Honor.

14            THE COURT:  All right.  We need to deal with that.

15        Let's go with the continuance motion first.  And who is

16   going to argue that for Waymo?

17            MR. VERHOEVEN:  Charles Verhoeven, Your Honor.

18        To the extent the Court is interested in some -- the

19   details, I may rely on Mr. Perlson and Mr. Jaffe.

20            THE COURT:  All right.  Go ahead.

21            MR. VERHOEVEN:  Your Honor, to say that the number of

22   Google and Waymo documents that have been disclosed after the

23   Federal Circuit ordered -- affirmed Your Honor's order, an

24   order on the Stroz reports and related documents, to say that

25   this volume is surprising is an understatement.  It's shocking.
```

```
1   It's unbelievable.  We have been asking counsel for defendants
2   repeatedly from the outside of this case *Do you have any actual*
3   *Google or Waymo documents?*  They have refused to say, over and
4   over and over again.  Your Honor, I'm not aware of one time
5   during all these privileged fights that they asserted that the
6   actual documents were covered by privilege.  They clearly
7   aren't.  They're our property.  Yet the defendants withheld
8   millions of files that belong to us and did not produce those,
9   particularly --
10       THE COURT:  Well, say again.  You're saying Stroz
11   withheld it, Uber withheld it, Morrison withheld it?  You keep
12   saying "they."
13       MR. VERHOEVEN:  The agents for Uber and Otto is what
14   I'm talking about.
15       THE COURT:  All right.  So that's Stroz and MoFo.
16       MR. VERHOEVEN:  Right.
17       THE COURT:  It's not quite the same thing as Uber.
18       MR. VERHOEVEN:  Well, they were commissioned by Uber.
19   Stroz is still employed by Uber as part of their litigation
20   team, so is MoFo.  And we asked repeatedly over and over, and I
21   believe Your Honor ordered that any documents like that be
22   produced from the very first order, and they did not produce
23   them.  It wasn't until you -- you, Your Honor, issued an OSC to
24   MoFo that we first heard maybe they have a sliver of documents
25   that are from Google and Waymo.  Well, that sliver turned out
```

1    to be 64,000 Waymo/Google documents, Your Honor.

2        So I read their opposition brief --

3        **THE COURT:**  Well, but wait now.  Wasn't there a story

4    there, something like MoFo only came into possession of those

5    because it was defending Levandowski in the arbitration that

6    Waymo brought?

7            **MR. VERHOEVEN:**  It doesn't matter.

8            **THE COURT:**  Well, maybe it matters.

9            **MR. VERHOEVEN:**  They have them, Your Honor.

10           **THE COURT:**  I know, but you're making it sound like

11   they had them back at the time of the acquisition, and my

12   memory of the story is that that wasn't true, at least as it

13   was represented to me by Arturo Gonzalez, that they got those

14   later in connection with the arbitration.

15           **MR. VERHOEVEN:**  Well, I'm sorry if I misled you, Your

16   Honor.  I'm talking about since this litigation started, we

17   have been asking over and over and over where are any documents

18   that Levandowski or other Uber/Ottomotto people who came from

19   Waymo took, and they've refused.

20       I sent a detailed letter to Mr. Jacobs at the outset of

21   this case.  He wouldn't even respond to it.  We have removed

22   several times, Your Honor ordered it.  It wasn't until, as Your

23   Honor even noted, you ordered it, they didn't come clean.  You

24   ordered it, they didn't come clean.  It was only until the OSC

25   you issued that they even mention a sliver.  And then after the

1    federal circuit rules, it's an avalanche.  And now they're

2    taking the position, after hiding this all the way up to way

3    after the end of discovery just a couple weeks before trial,

4    maybe three, that, *oh, we're going to cram* -- *you have to cram*

5    *all that stuff we hid into those number of weeks*, *because we*

6    *don't think there should be a continuance*.  It's blatant, their

7    conduct, Your Honor.

8        And to say that:  Oh, we don't have a case, and that's why

9    we're really doing it, it's insulting.  We do have a case, but

10   we're entitled to see what more there is in a massive amount

11   that dwarfs what the defendants have produced so far, that

12   dwarfs it.  It was withheld.

13           **THE COURT:**  You don't have to scream and shout.

14           **MR. VERHOEVEN:**  I'm sorry, Your Honor.  I'm mad about

15   it.  I apologize.

16           **THE COURT:**  All right.  Let me hear from the other

17   side.

18           **MR. GONZALEZ:**  Just briefly, Your Honor.  They knew

19   when you set this trial date that there was the possibility

20   they might not even see the Stroz report.  They knew that.

21   They might have to go to trial without ever knowing what was in

22   there.

23           **THE COURT:**  Well, that's fair up to a point, but it's

24   also fair to say that they also knew that if the avalanche had

25   came, they could throw themselves on the mercy of the Court and

1    ask for an extension.

2           **MR. GONZALEZ:**  That's right.  So let's talk about that

3    avalanche, Your Honor.  What is this avalanche they keep

4    talking about?  Interesting, I didn't hear anything about the

5    documents that we produced last week, which is a big piece of

6    their brief.  We explained in declarations what happened there.

7    We've reviewed those documents.  We couldn't find a single

8    Google document in that batch.

9           Second, this avalanche, the vast majority of these devices

10   I can now say -- because they decided to make the Stroz report

11   public yesterday, even though you told us to kind of lay low --

12   the vast majority of this stuff in this avalanche are devices

13   that Anthony Levandowski had in a storage facility in Turlock

14   that were very dated that I don't believe he used since 2010, a

15   bunch of old stuff.  It was so old that what we decided at the

16   time of the acquisition was there's no way we could review all

17   of this stuff, why don't we do the next best thing:  Let's put

18   it in a vault, which is what they haven't mentioned.  All of

19   this avalanche has been in a vault since well before

20   Mr. Levandowski ever came to Uber.  It's been sitting in this

21   vault.  Now, if they want to Whales their time going through

22   that, they can, but they haven't found anything, and they won't

23   "found" anything in the avalanche, because it's old, old stuff.

24   It's not good cause for a continuance.

25           **THE COURT:**  Well, wait, wait.  But the due diligence

1    report was not about old stuff.  It was -- there were things in

2    there of some importance.

3        **MR. GONZALEZ:**  Your Honor, and they have that, and

4    they had that.  What I'm saying to you is that the bulk of the

5    material that they now say they have to review, that's so much

6    stuff, is this old stuff.

7        With respect to the newer stuff that was actually on

8    Mr. Levandowski's computer at the time -- that, by the way, has

9    been sitting in the vault with everything else this whole

10   time -- they know what that is.  They've had that information.

11   They can run search terms.  And the documents that MoFo had, we

12   gave them those documents the day after the Federal Circuit

13   ruled.

14       And what have they identified in their papers, you know

15   they have an army of lawyers, unlimited resources.  They say

16   they've spent 4,450 hours reviewing this stuff, and what do

17   they have for reviewing 4,450 hours of work?  20 documents,

18   which they identify.

19       **THE COURT:**  Well, wait a minute.  I haven't seen

20   those, have I?

21       **MR. GONZALEZ:**  I don't know that you have, Your Honor.

22       **THE COURT:**  I don't think they were attached to

23   anything.  If there's a smoking gun, let me see.

24       **MR. GONZALEZ:**  That's what I was going to suggest,

25   Your Honor, because we've looked at those documents, and I

1    don't believe there's anything there that's any different than

2    what they've already got.  It's going to end up being

3    cumulative.

4         So there isn't good cause.  After 4,450 hours, what is it

5    that they have that's new that they didn't have before?  They

6    haven't identified anything.

7              THE COURT:  Well, they -- all right.  I want to turn

8    to something that bothers me, if I can find it.  I have given

9    you my lecture about half truths, and we're going to spend some

10   time now.  Please turn to page 5 of the Uber brief yesterday

11   that came in last night.  We're just going to find out who is

12   telling the truth.

13        I apologize to all of you people in the gallery.  Normally

14   this would be beneath a U.S. District Judge to do, but in this

15   case it's happened so many times I'm going to find out who is

16   telling the truth here.

17        All right.  So here's what Uber says, and I want you both

18   to be ready to give me the chapter and verse and hand me the

19   document if there's a question about it.

20        Okay.  This is what the -- I guess this is you, Arturo

21   Gonzalez, says:

22             Waymo -- the Court has cautioned the parties about

23        half truths.  Waymo's brief is littered with it.  Here are

24        just a few examples.

25        All right.  Here's the first one.

1          Waymo complains that Uber is refusing to supplement

2      its interrogatories.  Waymo fails to inform the Court,

3      however, that it requested this precise relief from Judge

4      Corley.  See citation.  And that Judge Corley issued an

5      order on Friday denying Waymo's request.

6      That's just out there; is that true?

7          **MR. PERLSON:**  Well, Your Honor.  The Court did not

8  deny that request.  There was one sentence at the end of our

9  brief that asked, after we asked them to -- we said we wanted

10  to issue some new interrogatories, there was one sentence at

11  the end of our brief that said:  "And Uber should supplement

12  their interrogatories."

13      Uber did not respond to that, to my knowledge, in their

14  opposition, and the Court made no ruling on that in her Order.

15  What the Court ruled on was that Waymo's request for additional

16  interrogatories is denied.  And I have the Order, and I can

17  hand it up.

18          **THE COURT:**  Well, first hand it to Mr. Gonzalez.

19          **MR. GONZALEZ:**  I'm familiar with the Order, Your

20  Honor.

21          **THE COURT:**  Well, what do you say to that,

22  Mr. Gonzalez?

23          **MR. GONZALEZ:**  What I say to that, Your Honor, is that

24  the motion that they filed specifically said, and I quote the

25  words that you just read.  They wanted the judge to allow them

1   to have new interrogatories and also to require, quote,

2   supplementation of existing interrogatories, unquote.  That's

3   what they wanted the magistrate to order.  She denied their

4   motion.  She may not have addressed every single thing that

5   they asked for, but they asked for it, and she denied it.  And

6   now they're complaining that we're not doing exactly what they

7   asked the magistrate to order us to do, and that's my point.

8          **THE COURT:**  Let's go back over it now.

9          Waymo complains that, quote, Uber is refusing to

10         supplement its interrogatories, close quote.

11         All right.  Let's just go back.  It says, page 15,

12   number 9, this is Waymo talking now:

13         Quote, as another example, Uber is refusing to

14         supplement its interrogatory responses on the theory that

15         discovery is closed, and it is one week before trial,

16         further demonstrating that -- demonstrating the prejudice

17         caused by having discovery run up to the eve of trial.

18         All right.  So then coming to the Uber brief:

19         Waymo complains that, quote, Uber is refusing to

20         supplement its interrogatories, close quote.  Waymo fails

21         to inform the Court, however, that it requested this

22         precise relief from Judge Corley -- see docket number

23         page 1 -- requesting that Judge Corley order new

24         interrogatories and require supplementation of existing

25         interrogatories.  And Judge Corley issue an order on

