Pages 1 - 18

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE

```
WAYMO, LLC,                    )
                               )
          Plaintiff,           )
                               )
     v.                        )   NO. 3:17-cv-00939-WHA
                               )
UBER TECHNOLOGIES, INC.;       )
OTTO TRUCKING, LLC;            )
OTTOMOTTO, LLC, et al.,        )
                               )
          Defendants.          )   San Francisco, California
_____)   Thursday, October 5, 2017
```

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING OF PROCEEDINGS**

FTR 1:34 p.m. - 1:56 p.m. = 22 minutes

**APPEARANCES**:

For Plaintiff:          Quinn, Emanuel, Urquhart, Oliver
                          & Hedges, LLP
                        50 California Street, 22nd floor
                        San Francisco, California  94111
                   BY:  **JAMES DUBOIS JUDAH, ESQ.**
                        **JAMES E. BAKER, ESQ.**
                        **JORDAN ROSS JAFFE, ESQ.**
                        (by telephone conference)


       (Appearances continued on following page.)


Transcribed by:         Leo T. Mankiewicz, Transcriber
                        leomank@gmail.com
                        (415) 722-7045

```
APPEARANCES: (cont.)

For Defendant Ottomoto LLC:

                    Morrison and Foerster, LLP
                    555 West Fifth Street, Suite 3500
                    Los Angeles, California  90013
               BY:  SYLVIA RIVERA, ESQ.
                    (by telephone conference)



   (The following individuals are indicated of record, but not

         participating actively in this proceeding.)


For Defendant Otto Trucking, LLC:

                    Goodwin Procter, LLP
                    Three Embarcadero Center
                    San Francisco, California  94111
               BY:  HAYES PHILLIPS HYDE, ESQ.

                    Goodwin Procter, LLP
                    601 South Figueroa Street, 41st floor
                    Los Angeles, California  90017
               BY:  TODD ANDREW BOOCK, ESQ.


Special Master:     JOHN L. COOPER
                    Farella, Braun & Martel LLP
                    235 Montgomery Street, 30th floor
                    San Francisco, California  94104
```

1    Thursday, October 5, 2017

2                                                          1:34 p.m.

3                       P R O C E E D I N G S

4         **THE CLERK:**  C17-0939, Waymo versus Uber.

5         Counsel, there's no need for you to state your
6    appearance.

7         **THE COURT:**  So good afternoon.  It's Judge Corley;
8    if I could first hear from Waymo.

9         **MR. JUDAH:**  Thank you, your Honor.  This is James
10   Judah for Waymo.  So the issue is the Ottomotto team site for
11   Slack, which was, according to the Stroz report, was set up as
12   a 280 systems Slack site on November 10th, 2015, and then it's
13   referenced repeatedly in the Stroz report that both
14   Mr. Levandowski and Mr. Ron were using Slack in the time period
15   prior to -- I guess the time that Stroz took the devices and
16   whatnot.

17        Stroz did not actually examine any of the Slack
18   materials, and we did not know about the -- this extensive use
19   of Slack in this time period or the policy of deleting all
20   messages and expressly using Slack as an alternative to e-mail
21   or other types of communication.

22        So this is basically a situation where, had we had
23   the Stroz report before the close of fact discovery and had
24   this information that we did not have before, we would have
25   asked to inspect the platform.  We also would have demanded to

1   get documents from Uber and Ottomotto from this time period
2   from the Slack channel.  We didn't know that either.
3           If there were deletions of material on the Slack
4   channel, on the Slack team site for Ottomotto, we probably need
5   to go with a subpoena to Slack, which we are prepared to do,
6   but in order to get user data, we would need consent of the
7   owner of that team site, and we don't know who that owner is.
8           So that's basically where we are.  The --
9           **THE COURT:**  So what are you --
10          **MR. JUDAH:**  -- privilege objections --
11          **THE COURT:**  So Mr. Judah, what are you asking for?
12          **MR. JUDAH:**  We would like to inspect, pursuant to
13  the PI order, the Ottomotto team site, the team site for Slack.
14          **THE COURT:**  And where would that inspection take
15  place?
16          **MR. JUDAH:**  That's a question that Uber is better
17  prepared to answer.
18          **THE COURT:**  Okay, and how long of an inspection?
19          **MR. JUDAH:**  That depends on the amount of content
20  that's still available.  It's difficult to answer that.
21  I mean, I don't know how many documents and messages are still
22  on there.
23          **THE COURT:**  Well --
24          **MR. JUDAH:**  The other thing we would ask for in this
25  connection is the consent of the Court -- the Court order that

