October 12, 2017

**VIA ECF**

Magistrate Judge Jacqueline Scott Corley
USDC, Northern District of California
San Francisco Courthouse Courtroom F - 15th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

Re:     *Waymo LLC v. Uber Technologies, Inc., et al.*, N.D. Cal. Case No. 3:17-cv-00939-WHA

Dear Magistrate Judge Corley:

Plaintiff Waymo LLC ("Waymo") submits this brief to 1) compel inspection of the two Levandowski laptops referenced in Angela Padilla's April 20, 2017 letter, or in the alternative Rule 30(b)(6) witnesses regarding same; 2) compel inspection of all Ottomotto corporate devices used by the Diligenced Employees that have not been searched to date by Uber for production in this case; 3) compel production of all drafts of the Stroz Report; 4) compel production of software demonstrations and test results, as well as Uber/Ottomotto's source code repository and log data; and 5) compel a Rule 30(b)(6) witness to authenticate the 69,000 files in the MoFo "Sliver".

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL**

**I.      Defendants Continue to Obstruct Waymo's Discovery as to Levandowski's Computers**

Waymo moves to compel Defendants to make available for inspection, or produce forensic images of, two laptops that Uber admits Anthony Levandowski used in his work at Uber.  These laptops are of critical importance to the issue of whether Mr. Levandowski used Waymo trade secrets in his work for Ottomotto and Uber.  Yet, Defendants have never made the laptops available for inspection and even refuse to answer the most basic questions about them, including their whereabouts and what has been done with them for purposes of this litigation.  If the laptops or their forensic images are somehow truly not available, Waymo alternatively asks that Defendants be ordered to provide Rule 30(b)(6) testimony about those laptops and what has happened to them.

By way of background, on September 11, this Court granted in part a motion to compel filed by Waymo.  (Dkt. 1506.)  Among other things, the Court ordered Uber to produce an "April 20 written directive from Uber in-house counsel Angela Padilla to Mr. Levandowski," which was referenced in a May 26 letter that Uber had produced.  (*Id.*)  On September 21, Uber produced this email which states in pertinent part: "



" (Ex. 1 [UBER00324612].)  Waymo deposed Ms. Padilla on October 2 and asked her if Uber had obtained these laptops  (Ex. 2 [Padilla Depo. Tr.] 63:17-20.)  She responded that she did not know, but that she believed the laptops were "                                        " (*Id.*) Ms. Padilla did not recall 

. (*Id.*, 63:21-65:10.)  Ms. Padilla testified that the best source of information as to who searched the laptops would be 

.

Following Ms. Padilla's deposition, Waymo asked Uber whether it has the two laptops and, if it does, requested that they be made available to Waymo for inspection immediately. (Ex. 3 [10/5/17 A. Roberts email.)  If the laptops were not in Uber's possession, Waymo asked Uber to provide an explanation of who did have possession of them. (*Id.*)  In the parties' subsequent meet and confers, Uber's counsel said that Uber never had possession of the laptops, but that Goodwin Proctor ran searches on at least one of the laptops and that hits from those searches have been produced.  Uber refuses to say what the searches were, whether Uber directed any of the searches, or identify which documents in Uber's production (if any) were from these laptops or when they were produced.  Otto Trucking has similarly said that Otto Trucking has never had possession of the laptops and that it does not currently have possession of either laptop.  However, Otto Trucking's counsel Goodwin Procter did have possession of at least one of the laptops at some undisclosed point in time, supposedly in its capacity as Mr. Levandowski's arbitration counsel.  Otto Trucking's counsel said it searched the laptops as part of Mr. Levandowski's obligations as a "former Uber employee" and that it gave the results to Uber.  However, Otto Trucking's counsel refuses to explain what those obligations were.  Otto Trucking's counsel also refuses to tell Waymo what searches were run, who they obtained the laptops from and who they handed them off to, or whether they have forensic images of one or both laptops.[1]  To date, just what happened to these laptops, what was done – or not done – with them, and

---

[1]      Mr. Levandowski is Otto Trucking's Managing Member and largest shareholder.  The Court previously held that Otto Trucking does not need to seek information from Mr. Levandowski because

at whose direction, or what specifically Ms. Padilla was referring to in her testimony is still unclear to Waymo.

