MORRISON | FOERSTER

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA  94105-2482

TELEPHONE: 415.268.7000
FACSIMILE: 415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

BEIJING, BERLIN, BRUSSELS,
DENVER, HONG KONG, LONDON,
LOS ANGELES, NEW YORK,
NORTHERN VIRGINIA, PALO ALTO,
SAN DIEGO, SAN FRANCISCO, SHANGHAI,
SINGAPORE, TOKYO, WASHINGTON, D.C.

October 17, 2017

Writer's Direct Contact
+1 (415) 268.7020
AGonzalez@mofo.com

The Honorable Jacqueline Scott Corley
USDC, Northern District of California
San Francisco Courthouse
Courtroom F - 15th Floor
450 Golden Gate Avenue
San Francisco, CA  94102

Re:   *Waymo LLC v. Uber Technologies, Inc. et al.,* Case No. 3:17-cv-00939-WHA

Dear Magistrate Judge Corley:

Defendants Uber Technologies, Inc. and Ottomotto LLC ("Uber") submit this response to Waymo's letter brief in support of its motion to compel 1) inspection of the two laptops referenced in Angela Padilla's April 20, 2017 email to Anthony Levandowski, or in the alternative, Rule 30(b)(6) witnesses regarding same; 2) inspection of all Ottomotto corporate devices used by the Diligenced Employees that have not been searched by Uber; 3) production of all drafts of the Stroz Report; 4) production of software demonstrations and test results, as well as Uber/Ottomotto's source code repository and log data; and 5) a Rule 30(b)(6) witness to authenticate the 69,000 files that Morrison & Foerster LLP received from Stroz Friedberg in its capacity as counsel for Mr. Levandowski in the arbitrations commenced by Google.  (Dkt. 1995.)

Respectfully submitted,

Arturo J. González

la-1363632

MORRISON | FOERSTER

The Honorable Jacqueline Scott Corley
October 17, 2017
Page Two

In spite of the August 24, 2017 close of discovery, Waymo continues to make wide-ranging and belated requests based on ever-changing and failing theories. Waymo fails to establish good cause for the relief it seeks, both with respect to its late timing and on the merits. The Court should deny Waymo's motion in its entirety.

### I.  UBER HAS PROVIDED ALL POSSIBLE DISCOVERY AS TO LEVANDOWSKI'S PERSONAL COMPUTERS

Uber does not have Mr. Levandowski's personal computers or forensic images of them. (*See* Declaration of Sylvia Rivera ¶ 4.) Uber also does not know the whereabouts of Mr. Levandowski's laptops. (*Id.*) Uber therefore cannot make them available for inspection.

A Rule 30(b)(6) deposition is also unwarranted and would not reveal any facts that have not already been disclosed to Waymo. Mr. Levandowski did not provide his personal computers to Uber in response to Ms. Padilla's April 20 letter. Goodwin Procter LLP, counsel for Mr. Levandowski in the Google arbitrations, agreed to search the two personal computers for the 14,000-plus filenames referenced in Waymo's preliminary injunction papers, the hash values for those 14,000-plus files, and Uber's and Waymo's search terms for those files[1]. (Declaration of Arturo J. González ¶ 2.) Uber does not have any further information regarding these searches. (*Id.*) Goodwin provided the results to Uber (*id.* ¶ 3), and Uber produced responsive documents to Waymo on June 19, 2017 (Rivera Decl. ¶ 5). All search hits, regardless of responsiveness, also have been available to Waymo for inspection. (*Id.* ¶ 6.) On September 28, 2017, Uber's forensic expert testified about those searches and the availability of all searches for review. (*Id.*, Ex. A (9/28 Faulkner Dep. 61:10-18; 198:11-199:14).)

