# EXHIBIT 2

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

\*\*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY\*\*

```
1            UNCERTIFIED REALTIME ROUGH DRAFT OF

2              DON BURNETTE TAKEN 10/13/2017

3

4                          ***

5   THIS REALTIME ROUGH DRAFT IS UNEDITED AND

6   UNCERTIFIED AND MAY CONTAIN UNTRANSLATED

7   STENOGRAPHIC SYMBOLS, AN OCCASIONAL REPORTER'S

8   NOTE, A MISSPELLED PROPER NAME/OR NONSENSICAL WORD

9   COMBINATIONS.  PURSUANT TO CCP SECTION 2025.540(b),

10  IT MAY NOT BE USED, CITED, OR TRANSCRIBED AS THE

11  CERTIFIED TRANSCRIPT OF THE DEPOSITION PROCEEDINGS.

12  THIS REALTIME ROUGH DRAFT TRANSCRIPT MAY NOT BE

13  CITED OR USED IN ANY WAY OR AT ANY TIME TO REBUT OR

14  CONTRADICT THE CERTIFIED TRANSCRIPT OF THE

15  DEPOSITION PROCEEDINGS AS PROVIDED BY THE

16  DEPOSITION OFFICER.  THIS DOCUMENT IS NOT TO BE

17  RELIED UPON IN WHOLE OR IN PART AS THE OFFICIAL

18  TRANSCRIPT.  THIS UNCERTIFIED REALTIME ROUGH DRAFT

19  VERSION HAS NOT BEEN REVIEWED OR EDITED BY THE

20  CERTIFIED SHORTHAND REPORTER FOR ACCURACY.

21

22  ACCEPTANCE OF THIS REALTIME ROUGH DRAFT IS AN

23  AUTOMATIC FINAL COPY ORDER.  I AGREE NOT TO SHARE,

24  GIVE, COPY, SCAN, FAX, OR IN ANY WAY DISTRIBUTE THE

25  REALTIME ROUGH DRAFT IN ANY FORM (WRITTEN OR
```

**HIGHLIGHT CONFIDENTIAL - ATTORNEYS' EYES ONLY**

1  focusing trying to solve.
2      Q.   Do you have a particular part of the
3  software stack that you are particular for?
4      A.   No.
5      Q.   Is there any particular part of this Uber
6  self-driving software stack that you filed that you
7  offered in some substantial way?
8      A.   No.
9      Q.   Do you have any direct reports?
10     A.   I have one current direct report.
11     Q.   Who is that?
12     A.   Jurin ****spell/spell***.
13     Q.   Okay.  Has your role changed from your
14 last deposition?
15     A.   In name, but more or less the same kind
16 of work just a little bit more structured.
17     Q.   I think your last deposition you said you
18 were kind of the technical lead for autonomy in
19 software is that still accurate?
20     A.   Yeah, that's still create.
21     Q.   Can you give me a little more color on
22 what -- on what that means?
23     A.   That was my at the time title at the same
24 time -- at the time I was still focusing on leading
25 technical priorities and leading technical efforts

8

1    Q.   Okay.  The term -- the -- the Otto
2    planner, I believe this came out of your last
3    deposition, it does -- (████████████████████)
4    (██████████████████); is that right?
5    A.   That's correct.
6    Q.   Was that a new approach that you came up
7    with at Otto?
8    A.   I wouldn't say that's a new approach, no.
9    Q.   Why not?
10   A.   It's wheel understood decades.
11   Q.   What other motion planners that you are
12   aware of for self-driving cars that (████████)
13   (████████████████████████████████████████████)
14   (████████████████████████████████████████████)?
15   A.   Waymo's.
16   Q.   Any others?
17   A.   No.
18   Q.   Have you ever referred to something
19   called -- I can't (█████████████████)?
20   A.   Sure.
21   Q.   Does the Otto planner use (████████)
22   (████████)?
23   A.   No.
24   Q.   All right.  Now we are talking (████████)
25   (████████████████████████████████████)?

