QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>Plaintiff,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>Defendants. | CASE NO. 3:17-cv-00939<br><br>**PLAINTIFF WAYMO LLC'S's PRECIS IN SUPPORT OF REQUEST TO FILE MOTION IN LIMINE REGARDING THE STROZ FRIEDBERG DUE DILIGENCE INVESTIGATION**<br><br>Date: TBD<br>Time: TBD<br>Ctrm: 8, 19th Floor<br>Judge: Honorable William H. Alsup<br>Trial Date: December 4, 2017 |

As this Court is aware, Defendants contend the investigation by Stroz was somehow a prophylactic safeguard that ensured no Waymo trade secret information did not make its way to Uber. For example, Defendants have made statements to the Court such as "Stroz took all of Mr. Levandowski's devices, even devices that were very old, and put it all into a vault" and that "those devices were quarantined at Stroz for a year and a half." (Dkt. 1261 at 22:6-8; Dkt. 1623-4 at 2.) Yet, as it has with many issues in this case, Defendants continue to cloak the Stroz investigation with claims of privilege that prevent Waymo from discovery into the very process Uber trumpets in purported defense of Waymo's misappropriation claims. By this precis, pursuant to the Court's Order After Hearing on Motion to Continue Trial Date (Dkt. 1954), Waymo seeks leave to bring a formal motion *in limine* to preclude Defendants from characterizing or referring to the Stroz due diligence investigation as a means for insulating Defendants from liability against Waymo's trade secret misappropriation claims, because allowing them to make that argument would sanction use of the attorney-client, work product, and common interest privileges as both a sword and a shield. Defendants should also be precluded from asserting any evidence or argument related to the Stroz evidence "vault" for the additional reason that it would be misleading to the jury and unduly prejudicial given that storage of Waymo's confidential and trade secret information was incomplete, and far from the purported "quarantine" that Defendants have claimed existed.

**I. DEFENDANTS SHOULD BE PRECLUDED FROM RELYING ON THE STROZ INVESTIGATION AS A DEFENSIVE MEASURE WHILE SHIELDING THE INVESTIGATION FROM DISCOVERY THROUGH CLAIMS OF PRIVILEGE.**

Since the Federal Circuit affirmed that the Stroz Report and related materials were not privileged and should be produced, Defendants have resorted to a fallback position based on this Court's prior rulings that post-April 11 documents, communications, and information shared between the common interest group (Uber, Ottomotto, Otto Trucking, Levandowski and Ron) remain privileged. (*See* Dkt. 731, 949.) Waymo's access to documents, testimony and correspondence related to the Stroz due diligence process has therefore been limited to the period pre-dating April 11. This has been so even though Stroz continued on with its due diligence investigation for nearly four months before issuing the final Report on August 5, 2016. Despite Defendants' refusal to provide Waymo access to information that covers an overwhelming

majority of the Stroz due diligence investigation timeline (between April 11 and August 5), Defendants rely on the very same investigation in their defense against Waymo's trade secret misappropriation claims, including the supposed "vaulting" that occurred before the August 5 final report. This is improper, and the Court has broad discretion to preclude this evidence or testimony because the privilege assertions are being used as "both [] a sword and a shield." *Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001) (affirming district court's *in limine* ruling prohibiting defendant from using attorney-client communications as both a sword and a shield); *Galaxy Comp. Serv'cs, Inc. v. Baker*, 325 B.R. 544, 559 (E.D.Va. 2005) (granting motion *in limine* to prevent witness from testifying about issues she refused to answer during her deposition on attorney-client privilege grounds); *Engineered Prods. Co. v. Donaldson Co., Inc.,* 313 F.Supp. 2d 951, 1022–23 (N.D. Iowa 2004) (barring plaintiff from introducing testimony at trial on issues it prevented defendant from exploring during deposition by invoking the attorney-client privilege).

