QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David A. Perlson (Bar No. 209502)
  davidperlson@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  John Neukom (Bar No. 275887)
  johnneukom@quinnemanuel.com
  Jordan Jaffe (Bar No. 254886)
  jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>       Plaintiff,<br><br>   vs.<br><br>UBER TECHNOLOGIES, INC.;<br>OTTOMOTTO LLC; OTTO TRUCKING<br>LLC,<br><br>       Defendants. | CASE NO. 3:17-cv-00939<br><br>**PLAINTIFF WAYMO LLC'S SECOND SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT OF THE PRELIMINARY INJUNCTION ORDER (Dkt. 426) AND EXPEDITED DISCOVERY ORDER (Dkt. 61)**<br><br>**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL** |

# TABLE OF CONTENTS

Page

I.      DEFENDANTS HAVE REPEATEDLY VIOLATED ORDERS AND MISLED
        THE COURT REGARDING LEVANDOWSKI'S PERSONAL LAPTOPS ........................2

II.     DEFENDANTS HAVE REPEATEDLY VIOLATED COURT ORDERS AND
        MISLED THE COURT REGARDING THE STROZ MATERIALS ................................14

III.    DEFENDANTS SHOULD BE SANCTIONED WITH AN ADVERSE
        INFERENCE ...................................................................................................................21

Waymo brings this supplemental brief to notify the Court of additional violations of the Court's March 16 Expedited Discovery Order and May 11 Preliminary Injunction Order that have come to light since September 13. In August, based on the then-current record, the Court recognized that Defendants had "misled the judge time and time again." (Dkt. 1261 at 28:5.) In the past few weeks, evidence has emerged that the full extent of Defendants' misrepresentations and defiance of Court Orders is broader than previously known.

First, Waymo has discovered that Defendants and their agents concealed from the Court their possession and control of two of Anthony Levandowski's personal laptops that Uber was aware Mr. Levandowski used for his work at Uber. Defendants specifically told the Court that they did not have access to any of Mr. Levandowski's personal devices. Yet, recently overruled privilege assertions, subsequent discovery by Waymo, and admissions from Defendants in response to a Waymo motion to compel have revealed that this was incorrect. Waymo now knows that Goodwin Procter ("Goodwin"), counsel for Otto Trucking (also counsel for Mr. Levandowski) had possession of these two laptops in April and/or May 2017 and, at **Uber's** request, Goodwin purportedly ran searches on these laptops. Goodwin then transmitted search results to Uber, who purportedly produced seven documents from these laptops to Waymo in June (without disclosing that they came from Mr. Levandowski's personal devices). Defendants' own expert then apparently relied on these searches in support of his opinions about whether there were Waymo documents at Uber. Defendants' access to these two Levandowski personal laptops was never disclosed to either the Court or to Waymo during the discovery period despite Court Orders and the fact that they go to central issues in the case: what Waymo trade secret documents Mr. Levandowski was using for Uber's benefit while running Uber's self-driving car program.

Second, production of the Stroz Report, its exhibits, and copies of the files obtained by Stroz from Mr. Levandowski's devices has proven that Defendants have been not been accurate in representing – both in open court and in sworn pleadings – what these materials reveal and what Defendants knew about the downloaded materials. As just one example, Defendants obscured the undisputed fact that Stroz had identified downloaded material on Mr. Levandowski's devices during

the diligence investigation, and that some of these files were actually exhibits to the Stroz Report that have been in the possession of Uber's outside counsel for over a year.

Waymo has been severely prejudiced by Defendants' reckless disregard for Court Orders. Accordingly, Waymo renews its request that the Court instruct the jury that the adverse inference that the Court has previously ruled may be drawn against Mr. Levandowski be extended to include Defendants.

## I.  DEFENDANTS HAVE REPEATEDLY VIOLATED ORDERS AND MISLED THE COURT REGARDING LEVANDOWSKI'S PERSONAL LAPTOPS

Since the outset of the case, Defendants have consistently represented that Mr. Levandowski was refusing to provide them with his personal devices in connection with any Court Orders or discovery requests, based on his assertion of the Fifth Amendment privilege.  Waymo has recently learned that these representations were incorrect.  In late April and early May – at the same time that Defendants were telling the Court that they were unable to access Mr. Levandowski's personal computers – Goodwin obtained two of Mr. Levandowski's personal laptops, ran searches on them at Uber's direction, and then provided some results of those searches to Uber.   In June, Uber produced seven documents with "Anthony Levandowski" identified as the custodian, but did not disclose at that time that they came from Mr. Levandowski's personal devices (which Defendants had previously represented they did not have and could not get), or how Uber got them.  In September, Uber's hired forensic expert at Stroz (Kevin Faulkner) included a reference to "███████████████" of two of Mr. Levandowski's laptops "███████████████████████" to support his opinion that he could not find any Waymo confidential files at Uber.  But he did not disclose the circumstances surrounding the searches, such as who performed them, when, or how they were transmitted to Uber's litigation expert.   Waymo only discovered the actual facts about the whereabouts, possession, and search of these two laptops after Judge Corley ordered Uber on September 11 to produce an email from Angela Padilla that Uber had been withholding on an improper privilege objection.  This in turn led to testimony at Ms. Padilla's October 2 deposition that "████████████" had conducted the searches at Uber's direction, and ultimately to declarations provided by counsel for Defendants less than a week ago.

**A.      Factual Background**

Waymo provides the following chronology surrounding these laptops and Defendants'
statements about Mr. Levandowski's personal devices for the benefit of the Court:

**March 16**: The Court issues its Expedited Discovery Order, requiring Defendants to "produce
for inspection all files and documents downloaded by Anthony Levandowski … before leaving
plaintiff's payroll and thereafter taken by [him]."  (Dkt. 61 at 2.)

**March 29**:   At this hearing, which Defendants requested to be closed to the public,
Defendants' counsel represented they did not have access to Mr. Levandowski's personal computers
because of his Fifth Amendment invocation:

> We're really here to talk about two things that are related.  One is, anything that
> Mr. Levandowski may or may not have on his own -- let's just assume
> hypothetically that he's got something at home -- **that is not something we have
> access to.  And I just want to be forthright and tell you that**.

