1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
       Charles K. Verhoeven (Bar No. 170151)
2      charlesverhoeven@quinnemanuel.com
       David A. Perlson (Bar No. 209502)
3      davidperlson@quinnemanuel.com
       Melissa Baily (Bar No. 237649)
4      melissabaily@quinnemanuel.com
       John Neukom (Bar No. 275887)
5      johnneukom@quinnemanuel.com
       Jordan Jaffe (Bar No. 254886)
6      jordanjaffe@quinnemanuel.com
     50 California Street, 22nd Floor
7    San Francisco, California 94111-4788
     Telephone:     (415) 875-6600
8    Facsimile:      (415) 875-6700

9    Attorneys for WAYMO LLC

10                        UNITED STATES DISTRICT COURT

11                     NORTHERN DISTRICT OF CALIFORNIA

12                          SAN FRANCISCO DIVISION

13   WAYMO LLC,                          CASE NO. 3:17-cv-00939

14              Plaintiff,

15        vs.                            **PLAINTIFF WAYMO LLC'S MOTION
                                         FOR LEAVE TO FILE AMENDED LIST
16   UBER TECHNOLOGIES, INC.;            OF ELECTED TRADE SECRETS,
     OTTOMOTTO LLC; OTTO TRUCKING        SUPPLEMENTAL EXPERT REPORTS
17   LLC,                                AND REVISED WITNESS AND EXHIBIT
                                         LISTS**
18              Defendants.
                                         **REDACTED VERSION OF DOCUMENT
19                                       TO BE FILED UNDER SEAL**

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................1

I.  THE STROZ MATERIALS DISCLOSED NEW, HIGHLY MATERIAL
    EVIDENCE OF DEFENDANTS' WILLFUL TRADE SECRET
    MISAPPROPRIATION .................................................................................................3

    A.  New Evidence Of Misappropriation of the Nine Elected Trade Secrets...................4

    B.  New Evidence Of Uber Misappropriation of Two Waymo Software Trade
        Secrets ....................................................................................................................6

        1.  Description of Waymo's Two Software Trade Secrets...............................6

        2.  Based on the Production of the New Stroz Materials, Waymo
            Learned that Defendants Misappropriated Both Waymo's Trade
            Secret Nos. 123 and 124.........................................................................8

        3.  New Evidence of Uber's Knowledge of Levandowski's Acquisition
            of Waymo Trade Secrets, Deficiencies in the Due Diligence Process,
            and Failure to Take Adequate Steps to Prevent Trade Secret
            Misappropriation ...................................................................................11

II. WAYMO HAS GOOD CAUSE TO SUPPLEMENT ITS LIST OF ELECTED
    TRADE SECRETS TO ADD THE SOFTWARE TRADE SECRETS AND
    ADDITIONAL EVIDENCE OF WILLFUL MISAPPROPRIATION.................................13

    A.  Waymo Only Recently Obtained the New Evidence in Discovery.........................13

    B.  Waymo Pursued Its Investigation Into Defendants' Misappropriation
        Diligently...............................................................................................................14

    C.  Waymo Was Unable To Assert Claims In Connection With The Software
        Trade Secrets Because Defendants Concealed the Evidence Of Their
        Misappropriation ....................................................................................................16

    D.  Defendants Will Not Be Prejudiced By The Supplementation Proposed
        Here .......................................................................................................................16

    E.  Waymo Has Not Waived Its Right To Assert New Trade Secrets For Trial ..........18

III. WAYMO SHOULD BE PERMITTED TO SUPPLEMENT ITS EXPERT
     DISCLOSURES TO TAKE THE STROZ MATERIALS INTO ACCOUNT...................20

    A.  There Is Good Cause To Amend The Expert Disclosure Deadline ........................21

        1.  Waymo Was Diligent In Conducting Its Expert Discovery Prior To
            The Deadline For Initial Disclosures And The Need For Additional
            Expert Disclosures Was Entirely Foreseeable ..........................................22

        2.  Any Prejudice Is Due To Defendants' Refusal To Produce The Stroz
            Materials..................................................................................................22

     B.       Supplemental Expert Disclosures Are Appropriate Under Rule 26........................23

IV.     WAYMO SHOULD BE PERMITTED TO AMEND ITS LISTS OF EXHIBITS AND WITNESSES FOR TRIAL.............................................................................24

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT at 8:00 a.m. on October 26, or as soon thereafter as counsel may be heard by the above-captioned Court, Plaintiff Waymo LLC ("Waymo") will and hereby does move the Court for an order granting leave to amend its list of Elected Trade Secrets for trial, serve supplemental and new expert reports, and file revised lists of exhibits and witnesses for trial.

Waymo's requests are brought with leave of the Court (*see* Dkt. 1954) and pursuant to Rules 16(b) and 15(a) of the Federal Rules of Civil Procedure on the ground that it discovered additional trade secrets that were misappropriated by Defendants Uber Technologies, Inc., Ottomotto LLC and Otto Trucking LLC (collectively, "Defendants") following its review of documents produced by Defendants and non-party Stroz Friedberg following the Federal Circuit ruling on Waymo's motion to compel.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Law, the Declaration of Nardinelli and exhibits thereto, filed herewith, the pleadings and papers on file herein, and upon such matters as may be presented to the Court at the time of the hearing.

Dated: October 23, 2017

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ Charles K. Verhoeven*

Charles K. Verhoeven
Attorneys for WAYMO LLC

## **MEMORANDUM OF POINTS AND AUTHORITIES**

By this motion, Plaintiff Waymo LLC ("Waymo") seeks leave pursuant to Federal Rule of Civil Procedure 16 and this *Court's Order After Hearing on Motion to Continue Trial Date* (Dkt. 1954) to supplement its list of Elected Trade Secrets to add two, related software trade secret claims, supplement its evidence concerning Defendants' misappropriation of the nine elected trade secrets and it's evidence of knowledge of misappropriation and willful intent, serve supplemental and new expert reports, and file revised exhibit and witness lists for trial incorporating and based on new evidence produced and obtained after the Federal Circuit's ruling on September 13.[1]

Based on files discovered in the Stroz production (the "Stroz Materials"), Waymo has discovered that Uber is misappropriating two, highly valuable Waymo trade secrets related to planner software. Planner software is the software that processes data from an autonomous vehicle's sensors (including Lidar sensors) to control the vehicle's movement, such as velocity, lane changes, etc. The Waymo trade secrets are specific, narrow algorithms: (███████████████████████████████ ████████████████████████████. The trade secrets were taken by Don Burnette and implemented in Otto/Uber's new planner software. Burnette was one Waymo software engineer responsible for developing the specific software at issue while at Waymo. He was recruited to join Otto/Uber as part of Travis Kalanick's plan to hire Levandowski's AV "team". He currently is Uber's technical lead for software autonomy.

At his pre-Stroz deposition, Burnette testified that the planner software he developed after leaving Waymo was ███████████████████ According to Burnette, "we pretty much went to the drawing board and said, How should we create this, based on what we've seen in the industry, what people are -- people are working on? What's in the academic research?" (Dkt. 2011-6 - Burnette Dep. Aug. 18, 2017, at 53:20-23; *see also id.* at 54:24-56:21) A review of the Stroz Materials, however, disclosed that Burnette's pre-Stroz testimony was, to understate it, less than accurate.

---

[1] Waymo does not believe these revisions necessitate the filing of an amended complaint. To the extent the Court disagrees, Waymo respectfully requests leave to amend its complaint to incorporate allegations regarding Defendants' misappropriation of Waymo's Software Trade Secrets.

