# EXHIBIT 9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2                 SAN FRANCISCO DIVISION
 3
 4      _____
                                           )
 5      WAYMO LLC,                         )
                                           )
 6                     Plaintiff,          )
                                           )
 7              vs.                        ) Case No.
                                           ) 3:17-cv-00939-WHA
 8      UBER TECHNOLOGIES, INC.,           )
        OTTOMOTTO LLC; Otto                )
 9      Trucking LLC,                      )
                                           )
10                     Defendants.         )
        _____)
11
12
13
14
15       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
16          VIDEOTAPED DEPOSITION OF NINGJUN QI
17              San Francisco, California
18              Thursday, June 22, 2017
19                    Volume I
20
21
22
        Reported by:  SUZANNE F. GUDELJ
23      CSR No. 5111
24      Job No. 2644340
25      PAGES 1 - 320
```

Page 1

**Page 58**

1  MR. JACOBS: You can answer that like
2  whether it was orally or by email or --
3  THE WITNESS: I don't know.
4  BY MS. ROBERTS:
5  Q  Did you ever learn the reasons that he         10:00:14
6  conveyed why his idea wouldn't infringe on other IP?
7  MR. JACOBS: And you can answer that yes or
8  no.
9  THE WITNESS: I learned of one reason.
10 BY MS. ROBERTS:                                    10:00:26
11 Q  What was that reason?
12 MR. JACOBS: Can we confer?
13 MS. ROBERTS: Sure. Actually, now is a
14 good time for a break anyway.
15 VIDEO OPERATOR: Going off the record. The  10:00:34
16 time is 10:00 a.m.
17 (Recess.)
18 VIDEO OPERATOR: Back on the record. The
19 time is 10:13 a.m.
20 BY MS. ROBERTS:                                    10:13:25
21 Q  Before the break, we were talking about the
22 reasons that Mr. Levandowski gave for why his idea
23 wouldn't infringe on other IP. And the question I
24 had asked you is: Did you ever learn the reasons
25 that he conveyed? And you said you learned of one   10:13:40

**Page 59**

1  reason. And then I asked: What was that reason?
2  MR. JACOBS: And then -- so I'll instruct
3  you not to answer as to the specifics of the reason,
4  but in general terms what Mr. Levan- -- what the
5  nature of Mr. Levandowski's response.              10:13:52
6  THE WITNESS: He thought that his idea, the
7  way it was designed, was not -- would not infringe
8  on other companies' patents.
9  BY MS. ROBERTS:
10 Q  So it was specific to patents?                  10:14:11
11 A  Yes.
12 Q  And when -- when you say that he thought
13 his idea would not infringe on other companies'
14 patents, did -- were specific companies discussed?
15 A  Yes.                                            10:14:30
16 Q  What companies were discussed?
17 MR. JACOBS: You can answer that.
18 THE WITNESS: Velodyne, Google.
19 BY MS. ROBERTS:
20 Q  Anybody else?                                   10:14:41
21 A  Not that I can remember.
22 Q  Did Mr. Levandowski indicate or convey to
23 Uber that he -- whether he thought his idea would
24 use trade secrets of other companies?
25 MR. JACOBS: You can answer on the topic of  10:14:59

**Page 60**

1  whether you have a specific recollection of trade
2  secrets being discussed in the conversation you have
3  in mind. Otherwise, I instruct you not to answer.
4  THE WITNESS: I don't have a specific
5  recollection.                                      10:15:14
6  BY MS. ROBERTS:
7  Q  Okay. Back to questions about document
8  retention. Do you use text messages in the course
9  of your work at Uber?
10 A  If by "text messages" -- I mean, yes, if        10:15:42
11 you broadly define "text messages."
12 Q  Okay. Can you clarify what you mean by
13 that?
14 A  SMS versus like an iMessage type client.
15 Q  Okay. So you're including both of those in 10:15:59
16 your def- -- defining broadly?
