**PAGES 1 -** 75

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE

WAYMO LLC,

                    PLAINTIFF,

 VS.                         NO. C 17-00939 WHA (JSC)

UBER TECHNOLOGIES, INC;

OTTO TRUCKING LLC;

AND OTTOMOTTO LLC,

                    DEFENDANTS.

_____ _____

                    SAN FRANCISCO, CALIFORNIA
                    MONDAY, OCTOBER 23, 2017

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

FOR PLAINTIFF:
             QUINN, EMANUEL, URQUHART & SULLIVAN LLP
             50 CALIFORNIA STREET - 22ND FLOOR
             SAN FRANCISCO, CALIFORNIA  94111
             BY:  **JAMES E. BAKER**
                  **DAVID A. PERLSON**
                  **JORDAN ROSS JAFFE**
                  **MELISSA J. BAILY**
                  JAMES DUBOIS JUDAH
                  **JEFFREY W. NARDINELLI**
                  ANDREA ROBERTS
                  **ATTORNEYS AT LAW**

FURTHER APPEARANCES ON NEXT PAGE

```
 1

 2    FURTHER APPEARANCES:

 3    FOR DEFENDANTS:
                    MORRISON & FOERSTER LLP
 4                  425 MARKET STREET
                    SAN FRANCISCO, CA 94105
 5           BY: ESTHER KIM CHANG
                    ATTORNEY AT LAW
 6    AND

 7                  MORRISON & FOERSTER LLP
                    555 W. FIFTH STREET
 8                  SUITE 3500
                    LOS ANGELES, CALIFORNIA 90013-1024
 9           BY: SYLVIA RIVERA
                    ATTORNEY AT LAW
10    AND

11    FOR DEFENDANT OTTO TRUCKING LLC:

12

13                  GOODWIN PROCTER, LLC
                    THREE EMBARCADERO CENTER
                    SAN FRANCISCO, CALIFORNIA 94111
14           BY: BRETT SCHUMAN
                    ATTORNEY AT LAW
15

16                  GOODWIN PROCTER, LLC
                    135 COMMONWEALTH DRIVE
17                  MENLO PARK, CALIFORNAI 94025
             BY: JAMES LIN
18                  ATTORNEY AT LAW

19    AND         FOR STROZ FRIEDBERG, LLC:
                    LATHAM AND WATKINS, LLP
20                  505 MONTGOMERY STREET, SUITE 2000
                    SAN FRANCISCO, CALIFORNIA 94111
21           BY: WHITNEY WEBER
                    ATTORNEY AT LAW
22    FURTHER APPEARANCES, NEXT PAGE

23    REPORTED BY:     KATHERINE WYATT, CSR #9866 RPR , RMR,
                        PRO TEM COURT REPORTER
24

25
```

SPECIAL MASTER:
       FARELLA, BRAUN & MARTEL LLP
       RUSS BUILDING
       235 MONTGOMERY STREET, 18TH FLR
       SAN FRANCISCO, CALIFORNIA  94104
   **BY:  JOHN L. COOPER**

**MONDAY - OCTOBER 23, 2017**                    **2:00 P.M.**

**P R O C E E D I N G S**

**---000---**

THE CLERK:   CALLING CIVIL C17-0939, WAYMO VERSUS UBER.

MR. SCHUMAN:   GOOD AFTERNOON, YOUR HONOR.

THE COURT:   ALL RIGHT.  LET'S START WITH WAYMO.  GO AHEAD, AND MAKE YOUR APPEARANCES.

MR. PERLSON:   GOOD AFTERNOON, YOUR HONOR.  DAVID PERLSON FROM QUINN EMANUEL ON BEHALF OF WAYMO.  WITH ME, JAMES BAKER, ANDREA ROBERTS, JEFF NARDINELLI, JORDAN JAFFE AND JAMES JUDAH.

THE COURT:   GOOD AFTERNOON.

MS. RIVERA:   GOOD AFTERNOON, YOUR HONOR.  SYLVIA RIVERA WITH MORRISON & FOERESTER, FOR DEFENDANTS OTTOMOTTO AND UBER TECHNOLOGY.  AND ALONG WITH ME IS ESTHER CHANG.

MR. SCHUMAN:   GOOD AFTERNOON, YOUR HONOR.  BRETT SCHUMAN FROM GOODWIN PROCTER ON BEHALF OF OTTO TRUCKING, ET AL.

I HAVE JAMES LIN WITH ME HERE, AS WELL.

THE COURT:   ALL RIGHT.

SPECIAL MASTER:   GOOD AFTERNOON, YOUR HONOR.  JOHN COOPER, SPECIAL MASTER.

THE COURT:   GOOD AFTERNOON.

ALL RIGHT.  SO LET'S SORT OF -- I JUST THOUGHT IT WOULD BE EASIER TO DO ORALLY SOME OF THESE THINGS.

1          BUT LET'S START WITH THE SANCTIONS MOTION.  SO I'LL

2     NEED OTTO TRUCKING UP HERE AND WAYMO.  I DON'T NEED UBER.

3          AND LET ME SORT OF TELL YOU MY ANALYSIS GOING THROUGH

4     IT.  FIRST, I JUST WANT TO PUT IN CONTEXT, WHICH IS I THINK

5     PRETTY MUCH EVERY SINGLE FILING IN THIS CASE, WHICH HAS BEEN

6     MORE THAN A FEW, HAS WITH IT AN ADMINISTRATIVE MOTION TO SEAL.

7          AND IF THE COURT WERE -- JUDGE ALSUP AND MYSELF -- TO

8     RULE ON THOSE IN CONNECTION WITH EVERY MOTION, YOU'D NEVER GET A

9     RULING ON THE MERITS IN ANYTHING, BECAUSE THOSE WE ACTUALLY

10    LOOKED CAREFULLY AT THEM, AND THEY TOOK A LOT OF TIME.

11         SO WHAT WE'VE BEEN DOING IS RULING ON THE MOTION,

12    PUTTING THOSE ADMINISTRATIVE MOTIONS TO SEAL ASIDE, RULING ON

13    THEM WHEN WE CAN.  IN FACT, THE LAST FEW WEEKS MY EXTERNS HAVE

14    BEEN WORKING ON SORT OF GLOBAL ONES TO TRY TO GET EVERYTHING

15    CAUGHT UP.

16         WITH RESPECT TO, THOUGH, THE MOTION TO SEAL THAT IS

17    AT ISSUE IN THE MOTION TO SANCTION, I WENT AHEAD AND RULED ON

18    THAT ONE IMMEDIATELY, BECAUSE, IF YOU RECALL, THERE WAS AN ISSUE

19    AS TO -- I THINK IT WAS AN E-MAIL FROM MR. -- I ALWAYS

20    MISPRONOUNCE HIS NAME.

21              **MR. BAKER:**  ZBROZEK, YOUR HONOR.

22              **THE COURT:**  ZBROZEK.  AND THERE WAS AN ISSUE, AND IT

23    WASN'T REALLY SEALABLE.  AND SO I WANTED TO GET THAT OUT.  AND

24    ACTUALLY BY THE TIME YOU REVISED IT YOU AGREED IT WASN'T

25    SEALABLE AT THAT POINT.

1          SO I RULED.  BUT MY RULING WAS INTENTIONALLY, I WILL

2    SAY, SOMEWHAT AMBIGUOUS, AT LEAST NOT CLEAR.  I SAID THE

3    TECHNICAL -- THE TECHNOLOGICAL INFORMATION WAS SEALED.  AND I

4    DID THAT BECAUSE, AGAIN, THAT IF I WAS TO GO THROUGH LINE BY

5    LINE AND SAY WHICH ONE, YOU'D NEVER GET A RULING OUT OF ME ON

6    THE MERITS.  AND I THINK WE ALL CARE MORE ABOUT THE RULING ON

7    THE MERITS.

8          SO AT THAT POINT I RELY ON THE PARTIES TO THEN MEET

9    AND CONFER AND COME UP WITH:

10              "WELL, WHAT DOES SHE MEAN?  WHAT DOES THAT AGREE

11   WITH?"

12          AND IF YOU CAN'T AGREE, YOU CAN BRING IT BACK TO ME,

13   IF IT WAS IMPORTANT.  I ASSUMED IT PROBABLY WOULDN'T BE, AND

14   THAT YOU WOULD BE ABLE TO AGREE.  BECAUSE WHAT WAS IMPORTANT TO

15   OTTO TRUCKING AND UBER WAS THAT OTHER SUBSTANTIVE STUFF, NOT THE

16   DOMAIN NAME OF THE SERVER.  RIGHT?

17          AND THAT IS, IN FACT, WHAT HAPPENED ON THAT DAY.

18   UBER THEN WANTED TO SHOW TO THEIR CLIENT -- I DON'T KNOW, BY THE

19   WAY, WHY THIS STUFF IS AEO.  BUT, NONETHELESS, UBER TOOK EXHIBIT

20   10, IS WHAT WE'RE TALKING ABOUT, AND SENT IT IN GOOD FAITH.

21          UBER SENT IT IN GOOD FAITH TO WAYMO AND SAID:

22              "THIS IS WHAT WE'RE PROPOSING TO SHOW OUR CLIENT

23   WITH THESE REDACTIONS."  AND IT INCLUDED THE SVN SERVER NAME

24   REDACTED.

25          SO THERE SEEMED TO BE AN AGREEMENT THAT THE COURT'S

1    ORDER APPLY TO THAT.  AND WAYMO THOUGHT SOME OTHER THINGS,

2    PERHAPS, SHOULD BE REDACTED.  AND YOU WENT BACK AND FORTH.  AND

3    OTTO TRUCKING WAS CC'D ON ALL THOSE.  OTTO TRUCKING'S LEAD

4    COUNSEL WAS CC'D ON ALL THOSE COMMUNICATIONS.  RIGHT?

5              **MR. BAKER:**  YES.

6              **THE COURT:**  AND FIVE DAYS LATER -- THAT WAS SEPTEMBER

7    1ST -- SEPTEMBER 6TH OTTO TRUCKING FILED EXHIBIT 10 IN RESPONSE

8    TO MY ORDER, AS IT'S SUPPOSED TO DO, BECAUSE SOME OF THE STUFF

9    IS NOT SEALED.

10             HOWEVER, IT DIDN'T SEAL THE SVN SERVER DOMAIN NAME.

11   SO THAT WAS MISTAKE NUMBER ONE.  THAT WAS AN ERROR.

12             IT WAS IN ERROR FOR TWO REASONS.  ONE:  OTTO TRUCKING

13   WAS COPIED ON THE COMMUNICATIONS BETWEEN UBER AND WAYMO, WHICH

14   ATTACHED THE EXHIBIT 10, AND THERE WAS NO DISPUTE THAT THAT

15   WOULD BE SEALED.

16             SO IF OTTO TRUCKING DISPUTED THAT, IT WAS OBLIGATED

17   TO BRING THAT TO WAYMO'S ATTENTION, AND THEN TO THE COURT'S

18   ATTENTION, NOT TO UNILATERALLY DECIDE IT WASN'T GOING TO SEAL.

19   THAT WAS ERROR NUMBER ONE.

20             AND SECOND, TO THE EXTENT THAT, AS HAS BEEN EXPLAINED

21   IN THE PAPERS, THE ATTORNEYS WHO FILED IT ON OTTO TRUCKING'S

22   BEHALF WASN'T AWARE OF THOSE COMMUNICATIONS.  I DON'T THINK

23   THAT'S AN EXCUSE, BUT GIVEN THE SIZE OF THIS CASE,

24   UNDERSTANDABLE.

25             AGAIN, MY ORDER WAS NOT SPECIFIC.  AND BEFORE OTTO

1    TRUCKING FILED EXHIBIT 10 I CERTAINLY EXPECTED -- OR AT LEAST

2    000HOPED -- THAT THE PARTIES AND THE PARTY FILING IT WOULD SEND

3    THE COPY TO WAYMO AND SAY:

4               "THIS IS WHAT WE BELIEVE IS THE TECHNOLOGICAL

5    INFORMATION THE COURT WAS REFERRING TO, AND THIS IS WHAT WE'RE

6    SEALING.  DO YOU AGREE OR DISAGREE?"

7               SO THAT'S WHAT OTTO SHOULD HAVE DONE.  THAT THAT WAS

8    ERROR NUMBER TWO.  AND THEN, THAT ERROR WAS COMPOUNDED WHEN IT

9    THEN WENT THROUGH AND IN CONNECTION WITH OTHER MOTIONS, I THINK,

10   MOTION IN LIMINE SEPTEMBER 13TH, IN CONNECTION WITH MOTION IN

11   LIMINE NUMBER 26; SEPTEMBER 15TH, IN CONNECTION WITH OTTO

12   TRUCKING'S OPPOSITION TO WAYMO'S MOTION FOR AN ORDER TO SHOW

13   CAUSE; SEPTEMBER 16TH, OTTO TRUCKING'S MOTION IN LIMINE TO

14   EXCLUDE TESTIMONY OF MR. BROWN.  AGAIN, SEPTEMBER 16TH IN

15   CONNECTION WITH OTTO TRUCKING'S MOTION IN LIMINE TO EXCLUDE THE

16   TESTIMONY OF DR. HESSELINK.

17              EACH OF THOSE TIMES IT FILED EXHIBIT 10, WITH A

18   DOMAIN NAME REDACTED.  AND THAT'S AN ERROR FOR THE SAME REASON:

19   THAT I HAD EXPECTED THAT IT WOULD MEET AND CONFER WITH WAYMO

20   BEFORE DOING THAT.

21              AND THEN, OF COURSE, FINALLY, THEN, WHEN ON

22   SEPTEMBER 27TH OTTO TRUCKING WAS CONTACTED BY WAYMO, WHO

23   BELATEDLY REALIZED THAT THIS HAD BEEN FILING.  OTTO TRUCKING

24   SHOULD HAVE IMMEDIATELY AGREED TO HAVE THAT SEALED, AND SO THAT

25   THE ISSUE COULD BE RESOLVED BY THE COURT.

1          BUT THERE WAS ABSOLUTELY NO GOOD FAITH REASON TO

2     OBJECT TO GETTING IT LOCKED IN THE INTERIM AT ALL.  AND, IN

3     FACT, WHAT HAPPENED WAS ON FRIDAY AFTERNOON MR. COOPER CALLED

4     THE COURT'S CHAMBERS AND SAID:

5               "THERE'S A DISPUTE ABOUT THIS AND THEY NEED TO

6     SEE YOU AND HEAR YOU RIGHT AWAY."

7          I SAID:

8               "WHAT ARE YOU TALKING ABOUT?  JUST LOCK IT AND

9     I'LL DEAL WITH IT LATER."

10         BUT I SHOULDN'T HAVE EVEN HAD TO DO THAT, BECAUSE

11    OTTO TRUCKING, AS SOON AS THEY KNEW THAT WAYMO WAS CONTESTING

12    IT, SHOULD HAVE SEALED IT.  THERE WAS ABSOLUTELY NO REASON NOT

13    TO DO THAT.  NONE WHATSOEVER NOT DO THAT.  AND THAT'S WHAT

14    SHOULD HAVE BEEN DONE.

15         YOU'RE PRESERVING YOUR RIGHT.  YOU COULD THEN ARGUE

16    TO THE COURT LATER THAT IT DOESN'T DESERVE SEALING.  SO THAT WAS

17    ANOTHER ERROR.  BUT SO THOSE WERE ALL THOSE ERRORS THERE.

18         BUT ON THE OTHER HAND, THEN, WAYMO -- AND THIS,

19    MR. BAKER, I JUST FIND UNFATHOMABLE -- SUBMITTED ON ALL THOSE

20    SEPTEMBER 13, 15, 15, 16 SUBMITTED DECLARATIONS IN SUPPORT OF

21    OTTO TRUCKING'S ADMINISTRATIVE MOTION TO SEAL EXHIBIT 10, SAYING

22    THE DOMAIN NAME SHOULD BE SEALED, EVEN THOUGH THE DOCUMENT,

23    EXHIBIT 10, THAT THEY FILED, IT WAS NOT SEALED.

24         AND THE ONLY EXPLANATION OF THAT IS THE PERSON WHO

25    SUBMITTED AND FILED THAT DECLARATION ACTUALLY DIDN'T LOOK AT

1    THAT EXHIBIT 10 THAT WAS IN THE DOCKET.

2            AND THAT, TO ME, IS ALSO A HUGE ERROR, BECAUSE MY

3    STAFF IS SITTING THERE GOING THROUGH ALL THESE MOTIONS TO SEAL.

4    AND, IN FACT, YOU GUYS AREN'T EVEN LOOKING AT ALL THIS STUFF

5    THAT IS BEING FILED.  AND SO THAT YOU DISCOVERED THIS

6    SEPTEMBER 27TH AS OPPOSED TO SEPTEMBER 6TH IS WAYMO'S BAD,

7    BECAUSE ABSOLUTELY THEY SHOULD BE POLICING IT.

8            SO MY ANALYSIS IS THAT IT'S OFFSETTING PENALTIES

9    HERE, AND THAT NO ONE SHOULD GET ANYTHING.  SO I'M DENYING YOUR

10   MOTION TO SANCTION.  BUT OTTO TRUCKING ALSO DOES NOT TO GET TO

11   ARGUE IN THIS CASE THAT SOMEHOW -- AND WE'RE NOT TALKING ABOUT

12   THE DOMAIN NAME BEING THE TRADE SECRET.  IT'S WHAT IS IN THERE.

13   AND I ASSUME BY NOW WAYMO HAS ACTUALLY CHANGED THE DOMAIN NAME.

14   RIGHT?  SO WE DON'T EVEN HAVE TO WORRY ABOUT SEALING IT ANYMORE,

15   I WOULD HOPE.

16           **MR. BAKER:**  WELL, WE'RE IN THE PROCESS.  I'LL CHECK

17   WITH MY CLIENT.

18           **THE COURT:**  WE WILL GET THERE, YEAH.  LET ME FINISH,

19   AND THEN YOU CAN TELL ME.  BUT I WOULD ASSUME THAT THEY WOULD DO

20   THAT.

21           SO YOU DON'T GET TO ARGUE THAT IT'S NOT A TRADE

22   SECRET BECAUSE FOR THESE SIX FILINGS IT WAS OUT IN THE PUBLIC

23   RECORD.  BUT, ON THE OTHER HAND, I'M NOT GOING TO GRANT THEIR

24   MOTION SAYING YOU'RE EXCLUDED FROM ARGUING IT'S NOT A TRADE

25   SECRET.  RIGHT?  WE'RE JUST GOING OVER OFFSETTING PENALTIES

1    THERE.  THAT'S MY ANALYSIS, AND YOU CAN TELL ME.

2            **MR. BAKER:**  SURE.  AND I'LL JUST RESPOND BRIEFLY,

3    YOUR HONOR, TO OUR REVIEW OF THE SEALING PAPERS.  I THINK WHAT

4    HAPPENED WAS THAT WE WERE REVIEWING THE PAPERS, BUT THAT NO ONE

5    CAUGHT THAT THE DOMAIN NAME HAD BEEN UNREDACTED, WHICH IS NOT

6    ENTIRELY SURPRISING, BECAUSE IT WAS NEVER IN DISPUTE.

7            YOU KNOW, ON SEPTEMBER 1ST, WHEN WE HAD THIS LENGTHY

8    E-MAIL EXCHANGE --

9            **THE COURT:**  NO, I SAID ALL THAT.

10           **MR. BAKER:**  YES.

11           **THE COURT:**  I UNDERSTAND ALL THAT.  BUT, MR. BAKER, I

12   CAN SEE THAT ONE TIME, BUT I CAN'T SEE IT ONE, TWO, THREE, FOUR,

13   FIVE TIMES OR, NO, SIX TIMES, BECAUSE THERE WAS ALSO UBER DID IT

14   WITH ONE MOTION, AS WELL.  RIGHT?  SIX TIMES.  THAT IT WAS

15   MISSED SIX TIMES?  NO, IT WASN'T LOOKED AT.

16           **MR. BAKER:**  BUT THE REASON I THINK IT WAS MISSED SIX

17   TIMES IS BECAUSE IT WAS THE SAME DOCUMENT.  SO WHEN PEOPLE ARE

18   PREPARING THESE PAPERS THEY SEE THAT THIS IS THE EXACT SAME

19   EXHIBIT THAT THEY HAVE ALREADY DEALT AND SO THEY PUT IT IN THE

20   EXACT SAME PAPER.

21           **THE COURT:**  WITHOUT LOOKING AT IT.

