Pages 1 - 44

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

WAYMO, LLC                          )
                                    )
            Plaintiff,              )
                                    )
   vs.                              ) No. C 17-00939 WHA
                                    )
UBER TECHNOLOGIES, LLC., OTTO       )
TRUCKING, LLC, and OTTOMOTTO, LLC,  )
                                    ) San Francisco, California
            Defendants.             ) Thursday
                                    ) October 26, 2017
_____   ) 9:00 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          QUINN, EMANUEL, URQUHART, OLIVER
                              & SULLIVAN, LLP
                            50 California Street
                            22nd Floor
                            San Francisco, California 94111
                    BY: **CHARLES KRAMER VERHOEVEN, ESQ.**
                        **DAVID PERLSON, ESQ.**
                        **JORDAN R. JAFFE, ESQ.**
                        **MELISSA BAILY, ESQ.**
                        **DAVID EISEMAN, ESQ.**


                            QUINN, EMANUEL, URQUHART, OLIVER
                              & SULLIVAN, LLP
                            555 Twin Dolphin Drive
                            5th Floor.
                            Redwood Shores, California 94065
                    BY: **ANDREA PALLIOS ROBERTS, ESQ.**
                        **MARK TUNG, ESQ.**

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
        *Official Reporter - US District Court*
        *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

For Defendants:          MORRISON & FOERSTER, LLP
                         425 Market Street
                         San Francisco, California 94105
                  BY:  **ARTURO J. GONZÁLEZ, ESQ.**
                       **MICHAEL A. JACOBS, ESQ.**
                       **ESTHER KIM CHANG, ESQ.**


                         MORRISON AND FOERSTER LLP
                         2000 Pennsylvania Avenue, NW
                         Suite 6000
                         Washington, DC 20006
                  BY:  **MICHELLE YANG, ESQ.**


For Defendants:          SUSMAN, GODFREY, LLP
                         1301 6th Avenue
                         32nd Floor
                         New York, New York 10019
                  BY:  **BILL CARMODY, ESQ.**


                         SUSMAN, GODFREY, LLP
                         1000 Louisiana Street
                         Suite 5100
                         Houston, Texas, 77002
                  BY:  **JOSEPH S. GRINSTEIN, ESQ.**


For Defendants:          BOIES, SCHILLER AND FLEXNER, LLP
                         435 Tasso Street
                         Suite 205
                         Palo Alto, California 94301
                  BY:  **MEREDITH R. DEARBORN, ESQ.**


For Intervenor Defendant
Anthony Levandowski:      GOODWIN PROCTER, LLP
                         135 Commonwealth Drive
                         Menlo Park, California 94025
                  BY:  **INDRA NEEL CHATTERJEE, ESQ.**

           (APPEARANCES CONTINUED ON FOLLOWING PAGE)

**APPEARANCES:   (CONTINUED)**

Special Master:          FARELLA BRAUN & MARTEL, LLP
                         Russ Building, 30th Floor
                         235 Montgomery Street
                         San Francisco, California 94104
                    BY:  **JOHN L. COOPER, ESQ.**


                         -   -   -

**P R O C E E D I N G S**

OCTOBER 26, 2017                                        9:06 A.M.

---000---

THE CLERK:  Calling Civil Action 17-939, Waymo, LLC

versus Uber Technologies, Inc. et al.

     Counsel, please approach the podium and state your

appearances for the record.

     MR. PERLSON:  Good morning, your Honor.  David

Perlson from Quinn Emanual for plaintiff Waymo.

     With me is Charlie Verhoeven, Jordan Jaffe, Mark Tung,

David Eiseman, Andrea Roberts and Melissa Baily.

     THE COURT:  All right.  Thank you.

     MR. GONZÁLEZ:  Good morning, your Honor.  Arturo

González from Morrison and Foerster.

     Also with me is my partner, Michael Jacobs, Esther Kim

Chang and Michelle Yang.

     THE COURT:  Okay.  Thank you.

     MR. CARMODY:  Good morning, your Honor.  Bill Carmody

with Sussman Godfrey, and I have Joe Grinstein with me as well.

     THE COURT:  Thank you.

     MS. DEARBORN:  Good morning, your Honor.  Meredith

Dearborn from Boies Schiller and Flexner.

     MR. CHATTERJEE:  Good morning, your Honor.  Neel

Chatterjee from Goodwin Procter.

     MR. COOPER:  Good morning, your Honor.  John Cooper,

```
 1   Special Master.
 2                THE COURT:  Thank you, all.
 3        All right.  We'll here for -- this hearing is about the
 4   proposed two additional trade secrets to be added to the case,
 5   but -- we'll come to that, but before we get to that, I want to
 6   focus on a different part of that motion, which is additions
 7   that relate to the original nine trade secrets and don't relate
 8   to the proposed two.  In other words, kind of the old business
 9   part of the case for a moment.  I want to focus on that.
10        Now, as I understand it, the Defendants don't object to
11   supplementing the Hesselink report and you don't object to a
12   new expert Crain, C-R-A-I-N, re the due diligence process so
13   long as you get to do a rebuttal report -- not rebuttal, but
14   opposition report.
15                MR. JACOBS:  Yes, your Honor.  Matthew Jacobs.
16   That's correct.
17                THE COURT:  That sounds reasonable to me.  I'm going
18   to ask briefly is there any -- can we at least agree on that
19   had much?
20                MR. VERHOEVEN:  We can.
21                THE COURT:  Okay.  All right.
22        Next.  Defendant wants -- no.  Defendant objects to new
23   witnesses, Levandowski -- Max Levandowski, Ratner, Bananzadeh
24   on the basis that they have nothing to do with the Stroz report
25   or with any new evidence.
```

 1        Is that true?  You still object?

 2             **MR. JACOBS:**  We do, your Honor.

 3             **THE COURT:**  So let me give you a chance to -- just

 4   give me  -- just articulate it in two minutes what your

 5   objections are.  Then we'll -- your name is?

 6             **MS. ROBERTS:**  Andrea Roberts.

 7             **THE COURT:**  Andrea Roberts.  We're going to hear from

 8   Ms. Roberts.  Then we'll come back to you and give you more of

 9   a rebuttal.

10        So take two minutes and explain why you object.

11             **MR. JACOBS:**  The objection, your Honor, is based on

12   the following principle.  Where the proposed addition can

13   fairly be traced to new information developed through the Stroz

14   disclosures that occurred after the Federal Circuit ruled, then

15   at least as a principled matter -- we may have granular

16   evidentiary objections, but as a principled matter, we don't

17   object to it going on their list of proposed witnesses,

18   proposed exhibits, et cetera.

19        Where, on the other hand, what we see as they are

20   attempting to backfill to their original case, or the case that

21   was in place before the Stroz disclosures, that strikes us as

22   unfair.  That's basically a violation of your scheduling order.

