IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAYMO LLC, | No. C 17-00939 WHA |
| Plaintiff, | |
| v. | **ORDER RE MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND MOTION TO STRIKE ASSERTED TRADE SECRET NUMBER 96** |
| UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; and OTTO TRUCKING LLC, | |
| Defendants. | (UNDER SEAL) |

**INTRODUCTION**

In this action for trade secret misappropriation, all parties move for partial summary judgment on select issues. Plaintiff's motion is **GRANTED IN PART** and **DENIED IN PART**. Defendants' motion is also **GRANTED IN PART** and **DENIED IN PART**. Defendants' motions to strike and for summary judgment as to asserted trade secret number 96 are **GRANTED.**

**STATEMENT**

The factual background of this action has been detailed in a prior order. In brief, plaintiff Waymo LLC sued defendants Uber Technologies, Inc., Ottomotto LLC (collectively, "Uber"), and Otto Trucking LLC for alleged misappropriation of trade secrets concerning Light Detection and Ranging (LiDAR) technology that helps self-driving cars "see" their surroundings. The centerpiece of Waymo's case is its evidence that its former star engineer, non-party Anthony Levandowski, downloaded over 14,000 confidential files from Waymo immediately before leaving his employment there to start Ottomotto and Otto Trucking

(collectively, "Otto"). Uber then acquired Ottomotto and hired Levandowski as the head of its self-driving car efforts (Dkt. No. 426).[1]

By agreement of both sides, this action was set for a jury trial on October 10. After the belated production of non-party Stroz Friedberg's due diligence report on the Otto acquisition, however, Waymo successfully moved to continue the trial date to December 4 (Dkt. No. 1954).

Waymo moves for partial summary judgment on certain affirmative defenses (Dkt. No. 1418). Uber moves for partial summary judgment that Waymo's asserted trade secret number nine is not a trade secret, and Otto Trucking moves for summary judgment that it has not misappropriated any alleged Waymo trade secret (Dkt. No. 1423). All defendants also move for partial summary judgment on Waymo's asserted trade secret number 96 on multiple grounds, including that it was inadequately disclosed (Dkt. Nos. 1514, 1518). The latter motion also represents the final piece of defendants' prior motion to strike certain trade secret claims (Dkt. Nos. 1108, 1129), which has already been denied as to all challenged claims except asserted trade secret number 96 (*see* Dkt. No. 1260 at 108:5–15, 110:13–111:3, 133:24–134:13).[2]

This order follows full briefing and oral argument.

**ANALYSIS**

1.  **LEGAL STANDARD.**

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. A genuine dispute of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In deciding a motion for summary judgment, the court must believe the non-movant's evidence and draw all justifiable inferences in their favor. *Id.* at 255. "The mere existence of a scintilla of evidence" or "some metaphysical doubt as to the material facts" in the non-movant's favor, however, will not suffice. *Id.* at 252, 260–61 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

---

[1] For the benefit of the court of appeals and with apologies to the public, most record citations herein are to the unredacted versions of the documents cited.

[2] Defendants also moved for summary judgment of noninfringement of Waymo's United States Patent No. 9,368,936, but Waymo's dismissal of its patent claim moots that part of the motion (Dkt. No. 1593).

2

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (quotation and citation omitted).

### 2. WAYMO'S MOTION RE AFFIRMATIVE DEFENSES.

Waymo initially moved for summary judgment on eleven of defendants' affirmative defenses (Dkt. No. 1418). In their opposition brief, defendants waived all but two (Dkt. No. 1524-3 at 2). Only defendants' failure-to-mitigate defense and Otto Trucking's unclean hands defense remain in dispute on this motion.

#### A. Failure to Mitigate.

Waymo contends defendants have no evidence that it failed to mitigate its damages because (1) Waymo sued "within weeks of obtaining evidence of . . . trade secret misappropriation," *i.e.*, the email dated December 13, 2016, from LiDAR component vendor Gorilla Circuits (*see* Dkt. No. 426 at 5); (2) any "delay" in bringing suit was *de minimis*; and (3) "[t]he length of the head start created by Uber's trade secret misappropriation does not depend on the timing of Waymo's suit" (Dkt. No. 1418 at 8–9).

Defendants note that Waymo "began investigating a compromise of its alleged trade secrets" months before receiving the Gorilla email, involved outside counsel in said investigation by July and August 2016, "accelerated its investigation after learning about Uber's imminent acquisition of Ottomotto," and internally discussed when to reach out to Uber about its "potential concerns" (Dkt. No. 1524-3 at 16). Far from showing failure to mitigate, these facts actually indicate that Waymo acted diligently by actively investigating its "potential concerns" and "accelerat[ing] its investigation after learning about Uber's imminent acquisition of Ottomotto." These facts do nothing to rebut Waymo's point that it filed suit promptly after receiving the Gorilla email that appeared to contain first evidence of actual trade secret misappropriation by defendants.

