IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WAYMO LLC,

    Plaintiff,

  v.

UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; and OTTO TRUCKING LLC,

    Defendants.

No. C 17-00939 WHA

**ORDER EXCLUDING MICHAEL WAGNER, RESTRICTING USE OF FINANCIAL EVIDENCE AT TRIAL, AND DENYING OTHER RELIEF**

(UNDER SEAL)

## INTRODUCTION

In this action for trade secret misappropriation, defendants move to strike plaintiff's initial disclosures and to preclude its damages claims and certain witnesses. Defendants also move to exclude plaintiff's damages expert, and to exclude evidence of certain financial information pertinent to plaintiff's damages theory. Defendants' motion to exclude Michael Wagner is **GRANTED**. Their motion to exclude evidence of financial information is **GRANTED IN PART** and **DENIED IN PART** as stated herein. Except to the extent stated herein, their motion to strike is **DENIED**.

## STATEMENT

The factual and procedural background of this action has been detailed in prior orders and need not be repeated here. In July of this year, defendants Uber Technologies, Inc., Ottomotto LLC (collectively, "Uber"), and Otto Trucking LLC moved to strike plaintiff Waymo LLC's initial disclosures and to preclude its damages claims and certain witnesses (Dkt. Nos.

797, 942). A prior order held those motions in abeyance pending evaluation of Waymo's eventual damages theory (*see* Dkt. No. 1261 at 78:6–14).[1]

After discovery closed and the parties disclosed expert reports, defendants moved to exclude the testimony and opinions of Waymo's hired damages expert Michael Wagner (Dkt. Nos. 1614-4, 1653). Wagner is not an economist but merely an *inactive* certified public accountant and *inactive* California-licensed attorney. He currently works as managing director at LitiNomics, Inc., "a financial and economic consulting firm specializing in the analysis of economic issues that arise in commercial disputes." He claims to have "specialized in the computation of commercial damages over the last 40 years of [his] professional career" (Dkt. No. 1615 ¶¶ 3–5). Defendants also moved *in limine* to exclude evidence of certain financial information pertinent to Waymo's damages theory (Dkt. No. 1557-4). Both motions were heard at the first final pretrial conference on September 27.

While those motions hung fire, Waymo voluntarily dismissed its patent claims (Dkt. Nos. 841, 1593) and another order granted summary judgment of no liability in favor of Otto Trucking (Dkt. No. 2151). Insofar as it pertains to Waymo's patent claims, Uber's motion to strike (Dkt. No. 797) has therefore been mooted. Otto Trucking's separate motion to strike (Dkt. No. 942) has also been mooted. The issues remaining for adjudication pertain only to Waymo's damages theory against Uber for alleged trade secret misappropriation. With the full benefit of multiple rounds of briefing and hearing, this order now resolves those issues.

## ANALYSIS

### 1. MOTION TO EXCLUDE MICHAEL WAGNER.

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably

---

[1] For the benefit of the court of appeals and with apologies to the public, most record citations herein are to the unredacted versions of the documents cited.

2

applied the principles and methods to the facts of the case." FED. R. EVID. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–94 (1993). District courts have a "gatekeeping role" to ensure that expert testimony admitted into evidence is both reliable and relevant, and to exclude "junk science." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014); *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008).

Wagner offered opinions labeled as both unjust enrichment and reasonable royalty. Other than grade-school arithmetic, however, he did not apply any coherent principle, methodology, theory, or technique, much less one possessing any discernible indicia of reliability. Instead, he made the same arguments that the lawyers can make based on other evidence in the case that can speak for itself. As this order now explains, Wagner's opinions will be excluded both because they do not qualify as expert testimony under FRE 702 and because they are substantially more prejudicial than probative under FRE 403.

### A. Unjust Enrichment.

Wagner opined that, as to eight of the nine asserted trade secrets Waymo selected for trial, Uber's alleged unjust enrichment could be measured in terms of either incremental future profits or saved development costs as a result of accelerated autonomous-vehicle development. As to asserted trade secret number 90, he took a different approach, as explained below. He also described a host of "other ways in which Defendants have been unjustly enriched that [he was] unable to quantify" (*see* Dkt. No. 1615 ¶¶ 264–65).[2]

#### *1. Incremental Future Profits.*

To quantify incremental future profits from accelerated autonomous-vehicle development, Wagner relied on an internal presentation slide that had been created by Uber executive Nina Qi prior to the Ottomotto acquisition to summarize her analysis of how the acquisition could potentially benefit Uber. The Qi slide estimated that the entire Ottomotto acquisition could potentially accelerate Uber's autonomous-vehicle development timeline by one to two years. Based on this estimated acceleration and Uber's own internal "Rubicon"

---

[2] A prior order deleted asserted trade secret number 96 from the original list of nine selected for trial (*see* Dkt. No. 2151 at 13–18). Number 96 is nevertheless mentioned in this order only to faithfully reproduce the relevant sections of Wagner's report discussed below.

3

business model, the Qi slide estimated that the present value of incremental future profits to Uber as a result of the Ottomotto acquisition ranged from $836 million (one year) to $1.69 billion (two years) given a "baseline" assumption (thirteen cities covered by 2022), and from $1.585 billion (one year) to $2.61 billion (two years) given an "optimistic" assumption (thirty cities covered by 2022) (*id.* ¶¶ 271–81).

The Qi slide will come into evidence and Waymo can try to hold Uber to those sky-high numbers. But Waymo seeks to transmogrify this slide into proof that a single trade secret alone should top out at the highest number in the slide. This is a fantastic leap. Here is a summary of how Wagner made it.

Assuming that the Qi slide reliably estimated incremental future profits based on accelerated autonomous-vehicle development, Wagner then purported to estimate how much time Uber had allegedly saved by misappropriating eight of the nine asserted trade secrets Waymo had selected for trial. He had no independent opinion about this. Instead, he relied on the opinion of Lambertus Hesselink, another Waymo-hired expert, that Uber had saved two years just by misappropriating asserted trade secret number 25 and one year just by misappropriating asserted trade secret number 111. For asserted trade secret numbers 9, 96, 2, 13, 14, and 7, Wagner cherry-picked from Uber's interrogatory responses, which estimated how long it would take an independent contractor to redesign the accused features in its LiDAR system. Wagner claimed those estimates represented the amounts of time by which each asserted trade secret accelerated Uber's *entire* autonomous-vehicle development timeline, despite Uber's clarification in the very same interrogatory responses that its redesign estimates "would not significantly or materially impact" its overall development timeline. For asserted trade secret number 90, Wagner took a different approach, as explained below (*see id.* ¶ 284, Dkt. No. 1786-3 at 46:18–47:15).

Wagner then simply multiplied the dollar amounts from the Qi slide with the units of saved time taken from other evidence in the case to arrive at his unjust enrichment conclusion, as quoted now from his report (Dkt. No. 1615 ¶ 285):

4

Figure 10: PV of Incremental Profit for Accelerated AV Development, by trade secret (Baseline Coverage)[618]

| | Accelerated AV Development (Years) | Uber's Unjust Enrichment Measured by Accelerated AV Development |
|---|---|---|
| Trade Secret #25 | 2.00 | $1,690,000,000 |
| Trade Secret #111 | 1.00 | $836,000,000 |
| Trade Secret #9 | 0.34 | $283,816,564 |
| Trade Secret #96 | 0.13 | $105,286,790 |
| Trade Secret #2 | 0.11 | $96,131,417 |
| Trade Secret #13 | 0.11 | $93,842,574 |
| Trade Secret #14 | 0.11 | $93,842,574 |
| Trade Secret #7 | 0.05 | $43,488,022 |

Figure 11: PV of Incremental Profit for Accelerated AV Development, by trade secret (Optimistic Coverage)[619]

| | Accelerated AV Development (Years) | Uber's Unjust Enrichment Measured by Accelerated AV Development |
|---|---|---|
| Trade Secret #25 | 2.00 | $2,610,000,000 |
| Trade Secret #111 | 1.00 | $1,585,000,000 |
| Trade Secret #9 | 0.34 | $538,097,194 |
| Trade Secret #96 | 0.13 | $199,616,701 |
| Trade Secret #2 | 0.11 | $182,258,727 |
| Trade Secret #13 | 0.11 | $177,919,233 |
| Trade Secret #14 | 0.11 | $177,919,233 |
| Trade Secret #7 | 0.05 | $82,450,376 |

Of course, if each of those asserted trade secrets independently accelerated Uber's development timeline as much as Wagner concluded it did, then Uber would have saved nearly *four* years' worth of development time and over $5.5 billion (given the "optimistic" assumption) for just *eight specific trade secrets* — remarkable figures by any measure, but particularly in comparison with the Qi slide's estimate of *one* to *two* years and $836 million to $2.61 billion for the *entire Ottomotto acquisition*. (Uber would have saved *three* years with just numbers 25 and 111, according to Wagner.)

Amazingly, these figures, taken together, far exceed the highest numbers anywhere in the Qi slide and leave no room for the possibility that the real value of the Ottomotto acquisition came from legitimate benefits as opposed to the misappropriation of eight specific trade secrets selected for trial after discovery.

To blur the avaricious optics of overreaching, Wagner added two conclusory sentences that stated, "If multiple trade secrets are found to be infringed, I have conservatively assumed

5

that the accelerated AV development is not additive. Therefore, only the corresponding unjust enrichment for the trade secret with the longest period of accelerated AV development should be awarded" (*id.* ¶ 286). Wagner's report offered no explanation for this assumption, although Waymo (in briefing) and Wagner (in deposition) subsequently explained that he had assumed different aspects of LiDAR development could proceed concurrently (*see* Dkt. Nos. 1777-3 at 12, 1786-3 at 96:5–17). (That explanation raised other problems, as explained below.) The litigation tactic of the assumption, however, is apparent. Wagner's emphasis on his supposed "conservatism," both in the aforementioned paragraph and throughout his report, was an effort to appear reasonable despite the astronomical valuations assigned to each of Waymo's asserted trade secrets. Put differently, it was a transparent attempt to skew the damages horizon and desensitize the jury to the enormity of what Waymo is seeking by contrast with what it supposedly could have sought. In short, Wagner's phony cloak of conservatism was a mere trial gimmick — a factor that further undercuts the reliability of his opinion.

Wagner's report left ambiguous whether, in his opinion, the Qi slide actually included Waymo's trade secrets as part of its estimation of Ottomotto's value (which would be consistent with Waymo's theory that Uber knowingly misappropriated its trade secrets through Ottomotto) or whether the Qi slide was useful only as a general formula for converting accelerated autonomous-vehicle development into incremental future profits (which would undermine Waymo's theory that Uber knowingly misappropriated its trade secrets through Ottomotto). Either way, however, raises serious problems with the reliability of Wagner's opinion.

Possibly, Wagner's (and Waymo's) theory was that the Qi slide included the value of Waymo's trade secrets in its estimation of Ottomotto's value. Wagner and Waymo have both suggested as much, frequently construing evidence in the case to conflate Uber's expressed desire for LiDAR technology *in general* during the Ottomotto acquisition with Uber's alleged intent to misappropriate Waymo's *specific* trade secrets (*see, e.g.*, Dkt. Nos. 1615 ¶¶ 309–11, 409; 1777-3 at 4 ("Uber was evaluating whether to acquire Otto (and thus, Waymo's trade secrets)."), 9 ("Evaluating Waymo's trade secrets as part of the Otto acquisition, Uber estimated that Otto could advance these efforts by one to two years."); 1834-4 at 1 ("[Wagner] is

calculating Defendants' unjust enrichment based on how *Uber* expected the trade secrets to accelerate its own AV timeline at the time of misappropriation."), 2 ("As Defendants were misappropriating Waymo's trade secrets (*i.e.*, as they were acquiring Otto), Uber calculated the potential enrichment *to itself* as of that date.") (emphasis in original)).

Under this interpretation, however, the Qi slide would actually contradict Wagner's conclusion because it estimated incremental future profits attributable to the *entire Ottomotto acquisition*, including *legitimate* assets like an entire team of engineers with knowledge, skill, and experience in a highly specialized and in-demand field, as well as *legitimate* anticipated benefits for Uber, like the potential to disrupt and slow down the development efforts of competitors. Indeed, Wagner himself admitted later in his report that "any gain to Uber from recruiting engineers and reducing the engineer ranks at Google is unrelated to the misappropriation of trade secrets" and should therefore not be included in calculating unjust enrichment (Dkt. No. 1615 ¶¶ 309–11). Thus, the estimated incremental future profits actually attributable to trade secret misappropriation would have been far less than the full amounts stated in the Qi slide and copied by Wagner. Under this interpretation, Wagner's reliance on the Qi slide's estimates with no apportionment for the *legitimate* elements of the Ottomotto acquisition encompassed therein would render his opinion unreliable under FRE 702.

Alternatively, perhaps Wagner (and Waymo) assumed the Qi slide never contemplated Waymo's trade secrets in its estimation of Ottomotto's value, and they relied on the slide only as a general formula to calculate incremental future profits from saved development time (*e.g.*, one year equals $836 million and two years equals $1.69 billion). Waymo gave an explanation to this effect when asked why Wagner never apportioned the Qi slide's estimates between trade secret misappropriation and the legitimate benefits of acquisition (*see* Dkt. No. 1863 at 12:21–15:11). This interpretation would avoid the aforementioned apportionment problem but still run headlong into other flaws in Wagner's report.

With respect to asserted trade secret numbers 9, 96, 2, 13, 14, and 7, Wagner purported to rely on Uber's interrogatory responses about redesign times but selectively excised parts of those responses unfavorable to his cause. Uber specifically noted in its interrogatory responses

7

that "*schedule times identified for the redesigns . . . would not significantly or materially impact the timeline for commercialization and rollout of Uber's fully-autonomous self-driving technology to the general public*" (Dkt. No. 1617-2 at 4 (emphasis added)). Significantly, Uber's caveat actually remains consistent with both Waymo and Wagner's after-the-fact explanation that different aspects of LiDAR development could indeed proceed concurrently (*see* Dkt. Nos. 1777-3 at 12, 1786-3 at 96:5–17). Wagner, however, rejected this caveat; in other words, he seized on the part of the answer he liked and tossed aside the part he disliked.

Wagner attempted to justify this cherry-picking by quoting Hesselink's opinion that Uber's redesign estimates did not adequately capture its unjust enrichment. Wagner also pointed out in his deposition and reply report that LiDAR is important to Uber's development (*see* Dkt. Nos. 1615 ¶ 284, 1777-10 ¶ 74, 1786-3 at 92:18–93:22). *First*, it was inconsistent of Wagner to simultaneously rely on both selective fragments of Uber's interrogatory responses *and* Hesselink's opinion that those very same interrogatory responses were an unreliable metric of unjust enrichment. Wagner's willingness to stitch together strategic fragments of contradictory evidence further indicates that he picked facts to suit his conclusions instead of drawing conclusions from reliable analysis of the facts. *Second*, the general proposition that LiDAR is important to Uber in no way justifies Wagner's decision to selectively rely on Uber's redesign estimates while ignoring its accompanying commentary about the impact of redesign on its overall development timeline. Nor does it explain away the tension between Wagner's (and Waymo's) assumptions that (1) each asserted trade secret would bottleneck Uber's entire development timeline, yet (2) Waymo's damages are not additive because different aspects of LiDAR development could proceed in parallel (*see, e.g.*, Dkt. Nos. 1777-3 at 8, 12; 1786-3 at 96:5–17, 111:14–112:2).

A separate problem is that Wagner brings no specialized knowledge to the table. To repeat, he is not an economist but merely an inactive CPA and inactive lawyer. Here, for example, Wagner simply adopted the opinions of others and performed grade-school arithmetic counsel can do on an easel. Where is any specialized knowledge? There is none. The absence of any real expertise is a pervasive problem in Wagner's incremental future profits "analysis,"

though it is clearer with respect to asserted trade secret numbers 25 and 111 because they are not further complicated by the aforementioned cherry-picking problem. The rub is that the evidence Wagner relied on can speak for itself, and his only contribution would be to pile on a misleading facade of expertise. His opinion should therefore be excluded under both FRE 702 and FRE 403. *See Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."); *United States v. Gadson*, 763 F.3d 1189, 1212 (9th Cir. 2014) (expert witnesses may receive "unmerited credibility" for lay testimony because their testimony is "likely to carry special weight with the jury").

To take the examples of asserted trade secret numbers 25 and 111, Wagner essentially parroted Hesselink's opinions that they saved Uber two years and one year of development time, respectively (*see* Dkt. No. 1615 ¶ 284). Assuming for the sake of argument that Hesselink's opinions regarding saved development time were reliable in the first instance, Wagner applied no "specialized knowledge" by simply multiplying the units of time espoused by Hesselink with dollar amounts lifted from the Qi slide (*see* Dkt. Nos. 1777-3 at 4, 1786-3 at 46:6–47:15). Straightforward application of grade-school arithmetic to uncomplicated numbers is well within the ken of the average juror. There is no reason for Wagner to serve as a mouthpiece for arguments that Waymo's lawyers can make. *See, e.g.*, *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997) (expert witness testimony is admissible under FRE 702 if the subject matter at issue is "beyond the common knowledge of the average layman").

Insofar as the Qi slide and other evidence in this case may turn out to be good barometers of Uber's expectations going into the Ottomotto acquisition, that evidence can stand on its own for the jury's consideration. Wagner's *ipse dixit* and pseudo-"analysis" are nothing more than lawyer argument dressed up as expert opinion. His opinion will therefore also be excluded under FRE 403 because its danger of confusing the issues, misleading the jury, and causing unfair prejudice substantially outweighs the probative value of its lawyer argument.

### *2. Saved Development Costs.*

To quantify the development costs allegedly saved by Uber, Wagner relied on another internal Uber document about the Ottomotto acquisition that forecasted saving "months" of

9

development, wherein each month of development saved translated to $20 million (Dkt. No. 1615 ¶ 292). Wagner took this internal estimate and, using the same units of time supposedly saved (discussed above), multiplied the $20 million figure by months supposedly saved to produce the following results, quoted from his report verbatim (*id.* ¶ 293):

Figure 12: Uber's Saved Development Expense by Trade Secret[635]

| | Accelerated AV Development (Years) | AV Development Expense Run Rate (Annual) | Uber's Unjust Enrichment Measured by Saved Development Expenses |
|---|---|---|---|
| Trade Secret #25 | 2.00 | $240,000,000 | $480,000,000 |
| Trade Secret #111 | 1.00 | $240,000,000 | $240,000,000 |
| Trade Secret #9 | 0.34 | $240,000,000 | $81,478,439 |
| Trade Secret #96 | 0.13 | $240,000,000 | $30,225,873 |
| Trade Secret #2 | 0.11 | $240,000,000 | $27,597,536 |
| Trade Secret #13 | 0.11 | $240,000,000 | $26,940,452 |
| Trade Secret #14 | 0.11 | $240,000,000 | $26,940,452 |
| Trade Secret #7 | 0.05 | $240,000,000 | $12,484,600 |

Wagner then repeated, again in conclusory fashion, that he "conservatively assumed that the saved development time is not additive," so "only the corresponding unjust enrichment for the trade secret with the longest period of saved development time should be awarded" (*id.* ¶ 295). As stated, this assumption was highly suspect, a way to deflect attention from the stratospheric figures Wagner would assign to each asserted trade secret so as to avoid the absurd result of an even higher total while preserving high numbers in case the jury finds liability only as to one or a few asserted trade secrets. This assumption, the reference to Uber's internal $20 million figure, and the basic arithmetic required to produce the foregoing chart represented the totality of Wagner's "analysis" regarding saved development costs.

Again, the documents cited by Wagner can independently come into evidence and counsel can make the argument as well as Wagner, who adds nothing by way of expertise. The jury can do the grade-school arithmetic and follow counsel's closing argument on an easel. Wagner's "analysis" regarding saved development costs should be excluded under FRE 702 because it amounted to nothing more than uncritical acceptance of other evidence in the case, which can speak for itself, plus some basic arithmetic using a straightforward $20 million figure

10

from Uber's internal documents.  This is not "specialized knowledge" that will help the jury understand the evidence or determine a fact in issue.  *See, e.g.*, *Morales*, 108 F.3d at 1038. Indeed, Wagner's "analysis" would not only fail to improve on the probative value of the evidence he cited but also actually muddy the uncomplicated facts with his facade of expertise. *See Daubert*, 509 U.S. at 595; *Gadson*, 763 F.3d at 1212.  It is "junk science" that should be excluded under FRE 702, *see Messick*, 747 F.3d at 1197, and should further be excluded as substantially more prejudicial and misleading than probative under FRE 403.[3]

### 3. *Asserted Trade Secret Number 90.*

Asserted trade secret number 90 received Wagner's separate consideration.  To quantify Uber's alleged unjust enrichment with respect to asserted trade secret number 90, Wagner again adopted wholesale Hesselink's opinion that (1) Tyto, another autonomous-vehicle company that Waymo claims was surreptitiously owned by Levandowski, spent two years and five months using asserted trade secret number 90 to develop its product, and (2) Uber acquired Tyto in 2016, so (3) defendants saved two years and five months by misappropriating asserted trade secret number 90 (Dkt. No. 1615 ¶¶ 298–99).  Wagner then noted that Uber paid a total of ▮ (▮) in consideration for Tyto (*id.* ¶¶ 301, 304, 306).  From this he concluded that "the ▮ cash consideration is a reasonable number to use for the unjust enrichment of Defendants related to Trade Secret No. 90" (*id.* ¶¶ 307–08).

It will suffice to simply point out one glaring problem in Wagner's "analysis," namely that he made no attempt to apportion the alleged acceleration of Uber's development timeline between legitimate benefits and trade secret misappropriation.  Indeed, Wagner agreed in deposition that the ▮ dollars of consideration accounted for "a number of benefits," including Tyto's employees, certain *legitimate* forms of intellectual property, and some tangible property, yet he did no work whatsoever to account for the value of those legitimate benefits (*see* Dkt. No. 1786-3 at 114:4–117:19).  The closest Wagner came to acknowledging this critical distinction in his report was when he stated, "I recognized that in addition to the

---

[3] If Uber also plans on using an "expert" who is little more than a mouthpiece for presenting the argument of counsel based on uncomplicated evidence already in the case, then fair play will require exclusion of that expert too.  Either both sides can do it, or neither can.

11

technology, Defendants were also acquiring five employees from Tyto. However, Defendants also paid additional consideration beyond the ▉ cash in the form of ▉ equity in Ottomotto" (Dkt. No. 1615 ¶ 307). He never bothered to explain the significance of that equity but perhaps meant to suggest that it fully accounted for any value Tyto's employees might have contributed at any point in time. If so, this suggestion was wholly inadequate because it (1) did not even state Wagner's conclusion but merely left it to implication, (2) flatly contradicted his deposition testimony that the ▉ dollars of consideration also accounted for Tyto's employees, (3) made no attempt to explain how the equity corresponded even approximately to the legitimate benefits acquired, and (4) still did not account for other legitimate benefits on the table in the Tyto acquisition, including legitimate forms of intellectual and tangible property.

It was absurd for Wagner to simply attribute Tyto's full sticker price to the value of a single asserted trade secret. His "analysis" as to asserted trade secret number 90 failed to account for commonsensical factors vital to any reliable computation of unjust enrichment from trade secret misappropriation in this case. The analytical chasm between the data he cited and the opinion he proffered warrants his exclusion under FRE 702. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Moreover, as with his other opinions, this opinion would be no more probative than the evidence it cited and would likely distort that evidence with the facade of expertise. It, too, should be excluded under both FRE 702 and FRE 403.

### *4.    Unquantifiable Unjust Enrichment.*

The final section of Wagner's unjust enrichment opinion also fails to pass muster under FRE 702. To give just one example, Wagner opined (Dkt. No. 1615 ¶ 319 (emphasis added)):

> There is evidence that Uber is likely to achieve significant cost savings over the next several years on its LiDAR sensors, and this will result in substantial cost savings given the number of vehicles that it expects to roll out. Just as an example calculation, if Uber expects to purchase ▉ vehicles per year, and is developing its own LiDAR results in volume purchase savings for LiDAR from the ▉ expected in 2018 down to the ▉ expected in 2020 for savings of ▉ per vehicle, the cost savings would be *$1,895.5 billion per year*. Therefore, depending on the expected cost of third-party LiDAR at volume, the expected cost savings could be dramatic. *At this time, I have not found enough evidence to reliably estimate the cost savings that Uber will achieve based on developing its own LiDAR, let alone the cost savings attributable to the misappropriation of the trade secrets.*

12

United States District Court
For the Northern District of California

> Therefore, I have not performed a specific quantification for the value to Uber related to cost savings based on lower costs of LiDAR at this time.

This is just another attempt to surround astronomical numbers with a facade of conservatism. In effect, this leaves the impression, "The numbers could go even higher but being conservative and faithful to reliable data, I will not go there." Wagner will not get the opportunity to play this card and invite the jury to speculate about "significant," "substantial," or "dramatic" cost savings, because his actual opinions will be excluded under both FRE 702 and FRE 403.

### B. Reasonable Royalty.

To quantify a reasonable royalty that defendants would have paid for Waymo's allegedly misappropriated trade secrets, Wagner began with a hypothetical negotiation in the December 2015 to August 2016 period and a "baseline royalty" equal to the unjust enrichment (measured by incremental future profits) that he had calculated earlier (*id.* ¶¶ 383–85). He ran through the *Georgia-Pacific* factors, concluding that fourteen were either "neutral" or would tend to increase the reasonable royalty by some unspecified amount while the fifteenth "in essence synthesizes the fourteen" other factors (*id.* ¶¶ 386–438). *See generally Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (listing fifteen factors pertinent to reasonable royalty calculations for a patent license). After summing up these "neutral" or "increase" factors, Wagner then simply concluded, "In my opinion, based on all the considerations described above, the reasonable royalty that would be agreed to by the parties is a ten percent (10%) increase over the Baseline Royalty" (Dkt. No. 1615 ¶ 439).

Mind you, this comes to a total royalty *more than ten times greater than* a "ten percent" royalty. Wagner calls it "ten percent," evidently to masquerade as more reasonable. His reasonable royalty "analysis" is summed up as follows (*see id.* ¶ 440):[4]

---

[4] In a reasonable royalty analysis, you don't get *both* the "base" *and* the "royalty." Plus, neither CUTSA nor DTSA permits an award of damages measured by *both* unjust enrichment *and* a reasonable royalty. *See* 18 U.S.C. 1836(b)(3)(B)(ii); CAL. CIV. CODE § 3426.3(b).

13

Figure 21: Concluded Reasonable Royalty for Misappropriation of Trade Secrets[791]

| Trade Secret | Baseline Royalty | Georgia-Pacific Analysis Adjustment | Concluded Reasonable Royalty |
|---|---|---|---|
| Trade Secret #25 | $1,690,000,000 | 10% | $1,859,000,000 |
| Trade Secret #111 | $836,000,000 | 10% | $919,600,000 |
| Trade Secret #9 | $283,816,564 | 10% | $312,198,220 |
| Trade Secret #96 | $105,286,790 | 10% | $115,815,469 |
| Trade Secret #2 | $96,131,417 | 10% | $105,744,559 |
| Trade Secret #13 | $93,842,574 | 10% | $103,226,831 |
| Trade Secret #14 | $93,842,574 | 10% | $103,226,831 |
| Trade Secret #7 | $43,488,022 | 10% | $47,836,824 |

Wagner's reasonable royalty calculation is premised on his unjust enrichment (measured by incremental future profits) opinion, so it suffers from the same problems discussed above and should be excluded on this basis alone. It should also be excluded because he made no attempt whatsoever to bridge the analytical gap between his discussion of unquantified "neutral" and "increase" factors in a hypothetical licensing negotiation and his decision to simply raise his unjust enrichment numbers by ten percent across the board. *See Joiner*, 552 U.S. at 146.

In summary, Wagner's opinions fail to pass muster under FRE 702 and *Daubert*. They are also substantially more prejudicial than probative and therefore subject to exclusion under FRE 403. Defendants' motion to exclude Wagner's opinions and testimony is **GRANTED**.[5]

### 2. MOTION TO EXCLUDE EVIDENCE OF FINANCIAL INFORMATION.

Defendants move to exclude evidence of (1) Waymo's estimates of its own investments in trade secret development relating to autonomous-vehicle technology, (2) Waymo's future revenue forecasts and estimated lost profits, and (3) Uber's financial condition or resources. Much of defendants' motion is actually dedicated to arguments about the inadequacies in Wagner's damages opinions and therefore mooted in light of his exclusion. Similarly, insofar as Waymo insists that the aforementioned evidence is relevant to Wagner's damages opinions,

---

[5] Defendants' other stated objections to Wagner's opinions may well have merit, but this order need not reach them because the foregoing problems are already more than sufficient to warrant Wagner's exclusion from our upcoming trial this year. This order states no opinion as to the admissibility of Wagner's proposed supplemental report regarding damages attributable to Waymo's proposed new software misappropriation claims (*see* Dkt. No. 2062 at 20–21).

14

that argument no longer carries any weight. This order focuses only on the parties' arguments about the actual evidence proffered by Waymo separate and aside from Wagner's opinions.

*First*, defendants contend Waymo's estimates of its own investments are "conclusory," improperly calculated, irrelevant to Wagner's damages theory, and likely to skew the damages horizon because of their high figures (*see* Dkt. No. 1557-4 at 2). Waymo responds that its own investments — supposedly "between $50 million and $1 billion to develop the individual asserted trade secrets (over the course of 2–7 years)" — are relevant to corroborate the reasonableness of *Uber's* estimate that each month of saved development time would translate to $20 million saved (Dkt. No. 1557-12 at 2–3). It seems unlikely that this type of simple comparison between two very different corporations' expenses could add much probative value to Uber's internal document containing the $20 million figure, which could speak for itself, especially given the vast universe of variables that would be swept under the rug. At this point, however, it is not clear that this evidence should be excluded outright. This order therefore concludes only that Waymo must seek the Court's advance permission via a written offer of proof before introducing evidence of Waymo's estimated investments at trial.

*Second*, and in a similar vein, defendants contend Waymo's own future revenue forecasts and estimated lost profits are irrelevant to its damages theory and likely to skew the damages horizon for the jury (Dkt. No. 1557-4 at 2–4). Waymo responds that, like its estimated investments, its own future revenue forecasts and estimated lost profits are relevant as "checks" on the reasonableness of Uber's corresponding figures (Dkt. No. 1557-12 at 3–4). Again, it seems unlikely that this proposed comparison would add much probative value to the straightforward evidence of Uber's own internal estimates, but conceivably Waymo could still propose a suitable use for this evidence at trial. This order therefore concludes Waymo must also seek the Court's advance permission via a written offer of proof before introducing evidence of its future revenue forecasts and estimated lost profits at trial.

*Third*, defendants assert in conclusory fashion that "Waymo should be precluded from offering any evidence about Uber's current revenues, profitability, or other financial resources because such information is irrelevant and poses a risk of biasing the jury's award" (Dkt. No.

1557-4 at 4). This is not sufficient to justify outright exclusion of such broad swaths of evidence. Even without Wagner, it is conceivable that Waymo could present a damages theory under which Uber's revenues, profitability, or financial resources may be relevant. Defendants' motion as to this evidence is therefore **DENIED** without prejudice to targeted objections to specific items of evidence at trial. As stated herein, their motion to exclude evidence of financial information is **GRANTED IN PART** and **DENIED IN PART**.

### 3. REMAINDER OF UBER'S MOTION TO STRIKE.

With the benefit of Waymo's full damages theory and the foregoing rulings, this order finds that no further relief is necessary under these circumstances to remedy any shortfalls in Waymo's initial disclosures. Insofar as the remainder of Uber's motion to strike seeks relief above and beyond what has already been granted herein, it is **DENIED**.

## CONCLUSION

For the foregoing reasons, defendants' motion to exclude Michael Wagner is **GRANTED**. Their motion to exclude evidence of financial information is **GRANTED IN PART** and **DENIED IN PART** as stated herein. Except to the extent stated herein, their motion to strike is **DENIED**.

**IT IS SO ORDERED.**

Dated: November 2, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE