# Exhibit 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5   WAYMO LLC,

 6        Plaintiff,

 7            vs.           Case No.

 8   UBER TECHNOLOGIES,INC.;   17-cv-00939-WHA

 9   OTTOMOTTO, LLC; OTTO

10   TRUCKING LLC,

11        Defendants.

12   _____

13

14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

16   CONTINUED VIDEOTAPED DEPOSITION OF CAMERON POETZSCHER

17              San Francisco, California

18              Friday, September 29, 2017

19                   Volume III

20

21   REPORTED BY:

22   REBECCA L. ROMANO, RPR, CSR No. 12546

23   JOB NO. 2716653

24

25   PAGES 474 - 675
```

Page 474

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4

5    WAYMO LLC,

6         Plaintiff,

7              vs.          Case No.

8    UBER TECHNOLOGIES,INC.;   17-cv-00939-WHA

9    OTTOMOTTO, LLC; OTTO

10   TRUCKING LLC,

11        Defendants.

12   _____

13

14

15

16        CONTINUED VIDEOTAPED DEPOSITION OF CAMERON

17   POETZSCHER, taken on behalf of the Plaintiff, at

18   Quinn Emanuel Urquhart & Sullivan, 50 California

19   Street, 22nd Floor, San Francisco, California,

20   commencing at 9:30 a.m., Friday, September 29, 2017

21   before Rebecca L. Romano, Certified Shorthand

22   Reporter No. 12546

23

24

25

                                      Page 475

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              MR. JACOBS:  Delayed -- objection to      09:38:07

2     form.

3              THE DEPONENT:  Delayed relevant to what?

4         Q.  (By Mr. Gorman)  To when it was

5     anticipated that it would begin?                   09:38:13

6         A.  I am still not sure what the connection

7     is to the term sheet.

8         Q.  My understanding is that the term sheet

9     has an indemnity construct --

10        A.  Right.                                      09:38:25

11        Q.  -- built into it, which calls for an

12    independent third-party forensic investigation.

13        A.  Correct.  But I don't know what the term

14    sheet has to do with the delay.

15        Q.  Well, maybe it doesn't.  Let's leave the   09:38:35

16    term sheet out of it.

17        A.  Uh-huh.

18        Q.  From your perspective, was the Stroz

19    investigation delayed?

20        A.  I mean, it took longer than anticipated,   09:38:43

21    so the ending was delayed on it.  I don't think the

22    beginning was delayed, or I -- I don't recall.

23        Q.  What was your involvement in the

24    Stroz investigation?

25        A.  Very little.  I had -- I didn't review     09:38:55
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    the report.  I didn't really have any direct            09:38:57

 2    communications with Stroz.  I helped occasionally

 3    to try to get Anthony or Lior to, you know, move

 4    faster because they were very busy guys.  And so

 5    sometimes the lawyers would ask me to call them to      09:39:10

 6    say, Can you please, you know, go to this interview

 7    or provide this device or whatever.  But that was

 8    basically the extent of it.  I wasn't directly

 9    involved in it.

10         Q.   Did you receive reports about the             09:39:22

11    investigation?

12         A.   No.

13         Q.   Did you receive any updates about the

14    findings of the investigation?

15         A.   Only that was discussed with lawyers.         09:39:34

16         Q.   So the only times that you received

17    updates about the Stroz's findings was in

18    conversations with lawyers?

19         A.   Correct.

20         Q.   Did you ever personally speak with            09:39:48

21    anybody at Stroz?

22         A.   Not that I recall.  I know we had one

23    discussion with John Gardner and Anthony, and I

24    don't recall if someone from Stroz was on that.  I

25    believe they weren't, but I couldn't say for           09:40:03
```

Page 494

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    could start working, right, and then finish the         09:59:08

 2    other ████████ later.

 3         Q.   (By Mr. Gorman)  You can put that down.

 4              More generally, in late March, early

 5    April, did you understand that the Stroz              09:59:27

 6    investigation was far from completion?

 7              MR. JACOBS:  To the extent you can -- so

 8    you can answer what was in -- what was your state

 9    of mind at the time.  I don't -- but I would

10    instruct you not to answer that -- what specific      09:59:42

11    communications came from counsel.

12              THE DEPONENT:  Okay.

13              Yeah, I mean, my general understanding

14    was that it was taking longer than we had expected.

15    I wouldn't say far from completed.                    09:59:52

16         Q.   (By Mr. Gorman)  Other than information

17    you may have received from counsel, what was your

18    understanding of how long it would take to complete

19    the Stroz investigation?

20         A.   The only --                                 10:00:07

21              MR. JACOBS:  Objection.

22              Are you asking as of -- what was his

23    understanding at what point in time?

24              MR. GORMAN:  At the end of March, very

25    beginning of April.                                   10:00:16
```

Page 511

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              THE DEPONENT:  I mean, the only updates I    10:00:17
 2   got on it were from counsel.
 3              (Exhibit 7754 was marked for
 4   identification by the court reporter and is
 5   attached hereto.)                                        10:00:39
 6       Q.   (By Mr. Gorman)  Mr. Poetzscher, you have
 7   just been handed Exhibit 7754.  There's the Bates
 8   number, UBER00322804 through 322806.  The top
 9   message is an email from Eric Friedberg to
10   Eric Tate, Hanley Chew, Mary Fulginiti.                  10:01:03
11              Do you have any familiarity with who
12   these people are?
13       A.   I know Eric Tate.  And obviously
14   Eric Friedberg.  I recognize the name from
15   Stroz Friedberg.                                         10:01:18
16       Q.   Do you know who Hanley Chew and
17   Mary Fulginiti were?
18       A.   No.
19       Q.   What's your understanding of
20   Eric Friedberg's role?                                   10:01:29
21       A.   I mean, I know he's one of the
22   principals, presumably, of Stroz Friedberg.  Other
23   than that, I have no idea what he was doing
24   specifically.
25       Q.   So you didn't know whether he was           10:01:39
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A.   No.                                    10:05:05

2        Q.   Did you receive any reports or

3    information on Levandowski's interviews with Stroz?

4             MR. JACOBS:  You can answer that yes or

5    no.                                             10:05:17

6             THE DEPONENT:  Yeah, I mean, I didn't

7    receive any reports.  Obviously I had discussions

8    with lawyers about it.  So if that counts as

9    information then, yes, I received information.

10       Q.   (By Mr. Gorman)  How often did you     10:05:33

11   receive information about Levandowski's interviews

12   with Stroz?

13       A.   Probably a few times, not many.

14       Q.   Is a few less than five or more than

15   five?                                           10:05:44

16       A.   Definitely less than five.  And when I --

17   and I'm talking not just Anthony's interviews,

18   basically the whole Stroz discussion.

19            So there's probably less than five

20   occasions where I got sort of feedback related to  10:05:54

21   Stroz from our lawyers.  I can't recall if it was

22   specifically Anthony's interviews or other.

23       Q.   What was the format in which the Uber

24   side received information about

25   Anthony Levandowski's interviews with Stroz?     10:06:16
```

Page 516

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   Again, I don't know.                          10:06:18

2      Q.   Did you attend any conference calls in

3  which information from Stroz interviews on

4  Levandowski was relayed to Uber?

5      A.   Not directly.  I had discussions with our   10:06:26

6  lawyers where they described some of what they had

7  learned, but I was never on a call with any Stroz

8  people as far as I am aware.

9      Q.   So Stroz gave information to Uber's

10  outside counsel, and then Uber's outside counsel    10:06:41

11  relayed it to -- to Uber team in-house?

12      A.   I don't know where the chain ended up,

13  but somehow it went from Stroz to internal and

14  external counsel, and then I would have discussions

15  with some combination of internal and external      10:06:56

16  counsel.

17      Q.   Did you receive any information on

18  Stroz's forensic investigation on the devices and

19  data collected from the diligenced employees?

20      A.   Again, I didn't receive any reports.  I    10:07:13

21  did have discussions with lawyers, so I am not sure

22  if that counts as information or not in your

23  question.

24      Q.   You had conversations with lawyers about

25  results from forensic investigation?                 10:07:28

                                              Page 517

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   No.  Well -- I mean, it depends what you      10:07:30

 2   mean by the forensic investigation.  I had

 3   conversations with lawyers about the

 4   Stroz investigation overall.  So that was obviously

 5   interviews, forensic analysis of their devices.       10:07:37

 6             So all of that collectively, I can't

 7   recall specific -- you know, talking about whether

 8   it's coming from devices or coming from interviews

 9   or whatever, right, other than the five disks which

10   we've talked about separately.                        10:07:51

11        Q.   And all of those conversations that you

12   had with lawyers where you received information or

13   updates on the Stroz investigation, that's all

14   encompassed in the three or four conversations that

15   you participated in?                                  10:08:07

16        A.   Uh-huh.

17             MR. JACOBS:  You need to answer that yes

18   or no.

19             THE DEPONENT:  I'm sorry.  Yes.

20        Q.   (By Mr. Gorman)  Did you receive any        10:08:15

21   email updates on the Stroz investigation?

22        A.   There may have been email updates on

23   timing.  I don't recall.

24        Q.   But no email updates about the interim

25   findings from Stroz, to your recollection?           10:08:34
```

Page 518

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   Not that I recall.  You have all my        10:08:37

 2   emails anyway, so I am sure you know.

 3             MR. GORMAN:  I'm going to hand you a

 4   document that's been previously marked as

 5   Exhibit 7111.                                         10:08:56

 6        Q.   (By Mr. Gorman)  The title is, "Draft

 7   Summary Interview of Anthony Levandowski."

 8             Mr. Poetzscher, have you ever seen this

 9   document before?

10             MR. JACOBS:  You can answer that outside    10:09:30

11   of anything you might have seen in the course of

12   deposition preparation.

13             THE DEPONENT:  Yeah, I never seen it

14   other than in the depo prep.

15        Q.   (By Mr. Gorman)  Okay.                      10:09:38

16             Do you dispute or disagree with any

17   aspect of Exhibit 7111, the Levandowski interview

18   memo?

19             MR. JACOBS:  Objection.  Form.

20             THE DEPONENT:  I've never even read it.     10:09:49

21        Q.   (By Mr. Gorman)  Even if you haven't read

22   Exhibit 7111, you did receive information prior to

23   April 11th on Levandowski's Stroz interviews,

24   didn't you?

25        A.   I received information about the Stroz      10:10:07
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        Q.   It does, but you have no opinion one way      10:39:40
2    or another?
3        A.   I mean, I know you are deposing all our
4    lawyers, why don't you ask them that question.
5        Q.   We certainly will.  And I -- I -- we          10:39:48
6    certainly will.  I am just trying to understand.
7    And this is my last question, and I'll take a
8    break.
9            Is what you are trying to say that this
10   was all sort of done at levels below you, and you      10:40:00
11   weren't you in the loop on whatever was being
12   conveyed by Stroz; is that the sense --
13       A.   No, I wouldn't say that.  Obviously the
14   lawyers are professionals.  I'll leave it to them
15   to do their job in terms of determining how to        10:40:12
16   conduct a forensic investigation, right?
17           They had some protocol between them and
18   Stroz to get information updates, and then they
19   would communicate to me the information they felt
20   was important.  From that I got the gist of the        10:40:23
21   overall investigation.
22           I just didn't get, you know, exactly what
23   updates they were getting.  They didn't tell me
24   whether it was from Anthony's interview notes or
25   devices or whatever.  They conveyed general            10:40:32
```

Page 545

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    information to me, and I see no reason to speculate    10:40:34

 2    now about what that information flow was, you know,

 3    18 months ago.

 4        Q.   Okay.  I -- I think I understand now.

 5             You received updates -- you received          10:40:46

 6    updates about the results -- the interim results

 7    from Stroz's investigation; but sitting here today,

 8    you don't know whether the results were gleaned

 9    from an interview as opposed to a computer, as

10    opposed to an email, as opposed to some other        10:40:58

11    source?

12        A.   I assume they were gleaned from

13    everything collectively, right.  If we were doing

14    all these things, it would make sense to reference

15    those.  But I don't know specifically what -- what   10:41:05

16    components were in the updates I got.

17             MR. GORMAN:  Okay.  Thank you for being

18    so precise.  I appreciate it.

19             We can take a break.  Go off the record.

20             THE VIDEOGRAPHER:  Okay.  We are now         10:41:16

21    going off the record.  The time is 10:41.

22             (Recess taken.)

23             THE VIDEOGRAPHER:  Okay.  We are now back

24    on the record.  The time is 10:51.

25             MR. GORMAN:  And would you like to make      10:51:49
```

Page 546

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1         A.    I mean, I recognize it.  I -- you know.        10:53:07

 2         Q.    Maybe not the whole thing, but you are

 3    familiar with this discussion?

 4         A.    Yes.

 5         Q.    Levandowski's lawyer writes,

18               Do you see all that?

19         A.    Yes.

20         Q.    When Uber executed the                         10:54:01

21    indemnification agreement, do you believe it

22    received sufficient information from the outside

23    expert to proceed with the transaction and enter

24    into the indemnification agreement?

25         A.    That's certainly what we felt at the           10:54:15
```

                                              Page 548

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | time. | 10:54:16 |
| 2 | Q.   Do you not feel that way anymore? | |
| 3 | A.   I mean, we're aware of these allegations, | |
| 4 | now, that Anthony took trade secrets. | |
| 5 | So whether that would have come out in | 10:54:28 |
| 6 | the rest of the diligence process, I can't | |
| 7 | speculate.  I don't believe it did when -- when we | |
| 8 | got the final report; although, I haven't seen it. | |
| 9 | So, in that sense, it wouldn't have made | |
| 10 | any difference whether we waited to get the final | 10:54:40 |
| 11 | report or not.  Right? | |
| 12 | On the other hand, obviously, if we'd | |
| 13 | known what he was alleged to have done in | |
| 14 | December 2015, I think we would have had a | |
| 15 | different perspective on the transaction. | 10:54:50 |
| 16 | Q.   But at the time you executed the papers, | |
| 17 | the put call agreement in the | |
| 18 | indemnification agreement in early April of 2016, | |
| 19 | you believed that you had received sufficient | |
| 20 | information from Stroz to proceed with the | 10:55:08 |
| 21 | transaction? | |
| 22 | A.   Correct. | |
| 23 | Q.   But in hindsight, perhaps, you didn't? | |
| 24 | A.   Again, I believe, at this point, if we | |
| 25 | had waited to get the final report, it wouldn't | 10:55:24 |

Page 549

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    have changed our minds.                          10:55:26

2           Because as I understand it -- again, I

3    haven't seen the final report -- nothing -- sorry.

4    Nothing that was in the final report was materially

5    different from what we understood at the interim    10:55:36

6    stage.

7           So, in that sense, I don't think that

8    would have changed.  Obviously, if we had initial,

9    you know, knowledge of everything and knew that the

10   allegations that Google was making of Anthony were  10:55:47

11   true, which -- at least I don't know if that's

12   true -- but if we knew those were true, we would

13   never have done the transaction.

14       Q.   Do you recall having any concerns about

15   Mr. Gardner's suggestion that Uber should agree      10:55:59

16   that it has ███████████████████████████████

     ████████████████████████████

18       A.   Not personally.

19           (Exhibit 7756 was marked for

20   identification by the court reporter and is          10:56:09

21   attached hereto.)

22       Q.   (By Mr. Gorman)  You have just been

23   handed Exhibit 7756, which bears the Bates number

24   UBER00320759 through 320765.

25           The very top of the first page is an         10:56:42
```

Page 550

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1

2

3

4          Do you see that?

5      A.   Yes.                                            11:01:37

6      Q.   Why did Uber agree to move forward with

7  the acquisition and the indemnification before

8  having access to the final reports?

9      A.

10

11

12

13

14

15                                                          

16

17

18      Q.   I would like to talk about the -- the

19  first reason you just gave,

20                                                          11:02:19

21

22

23

24

25                                                          11:02:33

Page 555

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    spoke.  I just don't recall what he said.  And as I        11:40:14

2    said, I don't know for sure if Anthony was even on

3    the call or not.

4         Q.   Let me see if I can sum up.

5              By April 11th, 2016, you knew that Stroz          11:40:48

6    was investigating Mr. Levandowski's claims about

7    destroying those five hard drives?

8         A.   Correct.

9         Q.   And by April 11th, 2016, you knew that

10   Mr. Levandowski had delayed in disclosing the name         11:41:03

11   of the facility where he allegedly shredded the

12   five disks?

13             MR. JACOBS:  Objection.  Form.

14             THE DEPONENT:  Yeah, I wouldn't say he

15   delayed in disclosing the name.  What I would say          11:41:12

16   is that I didn't get the name directly from him.

17        Q.   (By Mr. Gorman)  Okay.  Did you have any

18   knowledge of him delaying in disclosing the name?

19        A.   No.

20        Q.   Okay.  Before April 11th, 2016, you had          11:41:21

21   received some of Stroz' interim findings on the

22   investigation into the destruction of the five hard

23   drives?

24        A.   I mean, I don't want to say I received

25   Stroz' findings.  It makes it sound like I got a           11:41:43

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   report.  I had discussions, obviously, with lawyers      11:41:43

 2   about the five disks and the investigation to try

 3   to figure out if there was a receipt or some other

 4   proof.

 5        Q.   Okay.  I believe you said you didn't know       11:41:55

 6   by April 11th that Stroz had interviewed the

 7   personnel at Shred Works and that the personnel

 8   there were unable to recognize Levandowski by

 9   photograph or description?

10             MR. JACOBS:  Objection.  Form.                  11:42:09

11             THE DEPONENT:  Yeah, I mean, I don't

12   recall knowing that.

13        Q.   (By Mr. Gorman)  Okay.

14        A.   Obviously, we had that discussion where

15   they talked about, you know, what they had done.  I     11:42:15

16   just don't recall the photo or -- or not

17   recognizing Anthony.

18        Q.   Sitting here today, do you think

19   Mr. Levandowski destroyed the five hard disks?

20        A.   Yes.                                            11:42:33

21        Q.   When do you think he did it?

22        A.   I think what happened is, he -- on Friday

23   afternoon, he dropped them off at this facility,

24   and then the disks were probably shredded on

25   Monday, if that's what the receipt shows, or the        11:42:42
```

Page 591