QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>             Plaintiff,<br><br>      vs.<br><br>UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>             Defendants. | CASE NO. 3:17-cv-00939<br><br>**PLAINTIFF WAYMO LLC'S MOTION IN LIMINE NO. 18 TO PRECLUDE RELIANCE ON THE STROZ FRIEDBERG DUE DILIGENCE INVESTIGATION**<br><br>Date:         Nov. 28, 2017<br>Time:        8:00 a.m.<br>Ctrm:        8, 19th Floor<br>Judge:       Honorable William H. Alsup<br>Trial Date:  December 4, 2017 |

01980-00104/9678245.2

Waymo moves *in limine* to preclude Uber from introducing evidence or argument to the jury regarding its purported reliance on the Stroz due diligence investigation and Stroz Report. Uber has made the Stroz investigation and Report a central portion of its defense despite a lack of non-privileged evidence to prove its reliance on the investigation or the Report. Uber's non-lawyer witnesses have testified that they never even saw the Stroz Report and only received information concerning Stroz's investigation through Uber's counsel. However, Uber's in-house and outside counsel were either instructed not to answer questions regarding the Stroz due diligence investigation and Stroz Report on grounds of privilege, or testified that they had no non-privileged information. Under this Court's order (Dkt. 438), Uber is now precluded from waiving privilege and asserting it relied on advice of counsel as a defense against Waymo's claims of willful trade secret misappropriation. Given this lack of any admissible evidence, Waymo would be severely prejudiced should Uber's attorneys be permitted to argue reliance on the Stroz investigation—including Uber's assertions that Stroz made sure to place Waymo's confidential information in its "vault," or that nothing made its way to Uber—or otherwise rely on the Stroz Report. Waymo's motion should be granted.

## I. UBER INTENDS TO RELY ON THE STROZ INVESTIGATION AND REPORT TO COMBAT WAYMO'S CLAIMS OF WILLFUL TRADE SECRET MISAPPROPRIATION.

In its briefing and arguments, Uber has repeatedly relied on the Stroz diligence investigation to challenge Waymo's assertions of willful trade secret misappropriation. Uber affirmatively asserted that "the facts show that the due diligence worked," and has made the Stroz due diligence investigation a central part of its defense that it ensured no trade secret information "made its way to Uber or Ottomotto." (Dkt. 1623-4 at 1-3; Dkt. 2091 at 2 ("[T]he Stroz Report only confirms that Uber did not want to, and did not, acquire Waymo trade secrets.").) Uber's we-put-it-in-the-vault theme refers to the Stroz investigation and Report, and Uber intends to rely on Stroz to assert that "there was no way for [Levandowski] to access any Google information on [his devices] for the remainder of his time at Otto or once he joined Uber." (Dkt. 1623-4 at 4; *see also* Dkt. 1261 at 22:6-12 ("Stroz took all of Mr. Levandowski's devices, even devices that were very old, and put it all into a vault. And the only thing he got back was his phone. And this is why I said to you the first day I walked in here that

I was confident that this stuff is not at Uber because we vaulted it all."); Dkt. 1623-4 at 2 ("[T]hose devices were quarantined at Stroz for a year and a half."); Dkt. 2091 at 5 (stating that "securing devices in Stroz's evidence vault" is one way that Uber used the diligence process to "ensure that no confidential Google information came to Uber").) Thus, reliance on the Stroz investigation and Report has become a central aspect of Uber's defense against Waymo's willful misappropriation claims.

## II. UBER HAS NO EVIDENCE THAT IT RELIED ON THE RESULTS OF THE STROZ INVESTIGATION, THE "VAULTING" OF GOOGLE'S PROPERTY, OR THE STROZ REPORT.

### A. Uber Funneled All Information Concerning The Stroz Investigation Through Privileged Communications.

While Uber has trumpeted the Stroz due diligence investigation as a central part of its defense, Uber does not have any admissible evidence to support its reliance on the investigation or the Report. Uber admits that its non-attorney witnesses involved in the acquisition, Mr. Kalanick, Mr. Poetzscher, and Ms. Qi, never received the Stroz Report.[1] (*See* Dkt. 1170.)  Mr. Kalanick even testified that he "wasn't aware of a report" and never received an interim report from Stroz about the results of its due diligence before signing the acquisition documents. (Ex. 1 at 472:3-22; *see also* 461:4-23, 466:10-24, 469:21-470:6.) Mr. Poetzscher and Ms. Qi confirmed that the only information they received about the Stroz investigation was provided to them by Uber's attorneys. (Ex. 2 at 493:23-494:19, 516:2-22, 517:2-23; Ex. 3 at 579:3-580:7.) Thus, Uber's non-lawyer witnesses involved in the acquisition lack any non-privileged knowledge about the findings of the Stroz due diligence investigation, and cannot provide testimony at trial concerning Uber's reliance on the investigation or Report.

With respect to the communications involving Uber's counsel, including in-house counsel Ms. Padilla, Mr. Suhr, and Ms. Yoo, and outside counsel Mr. Tate, Uber asserted privilege over all substance concerning the Stroz investigation and Report. During Mr. Suhr's deposition, Uber took the

---

[1] Although Uber previously represented that Mr. Poetzscher and Ms. Qi received a copy of a "redacted interview memorandum" in April 2016 (Dkt. 823 at 3, Ex. 4), Mr. Poetzscher's testimony expressly contradicts Uber's representation to the Court, and Ms. Qi was unable to confirm whether or not she received the document that Uber claims she received. (Ex. 2 at 519:3-20; Ex. 3 at 583:3-584:25.)

position that the facts related to the due diligence investigation were privileged if they were known by Uber only through communications with legal counsel. (Ex. 5 at 87:6-89:12, *see also* 150:23-152:8, 222:18-225:20.) Similarly, Ms. Padilla testified that she was "working together [with outside counsel] to give advice to the company" when specifically declining to answer a question about Stroz's communications with Uber. (Ex. 6 at 29:20-31:25.) Ms. Yoo was also instructed not to answer questions concerning the Stroz investigation and Report. (Ex. 7 at 50:25-52:18, 60:12-24, 82:23-83:15, 92:18-93:7, 96:17-23, 104:2-11; *see also* 103:3-25.) Uber's outside counsel, Eric Tate, represented that he had no non-privileged information to provide about Uber's consideration of the Stroz investigation and its results. (Ex. 8 at 171:5-172:2.)

> **B.   Uber's Alleged Involvement In The "Design" Of The Stroz Investigation Cannot Show Reliance On Its Results.**

Uber misses the point when it asserts in its response to Waymo's precis brief that Mr. Poetzscher, Ms. Padilla, and Mr. Suhr have provided "non-privileged" testimony about the purported "design" of the Stroz due diligence process. (Dkt. 2091 at 2.) The testimony Uber relies on does not establish that anyone at Uber actually received or relied on any action or information from Stroz – including supposedly putting things in a "vault", making sure nothing came over to Uber, or any results of the Stroz investigation. (*See* Dkt. 2089-8; Dkt. 2089-10; Dkt. 2089-14.)

To the contrary, there is no admissible evidence of reliance by any of the three witnesses identified by Uber. While Mr. Poetzscher did testify that Uber was willing to move forward with Ottomotto acquisition based on the interim diligence done prior to April 11 (Ex. 2 at 548:20-550:3, 555:6-17), the only basis for his knowledge about the Stroz findings was from privileged conversations with lawyers. (*Id.* at 494:10-19, 511:4-512:2, 516:2-9, 517:2-23, 545:9-546:3, 590:20-591:4; Ex. 9 at 267:9-270:14.) As for the in-house counsel identified by Uber, Ms. Padilla testified that she has no first-hand knowledge of information about the Stroz due diligence investigation because any information she received "was told to [her] by either outside counsel or [her] colleagues, in-house counsel" and further that she "delegated" the role of interfacing with Stroz. (Ex. 6 at 25:4-26:17.) Ms. Padilla was also instructed not to answer questions related to her goals for the Stroz investigation, her understanding of what was done during the investigation, and Uber's consideration

of the results of the Stroz investigation in relation to the Ottomotto acquisition. (*Id.* at 18:15-21:7, 29:20-31:25, 35:9-37:13.)  On the specific issue of Uber's reliance on the Stroz investigation, Mr. Suhr testified that he would be speculating as to what effect the results of the due diligence investigation had on Mr. Kalanick or the Board's decision to acquire Ottomotto, and that "to some extent it might cause me to waive attorney-client communications."  (Ex. 5 at 17:24-19:10, 229:19-230:1.)

Moreover, the pre-April 11 protocols between Stroz and the parties' outside counsel makes no mention of the sequestration of devices, or any steps Stroz would take to ensure Google information never made it to Uber.  (Ex. 10, 11.)  Indeed, the detailed preliminary forensic reports that explain which devices Stroz retained from Levandowski were not completed until late July, well after the acquisition documents were signed.  (*See, e.g.,* Dkt. 1603-6.)  Thus, much, if not most, of Stroz's forensic work that was the focus of the due diligence investigation, including Stroz's decision to retain certain devices, *did not even begin until <u>after</u>* the April 11 privilege cutoff set by the Court and strictly adhered to by Defendants.  (*See* Dkt. 731, 949.)

### III. <u>UBER SHOULD BE PRECLUDED FROM RELYING ON INFORMATION FROM ITS COUNSEL AS A BASIS FOR ITS RELIANCE ON THE STROZ INVESTIGATION AND REPORT.</u>

It is established law that, if Uber were permitted to rely on attorney advice concerning the Stroz due diligence investigation and Report, Uber would waive any privilege concerning the Stroz investigation and Uber's attorney advice.  *Aclara Biosciences, Inc. v. Caliper Techs. Corp.*, No. C99-1968 CRB (JCS), 2001 WL 777083, at *10 (N.D. Cal. June 16, 2000) ("[W]here a party relies upon an advice of counsel defense, federal courts have held that the assertion of that defense gives rise to waiver of privilege and determine the scope of the waiver based on fairness concerns."); *Fort James Corp. v. Solo Cup Co.,* 412 F.3d 1340, 1349 (Fed. Cir. 2005) ("The widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to all other communications relating to the same subject matter."); *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1042 (9th Cir. 2009) ("Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived.") (citations omitted); *Theranos, Inc. v. Fuisz Techs., Ltd.*, No. C 11-5236 PSG, 2013 WL 2153276, at *3

(N.D. Cal. May 16, 2013) (the party asserting privilege bears the "burden to show that fairness does not require waiver of the privilege over documents relating to the same subject matter as the documents disclosed"); *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-CV-03424-JCS, 2016 WL 7475820, at *7-8 (N.D. Cal. Dec. 29, 2016) (fairness required subject matter waiver as to the "the *issues* . . . discussed in the privileged communications disclosed in the reexamination, and is not limited to what they knew about those issues at the time") (emphasis in original).

Permitting Uber witnesses to assert that Uber retained Stroz to ensure everything was put in a "vault" and that nothing came over to Uber, when Uber funneled all information about the Stroz investigation through attorneys and instructed its witnesses not to answer any substantive questions about the investigation, would improperly sanction the use of privilege as "both [] a sword and a shield." *Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001) (affirming district court's *in limine* ruling prohibiting defendant from using attorney-client communications as both a sword and a shield); *Galaxy Comp. Serv'cs, Inc. v. Baker*, 325 B.R. 544, 559 (E.D.Va. 2005) (granting motion *in limine* to prevent witness from testifying about issues she refused to answer during her deposition on attorney-client privilege grounds); *Engineered Prods. Co. v. Donaldson Co., Inc.,* 313 F.Supp. 2d 951, 1022–23 (N.D. Iowa 2004) (barring plaintiff from introducing testimony at trial on issues it prevented defendant from exploring during deposition by invoking the attorney-client privilege).

The Court set June 1 as the last day Uber could waive the privilege by relying on its counsel's advice. (Dkt. 438.) The Court made clear that subsequent waiver would be precluded. *Id.* Uber has succeeded in shielding from discovery any information related to Uber's reliance on the Stroz due diligence investigation  Under the Court's order and the law, Uber must be precluded from now relying on its attorney advice to support its assertion that it relied on Stroz to put everything in a "vault," or to make sure nothing came over to Uber, or on the results of the Stroz investigation.

### IV. WAYMO WILL SUFFER PREJUDICE IF UBER IS PERMITTED TO PROVIDE EVIDENCE OR ARGUMENT REGARDING RELIANCE ON THE STROZ REPORT TO THE JURY.

Absent preclusion, Waymo will be severely prejudiced. Due to the continued privilege assertions outlined above, Waymo's access to documents, testimony and correspondence related to the

Stroz due diligence process has been limited to only pre-April 11 information shared by and between the common interest group, and not any communications between Uber and its attorneys. Accordingly, Uber refused to let any of its witnesses disclose what advice or facts they received from their attorneys, or what information was communicated by the attorneys to others at Uber.

Moreover, Uber has blocked any discovery into the little information that is available through the Stroz Report itself concerning the attorney's communications with Stroz after April 11. For example, in an exhibit to the Stroz Report, Stroz also explains how it was forced to "analyze[] and review[] a significant population of documents (millions) in a short period of time (approximately 3 weeks)" and "[d]uring the course of performing the final review *in late April, Stroz Friedberg was asked to cease all remaining document review*" and counsel decided to forgo "a number of outstanding checks and analyses that Stroz Friedberg suggested to help bolster the confidence in the thoroughness of the review." (Dkt. 1603-7.) Uber has blocked further inquiry into this information under the common interest privilege.

## V.  CONCLUSION.

In sum, Uber should be precluded from presenting evidence or argument that it relied on the Stroz investigation or Report. It has no non-privileged evidence of reliance. It cannot now waive privilege and rely on advice of counsel. Absent preclusion, Waymo would be severely prejudiced were counsel permitted to rely on Stroz to argue that it "put it in a vault" or used Stroz to make sure that no information came over the Uber, or otherwise relied on the Stroz Report.

DATED: November 13, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By */s/ Charles K. Verhoeven*
Charles K. Verhoeven
Attorneys for WAYMO LLC