# Exhibit 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                  SAN FRANCISCO DIVISION
4
5    WAYMO LLC,
6         Plaintiff,
7              vs.              Case No.
8    UBER TECHNOLOGIES,INC.;    17-cv-00939-WHA
9    OTTOMOTTO, LLC; OTTO
10   TRUCKING LLC,
11        Defendants.
12   _____
13
14       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
15
16   CONTINUED VIDEOTAPED DEPOSITION OF CAMERON POETZSCHER
17               San Francisco, California
18             Friday, September 29, 2017
19                     Volume III
20
21   REPORTED BY:
22   REBECCA L. ROMANO, RPR, CSR No. 12546
23   JOB NO. 2716653
24
25   PAGES 474 - 675
```

Page 474

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1            UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF CALIFORNIA
3              SAN FRANCISCO DIVISION
4
5   WAYMO LLC,
6        Plaintiff,
7           vs.              Case No.
8   UBER TECHNOLOGIES,INC.;   17-cv-00939-WHA
9   OTTOMOTTO, LLC; OTTO
10  TRUCKING LLC,
11       Defendants.
12  _____
13
14
15
16       CONTINUED VIDEOTAPED DEPOSITION OF CAMERON
17  POETZSCHER, taken on behalf of the Plaintiff, at
18  Quinn Emanuel Urquhart & Sullivan, 50 California
19  Street, 22nd Floor, San Francisco, California,
20  commencing at 9:30 a.m., Friday, September 29, 2017
21  before Rebecca L. Romano, Certified Shorthand
22  Reporter No. 12546
23
24
25

```
 1            MR. JACOBS:  Delayed -- objection to        09:38:07
 2   form.
 3            THE DEPONENT:  Delayed relevant to what?
 4       Q.  (By Mr. Gorman)  To when it was
 5   anticipated that it would begin?                     09:38:13
 6       A.   I am still not sure what the connection
 7   is to the term sheet.
 8       Q.   My understanding is that the term sheet
 9   has an indemnity construct --
10       A.   Right.                                      09:38:25
11       Q.   -- built into it, which calls for an
12   independent third-party forensic investigation.
13       A.   Correct.  But I don't know what the term
14   sheet has to do with the delay.
15       Q.   Well, maybe it doesn't.  Let's leave the    09:38:35
16   term sheet out of it.
17       A.   Uh-huh.
18       Q.   From your perspective, was the Stroz
19   investigation delayed?
20       A.   I mean, it took longer than anticipated,    09:38:43
21   so the ending was delayed on it.  I don't think the
22   beginning was delayed, or I -- I don't recall.
23       Q.   What was your involvement in the
24   Stroz investigation?
25       A.   Very little.  I had -- I didn't review      09:38:55
```

Page 493

```
1    the report.  I didn't really have any direct            09:38:57
2    communications with Stroz.  I helped occasionally
3    to try to get Anthony or Lior to, you know, move
4    faster because they were very busy guys.  And so
5    sometimes the lawyers would ask me to call them to      09:39:10
6    say, Can you please, you know, go to this interview
7    or provide this device or whatever.  But that was
8    basically the extent of it.  I wasn't directly
9    involved in it.
10        Q.   Did you receive reports about the             09:39:22
11   investigation?
12        A.   No.
13        Q.   Did you receive any updates about the
14   findings of the investigation?
15        A.   Only that was discussed with lawyers.         09:39:34
16        Q.   So the only times that you received
17   updates about the Stroz's findings was in
18   conversations with lawyers?
19        A.   Correct.
20        Q.   Did you ever personally speak with            09:39:48
21   anybody at Stroz?
22        A.   Not that I recall.  I know we had one
23   discussion with John Gardner and Anthony, and I
24   don't recall if someone from Stroz was on that.  I
25   believe they weren't, but I couldn't say for            09:40:03
```

```
 1   could start working, right, and then finish the          09:59:08
 2   other ▓▓▓▓▓▓ later.
 3       Q.   (By Mr. Gorman)  You can put that down.
 4           More generally, in late March, early
 5   April, did you understand that the Stroz                 09:59:27
 6   investigation was far from completion?
 7           MR. JACOBS:  To the extent you can -- so
 8   you can answer what was in -- what was your state
 9   of mind at the time.  I don't -- but I would
10   instruct you not to answer that -- what specific         09:59:42
11   communications came from counsel.
12           THE DEPONENT:  Okay.
13           Yeah, I mean, my general understanding
14   was that it was taking longer than we had expected.
15   I wouldn't say far from completed.                       09:59:52
16       Q.   (By Mr. Gorman)  Other than information
17   you may have received from counsel, what was your
18   understanding of how long it would take to complete
19   the Stroz investigation?
20       A.   The only --                                      10:00:07
21           MR. JACOBS:  Objection.
22           Are you asking as of -- what was his
23   understanding at what point in time?
24           MR. GORMAN:  At the end of March, very
25   beginning of April.                                      10:00:16
```

Page 511

1      THE DEPONENT:  I mean, the only updates I          10:00:17

2  got on it were from counsel.

3      (Exhibit 7754 was marked for

4  identification by the court reporter and is

5  attached hereto.)                                       10:00:39

6      Q.   (By Mr. Gorman)  Mr. Poetzscher, you have

7  just been handed Exhibit 7754.  There's the Bates

8  number, UBER00322804 through 322806.  The top

9  message is an email from Eric Friedberg to

10 Eric Tate, Hanley Chew, Mary Fulginiti.                 10:01:03

11     Do you have any familiarity with who

12 these people are?

13     A.   I know Eric Tate.  And obviously

14 Eric Friedberg.  I recognize the name from

15 Stroz Friedberg.                                        10:01:18

16     Q.   Do you know who Hanley Chew and

17 Mary Fulginiti were?

18     A.   No.

19     Q.   What's your understanding of

20 Eric Friedberg's role?                                  10:01:29

21     A.   I mean, I know he's one of the

22 principals, presumably, of Stroz Friedberg.  Other

23 than that, I have no idea what he was doing

24 specifically.

25     Q.   So you didn't know whether he was              10:01:39

Page 512

| | | |
|---|---|---|
| 1 | A.  No. | 10:05:05 |
| 2 | Q.  Did you receive any reports or | |
| 3 | information on Levandowski's interviews with Stroz? | |
| 4 | MR. JACOBS:  You can answer that yes or | |
| 5 | no. | 10:05:17 |
| 6 | THE DEPONENT:  Yeah, I mean, I didn't | |
| 7 | receive any reports.  Obviously I had discussions | |
| 8 | with lawyers about it.  So if that counts as | |
| 9 | information then, yes, I received information. | |
| 10 | Q.  (By Mr. Gorman)  How often did you | 10:05:33 |
| 11 | receive information about Levandowski's interviews | |
| 12 | with Stroz? | |
| 13 | A.  Probably a few times, not many. | |
| 14 | Q.  Is a few less than five or more than | |
| 15 | five? | 10:05:44 |
| 16 | A.  Definitely less than five.  And when I -- | |
| 17 | and I'm talking not just Anthony's interviews, | |
| 18 | basically the whole Stroz discussion. | |
| 19 | So there's probably less than five | |
| 20 | occasions where I got sort of feedback related to | 10:05:54 |
| 21 | Stroz from our lawyers.  I can't recall if it was | |
| 22 | specifically Anthony's interviews or other. | |
| 23 | Q.  What was the format in which the Uber | |
| 24 | side received information about | |
| 25 | Anthony Levandowski's interviews with Stroz? | 10:06:16 |

```
1      A.   Again, I don't know.                              10:06:18
2      Q.   Did you attend any conference calls in
3   which information from Stroz interviews on
4   Levandowski was relayed to Uber?
5      A.   Not directly.  I had discussions with our         10:06:26
6   lawyers where they described some of what they had
7   learned, but I was never on a call with any Stroz
8   people as far as I am aware.
9      Q.   So Stroz gave information to Uber's
10  outside counsel, and then Uber's outside counsel          10:06:41
11  relayed it to -- to Uber team in-house?
12     A.   I don't know where the chain ended up,
13  but somehow it went from Stroz to internal and
14  external counsel, and then I would have discussions
15  with some combination of internal and external            10:06:56
16  counsel.
17     Q.   Did you receive any information on
18  Stroz's forensic investigation on the devices and
19  data collected from the diligenced employees?
20     A.   Again, I didn't receive any reports.  I           10:07:13
21  did have discussions with lawyers, so I am not sure
22  if that counts as information or not in your
23  question.
24     Q.   You had conversations with lawyers about
25  results from forensic investigation?                      10:07:28
```

Page 517

| | | |
|---|---|---|
| 1 | A. No. Well -- I mean, it depends what you | 10:07:30 |
| 2 | mean by the forensic investigation. I had | |
| 3 | conversations with lawyers about the | |
| 4 | Stroz investigation overall. So that was obviously | |
| 5 | interviews, forensic analysis of their devices. | 10:07:37 |
| 6 | So all of that collectively, I can't | |
| 7 | recall specific -- you know, talking about whether | |
| 8 | it's coming from devices or coming from interviews | |
| 9 | or whatever, right, other than the five disks which | |
| 10 | we've talked about separately. | 10:07:51 |
| 11 | Q. And all of those conversations that you | |
| 12 | had with lawyers where you received information or | |
| 13 | updates on the Stroz investigation, that's all | |
| 14 | encompassed in the three or four conversations that | |
| 15 | you participated in? | 10:08:07 |
| 16 | A. Uh-huh. | |
| 17 | MR. JACOBS: You need to answer that yes | |
| 18 | or no. | |
| 19 | THE DEPONENT: I'm sorry. Yes. | |
| 20 | Q. (By Mr. Gorman) Did you receive any | 10:08:15 |
| 21 | email updates on the Stroz investigation? | |
| 22 | A. There may have been email updates on | |
| 23 | timing. I don't recall. | |
| 24 | Q. But no email updates about the interim | |
| 25 | findings from Stroz, to your recollection? | 10:08:34 |

Page 518

| | | |
|---|---|---|
| 1 | A.   Not that I recall.  You have all my | 10:08:37 |
| 2 | emails anyway, so I am sure you know. | |
| 3 | MR. GORMAN:  I'm going to hand you a | |
| 4 | document that's been previously marked as | |
| 5 | Exhibit 7111. | 10:08:56 |
| 6 | Q.   (By Mr. Gorman)  The title is, "Draft | |
| 7 | Summary Interview of Anthony Levandowski." | |
| 8 | Mr. Poetzscher, have you ever seen this | |
| 9 | document before? | |
| 10 | MR. JACOBS:  You can answer that outside | 10:09:30 |
| 11 | of anything you might have seen in the course of | |
| 12 | deposition preparation. | |
| 13 | THE DEPONENT:  Yeah, I never seen it | |
| 14 | other than in the depo prep. | |
| 15 | Q.   (By Mr. Gorman)  Okay. | 10:09:38 |
| 16 | Do you dispute or disagree with any | |
| 17 | aspect of Exhibit 7111, the Levandowski interview | |
| 18 | memo? | |
| 19 | MR. JACOBS:  Objection.  Form. | |
| 20 | THE DEPONENT:  I've never even read it. | 10:09:49 |
| 21 | Q.   (By Mr. Gorman)  Even if you haven't read | |
| 22 | Exhibit 7111, you did receive information prior to | |
| 23 | April 11th on Levandowski's Stroz interviews, | |
| 24 | didn't you? | |
| 25 | A.   I received information about the Stroz | 10:10:07 |

Veritext Legal Solutions
866 299-5127

```
 1        Q.   It does, but you have no opinion one way      10:39:40
 2   or another?
 3        A.   I mean, I know you are deposing all our
 4   lawyers, why don't you ask them that question.
 5        Q.   We certainly will.  And I -- I -- we          10:39:48
 6   certainly will.  I am just trying to understand.
 7   And this is my last question, and I'll take a
 8   break.
 9             Is what you are trying to say that this
10   was all sort of done at levels below you, and you       10:40:00
11   weren't you in the loop on whatever was being
12   conveyed by Stroz; is that the sense --
13        A.   No, I wouldn't say that.  Obviously the
14   lawyers are professionals.  I'll leave it to them
15   to do their job in terms of determining how to         10:40:12
16   conduct a forensic investigation, right?
17             They had some protocol between them and
18   Stroz to get information updates, and then they
19   would communicate to me the information they felt
20   was important.  From that I got the gist of the         10:40:23
21   overall investigation.
22             I just didn't get, you know, exactly what
23   updates they were getting.  They didn't tell me
24   whether it was from Anthony's interview notes or
25   devices or whatever.  They conveyed general             10:40:32
```

Page 545

```
 1   information to me, and I see no reason to speculate    10:40:34
 2   now about what that information flow was, you know,
 3   18 months ago.
 4        Q.   Okay.  I -- I think I understand now.
 5             You received updates -- you received          10:40:46
 6   updates about the results -- the interim results
 7   from Stroz's investigation; but sitting here today,
 8   you don't know whether the results were gleaned
 9   from an interview as opposed to a computer, as
10   opposed to an email, as opposed to some other          10:40:58
11   source?
12        A.   I assume they were gleaned from
13   everything collectively, right.  If we were doing
14   all these things, it would make sense to reference
15   those.  But I don't know specifically what -- what    10:41:05
16   components were in the updates I got.
17             MR. GORMAN:  Okay.  Thank you for being
18   so precise.  I appreciate it.
19             We can take a break.  Go off the record.
20             THE VIDEOGRAPHER:  Okay.  We are now         10:41:16
21   going off the record.  The time is 10:41.
22             (Recess taken.)
23             THE VIDEOGRAPHER:  Okay.  We are now back
24   on the record.  The time is 10:51.
25             MR. GORMAN:  And would you like to make     10:51:49
```

Page 546

```
 1        A.   I mean, I recognize it.  I -- you know.         10:53:07
 2        Q.   Maybe not the whole thing, but you are
 3   familiar with this discussion?
 4        A.   Yes.
 5        Q.   Levandowski's lawyer writes, ███              ███
```



```
18             Do you see all that?
19        A.   Yes.
20        Q.   When Uber executed the                         10:54:01
21   indemnification agreement, do you believe it
22   received sufficient information from the outside
23   expert to proceed with the transaction and enter
24   into the indemnification agreement?
25        A.   That's certainly what we felt at the           10:54:15
```

Page 548

| | | |
|---|---|---|
| 1 | time. | 10:54:16 |
| 2 | Q.   Do you not feel that way anymore? | |
| 3 | A.   I mean, we're aware of these allegations, | |
| 4 | now, that Anthony took trade secrets. | |
| 5 | So whether that would have come out in | 10:54:28 |
| 6 | the rest of the diligence process, I can't | |
| 7 | speculate.  I don't believe it did when -- when we | |
| 8 | got the final report; although, I haven't seen it. | |
| 9 | So, in that sense, it wouldn't have made | |
| 10 | any difference whether we waited to get the final | 10:54:40 |
| 11 | report or not.  Right? | |
| 12 | On the other hand, obviously, if we'd | |
| 13 | known what he was alleged to have done in | |
| 14 | December 2015, I think we would have had a | |
| 15 | different perspective on the transaction. | 10:54:50 |
| 16 | Q.   But at the time you executed the papers, | |
| 17 | the put call agreement in the | |
| 18 | indemnification agreement in early April of 2016, | |
| 19 | you believed that you had received sufficient | |
| 20 | information from Stroz to proceed with the | 10:55:08 |
| 21 | transaction? | |
| 22 | A.   Correct. | |
| 23 | Q.   But in hindsight, perhaps, you didn't? | |
| 24 | A.   Again, I believe, at this point, if we | |
| 25 | had waited to get the final report, it wouldn't | 10:55:24 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | have changed our minds. | 10:55:26 |
| 2 | Because as I understand it -- again, I | |
| 3 | haven't seen the final report -- nothing -- sorry. | |
| 4 | Nothing that was in the final report was materially | |
| 5 | different from what we understood at the interim | 10:55:36 |
| 6 | stage. | |
| 7 | So, in that sense, I don't think that | |
| 8 | would have changed.  Obviously, if we had initial, | |
| 9 | you know, knowledge of everything and knew that the | |
| 10 | allegations that Google was making of Anthony were | 10:55:47 |
| 11 | true, which -- at least I don't know if that's | |
| 12 | true -- but if we knew those were true, we would | |
| 13 | never have done the transaction. | |
| 14 | Q.   Do you recall having any concerns about | |
| 15 | Mr. Gardner's suggestion that Uber should agree | 10:55:59 |
| 16 | that it has ███████████████████████████ | |
| 17 | ███████████████████████ | |
| 18 | A.   Not personally. | |
| 19 | (Exhibit 7756 was marked for | |
| 20 | identification by the court reporter and is | 10:56:09 |
| 21 | attached hereto.) | |
| 22 | Q.   (By Mr. Gorman)  You have just been | |
| 23 | handed Exhibit 7756, which bears the Bates number | |
| 24 | UBER00320759 through 320765. | |
| 25 | The very top of the first page is an | 10:56:42 |

Page 550



1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮
2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3    ▮▮▮▮▮▮
4         Do you see that?
5    A.   Yes.                                    11:01:37
6    Q.   Why did Uber agree to move forward with
7    the acquisition and the indemnification before
8    having access to the final reports?
9    A.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮
11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮
16   ▮▮▮▮▮▮▮▮
17        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18   Q.   I would like to talk about the -- the
19   first reason you just gave, ▮▮▮▮▮▮▮▮▮▮▮▮
     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                     11:02:19
     ▮▮▮  ▮▮
     ▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
     ▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮          11:02:33

Page 555

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   spoke.  I just don't recall what he said.  And as I      11:40:14
 2   said, I don't know for sure if Anthony was even on
 3   the call or not.
 4        Q.   Let me see if I can sum up.
 5             By April 11th, 2016, you knew that Stroz       11:40:48
 6   was investigating Mr. Levandowski's claims about
 7   destroying those five hard drives?
 8        A.   Correct.
 9        Q.   And by April 11th, 2016, you knew that
10   Mr. Levandowski had delayed in disclosing the name       11:41:03
11   of the facility where he allegedly shredded the
12   five disks?
13             MR. JACOBS:  Objection.  Form.
14             THE DEPONENT:  Yeah, I wouldn't say he
15   delayed in disclosing the name.  What I would say        11:41:12
16   is that I didn't get the name directly from him.
17        Q.   (By Mr. Gorman)  Okay.  Did you have any
18   knowledge of him delaying in disclosing the name?
19        A.   No.
20        Q.   Okay.  Before April 11th, 2016, you had        11:41:21
21   received some of Stroz' interim findings on the
22   investigation into the destruction of the five hard
23   drives?
24        A.   I mean, I don't want to say I received
25   Stroz' findings.  It makes it sound like I got a         11:41:43
```

Veritext Legal Solutions
866 299-5127

```
 1   report.  I had discussions, obviously, with lawyers    11:41:43
 2   about the five disks and the investigation to try
 3   to figure out if there was a receipt or some other
 4   proof.
 5       Q.   Okay.  I believe you said you didn't know     11:41:55
 6   by April 11th that Stroz had interviewed the
 7   personnel at Shred Works and that the personnel
 8   there were unable to recognize Levandowski by
 9   photograph or description?
10            MR. JACOBS:  Objection.  Form.                11:42:09
11            THE DEPONENT:  Yeah, I mean, I don't
12   recall knowing that.
13       Q.   (By Mr. Gorman)  Okay.
14       A.   Obviously, we had that discussion where
15   they talked about, you know, what they had done.  I    11:42:15
16   just don't recall the photo or -- or not
17   recognizing Anthony.
18       Q.   Sitting here today, do you think
19   Mr. Levandowski destroyed the five hard disks?
20       A.   Yes.                                          11:42:33
21       Q.   When do you think he did it?
22       A.   I think what happened is, he -- on Friday
23   afternoon, he dropped them off at this facility,
24   and then the disks were probably shredded on
25   Monday, if that's what the receipt shows, or the       11:42:42
```