QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC, <br><br> Plaintiff, <br><br> vs. <br><br> UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC, <br><br> Defendants. | CASE NO. 3:17-cv-00939 <br><br> **PLAINTIFF WAYMO LLC'S REPLY TO DEFENDANTS' COUNTER-CRITIQUE OF FURTHER TENTATIVE JURY INSTRUCTIONS ON TRADE SECRET MISAPPROPRIATION (DKT. 2078)** <br><br><br> Judge: The Honorable William Alsup <br><br> Trial Date: December 4, 2017 |

Pursuant to the Court's Order (Dkt. 2181), Waymo submits the following reply regarding the FTJI (Dkt. 2078).[1]

## I. DEFENDANTS' GENERAL OBJECTION IS MERITLESS.

Defendants' Counter-Critique (Dkt. 2180) nowhere disputes that "technical specifications" may constitute a trade secret. *Compare* Dkt. 2171 at 1-3 *with* Dkt. 2180. And it actually concedes both that "a trade secret may be kept in the mind of a former employee," Dkt. 2180 at 3:12-13, and that "some 'negative know-how' may be protectable as a trade secret." *Id.* at 3:21-22. Rather than disputing that these concepts are integral parts of trade secret law, the Counter-Critique instead objects to all of Waymo's instructions as "unnecessary" because they are beyond the scope of Defendants' unilateral conception of the purpose of this untitled FTJI—namely, to "instruct[] the jury on how to differentiate between trade secrets and those skills and information acquired by former employees which are not trade secrets." *Id.* at 1.

Defendants' objection is illogical as it is impossible to "differentiate between" concepts without in some way defining them. Any instruction on "how to differentiate between trade secrets" and non-trade secrets must both incorporate and supplement any other instructions which Defendants believe squarely "define" trade secrets—a distinction which the Court did not make by applying titles to the TJIs. Moreover, Defendants cannot dispute that these concepts are both highly relevant to Waymo's claim and not covered elsewhere in the TJIs. The Court should reject Defendants' argument that the FTJI is not the place for these concepts, especially in light of their failure to suggest any other place where these concepts *should* go.

## II. THE JURY SHOULD BE INSTRUCTED THAT A TRADE SECRET IS NOT LIMITED TO "SPECIFIC ENGINEERING SOLUTIONS."

As Waymo demonstrated in its Critique, a trade secret is not limited to "specific engineering solutions," but may also include "technical specifications" and "negative trade secrets." Dkt. 2171 at 1-3. Waymo has asserted trade secrets falling into each of these categories. *Id.* at 1. But the FTJI effectively limits the definition of a trade secret to only "specific engineering solutions":

---

[1] Unless otherwise noted, capitalized terms are as defined in Waymo's Critique of the FTJI (Dkt. 2171) and Critique of the TJIs and Form (Dkt. 2077).

> The engineer cannot, however, go further in his new job with a new employer and misappropriate *specific engineering solutions* developed by his prior employer, even those developed by him or her, where such specific solutions qualify as a trade secret.

Dkt. 2078 (emphasis added).

As an initial matter, Defendants' objection to Waymo's proposed additions to the FTJI on the grounds that these additional types of trade secrets are "unnecessary" must be rejected. As presently constituted, the TJIs nowhere affirmatively outline what types of information may actually qualify as trade secrets; rather, they only describe what cannot qualify. For instance, both TJI#5 (which Defendants cite) and TJI#6 (which they do not) nowhere describe what a trade secret is, but instead describe information that cannot qualify as a trade secret. *See* Dkt. 2010 at 3. The FTJI's description of a trade secret as a "specific engineering solution" is thus the only affirmative description of a trade secret in the TJIs other than the general checklist in TJI#3, and could easily convince a jury lacking other guidance that no protection is granted "technical specifications" or "negative trade secrets." Defendants do not dispute that "technical specifications" and "negative trade secrets" may in fact constitute trade secrets, and Waymo's revisions reflecting that substantive agreement collectively adds no more than 18 words to a single jury instruction. Waymo's proposed edits will thus help avert significant risk of jury confusion with minimal changes where there is no disagreement on the law.

### A. The Jury Should Be Instructed That A "Technical Specification" May Be A Trade Secret.

Defendants have raised no specific objections to the language Waymo proposes. As this language is essential to complete the jury's understanding of what may constitute a trade secret, *see supra*, it should be added.

### B. The Jury Should Be Instructed That A "Negative Trade Secret" May Be A Trade Secret.

Defendants admit that "some 'negative know-how' may be protectable as a trade secret." Dkt. 2180 at 3:21-22. They further admit that Waymo cited valid authority for the proposition that negative trade secrets may be enforceable trade secrets in California. *Id.* at 3-4 (citing *Courtesy Temp. Serv. Inc. v. Camacho*, 222 Cal App. 3d 1278, 1287 (Cal. Ct. App. 1990)). They nevertheless spend two full pages asserting that "not all such 'blind alleys' will qualify." Dkt. 2180 at 3; *see also id.* at 3-5. Defendants' argument is a straw man. *Of course* "not all 'blind alleys' will qualify" as negative

trade secrets. However, under controlling precedent, and as contemplated by both the California legislature and the drafters of the UTSA, knowledge of what *not* to do is protectable under trade secret law to the same extent as "affirmative" information, provided it meets the other required elements:

> The definition of "trade secret" contains a reasonable departure from the Restatement of Torts (First) definition which required that a trade secret be "continuously used in one's business." The broader definition in the proposed Act extends protection to a plaintiff who has not yet had an opportunity or acquired the means to put a trade secret to use. The definition includes information that has commercial value from a negative viewpoint, for example the results of lengthy and expensive research which proves that a certain process will not work could be of great value to a competitor.

Cal. Civ. Code § 3426.1 (Leg. Comm. Cmt.); *Uniform Trade Secret Act* § 1, Comment 5 (Natl. Conf. of Commissioners on Uniform State Laws 1985), http://www.uniformlaws.org/shared/docs/trade%20secrets/utsa_final_85.pdf (same); *see also* Dkt. 2171 at 2-3 (citing cases).

Defendants have cited no authority to the contrary. *Winston Research Corp. v. Minn. Minin & Mfg. Co.*, 350 F.2d 134, 143-44 (9th Cir. 1965), was decided 20 years *before* the passage of CUTSA and the decision in *Courtesy Temp.*, 222 Cal. App. 3d 1278, and did not hold that negative trade secrets were unenforceable generally. Rather, *Winston Research* stands for the uncontroversial propositions that (i) a trade secret cannot consist of material that is generally known, (ii) an injunction cannot be worded so broadly such as to prohibit an engineer from using non-trade secret information, and therefore (iii) an injunction cannot obtain when the plaintiff describes "what not do to" broadly, as opposed to detailing the specific engineering problem faced and the specific approaches tried. *Winston Research*, 350 F.2d at 143-44. Defendants' apparent argument that a 52-year old federal case trumps the later acts of Congress, the California legislature, and California courts interpreting California law, is unavailing.

Defendants' argument is also internally inconsistent. The same general test for trade secret status—namely, that described in TJI#3—applies to the "specific engineering solutions" the Court proposed in the FTJI and both the "technical specifications" and "research indicating that a certain process or approach will not work" which Waymo proposed in the Critique. But Defendants lodged no objection to the inclusion of either "specific engineering solutions" or "technical specifications" based on a parallel concern that "*all* specific engineering solutions" or "*all* technical specifications"

are trade secrets. *See* Dkts. 2169, 2180. It is unclear what about the inclusion of "research indicating that a certain process or approach will not work" Defendants believe the jury will find so confusing. Consistent with the cases cited by both parties, Waymo's proposed jury instruction reflects that "research indicating that a certain process or approach will not work," like "specific engineering solutions" and "technical solutions," may or may not be a trade secret, depending on the specific facts.

### III. THE JURY SHOULD BE INSTRUCTED THAT A TRADE SECRET MAY BE HELD IN MEMORY.

By its own admission, "Uber does not dispute that a trade secret may be kept in the mind of a former employee." Dkt. 2180 at 3:12-13. Defendants nevertheless object to the inclusion of "regardless of whether contained in a document or retained in the engineer's memory" on the grounds that it is confusing and unnecessary. Not so. There is nothing confusing about the fact that a trade secret may be stored in memory rather than documents; indeed, this is how most jurors will have first learned to keep secrets. But it would be error if the Court's instructions caused the jury to believe that Waymo must prove an unbroken paper trail from its files to the Defendants to show misappropriation. In addition, failure to give this instruction could create a false dichotomy in jurors' minds between trade secrets having physical manifestations on the one hand, and skill and know-how stored in memory on the other. The proposed language should be added because the risk of confusion is very low in comparison to the prejudice avoided.

### IV. WAYMO WILL WITHDRAW ITS PROPOSED MODIFICATION OF "SKILL" TO "GENERAL SKILLS".

Defendants object to Waymo's addition of the word "general" before "skills" in the following sentence: "An engineer will, through trial and error and application of his or her professional skills, sharpen his or her skills and accumulate insights and supplement the **general** skills and know-how otherwise known in his or her field." Dkt. 2180 at 1:24-25; 1:28 ("Uber also specifically objects to . . . the term "general" before skills;" "The first addition ("general" before "skills") is unnecessary . . ."). Contrary to Defendants' suggestion, Waymo did not intend the addition of the term "general" here to exclude specialized knowledge of those skilled in a particular trade that does not constitute a trade secret; thus, Waymo is willing to withdraw this proposed addition to avoid any risk of this unintended meaning.

DATED: November 13, 2017        QUINN EMANUEL URQUHART & SULLIVAN, LLP

By */s/ Charles K. Verhoeven*
Charles K. Verhoeven
Attorneys for WAYMO LLC