QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David A. Perlson (Bar No. 209502)
  davidperlson@quinnemanuel.com
  Melissa J. Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  John Neukom (Bar No. 275887)
  johnneukom@quinnemanuel.com
  Jordan Jaffe (Bar No. 254886)
  jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:      (415) 875-6600
Facsimile:      (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>            Plaintiff,<br><br>      vs.<br><br>UBER TECHNOLOGIES, INC.;<br>OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>            Defendants. | CASE NO. 3:17-cv-00939<br><br>**PLAINTIFF WAYMO LLC'S NOTICE OF MOTION AND MOTION FOR JURY INSTRUCTION BASED ON SPOLIATION**<br><br>Judge: The Honorable William Alsup<br><br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL** |

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 9.30 a.m. on November 27, 2017, or as soon thereafter as the matter may be heard, before the Honorable William H. Alsup, U.S. District Court Judge, Plaintiff Waymo LLC ("Waymo") will and hereby does move the Court to given an adverse inference jury instruction based on the intentional spoliation of evidence by Defendants Uber Technologies, Inc., ("Uber") and Ottomotto LLC ("Ottomotto").

Plaintiffs bring this Motion pursuant to the Court's inherent authority and Federal Rule of Civil Procedure 37 and base the Motion on the following grounds:

(1) Defendants had a duty to preserve evidence, including electronically stored information, no later than January 2016 but failed to do so – instead, they not only destroyed relevant evidence but also failed to preserve evidence even after the filing of the complaint in this action;

(2) the destroyed evidence was relevant to Waymo's claims; and

(3) Waymo has been prejudiced by Defendants destruction of evidence such that an adverse inference jury instruction is appropriate.

The Motion is supported by this Notice of Motion, the attached Memorandum of Points and Authorities, the accompanying Declaration of M. Schroeder, the pleadings and papers on file in this action, and such arguments and authorities as may be presented to the Court at or before the hearing on this Motion.

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................1

    A.    Defendants Anticipated This Action In January 2016 ................................2

        1.    Defendant Uber Retained Litigation Counsel In January 2016 ....................3

        2.    Defendant Ottomotto Anticipated This Litigation By January 2016 ............4

        3.    Defendants Retained Stroz In Anticipation Of Litigation With Google ........................................................................................4

        4.    The Indemnification Provided As Part Of The Ottomotto Acquisition Further Confirms That Ottomotto And Uber Contemplated "████████ Litigation" ........................................6

    B.    Defendants Destroyed Hundreds Of Relevant Communications And Files Despite Knowing That Litigation With Waymo Was Likely ................7

        1.    Uber's Executives Destroyed Evidence ........................................7

        2.    While An Officer Of Ottomotto And A Consultant To Uber, Levandowski Destroyed Relevant Evidence ................................10

        3.    Ottomotto Executives Intentionally Destroyed Communications Relating To The Destruction Of Files And Data ..........................11

        4.    Tyto Emails And Email Archives Were Destroyed After Tyto Was Acquired By Ottomotto ........................................................12

    C.    Defendants Failed To Preserve Potential Evidence, Even After The Filing Of The Complaint ........................................................13

ARGUMENT ........................................................................14

I.    SANCTIONS ARE APPROPRIATE WHERE A PARTY FAILS TO PRESERVE EVIDENCE RELEVANT TO A PENDING OR FORESEEABLE LAWSUIT ................14

    A.    Defendants Destroyed Evidence They Were Obligated To Preserve ................17

    B.    Defendants Acted With A Culpable Mindset ................................18

    C.    The Destroyed Evidence Was Relevant To Waymo's Claims ................19

    D.    The Court Should Issue An Adverse Inference Jury Instruction ................20

        1.    An Adverse Inference Jury Instruction Is The Appropriate Remedy Here ........................................................................20

        2.    The Court Should Instruct Jurors To Presume That The Destroyed Evidence Would Have Been Favorable To Waymo And Unfavorable To Defendants ................................................................22

CONCLUSION ................................................................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

<u>Pages</u>

**Cases**

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
    888 F. Supp. 2d 976 (N.D. Cal. 2012) ................................................................. 15, 16, 19, 21

*Compass Bank v. Morris Cerullo World Evangelism*,
    104 F. Supp. 3d 1040 (S.D. Cal. 2015) ................................................................................ 18

*Cyntegra, Inc. v. IDEXX Labs, Inc.*,
    322 Fed. Appx. 569 (9th Cir. 2009) ...................................................................................... 16

*Glover v. BIC Corp.*,
    6 F.3d 1318 (9th Cir. 1993) ............................................................................................ 15, 16

*Hickman v. Taylor*,
    329 U.S. 495 (1947) .............................................................................................................. 14

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    645 F.3d 1336 (Fed. Cir. 2011) ............................................................................................ 15

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    591 F. Supp. 2d 1038, 1060 (N.D. Cal. 2006) ...................................................................... 19

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    897 F. Supp. 2d 939 (N.D. Cal. 2012) ........................................................................... 15, 20

*ILWU-PMA Welfare Plan Bd. of Trustees & ILWU-PMA Welfare Plan v. Connecticut
    Gen. Life Ins. Co.*,
    2017 WL 345988 (N.D. Cal. Jan. 24, 2017) .............................................................. 14,17,21

*In re Napster, Inc. Copyright Litigation*,
    462 F. Supp. 2d 1060 (N.D. Cal. 2006) ............................................................ 14, 17, 19, 22

*Internmatch, Inc. v. Nxtbigthing, LLC*,
    2016 WL 491483 (N.D. Cal. 2016) ................................................................................ 15, 21

*Io Grp. Inc. v. GLBT Ltd.*,
    2011 WL 4974337 (N.D. Cal. 2011) ............................................................................ 16,19,22

*Leon v. IDX Sys. Corp.*,
    464 F.3d 951 (9th Cir. 2006) ........................................................................................ 15,16,19

*Mosaid Techs. Inc. v. Samsung Elecs. Co.*,
    348 F. Supp. 2d 332 (D.N.J. 2004) ...................................................................................... 22

*O'Berry v. Turner*,
    2016 WL 1700403 (M.D. Ga. 2016) ..................................................................................... 22

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
    306 F.3d 99 (2d Cir. 2002) ............................................................................................... 16,18

*Schmid v. Milwaukee Elec. Tool Corp.*,
    13 F.3d 76 (3d Cir. 1994) ..................................................................................................... 21

*United Medical Supply Co. v. United States*,
    77 Fed. Cl. 257 (Fed. Cl. 2007)............................................................................................... 2

*Victorino v. FCA US LLC*,
    2017 WL 4541653 (S.D. Cal. Oct. 11, 2017)........................................................................ 18

*Zubulake v. UBS Warburg LLC,*
    220 F.R.D. 212 (S.D.N.Y. 2003) ........................................................................... 14

*Zubulake v. UBS Warburg LLC,*
    229 F.R.D. 422, 437 (S.D.N.Y. 2004) ................................................................... 19

**Rules and Regulations**

Fed. R. Civ. P. 37 ...................................................................................... 16, 17, 22

## MEMORANDUM OF POINTS AND AUTHORITIES

The spoliation of relevant evidence in this case is as remarkable as it is clear.  Defendants Uber and Ottomotto hired several different law firms starting in January 2016 in anticipation of litigation, including counsel of record in this case Morrison & Foerster.  Defendants further have provided reams of declarations, attorney admissions, and other evidence arguing *ad nauseum* that they anticipated this very lawsuit and were already preparing for litigation as early as January 2016—all activity well above and beyond the standard necessary to trigger the duty to preserve evidence.  Uber's General Counsel recently testified at deposition that ███████████████████ ████████████████.

At the same time that Defendants were working hand in glove with litigation counsel to prepare for this case, employees of Ottomotto and Uber were destroying relevant evidence left and right.  There is no need to just take Waymo's word for it: the destruction of evidence is detailed the Stroz Report.  The Stroz Report describes a "real time" effort by Levandowski and his colleagues to delete information—information that would likely be supportive of Waymo's claims.  (*See, e.g.*, Dkt. 1928-24 [Stroz Report], at 12 ("Stroz Friedberg's analysis also identified relevant files that were accessed on Levandowski's personal laptop and subsequently deleted between September 1, 2015 and March 22, 2016.")  But the evidence of spoliation goes beyond that detailed in the Stroz Report.  For example, Uber's lead corporate development executive destroyed all her text messages with Levandowski at Levandowski's request.  Travis Kalanick, then Uber's CEO, configured his cell phone to ensure that hundreds of contemporaneous text messages between himself and Anthony Levandowski were deleted.  Kalanick similarly instructed Levandowski to "do what he needed to do" when he learned that Levandowski stole Waymo's confidential information and destroy at least one copy of it.  (*Id.* at 10.)

There can be no legitimate dispute that the evidence Defendants destroyed is relevant to Waymo's claims—indeed, the Stroz Report specifically identifies files deleted by Levandowski as "relevant" to their investigation.  (*Id.* at 12.)  Moreover, many of the deleted communications between Uber and Ottomotto date from early January 2016, a time when Kalanick and Levandowski

1    were discussing "███████████████" (*see* Ex. 1 [Uber Meeting Notes, UBER003118294]) and

2    Kalanick personally promised to indemnify Ottomotto against Google's claims.  Their text messages

3    likely discussed these very topics.  And, the absence of the communications from the documents

4    produced by Defendants in this action begs the question: what conduct did Defendants fear Google

5    would uncover and sue over—and what did they want to hide?  Waymo also knows that Ottomotto

6    and Uber corporate development executives were discussing specific LiDAR milestones as part of

7    the transaction, where Ottomotto would be highly incentivized to provide ████████████████

8    ███████████ LiDAR devices for Uber—designs that are now at the center of this case.

9    Communications concerning those milestones would also be highly likely to be relevant to this case.

10   It is notable that Defendants have repeatedly sought to profit from their spoliation in this litigation,

11   arguing a lack of evidence supporting Waymo's claims or pointing to the absence of a smoking gun

12   while their own litigation counsel's notes from March 2016 indicate that he knew that Levandowski

13   had retained ███████████████████████████████████████████████

14   ████████████████████"—but claimed to have destroyed those files.  (Dkt. 2053-9

15   [UBER00324103], at 1.)  It is Defendants' spoliation (not to mention the myriad of bogus privilege

16   claims) that have made the entirety of the evidence relevant to Waymo's trade secret

17   misappropriation claims unavailable to Waymo in this case.

18       Defendants' litigation strategy of destroying evidence and seeking to avoid judgment based

19   on a lack of evidence should not be countenanced.  "Aside perhaps from perjury, no act serves to

20   threaten the integrity of the judicial process more than the spoliation of evidence.  Our adversarial

21   process is designed to tolerate human failings—erring judges can be reversed, uncooperative

22   counsel can be shepherded, and recalcitrant witnesses compelled to testify.  But, when critical

23   documents go missing, judges and litigants alike descend into a world of *ad hocery* and half

24   measures—and our civil justice system suffers."  *United Medical Supply Co. v. United States*, 77

25   Fed. Cl. 257, 258-59 (Fed. Cl. 2007).  Defendants spoliation should not go unsanctioned here.

26   **A.    Defendants Anticipated This Action In January 2016**

27       The record is clear:  Defendants foresaw litigation over the very claims brought by Waymo

28

1   here no later than January 2016 and throughout the period from January 2016 until the filing of

2   Waymo's complaint.  As Magistrate Judge Corley has recognized, Uber has repeatedly argued that

3   very fact to this Court.  (Dkt. 1414 [Aug. 28 Hr'g Tr.], at 82:4-7 ("Uber has told me, since January

4   2016, they thought this litigation would be coming so everybody knew this litigation would be

5   coming, and sure enough, here it is."); Dkt. 369 [Mot. to Compel Opp.], at 7 ("the facts in the record

6   establish that Uber and Ottomotto reasonably anticipated litigation would be commenced by

7   Google"); *id.* at 8-9 ("Apart from the evidence that Uber and Ottomotto reasonably anticipated

8   litigation in early 2016….").  Contemporaneous evidence also supports this conclusion.

9                    1.    Defendant Uber Retained Litigation Counsel In January 2016

10         Uber contacted the law firm of Morrison & Foerster LLP ("MoFo") in January 2016 "to

11  provide legal advice in connection with a potential corporate transaction, which would ultimately

12  become Uber's planned acquisition of…Ottomotto LLC."  (Dkt. 378 [J. Suhr Decl.], ¶ 2.)  In

13  particular, as Justin Suhr, Uber's Legal Director, explained to this Court, the parties:

> **contemplated the specific possibility that Google could bring claims arising out of
> Uber's acquisition of Otto** against some or all of the parties to the joint defense and
> common interest agreement. The parties agreed it was in their collective best interests
> to **share certain confidential legal advice and analysis prepared by attorneys in
> anticipation of litigation**, as well as confidential business, technical and other
> information in order to facilitate each party's attorneys in providing legal advice and
> analysis, all so as to further the parties' common interest in opposing and engaging
> in a joint defense, against any potential litigation.

19  (*Id.* at ¶ 6 (emphasis added).)  This was confirmed by MoFo partner Eric Tate, who informed

20  the Court that he "was contacted in late January 2016 by in-house counsel for [Uber], to provide

21  legal advice regarding a potential corporate transaction. ... Uber had retained counsel, Cooley LLP,

22  to advise it on the standard diligence, negotiation and other corporate aspects of the potential

23  transaction.  Uber contacted [him] and [MoFo] *seeking legal advice as to potential litigation

24  exposure* arising out of the transaction…."  (Dkt. 370 [E. Tate Decl.], at ¶¶ 2-3 (emphasis added);

25  *see also* Dkt. 369 [Mot. to Compel Opp.], at 7 ("MoFo was retained in January 2016 specifically to

26  analyze litigation risk, while Uber maintained separate corporate counsel for the deal.").)  The

27  potential litigation exposure at issue included the risk of potential claims by Google against Uber.

28

1  (*See* Ex. 2 [E. Tate Tr.], at 66:5-16 (███████████████████████████

2  ██████████████████████████).)   The privilege logs served by Uber in this action

3  provide further evidence of this: the logs list numerous pre-acquisition closing communications that

4  Uber withheld on the basis that the communications reflected "legal analysis or advice, in

5  anticipation of litigation, regarding due diligence for potential acquisition of Ottomotto." (*See, e.g.*,

6  Ex. 3 [Uber April 10 Privilege Log Excerpt], Entries 2055-2060.)

7           2.    Defendant Ottomotto Anticipated This Litigation By January 2016

8         Defendant Ottomotto and its executives, Anthony Levandowski and Lior Ron, anticipated

9  litigation against Google starting as early as September 2015.  In an email sent to one of his contacts

10 on September 21, 2015, for example, Ron ████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████ (*See* Ex. 4

13 [L. Ron Email, UBER00313385] (emphasis added).)

14        Ottomotto ultimately retained the law firm O'Melveny & Myers LLP ("OMM") in January

15 or February 2016.  (Dkt. 376 [A. Bentley Decl.], at ¶ 3.)  OMM was hired to negotiate a deal with

16 Uber and to "advise[] Otto regarding ***the risk of potential litigation*** by Google arising out of Uber's

17 acquisition of Otto…." (*Id.* at ¶ 4 (emphasis added).)  Ottomotto CEO Levandowski's counsel, John

18 Gardner, testified that all parties to the acquisition transaction "recognized from the outset that ***there***

19 ***was a tangible risk that Google would file litigation*** against Uber, Otto, Mr. Levandowski, and Lior

20 Ron … if the Transaction was consummated. … The litigation risk was particularly high due to the

21 intensely competitive nature of the self-driving vehicle industry and the potentially billion dollar

22 commercial market involved." (Dkt. 381 [J. Gardner Decl.], at ¶ 3 (emphasis added).)  Gardner was

23 no doubt retained at least in part due to his experience in this field: a "significant part of [his] practice

24 is supervising litigation on behalf of corporate clients, which has included corporate disputes

25 regarding executives moving from one company to another." (*Id.*)  He was, as he put it, "particularly

26 aware of this issue and the potential risk." (*Id.*)

27           3.    Defendants Retained Stroz In Anticipation Of Litigation With Google

28

1    Defendants Uber and Ottomotto also retained Stroz Friedberg due to their anticipation of

2    this litigation.  This is called out in Stroz's engagement letter dated March 4, 2017, which stated

3    that █████████████████████████████████████████████████████████

4    █████████████████████████████████████████████████████████████

5    █████████████████████████████████████████████████████████████

6    █████████████████████████████████████████████████████████████

7    █████████████████████████████████████████████████████████████

8    ███████████████████████████████████████████████████████ (Ex.

9    5 [Stroz Engagement Letter], at 1.)   Uber's lawyer, Eric Tate, testified that ███████

10   █████████████████████████████████████████████████████████████

11   ███████████████████. (*See* Ex. 2 [E. Tate Tr.], at 82:11-18 ("████████

12   █████████████████████████████████████████████████████████████

13   █████████████████████████████████████████████████████████████

14   █████████████████████████████████████████████████████████████

15   ███████████████).) Uber's Chief Legal Officer, General Counsel and Corporate Secretary, Salle

16   Yoo, also testified at her deposition that ████████████████████████████████

17   █████████████████████████████████████████████████████████████

18   █████████████████████████████████████████."[1] (Ex. 6 [S. Yoo

19   Tr.], at 37:22-38:1.)

20   All of the former Google employees "diligenced" by Stroz were instructed not to delete

21   information or documents prior to handing those materials over to Stroz.  (See Ex. 2 [E. Tate Tr.],

22   at 99:1-12 ("Q. Do you believe that you had discussions with those diligenced employees or their

23   counsel about the fact that they needed to not delete devices or information before handing it over

24   to Stroz?  A.  Through O'Melveny, yes. Again, I did not speak directly to the diligenced employees.

---

26   [1]  Following the Court's Order granting Waymo permission to file this motion, Uber served an
     errata for Ms. Yoo's testimony.  The errata contends that Ms. Yoo "misspoke" and seeks to change
27   the testimony from saying that Uber hired Stroz "████████████████████████████
     █████████" to "███████████████████████████████████" (Ex. 29 [S.
28   Yoo Errata].)

Q.  But you believe that O'Melveny understood that Uber did not want those diligenced employees to delete information or devices before handing them to Stroz?  A.  Yes.").)

    4.    <u>The Indemnification Provided As Part Of The Ottomotto Acquisition Further Confirms That Ottomotto And Uber Contemplated "████████ Litigation"</u>

As early as January 2016, then Uber CEO Travis Kalanick told Levandowski that ████ ███████████████████████████████████████████████████████████████ (Ex. 7 [Poetzscher Dep. Ex. 277].)  Defendants memorialized this promise in a February 22 term sheet, which not only repeatedly referenced the parties' respective indemnification obligations but also included an "Indemnity Construct" setting forth the agreed indemnification terms as an exhibit.  (*See* Dkt. 515-14 [Term Sheet and Ex. C thereto]; *see also* Dkt. 376 [A. Bentley Decl.], at ¶ 7 ("On or about February 22, 2016, Otto and Uber signed a term sheet for the potential acquisition.  The term sheet set forth, among other things, the agreed economic terms of Uber's potential acquisition of Otto and an indemnification construct."); Dkt. 580 [Goodwin Letter Br.], at 2 ("Defendants were aware at the time [they entered into the term sheet] that because of the competition in developing autonomous driving technology, and because the deal involved companies formed by two ex-Google employees, such an acquisition had the potential to invite intense litigation from Waymo."); *see also id.* at 4 ("The Defendants knew that they would likely be sued by Waymo if the merger were consummated.").)

Tellingly, the February 22 term sheet even repeatedly acknowledged ████████████ ██████████████████████████████████████████████████████████████████ ███████████████ (*See* Dkt. 515-14 [Term Sheet] at 3-4.)  Specifically, the term sheet contemplated a ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████.

(*Id.*)  The definition of ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████

1    (*Id.* at Ex. C.)

2    Defendants also began negotiating a joint defense agreement almost immediately in

3    connection with the Ottomotto transaction. By February 25, 2016, a draft joint defense agreement

4    was ready for circulation. (*See* Dkt. 370-1 [A. Bentley Email to E. Tate], at 1.) Unsurprisingly, the

5    agreement ultimately signed into by the parties, on April 11, 2016, expressly stated that it was

6    "

7    " (Dkt. 370-2

8    [Joint Defense Agreement], at 1.) The agreement further acknowledges

9

10

11    (*Id.*) Defendants also agreed that they

12

13

14    (*Id.*) And, they

15

16

17

18    (*Id.* at 2.)

### B.    Defendants Destroyed Hundreds Of Relevant Communications And Files Despite Knowing That Litigation With Waymo Was Likely

19

20    Defendants Uber and Ottomotto intentionally destroyed evidence to seek an advantage in

21    this very action in the months following their realization that litigation with Waymo was likely, and

22    while they were the only parties with access to these relevant documents and communications.

23        1.    Uber's Executives Destroyed Evidence

24    Hundreds of text messages that Travis Kalanick sent and received, including his text

25    message communications with Levandowski while the pair were negotiating the terms of the

26    Ottomotto acquisition transaction and the scope of Uber's indemnification of Ottomotto officers,

27    were deleted. Kalanick testified that these deletions were automatic, a function of his activation of

28

-7-

a setting on his iPhone that automatically deleted text messages after thirty days, which he did not suspend until immediately before his deposition in this action on July 27, 2017. (Ex. 8 [T. Kalanick Tr.], at 160:9-12 ("Q. Do you have any practices with respect to deleting texts on your phone? A. Outside of just the auto-delete, the 30-day auto-delete, no."); *id.* at 160:19-25 ("Q. … [I]s that still your setting on your phone? A. No. … Q. And when did you change the setting? A. A few weeks ago.") In response to Waymo's Motion to Compel, an expert retained by Orrick Herrington & Sutcliffe, LLP on Kalanick's behalf asserted that "[his] review of the configuration files contained on the image of Mr. Kalanick's iPhone confirmed that prior to June 2017, Mr. Kalanick's iPhone was set to auto-delete text messages once they became 30 days old." (Dkt. 1153-5 [A. Vogel Decl.], at ¶ 9.)

Based on Kalanick's and his expert's testimony, Judge Corley denied Waymo's motion to compel Defendants' production of Kalanick's text messages. (Dkt. 1176 [Order], at 1-2.) But Judge Corley did order Kalanick to produce the configuration files verifying that he used this automatic deletion setting. (*Id.* at 1.) In response, Kalanick's counsel produced a set of configuration files from his phone that would supposedly verify his use of automatic deletion. *See* Ex. 9 [8/23/2017 R. Uriarte Email]. Waymo has found nothing in these files that corroborates Kalanick's claim.[2] In any event, it is undisputed that hundreds of text messages between Kalanick and Levandowski were destroyed. To wit, according to the Stroz Report, Kalanick exchanged over 200 text messages with Levandowski prior to March 22, 2016 (*see* Dkt. 1928-24 [Stroz Report], at 9)—at a time when the parties were discussing not only the business terms of their deal but also the scope of Uber's indemnification of Levandowski and other Ottomotto executives in the event of claims brought by Google. Less than 40 of those text messages have been produced in this action. (*See* Dkt. 1117-11; Dkt. 1117-12.)

Other Uber executives also intentionally destroyed evidence relevant to Waymo's trade secret misappropriation claims. For example, Nina Qi admitted that she intentionally destroyed text

---

[2]   Neither Uber nor Kalanick's counsel provided any context or indication to Waymo as to which of these files purportedly contains evidence of the 30-day auto-delete function. (Ex. 9 [8/23/2017 R. Uriarte Email].) Waymo's review has not uncovered this evidence. (Ex. 10 [M. Schroeder Decl.], at ¶¶ 7-9.)

messages "related to the acquisition of Otto," including all of her text message communications with Levandowski. (*See* Ex. 11 [N. Qi Tr.], at 61:14-22; *see also id.* at 62:21-63:5 ("A. So when you open up your message client on your phone and you see all the messages, right, from various people, without drilling into the specific person, I just deleted that group, that – basically [Levandowski's] name. Q. So that would have deleted all messages with Mr. Levandowski prior to the date that you deleted? A. That is my understanding of the technology, yes.").) Qi also testified that she deleted these texts at Levandowski's request. (*See id.* at 178:19-179:5 ("Q. You said you don't knew when you were asked to delete [your text messages] … Who asked you to delete them? A. Anthony [Levandowski]." … Q. Did he ask you to delete them before or after the merger and acquisition agreement as signed [on April 11]? A. Before.").) Again, the deleted text messages likely discussed matters related to Uber's purported due diligence – and eventual indemnification – of Ottomotto, matters directly relevant to the subject matter of this litigation.

Apparently as a result of these deletions, Uber failed to produce hundreds of text message communications between Uber and Levandowski from May 2015 (when Uber and Levandowski first began discussing a potential collaboration) through Uber's acquisition of Ottomotto, and subsequent employment of Levandowski, in April 2016, and beyond. During this time, Levandowski participated in regular calls and meetings with Uber executives, including Qi and Kalanick (*see* Ex. 12 [Communications Log] (logging communications between Levandowski and Uber executives starting in May 2015), and acted as a consultant to Uber, including regarding LiDAR (*see* Ex. 13 [J. Bares Tr.], at 26:21-27:2 (testifying that Levandowski "provided advice to [Kalanick] from sometime in … December 2015 to January 2016;" *id.* at 19:22-20:1 (Q. Was Mr. Levandowski's consulting work [from April to August 2016], that included Lidar; correct? A. ██████████████████████████████████████████████████████████████ ██████████████████").) At whiteboarding meetings in January 2016, for example, Levandowski and Kalanick discussed ██████████████████████████████████████████ ████████████████████████ (*see* Ex. 1 [Uber Meeting Notes, UBER003118294 - 297], at 1, 4.) Kalanick also offered to indemnify Levandowski at around the same time. (*See* Ex.

7 [Poetzscher Dep. Ex. 277].)   Contemporaneous text messages exchanged between them concerning these topics—topics at the heart of Waymo's misappropriation claims against Uber and Ottomotto—have not been produced in this action due to their deletion.   To the extent their communications evidenced Uber's participation in the misappropriation of Waymo's trade secrets, that evidence has apparently been lost.

2.   While An Officer Of Ottomotto And A Consultant To Uber, Levandowski Destroyed Relevant Evidence

In an interview with Stroz, Levandowski stated that he "discovered that he possessed Google proprietary information on five disks in his personal Drobo 5D" and that he informed Uber of this fact in mid-March 2016.  (Dkt. 1928-24 [Stroz Report] at 10.)  These Drobo disks contained "███████ ███████"—*i.e.* files obviously relevant to Waymo's claims.  (Dkt. 2053-9 [UBER00324103], at 1; *see also* Ex. 2 [E. Tate Tr.], at 145:14-146:10 (discussing same).)   At the time, Levandowski was running Ottomotto out of his *home*.  (Ex. 14 [6/19/17 Ron Tr.], at 157:4-10 (testifying that ███████ ███████).)

Uber's head of corporate development, Cameron Poetzscher, "instructed Levandowski not to destroy the disks and to preserve them for record keeping purposes."  (Dkt. 1928-24 [Stroz Report] at 10.)  The Stroz Report, however, states Uber's then CEO Kalanick did not agree:

> Kalanik [*sic*] told Levandowski to "***do what [he] need[ed] to do***."   Levandowski understood this statement to mean that Kalanik [*sic*] wanted Levandowski to destroy the disks so he told Kalanik [sic]that he would destroy them[.]  ***In response, Kalanik [sic] nodded.***  Poetzcher [*sic*] appeared uncomfortable with this decision.  Qi was quiet but appeared to be amused and astonished. This conversation lasted approximately three minutes.

(Ex. 15 [Stroz Report Ex. 5], at 15.)  (*Id.* (emphasis added).)  The Stroz Report further notes that Levandowski claimed to have destroyed that misappropriated data, but Stroz could not confirm that claim.  (Dkt. 1928-24 [Stroz Report] at 10-11.)  Nonetheless, Uber contends that ███████ ███████ (Ex. 16 [Uber Expedited Rog No. 17 Response].)  Levandowski will not testify about the contents about the

-10-

Drobo 5D files because he has asserted the Fifth Amendment as to Waymo's questions about the purported destruction of these files. (*See* Ex. 17 [A. Levandowski Tr.], at 67:5-68:24).) So whatever happened to them, they certainly have not been produced to Waymo.

> 3. <u>Ottomotto Executives Intentionally Destroyed Communications Relating To The Destruction Of Files And Data</u>

Defendant Ottomotto's executives, including Levandowski and Ron, intentionally destroyed communications relating to their destruction of evidence in this litigation.

In particular, Levandowski:

- deleted numerous files from the iPhone he used to communicate with other Ottomotto executives and Uber, including "three deleted chat messages between Levandowski and [Ottomotto human resources head Rhian] Morgan referring to Shred Works and/or the destruction of 'stuff,'" dating between February 26 and March 1 (*see* Dkt. 1928-24 [Stroz Report], at 10; *see also* Ex. 18 [Stroz Report Ex. 30]);

- texted an unknown recipient on March 1, 2016 instructions to "███████████████████████" (Ex. 19 [Stroz Report Ex. 31]; Dkt. 1928-24 [Stroz Report], at 13);

- deleted a March 9, 2016 message from himself to Ron instructing Ron to "[m]ake sure you delete all the messages tonight on both your PC and iPhone" (Dkt. 1928-24 [Stroz Report], at 20); and

- "attempted to empty the Trash bin on his MacBook Pro while he was at Stroz Friedberg's office on March 22, 2016 at approximately 12:12 p.m." (*id.* at 13).

Similarly, Ron:

- "deleted communications with Levandowski regarding wiping and deleting data, among other things" from his MacBook Laptop, iPad, and iCloud Backup (*id.* at 19); and

- used his MacBook Laptop and iMac "to conduct internet research regarding how to delete and destroy digital data in January 2016" – specifically, "how to secretly delete files mac," "secure delete of trash on mac," and "how to permanently delete google drive files from my computer" (*id.* at 19-20).

Indeed, during his deposition, Ron admitted that he and Levandowski discussed deleting all of their PC and iPhone messages. Specifically, Ron testified that "Anthony has mentioned to me from time to time his desire to delete messages." (Ex. 20 [10/2/17 L. Ron Tr.], at 518:13-14.)

In addition, the Stroz Report identified several items that Ron accessed between January 6, and January 22, 2016. Most notably, these items included a Google-related document entitled "Chauffeur win plan.docx," deleted on March 22, 2016, shortly before Stroz Friedberg conducted

1    Ron's interview.  (Dkt. 1928-24 [Stroz Report], at 19.)

2           Finally, Stroz Report identifies "an Ottomotto team site on the Slack collaboration platform

3    (www.slack.com)" accessed by Anthony Levandowski, Lior Ron, and "other Ottomotto

4    employees." (Dkt. 1928-24 [Stroz Report], at 12.) Otto's first Slack platform

5    (280systems.slack.com) was created on November 10, 2015; a second platform

6    (ottomotto.slack.com) was created on February 20, 2016.  (Dkt. 2183-1 [J. Judah Decl.], ¶¶ 2-3.)

7    Ron and Levandowski purposely used Slack to prevent the archiving of their communications: in a

8    November 10, 2015 iMessage, Ron suggests to Levandowski that they "try Slack" because it is

9    "secure;" a December 18, 2015 iMessage from Levandowski to Ron suggested that the pair limit

10   their communications to Slack ("Let's do Slack and iMessage only ;-)"), apparently in the hope of

11   avoiding the retention of those communications.  ((Dkt. 1928-24 [Stroz Report], at 24).  Ron

12   intentionally deleted the 280systems.slack.com site, thereby destroying all its contents, on January

13   21, 2016.  (Dkt. 2182-5 [Waymo's Mot. to Compel Slack Site, Ex. 6].)

14              4.    Tyto Emails And Email Archives Were Destroyed After Tyto Was
                     Acquired By Ottomotto

15          Ottomotto executives, including Levandowski, with the knowledge and approval of Uber's

16   senior management, actually structured Ottomotto's acquisition of Tyto LIDAR, LLC ("Tyto") to

17   ███████████████████████████.  The Ottomotto-Tyto Asset Purchase Agreement,

18   dated May 5, 2016, specifically excluded "███████████████████████████"

19   (Dkt. 1773-5, Ex. C [UBER00047830].)  Levandowski, who owned and controlled Tyto through a

20   series of shell companies and trusts,[3] initiated the negotiations and personally participated in them,

21   along with Ron (for Ottomotto) and Ognen Stojanovski (for Tyto).  (See Ex. 21 [O. Stojanovski Tr.],

22   at 277:24-279:1; Dkt. 1773-6.)  Stojanovski, a long-time friend of Levandowski and the nominative

23   "manager" of Tyto (and its shell company parent), testified that subsequent to Tyto's acquisition by

24   Ottomotto, the Tyto email archives were destroyed in their entirety.  (See Ex. 21 [O. Stojanovski

25   Tr.], at 310:7-311:2.)   Beyond Levandowski himself, there is evidence that at least one other

26

27   ───────────────────
       [3]   See Dkt. 1611-6 [J. Timmins Expert Report], at 7, ¶ 22c.

28

Ottomotto executive—Lior Ron—knew that Levandowski controlled Tyto through the trusts and shell companies.[4]  And, Uber discussed Ottomotto's acquisition of Tyto with Ottomotto extensively prior to Ottomotto's acquisition of Tyto (*see e.g.*, Ex. 26 [UBER00310130]; Ex. 27 [RON0024044]); in fact, the final asset purchase agreement—including ████████████████████ ████████████████████—was personally reviewed and approved by Travis Kalanick. (Ex. 28 [5/4/16 L. Ron Email to T. Kalanick] (attaching draft asset purchase agreement for Kalanick's review).)  Defendants, including both Ottomotto and Uber executives, therefore knew about and approved of the destruction of the emails, even though they included potential communications regarding confidential Google information that would be directly relevant to Waymo's trade secret misappropriation claims (including, in particular, asserted Trade Secret 90).

## C.   Defendants Failed To Preserve Potential Evidence, Even After The Filing Of The Complaint

Defendants also deliberately failed to preserve evidence even after the filing of Waymo's complaint.  Defendants knew that Goodwin Procter, counsel for Otto Trucking and Levandowski, had obtained and searched two of Levandowski personal laptops.  (Dkt. 2018-3 [A. Gonzalez Decl.], at ¶ 2).  In April 2017, while Levandowski was employed by Uber, Uber asked Goodwin to run

---

[4]   At his deposition, Ron denied knowledge that Tyto was Levandowski's company.  (Ex. 14 [6/19/17 Ron Tr.], at 175:7-14 ("███████████████████████████████████████████████████ ████████████████") (objections omitted); *see also id.* at 172:6-182:2.)  But, on April 19, Ron emailed Levandowski regarding ██████████████████████████████████████████ ███████████████ (Ex. 22 [UBER_AL_00014042].) ████████████████████████████████████ ███████████████████████████████████████████████████████  As another example, on April 20 (the day after the Ron and Levandowski email), Stojanovski wrote Ron, regarding ████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████" [Dkt. 1773-11 [4/20/2016 O. Stojanovski Email to L. Ron].  As a final example, the prior month, Ron had asked Stojanovski to review the draft Uber-Ottomotto Put Call Agreement, and Stojanovski had flagged that ███████████ █████████████████████████████████████████████████████████████████.  (Ex.  23 [STROZ_R_000176218].) ████████████████████████████████████████████ (*Id.*; Ex. 24 [STROZ_R_000176134] at 20.)  Instead of asking Stojanovski why ███████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████ (Ex. 23 [STROZ_R_000176218]*; see also* Ex. 25 [STROZ_R_000000806].)

---

search terms on the devices and provide the results to MoFo.  (*Id.*)  Goodwin apparently did so at

Uber's request, using search terms provided to Goodwin by MoFo.  (*Id.*, at ¶¶ 2-3.)  But Uber did

nothing else; in particular, Uber did nothing to ensure that Goodwin searched those devices for

documents responsive to Waymo's document requests.  (*Id.*)  For example, Uber did not obtain "the

details of the searching that was conducted on Mr. Levandowski's personal computers, including

who ran the searches, what searches were actually run, or how the searching was done" from

Goodwin.  (*Id.*)  Instead, Uber produced seven responsive documents supposedly located by

Goodwin without disclosing to Waymo that the documents had come from Levandowski's personal

devices or that Goodwin had those devices or that Uber had any ability to obtain documents from

them.[5]  Defendants now disclaim any knowledge of where the devices are or how the evidence on

them could be made available to Waymo.

## ARGUMENT

### I.   SANCTIONS ARE APPROPRIATE WHERE A PARTY FAILS TO PRESERVE EVIDENCE RELEVANT TO A PENDING OR FORESEEABLE LAWSUIT

Litigation discovery rules are intended to provide parties with the ability "to obtain the fullest

possible knowledge of the issues and facts before trial."  *Hickman v. Taylor*, 329 U.S. 495, 501

(1947).  Consistent with this overarching goal, potential litigants "have a duty to preserve relevant

information when litigation is reasonably foreseeable."  *ILWU-PMA Welfare Plan Bd. of Trustees*

*& ILWU-PMA Welfare Plan v. Connecticut Gen. Life Ins. Co.*, 2017 WL 345988, at *4 (N.D. Cal.

Jan. 24, 2017) (*quoting* Fed. R. Civ. P. 37(e) Advisory Committee's Note to 2015 Amendment).

Consequently, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document

retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant

---

[5]  Defendants previously represented to this Court that they did not have access to any of Levandowski's personal devices; it was only after Defendants' privilege assertions were overruled, and additional discovery obtained, that Waymo learned this was false.  Additionally, Uber's hired forensic expert at Stroz (Kevin Faulkner) utilized what was found on these laptops to support his opinion that he could not find any Waymo confidential files at Uber.  But Faulkner did not disclose the circumstances surrounding the searches, and Waymo only discovered that they had been conducted by Goodwin Proctor after Judge Corley ordered Uber to produce an April 20 e-mail from Angela Padilla to Levandowski that had been improperly withheld by Uber.  (*See* Dkt. 519-2; *see also* Dkt. 1506, at 2.)  The April 20 e-mail ██████████████████████████
██████████████████████████ (Dkt. 2053-5 [4/20/17 A. Padilla Email to A. Levandowski].)

documents." *In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1070 (N.D. Cal. 2006) (*quoting Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003)).

Spoliation occurs "when one destroys or materially alters evidence or fails to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Hynix Semiconductor Inc. v. Rambus Inc.*, 897 F. Supp. 2d 939, 975 (N.D. Cal. 2012); *see also Apple Inc. v. Samsung Elecs. Co., Ltd.,* 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012).  Litigation does not need to be imminent to be "reasonably foreseeable."  *Hynix Semiconductor Inc. v. Rambus Inc*., 645 F.3d 1336, 1345 (Fed. Cir. 2011) (the standard "does not carry a gloss requiring that litigation be imminent, or probable without significant contingencies").

Where a party fails to abide by its document preservation obligations, spoliation sanctions are appropriate under both Rule 37 and "the inherent power of federal courts to levy sanctions in response to abusive litigation practices." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006).

*First*, spoliation sanctions are appropriate under Rule 37 of the Federal Rules of Civil Procedure. Of particular relevance here, Rule 37 expressly provides that sanctions, including an adverse inference jury instruction, are appropriate where, as here, a party has destroyed electronically stored information:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is ***lost because a party failed to take reasonable steps to preserve it***, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> > (A) presume that the lost information was unfavorable to the party;
> >
> > (B) ***instruct the jury that it may or must presume the information was unfavorable to the party***; or
> >
> > (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e) (emphasis added); *Internmatch, Inc. v. Nxtbigthing, LLC*, 2016 WL 491483, at *13 (N.D. Cal. 2016) (ordering adverse inference instruction following Defendants' spoliation).

*Second*, federal courts have "the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993); *see also Micron Tech. v. Rambus Inc.,* 645 F.3d 1311, 1326 (Fed. Cir. 2011) (district courts have the inherent power to control litigation by imposing sanctions appropriate to rectify improper conduct by litigants). This inherent authority includes "the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior." *Glover*, 6 F.3d at 1329.

Whether imposed under Rule 37(e) or the Court's inherent authority, the sanctions available for spoliation of evidence can include dismissal of the spoliating party's claims or defenses, exclusion of testimony or evidence based on the spoliation, and instructing the jury to infer that evidence destroyed or suppressed was adverse to the party who destroyed it. *See* Fed. R. Civ. P. 37(e); *see also Leon*, 464 F.3d at 958-61 (discussing potential sanctions); *Io Grp. Inc. v. GLBT Ltd.*, 2011 WL 4974337, at *3 (N.D. Cal. 2011) (same); *see also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) ("a district court has broad discretion in fashioning an appropriate sanction, including the discretion to delay the start of a trial (at the expense of the party that breached its obligation), to declare a mistrial if trial has already commenced, or to proceed with a trial and give an adverse inference instruction"). In considering which spoliation sanction to impose, courts generally consider: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Apple*, 888 F. Supp. 2d at 992 (internal quotation marks omitted). In the Ninth Circuit, "spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it." *Id.* at 993 (internal quotation marks and citation omitted).

## II.   THIS COURT SHOULD SANCTION DEFENDANTS FOR THEIR SPOLIATION OF RELEVANT EVIDENCE WITH AN ADVERSE INFERENCE INSTRUCTION

An adverse inference jury instruction for spoliation is appropriate where: (A) the party with control over the evidence had an obligation to preserve it at the time it was destroyed, (B) the evidence was destroyed with a culpable state of mind, and (C) the destroyed or missing evidence

-16-

was relevant to the party's claim or defenses.  *Apple*, 888 F. Supp. 2d at 989-90; *see also Cyntegra, Inc. v. IDEXX Labs, Inc.*, 322 Fed. Appx. 569, 572 (9th Cir. 2009) (district court did not abuse discretion in imposing an adverse jury instruction for spoliation where the other party suffered prejudice by being deprived of relevant and non-cumulative evidence to support its case).  Each of these factors is present here.

### A.     Defendants Destroyed Evidence They Were Obligated To Preserve

As discussed above, by January 2016, Defendants foresaw not only litigation against Waymo generally, but litigation regarding Waymo's trade secret misappropriation claims specifically.  *See* Background Part A, *supra*.  Again, Defendants repeatedly argued this very point before this Court.  (*See, e.g.*, Dkt. 580 [Otto Trucking Opp. Mot.], at 4.)  As Judge Corley observed, "Uber has told me, since January 2016, they thought this litigation would be coming so everybody knew this litigation would be coming, and sure enough, here it is."  (Dkt. 1414 [Aug. 28 Hr'g Tr.] at 82:4-7); *ILWU-PMA*, 2017 WL 345988, at *4 (litigation is reasonably foreseeable when claims are contemplated by the parties); *In re Napster*, 462 F. Supp. 2d at 1070 (document preservation obligations arise as soon as the potential party reasonably anticipates litigation).

As discussed more fully above, rather than preserve evidence when they first anticipated this action, Defendants deleted or misplaced, mostly intentionally, hundreds of communications and other files, including:

- hundreds of text messages between Kalanick and Levandowski (*see* Ex. 8 [T. Kalanick Tr.], at 160:9-12);

- an unknown number of Nina Qi's text messages "related to the acquisition of Otto," including all of her text message communications with Levandowski (*see* Ex. 11 [N. Qi Tr.], at 61:14-22; *see also id*. at 62:21-63:5);

- numerous files from the iPhone Levandowski used to communicate with other Ottomotto executives and Uber (*see* Dkt. 1928-24 [Stroz Report], at 12-13);

- Ottomotto's Slack collaboration platform (*see* Dkt. 2182-5 [Waymo's Mot. to Compel Slack Site], Ex. 6); and

- all of the Tyto email accounts and archives (*see* Ex. 21 [O. Stojanovski Tr.], at 310:7-311:2).

Additionally, Levandowski claims to have destroyed – and did not produce here – five Drobo 5D disks containing " ███████████████████████████████████████████████████

1 ██████████████.”  (Dkt. 1928-24 [Stroz Report] at 10; Dkt. 2053-9 [UBER00324103], at

2 1.)   The evidence described above was not produced to Waymo, so defendants "effectively lost or

3 destroyed relevant evidence."  *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d

4 1040, 1056 (S.D. Cal. 2015).

5 **B.       Defendants Acted With A Culpable Mindset**

6 The purpose of an adverse inference "is not to impose any moral blame but to restore evidentiary

7 balance and the risk should fall on the party responsible for the loss."  *Victorino v. FCA US LLC*, 2017

8 WL 4541653, at *9 (S.D. Cal. Oct. 11, 2017) (citing *Residential Funding Corp.*, 305 F.3d at 108).  The

9 "culpable state of mind factor" is thus met by demonstrating that the evidence at issue "was destroyed

10 knowingly, even if without intent to [breach a duty to preserve it], or negligently."  *Id.*  (internal quotation

11 marks and citations omitted).  Defendants acted with a culpable state of mind here.

12 *First*, the record is replete with examples of Defendants intentionally destroying potentially

13 relevant documents and files long after they had notice that these documents were potentially relevant

14 to a litigation with Waymo.  (*See, e.g.,* Ex. 11 [N. Qi Tr.], at 61:14-22, 62:21-63:5; 178:19-179:5; Ex.

15 16 [Uber Expedited Rog No. 17 Response]; Dkt. 1928-24 [Stroz Report], at 13, 19, 20; *see also* Dkt.

16 2018-3 [10/17/2017 A. Gonzalez Decl.], at ¶¶ 2-3.)  This destruction of evidence was intentional:

17 Levandowski asked Ron, Qi, and an unknown text message recipient to delete their communications

18 (*see* Dkt. 1928-24 [Stroz Report], at 13, 20; Ex. 11 [N. Qi Tr.] at 178:19-179:5; Ex. 20 [10/2/17 L.

19 Ron Tr.], at 518:13-14); Ron researched "how to delete and destroy digital data" in January 2016 (*see*

20 Dkt. 1928-24 [Stroz Report], at 19); and Kalanick requested that Levandowski destroy the five

21 Drobo 5D disks in his possession (*see* Dkt. 1928-24 [Stroz Report], at 10).  Such willful destruction

22 of hundreds of documents and communications at a time when Defendants knew they faced

23 litigation with Waymo —even after ███████████████████████████

24 (*see, e.g.*, Ex. 2 [E. Tate Tr.], at 96:17-97:9)—demonstrates Defendants' culpable frame of mind.

25 *See Clear-View Technologies, Inc. v. Rasnick*, 2015 WL 2251005, at * 8 (N.D. Cal. 2015).

26 Defendants' contention that Levandowski's "destruction of the disks was a *good-faith* attempt by

27 Mr. Levandowski to avoid bringing any Waymo information to Uber" (Dkt. 2090-4 [Uber Precis

28 Opp.], at 5) is not supported by the record.  It is also a red-herring: Defendants were on notice that

litigation was foreseeable and not only failed to take reasonable steps to preserve relevant evidence but also affirmatively destroyed it.  *See Leon*, 464 F.3d at 959 (bad faith finding was not clearly erroneous where defendants intentionally destroyed evidence when under a duty to preserve it).

*Second*, even if, *arguendo*, the Court credits Uber's unsupported contention that Kalanick's text message communications with Levandowski were destroyed automatically due to routine document destruction practices, Defendants were, at best, grossly negligent when they failed to suspend those practices to retain documents potentially relevant here.  *See In re Napster*, 462 F. Supp. 2d at 1070-74 (failure to suspend e-mail destruction policies is grossly negligent).  The failure to suspend ordinary document destruction practices is sanctionable.  *See, e.g.*, *Io Grp.*, 2011 WL 4974337, at *7 (sanctioning defendants who consciously disregarded their obligation to preserve relevant evidence by failing to suspend their email system's automatic deletion function).

### C.      The Destroyed Evidence Was Relevant To Waymo's Claims

As an initial matter, Waymo is entitled to a presumption that Defendants' destruction of communications and other files resulted in the destruction of relevant evidence: "[i]n the Ninth Circuit, spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it."  *Apple*, 888 F. Supp. 2d at 993 (internal citation omitted); *see also Hynix Semiconductor*, 591 F. Supp. 2d 1038, 1060 (N.D. Cal. 2006) ("if spoliation is shown, the burden of proof logically shifts to the guilty party to show that no prejudice resulted from the spoliation" because that party "is in a much better position to show what was destroyed and should not be able to benefit from its wrongdoing"), *rev'd on other grounds*, 645 F.3d 1336, 1344-1347 (Fed. Cir. 2011); *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 437 (S.D.N.Y. 2004) ("No one can ever know precisely what was on those tapes, but the content of e-mails recovered from other sources—along with the fact that UBS employees wilfully deleted e-mails—is sufficiently favorable to Zubulake that I am convinced that the contents of the lost tapes would have been similarly, if not more, favorable.").

Even without this presumption, the record here is clear: the evidence destroyed by Defendants was directly relevant to Waymo's claims. For instance, as discussed above, Levandowski admitted that the 5 Drobo disks contained ██████████████████████

1

2      (*See* Dkt. 1928-24 [Stroz Report], at 10].)  Defendants contend that the contents of

3   these disks "would be, at the very most, cumulative of other evidence that Waymo already

4   has." (Dkt. 2090-4 [Uber Precis Opp.], at 4.)  But, as this evidence was not produced, the contents

5   of those disks cannot be verified, and Waymo is unable to investigate whether the materials saved

6   on the disks was transferred elsewhere or transmitted to Uber.  As Uber and Ottomotto both contend

7   that they did not misappropriate Waymo trade secrets, whether they had access to or received the

8   information stored on the Drobo disks is central to Waymo's claims.  Uber also contends that

9   materials destroyed before Levandowski was an Uber employee "cannot reflect evidence about the

10  central matter in this case—whether Waymo's trade secrets were misappropriated by

11  **Uber**." (*Id.*)  But Levandowski was CEO of Defendant Ottomotto at that time.  And Uber then

12  acquired Ottomotto.  So the materials Levandowski destroyed are absolutely relevant to Waymo's

13  claims, regardless of whether he was not yet an Uber employee at the time of deletion.

14       Similarly, Ron deleted a document titled "Chauffeur win plan.docx" shortly before his Stroz

15  interview.  (Dkt. 1928-24 [Stroz Report], at 19.)  In addition, Kalanick and Qi deleted hundreds of

16  text message communications with Ottomotto executives before, during, and after completion of the

17  Stroz due diligence investigation into whether Google proprietary information was taken; the

18  deleted communications include text messages sent and received while Uber and Ottomotto were

19  negotiating the terms of the acquisition transaction and the scope of Uber's indemnification of

20  Ottomotto against Google's trade secret misappropriation claims.  *See* Background, Part B.1, B.3,

21  *supra*.   These documents and communications are directly related to Waymo's trade secret

22  misappropriation claims, and Waymo has been prejudiced by its inability to review them, and the

23  other destroyed evidence, to assess the extent of Defendants' misappropriation of Waymo's trade

24  secrets.

25       **D.     The Court Should Issue An Adverse Inference Jury Instruction**

26            1.    An Adverse Inference Jury Instruction Is The Appropriate Remedy Here

27       District courts have broad discretion to determine the appropriate spoliation sanction.  *See*

28  *generally Hynix*, 897 F. Supp. 2d at 984 (noting that the court "has wide discretion" to impose

-20-

sanctions).   In considering what spoliation sanction to impose under the court's inherent authority, courts generally look to the degree of fault of the party who altered or destroyed the evidence, the degree of prejudice suffered by the opposing party, and whether there is a lesser sanction that will avoid substantial unfairness to the opposing party.  *Apple*, 888 F. Supp. 2d at 992 (internal quotation marks omitted).  Similarly, where the lost evidence at issue was electronically stored, Rule 37(e) instructs courts to inquire into the prejudice suffered by the other party from the loss of the information and the spoliating party's "intent to deprive another party of the information's use in litigation."  *See generally ILWU-PMA*, 2017 WL 345988, at *6-7 (finding spoliation but reopening discovery prior to determining the appropriate sanctions where the record did not evidence how the loss of electronically stored information happened, who was responsible, the impact of spoliation on the litigation, or the extent of prejudice to plaintiff).  An adverse inference jury instruction is an appropriate to sanction Defendants' spoliation of hundreds of relevant files and communications here under both Rule 37(e) and the Court's inherent authority.  *See Internmatch*, 2016 WL 491483, at *13 (sanctions, including an adverse inference instruction, are appropriate under both Rule 37 and the district court's inherent authority).

First, the evidence here shows that Defendants acted in bad faith.  A party acts in bad faith when it can be shown that the spoliating party "intended to impair the ability of the potential defendant to defend itself."  *Micron Tech.*, 645 F.3d at 1326 (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 80 (3d Cir. 1994)).  "The fundamental element of bad faith spoliation is advantage-seeking behavior by the party with superior access to information necessary for the proper administration of justice."  *Id.*  As discussed above, Defendants here not only intentionally destroyed evidence but also and repeatedly reminded each other to do so for months after they anticipated litigation with Waymo to cover their tracks.  (*See, e.g.*, Dkt. 1928-24 [Stroz Report], at 9, 19, 20 & 31; Ex. 11 [N. Qi Tr.], at 61:17-63:5; 178:22-23.)

Second, Waymo has been prejudiced by being unable to review the destroyed and missing communications and files.  Those spoliated documents included, for example, hundreds of communications amongst Ottomotto executives and between Ottomotto and Uber executives concerning the terms of Uber's acquisition of Ottomotto both before and after the parties entered into

the February 11 term sheet, as well as Levandowski's personal Drobo archives and two personal computers, the Slack platform used by Ottomotto prior to its acquisition by Uber, and all of the Tyto email archives. *See* Background Part B.1 – B.4, *supra*. This evidence goes to the very heart of Waymo's trade secret misappropriation claims, and it cannot be replaced.

Defendants' conduct here is particular egregious as it took place contemporaneously with their attempts to conceal their conduct by pointing to the Stroz investigation. The diligenced employees were instructed to retain their devices and hand them over to Stroz so that any confidential Google information could be "remediated." The Stroz Report points out, for example, that Levandowski deleted numerous files at a time when he should have known better:

> Many of these deletions may have been good faith attempts by Levandowski to purge retained Google material from his devices in accordance with his obligation not to retain confidential Google data. However, by March 2016, Levandowski was aware that Stroz Friedberg was going to implement a process to preserve, identify, and potentially remediate retained Google material from his devices. At that point, the better course would have been to let that process control. In addition, there was an effort by Levandowski and his Ottomotto colleagues to delete texts in real time. Stroz Friedberg did not re-interview Levandowski or others regarding their reason for this practice.

(Dkt. 1928-24 [Stroz Report], at 13-14.) The destroyed evidence, including hundreds of messages exchanged amongst Ottomotto officers and between Ottomotto officers and Uber executives—messages sent and received while the companies were negotiating both the terms of the acquisition transaction and the scope of Uber's indemnification of Ottomotto executives—goes to the heart of Waymo's trade secret misappropriation claims. Defendants should not be permitted to delete key evidence to create gaps in the record and then point to those gaps to undermine Waymo's claims at trial.

An adverse inference instruction is the appropriate sanction to remedy the harm to Waymo caused by Defendants' conduct here—no lesser sanction will suffice. Indeed, federal courts in this district and elsewhere routinely issued adverse inference instructions in analogous circumstances. *See, e.g.*, *In re Napster*, 462 F. Supp. 2d at 1077; *Io Grp. Inc.,* 2011 WL 4974337, at *8; *O'Berry v. Turner*, 2016 WL 1700403, at *4 (M.D. Ga. 2016); *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 339 (D.N.J. 2004). Such an instruction is plainly warranted to remedy the harm to Waymo here.

          2.      The Court Should Instruct Jurors To Presume That The Destroyed Evidence

-22-

<u>Would Have Been Favorable To Waymo And Unfavorable To Defendants</u>

In light of the above, Waymo seeks a jury instruction to the effect that:

1)  Defendants had a duty to preserve relevant evidence, including text message communications, collaboration platforms, and external hard drives and disks;

2)  Despite this obligation, Defendants failed to preserve large volumes of relevant emails and other documents;

3)  Defendants acted in bad faith in failing to preserve the relevant documents; and

4)  the jury should presume that the communications, documents and other files that Defendants failed to preserve would have been favorable to Waymo's case and unfavorable to Defendants' case.

## **CONCLUSION**

For these reasons, Waymo respectfully requests that the Court grant Waymo's motion and issues the adverse inference jury instruction at trial to sanction Uber's and Ottomotto's spoliation of evidence.

DATED:  November 13, 2017              QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ Charles K. Verhoeven*
    Charles K. Verhoeven
    Attorneys for WAYMO LLC

-23-