Pages 1 - 111

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

```
WAYMO LLC,                       )
                                 )
            Plaintiff,           )
                                 )
   VS.                           )   No. C 17-0939 WHA
                                 )
UBER TECHNOLOGIES, INC.;         )
OTTOMOTTO LLC; OTTO TRUCKING     )
LLC,                             )
                                 )
            Defendants.          )
_____)   San Francisco, California
                                     Tuesday, November 14, 2017
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                        50 California Street, 22nd Floor
                        San Francisco, California  94111
                   BY:  **DAVID ANDREW PERLSON, ESQUIRE**
                        **DAVID EISEMAN IV, ESQUIRE**
                        **JORDAN R. JAFFE, ESQUIRE**
                        **LINDSAY COOPER, ESQUIRE**
                        **JOHN W. McCAULEY IV, ESQUIRE**


(Appearances continued on next page)




Reported By:   Katherine Powell Sullivan, CSR #5812, RMR, CRR
               Official Reporter - U.S. District Court

 1 | **APPEARANCES (CONTINUED):**

 2 | For Defendant Uber Technologies, Inc. and Ottomotto LLC:
   |                         MORRISON & FOERSTER LLP
 3 |                         425 Market Street
   |                         San Francisco, California 94105-2482
 4 |                   BY: **ARTURO J. GONZÁLEZ, ESQUIRE**
   |                       **ESTHER K. CHANG, ESQUIRE**
 5 |                       **RACHEL S. DOLPHIN, ESQUIRE**

 6 |                         SUSMAN GODFREY LLP
   |                         1301 Avenue of the Americas, 32nd Floor
 7 |                         New York, New York 10019
   |                   BY: **WILLIAM C. CARMODY, ESQUIRE**
 8 |
   |                         SUSMAN GODFREY LLP
 9 |                         1201 Third Avenue, Suite 3800
   |                         Seattle, Washington 98101
10 |                   BY: **MATTHEW ROBERT BERRY, ESQUIRE**

11 |                         BOIES SCHILLER FLEXNER LLP
   |                         1401 New York Avenue NW
12 |                         Washington, DC 20005
   |                   BY: **KAREN L. DUNN, ESQUIRE**
13 |
   |                         BOIES SCHILLER FLEXNER LLP
14 |                         435 Tasso Street, Suite 205
   |                         Palo Alto, California 94301
15 |                   BY: **MEREDITH R. DEARBORN, ESQUIRE**

16 | Special Master:         FARELLA, BRAUN & MARTEL LLP
   |                         Russ Building
17 |                         235 Montgomery Street
   |                         San Francisco, California 94104
18 |                   BY: **JOHN L. COOPER, ESQUIRE**

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1    **Tuesday, November 14, 2017**                    **8:10 a.m.**

2                     P-R-O-C-E-E-D-I-N-G-S

3                        ---000---

4           THE CLERK:  Calling civil action 17-939, Waymo LLC

5    versus Uber Technology, Inc.

6       Counsel, please approach the podium and state your

7    appearances for the record.

8           MR. PERLSON:  Good morning, Your Honor.

9    David Perlson, of Quinn Emanuel, for plaintiff Waymo.  With me

10   is David Eiseman, Lindsay Cooper, John McCauley, and Jordan

11   Jaffe.

12          THE COURT:  Great.  Welcome to all of you.

13          MR. PERLSON:  Good morning.

14          MR. GONZÁLEZ:  Good morning, Your Honor.

15   Arturo González, Esther Kim Chang, and Rachel Dolphin, from

16   Morrison & Foerster, for Uber.

17          MS. DUNN:  Good morning, Your Honor.  Karen Dunn and

18   Meredith Dearborn, from Boise Schiller Flexner, for Uber.

19          MS. DEARBORN:  Good morning, Your Honor.

20          MR. BULAND:  Good morning, Your Honor.  Cory Buland

21   and Matt Berry, from Susman Godfrey, for Uber.

22          MR. COOPER:  Good morning, Your Honor.  John Cooper,

23   special master.

24          THE COURT:  Good morning to all of you.  Thank you.

25       So, first, my law clerk will give each side a revised

special verdict form.  I don't think we'll have time today to

go over it.  But you will see, it will give you a word of why I

have adopted the first form of question as I have.

In drafting the prior form, I realized there was this

problem that you have at trials -- which I know you recognize

it too -- which is the possibility that the jury would get hung

up on, say, trade secret number X, on the very first question,

and could come to an impasse on what are trade secrets.

But if they had reversed the order and done a different

question, they would have easily decided that it either was or

was not -- let's say, in this case, was not used or disclosed.

But they never would have reached that question because they

were hung up on whether or not it was a valid trade secret to

begin with.

I tried to figure out how would we -- do we instruct the

jury that they could jump ahead.

Well, anyway, I put the question of use and disclosure

first because I thought that was the one where they were most

easily -- if they were going to decide that there was no

infringement, that that's where they would come up, and that

that was an easier decision for the jury to make in this case

than whether it was a valid trade secret.

However, both of you disagreed with my approach, for your

own reasons, I'm sure.  But, nevertheless, I respect you.

So I went back to the drawing board.  And I have solved

1    that whole problem with this form.   This form is a different

2    setup, but it allows the jury to say "no" in any column.   And

3    that's the end of that trade secret for good.   Four columns,

4    four "no," history.

5          So, no, we're not going to discuss it now.   So you can

6    discuss it at final pretrial conference.   But I wanted you to

7    know why I came up with that setup.   So you all can make your

8    arguments to me later on that.

9          But both of you, both sides were inviting disaster by

10   inviting the jury to get hung up on a question and not reach

11   some easier question down the road.   And that, to me, is

12   unacceptable.   And we need to be better to the jury.

13         Now, I must say I made the same mistake, but at least I

14   recognized the problem and tried to give them the easier

15   question first.

16         Okay.   I gave you this so you'll have a chance to look it

17   over.   And we'll talk about it later.

18         Now we're coming to the main item today, which is, I have

19   been working on these jury instructions.   And I've given you

20   copies.   And you all made comments.   And I appreciate your

21   comments.

22         Today, though, one of the things that I have found that

23   you do is you often do not cite to any authority.   You just

24   assert, which is not too helpful to the poor judge.

25         Of course, on appeal you will cite -- if you lose, you

1    will cite to authority.  But that will get lost in the shuffle.

2    So I want you to please give me authorities.

3         We're going to start with question number 1 on my notice

4    for today's hearing.  I'll just read it out loud.

5         Now, when you -- it's not going to do me any good for you

6    to say you agree.  This is what Mr. González did to me a few

7    days ago.  Oh, we agree, Judge, with what you propose.

8         That's ridiculous.  You've got to give me authorities that

9    say exactly what you want me to say in the instructions.

10        All right.  Okay.  Number 1:

11             "The agency issue concerning Stroz and Morrison."

12        This is tentative jury instruction number 12.  "In

13        addition to the general issue, be prepared on these

14        subparts."

15        And we're going to go through the subparts first.

16             "When a company wants to hire an engineer but wants to

17        make sure he is not bringing trade secrets of his prior

18        employer, what are the judicially approved procedures to

19        vet the potential employee?"

20        Plaintiff first.  And you have to give me a decision.

21   Hand it up to me or just say there is no such authority.  That

22   would be okay.  But if you're going to just start -- if you're

23   going to say there is authority, you've got to give it to me.

24        All right.  Please, go ahead.

25             **MR. PERLSON:**  Your Honor, we don't think that there is

1   a specific judicially approved procedure to vet the potential

2   employee in the manner that you've asked this question.

3         THE COURT:  The plaintiff.  None exists.  That's what

4   I'm writing down.

5      Okay.  How about defense?

6         MR. GONZÁLEZ:  We agree with that, Your Honor.  We

7   couldn't find anything.

8         THE COURT:  Okay.  Agreed.  Okay.  Thank you.

9      See.  This is very helpful to know.  Even if you don't

10  have authorities, it is very helpful to know there is no

11  authority.

12         "(b) If the new employer accepts the new employee on

13         the condition and promise to return all files to the prior

14         employer, will that precaution immunize the new employer

15         from liability if it turns out the new employee fails to

16         do so?"

17     What do plaintiffs say to that one?

18         MR. PERLSON:  No, that -- we're not -- we're not aware

19  of any authority that would immunize -- would say that the

20  employer's immunized from liability if it accepts an

21  employee --

22         THE COURT:  See.  You're being clever.  Please don't

23  be clever.  Just say, is there authority on point?

24         MR. PERLSON:  I don't think there is.  We haven't

25  found a specific case that addresses this issue.

1          **THE COURT:**  None on point.  Okay.  That's what I'm

2    writing down.

3        Don't try to slant it like, oh, there's no authority going

4    their way.  Well, there's no authority going your way either.

5        All right.  What do you say?

6          **MR. GONZÁLEZ:**  I agree with that, Your Honor.  We

7    couldn't find any authority.

8          **THE COURT:**  All right.  Okay.

9          "If the engineer possesses trade secret files of the

10         first employer, isn't she already under a legal duty to

11         return them to the first employer?"

12       All right.  What does plaintiff say?

13         **MR. PERLSON:**  Yes, we would agree with that.

14         **THE COURT:**  But is there --

15         **MR. PERLSON:**  And --

16         **THE COURT:**  Is there a decision that says that?

17         **MR. PERLSON:**  Yes.  *California Intelligence Bureau*

18   *versus Cunningham.*  I can get you copies of that.

19         **THE COURT:**  Great.

20       Let me jump ahead.  Do you agree that that's a correct

21   statement?

22         **MR. GONZÁLEZ:**  Your Honor, somewhat surprisingly, we

23   couldn't find any cases on point.

24         **THE COURT:**  All right.  So you don't agree.  But I

25   want to see what -- to me, this ought to be the law.  But I

1  don't want to just go with what I think.  I want to go with

2  what the law actually is.

3       What page should I look at?

4       MR. PERLSON:  It's highlighted on 203.  Should be

5  highlighted in yours.

6       THE COURT:  I got it, okay.

7       MR. PERLSON:  And basically what this is saying is

8  that, you know, what an employee has, by virtue of his

9  employment, is the employer's property.  And it cites the Labor

10  Code to that effect.

11      So by virtue of the fact that it's their employer's

12  property, you would have a duty to return it.  Maybe it doesn't

13  go so far to say that exact second point, but that seems

14  obvious from it.

15      THE COURT:  All right.  I appreciate your candor.

16      The part that I think you're referring to says this,

17  quote:  Everything -- this is quoting the Labor Code.  Does it

18  still say this in the Labor Code?

19      MR. PERLSON:  I believe so, Your Honor.

20      THE COURT:  You believe so or you know --

21      MR. PERLSON:  I am not positive, but I believe it

22  does.  I don't --

23      THE COURT:  All right.  At least at that time, 1948,

24  the Labor Code Section 2860 said, quote:

25          "Everything which an employee acquires by virtue of

1          his employment, except the compensation which is due him

2          from his employer, belongs to the employer whether

3          acquired lawfully or unlawfully or during or after the

4          expiration of the term of his employment."

5          Okay.  So we need to know, is that still -- still in the

6     Labor Code?

7          Your point is, okay, if it belongs to the employer, isn't

8     the -- you would then go the next step and say the former

9     employee has a legal duty to return them.  That's at least

10    plausible.

11         All right.  So --

12         **MR. GONZÁLEZ:**  Your Honor, if I could just comment on

13    that.

14         **THE COURT:**  You may comment.

15         **MR. GONZÁLEZ:**  The creation of a duty is something

16    that we didn't find in any case.  And so I'm not surprised that

17    this is all they can come up with.

18         I'll just assume, for purposes of argument, that the Labor

19    Code has not changed since 1948, on this point.  I'm just going

20    to assume this is still in the Labor Code.  It didn't address

21    your question.  Your question is whether there's a legal duty.

22         What this says is that it belongs to the employer.  We're

23    not necessarily going to have a dispute about that in this

24    case.

25         The question that you asked is, does every employee, when

```
 1   he or she leaves his employer, have a duty under the law to

 2   return it such that if you don't you can be sued?

 3        That's the step that the courts haven't taken and the

 4   legislature hasn't either.

 5             THE COURT:  Well, have you got authority that they

 6   don't have such a duty?

 7             MR. GONZÁLEZ:  No, Your Honor.  I was very straight

 8   with you at the outset.  We couldn't find a case -- by the way,

 9   what you said at the beginning is interesting.  I don't mind

10   telling you that that's what I expected to find.  I thought

11   that there would be a case out there where they say you've got

12   a duty; but there isn't.

13        So there isn't going to be a dispute in this case about

14   whether or not Waymo owns something.  That's not going to be an

15   issue.  But I don't think that you can go from these words here

16   and jump to the conclusion that, therefore, there's a duty to

17   return.

18        I think, frankly, that's a decision that the legislature

19   needs to make, whether every employee in the Silicon Valley,

20   and the truck driver, whoever you may be, has a legal duty to

21   return every piece of paper that you may have gotten from your

22   employer.

23        I don't think any court -- I'm almost certain -- you've

24   got two big firms here.  Neither one of us could find a case

25   where any court imposed that duty.
```

1    In fairness, I couldn't find a case on the other side

2    either.  But my point to you is that I think that it would be

3    improper to instruct the jury in this case that there is such a

4    duty.

5         THE COURT:  Well, if there's no decision on point and

6    it's an issue in play in the case, maybe the poor judge -- even

7    though the lawyers can't help the poor judge, maybe the poor

8    judge has a duty to the jury to tell them what he thinks the

9    law is.  And then it will be up to the Federal Circuit to

10   decide if I guessed right.

11        So, all right.

12        "(d) can this duty be eliminated by her physically

13        delivering the files to a third party (like Stroz or

14        Morrison) for storage?"

15        Okay.  So what does plaintiff say there?

16        MR. PERLSON:  I'd cite the -- I have a case of

17   *Naftzger versus American Namismatic*.  Let me get a copy of it.

18        Once again, it should be highlighted, the relevant

19   portions; but, alas, it looks like it is not.

20        It's on 431 to 432.  I'm sorry, 432 to 433.  And I'm not

21   sure whether this is exactly responsive to what you asked, but

22   it's about as close -- it's as close as we could find.

23        THE COURT:  This is not highlighted so --

24        MR. PERLSON:  Yeah, I apologize for that.

25        THE COURT:  Where --

1        **MR. PERLSON:**  It's on 432 --

2        **THE COURT:**  I see 433.  Okay.  431 --

3        **MR. PERLSON:**  I think it's -- the relevant portion is

4    sort of on -- if you look on page 7, in the bottom-left column,

5    "The rationale underlying."

6        **THE COURT:**  Okay. I see that paragraph.  Let me read

7    it to myself.

8        Well, look.  This says -- the very first sentence says:

9            "The rationale underlying the separate limitations

10           periods for receiving, concealing, withholding and selling

11           stolen property is that the law imposes a continuing

12           affirmative duty to restore stolen property to its

13           rightful owner."

14       **MR. PERLSON:**  I guess that's helpful to the --

15       **THE COURT:**  Why didn't you cite that on the first

16   point?

17       **MR. PERLSON:**  I guess I outsmarted myself, Your Honor.

18   I apologize.

19       **THE COURT:**  Well, okay.  Mr. González said no such

20   decision existed in the history of the universe.  But I just

21   read it out loud.

22       **MR. GONZÁLEZ:**  Your Honor, I said we couldn't find it.

23   And even this doesn't --

24       **THE COURT:**  How hard did you look?

25       **MR. GONZÁLEZ:**  We looked pretty hard.

1        **THE COURT:**  Yeah.  Okay.

2     All right.  "Stolen property remains stolen property no

3  matter how many years have transpired from" -- this is going to

4  be a great instruction for the jury.  "Stolen property remains

5  stolen property no matter how many years have transpired from

6  the date of the theft."  Uber is going to love this

7  instruction.  "Moreover, a thief cannot convey valid title to

8  an innocent purchaser of stolen" -- all right.

9     Okay.  Well, this is pretty close.  I may have to adjust

10  some of the hyperbole, but this is close on point.  Okay.

11     So do you have anything on this one, Mr. González?

12        **MR. GONZÁLEZ:**  No, Your Honor.

13        **THE COURT:**  All right.  The name of this is *Naftzger*.

14        **MR. GONZÁLEZ:**  Your Honor, the one thing I would ask

15  you to keep in mind, as you're mulling over this instruction,

16  is that this instruction would be appropriate, perhaps, if they

17  had a lawsuit against Mr. Levandowski, because he's the one

18  that supposedly stole whatever they claim was stolen.  So just

19  keep that in mind, whatever words you use.

20        **THE COURT:**  I got that.  I got that.  That's a problem

21  that Waymo has.

22     But think about this from the point of view of the jury

23  that's sitting over there where Mr. Cooper is sitting.  They

24  are not going to know all the legal gymnastics that we went

25  through.

1      They're going to hear a lot about Mr. Levandowski.  And

2  these are questions the jury is likely to have in their mind as

3  they deliberate.  So that's something that the judge is -- he's

4  an important player in the case.  And what he did ties in with

5  what the parties did here.  So --

6      **MR. GONZÁLEZ:**  Your Honor, let me add this:  I don't

7  think there's going to be an issue in this case -- this is not

8  going to be a case where somebody stole something and then gave

9  it to somebody else, and that somebody else is the defendant;

10  and so now you've got to give the jury an instruction because

11  that somebody else is saying, I don't have to give it back; I

12  didn't steal it.

13      That's not this case.  That's not the case.

14      We are --

15      **THE COURT:**  Pretty close.

16      **MR. GONZÁLEZ:**  No.

17      **THE COURT:**  Pretty close.

18      What happened was Levandowski -- let's say evidence

19  supports -- stole the property and then, with the connivance of

20  Uber, gave it to Stroz.  That's the best that you can say for

21  your situation.

22      So that's pretty close, isn't it?

23      **MR. GONZÁLEZ:**  No, because -- here's why:  The facts

24  of this case are not going to be that he stole something; we

25  knew he stole it and told him give it to Stroz so they could

 1   hide it.  Those aren't going to be the facts.

 2       The facts are going to be that we told him, give

 3   everything you have, whatever it might be, to Stroz, as part of

 4   our investigation.  And there's not going to be a defense on

 5   our side, that we didn't steal it.

 6       I think, Your Honor, what we need to focus on, now that

 7   we're close to trial, is, what is the jury going to decide?

 8       They made a major concession on Sunday, that I assume you

 9   saw, that you need to know.  They made a major concession that

10   they're not seeking damages because Stroz or MoFo had

11   possession of these things.

12       What they know they have to prove is that they're trade

13   secrets and that they were used.  That's what the jury is going

14   to have to decide, whether or not these trade secrets, if they

15   were trade secrets, were actually used by Uber.

16       **THE COURT:**  What would you then tell the jury -- the

17   jury is going to hear all about the due diligence.  They're

18   going to hear all about the due diligence report, Stroz, and

19   what happened to these documents.

20       And what would you have us tell the jury about that piece

21   of the case?

22       **MR. GONZÁLEZ:**  Well, very little.  And here's why:

23   Because they've made the concession that Stroz's possession of

24   these documents didn't cause them any damages.  And, for that

25   matter, MoFo too.  Although, MoFo only had a small piece of

1   what Stroz had.

2        It's almost irrelevant that they had these documents.

3   It's almost irrelevant.

4        **THE COURT:**  No, it's not irrelevant.

5        Do you say it's irrelevant on the plaintiff's side?

6        **MR. PERLSON:**  No.  We think it's very relevant.

7        **THE COURT:**  I think it's relevant too.

8        If we accept your version of the facts, it's even relevant

9   then.  But I can't just take your version of what you think

10  happened and then say, well, okay, Uber is going to win; so,

11  therefore, I can instruct in accordance with victory for Uber.

12       **MR. GONZÁLEZ:**  So, Your Honor, this is why I'm

13  bringing to your attention their concession from Sunday,

14  because that really changes the composition of the case --

15       **THE COURT:**  It doesn't.

16       I know your argument.  Your argument is, just because it

17  got acquired by Stroz and MoFo, acquisition is not enough for

18  damages.  That may be true.  And they're not seeking damages on

19  account of that.

20       But the jury is going to want to know, what is the legal

21  significance of what happened with Stroz and MoFo.  We cannot

22  let them go unguided in that major piece of the case.  We have

23  to give them some guide- -- that will be one of the first three

24  questions they send out of the jury room.  That would be a

25  mistake on my part not to give them some guidance.  So I'm not

1   going to ignore that part.

2        And I'm also going to ask them about the acquisition.

3   They need -- they need to distinguish between acquisition, use,

4   and disclosure.  And I'm going to ask them, even though it may

5   not lead to damages, it certainly would help me on injunctive

6   relief.  But beyond that, they should distinguish between

7   acquisition.  Maybe they say yes to that but they say no to

8   use.

9        So I disagree with your trying to keep this -- the whole

10  MoFo-Stroz thing out of the case.  It's part of the case.

11       **MR. GONZÁLEZ:**  Your Honor, to be clear, I'm not

12  suggesting that it's not part of the case.  We understand it

13  will come into evidence.

14       I'm talking about how much detail does the jury need to

15  know about the law?  These are great academic questions.  And

16  for a first-year law class these are fantastic questions.  But

17  for the jury --

18       **THE COURT:**  You're not helping me, Mr. González.

19  You're off on a side tangent.  You've made your point.  I'm

20  overruling it.

21       We're going to give some instructions -- or at least I'm

22  going to frame it.  So you're not even giving me assistance on

23  something I want to understand well enough.  You just keep

24  stamping your feet and saying, Don't even consider this, Judge.

25  Don't even consider this.

1        I am considering it, so stop that argument.  I overruled

2    that argument.  I want to understand this well enough to craft

3    an instruction to the jury.

4        By the way, this is the one I asked you two to agree on.

5    Have you agreed on it yet?  You told me in your submission you

6    were close to an agreement.

7            MR. PERLSON:  Which aspect of it?

8            THE COURT:  This very question that we're on here, all

9    these subparts.

10       You told me in your submission Sunday that you were still

11   working with Uber and you were close to an agreement.

12           MR. EISEMAN:  Your Honor, I hope we didn't lead you to

13   believe we were close to an agreement.  We were talking with

14   them, but we did not reach an agreement on the instructions.

15           THE COURT:  All right.  Is that same thing true on the

16   other one, about mobility of engineers?

17           MR. EISEMAN:  It is, Your Honor.

18           THE COURT:  Well, see, now -- you know, you lawyers

19   have blown an opportunity.

20       Silicon Valley and the rest of the technical world out

21   there in the United States is very interested to know how we

22   balance these competing factors here.

23       You two have a great opportunity to provide an instruction

24   that might guide a lot of cases in the future.  And here you're

25   just folding your arms and saying you're going to reserve all

1   rights and insist on a one-sided -- you're not going to get a

2   one-sided instruction.

3        **MR. EISEMAN:**  Well, Your Honor --

4        **THE COURT:**  It's going to be something I think is fair

5   to both sides and states the law and admits that there is

6   mobility for employees.

7        So, okay.  You can't agree.  Then you're leaving it to the

8   poor judge.

9        Okay.  Please have a seat.

10       We're going to go back to my questions.

11            "By what authority, moreover, can the third party

12            knowingly retain such 'stolen property'?"

13       In other words, how could Stroz -- knowing that it's

14  stolen or suspecting that it's stolen, by what authority does

15  Stroz have the right to retain it?

16       **MR. PERLSON:**  We are certainly not aware of any

17  authority.

18       **THE COURT:**  I think the *Naftzger* case is close on

19  point.

20       Mr. González, were you able to find anything in whatever

21  time you put into this?

22       **MR. GONZÁLEZ:**  So, Your Honor, it's the Fifth

23  Amendment issue that we previously briefed, and that you

24  actually ruled upon in this case, is that -- and you've laid

25  out the two-prong standard in one of your prior orders -- is

1   that as long as the information was provided to the lawyer for

2   purposes of providing legal advice, and there's a legitimate

3   Fifth Amendment issue, then that's privileged information.

4          **THE COURT:**  Okay.  So you're standing on the Fifth

5   Amendment.

6          **MR. GONZÁLEZ:**  Correct.

7          **THE COURT:**  Do you have any authority that is more on

8   point?

9       I may just wind up disagreeing with you as to whether or

10  not Stroz -- Stroz has the information.  Stroz comes in --

11  Stroz has a contract, but Stroz is -- gets the information,

12  knows it's stolen, somehow thinks it has -- it's immune from

13  turning it over.  All right.  That's your view.

14      Do you have a -- what is your closest decision on point?

15         **MR. GONZÁLEZ:**  Your Honor, it would be -- it's cited

16  in document 883, which is our response to the order to show

17  cause.

18         **THE COURT:**  That's the best you can do?  You can't get

19  me a decision?

20         **MR. GONZÁLEZ:**  Yes, Your Honor.  The authorities are

21  cited here.  It includes your docket 202.

22         **THE COURT:**  Give me the best decision, please.

23         **MR. GONZÁLEZ:**  *Fisher v. United States*, Your Honor,

24  lays out the test for attorney-client privilege protection from

25  production.

1              THE COURT:  All right.

2              MR. GONZÁLEZ:  And *Lowthian versus United States*.  575

3     F.2d 1292, Ninth Circuit case.

4              THE COURT:  What was the second one?

5              MR. GONZÁLEZ:  *Lowthian*, 575 F.2d 1292, which I

6     believe lays out the same test that you laid out in your docket

7     202.

8              THE COURT:  All right.  Next question --

9              MR. PERLSON:  Your Honor, can I just make one brief

10    response to that?

11             THE COURT:  Go ahead, yeah.

12             MR. PERLSON:  The documents were held long before

13    there was any assertion of the Fifth Amendment.

14             THE COURT:  Well, maybe.  But -- all right.

15             "Is the third party acting as the agent for the

16        acquiring company such that the principal is charged with

17        possession of the files?"

18        Now, several months back you were all arguing over the

19    restatement.  Remember that restatement?

20             MR. PERLSON:  Yes.

21             THE COURT:  And Uber was saying there was a

22    restatement that says that if there's a contractual duty not to

23    turn them over, then that supercedes, then you're not charged

24    with knowledge.

25        Is that still Uber's position or -- because it seemed to

1   change in the critique of the proposed instructions.

2          **MR. GONZÁLEZ:**  So, Your Honor, we have two points.

3   And if you'd like these cases, I can hand them to you.

4          **THE COURT:**  Yes, please.  If they're on point.  If

5   they're not on point, forget it.

6          **MR. GONZÁLEZ:**  I believe that they're on point.

7          **THE COURT:**  All right.  Let's see them.

8          **MR. PERLSON:**  Thanks.

9          **THE COURT:**  Okay.  Number one case is -- you know, I

10  just want one decision.  Whenever you give me two or three then

11  I know you don't have one on point.

12      So I'm going to look at your *Parish* case.  It says:

13          "The Uniform Trade Secrets Act requires an actual or

14      threatened misappropriation.  Mere possession of trade

15      secrets by departing employee is not enough for an

16      injunction."

17      This is 2009.

18          **MR. GONZÁLEZ:**  So that's the first point.  I have two

19  points.  One is that mere possession is not enough.  The second

20  point, Your Honor, is that the plaintiff has the burden of

21  proving both agency and scope.

22      And I have two cases on point there, as well, but I'll

23  just give you one.

24          **THE COURT:**  Can you hand up to me that restatement

25  that you were relying on the other -- about a month ago.

1    Because it seemed to me that it put the burden on you.

2            **MR. GONZÁLEZ:**  So, Your Honor, I'm going to hand you

3    the restatement.

4            **THE COURT:**  So I am looking at "Restatement (third) of

5    agency," Section 5.03.

6            "For purposes of determining a principal's legal

7        relations with a third party, notice of a fact that an

8        agent knows or has reason to know is imputed to the

9        principal if knowledge of the fact is material to the

10       agent's duties to the principal, unless the agent is

11       subject to a duty to another not to disclose the fact to

12       the principal."

13   All right.  So do you both agree that this applies in this

14   case?  Yes or no?  Yes?

15           **MR. PERLSON:**  Yes.  Generally, yes.

16           **MR. GONZÁLEZ:**  Generally, yes, Your Honor.

17           **THE COURT:**  All right.  So who has the burden on the

18   issue of "subject to a duty to another not to disclose the fact

19   to the principal"?

20           **MR. GONZÁLEZ:**  The duty, Your Honor, is on the

21   plaintiff because they have both the obligation to show that

22   there is an agency relationship, and the plaintiff has an

23   obligation to show the scope of the agency.

24       And I have two cases here.  But you asked that I hand you

25   just one, so I --

 1              **THE COURT:**  Hang on a minute.  Pause for a second.

 2         What do you say on that point?

 3              **MR. PERLSON:**  Your Honor, it's an exception to the

 4     general rule.  We would say that it is -- it's their burden to

 5     establish the exception.  I don't have a case specifically

 6     addressing that point.

 7              **THE COURT:**  How valuable is that?

 8         See.  Both of you are relying on general principles.

 9              **MR. PERLSON:**  Well, I think it was actually generally

10     the case, when there's an exception to something, that the

11     person providing the exception would have the burden on that.

12              **THE COURT:**  Generally, that applies.  But it's also

13     generally the rule that the plaintiff has the burden of proof.

14     So both of these general principles are in conflict.

15              **MR. PERLSON:**  Well, I think that -- I mean, there's

16     all sorts of burden shifting and -- you know, that goes on in

17     many different types of claims.  And you don't have to disprove

18     every exception to prove your claim.

19         And that's generally the case.  And we would say that that

20     would apply here too.

21              **THE COURT:**  All right.  You said you had a decision on

22     point.

23              **MR. GONZÁLEZ:**  We have two.

24              **THE COURT:**  All right.  Hand up one first.

25              **MR. GONZÁLEZ:**  I'll hand you this one.  And if you

1    like, if you can give me leave of court to hand you a second

2    one.

3            THE COURT:  All right.  The first one you handed up is

4    called *Oswald Machine*, 1992 California decision.  This is a

5    quote.

6            "Actual authority is such as a principal intentionally

7        confers upon the agent or intentionally or by one of

8        ordinary care caused the agent to believe himself to

9        possess.  Unless the evidence is undisputed, the scope of

10       the agency relationship is a question of fact, and the

11       burden of proof rests on the party asserting the

12       relationship."

13   This doesn't go to this exception and who has the burden

14   of proof.

15           MR. GONZÁLEZ:  Well, Your Honor, it says that the

16   burden is on the party asserting the relationship.  That would

17   be the plaintiff.  The plaintiff is making that assertion in

18   this case.

19           THE COURT:  All right.

20           MR. GONZÁLEZ:  And I have a second --

21           THE COURT:  This is not on point.  But it's just the

22   general proposition.

23       Okay.  What else do you have?  I'll look at your other

24   one.

25           MR. GONZÁLEZ:  So, Your Honor, here's the second case.

1            **MR. PERLSON:**  Thanks.

2            **MR. GONZÁLEZ:**  That is even more clear.

3            **THE COURT:**  *California Viking Sprinkler Company*, 1963.

4    Cal.App again.

5        Well, again, it says more or less the same thing.  But it

6    doesn't come to grips with this exception.

7            **MR. GONZÁLEZ:**  Well, no, Your Honor.  That's my point.

8    These cases don't say there's an exception.  The burden of

9    proving agency and the scope of that agency is on the

10   plaintiff.  They're the ones that are telling you there is some

11   exception; not me.  They don't have a single case that says

12   that.

13       But this couldn't be more clear.  The burden of proving

14   agency, as well as scope of the agent's authority, rests upon

15   the party asserting the existence thereof, and seeking thereby

16   to charge the principal upon representations of the agent.

17   That's what they're doing.

18       Their argument, I suppose, would be that Uber is liable

19   because --

20           **THE COURT:**  You're asking them to prove a negative.

21   You're saying in addition to showing that they were agents,

22   you're saying that they need to show that there was no

23   agreement that restricted the -- what discovery has been taken

24   in this case on that issue?

25           **MR. PERLSON:**  On which aspect of that?

1    **THE COURT:**  On whether or not, let's say, MoFo and

2   Stroz were under a contractual duty not to disclose what

3   Levandowski had in his possession to Uber.

4    **MR. PERLSON:**  Well, there's a -- there's a March 4th,

5   2016 letter from -- it's the engagement letter in which MoFo,

6   O'Melveny, and Uber and Ottomotto retained Stroz.  And there is

7   some language in there that suggests that materials shouldn't

8   be shared with Uber or the other clients.

9    But then there's a subsequent letter to that, on

10   March 21st, 2016, between Stroz and Levandowski himself, which

11   says that Stroz has -- it says that -- it reiterates that

12   they're not, you know, generally supposed to share things with

13   MoFo or Uber.  But it says that Stroz can do so if it's -- it

14   feels that it's relevant to their investigation.

15    So there's a letter that specifically allows Stroz to

16   provide information to Uber if it deems it relevant.

17    **THE COURT:**  And it calls out Uber?

18    **MR. PERLSON:**  Yeah.  Hold on.

19    **THE COURT:**  Is that right?  So Stroz had the -- had

20   the express authority to reveal information to Uber if Stroz

21   felt it was pertinent?

22    How did that work, Mr. González?

23    **MR. GONZÁLEZ:**  So, Your Honor, I'll see what it is

24   that he has.  I can show you a couple of pieces of evidence

25   that I have.

1       The engagement letter says that if there's any information

2    that might be Waymo/Google information, that can be provided to

3    the outside law firms as outside attorneys' eyes only.   That's

4    what the engagement letter says.

5       And then there was a protocol.   And I have here just one

6    page, not a lot of stuff, from the testimony of Stroz, where

7    they talk about the protocol.   And I'll just read one question.

8           "That protocol prevented Stroz from disclosing any

9           Google proprietary information to Uber and Otto; is that

10          right?

11          "Correct."

12      So that is my general understanding.   Now, if there's

13   something that suggests that I'm wrong about that --

14          **THE COURT:**  Let's --

15      **MR. PERLSON:**  Let me, Judge, read the language.

16          **THE COURT:**  Please, read the language that you're

17   relying on.

18          **MR. PERLSON:**  This is at -- I apologize.   I only seem

19   to have one copy of it.   It's from docket 806, I think, dash 4.

20   And it's the Stroz Friedberg, John Gardner letter.   And Gardner

21   was Levandowski's personal attorneys from March 21st, 2016.

22   And it states at the end of it:

23          "Notwithstanding the foregoing, but subject to the

24          examination protocol, nothing in this letter prohibits

25          Stroz from reporting to its clients, if applicable at the

1          end of the Stroz examination, any portion of the Aspen

2          information" -- and Aspen refers to Google in this

3          instance -- "which Stroz, in the opinion of Stroz,

4          believes constitutes factual information which may relate

5          to or be relevant to a potential breach of any fiduciary

6          duty, duty of loyalty, or other confidentiality

7          nonsolicitation, noncompetition, or other obligation based

8          in contract, statute, or otherwise, as defined by

9          clients."

10          **THE COURT:**  That very first part, though, said

11   something like subject to the protocol.

12          **MR. GONZÁLEZ:**  And, Your Honor --

13          **THE COURT:**  Wait.  Wait.  Wait.

14          **MR. GONZÁLEZ:**  Sorry.

15          **THE COURT:**  Is that right?

16          **MR. PERLSON:**  And the protocol is attached to that as

17   well.  And I've looked at it.  I don't see anything that undoes

18   what -- that language.

19          **THE COURT:**  Okay.  What in the -- now, you read from

20   some maybe self-serving testimony, but what in the actual

21   document attached to that document would have prevented Stroz

22   from turning over material to Uber?

23          **MR. GONZÁLEZ:**  Two things.  You need to understand,

24   Your Honor, that what he just read, which says we can disclose

25   it to the clients, the clients are the law firms.  MoFo and

1    O'Melveny.

2        And the engagement letter says that any such information

3    is on an outside attorneys' eyes only basis.

4        So I do not dispute that Stroz had the capability of

5    disclosing information, that may have been Google information,

6    to MoFo and O'Melveny.  That's what the engagement letter says.

7        Can I just hand you the engagement letter?  Would you like

8    to see that?  If you don't, I won't hand it to you.

9        **THE COURT:**  Not yet.  Not yet.

10       Pause on that.

11       Is that true, that the client that's being referred to

12   there is MoFo and O'Melveny?

13       **MR. PERLSON:**  I'll read you exactly what it says

14   because I don't think that's what it says.  It says -- in this

15   letter it says:

16       "We represent Anthony Levandowski individually, with

17       respect to a proposed examination by Stroz Friedberg, of

18       Mr. Levandowski's electronic media," et cetera, "as

19       described in your joint engagement letter with Morrison

20       and its client Uber, and O'Melveny & Myers and its client

21       Ottomotto (collectively clients)."

22       So I read that as including all of them as clients, as

23   referred to in this letter.

24       **THE COURT:**  Where -- go to the part where it says that

25   they reserve the right to disclose to clients.  Read that part.

1          **MR. PERLSON:**  It says:

2          "Notwithstanding the foregoing, but subject to the

3      examination protocol, nothing in this letter prohibits

4      Stroz from reporting to its clients, if applicable, at the

5      end of the Stroz examination any portion of the Aspen

6      information which Stroz, in the opinion of Stroz, believes

7      constitutes factual information which may relate to or be

8      relevant to a potential breech of any fiduciary duty, duty

9      of loyalty, or other confidentiality, nonsolicitation,

10     noncompetition, or other obligations" --

11         **THE COURT:**  Okay.  Hold that thought.

12         **MR. PERLSON:**  -- "as defined by" --

13         **THE COURT:**  So what -- Perlson, right? -- Mr. Perlson

14     is saying is, okay, you've got your version of what it meant;

15     but by its own definition, the term "clients" includes Uber.

16         What's wrong with that?

17         **MR. GONZÁLEZ:**  Because, Your Honor, the engagement

18     letter says, regardless of whether it includes Uber, that if

19     there's information that they find that may be information from

20     Google, that it can be produced to clients only on an outside

21     counsel attorneys' eyes only basis.

22         And then when Stroz testified -- and I can hand you this

23     if you want to see it -- they said that the protocol prevented

24     Stroz from disclosing Google information to Uber and Otto.

25         **THE COURT:**  Okay.  Stop there.

1        All right.  Is that right, that the language you read to

2   me says it has to be -- the protocol says it has to be on an

3   attorneys' eyes only basis?

4        MR. PERLSON:  So what Mr. González is reading from is

5   the March 4th letter, that is between Stroz and MoFo and these

6   other entities.

7        I'm reading from a subsequent letter to that, on

8   March 21st, in which Stroz is agreeing with Levandowski

9   regarding what they can or can't do.

10       So this -- to the extent that they said in that other

11  letter that they can't share, this letter says that they can.

12       THE COURT:  Well, how about the protocol that was

13  attached to the one you're relying on?

14       MR. PERLSON:  As I said, I don't see anything in that

15  protocol that undoes that specific language --

16       THE COURT:  Does it say anything in there about

17  attorneys' eyes only?

18       MR. PERLSON:  It does.  But then it goes on to say:

19       "If the parties agree that Unicorn and Zing or

20       executives should have access to the proposed disclosure

21       folder, Stroz Friedberg will arrange for such access."

22  So, I mean --

23       THE COURT:  Read that to me again.  If what happens

24  they will arrange it?  Say it again.

25       MR. PERLSON:  It says if parties agreed to --

1          "If the parties agree that Unicorn or Zing executives

2      should have access to the proposed disclosure folder,

3      Stroz Friedberg will arrange for such access."

4      Then it says:

5          "Unicorn executives will not have access to the

6      outside counsel or attorneys' eyes order folder."

7      And it has a procedure for putting stuff in one

8  disclosure -- in a proposed disclosure these are things we want

9  to share.  And then another one that defines as attorneys' eyes

10  only, which we don't want to share.

11      **THE COURT:**  Is attorneys' eyes only outside counsel?

12  Or would that include Uber inside counsel?

13      **MR. PERLSON:**  Well, the outside counsel only order or

14  attorneys' eyes only order.  It's not, frankly, the clearest.

15      **MR. GONZÁLEZ:**  The engagement letter, at least, is

16  clear that it's outside attorneys' eyes only.  At least in the

17  engagement letter.

18      **MR. PERLSON:**  Yeah, I mean, my point is, I understand

19  that language is in there.  I'm not disputing it's there.  But

20  we have this other agreement afterwards that suggests

21  otherwise.

22      **MR. GONZÁLEZ:**  You see, Your Honor --

23      **THE COURT:**  Wait a second.  I want to follow through a

24  minute on -- let's just hold Mr. Perlson's thought for a

25  second.  Let's just stick with the MoFo version for a minute.

1              Couldn't a jury -- you've asserted attorney-client over
2    what was said between MoFo and Uber.  I believe I'm right on
3    that.  And that was sustained?
4              **MR. GONZÁLEZ:**  Generally, yes.
5              **THE COURT:**  All right.  So let's say that Mr. Perlson
6    proves to the jury's satisfaction that Stroz had the right --
7    as agent, had the right to turn it over to counsel for Uber.
8    And then whatever was said between -- and that Morrison had the
9    right, maybe even the duty, to disclose to Uber what was in
10   there.  And yet you asserted the privilege.
11             So couldn't a jury reasonably conclude that if the
12   information got as far as Morrison, that Morrison as the lawyer
13   had a duty to explain what was in there to the client?  And end
14   of story.  And, therefore, they're the agent.
15             So what's wrong with that argument?
16             **MR. GONZÁLEZ:**  Well, Your Honor, I think maybe we're
17   taking up an argument on this point that we don't need to.
18             This isn't a case where MoFo had some super-damaging
19   information that never got to Uber.
20             The Stroz report, that by now we're all very familiar
21   with, is what contained whatever smoking gun there may have
22   been.  And that did get to Uber.  And the jury is going to know
23   that.
24             So this isn't the case where MoFo has some smoking gun and
25   the jury has to decide whether somehow MoFo was obligated to

1   tell Uber.  That's not this case.

2          THE COURT:  When did the -- when did the -- I thought

3   you were contending that all of the secrets stayed with Stroz

4   and never got to Uber.  Now you're telling me they did?

5          MR. GONZÁLEZ:  Your Honor, the information in the

6   Stroz report did get to some people at Uber.

7          THE COURT:  All of them?  No.  I was under the

8   impression that some selected version of that got to Uber.

9          MR. GONZÁLEZ:  Well, this might be the confusion, Your

10  Honor.

11      Uber received the Stroz report in its entirety but not the

12  exhibits.  That may be what the Court is remembering.

13      But the --

14          THE COURT:  Probably it is.  Okay.

15          MR. GONZÁLEZ:  But my point to you is that the juicy

16  stuff, if you will, the stuff that they think is good, is in

17  the Stroz report.  And this is what I'm trying to explain.  And

18  maybe I'm making it too complicated.

19      There's not going to be a secret in the trial about

20  whether Uber knew it, because that report did get to some

21  people at Uber.

22          THE COURT:  Who did it get to?

23          MR. GONZÁLEZ:  I don't even remember, Your Honor.  But

24  it's been disclosed.

25          THE COURT:  Was it more than just the lawyers?

1            **MR. GONZÁLEZ:**  Ultimately, yes.

2            **THE COURT:**  I mean before the litigation was it more

3    than just the lawyers?  I know that some members of the board

4    saw it once the litigation was underway.  But --

5            **MS. DUNN:**  No.

6            **THE COURT:**  Back when they were doing the design work,

7    did some executives there at the -- at Uber have access to this

8    material?

9            **MS. DUNN:**  No, Your Honor.  It was simply members of

10   the office of legal counsel -- and not that many of those

11   either -- before the litigation began.

12           **THE COURT:**  Well, I come back to let's say that

13   there's -- let's say that at the -- you're going to want to --

14   Uber is going to want to make the point to the jury that the

15   report got to Uber but the exhibits did not.

16       And I come back to the chain of reasoning that I had

17   earlier, which was with respect to the exhibits, those could

18   have been given to MoFo.

19       MoFo could have described them to -- even if not handing

20   them copies, could have described them to somebody at Uber.

21   And, therefore, wouldn't that satisfy the requirement in the

22   restatement and eliminate any duty to another not to disclose

23   the fact to the principal?

24       So what do you say to that line of reasoning that,

25   arguably, the jury could indulge?

1       **MR. GONZÁLEZ:**  So first, Your Honor, to be clear, MoFo

2   did see the exhibits.  So you said "the jury could find."

3   There is no question about that.  MoFo saw the exhibits in the

4   Stroz report.

5       Second, it's also clear that MoFo's communications with

6   the client are privileged.  So those two facts are true.

7       **THE COURT:**  Yes, but they don't need to show that it

8   actually was revealed.  They just need to show that it was

9   not -- that you were under no bar from disclosing that.

10      In other words, in fact, the fact -- in other words, you

11  the lawyer, of course you're going to tell the lawyer whatever

12  you think is in their interest.  And that's not a duty to

13  another not to disclose the fact to the principal.

14      Unless I'm missing something.  Was there a document

15  somewhere that said under no circumstances will MoFo ever tell

16  what's in these documents to Uber?

17      Maybe.  I don't know.  Could be.  This case has got a lot

18  of turns.

19      **MR. GONZÁLEZ:**  I don't know that there's such a

20  document, Your Honor.

21      **THE COURT:**  Well, then, it seems to me that the -- all

22  right.  So we come back to who has the duty here to explain to

23  the jury -- who has the burden of proof?

24      **MR. GONZÁLEZ:**  And, Your Honor, as I noted --

25      **THE COURT:**  I think the issue is going -- I think we

1    do have to instruct the jury, or at least I've got to have --
2    get us close to one and then decide whether to give it.  But I
3    don't want to dodge this and say, oh, we don't have to give an
4    instruction.  I want to know what the law would be and so
5    forth.
6        Nobody has a decision on point?
7            MR. PERLSON:  Your Honor, I would suggest that by the
8    nature of the fact of how these things are normally handled,
9    when you have an exception like this, that perhaps that's why
10   there's no case on point.  Because it seems like it's an
11   obvious thing, that it would not be our burden to prove the
12   negative in relation to the exception.
13           MR. GONZÁLEZ:  If we keep talking about an exception,
14   Your Honor, the rule is the plaintiff has an obligation to
15   prove the scope of the duty.  We're not arguing an exception.
16           THE COURT:  What you're both saying is generally true.
17           MR. GONZÁLEZ:  And, Your Honor --
18           THE COURT:  We both know that there are cases -- you
19   will agree, Mr. González, that if we looked hard enough, we
20   would find cases where you don't ask the plaintiff to prove a
21   burden.  You turn that into an affirmative defense.  And you
22   make the defendant prove that.
23       There are cases like that.  You have to admit that.
24           MR. GONZÁLEZ:  In some cases, perhaps, but not on this
25   point.  That's my point to you, Your Honor.  Not on this point

1    about the scope of the duty.

2        The cases on the scope of the duty are on point, and they

3    are all on our side.  That's why they haven't shown you one

4    case that says we have to prove the scope.

5            THE COURT:  We're talking about, here, two different

6    duties.  "Imputed to the principal if knowledge of the fact is

7    material to the agent's duties to the principal unless the

8    agent" -- then it refers to a different duty -- "is subject to

9    a duty to another."

10       So it's talking about two different duties.  Yes, they've

11   got to prove the first duty.  But who has to prove the second

12   duty or a negative second duty?

13           MR. GONZÁLEZ:  I would say that that all falls within

14   the scope of the agency and that the burden is on them.

15           THE COURT:  Maybe; maybe not.

16           MR. GONZÁLEZ:  Your Honor --

17           THE COURT:  This is one where the lawyers have let me

18   down.  I bet you there's somewhere in the universe -- somewhere

19   in the universe, in the state of Iowa, Nebraska --

20           MS. DUNN:  How about Illinois?

21           THE COURT:  -- Indiana.

22       What?

23           MS. DUNN:  Your Honor, there may, in fact, be a case

24   in Illinois.

25           THE COURT:  Okay.  I was close, wasn't I?

1          (Laughter)

2                MS. DUNN:  It's very close to Iowa.

3                THE COURT:  All right.  What does it say?

4                MS. DUNN:  So I'm reading it now, having looked just

5     at the restatement.  And it's cited.  It's called *Evanston Bank*

6     *v. Conticommodity Services, Inc.*, 623 F.Supp 1014.  Pincite

7     1035.

8                THE COURT:  Give me the cite again.

9                MS. DUNN:  623 F.Supp 1014.  And then the pincite is

10    1035.

11               THE COURT:  623 F.Supp.2d?

12               MS. DUNN:  No.

13               THE COURT:  Just Supp?

14               MS. DUNN:  Just Supp.

15               THE COURT:  623.  And what's the page number?

16               MS. DUNN:  1035.

17               THE COURT:  1035.  This is under the restatement?

18               MS. DUNN:  Yeah.  If you look at the notes of the

19    restatement, under reporter's notes, subsection B.

20               MR. GONZÁLEZ:  It's on page 13.

21               MS. DUNN:  On page 13, if you have that up there.

22    There's a paragraph at the bottom of page 13, which starts:

23               "Notice of a fact is not imputed to a principal when

24         to learn the fact would require action by an agent beyond

25         the scope of the agent's duties."

1          Which is what we've already discussed.  And then in the

2     parenthetical it says:

3               "No showing there was a duty of extended analysis of

4          information in reports."

5          And so I looked up this case.  And what it seems to say,

6     on 1035, is that there was a requirement that there be a

7     showing, evidently, on the part of the plaintiff that

8     established that duty; and so, therefore, establishing what was

9     in the scope of the agency.

10         So I do think the parties probably need to look more

11    closely at this case, since I just looked it up.  But that's

12    what it appears to me to be saying.

13         **THE COURT:**  Thank you.  You raise a good point here,

14    and that is, what does the reporter's comments say about the

15    exception that we're dealing with?  You know, there must be

16    some commentary here somewhere.

17         **MS. DUNN:**  I agree that's probably the case.  And we

18    should look that up as well.

19         **THE COURT:**  Let's just pause here and see if we can

20    find it.

21         **MS. DUNN:**  Okay.

22         Oh, the other thing, Your Honor, is that if you look at

23    pincite 1035 in this case, it says -- I think this is probably

24    the most relevant line.  It says:

25               "The party seeking to establish a ratification" --

1          which in this case is the duty they were talking about --

2          "must show that the knowledge which he seeks to impute

3          concerns a matter within the scope of the agent's

4          authority."

5      And then I agree with you, we have to figure out the

6  relevance of the notes.

7          **MR. PERLSON:**  Your Honor, if I could just interject.

8  I don't have the case in front of me, but it sort of sounds to

9  me like the question in that is not related to what we're

10  really talking about here but, instead, whether the -- what

11  this agent was doing relates to what they had been retained to

12  do on behalf of the principal.

13      And I don't think that that is -- I think that's a

14  separate issue.  And, frankly, I don't think it would really be

15  in dispute that MoFo and Stroz obtained these materials by

16  virtue of the work that they did as agents for their

17  principals.

18      (Pause)

19          **THE COURT:**  Okay.  Look at page 20, paragraph about

20  midway down the page, for the point that an agent's knowledge

21  is not imputed to the principal when the agent owes a duty to

22  another not to disclose the information.  See *Imperial*

23  *Financial Corporation versus*, et cetera, 490 P.2d 662 (Haw.

24  1971).

25          "Officer of Finance Corporation sought and received

1              agreement of insurer's agent not to reveal the existence

2              of attachment bond to defendant.  Finance Corporation is

3              estopped from asserting that knowledge of attachment bond

4              should be imputed to defendant which breached their duty

5              in obtaining the mortgage lien on the same property

6              priority over attachment bond."

7         Then there's a North Carolina cite.

8         Somebody who has computers can look those two up right now

9    and see what they say.

10        Anybody found the answer?  How about Mr. Cooper?  Does

11   Mr. Cooper have the answer?

12             **MR. COOPER:**  I haven't found the answer yet.

13             **THE COURT:**  Well, maybe somebody will find that and

14   we'll come back to it.

15             **MR. PERLSON:**  I will say, just looking at these, Your

16   Honor, these cases seem to be discussing a situation where you

17   might have somebody having knowledge of a fact in relation

18   to -- you know, that's relevant down the road.  Like, if you've

19   misrepresented something, is that fact, you know, the knowledge

20   of that imputed to somebody else?

21        Here, our situation is really -- I mean, it's not just

22   like knowledge of something.  I mean, we're talking about

23   something that's possessed, that Stroz and MoFo had the stuff.

24   It's not just knowledge.

25        So the -- you know, I haven't read those cases, but I'm

```
1   not sure that they're going to be directly on point to our
2   situation.  That's all that I'm saying.
3          THE COURT:  Yeah, but they relate to the very
4   exception that Uber is invoking.  So it may be -- all right.
5       Now, we're going to go to the second question.
6          "If the jury finds that the only acquisition of trade
7          secrets by Uber was via Stroz and/or Morrison, what
8          damages will the evidence at trial support?"
9       I read your recent statement to say you're not seeking
10  damages under that scenario.
11         MR. EISEMAN:  That's correct, Your Honor.  With
12  respect to Stroz and Morrison only.
13         THE COURT:  Right.  Okay.  That's good to know.
14      Next:
15         "What specific offer of proof is there that defendant
16         disclosed any trade secret?"
17      Let's pass that for now.  I read the submission, and I
18  don't think we ought to try to rehash it here.
19      All right.  I do want to go to number 4, though.  Let me
20  just begin by saying, we -- this case presents, as do many
21  trade secret cases, the right of employees to leave, engineers
22  particularly, to leave their employment and continue their
23  profession at some other company.
24      And so they necessarily are going to pick up some
25  knowledge and lessons learned along the way.  And when they get
```

to the second employer, Waymo wants to shut them down cold
almost.  I mean, that's a harsh way to say.  But it just can't
be the law that they cannot continue to practice their skill
and their knowledge.

And it gets complicated where a company like Waymo
designates everything in the universe as a trade secret so that
the poor employee has no clue about what really is and is not a
trade secret, because they overreached.

So I'm sympathetic to the engineer who is trying to make a
living and pay the rent as opposed to the big company who's
trying to glom on to everything and overreach.  That's my
sympathies, but I want to go with what the law here is.

On the other hand, the other side of the equation is that
a big company like Uber should not be allowed to steal somebody
else's crown jewels.  Period.  I agree with that too.

But when I get you all to help -- the jury is going to
want to know the answer to some of these questions.

Let's just take this -- I don't want to get into the
specifics because we've got people in the courtroom.  But a
number of these trade secrets are going to bring this up
easily.

So somebody is working as an engineer at Waymo.  And they
are assigned to work on the XYZ project.  And to that they
apply their professional skills and engineering principles that
they've learned.  And in doing that, they discover some new

1   lessons, which anyone working on that project would have

2   discovered; any engineer working on that project would have

3   discovered.  So they are an extension of recognized principles.

4         Now, when that poor engineer goes to work at Uber, why

5   shouldn't that engineer be allowed to rely upon the extension

6   of those skills and lessons that they learned?

7         I agree they shouldn't be allowed to copy and take

8   documents or memorize documents or specific layout of PC boards

9   and all that.  Of course that's true.

10        But Waymo wants to go a lot further than that.  Waymo

11  wants to stop them from using what they learned, the lessons

12  they learned at the first job.  I have some trouble with that.

13        So that's the background here.  So let's go through these

14  questions.

15             "When an engineer cleanly moves from one employer to

16        another (without any files of any type), how can she be

17        expected to forget the engineering lessons learned in her

18        earlier jobs?"

19        Okay.  Let's hear from the plaintiff.

20        **MR. PERLSON:**  Well, first, I would point out that

21  that's definitely not this case.  There's no cleanly moving --

22        **THE COURT:**  Wait.  Wait.  Wait.  Because you're

23  relying on a lot more than Levandowski.  You have said, and

24  I've given you the okay, to assert that some other people -- I

25  won't name any of the names, but that they are using trade

1    secrets of Waymo.  So there are some people who came clean.

2    And there's some like Levandowski who came with documents.

3        So this is going to come up on your own theory.

4        MR. PERLSON:  Well, I think that there might be

5    disputes as to whether any of them came clean under the

6    situation.  But, nevertheless --

7        THE COURT:  If it's disputed, I can't just assume.

8    I've got to tell the jury what the law would be in that case.

9        MR. PERLSON:  Well, I guess, the -- for things that

10   are trade secrets, the law says that you can't use them at your

11   next employer.

12       THE COURT:  Correct.

13       MR. PERLSON:  That's what the law is.

14       THE COURT:  Yes, but we have to define -- help them

15   define what is a trade secret.

16       One of the decisions that I found very useful, I don't

17   have it up here with me right now, but it was -- it was a case

18   in California about a guy who worked 50 years, I think, 40

19   years, at a -- as the superintendent, building water tanks made

20   out of wood.  And eventually he decided to go out and start his

21   own business doing exactly the same thing.

22       And the Court said he has the right to do that, that

23   that's -- even though the prior employer was saying, just like

24   Waymo here, oh, those are all our trade secrets.  They said

25   this is his profession.  He has the right to do it.  And he's

1    the one who invented all that stuff.  He's the one that came up

2    with all those solutions.  It's his craft.  And here is the big

3    company trying to squash the little guy.  Just like you're

4    trying to do in this case.

5         That's the way the jury might see it.

6         So you need to tell me -- I just don't buy the idea

7    that -- this is part of deciding what is a trade secret is, is

8    this part of the skill of the engineer or is it something that

9    qualifies as a trade secret?

10        Skill of the engineer does not qualify as a trade secret.

11            MR. PERLSON:  Well, Your Honor, I think that some of

12   what you're pointing out to is, frankly, just some of the

13   disputes that we've been seeing in defendants arguing that some

14   of what we've asserted is a trade secret is not a trade secret.

15            THE COURT:  Right.

16            MR. PERLSON:  That's something that they're going to

17   argue to the jury.

18            THE COURT:  I agree with you.  And I need to give the

19   jury guidance as to what the law is, and then you two go ahead.

20   And one of you is going to win.  One of you is going to

21   persuade the jury it is a trade secret.  The other one is going

22   to say it's not a trade secret because it's skill.

23        So I wish my law clerk could hand up to me that decision

24   that I'm talking about.  Do you have it right there?  No, no,

25   don't go get it.  I thought you had it with you.  Maybe I've

1    got it up here.

2         I think I do.  It's called *Sarkes Tarzian*, 166 F.Supp 250,

3    1958.  It says:

4              "What is a trade secret?  What is a trade secret is

5         difficult to define.  It must consist of a particular form

6         of construction of device, a formula, a method or process

7         that is of a character which does not occur to a person in

8         the trade with knowledge of the state of the art or which

9         cannot be evolved" -- listen to this language -- "or which

10        cannot be evolved by those skilled in the art from the

11        theoretical description of the process, compilation or

12        compendium information of knowledge.  Illustrative of such

13        a situation is a leading California case where a person

14        had been in the employ of an industrial corporation and

15        his predecessor engaged in the manufacture of wood tanks,

16        cooling towers, and other industrial wood specialties for

17        35 years.  During a major portion of such period he was a

18        field superintendent, in which capacity he supervised the

19        construction jobs of his employer and had access to their

20        books, patents, and engineering data.  After terminating

21        his employment, he began operating his own concern, with

22        his son, manufacturing tanks and cooling towers of the

23        type manufactured by his former employers.

24             "Although, the Court was of the view that there was

25        evidence to show the business of constructing towers is

1          extremely complicated and difficult, and is dependent upon

2          formulas developed by technically skilled engineers

3          through long periods of trial and error, and that the

4          defendant had a great wealth of general experience which

5          was the primary asset of the new concern, nevertheless,

6          the Court held an injunction was properly denied

7          saying..." and it goes on to talk about how "to grant

8          relief prayed for would virtually operate to deprive

9          respondents of the right to pursue a gainful and lawful

10         occupation."

11         So I think you've got to -- you, on that side, have got to

12    help the poor judge reconcile that body of authority with

13    what -- you want to just say that it's a trade secret, trade

14    secret.  So --

15         **MR. PERLSON:**  Your Honor, I think we did try to help

16    in our critique, as you had asked for.  It's docket 2171, where

17    we're conveying our thoughts on how this issue can be presented

18    to the jury.

19         **THE COURT:**  So let's say this:  Let me give you a

20    hypothetical.  Let's say that an engineer is -- Waymo says, we

21    need to determine whether the following four things will work;

22    and you, as the engineer, go into the laboratory and figure

23    that out.

24         All right.  So the engineer goes into the lab and applies

25    standard well-known techniques to a new subject, at least,

1   let's say, to her.  Let's say it's a woman.  And she figures it

2   out, decides that none of those items are going to work; that

3   there's a problem with each one of them.

4       Now, any engineer given that assignment using basic

5   principles would have come to that same conclusion if they had

6   the time and could do the homework.  She did the homework.

7       Okay.  Now, she leaves that job and goes to another job.

8   And she takes no documents.  Takes no -- she has never tried to

9   memorize anything.  But this is the main thing she worked on.

10      Is she supposed to forget and have to go back and

11  revalidate all of those four things when her next employer asks

12  her to test that very question?  She's got to reinvent the

13  wheel?  Is that really the way it works?

14          **MR. PERLSON:**  Well, Your Honor, I think, like most of

15  these, you have seen these are very fact-intensive issues.  I

16  think it's sort of difficult to answer a question like that

17  just in the abstract and hypothetical.

18      I mean, there are situations -- and the Court and courts

19  have recognized it -- that there are negative trade secrets

20  that someone, you know, does something.  And the trial and

21  error and the time it takes to do that, you could have a number

22  of engineers working for, you know, months on an issue and come

23  up with a solution, and that that trial and error is

24  protectable.  That's what the law says.

25      Whether that fits your exact scenario or not, I don't know

1    the answer to that.  But that is what the law is.

2          **THE COURT:**  There are statements.  You're right.

3    There are statements about negative knowledge.  I looked at all

4    of those.

5          I did look at your authorities.  I don't think any of them

6    are conclusive enough to say that that is a -- for example,

7    take my case.  The engineer decides all four won't work.  Or

8    take the case of the guy that built the water towers; that he

9    decides it won't work to use a certain type of wood and it will

10   work to use a different type of wood; that redwood is great but

11   plyboard is not great, let's say.

12         So is he supposed to start building his tanks with

13   plyboard because he learned the negative lesson that plyboard

14   is no good but redwood works?

15         **MR. GONZÁLEZ:**  Your Honor --

16         **THE COURT:**  Wait a minute.  Wait a minute.

17         I want you to know that the lawyers are not helping me

18   by -- I want decisions on point that guide -- we can give

19   guidance to the jury.  Even if it's in a more general way, I'm

20   okay with it being general.

21         But this is -- this is -- just like the Stroz and the MoFo

22   thing, this is part of what the jury is going to be asking.

23   And it's going to come up.  It's going to come up.  And the

24   jury is going to want to know the answer to the -- how

25   freely -- is an engineer really supposed to get a frontal

1   lobotomy before they go to the next job?  I think the answer

2   has got to be no.

3       But, at the same time, there are some things like -- let's

4   say they know the recipe for Coca-Cola.  They can't disclose

5   that either, even though they learned it in their prior job.

6   They do have to forget that item.

7       All right.  What did you want to say?

8           MR. GONZÁLEZ:  So, Your Honor, if it's helpful to the

9   Court, I have a series of cases from throughout the country

10  that have all held precisely what you've said, including two

11  that quote the frontal lobotomy comment.

12          THE COURT:  That's the Seventh Circuit case.

13          MR. GONZÁLEZ:  Correct.

14          THE COURT:  I have that already.

15          MR. GONZÁLEZ:  There are a number of other cases, Your

16  Honor, that follow the same basic rule, including starting off

17  with *Winston*, which is a case that you've cited in one of your

18  orders in this case.  You've cited the *Winston* case out of the

19  Ninth Circuit that actually, Your Honor, is very much on point.

20  Because what happened in *Winston* was it dealt with a tape

21  recorder and a tape recorder speed.  And a couple of employees

22  left 3m and formed their own company.  And they created a

23  machine that functioned just as well as 3m's machine.

24      And the Judge in that case issued an injunction that

25  included the following phrase, that the employees couldn't --

quote, "knowledge of what not to do and how not to make the
same mistakes," unquote, was something the Court said was a
trade secret; knowledge of what not to do and how not to make
the same mistakes.  The examples you're talking about.  That's
what the judge said in that case.

     And the Ninth Circuit says, no, no, no, you've got it
wrong.  That part cannot stand.  Because, the Court said, the
general approach and the basic mechanical elements are not
protectable trade secrets.

     And then the Court went on and it said this:

          "The only practical way of enforcing the broad
     injunctive provisions here challenged would be to prohibit
     former Mincom employees from engaging in any development
     work in this area at all.  They simply could not exclude
     their knowledge of what not to do and why Mincom's machine
     was built as it was from any development work they might
     now attempt involving the general approach and basic
     mechanical elements of the Mincom machine."

     It's what you've been saying.  They understood.  And there
are two ways to do something.  And if you know one of them is
going to blow up in your face and explode, you can't possibly
be expected to have to do that at your next job.  You obviously
are able to use your general -- here's what the Court said:

          "Employees cannot be denied the right to use their
     general skill, knowledge, and experience even though

1        acquired, in part, during their employment by plaintiff."

2        And that, Your Honor, is a standard that's been used by

3   courts throughout the country.

4        I can very briefly give you --

5             THE COURT:  Let me get the name of the decision again.

6             MR. GONZÁLEZ:  Can I hand it to you, Your Honor?

7             THE COURT:  That would be even better.  I think I've

8   read this one, but I don't remember for sure.

9             MR. GONZÁLEZ:  Do you mind if I hand you four?

10  They're all good.

11            THE COURT:  What?

12            MR. GONZÁLEZ:  I have four cases, Your Honor, that I

13  want to talk about just briefly.

14            THE COURT:  Give me -- no.  Just give me the one you

15  were talking about.

16            MR. GONZÁLEZ:  The one I referenced, Your Honor, was

17  *Winston*, from the Ninth Circuit.

18            THE COURT:  1965.  *Winston versus 3m*, 1965.  Is this

19  the Browning decision?  Yes.  I read this.

20            MR. GONZÁLEZ:  You did.  And you cited it in one of

21  your prior orders in this case, so I know you're familiar with

22  it.

23        And I'm raising it because it is as close as we can get to

24  the point that you're raising.  And it's out of the Ninth

25  Circuit, which, by the way -- I may be wrong about this, but I

think now we're back in the Ninth Circuit, now that the patent

claims are out of the case, for whatever it is worth.

In any event, Your Honor --

THE COURT:  No, I don't think that's right.  I think

the rule is that if there ever was a patent claim anywhere in

this case, for a split second, it goes to the Federal Circuit.

Unless the law on that has changed.

MR. GONZÁLEZ:  That's what I understood.

THE COURT:  But I don't care.

MR. GONZÁLEZ:  I don't either, Your Honor.

THE COURT:  They would apply Ninth Circuit law.

MR. GONZÁLEZ:  They would regardless.

Your Honor, what I want to do, just briefly, because you

say we're not helping, I would like to try to help.  I've got

three or four other very good examples of situations where

other courts have come out the same way on this very important

issue.  You've already cited --

THE COURT:  Let's hear the second one.  The Seventh

Circuit I know about.  What else do you know?

MR. GONZÁLEZ:  The Seventh Circuit one is *AMP*.  Would

you like a copy of that?

THE COURT:  That's the Seventh Circuit.

MR. GONZÁLEZ:  Seventh.

THE COURT:  I have a copy of that one.  I don't need

that.

1      What's the next one?

2           MR. GONZÁLEZ:  Okay.  The next one, Your Honor, is I

3      wanted to give you a couple of examples from other courts.

4           So we have a case from the Idaho Supreme Court.  Would you

5      like to see that?

6           THE COURT:  All right.  Let's see it.

7           While you're doing it, go ahead and hand up the Seventh

8      Circuit.  Even though I read it, I would like to get the one

9      that has your highlighting in it.

10          MR. GONZÁLEZ:  The Seventh Circuit case is *AMP*.

11          Then, Your Honor, I want to hand you up from the Idaho

12     Supreme Court Northwest.

13          THE COURT:  Okay.  What else?

14          MR. GONZÁLEZ:  Then, Your Honor, I'd like to hand you

15     a case out of Texas describing Texas law.

16          The point that I'm making is that this is the law

17     throughout the land.

18          THE COURT:  You have four.  You've got Ninth Circuit,

19     Seventh Circuit, Idaho, and Texas.  Is that throughout the

20     land?

21          MR. GONZÁLEZ:  Well, that's different geographies.

22          THE COURT:  Okay.

23          MR. GONZÁLEZ:  And, Your Honor, you'll see the

24     language we cited quoted there.

25          And then I want, also, to call your attention to a couple

1    of cases out of California, including a case called *Argo*.

2              **THE COURT:**  Look --

3          **MR. GONZÁLEZ:**  Is that enough?

4              **THE COURT:**  No, no, no, I want -- I do want California

5    law.  That's what we're basically applying here.  So give me

6    your best California decision.

7         We need to take a break soon for our court reporter.  So

8    we will in -- I'm going to give the other side a chance to talk

9    first.  Go ahead.

10             **MR. GONZÁLEZ:**  So, Your Honor, I have two.  Hard to

11   say which one is the best.

12        I'll hand you Judge Ishii's opinion out of Fresno, which

13   is a case called *Agency Solutions*.

14        If you would like to see it, I also have a case from the

15   Central District.

16             **THE COURT:**  What's the name of that one?

17         **MR. GONZÁLEZ:**  *Argo*.

18             **THE COURT:**  I don't know.  What you highlighted is not

19   so much on point in the *Agency Solutions* case.

20        So give me your next one.

21         **MR. GONZÁLEZ:**  This is *Argo*.

22        And of the *Agency Solutions* case, Your Honor, what I like

23   about it is it talks about know-how, that an employee can use

24   his or her know-how at a new job.

25             **THE COURT:**  All right.  Let's hear from the other side

1   for a moment.  Go ahead.

2          MR. PERLSON:  Well, first of all, on the *Winston* case,

3   if you look at the -- the CEB, the Continuing Education Book, I

4   think that you had cited in one of your recent --

5          THE COURT:  Right.  My law clerk has it right over

6   there.

7          MR. PERLSON:  It actually says in the section on

8   negative information --

9          THE COURT:  Please hand it to the clerk.

10         MR. PERLSON:  -- that *Winston* -- that the Uniform

11  Trade Secret Act overrules *Winston*.  And it says that on page

12  11, that you have.

13     Now, it doesn't cite a case for that, but it's noting the

14  proposition which is, I think --

15         THE COURT:  It does say -- this is interesting.  Down

16  at the bottom of page 11, "Note:  The UTSA" -- that's the --

17  Uniform Act -- "overrules *Winston Research*, which held that

18  negative information is not protectable."

19         MR. GONZÁLEZ:  And there's no citation and no court

20  has held that, Your Honor.  *Winston* has been cited some 85

21  times.

22         THE COURT:  Well, what part of the legislative

23  comments to the UTSA --

24         "Definition of 'trade secret' includes information

25     that has commercial value from a negative viewpoint.  For

1    example, the results of lengthy and expensive research

2    which proves that a certain process will not work could be

3    of great value to a competitor."

4    When it says "legislative comments," what legislature is

5    that?

6         MR. PERLSON:  I think that's the comments to the

7    Uniform Trade Secrets Act, when it was released.  But I'm not

8    positive exactly.  It says "comment to cc."  I can track that

9    down.  But I'm not positive whether that's the comments in

10   relation to the folks who developed the UTSA or the California

11   legislature when they adopted it.

12   I do have another case from California.

13        THE COURT:  All right.  Let's see.

14        MR. GONZÁLEZ:  Your Honor, while he's handing you

15   that, I don't think that this note that he just called your

16   attention to even fairly characterizes *Winston*.  I don't think

17   that *Winston* held that negative information is not protectable.

18   But having said that, there is no case, state or federal,

19   that even suggests that *Winston* is no longer the law.

20        MR. PERLSON:  Well, I think that that's basic -- well,

21   I think that that comment is instructive to the extent that

22   *Winston* can be read to suggest that there's no negative trade

23   secrets, it's wrong.  And that's the point that's being made

24   here.  And it doesn't even seem to be conceded.

25   What you've seen from defendants are just a series of

1    cases that, kind of like, make some general points about, you

2    know, general things you can keep on doing.  Dah dah dah dah

3    dah.  You know, you can't erase your mind of everything.

4        And none of that, I think, is really directed to the

5    specific point we're dealing with here, which is, you know, if

6    there are specific trade secrets, you know, can you prevent

7    somebody from using them?  And the law is that you can.

8        And here's one more -- I don't think I passed this one up.

9        **THE COURT:**  What was the negative information in the

10   *Winston* case that was so much in -- that was controverted?

11       **MR. PERLSON:**  I don't have that at my fingertips.

12       **MR. GONZÁLEZ:**  And, Your Honor, I submit that when we

13   have the Ninth Circuit on one hand and a footnote in a treatise

14   in another, that there isn't much of a question as to which

15   path this Court should follow.  With all due respect to the CEB

16   and lots of panels.

17       **MR. PERLSON:**  I think --

18       **THE COURT:**  What is this you handed up?  *Courtesy* --

19       **MR. PERLSON:**  *Courtesy* --

20       **THE COURT:**  Yeah, *Courtesy*.  What's the part you want

21   me to read there?

22       **MR. PERLSON:**  If you look at -- it's page 5 and 6 in

23   the highlighted areas.  And it talks about how -- you know, the

24   definition includes negative trade secrets and where there's a

25   commercial value from a negative viewpoint.

1          And then it goes on in the next page and talks about how

2     the concept of negative research was emphasized in the case of

3     *Hollingsworth Solderless Terminal Co.*.

4          **THE COURT:**  So would you all agree with this, that it

5     looks like one way to reconcile all of this is to say the

6     negative is a -- can be a trade secret when it is acquired by

7     lengthy and expensive efforts?

8          **MR. GONZÁLEZ:**  Your Honor, that statement is made in

9     the context of a customer list.  And, in fact, almost every

10    case that they cite is a customer list case, which is not an

11    issue in this case and which we don't dispute.

12         What they're saying there is that if a company has a

13    lengthy customer list, you can't do what the branch manager did

14    in that case.  The branch manager quit.  He set up a competing

15    business.  And he just transferred all the customers over to

16    his new business.  That's what he did.

17         And the Court was saying, well, wait a minute.  That

18    customer list took a long time to put that together.  You can't

19    do that.

20         We don't dispute that principle.  But all of these cases

21    that they're citing, *Greenly*, *Kalmbach*, *Earthbound*, they're all

22    customer list cases.  That doesn't work, as these other cases

23    have recognized and as you've recognized, in the Silicon

24    Valley.

25         That doesn't work because a company can argue that

1  everything we do is hard and everything we do takes a lot of

2  work.  Everything we do takes a lot of effort, or whatever this

3  language is in here.  Lengthy and expensive effort.

4      Everything Google does is lengthy and expensive.

5  Everything.  That's what they would argue.

6      That's not the standard.  If that were the standard, you

7  would fall right into the trap that you're correctly pointing

8  out we can't put employees in.

9      If I'm an employee at -- pick a company -- Intel, and I

10  work there for five years, I'm going to learn a lot of general

11  knowledge in those five years.  I'm going to be better when I

12  leave in five years.  I'm going to be a better engineer because

13  I'm going to be far more knowledgeable.  I may know that a

14  certain type of wood works better than another type of wood.

15      According to them -- and this one case is talking about a

16  customer list -- as long as they can show that, oh, it took a

17  lot of effort and was expensive, then I can't use that, I can't

18  use that knowledge.

19      So where am I to go?  The Intel engineer who has been

20  there five years.  I've learned a lot.  And I concede it was

21  expensive.  Just what they paid me was a lot of money.

22  Probably half a million; maybe more, a lot more.  That's not

23  the standard and that shouldn't be the standard.  That standard

24  wouldn't work in the Silicon Valley.

25      I have one more thing to add.  I think it is directly on

```
 1   point.  If you want to do it after the break, we can.

 2        I can demonstrate to you that what they are proposing

 3   wouldn't work.  They know it wouldn't work.  And for that

 4   reason, you know what they do?  They shared this information

 5   that they claim is a trade secret in this case.  They share it

 6   with other companies.  And they have contracts with those other

 7   companies on what they can or cannot do with that information.

 8        And the language of those contracts, Your Honor, is very

 9   consistent with the language in these cases that I've shown

10   you.  And it's completely inconsistent with what they are

11   arguing now.

12        You see, Your Honor, there's two problems.  Not only can

13   the employee no longer move, but if the law were as strict as

14   they are now arguing, the Silicon Valley couldn't function

15   because we always share our secrets with other companies.

16   Always.  And there's always a NDA.  And the NDA has to have

17   language on what they can and cannot do with that information.

18        I want to show you, Your Honor, just one NDA.

19             THE COURT:  No.

20             MR. GONZÁLEZ:  It's right on point.

21             THE COURT:  You usurped Mr. Perlson's time.

22        I wanted to give you a chance to finish, and Mr. González

23   jumped in there.

24        Then we're going to take our break.

25        So you finish up your presentation on this point.
```

1           **MR. PERLSON:**  Well, Your Honor, I think that what

2      we've just heard really demonstrates my point, which is that

3      the arguments that we're hearing are really just jury

4      arguments.

5           If they want to argue to the jury that the negative trade

6      secret we have is not a trade secret because it's just they're

7      tools, and that sort of thing, then they can argue that.

8           As I mentioned before, we think that the -- the

9      tentative -- the further tentative jury instruction on trade

10     secret misappropriation, and the suggestions that we have to

11     it, have the correct balance to address these very concerns

12     that we're talking about.

13          **THE COURT:**  Did you all try to meet and confer on this

14     jury instruction?

15          **MR. EISEMAN:**  We had discussions about exchanging

16     proposals, but we never ultimately exchanged proposals on it,

17     Your Honor.

18          **THE COURT:**  You failed to do what I asked.  You didn't

19     actually sit down at a table and argue it out.

20          **MR. EISEMAN:**  With respect to number 4, that's

21     correct, Your Honor.

22          **THE COURT:**  Well, I certainly -- I think between these

23     two -- just between the two of you standing here, three of you,

24     you know the issues so well.  You will come up, if you tried,

25     with a better instruction than I could give.  But you're not

1    doing it, so I regret that.

2         **MR. EISEMAN:**  Your Honor, as Mr. Perlson said, we

3    think that your further tentative jury instruction got pretty

4    close to striking the right balance.

5         And our proposed changes in the document we filed on

6    November 3rd, we believe, takes this Court to where it needs to

7    be on this issue, because it is a balance.

8         **THE COURT:**  Maybe.  I'll go look and see.  We need to

9    take a break now.

10        Wait.  Ms. Dearborn wanted to say something.

11        **MS. DEARBORN:**  Just a quick point on the meet and

12   confer, Your Honor.  We actually did propose language to Waymo

13   regarding this issue on number 4.  We proposed a modification

14   to TGI5.

15        **THE COURT:**  All right.  We're going to come back and

16   continue in a minute.

17        We've got to deal with reasonable royalty, willfulness,

18   malicious, Ottomotto LLC, how we can tidy up the instructions

19   in this case.

20        Okay.  We'll see you in 15 minutes.  Thank you.

21        **MR. GONZÁLEZ:**  Thank you.

22                    (Recess taken at 9:51 a.m.)

23               (Proceedings resumed at 10:10 a.m.)

24        **THE COURT:**  Let's go back to work.  Let's go to

25   reasonable royalty.

1          **MR. BULAND:**  Your Honor, before we jump into

2    reasonable royalty --

3          **THE COURT:**  Your name is?

4          **MR. BULAND:**  Cory Buland, Susman Godfrey, Your Honor.

5          **THE COURT:**  Wait a second.  Let me get my list of

6    lawyers.

7      Cory Buland.

8          **MR. BULAND:**  Yes, Your Honor.

9          **THE COURT:**  Okay.  Go ahead.

10         **MR. BULAND:**  We moved past question number 3.  I

11   understand the offer of proof involves a lot of technical

12   information that we're not going to discuss today, but I did

13   want to raise an issue with Your Honor just so you're aware of

14   it.

15         **THE COURT:**  Fine.  Go ahead.

16         **MR. BULAND:**  And that's that one of the theories that

17   was disclosed in the order of proof was this theory that Uber

18   had disclosed trade secrets to its vendors.  The first time we

19   heard of it.  It was never disclosed previously.  There was no

20   discovery on it.  And, in fact, there are three interrogatory

21   responses that should have had that and did not.  And I would

22   be happy to provide you with those interrogatories.

23         **THE COURT:**  Wait a minute.  It's going to take me a

24   minute to digest what you just said.

25      You're saying that the theory of disclosure to vendors by

```
 1   Uber should not be permitted at trial on account of failure to
 2   answer interrogatories about that point?
 3        MR. BULAND:  And failure to disclose in any way that
 4   would have made us aware of it, take discovery on it and
 5   develop a defense on it.
 6        THE COURT:  Well, this has nothing to do with
 7   instructions, but I did ask the question.  So, okay, give me
 8   your -- give me a very short version of what interrogatory
 9   called for this information and was not answered properly.
10        MR. BULAND:  Sure, Your Honor.
11      The first is Interrogatory No. 28, where Uber asks
12   separately for each alleged Waymo trade secret.
13          "Describe in detail how Uber Otto's acquisition, use,
14       or disclosure of such trade secret was a substantial
15       factor" --
16        THE COURT:  Wait.  Wait.  Wait.  Read slower.
17        MR. BULAND:  Sorry.  I can hand these up if you would
18   like to read along with me.
19        THE COURT:  No.  Just read it to me, please, but
20   slower.
21        MR. BULAND:  (Reading)
22          "Separately, for each alleged Waymo trade secret from
23       plaintiff's list of asserted trade secrets, pursuant to
24       California Code Civil Procedure 2019.210, describe in
25       detail how Uber Otto's acquisition, use, or disclosure of
```

1      such trade secret was a substantial factor in causing

2      Waymo's harm or Uber Otto's unjust enrichment, including

3      identifying whether the alleged act was acquisition, use,

4      or disclosure, and identifying all documents by Bates

5      number that relate to this allegation."

6      And the answer for each of the trade secrets at issue was:

7          "The risk that defendants will disclose Trade

8      Secret" -- I have right in front of me -- "Number 2 is

9      another substantial factor in causing Waymo harm, although

10     not one that Waymo can necessarily quantify.

11         "Defendants have already begun making regulatory

12     filings" --

13         **THE COURT:**  Wait.  You're going too fast.  Read it

14   more slowly.  For some reason, when you go fast I just can't

15   hear all the words clearly.

16         **MR. BULAND:**  Sorry, Your Honor.

17         "The risk that defendants will disclose Trade Secret

18     Number 2 is another substantial factor in causing Waymo

19     harm.  Although, not one that Waymo can necessarily

20     quantify."

21         "Defendants have already begun making regulatory

22     filings that reference Waymo's trade secrets.  And if

23     defendants continue using Waymo's trade secrets in their

24     self-driving car endeavors, there would likely be

25     additional filings disclosing other aspects of Waymo's

1    trade secrets.

2         "Improper disclosure of trade secrets is, of course, a

3    classic injury because such disclosure destroys trade

4    secrets altogether."

5    That's the only thing about disclosure in the answer

6    there.  Nothing about vendors.

7         **THE COURT:**  Okay.  Hold that thought.

8    Is that correct, Mr. Jaffe?

9         **MR. JAFFE:**  Do you have a copy of the interrogatory

10   response?

11   This is the first we're hearing of this argument from

12   them.

13        **THE COURT:**  Well, take a quick look.  I'm not going to

14   make a ruling on this right now.  I just would like to --

15        **MR. BULAND:**  Your Honor, would you like a copy for

16   your records?

17        **THE COURT:**  Sure.  Give it to me.

18        **MR. JAFFE:**  Counsel just handed me an 18-page response

19   to supplemental interrogatories that I haven't had a chance to

20   review.

21   But just as a starting point, this Interrogatory 28 is

22   talking about "substantial factor in causing harm."  At least

23   my reading of what this is asking about is asking about

24   injunctive relief, and is really a remedies-related --

25        **THE COURT:**  Which question are we focusing on?

1          **MR. JAFFE:**  Well, this is Interrogatory No. 28, that

2     Counsel had just read.

3          I think -- if I can just back up for a second and make two

4     brief points.  Number one is, the trial exhibits that we've

5     disclosed, these are ones that we used and I used with their

6     experts, their fact witnesses repeatedly.  And we cite in here

7     discussion of them sending these documents to their experts.

8          If they want to object on the basis of these documents

9     coming into evidence at that time, with the idea they weren't

10    disclosed in discovery, which they were --

11         **THE COURT:**  Wait.  Were they disclosed in the Rule

12    26(a) initial disclosures or supplements thereto?  That's got

13    to be done too.

14         **MR. JAFFE:**  I don't see how these specific documents

15    would be required to be disclosed in a Rule 26(a) initial

16    disclosures.

17         **THE COURT:**  Well, if you want to use it at trial,

18    you've got to disclose it in Rule 26.

19         **MR. JAFFE:**  Witnesses.

20         **THE COURT:**  That's what the rule says.  Witnesses and

21    documents.

22         **MR. JAFFE:**  Yeah.  I mean, categorically --

23         **THE COURT:**  Categories of documents, yes.  It doesn't

24    have to be specific documents.  Like, you can say in an

25    employment case, "the employment file."  That's okay.  That's

1    good enough.

2        But it has -- or you could have said in this case,

3    communications to vendors, or things that might have picked it

4    up, but in some fair way.  In the disclosure itself, they've

5    got to be on notice.  That's how they decide who to take

6    depositions of is what's in those disclosures.

7        **MR. JAFFE:**  Our categories of information, I'm pretty

8    sure, included things -- I don't have it at the tip of my

9    fingertips, but included evidence of misappropriation,

10   including disclosure.  But I don't have that in front of me, so

11   I don't want to represent that one way or the other without

12   looking at it.

13       What I can -- what I can tell you is, these are Uber

14   documents, not our documents, that we received in discovery and

15   we're asking them about.  And there's no sort of surprise as to

16   the vendor issues here.

17       If Your Honor remembers, this all started when one vendor

18   erroneously sent an email to us.  So the idea they haven't

19   known about vendors is -- is a nonstarter.  That's what kicked

20   off this case.

21       **THE COURT:**  Look.  We're not going to solve this

22   problem today.  Thank you for bringing it to my attention.

23       I'm not making any ruling about whether or not the

24   disclosures were adequate or the interrogatory answers were

25   better.  But I do want to say one thing to Uber was "a

1    substantial factor in causing" was a qualifier.  So you --

2              **MR. BULAND:**  Your Honor, there's another interrogatory

3    that actually says:

4              "Describe all instances in which the trade secret or

5         Waymo LiDAR device containing the trade secret was

6         publicly or otherwise disclosed to third parties.  And

7         identify all documents concerning" --

8              **THE COURT:**  That one is more on point.

9              **MR. BULAND:**  And they say nothing.

10             **THE COURT:**  Well, where is that one?

11             **MR. BULAND:**  It's interrogatory No. 8, Your Honor.

12             **THE COURT:**  Did you give me that one?  Why didn't you

13   start with that one?  Why did you start with one that has --

14             **MR. BULAND:**  Your Honor, I started with that one

15   because that's the only one where their disclosure actually

16   appeared in response.  And the actual interrogatory is:

17             "Separately, and for each alleged Waymo trade secret

18        identified in response to interrogatory 1" --

19             **THE COURT:**  I'm sorry, which one of these do I look

20   at?

21             **MR. BULAND:**  I'm sorry.  It's number 8, Your Honor.

22             **THE COURT:**  Number 8.  It goes from -- here's 8.  All

23   right.

24             **MR. BULAND:**  We tried to save a few trees.

25             **THE COURT:**  It says "Uber does not dispute."

1   See.  You're saying that there's no -- well, they do refer

2 to the gorilla circuits here.  That's a disclosure; right?

3    **MR. BULAND:**  Your Honor, I think near the end of this,

4 the disclosure, it says:

5     "Waymo is not aware of any instances in which the

6     trade secrets identified in response to Interrogatory No.

7     1 or any Waymo LiDAR device utilizing the trade secret was

8     publicly or otherwise disclosed to third parties."

9    **THE COURT:**  I must be looking at the wrong place.  I'm

10 looking at page 14.  Bottom of 14.

11    **MR. BULAND:**  Sorry, Your Honor.  Page 185.

12    **THE COURT:**  You didn't give me --

13    **MR. BULAND:**  Objection number 8.

14    **THE COURT:**  Interrogatory No. 8 incorporates its

15 general objections.  Many objections.

16  Okay.  Was there ever any supplement to this?

17    **MR. BULAND:**  Not that I could locate, Your Honor.  I

18 looked for any further --

19    **THE COURT:**  All right.  What is your response to this

20 one?

21    **MR. JAFFE:**  Your Honor, I think a fair reading of this

22 one, and our interpretation of it when we were responding, is

23 this is asking whether we publicly disclosed anything.  And

24 that's how we responded.  This is asking, did you disclose this

25 thing publicly or to third parties?  And our answer is, no, we

1    didn't.

2            **THE COURT:**  Well, were the other ones that surround,

3    like, 7 and 9, were they related to the validity of the trade

4    secret?

5            **MR. JAFFE:**  I'm sorry?

6            **THE COURT:**  In other words, what leads you to believe

7    that the passive tense that was used here was Waymo?

8            **MR. JAFFE:**  We were focusing on the word "publicly."

9    And the parenthetical says "or any Waymo LiDAR device using the

10   trade secret."  This is talking about us, Waymo.

11           **MR. BULAND:**  They didn't even disclose their own

12   vendors, if that was the interpretation.

13           **THE COURT:**  Why didn't you, when you framed your own

14   interrogatory, say "Identify all instances in which Uber" --

15           **MR. BULAND:**  That would have been another way to do

16   it, Your Honor.  I agree that might have been even more clear.

17           **THE COURT:**  I don't have an answer for you.  But I

18   don't -- there we go.  We've got to move on.

19        Okay.  Now we go to question number 5, on reasonable

20   royalty.  "Does the judge or jury decide reasonable royalty?"

21           **MR. EISEMAN:**  The jury does, Your Honor.

22           **THE COURT:**  Is there a decision right on point?

23           **MR. EISEMAN:**  Under the California Uniform Trade

24   Secret Act we cite Your Honor.  We've cited this case in our

25   critique.  It's *De Lage Landen versus Third Pillar Systems*.

1    It's an Eastern District of Pennsylvania case.

2            **THE COURT:**  Okay.  And I'm looking at that.

3            **MR. EISEMAN:**  If you look -- I didn't highlight the

4    first sentence, but if you take a look at the first sentence of

5    the opinion, Your Honor, it reads:

6            "Before the court for resolution is the question

7        whether plaintiff's damage claim for reasonable royalties

8        under the California Uniform Trade Secrets Act is to be

9        decided by a judge or by a jury."

10       And applying Seventh Amendment jurisprudence, the Court

11   goes through, on pages 2 and 3 of the opinion, the two-step

12   process, determining whether there's a Seventh Amendment right.

13   And on the last page of the opinion the Court concludes as

14   follows:

15           "In sum, the Seventh Amendment to the Constitution

16       guarantees Third Pillar the right to a jury determination

17       of reasonable royalties under the CUTSA."

18       And so it's right on point, Your Honor.  It's an Eastern

19   District of Pennsylvania decision, but it's on point.

20           **THE COURT:**  And it's attempting to apply California

21   law?

22           **MR. EISEMAN:**  It is, Your Honor.

23           **THE COURT:**  So it is exactly on point; although, it's

24   not a Ninth Circuit decision.

25       So what do you say to this decision?

1          **MR. BULAND:**  Your Honor, let me start by saying we

2    agree that the jury should be instructed on the issue of

3    reasonable royalty.  Although, Your Honor can always treat it

4    as advisory under rule 39.

5          **THE COURT:**  Wait.  I didn't hear the last sentence.

6    Say it again.

7          **MR. BULAND:**  Your Honor could always, after the trial,

8    revisit it and treat it as advisory, if there is actually a

9    reasonable royalty ruling.

10       But we don't think that there's enough evidence in this

11   case to present a reasonable royalty to this jury.  So we don't

12   think Your Honor --

13        **THE COURT:**  Why would you say that?  I haven't heard

14   the evidence yet.  We don't know until we hear the -- you know,

15   you lawyers think you can't prove anything unless there's an

16   expert.

17        **MR. BULAND:**  Your Honor --

18        **THE COURT:**  That's not true.

19       You know, in the old days, lawyers actually could try

20   cases with a fact witness.  They didn't have to have

21   mouthpieces on both sides to prove up everything.

22       And so the fact witnesses can prove up reasonable royalty.

23   Maybe.  I don't know.  I haven't heard the evidence yet.

24        **MR. BULAND:**  Your Honor is right that you don't need

25   an expert in every case.  You've got a reasonable royalty case.

1   We agree with that.

2       But there are some cases where there's not enough evidence

3   for a jury to render a nonspeculative opinion.

4       Waymo has now submitted an order of proof.  When we had

5   the interrogatories and all the fights over disclosures of the

6   damages earlier this year, they said, We're going to have an

7   expert do it.  We're going to have an expert do it.

8       The expert did it.  He got struck.

9       Now we have a new disclosure about how they'll prove the

10  reasonable royalty.  There is nothing in that disclosure that

11  would let a jury render a nonspeculative award about the amount

12  of reasonable royalty.  And the Ninth Circuit says juries don't

13  get to do that.

14          THE COURT:  Ninth Circuit says what?

15      MR. BULAND:  Juries don't get to render speculative

16  awards like that.

17      And there's a case almost directly on point.  It's in the

18  copyright context, but it's dealing with the hypothetical

19  license which is analogous.  That case is *Oracle versus SAP*.

20          THE COURT:  I think I read that one.  You cited that

21  in your earlier brief.  Okay.  That's copyright, Ninth Circuit.

22  All right.

23      MR. BULAND:  Your Honor, and there's also another

24  case -- so that's copyright.

25          THE COURT:  What does the statute actually say?  I

1    thought the statute said something like that if you can't prove

2    unjust enrichment, then you turn to reasonable royalty.

3              **MR. BULAND:**  That's exactly --

4              **THE COURT:**  Is that the way it works under both

5    statutes?

6              **MR. BULAND:**  Your Honor, that's exactly how it works

7    under the CUTSA.  That's what the language says.  Just

8    paraphrase.

9         The DTSA is ambiguous.  But both houses of Congress said

10   that's how we want it to work, as a remedy of last resort.

11             **THE COURT:**  Wait a minute.  I understood what you

12   meant on California.  You're saying that under the federal

13   statute it's ambiguous.

14        Somewhere up here I actually have the federal statute.

15   But I've got too much paper now, and I can't find it.

16        All right.  Hand it up to me.

17        What you've handed me is 18 U.S.C. 1836.  What part do I

18   look at?

19             **MR. BULAND:**  Remedies are on the last-to-back page,

20   Your Honor, the fully back page.

21             **MR. EISEMAN:**  Item 3 large B, Your Honor.

22             **THE COURT:**  Okay.  Under B it says:

23             "Award - Damages for actual loss ... 2, damages for

24        unjust enrichment ..."  Wait.  I should back up.  "Damages

25        for actual loss ... and damages for unjust enrichment ...

1          or in lieu of damages by any other methods, the damages

2          caused by the misappropriation measured by the imposition

3          of liability for a reasonable royalty for the

4          misappropriator's disclosure or use of the trade secret."

5          So it does seem that under the federal statute, you either

6     get damages measured by unjust enrichment and actual loss or

7     damages measured by reasonable royalty, but not -- you don't

8     get all of them.

9          **MR. EISEMAN:**  That's correct, Your Honor.

10          **THE COURT:**  Correct?

11          **MR. EISEMAN:**  That's correct, Your Honor.

12          **THE COURT:**  So you agree with that. okay.

13          You tell me, what is the point of disagreement between you

14     two?

15          **MR. EISEMAN:**  I think there is no point of

16     disagreement.

17          I guess that there's a jury trial right, which is what I

18     thought we were talking about here.  And then I heard

19     Mr. Buland say we're not going to be able to make proof of

20     reasonable royalty to get damages.

21          But we've submitted an offer of proof.  Your Honor is

22     going to instruct the jury on reasonable royalty factors.  And

23     there's going to be plenty of evidence from which a jury can

24     find --

25          **THE COURT:**  And we use the *Georgia-Pacific*, is that --

1          **MR. EISEMAN:**  That's correct, Your Honor.

2          **THE COURT:**  Both sides agree that it goes -- that if

3     the jury decides *Georgia-Pacific* factors should apply?

4          **MR. BULAND:**  Your Honor, if there was enough evidence

5     to give that instruction, we agree with the one previously

6     submitted on the *Georgia-Pacific* factors, yes.

7          **THE COURT:**  Okay.

8          All right.  You say on the Uber side that it would be

9     advisory and for the judge to decide.  It would be an advisory

10    verdict on reasonable royalty?

11         **MR. BULAND:**  Your Honor, it may be we think that --

12    the issue, frankly, has only come up in a few District Court

13    cases.  They all, candidly, have gone Waymo's way outside of

14    this Circuit.

15         It comes down to a constitutional issue of whether or not

16    California statute and the federal statute, which do commit

17    reasonable royalty to the Court, pass Seventh Amendment muster.

18    And it's a close question.

19         **THE COURT:**  Wait a minute.  That was too many

20    compound -- wait.  The federal commits it to the judge, you're

21    saying?

22         **MR. BULAND:**  Yes, Your Honor.

23         If you turn to the previous page, it talks about a court

24    may.  A court -- it says a court may do these things.  And when

25    it says that, the question of whether there's a jury right just

```
1    is a straight Seventh Amendment analysis.

2         THE COURT:  Well, it says:  A court may, A, grant an

3    injunction; and then, B, award.  Then it says "damages."

4         So it's true that an injunction is by the judge.  But

5    damages would normally be by a jury.

6         I don't get -- what is your argument?  That under the

7    federal statute the judge should decide reasonable royalty?

8         MR. BULAND:  Well, the question is whether the Seventh

9    Amendment compels it.  That's the question when a statute is

10   silent, is whether the Seventh Amendment compels it.  If it

11   compels it here, it also compels it in California, rendering

12   the CUTSA provision unconstitutional.

13        And we think the Court should hold off on the final

14   determination and doing the Seventh Amendment analysis, out of

15   constitutional avoidance, until we get to that point after

16   trial.

17        THE COURT:  Wait.  You would let the jury decide it as

18   if -- as if the jury should decide it?

19        MR. BULAND:  Yes.

20        THE COURT:  Then if you lose, you want to argue with

21   me that I should substitute my judgment.

22        MR. BULAND:  We may argue that, Your Honor.  But,

23   candidly, we haven't found any authority contrary on this

24   issue.

25        THE COURT:  Maybe that's the way we go, but --
```

1          **MR. EISEMAN:**  Could I make one point --

2          **THE COURT:**  Please, go ahead.

3          **MR. EISEMAN:**  -- with respect to the federal statute?

4     Your Honor, there is no case under the DTSA deciding

5     whether there's a Seventh Amendment jury trial right.

6          But the DTSA was modeled after the USTA.  And I can give

7     you legislative history to that effect, but I don't think the

8     defendants dispute that.

9          And there are Seventh Amendment cases under the UTSA --

10    and I'll hand up one to Your Honor -- specifically saying

11    there's a Seventh Amendment right to have reasonable royalty

12    damages decided.

13         And so we think that, in effect, under the DTSA, the exact

14    same Seventh Amendment jurisprudence would govern.

15         This is *MSC Software Corp.* versus *Altair Engineering*.

16         If you look down -- again, I didn't highlight the

17    beginning of this, but at the bottom of the first column the

18    Court writes: "MSC contends" --

19         **THE COURT:**  You highlighted virtually every paragraph

20    here.  Okay.  All right.

21         **MR. EISEMAN:**  In the first column:

22         "MSC contends that it is entitled to a jury trial on

23         all aspects of its misappropriation claim, including all

24         of its theories of damages which encompasses a reasonable

25         royalty and unjust enrichment.  The Court agrees with MSC.

1    The reason follows."

2        And then the Court goes through a Seventh Amendment

3    two-prong analysis and concludes that under the UTSA, which was

4    the model for the DTSA, there is a Seventh Amendment jury trial

5    right on this issue.

6        **THE COURT:**  Okay.  All right.  Let's move to the next

7    topic.

8        **MR. BULAND:**  Your Honor, I just wanted to make -- if I

9    could indulge for one minute -- make one more point about the

10   ability to present this case to a jury on the reasonable

11   royalty cases.  It's important for another reason that I just

12   wanted to flag for Your Honor.

13       There's a lot of the evidence they cite in that offer of

14   proof; in fact, almost all of it.  They make no attempt to

15   apportion it.  They make no attempt to tie it to the trade

16   secrets at issue.

17       And Your Honor is very familiar with the Federal Circuits'

18   line of cases about -- *Laser Dynamics* and others, that say you

19   can't just lob these big numbers at a jury, say, they'll think

20   of something.  It will pollute the verdict irrevocably.

21       And so I think it is an issue that should be addressed

22   before they start introducing these large numbers, which is

23   basically our entire reasonable royalty case, of which they

24   still haven't apportioned in any way.

25       Rule 26 says they need to give us a computation of their

1    damages.  It's right there in the rule.  They never did at the

2    beginning of the trial.  Their interrogatory never computed a

3    reasonable royalty.  They said, well, an expert would do it.

4    The expert is gone.  Their order of proof still doesn't do it.

5        They haven't shown any way to compute a reasonable

6    royalty.  And if you don't have a way to compute it that's not

7    speculative, it shouldn't go to the jury.  And we shouldn't

8    have to deal with all these problems that will be introduced by

9    their evidence on reasonable royalties, these billions and

10   billions figures.

11           **THE COURT:**  Okay.  Would you like to respond or not?

12           **MR. EISEMAN:**  Certainly, Your Honor.

13       First of all, respectfully, we don't agree with Your

14   Honor's decision with respect to Mr. Wagner, but you've made

15   the decision.  And you were very clear in your order that we

16   would still get to put on a damages case based upon documents

17   and witness testimony.  And we intend to do that.

18       And they'll get to cross-examine the witnesses presenting

19   documents and testimony; and we'll cross-examine theirs; and

20   the jury will be instructed.

21           **THE COURT:**  I was mainly talking there about the

22   unjust enrichment damages.  I don't think I even got into

23   reasonable royalty.  But I'm not going to rule on that now.

24       The general principle still applies.  Though, on the facts

25   of this record, it may -- I don't know the answer yet.  But the

```
 1   general principle is, you do not have to have an expert prove

 2   reasonable royalty.

 3       Let's just take an easy case.  Let's say that you had --

 4   you had a patent case where the accused had sent a letter

 5   offering to pay 2 percent royalty.  And you had a pattern and

 6   history where the company in question, the patent owner, had

 7   licensed the very same technology for 2 percent to many people.

 8   It would be a no brainer for the jury to award 2 percent.  You

 9   don't have to have an expert say that it's a reasonable

10   royalty.  It would be perfectly okay.  So the idea that you

11   have to have an expert prove everything in a case is wrong.

12       Now, do I know that our case is that simple and

13   straightforward?  It's probably not close to that.  However,

14   there could be -- I'm not prepared to say there's not enough

15   admissible evidence that a jury could find a reasonable royalty

16   here.

17       All right.  So we're not going to -- I'm not going to rule

18   it out just on the fly like that.

19       Yes, go ahead.

20       **MR. BULAND:**  Your Honor, I think the *Oracle* case we

21   handed up, they said on remand you can't present this to the

22   jury because there's no way to calculate a reasonable royalty

23   from this.

24       It's not speculative.  They had a lot of the same numbers.

25   Internal sales projections, the size of the theft, and things
```

1  like that.

2       THE COURT:  After I hear it, I can maybe rule it out

3  before it goes to the jury.

4       MR. BULAND:  But once we're at that point, Your Honor,

5  they will have introduced all these billions and billions they

6  want to talk about.  The Federal Circuit says, once that's in,

7  the verdict is compromised.  Once they've shown --

8       THE COURT:  I don't believe that's what the Federal

9  Circuit -- that's not the way you try a case.  That's not the

10  way you can possibly try a case.  You're saying a judge has got

11  to sort it out in every case -- has got to sort out the damages

12  numbers ahead of time, in every case, and not actually hear the

13  evidence?

14       MR. BULAND:  No, Your Honor.

15       THE COURT:  It's impossible and immoral to do that.

16       MR. BULAND:  I'm sorry to interrupt, Your Honor.

17    That's why Rule 26 says the plaintiffs have to compute

18  damages.  That's why interrogatories say you compute it.  And

19  we have a chance to see.

20     We still don't have a royalty number.  We still don't know

21  if it's a running rate, a lump sum.  There's no way to

22  calculate it.

23       THE COURT:  Well, that's because you knocked out their

24  expert.

25       MR. BULAND:  Well, they still need to disclose under

1  Rule 26 what it is.  They have an offer of prove.  There's

2  still no royalty.

3          **THE COURT:**  I'm not knocking it out upfront.  I may

4  knock it out at Rule 50 time, but I'm not knocking it out --

5          **MR. BULAND:**  Your Honor, may we still object at trial

6  to these specific damages figures that we do think are

7  objectionable under --

8          **THE COURT:**  Object away.  Object away.  Maybe one or

9  two of them you will sustain it on a case-by-case basis.

10      But it's impossible to try a case the way you want to try

11  the case.  It's -- no.  No.  No more on this.

12      We're going to number 6.  "Definitions of 'willful' and

13  'malicious.'"

14          **MR. EISEMAN:**  I have good news for you on that one,

15  Your Honor.  We have an agreement with the other side.  Can I

16  hand it up?

17          **THE COURT:**  You may.

18      Is this Ms. Meredith Dearborn?

19          **MS. DEARBORN:**  Yes.

20          **THE COURT:**  Are you the one responsible for this

21  agreement?

22          **MS. DEARBORN:**  I will take credit for it, Your Honor.

23  Although, obviously --

24          **THE COURT:**  You are a model for the rest of the

25  lawyers in this room who can't agree on anything.  Thank you

```
 1    for this.

 2             MR. EISEMAN:  Do I get 50 percent credit?

 3             THE COURT:  No, no.

 4             MS. DEARBORN:  I was just going to offer that, Your

 5    Honor.

 6             THE COURT:  That's why she's able to reach an

 7    agreement, because she's so reasonable.

 8          Okay.  Go ahead.

 9             MR. EISEMAN:  We based this jury instruction on CACI

10    4411.  And we modified it -- the parties agreed to modify it

11    only so that it fit the tenses that you used in your tentative

12    jury instruction 19.

13          CACI talks about "willfully and maliciously."  And Your

14    Honor's language was "willful and malicious."  So we just

15    modified the tenses.

16          If you want authority beyond CACI 4411, to support Your

17    Honor giving this instruction --

18             THE COURT:  99 percent I'm going to give it exactly

19    this way.  But if I do anything, it will be a minor tweak, so

20    it will only be to fit the verb tense.

21             MR. EISEMAN:  For the record, if you want a case

22    supporting giving this instruction, it would be *Ajaxo versus*

23    *E-Trade*, 135 Cal.App 421 2005.

24             THE COURT:  Thank you.

25          So next question.  Why do we even need Ottomotto LLC in
```

1   this case?  Why can't counsel tidy this up for the jury?

2       Okay.  What do you say to that?

3       **MS. DEARBORN:**  So, Your Honor, we proposed to Waymo

4   that Ottomotto be dismissed from the case.  They declined to

5   stipulate to that.

6       I think that the parties cannot reach a stipulation on

7   this front.  And so because they are different legal entities,

8   and plaintiff has chosen to sue both legal entities separately,

9   and indeed, Your Honor, plaintiff's proof in many ways depends

10  on legal entities being separate, we think that the jury needs

11  to be instructed on them both and to have separate jury verdict

12  forms.

13      **THE COURT:**  Well, tell me this, does Ottomotto LLC

14  even exist anymore?

15      **MS. DEARBORN:**  Yes, Your Honor.

16      **THE COURT:**  It does?

17      **MS. DEARBORN:**  Yes.  That is my understanding.

18      **THE COURT:**  Who owns the stock in that?

19      **MS. DEARBORN:**  My understanding -- and forgive me,

20  Your Honor.  I do not have documents in front of me, and I

21  don't want to misrepresent anything to the Court.  But my

22  understanding is that it's a wholly owned subsidiary.

23      **THE COURT:**  Who does?

24      **MS. DEARBORN:**  That it's a wholly owned subsidiary of

25  Uber.  But, again, I don't want to misrepresent.

1          **THE COURT:**  Does anyone over there know for sure?

2          **MS. DEARBORN:**  Let me just check.

3          **THE COURT:**  You ought to know that by now.  Maybe you

4     have the answer.

5          **MR. PERLSON:**  That's what I thought, Your Honor.

6          **THE COURT:**  What?

7          **MR. PERLSON:**  That it was a wholly owned subsidiary of

8     Uber.

9          **MS. DEARBORN:**  That appears to be the general

10    impression on our side, Your Honor.

11         **THE COURT:**  Why do you need Ottomotto LLC in this

12    case?

13         **MR. PERLSON:**  Well, I think there are a couple of

14    reasons.

15         One is, there's actually a -- one of the defenses that

16    you've heard from time -- time and again is that none of this,

17    you know, material made it to Uber.

18         But it did -- you know, really, I don't think there can be

19    any legitimate dispute that the principals of Ottomotto did

20    have these materials and -- talked about at length in the Stroz

21    report.

22         And so -- and then Uber bought Otto.  So part of the

23    entity that acquired trade secrets and used them, that was

24    Otto.  And then Uber bought Otto.  And Uber seemingly is trying

25    to take the position that they're not responsible for what went

1    on at Otto and the company that they bought and acquired all

2    its assets and liabilities.

3          THE COURT:  Well, maybe Otto is responsible.  But how

4    are you going to prove that Uber is responsible for what a

5    wholly owned subsidiary did wrong?

6          MR. PERLSON:  Well, we'll be able to prove -- we have

7    evidence that Uber has used it itself, also.  And then there's

8    also --

9          THE COURT:  That's a separate point.  That's a

10   legitimate point if you prove it.

11         But I'm wondering what individual acts done by Ottomotto

12   that Uber didn't do -- I guess you've got the spider thing.  Is

13   that it?

14         MR. PERLSON:  That's part of it.  And there's this

15   whole period of time from -- I mean, the misappropriation

16   occurred from when Ottomotto was created through the time in

17   which Uber acquired it.

18         THE COURT:  All right.  So let's say --

19         MR. PERLSON:  That's part of the whole story.

20         THE COURT:  I don't know.  You're the ones that have

21   to try the case.

22         But I've seen some things like this in prior cases.  So

23   the jury is in the jury room.  And they say, okay, they don't

24   have much of a case against Uber, but this Ottomotto group,

25   they're really guilty, so we're going to hit Ottomotto.  So

1    they hit them for a lot of money, but not Uber.

2          And then Uber just says, okay, they go into bankruptcy.

3    Good-bye Ottomotto.  But Uber walks away because they are not

4    the same as Ottomotto.  They are a separate entity.

5          Now, do we need to get into piercing the corporate veil

6    and all that stuff?  Has that been in play in the case?

7          MR. PERLSON:  I hadn't anticipated that those sorts of

8    shenanigans would come into play.

9          (Unreportable simultaneous colloquy.)

10         THE COURT:  -- that's a shenanigan.  It could be.  But

11   it might also be a legitimate -- corporate veil is sometimes

12   legitimate.

13         So what I was hoping you all would do is just agree that

14   whatever Ottomotto did wrong, we would eliminate them from the

15   case and tell the jury -- well, we would just say to the Uber,

16   Uber stands behind Ottomotto; and whatever Ottomotto did wrong,

17   Uber will make good on it.  Then Uber will be responsible for

18   everything.

19         That would simplify it for our jury.

20         MR. PERLSON:  Well --

21         THE COURT:  Are you willing to do that?

22         MS. DEARBORN:  No, Your Honor.  That would not be an

23   issue for the jury to decide.

24         The scenarios that I've heard here actually support Uber

25   and Ottomotto being separate on the jury form and in the jury

1    instructions.

2        Obviously we don't think any shenanigans are going on.

3    But these are separate legal entities.  The theories are

4    separate as to these two entities.  And the jury needs a way to

5    express its -- its conception that one entity --

6        **THE COURT:**  All right.  That's the way I'm going to

7    leave it.

8        But I want you to know, I have seen things like this

9    before.  And you good lawyers have too.  The jury could wind up

10   Uber wins, Ottomotto loses, and they actually think they are

11   helping the plaintiffs out to award money against a defunct

12   company.  And then you get to go home and declare victory, but

13   you get no money because there's no money there.  Think about

14   that.

15       All right.  I'm going to leave Ottomotto in.  You all

16   won't do what I asked you to do.

17       I think I have run out of points to bring up.

18       **MR. PERLSON:**  I think that was the last question.

19       **THE COURT:**  Say what?

20       **MR. PERLSON:**  I think that was the last question.

21       **THE COURT:**  Let me tell you what I would like for you

22   to do though.

23       By Friday noon, please submit any further objections that

24   you have on the special verdict form.

25       My pretty strong inclination is that, contrary to Uber, I

1    am going to ask whether or not the -- either defendant

2    acquired, but it will be a separate -- that's another -- I know

3    that you on -- that's another one that's going to possibly

4    backfire on the plaintiff because the jury could say, oh, we'll

5    split the baby.  Plaintiff wins on "acquire," loses on "use."

6    It's a very easy way this case could go.

7        So you get -- you know, I'm going to do it.  I'm going to

8    give you what you want on that.  You're going to get a question

9    on "acquire" because I want it for my own purposes.  I think it

10   helps the jury keep what the law is straight.  I will keep

11   Ottomotto in.

12       I'm going to try to come up with a good instruction on the

13   engineer mobility problem.  I'm going to come up with a good

14   instruction on negative know-how and, also, one on this agency

15   issue with Stroz and Morrison.

16       But that will not be done -- I'm going to try to get it

17   done before the final pretrial conference, but I can't promise

18   you that I will even have it done by then.

19       Let's talk a minute about the jury selection.  I believe

20   I'm going to do the same procedure that I did in the *Oracle*

21   *versus Google* case.

22       And I will have the -- there will be a short

23   questionnaire.  The questionnaire will be given only to us --

24   or only to the lawyers when that person is called forward.  So

25   you will not know who the -- what gems or horrors or cases are

1   waiting in the venire in the back of the room.

2       The jury office has told me we have plenty of people who

3   say they're available for the case, which surprises me.  But we

4   will not run out of jurors.  So we will get jury selection done

5   on that date.

6       And we will -- we will use the -- you stand up.  When you

7   exercise your three peremptories, you've got to stand up and

8   say we thank and excuse Mr. So-and-so.

9       So and then the challenge will go back and forth, so we

10  will all see who you challenged.

11      MR. GONZÁLEZ:  What's your thinking on alternates,

12  Your Honor?

13      THE COURT:  We already decided that.  We're going to

14  have ten altogether.  We're going to have a jury of ten.

15      And everything else we already decided at the final --

16  earlier pretrial conference.  So the next pretrial conference

17  will just be those items that we -- I think there are about

18  five or six things that you have brought up recently and that

19  we're going to have to plow through.

20      There are a couple of things that I owe you, that deal

21  with discovery, stonewalling and so forth.  I owe you on that.

22      Is there any hope that you would agree to back-to-back

23  experts so that experts on the same subjects would go back to

24  back, so it would be clearer to the jury?

25      So, for example, plaintiff puts on their expert to show

1  that these are trade secrets, and then that's immediately

2  followed by the other side's expert.

3          **MR. PERLSON:**  I don't think that Waymo would agree to

4  that, Your Honor, unfortunately.  I think that that would

5  involve them putting their experts in our case.

6          **THE COURT:**  Yeah, it would.  It would make it easier

7  for the poor jury to follow it.

8      What do you say?

9          **MR. GONZÁLEZ:**  Generally speaking, Your Honor, we

10 might be willing to consider something like that.

11         **THE COURT:**  You know that's about as --

12         **MR. GONZÁLEZ:**  Here's the issue.

13         **THE COURT:**  -- unhelpful, generally speaking you might

14 consider that.

15         **MR. GONZÁLEZ:**  Can I tell you what the issue is, Your

16 Honor?

17         **THE COURT:**  What?

18         **MR. GONZÁLEZ:**  If their expert falls flat, we may

19 decide not to call an expert at all.

20         **THE COURT:**  I don't believe that.  I don't believe

21 that for a second.

22     They're not going to fall that flat anyway.  You might

23 score a point here or there.

24         **MS. DUNN:**  I think the issue, Your Honor, is that with

25 the 16-hour clock we really have to figure out where we want to

1    prioritize our time.

2        So if you'd let us think about this question, that would

3    be helpful.

4        **THE COURT:**  All right.  You think about it for the

5    final pretrial.

6        I can order it.  I don't need your okay.  I can just say

7    that's the way it's going to be.  But I don't want to do that.

8    I would prefer you agree on this.

9        I'm telling you, other judges have used this, and they say

10   it vastly improves -- so do we have any members of the press

11   out there?

12       (Show of hands)

13       **THE COURT:**  Anybody in the press.

14       So one of the tutorial points, teaching points is, how do

15   we help the jury understand the case?  What are the methods

16   that we could use to help the jury understand the case?  So

17   this is one that -- sometimes judges who have more experience

18   than me have suggested back-to-back experts.

19       So I think I'd like to consider it.  But right now I'm not

20   going to order it.  I'm just going to say that even though I

21   have the authority to order it, I would like for you all to

22   think about whether or not it should be done.

23       Okay.  I'm about to leave the bench.  I don't want to get

24   into any argument on new motions.  But if you have a

25   housekeeping thing, I'm happy to hear it now.

1      Anything you want to bring up?

2          MR. GONZÁLEZ:  So, Your Honor, can I give you -- yeah,

3  one housekeeping is that we filed a motion on Trade Secret

4  number 5.

5          THE COURT:  I am inclined to deny that.  You used

6  up -- I gave you one motion in limine, and you used it on

7  something else.

8          MR. GONZÁLEZ:  We did, Your Honor.  And we were very

9  candid about that, saying there's another issue that we think

10  the jury would benefit from having it resolved before, but we

11  leave that to your judgment.

12          THE COURT:  I'm thinking I will probably deny that

13  one.

14      What else?

15          MR. GONZÁLEZ:  The other issue is, one of the cases I

16  was handed --

17          THE COURT:  Let's just say denying you the right to

18  bring yet another motion in limine.  That's not to say that

19  some of those evidentiary points are not valid.

20      Please don't think that I'm ruling that they don't get to

21  raise these things question by question.  That would be a

22  different thing.

23          MR. GONZÁLEZ:  Of course.

24          THE COURT:  Yes.

25          MR. GONZÁLEZ:  Just briefly, Your Honor.  Just one

```
 1   sentence.  On the case that they handed me, that I didn't have
 2   a chance to review, that you liked on the duty to restore
 3   stolen property --
 4           THE COURT:  Yeah.
 5           MR. GONZÁLEZ:  -- I have now read it.  I just wanted
 6   to note that this is language that comes in a criminal context.
 7   And both cases that it cites are criminal cases.
 8        So, as you know, under the Trade Secrets Act, all of the
 9   claims are preempted.  So this language, in our view, shouldn't
10   apply to this case at all because it's in the context of a
11   criminal case.
12        And the last thing I wanted to mention, Your Honor, is --
13   I mentioned this briefly during the argument -- I think it
14   would be helpful to you, when you're trying to decide what the
15   jury should be told about what's in someone's head and whether
16   or not that's a secret, I think it would be helpful to you if
17   you saw -- it's just one sheet of paper -- their standard
18   nondisclosure agreement, because it addresses that exact point.
19        And it says that they are allowed to use information in
20   their heads.  And the only exception is if they intentionally
21   try to memorize it.  This is in their NDA.
22           THE COURT:  Show it to me.  This is what they show
23   employees or show vendors?
24           MR. GONZÁLEZ:  This is what Google provides to vendors
25   who receive the precise same information that they claim is a
```

1   trade secret in this case.

2           THE COURT:  What do the employees have to sign?

3           MR. PERLSON:  Your Honor, this just seems totally

4   irrelevant.

5           THE COURT:  No, I don't think it's irrelevant.  I

6   would just say -- I would just say this is only part of the

7   story.

8       Okay.  I see your point.  I'll just hold on to this.

9           MR. GONZÁLEZ:  And so my point was that in terms of

10  deciding, you know, what to say to the jury about how they

11  should treat what's in the head of an employee, I think the

12  Court should at least consider what they say to other

13  companies.

14          THE COURT:  No.  What the facts are is one thing.

15  What the law is, is another.

16      So that may be a good jury argument, but it -- this is

17  not -- this is not the law.  What Google tells its vendors is

18  not the law necessarily.  It's what they impose on their

19  vendors.

20          MR. GONZÁLEZ:  One sentence to fix what I said,

21  because this is the clarification.  The point that I'm making

22  with this document is that they understand, themselves, that

23  the law cannot be what they are now arguing that it should be;

24  that everything in somebody's head is a trade secret.

25      They understand that is unworkable.  And so when they

1   share this information with third parties, even the third

2   parties can use what's in their head, at the end of the day,

3   because they know it would be unworkable to say to the third

4   party, you can't use anything in your head because it's our

5   trade secret.

6       That's my point.

7           **THE COURT:**  All right.  All right.

8       Since you got that extra, you want to say anything, have

9   equal time?

10          **MR. PERLSON:**  Your Honor, I don't think that

11  accurately characterizes our position, which I think is

12  reflected in our proposed jury instruction which I think

13  resolves these issues.

14      I think we've already had plenty of argument on this, this

15  morning.  If there are some specific questions you want me to

16  answer, I'm happy to do so.  But I'm not sure how productive it

17  is to reargue what we already did this morning.

18          **THE COURT:**  Let me ask you another question that I've

19  been contemplating.

20      I've been thinking about the -- Levandowski.  And I'm

21  balancing in my mind two things.  One is the legitimate need of

22  the jury or the legitimate interest of the jury in actually

23  seeing him in the flesh on the stand, even if all he does is

24  invoke the Fifth Amendment.  I think he's such an important

25  player in the case that the jury should see him.

```
 1        On the other hand, I think that allowing either side to go

 2   on and on with the argumentative questions, knowing that

 3   everything he's going to be taking the Fifth, I'm thinking

 4   about putting a limit, like 25 questions.  So you pick your

 5   best 25 on both sides, and ask those questions, and then we

 6   excuse him.

 7        I could be talked into a bigger number, a smaller number.

 8   But I am probably going to put some limit on how many questions

 9   there are.  And then that's kind of the balance I'm thinking

10   of.

11        We don't need to argue that now.  But I want to alert you

12   that I'm thinking that we'll take it up at the pretrial

13   conference.

14        MR. GONZÁLEZ:  Can I ask you a clarification on that,

15   Your Honor?

16        I am assuming that when you say that, you want to put a

17   limit on the questions that we know he's not going to answer?

18        THE COURT:  Yeah.  Ones that he does answer, no limit

19   on those.  But I'm thinking he won't answer any questions.  So

20   I'm thinking that he'll give his name and address, and then

21   he'll start -- now, if it were to be that because he's

22   buddy-buddy with Uber, that he's willing to answer your

23   questions, but he's not going to answer their questions, well,

24   I think everyone would see through that pretty quickly.  And he

25   will be ordered, on pain of going to prison, ordered to answer
```

1    the reciprocal questions for them.

2        He's not going to do that.  I know you're too good a

3    lawyer to try such a trick.  But if he were to answer

4    questions, then those don't count against him.

5            MS. DUNN:  Your Honor, the line that he drew in

6    deposition was he answered questions from anybody who asked

7    about the time before he got to Google.  So I don't -- we don't

8    have insight into what his --

9            THE COURT:  Did Google ask questions about that in the

10   deposition?

11           MR. PERLSON:  Not many, Your Honor.  So, I mean,

12   what -- if we have this limit, what -- what -- I mean, at least

13   in I think it was the first deposition, what happened was, I

14   asked a bunch of questions.  And he answered almost none of

15   them.  And then there was, like, a redirect from Uber, that

16   kind of like brought out the history.

17       Remember the great story that Mr. González told you

18   that --

19           THE COURT:  Yeah.

20           MR. GONZÁLEZ:  -- they had at the beginning of the

21   case?

22           THE COURT:  What's wrong with letting the jury know

23   that great story --

24           MR. PERLSON:  They can ask those questions --

25           THE COURT:  -- motorcycle --

1        **MR. PERLSON:**  They can ask those questions if they

2   want.

3     I think that what you're going to see is that if you put

4   some sort of limit on the number of questions that can be

5   asked, that will elicit a Fifth Amendment answer, then it's

6   going to be lopsided so that they can ask more questions than

7   we can ask.

8        **THE COURT:**  Well, then, the -- well, you could still

9   ask questions about the prior period.

10        **MR. GONZÁLEZ:**  And they go first.  If they want to

11   call him and ask him all his background --

12        **THE COURT:**  You raise a point.  It can't come out

13   looking lopsided.  Maybe 25 is too few.  But I don't think you

14   should ask -- you put in, like, 3- or 400 questions before.

15   That's way too many.  So I don't -- that just allows you to try

16   to prove your case through an adverse inference instead of real

17   proof.  And that's not -- that's not fair to the system.

18     So you -- we need some balance of these competing

19   interests.  So be thinking about what a proper limit is.

20        **MR. PERLSON:**  I take your point, Your Honor.  We'll

21   think about it.  And we can discuss it further at the pretrial

22   conference.

23        **THE COURT:**  If you two could agree, I would appreciate

24   it.  That would be great.

25        **MR. PERLSON:**  I can tell you, just as a matter of -- I

1    think at some point the jury probably wouldn't want to, you

2    know, hear two days of someone saying the exact same thing.

3    So, you know, there's back and forth --

4              **THE COURT:**  Or even two hours.

5              **MR. PERLSON:**  Right.  Understood.

6              **THE COURT:**  Even two hours.  I would say somewhere

7    around 30 minutes to 45 minutes of "I take the Fifth Amendment"

8    would be plenty.

9         All right.

10             **MS. DUNN:**  Your Honor, just to clarify.  I think this

11   is implicit based on your prior rulings, but you -- you plan to

12   still evaluate the questions for whether there's been a factual

13   predicate, so that --

14             **THE COURT:**  I do, yeah.

15        There's got to be corroborating evidence to support each

16   question.  But it doesn't have to be powerful evidence.  It

17   just has to be plausible evidence to support it, that's

18   actually going to get into evidence.  I don't mean an ex-parte

19   showing to me.  I mean something the jury is going to otherwise

20   hear.

21        Oh, the last thing I want to raise with you, I am

22   concerned about the public and the members of the press and

23   their convenience.

24        There will be times that we need to clear the courtroom.

25   But I would like to be able to consolidate all of those time

1   periods into one, two, or three or four limited periods so that

2   members of the public and press don't have to go in/go out, go

3   in/go out.  And that will be even more disruptive to the jury.

4        So we need -- you all need to think of a way to -- for

5   example, if you're going to have -- okay.  Today we're going to

6   go through the trade secrets.  So we say to the -- well, let's

7   say we announce at the end of the day, okay, tomorrow you might

8   as well not show up because we're going to clear the courtroom

9   for the entire day.  That could be one way to deal with it.

10       But you need to -- you need to help me find a way to make

11  this work for the public and the press.  So think about it.

12  It's something that I'm sensitive to.  And if it gets out of

13  hand, I may just say, Cover it later; we're not going to cover

14  it now; the press gets to stay, so go to something else.

15       So you may put me in that box, and I don't want to be

16  there.  I want you lawyers to work that out.

17       All right.  I think I've run out of things to go over.

18       Anything more?

19       **MS. DUNN:**  Your Honor, there is one thing that I just

20  want to make sure that we have put on the record as part of our

21  argument on the imputation issue, which has to do with this

22  case *Naftzger*, that they raised.  And we don't need to discuss

23  it, but I want to make sure we argued in on the record.

24       This case refers to a criminal statute about theft.  And

25  my -- my legal --

1          **THE COURT:**  That's what Mr. González said.  It's a

2     criminal case.

3          **MS. DUNN:**  The legal concern that I think we need to

4     put on the record is that importing this Penal Code, the

5     elements of the criminal offense in the Penal Code, risks

6     supplanting the misappropriation statute and the elements that

7     it sets out for what constitutes misappropriation of a trade

8     secret.

9          And, as you know, the CUTSA and the DTSA preempt these

10    conversion and stolen property statutes.  And we've been down

11    the road of those Penal Code statutes in some of our arguments

12    in this case, all of which have been rejected.

13         And so I know you'll be considering this, but I think it

14    is very important because it is the misappropriation statute

15    element that needs to apply here and need not be --

16         **THE COURT:**  I asked you to bring me good authorities.

17    And earlier in the hearing I kept saying, Where are your

18    authorities?  And Mr. González kept saying they couldn't find

19    any.  I said, How hard did you look?  And he didn't know.

20    Well, but when we got to the other part of the case, where

21    they -- you had looked pretty hard, you handed up five or six

22    authorities.

23         Makes me wonder how hard you looked.  On the issue that

24    goes against you, you didn't look very hard.  And maybe on the

25    one that goes more for you, you did look hard.

1      So, you know, I've given you a chance to help me find some

2  cases on point.  All you're doing is whining about their

3  authorities.  They did find some authorities.  And now you're

4  saying, well, those were criminal cases, they don't count.

5          **MS. DUNN:**  Right.

6          **THE COURT:**  Maybe they do count.

7          **MS. DUNN:**  Your Honor, I understand that.  We can

8  certainly go back.

9      I do think, since we never saw this authority before, and

10  there may be a substantial legal problem with it, I do think

11  it's important we raise it with the Court.  And we take your

12  point --

13          **THE COURT:**  By Friday at noon you can -- okay.  By

14  Friday at noon -- no.  You know, the thing is, if I give you

15  that permission, I'll just get a bunch of blather.  I don't

16  know if I should give you another authority.

17      Did you turn this decision over to the other side before

18  the hearing?

19          **MR. PERLSON:**  I don't think either side was exchanging

20  authorities.

21          **THE COURT:**  All right.  With any of the decisions that

22  you handed up to me, the other side, by Friday at noon, can

23  respond to those decisions only.  You can do that by Friday at

24  noon.

25      Okay.

1          **MS. DUNN:**  Thank you.

2          **THE COURT:**  I think we're done.

3          **MR. GONZÁLEZ:**  Thank you, Your Honor.

4          **THE COURT:**  Thank you.  Have a good day.

5          **MR. PERLSON:**  Thank you, Your Honor.

6        (At 11:08 p.m. the proceedings were adjourned.)

7                         -  -  -  -

8

9                    CERTIFICATE OF REPORTER

10          I certify that the foregoing is a correct transcript

11    from the record of proceedings in the above-entitled matter.

12

13    DATE:   Wednesday, November 15, 2017

14

15

16

17    _____

18    Katherine Powell Sullivan, CSR #5812, RMR, CRR
                U.S. Court Reporter
19

20

21

22

23

24

25