1 [COUNSEL LISTED ON SIGNATURE PAGE]

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                            NORTHERN DISTRICT OF CALIFORNIA

10                                SAN FRANCISCO DIVISION

11 | WAYMO LLC,                              | CASE NO. 3:17-cv-00939
   |                                         |
12 |         Plaintiff,                      | **JOINT PROPOSED JURY INSTRUCTIONS RE REASONABLE ROYALTY**
13 |     vs.                                 |
   |                                         |
14 | UBER TECHNOLOGIES, INC.;                |
   | OTTOMOTTO LLC; OTTO TRUCKING            |
15 | LLC,                                    | Judge: The Honorable William Alsup
   |                                         |
16 |         Defendants.                     | Trial Date: December 4, 2017

Pursuant to the Court's November 15, 2017 Order re Reasonable Royalty Instructions (Dkt. 2221), Plaintiff Waymo LLC ("Waymo") and Defendants Uber Technologies, Inc. and Ottomotto LLC ("Defendants") submit their agreed-upon jury instructions on the reasonable royalty issue.[1]

DATED: November 17, 2017        QUINN EMANUEL URQUHART & SULLIVAN, LLP

By /s/ Charles K. Verhoeven
   Charles K. Verhoeven
   Attorneys for Plaintiff WAYMO LLC

DATED: November 17, 2017        MORRISON & FOERSTER LLP

By /s/ Arturo J. González
   Arturo J. González
   Attorneys for Defendants
   UBER TECHNOLOGIES, INC. and
   OTTOMOTTO LLC

---

[1] Defendants continue to object to any instruction on reasonable royalty due to Waymo's inadequate Rule 26 disclosures and Waymo's failure to proffer sufficient evidence to establish an objective, non-speculative, and properly-apportioned royalty. *See*, *e.g.*, *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1089, 1093 (9th Cir. 2014); *MGE UPS Systems, Inc. v. GE Consumer and Industrial, Inc.*, 622 F.3d 361, 370, n.2 (5th Cir. 2010); *Alcatel USA, Inc. v. Cisco Systems, Inc.*, 239 F. Supp. 2d 660, 672-673 (E.D. Tex. 2002). Waymo disagrees with Defendants' position. In addition, the parties reserve their rights to propose revisions to these instructions, as well as to the Court's Tentative Jury Instructions and Further Tentative Jury Instruction, based on the evidence introduced during trial and/or further rulings by the Court.

1

**REMEDIES FOR MISAPPROPRIATION OF TRADE SECRETS**

If Waymo proves that any Defendant misappropriated one or more Alleged Trade Secrets, then Waymo is entitled to recover damages if the misappropriation was a substantial factor in causing that Defendant to be unjustly enriched.

If any Defendant misappropriated one or more Alleged Trade Secrets but that misappropriation did not cause that Defendant to be unjustly enriched, Waymo may still be entitled to a reasonable royalty. However, Waymo is not entitled to both unjust enrichment damages and a reasonable royalty.

[COURT'S UNJUST ENRICHMENT INSTRUCTIONS TO BE INSERTED HERE]

# REASONABLE ROYALTY – DEFINITION[2]

---

[2] Model Patent Jury Instructions for the Northern District of California 5.7

A royalty is a payment made to a patent holder in exchange for the right to make, use or sell the claimed invention. This right is called a "license." A reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between the patent holder and the infringer taking place at the time when the infringing activity first began. In considering the nature of this negotiation, you must assume that the patent holder and the infringer would have acted reasonably and would have entered into a license agreement. You must also assume that both parties believed the patent was valid and infringed. Your role is to determine what the result of that negotiation would have been. The test for damages is what royalty would have resulted from the hypothetical negotiation and not simply what either party would have preferred.

A royalty can be calculated in several different ways and it is for you to determine which way is the most appropriate based on the evidence you have heard. One way to calculate a royalty is to determine what is called an "ongoing royalty." To calculate an ongoing royalty, you must first determine the "base," that is, the product on which the infringer is to pay. You then need to multiply the revenue the defendant obtained from that base by the "rate" or percentage that you find would have resulted from the hypothetical negotiation. For example, if the patent covers a nail, and the nail sells for $1, and the licensee sold 200 nails, the base revenue would be $200. If the rate you find would have resulted from the hypothetical negotiation is 1%, then the royalty would be $2, or the rate of 0.01 times the base revenue of $200. By contrast, if you find the rate to be 5%, the royalty would be $10, or the rate of 0.05 times the base revenue of $200. These numbers are only examples, and are not intended to suggest the appropriate royalty rate.

Instead of a percentage royalty, you may decide that the appropriate royalty that would have resulted from a hypothetical negotiation is a fixed number of dollars per unit sold. If you do, the royalty would be that fixed number of dollars times the number of units sold.

If the patent covers only part of the product that the infringer sells, then the base would normally be only that feature or component. For example, if you find that for a $100 car, the patented feature is the tires which sell for $5, the base revenue would be $5.

4

1   If any Defendant misappropriated one or more Alleged Trade Secrets but the
2  misappropriation did not cause that Defendant to be unjustly enriched, Waymo may still be
3  entitled to a reasonable royalty for no longer than the period of time the use could have been
4  prohibited.

5   A royalty is a payment made in exchange for the right to use the claimed trade secrets.
6  This right is called a "license." A reasonable royalty is the payment for the license that would
7  have resulted from a hypothetical negotiation between the owner of the trade secret and the

---

**[However, in a circumstance in which the patented feature is the reason customers buy the whole product, the base revenue may be the value of the whole product.][2]**

**[In this case the [ ] patent covers only one component of the product that [alleged infringer] uses or sells. It is [patent holder]'s burden to demonstrate what value that component has added to the desirability of the product as a whole and to separate the value of the patented contribution from the value of other parts of the product that are not attributable to the patented invention.]**

**[In this case, [patent holder] [accused infringer] has introduced evidence of licenses between [licensees] and [licensors]. The royalty rate in one or more of those licenses may be considered if it helps to establish the value that is attributable to the patented invention as distinct from the value of other features of [alleged infringer's] product.][2]**

**The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more. When the accused infringing products have both patented and unpatented features, measuring this value requires you to identify and award only the value of the patented features.**

**Another way to calculate a royalty is to determine a one-time lump sum payment that the infringer would have paid at the time of the hypothetical negotiation for a license covering all sales of the licensed product, both past and future. This differs from payment of an ongoing royalty because, with an ongoing royalty, the licensee pays based on the revenue of actual licensed products it sells. When a one-time lump sum is paid, the infringer pays a single price for a license covering both past and future infringing sales.**

**It is up to you, based on the evidence, to decide what type of royalty is appropriate in this case for the life of the patent.**

5

misappropriator taking place at the time when the misappropriation first began. In considering the nature of this negotiation, you must assume that the trade secret owner and the misappropriator would have acted reasonably and would have entered into a license agreement. You must also assume that both parties believed the trade secret owner to be in possession of enforceable trade secrets. Your role is to determine what the result of that hypothetical negotiation would have been. The test for damages is what royalty would have resulted from the hypothetical negotiation and not simply what either party would have preferred.

Waymo and Defendants agree that, in the event misappropriation is found and a reasonable royalty awarded, such royalty should be in the form of a one-time lump sum payment that would have paid at the time of the hypothetical negotiation for a non-exclusive, worldwide license covering all use of the Alleged Trade Secrets, both past and future. When a one-time lump sum is paid, the misappropriator pays a single price for a license covering both past and future infringing use.

# **REASONABLE ROYALTY FACTORS**[3]

---

[3] AIPLA's Model Patent Jury Instructions 11.15; Fed. Cir. Bar Association's Model Patent Jury Instruction B.6.7 (2017).

**In determining the amount of a reasonable royalty, you may consider evidence on any of the following factors, in addition to any other evidence presented by the parties on the economic value of the patent:**

1. **Any royalties received by the licensor for the licensing of the patent-in-suit, proving or tending to prove an established royalty.**
2. **The rates paid by [the Defendant] to license other patents comparable to the [abbreviated patent number] patent.**
3. **The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold.**
4. **The licensor's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that exclusivity.**
5. **The commercial relationship between the licensor and the licensee, such as whether or not they are competitors in the same territory in the same line of business.**
6. **The effect of selling the patented product in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such collateral sales.**
7. **The duration of the [abbreviated patent number] patent and the term of the license.**
8. **The established profitability of the product made under the [abbreviated patent number] patent; its commercial success; and its current popularity.**
9. **The utility and advantages of the patented invention over the old modes or devices, if any that had been used for achieving similar results.**
10. **The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.**
11. **The extent to which [the Defendant] has made use of the invention; and any evidence that shows the value of that use.**
12. **The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.**
13. **The portion of the profit that arises from the patented invention itself as opposed to profit arising from unpatented features, such as the**

In determining the amount of a reasonable royalty, you may consider evidence on any of the following factors, in addition to any other evidence presented by the parties on the economic value of the Alleged Trade Secrets:

1. The rates paid by any Defendant for the use of other trade secrets comparable to the Alleged Trade Secrets.
2. The extent to which Waymo had an established policy and marketing program to maintain its right to exclude others from using the Alleged Trade Secrets by not licensing others to use the Alleged Trade Secrets, or by granting licenses under special conditions designed to preserve that exclusivity.
3. The commercial relationship between Waymo and Defendants, such as whether or not they are competitors in the same territory in the same line of business.
4. The duration of the Alleged Trade Secrets and the term of the license.
5. The utility and advantages of the Alleged Trade Secrets over the old modes or devices, if any, that had been used for achieving similar results.
6. The nature of the Alleged Trade Secrets; the character of the commercial embodiment of the products or services using the Alleged Trade Secrets as owned

---

**manufacturing process, business risks, or significant features or improvements added by the accused infringer.**
**14. The opinion testimony of qualified experts.**
**15. The amount that a licensor and a licensee (such as [the Defendant]) would have agreed upon (at the time the infringement began) if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license.**
**16. Any other economic factor that a normally prudent business person would, under similar circumstances, take into consideration in negotiating the hypothetical license.**

and produced by Waymo; and the benefits to those who have used the Alleged Trade Secrets.

7. The extent to which Defendants have made use of the Alleged Trade Secrets; and any evidence that shows the value of that use.

8. The portion of the profit, if any, that arises from use of the Alleged Trade Secrets as opposed to profit arising from non-trade secret features such as the manufacturing process, business risks, or significant features or improvements added by Defendants.

9. The opinion testimony of qualified experts.

10. The amount that a licensor (such as Waymo) and a licensee (such as Defendants) would have agreed upon (at the time the misappropriation began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to use the Alleged Trade Secrets—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent licensor who was willing to grant a license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. You may also consider any other factors which a normally prudent business person would, under similar circumstances, take into account.

9