MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzalez@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Tel: 415.268.7000 / Fax: 415.268.7522

KAREN L. DUNN (*Pro Hac Vice*)
kdunn@bsfllp.com
HAMISH P.M. HUME (*Pro Hac Vice*)
hhume@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington DC 20005
Tel: 202.237.2727 / Fax: 202.237.6131

WILLIAM CARMODY (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
SHAWN RABIN (*Pro Hac Vice*)
srabin@susmangodfrey.com
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel: 212.336.8330 / Fax: 212.336.8340

Attorneys for Defendants
UBER TECHNOLOGIES, INC.
and OTTOMOTTO LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>UBER TECHNOLOGIES, INC.,<br>OTTOMOTTO LLC; OTTO TRUCKING<br>LLC,<br><br>                    Defendants. | Case No.        3:17-cv-00939-WHA<br><br>**DEFENDANTS UBER<br>TECHNOLOGIES, INC. AND<br>OTTOMOTTO LLC'S OPPOSITION TO<br>WAYMO LLC'S MOTION FOR JURY<br>INSTRUCTION BASED ON<br>SPOLIATION**<br><br>Trial Date: December 4, 2017 |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................. 1

II.   WAYMO'S MOTION IS UNJUSTIFIABLY LATE ......................................... 1

III.  WAYMO CANNOT MAKE THE SHOWING REQUIRED FOR ADVERSE
      INFERENCE SANCTIONS ............................................................................... 5

      A.   Waymo's Request for Adverse Inferences Must be Denied Because
           Defendants Did Not Have a Duty to Preserve Evidence at the Time of the
           Events Described in Waymo's Motion .................................................... 6

           1.   Uber's Retention of MoFo Does Not Establish a Duty to Preserve .......... 10

           2.   Ottomotto's Retention of Counsel Does Not Establish a Duty to
                Preserve .......................................................................................... 10

           3.   Defendants' Retention of Stroz Does Not Establish a Duty to
                Preserve .......................................................................................... 11

           4.   Defendants' Indemnification Agreement Does Not Establish a Duty
                to Preserve ...................................................................................... 12

           5.   The Joint Defense Agreement Does Not Establish a Duty to
                Preserve .......................................................................................... 12

      B.   Waymo's Request for Sanctions Also Must be Denied Because Uber Did
           Not Act with the Intent to Deprive Waymo of the Use of ESI in this
           Lawsuit ....................................................................................................... 13

      C.   Waymo Incorrectly Argues that the Court Can Grant an Adverse Inference
           Sanction Under Its Inherent Powers ...................................................... 17

      D.   Waymo Fails to Show an Adverse Inference Sanction Is Appropriate Under
           These Circumstances ............................................................................... 17

           1.   An Adverse Inference Sanction Is Not Appropriate Because the
                Allegedly Destroyed ESI is Not Relevant to Waymo's Claims or
                Defenses ......................................................................................... 19

           2.   An Adverse Inference Sanction Is Not Appropriate in Light of
                Uber's Lack of Bad Faith and Its Efforts to Recover ESI ................ 20

      E.   Waymo's Cases Do Not Support Granting an Adverse Inference Sanction
           Here ............................................................................................................. 22

IV.   WAYMO'S CLAIM ALSO FAILS UNDER THE INCORRECT STANDARDS
      WAYMO APPLIES ............................................................................................ 23

V.    CONCLUSION ................................................................................................... 24

## I.    INTRODUCTION

Waymo's case has crumbled—its current allegations look nothing like its original complaint and its allegations of trade secret theft simply don't match Uber's technology.  Now, Waymo seeks to somehow rebuild its case with unsubstantiated adverse inferences.  Rather than bringing a good faith motion, Waymo is pursuing a last-ditch effort to address its evidentiary shortcomings, having come up empty-handed once again after receiving "1.4 million documents from Stroz, 16,000 emails and 85 GB of data from Ottomotto, and hundreds of terabytes" of *preserved data* (Dkt. 1928-4 at 9:23-24).  Its request should be rejected for at least the following reasons:

- Waymo's motion is incurably late. Waymo knew about these facts for months; indeed, Waymo consistently cites to evidence that was produced as early as May.
- Waymo fails to establish that Defendants had a duty to preserve evidence at the time of the alleged instances of destruction or that Defendants deliberately destroyed any information with the intent of depriving Waymo of its use in this litigation.
- Waymo fails to show that spoliation occurred at all, much less spoliation of a nature that would warrant a sanction courts recognize as "extreme," "harsh," "severe," and "drastic."

Waymo should be required to prove its case with evidence, not unsubstantiated adverse inferences, as it has promised to do from the beginning.  Its motion for a jury instruction of adverse inferences based on spoliation should be denied.

## II.    WAYMO'S MOTION IS UNJUSTIFIABLY LATE

Waymo's motion is untimely under Civil Local Rule 7-8(c), which requires that a party bring a sanctions motion "as soon as practicable, after the filing party learns of the circumstances that it alleges make the motion appropriate."  *See also Mondragon v. Fernandez*, No. C08-05722 RMW (HRL), 2010 WL 1992536, at *1 (N.D. Cal. May 18, 2010) (denying a sanctions motion as untimely where plaintiffs waited five months after the order giving rise to their motion was issued); *Siebert v. Gene Sec. Network, Inc.*, No. 11-cv-01987-JST, 2014 WL 5808755, at *1, 2

1    (N.D. Cal. Nov. 6, 2014) (denying a sanctions motion requesting reimbursement of expenses on

2    multiple grounds and stating "[t]hese deficiencies are compounded by Plaintiff's delay in

3    bringing the motion, which was filed eight months after the allegedly offending conduct. The

4    Court is unable to conclude that Plaintiff moved for sanctions 'as soon as practicable' under Civil

5    Local Rule 7-8(c).")  Each instance of alleged spoliation in Waymo's motion is based on

6    information that has been known to Waymo since as early as June, and at least prior to the

7    production of the Stroz report in September.  Waymo does not cite to any novel evidence that

8    would justify its delay in bringing these claims.  Its motion should be denied as untimely.

9          First, Waymo raises Travis Kalanick's deletion of text messages with Anthony

10   Levandowski.  But Mr. Kalanick informed Waymo at his deposition in July that his phone had

11   been set to automatically delete text messages after thirty days (Dkt. 2199-3, 7/27/2017 Kalanick

12   Dep. Tr. at 160:9-25).  Waymo subsequently moved to compel additional productions of

13   Mr. Kalanick's text messages and to inspect the phone itself, which Judge Corley denied.  (Dkts.

14   1117-4, 1176.)  Judge Corley held that "Uber and Mr. Kalanick have performed an adequate

15   search for responsive text messages," and noted that Waymo offered no expert declaration or

16   testimony as to "what more can be done to recover deleted text messages."  (Dkt. 1176 at 1:28-

17   2:4.)  Waymo does not explain why it waited four months after Judge Corley's order before

18   pursuing the issue further by requesting sanctions based on Mr. Kalanick's deleted text messages.

19   Pursuant to L.R. 7-8(c), it should be barred from seeking those sanctions now.

20         Second, Waymo raises deletions of text messages by Nina Qi and Lior Ron, and

21   Mr. Levandowski's requests of them to do so.  But Waymo also has known of this activity for

22   months.  Indeed, Waymo cites Ms. Qi's *June 22, 2017*, testimony that she had deleted texts with

23   Mr. Levandowski at his direction.  (Dkt. 2199-6, 6/22/2017 Qi Dep. Tr. at 61:14-22; 62:21-63:5.)

24   That the Stroz materials also disclose conduct Waymo has long been aware of does not entitle

25   Waymo to request sanctions based on that conduct for the first time now.

26         Once Waymo learned that Mr. Levandowski had asked Ms. Qi to delete text messages, it

27   had the opportunity to seek further discovery to determine whether Mr. Levandowski made

28   similar requests to others, such as Mr. Ron.  Waymo failed do so, and should similarly not be

1  permitted to pursue a sanctions motion based on Mr. Ron's deletion of text messages or

2  Mr. Levandowski's requests to him to do so at this late date.

3        Third, Waymo points to the five Drobo 5D disks about which it has been aware since

4  June 5, 2017.  (*See* Dkt. 676-4 at 2.)  Each of the three Uber employees who were present at the

5  March 11, 2016 meeting where Mr. Levandowski told Uber about finding the five disks, as well

6  as Mr. Ron, testified about this meeting and communications regarding the disks at their

7  depositions in June and July.  Specifically, these individuals testified that when Mr. Levandowski

8  raised the issue, he was instructed (a) not to bring the material to Uber under any circumstances

9  and (b) to contact his lawyer about what to do with it.  (Dkt. 2096-10, 6/22/2017 Qi Dep. Tr. at

10  279:4-284:12; Dkt. 2096-11, 6/19/2017 Poetzscher Dep. Tr. at 253:3-256:7; Dkt. 2094-6,

11  7/27/2017 Kalanick Dep. Tr. at 22:4-23:16; Declaration of C. Tapernoux, Ex. 1, 6/19/2017 Ron

12  Dep. Tr. at 30:5-15.)  Again, that this activity was also disclosed with no material differences in

13  the Stroz report does not justify Waymo's delay in seeking sanctions.

14        Fourth, Waymo argues that the Ottomotto-Tyto Asset Purchase Agreement effectuated

15  alleged spoliation.  Specifically, Waymo argues for the first time that the transaction was

16  structured to "ensure the destruction of all Tyto email archives."  But Uber produced the Asset

17  Purchase Agreement—which contains the specific language Waymo argues caused the alleged

18  spoliation—on June 5, 2017.  Similarly, three of the four emails Waymo cites were produced in

19  June, July, and August of 2017, and the cited Ognen Stojanovski deposition testimony is from

20  July 20, 2017.  Moreover, Mr. Stojanovski testified that if he wanted to "try to recover those e-

21  mails," he would contact Google.  (Dkt. 2199-13, Stojanovski Dep. Tr. at 311:18-24.)  Waymo

22  never pursued this option, and having chosen not to do so during discovery, should not now be

23  permitted to allege spoliation and seek sanctions.  *See Durst v. FedEx Express*, C.A. No. 03–5186

24  (JBS), 2006 WL 1541027, at *4 (D.N.J. June 2, 2006) finding spoliation sanctions inappropriate

25  in a discovery dispute that "should have been raised" during discovery through a motion

26  to compel); *Flanders v. Dzugan*, C.A. No. 12-1481, 2015 WL 5022734, at *6 (W.D. Pa. Aug. 24,

27  2015) ("Moreover, a spoliation inference is not intended as a remedy to correct the moving

28  party's failure to request everything it needs in discovery.").  The only evidence Waymo refers to

1    here that post-dates production of the Stroz report (RON0024044) is cited for the proposition that

2    "Uber discussed Ottomotto's acquisition of Tyto with Ottomotto extensively prior to Ottomotto's

3    acquisition of Tyto"—a proposition Waymo acknowledges is evident in two other documents

4    (Dkts. 2197-25; 2197-27) that were produced in June and July, respectively.  As with each of its

5    other claims, Waymo has presented no newly-disclosed information about the Tyto emails that

6    can justify the late date on which Waymo brought this motion.

7           Fifth, while Waymo cites to testimony from Salle Yoo's deposition in October, Ms. Yoo

8    did not provide any testimony that would have given Waymo a new basis to bring this motion.

9    Ms. Yoo's statements do not establish a new instance or potential instance of alleged spoliation;

10   instead, they are relevant to whether Uber had a duty to preserve evidence at the time of the

11   alleged spoliation.  Waymo argues that Uber had such a duty based on several grounds, including

12   Uber's retention of MoFo, Otto's retention of counsel, Uber's retention of Stroz, and Uber's and

13   Otto's indemnification and common interest discussions.  Waymo has been well aware of each of

14   these other bases for many months.  For example, Waymo relies heavily on five documents from

15   a filing on May 8, 2017, to support its argument that Uber's duty to preserve arose in January.

16   (Dkt. 2197-4 at 3:10-4:26.)  Waymo also cites to a privilege log produced on April 10 (*id.* at 4:2-

17   6), an acquisition document that was publicly filed on May 26 (*id.* at 6:8-9), and a deposition

18   exhibit from June 19 (*id.* at 6:4-6).  Ms. Yoo's October testimony does not justify Waymo's

19   untimely request.

20          Finally, Waymo complains about an issue that has nothing to do with spoliation.

21   Waymo claims Mr. Levandowski's counsel at Goodwin Procter should have taken their client's

22   laptops and turned them over to Waymo, in violation of his express instructions and his Fifth

23   Amendment rights.[1]  Not surprisingly, Waymo cites no authority for this proposition.

24
                _____

25          [1] In April 2017, Uber sought Mr. Levandowski's personal laptops to comply with the
     Court's discovery orders.  Mr. Levandowski invoked his Fifth Amendment rights and refused to
     provide them to Uber.  (Dkt. 2096-7, Buland Decl. Ex. 6 ¶ 2.)  As an accommodation,
26   Mr. Levandowski agreed to provide the laptops to his personal counsel (Goodwin Procter, who
     represent him in the Google arbitration) for searching in connection with Uber's investigation into
27   the downloading of the 14,000 files.  (*Id.*)  Uber provided Goodwin Procter with the 14,000-plus
     file names, the hash values for those 14,000 files, and Uber's and Waymo's search terms then
28   being used to search Uber's own systems.  (*Id.*)  The results of the searches were given to Uber's

1    Mr. Levandowski exercised his Fifth Amendment right to not provide his computers to the parties

2    for inspection in this case, and his counsel at Goodwin Procter cannot be compelled to ignore or

3    try to circumvent invocation of his rights.  S*ee Malloy v. Hogan*, 378 U.S. 1, 9 n.7 (1964);

4    *Lekfowitz v. Cunningham*, 431 U.S. 801, 806 (1977).  Moreover, Rule 37 is inapplicable to

5    information that is not in control of the party accused of spoliation (Fed. R. Civ. P. 37(e) advisory

6    committee's note to 2015 amendment), and Uber does not and has never had control of these

7    laptops.  There is simply no issue of spoliation here—Waymo has not shown that any evidence

8    was destroyed, as opposed to being unavailable due to Mr. Levandowski's Fifth Amendment

9    invocation.

10   **III.    WAYMO CANNOT MAKE THE SHOWING REQUIRED FOR ADVERSE
11            INFERENCE SANCTIONS**

12              To prevail on its motion for the severe sanction of an adverse inference at trial, Waymo

13   must meet the stringent requirements of Rule 37(e), which "authorizes and specifies measures a

14   court may employ if information that should have been preserved is lost, and specifies the

15   findings necessary to justify these measures."  Fed. R. Civ. P. 37(e)(2) advisory committee's note

16   to 2015 amendment.  Under the rule, Waymo must establish that (i) ESI that "should have been

17   preserved in the anticipation or conduct of litigation [was] lost because [Defendants] failed to

18   take reasonable steps to preserve it," and (ii) Defendants "acted with the intent to deprive

19   [Waymo] of the information's use in the litigation" here. Fed. R. Civ. P. 37(e)(2).  Waymo has

20   not satisfied—and cannot satisfy—this very high burden.  Nor does Waymo even attempt to do

21   so, instead largely ignoring Rule 37(e) and relying on authority that predates the 2015

22   amendments to the rule.  This is fatal to Waymo's motion.

23              In particular, Waymo fails to establish that Defendants had a duty to preserve any lost

24   information at the time of the loss or that Defendants deliberately destroyed any information with

25   the intent of depriving Waymo of its use in this litigation.  Tellingly, Waymo does not even

26   _____

27   outside counsel and produced to Waymo on June 19, 2017.  (Dkt. 2097-7, Ex. 6 ¶ 2; Dkt.2097-8,
     Ex. 7 ¶ 5.)  None of the Defendants ever possessed the devices and none knows their current
28   whereabouts. (Dkt. 2097-8, Ex. 7 ¶ 4; Dkt. 2097-9, Ex. 8 ¶ 5.)

1    allege—much less attempt to show—this second critical factor, which readily disposes of its

2    motion.

3         A.    **Waymo's Request for Adverse Inferences Must Be Denied Because
               Defendants Did Not Have a Duty to Preserve Evidence at the Time of**

4         **the Events Described in Waymo's Motion**

5         The primary case Waymo relies on to establish when the duty to preserve evidence arises

6    is *Hynix Semiconductor Inc. v. Rambus Inc.*, 897 F. Supp. 2d 939, 975 (N.D. Cal. 2012).  In

7    *Hynix*, the Federal Circuit vacated the district court's finding of spoliation and directed it to

8    reconsider the issue under the framework set forth in the companion case *Micron Technology,*

9    *Inc. v. Rambus Inc.,* 645 F.3d 1311, 1326 (Fed. Cir. 2011).  *Hynix,* 897 F. Supp. 2d at 942.[2]  Both

10   the *Micron* opinion and the *Hynix* court's detailed analysis on remand make clear that Waymo

11   misinterprets the "reasonably foreseeable" standard articulated in *Micron*, and that the present

12   litigation was not "reasonably foreseeable" to Uber in early 2016 as that standard has been

13   applied by this court and the Federal Circuit.

14        *Hynix* involved a dispute about two different dynamic random access memory ("DRAM")

15   methods.  Defendant Rambus patented one of these methods, known as RDRAM.  The other

16   method was known as SDRAM.  *Micron*, 645 F.3d at 1315.

17        Rambus licensed its IP to DRAM manufacturers.  *Hynix,* 897 F. Supp. 2d at 945.

18   RDRAM licensees were granted a narrow license to produce RDRAM, and were generally barred

19   from using Rambus's IP for other purposes (such as to produce SDRAM-compliant chips).  *Id.* at

20   946.  Some time prior to October 1997, Rambus became concerned that companies were using

21   Rambus's inventions in SDRAM chips without a license.  *Id.* at 948.  Rambus believed that its

22   patents were broad enough to encompass SDRAM, giving rise to potential claims for

23   infringement against these companies.  *Micron,* 645 F.3d at 1315.

24        Hynix's spoliation claim was based on Rambus's institution of a document retention

25   policy that included annual shred days around the same time it developed a joint

26

27        [2] In *Micron*, the Federal Circuit affirmed a finding of spoliation by Rambus in a sister case
     from Delaware.

28

licensing/litigation strategy to address this potential infringement.  *Hynix,* 897 F. Supp. 2d at 953.
The district court set out to determine whether spoliation had occurred on either the first
(September 1998) or second (August 1999) annual shred day under *Micron*.

*Micron* held that "[s]poliation occurs when one destroys or materially alters evidence or
fails to preserve property for another's use as evidence in pending or reasonably foreseeable
litigation." *Id.* at 975.  *Micron* then set forth a framework for determining whether a duty to
preserve has been triggered.  First, *Micron* explained that "[w]hen litigation is 'reasonably
foreseeable' is a flexible fact-specific standard that allows a district court to exercise the
discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry.
**This standard does not trigger the duty to preserve documents from the mere existence of a
potential claim or the distant possibility of litigation.**  However, it is not so inflexible as to
require that litigation be 'imminent, or probable without significant contingencies,' as Rambus
suggests." *Micron,* 645 F.3d at 1320, emphasis added, internal citations omitted.  *Micron* also
recognized that "whether litigation was reasonably foreseeable was largely dependent on whether
Rambus chose to litigate.  It is thus more reasonable for a party in Rambus's position as a
patentee to foresee litigation that does in fact commence, than it is for a party in the
manufacturers' position as the accused." *Id.* at 1325.

Waymo also relies on *Apple*, which, citing *Hynix*, describes the standard for duty to
preserve as follows:

> Although the Ninth Circuit has not precisely defined when the duty
> to preserve is triggered, trial courts in this Circuit generally agree
> that, "[a]s soon as a potential claim is **identified**, a litigant is under
> a duty to preserve evidence which it knows or reasonably should
> know is relevant to the action."

*Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 991 (N.D. Cal. 2012) (emphasis added).

In *Apple*, the court found Samsung's preservation duty arose when Apple "confronted
Samsung with 'a comprehensive summary of its **specific patent infringement claims** against
**specific Samsung products'.**" *Apple Inc.,* 888 F. Supp. 3d at 991 (emphasis added).  Reading
*Apple* in connection with *Micron* indicates that a party's awareness of potential litigation or the

general potential for a claim such as trade secret misappropriation does not trigger the preservation duty, while awareness of a specifically identified claim, such as the misappropriation of particular trade secrets, could trigger the obligation to preserve.

On remand, the *Hynix* court applied the "reasonably foreseeable" standard and the Federal Circuit's framework in order to determine whether spoliation occurred on either of Rambus's first two shred days. The opinion sets out "several developments [that] took place that made litigation more likely" between March 1998 and July 1998, but which did not make litigation reasonably foreseeable. 897 F. Supp. 2d at 977. The court then sets out the subsequent developments which it held did make litigation reasonably foreseeable by September 1998. The activities Waymo sets forth in its motion do not rise to the level of the developments that both the *Hynix* court and the Federal Circuit in *Micron* found sufficient to make litigation "reasonably foreseeable." Specifically, *Hynix* and *Micron* found that the following developments did ***not*** make litigation reasonably foreseeable.

**March 1998 Board Presentation on Litigation Strategy.** First, the Rambus licensing/litigation strategy head, Joel Karp, made a "strategic licensing and litigation strategy" presentation to the Rambus board in March 1998. *Hynix*, 897 F. Supp. 2d at 977. Karp "had learned through his experience that the DRAM industry was very litigious." *Id.* at 948. One counsel had previously commented "that insistence on [the royalty rate Karp had in his strategy] would **inevitably lead to litigation**" and Karp "acknowledged that such royalty rates 'will probably push us into litigation quickly.'" *Id.* at 949 (emphasis added). Karp's presentation recommended that "[i]f licensing discussions do not result in resolution, tiered litigation strategy kicks in." *Id.* at 952. Several licensees, including Hynix, were given as examples of possible defendants. *Id.* Karp's presentation had been prepared pursuant to the Rambus CEO's directive that he wanted a "***litigation strategy*** *by March board meeting*." *Id.* at 949 (bold emphasis added).

**April 1998 Meeting with Intel.** Second, Rambus had previously acknowledged that its instigation of litigation was contingent on competition from Intel. *Id.* at 955. That contingency became reality in April 1998 when Intel was "basically going to compete with [Rambus] on [the] next generation [of its product]." *Id.* at 977.

**May 1998 Advice Regarding Document Retention Policy.**  Third, Karp "advised that he was going to implement a company-wide document retention policy" and explicitly "described implementing the document retention policy as a top level litigation goal" rather than a general records management objective.  *Id.*

**Other Litigation Considerations.**  Additionally, in late 1997, Rambus had assembled a team of outside counsel and intentionally included an experienced litigator in addition to technology licensing attorneys.  *Id.* at 949.  By February 1998, Rambus had "authorized outside counsel to begin organizing documents and preparing a discovery data base, so that if and when Rambus elect[ed] to proceed with litigation, it [would] not unduly disrupt the company's activities."  *Id.* at 951.  Also in February, Rambus's lawyer advised that "Rambus needed to 'make [itself] **battle ready'**."  *Id.* at 950 (emphasis added).

Again, the court found that even under all these circumstances, the litigation was not yet reasonably foreseeable to Rambus.  *Hynix* didn't find that the litigation was reasonably foreseeable until a series of additional events occurred, including (1) Karp specifically advising Rambus employees to discard documents that questioned the patentability of ideas; (2) Rambus's decision to pull five patent prosecution cases for applications that would cover SDRAM features from its outside counsel in order to process them more quickly in-house; and (3) Rambus's active attempts to renegotiate or eliminate Hynix's license provision allowing it to make SDRAM-compatible DRAMS, in order to "clear[] the way to sue Hynix for infringement for making the competing SDRAM."  *Id.* at 977-78.  Moreover, the Delaware decision affirmed by the Federal Circuit in *Micron* did not find that the litigation was reasonably foreseeable until even more events had occurred, including "choosing and prioritizing manufacturers to sue, selecting forums in which to bring suit within a planned timeframe, creating claim charts, and including litigation as an essential component of its business model."  *Micron,* 645 F.3d at 1324-25.

Waymo argues that the evidence it sets forth shows that Uber "reasonably anticipated" this lawsuit by January 2016.  *Micron*, *Hynix*, and *Apple* make clear that the applicable "reasonably foreseeable" standard requires much more than the purported "anticipation" Waymo argues, or that the evidence shows.  The activities and evidence Waymo points to are similar or

analogous to the many circumstances that courts have held did *not* make litigation "reasonably foreseeable."  Waymo fails to set forth any evidence that Uber reasonably foresaw this lawsuit at the time of the instances of alleged destruction, and it therefore does not have a claim for spoliation.

### 1.     Uber's Retention of MoFo Does Not Establish a Duty to Preserve

Waymo first argues that Uber "anticipated this litigation by 2016" because Uber retained MoFo to represent it in connection with its acquisition of Otto.  Waymo fails to address the fact that corporations routinely retain counsel to advise on acquisitions in order to assess potential litigation exposure that might result from a deal.  Waymo makes much of MoFo's retention specifically to advise on litigation exposure, but this court already rejected that reasoning in *Hynix*, where it found Rambus's choice to place a litigator on its licensing team was not nearly enough to support a finding of reasonable foreseeability.  (*Hynix,* 897 F. Supp. 2d at 949.)

Waymo argues only that "[t]he **potential** litigation exposure" for which Uber sought MoFo's advice "included the risk of **potential** claims by Google against Uber."  (Dkt. 2197-4 at 3:26-27 (emphasis added).)  But as the Federal Circuit held in *Micron*, the "existence of a potential claim" does not create reasonable foreseeability.  *Micron,* 645 F.3d at 1320.  Uber's retention of MoFo at most suggests that Uber sought to explore the potential for future litigation, not that such litigation was "reasonably foreseeable" as that standard has been applied.  To the contrary, by retaining MoFo and requesting legal advice on these issues, Uber was seeking to minimize the possibility that future litigation might occur.  Uber's retention of counsel is not evidence that this litigation with Google was reasonably foreseeable and did not trigger a duty to preserve.

### 2.     Ottomotto's Retention of Counsel Does Not Establish a Duty to Preserve

Second, Waymo argues that Mr. Ron and Mr. Levandowski anticipated litigation against Google, pointing to their search for counsel and ultimate retention of O'Melveny & Myers LLP ("OMM") and John Gardner.  This argument fails for all the same reasons Waymo's argument

regarding Uber's retention of MoFo fails. First, Waymo quotes then-OMM attorney Adam Bentley as explaining that OMM was hired to advise on "the risk of **potential** litigation," and cites Mr. Levandowski's attorney John Gardner's statement that he was "particularly aware of this issue and the **potential** risk." (Dkt. 2197-4 at 4:16; 25-26 (emphasis added).)  As above, Waymo's evidence regarding the potential for litigation does not support a finding of reasonable foreseeability.

Waymo also argues that Mr. Gardner's specialty in litigation supports its position.  But again, this court has already rejected that argument.  (*Hynix*, 897 F. Supp. 2d at 949.)  Finally, Waymo cites Mr. Gardner's statement that "the litigation risk was particularly high due to the intensely competitive nature of the self-driving vehicle industry."  This theory too was rejected by *Hynix*.  (*Hynix*, 897 F. Supp. 2d at 948 (that Karp "had learned through his experience that the DRAM industry was very litigious" was not enough to establish reasonable foreseeability).)

### 3.  Defendants' Retention of Stroz Does Not Establish a Duty to Preserve

Next Waymo argues that Uber's retention of Stroz is evidence that Uber anticipated this litigation.  As with its retention of counsel, Uber's retention of Stroz was an effort to assess and minimize the risk of future potential litigation, not evidence that such litigation was reasonably foreseeable.  It is illogical to argue that Uber reasonably foresaw this litigation at the time that it set out to assess whether the Ottomotto deal even would give rise to potential litigation exposure.

As above, the evidence Waymo cites at most shows that Uber thought there might be a general potential for future litigation.  First, Eric Tate testified that trade secret litigation generally was a "**potential** exposure area." (Dkt. 2197-6, 9/29/2017 Tate Dep. Tr. at 82:11-18 (emphasis added).)  Second, Ms. Yoo's testimony regarding the likelihood of litigation due to Uber competing "in the space that Google was in, in terms of where they wanted to go with autonomous ridesharing" simply reflects Ms. Yoo's understanding of the highly competitive marketplace in which a competitor might be more motivated to litigate in some way at some point. (Dkt. 2197-13, 10/12/2017 Yoo Dep. Tr. at 37:17-38:1.)  As discussed above, this court has already found that a belief that players in a certain market are very litigious is not enough to

1   support a finding of reasonable foreseeability.  (*Hynix*, 897 F. Supp. 2d at 948.)  Finally, Stroz's

2   instructions to the diligenced employees to preserve information for purposes of the due diligence

3   investigation have no bearing on whether those employees had a legal duty to preserve evidence

4   for litigation, and any insinuation otherwise should be rejected.

### 4.   Defendants' Indemnification Agreement Does Not Establish a Duty to Preserve

Next Waymo focuses on Uber's and Otto's indemnification discussions during their

negotiations leading up to the deal.  Waymo points to no particular communications or term sheet

language here to support its argument that the indemnity discussions rise above standard business

negotiations to constitute anticipation of this litigation, much less reasonable foreseeability.  The

parties' recognition that "because of the competition in developing autonomous driving

technology, and because the deal involved companies formed by two ex-Google employees, such

an acquisition had the potential to invite intense litigation from Waymo" (Dkt. 2197-4 at 6:12-15)

does not support such a finding.  Once again, recognition that a certain field is particularly

competitive and litigious does not support a finding of reasonable foreseeability.  (*Hynix*, 897 F.

Supp. 2d at 948.)  And while Uber and Otto may have been aware that their activities could *invite*

litigation from Waymo, Defendants had no ability or basis to view that as more than a mere

possibility.   "As recognized by the Federal Circuit, '[i]t is ... more reasonable for [a plaintiff-

patentee] to foresee litigation that does in fact commence, than it is for a [a defendant-

accused].' *Micron.*, 645 F.3d at 1325; *see id.* at 1325 n. 1."  *Apple Inc.*, 888 F. Supp. 2d at 997

(finding Samsung's preservation duty arose when Apple "confronted Samsung with 'a

comprehensive summary of its specific patent infringement claims against specific Samsung

products'.")  Furthermore, defining the term "super duper" litigation reflects the **magnitude** of a

potential future lawsuit, not the **likelihood** that such a lawsuit would be initiated.

### 5.   The Joint Defense Agreement Does Not Establish a Duty to Preserve

Finally, the Joint Defense Agreement refers only to "potential" litigation, and none of the

other provisions Waymo quotes has any bearing on whether this litigation was reasonably

foreseeable to Uber or Otto.  In *Hynix*, the court did not find "reasonable foreseeability" even

after Rambus had been advised to make itself "battle ready," and taken steps to do so above and beyond entering a JDA.  (*Hynix*, 897 F. Supp. 2d at 950 (emphasis added).)  Under this reasoning, Uber's and Otto's precautionary transactional measures taken with potential litigation in mind do not support a finding of reasonable foreseeability.

\*                   \*                   \*

In sum, all Waymo has shown is that Uber and Otto recognized a general potential for future litigation after they began negotiations, in light of their awareness that they were entering a competitive industry and Waymo might be upset about losing some of its engineers to a competitor.  Under *Apple* and *Hynix*, this recognition of a general potential for future litigation, as opposed to reasonably foreseeing a specifically identified claim, does not support a finding of reasonable foreseeability.  Because Waymo cannot show reasonable foreseeability, its request for sanctions must be rejected.

**B.      Waymo's Request for Sanctions Also Must be Denied Because Uber Did Not Act with the Intent to Deprive Waymo of the Use of ESI in this Lawsuit**

Rule 37(e) of the Federal Rules of Civil Procedure was amended in 2015 to mandate that an adverse inference jury instruction is only permissible "upon finding that the party acted with the intent to deprive another party of the information's use in the litigation."  Fed. R. Civ. P. 37(e)(2).  "Subdivision (e)(2) limits the ability of courts to draw adverse inferences based on the loss of information … permitting them *only* when a court finds that the information was lost with the *intent* to prevent its use in litigation."  Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment (emphasis added); s*ee also Nuvasive, Inc. v. Madsen Med., Inc.*, No. 13cv2077, 2016 WL 305096, at \*2 (S.D. Cal. Jan. 26, 2016) (finding that Rule 37 controls and an adverse inference instruction would not be proper where loss of text messages was unintentional).

Rather than seek to prove the requisite intent, Waymo instead relies on an outdated and inapplicable standard that includes a "culpable state of mind" requirement.  Waymo cites *Victorino v. FCA US LLC*, No. 16cv1617-GPC (JLB), 2017 WL 4541653, at \*9 (S.D. Cal. Oct. 11, 2017) for the proposition that "[t]he culpable state of mind factor is met by demonstrating that the evidence [at issue] was destroyed 'knowingly, even if without intent to

1    [breach a duty to preserve it], or negligently.'"  *Victorino*, a case from the Southern District of

2    California, relies on *Residential Funding Corp. v. DeGeorge Financial Corp*., 306 F.3d 99 (2d

3    Cir. 2002) for this proposition.  But the advisory committee notes explain that the express purpose

4    of imposing the "intent to deprive" standard in Rule 37 was to reject the logic of *Residential*

5    *Funding* to the extent it permitted adverse inference awards based on lesser culpability, such as

6    negligence or gross negligence.  Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015

7    amendment.  Waymo cites to no controlling authority for the proposition that an adverse

8    inference instruction can still be given absent a finding of the specific intent to deprive an

9    adversary of use of the information in the litigation at issue.  This proposition directly contradicts

10   the plain text of Rule 37, the unambiguous purpose of the 2015 amendment as articulated in the

11   advisory committee notes, and subsequent caselaw recognizing that the intent requirement of

12   Rule 37 controls.  *See Nuvasive*, 2016 WL 305096, at *3.

13       Waymo fails to show that any of the individuals it accuses of spoliation acted with the

14   intent to deprive Waymo of the use of the destroyed documents in this litigation.  First,

15   Mr. Kalanick's phone was set to automatically delete text messages after 30 days "at all times

16   relevant."  (Dkt. 1153-3 at 3; Dkt. 2094-1 at 3:17-19.)  The automatic nature of these deletions

17   contradicts any argument that Mr. Kalanick destroyed potentially relevant text messages with the

18   intent to prevent Waymo from using them in this litigation.  Rather, auto-delete is a feature

19   commonly used by individuals such as Mr. Kalanick with high text volumes, in order to manage

20   storage space on a phone.  (Dkt. 2094-1 at 3:26-28.)  Multiple courts have declined to award

21   sanctions for unintentional or automatic deletions of text messages, even after the initiation of

22   litigation.  *Nuvasive,* 2016 WL 305096, at *2 (adverse inference instruction improper where

23   failure to preserve text messages was unintentional); *Living Color Enters, Inc. v. New Era*

24   *Aquaculture, Ltd.*, No. 14-CV-62216, 2016 WL 1105297, at *2 (S.D. Fla. Mar. 22, 2016)

25   (declining to award sanctions for spoliation where defendant deleted text messages due to a 30-

26   day auto-delete setting, after the lawsuit was filed).

27       Furthermore, Waymo's assertion that its forensic examiner Matthew Schroeder "found

28   nothing in [the configuration] files that corroborates Kalanick's claim [that the feature had been

turned on at all relevant times]" reveals nothing more than a lack of basic understanding (or effort) regarding examination of the plist files.  Mr. Kalanick produced 18 plist files that each reflected text message settings (Mr. Schroeder inexplicably rounds up to "20 files" in his declaration).  Waymo claims that "[n]either Uber nor Kalanick's counsel provided any context or indication to Waymo as to which of these files purportedly contains evidence of the 30-day auto-delete function."  But using the legend Mr. Kalanick produced (attached to Mr. Schroeder's declaration as Exhibit A) and readily available forensic tools, an experienced examiner would be able to identify the relevant data from these plist files showing the auto-deletion settings, as explained in detail in the attached declaration from Mr. Kalanick's forensic expert.  (Tapernoux Decl. Ex. 2, Vogel Decl. at ¶¶ 4-7).

Mr. Schroeder appears to have believed that these 18 files only contained information related to "WiFi networks, the thermal status of the phone, [or] the status of the phone's radios," or had "no meaningful content."  (Dkt. 2197-13, Ex. 10 ¶ 7.)  Based on this incorrect belief, Mr. Schroeder appears not to have examined those files in order to find the relevant data.  Instead, he relied on a blog post regarding a particular text retention plist file that was part of the iOS 8 operating system—when Mr. Kalanick's phone used iOS 10.3.2—to conclude that Uber's production was missing "the" plist file that reflects text retention settings, identified by Waymo's expert as /mobile/library/preferences/com.apple.mobileSMS.plist.  But that plist file does not contain the relevant data.  (Tapernoux Decl. Ex. 2 ¶ 8.)  In short, Mr. Schroeder's declaration does not raise any legitimate question as to whether the 30 day auto-delete setting had indeed been turned on at all relevant times.

Finally, Waymo's allegation that Mr. Kalanick "configured his cell phone to ensure that hundreds" of texts messages were deleted is false.  As established by Mr. Kalanick's forensic expert, Mr. Kalanick's text messages were automatically overwritten only as memory space became needed, (Dkt. 2094-1 ¶¶ 7-8), so the auto-deletion feature did not "ensure" that any texts would be overwritten at all.

There is similarly no evidence that Ms. Qi, Mr. Levandowski, or Mr. Ron deleted text messages with the requisite intent.  Ms. Qi's motivation for deleting text messages was simply

1   that she'd been asked to do so.  Nor was there anything untoward about that request;

2   Mr. Levandowski was aware of the confidential nature of these business discussions, which

3   would logically have motivated him to minimize recorded information that could negatively

4   impact the negotiations.  (Dkt. 2096-10, 6/22/2017 Qi Dep. Tr. at 179:19-23 ("He didn't go into

5   specifics, but he did say that it was important to him [that] these discussions were confidential.").)

6   There is no evidence that Mr. Levandowski or Mr. Ron acted in bad faith by deleting texts

7   messages, rather than out of precaution concerning the sensitive nature of their business

8   negotiations in a highly secretive, competitive, and rapidly evolving field.

9       Regarding the five Drobo 5D disks, the evidence shows no intent to deprive Waymo of

10  their use in this litigation; the only intent was to ensure that any Google material on those disks

11  would not make it to Uber.  (Dkt. 2096-11, 6/19/2017 Poetzscher Dep. Tr. at 254:14-15; Dkt.

12  2094-6, 7/27/2017 Kalanick Dep. Tr. at 22:4-23:16.)  As for the 280systems.slack.com site,

13  Waymo does not allege or set forth any evidence that Mr. Ron's deletion of the site was done in

14  bad faith, much less with the requisite intent.

15      Waymo similarly fails to argue or present any evidence that shows any alleged destruction

16  of files in connection with the Tyto Asset Purchase Agreement was done with the intent to

17  deprive Waymo of their use in this litigation—or indeed that there was any destruction at all.

18  Mr. Stojanovski, Tyto's manager, testified that the Tyto emails were excluded from the purchase

19  agreement because "it really wasn't part of what Ottomotto was interested in acquiring, which

20  was primarily the engineering talent and maybe the Owl Sensor."  He further testified that the

21  issue of the Tyto email accounts "never really came up" during the negotiations, and that he

22  "eventually closed down the [Tyto] e-mail accounts" after the asset purchase because Tyto "no

23  longer was an ongoing concern with real business opportunities" and because he "didn't need to

24  have access to Tyto LiDAR e-mail anymore, so there wasn't any sense in paying for ongoing e-

25  mail hosting services."  (Tapernoux Decl. Ex 3, 7/20/2017 Stojanovski  Dep. Tr. at 308:8:-311:2.)

26  When asked if he thought the emails had been permanently destroyed, Mr. Stojanovski responded

27  "I don't know if they have been permanently destroyed or not."  (*Id.* at 311:14-17.)  Lastly,

28  whether Mr. Ron was aware of Mr. Levandowski's financial relationship to Tyto has no bearing

1    on Waymo's spoliation claim, and Mr. Kalanick's review of the final Agreement is not evidence

2    that he intended to destroy emails.  In short, there is no evidence that anyone destroyed Tyto

3    emails, much less with the intent to deprive Waymo of their use in this litigation.

4         In sum, Waymo fails to meet the specific intent requirement of Rule 37(e) for each of its

5    allegations of spoliation.

6         **C.**    **Waymo Incorrectly Argues that the Court Can Grant an Adverse**
              **Inference Sanction Under Its Inherent Powers**

7

8         Waymo also argues that an adverse inference sanction is available under the Court's

9    inherent authority.  Not so.  Under the new Rule 37, a court may no longer rely on inherent

10   authority to issue an adverse inference instruction to a jury.  The Rule is "designed to provide a

11   uniform standard in federal court for use of these serious measures when addressing failure to

12   preserve electronically stored information."  *See* Fed. R. Civ. P. 37(e)(2) advisory committee's

13   note to 2015 amendment.  In fact, the advisory committee's notes regarding the 2015 amendment

14   to the Rule clearly state that Fed. R. Civ. P. 37(e) "authorizes and specifies measures a court may

15   employ if information that should have been preserved is lost, and specifies the findings

16   necessary to justify these measures.  It therefore ***forecloses reliance on inherent authority*** or

17   state law to determine when certain measures should be used." (emphasis added); s*ee also Fiteq*

18   *Inc. v. Venture Corp.*, No. 13-cv-01946, 2016 WL 1701794, at *3 (N.D. Cal. April 28, 2016)

19   (noting that reliance on inherent authority is foreclosed under Fed. R. Civ. P. 37(e)); *Living Color*

20   *Enters., Inc.*, 2016 WL 1105297, at *2 (same).

21        Because Rule 37 forecloses reliance on inherent authority to grant a sanction of adverse

22   inferences, Waymo can only be granted such a sanction if it meets the requirements of the Rule.

23   As shown above, the strict requirements of Rule 37 are not met, and Waymo's request for adverse

24   inference sanctions must be denied.

25        **D.**    **Waymo Fails to Show an Adverse Inference Sanction Is Appropriate**
              **Under These Circumstances**

26

27        Even if Waymo could meet the requirements of Rule 37(e), which it cannot, "[f]inding an

28   intent to deprive another party of the lost information's use in the litigation does not require a

court to adopt any of the measures listed in subdivision (e)(2)."  Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment.  This court has recognized that an adverse inference sanction should not be "imposed casually.  *See Rimkus Consulting Grp., Inc. v. Cammarata,* 688 F.Supp. 2d 598, 619 (S.D. Tex. 2010) (adverse inferences are "among the most severe sanctions a court can administer"); *Keithley v. Homestore.com, Inc.,* No. C-03-04447 SI (EDL), 2008 WL 4830752, at *10 (N.D. Cal. Nov. 6, 2008) ("[A]n adverse inference instruction is a harsh remedy."); *Consol. Aluminum Corp. v. Alcoa, Inc.,* 244 F.R.D. 335, 340 (M.D. La. 2006) (adverse inference sanctions are "drastic"); *Thompson v. U.S. Dep't of Hous. & Urban Dev.,* 219 F.R.D. 93, 100–01 (D.Md. 2003) (adverse inference sanctions are "extreme" and "not to be given lightly"); *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 219–20 (S.D.N.Y. 2003) ("In practice, an adverse inference instruction often ends litigation—it is too difficult a hurdle for the spoliator to overcome .... Accordingly, the adverse inference instruction is an extreme sanction and should not be given lightly.")."  *Apple, Inc.,* 888 F. Supp. 2d at 994.  Courts often decline to give an instruction where other evidence can compensate for lost evidence or the lost evidence is not central to the case. *See Erhart v. BofI Holding, Inc.*, No. 15-cv-02287, 2016 WL 5110453, at *8 (S.D. Cal. Sept. 21, 2016) ("[T]he Court concludes BofI has not suffered, and does not face the risk of, prejudice that is sufficient enough to warrant sanctions."); *Toppan Photomasks, Inc. v. Park*, No. 13-cv-03323-MMC (JCS), 2014 WL 2567914, at *10 (N.D. Cal. May 29, 2014) ("The Court finds that in light of this incomplete showing of prejudice, the adverse inferences sought . . . are not appropriate."); *Ahcom, Ltd. v. Smeding*, No. 07-1139 SC, 2011 WL 3443499,at *9 (N.D. Cal. Aug. 8, 2011) ("The availability of secondary sources of evidence to compensate for the despoiled evidence lessens any risk of prejudice at trial.").

An adverse inference instruction is not appropriate here, given Waymo's delay in bringing this motion, the irrelevance of the information it alleges was destroyed, and the extreme sanction it requests on one hand, and Uber's vast productions and good faith, often successful efforts to recover or locate alternative sources for data that was no longer available on the other. Waymo makes no request for a lesser sanction, nor is any appropriate.  The time to address Waymo's issues with Uber's production, whether through discovery remedies or sanctions, has

1     passed.

2          1.      **An Adverse Inference Sanction Is Not Appropriate Because the**
            **Allegedly Destroyed ESI is Not Relevant to Waymo's Claims or**
3           **Defenses**

4          The evidence Waymo alleges was destroyed would not have been relevant to Waymo's

5     claims or defenses.  First, text messages among Mr. Kalanick, Mr. Levandowski, Mr. Ron, and

6     Ms. Qi during the Uber/Otto acquisition negotiations would have involved contract terms and

7     business discussions, and would not have been relevant to Waymo's claim that Uber received and

8     used Waymo's trade secrets.  Contemporaneous evidence supports this conclusion.  Waymo has

9     twice deposed each of these witnesses, and received over 8,000 emails, texts messages, and

10    documents sent and received by the primary individuals involved in these negotiations

11    (Mr. Kalanick, Mr. Levandowski, Mr. Ron, Ms. Qi, John Bares, and Cameron Poetzscher), 1,390

12    of which are from the time period at issue (January – March 2016).  (Tapernoux Decl. ¶ 5.)  Not a

13    single piece of evidence from deposition testimony or Uber's voluminous production indicates

14    that any of these text messages might have contained information supporting Waymo's trade

15    secret misappropriation claim.  To the contrary, the evidence consistently indicates that during

16    these negotiations, Uber executives explicitly told Mr. Levandowski not to bring Google

17    information to Uber under any circumstances.  (Dkt. 2096-11, 6/19/2017 Poetzscher Dep. Tr. at

18    254:14-15; Dkt. 2094-6, 7/27/2017 Kalanick Dep. Tr. at 22:4-23:16; Tapernoux Decl. Ex. 1,

19    6/19/2017 Ron Dep. Tr. at 30:5-15.)

20         The five Drobo disks also did not contain information relevant to Waymo's claims or

21    defenses.  These materials were destroyed before Mr. Levandowski joined Uber and therefore

22    cannot reflect evidence about the central matter in this case—whether Waymo's trade secrets

23    were misappropriated by ***Uber***.  To the extent that Waymo would use the disks to show that

24    Mr. Levandowski retained confidential Google information following his departure, Waymo has

25    purported evidence of that elsewhere.  For example, Waymo has access to the preserved copies of

26    "approximately 100" of Levandowski's other electronic devices, Dkt. 1603-4 at 1, and claims to

27    have found the materials showing that Levandowski retained information related to all nine of the

28    trade secrets at issue.  (Dkt. 2057-4 at 4-5.)  Moreover, Mr. Levandowski has admitted that the

1    disks contained Google information.  Thus, Waymo's allegation that it "is unable to investigate

2    whether the materials saved on the disks was transferred elsewhere or transmitted to Uber" is

3    illogical.  (Dkt. 2197-4 at 20:5-6.)  Uber has searched exhaustively for *any* Google content at

4    Uber, including content specifically identified by Waymo as reflecting Waymo trade secrets, and

5    found none.  The contents of the five disks would therefore be, at the very most, cumulative of

6    other evidence that Waymo already has.

7            Nor would any Tyto emails have any relevance to Waymo's trade secret allegations.  As

8    with the Drobo disks, any Tyto emails would have predated Uber's acquisition of Otto and cannot

9    reflect evidence about whether Waymo's trade secrets were misappropriated by Uber.  Waymo

10   itself doesn't even argue that the emails are relevant beyond the conclusory and wholly

11   unsupported statement that "they included potential communications regarding confidential

12   Google information that would be directly relevant to Waymo's trade secret misappropriation

13   claims."  (*Id.* at 13:8-10.)  Waymo similarly provides nothing but attorney argument that the

14   information from the 280systems.slack.com site (also deleted before Uber's acquisition of Otto)

15   would be relevant.  Additionally, the individuals with relevant knowledge of the Tyto emails and

16   280systems.slack.com site, including Mr. Stojanovski and Mr. Ron, were deposed at length and

17   nothing in their testimony indicates that the information from either of these sources would have

18   been relevant to Waymo's claims.

19           The allegedly destroyed information would have been irrelevant to Waymo's claims and

20   defenses, as well as cumulative.  Under these circumstances, an adverse inference sanction is not

21   appropriate.

22                    **2.      An Adverse Inference Sanction Is Not Appropriate in Light of
                               Uber's Lack of Bad Faith and Its Efforts to Recover ESI**

23

24           That Uber did not act in bad faith in connection with any of the instances of alleged

25   destruction of evidence, as well as Uber's good faith efforts to recover and produce electronically

26   stored information—particularly when considered in connection with instances of destruction of

27   evidence for which Waymo is at fault—also weigh against granting an adverse inference or other

28   sanction.

As discussed in detail above, there is no evidence that Mr. Kalanick acted in bad faith by using his phone's auto-delete function. The auto-deletion feature did not "ensure" that any texts would be overwritten (*supra,* at 15:27-16:3), and Waymo's forensic examiner does not raise any legitimate question as to whether the 30 day auto-delete setting had indeed been turned on at all relevant times. (S*upra,* at 15:4-26.)

Rather than act in bad faith, Mr. Kalanick actually acted in good faith to help recover these text messages once this issue was discovered. Specifically, Mr. Kalanick's counsel retained a forensics expert to analyze the phone and retrieve as many messages as possible. (Dkt. 2094-1, Buland Decl. Ex. 1 ¶ 9.) After the forensic work, Mr. Kalanick was able to produce 554 text messages between him and Mr. Levandowski. (Dkt. 2096-3, Ex. 2 ¶¶ 2-6.) And while Waymo asserts that Judge Corley "order[ed] Kalanick to produce the configuration files verifying that he used this automatic deletion setting," (Dkt. 2197-4 at 4), Mr. Kalanick actually volunteered to do so. (Dkt. 1153-3 at 3.) That Mr. Kalanick did not engage in bad faith deletion of text messages, and moreover sought to recover as much of the deleted data as possible once the issue was raised, weighs strongly against issuing sanctions based on any missing text messages from his phone.

Similarly, Ms. Qi, Mr. Levandowski, and Mr. Ron did not act in bad faith in connection with any alleged deletion of text messages, (*supra* at 15:27-16:8), nor is there any evidence of bad faith in connection with the Drobo 5D disks (*supra* at 16:9-14). Waymo may believe that Mr. Levandowski's motives were otherwise, but the parties should argue that issue to the jury and not have it prejudged by an unmerited adverse inference instruction from the Court. Finally, not only does Waymo fail to show that any Tyto emails were destroyed (much less in bad faith), but Waymo also was told in July that the emails might be recoverable by contacting Google. (Dkt. 2199-13 at 311:18-24.) Waymo never pursued this option, and should be foreclosed from seeking sanctions months later after failing to ever even ask that Uber attempt to recover this data.

Waymo's own actions should also be considered when determining whether sanctions are appropriate.



On balance, Uber's lack of bad faith, as well as its good faith efforts to recover and produce evidence when possible, weighs heavily against issuing sanctions based on any of the activities alleged in Waymo's motion.

### E.   Waymo's Cases Do Not Support Granting an Adverse Inference Sanction Here

Waymo concludes by claiming that courts "routinely issued adverse inference instructions in analogous circumstances," citing three cases. Each of these cases was decided on inapplicable standards and/or is readily distinguishable.

First, the court in *In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060 (N.D. Cal. 2006) relied on its inherent authority to award sanctions. This standard is no longer a basis upon which to award the sanction of adverse inferences under the amended Rule 37. Far from applying Rule 37's mandatory "intent to deprive" standard, the *Napster* court found that conduct amounting to "gross negligence, if not willfulness" was "sufficient culpability to justify an adverse inference." *Napster*, 462 F. Supp. 2d at 1078. Moreover, the spoliation in *Napster* occurred *after* litigation had commenced; the alleged destruction here, in contrast, happened long before Waymo filed suit.

Similarly, the alleged spoliation in *O'Berry v. Turner*, C.A. Nos. 7:15-CV-00064-HI, 7:15-CV-00075, 2016 WL 1700403 (M.D. Ga. 2016) happened months after litigation commenced. Further, the missing evidence was found to be plainly relevant to the case and non-

cumulative:  Defendant (a trucking company) could not locate the driver log from the relevant time frame for its driver-employee involved in a car crash giving rise to the lawsuit.  Notably, this case recognizes that "Federal Rule of Civil Procedure 37(e) governs the failure to preserve electronically stored information ("ESI").  This portion of the Rule was initially adopted in 2006, but underwent significant revisions in the 2015 Amendment in order to "foreclose[ ] reliance on inherent authority or state law to determine when certain measures should be used."  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 Amendment."  *Id.* at *2.

Finally, *Mosaid Technologies Inc. v. Samsung Electronics Co.*, 348 F. Supp. 2d 332, 339 (D.N.J. 2004), like *Napster,* applies an inapplicable pre-amendment four-part test to determine whether an adverse instruction is appropriate.  None of the factors discuss intent or even a culpable state of mind.  In fact, the court explicitly stated that "the offending party's culpability is largely irrelevant" to the determination of whether an adverse instruction is appropriate.  *Id.* at 338.  Moreover, in *Mosaid*, defendant Samsung never placed a litigation hold on its email document retention policy *after* litigation commenced.  "As a result, Samsung failed to produce a single technical e-mail in this highly technical patent litigation because none had been preserved."  *Id.* at 333.  These circumstances are far different from the voluminous amount of evidence available in this case that is relevant to Waymo's claims.

## IV.   WAYMO'S CLAIM ALSO FAILS UNDER THE INCORRECT STANDARDS WAYMO APPLIES

Throughout its brief, Waymo argues that an outdated standard applies to its request for sanctions.  Specifically, Waymo incorrectly asserts that "[a]n adverse inference jury instruction for spoliation is appropriate where: (A) the party with control over the evidence had an obligation to preserve it at the time it was destroyed, (B) the evidence was destroyed with a culpable state of mind, and (C) the destroyed or missing evidence was relevant to the party's claim or defenses.  *Apple, Inc.*, 888 F. Supp. 2d at 989-90; *see also Cyntegra, Inc. v. IDEXX Labs, Inc.*, 322 Fed. App'x 569, 572 (9th Cir. 2009)."  (Dkt.2197-4 at 16-17.)

As detailed above, this standard has been plainly superseded by Rule 37(e), and cannot govern the outcome of Waymo's motion.  But even under this incorrect framework, Waymo's

1   motion fails.  First, Section III(A) *supra* establishes that Uber did not have a duty to preserve

2   evidence at the time of the alleged destruction described in Waymo's motion.  Uber has similarly

3   shown that it did not have a culpable state of mind or act in bad faith in any of the instances of

4   alleged destruction.  (*Supra,* Section III(C)(2).)  And finally, as shown in Section III(C)(1) *supra,*

5   the allegedly destroyed evidence would not have been relevant to Waymo's claims or defenses.

6       **V.    CONCLUSION**

7           Waymo's motion should be denied for several independent reasons.  First, Waymo's

8   request is untimely and Waymo does not address, much less justify, its delay.  Second, Waymo

9   fails to show that Uber had a duty to preserve evidence at the time of the alleged instances of

10  destruction.  Third, Waymo fails to even argue, must less show, that Uber acted with the specific

11  intent to deprive Waymo of the use in this litigation of any alleged destroyed information.

12  Finally, Waymo fails to justify that the "harsh," "severe," and "drastic" sanctions it seeks are

13  warranted here.

14  Dated:  November 20, 2017                  MORRISON & FOERSTER LLP

15

16                                  By:  _____*/s/ Arturo J. González*_____
                                         ARTURO J. GONZÁLEZ
17

18                                       Attorneys for Defendants
                                         UBER TECHNOLOGIES, INC.
19                                       and OTTOMOTTO LLC

20

21

22

23

24

25

26

27

28