Pages 1 - 177

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| | |
|---|---|
| WAYMO, LLC ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | No. C 17-00939 WHA |
| ) | |
| UBER TECHNOLOGIES, LLC., OTTO ) | |
| TRUCKING, LLC, and OTTOMOTTO, LLC, ) | |
| ) | San Francisco, California |
| Defendants. ) | Tuesday |
| ) | November 28, 2017 |
| _____ ) | 8:00 a.m. |

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For Plaintiff:**          QUINN, EMANUEL, URQUHART, OLIVER
                            & SULLIVAN LLP
                            50 California Street
                            22nd Floor
                            San Francisco, California 94111
                BY:   **CHARLES KRAMER VERHOEVEN, ESQ.**
                      **JORDAN R. JAFFE, ESQ.**
                      **DAVID ANDREW PERLSON, ESQ.**
                      **MELISSA J. BAILY, ESQ.**
                      **DAVID EISEMAN, ESQ.**
                      **ANDREA PALLIOS ROBERTS, ESQ.**
                      **JEFFREY W. NARDINELLI, ESQ.**


                            QUINN, EMANUEL, URQUHART, OLIVER
                            & SULLIVAN, LLP
                            1299 Pennsylvania Avenue, NW
                            Suite 825
                            Washington, DC 20004
                BY:   **JARED WESTON NEWTON, ESQ.**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*  *Debra L. Pas, CSR 11916, CRR, RMR*
               *Katherine Sullivan CSR 5812, CRR, RMR*
               *Official Reporters - US District Court*

```
 1   APPEARANCES:   (CONTINUED)

 2
     For Defendants:          MORRISON & FOERSTER, LLP
 3                            425 Market Street
                              San Francisco, California 94105
 4                   BY:   ARTURO J. GONZÁLEZ, ESQ.
                          MICHAEL A. JACOBS, ESQ.
 5                        ESTHER KIM CHANG, ESQ.

 6
                              MORRISON AND FOERSTER LLP
 7                            707 Wilshire Boulevard
                              Los Angeles, California
 8                   BY:   SYLVIA RIVERA, ESQ.

 9
10   For Defendants:          BOIES, SCHILLER AND FLEXNER, LLP
                              5301 Wisconsin Avenue, NW
11                            Washington, DC 20015
                     BY:   KAREN LEAH DUNN, ESQ.
12
13                            BOIES, SCHILLER AND FLEXNER, LLP
                              435 Tasso Street
14                            Suite 205
                              Palo Alto, California 94301
15                   BY:   MICHAEL BRILLE, ESQ.
                          MEREDITH R. DEARBORN, ESQ.
16
17                            BOIES, SCHILLER & FLEXNER
                              1999 Harrison Street
18                            Suite 900
                              Oakland, California 94612
19                   BY:   MAXWELL V. PRITT, ESQ.

20
21   For Defendants:          SUSMAN, GODFREY, LLP
                              1000 Louisiana Street
22                            Suite 5100
                              Houston, Texas, 77002-5096
23                   BY:   JOSEPH S. GRINSTEIN, ESQ.

24           (APPEARANCES CONTINUED ON FOLLOWING PAGE)

25
```

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendants:          SUSMAN, GODFREY, LLP
                              1301 Avenue of the Americas
 3                            32nd Floor
                              New York, New York 10019
 4                     BY:   WILLIAM CARMODY, ESQ.
                              SHAWN RABIN, ESQ.
 5

 6                            SUSMAN, GODFREY, LLP
                              1201 Third Avenue
 7                            Suite 3800
                              Seattle, Washington 98101
 8                     BY:   MATTHEW ROBERT BERRY, ESQ.

 9

10   For Richard Jacobs:      BOERSCH SHAPIRO, LLP
                              1611 Telegraph Avenue
11                            Suite 806
                              Oakland, California 94612
12                     BY:   MARTHA A. BOERSCH, ESQ.

13

14   Media Intervenor:        BALLARD SPAHR, LLP
                              1225 17th Street
15                            Suite 2300
                              Denver, Colorado  80202
16                     BY:   STEVEN ZANSBERG, ESQ.

17

18   Lyft Intervenor:         MUNGER, TOLLES & OLSON
                              560 Mission Street
19                            27th Floor
                              San Francisco, California  94105
20                     BY:   CAROLYN HOECKER LUEDTKE, ESQ.

21

22   Special Master:          FARELLA BRAUN & MARTEL, LLP
                              Russ Building, 30th Floor
23                            235 Montgomery Street
                              San Francisco, California 94104
24                     BY:   JOHN L. COOPER, ESQ.

25                        -  -  -
```

```
 1              P R O C E E D I N G S
 2   NOVEMBER 28, 2017                              8:02 A.M.
 3                      ---oOo--
 4        THE CLERK:  Calling Civil Action 17-939, Waymo LLC
 5   versus Uber Technologies, Inc., et al.
 6      Counsel, please approach the podium and state your
 7   appearances for the record.
 8        MR. VERHOEVEN:  Good morning, Your Honor.  Charles
 9   Verhoeven.  With me is David Perlson, Melissa Baily, David
10   Newton, Andrea Roberts, David Eiseman, Jordan Jaffe.  We are
11   ready to proceed.
12        MR. GONZÁLEZ:  Good morning, Your Honor.  Arturo
13   González, Michael Jacobs, Silvia Rivera, and Esther Kim Chang,
14   from Morrison & Foerster, for Uber.
15        MR. CARMODY:  Good morning, Your Honor.  Bill
16   Carmody, with Susman Godfrey.  With us I have Shawn Rabin, Joe
17   Grinstein, and Matt Berry.
18        MS. DUNN:  Good morning, Your Honor.  Karen Dunn,
19   from Boise Schiller.  With me is Mike Brille and Meredith
20   Dearborn.
21        MR. COOPER:  Good morning, Your Honor.  John Cooper,
22   special master.
23        THE COURT:  Thank you, Mr. Cooper.
24      Any other appearances, please.
25        MR. ZANSBERG:  Good morning, Your Honor.  Steven
```

1   Zansberg, from Ballard Spahr, on behalf of the proposed media

2   intervenors.

3           THE COURT:  All right.  Anyone else?

4           MS. BOERSCH:  Good morning, Your Honor.  Martha

5   Boersch appearing for Rick Jacobs.

6           THE COURT:  Is he here?

7           MS. BOERSCH:  Yes, he is.

8           THE COURT:  He is standing.  Thank you.

9       Mr. Jacobs, I know you went through a lot of trouble to be

10  here today.  Thank you.  We'll come to you later.

11      All right.

12          MS. LUEDTKE:  Good morning, Your Honor.  Carolyn

13  Luedtke for proposed intervenor Lyft.

14          THE COURT:  Great.  Thank you.

15      Well, welcome, everyone.  We were going to be here for a

16  final pretrial conference, but last Wednesday the United States

17  Attorney's Office sent a letter to me out of the blue.  It

18  was -- I had no knowledge it was coming.

19      And it made reference to Mr. Jacobs and information that

20  he had supplied in the criminal investigation to the

21  United States Attorney's Office, information which, if true,

22  would contradict a lot of things that Morrison & Foerster and

23  all the other lawyers at that table had represented to me over

24  time.

25      I don't know if it's true or not.  It could just be a

1    disgruntled employee making allegations.  But it's serious.  So

2    I sent it to the lawyers, said we're going to talk about it

3    today, and I gave them some questions to answer.

4        Last night a motion for a continuance came in from Waymo

5    saying they wanted to take more discovery into the allegations.

6    I want to hear both sides out on this.  So let's -- we'll start

7    with Waymo.

8        Go ahead, please.

9             MR. VERHOEVEN:  Thank you, Your Honor.  Before I get

10   into the argument --

11            THE COURT:  I want to -- I want to say this first.

12   I've read everything.  There's not a stitch of anything in any

13   of those papers that should have been redacted.  And it should

14   all be public.

15       If there's anybody here who wants to argue over that,

16   let's argue over it now.  I know it's -- I know it's

17   scandalous, but it's something that the United States Attorney

18   thinks at least is true enough to give to me.

19       So I -- I'm not going to withhold this from the public

20   unless there's some -- something you want to say.  So let's

21   hear -- Ms. Boersch is coming forward.

22       I'm going to overrule your grand jury thing.  That was

23   ridiculous.  But I'm going to let you make the argument.

24       Let's hear, first, from Ms. Boersch.

25            MS. BOERSCH:  Your Honor, I don't -- I don't know

```
 1    what was redacted because I don't have a copy of the unredacted
 2    sealing.
 3         But to the extent the motion recounted information from
 4    Mr. Jacobs' letter, that letter was sent in the context of
 5    confidential settlement negotiations.  There was information in
 6    that letter that Mr. Jacobs provided to Uber, intending to keep
 7    it confidential in order to protect other people, the names of
 8    other people.  Some of those apparently were in the motion that
 9    Waymo filed.
10         Mr. Jacobs believes, and I believe, that there is a reason
11    to keep Mr. Jacobs' letter and the information in there
12    confidential because of Federal Rule of Evidence 408 and also
13    because of the context in which it was provided to Uber.
14              THE COURT:  All right.  Have -- have you finished?
15              MS. BOERSCH:  Yes, I have.
16              THE COURT:  All right.  Let's hear from Waymo.
17              MR. VERHOEVEN:  Your Honor, I would be interested to
18    know if the dispute has been settled, and, if so --
19              THE COURT:  Yes.  Ms. Boersch, I was going to ask you
20    that.
21              MR. VERHOEVEN:  And how much money.
22              THE COURT:  I would like to know if the dispute was
23    settled.  And if it's still ongoing, where is that lawsuit?
24              MS. BOERSCH:  Mr. Jacobs has settled with the
25    company.  That settlement agreement is in that -- it's a
```

```
 1   confidential settlement agreement.
 2              THE COURT:  When was the settlement?
 3         MS. BOERSCH:  It would have been in late May, early
 4   June.  Maybe later.  I'd have to check.
 5              THE COURT:  All right.  Anyone else want to be heard
 6   on the subject of the letter?
 7              MR. VERHOEVEN:  Really quickly, Your Honor.
 8       I don't have any of the facts, but I would like to know,
 9   what is the settlement?  How much was it for?  Is there a gag
10   provision in the settlement?  Is there --
11              THE COURT:  Would it matter how much it's for?
12              MR. VERHOEVEN:  What?
13              THE COURT:  Why would it matter how much it's for?
14              MR. VERHOEVEN:  Because we're -- we're -- it will
15   inform us as to the seriousness of the allegations.  It will
16   inform us as to the fact that I don't know what Mr. Jacobs is
17   going to say.  But if he does say --
18              THE COURT:  You can ask him that when he testifies.
19              MR. VERHOEVEN:  Yes, Your Honor.
20              THE COURT:  You're going to get that chance at some
21   point.
22       All right.
23              MR. VERHOEVEN:  Thank you, Your Honor.  I still don't
24   think that --
25              THE COURT:  Do you want to say anything about Rule
```

```
 1    408?

 2                MR. VERHOEVEN:  Your Honor --

 3                THE COURT:  Or grand jury, Rule 6?

 4                MR. VERHOEVEN:  This -- this was -- this was a set of

 5    allegations that were sent to Uber, in-house counsel,

 6    Ms. Padilla, in May, that had allegations regarding our case

 7    specifically.  And none of this was produced.  And it should be

 8    public, what these allegations are.

 9                THE COURT:  All right.  What do you want to say,

10    Mr. González?

11                MR. GONZÁLEZ:  Just briefly, Your Honor.

12        I think it's important to separate two things.  If there's

13    anything, anything that this witness has to say about Waymo,

14    about Google, anything related to this case, we have no issue

15    with that.

16        The problem with this letter -- and you haven't seen the

17    portions that were redacted -- is that this 37-page 408 letter

18    written by a lawyer, Your Honor, raises issues, allegations

19    regarding foreign countries all over the globe that have

20    nothing, whatsoever, to do with this case.

21        So I want to make it very clear to Your Honor, we have

22    witnesses here.  We're prepared to testify about anything

23    remotely related to this case so that you can see that there is

24    no --

25                THE COURT:  Well, the one thing that was remotely
```

1    related to this case was that Uber, if this information is

2    true -- you stood up so many times and said, Judge, we searched

3    our servers; these documents never hit a Uber server.

4        You never told me that there was a surreptitious,

5    parallel, nonpublic system that relied upon messages that

6    evaporated after six seconds or after six days.  You never

7    mentioned any of that stuff.  You never mentioned that there

8    were these offline company-sponsored laptops that -- where the

9    engineers could use that.

10        Now, are you saying that just is false?

11            MR. GONZÁLEZ:  Your Honor, what I am saying to you is

12    that, as you'll hear from witnesses who we are prepared to put

13    on the stand today -- and I have told them we're ready to make

14    them available for deposition -- that allegation that you just

15    referenced is not going to impact this case because what you

16    just referenced is something that was confined to a group of

17    people who are doing things that are very legitimate, for very

18    legitimate reasons that we can explain.

19        The folks who are witnesses in this case, Your Honor,

20    there will not be any evidence that any of them engaged in any

21    of that sort of activity.

22        Let me just take 20 seconds to say one thing.

23            THE COURT:  Well, the evidence has -- has all been

24    destroyed.

25            MR. GONZÁLEZ:  No.

 1          **THE COURT:**  Yeah.  They -- they disappear after six

 2   days or six minutes or whatever they set it to.

 3        So Mr. Verhoeven is entitled to get up there and say they

 4   had the public thing, but they didn't want to leave a document

 5   trail.  They didn't want to leave a paper trail, so they had

 6   this surreptitious thing on the side.  And, yeah, Mr. González

 7   is right, there's nothing in there because it all got

 8   destroyed.

 9          **MR. GONZÁLEZ:**  And, Your Honor, that assumes that

10   everything in the letter and everything in their brief is true.

11          **THE COURT:**  Yeah.

12          **MR. GONZÁLEZ:**  Exactly.  What we will demonstrate to

13   you --

14          **THE COURT:**  That's for the jury to decide, isn't it?

15          **MR. GONZÁLEZ:**  No, Your Honor.

16          **THE COURT:**  Not for you to decide.  Not for Uber to

17   come in here, and once again be guilty -- how many times in

18   this case have you had to stand there and apologize for

19   something that Uber did on -- and withholding documents?

20          **MR. GONZÁLEZ:**  So --

21          **THE COURT:**  Like Levandowski's own personal file and

22   somehow didn't get checked.  That led to continuance number

23   one.

24          **MR. GONZÁLEZ:**  So, Your Honor, let me be real clear.

25        The information in this letter does not pertain to the

1    witnesses in this case.  I -- I -- so -- so it would not be

2    accurate, Your Honor -- I -- I can understand if the witnesses

3    who are engineers, and all of these people that are connected

4    with this case, I can understand, Your Honor, why you would be

5    upset if they have some other computer and system and all of

6    this that destroys stuff.  I get it.  That didn't happen.

7            THE COURT:  So you say.

8        You know, earlier I said -- there was a point in this case

9    where I said I can no longer trust the word of the lawyers in

10   this case.  This is a point where lawyer credibility might make

11   a difference.

12           MR. GONZÁLEZ:  I agree.

13           THE COURT:  I can't trust anything you say because

14   it's been proven wrong so many times.

15           MR. GONZÁLEZ:  Your Honor, we have witnesses that

16   will demonstrate to you that what you just said is incorrect.

17           THE COURT:  We'll find out.  We'll find out.

18           MR. VERHOEVEN:  Really briefly, Your Honor.  I didn't

19   hear denial of --

20           THE COURT:  He admits that there was some unit, some

21   plumbers' unit, some plumbers' unit out there doing bad deeds.

22   He didn't say "bad deeds."  That's my term.  But he claims that

23   it never impacted this case, that Waymo was not involved in

24   this.

25           MR. VERHOEVEN:  Yeah.  And --

1        **THE COURT:**  The letter said that Waymo was involved.

2        **MR. VERHOEVEN:**  Exactly.  And you've noticed that

3   Mr. González' answers are very careful.  He said you won't find

4   any evidence.  He also said the -- that the witnesses in

5   this -- that are in this case aren't going to have relevant

6   information.

7        Well, what about the witnesses in the letter that they

8   have identified that ran this clandestine -- clandestine

9   program?

10        **THE COURT:**  I think we're going to find out.  That's

11   what we're going to do.

12        **MR. VERHOEVEN:**  Okay.  Shall I keep arguing?

13        **THE COURT:**  No.

14        **MR. VERHOEVEN:**  Okay.

15        **THE COURT:**  No.  No, because this is too important.

16        Here's what we're going to do on this.  I must say you

17   don't get taught how to deal with this problem in law school.

18   In 25 years of practice and then 18 years on this job I've

19   never seen such a problem.  But I have no doubt what the right

20   answer is.

21        The right answer is we're going to -- we're going to use

22   the time that would have been devoted to trial, starting today,

23   for an evidentiary hearing.

24        We're not going to -- at some point I may say we're going

25   to turn it over to the lawyers, you can go do depositions.  But

1   then Mr. González would object all day long and we would never

2   get anywhere.

3       So if we do it right here in open court, then Waymo will

4   get some testimony out of these witnesses and Uber will get

5   testimony out, and we'll just hear them up on the stand.  The

6   public is going to hear it all.  That's the way it's going to

7   be.  We're going to find out what happened here.

8       Meanwhile, we're going to have to put the trial off,

9   because if it is true -- if even half of what's in that letter

10  is true, it would be a huge injustice to force Waymo to go to

11  trial and not be able to prove the things that are said in that

12  letter.

13      And, to my mind, that letter -- that letter should -- my

14  court order said stuff like that had to be produced.  It was

15  withheld from me.  Morrison & Foerster and the rest of the Uber

16  lawyers withheld evidence.  There was a direct order to produce

17  stuff like that in the provisional relief order.

18      And to get -- to -- to have hidden this from the lawyers

19  and the judge and not be upfront about it, it just is so

20  upsetting.

21      Anyway, on the other hand, I do want to say this.  And I

22  believe there is such a thing as a disgruntled witness who is

23  willing to make stories up to discredit his former employer

24  because they got fired.  That happens.  So maybe that's the way

25  it will come out.  I don't know.

1        But when the United States Attorney has enough faith in

2    the evidence to submit it to the judge in a civil case, who had

3    no idea this was coming, they must believe that it has some

4    credibility.  So I'm going to treat it that way.

5        Now, is there anybody here from the United States

6    Attorney's Office yet?  Sometimes they show up late.

7        I want you to know, I'm going to let the public -- I'm

8    going to let the public hear everything that is involved in

9    any -- the U.S. Attorney letter and in the letter that was sent

10   to Angela Padilla in May of this last -- this year, that should

11   have been produced to me and was not.

12       All right.  Now, those of you who are here, intervenors

13   for purposes of the First Amendment, who were they again?

14   Raise your hand, please.

15       All right.  I'm sorry.  We're going to come to you a lot

16   later.  But we're going to proceed to the evidentiary -- are

17   you prepared to proceed now with the evidentiary hearing?

18       **MR. VERHOEVEN:**  Well, I will -- I will do the

19   evidentiary hearing right now, if Your Honor wants.

20       **THE COURT:**  That's what I want.

21       **MR. VERHOEVEN:**  I have no discovery.  I have just a

22   few hours of this, but I --

23       **THE COURT:**  Pretend you're a criminal lawyer.

24       **MR. VERHOEVEN:**  -- can ask questions.  I can ask

25   questions --

1    **THE COURT:**  Pretend you're a criminal lawyer and

2  having to do a cold cross.

3    **MR. VERHOEVEN:**  Okay.

4    **THE COURT:**  You're good enough to do that.

5    All right.  Mr. Jacobs, would you please come forward,

6  please.

7    **MS. BOERSCH:**  Your Honor, Mr. Jacobs is coming

8  forward, but I have to put on the record my objection to

9  calling him to testify without sufficient notice and without

10  time for us to prepare this witness.

11    As you know, there is an ongoing criminal investigation.

12  He's about to testify under oath without preparation from his

13  lawyers.

14    We have no problem with him testifying as to the

15  allegations relevant to this lawsuit.  As to the other

16  allegations that are in that letter, I don't see how they're

17  relevant here.

18    And I do, for the reasons I stated earlier, with respect

19  to the letter being sent in the context of 408 and settlement

20  negotiations, I do object to any questions or --

21    **THE COURT:**  Well, Rule 408, I'm overruling that

22  because that -- this information has come out one way or the

23  other.  And that 408, it was just as between the parties.

24    We're now in the United States District Court, and

25  that's -- and that could have even been a crime to settle that

1    case and keep those allegations from becoming public.

2         So I'm not going to entertain -- I'll entertain it, but

3    I'm overruling 408.

4         Now, if you want to assert the Fifth Amendment for some

5    reason, that I would have to honor.  But I don't want to -- I'm

6    not asking -- inviting that.  I hope you won't do that.

7         But that is a -- something we would have to go through,

8    possibly, in-camera proceedings and lots of other steps before.

9    But you're not -- I didn't hear you say that.

10        **MS. BOERSCH:**  No.  No, I'm not.  Mr. Jacobs is not

11   asserting the Fifth Amendment.  Although, I do have some

12   concerns with your suggestion that my settling an employment

13   matter --

14        **THE COURT:**  No, I didn't mean him being guilty of

15   anything.  I mean Uber being guilty of something, if they tried

16   to cover up the information with a settlement.  That's for the

17   U.S. Attorney to decide.

18        **MS. BOERSCH:**  Thank you, Your Honor.

19        And one other matter, which is with respect to the terms

20   of the settlement agreement, those are confidential.  And I

21   would ask that any questions or anything related --

22        **THE COURT:**  All right.  Here's the ground rule.  For

23   the time being, no -- no questions about the settlement

24   agreement.  No questions about other bad acts.

25        You can examine on Waymo.  You can examine on Levandowski.

```
 1   You can examine on the surreptitious text messages and the --

 2   and that whole invisible system that was not part of the

 3   regular server system.

 4        There is plenty to cover.  And then we'll come to the

 5   other things later, that you don't want us to get into.  Maybe

 6   at that point it won't matter so much.

 7        All right?

 8             MS. BOERSCH:  Thank you, Your Honor.

 9             THE COURT:  Okay.  Now, Mr. Jacobs.

10             THE WITNESS:  Yes, sir.

11             THE COURT:  Please raise your right hand and take an

12   oath.

13                       RICHARD JACOBS,

14   called as a witness for the Plaintiff herein, having been duly

15   sworn, testified as follows:

16             THE COURT:  All right.  Welcome, Mr. Jacobs.  You

17   have to sit down there, please, and adjust the mic so it

18   catches your voice.

19             THE WITNESS:  Thank you.

20             THE COURT:  Say your name so we can make sure it's

21   coming through.

22             THE WITNESS:  Richard A. Jacobs.

23             THE COURT:  Is that coming through over there?

24   Doesn't sound very loud.

25        Mr. Cooper, could you hear it?
```

```
 1              MR. COOPER:  Yes.

 2              THE COURT:  Make sure it's loud enough.  You got to

 3     be about this close.  Otherwise, we won't hear.

 4          Again, I want to thank you for coming in on short notice.

 5     You came all the way from Seattle; right?

 6              THE WITNESS:  That's correct.

 7              THE COURT:  Thank you for doing that.

 8          And where is Ms. Boersch?

 9          Ms. Boersch, if you want to ask questions at some point --

10     well, you're the lawyer, but we'll start with Mr. Verhoeven.

11          Mr. Verhoeven, the floor is yours.

12              MR. VERHOEVEN:  Thank you, Your Honor.

13                          DIRECT EXAMINATION

14     BY MR. VERHOEVEN:

15     Q.   Good morning, Mr. Jacobs.

16     A.   Good morning.

17     Q.   You were hired by Uber as its manager of Global

18     Intelligence in March 2016?

19     A.   Yes.

20              THE COURT:  Okay.  One second.  I hate to interrupt.

21          In the back row, can you hear okay?

22          Raise your hand if you're having trouble hearing.  All

23     right.

24          Angie, turn up the volume enough so the people in the

25     gallery can hear.
```

 1       Thank you.  Go ahead.

 2   **BY MR. VERHOEVEN:**

 3   **Q.**   And you were constructively terminated from Uber in April

 4   of 2017?

 5   **A.**   Yes.

 6           **MR. VERHOEVEN:**  Your Honor, I would like to introduce

 7   the letter in redacted form.

 8           **THE COURT:**  All right.  It will stay in redacted form

 9   for the time being, subject to being -- by the way, Uber is

10   supposed to be producing to me today the entire letter

11   unredacted.  We'll come to that in a minute, but I want it

12   today.

13       All right.  Go ahead.

14           **MR. VERHOEVEN:**  Thank you, Your Honor.

15           **THE COURT:**  It will be Exhibit Number 1.

16       (Plaintiff's  Exhibit 1 marked for identification)

17           **MR. VERHOEVEN:**  Should I hand up another copy to the

18   witness, Your Honor?

19           **THE COURT:**  Is it marked?  You need to have it

20   marked.

21           **MR. VERHOEVEN:**  Can I have it marked?

22           **THE COURT:**  The court reporter -- the clerk of the

23   court will mark it Exhibit 1.

24       Do you have the tag, Angie?  We need to mark it as

25   Exhibit 1, and then give it back to counsel.

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1          **MS. BOERSCH:**  Your Honor, could we have a copy as

2     well?

3          **THE COURT:**  Mr. Verhoeven, my clerk has let me down.

4     Would you just mark with a pencil "Exhibit 1" in the upper

5     corner.  And then we will put the official tag on it in due

6     course.

7          **MR. VERHOEVEN:**  Thank you, Your Honor.

8     May I approach?

9          **THE COURT:**  Yes.

10         **MR. VERHOEVEN:**  Thank you.

11    BY MR. VERHOEVEN:

12    Q.   Who is the -- who is Hallinan Law?

13    A.   It's a plaintiff's attorney who represented me for a time.

14    Q.   Which attorney represented you?

15    A.   Clay Hallinan was the lead attorney from that firm.

16    Q.   Do you recognize this letter?

17    A.   Yes, I believe I do.

18    Q.   Direct your attention to the last -- direct your attention

19    to the last page, page 37.

20    A.   Okay.

21    Q.   Is that the signature of your attorney?

22    A.   Yes, I believe so.

23    Q.   In this letter there are a number of statements that are

24    attributable to you.  You've read those; right?  You've read

25    those -- that part of the letter?

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1    A.    I don't know which ones you're referring to specifically.

2    Q.    I'm just saying generally.

3    A.    Quotations?

4    Q.    Have you read this letter?

5    A.    Yes.

6    Q.    Did you read it before it went out?

7    A.    Uhm, I can't recall if I saw it in full before it went

8    out.

9    Q.    Did you make sure that it was accurate before you sent it

10   out?

11   A.    I did not send it out.

12   Q.    That's correct.   Thank you.

13         Did you make sure it was accurate before you had your

14   attorney send it out?

15   A.    I made sure everything I reviewed was accurate before I

16   gave my approval, yes.

17   Q.    Do you stand by the allegations contained in this letter?

18   A.    I -- I -- the letter contains a mix of summation and

19   direct allegations.   I stand by those.

20   Q.    You stand by all of them?

21   A.    Again, I'd --

22              THE COURT:   He's asking, are -- do you stand by the

23   surmise as well as the direct allegations?

24              THE WITNESS:   Yes.

25              THE COURT:   All right.

1    BY MR. VERHOEVEN:

2    Q.    Are you being paid to be here today?

3          THE WITNESS:  Our Honor, I think that gets into

4    confidential issues that you raised that weren't going to be

5    part of --

6          THE COURT:  Well, I overruled those confidential

7    things.  If you're being paid to be here today, then the Court

8    is entitled to know that.

9          MS. BOERSCH:  Your Honor, could I have a moment with

10   my client?

11         THE COURT:  What?

12         MS. BOERSCH:  Could I have a moment with Mr. Jacobs?

13         THE COURT:  Sure.

14      (The witness confers with his counsel sotto voce.)

15         THE WITNESS:  Thank you.

16      My expenses, I believe, are being reimbursed by Uber.

17   BY MR. VERHOEVEN:

18   Q.    And how much are you being paid?

19   A.    My expenses should amount to around a thousand dollars for

20   the airfare and hotel.

21   Q.    Is there a provision in your settlement agreement that

22   requires you to cooperate with Uber?

23         MS. BOERSCH:  Your Honor, objection again in terms of

24   the terms of the settlement agreement.

25         THE COURT:  Well, that's relevant, though, to today's

JACOBS - DIRECT EXAMINATION / VERHOEVEN

 1    proceeding.   The objection is overruled.

 2         Please answer.

 3              THE WITNESS:   I've agreed to assist the internal

 4    investigation and any government's directed investigations.

 5    And, certainly, Your Honor's order to appear today would fall

 6    into that category, yes.

 7    BY MR. VERHOEVEN:

 8    Q.   So the terms of your settlement require you to cooperate

 9    with Uber; correct?

10    A.   To cooperate with the internal investigation.

11    Q.   What's your understanding of what that means?

12    A.   My understanding is it means that Uber took the

13    allegations seriously and are looking to root out bad behavior,

14    and I can assist in that.

15    Q.   Does your agreement require that you cooperate on behalf

16    of Uber in District Court proceedings?

17    A.   I would say that I am cooperating, representing the truth.

18    But certainly not any sort of bias.   I would -- yeah.   I'm

19    representing the truth of the matter and working to resolve

20    some of these behaviors.

21    Q.   What does your agreement say about cooperation?

22    A.   Generally, that I will assist in helping Uber with their

23    internal investigation and obviously cooperate with any

24    government or municipality-led investigation of the company.

25              THE COURT:   I think we should move to big topic.

 1              **MR. VERHOEVEN:**  Yes, Your Honor.

 2    **BY MR. VERHOEVEN:**

 3    **Q.**   I want to -- before we go into this letter, I want to

 4    confirm a few points just to start with.

 5         Uber had a group dedicated to stealing trade secrets and

 6    confidential information from competitors; correct?

 7    **A.**   Uhm, I believe that's a hyperbolic way to state something

 8    that --

 9    **Q.**   Is it true or not?

10    **A.**   I'm sorry, I'm searching my mind to recall if I have

11    direct knowledge of any actual trade secrets that were stolen.

12    **Q.**   If your letter says you do, would you -- would that be an

13    accurate statement?

14    **A.**   Again, this letter was not sent by me, so I won't accept

15    the characterization that it's my letter.  But I'm trying to

16    search to give you as complete and accurate an answer on that

17    question as possible.  Search my mind.

18    **Q.**   So did Uber have a group within Uber that was dedicated to

19    obtaining trade secrets and confidential information from

20    competitors?  Yes or no?

21    **A.**   To which group are you referring?

22    **Q.**   Any group.

23              **THE COURT:**  So, wait.  This is a legitimate line of

24    questions.  But when you appear to be reading from a document,

25    make sure you read it exactly.  Don't use editorial license.

1          **MR. VERHOEVEN:**  Yes, Your Honor.

2          **THE COURT:**  So make sure you're reading the document

3    as it's written so we all know that's what's in the letter as

4    opposed to having to guess whether or not you're putting a spin

5    on it.

6          **MR. VERHOEVEN:**  Let's go straight to the letter then.

7    **BY MR. VERHOEVEN:**

8    **Q.**   Would you turn to page 4.  Actually, start with page 3.

9    Turn to page 3.

10         There's a section here, Uber's relevant corporate

11   structure.  Do you see that?

12   **A.**   Yes.

13   **Q.**   And then this letter describes various organizations

14   within Uber; right?

15   **A.**   Yes, uh-huh.

16   **Q.**   What's Global Intelligence?

17   **A.**   Global Intelligence was the intelligence -- Threat

18   Intelligence Analysis Section.

19   **Q.**   What is -- turning to the next page, what is Strategic

20   Services Group, SSG?

21   **A.**   Strategic Services Group was an information sourcing group

22   that conducted due diligence checks for Uber's compliance

23   program and got on-the-ground truth about dynamics in the

24   countries in which Uber operated.

25   **Q.**   What is Investigations?

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1  A.    Investigations was responsible primarily for internal

2  investigations of abuse on the platform that is Uber's

3  application and also internal employee issues like, you know,

4  if, for instance, an employee with access to sensitive user

5  data was in any way abusing those privileges, Investigations

6  was the team that looked into it.

7  Q.    Law Enforcement Outreach?

8  A.    Right.  So there's -- there's really two teams under the

9  sort of law enforcement umbrella.  There's Outreach and

10  Response.  Outreach reaches out to the law enforcement

11  community and teaches them how to interact with Uber.  Response

12  is the one that answers the sort of legal process documents,

13  requesting information from the company as they investigate,

14  for instance, crimes carried out during trips, things like

15  that.

16  Q.    Says here in this letter that this organization, part of

17  its purpose is to train law enforcement how to interact with

18  Uber.

19  A.    Yes.  And they deliver presentations just how to, I guess,

20  tailor -- I shouldn't say "I guess"; I know -- how to tailor

21  their legal process requests to get the information they need

22  and to not accidentally, you know, request overly broad sets of

23  data that would in- -- inundate them, rather, with useless

24  information when they are trying to investigate a specific

25  crime.

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1   **Q.**   What is Marketplace Analytics?

2   **A.**   Marketplace Analytics is a group that derives metrics and

3   facts about the -- the competitive landscape in which Uber

4   operates.

5   **Q.**   And this used to be the competitive intelligence referred

6   to as COIN, C-O-I-N?

7   **A.**   I don't know that firsthand.  That's what I've been told

8   by other employees who predated me at the company.  It was not

9   called that during my time.

10   **Q.**   In your letter you say:

11         "Marketplace Analytics" -- and I quote -- "exists

12      expressly for the purpose of acquiring trade secrets, code

13      base, and competitive intelligence."

14      And it goes on.  Do you see that?

15   **A.**   I do, yes.

16   **Q.**   That's a true statement?

17         **MR. GONZÁLEZ:**  Your Honor, at this point I would

18   object that there's no foundation that's been established.

19         **THE COURT:**  Overruled.

20      Please answer.

21         **THE WITNESS:**  Could you restate the question?

22   **BY MR. VERHOEVEN:**

23   **Q.**   In your letter -- excuse me.  In your attorney's letter

24   about you, the attorney states that "The Marketplace

25   Analytics" -- you can look at it in the document here.  Do you

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1    see it?

2    A.    Yes.

3    Q.    -- quote, "exists expressly for the purpose of acquiring

4    trade secrets, code base, and competitive intelligence."

5          Do you see that, sir?

6    A.    Yes.

7    Q.    That's an accurate statement, isn't it?

8    A.    I -- I'm searching my mind.  I don't -- off the top of my

9    head, I can't recall firsthand knowledge of the acquisition of

10   trade secrets.  The code base and its competitive intelligence

11   probably is an accurate statement, yes.

12   Q.    Well, your lawyer said it, didn't he?

13   A.    My lawyer sent this letter, yes.

14   Q.    And you reviewed it to make sure it was accurate; right?

15   A.    I believe what I said was the things that I reviewed were

16   accurate.  And I can't recall how much time I had with this

17   particular document.  It was a short and a long document, and

18   so there may be things that aren't exactly how I would have

19   stated them.

20   Q.    Would you let your lawyer send out a letter about you and

21   about your knowledge in which it says that Marketplace

22   Analytics exists expressly for the purpose of acquiring trade

23   secrets if that was not true?

24         MS. BOERSCH:   Objection, Your Honor.  Calls for a

25   legal conclusion.

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1      **THE COURT:**  Overruled.

2         Please answer.

3      **THE WITNESS:**  I believe that it is true in my

4   firsthand knowledge.  And, also, there's some surmising

5   involved in this.

6      **THE COURT:**  I want you to explain which part is

7   surmise and which part is firsthand knowledge.

8      **THE WITNESS:**  Trade secrets, surmised.  Well, I

9   should say it's all either surmised or from hearsay.  I never

10  had direct access to M.A.'s work.

11     **THE COURT:**  Just a moment.  Just a moment.

12     **THE WITNESS:**  Sure.

13     **THE COURT:**  You're drawing a sharp distinction

14  between knowledge, like Biblical firsthand "I saw it with my

15  own eyes knowledge," versus belief.

16        Now, when somebody reads that letter, they at least think

17  that you believe it to be true.

18     **THE WITNESS:**  That's accurate, yes.

19     **THE COURT:**  All right.  So you had to base that

20  belief on something.  And even if you don't have direct

21  firsthand "I saw it with my own eyes" knowledge which somebody

22  has put you up to saying, then you've got to tell us what your

23  belief is based -- was based on, even if it's hearsay.  Even if

24  it's surmise.  Counsel is entitled to get that.

25        So you're dancing around on this, and we're not going to

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1    allow it.  We are going to make you answer that.

2            THE WITNESS:  Absolutely.

3            THE COURT:  All right.  So tell us -- tell us what

4    you based the statement on that that organization was set up to

5    steal trade secrets.

6            THE WITNESS:  Yes, Your Honor.

7        And I think the difference is just as I'm -- you know, I

8    think there's a discrepancy, perhaps, in the definition around

9    trade secrets.  But -- so it is my belief that this is an

10   accurate statement, yes.

11           THE COURT:  What did you base it on, the belief?

12       In other words, did somebody come to you one day and say,

13   hey, we just stole some trade secrets, or we're going to get

14   some trade secrets?  Or is it you overheard a conversation?

15   You must have based it on something other than just a dream you

16   had.

17       So what actually happened in the workplace that caused you

18   to believe that?

19           THE WITNESS:  So it was discussion in the workplace,

20   comments made by my manager, the manager of the Marketplace

21   Analytics team, members of the team discussing some of their

22   successes and tactics around work against rival firms overseas.

23           THE COURT:  All right.  Next question.

24   BY MR. VERHOEVEN:

25   Q.   You referred to people in the Analytics team.  Who was

1    your manager, for the record?

2    **A.**    I was part of the Threat Operations team.   The manager was

3    Matt -- or is Matt Henley.

4    **Q.**    And is that the person you were referring to in your

5    answer to His Honor?

6    **A.**    Yes.   He was my manager throughout my entire time at Uber.

7    **Q.**    And --

8    **A.**    I should say until the final month.   I was reassigned to

9    work for a manager named Nick Gicinto.

10   **Q.**    Were you referring to both of those gentlemen in your

11   answer?

12   **A.**    No.   Matt Henley.

13   **Q.**    You were referring to Matt?

14   **A.**    Correct.

15   **Q.**    And who were the members of your team you referenced in

16   your answer?

17   **A.**    So Kevin Maher was the manager of the team.

18   **Q.**    I'm sorry.   Can you spell that last name?

19   **A.**    M-a-h-e-r.

20       And then various members of the team and I talked at

21   different points.

22   **Q.**    Which various members?

23   **A.**    That's what I'm trying to get at, trying to recall the

24   names of those people.

25       I believe one was named David Hughes.   And Michael

JACOBS - DIRECT EXAMINATION / VERHOEVEN

 1  McLaughlin was another long-term member of the team.  Those are

 2  the two names that I recall right now.

 3  **Q.**   Who told you about successes that the team had had and

 4  tactics that the team had engaged in, as you -- as you

 5  mentioned when you answered His Honor's question?

 6  **A.**   All -- all four of those individuals at various points.

 7  But in terms of successes, the specific recollection I have is

 8  around Matt Henley and Mr. Maher, Kevin Maher.

 9  **Q.**   And what did Mr. Maher say to you?

10  **A.**   There was a discussion around the acquisition of data

11  about a rival firm overseas that had been a success.

12  Mr. Henley also describes a finding, what was meant to be

13  private or corporate code base on GitHub, on people's public

14  accounts.

15      So a way to understand more about how rival platforms

16  functioned by finding sort of spilled data, so to speak, on the

17  Internet.

18  **Q.**   When you referred to acquisition of data in the first --

19  first part of Your Honor's answer --

20  **A.**   Yes.

21  **Q.**   -- what does that mean, "acquisition of data"?  Does it

22  mean that he hacked -- he hacked in his competitors' computers?

23  Does it mean something else?

24  **A.**   I have no knowledge of -- of a hack into competitors'

25  computers.

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1    Q.    Well, then what does it mean?

2    A.    Part of what it means is the acquisition of leaked code

3    base on GitHub.  And part of it is getting, for instance,

4    information on drivers who operate on competitor platforms

5    overseas.

6    Q.    Anything else?

7    A.    Then general metrics around competitor businesses like,

8    sort of, volume of drivers, and insights into incentives

9    paid -- incentives paid by rival firms to, for instance, get

10   drivers on their platform, using their platform, to understand

11   the competitive landscape.

12   Q.    Did you understand, when you were speaking with --

13   withdrawn.

14        Did you ask Mr. Maher whether it was legal to collect this

15   information?

16   A.    I did not.

17   Q.    You knew it was not legal, didn't you?

18            MS. BOERSCH:  Objection.  Calls for a legal

19   conclusion.

20            THE COURT:  Well, did you believe?  You may ask that.

21   Did you believe that it was not legal?

22            THE WITNESS:  I did not believe it was patently

23   illegal.  I had questions about the ethics of it.

24   BY MR. VERHOEVEN:

25   Q.    What were your questions?

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1    A.    Whether or not it was ethical.

2    Q.    And why did you think it might not be ethical, sir?

3    A.    I suppose because of my personal metrics, it felt overly

4    aggressive and invasive and inappropriate.

5    Q.    And it was overly invasive because they were obtaining

6    private confidential information; right?

7          Excuse me.  Let me rephrase.

8          It was overly invasive because, as represented by the

9    manager of the team, Mr. Maher, they were obtaining nonpublic,

10   private confidential information; right?

11   A.    Nonpublic, yes.

12   Q.    What is -- I forget what you said.  You said "get" some

13   site.  "Get" something?

14   A.    Oh, GitHub.

15   Q.    GitHub?

16   A.    G-i-t H-u-b.  It's -- it's basically the main online

17   repository for code base that programmers use to create, share

18   and store scripts or codes for computer programming.

19   Q.    What's the purpose -- strike that.

20         Is there -- or withdrawn.

21         Is there a portion of GitHub that's dedicated to

22   publishing otherwise confidential code base?

23   A.    Could you rephrase the question?  I'm not sure I

24   understand.

25   Q.    Is there a portion of GitHub on the site that you can go

1   to, to try and find confidential code base that someone has

2   leaked or put out?

3   **A.**   Shall I just state my understanding of GitHub and note

4   that I'm not -- certainly not a programmer?

5   **Q.**   Yes, sir.

6   **A.**   My understanding is there are effectively two instances,

7   two verticals of platform.

8        There's the public vertical, where people make and write

9   code and share publicly for personal projects or for whatever

10  reason that they see fit to -- to help people out.

11       And then there are private or corporate instances of the

12  site, where the code base is restricted just to personnel that

13  work at that firm, for efficiencies in their programming or

14  scripting.

15       But, at times, some of that restricted corporate

16  information is spilled over to the public site.  And if you

17  know what you're looking for, you can find what is meant to be

18  nonpublic on a public site.  That's my understanding.

19  **Q.**   Did the Marketplace Analytics team hack the GitHub site?

20  **A.**   Not --

21           **MR. GONZÁLEZ:**  Objection.

22           **THE WITNESS:**  -- to my knowledge.

23  BY MR. VERHOEVEN:

24  **Q.**   What about -- do you recall anything else that Mr. Maher,

25  M-a-h-e-r, said relating to the Analytics team's successes and

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1    tactics as it relates to confidential information of Uber's

2    competitors?

3    **A.**    Nothing in addition to what I've already stated.

4    **Q.**    Now, you also mentioned another individual.  Was it

5    Mr. Hughes, David Hughes, who you had conversations with?

6    **A.**    Yes.

7    **Q.**    And how many conversations did you have with Mr. Hughes on

8    the subject?

9    **A.**    I can't recall specifically.

10   **Q.**    Is it more than five?

11   **A.**    I would say probably fewer than five where we talked

12   substance.

13   **Q.**    Okay.  More than two?

14         **THE COURT:**  What subject are we talking about now?

15         **MR. VERHOEVEN:**  We're talking about the subject that

16   Mr. Jacobs referenced in his answer to Your Honor's question

17   about where he referenced his manager, members of the team, and

18   a discussion of success -- successes and tactics relating to

19   the allegation in this letter, again, which states, quote,

20   "M.A. exists expressly for the purpose of acquiring trade

21   secrets, code base and competitive intelligence," closed quote.

22         **THE COURT:**  All right.  So with that in mind, go

23   ahead and answer the question.  Or repeat the question, please.

24         **THE WITNESS:**  Is the question about number?

25

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1    BY MR. VERHOEVEN:

2    Q.   Yeah.  Can you be more precise?  Was it two?  Was it

3    three?

4    A.   I can't be more precise.

5    Q.   Sorry?

6    A.   I can't be more precise.

7         You know, this is general discussion around the office,

8    and so I didn't, sort of, log every -- every discussion in my

9    mind that I had in passing with employees.  So it's hard for me

10   to say specifically how many substantive conversations I had

11   with somebody who worked, you know, two desks away for a time.

12   Q.   Did Mr. Hughes indicate to you that the market analytics

13   team had acquired trade secrets of a competitor?

14   A.   I think this gets to the definition of the term "trade

15   secrets."

16   Q.   What's your understanding of the term "trade secrets"?

17   A.   Uhm, broadly, any nonpublic information about a

18   corporation.

19   Q.   Okay.  Using that definition, I repeat the question.  Do

20   you have it in mind, or should I repeat it?

21   A.   Please repeat it, if you would.

22   Q.   Did Mr. Hughes discuss with you in these conversations --

23   withdrawn.  I misstated my prior question.

24        Mr. Hughes, during these conversations, told you about the

25   fact that the market analytics team had acquired trade secrets

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1  of a competitor, didn't he?  Using your definition of trade

2  secrets.

3  **A.**   I can't recall him specifically telling me that they had

4  accomplished as much.  I want to say that our conversations --

5  I believe our conversations were more around their general work

6  and not specific, you know, accomplishments, so to speak.

7  **Q.**   Mr. Hughes told you that market analytics generally had

8  success in acquiring trade secrets from its competitors;

9  correct?

10  **A.**   No.  I believe that my conversations were more about

11  general practices.  And, again, I can't recall him specifically

12  saying --

13          **THE COURT:**  Now you're giving a clever answer.

14          **THE WITNESS:**  I'm just trying to not --

15          **THE COURT:**  You're saying "my" -- you're saying "my

16  answer" -- "my conversations were 'more' around."  Well, that's

17  begging the question of how much they involved exactly the

18  subject that counsel is asking you about.

19      So you've got to -- you can't shift to other things you

20  talked about.  Answer the question that if -- it's either yes

21  or no.  But you can't say, well, I talked more about something

22  else, because that's begging the question of did you talk about

23  what he's interested in.

24          **THE WITNESS:**  I understand.

25          **THE COURT:**  So ask the question again.  And let's get

1  either a yes or no answer.  Say "yes," "no," or "I don't

2  recall."  And you can only say "I don't recall" if it's true

3  that you don't recall.

4       All right.  Go ahead.  Ask the question again.

5  **BY MR. VERHOEVEN:**

6  **Q.**   We're talking generally, not a specific competitor and not

7  a specific conversation.  Are you with me?

8  **A.**   Yes.

9  **Q.**   Mr. Hughes told you generally that the Marketplace

10 Analytics team had acquired trade secrets of competitors;

11 right?

12 **A.**   I don't recall.

13 **Q.**   You don't recall.

14      What do you recall Mr. Hughes saying to you?

15           **MS. BOERSCH:**  Objection.  Asked and answered.

16           **THE COURT:**  Overruled.

17      Please answer.

18           **THE WITNESS:**  I don't recall the specifics from my

19 conversations with Mr. Hughes.  I just know that he was, you

20 know, someone with whom I spoke generally about the purpose of

21 the team.  And so that's why I -- and whose name I recall.  But

22 I don't recall any more about my conversations with him right

23 now.

24 **BY MR. VERHOEVEN:**

25 **Q.**   Well, the purpose of the team discussion -- let me follow

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1  up with that, because your lawyer's letter says, quote:

2          "M.A. exists expressly for the purpose of acquiring

3      trade secrets, code base, and competitive intelligence."

4      Is that what Mr. Hughes said to you?

5  **A.**   No.

6  **Q.**   Well, what did he say about the purpose of the market

7  Analytics team?

8  **A.**   I believe Mr. Hughes described their efforts to derive

9  metrics about competitors overseas.

10  **Q.**   And what were those efforts?

11  **A.**   That they were seeking to understand the -- and identify

12  the -- for instance, the drivers on competitor platforms, and

13  details about the incentives paid by those companies, and

14  function of competitor apps.

15  **Q.**   What do you mean by "function of competitor apps"?

16  **A.**   How they serve up -- as I understood it, how they serve up

17  data to riders and drivers, visualization and the data behind

18  it, how they solve potentially common problems among

19  ridesharing applications.

20  **Q.**   That's confidential information of the competitors, isn't

21  it, sir?

22          **MR. GONZÁLEZ:**  Objection, Your Honor.  That's a legal

23  conclusion.  No foundation.

24          **THE COURT:**  Overruled.  Overruled.

25      Please answer.

1          THE WITNESS:  I don't know.

2   BY MR. VERHOEVEN:

3   Q.   You have no idea whether the mechanisms of the app, and

4   how it operates, how it functions, is something that's private

5   to the companies that are competitors of Uber?

6          MS. BOERSCH:  Objection.  Overbroad.  Vague.

7          THE COURT:  It is overbroad.

8       Mr. Verhoeven, even the ordinary consumer who is a

9   customer is going to know how the app works.  That can't be a

10  trade secret.  You must mean something else.

11  BY MR. VERHOEVEN:

12  Q.   What did you mean when --

13          MR. VERHOEVEN:  I'm sorry.  Can I ask --

14          THE COURT:  Go ahead and ask a more clear question.

15  BY MR. VERHOEVEN:

16  Q.   What do you mean when you say "who the drivers are"?

17  A.   Well, for instance, that could be -- I'm just trying to

18  give you a complete answer.  So let me give you examples on

19  both sides of -- of the coin so to speak.

20       If an app has rudimentary function overseas, especially

21  when it's first launched, a rider could simply pull up their

22  app, request a ride.  And as soon as they request a ride, it

23  identifies a driver, their name, and their vehicle and license

24  plate number or phone number.  Any -- any rider, anybody who

25  has an email address could register and get that data about

1    drivers.

2        Apps that are more developed, like, you know, the Uber app

3    to be able to do that *en masse* and to get contact information

4    for drivers in a new country where the app has been operating

5    for a long period of time would be much more difficult.

6        So there's sort of a spectrum there about how driver data

7    could be served up and whether or not, you know, one could

8    consider the information public or nonpublic, private or not.

9            THE COURT:  Mr. Verhoeven, I know there's a lot you

10   could cover in this letter --

11           MR. VERHOEVEN:  Yes.

12           THE COURT:  -- but we don't have all day.

13           MR. VERHOEVEN:  Okay.

14           THE COURT:  So I think you ought to move to the

15   things that are most pertinent to Waymo.

16           MR. VERHOEVEN:  Yes, Your Honor.  Just about to do

17   that.

18   BY MR. VERHOEVEN:

19   Q.   Can you turn to page 5 of the letter.

20        Do you see there's a paragraph there that begins with,

21   quote, "Uber has knowingly violated 18 U.S.C. Section 1519, and

22   continues to do so"?  Do you see that?

23   A.   I do.

24   Q.   And then this is a letter from your lawyer.  Continues:

25           "Craig Clark, Uber's lead director for Threat Ops,

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1          and Matt Henley, who is director of Threat Operations, led

2          Uber's efforts to evade current and future discovery

3          requests, court orders, and government investigations, in

4          violation of state and federal law, as well as ethical

5          rules governing the legal profession."

6          Do you see that?

7    A.    Yes.

8    Q.    And that's -- you stand by that statement from your

9    lawyer?

10   A.    I don't know that I can answer what 18 U.S.C. says.  I can

11   talk about specific practices.

12   Q.    Well, let's move -- let's go to the most relevant one

13   first.  The sentence continues, quote:

14          "Clark devised training and provided advice intended

15          to impede, obstruct, or influence the investigation of

16          several ongoing lawsuits against Uber and in relation to

17          or contemplation of further matters within the

18          jurisdiction of the United States.

19          Do you see that?

20   A.    Yes.

21   Q.    And do you stand by that statement?

22                MR. GONZÁLEZ:  Your Honor, there is no foundation for

23   this.

24                MR. VERHOEVEN:  Your Honor --

25                THE COURT:  It's in the letter from the lawyer who

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1   represented him.  That's enough foundation for the witness to

2   be able to answer it.

3        Overruled.

4             **THE WITNESS:**  Your Honor, if I may ask.  We're

5   talking about advice provided by a lawyer.  Should I have any

6   concerns about attorney-client privilege in this line of

7   questioning?

8             **THE COURT:**  He is asking what you knew.  In other

9   words, your lawyer made a representation to Uber about what had

10  happened in your case and what was going on at Uber.  And that

11  was made on your behalf.

12       Now, when you were an employee there, if you observed any

13  of this or you surmised any of it, of -- of wrongdoing, there's

14  no way any kind of attorney-client is going to protect you from

15  having to reveal that.

16       So you -- you -- no.  The answer is, you -- you shouldn't

17  tell us what you told your lawyer and your lawyer told you.

18  That would be privileged.  But -- but in terms of what you

19  observed and surmised or saw firsthand in the workplace, that's

20  an open book.

21             **THE WITNESS:**  Understood.

22             **THE COURT:**  All right.

23             **THE WITNESS:**  Yes.

24             **MR. GONZÁLEZ:**  Your Honor, one point of clarification

25  for the Court.  Mr. Clark, who is referenced here, is an

1   attorney.  And I believe -- I'm just surmising myself now that

2   that's what the witness was concerned about with respect to

3   privilege.

4           MR. VERHOEVEN:  I object to these speaking

5   objections.  They're -- they're not appropriate.

6           MR. GONZÁLEZ:  It is appropriate if there is

7   attorney-client information, Your Honor.

8           THE COURT:  Well, I'm going to let you ask about the

9   contents of this letter as it relates to Mr. Clark.  So go

10  ahead.  That objection is overruled.

11  BY MR. VERHOEVEN:

12  Q.  Did -- did Mr. Clark devise training and provide advice

13  that was intended to impede, obstruct or influence

14  investigation in several ongoing lawsuits against Uber?  Yes or

15  no?

16  A.  I would say more generally the purpose was to impede,

17  obstruct or influence the investigation of any lawsuit against

18  Uber.  Which is to say, you know, I can't point at several

19  ongoing lawsuits for which his training was -- was intended,

20  but that more generally speaking it was intended to protect

21  against any contemplated suits or discovery process.

22  Q.  What did Mr. Clark do that was intended to impede,

23  obstruct or influence ongoing lawsuits?

24  A.  There was legal training around the use of

25  "attorney-client privilege" markings on written materials and

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1    the implementation of encrypted and ephemeral communications

2    intended to both protect and destroy communications that might

3    be considered sensitive.

4    **Q.**    Anything else?

5    **A.**    And then there was just generally, sort of,

6    communications.  Practice, order of preference.  You know,

7    instructing employees to make phone calls, have video calls.

8    And then, if necessary, have written correspondence via

9    encrypted or ephemeral communications as, sort of, email as a

10   last resort.

11   **Q.**   Okay.  What did he say about implementing a practice of

12   encrypting -- I guess you referred to it as ephemeral

13   communications to protect and destroy information?

14        What was he doing?  What was Uber doing?

15        **MS. BOERSCH:**  Objection.  Vague.  Overbroad.

16        **THE COURT:**  Sustained.

17   **BY MR. VERHOEVEN:**

18   **Q.**   What did he say about how Uber was implementing these

19   encryption and ephemeral systems?

20   **A.**   So I think the first thing I would say is that this was

21   relevant and constrained to this department within security as

22   opposed to an Uber-wide policy.  This was a policy that was

23   implemented in a small workgroup of the company.  That's the

24   first point.

25        And then the question is what did he say --

1  Q.   That wasn't my question, sir.

2  A.   I'm just trying to clarify it so that I can answer it

3  honestly and fully.

4  Q.   What did he say about implementing encrypted, ephemeral

5  systems for the purpose of protecting and destroying

6  information?

7  A.   He described the need to protect sensitive information and

8  to ensure that we didn't create a paper trail that could come

9  back to haunt the company in any potential criminal or civil

10  litigation.

11  Q.   And what steps did he instruct vis-a-vis not creating a

12  paper trail?  What did he say you should do not to create a

13  paper trail?

14  A.   Well, one principal example was I was managing an

15  Intelligence Analysis team.  We had access to a bunch of

16  different reporting streams, but to build continuity for the

17  team in the years to come and to build a repository of data

18  around the -- about the countries in which Uber operated,

19  threat intelligence, I sought to develop a centralized database

20  to maintain our records so that we could work more efficiently,

21  and we would have continuity for years to come.  And that was

22  an effort that Mr. Clark objected to vehemently because he did

23  not want to create a paper trail about some of the sensitive

24  information my team received.

25  Q.   Did Mr. Clark or anyone in his group discuss the use of

1  non-attributable devices?

2  **A.**   Yes.

3  **Q.**   And what did they -- did they -- sorry, withdrawn.

4        Did this group create or supervise non-attributable

5  devices?

6  **A.**   Which group are you referring to?

7  **Q.**   Mr. Clark's group.

8  **A.**   Mr. Clark was the legal director for part of the time for

9  Threat Operations, which means he was effectively an advisor

10  but had no group of his own.

11        And then for part of his tenure, I understood he was --

12  was part of the two security officers, Joe Sullivan's work

13  group.

14        So when you say "his group," I will define it as the

15  Threat Operations team.  Is that fair?

16  **Q.**   Fine.

17  **A.**   Okay.  So the question is what did he say?  I'm sorry,

18  could you restate it now that I have said that.

19  **Q.**   Let me ask you this more generally.

20  **A.**   Sure.

21  **Q.**   Did anyone at Uber instruct that non-attributable devices

22  be purchased, maintained and used in connection with the effort

23  to protect and destroy information?

24        **MS. BOERSCH:**  Objection.  Vague, overbroad and

25  compound.

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1          **THE COURT:**  Well, I agree it's a little too

2    overbroad.  Let me ask a simpler question and counsel can

3    follow up.

4          Tell us what the story was about non-attributable devices

5    as they were used at Uber?  Be complete in your answer.

6          **THE WITNESS:**  Okay.  So non-attributable devices were

7    used in a limited number of circumstances within the Security

8    team.  One example would-be non-attributable devices were used

9    to communicate with third-party vendors who were providing

10   on-the-ground information about threat intelligence against the

11   company, for instance.  And so, effectively, it would -- it

12   would be a way for those vendors to communicate directly with

13   people who worked for the company but not have the

14   communications crossed or stored on a -- across the Uber

15   network or be stored on an Uber computer.

16         Another example would be non-attributable devices were

17   acquired for research into protest or threat actors -- protest

18   groups or threat actors who were targeting Uber so that

19   research into those groups, their social media profiles,

20   their -- their communications, their online presence wouldn't

21   resolve to Uber's systems.

22   **BY MR. VERHOEVEN**

23   **Q.**   Now, Uber managed -- created and managed this program,

24   right?

25         **MS. BOERSCH:**  Objection.  Vague again.

1           **THE COURT:**  Overruled.

2      Please answer.

3           **THE WITNESS:**  The program was created and managed

4  within the Threat Operations team at Uber, which is just a

5  small subset of the Security team.  Which is to say that these

6  practices were noteworthy and different from the work of my

7  colleagues in other work groups who, you know -- clearly, they

8  were foreign to them when we tried to -- when these practices

9  were implemented or they were asked to communicate in different

10  ways, the ways that are distinct from the majority of the work.

11  **BY MR. VERHOEVEN**

12  **Q.**  Travis Kalanick knew about this program, didn't he?

13           **MR. GONZÁLEZ:**  Objection.  Lacks foundation.

14           **MS. BOERSCH:**  Objection.

15           **THE COURT:**  Overruled.  Overruled.

16      Please answer.  If you have direct knowledge, give us

17  that.  If you have information, hearsay or otherwise, you must

18  give us that.

19  **A.**  About the non-attributable communications?

20  **BY MR. VERHOEVEN**

21  **Q.**  Yes.  About the -- when you say "program," are you --

22  would you rather use a different word than "program"?

23  **A.**  I just want to know which program you're referring to.

24  **Q.**  I'm referring to the one we have been talking about, about

25  non-attributable devices used to encrypt, protect and destroy

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1    information.

2    A.   I have no direct knowledge of -- that he knew about it.

3          THE COURT:  Do you have any information that he knew

4    about it?

5          THE WITNESS:  No.

6          THE COURT:  Hearsay or otherwise.

7          THE WITNESS:  About non-attributable devices, no.

8    BY MR. VERHOEVEN

9    Q.   Senior management knew about this practice, didn't they?

10          MS. BOERSCH:  Objection.  Vague --

11          MR. GONZÁLEZ:  Objection.  Vague and no foundation.

12          THE COURT:  Overruled.

13       But answer again with respect to information and/or

14    personal knowledge.

15          THE WITNESS:  My manager knew about it.  Mr. Clark

16    knew about it, and I would surmise that Mr. Sullivan knew about

17    it.

18    BY MR. VERHOEVEN

19    Q.   What was Mr. Clark's formal title?

20    A.   I believe he was referred to as Legal Director for Threat

21    Operations, and then later was assigned to work directly for

22    the Chief Security Officer.  And I do not recall his title in

23    that capacity.

24    Q.   He was a senior management executive in the company,

25    right?

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1    **A.**    He was a director-level employee.

2    **Q.**    Mr. Kalanick knew about the Threat Ops team, right?

3              **MR. GONZÁLEZ:**  Same objection, your Honor.  No

4    foundation.

5              **THE COURT:**  Overruled.

6         Please answer.

7    **A.**    I understood that Matt Henley, who was the manager of

8    Threat Operations, would meet with Mr. Kalanick from time to

9    time.  So I believe he knew the existence of Threat Operations.

10   **BY MR. VERHOEVEN**

11   **Q.**    Directing your attention to --

12             **MR. VERHOEVEN:**  Your Honor, I'm going to try to keep

13   this shorter than I would if it were a deposition, if that's --

14             **THE COURT:**  You should keep it short because we've

15   got a lot to do today.

16             **MR. VERHOEVEN:**  Okay.

17             **THE COURT:**  But there are things in this letter about

18   Waymo that you should be asking about.

19             **MR. VERHOEVEN:**  I'm going right into it, your Honor.

20             **THE COURT:**  All right.  Go ahead.

21   **BY MR. VERHOEVEN**

22   **Q.**    Directing your attention to Page 12.

23   **A.**    All right.  I'm there.

24             **MS. BOERSCH:**  I'm sorry, counsel.  What page?

25             **MR. VERHOEVEN:**  12.

1    BY MR. VERHOEVEN

2    Q.    There's a bunch of redactions on this page.  Do you see

3    that?

4    A.    Yes.

5    Q.    It starts on the top of Page 12 by repeating, stating,

6    quote:

7              "Uber Marketplace Analytics team exists expressly

8         for the purpose of acquiring trade secrets, code base

9         and competitive intelligence."

10        Do you see that?

11   A.    I do.

12   Q.    You knew that your lawyer was saying that when this letter

13   went out, right?

14             MS. BOERSCH:  Objection.  Asked and answered.

15             THE COURT:  Overruled.

16        Please answer.

17             THE WITNESS:  Yes.

18   BY MR. VERHOEVEN

19   Q.    And you didn't object, did you?

20             THE COURT:  Well, that would be attorney-client.  So

21   don't answer.

22             MR. VERHOEVEN:  Okay.  We'll move on.

23   BY MR. VERHOEVEN

24   Q.    And then below the first set of redactions, it says:

25             "These tactics were used to obtain trade secrets

**JACOBS - DIRECT EXAMINATION / VERHOEVEN**

1              about..."

2         And then all the things that the trade secrets are about

3    are redacted.  Do you see that?

4    **A.**   Yes.  The bulleted list there, yes.

5    **Q.**   So I can't ask you about those at this time.

6         Then it continues:

7              "These tactics were employed clandestinely

8         through a distributed architecture of anonymous

9         servers, telecommunications architecture and

10        non-attributable hardware and software."

11        Do you see that?

12   **A.**   I do.

13   **Q.**   What were the anonymous servers, and where were they

14   located?

15   **A.**   I -- I don't know for sure.  I understood that the team

16   used a separate instance of cloud computing for their purposes

17   that was just distinct from the -- the main part of Uber, but I

18   don't have too much firsthand knowledge of how that -- you

19   know, who decides which servers they use and things like that.

20   **Q.**   But this system was designed so that it would be off the

21   Uber server system, correct?

22   **A.**   That was my understanding.

23   **Q.**   It was designed that way in part so that Uber could avoid

24   discovery in civil litigation and criminal litigation, correct?

25             **MR. GONZÁLEZ:**  Objection.  No foundation.

1          **THE COURT:**  Overruled.

2      Was that what you were told?

3          **THE WITNESS:**  I was not told that about the M.A.'s

4  architecture.

5  **BY MR. VERHOEVEN**

6  **Q.**  Well, let's go to Page 6 of your letter, the first full

7  paragraph.  Do you see that, sir?  I'll read it into the

8  record:

9          "Jacobs then became aware that Uber, primarily

10          through Clark and Henley, had implemented a

11          sophisticated strategy to destroy, conceal, cover up

12          and falsify records or documents with the intent to

13          impede or obstruct Government investigations as well

14          as discovery obligations in pending and future

15          litigation."

16      Do you see that, sir?

17  **A.**  Yes.

18  **Q.**  Do you stand by that statement?

19  **A.**  Yes.

20  **Q.**  Let's go back to Page 12.  Do you see where at the bottom

21  it talks about Mr. Ed Russo?

22  **A.**  Yes.

23  **Q.**  It says:

24          "In the summer of 2016, SSG specifically hired Ed

25          Russo to further develop its intelligence program."

JACOBS - DIRECT EXAMINATION / VERHOEVEN

```
 1        Is that accurate?
 2   A.   Yes.
 3   Q.   And then at the bottom, it says, after the last redaction:
 4            "Part of his role was to enable competitive
 5        intelligence and the threat of trade secrets by
 6        recruiting sources within competitor organizations.
 7        He vetted insiders and identified those who are
 8        willing to provide Uber with competitive trade
 9        secrets.  Jacobs is aware that Uber used the M.A. team
10        to steal trade secrets at least from Waymo in the
11        United States."
12        Do you see that?
13   A.   Yes.
14   Q.   Do you stand by that statement?
15   A.   No.
16   Q.   So your lawyer got it wrong?
17   A.   I don't stand by that statement.
18   Q.   Did your lawyer -- you reviewed this letter, right?
19   A.   As I said, I had limited time, so that it's -- you know, I
20   can't -- I can't say that I remember reading that before it was
21   sent.
22   Q.   Well, it was sent by your lawyer, right?
23   A.   Yes.
24   Q.   And it says:
25            "Jacobs is aware that..."
```

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1          And then it goes on.  Do you see that?

2   A.    Yes.

3   Q.    Did you make sure that representations about what you're

4   aware of or not in this letter were accurate?

5          MS. BOERSCH:  Objection.  Asked and answered.

6          THE COURT:  Overruled.  Please answer.

7          THE WITNESS:  I don't think I did as thorough a job

8   as I wish I could have.

9   BY MR. VERHOEVEN

10  Q.    Did you endeavor to make sure that any representations in

11  this letter about what you knew or didn't know were accurate?

12  A.    Like I say, I reviewed it as thoroughly as I could in the

13  time that I had with the materials.

14  Q.    So is that a "yes" to my question?

15  A.    Did I endeavor?

16  Q.    Did you endeavor to make sure that whatever your personal

17  lawyer put in this letter about what your awareness of one

18  thing or another, that those representations about you were

19  accurate?

20  A.    I'm sorry.  What do you mean by "endeavor"?

21  Q.    Did you try to make sure that they were accurate?

22  A.    Yes, I tried.

23  Q.    What were you aware of with respect to Uber's use of the

24  M.A. team to steal trade secrets from Waymo?

25  A.    Nothing.

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1   **Q.**   Nothing.  It says right here that -- very specifically,

2   how did that get in there?

3   **A.**   Like I say, I didn't write the letter.  And so there's --

4   **Q.**   Well, you endeavored to make sure it was accurate, right?

5   **A.**   I tried to make sure it was accurate with the time that I

6   had, but it's -- it's possible that there are -- there's

7   hyperbolic language in here or things that I would not have

8   stated in the same manner, but this letter is not -- I did not

9   write the letter.

10  **Q.**   What is hyperbolic about this sentence, sir?

11  **A.**   I'm referring to an earlier answer I gave you, sir.

12  **Q.**   This is a factual statement, isn't it?

13        **MS. BOERSCH:**  Objection.  Vague.

14        **THE COURT:**  It's argumentative.  It is a factual

15  statement, Mr. Jacobs, it says:

16        "Jacobs is aware that Uber used the M.A. team to

17        steal trade secrets, at least from Waymo in the United

18        States."

19  So when you read that in the draft or whatever, did you --

20  did some alarm go off and say:  Oh, this is not true?

21        **THE WITNESS:**  I cannot recall seeing that statement

22  before the letter went out.  So that's why I'm answering

23  honestly, that I tried to make sure that everything that went

24  out was -- was accurate.

25        I don't recall seeing that before it went out, but it's

 1    possible with limited time that I missed a statement that I

 2    would have otherwise corrected if given, you know, more time to

 3    review.

 4         And I am saying that it is -- I do not have first-hand

 5    knowledge of M.A. use -- M.A.'s work to steal trade secrets

 6    from Waymo.  I think that --

 7              THE COURT:  No, now you just did it again.

 8    First-hand knowledge.  In this proceeding we can inquire about

 9    information.

10              THE WITNESS:  Yes, your Honor.

11              THE COURT:  Did you have any information of any sort

12    that would have indicated that that statement was true?

13              THE WITNESS:  No.

14              THE COURT:  All right.

15    BY MR. VERHOEVEN

16    Q.   What were you aware of with respect to the M.A. team and

17    its interaction with the Waymo litigation?

18    A.   Nothing.

19    Q.   Did you hear indirectly from anyone about the Waymo

20    litigation?

21    A.   Not about the litigation itself, but, you know, there was

22    talk about -- I'm sorry, details about the litigation.  But

23    there was certainly talk about the case just generally within

24    the workplace.

25    Q.   Did you speak with anyone from the M.A. team about any

1   attempt to acquire information from Waymo in connection with

2   this litigation?

3   **A.**   No.

4   **Q.**   Did you hear indirectly from anyone anything related to

5   this sentence you just -- that I just read into the record;

6   that you were aware that Uber used the M.A. team to steal trade

7   secrets?

8   **A.**   I'm sorry.  Could you ask the question again, please?

9   **Q.**   I'm saying, you don't remember it.  Do you know of anybody

10  who talked to you or do you have any knowledge relating to the

11  subject matter of the M.A. team and any attempts by that team

12  to obtain or protect the trade secret information of Waymo or

13  Google?

14  **A.**   No.  M.A. was focused solely on overseas work, as far as I

15  understood.

16  **Q.**   So this -- this sentence just magically appeared?

17          **MS. BOERSCH:**  Objection.  Argumentative.

18          **THE COURT:**  Sustained.  But what -- okay.  Even if

19  you don't remember anything about Waymo, help us understand.

20      Were you aware with hearsay or information that the M.A.

21  team tried to obtain trade secrets from anybody, let's say,

22  first in the United States?

23          **THE WITNESS:**  No.  Absolutely no.  No firsthand or

24  secondhand, no surmising about work, the M.A. team against

25  firms in the U.S., and certainly not Waymo.

1            THE COURT:  So you're saying it was all directed

2     overseas?

3            THE WITNESS:  Correct.

4            THE COURT:  Okay.  All right.

5     BY MR. VERHOEVEN

6     Q.   Do you have any -- do you have any understanding of how

7     your attorney came to believe that you were aware of the M.A.

8     team -- M.A. team trying to steal trade secrets from Waymo in

9     the United States?

10            MS. BOERSCH:  Objection.  Attorney-client privilege.

11            THE COURT:  That is argumentative so --

12            MR. VERHOEVEN:  Can I ask for a yes or no?

13            THE COURT:  No.  It's too argumentative.

14            MR. VERHOEVEN:  Let me try another one and see if

15     this is too argumentative, your Honor.

16     BY MR. VERHOEVEN

17     Q.   "Yes" or "no."  Did you have any discussion with your

18     attorney on the subject matter of any attempt to obtain

19     confidential information from Waymo in the United States?

20            MS. BOERSCH:  Objection.  Privileged, potentially.

21            THE COURT:  Overruled.

22     A.   Could you restate the question, please?

23     BY MR. VERHOEVEN

24     Q.   Yes.  I'm asking you "yes" or "no."  Okay?  Just a "yes"

25     or "no."

JACOBS - DIRECT EXAMINATION / VERHOEVEN

 1       And the question is:  Did you have any discussion with

 2  your attorney with respect to the subject of the M.A. team or

 3  anyone else at Uber attempting to acquire confidential

 4  information from Waymo?

 5       **MS. BOERSCH:**  Objection.  Attorney-client privilege.

 6       **THE COURT:**  Would the court reporter please read it

 7  out.  I need to hear it again.

 8       (Record read as requested.)

 9       **THE COURT:**  All right.  The -- that will only go to

10  the subject matter of the privileged communication, and that's

11  not a privilege in and of itself.  So the -- you can answer

12  "yes" or "no," but don't give us the details of any

13  conversation.

14       So the objection is overruled.  But answer only "yes" or

15  "no" or "I don't recall," if that's a truthful response.

16       **THE WITNESS:**  Okay.  I'm sorry.  It's the -- the

17  clause there.  So M.A. or anyone at Uber, is that the question?

18  **BY MR. VERHOEVEN**

19  **Q.**   Yes.

20  **A.**   And did I discuss...  I'm sorry.  The question is getting

21  overly complex.  I'm just having a hard time --

22  **Q.**   You can't understand that question?

23  **A.**   I'm just asking you to maybe repeat it one more time.

24       **MR. VERHOEVEN:**  May we have it read back?

25       (Record read as requested.)

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1    **A.**    No.

2             **THE COURT:**  We need to take a break.  And I'm going

3    to ask you to finish up, within about 30 minutes, your

4    examination so we can give the other side some time to ask

5    questions and Ms. Boersch, if she wants to ask questions.

6         And we will take a 15-minute recess at this time.  Thank

7    you.

8         (Whereupon there was a recess in the proceedings

9          from 9:28 a.m. until 9:44 a.m.)

10            **THE COURT:**  Welcome back.

11        Now, where is your lawyer though?  I don't see your

12   lawyer.

13            **THE WITNESS:**  I was going to ask the same question.

14            **THE COURT:**  I don't want to go ahead without the

15   lawyer.  We'll wait just a minute.

16            **THE WITNESS:**  Okay.

17        (Brief pause.)

18            **MS. BOERSCH:**  Sorry, your Honor.

19            **THE COURT:**  Sure.

20        All right.  So for today's examination of this witness on

21   direct, you have about 30 more minutes.

22            **MR. VERHOEVEN:**  Yes, your Honor.

23            **THE COURT:**  So please use the time wisely.

24            **MR. VERHOEVEN:**  Thank you, your Honor.

25

1   BY MR. VERHOEVEN

2   Q.   As part of your settlement agreement with Uber, was there

3   a non-disparagement clause that prevents you from saying

4   anything negative about Uber?

5            MS. BOERSCH:   Objection, your Honor.   Calls for the

6   terms of the settlement agreement.

7            THE COURT:   I'm going to overrule all of those

8   objections.   Here we have a situation where the witness has

9   deviated from what's in his lawyer's letter in significant

10  ways.   It's conceivable -- I'm not saying that he did, but it

11  could be he's been bought off by Uber.

12       So I'm going to allow the amount of the settlement to be

13  inquired into, all of the terms and conditions in the

14  settlement agreement.

15       Is there any objection from Uber?

16           MR. GONZÁLEZ:   No, your Honor.

17           THE COURT:   All right.   So Uber has no objection.   So

18  you may inquire into all of those things.

19           MR. VERHOEVEN:   Thank you, your Honor.

20           MS. BOERSCH:   Then my objection will be --

21           THE COURT:   Your objection is for the record, but let

22  me say, there is a good cause here to require disclosure of

23  this information.

24       Go ahead.

25

1   BY MR. VERHOEVEN

2   Q.   When did you reach settlement with Uber?

3   A.   I believe it was August 22nd or 25th.  But latter part of

4   August 2017.

5   Q.   Was there a monetary component in your settlement?

6        Let me -- let me make it simpler.  How much did Uber pay

7   you to settle this case -- settle this dispute?

8             MR. GONZÁLEZ:  I object to that.  I object to that as

9   being confidential under the terms of the settlement agreement.

10            THE COURT:  You just got through saying you had no

11   objection.

12            MR. GONZÁLEZ:  Your Honor, I had no objection to the

13   question that he asked about is there anything in the document

14   that prevents you from saying what's true.  That, I have no

15   objection to.

16            THE COURT:  Well, I had said that I'm allowing

17   complete discovery into the terms of the settlement.  Do you

18   have any objection to that, including the dollar amount?

19            MR. GONZÁLEZ:  Yes, your Honor.

20            THE COURT:  And what would that be?

21            MR. GONZÁLEZ:  The objection is that it's

22   confidential settlement with the witness.  We have no objection

23   to the witness answering any question he may be asked

24   truthfully about the substance of this case.

25            THE COURT:  Well, that's -- we're trying to find out

1   if it is true, and so part of figuring that out is how much

2   money he has been paid.

3       Objection overruled.  Ask that question.

4       **MS. BOERSCH:**  Your Honor, if I may raise one other

5   issue, and this is -- again, this witness has been not even

6   subpoenaed, ordered to come here without preparation, without

7   documents.

8       To the extent he can answer about his settlement agreement

9   without the document in front of him, he can do so pursuant to

10  the Court's order, but he does not have it in front of him.

11      **THE COURT:**  That's a -- that's a fair point.  If

12  there really is something that he doesn't know without seeing

13  the document, of course, that's a legitimate point, but I

14  suspect -- I suspect he knows how much the dollar amount was.

15  So let's find out.

16      Ask that question.

17      **MR. VERHOEVEN:**  Before I start, your Honor, we have

18  20 lawyers from Uber here.  I'm sure someone can find the

19  settlement agreement if we need it.

20      **THE COURT:**  Let's go.  We got 28 minutes left.

21  **BY MR. VERHOEVEN**

22  **Q.**   How much -- how much did Uber pay you to resolve the

23  dispute that you had with them?

24  **A.**   Do you want to know to date, or do you want to know --

25  **Q.**   Explain the whole structure of the payments.

1    A.    Total compensation to me personally is 4.5 million:

2    2 million paid upfront, 1 million paid over the course of one

3    year consulting, and 1.5 million paid in restricted stock.

4    Q.    So you're getting paid a million dollars to consult with

5    Uber?

6    A.    A million dollars paid over the course of the year from

7    settlement date.

8    Q.    And what consulting are you doing for Uber?

9    A.    I'm assisting, as I stated earlier, in internal

10   investigation and helping to root out the activities that I

11   highlighted, the concerns that were highlighted in my

12   termination letter and this letter.

13   Q.    So your consulting involves this letter that we're talking

14   about?  I don't understand your answer.

15   A.    I'm assisting in the internal investigation in some of

16   these behaviors.  As I understand it, Uber is looking to end

17   these practices, and I'm helping them get to the bottom -- the

18   bottom-line truth on these accusations.

19   Q.    So you're actually being retained by Uber to investigate

20   the allegations in this letter; is that right?

21            MS. BOERSCH:  Objection.  Misstates his testimony.

22            THE COURT:  Well, how close is it?  How accurate is

23   it?  You can qualify your answer any way you want, but it's a

24   fair question.

25   A.    I am being paid to assist their investigation.  I am not

1   investigating.  Does that answer it?

2   **BY MR. VERHOEVEN**

3   **Q.**   What have you done to assist in their investigation?

4   **A.**   I have met with the law firms retained to investigate

5   these accusations and provided thorough and accurate testimony

6   and made myself available for any Government -- any related

7   Government inquiries and, of course, appearing here today to

8   fully and truthfully answer any questions that you have.

9        **MR. VERHOEVEN:**  This has been marked Exhibit 2.

10       (Plaintiff's  Exhibit 2 marked for identification)

11       **MR. VERHOEVEN:**  Letter to your Honor from the United

12   States Attorney for the Northern District of California dated

13   November 22, 2017.

14       **THE COURT:**  Fine.

15       **MR. VERHOEVEN:**  Do you have it there yet?

16       **THE COURT:**  I'm going to let you ask questions about

17   it, and you can even quote from portions of it.

18       But is there anyone from the U.S. Attorney's Office here?

19       (No response.)

20       **THE COURT:**  Since they are not here, they -- they

21   made a request that this be under the protective order, but

22   that was just a request.

23       In my view, there is nothing in here that deserves to be

24   under seal, but the letter itself will remain under seal until

25   tomorrow at 5:00 o'clock, and that will give the Government an

1   opportunity, if they wish, to file a motion to keep it under

2   seal.

3        But in the meantime, you may ask questions that are

4   suggested by the letter and even quote from the letter, if you

5   wish, being mindful that the United States attorney has made

6   that request.  But you may quote from it in the public

7   proceeding.

8             MR. VERHOEVEN:  Thank you, your Honor.

9   BY MR. VERHOEVEN

10  Q.   Do you have the letter yet?

11  A.   No.

12  Q.   Should I just give him --

13            THE COURT:  No, no, no.  The Clerk gave it to me.

14  Hand that to the witness.

15       (Whereupon document was tendered to the witness.)

16            THE WITNESS:  Thank you.

17  BY MR. VERHOEVEN

18  Q.   Have you read this letter before?

19  A.   No.

20  Q.   I direct your attention to the last paragraph on the first

21  page of this letter.  Quote:

22            "Mr. Jacobs' attorney laid out the substance of

23       these allegations in a May 5th, 2017 letter to Angela

24       Padilla, Uber's associate general counsel.

25       Mr. Jacobs' statements to the Government were

JACOBS - DIRECT EXAMINATION / VERHOEVEN

```
 1          consistent with the allegations set forth in the

 2          letter."

 3          Do you see that?

 4  A.   I do.

 5  Q.   Were your statements to the Government consistent with the

 6  allegations in this letter?

 7          MR. GONZÁLEZ:  Objection.  That's overbroad, your

 8  Honor.  It's vague.

 9          THE COURT:  Well, it's ambiguous.

10     Which letter do you mean?  The letter -- the Government

11  letter, or do you mean the lawyer letter to Uber?

12          MR. VERHOEVEN:  I'm referring to the May 5th, 2017

13  letter to Angela Padilla, Uber's Associate General Counsel.

14  BY MR. VERHOEVEN

15  Q.   Referring to that letter, the United States Attorney for

16  the Northern District of California states:

17          "Mr. Jacobs' statements to the Government were

18          consistent with the allegations set forth in the

19          letter."

20          Do you see that?

21  A.   I do.

22  Q.   Do you believe your statements to the Government were

23  consistent with the May 5th letter?

24          MS. BOERSCH:  Objection.  Overbroad as to

25  "statements."  There were many statements made to the
```

1  Government.

2      If he's referring to the statements that are recounted in

3  this letter, that's one thing.  But "statements" generally is

4  overbroad.

5          THE COURT:  Well, to the extent that you are able to

6  answer the question, you should -- it's a fair question.

7      But it does ask you to have in mind many things that you

8  might have said to the Government and many things that were in

9  that 37-page letter.  And so to that extent it's -- it's a bit

10  unfair to ask the witness to have all that in mind.

11      But nevertheless, with that caveat, please do your best to

12  answer the question.

13          THE WITNESS:  I would say that the Government did not

14  ask about every -- every line, every allegation, every detail

15  described in that 37-page, or whatever it is, letter.  But

16  certainly my statements were all truthful and as thorough as

17  possible and consistent with the broad outlines of that, of

18  that letter, yes.

19  BY MR. VERHOEVEN

20  Q.   Did you tell the -- did you tell the Government that your

21  statement with respect to Waymo about the threat of trade

22  secrets was false and erroneous?

23  A.   I don't believe they asked about that.

24  Q.   So you did not, correct?

25  A.   Are you referring to the specific sentence:  "M.A.

1    Waymo" --

2    **Q.**   Yes.

3    **A.**   Yeah.  I don't believe they asked about that, to my

4    recollection.

5    **Q.**   Did you volunteer --

6          **THE COURT:**  He's asking:  Did you say to them that

7    that was an inaccurate statement even if they didn't ask?

8          **THE WITNESS:**  I don't recall.

9    **BY MR. VERHOEVEN**

10   **Q.**   You endeavored to provide truthful testimony to the

11   Government, correct?

12         **THE COURT:**  Well, wait a minute.  "Testimony."  I

13   don't -- do we have anything we believe he has testified?  I

14   don't think so.

15         **MR. VERHOEVEN:**  Sorry, your Honor.

16   **BY MR. VERHOEVEN**

17   **Q.**   You endeavored -- with reference to the statements

18   referred to in the U.S. Attorney's letter of November 22, 2017,

19   in making those statements to the Government, you endeavored to

20   be truthful, right?

21   **A.**   Yes.  I -- of course, I was being truthful with the

22   Government.

23   **Q.**   And you were telling the whole truth, right?

24   **A.**   I actually -- like I say, I answered their questions as

25   thoroughly as possible and, of course, entirely truthfully; but

 1  their interests may not align with yours, which I think might

 2  cause some gaps in terms of the subjects that they covered.

 3  Q.   You didn't omit information in the letter that you knew to

 4  be false?  You didn't omit that from telling the Government the

 5  whole truth, did you?

 6           **MS. BOERSCH:**  Objection.  Compound.  Ambiguous.

 7           **THE COURT:**  It's -- it's argumentative.  I think we

 8  should move to something that -- in the letter that is

 9  directly -- that directly affects Waymo.

10           **MR. VERHOEVEN:**  Yes, your Honor.

11  **BY MR. VERHOEVEN**

12  Q.   I direct your attention to Page 9 of Exhibit 1.

13  A.   All right.

14  Q.   The last paragraph.  I will read it into the record, first

15  two sentences into the record:

16           "Clark and Henley's directives described above

17       specifically implicate ongoing discovery disputes,

18       such as those in Uber's litigation with Waymo.

19       Specifically Jacobs recalls that Jake Nocon, Nick

20       Gicinto, G-I-C-I-N-T-O, and Ed Russo went to

21       Pittsburgh, Pennsylvania, to educate Uber's Autonomous

22       Vehicle Group on using the above practices with the

23       specific intent of preventing Uber's unlawful schemes

24       from seeing the light of day."

25       Do you see that?

1    A.    Yes.

2    Q.    Do you stand by your lawyer's statement here?

3              MR. GONZÁLEZ:  Your Honor, just for the record, I

4    object.  There is no foundation for that.  It's calling for

5    speculation as to why other people went to Pittsburgh.

6              THE COURT:  Overruled.

7         Do you stand by that statement?

8              THE WITNESS:  I would say yes, it implicates any

9    potential litigation.

10        As I described earlier those practices, I did not -- I

11   don't have direct knowledge that -- of all the ongoing

12   litigation that they were intended for, but broadly speaking,

13   it was -- those practices were implemented to protect -- to

14   further protect the company.

15   BY MR. VERHOEVEN

16   Q.    So do you stand by the statements I read into the record?

17   "Yes" or "no."

18             MS. BOERSCH:  Asked and answered.

19             THE COURT:  Well, let's break it down first.  I'll do

20   it to save time.  Do you know who Nocon, Gicinto and Russo

21   were?

22             THE WITNESS:  Yes.

23             THE COURT:  Did they go to Pittsburgh?

24             THE WITNESS:  Yes.

25             THE COURT:  Did they go there to educate Uber's

 1    Autonomous Vehicle Group about something?

 2             THE WITNESS:  Yes.

 3             THE COURT:  And was the something to educate them on

 4    using the practices with the -- the above practices to prevent

 5    information from seeing the light of day?

 6             THE WITNESS:  I would say it's fair to say that they,

 7    among other things, educated the members of the Autonomous

 8    Vehicle Group on the existence of the capabilities their team

 9    had and taught them how to communicate more securely with the

10    team.

11    BY MR. VERHOEVEN

12    Q.   I direct your attention --

13             THE COURT:  Wait, wait, wait.  Just a minute.  With

14    the --

15             THE WITNESS:  With their team.

16             THE COURT:  Let's be very clear on something.  Was

17    the idea that the Autonomous Vehicle Group would learn how to

18    communicate among each other with more hard-to-uncover

19    communications, or are you simply saying that if the Autonomous

20    Vehicle Group one day woke up and said, "We need to communicate

21    with Mr. Russo," that they would have this more secure channel?

22             THE WITNESS:  The second one; that if the leadership

23    or the members of the Autonomous Vehicle Group or Autonomous

24    Technology Group needed to communicate with SSG, that they

25    would have a more secure way of doing so.

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1    **THE COURT:**  And so they weren't going there to

2    educate -- I mean, look at the way this letter is saying:

3           "Went to Pittsburgh to educate Uber's Autonomous

4       Vehicle Group on using the above practices with the

5       specific intent of preventing Uber's unlawful schemes

6       from seeing the light of day."

7           **THE WITNESS:**  Uh-huh.

8           **THE COURT:**  So what were you talking -- what was your

9    lawyer talking about there?

10          **THE WITNESS:**  It's difficult for me to answer what my

11   lawyer was intending --

12          **THE COURT:**  All right.  But you're the plaintiff in

13   that case.  So what were you talking about?

14          **THE WITNESS:**  That, among other things, I understood

15   that there had been training on more secure communications

16   practices like I described, and that umbrella of practices was

17   meant to prevent sensitive information from potential legal

18   discovery.

19   **BY MR. VERHOEVEN**

20   **Q.**   Through the use of non-attributable devices and ephemeral

21   communications, right?

22   **A.**   Ephemeral communications, I believe, is accurate in this

23   case.

24          So non-attributable devices, I don't have any knowledge of

25   them being used with regard to the autonomous technology

1    groups.

2    **Q.**    I direct your attention -- at this time, I direct your

3    attention to Page 13.

4    **A.**    Okay.

5    **Q.**    Do you see the section heading that says "Waymo"?

6    **A.**    Yes.

7    **Q.**    I'll just quote some of this:

8            ∎"Shortly after the Otto acquisition" --

9        And you put "acquisition" in -- your attorney put

10   "acquisition" in quotes.  Do you see that?

11   **A.**    I do.

12   **Q.**    (As read)

13           ∎"-- comma, Ed Russo presented a, quote,

14       fictionalized, close quote, account of SSG's recent

15       contributions to Uber employees, including Jacobs.  He

16       asked his audience to consider a situation in which

17       the CEO of a large company sought to acquire a smaller

18       start-up with industry-changing technology in the

19       large competitors field.  Russo boasted that SSG,

20       using ex-CIA field operatives skilled in counter

21       surveillance could ensure the secrecy of meetings

22       between the company's CEOs for months before any

23       acquisition was announced or finalized."

24       Do you see that, sir?

25   **A.**    Yes.

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1   Q.   And then your attorney's letter states:

2          "Given the timing of this presentation

3        immediately following Otto's acquisition when Jacobs

4        and others heard Russo's so-called fictionalized

5        account, they assumed Russo was alluding to the actual

6        events surrounding the Otto acquisition."

7   A.   Yes.

8   Q.   Do you stand by those statements in your lawyer's letter?

9   A.   I -- so there's -- let me just point out a couple areas of

10  clarification and then I can answer that.

11  Q.   Well, can you answer the question first, and then you can

12  clarify?  Do you stand by these statements?  "Yes" or "no."

13  A.   Not in their entirety.

14          THE COURT:  Well, just tell us which ones you agree

15  with and which ones you say are wrong.

16          THE WITNESS:  So the use of ex-field operatives, I

17  don't recall him saying that specifically.  I think that was

18  surmised in the context of understanding some of the work more

19  broadly and inferred from the context of where he described,

20  you know, implementing trade craft for secretive meetings.  And

21  these -- so in that -- that sense I have to disagree with the

22  characterization of ex-field operatives.  I don't believe that

23  was stated.

24          And then -- yes, and then I stand by the rest of that

25  statement.

1   BY MR. VERHOEVEN

2   Q.    Now, would ex-field -- your lawyer put in this phrase,

3   "using ex-CIA field operatives skilled in counter

4   surveillance."  Do you see that?

5   A.    Yes.

6   Q.    Where did that come from?

7   A.    From the broader context of vendors that were being used

8   by the company.

9   Q.    Well, you told your lawyer about it, right?  "Yes" or

10  "no."

11  A.    You're asking about conversations between me and my

12  lawyer.

13  Q.    How did your lawyer become aware of this statement that he

14  represents that you were able to provide to him relating to

15  using ex-CIA field operatives skilled in counter surveillance,

16  et cetera?

17         MS. BOERSCH:  Objection.  That calls for speculation

18  and attorney-client privilege.

19         THE COURT:  Whatever information that you have on

20  that subject, please give it to us, and you can tell us if it's

21  hearsay or not.

22         THE WITNESS:  Okay.  Could you just restate the

23  question one more time, please?

24         MR. VERHOEVEN:  Can you read it back?

25         (Record read as requested.)

1          **THE WITNESS:**  I told him about the practices of the

2     team and gave him fuller context around their -- their

3     activities elsewhere in the company and provided my -- you

4     know, what I surmised from the presentation and provided my

5     interpretation or read of what was intended.

6     **BY MR. VERHOEVEN**

7     **Q.**   Which ex-CIA field operatives is being referred to here?

8     **A.**   Well --

9          **MR. GONZÁLEZ:**  Excuse me.  I'm sorry, your Honor.  I

10    don't know if this is going to elicit the name of someone.  If

11    it is, we would have an objection on privacy grounds.

12        There's serious security issues here.  I don't think it's

13    relevant to this proceeding.  If he wants to talk just

14    generally about what these people do, that's fine.

15         **THE COURT:**  Overruled.  You can ask who these

16    people -- but not who the lawyer thought.  Ask who he thought,

17    who --

18         **MR. VERHOEVEN:**  What's your --

19         **THE COURT:**  -- these people were.

20    **BY MR. VERHOEVEN**

21    **Q.**   Who were these people, these ex-CIA field operatives?

22    **A.**    In the context of this hypothetical scenario that

23    Mr. Russo briefed on, I did not state which vendors or

24    individuals were involved specifically, and so I inferred that

25    they used some of the vendors that were used in other another

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1   circumstance.

2       And I would also say that Mr. Russo, the timing of his

3   handwriting and acquisition of Otto suggests that Mr. Russo

4   could not have been personally involved.  So I surmised that it

5   was other members of the team that pre-dated him and pre-dated

6   the acquisition of Otto.

7   Q.   And when you --

8   A.   Again, that's me surmising.

9   Q.   When you used the phrase "vendors," as you have several

10  times today, who are you referring too?

11  A.   A handful of security vendors.

12  Q.   Who are they?

13  A.   I'm sorry?

14  Q.   Who are they?

15  A.   The -- you know, there may be as many as -- as 10 or

16  something, but I can just try to name some of the firms that

17  were used by that group.

18      Red 5 was one.  TAL Global, T-A-L Global was another.  I

19  believe one was called I-OnAsia.

20      There were, you know, several vendors whose names I don't

21  know.  You know, and I didn't have direct management of the

22  budget or the vendor relationships in these instances.

23  Q.   Who were the vendors in the United States you're aware of?

24  A.   Tal Global worked for the U.S.  Right now I'm -- I don't

25  recall the names of other firms that operated in the U.S., but

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1    that was -- that's the only one that I recall right now.

2    Q.    Okay.  Let's go back to Page 13.  The next paragraph says:

3            "Of course, by the time of its acquisition Otto

4        was just eight months old.  Nevertheless, Uber

5        acquired this eight-month old company at an estimated

6        cost of 680 million.  Then, as stated above, shortly

7        after the acquisition and just three weeks before the

8        roll out of Uber's Autonomous Vehicle Group in

9        Pittsburgh, Russo, Gicinto and Nocon traveled to

10       Pittsburgh and educated the team on using ephemeral

11       communications, non-attributable devices, and false

12       attorney-client privileged designations with the

13       specific intent of preventing the discovery of

14       devices, documents and communications in anticipated

15       litigation."

16       Do you see that, sir?

17   A.    Yes.

18   Q.    Do you stand by these statements?

19   A.    I -- I don't recall specific information in the context of

20   their training in Pittsburgh and their work in Pittsburgh of

21   non-attributable devices.  I think that's more broadly saying

22   that's security -- extra security practices were -- were

23   federated to the Autonomous Technology Group as it was being --

24   you know, as the acquisition and all those sorts of things were

25   rolling out.

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1          But other than that, you know, this is to say that the

2    general practices that I've described that were going on within

3    this group and with their client base within the company were

4    brought to the Autonomous Technology Group, and I stand by

5    that.

6    **Q.**   Do you stand by these statements that I read into the

7    record with the exception of non-attributable devices?

8    **A.**   No, sir, I don't.

9          **MR. GONZÁLEZ:**  Your Honor, I would simply object that

10   there was no foundation.  He wasn't in Pittsburgh.  He doesn't

11   know what the people were told.  This is all speculation.

12         **THE COURT:**  Overruled.

13         Please answer.

14         **THE WITNESS:**  I stand by the fact that this was my

15   belief that that was -- yeah, that that was my belief, but I --

16   I don't have first-hand knowledge.

17         I can recall being told that -- that they were trained on

18   how to work with the team and how to protect information, and I

19   understood that they were, you know, trained in this sort of

20   general umbrella of additional layers of security to

21   communicate with SSG for any future requirements they might

22   have.

23   **BY MR. VERHOEVEN:**

24   **Q.**   Okay.  I direct your attention to Page 32 of your

25   attorney's letter.

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1   **A.**   Okay.

2   **Q.**   Top paragraph, I'll quote:

3           "During a March 8th, 2017 meeting between Jacobs

4       and Gicinto, Jacobs questioned the hiring of two

5       additional people who were allocated to the newly

6       formed Strategic Intelligence team discussed below.

7       Gicinto said that the two persons were intended to

8       support Uber's Autonomous Technology Group, but

9       because of the recent lawsuit by Waymo against Uber,

10      strategic intelligence would keep them off the ATG

11      books while litigation was ongoing."

12          Do you see that, sir?

13  **A.**   Yes.

14  **Q.**   Do you stand by that statement?

15  **A.**   Yes.

16  **Q.**   Who are the two individuals?

17  **A.**   I don't know.  I think that the best characterization

18  would be a two-head count.  So that is two, you know, allocated

19  positions for which they could hire against as opposed to two

20  specific individuals.

21  **Q.**   I direct your attention to -- just one second.

22          Next sentence says:

23          "Gicinto, working with Clark and Henley, said

24      this would enable Uber's competitive intelligence

25      efforts to remain hidden and protected from discovery

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1       or any legal proceedings."

2       Do you stand by that statement?

3  A.   I'm sorry.  Where are you now?

4  Q.   The next sentence, "Gicinto working with both Clark and

5  Henley."

6  A.   Oh, I've got it now.  One second please.

7       (Brief pause.)

8  A.   I would say that's speculative based on the context of the

9  previous statement.

10 Q.   Your lawyer says that you were told by Gicinto, quote:

11          "He said this would enable Uber's competitive

12          intelligence efforts."

13       And it goes on.  Do you see that?

14 A.   I do.

15 Q.   Mr. Gicinto told you that, didn't he?

16 A.   It's not a quotation, no.

17 Q.   He, in substance, told you that, didn't he?

18 A.   Mr. Gicinto was the one that described the reallocation of

19 head count to a different organization to effectively obscure

20 the fact that these people would be supporting the Autonomous

21 Technology Group; that is an accurate statement.

22 Q.   I direct your attention to Page 33.

23 A.   Okay.  Okay.

24 Q.   Now, you were -- as you said at the beginning, you were

25 constructively terminated by Uber, correct?

1   A.   Maybe it bears further explanation, but I would say that

2   the circumstances that are placed -- that I was placed in, you

3   know, were effectively a constructive termination, but that I

4   initiated the final resignation.

5        You know, it's a -- sorry.  It's sort of a fine point

6   around the specific terms.  So maybe if you want to know more,

7   I can talk about, like, the actual action and incidents.

8   Q.   You met with Henley to -- on February 14, 2017 to discuss

9   your performance review, correct?

10  A.   Yes.

11  Q.   And if you see on Page 33 of your discussion of that

12  meeting, you state:

13          "Henley claimed that Jacobs was not working with

14      Legal enough and needed to further protect information

15      from discovery."

16      Do you see that?

17  A.   Yes.

18  Q.   Is that an accurate statement?

19  A.   Yes.

20  Q.   And then the next paragraph, you say you were abruptly

21  demoted by Henley.  Is that true?

22  A.   Yes.  My position, my role was changed from management to

23  individual contributor.  My actual level was not changed.

24      So I moved from being the manager of the Global

25  Intelligence team to being the senior analyst for the strategic

```
 1   -- newly formed Strategic Intelligence team, but I remained in

 2   the same pay band.

 3   Q.   You state --

 4           THE COURT:  You're almost out of time.

 5           MR. VERHOEVEN:  Yes, I am.  Maybe a minute?

 6           THE COURT:  Yes.

 7   BY MR. VERHOEVEN

 8   Q.   You say that you were floored by the negative review and

 9   that it was a gut punch, right?

10   A.   Yes.

11   Q.   And then you state, your lawyer states on Page 33:

12           "Jacobs experienced this review and demotion as

13        pure retaliation for his refusal to buy into the

14        Threat Ops culture of achieving business goals through

15        illegal conduct, even though equally aggressive legal

16        means were available to achieve the same end."

17        Do you see that?

18   A.   Yes.

19   Q.   Is that an accurate statement?

20   A.   Yes.

21   Q.   Have you ever addressed the contents of your attorney's

22   letter, your May 5 letter with any in-house lawyer at Uber?

23           MS. BOERSCH:  Objection.  Vague as to addressed.  I'm

24   not sure what he means.

25           THE COURT:  Sustained.
```

JACOBS - DIRECT EXAMINATION / VERHOEVEN

1   BY MR. VERHOEVEN

2   Q.   Have you ever discussed it?  Have you ever discussed any

3   of the contents --

4           THE COURT:  Well, you're already starting out with

5   maybe -- do you mean any of the subjects in the letter, did he

6   ever bring that up with in-house counsel?

7           MR. VERHOEVEN:  Yes, your Honor.  Thank you.

8           THE COURT:  Let's go with that question.

9           THE WITNESS:  Did I ever discuss any of the subjects

10  of the letter with in-house counsel?

11          THE COURT:  Correct.

12  BY MR. VERHOEVEN

13  Q.   At Uber?

14  A.   Does that mean Uber employees?

15  Q.   Uber in-house attorneys.

16  A.   Does that mean Uber employees?

17  Q.   Yes.

18  A.   Okay.  Substance...  I did not discuss, as in verbally, I

19  would say that my other -- my resignation email dealt with

20  similar subject matter, and that was the only other direct

21  communication that I had with Uber's attorneys about this.

22  Q.   What about discussions with Morrison and Foerster?  Did

23  you ever discuss --

24  A.   No.

25  Q.   Did you or your attorney ever discuss the subject matters

1  that we've gone over here today in your May 5th letter with

2  Morrison and --

3  **A.**   I don't know what my attorneys have discussed, but I have

4  been not been part of any discussion.

5  **Q.**   Have your attorneys met with Morrison and Foerster?

6          **MS. BOERSCH:**  Objection.  Lacks foundation.

7          **THE COURT:**  If you know, answer; if you don't know,

8  answer that way.

9          **THE WITNESS:**  Met with?  No.  Not to my knowledge.

10  **BY MR. VERHOEVEN**

11  **Q.**   Now, last question.  I asked you at the beginning but I'm

12  not sure I got an answer.  Do you have a non-disparagement

13  clause in your settlement agreement that requires you not to

14  say negative things about Uber?

15          **THE COURT:**  Why don't you break that into two parts.

16      Is there a non-disparagement clause in your agreement?

17          **THE WITNESS:**  I would be happy to answer it as is.

18      My understanding is that I would not make disparaging

19  remarks to press or publicly about Uber, but I understand that

20  the -- the thing that takes primacy is any Government

21  proceeding or, obviously, telling a thorough and truthful story

22  about everything that I know at the company so they can get to

23  the root of any potential wrongdoing.

24      Nothing -- nothing in the agreement would prohibit me from

25  doing that, obviously.

JACOBS - CROSS EXAMINATION / GONZÁLEZ

```
 1              THE COURT:  All right.  We need to move on.

 2              MR. VERHOEVEN:  Yes, I'll pass the witness, your

 3    Honor.

 4              THE COURT:  All right.  So cross examination.

 5        However, don't ask leading questions.  Since this is a

 6    witness allied with you by contract.

 7                        CROSS EXAMINATION

 8    BY MR. GONZÁLEZ

 9    Q.   Good afternoon.

10    A.   Good afternoon.

11    Q.   Sir, you and I have never met?

12    A.   No, we have not.

13    Q.   We've never spoken to each other?

14    A.   No, we have not.

15    Q.   I didn't talk to you at a break?

16    A.   No.

17    Q.   Sir, I want this to be clear to the judge.  The settlement

18    agreement that you have with Uber in no way prevents from you

19    telling the truth --

20              MR. VERHOEVEN:  Objection.  Leading.

21              THE WITNESS:  I would say that --

22              THE COURT:  Sustained.  It's leading.

23    BY MR. GONZÁLEZ

24    Q.   Does the settlement agreement in any way prevent you from

25    telling the truth right here in front of Judge Alsup?
```

 1   **A.**   No.

 2   **Q.**   And you've done your best -- have you done your best to

 3   tell the truth?

 4   **A.**   Absolutely, yes.

 5   **Q.**   You understand you're under oath?

 6   **A.**   Yes.

 7   **Q.**   You take that very seriously?

 8   **A.**   Of course, yes.

 9   **Q.**   Sir, I want to put your testimony into context.  You

10   mentioned a couple of times of threats and threat intelligence,

11   and I would just like to give the judge some background.

12       Is it your understanding, sir, that on a weekly basis Uber

13   drivers or employees are assaulted somewhere around the world?

14   **A.**   Absolutely, yes.

15   **Q.**   Part of the work that you did, did it involve trying to

16   get intelligence in different regions of the world about what

17   threats Uber or its drivers might face?

18   **A.**   Yes.

19           **MR. VERHOEVEN:**   Objection.  This is all leading, your

20   Honor.

21           **THE COURT:**   It's very leading.  Sustained.

22   **BY MR. GONZÁLEZ**

23   **Q.**   Tell the Court, what are the threats that you personally

24   were involved in trying to anticipate with respect to your work

25   for Uber?

1   **A.**   So I saw my work along sort of three -- three separate but

2   sometimes overlapping verticals.

3       Protected intelligence is the protection of our personnel

4   our rider driver community and our assets overseas.  Obviously

5   that's priority one, for the company in general and for my team

6   as well.

7       Also, forward-looking geopolitical analysis and assessment

8   to help the company understand changing dynamics, like

9   potential civil war or coups or political upheaval that could

10  more broadly affect the cities in which we operated.

11      And then market entry, market launch support.  So kind of

12  framing the landscape for the company before they go into

13  different cities.  And that's to say we could lower the

14  operating costs and protect our rider-driver community by

15  identifying high threat areas like neighborhoods of certain

16  major cities across the globe where disproportionate amounts of

17  property crime and physical violence take place and help the

18  company to avoid those areas for the protection of our

19  community and our business -- Uber's business, rather.

20  **Q.**   And just in general, would you please educate the judge on

21  what you would do to try to identify potential threats?

22  **A.**   So I and my team would use information from all available

23  sources, social media, geopolitical analysis, press, any

24  available source to -- to identify particularly high-risk

25  areas, to provide a general understanding of the landscape in

1    which Uber was going to operate and communicate those findings

2    succinctly back to the business so that they could operate

3    safely and securely or implement additional security practices

4    to lower the -- the risks and operational costs.

5    **Q.**   And, sir, you, yourself, were actually out in the field

6    helping to identify these threats; is that right?

7    **A.**   I traveled to several Uber offices, yes.

8    **Q.**   And when you and your team traveled to these various

9    regions of the world where there are threats, is your safety of

10   concern to you?

11   **A.**   My safety?

12   **Q.**   And your team's.

13   **A.**   Well, certainly my team's safety is something that I'm

14   concerned with.  I can't say that I ever felt my safety was in

15   jeopardy.

16   **Q.**   Tell the judge just a little bit about why are you

17   concerned with the safety of your team?

18   **A.**   Well, I think -- broadly speaking, I think my team and the

19   company, I think -- you know, the purpose of my -- my -- these

20   letters and my employment discussions with Uber after my

21   resignation was to end practices that I thought would endanger

22   my team and employees of the company, practices that really had

23   no place in private industry and, you know, could potentially

24   endanger people.

25        And I got to a point where my leadership chain was no

1  longer interested in hearing my objections and, in fact, was

2  interested in restricting my ability to -- my voice within the

3  group.  And so I felt my only recourse was to go with this more

4  kind of high order approach of lodging the complaints more sort

5  of strongly to a higher level audience where they could no

6  longer choose to ignore them.

7  **Q.**  How many -- I'm sorry.

8  **A.**  Which is to say that I still have lingering concerns that

9  if details of this letter were revealed, they will -- you know,

10  they could potentially endanger people working for Uber

11  overseas needlessly.  Because it's counter to the entire

12  purpose here and I don't think there is a -- that this helps

13  anybody understand what Uber was up to.

14      I think that it's very clear that there has been a full

15  revelation to the people that need to know, like DOJ, and there

16  is a -- a real requirement here.  It's necessary that we all

17  take seriously and probably most seriously in this entire case.

18  You know, this goes beyond any potential litigation.  We're

19  talking about people's lives and protecting them from -- from

20  any inference of misbehavior in places where the rule of law of

21  the U.S. doesn't apply.

22          **THE COURT:**  Well, wait a minute.  You got the

23  document in front of you.

24          **THE WITNESS:**  Yes, sir.

25          **THE COURT:**  Point to a page and show me an instance

1  where somebody who is working overseas might -- I might redact

2  that.  I might require that to be redacted, so.

3          THE WITNESS:  I would have to go back through it.  I

4  would say the redactions, I do a strong job of protecting the

5  types of information and naming specific countries.  You know,

6  I think that -- yeah, I'd have to go through it in greater

7  detail and I would be happy to do that for you, your Honor, if

8  you --

9          THE COURT:  Well --

10         THE WITNESS:  -- would like.

11         THE COURT:  Of the parts that are not redacted -- and

12  you have been up here now two hours -- have you seen anything

13  that would put somebody's life in endanger overseas if it gets

14  public?  Which it's going to be public, but I could redact it

15  if there is somebody's name called out, for example.

16         THE WITNESS:  I would say, yeah, that's a good point.

17  What I should emphasize is even saying locations in some places

18  could endanger people.

19     Obviously, employees of the company in certain overseas

20  locations are public knowledge and, you know, if there is seen

21  to be untoward or illegal behavior going on  --

22         THE COURT:  Listen, you're just giving me blather.

23  If you can give me a specific paragraph to look at, I will look

24  at it now, but you're just giving me a generalized statement.

25     So if you don't have anything in mind, then let's forget

1    it; but if you do, this is a good time to point it out.

2           MS. BOERSCH:  Your Honor, I might request if we could

3    after the hearing have some time to look at the letter in more

4    detail, then --

5           THE COURT:  You have until 5:00 o'clock today.

6           MS. BOERSCH:  That's fine.  Thank you.

7           THE WITNESS:  Okay.

8           MR. GONZÁLEZ:  Thank you, your Honor.  You may have

9    cut to the chase here.

10   BY MR. GONZÁLEZ

11   Q.   My point is this.  Some of the points of the letter that

12   you have in front of you clearly are redacted.  Do you see

13   that?

14   A.   Yes.

15   Q.   And generally, generally speaking, the redacted portions

16   of the letter deal with many other countries; is that correct?

17   A.   Correct.

18          MR. VERHOEVEN:  Objection.  Leading.  Foundation.

19          THE COURT:  It is leading, but I will allow it in

20   this instance.

21        Go ahead.

22   BY MR. GONZÁLEZ

23   Q.   And your concerns about security, to the extent that you

24   mentioned these other locations and people from -- connected to

25   Uber that might be involved with those locations, do you

1    believe that there were security concerns with respect to

2    releasing that information?

3    **A.**    Yes.

4              **THE COURT:**    But if you think for a minute that that

5    excused not producing this document in this case, that's not

6    good enough.

7              **MR. GONZÁLEZ:**    That's a whole other issue that we'll

8    address, your Honor.

9              **THE COURT:**    Another issue.

10   **BY MR. GONZÁLEZ**

11   **Q.**    Sir, do you also -- in your work do you work with local

12   law enforcement to either identify threats or help them

13   investigate acts of violence against Uber employees?

14   **A.**    I have, yes.

15   **Q.**    How many employees were in the M.A. group when you left?

16   **A.**    I don't recall the exact number.  I want to say it's

17   around 13.

18   **Q.**    I think you mentioned this before in your testimony, but I

19   wanted to be clear.  These devices, these non-attributable

20   devices?

21   **A.**    Yes.

22   **Q.**    You don't have any information -- do you have any

23   information that anybody outside of the 13 M.A. group used such

24   devices?

25   **A.**    Yes.

JACOBS - CROSS EXAMINATION / GONZÁLEZ

1    **Q.**   What groups would those be?

2    **A.**   SSG.

3    **Q.**   Do you have any information of anyone outside of SSG or

4    M.A. using those devices?

5    **A.**   No.

6    **Q.**   Do you know how many people worked at SSG when you left?

7    **A.**   Four.  I should say when I left, SSG was no longer its own

8    entity.  It was merged with the Intelligence Analysis function

9    about a month before I left.

10   **Q.**   All right.  That's fair.  But for the judge's benefit, I

11   just want to make clear that when we're talking about SSG,

12   we're talking about a very small group at Uber; would that be

13   fair?

14   **A.**   That is accurate, yes.

15   **Q.**   Sir, you were asked a lot of questions about one

16   particular sentence in the letter at the bottom of Page 12,

17   where it made reference to you being aware that Uber used the

18   M.A. team to steal trade secrets from Waymo.  Do you recall

19   that?

20   **A.**   Yes.

21   **Q.**   The letter doesn't provide any specific example of that,

22   does it?

23          **MR. VERHOEVEN:**   Objection.  Leading.

24   BY MR. GONZÁLEZ

25   **Q.**   Does the letter provide --

1        **THE COURT:**  You can -- all right.  Rephrase it,

2   please.

3   **BY MR. GONZÁLEZ**

4   **Q.**   Does the letter provide any specific example, any fact?

5        **MR. VERHOEVEN:**  This is all leading, your Honor.

6        **THE COURT:**  It is leading.  A "does" question in this

7   context is leading.

8        Go ahead answer the question.  Overruled.

9   **A.**   I don't recall any additional detail in the letter.  I

10  haven't had a lot of time to review the materials in

11  preparation for today, so I don't feel comfortable saying that

12  there is nothing, but I don't recall any additional details.

13       And as I stated earlier, this -- this statement is in a

14  letter sent from my attorney; not my letter.

15  **BY MR. GONZÁLEZ**

16  **Q.**   And I don't think this was made clear.  You've already

17  testified that you did not have a lot of time to review this

18  37-page letter.

19       Do you have any recollection as to how much time you had

20  to review this before it went out?

21  **A.**   I believe I reviewed the letter in approximately 20

22  minutes while I was on vacation with my wife in Chicago, as it

23  happened.  So there was a bunch of dynamics at play there:  The

24  attorney's desire to get it out quickly, to either meet some

25  end-of-week deadline or some sort of deadline, and the dynamics

JACOBS - CROSS EXAMINATION / GONZÁLEZ

1   of where I was and what I was doing.  I believe I only had

2   about 20 minutes with the letter itself.

3   **Q.**   And, sir, I think this was clear, but I want to make sure

4   that it is.  These communications that you've talked about, the

5   non-attributable communications?

6   **A.**   Yes.

7   **Q.**   That is something that is used with respect to overseas

8   operations?

9   **A.**   Overseas.  And I understood that domestically it was used

10  to research protest and threat groups targeting Uber, but not

11  in the context of -- yeah, those were the -- the focuses, as I

12  understood them.

13  **Q.**   And can you educate your Honor on why that method of

14  communication was used with respect to threat groups?  Why not

15  just send them you're own email and say, "Here I am"?

16  **A.**   Obviously, to obfuscate the actual people involved in

17  researching the group, accessing pages where people might be

18  logging the IP activity of -- IP registration to make it seem

19  as if people who aren't affiliated with Uber were interested in

20  the group or, you know, to create avatars, effectively, to

21  communicate with people that would not normally want to

22  communicate with Uber.

23  **Q.**   When your team is investigating potential threats of

24  violence against the company, do you want the people that

25  you're investigating to know who you are?

PROCEEDINGS

```
 1   A.   No.

 2   Q.   Is that why you sometimes use machines that are not Uber

 3   machines?

 4   A.   I did not use non-attributable machines.

 5   Q.   Not you.  Is it your understanding that that is why these

 6   folks were using these non-Uber machines?

 7   A.   Yes, yes.

 8            MR. GONZÁLEZ:  Thank you, your Honor.  That's all I

 9   have.

10            THE COURT:  Who supplied the non-attributable

11   machines?  Was that the company?  A vendor?  Who supplied

12   those?

13            THE WITNESS:  Yeah.  I understood that the

14   acquisition was through third-party vendors, who would go out

15   and buy the devices off the open market and supply them back to

16   Uber employees to use.

17       So there was no direct, you know, line item in any kind of

18   invoice or budget that logged the purchase.

19            THE COURT:  And did Uber ultimately reimburse the

20   vendor for that?

21            THE WITNESS:  I don't have any direct knowledge.

22   That would be -- I would surmise that that's accurate.

23            THE COURT:  All right.

24            THE WITNESS:  That's my belief, yes.

25            THE COURT:  If we wanted to get a record of anyone in
```

PROCEEDINGS

1    the Pittsburgh Autonomous Group, vehicle group, that used Wickr

2    or some other ephemeral communication device, how would we go

3    about doing that?

4            THE WITNESS:  A record?  How would you get a record

5    of someone in Pittsburgh using one of those devices?

6        I would guess testimony.  And I'm not certain, but I

7    believe the sort of second generation of Wicker was an

8    enterprise account.  So there may -- there might be at least --

9    even if there is not records of the communications, there might

10   be account registration data or something like that, but I

11   honestly -- I'm just speculating for your Honor.

12       I don't know how to prove that any clearer than just

13   knowing that the practices were underway.

14           THE COURT:  Let's say you've got engineer number one

15   in Pittsburgh.

16           THE WITNESS:  Yes, sir.

17           THE COURT:  And engineer number two -- this is a

18   hypothetical -- and they both have the Wicker accounts on a

19   device.  As it was set up in Uber, could they communicate with

20   each other directly or indirectly using Wicker?

21           THE WITNESS:  Yes.

22           THE COURT:  Now, would the vendors -- which vendors

23   would have supplied these devices?

24           THE WITNESS:  Okay.  Yeah.  I think it's -- and

25   please stop me.  I'm just trying to understand the intent

PROCEEDINGS

1    behind your question.

2        I would say the ephemeral communications of Wicker were

3    something that were used within a small subset of the company,

4    a small subset of security, and then used to communicate with

5    internal clients to make the communications encrypted and

6    ephemeral, but oftentimes used on Uber computers and across

7    Uber networks.

8        The non-attributable devices were a much smaller subset

9    supplied by third-party vendors and not necessarily aligned

10   with the users of those ephemeral communications.

11       Those are two distinct sort of categories or -- you know,

12   it's two distinct MOs, so to speak.

13           THE COURT:  Let me ask you this then.  Let's say you

14   have a regular desktop computer.  You help me on this.  Maybe

15   it's a past thing now, but did they have desktop computers at

16   Uber where people would sit at a desk and have a big screen and

17   type, or is it done a different way these days?

18           THE WITNESS:  Yeah.  Everybody would have -- would be

19   assigned a laptop computer and then would have a dock of some

20   sort to display it on a large monitor.

21           THE COURT:  That would be a computer issued by the

22   company?

23           THE WITNESS:  Correct.

24           THE COURT:  All right.  So on that computer did

25   anyone ever -- did anyone, say, in Pittsburgh, would they have

```
 1   had the ability to send an ephemeral message?

 2            THE WITNESS:  They would have had the ability if they

 3   -- yes.

 4            THE COURT:  Even though it's a company issue, right?

 5            THE WITNESS:  Yes, because the message is -- is an

 6   encrypted.  The only people that can decode the decryption are

 7   those two communicants.  So even if you see the data stream

 8   across the network, it would be encrypted.  It would be

 9   indecipherable.

10       And then the added layer with Wickr is it would be

11   ephemeral, which is to say it would set an expiration date from

12   anywhere from six seconds to, I think, six days, at which time

13   it would automatically be deleted.  And so --

14            THE COURT:  When it's deleted, is it deleted off the

15   server too?

16            THE WITNESS:  I believe it deletes it off of Wickr's

17   servers, which would be the only place that it was contained.

18            THE COURT:  So it would not be on the Uber server;

19   true?

20            THE WITNESS:  True.  That's my understanding.  And

21   then -- and I stress that I'm not a technical expert in that

22   domain, but that's my understanding, yes.

23            THE COURT:  So who of the vendors was the one who did

24   some of this -- set up these ephemeral things?

25            THE WITNESS:  The ephemeral was not set up by the
```

PROCEEDINGS

1    vendors.  It was set up by the actual full-time employees, the

2    members of the SSG group in speaking to clients, and even my

3    members of my team talking with internal clients saying this is

4    the preferred method of communication.  Get on Wickr, register

5    yourself for an account; here's my user name.  And then trying

6    to restrict the issues that the overall program, as I've

7    described, was implemented by Mr. Clark and Mr. Henley as the

8    kind of principal referents within the company.

9            THE COURT:  Now, when they are communicating by

10   ephemeral, they're not talking about some date at the movie

11   house.  They're talking company business; true?

12           THE WITNESS:  The primary purpose was to communicate

13   sensitive company business.  But, I mean, certainly there's a

14   bit of, you know, the normal stuff that transpires between

15   employees across chat.  But it is -- you know, by and large was

16   more about sensitive issues.

17           THE COURT:  So if you say that the ephemeral part was

18   set up by your group, so who in your group would know the most

19   about setting up the ephemeral?

20           THE WITNESS:  Matt Henley.

21           THE COURT:  Say his name again.

22           THE WITNESS:  Matt Henley.

23           THE COURT:  Is he still at Uber, to your knowledge?

24           THE WITNESS:  My understanding, yes.

25           THE COURT:  All right.  And who in your group would

PROCEEDINGS

1    know the most about the non -- what's the word?

2            THE WITNESS:  Non-attributable device.

3            THE COURT:  Non-attributable devices?

4            THE WITNESS:  Mr. Gicinto.

5            THE COURT:  When you say "non-attributable device,"

6    is that like a smartphone, or is that like a desk -- a

7    notebook?  What is it?

8            THE WITNESS:  I understood there to be notebook

9    computers and MiFi devices, so sort of portable cellular WiFi

10   devices.

11       So you would have a computer that wasn't assigned to Uber

12   or issued by Uber directly and a way for it to communicate over

13   the Internet without crossing Uber's network.

14       That's kind of the general setup of it so that it looks as

15   if it's coming from just some consumer that purchased that

16   computer, you know, out on the open market, and is

17   communicating through a MiFi device that is also like, you

18   know, an individual consumer sort of fingerprint, so to speak.

19           THE COURT:  You may not know the answer to this, but

20   do you have any educated guess as to how many of these devices

21   there were that were non-attributable?

22           THE WITNESS:  Five to ten.

23           THE COURT:  In the entire company?

24           THE WITNESS:  Within SSG.

25       And I don't really have -- I don't have firsthand

PROCEEDINGS

1    knowledge of their use elsewhere, where I can put a number on

2    it, Your Honor.

3            THE COURT:  All right.  Now, did Travis Kalanick, do

4    you have any knowledge one way or the other or any information

5    one way or the other whether he used any of these

6    communications modes?

7            THE WITNESS:  I have no knowledge of that.

8            THE COURT:  Do you have any information?

9            THE WITNESS:  Not about Travis's communication with

10   respect to ephemeral or non-attributable.

11       I know that some of the C suite, so to speak, the

12   executives of the company, the principal executives of the

13   company -- I know that at least my executive sponsor, Joe

14   Sullivan, used ephemeral communications because I communicated

15   with him on Wickr.  But that's the only firsthand knowledge of

16   that reaching those levels of the company.

17           THE COURT:  Again, did anyone -- going back to the

18   example of Pittsburgh and engineer number one and engineer

19   number two, were employees free to use their own personal

20   iPhones or personal devices and use that as opposed to one that

21   was provided by the vendor?

22           THE WITNESS:  Yes.

23           THE COURT:  Is there anyplace that there would be a

24   record of who -- who was using Wickr?

25           THE WITNESS:  I would have to speculate to -- to

PROCEEDINGS

1    answer that question.

2              **THE COURT:**  Go ahead.

3              **THE WITNESS:**  Thanks.

4        I would -- as I mentioned, I think the second generation

5    was an enterprise account.  So there may be some roster of

6    registered users or somebody within the company that would have

7    a roster of registered users of Wickr.

8        I think that would be, you know, kind of the best --

9              **THE COURT:**  When you say "enterprise account," you

10   mean a company-wide account set up by Uber with Wickr?

11             **THE WITNESS:**  Yeah.  That's a great point of

12   clarification.

13       When Wickr was first implemented, it was a very small

14   subset within -- you know, a group smaller than my threat

15   operations team to which I belonged.  It was a subset of that

16   group.  So, you know, maybe a dozen or so people.

17       Over time, Wickr developed an enterprise system that could

18   have potentially hundreds or, I guess, thousands of users.  And

19   Uber tested the enterprise software and then began to implement

20   it.

21       But, again, it was implemented just among a subset of

22   security personnel and very small group of internal clients who

23   needed to communicate with security about sensitive issues.  So

24   we're talking dozens of people at that point.

25       So to say "enterprise," it was not a wide-ranging

PROCEEDINGS

```
 1   company-wide policy.  It was just -- it went from maybe single

 2   digits, around a dozen, to dozens of people.

 3              THE COURT:  Okay.  You live now in Seattle; right.

 4              THE WITNESS:  I do, yes.

 5              THE COURT:  After you left Uber, did you -- what job

 6   did you get?

 7              THE WITNESS:  I'm unemployed.  I do some work trying

 8   to support a friend of mine, who's starting up a consulting

 9   company.  But I'm otherwise unemployed.

10              THE COURT:  All right.  Ms. Boersch, I said you could

11   ask questions.  Would you like to ask any questions?

12              MS. BOERSCH:  Your Honor, I don't have any questions

13   except if the Court is inclined to unredact those portions of

14   the 37-page letter from Mr. Hallinan that deal with overseas

15   contacts and people overseas.

16        As to those portions of the letter, we -- Mr. Jacobs

17   strongly believes that disclosure of even --

18              THE COURT:  I'm going to redact that if somebody can

19   point out to me where they are.  I haven't seen any such things

20   yet.

21        But if it just says something like, We had projects going

22   in Southeast Asia, that's not sensitive.  But if it was naming

23   somebody in Tokyo and saying, Our Tokyo office spied on... then

24   I would redact that.

25        I think what you have to do is help me find the portions
```

1    you want to have redacted.

2          MS. BOERSCH:  Yeah.  And I'll do that.  Let me just

3    make clear -- and I maybe misunderstood the Court.  The copy of

4    the letter that we have is currently redacted.  And I

5    understood the Court to suggest that the Court was going to

6    unredact what's currently redacted.

7          THE COURT:  That's right.  Except I'll re-redact the

8    things that you're talking about.

9          MS. BOERSCH:  Okay.  All right.  Well, on the

10   assumption that we can do that and the Court will redact any

11   names or information about -- that we consider a threat to

12   people in foreign countries, then I don't have any questions

13   for Mr. Jacobs.

14         THE COURT:  Thank you.

15      I assume you have no further questions, at least at this

16   time.  Right, Mr. Verhoeven?

17         MR. VERHOEVEN:  I have tons of questions.  I assume I

18   could ask in discovery though.

19         THE COURT:  Well, we'll see.

20         MR. VERHOEVEN:  Okay.

21         THE COURT:  Here's the thing.  I'm trying to figure

22   out how the most efficient way to proceed is.  And I want to

23   emphasize, again, Mr. Jacobs, you did a Herculean thing to get

24   on an airplane and come down here.  Thank you for that, again.

25      We're going to go to another witness, either Russo or

PROCEEDINGS

```
 1   Angela Padilla, in a moment.  And it could be that we need you
 2   back, is the thing.  So -- Mr. Jacobs.  So -- but I don't think
 3   we're going to need you back today.
 4            THE WITNESS:  Okay.
 5            THE COURT:  And my -- I'm going to keep you subject
 6   to the jurisdiction of the Court.
 7        So if I say to Ms. Boersch, bring Mr. Jacobs back, will
 8   you do that?
 9            THE WITNESS:  Yes.
10            THE COURT:  Is that okay with you, Ms. Boersch?
11            MS. BOERSCH:  Well --
12            THE COURT:  He's here.  He's in my jurisdiction.  I
13   can see him.  So I have the power to do that.  I don't want to
14   have to go through subpoenas and all that.
15            MS. BOERSCH:  I understand.
16        Mr. Jacobs has a wedding to attend in Los Angeles on
17   Friday.  He would rather not miss that wedding if possible.  I
18   just want to raise that.
19            THE COURT:  You can go to that wedding.
20        (Laughter)
21            THE WITNESS:  Thank you.
22            THE COURT:  And we may not need you back here for
23   some time.  But I need to see how this sorts out.
24        So you may step down, again with the thanks of the Court
25   for coming.
```

PROCEEDINGS

1          **THE WITNESS:**  Thank you.

2      (Witness steps down.)

3          **THE COURT:**  And you're free to stay, if you wish, I

4   guess.  No one raised any problem with witnesses being in the

5   courtroom.  So I'm not going to -- I'm not going to order you

6   out of the courtroom yet.

7      Here's some things that I want Uber to produce to me:  The

8   resignation email by this witness.  I want the rest of this

9   letter that -- 37-page letter in unredacted form.  But I will

10  redact out the things that would place any overseas operative

11  in danger.  I will do that.

12     I want a complete list from Uber of everybody who had a

13  Wickr account at the company, including those people in

14  Pittsburgh that had Wickr accounts.  Whether it's on their

15  company-issued machine or their personal machine.

16     Okay.  For right now, that's all I've got.

17     Okay.  Who shall we call as our next witness?

18         **MR. GONZÁLEZ:**  Your Honor, you've asked us to bring

19  Mr. Russo.  And Mr. Russo is here and prepared to answer your

20  questions, if you would like.

21         **THE COURT:**  All right.  Let's have Mr. Russo come up.

22     Welcome, Mr. Russo.  Please raise your right hand and take

23  an oath to tell the truth.

24

25

PROCEEDINGS

1                          **EDWARD RUSSO**,

2     called as a witness for the Plaintiff, having been duly sworn,

3     testified as follows:

4                  **THE COURT:**  Thank you.

5          Welcome.  Please be seated.  And you need to get about

6     this close to the mic in order for it to catch your voice.  Why

7     don't you say your name as a test.

8                  **THE WITNESS:**  Edward Russo.

9                  **THE COURT:**  Perfect.  All right.  So go ahead,

10    Mr. Verhoeven.

11                 **MR. VERHOEVEN:**  Before I start, Your Honor, the

12    May 5th letter refers to a presentation that Mr. Russo made.

13    And I'd like to inquire if we have that presentation.

14                 **THE COURT:**  That's a good point.  I meant to put that

15    on my list.  So if we have it, we can save some time.

16                 **MR. GONZÁLEZ:**  Your Honor, he can ask the witness the

17    question, but I don't believe that the presentation exists.

18                 **THE COURT:**  Don't believe?  Or you know?

19                 **MR. GONZÁLEZ:**  (Gesturing.)

20                 **THE COURT:**  I'm going to order you to produce it.  If

21    it turns out you don't have it, it's gone, you need to find

22    out.

23         Go ahead, Mr. Verhoeven.

24                 **MR. VERHOEVEN:**  Thank you.

25

### DIRECT EXAMINATION

**BY MR. VERHOEVEN:**

**Q.**   Good morning, Mr. Russo.

**A.**   Good morning.

**Q.**   Is it Russo?

**A.**   Russo.

**Q.**   Thank you.

You were hired by Uber in the summer of 2016; is that right?

**A.**   That's correct.

**Q.**   And your position was Senior Risk and Threat Analyst?

**A.**   Yes, that's correct.

**Q.**   You worked in the Strategic Services Group?

**A.**   Yes, sir.

**Q.**   You're a retired government employee; is that right?

**A.**   I am.

**Q.**   And part of your role was to enable competitive intelligence and -- correct?

**A.**   Enable competitive intelligence?

**Q.**   Yes, sir.

**A.**   I don't quite understand what you mean by that.  But my role in risk and threat analyst involved looking at competitors, yes, indeed.

**Q.**   And was part of your role to attempt to obtain confidential information from those competitors?

1    **A.**    No.  That was never part of the role.

2    **Q.**    So what was your role, then, with respect to competitors?

3    **A.**    With respect to competitors, the primary function was to

4    use open source information, hire vendors for market research,

5    that type of thing, to determine the role or the place of a

6    competitor in the marketplace.

7    **Q.**    Do you have those exhibits up there?

8    **A.**    Yes, I do.

9    **Q.**    Turn to Exhibit 1, please.

10   **A.**    Yep.

11   **Q.**    The bottom paragraph refers to you.  It says, quote:

12          "In the summer of 2016 SSG" --

13          Are you there?  Page 12.

14   **A.**    Page 12.  Okay.

15   **Q.**    This is a letter, as you know because you've been in here,

16   from Mr. Jacobs' attorney?

17   **A.**    Uh-huh.

18   **Q.**    You understand that?

19   **A.**    Uh-huh.

20   **Q.**    Yes?  You have to answer yes or no.

21   **A.**    I'm sorry.  Yes, I do.

22   **Q.**    Says, quote:

23          "In the summer of 2016, SSG specifically hired Ed

24          Russo to further develop its intelligence program."

25          Talks about you being retired?

RUSSO - DIRECT EXAMINATION / VERHOEVEN

 1   **A.**   Uh-huh.

 2   **Q.**   And then it says:

 3            "His official title was Senior Risk and Threat

 4        Analyst, but he was actively engaged in HUMINT," all caps.

 5        Do you see that?

 6   **A.**   I do.

 7   **Q.**   How is that pronounced?

 8   **A.**   In the government we pronounce it HUMINT.

 9   **Q.**   What is HUMINT?

10   **A.**   Stands for "human intelligence."

11   **Q.**   What does that mean?

12   **A.**   It means acquiring intelligence or information from human

13   beings versus from wiretaps or things like that.

14   **Q.**   As part of your work, did you ever do any wiretaps?

15   **A.**   Sorry?

16   **Q.**   As part of your work at Uber, did you do any wiretaps?

17   **A.**   No, not at all.

18   **Q.**   Did you ever do any HUMINT?

19   **A.**   HUMINT, no.

20   **Q.**   So this statement that Mr. Jacobs' lawyer has in here,

21   that you were actively engaged in HUMINT, that's a false

22   statement?

23   **A.**   I would say it is, yes, sir.

24        If by HUMINT you're going with the traditional definition

25   of looking for clandestine information or protected

RUSSO - DIRECT EXAMINATION / VERHOEVEN

1   information, yes, that's a false statement.

2   **Q.**   What about human information, did you ever become actively

3   involved in that --

4   **A.**   Sure.  I mean, if it's --

5   **Q.**   Let me finish the question.

6        -- while you were at Uber?

7   **A.**   Yes, sir.

8   **Q.**   What did you do?

9   **A.**   For that, I did a variety of things.  We -- overseas we

10  had several competitors, of course.

11       So, again, trying to understand their position in the

12  marketplace, we could contract with vendors, we could use open

13  source.  And, in doing so, what we would do is collect

14  information as far as the human part of it goes, traditional

15  market research involving sending an expert in the region

16  overseas.

17       That person talks to a variety of folks -- in our

18  particular case, it may be taxi drivers or what have you; it

19  may be economics professors at universities -- to get an idea

20  and understanding of the marketplace, of our position and

21  sometimes competitors' positions in it, et cetera.

22  **Q.**   And did this effort involve speaking or identifying who

23  the drivers were of your competitors?

24  **A.**   Identifying them?

25  **Q.**   Yes.

RUSSO - DIRECT EXAMINATION / VERHOEVEN

1    A.    No, not necessarily.

2    Q.    Identifying.

3    A.    Identifying?  No.

4    Q.    So you never took part in trying to identify overseas the

5    drivers who were working for your competitors?

6    A.    No.

7    Q.    What about the United States?

8    A.    No.

9    Q.    The next sentence after the redaction, on page 12 --

10   A.    Uh-huh.

11   Q.    -- from Mr. Jacobs' attorney says, and I quote:

12            "Part of his role was to enable competitive

13         intelligence and the theft of trade secrets by recruiting

14         sources within competitor organizations," closed quote.

15         Do you see that?

16   A.    I do.

17   Q.    Is that a true statement?

18   A.    It is not a true statement.

19   Q.    Why?

20   A.    Two reasons.  One, it's never been our role or my role to

21   engage in the theft of trade secrets.  We never recruited

22   sources within competitor organizations.  And that's false.

23   Q.    All right.  So is it your contention that Mr. Jacobs is

24   not telling the truth?

25   A.    Uhm, at the very least, he has that wrong.  But, yeah, if

RUSSO - DIRECT EXAMINATION / VERHOEVEN

1    it's between true and false, that's a false statement.

2    **Q.**   It says that -- continues, quote, "He" -- "he" is you;

3    right?

4    **A.**   Yes.

5    **Q.**   Quote:

6            "He vetted insiders and identified those who were

7            willing to provide Uber with competitive trade secrets."

8            I take it you say that's false?

9    **A.**   Absolutely false.  I've never done any such thing.

10   **Q.**   Have you ever vetted any insiders within your competition?

11   **A.**   No.

12   **Q.**   Have you ever spoken to any insiders with your

13   competition?

14   **A.**   No.

15   **Q.**   You have never spoken to -- have you spoken to anyone who

16   was an employee, officer, or consultant of the competition?

17   **A.**   No.

18   **Q.**   Direct your attention to page 13.

19   **A.**   Sure.

20   **Q.**   Do you see the heading "Waymo"?

21   **A.**   I do.

22   **Q.**   I read this before, but just for context I'll read it

23   again.

24            "Shortly after the Otto acquisition, Ed Russo

25            presented a fictionalized account of SSG's recent

RUSSO - DIRECT EXAMINATION / VERHOEVEN

1            contribution to Uber employees, including Jacobs."

2        First question is, did you make a presentation at which

3    Jacobs attended?

4    A.    Yes, I did.

5    Q.    When was that?

6    A.    5th of December, 2016.

7    Q.    Do you believe that's the meeting that he's referring to

8    here?

9    A.    I believe it is.

10   Q.    Why do you think that?

11   A.    Because on my calendar at work it shows that that's the

12   date I gave a presentation.

13   Q.    To whom did you give the presentation?

14   A.    To the Threat Ops team.

15   Q.    Did you present a fictionalized account of SSG's recent

16   contributions?

17   A.    Honestly, that's kind of two different parts.  And if I

18   could take them in each part.

19        It wasn't about SSG's contributions.  The presentation did

20   start out with a hypothetical situation in which at the end of

21   the presentation I revealed that the individuals I was talking

22   about was Mr. Kalanick and Mr. Levandowski.

23   Q.    Okay.  So the account that you're referring to was

24   actually something that had been done with Mr. Kalanick and

25   Mr. Levandowski?

RUSSO - DIRECT EXAMINATION / VERHOEVEN

1    **A.**    If I could, can I just tell you the story what this is

2    about?

3    **Q.**    Sure.

4    **A.**    All right.  The Threat Ops team, back then anyway, would

5    hold biweekly staff meetings.  The entire team would attend, or

6    everybody from the entire team would be invited.  And on this

7    particular day, according to my calendar, some 41 people had

8    accepted invitations.

9         The practice back then was at the end of the staff

10   meeting, which usually ran about an hour -- it would rotate

11   from team to team or individual to individual, but a different

12   individual at each staff meeting would take the final ten

13   minutes or so, give about a six- or seven-minute presentation.

14   That presentation was usually on something like a new

15   capability or perhaps a recent success or accomplishment or

16   something to that nature.

17        In, I guess, mid to late November, I was asked to give a

18   presentation.  The presentation theme that I was asked to

19   deliver was how protecting information or how using good

20   methods to protect information helps mitigate threats to the

21   company.

22        And that's essentially my role, if we can get that out

23   there, is mitigating threats to the company.

24        So, obviously, this is a somewhat serious subject.  But

25   how do you deliver that and convey the seriousness in just six

RUSSO - DIRECT EXAMINATION / VERHOEVEN

1   or seven minutes or so?

2        So I hit upon an idea to kind of take a light-hearted

3   approach with it.  And I had recalled that back in mid-August

4   or so *Bloomberg* -- actually, bloomberg.com had published an

5   article in which at the end of the article they described the

6   methods that Mr. Kalanick and Mr. Levandowski used to conduct

7   their meetings when they were discussing the acquisition, such

8   as to keep them secret until they were ready to present them to

9   the public, such that, you know, there would be no

10  interference, nothing would go public, nothing could monkey

11  wrench the deal until they could work out the details.

12       So I took that information from the *Bloomberg* article and

13  turned it into a very brief presentation.

14       What I did, again taking kind of a light-hearted approach,

15  I went through -- and the whole thing was probably 10 or 11

16  slides.  But I started out with a picture of a conference

17  because that's where Mr. Kalanick and Mr. Levandowski met.

18  They met at a TED conference, I believe it was.

19       So I described the fact that it was -- and I hadn't named

20  them in the presentation yet, but I said the point was:  Two

21  high-profile individuals, they meet at a conference.  They

22  realize -- shortly thereafter, they become friends.  They

23  realize they share a lot of professional goals.  They have the

24  same kind of vision for revolutionizing aspects of technology

25  in the world.

1      But, again, coming from rival organizations, trying to
2  make their shared vision a reality, how do they accomplish
3  that?  Because, obviously, if people find out prematurely, then
4  it could monkey wrench the whole thing.
5      Again, that's pretty much out of the *Bloomberg* article.
6  Right in there they write that they did this in a way such that
7  employees, journalists, and competitors would not find out.
8      So then I discussed what was in the article, which was at
9  night, beginning in -- well, at night, that they would depart
10  their offices, usually by a back entrance so that they wouldn't
11  be seen leaving.  They would get some takeout food, go to the
12  Ferry Building, walk to the Golden Gate Bridge, have their
13  discussions, walk back.  And they did this a few times.  And
14  then they were able to bring their vision to reality.
15      At that point in the presentation, I asked the entire
16  team, Does anybody here know who I'm talking about?  Nobody
17  did.  Click the button.  The next slide comes up, and it's
18  pictures of Mr. Kalanick and Mr. Levandowski.
19      And then I explained that -- again, because the purpose of
20  the presentation was to emphasize good information security
21  practices, I then said words to the effect that, you know, if
22  our CEO is willing to go to these kinds of length to help
23  protect information while he's trying to negotiate a deal, what
24  does that say about the contributions we can make in protecting
25  information?

RUSSO - DIRECT EXAMINATION / VERHOEVEN

1        Then I went through some of the basic things you do to

2    protect information.  You be discreet.  You don't talk about

3    private company business where you can be overheard at a

4    restaurant.  You practice good security with your computer.

5    You always have your computer or phone accounted for.  Those

6    kinds of things.

7        That was essentially the entire presentation.

8        To Your Honor's question earlier, I put this presentation

9    together.  It was not part of a program.  It was not part of

10   any kind of core curriculum.  It was just to stress this point

11   at this team meeting.

12       So I put it together on my laptop's desktop.  A few weeks

13   later, I went and removed it because there was no further use

14   for it.  And I never imagined it would turn up as an issue

15   here.

16   **BY MR. VERHOEVEN:**

17   **Q.**   It's your testimony you do not have this set of slides?

18   **A.**   No, I do not have those slides.

19   **Q.**   What computer were they on when you presented them?

20   **A.**   They were on my Uber-issued laptop.

21   **Q.**   Do you still have that laptop?

22   **A.**   I do.

23   **Q.**   Now, it's your testimony to the Court here that in making

24   a presentation to 41 people about how to protect confidential

25   information and mitigate threat risks, that you discussed a

1    *Bloomberg* article?

2    **A.**    Yeah.  In fact, that was my closing comment in the -- in

3    the presentation.  I said that the irony here is that the only

4    reason anybody -- anybody here knows this is because we read it

5    in *Bloomberg*; that Mr. Kalanick did not actually seek out the

6    security department's advice on this, nor did he come back

7    later and say, hey, guys, guess how I did this.

8    **Q.**    And that's what you told everybody?

9    **A.**    That's what I told everybody.

10   **Q.**    Okay.  Did you check with Kalanick to see if he had talked

11   to anybody within Threat Ops?

12   **A.**    I know he had spoken to nobody in Threat Ops.

13   **Q.**    How do you know that, sir?

14   **A.**    Because I briefed the Threat Ops team from the management

15   on down.  And that was a true fact.

16   **Q.**    You briefed the team.  How does that mean that you know

17   that he never spoke with anybody?

18   **A.**    Because my boss's boss would have absolutely told me if I

19   had that fact wrong.  And if I'm not mistaken, he may have seen

20   a copy of the slides ahead of time.  But I'm not --

21   **Q.**    Your boss?  What did you say?

22   **A.**    My boss's boss.  That would be Matt Henley, head of Threat

23   Ops.

24   **Q.**    So your boss's boss necessarily would have told you?

25   **A.**    Yes, sir, he would have.

RUSSO - DIRECT EXAMINATION / VERHOEVEN

1  Q.   What about your boss?

2  A.   He would have told me, too, if he had known.

3  Q.   And was there any requirement that either of these

4  gentlemen tell you everything about Mr. Kalanick?

5  A.   Nope.  No requirement whatsoever.  But they certainly

6  would have corrected me had I presented incorrect information.

7  Q.   Well, the only thing you presented was a *Bloomberg*

8  article, according to you; right?

9  A.   Yes, sir.  Yep.

10 Q.   This whole group is concerned with hiding information,

11 isn't it?

12        THE COURT:  Let's --

13        MR. VERHOEVEN:  Let me rephrase.

14        THE COURT:  Now you're drifting off into argument

15 now.

16 BY MR. VERHOEVEN:

17 Q.   Let's rephrase.

18      The Threat Ops group deals with restricting access to

19 information; right?

20 A.   Yes, sir.  It protects information.

21 Q.   So isn't it possible that people above your head didn't

22 want lower people in the Threat Ops team to know that

23 Mr. Kalanick was working and using the -- the tools and

24 techniques that Mr. Jacobs is referring to in his letter?

25 A.   Say that question again, please.

RUSSO - DIRECT EXAMINATION / VERHOEVEN

1          THE COURT:  I don't like that question.  I think it's

2    just too speculative and argumentative.  And we've got limited

3    time here.

4          MR. VERHOEVEN:  Okay.

5          THE COURT:  Let's go to something he can answer, a

6    fact question.

7          MR. VERHOEVEN:  Yes, Your Honor.

8    BY MR. VERHOEVEN:

9    Q.   Which -- which *Bloomberg* article are you referring to?

10   A.   It would have been -- I want to say it was mid-August.  It

11   was -- the title was along the lines of Uber To Go Live In

12   Pittsburgh, or Autonomous Vehicles To Go Live In Pittsburgh.

13   Something like that.

14   Q.   Do you have that *Bloomberg* article?

15   A.   Not with me in the courtroom, no.

16         THE COURT:  Somebody at your table is probably

17   looking it up right now.  So we'll have a it in a few minutes.

18      Let's just move on.

19         MR. VERHOEVEN:  Yes, Your Honor.

20         THE WITNESS:  If you find it, it's the bottom

21   paragraphs.

22         THE COURT:  It's what?

23         THE WITNESS:  It's the last couple of paragraphs.

24   BY MR. VERHOEVEN:

25   Q.   If you look at the next -- or a couple of sentences down,

1    it begins with "Russo boasted," on page 13.  Do you see that?

2    A.   Yes, sir, I do.

3    Q.   And I quote.

4         "Russo boasted that SSG, using ex-CIA field

5         operatives skilled in counterintelligence, could ensure

6         the secrecy of meetings between the company's CEOs for

7         months before any acquisition was announced or finalized."

8         Do you see that?

9    A.   I do, sir.

10   Q.   Did you say that?

11   A.   I did not.

12   Q.   Did you mention any ex-CIA field operatives in your

13   presentation?

14   A.   No, sir, I did not.

15   Q.   Did you mention any activity undertaken by anyone in

16   Threat Ops or SSG or COIN with respect to ensuring that these

17   two CEOs -- the fact they're meeting, what they were

18   discussing, was not disclosed?

19   A.   Sorry.  Say that question again.

20   Q.   That was a long question.  Let me try to rephrase it.

21        Did you -- during this presentation on December 5th,

22   2016 --

23   A.   Yes, sir.

24   Q.   -- did you present any information to the group about any

25   activity by SSG, Threat Ops, or COIN in relation to this

RUSSO - DIRECT EXAMINATION / VERHOEVEN

1   fictionalized account you presented?

2   **A.**   No.

3   **Q.**   Okay.  But you were asked to present in the final ten

4   minutes things like recent successes and things related to the

5   company, weren't you?

6   **A.**   Traditionally, those final ten minutes, whoever was

7   presenting, would present -- excuse me, would present something

8   along the lines of a recent accomplishment or success, or

9   perhaps a new capability or what have you.

10       I was asked to present -- or to do a presentation about

11  good security practices surrounding the protection of

12  information.  This was the vehicle I chose to use.

13  **Q.**   Who asked you to do that?

14  **A.**   It came from Matt Henley.

15  **Q.**   Matt Henley?

16  **A.**   Yes.  Head of Threat Ops.  And it came down through my

17  boss, Nick Gicinto.  It was a request that our team present

18  something along that theme.

19  **Q.**   Mr. Jacobs referred to various vendors used by Uber.

20  **A.**   Uh-huh.

21  **Q.**   Do you have any role in hiring or managing these vendors?

22  **A.**   I have worked with some of those vendors, yes.

23  **Q.**   Who have you worked with?

24  **A.**   I've worked with some of the ones he's named.  Red5.

25  I-OnAsia.

RUSSO - DIRECT EXAMINATION / VERHOEVEN

| | |
|---|---|
| 1 | **Q.**   Anybody else? |
| 2 | **A.**   Uh, Frontera. |
| 3 | **Q.**   Anybody else? |
| 4 | **A.**   Yeah, Xebec. |
| 5 | **Q.**   How do you spell that? |
| 6 | **A.**   X-e-b-e-c. |
| 7 | **Q.**   X? |
| 8 | **A.**   X -- X ray echo bravo echo Charlie. |
| 9 | **Q.**   Any others that you remember? |
| 10 | **A.**   No, sir. |
| 11 | **Q.**   Which of these vendors did you have a role in hiring, if |
| 12 | any? |
| 13 | **A.**   Xebec. |
| 14 | **Q.**   Who was your contact at Xebec? |
| 15 | **A.**   The president. |
| 16 | **Q.**   Who's he? |
| 17 | **A.**   Phil Jones. |
| 18 | **Q.**   I assume there's documents related to -- withdrawn. |
| 19 |     What did you hire him to do? |
| 20 | **A.**   They helped us provide some security when we did the live |
| 21 | launch in Pittsburgh. |
| 22 | **Q.**   Did you sign an agreement with Xebec? |
| 23 | **A.**   The company did, yeah. |
| 24 | **Q.**   What was the scope of work? |
| 25 | **A.**   The launch in Pittsburgh, what we're referring to is the |

1    mid-September 2016 event, where the company actually put live

2    paying customers in autonomous vehicles while the vehicles ran

3    autonomously.

4         That was kind of a large press event.  It was a

5    significant event for the company.  So their scope of work was

6    to help us ensure that nothing went wrong, especially out on

7    the street.  And if anything did, that they could be in

8    position to help document what happened.

9    Q.   What expertise did Xebec have that Uber did not have?

10   A.   The ability to resource teams of individuals to go out and

11   basically drive through the bubble, if you will, or the routes

12   that we were going to use; the ability to keep eyes on cars,

13   make sure things were going safely.

14   Q.   Did you hire Red5?

15   A.   No, I did not.

16   Q.   I-OnAsia?

17   A.   I did not.

18   Q.   What was your role, if any, with those two vendors?

19   A.   I've had a very limited role with Red5.  I've met them

20   once or twice, basically back benching meetings.

21        With I-OnAsia, they do overseas market research.

22   Q.   Frontera, did you hire them?

23   A.   I did not.

24   Q.   What do they do for Uber?

25   A.   Same thing.  Same thing.  Market research overseas.  On

 1    the ground truth collection as well.

 2    **Q.**   Were any vendors hired, other than Xebec, for work in the

 3    United States?

 4    **A.**   Work in the United States?  I guess --

 5                 **MR. GONZÁLEZ:**  Excuse me, Your Honor.  Aren't we well

 6    beyond the scope of this litigation, getting into company

 7    sensitive information?  Who cares what vendors we hired?

 8                 **THE COURT:**  Those vendors may have information about

 9    ephemeral devices, non-attributable devices, and this

10    alternative setup Uber had for communicating within the

11    company.

12         So you didn't produce those documents, but maybe the

13    vendors will when they're subpoenaed.  That's why it's

14    relevant.

15                 **MR. GONZÁLEZ:**  My suggestion was going to be to see

16    if any of them even did any of that work.  But if we hired

17    somebody for security to guard --

18                 **THE COURT:**  Well, maybe that's not all they got hired

19    for.

20         I have two questions.  Was a company called Stroz one of

21    these vendors?

22                 **THE WITNESS:**  Not to my knowledge, no, sir.

23                 **THE COURT:**  All right.  Which were the vendors that

24    had anything to do with ephemeral, and which is the ones that

25    had anything to do with non-attributable?

RUSSO - DIRECT EXAMINATION / VERHOEVEN

1            THE WITNESS:  None of those.

2            THE COURT:  "None of those."  What do you mean

3   "those"?

4            THE WITNESS:  Sorry?

5            THE COURT:  The last witness just got through saying

6   that there were some.  So are you --

7            THE WITNESS:  I understand, Your Honor.

8            THE COURT:  So tell us who the vendors were who had

9   some connection to those two subjects.

10           THE WITNESS:  As far as ephemeral, Your Honor, Wickr

11  is a company.  It's an app.  You download it off your phone or

12  onto your computer.  So, I mean, there's no hiring of the

13  vendor for Wickr.  I mean, you just --

14           THE COURT:  So you're telling us flatout nobody -- no

15  vendor ever got hired to help with Wickr?

16           THE WITNESS:  I'm not saying that, Your Honor,

17  because there was an enterprise solution that was provided to

18  the company.  But --

19           THE COURT:  Some vendor might have helped on that.

20           THE WITNESS:  Perhaps.  I do not know whom.

21           THE COURT:  Do you have an educated guess?

22           THE WITNESS:  No, sir, I do not.

23           THE COURT:  All right.  How about on the

24  non-attributable?

25           THE WITNESS:  On the non-attributable, there was a

RUSSO - DIRECT EXAMINATION / VERHOEVEN

```
1    vendor that provided those.  And that would be Frontera, that

2    provided the --

3            THE COURT:  They are located where?

4            THE WITNESS:  That's a good question.  I honestly

5    don't know.

6            THE COURT:  All right.  You've got about -- we're

7    running out of time, Mr. Verhoeven.  So let's -- you get about

8    five to six more minutes, and then we're going to give the

9    other side -- this is without prejudice to more questions

10   later.  But we have limited time today.

11           MR. VERHOEVEN:  Yes.  Thank you, Your Honor.

12   BY MR. VERHOEVEN:

13   Q.   Let's go to -- excuse me.  Page -- let's go to page 13

14   again.  And I want you to turn to the paragraph below the one

15   we were just looking at.  Starts with "of course."

16   A.   Yes, sir.

17   Q.   And the second sentence states, quote:

18           "Then, as stated above, shortly after the acquisition

19       and just three weeks before the rollout of Uber's

20       Autonomous Vehicle Group in Pittsburgh, Russo, Gicinto,

21       and" -- is it "Nocon"?

22   A.   Yes, sir.

23   Q.   (As read:)

24           -- "traveled to Pittsburgh and educated the team."

25       And it goes on.  I'll talk about the rest of the sentence
```

1  later.  Did you travel to Pittsburgh?

2  A.   Yes, sir.

3  Q.   And did you go with Gicinto and Nocon?

4  A.   My first trip to Pittsburgh was with Mr. Gicinto.  My

5  second trip was with Mr. Nocon.  And my third trip was with

6  Mr. Gicinto.

7  Q.   Okay.  When was your first trip?

8  A.   It would have been the week of 5 September.  Thereabouts.

9  Q.   September 5th week?

10  A.   Yes, sir.

11  Q.   2016?

12  A.   Yes.

13  Q.   And who went with you on that one?

14  A.   Mr. Gicinto and I.

15  Q.   Anyone else?

16  A.   No.

17  Q.   What was the purpose of traveling out there?

18  A.   That was a preparatory trip because we had just been

19  assigned the task of helping augment the security out there for

20  the live launch of the autonomous vehicles.

21      So we had never been to Pittsburgh before.  We didn't know

22  any of the personalities there.  So we traveled up there to

23  meet with the key folks from the security side, from the

24  vehicle operations side, to try to get the lay of the land and

25  understand what they were going to do, and figure out how we

RUSSO - DIRECT EXAMINATION / VERHOEVEN

 1   were going to augment that security.

 2   Q.   Who did you meet with?

 3   A.   Met with Mr. Charles Burns, Mr. Curtis Lloyd.  Yeah.

 4   Those were the two primary interlocutors on the first trip up.

 5   Q.   Second trip --

 6   A.   Uh-huh.

 7   Q.   Can you just explain it in the interest of time.  Why did

 8   you go out there?  And who did you meet with?

 9   A.   That trip was Mr. Nocon and I.  And that was for the

10   actual launch of the vehicles.  And we worked primarily with

11   Mr. Burns, Mr. Lloyd, as well.  And Mr. Fullerton, Jeff

12   Fullerton.

13   Q.   And the third trip, when was that?

14   A.   Third trip would have been early November.  I would say

15   probably the 10th or so of November.

16   Q.   Who went with you then?

17   A.   Mr. Gicinto and I went on that trip.

18   Q.   And what was the purpose of that trip?

19   A.   To do a vulnerability assessment of ATG.  It was ATC at

20   the time, but either way.

21   Q.   Now, this letter from Mr. Jacobs' attorney, the sentence

22   continues, after referencing the trip to Pittsburgh, and says

23   purportedly what you did there.  What you, Gicinto, and Nocon

24   did there.

25   A.   Right.

RUSSO - DIRECT EXAMINATION / VERHOEVEN

1   Q.   It says, quote:

2          "And educated the team on using ephemeral

3      communications, non-attributable devices, and false

4      attorney-client privilege designations with the specific

5      intent of preventing the discovery of devices, documents,

6      and communication in anticipated litigation."

7      Do you see that?

8   A.   I do, sir.

9   Q.   Did you discuss ephemeral communications on any of your

10  Pittsburgh trips?

11  A.   No, sir.

12  Q.   What about Mr. Nocon or Mr. Gicinto?

13  A.   No, sir.  Certainly not in my presence.  But they

14  didn't -- they didn't have that discussion anyway.

15  Q.   Did you discuss use of non-attributable devices?

16  A.   No.

17  Q.   Same question for the others who went with you.

18  A.   Same answer.  None of us discussed it.

19  Q.   Did anyone talk to you about -- from Pittsburgh, about the

20  use of ephemeral communications or non-attributable devices?

21  A.   No, sir.

22  Q.   Are you aware of a practice within Uber to create or

23  overdesignate documents as attorney-client privilege by

24  inserting slugs on documents that say "attorney-client

25  privilege" even though they aren't?

RUSSO - DIRECT EXAMINATION / VERHOEVEN

1    A.    As a practice?  No, I've never, ever heard of that.

2    Q.    Well, just generally have you heard?

3    A.    Not even generally, no, sir.

4          I've attended two training classes on attorney-client

5    privilege.  And just the opposite was stressed.

6    Q.    Other than those two training classes, have you ever been

7    involved in designating something attorney-client privileged or

8    not?

9    A.    Yes, yes.

10   Q.    In what instances?

11   A.    When we're -- well, let me back up.

12         Another part of my function is to do support to internal

13   investigations of employee malfeasance, et cetera.  So

14   virtually all those documents, when I'm conducting an

15   investigation or writing up the findings, are attorney-client

16   privilege.

17   Q.    Have you ever spoken with Anthony Levandowski?

18   A.    No, I have not met him.

19   Q.    Did you ever have an assignment to look at malfeasance

20   related to the acquisition of Ottomotto?

21   A.    I'm sorry, say that again.  Have I ever --

22   Q.    Have you ever had any responsibilities with respect to an

23   investigation into malfeasance with regard to the acquisition

24   of Ottomotto?

25   A.    No.  No, we never did.

1    Q.    Have you ever been involved in any investigation with

2    respect to Waymo or Google?

3    A.    No.

4    Q.    Have you ever talked to anybody in the company about

5    Waymo?

6    A.    Talked to anybody in the company about Waymo?  Could you

7    be more specific, please.

8    Q.    I'm just asking generally.  Can you remember any instance

9    in which you talked to anybody in the company about Waymo?

10   A.    Waymo's a primary competitor of Uber in the autonomous

11   vehicle field, so, yes, we've had discussions about Waymo's

12   ability and, you know, where are they at and where are we at,

13   et cetera.

14   Q.    How is that relevant to Threat Ops' responsibilities?

15   A.    Not -- you didn't ask me if it was relevant to Threat Ops'

16   responsibilities.

17   Q.    Now I'm following up.

18   A.    You just asked if I had a conversation.

19   Q.    Following up.

20   A.    It's not directly relevant.

21   Q.    With whom --

22   A.    I'm sorry?

23   Q.    Go ahead, finish.

24   A.    No, no.  Please, your question, sir.

25   Q.    With whom did you have these conversations if it wasn't

1  within Threat Ops?

2  **A.**   I didn't say it wasn't within Threat Ops.  You asked me if

3  it was part of Threat Ops' responsibility to have these

4  questions or to have these conversations.

5  **Q.**   Yeah, the conversations within Threat Ops.

6  **A.**   Yes, sir.

7  **Q.**   With who?

8  **A.**   Nick Gicinto, Jake Nocon, Matt Henley.

9          **THE COURT:**  You've got about two more minutes.

10         **MR. VERHOEVEN:**  Thank you, Your Honor.

11 **BY MR. VERHOEVEN:**

12 **Q.**   Anyone else?

13 **A.**   Anna Chung is another.

14 **Q.**   Can you spell the last name?

15 **A.**   Sure.  C-h-u-n-g.

16 **Q.**   Anyone else?

17 **A.**   I'm sure there's been a few others, yes, sir.

18 **Q.**   Have you ever had any conversations with Travis Kalanick?

19 **A.**   No, sir.  I've never met him.

20 **Q.**   What about Ms. Padilla?

21 **A.**   Yes, sir, I have.

22 **Q.**   Have you ever had any conversations with Ms. Padilla about

23 Waymo?

24 **A.**   No.  No, sir.

25 **Q.**   Google?

**RUSSO - CROSS / GONZÁLEZ**

 1   A.   No, sir.

 2   Q.   The acquisition of Ottomotto?

 3   A.   No, sir.

 4           THE COURT:  All right.

 5   BY MR. VERHOEVEN:

 6   Q.   One last question.  Have you spoken to the U.S. Attorney?

 7   A.   No, sir, I have not.

 8           THE COURT:  Okay.  Mr. González.

 9                       CROSS-EXAMINATION

10   BY MR. GONZÁLEZ:

11   Q.   Sir, I want to start, on page 13.  You were asked some

12   questions about the paragraph.

13   A.   Uh-huh.

14   Q.   And one thing you were not asked, and I want to make sure

15   we don't forget it.  It also says that this is about your trip

16   to Pittsburgh?

17   A.   Yes, sir.

18   Q.   It says that the trip to Pittsburgh was also to talk about

19   false attorney-client designations.

20        Did you ever have any conversations with anybody about

21   that?

22   A.   I've never had a conversation with anybody, ever, about

23   that subject.

24   Q.   The presentation that you made on December 5th --

25   A.   Yes, sir.

**RUSSO - CROSS / GONZÁLEZ**

1   Q.   Did you even mention Waymo in that presentation?

2   A.   No, sir, I did not.

3   Q.   Or stealing trade secrets?

4   A.   No.

5   Q.   Did you say or suggest in any way that the SSG group had

6   set up those meetings between Mr. Levandowski and Mr. Kalanick?

7   A.   No, because it wasn't true.  It never happened.

8   Q.   The trips to Pittsburgh, you mentioned the first and the

9   second were about the release -- the launch of the vehicles.

10   Then you said that the third trip was about vulnerability

11   assessment.

12       And I just want you to educate the judge a little bit

13   about what you meant.  Can you tell him just a little bit about

14   what that means.

15   A.   Sure.  On that particular trip, we interviewed six

16   different individuals, from a range of disciplines, at the ATC

17   facility in Pittsburgh.

18       And what we were trying to get at is, from their

19   perspective, was there anything that they had a concern of in

20   terms of our own trade secrets being vulnerable to theft or

21   loss through inattention to detail or some other -- something

22   like that.

23       So we spoke -- part of it also was to educate ourselves on

24   the autonomous vehicle program so we could help better protect

25   it.

1       And so we spoke about -- we learned things about -- like,

2   we learned about things like source code and how important that

3   is; the fact that we had, at the time anyway -- and I honestly

4   don't know if it's still true, but at the time, anyway, we had

5   a single source supplier for the LiDAR, which was Velodyne.

6       A lot of people were concerned about the fact that we had

7   one supplier for that, and if something would interrupt that

8   supply chain, it could set back our efforts.

9       This was at about the same time.  And I honestly can't

10  remember if -- but this was at about the same time that the

11  company's Baidu and Ford Motors had combined to invest

12  $150 million into Velodyne.

13      So, again, it was seeing the vulnerability if two major

14  competitors had that kind of interest in our Velodyne supplier

15  of LiDAR, you know, could that potentially affect our research

16  and work down the road.

17      So these were the kinds of things we were talking about.

18      We were talking about good practices with, you know, the

19  employees there.  Are they attentive and have good practices

20  with their computers and things like that?  You know, are they

21  always attending to them.  Are they password protected.  Those

22  kinds of things as well.  Even the basic security stuff.

23  Q.   During that presentation, was there any reference

24  whatsoever to Waymo or Google?

25  A.   If I can clear -- it wasn't a presentation.  It was a

**RUSSO - CROSS / GONZÁLEZ**

1  conversation that we had with these guys.  But no, no reference

2  to those guys.

3  **Q.**   I appreciate that clarification.

4       You mentioned a vendor in Asia that you worked with.

5  **A.**   Uh-huh.

6  **Q.**   If you can tell us, just very briefly, did that vendor

7  have anything to do with ephemeral communications?

8  **A.**   I assume you mean I-OnAsia.  No.  No, they have not.

9           **MR. GONZÁLEZ:**  Thank you.  That's all I have, Your

10  Honor.

11       Oh, I'm sorry.

12  **BY MR. GONZÁLEZ:**

13  **Q.**   The presentation that you made, you said it was a 10- or

14  11-page PowerPoint.

15  **A.**   Yeah.

16  **Q.**   You did try to find that, to bring it to court?

17  **A.**   Yes, sir, I did.

18  **Q.**   You didn't find it?

19  **A.**   No, sir.

20  **Q.**   At the time that you deleted that document, did you think

21  it was important to preserve it?

22  **A.**   No.  Again, like I mentioned -- and I'm happy to

23  reiterate -- it wasn't part of a program.  It wasn't part of a

24  course curriculum.  It was kind of a one-off, hey, can you give

25  a presentation to once again stress the importance of good

1    information security.

2         So we put it together for the -- you know, the 10-minute

3    span at the end of the biweekly meeting.  That's all there was

4    to it.

5              MR. GONZÁLEZ:  Thank you.  That's all I have.

6              THE COURT:  All right.  You may step down.  Thank

7    you, sir.

8              THE WITNESS:  Yes, sir.

9              THE COURT:  You're subject to more testimony later

10   on.  But for now, that will do.

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Thank you.

13        (Witness steps down.)

14             THE COURT:  I think I owe it to First Amendment

15   lawyers -- raise your hands again if you're still here.

16        Okay.  What we're going to do is take a 15-minute break.

17   And when we come back we're going to hear your arguments about

18   closing the courtroom during the trial.

19        Now, the trial probably isn't going to happen on schedule

20   on account of this problem that we've been discussing this

21   morning.

22        But we're going to go ahead and deal with your First

23   Amendment issue anyway.  So when we come back in 15 minutes,

24   we'll do that.

25        I've got a few other things -- I want to make sure we have

PROCEEDINGS

1   the -- that Uber supplies the Court and counsel with a list of

2   all of these vendors who had anything to do with

3   non-attributable devices or had anything to do with ephemeral

4   anything.

5        I want you to also tell the government lawyers that I am

6   giving them until 5 o'clock today if they object to me making

7   their letter public, and to tell me what the basis is of their

8   objection.  Grand jury is not good enough.  Really, I don't see

9   any basis.

10       I want Uber to supply all documents in the entire company

11  that have anything to do with ephemeral, anything to do with

12  non-attributable devices, or anything to do with using

13  contrived attorney-client privilege.  That's a tall item, but

14  you've got to search.  We're going to find out what was put in

15  writing on that, that still exists.

16       Okay.  We're going to take a 15-minute break.

17       (Whereupon there was a recess in the proceedings

18        from 11:34 a.m. until 11:50 a.m.)

19           THE COURT:  Please be seated.

20       Before we go on, we have to get more to the bottom of this

21  shadow system that Uber set up, and it may turn out to be

22  nothing, but it may turn out to be an important way to conceal

23  evidence from the U.S. District Court.  So tomorrow we will

24  continue the testimony with Angela Padilla, and anybody else

25  that each side wants to subpoena for the hearing, and probably

**PROCEEDINGS**

1    we will use the trial time that's been set aside to hear more

2    witnesses right here in open court.

3         So I'm going to direct my -- unless I hear an objection,

4    I'm going to -- I'll hear you out on your objection.  I'm going

5    to go direct my Clerk to go cancel the jury for tomorrow so

6    those good people won't come from all over the district for a

7    trial that is not going to occur.

8         Any objection?

9             **MR. GONZÁLEZ:**  Your Honor, I appreciate where the

10   Court is coming from.  I will simply note there isn't -- I

11   realize there is a lot of smoke, I get that.

12        I realize, your Honor, you may want to hear from another

13   witness, but given what you've already heard, all of this was

14   caused by a demand letter from a plaintiff's lawyer seeking

15   money.  You've now heard from the, quote/unquote, plaintiff

16   himself.  He has no knowledge whatsoever of anything that

17   anybody allegedly took from Waymo or from Google, there is no

18   "there" there.  You've heard from the second witness.  All this

19   business about the trip to Pittsburgh, there is nothing there

20   either.

21        Yes, it is true, your Honor, there are some devices that

22   some people use for very legitimate reasons that involve

23   safety.  There isn't a shred of evidence that there is anything

24   that that has to do with this case.

25            **THE COURT:**  There is a shred of evidence.  We had the

**PROCEEDINGS**

1   first guy up here testifying that that's the way he understood

2   that it worked.  He didn't have direct firsthand knowledge,

3   maybe.  But he worked in that group.  That's good enough for us

4   to pause and go take discovery and bring witnesses in to find

5   out what was going on.

6       I repeat again -- no, I'm not going to repeat again.  I'm

7   just going to say to you:  I would look like a fool if Uber

8   were to fool me on this.  You told me many times there were --

9   none of these documents ever hit the server.

10          MR. GONZÁLEZ:  We stand by that.

11          THE COURT:  Okay.  Well, it turns out the server is

12   only for the dummies, and that the real stuff goes on, on the

13   shadow system.

14       So now you deny that, but that's what -- that's one way to

15   read this record so far.  And it would not be fair to the other

16   side to not give them a chance -- you should have come clean

17   with this long ago.  He should have given me that letter back

18   in May so they could have investigated it.

19       Instead, now that we're on the eve of trial, the

20   Government -- the Government has enough faith in it to have

21   provided it.  I would just be wrong, it would be unfair not to

22   give them a chance to follow up on this and see if there is

23   anything there.

24          MR. GONZÁLEZ:  Your Honor, just one other point --

25          THE COURT:  There is enough to -- under oath for me

1    to believe there is a 50/50 chance this is going to prove out

2    to be something very bad for Uber.  There is a 50/50 chance

3    it's going to turn out to be a dry hole.  But we've got to find

4    out.

5            MR. GONZÁLEZ:  Fair enough, your Honor.  Let me just

6    make a couple things clear.

7        Number one, and you will learn this and I want you to know

8    it now.  This letter that we're discussing, this demand letter

9    from this lawyer, nobody on this defense team knew about that

10   letter before we got your order and the order and the letter

11   from the U.S. Attorney.  I just want that to be clear to your

12   Honor.

13           THE COURT:  You're talking about the outside counsel.

14   Obviously, Angela Padilla knew about it.

15           MR. GONZÁLEZ:  Understood, your Honor.  I'm just -- I

16   want this to be clear to the Court; that the Defense team in

17   this case is not the team of lawyers that investigated that

18   letter.  There is another firm that was engaged for that

19   purpose.  I just want you to know that.  That's all.

20           THE COURT:  All right.  Well, I appreciate being

21   informed that you didn't know.  But somebody at Uber knew.  So

22   I -- I'm still -- that's not -- it helps me have more

23   confidence in your team, but it doesn't -- it doesn't solve the

24   Uber problem here.

25           MR. GONZÁLEZ:  Understood.  And, your Honor, I want

1    this to be clear as well.  And I've communicated this to the

2    other side and to the Special Master.  And I want to say it to

3    you.  If there is anybody else they want us to bring, just tell

4    us who it is and we will put them on the stand.  We don't have

5    anything to hide other than --

6            THE COURT:  Well, let's get the documents.  I want to

7    ask you a question.  Back in the day when I was a practicing

8    lawyer, if -- if I was supposed to produce documents, it was

9    Old Bill who went to the site, meaning me.  And I read the

10   documents and I made sure the client came clean, even when the

11   bad documents had to be produced.

12       I'm getting the idea that your firms don't do that anymore

13   and that you turn it all over to somebody like Stroz or some --

14   some hired gun who is going to go in there and figure out

15   clever ways to avoid producing the bad stuff.

16       Is that the way it works now?

17           MR. GONZÁLEZ:  No.  And let me get to one sentence

18   here that's important.  So you just gave me the opportunity to

19   say what I wanted to say.

20       There are search terms and a protocol that the two sides

21   negotiated at the outset of the case.  That is what we used,

22   your Honor.

23           THE COURT:  All right.  Okay.

24           MR. GONZÁLEZ:  There has not been -- I just wanted to

25   be clear --

1      THE COURT:  Again, that's only going to go to the

2  server, and the server turns out to be for dummies.  That's

3  where -- that's where the stuff that doesn't matter shows up.

4      But the stuff that did matter, according to one witness,

5  is going to be in the Wickr evaporate file.

6      MR. GONZÁLEZ:  And, your Honor, last thing and I'll

7  sit down.  It's important.

8      There is not bit -- not one bit of admissible jury

9  evidence from that witness that that is true, your Honor.  I'm

10  sorry.  There is not one bit.  It's speculation.

11      THE COURT:  There is some admissible evidence.  He --

12  he can testify that they had the ephemeral system up and

13  running.  He's got enough information to know that.  He may not

14  be able to say what exactly happened in Pittsburgh, but he may

15  be able to say, that contrary to Russo, that Russo told him

16  that's what happened.

17      So I -- so it's true a lot of what he said was

18  speculation, but other things qualify as admissible.

19      I think what's going to happen, when we ever do get to

20  trial, is that you're going to stand up and say:  Server,

21  server, server, no hits.

22      And he's going to stand up and say:  Surreptitious,

23  surreptitious email system that wasn't on the server.

24      And -- and there -- and you're going to say:  Well, where

25  is the proof that any of those trade secrets ever even hit the

**PROCEEDINGS**

1  secret system?

2      And Mr. Verhoeven is going to say:  Yeah, that's because

3  they evaporated after six minutes.

4      And that's going to hurt your case because any company

5  that would set up such a surreptitious system, it just is as

6  suspicious as can be.  When the whole point is to -- to avoid

7  leaving a, quote, paper trail.  I don't know how you're ever

8  going to -- how you're going to get around that one.  But you

9  being a good lawyer, you'll find a way.

10      But it's -- I'm giving this side a chance to prove that

11  there is more to it than what I've heard already, which is

12  disturbing enough.

13      Okay.  But I'm going to -- I'm calling off the jury venire

14  for tomorrow.  There is no way we can go to trial on

15  December 4th until we get more to the bottom of this.  So I'm

16  going to direct my Clerk to go tell the jury office so those

17  good people won't be wasting their time tomorrow.

18          **MR. GONZÁLEZ:**  Thank you, your Honor.

19          **THE COURT:**  Thank you.

20          **MR. VERHOEVEN:**  Just legit, a couple of follow-ups.

21  You ordered the other side to produce some things, and I think

22  you said all documents related to non-attributable devices.

23      I just want to make sure or ask you to order them to

24  provide an inventory of all of these devices and who had them

25  across the country.  That would be very useful for us.

1    **THE COURT:**  I thought I -- didn't I say that?  I did

2    say that for the Wickr accounts.  All right.  But I'm going

3    to -- who had these devices, we'll say from January 1 of 2016

4    forward.  That would be two years' worth.

5    **MR. VERHOEVEN:**  Yes, but the discussions between

6    Kalanick and Levandowski began in summer of 2015.

7    **THE COURT:**  All right.  Summer of 2015 forward.

8    We'll say June 21.

9    Yes.

10    **MR. GONZÁLEZ:**  I'm sorry.  That's just not accurate.

11    There were no discussions in the summer of 2015.  And let me

12    say this --

13    **THE COURT:**  Well, then when do you say they began?

14    **MR. GONZÁLEZ:**  They were much later than that, your

15    Honor.

16    **MS. DUNN:**  I can --

17    **THE COURT:**  Tell me when they were.  I am being

18    reasonable.

19    **MS. DUNN:**  Your Honor, the record evidence is that

20    the conversations between Levandowski and Kalanick did not

21    start until December.  And the record evidence --

22    **THE COURT:**  Well, the record evidence could be phony

23    record evidence.  What is the -- what is the truth?

24    **MS. DUNN:**  The truth is late December.

25    **THE COURT:**  All right.  I'm going to say --

PROCEEDINGS

1          **MR. VERHOEVEN:**  Your Honor, I'm sorry.

2    Mr. Levandowski --

3          **THE COURT:**  I'm not going to do it.  I'm not going

4    to -- see, you've created a hornet's nest by asking for too

5    much.

6       It's going to be December 1 forward.  If it turns out that

7    they have lied to me, then I'm going to do something bad.  But

8    December 1, 2015 forward.

9          **MR. GONZÁLEZ:**  Thank you, your Honor.

10         **MR. VERHOEVEN:**  Your Honor, additionally this whole

11   thing, we're trying to put sense of it.  We've only known about

12   it for a few days.

13      So they have testified about Wickr.  We had some -- we

14   went back and searched around and we found another -- another

15   self-destruction app that we think they might have used as

16   well.

17         **THE COURT:**  What's that one called?

18         **MR. VERHOEVEN:**  It's called Telegram.  And so what we

19   would like is the same order apply to Telegram.  If you look at

20   the website, it's self-destructing messages and --

21         **THE COURT:**  What's wrong with turning that over, too?

22         **MR. GONZÁLEZ:**  Okay, here we go.  Two things.

23      Number one, this is nothing new.  Telegram came up in

24   deposition, and they asked our witnesses about Telegram.  So

25   why now are we reopening discovery about something that they

**PROCEEDINGS**

 1  knew about and questioned our people about?

 2          THE COURT:  All right.  Why -- I didn't know that you

 3  already knew about this.

 4          MR. VERHOEVEN:  Again, your Honor, we had no

 5  knowledge that -- we hadn't discovered anything.  They hadn't

 6  produced anything from these secret op spy agency that they

 7  have within tucked inside of Uber.  And so we didn't have --

 8          THE COURT:  Look, I'm going to make it broader.  I'm

 9  going to say Wickr or any other self-deleting communication

10  system.

11          MR. GONZÁLEZ:  Your Honor --

12          THE COURT:  Instagram, whatever.  Whatever it is.

13  All of those would be used for -- have I got the wrong one?

14  What is the right one?

15          MR. VERHOEVEN:  It's called Telegram.

16          THE COURT:  Telegram.  What is the other one?  I

17  thought Instagram is the same thing.

18          MR. VERHOEVEN:  Wickr.

19          THE COURT:  Isn't there another one?  Snapchat,

20  that's the one.  Any of those.  Any of those.  It ought to be

21  easy enough to find them.

22          MR. GONZÁLEZ:  Your Honor --

23          THE COURT:  You're just making the impression that

24  this is a total cover up.  You know, you, in this position,

25  you -- you know, your client is in a bad way now because this

 1   has happened, and you made me upset.

 2       And you should be the one saying:  We're going to open our

 3   doors.  We are going to get all the way to the bottom of this.

 4   We're going to show you, Judge, that this is false.  And

 5   instead, you're fighting over every little thing.

 6       So then I'm going to worry:  Well, okay.  In that case the

 7   guy used Telegram, but he wouldn't produce those documents.

 8           **MR. GONZÁLEZ:**  So, your Honor, here is the issue I

 9   want to raise.  It's not that.

10           **THE COURT:**  What is it?

11           **MR. GONZÁLEZ:**  We should be able to find out from

12   them whether they used any of this stuff, because they

13   shouldn't be allowed to come into court and say somehow we're

14   evil because we use it, when I'll bet they probably use it,

15   too.  Why can't they find out from them whether they used the

16   stuff.

17           **THE COURT:**  All right.  Did you use any of these,

18   your company?

19           **MR. VERHOEVEN:**  I don't know off the top of my head,

20   your Honor.

21           **THE COURT:**  You find out and you report.

22           **MR. VERHOEVEN:**  Okay.

23           **THE COURT:**  And if your company -- if your company

24   turned out to have evaporated documents just as much as they

25   did, then the jury is going to know that too.

PROCEEDINGS

```
 1              MR. VERHOEVEN:  Okay.

 2              MR. GONZÁLEZ:  Thank you, your Honor.

 3              THE COURT:  All right.

 4         All right.  So tomorrow morning Ms. Padilla will start

 5    testifying at 8:00 a.m.  And then if you want to subpoena or

 6    bring some other witness, we can use the time tomorrow.  So if

 7    you -- you know, we're going to just keep going.

 8              This is without prejudice to depositions that I will

 9    eventually allow you to -- I think you ought to come up with a

10    plan, a reasonable plan.  Not one where you depose 25 people,

11    or even 20, but a reasonable plan for getting through this

12    quickly enough that we can decide what's there.  All right?

13              MR. VERHOEVEN:  May I ask, does your Honor want -- I

14    mean, we -- there are several witnesses that we could ask the

15    other side to bring tomorrow, but we wouldn't have the benefit

16    of document discovery before that.  Would you like us to do so?

17    We can do so.

18              THE COURT:  Sometimes I think it's better to do it

19    before they get woodshedded.

20              MR. VERHOEVEN:  Okay.

21              THE COURT:  So it's up to you.  If you want to do it,

22    okay.  I'm not -- I'm not ordering you to.  I'm saying we will

23    probably have the time to examine at least one more witness.

24              MR. VERHOEVEN:  Okay.

25              THE COURT:  If you want to do it, okay.  If you
```

 1    don't, then we'll use the time for something else.

 2              MR. VERHOEVEN:  We'll do it, your Honor.

 3              THE COURT:  All right.

 4              MR. GONZÁLEZ:  Your Honor, you had asked for the

 5    unredacted letter.

 6              THE COURT:  Yes.

 7              MR. GONZÁLEZ:  I would like to hand it to the Court.

 8              THE COURT:  Fine.

 9         (Whereupon document was tendered to the Court.)

10              THE COURT:  Have you ever given the other side a

11    copy?

12              MR. GONZÁLEZ:  I have not given the other side the

13    unredacted.

14              MR. VERHOEVEN:  We don't have a copy.

15              MR. GONZÁLEZ:  I have not.  That's true.  They came

16    to our office and they were allowed to review it, but they do

17    not have it.  That, in our view, would defeat the purpose of

18    the redactions.

19              THE COURT:  All right.  I will review this, and I'll

20    tell you what you've got to unredact.

21              MR. GONZÁLEZ:  Fair enough, your Honor.

22              MR. VERHOEVEN:  Your Honor, just a point of fairness,

23    we don't have an opportunity to even respond because we haven't

24    even seen what's in there.

25         As far as I can tell, they are not saying it's

**PROCEEDINGS**

1  attorney-client privilege.  They are saying it's protecting

2  people from being injured --

3           THE COURT:  I understand enough about the case to

4  make a -- probably, I'm going to let most of this be shown

5  publicly.  But I've got to read it first.  Okay?

6       Please have a seat.

7       All right.  Now, where are the First Amendment lawyers?

8  Okay.  Let's hear from the Bill of Rights.

9           MR. ZANSBERG:  Good afternoon, your Honor.  I am

10 Steve Zansberg.  I represent 11 media companies who took up

11 your Honor's invitation to respond to Waymo's motion to close

12 the then-impending trial on September 26th.

13      And as far as I know on the intervention motion, I don't

14 believe anyone has opposed it --

15          THE COURT:  I'm going to let you argue this.  Are you

16 objecting to them arguing?  Here, I invited them to come.

17          MS. ROBERTS:  No, your Honor.

18          THE COURT:  Let's go to the merits.

19          MR. ZANSBERG:  All right.  On the merits, your Honor

20 has left no doubt about this Court's commitment to openness,

21 both in this morning and throughout.  And on the March 29th

22 hearing, your Honor said that 99 percent or 90 percent of the

23 trial will be open, and we have no concerns about that.

24      The concerns are -- the motion that Waymo filed, argued

25 that there was a common-law right of access to these

1  proceedings.  And we felt the need to correct the parties that

2  the First Amendment guarantees the public the right to attend

3  these proceedings.

4          THE COURT:  Are you sure about that now?  I think my

5  memory of the *Kamakana*.  Do you remember that case?

6          MR. ZANSBERG:  Which one?

7          THE COURT:  The *Kamakana* case in the Ninth Circuit.

8          MR. ZANSBERG:  Yes.

9          THE COURT:  That's entirely based on the common law.

10  It's not based on the First Amendment.

11          MR. ZANSBERG:  Right.

12          THE COURT:  That is the access of the public.  And

13  the ability of the public, all those people out there, they

14  have the right to see what's going on in our court system

15  because we belong, not to these law firms and not to these

16  parties.  And we're not JAMS, we belong to the people.  But

17  it's a common-law right.  That's the way the *Kamakana* case,

18  Judge Betty Fletcher explained it.  So --

19          MR. ZANSBERG:  And subsequent to that --

20          THE COURT:  So I don't know why we have to get off to

21  the First Amendment.

22          MR. ZANSBERG:  We do, because subsequent to that

23  decision, the Ninth Circuit issued a decision in *Courthouse*

24  *News versus Planet* in which it held that the First Amendment

25  guaranteed the right of access to both judicial records and

**PROCEEDINGS**

 1   judicial proceedings, including civil cases.

 2           THE COURT:  Okay.  I don't know that case.  Explain

 3   it to me.

 4           MR. ZANSBERG:  So it was a case brought by Courthouse

 5   News for access to instantaneous contemporaneous filings, civil

 6   filings in the courts.  And the Ninth Circuit held that the

 7   First Amendment, as I said, applies not only to criminal

 8   proceedings, as the U.S. Supreme Court has held, but here,

 9   within the Ninth Circuit, it applies as well to all civil

10   cases, civil trials, that was specifically part of the holding,

11   and civil court filings.

12       And so by virtue of that more recent decision, just in

13   2016 I believe, it is now established and binding authority

14   that the First Amendment is at play.

15           THE COURT:  All right.  But does it always mean that

16   you get access?

17           MR. ZANSBERG:  No.  No, of course not.

18           THE COURT:  How do we decide?

19           MR. ZANSBERG:  We decide by applying the First

20   Amendment standard, which requires a showing by any party.  And

21   the parties are generally in agreement that there is a very

22   strong presumption of access, whether under the common law, as

23   argued by Waymo, or under the First Amendment.  It is not

24   absolute.  Of course, it can be closed.  Courtrooms can be

25   closed in criminal cases, as well as civil cases.

**PROCEEDINGS**

1    So there has to be a showing that the burden.  It's really

2   Waymo's motion, or Lyft has sought to intervene to support that

3   motion, to close the courtroom during the trial eventually for

4   certain limited portions.  And their burden is to satisfy your

5   Honor through evidence and through your Honor's ability to make

6   judicial findings, as the First Amendment requires, of a

7   substantial probability of harm to a compelling state interest,

8   obviously narrow tailoring, and that there is no less

9   restrictive means.

10    As your Honor is probably very familiar with from the

11   criminal body of law, precedent, et cetera, that there has to

12   be a compelling or an interest of the highest order that will

13   be effectively protected through closure that would not be

14   protected without closure and that there is no less restrictive

15   means.

16    And so Waymo has argued that for four categories of

17   information to be presented during the trial, the courtroom

18   should be cleared of the public.

19    For trade secrets, the eight secrets remaining to be

20   tried.

21    For the negotiations and discussions of seven documents on

22   the -- I guess, on Uber's Exhibit List dealing with

23   communications and negotiations between Waymo and Lyft and

24   Waymo and Ford and five other companies.

25    And then Waymo's financial projections, its launch plans

1    and its internal assessments of profitability, what-have-you.

2         And then lastly some discrete employment information about

3    employees, their compensation and things of that sort.

4         And in broad strokes within those broad categories there

5    may well be information by which Waymo could satisfy that very

6    stringent First Amendment strict scrutiny standard.  They

7    haven't done so yet, is our position.  And they need to do so

8    in order for the Court to abide by the First Amendment in order

9    to make the requisite findings:  Substantial harm, compelling

10   interest, narrowly tailored, no less restrictive alternative.

11        And as I said, while my clients have no concerns about

12   your Honor's commitment to doing that, I think there is good

13   reason already established in the record to not take at face

14   value the parties' representations to the Court about what is

15   confidential and what is not.  The Court has previously

16   commented on the over-redaction of documents that have been

17   filed.

18        Last week Magistrate Judge Jacqueline Scott Corley issued

19   a ruling, it's Document Number 2237, in which she categorically

20   rejected 23 separate documents in their entirety that the

21   parties had asked to be maintained under seal, finding in 21 of

22   those cases that there was no showing whatsoever of any need

23   for confidentiality in any portion of those documents.  And in

24   certain instances she found that there were -- not that there

25   wasn't any such showing, but that there was no confidential

1   information, went even farther.

2        All we're saying -- and, really, all we are saying in

3   response to your Honor's invitation -- is that we wanted to

4   remind first the parties and the Court of the applicable test

5   and that before any portion of the future trial in this case is

6   closed to the public; that the requisite showing has been made

7   and that your Honor enters the findings that are required,

8   which requires a consideration and a rejection of alternative

9   means to protect the compelling state interest.

10       And on that last score, and then I will close, the parties

11  have already acknowledged that there are alternative means in

12  some cases, not so much with the trade secrets themselves,

13  though they can be -- your Honor has issued orders naming them,

14  numbering them and citing from the expert's report in which the

15  number has been referred to; but with respect to employment

16  compensation and bonuses and even the two Lyft documents.

17       The parties in their own pleadings in response to our

18  motion to intervene have acknowledged that there are means by

19  which those topics can be discussed without clearing the

20  courtroom.  And that, in our mind, is the least restrictive

21  means that must be first found to be ineffective before we

22  allow that information to be presented and the public sent from

23  this courtroom.

24       So we're just asking that, lastly, to the extent that the

25  Court does allow the closure of any portion of the trial before

 1   making the requisite findings, that the transcript of the

 2   closed proceeding be released expeditiously in a redacted form,

 3   which your Honor has already done in a previous proceeding.

 4       So that's all I have to say.

 5           THE COURT:  Don't you agree that if you have a

 6   witness testifying about the trade secret and why it's so

 7   valuable and that -- and describing what the trade secret

 8   actually is, don't you agree that has to -- we have to do that

 9   in a closed courtroom?

10       MR. ZANSBERG:  I agree that if -- if the showing has

11   been made that the information is actually a trade secret or

12   that it couldn't be actionable and that it hasn't been

13   previously disclosed, that it could well --

14           THE COURT:  But that's for the jury to decide.  If I

15   were to just blurt it out, then everyone would know and it

16   would no longer be a trade secret.

17       MR. ZANSBERG:  Right.  And the jury can certainly be

18   privy to the trade secrets where the public cannot.  And there

19   are alternate means that have been used in other proceedings

20   where the jury is given the actual trade secret and the

21   witnesses discuss them in more generalized terms.

22           THE COURT:  Well, that's kind of what we've got going

23   here.  But there will be moments where the witnesses have got

24   to explain why it's a trade secret.  You know, why, when you

25   slice the bread loaf in a certain way that nobody else has

1   thought of that yet, and that's our special way to do it, they

2   have to explain it.

3       So I don't see -- you've got to give them that flexibility

4   or explain why it's not a trade secret.

5           **MR. ZANSBERG:**  Right.  And my clients are not

6   demanding that the courtroom never be closed for -- as I said,

7   your Honor has previously stated that either 99 or 90 percent

8   it anticipates that this is a public proceeding.  That doesn't

9   mean 100 percent of it will be open.

10      We're asking that prior to any closure, that the requisite

11  findings be made and that the closure be as narrowly --

12          **THE COURT:**  I don't know if I can do that every time,

13  but I will think about your request.

14      Okay.  What does Waymo have to say on this subject?

15          **MS. ROBERTS:**  Well, your Honor, I think -- I think

16  we're in agreement that the trial should be public and only a

17  very narrow -- narrow portions should be closed.  And that's

18  all we are asking for.  And there are four categories we're

19  seeking to have the courtroom closed for, and for the various

20  different categories the availability of less restrictive means

21  are more or less available.

22      So the first off, of course, is the trade secrets that are

23  at issue in this case.  There is no way to present this case,

24  your Honor, without disclosing the trade secrets to the jury.

25  And so for those portions where the actual substance of the

**PROCEEDINGS**

1   trade secret is discussed, we need to have the courtroom

2   closed.   Otherwise, there is really no point in -- the law does

3   not provide much protection for trade secrets.

4           THE COURT:  I got that one.   Okay.

5           MS. ROBERTS:  So the other -- other three -- and then

6   I should add that we will endeavor to try to group those

7   portions of testimony that are going to discuss --

8           THE COURT:  How about your other three?

9           MS. ROBERTS:  The other three, the second one are

10  deal terms for various different deals.   There are seven deals

11  and potential deals that Google was a party to.   And then there

12  is the Lyft partnership agreement --

13          THE COURT:  But there has been all kinds of times

14  whenever Uber wanted to keep something like that secret and

15  Mr. Verhoeven couldn't wait to let the public know about it.

16  He couldn't wait to attach it to some filing, and then he

17  blurted it all out right here in court.   And I happened to

18  think it was okay.

19      But don't I get to say:   Look, too bad for you.   Waymo

20  can't -- see, I want the public to see how hypocritical this

21  is.   Waymo wants all the dirt on Uber to come out, but no, no,

22  no, they don't want any dirt coming out on Waymo.   Yes.   No.

23      Now, I'm going to -- I'll just let you know.   I'm going to

24  apply the Waymo standard that you have applied to Uber in

25  deciding whether or not the Lyft deal should be made public.

 1   Right now, I think it ought to be made public.

 2       I'm going to hear the Lyft lawyer in a minute, but tons of

 3   stuff like this Mr. Verhoeven has just handed out, basically in

 4   pamphlet form to the press, so that they can write it all up

 5   and make fun of Uber.

 6       So I feel like you're trying to have it both ways.

 7           MS. ROBERTS:  Well, I'm not sure I agree with that

 8   characterization, your Honor.  I certainly wouldn't

 9   characterize this as "dirt," particularly with the deal

10   terms --

11           THE COURT:  It's not dirt, but it's deals.  It's

12   deals.  And you get into some of the deals that they made.

13           MS. ROBERTS:  And so, your Honor, just to be clear,

14   for some of these deals, they are internal Google

15   communications about terms.  So it's not even the final deal

16   sheet that Uber has put on their Exhibit List.  So if that were

17   made public, then other parties who would potentially negotiate

18   with Uber or Waymo would have insight into their deals.

19           THE COURT:  Yeah.  That was the argument they made

20   and we overruled that.

21       All right.  I will think about it one by one.

22       Now, what's the thing about, you want to have witnesses

23   come forward, but you don't want the world to know how many

24   hundreds of millions of dollars they make a year.  Is that it?

25           MS. ROBERTS:  Your Honor, we don't actually -- we

1   don't have any intention of introducing the documents on the

2   Exhibit List that include employee compensation.

3         **THE COURT:**  You don't.

4         **MS. ROBERTS:**  We're talking --

5         **THE COURT:**  But they do.  They want to show how

6   biased they are because they get paid $100 million a year, or

7   whatever the number is.  I'm making that up.

8        So, to me, that's a legitimate use of what their salary

9   is, to show how biased they are.  If it's your witness.

10        **MS. ROBERTS:**  Your Honor, there is -- there is

11   authority for keeping the private HR, if you will, information

12   about other -- other employees confidential.

13        And I don't know, your Honor, how they are going to

14   present it, if they are just going to be examining those

15   witnesses who are on the stand or if there is also

16   documentation that provides -- provides summaries of employees

17   who are not at all related to this case.

18         **THE COURT:**  I agree with you on this.  Nobody's home

19   address is going to be put out there.  Nobody's telephone

20   number is going to -- or Social Security number.  And I don't

21   believe that Uber lawyers would try such a trick.  So that

22   would be a non-starter.

23        But in terms of what their compensation is and what

24   their -- what somebody's compensation is, I think they --

25   that's an open book whenever they are up there testifying and

1   pretending to the jury that they have no bias, then they come

2   back, the other side says:  Yeah, you got a bias.  You get paid

3   X million dollars a year.  That's legit.

4           MS. ROBERTS:  And, your Honor, the request is not

5   limited to those people who are going to take the stand.  I

6   have in mind at least one document that lists all the employees

7   on the Chauffeur team, a good portion of which are not

8   testifying in this case, and many have not been deposed.  And

9   their private bonus and compensation information really has no

10  business.

11          THE COURT:  Well, maybe not.  I will have to figure

12  that one out when we get there.

13      But you would have to have -- you would have to have a

14  legitimate -- maybe that guy gets redacted from the list.  You

15  would have to have some good reason for laying that kind of

16  information out.

17      Okay.  What's your last category?

18          MS. ROBERTS:  The last category is the financial

19  information and business plans.  And we laid out -- we got more

20  specific in our supplemental brief that we filed yesterday,

21  your Honor.  We intend to introduce Waymo's future profit

22  projections, details about launch plans, assessments of

23  potential avenues for commercialization.

24          THE COURT:  This is Waymo?

25          MS. ROBERTS:  This is Waymo's information, yes.

**PROCEEDINGS**

1        Internal assessments of competitors.  And there is

2    authority that supports keeping that confidential because that

3    would give competitors a competitive edge if they had insight

4    into our financial information and business strategies.

5        And, again, your Honor --

6            THE COURT:  Maybe.  Maybe.

7        Is this stale or is this something that is active right

8    this very minute and competitors would love to know this?  Or

9    is it a year old at this point?

10           MS. ROBERTS:  I believe it's active.

11           THE COURT:  Okay.  Well, if it is active, you may

12   have a good point.

13           MS. ROBERTS:  And just to be clear, at least some of

14   it is.  And so we certainly would like to protect that, the

15   active information.

16           THE COURT:  Well, let's see.  You know, everything

17   changes in this.  So anything that's a year old is probably

18   stale by now.

19       Okay.  Let's hear from the Lyft lawyer.

20           MS. LUEDTKE:  Thank you, Your Honor.  Carolyn Luedtke

21   on behalf of Lyft.

22       So Lyft filed a motion to intervene based on the --

23           THE COURT:  I'm going to allow your motion to

24   intervene.

25           MS. LUEDTKE:  Thank you, your Honor.

1     -- on the narrow point of supporting closing the courtroom

2     just for the discussion, if it ever arose, of the Lyft-Waymo

3     collaboration agreements, which is Exhibits 3550 and 4987,

4     which I understand is on the final Exhibit List.

5          And we've submitted a declaration from Mr. Matheson, who

6     is an executive at Lyft who has provided testimony about the

7     competitive harm that could befall Lyft if the terms of this

8     collaboration are made public.

9          Right now the existence of the collaboration is known.  It

10    was entered into earlier this year, but no details about the

11    collaboration have been made public.  And, in fact, most of the

12    details about the collaboration are still confidential to a

13    very small team within Lyft.  Lyft has taken measures to keep

14    this sensitive information quite confidential and confined to a

15    small number of people.

16         Lyft's concern, as you've heard this morning, Uber is

17    engaged in a lot of competitive intelligence.  Lyft is

18    concerned that they are trying to engage in some competitive

19    intelligence here about what Lyft is doing in the U.S. market.

20         I don't understand how it's --

21              THE COURT:  Well, your deal was with -- who was your

22    deal with?

23              MS. LUEDTKE:  Our deal is with Waymo.  Lyft and Waymo

24    are in collaboration.  And they -- they sent a subpoena to

25    Lyft.  Lyft successfully quashed that subpoena with Magistrate

1   Judge Corley, who found that the information -- broad swath of

2   information they sought from Lyft was not relevant and was

3   highly sensitive.  She did allow the production of some limited

4   documents from Waymo, so that's how they got the agreement was

5   from Waymo.  She did order that it needed to be produced

6   Attorneys' Eyes Only, recognizing the sensitivity of the

7   information, particularly in the hands of Lyft's competitor

8   Uber.

9        Right now the filings before the Court, both Uber and

10  Waymo, say neither of them intend to use the information.  So

11  this may all be academic.  I haven't any understanding as to

12  how it's relevant to this case, but my client --

13          THE COURT:  You will be the first lawyer in this case

14  who is batting 100 percent then, because you will win.  They

15  want -- both sides are giving up then.

16          MS. LUEDTKE:  That would be delightful if we would

17  both agree not to use it, but my understanding is nobody can

18  agree to that.

19          THE COURT:  Here.  Can we have an agreement that

20  nobody will mention Lyft in front of the jury or the public

21  without my prior okay?  Then we can deal with it then.

22          MS. ROBERTS:  Yes, your Honor.

23          MR. VERHOEVEN:  Yes, your Honor.

24          MR. CARMODY:  We certainly can mention it, your

25  Honor.  We don't have to get into the gory details of a deal,

**PROCEEDINGS**

1   but the fact of the matter is this case, as you well recognize,

2   is about competition in part, and it's about the other side,

3   Waymo, trying to squash Uber.  That is what part and parcel

4   this case is about.

5            THE COURT:  Well, that -- tell me what you are going

6   to say in your opening statement.

7            MR. CARMODY:  That they are doing -- that they have

8   done a deal with Lyft.

9            THE COURT:  All right.

10            MR. CARMODY:  They don't have to --

11            THE COURT:  All right.  That's public already.

12            MR. CARMODY:  That's -- absolutely.

13            THE COURT:  All right.  So you can say that much in

14   your opening statement.

15            MR. CARMODY:  Yes.

16            THE COURT:  But before you try to elicit more

17   testimony or put in documents, you've got to bring it up with

18   me.

19            MR. CARMODY:  That's fine.

20            THE COURT:  Okay.

21            MS. LUEDTKE:  And, your Honor, could we get notice

22   and dash over?

23            THE COURT:  Yes.  You good lawyers notify Lyft's

24   counsel 24 hours before.  Then if you happen to be somewhere,

25   you know, inconvenient --

PROCEEDINGS

```
 1            MS. LUEDTKE:  One of my colleagues can come.

 2            THE COURT:  -- somebody else will have to show up for

 3   you.

 4            MS. LUEDTKE:  Thank you, your Honor.  I appreciate

 5   it.

 6            THE COURT:  Okay.  The First Amendment returns.

 7            MR. ZANSBERG:  Just one point, your Honor.

 8        As this trial is being postponed, I think it is -- your

 9   Honor brought up a point about what's already been publicly

10   disclosed.  And, obviously, information that's been publicly

11   disclosed is not appropriate for closing a courtroom.

12        And just by way of example, while the Lyft-Uber deal is

13   public, so is, as of October 19th through Lyft posting on its

14   blog, a $1 billion investment from Google's CapitalG fund into

15   Lyft.  Lyft posted that itself.  So that's no longer private

16   either.

17        So I would just urge your Honor to await until trial to

18   make these decisions to see what further information becomes

19   part of the public record at that time.

20            THE COURT:  Okay.  I want to thank the lawyers for

21   your arguments there.

22        All right.  We're about to bring things to a close.  I'll

23   see you at 8:00 a.m. tomorrow with our next witness.

24        Thank you.

25        (Proceedings adjourned.)
```

## I N D E X

**PLAINTIFF'S WITNESSES**                                    **PAGE**   **VOL.**

**JACOBS, RICHARD**
(SWORN)                                                        18      1
Direct Examination by Mr. Verhoeven                            19      1
Cross Examination  Mr. González                               91      1

**RUSSO, EDWARD**
(SWORN)                                                       114      1
Direct Examination by Mr. Verhoeven                          115      1
Cross-Examination by Mr. González                            142      1

- - -

## E X H I B I T S

**PLAINTIFF'S EXHIBITS**                          **IDEN**   **EVID**   **VOL.**

1                                                   20                  1

2                                                   69                  1

— — —

## CERTIFICATE OF REPORTER

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Katherine Sullivan, CSR 5812, CRR, RMR

Tuesday, November 28, 2017