Pages 1 - 170

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

WAYMO, LLC                          )
                                    )
              Plaintiff,            )
    vs.                             ) No. C 17-00939 WHA
                                    )
UBER TECHNOLOGIES, LLC., OTTO       )
TRUCKING, LLC, and OTTOMOTTO, LLC,  )
                                    )  San Francisco, California
              Defendants.           )  Wednesday
                                    )  November 29, 2017
_____)  8:00 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**              QUINN, EMANUEL, URQUHART, OLIVER
                                 & SULLIVAN LLP
                                50 California Street
                                22nd Floor
                                San Francisco, California 94111
                        BY:  **CHARLES KRAMER VERHOEVEN, ESQ.**
                             **JORDAN R. JAFFE, ESQ.**
                             **DAVID ANDREW PERLSON, ESQ.**
                             **MELISSA J. BAILY, ESQ.**
                             **DAVID EISEMAN, ESQ.**
                             **ANDREA PALLIOS ROBERTS, ESQ.**
                             **JEFFREY W. NARDINELLI, ESQ.**


                                QUINN, EMANUEL, URQUHART, OLIVER
                                 & SULLIVAN, LLP
                                1299 Pennsylvania Avenue, NW
                                Suite 825
                                Washington, DC 20004
                        BY:  **JARED WESTON NEWTON, ESQ.**

           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*  *Debra L. Pas, CSR 11916, CRR, RMR*
                *Katherine Sullivan CSR 5812, CRR, RMR*
                *Official Reporters - US District Court*

```
1   APPEARANCES (Continued)

2   For Defendants:          MORRISON & FOERSTER, LLP
                             425 Market Street
3                            San Francisco, California 94105
                        BY:  ARTURO J. GONZÁLEZ, ESQ.
4                            MICHAEL A. JACOBS, ESQ.
                             ESTHER KIM CHANG, ESQ.
5

6                            MORRISON AND FOERSTER LLP
                             707 Wilshire Boulevard
7                            Los Angeles, California
                        BY:  SYLVIA RIVERA, ESQ.
8

9
    For Defendants:          BOIES, SCHILLER AND FLEXNER, LLP
10                           5301 Wisconsin Avenue, NW
                             Washington, DC 20015
11                      BY:  KAREN LEAH DUNN, ESQ.

12
                             BOIES, SCHILLER AND FLEXNER, LLP
13                           435 Tasso Street
                             Suite 205
14                           Palo Alto, California 94301
                        BY:  MICHAEL BRILLE, ESQ.
15                           MEREDITH R. DEARBORN, ESQ.

16
                             BOIES, SCHILLER & FLEXNER
17                           1999 Harrison Street
                             Suite 900
18                           Oakland, California 94612
                        BY:  MAXWELL V. PRITT, ESQ.
19

20
    For Defendants:          SUSMAN, GODFREY, LLP
21                           1000 Louisiana Street
                             Suite 5100
22                           Houston, Texas, 77002-5096
                        BY:  JOSEPH S. GRINSTEIN, ESQ.
23

24          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

25
```

```
1    APPEARANCES:   (CONTINUED)

2    For Defendants:           SUSMAN, GODFREY, LLP
                               1301 Avenue of the Americas
3                              32nd Floor
                               New York, New York 10019
4                         BY:  WILLIAM CARMODY, ESQ.
                               SHAWN RABIN, ESQ.
5

6                              SUSMAN, GODFREY, LLP
                               1201 Third Avenue
7                              Suite 3800
                               Seattle, Washington 98101
8                         BY:  MATTHEW ROBERT BERRY, ESQ.

9

10

     For Mat Henley:           SPERTUS, LANDES & UMHOFER, LLP
11                             1990 South Bundy Drive
                               Suite 705
12                             Los Angeles, California 90025
                          BY:  MATTHEW DONALD UMHOFER, ESQ.
13

14

15   Special Master:           FARELLA BRAUN & MARTEL, LLP
                               Russ Building, 30th Floor
16                             235 Montgomery Street
                               San Francisco, California 94104
17                        BY:  JOHN L. COOPER, ESQ.

18                             -   -   -

19

20

21

22

23

24

25
```

PROCEEDINGS

```
1                    P R O C E E D I N G S
2    NOVEMBER 29, 2017                              8:02 A.M.
3                          ---000--
4         THE CLERK:  Calling Civil 17-939, Waymo, LLC versus
5    Uber Technology, Inc., et al.
6         Counsel, please approach the podium and state your
7    appearances for the record.
8         MR. PERLSON:  Good morning, your Honor.  I am David
9    Perlson from Quinn, Emanuel for Plaintiff Waymo.  Charlie
10   Verhoeven, David Eiseman, Andrea Roberts and Melissa Baily here
11   with me.
12        THE COURT:  Okay.
13        MR. GONZÁLEZ:  Good morning, your Honor.  Arturo
14   González, Michael Jacobs, Esther Kim Chang from Morrison &
15   Foerster for Uber.
16        THE COURT:  Thank you.
17        MR. CARMODY:  Good morning, your Honor.  Bill Carmody.
18   I have Shawn Rabin here, Joe Grinstein and Matt Berry from
19   Susman, Godfrey.
20        THE COURT:  Thank you.
21        MS. DUNN:  Good morning, your Honor.  Karen Dunn from
22   Boies, Schiller with Mike Brille and Meredith Dearborn.
23        THE COURT:  Good morning.
24        MR. COOPER:  Good morning, your Honor.  John Cooper,
25   Special Master.
```

PROCEEDINGS

```
 1          THE COURT:  Thank you again.
 2      So I have -- whenever we eventually do get around to a
 3  trial, I do want to hand out a solution to one of the whining
 4  problems.  The Law Clerk will hand it out now.
 5      This is the problem that Waymo has over-designated
 6  witnesses and the other side, despite its multitude of legions
 7  of lawyers cannot prepare for a court trial without knowing.
 8      So I'm going to use a solution I've used in other cases,
 9  which is each side has to maintain a rolling written list of
10  the next seven or fewer witnesses it intends to call at trial.
11  You can update this at the end of each day.  You don't have to
12  call them in any particular order, but they've got to be on the
13  list.  If they are not on the list, too bad.  Then the time
14  gets counted against you if you wind up with no witnesses for
15  the rest of the day.  Because it's an old trick, and you're not
16  going to get away with it on the Waymo side, nor on the Uber
17  side.
18      Anyway, I've used this in several other cases.  I have 38
19  hours in here for the notice, but if you-all agree to a
20  different time, I'll go along with whatever you agree to.  So
21  let me know soon what your druthers are on the -- whether you
22  want to change the 38 hours or not.
23      Okay.  We're ready to proceed with the next witness.
24          MR. GONZÁLEZ:  Your Honor, I wanted you to know that
25  we were asked to bring -- Ms. Padilla is here.  She's ready to
```

PROCEEDINGS

1   start, as you ordered.

2       We were asked yesterday to bring two additional witnesses,

3   Nick Gicinto and Mat Henley.  And they both are present as

4   well.

5           THE COURT:  And you made the request?

6           MR. VERHOEVEN:  Yes, your Honor.

7           THE COURT:  Okay.  Good.

8           MR. GONZÁLEZ:  I wanted to add one last thing, which

9   is I'm just looking at some point there is some reciprocity

10  here.  We asked Google to bring just one witness, just one

11  person to talk about something called Google Allo and they have

12  refused.  And so I would --

13          THE COURT:  Well, I will address that right now.  I'm

14  going to order Waymo -- because it's not fair for you to get

15  away with finding out that they have got ephemeral going, and

16  you've got to certify to me after investigation that your

17  company doesn't have the same thing or your company didn't use

18  non-attributable devices.  You're going to do a complete

19  investigation and you're going to report soon.

20          MR. VERHOEVEN:  Yes, your Honor.  I heard that.

21          THE COURT:  And if it turns out that your company did

22  the same dirty trick that they do, then you will be in a little

23  bit of trouble with all of this evidence because the jury is

24  going to find out that Waymo did the same thing.

25      But for the moment I'm taking your -- your shock at face

PROCEEDINGS

 1  value that your company is innocent.

 2          MR. VERHOEVEN:  Yes, your Honor.

 3          THE COURT:  So you better -- it better be true,

 4  because I'm going to let them do some follow-up depositions to

 5  find out.

 6          MR. VERHOEVEN:  Yes, your Honor.

 7      And we heard you yesterday and we started that process.

 8  It's underway.  We want to make sure it's accurate so we can't

 9  get back to you today.

10          MR. GONZÁLEZ:  May I clarify one thing, your Honor?

11          THE COURT:  Yeah.

12          MR. GONZÁLEZ:  Throughout this case on discovery it

13  has not been just Waymo.  It's been Waymo and Google.  Because,

14  remember, this whole thing was Google.  Waymo didn't even exist

15  before -- shortly before the lawsuit was filed.

16      So we would like the information they are going to provide

17  would be Google information, not just Waymo.

18          THE COURT:  Google is not a party in the case.

19          MR. GONZÁLEZ:  But, your Honor, if Google, the parent

20  company, and Alphabet, the parent company, if they are doing

21  the same thing, that's certainly relevant.

22          THE COURT:  I don't know.

23          MR. VERHOEVEN:  Your Honor, this is the first time I

24  personally heard this.  I think we should negotiate --

25          THE COURT:  I'm not going to go -- I'm going to

PROCEEDINGS

 1   definitely go to Waymo, but I'm not necessarily going to go

 2   with you -- you-all negotiate over that.  I'm not ordering

 3   anything on Google.

 4       I'm sure you can find some other company out there that

 5   does the same thing that Uber does, but -- you know, this is

 6   going to be just as an aside.  As an aside, going forward every

 7   law firm, like the law firms involved here, will be possibly

 8   committing malpractice if you do not inquire into off-line,

 9   off-server communication systems within the other side.  You

10   see what happened here.

11       So I'm not saying anybody committed malpractice here.

12   Believe me, I'm not saying that.  I am absolutely not saying

13   that, but I'm saying going forward that will become an issue in

14   every case.

15       All right.  Let's call the first witness.

16       **MR. VERHOEVEN:**  One final housekeeping, your Honor.

17   We would like to invoke the rule today for sequestration.

18       **THE COURT:**  Fine.  Who is the first witness you're

19   going to call?

20       **MR. VERHOEVEN:**  Ms. Padilla.

21       **THE COURT:**  All right.  So all the other witnesses

22   that were referenced should step out in the hall, not go far

23   because we may need you soon.

24       Who are they?  I need the help of the lawyers to identify

25   them.  Are they already outside?

PROCEEDINGS

1          **MR. UMHOFER:**  Your Honor, I'm here on behalf of

2     Mr. Gicinto, Matt Umhofer.

3          **THE COURT:**  Please.

4       Any other witnesses present in the courtroom?

5          **MR. VERHOEVEN:**  I notice Mr. Russo.

6          **THE COURT:**  He has already testified.

7          **MR. VERHOEVEN:**  Well, he testified for a very few

8     minutes and he's got his deposition coming up, your Honor.  We

9     would prefer to have him sequestered.

10         **THE COURT:**  Mr. Russo, you've got to step outside,

11    too.

12      (Mr. Russo exits the courtroom.)

13         **MR. UMHOLDER:**  The only other witness would be

14    Mr. Henley.  I don't know if he's in the courtroom at this

15    point.

16         **THE COURT:**  Is Mr. Henley here?

17         **MR. UMHOLDER:**  We'll keep him out, your Honor.

18         **THE COURT:**  All right.  So if Mr. Henley shows up, I'm

19    going to have to rely upon the lawyers to point him out.

20         **MR. UMHOLDER:**  Thank you, your Honor.

21         **THE COURT:**  Let's called forward Ms. Padilla.

22      All right.  Please raise your right hand.

23                     **ANGELA PADILLA**,

24    called as a witness for the Plaintiff herein, having been duly

25    sworn, testified as follows:

PADILLA - DIRECT EXAMINATION / VERHOEVEN

```
 1              THE WITNESS:  Yes.  So help me God.
 2              THE COURT:  All right.  Thank you.  And have a seat.
 3    Speak into the mic and then say your name again.
 4              THE WITNESS:  My name is Angela Lucia Padilla.
 5              THE COURT:  All right.  Very good.  Thank you.
 6         Counsel.
 7              MR. VERHOEVEN:  Thank you, your Honor.
 8                        DIRECT EXAMINATION
 9    Q.   Good morning, Ms. Padilla.
10    A.   Good morning.
11    Q.   You are the Vice-President and Deputy General Counsel of
12    litigation and of employment at Uber, correct?
13    A.   That's correct.
14    Q.   You were hired by Uber to build and manage the company's
15    Litigation Group?
16    A.   Yes.
17    Q.   And you were also asked to help with employment matters at
18    Uber, right?
19    A.   Yes.
20    Q.   You first learned about Uber's potential acquisition of
21    Ottomotto in January of 2016, correct?
22    A.   That sounds about right, yes.
23    Q.   You were brought in to assess how to prudently hire
24    employees from a competitor company and make sure that they
25    don't run afoul of agreements that they have with their prior
```

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1   employer like Waymo, right?

2   **A.**    In general, yes.  It's one of the reasons.

3   **Q.**    You are the in-house litigation attorney responsible for

4   managing this litigation, right?  The Waymo litigation?

5   **A.**    Let me clarify that.  I manage a docket of about 750

6   cases, and this is one of them.  This case is managed by

7   members on my Leadership Team because I cannot manage 750 cases

8   myself personally.

9        So I always delegate either to members of leadership or to

10  younger lawyers because I want younger lawyers to get

11  experience as well.

12  **Q.**    Have you ever missed a hearing in this case?

13  **A.**    Yes.

14  **Q.**    How many hearings have you gone to?

15  **A.**    Hmm, maybe half or less.

16  **Q.**    Well, was it half or how many would you estimate?

17  **A.**    I was here for the preliminary injunction hearing.  I was

18  here for the argument on the *Daubert* motion.  And there may

19  have been one other.

20  **Q.**    So it's your testimony you were only here for three

21  hearings?

22  **A.**    Those are the three I can recall right now.  I might have

23  been here for four or five, but those are the ones I remember.

24  **Q.**    Isn't it true that you have been here for at least half of

25  the hearings before Judge Alsup?

1   **A.**    I'm not sure what the total number of hearings has been.

2   I know it's been a lot.   I'm not sure I have been here for

3   half.   That seems to be a little bit overstating it, but the

4   members of my team that run the case have been here for all the

5   hearings.

6   **Q.**    And do they report to you?

7   **A.**    Yes, they do.

8   **Q.**    Do they tell you about what happened at the hearings?

9   **A.**    Sometimes, yes.   We also get write-ups from outside

10   counsel, which I try to look at if I can.

11   **Q.**    You have attended depositions in this case, correct?

12   **A.**    No.   I've only attended my own deposition.

13   **Q.**    Who from your department has attended depositions?

14   **A.**    Well, the only ones I'm aware of are Aaron Bergstrom, who

15   is a senior counsel in litigation.   And Nicole Bartow, who is a

16   director in litigation.

17   **Q.**    And you receive reports from Ms. Bartow and Mr. Bergstrom

18   with respect to what happens at these depositions?

19   **A.**    Candidly?   Not very frequently.

20   **Q.**    How often?

21   **A.**    Hmm, I would say if there was a really key star witness, I

22   might get a short description of what happened, but I would say

23   that that's probably been -- I know there have been a lot of

24   depositions in the case.   I heard that there have been over 100

25   maybe, 150.   And I'd say maybe 10 or less I have had reports

PADILLA - DIRECT EXAMINATION / VERHOEVEN

 1   on.

 2   **Q.**   Who do you remember?

 3   **A.**   I remember the Google executives, whether it was Larry or

 4   Sergey.  I remember Travis.  I remember, I think, Eric

 5   Meyhofer.  I can't remember if Anthony Levandowski gave a

 6   deposition or not, but I know he's claiming the Fifth, so maybe

 7   he didn't.  Those are the ones that come to mind right now.

 8   **Q.**   Can you think of any others?

 9   **A.**   James Haslim, he's an engineer.

10   **Q.**   Anybody else?

11   **A.**   No.

12        **MR. VERHOEVEN:**  Do we have the exhibits from

13   yesterday?

14        **THE COURT:**  Do we have the exhibits from yesterday?

15        **THE CLERK:**  Yes.

16        **THE COURT:**  Counsel is entitled to see them.

17        **MR. VERHOEVEN:**  Can you hand both up to the witness,

18   please?

19        (Whereupon document was tendered to the witness.)

20        **THE WITNESS:**  Thank you.

21   **BY MR. VERHOEVEN**

22   **Q.**   I direct your attention to Exhibit No. 1.

23   **A.**   Okay.  I'm with you.

24   **Q.**   This is a letter that Mr. Jacobs sent to you on May 5th,

25   2017, correct?

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1   **A.**   No.  It came from his lawyer, Clayton Halunen.

2   **Q.**   All right.  This is a letter that Mr. Jacobs' lawyer sent

3   to you on May 5th, 2017, correct?

4   **A.**   It is, yes.

5   **Q.**   And you read this letter, didn't you?

6   **A.**   I read -- I skimmed it.  I skimmed it.

7   **Q.**   You read the letter, didn't you?

8   **A.**   I did read it, but I -- it's very dense.  I'll tell you,

9   and I started to get lost about halfway through it, but I

10  did -- I did attempt to skim the whole letter start to finish.

11  Yes, I did.

12  **Q.**   Did you think the letter didn't contain important

13  allegations?

14  **A.**   It contained very important allegations.

15  **Q.**   Wouldn't you read carefully a letter that contained very

16  important allegations to your company?

17  **A.**   Yes, but I had procured this letter at the request of the

18  Compliance Department, and the two lawyers in our Compliance

19  group were working with me to try to understand what had

20  happened here.

21       We had asked Mr. Jacobs to come in and talk to us right

22  after he left the company, to sit down and explain everything

23  that he thought had gone wrong and he declined, which is

24  unusual because whenever we have a departing employee who is

25  unhappy, especially one who is this unhappy, we ordinarily get,

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1   you know, a whole day with them where they are happy to sit and

2   tell us everything that happened.

3        So it was odd that Mr. Jacobs would not come in and sit

4   down and talk to Compliance.  And we offered him:  Do you want

5   to talk to anybody in the company?  Do you want to talk to

6   Compliance?  Do you want to talk to HR?

7   **Q.**   Who is "we"?

8   **A.**   Myself, Joe Spiegler, he was then the head of Compliance,

9   and Sidney Majalya, who also worked in Compliance.  They are

10  both attorneys.

11       Long story short, he refused to come in and so finally,

12  though, I was able to prevail upon his attorney, Mr. Halunen,

13  to put all of the claims in writing because I was saying:  I

14  can't assess what your client is saying without understanding

15  what the claims are.

16  **Q.**   And then you just skimmed the letter?

17  **A.**   And, yes.  And so I -- I read it in -- I read it, you

18  know, in brief.  I handed it over to Joe and Sidney.  We had a

19  meeting with Joe Spiegler, Sidney Majalya and our general

20  counsel Salle Yoo.  Handed it over to them.

21       And then it was decided that the Compliance Department

22  would take the internal investigation forward.  They retained

23  the law firm of WilmerHale, in particular Randall Lee, who is a

24  former federal prosecutor and a former SEC prosecutor.

25  **Q.**   Sorry.  I missed the name?

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1   A.   Randall, R-A-N-D-A-L-L; Lee, L-E-E.  And Heather, like the

2   lady's name Heather, Tewkesbury, T-E-W-K-E-S-B-U-R-Y.  She's

3   also a former federal prosecutor.

4        The Compliance Group retained them.  It was decided that

5   they would be retained to come in and to examine everything

6   that was stated in Mr. Jacobs' letter and that -- and I was

7   then told that I was -- it was no longer my work and that I

8   should not discuss the letter with anyone inside or outside of

9   the company for fear of jeopardizing the internal

10  investigation.

11  Q.   Thank you for that, but just -- I wanted to know -- I

12  didn't ask about any of that.  So, please, could you answer my

13  questions.

14       Who were the two individuals in the Compliance Department?

15  That's all I want to know.

16  A.   Joe, J-O-E, Spiegler, S-P-I-E-G-L-E-R.  He's a licensed

17  attorney.

18       The second is Sidney, S-I-D-N-E-Y, Majalya.  I believe

19  M-A-J-A-L-Y-A.

20  Q.   When you read --

21  A.   And Salle Yoo.  I'm sorry, Salle Yoo, the General Counsel.

22  Q.   Was Salle Yoo part of the Compliance Department?

23  A.   No, but she -- they reported in to her.  And so when I

24  received the letter and gave it to Joe and Sidney, Salle -- we

25  had a meeting and I gave it to them in a meeting that Salle was

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1    also present in.

2    **Q.**    When you read this letter, you saw that it referred to

3    Waymo, didn't you?

4    **A.**    I remember seeing a reference to Waymo, yes.

5    **Q.**    And you were familiar with the Waymo litigation, weren't

6    you?

7    **A.**    Yes.

8    **Q.**    And you knew that Waymo was asserting misappropriation of

9    trade secrets at the time that you read this letter, isn't that

10   correct?

11   **A.**    It is.

12   **Q.**    And doesn't the letter refer -- make an allegation that

13   trade secrets of Waymo were stolen by the company?

14   **A.**    It was.

15   **Q.**    Why didn't you give that to MoFo?

16   **A.**    Because the company's plan was to give it to WilmerHale,

17   to the two former federal prosecutors to have it internally

18   investigated by an outside independent firm to ascertain

19   whether anything in the letter was even remotely true or not as

20   there were so many allegations, some of which were quite

21   fantastical.

22   **Q.**    So you thought it was okay to withhold this information

23   from Waymo's counsel until you could investigate it and make

24   determinations as to whether you agreed with it or not?

25   **A.**    No.  I think that mischaracterizes what actually happened.

1     At the time the goal was to get Mr. Jacobs' allegations

2     stated as fully as we could and then have the Compliance

3     Department work with an outside law firm, the best we could

4     find, with federal prosecutors, to review all of the

5     allegations.  None of us were focused on Waymo at the time that

6     those events occurred candidly.

7     **Q.**   You knew that the letter accused the company of stealing

8     Waymo's trade secrets, and you knew about the Waymo litigation,

9     correct?

10    **A.**   Those two things are both correct.

11    **Q.**   And as an attorney, didn't you have a duty to at least

12    send this letter to outside counsel handling the Waymo

13    litigation?

14    **A.**   No.  I felt that the duty was to do what the company was

15    instructing and planning to do, which is to hire the best

16    former federal prosecutors to do an independent investigation.

17         Obviously, if the independent investigation turned up

18    anything remotely related to the Waymo case, that would be

19    turned over.

20         In addition, the parties at this time did have discovery

21    protocols in place, and I also assumed that if there was

22    something in here that related to the case, if it was

23    responsive, that it would be picked up and produced as well.

24    **Q.**   Suppose there was a letter that someone -- some former

25    employee sent to Waymo that said:  This trade secret case

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1   you're asserting is BS and you're just trying to hurt

2   competition.

3        You think it's okay for us not to produce that and to just

4   withhold it and investigate it, and if we decide it's not true,

5   never to disclose it?  Do you think that would be okay?

6   **A.**   It might depend on the circumstances.

7   **Q.**   Didn't you have an ethical duty, Ms. Padilla, as an

8   attorney to disclose this information to Waymo's counsel?

9        **MR. GONZÁLEZ:**   Your Honor, I think that question has

10  been asked and answered, and at this point it's getting

11  repetitive.  It was just asked and she responded.

12       **THE COURT:**   Overruled.  Please answer.

13  **A.**   I felt that I had an ethical duty to escalate it within

14  the company and have it be fully reviewed by the Compliance

15  Team so that they could determine the extent to which any facts

16  arose which should be disclosed in the litigation.

17       In addition, the letter sat in my email system and sat in

18  the email systems of many other people in the company, all of

19  which I understood to be part of the discovery protocol in this

20  litigation.

21       So my instinct was that to the extent this was called for

22  or responsive to anything in the litigation, it would

23  inherently be picked up and reviewed and produced as part of

24  the ordinary discovery course.

25  **BY MR. VERHOEVEN:**

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1   Q.   So what you're saying is you relied on other attorneys to

2   make the decision of whether to disclose it.  And even though

3   you knew it was in your personal files and it wasn't

4   privileged, you just let it sit there and it was somebody

5   else's responsibility to find it and produce it; is that what

6   you're saying?

7   A.   No.  I didn't let it sit there.  As mentioned, escalated

8   it to Compliance and the general counsel.  Ultimately the Audit

9   Committee also had visibility into this matter.

10       And finally the Special Matters Committee of the Board,

11  those are both Board of Directors committees, the Audit

12  Committee and the Special Matters Committee, ran both the

13  litigation and this internal investigation.  And I felt --

14           THE COURT:  Go ahead.  Finish your point, but I --

15  I've got a question on one of your earlier answers.

16  A.   I felt I had discharged my duty by appropriately

17  escalating it within the company.

18           THE COURT:  You said that this letter from the lawyer,

19  Jacobs' lawyer, was in the email system.  Did I understand you

20  correctly?

21           THE WITNESS:  Yes, sir.

22           THE COURT:  The letter, we've seen, just looks like an

23  ordinary letter.  So is there another one in the email system

24  or what -- what's going on there?

25           THE WITNESS:  Well, as you can see, it was -- it was

1    emailed to me, angelapadilla@uber.com.

2              THE COURT:  So that came in that form as an email to

3    you?

4              THE WITNESS:  That's my recollection.

5              THE COURT:  Okay.  All right.  Thank you.

6    BY MR. VERHOEVEN

7    Q.   Who made the decision --

8              THE WITNESS:  And I forwarded it on, by the way, just

9    by the way, the email to others in the company.

10   BY MR. VERHOEVEN

11   Q.   Okay.  To whom did you forward it to?

12   A.   As I mentioned, I believed Joe Spiegler, Sidney Majalya,

13   Salle Yoo, and then ultimately to the lawyers for the members

14   of our Audit Committee and the lawyers for the members of our

15   Board Special Matters Committee.

16   Q.   What about the two attorneys that were managing the Waymo

17   litigation day-to-day, did you send it to them?

18   A.   I did not.

19   Q.   Why not?

20   A.   Because -- I mean, that's a good question.  Because -- but

21   the reason why at the time was I was instructed that if this

22   letter was circulated widely beyond the scope of people who

23   were investigating it, that I would be obstructing a fair

24   investigation of the allegations.

25   Q.   Who told you that?

1    **A.**    Joe Spiegler and Sidney Majalya.

2    **Q.**    So you weren't allowed to produce this clearly relevant

3    letter that wasn't privileged because they told you it would

4    obstruct their investigation of whether the letter is true or

5    not?  Is that your testimony?

6    **A.**    I wasn't -- I wasn't allowed to share it outside of the

7    small group of people in Compliance who were investigating it

8    until we had some results, that's correct.  Until it was read

9    out to the Special Matters Committee, that's correct.

10   **Q.**    So, again, you thought that your responsibilities when

11   you -- when you're in charge of the Waymo litigation and you

12   see a letter that's not privileged that alleges that Uber stole

13   Waymo trade secrets, your belief is that your duty is not --

14   you don't have to produce it, but that Uber can withhold it and

15   investigate whether it's true or not and then make a

16   determination of whether or not to produce it.  Is that your

17   testimony?

18   **A.**    No.  There was no view of whether it should be produced or

19   not.  That was not a question that they were looking at at the

20   time.

21   **Q.**    It never occurred to you that maybe opposing counsel in

22   the Waymo case would like to know about this?

23   **A.**    When the letter first came in, no, that never occurred to

24   me.  Because we receive a lot of letters from unhappy

25   employees, from drivers, from riders, and a lot of them are

1  very fantastical.  In fact, make all sorts of wild, crazy

2  allegations that are never substantiated.

3      So, no.  At the time the focus was getting it into the

4  hands of Compliance, getting WilmerHale on board, getting

5  former federal prosecutors involved to look into it, to see

6  whether any of it was true, and then take it from there.

7  **Q.**   This wasn't any wild fantastical letter, was it,

8  Ms. Padilla?

9  **A.**   I believe so.

10 **Q.**   It went all the way up to two committees of the Board of

11 Directors.  Does every wild fantastical claim that you get go

12 up to the Board of Directors and the Board votes on it?

13 **A.**   It depends on the nature of the letter.

14 **Q.**   How many have gone up to the Board for the Board to

15 consider?

16 **A.**   I can't get into that without invading this privilege.

17 **Q.**   Can you tell me the number?

18 **A.**   I can tell you that numerous have.

19 **Q.**   Which ones?

20 **A.**   Again, I can't get into that without invading the

21 privilege.

22      **THE COURT:**  Well, the subjects probably are

23 privileged, but the number is not privileged.  So if the number

24 is three, then you have to tell us three.  It's not -- it's

25 that's not privileged.

1          So that statement is incorrect.  You need to tell us the

2     number, if you know the number, or the approximate number.

3          **THE WITNESS:**  So I don't know the exact number off the

4     top of my head, but as I reflect on the last two years of

5     reporting to the Audit Committee, I can think of between 10 and

6     15.

7          **THE COURT:**  All right.  There we go.

8          Next question.

9     **BY MR. VERHOEVEN**

10    **Q.**    Did you give the letter to Boies Schiller?

11    **A.**    No, I did not.

12    **Q.**    Did you give the letter to Susman Godfrey?

13    **A.**    No, I did not.

14    **Q.**    You didn't give the letter to anyone with any

15    responsibility except -- excluding yourself, with respect to

16    the Waymo litigation; is that your testimony?

17    **A.**    That's correct.  I didn't given it to any member of the

18    trial team.

19    **Q.**    Isn't it true that Uber -- Uber's purpose in dealing with

20    this was to hide the information from the public?

21    **A.**    No.  May I explain why?

22    **Q.**    You can explain on redirect.

23          Did Mr. Travis Kalanick know about the letter?

24    **A.**    I believe he did.

25    **Q.**    Did you have any conversations with him?

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1   **A.**   Not directly.

2   **Q.**   What about indirectly?  Did you have any information about

3   his discussions about the letter?

4   **A.**   I -- I think -- as I recall, I think that Salle might have

5   spoken to Travis and then I might have spoken to Salle, but

6   that's really all I can remember.

7   **Q.**   Do you remember any report on the substances of that

8   conversation?

9           **MR. GONZÁLEZ:**   Excuse me, that's just "yes" or "no."

10  **A.**   I do not remember any report, either oral or in writing.

11  **BY MR. VERHOEVEN**

12  **Q.**   Did Mr. Cameron Poetzer get a copy of the letter?

13  **A.**   I have no idea.

14  **Q.**   Eric Meyhofer?

15  **A.**   I have no idea.

16  **Q.**   Did the Board of Directors get a copy of the letter?

17  **A.**   I believe that those Board members who sat on the Audit

18  Committee and who sat on the Special Matters Committee -- and

19  there is some overlap between those committees -- did receive

20  copies of the letter.

21  **Q.**   Can you for the record identify members of both the

22  committees?

23  **A.**   Yes.  Okay.  Starting with the Audit Committee and

24  remembering that the committees have changed over time --

25          **THE COURT:**   Give us the names at the time in question,

1    not necessarily the names now.  That's what matters.

2          **THE WITNESS:**  Okay.

3    **A.**   So at the time in question on the Audit Committee, as I

4    recall, we had Bill Gurley.  We had Garrett Camp.  We had Ryan

5    Graves, also known as R.G.  Gosh, and there was an observer on

6    the Audit Committee, but I can't remember his name.  He's like

7    a -- he's an academic or something at Stanford.

8    **Q.**   And what about the Special Matters Committee?

9    **A.**   The Special Matters Committee, whose composition has also

10   changed, but at the relevant time would be a representative of

11   Benchmark, who initially would have been Bill Gurley and then

12   became Matt Cohler.  A representative of TPG, who originally

13   was David Bonderman, and then became David Trujillo.  And then

14   a new member, Wan-ling Martello, M-A-R-T-E-L-L-O, from Nestle

15   Company.  She's the most recent member to join.  And I believe

16   that covers it.

17   **Q.**   Ariana Huffington --

18   **A.**   I'm sorry, Ariana.

19   **Q.**   -- was on the Special Matters Committee?

20   **A.**   Right.  Pardon me.  Martello, the Nestle executive, she

21   sat on the Audit Committee, but Ariana sat on the Special

22   Matters Committee.  Thank you.  That's exactly right.

23   **Q.**   Why was the letter sent to the Special Matters Committee?

24   **A.**   Because they had passed a resolution whereby they were

25   running the Waymo litigation and the Rick Jacobs investigation.

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1   Q.   So it was -- the letter was sent to the Special Matters

2   Committee of the Board because it mentioned the Waymo

3   litigation and allegations with respect to the Waymo

4   litigation, correct?

5   A.   No.  Actually, that wasn't why it was sent.  It wasn't

6   sent for that reason.  It was sent because it mentioned FCPA

7   and many other risky activities that were the concern of the

8   company.

9   Q.   All right.  I'm just going to read back to you -- I have

10  realtime reporting here -- what you just said.  Quote:

11      "QUESTION:  Why was the letter sent to the Special

12      Matters Committee?

13      "ANSWER:  Because they had passed a resolution whereby

14      they were running the Waymo litigation and the Rick

15      Jacobs investigation."

16      Is that true testimony?

17  A.   It is.  And they are also running -- by the way, they are

18  running many other matters as well.

19  Q.   They received the letter, the May 5th letter?

20  A.   At some point in time, yes.  I think by that point in time

21  we had already disclosed it to the U.S. Attorney's Office.

22      So we -- we voluntarily disclosed Mr. Jacobs and his

23  allegations on June 27th to the Northern District of California

24  U.S. Attorney's Office.  That disclosure was done by Damali

25  Taylor at O'Melveny & Myers who phoned the office and let them

1  know that we had an ex-employee who was very unhappy with the

2  company, was making a wide range of allegations, and we wanted

3  them to know that so that they could start to investigate.

4      And subsequently on September 12th and the week -- the

5  week of September 12th we disclosed the letter to the Southern

6  District of New York, Main Justice in Washington D.C. and to

7  the Northern District of California, and those disclosures, I

8  believe, were handled by WilmerHale, by Randall Lee.

9  Certainly, for Main Justice and SDNY.  Possible that Damali

10 sent the letter to NDCA at that time.

11 **Q.**   Why did you send the letter to the District Attorney's

12 Office?

13 **A.**   You mean, the U.S. Attorney's Office?

14 **Q.**   Yes.  I apologize.  I misspoke.

15     Why did you send the letter to the U.S. Attorney's Office

16 voluntarily?

17 **A.**   Because we felt that Halunen was trying to extort the

18 company, and I wanted to take the air out of his extortionist

19 balloon.

20 **Q.**   Okay.  Did you write down or convey to Mr. Jacobs that he

21 was trying to extort the company?

22 **A.**   Tony Piazza told him that multiple times in an employment

23 mediation that we did with him.

24 **Q.**   Were you there?  Did you hear him say that to them?

25 **A.**   No, he told it to us.  He told us he had just said that to

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1   him.

2   **Q.**   So you said it to Mr. Piazza?

3   **A.**   No.  Mr. Piazza said it to Mr. Jacobs, and then Mr. Piazza

4   told us he said to it Mr. Jacobs.

5   **Q.**   Okay.  So you heard from Mr. Piazza that he said it to

6   Mr. Jacobs?

7   **A.**   Yes, that's right.

8   **Q.**   How many mediations have you been in that involved

9   extortion?

10  **A.**   You know, sometimes there are meritorious claims brought

11  forward and you feel that the company should do -- should

12  settle because some of the claims are meritorious.

13       Other times the claims you feel are being brought just for

14  nuisance and just to harass the company.  In those cases you

15  might also decide to settle just to avoid the distraction,

16  risk, expense of protracted litigation.

17       This case, given the huge sums of money that Mr. Jacobs

18  was demanding at the outset, I felt was clearly extortionist,

19  especially given the low value of his claims.  And so I made

20  the decision to direct O'Melveny & Myers and I consulted with

21  the Special Matters Committee, of course, to tell the Northern

22  District of California that we had this ex-employee who was

23  making these claims.

24  **Q.**   Does Uber pay money to extortionists?

25  **A.**   We really try not to.

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1  Q.   Does Uber pay money to keep people from disclosing

2  information it doesn't like to the public?

3  A.   We -- we settle claims when we think there is some value

4  to the claim.  Usually, like all settlement agreements, there

5  is a confidentiality clause.

6       However, we have been scrupulous about having settlement

7  agreements that specifically and expressly preserve the

8  employee's right to go to the Government, to go to every

9  possible Government agency and to act as a whistleblower and

10 to, you know, vindicate their rights in whatever way they wish

11 with respect to governing agencies.

12 Q.   How many extortionists has Uber hired to be consultants

13 after the fact?

14 A.   I know that you're referring to Rick here because he has

15 this ongoing consultancy agreement --

16 Q.   My question is how many?  How many?

17 A.   How many?

18 Q.   Yes.

19 A.   Umm, let's see.  I think Rick's case would be the most

20 extreme.  I can think of a few others where the dollars spent

21 may not have been worth it, but Rick's case would be extreme.

22 Q.   How many extortionists, other than Mr. Jacobs, has Uber

23 hired after the fact to consult for a year or at any time?

24       MR. GONZÁLEZ:   This is argumentative.  And aren't we

25 going well beyond the purpose of this hearing now?

 1          THE COURT:  No, no.  The witness has said that there

 2     was no merit and that he was an extortionist.

 3          Counsel is raising a fair point.  Then why would you hire

 4     such a person to be your consultant and pay them a lot of

 5     money?  That's a fair question.  He is trying to test the

 6     veracity of the story.

 7          Overruled.  Please answer.

 8          THE WITNESS:  So, your Honor, I'm not sure that I said

 9     there was no value to Rick Jacobs' letter.  I think I said

10     there was little value to his letter.

11     BY MR. VERHOEVEN

12     Q.   There is no question pending.

13     A.   Oh, I'm sorry.

14          THE COURT:  You did have a question pending, which

15     was --

16          MR. VERHOEVEN:  How many.

17          THE COURT:  -- how many extortionists have you hired

18     as a consultant?

19          THE WITNESS:  Then let me make sure that I'm clear.

20     I believe that Rick's demands were extortionate.  The demands

21     themselves, the letter, I think they were extortionate.

22     BY MR. VERHOEVEN

23     Q.   Could you just answer my question?

24     A.   He was the only who, I would say --

25     Q.   Ms. Padilla, can you answer my question?

1          MR. GONZÁLEZ:  She's trying to, your Honor.  If he

2   would just let her.  He doesn't like the answer.

3          THE COURT:  Let the witness finish the -- this is not

4   a jury case.  We can let the witness -- if it gets out of hand

5   and there are too many speeches, I'm going to -- but not yet.

6          Go ahead and finish the answer the way you want to, but

7   you've got to tell us the number.

8          THE WITNESS:  Yes.

9   A.    So he's the one who I felt was -- who I felt was -- whose

10  original claims were the most extortionate who then had a

11  consultancy agreement.  And his agreement, of course, is to

12  help us address the issues that he felt were happening at the

13  company.

14  BY MR. VERHOEVEN

15  Q.    How many others?

16  A.    He's the only one that I think of in that way.

17  Q.    So he's an extortionist and his claims were meritless, but

18  you hired him for a year to address his claims and correct four

19  practices, is that what you said?

20          MR. GONZÁLEZ:  Your Honor, he's just arguing.

21          THE COURT:  No, no.

22          MR. GONZÁLEZ:  And it mischaracterizes what she said.

23  She said the amount of money.

24          THE COURT:  No, no.  You are coaching the witness.

25  Don't do that.

 1          This -- the witness gave a long answer, and counsel is

 2     entitled after a long answer like that to try to draw out of it

 3     what he thinks -- the point that he's trying to make.  If it's

 4     not true, then the witness can say it's not true.

 5          So ask the question again, Mr. Verhoeven.

 6          **MR. VERHOEVEN:**  Can we read it back?  It's been --

 7     listening to all of that, it's not present in my mind.  I want

 8     to make sure I have it accurately.

 9          (Record read as requested.)

10          **MR. GONZÁLEZ:**  Your Honor, my objection is it

11     mischaracterizes what she said.

12          **THE COURT:**  Well, then, the witness is a lawyer and

13     she's capable of telling us that it has been mischaracterized.

14          But you heard the question, and please answer it.

15     **A.**   It doesn't fairly reflect what I was trying to say, which

16     was the original demand was extortionate.

17          I wanted to take the air out of that balloon by going over

18     to the Government ourselves, because that's his big threat, is

19     "I'm going to go to the Government and in order to get me not

20     to go, you have got to pay me a lot of money."

21          And I said, "Let's go to the Government because your

22     claims do not look to be very valid."

23          And there may be some places along the edges where things

24     he said are true, but the bulk of his letter is meritless.  And

25     so I said, "Let's go.  Let's go take this to the Government."

1          **THE COURT:**  You're not coming to grips with counsel's

2     question, which is:  You've said that the letter was

3     fantastical and now you say it's without merit except around

4     the edges.

5          So a lot of people in this room are wondering:  Why would

6     you pay him so much money then to become a consultant to help

7     you solve problems that don't exist?

8          That's what counsel is asking you.

9          **THE WITNESS:**  It was in the context of a settlement

10    and to resolve disputed claims.

11    **BY MR. VERHOEVEN**

12    **Q.**   So you just paid him the money to resolve the disputed

13    claims?

14    **A.**   Correct.

15    **Q.**   Including the consulting money?

16    **A.**   Correct.  We were resolving his employment law claims.

17    **Q.**   So he wasn't consulting at all, was he?

18    **A.**   Umm, I -- you'd have to ask WilmerHale whether they have

19    used him as a consultant.  The notion was that he would help

20    WilmerHale in their internal investigation.

21    **Q.**   Did he do anything for Uber during the one year when he

22    was paid -- while he was being paid 1 million in monthly

23    installments to consult for Uber?

24    **A.**   I don't have any personal knowledge of that, but

25    WilmerHale, I think, would know whether he had done any

1    consulting for them, because that was the arrangement.

2    **Q.**   So the settlement agreement specifies that he was

3    consulting for outside counsel?

4    **A.**   It was -- it spoke very broadly about what he was going to

5    be consulting on, and it included security issues, and that was

6    the subject of WilmerHale's investigation.

7              THE COURT:   Can I ask, did the WilmerHale

8    investigation ever come to an end and somebody got a report?

9              THE WITNESS:   Well, your Honor, it was a very long

10   investigation.   I believe -- and there were report-outs along

11   the way.

12       I believe that the Special Matters Committee received the

13   final report-out this month, in this month of November.

14             THE COURT:   Like this week?   Last week?   When?

15             THE WITNESS:   I -- I believe it was before

16   Thanksgiving.

17             THE COURT:   What day?   Give us the specific day in

18   November.

19             THE WITNESS:   WilmerHale could do that.   I don't --

20   I'm sorry.   I don't sit on the Special Matters Committee and I

21   don't know when they meet on these issues.

22             THE COURT:   Did you see the report yourself?

23             THE WITNESS:   I've never seen it, no.   They've kept it

24   very confidential to the Special Matters Committee until it's

25   read out.

PADILLA - DIRECT EXAMINATION / VERHOEVEN

 1          **THE COURT:**  All right.  Go on.

 2      Thank you for that.

 3      Go ahead.

 4  **BY MR. VERHOEVEN**

 5  **Q.**   Let's go -- I would like to show you an exhibit I'll mark

 6  as exhibit -- well, before I do that, I want to show you the

 7  settlement agreement.

 8          **MR. VERHOEVEN:**  Which we received last night, your

 9  Honor.

10      I'm doing my own stickers.

11      (Brief pause.)

12      I'm sorry, your Honor.  First I want to address the Board

13  minutes.

14          **THE COURT:**  Okay.

15          **MR. VERHOEVEN:**  I'll hand this up.

16      (Plaintiff's  Exhibit 3 marked for identification)

17  **BY MR. VERHOEVEN**

18  **Q.**   This document is largely redacted as privileged.  Do you

19  see that?

20  **A.**   I do.

21  **Q.**   It says -- on the portions that are not redacted, do you

22  see that you attended this Board meeting?

23  **A.**   Yes, I see that.

24  **Q.**   So did Salle Yoo?

25  **A.**   Yes.

1    Q.   And so did Travis Kalanick?

2    A.   I see that, too.

3    Q.   Number 1, "Update on Waymo litigation."  Is it your

4    contention that this is privileged?

5    A.   Apparently, yes.

6    Q.   It says -- well, you were there.

7    A.   Uh-huh.

8    Q.   It --

9    A.   It is privileged when --

10   Q.   It says:

11           "The Board discussed various employees and

12       certain contractual matters related to the Waymo

13       litigation."

14       What's that referring to?

15           MR. GONZÁLEZ:  Excuse me.  I would just caution the

16   witness not to disclose privileged information that was

17   discussed with the Board.

18           THE COURT:  Well, the topic can be disclosed.  So do

19   your best to answer the question.

20           THE WITNESS:  Okay.

21   A.   My best shot, and I may be wrong about the date, but I

22   believe what this refers to is Anthony Levandowski and his

23   employment contract.

24   BY MR. VERHOEVEN

25   Q.   Did the Board at this meeting discuss Mr. Jacobs and

1    contractual matters with respect to him?

2    **A.**    No, not at all.

3    **Q.**    Number 2 says, "Update on," blacked out, whatever it

4    means, "investigation."

5         Was Mr. Jacobs discussed -- was there an investigation of

6    Mr. Jacobs that was discussed at this meeting?

7    **A.**    I don't recall.  I see that there are two investigations

8    that are noted, but redacted.  And I don't think it was

9    Mr. Jacobs.

10        I would venture to say that at this point, without getting

11   into substance, we were discussing DOJ investigations with the

12   Board.

13            **MR. VERHOEVEN:**  Your Honor, we would request that the

14   subject matter headings 2 and 3 be unredacted so that we can

15   see what the subject matter of the discussion was.

16            **MR. GONZÁLEZ:**  Well, your Honor, if it's not related

17   to -- if it's not the Jacobs investigation, why would it matter

18   in this litigation?

19            **THE COURT:**  Well, I have nothing -- I don't -- how can

20   I do that?  All I've got is what you have.

21            **MR. VERHOEVEN:**  Right.

22            **THE COURT:**  I have no idea.  I can't tell whether it's

23   privileged or not.

24            **MR. VERHOEVEN:**  Well, the subject -- this "Update on

25   Investigation," that's a subject matter.  That's something you

 1    put on a privilege log, your Honor.

 2          THE COURT:  Well, if it's like -- if it's like --

 3    yeah, I agree with that.  If it's like "Soviet Union

 4    Investigation," then -- then that's not privileged.

 5          So a topic is never -- I can't say "never."  It's almost

 6    never privileged.

 7          So in a privilege log -- for example, you have to say:

 8    Letter from Ms. Padilla to outside counsel dated such-and-such,

 9    Re.  And then say:  Whether or not to settle the case.  That

10    would be -- that would be -- none of that's privileged because

11    the specific legal advice or the specific communications are

12    not revealed.

13          So I think we're going to wind up wasting a lot of time on

14    this.  Can't you agree that Number 2 and 3 should be revealed?

15          MR. GONZÁLEZ:  Your Honor, here is what I'll do.

16    We'll go back and I'll see what Number 2 and 3 are.  I agree

17    with you in general, that usually it's not, but there are

18    exceptions.

19          So let me see what Number 2 and 3 are and we'll confer

20    with counsel.

21          THE COURT:  Well, when are you going to respond?

22          MR. GONZÁLEZ:  Today.

23          THE COURT:  No.  How about within the next -- before

24    this witness is off the stand.  You can do that.  You've got

25    legions of people here.  Somebody over there ought to have the

PADILLA - DIRECT EXAMINATION / VERHOEVEN

 1  original of this.

 2          MR. GONZÁLEZ:  We'll do our best, your Honor.

 3          THE COURT:  All right.  Okay.  Go to something else if

 4  you -- we'll let counsel try that.

 5          MR. VERHOEVEN:  Yes, your Honor.

 6      I've marked as Exhibit 4 another set of Board meeting

 7  minutes.  This one is dated June 22, 2017.

 8      (Plaintiff's Exhibit 4 marked for identification.)

 9          THE COURT:  Are these things produced last night?  You

10  led me to believe this was last night, but this was --

11          MR. VERHOEVEN:  Oh, no.  I'm sorry.  The settlement

12  agreement, which I was going to go to but I switched off of,

13  was produced last night.

14          THE COURT:  All right.  So these you have had for some

15  time.

16          MR. GONZÁLEZ:  Correct.

17          THE COURT:  Go ahead.

18          MR. GONZÁLEZ:  Counsel, may I have a copy, please?

19      (Whereupon document was tendered to counsel.)

20  BY MR. VERHOEVEN

21  Q.  These are Board minutes from June 22, correct?

22          MR. UMHOFER:  It looks like it.

23  Q.  I direct your attention to Page 3, Item No. 4.

24  A.  Mm-hmm.

25  Q.  It says, "Discussion of employee letter."  That's a

1    reference to the Jacobs' letter, isn't it?

2    **A.**    Honestly, I don't know.  I'm not even sure, was I at this

3    Board meeting?

4    **Q.**    You were not.

5    **A.**    Okay.  I'm sorry, I don't know.  We do receive, as I

6    mentioned before, a lot of letters.  Many are very, very long

7    and colorful from unhappy or current employees.

8    **Q.**    Who would know what this discussion was, Ms. Yoo?

9    **A.**    Well, I suppose anybody who was in the meeting, but if you

10   had it unredacted, you would also know.

11   **Q.**    Yeah, that would be helpful.

12   **A.**    So I think Mr. González is checking that.

13   **Q.**    Okay.  We would request that Item 4 be checked on as well

14   so that we can determine what the subject matter was, beyond

15   that it was an employee letter.

16          **MR. GONZÁLEZ:**  We're checking, your Honor, to see if

17   it's Mr. Jacobs.  If it's not Mr. Jacobs, I don't see how it's

18   relevant to this proceeding.

19          **THE COURT:**  Well, it could be relevant if it was

20   related to the Waymo case in some other way.  So if there is

21   any arguable relevance, I would like to know about it.  So

22   please check.

23          **MR. GONZÁLEZ:**  Thank you.

24   **BY MR. VERHOEVEN**

25   **Q.**    Are you aware of the Jacobs' letter being discussed at

1  Board meetings?

2  **A.**   Not specifically, no.  Not that I can recall.

3       And may I just finish that just so you understand the

4  context?  I don't attend Board meetings in full.  I only attend

5  Board meetings when I give updates on litigation and employment

6  law issues, sometimes on Government investigations.

7       So it could have been discussed outside of my presence.  I

8  just don't know.

9  **Q.**   Who was the Uber lawyer who had responsibility for

10  advising the Special Master's Committee with respect to the

11  Jacobs' matter?

12  **A.**   You said "Master," "Special Master."  I think you meant

13  something else.

14       **MR. VERHOEVEN:**  I'm sorry, your Honor.  I meant

15  Special Matters Committee.

16  **A.**   So the Special Matters Committee itself has its own

17  lawyer, John Dwyer at Cooly.  So he acts as the lawyer giving

18  advice to the Special Matters Committee.

19       And then each member of the Special Matters Committee has

20  their own set of lawyers who also give advice to the individual

21  members of the Special Matters Committee.

22       Patrick Robbins at Shearman and Sterling has also given

23  advice to -- to the Special Matters Committee as lawyer for the

24  Special Matters Committee.

25

1    BY MR. VERHOEVEN

2    Q.    Are you aware of the identity of any of the lawyers that

3    are assigned to the specific members of the committee to advise

4    those specific members?

5    A.    Let me think about it for just a moment.  I feel that

6    Marty Flumenbaum at Paul Weiss and David Mills at Stanford Law

7    School give advice to Benchmark.

8          Let's see.  Ariana Huffington, I think, is Greg Joseph in

9    New York.

10   Q.    What firm is he with?

11   A.    I don't remember.  I think he broke off of one of the big

12   firms and started a boutique.  Greg Joseph is the name.

13         And then I can't think of the outside lawyer for TPG.

14   They rely a lot on their inside attorney.  They have two inside

15   general counsels that they rely a lot on.  I just can't think

16   of who their outside lawyers were.

17         Oh, and I'm sorry.  Fenwick and West, also corporate

18   lawyers for the Board of Directors and, also, were -- would

19   give advice to the Special Matters Committee --

20   Q.    Which lawyers?

21   A.    -- as a Board committee.

22         Gordy Davidson and Susan Muck.

23   Q.    I'm sorry.  What's the last name again?

24   A.    Susan Muck.  M-U-C-K, like muck out a horse stall.

25              MR. VERHOEVEN:  Let's mark as Exhibit 5 a portion of

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1    the Defendant's privilege log in this case.

2         (Plaintiff's Exhibit 5 marked for identification)

3    **BY MR. VERHOEVEN**

4    **Q.**    I direct your attention to Item 31 on the log.  You see

5    this is dated -- this bears the control number -- or this is

6    referencing a document bearing control number Uber 101505,

7    correct?

8    **A.**    Are you asking me whether the entry for Item 31 refers to

9    Uber Bates No. --

10   **Q.**    Yes.

11   **A.**    -- 101505?

12   **Q.**    Yes.

13   **A.**    That appears to be what the document says, yes.

14   **Q.**    Now, if you look at the May 25th Board meeting minutes,

15   the control numbers correspond, correct?

16   **A.**    Minus a zero.

17   **Q.**    Uber 101505 --

18   **A.**    The --

19   **Q.**    -- on May 25th, 2017?

20   **A.**    Well, the control number on the May Board meeting starts

21   with two zeroes and the control number on the document listed

22   on the privilege log at Item No. 31 starts with three zeroes.

23   **Q.**    Other than that, the number is the same?

24   **A.**    Well, I mean, that could be a huge significance because

25   these are intended to be exact numbers, as I recall, from my

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1    Bates stamping days.

2    **Q.**   Okay.  So it's your contention that a control number that

3    says 00101505 references a different document than a control

4    number that says 000101505?

5    **A.**   I just don't know.  I mean, I literally don't know.  If

6    your convention is that you have one, two or three zeroes at

7    the beginning of a Bates number and it's all the same, then

8    they are the same.  But if your convention is that the Bates

9    numbers need to match exactly, then they are not the same.

10       I'm sorry.  I just -- I just don't have a basis for saying

11   whether it's identical or not.

12   **Q.**   That's fine.

13       **THE COURT:**  I have a question on that.  Maybe the

14   Defense lawyers can...

15       Do the Defense lawyers say that 0001 is a different number

16   than 001?

17       **MR. GONZÁLEZ:**  I have no idea, your Honor.

18       **THE COURT:**  Well, what's your explanation for this?

19       **MR. GONZÁLEZ:**  I am seeing this for the first time,

20   your Honor.  I don't know.

21       **THE COURT:**  All right.  Well, add that, please, to the

22   list.

23       All right.  Go ahead, Mr. Verhoeven.

24   **BY MR. VERHOEVEN:**

25   **Q.**   Can you identify any place in Item 31 where it says this

1    document is minutes of a Board meeting?

2         I found it.  It's right here.  Withdrawn.

3    **A.**   Yes.  It's on the next page.  It says minutes of the Board

4    meeting.

5    **Q.**   And it says that -- in the privilege log entry that it

6    contains nonresponsive and nonrelevant information.

7    **A.**   It says that Uber's Board of Directors --

8              "Other portions of these minutes from a meeting

9         of Uber's Board of Directors have been redacted

10        because they contain nonresponsive and nonrelevant

11        information about highly sensitive business and

12        financial matters."

13        That is what it says.

14   **Q.**   Including Item No. 4, "Discussion of Employee Letter,"

15   which is redacted on this document.

16   **A.**   I'm sorry.  Item No. 4 on this document is "Board

17   Fidicuary Duty Review."

18   **Q.**   "May 25, 2017 Board Minutes," which you're not sure if

19   this is referencing or not?

20   **A.**   I have these are the May 25th Board minutes, and this is

21   Exhibit No. 3.

22             **THE COURT:**  What has this got to do with the Jacobs'

23   letter, which came later?

24             **MR. VERHOEVEN:**  I'll just move on, your Honor.  This

25   is getting into too much minutiae for the Court.  It should be

1    a deposition subject.

2    **BY MR. VERHOEVEN**

3    **Q.**    Let's go to the settlement agreement.

4         (Brief pause.)

5              THE COURT:  Can I ask a question while you're fumbling

6    around?

7              MR. VERHOEVEN:  Yes.

8              THE COURT:  Ms. Padilla, earlier, some 30 minutes ago,

9    you said that you did not provide the Jacobs' attorney's letter

10   to the two in-house lawyers that were handling the Waymo

11   litigation for you.  Let's make sure that I understood that

12   correctly.

13             THE WITNESS:  Yes, sir.

14             THE COURT:  All right.  And you did not give it to the

15   outside lawyers handling the Waymo litigation, correct?

16             THE WITNESS:  Yes, sir.

17             THE COURT:  So you said the reason you didn't give it

18   to the in-house lawyers handling the Waymo litigation was it

19   somehow might taint the special investigation.

20        Did I hear that right?

21             THE WITNESS:  You heard -- that's part of what I said.

22        I said, yes, that my colleagues in Compliance did instruct

23   me to not discuss the letter and not to give it to anyone

24   inside or outside the company for fear that it would obstruct

25   or hinder or taint the internal investigation.

1          THE COURT:  Then why did Mr. Kalanick get to see it?

2          THE WITNESS:  I'm sorry?

3          THE COURT:  Why did Mr. Kalanick get to see the

4     letter?

5          THE WITNESS:  I don't know whether it ultimately went

6     to him.  I think it did.  I think it did.

7          THE COURT:  You said earlier it did, and that Salle

8     Yoo had presented it to him.

9          THE WITNESS:  I believe that she did.

10         THE COURT:  All right.  So if anybody is going to get

11    tainted, wouldn't it have been him, for goodness sakes?

12        I mean, why keep it from the lawyers who are helping you

13    with the Waymo litigation, but give it to the head of the

14    company?

15         THE WITNESS:  Because -- because, as CEO, our practice

16    was to escalate everything to Travis that was going to turn

17    into an internal investigation unless he, himself, personally

18    was the target of the investigation.

19         THE COURT:  Even though it would taint the -- don't

20    you think that showing it to him would taint the investigation

21    more than showing it to two in-house lawyers that probably had

22    nothing to do with these allegations?

23         THE WITNESS:  It was -- unfortunately, this was not my

24    judgment, but --

25         THE COURT:  Well, then whose judgment was it?

1           THE WITNESS:  I see your point.

2           THE COURT:  Maybe we should bring that person in here.

3    Whose judgment was it?

4           THE WITNESS:  I think I escalated to Compliance and to

5    the General Counsel and from there decisions were made.

6           THE COURT:  Was it -- all right.  So you're telling us

7    that you might have done something different, but you followed

8    their instructions as to how to handle the letter; is that

9    right?

10          THE WITNESS:  I did.  I did.  But I want to -- but I

11   want to add to that, which is that I assumed, your Honor, that

12   the letter itself could be potentially discoverable if it was

13   responsive to anything and that in due course, in the carrying

14   out of the company's agreed-upon discovery protocols with

15   Waymo, that it might, you know, be -- if it was responsive,

16   that it would be part of that process.

17       And the other piece was that we had hired two federal

18   prosecutors, former federal prosecutors at WilmerHale to review

19   it and if anything in it was substantiated, that information, I

20   certainly knew, would be passed on to the Waymo team.

21          THE COURT:  I have a question.  Maybe you know the

22   answer, but maybe not.

23       Was this letter ever logged on a privilege log?

24          THE WITNESS:  I do not know.

25          THE COURT:  Do you know the answer, Mr. Verhoeven?

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1          THE WITNESS:  I doubt it.

2          MR. VERHOEVEN:  It was not.

3          THE WITNESS:  I doubt it.

4          MR. VERHOEVEN:  I'm sorry.  Which letter are you

5     talking about?

6          THE COURT:  The letter from Jacobs' attorney.

7          MR. VERHOEVEN:  No, it was not.

8          THE COURT:  So why would you assume that it would be

9     picked up in the -- if it was picked up in the normal course

10    through the email system, then it would have been on the

11    privilege log, presumably; but, apparently, it never got there.

12        How do you explain that?

13         THE WITNESS:  I'm sorry.  I haven't seen the privilege

14    log.

15         THE COURT:  All right.

16         MR. GONZÁLEZ:  Your Honor --

17         THE WITNESS:  And I don't know why it wasn't picked

18    up.  My apologies, your Honor.

19         MR. GONZÁLEZ:  You want me to answer that question,

20    your Honor?

21         THE COURT:  After the witness is off the stand, you

22    can answer that question.

23         MR. GONZÁLEZ:  All right.

24         THE COURT:  Can I just -- you're beating around the

25    bush so much, Mr. Verhoeven.  You're doing it methodically.  We

 1    don't have all day.

 2              **MR. VERHOEVEN:**  Yes.

 3          **THE COURT:**  So I want to get to the questions that are

 4    bothering me.

 5              **MR. VERHOEVEN:**  Okay.

 6          **THE COURT:**  Here is the way it looks, Ms. Padilla.

 7          **THE WITNESS:**  Uh-huh.

 8          **THE COURT:**  You said it was a fantastic BS letter, no

 9    merit and, yet, you paid four and a half million dollars.

10          Now, to somebody like me, an ordinary mortal, and to

11    people out there in the audience, ordinary mortals, and to the

12    jury, that's a lot of money.  That is a lot of money.  And

13    people don't pay that kind of money for BS.  That's one point.

14    And you certainly don't hire them as consultants if you think

15    everything they've got to contribute is BS.

16          This was a highly relevant letter.  On the surface this

17    looks like you covered this up, refused to turn it over to the

18    lawyers who are most involved with the Waymo case, including

19    your own in-house people, for reasons that, to me, are

20    inexplicable; that it would somehow taint the special

21    investigation.  That somehow that -- to me, it does not add up.

22          So you -- I want to give you a full and fair opportunity

23    before anything gets put down in writing as to what happened

24    here.  So if you want to answer that question again and try to

25    explain these circumstances away, I'd like to hear it.  Please.

1          **THE WITNESS:**  I believe I've already explained, but

2   let me -- let me put it all together.

3      Number one, there was no effort to cover this up because

4   if you look at what I've said, what the facts are, this letter

5   gets escalated up through the company --

6          **THE COURT:**  Why didn't it get escalated up to the

7   lawyers in the Waymo case?

8          **THE WITNESS:**  You're right, it didn't.

9          **THE COURT:**  It should have, shouldn't it?

10          **THE WITNESS:**  In retrospect I feel that, yes, it

11   should have, and I will take full responsibility for that.

12          **THE COURT:**  Well, maybe you should.

13          **THE WITNESS:**  I am.

14          **THE COURT:**  In addition, in addition, whoever it is

15   that instructed you not to give -- did they instruct you not to

16   give it to the MoFo lawyers?

17          **THE WITNESS:**  Not in so many words.  The instruction

18   was, do not share it with anyone outside of the Compliance

19   Department.

20          **THE COURT:**  Well, I'm just going to tell you that is

21   not the way litigation works in your U.S. District Court.

22          **THE WITNESS:**  I'm aware.

23          **THE COURT:**  All right.

24          **THE WITNESS:**  I'm aware.

25          **THE COURT:**  So you had better tell those people that

1   told you otherwise they are in trouble, and maybe you're in

2   trouble.

3       All right.  I'll shut up at this point, but I -- to me,

4   this document should have been produced.  I just -- I just

5   cannot -- we had to continue an entire trial because of your

6   decision.  You wanted this case to go to trial so that they

7   didn't have the benefit of that document.  That's the way it

8   looks.  Jam it, jam it.  And then -- and then it just turns out

9   that the United States Attorney did an unusual thing and gave

10  it to us.  Put us on to it.

11      Now, maybe the guy is a disgruntled employee and all that,

12  but that's not your decision to make.  That's for the jury to

13  make that decision.

14          THE WITNESS:  Your Honor, I do want to make sure that

15  it was clear; that you're quite right, that this letter was not

16  given to the Waymo lawyers and it was not given to the Court,

17  and for both of those things I will take full responsibility.

18      However, we did produce it to the U.S. Attorney on

19  multiple occasions --

20          THE COURT:  That does the jury in our case a lot of

21  good.

22          THE WITNESS:  -- in June and September.

23          THE COURT:  That does the jury a lot of good in our

24  case.

25          THE WITNESS:  I understand, but that undercuts this

1    notion that there was an attempt to keep this document secret.

2          THE COURT:  Not necessarily.  Not necessarily.

3          THE WITNESS:  Well, no.  When you give it to the

4    federal prosecutor's office, four of them, you're clearly

5    signaling that you're not trying to hide --

6          THE COURT:  I bet you Damali Taylor, who was in that

7    office, told you in a confidential communication that there was

8    no way the U.S. Attorney in the history of the world would turn

9    that over in civil litigation to us.

10       So you knew that they -- there was no way that document

11   was ever going to go from the U.S. Attorney to this Court,

12   although it wound up they did something very unusual and did

13   give it to us.

14       So I believe that that does not excuse your failure to

15   turn that over to the lawyers so they could make a decision on

16   whether to produce on it not.

17       Mr. Verhoeven, you're beating around the bush.  I'm going

18   to let you continue on, but ask questions -- we have other

19   witnesses here.

20       We're going to take a break in a few minutes.  I'm going

21   to do this.  We're going to take a 15-minute break.  When we

22   come back, you have 15 more minutes.  After that, it goes to

23   the other side and we're going to hear the remainder of the

24   witnesses.  15 minutes.

25         THE CLERK:  Court is in recess.

PADILLA - DIRECT EXAMINATION / VERHOEVEN

```
1              (Whereupon there was a recess in the proceedings
2          from 9:15 a.m. until 9:29 a.m.)
3              THE COURT:  All right.  Thank you.  Please be seated.
4      All right.  Let's continue.
5  BY MR. VERHOEVEN:
6  Q.   Ms. Padilla, I have marked three exhibits, 6, 7, and 8.
7          6 is entitled "Confidentiality Agreement."  7 is entitled
8  "Confidential Settlement Agreement and General Release of
9  Claims."  And 8 is entitled "Consulting Agreement."
10         Do you see those?
11 A.   I see them now, yes.
12 Q.   These are the three contracts that were signed as part of
13 the settlement, right --
14 A.   Yes.
15 Q.   -- with Mr. Jacobs?  Yes?
16 A.   Yes.
17 Q.   Just for the record, yes.
18         Okay.  Direct your attention --
19             MR. VERHOEVEN:  And I have copies, hopefully, for the
20 Court.
21 BY MR. VERHOEVEN:
22 Q.   So the first one I'm going to ask about is Exhibit 7,
23 which is the confidential settlement agreement and general
24 release of all claims.  Starts with control number 6370.
25         Direct your attention to page 2.
```

PADILLA - DIRECT EXAMINATION / VERHOEVEN

```
 1        You see under item 2, "Consideration"?

 2   A.   I'm looking there, yes.

 3   Q.   (As read)

 4            "The company will cause to be delivered to Halunen

 5        Law two checks in the gross total amount of $5 million."

 6        Is that accurate?

 7   A.   It's what it says, yeah.

 8   Q.   (As read)

 9            "The first check payable to Richard Jacobs, in the

10        gross amount of $2 million."

11        Do you see that in subsection "i"?

12   A.   Yes, I see that.

13   Q.   And then subsection "ii" says:

14            "A second check payable to Halunen Law in the gross

15        amount of $3 million."

16        Do you see that?

17   A.   Yes, I do.

18   Q.   So Uber paid Mr. Jacobs' lawyer $3 million in addition to

19   the payments to Mr. Jacobs?

20   A.   Yes.

21   Q.   And was this -- the reason you paid him this money was so

22   that he would sign a confidentiality agreement and not talk

23   about this; right?

24   A.   No.

25   Q.   Why would a lawyer -- do you -- is it your testimony that
```

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1    Mr. Halunen spent $3 million in legal fees?

2    **A.**    Uhm, he presented information about time spent.  It was

3    not on a rates-times-hours basis $3 million.  On a contingency

4    or kind of finder's fee basis, I think it approached that

5    number.  At the end of the day, these were just number

6    negotiations.  What was palatable to us and what would he take.

7    **Q.**    What was Mr. Halunen's fees?  Did he tell you?

8    **A.**    Geez.  I cannot recall, but I know that he spoke to Tony

9    Piazza about it.

10   **Q.**    So from Uber's perspective, all this money was --

11   regardless of where it went, went to the attorney or

12   Mr. Jacobs, it was the money they needed to pay to get settled?

13   **A.**    Well, in general when -- right.  When you're negotiating a

14   settlement agreement, one side wants one amount; the other side

15   wants another amount.  And you drive towards compromise.

16   **Q.**    Now, subsection B of section 2, "Clawback".  Do you see

17   that?

18   **A.**    Yes.

19   **Q.**    And this provision is saying that Uber gets to take all

20   that money back if certain things occur; right?

21   **A.**    Yes.

22   **Q.**    And specifically it says, under "i", quote:

23           "Jacobs shall repay and cause to be repaid to the

24        company an amount equal to the sums paid directly to

25        Jacobs under this agreement and under the attached

PADILLA - DIRECT EXAMINATION / VERHOEVEN

```
 1            consulting agreement for clawback events."
 2            Right?
 3   A.    Yes.
 4   Q.    And if you turn to page 3, it defines the clawback trigger
 5   event.
 6            Do you see that, Ms. Padilla?
 7   A.    I do.
 8   Q.    For the record, quote:
 9               "A clawback trigger event shall be defined as a
10            breach of any material term of this agreement, including,
11            but not limited to paragraph 7, confidentiality; paragraph
12            13, nondisparagement; and paragraph 14, cooperation of
13            this agreement."
14            Do you see that?
15   A.    I do.
16   Q.    So the agreement was we can take all this money back if
17   you tell people about this or if you don't cooperate with us or
18   if you say bad things about us?
19            MR. GONZÁLEZ:  Your Honor, that's vague.  "Tell people
20   about" is vague.
21            THE COURT:  The witness can correct it if it's wrong.
22   Overruled.
23            Please answer.
24            THE WITNESS:  No, I disagree with that
25   characterization of the document.
```

1   **BY MR. VERHOEVEN:**

2   **Q.**   Well, we'll get to the definitions of those --

3   **A.**   For example, cooperation.  If you look at paragraph 14,

4   what the agreement was for was to assure that Mr. Jacobs would

5   cooperate with any internal or external investigation by the

6   company or any governmental or regulatory agency, and with the

7   company in investigating or defending potential and actual

8   claims of litigation.

9   **Q.**   It says, quote --

10  **A.**   Wanted to make sure that he would make himself available

11  for government investigations, as well as other kinds of

12  internal investigations.

13  **Q.**   You finished?  Okay.

14      For the record, it says that the cooperation includes an

15  obligation, quote:

16          "To fully cooperate, at the company's request, with

17      any internal or external investigation by the company or

18      any government or regulatory agency and with the company

19      in investigating or defending any potential, threatened,

20      or actual claim or litigation that currently exists or may

21      arise subsequent to the execution of this agreement."

22      Do you see that?

23  **A.**   Yes, I do.

24  **Q.**   So if Mr. Jacobs didn't cooperate with you, he had to pay

25  back all the money?

1   **A.**    Uhm, it depends on how you define "cooperate with us."

2       So to give you an example, his appearance yesterday here

3   in the courtroom, at the order of Judge Alsup, was a form of

4   cooperation.

5   **Q.**    Okay.  And it specifically mentions discussing and

6   reviewing the allegations that Mr. Jacobs made in his

7   resignation email, which we'll get to in a minute, dated

8   April 14th, and in his letter -- counsel's letter to you, dated

9   May 5th, 2017; right?

10  **A.**    Uh-huh, yes.

11  **Q.**    Just to make clear, he needs to cooperate on those things;

12  right?

13  **A.**    Yes.

14  **Q.**    Okay.  Let's go back to -- in the interests of time, let's

15  go back to page 3, paragraph 4.  This bears the heading, quote,

16  "Future employment with company prohibited," closed quote.

17      And then it goes on, quote:

18          "Jacobs agrees not to seek, accept or continue

19      employment with the company or any of its related or

20      affiliated companies in the future."

21      And it goes on.  Do you see that?

22  **A.**    Yes.

23  **Q.**    And then the next sentence, the very next sentence says,

24  quote:

25          "This provision does not apply to the consulting

1          agreement attached hereto as Exhibit A."

2      Do you see that?

3  **A.**   I do.

4  **Q.**   So part of this agreement was Jacobs had to do this

5  consulting for a year in order to get paid another million

6  dollars, but you don't know what he did for that consulting

7  agreement.

8      And, by the way, he's barred from doing anything with the

9  company outside of that consulting agreement; right?

10  **A.**   Well, it's true that he was not eligible for reemployment.

11  And it is true that he had a consultancy agreement.  The extent

12  to which he worked under that consultancy agreement would be

13  answered by WilmerHale and others who would have worked

14  directly with him.

15          **MR. VERHOEVEN:**  Your Honor, there's only five minutes.

16  There's one other document I have to get done with these.  Do I

17  have to do it in five minutes?  I have a couple more questions

18  on the settlement.

19          **THE COURT:**  How many more do you have?

20          **MR. VERHOEVEN:**  Maybe seven, eight minutes total.

21          **THE COURT:**  All right.  Take seven or eight minutes.

22          **MR. VERHOEVEN:**  Thank you, Your Honor.

23  **BY MR. VERHOEVEN:**

24  **Q.**   All right.  Turn your attention to Exhibit 8, the

25  consulting agreement.

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1   A.   Yes, I have it in front of me now.

2   Q.   See, and this is an agreement with Mr. Jacobs; right?

3   A.   Uhm, yes.

4   Q.   And direct your attention to paragraph 3, compensation.

5   A.   Okay.

6   Q.   Quote:

7            "Company agrees to pay consultant a consultancy fee

8        of $38,461.54 every two weeks, beginning on August 23,

9        2017, for 26 total payments equaling $1 million cash."

10   Do you see that?

11   A.   Yes.

12   Q.   And it also says that if there's a clawback trigger event,

13   all that's due back; right?

14   A.   Uh-huh.

15   Q.   Then if you look to page 3, on the first paragraph -- are

16   you with me?

17   A.   I am, yes.

18   Q.   Quote:

19            "Subject to approval of the company's Board of

20        Directors" -- and I'm skipping the parenthetical, "as an

21        additional consultancy fee, consultant shall be granted

22        36,015 RSUs based on the current 409A value as of the

23        effective date of this agreement, which shall equal to

24        $1.5 million.  The RSUs shall vest as to one-half of the

25        units" -- excuse me.  Quote, "The RSU shall vest as to one

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1            one-twelfth of the units on each monthly anniversary of

2            the date of this agreement" -- and then it continues --

3            "so long as no clawback trigger event has occurred."

4            Do you see that?

5    A.    I do, yes.

6    Q.    So Uber agreed to pay over time $2.5 million in addition

7    to the 5 million in the settlement agreement; correct?

8    A.    The 5 million of which 3 million went to the lawyer.

9    That's correct.

10   Q.    Uber paid 5 million.  And it's agreeing here in the

11   consulting agreement to pay another 2.5 million; right?

12   A.    Yes, that's correct.

13   Q.    And these payments wouldn't occur right away.  They --

14   you'd only get them for over a 12-month period; right?

15   A.    Yes.  That's generally how we structure these agreements.

16   Q.    And so if he -- if Mr. Jacobs decided, you know what, this

17   stuff is just too important, I need to go talk to the

18   government about it, or I need to go voluntarily talk to the

19   *New York Times*, all this money would have to be returned, and

20   the money in the future he wouldn't get; right?

21   A.    No, that's not true.  We expressly discussed with his

22   lawyers that he was free at all times to go to any government

23   authority, including federal, and make any allegations, raise

24   any concerns that he wanted with them.

25   Q.    Can you tell me where it says that here or in any of these

PADILLA - DIRECT EXAMINATION / VERHOEVEN

```
 1    agreements?
 2              MR. GONZÁLEZ:  In interests of time, Your Honor,
 3    paragraph 5.
 4              THE WITNESS:  Thank you.  I know it's in there.
 5              MR. VERHOEVEN:  This is inappropriate.
 6              THE COURT:  Well, look at paragraph 5 and see if it
 7    helps.  Is that on point?
 8              THE WITNESS:  Yes, that's one of them.
 9              THE COURT:  Read out loud what it says.
10              THE WITNESS:  May I -- may I read it?
11              THE COURT:  Yes, please.
12              THE WITNESS:  Okay.  Paragraph 5:
13              "No interference with rights.  Nothing in this
14         agreement limits or affects consultant's ability to
15         initiate or participate in an investigation or proceeding
16         by any federal, state, or local agency charged with the
17         enforcement of any laws or regulations, including by
18         providing documents or other information."
19    BY MR. VERHOEVEN:
20    Q.  Direct your attention to the next paragraph.  Do you see
21    this says, quote:
22              "Any violation of by consultant of this agreement
23         would cause immediate, serious and irreparable harm to the
24         company"?
25         Do you see that?
```

PADILLA - DIRECT EXAMINATION / VERHOEVEN

```
 1   A.   Yes, I do.
 2   Q.   Let's move on, in the interests of time.  Let's go to
 3   Exhibit 9.
 4        MR. VERHOEVEN:  And Your Honor should have one of
 5   those on your desk.
 6        MR. GONZÁLEZ:  What is it, Counsel?
 7        MR. VERHOEVEN:  Exhibit 9.
 8        MR. GONZÁLEZ:  I don't have 9.
 9        MR. VERHOEVEN:  I left it in your chair, sir.
10   BY MR. VERHOEVEN:
11   Q.   Do you have it in front of you?
12   A.   I do now.  Thank you.
13   Q.   This is a resignation letter from Rick Jacobs.  Do you see
14   that?
15   A.   Yes.
16   Q.   Dated April 14th, 2017; correct?
17   A.   Correct.
18   Q.   And he sent it to Travis Kalanick; correct?
19   A.   Yes.
20   Q.   And also Liane Hornsey, Salle Yoo, Jill Hazelbaker;
21   correct?
22   A.   That's right.
23   Q.   Subject line says "Criminal and Unethical Activities in
24   Security."
25        Do you see that?
```

1  **A.**   I do.

2  **Q.**   Now, this is a letter that Mr. Jacobs wrote himself, isn't

3  it?

4  **A.**   Yes.  This is an email that he wrote the day -- yes.

5        We caught him exfiltrating company confidential and IP

6  materials to his private email account.  We had set up an

7  investigatory interview with him that morning with our I-team.

8  And as soon as he received notice of his interview --

9  inculpatory interview for theft of our own documents, he sent

10  this email to us.

11  **Q.**   Okay.  Where does it mention that in any of the settlement

12  agreements you have?

13  **A.**   It doesn't.  It's just what happened.

14  **Q.**   Where does it mention that in his resignation letter?

15  **A.**   What?

16  **Q.**   What you just testified to.  I didn't ask you, but you

17  volunteered your explanation.

18  **A.**   Yes.

19  **Q.**   Where is it found anywhere in his resignation letter?

20  **A.**   It's not found in his resignation letter.

21  **Q.**   Are you saying he was fired?

22  **A.**   No, he wasn't fired.  But he knew that he was minutes away

23  from an inculpatory interview for having exfiltrated company

24  confidential, potentially trade secret information from Uber to

25  himself at his home computer, which -- which is an activity

1   that was detected in due course by our IT specialists.

2        And, as a result, the employee relations team had put time

3   on his calendar this morning of his resignation email to

4   confront him and say, why are you stealing company confidential

5   documents?

6   **Q.**   So presumably there's records of this?

7   **A.**   Uhm, of his theft of our information?

8   **Q.**   Records relating to your accusations you're making under

9   oath?

10  **A.**   Oh, yes.

11  **Q.**   Okay.  What records are there?

12  **A.**   There are -- let's see.  We preserved all of the emails

13  that he -- emails and business documents that he had

14  exfiltrated to his own personal email accounts.

15       We also have the meeting set up with the employment --

16  employee relations investigators.  And there is very likely

17  email between the employee relations team and the security team

18  regarding the -- noticing this unusual activity and

19  exfiltrating documents outside of our firewall.

20  **Q.**   If those allegations are true, can you explain to His

21  Honor why Uber would pay Mr. Jacobs and his attorneys

22  $7.5 million?

23  **A.**   Yeah.  So his theory at the mediation was that he was

24  exfiltrating or stealing those documents in order to be a

25  whistleblower, and that he needed those documents in order to

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1  prove that he was a whistleblower.

2  **Q.**   Can you -- so you paid him the money so that he wouldn't

3  blow the whistle?  Is that what you're saying?

4  **A.**   No, no, no, no, no.  What I'm saying is that that's his

5  reason for why he was exfiltrating those documents.

6  **Q.**   That wasn't my question, Ms. Padilla.

7  **A.**   Uh-huh.

8  **Q.**   Can you explain to His Honor, if indeed this person was

9  stealing your information, why Uber would pay him and his

10  lawyer $7.5 million.

11  **A.**   So what I'm explaining to you is that the frame around his

12  theft of our documents --

13          **MR. VERHOEVEN:**   Your Honor, I object to the --

14          **THE WITNESS:**   -- was to --

15          **MR. VERHOEVEN:**   -- nonresponsiveness --

16     (Unreportable simultaneous colloquy.)

17          **THE WITNESS:**   -- as a whistleblower.

18  **BY MR. VERHOEVEN:**

19  **Q.**   I'll try one more time.

20      Can you explain to His Honor why Uber would pay an

21  individual and his attorney, who Uber believed stole trade

22  secrets from Uber, an amount of $7.5 million?  Why would you do

23  that?

24  **A.**   I've already explained to you why we settled with

25  Mr. Jacobs.

PADILLA - DIRECT EXAMINATION / VERHOEVEN

1  Q.   Do you have any further information to provide?

2  A.   I really don't.

3       MR. VERHOEVEN:  I could keep going through this

4  letter, Your Honor.  It speaks for itself, if you want to stop.

5       THE COURT:  I would like to know, was this letter put

6  on the privilege log, or was it produced in litigation?

7       MR. VERHOEVEN:  We've never seen it before, Your

8  Honor.

9       THE COURT:  Was it on the privilege log?

10      MR. GONZÁLEZ:  I don't believe so, Your Honor.

11      THE COURT:  All right.  I think you should ask

12  questions why this letter was not -- what's the story on

13  this -- this is not a letter.  It's an email.

14      This specifically mentions Waymo at the end.  This is

15  April 14th.  It makes allegations about -- so that activities

16  and communications could be done without regards to judicial

17  orders and subpoenas, hiding employees and so forth.

18      Now, whether or not it's true or not, why -- what was the

19  sequence here?  This goes to -- maybe it didn't even go to you.

20      Did you ever see this?

21      THE WITNESS:  It did not come to me, Your Honor, but I

22  can tell you --

23      THE COURT:  Well, did you ever see it back then?

24      THE WITNESS:  Yes, it was forwarded to me.  And I then

25  forwarded it to the -- both the manager of this organization

PADILLA - DIRECT EXAMINATION / VERHOEVEN

```
 1   and Mr. Jacobs' immediate manager, which is what I normally do
 2   when we get a disgruntled email like this, and I say, hey,
 3   looks like you have something going on in your org.  We need to
 4   sit down and talk about this.
 5           THE COURT:  Did you have any specific sit-down and
 6   talk-abouts about whether or not this document should be turned
 7   over to the outside lawyers or the inside lawyers dealing with
 8   Waymo?
 9           THE WITNESS:  Honestly, no.  No.
10           THE COURT:  So --
11           THE WITNESS:  This letter became the springboard for
12   the longer letter that we were able to obtain in May.
13           THE COURT:  So -- but this looks like it is an email
14   and it's on your system somewhere.
15           THE WITNESS:  It is.  It should be.  It's in Travis,
16   Liane, Salle, and Jill's email boxes.  But I don't know the
17   protocol of how --
18           THE COURT:  Let me ask the lawyers a question a
19   minute.
20       Whenever you did those searches of the server with
21   queries, can you look at this letter and tell me whether or not
22   the -- this letter would have been a hit?  I'm sorry, talking
23   about this email from Rick Jacobs.
24           MR. GONZÁLEZ:  May I now say what I wanted to say
25   earlier, Your Honor?
```

1          I'll wait, if you'd like.

2              **THE COURT:**  No, no.  Go ahead.  Tell me.  I would like

3     to know.

4              **MR. GONZÁLEZ:**  I would like to know too.  I'm trying

5     to piece it together.

6          Here is what I think the answer was.  I was quite

7     surprised to learn that "Waymo" is not a search term.  And

8     so -- because when I saw this, I said, wait a minute, it

9     references Waymo, but Waymo was not one of the search terms

10    that the parties used.  So that's why I think this document was

11    not a hit.

12             **THE COURT:**  Well, but were there other search terms

13    where it was a hit?

14             **MR. GONZÁLEZ:**  I don't believe so, Your Honor.

15             **THE COURT:**  For example, it refers to the ATG.  That

16    might have been a hit.  I don't know the answer to it.

17         But your -- is it true, Mr. Verhoeven, that you neglected

18    to put "Waymo" as a search term?

19             **MR. VERHOEVEN:**  I wasn't in charge of that.

20    Ms. Padilla was in charge of that.  But --

21             **MS. ROBERTS:**  Roberts.

22             **MR. GONZÁLEZ:**  No, she wasn't.

23             **THE WITNESS:**  I was not in charge of that.

24         (Laughter)

25             **MR. VERHOEVEN:**  But I just want to make a point before

1   you ask her questions.  This shouldn't be a game of hide and

2   seek, where we have to ask the right question.  This went to

3   Ms. Padilla, the head of litigation, and specifically

4   referenced Waymo.  They had a duty to come forward with that,

5   just like they had --

6           **THE COURT:**  I'm not sure that's right.  I'm not sure

7   that's right.  If you didn't ask for it, they've got an

8   argument, well, okay, if they want it, they have to ask for it,

9   we're not -- we're not lawyers for Mr. Verhoeven.  You have to

10  ask the right terms.

11      Now, there have been a lot of requests in this case for

12  documents.  And, in fact, I sent out orders saying what had to

13  be done.

14          **MR. VERHOEVEN:**  Right.

15          **THE COURT:**  So maybe this would have been picked up by

16  one of my orders.  But I'm asking a narrower question.

17          **MR. VERHOEVEN:**  Okay, Your Honor.

18          **THE COURT:**  And that is, did you do a search that

19  should have collected this document?  Do you know the answer

20  for sure?

21          **MS. ROBERTS:**  Your Honor, I haven't compared word for

22  word the resignation letter.  And I'm happy to do that in court

23  today.  "Waymo" was not a negotiated search term.

24      And just to give you a little background, the parties

25  didn't negotiate search terms until starting in July.  Both

1   parties were running their own searches.  And we certainly did

2   not limit our searches to the negotiated terms with the other

3   side.  And on multiple occasions we made clear, I personally

4   made clear that we expected that they were not limiting their

5   searches to the negotiated terms.  But "Waymo" was not a search

6   term.

7        Internal code names for Waymo or Project Chauffeur were

8   proposed.  "Project Chauffeur" itself was a search term.  And

9   the reason why we didn't have "Waymo" and "Uber" also wasn't a

10  search term, is because it would pick up a lot of mishits.

11       And so it's common for the company names not to be a

12  search term, but that shouldn't be the reason why these

13  documents that they were aware of were excluded.  But it was

14  not a search term, Your Honor.

15       THE COURT:  I would like to know -- this is not a

16  long -- it's two pages.  You ought to be able to go through

17  here and say with the search terms that you negotiated was this

18  going to be a hit or not.  That would be important to know.

19       MS. ROBERTS:  Certainly, Your Honor.

20       And I can say "Otto" was a search term.  And so the longer

21  letter, I know Otto was mentioned in that letter.  So that

22  would have been hit on the search terms if that letter was sent

23  to any of the custodians.

24       Ms. Padilla was not a custodian, but Mr. Kalanick was.

25  I'm happy to do a side-by-side comparison while we are in

 1   court.

 2           THE COURT:  Please do that.  All right.

 3           MR. GONZÁLEZ:  Your Honor, may I just make one last

 4   point --

 5           THE COURT:  All right.

 6           MR. GONZÁLEZ:  -- since we are on it.

 7       And she just alluded to it, but I want to make sure you

 8   heard, which is, we not only agreed to search terms, we also

 9   agreed the custodians.

10       And for context, you know how fast we were moving.  And

11   together they told us what custodians to use.  And Ms. Padilla

12   was not one of the custodians.  Just want to make that clear to

13   you.

14           THE COURT:  Yeah, but was Travis Kalanick a custodian?

15           MR. GONZÁLEZ:  Your Honor, Mr. Kalanick, I believe,

16   was.  I do not believe that Mr. Kalanick received this letter.

17           THE COURT:  It says it's to him.

18           MR. GONZÁLEZ:  Well, no, this is an email.  This was

19   an email.  But it wasn't -- it wasn't every single document

20   that mentions Travis.  That's not --

21           THE COURT:  It's from Rick Jacobs to Travis Kalanick.

22   So if Kalanick was a custodian, his email should have picked it

23   up.

24           MR. GONZÁLEZ:  No.  Only the search terms hit, Your

25   Honor.  You got a bunch of --

PADILLA - DIRECT EXAMINATION / VERHOEVEN

```
 1              THE COURT:  That's what I'm asking.  Come on.  You're

 2    going in circles.  I'm asking, was there a search term

 3    associated with Kalanick that would have picked up this letter?

 4              MR. GONZÁLEZ:  And I think this answer is no.

 5              THE COURT:  Well, that's what you think.  Let's find

 6    out for sure.

 7              MR. VERHOEVEN:  Well, I just have to address the

 8    completely made-up statement about Travis not receiving his

 9    emails.  I took his deposition.  He never once denied that he

10    didn't read an email that was sent to him.

11              MR. GONZÁLEZ:  I didn't say that.

12              MR. VERHOEVEN:  There's no evidentiary basis for that

13    statement.

14              MR. GONZÁLEZ:  I didn't say that.

15              THE COURT:  All right.  Are you done now?

16              MR. VERHOEVEN:  One more minute.

17              THE COURT:  All right.

18              MR. VERHOEVEN:  I think it's important to ask.

19              THE COURT:  Please.  Go ahead.

20    BY MR. VERHOEVEN:

21    Q.   You've heard of COIN, competitive intelligence?

22    A.   I have.

23    Q.   Did Uber search any of the files of COIN in connection

24    with this suit, to look for responsive information?

25    A.   I'm not sure what files you're referring to.
```

PADILLA - DIRECT EXAMINATION / VERHOEVEN

 1    Q.    Any of the files of COIN.

 2          MR. GONZÁLEZ:  Objection as vague.

 3          THE WITNESS:  I -- I just -- I don't know one way or

 4    the other, and I'm not even sure what files of COIN you're

 5    referring to.

 6    BY MR. VERHOEVEN:

 7    Q.    I'm referring to files that people who work at COIN have.

 8    A.    Okay.  I don't know.  I just don't know.

 9    Q.    What about the Strategic Services Group?  Did Uber search

10    any of the files of the people who work in the Strategic

11    Services Group as part of its effort to produce and find all of

12    the important information in this case?

13    A.    Unfortunately, I did not run the discovery in this case.

14    And I truly am not close enough to be able to answer levels --

15    questions at this level of detail.  But I am sure others on the

16    team will be able to answer these questions.

17    Q.    Well, you were asked to be prepared to testify today;

18    right?

19    A.    Yes.

20          MR. GONZÁLEZ:  Your Honor, now it's just argument.

21          THE COURT:  All right.  She has answered a lot of

22    questions.  And maybe there's a few she doesn't know.

23          MR. VERHOEVEN:  One more question, Your Honor.

24          THE COURT:  All right.

25

1    BY MR. VERHOEVEN:

2    **Q.**   Who was?  Who can answer these questions about whether

3    these searches were done?

4    **A.**   I think you might just confer in a gentlemanly way with

5    your esteemed colleagues.

6         **THE COURT:**  No, no.  That's not good enough.

7         Who in your company?  These two people, these lawyers who

8    are in charge of the Waymo litigation, would they know the

9    answer?

10        **THE WITNESS:**  Very likely.  So you could start with

11   Aaron Bergstrom and Nicole Bartow and go from there.

12        **THE COURT:**  All right.  Let's go to the next.  Other

13   side's turn now.

14                          <u>**CROSS-EXAMINATION**</u>

15   BY MR. GONZÁLEZ

16   **Q.**   Ms. Padilla, I have just a few questions to clarify a few

17   things.

18        First of all, and you read this into the record, I

19   believe, but as noted on Exhibit 8 paragraph 5, it says here:

20            "Nothing in this agreement limits or affects

21        consultant's ability to initiate or participate in any

22        investigation."

23        "Consultant," that would be Mr. Jacobs?

24   **A.**   Yes, it would be.

25   **Q.**   Is that consistent with your understanding of the deal,

1  that Mr. Jacobs is free to initiate any investigation that he'd

2  like with prosecutorial agencies?

3  **A.**   Absolutely right.

4  **Q.**   And when you provided the letter to three different

5  government agencies, did you tell them that they couldn't share

6  information with Judge Alsup?

7  **A.**   Never.

8           **THE COURT:**  Did you think they would?

9           **THE WITNESS:**  Uhm, actually, potentially, yes.

10          **THE COURT:**  I just find that hard to believe.  Because

11  in my experience in this district -- and I've been practicing

12  and been on this bench a long time in this district -- this is

13  the first time it's ever occurred.

14      What do you base that on?  When you say, potentially they

15  would share it with me, what do you base it on?

16          **THE WITNESS:**  I base it on the fact that you had --

17  Your Honor had made a referral of the case to the Office, and

18  the Office has subsequently opened up on this matter.  And so

19  there's an active case.  And it felt reasonable.  And we had no

20  one telling us to the contrary that there could be some sharing

21  of the information.

22          **THE COURT:**  Well, I can't imagine how you can think

23  that I'm sharing information about this case with the

24  United States Attorney, other than that one-sentence referral.

25  That was it.

PADILLA - CROSS / GONZALEZ

1          I don't see how you could possibly think that we were

2     sharing or swapping information back and forth.

3               MR. GONZÁLEZ:  And if the federal government --

4          THE COURT:  Is there something in writing to back up

5     what Ms. Padilla just said, something that would show she

6     really did think that?

7               MR. GONZÁLEZ:  I don't think she said, Your Honor,

8     that you were sharing information with the authorities.  I

9     think she said that there had been a referral.

10              THE COURT:  Yeah, that's true.

11              MR. GONZÁLEZ:  That's all she said.

12              THE WITNESS:  Uh-huh.

13              THE COURT:  I think it was more than that, but you

14    read the record.

15    BY MR. GONZÁLEZ

16    Q.   When the information was provided to the Government

17    authorities, did you understand that one possibility is that

18    they could open up an investigation?

19    A.   Yes.  Absolutely.

20    Q.   And maybe possibly issue indictments?

21              MR. VERHOEVEN:  Objection.  Leading.

22    BY MR. GONZÁLEZ:

23    Q.   Well, wasn't that one possibility?

24              THE COURT:  It is leading.  Sustained.

25

1   BY MR. GONZÁLEZ

2   Q.   What was your understanding, when this information was

3   provided to the prosecutors, as to whether or not there was a

4   possibility that they might actually prosecute someone?

5   A.   Okay.  So I assumed that NDCA, SDNY, Main would open up on

6   this matter.  And they would have to duke it out as to who was

7   going to be the lead investigative office, of course.  But the

8   assumption was that they would all open on it, and then we

9   would receive subpoenas, grand jury subpoenas, and take it from

10  there.

11  Q.   Now, I want to separate two things that I think became

12  jumbled in your testimony.  I want to separate your state of

13  mind when you received the 37-page letter at that time from

14  your state of mind today, about the 37-page letter and whether

15  it should have been caught, and search terms, and all of that.

16       So let's start with the first part.

17            MR. VERHOEVEN:  This is -- Your Honor, I object.  His

18  entire setup is leading.

19            MR. GONZÁLEZ:  I'm separating two things, Your Honor.

20            THE COURT:  He is.

21       And at the time when there's a jury, you will be in

22  trouble with me if you do some of this.  But go ahead.  What is

23  your actual question going to be?

24  BY MR. GONZÁLEZ:

25  Q.   Focusing on the time that you received the 37-page letter,

**PADILLA - CROSS / GONZALEZ**

1  at that time, did you think, in your mind, about not producing

2  the document to the folks at the defense table here?

3  **A.**   No.

4  **Q.**   And when you were told by someone that you shouldn't

5  disclose the information, did they mention specifically this

6  case?

7  **A.**   No.

8  **Q.**   Or Judge Alsup?

9  **A.**   No.

10  **Q.**   You were just told generally not to distribute it any

11  further; is that right?

12         **MR. VERHOEVEN:**   Objection.   Leading.

13         **THE COURT:**   Sustained.

14  **BY MR. GONZÁLEZ:**

15  **Q.**   Now let's talk about this point of why did you pay so much

16  money.

17         First of all, without getting into the details of the

18  letter, what is your recollection as to how many countries were

19  referenced in this document?

20  **A.**   Uhm, gosh, about a dozen or so.   Maybe more.

21  **Q.**   And the letter also raised issues domestically?

22  **A.**   Correct.

23  **Q.**   Did the letter reference names of people who worked with

24  Uber and these various locales?

25  **A.**   It did.   It mentioned a number of names, including

1   individuals for whom, for national security reasons, their

2   identities shouldn't be compromised.

3   **Q.**   And how long have you been practicing law?

4   **A.**   I started at Morrison & Foerster in October 1991.  So 26

5   years.

6   **Q.**   You were a partner there?

7   **A.**   I was a partner at Morrison & Foerster.

8   **Q.**   Then you were a partner at Orrick?

9   **A.**   I was a partner at Orrick.

10  **Q.**   Then you went in-house at VMware?

11  **A.**   I was at VMware.

12  **Q.**   How long were you there?

13  **A.**   Just under six years.

14  **Q.**   What was your title?

15  **A.**   At VMware, I was Vice-President, Deputy General Counsel

16  for Global Compliance Litigation and Employment Law.

17  **Q.**   And just generally, what did you do there?

18  **A.**   I ran the company's entire compliance program, which

19  included FCPA, export control, bribery, anticorruption.  It

20  included litigation of all types.  And it included all of the

21  company's employment law issues.

22  **Q.**   Given your 20-some years of legal experience, including,

23  sounds like, more than a decade as in-house counsel, and the

24  fact that the allegations in that 37-page letter were vast,

25  what is your estimate as to how much it would have cost Uber if

1   you had taken that case, litigated that case through trial?

2   **A.**   There would have been two costs.   One would have been

3   the -- just the sheer dollars and cents for outside counsel.

4   And that would have been a lot.   Probably 5 to 10 million by

5   the time you deal with a very, very capable whistleblower

6   specialist from Tennessee.

7        The other cost would have been, of course, in terms of

8   distraction, lost productivity, disruption to the business, and

9   of course the reputational damage done by the release of

10  salacious unanswered allegations.

11  **Q.**   And e-discovery alone, set aside the lawyer fees, how much

12  do you estimate e-discovery would have cost Uber if you had to

13  get in litigation involving multiple countries?

14          **MR. VERHOEVEN:**   Objection.   Foundation.

15          **THE COURT:**   She probably knows.

16          **THE WITNESS:**   I do know.   I've handled these types of

17  matters in litigation, particularly on an FCPA front.   And the

18  e-discovery on that is going to be 4 to 5 million alone.

19  **BY MR. GONZÁLEZ:**

20  **Q.**   And is it fair to say that there were concerns about the

21  safety of these Uber employees in these foreign jurisdictions

22  as well?

23  **A.**   Yes.   Well documented.

24  **Q.**   And I don't want to get into too much detail, but other

25  witness made this point.

1      Have there been Uber employees or Uber drivers who have

2  been the victims of violence in multiple different countries?

3  A.   Yes.  Some have been killed.

4  Q.   Many of have been killed?

5  A.   Many have been killed.

6  Q.   One driver was burned alive; is that right?

7  A.   Yes.

8          MR. VERHOEVEN:  Objection.  Mr. González shouldn't be

9  testifying; the witness should.

10 BY MR. GONZÁLEZ:

11 Q.   Was there a driver that was burned alive?

12 A.   Yes.

13 Q.   Have there been people kidnapped?

14 A.   Many.

15 Q.   So when this case was settled, you had in mind the cost of

16 litigation; would that be fair?

17 A.   Yes.

18 Q.   The distraction to the company?

19 A.   Yes.

20 Q.   The safety of the employees?

21 A.   Very much so.

22 Q.   This is important, Ms. Padilla.

23      When you settled that matter, did you do it because you

24 didn't want Judge Alsup to find out about it?

25 A.   Hell no.

**PADILLA - CROSS / GONZALEZ**

1   Q.   And to be clear, because I don't think it is, you've got

2   to tell this judge:  When you didn't give that document to the

3   lawyers at this table, was that purposely intending to keep it

4   away from Google?

5         MR. VERHOEVEN:  Objection.  Leading.

6         THE WITNESS:  Absolutely not.

7         THE COURT:  No.  When an accusation is made of the

8   type that Mr. Verhoeven has made, it's okay to lead to give

9   the -- give the witness a clear-cut opportunity to give a

10   denial.  It is leading.  But, nevertheless, it is a

11   time-honored exception.

12     So, please, answer the question.

13         THE WITNESS:  The answer was "Absolutely not."

14   BY MR. GONZÁLEZ:

15   Q.   In fact, even right now, that we've got this 37-page

16   letter, even right now, do you think that 37-page letter is

17   going to make them win?

18   A.   No.

19         THE COURT:  Mr. González.

20     (Laughter)

21         MR. GONZÁLEZ:  Well, it's just a point, Your Honor.

22   It's just a point.

23         THE COURT:  Ridiculous.

24         MR. GONZÁLEZ:  She has no -- she has no motive to hide

25   this from you.  This is -- these are bogus allegations that

```
 1   barely touch upon this case.  Barely.  She had no motive to
 2   hide it.
 3           THE COURT:  Well, it shows a surreptitiously
 4   clandestine alternative communication system that is off the
 5   servers, which would be ready-made for explaining why
 6   Mr. Verhoeven hasn't found the trade secrets on the server.  So
 7   it has a lot to do with this case.
 8           MR. GONZÁLEZ:  The next witness will demonstrate that
 9   that's not quite accurate, Your Honor.  But I understand.
10           THE COURT:  I look forward to hearing it.
11           MR. GONZÁLEZ:  We do too.  That's all.
12           THE COURT:  I'm going to let this witness step down.
13   Anything more?
14       Thank you.  We will -- you may step down, Ms. Padilla.
15           THE WITNESS:  Thank you.
16       (Witness steps down.)
17           THE COURT:  All right.  Who's our next witness?
18           MR. VERHOEVEN:  Sorry, Your Honor.  Next witness we
19   request is Mr. Henley, Mr. Mat Henley.
20           MR. GONZÁLEZ:  I believe he is in the witness room,
21   Your Honor.  Somebody is going to get him.
22           THE COURT:  Good.  Good.
23       While we have a delay here, now, I know a number of people
24   out there are lawyers that work for one side or the other.  But
25   on a day like this, when it's crowded, I want that -- you can
```

1  take up the front row in the well, but you shouldn't be taking

2  up seats that otherwise would go to the public.

3      So the law firms have got to not be greedy on taking up a

4  lot of space in the gallery.  Just think about that, and then

5  we'll -- I hope it's not a problem, but it looks like it's

6  pretty crowded out there to me.

7              **MR. VERHOEVEN:**  Your Honor, the rule has been invoked,

8  and I notice that Ms. Padilla is still in the courtroom.

9              **MR. GONZÁLEZ:**  Your Honor, Ms. Padilla is the head of

10  litigation at Uber.  I mean, she ought to be able to stay and

11  listen to this.

12             **THE COURT:**  I think so.  It's okay for her to stay for

13  that reason.

14      (Pause)

15             **THE CLERK:**  Will the witness please approach the

16  witness stand.

17             **THE COURT:**  Okay.  Welcome.  Please raise your right

18  hand.  Take an oath to tell the truth.

19                          **MAT HENLEY**,

20  called as a witness for the Plaintiff, having been duly sworn,

21  testified as follows:

22             **THE COURT:**  What did you say?  I didn't hear you.

23             **THE WITNESS:**  "I do."

24             **THE COURT:**  You have to say it audibly.  Thank you.

25  Please be seated.

```
 1        And say your name for the record into the microphone so we

 2   can hear you.

 3             THE WITNESS:  Mat Henley.

 4             THE COURT:  Very good.

 5        Who are you?

 6             MR. UMHOFER:  Your Honor, my name is Matthew Umhofer.

 7   I'm counsel for Mr. Henley.  And I'll be on call here, if you

 8   will, if any issues come up.

 9             THE COURT:  Of course.  Why don't you go sit right

10   there in the front row, in the jury box, and make yourself

11   comfortable.  If you need to leap to the occasion, just do it.

12             MR. UMHOFER:  I will, Your Honor.

13        One point I wanted to make.  Mr. Henley is prepared to

14   proceed today.  I got a call yesterday, yesterday evening,

15   landed at 12:30, and met with Mr. Henley for the first time a

16   few hours ago.  I have not had sufficient time to prepare for

17   this.  I'm sure few people in the courtroom have.

18        My only request, in light of that, is that if Mr. Henley

19   has a moment where he feels he needs to consult with me, he be

20   afforded the opportunity to do so.

21             THE COURT:  Well, that depends on the question.  If

22   the question, I think, requires such a consultation, sure.

23             MR. UMHOFER:  Thank you, Your Honor.

24             THE COURT:  But maybe not.

25             MR. UMHOFER:  Understood.
```

HENLEY - DIRECT / VERHOEVEN

```
 1              THE COURT:  Depends on the question.

 2              MR. UMHOFER:  Understood, Your Honor.  Thank you.

 3              THE COURT:  You have a seat.

 4         And, Mr. Verhoeven, go ahead.

 5              MR. VERHOEVEN:  Thank you, Your Honor.

 6                       DIRECT EXAMINATION

 7    BY MR. VERHOEVEN:

 8    Q.   Good morning, Mr. Henley.

 9    A.   Good morning.

10    Q.   You were hired by Uber in the summer of 2015?

11    A.   Yes.

12    Q.   And your title was Director of Global Threat Operations?

13    A.   That's my current title.

14              THE COURT:  Repeat your answer.  That's your current

15    title.

16              THE WITNESS:  That is my current title.

17    BY MR. VERHOEVEN:

18    Q.   What was your title when you started?

19    A.   Senior Manager of Threat Operations.

20    Q.   And then you were promoted to Director?

21    A.   Correct.

22    Q.   Who do you report to currently?

23    A.   Currently, Tony West.

24    Q.   Did you ever report to Joe Sullivan?

25    A.   Yes.
```

HENLEY - DIRECT / VERHOEVEN

1  Q.   Can you give me the time frames when you reported to Joe

2  Sullivan?

3  A.   Uhm, from the time of start until Tuesday.

4  Q.   When he was terminated?

5  A.   Correct.

6  Q.   Do you have an understanding as to why he was terminated?

7  A.   I don't know the whole specifics, no.

8  Q.   Do you have any understanding?

9  A.   I have -- what I read in the press.

10          THE COURT:   I don't think that's worthwhile to pursue.

11  BY MR. VERHOEVEN:

12  Q.   Okay.  You should have tab -- or excuse me, Exhibit 1 in

13  front of you.

14          MR. UMHOFER:   Your Honor, could I see copies of these

15  as well?

16          THE COURT:   Yes, you may.  Yes.

17          MR. VERHOEVEN:   We marked these yesterday.

18          THE COURT:   And then, in the meantime, while

19  they're -- just go stand right by your client, look over his

20  shoulder.  And you may do that.  Just don't talk to him

21  without -- without permission of the Court.

22      Are you ready to go?

23          MR. VERHOEVEN:   Here's another one.  I don't have a

24  staple for you.

25          THE COURT:   Okay.

HENLEY - DIRECT / VERHOEVEN

```
 1              THE WITNESS:  It's not labeled as 1.  Confirming this
 2      is 1?
 3              THE COURT:  Is that the letter from the lawyer?
 4              MR. VERHOEVEN:  That's Mr. Jacobs' letter -- excuse
 5      me, the letter from Mr. Jacobs' lawyer.
 6              THE COURT:  All right.  So that's Number 1.
 7      BY MR. VERHOEVEN:
 8      Q.   Have you seen this letter before?
 9      A.   The first time I saw it was last night, around 11 o'clock.
10      Q.   No one showed you this and asked you any questions about
11      it before then?
12      A.   I was interviewed regarding it, but I've never seen the
13      statement until last night.
14      Q.   When were you interviewed?
15      A.   Several times over the past six months.
16      Q.   You said "several times"?
17      A.   Yeah.
18      Q.   All right.  Can you be more specific?  How many times?
19      A.   I don't recall.
20      Q.   "Several" usually means like three to six.  Is that how
21      many?
22      A.   Yeah, that would be right.
23      Q.   Who interviewed you?
24      A.   Attorneys from WilmerHale.
25      Q.   What was the subject matter of the interview?
```

HENLEY - DIRECT / VERHOEVEN

```
 1   A.    Questions around his allegations.
 2   Q.    Did you receive a summary of the interview?
 3   A.    No.
 4   Q.    Was the information you provided to WilmerHale factual?
 5   A.    Yes.
 6   Q.    Did they ask you for any of your opinions?
 7   A.    I don't recall.
 8   Q.    So it was just a fact -- a fact interview?
 9   A.    I don't recall if there were opinions.
10   Q.    But there -- but you did provide facts?
11   A.    Correct.
12   Q.    Could you distinguish between these different meetings?
13   A.    Restate.
14   Q.    Do you know when they occurred relative to each other,
15   what dates?
16   A.    Not specifically.  It's been over six months.
17   Q.    So can you give me a time frame of when they started and
18   when they -- when the last one was?
19   A.    Sometime in the spring, up until maybe a month ago.
20   Q.    Did any of the questions you were asked concern Waymo?
21   A.    Yes.
22   Q.    Were you asked about trade secrets in connection with
23   Waymo?
24   A.    Yes.
25   Q.    And you provided factual information?
```

**HENLEY - DIRECT / VERHOEVEN**

1    **A.**    Yes.

2    **Q.**    Were you asked about ephemeral devices, ephemeral

3    communication devices?

4    **A.**    Yes.

5    **Q.**    Were you asked about non-attributable devices?

6    **A.**    Yes.

7            **MR. GONZÁLEZ:**  Excuse me, Your Honor.  These are

8    privileged interviews of lawyers doing an investigation for the

9    company.

10          I'm willing to let him ask the Waymo thing, but he ought

11   to just ask him for the facts that he's aware of.

12          **THE COURT:**  These are not privileged.  I've ruled in

13   other cases in litigation, if a company does some kind of

14   special investigation -- well, has this been -- has this report

15   been turned over to any other outside company or a government

16   agency?

17          **MR. GONZÁLEZ:**  I can check, Your Honor, but I don't

18   believe so.

19          **THE COURT:**  Well, if it's intended to be turned over

20   to the United States Attorney or the SEC, or anyone else, my

21   view is that that's a waiver.

22          But until then -- until then, the information itself is

23   not privileged, but the -- but his statements to the lawyers,

24   why is that privileged?  Tell me why that would be privileged.

25          **MR. GONZÁLEZ:**  Your Honor, otherwise, you can -- you

HENLEY - DIRECT / VERHOEVEN

1   can always learn from witnesses what they talked to the lawyers

2   about.  What the lawyer chooses to ask a witness is work

3   product.

4          THE COURT:  All right.  Look, that is a -- that one is

5   overruled.  That's qualified privilege.  And there's enough

6   good cause here to overrule that.  But the WilmerHale lawyers,

7   there's no way they were representing him.

8          MR. GONZÁLEZ:  They were representing the company,

9   Your Honor, and performing the investigation.

10         THE COURT:  But they weren't representing him.  So he

11  was not there to get legal advice.  So I don't believe that

12  there's any attorney-client privilege either.  So I'm

13  overruling your objection.  I'm going to allow Mr. Verhoeven to

14  ask these questions.

15         MR. VERHOEVEN:  Thank you, Your Honor.

16  BY MR. VERHOEVEN:

17  Q.   Did you -- were any other interviews conducted of you,

18  besides the WilmerHale interviews?

19  A.   Yes.

20  Q.   Okay.  Can you explain?

21  A.   Uhm, there was an interview around the termination of Rick

22  Jacobs.

23  Q.   Who interviewed you?  Who interviewed you?

24  A.   I don't recall.

25  Q.   Was it an outside counsel, or somebody within Uber?

**HENLEY - DIRECT / VERHOEVEN**

```
 1   A.    I don't recall.

 2   Q.    Did the subject of the -- was it a lawyer?

 3   A.    Yes.

 4   Q.    Do you remember the lawyer's name?

 5   A.    No.

 6   Q.    Was the subject -- did the subjects in the interview

 7   concern Waymo?

 8   A.    No.

 9   Q.    You weren't asked any questions that would relate to

10   Waymo?

11   A.    Not that I recall, no.

12   Q.    What about theft of trade secrets, were you asked any

13   questions that might relate in any way to theft of trade

14   secrets?

15   A.    Not that I recall.

16   Q.    What was the subject of the interview?

17   A.    Why he was terminated.

18   Q.    Okay.  Who terminated him?

19   A.    I did.

20   Q.    Why did you terminate him?

21   A.    Performance issues.

22   Q.    Okay.  What were the performance issues?

23   A.    Lack of.

24   Q.    That's very concise.  But could you explain what -- what

25   you mean by "lack of"?
```

HENLEY - DIRECT / VERHOEVEN

```
 1   A.    Yeah.  He did not perform at his job over a long period of
 2   time; received negative feedback throughout the company,
 3   including from other leadership.  And we attempted to demote
 4   him into a more appropriate role, to give him a second
 5   opportunity.  And when we discovered him stealing data, we
 6   moved to term him.
 7   Q.    Was it your view that Mr. Jacobs was not working with
 8   Legal enough and needed to further protect information from
 9   discovery?
10   A.    No.
11   Q.    Did you say that to him?
12   A.    Never.
13   Q.    Did you give him a performance review?
14   A.    Yes.
15   Q.    Is that written down?
16   A.    Yes.
17   Q.    In what form?
18   A.    We have a formal system of giving performance reviews.
19   There's a system at Uber.
20   Q.    Okay.  Could you just briefly describe how that works.
21   A.    Yeah.  You collect feedback from peers and stakeholders.
22   And it's factored into my review of him, which is then
23   documented.
24   Q.    Does the -- does the employee have an opportunity to
25   respond?
```

HENLEY - DIRECT / VERHOEVEN

1    A.   Yes.

2    Q.   And how does that work?

3    A.   How does that work?

4    Q.   Yeah.  I mean, just like you described how the performance

5    review works.

6    A.   Yeah, they're presented with their review.

7    Q.   Yes.

8    A.   And then they have a chance to respond.

9    Q.   Just orally?

10   A.   Yes.

11   Q.   So there's no opportunity for them to write a written

12   response?

13   A.   There's every opportunity to write one.  There's every

14   opportunity to write one.  Whether they choose to is different.

15   Q.   Okay.  Did Mr. Jacobs write a written response?

16   A.   No.

17   Q.   Have you searched the files to make sure?

18   A.   No.

19   Q.   What were the tasks that he wasn't performing enough of?

20   When you said "lack of," which specific tasks was -- was there

21   a lack of his performance?

22   A.   A lack of prioritizing his work.  He has a specific

23   charter for his team, which is to anticipate threats to the

24   company.  There were multiple misses that should not have been

25   missed.  Those continued over time.

**HENLEY - DIRECT / VERHOEVEN**

1   Q.   Did the threats that he was charged with anticipating

2   include litigation?

3   A.   Restate the question.  I don't understand.

4   Q.   Were the threats -- were the threats that he was charged

5   with anticipating, did those include litigation, future

6   litigation?

7   A.   What threats?

8   Q.   You testified, I believe, that -- that he wasn't

9   prioritizing his work and he wasn't anticipating threats to the

10  company.

11  A.   No.  The threats would be threats against violence against

12  our driver partners, violence against our employees.

13  Q.   Anything else?

14  A.   Uhm, that sums up the major ones.

15  Q.   Well, was there anything else?

16  A.   Not that I can think of.

17  Q.   Did he have any responsibilities for obtaining information

18  from competitors?

19  A.   Not that I recall.

20  Q.   Did he have any oversight of any hacking that occurred?

21  A.   No.

22  Q.   Let's go back to the letter.  And direct your attention to

23  page 4.  This is Exhibit 1, for the record.

24  A.   Page 4?

25  Q.   Yes, sir.

**HENLEY - DIRECT / VERHOEVEN**

1  A.   I'm there.

2  Q.   So this is Mr. Jacobs' letter, just so we set the stage;

3  correct?

4          THE COURT:  Isn't that the letter from the lawyer?

5  BY MR. VERHOEVEN:

6  Q.   I'm sorry.

7       The letter from the lawyer, to set the stage, for

8  Mr. Jacobs' lawyer; right?  Do you understand that?

9  A.   Not really.  I just saw this letter, again, at 10 o'clock

10  last night.

11  Q.   This is a letter you saw for the first time last night?

12  A.   Yes.

13  Q.   And you see on page 4 there's two little ii's with the

14  heading "Strategic Services Group"?

15  A.   Yes.

16  Q.   What is the Strategic Services Group?

17  A.   It's part of our intel group.

18  Q.   But what is it?

19  A.   They're responsible for the nontechnical side.  Intel

20  collections and investigative support.  So interviewing

21  employees, et cetera.

22  Q.   Anything else?

23  A.   No.  That sums it up.

24  Q.   Who's responsible for the technical side of intel

25  collection?

HENLEY - DIRECT / VERHOEVEN

```
 1   A.   That would be Marketplace Analytics.  It's also one of my
 2   teams.
 3   Q.   Okay.
 4   A.   Do you want --
 5   Q.   Market Analytics?
 6   A.   Marketplace Analytics.
 7   Q.   Can I just call it MA?
 8   A.   Sure.
 9   Q.   And is there a person who specifically is in charge of the
10   tech side of intelligence collections within MA?
11   A.   I am technically in charge.  There is a people manager,
12   Kevin Maher.
13   Q.   And do you have a tech background, sir?
14   A.   Yes.
15   Q.   Can you summarize that for the Court?
16   A.   Security engineering background.
17   Q.   Can you read code?
18   A.   Yes.
19   Q.   Can you create programs and things like that?
20   A.   I am not a software engineer.
21   Q.   Where is your area of expertise?
22   A.   Systems security, infrastructure security, areas in that
23   space.
24   Q.   So security for systems, like against hackers; right?
25   A.   Yes.
```

**HENLEY - DIRECT / VERHOEVEN**

1    Q.    Okay.  Going back to the document, it refers to

2    H-U-M-I-N-T.  Do you see that?

3    A.    Yes.

4    Q.    What does that organization do?  Or is that an

5    organization?

6    A.    No, that's not an organization.

7    Q.    What's that a reference to?

8    A.    Human intelligence.

9    Q.    All right.  So part -- do you agree that part of the

10   Strategic Services Group is human intelligence?

11   A.    Yes.  That's what I meant by the "nontechnical"

12   components.

13   Q.    Okay.  And who was in charge of these nontechnical

14   intelligence collection components?

15   A.    Ultimately me, managed by Nick Gicinto.

16   Q.    It also says that you -- further down the paragraph, that

17   you, quote, "task SSG with assignments."

18         Do you see that?

19   A.    Yes.

20   Q.    What kind of assignments do you task SSG with?

21   A.    Can you be more specific?

22   Q.    Do you task them with assignments to collect intelligence

23   about competitors?

24   A.    Yes.

25   Q.    Okay.  Can you explain what you mean by "yes"?  What is it

HENLEY - DIRECT / VERHOEVEN

1    that you do?

2    **A.**   I task them to collect intelligence on competitors.

3    **Q.**   And is this for both the non-tech side and the tech side?

4    **A.**   No, this is for the non-tech side.

5    **Q.**   Okay.  And what do -- what's your understanding of what --

6    once you task SSG with this, someone in SSG, what's your

7    understanding of what they do?

8    **A.**   It's generally around interviews or surveillance.

9    **Q.**   What do you mean by "surveillance"?

10   **A.**   Viewing activities in public spaces.

11   **Q.**   What sort of activities?

12   **A.**   Whatever they've been tasked to view.

13   **Q.**   What activities have you tasked SSG to surveil?

14   **A.**   Uhm, in what context?

15   **Q.**   Any context.

16   **A.**   Just an example?

17   **Q.**   Sure.

18   **A.**   We've tasked them to view the routes of a competing

19   autonomous program.

20   **Q.**   Do you surveil competitors' drivers?

21   **A.**   No.

22   **Q.**   Just their routes?

23   **A.**   When I'm speaking of "autonomous," I'm not thinking of

24   drivers.  So we're thinking of the routes that their cars are

25   taking.

**HENLEY - DIRECT / VERHOEVEN**

1   **Q.**   So the drivers are in the cars; right?

2   **A.**   Sure.

3   **Q.**   Does SSG surveil the -- in an attempt to obtain the

4   identity of the drivers that work for your competition?

5   **A.**   No.

6   **Q.**   Does anybody under your command do that?

7   **A.**   No.

8   **Q.**   Has it ever been done, to your knowledge, at Uber?

9   **A.**   Not to my knowledge.

10        **THE COURT:**  Mr. Verhoeven, I think -- I need to let

11   you know that at noon today I have a hearing in another case

12   that I have.  It's a TRO.  So we have about an hour and a half

13   total, and then we'll have another break in there.

14      So you should be -- if you're going to cover the

15   ephemeral, non-attributable, and all that, you should move to

16   that.

17        **MR. VERHOEVEN:**  Thank you, Your Honor.

18        **THE COURT:**  Please.

19        **MR. VERHOEVEN:**  Thank you.  I didn't see anything on

20   your calendar, so I thought we had a little bit more time.

21        **THE COURT:**  It was an emergency set last night from an

22   immigration case.

23        **MR. VERHOEVEN:**  Yes, Your Honor.  Let me move on then.

24   **BY MR. VERHOEVEN:**

25   **Q.**   What technical surveillance is done in SSG?

HENLEY - DIRECT / VERHOEVEN

```
1    A.    I stated that already.  They don't do the technical.

2    Q.    What do the technical folks do in SSG?

3    A.    The group does not have technical people.  The team does

4    not have engineers.

5    Q.    That's all in MA?

6    A.    Yes.

7    Q.    Okay.  What -- generally, how many people in MA?

8    A.    Well, the team does not exist anymore.  So the answer

9    right now is zero.

10   Q.    What happened to it?

11   A.    We've repurposed them to the MI program.

12   Q.    Did MA have a predecessor?

13   A.    Yes.

14   Q.    What was the name of that?

15   A.    COIN.

16   Q.    Why did the company change the name of COIN?

17   A.    I changed the name.

18   Q.    Why?

19   A.    It was a new team rebranding.

20   Q.    Didn't have anything to do with any reputational concerns

21   of COIN?

22   A.    No.  It was a new team.  It was my team.

23   Q.    And COIN became MA?

24   A.    Correct.

25   Q.    What's MI?
```

**HENLEY - DIRECT / VERHOEVEN**

1  A.   Marketplace Integrity.

2  Q.   And does the name signify a difference in function?

3  A.   Yes.

4  Q.   Can you explain?

5  A.   We are detecting and mitigating technical surveillance by

6  our competitors against us.

7  Q.   Is it your testimony that Uber itself does no technical

8  surveillance of the competition?

9  A.   Currently we do not.

10  Q.   Currently.  Well, did you in the past?

11  A.   Yes.  That is what Marketplace Analytics was doing, as I

12  stated.

13  Q.   Okay.  All right.

14      When -- who made the decision to cease doing that?

15  A.   Joe Sullivan.

16  Q.   And do you understand the reason for that?

17  A.   I do not.

18  Q.   You have no understanding whatsoever?

19  A.   I do not.

20  Q.   You are in charge of that group; right?

21  A.   Correct.

22  Q.   You didn't ask him, Why are we doing this?

23  A.   I did not.

24  Q.   Why not?

25  A.   Because he's my boss.

**HENLEY - DIRECT / VERHOEVEN**

1    Q.    You never asked any questions of your boss?

2    A.    Not in that case.

3              MR. UMHOFER:  Objection, Your Honor.  This is

4    argumentive.

5              THE COURT:  It is argumentative.  Sustained.

6    BY MR. VERHOEVEN:

7    Q.    What surveillance of competitors did MA do?

8    A.    What -- restate.

9    Q.    MA did -- in the past, did technical surveillance of

10   competitors; right?

11   A.    We don't call it "surveillance" in the context of MA.

12   Q.    What do you call it?

13   A.    "Collections."

14   Q.    Okay.  What does that refer to?

15   A.    Web scraping.

16   Q.    Okay.  What's web scraping?

17   A.    Automated collection of information on the public

18   Internet.

19   Q.    Anything else?

20   A.    No.

21   Q.    Did MA do any other technical surveillance, whether you

22   called it surveillance or collection?

23   A.    No.

24   Q.    It's the only thing it did?

25   A.    Correct.

HENLEY - DIRECT / VERHOEVEN

```
 1   Q.   And did MA have any other functions besides web scraping?

 2   A.   No.

 3   Q.   Are you familiar with the practice at Uber of using

 4   ephemeral devices?

 5   A.   Yes.

 6   Q.   What do you mean when you say -- when you hear the term --

 7   withdrawn.

 8        What do you understand when you hear the term "ephemeral

 9   device"?

10   A.   You want my definition of ephemeral messaging?

11   Q.   Sure.  When we're -- I just want to make sure that we're

12   talking about the same thing.

13   A.   Uh-huh.

14   Q.   So there's a reference in Mr. Jacobs' lawyer's letter to

15   "ephemeral."  I can get the quote if you want.  But you looked

16   at that; right?

17   A.   No.  You could read the quote --

18        THE COURT:  Tell us what you think it means, and then

19   move this along.

20        THE WITNESS:  Happy to.

21        THE COURT:  Go ahead.

22        THE WITNESS:  Ephemeral message is messaging that has

23   expirations on the message themselves.  It prohibits long-term

24   logging of conversations.

25        THE COURT:  Like six minutes?
```

HENLEY - DIRECT / VERHOEVEN

```
1              THE WITNESS:  It's -- different products do it with

2     different time frames.

3              THE COURT:  What are the typical time frames?

4              THE WITNESS:  I mean, I can guess at 'em.

5        I know -- like Google Hangouts, their ephemerality is set

6     to within a day.

7        Wickr's is configurable based on whatever the user sets.

8     So they could set anywhere from, you know, six hours to -- I

9     believe ten days, maybe, is the top.

10       But most of them are configurable based on the user.

11             THE COURT:  And then after that, the message

12    disappears?

13             THE WITNESS:  Correct.

14             THE COURT:  All right.  Thank you.  Go ahead.

15    BY MR. VERHOEVEN:

16    Q.   So which ones did -- so Wickr.  Is it true that Wickr

17    didn't run through any of Uber's servers?

18    A.   That, from a technical perspective, makes no sense.  So if

19    you could rephrase what you are trying to get at.

20    Q.   Why doesn't it make sense to you?

21    A.   Because that's not how a communication protocol works.

22    Q.   How does it work?

23    A.   It's hosted at the provider; right.  So the servers, just

24    like -- if I'm just talking to you over Gchat, that does not

25    reside at an Uber server.
```

**HENLEY - DIRECT / VERHOEVEN**

1  Q.   So the communications on -- excuse me.

2      The communications on Wickr are never stored on any Uber

3  servers; correct?

4  A.   Currently, with our new installation of Uber -- of Wickr,

5  they do.

6  Q.   On the break, I noticed that your CEO has said that you've

7  discontinued using Wickr?

8  A.   We discontinued using the -- our previous installation of

9  Wickr to build out more abilities to do long-term storage of

10 messages.

11 Q.   So previously the Wickr messaging back and forth never was

12 stored on any Uber server; correct?

13 A.   Again, that was not possible by the technology of the

14 Wickr messaging system.

15 Q.   Right.  So everyone who used it knew that none of it would

16 ever be saved on an Uber server?

17        MR. GONZÁLEZ:  Objection.  That calls for speculation,

18 Your Honor, what people knew and servers.

19        THE COURT:  Well, you knew that; is that true?

20        THE WITNESS:  Yes, I knew that.

21        THE COURT:  All right.

22 BY MR. VERHOEVEN:

23 Q.   Are you familiar with Telegram?

24 A.   Yes.

25 Q.   That was used at Uber?

**HENLEY - DIRECT / VERHOEVEN**

1    A.   Yes.

2    Q.   Travis Kalanick used Telegram; right?

3    A.   I do not know.

4    Q.   Is it correct that when one uses Telegram, none of the

5    messaging ever appears on any Uber server?

6    A.   I believe that is the case.

7    Q.   Has Uber now discontinued using Telegram?

8    A.   I have no idea.

9    Q.   No one has told you to stop using it?

10   A.   I don't use Telegram.

11   Q.   I mean, no one has told you to instruct anybody in the

12   organization, hey, we're not using Telegram anymore; correct?

13   A.   There's recently been pushed a communications policy.  But

14   I'm not familiar with the full details of it.

15   Q.   Did you have any input to it?

16   A.   No, I did not write it.

17   Q.   This is a written document?

18   A.   Yes.

19   Q.   And when did it come out?

20   A.   I have no idea.

21   Q.   You said it was recent?

22   A.   Recent.

23   Q.   Can you give me any more --

24   A.   Couple of months.

25   Q.   Couple of months.  Okay.

HENLEY - DIRECT / VERHOEVEN

```
 1        So it was a couple of months ago, roughly?

 2   A.   Roughly.

 3   Q.   Was it within the last week?

 4   A.   No.

 5   Q.   What about non-attributable devices?  Uber uses

 6   non-attributable devices; right?

 7   A.   There are a few people that do, yes.

 8   Q.   Which ones are you aware of that do?

 9   A.   Which individuals?

10   Q.   The few people you just referenced.

11   A.   Yeah.  The people that I know that use them are analysts

12   and our researchers.

13   Q.   So who are they?

14   A.   They would be team members within SSG.

15   Q.   So the folks at SSG use them?

16   A.   Correct.

17   Q.   Other people within Uber use them too; right?

18   A.   I do not know.

19   Q.   Does Mr. Kalanick use them?

20   A.   I do not know.

21   Q.   Did you have any role in the setting up or managing of

22   these non-attributable devices?

23   A.   No.

24   Q.   Direct your attention to the -- Mr. Jacobs' lawyer's

25   letter, at page 7 through 8.
```

HENLEY - DIRECT / VERHOEVEN

1    **A.**    Yep.

2    **Q.**    At the bottom you see the last paragraph that carries

3    over?  Well, why don't we go over to the redacted paragraph

4    immediately above it.

5    **A.**    Okay.

6    **Q.**    It says, quote:

7            "Likewise, Gicinto and the SSG team had similar

8        non-attributable devices purchased through vendors and

9        sub-vendors where they conducted" -- and it's blanked out.

10       We don't know what they redacted.

11       And then it continues:

12           "SSG used devices to store raw information collected

13       by their operative from" -- and then it's blacked out.

14       Do you see that?

15   **A.**    I see that.

16   **Q.**    Who are the vendors and subvendors?

17   **A.**    I don't know.

18   **Q.**    Do you know any vendors or sub-vendors that Uber uses in

19   any of your departments in which you are head of?

20   **A.**    Yes, I know of them.

21   **Q.**    Can you list them for me?

22   **A.**    I -- I wouldn't be able to list every vendor.

23   **Q.**    Which ones do you recall?

24   **A.**    Red5 Consulting.

25   **Q.**    Who else?

HENLEY - DIRECT / VERHOEVEN

1  **A.**   Quintel.  RiskIQ.

2       Those are the three, off the top of my head, of my main

3  vendors.

4  **Q.**   Can you think of any others?

5  **A.**   No.

6  **Q.**   And do these vendors have responsibility within the

7  United States?

8  **A.**   Yes.

9  **Q.**   And do you use these vendors as part of the program setup

10  of non-attributable devices?

11  **A.**   I do not know.

12  **Q.**   Who would know that?

13  **A.**   Nick Gicinto.

14  **Q.**   The next paragraph, please, take a look.

15       **MR. VERHOEVEN:**  I'll just read, Your Honor.

16  **BY MR. VERHOEVEN**

17  **Q.**   Quote:

18       "By storing this data in non-attributable devices,

19       Uber believed it would avoid detection and never be

20       subject to legal discovery.  This is because a standard

21       preservation of evidence order typically focused on Uber

22       work laptops, Uber networks, and Uber mobile devices.

23       Non-attributable devices were deemed as not reasonably

24       subsumed by any such preservation order and the team

25       could, and did, 'legally' (not so) dispose of any evidence

1     or documentation held on these devices in the intervening

2     period before knowledge of the devices' existence could be

3     uncovered.  Likewise, members of the ThreatOps team,

4     notably Matt Henley, were known to use personal computers

5     to conduct substantial Uber-related work for the purpose

6     of evading discovery."

7     Do you see that?

8  **A.**  I do see that, yeah.  My name is misspelled.

9  **Q.**  Did you -- does that mean that, therefore, the rest of the

10  statements are false?

11  **A.**  No.

12  **Q.**  Okay.  Did you ever use a personal computer in the way

13  described here?

14  **A.**  No.  I've used a personal computer to read my web mail

15  occasionally at home, but that's the extent.

16  **Q.**  You've never done any work on your personal computer?

17  **A.**  No.

18  **Q.**  So if we took an image of it, there wouldn't be anything

19  related to Uber on it?

20  **A.**  Correct.

21  **Q.**  Did you -- have you ever used a non-attributable device?

22  **A.**  Yes.

23  **Q.**  When have you used that?

24  **A.**  When?

25  **Q.**  Describe the circumstances in which you used that.

1   **A.**   We used non-attributable devices, as you guys are calling

2   them, as our research laptops.  They are used so that we can

3   research criminal groups and others who we can't have

4   attribution to the Uber networks tied back to them.

5        And we are also dealing with hostile web platforms that --

6   which gives security concerns, which is why we have the VMs set

7   up to protect the analysts against that.

8   **Q.**   Has any -- have any messages, that you're aware of, been

9   exchanged on this non-attributable device system that concerns

10  in any way Uber's competitors?

11  **A.**   Can you rephrase?  What on the devices?

12  **Q.**   Any messaging take place, that you're aware of, on these

13  non-attributable device --

14  **A.**   To find messaging?

15  **Q.**   A sentence, a document, a picture.  Things like that.

16  **A.**   Yeah.  If we're doing research, the way it works is the

17  VMs are up there as temporary.  If it is something that the

18  researcher or analyst is going to be keeping for their work,

19  they move it to their Uber laptop because the VM will be

20  destroyed at the point of shutting it down.

21        **THE COURT:**  Mr. Verhoeven, I think you ought to try to

22  wind up in about five more minutes.

23        **MR. VERHOEVEN:**  Okay, Your Honor.  Let's mark as

24  Exhibit 10, a Zoom meeting, February 14, 2017.

25        **MR. UMHOFER:**  Your Honor, may I approach?

```
 1            (Counsel shown document.)

 2            THE COURT:  Go ahead.

 3            MR. VERHOEVEN:  Apologize, Your Honor.  We're pedaling

 4   as fast as we can on these exhibits.

 5       I have one copy to hand up.  And I'll get some other

 6   copies real soon.

 7       You can look at that.  One for His Honor.

 8   BY MR. VERHOEVEN:

 9   Q.   Do you recognize the format of this document?

10   A.   Yes.

11   Q.   What is -- what kind of document is it?

12   A.   It is a meeting invite.

13   Q.   Okay.  And you see on the right-hand side it says

14   "Participants"?

15   A.   Yes.

16   Q.   And is your name on there?

17   A.   Yes.

18   Q.   Mr. Gicinto is on there?

19   A.   Yes.

20   Q.   Mr. Anthony Levandowski is on there?

21   A.   Yes.

22   Q.   Mr. Lior Ron is on there?

23   A.   He's on there, but he is not checked as confirmed.

24   Q.   Who is Susan Chiang?

25   A.   She's another member of the security org.
```

**HENLEY - DIRECT / VERHOEVEN**

1   **Q.**   What part?

2   **A.**   She works in our Business Operations.

3   **Q.**   What does Business Ops do?

4   **A.**   All the operational components of running an organization,

5   from finance to people, et cetera.

6   **Q.**   Did it have -- do you see the subject matter line on this

7   meeting?

8   **A.**   Yes.

9   **Q.**   Can you read it out?

10   **A.**   "Mat|Lior|Nick."

11   **Q.**   And do you see the description box?

12   **A.**   Yes.

13   **Q.**   It says, quote:

14         "Taylor Benson is inviting you to a scheduled Zoom

15   meeting."

16   Do you see that?

17   **A.**   Correct.

18   **Q.**   Zoom refers to -- it's codename, refers to the Otto

19   acquisition project; right?

20   **A.**   Incorrect.

21         (Laughter)

22   **Q.**   Okay.  What do you think is Zoom?

23   **A.**   Zoom is a company that provides videoconferencing.

24         (Laughter)

25         **MR. VERHOEVEN:**  I apologize, Your Honor.  I'm doing

HENLEY - DIRECT / VERHOEVEN

```
 1    this very fast, Your Honor.
 2              THE COURT:  Please, zoom right along.
 3         (Laughter)
 4              MR. VERHOEVEN:  Thought I had something there.
 5    BY MR. VERHOEVEN:
 6    Q.   So you attended this meeting; right?
 7    A.   Correct.
 8    Q.   And it was on February 14th, 2017?
 9    A.   Correct.
10    Q.   What was the purpose of the meeting?
11    A.   I do not remember.
12    Q.   Why were you meeting with Mr. Levandowski?
13    A.   We met with Anthony from time to time.
14    Q.   Who is "we"?
15    A.   The people you see on that list.
16    Q.   How many times did you meet with Anthony?
17    A.   I don't remember the exact number.  Under six.  More than
18    one.
19    Q.   So, like, several?
20    A.   Under six, more than one --
21         (Laughter)
22    A.   -- is what I remember.  I don't know what your definition
23    of "several" is.
24    Q.   Several is three to six, in my view.
25    A.   I would call it one to six.
```

1   Q.   Okay.  And you can't give me anything more specific?  I

2   thought you said you met with them more than once.

3   A.   What?

4   Q.   I thought you said you met with them more than once?

5   A.   Between one and six times.  So two would be between there.

6   Q.   Did you meet with them more than once?

7   A.   Yes.  About operations --

8   Q.   So it's two to six then at least, right?

9   A.   Between one and six would be two to five, actually.

10   What's the question?

11   Q.   What's the first meeting you recall with Mr. Levandowski?

12   A.   An introduction meeting.

13   Q.   Okay.  And who attended?

14   A.   I don't remember.  Myself, Anthony and Lior were there,

15   but I don't remember who else was there.

16   Q.   And what happened at that meeting?

17   A.   We introduced ourselves.

18   Q.   Just appropos of nothing?  Or was there some reason you

19   were introducing yourself?

20   A.   He was new to the company and he was meeting all of the

21   different organizations.

22   Q.   Why would he meet with you guys?

23   A.   He met with all of the organizations.

24   Q.   Why would he meet with your --

25   A.   Because we're one of the organizations.

**HENLEY - DIRECT / VERHOEVEN**

1    Q.   That's the only reason?

2    A.   He met with all of the organizations.

3           MR. GONZÁLEZ:  Your Honor --

4    BY MR. VERHOEVEN

5    Q.   How do you know that?

6    A.   Because we worked with his EA over months to get on his

7    calendar as he worked his way through all of the organizations.

8    Q.   How do you know that he --

9           THE COURT:  We have about one minute to go.  You're

10   wasting time.

11          MR. VERHOEVEN:  Okay, your Honor.

12   BY MR. VERHOEVEN

13   Q.   Did you ever discuss any of your operations with

14   Mr. Levandowski?

15   A.   Which operations?

16   Q.   Any operations.

17   A.   Define "operations."

18   Q.   We've got one minute, sir.

19   A.   Define "operations."

20   Q.   Anything that you do in the organizations under your

21   control, did you have discussions with any of that with

22   Mr. Levandowski?

23   A.   We had discussions with Mr. Levandowski about a variety of

24   things.  I cannot recall exactly what we talked about.

25   Q.   What do you recall having discussions with him about?

HENLEY - DIRECT / VERHOEVEN

1   A.   I just said, I can't recall exactly what we had

2   discussions about.

3   Q.   What were the variety of things?

4   A.   Their work, their progress, their launch in Pittsburgh,

5   things along those lines.

6   Q.   Did you discuss with Mr. Levandowski or Mr. Ron at any

7   time the use of ephemeral devices or non-attributable devices

8   or some way of securing their communications so that others

9   couldn't see them?

10  A.   I never discussed that with them.  They did use Wickr.

11  Q.   And how do you know that?

12  A.   Because I talked to them on Wickr.

13  Q.   Any other reason?

14  A.   No, not to my knowledge.

15       THE COURT:  Who is the "them" that you are referring

16  to?

17  A.   Lior and Anthony.

18       MR. VERHOEVEN:  I've used a minute, your Honor.

19       THE COURT:  All right.  We're going to take a

20  15-minute break.  Do we have any other witnesses?  Don't we

21  have another witness?

22       MR. GONZÁLEZ:  I brought another witness at their

23  request, your Honor.

24       THE COURT:  Well, around 11:30 I would like to do some

25  case management with you.

```
 1            MR. VERHOEVEN:  We can talk about the other witness.

 2    We don't have to do him today.

 3            THE COURT:  Well, let's --

 4            MR. VERHOEVEN:  I thought your schedule was open all

 5    day.

 6            THE COURT:  I wish it was, but sometime around 11:30

 7    to 11:40 we need to turn to a schedule for the case.  So you

 8    two confer about the witness situation and we'll be back in 15

 9    minutes.

10        Thank you.

11        (Whereupon there was a recess in the proceedings

12          from 10:59 a.m. until 11:11 a.m.)

13            THE COURT:  Okay.  What's the plan for the third

14    witness?

15        Wait.  We haven't finished with this witness yet.

16            MR. VERHOEVEN:  Right.  I'm perfectly happy to

17    question this witness for a few minutes, but I'm fine with

18    the -- if Uber would rather not have it happen in such a short

19    time frame.  Either way.

20        And I don't know how much your Honor has to discuss, and I

21    don't know how long he's going to go on cross, or on his exam.

22    But I could do 10 minutes if you want.

23            THE COURT:  Where is -- but -- how about the witness

24    that was on the stand?  What happened to him?

25            MR. GONZÁLEZ:  He should be right outside, your Honor.
```

1    I believe he's on his way.

2            THE COURT:  Do you have questions for him?

3            MR. GONZÁLEZ:  Yes, I do.

4            THE COURT:  Let's bring him back and finish that part.

5        (Witness resumes stand.)

6            THE COURT:  Okay.  Witness is returning to the stand.

7    Welcome back.  Have a seat.

8        Now the other side gets to ask you questions.

9                        **CROSS EXAMINATION**

10   BY MR. GONZÁLEZ

11   Q.   Sir, just a few questions.  Did you ever instruct

12   Mr. Jacobs to conceal documents?

13   A.   Never.

14   Q.   Did you ever tell him that he was being disciplined or

15   terminated because he didn't work enough with Legal?

16   A.   No.

17   Q.   Did you ever participate in stealing Google or Waymo trade

18   secrets?

19   A.   No.

20   Q.   Did you ever tell anyone that claimed privilege on a

21   document that was knowingly not privileged?

22   A.   No.

23   Q.   I want to talk about these computers that we have heard a

24   lot about the last two days, the -- you said so-called

25   misappropriated or there was -- mis-attributable,

1    non-attributable, what do you call them?

2    **A.**    Research laptops.

3    **Q.**    All right.   Those laptops, can they store -- do you store

4    information when you use those non-attributable or research

5    laptops?

6    **A.**    No.

7    **Q.**    You said something that the VM is temporary.   And I want

8    to slow down and make sure the judge understood that.   What did

9    you mean by "VM"?

10   **A.**    Virtual machine.   It's a -- basically a computer that runs

11   inside of a security.

12   **Q.**    VMware does that?

13   **A.**    Correct.

14   **Q.**    And so these non-attributable machines that we're talking

15   about when they are virtual, let's say you use them one day and

16   now you're finished, does it save documents on the virtual

17   machine once you shut it down?

18   **A.**    No.

19   **Q.**    So if Anthony Levandowski took 14,000 files, are they on

20   any of these non-attributable devices that don't save data?

21          **MR. VERHOEVEN:**   Objection.   Foundation.

22          **THE COURT:**   If you know the answer, please answer.   If

23   not, say you don't know.

24   **A.**    Yeah, I -- I don't know if he had a non-attributable

25   device.

HENLEY - CROSS EXAMINATION / GONZÁLEZ

1    BY MR. GONZÁLEZ

2    Q.    Okay.  Can those 14,000 documents be on any of the

3    non-attributable devices if they don't save documents?

4    A.    No.

5    Q.    When you said VM is temporary, can you please explain to

6    the judge briefly what you meant by that?

7    A.    It's temporary to protect the security of the researcher

8    or the analyst.

9    Q.    And why are you concerned about protecting the security of

10   the researcher or analyst?

11   A.    A lot of what we are researching are very violent

12   criminals, especially in areas, say, within Africa, when we're

13   researching opposition groups that are literally murdering our

14   drivers.  Protecting our employees from being discovered as the

15   ones researching them is very important.

16   Q.    Is that what this device is used for?

17   A.    It's an example, yes.

18   Q.    Do you have any knowledge or information that these

19   devices were ever used to store Google or Waymo trade secrets?

20   A.    Not that I know of.

21   Q.    And I want to be specific with this judge.  When you say

22   "threats of violence," can you be more specific as to what your

23   people are facing out in some of these foreign countries?

24   A.    Sure.  I mean, we've -- the SSG group that we spoke of

25   earlier has dealt with dozens of drivers that were murdered in

HENLEY - CROSS EXAMINATION / GONZÁLEZ

1    Brazil.  We have luring cases in Zimbabwe, where they entrap

2    our drivers and torch their cars with them inside of it.

3        We had an executive attacked following Dara's visit in

4    South America here recently.  It's -- it's severe violence

5    against our driver partners and employees.

6    Q.   And what is your understanding as to who these people are

7    that are doing this?

8    A.   What is my understanding?

9    Q.   Yeah.  Who are these people?

10   A.   People that don't like us or our business model.

11   Q.   And when you mentioned hostile web platforms, can you be a

12   little bit more specific in plain English what you mean?

13   A.   Sure.  Frequently when we're looking at technical threats,

14   say, in the fraud space, a lot of times, say, the forums where

15   the bad guys are hanging out, exchanging their methodologies of

16   carrying out fraud against our company, you know, based on the

17   type of criminal individuals that are there, there is a lot of

18   stuff that's going on around them trying to compromise each

19   other and -- and using VMs that destroy themselves prevent

20   something like that from actually impacting their machine.

21   Q.   Like not allowing a bug to get onto the Uber system?

22   A.   Yeah.  Not allow it to get in and infect it, not allow it

23   to spread and things like that.

24   Q.   So would you please tell this judge, as far as you know,

25   were these machines, whether you call them "research machines"

1   or whether they are called "non-attributable hardware," were

2   they ever used to hide stuff from any court?

3   A.   Never.

4   Q.   By the way, you did read that letter last night, the

5   37-page letter?

6   A.   By the time I got off with Matt here, I needed to get four

7   hours' sleep to get up here, so no.   I still haven't read it.

8   I hear it's great.

9        (Laughter.)

10  Q.   Let me ask you about a couple of things that you said in

11  your testimony.   You mentioned Google Hangouts.

12  A.   Correct.

13  Q.   Is that literally a Google product?

14  A.   Yes.

15  Q.   And how is it that Google Hangouts is one of these

16  ephemeral methods of communication, just briefly?

17  A.   Yes.   They controlled their ephemerality components in

18  Hangout through the history setting.   You're able to set no

19  storage of chats within Google Hangouts.

20  Q.   So someone using Google Hangouts can chat all day long and

21  depending on their storage, poof, it disappears, correct?

22  A.   Correct.

23  Q.   What about Gchats, what is that?

24  A.   Same thing.   Conceptually same thing.

25  Q.   Does "G" mean Google?

HENLEY - CROSS EXAMINATION / GONZÁLEZ

1  A.   Yes.

2  Q.   That's another Google product?

3  A.   Yes.

4  Q.   You can also set it so the communications goes zappo?

5  A.   I'm most familiar with Hangouts at this point.

6  Q.   How about something called Google Allo?  Have you heard of

7  that?

8  A.   Yes.

9  Q.   A-L-L-O.

10      Please tell the judge, what is Google Allo?

11  A.   It's their new chat client.

12  Q.   And what does Google Allo do?

13  A.   Tries to compete with Facebook Messenger.  Has a lot of

14  different implementations in it, including a heavy push on

15  ephemerality, lots of different things around end-point

16  security.

17          MR. GONZÁLEZ:   Your Honor, I'd like to mark an

18  exhibit.

19      (Defendant's Exhibit 11 marked for identification)

20  BY MR. GONZÁLEZ

21  Q.   Sir, I'll represent to you that Exhibit 11 is a document

22  that I printed off the Google website last night.  I actually

23  had somebody do it for me.

24      I want you to turn to Page 3 of 7, and if you can look in

25  the bottom.

1    A.    Yep.

2    Q.    It says, "Chat in incognito mode."  Do you see that?

3    A.    Yes.

4    Q.    Start, and then it reads:

5              "Start an incognito chat to send a message with

6         end-to-end encryption.  Incognito mode also comes with

7         expiring chats so you can control how long your

8         messages stick around and private notifications to

9         keep your chats more discreet."

10        Do you see that?

11   A.    Yes.

12   Q.    Is that basically the same thing as Wickr?

13   A.    Yes.

14            MR. VERHOEVEN:  Objection.  No foundation.

15   BY MR. GONZÁLEZ

16   Q.    So those are copies --

17            MR. VERHOEVEN:  I object, your Honor, to use an Uber

18   witness to talk about what Google does.

19            THE WITNESS:  It's a consumer product.

20            THE COURT:  Well, the witness is qualified to make the

21   comparison.  Overruled.

22   BY MR. GONZÁLEZ

23   Q.    Is this essentially the same functionality that Google is

24   using that Wickr does?

25            MR. VERHOEVEN:  Objection.  Foundation.

1         THE COURT:  Well, wait.  Wait, wait, wait.  Where is

2   the evidence that Google uses it?

3         MR. GONZÁLEZ:  Well --

4         THE COURT:  It's in-house for doing Google-type

5   business.  This is just a product that --

6         MR. GONZÁLEZ:  We will get to that, your Honor.

7         THE COURT:  -- you know, teenagers use.

8         MR. GONZÁLEZ:  Let me rephrase the question.  I'm not

9   sure that it's just teenagers, your Honor, but let me rephrase.

10  BY MR. GONZÁLEZ

11  Q.   This product of Google's, this Google Allo, does it have

12  the same functionality as Wickr?

13        MR. VERHOEVEN:  Same objection.  Lacks foundation.

14  Leading.

15        THE COURT:  I think that unless you've studied them

16  both carefully so that you can vouch that every single

17  functionality is the same, then --

18        MR. GONZÁLEZ:  I'll rephrase.

19        THE COURT:  -- that's too broad a question.

20        MR. GONZÁLEZ:  I'll rephrase, your Honor.  Thank you.

21  BY MR. GONZÁLEZ

22  Q.   The functionality in Google Allo that allows the user to

23  have messages disappear in a short period of time, is that

24  functionality the same as Wickr?

25  A.   Yes.

```
 1   Q.   Did the demotion of Mr. Jacobs have anything to do with

 2   this case?

 3   A.   No.

 4   Q.   Or with Waymo or Google?

 5   A.   No.

 6             THE COURT:  You said "motion"?

 7             MR. GONZÁLEZ:  Demotion.

 8             THE COURT:  Demotion, okay.

 9        Is that the way you understood it?

10             THE WITNESS:  Yes.

11             THE COURT:  Demotion, all right.

12   BY MR. GONZÁLEZ

13   Q.   By the way, one thing I didn't put on the record

14   yesterday.  Mr. Russo testified yesterday.  Do you know where

15   he lives?

16   A.   Do I know where --

17   Q.   Where he lives or works?

18   A.   Ed?

19   Q.   Yeah, Ed Russo.

20   A.   Yeah.

21   Q.   Do you know where he lives or works?

22   A.   Washington D.C. area.

23             MR. GONZÁLEZ:  Thank you.  That's all I have.

24             THE COURT:  Where do you live?

25             THE WITNESS:  San Jose.
```

1          **MR. GONZÁLEZ:**  Our next witness, your Honor, grew up

2     in Kansas City.

3          I just wanted the Court to know that because you gave

4     props to the first witness that came from Seattle.

5          (Laughter.)

6          **THE COURT:**  Yes.  And you were good enough to pay his

7     expenses.

8          **MR. GONZÁLEZ:**  We did.  We did because we have nothing

9     to hide.

10         **THE COURT:**  All right.  Do you have any redirect?

11         **MR. VERHOEVEN:**  I have some extra questions.  If we're

12    not going to do Mr. Gicinto, we have a little bit of time and I

13    have some further questions.

14         **THE COURT:**  Well, wait.  He came all the way from

15    Kansas City.

16         **MR. GONZÁLEZ:**  He did, your Honor.

17         **MR. VERHOEVEN:**  I could do him, too.

18         **THE COURT:**  I think --

19         **MR. GONZÁLEZ:**  Give us each five minutes?

20         **THE COURT:**  I think we should save -- I think we

21    should bring him in.  I hate for somebody to come this far and

22    not get a chance to perform.

23         So you get to step down.

24         (Witness excused.)

25         **MR. GONZÁLEZ:**  Hopefully he's still here, your Honor.

 1          THE COURT:  Well, let's find out.  Don't -- you can

 2   stay right there until you find out if he's still here.

 3          MR. GONZÁLEZ:  And while we're looking, can we just

 4   agree to share time?  I don't want them to use all the time and

 5   then I don't get to ask any questions.

 6          MR. VERHOEVEN:  I'm sure His Honor will cut me off if

 7   I go beyond my time.

 8          THE COURT:  Mr. González, you speak twice as fast as

 9   Mr. Verhoeven.

10          MR. VERHOEVEN:  Actually double time.

11          MR. JACOBS:  I stipulate I should get twice as much

12   time.

13          MR. UMHOLDER:  Your Honor, I will go get Mr. Gicinto.

14      (Brief pause.)

15          THE COURT:  So I have a question for the Uber side.

16   You wanted to know earlier whether or not Waymo used one of

17   these things that disappeared, ephemeral.

18          MR. GONZÁLEZ:  Yes.

19          THE COURT:  Like Wickr.

20          MR. GONZÁLEZ:  Yes.

21          THE COURT:  But you should know the answer, because

22   60-plus Waymo engineers came to work for Uber.  You could just

23   go ask them.  You can just say:  Hey, when you were over at

24   Waymo, did you use Wickr?  Did you use this thing (indicating)?

25   So it's easy for you to find that out.

1          **MR. GONZÁLEZ:**  We can do that, your Honor.

2      They can also ask former Uber employees what they used.

3  But you've ordered us to do something that requires us to dig,

4  and that ought to be a mutual thing.  They ought to dig, too.

5          **THE COURT:**  Well, but you're just trying to make them

6  dig for something you should already know the answer to.

7      Okay.  Here we go.

8          **MR. GONZÁLEZ:**  Fantastic.

9          **THE COURT:**  Who is our next -- call our next witness

10  please.

11      Your name is?

12          **THE WITNESS:**  Nicholas Gicinto.

13          **THE COURT:**  Gicinto.

14          **THE WITNESS:**  Yes.

15          **THE COURT:**  Welcome, sir.  Thank you for coming from

16  Missouri, or Kansas City.

17          **THE WITNESS:**  Kansas City.

18          **THE COURT:**  Raise your right hand and take an oath.

19                          **NICHOLAS GICINTO,**

20  called as a witness for the Plaintiff herein, having been duly

21  sworn, testified as follows:

22          **THE WITNESS:**  I do.

23          **THE COURT:**  All right.  So have a seat.  And you're

24  going to have to speak into the mic.

25      Now, here is the deal.  We're not going to have long with

GICINTO - DIRECT EXAMINATION / VERHOEVEN

1   you.

2          THE WITNESS:  Okay.

3          THE COURT:  So I'm directing these lawyers to get to

4   the point and then they can probably take your deposition

5   later, maybe.  But I want the lawyers to get right to the

6   point.  Okay.

7          THE WITNESS:  Very refreshing.

8          THE COURT:  All right.  So go ahead, Mr. Verhoeven.

9          MR. VERHOEVEN:  Thank you, your Honor.

10      Good morning, Mr. Gicinto.

11          THE WITNESS:  She asked me to state my name for the

12   record.

13          MR. VERHOEVEN:  Oh, sorry.

14          THE WITNESS:  Nicholas Gicinto, N-I-C-H-O-L-A-S,

15   G-I-C-I-N-T-O.  You can call me Nick.

16          THE COURT:  Proceed.

17                  **<u>DIRECT EXAMINATION</u>**

18   BY MR. VERHOEVEN

19   Q.   Good morning, Mr. Gicinto.

20   A.   Good morning.

21   Q.   You are the manager of SSG?

22   A.   Correct.

23   Q.   And your team supports intelligence, investigations and

24   marketplace analytics?

25   A.   I would say that's fairly accurate.  Not entirely

GICINTO - DIRECT EXAMINATION / VERHOEVEN

1    accurate.

2    **Q.**   What's wrong with it?

3          **THE COURT:**  Well, let's go to the key questions.

4          **MR. VERHOEVEN:**  Okay.  Yes, your Honor.

5    **BY MR. VERHOEVEN**

6    **Q.**   Can you please look at Exhibit 9?  That should be in front

7    of you.

8          (Witness complied.)

9          **MR. VERHOEVEN:**  I can help him find it, if you'd like.

10         **THE COURT:**  Please help him find the right document.

11         **THE WITNESS:**  I see it.

12   **BY MR. VERHOEVEN**

13   **Q.**   This is a resignation letter of Mr. Jacobs.  Have you seen

14   this before?

15   **A.**   I have not seen this in its entirety.

16   **Q.**   I'm sorry, you haven't seen it in its entirety?

17   **A.**   Not in its entirety.

18   **Q.**   What parts have you seen?

19   **A.**   Well, I have seen maybe a paragraph or two.

20   **Q.**   Which paragraphs?

21   **A.**   And this was some time ago.

22   **Q.**   Which paragraphs?

23   **A.**   Give me a moment, please.  It's been some time.

24         (Brief pause.)

25   **Q.**   We don't have the time for you to do that.

GICINTO - DIRECT EXAMINATION / VERHOEVEN

1   **A.**   I believe it was the fourth paragraph that named me.

2   **Q.**   Okay.  Let's go to that.  This paragraph says, quote --

3   and I'm going to do the middle of it, not the whole thing in

4   the interests of time.

5        Quote:

6            "This program, formerly known as the Strategic

7        Services Group, under Nick Gicinto, collected

8        intelligence and conducted unauthorized surveillance,

9        including unauthorized recording of private

10       conversations against executives from competitor

11       firms, such as DiDi Chuxing" -- that's D-I-D-I

12       C-H-U-X-I-N-G -- "and against its own employees and

13       contractors at the Autonomous Technologies Group in

14       Pittsburgh."

15       Do you see that?

16   **A.**   I saw it.

17   **Q.**   Did SSG, under your management, collect intelligence?

18   **A.**   Yes.

19   **Q.**   Did you conduct surveillance?

20   **A.**   Yes.

21   **Q.**   Did you conduct surveillance that the people you were

22   surveilling didn't know about?

23   **A.**   Yes.

24   **Q.**   Did you record conversations?

25   **A.**   I did not record conversations.

GICINTO - DIRECT EXAMINATION / VERHOEVEN

1   Q.    Did anyone in the group record conversations?

2   A.    No one in my group recorded conversations.

3   Q.    Are you aware of Uber recording private conversations at

4   all, ever?

5   A.    I am not aware of anyone in Uber recording -- well, pardon

6   me.  I take that back.

7         I had an audio recording that was sent to me.  I don't

8   remember the time exactly of an audio recording that appeared

9   to be in a restaurant.  I was asked whether or not I could

10  clear up the background noise because it was difficult to hear.

11  I wasn't given any context or background about the recording

12  itself.

13  Q.    Did any of your vendors that you used as part of this

14  organization's work, Uber's work under your control, did any of

15  those vendors record private conversations?

16  A.    Not private conversations, no.

17  Q.    Did they record any conversations?

18  A.    One conversation.

19  Q.    Which conversation?

20  A.    It was a conversation open in public, in a public space.

21  Q.    Which conversation?

22  A.    It was a conversation between staffs for DiDi and Grab in

23  a public space.

24  Q.    What was the second entity you said?

25  A.    Sorry?  Grab.

GICINTO - DIRECT EXAMINATION / VERHOEVEN

1    Q.    Can you spell it?

2    A.    G-R-A-B.

3    Q.    DiDi is a Chinese company?

4    A.    Correct.

5    Q.    What's Grab?

6    A.    It's a ride-share company in Southeast Asia.

7    Q.    Did they know that your vendor was recording them?

8    A.    No.

9          MR. GONZÁLEZ:  Calls for speculation, your Honor.

10   BY MR. VERHOEVEN

11   Q.    Your answer was no?

12         THE COURT:  Well, do you have any reason to believe

13   that they knew it was being recorded?

14         THE WITNESS:  I have no reason to believe that.

15   BY MR. VERHOEVEN

16   Q.    Did you ever tell your vendors not to record folks that

17   didn't know about it?

18   A.    It had never come up before and so I had never thought to

19   provide them specific guidance, but I didn't ask them to do it.

20   Q.    Did you or anyone else in SSG monitor the employees of

21   Uber within the Autonomous Technology Group?

22   A.    No.

23   Q.    Did you record any conversations from the Autonomous

24   Technologies Group?

25   A.    No.

GICINTO - DIRECT EXAMINATION / VERHOEVEN

1    Q.    Did you review communications within the Autonomous Group?

2    A.    No.

3    Q.    Did you go to Pittsburgh and tell them how to use

4    ephemeral devices?

5    A.    No.

6    Q.    When -- you went to Pittsburgh once with respect to the

7    cars coming out, right?

8    A.    Yes.

9    Q.    And then you went another time?

10   A.    Yes.

11   Q.    What was the second time?  Why did you go?

12   A.    I went with my colleague, Ed Russo.  We spoke with several

13   members of the Security team and others there to understand

14   security vulnerabilities at the facility.

15   Q.    What else?  Did you ever instruct them with respect to

16   anything?

17   A.    We -- we were more in receive mode and just understanding

18   their perspective what vulnerabilities existed.

19   Q.    Did you ever meet with Anthony Levandowski and Lior Ron?

20   A.    Yes.

21   Q.    And what was discussed at that meeting?

22   A.    We kind of had a general discussion of SSG capabilities

23   and that led ultimately to them providing ATG head count for

24   SSG.

25   Q.    Did you use that head count?

GICINTO - DIRECT EXAMINATION / VERHOEVEN

| | |
|---|---|
| 1 | **A.**   Yes.  We hired -- we hired against the head count, yes. |
| 2 | **Q.**   You did what? |
| 3 | **A.**   We hired against the head count. |
| 4 | **Q.**   What does that mean, you "hired against the head count"? |
| 5 | **A.**   We hired to fill the head count. |
| 6 | **Q.**   So SSG was part of -- did recruitment? |
| 7 | **A.**   Can you rephrase your -- |
| 8 | **Q.**   What do you mean by you "hired against the head count"? |
| 9 | **A.**   Head count is an open, vacant spot for -- to hire an |
| 10 | employee.  So we hired employees into that vacant spot. |
| 11 | **Q.**   So part of SSG's responsibilities was recruiting employees |
| 12 | for ATG? |
| 13 | **A.**   No, sir.  We hired employees for SSG.  The head count, the |
| 14 | actual spot to hire a person came from ATG. |
| 15 | **Q.**   Got it.  I apologize for being dense there. |
| 16 | So there's a reference in the documents to two employees |
| 17 | from SSG going over to ATG or ATV?  No? |
| 18 | **A.**   No. |
| 19 | **Q.**   Who did you hire? |
| 20 | **A.**   We hired two employees onto our team who are -- |
| 21 | **Q.**   Who are they? |
| 22 | **A.**   Specifically names? |
| 23 | **Q.**   Yes, sir. |
| 24 | **A.**   We hired Shawn Delaney into that spot. |
| 25 | **Q.**   Spell his last name. |

GICINTO - DIRECT EXAMINATION / VERHOEVEN

```
1    A.    Her.

2    Q.    Her.

3    A.    D-E-L-A-N-E-Y.

4    Q.    Second person?

5    A.    The offer is out right now.  So they haven't formally come

6    on board.

7    Q.    These would be employees in SSG?

8    A.    Yes.

9    Q.    And they would have responsibility for ATV?

10   A.    Well, they would have responsibilities to the SSG mission,

11   one of which was to support ATG.

12         MR. VERHOEVEN:  Thank you, your Honor.  I could go on,

13   but I think I've already used five minutes.

14         THE COURT:  Well, let me -- okay, thank you.  I have

15   some questions.

16      What do you know about Wickr?

17         THE WITNESS:  I've used it.  I've just used it.

18         THE COURT:  All right.  Now, we've heard testimony

19   that some people at the Autonomous Group, Vehicle Group, had

20   Wickr on their cell phones or laptops or something.  What do

21   you know about that subject?

22         THE WITNESS:  I don't know of anyone using it at ATG

23   in Pittsburgh.  I understand that it's been suggested that I

24   trained individuals there, and that's false.

25      So I can't speak to that, that accusation other than just
```

GICINTO - DIRECT EXAMINATION / VERHOEVEN

1    saying it didn't happen.

2         I understand that an invitation was sent to Lior Ron and

3    Anthony Levandowski sometime, maybe in the spring of 2017, to

4    join the enterprise version of Wickr.  But that's, to my

5    knowledge, the only ATG employees that were invited into the

6    enterprise version.

7              THE COURT:  And what happened with that invitation?

8              THE WITNESS:  Well, as I recall, it took quite some

9    time before Mr. Levandowski accepted it and joined, and

10   conversations were sparse and infrequent.  At his level to my

11   level there wasn't a lot of conversation there.

12             THE COURT:  Well, you mean you were communicating with

13   him on Wickr?  Is that what you're suggesting?  How were you

14   communicating with Levandowski?

15             THE WITNESS:  Well, there were some Wickr

16   conversations, yes.

17             THE COURT:  Do you have any way of knowing how often

18   Levandowski used Wickr?

19             THE WITNESS:  I couldn't speak to how often he used

20   it.

21             THE COURT:  How about the other guy, Ron?

22             THE WITNESS:  I couldn't speak to that either.

23             THE COURT:  Do you have any way of being able to tell

24   us for sure who else in the Autonomous Vehicle Group, whether

25   they are in Pittsburgh or out here, used Wickr?

1    **THE WITNESS:**  So the enterprise version of Wickr, you

2    needed an invitation because it was for the company's use only.

3    So there would be, I would speculate -- I wasn't the person who

4    would manage that system, but I would speculate because I got

5    an invitation to use it that there would be some sort of a log

6    and email that that person received the invitation.  So whether

7    they accepted it, that's another question I would imagine.

8    **THE COURT:**  So who's in charge of the enterprise part

9    that could tell us are the answer to -- who and how many got

10   the invitation?

11   **THE WITNESS:**  I don't know that.  I'm sorry.

12   **THE COURT:**  Is that in your group?

13   **THE WITNESS:**  I -- I would believe it's in Security

14   because it was originally coined for Security's use.

15   **THE COURT:**  So who was in charge of that group?

16   **THE WITNESS:**  I would ask Mat Henley the question.

17   **THE COURT:**  Okay.  I guess we lost our chance.

18   **THE WITNESS:**  I'm sure he's not too far away.

19   **THE COURT:**  Okay.  Now, I just heard in the break that

20   the new head of your company said on Twitter that yes, indeed,

21   Uber has been using Wickr; but he was going to put a stop to

22   it.  Something like that.

23   Is that -- are you familiar with this subject?

24   **THE WITNESS:**  Yes, sir.

25   **THE COURT:**  All right.  Tell us -- I may not have

GICINTO - DIRECT EXAMINATION / VERHOEVEN

1   gotten it right, so you tell us what is the correct version of

2   what just happened on this subject.

3          **THE WITNESS:**  I believe sometime in September there

4   was an email that was sent to -- and I don't know exactly to

5   whom.  I presume it was a very wide distribution in the company

6   and I believe the email was from Joe Sullivan, stating that he

7   was shutting down the use of the enterprise version of Wickr

8   for the company and that no employees were to use Wickr for

9   Uber business.

10         Further, it was planned to essentially turn on a feature

11  in Wickr that would remove the ephemeral ability of the system

12  and that they would notify us when they had made that change,

13  but that no one was to use it until they made that

14  notification.

15         So, my knowledge, everyone was to cease using it until

16  they received further notice.

17             **THE COURT:**  And that was from Mr. Sullivan?

18             **THE WITNESS:**  Correct, as I recall.

19             **THE COURT:**  As an email?  Or what was the form of that

20  communication?

21             **THE WITNESS:**  It was an email.

22             **THE COURT:**  Company-wide?

23             **THE WITNESS:**  I can't say for sure that it was

24  company-wide.  That would make sense to me, if you wanted to

25  ensure that everyone understood what the policy was.  I would

 1    say it has at least to Security, all of Security.  A

 2    company-wide email would make sense, but I would have to pull

 3    it up on my laptop to see.

 4          **THE COURT:**  And so then the new announcement by your

 5    new CEO, how did that come about?

 6          **THE WITNESS:**  Well, the announcement that you're

 7    referring to today?

 8          **THE COURT:**  Correct.

 9          **THE WITNESS:**  I wouldn't presume to know, sir.  I'm

10    sorry.

11          **THE COURT:**  Okay.  Thank you.

12       All right.  Any questions by Uber counsel?

13          **MR. GONZÁLEZ:**  Just five minutes, your Honor.  Maybe

14    not even that.

                            <u>**CROSS EXAMINATION**</u>

15

16    **BY MR. GONZÁLEZ**

17    **Q.**   Sir, the devices that have been referred to as

18    non-attributable hardware --

19    **A.**   Yes.

20    **Q.**   -- to your knowledge, have they ever been used for -- to

21    conceal or hide any confidential information from Google or

22    Waymo?

23    **A.**   No, sir.

24    **Q.**   As far as you know, can you even store documents on those

25    non-attributable devices?

GICINTO - CROSS EXAMINATION / GONZÁLEZ

1  **A.**   The devices themselves were used as research laptops.

2  They were meant to be used with virtual machines so that once

3  the session was over, you would close the virtual machine.

4      The information would be gone, to prevent any malware that

5  you might pick up in the research, viruses, anything of that

6  nature.  You don't want to pull that in based on wherever you

7  were conducting your research.

8      So when the virtual machine closed, the data would be

9  wiped for security and protection so there was no abilities to

10  store data in the virtual machine.

11      **THE COURT:**  Even with a thumb drive, you couldn't

12  stick the thumb drive in a USB port and hit the button to say

13  what's on the screen?

14      **THE WITNESS:**  You could absolutely put a peripheral

15  device in and save it, if you needed to save a document or you

16  needed to save something that you researched, you know, on the

17  open source, of course, but nothing would be saved on the

18  laptop itself.

19      **THE COURT:**  All right.  Thank you.

20  **BY MR. GONZÁLEZ**

21  **Q.**   And do you have any knowledge of anybody using a thumb

22  drive or any other device to store any Google or Waymo

23  information that may have been on a non-attributable machine?

24  **A.**   No, sir.

25  **Q.**   Did you ever have any discussions with anyone about

GICINTO - CROSS EXAMINATION / GONZÁLEZ

1   possibly misappropriating confidential information or trade

2   secret information from Waymo or Google?

3   **A.**   No, sir.

4   **Q.**   You mentioned surveillance.   Is the surveillance that you

5   have done always surveillance in public?

6   **A.**   Yes.   Always.

7   **Q.**   The ephemeral communications that you are aware of, are

8   you aware of any ephemeral communications involving Waymo or

9   Google trade secrets?

10  **A.**   No, sir.

11  **Q.**   Have you ever told anybody that they should use ephemeral

12  communications or non-attributable devices in order to hide

13  information from any court?

14  **A.**   No, sir.

15  **Q.**   Have you ever told anybody that they should label

16  documents as privileged, even though they are not?

17  **A.**   Could you repeat the question, please?

18  **Q.**   Yes.   Have you ever told anyone that they should put

19  attorney-client privilege on documents in order to hide them

20  from the court?

21  **A.**   I have never told anyone to do that.

22  **Q.**   And there has been some testimony about trips to

23  Pittsburgh.   During those trips to Pittsburgh, did you even

24  discuss Google or Waymo?

25  **A.**   No, sir.

GICINTO - CROSS EXAMINATION / GONZÁLEZ

1    Q.    Did you have discussions with people in Pittsburgh about

2    how they can hide information from the courts?

3    A.    Absolutely not.

4    Q.    Would you ever do that?

5    A.    No, sir.

6    Q.    You've read the 37-page letter?

7    A.    Umm, in all honesty, sir, I received it for the first time

8    at about 9:00 o'clock last night.  It was the first time I had

9    ever seen it.

10        So have I read it in its entirety in detail?  No, I have

11   not, but I'm appalled.  And I'm appalled that he was paid

12   $4.5 million to write that letter.

13   Q.    Are you offended by the allegations in the letter?

14   A.    Most definitely, offended and appalled.

15   Q.    Because we're limited in time --

16   A.    Yes, sir.

17        THE COURT:  Well, wait a minute.  Maybe you don't

18   understand.

19        Uber paid him.  It turns out to be more than 4.5 million.

20        THE WITNESS:  I'm disappointed in that, sir.

21        THE COURT:  So what you're trying to say is that you

22   would not have paid any -- I don't know.  What would you have

23   paid?  What would a reasonable settlement have been in your

24   mind?

25        THE WITNESS:  What's the least possible amount that

1   you could give somebody, sir?

2           THE COURT:  Zero.

3           THE WITNESS:  Well, that sounds pretty good to me.

4       In all honesty, your Honor, there is very little truth in

5   that document, and what truth there is Mr. Jacobs is up to his

6   eyeballs in that truth.  I worked with him side-by-side as a

7   colleague for over a year.  He was very close to a lot of the

8   information that -- that I had access to, and he has perverted

9   it and twisted it to no end to serve his own devices.

10      And I think yesterday you had pointed out that there is a

11  possibility here that this is a disgruntled employee.  I would

12  testify that that's certainly my opinion and based on

13  observations that I had over the past year of working with him,

14  that would be -- that would be my opinion.

15          THE COURT:  All right.  Are you done?

16          MR. GONZÁLEZ:  Just about, your Honor.

17  BY MR. GONZÁLEZ

18  Q.  There has been some testimony that Mr. Jacobs was demoted,

19  disciplined in some way.  Did that have anything to do with

20  Google or Waymo?

21  A.  No, sir.

22  Q.  Did that have anything to do with his refusal to do things

23  that were just wrong?

24  A.  I'm sorry?

25  Q.  Did it have anything to do with him refusing to do things

GICINTO - CROSS EXAMINATION / GONZÁLEZ

1  that were illegal?  Is that why he was disciplined?

2  **A.**    No.  And, in fact, I never heard him one time, in my

3  entire history of working with him did he ever object to

4  anything personally that we were doing as a team or as a

5  company.

6  **Q.**    All right.  So the first time that this guy, Mr. Jacobs,

7  complains about all these things is in this letter?

8  **A.**    Yes, sir.

9        **MR. VERHOEVEN:**  Your Honor, he has been using leading

10  questions for 20 minutes now.

11        **THE COURT:**  What about the email?

12        **MR. GONZÁLEZ:**  He doesn't know about the email, your

13  Honor.

14        **THE COURT:**  Well, what is this, a jury argument?  Come

15  on.

16  **BY MR. GONZÁLEZ**

17  **Q.**    The information that you saw in the letter that accuses

18  you and others of wrongdoing, did Mr. Jacobs ever raise any of

19  that when he worked with you before this letter?

20  **A.**    He never raised any personal objections to me at all.

21        **MR. GONZÁLEZ:**  Thank you.

22        **THE COURT:**  Thank you.  All right.  You can step down

23  now.  Thank you.

24        **THE WITNESS:**  Thank you, sir.

25        **THE COURT:**  They may ask you questions at a deposition

1  but for now you're done.

2          **THE WITNESS:**  I understand.  Thank you.

3      (Witness excused.)

4          **THE COURT:**  Thank you.  And I want to thank your

5  counsel, too.

6          **MR. UMHOFER:**  Thank you.

7      I do have one issue.  I have several others, but I will

8  get out of your hair as soon as I address this one.

9      I understand, your Honor, that yesterday the Court

10  permitted counsel for Mr. Jacobs to suggest redactions to the

11  letter based on security concerns.  My clients are probably

12  better positioned than Mr. Jacobs to come look at that letter

13  and identify security concerns, and we would like the

14  opportunity to do that and submit any proposed redactions.

15          **THE COURT:**  Well, Uber has already done that for you,

16  right?

17          **MR. GONZÁLEZ:**  We did redact -- we did redact the

18  letter.

19          **THE COURT:**  I went through it myself one-and-a-half

20  times, and I have made some redactions in order to protect

21  individuals that are -- in that letter, but I -- look, it's got

22  to come to an end.  So no, we're not going to give you that

23  further opportunity.

24          **MR. UMHOFER:**  Understood, your Honor.  Thank you.

25          **THE COURT:**  Okay.  Let's start with the discovery.

PROCEEDINGS

```
 1        I'm going to tell you how I see this so far, and I'm not
 2   making any final decisions on what the -- in fact, it may be up
 3   to the jury.  I'm not sure it will ever be my -- this whole
 4   thing with the Jacobs letter, it could easily be that it's a
 5   disgruntled employee who sees the handwriting on the wall that
 6   he's about to be fired and then does -- as I've seen in
 7   probably 60 cases, they write a letter exactly like the one we
 8   saw, and then they get fired, and then they get -- they bring a
 9   lawsuit and -- because it's called "retaliation."  So it could
10   be that.
11        But on the other hand, it could also be that there is a
12   genuine truth in there.  And, in fact, the witnesses are not
13   confirming, contrary to what was said by Mr. Gonzalez, that the
14   Wickr was used outside the SSG.  You told me Wickr was used
15   only in SSG, and it turns out that Levandowski and Lior Ron
16   used it and maybe others.
17        So it would be a way for someone to -- Levandowski or
18   someone communicating with him to say:  By the way, how did we
19   do that back at Waymo?  How did we solve that problem?  Well,
20   easy, we used "X" instead of "Y."  And all that vanishes in 30
21   seconds.  You don't have to have a blueprint.  You just ask the
22   question:  How did we do it at Waymo?
23        Now, did that happen?  I don't know, but to me it's
24   plausible that it happened.  And the evidence is gone now
25   because it was an intentionally set-up system to not leave a
```

1    paper trail.  So that's the -- the Wickr part.

2        The part that deals with non-attributable devices, it does

3    seem to me there that the preponderance of the evidence so far

4    is favoring Uber, and that these were used by the Security

5    people to spy on bad guys and competition, but they -- they

6    just didn't want it to be traceable back to Uber.  And I bet

7    your company does the same thing.  That's probably -- that's

8    probably legal enough.

9        In terms of over-designation of documents as

10   attorney-client, we don't have much of a record here so it's

11   hard for me to give you any thoughts on that.

12       But where I do come out on this is this is definitely

13   something that you should take more discovery on.  It's

14   probably going to be a substantial issue at trial.

15       And poor Uber, I don't feel sorry for you because you

16   brought all this on yourself.  But you've got Levandowski,

17   14,000 downloads, easy to prove.  You've got Wickr,

18   Levandowski's computer, easy to prove.  You've got due

19   diligence reports shrouded in 14 layers of privilege, finally

20   busted through by the Federal Circuit, easy to -- not so easy

21   to prove, but it can be proven.

22       So these are -- your good point is that so far they

23   haven't found any of your -- their trade secrets on your

24   server, okay, or in the actual equipment.  But that's not quite

25   so clear.  There are some that are arguable, but there is no

1   home run.  So you can still make that point.

2        But here it is.  It's shrouded.  And that would otherwise

3   have been a good point for Uber to make because of the

4   withholding of this evidence, which is going to come out,

5   because of the -- the fact that you didn't produce the

6   Levandowski files and we had to continue the trial twice.  You

7   had brought all this on -- you've made it a mess, of what would

8   have been a decent point is now going to get clouded up in the

9   atmospherics.

10       Now, don't come back to me later and say they don't get to

11  use the atmospherics.  Of course, they get to use the

12  atmospherics.  I'm going to let them use that.

13       Let's talk about the fact that Wickr was in use for

14  company business.  Absolutely clear.  Company business was

15  being done on Wickr, and the only possible reason is because it

16  evaporates after six minutes.

17       That's going to -- it's an easy argument for them to make

18  on the Waymo side.  Yeah, we couldn't find our blueprints in

19  their files, but -- but the places they would have been, or at

20  least the trade secrets, would have been on the Wickr and Wickr

21  evaporated.

22       Now, you can't really put a blueprint on a Wickr.  I

23  assume that.  But the questions about:  How did we do it at

24  Waymo?  How did we solve this problem at Waymo?  Oh, remember,

25  we did it with "X" and then the "Y" and then the "Z."

PROCEEDINGS

```
 1          So it's a situation where both sides are going to get
 2   their chance, I guess, to try to persuade a jury, but --
 3   anyway, I'm -- you get to take more discovery.
 4          MR. VERHOEVEN:  Thank you, your Honor.
 5          THE COURT:  And I want it all done, though, and I -- I
 6   told you yesterday what each side had to produce.  I want that
 7   to be done by next Monday at noon, the materials.  I can't
 8   remember what they all were now, but there were a number of
 9   them.
10          I've jotted a couple more things.  I think the personnel
11   file on Mr. Jacobs should be produced.
12          MR. VERHOEVEN:  Your Honor, this is probably in the
13   file, but the -- the performance review.
14          THE COURT:  Performance reviews, yes.  You know, all
15   the ones where he was said to be so bad.
16          Now, if history is any guide, it will say he was great.
17   That's what I see in every single one of these companies.  The
18   company comes in and says he was a terrible employee, but you
19   look at the performance reviews and it says "meets or exceeds
20   expectations."  So -- because they are always afraid to put
21   down the truth.
22          So that's -- I don't know why, but that's what happens.
23   So anyway, the personnel file.  They get to see the personnel
24   file.
25          I didn't understand this.  He said 4.5, but you said
```

1    7 million.  Now, what did I miss?

2         MR. VERHOEVEN:  Yes, it's in the -- it's in the

3    agreements that I handed up.

4         THE COURT:  But are you -- don't go through it.  But

5    was there some extra chunk of money?

6         MR. VERHOEVEN:  Yes.  The -- his -- Jacobs' outside

7    counsel was paid $3 million --

8         THE COURT:  Oh, that's another thing.  You get to go

9    take a subpoena to that law firm and find out how many hours

10   they worked.

11        MR. VERHOEVEN:  Okay.

12        THE COURT:  If it turns out that that was a payoff to

13   be quiet, we're going to let the jury hear that.

14        MR. VERHOEVEN:  Yes, your Honor.  That's what I was

15   referring to.

16        THE COURT:  That, to me, is unconscionable, that some

17   lawyer for writing one letter would get that much money.

18        MR. VERHOEVEN:  And I think to Jacobs is, if you add

19   it up, it was 2 immediately, 1 over a period of years for

20   consulting, and 1.5 in stock that would be paid out every

21   month.  So however that adds up.  I think those were the

22   payments.

23        THE COURT:  On the other hand, this hurts you in a way

24   because now he will be your star witness and you will be

25   impeaching him for what he did.  So I don't know.

PROCEEDINGS

1          **MR. VERHOEVEN:**  Well, your Honor --

2          **THE COURT:**  You'll have to figure out how to deal with

3    that.

4          **MR. VERHOEVEN:**  Well, your Honor, we saw yesterday

5    that he certainly was walking away from certain points in his

6    letter.

7          **THE COURT:**  He did.  Yes, he did.

8          **MR. VERHOEVEN:**  But, anyway, I think if you add it

9    up --

10         **THE COURT:**  Hold on.  I want to say something else.

11         You had a lot of flexibility yesterday, but the idea that

12   you're going to be able to put that letter in front of the jury

13   and ask questions about it, that's very iffy.  That letter is

14   not evidence.  It's hearsay.  You're going to have to figure a

15   way to deal with that.

16         But you've got -- you've got a lot of freedom here because

17   it's just the judge.  But when we're talking about the trial,

18   that's -- got to figure out how you're going to get that thing

19   into evidence.

20         **MR. VERHOEVEN:**  We will.  And he also personally typed

21   out his resignation email.

22         **THE COURT:**  That, too.

23         **MR. VERHOEVEN:**  It's a business record.

24         **THE COURT:**  Maybe.

25         All right.  So I want the Special Master, he's going to --

1   I'm going to wreck his holiday here.  I'm going to wreck the

2   holiday for all you lawyers, but you get paid so much money I

3   don't feel badly.

4       I want you to supervise, and I want to be liberal in

5   giving these folks at the Waymo table the discovery -- err on

6   the side of discovery to get to the bottom of the story of the

7   use of Wickr, particularly, but all these allegations that --

8   and documents can be requested.

9       I want everything done on the supplemental discovery by

10  December 22.  And the last day to file any discovery dispute is

11  going to be December 29.  Final pretrial conference will be

12  January 30.  We will select the jury on January 31, and the

13  trial will proceed the following Monday.

14      So take up February, probably, but I have other cases that

15  are already set for trial and I am -- I'm going to have to

16  figure out how to deal with that, but you -- that's the

17  schedule, the best I think I can do on the schedule that I've

18  got.

19          **MR. VERHOEVEN:**  Your Honor.

20          **THE COURT:**  Go ahead.

21          **MR. VERHOEVEN:**  We were working to send over a

22  proposal, try to reach agreement on a schedule.  Should we not

23  do that now because of this?

24          **THE COURT:**  I think in terms of the trial date, you

25  should not do that.  You shouldn't try to adjust the trial

PROCEEDINGS

 1   date.  I would be open to letting you adjust some of these

 2   other dates if -- if the -- if it's not too much, but I don't

 3   want you jamming me and jamming the magistrate judge.

 4       See, we only have -- in my chambers it's me and that Law

 5   Clerk over there trying to wade through -- plus I've got

 6   hundreds of other cases.

 7           MR. VERHOEVEN:  I realize this is burdensome on the

 8   Court.

 9           THE COURT:  It is very burdensome.  And so if you try

10   to jam us right toward the end --

11           MR. VERHOEVEN:  We won't do that.

12           THE COURT:  The other thing I'm going to do is I am

13   going to rule on some of these pending motions without further

14   argument.  I don't think I need further argument.

15       I might knock out part of your Hesselink guy.  He's going

16   to be history in part, and we're not going to have any more

17   hearings on it because we've just run out of time to deal with

18   your -- all these experts that you want.

19           MR. VERHOEVEN:  Your Honor, what about -- there is

20   three Motions in Limine that have a sort of history on them,

21   and it might be useful to have oral argument on those.

22           THE COURT:  Which ones are those?

23           MR. VERHOEVEN:  Well, they are all three of ours,

24   coincidentally.  But the ones I'm thinking of are, there is a

25   Motion in Limine about this issue of doing the search and we

PROCEEDINGS

 1   searched all our servers and everything.  Obviously, that plays

 2   into what's happening right now, but that's post-Complaint

 3   conduct.

 4        And you may remember, it's a long time ago, but my

 5   argument essentially was, you know, if they are going to be

 6   doing that and saying they are all golden, then in fairness we

 7   can talk -- we should be able to talk --

 8             **THE COURT:**  Yes, yes.

 9             **MR. VERHOEVEN:**  That's one.

10             **THE COURT:**  Okay.

11             **MR. VERHOEVEN:**  The other thing is they want to say

12   that Mr. Levandowski wasn't cooperating with them and, because

13   of that, they fired him.

14        And they prevented us from taking any discovery about

15   whether or not Mr. Levandowski was cooperating with them under

16   the attorney-client privilege.

17        And so I think it's important to at least have us explain

18   that, for me to explain --

19             **THE COURT:**  I have it very well in mind.

20        Maybe.  I will tell you what I see.  There's five issues

21   that are in this category.  I'll see if I can remember them.

22        One is the -- what I call the good citizen versus bad

23   citizen.  Now, that's the issue you were alluding to.

24        One is the violations of the preliminary injunction order

25   and the contempt motion.

PROCEEDINGS

1      One is the adverse inferences that you want to have drawn.

2      One is the failure to produce Levandowski documents that

3   resulted in continuance number one.

4      And the last one is the failure to produce this Jacobs

5   letter, which led to continuance number two.

6      Now, my normal inclination would be let's just decide the

7   case on the merits.  But I've never seen a case where there

8   were so many bad things that -- like Uber has done in this

9   case.  So many.

10      Usually it's more evenly divided.  But Uber has caused two

11   continuances.  So all of those things go together.  And I

12   don't -- I am weighing in my mind, and I actually think about

13   it a lot, what is the fair thing to do.

14      Part of it is we want the case to be decided on the

15   merits.  But part of it is, to take a perfect example, you were

16   stymied many times, Mr. Verhoeven, in trying to get to what

17   were the reasons for firing, what was the extent of

18   cooperation.  And they invoked attorney-client privilege like

19   the Jacobs letter said.  And you never got a chance to find

20   out.

21      Now they want to come back and prevent you from putting on

22   your side of what's going on because you never got the

23   evidence.  It bothers me that that was done.

24      So I don't have an answer for you.  I want you to know

25   that I am thinking about it.  I'm thinking of all of those as

1   one constellation of problems.

2            MR. GONZÁLEZ:  Your Honor, one comment on that point.

3            THE COURT:  Sure.

4            MR. GONZÁLEZ:  We did produce the two letters to

5   Mr. Levandowski.  The letter that we wrote after you issued

6   your order, saying, We need you to cooperate.  And if you

7   don't, you're going to be fired.  And then the letter saying,

8   You didn't cooperate, and you got fired.  And we offered

9   testimony on those letters.

10           THE COURT:  Yes, but that sounds contrived, isn't it?

11       What about all the meetings before, where he did

12   cooperate, where attorneys were put into the room so the

13   attorney -- so that now it's impossible for Mr. Verhoeven to

14   say, well, look, we want to show you 42 examples where he did

15   cooperate.

16           MR. GONZÁLEZ:  Your Honor, maybe -- I think that we're

17   addressing an issue that's not a real issue.  There's not going

18   to be -- we're not going to stand up and say, We fired him

19   because he didn't cooperate.

20       We can phrase it however you want.  We can phrase it to

21   say, The judge issued an order to produce computers.

22   Mr. Levandowski wouldn't give us his personal computer.  And we

23   told him, If you don't, you're going to get fired.  He didn't

24   give it to us.  He got fired.  That's what happened.

25           MR. VERHOEVEN:  We would have no opportunity to test

PROCEEDINGS

```
 1   any of that because we've been instructed -- we were

 2   instructed, Your Honor, on questions about the letter they

 3   selectively produced, which was from the attorney to

 4   Mr. Levandowski, while he was still an employee, because it was

 5   attorney-client privilege.

 6       This is classic selective disclosure, just like Judge

 7   Corley has already found has happened with these folks.  It's

 8   just not appropriate.

 9           MR. GONZÁLEZ:  So we have to look very carefully at

10   the record, Your Honor, because that is not accurate.

11       Any communications that we had with Mr. Levandowski,

12   telling him that he better give us this stuff or he'll be

13   fired, we have testimony on that from Ms. Padilla.

14       And so there isn't any selective anything here.  These are

15   two totally separate things.  Sure, at the beginning of the

16   conversation there were privileged discussions.  Granted.

17   That's not why he was fired.  He was fired because you then

18   issued an order saying, You've got to produce all of this

19   stuff.  He wouldn't give us his device.  He got fired.

20       I don't understand what the issue is.

21           THE COURT:  Ms. Dunn told me, standing right there, I

22   said, Would you have fired him anyway, irrespective of my

23   order?  She said yes.

24       So do you want to change what you said?

25           MS. DUNN:  No, Your Honor.  That -- that's the case.
```

PROCEEDINGS

```
 1            THE COURT:  What?

 2            MS. DUNN:  That's the case.

 3       There is testimony, I believe, but the witnesses would say

 4   that Your Honor's order played a part but was not the entirety

 5   of their decision.

 6       But I do think we should look at the record, because I'm

 7   not sure what Mr. Verhoeven said is accurate about the letter.

 8            MR. VERHOEVEN:  Can I say one thing, Your Honor?

 9   Mr. Perlson mentioned to me, and he took Ms. Padilla's

10   deposition, general counsel, general counsel at the time.  He

11   asked her, do you have any nonprivileged information to provide

12   about Mr. Levandowski's firing?  And she said everything she

13   had is privileged.

14            THE COURT:  Okay.  I'm not deciding this yet.

15       Now, I want to go back to the documents.

16       Waymo has got to do a thorough investigation and let me

17   and the other side know the extent to which Wickr or anything

18   like it was used in the workplace by employees.

19            MR. VERHOEVEN:  Understood, Your Honor.

20            THE COURT:  If it turns out you are as guilty as they

21   are, I don't know.

22       Also the extent to which non-attributable devices were

23   used.

24            MR. VERHOEVEN:  Yes, Your Honor.

25            THE COURT:  You've got to do that.  And you've got to
```

1    get me the answer by -- what did I say earlier?  Monday.

2    Monday at noon.  Okay.  Monday at noon.

3            **MR. VERHOEVEN:**  On the document production, how many

4    days until Monday?  Could we negotiate on that and --

5            **THE COURT:**  Yes.  But not much.

6            **MR. VERHOEVEN:**  Okay.

7            **THE COURT:**  I'll say a couple of days.  But you're

8    talking-- please don't agree to put these depositions into

9    January.

10        If I have to order Mr. Big or Ms. Big to show up, they're

11   going to show up.  And I promise you, I'll wreck their holiday,

12   too, because you all are not going to -- you're going to work

13   right through the holidays to get this thing ready for trial.

14           **MR. VERHOEVEN:**  Yes, Your Honor.  I wish I had known

15   it was continued.  I would have gone at Thanksgiving to see my

16   folks.

17           **THE COURT:**  Well --

18           **MR. VERHOEVEN:**  So be it.  I chose the profession.

19           **THE COURT:**  You chose the profession.  It's your

20   fault.

21        All right.  I want you to come back here at -- when we

22   were going to have a trial.  I want you to be back here at

23   9 o'clock on Monday, so I can iron out whatever problems that

24   come up in the meantime.

25        But by then, I hope the report is going to be that you've

PROCEEDINGS

1   got it all squared away; we're in good shape; the depositions

2   are going to take place; nobody is stonewalling; nobody is

3   stalling; we're getting the information that we need.

4       If not, I'm going to be here, for example, saying that

5   Mr. Big at your company, Waymo, has got to show up for

6   deposition on December 23, or whatever date.  But it's going to

7   get done in December.

8           MR. VERHOEVEN:  Yes, Your Honor.

9           MR. GONZÁLEZ:  Your Honor, we will make our people

10  available.  As I noted, we flew somebody here from Kansas City,

11  and somebody else from D.C., on very short notice.

12      I do want to make this clear that we're at least allowed,

13  on our end, to take at least one deposition of whatever

14  information they find out on Flickr.

15          THE COURT:  I think you're entitled to that, sure.

16          MR. GONZÁLEZ:  Thank you.

17          THE COURT:  Here's another thing.  Jacobs is beyond

18  the subpoena reach.

19          MR. GONZÁLEZ:  That's true.

20          MR. VERHOEVEN:  But not for deposition.

21          THE COURT:  Not for deposition.  And you can do it

22  under deposition.  Absolutely.

23      But for trial purposes, since you have a contract with him

24  on the Uber side that requires any cooperation, I'm ordering

25  you to make sure he is present physically if Waymo's counsel

1   wants him in their case.

2          **MR. GONZÁLEZ:**  Your Honor, what I can commit to is

3   that we will make every effort to get him here.  I obviously

4   can't drag him in.  But I will tell you what I did.

5          **THE COURT:**  You can say it's in your contract that

6   he's got to cooperate with Uber.

7          **MR. GONZÁLEZ:**  Your Honor, that's exactly right.

8          **THE COURT:**  This is cooperation because the judge

9   wants him here.

10         **MR. VERHOEVEN:**  I think there's 4.5 million reasons.

11         **MR. GONZÁLEZ:**  We brought him here, Your Honor.  We're

12  going to try to get him here again.  Like I said, we have

13  nothing to hide.

14         **THE COURT:**  You did good the first time.

15         **MR. GONZÁLEZ:**  May I ask this question, Your Honor?  I

16  realize you have a lot on your mind.  Well, forget it.  I will

17  save it.

18         **THE COURT:**  Save it.

19         **MR. GONZÁLEZ:**  I'll save it for later.

20         **THE COURT:**  All right.  So I'll see you at 9:00 a.m.

21  on -- please, Mr. Special Master -- this is the first time I've

22  ever used a special master.

23         **MR. GONZÁLEZ:**  He's done a great job.  Both sides

24  agree.

25         **THE COURT:**  Good.  But we shouldn't be having these

PROCEEDINGS

```
 1   continuances.

 2              MR. COOPER:  I understand.

 3              THE COURT:  I'm counting on you.  You have to manage

 4   this in such a way that there is not a third continuance.

 5              MR. COOPER:  I will do that.

 6         And, Your Honor, I am required by the parties to produce

 7   the unredacted document, a copy of the Jacobs letter.  And it

 8   was available --

 9              THE COURT:  Yes.

10              MR. COOPER:  -- to the parties.

11              THE COURT:  Thank you for that.

12         Thank you for your excellent work on this case.

13              MR. GONZÁLEZ:  Thank you, Your Honor.

14              THE COURT:  We are in recess.

15              MR. VERHOEVEN:  Thank you.

16         (Proceedings adjourned.)

17

18

19

20

21

22

23

24

25
```

## I N D E X

**PLAINTIFF'S WITNESSES**                                    **PAGE**  **VOL.**


**PADILLA, ANGELA**
(SWORN)                                                        9        1
Direct Examination by Mr. Verhoeven                           10        1
Cross Examination by Mr. González                            77        1


**HENLEY, MAT**
(SWORN)                                                       87        1
Direct Examination by Mr. Verhoeven                          89        1
Cross Examination  Mr. González                             123        1


**GICINTO, NICHOLAS**
(SWORN)                                                      134        1
Direct Examination by Mr. Verhoeven                         135        1
Cross Examination  Mr. González                            146        1

                              -   -   -

## E X H I B I T S

**PLAINTIFF'S EXHIBITS**                          **IDEN**  **EVID**  **VOL.**

  3                                                 36                   1

  4                                                 40                   1


**DEFENDANT'S EXHIBITS**                          **IDEN**  **EVID**  **VOL.**

  11                                               128                   1

                              —   —   —

*Debra L. Pas, CSR, CRR and Katherine Sullivan, CSR, CRR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-147*

## CERTIFICATE OF REPORTER

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Katherine Sullivan, CSR 5812, CRR, RMR

Wednesday, November 29, 2015