**quinn emanuel** trial lawyers | san francisco

50 California Street, 22nd Floor, San Francisco, California 94101 | TEL (415) 875-6600

August 17, 2017

Magistrate Judge Jacqueline Scott Corley

Re:   *Waymo LLC v. Uber Technologies, Inc., et al.*, N.D. Cal., Case 3:17-cv-00939-WHA
      **Waymo's Opposition to Uber's Motion to Compel RFP & ROG Responses, Enforce Order, and Compel 30(b)(6) Testimony.**

Dear Judge Corley:

Please find below Plaintiff Waymo LLC's opposition to Defendant Uber LLC's motion to compel RFP & ROG responses, enforce order, and compel 30(b)(6) testimony (Dkt. 1215).

Sincerely,

*/s/ Charles K. Verhoeven*

Charles K. Verhoeven

**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL**

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

As discovery comes to a close the targets of Uber's motion practice become increasingly, vanishingly, tangential to its case. Waymo responds to Uber's six-page brief below.

## I. Efforts to Protect Confidentiality and Secrecy Unrelated To Trade Secrets (ROG 19; RFP Nos. 171, 173)

Uber has already served complete discovery into Waymo's efforts to maintain the confidentiality of its trade-secret information. *See* Rog No. 7 ("Separately for each alleged Waymo trade secret identified in response to Interrogatory No. 1, identify all efforts to maintain the secrecy and confidentiality of the trade secret"); RFP No. 2 ("All documents supporting Waymo's contention that 'Waymo's LiDAR technology is subject to robust measures to protect its secrecy,' including documents that show any steps taken by Waymo to ensure the security and confidentiality of every Alleged Waymo Trade Secret that was allegedly misappropriated by Defendants."). Waymo has responded to those requests, and Uber does not move for additional responses.

Instead, Uber seeks to compel Waymo to respond to Interrogatory No. 19, which asks for a description of the steps Waymo takes, including due diligence, in deciding whether to hire, partner with, merge with, invest in, etc., any other company or entity, and to produce documents showing the steps; and to produce documents regarding Waymo's M&A transactions and legal actions instituted against former employees. This discovery is far afield and should be denied.

Through Interrogatory No. 19 and RFP 173, Uber seeks to dive into Waymo's and Alphabet's due diligence practices and efforts to protect the confidentiality of their business transactions, including but not limited to M&A policy documents and actual deal agreements. In support Uber offers the non sequitor that "Waymo's efforts to maintain the secrets of its alleged trade secrets … is directly relevant to the parties' claims and defenses." (Br. 2.) Waymo agrees that its efforts to maintain its trade secrets are relevant. But confidentiality protections over business transactions NOT involving Waymo's trade secrets have nothing to do with that issue. Further, there is nothing "vague" or "conclusory" about Waymo's response to Interrogatory No. 19. Waymo explained its practices, which are standard. Waymo conducts business discussions with outside parties under NDA agreements, and requires all employees to agree to and abide by Google-wide policies governing confidentiality. Waymo produced these policies and agreements, and also produced its NDA agreements with every vendor with whom Waymo may have exchanged confidential information. To ask Waymo to produce NDAs covering every business opportunity that Alphabet has ever explored is completely beyond the pale and not proportionate to the needs of this case.

In an alternative argument, Uber abandons any pretense of a tie to trade secrets and pleads that it is entitled to Waymo/Alphabet's M&A agreements in order to prove that its agreement with Otto is standard. (Br. 2.) This Court has already rejected Uber's me-too theory of discovery. During the PI phase, in order to defend the legitimacy of its common-interest agreements at issue in this case, Uber issued an RFP seeking "Documents sufficient to show any joint interest or joint defense agreement that Waymo has entered into during the past three years." The Court stated: "You know, it actually doesn't matter, I have to tell you. I know you want it, but it doesn't matter. Like, we don't decide these things on tit-for-tat." (Apr. 25 Hr'g at 43-44.) Two days later on the same issue the Court ruled: "So with respect to the common interest documents,

whatever, I think, as I said, I'm not going to order those. I don't think they're relevant. If Judge Alsup wants to ask them, like he did arbitration, he can, and then of course the parties will comply, but he didn't." (Apr 27 Hr'g at 2:17-19.)  This Court should similarly reject the tit-for-tat justification Uber offers here.  *See, e.g.*, Br. at 2 ("discovery of *Waymo's* efforts to maintain the confidentiality of its M&A transactions is necessary to rebut Waymo's allegations that *Uber's* efforts to maintain the confidentiality….") (emphasis added).

Through RFP 171 Uber seeks legal actions that Waymo or Alphabet have taken against former employees for trade secret misappropriation or similar transgressions. This information has no relevance to what constitutes reasonable efforts to maintain secrecy. Cal Civ. Code. § 3426.1(d)(2).  "'Reasonable efforts' can include advising employees of the existence of a trade secret, limiting access to the information on a need to know basis, requiring employees to sign confidentiality agreements, and keeping secret documents under lock." *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1253 (N.D. Cal. 1995) (quotation marks and internal citations removed).  Subsequent legal actions against violators is, notably, absent.  *See Henry Hope X-Ray Prod., Inc. v. Marron Carrel, Inc.*, 674 F.2d 1336, 1340 (9th Cir. 1982) ("The owner of the secret need only take reasonable precautions to ensure that it would be difficult for others to discover the secret without using improper means.").

**II.  M&A Transactions and Due Diligence (Interrogatory 18; RFP Nos. 170, 172; 30(b)(6) Topic 7.)**

First, to be clear, Waymo has not limited its responses to acquisitions post-dating Waymo's creation in December 2016.  Waymo, meaning the self-driving program from 2009 to the present, has made two acquisitions, both in 2011.  Waymo produced full deal documentation surrounding both, as well as voluminous correspondence and analysis surrounding those deals.  Uber makes no complaint about the sufficiency of Waymo's production on these self-driving-related acquisitions.

Instead, Uber complains only of Waymo's refusal to produce Google/Alphabet M&A and due-diligence documents about hires and transactions with zero pertinence to self-driving.  Uber's "limitation" of its demand to full deal terms and due-diligence efforts surrounding only seven acquisitions and seven hires by Alphabet, as well as an unbounded investigation into whether Alphabet has hired "teams" from other competitors and Alphabet's hiring techniques, does not cure the problem with these requests.  Uber again provides no case law justifying its ask and no reasoning other than that unrelated Alphabet transactions constitute evidence bearing on its acquisition of Otto.  Other than this tit-for-tat basis, Uber gives no explanation of why Alphabet's unrelated M&A transactions not involving Waymo have any bearing on the facts of this case.

**III.  Efforts to Prevent Misappropriation (Interrogatory Nos. 20, 24; RFP No. 174, 175)**

Continuing the theme of tit-for-tat requests, Uber seeks discovery into whether trade-secret information has *entered* Waymo.  Request No. 174 and Interrogatory No. 20 seek Waymo's efforts to prevent improper infiltration, and Request No. 175 and Interrogatory No. 24 ask for specific instances where confidential information has wrongly entered Waymo.

Uber justifies its ask by stating that Waymo made Uber's efforts to prevent other companies' confidential information from coming into Uber "the central issue in its case." (Br. 4.) Not so (and even if that were true, it is unclear how Waymo's efforts are relevant to Uber's efforts). The "central issue" in this case is whether Uber, in this action, under these specific circumstances and involving the specific actors and events on this suit, in fact misappropriated Waymo's trade secrets. What Waymo does to prevent entry of other companies' trade secrets has no bearing on whether Uber misappropriated the trade secrets at issue.

### IV.  Alleged Use of the 14,000 Files (Interrogatory No. 25)

Uber's Interrogatory No. 25 asked Waymo to identify facts showing use, by Uber, of the 14,000 files improperly stolen by Anthony Levandowski. In response, Waymo first incorporated by reference its response to Interrogatory No. 1, which detailed all facts and documents showing use by Uber of Waymo's trade secrets, including by explaining the way that those trade secrets are found within the stolen files. In addition Waymo provided an extended narrative answer laying out the case that Uber used the 14,000 files. Among the facts cited in Waymo's response were: after Levandowski stole the files, he operated Otto out of his house, where he could have relied on the 14,000 files with impunity; after Uber bought Otto, it placed no policy to limit Levandowski's input into LiDAR development; Levandowski remained free to (and in fact did) bring his personal devices into work; as reflected in a log provided by Defendants, Levandowski had over 1,000 LiDAR-related communications with others at Uber; and Levandowski pleaded the Fifth Amendment to hordes of questions about use of the 14,000 files at Uber, supporting an adverse inference. These **facts** indicate Uber's use of the 14,000 files.

Uber dismisses Waymo's factual responses as "unsupported inferences and argument" and wildly demands that Waymo "admit[] there are no[]" facts indicating Uber's use of the 14,000 files. (Br. 5.) Nonsense. Waymo described facts from which a jury could conclude that Uber used the 14,000 files. Uber mistakes circumstantial evidence for "inferences and argument," and it's a bad mistake. Circumstantial evidence "is weighed on the same scale and laid before the jury in the same manner as direct evidence." *United States v. King,* 552 F.2d 833, 845 (9th Cir.1976) (citing *Holland v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1954)). "[C]ircumstantial evidence is not inherently less probative than direct evidence." *United States v. Cruz,* 536 F.2d 1264, 1266 (9th Cir.1976) (citation and internal quotation marks omitted). Facts showing that Levandowski stole Waymo's files, put them on a personal device, and used personal devices without limitation while providing constant input and guidance into Uber's LiDAR program, coupled with the appearance of Waymo's trade secrets within Uber's designs, constitute completely permissible and strong evidence of Uber's misappropriation.

### V.  Conflicts with Mr. Levandowski (RFP 166)

Despite Waymo's representation that it produced documents concerning all disputes involving Levandowski, as confirmed through speaking with three separate HR personnel, Uber demands that Waymo speak to an additional two individuals. On a meet-and-confer call with the Special Master, Waymo refused to interview an additional two individuals for the same information. Uber's motion is limited to demanding that Waymo interview these individuals, for a total of five in response to a single RFP.

3

As already explained to Uber, Waymo produced all of Levandowski's performance evaluations. Waymo spoke with three people in HR (not two, as Uber suggests) about locating documents involving conflicts relating to Levandowski. Those three individuals have been at Waymo/Google since 2012, 2012, and 2004; Waymo is unclear on why Uber suggests otherwise. None of these three individuals identified any disputes or complaints other than those reflected in documents already produced, including but not limited to: Google's discovery around 2010 that Levandowski was operating competing side businesses; Levandowski's performance issues and performance improvement plan in 2014; an investigation in August 2015 following rumors that Levandowski was seeking to gather a group of personnel to sell to Uber; Levandowski's ongoing clashes with one of his managers; the entirety of events surrounding Levandowski's resignation in January 2016; and, to the extent not privileged, Waymo's subsequent investigation into Levandowski. Further, Waymo searched Chelsea Bailey and Stacy Sullivan's emails for all references to "Levandowski," which would have brought up responsive documents. Waymo's search for documents responsive to this Request was reasonable and nothing further should be required. Moreover,

Further, Uber is has or will depose four of the individuals that it demands that Waymo interview, Joanne Chin, Chelsea Bailey, Jolie Sorge, and Stacy Sullivan, and so will have the opportunity to confirm with the witnesses that there is nothing further. In the unlikely event that any testifies to some additional dispute regarding Levandowski, Waymo will immediately produce documents on that dispute. And there will be no need to involve the Court.

**VI. Bonus Search Term Custodian**

After a month of delay in meeting and conferring with Waymo regarding an ESI Order, a month of negotiations over overbroad search terms and custodians Uber proposed (*see* Dkt. 1090), a motion by Uber seeking to compel Waymo to run two overbroad search terms (Dkt. 1081), and an order from the Court denying Uber's motion to compel and only requiring Waymo to run the much narrower terms that Waymo proposed (Dkt. 1094), Uber now demands that Waymo run Uber's bonus-related search term for three new custodians. The parties are seven days away from the last day of fact discovery and Uber has not justified why it needs the bonus-related search term run against these three custodians or how what has been done to date is insufficient. As the Court found, "Waymo is already producing the most relevant documents in response to Uber's document request, and it has run and did not find any emails involving Mr. Levandowski that discuss the bonus program." (Dkt. 1094.) Waymo refers the Court to its prior briefing, explaining the documents it has already produced and the searches it already ran. (Dkt. 1090.) Since that prior briefing, Waymo ran more searches for bonus-related documents by virtue of having run the term at issue in the prior briefing. Thus, Waymo has done more than what the Court already found to be sufficient. Uber's present motion should be denied because Uber makes no effort to show that Waymo's searches or production of bonus-related documents is insufficient.

Accordingly, Waymo should not be required to search an additional three custodians' documents. Uber's claim that the Court only ordered Waymo to run this term for 11 custodians is not correct; the Court ordered Waymo to run that term for the specific 11 custodians identified in the briefing, and Waymo complied. Uber now asks Waymo to search a 12th custodian. In addition,

4

Uber demands that Waymo add a 13th and 14th custodian, merely because Waymo designated them in response to one of Uber's 30(b)(6) topics. This, however, does not mean that relevant documents are missing. Waymo ran the bonus-related term against the emails of the two individuals, Chris Urmson and Sebastian Thrun, who were the Chauffeur project leads during the relevant time frame. Searching their emails for such documents is more than sufficient, and Uber's demand for further, duplicative searches, is not proportional to the needs of the case.

**VII. Uber is Not Entitled to a Corporate Witness on 30(b)(6) Topic 7.**

Finally, Uber requests a 30(b)(6) witness to testify to Google's use of indemnification provisions. Uber argues that the indemnification agreement between Uber and Levandowski is at issue in this case. Again, Uber fails to explain how Waymo/Google/Alphabet's use of indemnification provisions, in unrelated contracts and in unrelated circumstances, bears upon the issue of whether Uber misappropriated Waymo's trade secrets. Examples of Google's indemnification provisions are of no more relevance than examples of Google's common-defense agreements, and Waymo therefore need not provide tit-for-tat corporate testimony on the topic at all, much less over indemnification provisions in any acquisition or employment contracts over a ten-year period, as Uber requests.