Pages 1 - 62

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

WAYMO LLC,                            )
                                      )
              Plaintiff,              )
    vs.                               ) No. C 17-00939 WHA
                                      )
UBER TECHNOLOGIES, LLC., OTTO         )
TRUCKING, LLC, and OTTOMOTTO, LLC,    )
                                      )  San Francisco, California
              Defendants.             )  Monday
                                      )  December 4, 2017
_____  )  9:00 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**            QUINN, EMANUEL, URQUHART, OLIVER
                               & SULLIVAN LLP
                              50 California Street
                              22nd Floor
                              San Francisco, California 94111
                     BY:  **CHARLES KRAMER VERHOEVEN, ESQ.**
                          **JORDAN R. JAFFE, ESQ.**
                          **DAVID ANDREW PERLSON, ESQ.**
                          **MELISSA J. BAILY, ESQ.**
                          **ANDREA PALLIOS ROBERTS, ESQ.**


**For Plaintiff:**            QUINN, EMANUEL, URQUHART & OLIVER
                              51 Madison Avenue
                              Suite 22
                              New York, New York 10010
                     BY:  **JAMES E. BAKER, ESQ.**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                  *Official Reporter - US District Court*
                  *Computerized Transcription By Eclipse*

1  **APPEARANCES (Continued)**

2

3  **For Defendants:**          MORRISON & FOERSTER, LLP
                                425 Market Street
                                San Francisco, California 94105
4                      BY:   **ARTURO J. GONZÁLEZ, ESQ.**
                             **MICHAEL A. JACOBS, ESQ.**
5                            **ESTHER KIM CHANG, ESQ.**

6

7

8  **For Defendants:**          BOIES, SCHILLER AND FLEXNER, LLP
                                435 Tasso Street
                                Suite 205
9                               Palo Alto, California 94301
                         BY:  **MEREDITH R. DEARBORN, ESQ.**
10

11

12 **For Defendants:**          SUSMAN GODFREY, LLP
                                1301 Avenue of the Americas
13                              32nd Floor
                                New York, New York 10019
14                       BY:  **WILLIAM CARMODY, ESQ.**

15

16

17 **Special Master:**          FARELLA BRAUN & MARTEL, LLP
                                Russ Building, 30th Floor
                                235 Montgomery Street
18                              San Francisco, California 94104
                         BY:  **JOHN L. COOPER, ESQ.**
19

20                              - - -

21

22

23

24

25

PROCEEDINGS

```
1                    P R O C E E D I N G S

2    DECEMBER 4, 2017                              8:58 A.M.

3                          ---oOo--

4           THE CLERK:  Calling Civil Action 17-939, William, LLC

5    versus Uber Technologies, Inc., et al.

6         Counsel, please states your appearances for the record.

7           MR. PERLSON:  Good morning, your Honor.  David

8    Perlson, Quinn Emanuel, for plaintiff Waymo.

9         With me, Charlie Verhoeven, Jordan Jaffe, Jim Baker,

10   Andrea Roberts and Melissa Baily.

11          THE COURT:  Welcome.

12          MR. GONZÁLEZ:  Good morning, your Honor.  Arturo

13   González, Michael Jacobs, Esther Kim Chang from Morrison and

14   Foerster for Uber.

15          MR. CARMODY:  Good morning, your Honor.  Bill Carmody

16   with Susman Godfrey.

17          THE COURT:  Welcome.

18          MS. DEARBORN:  Good morning, your Honor.  Meredith

19   Dearborn, Boies, Schiller and Flexner, for Uber.

20          MR. COOPER:  Good morning, your Honor.  John Cooper,

21   Special Master.

22          THE COURT:  All right.  Welcome to you.

23        So I'm going to do some business here.  Mr. González, why

24   are you standing up?

25          MR. GONZÁLEZ:  I had some things I needed to tell the
```

PROCEEDINGS

1    Court, but I'll wait, your Honor.

2         THE COURT:  Before you do, let me do some old

3    business first.

4         I had given you a few days ago a solution to your problem,

5    over-designation of witnesses, the rolling list problem

6    solution.  And now is the time to stand and deliver.

7         Does anyone have an objection to the way this is written?

8    I asked you to meet-and-confer, but I heard nothing back, so

9    I'm going to finalize this unless I hear something.

10        MR. PERLSON:  I think that's fine with both of us.

11        MR. GONZÁLEZ:  That's fine, your Honor.  Thank you.

12        THE COURT:  Good.  It's done then.

13        Okay.  Now, next problem is to see where we are on the

14   supplemental discovery.  And I'd like for you to make reports

15   on both sides and then maybe the Special Master make a report.

16        Mr. González, go ahead.

17        MR. GONZÁLEZ:  So, your Honor, we received last week

18   a list of 16 witnesses that Waymo would like to depose.  We've

19   given them deposition dates for every single one that we

20   control.

21        Of the 16 I believe the only ones that we don't have a

22   deposition date for are Mr. Jacobs, who was here in court, our

23   former employee; Mr. Jacobs' lawyer; and one former Uber

24   employee, Mr. Clark, who is an attorney.  I've reached out to

25   Mr. Clark's lawyer.  I've given counsel that lawyer's name so

PROCEEDINGS

 1  they can reach out themselves as well, but everyone else has

 2  now been scheduled for deposition.

 3           THE COURT:  Scheduled before December 22.

 4           MR. GONZÁLEZ:  That is correct.  Thank you for that

 5  clarification.  Thank you, your Honor.

 6       And the personnel file for Mr. Jacobs has been produced.

 7  We will be producing today documents regarding non-attributable

 8  devices and ephemeral messaging.

 9       And, in fact, your Honor I want to clarify one thing here.

10  It's a good time to do it.  You and I had an exchange last week

11  where the Court thought that I had misled you on a point, and

12  here is what I want to clarify.

13       What I said was that the non-attributable devices, it is

14  my belief that when the evidence comes in, will be limited to

15  SSG and MA.  I do not believe those were used by the people in

16  the Autonomous.

17       The ephemeral messaging, your Honor, was used by people in

18  the Autonomous, and that was known to Waymo even before the

19  hearing.

20           THE COURT:  What was that word?

21           MR. GONZÁLEZ:  The ephemeral messaging, the stuff

22  that disappears.

23           THE COURT:  I know, but was used by people in the

24  what?

25           MR. GONZÁLEZ:  In the Autonomous Group.

PROCEEDINGS

1            **THE COURT:**  Oh, Autonomous.   Okay.

2            **MR. GONZÁLEZ:**  Yes.

3            **THE COURT:**  Okay.

4            **MR. GONZÁLEZ:**  What I wanted you to know, which was

5     not made clear last week and I should have made it clear, Lior

6     Ron, whose name came up last week, and Eric Meyhofer have both

7     testified in deposition that they used ephemeral messaging to

8     communicate with Anthony Levandowski.  So that may have been

9     used to your Honor, but it wasn't used for the parties.  And,

10    in fact, there were five other people who were already

11    questioned by Waymo about ephemeral messaging.

12        I just wanted you to know that so that it could be clear

13    that when I made my representation to you, I was limiting it to

14    non-attributable devices and that the ephemeral messaging is

15    not a big development in the case.

16            **THE COURT:**  When did those depositions take place?

17            **MR. GONZÁLEZ:**  I will tell you, your Honor, that Lior

18    Ron was deposed on June 19th of 2017 and he was asked

19    specifically about the use of Telegram.  Telegram is one of

20    these ephemeral things.  And he was asked whether he

21    communicated with Mr. Levandowski on Telegram and he said yes.

22    And he went on and there is multiple pages of that testimony.

23        And then let me just very briefly tell you about

24    Mr. Meyhofer.  He was deposed on August 18th, 2017.  He was

25    also asked about Telegram and how it destructs --

PROCEEDINGS

1    "QUESTION:  ...has self-destructing messages; is that

2    right?

3    "ANSWER:  That's correct.

4    "QUESTION:  Have you used Telegram to communicate with

5    Mr. Levandowski?

6    "ANSWER:  Yes, I have."

7         And so that -- this was all information that had already

8    been elicited.  And there are five other people who were asked

9    about the use of ephemeral messaging, in particular Telegram,

10   and then there was one other one that was mentioned.

11        THE COURT:  So let me summarize your point.

12        You're saying that I misunderstood you and that what you

13   had intended to communicate was that the use of

14   non-attributable telephones or smartphones was limited to the

15   SSG and MA groups and was not used by the Autonomous Vehicle

16   Group, but by contrast the ephemeral messaging was used in the

17   Autonomous Vehicle Group, maybe elsewhere in the company, but

18   that that, that fact was already known in prior depositions.

19        MR. GONZÁLEZ:  Precisely, your Honor.

20        THE COURT:  All right.

21        Is that true?  If that's so, then no one bothered to tell

22   me that.

23        MR. PERLSON:  Well, your Honor, the use of ephemeral

24   communications generally was known.

25        What was not known was what is talked about in the letter,

PROCEEDINGS

1   and that's what the issue is.  The fact that there was -- you

2   know, for example Clark and Henley -- it says that:

3           "Henley and Clark implemented a program of

4       ephemeral encrypted communications with the express

5       purpose of destroying evidence of illegal or unethical

6       practices to avoid discovery in actual or potential

7       litigation."

8       That's what's at issue here, not just using ephemeral

9   communications generally.

10          THE COURT:  Well, but that's -- that's a possibly

11  thin distinction.  I don't know.

12      I thought you were -- I thought you were totally unaware

13  of the ephemeral devices.  Did it turn out that your own

14  company uses these ephemeral devices?

15          MR. PERLSON:  Well, ephemeral communications, yeah,

16  there are -- people use for business purposes Google Hangouts,

17  which is a chat service, and use that.  It has sometimes used

18  Off the Record.  We're going to be filing a filing at noon

19  today that explains all of that, as you directed.

20          THE COURT:  Well, make sure it's complete and if

21  Wickr is used and Telegram is used and all those other ones are

22  used, make sure you're complete on that.

23      Okay.  All right.  You continue with your speech.

24          MR. GONZÁLEZ:  Yes.  Thank you, your Honor.

25      Two things.  First of all, there was reference to

PROCEEDINGS

 1  surveillance videos during the testimony last week, if you

 2  recall from one of the witnesses; that we take videos of cars

 3  driving around, competitor vehicles.

 4          **THE COURT:**  Yes, okay.  I do remember that, yeah.

 5          **MR. GONZÁLEZ:**  So we have found those.  I don't know

 6  exactly how relevant they are, but we're going to go ahead and

 7  produce those.

 8      Here is what I want you to know.  We found those videos,

 9  your Honor, on a site that SSG used to use.  They don't any

10  more.  It's a cloud storage site.  We're producing not only the

11  videos, but reviewing -- but we are reviewing everything on

12  that site.  Anything else that's responsive will be produced.

13  They will have it this week.

14      The other thing I wanted to mention, you just asked about

15  their use of these devices.  We have learned that there is

16  something called Off the Record, where if you turn that on, the

17  communications are not saved and they used that.

18          **THE COURT:**  Sorry.  Wait, wait, wait.  That's going

19  by me too fast.  Say that again.

20      What is Off the Record?  "They" meaning the other side

21  uses it?

22          **MR. GONZÁLEZ:**  Yes.

23          **THE COURT:**  "They," Waymo uses Off the Record?

24          **MR. GONZÁLEZ:**  Yes, precisely.

25          **MR. PERLSON:**  That's what I just talked about, your

PROCEEDINGS

 1 | Honor.

 2 |           **MR. GONZÁLEZ:**  I want to make sure that you

 3 | understand the significance of what it means because when I

 4 | heard it, I didn't understand.  This is what it means.

 5 |      They have something called Gchat, where they communicate

 6 | within Google.  And if you turn on Off the Record -- that's

 7 | what they call it, Off the Record -- those communications are

 8 | not preserved.  And we believe that that is used extensively.

 9 |           Now, here is where I need your help on one point.  Special

10 | Master tried to help us, but he couldn't.  You said, your

11 | Honor, that we can talk to our own people, obviously, about:

12 | Did you use this stuff at Google?  They will not allow us to

13 | ask the following questions of our own people.

14 |      And, by the way, our people were concerned when we went to

15 | them.  They don't want to get sued by Google.  And so we had

16 | some questions that they wanted to ask our people that they

17 | refused to let us ask.

18 |           **THE COURT:**  What point?  Give me an example.

19 |           **MR. GONZÁLEZ:**  I'm going to give you an example.

20 |           "Was there any written or unwritten Google policy

21 |      on the use of ephemeral messaging for work?"

22 |      They won't let us ask that.

23 |           **THE COURT:**  Okay.  Stop.

24 |      Is that true?

25 |           **MR. PERLSON:**  Your Honor, I -- we have concerns with

PROCEEDINGS

 1   them going into asking questions about Google policies, fishing

 2   for information that might involve attorney-client

 3   communications, things like that.

 4        They shouldn't -- you know, we did say they could ask them

 5   questions:  Did you use ephemeral devices -- I mean, ephemeral

 6   communications?  We said that's fine.  That's exactly what you

 7   said.

 8        But we're going to be providing the policies and we're

 9   going to be providing what is in there.  They shouldn't be

10   going around asking our witnesses about what they did at our

11   company.  I mean, our former employees.

12        **THE COURT:**  You're wrong on that.  This is a direct

13   order.  And the public ought to be aware.  This is -- I can't

14   stand it when Waymo or the other side wants it both ways.

15        Mr. González, you have the Court's permission to go and

16   ask any former Waymo employee working for Uber what -- not only

17   what the practices were, but the policies about ephemeral

18   communications when they were at Waymo.

19        **MR. GONZÁLEZ:**  Thank you, your Honor.

20        **THE COURT:**  And, and preserve those records where

21   they obstructed your inquiry because they may be shown to the

22   jury.

23        **MR. PERLSON:**  Well, your Honor, one of the things

24   that the Special Master also asked was that we be told about

25   those communications and those should be reported to us, and

 1  they refused to provide what our former employees would say.

 2          THE COURT:  No.  They don't have to give you that.

 3          MR. PERLSON:  Okay.  That was part of what the

 4  Special Master said.

 5          THE COURT:  Too bad.  They came to work for Uber.

 6  They get to ask those questions.

 7      I'm overruling any confidentiality contract.  This is a

 8  bogus stonewalling attempt to obstruct justice.  It's too

 9  strong a word.  I take back "obstruct justice," but obstruct

10  discovery in this case.

11      You're trying to blame them for ephemeral, and they are

12  going to get to show that you do it just as badly as they do

13  it.

14      All right.  What's your next grievance?

15          MR. GONZÁLEZ:  I think I know what the answer is,

16  your Honor, but there's two other questions that I wanted to

17  ask my people, but they won't let me ask.

18      One is:  Do you know of anybody else at Google or Waymo

19  who used ephemeral messaging?

20          THE COURT:  Of course you can ask that.

21          MR. GONZÁLEZ:  The other one was:  Were you ever

22  instructed to use it or not to use it?

23          THE COURT:  You can ask that.  Unless it's a lawyer.

24  You've got to say that -- if a lawyer told you to use it or not

25  to use it, then reserve that question.

PROCEEDINGS

 1        Just say:  Anyone other than a lawyer tell you to use it

 2   or not use it?

 3             **MR. GONZÁLEZ:**  That's fair, your Honor.  And that's

 4   precisely what we said to them we wanted to do; that we're

 5   going to tell our people:  Do not tell us anything that lawyers

 6   said to you in responding to these questions.

 7             **THE COURT:**  You should make the questions clear

 8   enough to protect any attorney-client confidences.

 9             **MR. GONZÁLEZ:**  We will do that, your Honor.  Thank

10   you.

11        Two very quick points, in addition to that, from last

12   week's testimony that I just wanted to make sure were clear.

13        One is, from reading the transcript I was left with the

14   impression that the Court thought that there was a final

15   written report that had been prepared by WilmerHale.

16   Ms. Padilla was using the phrase "report out."

17        And I wanted you to know that I've checked with

18   WilmerHale.  They have not prepared a final report.  They are

19   still investigating.

20        They certainly haven't prepared a document for the U.S.

21   Attorney's Office, but they have made periodic reports to the

22   client, but there is no final report.  So I just wanted that to

23   be clear.

24        The second and final item that I wanted to clarify or

25   supplement from last week.  There was some testimony about

PROCEEDINGS

 1   technical surveillance and something called web scraping that

 2   you might recall.

 3        One other thing that Uber did, and I want them to know

 4   this so they can question my people about it and not say later

 5   they get to bring them back because I haven't disclosed it,

 6   they did some reverse engineering.  I'm not going to get into

 7   the details of what that is because I'll probably get it wrong,

 8   but it's referred to as API scraping.  So when they question

 9   our people, all of the SSG people who testify or are scheduled

10   for deposition, I'm disclosing that so they can ask them

11   about that as well.

12        And the last thing I wanted to do, your Honor, is disclose

13   some information to the Court and to Waymo.  One of the issues

14   is going to be -- oh, I'm sorry.  I did get a note.

15        I think the Court misspoke earlier.  The Court said

16   "non-attributable phones" and I think it's non-attributable

17   computers.

18            THE COURT:  Devices, I thought it was.

19            MR. GONZÁLEZ:  Devices.  Let's say devices.

20            THE COURT:  I misspoke and you misspoke.

21            MR. GONZÁLEZ:  All right, devices.  Thank you, your

22   Honor.

23        Here is what I want to disclose both to the Court and to

24   Waymo.  And I'll preface it by saying you made a comment last

25   week that made me smile because it was exactly what I was

1    thinking.  You said:  There are certain things they don't teach

2    you in law school.  They just come up and you've just got to

3    deal with them.

4         And I'm going to disclose now something to you that's

5    precisely within that category.

6         The question that you're addressing is:  Did Uber

7    intentionally hide the stuff from the Court or from Waymo?  And

8    I believe strongly that the answer is no.

9         But now I want to address my law firm and what we knew and

10   when we knew it, and preface that by answering a question that

11   you asked about the search term hits.

12        I told you last time I was here that I did not think that

13   there were search term hits on that resignation email.  I was

14   right.  I've confirmed that with my team.  That explains why

15   the resignation email was not produced.

16        And, by the way, I wrote to Waymo and I said:  I'm going

17   to make these representations to Judge Alsup.  If you think

18   I've got it wrong, please let me know.  And, thankfully, this

19   is one thing that we agreed upon.  There were no hits for that

20   email and that's why the email wasn't produced.

21        Second, this 37-page letter.  Counsel for Waymo said last

22   week that there was the word "Otto" in that letter and "Otto"

23   was a search term.  She's right.  However, what she didn't tell

24   you is that the parties agreed that we would only have to

25   review documents that hit on "Otto" during a certain window

PROCEEDINGS

```
 1   period, and both of these documents fell outside of that window

 2   period.

 3        So the bottom line is, using the criteria that the parties

 4   agreed to, neither one of those documents would have been hit

 5   upon or produced.  I thought that was an important thing for

 6   the Court to know.

 7             THE COURT:  That's one of the questions I was going

 8   to ask today is, I want to -- I have more questions for you on

 9   that, but just how about the phrase "Autonomous Vehicle Group?"

10   Was that one of the search terms?

11             MR. GONZÁLEZ:  I do not believe so, your Honor.

12             THE COURT:  How about the term "Otto acquisition?"

13   Was that one of the -- a search term?

14             MR. GONZÁLEZ:  I do not believe so, your Honor.

15        The word "Otto" was, but only for a limited period of

16   time.  These documents are outside of that window.

17             THE COURT:  All right.  Is that all true?  I mean --

18             MR. PERLSON:  Well, it is -- on the search terms it

19   is not true that we agree that only documents that hit those

20   search terms needed to be produced.  Both sides produced all

21   sorts of documents beyond that.

22        And we certainly didn't agree that --

23             THE COURT:  Show me the document request or

24   agreement.

25        Let me tell you how I see it first, and then you tell me
```

PROCEEDINGS

 1   where it's wrong.  Because I have been thinking about this and
 2   I'm not -- this is not a ruling.  This is just the way I think
 3   about it.  And then you can explain what...

 4        To my mind, there are two categories of broad information
 5   here for document requests.  One are hard copy documents.  And
 6   there we use the traditional rules that I was familiar with for
 7   decades before I got this job, where you have a document
 8   request and then there is maybe negotiations; but anyway, there
 9   is a document request and either the request calls for the
10   document or it doesn't.

11        In addition, now we have this problem of massive servers
12   that have to be searched and so the lawyers use search terms to
13   do that.  That's where emails come in, so the electronically
14   stored stuff.

15        I assume that we had both categories here, right?  And so
16   it occurred to me that this -- this letter from the lawyer,
17   Halunen Law, was reduced -- somebody printed it out.  So it's
18   not just an email on the electronic server.  It's also a hard
19   copy.  Maybe Angela Padilla printed it out.  It seems like it
20   got a lot of circulation.  It would seem logical to me it did
21   get printed out somewhere.

22        So then there is a question of did any of the document
23   requests that were applicable to written materials in hard
24   copy, did it pick this up or not?

25        Now, that presupposes that it wasn't a hard copy.  I don't

 1   know that.  I think it's reasonable to assume that it was, but

 2   it's not.  That's just an assumption.

 3        But the -- the third thing is that if you had some

 4   agreement between the two of you that certain things would be

 5   produced even though they weren't specifically called for, like

 6   a meet-and-confer letter or something, then, of course, that

 7   would apply as well.

 8        And then the fourth category is if I ordered it on a

 9   provisional relief order.

10        But if it didn't get picked up in one of those categories,

11   then you can't accuse the other side of suppressing evidence

12   that wasn't required to be produced.  That's my -- that's the

13   general framework.

14        Now, tell me where I'm wrong on that.

15            MR. PERLSON:  Well, I -- in -- so first of all, we --

16   as you ordered us to do, we filed just shortly before the

17   hearing a written response outlining the places in the order --

18            THE COURT:  I didn't see that.  My Law Clerk, I asked

19   specifically, and she did it 30 minutes ago.  She said -- I

20   said, "Have they responded yet?"  "No."

21            MR. PERLSON:  I think these -- these were due at

22   noon, your Honor.  I apologize that we didn't have it before,

23   but it was -- it was filed shortly before the hearing.  I

24   apologize for that.

25        But it outlines the orders to which it was responsive to.

 1   It outlines the specific document requests it was responsive
 2   to.  It outlines an interrogatory that it would have been
 3   responsive to.  And it also outlines the history in relation to
 4   the negotiation of the search terms and what happened with
 5   that.  And that it was not the case that just because something
 6   happened to be in electronic form, that the parties agreed that
 7   if it didn't hit on search terms, that it didn't need to be
 8   produced.  That is absolutely not the case.
 9        What is the case is that for certain types of documents,
10   like emails in which there are, you know, voluminous categories
11   of it, instead of going through every single email, you run
12   search terms and you do a review on that.
13        And it was not in that category, but it was responsive to
14   these document requests.  It was -- you know, people in senior
15   management up and down knew about it.  And even -- and I
16   thought on the stand Ms. Padilla testified that in the meeting
17   she had with the -- the people from the Compliance Department,
18   that she said she handed it to them, which -- and that's also
19   detailed in here, that testimony, which like you, it seems to
20   me, it had to have been in paper form as well, to the extent
21   that that is even a separate category.
22        But, you know, we didn't even start talking about
23   negotiating specific search terms until July 1st and before
24   then there were thousands of documents that both parties
25   produced.

1          This document, the first -- the resignation email was in

2     April.  The Jacobs letter was May 5th, and Uber wouldn't even

3     start talking to us about these search terms until after it had

4     provided the letter to the U.S. Attorney on June 27th.

5          So to say that, you know, somehow the parties agreed that

6     electronic documents didn't need to be produced if they weren't

7     responsive to search terms is just a complete 180 from the way

8     that both parties have handled the case.

9          **THE COURT:**  But did you hear what I said?  I said

10    that if there was a document request and there was a hard copy

11    of the document and it fell within the request, it had to be

12    produced.

13         **MR. PERLSON:**  I agree.

14         **THE COURT:**  Okay.  So, but if it only was on the --

15    in the electronic world and never got off the -- it was only on

16    the server and never got reduced to hard copy, then it seems to

17    me that the argument may have some weight; that if it wasn't

18    part of the search terms, they didn't have to produce it.

19         **MR. PERLSON:**  That's what I'm saying, your Honor, is

20    that is not how either party has operated in the case.  We have

21    not -- neither party limited their production of electronic

22    documents solely to those that hit on search terms.

23         Under this logic it would be -- you know, since Angela

24    Padilla was not a specific email custodian, after he was fired,

25    Anthony Levandowski could have emailed her admitting

1   everything, and then they say:  Oh, well, we didn't need to

2   produce it because it didn't hit a search term.

3        That's not how it works, and we've cited cases that show

4   that that's not how it works.

5        **THE COURT:**  Well, I'm going to ask my Special Master

6   maybe -- I want you to be thinking about it -- is that the way

7   you understood it?  Don't say anything yet.  I just want you to

8   be thinking, because I'm a little surprised to hear what

9   counsel says, but it could be true, and it could be that both

10  sides -- both sides -- I don't know.

11       So what you're telling me is that -- so two lawyers from

12  back there have come forward to woodshed the lawyer.  Now, do

13  you need to correct something?  I -- any time a note comes

14  forward, I should let you --

15            **MR. PERLSON:**  Well, they are helping me.

16            **THE COURT:**  What are they --

17            **MR. PERLSON:**  They are not correcting me.  They are

18  helping me.

19            **THE COURT:**  Okay.  You need to say anything in

20  response?

21            **MR. PERLSON:**  Yes.  James helped me by pointing out

22  that search terms are for searching for documents.

23       So, for example, when you have email, there is tons of --

24  sort of what I referred to earlier; that you have tons and tons

25  of email, millions of email.  Instead of having to look through

1   every single one of them, you do search terms to see -- look

2   for hits and then you see whether they are relevant.

3      But if you already have the documents, like this one, when

4   the head of litigation has the document in her hand and right

5   in front of her face, you don't need a search term.  You don't

6   need to go look for it.  You don't need to go find it.  You

7   have it.

8          THE COURT:  But that's -- if it's in a hard copy and

9   it's called for, I agree with you.

10      But I'm positing the case where it's only email.  Let's

11   say she never printed it out.  It was always just on the

12   computer.  And her testimony is that she just assumed that

13   whatever search terms picked it up, would have picked it up,

14   and she didn't have to worry about the discovery part.  So

15   that's not entirely unreasonable.

16      So what do you say to that?

17          MR. PERLSON:  Well, that's not what she said.

18          THE COURT:  That is what she said.

19          MR. PERLSON:  She said that she made a decision not

20   to do it because the compliance lawyers told her not to share

21   it with anybody.

22          THE COURT:  No.  No, no.  That's not quite -- she

23   said she didn't share it with MoFo or her own in-house lawyers

24   for that reason, but that she assumed that if it was going to

25   be producible in discovery, that the search terms would pick it

1   up off the server.  That's what she said.

2       **MR. PERLSON:**  I don't think that that is an

3   acceptable or reasonable position for head of litigation in a

4   sophisticated company in this day and age to believe.

5       They know what search terms are for.  They are not --

6   neither party in these cases are only producing documents --

7   that that hit on search terms in electric [sic] form.  I mean,

8   for example, Jacobs personnel file, they produced that.  It was

9   electric form.  I mean, I imagine it probably was stored

10  somewhere in electric form.  There's all sorts of documents

11  that are stored in electric form.  Probably most of Uber's

12  documents are.

13      **THE COURT:**  Okay.  But there is the post-Jacobs and

14  the pre-Jacobs.  The accusations are all in the pre-Jacobs era,

15  and we need to know whether -- okay.  Hold that thought.  Don't

16  go away on that.

17      What is your view?  And I am -- I want you to be honest

18  about what the practice was between the two sides.  If it is

19  true that even if it wasn't hit by the search terms, you

20  nevertheless produced it if you knew about it, then confess

21  that and let me know.

22      **MR. GONZÁLEZ:**  So here is what we agreed to, your

23  Honor.  What we agreed to was search terms and custodians.

24  That's the part that you have not focused upon yet.

25      And that's where I disagree with what your Honor just now

PROCEEDINGS

 1   said about if somebody has it somewhere in hard copy, then it

 2   should have been produced.

 3        We have 15,000 employees, somewhere between 12 and 15,000.

 4   It obviously is not practical to go to all of those people.

 5        We conferred about that and we agreed upon custodians,

 6   your Honor; that we would go to certain people.

 7        THE COURT:  I thought that was for emails.

 8        MR. GONZÁLEZ:  Well, that was also for hard copy.  We

 9   obviously didn't agree to go to every employee in the company.

10   They knew that and they didn't either.

11        THE COURT:  Is that true, that the document research

12   for hard copies only had to be for certain custodians?

13        MR. PERLSON:  I don't know what he's talking about,

14   your Honor.  That's not how it works.

15        First of all, most of these people don't have a file

16   cabinet sitting around.  The reason why you're looking at these

17   search terms and what you're looking at are electronic

18   documents.  They are not scanning documents in someone's file

19   cabinet and then running a search term.  That's not what's

20   going on.

21        THE COURT:  Look.  Don't tell me that there are not

22   hard copies of documents that you're interested in or the other

23   side is not -- there are hard copies, even though

24   most everything is on the server, but --

25        MR. PERLSON:  I'm not saying --

```
 1            THE COURT:  Just a second.

 2       So let's be clear.  You're telling me that for both, for

 3   both electronic and hard copies, each side reached agreements

 4   on custodians and search terms?

 5            MR. GONZÁLEZ:  Exactly.

 6            THE COURT:  Even for a hard copy?

 7            MR. GONZÁLEZ:  Exactly.

 8       And, your Honor, there were certain documents that came up

 9   during the course of the litigation.  For example, Board

10   minutes.  If there is something specific that they wanted that

11   somebody might have in hard copy, the file that we just

12   produced, they would ask for it.

13       So there absolutely were exceptions.  He's right about

14   that.  If somebody mentioned something in deposition, if

15   somebody said something about a document, they would say:

16   Produce that document.  And both sides did this.  That's how

17   this case went.

18       But neither side has gone to every employee in the company

19   to get responsive documents.

20            THE COURT:  No, no.  But you're dodging the issue a

21   little bit.

22       What should Angela Padilla, knowing of the existence of

23   this document, should she -- should you -- should she have

24   turned it over to the other side in this litigation?

25            MR. GONZÁLEZ:  I think, your Honor, that that
```

PROCEEDINGS

 1  document is in her email system.

 2      I think that if the search terms that the parties agreed

 3  to -- if the parameters -- let's say parameters, because it

 4  includes search terms and other things; custodians, date, time

 5  periods.  If the parameters picked it up --

 6          **THE COURT:**  Let's say it didn't.  You told me it

 7  didn't.

 8          **MR. GONZÁLEZ:**  It didn't.  Precisely.

 9          **THE COURT:**  So here is a document that she knows

10  about that was not produced.

11      What counsel is saying, on the other side, is that you had

12  a pattern and practice on both sides of nevertheless turning

13  over relevant materials and that you didn't do that here.

14  That's what is being -- was that the pattern and practice?

15          **MR. GONZÁLEZ:**  It was not, your Honor.  Let me read

16  to you one line.  One line from an email that they wrote in

17  August.

18          "It seems sufficient to produce documents located

19      by running the agreed-upon search terms over the

20      agreed-upon custodians."

21          **THE COURT:**  Who said that?

22          **MR. GONZÁLEZ:**  They did.

23          **THE COURT:**  Who wrote that email?

24          **MR. GONZÁLEZ:**  Jeff Nardinelli.

25          **THE COURT:**  Who is that?  Is that guy here?

PROCEEDINGS

1         MR. GONZÁLEZ:  One of their associates wrote an email

2    to us on August 8th, when we were conferring about these very

3    issues, and wrote those words.

4         THE COURT:  How do you get around that?

5         MR. PERLSON:  Your Honor, I have no idea what a

6    single email, one line of an email said.  I mean, I don't even

7    know the context of what it's in.

8         THE COURT:  Well, of course you do.  Go look at it

9    right now, since he's got it right in front of him.

10        MR. GONZÁLEZ:  Your Honor, this is not the actual

11   email.  It is an email that was written to me with various

12   different communications with them.  It includes that quote.

13        I'm holding my work product.  But it's August 8th from

14   Jeff Nardinelli.

15        THE COURT:  All right.  Just a minute.  You finish

16   your point.  Then I want to hear the other side's point.

17        MR. PERLSON:  Okay.

18        MR. GONZÁLEZ:  Well, on that issue, your Honor, I

19   think I'm finished on that issue.

20        MR. PERLSON:  Your Honor, I would just suggest that

21   you read our written submission that we -- that we've outlined.

22        Again, it was responsive to Court orders.  That shouldn't

23   matter whether it's hard copy, electronic or written on a

24   napkin or whatever.  They should have produced it.  It's

25   responsive to documents.

1        Their head of litigation knew it had to have been

2   relevant.  She got it two days after the preliminary injunction

3   hearing.  And -- and it went through back-and-forth and all

4   sorts of channels with all sorts of lawyers up and down and all

5   over the place.  Nobody -- and none -- and these people

6   presumably had it in hard copy.  They probably emailed it

7   around.  This was known.  It was a known document.

8        They can't get out -- well, first of all, I reject the

9   notion that we've -- that the parties have agreed that

10  electronic documents did not need to be produced if they

11  weren't responsive to search terms.

12       As I said before, we didn't even start talking about

13  search terms until July 1st.  Uber themselves had produced, I

14  think, 16,000 documents.  Where did those come from?  I mean,

15  this document should have been produced then, before we even

16  started talking about search terms.

17            THE COURT:  Well --

18            MR. GONZÁLEZ:  May I add something that would help?

19            THE COURT:  Wait, wait, wait.

20       But when was your document request that clearly picked up

21  the -- give me your -- I'm going to read your document.  I wish

22  you had given that to me before.  Because I asked for it this

23  morning.  My Law Clerk said it wasn't there.  You did it just

24  before the hearing.

25       I am very interested in this, but give me your single best

PROCEEDINGS

1  document request that would have picked up the Jacobs letter,

2  the 37-page letter, that -- where the time period in which to

3  respond had already run prior to the time that you moved into

4  the search term mode.

5      MR. PERLSON:  RFP No. 73 calls for:

6      "All documents and communication regarding the

7      misappropriated materials, including but not limited

8      to documents containing information derived from

9      misappropriated materials, any electronic media that

10     contains or contained the misappropriated materials,

11     any documents, any meetings or discussion regarding

12     the substance of the misappropriated materials outside

13     of Waymo."

14     If I could indulge you with one more?

15      THE COURT:  Sure.

16      MR. PERLSON:  RFP No. 29:

17     "All documents and communications regarding

18     negotiations over Uber's acquisition of Ottomotto."

19     If you recall, the letter refers to that -- you know, this

20  presentation about the hypothetical -- supposedly hypothetical

21  work that was done to keep the discussions between what people,

22  assumed to be Mr. Kalanick and Mr. Levandowski, regarding the

23  Otto acquisition, you know, confidential through this -- the

24  work of this secret network.

25     And then, you know, it also talks about the theft of

PROCEEDINGS

 1    Waymo's trade secrets.

 2        Both of those are directly responsive to those document

 3    requests.  It's pretty basic.  And they are responsive to your

 4    order when you talked about, you know, documents regarding

 5    deletion of materials.

 6            THE COURT:  Did you want to say something?

 7            MR. GONZÁLEZ:  Yes.  Two things, very briefly.

 8        The documents that we produced earlier, the Special Master

 9    will confirm that this is what happened.

10        If you can recall, your Honor, in response to your order

11    on injunction, you gave them leave to take a bunch of

12    depositions on very short notice.  And they were allowed, I

13    think, six document requests per witness.  They gave us super

14    broad requests.  We conferred -- in fact, in open court you

15    knocked out one of them.

16        We conferred with the Special Master to narrow it down.

17    The Special Master said, correctly, to Waymo:  Look guys, you

18    can't get everything you want.

19        We only had, I think, four days, or something like that,

20    to produce documents.  So the Special Master said:  You've got

21    to cut it down to what you really need for this deposition.

22        So there was a meet-and-confer with the Special Master

23    where they identified specific things, narrowed the request and

24    we gave them information in response to those very narrowed

25    requests.  That part is true.  That happened.

PROCEEDINGS

1          On the two requests that he just gave you, we obviously

2     need an opportunity to respond to whatever they filed.  I

3     haven't seen it.

4          But listen to what they just said.  No. 29:

5               "Negotiations about the acquisition of Otto."

6          What?  I wouldn't even have thought about these documents

7     in connection with that document request.

8          And the other one he said, No. 73, it went on for 30

9     seconds.  I'm sure we objected to that as being overbroad.  And

10    there was probably a meet-and-confer back and forth.  And then

11    we fell back on the search terms and on the custodians.

12         But misappropriation of materials?  There is one line in

13    that 37-page letter that they really like.  They cited it four

14    times.  And you heard what the witness said about that one

15    line.  He knows nothing about any effort to steal stuff from

16    Waymo.

17         **THE COURT:**  Look.  Whether he knew anything about it

18    or not, the one line was in there.

19         **MR. GONZÁLEZ:**  I agree.  I agree, your Honor.  I'm

20    simply noting that the document request that he just read, one

21    of them is completely irrelevant, the Otto acquisition thing,

22    and the other one was extremely overbroad.  And we negotiated

23    and that's when we came up with search terms, custodians.

24         And to suggest that because of that we had to produce this

25    one document, I don't think that it would be fair.

1        **THE COURT:**  Look.  I have an idea.  Tell me what you

2    think of this.  It involves the Special Master.

3        I think we should have a -- we will only do this if you

4    both agree, but why don't we let the -- the Special Master has

5    been involved in all this discovery.  Why don't we let the

6    Special Master decide, after hearing both in a private -- or

7    some kind of meeting with -- conference with the Special

8    Master.  And he can have as many meetings and briefs from you

9    as each side wants.

10        Then the issue will be whether or not -- under the way in

11   which this case was conducted on both sides and through the

12   document requests, whether or not the email and/or 37-page

13   and/or settlement agreement were required to be produced by

14   Uber.  And then he can give us a written report.

15        What do you say?

16        **MR. GONZÁLEZ:**  That would be fine.

17        **MR. VERHOEVEN:**  Your Honor, we're fine with that, but

18   I just wanted to -- from the trees to the forest here.

19        **THE COURT:**  Yeah.

20        **MR. VERHOEVEN:**  This is a misappropriation of trade

21   secrets case.  This letter accuses Waymo of misappropriating --

22   accuses Uber of misappropriating Waymo's trade secrets.

23        The notion that somebody couldn't figure out this was

24   relevant and they had a duty under the -- under the Rules of

25   Civil Procedure to produce documents that they know are

 1   relevant is ludicrous.

 2          THE COURT:  No, no, no, no.  You have to ask for

 3   documents.

 4          MR. VERHOEVEN:  No.  You have a duty to --

 5          THE COURT:  That's only for disclosure of documents

 6   you're going to use.  The disclosure rules require that if

 7   you're going to use the document, you must disclose it.  But it

 8   does not say that you have to disclose everything that is

 9   relevant.

10          MR. VERHOEVEN:  I believe, your Honor -- and we'll

11   brief this in front of the Special Master, but I believe

12   attorneys have a duty, if they know that there is some

13   incriminating, highly relevant evidence, not to hide that; to

14   produce it.

15      And here the Board of Directors are looking at this thing.

16   They got an outside law firm to look at it.  I mean, this isn't

17   even a close call.

18          THE COURT:  Well, maybe not in your mind, but in my

19   mind it -- and, again, I want the Special Master to know that

20   these musings of mine about what my own experience has been are

21   not binding on you.

22      I want you to figure out whether the -- because you know

23   the give-and-take between these two sides better than anybody

24   and you know the custom and practice that evolved and what

25   would have been expected and so forth.  I think you should --

PROCEEDINGS

1   you should make the decisions.  But you should look carefully

2   at the requests and the orders that were issued and the briefs

3   that they give you and figure out:  Should these documents have

4   been turned over or not?

5       Now, I will agree with Mr. Verhoeven.  I'll give you a

6   example where it would be true.  Let's say that a particular

7   document had never been requested, but that in deposition

8   testimony the CEO of the company, some important witness, just

9   gave testimony that was just flat out opposite of what was in a

10  letter.  Then I think maybe in that kind of circumstance the

11  lawyer may have a duty to turn the letter over, because you can

12  see the problem.

13      It's -- you know, otherwise they are putting forth a story

14  that is directly contradicted by things they haven't produced

15  even though they weren't called for.  So maybe in a case like

16  that, but I don't know whether we have that scenario or not

17  here.

18      Look, I will try to get out an order today, but it's going

19  to basically turn this over -- this particular issue over to

20  Mr. Cooper.

21      Now, why does this matter?  It looks like you were about

22  to say something again.  What do you want to say before I

23  continue?

24          **MR. GONZÁLEZ:**  I think this is important, your Honor.

25  I was just given a very important note.

PROCEEDINGS

1      **THE COURT:**  What I was saying was not important,

2   but...

3      **MR. GONZÁLEZ:**  I thought this was a good time to

4   interject with this comment, because I don't want to forget it

5   the way I forgot last time, and tell you about these Telegram

6   depositions.

7      The two document requests that were just read by

8   Mr. Perlson led directly to the negotiations about the search

9   terms.  And that's how our dispute was resolved.

10     When we said those requests are way overbroad -- you heard

11  how long it was, you could drive a truck through it -- we

12  agreed to certain parameters, including search terms and other

13  people.

14     And we're going to present this to the Special Master, but

15  I wanted you to know about it.

16     **THE COURT:**  Thank you.  All right.  Now we've got a

17  new face at the other side.

18     Please go ahead.  Wait.  You're -- don't tell me -- Andrea

19  Roberts.

20     **MS. ROBERTS:**  Good job, your Honor.  I'm sorry, I

21  just have to respond to that, your Honor.

22     On May 30th we proposed entering into an ESI stipulation

23  with the other side where we would negotiate search terms.  The

24  Special Master encouraged the parties to negotiate search

25  terms.

PROCEEDINGS

1        I personally sent that email on May 30th with a proposed

2   stipulation.  I sent follow-ups at least three times in early

3   June.  We got no responses.  It wasn't until July 1st, well

4   after these document requests had been served and they had

5   responded to them, that they reached out and wanted to start

6   discussing search terms.

7        So I think the statement that this all came about because

8   of overbroad search terms, that's not consistent with the

9   history and the negotiations.

10        THE COURT:  Thank you.  Okay.

11        I want to -- now someone is coming forward to help you

12   out.

13        MR. GONZÁLEZ:  We're good.  We're good, your Honor.

14   On that point, we're good.

15        THE COURT:  Okay.  I've got a -- I wanted to tell you

16   why it matters.  There could be other reasons, but one of the

17   reasons I'm focused on this is that if the answer comes back

18   that the document was required to be produced, you know, even

19   one of these documents, such that it looks like that issue is

20   gone.  It should have been produced and it wasn't produced.

21   It's a highly inflammatory, highly material document.  I think

22   everybody should agree that it's at least that.  Then what I

23   have been -- I have been going through in my mind and, also,

24   through all your arguments, a long list of issues that are

25   still hanging fire.

1          I'll just -- I ticked off some of them the other day, but

2     it's the due diligence report.  It's the spoliation issue.

3     It's the Tyto destruction of emails.  It's the other failure to

4     produce the Levandowski emails.  It's -- there is a long list

5     here that I am not -- I'm not able to remember off the top of

6     my head.  And I am going to -- I'm going to consider those all

7     together because it's part of a common story.

8          And the question that I am trying to figure out is:

9     Should that -- how much of that story should be told to the

10    jury?

11         Let me give you one easy example.  This is, I guess, maybe

12    not a no-brainer, but on the easier side.  Mr. González wants

13    to say terabytes to the jury.  We produced terabytes and they

14    found -- not a single one of these documents was found in our

15    terabytes of the server.  Always emphasizing the word "server."

16    Uber server.  Never hit on an Uber server.

17         Well, it's a very good answer to come back and say:  Well,

18    now we learned that they had an ephemeral communication system,

19    a shadow system, a clandestine system where they destroyed

20    everything within six minutes or up to six days and that helps

21    explain why that -- they weren't on the server.

22         So maybe -- you can see how that -- that -- but there's

23    more to it than just that one example.

24         Is there enough of a systematic concealment of evidence,

25    destruction of evidence, that the jury -- let me give you the

```
 1   whole -- the whole nine yards.  The whole nine yards would be
 2   that the jury learns the first trial got postponed on account
 3   of Uber's failure to produce the most important witnesses in
 4   the case's file.
 5        Second trial gets postponed on account of the Jacobs
 6   letter.  And let's say the Special Master determines that that
 7   should have been produced, in which case the jury would be told
 8   that it should have been produced.
 9        Spoliation of the five shredded disks.
10        Tyto records destroyed.
11        Due diligence structure completely shrouded in
12   attorney-client privilege, which got busted through at the
13   Court of Appeals.  I mean, there is a pretty good story to tell
14   there, too.
15        Now, on the other hand, the -- if this -- if both sides
16   were playing fair and square -- that's not quite the word I
17   want to use, but let's take it in a different case where both
18   sides play fair and square and there's none of these issues,
19   then you get to decide the case strictly on the merits.  Is
20   there a trade secret that's protectable?  Did they disclose it?
21   Did they use it?  Did they acquire it?  Did it go to damages
22   maybe?  And you don't get off into destruction of evidence.
23        But this is not the usual case.  There has been a lot of
24   this destruction of evidence.  A lot of what looks like hide
25   the ball, but not necessarily.  Some of it could have been
```

PROCEEDINGS

```
 1   innocent.  But it has been a lot, in my experience.  And so
 2   much so that I am carefully working my way through every single
 3   one of these problems to see if -- how much of it the jury
 4   should be told.
 5        So I haven't decided on that yet.  I'm working on it.  But
 6   this is where the Special Master thing comes in.  And if it was
 7   a document that should have been disclosed and if a lot of this
 8   or some of this is going to get explained to the jury, the
 9   Special Master's report may help me decide how much the jury
10   should learn about these problems that are all of Uber's
11   making.
12        Now, I want to be clear.  I want your discovery to go
13   forward.  I wanted to know about the -- the information about
14   which search terms picked it up.  Maybe no search term picked
15   it up.
16        Let's say no search term picked it up.  I want your
17   discovery to go forward anyway, but why that is relevant is
18   going to -- is tied in to how much culpability is there here
19   and how much -- that helps inform me as to how much the jury
20   should learn about all of this.
21        Let's say -- I will give you another thing that's not
22   terribly easy.  What do we say about the Jacobs letter to the
23   jury?  How is that going to come in?  It's definitely hearsay,
24   so it can't come in for the truth, but it could come in for
25   possible notice.  I don't know, maybe.  Notice.
```

 1        But if it was concealed, it could come in for cover-up,

 2   even if it's not true.  But cover-up requires -- what if it

 3   wasn't called for?  What if no search term report?  Is that a

 4   cover-up?  Mr. Verhoeven says it is, but I'm not so sure it is

 5   in that scenario.  You would have to look at the document

 6   request.  All those things the Special Master is going to look

 7   at.

 8        So I -- I know you think I'm rambling, but I want you to

 9   know how the argument fits into the larger picture.  It will be

10   part of -- a piece of a larger story and that may influence

11   what the story is and -- or even whether that story gets told

12   to the jury at all.

13        Okay.  Enough of that.  You can comment on it or questions

14   or whatever you want to say, but I -- thank you for giving me

15   that chance.

16        Mr. González, you get to go first.

17        **MR. GONZÁLEZ:**  Just very briefly, your Honor.  First

18   of all, I don't consider that rambling at all.  I think that's

19   quite helpful to us and I appreciate the fact that the Court is

20   thinking about these issues that are very important.

21        A couple of things.  One thing that I would just ask that

22   the Court keep in mind, and this is the "they don't teach you

23   this stuff in law school" part.

24        And the Special Master, I almost wish you would sit down

25   and talk to the Special Master for a few minutes.

1        **THE COURT:**  Almost wish what?

2        **MR. GONZÁLEZ:**  That you would sit down and talk to

3   the Special Master about some of the history because we have

4   been running 150 miles per hour since we first set foot in this

5   courtroom and I've got multiple lawyers that are probably going

6   to bill 3,000 hours this year.

7        So the context of this, I think, is important.  That's

8   number one.  It's just the context.

9        They insisted on an early trial and a hectic schedule.

10  Well, that leads to imperfections.

11       **THE COURT:**  Well, wait, wait.  You agreed to that

12  early trial.  You agreed to it.

13       **MR. GONZÁLEZ:**  I'm not blaming anybody, your Honor.

14  I'm just making the point that the context, I think, is

15  important.  When you move that fast, there will be

16  imperfections.

17       Second thing.  These Levandowski emails that were not

18  produced, I just want to make sure that the Court understands

19  this, and I think that you do.  He had a number of different

20  email addresses and we produced substantial documents for

21  Mr. Levandowski's emails.

22       With respect to the one email address that he didn't

23  produce any documents from, I was curious about this.  I asked

24  my team:  Go look at their trial exhibits.  How many documents

25  are even on their very lengthy Trial Exhibit that came from

PROCEEDINGS

1   that production?  And there are three.  And those three are

2   little measly emails that when you see them, you'll see that

3   these are nothings.

4       I mention that because, your Honor, it shows that that was

5   not intentional.  There was not some smoking gun there.  That

6   was simply an oversight.

7           **THE COURT:**  Well, if we went with that theory, then

8   the letter to Angela Padilla would be pretty shocking that it

9   didn't get produced, if we -- if we go by what the -- what the

10  after-the-fact results are.

11      All right.  Thank you for that clarification.

12          **MR. VERHOEVEN:**  I don't want to belabor the point,

13  your Honor.  Two brief comments on that.

14      We wasted thousands of attorneys' hours just trying to get

15  the Stroz materials, and these two continuances have caused us

16  to spend much more money than if we didn't have to have them.

17  So hearing about them spending attorney hours is a non-starter

18  for us.

19      Number two.  MoFo had 64,000 of Google's documents in

20  their possession, your Honor.

21          **THE COURT:**  Say that again.

22          **MR. VERHOEVEN:**  MoFo had -- at least my count is

23  64,000.

24          **THE COURT:**  64,000 what?

25          **MR. VERHOEVEN:**  In the sliver of documents that they

PROCEEDINGS

```
 1   said that they had.  They had it in their possession.
 2            THE COURT:  Sliver or 64,000?
 3            MR. VERHOEVEN:  Both.  They said it was a sliver.
 4   Turned out to be 64,000.
 5            THE COURT:  Of what though?
 6            MR. VERHOEVEN:  Of our documents.  Of Waymo/Google
 7   documents.
 8            THE COURT:  These are trade secret documents or
 9   public documents?
10            MR. VERHOEVEN:  These are documents that could not
11   possibly be claimed as privileged because they are our
12   documents.  And those documents weren't even produced until
13   after the Federal Circuit --
14            THE COURT:  Oh, this is the due diligence material.
15            MR. VERHOEVEN:  Yeah.
16            THE COURT:  All right.
17            MR. VERHOEVEN:  But the notion that everyone was
18   pedaling as fast as they can and nothing was being held back is
19   -- let's take a step back.  Look at this.
20        Literally terabytes of information that were our
21   information, our property, was being withheld through Stroz,
22   through MoFo, until -- under privilege, source documents.  I'm
23   not talking about characterizations.  I'm not talking about the
24   investigation.  Source documents of ours were withheld until
25   the very, very end.  We didn't get them until two, three weeks
```

PROCEEDINGS

1    before the first scheduled trial.

2        And so I know we'll argue about this later, but I just

3    have to respond to the notion that this is all some innocent

4    things falling through the crack.  It's not true.

5            **MR. GONZÁLEZ:**  So, just briefly.

6            **THE COURT:**  All right.

7            **MR. GONZÁLEZ:**  To refresh your recollection, those

8    documents that he's referencing are documents that we received

9    when we represented Anthony Levandowski.  We were not allowed

10   to share them with Uber.  Uber didn't even know that we had

11   those documents.  That's exactly the kind of thing that I think

12   is important to clarify.

13           **THE COURT:**  Well, if these were due diligence

14   documents --

15           **MR. GONZÁLEZ:**  That's correct.  Uber did not know

16   that MoFo had some of these documents.  All this stuff is at

17   Stroz.  This isn't anything new.

18       The reason I called it a sliver is because 64,000, he

19   says, out of -- and I told the Court it was tens of

20   thousands -- out of, you know, two of million or whatever it is

21   over at Stroz.

22       But the point is, we got it representing Anthony

23   Levandowski.  Never shared that fact with Uber because we

24   weren't allowed to.  And that's what ultimately led to our

25   withdrawal.

PROCEEDINGS

1    **THE COURT:**  Withdrawal from representing Levandowski.

2    **MR. GONZÁLEZ:**  Correct, your Honor.

3    **THE COURT:**  To be clear for the record.

4    **MR. GONZÁLEZ:**  Thank you.

5    **THE COURT:**  All right.  Enough on that.

6        Wait.  Meredith Dearborn has a message for González.

7    **MR. GONZÁLEZ:**  She was simply making the point that

8    Uber did not appeal your ruling to the Federal Circuit.  So to

9    the extent that they are upset there was delay there, that

10   wasn't Uber.  Fair point.

11   **THE COURT:**  But your ally did.  Your arguable ally

12   did.

13   **MR. GONZÁLEZ:**  Well, we fired him, your Honor.

14   **THE COURT:**  Okay.  I want to give you a new

15   additional date; not a new date, but an additional date.

16   January 12 at noon Waymo should file its complete offer of

17   proof.  And be specific.  I mean, very specific items of

18   evidence that cover the waterfront of not only the new material

19   that has come up in this round of discovery, but how it relates

20   to other alleged concealment, spoliation, Tyto, due diligence,

21   any of those other subjects so that I can -- again, so that I

22   can see the larger -- have the larger picture.

23       Then January 19th the other side gets to respond.

24       Okay.  I have a different question I'd like to bring up,

25   but anything more?

PROCEEDINGS

```
 1              MR. GONZÁLEZ:  Yes, your Honor.

 2        I'm going to disclose this to the Special Master, but I

 3   want to disclose it to you here so that you don't ask later why

 4   I didn't tell you.

 5              THE COURT:  Yes.

 6              MR. GONZÁLEZ:  This will be short.

 7        Chuck Duross is one of my partners in Washington D.C.

 8              THE COURT:  Who?

 9              MR. GONZÁLEZ:  Chuck Duross.  This is a new name to

10   your Honor.

11              THE COURT:  Yes.

12              MR. GONZÁLEZ:  He is the head of our global

13   anticorruption practice.  He led the FCPA Unit at the

14   Department of Justice.  He was in charge of supervising all of

15   the Department of Justice's investigations and prosecutions of

16   FCPA.

17        Why do I mention Chuck Duross?  Chuck Duross, in April of

18   this year, was retained by Uber to do some general compliance

19   assessment; how we do on an FCPA, how can we do better,

20   et cetera.  He was doing that work when this resignation

21   letter -- or email, resignation email comes in from Mr. Jacobs.

22        At that time Uber initially had decided that Chuck Duross,

23   together with WilmerHale, would investigate those allegations.

24   Ultimately we were told on May 4th that we would not be

25   investigating those allegations.  It was going to be done by
```

 1    Wilmer, and Wilmer has, in fact, done it.

 2         However, Mr. Duross did receive the resignation email

 3    pertaining to Mr. Jacobs.  He then forwarded that resignation

 4    email to seven partners at MoFo, myself included, in April of

 5    this year and Eric Tate, who has been deposed.

 6         I will tell you that I don't recall receiving it.  I don't

 7    recall reading it.  I didn't forward it to anybody.  I didn't

 8    respond.  But he sent it to me.

 9         Also, on May 5th the 37-page letter was sent to my partner

10    Chuck Duross and to Stacey Sprenkel.  It was actually sent to

11    WilmerHale.  Since they were going to investigate it, they

12    copied Chuck Duross and Stacey Sprenkel, two of my partners.

13    They did not forward that document to anybody else at MoFo and

14    they did not play any role in the investigation, but they had

15    it.  It's in their email.

16              THE COURT:  Who is the "they"?

17              MR. GONZÁLEZ:  Chuck Duross, the partner in

18    Washington D.C., who was doing the general compliance work for

19    Uber, and Stacey Sprenkel is an FCPA partner here in

20    San Francisco, who is working with Chuck.

21              THE COURT:  You said -- you used an abbreviation that

22    I just didn't catch for the Nancy person.  Say it again more

23    slowly?

24              MR. GONZÁLEZ:  Stacey Sprenkel?

25              THE COURT:  Yeah.

PROCEEDINGS

```
 1              MR. GONZÁLEZ:  Is a partner in San Francisco who
 2    works with Mr. Duross on FCPA --
 3              THE COURT:  FCPA.
 4              MR. GONZÁLEZ:  -- investigation-type work.
 5              THE COURT:  So for the benefit of the public, what
 6    does that mean, FCPA?
 7              MR. GONZÁLEZ:  I believe it's Foreign Corrupt
 8    Practices Act.
 9              THE COURT:  Okay.
10              MR. GONZÁLEZ:  And so the two of them received that
11    document.  They didn't respond.  They didn't forward it to
12    anybody.  They didn't discuss it with me.  I didn't know about
13    it.
14              THE COURT:  The 37-pager?
15              MR. GONZÁLEZ:  Correct.  When I received your email,
16    your order the day before Thanksgiving, I had no idea who
17    Mr. Jacobs was.  First time I met him or spoke to him was here
18    in court.  And I immediately start inquiring:  Who is this guy,
19    Mr. Jacobs?  And what is this letter that they say was sent to
20    Angela Padilla?
21         I didn't know anything about that.  Nobody in my team did.
22    Nobody on the Defense team did.
23         But I wanted you to know, I'm going to disclose it to the
24    Special Master, that these documents are in our email system.
25    Obviously, neither one of them are custodians.  So those would
```

PROCEEDINGS

```
1   not have been picked up either because they are not custodians
2   or earlier they wouldn't have hit the search terms.
3          THE COURT:  All right.  Thank you for the disclosure.
4   Okay.
5          MR. VERHOEVEN:  I'm just -- I'm not sure I heard
6   right.  Was the resignation letter sent to yourself?
7          MR. GONZÁLEZ:  The resignation email was sent to me
8   and to Eric Tate and to five other partners at MoFo.
9          THE COURT:  From the guy in Washington?
10          MR. GONZÁLEZ:  Correct.  From my partner Chuck
11   Duross.
12          THE COURT:  It was forwarded and not sent.
13          MR. GONZÁLEZ:  Correct.
14          THE COURT:  The 37-pager was not sent to you at all,
15   is that correct?
16          MR. GONZÁLEZ:  It wasn't sent to anybody.  They
17   didn't forward it to anybody, that's correct.
18          THE COURT:  But the guy in Washington, in your
19   Washington office did get it?
20          MR. GONZÁLEZ:  That's correct.
21          THE COURT:  And Nancy somebody got it.
22          MR. GONZÁLEZ:  Stacey Sprenkel in San Francisco, who
23   works with Chuck, yes.
24          THE COURT:  Stacey, okay.
25      Well, thank you for the disclosure.  That kind of thing is
```

PROCEEDINGS

 1   most appreciated.

 2       Okay.  I want to change the subject all together because

 3   you know I have been working also on the Jury Instructions.

 4   And this is one of those deals where it's a sub-sub-sub-issue,

 5   that I don't feel the parties are giving me as much help as you

 6   should.

 7       But try to capture the issue is whether or not Waymo, in

 8   order to prove its case, must prove unjust enrichment.  Even if

 9   it can't prove the amount, does it still have to prove that

10   there was some unjust enrichment?

11       Here is how the issue comes up.  You both cited to the

12   State court proposed Jury Instructions -- I think it's 4401,

13   but I'm not sure of that number now -- where the elements of a

14   misappropriation of trade secrets claim are laid out and one of

15   those elements is that the -- proof that the Defendant was

16   unjustly enriched.  And it seems to be there as an element of

17   liability, otherwise why would it be in there?  You've got to

18   prove unjust enrichment or else you -- you can't recover if you

19   can't prove liability.

20       Now, in the most recent round of comments and critique

21   Waymo objected to explaining that to the jury and said that for

22   misappropriation it's only necessary to show that Uber acquired

23   the trade secrets.  Just acquisition alone would be enough.

24       Now, in my own view, that's certainly enough for an

25   injunction.  In other words, if somebody were to acquire a

 1   trade secret of somebody else's, even if they never did

 2   anything with it, then there is a risk it could be

 3   misappropriated further.  So a judge could be -- order the

 4   Defendant to return the trade secret and destroy all copies,

 5   even if there are no damages.

 6        So when it comes to an injunction, I -- I would agree with

 7   Waymo, that you don't have to prove unjust enrichment.

 8        But that's not what the difference is between you.  The

 9   problem is the jury is mainly concerned -- only concerned with

10   damages.

11        So does -- does the -- does Waymo, in order to prove its

12   case, have to prove up the fact of unjust enrichment as an

13   element.

14        So just to take an example.  Let's say that somehow one of

15   these trade secrets did get acquired by Uber, but no one ever

16   used it, disclosed it, and it was almost an accident that it

17   was there.  The jury might say:  No, no.

18        Let me back up and say, sometimes the public, I think,

19   doesn't recognize this.  This case involves more than just

20   Levandowski downloading 14,000.  Waymo has been given

21   permission to accuse Uber at trial of use of trade secrets

22   through any other means; such as, somebody who comes over from

23   Waymo, an engineer -- not Levandowski, just somebody else we

24   haven't even heard about yet -- who happens to remember the

25   trade secret at Waymo and applies it in his or her work at

1    Uber.  So we -- we have more, quote, innocent, close quote,

2    avenues of the way in which trade secrets might have come into

3    Uber's workplace.

4        All right.  So now go back to the point, which I've now

5    forgotten.  It was something like the -- doesn't -- under the

6    instructions that the State Court uses, doesn't Waymo at least

7    have to prove, to get to the damages first base, that there was

8    unjust enrichment in addition to acquisition?

9        Now, to that Waymo says no, they don't have to prove that,

10   but Waymo cites to the 4401 standard instruction, which seems

11   to require that it be proven.

12       Now, there is one last wrinkle here, and that is the

13   reasonable royalty thing.  The way I read both statutes,

14   federal and state right now, you could convince me otherwise,

15   but it looks to me like you never get to the question of

16   reasonable royalty unless the jury decides, yes, there was

17   unjust enrichment, but it's so speculative that we can't

18   quantify it.

19       So it's impossible to prove the amount, but it is possible

20   to conclude that there was unjust enrichment.  And once you

21   make that finding, then the statute authorizes a reasonable

22   royalty.

23       Now, what I'd like to know is:  Does the statute allow

24   reasonable royalty even when there has been no unjust

25   enrichment, but there has been acquisition?  In other words,

PROCEEDINGS

 1   there was acquisition -- let's say there was no use.  There was

 2   no disclosure.  Just acquisition.  No unjust enrichment of any

 3   type, but because there was acquisition does Waymo get a

 4   reasonable royalty in those circumstances?  I'm inclined to

 5   believe no, that there has to be at least proof of

 6   unquantifiable unjust enrichment before you open the door into

 7   a reasonable royalty inquiry.

 8        There is a final question of does the judge versus the

 9   jury decide the issue of reasonable royalty.  Both sides

10   vehemently disagree on that.  And I am not necessarily going to

11   reach that the way I've got the instructions prepared, but you

12   -- I do recognize you both have given me about every possible

13   authority on point.

14        But these other earlier issues, you have not given me very

15   much help.  To put a point on it again, that is, is it an

16   absolute requirement that to get to first base that Waymo prove

17   unjust enrichment even if it's unquantifiable or is it simply

18   enough to prove improper acquisition?

19        So oral argument -- I'm going to let each of you -- I want

20   to hear if you miraculously agree.  Then you save me a lot of

21   work, but I don't think you will.

22        Yes.

23             MR. VERHOEVEN:  Your Honor, you can see all these

24   people we brought here because we didn't know exactly what was

25   going to come up and we misguessed.  And Mr. David Eiseman, who

PROCEEDINGS

 1   has been handling all our Jury Instructions, is not here right

 2   now.  So we're really not prepared to answer this.

 3        THE COURT:  That's fine.  I'm going to let you brief

 4   it.

 5        But the other side, I bet somebody knows.  Yes, I bet

 6   Meredith Dearborn knows the answer to this over there.  I would

 7   say she probably knows it.

 8        But I'll let you talk first, Mr. González.

 9        MR. GONZÁLEZ:  You're right, your Honor.  CACI lays

10   out the elements.

11        THE COURT:  CACI?

12        MR. GONZÁLEZ:  The California Jury Instructions.

13        THE COURT:  No, no, no, no.  No, no, no.  That's not

14   law.  That is not law.  That's just some committee of lawyers

15   who -- I have been on those committees.  That's not the law and

16   the courts are very clear that's not the law.  Sometimes they

17   get overruled.

18        All right.  But nevertheless you both cited to it.

19        MR. GONZÁLEZ:  Yes.

20        THE COURT:  So that --

21        MR. GONZÁLEZ:  My point is the reason why we cited to

22   it is because it accurately reflects the lawful.  You've got to

23   have unjust enrichment.

24        THE COURT:  Give me the decision by a judge or the

25   commentary by the state legislature that says you've got to

1    prove unjust enrichment or you're out of court.

2          MR. GONZÁLEZ:  And that I don't have.

3          THE COURT:  At least out of a jury.

4          MR. GONZÁLEZ:  I don't have that with me, your Honor.

5          THE COURT:  Meredith Dearborn looks like she might.

6          MR. PERLSON:  Your Honor, if I could just read the

7    statute?  I'm not the expert, but I was just looking at -- and

8    the California Civil Code Section 3426.3(b) says:

9               "If neither damages nor unjust enrichment caused

10         by misappropriation are provable, the Court may order

11         payment of a reasonable royalty for no longer than the

12         period of time that the use could have been

13         prohibited."

14   And then the U.S. -- the federal statute says:

15              "In lieu of damages measured by any other

16         methods, the damages caused by the misappropriation

17         measured by imposition of liability for reasonable

18         royalty for the misappropriation's unauthorized

19         disclosure or use of the trade secret."

20         THE COURT:  Read to me the state one again, please?

21         MR. PERLSON:  (As read)

22              "If neither damages nor unjust enrichment caused

23         by misappropriation are provable, the Court may order

24         payment of a reasonable royalty for no longer than the

25         period of time the use could have been prohibited."

 1          **THE COURT:**  But that's referring to use.  I'm just --

 2   I'm positing the case of acquisition without use or disclosure.

 3   So that's -- that's a good -- okay.  That --

 4          **MR. PERLSON:**  I'm trying to help.

 5          **THE COURT:**  That gets you about 70 percent of the

 6   way, but it's not all the way.

 7      All right.  What do you say over there?

 8          **MS. DEARBORN:**  I have a couple of decisions for you,

 9   your Honor, that stand for the proposition that -- that actual

10   or threatened injury is an element of a trade secrets claim.

11      CACI 4401 cites to the *Silvaco* decision, which your Honor

12   is familiar with.  That's 1840 Cal. App. 4th 210.

13          **THE COURT:**  Read to me the sentence that says that.

14          **MS. DEARBORN:**  I apologize, your Honor.  I am also

15   doing this on the fly.  I can pull it up in just a minute.

16      But I can give you another cite, another citation, which

17   is *Unilogic versus Burroughs Corporation*.  That citation is 10

18   Cal. App. 4th 612.  And in that case -- I do actually have that

19   one pulled up.  In that case the Court granted a nonsuit

20   because the plaintiff did not present evidence of damages

21   specific to the disputed hand and relevant to the measure of

22   damages.

23      So those are two citations.

24      In addition, your Honor, I believe the circumstance that

25   you were discussing in which there is acquisition, but no proof

1   of harm.  CACI actually addresses this as well.  So the note to

2   CACI 4405, I believe, states that in that circumstance the jury

3   should not be instructed on acquisition at all or disclosure if

4   there is no -- if there are no damages flowing from acquisition

5   or disclosure.

6       And this, I think, just underscores your Honor's instinct

7   that when damages flowing from these types of --

8          THE COURT:  But then do you get reasonable royalty in

9   that circumstance?

10         MS. DEARBORN:  So the -- as your Honor is aware, the

11  statute -- the structure of the statutes actually have a

12  reasonable royalty set by the Court.

13      I believe Mr. Buland already represented this earlier and

14  we are okay having that be submitted to the jury.  But, again,

15  I should consult with my colleagues.

16         THE COURT:  Okay.  What does Mr. Perlson say?

17         MR. PERLSON:  Your Honor, I -- I don't know the

18  specifics of those cases on the fly.  I think we should brief

19  it, as we talked about before.

20         MS. DEARBORN:  If I could suggest, your Honor, we --

21  this issue was actually raised, as you correctly noted, in the

22  last round of briefing.  We haven't had an opportunity to

23  respond to this on the paper.  So if your Honor would like to

24  hear briefing on this, we can submit it.

25         THE COURT:  How about this?  Can you give me a brief

 1    by Thursday, both sides a brief on this?

 2            **MR. PERLSON:**  Sure.

 3            **THE COURT:**  But I'm willing to give you more time if

 4    you will promise to go get me the real -- the cases that deal

 5    with the scenarios that I'm talking about, where there is

 6    acquisition -- let's say it's an improper acquisition, but it

 7    just turns out there is no provable -- let's say there is no

 8    unjust enrichment.  Even the fact of unjust enrichment is

 9    unprovable.  So the jury -- but does that then mean plaintiff

10    loses?  Does that mean that plaintiff can still get a

11    reasonable royalty even if it's decided by the judge?

12            **MS. DEARBORN:**  I think we should look at that, your

13    Honor.

14            **THE COURT:**  A good argument can be made that you

15    don't get anything unless there has actually been unjust

16    enrichment.  You get an injunction, but you don't get damages

17    of any type unless there has been damages, but I -- or unjust

18    enrichment.

19        So here is the last point that I want to make on this.  I

20    think I gave you the draft where I said we would not instruct

21    the jury on reasonable royalty at the outset, but only if they

22    reach that juncture.

23        Did I give you that?  Did I give you that or is that --

24    okay, Ms. Baily is saying yes.

25        Now, here is the reason for that.  When I tried to draft a

PROCEEDINGS

1  set of instructions that included what you -- the

2  *Georgia-Pacific* factors and all the reasonable royalty stuff,

3  those reasonable royalty instructions would overwhelm the rest

4  of the instructions.  They would become the dominant thing in

5  the case.  And that's ridiculous.  It's ridiculous for that

6  issue to swamp everything else that the jury has got to decide.

7  So, and it's a small contingency that they would ever get to

8  that.

9       So I -- my view is that we would have a -- if they gave

10 the right answers, that, yes, there was unjust enrichment, but

11 we can't quantify it, then we would have a short supplemental

12 proceeding, where both sides would give your arguments, and

13 then they would go back and do a reasonable royalty assessment

14 based on that.

15      I think the chances that we would get there are 20 percent

16 and that if we did, we can deal with it.  We can manage it and

17 handle it.  But it would swamp the integrity and the

18 comprehensibility of the instructions if we were to go through

19 those *Georgia-Pacific* factors and the reasonable royalty.

20      So you don't have to respond now.  I just want you to know

21 the reason that I feel that way.  So that -- and I'm not trying

22 to get out of any work.  I'm trying to help the jury comprehend

23 the case and what the issues they are -- they have got to

24 decide.

25           MR. PERLSON:  Understood.

 1              MS. DEARBORN:  Understood.

 2              THE COURT:  All right.  Anything else?  I've run out

 3    of things to bring up.  Anything else that you all want to

 4    bring up today?

 5              MR. VERHOEVEN:  Nothing from Waymo.

 6              MR. GONZÁLEZ:  No, your Honor.  Thank you.

 7              THE COURT:  Okay.  Now, the Special Master, I want

 8    you to set a prompt schedule for getting to the bottom of your

 9    issues.

10              MR. COOPER:  We're going to address this this

11    afternoon at 3:00 o'clock in an already-scheduled meeting.

12              THE COURT:  Would you give me a rough idea -- give me

13    an idea where I can put it in the order of when you will give

14    me a report on the issue I'm referring to you?

15              MR. COOPER:  Well, I would want to see briefs from

16    the parties citing the record and citing the history of this

17    case as soon as possible.  I think a week from Wednesday.

18              THE COURT:  All right.

19              MR. VERHOEVEN:  Your Honor, I might suggest that you

20    have the call first to make sure that he's got all the

21    information points that he needs, but I defer to you guys.

22              MR. COOPER:  Well, I want to see the parties brief

23    the issues that you addressed this morning.

24              THE COURT:  You set a schedule for them to brief it

25    that suits you.  A week from Wednesday would be fine.  What if

PROCEEDINGS

```
1    I give you a Friday, a week from Friday?

2             MR. COOPER:  A week from Friday, that would even be

3    better.

4             THE COURT:  If you need to ask for an enlargement,

5    I'll give you one.

6             MR. COOPER:  Okay.  Thank you.

7             MR. GONZÁLEZ:  Your Honor, just a question of

8    procedure.  We haven't seen the report that they are going to

9    give us on their use of ephemeral.  We will now go back and

10   talk to our people.  You've already said we can take a 30(b)6.

11       If we need some minimal -- not 19 depositions.  They have

12   already asked for 19 people.  If we need some minimal discovery

13   on this point, should we raise that with your Honor, with the

14   Special Master?

15            THE COURT:  Well, I do think you -- if you're not

16   satisfied with the ephemeral report that they give you, yeah,

17   the 30(b)6, take the 30(b)6 first.

18            MR. GONZÁLEZ:  Okay.

19            THE COURT:  Then if it turns out that you've got good

20   cause to go beyond the 30(b)6, I will probably authorize

21   something more.

22       However, I don't want to -- you do have access to your own

23   employees who used to work there.

24            MR. GONZÁLEZ:  That's correct.

25            THE COURT:  That ought to be a gold mine right there.
```

PROCEEDINGS

1        **MR. GONZÁLEZ:**  All right.  I understand.  So if we do

2   want two or three additional depositions, not 19, would we go

3   to the Special Master?  Would we send you a letter?  How would

4   you like us to handle that?

5        **THE COURT:**  Go to the Special Master and then the

6   magistrate judge.

7        **MR. GONZÁLEZ:**  Thank you.  Thank you, your Honor.

8        **THE COURT:**  Thank you.

9      All right.  Good luck to both sides.

10        **MR. VERHOEVEN:**  Thank you, your Honor.

11        **THE CLERK:**  Court is in recess.

12      (Proceedings adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25

### <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, December 4, 2017