QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:      (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>             Plaintiff,<br><br>     vs.<br><br>UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>             Defendants. | CASE NO. 3:17-cv-00939<br><br>**PLAINTIFF WAYMO'S SUBMISSION TO SPECIAL MASTER COOPER REGARDING UBER'S OBLIGATION TO PRODUCE JACOBS LETTER AND RELATED DOCUMENTS**<br><br>Trial Date: February 5, 2018 |

1   In response to the Court's December 4 Order (Dkt. 2341), Waymo submits this brief
2   explaining why the Special Master should conclude and recommend to the Court that the April 14
3   Jacobs resignation email ("resignation email") and May 5 Jacobs letter ("Jacobs letter") should
4   have been produced to Waymo during discovery.

**1.   Introduction.**

This is a trade secret case. Waymo asserts that Uber has misappropriated its trade secrets in violation of the DTSA and the CUTSA. The Jacobs letter expressly states: ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ Ex. 1, at 12.) The resignation email states: ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ Ex. 2.) The argument that these documents need not be disclosed and are not material to Waymo's trade secret litigation fails the straight face test. It insults the intelligence of Waymo, the Special Master and the Court.

The only excuse Uber has articulated for its intentional hiding of these documents is that the documents were not responsive to Waymo's discovery requests and not expressly called for by Court order. Waymo disputes these assertions, as set forth below. But even if it were true that Uber would not have found the Jacobs documents in response to these requests/orders, it is undisputed that Uber **already knew** about the Jacobs documents. Uber's argument that no requests called for the Jacobs documents might be a colorable excuse if Uber's in-house and outside counsel litigation team **were not aware** of the Jacobs documents. If that were the case, we could argue over whether they had an excuse. But here Uber admits that it knew of the Jacobs documents and it intentionally chose to hide the documents from the Court and Waymo.

Uber's head of litigation, responsible for monitoring this very case, admits that she had possession of the documents. That she read the documents and saw the references to Waymo. (11/29/2017 Hr'g Tr. at 14:2-17:14.) That she forwarded the documents to compliance attorneys for review. (*Id.* at 15:17-20.) That she sent a copy of the Jacob's letter to Travis Kalanick, then the CEO of the company. (*Id.* at 48:1-49:5.) That the Board of Directors got the Jacobs letter. (*Id.* at 20:7-17.) That Uber retained outside counsel to investigate the Jacobs documents. (*Id.* at

17:15-21.) Indeed, although Uber's outside litigation counsel initially represented to Judge Alsup that "nobody on this defense team knew about that letter before we got your order and the order and the letter from the U.S. Attorney" (11/28/17 Hearing Tr., at 150:9-11), counsel later admitted that Eric Tate—the attorney who ran the Stroz investigation—and Arturo Gonzalez—MoFo's lead litigation counsel—received copies of the document resignation email. (12/4/17 Hearing Tr., at 47:2-5.)

There is no question of fact that Uber's litigation team knew of the allegations in the Jacobs letter that Uber used non-attributable devices, ephemeral communications, and false attorney-client privilege designations ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and failed to disclose them to Waymo. Indeed, Ms. Padilla admitted that she intentionally chose **not** to disclose the documents to Waymo—or even her in-house subordinates working on this litigation. (11/29/17 Hearing Tr., 47:8-25.) Her explanation: that it might "obstruct or hinder or taint" the investigation that Uber's compliance team was conducting. (*Id.*) In other words, Uber's head of litigation contends that Uber is not obligated to produce the Jacobs documents until after Uber first made a determination as to whether the allegations in the documents were true. That is not the way it works in the federal courts of this country. As Judge Alsup stated at the evidentiary hearing: "to me, this document should have been produced. . . . You wanted this case to go to trial so that they didn't have the benefit of that document. That's the way it looks." (12/4/17 Hearing Tr., 53:3-8.)

The Jacobs documents are highly material to this case. Judge Alsup continued the trial because of them. Uber disclosed the Jacobs letter to the U.S. Attorney investigating the allegations in this case for criminal liability. And the U.S. Attorney found the Jacobs allegations so material to this case that it broke protocol and sent a letter to the Court informing Judge Alsup that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Dkt. 2260-1.) The documents should have been turned over in discovery.

Contrary to Uber's excuses, both documents are responsive to multiple requests for production, interrogatories, and Court orders. That they did not hit on search terms is irrelevant. Search terms have no bearing on Uber's obligation to comply with Court orders or provide complete interrogatory responses. Moreover, at no point did the parties ever agree that searches for documents would be limited to using electronic search terms. Uber cannot point to any such agreement. To the contrary, during discovery Uber *insisted* that Waymo not limit its searches to the use of electronic search terms. Now, to provide excuses for withholding highly relevant documents from Waymo, Uber suddenly contends that the parties were only required to use search terms. Not so.

Finally, Uber was obligated to produce the Jacobs documents because they directly contradict numerous representations made by Uber's counsel and witnesses. Ms. Padilla testified that Uber "moved heaven and earth" to search for documents in this case, but the Jacobs letter reveals locations and custodians that were never searched. Former CEO Travis Kalanick provided similar testimony, and Uber's counsel has made similar arguments to the Court which are also contradicted by the allegations in the Jacobs letter. As Judge Alsup stated at the hearing, where, for example, a witness gives testimony that is "flat out opposite of what was in the letter. Then I think maybe in that kind of circumstance the lawyer may have a duty to turn the letter over, because you can see the problem. It's – you know, otherwise they are putting forth a story that is directly contradicted by things they haven't produced even though they weren't called for." (12/4/17 Hearing Tr., 34:6-12.)

**2. The Jacobs Documents Were Responsive and Should Have Been Produced in Response to Several Waymo RFPs.**

a. Relevant Document Requests.

The Jacobs letter is responsive to several of Waymo's document requests, which are set forth below. Each of these requests was served in Waymo's First Set of Requests for Production on May 9.

**RFP No. 29:** All DOCUMENTS and COMMUNICATIONS REGARDING negotiations over UBER's acquisition of OTTOMOTTO." (Ex. 3.)

The Jacobs letter is responsive because it states that Ed Russo provided a "███████

-3-

██████████████████████████████ (Ex. 1, at 13.) ████████████

██████████████████████████████████████████████████████████

████████████████████████ (*Id.*) ██████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ (emphases added)  Russo testified that he told the group to whom he made the presentation that he was talking about Kalanick and Levandowski. (11/28/17 Hearing Tr., 121:19-22)  Thus, the Jacobs letter is responsive to RFP No. 29, as it relates to the negotiations between Uber and Ottomotto—even if Uber (after the fact) argues that the presentation was based on a Bloomberg article rather than on SSG's involvement in the Kalanick and Levandowski negotiations.

**RFP No. 72**: All DOCUMENTS REGARDING DEFENDANTS' policies regarding employees' use of personal computers or other devices while working at or for DEFENDANTS.[1]  (Ex. 3.)  The Jacobs letter discusses ████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ (Ex. 1, at 13.)  The resignation letter does so as well.  (Ex. 2) ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████  Thus, both the Jacobs letter and resignation email are responsive to RFP No. 72.

**RFP No. 73**: All DOCUMENTS AND COMMUNICATIONS REGARDING the MISAPPROPRIATED MATERIALS, INCLUDING but not limited to (i) DOCUMENTS

---

[1] During meet-and-confer negotiations, Waymo agreed to limit the scope of RFP. No. 72 (without prejudice) to the use by Mr. Levandowski of such personal computers or other devices while working at or for Uber and Ottomotto.

containing any information derived from the MISAPPROPRIATED MATERIALS, (ii) any electronic media that contains or contained the MISAPPROPRIATED MATERIALS, and (iii) any DOCUMENTS REGARDING any meetings or discussions REGARDING the substance of the MISAPPROPRIATED MATERIALS outside of WAYMO.  (Ex. 3.)

The Jacobs letter explicitly references the theft of Waymo trade secrets, saying ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (Ex. 1, at 12.)

The letter also states, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  (Ex. 1, at 13 (emphasis added).)  The letter is therefore responsive to RFP No. 73.  The resignation email also refers to Uber's MA group mission of stealing trade secrets and then references efforts to hide discovery in the Waymo litigation.  (Ex. 2.)  Thus, it is similarly responsive to RFP No. 73.

**RFP 91:** All DOCUMENTS AND COMMUNICATIONS REGARDING any of LEVANDOWSKI's past and present "Authorized Devices" (as that term is defined in UBER00006444, Section 7), INCLUDING (without limitation) any request for approval in connection with Section 7.2 or any de-authorization (whether contemplated or effecutated) under Section 7.3.  (Ex. 3.)

As noted above, both the Jacobs letter and resignation email refer to the use of non-attributable devices.  To the extent Levandowski used non-attributable devices, both documents would be responsive to this request.

      Thus, both the Jacobs letter and resignation email were responsive to Waymo RFPs.  Because Uber withheld both documents, Uber deprived Waymo of the opportunity to serve additional document requests directed at Uber's dispute with Jacobs, including the settlement documents.[2]

      b.     The Search Protocol Did Not Limit the Parties' Obligations to Using Search Terms.

      Initially, the issue of search terms is not relevant to Uber's obligation to locate and produce hard copy versions of the Jacobs letter or resignation email.  Judge Alsup stated that it is likely that somebody printed out the Jacobs letter.  "So it's not just an email on the electronic server.  It's also a hard copy.  Maybe Angela Padilla printed it out.  It seems like it got a lot of circulation.  It

---

[2]  Waymo also reminds the Special Master that on June 7, Uber insisted for the first time that Waymo be limited to the RFPs already served as of that date.  The Special Master agreed that Waymo could not serve further RFPs without first getting permission from the Special Master.

would seem logical to me it did get printed somewhere." (12/4/17 Hearing Tr., 17:15-21.) Indeed, according to Ms. Padilla, the letter was "handed" over to others at Uber (*id.* at 15:16-24), which suggests that the letter exists at Uber in hard copy. An electronic search protocol is irrelevant to locating hard copy documents. If there are hard copies of the Jacobs letter or resignation email, both of which are responsive to Waymo's document requests, then Uber's arguments about search terms are moot. Uber has not yet confirmed whether hard copies exist. If there were indeed hard copies of these documents responsive to Waymo's RFPs, Uber was obligated to produce them.[3]

With respect to electronic copies of the documents, the fact that the Jacobs letter and resignation email would not have hit on negotiated search terms does not excuse Uber's failure to produce these known documents for several reasons. Initially, as the Special Master should recall, the parties **never** entered into an agreement under which the parties agreed that they each only needed to use search terms to try to locate responsive documents. Tellingly, Uber did not point the Court to any such agreement at any of the recent hearings on this subject. Nor can it.

Search terms are intended to help parties <u>search</u> large volumes of ESI to find responsive documents; they do not obviate a party's discovery obligations once responsive documents are already <u>found</u>. Once Uber and its senior management and counsel had actual knowledge of the Jacobs documents and their relevance to this case, they should have produced them. Indeed, courts have recognized that while search terms have a place in e-discovery, it is unreasonable for parties to rely entirely on such terms in searching for and producing responsive information. *See F.D.I.C. v. Baldini*, Case No. 1:12-cv-7050, 2014 WL 1302479, at *2 (S.D. W. Va. Mar. 28, 2014) ("If, however, a producing party is aware of a relevant document that is not triggered by the application of the search terms, the producing party shall produce that document."); *Moore v. Publicis Groupe*, 287 F.R.D. 182, 190-91 (S.D.N.Y. 2012) (noting the limitations of key word searches); *cf Arthur v. Atkinson Freight Lines Corp.*, 164 F.R.D. 19, 20 (S.D.N.Y. 1995) ("[T]he

---

[3] Waymo notes that the definition of "DOCUMENTS" in its document requests included documents in any medium, and so would call for both hard copy and electronic documents. (Ex. 3.)

federal discovery rules place a duty on a party to turn over not only proper materials of which he is aware, but also those of which he reasonably ought to have been aware.").

Uber's obligation to search for and collect documents beyond those returned by the search terms is also confirmed by Uber's own statements in discovery in this case, as well as with Waymo's practice and understanding of the parties' search obligations. To refresh the Special Master's recollection, Waymo provides as an appendix a timeline of the parties' negotiations regarding search terms, juxtaposed with the recently-discovered relevant dates relating to the Jacobs letter and resignation email.

The parties' course of conduct establishes that there was never any agreement that searching for responsive documents would not be limited to using search terms, and indeed ***both sides*** expected that the other was not so limiting its searches. This course of conduct applied to electronic and hard copy documents alike. In other words, searching for responsive documents beyond the scope of search terms would include searches for both hard copy and electronic responsive documents.

Uber's admissions in discovery confirm that the parties are obligated to provide responsive discovery beyond just search terms. For example:

- On July 6, complaining about the adequacy of the search terms Waymo used to locate potentially responsive documents, Uber's counsel Max Pritt wrote: "Waymo apparently has not satisfied its obligation produce *all documents* responsive to Uber's requests to the extent Waymo agreed to produce—***not just ones that hit on Waymo's restrictive search terms.*** Waymo must search for and produce all responsive documents for Mr. Salesky and all other deponents. (Ex. 4 (7/6/17 Email from M. Pritt)) (emphasis added).

- On July 20, when negotiating search terms that Uber proposed that Waymo run, Uber's counsel Max Pritt wrote: "***Waymo has an obligation to conduct a reasonable search for responsive documents separate and apart from any search term negotiations***." (Ex. 5 (7/20/17 Email from M. Pritt)) (emphasis added).

And Waymo repeatedly made clear that its searches were not limited to using search terms:

- On July 25, Waymo wrote to Uber regarding disputed RFPs and said "We conducted a reasonably diligent search in response to Defendants' document requests using appropriate search terms, ***as well as additionally searching for responsive documents in various custodial and non-custodial repositories without the use of electronic search terms***." (Ex. 6 (7/25/17 Letter from A. Roberts to M. Pritt) (emphasis added).)

- In an August 5 opposition to a motion to compel, Waymo explained to the Court and Uber that Waymo did not limit its own searches to just the agreed search terms. (*See* Dkt. 1090 ("Waymo searched custodian and non-custodial documents ***both with search terms and without*** to locate documents responsive to Defendants' then-served RFPs.") (emphasis added)).

- In an August 8 email, Waymo's counsel Jeff Nardinelli identified several Uber RFPs for which Waymo was conducting searches in addition to using agreed search terms: regarding RFP 165, "***In addition to running the terms agreed to by the parties over the list of custodians agreed to by the parties***, Waymo is additionally searching for documents sufficient to show the amount and timing of all payments made to employees under the Project Chauffeur bonus program"; regarding RFP 166, "***Waymo has produced responsive documents located after talking with HR personnel and will further produce all responsive documents located by running the terms agreed to by the parties over the list of custodians agreed to by the parties***." (Ex. 7 (8/8/17 J. Nardinelli Email) (emphasis added)). Uber's counsel referenced an August 8 email from Mr. Nardinelli during the December 4 hearing. Waymo believes that this is the same email. Uber's counsel only read a portion of the email to the Court and neglected to inform the Court of the multiple times in that email where Waymo counsel made clear that its searches were not limited to using search terms.

In addition to representations made in writing, Waymo also indicated on telephonic meet and confers with the Special Master that it was not limiting its searches for responsive documents to documents that hit on search terms. Uber's counsel made representations which suggested that Uber too was conducting searches that were not limited to the agreed search terms:

- On June 13, the parties met and conferred about Uber's responses to Waymo's First Set of Expedited RFPs. Uber's counsel explained that Uber would not search for diligence documents from the Uber-Otto acquisition that were not stored in the Data Room because doing so would require conducting email searches, which Uber would not do in response to an expedited request. Uber would produce documents from the Data Room and ask custodians about the existence of additional responsive documents. (Ex. 8 - 6/14/17 Email from A. Roberts).

- On July 1, Uber explained that the reason why it did not engage in negotiations regarding search terms earlier was that Uber was "in the throes" of responding to expedited discovery and so was already searching for documents in response to Waymo's requests. (Ex. 9 (7/3/17 Email from A. Roberts to E. Takashima).) In other words, Uber searched for responsive documents before negotiating with Waymo regarding agreed search terms. Indeed, by July 1 when the parties first started discussing negotiating search terms, Uber had produced over 16,000 documents.

- When the parties exchanged protocols for the search of email and custodial documents on July 3, Uber indicated that it would search terms to "custodial email data." And, Uber would also produce certain responsive folders and files in online repositories, as well as responsive files from servers in the Bay Area and Pittsburgh. (Ex. 10 (Attachment to 7/3/17 Email from S. Rivera).) Uber did not indicate that it would use search terms to search these non-email

Case 3:17-cv-00939-WHA   Document 2368   Filed 12/11/17   Page 10 of 18

repositories and servers, and the parties did not discuss using search terms to search non-email locations.

Indeed, Uber produced documents that did not hit on search terms. For example, as the Special Master is aware, Uber produced Minutes from Board of Director meetings (UBER00101507, UBER00101505). Those Minutes do not hit on the agreed search terms, but Uber nevertheless produced them because they are responsive to Waymo document requests. Having repeatedly ***insisted that Waymo not limit its searches to the search terms***, Uber cannot now be heard to contend that Uber was not obligated to search for responsive documents beyond using the agreed upon search terms.

It is further worth noting that there are recognized deficiencies in reliance on search terms. "Because knowledge of the producing party's data is usually asymmetrical, it is possible that refusing to 'aid' opposing counsel in designing an appropriate search protocol that the party holding the data knows will produce responsive documents could be tantamount to concealing relevant evidence." The Sedona Conference, *The Case for Cooperation,* 10 Sedona Conf. J. 339, 344 (2009); *see also Moore v. Publicis Groupe*, 287 F.R.D. 182, 190-191 (S.D.N.Y. Feb. 24, 2012) ("In too many cases, however, the way lawyers choose keywords is the equivalent of a child's game of 'Go Fish.' The requesting party guesses which keywords might produce evidence to support its case without having much, if any, knowledge of the responding party's 'cards' . . . Indeed, the responding party's counsel often does not know what is in its own client's 'cards.'") Given Uber's undisputed knowledge of the existence of the Jacobs letter and resignation email at the time the parties started discussing the search terms—Uber had already gone so far as to disclose Jacobs and his allegations to the U.S. Attorney for the Northern District—and knowledge that Angela Padilla was a relevant witness in the litigation, having disclosed her in its June 21 Initial Disclosures (Ex. 11), that Uber did not "aid" Waymo in implementing search terms that would have uncovered these known responsive documents "could be tantamount to concealing relevant evidence." Thus, it is possible that Uber did not suggest Padilla as a custodian, and/or suggested a date cut-off of August 2016, knowing that doing so would ensure that these documents would not be located using electronic searches.

-9-
WAYMO'S SUBMISSION TO SPECIAL MASTER COOPER

        c.       The Jacobs Letter and Resignation Email Were Known to Uber and Its Counsel.

Uber's obligation to produce the Jacobs letter and resignation email was especially clear-cut here given Ms. Padilla's testimony and Mr. Gonzalez's representations. Indeed, the testimony and representations suggest that Uber deliberately took steps to hide these documents from Waymo and the Court. Ms. Padilla testified that she had actual knowledge of the documents in question and their significance to this case. (11/29/2017 Hr'g Tr. at 14:2-17:14.) According to Mr. Gonzalez, the resignation email was sent to several MoFo attorneys, including himself and Eric Tate, in April. (12/4/17 Hearing Tr., 47:2-5.) The resignation email was sent to MoFo's Chuck Duross because "Duross, together with WilmerHale, would investigate those allegations." (*Id.*, 46:17-23.) Uber has not disclosed the dates that each MoFo attorney received the resignation email, why each of them received the resignation email, or the extent and date of communications about the resignation email and allegations therein within MoFo or between MoFo, Uber, and WilmerHale. On the parties' December 5 meet and confer, Mr. Gonzalez represented that MoFo attorneys in addition to Chuck Duross and Stacey Sprenkel may have received the Jacobs letter. When Waymo pressed for clarification, because this differed from the representations made to the Court on December 4, Uber's counsel indicated that they were looking into this and did not want to give an incorrect answer. Thus, Waymo does not yet have knowledge of the extent to which MoFo was aware of the resignation email, Jacobs letter, or allegations therein. Waymo will supplement the record based on discovery in its reply submission and at oral argument.

In any event, Ms. Padilla testified that at some point before receiving the May 5 Jacobs letter, she was in contact with Mr. Jacobs and/or his counsel, Clayton Halunen. She said she "was able to prevail upon . . . Mr. Halunen, to put all of [Jacobs'] claims in writing." (11/29/17 Hearing Tr., 14:17-15:15.) Then, on May 4, Uber told MoFo that it would not be investigating the allegations in Jacobs' resignation email. (12/4/17 Hearing Tr., 46:17-25.) Waymo does not know why Uber chose to no longer have MoFo involved in this investigation, including whether MoFo's involvement in this litigation had any bearing on that decision. Ms. Padilla received the Jacobs letter on May 5—two days after attending the preliminary injunction hearing in this case, and one day after Uber told MoFo that MoFo would not investigate Jacobs' claims.

Ms. Padilla testified that she made the intentional decision not to provide the Jacobs letter to the two in-house counsel handling this litigation for fear that doing so would somehow taint Uber's investigation of the allegations contained in the letter. (11/29/2017 Hr'g Tr. at 47:21-25.) Ms. Padilla, however, admitted that the letter was provided to Travis Kalanick which, as the Court recognized, would have a greater chance of tainting the investigation than sharing the letter with counsel running the litigation. (*Id.* at 48:1-49:5.) Moreover, the letter was provided to committees of the Uber Board of Directors, including the Special Matters Committee responsible for managing this litigation and handling Jacobs' claims, and was provided to Salle Yoo, Uber's then General Counsel. (*Id.* at 20:7-17.) Uber thought the Jacobs letter was relevant enough to disclose Jacobs and his allegations to the acting United States Attorney for the Northern District of California on June 27 (*id.* at 27:20-28:3), and disclosed the letter to the acting United States Attorney for the Northern District of California, United States Attorney for the Southern District of New York, and to Main Justice in Washington, D.C. during the week of September 12. (*Id.* at 28:4-10.) Between May and September, the Jacobs letter and email were also the subject of an Uber internal investigation carried out by the law firm Wilmer Hale. (*Id.* at 17:15-21.) Uber received reports throughout the investigation. (*Id.* at 35:7-13.) Uber engaged in a formal mediation with Mr. Jacobs and ultimately entered into a settlement agreement with him in August 2017. (*Id.* at 28:20-23.) These were heavily discussed documents responsive to Waymo's document requests. Uber should have produced them.

**3.    The Information in the Documents At Issue Should Have Been Disclosed in Response to Interrogatories.**

The information disclosed in the Jacobs letter and resignation email is responsive to multiple interrogatories:

**Common Interrogatory No. 8**: Describe in detail YOUR policies and practices with respect to the retention and/or destruction of DOCUMENTS (including without limitation emails, instant messages, electronically stored information, and hard copies), from 2014 to the present. (Ex. 12.)

The Jacobs letter includes allegations about policies for destruction of documents and thus information therein would be responsive to this interrogatory.

**Expedited Interrogatory No. 6**: Describe DEFENDANTS' efforts to preserve evidence relevant to THIS CASE, INCLUDING (without limitation) when DEFENDANTS instituted any litigation

hold(s) REGARDING THIS CASE, how DEFENDANTS implemented any litigation hold, all PERSONS who received any litigation hold, when each PERSON received each litigation hold, which PERSON(S) was responsible for monitoring compliance with each litigation hold, and any instances of non-compliance with such litigation hold.  (Ex. 13.)

Again, the Jacobs letter describes systems set up for the purpose of destroying evidence. Information about those systems is responsive to Uber's response regarding its efforts to preserve evidence relevant to this case.  Uber's arguments regarding search terms have no bearing on Uber's obligations to provide full and complete interrogatory responses.

**4.    The Jacobs Letter Was Responsive and Should Have Been Produced Pursuant To The Court's Orders.**

The April 14 resignation email and May 5 Jacobs letter should have been produced in response to this Court's orders.  For starters, in its March 16 expedited discovery order, the Court required the following:

> By March 31, defendants shall produce for inspection all files and documents downloaded by Anthony Levandowski, Sameer Kshirsagar, or Radu Raduta before leaving plaintiff's payroll and thereafter taken by them. Defendants shall also produce for copying the card reader, thumb drive, or other media used for the downloads, as well as all subsequent emails, memoranda, PowerPoints, text messages, or notes that have forwarded, used, or referred to any part of said downloaded material. If any part of said downloaded material has been deleted, destroyed, or modified, then defendants shall state the extent thereof and produce all documents bearing on said deletion, destruction, or modification.

(Dkt. 61 ¶ 4.)  Because the Jacobs letter references misappropriation of Waymo trade secrets and describes efforts by Uber to delete or destroy evidence of such misappropriation (Dkt. 2307-2 (Jacobs Letter) at 9-10), the letter was responsive to the expedited discovery order and should have been produced long ago.  Uber has not claimed otherwise.

The Court's April 4 Order asked Defendants to provide "A list of all servers (and their locations) used at any time in any way for defendants' LiDAR-related activities.  Do not leave anything off the list merely because some other server supposedly houses the same materials." (Dkt. 144.)  According to the Jacobs letter, Uber had a "distributed architecture of anonymous servers, telecommunications architecture, and non-attributable hardware and software."  (Ex. 1, at 12.)  Information about those anonymous servers was not provided in response to that Order.  To the extent that these systems were used at any time for Uber's LiDAR-related activities, they

-12-

should have been disclosed pursuant to that order.

Further, Uber was required to produce the Jacobs letter and email in response to the May 11 provisional relief order—which issued less than a week after Ms. Padilla received the Jacobs letter. Specifically, Uber was required to "conduct a thorough investigation and provide a detailed accounting under oath setting forth every person who has seen or heard any part of any downloaded materials, what they saw or heard, when they saw or heard it, and for what purpose." (Dkt. 426 at 24 ¶ 4.) Given the allegations of trade secret theft and destruction of evidence contained in both the Jacobs letter and resignation email, Uber should have disclosed these materials as part of its "thorough investigation." Indeed, the Court already recognized that these documents were responsive to the provisional relief order. (11/28/2017 Hr'g Tr. at 14:13-17 ("Morrison & Foerster and the rest of the Uber lawyers withheld evidence. There was a direct order to produce stuff like that in the provisional relief order. And to get – to – to have hidden this from the lawyers and the judge and not be upfront about it, it just is so upsetting.").) Uber has not refuted this.

The provisional relief order also required Uber to provide "a complete and chronologically organized log of all oral and written communications—including, without limitation, conferences, meetings, phone calls, one-on-one conversations, texts, emails, letters, memos, and voicemails—wherein Anthony Levandowski mentioned LiDAR to any officer, director, employee, agent, supplier, or consultant of defendants." (*Id.* at 25 ¶ 5.) Uber's log referred to "text messages" that Mr. Levandowski exchanged with Uber personnel regarding LiDAR (but which could not be produced because they had been destroyed), but did not disclose the existence of any Wickr or other ephemeral communications involving Mr. Levandowski. (*See, e.g.*, Dkt. 1469 at 66-67.) On December 4, Uber disclosed that Mr. Levandowski had accounts for Wickr SCIF/PRO, Wickr ME, and Telegram. (Ex. 14 - 12/4/17 Disclosure of Personnel Who Have Used Wickr or Similar Platform.) To the extent Mr. Levandowski was using these forms of communication to develop LiDAR technology, that too would have been responsive to the Court's Order.

**5.    The Jacobs Letter and Resignation Email Should Have Been Produced Because they Directly Contradict Multiple Representations Made by Uber and its Counsel.**

Finally, the existence of the Jacobs letter and email was responsive to deposition questions asked of Uber witnesses. In those circumstances, Uber was obligated to produce it:

> Let's say that a particular document had never been requested, but that in deposition testimony the CEO of the company, some important witness, just gave testimony that was just flat out opposite of what was in a letter. Then I think maybe in that kind of circumstance the lawyer may have a duty to turn the letter over, because you can see the problem. It's – you know, otherwise they are putting forth a story that is directly contradicted by things they haven't produced even though they weren't called for.

(12/4/17 Hearing Tr., 34:6-12.) Here, of course, these documents were called for by Waymo's RFPs. But, even if they were not, they contradict the testimony of Uber witnesses and so should have been produced.

Uber's own Vice-President and Deputy General Counsel, Angela Padilla, to whom the Jacobs letter was addressed denied personal knowledge of precisely where Uber searched for responsive materials. Yet, Ms. Padilla testified that Uber had searched "everywhere" to comply with its obligations under the Court's Order. (*See* Ex. 15 Padilla Tr. at 45:3-13 (Q. So you can't testify as to what sources within Uber were searched or not searched in – to comply with the court's [expedited discovery] order; is that right? A. I don't know if that impinges on privilege or not. Q. Okay. What sources did Uber search within Uber to comply with the court's order? A. As far as I recall, everywhere. Meaning we took this order very, very seriously and put a ton of people power on the direction here in paragraph 4. And I believe we also retained outside experts to help us and moved heaven and earth to look under every rock and understand the answer to paragraph 4.").) The Jacobs letter, however, discloses locations that plainly have not been searched, i.e. anonymous servers, non-attributable devices, and ephemeral communications. Additionally, Uber did not search the files of the persons who handled the Jacobs investigation—the in house compliance lawyers—or the several witnesses identified in the Jacobs letter, such as Ed Russo, Nick Gicinto, Mat Henley, Joe Sullivan, or Craig Clark. Uber's failure to search those locations contradicts Ms. Padilla's testimony.

Similarly, Travis Kalanick, who was aware of the allegations in the Jacobs letter, testified that he made it clear to Levandowski that it was important that "nothing that he downloaded made it to Uber in any way . . . and that we would look into everything every server, every person at the

1  company, to make sure that that was true."  (Ex. 16 – Kalanick Tr. at 45:18-22.)  He further
2  testified "we certainly had an investigation that started looking through every server forensically."
3  (*Id.*, 51:13-19.)  Again, the Jacobs letter contradicts the claim that Uber looked everywhere and
4  talked to everyone.

5       Uber's counsel has similarly argued that it intends to present to the jury that Uber
6  conducted extensive searches to find evidence of misappropriation of Waymo trade secrets, and
7  opened up its doors for Waymo to come on-site to Uber to allow Waymo to search for evidence of
8  misappropriation which, according to Uber, Waymo did not find.  (7/26/17 Hearing Tr., 62:9-
9  64:19, 72:8-10; 6/23/17 Hearing Tr., 11:19-23.)  Again, the Jacobs letter reveals that Uber's
10 searches were not extensive because they did not include various locations and custodians likely to
11 contain relevant information.  Uber "put[] forth a story that is directly contradicted" by the Jacobs
12 letter.

13      In sum, Uber should have produced the Jacobs letter and email in response to multiple
14 orders issued by this Court and in response to Waymo's various RFPs, interrogatories, and
15 deposition questions.

### Search Term Negotiation Timeline

**April 14** – Jacobs sends resignation email to Salle Yoo and Travis Kalanick. It is shared with at least nine MoFo attorneys, including counsel of record Arturo Gonzalez and Eric Tate. (12/4/17 Hearing Tr., 47:2-5.) Uber initially decides that MoFo's "Chuck Duross, together with WilmerHale, would investigate those allegations." (*Id.*, 46:17-23.)

**Between April 14 and May 5** – Angela Padilla was in contact with Mr. Jacobs and/or his counsel, Clayton Halunen, and "was able to prevail upon . . . Mr. Halunen, to put all of the claims in writing." (11/29/17 Hearing Tr., 14:17-15:15.)

**May 3** – Preliminary injunction hearing in this case. Ms. Padilla attends the hearing. (11/29/17 Hearing Tr., 11:17-19.)

**May 4** – MoFo is told it would not be investigating the allegations in Jacobs' resignation email. (12/4/17 Hearing Tr., 46:17-25.)

**May 5** – Angela Padilla receives the Jacobs letter.

**May 9** – Waymo serves its First Set of Requests for Production.

**May 11, 22 and 26** – Waymo servers its Second Set of Requests for Production, First Set of Expedited Requests for Production, and Second Set of Expedited Requests for Production, respectively

**May 30** – Waymo emails Uber a proposed ESI Order (Dkt. 1090-2)

**May 31** – Waymo serves its Third Set of Requests for Production

**June 2, 7, 8, and 14** – Waymo follows up on the proposed ESI Order (Dkt. 1090-3, Dkt. 1090-4, Dkt. 1090-5, Dkt. 1090-6)

**June 7** – Uber takes the position for the first time that Waymo should be limited to the RFPs already served and not permitted to serve any more. The Special Master agrees that Waymo may not serve additional RFPs without first obtaining his permission.

**June 27** - Uber discloses Jacobs and his allegations to the United States Attorney for the Northern District of California (11/29/17 Hearing Tr., 27:22-24.)

**June 28** – Waymo servers its Fourth Set of Requests for Production, after having to obtain leave from the Special Master to serve RFPs directed at damages.

**July 1** – During a meet and confer, Uber for the first time wants to discuss exchanging proposed search terms

**July 3-early August** – The parties negotiate search terms.

DATED:  December 5, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By /s/ Charles K. Verhoeven
Charles K. Verhoeven
Attorneys for WAYMO LLC