# EXHIBIT 16

ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
 4
 5   WAYMO LLC
 6       Plaintiff,
 7            vs.              Case No.
 8   UBER TECHNOLOGIES, INC.;   17-cv-00939-WHA
 9   OTTOMOTTO, LLC; OTTO
10   TRUCKING LLC,
11       Defendants.
12   _____
13
14            **ATTORNEYS' EYES ONLY**
15
16     VIDEOTAPED DEPOSITION OF TRAVIS KALANICK
17              San Francisco, California
18              Thursday, July 27, 2017
19                     Volume I
20
21   REPORTED BY:
22   REBECCA L. ROMANO, RPR, CSR No. 12546
23   JOB NO. 2665725
24
25   PAGES 1 - 329
```

Page 1

```
 1   many people at the company.                              08:55:13

 2          And when you hear of something like

 3   somebody downloading files, you say, Look, have --

 4   has any of these files made it over to Uber?

 5          And you get through that question, and           08:55:28

 6   then the next question or the next sort of

 7   statement or command is, You need to make sure that

 8   nothing of any kind that comes from any previous

 9   place makes it to this company, period.

10      Q.   What did you say to Mr. Levandowski on           08:56:08

11   that subject?

12      A.   I made it very clear to him that we -- I

13   made it very -- well, the first question is, Did

14   anything make it to Uber?

15          And he made it very clear to me that             08:56:22

16   absolutely nothing that he downloaded made it to

17   Uber in any way.

18          And the second part is, I made it very

19   clear to him how important it was to me that that

20   was the case and that we would look into               08:56:37

21   everything, every server, every person at the

22   company, to make sure that that was true.

23      Q.   Okay.  So -- when -- when did this

24   conversation happen?

25      A.   I don't remember -- I don't remember when      08:56:50
```

Page 45

```
 1   this specific conversation happened or like the        08:56:52
 2   exact date or time, but I know that that kind of
 3   conversation happened with him.
 4        Q.   How do you know that?
 5        A.   I just -- I just generally recollect that    08:57:07
 6   kind of conversation.
 7        Q.   But you don't remember when it happened?
 8        A.   No.
 9        Q.   Do you remember what month it happened
10   in?                                                    08:57:18
11        A.   I mean, I can guess that it was pretty
12   close to the all-hands meeting.
13        Q.   Was it after or before the all-hands
14   meeting?
15        A.   I feel like that was after, but I don't      08:57:31
16   know for sure.  It may have been after the
17   complaint and before the all-hands, but I -- I
18   can't remember for sure.
19        Q.   Was it in February of 2017?
20        A.   I mean, whenever the complaint was and       08:57:50
21   the all-hands, there was probably, I don't know,
22   maybe 12 to 24 hours in between.  It was either in
23   that portion of time or in the hours following the
24   all-hands meeting.  And I don't know exactly --
25        Q.   Was the conversation in person?              08:58:00
```

ATTORNEYS' EYES ONLY

```
1        A.   I don't know for sure.                      08:58:04

2        Q.   Was it over the phone?

3        A.   It may have been.

4        Q.   But you don't remember if it was in

5   person or over the phone?                             08:58:14

6        A.   I do not know.

7        Q.   Was anyone else present during the

8   conversation or on the line?

9        A.   I don't know for sure.  I mean, on the

10  line, my guess is probably not if it were over the    08:58:23

11  phone.  If it were in person, it could have just

12  been like passing in the hall, or it could have

13  been that I was with an attorney.  I just don't --

14  I don't remember.

15       Q.   Would that have been set on your            08:58:41

16  calendar?

17       A.   It may have been.  I don't know.  I -- I

18  don't -- I don't know.

19       Q.   Did you schedule a meeting with him about

20  it?                                                   08:58:54

21       A.   I don't remember a specific meeting about

22  it other than the all-hands, of course.

23       Q.   What did you say to him specifically?

24       A.   I don't remember what I specifically

25  said.                                                 08:59:25
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | Q.   What did you say to him generally? | 08:59:25 |
| 2 | A.   I generally said -- well, the -- the | |
| 3 | first -- the first thing is, Did any of these files | |
| 4 | make it over to Uber? | |
| 5 | Q.   Okay.  So you asked him that question. | 08:59:38 |
| 6 | A.   Yes. | |
| 7 | Q.   What did he say? | |
| 8 | A.   He said, Absolutely not. | |
| 9 | Q.   Did you ask him, Did you take Google | |
| 10 | files with you? | 08:59:48 |
| 11 | A.   I did not ask him. | |
| 12 | Q.   Why not? | |
| 13 | A.   I -- I don't know.  I just didn't. | |
| 14 | Q.   Wouldn't that be important to you to | |
| 15 | know? | 08:59:56 |
| 16 |         MS. DUNN:  Objection to form. | |
| 17 |         THE DEPONENT:  My biggest concern was | |
| 18 | that nothing from Google ended up at Uber.  That | |
| 19 | was the most important thing for me. | |
| 20 | Q.   (By Mr. Verhoeven)  But you were | 09:00:09 |
| 21 | concerned that -- that -- about the allegation that | |
| 22 | he downloaded 14,000 proprietary files from Google | |
| 23 | before he left and joined your company, weren't | |
| 24 | you? | |
| 25 |         MS. DUNN:  Objection to form. | 09:00:19 |

Page 48

```
 1            THE DEPONENT:  I was very -- I didn't        09:00:21
 2   know the details of the allegation.  We were going
 3   to -- we were going to look into that allegation
 4   and find out what the details were.
 5            But in the -- in the moment of that          09:00:33
 6   complaint and sort of let's call it the following
 7   days, my No. 1 concern is that nothing from Google
 8   ended up at Uber.  Period.
 9            And I was not just going to ask and find
10   out, Hey, did anything make it?  But I was also      09:00:50
11   going to do everything in my power to verify that
12   that was true.
13      Q.   (By Mr. Verhoeven)  But my question was,
14   certainly you were concerned about the allegation
15   that had been made in the complaint that             09:01:04
16   Mr. Levandowski took files with him when he left
17   Google to join Uber.
18            MS. DUNN:  Objection to form.
19      Q.   (By Mr. Verhoeven)  Weren't you concerned
20   about that?                                          09:01:19
21      A.   Anytime there's an allegation, and
22   including this kind of allegation, you're going to
23   have some kind of concern.  And then the next thing
24   is you have to start looking into it and find out
25   what's true.                                         09:01:31
```

Page 49

| | | |
|---|---|---|
| 1 | Q.  At the time you had the conversation, you | 09:01:32 |
| 2 | were concerned about that, right? | |
| 3 | A.  Yes.  But what I -- but what I was most | |
| 4 | concerned about was making sure that nothing from | |
| 5 | Google -- verifying that nothing from Google had | 09:01:43 |
| 6 | made it over to Uber. | |
| 7 | Now, I was generally confident that | |
| 8 | nothing had.  But when an allegation like that | |
| 9 | comes, you need to double- and triple-check. | |
| 10 | Q.  But you are sure you didn't ask him | 09:01:57 |
| 11 | whether he downloaded those files? | |
| 12 | A.  He admitted that he downloaded files. | |
| 13 | Q.  Okay.  Did you talk about that with him | |
| 14 | when you had this conversation shortly after the | |
| 15 | complaint? | 09:02:07 |
| 16 | A.  I don't remember doing that, no. | |
| 17 | Q.  Why wouldn't you? | |
| 18 | MS. DUNN:  Objection to form. | |
| 19 | THE DEPONENT:  I was most concerned about | |
| 20 | whether files had made it to Uber and had -- that's | 09:02:22 |
| 21 | where I'm starting. | |
| 22 | You can imagine being in my position. | |
| 23 | The first thing you're going to ask, Did anything | |
| 24 | that you have from your previous employer make it | |
| 25 | to Uber? | 09:02:32 |

```
 1              And then you get a very confirma- -- I        09:02:34
 2   got a very confirmatory, Absolutely not.
 3              And then my second thing is, We are going
 4   to make sure that that is the case.  We are going
 5   to have independent investigators look into this        09:02:44
 6   and find out whether that is true.  And you need to
 7   make sure that that continues to be true.
 8       Q.   (By Mr. Verhoeven)  Okay.  Do you
 9   remember what you said to him about having
10   independent investigators --                            09:03:02
11       A.   No.
12       Q.   -- make sure?
13       A.   I don't remember the specifics, but we
14   certainly had an investigation that started looking
15   through every server forensically, and started          09:03:15
16   interviewing -- started interviewing, you know,
17   many engineers, dozen of engineers, to verify that
18   they hadn't seen any files, and verify that those
19   files never touched us.
20       Q.   Did you direct that specifically to            09:03:33
21   happen?
22       A.   Our chief security officer, Joe Sullivan,
23   did.
24       Q.   And how do you know that?
25       A.   At some point I was told that that was         09:03:42
```

Page 51