# MORRISON | FOERSTER

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA  94105-2482

TELEPHONE: 415 268 7000
FACSIMILE: 415 268 7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

BEIJING, BERLIN, BRUSSELS,
DENVER, HONG KONG, LONDON,
LOS ANGELES, NEW YORK,
NORTHERN VIRGINIA, PALO ALTO,
SAN DIEGO, SAN FRANCISCO, SHANGHAI,
SINGAPORE, TOKYO, WASHINGTON, D.C.

December 12, 2017

Writer's Direct Contact
+1 (415) 268.7020
AGonzalez@mofo.com

The Honorable Jacqueline Scott Corley
USDC, Northern District of California
San Francisco Courthouse
Courtroom F - 15th Floor
450 Golden Gate Avenue
San Francisco, CA  94102

Re:     *Waymo LLC v. Uber Technologies, Inc. et al.,* Case No. 3:17-cv-00939

Dear Magistrate Judge Corley:

Attached is Uber's letter brief for tomorrow's 2:00 telephonic hearing.

Respectfully submitted,

*/s/ Arturo J. González*

Arturo J. González

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

sf-3849769

## *UBER'S ISSUES*
**1. 30(b)(6) Depositions**: Waymo has served Uber with a request to produce a witness on "Surveillance conducted by or at the direction of DEFENDANTS of any PERSONS who are witnesses or attorneys in THIS CASE." (Topic No. 8.) Uber will be producing a witness on this topic. In addition, Uber has recently produced surveillance videos of Uber videotaping competitor vehicles. To balance this evidence, Uber has served a 30(b)(6) notice that includes this topic: "The surveillance, if any, that Waymo or Project Chauffeur has conducted of its autonomous vehicle competitors." Waymo refuses to produce a witness.

Uber has also served Waymo with a request to produce a witness on "The identity of any litigation matter where Waymo or Google has disclosed the 'off the record' default within Google Talk or Google Hangouts." Before September 2008, Google used to save all of its chats on servers, just like emails. Uber has learned, however, that in September 2008, Google changed the default to "off the record," which means that all of its chats are immediately destroyed, unless the employee takes affirmative steps to save the chat. And Google did so to avoid having to produce chats in connection with legal and regulatory matters it would face in the future. (Exhibit 1.) This was never disclosed in this litigation. Uber believes that Google may have *defended* its chat destruction in other litigation matters, and that Google's past positions are highly relevant to its current position in this litigation. Waymo refuses to produce a witness.

**2. Document Requests**:
**RFP 208**: Uber has requested documents regarding "who" proposed the 2008 change to an "off the record" retention setting for chats and "why" that change was made. No documents have been produced on this key point. Waymo has produced only 12 documents total. Waymo claims that a declaration filed in another case addresses this request but it does not. It only states: ▌
▌
▌ Exhibit 2.) This does not tell us "who" proposed it, including who proposed or announced the policy change to Google's employees, or "why." There must be documents on this point.

**RFP 213**: Uber has requested "training materials" regarding chats, including any communications about not discussing certain topics in non-ephemeral settings. No documents have been produced.

**RFP 217**: Uber has requested documents sufficient to show the number of chats that were preserved each year from 2007 to the present, and the total number of chats sent those years. This will show the impact that the 2008 change had on the preservation (or lack thereof) of Google's/Waymo's chats. Waymo initially claimed this was burdensome, and now claims there are no documents. But there must be records of how many chats are saved on Google's servers.

## *WAYMO'S ISSUES*
**1. Demand Letter Redactions**: The redactions to the demand letters sent by two terminated attorneys are privileged. The letters discuss the substance of discussions within Uber about the legal advice being provided to the company, and what legal positions the company should take, including the possible implementation of a program referred to as ▌
▌

███████████████.  The letters refer to the details of these discussions, including references to specific pending cases (but not the litigation with Waymo) and discussions between Uber and outside counsel.  This is classic attorney-client communication as well as attorney work product.

Waymo similarly complains that Uber did not produce the ████████████ provided by either Uber or the terminated attorneys in the course of ████████████, but these are also protected communications. ████████████████████████████████



Waymo does not argue that the communications are not privileged.  Instead, Waymo relies on a passing comment about the terminations in an email written by Jill Hazelbaker, an executive on Uber's communications staff who was not involved in the terminations.  Waymo ignores the response from Salle Yoo, Uber's former Chief Legal Officer, pointing out that the terminated attorneys did not provide outside counsel with the full facts.  More importantly for purposes of this motion, even if Waymo's speculation about the terminations were true, that would not overrule the applicable privileges.

2. **Special Matters Committee ("SMC") Documents:**  First, this issue is moot.  This week, counsel for the SMC at Cooley and Shearman will be producing responsive, non-privileged documents.  The three SMC members will also produce responsive, non-privileged documents pursuant to subpoenas served today—as discussed with the Special Master yesterday.

Second, any delay in producing such documents is entirely of Waymo's making.  For example, Waymo's original document requests were marked "Attorneys' Eyes Only," preventing Uber from showing them to the SMC and its counsel.  Waymo never responded to Uber's request to de-designate the document requests.  As another example, last Tuesday, Uber's counsel called Waymo's counsel to meet and confer about the scope of discovery for SMC documents outside of Uber's custody and control.  Waymo's counsel never returned the call.  Last Wednesday, Uber raised the issue on the meet and confer with the Special Master.  Waymo apologized for not returning the call and promised to do so the next day.  Last Thursday, the parties met and conferred and reached a tentative agreement.  The parties could not reach a final agreement because counsel for Waymo represented that he did not have authority to do so.  Last Friday, a different counsel for Waymo reached an agreement with Uber on the scope of the searches to be run by counsel for the SMC, subject to some testing.  Over the weekend, counsel for Uber emailed

counsel for Waymo twice seeking clarification. Waymo never responded to these emails. Then, very late Sunday night, Waymo began issuing new demands on the scope of the searches. Today, the parties engaged in further meet and confers by email and the members of the SMC will attempt to produce documents from the searches agreed upon.

Third, these productions are occurring despite the fact that these requests to Uber's board members being pure harassment. As explained to Waymo, the nature of the SMC means that these documents will be privileged. Despite this, Waymo demands that the SMC engage in a costly and burdensome logging process. Nonetheless, the SMC and its members have agreed to do so and on an expedited basis, to the extent possible within the very short time frame allowed in the supplemental discovery period.

**3. Issues with specific RFPs:** Uber did not impose improper limitations on the scope of production in response to these RFPs. Uber reasonably—and necessarily—tailored its responses and commitment to produce documents based on: (1) the Court's December 1, 2017 Order and (2) the extraordinarily expedited schedule for production set by the Special Master. Waymo served its *forty* RFPs at 10:55 p.m. on Thursday, November 30. On December 5, 2017, just three business days later, the Special Master directed Uber to complete its production by December 8, just three business days later. Uber devoted all available resources to its review and production efforts. Given the expedited schedule and hefty discovery demands, Uber's efforts to tailor Waymo's broad requests to issues that are relevant to this litigation were not just reasonable, they were also necessary.

**RFPs 5-8** seek "all documents" regarding Uber's investigation into the Jacobs Letter, communications with Jacobs or any employee about any issues described in the letter, and Jacobs's separation from Uber. Uber responded that it would produce responsive, non-privileged documents to the extent that they exist and "pertain to the allegations in the Jacobs Letter regarding use of non-attributable devices, ephemeral communications, Waymo's trade secrets or other confidential information, the Uber-Otto acquisition, Uber's document retention policies, and the use of attorney client and work product privileges." Uber's response is consistent with the Court's order granting additional discovery as it pertains to the topics in the letter. (Dkt. 2315 at 1:27-2:21 (authorizing discovery into use of non-attributable devices, ephemeral communications, alleged contrived claims of privilege and other inquiries *specific to relevant issues* raised in the email or letter).) In meeting and conferring, Waymo identified no other relevant category from the letter, stating only that it is entitled to "general competitive intelligence gathering." That topic is already covered by RFPs 1 and 28.

**RFPs 12, 15, and 19-20** seek "all documents" regarding the use by any Uber employee of "anonymous servers" or virtual machines that wipe clean. Uber agreed to produce any responsive, non-privileged documents for personnel in Uber ATG, Marketplace Analytics, or Strategic Services Group—these groups include Uber's AV group and the units primarily implicated by the Jacobs Letter. That is sufficient.

**RFP 36** seeks "all documents" regarding the creation, purpose, branding, and rebranding of Threat Operations, SSG, SI, and MA. Uber agreed to produce documents "sufficient to show." That is eminently reasonable in light of the expedited schedule.