John L. Cooper (State Bar No. 050324)
jcooper@fbm.com
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

Special Master

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAYMO LLC,<br><br>   Plaintiff,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC. *et al.*,<br><br>   Defendants. | CASE NO. 3:17-cv-00939<br><br>**REPORT OF THE SPECIAL MASTER REGARDING THE JACOBS MATERIALS** |

Pursuant to the Court's December 4, 2017 Order (ECF No. 2341), the Special Master submits the following report to the Court regarding whether and to what extent Defendant Uber Technologies, Inc. ("Uber") was obligated to provide any information arising from (1) an April 14, 2017, resignation e-mail submitted to Uber by Richard Jacobs (the "Jacobs E-mail"), (2) a May 5, 2017, letter Mr. Jacobs' attorney sent to Uber's head of global litigation (the "Jacobs Letter"), or (3) the settlement agreement that Uber and Mr. Jacobs executed in mid-August (the "Jacobs Settlement") (collectively, the "Jacobs Materials").

## I.  INTRODUCTION

The trial of this trade secrets case was continued for a second time after the belated discovery of inflammatory communications by a former Uber employee came to light outside the normal discovery process. On April 14, 2017, Richard Jacobs sent a resignation e-mail to Uber's

then-CEO and then-general counsel, among others, accusing Uber of having a dedicated division with a "mission" to "steal trade secrets in a series of code-named campaigns" and engaging in other allegedly wrongful or inappropriate conduct. A few weeks later, on May 5, 2017, Mr. Jacobs' lawyer, Clayton Halunen, sent a letter to Angela Padilla, Uber's Vice President and Deputy General Counsel for Litigation and Employment. That 37-page letter expanded in some detail on Mr. Jacobs' e-mailed accusations regarding clandestine and concerted efforts to steal competitors' trade secrets, including those belonging to Waymo. It also addressed allegations touching on Anthony Levandowski's alleged downloading of Waymo trade secrets. The Jacobs Letter laid out what his lawyer described as a set of hardware and software programs, and usage protocols that would help Uber to allegedly carry out its thefts and other corporate espionage in secret and with minimized risk of evidence remaining on Uber servers or devices. By mid-August Mr. Jacobs and Uber settled their disputes and executed a written settlement agreement on August 14-15, 2017.

Despite extensive discovery and multiple Court orders to produce an extensive amount of information related to the accusations in the Jacobs Materials, Waymo did not learn of their existence until after November 22, when the Court notified the parties that a federal prosecutor wrote a letter to this Court disclosing the gist of the Jacobs allegations.

This Report analyzes whether Uber was obligated to have produced the Jacobs Materials in response to any of the Court's prior orders or Waymo's discovery requests. After reviewing the parties' briefs, the applicable law, the Federal Rules of Civil Procedure, and considering the parties' arguments provided at a hearing before the Special Master on December 12, 2017, and as further discussed below, I find that the Jacobs Materials were not required to be disclosed in response to any Court Order issued before November 22. Based on the facts presented to the Special Master, neither the Jacobs E-mail nor the Jacobs Settlement is responsive to Waymo

//
//
//
//

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

SPECIAL MASTER'S REPORT REGARDING
JACOBS MATERIALS
Case No. 3:17-cv-00939-WHA

2

34390\6356321.2

discovery requests served before the disclosure of the Jacobs Materials. However, the Special Master finds that the Jacobs Letter was responsive to certain discovery requests propounded by Waymo, and Uber was obligated to produce it in response to those requests.[1]

## II. BACKGROUND

### A. Court Orders

The Court on March 16, 2017, issued its Order re Expedited Discovery and Related Matters. ECF No. 61. Among other things, the Order provided:

> By March 31, defendants shall produce for inspection all files and documents downloaded by Anthony Levandowski, Sameer Kshirsagar, or Radu Raduta before leaving plaintiff's payroll and thereafter taken by them. Defendants shall also produce for copying the card reader, thumb drive, or other media used for the downloads, as well as all subsequent emails, memoranda, PowerPoints, text messages, or notes that have forwarded, used, or referred to any part of said downloaded material. If any part of said downloaded material has been deleted, destroyed, or modified, then defendants shall state the extent thereof and produce all documents bearing on said deletion, destruction, or modification.

ECF No. 61 ¶ 4.

Soon thereafter, on April 4, 2017, the Court ordered Uber to bring to a discovery hearing "[a] list of all servers (and their locations) used at any time in any way for defendants' LiDAR-related activities. Do not leave anything off the list merely because some other server supposedly houses the same materials." ECF No. 144.

The Court on May 11 entered its Order Granting in Part and Denying in Part Waymo's Motion for Provisional Relief. ECF No. 426. In that Order, the Court ordered Uber to, among other things, "provide a detailed accounting under oath setting forth every person who has seen or heard any part of any downloaded materials, what they saw or heard, when they saw or heard it, and for what purpose." ECF No. 426 at 24 ¶ 4. The Court instructed Uber that it "must do more than query servers with term searches." *Id.*

---

[1] The Jacobs Settlement was not by itself responsive to any of the Court orders or discovery requests at issue in this case. Waymo has not argued otherwise.

SPECIAL MASTER'S REPORT REGARDING JACOBS MATERIALS
Case No. 3:17-cv-00939-WHA

3

34390\6356321.2

B. **Waymo Discovery Requests**

Waymo argues the Jacobs Materials are responsive to one or more of the following requests contained in Waymo's First Set of Requests for Production to Defendants served May 9, 2017:

1. **RFP No. 29**

Waymo requested:

> All DOCUMENTS and COMMUNICATIONS REGARDING negotiations over UBER's acquisition of OTTOMOTTO.

Rivera Ex. A at 16.[2]

In addition to objecting to the relevance and breadth of this request, among other objections, Uber responded by offering to confer with Waymo on how to narrow the request's "scope, subject matter, and time frame of this Request." *See id.* at 16-17. Pursuant to that offer, the parties reached an agreement during the first week of July to limit this request. *See* Rivera Ex. E at 1-3. Subject to that deal, Uber agreed to produce non-privileged documents "pertaining to the negotiation of the consideration for the Uber-Otto transaction, the IP acquired, and the satisfaction of certain closing conditions." *Id.* at 2.

2. **RFP No. 72**

Waymo requested:

> All DOCUMENTS REGARDING DEFENDANTS' policies regarding employees' use of personal computers or other devices while working at or for DEFENDANTS.

Rivera Ex. A at 39.

Uber stated in response that it already had produced one particular document not relevant for present purposes and that it would "produce further relevant, responsive non-privileged DOCUMENTS located through a reasonably diligent search." *See id.* Uber also added objections over relevancy, breadth, and proportionality concerns. *Id.* The parties agreed to limit the scope of

---

[2] All references to "Rivera Exhibits" in this Report are to the exhibits attached to the Declaration of Sylvia Rivera in support of defendants' Response to Waymo's Submission to Special Master Cooper Regarding the Jacobs Documents ("Uber Response Br."). *See* ECF No. 2355.

this request, without prejudice to Waymo re-opening the matter later. Specifically, they agreed that Uber would produce non-privileged documents "regarding Anthony Levandowski's use of personal computers or other devices, to the extent it locates such documents." Rivera Ex. F at 1.

### 3. RFP No. 73

Waymo requested:

> All DOCUMENTS AND COMMUNICATIONS REGARDING the MISAPPROPRIATED MATERIALS, INCLUDING but not limited to (i) DOCUMENTS containing any information derived from the MISAPPROPRIATED MATERIALS, (ii) any electronic media that contains or contained the MISAPPROPRIATED MATERIALS, and (iii) any DOCUMENTS REGARDING any meetings or discussions REGARDING the substance of the MISAPPROPRIATED MATERIALS outside of WAYMO.

Rivera Ex. A at 39. For the purposes of its request, Waymo defined "Misappropriated Materials" to mean "all GOOGLE and WAYMO DOCUMENTS . . . for which any current or former employee of DEFENDANTS retained possession, without authorization of either GOOGLE or WAYMO, after the employee ended his or her employment with GOOGLE/WAYMO."

Uber responded by stating several objections and by agreeing to "continue to search for DOCUMENTS and COMMUNICATIONS responsive to this Request." Rivera Ex. A at 39-40. Uber also stated that it would produce "non-privileged responsive DOCUMENTS and COMMUNICATIONS located through a reasonably diligent search." *Id.* at 40 (emphasis added). Uber later confirmed that, as to this request, it was "not withholding any responsive documents on grounds other than privilege, and will not be withholding any responsive, non-privileged documents." Rivera Ex. E at 6.

### 4. RFP 91

Waymo requested:

> All DOCUMENTS AND COMMUNICATIONS REGARDING any of LEVANDOWSKI's past and present "Authorized Devices" (as that term is defined in UBER00006444, Section 7), INCLUDING (without limitation) any request for approval in connection with Section 7.2 or any de-authorization (whether contemplated or effectutated [sic]) under Section 7.3.

Rivera Ex. A. at 49.

Uber replied by asserting privilege objections and stating that "[a]fter a diligent search and reasonable inquiry, . . . there are no non-privileged documents responsive to this Request." Rivera Ex. A at 49.

### 5. Common Interrogatory No. 8

Waymo asked Uber to:

> Describe in detail YOUR policies and practices with respect to the retention and/or destruction of DOCUMENTS (including without limitation emails, instant messages, electronically stored information, and hard copies), from 2014 to the present.

Rivera Ex. L at 11.

### 6. Expedited Interrogatory No. 6

Waymo asked Uber to:

> Describe DEFENDANTS' efforts to preserve evidence relevant to THIS CASE, INCLUDING (without limitation) when DEFENDANTS instituted any litigation hold(s) REGARDING THIS CASE, how DEFENDANTS implemented any litigation hold, all PERSONS who received any litigation hold, when each PERSON received each litigation hold, which PERSON(S) was responsible for monitoring compliance with each litigation hold, and any instances of non-compliance with such litigation hold.

Rivera Ex. L at 11-12.

## C. Uber's Receipt of Jacobs Materials

Waymo served the foregoing document requests on Uber on May 9. About three weeks before that, on April 14, Mr. Jacobs sent his resignation e-mail to, among others, then Uber CEO Travis Kalanick and Salle Yoo, Uber's general counsel at the time. In the e-mail, Mr. Jacobs tendered his immediate resignation and accused Uber of retaliating against him for his efforts to expose within the company certain alleged activities he believes were wrongful, unethical, and/or illegal. He asserted that certain alleged information-gathering activities "were hidden from any oversight or legal process by an elaborate set of technical protections[.]" He further alleged that those measures involved moving two employees engaged in those activities "from Uber's [Autonomous Technologies Group] after the Waymo suit so that the activities and

communications could be done without regard from judicial orders and subpoenas."

For the next couple of weeks, Uber Vice President and Deputy General Counsel of Litigation and Employment Angela Padilla sought to discuss these allegations with Mr. Jacobs. Ms. Padilla personally attended the hearing on Waymo's motion for preliminary injunction. Nov. 29, 2017 Hr'g Tr. at 11:17-19. Ms. Padilla has testified that her effort to get more information from Jacobs personally were unfruitful, but she was "able to prevail upon his attorney" to set out Mr. Jacobs' claims in writing. *See* Nov. 29, 2017 Hr'g Tr. at 14-21-15:15. That writing came in the form of the Jacobs Letter, submitted to Ms. Padilla via e-mail on May 5.

That 37-page letter set forth multiple allegations relating to alleged efforts by Uber individuals and divisions. Among other things, the letter alleges that Uber planned to use certain hardware devices and software to conceal the creation and destruction of corporate records that, as a result, "would never be subject to legal discovery." *See* ECF No. 2307-2 at 7. These activities, Mr. Jacobs' lawyer asserted, "implicate ongoing discovery disputes, such as those in Uber's litigation with Waymo." *Id.* at 9. He continued:

> Specifically, Jacobs recalls that Jake Nocon, Nick Gicinto, and Ed Russo went to Pittsburgh, Pennsylvania to educate Uber's Autonomous Vehicle Group on using the above practices with the specific intent of preventing Uber's unlawful schemes from seeing the light of day.
>
> [¶] Jacobs' observations cast doubt on Uber's representation in court proceedings that no documents evidencing wrongdoing can be found on Uber's systems and that other communications are actually shielded by the attorney-client privilege. Aarian Marshall, *Judge in Waymo Dispute Lets Uber's Self-driving Program Live—for Now*, wired.com (May 3, 2017 at 8:47p.m.) ("Lawyers for Waymo also said Uber had blocked the release of 3,500 documents related to the acquisition of Otto on the grounds that they contain privileged information .... Waymo also can't quite pin down whether Uber employees saw the stolen documents or if those documents moved anywhere beyond the computer Levandowski allegedly used to steal them. (Uber lawyers say extensive searches of their company's system for anything connected to the secrets comes up nil.)"), available at (citation omitted).

*Id.* at 9-10.

The Jacobs Letter also accuses Uber of "Illegal Intelligence Gathering," particularly in the form of a "Marketplace Analytics" team designed "expressly for the purpose of acquiring trade

secrets . . . from major ridesharing competitors globally." *See* ECF No. 2307-2 at 10-12. In support of that accusation, the letter asserts allegations pertaining to this case. In particular, it describes—under a bolded subheading titled "Waymo"—what appears to be two separate meetings between certain members of an Uber group allegedly involved in clandestine and unlawful information-gathering activities and Uber employees. In one meeting, supposed to have occurred shortly after Uber's acquisition of Ottomotto, the members of the information-gathering group told a story about how they could help "ensure the secrecy of meetings between" a the CEOs of "large company" and a "smaller startup with industry-changing technology." *Id.* at 13. Those attending this meeting, the letter asserts, assumed that the story "was alluding to the actual events surrounding" Uber's acquisition of Ottomotto. *Id.* The second meeting involving the alleged Uber spies was also shortly after the acquisition. In this meeting, the group traveled to visit Uber employees of the Autonomous Vehicle Group in Pittsburgh. Those employees allegedly were trained on using the hardware and software designed to conceal information from the legal process. *Id.* The letter accused the Uber spies of carrying out this training:

> with the specific intent of preventing the discovery of devices, documents, and communications in anticipated litigation. These facts corroborate Google's legal theory in pending litigation that Otto was simply a shell company whose sole purpose was to dissemble Uber's conspiracy to steal Waymo's intellectual property.

*Id.* at 13.

### D. Disclosure and Non-Disclosure of Jacobs Materials

Ms. Padilla testified in this Court that she read the letter "in brief" and turned it over to other Uber attorneys, including Ms. Yoo, to begin an internal investigation. Nov. 29, 2017 Hr'g Tr. at 15:17-24. The letter also made its way to two separate committees of Uber's Board of Directors, including the committee that was or is overseeing special litigation, including this case and the Jacobs matter. *Id.* at 20:10-13; 26:23-25. On June 27, Uber disclosed the allegations in the Jacobs Letter to the U.S. Attorney for the Northern District of California. *Id.* at 27:20-14. It disclosed the Jacobs Letter itself on or around September 12 to the same U.S. Attorney's Office, to another U.S. Attorney, in the Southern District of New York, and to the U.S. Department of Justice in Washington. *Id.* at 28:4-10. Ms. Padilla testified that Uber made these disclosures to

multiple prosecutors "to take the air out of [Jacobs'] extortionist balloon." *Id.* at 28:18-19. Nearly one month before that distribution of the letter to federal prosecutors, on August 14, Uber settled with Mr. Jacobs—the terms of which included $4.5 million in compensation to Jacobs and $3 million to his lawyers. *See id.* at 62:6-63-12.

Uber distributed the Jacobs E-Mail to two of Uber's counsel of record at Morrison Foerster ("MoFo") in this case. *See* Dec. 4, 2017 Hr'g Tr. at 46:1-47:5. Other MoFo attorneys directly involved in this case and related discovery issues e-mailed with other MoFo attorneys in late April about "Uber's ediscovery systems regarding potential investigation into Jacobs resignation letter."[3] *See* Waymo Ex. 21.[4]

None of the Uber outside counsel working on this case got a copy of the Jacobs Letter. Neither did the two Uber in-house lawyers who were or are handling this case; Ms. Padilla testified that she did not send it to them. Nov. 29, 2017 Hr'g Tr. at 47:8-16. By late June, some attorneys from Boies Schiller and Flexner, also counsel in this matter for Uber, had discussions with other outside counsel and Ms. Padilla about issues arising from the internal investigation triggered by the Jacobs Materials. *See* Waymo Ex. 20, Entries 22-22(h).

On November 22, 2017, the U.S. Attorney for the Northern District of California notified this Court of the Jacobs allegations and specifically referenced the account Jacobs put in his letter about the efforts to keep the Ottomotto acquisition secret. *See* ECF No. 2383. The Court on the same day issued an order disclosing receipt of the letter from the U.S. Attorney and asked the parties to inform the Court about the extent of any prior disclosure of the Jacobs allegations. *See* ECF Nos. 2260-2261. After continuing the trial date in light of the parties' responses to that query, the Court on December 4, 2017, ordered the Special Master "to determine whether and to what extent, including the history of this action and both sides' past conduct, defendants were

---

[3] The privilege log cited here refers to the Jacobs "resignation letter," but must mean to refer to the Jacobs E-mail; the letter was not submitted to Ms. Padilla until May 5.

[4] References to "Waymo Exhibits" are to the exhibits submitted in support of Waymo's Submission to Special Master Cooper Regarding Uber's Obligation to Produce Jacobs Letter and Related Documents, *see* ECF No. 2367-3, and in support of Waymo's as-yet unfiled Reply Submission ("Waymo Reply").

required to earlier produce the Jacobs letter, resignation email, or settlement agreement, or required to provide any information in those documents in response to interrogatories, Court orders, or other agreements among counsel." ECF No. 2334, 2341.

## III. ANALYSIS & FINDINGS

### A. Responsiveness to Court Orders

Waymo has cited the March 16, April 4, and May 11 orders as the orders potentially implicating the Jacobs Materials.

#### 1. March 16, 2017 Order

Paragraph 4 of this Order first requires production of "files and documents downloaded by Anthony Levandowski, Sameer Kshirsagar, or Radu Raduta" before they left Waymo. It also orders production of "the card reader, thumb drive, or other media" those three people "used for the downloads." Neither of these instructions implicate any of the Jacobs Materials, nor do the Jacobs Materials constitute the device or devices by which those people downloaded the "files and documents" at issue in the Order.

The remainder of Paragraph 4 of this Order presents a closer call. It required two additional things of Uber. First, it demanded that Uber produce "all subsequent emails, memoranda, PowerPoints, text messages, or notes that have forwarded, used, or referred to any part of said downloaded material. It next ordered Uber to produce all documents bearing on any "deletion, destruction, or modification" of "any part" of the downloaded materials.

Waymo has not directly argued that the Jacobs E-Mail and Jacobs Settlement are responsive to this Court Order, and I find that neither is responsive. The Jacobs Letter, however, bears directly on the supposed systematic destruction of materials relating to the alleged theft of Waymo's trade secrets. Specifically, the Jacobs Letter alleges that Uber employees were instructed and trained on how to use "ephemeral communications" and "non-attributable hardware and software" to "prevent[] Uber's unlawful schemes from seeing the light of day." ECF No. 2307-2 at 9. Most directly relevant to this Order, the Jacobs Letter then argues that such strategies "cast doubt on Uber's representation in court proceedings that no documents evidencing wrongdoing can be found *on Uber's systems* . . . ." *Id.* It then quotes a Wired article that reported

that "Waymo also can't quite pin down whether Uber employees saw the stolen documents or if those documents moved anywhere beyond the computer Levandowski allegedly used to steal them." *Id.* at 10. Those portions of the Jacobs Letter do not delve into the detail of *what* the materials Mr. Levandowski downloaded were. They do bear on the potential deletion, destruction, or modification of the materials.

Uber noted at the December 12 hearing before the Special Master that the Jacobs Letter could not be responsive to this Order because it post-dates the required March 31 date of production. Parties generally have an obligation in discovery to "supplement or correct" a discovery response "if the party learns that in some material respect the disclosure or response is incomplete or incorrect[.]" Fed. R. Civ. P. 26(e). The March 16 Order is not a discovery request and the Court's Order pertained to the expedited discovery related specifically to the hearing on Waymo's motion for provisional relief. The hearing on that motion occurred on May 3, with the matter taken that day under submission. The Jacobs Letter arrived in Padilla's inbox two days later. Because the Jacobs Letter did not reach Uber until after the motion for provisional relief was heard and submitted and after the Order's March 31 deadline had passed, it was not responsive to the March 16 Order.

### 2. April 4, 2017 Order

This Order required Uber to list "all servers (and their locations) used at any time in any way for defendants' LiDAR-related activities." ECF No. 144 at 1 ¶ 1. Waymo has not argued that the Jacobs E-Mail and Jacobs Settlement are responsive to this Court Order, and I find that neither is responsive.

The Jacobs Letter alleges the existence of a "distributed architecture of anonymous servers, telecommunications architecture, and non-attributable hardware and software." ECF No. 2307-2 at 12. But it does not state whether those "anonymous servers" were used for Uber's LiDAR-related activities. Lacking that information, Waymo is left to conjecture, arguing that if the servers *were* so used, then the Jacobs Letter would be responsive.[5] I disagree. This Order does

---

[5] Waymo argues that Uber has not said that the anonymous servers were not used for LiDAR-

SPECIAL MASTER'S REPORT REGARDING
JACOBS MATERIALS
Case No. 3:17-cv-00939-WHA

11

34390\6356321.2

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

not instruct Uber to list all documents bearing on the servers used for LiDAR activities or where those servers are located. The Order requires only that Uber list those items. The Jacobs Letter is relevant to whether the list that Uber provided in response to the Order was complete, but Uber had no obligation to produce it here.

### 3.     May 11, 2017 Order

Under this Order, Uber was required to "provide a detailed accounting under oath setting forth every person who has seen or heard any part of any downloaded materials, what they saw or heard, when they saw or heard it, and for what purpose." ECF No. 426 at 24 ¶ 4. The Court instructed Uber that it "must do more than query servers with term searches." *Id.*

The Jacobs E-mail and Jacobs Letter both were in Uber's possession by the time of this Order. However, nothing in those materials makes any reference to Mr. Jacobs or to anyone else actually having seen the "downloaded materials" or heard of their specifics. This provision in the Court's Order is directed at getting to the bottom of who learned something about the files and information that Levandowski allegedly took from Waymo and when those people learned it. *See, e.g., id.* ¶ 4 ("The accounting shall also identify the complete chains of custodians for every copy of any downloaded materials or due diligence report referencing the downloaded materials."). The Jacobs Letter makes broad assertions that Uber was allegedly engaged in coordinated efforts to steal competitors' trade secrets. It also makes the inferential connection that those efforts implicated the alleged theft at issue in this case, but it does not actually describe or refer to the specifics of the trade secrets or "downloaded materials" and who at Uber knew about them. I do not find, based on the evidence currently available to me that Uber was obligated to produce the Jacobs Materials in response to this Order.

### B.     **Responsiveness to Waymo Discovery Requests**

#### 1.     **Interrogatories**

Neither of the Waymo interrogatories at issue should have turned up the Jacobs Materials themselves. Waymo argues that the facts in the Jacobs Documents are responsive to Common

---

related activities. But Uber has said that "[a]ll LiDAR-related servers were properly disclosed." Uber Response Br. at 2.

SPECIAL MASTER'S REPORT REGARDING    12
JACOBS MATERIALS
Case No. 3:17-cv-00939-WHA

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

34390\6356321.2

Interrogatory No. 8 and Expedited Interrogatory No. 6. But those *allegations* in the Jacobs E-mail and Jacobs Letter are clearly disputed by Uber. So, for example, when Common Interrogatory No. 8 demands that Uber describe "YOUR policies and practices" regarding document retention, *see* Rivera Ex. L at 11, Uber had no obligation to describe the policies and practices that an employee has accused Uber of creating and implementing. It is one thing to ask whether, in light of the accusations in the Jacobs Materials, Uber truthfully and completely responded to these interrogatories, but that is not the question before me, and it is not one that could be answered without the benefit of substantially more evidence than is available in this record right now.

### 2. RFP 29

Uber and Waymo agreed that Uber could satisfy its obligation to respond to this request by producing non-privileged documents "pertaining to the negotiation of the consideration for the Uber-Otto transaction, the IP acquired, and the satisfaction of certain closing conditions." Rivera Ex. E at 2.

The Jacobs E-mail does not pertain to any of the three topics to which the parties agreed. It discusses alleged clandestine activities designed to steal trade secrets and cover up evidence of the theft; there is no reference to the Ottomotto acquisition. I find that the e-mail and settlement agreement are not responsive to this request.

The Jacobs Letter, however, is responsive. While it does not pertain to the negotiations of the acquisition's closing conditions, the letter does pertain to the other categories of items Uber agreed to find and produce. Specifically, it refers to secret meetings between Mr. Kalanick and Mr. Levandowksi regarding the Uber-Ottomotto deal, the use of counter-surveillance techniques to keep those negotiations secret, and the price Uber paid for the company as a result of those negotiations. *See* ECF No. 2307-2 at 13. The Jacobs Letter also states that the training in Pittsburgh on employee use of ephemeral communications and non-attributable devices was specifically designed to prevent certain information about the acquisition (and, by implication, the meetings and negotiations) from becoming public or disclosed in litigation. *Id.* And it ends its discussion on the "Waymo" issue by asserting that the secrecy and alleged intentional destruction

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

of information support the conclusion that the acquisition was a sham designed to acquire Waymo's intellectual property (allegedly by theft). *Id.*

Uber argues that the Jacobs Letter is not responsive because "[i]t does not *reflect* negotiations" of the three items the parties agreed on. *See* Uber Response Br. at 10 (emphasis added). But the parties did not agree to limit Uber's obligation to documents that only reflected the negotiations at issue. Uber agreed to find and produce documents pertaining to negotiations of the consideration, IP to be acquired, and closing conditions. Moreover, Waymo notes that Uber did not limit its production in response to this request to only items that reflected the negotiations. *See* Waymo Reply at 4 (noting production of "calendar invites for meetings, emails discussing Levandowski's reputation, and emails discussing the value of the team Levandowski would bring over and the value of the acquisition."). The Jacobs Letter responds to RFP 29 as limited by the parties' agreement.

### 3. RFP 72

The parties agreed to narrow this request such that Uber would satisfy its obligation by locating non-privileged documents "regarding Anthony Levandowski's use of personal computers or other devices, to the extent it locates such documents." Rivera Ex. F at 1. Neither the Jacobs E-mail nor the Jacobs Letter refers to any policy, alleged or otherwise, specifically relating to Levandowski's use of personal computers or other devices. The Jacobs Letter could be fairly said to be responsive to RFP 72 as phrased without regard to the parties' agreement to narrow it. The letter discusses at length alleged policies regarding use of non-attributable devices to obscure information from discovery. But the agreement to limit Uber's obligation is key, and Waymo seems to acknowledge this, noting in its briefing that the Jacobs Materials' responsiveness is conditional. *See* Waymo Reply at 5 ("Although Uber points to the narrowing of this request, it does not dispute *that to the extent that Levandowski used non-attributable devices*, the Jacobs letter is responsive because it discusses policies advocating use of such non-attributable devices."). I find that the Jacobs Materials were not responsive to this request, as narrowed by the parties.

### 4. RFP 73

This request seeks documents and communications regarding information that was

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

SPECIAL MASTER'S REPORT REGARDING
JACOBS MATERIALS
Case No. 3:17-cv-00939-WHA

14

34390\6356321.2

allegedly stolen from Waymo by an Uber employee who took the information while employed at Waymo or Google. The Jacobs E-mail does not respond to this request because it does not directly refer to a theft of Waymo material by a former Waymo or Google employee. It instead refers broadly to the alleged theft of trade secrets from multiple competitors by a "Marketplace Analytics" team, and it mentions that some "SSG employees" were reassigned from Uber's ATG after this case began so they could carry out various alleged activities without being discovered. Because the definition Waymo used to define "Misappropriated Materials" does not include any particular Uber employee's theft of trade secrets and because the Jacobs E-mail does not address the backgrounds of the alleged thieves it does mention, I do not find that this document is responsive to RFP 73.

The Jacobs Letter, however, directly relates to the allege theft of Waymo's information by a former Waymo employee who later worked for Uber: Mr. Levandowski. It also references the files that Levandowksi downloaded, which was included in the definition of "Misappropriated Materials" used in this request. The Jacobs Letter also describes the Ottomotto acquisition as a sham designed to try to hide the alleged theft of Waymo's trade secrets. Uber's argument to the contrary ignores the specific Levandowski and Ottomotto references in the Jacobs Letter. *See* Uber Response Br. at 11. I find that the Jacobs Letter is responsive to RFP 73.

### 5. RFP 91

As with RFP 72, Waymo argues that the Jacobs Materials are conditionally responsive to this request: if Levandowski used the non-attributable devices described in those materials, then both would be responsive. That is true as far as it goes, but on the facts currently available I cannot make that determination. Instead, as Uber notes, the Jacobs Materials do not discuss Mr. Levandowski's "Authorized Devices," which are the subject of this request. The materials are therefore potentially relevant but not, as far as the available evidence shows, responsive to this request.

* * *

I find that based on the facts available to me at this time, the Jacobs E-mail and Jacobs Settlement are not responsive to any of Waymo's discovery requests. The Jacobs Letter, however,

is <u>responsive</u> to RFP 29 and RFP 73.

## C. Effect of Search Terms on Uber's Obligation to Produce

The remaining question, then, is whether Uber should have produced the Jacobs Letter in response to RFP 29 and RFP 73 despite the fact that it did not hit on any of the search terms Uber ultimately agreed to apply to the electronic files of the custodians Uber agreed to search.

Uber contends that a party has no obligation to produce information that does not respond to such agreed-upon search protocols. Waymo disagrees, arguing that resort to search terms and select custodians are a non-exclusive means to an end and no such agreement had been reached as of the date when Uber had an obligation to produce the Jacobs Letter. Neither party was able to provide case law directly on point, and the Special Master has been unable to locate any directly controlling the question here, either. A focus on the language and principles of the Federal Rules is therefore instructive.

Subject to some limitations, parties enjoy broad rights to discovery. *See* Fed. R. Civ. P. 26(b)(1). One of those limitations arises when a party would have to search through massive amounts of electronic information to find unknown documents or information responsive to a discovery request. The Rules were amended in 2006 to reflect that reality. *See* Fed. R. Civ. P. 26(b)(2)(B) ("A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost."). That change was specifically intended "to address issues raised by difficulties in locating, retrieving, and providing discovery of some electronically stored information." Fed. R. Civ. P. 26(b)(2)(B) advisory committee's note (2006). Under this rule, however, "a responding party should produce electronically stored information that is relevant, not privileged, and reasonably accessible, subject to the (b)(2)(C) limitations that apply to all discovery." *Id.*

Subject to the Rule 26 parameters on all discovery, a party is entitled to request documents in another party's "possession, custody or control." Fed. R. Civ. P. 34(a). A party responding to such a request must "then make a reasonable inquiry to determine whether the responsive documents exist[.]" *Ujhelyi v. Vilsack*, No. C 12-04282 JSW, 2014 WL 4983550, at *4 (N.D. Cal. Oct. 6, 2014); *see also, e.g., Rogers v. Giurbino*, 288 F.R.D. 469, 485 (S.D. Cal. 2012). That

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

SPECIAL MASTER'S REPORT REGARDING
JACOBS MATERIALS
Case No. 3:17-cv-00939-WHA

16

34390\6356321.2

requirement carries with it "an affirmative duty to seek that information reasonably available to it from its employees, agents, or others subject to its control." *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 189 (C.D. Cal. 2006) (quoting *Gray v. Faulkner*, 148 F.R.D. 220, 223 (N.D. Ind. 1992)) (internal brackets omitted).

Uber argues, that in some scenarios, reliance on search terms is enough to satisfy a party's obligation to find responsive documents. *See, e.g., T.D.P. v. City of Oakland*, No. 16-cv-04132-LB, 2017 WL 3026925, at *5 (N.D. Cal. July 17, 2017) (finding certain search terms adequate for needs of case). But I find there are two main reasons why an exclusive focus on the use of search terms is inappropriate for determining whether the Jacobs Letter should have been produced in response to RFP 29 and RFP 73.

First, the parties never reached an agreement to limit their obligation to searching for documents to only those documents that hit on agreed-upon search terms. *See* Waymo Ex. 5 (Uber counsel telling Waymo during search-term negotiations that "Waymo has an obligation to conduct a reasonable search for responsive documents *separate and apart* from any search term negotiations"). (Emphasis added)

Second, Uber needed no such help in finding the Jacobs Materials. They were not stowed away in a large volume of data on some server. They were not stashed in some low-level employee's files. Parties agree to use search terms and to look into the records of the most likely relevant custodians to help manage the often unwieldy process of searching through massive amounts of data. These methods are particularly called for when a party, instead of merely having to look for a needle in a haystack, faces the prospect of having to look for lots of needles in lots of haystacks. This needle was in Uber's hands the whole time.

Uber argues that it cannot be that the mere possession and knowledge of a relevant document must trigger a duty to scrutinize it and see if it matches any discovery requests. It asked at the December 12, 2017, hearing before the Special Master: Should every client be forced to instruct every one of its employees to turn over every e-mail and document to satisfy its discovery obligations to produce relevant and responsive documents? Must every head of litigation for every company regularly confronted with discovery obligations search their files for responsive

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

documents, notwithstanding any prior agreement with the requesting party to search for responsive documents by the use of search terms?

It is not easy, in the abstract, to determine where the line regarding the scope of discovery search should be drawn. But this is not a case involving mere possession of some document. The facts in this case suggest that Ms. Padilla knew of the Jacobs Letter at the time Uber had to respond to discovery requests calling for its production—it certainly was "reasonably accessible." Mr. Jacobs' correspondence alleged systemic, institutionalized, and criminal efforts by Uber to conceal evidence and steal trade secrets, and not just as a general matter but also specifically involving the evidence and trade secrets at issue in this case—maybe the largest and most significant lawsuit Uber has ever faced. Ms. Padilla, Uber's vice president and deputy general counsel for litigation and employment received the Jacobs Materials around the same time that discovery in this case was picking up and around the same time that the Court partially granted Waymo's requested provisional relief. Shortly after that, Uber told federal prosecutors about the Jacobs allegations and then later sent them a copy of the letter. It sent the materials to outside counsel, including lawyers at MoFo that Uber hired to investigate the allegations. Two separate Uber board committees got involved, including the committee overseeing *this case*. Uber paid Mr. Jacobs $4.5 million, and his lawyer $3 million, to settle his claims.

The Federal Rules obligate a party to produce known, relevant and reasonably accessible material that on its face is likely to be responsive to discovery requests. RFP 29 and RFP 73 were served on Uber on May 9, just a few days after Ms. Padilla received the Jacobs Letter on May 5. Uber was therefore obligated to conduct a reasonable inquiry into those requests (and all others it received) to see if it had documents responsive to those requests and produce non-privileged responsive documents.

//

//

## IV. CONCLUSION

The Jacobs E-mail and Jacobs Settlement are not responsive to the Court orders or to discovery requests that preceded their belated disclosure to Waymo. The Jacobs Letter is

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

SPECIAL MASTER'S REPORT REGARDING
JACOBS MATERIALS
Case No. 3:17-cv-00939-WHA

18

34390\6356321.2

responsive to Waymo's Request for Production No. 29 and Request for Production No. 73, and Uber should have produced it to Waymo in response to those requests.

DATED: December 15, 2017

_____
Special Master
John L. Cooper