QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:   (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>Plaintiff,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC,<br><br>Defendants. | CASE NO. 3:17-cv-00939<br><br>**PLAINTIFF WAYMO LLC'S SUBMISSION IN RESPONSE TO THE COURT'S ORDER REQUIRING FURTHER RESPONSE RE UNJUST ENRICHMENT (DKT. 2404)**<br><br>**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>Judge: The Honorable William Alsup<br><br>Trial Date: February 5, 2018 |

Waymo submits the following brief in response to the Court's Order Requiring Further Response Re Unjust Enrichment (Dkt. 2404), in which the Court asked two questions:

(1) "Do both sides agree that acquisition alone can be enough to support an unjust enrichment award under both CUTSA and DTSA?" and

(2) "Has Waymo preserved an unjust enrichment theory based on acquisition alone?"

## I. THE PARTIES AGREE THAT ACQUISITION ALONE CAN SUPPORT DAMAGES, INCLUDING AS MEASURED BY UNJUST ENRICHMENT.

The parties agree that acquisition alone can support a damages award, including in the form of unjust enrichment, under both CUTSA and DTSA. As Waymo has repeatedly noted, both the statutory text and case authorities citing the same indicate that acquisition alone is sufficient for a damages award. *See, e.g.*, Dkt. No. 2077 at 1-2; Dkt. No. 2230 at 1-2; Dkt. No. 2278 at 3-5; Dkt. No. 2351 at 11-12; and Dkt. No. 2397 at 1-4. Three days ago, in their Second Supplemental Brief on Jury Instructions, Defendants admitted that they "do not dispute that, based on the statutory text, damages (but not a reasonable royalty) could theoretically be awarded for acquisition alone." Dkt. 2398 at 1. Thus, the parties agree that acquisition alone can be enough to support an unjust enrichment award under both CUTSA and DTSA.

## II. WAYMO HAS PLED AND PRESERVED AN UNJUST ENRICHMENT THEORY BASED ON ACQUISITION ALONE.

Waymo has indeed pled and preserved that Defendants were unjustly enriched by their acquisition of Waymo's trade secrets based on acquisition alone, absent any disclosure or use. As an initial matter, Waymo's Corrected Supplemental Initial Disclosures provide that Waymo seeks unjust enrichment damages with no limitation to any particular theory of misappropriation. Dkt. 797-3. Similarly, in the Joint Pretrial Order, the parties jointly identified as an issue to be tried, "[w]hether Uber or Otto Trucking was unjustly enriched by *any* misappropriation of the alleged trade secrets by Uber or Otto Trucking, and if so, the amount of that unjust enrichment." Dkt. 2257 at 15 (emphasis added). Thus, the parties did *not* limit unjust enrichment to use and disclosure based misappropriation, but included acquisition as well. *See id.* at 13-14 (issues 4 and 5 to be tried include whether Uber misappropriated any of the alleged trade secrets by improperly acquiring them in violation of CUTSA or DTSA). In addition, Waymo has pled more specific unjust enrichment as

described below.

### 1. *Acquisition of Competitive Knowledge*

Merely "acquiring" a competitor's trade secrets can confer improper competitive benefits, which can be in some ways *more* damaging than "actual use." For example, general knowledge of a competitor's trade secrets, technological and research progress, or timing toward practical implementation of an idea or technology, can confer a tremendous advantage. A misappropriating company might acquire a competitor's trade secrets not to "use" them, but merely in order to evaluate that competitor's progress in developing similar technology. Acquiring this knowledge could be tremendously valuable to the misappropriator in a range of ways from setting research priorities to allocating resources and assessing capital requirements, but this very beneficial employment of knowledge about the state of the competitor's technology might fall short of actual "use" of the technology itself. *See* Dkt. 2251 at 7 (RTJI XV).

Waymo has consistently pled that Defendants have been unjustly enriched by their gain of a competitive advantage through acquisition of Waymo's trade secret information. In its Third Supplemental Response to Defendants' Interrogatory No. 13, Waymo stated that Defendants "have been unjustly enriched due to their misappropriation of Waymo's trade secrets." Ex. 1 at 53. Waymo then identified multiple ways in which Defendants had been unjustly enriched, including "the value that was paid (or will be paid) by Uber for Ottomotto and Otto Trucking (collectively, 'Otto')," which they valued internally at $592 million. Waymo explained that, for Uber, simply having access to the misappropriated trade secrets alone would be very beneficial and valuable while developing medium and long-range LiDAR:



Defendants do not dispute that Mr. Levandowski had access to Waymo's files at this time—as a result of both his ongoing employment at

-2-
WAYMO'S SUBMISSION IN RESPONSE TO ORDER REQUIRING FURTHER RESPONSE RE UNJUST ENRICHMENT (DKT. 2404)

Waymo, and his illicit downloads.

> Uber and Otto began negotiating the term sheet for the acquisition of Otto in January and February 2016, with the final term sheet executed on February 22, 2016. (UBER00017518-578; UBER00069043-064.) For at least some of this period, Mr. Levandowski was still an employee of Google. Because Otto had no products when Uber and Otto began negotiating (Qi Tr. 146:8-18; Poetzscher Vol. I Tr. at 129:18-20; Poetzscher Vol. II Tr. at 399:8-14; Ron Tr. at 69:9-70:24), the only things of value to be acquired by Uber were likely (1) the engineers that Uber acquired; and (2) Waymo's technology. Therefore, the misappropriated trade secrets represented a significant portion of the assets acquired by Uber, as well as the talents of the employees that would be engaged in connection with the acquisition.

Ex. 1 at 53-54. As described above, Uber recognized that, at a minimum, general knowledge of Waymo's LiDAR trade secrets would be extremely valuable to Uber, especially given that developing an autonomous vehicle was described as "basically existential" for Uber by Uber's then CEO. *Id.* at 56. Moreover, Waymo's cited John Bares' deposition testimony, which further reinforces that merely having access to Waymo's trade secrets in the future would benefit Defendants:



Ex. 3 at 179:14-180:12. As this testimony cited in Waymo's Interrogatory Response reveals, Uber saw value in acquiring the trade secrets *even if it never actually used them.* As further disclosed in Waymo's Response to Interrogatory No. 13, Defendants similarly saw value in acquiring the misappropriated trade secret at Tyto, which Otto acquired for ▓▓▓▓ within a month of the Uber-Otto acquisition. Ex. 1 at 54-55.

### 2. *Acquisition of Negative Trade Secrets And Negative Information Regarding Positive Trade Secrets.*

Acquiring knowledge of a negative trade secret can also confer benefits apart from "use." The California Court of Appeals hinted at such benefits:

> Entirely absent from E*Trade's discussion is the fact that a defendant may achieve any number of nonpecuniary benefits by stealing a trade secret. For example, the stolen secrets might reveal that a particular avenue of inquiry would be unsuccessful, thereby saving the defendant significant research and development efforts. But as E*Trade would have it, even where liability is proved and the defendant has enjoyed some nonpecuniary benefit as a result of the theft, if a plaintiff offers any sufficient evidence to show the defendant was unjustly enriched and the jury rejects the evidence, the trial court would have no discretion to award any monetary relief at all. The defendant would have benefitted by the plaintiff's efforts and ingenuity but the plaintiff could not be compensated. This would be inconsistent with the public policies underlying the law.

*Ajaxo Inc. v. E*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1312 (2010). The language used by the *Ajaxo* court hints at real benefits apart from "actual use" of a negative trade secret. For example, a misappropriating company might acquire a competitor's trade secrets, only to discover that that competitor's research had proven fruitless. Acquiring this knowledge about the trade secret could still be tremendously valuable to the misappropriator in a range of ways similar to those cited above, including with regard to setting research priorities, allocating resources, and assessing capital requirements. Moreover, the misappropriating company might benefit from unique insight into the prospects (or lack thereof) of competitors pursuing similar approaches. But, the misappropriator's very beneficial employment of knowledge about the state of the competitor's technology might not necessarily qualify as "actual use" of it. *See* Dkt. 2251 at 7 (RTJI XV).

Waymo has pled this type of benefit with respect to both negative trade secrets and negative aspects of "positive" trade secrets. For example, in its Third Supplemental Response to Defendants' Interrogatory No. 13, which is directed to the bases for Waymo's damages, Waymo identified the

-4-

unjust enrichment that Defendants enjoyed by acquiring Trade Secret 111—a negative trade secret. Waymo stated:

> With respect to Trade Secret 111, Defendants have likely saved at least one years' worth of development expenses. Trade Secret 111 covers the know-how associated with the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Waymo spent approximately one year working on this trade secret before deciding not to pursue it, and there is evidence that Uber was considering the same solution before acquiring Otto. (*See* UBER00072238.) However, Anthony Levandowski urged Uber not to pursue this design, and Uber did not. (Haslim Vol. III Tr. at 481:20-482:22.)

Ex. 1 at 57-58. This response identifies at least two categories of unjust enrichment accruing to Defendants—(1) one years' worth of development expenses which Defendants saved by avoiding a particular dead-end, and (2) Defendants' knowledge that Waymo was not pursuing this particular line of inquiry at all—each of which would be independently useful to Defendants. Each of these provides an independent basis for unjust enrichment based on acquisition alone, without any "actual use" of the underlying trade secret.

Similarly, Waymo has also described the benefits that Defendants accrued solely from acquisition of Trade Secret 25, which covers ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Waymo's Third Supplemental Interrogatory Response cites deposition testimony from Waymo's Dimitri Dolgov, who explained that Trade Secret 25 is tremendously valuable because "it captures the experience accumulated over the course of developing the system and trying different ideas and understanding, you know, *what problems we had to solve* and, you know, *which ones you don't have to solve*, and *which ones get subsumed by others*." Ex. 1 at 57 (citing Dolgov Indiv. Tr. at 153:7-12) (emphasis added). Thus, while Trade Secret 25 is not a negative trade secret, it encompasses aspects of negative trade secrets insofar as it identifies which ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ do *not* need to be solved, thereby saving the misappropriator years of working on unnecessary problems. *See id.* (citing Dolgov Indiv. Tr. at 152:15-17 (noting that Trade Secret 25 is the "product of the experience that the team has accumulated over the years of working on this technology")). Moreover, even if Defendants had not made "actual use" of the technology itself, the associated roadmap of which problems did and did not need to be addressed, or which were subsumed into others, was a highly valuable aid to

-5-

Defendants in assessing whether or not to pursue a similar approach, and in making any cost-benefit analysis relating to the same significantly more accurate. Thus, Defendants received significant benefits based on acquisition alone, including each of a practical technological benefit, knowledge about the state of Waymo's development, and a roadmap for evaluating whether and how to pursue a similar approach.

Finally, in Waymo's Response to Interrogatory No. 28 regarding how Defendants' misappropriation was a substantial factor in causing Defendants' unjust enrichment,[1] Waymo stated: "Uber is being unjustly enriched by the acquisition and use of Waymo's trade secrets in terms of saved development expenses. When considering whether to acquire Otto, Uber acknowledged that Mr. Levandowski ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ Ex. 2 at 8. As described above, Mr. Levandowski effectively offered Defendants the chance to benefit from trade secrets without "actual use" of the underlying technology. This misappropriation by acquisition alone is compensable by damages for unjust enrichment.

### 3. *Acquisition of Control.*

Acquiring knowledge of trade secrets can confer unjust benefits through the improper acquisition of control over that information. The California Supreme Court has recognized the value of control over such information:

> Although KMSL fails to provide a citation for that assertion, KMSL proceeds to quote language in Silvaco drawing a distinction between patent law and trade secret law. Silvaco explained, "The sine qua non of a trade secret ... is the plaintiff's possession of information of a type that can, at the possessor's option, be made known to others, or withheld from them, i.e., kept secret. This is the fundamental difference between a trade secret and a patent. A patent protects an *idea,* i.e., an invention, against appropriation by others. Trade secret law does not protect ideas as such. Indeed a trade secret may consist of something we would not ordinarily consider an *idea* (a conceptual datum) at all, but more a *fact* (an empirical datum), such as a customer's preferences, or the location of a mineral deposit. In either case, *54 the trade secret is not the idea or fact itself, but *information* tending to communicate (disclose) the idea or fact to another. Trade secret law, in short, protects only *the right to control the dissemination of information.*" (*Silvaco, supra,* 184 Cal.App.4th 210 at pp. 220–221, 109 Cal.Rptr.3d 27.) . . .

---

[1] Notably, in response to Defendants' Interrogatory No. 28, Waymo incorporated by reference its response to Uber's Interrogatory No. 13. Ex. 2 at 6.

-6-

> In conclusion, it is clear that if a patentable idea is kept secret, the idea itself can constitute information protectable by trade secret law. In that *56 situation, trade secret law protects the inventor's "*right to control the dissemination of information*" (*Silvaco, supra,* 184 Cal.App.4th at p. 221, 109 Cal.Rptr.3d 27)—the information being the idea itself—rather than the subsequent use of the novel technology, which is protected by patent law (*Cadence Design Systems, Inc. v. Avant! Corp., supra,* 29 Cal.4th at p. 222, 127 Cal.Rptr.2d 169, 57 P.3d 647). In other words, trade secret law may be used to sanction the misappropriation of an idea the plaintiff kept secret. (See, e.g., *Learning Curve, supra,* 342 F.3d at p. 721 [misappropriation of "concept" for noise-producing toy railroad track]; *Contour Design, Inc. v. Chance Mold Steel Co.* (D.N.H., Jan. 14, 2010, 09–CV–451–JL) 2010 WL 174315 [misappropriation of ergonomic mouse "concept"]. This is consistent with the proposition that "The sine qua non of a trade secret ... is the plaintiff's possession of information of a type that can, at the possessor's option, be made known to others, or withheld from them, i.e., kept secret." (*Silvaco,* at p. 220, 109 Cal.Rptr.3d 27)

*Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.*, 226 Cal. App. 4th 26, 53–56 (2014) (misappropriation involving use and improper acquisition). The *Altavion* court identifies real harm to a trade secret owner from loss of control over its property and suggests that corresponding real benefits accrue to the misappropriator from gaining such control, regardless of whether the misappropriator actually uses or discloses the underlying information. Similar concerns about "access to," not just "use of" a trade secret have animated at least one other decision within this district:

> In arguing that they have not "used" the computerized data which constitutes the trade secrets in this case, defendants mistakenly rely on *University Computing.* Unlike the misappropriation and attempted sale of a tangible product contemplated by *University Computing,* this case simply involves unlawful access to information about plaintiffs' customers. The Court has already found that the misappropriation occurred when defendants improperly acquired the TBR. *See* Summary Judgment Order at 12. Because defendants could have lawfully acquired the information through other avenues, the issue of heir intended use of die [sic] information in their Awards program is irrelevant. *See id.* That defendants never fully implemented the Awards program based on that access is immaterial to the royalty question. It is relevant, however, that defendants conceded that they referred to the TBR for approximately 400,000 high-use customers. It is this use of the data which triggers defendants' financial obligation. Because the central element of this case is access to the information, not the sale of data or the marketing of the Awards program, once defendants accessed the misappropriated TBR from plaintiffs' databases and examined that data they became obligated to pay for their use of that unlawfully acquired information.

*AT&T Communs. v. Pac. Bell*, No. C 96-1691 CRB, 1998 U.S. Dist. LEXIS 13459, at *6-7 (N.D.

-7-
WAYMO'S SUBMISSION IN RESPONSE TO ORDER REQUIRING FURTHER RESPONSE RE UNJUST ENRICHMENT (DKT. 2404)

Cal. Aug. 26, 1998), *subsequent history omitted*. Indeed, in *ATS Prods., Inc. v. Champion Fiberglass, Inc.*, another court in this district found that a plaintiff had pled sufficient facts to state a claim for misappropriation through acquisition, and in doing so highlighted that a trade secret owner's loss of control over its proprietary information could result in unjust enrichment to the misappropriator:

> When a party misappropriates a trade secret, the actual owner of the trade secret forfeits a degree of control over the information. *Silvaco*, 184 Cal.App. 4th at 220–21 ("The *sine qua non* of a trade secret ... is the plaintiff's possession of information of a type that can, at the possessor's option, be made known to others, or withheld from them.... Trade secret law ... protects ... the right to control the dissemination of information.") (emphasis omitted). It is possible for a party to suffer injury when another party gains control of trade secret information through improper acquisition. *See Cytodyn, Inc. v. Amerimmune Pharm., Inc.*, 160 Cal.App. 4th 288, 296 (2008) ("The statute allows a complainant to recover damages for the actual loss caused by a misappropriation, and to recover for the unjust enrichment caused by the misappropriation.").

No. C 13-02403 SI, 2014 WL 466016, at * 3 (N.D. Cal. Feb. 3, 2014). Thus, for example, a misappropriating company might acquire a competitor's trade secrets and not make "actual use" of that information. But merely having access to that information at will could immediately confer indirect benefits, such as increased valuation during a private capital raise or acquisition, whether on the assumption that the misappropriator *might* access the information or due to more precise information about the misapporpiator's standing *vis-à-vis* its competitors. As above, while the misappropriator's very valuable control over the competitor's technology may not necessarily qualify as "actual use" of it, *see* Dkt. 2251 at 7 (RTJI XV); nevertheless, it is unjust enrichment.

In Waymo's Response to Interrogatory No. 28, Waymo explained how it would be harmed (and Defendants, as competitors, would benefit) from this loss of dominion over its trade secrets. Specifically, Waymo described the exponentially greater danger of additional disclosure up to and including public disclosure of the trade secrets. For example, Waymo stated the following with respect to Trade Secret No. 2:

> *The risk that Defendants will disclose Trade Secret No. 2 is another substantial factor in causing Waymo harm*, although not one that Waymo can necessarily quantify. Defendants have already begun making regulatory filings that reference Waymo's trade secrets. Dkt. 27-31. And if Defendants continue using Waymo's trade secrets in their self-driving car endeavors, there would likely be additional

-8-

> filings disclosing other aspects of Waymo's trade secrets. Improper disclosure of trade secrets is, of course, a classic injury because such disclosure destroys the trade secret altogether. *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006) ("Public disclosure of a trade secret destroys the information's status as a trade secret.").

Ex. 2 at 9 (emphasis added). Waymo made similar disclosures with respect to Trade Secret Nos. 7, 9, 13, 14, 25, 90, and 111. *See id.* at 10, 11, 12, 13, 14, 15, 17.

### III. IF WAYMO DOES NOT PROVE MISAPPROPRIATION BY USE, WAYMO'S PLEADINGS ON USE WOULD STILL BE RELEVANT TO UNJUST ENRICHMENT DAMAGES FROM MISAPPROPRIATION BY ACQUISITION.

Defendants will undoubtedly argue that Waymo's pleadings with respect to unjust enrichment from misappropriation by acquisition are inextricably intertwined with its pleadings with respect to unjust enrichment from misappropriation by use. But even if true, this is irrelevant, as damages from improper acquisition alone will only become relevant if Waymo has failed to prove disclosure or use. In that unlikely event, the jury need not parse out what damages relate to misappropriation by use and what misappropriation is related to acquisition; rather, all of the misappropriation is related to improper acquisition---including actions which lie on the border between "acquisition" and "use."

The cases support this sometimes blurred line between "acquisition" and "use." For example, as quoted above, the district court in *AT&T* found on summary judgment that "the misappropriation occurred when the defendants improperly acquired the TBR" and stated that "this case simply involves unlawful access to information about plaintiffs' customers." 1998 U.S. Dist. LEXIS 13459, at * 6. Nevertheless, when it came time for the court to assess a royalty, the primary dispute concerned whether the defendants "used" the TBR data that constituted the trade secrets. *Id.* Slipping between referring to the defendants' unlawful acquisition as "access" and "use," the court concluded: "Because the central element of this case is *access* to the information, not the sale of data or the marketing of the Awards program, once defendants *accessed* the misappropriated TBR from plaintiffs' databases and *examined* that data they became obligated to pay for their *use* of that unlawfully *acquired* information." *Id.* at *6-7 (emphasis added). Similarly, here, there is little practical difference between "acquiring" knowledge of the substance of a negative trade secret or competitive advantage surrounding a trade secret, and making "actual use" of it. And thus, if

-9-

Waymo succeeds in showing the value of benefits to Defendants other than losses avoided, it can prove unjust enrichment damages.

Nevertheless, if Waymo cannot prove the value of that benefit or show proximate causation to Defendants' actions, it may *still* be entitled to a reasonable royalty based on unquantifiable or non-pecuniary benefits. Indeed, Waymo and Defendants appear to agree not only that (i) misappropriation by acquisition may lead to damages, *see supra* Section I, but also that (ii) a reasonable royalty is available if Defendants have benefitted from misappropriation but "the actual loss or benefit is difficult or impossible to quantify," Dkt. 2350. And as Waymo has demonstrated previously, there is neither support for nor a rationale underlying the idea that a reasonable royalty would *not* be available for misappropriation by acquisition alone. *See* Dkt. 2397 at 5-6; Dkt. 2351 at 11-13.[2]

DATED: December 18, 2017           QUINN EMANUEL URQUHART & SULLIVAN, LLP

By *[/s/ Charles K. Verhoeven](/s/ Charles K. Verhoeven)*
Charles K. Verhoeven
Attorneys for WAYMO LLC

---

[2] The parties' dispute regarding whether "unquantified" or "non-pecuniary" harm is *necessary to*, or merely *sufficient for* the award of a reasonable royalty is irrelevant here.