```
 1        Friday denying Waymo's request.

 2        Well, let me see the Waymo brief that says that made that

 3   request.  And I have her Order here already.

 4             MR. GONZALEZ:  May I approach, Your Honor?

 5             THE COURT:  You may give it to the Clerk, who will --

 6             MR. GONZALEZ:  It's the last sentence of the document

 7   on the left at the bottom.

 8                  (Laptop handed up to the Court.)

 9             THE COURT:  I'm looking at a laptop.  I don't know how

10   to work this very well, but...

11             MR. GONZALEZ:  The document on the left, the very last

12   one.

13             THE COURT:  I see it, and it looks like a letter; is

14   that what it is?

15             MR. GONZALEZ:  It is.  It's a letter brief submitted

16   by Waymo to Magistrate Corley.

17             THE COURT:  Mr. Verhoeven says:

18        Waymo also asked the Court to order defendants to

19        supplement their existing interrogatory responses as

20        necessary now that any privileged objections have been

21        overruled by the Federal Circuit.

22        What was the date of that letter?  I don't want to touch

23   this for fear that I'll goof it up.

24             MR. GONZALEZ:  May I approach, Your Honor?

25                  (Pause in the proceedings.)
```

1            **MR. GONZALEZ:**  September 24, Your Honor.

2            **THE COURT:**  All right.  And did she hold a hearing on

3     this?

4            **MR. PERLSON:**  No, Your Honor.

5            **MR. GONZALEZ:**  She issued a written Order dated

6     September 29, which was Friday.

7        And then, Your Honor, this is important, and if I had more

8     time I would have added this to my brief, the very next day --

9     and the Special Master is here -- the very next day we had a

10    call with the Special Master -- we've been talking to the

11    Special Master literally every day probably for the last three

12    weeks -- and on Saturday there was a meet-and-confer call where

13    they raised it again, wanting us to supplement our

14    interrogatories, and the Special Master agreed that we didn't

15    need to do so, but made a suggestion that we stipulate to a

16    couple of exhibits that they were concerned about, which we

17    have agreed to do.

18        So both Magistrate Corley and the Special Master ruled, if

19    you will, against them, and they omit that from their brief,

20    and instead they just say that we're refusing to do something

21    that both the Magistrate and the Special Master agreed we

22    didn't have to do.

23            **MR. PERLSON:**  Well, Your Honor, can I just respond

24    briefly?  The Exhibit 12 to our brief that we filed yesterday,

25    we attach an email from Mr. Gonzalez sent at 9:58 p.m. on

```
 1   September 29th, which I believe is after the time of Judge

 2   Corley's Order on the same day.  And we -- and the response to

 3   our request to supplement the interrogatories was not that the

 4   Court already ruled.  This is what Mr. Gonzalez said:

 5           What is your authority for the proposition that

 6       interrogatories have to be supplemented after discovery is

 7       closed and one week before trial?

 8       That's what Mr. Gonzalez said.

 9       And so I can understand, I suppose, why they might say

10   that -- raise the fact that there was one sentence in a brief

11   that wasn't even responded to in their opposition, that wasn't

12   dealt with in the Court's Order as, you know, some sort of

13   argument that the Court decided it.  But if you look at Judge

14   Corley's Order, I think Your Honor, frankly, she probably just

15   didn't see that it was there.

16       THE COURT:  Okay.  Did that letter also request

17   additional interrogatories?

18       MR. GONZALEZ:  It did.

19       THE COURT:  All right.  So her order, which is only

20   one sentence -- two sentences long on this point, said:

21           Waymo's request for additional interrogatories is

22       denied.  Waymo does not even identify the interrogatories

23       let alone show good cause.

24       So what is the reason that -- maybe she doesn't address

25   expressly supplemental interrogatories -- I mean supplement to
```

1    the existing interrogatory answers.  It sounds like that

2    question, maybe it got taken up with the Special Master on

3    Saturday.

4         **MR. GONZALEZ:**  Correct.  And the Special Master agreed

5    with us that we did not have to supplement, but suggested that

6    we consider stipulating to two exhibits, which we agreed to do.

7         **THE COURT:**  All right.  I think we have the Special

8    Master here.

9       Is that true?

10        **MR. COOPER:**  Yes, Your Honor, it is.  And I read Rule

11   26E as it qualifies the obligation to supplement as information

12   that is not known, and we talked about that at some length

13   about whether it was known or not known, and we're on the brink

14   of trial, and that was my ruling.

15        **THE COURT:**  All right.  So why didn't you point that

16   out in your brief on -- why didn't you point out that the

17   Special Master had said there was no need for supplementation?

18        **MR. PERLSON:**  Well, Your Honor, the Special Master is

19   not issue authority on what can or can't happen in the case,

20   and if we needed to bring a motion, we can do that.  He can

21   provide his view.  I don't think either party has extensively

22   said every time the Special Master has said something one way

23   or the other.  So I apologize if we didn't include that the

24   Special Master disagreed with us, but the fact is that what we

25   said is absolutely true and not half truth that they are

1  refusing to supplement.

2          **THE COURT:**  Come on.  It was a half truth.  They

3  refused.  They got sustained by the Special Master, and you

4  left out that part.

5      Now, the part, though, that I want to criticize

6  Mr. Gonzalez for is that you left the impression in your brief

7  that Judge Corley denied supplementation.  She did not.  She

8  did not.  You said she issued an order on Friday denying

9  Waymo's request.  Actually, she only denied, expressly anyway,

10  the part about additional interrogatories.

11      So on this one it's going to be 3/4ths half truth goes to

12  Waymo, and 1/4th half truth goes to Uber.

13      Now let's go to the next one.  This is what Uber says:

14          Waymo complains that defendants attempted to delay the

15          deposition of Travis Kalanick.  Again, Waymo does not tell

16          the full story.  Mr. Kalanick's personal counsel requested

17          an accommodation due to Mr. Kalanick's schedule.  Waymo

18          objected.  The parties had a meet and confer with Special

19          Master Cooper, and Mr. Cooper directed the parties to

20          proceed with the deposition.  Accordingly, Mr. Kalanick

21          appeared for the deposition as originally scheduled.

22      Is all that true?

23          **MR. PERLSON:**  Well, I do -- they -- what happened was

24  is that Mr. Carmody, who is lead counsel for plaintiff,

25  contacted Mr. Verhoeven and tried -- and said that Mr. Kalanick

```
1    is in the middle of a board dispute, and that he's very busy,

2    and that he wanted to move the deposition later.  And then

3    Mr. Kalanick's personal counsel also contacted Mr. Verhoeven

4    and asked for it to be delayed.

5        We -- you know, this is the night before the deposition.

6    I think this maybe started around 5:00 o'clock or so on Sunday

7    night.  And we said that we did not think it was appropriate,

8    because Mr. Kalanick's board fight had been going on since I

9    think Thursday of last week, and that Mr. Verhoeven had been

10   preparing for the deposition, and that it was not fair for him

11   to move later and interrupt his trial preparation to take this

12   deposition.  So we said we wanted to keep it forward, so...

13           THE COURT:  But you made it sound -- I don't know.

14   Your footnote made it sound like it was the defendants who had

15   attempted to delay.

16       But I think your point is (indicating), it wasn't the

17   defendants, it was Mr. Kalanick's personal counsel; is that

18   true?

19           MR. PERLSON:  Well, let me respond.  But, I mean, it

20   was defendants' lead counsel called Mr. Verhoeven asking to

21   delay the deposition, and then Mr. Kalanick's personal lawyer

22   also called.  Mr. Kalanick, I think, is still a board member of

23   Uber -- yes? -- and was the CEO.  So, I mean --

24           THE COURT:  Well, all right.  Wait a minute.  Well,

25   who -- is it true, Ms. Carmody, that you made the call?
```

1          **MR. CARMODY:**  Your Honor, I called Sunday afternoon,

2     counsel, I called Charlie Verhoeven.  He didn't get back to me,

3     and a few hours later he sent a long email saying no, because

4     it's -- you know, they're going to be moving for a continuance.

5     And so then Melinda gets on the phone and tries to get a hold

6     of I think Charles Verhoeven, and ultimately got the Special

7     Master on the phone.  The other side opposed all this, and so

8     the deposition went off of schedule.

9          I mean, I don't understand them raising the deposition

10    because it went off schedule.

11         **THE COURT:**  Well, you're the one that said that they

12    gave me a half truth, your side.  It sounds like you did make

13    the request, and whereas Mr. Arturo Gonzalez told me that it

14    was the personal counsel who requested.

15         **MR. CARMODY:**  I absolutely positively made a request

16    to Charlie Verhoeven to accommodate us and to push back the

17    deposition.  He said no.  And then Melinda Haag got on the

18    phone with the Special Master, who is the personal lawyer of

19    Travis Kalanick.  At that point I was out of it.  And she was

20    representing Travis Kalanick, and she got on the phone with the

21    Special Master.  I did not participate in that call, and I

22    haven't been involved since, and the deposition went off as

23    set.

24         **THE COURT:**  All right.  But Mr. Gonzalez, you made it

25    sound like Mr. Kalanick's personal counsel was the one who

1    made -- asked for the accommodation.  You didn't bring out the

2    fact that your lead lawyer was the one that made that request.

3         **MS. DUNN:**  Your Honor, let me address this briefly,

4    which is it is true that Mr. Carmody made that call.  It's also

5    true that we did this at the request of Mr. Kalanick's personal

6    counsel.  So agree that Mr. Carmody did make the phonecall.

7         I think it is clear to both parties, because Ms. Haag is

8    the one that requested the call with Mr. Cooper -- Mr. Cooper,

9    I assume, would agree to this -- that she requested the

10   phonecall, and that the -- everybody had a phonecall with

11   Mr. Cooper where Mr. Kalanick's personal counsel laid out their

12   reasons, Waymo laid out their reasons, Mr. Cooper did what his

13   role is here, which is to adjudicate that, said no to

14   Mr. Kalanick's personal counsel, could not be delayed, and then

15   the deposition went forward.

16        The point of inclusion in this list is that obviously

17   there's more to the story than just simply saying to Your Honor

18   defendants attempted to delay.  And so we tried to explain the

19   story about what actually happened.  And, in reality, this is

20   really a small blip, and we don't see it as --

21        **THE COURT:**  Well, why did you bring it up as one of

22   your key bullet points in that list of half truths?

23        **MS. DUNN:**  Well, I don't think it's a blip as a half

24   truth.  I think it's a blip as an issue in the story of the

25   greater discussion of whether a continuance is warranted.  A

1    personal counsel made a request:  Please continue this depo for

2    a couple days before a scheduling matter.  Special Master

3    adjudicated no, and then we had a deposition.

4         **THE COURT:**  This matters to me on whether or not I can

5    place any stock in the word of a single lawyer in this

6    courtroom, both sides, and whether or not -- you'll see in due

7    course.

8         All right.  On this one Mr. Gonzalez is mostly at fault.

9    He should have told me that his own lead lawyer had made the

10   request.

11        So 3/4ths half truth to Uber and 1/4th to Waymo.

12        All right.  Let's go.  We don't have that many.  Don't

13   despair out there.

14                       (Laughter)

15        **THE COURT:**  We don't have that many more to go.

16        Here's the next one.

17             Waymo complains that it has been told that it does not

18        have unlimited access to Ottomotto software.  Citation.

19        Waymo fails to tell the Court that the Ottomotto source

20        code has been available for inspection since August 17,

21        and that since September 27th, Waymo has reviewed

22        Ottomotto's source code for more than 45 hours, including

23        on weekends and some evenings.  Counsel for Uber has twice

24        asked Waymo if it had found any evidence at all that

25        Google source code had been misappropriated.  In response,

1          there has only been the sound of crickets.

2                      (Laughter)

3          **THE COURT:**  All right.  So let's see what the

4     statement that was made.  So page 16, show me, Mr. Gonzalez, on

5     page 16 where you cite to line 24.  Where is it that Waymo

6     complained that it has been told it does not have unlimited

7     access to Ottomotto's software?

8          **MR. GONZALEZ:**  It's line 25, Your Honor.  They quote

9     an email that I wrote to them saying you don't have unlimited

10    access.

11         **THE COURT:**  All right.  Here we go.  I'll read it:

12             You don't have unlimited access to our clients' code,

13         and we need to prepare for trial.

14         All right.  So...

15         **MR. GONZALEZ:**  And the very next sentence that they

16    say is:

17             This only serves to highlight the extreme prejudice to

18         Waymo.

19         **THE COURT:**  All right.  That's true, it does say,

20    Waymo's brief says:

21             It only serves to highlight the extreme prejudice to

22         Waymo of the situation.  Furthermore, based on Waymo's

23         review of source code to date, source code to date, Uber

24         has not provided the latest version of its source code.

25         All right.  So and then it goes on:

1          This is critical, because as Uber witnesses have

2     testified, Uber had incorporated patch onto patch onto

3     patch and the code had turned into a complete mess.  And

4     Uber then engaged in a refactor, close quote, of its

5     Motion Planner Code which has, quote, happened by now.

6     Waymo needs to review the version of the code that

7     incorporates all of the patches and not an earlier version

8     that does not.

9     All right.  So go back to what you say.

10         Waymo complains that it has been told that it does not

11    have unlimited access to Ottomotto's software code.  Waymo

12    fails to tell the Court that Ottomotto's software code has

13    been available for inspections since August 17, and that

14    since September 27 Waymo has reviewed Ottomotto's source

15    code for more than 45 hours, including on weekends, days,

16    and some evenings.

17    All right.  So what does Waymo say on this one?

18         **MR. JAFFE:**  Good morning, Your Honor.

19    If you look at Exhibit 18, you can see that the -- this

20    conversation started with a request, an email that I wrote this

21    past Saturday evening at 11:06 p.m.  And the first part of the

22    request was that the source code that they made available, the

23    tools weren't sufficient for our source code consultants to do

24    a timely review, and so I asked that certain tools be provided.

25         The second thing that's in the email is we've been unable

1   to locate this certain functionality that has come up in a

2   deposition, and we cite the deposition in the email.  And we

3   cite that some of the same code or related code was included as

4   an exhibit to the Stroz Report.  And then we said, given these

5   disclosures, given the lack of this code on the machines that

6   we've been inspecting, please provide the current version of

7   the code.  That's what the email said.  And then the response

8   from Mr. Gonzalez was:

9        Your consultants have reviewed the code for what, four

10       days, or is it more than that?  Have you found anything?

11       At some point very soon the drawbridge will come up.  You

12       don't have unlimited access to our client's code, and we

13       need to prepare for trial.

14       We were asking for the code, and their response was "you

15   don't get unlimited access to the code."  Those are the

16   relevant facts here.

17       **THE COURT:**  Well, but is it true that you've been

18   reviewing it -- you've had access -- it's been available for

19   inspection since August 17?

20       **MR. JAFFE:**  Some code has been available since

21   August 17, that's correct, Your Honor.

22       **THE COURT:**  And that since the 27th, you've had 45

23   hours working on the code?

24       **MR. JAFFE:**  Our consultants have been reviewing the

25   code.  But there's an important piece of context here, which is

```
 1   we're trying to look at three, essentially three piles of code
 2   and do a comparison.  One is the source code that's been newly
 3   discovered from Stroz, and, as I can go into if you'd like, we
 4   haven't gotten access to that code until literally days ago, in
 5   some cases.  The other is the Otto code, the Uber code, and the
 6   other is our code, so we're trying to do kind of a three-part
 7   review and comparison here.  So 45 hours is -- it's not a large
 8   amount of time in the context of the complex type of code and
 9   the type of comparison that we're doing.
10          THE COURT:  What are you looking for?  What is the
11   point of this code exercise?
12          MR. JAFFE:  We now know, based on the disclosures in
13   the Stroz Report, that employees that are now at Uber had
14   source code, and the Stroz Report says:  *We found lots of*
15   *source code.  We don't know what it is.  You should hire*
16   *someone to look at it, but we're not looking at it.*  And we
17   didn't know that before.  Now we know that they have source
18   code.
19          Our source code we don't know.  We're looking.  We're
20   trying to find this issue out.  We know that at least one
21   exhibit to the Stroz Report includes some of our code, so now
22   we want to look at their code, and that's what we're doing, to
23   try and figure out whether there's any overlap between the two,
24   an instance of trade secret was appropriated, for example.  And
25   they shouldn't benefit from withholding all the source code
```

1    from us.

2              THE COURT:  Isn't there a program you can run that you

3    put A in this side and B in that side and then it will make

4    instantaneous comparisons to tell you if there's any overlap?

5              MR. JAFFE:  There are.  I think what Your Honor may be

6    referring to is a type of plagiarism-type software.

7              THE COURT:  Correct.

8              MR. JAFFE:  We haven't been able to run that, because

9    the first part of my email was saying that it wasn't made

10   available in the type of tool that it would allow us to even do

11   those things.  That was the first part of my email sent this

12   past Saturday evening.

13        But as a general matter, we are looking for not just

14   overlaps in terms of plagiarism, we're looking for trade secret

15   misappropriation.  And even if they wrote it using different

16   variable names, that doesn't mean it still isn't our stuff.

17        And so that's the type of analysis that we're doing.

18        We know from the Stroz report that some of these folks

19   were taking great pains to cover their tracks.  And so the

20   analysis that we need to do is a more detailed, substantive

21   analysis.

22             THE COURT:  And that's like in -- back in the '60s

23   they used to say the best proof of existence of secret police

24   was that you could never find them.

25                      (Laughter)

```
 1           THE COURT:  So think about that.

 2                       (Laughter)

 3           THE COURT:  Now we go -- on this one I'm going to say

 4     no one is guilty.  You're all within the realm of honesty,

 5     stretched generously.

 6        Next one:  Waymo references that more than one-third of

 7     certain documents were accessed after February 1, 2016, without

 8     noting that, one, Stroz could not determine whether Levandowski

 9     had in fact accessed those files at all.  Let me just stop

10     there.

11        What is your point on that one, Mr. Gonzalez?

12           MR. GONZALEZ:  So they leave the reader with an

13     impression that Mr. Levandowski sat down one day, after he had

14     left Google, and accessed certain Google documents, when in

15     fact the Stroz Report says they can't tell whether or not he

16     actually accessed those documents or whether something happened

17     computer-wise that let it appear that these documents had been

18     accessed.

19           THE COURT:  Well, who else could have accessed them?

20           MR. GONZALEZ:  Well, Your Honor, it's the very next

21     point here, is that there are dozens of documents, dozens, in

22     one case there were 71, quote-unquote, access during the same

23     exact minute; and those that were accessed in that same exact

24     minute include things like a picture of a hanging plant and a

25     picture of muffins in a basket.  I don't think they contend
```

1    that Mr. Levandowski was out looking for plants and muffins on

2    this day.

3        And so it appears obvious that something happened

4    computer-wise, and I'm not -- I don't have the qualification to

5    say what that might be -- that made it appear that these

6    documents had been accessed when they may not have been.  That

7    is the point.

8        So when they say that they were clearly accessed by

9    Mr. Levandowski --

10            THE COURT:  But all these points one, two, and three,

11   were those qualifications in the -- there's no citation here to

12   say Waymo references that.  Where do they reference that?  It's

13   not in -- you don't give me a brief or citation to the brief.

14            MR. GONZALEZ:  I'll find it, Your Honor.

15                    (pause in proceedings.)

16            MR. GONZALEZ:  We cite, Your Honor, to the exhibit

17   that they attach to their declaration, which is the last access

18   exhibit.  I'm having trouble finding exactly where it is in

19   their brief.

20        Yes, Your Honor it's the top of page 5 of their brief.

21            THE COURT:  Where is the one-third part?

22            MR. GONZALEZ:  That is in the exhibit, Your Honor.

23   I'm trying to see if it's also in the brief.

24            THE COURT:  The part that you referred to at the top

25   of page 5 is not quite what you're saying.  It doesn't have --

 1    it doesn't match up with the dates you have in your --

 2              **MR. GONZALEZ:**  Your Honor, it is also at the bottom of

 3    page 14, the very last line:  "Indeed more than one-third of

 4    the documents," and it rolls over on page 15.

 5              **THE COURT:**  Let me read that:

 6              Indeed, more than one-third of the documents listed on

 7         Exhibit 16 were accessed after February 1, 2016, after

 8         Levandowski left Google and formed both Otto entities and

 9         began working on Uber's self-driving cars.

10         So this comes up in a thing entitled Defendants

11    Stonewalling.

12              **MR. GONZALEZ:**  They go on to say, at the next

13    sentence, Your Honor, at the end of line 3, that these files

14    were accessed by Levandowski.  Again, referring to the files

15    that --

16              **THE COURT:**  (reading)

17              But the information in Exhibit 16 is insufficient to

18         identify the files it describes, which were accessed by

19         Levandowski while he was working for the Otto entities.

20         Waymo has asked Stroz to repeatedly identify these files,

21         as it is apparent that at one time they identified them,

22         but Stroz has not yet provided this information.

23         And it goes on.

24         All right.  So your point is that, all right, so they've

25    overstated the importance.  In fact, you say:

1          Stroz could not determine whether Levandowski had in

2      fact accessed those files at all.

3      Now, is that information that was known to Waymo?

4          MR. GONZALEZ:  Yes, it's in the Stroz Report, Your

5  Honor.

6          THE COURT:  It says that flat out, that they could not

7  determine whether Levandowski had accessed them?

8          MR. GONZALEZ:  Correct, they couldn't determine

9  whether he in fact had access to them or whether it was some --

10  I'm just going to use a phrase "computer thing," I'm sure

11  there's a more appropriate word -- because of the fact that so

12  many were accessed at the exact same minute.  There was one

13  minute, and I'm not recalling the exact minute, where there

14  were 71 documents, quote-unquote, accessed during the exact

15  same minute.

16          THE COURT:  All right.

17          MR. GONZALEZ:  Including the hanging plant and the

18  muffin.

19          THE COURT:  So is it true that Stroz's own report said

20  that they could not determine whether or not Levandowski had in

21  fact accessed those spots?

22          MR. JAFFE:  So I don't -- I think the report says that

23  it's inconclusive.  But I want to focus on what we say in our

24  brief, because I think it's clear that we are sticking very

25  close to the facts here.

1          Exhibit 16 is an exhibit that Stroz Friedberg prepared.

2   It's not an exhibit that we Quinn, Emanuel prepared.  This was

3   something that was in the Stroz Report.  And if you look at

4   Exhibit 16, there are a number of files listed on it, and

5   there's a column that says, "last accessed."  Again, this is

6   not something that we created.  This is literally what it says;

7   it says, "last accessed."  Included on this spreadsheet are

8   things like -- entry 66:  Aspen Confidential Presentation Re

9   Self-Driving Car.  Aspen is Mr. Levandowski's -- or their code

10  name for Google.

11          Okay.  And the last access is March 22nd, 2016.  We didn't

12  create this.  What we're doing is just quoting what Stroz did

13  and the last access time that they gave us.  I understand

14  Mr. Gonzalez now wants to say we have an excuse for this last

15  access date.  But we aren't going into the excuses, we're just

16  quoting what Stroz said.

17          THE COURT:  No, well, but not quite.  Your brief said:

18  Which were accessed by Levandowski while he was working for the

19  Otto entities.  So what Mr. Gonzalez is saying is that the

20  Stroz Report says that they expressly said they could not say

21  that there was access by Levandowski.

22          MR. JAFFE:  The spreadsheet says, "last accessed on

23  his laptop," that's what we're quoting.

24          THE COURT:  That doesn't say by Levandowski.  Last

25  accessed by Levandowski or just last date of access?

1              **MR. JAFFE:**  It says, "date of access."

2              **THE COURT:**  But --

3              **MR. JAFFE:**  But it's his computer, to be clear.  We're

4     talking about his computer and his devices that I'm assuming

5     are password protected.  So we're not trying to say that

6     there's some third person that came in and accessed these.

7              **THE COURT:**  Well, your point is -- your argument to

8     the jury is going to be that, well, who else could it have

9     been, it must have been Levandowski.  But what Mr. Gonzalez is

10    saying is that you should have pointed out to the Court that

11    that's your argument, but it's just an argument, and that Stroz

12    expressly says he couldn't draw that conclusion.

13         All right.  On this one I'm going to -- I'm not going to

14    assign any blame on this one.  I think what you said was within

15    the realm of honest argument.

16         All right.  Next we go to the last one:

17              Waymo contends that the Special Master is currently

18              reviewing certain documents that were objected to on

19              privacy grounds, motion 16, but fails to inform the Court

20              that the Special Master in fact resolved those objections

21              last week.

22         What do you say to that?

23              **MR. PERLSON:**  Well, Your Honor, last night

24    Mr. Gonzalez emailed the Special Master and said I thought you

25    ruled on this, and the Special Master responded and said that

1    he had.  And we talked to our team, and we were wondering how

2    is it possible that that happened, because we didn't receive

3    any notice of that.  And I think, Your Honor, perhaps this is

4    one that you chalk up to an honest mistake perhaps on both

5    sides, because apparently there was a process that was set up

6    without our knowledge, and certainly not with any ill intent,

7    but whereby Stroz gave access to the Special Master to

8    redesignate documents that had been marked with a privacy

9    designation.  There was an email between the Special Master and

10   Stroz that we were not copied on to that effect, and so we were

11   unaware that this process was occurring.  Apparently in the

12   past week or so the Special Master did review these documents

13   and unmark them, but we didn't know because we didn't even know

14   that that process was occurring.  And it wasn't like there was

15   any notice to us saying:  We overrule this objection, and/or --

16   and these are now available.  So we didn't even know, and, you

17   know, there's 1.5 million in there.  So there was a ruling, but

18   we don't know.  We didn't know.

19          **THE COURT:**  All right.  Let me hear from Mr. Cooper.

20       Mr. Cooper, did Waymo counsel know or not?

21          **MR. COOPER:**  No, they didn't, I don't believe, Your

22   Honor.  And I could hand up the emails that I received from

23   Whitney Weber about how to do the review by the Special Master

24   of documents that were designated to either be withheld under

25   privilege or privacy.  And this challenges my eyes, but there

```
1    are three places to mark, and one of them is discuss among

2    counsel, the other is to keep private, and another is to remove

3    privacy.  And I was under the impression that everyone knew

4    about this, because it was conveyed to us by Latham & Watkins.

5    And when I realized that it did not include -- or that

6    Mr. Perlson did not know about this, I sent him a copy of this

7    this morning, of this email this morning.  But when we reviewed

8    them, we did it promptly, and we changed the designation.  But

9    I did not write to Mr. Perlson.  I did not write to Quinn,

10   Emanuel and tell them that, because I believed --

11            THE COURT:  Well, then why Mr. Gonzalez did you

12   criticize Waymo counsel for a point that they didn't even know

13   about?

14            MR. GONZALEZ:  Well, Your Honor, first, I didn't know

15   they didn't know, but more importantly, the Special Master has

16   been very prompt.  He gets back to us the same day or the next

17   day on any issue.  And these are documents that they raised

18   over a week ago, so if they thought that the Special Master had

19   not ruled on something that they think is important, they

20   should have raised it.  We've been having phonecalls multiple

21   times a day.  They never raised it, and instead they waited

22   until their supplemental motion and then used that as one of

23   the reasons why they claim they need a continuance.  That's --

24   my point is --

25            MR. PERLSON:  Well...
```

1          **MR. GONZALEZ:**  I don't know what they knew, but my

2     point is this.  If this is important, if this is important to

3     Waymo's prosecution of this case, all they had to do was

4     mention it to John in one of our many, many calls.

5          **THE COURT:**  Well, you led me to believe that the Waymo

6     people knew -- we call this a half truth.  This is a list of

7     your half truths.  You said their brief is littered with half

8     truths.  All right.  So you're telling me through that mode of

9     argument that Waymo counsel knew that there had been a ruling

10    but failed to tell me about it.

11         **MR. GONZALEZ:**  That's right.

12         **THE COURT:**  Now it turns out they didn't know about

13    the ruling, so this argument is not a fair argument.

14         **MR. GONZALEZ:**  Your Honor, their brief says the

15    Special Master is currently reviewing certain exhibits, and

16    that that is one of the reasons why they need a continuance,

17    because the Special Master is currently reviewing documents,

18    and that's not accurate.

19         **THE COURT:**  That part you're right about.

20         **MR. GONZALEZ:**  That's not accurate.

21         **THE COURT:**  But that's a different point.  This is --

22    okay.  On this one --

23         You can have a seat.  Thank you, Mr. Cooper.

24         On this one Uber has a point that the -- original point

25    about currently reviewing documents is incorrect, that there

1   had in fact been a ruling, and I was misinformed by Waymo.   But

2   it is incorrect to say that that was a half truth, because

3   Waymo counsel didn't know any better, because they had not been

4   copied on the email.

5       All right.   I think the thing to do is to tell you what I

6   believe should be done here.

7       I don't know what to say, and I'm now speaking in the

8   distant future to the courts of appeal, perhaps the Supreme

9   Court, maybe even the International Court of the Hague --

10                         (Laughter)

11       **THE COURT:**   -- that it is true, despite the excellent

12   quality of the lawyers here, I cannot trust what they say.   I

13   have to evaluate everything that comes in a brief or an oral

14   statement through the past history of a lot of half truths,

15   things that may be honest argument, but is not quite accurate,

16   but even though they're made in good faith, they're not quite

17   accurate, and overstatements.   It's very hard to get anywhere

18   when a poor judge has to -- there are many cases where the

19   lawyers are just outstanding and they admit the warts, they

20   tell me what the warts are, and it makes it so much easier, but

21   this case is none of that on both sides.

22       Now, here's the way I see this.   I have to back up a

23   little bit to tell you why -- the nature of ruling.   I'm going

24   to grant -- I'm going to jump ahead.   I'm going to grant a

25   continuance, but it will be under the terms that I'm going to

1    give you in a minute.

2        I believe that Waymo has exaggerated the need for a

3    continuance, and it is not nearly as dire as what -- as has

4    been represented to me.  But to help you see that, I want to

5    put this in context.  The word "cumulative" is going to become

6    important in a minute.

7        When this case started, Waymo had a strong case against

8    Levandowski, but since it didn't sue Levandowski in order to

9    avoid the arbitration clause, it sued Uber and alleged that

10   Uber had stolen its trade secrets, and that it was violating

11   four patents, had people signing under oath stating how the

12   patents had been violated.  And it has now turned out that the

13   patent claims have completely vanished, been dropped, because

14   that expert that you had just was way out of bounds, and there

15   was no patent infringement.

16       In addition, on the trade secrets, Uber has -- one of the

17   key questions is can you take a trade secret that's in that

18   long list and tie it into what the Uber product is going to be.

19   Well, I think when Waymo got into this case, it thought that it

20   was going to open up the files and find the exact duplicates of

21   the Waymo product, but as it turns out, the product is

22   dissimilar, in a lot of ways it may even a vast improvement

23   over what was going on at Waymo.  And so they have come up a

24   little short there.

25       Now, I'm not saying they don't have a case.  I told you I

1    think there's some of these trade secrets that's for the jury

2    to decide if Uber used them.  I won't get into the -- how you

3    divide that number 64.  I know that's an alleged trade secret,

4    so I won't -- that's one that conceivably the jury can find as

5    a trade secret, and maybe the way Uber does it was a violation.

6    There's some other examples I could give.  So Uber has a case

7    to be made there, but it is not the home run they were

8    expecting to find.  But -- did I say Uber?  I meant Waymo.

9    Waymo did not find.  But Waymo still has a very strong case

10   against Levandowski.

11        So now let's turn to the present problem.  We have two

12   events that have occurred within the last few weeks.  The

13   Federal Circuit agreed with the magistrate judge in this case

14   and the trial judge that the due diligence thing was not

15   protected privilege, and that was ordered to be turned over,

16   and that's a lot of documents in there, and Waymo is correct

17   that they need time to look at that, but with the qualification

18   I'm going to give in just a moment.

19        The point that Uber keeps making, which is only partially

20   correct, is that there came a point in time when Uber decided

21   it would no longer assert privilege and would just stand on the

22   sidelines while Levandowski asserted the privilege.  And so

23   then Uber says we're innocent on this, we shouldn't be blamed.

24   But really that's wrong.  That's wrong, because Uber is the one

25   that set up this elaborate scheme to try to conceal the facts

from the public and from -- particularly from Waymo, if it ever

came to light, and to engineer this elaborate attorney-client

joint defense idea that now every judge has looked at it has

rejected.  So Uber is more at fault than Waymo on this, on the

delay caused by the due diligence thing.

All right.  So that's point one.

Point two is that Uber has found -- we were here in court

last time, and Mr. Verhoeven complained that the Ottomotto

documents had not been produced.  And I asked Mr. Gonzalez is

that true?  He said no, and with his understanding they had

been produced, but they had been migrated over to the Uber

system.  He used that word.  Now, I was wondering at the time

was he using "system" differently from "server," and that's a

point for us to debate at a future date.  But I noted the

difference between "server," because he kept saying that none

of those documents ever hit the Uber "server."  But then when

he talked about the migration, it was to the system.  The point

was not lost on me.  I don't know if he intended something

important there or not, but nevertheless that's what was

represented to me, that they had in fact been produced.

Well, a few days go by, not many, maybe two days, and then

word comes from Uber that oh, my God, they had not produced

Levandowski's own Ottomotto files, which seemed remarkable to

me after 25 years of doing what you lawyers are doing, and now

18 years doing this, that the most important witness in the

```
 1   case somehow his own files got overlooked.  Very suspicious.

 2        So then a bunch of declarations came in, which I don't

 3   know if they completely answer the question, but the report

 4   said that Uber is innocent, there was no suppression of

 5   evidence, just an honest mistake.  Maybe that's true.  Here's

 6   the -- I want to come back to that word "cumulative," though.

 7        All of these documents, both the due diligence and the

 8   documents from Ottomotto, relate to a time period before Uber

 9   acquired Ottomotto, and are not help -- I can't rule out -- I

10   can't say "never," but it's hard to believe that you're going

11   to find anything in there that will show that Uber was using

12   the trade secrets.  Conceivably could show that Levandowski

13   used them, but you've already got that covered.  That's why

14   it's cumulative in a way.

15        Levandowski is almost a lay down, and your case against

16   him, so you don't need much more against -- you don't -- but

17   it's conceivable that you could find in all of those records

18   documents that would help show that Uber used the trade secrets

19   in some fashion.  I can't rule that out, but I could tell you

20   this.  It seems unlikely to me that you're going to find a

21   bunch of value in any of those materials, including due

22   diligence.  And I think if you had been finding smoking guns

23   after having 96 people, or however many it is you have working

24   on this case, you would have brought it to me today to say:

25   *Look, we've already found four*.  *Look at these documents*.  *This*
```

1   *shows how guilty Uber is*.  And you haven't found any of that.

2        Nevertheless, I'm going to give you a brief opportunity,

3   and when I say "brief" it's more than brief, but I'm going to

4   give you an opportunity to make some changes.  And I have to

5   take into account my -- my own court schedule, and I am going

6   to give you a schedule, and we're not going to argue about it.

7   It's just going to be the way it is, and you can take an appeal

8   if you don't like it.

9        So trial is now going -- we're going to pick the jury on

10  November 29.  We will start with trial on December 4.  We will

11  run up through December 20.  There's a possibility that I will

12  ask the jury to keep the week of January 8th open.

13        By October 23, twenty days from now, Waymo may bring a

14  motion -- it has -- the burden is on Waymo -- bring a motion to

15  amend its list of nine trade secrets that it wishes to assert

16  at trial, and to revise expert reports accordingly, and those

17  revisions must be included in the motion, a motion to also add

18  any new Trial Exhibits based on what you're reviewing, and any

19  new witnesses.  The opposition for that will be two days later

20  on October 25.  There will not be any reply.  We will return

21  here for a hearing on October 26th, and I think that's

22  8:00 a.m., but I haven't confirmed that.  I believe that's

23  right.  We'll leave it at 8:00 a.m. for now.

24        There will be no new discovery, absent stipulation or

25  Judge Corley decides that it's warranted.  You must, of course,

1    finish up the discovery that is hanging in the fire and that

2    you all have lined up already.  That part stays in place.  But

3    in terms of any new discovery, no, unless it's by stipulation

4    or Judge Corley thinks it's needed.

5        Now, if the motion to amend is granted to allow more trade

6    secrets to be asserted, which I'm not saying is -- I know that

7    Waymo thinks it didn't waive anything, I just want you to know

8    I thought you had, and you certainly led me to half truths to

9    believe that you had, and so I'm going to stick with my

10   position that you're stuck with nine.  But I will -- if you

11   come up with some genuine need to amend it, there are

12   suggestions in your brief that you found that certain trade

13   secrets were violated by the due diligence thing, okay, maybe

14   that would be work included in the motion to amend.

15       Anyway, if that motion were granted, then I will give some

16   additional time for more discovery possibly to the Uber side.

17   It would be compressed if there was any further discovery, but

18   then you would get a chance to adjust your expert reports as

19   well.

20       Then we go into -- we'll have a Final Pretrial Conference

21   on November 28th, the day before we select the jury on

22   November 29, and, again, the trial starts on December 4.

23       On October 23, I want to give Waymo a further opportunity

24   to supplement its existing offer of proof as to Otto Trucking.

25   Now, this is not Ottomotto, this is Otto Trucking.  There's a

pending motion by Otto Trucking to be dismissed from the case,
and I have that under consideration.  But it occurred to me
that, well, I should give you a fair chance on the Waymo side
to supplement your opposition to that motion by October 23 in
order to -- because you might come up with some great document
in that review.

       Now, in addition, we have a motion to close the courtroom.
I'm going to defer on that, because we're not going to have a
trial on the 10th.  The Media Coalition moved to intervene
yesterday on October 2nd, and the hearing is currently set for
October 10, but now the response is going to be as follows:

       The response briefs are due on October 16th, reply briefs
are due October 23, and we will hear this at the Final Pretrial
Conference, hear the motion at the Final Pretrial Conference.

       All right.  We have one last motion for today, which is
the -- sorry.  I've lost track.  Waymo -- sorry, no.  Otto
Trucking motion to sever the trial.

       **MR. SCHUMAN:**  That's correct, Your Honor.  Thank you.
Brad Schuman for Otto Trucking.

       **THE COURT:**  Go ahead.

       **MR. SCHUMAN:**  Your Honor, I'll be brief.  The
opposition came in late last night to the motion for a separate
trial, and I think all it does is confirm the very substantial
differences between the -- call it heavyweight bout here
between Waymo and Uber, and the case that they appear to want

1    to bring against my client Otto Trucking.

2        The case against Uber is based on use, alleged use of

3    non-trade secrets causing alleged damages in the billions of

4    dollars.  The opposition to our motion for separate trial makes

5    clear, Your Honor, Waymo does not assert use by Otto Trucking,

6    that's on page 4, line 20, and also makes clear that Waymo's

7    expert did not calculate any such damages as to my client Otto

8    Trucking.

9        Now, for a long time in this case, Your Honor, Waymo had a

10   convention of conveniently grouping defendants all together,

11   and we saw a little bit of this just this morning when the

12   Court asked I think Mr. Verhoeven who the "they" is he's

13   referring to.  For the longest time they talked about

14   "defendants" jointly.  And it was only toward the latter stages

15   of discovery in this very expedited case that we started to

16   figure out what their distinct theory is against Otto Trucking

17   may be.  And at the summary judgment hearing two weeks ago we

18   heard it may be that Mr. Levandowski accessed some of -- some

19   Google documents after Otto Trucking was formed.  And the Court

20   asked I think the question that was hanging after the summary

21   judgment is: *Well, was he wearing his Otto Trucking hat when*

22   *he did that, or was he wearing some other hat*?  Because, of

23   course, he was an Uber employee, or became an Uber employee,

24   and he also was an Ottomotto employee.

25       And, Your Honor, I respect the Court's ruling that Waymo

1    is going to get a chance to supplement by October 23rd.   But

2    even if they do, Your Honor, they've made very clear their

3    theory against Otto Trucking is very, very different.   And we

4    have no idea what the damages could be to Otto Trucking.

5        So the reason for our motion for a separate trial is:

6    One, the case is very, very different; and, two, the prejudice

7    to my client Otto Trucking of being sort of folded in to this

8    trial about billions of dollars in alleged damages and nine

9    trade secrets that appear nowhere in their opposition.   They

10   don't mention these trade secrets.   They don't have a case

11   based on the nine trade secrets against Otto Trucking.

12       Your Honor, the opposition makes a point about timing,

13   claiming we brought this on the eve of the Pretrial Conference.

14   We mentioned our request for a separate trial in the Joint

15   Pretrial Order which was filed a week earlier on

16   September 21st.

17       One of the theories that came up at summary judgment, Your

18   Honor, was a joint and several liability theory.   They argued

19   that my client would be jointly and severally liable for any

20   damages to Uber.   That makes no sense.   Otto Trucking has no

21   business, no employees.   It can't possibly be liable for

22   billions of dollars worth of damages.   Their expert disclaims

23   any applicability of his damages theories to Otto Trucking.

24       And most importantly, Your Honor, that theory, joint and

25   several liability, which is an issue for the Court, not for the

jury, does not appear anywhere in their opposition to the
motion for separate trial.  They didn't say, Your Honor, *Otto*
*Trucking should be part of this trial*, *because it would prove*
*our case against Uber*.  *Otto Trucking is jointly and severally*
*liable*.  They don't make that argument in their opposition,
which was focused just on our client, eleven pages long, and
filed just last night.  So they appear to be giving up on the
joint and several liability theory.  I appreciate it's still
under submission on our motion for summary judgment.

        In the Pretrial Order, they mentioned a very strange
theory of vicarious liability on the part of Otto Trucking
based on the fact that the O'Melveny & Myers law firm had a
copy of the Stroz Report.  They mentioned that in the Pretrial
Order, but in their opposition to the motion for separate trial
they don't say anything about why that requires that we be
folded into this trial.  It doesn't support that.

        Lastly, Your Honor, they make a Seventh Amendment
argument.  They claim that citing a case from the Seventh
Circuit, *In the Matter of Rhone-Poulenc*, that somehow separate
trials here would violate their Seventh Amendment rights.  Of
course Rule 42B gives the Court the discretion to grant a
separate trial.  The *Rhone-Poulenc* case they cite is a Seventh
Circuit case.  What they don't tell the Court is that the Ninth
Circuit in *Valentino versus Carter Wallace*, 97 F.3d 227, at --
sorry -- 1227, at 1233 explicitly considered and declined to

1   follow the *Rhone-Poulenc* case in the Ninth Circuit, so they're

2   citing law that does not apply to this court.

3            **THE COURT:**  All right.  Ms. Bailey.

4        **MS. BAILY:**  Your Honor, first of all, counsel will

5   correct me if I'm wrong, but I believe that now with the trial

6   date that you have set, that Uber by then will have been forced

7   to have exercised its option -- decided whether or not to

8   exercise its option to acquire Otto Trucking.  So it may well

9   be that Otto Trucking will be a subsidiary of Uber at the time

10  of trial, just the same way that Ottomotto is.  So that's one

11  thing that's out there.

12       And besides that, it really -- it just makes no sense to

13  have a separate trial for Otto Trucking, because of the number

14  of issues and complex issues that would need to be described to

15  two separate juries in order to have it happen.  It would be

16  the opposite of judicial economy.

17       And I just want to run through some of the common facts

18  that would need to be put on to two different juries if Otto

19  Trucking's motion was granted.  So of course Levandowski was

20  meeting with Uber when he created both Ottomotto and Otto

21  Trucking within weeks of each other.  Uber entered into a

22  put-call agreement with Otto Trucking on the same day it

23  entered into its put-call agreement with Ottomotto, and the

24  negotiations leading up to that day were the same, they were

25  intertwined, and that's evidence that's going to be put on at

1   trial.

2        On the same day that those two agreements were executed,

3   Uber agreed to indemnify Otto Trucking, Ottomotto, and the

4   individuals for trade secret misappropriation claims brought by

5   Waymo.  Same indemnification agreement.  The evidence on that

6   is going to be the same.

7        The findings of the Stroz investigation about what Google

8   information Levandowski was accessing and when, that's going to

9   be relevant to Levandowski's activities from the time he left

10  Google until the time Ottomotto was acquired.  All of that

11  evidence is going to relate to Otto Trucking as well.  And, you

12  know, we're still doing the discovery on that piece.  But the

13  notion that the whole Stroz due diligence structure and

14  findings are not going to come in to both trials just doesn't

15  hold water, at least from my perspective.

16       So even just based on what I've already said, we have

17  Stroz witnesses, Uber witnesses, Waymo witnesses, all of them

18  need to testify about the exact same things with respect to

19  Ottomotto and Uber, and then with respect to Otto Trucking.  So

20  giving Otto Trucking its own trial would be the opposite of

21  judicial economy.  And beyond that, Otto Trucking is completely

22  intertwined with Uber.  The president of Otto Trucking

23  testified at deposition that Otto Trucking pays Uber to use

24  Uber employees, and when he testified to that, he said:

25            "Uber employees are working on the Otto Trucking

1          Project."  And then he lists some employees.

2          And then he's asked:

3              "What is the Otto Trucking Project?"  And he answers:

4              "The Otto Trucking Project is to develop an AV kit

5          that can be integrated to a truck.

6          And "AV" stands for autonomous vehicle.

7          So this whole notion that Otto Trucking is just a holding

8     company, we saw that again in the motion to sever, that's

9     disputed.  Otto Trucking and Uber are working together with the

10    same people to develop AV technology.

11         So the intertwining of the facts that would need to be

12    presented to a jury, with respect to Uber, Ottomotto, and with

13    respect to Otto Trucking, they're just so many of the same

14    facts that it would not at all be efficient to have two trials.

15         And of course Levandowski would need to testify at both

16    trials.  He's a managing member of Otto Trucking.  He's still

17    at Otto Trucking, and, you know, he obviously had a role with

18    Ottomotto and Uber.

19         So I'll deal with the summary judgment issues in the

20    supplemental submission that Your Honor has granted us, which

21    we appreciate.  We're not giving up on a joint and several

22    liability theory.  We have several theories with respect to

23    Otto Trucking in the case, and we can deal with those on the

24    summary judgment issue.  But in terms of having a separate

25    trial, it would be enormously inefficient to do that.

1          **THE COURT:**  All right.  That's under submission.

2      I have a couple more points, then I think we're done.

3      I want to make clear that no new motions of any type to me

4  as a district judge without first giving me a précis.  Now, I'm

5  going to give an exception to the motion to amend the list.

6  Right off the bat I'm giving you permission to bring that

7  motion on I believe I said October 23.  That motion you may --

8  you already have permission to bring, but no other motions

9  unless you do the précis thing first and get the okay.  Now,

10 that does not apply to Judge Corley.  She's got her own ground

11 rules, so Judge Corley must follow her ground rules.

12     Second, if there are any refinements to the new pretrial

13 schedule that I gave you that you both agree to, not both, all

14 three of you agree to, then most likely I would fold it into

15 and approve it, but you'd have to submit it to see.  So I'm not

16 ordering you to do that.  You're free to be -- stonewall the

17 other side.  But on the other hand, maybe it would be in your

18 mutual instant to set some other practical deadlines that I

19 haven't been able to think of.  But it's got to be stipulated

20 to.

21     I'm done for the day.  If there's anything you want to

22 bring up now that is on our schedule for the day, okay, but

23 otherwise we're done.

24          **MR. GONZALEZ:**  Your Honor, I just -- I feel I have a

25 duty to tell you, I appreciate what you said about we're not

1  going to change the schedule.  I have a -- I'm scheduled to

2  pick a jury on Monday of the same week that you set here, the

3  Monday after Thanksgiving before Judge Styn in San Diego County

4  Superior Court.  Both parties went in and requested a

5  continuance.  We had a stipulation, and he said no, it's a firm

6  date.

7         **THE COURT:**  You represented to me earlier you were the

8  lead lawyer in this case.  Now it turns out Mr. Carmody is the

9  lead lawyer.  I'm sorry, there's a table, you only need three

10  of the lawyers you got over there to try this case.  Too bad.

11         **MR. GONZALEZ:**  I just thought --

12         **THE COURT:**  We will miss you.  We will miss you

13  greatly.  I was looking forward to seeing you perform in this

14  case, but that is not a good enough reason.  And next time

15  maybe you ought to produce the documents.

16     All right.  Anything -- you've made your point.

17  Overruled.

18     Anything you want to bring up on your side?

19         **MR. VERHOEVEN:**  No, Your Honor.

20         **THE COURT:**  All right.  Thank you.  We're done.

21            (Proceedings adjourned at 12:21 p.m.)

22                   ---oOo---

23

24

25

1

2

<u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Tuesday, October 3, 2017

8

9

10

11    _____

12          Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
                         Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25