1  whoever the team owner is currently for this Ottomoto Slack
2  account, which was merged with Uber's, apparently, that they
3  grant consent for Slack to produce, in response to a subpoena,
4  any user data that has been deleted and is no longer available
5  through whatever access Uber itself has.
6           **THE COURT:**  All right, let me hear from Ms. Rivera.
7           **MS. RIVERA:**  Thank you, your Honor.  With regard to
8  the Slack issue that we're discussing, I think Waymo is trying
9  to use the Stroz report as an excuse to reopen discovery about
10 something that they've known about and could have requested
11 months ago, but failed to do so.  As your Honor knows, Judge
12 Alsup has ruled that no new discovery is allowed unless your
13 Honor grants it, and in this case, I just don't see any good
14 cause.
15          Waymo has known that Uber and Otto use a Slack
16 channel since at least April 13th, 2017, when we produced
17 documents from the Slack channel, and we specifically
18 referenced the Slack channel in an RFP response.  They served
19 an RFP that asked for documents sufficient to show defendant's
20 knowledge of Waymo's autonomous vehicle program, including all
21 documents that discuss or mention the design of Waymo's LIDAR.
22 The written response that we served on April 13th says,
23              "Defendants will produce non-privileged documents
24          that discuss or mention the design of Waymo's LIDAR
25          that had been collected from defendant's internal

1                Slack channel."
2                This was on April 13th, 2017.
3                **THE COURT:** So did you produce -- did you produce
4   the chauffeur_next_steps_we_need_team.mac file?
5                **MS. RIVERA:** Sure, so your Honor, we have searched
6   for that, and that is not on the Slack communications.
7                **THE COURT:** So --
8                **MS. RIVERA:** So let me provide your Honor with a
9   little bit more background on my understanding of the Slack
10  channel based on basically the investigation that we've been
11  doing in response to, you know, Waymo's recent request.
12               The Ottomotto Slack channel was merged with Uber's
13  Slack channel in October of 2016, and in the normal course, the
14  public or group discussions were preserved and merged.
15  One-on-one discussions were not merged.
16               I don't know what the Stroz investigators were
17  talking about in the Stroz report.  I know that Waymo has
18  reached out to Stroz and said, hey, somewhat, can we review
19  this Slack -- and counsel for Stroz responded back, well,
20  actually, Stroz did not review any Slack.  The report was
21  simply referring to times when, according to the data on the
22  Diligent employees' devices, times when they were accessing
23  Slack, but Stroz didn't actually review it.
24               So in a way, I'm kind of reconvening (phonetic)
25  here, because I don't know what the Stroz report is

1  specifically referring to.  We do know that there was and is an
2  Ottomotto Slack channel that was merged with Uber's in October
3  of 2016.  Private messages were not merged.  Group messages
4  were merged.  To the extent there were press messages and, you
5  know, the reference to that Chauffeur document, you know, it
6  was in private messages.  My understanding is that content was
7  not, you know, merged over and retained in what is now the
8  current combined Slack channel.
9           I do want to reiterate, though, we did search that
10 Slack channel.  We searched it -- it was included in the scope
11 of our search for the 14,000 allegedly misappropriated files.
12 We then -- we specifically searched it again for that response
13 to RFP number 5, which was served during the preliminary
14 injunction phase of discovery.
15          So it certainly indicates that we have searched
16 what's available, of the combined --
17          **THE COURT:**  So -- wait -- so let me understand.  You
18 have searched the merged Slack -- I don't know what to call
19 it -- platform, whatever you have it -- with Waymo's search
20 terms.  Is that what you're saying?
21          **MS. RIVERA:**  Correct.
22          **THE COURT:**  Okay.  All right, so --
23          **MR. JUDAH:**  Your Honor, I just want to -- this is
24 James Judah.
25          **THE COURT:**  Yeah.

1       **MR. JUDAH:** I just want a clarification. Is that --
2  so is that all the search terms or just for the 14,000 files
3  and any response to the PI phase expedited RFP number 5?
4       **MS. RIVERA:** That's correct, that's for the --
5  pardon me -- the search for the 14,000 files and for the
6  expedited PI -- the expedited PI search that we did. We also
7  searched for Anthony Levandowski communication.
8       As far as searching it sort of more broadly for the
9  other -- what I'll refer to as the regular RFPs, that the
10 parties were responding to in July and August of this year, you
11 know, on July 3rd or 4th, we disclosed to Waymo the sources
12 that we were searching for those regular RFPs.
13      The parties had an extensive meet-and-confer that
14 continued for multiple weeks about -- we disclosed both the
15 sources and the custodians that were being searched. We met
16 and conferred for multiple weeks about those disclosures.
17 Again, it was actually a mutual disclosure, because Waymo
18 basically gave us their sources and custodians and we gave
19 Waymo our sources and custodians. We conferred for three weeks
20 until we finally reached agreement, and Slack was not among any
21 of the materials that Waymo asked us to search for the regular
22 RFP.
23      **THE COURT:** Okay, but so --
24      **MR. JUDAH:** Your Honor, may I respond to that?
25      **THE COURT:** Wait, wait. Wait, just so I understand,

1  so you have, though, searched the merged file for that
2  chauffeur_next_steps_we_need_team.mac file, or folder.
3              **MS. RIVERA:**  Yes, so that, your Honor, I actually
4  had them search that, searched for -- I had them search for the
5  word "chauffeur," yes, right, because certainly, if that's in
6  there, we have no problem grabbing it and producing it.  They
7  searched for the word "chauffeur" last night, and they found a
8  handful of instances, most of which were referring to
9  "chauffeur" as, like, "Yeah, I'll ask my chauffeur to take care
10 of it."
11             There was one instance where someone was referring
12 to Chauffeur as a reference to "Google Chauffeur," and what
13 they said is, "Isn't Google's AB program already called the
14 Chauffeur?"  Question mark.  And that's all we could find in
15 Slack that referred to "chauffeur."
16             **THE COURT:**  And then as I understand --
17             **MS. RIVERA:**  -- the case --
18             **THE COURT:**  Yeah, and as I understand it --
19             **MS. RIVERA:**  Your Honor, it's just that, if you want
20 to -- sorry, your Honor.
21             **THE COURT:**  No, I was going to say, as I understand
22 it, you said you also searched it for Mr. Levandowski's
23 communications?
24             **MS. RIVERA:**  Correct, Mr. Levandowski's
25 communications and searches for the -- there is a long list of

1    search terms the parties were using to search for the 14,000
2    allegedly misappropriated files --
3             **THE COURT:** Okay, Mr. --
4                  (Simultaneous colloquy.)
5             **MS. RIVERA:** -- bucket.
6             **THE COURT:** Go ahead, Mr. Judah.
7             **MR. JUDAH:** So a couple things.  First, your Honor,
8    we saw a reference that defendants had -- used Slack channels,
9    and I checked the production last night.  The earliest e-mails
10   or communications I saw from the Ottomotto side that referenced
11   Slack were from April 2016.
12            So we -- I mean, we literally had no idea, until we
13   got the Stroz report, which we've been asking for, of course,
14   the whole case, that on, for example, December 18th, 2015, Lior
15   Ron, or Anthony Levandowski, but Lior Ron went through, "Let's
16   do Slack and iMessage only," smiley face, and the response was,
17   "Okay," and also that documents on, I think, everywhere were
18   being destroyed up until at least March.
19            So we really were not in a position, through no
20   fault of our own, to know how highly relevant these Slack
21   materials were going to be.
22            It also sounds like there's been deletions of
23   evidence and communications, and of documents, apparently,
24   relating to Chauffeur at least, on the Slack channel, that
25   I think we're going to need to subpoena Slack, and my

1  understanding of the privacy laws is that in order to get the
2  user data, which would be necessary to, for example, see the
3  contents of that Chauffeur plan document, among likely many
4  others, we need consent of the team site owner.
5          **THE COURT:** Okay.
6          **MR. JUDAH:** So I mean --
7          **THE COURT:** That I understand.  That I understand,
8  so who is that?
9          **MR. JUDAH:** We don't -- I don't have that
10 information.  That's information that we do not -- that Waymo
11 does not have at this time.
12         **THE COURT:** All right, so then -- so I don't
13 think -- it sounds like -- I don't think -- I think what you
14 need, I agree, is because what Ms. Rivera's represented is that
15 the individual messages, which is where that file would have
16 been, and the stuff that's deleted, I understand why you want
17 the stuff that's deleted, and I don't think that you could have
18 known about that, but that you need to subpoena.
19         And so the question is:  How do we get you the
20 information you need in order to do your subpoena?
21         **MR. JUDAH:** I agree that's the question, your Honor.
22         **THE COURT:** Okay.  So Ms. Rivera, do you....
23         I mean, well, so what is it that you need to know,
24 so maybe Ms. Rivera can find that out?
25         **MR. JUDAH:** So we need to know the -- it's going to

1   be the owner of the team site.
2            **MS. RIVERA:**  The owner of the team site.
3            **MR. JUDAH:**  Yeah, the team owner for the Ottomotto
4   Slack site, and it was merged into Uber; it might be the
5   current Uber owner, and if it wasn't, it might -- it's possible
6   the owner is someone like Lior Ron, or it's possible it's
7   someone at Uber, but we don't know, and we need that in order
8   to get a consent form to Slack so that they could produce the
9   user data.
10           **THE COURT:**  I mean, I don't know, but I'm wondering
11  if maybe what you need to do is serve that subpoena and then
12  Slack will tell you, because this -- I don't know, but you
13  might want to do it simultaneously, I guess is what I'm saying,
14  as opposed to waiting for a consent.
15           **MR. JUDAH:**  Understood, your Honor.  The other thing
16  that we could -- that we need, and if Uber doesn't have it, but
17  there's an option for a "compliance export," it's called.  It's
18  a Slack term of art, I believe.  But that will include
19  information about activity and access from users of the Slack
20  site, of the team site.  So if Uber has a compliant export for
21  that -- and that's an option which may or may not apply to an
22  account.  It's something that, when you set it up -- but that's
23  something that we may need to get, in addition to the user data
24  and the metadata from Slack itself, if it's not available to
25  Uber.

1          **THE COURT:** All right, Ms. Rivera, can you find out
2  if that's available? I know you can't tell me off the top of
3  your head if it is or is not, but can you --
4          **MS. RIVERA:** Yeah, I just -- actually just wanted to
5  mention, we got the request for the inspection of the Otto
6  Slack at 5:30 p.m. last night.
7          **THE COURT:** Yeah.
8          **MS. RIVERA:** So these are sort of details that I'm
9  just not --
10         **THE COURT:** No, no, no, I understand, but what
11 I want to know is, do you have any objection to looking for
12 that -- meeting with Mr. Judah and figuring out that -- what
13 he's talking about, and then --
14         **MS. RIVERA:** Yeah, I think it makes sense for us to
15 talk a little bit more, because I'm sort of doing this based on
16 references to page 12 and page 19 of the Stroz report, which
17 were the pages that Waymo had referred to --
18         **THE COURT:** Okay.
19         **MS. RIVERA:** -- and then going back and talking to
20 clients about that.
21         **THE COURT:** Okay.
22         **MS. RIVERA:** James, it sounds like you've had
23 conversations with Slack, and so maybe we need to talk, you
24 know, to talk, so I can get a better understanding of what it
25 is. Like the compliance export, I'm not sure if that's

1  something that you're indicating that we should already have or
2  it's something that you should be able to request from
3  Slack...?
4          **MR. JUDAH:**  It's an option, as I understand it, that
5  would -- that Uber would, if it had it signed up with the
6  account that way, would be able to access itself, but it
7  depends on the user account.
8          **THE COURT:**  Okay.
9          **MR. JUDAH:**  But the other thing I would just add,
10 your Honor, is, in order to get user data, my informed
11 understanding is that we would need the consent of the team
12 owner.
13         So I don't know -- I haven't heard representation
14 from Uber that if they -- if they or someone they control, the
15 team owner, that we would get that consent.  So I just don't
16 want to have to delay this process and then come back in front
17 of you, you know, tomorrow or the day after, on the same issue.
18         **THE COURT:**  You can't come back to me the day after
19 in any event, but I'm sure that Uber will give the consent, I'm
20 sure that Mr. Levandowski will not, and I don't know who else
21 is there.  I'm sure probably Mr. Ron would, I don't know, but
22 obviously....
23         So this is what I'm going to say.  Oh -- so this is
24 what I want to say.  The one thing I would say is that the
25 relevance of this, of trying to get the stuff that was deleted

1  from Slack, was apparent from the due diligence report which
2  was produced to Uber -- I mean, to Waymo, I think about three
3  weeks ago now.  So I actually do think this request is a bit
4  late.  But nonetheless, I hadn't given you any deadline for
5  that.
6            But to the extent now you're going to justify a
7  request for new discovery, which has to come to me unless
8  stipulated to, based on the due diligence report, it needs to
9  be made by 5:00 p.m. tomorrow, because this is just based
10 solely on the due diligence report, and I'll note that Waymo
11 complained that it took Uber four hours to get it to them.
12           So I assume that at that four hours, you had many
13 people reading it, beginning to end, and the relevance of this
14 was obvious.  And so I don't know what the delay is.  You don't
15 need to tell me, I'm going to let you get it.  But to the
16 extent there's anything else like this in the due diligence
17 report, it must be requested by 5:00 p.m. tomorrow.
18           The other thing with respect to Judge Alsup's order
19 and new discovery, whatever requests have to be brought to me
20 by October 20th.  That's our deadline.  That forces Waymo,
21 I think, to prioritize where it's spending its time, because if
22 it's going to uncover something which then justifies some new
23 discovery, it needs to be uncovered quickly.  All right?  And
24 I'll put something on the docket that reflects that.
25           And the third thing is, I do think they're entitled

1   to get whatever -- or I'm going to order Uber to cooperate with
2   Waymo to get the information they need in order to subpoena the
3   information as to the deleted, or no longer available to Uber,
4   information as to the Slack site.
5           **MS. RIVERA:**  Your Honor, this is Ms. Rivera, if
6   I can be heard for a quick moment?
7           **THE COURT:**  Sure.
8           **MS. RIVERA:**  As to that, your Honor, I don't know
9   what sort of deliverable Slack would be making, or, you know,
10  what sort of fine distinctions that they would be making, but
11  I know that, you know, Slack has, or -- is the service
12  provider -- I shouldn't say Slack is -- whoever the service
13  provider is, you know, there's both Otto Slack, there's Uber
14  Slack, there's like over a thousand channels, I understand, and
15  the time period that is covered, you know, we're already in
16  October 2017 --
17          **THE COURT:**  No, no we're talking about
18  pre-April 2016, pretty much.
19          **MS. RIVERA:**  Sure.  So that's -- exactly, your
20  Honor.  I just wanted to be clear about the scope of what
21  they're getting, because I wouldn't want there to be, you know,
22  a really over-broad production.
23          I'm also concerned about there being privileged
24  information in there.  I just don't know what -- you know, who
25  all would be the people participating in the communications.

1   **THE COURT:** I don't know, but --
2   **MS. RIVERA:** So it's -- it's -- if your Honor
3   would --
4   **THE COURT:** I'm going to assume that there --
5           (Simultaneous colloquy.)
6   -- I'm going to assume there weren't lawyers
7   participating in the communications, that there were
8   communications going about, "Let's delete this every night, so
9   we don't have it," I'm going to actually assume we don't have
10  lawyers, and so that's not going to be an issue.
11  **MS. RIVERA:** Sure, sure. Sure. I'm just wondering
12  if there's a way to sort of carve out what it is that they're
13  entitled to get, so that Slack knows exactly what they need to
14  do and they're not turning over, you know, two years' worth of
15  stuff.
16  **THE COURT:** Well, my proposal would be, from its
17  creation, April 16th -- April 2016 back.
18          What about that, Mr. Judah?
19  **MR. JUDAH:** Your Honor, that sounds like something
20  we could agree to.
21  **THE COURT:** Yeah, okay, and I think you're only
22  really talking about three or -- six or seven months at the
23  most, there.
24  **MS. RIVERA:** And your Honor, would it be -- would it
25  be okay for privilege purposes for Uber to do a quick review on

```
 1   those messages before they get produced?
 2           THE COURT:  No, we'll do --
 3           MS. RIVERA:  -- privileged material.
 4           THE COURT:  Claw-back.  We'll do claw-back again.
 5   Again, we have no reason to believe that there's anything
 6   there.  I think that's just going to delay things.
 7           MR. JUDAH:  Thank you, your Honor.
 8           THE COURT:  Okay, but -- so just -- so Mr. Judah,
 9   just so you're clear, if there's anything else, based on this
10   due diligence report, your deadline is 5:00 p.m. tomorrow to
11   make that request, and any other new discovery requests have to
12   be brought to my attention by October 20th, unless otherwise
13   stipulated to.
14           MR. JUDAH:  Understood.
15           THE COURT:  Okay.  Thank you.
16           MS. RIVERA:  Thank you, your Honor.
17           MR. JUDAH:  Thank you, your Honor.
18           THE COURT:  Thank you, Ms. Cooper.
19                                                      1:56 p.m.
20                            ---o0o---
21
22
23
24
25
```

```
 1
 2
 3                    **CERTIFICATE OF TRANSCRIBER**
 4
 5          I, Leo Mankiewicz, certify that the foregoing is a
 6   true and correct transcript, to the best of my ability, of the
 7   above pages of the official electronic sound recording provided
 8   to me by the U.S. District Court, Northern District of
 9   California, of the proceedings taken on the date and time
10   previously stated in the above matter.
11          I further certify that I am neither counsel for,
12   related to, nor employed by any of the parties to the action in
13   which this hearing was taken; and, further, that I am not
14   financially nor otherwise interested in the outcome of the
15   action.
16
17              [Signature]                    10/06/2017
18              Signature of Transcriber          Date
19
20
21
22
23
24
25
```