There is no dispute that Mr. Levandowski's two laptops are relevant to this case, given that he used them "███████████" (Ex. 1 UBER00324612]), and that that they contain information that would be responsive to both Court Orders and Waymo discovery requests.  Indeed, Ms. Padilla ████████████
████████████████████████████████████████████████████████████████

Yet what – if anything – has been done with them to comply with Court orders or to produce material responsive to discovery requests is entirely unclear, even though these would seem to be questions that Defendants should not have trouble providing clear answers to.  At this point, Defendants should turn the laptops over to Waymo for a full inspection.  To the extent that any of the Defendants do not have the laptops, but have forensic images of the laptops, the forensic images should be made available to Waymo for inspection.

If Defendants really do not have possession, custody, or control of the laptops or of their forensic images, Defendants should provide 30(b)(6) testimony about the laptops' whereabouts and chain of custody, and what was done with them in connection with this litigation.  To date, there has been no real explanation about what Ms. Padilla said at her deposition, or why – given her testimony – there should not be more information available about the whereabouts of these laptops and what data Defendants have from them.  The recent revelation by Uber regarding the previously unsearched Ottomotto domain that was the subject of this Court's recent Orders (*see e.g.* Dkt. 1903), only further highlights the need for testimony, under oath, as to what has happened with these laptops.  Waymo is entitled to know, at minimum: whether Defendants know the whereabouts of the Levandowski laptops; if they do, where the laptops are[2]; who Goodwin Procter got the laptops from; who Goodwin Procter gave the laptops to; what the chain of custody of the laptops is; what search terms Goodwin Procter ran on the laptops as part of Mr. Levandowski's purported obligations as a former Uber employee; what the obligations under which Mr. Levandowski ran searches on his laptops were; when Goodwin Procter ran those searches on the laptops as part of Mr. Levandowski's obligations as a former Uber employee; whether Uber directed the searches that Goodwin Procter ran on the laptops as part of Mr. Levandowski's obligations as a former employee; whether the searches conducted by Goodwin Procter were part of Uber's efforts to try to locate the 14,000 stolen SVN schematics; whether Goodwin Procter provided the results of the searches ran on the laptops as part of Mr. Levandowski's obligations as a former employee to Uber; whether Uber produced to Waymo in this litigation any of the results of the searches ran on the laptops as part of Mr. Levandowski's obligations as a former employee and, if so, which documents they are; whether Uber withheld any such documents and, if so, on what basis; and whether the laptops contain any downloaded materials responsive to any Court Order.

Last, although Defendants did not raise this argument on the parties' meet and confers, Defendants may argue that it is too late for Waymo to take discovery regarding the Levandowski laptops.  Not so.  Uber did not disclose the April 20 Padilla email until September 21.  Waymo expected that Ms. Padilla would be prepared to testify about what happened with the laptops at her October 2 deposition,

---

he will not cooperate with discovery due to his Fifth Amendment claims. (Dkt. 881.)  That Otto Trucking's counsel was still apparently able to obtain cooperation from Mr. Levandoswki for Uber in their supposed role as his personal counsel, due to his supposed "contractual obligations" to Uber, shows the folly in Otto Trucking's assertions that formed the basis of this ruling.

[2]   Defendants have not said that the laptops are in Mr. Levandowski's possession, or that Defendants cannot provide further information based on Mr. Levandowski's Fifth Amendment assertion.

but she knew very little about them.  Waymo promptly raised the issue with Defendants after her deposition.  Waymo could not seek this discovery earlier because Uber withheld the underlying April 20 email.  Waymo should not be denied discovery based on Uber's conduct.

## II.     Uber Must Make Available for Inspection Any Ottomotto Corporate Devices Not Already Searched In Connection with this Litigation

Uber recently disclosed that large volumes of evidence connected to Mr. Levandowski's Ottomotto domain account – specifically, over 16,000 of his Ottomotto emails and 85 GB of his Ottomotto Drive documents – were never searched for responsive documents in this litigation due to "migration" errors.  Waymo has since asked Uber to confirm that all Ottomotto corporate devices used by Mr. Levandowski and the other Diligenced Employees – which were not collected or analyzed by Stroz in its due diligence investigation, which was limited to their "personal" devices – have been searched for relevant documents.  Uber has refused to do so.

Uber has indicated that to the extent any of these Ottomotto devices continued to be used at Uber, they have been searched.  But Uber has adamantly refused to conduct any investigation into how many of the Ottomotto devices are **not** still in use and therefore fall into Uber's self-created discovery blind spot.  As the Court is well aware, Ottomotto is a Defendant in this case, on top of which the Diligenced Employees were advising Uber's AV efforts well before the closing of the acquisition in August 2016.  If Ottomotto devices exist that have never been searched by either Stroz or Uber for Waymo trade secret documents, then they are highly relevant and Waymo is entitled to discovery into what is on them (and what has been deleted from them and when).  Waymo therefore seeks an order compelling Uber to permit Waymo to inspect any Ottomotto corporate devices used by any of the Diligenced Employees that have not already been searched by Uber for responsive documents.

## III.     There Is No Basis to Withhold Production of Drafts of the Stroz Report

Waymo's May 10 subpoena to Stroz sought, in addition to the final Stroz Report, "**[a]ll** reports or analyses prepared by [Stroz]" in connection with its due diligence investigation.  (Dkt. 570-1 [Stroz Subpoena], Request No. 7 (emphasis added)[3].)  Uber moved to quash the subpoena, including Request No. 7, on grounds of attorney client privilege and/or work product protection, but the Court denied that relief and compelled production of "any other reports and analyses created by Stroz pursuant to its retention by Uber and Otto":

> Requests for Production Nos. 6, 7 and 8 (the Stroz Due Diligence Report **and any other reports and analyses created by Stroz pursuant to its retention by Uber and Otto**).  Objections to the Court's Order compelling the Stroz Report's production are currently pending before the district court.  **Neither Uber nor Levandowski has identified any other analyses or reports and thus neither has met its/his burden of showing that such reports or analyses are privileged from production**.  Stroz shall produce such analyses by Tuesday, June 27, 2017 or by that same date advise Waymo that responsive documents (other than the Stroz Report and its exhibits) do not exist.

---

[3]   "All reports or analyses prepared by YOU for any DEFENDANT REGARDING LEVANDOWSKI, Lior Ron, the DUE DILIGENCE REPORT (or the subject matter discussed therein), OTTO TRUCKING, OTTOMOTTO, GOOGLE, WAYMO, or the MISAPPROPRIATED MATERIALS."

(Dkt. 670 at 9 (emphases added and removed).)  Uber raised objections to the Court's Order with the District Court (Dkt. 727), which were denied in their entirety on June 27.  (Dkt. 745 at 6 ("For the foregoing reasons, all motions for relief from Judge Corley's order granting Waymo's motion to compel compliance with its subpoena to Stroz Friedberg are **DENIED**.  All stated objections to Judge Corley's order are **OVERRULED**.").)  The District Court acknowledged Uber's argument that there could be privileged and/or work product protected materials responsive to the subpoena that were not previously logged on any of Uber's privilege logs, but held that under the Court's Standing Order, "insofar as Uber has asserted any privilege beyond the scope of its initial privilege log (provided pursuant to the expedited discovery order dated March 16 (Dkt. No. 61)) during the course of this litigation, **it should have already supplemented that privilege log accordingly**."  (Dkt. 745 at 3 (emphasis added).)  The District Court went on to say:

> Given the foregoing, it remains a mystery what responsive "documents and communications" could fall outside the scope of both the expedited discovery order and the privilege issues that have been litigated thus far in connection with Stroz Friedberg's due diligence investigation and report.  Uber offered no details about this theoretical category of "documents and communications" before Judge Corley or in its instant motion for relief. … Insofar as Uber's "objection" is essentially a request to clarify that Judge Corley's order did not purport to find any waiver of privileges that Uber has had no opportunity to assert, that request should be made to Judge Corley in the first instance.  Insofar as Uber intends to assert new claims of privilege over some theoretical category of "documents and communications" that has not yet been identified or litigated, those claims should likewise be made before Judge Corley in the first instance and in full compliance with the undersigned judge's standing order.

(*Id.*at 3-4.)  On September 16, Uber belatedly provided a massive privilege log of over 7200 entries (over 1100 pages long) of documents responsive to Waymo's subpoena that Uber was instructing Stroz to withhold from production.  (Ex. 4 [9/16/2017 Uber Privilege Log].)  After Waymo raised issues surrounding the overbreadth of Uber's privilege assertions, Uber withdrew its privilege assertions over several hundred of the entries (suggesting they had been "inadvertently withheld"[4]) and provided an amended privilege log on September 27 (with 6509 entries).  (Ex. 5 [9/27/2017 Uber Privilege Log].)

One of the obvious deficiencies with Uber's September 16 privilege log is that it purported to assert privilege – for the very first time – over drafts of the Stroz Report, which were squarely within the scope of Waymo's subpoena and readily known to Uber (who could simply ask its agent Stroz to confirm that there were drafts before the final report was sent to Uber on August 5), yet never identified as being subject to a work product or privilege assertion during the pendency of motion practice over the Stroz subpoena or the ensuing objections and appeals of the Court's Order compelling production.

Waymo expressly asked Uber, on September 21, "are Defendants withholding any drafts of the Due Diligence Report?" and requested a meet and confer on the issue.  (Ex. 6 [9/21/2017 D. Perlson

---

[4]   *See*, *e.g.*, Ex. 11 [9/22/2017 Stroz Subpoena Production Letter] ("This production supplements Stroz's September 16, 2017, production of documents.  These documents were not included in that production because they were withheld by counsel for Uber … on privilege grounds.  Uber's counsel has informed us that the withholding of these documents was inadvertent, and that the documents should be produced.").)

email].)  The Special Master set the meet and confer for 10:00 a.m. the next day.  (*Id.*)  In response, Uber wrote, "**We are not withholding any drafts**.  There is no need for a call."  (*Id.* [9/21/2017 A. Gonzalez email] (emphasis added).)  This was untrue.  Uber's amended privilege log for the Stroz subpoena, served six days later, showed that Uber was continuing to withhold drafts of the Stroz Report.  (*See*, *e.g.*, Ex. 5 [9/27/2017 Uber Privilege Log] at Entry Nos. 1904, 2270, and 2990.)  Notably, Uber did nothing to correct its prior representation that Uber was not withholding drafts.

In any event, there is no basis to withhold drafts of the Stroz Report from discovery, any more than there was ever a basis to conceal the final draft (a proposition that has been rejected by every Court that has ever considered the issue).  To the extent drafts of the Stroz Report were ever protected by any work product protection or privilege, Uber has waived those protections.  Uber failed to assert work product protection over drafts in its Motion to Quash, its objections to the Order compelling Request No. 7 to the subpoena, or in any subsequent motion for clarification or other briefing before Judge Corley.  Uber even affirmatively told Waymo that it was not withholding any drafts on September 21, only to re-assert privilege objections over these same category of documents less than a week later.

Finally, even if any work product protection ever applied and has not been waived, Waymo has a substantial need for these drafts.  Waymo has already uncovered evidence that MoFo and Uber were influencing the supposedly "independent" Stroz investigation before April 11 (*see*, *e.g.*, Ex. 7 [Friedberg Depo] at 110:14-111:14; Ex. 8 [STROZ0007726]; Ex. 9 [OTTOTRUCKING00024709]), and suspects that earlier drafts of the report may have been even more damaging to Uber and Mr. Levandowski, but were watered down based on the pre-determined outcome Uber and MoFo wanted. (*See*, *e.g.*, Ex. 10 [UBER00315769] (4/8/2017 email from Uber counsel to John Gardner, "████████████████████ ████████████████████████████████").)  Much of the draft reports would contain fact, not opinion work product, and Waymo is entitled at least to those portions.

## IV.  Waymo is Entitled to Specific Categories of Information About Uber and Ottomotto's Software Development

On October 9, 2017, Waymo filed a motion to compel Uber to produce the current version of its autonomous vehicle source code in light of the Stroz Report and related productions. (Dkt. 1977.)  Uber's opposition to that motion, filed earlier today, attempts to downplay the significance the Stroz Report, but omits or glosses over important details. (Dkt. 1990-10.)  First, Uber focuses on the fact that no Waymo source code was found on Mr. Burnette's laptop, but fails to disclose that he "factory reset" (i.e., wiped) the laptop in early March – after learning that he had to hand over the computer to Stroz, but before Stroz could analyze it – and that the backup Mr. Burnette kept of his laptop was not provided to the investigators. (*See* 1928-24 [Stroz Report] at 26.)  Second, Uber admits that Mr. Burnette maintained a Waymo performance review in his Gmail account, but dismisses the review as describing "fixing bugs in self-driving software."  In fact, the review provides a detailed description of one aspect of Waymo's motion planning software, including changes Mr. Burnette himself proposed to the optimization algorithm at the heart of the software. (Dkt. 1976-8.)  Third, Uber argues that any source code on Anthony Levandowski's Drobo device was destroyed (or *maybe* destroyed—Uber doesn't know for sure because it didn't ask Stroz to follow up on this part of the investigation), but Uber glosses over the undisputed fact that Mr. Levandowski was in possession of that source code while he and Mr. Burnette were developing Ottomotto's software in February and early March 2016.  In light of these facts, as set forth in Waymo's motion, Waymo is entitled to inspect Uber's source code to determine the extent to which it incorporates Waymo's trade secrets.  In addition, Waymo requests two narrow categories of documents that will shed additional light on the development history of Ottomotto and Uber's software.

**Software Demonstrations and Test Results.**  Mr. Burnette testified that when he first met with Uber engineers,  . (Dkt. 1976-7 at 97:10-25.)

. (*Id.*)  The Stroz Report has now shown that Mr. Burnette was using Waymo proprietary techniques to develop the Ottomotto code.  The requested software demonstrations and test results will show the "before and after" of Uber's software and allow Waymo to see whether Uber is now using Waymo's motion planning techniques, including to solve the lane-changing problem, in the same way that Waymo does.

**Ottomotto's Source Code Repository and Logs.**  Ottomotto's source code repository and change logs will show exactly what changes Mr. Burnette was making and when, which will allow Waymo to determine the extent to which he relied on Waymo's technology in developing the Ottomotto code that was later provided to Uber.  The relevance of these materials greatly outweighs any burden on Uber.  Uber simply needs to provide Waymo's reviewers with access to the source code as it resides on Uber servers in the normal course of business, where this information is readily available.

## V.      Uber or Its Agents Must Authenticate the 69,000 Files in the MoFo "Sliver"

MoFo initially denied having any downloaded materials.  (*See*, *e.g.*, Dkt. 806-3 [7/5/2017 Wendy Ray Declaration] ¶ 7 ("MoFo does not have any downloaded materials (or any copies, excerpts, or summaries thereof), except to the extent that any such material may appear excerpted in or as an exhibit to the Stroz Report").)  Shortly thereafter, however, MoFo notified the Court that it did in fact have downloaded materials – but was vague about what they were or which of Mr. Levandowski's devices they came from.  (*See*, *e.g.*, Dkt. 885-1 [7/12/2017 Corrected Wendy Ray Declaration] ¶ 7 ("In addition, MoFo has some materials that it received in its role as personal counsel for Levandowski—materials that Levandowski provided to Stroz, and that Levandowski authorized Stroz to provide to MoFo in its role as personal counsel for him"); *see also* Dkt. 1170 [Uber's Third Supplemental Paragraph 4 Accounting] at 3 (referring to "some additional files from Stroz's collection of Mr. Levandowski's personal devices") and Dkt. 1414 at 82:20-21 ("One is, as you know, a sliver of the Stroz material is sitting at MoFo.").)  Once Waymo finally got access to the MoFo "sliver," after the Federal Circuit ruling, Waymo discovered that it consisted of over **69,000** files including photographs of dozens of Waymo trade secret documents.  (*See*, *e.g.* Dkt. 1928-7.)

Now that Waymo finally has the "sliver" of files, it needs clarity on where they came from – *i.e.*, which of Mr. Levandowski's devices these Waymo trade secret documents were found on.  MoFo has been willing to tell Waymo over the phone that the files came from Mr. Levandowski's Macbook, but has refused to put that information in a verified, admissible format (such as a stipulation of fact or a declaration).[5]  In other words, the facts about the provenance of the 69,000 files do not appear to be in dispute, but Uber's agents at MoFo are obstructing Waymo from introducing those facts either in briefing or at trial.  Waymo therefore seeks relief from the Court.  If Uber or its agents at MoFo refuse to provide this information in a verified, admissible form, then MoFo should provide a Rule 30(b)(6) witness to authenticate these files and where they came from.

---

[5]    Counsel for Uber emailed Waymo on this and other discovery issues slightly after 8 PM this evening, but did not agree to provide a stipulation, declaration, or authenticating witness.  Waymo will continue to work with Defendants to find a resolution, but requests judicial relief if necessary.

Respectfully,

*/s/ Charles K. Verhoeven*
Charles K. Verhoeven
cc:      All counsel of record; Special Master John Cooper

01980-00104/9617382.1

7