### II. THERE ARE NO GROUNDS FOR WAYMO'S LATE REQUEST FOR INSPECTION OF OTTOMOTTO CORPORATE DEVICES

The Court should deny Waymo's request for an order compelling Uber to permit Waymo to inspect any Ottomotto-owned device used by any Diligenced Employee that Uber has not already searched. Waymo does not – and cannot – contend it was unable to seek such discovery before fact discovery closed on August 24, 2017. To the contrary, Waymo inspected Uber's facilities, business records, and devices for approximately 60 hours during fact discovery (Declaration of Esther Chang ¶ 2). It inspected LiDAR devices, schematics, source code, and CAD files. (*Id.* ¶ 3.) It also inspected hundreds of thousands of LiDAR-related emails of 60 Uber personnel. (*Id.* ¶ 4.) Waymo specifically requested inspection of the computers and phones assigned to engineers Anthony Levandowski, Daniel Gruver,

---

[1] These search terms include the terms Uber disclosed to the Court and the 15 terms Waymo proposed to Uber pursuant to Dkt. 163.

MORRISON | FOERSTER

The Honorable Jacqueline Scott Corley
October 17, 2017
Page Three

James Haslim, Max Levandowski, Asheem Linaval, Gaetan Pennecot, and William Treichler. (*Id.* ¶ 5.) As to Anthony Levandowski, on June 6 and June 12, 2017, Waymo inspected his iPhone, inspected his Uber-issued laptop, inspected a partial backup of another computer he had used, and examined his desk. (*Id.* ¶ 6.) Waymo also asked about Ottomotto devices during depositions in June and August 2017. (Rivera Decl., Ex. B (6/19/17 L. Ron Dep. 36:2-37:19, 74:16-24); Ex. C (8/18/17 R. Morgan Dep. 120:2-121:13, 121:20-122:4); Ex. D (8/18/17 D. Burnette Dep. 37:7-23).) Yet Waymo failed to request to inspect the devices of Mssrs. Ron, Burnette, Sebern, or Juelsgaard, notwithstanding that Waymo has known since at least June 5, 2017 that each was among the Diligenced Employees who were the subjects of the Stroz due diligence investigation. (*Id.*, Ex. E (6/5/2017 Expedited Rog No. 2 at 5 identifying Diligenced Employees).

Waymo provides no justification for its extreme tardiness. That Uber recently produced emails and documents that, unbeknownst to it, failed to migrate from Mr. Levandowski's ot.to account to his Uber account is no excuse. Uber has explained that it was unaware of that migration error and had no reason to suspect there was any such issue.[2] (*See* Dkts. 1893-4, 1912, 1913, 1916.) That has nothing to do with the Diligenced Employees' devices and, in any event and as noted above, Waymo already inspected Mr. Levandowski's devices.

As a practical matter, Uber believes it has searched all computers issued by Ottomotto or Uber to any of the Diligenced Employees that are within Uber's (or Ottomotto's) possession, custody, or control. (Rivera Decl. ¶ 2; *id.*, Ex. F (8/22/17 Sebern Dep. 61:25-63:17 (explaining that Ottomotto computers became Uber computers)). Uber searched them for the 14,000 files and ran search terms for responsiveness to document requests. (Rivera Decl. ¶ 3.) As a matter of principle, however, Uber has justifiably declined Waymo's request – made six weeks after discovery closed – that it confirm to Waymo that there are no such Ottomotto devices that were not searched or allow Waymo to inspect any such devices.

### III. UBER PROPERLY ASSERTED PRIVILEGE OVER DRAFTS OF THE STROZ REPORT

Uber never received and had no access to drafts of the Stroz Report in Stroz's sole possession until August 2017. (Tate Decl. ¶ 5; Declaration of Adam Bentley ¶ 6; Rivera

---

[2] Waymo erroneously states that 16,000 of Mr. Levandowski's Ottomotto emails and 85 GB of his Ottomotto Drive documents were never searched for responsive documents. Thousands of emails to or from Mr. Levandowski's @ot.to address were searched and produced because they resided with other custodians too. And Mr. Levandowski owned only 40 Ottomotto Drive documents, such that the vast majority of the recently-produced Drive documents likely are owned by others in the company and thus reside in their accounts too. (Dkts. 1912 ¶¶ 4, 7; 1913 ¶¶ 7-8.)

la-1363632

MORRISON | FOERSTER

The Honorable Jacqueline Scott Corley
October 17, 2017
Page Four

Decl. ¶ 8.) At that time, Stroz made available to Uber's counsel thousands of documents Stroz had identified for proposed production in response to Waymo's subpoena, Uber invested substantial resources to review the documents to identify any that are privileged, and Uber served a privilege log for the documents over which it asserts privilege just hours after Stroz transmitted its document production on September 16, 2017. (Rivera Decl. ¶ 8.) The privilege log included entries for drafts of the Stroz Report – which Uber never received. (Rivera Decl. Ex. G (9/17/2017 Nancy Hoang email); *see* Mot., Ex. 4 (Uber's Sept. 17 Privilege Log) entries 3692, 3734, 3796, 3802, 3821, 4010, 4078 (variations of "Draft summary report concerning legal analysis or advice, in anticipation of litigation involving Google, regarding due diligence for acquisition of Ottomotto.").) The drafts post-date the signing of the merger agreement on April 11, 2016, and thus are privileged.³ Uber's assertion of privilege over those drafts therefore was timely and effective.

To avoid those stubborn facts, Waymo argues that the Court previously ruled that Uber should have logged these unknown documents earlier, during the pendency of the motion to quash. (Mot. at 3-4.) Not so. Uber specifically objected to the June 21, 2017 order to the extent the order could be read to imply that there had been a waiver over documents that Uber had never seen and that therefore were not on Uber's own privilege logs (*i.e.*, this exact situation). (Dkt. 727 at 2-3.) The Court overruled Uber's objection, but in so doing expressly ruled that the June 21 order had no "preclusive effect" on "new claims of privilege that Uber has had no opportunity to assert" because "the challenged part of [the] order did not contemplate, much less decide, the waiver issue Uber is now objecting over." (Dkt. 745 at 3-4.) Uber previously "had no opportunity to assert" privilege over drafts of the Report. (*Id.*) Until Stroz first identified the documents in August 2017, Uber simply did not know what documents existed that had never been in Uber's possession; it follows *a fortiori* that Uber could not have logged those documents. *San Diego Unified Port Dist. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, No. 15cv1401-BEN-MDD, 2017 WL 3877730, at *3 (S.D. Cal. Sept. 5, 2017) (asserting privilege "is worthless without . . . a description of the documents . . . ."). There was no waiver.⁴

---

³Dkt. 731 at 3-4 (concluding that common interest privilege exists as of the signing of the merger agreement on April 11, 2016); Dkt. 949 at 3-5 (overruling Waymo's objections to June 26, 2017 order finding a common interest).

⁴ Waymo's suggestion that Uber misrepresented its position on drafts of the Stroz Report in an email exchange is off base. The parties' email exchange on September 21, 2017 concerned Waymo's request that Uber serve new versions of the privilege logs this Court adjudicated on June 26, 2017, amended to include the production Bates numbers for the documents Uber removed from the privilege logs and produced as a result of the Federal Circuit's order. (Rivera Decl., Ex. H (A. Gonzalez email 9/21/2017).) Mr. Gonzalez correctly responded that Uber was not withholding any drafts of the Stroz Report on those

la-1363632

MORRISON | FOERSTER

The Honorable Jacqueline Scott Corley
October 17, 2017
Page Five


Waymo's alternative argument also lacks merit because Waymo fails to establish "substantial need" for drafts of the Stroz Report. A party can only obtain materials covered by work product protection if the party demonstrates that it "has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." *SEC v. Schroeder*, No. C07-03798 JW (HRL), 2009 U.S. Dist. LEXIS 39378, at *18 (N.D. Cal. Apr. 27, 2009) (quoting Fed. R. Civ. P. 26(b)(3)(A)). Waymo's purported rationale for its "substantial need" is that it "has already uncovered evidence that MoFo and Uber were influencing the . . . Stroz investigation" and that it "**suspects** that earlier drafts of the report may have been even more damaging . . . but were watered down." (Mot. at 5 (emphasis added).) Waymo's argument fails for three reasons: (1) Waymo's evidence does not support the proposition for which it is cited, (2) Waymo omits evidence directly contradicting its assertions, and (3) Waymo can obtain the evidence it seeks by other means, and in fact has already done so.

*First*, the evidence Waymo cites to demonstrate its purported "substantial need" does not actually support its allegations. Far from showing that Uber or MoFo was attempting to water down the report, the cited evidence demonstrates that they wanted an independent and exhaustive report. The Eric Friedberg deposition excerpt establishes that the parties completed the forensic and document review part of the investigation after April 11, 2016—it makes no reference to Uber or MoFo influencing the investigation. (*See* Mot., Ex. 7.) Moreover, Mr. Friedberg explicitly rejected the idea that Stroz's independence was in anyway compromised by interim reporting. (*Id.*, Ex. 8.) The emails from John Gardner further demonstrate that MoFo wanted an exhaustive review and not a "pre-determined outcome." (*See id.*, Ex. 9 (discussing the additional information requested by MoFo), Ex. 10 (demonstrating that it was important to Uber to complete the Stroz investigation and receive the final report).)

*Second*, Waymo omits critical evidence refuting its allegations. Mr. Friedberg provided *direct* testimony that Uber and MoFo wanted an independent and robust investigation and that he did not "feel like [Uber or Ottomotto] were looking for predetermined results or answers." (Rivera Decl. Ex I (Friedberg Dep. 230:14-231:7; *see also id.* at 96:4-12 ("Uber was trying in my view to conduct a good faith investigation, *an independent investigation*, and get *independent* validation that all diligence[d] employee were not bringing Google confidential information…with them[;]" (emphases added)), *id.* at 114:20-115:1 (rejecting Waymo's contention that either Uber or Ottomotto were interested in minimizing issues found).)

---

privilege logs. Waymo did not request revisions to the privilege log that Uber prepared and served on September 17 for documents in Stroz's possession over which Uber asserted privilege. (Rivera Decl. ¶ 10.)

la-1363632

MORRISON | FOERSTER

The Honorable Jacqueline Scott Corley
October 17, 2017
Page Six

*Third*, Waymo has not even alleged it cannot explore its theories through other means—nor could it. Waymo has already deposed Mr. Friedberg, who ran the investigation and made all the major decisions. (Rivera Decl., Ex J (Chew Dep. 56:4-5 (testifying that Mr. Friedberg ran the investigation and made all major decisions). Waymo has also already deposed Hanley Chew who was a key member of the Stroz diligence team. Moreover, today Waymo deposed another Stroz Friedberg employee and will depose a fourth this week, so it will have further opportunities to explore its theories. (Rivera Decl. ¶ 15.) Just because Waymo does not like the answers it has received so far does not entitle it to invade Uber's work product privilege. *SEC*, 2009 U.S. Dist. LEXIS 39378, at *22-23 (rejecting plaintiff requests for drafts of a produced report for cross checking purposes and/or to see if the attorneys improperly withheld information).

### IV. WAYMO IS NOT ENTITLED TO BROAD DISCOVERY OF UBER AND OTTOMOTTO'S SOFTWARE DEVELOPMENT AT THIS LATE STAGE

Waymo broadly seeks *all* Uber software demonstrations and test results and *all* of Ottomotto's source code repository and log data, based on the same trumped-up Stroz evidence cited in its previous motion to compel Uber source code, which Magistrate Corley denied. (Mot. at 5 (citing Dkt. 1977, motion to compel Uber source code); Dkt. 2006 (order denying motion).) Waymo once again seeks discovery in an attempt to validate as-yet-undefined source code trade secrets, but does not identify any valid Stroz basis for doing so. (*See* Dkt. 2006 at 3.)

First, Waymo insinuates that Mr. Burnette "wiped" his laptop to hide evidence from Stroz, but Mr. Burnette testified that he restored the backup image from a damaged laptop so that the files were all on his new device. (Ex. L (10/13/17 D. Burnette Dep. 354:20-355:12, 357:20-358:7, 375:20-24).) Despite access to information from Mr. Burnette's devices, Waymo still cannot show that Mr. Burnette retained any Waymo source code. (*See* Dkt. 2001-4 at 2; Dkt. 2006 at 3.) Second, Waymo quibbles with the description of Mr. Burnette's performance review. Yet, it still offers no evidence that the review contains any Waymo trade secrets, even though only Waymo could make such a showing, or that the review's information is reflected in Ottomotto source code. Third, Waymo argues that Mr. Levandowski was in possession of five disks from his Drobo device until early March. But, as with its previous "source code snippets" basis for discovery, Waymo offers no evidence on the significance of the disks' contents, nor any evidence that such contents were shared with Mr. Burnette or used in Ottomotto's source code. Finally, Waymo pretends to request Ottomotto's source code repository—which it already has—and change logs, but this request is a sham. Waymo wants "access to the source code as it resides on *Uber* servers in the normal course of business." (Mot. at 6 (emphasis added.) The Court has denied discovery of Uber's source code repository and should deny it again. (Dkt. 2006.) Waymo knows the contents of its own source code, yet has not identified any misappropriated trade secrets in

la-1363632

MORRISON | FOERSTER

The Honorable Jacqueline Scott Corley
October 17, 2017
Page Seven

Ottomotto's source code, despite nearly two months of access.  Waymo has not shown any Stroz materials contain its alleged trade secrets, and its overbroad requests should be denied.

### V.   UBER AND MOFO CANNOT AUTHENTICATE THE FILES IN THE MOFO SLIVER

MoFo received the sliver[5] in its prior capacity as counsel for Mr. Levandowski in the arbitrations commenced against him by Google—not as counsel for Uber.  (Tate Decl. ¶ 6; Rivera Decl. ¶ 11.)  MoFo did not inform Uber when it received the sliver.  (Rivera Decl. ¶ *Id.*)  Uber learned of the sliver only in connection with MoFo's disclosure to the Court in this litigation.  (*Id.*)  Uber therefore cannot authenticate it.  This fact alone disposes of any need to authenticate the sliver.  MoFo's possession of the sliver has nothing to do with its representation of Uber, and Uber had no knowledge of or control over the sliver.  Any attempt by Waymo to argue that MoFo's possession of the sliver should be imputed to Uber is misleading and inappropriate.  Nonetheless, the facts known to MoFo are set forth below.

MoFo received the sliver from Stroz because the file types of these materials—largely photographs, images and videos—could not be reviewed easily in the Relativity review platform.  (Rivera Decl. ¶ 12.)  MoFo did not select the materials because of their source, and MoFo does not have first-hand knowledge of the original source of these files.  (*Id.*)  MoFo therefore cannot provide admissible evidence of the original source of these files.

MoFo understands from Stroz that these files came from the MacBook Mr. Levandowski provided to Stroz, and it has shared that information with Waymo.  (Rivera Decl. ¶ 13.)  Counsel for Stroz also confirmed that to Waymo directly.  (*Id.*, Ex. K (M. Blunschi email identifying the MacBook).)  Moreover, Waymo's forensic expert has access to the native image of the MacBook and likely can confirm that the sliver came from that machine.  There is no basis for the relief Waymo seeks.

---

[5] Waymo notes that the sliver consists of 69,000 files.  This should have been no surprise given that MoFo told the Court that the sliver consisted of tens of thousands of files.  (Dkt. 1260, 8/16/17 OSC & Discovery Hr'g Tr. at 21:18 - 22:21 (MR. GONZÁLEZ:  Your Honor, we have tens of thousands of documents.  . . . What happened, Your Honor, is that Stroz took all of Mr. Levandowski's devices, even devices that were very old, and put it all into a vault.  And the only thing he got back was his phone.  And this is why I said to you the first day I walked in here that I was confident that this stuff is not at Uber because we vaulted it all.  We have a sliver of that information, Your Honor.").)

la-1363632