26

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

```
 1            MS. HARTNETT:  Join.
 2            THE DEPONENT:  No, I don't believe we are
 3   using (███████████████████).
 4       Q.   (By Mr. Jaffe)  (████████████████)
 5   (███████████████)
 6            MS. HARTNETT:  Objection.
 7            THE DEPONENT:  (████████████████)
 8   (████████)
 9       Q.   (By Mr. Jaffe)  In the current Uber
10   version?
11       A.   Yeah.
12       Q.   What are (██████████████████████)?
13       A.   I am -- I am not 100 percent sure.
14       Q.   Do you have idea what they are?
15       A.   I believe we use (████████████████)
16   (██████████████████)
17       Q.   What's that called?
18       A.   (██████)
19       Q.   You are still using (██████████)?
20       A.   Yeah (████████████████████████████████)
21   (█████████████████████████████████████)
22   (█████████████) it's.
23       Q.   (██████████████████████████████████)
24   (██████████████████)
25       A.   Correct.
```

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

1        A.    No, I -- I don't think so.
2        Q.    When you say, I don't think so?
3        A.    I don't believe I did.
4        Q.    You are not sure you are kinds of
5    hesitating?
6        A.    I know I wrote notes left Waymo before I
7    started at -- before I left for my vacation in
8    February.
9        Q.    What was your last official day at Waymo?
10       A.    February 9th, 2016.
11       Q.    And so these are the next day?
12       A.    Yes.
13       Q.    Okay.  Why were you writing these notes
14   the day after you left Waymo?
15       A.    There were a couple reasons.  One I was
16   committed to get started on the new path for the
17   trucking project that we were going to be working
18   on at Otto.  Two, I was going on vacation, that I
19   had plan for a long time for the second half of
20   February.  And I knew that your inventor was
21   joining Otto and was going to start working on the
22   plan controller implementation and I wanted to make
23   sure that he understood some of my ideas while I
24   was gone and I didn't get to be there with him so I
25   wanted to write them up as soon as I could have to

75

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1  them available for them while I was gone.
2       Q.   On the -- then actually go to Google at
3  time did you go -- by -- the office --
4       A.   On the ninth I believe on the ninth.
5       A.   Yes.
6       Q.   And approximately what time did you
7  leave?
8       A.   4:00 p.m. maybe.
9       Q.   Approximately how many hours later, did
10 you write these notes?
11      A.   Twenty-four hours.
12      Q.   Like so for 4:00 p.m. the next day?
13      A.   Approximately.
14      Q.   Did you start on them any earlier?
15      A.   No.
16      Q.   Were you looking at anything when you
17 wrote these notes?
18      A.   No.
19      Q.   You weren't referring to anything else?
20      A.   No.
21      Q.   Did any of the concepts that are
22 described in these notes in Exhibit 7902, did they
23 come from somewhere else?
24           MR. BARTLETT:  Objection.
25           THE DEPONENT:  What do you mean did they

1  come from.
2       Q.   (By Mr. Jaffe)  Did you import these
3  concepts from somewhere else?
4            MR. BARTLETT:  Objection.
5            MS. HARTNETT:  Join.
6            THE DEPONENT:  I mean this -- this is
7  fairly basic concept.  Wheel known.
8       Q.   (By Mr. Jaffe)  Where did you get this
9  basic concept from?
10      A.   The concept of (███████████████████
11 ████████████████████████████████████████████)
12 (█████████)
13      Q.   Wheel I'm being more specific to the
14 specific approach that is described here?
15      A.   That -- the notes are about what I just
16 described.
17      Q.   This is (█████████████████████),
18 right?
19      A.   Part of it, yes.
20      Q.   And you created (█████████████
21 █████) at Waymo right?
22      A.   Yes.
23      Q.   With the same (████████████)?
24      A.   The same -- same (█████████████████
25 ██████████████████████████████████)

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1   (███████████████████████████████████████)
2   (████████████████████).
3       Q.   And the same (████████)?
4       A.   Sure.
5       Q.   And is isn't it fair to say that what you
6   described in 7902 that it is uses the approach that
7   you came up with at Waymo?
8            MR. BARTLETT:  Objection.
9            MS. HARTNETT:  Join.
10           THE DEPONENT:  Yes.
11      Q.   (By Mr. Jaffe)  Okay.
12      Q.   How long did it take you to write these
13  notes here in Exhibit 7902?
14      A.   I have no idea.
15      Q.   An hour?
16      A.   I have no idea approximately a day.
17      Q.   You started at 4:00 p.m.?
18      A.   I actually don't remember when I started.
19      Q.   Again to talk about my earlier question
20  then.  Can you tell me how many hours after you
21  left Google that you started writing these notes?
22      A.   I cannot tell you that.
23      Q.   Okay.  So it could have been pretty soon?
24           MS. HARTNETT:  Objection.
25           MR. BARTLETT:  Join.

**HIGHLIGHT CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    A.    Yeah, I -- so there are -- there are
2    two -- there are kind of approaches to way you can
3    set up planning there (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
4    (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  So obviously as we
5    have discussed, Waymo had chosen to use (▮▮▮▮▮▮)
6    (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) and I wanted to push
7    for an approach that involved (▮▮▮▮▮▮▮▮▮▮▮▮)
8    (▮▮▮▮▮▮▮▮).
9    Q.    And you created (▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
10   (▮▮▮▮)?
11         MR. BARTLETT:  Objection.
12         MS. HARTNETT:  Join.
13         THE DEPONENT:  The motion of (▮▮▮▮▮▮▮▮)
14   (▮▮▮▮▮▮) was not novel or unknown but I implemented
15   one, yes.
16   Q.    (By Mr. Jaffe)  Right that wasn't my
17   question as part of your work on the motion planner
18   team at Waymo, you created (▮▮▮▮▮▮▮▮▮▮▮▮▮▮)
19   (▮▮▮▮)?
20         MR. BARTLETT:  Objection.
21         THE DEPONENT:  I implemented one.
22   Q.    (By Mr. Jaffe)  And.  What you said in
23   here on performance review is and I'm this part of
24   the first it became apparent to me current planning
25   architecture would not be sufficient to solve

89

**\*\*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY\*\***

```
 1      A.   Yes.
 2      Q.   You kept working on your (████████)
 3   (████) at this right?
 4           MR. BARTLETT:  Objection.
 5           MS. HARTNETT:  Join.
 6           THE DEPONENT:  No.
 7      Q.   (By Mr. Jaffe)  You stopped working on
 8   it?
 9      A.   Yes.
10      Q.   Was someone else working on it?
11      A.   No.
12      Q.   No one else worked on (████████)
13   (████)?
14      A.   No.
15      Q.   Do you have any idea whether Waymo is
16   doing (████████████████) now?
17      A.   I do not.
18      Q.   All right.  Next paragraph to understand
19   additional benefits provided new system it is
20   necessary to dive little deeper into (████████)
21   (████████████).
22           Do you see thank yes.
23      Q.   You described your (████████████)
24   (████) as a new system, didn't you?
25      A.   I did.
```

                                                    94

1  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
2  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9  ▓▓▓▓▓▓▓
10       Q.   The ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12  ▓▓▓▓▓▓▓▓▓▓▓▓ file that we looked at that was
13  your laptop?
14       A.   Yes.
15       Q.   Do you have any explanation for why those
16  are the same?
17       A.   These values are ▓▓▓▓▓▓▓▓▓▓▓▓
18  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
19  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ are not unique to Waymo
20  or solving drive cars.  They are commonly referring
21  to physical quantities that you would find in any
22  motion based physical robotic.
23       Q.   Right here ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
25  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    Q.   And when would this have been?
2    A.   In the month that the -- the review was
3    due March.
4    Q.   Do you recall accessing this document at
5    any time after that?
6    A.   No.
7    Q.   When was -- what was the month that this
8    review was due?
9    A.   I believe it was Q1, 2015.
10   Q.   And you recall document number or the
11   exhibit No. 7905 the metadata for that document.
12        Do you see that?
13   A.   7905, are the dates consistent with the
14   document accessed this memorandum.
15        MR. JAFFE:  Objection.  Leading.
16        THE DEPONENT:  Yes.
17   Q.   (By Mr. Bartlett)  You were shown a
18   couple of source code files or what were alleged to
19   be source code files on the -- on they are still on
20   the scene do you recall that?
21   A.   Yes.
22   Q.   The source code files have the end in.H.
23        Do you see that?
24   A.   Yes.
25   Q.   Do you know what a .h file is?

**HIGHLIGHT CONFIDENTIAL - ATTORNEYS' EYES ONLY**

1   A.   It's a header file.
2   Q.   What's a header file?
3   A.   A header file is a -- two parts of C++
4   plus class where define the basic function name
5   that go into the class.
6   Q.   What do you mean by function name?
7   A.   So the -- the structure of the class is
8   laid out in the header, which just has the -- the
9   names of the -- the methods that you would call on
10  the class defined.
11  Q.   And what is a header file how is that
12  differ from other kinds of files?
13  A.   So you have -- in C++ you have header
14  file and you have a C file are or a CPP file or a
15  CPC it does what called the ending.  It's a
16  implementation portion of the class.
17  Q.   What is the implementation portion?
18  A.   It's the part of the code where the
19  actual bulk of the algorithm would sit.
20  Q.   And you are talking about the C file now?
21  A.   Yeah.
22  Q.   Or CPP?
23  A.   Yeah CPP or C file yes.
24  Q.   Were you shown a C file today from your
25  computer?

**HIGHLIGHT CONFIDENTIAL - ATTORNEYS' EYES ONLY**

```
1       A.    I was not.
2       Q.    Were you shown a CPP file today from your
3    computer?
4       A.    I was not.
5       Q.    You were asked earlier about (              )
6    (                                              )
7    (                              ) et cetera et cetera.
8             Do you recall that testimony?
9       A.    Yes.
10            MR. JAFFE:  Object to form.
11      Q.    (By Mr. Bartlett)  And your term was
12   these values are commonly referring to physical
13   quantities that you would find in any motion based
14   physical robotic or robotic system do you recall
15   that testimony?
16            MR. JAFFE:  Object to form.  Also
17   leading.
18            THE DEPONENT:  I do.
19      Q.    (By Mr. Bartlett)  Can you explain that
20   testimony?
21            MR. JAFFE:  Same objections.
22            THE DEPONENT:  Yeah, I was -- I was
23   simply saying that quantities that describe (
24   (                                                    )
25   (                              ) those are general
```

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

1  physical quantities that describe for trajectory
2  for any robotic system in -- in -- there's no other
3  way to ████████████████████████████████████
4  ████████
5       Q.   (By Mr. Bartlett)  How do you know that?
6            MR. JAFFE:  Object to form.
7            THE DEPONENT:  I worked on many robotic
8  systems in the past.
9       Q.   (By Mr. Bartlett)  Just for example?
10      A.   At the University of the Florida I was
11 the lead software engineer on -- -- and --
12 autonomous sub marine competition team where I
13 wrote most of the software including the motion
14 planner and controller for that robotic.
15      Q.   Without going through all of them are
16 there other examples that you can name as well?
17      A.   There are.
18      Q.   You were asked about the ideas ████████
19 ████ earlier do you recall that testimony?
20      A.   Yes.
21      Q.   You testified that ████████████ were
22 basic physical quantities as any planner would
23 have, have I correctly restated your testimony?
24           MR. JAFFE:  Objection.  Leading.
25           THE DEPONENT:  I don't remember