For example, following production of the Stroz Report, Defendants served amended privilege logs containing thousands of entries post-dating April 11 that remained withheld as privileged. (*See e.g.* Dkt. 1994-9.) In addition, trial witnesses who Defendants identified as providing testimony regarding the Stroz due diligence investigation, including Eric Tate, Eric Friedberg, John Gardner, Angela Padilla, and Justin Suhr, were instructed not to answer questions about information provided by Stroz, or communications with Stroz, after April 11. (*E.g.* Oct. 13, 2017 Deposition of Justin Suhr at 24:8-25: "Q. Is there anything else you can tell me about those communications with Stroz that is not, in your view, covered by the attorney-client privilege? MR. GONZALEZ: Or that they would be a joint interest privilege, and I would instruct not to answer if they occurred in the summer. If you had any conversations with them before April 11th, you can tell her that. THE WITNESS: I don't believe I had conversations prior to April 11th directly with Stroz Friedberg. Q. And you'll follow your counsel's instruction not to answer questions regarding the communications you had with Stroz in the summer of 2016? A. Yes."; Sept. 29, 2017 Deposition of John Gardner at 157:20-158:6: Instructed not to answer whether Stroz put documents in a proposed disclosure folder after April 11; Sept. 29, 2017 Deposition of

Eric Tate at 16:9-17:19, 115:11-17: establishing privilege ground rules regarding April 11 cutoff and setting out position that communications with Stroz after April 11 are privileged.) When permitted to testify, witnesses were repeatedly instructed to cabin their answers to pre-April 11 knowledge and information when Waymo asked questions concerning the Stroz investigation.

The privilege cutoff shields a significant portion of the Stroz due diligence investigation from discovery. Stroz was not retained until March 4 and did not begin collecting devices for forensic analysis until March 22. Uber's counsel, Eric Tate, testified that the Stroz forensic review process was then delayed due to scheduling issues and the existence of more devices than Stroz expected. (Sept. 29, 2017 Deposition of Eric Tate at 100:4-20.) In an exhibit to the Stroz Report, Stroz also explains how it was forced to "analyze[] and review[] a significant population of documents (millions) in a short period of time (approximately 3 weeks)" and "[d]uring the course of performing the final review *in late April, Stroz Friedberg was asked to cease all remaining document review*" and counsel decided to forgo "a number of outstanding checks and analyses that Stroz Friedberg suggested to help bolster the confidence in the thoroughness of the review." (Dkt. 1603-7.) Moreover, Stroz created detailed preliminary forensic reports in late July of the devices Levandowski and the other Diligenced Employees provided to Stroz. (*See, e.g.,* Dkt. 1603-6.) Thus, much, if not most, of Stroz's substantive forensic analysis work that was the focus of the due diligence investigation, and that now forms a central piece of Uber's defense strategy, *did not even begin until <u>after</u>* the April 11 privilege cutoff set by the Court and strictly adhered to by Defendants. In addition, documents that predate the privilege cutoff show infighting between the parties related to the involvement of Uber's counsel in the direction of the investigation. (Dkt. 1603-9 (Email from Levandowski's attorney noting the need for an independent, third party examination by Stroz and asserting that MoFo's direction of Stroz's work was inappropriate.) Waymo has no way to determine whether and to what extent these issues persisted throughout the remaining four months of the investigation, and what effect any continuation of these or other issues may have had on the final outcome of the Stroz investigation and their deliverables.

1     This is particularly prejudicial because Defendants have affirmatively asserted that "the
2 facts show that the due diligence worked," claiming that "the Stroz due diligence process itself
3 was carefully structured so that Uber did not receive any confidential or proprietary Google
4 information identified by Stroz," and making the Stroz due diligence investigation a central part of
5 their defense that no trade secret information "made its way to Uber or Ottomotto." (Dkt. 1623-4
6 at 1, 2, 3.)   Due to the privilege assertions over post-April 11 documents and testimony,
7 Defendants have precluded Waymo from taking discovery into the vast majority of the time that
8 the Stroz investigation occurred. This includes the underlying forensic work reflected in the Stroz
9 Report and its attached exhibits in that timeframe. This limits Waymo's ability to substantively
10 challenge Defendants' characterizations of the investigation because has Waymo no insight into
11 issues such as the aforementioned direction for Stroz to cease all remaining document review and
12 forgo a final confidence check for its review, or any other issues not explicitly referenced in the
13 produced materials but may have been revealed by the multitude of withheld documents that post-
14 date April 11. Defendants cannot have it both ways, relying on characterizations of the Stroz due
15 diligence investigation as a lynchpin to their defense against Waymo's trade secret
16 misappropriation claims while at the same time preventing discovery into a large portion of the
17 same investigation. For the foregoing reasons, this information should be excluded as an improper
18 use of privilege as both a sword and a shield.

**II.      THE COURT SHOULD EXCLUDE EVIDENCE OR ARGUMENT RELATED TO THE STROZ "EVIDENCE VAULT" FOR THE ADDITIONAL REASON THAT IT IS UNDULY PREJUDICIAL AND LIKELY TO LEAD TO JURY CONFUSION**

21     A subset of the Stroz due diligence investigation involves the alleged Stroz "vault" –
22 which Defendants have pointed to in asserting that "there was no way for [Levandowski] to access
23 any Google information on [his devices] for the remainder of his time at Otto or once he joined
24 Uber." (Dkt. 1623-4 at 4.) Defendants have also asserted that "Stroz took all of Mr.
25 Levandowski's devices, even devices that were very old, and put it all into a vault" and that "those
26 devices were quarantined at Stroz for a year and a half." (Dkt. 1261 at 22:6-8; Dkt. 1623-4 at 2.)
27     The references to a "vault" are at best misleading and at worst plainly incorrect. (Dkt.
28 1623-4 at 4.) For example, Stroz witnesses confirmed that access to the online, cloud-based

repositories – where Levandowski admitted he stored Waymo confidential information – was never cut off, leaving him with unfettered access to those sources throughout the Stroz investigation. (*See* Oct. 6, 2017 Deposition of Hanley Chew at 229:17-230:16; Oct. 20, 2017 Deposition of Melanie Maugeri at 178:12-180:12; *see also* Dkt. 1928-11 (listing of thousands of files in the "chauffeur" folder of Levandowski's Dropbox account covering confidential and proprietary information describing Waymo's LiDAR systems and numerous other aspects of its self-driving car technology.) Indeed, Melanie Maugeri, who led the forensic due diligence analysis at Stroz, acknowledged at her deposition that allowing such access was counter to her professional recommendation. (Oct. 20, 2017 Deposition of Melanie Maugeri at 180:14-19.) Ms. Maugeri also testified that Stroz had identified a Slack site used for team collaboration as a source of potentially relevant material that Stroz "would have been interested in reviewing" if access was provided, but no such access was ever granted. (*Id.* at 36:5-39:15.) Finally, not all of Levandowski's devices remained in the "vault," as Defendants have previously acknowledged, Stroz returned Levandowsi's iPhone. (Dkt. 1623-4 at 4; *see also* Dkt. 1603-6 at 2.) Thus, the Stroz Report simply does not state that the possible sources of access to Waymo's trade secrets were all held in a "vault" or somehow otherwise quarantined.

Under FRE 403, evidence should be excluded if its probative value is substantially outweighed by a danger of "confusing the issues," "misleading the jury" or "wasting time," which is the case here. If Defendants' argument and evidence concerning the supposed "vaulting" is admitted, the jury could be left with the misimpression that Stroz prevented access to any and all sources of Waymo confidential and trade secret information. Waymo would then have to spend time at trial laying out each fact above in detail in order to explain why this is not true. Thus, any argument or evidence concerning the Stroz "vault" should be excluded for the additional grounds that references to the Stroz "vault" lack any probative value but create significant potential for prejudice to Waymo caused by confusing the issues and misleading the jury.

DATED: October 23, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By */s/ David A. Perlson*
David A. Perlson
Attorneys for WAYMO LLC