(Dkt. 131 at 11:24-12:3 (emphasis added).)

**March 31**:  Uber makes its production in response to the Expedited Discovery Order, and
states in correspondence that "As I advised Judge Alsup, we have not reviewed any documents or files
that belong to Mr. Levandowski personally."  (Ex. 1 [3/31/2017 A. Gonzalez email].)

**April 5**:  Uber files a letter brief stating that the assertion that "Uber has control over personal
files that may belong to one of its employees, Mr. Levandowski" was based on a "faulty premise" and
was "incorrect."  (Dkt. 161 at 1.)

**April 20**: Uber's head of litigation, Angela Padilla, sends an email to Mr. Levandowski (cc-ing
Travis Kalanick), asking Mr. Levandowski to hand over to Uber two laptops "that you've used for
Uber work":

> I understand that there are two laptop computers in your possession that you've used
> for Uber work that have not yet been provided to us for inspection in the Waymo
> litigation. ███████████████████████████████████████
> ████████████████████████████████

(Ex. 2 [4/20/2017 email from A. Padilla].)  Uber initially withholds this document from production
based on an assertion of attorney-client privilege (*see*, *e.g.*, Dkt. 519-2), until later being ordered to
produce it on September 11.  (Dkt. 1506 at 2.)

**April 20-22**: Sometime after Ms. Padilla sent her email, but before April 22, Neel Chatterjee, of Goodwin, tells Arturo Gonzalez, of MoFo, "that Mr. Levandowski would not turn over the personal computers for searching due to his invocation of the Fifth Amendment." (Dkt. 2018-3 [10/17/2017 A. Gonzalez Declaration] at 1.)

**April 21**: Mr. Chatterjee files a Notice of Appearance on behalf of Anthony Levandowski. (Dkt. 251.)

**April 22**: Mr. Gonzalez asks Mr. Chatterjee "to agree to run search terms on the personal computers and to provide the results." (Dkt. 2018-3 [10/17/2017 A. Gonzalez Declaration] at 1.)

**April 22-May 17**: Sometime between April 22 (when counsel for Uber made the request), and May 17 (when Goodwin transmitted search results to Uber), MoFo provides Goodwin with search terms (including those that Waymo had designated AEO under the Protective Order) for the 14,000 downloaded SVN files, and Goodwin then obtains from Mr. Levandowski the two personal laptops and runs searches on them:

> Morrison & Foerster provided Goodwin Procter with the 14,000-plus filenames referenced in Waymo's preliminary injunction papers, the hash values for those 14,000-plus files, and Uber's and Waymo's search terms for those files for the searches. Mr. Chatterjee did not provide me or anyone else at Morrison & Foerster with the details of the searching that was conducted on Mr. Levandowski's personal computers, including who ran the searches, what searches were actually run, or how the searching was done.

(Dkt. 2018-3 [10/17/2017 A. Gonzalez Declaration] at 1; *see also* Dkt. 2019-1 [10/17/2017 R. Walsh Declaration] at 1-2 ("At Uber's request, Mr. Levandowski provided the two computers to Goodwin for Goodwin to run searches provided by Uber. Goodwin ran those searches and provided the results to Uber.").)

**April 24**: Mr. Chatterjee files a Notice of Appearance on behalf of Defendant Otto Trucking. (Dkt. 257.) The signature block also identifies Mr. Chatterjee as counsel for Mr. Levandowski. (*Id.*)

**April 24**: Mr. Chatterjee files a Notice of Change in Counsel, withdrawing as counsel for Anthony Levandowski. (Dkt. 261.)

**April 24**: MoFo withdraws as counsel for Otto Trucking. (Dkt. 262.)

**May 3**:  The Court conducts a hearing on Waymo's Motion for a Preliminary Injunction.
Counsel for Uber represents that Mr. Levandowski has "a personal device" (i.e., one, not two), and
that his personal counsel are refusing to provide that computer to Uber based on an assertion of the
Fifth Amendment privilege:

> THE COURT: Well, the best thing to do would be to look at his actual laptop
> and get one of those computer scientists to run it and see when it was
> accessed, what files were accessed.  But you won't turn that over.  You all –
> the lawyers are saying Fifth Amendment.
> MR. GONZALEZ: So, your Honor, to be clear, just to be clear and to be fair.
> He does have an Uber-issued laptop that we have forensically examined,
> analyzed and produced anything responsive from.  To be clear on that point.
> We've also analyzed all of his emails and all of his Google Drive documents
> at Uber.  I've made that clear.  **You are correct that he does have a
> personal device that his lawyers have instructed him to assert the Fifth
> Amendment on.  That is true.**
> THE COURT: All right. So that's the point.  That would be the best way to
> figure it out, but the Fifth Amendment is blocking that.
> MR. GONZALEZ: Yeah.  The Fifth Amendment isn't blocking the analysis
> of his Uber work computer, your Honor.  **But you're right, it is with respect
> to his private computer.**

(Dkt. 502 [5/3/2017 Public Session Hearing Tr.] at 77:16-78:14 (emphases added).)

**May 11:**  The Court issues its Order granting in part and denying in part Waymo's Motion for
a Preliminary Injunction.  Among other things, the Court notes that "Waymo asks the Court to infer,
based on Levandowski's assertion of his Fifth Amendment privilege and defendants' withholding of
discovery, that ... (ii) Levandowski has brought copies of Waymo's files to Uber on his personal
laptops and electronic devices (**which Uber has admittedly never searched**)[.]"  (Dkt. 426 at 8
(emphasis added).)

**May 15:**  Salle Yoo, Uber's General Counsel, sends a letter to Mr. Levandowski (care of Miles
Ehrlich, Mr. Levandowski's criminal counsel), cc-ing Mr. Kalanick, regarding compliance with the
Court's PI Order.   (Dkt. 466-2 [5/15/2017 S. Yoo letter].)   Although the letter directs Mr.
Levandowski that he will no longer be permitted to use personal devices in his work for Uber and to
turn over all such devices to Uber, it makes no mention of the two personal laptops referenced in Ms.
Padilla's April 20 email, or any arrangement between Uber and Goodwin to run searches on those
laptops at Uber's direction.  (*Id.*)

**May 17:** "Goodwin Procter transmit[s] the results of the searches of Mr. Levandowski's computers to Morrison & Foerster." (Dkt. 2018-3 [10/17/2017 A. Gonzalez Declaration] at 1.)

**May 18:** Counsel for Uber contacts Mr. Ehrlich "to request a search of Anthony Levandowski's personal emails and devices, including text messages from his personal phone." (Dkt. 762 at 4.) Uber discloses this communication on its First Supplemental Paragraph 4 Accounting.

**May 18-June 22.** Between May 18 and June 22, counsel for Uber and Mr. Levandowski's criminal counsel confer regarding search terms to run on Mr. Levandowski's personal devices. (Dkt. 762 at 4-5.) On June 22, Amy Craig (of Mr. Levandowski's criminal counsel) informs counsel for Uber that they will not be providing personal devices or search results. (*Id.*) These communications are also disclosed on Uber's First Supplemental Paragraph 4 Accounting.

**May 26:** Ms. Yoo sends a letter to Mr. Levandowski (care of Mr. Ehrlich), cc-ing Mr. Kalanick, notifying Mr. Levandowski that his employment at Uber is terminated. (Dkt. 519-2 [5/26/2017 S. Yoo letter].) The letter cites Mr. Levandowski's purported refusal to comply with the directives in Ms. Padilla's April 20 email as grounds for termination:

> Second, you did not comply with the prior written directive to cooperate with Uber's investigation sent to you on April 20, 2017, by Angela Padilla (the contents of which are privileged). Your failure impeded Uber's internal investigation and defense of the lawsuit referenced above and constitutes a ground for termination for Cause.

(*Id.* at 1.) Uber does not assert any privilege over this letter.

**May 30:** Mr. Chatterjee, on behalf of Otto Trucking, sends a letter to Mr. Levandowski (care of Mr. Ehrlich), regarding compliance with the Court's PI Order. (Dkt. 717-1 at 5-7.) Otto Trucking discloses this letter in its initial Paragraph 4 Accounting. The letter instructs Mr. Levandowski "to return any and all downloaded materials and any copies and excerpts of the same to our outside counsel at Goodwin Procter LLP, if such materials exist," but does not reference the two laptops that Goodwin possessed and searched for Uber earlier in May. (*Id.*)

**June 19:** Uber produces seven documents in production UBER_057, which identify Mr. Levandowski as the custodian. (Ex. 3 [6/19/2017 E. Villegas email].) There is no cover letter with this production or indication that these documents came from any of Mr. Levandowski's personal devices. On October 17, Uber provides a declaration that states: "On or about June 19, 2017, Uber

produced to Waymo responsive documents from the search results provided to us by Goodwin Procter." (Dkt. 2020 [10/17/2017 S. Rivera Declaration] at 1-2.)  Although Uber does not identify Production UBER_057 specifically, that appears to be the production that Uber is referring to in the October 17 declaration.

**June 23:**  Uber submits its initial Paragraph 4 Accounting.  (Dkt. 715.)  This Accounting makes no mention of Levandowski's two personal laptops or of Uber's interactions with Goodwin regarding obtaining those laptops or searching them for downloaded materials.  (*Id.*)

**June 23:**  Otto Trucking submits its initial Paragraph 4 Accounting.  (Dkt. 717.)  This Accounting makes no mention of Levandowski's two personal laptops, of Goodwin's possession of them, or of any searches made on them to identify downloaded materials.  (*Id.*)

**July 26:**  The Court conducts a hearing regarding adverse inferences arising from Mr. Levandowski's invocation of the Fifth Amendment.  The Court asks Mr. Chatterjee whether he has personally looked at Mr. Levandowski's personal computer.  Mr. Chatterjee does not disclose that Goodwin had had possession of two of Mr. Levandowski's personal laptops and had conducted searches on them at Uber's direction:

> [MR. CHATTERJEE:]  The second issue is, is there has always been this inference in the case that Mr. Levandowski, when he used authorized Google computers to access an authorized system in this downloading issue, that it was then transferred to a personal device.  That has been an issue in this case, and it has been something that, as I heard things, people accept as true.  I'll suggest to Your Honor that when we – if we litigate that issue, I have not yet seen any corroborating evidence that that actually occurred, and I've been digging deeply into this.
> THE COURT: Maybe they have not shown it to you.  **Have you personally look at his personal computer?**
> MR. CHATTERJEE: Excellent question, Your Honor.  We've asked for a forensic image, and they've refused to give it.
> THE COURT: Well, maybe that's the proof in the pudding right there.
> MS. DUNN: Your Honor –
> THE COURT: No, I'm talking about his personal – **I'm talking about Levandowski's own personal computer**.  There's no way that Waymo would have that.
> MR. CHATTERJEE: Oh, **there's the Fifth Amendment issue on that, Your Honor**.
> THE COURT: That's the point.

(Dkt. 1050 at 95:20-96:18.)

At that same hearing, the Court holds argument on Waymo's MIL No. 4, regarding evidence and argument about efforts taken in response to the Court's PI Order.  The Court indicates that evidence of inspections and searches of Uber's servers would not be prejudicial to Waymo because no searches had been done on Mr. Levandowski's personal computer:

> What's wrong -- I'm sympathetic to the idea that the Stroz guy gets to come in here and say exactly that, and then you get to cross-examine.  And you would say, ***well, isn't it true, did you search Mr. Levandowski's computer, personal computer? The answer will be "no;" right?***  And then within reason you could say*: Well, isn't that where the documents would likely be? And then the guy will shrug his shoulders and he'll be a hired gun, bought-and-paid-for expert. You could just beat him up all day long. Why wouldn't that be good for you?*

(*Id.* at 64:21-65:4.)  Neither Mr. Chatterjee nor counsel for Uber correct the record to inform the Court that searches had been done on two of Mr. Levandowski's personal laptops.

**August 13:**  Uber submits its Third Supplemental Paragraph 4 Accounting (its most recent). (Dkt. 1170.)  This Accounting makes no mention of the two laptops or of Uber's interactions with Goodwin regarding obtaining those laptops or searching them for downloaded materials.  (*Id.*)

**August 31:**  Waymo moves to compel production of the April 20 email from Ms. Padilla. (Dkt. 1439.)

**September 7:**  Uber's hired forensic expert at Stroz submits his report regarding ███████████ ████████████████████████████████████████████████████ (Dkt. 2017-5 [9/7/2017 Expert Report of Kevin Faulkner] at 1.)  The report refers to ██████████ ████████████████████████████████████████████████████████████████ ██████████ (*id.* at 13), which Waymo now understands to refer to the two personal laptops searched by Goodwin.  The body of the report provides no other substantive information about these laptops.  Exhibit 2 to Mr. Faulkner's report is a ██████████████████████████ ███████████████████████████████████████ (*Id.* at Exhibit 2.)  ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████ (*Id.*)

**September 11:**  Judge Corley orders Uber to produce the "April 20 written directive from Uber in-house counsel Angela Padilla to Mr. Levandowski."  (Dkt. 1506 at 2.)

**September 21:**  Uber produces the April 20 email from Ms. Padilla.

**October 2:**  Waymo deposes Ms. Padilla.  She testifies that "a trusted third person" – i.e., "another law firm" – searched the laptops for "responsive" information:

> Q Okay. He -- he -- you do remember that Mr. Levandowski at least did cooperate to some extent in turning over devices; is that fair?
> A I don't know if "cooperate" is the right word.  He certainly gave us some devices to search.
> Q Some of his devices?
> A Yes.
> Q Did you ever get the two laptop computers that are referred to in your April 20, 2017 e-mail?
> A I am not sure that we got them, but I believe they were searched by another law firm.
> Q Okay. Do you know what law firm that was?
> A I don't.
> Q Was it Mr. Levandowski's counsel?
> A It could have been Miles and Izzy.  It could have been Ne[e]l. I don't know. Okay. And how -- and why do you -- what's the basis of you thinking that they were eventually searched by somebody?
> A Because this was megillah. Do you know what a megillah is? It's Yiddish for long story.  This megillah went on for a long time, because I was not going to let go of these two computers.  And I insisted that we get information off of them, and they were insisting they weren't going to give us the computers.  And so I believe that finally some kind of a comprise was reached after a back and forth and back and forth that some trusted third person would review the document -- the computers.  And if anything responsive in this litigation was found on them, that would be provided.

(Dkt. 1994-6 [10/2/2017 A. Padilla Deposition Tr.] at 63:10-64:16.)

**October 12:**  Waymo moves to compel Mr. Levandowski's two personal laptops, or, in the alternative, Rule 30(b)(6) testimony about the laptops, including: "whether Defendants know the whereabouts of the Levandowski laptops; if they do, where the laptops are; who Goodwin Procter got the laptops from; who Goodwin Procter gave the laptops to; what the chain of custody of the laptops is; what search terms Goodwin Procter ran on the laptops as part of Mr. Levandowski's purported obligations as a former Uber employee; what the obligations under which Mr. Levandowski ran

searches on his laptops were; when Goodwin Procter ran those searches on the laptops as part of Mr. Levandowski's obligations as a former Uber employee; whether Uber directed the searches that Goodwin Procter ran on the laptops as part of Mr. Levandowski's obligations as a former employee; whether the searches conducted by Goodwin Procter were part of Uber's efforts to try to locate the 14,000 stolen SVN schematics; whether Goodwin Procter provided the results of the searches ran on the laptops as part of Mr. Levandowski's obligations as a former employee to Uber; whether Uber produced to Waymo in this litigation any of the results of the searches ran on the laptops as part of Mr. Levandowski's obligations as a former employee and, if so, which documents they are; whether Uber withheld any such documents and, if so, on what basis; and whether the laptops contain any downloaded materials responsive to any Court Order." (Dkt. 1994-4 at 2.)

**October 17:** Uber and Otto Trucking oppose Waymo's motion to compel. Uber provides a declaration from Mr. Gonzalez regarding his communications with Mr. Chatterjee about the two laptops, and Goodwin's possession and search of same. (Dkt. 2018-3 [10/17/2017 A. Gonzalez Declaration] at 1.) Otto Trucking provides a declaration from Rachel Walsh that states that "[a]t Uber's request, Mr. Levandowski provided the two computers to Goodwin for Goodwin to run searches provided by Uber. Goodwin ran those searches and provided the results to Uber." (Dkt. 2019-1 [10/17/2017 R. Walsh Declaration] at 1-2.) Mr. Chatterjee does not submit a declaration. None of Defendants' declarations identify when Goodwin obtained the laptops and what Goodwin did with them after it ran the searches requested by Uber.

### B. Defendants' Conduct With Respect to Mr. Levandowski's Personal Laptops Has Violated Numerous Court Orders

The two personal laptops – that Mr. Levandowski was using for Uber work while he was running Uber's self-driving car program – are a potential source of downloaded material and are therefore highly material to the Court's Expedited Discovery and Preliminary Injunction Orders. Ms. Padilla recognized this in her April 20, 2017 email directing Mr. Levandowski to hand them over to

1   Uber: ███████████████████████████████████ (Ex. 2

2   (emphasis in original).)  The Court's PI Order expressly required Defendants to "exercise the full

3   extent of their corporate, employment, contractual, and other authority to" a) prevent Mr.

4   Levandowski and "agents of defendants" from consulting, copying, or otherwise using the

5   downloaded materials; and b) cause them to return the downloaded materials and all copies, excerpts,

6   and summaries thereof to Waymo (or the Court).  (Dkt. 426 at 23 ¶ 2.)  The PI Order also required

7   Defendants to "conduct a thorough investigation and provide a detailed accounting under oath"

8   regarding the downloaded materials, including for Mr. Levandowski "**and his separate counsel**." (*Id.*

9   at 24 ¶ 4 (emphasis added).)  The accounting could only exclude, "for only the time period after the

10  commencement of the civil action, the attorneys of record and their staff and experts **employed for**

11  **this litigation**." (*Id.* (emphasis added).)  Finally, the PI Order required that "Defendants must also use

12  the full extent of their authority and influence to obtain cooperation with the foregoing procedure for

13  all involved.  For example, **if a potential custodian refuses to cooperate, then defendants'**

14  **accounting shall set forth the particulars, including all efforts made to obtain cooperation**." (*Id.*

15  (emphasis added).)  The 11th hour revelations regarding Defendants' and their agents' conduct

16  surrounding the two Levandowski personal laptops demonstrate that in addition to misleading the

17  Court, they have repeatedly violated these orders.

18         First, Defendants have not used the full extent of their authority to prevent Mr. Levandowski

19  from consulting, copying, or otherwise using any downloaded materials on the laptops.  (Dkt. 426 at

20  23 ¶ 2.)  Counsel for Otto Trucking had possession of the laptops (purportedly in their capacity as

21  counsel of Mr. Levandowski, as discussed further below).  But they purportedly then relinquished

22  custody of the laptops – presumably to Mr. Levandowski (or one of his agents).  And Uber had control

23  over these devices, at least sufficient to direct counsel for Otto Trucking to obtain them from Mr.

24  Levandowski and run searches on them.  But the searches that Defendants purportedly ran on these

laptops did not encompass all downloaded material.  Rather, they were limited to the "14,000-plus filenames referenced in Waymo's preliminary injunction papers" and related hash values and search terms.  (Dkt. 2018-3 at 1.)  And even for that subset of downloaded materials, if they were stored in certain types of encrypted, container-type files (such as sparse bundles, which the Stroz Report indicates Mr. Levandowski employed) then filename or hash value searches would not detect the files.  (*See*, *e.g.*, Expert Report of Andy Crain, ¶¶ 23, 40.)  Defendants therefore did not use the full extent of their authority to determine whether these contained downloaded materials before (apparently) returning them to Mr. Levandowski (or one of his agents).

Second, Defendants have not used the full extent of their authority to cause Mr. Levandowski and his agents to return any downloaded materials on the two laptops to Waymo or the Court.  (Dkt. 426 at 23 ¶ 2.)  Defendants and their agents have failed to conduct complete searches of these laptops for downloaded materials (or, in the alternative, provide them to Waymo), and therefore are not in compliance with the Court's Order requiring the exercise of all of their authority to return all downloaded materials to Waymo, as well as all copies, excerpts, and summaries thereof.

Third, to the extent Defendants claim that their efforts to investigate downloaded materials on the laptops were obstructed by non-cooperation from Mr. Levandowski or any of his agents (such as Mr. Levandowski's personal counsel), then Defendants' Paragraph 4 Accountings are substantially non-compliant with the PI Order's explicit requirements.  The PI Order explicitly provides that "Defendants' accounting shall not be limited to Uber but shall include all persons who fit the foregoing description, including Levandowski and his separate counsel."  (Dkt. 426 at 24 ¶ 4.)  The **only** persons who may be excluded from the accounting are "attorneys of record and their staff and experts employed for this litigation."  (*Id.*)  Uber's Accountings identifies efforts to obtain devices from Mr. Levandowski's criminal attorneys at Ramsey & Ehrlich, but do not refer to any efforts to obtain the laptops from Goodwin in their capacity as Mr. Levandowski's personal counsel, or non-

cooperation from Goodwin regarding requests to obtain the laptops. (*See*, *e.g.*, Dkt. 1170 at 1 and 4-5.) Similarly, Otto Trucking's Accountings identify a letter sent to Mr. Levandowski on May 30 (care of Mr. Ehrlich), but do not mention Goodwin's possession of the laptops, or any efforts to obtain Goodwin's cooperation in obtaining the laptops.

Defendants' only possible justification for excluding Goodwin from the Paragraph 4 Accountings would be if Goodwin obtained Mr. Levandowski's laptops in their capacity as counsel of record for Otto Trucking in this litigation. In that case, however, Otto Trucking is in willful violation of the Court's Orders by failing to produce the laptops. On the other hand, if – as suggested by the Declarations of Rachel Walsh and Arturo Gonzalez – Goodwin obtained the laptops solely in their capacity as counsel for Mr. Levandowski, then both Defendants are in willful violation of the Court's Orders for failing to exercise all efforts to obtain cooperation from Goodwin in recovering the laptops (and for failing to "set forth the particulars" of those efforts in their Paragraph 4 Accountings).[1] Indeed, both Defendants would be under an obligation to use all efforts to prevent Goodwin (as Mr. Levandowski's alleged "separate counsel") from accessing the laptops or any downloaded material on them.

Moreover, if Goodwin obtained the laptops in its capacity as counsel for Mr. Levandowski in the arbitrations, then Uber would presumably have a contractual right to demand them. Indeed, on meet and confers in advance of Waymo's motion to compel, counsel for Defendants indicated that the

---

[1]   In addition, MoFo would likely have violated the Protective Order by sending Goodwin "the 14,000-plus filenames referenced in Waymo's preliminary injunction papers, the hash values for those 14,000-plus files, and Uber's and Waymo's search terms for those files for the searches." (Dkt. 2018-3 [10/17/2017 A. Gonzalez Declaration] at 1.) Waymo designated those file names and search terms, which reveal highly confidential Waymo trade secret information, "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" under the Protective Order. (*See*, *e.g.*, Dkt. 2019-3 at Ex. 9.) Under the Protective Order, materials with that designation may be only be disclosed to Outside Counsel of Record and "only for prosecuting, defending, or attempting to settle this litigation." *See* Patent Local Rule 2-2 Interim Model Protective Order at Section 7.1 and 7.3.

searches were run on the laptops pursuant to "contractual obligations" Mr. Levandowski owed to Uber.  (*See*, *e.g.*, Dkt. 1994-4 at 2 n.1.)  ████████████████████████████████████

████████████████████████████████████████

████     (*See* Ex. 4 [UBER00098457].)   Under the Indemnification Agreement, Uber has the contractual right to ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████   (Ex. 5 [UBER00098492] at Section 2.2(c); *see also* Ex. 6 [UBER00098538] at 2.)  Uber's failure to attempt to enforce that provision by demanding the laptops (which would presumably be relevant to the arbitrations) from Goodwin would be a further violation of the PI Order.

Finally, Defendants failed to disclose these two laptops on their Paragraph 4 accountings at all. Uber's Accounting has a section entitled "Other Potentially Downloaded Materials," but these laptops – which Defendants knew about, knew could contain potentially downloaded materials, and knew they had not searched for all such materials – are not identified, either in that section or anywhere else in any of the Accountings. (Dkt. 1170 at 10.)  This lack of candor is itself a violation of the Court's PI Order.

## II.  DEFENDANTS HAVE REPEATEDLY VIOLATED COURT ORDERS AND MISLED THE COURT REGARDING THE STROZ MATERIALS

Defendants have failed to follow multiple Court orders to disclose and accurately account for the materials Mr. Levandowski downloaded from Waymo.  Below are representative examples of this ongoing pattern of non-compliance and misrepresentation.

**Downloaded Materials in the Stroz Report and Materials.**   Uber has repeatedly misrepresented the contents of the Stroz Report, its Exhibits, and the Waymo files extracted by Stroz from Mr. Levandowski's personal devices and accounts.  The Court's PI Order clearly defined "Downloaded Materials" as "any and all materials that Anthony Levandowski downloaded from

Waymo and kept upon leaving Waymo's employment, regardless of how long he kept them for and whether or not any such materials qualify as trade secrets or proprietary or confidential information." (Dkt. 426 at 22.)  That Order required Defendants to "conduct a thorough investigation and provide a detailed accounting under oath setting forth every person who has seen or heard any part of any downloaded materials, what they saw or heard, when they saw or heard it, and for what purpose." (*Id.* at 24).  The Stroz Report unequivocally identified Downloaded Materials on Mr. Levandowski's personal devices.  For example, the section entitled "Documents Identified During Stroz Friedberg's Review: Google Data or Information," listed among the documents recovered from Mr. Levandowski's devices and web-based repositories:

- "Technical drawings and diagrams, such as a figure depicting radar technology, simulations, LIDAR-related diagram, and Google Confidential PBR 0.7 optical cavity drawing (Exhibit 33)";
- "Keynote files showing Google car road test (Exhibit 36)";
- "Source code 'snippets' (Exhibit 37)";
- "Chauffeur group e-mail including, the Chauffeur-laser group e-mail discussing testing lasers and Chauffeur-all group e-mail discussing additions to 2081 (Exhibit 41 )"; and
- "Presentations and PDF files, including information marked 'Google Confidential and Proprietary' titled GBr Assembly Flowchart SOP (Exhibit 42), Chauffeur-LIDAR Simulations (Exhibit 43), 'Confidential-do not share' files related to Chauffeur's business plan and 2014 funding ask (Exhibit 44), and a draft PBR v7 Laser Classification Memo (Exhibit 45)".

(Dkt. 1928-24 [Stroz Report] at 14.)  The Stroz Report also states that Mr. Levandowksi accessed a file named "Chauffeur TL weekly updates – Q4 2015" a month after his departure from Google, when he working full time developing LiDAR for Defendant Ottomotto.  (*Id.* at 12).  Two of these Downloaded Materials – "GBr Assembly Flowchart SOP" and "Chauffeur TL weekly updates – Q4 2015", both of which are Exhibits to the Stroz Report (Exhibits 43 and 27) – were specifically identified by Waymo as stolen trade secret documents in its Preliminary Injunction papers and trade secret list.  (*See* Dkt. 25-7 [Plaintiff's List of Asserted Trade Secrets] at 42-43 ("GBr Assembly Flowchart Standard Operating Procedure presentation (Ex. 12)") and 48-49 ("Chauffeur Weekly Update for Q4 2015 document (Ex. 14)"); *see also* Dkt. 25-18 [GBr Assembly Flowchart SOP]; Dkt.

25-20 [Chauffeur TL weekly updates – Q4 2015])[2].  Defendants' employees and officers (including

Angela Padilla, Justin Suhr, Adam Bentley, and Lior Ron) received the Stroz Report in August 2016.

Uber's outside counsel at MoFo received all of the exhibits at that same time.  There is no dispute that

Uber and its lawyers knew over a year ago of the existence of Downloaded Materials, and specifically

that Uber's lawyers at MoFo (and anyone else with copies of the Stroz Report exhibits) and its agents

at Stroz (and anyone else with copies of the Relativity database or images of Mr. Levandowski's

devices) had in their possession Downloaded Materials.

Nevertheless, Defendants' Accountings and pleadings before the Federal Circuit ruling

repeatedly did not reveal these basic facts.  Uber's Paragraph 4 Accounting, for example, does not

state that MoFo possessed and viewed Downloaded Materials contained in specific exhibits to the

Stroz Report; rather, the Accounting states that "[i]ndividuals at Morrison & Foerster viewed

**potentially** downloaded materials in connection with the firm's representation of Uber in its

acquisition of Ottomotto, as well as the firm's representation of Anthony Levandowski and Lior Ron

in the *Google Inc. v. Levandowski and Ron* arbitration."  (Dkt. 1170 at 3 (emphasis added).)  Counsel

for Uber also represented in open court that MoFo never had possession of any of the downloaded

documents:

> Your Honor, the notion that Morrison & Foerster has the stolen documents or ever
> had the stolen documents is completely baseless.

(Dkt. 1260 [8/16/2017 Hearing Tr.] at 28:8-10 ).  In pleadings, Uber challenged whether Mr.

Levandowski had even downloaded documents that were exhibits to the Stroz Report.  For example,

in opposing Waymo's Motion to Compel software modules in June, Uber wrote:

---

[2]  *See also* Dkt. 24-2 [3/9/2017 Declaration of Gary Brown] at 5 ("[T]he Google GAIA ID …
assigned to Anthony Levandowski – exported five documents from Google Drive to a personal device
(i.e., one that was not issued by Google) on January 4, 2016," including the file "GBr Assembly
Flowchart SOP"; "on January 11, 2016, the Google GAIA … assigned to Anthony Levandowski –
exported [Chauffeur TL weekly updates - Q4 2015] from Google Drive to a personal device.")

Waymo argues that these software modules are relevant to its trade secret claims because Anthony Levandowski **allegedly** downloaded a project spreadsheet, "Chauffeur TL weekly updates – Q4 2015.

(Dkt. 748-13 at 3 (emphasis added).)  At the time MoFo filed that brief, in June 2017, both MoFo and Uber knew this was not an "allegation," but rather a **fact** – the Stroz Report identified "Chauffeur TL weekly updates – Q4 2015" as a downloaded document discovered on Mr. Levandowski's personal laptop, and actually attached it as an exhibit to the Stroz Report (an exhibit that MoFo had in its possession).   Uber's lack of candor regarding undisputed facts about Downloaded Materials referenced in the Stroz Report and contained in its Exhibits in the possession of its attorneys was a tactical strategy seeking to take advantage of Uber's privilege assertions.   Even if these privilege claims were justified, that does not excuse representations made by counsel that are contradicted by the withheld discovery.

**Downloaded Materials Sent to John Gardner**.  As reflected in the Stroz Report, as well as through Waymo's subsequent review of the more than 1.4 million files contained in the Stroz Relativity Database – which extracted user generated data from Mr. Levandowski's personal devices – that Relativity Database contained copious amounts of Downloaded Materials.  Moreover, Uber and MoFo were well aware of this by no later than the date they received the Stroz Report in August 2016.  Nevertheless, on April 4, 2017 – **after** the filing of the Complaint, and **after** Uber was expressly informed that Waymo trade secrets were contained in two documents that Uber knew were exhibits to the Stroz Report (and which came from materials on the Stroz Relativity Database), Uber's agent Stroz sent a copy of the entire Relativity database to John Gardner, Mr. Levandowski's personal counsel. (Dkt. 1170 at 7 ("Two copies of the Relativity data were created: one was sent to John Gardner as counsel for Mr. Levandowski on April 4[.]").)  And there is no evidence that Defendants have ever taken any steps to recover the Stroz Relativity Database from Mr. Gardner, or prevent him from providing access to Waymo trade secret files contained therein to Mr. Levandowski.  Defendants

1    are well aware of the risk that Mr. Gardner will disclose Downloaded Material to Mr. Levandowski –

2    indeed, it is evident from Uber's Paragraph 4 Accounting that Mr. Levandowski received the Stroz

3    Report **from** Mr. Gardner.[3]

4         **The 14,000 Files.**  Before the production of the Stroz Report, Defendants repeatedly claimed

5    ignorance about the more than 14,000 documents Mr. Levandowski downloaded from Waymo's SVN

6    repository.  For example, at the May 3 hearing on Waymo's Motion for a Preliminary Injunction,

7    counsel for Uber stated:

8

9         All of the folks that they have deposed have been asked, I believe: do you know anything
         about the 14,000 files, or anything along those lines?  Either that, or we put it in their
10        declarations. **And there is no evidence that anybody at Uber knew anything about
         these 14,000 files before this lawsuit was filed**.
11

12   (Dkt. 503 [5/3/2017 Public Session Hearing Tr.] at 60:12-17.)   But the Stroz Report, which by

13   Defendants' own admission was given to half a dozen of their lawyers and employees in August 2016,

14   clearly identifies that Mr. Levandowski had downloaded more than 14,000 files – 24,000 in total –

15   from Waymo's SVN server:

16        [O]n December 14, 2015, approximately 24,000 files were located within the folder path
         "/Users/Anthony/Desktop/boards/chauffeur-svn/". These same system logs indicate that on
17        December 14, 2015, approximately 24,000 files were located within the folder path
         "/users/Anthony/.Trash/boards/chauffeur-svn/." A review of the names of the deleted files
18        indicates that they were source code and electronic design files relating to driverless cars.

19   (Dkt. 1928-24 [Stroz Report] at 12.)   Uber knew about these 24,000 files in the folder path

20   "Users/Anthony/Desktop/**boards**/**chauffeur-svn**/" on Mr. Levandowski's personal laptop over seven

21   months before this lawsuit was filed.  And any possible uncertainty about the provenance of these files

22   was obliterated by Waymo's Preliminary Injunction papers:

23        [T]he Levandowski work laptop ran a MoMA search for the strings "**chauffeur svn** login"
         and "**chauffeur svn eee setup**" on December 3, 2015. "**Chauffeur**" was the name of

24   _____

25   [3]  *See* Dkt. 1170 at 9 ("Anthony Levandowski. Defendants have not been able to determine when and
     from whom Mr. Levandowski received the report. Mr. Levandowski's personal attorney, John
26   Gardner, received the final due diligence report on or about August 6, 2016. While Defendants know
     that Mr. Levandowski has read the report, we do not know when he read or received any part of the
27   due diligence report or its exhibits, because neither Mr. Levandowski nor Mr. Gardner are cooperating
     with Defendants' investigation. Mr. Levandowski did not receive any part of the due diligence report
28   or its exhibits from Uber or its counsel.").

Google's self-driving car project, and "**SVN**" refers to a repository used by that project which contains Waymo's design files, schematics and other confidential information.

(Dkt. 24-2 [3/9/2017 Declaration of Gary Brown] at 4 ¶ 15 (emphases added).[4])

Defendants have also disputed that the download happened at all. For example, at the July 26 Hearing, counsel for Otto Trucking asserted that it was "not true" that any of the SVN files were removed from Mr. Levandowski's work laptop:

> THE COURT: Once again you're trying to put so many hoops and burdens on Waymo that they could never satisfy you. I don't know that that's right. It's illogical -- to me it's logical that he would have put it somewhere convenient. He downloaded 14,000 –
> MR. CHATTERJEE: Onto his work computer while he was an employee for things that he did at his job.
> THE COURT: No, he put it onto like a thumb drive.
> MR. CHATTERJEE: **That is not true, Your Honor**.
> THE COURT: It is true.
> MR. CHATTERJEE: **It is absolutely not**. If you look at Gary Brown's declaration, he talks about what that is. And in his deposition he said he didn't know whether something was transferred off or on.
> THE COURT: An inference would be that it went off to some storage device, that he could take with him. That's an inference, that is a reasonable inference.

(Dkt. 1050 [7/26/2017 Hearing Tr.] at 96:23-97:14.) Even as recently as September 20 – after the Stroz Report was produced, but before Waymo had received the native images of Mr. Levandowksi's devices, counsel for Uber made a similar argument on the record:

> THE COURT: So there's two. There's the innocent explanation that would be, like me, he hit the wrong button; suddenly he's downloading 14,000 files. Then maybe that's innocent. But then he transfers all of that to a portable disk and takes it with him. So that doesn't sound so innocent.
> MR. GONZÁLEZ: So, Your Honor, we -- we dispute that the evidence was that he took it with him. But our point is this.
> THE COURT: Wait. Wait. Wait. Do you dispute that he transferred it to another device?
> MR. GONZÁLEZ: Your Honor, we concede that there's evidence that he plugged in some device afterwards, and it was plugged in for eight hours. And I don't mean to

---

[4]   *See also* Dkt. 25-47 [3/9/2017 Declaration of Michael Janosko] at 6 ("Waymo uses Subversion (**SVN**)- a revision control system- to store its electrical design information. In particular, Waymo uses the Apache **SVN server** hosted out of Google Compute Engine to store all revisions of electronic design files. Those files represent complete designs - electrical schematics, **printed circuit board (PCB) layouts**, mechanical drawings, design rules, and component libraries. This server holds detailed technical information related to Waymo's LiDAR systems.") (emphases added).)

sound technical, but this is very important.  **There is no evidence that he actually downloaded anything onto that device.  It's very important.**

((Dkt. 1723 [9/20/2017 Hearing Tr.] at 9:13-10:3.)

Now that Waymo has finally had the opportunity to review the native images of Mr. Levandowski's devices from the Stroz materials, Waymo can shed additional light on what happened to these files after they were downloaded by Mr. Levandowski onto his Waymo computer on December 11, and after Mr. Levandowski attached the "thumb drive" to that computer for eight hours on December 14.  As set forth in the contemporaneously filed Expert Report of Andrew Crain, after Mr. Levandowski attached a card reader, likely containing a 64 GB memory card – *i.e.*, the "thumb drive" – to his work laptop for eight hours on December 14, he removed the memory card from the card reader and mounted the memory card onto his personal laptop.  (Expert Report of Andy Crain, ¶¶ 29-30.)  Five minutes after mounting the 64 GB drive, Mr. Levandowksi created a folder on his personal laptop entitled "boards."  (*Id.* at ¶ 33.)  He then copied the 14,000 files into this "boards" folder, after which he removed the 64 GB memory card from his personal computer.  (*Id.* at ¶¶ 33-36.)  Next, Mr. Levandowski created an encrypted file container called a "sparse bundle," into which he copied the 14,000 files.  (*Id.* at ¶¶ 37-39.)  He then securely deleted the "boards" folder from his personal laptop, but then copied one or more sparse bundles containing the 14,000 files to his "Drobo2" storage volume, and possibly to other devices.  (*Id.* at ¶¶ 39-51.)

**The Five Disks.**  Uber's most recent Paragraph Four Accounting lists the five Drobo disks that Mr. Levandowski disclosed to Uber in March 2016 in a section entitled, "Other Potentially Downloaded Materials," and states that Defendants "do not know whether those disks did in fact contain downloaded material." (Dkt. 1170 at 10)  Yet, the Stroz Report informed Uber in August of last year that "Levandowski stated that he discovered that he possessed **Google proprietary information** on five disks in his personal Drobo 5D" which "included **source code, design files, laser files, engineering documents, and software** related to Google self-driving cars." (Dkt. 1928-24 [Stroz Report] at 10 (emphases added).)  Uber's attorneys, including Eric Tate, were aware as early as March 2016 that the five disks ████████████████████████

███████████████████████████████████████████." (Ex. 7 [UBER00324103] (3/23/2016 E. Tate email).).)  Defendants should have disclosed this in their Paragraph 4 Accountings, rather than suggest that the five disks were "potentially downloaded material" that "may have contained downloaded material."

### III.  DEFENDANTS SHOULD BE SANCTIONED WITH AN ADVERSE INFERENCE

In additional to concealing evidence behind meritless privilege claims, Defendants have utilized those privilege assertions to misrepresent the factual record and mislead both Waymo and the Court.  Many of these violations of Court Orders and misrepresentations would remain cloaked to this day had the Federal Circuit not affirmed the Court's rulings regarding the Stroz Report and related materials.  Defendants' abuse of privilege assertions has been particularly prejudicial with respect to the two Levandowski laptops.  Defendants have been provided access to them by Mr. Levandowksi during the course of this litigation, but have used Mr. Levandowski's purported non-compliance with their discovery efforts to justify why his assertion of the Fifth Amendment privilege should not result in an adverse inference against them.  For example, Uber's Brief Regarding Levandowski's Adverse Inferences cites "Uber's decision to terminate Levandowski's employment for failure to cooperate and testify," and specifically the May 26 letter from Salle Yoo regarding that purported non-compliance, as weighing "against drawing any adverse inference against Uber" – but makes no mention of Defendants' access to Mr. Levandowski's two personal laptops.  (Dkt. 821 at 1 and 5.)   Waymo therefore renews its request for the sanction that the adverse inference against Mr. Levandowski should also apply to Defendants. Waymo has already provided sufficient evidence to support an adverse inference against Defendants, and would be happy to supplement that briefing if requested. (Dkt. 818-4 and Dkt. 896-4.)  Given Defendants' continuing pattern of misconduct, and the full scope of Defendants' misconduct in this case, an additional adverse inference sanction is not only appropriate, but necessary in these circumstances.[5]

---

[5]  Should the Court decline to grant the adverse inference against Defendants, Waymo requests that Waymo be permitted to propose a further jury instruction that encompasses these additional instances of misconduct.

1   DATED:  October 23, 2017             QUINN EMANUEL URQUHART & SULLIVAN,
                                         LLP
2
3                                        By  /s/ Charles K. Verhoeven
                                             Charles K. Verhoeven
4                                            Attorneys for WAYMO LLC

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-22-

WAYMO'S SUPPLEMENTAL BRIEF ISO MOTION FOR ORDER TO SHOW CAUSE