1    For example, Waymo located some Burnette handwritten notes included in an image of his

2    laptop taken by Stroz in March 2016.  The notes outlined a remarkably similar planning software

3    approach to the one he was working on at Waymo, including referencing the two specific Waymo

4    trade secret algorithms.  When shown these notes at his post-Stroz deposition, Burnette outright

5    admitted that they described the same planner software approach ███████████████

6    ██████████████████████████████████████████

7    ████████████████████████████

8    ██████████████

9    Dkt. 2011-5 at 261:7-12 (objections omitted).  Burnette testified that he wrote the notes the day after

10   he left Waymo for Otto/Uber.  He said he created the notes ████████████████

11   ████████████████████████.  And he testified ███████████████

12   ████████████████████████████████████████

13       Importantly, Burnette admitted that ████████████████████████

14   ███████████████████ detailed in his hand written notes.  This testimony is

15   confirmed by documents produced since September 13 showing ████████████████

16   ████████████████████████████████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ████████████████████████████████████████████

20   ██████████████████████████

21       In addition to the planning software revelation, the Stroz Materials also disclosed a significant

22   number of additional documents related to Uber's misappropriation of the nine previously elected

23   Waymo Lidar trade secrets.  For example, Stroz Materials show Levandowski took and copied the

24   14,000 files onto his personal laptop, although the card readers he used to do so remain missing.  They

25   show that Levandowski had copies of Waymo material relating to each of the nine elected trade

26   secrets after leaving Waymo.  They contradict certain of Defendants' claims of independent

27   derivation.  And they also show knowledge of misappropriation by Uber and conduct by Uber

28   inconsistent with its claims that it did everything it could to avoid use of Waymo material.

As detailed below, Waymo has good cause to supplement its evidence and trade secret contentions with the newly-produced materials.  Waymo was not able to obtain the evidence supporting these amendments until the eve of trial.  The aggressive efforts of Uber and OT's owner Levandowski to block production of the Stroz Materials through privilege claims delayed the production of these materials until significantly after the close of discovery.  On September 13, seven months into this case, and less than a month before the originally-scheduled trial date, the Federal Circuit affirmed this Court's order requiring production of the Stroz Materials.  The bulk of the Stroz materials was first made available for inspection on September 18.  Waymo is in no way at fault for the fact that this large production of materials was withheld until after discovery closed in this case.

Moreover, Defendants' can show no cognizable prejudice to this targeted supplementation, especially because the Court's schedule contemplates a period in which Defendants may respond with their own expert and fact evidence.  Failure to allow supplementation here would reward Defendants for their assertion, now rejected by five judges, that the Stroz Materials are privileged would reward Defendants' blocking conduct and would unfairly prejudice Waymo by denying the use of highly material evidence to support its misappropriation claims.  (*See* Dkt. 1965 [Oct. 3 Hr'g. Tr.], at 38:24-39:5 ("Uber is the one that set up this elaborate scheme to try to conceal the facts from the public and from -- particularly from Waymo, if it ever came to light, and to engineer this elaborate attorney-client joint defense idea that now every judge has looked at it has rejected.").)  Any prejudice to Defendants is of their own making.  Waymo respectfully requests that its motion to supplement be granted.

## ARGUMENT

### I.   THE STROZ MATERIALS DISCLOSED NEW, HIGHLY MATERIAL EVIDENCE OF DEFENDANTS' WILLFUL TRADE SECRET MISAPPROPRIATION

According to the Stroz Report, Stroz located "over 100,000 potentially relevant documents, e-mails, chats, and text messages extracted from the Diligenced Employees' computers, web-based e-mail and data repositories, and mobile devices; over 74,000 potentially relevant pictures; and over 176,000 source code files," that were "potentially relevant" to determining whether Levandowski and the other Diligenced Employees "took with them or retained confidential and/or proprietary information from their former employer, Google, Inc. ('Google')" or "breached their non-solicitation,

non-compete, or fiduciary obligations in connection with their move to Ottomotto." (Dkt. 1603-5 - Stroz Report, at 3, 5.) Put another way, Stroz reported that it identified at least 350,000 documents as "potentially relevant" to its investigation into whether the Diligenced Employees retained confidential or proprietary Waymo information when they moved to Ottomotto. Stroz's production included making available to Waymo its Relativity database, comprising over 1.4 million documents, as well as forensic images of the devices collected from the Diligenced Employees. These documents (the "Stroz Materials") – representing more than 3.5 times the volume of documents produced in the entire case prior to the Federal Circuit's ruling – did not start being produced until September 18.[2] Defendants, Stroz, Levandowski, Ron, and Levandowski's personal attorney John Gardner, also produced documents relating to the Stroz due diligence process following the Federal Circuit order. In addition to reviewing all of these files, hiring software experts to review the newly discovered source code, Waymo conducted follow-up depositions of Uber and third party witnesses.

The newly-produced Stroz Materials go to the very heart of Waymo's trade secret misappropriation claims and establish not only the theft of Waymo's trade secrets, but also Uber's knowledge of that theft. Of particular relevance here, the Stroz Materials include: (i) additional evidence of Defendants' misappropriation of each of the nine Elected Trade Secrets; (ii) evidence of the misappropriation of two additional software trade secrets (the "Software Trade Secrets") that Waymo previously did not know had been used or acquired by Defendants; and (iii) evidence of Uber's knowledge of Levandowski and other Diligenced Employees' trade secret theft before acquiring Ottomotto. All of this evidence has been in Defendants' possession not just since the start of this litigation, but since they created this evidence as part of the forensic due diligence process. Indeed, as these materials relate entirely to actions taken by Defendants and their counsel, officers, employees, and owners, those same parties were integrally involved in many of the underlying facts.

**A.     New Evidence Of Misappropriation of the Nine Elected Trade Secrets**

The Stroz Materials included further evidence of Defendants' misappropriation of the Elected

---

[2]   The Stroz Report itself, and its 159 exhibits comprising thousands of pages, were produced on September 13. Production of the remaining documents was on a rolling basis from September 18.

Trade Secrets, including evidence that Anthony Levandowski retained documents related to each of the Elected Trade Secrets. (*See* Ex. 1 [Supp. Hesselink Report], ¶¶ 13-51.)   For example, the documents produced for the first time with the Stroz Materials included:

- ███████████████████████████████████████████ as claimed in Trade Secret No. 2 and documents showing that Levandowski was in possession of a GBr3 design review that provides a high-level overview of several Elected Trade Secrets, including Trade Secret No. 2, *see id.* ¶¶ 22-25;

- evidence that Levandowski had computer-aided design schematics showing ████████ ███████████████████████████████████████ of Trade Secret No. 7 and the ████████████████ of Trade Secret No. 9 in his possession while working at Ottomotto and Otto Trucking, *see id.* ¶¶ 26-30;

- ████████████████████████████████████, claimed as Trade Secret No. 25, as well as a presentation outlining ██████████████████████████████████████████████ ███████████████████████████████████████████████████████, *see id.*, ¶¶ 14-18;

- evidence that Levandowski saved a copy of the document identified as Trade Secret No. 90 (describing Waymo's ████████████████████) and also had numerous emails providing additional detail about Waymo's ███████████, *see id.* at - 43-48; the Stroz Materials also included a presentation outlining ████████████ ███████████████████████, a manual describing in detail and step by step how to assemble KBr, the predecessor to the Trade Secret No. 90's claimed ███████████ ███████████, including the precise ███████████████████████████████████████████ ███████████████████, and a preliminary design review for the ███████████████ claimed as Trade Secret No. 90, *id.*, as well as a document containing the precise specifications for the ████████████████████ that was in the possession of Morrison Foerster, *id.*; and

- evidence that Levandowski was in possession of documents describing Waymo's MBr LiDAR device to which Trade Secret No. 111 is directed, *see id.* at 19-21.

None of these documents were available to Waymo prior to production of the Stroz Materials. (Decl. of Jeff W. Nardinelli in Support of Motion to Amend ("Nardinelli Decl."), ¶¶ 2-3.)   These documents are material and not cumulative.   For example, while Defendants have argued that Trade Secret No. 25 was not disclosed in any documents stolen by Levandowski, one document expressly cited in Trade Secret No. 25 was found in the Stroz Materials.   (Ex. 1, ¶¶ 14-18.[3])   Documents found

---

[3]   All references to exhibits are to exhibits to the Nardinelli Declaration.

WAYMO'S MOTION FOR LEAVE TO AMEND

1    in Levandowski's possession while he was working on LiDAR for Ottomotto and Otto Trucking

2    disclose each of the Elected Trade Secrets, thus tending to undermine Defendants' claims that they did

3    not misappropriate Waymo's trade secrets.

4    **B.    New Evidence Of Uber Misappropriation of Two Waymo Software Trade Secrets**

5            The Stroz Materials included new evidence that Defendants misappropriated the two Waymo

6    software trade secrets described in the Supplemental List of Elected Trade Secrets attached hereto as

7    Ex. 2.  This evidence was not available to Waymo prior to production of the Stroz Materials.  (*See*

8    Nardinelli Decl., ¶¶ 2-4.)

9            1.    *Description of Waymo's Two Software Trade Secrets*

10           Waymo's Trade Secret No. 124 – ████████████████████.  For at least the past

11   seven years, Waymo has been investigating ██████████████████, an essential part

12   of self driving vehicle technology.  (Ex. 3 [How Report], at ¶ 27) ("██████████████

13   ██████████████████████████████████████████████

14   ████████████████████████")  To be useful, the process must create trajectories that

15   are feasible (so that the vehicle can follow them within the limitations of its dynamics and the inputs

16   available), safe (so that it avoids collisions with known, or sensed, obstacles), efficient (so that it

17   generates good solutions that are comfortable to passengers and optimizes objectives related to arrival

18   time or energy utilized), and robust to uncertainty (so that it can function well in an environment that

19   is observed using sensors that might be noisy and/or imprecise).  (*Id.*)  After years of research and trial

20   and error, Waymo determined that using ████████████████ is helpful for motion

21   planning in self driving because ████████████████████████████████

22   ████████████████████████████████████.[4]  (*See* Ex. 2

23   [Supp. List of Elected Trade Secrets], at 3.)    Over time, with more research and trial and error,

24   Waymo improved the trajectory ████████████████████████████████████

25   ██████████████████████████████.  (Ex. 3 – How Report, at ¶

26

27   [4] ██████████████████████████████ (Ex. 3 [How Report], ¶

28   59.)

1  59 ("Waymo discovered that, ███████████████████████████████████

2  ██████████████████████████████.").)   This innovation is not generally known to the

3  public or to competitors, and it derives economic value from its secrecy, for example, the fact that

4  Waymo's algorithm allowed fundamental improvements to the optimization of the trajectory, resulting

5  in major improvements in quality.  (*Id.* at ¶¶ 60, 120-124.)  As explained by Don Burnette at the time

6  while at Waymo:  "███████████████████████████████████████████████

7  ██████████████████████████████████████████████████████████

8  ███████"  (Dkt. 2011-8 [Burnette 3Q 2015 Evaluation], at 2.)

9      Waymo has engaged MIT Professor Jonathan How, with 25 years in robotics and trajectory

10  planning to evaluate whether Waymo's Trade Secret No. 124 was generally known or readily

11  ascertainable.  After a survey of relevant literature and knowledge in the field, he concluded: "Based

12  on my research and review of the relevant references and my up-to-date knowledge of the

13  technologies at issue, it is my opinion that Waymo's Trade Secret 124 …[is] not generally known in

14  the relevant field or readily ascertainable. (Ex. 3 [How Report], at ¶ 72 .)

15      Waymo's Trade Secret No. 123 -- ████████████████████████.  Waymo's

16  initial approach to planning (i.e., determining a trajectory for the car) was based on ███████

17  █████████████████████.  In other words, the original planner ███████████

18  ██████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████████

20  ██████████████  While Don Burnette was at Waymo, he and others at Waymo worked on

21  ██████████████████████████████████████████████████████████

22  ██████████████████.  Waymo is not claiming herein the concept of ██████████

23  planning as a trade  secret.  Rather, it is claiming its specific implementation as a trade secret as

24  defined in its Supplemental List of Trade Secrets.  For example, one unique aspect of t███████

25  ██████████████████████████████████████████████████████████

26  ██████████████████████████████████████████████████████████

27  ██████  was a coined term used by Waymo to refer to the ████████████████.  Waymo also

28  utilized the following ████████████████████████████████████████

-7-

1    ████████████   One of the challenges faced in the motion planner development

2    included ██████████████████████████████████████████████████.

3    If not done correctly, ███████████████████████████████████████.

4    Waymo's ██████████████ planner addressed this problem along with providing key

5    safety benefits.  (Ex. 3 [How Report], ¶¶ 114-119.)

6         As with Waymo's Trade Secret No. 124, Prof. How analyzed this trade secret based on his

7    experience and review of public literature and determined it is neither known nor readily

8    ascertainable.  (*Id.*, ¶¶ 100-105.)  Waymo's Trade Secret No. 124 further derives economic value from

9    its secrecy, because, for example, it "allows [Waymo] to ████████████████████████

10   ████████████████████████████████████████████████████████████████

11   █████████."  (Ex. 4 [STROZ_R_000178997].)  Indeed, the very person who misappropriated

12   this trade secret – Don Burnette – touted the uniqueness and innovative aspects of this trade secret.

13   For instance, in one of his performance self- reviews while at Waymo, he believed "this new system

14   would solve some of our toughest critical bugs."  *Id.*  Burnette continued,  it "████████████

15   ████████████████████████████████████████████████████████████████

16   ██████████████████████████████."  (Ex. 5 [WAYMO-UBER-00144446].)

17             2.    *Based on the Production of the New Stroz Materials, Waymo Learned that*
                    *Defendants Misappropriated Both Waymo's Trade Secret Nos. 123 and 124*

18

19        The Stroz Materials revealed, for the first time, evidence showing that Defendants

20   misappropriated Waymo's secret ████████████ and ████████████ ████████

21   Waymo was unable to assess Defendants' misappropriation of the Software Trade Secrets prior to

22   production of the Stroz Materials.  Prior to production of the Stroz Materials, for example, Don

23   Burnette, a former Waymo employee and current technical lead for software autonomy at Uber,

24   testified that the Ottomotto planner software was ████████████████████████████

25   (Dkt. 2011-6 [Burnette Dep. Aug. 18, 2017], at 54:24-56:21) because Waymo's planner ████

26   ████████████████████████████████████████████████████████████████

27   ████████████████   Another Uber software engineer, Jur Van Den Berg,

28   testified to the same effect.  (Ex. 31 [Van Den Berg Dep.], at 27:20-28:22 (testifying that the Waymo

1   planner involved ███████████████████████████) Burnette further testified that

2   ████████████████████████████████████████████████████████████████████

3   ██████████████████████████████████████████████████ (Dkt.

4   2011-6 [Burnette Dep. Aug. 18, 2017], at 53:9-23.)  However, the testimony of both Burnette and Van

5   Den Berg, given before production of the Stroz Material, was untrue.

6       Documents produced with the Stroz Material revealed a different story than previously

7   presented by Uber's witnesses:  that Burnette's ██████████████████████████████

8   ████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████

10  ████████████████████████████████

11      Waymo had no access to these documents prior to receiving discovery from Stroz.  Burnette

12  was a "Diligenced Employee" under the Stroz protocol.  Waymo found the notes in Burnette's

13  personal laptop that was stored at Stroz.  (*See* Nardinelli Decl., ¶ 5.)[5]

14      After receiving production of the Stroz Materials, on October 13 Waymo took the continued

15  deposition of Don Burnette.  (Dkt. 2011-5 [Burnette Dep. Oct. 13, 2017], at 184:23-185:2.)  Burnette

16  was confronted with the handwritten notes found on his personal laptop.  Burnette outright admitted

17  that ████████████████████████████████████████: "███████████████████

18  ████████████████████████████████████████████████████████████████████

19  ██████████████████████" (Dkt. 2011-5, at 261:7-12 (objections omitted).

20      He confirmed that his notes were used to create ██████████████████████

21  ████████████████████████████████████████████████████████████████████

22

23      [5]  Waymo had no real opportunity to learn of—let alone take discovery on—these claims earlier.

24  While Waymo moved to compel production of software modules that were named in the Otto-Uber
    acquisition documents on June 21, Defendants successfully blocked production of any code until

25  August 17, 2017—17 days after Waymo was required to elect nine trade secrets for trial.  The Court
    further stated that this production was permitted *not* because it was within the scope of Waymo's

26  current trade secrets, but rather was possibly relevant to damages issues for the Elected Trade Secrets:
    "This issue falls well within the scope of Waymo's *misappropriation* claim even if it does not directly

27  concern Waymo's own asserted trade secrets."  (Dkt. 1188, at 2.)  Seven days later, fact discovery
    closed and opening expert reports were due.  (*See* Dkt. 563.)

28



1    ███████. He testified ██████████████████████████████

2    ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████

4    ████████ The notes—which Waymo had no access to before it began receiving discovery from

5    Stroz—were dated ***February 10***.  (Dkt. 2011-7.)  Burnette's last day at Waymo was ***February 9***.

6    (Dkt. 2011-5, 258:6-9.)  Burnette admitted that he created the notes outlining his ████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████████████. (*Id*. 259:17-21; 396:23-397:6).  He also could not

9    ████████████████████████████████████ (*Id.* 261:22-262:9;

10   263:16-264:11.)

11        Finally, Burnette admitted that ████████████████████████████

12   ████████████████████████████████████████████████████████

13   ███████████████████████████. (*Compare* Dkt. 2011-5, at 207:17-208:7, *with*

14   Dkt. 2011-7, at 2.)  In doing so, he confirmed other evidence recently disclosed to Waymo indicating

15   that ███████████████████████████████████████████████████

16   ████████████████████. (*See* Dkt. 2011-11 (May 10, 2016 email from an Ottomotto

17   team member to the head of Uber's ATC attaching "████████████████████████");

18   Dkt. 2011-12, at 3 (June 11, 2016 email from Uber employee indicating that ██████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ███████); Dkt. 2011-13 at 4 ("████████████████████████████████

22   ██████████████████████████████.").  These notes ████████████████

23   ██████████████████. (*See* Dkt. 2011-5, at 258:10-258:25.)  The notes and resulting code

24   reflect use of Waymo's Trade Secret Nos. 123 and 124.  Waymo expert Professor Martin Rinard

25   analyzed the notes, the Ottomotto code and the Uber code and determined they used Waymo's Trade

26   Secret Nos. 123 and 124.  (*See* Ex. 23 [Rinard Report], at ¶¶ pp.  11-18.)

27

28

3.   *New Evidence of Uber's Knowledge of Levandowski's Acquisition of Waymo Trade Secrets, Deficiencies in the Due Diligence Process, and Failure to Take Adequate Steps to Prevent Trade Secret Misappropriation*

The Stroz Report and Stroz Materials revealed evidence that Uber was aware that Levandowski and other Diligenced Employees had possession of Waymo's trade secrets before the Uber-Otto acquisition closed.  (Dkt. 1603-5 [Stroz Report].)  As noted above, Stroz located massive amounts of Waymo data on the devices of Levandowski and the other Diligenced Employees and reported this in the Stroz Report that was provided to Uber.  (*Id.*; Dkt. 1170.)  Stroz also advised that it did not have the capability to inspect the source code located on the Diligenced Employees' devices and recommended that Uber retain an expert to do so.  (Dkt. 1603-5 –[Stroz Report], at 17.)  There is no evidence that Uber followed Stroz's recommendation.

As this Court is aware, Levandowski told Uber executives on March 11, 2016, that he had five disks containing Google proprietary materials.  (Dkt. 677, at 2, 6, 13.)  In notes from a meeting with Stroz, Uber's counsel, MoFo's Eric Tate, described the content on those disks as " ███████████ ███████████████ ."  (Ex. 7 [Tate Ex. 7815].)  The Stroz Report revealed that the accounts of the March 11 meeting that the Uber witnesses provided during fact discovery are inconsistent with the account that Levandowski gave in his interview to Stroz on March 22-23, 2016.  (*Compare* Ex. 6 - Stroz Ex. 5, at 15; Ex. 8 - Poetzcher 6/19/17 Depo., 253:11-255:20.)  The Stroz Report further revealed that Stroz went to great lengths to verify Levandowski's claim that he destroyed the five disks, but were not able to verify it.  (Dkt. 1603-5 - Stroz Report, at 10-11; Ex. 9 - Stroz Report, Ex. 23.)  Uber was aware that Stroz could not verify Levandowski's claim before entering into the Put/Call agreement.

The Stroz Report and Stroz Materials also reveal that many files that Levandowski self-identified to Stroz as having Google confidential information have metadata that shows "last access" dates after Levandowski left Google and while he was working on LiDAR for Ottomotto, and show that they were accessed at the same time.  (Dkt. 1603-5 - Stroz Report, at 11-12 (citing Stroz Exhibit 16)); Ex. 11 - Tate Ex. 7820.)  Stroz determined that it was inconclusive as to whether the access was system- or user-generated and ██████████████████████████████████ ████████████████████████████████████████████ (Ex. 12 -

WAYMO'S MOTION FOR LEAVE TO AMEND

1  Tate Ex. 7803.)  At the very least, Uber's counsel was aware of this before entering into the Put/Call

2  Agreement on April 11, 2016.  (Ex. 13 - Poetzcher Ex. 7760.)

3      The Stroz Report and Materials further cast doubt on the effectiveness of Uber's purported

4  efforts to ensure that Levandowski did not bring Waymo trade secrets to Uber.  At a prior deposition,

5  Cameron Poetzcher testified that Levandowski had to sign an attestation that he would not bring

6  proprietary information of a former employer to Uber.  (Ex. 8 - Poetzcher 6/19/17 Depo., 122:9-

7  124:25.)  But, Levandowski's attestation was withheld as privileged until produced as part of the Stroz

8  Materials.  That attestation reveals that ███████████████████████████████████████

9  ███████████████████████.  (Ex. 16 - Gardner Ex. 7669.)  In fact, an earlier draft of the attestation

10  included ██████████████████████████████████████████████████████████.

11  (Ex. 17 - Gardner Ex. 7670.)  Further, Uber points to Levandowski's employment agreement as

12  providing the same restriction, but his employment agreement was not operative until August 2016,

13  and he discussed LiDAR with Uber over 400 times prior to that date.  (Ex. 8 – Poetzscher 6/19/17

14  Depo., 125:1-23; Exs. 28, 29; Dkt. 1469.)  Additionally, Uber's counsel often makes dramatic claims

15  that all of Levandowski's devices were put in a "vault" so he could not access them.  (Dkt. 1965 –

16  Oct. 3 Hr'g Tr., at 8:9-24, 9:7-10.)  But, the Stroz Report and Stroz Materials prove that is not true;

17  Stroz returned Levandowski's phone to him.  (Ex. 18 - Stroz Ex. 17, at 1-2.)  The Stroz Report further

18  reveals that Levandowski had Waymo confidential information in his Dropbox account.  (Dkt. 1603-5

19  - Stroz Report, at 8.)  The Stroz Report and Stroz witnesses confirmed that Levandowski ███████

20  ██████████████████████████.  (Ex. 18 - Stroz Ex. 17; Ex. 19 - Chew Depo., 229:8-

21  230:16.)  In fact, Stroz's forensic witness testified that █████████████████████████████

22  ████████████████████████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████  (Ex. 30 -

24  Maugeri Rough Depo. Tr. at 167:10-169:16.)  In other words, ██████████████████████

25  ████████████████████████████████████████████████████████████████████████

26      ████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████████

28



(Ex. 20, Crain Report, ¶¶ 26-43.)

(Ex. 18 - Stroz Ex. 17.)  Moreover, Mr. Crain's analysis reveals that

.   (Ex. 20, Crain Report, ¶¶ 44-50.)

.  (*Id.* ¶¶ 51-53; Ex. 18 - Stroz Ex. 17.)

II.   <u>**WAYMO HAS GOOD CAUSE TO SUPPLEMENT ITS LIST OF ELECTED TRADE SECRETS TO ADD THE SOFTWARE TRADE SECRETS AND ADDITIONAL EVIDENCE OF WILLFUL MISAPPROPRIATION.**</u>

A.   **Waymo Only Recently Obtained the New Evidence in Discovery.**

Waymo has good cause to supplement its list of Elected Trade Secrets to add the Software

Trade Secrets and to add the additional evidence supporting willful misappropriation discovered in the

1   Stroz Materials.  As shown above, this evidence is plainly material to this case.  "Allowing parties to

2   amend based on information obtained through discovery is common and well established."  *Fru-Con*

3   *Const. Corp. v. Sacramento Mun. Util. Dist.*, 2006 WL 3733815, at *5 (E.D. Cal. Dec. 15, 2006).

4          Consistent with this general rule, courts in this State, this Circuit, and elsewhere, routinely

5   recognize that a plaintiff may amend its asserted trade secret claims, where, as here, it has good cause

6   to do so.  *See, e.g., Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.*, 226 Cal. App. 4th 26, 44-45 (2014)

7   (finding no error regarding plaintiff's third amended trade secrets identification); *Perlan Therapeutics,*

8   *Inc. v. Superior Court*, 178 Cal. App. 4th 1333, 1350 (2009) ("If, through discovery, Perlan uncovers

9   information suggesting defendants misappropriated additional trade secrets, it may have good cause to

10  amend its trade secret statement under appropriate circumstances."); *Soc. Apps, LLC v. Zynga, Inc.*,

11  2012 WL 2203063, at *5 (N.D. Cal. June 14, 2012) (amended identification of trade secrets possible

12  with good cause); *Neothermia Corp. v. Rubicor Med., Inc.*, 345 F. Supp. 2d 1042, 1045 (N.D. Cal.

13  Nov. 15, 2004) (amendment to trade secret identification permissible when supported by good cause);

14  *StoneEagle Servs., Inc. v. Valentine*, 2013 WL 9554563, at *5 (N.D. Tex. June 5, 2013) (finding that

15  requiring the plaintiffs to provide a list of trade secrets at issue defined with reasonable particularity

16  "will not prevent Plaintiffs from seeking to amend or supplement their list in the future, should the

17  circumstances warrant doing so"); *Dura Glob. Techs., Inc. v. Magna Donnelly Corp.*, 2011 WL

18  4527576, at *9 (E.D. Mich. Sept. 29, 2011) (permitting plaintiff to assert at trial trade secrets not

19  added to plaintiff's trade secret lists until plaintiff submitted its proposed pretrial order where plaintiff

20  did not learn of additional trade secret misappropriation until "near and after the discovery deadline"

21  and "timely brought these alleged trade secrets to the Court's and [the defendant's] attention").

22  Waymo should be permitted to amend its asserted trade secret lists here.

23          **B.      Waymo Pursued Its Investigation Into Defendants' Misappropriation Diligently**

24          Waymo complied fully with the Court's Case Management Order and pursued its investigation

25  into Defendants' misappropriation of its trade secrets diligently from day one, but its efforts were

26  stymied by Defendants' assertions of privilege over materials going to the very heart of Waymo's

27  claims.  In particular, Waymo vigorously pursued the Stroz Report and associated documentation from

28

the outset, including through not one but *two appeals* to the Federal Circuit.[6]  Counsel for Waymo also repeatedly reminded Defendants – and the Court – of the importance of the Stroz Materials to its investigation, both before and after the Federal Circuit ruled.  On August 1, for example, when Waymo narrowed its list of Elected Trade Secrets in compliance with the Court's Case Management Order, and reduced the number of trade secrets for trial to nine, it did so on the basis of evidence that had been produced as of that date and subject to an express reservation of rights.  (*See* Dkt. 1110-1.)  Since then, Waymo repeatedly emphasized the need to review the Stroz Materials before finalizing its list of Elected Trade Secrets for trial.  (*See, e.g.*, Dkt. 1723 - Sept. 20 Hr'g Tr at 77:7-18); Dkt. 1603-4 at 4, 8-9, 12-13, 17; Dkt. 1928-4 at 17-19; Dkt. 1847-4 at 2, 6, 11.)

Waymo has exerted extraordinary efforts to review this material as quickly as possible, employing approximately 100 additional attorneys and numerous e-discovery consultants to deal with the flood of Stroz Materials, including the 15,000 emails and 85 GB of Google drive documents from an Ottomotto domain used by Levandowski while working for defendant Ottomotto that Defendants appear to have possessed since the outset of this case which was only produced to Waymo on September 29, the 68,000 documents—provided by Levandowski to MoFo after this lawsuit was filed—and finally turned over to Waymo on September 14, and the 1.4 million documents and 176,000 source code files that Stroz made available for review as of September 18 and September 28 (respectively).  Collectively, Waymo's counsel and consultants and have spent thousands of hours, working full-time and overtime, reviewing these files.

Modifying a case management order is appropriate where, as here, the moving party has acted diligently to comply with the court's deadlines but was unable to in light of "new information [that

---

[6]  Prior to the close of fact discovery on August 24, and in accordance with the schedule set forth in the Case Management Order, counsel for Waymo reviewed tens of thousands of produced documents, took more than fifty party and non-party depositions, and served dozens of document requests, interrogatory requests, and requests for admission.  Waymo has been equally diligent since the Stroz Materials were produced: in the weeks since September 13, Waymo's counsel and technical experts have reviewed tens of thousands of documents, taken more than a dozen new and supplemental depositions, identified and worked with new expert to interpret the newly-produced documents, conducted forensic analysis of the devices the Diligenced Employees provided to Stroz, and prepared the new and supplemental expert reports attached as exhibits hereto.

came] to light during discovery." *M.H. v. County of Alameda*, 2012 WL 5835732, at *3 (N.D. Cal. Nov. 16, 2012) (internal citation omitted); *see also Finjan, Inc. v. Blue Coat Sys., Inc.,* 2014 WL 6626227, at *1 (N.D. Cal. Nov. 20, 2014) (granting leave to amend pleadings after scheduling order deadline had passed where the relevant facts were discovered during discovery).

**C.     Waymo Was Unable To Assert Claims In Connection With The Software Trade Secrets Because Defendants Concealed the Evidence Of Their Misappropriation**

Good cause exists to grant Waymo leave to amend its list of Elected Trade Secrets because Waymo's inability to discover facts supporting misappropriation claims including the two new Software Trade Secrets was due solely to Defendants' refusal to produce the Stroz Materials earlier in the discovery process. *See G.P.P., Inc. v. Guardian Prot. Prod., Inc.*, 2016 WL 4041194, at *5 (E.D. Cal. July 27, 2016) ("'[D]iscovery of new evidence is often sufficient to satisfy the good cause standard' under Rule 16(b)") (citation omitted); *Enzymotec Ltd. v. NBTY, Inc.*, 754 F. Supp. 2d 527, 537 (E.D.N.Y. 2010) (good cause existed to permit plaintiff to file and amended pleading because "delayed discovery … deferred its ability to discover the facts supporting the proposed cause of action"); *Blackhawk v. City of Chubbuck*, 2005 WL 3244406, at *1 (D. Idaho Nov. 21, 2005) (granting motion to amend schedule where defendants failed to timely respond to discovery requests).

**D.     Defendants Will Not Be Prejudiced By The Supplementation Proposed Here**

Prejudice to the non-moving party is only "a secondary consideration" to a court considering a motion to motion to amend a Rule 16 scheduling order. *Fru-Con*, 2006 WL 3733815, at *3. The fact that an amendment "may cause more work" does not constitute prejudice. *Id.* at *5. Defendants will not be prejudiced by the addition of the supplemental evidence of misappropriation including the Software Trade Secrets because Defendants' misappropriation is part of the same general conduct and causes of action already at issue and, in any event, the delay is entirely of Defendants own making. Moreover, the Court in its schedule has already set aside time for Defendants to take discovery and submit amended expert reports.  (*See* Dkt. 1965 - Oct. 3 Hr'g Tr., at 42:15-19 ("Anyway, if that motion were granted, then I will give some additional time for more discovery possibly to the Uber side. It would be compressed if there was any further discovery, but then you would get a chance to adjust your expert reports as well.").)

1   As this Court has recently reaffirmed elsewhere, "where, as here, the basic fact pattern will

2   remain the same after amendment, the additional cost and effort to defendant is a marginal argument

3   at best and does not bar leave to amend." *Sudhir*, 2017 WL 3142114, at *2; *see also Navarro v.*

4   *Eskanos & Adler*, 2006 WL 3533039, at *3 (N.D. Cal. Dec. 7, 2006) (granting leave to amend

5   pleading under Rule 16 where "[t]he basic fact pattern will remain the same. All that is being added is

6   another legal string to the same old bow.").

7   Waymo is not proposing to greatly expand the scope of this litigation or change the direction

8   of the case; the "basic fact pattern" at issue remains the same, and any additional cost to or effort by

9   Defendants will be marginal at most.  It certainly will be eclipsed by the cost and effort plaintiff was

10  required to undertake to compel the Stroz Materials, review the massive number of source files

11  improperly hidden behind alleged privilege in a matter of weeks, and retake numerous depositions to

12  ask about the substance of the Stroz Materials.  In contrast, Defendants (and Defendants alone) have

13  had access to these materials since at least August 2016.  They have had over a year to review and

14  analyze the Stroz Materials.  Indeed, Defendants' current litigation counsel, in-house counsel, officers,

15  employees, and owners were integrally involved in the facts that were only recently revealed to

16  Waymo.  Even if there were some amount of prejudice to Defendants, it is entirely of their own

17  making.  Had Defendants produced the Stroz Materials earlier, the new evidence would have been

18  incorporated into deposition questioning, expert reports and other aspects of the case.  Defendant's

19  complaint of prejudice reminds one of the old analogy of the child who murdered his parents begging

20  mercy on the court because he is an orphan.  Defendants' plea of prejudice may not be used to deny

21  Waymo two additional trade secret claims, or the use of the Stroz Materials in its exhibits and expert

22  reports.  *See, e.g., Audionics Sys., Inc. v. AAMP of Florida, Inc.,* 2014 WL 3563311, at *9 (C.D. Cal.

23  Mar. 12, 2014) ("Had AAMP earlier disclosed information concerning the Weeder articles to Crux,

24  Crux could have filed its motion to amend sooner, and the court could potentially have heard it before

25  discovery closed.  Consequently, AAMP cannot now be heard to complain."); *Mondis Tech., Ltd. v.*

26  *LG Elecs., Inc.*, at *2 (E.D. Tex. May 5, 2011) ("The Court concludes that Mondis has shown good

27  cause and should be allowed to amend its infringement contentions.  Perhaps most important to this

28  Court is that to the extent TPV is prejudiced at all by this late amendment, this prejudice was caused

-17-

by TPV's failure to perform its discovery obligations in a reasonable manner."); *Convolve, Inc. v. Compaq Computer Corp.*, 643 F. Supp. 2d 336, 343 (S.D.N.Y. 2008) ("the Ray Thesis would have been added to the defendants' invalidity contentions at an earlier time but for the plaintiffs' failure to produce it during discovery.  As an equitable matter, then, the plaintiffs may not be heard to argue prejudice as a result of the amendment.").

This is particularly so as Waymo has repeatedly and diligently, since day one, reiterated its position that the Stroz Materials included evidence that could expand the scope of trade secrets asserted beyond the asserted LiDAR manufacturing trade secrets and that Waymo needed to review those documents prior to assessing any additional claims it may have.  (*See, e.g.,* Dkt. 1723 - Sept. 20 Hr'g Tr at 77:7-23); Dkt. 1603-4 at 4, 8-9, 12-13, 17.)  Waymo also apprised the Court of these very issues in view of the continuing production of Stroz-related discovery following the Federal Circuit's ruling.  (*See* Dkt. 1928-4 at 17-19; *see also* Dkt. 1847-4 at 2, 6, 11.)  Indeed, the Court continued trial in this action so as to enable Waymo to evaluate its claims in light of the Stroz Materials.  (*See* Dkt. 1965 - Oct. 3 Hr'g Tr. at 38:11-8 ("The Federal Circuit agreed with the magistrate judge in this case and the trial judge that the due diligence thing was not protected privilege, and that was ordered to be turned over, and that's a lot of documents … Waymo is correct that they need time to look at that…."); *id.* 40:17-19 ("it's conceivable that you could find in all of those records documents that would help show that Uber used the trade secrets in some fashion"); *id.* 41:13-19 (granting Waymo leave to "bring a motion to amend its list of nine trade secrets that it wishes to assert at trial").)  Incorporating this newly-discovered Stroz evidence into Waymo's asserted trade secret lists does not expand this litigation beyond its previously-anticipated scope, and Defendants cannot demonstrate any cognizable prejudice from allowing Waymo to amend its list of Elected Trade Secrets now.

### E.    Waymo Has Not Waived Its Right To Assert New Trade Secrets For Trial

Waymo's initial list of trade secrets included 121 trade secrets relating to Waymo LiDAR or to specific documents that Waymo had reason to believe were improperly acquired by Defendants.  (Dkt. 25-7.)  In its June 7 Case Management Order, the Court ordered Waymo to reduce that number to less than ten trade secrets.  (Dkt. 563, 4.)  At that time, the parties were in the middle of initial discovery and the Federal Circuit had not yet on ruled on Levandowski's appeal.  Waymo nonetheless complied

with the Court's Order and on August 1 identified nine trade secrets to be tried:  Trade Secret Nos. 2, 7, 9, 13, 14, 25, 90, 96, and 111 (the "Elected Trade Secrets").  (Dkt. 1110-1, 1:1-12.)  In so doing, however, Waymo expressly reserved its right to "modify its narrowed list of trade secrets based on additional information … in light of Defendants' concealment of evidence by asserting a web of inapplicable privileges with respect to the Stroz Friedberg due diligence investigation, which has hindered Waymo's efforts to discover relevant evidence."  (*Id.*, 1:13-18.)

Waymo vigorously pursued production of the Stroz Materials, and counsel for Waymo repeatedly reaffirmed both Waymo's reservation of rights and Waymo's intent to supplement its existing allegations or add new claims should those materials reveal additional evidence of trade secret misappropriation.  (*See, e.g.*, Dkt. 1261 - Aug. 16 Hr'g Tr. at 84:14-18 (MR. JUDAH: … I also want to clarify one point, that we are not agreeing to waive our rights to the other trade secrets.  That is -- that is not what I intended to say, and that's not what we are saying…."); Dkt. 1723 - Sept. 20 Hr'g Tr. at 77:5, 14-18 ("MR. VERHOEVEN: … Now, suppose we look at those [Stroz Materials] and we can tie those back into the software they provided so there's absolutely no question that he took some software and copied it and put it in. We might bring that up to the Court and we might say we want to add that claim."); *see also* Dkt. 1603-4 [Mot. for Continuance], at 4, 8-9, 12-13, 17.)

Waymo has not waived its right to add additional trade secrets to its list of Elected Trade Secrets for trial because it did not have sufficient evidence to assert claims in connection with the proposed additional trade secrets prior to Defendants' production of documents previously withheld by Uber.  (Dkt. 1965 - Oct. 3 Hr'g Tr. at 38:25-39:1.)  Waiver of claims can only occur if a party intentionally and voluntarily makes the choice to waive.  *See, e.g.*, *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004) ("[W]aiver is the intentional relinquishment or abandonment of a known right.") (internal quotation marks omitted).  Waymo made no such choice here.  Instead, it merely complied with the Court's Case Management Order (Dkt. 563 at 10) by designating nine trade secrets for trial on misappropriation (Dkt. 1110-1).  The Case Management Order did not state that any such narrowing would result in a waiver of any potential claims.  (Dkt. 563 at 10.)  And, as discussed above, Waymo repeatedly reserved its right to modify its narrowed list of Elected Trade Secrets. (*See also id.*, at 3; Dkt. 1261 - Aug. 16, 2017 Hr'g Tr. at 84:14-20; Dkt. 1603-4 Mot. for Continuance, at

17-19; Dkt. 1928-4 - Supp. Mot. for Continuance at 2-3, 20.)  The concern that "a claim selection order could come too early in the discovery process, denying the plaintiff the opportunity to determine whether particular claims might raise separate issues….," *see In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1313 (Fed. Cir. 2011), therefore applies forcefully here.  *See also id.* at 1311 (due process is violated if "the district court's claim selection procedure risked erroneously depriving it of its rights and that the risk outweighed the added costs associated with a substitute procedure").  Given the volume of evidence produced by Defendants in the weeks following the Federal Circuit's ruling in this case – a volume that is exponentially larger than that of all the material they produced in the previous months – it is hard to imagine a starker example of claim selection occurring too early and risking the deprivation of Waymo's rights.  There is no legal basis in the Federal Rules of Civil Procedure for this Court to require Waymo to waive trade-secret claims, especially while discovery was still ongoing, and doing so would violate Waymo's due process and Seventh Amendment rights.

### III.   WAYMO SHOULD BE PERMITTED TO SUPPLEMENT ITS EXPERT DISCLOSURES TO TAKE THE STROZ MATERIALS INTO ACCOUNT

There is good cause under Fed. R. Civ. Pro. 16 to amend the scheduling order's deadline for filing expert reports to allow two of Waymo's existing experts to file supplemental reports in light of the Stroz Materials and to permit Waymo to amend its expert disclosure to add three new experts to opine on the Software Trade Secrets.  All of the proposed additional expert discovery relates directly to the Stroz Materials.  *First*, Waymo seeks leave to submit supplemental reports from two of its existing experts:  Lambertus Hesselink and Michael Wagner.  Mr. Hesselink's proposed supplemental report details the newly-produced evidence that Defendants misappropriated the Elected Trade Secrets.  *See* Ex. 1 (Supp. Hesselink Report).  Mr. Wagner's proposed supplemental report values Waymo's damages due to Defendants' misappropriation of the Software Trade Secrets.  *See* Ex. 22 (Supp. Wagner Report).  *Second*, Waymo seeks to supplement its expert disclosures to disclose three new experts: (1) Andy Crain, Vice President of Forensics and Collections at Discovia, who has conducted a forensic analysis of some of the devices in the Stroz Materials and will opine on the devices to which Levandowski may have saved the 14,000 files, his browser history, and flaws in the

1   Stroz due diligence analysis, (*see* Ex. 20 - Crain Report); (2) Dr. Jonathan P. How, a professor of

2   Aeronautics and Astronautics at the Massachusetts Institute of Technology ("MIT"), who has

3   reviewed the Software Trade Secrets will opine on the motion planning techniques at issue (*see* Ex. 3 -

4   How Report); and (3) Dr. Martin Rinard, a professor of computer science at MIT, who has analyzed

5   Ottomotto's and Uber's motion planner source code to determine whether it uses Waymo Trade Secret

6   Nos. 123 and 124 (*see* Ex. 23 - Rinard Report).  These expert reports should be permitted here.

7         **A.**      **There Is Good Cause To Amend The Expert Disclosure Deadline**

8         The Court's Case Management Order required the parties to disclose expert reports on August

9   24.  (Dkt. 562.)  The Federal Circuit had not yet ruled by that date, and none of the Stroz Materials

10   had been produced.  Good cause therefore exists to amend the deadline to permit Waymo to designate

11   new experts and serve supplemental reports incorporating the newly-produced Stroz evidence.

12         Parties are permitted to supplement expert reports, disclose new experts, and file new expert

13   reports after the end of expert discovery where there is "good cause and with the judge's consent."

14   Fed. R. Civ. Pro. 16(b)(4); *Whitlock v. Pepsi Americas*, 2015 WL 603182, at *2 (N.D. Cal. Feb. 11,

15   2015) (granting motion to amend scheduling order and supplement expert report); *see also*

16   *GoDaddy.com LLC v. RPost Commc'ns Ltd.*, 2016 WL 454445, at *2 (D. Ariz. Feb. 5, 2016), *aff'd*,

17   685 F. App'x 992 (Fed. Cir. 2017) (motion to supplement an expert report implicates Rule 16's "good

18   cause" standard); *Zest IP Holdings, LLC v. Implant Direct Mfg. LLC*, 2014 WL 6851607, at *21 (S.D.

19   Cal. June 16, 2014) (noting that Rule 16 applies when moving to amend a scheduling order to

20   designate a new expert rebuttal witness).  As with other modifications to a court's scheduling order,

21   the good cause requirement in this context "primarily considers the diligence of the party seeking the

22   amendment."  *Whitlock*, 2015 WL 603182, at *2 (citing *Johnson v. Mammoth Recreations, Inc.,* 975

23   F.2d 604, 609 (9th Cir. 1992)).  Amongst the facts a court should consider in deciding whether to

24   amend a Rule 16 scheduling order to reopen discovery are: whether trial is imminent, whether the

25   request is opposed, whether the non-moving party would be prejudiced, whether the moving party was

26   diligent in obtaining discovery within the guidelines established by the court, the foreseeability of the

27   need for additional discovery in light of the time allowed for discovery by the district court, and the

28   likelihood that the discovery will lead to relevant evidence.  *City of Pomona v. SQM N. Am.*, 866 F.3d

1060, 1066 (9th Cir. 2017) (listing factors to consider and vacating judgment of district court where plaintiff's motion to reopen expert discovery was denied two months before trial but the potential delay was not plaintiff's fault).  These factors weigh in favor of permitting Waymo to supplement.

> 1. *Waymo Was Diligent In Conducting Its Expert Discovery Prior To The Deadline For Initial Disclosures And The Need For Additional Expert Disclosures Was Entirely Foreseeable*

As discussed above, Waymo diligently pursued expert discovery prior to the Case Management Order's deadline, including by serving three opening expert reports (opining on technical specifications, damages, and M&A practices, respectively) and two rebuttal expert reports in response to the reports submitted by Defendants.  Waymo was unable to complete its expert discovery due to Defendants' refusal to produce the Stroz Materials, however.  And, as also discussed above, Waymo has sought discovery into Defendants' trade secret misappropriation and production of the Stroz Materials since day one.  Through no fault of its own, Waymo only obtained access to those materials after the Federal Circuit's ruling on September 13, weeks after the deadline to file expert reports and disclosures had passed.  Waymo also provided Defendants with notice of the need for substantial expert discovery within days of its receipt of the Stroz Report (*see* Dkt. 1603-4 at 3, 13) – even as it raced to find appropriate experts to review and opine on the hundreds of thousands of newly-produced documents, including thousands of native files, over 74,000 potentially relevant pictures, and over 176,000 source code files.  Now, Waymo submits this motion in accordance with the schedule set forth by the Court (*see* Dkt. 1954) and attaches the expert reports it seeks to introduce, even though only weeks have passed since Waymo's experts first obtained the materials from Stroz.  The need for supplemental expert disclosures following production of the Stroz Materials was entirely foreseeable and Waymo has been diligent.

> 2. *Any Prejudice Is Due To Defendants' Refusal To Produce The Stroz Materials*

Defendants will not be prejudiced by Waymo serving supplemental and revised expert reports analyzing and opining on evidence produced with the Stroz Materials.  Indeed, any delay in Waymo serving these reports is entirely of Defendants' own making.  Consequently, if any prejudice does exist, it would be to Waymo, not Defendants:  Waymo would be gravely prejudiced by not being able to rely on experts to evaluate newly discovered, critical evidence to support its claims through no fault

-22-

of its own.  Courts routinely grant motions to amend scheduling orders to supplement expert reports

where the moving party did not cause the delay.  *See City of Pomona*, 866 F.3d at 1066 (district court

abused its discretion in refusing to grant supplemental expert discovery where the delay was due to the

court, not movant); *Whitlock*, 2015 WL 603182, at *2 (granting motion to amend and supplement

expert reports where defendants could conduct additional discovery and avoid prejudice but plaintiff

risked "extreme prejudice" if denied the ability to introduce expert opinions on newly-discovered

evidence); *see also* Wright & Miller Fed. Prac. & Proc. Civ. § 1522.2 (3d ed.) (relief is appropriate

where scheduling order modification "is necessitated by acts of the opposing party").

Denying Waymo's requested relief would provide Defendants with a substantial and

unwarranted benefit from concealing the Stroz Materials.  Courts routinely refuse to permit such an

unequitable result.  In *Zest IP Holdings, LLC*, 2014 WL 6851607, for example, the court granted leave

to file supplemental expert reports where 641,841 pages of belatedly-produced discovery documents

were received during the same month as the scheduling order required filing of opening expert reports.

*Id.*, at *25.  In *Walker & Zanger, Inc. v. Paragon Indus.*, 2006 WL 1581969, at *2 (N.D. Cal. June 6,

2006), the court held that Rule 16(b) good cause existed where the party seeking to strike a

supplemental expert report cased the delay by failing to produce information before the initial expert

report.  In *Robert Half Int'l Inc. v. Ainsworth*, 2015 WL 4662429, at *16 (S.D. Cal. Aug. 6, 2015) the

court granted a   motion to designate new experts where the plaintiff had "diligently sought to

complete discovery" and was not at fault for the discovery delays and "[it was] not unreasonable to

assume that [plaintiff] needed to obtain the discovery ... in order to adequately evaluate what experts

to designate … and the scope of [the plaintiff's] experts' anticipated testimony."  *Id.* at *16.  Here, as

in *Robert Half*, "[h]ad there been no delay in obtaining discovery … there likely would be no need to

extend the expert designation deadlines."  *Id.*

**B.    Supplemental Expert Disclosures Are Appropriate Under Rule 26**

Permitting Waymo to file new and supplemental expert reports is also proper under Fed. R.

Civ. P. 26(e), which imposes a duty to supplement expert disclosures and reports where new

information becomes available "to prevent surprise or ambush at trial."  *Whitlock*, 2015 WL 603182,

at *2 (internal citation omitted); *see also P.E.A. Films, Inc. v. Metro-Goldwyn-Mayer, Inc.*, 2016 WL

-23-

6818758, at *7 (C.D. Cal. 2016) (party has "a duty to supplement" an expert's report upon learning "that some aspect of the discovery or report is incomplete or inaccurate"). This is particularly appropriate where, as here, the supplemental reports are submitted in response to previously-withheld information. *Wechsler v. Macke Int'l Trade Inc.,* 221 F.R.D. 619 (C.D. Cal. Aug. 10, 2004) (allowing expert to file supplemental report after close of discovery where defendants withheld information).

The Stroz Materials were produced after the deadline for initial expert disclosures and opening reports, and the reports proposed here are needed to address the Stroz Materials not produced before that deadline. (*See, e.g.,* Ex. 1 - Supp. Hesselink Report, ¶¶ 1, 5-12 (noting that report concerns only evidence that was previously unavailable); Ex. 20 - Crain Report, at ¶¶ 9-10 (purpose of report is to opine on forensic examination of native images of the devices and accounts that formed part of Stroz investigation provided after September 13); *see also* Ex. 3 – How Report; Ex. 22 – Supp. Wagner Report; Ex. 23 – Rinard Report.) Defendants have long been on notice of Waymo's intent to seek supplemental expert testimony to opine on the Stroz Materials at trial. (*See, e.g.,* Dkt. 1603-4 at 3, 13.) And, each expert currently seeking to supplement his report expressly reserved the right to do so. (*See* Ex. 24 - Opening Hesselink Report, ¶ 473; *see also* Ex. 25 - Hesselink Reply Report, ¶¶ 72, 79, 119, 132, 183, 205, 223, 244; Ex. 26 - Opening Wagner Report, ¶ 442; Ex. 27 - Wagner Reply Report, ¶ 134.) Courts find such reservations of rights persuasive in granting motions to supplement the reports at issue. *See, e.g., GoDaddy.com LLC*, 2016 WL 454445, at *6 (citing reservation of the right to amend in permitting revisions). Finally, Waymo "timely" made its request for additional expert discovery shortly after production of Stroz Materials, and in accordance with the Court's schedule. Accordingly, Waymo's motion should be granted with respect to expert discovery, too.

## IV.   WAYMO SHOULD BE PERMITTED TO AMEND ITS LISTS OF EXHIBITS AND WITNESSES FOR TRIAL

During the conference on October 3, the Court granted Waymo leave to "add any new Trial Exhibits based on what you're reviewing, and any new witnesses" in this motion. (Dkt. 1965, at 41:17-19; *see also* Dkt. 1954, at 1:21-23 ("Any request by Waymo to amend its list of Elected Trade Secrets for trial, expert reports, or lineup of trial exhibits and witnesses must be made via a formal motion to be filed by **OCTOBER 23 AT NOON**….").) Waymo now seeks to amend its lists of trial

1    exhibits and witnesses as set forth below.

2         Waymo's amendments to its trial witness list and trial exhibit list are necessary to incorporate

3    new evidence obtained after production of the Stroz Report and Stroz Materials.  Waymo's amended

4    witness list adds: Professors How and Rinard, Waymo's technical experts regarding the Software

5    Trade Secrets; Andy Crain, Waymo's forensic expert, who analyzed the devices reviewed by Stroz as

6    part of its examination; Josh Herbach and Nathaniel Fairfield, Waymo software engineers on the

7    Planner team; and Shawn Banzandeh.  It also designates Neel Chatterjee, who Waymo recently

8    learned had possession of Levandowski's personal laptops and ran searches on them at Uber's request

9    and on which Uber's forensic expert relied in his report, as a witness who Waymo may call if the need

10   arises.  The other changes to Waymo's amended witness list consist of moving some witnesses who

11   were previously designated "may call if the need arises" to "will call," and moving some witnesses

12   previously designated as "will call" to "may call if the need arises."  Waymo also narrowed its witness

13   list in the process.  (Ex. 32.)

14        Waymo's supplemental exhibit list adds documents from the Stroz Materials, documents used

15   during depositions that were postponed until after production of the Stroz Report and Stroz Materials

16   (but, per Judge Corley's Order, were not limited in scope to the Stroz due diligence), documents

17   produced prior to the production of the Stroz Report and Stroz Materials but relevant to Waymo's trial

18   strategy as it has been impacted by the Stroz productions, documents supporting Waymo's claim of

19   misappropriation of the Software Trade Secrets, and documents relied upon by Waymo's experts in

20   their proposed supplemental reports (Hesselink and Wagner) and new reports (How, Rinard, and

21   Crain).  (Ex. 33.)  The volume of documents added to Waymo's exhibit list is large because the

22   volume of documents produced by Defendants and Stroz after September 13 was significantly – *3.5*

23   *times* – larger than what was produced during fact discovery.  Further, Waymo will work to narrow its

24   supplemental exhibit list prior to trial.

25                                              ***

26        For the foregoing reasons, Waymo respectfully requests that the Court grant Waymo's motion

27   for leave to amend its list of Elected Trade Secrets for trial, file supplemental and new expert reports

28   to incorporate newly-produced evidence, and revise its lists of trial exhibits and witnesses accordingly.

DATED:  October 23, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ Charles K. Verhoeven*
    Charles K. Verhoeven
    Attorneys for WAYMO LLC