17 A  Yes, I'm including when I look at my
18 message on my iPhone both green bubbles and blue
19 bubbles.
20 Q  Okay.                                           10:16:14
21 MR. JACOBS: I got that.
22 BY MS. ROBERTS:
23 Q  And so you used -- you communicate with
24 others in the context of your employment at Uber
25 using the text messaging technologies that you just 10:16:25

**Page 61**

1  referenced?
2  A  Yes.
3  Q  Have you ever deleted any texts that were
4  related to your employment at Uber?
5  A  Yes.                                            10:16:38
6  Q  And what is your practice for deleting text
7  messages relating to your employment?
8  A  There really isn't a practice. Sometimes I
9  clean out messages that -- from people that I don't
10 think I will talk to for a while.                   10:16:58
11 Q  How often do you clean out messages in that
12 manner?
13 A  I can't really say.
14 Q  Did you communicate with others via text
15 regarding the acquisition of Otto?                  10:17:15
16 A  Yes.
17 Q  And have you deleted any texts with anybody
18 which related to the acquisition of Otto?
19 A  Yes.
20 Q  And to the best of your recollection, what 10:17:27
21 texts did you delete?
22 A  I've deleted some texts with Anthony.
23 That's the only one I can remember.
24 Q  When did you delete those texts with
25 Anthony?                                            10:17:52

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

### Page 62

1  A  I don't have a good sense of when.
2  Q  Was it before or after you were aware that
3  the -- there was litigation relating to Uber's
4  acquisition of Otto?
5  A  Before.                                    10:18:07
6  Q  Before. Can you recall how long before you
7  learned of the litigation that you deleted texts
8  with Anthony?
9  A  Before 2017.
10 Q  Before 2017. How many texts did you delete  10:18:30
11 with Anthony?
12 A  I don't remember that.
13 Q  Was it like a single text that you deleted
14 or a larger group of texts?
15 A  I deleted based on when you open up your    10:18:56
16 iPhone and you can just delete. So I don't have a
17 good sense of number of texts.
18 Q  Okay. I'm not quite sure I'm understanding
19 the technology you're referring to. Can you provide
20 a little bit more detail?                           10:19:12
21 A  So when you open up your message client on
22 your phone and you see all the messages, right, from
23 various people, without drilling into the specific
24 person, I just deleted that group, that -- basically
25 his name.                                           10:19:33

### Page 63

1  Q  So that would have deleted all messages
2  with Mr. Levandowski prior to the date that you
3  deleted?
4  A  That is my understanding of the technology,
5  yes.                                                10:19:44
6  Q  Did you frequently communicate with Mr.
7  Levandowski via text relating to the acquisition of
8  Otto and negotiations associated with it?
9  A  I don't know about frequently. I don't
10 know how you would define that. But yes, I did      10:20:04
11 communicate with him via text.
12 Q  Have you handed over text messages to Uber
13 so that they can produce them in this litigation?
14 A  No.
15 Q  Have you handed your phone over to Uber so  10:20:21
16 that texts could be searched for to be produced in
17 this litigation?
18 A  No.
19 Q  To the best of your recollection, have all
20 text messages between you and Mr. Levandowski that  10:20:31
21 were on your phone been deleted by you?
22 A  Not -- what -- are you referring to a
23 specific time period?
24 Q  Well, you said you -- okay. Let me
25 clarify.                                            10:20:50

### Page 64

1  Q  You said that you deleted texts between you
2  and Mr. Levandowski sometime before 2017, correct?
3  A  Yes.
4  Q  And so if I understand your description of
5  the technology correctly, you deleted all messages  10:21:00
6  with Mr. Levandowski prior to that date that you
7  deleted them, correct?
8  A  Yes.
9  Q  Okay. And so there could be more text
10 messages with Mr. Levandowski since you deleted     10:21:11
11 everything prior to your -- that deletion date,
12 correct?
13 A  Yes --
14 Q  Okay.
15 A  -- that's correct.                          10:21:21
16 Q  And you haven't provided those to Uber for
17 production in this case?
18 A  No.
19 Q  Have you -- we talked about deleting text
20 messages between you and Mr. Levandowski. Are       10:21:38
21 there -- did you communicate with anybody else
22 relating to the acquisition of Otto and negotiations
23 via text?
24 A  Yes.
25 Q  Who else did you communicate with via text? 10:21:51

### Page 65

1  A  Cam.
2  Q  Cameron Poetzscher?
3  A  Yes.
4  Q  Anybody else?
5  A  Lior.                                       10:22:01
6  Q  Anybody else?
7  A  Anybody else -- anybody else would be a
8  speculation. I would not be able to tell you.
9  Q  Okay. Have you ever deleted any of your
10 texts with Mr. Poetzscher that relate to the Otto   10:22:11
11 acquisition or negotiations of the same?
12 A  It's possible, but I can't say for sure.
13 Q  So unlike where you specifically remember
14 that you went in and deleted texts with Mr.
15 Levandowski, you don't recall doing the same with   10:22:30
16 respect to texts for -- with Mr. Poetzscher?
17 A  That's correct.
18 Q  Okay. Turning to Mr. Ron, have you deleted
19 any texts between you and Mr. Ron?
20 A  Again, it's possible, but I don't remember  10:22:45
21 specifics.
22 Q  So again, unlike Mr. Levandowski where you
23 specifically recall that you deleted texts between
24 you and him, you don't specifically recall if you
25 deleted texts with Lior Ron?                        10:22:57

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

### Page 178

1    A    Lior.
2    Q    Anybody else?
3    A    His outside counsel.
4    Q    Why did you communicate with Mr.
5  Levandowski by text during this time period?        01:58:02
6    A    Because he preferred that we kept
7  communication off email and over text only, and
8  obvious -- text and phone.
9    Q    And you previously testified that at some
10  point before 2017, you deleted all of your texts        01:58:23
11  with Mr. Levandowski?
12    A    Yes, that's correct.
13    Q    So the texts that you had with him in the
14  first quarter of 2016 when negotiating an
15  acquisition agreement, those have all been deleted?    01:58:37
16    A    I don't know when I was asked to delete it,
17  so I can't really tell you if that time frame, those
18  texts were deleted or not.
19    Q    You said you don't know when you were asked
20  to delete them. Did I hear you correctly?              01:58:50
21    A    Yes, that's correct.
22    Q    Who asked you to delete them?
23    A    Anthony.
24    Q    And -- but you don't recall when he asked
25  you to do that?                                        01:59:01

### Page 179

1    A    Yes, that's correct.
2    Q    Did he ask you to delete them before or
3  after the merger and acquisition agreement was
4  signed?
5    A    Before.                                         01:59:13
6    Q    Did he say why you should delete the texts?
7    A    Yes. He was concerned, in general, that
8  other people may find out, and it's not unusual for
9  M&A deals to be conducted over other mediums besides
10  email.                                                 01:59:42
11    Q    So he -- he asked you to delete the texts
12  that you had with him because he was concerned, in
13  general, that other people may find out. Is that
14  about the deal?
15    A    Yes.                                           02:00:07
16    Q    Did he tell you explicitly what he was
17  concerned other people would find out about if you
18  didn't delete the texts exchanged with him?
19    A    He didn't go into specifics, but he did say
20  that it was important to him so that this -- these    02:00:20
21  discussions were confidential, and he would prefer
22  that -- he would prefer and asked us if we could
23  delete the messages.
24    Q    Did you consult with anybody about whether
25  you should delete the messages that he asked you to   02:00:39

### Page 180

1  delete?
2         MR. JACOBS: You can answer that yes or no.
3  Well, you can answer as to nonlawyers. If you
4  consulted with counsel, you can answer yes or no the
5  fact of such consultation without revealing the        02:00:51
6  advice you got.
7         THE WITNESS: I didn't consult anyone, but
8  Cam was in the room when Anthony asked us, and he
9  agreed that we would do that, because we understood
10  that M&A deals are confidential; and if this is       02:01:10
11  something that would make the other side feel more
12  comfortable, that it was something that we could do.
13  BY MS. ROBERTS:
14    Q    Did you tell anybody at Uber, other than
15  Mr. Poetzscher who was in the room at the time, that  02:01:25
16  Mr. Levandowski had asked you to delete emails -- or
17  excuse me, delete texts?
18    A    Yes.
19    Q    Who did you tell?
20    A    Lawyers.                                       02:01:37
21    Q    Did you ask the lawyers whether you should
22  delete the emails that Mr. Levandowski -- or excuse
23  me, delete the texts at Mr. Levandowski's request?
24         MR. JACOBS: I'm going to instruct you not
25  to answer because that calls for privileged advice.   02:01:53

### Page 181

1         THE WITNESS: I'm not going to answer that.
2         MS. ROBERTS: Let's go ahead and take a
3  break.
4         THE WITNESS: Okay.
5         VIDEO OPERATOR: Going off the record. The      02:02:00
6  time is 2:02 p.m.
7         (Recess.)
8         VIDEO OPERATOR: Back on the record. The
9  time is 2:09 p.m.
10  BY MS. ROBERTS:                                       02:09:24
11    Q    Before the break, we were discussing
12  communicating with Mr. Levandowski via text when
13  negotiating the potential acquisition, right?
14    A    Yes.
15    Q    Did you exchange draft term sheets with Mr.   02:09:34
16  Levandowski or anyone acting on his behalf?
17    A    Yes.
18    Q    And how did you exchange those?
19    A    When are you talking about?
20    Q    Before -- I guess before the deal became     02:09:50
21  public.
22         MR. JACOBS: But after its -- turn -- this
23  is now in phase 2 after the -- after late December
24  2015?
25         MS. ROBERTS: Right. I guess we're phase     02:10:01

Veritext Legal Solutions
866 299-5127

1 with acquiring Otto?
2      MR. JACOBS: I'm going to instruct you not
3 to answer.
4      THE WITNESS: I'm not going to answer that.
5      MS. ROBERTS: And for the record, all of     04:47:42
6 these instructions are based on privilege?
7      MR. JACOBS: Yes.
8 BY MS. ROBERTS:
9    Q   Do you recall a meeting with Mr.
10 Levandowski in March of 2016 in which some discs     04:47:54
11 containing Google information was discussed?
12   A   Yes.
13   Q   Tell me what you can recall about that
14 meeting.
15   A   We had convened the meeting to discuss     04:48:12
16 deal-related items. In that meeting, at one point,
17 Anthony mentioned that he at that time possessed
18 Google information, that while it was encrypted, he
19 had the ability to access it. He -- he mentioned
20 that he had not opened it, merely that he had the     04:48:44
21 ability to open it.
22       Lior said he was telling -- they were
23 telling us in the interest of being fully
24 transparent, and Anthony wanted to know what he
25 should do.     04:49:05

Page 278

1    Q   Who was present at this meeting?
2    A   Besides Anthony and Lior, Travis, Cam, and
3 myself.
4    Q   Did Mr. Levandowski provide any more detail
5 about what was on the five discs containing Google     04:49:27
6 information?
7    A   Yes.
8    Q   What did he say was on the discs?
9    A   I didn't understand him a hundred percent,
10 but I thought -- personally, I thought he was     04:49:41
11 referring to something mapping related that
12 potentially was also related to self-driving.
13   Q   So it was your understanding at the time of
14 this March 2016 meeting, based on Mr. Levandowski's
15 explanation, that he had in his possession -- in his     04:50:09
16 possession Google confidential information that
17 potentially related to self-driving vehicles?
18   A   My understanding was that it was mapping
19 specific.
20   Q   And then what made you think that that was     04:50:29
21 potentially related to self-driving technology?
22   A   He may have mentioned that or it may have
23 been my conclusion given the fact that it was
24 encrypted.
25   Q   When you say it may have been your     04:50:48

Page 279

1 conclusion given the fact that it was encrypted, can
2 you clarify that?
3    A   At that time, I personally thought it may
4 have had something to do with self-driving, but I
5 remember Anthony -- or I -- my understanding of what     04:51:07
6 Anthony said was that it seemed to be mapping
7 related.
8    Q   Did he say how he knew it was mapping
9 related?
10   A   Not that what I -- not based on what I can     04:51:23
11 remember.
12   Q   But he did tell you that the discs were
13 encrypted?
14   A   He said that there was an encryption on it,
15 yes.     04:51:34
16   Q   And that he could access the discs even
17 though they were encrypted?
18   A   Yes, he said that he had the ability to
19 unencrypt them.
20   Q   And had he done so?     04:51:46
21   A   He said he had not.
22   Q   Okay. So if he hadn't encrypt- --
23 unencrypted the discs that he had the -- that he had
24 the capability to unencrypt, did he say how he knew
25 that they contained mapping-related information?     04:52:05

Page 280

1    A   Not that I can remember.
2    Q   And then the -- your statement that the
3 information on these discs containing Google
4 confidential information may have related to
5 self-driving -- -driving vehicles, is that based on     04:52:26
6 the statement that Mr. Levandowski made?
7    A   I don't remember. I don't think so. I'm
8 not sure.
9    Q   Did Mr. Ron give any indication that he
10 knew what these materials were that Mr. Levandowski     04:52:42
11 still had from Google?
12   A   To the best of my recollection, no.
13   Q   And so just to make sure I understand, you
14 recall Mr. Levandowski saying that the discs
15 contained Google confidential information about     04:53:01
16 mapping, but you can't recall -- and -- and sitting
17 here today, you remember thinking that that
18 information might also be related to self-driving
19 vehicles; is that correct so far?
20      MR. JACOBS: Objection. Mischaracterizes     04:53:14
21 the testimony.
22      THE WITNESS: I don't think I said it was
23 confidential information, only that it was
24 encrypted.
25 BY MS. ROBERTS:     04:53:23

Page 281

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

### Page 282

1  Q   Okay. So taking a step back, you recall
2  Mr. Levandowski saying that the discs
3  containing Google in- -- contained Google
4  information about mapping; is that right?
5  A   Yes.                                04:53:44
6  Q   And sitting here today, you remember
7  thinking that the information might also be related
8  to self-driving vehicles; is that correct?
9  A   Yes.
10  Q   And sitting here today, you don't recall if  04:53:55
11  that understanding of yours was based on something
12  Mr. Levandowski said or an assumption by you?
13  A   That is correct.
14  Q   Okay. So after Mr. Levandowski said --
15  well, let me ask a different question.        04:54:11
16      You clarified that this information -- that
17  you didn't say that this information was Google
18  confidential information; is that right?
19  A   Yes, that's correct.
20  Q   Did Mr. Levandowski give you any indication  04:54:22
21  that the materials he had in his possession was --
22  were Google confidential information?
23  A   I'm not sure. I don't remember. I only
24  remember him saying that it was encrypted.
25  Q   And after he advised those of you at this  04:54:39

### Page 283

1  meeting that he had these five encrypted --
2  encrypted discs containing Google information,
3  what -- what was the response at that meeting?
4  A   There was some back and forth into
5  determining and to clarifying did he or did he not  04:55:00
6  open them; could he or could -- or could he not
7  op- -- actually like unencrypt the file.
8      At one point Cam jokingly said, "You should
9  probably just throw that in the river," or something
10  along those lines, to which Travis actually raised  04:55:22
11  his right arm to basically look like he was going to
12  block Cam like this (indicating) -- I know you can't
13  like record that -- and said like, "Don't listen to
14  him. He doesn't know what he's talking about. You
15  should talk to your lawyers," basically, and then  04:55:49
16  reiterated, "Don't listen to Cam." And then said,
17  "I know you'll do the right thing."
18      And we also said we would talk to our
19  lawyers.
20  Q   Okay. Going back to you said there was  04:56:09
21  sort of a back and forth trying to clarify whether
22  Mr. Levandowski had accessed the files and whether
23  he could access the files; is that right?
24  A   Yes.
25  Q   And in part of that back-and-forth       04:56:27

### Page 284

1  clarification, what was the ultimate conclusion?
2  A   That he had the ability to open the files,
3  but he did not open the files.
4  Q   Okay. And then after -- after Mr.
5  Poetzscher joked that Mr. Levandowski should throw  04:56:46
6  these files containing Google information into the
7  river, Mr. Kalanick said not to listen to him,
8  right?
9  A   Yes.
10  Q   And advised Mr. Levandowski to talk to his  04:56:58
11  lawyer?
12  A   Yes, that's correct.
13  Q   And also said that you, the Uber
14  individuals at this meeting, would talk to your
15  lawyers?                                     04:57:09
16  A   Yes.
17  Q   Did Uber -- did -- did the Uber individuals
18  who were at this meeting talk to Uber's lawyers
19  about what Mr. Levandowski should do with these
20  discs?                                       04:57:23
21      MR. JACOBS: You can answer that yes or no
22  as to the topic of what to do with the discs.
23      THE WITNESS: Yes.
24  BY MS. ROBERTS:
25  Q   And who specifically did you discuss it  04:57:31

### Page 285

1  with?
2      MR. JACOBS: You can answer that.
3      THE WITNESS: Lawyers.
4  BY MS. ROBERTS:
5  Q   Were they in-house lawyers or outside   04:57:38
6  counsel?
7  A   Both.
8  Q   Both. And what did Uber's lawyers tell you
9  Mr. Levandowski should do with the -- the discs
10  containing Google information?               04:57:52
11      MR. JACOBS: I'm going to instruct you not
12  to answer on the grounds that that seeks privileged
13  legal advice.
14      THE WITNESS: I'm not going to answer that.
15  BY MS. ROBERTS:                              04:58:00
16  Q   Did -- following the meeting with Mr.
17  Levandowski, did Uber convey to Mr. Levandowski what
18  Uber thought he should do with the discs?
19  A   Yes, I believe so.
20  Q   And what was conveyed to Mr. Levandowski  04:58:19
21  about what he should do with the -- the discs?
22  A   I don't think I can --
23      MR. JACOBS: You can say what was conveyed
24  to him by -- yes, you can answer that question.
25      THE WITNESS: Okay. We told him to talk to  04:58:32

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  VIDEO OPERATOR: This concludes today's
2  videotaped deposition of Nina Qi. We're off the
3  record at 5:45 p.m.
4       (TIME NOTED: 5:45 p.m.)

1       I, NINGJUN QI, do hereby declare under
9  penalty of perjury that I have read the foregoing
10 transcript of my deposition; that I have made such
11 corrections as noted herein, in ink, initialed by
12 me, or attached hereto; that my testimony as
13 contained herein, as corrected, is true and correct.
14      EXECUTED this _____ day of _____,
15 2017, at _____, _____.
16       (City)         (State)
17
18       _____
             NINGJUN QI
19           Volume I

1       I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4       That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were duly sworn; that a record
8  of the proceedings was made by me using machine
9  shorthand which was thereafter transcribed under my
10 direction; that the foregoing transcript is a true
11 record of the testimony given.
12      Further, that if the foregoing pertains to
13 the original transcript of a deposition in a Federal
14 Case, before completion of the proceedings, review
15 of the transcript [X] was [ ] was not requested.
16      I further certify I am neither financially
17 interested in the action nor a relative or employee
18 of any attorney or party to this action.
19      IN WITNESS WHEREOF, I have this date
20 subscribed my name.
21 Dated: 6/23/2017
22
23
         _____
24       SUZANNE F. GUDELJ
25       CSR No. 5111