22           **MR. BAKER:**  WITHOUT SEEING --

23           **THE COURT:**  RIGHT.  AND THAT WAS THE ERROR.  THAT'S

24   THE ERROR.

25           **MR. BAKER:**  I UNDERSTAND.

1    **THE COURT:**  BECAUSE, QUITE HONESTLY, IF IT'S SO

2    IMPORTANT THAT THE COURT CAN LOOK AT IT AND DO THAT, THEN YOU

3    CAN SPEND THE TIME TO LOOK AND SEE WHAT IS BEING DONE.  I MEAN

4    YOU, IN THE BROADER SENSE, WHAT IS BEING DONE AND FILE THAT.

5         SO THAT'S WHY I THINK, YOU KNOW, WHATEVER YOU WANT,

6    YOUR FEES OR COSTS, YOU KNOW, COME ON.  GIVE ME A BREAK.  THE

7    FEES THAT WAYMO SPENDS ON THIS CASE, THAT'S NOTHING. THAT'S NOT

8    THE POINT.

9         THE POINT I'M TRYING TO MAKE IS NOBODY SHOULD GET A

10   POINT FROM THIS WHOLE HOT MESS AT ALL.  BUT WE'LL JUST RESET.

11   GO BACK TO THE WAY IT SHOULD BE.  IT SHOULD BE SEALED FOR THE

12   PURPOSES OF THE DISCOVERY.  I THINK THEY HAVE MADE A GOOD CAUSE

13   SHOWING FOR DISCOVERY FOR THE ARGUMENTS THAT THEY MADE.

14   NOW, BUT THAT'S WHERE I GO BACK, MR. BAKER.  I WOULD

15   ASSUME NOW THAT THERE'S A NEW DOMAIN NAME.

16   **MR. BAKER:**  YES, I THINK THAT'S RIGHT, YOUR HONOR.  I

17   MEAN, WE HAVE INFORMED -- OBVIOUSLY, AS SOON AS THIS HAPPENED WE

18   INFORMED OUR CLIENT.  AND MY UNDERSTANDING IS THAT THEY PUT IN A

19   PROCESS TO TRANSFER THE FILES OVER TO AN NEW DOMAIN NAME.

20   THE ONLY THING I WOULD LIKE TO ASK, YOUR HONOR, IS IF

21   I CAN JUST CHECK WITH THE CLIENT, SEE WHAT THE STATUS IS.  IF

22   THERE'S ANY REASON THAT THEY WERE NOT ABLE TO COMPLETE THAT

23   PROCESS AND HAD TO LEAVE IT UP ON THIS SITE, THEN, OF COURSE, WE

24   WOULD WANT ALL THE FILINGS TO REMAIN SEALED.

25   BUT THE OTHER RELIEF THAT WE WOULD ASK THERE ARE

1   NUMEROUS SCRAPER SITES THAT MONITOR THE DOCKETS OF THE COURT AND

2   CAN POSSIBLY PULL DOWN INSTANTANEOUSLY VARIOUS -- YOU KNOW, THE

3   FILINGS. AND WHEN WE HAVE AN INADVERTENT FILING, WE HAVE TO GO

4   TO ALL THESE SCRAPER SITES AND TRY TO RETRIEVE THE INADVERTENT

5   FILING.

6           I THINK THAT IT HAS BEEN DONE IN THIS CASE.  BUT TO

7   THE EXTENT THAT IT HASN'T, AND THE NETWORK STILL NEEDS TO BE

8   DONE, I WOULD JUST SUGGEST THAT THAT'S SOMETHING THE DEFENDANTS

9   SHOULD HAVE TO DO.

10          **THE COURT:**  BUT WHY WILL IT NEED TO BE DONE

11  IF -- WELL, IT ONLY NEEDS TO BE DONE IF THEY HAVEN'T CHANGED THE

12  DOMAIN NAME.

13          **MR. BAKER:**  THAT'S RIGHT, THAT'S RIGHT, YOUR HONOR.

14  THAT'S RIGHT.

15          **THE COURT:**  I CAN'T BELIEVE THAT THAT HASN'T BEEN

16  DONE OR THAT IT CAN'T BE DONE. SO WHY DON'T YOU FIRST JUST DO

17  THAT?

18          **MR. BAKER:**  I WILL.

19          **THE COURT:**  THAT'S THE RESPONSE.

20          ANYWAY, DID YOU WANT TO SAY ANYTHING?

21          **MR. SCHUMAN:**  WELL, YOUR HONOR, I OBVIOUSLY CAME

22  PREPARED TO ADDRESS ALL THE POINTS, BUT I WILL ACCEPT THE

23  COURT'S RULING.  I DON'T APPRECIATE -- LET ME SAY SO THE RECORD

24  IS CLEAR:  I APPRECIATE THE COURT'S TAKING THE MOTIONS

25  SERIOUSLY.  WE TOOK THIS MOTION VERY SERIOUSLY.  I RESPECT THE

```
 1   COURT'S VIEWS AS TO WHAT WE SHOULD HAVE DONE DIFFERENTLY.

 2            OBVIOUSLY, WE POINTED OUT THESE DECLARATIONS.  THEY

 3   SAID WHAT THE COURT SAID THEY SAID.  THEY SUPPORTED OUR FILING,

 4   AND THEN THEREFORE THE THING KEPT GETTING FILED.

 5            THE COURT:  BUT THAT'S AFTER THE FACT.  WHAT I WOULD

 6   LIKE TO HEAR, MR. SCHUMAN, IS YOU AGREE.  AND BOTH SIDES, WHAT I

 7   FIND PROBLEMATIC ABOUT YOUR PLEADINGS -- AND IT'S NORMAL FOR

 8   THIS CASE -- NO SIDE WOULD TAKE RESPONSIBILITY FOR WHAT THEY

 9   DID.

10            SO I GET A REPLY FROM WAYMO SAYING:

11            "WELL, WE DIDN'T REALLY SUPPORT IT BECAUSE WE

12   SAID IN OUR DECLARATION THAT IT SHOULD BE REDACTED," WITHOUT

13   ACKNOWLEDGING THAT CLEARLY SOMEONE WASN'T LOOKING AT ALL THOSE

14   FILINGS. RIGHT?

15            AND YOU SAY:

16            "WELL, LOOK WHAT WAYMO DID."

17            BUT I SAY:

18            "YOU SHOULD HAVE NEVER, EVER FILED IT PUBLICLY."

19            AND THE MOST ALARMING THING WAS WHEN THEY BROUGHT IT

20   TO YOUR ATTENTION, THE RESPONSE IS:

21            "WELL, THAT SHIP HAS SAILED.  TOO LATE."

22            NO.  YOU AGREE TO LOCK IT, ESPECIALLY IF IT WAS

23   INCONSEQUENTIAL UNLESS YOU WERE TRYING UNFAIRLY TO GET A

24   TACTICAL ADVANTAGE IN THE CASE, WHICH I WOULDN'T HAVE LET YOU

25   DO.
```

```
1              SO THAT'S WHAT ACTUALLY I WANT TO HEAR, NOT -- I SAID

2   WHAT WAYMO DID.  I SAID WHAT YOU DID.  WHAT I WANT TO HEAR OTTO

3   TRUCKING SAYING IS IT WON'T HAPPEN AGAIN.

4              AND THEN, ALSO, WITH RESPECT TO THE OTHER FILINGS I

5   RULED ON IT.  WELL, YES.  IT JUST SHOULD NEVER HAVE BEEN DONE AT

6   ALL.  IT'S CONFIDENTIAL.  I DON'T HAVE TO SAY ANYTHING GOING

7   FORWARD.  YOU DON'T HAVE AN ORDER.  IT WAS NEVER BROUGHT TO MY

8   ATTENTION THAT IT SHOULD BE DISPUTED.  AND, IN FACT, IT'S GOING

9   TO BECOME MOOT BECAUSE THEY ARE GOING TO CHANGE THE DOMAIN NAME,

10  ANYWAY, SO THAT'S ACTUALLY WHAT I WANT TO HEAR.

11           MR. SCHUMAN:  RIGHT.  SO IT WON'T HAPPEN AGAIN.  I

12  THINK THAT'S ONE OF THE THINGS THE COURT WANTS TO HEAR.  AND I

13  DO RESPECT THE COURT'S VIEW THAT WE SHOULD NOT HAVE FILED IT

14  INITIALLY AS WE DID.

15           THE COURT:  OKAY.

16           MR. SCHUMAN:  I DON'T WANT TO TALK -- I RESPECT THE

17  COURT'S RULING.  I DON'T WANT TO TALK THE COURT OUT OF ITS

18  RULING.

19           THE INITIAL E-MAILS AND THE PAPERS REFLECT THIS WAS

20  BETWEEN WAYMO AND UBER.  MR. CHATTERJEE, AND NOT THE ENTIRE

21  TEAM.  NOT MYSELF, FOR EXAMPLE, WERE CC'D ON SOME OF THOSE

22  E-MAILS WHICH CAME IN THE FRIDAY BEFORE LABOR DAY, AND MR.

23  CHATTERJESS WAS OUT OF TOWN.

24           WE MISSED THEM BECAUSE THE WHOLE TEAM WASN'T COPIED.

25  SO WE MISSED THEM.
```

1          **THE COURT:**  I UNDERSTAND AND ACCEPT THAT.  BUT THAT

2    DOESN'T EXPLAIN WHY, THEN, WHEN YOU GET THIS ORDER -- I MEAN,

3    QUITE HONESTLY, NOW WHAT I'M GOING TO HAVE TO DO IN ALL MY

4    SEALING ORDERS IS SAY:

5               "BY THE SAY, BEFORE YOU HAVE FILE IT NOW, THE

6    NEW DOCUMENT, IN ACCORDANCE WITH MY ORDER, MAKE SURE YOU PLEASE

7    SEND A COPY" -- ALMOST ALWAYS WAYMO BECAUSE IT'S ALWAYS YOUR

8    TRADE SECRET -- "TO THEM, AND RUN IT BY THEM BEFORE YOU FILE

9    IT."

10          I HAVE TO DO THAT NOW, AND I JUST DIDN'T THINK I HAD

11   TO DO IT BEFORE.

12          **MR. SCHUMAN:**  I UNDERSTAND, YOUR HONOR.  AND I THINK

13   WE'RE COMING NEARLY TO THE END OF THE DISCOVERY.  IT WON'T

14   HAPPEN AGAIN.  I RESPECT COURT'S --

15          **THE COURT:**  WELL, I THINK WE ARE.

16          OKAY?

17          **MR. BAKER:**  THANK YOU, YOUR HONOR.

18          **THE COURT:**  ALL RIGHT.

19          **MR. SCHUMAN:**  THANK YOU, YOUR HONOR.

20          **THE COURT:**  I WAS GOING TO WRITE SOMETHING, BUT MAYBE

21   I DON'T NEED TO WRITE SOMETHING.  DO YOU THINK?  WELL, I DON'T

22   WANT TO PUT YOU ON THE SPOT, BUT I ASSUME NOBODY IS GOING TO

23   APPEAL ME ON THIS ISSUE.

24          **MR. BAKER:**  I DON'T THINK SO.

25          **MR. SCHUMAN:**  WE'LL WAIVE APPEAL, YOUR HONOR.

1        **THE COURT:**  ALL RIGHT.  THEN, I WON'T WRITE ANYTHING.

2        **MR. BAKER:**   THANK YOU, YOUR HONOR.

3        **MR. SCHUMAN:**  THANK YOU, YOUR HONOR.

4        **THE COURT:**  OKAY. NOW, LET'S TALK ABOUT -- WE'RE

5   TALKING ABOUT DOCKET NUMBER 1994, AND THEN WE NEED TO SET A

6   BRIEFING SCHEDULE IN WHAT I THINK MAY BE THE LAST TWO DISCOVERY

7   DISPUTES.

8            MAYBE THAT'S OFF, BUT LET'S FIRST TALK ABOUT

9   MR. LEVANDOWSKI'S LAPTOP.  THERE'S TWO LAPTOPS THAT APPARENTLY

10  HE USED AT UBER.

11           AND I GUESS, MR. PERLSON, MY FIRST QUESTION IS:  WHAT

12  IS THE REQUEST, THE DOCUMENT REQUEST THAT THIS WAS COVERED BY?

13           IN OTHER WORDS, HAD YOU PREVIOUSLY ASKED TO INSPECT

14  ALL DEVICES USED BY MR. LEVANDOWSKI AT UBER?

15       **MR. PERLSON:**  WELL, WE HAD -- THE COURT'S ORDER

16  REQUIRED THEM TO SEARCH LAPTOPS OR LEVANDOWSKI DEVICES.  WE

17  THOUGHT THAT HE WAS REFUSING -- THAT HE WAS REFUSING BASED ON

18  WHAT THEY HAD BEEN REPRESENTING ALL ALONG.  IF YOU RECALL, ALL

19  ALONG WE'VE BEEN TOLD THIS STORY THAT MR. LEVANDOWSKI WASN'T

20  COOPERATING IN RELATION TO HIS, YOU KNOW, PERSONAL PROPERTY,

21  WHICH PERSONAL LAPTOPS WOULD INCLUDE.  AND THAT THEY WOULD BE

22  SUBJECT TO THE FIFTH AMENDMENT.

23           AND THAT ADDITIONALLY, OTTO TRUCKING SAID:

24               "WELL, WE DON'T HAVE ANY CONTROL OVER

25  MR. LEVANDOWSKI, AND WE CAN'T PRODUCE DOCUMENTS FROM HIM BECAUSE

1    HE'S NOT COOPERATING, IN AN ORDER THAT YOU ASKED FOR," SO --

2              **THE COURT:**  SO I'M JUST GOING TO GO BACK FOR A

3    MINUTE.  SO WHAT YOU SAID IS THAT IT WAS THAT THEY WERE SUPPOSED

4    TO SEARCH THEM.

5              **MR. PERLSON:**  RIGHT.

6              **THE COURT:**  OKAY.  SO THEY SAY THEY DID.

7              **MR. PERLSON:**  NO, THEY DIDN'T SEARCH THEM.  WHAT THEY

8    DID WAS -- ALL THEY DID WAS THAT THEY -- WELL, FIRST OF ALL, HAD

9    WE KNOWN THESE EXISTED WE MAY HAVE REQUESTED TO INSPECT THEM.

10   WE HAD NO BASIS TO ASK TO INSPECT THEM BECAUSE THEY HID THEM

11   FROM US.

12             **THE COURT:**  NO.  WAIT.  WAIT.  THAT'S WHY -- THAT'S

13   WHY MY FIRST QUESTION WAS:

14                  "WHAT WAS YOUR REQUEST?"

15             IT'S CERTAINLY NOT A SECRET THAT HE HAD DEVICES THAT

16   HE USED WHEN HE WAS AT UBER, WHETHER YOU KNEW WHAT THE DEVICES

17   WERE OR NOT.

18             SO MY QUESTION IS:  DID YOU HAVE A REQUEST THAT SAID:

19                  "WE WANT TO THE INSPECT ALL DEVICES THAT

20   MR. LEVANDOWSKI USED AT UBER?"

21             **MR. PERLSON:**  THE PI ORDER ALLOWED US TO INSPECT ALL

22   ONGOING LIDAR WORK, WHICH IS, PRESUMABLY, THESE LAPTOPS WHICH

23   APPARENTLY WERE USED AT WORK.  WE SHOULD HAVE BEEN ABLE TO

24   INSPECT THEM, AND THEY WERE NOT MADE AVAILABLE.  AND WE DID ASK

25   TO INSPECT ALL OF MR. LEVANDOWSKI'S DEVICES, AND THEY WERE NOT

1    MADE AVAILABLE.  AND SO THAT'S ONE.

2            **THE COURT:**  OKAY.  SO WHAT WAS THAT REQUEST?

3            YOU CAN COME UP.

4            **MR. PERLSON:**  YES, MR. JUDAH KNOWS MORE SPECIFICS.

5            **MR. JUDAH:**  YOUR HONOR, YOU KNOW, MR. JAFFE ENGAGED

6    IN A NUMBER OF THESE REQUESTS ON MEET AND CONFERS.  AND HE WOULD

7    SHOW UP AT INSPECTIONS AND SAY:

8                "WE WANT TO SEE MR. LEVANDOWSKI'S, YOU KNOW,

9    WORKSTATIONS.  WE WANT TO INSPECT WHAT HE'S DOING WITH LIDAR."

10           AND THEY MADE SOME OF THOSE AVAILABLE, BUT THESE TWO

11   WERE NEVER EVEN MENTIONED.  SO I CAN GO BACK, AND WE CAN SEND

12   YOU A LAUNDRY LIST OF INSTANCES WHERE BOTH IN CORRESPONDENCE AND

13   I CAN ATTEST TO MEET AND CONFERS WHERE WE ASKED TO INSPECT

14   MR. LEVANDOWSKI'S DEVICES.

15           **THE COURT:**  AND HE WAS STILL AT UBER AT THE TIME?

16           **MR. JUDAH:**  IT DEPENDS ON WHEN THOSE REQUESTS WERE

17   FIRST MADE.  WHEN THEY WERE FIRST MADE AFTER THE PI ORDER, HE

18   WAS STILL AT UBER.  BUT, YOU KNOW, HE WAS TOLD HE WAS TERMINATED

19   ON MAY 26TH.  AND SO MOST OF THE REQUESTS WERE PROBABLY MADE

20   AFTERWARDS.

21           **THE COURT:**  OKAY.  OKAY.

22           **MR. PERLSON:**  AND THEN TO RESPOND TO YOUR -- I MEAN,

23   WE DID HAVE -- IN RELATION TO THE RFP'S, I MEAN WE HAD ALL SORTS

24   OF RFP'S THAT WOULD HAVE RESPONSIVE INFORMATION.  LIKE, FOR

25   EXAMPLE, YOU KNOW, LIKE DOWNLOADED MATERIALS, WHATEVER.

1      **THE COURT:**  BUT THEY SAY THEY SEARCHED IT.

2          **MR. PERLSON:**  WELL, HERE'S WHAT THEY DIDN'T DO.

3   THERE WAS A SEARCH, BUT FROM READING -- FIRST OF ALL, WE DON'T

4   KNOW EXACTLY WHAT WAS SEARCHED, BECAUSE GOODWIN PROCTER, OTTO

5   TRUCKING'S COUNSEL, HAD THE LAPTOPS.  AND YOU SAW NO DECLARATION

6   FROM THEM.

7          MR. CHATTERJEE, WHO WAS SUPPOSEDLY INVOLVED IN THIS,

8   ISN'T HERE.  AND ALL WE HAVE IS A DECLARATION FROM MR. GONZALEZ,

9   WHO SAYS THAT HE HAD A CONVERSATION WITH MR. CHATTERJEE.  AND

10  ALL I UNDERSTAND IS THAT THEY SEARCHED FOR ARE THE -- OR AT

11  LEAST THAT MR. GONZALEZ THOUGHT THEY SEARCHED FOR -- WAS THE

12  NAMES OF THE 14,000 FILES, AND THEN LIKE MAYBE 15 ADDITIONAL

13  TERMS THAT WE HAD PROVIDED IN THE EXPEDITED DISCOVERY PHASE.

14          I DON'T RECALL SEEING ANYTHING IN ANY OF THEIR PAPERS

15  THAT SAYS THEY APPLIED ANY SEARCH TERMS FOR CUSTODIAL DOCUMENTS,

16  OR THAT THEY LOOKED FOR, YOU KNOW, FILES, YOU KNOW, IN RELATION

17  TO OUR RFP'S.

18          **THE COURT:**  LET ME ASK MS. RIVERA, BECAUSE IT WAS A

19  REQUEST TO UBER.

20          **MS. RIVERA:**  THANK YOU, YOUR HONOR.

21          SO WITH RESPECT TO MR. LEVANDOWSKI'S COMPUTERS, I

22  WANT TO BE CLEAR.  THE COMPUTERS THAT WE'RE TALKING ABOUT HERE

23  ARE PERSONAL MACHINES.  AND WE MADE AVAILABLE FOR INSPECTION TO

24  WAYMO, AND THEY DID, IN FACT, INSPECT ALL OF THE DEVICES OF

25  MR. LEVANDOWSKI THAT WE HAVE POSSESSION, CUSTODY OR CONTROL

1    OVER.

2              **THE COURT:**  SO THESE WERE NOT UBER-ISSUED LAPTOPS.

3              **MS. RIVERA:**    THESE ARE DEFINITELY NOT UBER-ISSUED

4    COMPUTERS.

5              I DO WANT TO MENTION IT'S IN WAYMO'S PAPERS THAT

6    THESE ARE COMPUTERS THAT WERE USED FOR UBER WORK.  THAT IS A

7    REFERENCE TO THE E-MAIL THAT MS. PADILLA SENT TO

8    MR. LEVANDOWSKI.

9              THAT'S THE BASIS FOR THEIR STATEMENT.  THERE HASN'T

10   BEEN, YOU KNOW, ANY OTHER DISCOVERY THAT NECESSARILY PERTAINS TO

11   THAT.  HAVING SAID THAT, I WILL TELL YOUR HONOR -- THIS IS

12   SOMETHING THAT WAYMO KNOWS -- IT'S OUR UNDERSTANDING THAT ONE OF

13   THE COMPUTERS IN QUESTION IS A COMPUTER FOR WHICH THERE EXISTED

14   A PARTIAL BACKUP, THE CRASH PLAN PARTIAL BACKUP ON THE UBER

15   SYSTEM.

16             THAT'S MY UNDERSTANDING OF THE BASIS FOR BELIEVING

17   THAT, AT LEAST AS TO ONE OF THE COMPUTERS, IT MUST HAVE BEEN

18   USED FOR UBER WORK TO SOME DEGREE, BECAUSE THERE'S A PARTIAL

19   BACKUP THAT EXISTS ON UBER'S SYSTEM.

20             THAT'S A PARTIAL BACKUP THAT HAS BEEN MADE AVAILABLE

21   TO WAYMO, AND THEY INSPECTED.  THEY INSPECTED IT IN JUNE.  JUNE

22   WAS WHEN THEY MADE THEIR REQUEST TO UBER, PURSUANT TO THE

23   COURT'S PRELIMINARY INJUNCTION ORDER, TO INSPECT

24   MR. LEVANDOWSKI'S DEVICES.

25             SO A MOMENT AGO COUNSEL INDICATED THAT REQUEST WAS

1  MADE BEFORE MR. LEVANDOWSKI WAS TERMINATED.  AND, IN FACT, WAS

2  MADE AFTER HIS TERMINATION.  IT WAS MADE IN JUNE.  AND

3  EVERYTHING THAT WE HAD AVAILABLE TO US, WE MADE AVAILABLE TO

4  WAYMO.  AND THEY CAME OVER AND INSPECTED IT, I THINK, ON TWO

5  SEPARATE OCCASIONS.

6           SO EVERYTHING THAT WE HAVE HAS BEEN MADE AVAILABLE.

7  THE NOTION THAT THESE TWO PERSONAL COMPUTERS WERE HIDDEN IS

8  COMPLETELY FALSE.  LIKE I SAID, AS TO THE ONE COMPUTER THAT I

9  CAN STAND BEFORE YOUR HONOR AND SAY I -- WE HAVE A GOOD FAITH

10  REASON TO BELIEVE IT WAS USED AT LEAST ONCE ON UBER'S SYSTEM.

11  THAT'S A COMPUTER THAT WAS DISCLOSED IN OUR RESPONSE TO

12  EXPEDITED INTERROGATORY NUMBER THREE.

13           IT'S A COMPUTER THAT THEY INSPECTED THE PARTIAL CRASH

14  PLAN BACKUP OF.

15           AS TO THE SECOND COMPUTER, I CAN'T TELL YOUR HONOR

16  THAT WE HAVE ANY DEFINITIVE EVIDENCE THAT THAT COMPUTER WAS USED

17  FOR UBER WORK.  IT WAS MADE REFERENCE TO IN THE PADILLA E-MAIL,

18  BUT THAT'S REALLY ALL WE KNOW.  THAT ALSO IS A COMPUTER THAT WE

19  CURRENTLY AND DURING THE LIFETIME OF THIS LITIGATION HAVE NEVER

20  HAD POSSESSION, CUSTODY OR CONTROL OVER.

21           TO THE EXTENT WAYMO WANTED, YOU KNOW, THESE

22  COMPUTERS, THIS IS SOMETHING THAT AT MS. PADILLA'S OCTOBER 2ND

23  DEPOSITION SHE TESTIFIED:

24           "LOOK, I THINK THAT YOU HAVE TO TALK TO

25  MR. LEVANDOWSKI'S PERSONAL COUNSEL."

1      **THE COURT:**  RIGHT.   BUT WHAT I'M TRYING TO FIGURE

2    OUT IS I THOUGHT UBER SAID THAT IT ASKED -- THAT IT DID HAVE

3    GOODWIN RUN THE SEARCH TERMS.  GOODWIN, I UNDERSTAND, WAS

4    REPRESENTING MR. LEVANDOWSKI IN THE ARBITRATION.

5      **MS. RIVERA:**  CORRECT, YOUR HONOR.  SO MS. PADILLA

6    SENT HER E-MAIL ON APRIL 20TH ASKING FOR THESE COMPUTERS TO BE

7    MADE AVAILABLE TO UBER, IMPLORING MR. LEVANDOWSKI TO TURN THOSE

8    OVER TO US SO WE CAN IMAGE THEM AND PERFORM OUR SEARCHES.  I

9    THINK TWO DAYS LATER THERE'S AN EXCHANGE BETWEEN COUNSEL FOR

10   UBER AND MR. LEVANDOWSKI'S PERSONAL COUNSEL IN THE ARBITRATION

11   THAT GOOGLE COMMENCED.

12      AS IT HAPPENS, HIS PERSONAL COUNSEL IN THAT

13   ARBITRATION AT THE TIME WAS GOODWIN PROCTER.  MY UNDERSTANDING

14   HAD NOTHING TO DO WITH GOODWIN PROCTER'S REPRESENTATION OF OTTO

15   TRUCKING IN THIS CASE.  THIS WAS A COMMUNICATION BETWEEN COUNSEL

16   FOR UBER AND COUNSEL FOR GOODWIN PROCTER IN THEIR CAPACITY AS

17   THE AS MR. LEVANDOWSKI'S PERSONAL COUNSEL.

18      WE ASKED THEM -- THIS WAS IN APRIL.  SO THIS WAS

19   BEFORE THE PARTIES HAD STARTED THE REGULAR DISCOVERY IN THE

20   SENSE THAT WE HADN'T RECEIVED WAYMO'S 200 PLUS RFP'S.  BUT WE

21   COMMUNICATED WITH GOODWIN PROCTER; ASKED THEM TO RUN THE FILE

22   NAMES OF THE 14,000 FILES, THE HASH VALUES AND THE -- I SAY

23   APPROXIMATELY 100 OR SO SEARCH TERMS THAT THE PARTIES HAD BEEN

24   USING FOR PURPOSES OF LOCATING ANY OF THOSE 14,000 FILES.

25      AND THIS IS IN MY DECLARATION, YOUR HONOR, OF ABOUT A

1    MONTH LATER WE RECEIVED -- IT'S IN MY DECLARATION AND

2    MR. GONZALEZ'S DECLARATION.  ABOUT A MONTH LATER WE RECEIVED THE

3    RESULTS.  AND ABOUT A MONTH AFTER THAT WE PRODUCED ANY OF THE

4    RESULTS THAT WE DEEMED TO BE RESPONSIVE.

5              IN ADDITION TO THAT, IN CONNECTION WITH EXPERT

6    DISCOVERY, WE MADE AVAILABLE TO WAYMO A RELATIVITY DATABASE THAT

7    INCLUDES ALL THE HITS, ANYTHING THAT HITS ON A TERM THAT WAS

8    RELATED TO THE 14,000 FILES.  SO ALL OF THOSE HITS HAVE BEEN

9    MADE AVAILABLE TO THEM FOR INSPECTION.

10             **THE COURT:**  BUT HIS LAPTOPS WERE IN THE RELATIVITY

11   DATABASE.

12             **MS. RIVERA:**  YOUR HONOR, WE, COUNSEL FOR UBER, IN

13   CONNECTION WITH EXPERT DISCOVERY IN THIS CASE, TOOK ALL OF THE

14   DOCUMENTS THAT WE HAD SEARCHED TO WHICH WE HAD APPLIED THE

15   SEARCH TERMS THAT PERTAIN TO THE SEARCH FOR THE 14,000 FILES.

16             WE TOOK ALL THE DOCUMENTS THAT HIT ON THOSE SEARCH

17   TERMS, PUT THEM IN A RELATIVITY DATABASE, AND INVITED WAYMO TO

18   INSPECT THEM.

19             **THE COURT:**  ALL RIGHT.  BUT IN ANY EVENT --

20             **MR. PERLSON:**  I DON'T RECALL THAT HAPPENING?  IT MAY

21   HAVE HAPPENED, BUT I DON'T RECALL IT.

22             **THE COURT:**  OKAY.  ALL RIGHT.

23             **MS. RIVERA:**  IT HAPPENED.  IT WAS TESTIFIED TO BY OUR

24   FORENSIC EXPERT.

25             **MR. PERLSON:**  WHEN DID IT HAPPEN?  I'M ASKING.  NO

1 ONE HERE KNOWS WHEN THAT HAPPENED.

2          **MS. RIVERA:**  I DON'T KNOW THE DATE.  MR. FAULKNER

3 TESTIFIED TO IT ON SEPTEMBER 28 THAT THERE WAS A DATABASE THAT

4 WAS AVAILABLE TO YOU GUYS.

5          **MR. PERLSON:**  OH, MR. FAULKNER MADE IT AVAILABLE TO

6 US IN HIS DEPOSITION?  IS THAT WHAT YOU ARE SAYING?

7          **MS. RIVERA:**   I DON'T KNOW THAT HE MADE IT AVAILABLE

8 TO WAYMO DURING DEPOSITION.  HE TESTIFIED TO THE FACT DURING HIS

9 DEPOSITION THAT THERE WAS A SEARCH PERFORMED OF THESE COMPUTERS

10 BY MR. LEVANDOWSKI'S PERSONAL COUNSEL, AND THAT ALL OF THE

11 RESULTS OF THE SEARCHES FOR THE 14,000 FILES WERE PROMOTED TO

12 THE RELATIVITY DATABASE, AND THOSE HAVE BEEN AVAILABLE TO WAYMO

13 FOR INSPECTION.

14          **MR. PERLSON:**  YOUR HONOR, I FIND THIS -- I MEAN, WE

15 DON'T KNOW WHAT SHE'S TALKING ABOUT.

16          AND IF THERE'S EVIDENCE THAT YOU MADE IT AVAILABLE

17 TO -- I DON'T UNDERSTAND HOW THEIR EXPERT COULD MAKE SOMETHING

18 AVAILABLE TO US IN DISCOVERY.  IF THERE'S SOME RELATIVITY

19 DATABASE, THAT WOULD BE SOMETHING THAT I WOULD EXPECT THEM TO

20 DO, NOT THEIR EXPERT.

21          **THE COURT:**  I DON'T THINK THAT'S WHAT SHE SAID.

22 SHE'S NOT SAYING HE MADE IT AVAILABLE.  I THINK HE WAS

23 TESTIFYING THAT IT WAS AVAILABLE, AND THAT IT WAS OTHERWISE MADE

24 AVAILABLE.  I DON'T KNOW IF IT WAS OR IT WASN'T.

25          UBER DOESN'T HAVE THE LAPTOPS.

1    **MR. PERLSON:**  OKAY.  WELL, LET ME ADDRESS A FEW

2    THINGS THAT THEY SAID.  WELL, THAT'S A PROBLEM.  AND, FIRST OF

3    ALL, THEY DID HIDE THE IDENTITY OF THE LAPTOPS.  THEY KNEW ABOUT

4    IT, AND THEY DIDN'T DISCLOSE IT TO US AFTER THEY HAD -- OR THAT

5    THEY HAD, THEY WOULD HAVE ANY CONTROL OVER IT.  BOTH COUNSEL

6    FOR -- ON MAY 3RD, MR. GONZALEZ BEFORE THE COURT, HE SAID THAT

7    YOU'RE CORRECT, THAT HE DOES HAVE A PERSONAL DEVICE THAT HIS

8    LAWYERS HAVE INSTRUCTED HIM TO ASSERT THE FIFTH AMENDMENT ON.

9           THIS WAS AT A HEARING BEFORE JUDGE ALSUP, I BELIEVE.

10   AND THIS IS, I GUESS, AT THE SAME TIME IN WHICH THEY ARE HAVING

11   COMMUNICATIONS WITH GOODWIN PROCTER ABOUT GETTING THIS STUFF AND

12   GETTING DOCUMENTS FROM THEM.

13          HOW'S THAT NOT WITHHOLDING IT FROM US, IF THAT'S ONE

14   OF THE DOCUMENTS THAT THEY ARE TALKING ABOUT?

15          AND THEN, SECOND OF ALL, MR. CHATTERJEE, ON JULY 7TH,

16   HAD REPRESENTED -- THE COURT ASKED HIM, HE SAID:

17             "HAVE YOU LOOKED AT -- HAVE YOU PERSONALLY

18   LOOKED AT HIS PERSONAL COMPUTER?"

19          AND MR. CHATTERJEE RESPONDS -- NOT IDENTIFYING THE

20   CONVERSATIONS THAT HAPPENED BETWEEN HIM AND UBER -- HE SAYS:

21             "WE'VE ASKED FOR A FORENSIC IMAGE, AND THEY HAVE

22   REFUSED TO GIVE IT.

23             "WELL, MAYBE THAT'S THE PROOF IN THE PUDDING

24   RIGHT HERE," THE COURT SAYS.  AND THEN THE COURT SAYS:

25             "NO.  I'M TALKING ABOUT HIS PERSONAL.  I'M

1    TALKING ABOUT MR. LEVANDOWSKI'S OWN PERSONAL COMPUTER.  THERE IS

2    NO WAY THAT WAYMO WOULD HAVE THAT."

3              AND THEN, MR. CHATTERJEE SAYS:

4              "OH, THERE'S THE FIFTH AMENDMENT ISSUE ON THAT,

5    YOUR HONOR."

6              THEY NEVER SAID:

7              "OH, BY THE WAY, WE HAD THE LAPTOPS FOR AWHILE,

8    AND WE WERE RUNNING SEARCHES FOR UBER FOR THEM."

9              NO ONE EVER TOLD US THAT.  THEY HAVE BEEN HIDDEN FROM

10   US.

11             AND ALSO WE HEARD FROM UBER TRYING TO BACK AWAY FROM

12   WHAT THEIR HEAD OF LITIGATION SAID TO MR. LEVANDOWSKI.  EXHIBIT

13   1 TO OUR OPENING, WHICH IS THIS APRIL 20TH E-MAIL FROM MS.

14   PADILLA, SAYS:

15             "ANTHONY, I UNDERSTAND THAT THERE ARE TWO LAPTOP

16   COMPUTERS IN YOUR POSSESSION THAT YOU HAVE USED FOR UBER WORK

17   THAT HAVE NOT YET BEEN PROVIDED TO US FOR INSPECTION IN THE

18   WAYMO LITIGATION."

19             AND THEN SHE GOES ON TO SAY:

20             "UBER IS OBLIGATED BY LAW TO REVIEW THESE

21   COMPUTERS, AND IT'S ENTITLED TO DO SO.  IT IS ESSENTIAL FOR OUR

22   LAWYERS TO IDENTIFY AND RETRIEVE ANY, ANY UBER BUSINESS RECORDS

23   OR ELECTRONIC MEDIA THAT BELONG TO THE COMPANY AND THAT HAVE

24   POTENTIAL RELEVANCE TO THIS LITIGATION."

25             SO THEY CERTAINLY THOUGHT THAT THEY HAD RELEVANT

1    INFORMATION ON THEM, YET NOBODY DISCLOSED TO US THAT THEY WERE

2    THERE OR THAT --

3              **THE COURT:**  OKAY.  BUT IF THEY DON'T HAVE THEM NOW.

4    I'M JUST TRYING TO GET --

5              **MR. PERLSON:**  I DON'T KNOW.  I THINK WE'RE ENTITLED

6    TO GET A DEPOSITION TO FIGURE OUT WHAT THEY DO OR DON'T HAVE.  I

7    MEAN, PERHAPS MAYBE IT'S MORE APPROPRIATE FOR OTTO TRUCKING, IF

8    THEY ARE THE ONES WHO HAD IT, AND THEY SAY THEY NEVER HAD IT.

9    BUT I THINK WE SHOULD --

10             **THE COURT:**  WELL, I UNDERSTAND WHY YOU'RE CONFLATING

11   THIS, BUT GOODWIN WAS REPRESENTING MR. LEVANDOWSKI INDIVIDUALLY

12   IN THE ARBITRATION AT THE TIME, NOT OTTO TRUCKING.

13             **MR. PERLSON:**  THEN WHY IS IT THAT UBER IS CONTACTING

14   GOODWIN, OTTO TRUCKING'S COUNSEL, TO GET DOCUMENTS IN RELATION

15   TO THIS LITIGATION?

16             **THE COURT:**  WELL, THEY ARE CONTACTING GOODWIN AS

17   MR. LEVANDOWSKI'S COUNSEL.  WHY DO YOU SAY THEY ARE CONTACTING

18   OTTO TRUCKING?  I DON'T KNOW.  I MEAN, THAT'S SORT OF MAKING A

19   MESS OF THEIR OWN --

20             **MR. PERLSON:**  YOUR HONOR --

21             **THE COURT:**  WAIT.  LET ME HEAR FROM MR. SCHUMAN.

22             **MR. SCHUMAN:**  YOUR HONOR, GOODWIN DOES REPRESENT

23   MR. LEVANDOWSKI IN THE ARBITRATION.  MR. --

24             **THE COURT:**  STILL?

25             **MR. SCHUMAN:**  YES.  MR. GONZALEZ'S DECLARATION FILED

1    IN RESPONSE TO THIS MOTION WE'RE HEARING, DOCKET 2018-3 EXPLAINS

2    THIS.

3              UBER ASKED MR. LEVANDOWSKI TO TURN OVER HIS PERSONAL

4    LAPTOPS.  HE REFUSED ON THE GROUND OF HIS FIFTH AMENDMENT

5    RIGHTS.

6              MR. GONZALEZ CALLED MY PARTNER, MR. CHATTERJEE -- WHO

7    IS AT A MEDICAL APPOINTMENT TODAY, MR. PERLSON, SO THAT'S WHY HE

8    CAN'T BE HERE, SINCE YOU MADE A POINT OF THAT -- AND ASKED THAT

9    AS A COMPROMISE, WOULD WE RUN THOSE FOR UBER ON HIS PERSONAL

10   LAPTOPS.

11             MR. PERLSON HAS MISCHARACTERIZED WHAT THE SEARCH

12   INSTRUCTIONS WERE.  IT'S ALL SET FORTH IN MR. GONZALEZ'S

13   DECLARATION.  IT WAS THE FILE NAMES.  IT WAS HASH VALUES, YOU

14   KNOW, THE UNIQUE MB5 IDENTIFIERS FOR THE FILES.  AND THOSE

15   RESULTS WERE PROVIDED TO UBER.  AND THEY WERE PROVIDED IN --

16   THEY WERE REVEALED IN MR. FAULKNER'S EXPERT REPORT AND AT THE

17   DEPOSITION YOUR HONOR JUST HEARD ABOUT.  ALL OF THIS WAS A LONG

18   TIME AGO.  THIS HAS NOTHING TO DO WITH THE STROZ DISCOVERY.

19   THIS HAS NOTHING TO DO WITH THE STROZ REPORT.

20             **THE COURT:**  NO.  NO.  NO, BUT THE STROZ REPORT

21   REFERS TO ALL THE DOCUMENTS FOLLOWING.  IT'S BROADER THAN THAT.

22   RIGHT?  IT'S THE FEDERAL CIRCUIT OPINION.  AND MS. PADILLA'S

23   E-MAIL WAS WITHHELD.  SO I UNDERSTAND THAT ARGUMENT, BUT THAT'S

24   TOO NARROW.

25             THE FACT OF THE MATTER IS THERE WAS A WHOLE TROVE OF

1  E-MAILS AND THE LIKE THAT WERE WITHHELD PENDING THE FEDERAL

2  CIRCUIT'S OPINION.  THEY RULED, AND THEN THEY WERE PRODUCED.

3          SO YOU KEEP SAYING THAT IN THE PAPERS.

4          **MR. SCHUMAN:**  OKAY.  I UNDERSTAND THAT.  I

5  UNDERSTAND IT WAS PUT IN THE PAPERS.

6          OKAY.  SO WE MADE THE POINT IN THIS MOTION, AND SO

7  WHAT MR. PERLSON WAS DOING WAS READING TO YOU FROM A DOCUMENT

8  THAT THEY FILED ABOUT AN HOUR BEFORE WE GOT HERE TODAY WITH

9  JUDGE ALSUP.  THEY HAVE ENOUGH INFORMATION ABOUT THESE TWO

10 LAPTOPS THAT THEY ARE FILING MOTIONS FOR RELIEF BEFORE JUDGE

11 ALSUP.

12         WHAT IS BEFORE THIS COURT RIGHT NOW IS A MOTION FOR

13 INSPECTION OF THE LAPTOPS.  UBER, THE COURT HAS CORRECTLY SAID

14 HAS RESPONDED THEY DON'T HAVE THEM.  THEY DON'T KNOW WHERE THEY

15 ARE.

16         OTTO TRUCKING, WE PUT IN OUR PAPERS, NEVER HAD THEM.

17 OTTO TRUCKING NEVER HAD THEM.  DON'T KNOW WHERE THEY.

18         GOODWIN, AS THE COURT KNOWS FROM THE PAPERS, HAD THEM

19 FOR A BRIEF PERIOD OF TIME, RAN THESE SEARCHES AT UBER'S

20 REQUEST.  "WE DON'T HAVE THEM."

21         SO FOR PURPOSES OF INSPECTION OF THE LAPTOPS, THEY

22 CAN'T GET THEM FROM ANY OF THE PEOPLE THAT THEY BROUGHT THIS

23 MOTION TO. THEY WANT A DEPOSITION.  IT'S NOT CLEAR AS TO WHOM.

24 THE PAPERS DON'T ACTUALLY SAY THEY WANT THIS DEPOSITION OF --

25 WELL, THEY DON'T SAY WHO THEY WANT IN DEPOSITION.  IT JUST SAYS

1    "DEFENDANTS."

2              THERE IS NO ADDITIONAL INFORMATION THAT THEY ARE

3    GOING TO GET OUT OF THE DEPOSITION BEYOND WHAT IS IN THESE

4    RESPONSIVE DECLARATIONS THAT WERE FILED IN OPPOSITION TO THIS

5    MOTION.

6              AND, OBVIOUSLY, YOUR HONOR, WE HAVE BRIEFED THE POINT

7    ABOUT TRYING TO GET THE DEPOSITION OF OPPOSING LITIGATION

8    COUNSEL IS IMPROPER.

9         **MR. PERLSON:**  YOUR HONOR, WHERE ARE THESE LAPTOPS?

10   HOW CAN THEY NOT PROVIDE AN ANSWER TO THAT QUESTION?  I FIND IT

11   SHOCKING THAT COUNSEL HERE IS GOING TO TELL YOU THAT

12   THEIR -- THAT THEIR -- THEY TOLD YOU WE MOVED TO COMPEL OTTO

13   TRUCKING TO SAY -- TO HAVE THEM PRODUCE INFORMATION FROM

14   LEVANDOWSKI.  THEY SAID THEY CAN'T GETTING ANYTHING FROM

15   LEVANDOWSKI BECAUSE OF THE FIFTH AMENDMENT.

16             NOW, THEY ARE STANDING IN FRONT OF YOU SAYING THAT

17   WHEN THEY ARE GOING ON THEIR HAT FOR MR. LEVANDOWSKI, THAT HE'S

18   COOPERATING AND THAT THEY SOMEHOW -- MR. LEVANDOWSKI'S

19   COOPERATING IN RELATION TO THE ARBITRATION IN PRODUCING

20   DOCUMENTS IN THIS CASE.  BUT THEN, WHEN THEY GO INTO THIS HAT,

21   THEY DON'T KNOW ANYTHING ABOUT IT, AND THEY ARE OTTO TRUCKING,

22   EVEN THOUGH ANTHONY LEVANDOWSKI OWNS OTTO TRUCKING.

23        **THE COURT:**  I UNDERSTAND THAT.  THAT'S THE ONE

24   QUESTION I HAD IS THAT THE REPRESENTATION, MR. SCHUMAN, AS OTTO

25   TRUCKING'S COUNSEL.  AND THE CONFUSION FRANKLY IS

1    MR. LEVANDOWSKI'S OWN DOING; THAT HE CHOSE TO HAVE OTTO TRUCKING

2    AND HIMSELF REPRESENTED BY THE SAME ATTORNEY.  BUT --

3            **MR. SCHUMAN:**  WELL --

4            **THE COURT:**  BUT, BE THAT AS IT MAY, HAS OTTO TRUCKING

5    ASKED MR. LEVANDOWSKI, WHO IS, IN FACT, THE MANAGING AGENT OF

6    OTTO TRUCKING FOR THE LAPTOPS?

7            **MR. SCHUMAN:**  I THINK --

8            **THE COURT:**  IF THE ANSWER IS "NO," THEN MAKE WHATEVER

9    YOU WANT TO MAKE IN FRONT OF JUDGE ALSUP.  BUT THERE IT IS.

10   IT'S ALL LAID OUT THAT OTTO TRUCKING HASN'T DONE -- THIS IS WHAT

11   YOU DID WITH UBER BEFORE -- OTTO TRUCKING HASN'T DONE IT.  THEY

12   HAVEN'T ASKED MR. LEVANDOWSKI FOR IT.  THEY HAVEN'T DONE IT.

13   THAT GOODWIN, AS LEVANDOWSKI, HAD IT, BUT DIDN'T TURN IT OVER.

14           THERE ARE THE FACTS.  I DON'T THINK THERE'S ANY

15   DISPUTE AS TO THE FACTS.

16           **MR. SCHUMAN:**  THAT'S MY POINT.

17           **MR. PERLSON:**  WE WANT TO KNOW WHERE IT IS.  WE WANT

18   TO INSPECT IT FOR OUR CASE.  AND THEY ARE WITHHOLDING THE

19   INFORMATION UNDER THIS RUSE, THAT ON THE ONE HAND THE EXACT SAME

20   PEOPLE ARE REPRESENTING LEVANDOWSKI AND DOING WORK ON HIS BEHALF

21   THAT DOESN'T INVOLVE THE FIFTH AMENDMENT.  BUT THAT SOMEHOW WHEN

22   THEY GET UP HERE IN THIS CASE AND TALK TO YOU THAT THEY CAN'T

23   PROVIDE THIS INFORMATION BECAUSE THAT WORK, ON BEHALF OF OTTO

24   TRUCKING'S OWNER, HAS NOTHING TO DO WITH THIS CASE.

25           **THE COURT:**  WELL, DID YOU SUBPOENA THEM FROM

1    MR. LEVANDOWSKI?

2              **MR. PERLSON:**  I DON'T UNDERSTAND.

3              **THE COURT:**  THE DEVICE.  THEY ARE HIS LAPTOPS.

4              **MR. BAKER:**  OF COURSE WE SUBPOENAED MR. LEVANDOWSKI.

5    THEY ARE WITHHOLDING IT ON THE FIFTH.  BUT WE DIDN'T KNOW THAT

6    GOODWIN HAD IT, AND THEY HID IT FROM US THAT THEY DID.

7              **THE COURT:**  WELL, WAIT.  IF YOU KNOW THAT, IF HE'S

8    WITHHOLDING IT ON THE FIFTH, DOESN'T HE HAVE THEM?

9              **MR. PERLSON:**  WE DON'T KNOW.  WE ARE NOT -- WE DON'T

10   KNOW WHAT IS WITHHELD, BECAUSE IT WAS ALL -- THE LOG WAS

11   PROVIDED IN CAMERA.  WE HAVE NO IDEA WHAT MR. LEVANDOWSKI IS

12   HOLDING.

13             **THE COURT:**  BUT I THOUGHT YOU SAID HE PRODUCED THE

14   LOG.  OKAY.

15             **MR. PERLSON:**  NO, WE DON'T HAVE THE LOG.  IT WAS

16   PRODUCED IN CAMERA.

17             **THE COURT:**  MR. SCHUMAN.

18             **MR. SCHUMAN:**  YES, YOUR HONOR.

19             **THE COURT:**  DOES GOODWIN HAVE THOSE LAPTOPS?

20             **MR. SCHUMAN:**  NO, AND WE SAID THAT IN OUR PAPERS.

21             **MR. PERLSON:**  THEY MUST HAVE PROVIDED THEM TO

22   SOMEBODY.  AND I THINK WE'RE ENTITLED TO KNOW THAT, BECAUSE

23   GOODWIN IS OFFICERS OF THE COURT, AND THEY KNOW THAT THIS IS

24   RELEVANT TO THE LITIGATION, AND THEY HAVE GOTTEN RID OF

25   EVIDENCE.

1          **THE COURT:**  WHO DO YOU THINK HAS THEM IF UBER DOESN'T

2     HAVE THEM AND GOODWIN DOESN'T HAVE THEM, DOESN'T MR. LEVANDOWSKI

3     HAVE THEM?

4          **MR. PERLSON:**  I HAVE NO IDEA, YOUR HONOR.

5          **THE COURT:**  WELL, IS THERE SOMEBODY ELSE OUT THERE

6     THAT YOU THINK HAS THEM.

7          **MR. PERLSON:**  THEY KNOW?

8          **MR. SCHUMAN:**  THAT'S NOT ACCURATE, BECAUSE YOU FILED

9     SOMETHING WITH JUDGE ALSUP A COUPLE HOURS AGO SAYING IN WRITING

10    "PRESUMABLY MR. LEVANDOWSKI HAS THEM."

11         **MR. BAKER:**  RIGHT.  PRESUMABLY.  I DON'T KNOW.

12    THAT'S COMPLETELY CONSISTENT.  I DON'T KNOW.  BUT I GUESS HE

13    MIGHT.  BUT WHY DID THEY GIVE IT BACK TO HIM, AND WHEN DID THEY

14    GIVE IT BACK.  AND WHY --

15         **THE COURT:**  THAT'S NOT -- SEE, THAT'S AN ARGUMENT

16    THAT YOU WANT TO MAKE TO JUDGE ALSUP ABOUT WHETHER -- INFERENCES

17    TO BE DRAWN, I UNDERSTAND.  THAT'S NOT A DISCOVERY DISPUTE.

18         **MR. PERLSON:**  WELL, I THINK WE'RE ENTITLED TO

19    DISCOVERY TO FIND OUT WHAT WENT ON HERE WITH THIS STUFF THAT WAS

20    HID FROM US ALL THIS TIME.  AND OTTO TRUCKING IS THE ONE TO DO

21    THAT?  I THINK A 30 (B) (6) DEPOSITION IS APPROPRIATE TO FIGURE

22    THAT OUT.

23         **MR. SCHUMAN:**  YOUR HONOR, OTTO TRUCKING, AS I SAID IN

24    THE PAPERS, NEVER HAD THESE.  I APPRECIATE THE COURT'S POINT.

25    WE REPRESENTED MR. LEVANDOWSKI IN THE ARBITRATION.  THEY HAD A

1    LAW FIRM IN THE ARBITRATION ALSO REPRESENTING WAYMO HERE, IF

2    THAT CREATES SOME CONFUSION.

3            BUT THE REALITY IS OTTO TRUCKING HAD NO BUSINESS EVER

4    TAKING THESE LAPTOPS, NEVER TOOK THE LAPTOPS, DOESN'T HAVE THE

5    LAPTOPS.  THERE'S NO DISCOVERY THEY CAN GET IN THAT 30 (B) (6)

6    DEPOSITION BEYOND WHAT THEY KNOW ALREADY AND WHAT THE COURT

7    KNOWS ABOUT WHAT OTTO TRUCKING'S RELATION TO THESE LAPTOPS ARE.

8    THEY DON'T HAVE THEM.

9            TO YOUR HONOR'S PRIOR QUESTION --

10           **THE COURT:**  WELL, OTTO TRUCKING NEVER ASKED THEM FOR

11   THEM.

12           **MR. SCHUMAN:**  NO, THAT'S NOT MY REPRESENTATION.  I

13   NEVER GOT TO ANSWER THE COURT'S QUESTION.  AGAIN, THESE ARE NOT

14   PAPERS THAT THE COURT WOULD HAVE HAD TIME TO REVIEW, AND I

15   BARELY HAD TIME TO REVIEW THEM.  BUT THIS IS THE POINT THEY ARE

16   MAKING WITH JUDGE ALSUP.  THEY HAVE MADE THIS POINT THAT

17   MR. CHATTERJEE, ON OUR FIRM'S LETTERHEAD, MADE A REQUEST TO

18   MR. LEVANDOWSKI AFTER THE PRELIMINARY INJUNCTION ORDER CAME

19   DOWN, THEY POINTED THAT OUT TO JUDGE ALSUP.

20           WHAT WE REQUESTED -- IT'S IN A LETTER.  IT'S A

21   DOCUMENT.  THEY HAVE IT.  AND THEY ARE MAKING THAT POINT TO

22   JUDGE ALSUP.  THAT'S NOT FOR THIS DISCOVERY MOTION.  THAT'S FOR

23   THEIR SUBSTANTIVE ARGUMENTS THEY WANT TO MAKE TO JUDGE ALSUP.

24           **THE COURT:**  OKAY.  I'M JUST GOING TO TAKE IT UNDER

25   SUBMISSION.  I'M GOING TO TALK TO JUDGE ALSUP BECAUSE HE HAS

1    THAT ORDER MOTION IN FRONT OF HIM, AND FIGURE OUT WHAT HE WANTS

2    TO DO OR NOT.  IF HE WANTS TO DO IT UP THERE OR NOT.

3           **MR. PERLSON:**  UNDERSTOOD, YOUR HONOR.

4           **THE COURT:**  OKAY.  THAT WAS THE COMPLICATED ONE, I

5    THINK.

6           **MR. PERLSON:**  YOUR HONOR, JUST FOR THE RECORD, WE DID

7    FIRST ASK FOR INSPECTION ON MAY 22ND, JUST SO THE RECORD IS

8    CLEAR.

9           **THE COURT:**  OKAY.  SO OTTOMOTTO DEVICES NEVER

10   SEARCHED BY STROZ OR UBER, BUT IN ANY EVENT UBER REPRESENTS IT

11   DID APPLY THE SEARCH TERMS TO THOSE DEVICES.

12          **MS. RIVERA:**  CORRECT, YOUR HONOR.  YOUR HONOR, I

13   THINK THIS MIGHT BE ONE OF THOSE ISSUES WHERE ULTIMATELY THERE'S

14   NO DISPUTE.

15          **MR. PERLSON:**  I DON'T THINK THAT'S ACTUALLY WHAT THEY

16   SAID.  THEY SAID THAT THEY -- THE DEVICES THAT THEY LOOKED AT

17   THAT THEY HAD, THAT THEY APPLIED THE SEARCH TERMS TO THEM.  ALL

18   WE'RE ASKING, FRANKLY, YOUR HONOR, IS THAT THEY GO BACK AND

19   DOUBLECHECK BECAUSE OF THE ISSUE WITH THE DOMAIN.

20          I THINK IT'S FAIR TO SAY:

21             "HEY, WE UNDERSTAND YOU MADE A MISTAKE.  GO BACK

22   AND DOUBLECHECK THAT THERE AREN'T ANY UBER DEVICES OR  OTTOMOTTO

23   DEVICES THAT ARE SITTING AROUND THAT AREN'T BEING USED THAT YOU

24   MIGHT NOT HAVE SEEN."

25          THAT'S IT.  THAT'S ALL WE'RE ASKING.

1      **MS. RIVERA:**  YOUR HONOR, WITH RESPECT TO THE

2    CONFLATION OF THE ISSUES WE'RE HERE TO TALK ABOUT TODAY AND THE

3    MIGRATION ISSUE, THE ISSUE WITH MR. LEVANDOWSKI'S OTTO ACCOUNTS.

4    THEY ARE TWO TOTALLY SEPARATE ISSUES, AS YOUR HONOR SAW IN THE

5    DECLARATION THAT WE FILED AS TO MR. LEVANDOWSKI'S OTTOMOTTO

6    ACCOUNT.

7           THAT'S AN ISSUE THAT RESULTED AS A BYPRODUCT OF THIS

8    MIGRATION THAT WAS BEING DONE OF E-MAILS FROM THE OTTOMOTTO

9    DOMAIN TO THE UBER DOMAIN.  THIS IS NOT IN THE PAPERS THAT WERE

10   FILED WITH THE COURT.

11          THAT IS IN THE DECLARATIONS THAT WERE FILED A COUPLE

12   OF WEEKS AGO.  IT'S OUR UNDERSTANDING THE ISSUE THERE HAD TO DO

13   WITH THE FACT THAT MR. LEVANDOWSKI'S OTTO DATA WAS BEING

14   MIGRATED TO THE E-MAIL ACCOUNT.

15          **THE COURT:**  NO.  NO.  I READ ALL THAT.  WE DID ALL

16   THAT.  ALL THEY ARE SAYING IS THAT GIVEN THAT THAT WAS

17   OVERLOOKED -- AT LEAST I DON'T FIND THAT IT WAS DONE

18   INTENTIONALLY -- THEY ARE CONCERNED THAT PERHAPS OTHER THINGS

19   WERE OVERLOOKED.

20          CAN YOU JUST GO BACK AND MAKE SURE YOU DIDN'T

21   OVERLOOK ANY OF THIS?  THAT'S ALL THEY ARE SAYING.

22          **MS. RIVERA:**  SURE, YOUR HONOR.  AND, ACTUALLY, I

23   THINK I CAN TELL YOUR HONOR TODAY THAT CERTAINLY FOR PURPOSES OF

24   THIS HEARING WE DID GO BACK.  RIGHT?

25          SO DURING THE COURSE OF THE MEETING AND CONFERRING,

1   WE VIEW THIS AS AN ISSUE THAT SHOULD HAVE BEEN RAISED, IF AT

2   ALL, WAY BEFORE THE CLOSE OF DISCOVERY, AND DID NOT THINK THAT

3   GIVEN THAT THESE ARE THINGS THAT THEY ASKED ABOUT IN DEPOSITION

4   BEFORE THE CLOSE OF DISCOVERY, AND IF THEY HAD ANY CONCERNS

5   ABOUT THIS THEY COULD FOLLOW-UP ON IT BEFORE THE CLOSE OF

6   DISCOVERY.

7           WE DIDN'T THINK DURING THE COURSE OF THE MEET AND

8   CONFERRING THAT IT WAS SOMETHING THAT JUSTIFIABLY UBER SHOULD BE

9   REQUIRED TO GO BACK AND DO NOW.  THAT IS GO BACK AND RECONFIRM.

10          I WILL TELL YOUR HONOR, THOUGH, FOR PURPOSES OF

11  PREPARING FOR THIS HEARING WE DID GO BACK AND CONFER,

12  PARTICULARLY WITH COUNSEL FOR A NUMBER OF THE DILIGENCE

13  EMPLOYEES.

14          AND, OBVIOUSLY, I CAN'T TOTALLY DISCLOSE, YOU KNOW,

15  WHAT WE DISCUSSED, FOR ATTORNEY/CLIENT PRIVILEGE REASONS.  BUT

16  AS I STAND HERE TODAY, I CAN TELL YOUR HONOR THAT WE BELIEVED AT

17  THE TIME, AND STILL BELIEVE, THAT WE HAVE SEARCHED ALL OTTOMOTTO

18  DEVICES THAT WERE ISSUED TO ANY OF THOSE DILIGENCE EMPLOYEES

19  THAT WERE WITHIN UBER OR OTTOMOTTO'S POSSESSION, CUSTODY AND

20  CONTROL.

21          **MR. PERLSON:**  HAT'S NOT WHAT I WOULD THINK THEY WOULD

22  DO, FRANKLY.  I MEAN, THERE'S OTTO. THEY BOUGHT OTTO, AND THEY

23  DON'T NEED TO GO TO THE DILIGENCE EMPLOYEES' COUNSEL TO FIND OUT

24  WHAT WAS GOING ON.  THEY ASK THEIR OWN EMPLOYEES TO MAKE SURE

25  THERE'S NOTHING SITTING AROUND.  THAT'S WHAT I WOULD EXPECT

1    THEM TO DO.

2            **THE COURT:**  OKAY.  MR. PERLSON, I THINK THEY

3    REPRESENTED THAT.  I UNDERSTAND WHY THEY BROUGHT IT UP IN TERMS

4    OF BEING OVERLOOKED.  THEY SAID THEY HAVE NOT OVERLOOKED AND

5    THEY SEARCHED EVERYTHING.

6            **MR. PERLSON:**  OKAY.  WELL, I DON'T THINK WE'VE HAD

7    THAT REPRESENTATION HERE SAID TODAY, BUT I UNDERSTAND YOUR

8    HONOR'S RULING.

9            **THE COURT:**  ALL RIGHT.  NOW, THE STROZ DRAFT.  I

10   GUESS THE DRAFTS OF THE STROZ REPORT.  SO THEIR ATTORNEY WORK

11   PRODUCT NOT WAIVED, BECAUSE THEY WEREN'T SHARED WITH MR.

12   LEVANDOWSKI, WITH OTTOMOTTO BEFORE THE -- WELL, ACTUALLY, EVEN

13   AFTER THE PURCHASE ACQUISITION THEY WEREN'T SHARED.  SO JUST

14   UBER'S WORK PRODUCT.

15           **MR. JUDAH:**  WELL, YOUR HONOR, FIRST OFF THE ACTUAL

16   FINAL REPORT ITSELF WAS NOT SHARED BEFORE THE PUT CALL

17   AGREEMENT, AND IT WAS STILL COMPELLED.  AND SO I DON'T SEE WHY

18   THE DRAFTS ARE ANY DIFFERENT.

19           THIS WAS COMMISSIONED BY PARTIES THAT WERE ADVERSE.

20   THE FINAL REPORT IS NOT PRIVILEGED OR PROTECTED.  NEITHER ARE

21   THE DRAFTS.  BUT EVEN ASIDE FROM THAT, YOU KNOW, AT THE TIME

22   THAT WE SERVED THE SUBPOENA AND UBER PROVIDED OBJECTIONS, AND WE

23   FILED A MOTION TO QUASH --

24           **THE COURT:**  DON'T ARGUE TO ME THE PRIVILEGE LOG

25   ISSUE, BECAUSE THEN I AM NOT PERSUADED.  BUT WHAT YOU CAN ARGUE

1   IS WHETHER IT'S WORK PRODUCT OR NOT OR WHETHER IT FALLS WITHIN

2   THE ORDER.  THAT'S WHERE YOU SHOULD THE SPEND YOUR TIME.

3           **MR. JUDAH:**  WELL, OKAY.  WELL, LET ME JUST -- THE ONE

4   THING I WOULD SAY IS THAT, YOU KNOW, THIS WAS NOT AN UNKNOWN

5   CATEGORY OF INFORMATION. UBER HAD AN OPPORTUNITY TO ASSERT

6   PRIVILEGE OVER -- TO SAY:

7               "THERE ARE DRAFTS, AND WE ARE ASSERTING

8   PRIVILEGE AND WORK PRODUCT PROTECTION ON THOSE."

9           WITH RESPECT TO THE ACTUAL DRAFTS THEMSELVES, THIS IS

10  MATERIAL THAT THE -- THAT STROZ ITSELF, IN PREPARING THE

11  REPORT --

12          **THE COURT:**  CAN YOU PUT YOUR PHONE DOWN?  IT MAKES ME

13  NERVOUS THAT IT'S GOING TO GO FLYING.

14          **MR. JUDAH:**  I'M SORRY.  I'M SORRY, YOUR HONOR.

15          STROZ, THE STROZ PERSONNEL WHO PREPARED THE FINAL

16  REPORT THAT WAS SHARED WITH UBER THAT IS NOT PROTECTED BY ANY

17  CLAIM OF PRIVILEGE, THESE ARE THE SAME PEOPLE WHO WERE WORKING

18  ON THE DRAFT ITSELF.  AND SO IT'S BASICALLY THE SAME RULING THAT

19  WAS IN THE ORIGINAL MOTION.  AND IT'S ALSO A CATEGORY -- AND I

20  UNDERSTAND YOU DON'T FIND IT PERSUASIVE -- BUT IT'S A CATEGORY

21  THAT WAS KNOWN TO UBER AT THE TIME THEY FILED EVERYTHING, EVEN

22  ALSUP'S ORDER.

23          THEY SHOULD HAVE SAID:

24               "THERE ARE DRAFTS HERE.  WE ARE CLAIMING

25  PRIVILEGE OVER THEM."

1              IT WAS NOT AN UNKNOWN QUANTITY.

2              THE OTHER THING IS WE ASKED --

3         **THE COURT:**  I DON'T KNOW IF THEY KNEW THERE WERE

4    DRAFTS ANYMORE THAN YOU KNEW THERE WERE DRAFTS.  YOU WOULD

5    ASSUME THERE WERE DRAFTS.

6         **MR. JUDAH:**  WELL, YOUR HONOR --

7         **THE COURT:**  BUT YOU DIDN'T SAY:

8              "OH, THERE AREN'T ANY DRAFTS IN YOUR PRIVILEGE

9    LOG, EITHER."

10        **MR. JUDAH:**  WELL, YOUR HONOR --

11        **THE COURT:**  WHICH YOU COULD HAVE THEN RAISED WITH ME

12   BEFORE.  RIGHT?

13        **MR. JUDAH:**  WELL, YOUR HONOR, WE HAD NOT SEEN THE

14   REPORT, UNLIKE UBER.  I THINK SEEING THE REPORT, KNOWING WHAT IT

15   IS, IT'S PRETTY OBVIOUS THERE WAS DRAFTS.  BUT WE DIDN'T KNOW

16   WHAT IT WAS.  WE WERE NOT GETTING ANY INFORMATION.  THAT WAS

17   BEING CONCEALED.

18             THAT'S THE FIRST THING.  THE SECOND THING IS WE ASKED

19   THEM:

20             "ARE YOU WITHHOLDING ANY DRAFTS?"

21             AND THEY SAID:  "NO," WHICH MADE SENSE.

22             AND THEN, IT TURNS OUT THEY WERE.

23        **THE COURT:**  WHEN DID THEY SAY THAT?

24        **MR. JUDAH:**  THEY SAID ON SEPTEMBER 21ST THAT THEY

25   WERE NOT WITHHOLDING ANY DRAFTS.  STROZ HAD SENT ALL THIS STUFF

1  TO UBER --

2          **THE COURT:**  THAT'S WHAT MR. GONZALEZ SAID.

3          **MR. JUDAH:**  YES.  AND STROZ SENT EVERYTHING TO UBER

4  AND SAID:

5              WE'RE WILLING -- WE'RE READY TO PRODUCE THIS,

6  AND LET US KNOW IF WE SHOULD WITHHOLD ANYTHING."

7          AND UBER SAID:

8              "GOT TO WITHHOLD THOSE."

9          AND WE ASKED THEM ON SEPTEMBER 21ST TO CONFIRM THAT

10  THERE WERE -- "ARE THERE DRAFTS?  IF SO, WE WANT THEM."

11         AND THEY SAID:  "NO.  WE ARE NOT WITHHOLDING ANY

12  DRAFTS."

13         **THE COURT:**  CAN YOU REMIND ME WHAT EXHIBIT THAT IS?

14         **MR. JUDAH:**  SO MR. GONZALEZ --

15         **THE COURT:**  OKAY.  I FOUND IT.  IT'S EXHIBIT 6.

16         MS. RIVERA, WHAT ABOUT THAT?

17         **MS. RIVERA:**  SURE, YOUR HONOR.  WITH RESPECT TO

18  EXHIBIT 6, IF YOUR HONOR ACTUALLY, YOU KNOW, LOOKS THROUGH AND

19  READS THE WHOLE TRAIL OF E-MAILS, EXHIBIT 6 IS AN E-MAIL

20  EXCHANGE THAT SPECIFICALLY HAD TO DO WITH THE SET OF PRIVILEGE

21  LOGS THAT YOUR HONOR HAD ADJUDICATED BACK ON JUNE 26TH.

22         THESE WERE NOT THE PRIVILEGE LOGS THAT WE PREPARED IN

23  LATE AUGUST, EARLY SEPTEMBER FOR DOCUMENTS THAT WERE IN STROZ'S

24  POSSESSION, WHICH IS THE PRIVILEGE LOG THAT RELATES TO THE

25  DRAFTS OF THE STROZ REPORT.

1          THIS E-MAIL EXCHANGE RELATE TO A REQUEST THAT WAYMO

2     HAD MADE THAT UBER PROVIDE AN AMENDED VERSION OF THE LOG THAT

3     YOUR HONOR HAD ADJUDICATED ON JUNE 26TH, WHICH WERE LOGS OF

4     DOCUMENTS THAT WERE IN UBER'S POSSESSION, O'MELVENY'S OR

5     MORRISON & FOERSTER'S, RELATED TO THE STROZ DILIGENCE.

6          AND YOU SEE THE EXCHANGE THERE.  BASICALLY, THEY ARE

7     ASKING US TO CONFIRM WHEN WE'RE GOING TO BE PRODUCING THOSE

8     AMENDED LOGS.  AND THEN, THERE'S AN EXCHANGE BETWEEN MR. PERLSON

9     AND MR. GONZALEZ, WHERE MR. PERLSON ASKED:

10          "ARE YOU WITHHOLDING THE DRAFTS?  PRESUMABLY ARE

11    YOU WITHHOLDING ANY DRAFTS ON THE LOGS THAT ARE THE SUBJECT OF

12    OUR E-MAIL EXCHANGE RIGHT HERE."

13          MR. GONZALEZ RESPONDS:

14          "NO, WE'RE NOT," WHICH WAS ACCURATE THEN AND

15    CONTINUES TO BE ACCURATE TODAY AS TO THE PRIVILEGE LOGS THAT

16    WERE BEING DISCUSSED IN THIS E-MAIL EXCHANGE.

17          **THE COURT:**  SAYS:

18          "SYLVIA, ARE DEFENDANTS WITHHOLDING ANY DRAFTS

19    OF THE DUE DILIGENCE REPORT?"

20          HE ANSWERS:

21          "WE ARE NOT WITHHOLDING ANY DRAFTS."

22          **MS. RIVERA:**  CORRECT.  AND THE PRIVILEGE LOGS THAT

23    ARE BEING DISCUSSED HERE ARE THE LOGS IF YOU LOOK ON -- IT'S

24    INTERNAL PAGE NUMBER 2 OF THAT EXHIBIT.

25          **THE COURT:**  YEP.

1          **MS. RIVERA:**  THE E-MAIL FROM MELISSA BAILEY TOWARD

2     THE BOTTOM OF THE PAGE.

3          **THE COURT:**  YES.

4          **MS. RIVERA:**  "APPROXIMATELY WHEN TOMORROW DO YOU

5     EXPECT TO SEND THE AMENDED LOG?  IN THE MEANTIME, CAN YOU

6     IMMEDIATELY LET US KNOW THE BATES RANGE OF THE DOCUMENTS

7     PRODUCED OFF OF THE MOFO, UBER AND OMM LOG?"

8          **THE COURT:**  WELL, PRESUMABLY AT THAT TIME YOU KNEW

9     THERE WERE DRAFTS OF THE DUE DILIGENCE REPORT.

10         **MS. RIVERA:**  YOUR HONOR, WE HAD SERVED A PRIVILEGE

11    LOG FOR THE DOCUMENTS THAT WERE IN STROZ'S POSSESSION, A

12    PRIVILEGE LOG THAT I BELIEVE WAS ATTACHED AS AN EXHIBIT TO

13    WAYMO'S PAPERS.  IT'S A LARGE PRIVILEGE LOG.  I CERTAINLY CAN'T

14    SAY THAT I KNEW OR WAS COGNIZANT OF THE FACT THAT THERE WERE

15    DRAFTS ON THAT PRIVILEGE LOG THAT HAS MULTIPLE, MULTIPLE --

16         **THE COURT:**  I'M NOT ASKING WHETHER YOU KNEW THEY WERE

17    ON THE LOG.  I'M ASKING WHETHER YOU KNEW THERE WERE DRAFTS OF

18    THE STROZ REPORT.

19         **MS. RIVERA:**  AT THE TIME THAT THIS E-MAIL EXCHANGE

20    OCCURRED, I CAN'T SAY THAT I WAS AWARE OR MR. GONZALEZ WAS

21    AWARE.  I CAN TELL THE COURT THEY WERE ON THAT STROZ PRIVILEGE

22    LOG.  SO, YOU KNOW, A CONTRACT ATTORNEY HAD REVIEWED IT AND PUT

23    IT ON THE LOG.

24              WHEN THESE E-MAILS WERE EXCHANGED, I CERTAINLY WASN'T

25    COGNIZANT OF THE FACT THAT THERE WERE DRAFTS, AND I DON'T

1   BELIEVE MR. GONZALEZ WAS, EITHER.

2              BUT TO THE ULTIMATE QUESTION, YOUR HONOR, I

3   INTERPRETED THIS E-MAIL EXCHANGE THEN AND TODAY AS HAVING TO DO

4   WITH THE PRIVILEGE LOGS THAT WERE BEING DISCUSSED.

5          **THE COURT:**  THAT'S WHY I'M CUTTING TO THE CHASE,

6   BECAUSE THAT'S IMPROPER. WHEN SOMEBODY ASKS YOU:

7              "ARE YOU WITHHOLDING ANY DRAFTS OF STROZ'S

8   DRAFTS," AND YOU SAY:  "WE DON'T HAVE ANY.  WE'RE NOT

9   WITHHOLDING ANY DRAFTS," THAT'S NOT ON A LOG, WHATEVER, THAT'S

10  ALREADY WITHHOLDING DRAFTS.  SO THAT'S TOO NARROW.  THAT IS WHY

11  I'M JUST CUTTING TO IT.  THAT WAS AN IMPROPER RESPONSE.

12             IF YOU DON'T KNOW, THEN YOU SAY YOU DON'T KNOW.  BUT

13  YOU DON'T MAKE AN AFFIRMATIVE REPRESENTATION THAT:

14             "WE ARE NOT WITHHOLDING ANY DRAFTS," WHEN, IN

15  FACT, YOU ARE.

16         **MS. RIVERA:**  I CONCEDE TO THAT, YOUR HONOR.  SO I

17  THINK BECAUSE NEITHER UBER NOR OTTOMOTTO KNOW ANY PARTY, THE

18  LAWYERS ASSOCIATED WITH THEM HAD RECEIVED ANY DRAFTS OF THE

19  STROZ REPORT, I THINK EVERYONE WHO SAW THIS E-MAIL AT THE TIME,

20  AND CERTAINLY MR. GONZALEZ WHEN HE SENT IT, WERE NOT AWARE THAT

21  THERE WERE ANY DRAFTS THAT WERE BEING WITHHELD ON THIS OTHER

22  STROZ PRIVILEGE LOG.

23         **THE COURT:**  WHAT ABOUT ANY DRAFTS THAT WERE CREATED

24  PRIOR TO APRIL 11?  WHY ARE THOSE WORK PRODUCT IN LIGHT OF MY

25  RULING?

1      **MS. RIVERA:**  SO, YOUR HONOR, IF THEY WERE CREATED

2   PRIOR TO APRIL 11, THOSE ARE NOT DOCUMENTS OVER WHICH WE HAVE

3   ASSERTED PRIVILEGE.  IF WHAT WE'RE TALKING ABOUT IS A DRAFT OF

4   THE STROZ REPORT PRE-APRIL 11, YOU KNOW, SOMETIME AROUND 9:30 OR

5   10:00 P.M., THAT WAS CUT OFF.

6      **THE COURT:**  SO THEY ARE NOT BEING WITHHELD.

7      **MS. RIVERA:**  NOT BEING WITHHELD.  THE ONLY DRAFTS

8   THAT ARE BEING WITHHELD ARE THOSE THAT CAME AFTER THAT DATE.

9      **THE COURT:**  SO WHY DIDN'T THAT FALL WITHIN MY ORDER?

10   AT THAT POINT I RULED THAT THEY WERE -- THEY DID HAVE A COMMON

11   INTEREST AT THE SAME TIME BECAUSE THERE WAS AN OBLIGATION TO

12   PURCHASE AT THAT POINT.

13      **MR. JUDAH:**  WELL, YOUR HONOR, FIRST THE STROZ REPORT

14   ITSELF WAS NOT PRIVILEGED BECAUSE IT WAS COMMISSIONED BY ADVERSE

15   PARTIES, AND SO THE FINAL REPORT'S NOT PRIVILEGED.

16      **THE COURT:**  WELL, I DON'T KNOW IF IT WAS OR NOT.

17   IT'S BEEN PRODUCED, APPARENTLY.

18      **MR. JUDAH:**  RIGHT.

19      **THE COURT:**  I DON'T KNOW IF IT WAS PRIVILEGED OR NOT.

20   BUT I RULED THAT FOLLOWING APRIL 11, THAT THEY WERE ON THE SAME

21   SIDE THE LEDGER, SO TO SPEAK.  AND, THEREFORE, THEIR

22   COMMUNICATIONS BETWEEN EACH OTHER, BETWEEN OTTOMOTTO AND UBER

23   AND THEIR COUNSEL AND ALL THAT WERE PRIVILEGED.  SO THAT'S WHAT

24   I RULED.  AS FAR AS I KNOW, THAT RULING HASN'T BEEN OVERTURNED

25   AT THIS POINT.

1          THAT'S THE LAW OF THE CASE.  SO TELL ME IN LIGHT OF

2   THAT RULING WHY IS IT NOT ATTORNEY WORK PRODUCT?

3          **MR. JUDAH:**  FOR THE SAME REASON THAT THE FINAL REPORT

4   IS NOT.  WELL, THAT WOULD BE OUR POSITION.

5          **THE COURT:**  OKAY.  ALL RIGHT.  SO THAT'S CIRCULAR.

6   SO DO YOU WANT TO ARGUE TO ME ON THE MERITS WHY IN LIGHT OF MY

7   RULING OF APRIL 11 IT'S NOT ATTORNEY WORK PRODUCT GIVEN THAT

8   THEY WERE ESSENTIALLY CODEFENDANTS, WHATEVER YOU WOULD HAVE AT

9   THE TIME?  I MEAN, THAT WAS MY RULING.

10         **MR. JUDAH:**  WELL, SO, YOUR HONOR --

11         **THE COURT:**  ACTUALLY, I THINK YOU DID APPEAL AND IT

12  WAS UPHELD.  RIGHT?

13         **MR. JUDAH:**  I BELIEVE THAT'S CORRECT.

14         **THE COURT:**  OKAY.  THAT'S THE LAW OF THE CASE.

15         **MR. JUDAH:**  SURE, YOUR HONOR.  SO OKAY.  SO, YOU

16  KNOW, THE DRAFTS THEMSELVES -- AND, YOU KNOW, SURE.  LET'S SAY

17  THAT'S WORK PRODUCT.

18         **THE COURT:**  ALL THE TIME FINAL VERSIONS OF THINGS ARE

19  NOT PRIVILEGED, LIKE AGREEMENTS.  AND THE STUFF BEFORE THAT IS

20  WORK PRODUCT.  IT'S CLASSIC WORK PRODUCT.

21         **MR. JUDAH:**  UNDERSTOOD, YOUR HONOR.  I MEAN, I

22  UNDERSTAND WHAT YOU'RE SAYING.  SO WE WILL NOT DISPUTE THAT THE

23  STROZ DRAFTS, YOU KNOW, ARE WORK PRODUCT.

24         **THE COURT:**  NO.  NO.  NO.  YOU CAN -- YOU CAN DISPUTE

25  IF YOU WANT TO PRESERVE YOUR ARGUMENT.

1          **MR. JUDAH:**  SURE.  WE'LL DISPUTE.  THANK YOU.  I

2     APPRECIATE THAT.

3          **THE COURT:**  THAT'S PRESERVED.

4          **MR. JUDAH:**  OKAY.  BUT I WON'T ARGUE THAT ANY

5     FURTHER.

6          WHAT I WOULD LIKE TO FOCUS ATTENTION ON IS THERE'S

7     BEEN REPEATED WAIVERS.

8          **THE COURT:**  OKAY.

9          **MR. JUDAH:**  SO INCLUDING THE FACT THEY KNEW ABOUT IT

10     DURING THE MOTIONS.  THEY KNEW ABOUT IT DURING THE MOTION TO

11     QUASH.  THEY KNEW ABOUT IT, ALSUP'S, YOU KNOW, OBJECTIONS.  HE

12     EVEN SAID:

13               "IF THERE'S ANYTHING -- YOU KNOW, SHOULD HAVE

14     BEEN DONE ALREADY.  AND YOU SHOULD ALSO GET IN SOMETHING NOW."

15     THEY DON'T DO ANY OF THAT.

16          **THE COURT:**  WELL, WHAT ARE YOU -- I DON'T KNOW WHAT

17     YOU'RE REFERRING TO.

18          **MR. JUDAH:**  WELL, YOUR HONOR, WE MENTION THIS IN THE

19     ACTUAL MOTION ITSELF.  SO, YOU KNOW, THE JUDGE -- THE JUDGE, YOU

20     KNOW -- YOU COMPELLED EVERYTHING FROM THE STROZ REPORT.  ALL THE

21     ANALYSES AND ALL THE -- YOU KNOW, THE REPORTS AND ANALYSES THAT

22     WERE COVERED BY THESE RFP'S AND SUBPOENAS 6, 7 AND 8.

23          YOU COMPELLED EVERYTHING.  UBER OBJECTED.  AND THE

24     JUDGE SAID:

25               "ALL OBJECTIONS ARE OVERRULED."

```
 1              AND HE SAID:

 2                   "I'M NOT GOING TO -- I'LL AGREE THAT IF THERE'S,

 3    YOU KNOW, HYPOTHETICAL DOCUMENTS THAT UBER HAD NO OPPORTUNITY,

 4    LIKE NEW PRIVILEGES THAT THEY COULDN'T HAVE REALIZED, I'LL GIVE

 5    YOU AN OPPORTUNITY FOR A PRIVILEGE LOG."

 6              AND WE'RE ONLY GOING AFTER A VERY NARROW CATEGORY

 7    HERE, SOMETHING I DON'T THINK THEY CAN DISPUTE, THAT THEY WERE

 8    AWARE THAT THERE WERE DRAFTS OF THE STROZ REPORT.

 9              SO THERE'S A WAIVER ALL THE WAY THROUGH THE TIME OF

10    ALSUP'S ORDERS.

11              THE COURT:  WELL, SO WHAT JUDGE ALSUP SAYS IS:

12                   "IT DOES NOT APPEAR JUDGE CORLEY INTENDED HER

13    ORDER TO HAVE ANY PRECLUSIVE EFFECT ON SUCH CLAIMS."

14              SO I'M JUST TELLING YOU CANDIDLY I DIDN'T THINK ABOUT

15    DRAFTS AND HOW THAT -- WELL, BUT MY ORDER WAS -- BUT MY ORDER

16    HAD TO DO WITH PRE-APRIL 11.  SO THIS IS POST-APRIL 11.  RIGHT?

17    SO YOU CAN'T BE REFERRING TO THAT, BECAUSE MY RULING

18    POST-APRIL 11 IS THAT THE PRIVILEGE WAS PRESERVED.

19              MR. JUDAH:  WELL, YOUR HONOR, YOUR RULING ALSO SAID

20    THAT --

21              THE COURT:  SO I PRESERVED THAT ARGUMENT.

22              MR. JUDAH:  WELL --

23              THE COURT:  IN MY RULING I HELD THAT THERE WAS A

24    WAIVER AS TO ATTORNEY/CLIENT WORK PRODUCT AND ATTORNEY/CLIENT

25    PRIVILEGE, AND THE LIKE.  AND THEN, I SUBSEQUENTLY CLARIFIED
```

1   THAT THAT WAS PRE-APRIL 11TH.  AND THIS IS POST-APRIL 11, SO

2   THIS SEEMS TO FALL SQUARELY WITHIN MY RULINGS.  AND I THINK I

3   CLARIFIED THAT POST THIS JUDGE ALSUP -- DO YOU KNOW THE DATE

4   THAT I RULED ON THE APRIL 11 ISSUES?

5           **MS. RIVERA:**  THE HEARING TOOK PLACE ON JUNE 23RD, AND

6   YOUR HONOR'S WRITTEN ORDER WAS DATED JUNE 26.

7           **THE COURT:**  THE DAY BEFORE THIS ORDER OF JUDGE ALSUP.

8   MIGHT HAVE BEEN SHIPS PASSING IN THE NIGHT HERE.

9           **MR. JUDAH:**  SO, YOUR HONOR --

10          **THE COURT:**  SO GIVE ME A WAIVER ARGUMENT THAT COMES

11  POST-JUNE 26.

12          **MR. JUDAH:**  SO, FIRST OFF, THEY DIDN'T SUBMIT ANY

13  PRIVILEGE LOG AT ALL UNTIL, I BELIEVE, SEPTEMBER 6TH.  THAT'S

14  THE FIRST THING.

15          SECOND THING IS:  THEN THEY ADMIT THAT THEY

16  OVERLOGGED STUFF, SO THEY END UP REMOVING THE AMENDED LOG IN

17  LATE SEPTEMBER.  IN THE INTERIM, WE ASKED:

18              "ARE YOU WITHHOLDING ANY DRAFTS?"

19          AND WE ASKED -- WE SAY -- AND WE DON'T SAY:

20              "ARE YOU WITHHOLDING ANY DRAFTS ON THE OMM

21  PRIVILEGE LOG?"

22          THERE'S A SEPARATE E-MAIL.  YOU'VE SEEN IT.

23              "SYLVIA, ARE DEFENDANTS WITHHOLDING ANY DRAFTS?"

24          THE RESPONSE:  "NO, WE ARE NOT."

25          AND THEN, WE DON'T GET A RESPONSE FIRST.  FIRST,

1    THERE'S NO RESPONSE.

2                  AND THEN WE SAY:

3                      "JOHN" -- SPECIAL MASTER -- "WE WOULD LIKE A

4    MEET AND CONFER ON THIS."

5                  AND THEN -- AND THEN, YOU KNOW, MR. GONZALEZ SAYS:

6                      "THERE'S NO NEED FOR A MEET AND CONFER.  CALL

7    OFF THE MEET AND CONFER.  WE'RE NOT WITHHOLDING ANY DRAFTS."

8                  THAT'S A WAIVER.  AND THEN --

9              **THE COURT:**  WHY IS THAT A WAIVER?  WHAT MAKES THAT A

10   WAIVER?

11             **MR. JUDAH:**  BECAUSE THEY REPRESENTED THAT THEY WERE

12   NOT ASSERTING PRIVILEGE OR --

13             **THE COURT:**  AND THEN, HOW MANY DAYS LATER YOU FOUND

14   OUT THEY WERE?

15             **MR. JUDAH:**  WELL, THEN, THEY SERVED THEIR AMENDED

16   PRIVILEGE LOGS FOR ALL THE MATERIALS THEY HAD TOLD STROZ TO

17   WITHHOLD SIX DAYS LATER, AND THAT'S WHEN --

18             **THE COURT:**  OKAY. SO HOW ARE YOU PREJUDICED BY THAT

19   SIX-DAY DELAY?

20             **MR. JUDAH:**  WELL, THERE'S A LOT OF DISCOVERY THAT WAS

21   GOING ON AT THAT TIME.  THE DEADLINE TO FILE -- I'M LOSING

22   TRACK OF WHICH -- WHICH --

23             **THE COURT:**  I GUESS WHAT I'M GETTING AT IS YOU'RE

24   HERE NOW MAKING YOUR ARGUMENT, THE SAME ARGUMENT YOU WOULD HAVE

25   BEEN MAKING EARLIER IF MR. GONZALEZ HAD RESPONDED CORRECTLY:

1        "WE ARE WITHHOLDING DOCUMENTS," BUT IT WOULD

2   HAVE BEEN THE SAME ARGUMENT, WHICH IS WHY I JUST WANTED TO GET

3   TO THE MERITS.

4        **MR. JUDAH:**  SURE, YOUR HONOR.  AND SO FUNDAMENTALLY,

5   SO LIKE THERE'S A WAIVER EARLIER.  THERE'S WAIVER BY SEPTEMBER.

6   AND THEN, THERE'S WAIVER AGAIN.

7        **THE COURT:**  WHAT'S THE WAIVER EARLIER?

8        **MR. JUDAH:**  WELL, SO -- I MEAN, THE WAIVER THAT IT

9   WAS NOT MENTIONED IN THEIR OBJECTIONS.  IT WAS NOT MENTIONED IN

10  THEIR MOTION TO QUASH.  IT WAS NOT MENTIONED THE FACT THAT THEY

11  WERE CLAIMING PRIVILEGE OVER DRAFTS.

12       **THE COURT:**  BUT THEY WERE ALWAYS CLAIMING PRIVILEGE

13  OVER EVERYTHING THAT WAS POST-APRIL 11.

14       **MR. JUDAH:**  YOUR HONOR --

15       **THE COURT:**  THEY CLAIMED PRIVILEGE OVER EVERYTHING,

16  AS YOU TOLD ME MANY TIMES.  ACTUALLY, MR. PERLSON.  THEY

17  WITHHOLD EVERYTHING.  THEY WITHHELD EVERYTHING.  RIGHT?

18       **MR. JUDAH:**  WELL --

19       **THE COURT:**  AND THEN, I ISSUED MY ORDER, AND I

20  ALLUDED IN MY ORDER TO THIS APRIL 11TH DATE.  AND THEN, I

21  CLARIFIED THAT THE STUFF POST-APRIL 11 WAS PRIVILEGED.

22       **MR. JUDAH:**  YOUR HONOR, BUT IF I COULD DRAW YOUR

23  ATTENTION TO YOUR ORDER, WHICH WE QUOTE IN OUR MOTION, YOU

24  SPECIFICALLY ADDRESSED -- I MEAN, YOU ADDRESSED DIFFERENT

25  CATEGORIES OF RFP'S.  AND YOU WERE TALKING -- WHEN YOU'RE

1    TALKING ABOUT COMMUNICATIONS AS BETWEEN OR AMONG DIFFERENT

2    MEMBERS OF THIS PURPORTED JOINT DEFENSE GROUP.  YES,

3    COMMUNICATIONS AFTER A CERTAIN POINT.  YES, THEY ASSERTED WORK

4    PRODUCT PROTECTION AND PRIVILEGE OVER COMMUNICATIONS.

5              SPECIFICALLY, THE REQUEST FOR PRODUCTION 6, 7 AND 8,

6    YOU KNOW, WE ASKED FOR THE STROZ -- THIS IS YOUR ORDER.

7                 "THE STROZ DUE DILIGENCE REPORT AND ANY OTHER

8    REPORTS AND ANALYSES CREATED BY STROZ PURSUANT TO ITS RETENTION

9    BY UBER AND OTTO."

10             THEN, YOU WRITE:

11                "OBJECTION TO THE COURT'S ORDER COMPELLING THE

12   STROZ REPORTS'S PRODUCTION ARE CURRENTLY PENDING BEFORE THE

13   DISTRICT COURT.  NEITHER UBER NOR LEVANDOWSKI HAS IDENTIFIED ANY

14   OTHER ANALYSES OR REPORTS AND THUS NEITHER HAS MET ITS/HIS

15   BURDEN OF SHOWING THAT SUCH REPORTS OR ANALYSES ARE PRIVILEGED

16   FROM PRODUCTION."

17             AND THEN, YOU ORDER:

18                "STROZ SHALL PRODUCE SUCH ANALYSES BY TUESDAY,

19   JUNE 27, OR BY THAT SAME DATE ADVISE WAYMO THAT RESPONSIVE

20   DOCUMENTS, OTHER THAN THE STROZ REPORT AND ITS EXHIBITS, DO NOT

21   EXIST."

22             **THE COURT:**  CAN YOU GIVE ME THAT DOCKET NUMBER?

23             **MR. JUDAH:**  THAT IS YOUR ORDER, WHICH IS 670, DOCKET

24   670 AT 9.

25             **THE COURT:**  THANK YOU.  NOW I REMEMBER THAT.

1      YES.  SO, I MEAN, THAT DOES SEEM NOW -- THERE'S A

2  LOT -- IT'S COMING BACK TO ME.

3          **MR. JUDAH:**  THAT WAS THE WAIVER ARGUMENT I WAS TRYING

4  TO MAKE; THAT I WANTED TO MAKE THE WHOLE TIME.

5          **THE COURT:**  WELL, I DON'T KNOW ABOUT -- WELL, OKAY,

6  BECAUSE THAT'S THE ONE I SAID:  "OKAY."

7          **MS. RIVERA:**  YOUR HONOR, SO UBER SUBSEQUENTLY FILED

8  OBJECTIONS TO YOUR HONOR'S ORDER, WHICH JUDGE ALSUP OVERRULED.

9  BUT AS YOUR HONOR MENTIONED A MOMENT AGO, IN HIS ORDER HE MADE

10  CLEAR THAT YOUR HONOR'S ORDER, AS FAR AS HIS READING OF IT GOES,

11  HAD NO PRECLUSIVE EFFECT ON NEW CLAIMS OF PRIVILEGE THAT UBER

12  HAS HAD NO OPPORTUNITY TO ASSERT, BECAUSE THE ORDER DOES NOT

13  CONTEMPLATE, MUCH LESS DECIDE, THAT WAIVER ISSUE.

14          AND THE WAIVER ISSUE THAT I'M SPEAKING TO YOUR HONOR

15  IS UBER'S INABILITY TO ASSERT PRIVILEGE BY PREPARING A PRIVILEGE

16  LOG FOR A DOCUMENT THAT IT DOES NOT KNOW EXISTS; DID NOT KNOW IT

17  EXISTED AT THE TIME; AND DID NOT KNOW ABOUT, FRANKLY, UNTIL WE

18  WERE GIVEN ACCESS TO MULTIPLE, MULTIPLE THOUSANDS OF DOCUMENTS

19  THAT STROZ HAD TO FIRST GO THROUGH AND IDENTIFY WITHIN ITS

20  RECORDS WHAT IT BELIEVED WAS RESPONSIVE TO THE SUBPOENA.

21          ONLY AFTER THAT DID IT MAKE THE MATERIAL AVAILABLE TO

22  UBER, AND MORE SPECIFICALLY UBER'S COUNSEL FOR REVIEW.  AND WE

23  DEVOTED AN ABSOLUTE TON OF RESOURCES, YOUR HONOR, TO JUMP INTO

24  THOSE DOCUMENTS AND TRY TO GET THEM REVIEWED AS QUICKLY AS

25  POSSIBLE, SO THAT WE COULD PREPARE THE PRIVILEGE LOGS, WHICH WE

1    DID, WHICH WE SERVED, FRANKLY, IN THE WEE HOURS OF THE MORNING

2    ON SEPTEMBER 17, JUST AS SOON AS IT WAS READY TO GO.

3            **THE COURT:**  HOW MANY DRAFTS ARE WE TALKING ABOUT AND

4    WHAT ARE THE DATES?

5            **MS. RIVERA:**  THE EARLIEST DRAFT, YOUR HONOR, THAT I

6    HAVE SEEN IS DATED IN JULY.  I CAN'T SAY FOR CERTAIN, YOUR

7    HONOR, THAT THAT'S THE ABSOLUTE EARLIEST DRAFT.  THAT IS THE

8    EARLIEST ONE THAT I'M AWARE OF AS I STAND HERE TODAY.

9            **THE COURT:**  WELL, YOU KNOW, BECAUSE --

10           **MR. JUDAH:**  BASED ON THE PRIVILEGE LOG ENTRIES, WHICH

11   I THINK YOU KNOW WAYMO'S OPINION ABOUT THE ACCURACY OF SOME OF

12   THE DATES THAT ARE PROVIDED IN THE PAST.  BUT BASED ON THAT IT

13   LOOKS LIKE IT WAS MID-JULY.

14           **THE COURT:**  SO THERE'S ONLY ONE DRAFT?

15           **MR. JUDAH:**  NO.  NO.  THE EARLIEST DRAFT, I'M SAYING.

16           **THE COURT:**  HOW MANY DRAFTS ARE WE TALKING ABOUT?

17           **MR. JUDAH:**  I DON'T KNOW, BASED ON THE PRIVILEGE LOG,

18   WHETHER WE'RE TALKING ABOUT DUPLICATIVE ENTRIES.  BUT I WANT TO

19   SAY IT'S PROBABLY SOMETHING IN THE NEIGHBORHOOD OF 20, 10 TO 20.

20           **MS. RIVERA:**  YOUR HONOR, I CAN'T PROVIDE MORE

21   SPECIFICITY ON THE ABSOLUTE NUMBER OF DRAFTS OR HOW MANY OF THEM

22   ARE DUPLICATES THAT WERE JUST E-MAILED TO ONE PERSON AND THE

23   NEXT PERSON.

24           **THE COURT:**  I GUESS I DON'T UNDERSTAND WHEN YOU SAY:

25               "WELL, WE ONLY GOT ACCESS ONCE."

1      STROZ IS YOUR AGENT.  THAT'S BEEN THE ARGUMENT ALL

2  ALONG.  THEY ARE YOUR AGENT.  THEY ESSENTIALLY ARE UBER.  I

3  MEAN, THAT I DON'T ACCEPT.  YOU WERE PAYING THEM.  THEY ARE YOUR

4  AGENT.

5      **MS. RIVERA:**  SO, YOUR HONOR, AS I UNDERSTAND -- AND I

6  DON'T WANT TO SPEAK TOO MUCH TO STROZ'S PROCESS -- BUT THEY HAD

7  A PROCESS THAT THEY HAD TO UNDERTAKE IN TERMS OF COLLECTING

8  THESE E-MAILS AND DOING WHAT I ASSUME OR UNDERSTAND WAS A

9  FORENSIC COLLECTION OF E-MAILS FROM THEIR TEAM.

10      I DON'T KNOW WHAT THEIR TOTAL UNIVERSE OF DOCUMENTS

11  WAS THAT THEY WERE WORKING WITH, BUT THEY MADE AVAILABLE TO US

12  OVER 10,000 THAT WE THEN HAD TO, YOU KNOW, START AT DOCUMENT

13  NUMBER ONE AND LOOK THROUGH.

14      SO AS I MENTIONED A MOMENT AGO, YOUR HONOR, I

15  ACTUALLY DIDN'T KNOW THAT THERE WERE DRAFTS OF THE STROZ REPORT

16  UNTIL IT WAS, YOU KNOW, BROUGHT TO MY ATTENTION IN CONNECTION

17  WITH THE MEET AND CONFER THAT WAYMO REQUESTED, BECAUSE WE WERE

18  JUST DEALING WITH SO MANY DOCUMENTS.  LIKE I SAID, OVER 10,000.

19      AND WE COULDN'T DO THAT REVIEW UNTIL STROZ FIRST WENT

20  THROUGH AND FIGURED OUT WHAT IT WAS THEY WERE DEEMING TO BE

21  RESPONSIVE TO THE SUBPOENA.

22      **THE COURT:**  ALL RIGHT.  I NEED TO GO BACK AND LOOK AT

23  MY ORDER.  AND THEN JUDGE ALSUP'S ORDER AND FIGURE OUT -- DID

24  YOU WANT TO SAY SOMETHING?

25      **MS. WEBER:**  WHITNEY WEBER, ON BEHALF OF STKROZ.

1          SO JUST TO MAKE CLEAR FOR THE RECORD WHAT PROCESS

2     HAPPENED, AS MS. RIVERA WAS EXPLAINING, THAT STROZ COLLECTED

3     VARIOUS SOURCES OF INFORMATION AND REVIEWED IT FOR

4     RESPONSIVENESS.

5          AT THAT POINT IN TIME, AFTER WE MADE A RESPONSIVENESS

6     DETERMINATION, WE PROVIDED THE DOCUMENTS THAT WERE DEEMED

7     RESPONSIVE TO COUNSEL FOR UBER.  AT THAT POINT IN TIME THEY WENT

8     THROUGH THE DOCUMENTS.

9          THAT DID NOT HAPPEN UNTIL -- GOSH, I DON'T WANT TO

10    SAY THE EXACT DATE AND GET IT WRONG -- BUT IT WOULD HAVE BEEN IN

11    THE MID-SUMMER TIME PERIOD.  AND I BELIEVE THE DRAFTS WERE NOT

12    SHARED WITH COUNSEL FOR UBER PRIOR TO THAT TIME PERIOD, SO THEY

13    WOULD NOT HAVE KNOWN ABOUT THEM.

14         **THE COURT:**  OKAY.  ALL RIGHT.  WELL, I'LL GO THINK

15    ABOUT IT.  I MEAN, IT IS ATTORNEY WORK PRODUCT.  IT'S NOT STUFF

16    THAT YOU NORMALLY GET.  IT'S NOT LIKE IF YOU ARE BEING DEPRIVED

17    OF SOME RELEVANT EVIDENCE.  WHAT YOU'RE TRYING TO DO IS GET THEM

18    TO WAIVE AND GET SOMETHING THAT NORMALLY YOU DON'T HAVE YOUR

19    HANDS ON.

20         **MR. JUDAH:**  YOUR HONOR, IF I COULD MAKE TWO QUICK,

21    SHORT POINTS.  THE FIRST IS THAT THIS IS NOT -- WE'RE NOT TRYING

22    TO SEEK "GOTCHA" ABOUT THERE WAS SOME E-MAIL SOMEONE FROM STROZ

23    SENT TO SOME RANDOM PERSON THAT UBER LEGITIMATELY COULDN'T HAVE

24    KNOWN THAT EXACT COMMUNICATION, YOU KNOW, AT THE TIME WE SERVED

25    OUR SUBPOENA.  WE'RE TALKING ABOUT AN RPF THAT ASKS FOR ALL

1    REPORTS AND ANALYSES.

2              **THE COURT:** BUT YOU DIDN'T ASK FOR THE DRAFTS.

3              **MR. JUDAH:** WE SAID "ALL REPORTS AND ANALYSES."

4              **THE COURT:** USUALLY, OFTEN PEOPLE SAY:

5                   "ALL REPORTS, ALL DRAFTS OF THE REPORTS" AND THE

6    LIKE.

7              **MR. JUDAH:** YOUR HONOR --

8              **THE COURT:** RIGHT?  RIGHT?

9              **MR. JUDAH:** I'VE SEEN RFP'S LIKE THAT.

10             **THE COURT:** YES.

11             **MR. JUDAH:** BUT THE FACT THAT WE ASKED FOR THE

12   ANALYSES, IT WAS SQUARELY IN THE RFP --

13             **THE COURT:** THE REASON YOU DON'T ASK FOR THE DRAFTS

14   IS DRAFTS ARE WORK PRODUCT.  THAT'S WHY YOU DON'T DO IT.  LIKE,

15   THEY CAN'T ASK FOR DRAFTS OF YOUR BRIEFS OF THIS LETTER YOU

16   SUBMITTED, RIGHT, BECAUSE IT'S WORK PRODUCT.  EVEN THOUGH THE

17   DRAFT IS HERE AND IT IS PUBLISHED.  RIGHT?

18             SO THAT'S JUST THE ARGUMENT, "WELL, THE FINAL IS

19   THERE."  THE FINAL IS THERE, THE FINAL AGREEMENT.  BUT THE

20   DRAFTS ARE CLASSIC.  THEY ARE CLASSIC WORK PRODUCT.

21             **MR. JUDAH:** YOUR HONOR, I CAN ASSURE YOU THAT IF THEY

22   SUBPOENAED ALL OF QUINN EMANUEL'S ANALYSES IN THIS CASE, WE

23   WOULD SAY:

24                  "WE ARE CLAIMING WORK PRODUCT PROTECTION AND

25   PRIVILEGE OVER ALL DRAFTS."

1          YES, WE SERVE STUFF.  WE FILE STUFF OVER THE WIRE,

2    ALL DRAFTS.  AND UBER KNEW ABOUT THAT.  THAT'S EXACTLY WHAT YOU

3    SAID.  THEY DIDN'T IDENTIFY ANYTHING.

4          THE JUDGE, ALSUP, IDENTIFIED IN HIS ORDER OVERRULED

5    ALL OBJECTIONS THAT THEY DIDN'T IDENTIFY ANY SPECIFIC CATEGORIES

6    THAT WERE NOT ALREADY ON THE PRIVILEGE LOG.

7          **THE COURT:**  YES, I DO REMEMBER THAT.  I HAVE TO GO

8    BACK, BUT I WAS STRUCK BY THAT.

9          **MS. RIVERA:**  AND, YOUR HONOR, WHAT I CAN SAY, TOO, TO

10   THAT IS SIMPLY THAT WE WERE NOT AWARE THAT THERE WERE DRAFTS.

11   AND WE CERTAINLY WEREN'T AWARE OF THE DETAILS THAT WE WOULD NEED

12   IN ORDER TO PREPARE A PRIVILEGE LOG.  AS YOUR HONOR KNOWS, WAYMO

13   HAS TAKEN US TO TASK WITH RESPECT TO THE LEVEL OF DETAIL IN OUR

14   PRIVILEGE LOGS.

15         ON SEPTEMBER 17TH WE PREPARED A LOG THAT INCLUDED ALL

16   OF THE RELEVANT INFORMATION ABOUT WHO THESE DRAFTS WERE PREPARED

17   BY, WHO THEY WERE CIRCULATED TO.  IT WAS A VERY DETAILED

18   PRIVILEGE LOG.  THERE'S NO QUESTION THAT THAT'S INFORMATION THAT

19   WE COULD NOT HAVE PROVIDED TO WAYMO OR YOUR HONOR UNTIL WE

20   ACTUALLY DID THE REVIEW AND CAME ACROSS THESE DOCUMENTS.

21         **THE COURT:**  NO, BUT TO BE FAIR, YOU KNOW THERE'S A

22   REPORT BECAUSE UBER, TO ITS CREDIT, BROUGHT THAT REPORT TO THE

23   JUDGE'S ATTENTION.  RIGHT?  YOU BROUGHT IT TO THE JUDGE'S

24   ATTENTION, SO YOU KNOW THE REPORT IS OUT THERE.  SO YOU COULD

25   HAVE EASILY KNOWN.  IT'S AN EASY QUESTION:

1    "ARE THERE ANY DRAFTS?"

2         I MEAN, ACTUALLY, AT THAT POINT YOU'VE SEEN THE

3    REPORT AND READ IT.  IT'S PRETTY OBVIOUS FROM READING IT THAT

4    THERE ARE LIKELY GOING TO HAVE BEEN DRAFTS.  RIGHT?

5         **MS. RIVERA:**  WELL, NOT NECESSARILY, YOUR HONOR.  I

6    MEAN, WE PRESUMABLY WOULD HAVE KNOWN THAT THERE WAS LOTS OF

7    COMMUNICATION BACK AND FORTH BETWEEN AND AMONG INDIVIDUALS AT

8    STROZ.  WE HAD ABSOLUTELY NO INSIGHT INTO WHAT THAT WAS OR WHAT

9    IT LOOKED LIKE.

10        AS SOON AS THOSE MATERIALS WERE MADE AVAILABLE TO US,

11   YOU KNOW, WE HAD UPWARDS OF 15 CONTRACT ATTORNEYS THAT JUMPED ON

12   THOSE DOCUMENTS TO START REVIEWING THEM TO FIGURE OUT WHAT IS IN

13   THERE, WHAT ARE WE ASSERTING PRIVILEGE OVER, AND LET'S GET A

14   PRIVILEGE LOG PREPARED ASAP.

15        AND THAT'S EXACTLY WHAT WE DID.

16        **THE COURT:**  ALL RIGHT.  WELL, I'LL JUST GO BACK.

17        **MR. JUDAH:**  YOUR HONOR, I JUST HAVE TWO QUICK POINTS.

18   IF I CAN JUST MAKE THE SECOND ONE.

19        TO THE EXTENT THIS IS WORK PRODUCT, I MEAN THESE

20   REPORTS, I BELIEVE, ARE GOING TO HAVE A LOT OF FACT WORK

21   PRODUCT.

22        **THE COURT:**  YOU HAVE ALL THE FACTS.  YOU'VE GOT THE

23   STUFF IN THE REPORTS.  YOU'VE GOT EVERYTHING THAT THEY LOOKED

24   AT.

25        **MR. JUDAH:**  WELL --

1          **THE COURT:**  WHAT IS GOING TO BE THERE IS OPINION.

2     THAT'S WHAT IS GOING TO BE CUT OUT IS NUANCE OR THOSE KINDS OF

3     THINGS.

4          **MR. JUDAH:**  YOUR HONOR, BASED ON THE INFORMATION WE

5     HAVE, FOR EXAMPLE YOU COMPARE THE INTERVIEW SUMMARY WITH MR.

6     LEVANDOWSKI --

7          **THE COURT:**  YES.

8          **MR. JUDAH:**  -- TO WHAT IS IN THE FINAL REPORT, AND

9     CERTAIN MATERIAL THAT WAS IN THERE IS NOT INCLUDED IN THE

10    REPORT.  YOU KNOW --

11         **THE COURT:**  BUT YOU GOT THE INTERVIEW SUMMARY BECAUSE

12    IT WAS ATTACHED.  IT WAS AN EXHIBIT TO THE REPORT.

13         **MR. JUDAH:**  SURE.  WE HAVE THAT.  BUT IT SEEMS LIKE

14    THE ELEMENTS THAT WOULD HAVE BEEN EVEN MORE DAMAGING TO UBER

15    LOOK THEY MAY NOT HAVE MADE IT INTO THE FINAL REPORT, AND THEY

16    MAY BE IN THE DRAFTS.

17         **THE COURT:**  WHY DAMAGING TO UBER?  THEY WEREN'T

18    INVESTIGATING UBER.  THEY WERE INVESTIGATION MR. LEVANDOWSKI.

19         **MR. JUDAH:**  YEAH.  WELL, WERE DAMAGING TO OTTOMOTTO,

20    I SUPPOSE.  BUT DAMAGING TO UBER'S CASE, WHICH IS WHY THEY ARE

21    TRYING TO CONCEAL IT, IS WHAT I'M SAYING.

22         **THE COURT:**  IT IS ATTORNEY WORK PRODUCT PRIVILEGE.

23    RIGHT?

24         **MR. JUDAH:**  TO THE EXTENT IT IS, IT WOULD BE MOST OF

25    THAT IS FACT --

1          **THE COURT:**  I GUESS WHAT I'M TAKING ISSUE WITH IS

2     THEY ARE TRYING TO CONCEAL IT BECAUSE IT'S DAMAGING TO THEIR

3     CASE.  RIGHT?

4          **MR. JUDAH:**  WELL, I WOULD SAY WE HAVE A SUBSTANTIAL

5     NEED BECAUSE WE HAVE A LOT OF PRIVILEGE OBJECTIONS OVER ALL THE

6     ANALYSIS THAT WAS DONE AFTER APRIL 11, OTHER THAN WHAT IS IN THE

7     FINAL REPORT.  SO I THINK WE HAVE A SUBSTANTIAL NEED FOR A LOT

8     OF THE INFORMATION, INCLUDING THE FACT WORK PRODUCT THAT IS IN

9     THESE DRAFT REPORTS.

10         **THE COURT:**  I MEAN -- WELL, I DON'T KNOW IF THERE IS

11    FACT WORK PRODUCT IN THE DRAFT REPORT.  I MEAN, AND MAYBE YOU

12    HAVE A SUBSTANTIAL NEED WITH RESPECT TO THERE'S SOMETHING AS TO

13    MR. LEVANDOWSKI THAT'S IN THERE AS TO WHAT HE SAID, BECAUSE HE'S

14    NOT COOPERATING.

15         **MS. RIVERA:**  SO, YOUR HONOR, WITH RESPECT TO THE

16    DRAFTS AND THE POINT ABOUT THE SUBSTANTIAL NEED, WHAT WE'RE

17    TALKING ABOUT HERE IS WAYMO'S SPECULATION THAT THERE WERE DRAFTS

18    THAT WERE, I GUESS, MORE, I THINK -- USE THE TERM "DAMAGING" TO

19    UBER OR DAMAGING TO OTTOMOTTO.  THAT'S PURE SPECULATION.  THE

20    POINT THEY MADE IN THEIR PAPERS THAT THEY HAVE REASON TO BELIEVE

21    THAT THAT'S THE CASE, BUT THEY DEPOSED FOUR INDIVIDUALS FROM

22    STROZ.

23         THERE'S BEEN DIRECT TESTIMONY FROM PERSONNEL AT STROZ

24    TO THE EFFECT THAT UBER AND OTTOMOTTO WANTED AN INDEPENDENT AND

25    ROBUST INVESTIGATION.  THERE'S BEEN A DIRECT REPRESENTATION OF

1    THE IDEA THAT UBER IN ANY WAY URGED, YOU KNOW, A WATERED DOWN

2    VERSION OF THE FACTS.  SO THAT PART IS AT THIS POINT PURE

3    SPECULATION.  THAT'S NOT AT ALL SUPPORTED BY THE RECORD.

4              AND TO YOUR HONOR'S POINT, THEY DO HAVE ALL THE FACT

5    WORK PRODUCT.  THEY HAVE THE INTERVIEW MEMOS.  THEY HAVE THE

6    UNDERLYING FORENSIC ANALYSIS.  WHAT WE'RE TALKING ABOUT HERE IS

7    PURE OPINION WORK PRODUCT.

8              **THE COURT:**  I DON'T KNOW.  I HAVEN'T SEEN IT.  BUT I

9    DON'T KNOW.  MAYBE LET ME GO BACK AND LOOK AT THOSE ORDERS AND

10   SEE.  AND IF I HAVE A QUESTION THEN I MAY ASK YOU TO JUST SUBMIT

11   THEM TO ME IN CAMERA.  I'M NOT PREPARED TO DO THAT.

12             **MR. JUDAH:**  YOUR HONOR, MR. PERLSON MADE A GOOD POINT

13   THAT I WOULD BE REMISS IF I DIDN'T POINT OUT, WHICH IS I WOULD

14   BE ASTONISHED IF ON THE PRIVILEGE LOG OF UBER AND MOFO ATTORNEYS

15   THERE WASN'T SOME COMMUNICATION WITH MR. STROZ SAYING:

16             "WE HAVE A DRAFT IN PROGRESS.  WE HAVE A DRAFT,

17   BUT WE ARE STILL WORKING ON IT."

18             THE NOTION THAT THE LAWYERS AT MOFO WHO WERE

19   COMMUNICATING WITH STROZ DIDN'T KNOW THAT THEY WERE WORKING ON

20   DRAFTS?  AND THAT CONTEMPORANEOUSLY WHILE THEY ARE COMMUNICATING

21   WITH STROZ, THEY DIDN'T KNOW THAT DRAFTS EXISTED AND WERE

22   WORKING ON THE DRAFTS?

23             I FIND THAT INCREDIBLE, ALTHOUGH I HAVE NOT SEEN --

24             **THE COURT:**  WHAT DID STROZ SAY WHEN YOU DEPOSED THEM?

25             **MR. JUDAH:**  WE GOT PRIVILEGE OBJECTIONS ON ANYTHING

1    AFTER APRIL 11TH.

2              **MS. RIVERA:**  THE LAST ISSUE HERE, YOUR HONOR -- AND

3    YOU TOUCHED ON THIS A MOMENT AGO WITH RESPECT TO THE E-MAIL

4    EXCHANGE OF SEPTEMBER 21ST WAS THERE'S NO PREJUDICE HERE.  WE

5    HAVE ACTED IN GOOD FAITH.  WITH RESPECT TO THAT SEPTEMBER 21ST

6    E-MAIL EXCHANGE, YOUR HONOR, I UNDERSTAND WHAT YOUR HONOR SAID,

7    AND I CAN TELL YOUR HONOR THAT THAT WASN'T MY INTERPRETATION.

8    BUT IT MAY HAVE BEEN BECAUSE I WAS, YOU KNOW -- WE WERE IN THE

9    THROES OF PREPARING THOSE AMENDED LOGS, AND THAT'S WHAT WE WERE

10   THINKING ABOUT.

11             BUT WITH RESPECT TO THE ULTIMATE ISSUE OF:  ARE THESE

12   DRAFTS WORK PRODUCT?  YOU KNOW, I THINK IT'S UNQUESTIONABLE THAT

13   THEY ARE.  AND IN TERMS OF WHAT THE PREJUDICE IS, YOU KNOW, HAD

14   WE ASSERTED BACK IN JUNE THAT:

15             "BY THE WAY, WE SUSPECT THAT THERE MIGHT BE SOME

16   DRAFTS, OVER WHICH, YOU KNOW, IF THEY DO EXIST, WE'RE GOING TO

17   ASSERT PRIVILEGE," I DON'T UNDERSTAND WHAT DIFFERENT POSITION --

18             **THE COURT:**  I UNDERSTAND.  I'LL GO BACK AND LOOK.

19             BUT NOW IT'S BEEN A LONG TIME.  BUT -- AND WE ALL

20   FORGET -- BUT AT THE BEGINNING OF THIS CASE OF THESE ISSUES

21   THINGS WERE SORT OF BEING PULLED OUT OF UBER.  RIGHT?  WELL,

22   FIRST THE TERM SHEET, AND THEN EVERYTHING OUT.  AND SO THAT MAY

23   HAVE BEEN WHAT WAS IN MY MIND OR WHAT I WAS REFERRING TO.

24             BUT I'LL GO BACK AND LOOK AT THEM, AS I SAID.  AS I

25   SAID, I'LL DO THAT.  I DON'T THINK THERE'S ANY PREJUDICE.  WHAT

1   THEY ARE TRYING TO GET IS SOMETHING YOU DON'T NORMALLY GET IN

2   LITIGATION THAT YOU'RE NOT ENTITLED TO; THAT THERE'S NO -- YOU

3   KNOW, YOU HAVE TO TRY YOUR CASE WITHOUT IT IS NOT AN INJUSTICE

4   IN THAT SENSE.

5              BUT THERE ARE CERTAIN RULES THAT APPLY AND CERTAIN

6   RULINGS THAT HAVE BEEN MADE, AND SO I'LL GO BACK AND SEE HOW

7   THEY FIT TOGETHER AND I'LL TAKE A LOOK AT THEM.  OKAY.

8              **MR. JUDAH:**  THANK YOU, YOUR HONOR.

9              **THE COURT:**  THANK YOU.

10             OKAY.  THEN, LET'S SEE.  LET ME LOOK AT MY NOTES.

11             OKAY.  THE SOFTWARE WILL WAIT, AND WE'LL SET A

12  BRIEFING ON THAT MOTION.  I'LL DECIDE THAT ALL TOGETHER.

13             AND THEN, THE LAST ONE THEN IS -- WELL, I THINK THIS

14  IS TAKEN CARE OF NOW.  THE LEVANDOWSKI, WHAT THEY CALL THE

15  69,000 SLIVER.

16             AH, SOMEONE NEW.  YAY.  GOOD AFTERNOON.

17             **MS. ROBERTS:**  GOOD AFTERNOON.  HOPE YOU'RE STILL

18  EXCITED AFTER I SPEAK.

19             **THE COURT:**  I'M EXCITED TO HAVE YOU SPEAK, BRING

20  SOME -- I'M NOT GOING TO COMMENT ON IT.  OKAY.

21             **MS. RIVERA:**  AND I APOLOGIZE.  IT'S STILL ME, YOUR

22  HONOR, FOR UBER.

23             **THE COURT:**  YOU CAN STATE YOUR APPEARANCE.

24             **MS. ROBERTS:**  ANDREA ROBERTS.

25             **THE COURT:**  ROBERTS.  ALL RIGHT, MS. ROBERTS.  OKAY.

1   SO AS I UNDERSTAND IT, UBER -- NOT UBER -- WAYMO WOULD LIKE TO

2   KNOW IN AN ADMISSIBLE FORM WHERE THOSE IMAGES -- MOSTLY WHAT

3   WE'RE TALKING ABOUT, 69,000 CAME FROM.

4           MOFO, MS. RIVERA, HAS SAID IN A DECLARATION THAT THEY

5   CAME FROM THE MACBOOK.  ALSO STROZ'S COUNSEL SAID THE SAME

6   THING.

7           SO IF WE HAVE AN AGREEMENT -- NOW, I UNDERSTAND THAT

8   MOFO DISPUTES THAT UBER SHOULD BE RESPONSIBLE FOR THAT.  THAT'S

9   NOT A DISCOVERY ISSUE.  THAT'S AN INFERENCE, TRIAL ISSUE, I

10  THINK, FOR JUDGE ALSUP.  BUT AS FOR A DISCOVERY ISSUE, WHY ISN'T

11  WHAT THEY PROVIDED, ASSUMING WE AGREE THAT THAT'S ADMISSIBLE,

12  ADMISSIBLE?  THAT'S WHERE IT CAME FROM, HIS MACBOOK.

13          **MS. ROBERTS:**  SO I THINK IT COMES A LITTLE -- A

14  LITTLE SHORT FROM WHAT WE NEED TO BE ADMITTED AT TRIAL.  WE HAVE

15  A SET OF DOCUMENTS.  THESE DOCUMENTS, MOSTLY PHOTOS, WERE MADE

16  AVAILABLE FOR INSPECTION BY US AFTER WE GOT THE FEDERAL CIRCUIT

17  ORDER.

18          WE WENT TO MORRISON & FOERESTER, IDENTIFIED THE ONES

19  WE WANTED PRINTED.  THEY WERE PRINTED AND PRODUCED WITH BATES

20  NUMBERS.

21          I THINK WHAT WE WANT IS FOR THAT SET OF DOCUMENTS FOR

22  MOFO TO AUTHENTICATE THAT THIS SET OF DOCUMENTS WERE PROVIDED TO

23  US BY STROZ, RATHER THAN THE SORT OF VAGUE LANGUAGE, THE MOFO

24  SLIVER, IS NOT ENTITLED TO SPECIFIC DOCUMENTS THAT WE WILL BE

25  USING AT TRIAL.

1          AND, YOU KNOW, IF THEY CAN ALSO ATTEST TO THE FACT

2     THAT THEY CAME FROM THE MACBOOK --

3          **THE COURT:**  YOU'LL BE ATTEMPTING TO USE AT TRIAL.

4     THEY WILL ARGUE THAT YOU SHOULDN'T BE.

5          **MS. ROBERTS:**  CERTAINLY, YOUR HONOR.

6          **THE COURT:**  I'LL MAKE IT CLEAR.  IT'S NOT A RULING

7     THAT THEY GET TO USE THEM FOR THE PURPOSE THAT THEY WANT, BUT

8     JUST WHY ISN'T THAT --

9          **MS. RIVERA:**  SURE.  SO, YOUR HONOR, TWO THINGS.  WE

10    HAVE NO PROBLEM SAYING THAT.  WHEN I SAY "WE," TO BE CLEAR,

11    SPEAKING ON BEHALF OF MORRISON & FOERSTER.  IT WAS MORRISON &

12    FOERSTER WHO RECEIVED THESE AT THE TIME WE WERE COUNSEL FOR

13    MR. LEVANDOWSKI IN THE ARBITRATION, AND WE RECEIVED IT FROM

14    STROZ IN OUR CAPACITY AS COUNSEL FOR MR. LEVANDOWSKI, NOT IN OUR

15    CAPACITY AS COUNSEL FOR UBER.

16          I THINK IT'S CLEAR FROM THE PAPERS, AND YOUR HONOR

17    UNDERSTANDS THAT.  I JUST WANTED TO RECORD TO BE CLEAR.

18          HAVING SAID THAT, WE HAVE NO PROBLEM SAYING THAT

19    MORRISON & FOERSTER RECEIVED THE MATERIALS FROM STROZ.  THAT'S

20    SOMETHING THAT WE HAVE DIRECT FIRSTHAND KNOWLEDGE OF.  WHAT WE

21    CAN'T DO IS SPEAK TO THE PROVINCE OF THESE MATERIALS WITH

22    RESPECT TO WHICH SPECIFIC DEVICE OF MR. LEVANDOWSKI THEY CAME

23    FROM.

24          ALL WE CAN DO IS TELL WAYMO AND TELL YOUR HONOR WHAT

25    COUNSEL FOR STROZ HAS TOLD US.  I HAVE NO REASON TO DOUBT THAT

1    IT'S TRUE.  I BELIEVE IT TO BE THE CASE.

2              **THE COURT:**  OKAY.

3              **MS. RIVERA:**  BUT IN TERMS OF SIGNING A DECLARATION --

4              **THE COURT:**  NO, I UNDERSTAND.  BUT WILL YOU AGREE,

5    THEN, THAT YOU WON'T MAKE A HEARSAY OBJECTION TO THEIR OFFERING

6    WHAT YOU SAID?  IN OTHER WORDS, I MEAN, YOU COULD -- RIGHT?  YOU

7    SAID YOU HAVE NO REASON.

8              OR I HAVE COUNSEL FOR STROZ HERE?  THEY CAN JUST SIGN

9    THE STIPULATION THAT SAYS IT CAME FROM THE MACBOOK.  RIGHT?

10             **MS. RIVERA:**  SURE.  I HESITATE ONLY BECAUSE I'M NOT

11   SURE WHAT MY -- WHAT MY COLLEAGUES ON OUR TRIAL TEAM WOULD SAY

12   IN RESPONSE TO ME MAKING CONCESSIONS THAT --

13             **THE COURT:**  AH, WHAT YOU CAN SAY IS:

14             "YOU SHOULD HAVE BEEN AT THE HEARING."

15             **MS. RIVERA:**  WELL, I'LL HAVE TO NOTE THIS PART OF THE

16   TRANSCRIPT, YOUR HONOR, SO I CAN SHOW IT TO THEM.

17             **THE COURT:**  YES.

18             **MS. RIVERA:**  BUT TO YOUR POINT, YOUR HONOR, AGAIN, NO

19   PROBLEM WITH STANDING BY WHAT I SAID IN MY DECLARATION, WHICH

20   IS:

21             "LOOK, WE TALKED TO COUNSEL FOR STROZ.  THEY

22   INFORMED US THAT ACCORDING, YOU KNOW, TO THEIR INVESTIGATION

23   THESE MATERIALS CAME FROM MR. LEVANDOWSKI'S MACBOOK COMPUTER,

24   WHICH STROZ COLLECTED DURING THE DUE DILIGENCE AND STILL HAS.

25             THE FOLLOW-UP TO THAT POINT, THOUGH, IS THAT WAYMO

1  HAS ACCESS TO THAT COMPUTER, AND THEY HAVE BEEN INSPECTING IT.

2          **THE COURT:** OH, YEAH.  WHAT ABOUT THAT?  THEY SAID

3  THAT --

4          **MS. RIVERA:** SO THEY --

5          **THE COURT:** -- THE FORENSIC IMAGE YOU HAVE THAT THEY

6  WOULD ALL BE THERE.

7          **MS. RIVERA:** SO THEY CAN GET THESE PHOTOS DIRECTLY

8  FROM THAT DEVICE.

9          **MS. ROBERTS:** SO THE CHALLENGE WITH THESE PHOTOS --

10  AND I --

11          **THE COURT:** IS THAT YOU CAN'T SEARCH FOR THEM.

12          **MS. ROBERTS:** EXACTLY.  I SUSPECT THAT'S WHY MOFO HAD

13  THEM SEGREGATED.

14          **THE COURT:** I REMEMBER THAT.

15          **MS. ROBERTS:** BECAUSE WHEN WE WANT TO GO FIND THEM IN

16  THE DATABASE WE CAN'T JUST RUN --

17          **THE COURT:** LOOK, LET'S JUST CUT TO THE CHASE.  YOU

18  PUT IT IN YOUR DECLARATION.  YOU PUT IT IN YOUR LETTER,

19  THEREFORE -- AND YOU DIDN'T WITHHOLD AND SAY:

20              "BUT WE'RE GOING TO MAKE A HEARSAY OBJECTION."

21  YOU DID PRESERVE ABSOLUTELY YOUR OBJECTION THAT UBER SHOULD

22  SOMEHOW BE CHARGED WITH THAT POSSESSION OR KNOWLEDGE.

23  ABSOLUTELY PRESERVED.

24              BUT IN TERMS OF THE FACT THAT IT CAME FROM THE

25  MACBOOK, YOU PUT IT OUT THERE.  SO WHAT I WOULD SAY IS YOU GET

1    IT TO THEM, THAT WHATEVER SLIVERS OF THE SLIVERS THEY WANT YOU

2    TO SAY COME FROM THAT MACBOOK, OR I'LL LET THEM TAKE A

3    DEPOSITION, ANOTHER DEPOSITION OF STROZ, AND THEY CAN JUST ASK

4    THEM DIRECTLY AND HAVE THEM AUTHENTICATE IT DIRECTLY.

5            THAT WAY SEEMS LIKE A WASTE TO EVERYBODY'S TIME, BUT

6    JUST SEE IF YOU CAN GET TO A STIPULATION.

7            **MS. ROBERTS:**  AND, YOUR HONOR, I THINK WE CAN WORK

8    TOWARDS THAT.  I WOULD ADD I THINK IT'S A TWO-STEP PROCESS.  I'M

9    NOT SURE THAT STROZ CAN VERIFY THAT PRECISELY WHAT WE PRINTED OR

10   REQUESTED BE PRINTED FROM MOFO ARE THE MATERIALS THAT CAME FROM

11   THEM.

12           I THINK WE NEED THE REPRESENTATION FROM MOFO THAT

13   THESE ARE MATERIALS THAT THEY RECEIVED FROM STROZ, AND THEY CAN

14   SAY THAT STROZ SAID THAT THEY CAME FROM THE MACBOOK, IF THAT'S

15   WHAT THEY KNOW.

16           I'M CONCERNED IF WE LEAVE IT ALL TO STROZ THAT STROZ

17   WILL SAY:

18                "WELL, WE DON'T KNOW WHAT WAS ON THAT COMPUTER.

19           **THE COURT:**  YOU UNDERSTAND.

20           **MS. RIVERA:**  I UNDERSTAND THE POINT, YOUR HONOR.  AND

21   I THINK WE CAN PROBABLY EITHER DO IT IN A TWO-STEP PROCESS OR

22   JUST HAVE MOFO DO IT, BUT DO IT IN A WAY THAT ALSO INCLUDES AN

23   AGREEMENT THAT WE'RE NOT GOING TO AT TRIAL CONTEST ANYTHING

24   HAVING TO DO WITH --

25           **THE COURT:**  THAT UBER IS NOT GOING TO CONTEST.

1          **MS. RIVERA:**  CORRECT, YOUR HONOR.

2          **THE COURT:**  WITH YOUR OTHER HAT ON, ALTHOUGH THEY

3    ABSOLUTELY ARE OPEN AND CAN CONTEST THAT THEY SHOULDN'T BE

4    CHARGED WITH THAT POSSESSION.

5          **MS. RIVERA:**  ABSOLUTELY.  AND I WOULD BE REMISS IF I

6    DID NOT EMPHASIZE THAT WE ABSOLUTELY, IN FACT, INTEND TO DO

7    THAT.

8          **THE COURT:**  AND THAT'S ABSOLUTELY PRESERVED AS IS

9    MR. JUDAH'S OBJECTION THAT IT'S WORK PRODUCT.  RIGHT?

10         OKAY.

11         **MS. ROBERTS:**  THAT WORKS.  THANK YOU, YOUR HONOR.

12         **THE COURT:**  YOU WON.  CONGRATULATIONS.

13         **MS. RIVERA:**  THANK YOU, YOUR HONOR.

14         **THE COURT:**  ALL RIGHT.  LET'S FIGURE OUT BRIEFING ON

15   THE OTHER TWO MOTIONS.  RIGHT?  ONE FROM OTTO TRUCKING.  A LOT

16   OF TIME HAS PASSED, BUT, ANYWAY, YOU CAN BRING IT.  AND THEN ONE

17   FROM WAYMO.  AND LET ME TELL YOU I'M UNAVAILABLE NOVEMBER 1ST,

18   2ND AND 3RD.  SO IF YOU WANT TO HAVE IT RESOLVED BEFORE THEN,

19   I'M HAPPY TO DO THAT.

20         I ACTUALLY THINK WE SHOULD SET A HEARING, BECAUSE IN

21   PARTICULAR WITH WAYMO'S MOTION, AS I ALLUDED TO EARLIER.  AND I

22   WILL SAY THIS: JUDGE ALSUP CERTAINLY LEFT OPEN FOR WAYMO TO COME

23   BACK.

24         HE LEFT THAT OPEN IN HIS ORDER.  AND AS I ALLUDED TO

25   TO THE EXTENT -- I DON'T KNOW.  I HAVEN'T RULED ON THIS -- THEY

1    ARE ALLOWED TO GET SOME SOURCE CODE, PROBABLY GOING TO HAVE TO

2    GO BOTH WAYS.

3            IN OTHER WORDS, THIS IS A NEW ISSUE WHICH I

4    PRESUME -- LET ME JUST ASK YOU THIS, MR. BAKER:  I PRESUME THAT

5    THIS SOURCE CODE, OR MR. NARDENILLI, IS ON THE NEW LIST OF TRADE

6    SECRETS.

7            **MR. JAFFE:**  MR. JAFFE, ACTUALLY.

8            **THE COURT:**  OR MR. JAFFE.  SORRY.  NARDENILLI.

9            **MR. JAFFE:**  HE WAS SITTING RIGHT NEXT TO ME.  YES,

10   YOU'RE CORRECT.

11           **THE COURT:**  I JUST WANT TO MAKE SURE WE WEREN'T

12   ARGUING ABOUT NOTHING.  OKAY.  ALL RIGHT.  SO, ANYWAY, I THINK

13   WE SHOULD HAVE A HEARING, BECAUSE IF -- I'M NOT SAYING I DON'T

14   KNOW -- BUT SHOULD I ALLOW WAYMO TO DO SO, THEN THE DEFENDANTS

15   WOULD PROBABLY WANT SOME DISCOVERY OF WAYMO, AS WELL.  AND SO WE

16   NEED TO GET THIS WRAPPED UP QUICKLY.

17           **MS. CHANG:**  YOUR HONOR, IT MAY MAKE SENSE FOR JUDGE

18   ALSUP TO DECIDE WAYMO'S MOTION TO AMEND, BECAUSE IF THAT MOTION

19   TO AMEND IS DENIED AS TO THE SOFTWARE TRADE SECRETS, THEIR

20   DISCOVERY MOTION FOR UBER'S SOURCE CODE IS MOOT.

21           **THE COURT:**  I'M CERTAINLY GOING TO ASK HIM THAT.  BUT

22   HE MAY VERY WELL SAY, AS HE OFTEN DOES, HE WANTS ME TO DECIDE

23   FIRST, AND I DON'T KNOW.  THAT'S, OF COURSE, WHAT OCCURRED TO

24   ME.

25           BUT IN THE MEANTIME, THOUGH, LET'S SEE WHETHER IT BE

1    THE 31ST OR THE 30TH, AS OUR HEARING DATE, AND THEN WE CAN WORK

2    BACKWARDS WITH BRIEFING FROM THEM.  DOES THAT MAKE SENSE?

3              **MR. JAFFE:**  THAT WORKS FOR US.

4              **THE COURT:**  SO THE 31ST IS HALLOWEEN, AND I DON'T

5    KNOW IF ANYBODY HAS HALLOWEEN PARADES THEY HAVE TO GO TO.  I TRY

6    TO AVOID THAT, FOR THAT MATTER.  BUT I HAVE CALENDAR AT 9:30.

7    2:30?  NO, 8:30.  I THINK WE SHOULD DO 8:30.  THERE'S NO PARADE

8    AT 8:30.  DOES THAT WORK?  OR WE COULD DO THE 30TH AT 8:30, AS

9    WELL.

10             **MS. CHANG:**  WE WOULD PREFER A LATER DATE, BECAUSE WE

11   HAVE A BUNCH OF RESPONSIVE BRIEFS TO FILE BY WEDNESDAY THE 25TH,

12   SO MORE TIME WORKS FOR US.

13             **THE COURT:**  THE 31ST, THEN.  BUT I WANT TO DO IT BY

14   THEN, BECAUSE THEN I'M GONE THE REST OF THE WEEK.

15             31ST AT 8:30 WILL BE THE HEARING DATE ON BOTH

16   MOTIONS.  OKAY.  SO YOU FILED YOURS AND YOU FILED YOURS.  SO

17   WHEN DO YOU WANT TO FILE YOUR OPPOSITION?

18             **MS. CHANG:**  FOR THE SOURCE CODE MOTION I WOULD ASK

19   COULD WE DO IT FRIDAY, CLOSE OF BUSINESS?  BECAUSE, LIKE I SAID

20   BEFORE, WE HAVE AT LEAST SIX RESPONSIVE BRIEFS THAT WE HAVE TO

21   FILE BY WEDNESDAY NOON.

22             **THE COURT:**  YES, BUT AS I COUNT NOW I THINK YOU HAVE

23   AT LEAST THREE LAW FIRMS REPRESENTING YOU.  SO -- AND DON'T

24   FORGET ME.  RIGHT?  I NEED TO HAVE TIME TO REVIEW, AS WELL.

25             HOW ABOUT THURSDAY, 11:59 P.M., BOTH SIDES?

1            **MS. CHANG:**  OKAY.

2            **MR. BAKER:**   THAT'S FINE WITH US, YOUR HONOR.

3            **THE COURT:**  OKAY.  ALL RIGHT.  TO THE EXTENT THERE'S

4   ANY REPLY -- AND WHY DON'T I LET YOU DO A REPLY?  IF I DON'T

5   YOU'LL PROBABLY FILE ONE WITH THE REQUEST, ANYWAY.  SO ANY REPLY

6   BY 10:00 A.M. MONDAY.  OH, YES.  AND THEN, THE MOVING PARTY

7   NEEDS TO PROVIDE ME THE BINDERS BY NOON THEN ON MONDAY.

8            ACTUALLY, NOT THE REPLIES.  CAN YOU PROVIDE, BECAUSE

9   I'M ACTUALLY IN CLOSING ARGUMENTS FROM 11:00 A.M. PROBABLY UNTIL

10  LIKE 4:00 P.M. ON MONDAY.  SO GIVE ME THE BINDERS ON FRIDAY AND

11  I CAN JUST ADD THE REPLIES IN ON MONDAY.

12           SO THE MOVING PAPERS -- I HAVE MOVING SEPARATE.  GIVE

13  ME A BINDER WITH THE MOVING AND THE OPPOSITION, IF YOU COULD, BY

14  NOON ON FRIDAY, BECAUSE THE OPPOSITIONS WILL HAVE BEEN FILED THE

15  NIGHT BEFORE.

16           **MS. CHANG:**  AND, YOUR HONOR, IF YOU CONSULT WITH

17  JUDGE ALSUP AND HE WANTS TO RULE ON THE MOTION TO AMEND FIRST

18  YOU'LL ISSUE AN ORDER AND LET US KNOW?

19           **THE COURT:**  I WILL.  I WILL SO THAT YOU'RE NOT DOING

20  MAKEWORK.

21           **MS. CHANG:**  THANK YOU.

22           **THE COURT:**  GREAT.  WELL, I FEAR OUR TIME MAY BE

23  COMING TO AN END SLOWLY.  OKAY.  OR MAYBE I HOPE.  NO, JUST

24  KIDDING.

25           ALL RIGHT.  THANKS, EVERYBODY.

1          **MR. JAFFE:**  THANK YOU, YOUR HONOR.

2          **MR. BAKER:**  THANK YOU, YOUR HONOR.

3          (THEREUPON, THIS HEARING WAS CONCLUDED.)

4   STENOGRAPHY CERTIFICATION

5          "I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
    FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER."

6          OCTOBER 24, 2017
           KATHERINE WYATT

7   _____