23        They were supposed to list the witnesses and exhibits that

24   they had as of that date based on the information they had as

25   of that time, and they were supposed to put that in the

1    pretrial disclosures, and then we had a process for getting to

2    trial on those.

3              THE COURT:  All right.  Well, that's -- I understand

4    your point.

5         But are you equally guilty or at least somewhat guilty?

6    Do you have any witnesses or exhibits that are going to fall

7    into that category yourself?  In other words, just plain old

8    late disclosures.

9              MR. JACOBS:  Plain old late disclosures?  We'll have

10   to negotiate out plain old late disclosures with the other side

11   or make a showing to your Honor of good cause.

12             THE COURT:  Yes, but you're trying to stop them from

13   negotiating with you on these three witnesses, right?

14             MR. JACOBS:  Yes.  Well, just to be clear.  I think

15   we're at sort of a threshold stage right now of do -- on

16   account of Stroz, does this massive --

17             THE COURT:  What?

18             MR. JACOBS:  On account of Stroz --

19             THE COURT:  Oh, I see.  Okay.

20             MR. JACOBS:  -- does this massive addition to the

21   pretrial disclosures get allowed in or on account of Stroz does

22   it not get allowed in unless they can get it in on some other

23   basis that one is allowed to get in late stuff.

24        That's where we are.  That's where we understand we are

25   procedurally at this point.

 1          So if there is a late-discovered document, the usual stuff

 2     that happens pretrial we anticipate will happen here and we

 3     either will negotiate it out or come back to your Honor on a

 4     very granular basis.

 5          But let's take a look at this fellow Bananzadeh, for

 6     example.  That looks to us like an attempt to shore up their

 7     damages case with a witness that was never on the Rule 26

 8     disclosures.  The damages case that pre-dates the disclosures

 9     of Stroz, Stroz says nothing that's relevant to damages.  There

10     is no good cause in Stroz to add that particular witness to

11     their Witness List.

12          So as a matter of the Stroz development, the Federal

13     Circuit ruling, et cetera, that falls on our other side of the

14     dividing line we think your Honor should apply.

15          **THE COURT:**  All right.  Just hold that thought for a

16     minute.  Let's take Shawn Bananzadeh -- how do you say his

17     name?

18          **MS. ROBERTS:**  That's a good question, your Honor.  I

19     think it's Bananzadeh.

20          **THE COURT:**  All right.  So what is your answer on

21     him?

22          **MS. ROBERTS:**  I think he would fall into the category

23     that Mr. Jacobs referred to of the additions at the end.

24          I can go into Max Levandowski and Daniel Ratner.  Those

25     are tied to the Stroz report.

1      Mr. Bananzadeh is somebody that they deposed for a full

2  day in his 30(b)6 capacity and as an individual witness.  He

3  was deposed as a 30(b)6 witness on the cost of developing each

4  of the alleged Waymo trade secrets, the original nine.  And

5  that is the scope of the testimony that we would have him

6  testify about at trial.  And I would add, we added him as a

7  "may call if the need arises" witness.  So it may not even

8  arise.

9      With respect to Max Levandowski and Daniel Ratner, they do

10  derive from the Stroz disclosures.  We had Motion to Compel

11  practice before Judge Corley relating to their depositions.

12  The documents that related to them are AEO, so I won't discuss

13  the substance --

14          THE COURT:  Is Max Levandowski related to the other

15  Levandowski?

16          MS. ROBERTS:  He is.  He's his brother.

17          THE COURT:  What is his testimony going to be in this

18  case?

19          MS. ROBERTS:  So we deposed them a second time.  We

20  found documents with Mister -- Max Levandowski and Daniel

21  Ratner's names on them that were part of the Stroz production.

22  We filed them -- we sought to take their depositions a second

23  time about those late-produced documents.  Defendants objected

24  and didn't agree.

25      We took that to Magistrate Judge Corley.  She agreed with

1   us and granted us two hours, two additional hours with each of

2   those deponents.  And based on their testimony, we've added

3   them as "may call if the need arises" witnesses.  So they were

4   definitely added because of --

5           THE COURT:  When you took the deposition -- when you

6   took the deposition for two hours, did you confine yourself to

7   the subject matter of the newly-produced materials?

8           MS. ROBERTS:  I believe we did, your Honor.

9           MR. JAFFE:  More or less.

10          MS. ROBERTS:  More or less.

11          THE COURT:  All right.  So let's -- Mr. Jacobs, just

12   on Levandowski, Max Levandowski, what I've heard does tie him

13   in to the late-produced documents.  So what do you say to that?

14          MR. JACOBS:  To the extent it does, your Honor, then

15   it falls on the Stroz side of the line and our objection would

16   be -- would not apply.

17      They actually deposed him on a whole bunch of stuff in

18   that two-hour deposition.  It went beyond the Stroz

19   disclosures.

20      So I guess the question is what's the extent that he

21   gets -- that he now gets allowed -- that he now is allowed to

22   testify?

23          THE COURT:  All right.  How about Ratner?  Is he the

24   same or is there a different story?

25          MS. ROBERTS:  The same category in that we discovered

1  documents that related to him as part of the Stroz production.

2  We sought his deposition.  We moved to compel.  Magistrate

3  Judge Corley gave us two hours.

4       He was not previously deposed in the case and we

5  identified him as a "may call if the need arises" witness based

6  on what we learned from the Stroz production.

7            THE COURT:  But you're the plaintiff.  What do you

8  mean "may call"?

9       You're the -- you get to go first, so you -- you should

10  know what your case is going to look like, so are you going to

11  call these two people or not?

12            MS. ROBERTS:  Well, your Honor, we have -- I think

13  this is pursuant to the Rule 16.  But the witnesses are laid

14  out as "will call" and "may call if the need arises."  And both

15  sides did that in the pretrial order.

16       So I think he's not in the group that we are very likely

17  to call, but we reserve the right to call him if the need

18  arises.

19            THE COURT:  All right.  So let me give you a

20  tentative ruling.  You two can argue with me.  I'll just take

21  Sean Bananzadeh.

22            MS. ROBERTS:  Bananzadeh?

23            THE COURT:  Yes.

24       Since he was a 30(b)6 that you produced, but they deposed,

25  right?

1          **MS. ROBERTS:**  That's correct.

2          **THE COURT:**  If they use the 30(b)6 deposition in any

3     way before the jury, through an expert or directly read in,

4     then he gets to come back and explain it in your rebuttal case,

5     but not in your case-in-chief.

6          In other words, you can't use him in your case-in-chief

7     because he's a new witness.  But if they use him as a 30(b)6,

8     read-in or through the expert, that he's relied upon, then he

9     gets to come back limited to explaining what the -- the use

10    that was made of his testimony by the Defense.  But that would

11    only occur in your rebuttal case.

12         Now, what do you say to that?

13         **MS. ROBERTS:**  Well, your Honor, I think since --

14    since they deposed him, their approach to preparing to cross

15    examine him at trial would be no different than their approach

16    to cross examining everybody else because they have his

17    deposition.

18         **THE COURT:**  Yeah, but under that theory that

19    everybody who got deposed in the case then is open season.

20    Anybody can -- can just automatically add them to their trial

21    list, right?  Everybody who was deposed.

22         **MS. ROBERTS:**  Fair enough, your Honor.  There is just

23    one witness, and I think this falls into the category that

24    Mr. Jacobs raised, where sometimes parties negotiate for some

25    additions after they file their pretrial order.

```
 1              THE COURT:  But I'm not here to negotiate.  I'm here

 2   to try to make a ruling because you can't negotiate.

 3        All right.  Let me hear from your -- the other side.  What

 4   do you say to what I've proposed?

 5              MR. JACOBS:  That sounds fair, your Honor.

 6              THE COURT:  All right.  That's what's going to be the

 7   ruling on that guy.  Okay?

 8              MS. ROBERTS:  Thank you, your Honor.

 9              THE COURT:  All right.  Now, going to Max Levandowski

10   and Ratner.  You can add them to your list for trial, but it's

11   limited to testimony that came out of the Stroz report or

12   something that was newly produced in that time period after the

13   Stroz report.  And you cannot get off into other subjects in

14   your case-in-chief.

15        Do you object to that?

16              MS. ROBERTS:  I think that's fine, your Honor.

17              MR. JACOBS:  Same, your Honor.

18              THE COURT:  Okay, good.  So we've now solved those

19   three guys.

20        Now we go to:  Defendant's object to new witness Neel

21   Chatterjee on the basis that it has nothing to do with the

22   Stroz report or new evidence.

23        All right.  So what do you say to that?

24              MS. ROBERTS:  Well, your Honor, it does deal with new

25   evidence because it's evidence that's come to light in the last
```

1   few weeks.

2        Mr. Chatterjee is on the list because we recently learned

3   that Goodwin Procter, as Mr. Levandowski's personal counsel,

4   ran searches on his personal laptop and handed those searches

5   over to Uber, who handed them over to Uber's forensics expert

6   Kevin Faulkner.  And Mr. Faulkner relies on those searches and

7   so he's relying on the facts that were created by Goodwin

8   Procter.

9        We've sought discovery on this before Magistrate Judge

10  Corley because, you know, we don't know the details of who

11  specifically at Goodwin Procter ran the searches, but we know

12  that there were communications between Mr. González and Mr.

13  Chatterjee about having those searches run.  So Mr. Chatterjee

14  is added as a fact witness relating to those searches of

15  Mr. Levandowski's personal laptops who, until very recently,

16  Waymo did not know had been searched in this case.

17        **MR. JACOBS:**  Your Honor, I think the best objection

18  on this is the one that Otto Trucking itself filed on behalf

19  of -- in opposition to Mr. Chatterjee being added to the

20  Witness List, and Mr. Chatterjee is here.

21        We really don't -- we don't know a lot about what

22  happened.  You'll recall that Goodwin Procter also represented

23  Mr. Levandowski in the arbitration and in connection with that

24  representation had the laptops.

25        I think the briefing on this from Otto Trucking, from

1   Goodwin Procter, is probably the clearest explication of why

2   this should not happen.  It includes the argument that trial

3   counsel should not ordinarily be a witness and that the burden

4   of showing that it should be a witness is quite high.

5       In addition --

6           THE COURT:  But this is related to this other filing

7   that you have that I have read and I -- both sides, and I'm

8   not -- we're not going to get into it today, I don't think, but

9   the -- about the -- you wanted to add.  This is yet another

10  indictment against the lawyers for hiding the ball, to put it

11  in terms I can understand.  So I'm not sure I'm ready to rule

12  on that issue yet.  So maybe we'll postpone this one.

13      Okay.  Is there anything else -- we're going to postpone

14  this one.

15      Is there anything else that relates just to the asserted

16  nine trade secrets that is in this motion to amend?

17          MR. JACOBS:  Yes, your Honor.  There is the proposed

18  exhibits.

19          THE COURT:  4,000 new exhibits.

20          MR. JACOBS:  We filed an errata on that, your Honor.

21  It's 1200.

22          THE COURT:  All right.  How can you make a mistake

23  that big?

24          MR. JACOBS:  I think the -- we were starting with the

25  beginning of the Bates range and the end and missed that there

```
 1    were gaps in the middle as we put it together.
 2            THE COURT:  All right.  Well, 1200 is still a large
 3    number.
 4        So what's your objection?
 5            MR. JACOBS:  Well, the objection is the sheer --
 6    number one, the sheer volume of it.
 7        I think the other objection is actually tying it to
 8    anything significant.  We haven't gone through them yet on a
 9    granular basis.  I think probably the best approach to deal
10    with these is to take them in the ordinary -- more in the
11    ordinary course and we'll prepare whatever specific objections
12    we have to them, including the question of lateness.
13            THE COURT:  So why don't we -- but they are not --
14    they are late because you produced the documents late.  That's
15    not a good objection.  Right?
16        All of these 1200 comes from the Stroz and material
17    produced either at Stroz or later, right?
18            MR. JACOBS:  Yes.
19            MS. ROBERTS:  That's correct, your Honor.
20            THE COURT:  Okay.  Well, then to my mind lateness is
21    not a legitimate objection since Uber and Uber's counsel are
22    the ones that created this Frankenstein monster to begin with
23    about the due diligence report and they just got it.  They just
24    got it.  And they got it as fast as the Federal Circuit
25    would -- so it's not their fault on that one.
```

```
1          So lateness is not a problem, but there is a recurring

2     problem.  Maybe you're not the one for me to lecture, but

3     plaintiffs -- you're the plaintiff.  A plaintiff is supposed to

4     make it easy to get the case to trial, not hard to get the case

5     to trial.

6          You're supposed to solve problems and not create problems.

7     So when you throw 1200 indiscriminate documents out there,

8     you're just making it easy for the other side to whine.  Your

9     side is not supposed to whine.  You're side is supposed to

10    solve problems and make it easy to get a jury over there and to

11    present your case.  Sometimes that means giving up on a lot of

12    things in order to get the case there instead of constantly

13    holding on to every conceivable deal.

14         So I want you lawyers on that side of the room to take

15    that -- my view to heart; that sometimes you're letting the

16    poor judge down by complicating the case beyond.  All right.

17              MR. JACOBS:  Your Honor, if I could just clarify what

18    I meant.

19         First of all, we believe that some of these documents were

20    produced before the fact discovery cut-off.  So that is -- that

21    then falls on the other side of the line.

22              THE COURT:  See, I misunderstood that.

23              MR. JACOBS:  And I apologize.

24              THE COURT:  Then that is a problem.

25              MR. JACOBS:  The other aspect of lateness --
```

```
 1              THE COURT:  Do you believe that or do you know that?
 2   Come on.  You go from 4,000 to -- is it a belief?  I need to
 3   make sure you're right about that.
 4              MR. JACOBS:  That is our calculation, your Honor.
 5              THE COURT:  What do you mean?
 6              MR. JACOBS:  That we -- we looked at the documents
 7   and we put in our brief some of which were produced before
 8   discovery closed.
 9              THE COURT:  Yes, but were all of these produced as
10   part of the Stroz or later?  Because if it -- let's say it's
11   the identical document that got produced on day one, but
12   nevertheless it's also in the Stroz report.  That's -- that's
13   an independent event that has evidentiary value, if it was in
14   the Stroz report.
15         So the fact that it's a duplicate doesn't mean that it
16   doesn't -- that it's a late document because it's now being --
17              MR. JACOBS:  I take that as an amendment to our
18   dividing line, your Honor, and I accept that as a -- as a
19   rationale for proposing to add it to the Exhibit List.
20         What I meant by lateness in this context is the practical
21   point that I believe your Honor was just addressing.  We are
22   only a few weeks away from trial.  Depositions are done.  And
23   in order to get a document in front of the jury in this case
24   there should be a good reason, even if it was part of the
25   late-disclosed material from Stroz.
```

```
 1                THE COURT:  All right.

 2                MR. JACOBS:  And 1200 exhibits there cannot be a good

 3   reason for.

 4                THE COURT:  All right.  I'm sympathetic to that and

 5   that's the purpose of my lecture, but the lecture is -- I have

 6   to override that objection based on the ground that you,

 7   yourself, caused this problem with the late production.  You

 8   can't blame them for that late production, even though it makes

 9   it harder and harder.

10        So I'm overruling that objection.  The 1200 can stand, but

11   it's subject to individual objections, of course, that the --

12   that it shouldn't come into evidence for some other reason.

13        All right.  Now, let's turn -- are there more in the

14   category of things that relate just to the nine trade secrets?

15                MR. JACOBS:  No, your Honor.

16                THE COURT:  How about on your side?

17                MS. ROBERTS:  I don't have any objections to what we

18   added.

19                THE COURT:  All right.

20        Okay.  We will now turn to the proposal to add two new

21   trade secrets to the list.

22                MR. VERHOEVEN:  Shall I proceed?

23                THE COURT:  Yes.

24                MR. VERHOEVEN:  So the -- we are moving, your Honor,

25   to add two specific identified trade secrets.  We can't go into
```

```
 1   the substance because it's AEO.

 2           THE COURT:  Can't you refer to them in one word or

 3   two?  I believe you can without revealing any --

 4           MR. VERHOEVEN:  Yes.  I'll refer to them by number,

 5   if that's okay.

 6           THE COURT:  All right.  Go ahead.

 7           MR. VERHOEVEN:  123 and 124 identified in our briefs.

 8      We believe we have good cause to add these, your Honor,

 9   because we discovered new information about the individual,

10   Mr. Burnette, who was part of the team that Uber recruited that

11   came over with Mr. Levandowski and this new information was

12   notes that Mr. Burnette had on his personal laptop.

13      We had no knowledge of this before the Stroz production.

14   We had no knowledge of this until we looked at the image.

15           THE COURT:  Well, wait a minute.  You did have

16   knowledge of Burnette and you --

17           MR. VERHOEVEN:  Yes, we did.

18           THE COURT:  And you even examined him in deposition

19   way before you got the Stroz report on this very subject.

20           MR. VERHOEVEN:  We did cover this subject at his

21   deposition and his testimony, your Honor, was that the

22   Ottomotto planner was, quote, fundamentally different, close

23   quote, from Waymo's.

24      He further testified that he developed his approach --

25   this is pre-Stroz.  Developed his approach by going, quote, to
```

 1   the drawing board, close quote.  And reviewed what was, quote,

 2   seen in the industry.  And, quote, what people were working on,

 3   close quote.  And, quote, what was the academic research.

 4        So he testified before we had this discovery that this

 5   software was not like Waymo's; that he did it from scratch; and

 6   that he did it using publicly available information to help

 7   him.

 8        Then we took -- then we got the Stroz report and the Stroz

 9   report showed -- or the documents associated with the Stroz

10   report indicated that his -- on his personal laptop,

11   Mr. Burnette's personal laptop, he had created detailed notes

12   and the notes were created either the day after he left Waymo,

13   February 10th -- he left Waymo on February 9 -- or the day of

14   leaving Waymo.

15        He admits that the notes reflect the Waymo approach that

16   he was developing while he was at Waymo and he admits that he

17   used these notes to develop Otto's -- Ottomotto's approach.

18        And I'll just quote for your Honor.  This is Page 261,

19   Lines 7 through 12 of his deposition.

20        "Question" -- well, this is designated, but I don't think

21   it's confidential.  I'll summarize it.  That what he was

22   working on or what he's describing in his handwritten notes are

23   the same thing as what he was doing at Waymo.

24        And he further testified that he gave those notes to

25   another person who came over from Waymo as part of this

1    recruiting effort of Uber's so that that person could begin

2    developing the -- a different version, a different type of

3    planning software that Uber was going to use or that they were

4    going to tell Uber that they should use, your Honor.

5         This is all stuff that we learned subsequent to seeing

6    these notes.  And, you know, they say in their --

7              THE COURT:  Again, the notes that you saw for the

8    first time with Stroz were the handwritten notes or were

9    they -- were they the ones on the computer?

10             MR. VERHOEVEN:  They are handwritten notes, your

11   Honor.

12             THE COURT:  And you said something though about notes

13   that were on the computer.  Were those -- are those the same

14   thing?

15             MR. VERHOEVEN:  Mr. Jaffe has the specifics.

16             MR. JAFFE:  They were handwritten notes that were

17   scanned and on his computer.

18             THE COURT:  All right.  And he put those on either

19   the day he left or the day after he left.

20             MR. JAFFE:  They are dated February 10th.

21        And then when we asked him at his deposition, "When did

22   you do those?" he -- the best he could say is that it was that

23   day.

24             THE COURT:  And these notes are how long?

25             MR. JAFFE:  Three pages.

```
 1              THE COURT:  What do they describe in general?

 2              MR. JAFFE:  They describe what he came up with for

 3    the -- the Ottomotto planner, which was -- takes the approach

 4    that he came up with at Waymo.

 5              THE COURT:  So did he testify that what he came up

 6    with at Ottomotto was the same that he had done at Waymo?

 7              MR. JAFFE:  I mean, that was what Mr. Verhoeven was

 8    about to quote from his deposition, where --

 9         I don't know if you have the -- do you have that quote?

10              MR. VERHOEVEN:  Your Honor, let's see.  I have a

11    deposition cite.  This -- can I confer to see if they want to

12    keep their confidentiality on this?

13              THE COURT:  Sure.

14         (Discussion held off the record between counsel.)

15              MR. VERHOEVEN:  All right.  I've got permission to

16    quote it.

17         "QUESTION:  Isn't it fair to say that what you

18         described in the handwritten notes, that it uses the

19         approach that you came up with at Waymo?

20         "ANSWER:  Yes."

21         So this is just one quote.  I mean, the deposition, and

22    we've cited it in our briefs, also shows that he didn't consult

23    anything when he wrote the notes.  He just wrote them all down

24    the day after he left.  Didn't look at any documents.  Didn't

25    do any research.  Didn't look at any public things that are
```

1    available like he testified in his first deposition.  He just

2    wrote them up.

3              THE COURT:  Well, did he say that while he was at

4    Waymo, they -- that Waymo actually did carry out that approach?

5              MR. VERHOEVEN:  He personally developed the approach

6    while he was at Waymo.

7              THE COURT:  But did Waymo adopt it in its system?

8              MR. VERHOEVEN:  Well, he doesn't know that because

9    he's left, but the answer is yes.

10        Let's see.  I'll give you the facts.  We get chastised in

11   the brief because we didn't address that.  I apologize if we

12   should have addressed that, but the answer is, yes, we

13   currently use those trade secrets.

14        I don't know that it's completely relevant to a motion to

15   amend.

16             THE COURT:  All right.  Hold that thought for a

17   second.  We're going to come back.

18        But address what I've just heard, Mr. Jacobs.  What do you

19   say to that?

20             MR. JACOBS:  What we say to that, your Honor, is it's

21   got the heart and the course -- the cart and horse reversed.

22   You're supposed to know in advance what your trade secrets are.

23        They have never explained why their list of 121 trade

24   secrets, which included a software trade secret, which -- and

25   when they pursued software discovery in this case, why if this

1    is so valuable -- and now we know that it is used.

2         I thought their argument was going to be, well, we didn't

3    catalog it because it was on the shelf and we never implemented

4    it.  But now we know that it was -- now they are telling us it

5    was implemented.  So why isn't it on their list of 121?

6         What has happened instead is classic *ex post facto*

7    definition of a trade secret.  They get a document.  They see

8    the document in Stroz.

9         Their case is falling apart on the technical merits on the

10   existing nine.  They are doing everything they can to keep

11   their technical case alive.

12        **THE COURT:**  That's a different point.  Just stick to

13   the merits of this one.

14        Is it true that the witness said that he -- that this is

15   the approach he used at Waymo and this was the approach he used

16   at Ottomotto?  One in the same?

17        **MR. JACOBS:**  He did not -- I think we have to be very

18   careful on the technical aspects of what was being asked.

19        But he did not deny that there are aspects of what he

20   wrote in those notes that are similar to what he came up with

21   as part of an experimental plan that so far as he knew was

22   never implemented at Waymo because it had aspects of it that at

23   Waymo they deemed were impractical.

24        And so as far as he knew, these were -- these were ideas

25   that he put on the shelf in terms of software.  He tried to

1   persuade people, but they said:  No, you can't do it.

2       And at that level -- at a level of what variables go into

3   this, at the level of physical concepts, in his mind he was --

4   he had it his mind that these were not trade secrets and he

5   wrote it down in his notes when he got to Uber and to take

6   another shot at it.

7       But that does not explain under the applicable case law

8   why they get to add it at this late stage.

9            **MR. VERHOEVEN:**  May I address that, your Honor?

10           **THE COURT:**  What do you say to the fact that the --

11  you know, the whole point of the disclosure is -- and I've seen

12  it in so many cases.  The plaintiff gets into the other side's

13  files and suddenly they discover:  Oh, that's our trade secret.

14  But they didn't disclose it up front.  And you did not disclose

15  it up front.

16           **MR. VERHOEVEN:**  That's right, your Honor.  That's

17  because our case, when we filed it, was based on LiDAR, your

18  Honor.  And don't take my word for it.  In their own brief they

19  say, quote:

20           "Waymo's two new software secrets do not pertain

21       to the specific LiDAR hardware technology that has

22       been the focal point of this case from the outset."

23           **THE COURT:**  Why don't you have a new lawsuit then?

24  You could have a new lawsuit, non-LiDAR.

25           **MR. VERHOEVEN:**  Well, there's issues that we need to

```
 1   be concerned about, your Honor, in terms of claim splitting and

 2   preclusion, and we discovered it in this case.

 3        And if we just file it in a different case, they will move

 4   to dismiss because it comes from the same nucleus of operative

 5   fact and all of that.

 6        So what we did, your Honor --

 7             THE COURT:  Let's find out.  Would you agree they

 8   could file a separate lawsuit?

 9             MR. JACOBS:  No, your Honor.

10             MR. VERHOEVEN:  See.  There you go.

11             MR. JACOBS:  We will have a dispute about that

12   undoubtedly.

13             THE COURT:  What if I say they can?

14             MR. JACOBS:  I'm sorry?

15             THE COURT:  What if I say they can?

16             MR. JACOBS:  You're the czar, your Honor.

17             THE COURT:  Good.

18             MR. VERHOEVEN:  Your Honor, if I could just finish on

19   the points addressing the -- here.  Where was I?

20        So, first, this isn't a shifting sands of our trade secret

21   list.  This is a different desert.  And we -- we came upon it

22   solely through getting the Stroz materials.  And the Stroz

23   materials --

24             THE COURT:  No, no, no.  Because you deposed that guy

25   earlier, Burnette, before you got the Stroz material and you
```

1   asked him questions about this.

2          **MR. VERHOEVEN:**  That's true.

3          **THE COURT:**  So it's not quite right to say that you

4   only figured it out --

5          **MR. VERHOEVEN:**  That's true.  But in fairness to us,

6   he was a diligenced employee by Stroz.  He was a former Waymo

7   employee.  So we were just trying to figure out generally if he

8   took anything, your Honor.

9          And when we came to that, he said under oath that these

10  were completely different; that he developed this software from

11  scratch; that he developed it based on public materials that

12  were out there.

13         And when we got the Stroz materials, we have his own

14  handwritten notes dated the very next day after he left Waymo,

15  that he created without consulting anything, that he admits

16  are -- is the same thing he was doing at Waymo, your Honor.

17         And in terms of making things up, taking discovery to make

18  things up of new trade secrets, we're not making anything up.

19  His own self-performance reviews that he submitted while he was

20  at Waymo, your Honor, talk exactly about these two trade

21  secrets at Waymo.

22         How could we be making these up if -- if he, himself,

23  while he was at Waymo, bragged about his development of these

24  two things, your Honor?

25         We're not making anything up.  What's happened is we've --

```
 1   we validly discovered something through the Stroz report, which
 2   was that a significant amount of our software had been taken.
 3   When we filed the Complaint, we have didn't have a Rule 11
 4   basis to say that.  We discovered it from Stroz.
 5        And we followed that as fast as we could, in less than a
 6   month, and through that hard work we did we found a couple of
 7   software trade secrets that are highly significant to planning
 8   software that indisputably were taken and, by the way,
 9   that there is no dispute Uber is currently using.
10        So, you know, this is a significant development.  It's not
11   us playing games about --
12            THE COURT:  No, no.  But we don't know the -- you
13   haven't gotten the code.  You don't --
14            MR. VERHOEVEN:  Well, there's nothing in -- I think
15   that if they weren't doing it, they would say so in their
16   opposition brief, your Honor.
17        Sure, we haven't got the code, but Burnette says they are
18   using it and we cited your Honor to several documents that
19   indicate they loved it and were planning to put it in.
20        We'd like to get the code so that there will be no
21   question about it.  And if they are not using it, they
22   should -- they should want to give us the code.
23            THE COURT:  All right.  It seems to me that this is
24   not LiDAR.  This is something different from LiDAR.
25        Does this use a -- well, I don't want to -- gyroscopes,
```

 1   for example?

 2           **MR. VERHOEVEN:**  This is -- this is -- the planning

 3   software is like the key.  I mean, if you were to do a

 4   hierarchy of --

 5           **THE COURT:**  Everyone who is building these cars knows

 6   that you've got to do this.

 7           **MR. VERHOEVEN:**  You have to have planning software

 8   generally, yes.  And generally what the planning software does

 9   is it takes information from all the sensors.

10           **THE COURT:**  Yes.  But you need these two things that

11   use -- I won't use the -- they start with J.

12       These two J items, wouldn't every single company know

13   you've got to do this?  And then the only difference is going

14   to be how they implement it?

15           **MR. VERHOEVEN:**  I'm sorry.  I missed that because my

16   colleague handed me a note.

17           **THE COURT:**  It seems to me that every company that is

18   building a self-driving car knows that it has to address these

19   two J's.  I'm just --

20           **MR. VERHOEVEN:**  No.

21           **THE COURT:**  Yes, they do.  Come on.

22           **MR. VERHOEVEN:**  One of the Js is a coined term, your

23   Honor.  It's not even outside of Waymo.

24           **THE COURT:**  All right.  The concept then.  Maybe they

25   have got their own term for it.

```
 1                    MR. VERHOEVEN:  I disagree, your Honor.

 2                    THE COURT:  Okay.  That's you talking.

 3                    MR. VERHOEVEN:  Listen --

 4                    THE COURT:  I know something about engineering.  I

 5        believe you're wrong, but I'm not -- that's just me and maybe

 6        you could convince the jury.

 7               But nevertheless, it seems to me they would both be known

 8        questions to be addressed and every company has got to come up

 9        with some implementation to address them, otherwise the car is

10        going to run off the road right off the bat.

11                    MR. VERHOEVEN:  Well, under that theory, your Honor,

12        there is no such thing as trade secrets for --

13                    THE COURT:  That's not true.  That's not true.

14                    MR. PERLSON:  Well, these are specific

15        implementations --

16                    THE COURT:  Maybe your specific implementation would

17        be a trade secret.

18                    MR. VERHOEVEN:  That's why -- what we've tried to

19        define in 123 and 124, your Honor.

20                    THE COURT:  Maybe.  But what if it turns out -- all

21        right.

22                    MR. VERHOEVEN:  Their argument -- just so I could

23        just respond.

24               Their argument basically is:  Oh, these are just the

25        principles of physics.
```

1        Well, we're prepared to stipulate that every single one of

2   our trade secrets operate by the principles of physics.  That

3   doesn't mean it's not a trade secret, your Honor.

4           **THE COURT:**  If it's specific enough, then, yeah, it

5   qualifies as a trade secret.

6       Okay.

7           **MR. JACOBS:**  Your Honor, may I --

8           **THE COURT:**  You can address what you want to address.

9           **MR. JACOBS:**  I think the basic question is:  Have

10   they shown good cause under of the applicable legal standard?

11       They have never explained why, when they cataloged their

12   trade secrets, this was not in the catalog.

13           **THE COURT:**  Well, they did.  They say it wasn't a

14   LiDAR thing.

15           **MR. JACOBS:**  Well, no --

16           **THE COURT:**  And they were focusing on LiDAR and now

17   they find out that the problem goes beyond LiDAR.

18           **MR. JACOBS:**  May 26th, your Honor.  Waymo asks for

19   all software modules that were part of the Ottomotto

20   acquisition.

21       June 5 --

22           **THE COURT:**  You didn't give it to them, right?

23           **MR. JACOBS:**  But that's not to say they never thought

24   it was part of the case.  It's not that they -- it's not that

25   they didn't think -- the question is their state of mind.

1    They're cataloging their trade secrets.  They are going

2    through and saying:  We lost these people to Uber.  What might

3    they -- what do we have of value?  And, your Honor, they listed

4    121.

5          **THE COURT:**  Yeah.  But what if they had cataloged

6    everything, like what are the color of the wheels and

7    everything else?  Then there would have been 12,000.

8          **MR. JACOBS:**  In June 18th they argue in a discovery

9    dispute that they believe that Otto software will, quote,

10   reflect implementation of some of Waymo's trade secrets.

11        On June 21 they add Don Burnette to their supplemental

12   initial disclosures relating to matters that concern

13   misappropriation of trade secrets.

14        On June 21 they moved to compel the software modules.

15        On July 21 they say that the Otto software modules are

16   very relevant to determining what Uber acquired.

17        They had access to the Otto source code on August 17th

18   and, yet, now we're two months later and they are proposing to

19   add these to their trade secrets list.  This is not -- there is

20   no justifiable claim of:  We're shocked, your Honor.  We're

21   shocked that there is something in the software.

22        **MR. VERHOEVEN:**  Your Honor, may I respond to this

23   chronology?

24        **THE COURT:**  Yes, yes.

25        **MR. VERHOEVEN:**  First of all, our motion -- the

 1    source code we sought was because it was in the acquisition

 2    documents.  And our main argument for why we wanted it was

 3    to -- for damages, to assess valuation.

 4         We did argue that it would be relevant to a listed trade

 5    secret, not the software trade secrets, trade secret 85.  They

 6    said:  No, it's not.  And software is out of this case.  And

 7    Magistrate Judge Corley says we get it because of damages.

 8         They objected to your Honor and your Honor said we get it

 9    because of damages.  You didn't address whether it was relevant

10    to trade secrets or not.  So this is a reconstruction,

11    revisionist reconstruction of that.

12         Second, second point.  We got -- we finally got, after

13    having to fight for it, some software from them, but it was --

14    I don't have the exact dates.  I can get them for you.  It was

15    about a week before the end of fact discovery.  It was a little

16    bit -- a little bit over a week before we had to file all of

17    our supplemental -- excuse me, file all of our expert reports.

18    It was after your Honor had required us to narrow our claims to

19    nine claims.

20         It was something that in -- that we -- basically it would

21    be -- for us to prepare for trial and then start looking for

22    software trade secrets, which we hadn't alleged in our list,

23    would have been ridiculous.

24         We got it.  We got it late.  We didn't have time to look

25    at it.  We weren't bringing a software trade secret case.  It

```
 1    was relevant to damages, or one of the listed trade secrets.

 2         And then we get this Stroz report and everything changes.

 3    The Stroz report indicates significant misappropriation of

 4    Waymo software files.  And so we started pursuing that once we

 5    discovered that they had taken those files.

 6         We did not know that before.  And then when we started

 7    looking at it, we realized, your Honor, that -- through these

 8    notes, that these specific secrets, the evidence showed without

 9    question, had been taken.

10         And this is all in the rush, your Honor, of reviewing

11    1.4 million documents.  We didn't even have a software expert.

12    Neither did they.  So we hired a software expert on an

13    expedited basis and we meet the Court's deadline.

14         You know, all of this other stuff is happening --

15              THE COURT:  Is this in the whine category?

16              MR. VERHOEVEN:  No -- yeah.  Maybe I crossed over to

17    the whine category, your Honor.

18              THE COURT:  I think you're into the whine category.

19              MR. VERHOEVEN:  I'm just trying to say we were

20    diligent.  And if you look -- diligence really should be

21    measured at the Stroz point, where you saw the Stroz documents.

22    And if you look from that point on, there is no question we

23    were diligent.

24              THE COURT:  Okay.  Do you want to say something?

25              MR. JACOBS:  Sorry, your Honor.  Just, I know the
```

1    facts, your Honor.  The stubborn facts.

2        July 21, Docket 971, Waymo's brief in support of Judge

3    Corley's order to produce the Ottomotto source code states

4    that:

5            "Otto software modules are very relevant to

6        determining what Uber acquired; namely, whether it

7        acquired Waymo trade secrets."

8        They are asking for the software.  They are saying that

9    there are trade secrets in the software.  They have one

10   identified trade secret on their list.

11       We say, your Honor, that can't possibly open up all of our

12   software discovery.  What is going to happen if you give them

13   our software?  They are going to draw a bull's eye around an

14   arrow and they are going to claim it as a trade secret.

15       And that's exactly what has happened in violation of case

16   after case, which says that's exactly what's not supposed to

17   happen; that you're not supposed to be allowed to rummage

18   around and then declare what is a trade secret afterwards.  A

19   trade secret, your Honor, that they now say is worth six to

20   ten percent of the value of self-driving.

21           MR. VERHOEVEN:  Your Honor, I have to respond to

22   this.

23           MR. JACOBS:  They left this one on the shelf --

24           MR. VERHOEVEN:  I have to respond to this.  The

25   notion that we're "rummaging around" --

1              **THE COURT:**  Let Mr. Jacobs finish.  Have you

2    finished?

3              **MR. JACOBS:**  I think you've got it, your Honor.

4              **MR. VERHOEVEN:**  The notion that we're "rummaging

5    around."  These arguments are like truth is falseness.  They

6    are -- they are completely opposite of what happened in this

7    case.

8         What happened is we had been seeking the Stroz materials

9    since the very beginning of this case and been blocked --

10   whether it's right or wrong, been blocked by privilege

11   objections until well after the end of discovery and that we've

12   diligently looked at the Stroz materials in a Herculean effort,

13   in a short amount of time, and discovered these things.

14        We're not "rummaging around."  We found evidence that we

15   didn't know before that is documented and testified to that

16   they took two of these trade secrets.  The evidence of those

17   secrets are not made up.  They are in the employee's own

18   performance reviews while he was at Waymo.

19        This is not "rummaging around," your Honor.  This is us

20   finally getting access to a highly material investigation that

21   was done.  And, you know, just call it "rummaging around."  I'm

22   sorry.  I know I have a hot head, but that just is not what was

23   going on.

24             **MR. JACOBS:**  Last point for me, your Honor.

25        The reason this is whining is that the plaintiff here has

```
 1   asked that this all be done on a rush-rush basis.  The -- as
 2   recently as June you asked them whether they wanted to keep to
 3   their early trial date and you made it clear that has
 4   consequences, and now those consequences are coming home to
 5   roost.
 6        They should not be allowed -- when coming into this case
 7   the way they came in, with the case having fallen apart the way
 8   it has fallen apart -- to use your Honor's word
 9   "deteriorated" -- to now be able to resuscitate it on the basis
10   of trade secrets they never properly identified in accordance
11   with the applicable principles is fundamentally unfair.
12        MR. VERHOEVEN:  I could respond, but I'm going to
13   restrain myself, your Honor.
14        THE COURT:  Thank you.  Thank you.
15        All right.  Maybe I should get the Hastings -- are any
16   Hastings law students still here?  Maybe I should get them to
17   give me a show of hands on what they would do.
18        (Laughter.)
19        THE COURT:  All right.  Here is what the judge is
20   going to do.  The judge is -- I'm not denying this motion, but
21   I am not granting this motion and we're going to postpone this
22   motion until after the trial.
23        I probably would have granted -- I would have gone with
24   Mr. Jacobs, except that he absolutely refused on the splitting
25   of the cause of action thing.  And I think that might be
```

```
 1    unfair, too.  So we will hold for a future day whether we have

 2    trial two.

 3          We're going to have trial one November 29 and it will not

 4    include these two new trade secrets.  But maybe trial number

 5    two, in the distant future or the future of 2018, will include

 6    these two possible trade secrets, but I'm not ruling that they

 7    are in yet.  We're just going to wait and see.

 8          I do see some -- there are two very good points that are

 9    made.  Mr. Jacobs is totally right.  It is not fair -- not

10    totally right.  He's right to a point; that it's unfair for a

11    trade secrets plaintiff to get into the other side's files and

12    then say:  Ah-hah.  That's our trade secret.  That's why you

13    have the disclosure up front.

14          On the other hand, we have a situation where the -- the

15    Waymo side thought that the problem was LiDAR and then along

16    the way they begin to pick up signals that maybe it goes beyond

17    LiDAR.  Then when your due diligence report finally came out,

18    they could see more direct evidence of these handwritten notes

19    that show that he may have carried over whatever he was using

20    at Waymo to Ottomotto and, hence, to Uber.

21          Maybe it's not even a trade secret to begin with, but that

22    would be for another day.

23          I'm not ruling on this.  I'm not saying that we will have

24    a second trial.  It's just that after we get the first trial

25    done and the verdict is in -- and there won't, of course, be
```

1  any final judgments so no one will be able to appeal -- we will

2  have round two, maybe.

3       Now, I want to give more explanation here.  This is not

4  LiDAR, which has been the focus of the case.  This is a new

5  subject.  This is not Levandowski and the 14,000.  This is the

6  other fellow.

7            **MR. VERHOEVEN:**  Burnette.

8            **THE COURT:**  Burnette.

9            **MR. VERHOEVEN:**  Mr. Ron Burnette.

10           **THE COURT:**  Yeah, somebody else.  It's not in the

11  list of 121.  It's not in the list of nine.  It might even

12  require amendment of the Complaint.  It's not a hardware

13  problem, like the LiDAR things that we have been dealing with.

14       It's a -- it's a software problem.  When we get into code,

15  it's going to be harder and harder for the jury to put their

16  arms around this whole case.

17       We have a trial date set, it's November 29.  We're going

18  to do that trial because Uber has the right to clear its name,

19  if it can.

20       Now, Mr. Jacobs has overstated what I've said.  I do

21  believe -- I do believe that the plaintiffs thought they were

22  going to get into your files and find that there was absolute

23  duplicates.  They have not found any smoking guns on any of the

24  trade secrets, but they -- they may be able to prove the case

25  anyway through -- you don't have to have a smoking gun to win

```
 1    the case.  Maybe they will prove it.  So it's not as clean a
 2    case as the plaintiffs would like, but it is a triable case.
 3         So I think Waymo ought to get in there and put up or shut
 4    up.  We're going to get to the bottom of these trade secrets
 5    that are on the list.  Uber has the right to clear its name and
 6    if it thinks it can win these trade secrets, then God bless
 7    them.  They are going to win the trade secrets by the end of
 8    the year.  There will be a -- well, by the end of -- by the end
 9    of -- if we have to go into January, which I hope we won't, we
10    will get a verdict on these.
11         Then we'll come back and deal with whether or not to
12    enlarge the list of trade secrets for another day.  They are
13    severable problems.  So that's what we're doing.
14         I want to be clear.  I'm not granting that these two are
15    in, but I'm not saying they are out.  And we -- even if I were
16    to put them in, I would very likely sever them out of this
17    trial anyway.  So we're going to postpone that whole problem to
18    a future date.
19         Now, is that much clear?  Everybody understand what I just
20    said?
21              MR. VERHOEVEN:  Yes, your Honor.
22              MR. JACOBS:  Yes.
23              THE COURT:  Okay, good.
24         Now, we have a case to try and I need the help of the
25    lawyers to help get this to the jury and simplify things.  You
```

 1  all have a huge task in front of you.  You have 1200 documents

 2  that are brand new.

 3      No case needs more than about 100 documents, even in a big

 4  case like this.  I doubt that you're going to rely on more than

 5  100, maybe 200 documents per side.

 6          MR. VERHOEVEN:  I agree, your Honor, and --

 7          THE COURT:  So you need to start thinking.  I have a

 8  number of motions to knock out part of your case.  Knock out

 9  part of their affirmative defenses.  I'm very close to ruling.

10  I'm not quite there yet, but I'm going to get those out.

11      So we're going to be moving this case toward a triable

12  mode so that we can get the jury over there and we will be

13  starting and there will no longer be the opportunity to whine

14  and complain about pretrial stuff, other than the possibility

15  that I still have in mind, that some of the -- some of the

16  documents that weren't produced and so forth, that the jury

17  should know about that.  I haven't ruled on that yet.

18      We're going to get to trial.  We're going to have a

19  verdict.  Wheels of justice will grind.

20      Okay.  I think we're done for today.

21      Yes.

22          MR. JACOBS:  A housekeeping item.

23          THE COURT:  Yes.

24          MR. JACOBS:  Relates to the order you have rendered

25  on the motion to amend.  There is a pending discovery motion

1   before Judge Corley on seeking the production of Uber source

2   code.  It's the one that followed --

3         THE COURT:  If it relates to this subject, then we

4   ought to just postpone that until after the trial.

5         MR. JACOBS:  That would be terrific, your Honor.

6         THE COURT:  And then if these two trade secrets get

7   rolled into the case, it would be very interesting to compare

8   your code to their code and see how close the codes are.

9         MR. VERHOEVEN:  Well, I think that your Honor's

10  statement establishes what I was just about to say, which is we

11  don't have access to their code yet.  So before we reach that

12  issue, we should have access so we can do the comparison you're

13  talking about.

14        THE COURT:  First, I'd have to rule on whether or not

15  you even get to add that, the two to the list.  But if you were

16  allowed to put it on the list, then somebody ought to look at

17  the codes to see if they are the same or, you know, use

18  whatever you're claiming is your actual trade secret.

19        MR. JACOBS:  So can I take that as direction on the

20  motion before Judge Corley, your Honor, that that is deferred?

21        THE COURT:  If you both agree that it is directed

22  toward discovery on this new alleged trade secret, which -- is

23  it?

24        MR. VERHOEVEN:  Yes, it is.  But I just want to say

25  for the record that it would be helpful for us to have it so

```
 1    that we could further support the motion to amend.

 2            THE COURT:  No, no, no.  See, you all need to try to

 3    get your case ready for trial.  We're down to about one month

 4    away before we're selecting the jury.

 5        We should not be -- we should not be diverting ourselves

 6    into source code until after trial number one is out of the

 7    way.

 8            MR. JACOBS:  Thank you, your Honor.

 9            THE COURT:  All right.  So my next time to see you

10    all is the final pretrial conference again; is that right?

11            MR. JACOBS:  I believe that's right, your Honor.

12            THE COURT:  So I thank you very much.

13        I am going to -- after all my hearings, I let the Hastings

14    students come up and talk to me, but I don't talk about your

15    case or any case.  I just let them ask me questions.  You're

16    free to stay or not as you wish, but you have my word that we

17    will not talk about anything that happened in your hearing.

18    All right?

19            MR. JACOBS:  Thank you, your Honor.

20            MR. VERHOEVEN:  Thank you, your Honor.

21            THE COURT:  All right.  Have a good day.  Thank you.

22    We're off the record.

23        (Proceedings adjourned.)

24

25
```

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, October 26, 2017