As noted in the prior order granting provisional relief, defendants essentially "contend that Waymo lacks *sufficient* evidence of use but simultaneously criticize Waymo for not suing before it had *any* evidence of use" (Dkt. No. 426 at 19–20). This dissonance remains on full

3

display in defendants' opposition to the instant motion. For example, defendants specifically argue that "Waymo has failed to meet its duty to mitigate by delaying in seeking injunctive relief as to Otto Trucking" and in the very next paragraph claim "Waymo has no evidence that Otto Trucking is involved in the development of LiDAR or that it has used the purported trade secrets" (Dkt. No. 1524-3 at 15). Were this really true, it would be a mystery how or why Waymo could or would have sought earlier relief.

Insinuations about Waymo's ulterior motives, including that "Waymo did not care about Mr. Levandowski or his companies" and "made the strategic choice to delay in suing Otto Trucking until it could cobble together a way to sue Uber," permeate the defense brief (*see id.* at 16). Such facts, if true, may bear on the merits of Waymo's trade secret misappropriation claims insofar as they may speak to the value of the asserted trade secrets. But they do not further indicate, as defendants suggest, that Waymo had some prior opportunity to mitigate its damages and squandered it by filing suit later rather than sooner. This order agrees with Waymo that, taken as a whole, the record reflects only *de minimis*, if any, delay by Waymo in bringing this action.

Defendants have failed to show a genuine dispute of material fact on their failure-to-mitigate defense because this record, taken as a whole, could not lead a rational trier of fact to find for defendants on said defense as to any claim to be tried by a jury. Waymo's motion for summary judgment on this defense is **GRANTED** without prejudice to any future argument that, as an equitable matter, Waymo's timeliness (or lack thereof) in suing may somehow diminish its entitlement to equitable relief.

### B. Unclean Hands.

Unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)). As our court of appeals has said, "troubling" actions and "hands [that] are not as 'clean as snow'" do not necessarily rise to the level of unclean hands. *Id.* at 842. Rather, "the defense of illegality or unclean hands is recognized

only rarely, when the plaintiff's transgression is of serious proportions and relates directly to the subject matter of the . . . action" — for example, when a plaintiff "misused the process of the courts by falsifying a court order or evidence." *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 990–91 (9th Cir. 2009) (quotation omitted). "The application or rejection of the clean hands doctrine in a given case is equitable in nature and within the discretion of the trial court." *Wash. Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 478 (9th Cir. 1969).

Here, Waymo contends Otto Trucking has no evidence that "Waymo engaged in misconduct directly related to the claims that Waymo is asserting" (Dkt. No. 1418 at 9). In response, Otto Trucking claims "Waymo has 'sought at every turn to create the false impression' that its forensic investigation proved that Mr. Levandowski had stolen valuable trade secrets from Waymo by downloading 14,000 files — the entire repository — from Waymo's SVN server," citing evidence tending to show weaknesses in Waymo's case (Dkt. No. 1524-3 at 13–14). For example, Otto Trucking points to Sasha Zbrozek, a Waymo engineer, who told Waymo's lawyers the downloaded files were "low-value" and added that "it was regular practice for engineers" to download the entire SVN repository (*ibid.*), revelations that had to be pried out of Waymo by Court order. Given this stonewalling, Otto Trucking argues, Waymo's "presentation of its case contrary to facts" constitutes unclean hands.

Since this *equitable* defense will have meaning only if Waymo ultimately prevails on the merits, there is no need to reach it now. Indeed, it would be premature to decide the issue at this stage, since litigation remains ongoing and further evidence of Waymo's misconduct may yet come to light. It is conceivable that Waymo might win at trial and then seek some equitable relief, whereupon its own conduct in this litigation might loom large as an inequity and fairness may (or may not) require moderation or even denial of any relief. Moreover, inasmuch as Waymo's motion relates specifically to a defense asserted by Otto Trucking, it is mooted by this order, which grants summary judgment of no liability in favor of Otto Trucking. Thus, both because it is premature and because it is moot, Waymo's motion for summary judgment on the defense of unclean hands is **DENIED**.

5

1. **3.     UBER'S MOTION RE ASSERTED TRADE SECRET NUMBER NINE.**

Both the California Uniform Trade Secrets Act and the federal Defend Trade Secrets Act define "trade secret" as information that:

> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

CAL. CIV. CODE § 3426.1; *see also* 18 U.S.C. 1839. Here, Waymo's asserted trade secret number nine claims (Dkt. No. 25-7 at 8):



Defendants' motion relies on a compilation of evidence from various sources to argue that various subparts of Waymo's asserted trade secret number nine are generally known in the field. Defendants point out that Waymo's own United States Patent No. 8,836,922 (Dkt. No. 23-1) disclosed at all relevant times "a LiDAR system comprising a transmit block comprising a plurality of laser diodes, wherein said transmit block is comprised of a plurality of PCBs" (*see* Dkt. No. 1419-4 at 10). They also quote the deposition testimony of Waymo's engineers for the proposition that using FAC lenses to ▮▮▮ is a well-known concept in the field, as is the general notion that the lens in front of a light source can be ▮▮▮ ▮▮▮ (*see id.* at 10–12). Finally, they point to Velodyne's commercially-available LiDAR system as an example of another LiDAR system that uses FAC lenses to ▮▮▮ (*see id.* at 13).

None of the foregoing evidence conclusively shows that Waymo's entire asserted trade secret number nine was generally known to the public or in the field. The '922 patent did not disclose a "▮▮▮ ▮▮▮."

6

1  The same Waymo engineers quoted by defendants also testified to the effect that the strategy of
2  using FAC lenses to ▮▮▮▮▮ in a LiDAR system is not generally
3  known in the field (*see* Dkt. Nos. 1526-10 at 230:16–231:19; 1526-25 at 217:16–218:20). And
4  while Velodyne has used its FAC lenses to ▮▮▮▮▮ in its LiDAR systems (*see*
5  Dkt. No. 1526-28 at 68:7–69:6), Waymo contends this ▮▮▮ was used to ▮▮▮
6  ▮▮▮▮▮, not to ▮▮▮▮▮
7  ▮▮▮ in the first instance (*see* Dkt. No. 1526-4 at 16–17). For the latter purpose of
8  ▮▮, it seems, Velodyne relies on the strategic ▮▮▮▮▮
9  ▮▮▮▮▮ (*see, e.g.*, Dkt. No. 1526-27 at
10 19). Additionally, Velodyne itself insists — albeit in general terms — that the relevant details
11 of its LiDAR system constitute trade secret information (Dkt. No. 1455).
12     In their reply brief, defendants seize upon Waymo's explanation that the design claimed
13 in asserted trade secret number nine "stems in part from the fact that Waymo, unlike Velodyne,
14 positions *multiple* laser diodes on a single PCB, with multiple PCBs stacked *in parallel*" (*see*
15 Dkt. Nos. 1526-4 at 10, 1636-4 at 2 (emphasis added)). (Velodyne uses ▮▮▮▮▮
16 ▮▮▮▮▮.)
17 Defendants accuse Waymo of "acknowledg[ing] that it cannot bar its former engineers from
18 using multiple diodes on multiple PCBs" because of its '922 patent, yet "seek[ing] to bar them
19 from including in such a design the basic optical concept of ▮▮▮▮▮
20 ▮▮▮▮▮" (Dkt. No. 1636-4 at 2). But this reasoning merely begs the
21 question, *i.e.*, whether Waymo's use of FAC lenses to ▮▮▮▮▮ within
22 its patented LiDAR system is actually a "basic optical concept."
23     True, substantial parts of asserted trade secret number nine are encompassed by the '922
24 patent. But it remains a question of fact whether or not Waymo's use of FAC lenses to ▮▮
25 ▮▮▮▮▮ was generally known to the public or in the field. For
26 example, both sides agree that Velodyne's LiDAR system meets the definition of a LiDAR
27 system "comprising a transmit block comprising a plurality of laser diodes, wherein said
28 transmit block is comprised of a plurality of PCBs" (*see* Dkt. Nos. 1526-4 at 7, 1636-4 at 4 n.1).

7

1    Yet, as explained above, Velodyne's LiDAR system is significantly different from Waymo's,
2    including in how each system uses its FAC lenses to ███████████████████████████████
3    █████████████████. In short, it remains possible that a LiDAR design might use that part of
4    asserted trade secret nine that is encompassed by the '922 patent but nevertheless not arrive at
5    Waymo's particular solution of using FAC lenses to ███████████████████████████████.

   Defendants also brush off the question of "whether Velodyne's FAC design is public or confidential," urging instead that "the point is that the general concept of using an FAC to ███ ███ is known in the LiDAR field, and follows fundamental principles of optics" (Dkt. No. 1636-4 at 4). This argument dismisses the evidence without responding to it. The point is that whether or not Velodyne considers its design to be trade secret information may bear on whether or not Waymo's asserted trade secret number nine is *generally* known to the public or in the field, as defendants contend.

   In summary, defendants' arguments as to asserted trade secret number nine — including whether or not Waymo's asserted trade secret number nine encompasses no more than ordinary concepts and skills inherent in the head of every LiDAR engineer, the degree to which Waymo's '922 patent and Velodyne's commercially-available LiDAR system disclose asserted trade secret number nine, and whether or not Velodyne's designs constitute sufficient evidence that asserted trade secret number nine is generally known in the field — all present genuine disputes of material fact. They are accordingly reserved for the jury, and defendants' motion for summary judgment that asserted trade secret number nine is not a trade secret is **DENIED**.

### 4. OTTO TRUCKING'S MOTION RE MISAPPROPRIATION.

Otto Trucking has never been involved in the development or use of LiDAR systems, and exists simply as a holding company to own trucks equipped with Velodyne's LiDAR system (Dkt. No. 1419-4 at 16–20). Unlike Ottomotto, it has not been acquired by Uber and remains a separate company. Waymo nevertheless seeks to preserve its trade secret misappropriation claims against Otto Trucking by lumping it together with Uber and Levandowski under various unpersuasive theories, which this order now discusses.

8

A recurring problem in Waymo's briefing must be addressed at the outset. Waymo repeatedly suggests that *Otto Trucking* should be deemed automatically liable for trade secret misappropriation by *Levandowski*. To give just a few non-exhaustive examples, Waymo purports to identify "*Otto Trucking's* role in the misappropriation" but goes on to recite only that "a central figure in the misappropriation of Waymo's trade secrets — *Anthony Levandowski* — is Otto Trucking's Executive Chairman, co-Managing Member, and largest stockholder" (Dkt. No. 1526-4 at 19 (emphasis added)). Waymo also contends its claims "encompass *Otto Trucking's* acquisition — by way of *Mr. Levandowski's* theft — of the asserted trade secrets (*id.* at 21). And even Waymo's supplemental offer of proof as to *Otto Trucking* relies primarily on evidence of *Levandowski's* misappropriation (*see* Dkt. No. 2055-3 at 2–7). In short, Waymo's case against Otto Trucking rests largely on — in Waymo's words — its "very existence as Mr. Levandowski's company" (Dkt. No. 1526-4 at 23).

To be very clear, whether or not Otto Trucking and Levandowski are, as a practical matter, similarly situated or even interchangeable in some sense, they are *not* interchangeable for purposes of this particular litigation. In a special way, this is a key limitation of Waymo's own making. To avoid having to arbitrate this case, Waymo has repeatedly represented to both this Court and to the Federal Circuit that it has *not* sued Levandowski herein. By doing so, Waymo has successfully avoided arbitration and kept its claims in a public court. It must keep its word. Having made and benefitted from its strategic choice to not name Levandowski as a defendant, Waymo may not renege and suggest that Otto Trucking — or any other defendant — is somehow a stand-in for Levandowski, or that misappropriation by Levandowski is somehow automatically transmogrified into misappropriation by Otto Trucking — or any other defendant — such that Waymo need not separately prove the latter. This order evaluates Waymo's arguments on the instant motion through the lens of this foundational principle.

In its original opposition brief, Waymo contends Otto Trucking is vicariously liable for Levandowski's misappropriation because it failed to take adverse action against him after he formed it. Moreover, Waymo claims, Levandowski's possession of misappropriated trade secrets will increase Otto Trucking's value as an acquisition target for Uber. Thus, Waymo

9

reasons, Otto Trucking "accepted and retained" the benefit of Levandowski's misappropriation, thereby ratifying his continued possession of Waymo's trade secrets (*see* Dkt. No. 1526-4 at 20–25). But it is undisputed that Otto Trucking has no practical ability to take adverse action against Levandowski. Waymo's argument, if accepted, would mean that Otto Trucking must *always* be deemed to have "ratified" whatever Levandowski has done, and it would be of no moment for vicarious liability purposes that Otto Trucking has no meaningful choice in the matter. For all intents and purposes, Waymo's proposed theory of vicarious liability is indistinguishable from automatic equivalence of Levandowski and Otto Trucking. Under either approach, Waymo simply wants to be able to hold Otto Trucking liable by proving only that Levandowski misappropriated its asserted trade secrets. As explained, this will not be allowed.

Otto Trucking's potential future with Uber does not compel a different result. Insofar as Waymo is relying on Otto Trucking's possible *future* actions, those actions are not properly the subject of the operative complaint in *this* litigation (although Waymo remains free to file another lawsuit in the future if defendants' future actions give rise to additional claims). With respect to the trade secret misappropriation claims in *this* litigation, the plain text of CUTSA and DTSA provide for liability only through acquisition, use, or disclosure of trade secret information. Waymo cites no authority for its suggestion that *Otto Trucking* can be liable *now* merely because it might benefit in the *future* from the misappropriation of *other individuals and entities*. Indeed, this suggestion puts the cart before the horse. The question of whether a defendant benefitted from trade secret misappropriation would typically be one of damages, reached only *after* the misappropriation itself has been established in the first instance. Counting the mere possibility of such benefit as proof of misappropriation would turn this sequence on its head and drastically expand the scope of liability under CUTSA and DTSA.

Waymo correctly notes that any effective injunctive relief against Uber may have to include Otto Trucking as well, but incorrectly asserts that this practical fact bars summary judgment as to liability (*see* Dkt. No. 1526-4 at 23). The effectiveness of injunctive relief is a matter of remedies, not of liability.

Waymo's supplemental opposition brief similarly fails to raise a genuine issue of material fact as to Otto Trucking's liability for the claims at issue in this litigation. It substantially overlaps with Waymo's prior arguments and again relies heavily on evidence of *Levandowski's* misappropriation to state a case against *Otto Trucking* (*see* Dkt. No. 2055-3 at 2–9). It also summarizes evidence that Don Burnette, another co-founder and shareholder of Otto Trucking, misappropriated trade secrets in motion planning software that Waymo had sought to add as new claims late in the case (*see id.* at 9–10, 16). Those proposed new claims, however, will not be added to our upcoming trial this year, so they do not justify preserving Waymo's current claims against Otto Trucking (although they may justify adding Otto Trucking back in for a second trial later on if Waymo is eventually allowed to add in its proposed new software misappropriation claims) (*see* Dkt. No. 2129).

In its supplemental opposition brief, Waymo reiterates in one short paragraph that "Levandowski possessed and retained accessed [*sic*] to Waymo trade secret information while Mr. Levandowski was working at Otto Trucking," "that trade secret information was used in LiDAR development efforts by Mr. Levandowski and other individuals who were simultaneously employed by Uber and Otto Trucking," and "that work was done for the benefit of accelerating development of autonomous driving in both cars and trucks" (Dkt. No. 2055-3 at 10–11). Waymo styles this as a showing of direct liability but provides no explanation or authority for why this evidence against *other individuals and entities* adds up to a case against *Otto Trucking* on Waymo's current claims. This evidence fails to raise a genuine dispute of material fact as to *Otto Trucking*'s liability.

In its supplemental opposition brief, Waymo also expands its vicarious liability and ratification theories to include both Levandowski and Lior Ron, another co-founder and shareholder of Otto Trucking. As to Levandowski, these theories are rejected for the same reasons already stated. As to Ron, Waymo's supplemental offer of proof cites the due diligence report as evidence that Ron retained possession of some "confidential Waymo data." Significantly, although Waymo describes this data in some detail — and states in later argument that Ron possessed its trade secrets — it never points to specific evidence that the data retained

11

by Ron actually included any of the asserted trade secrets at issue in this case (*see id.* at 4). Waymo also summarizes evidence that both Levandowski and Ron attempted to cover their tracks and otherwise acted suspiciously during the due diligence process, but proffers no evidence that any of this shady behavior related to or indicated trade secret misappropriation on behalf of Otto Trucking (*see id.* at 4–5). In light of these deficiencies, Otto Trucking's "refus[al] to take any remedial actions" against Ron is of little significance (*see id.* at 13–14). In short, Waymo's supplemental evidence regarding Ron's actions fails to improve on its vicarious liability and ratification theories (*see id.* at 11–16).

Finally, in another short paragraph of its supplemental opposition brief Waymo argues that all defendants are jointly and severally liable "[r]egardless of the specific theory of liability the jury may use to find Otto Trucking liable" because many of the same individuals involved in Uber's LiDAR-development efforts are also Otto Trucking employees, and Otto Trucking stands to benefit in the future from Uber's development efforts. Again, Waymo provides no explanation or authority for why these assertions add up to a case against Otto Trucking on Waymo's current claims. Its blip about joint and several liability therefore fails to raise a genuine dispute of material fact as to Otto Trucking's liability.

In short, the record taken as a whole could not lead a rational jury to find Otto Trucking liable on Waymo's current trade secret misappropriation claims. Waymo's strongest evidence on misappropriation is about *Levandowski*, not about *Otto Trucking*, and as a result of its own litigation strategy, Waymo cannot treat the two as fungible targets. Nor can it circumvent this limitation of its own making by restyling its theory as one of vicarious liability, ratification, or joint and several liability. With this foundational principle in mind, the remainder of Waymo's evidence against Otto Trucking fails to raise a genuine dispute of material fact that Otto Trucking misappropriated any asserted trade secrets. Summary judgment is therefore proper as to Waymo's current claims for trade secret misappropriation against Otto Trucking.

That said, it remains a practical concern that, if Waymo prevails against Uber at trial, any effective injunctive relief may have to include Otto Trucking as well. The Court will therefore retain jurisdiction over Otto Trucking for the limited purpose of possibly facilitating

12

1    such relief. To the foregoing extent, Otto Trucking's motion for summary judgment is
2    **GRANTED.** Otto Trucking will not be a part of the upcoming trial this year.

### 5. DEFENDANTS' MOTIONS RE ASSERTED TRADE SECRET NUMBER 96.

Pursuant to its case management responsibility as well as Section 2019.210 of the California Code of Civil Procedure, which requires trade secrets to be identified "with reasonable particularity" prior to discovery thereon, the Court required Waymo to disclose up front its asserted trade secrets. (Otherwise, trade-secret plaintiffs are liable to get into the accused files and conveniently assert that contents therein were trade secrets stolen from them.)

Waymo's asserted trade secret number 96 claimed "the G[B]r3 PCB Transmit Board design schematics and layouts contained in folder '███████████████.'" The rest of Waymo's disclosure added that, "[f]or example, these details [in the schematics] include unique and unknown design characteristics such as the ███████████████████ ████, the selection and layout of individual electrical components, and the required manufacturing tolerances" (Dkt. Nos. 25-7 at 55).

Prior to the instant motion for summary judgment, defendants had moved to strike asserted trade secret number 96 as overbroad because "Waymo fails to identify with particularity what specific aspects of the hundreds of components disclosed in the 'detailed engineering schematics' it contends to be a trade secret" (Dkt. Nos. 1107-4 at 4, 1129). In response, Waymo stated, "It is not clear how a trade secret disclosure that identifies one specific PCB in one specific LIDAR design could be defined with any more 'reasonable particularity'" (Dkt. No. 1159-4 at 7). In other words, Waymo attempted to avoid the overbreadth problem by insisting that its asserted trade secret claimed only the specific design of one specific PCB (*see also* Dkt. No. 1491 at 32:3–4).

The judge personally examined the PCB schematic in question during a closed demonstration. It became readily apparent that the schematic in question included hundreds of components and specifications with no clue as to what part thereof might be considered trade secret information. Worse, Waymo argued that its asserted trade secret number 96 encompassed not only the information contained in the schematic itself but also strategies or

13

1   concepts "reflected" in the schematic (*see, e.g.*, *id.* at 54:18–55:6). It also comprehended,
2   Waymo said, "unique and unknown design characteristics *such as* the █████████████
3   █████████████, the selection and layout of individual electrical components, and the
4   required manufacturing tolerances" (Dkt. Nos. 25-7 at 55, 1260 at 113:10–21 (emphasis
5   added)). Such wide-ranging expanders compounded the misery in trying to place arms around
6   the breadth of asserted trade secret number 96.

7   This disclosure came nowhere near the required reasonable particularity. *See Advanced*
8   *Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 836 (2005) ("The degree of
9   'particularity' that is 'reasonable' will differ, depending on the alleged trade secrets at issue in
10  each case."). The vastness of Waymo's disclosure was most unfair, for it placed defendants in
11  the untenable position of having to prove that hundreds of subparts of the design schematic —
12  and innumerable other strategies and concepts arguably "reflected" therein, as Waymo put it —
13  either did not qualify as trade secret information or were not used in defendants' technology.
14  *See ibid.* ("Where, as here, the alleged trade secrets consist of incremental variations on, or
15  advances in the state of the art in a highly specialized technical field, a more exacting level of
16  particularity may be required to distinguish the alleged trade secrets from matters already
17  known to persons skilled in that field.")

18  Waymo's broad claim might have been forgiven had it accused defendants of
19  misappropriating the entire schematic lock, stock, and barrel. Its eventual accusation, however,
20  was exactly the opposite — seizing upon a seemingly-random subpart of a subpart and claiming
21  it had been misappropriated. When Waymo submitted its offer of proof as to defendants'
22  alleged misappropriation of trade secrets, it focused on one tiny portion of the schematic and
23  claimed that defendants copied it — but even that collapsed upon examination. Out of ████
24  PCBs in Waymo's LiDAR system, only one was even claimed to have been copied in any
25  respect into Uber's LiDAR system. The only aspect of the PCB design supposedly copied was
26  the █████████████████████████, nothing else.

27  It soon turned out that even the supposed equivalence of the ██████████ was untrue,
28  as will be explained in a moment. But the overbreadth of the disclosure itself was further

1  amplified when read in the context of asserted trade secret number one, so the reader will please
2  bear with us as we revisit that history.
3       Waymo's narrowed offer of proof as to asserted trade secret number 96 in large part
4  turned out to be merely a more detailed rendition of the evidence it had offered with respect to
5  asserted trade secret number one — which claimed the concept of ▮▮▮▮▮ on a
6  printed circuit board in a LiDAR system — at the provisional relief stage (*compare* Dkt. No.
7  1371-4 at 17–25 *with* Dkt. Nos. 25-61 at 8–11, 245-3 at 3–4). Significantly, the provisional
8  relief order had already specifically found that Waymo's asserted trade secret number one was
9  "nothing more than Optics 101," deleting that supposed "trade secret" from the case long before
10 the parties began to argue over asserted trade secret number 96 (*see* Dkt No. 426 at 16–17).
11      Defendants filed a supplemental brief pointing out that Waymo was essentially
12 attempting to circle back to claiming a ▮▮▮▮▮ concept. Waymo's response
13 confirmed that it was attempting to reframe its claim over an entire printed circuit board
14 schematic to a claim over "its implementation of its ▮▮▮▮▮ and the resulting ▮▮
15 ▮▮." Waymo attempted to distinguish number 96 from number one by suggesting that the
16 former claimed its *specific* ▮▮▮▮▮ configuration rather than the general concept of
17 ▮▮▮▮▮ (*see, e.g.*, Dkt. No. 1449-4 at 3–4). Moreover, Waymo argued that its
18 disclosure was adequate as to asserted trade secret number 96 because it "identified this exact
19 PCB schematic, and identified for Defendants that one unique aspect of the schematic *reflected*
20 'the ▮▮▮▮▮'" (*id.* at 4 (emphasis added)).
21      This raised problems. *First*, as explained, it effectively resurrected Waymo's asserted
22 trade secret number one, previously rejected as nothing more than "Optics 101." *Second*, it cast
23 into sharp relief the unreasonableness of Waymo's initial disclosure. Although Waymo did list
24 the ▮▮▮▮▮ as *one example* of many "characteristics" encompassed by its
25 asserted trade secret, it would have been wholly unreasonable to expect defendants to discern,
26 from the complex schematic and from Waymo's nonexclusive list of examples — not to
27 mention its expansion of the asserted trade secret to include "reflected" strategies and concepts
28 — that Waymo's true focus in asserted trade secret number 96 all along was only on its ▮▮

15

1 ▋or ▋ strategy. *Third*, and in a similar vein, Waymo's retreat back to its
2 asserted trade secret number one actually exacerbated the unreasonableness of its disclosure.
3 Even assuming for the sake of argument that defendants were obliged to guess what specific
4 component of the claimed schematic would emerge as the issue, the very *last* thing they could
5 be expected to guess would be something already deleted from the case.

To repeat, Waymo's disclosure might still perhaps have been reasonably adequate had Waymo presented evidence that defendants misappropriated its *specific implementation* (*see* Dkt. No. 1159-4 at 6). But the PCB in question was not copied in its entirety, not even close.

Nor, as it turns out, was the ▋ copied. The latter proved to be conclusively different, and no jury could reasonably find otherwise.

For starters, Waymo's PCB ▋ while Uber's ▋ (*see, e.g.*, Dkt. No. 1357-3 at 24). The Court nevertheless asked both sides to provide detailed comparisons of their ▋ strategies for both PCBs in question (and for all PCBs in both LiDAR systems) (*see* Dkt. Nos. 1408, 1416). In response, Waymo submitted a declaration by its hired expert Lambertus Hesselink (Dkt. No. 1456-3). In a series of parabolic graphs, Dr. Hesselink compared the Petzval surfaces of Waymo and Uber's respective transmit lenses, even scaling for the discrepancy between their focal lengths — 120 mm versus 150 mm — to maximize the overlap between the resulting parabolic graphs (*id.* ¶¶ 13–23).[3]

Two identical lenses, however, will always have identical Petzval surfaces — always. An overlay of Petzval surfaces proves nothing in this case. Waymo insists that "Prof. Hesselink's analysis shows that the lens material and lens shape do not meaningfully contribute to the shape of the Petzval surface in the case of the two transmit boards under comparison," so "his analysis shows that the transmit lenses [are] substantially similar in terms of their overall optical properties" (*see, e.g.*, Dkt. No. 1634-4 at 18–19). But asserted trade secret number 96, as broad as it is, has nothing to do with the "optical properties" of any transmit lens. Rather, what supposedly matters is the ▋ along the Petzval surfaces,

---

[3] In an optics system, the image corresponding to a linear object focused by a lens will lie on a curved surface also called the Petzval surface.

16

1  which ▮▮▮. Even with Dr.
Hesselink's overlay of the scaled Petzval surfaces, however, it is apparent from his own graphs
that the ▮ where Waymo and Uber's ▮ fall on the overlaid Petzval surface
do not overlap at all (*see* Dkt. No. 1456-3 ¶ 23).[4]

Nevertheless, Dr. Hesslink concluded (*id.* ¶ 24 (emphasis added)):

> This comparison allows evaluation of whether the ▮
> from the Uber system ▮ Waymo parabola. *They do, as
> reflected by the fact that the curves are quite similar.* The ▮
> ▮ are similar as well, but not identical, reflecting that Uber
> took a similar approach to Waymo in designing their ▮
> ▮.

In other words, Dr. Hesselink manufactured a visually-similar match between the Petzval
surfaces of Waymo and Uber's respective transmit lenses, and then tried to suggest that this
visually-similar match in Petzval surfaces somehow translated to similar ▮.
And despite acknowledging that the ▮ are "not identical" even on the scaled and
overlaid curves, he parroted, with no additional analysis, Waymo's unsupported litigation
position that Uber "took a similar approach to Waymo in designing their ▮."

To repeat, two identical lenses will always have identical Petzval surfaces — always.
That proves nothing for Waymo. What matters with respect to asserted trade secret number 96
is ▮ *Petzval surfaces* the ▮ in Waymo and Uber's respective LiDAR systems
▮. Of course, all ▮ somewhere on the Petzval surface —
otherwise they ▮. But, as stated, Uber's accused PCB ▮ while
Waymo's claimed PCB ▮ (*see, e.g.*, Dkt. No. 1357-3 at 24). Moreover, the ▮
of Uber's ▮ did not overlap with any ▮ on Waymo's claimed PCB, and the
▮ for each side produced dramatically different ▮.

Dr. Hesselink's emphasis on the similarity of the Petzval surfaces is a trick — smoke
and mirrors. His inexplicable leap from that similarity to the conclusion that Uber "took a
similar approach to Waymo in designing their ▮" — despite all the aforementioned
differences between the two sides' ▮ approaches — renders his opinion unreliable,

---

[4] This is consistent with other responses by both sides showing that their LiDAR systems share neither similar ▮ nor a similar ▮ strategy (*see, e.g.*, Dkt. Nos. 1458-5, 1461-5).

17

and thus inadmissible, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (a district court may exclude an expert opinion where "there is simply too great an analytical gap between the data and the opinion proffered"). Moreover, his suggestion that the overlap of the Petzval surfaces — which, of course, are visually similar — somehow constitutes evidence that Uber misappropriated Waymo's [redacted] strategy would be grossly misleading to the jury, more prejudicial than probative, and thus inadmissible under FRE 403 as well. Dr. Hesselink's opinion as to asserted trade secret number 96 is therefore **STRICKEN**.

In short, summary judgment is appropriate as to asserted trade secret number 96 because (1) it was inadequately disclosed at the outset of this litigation, (2) Waymo's evidence of misappropriation by defendants relied upon an unreliable expert opinion that would be more prejudicial than probative to the jury, (3) insofar as Waymo reformed its asserted trade secret to resurrect asserted trade secret number one, it is rejected again as "Optics 101," and (4) the evidentiary record shows that even under Waymo's reformed version of asserted trade secret number 96, there is no genuine dispute of material fact that defendants use neither Waymo's [redacted] nor its [redacted] strategy. Defendants' motions to strike and for summary judgment as to asserted trade secret number 96 are therefore **GRANTED**.

**CONCLUSION**

For the foregoing reasons, plaintiff's motion is **GRANTED IN PART** and **DENIED IN PART**. Defendants' motion is also **GRANTED IN PART** and **DENIED IN PART**. Defendants' motions to strike and for summary judgment as to asserted trade secret number 96 are **GRANTED.**

**IT IS SO ORDERED.**

Dated: October 30, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE