1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Charles K. Verhoeven (Bar No. 170151)
2     charlesverhoeven@quinnemanuel.com
      David A. Perlson (Bar No. 209502)
3     davidperlson@quinnemanuel.com
      Melissa Baily (Bar No. 237649)
4     melissabaily@quinnemanuel.com
      John Neukom (Bar No. 275887)
5     johnneukom@quinnemanuel.com
      Jordan Jaffe (Bar No. 254886)
6     jordanjaffe@quinnemanuel.com
    50 California Street, 22nd Floor
7   San Francisco, California 94111-4788
    Telephone:    (415) 875-6600
8   Facsimile:    (415) 875-6700

9   Attorneys for WAYMO LLC

10                       UNITED STATES DISTRICT COURT

11                    NORTHERN DISTRICT OF CALIFORNIA

12                         SAN FRANCISCO DIVISION

13                                          CASE NO. 3:17-cv-00939
    WAYMO LLC,
14                                          **PLAINTIFF WAYMO LLC'S RESPONSE**
                  Plaintiff,                **TO DEFENDANTS' BRIEF RE UNJUST**
15                                          **ENRICHMENT PER THE COURT'S**
           vs.                              **ORDER (DKT. 2409)**
16
    UBER TECHNOLOGIES, INC.;                Judge: The Honorable William Alsup
17  OTTOMOTTO LLC,
                                            Trial Date: February 5, 2018
18                Defendants.

19

20                                          **PUBLIC REDACTED VERSION OF**
                                            **DOCUMENT SOUGHT TO BE SEALED**
21

22

23

24

25

26

27

28

1    Waymo submits the following response to the December 18, 2017 Request for Response

2    from the Court, Dkt. 2409, requesting that Waymo respond to Defendants' Further Response

3    Regarding Unjust Enrichment "with respect to whether or not Waymo properly preserved a claim

4    for damages based solely on acquisition." *Id.*

5    Defendants admit that the statutory text of the CUTSA and DTSA allow unjust enrichment

6    damages to be awarded for trade secret misappropriation based on acquisition alone, but contend

7    that such scenarios are "not possible to envision." Dkt. 2405 at 1. Defendants' argument, however,

8    is based on the premise that any such unjust enrichment must be caused solely by the acquisition of

9    a trade secret and by no other conduct whatsoever. That fundamental premise is wrong and leads

10   Defendants to incorrectly conclude that Waymo has not properly preserved a claim for damages

11   based solely on acquisition. Waymo has preserved such a claim and is entitled to present it to the

12   jury.

13   **I.   DEFENDANTS' PREMISE THAT DAMAGES FOR AN ACQUISITION-BASED MISAPPROPRIATION CLAIM MUST BE CAUSED ONLY BY ACQUISITION IS**
14   **WRONG.**

15   According to Defendants, if Waymo prevails on a solely acquisition-based misappropriation

16   claim, Waymo may only recover unjust enrichment caused solely by the acquisition of Waymo's

17   trade secrets and not any use or other conduct. In Defendants' solely acquisition-based

18   misappropriation scenario, the trade secrets must be acquired and then somehow immediately placed

19   inside a figurative black box and never seen, heard from or thought of again. Any additional unjust

20   enrichment that was proximately caused by that acquisition is irrelevant, Defendants argue,

21   especially if it can be in any way characterized as involving any "use" of the trade secrets. But this

22   ignores the cases finding that acquisition alone can support damages and, in particular unjust

23   enrichment, as discussed in Waymo's Submission Regarding Unjust Enrichment. *See* Dkt. 2406

24   (discussing examples of competitive knowledge, negative information, and control); *see also, e.g.,*

25   *ATS Prods., Inc. v. Champion Fiberglass, Inc.*, 2014 WL 466016, at * 3 (N.D. Cal. Feb. 3, 2014)

26   ("It is possible for a party to suffer injury when another party gains control of trade secret

27   information through improper acquisition.").

28   Importantly, Defendants' arguments also ignore the fact that *both* the acquisition of a trade

-1-

secret *and* all other foreseeable consequences of the acquisition that proximately cause unjust enrichment support damages for a misappropriation claim solely based on acquisition.[1]   A jury is not precluded from considering the misappropriator's "use" of a trade secret—for example, if such use falls short of constituting misappropriation by use—as part of its damages analysis, especially if such "use" is a reasonably foreseeable consequence of the misappropriator's acquisition of the trade secret and would not have occurred but for the acquisition of the trade secret.   As discussed in previous briefs, misappropriation of trade secrets is an intentional tort, Dkt. 2232 at 6, Dkt. 2077 at 8-9, and damages awards in trade secret cases follow the tort law principles of reasonable foreseeability and proximate causation:

> The jury awarded only a fraction of the damages sought, but the question is whether it should have awarded anything above $18,000 since the additional damages are not based on the commercial exploitation of Dharma's trade secret, which is the usual form that misappropriation takes. But by refusing to negotiate a license agreement, MDBS forced Dharma to undertake measures of self-protection likely to irritate Unisys by jeopardizing Unisys's ability to perform its contract with the IRS. The loss of future business with Unisys was a foreseeable consequence of MDBS's misconduct, and so Dharma was entitled to seek damages for that consequence. Consequential damages, as long as they are reasonably foreseeable, are the norm in tort cases (with an irrelevant exception discussed in *Rardin v. T & D Machine Handling, Inc.*, 890 F.2d 24 (7th Cir.1989)), and the misappropriation of a trade secret is a tort; we are just surprised not to have found any case in which consequential damages were awarded for such a misappropriation.

*Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 658 (7th Cir. 1998).  *See also, e.g.*, *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1295 (9th Cir. 1994).

Damages awarded for an intentional tort do not need to be strictly categorized by the type of misappropriation—the damages only need to be a reasonably foreseeable result of the defendants' misconduct.  For example, in *Atl. Inertial Sys. Inc. v. Condor Pac. Indus.*, the defendants disputed whether they benefitted from drawings containing the misappropriated trade secrets submitted to

---

[1]   The statutory language of both CUTSA and DTSA provides only that the unjust enrichment must be caused by the misappropriation.  *See* Cal. Civ. Code § 3426.3(a) ("A complainant also may recover for the unjust enrichment *caused by misappropriation* that is not taken into account in computing damages for actual loss.") (emphasis added); 18 U.S.C. § 1836(b)(3)(B)(i) (limiting recovery to "damages for any unjust enrichment *caused by the misappropriation* of the trade secret that is not addressed in computing damages for actual loss") (emphasis added).

the U.S. government in order to obtain approval as a government supplier.  2015 WL 3825318, at

*7 (C.D. Cal. June 18, 2015).  The court found unequivocally that defendants obtained a benefit,

despite other contributing causes:

> Further, defendants plainly obtained a benefit from their use of plaintiff's trade
> secrets: a government contract to produce and repair gyroscopes. Defendants resist
> this conclusion, likewise on the basis that the government's approval of Condor II
> as a supplier was premised primarily on Condor II's willingness to become a
> supplier. Defendants effectively contend that the submission of the gyroscopic
> drawings was not the proximate cause of the government's approval decision. The
> Court finds no support in defendants' briefing or otherwise for the proposition that
> the benefit accrued by a defendant through the use of a misappropriated trade secret
> must accrue from the use of the trade secret in isolation. To the contrary, as the
> University Computing court explained, the reasonable royalty standard historically
> was used "to deal with the situation where the misappropriated idea is used either
> to improve the defendant's manufacturing process, or is used as part of a larger
> manufactured product." 504 F.2d at 536.

*Id.* at *7.

Courts applying these tort principles have looked beyond the type of misappropriation at

issue to other relevant conduct that was proximately caused by the misappropriation to assess

damages.  For example, in *AT&T Communs. v. Pac. Bell*, 1998 U.S. Dist. LEXIS 13459 (N.D. Cal.

Aug. 26, 1998), even though the Court found misappropriation under CUTSA based on improper

*acquisition* alone on summary judgment and characterized the case as "simply involv[ing] unlawful

access to information," *id.* at *6, the Court considered the evidence regarding the degree of the

defendants' *use* in connection with its assessment of a royalty:

> In arguing that they have not "used" the computerized data which constitutes the
> trade secrets in this case, defendants mistakenly rely on *University Computing.*
> Unlike the misappropriation and attempted sale of a tangible product contemplated
> by *University Computing,* this case simply involves unlawful access to information
> about plaintiffs' customers. The Court has already found that the misappropriation
> occurred when defendants improperly acquired the TBR. *See* Summary Judgment
> Order at 12. Because defendants could have lawfully acquired the information
> through other avenues, the issue of heir intended use of die information in their
> Awards program is irrelevant. *See id.* That defendants never fully implemented the
> Awards program based on that access is immaterial to the royalty question. It is
> relevant, however, that defendants conceded that they referred to the TBR for
> approximately 400,000 high-use customers. It is this use of the data which triggers
> defendants' financial obligation. Because the central **[*7]** element of this case is
> access to the information, not the sale of data or the marketing of the Awards
> program, once defendants accessed the misappropriated TBR from plaintiffs'

databases and examined that data they became obligated to pay for their use of that unlawfully acquired information.

*Id.* at *6-7.

As another example, in *Ajaxo Inc. v. E\*Trade Fin. Corp.*, after the first trial, the jury found misappropriation of Ajaxo's trade secret wireless trading technology by E\*Trade and Everypath. 135 Cal. App. 4th 21, 26 (2005) ("*Ajaxo I*").  The jury found that  E\*Trade misappropriated Ajaxo's trade secret by improperly disclosing it to Everypath without Ajaxo's consent in violation of an NDA, and Everypath misappropriated the trade secret by improperly acquiring and using it to develop technology that it sold back to E\*Trade.  *Id.*; *see also Ajaxo Inc. v. E\*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1301 (2010) ("*Ajaxo II*").  By the second trial on damages, Everypath was out of business and only E\*Trade remained.  *Id.* at 1302.  Although Ajaxo relied solely on an unjust enrichment measure of damages against E\*Trade, the discussion of the evidence presented reveals that it involved evidence relating to E\*Trade's use of the misappropriated trade secret technology developed by Everypath, even though E\*Trade had been held liable *solely* on a disclosure-based misappropriation theory:

At trial, Ajaxo's evidence of E\*Trade's unjust enrichment included evidence of the price at which it had offered to license its product and the price E\*Trade suggested in response. It also included the testimony of Ajaxo's expert, Walter Bratic, who opined that E\*Trade's misappropriation was responsible for 25 percent of the profit generated by all E\*Trade clients who opened accounts from September 1999 through December 2002, the period of time during which E\*Trade had presumably been using the misappropriated trade secrets. Bratic assumed that because wireless trading was one of the four primary business strategies E\*Trade had identified in its 10–K filings, one fourth of all new accounts opened during the relevant time period had been opened because E\*Trade was able to offer wireless trading. One fourth of the profit generated from all new accounts opened during the pertinent time period was about $301 million. Bratic did not consider E\*Trade's actual profits from wireless trading or the fact that no more than one half of 1 percent of E\*Trade clients ever traded on wireless devices. At the close of Ajaxo's case in chief, E\*Trade moved for nonsuit. The trial court denied the motion, concluding that there was enough evidence "to go to the jury" on the issue of E\*Trade's unjust enrichment.

…

The jury was instructed that the amount of E\*Trade's unjust enrichment was "the value of E\*Trade's benefit that would not have been achieved except for its misappropriation" less "the amount [of] E\*Trade's reasonable expenses...." The jury found that the value of the benefit conferred upon E\*Trade by the

misappropriation was $3,990,852 and that E*Trade's reasonable expenses were $6,411,761, resulting in a net loss of approximately $2.4 million.

*Id.* at 1302-03.  On appeal, the *Ajaxo* court upheld the trial court's exclusion of additional unjust enrichment evidence related to investments in Everypath on the basis that those investments represented benefits received by Everypath, not E*Trade.  *Id.* at 1305.

The same principles would apply here in the unlikely event that the jury is faced with evaluating unjust enrichment caused by misappropriation based solely on improper acquisition.  *See* Dkt. 2406.  As in *AT&T* and *Ajaxo II*, the relevant inquiry would be the value of Defendants' benefits that would not have been achieved except for its misappropriation.  Put another way, had Defendants not improperly acquired Waymo's trade secrets, would they have achieved that benefit?  The common sense answers to those inquiries likely extend beyond the black box of isolated acquisition that Defendants have conjured up.  Cases are rife with examples of defendants arguing, contrary to the law, that they have not misappropriated the asserted trade secret by "use" because (i) the defendant only employed the trade secret information in its internal experimentation and it did not result in a market product,[2] (ii) the defendant did not use *all* features, characteristics, or elements of the trade secret,[3] or (iii) the defendant's product differs in some respects from the from the trade

---

[2]  *See, e.g., 02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1072 (N.D. Cal. 2005) (upholding jury's finding of trade secret misappropriation, "the Court conclude[d] that internal experimentation with trade secret information not resulting in a market product can constitute use"); *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1197 (S.D. Cal. 2012) (denying summary judgment on trade secrets misappropriation claim and stating, "information may be improperly 'used' in that it is unlawfully acquired and then built upon or modified before being disclosed or benefit derived").

[3]  *See, e.g., InfoSpan, Inc. v. Emirates NBD Bank*, 2015 WL 13357646, at *5 (C.D. Cal. May 6, 2015) ("the Bank cannot avoid liability for misappropriation by allegedly taking a bundle of trade secrets and not using the entire bundle, but then selectively choosing which ones it would use. . . .  InfoSpan does not argue that the Bank used its SpanCash trade secrets to create a product with all the claimed unique features of SpanCash.  Instead, InfoSpan contends that it has presented sufficient evidence to show a genuine dispute as to whether the Bank used InfoSpan's trade secrets to research, develop, and/or modify four specific Bank products . . . The Court agrees . . . ."); *SkinMedica*, 869 F. Supp. 2d at 1197 ("Histogen argues it has not misappropriated the Bioreactor Method or Concentration System trade secrets because it does not use several of the claimed elements . . .  [T]his argument misunderstands the law on this point.  In the context of trade secret misappropriation, information may be improperly 'used' in that it is unlawfully acquired and then

---

secret.[4]  While that underscores the need for a jury instruction on misappropriation by use that addresses these issues, it also highlights the myriad ways that a defendant might "use" a misappropriated trade secret that is more than putting it in the so-called vault, but is less than using every element of the trade secret as claimed in its market product.  While many of those "uses" should correctly be found to be misappropriation by use under the law, there is still likely a wide spectrum of what is commonly referred to as use that would not be considered to be misappropriation by use.  Waymo is entitled to have the jury consider these fact questions if the situation arises.

## II.  WAYMO PRESERVED A CLAIM FOR DAMAGES BASED SOLELY ON ACQUISITION.

Starting from a flawed premise, Defendants' argument that Waymo has not preserved a claim for unjust enrichment based solely on acquisition improperly ignores relevant disclosures regarding unjust enrichment and other damages proximately caused by Defendants' improper acquisition.  Defendants would require any acquisition-based damages disclosure to be wholly disconnected from any discussion of any use of the trade secrets.  But, the bar Defendants are trying to set—requiring demonstration of unjust enrichment in the absence of *any evidence* of use—is too

---

built upon or modified before being disclosed or benefit derived. . . . [T]his scattershot attempt to disclaim use of various elements of the claimed trade secrets does not foreclose the possibility that Histogen's process was not substantially derived from the claimed trade secrets, even if it differed in specifics from the process described therein."); *GSI Tech., Inc. v. United Memories, Inc.,* 2016 WL 3035699, at *6 (N.D. Cal. May 26, 2016) (denying proposed partial use jury instruction that "GSI need not establish that defendants copied every element of GSI's trade secrets.  Use of any substantial portion of a trade secret constitutes misappropriation" as incorrect for that case but not disagreeing that it would be appropriate "in some circumstances.").

[4]  *Speech Tech. Assocs. v. Adaptive Commc'n Sys., Inc.,* 1994 WL 449032, at *10 (N.D. Cal. Aug. 16, 1994) (holding defendants liable on trade secrets misappropriation, "some of the technology used in the new products was different, many of the technical aspects, and most of the functional aspects of Prototype # 1 were incorporated into the revised Alltalks.  The incidental differences between Prototype # 1 and the redesigned Alltalks do not absolve defendants from liability for misappropriation of trade secrets."); *see also InfoSpan*, 2015 WL 13357646 at *5 ; *Verigy US, Inc. v. Mayder*, 2008 WL 564634, at *7 (N.D. Cal. Feb. 29, 2008) (granting preliminary injunction on trade secrets misappropriation claim, "[u]nder California law, minor variations in a product do not negate a claim for misappropriation of trade secrets.").

high.  The law does not require Waymo to present self-contained, wholly separate damages theories and disclosures, one stemming from use alone, and the other stemming from acquisition alone, without any overlap.  Indeed, the statutory language of CUTSA and DTSA's unjust enrichment provisions address only "misappropriation," not specific theories of liability, reflecting the overlap and fluidity between the evidence relevant to the different theories of liability.  Under the proper standard, as set forth in Waymo's Further Response Regarding Unjust Enrichment, Dkt. 2406, Waymo has preserved damages under an acquisition-based misappropriation claim in its Initial Disclosures, its Interrogatory Responses and the Amended Joint Pretrial Order.  *Id.*

> **A.**    **<u>Defendants Ignore Relevant Disclosures of Waymo's Acquisition Damages Theories in Waymo's Interrogatory Responses.</u>**

Defendants ignore the overwhelming evidence disclosed in Waymo's Interrogatory Responses that Defendants were unjustly enriched from their improper acquisition and use of the trade secrets—use which is relevant because, but for Defendants' improper acquisition of Waymo's trade secrets, it would not have occurred.  *See, e.g., Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 968-69 P.2d 1203 (1997) ("California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations. Under that standard, a cause in fact is something that is a substantial factor in bringing about the injury. The substantial factor standard generally produces the same results as does the 'but for' rule of causation which states that a defendant's conduct is a cause of the injury if the injury would not have occurred 'but for' that conduct. The substantial factor standard, however, has been embraced as a clearer rule of causation—one which subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact.") (internal citations omitted); *Bockrath v. Aldrich Chemical Co.*, 21 Cal. 4th 71, 79 (1999) ("The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical. Thus, 'a force which plays only an "infinitesimal" or

"theoretical" part in bringing about injury, damage, or loss is not a substantial factor', but a very minor force that does cause harm is a substantial factor. This rule honors the principle of comparative fault.") (internal citations omitted).

Contrary to Defendants' arguments, in Waymo's Response to Interrogatory No. 13 regarding damages, Waymo discloses unjust enrichment damages theories based on misappropriation by acquisition, describes acts upon which such theories could be based and provides various alternative measures of such unjust enrichment.  *See, e.g.*, Dkt. 2406-4 at 53-60.  For example, among other things, Waymo's disclosures include the following measures of unjust enrichment:

> "the value that was paid (or will be paid) by Uber for Ottomotto and Otto Trucking . . . the misappropriated trade secrets represented a significant portion of the assets *acquired* by Uber," *id.* at 53-54 (emphasis added);

> "the present value of the additional cash flows that Defendants will earn as a result of Uber's accelerated development of self-driving car technology," *id.* at 55;

> "the expected cost savings to Defendants from using Waymo's trade secrets in Uber's LiDAR systems," *id.* at 56; and

> "the expected cost savings due to reduced development expenses from using Waymo's trade secrets in Uber's LiDAR systems," *id.* at 57.

That some of these measures reference benefits to Defendants as a result of their *use* of the trade secrets does not mean that these disclosures do not *also* adequately disclose unjust enrichment based on *acquisition*.  In fact, Waymo's Responses to Interrogatory No. 28 identify multiple damages theories based on Defendants' improper acquisition, including:

> In addition to the value of the accelerated AV development, Uber is also being unjustly enriched by the *acquisition* and use of Waymo's trade secrets in terms of saved development expenses. When considering whether to acquire Otto, Uber acknowledged that Mr. Levandowski ███████████████████
> ████████████████████████████
> ████████████████████████████
> ████████████████████████████
> ██████████ Additionally, since Uber expected that the Otto acquisition would advance its AV development efforts, Uber's internal valuation of Otto, less an

-8-

amount that can be attributed to Uber's acquisition of a number of employees, can serve as a measure of its estimate of saved development expenses. Defendants' *acquisition*, use, and potential disclosure of Waymo's specific asserted trade secrets has been a substantial factor in causing Waymo's harm or Defendants' unjust enrichment, as described in more detail below.

Dkt. 2406-5 at 8 (emphasis added). Then, as to each asserted trade secret, Waymo discloses how "Defendants' *acquisition* and use of Waymo's Trade Secret . . . is a substantial factor in causing Waymo's harm or Defendants' unjust enrichment" in greater detail. *Id.* at 8-17 (emphasis added).

## B.   Defendants Ignore Relevant Disclosures of Waymo's Acquisition Damages Theories in the Amended Joint Pretrial Order.

Defendants' Response simply does not address the Amended Joint Pretrial Order, which identifies both acquisition-based misappropriation and unjust enrichment as issues for trial. Dkt. 2256-4 at 11-12. The Amended Joint Pretrial Order does not limit unjust enrichment to only certain types of misappropriation. *Id.* If Defendants believed that Waymo had not preserved the right to present a claim for damages, specifically unjust enrichment, to the jury on an acquisition-based misappropriation claim, Defendants were free not to agree to the inclusion of the following jointly identified factual issues that remain to be tried:

> 4.     Whether Uber misappropriated any of the alleged trade secrets by improperly acquiring, disclosing, or using any of the alleged trade secrets in violation of the DTSA or CUTSA.
> …
> 12.     Whether Uber was unjustly enriched by any misappropriation of the alleged trade secrets by Uber, and if so, the amount of that unjust enrichment.

Dkt. 2256-4 at 11-12. Indeed, when Defendants did not agree that a particular issue should be presented during trial, they noted their objection in the Amended Joint Pretrial Order, including their objection to the inclusion of "disclosing" in a footnote to item 4 above: "Uber disagrees that Waymo is entitled to trial on a disclosure theory." Dkt. 2256-4 at 11 n.12. Defendants also refused to join in the identification of reasonable royalty as an issue to be tried, which was identified as included solely on behalf of Waymo. *Id.* at 15 (Item 17). The issues to be tried are limited by the Court's order that "[t]he issues to be tried shall be those set forth in the joint proposed pretrial order[.]" Dkt.

-9-

1885 at 1.

**C.**   **The Court Has Already Denied Defendants' Motion to Strike Waymo's Initial Disclosures as Inadequate.**

Defendants' attacks on Waymo's Initial Disclosures are not well taken.  As set forth in Waymo's Opposition to Defendants' Motion to Enforce the Court's June 7, 2017 Order, Strike Waymo's Supplemental Initial Disclosure, and Preclude Damages Claims and Certain Witnesses, Waymo had very little damages-related discovery from Defendants at the time it made its Rule 26 initial disclosures and Waymo's damages disclosures were adequate under the circumstances.  *See* Dkt. 934.  Since that time, there has been extensive damages discovery in this case, including voluminous document discovery, lengthy interrogatories, numerous depositions, expert discovery and exhaustive Daubert briefing.  Defendants have had ample discovery regarding Waymo's damages theories.  Thus, not surprisingly, with the exception of specific evidence, the Court largely denied Defendants' Motion to Strike on November 2, 2017, stating:  "With the benefit of Waymo's full damages theory and the foregoing rulings, this order finds that no further relief is necessary under these circumstances to remedy any shortfalls in Waymo's initial disclosures."  Dkt. 2166 at 16.

In addition, the cases Defendants cite, none of which are trade secret cases, are unavailing. *See, e.g., Brandywine Commc's Tech., LLC v. Cisco Sys., Inc.*, 2012 WL 5504036, at *2 (N.D. Cal. 2012) (construing Rule 26(a)(1)(A)(iii) "in the patent-infringement context," specifically with respect to lost profits and reasonable royalty damages and the information that a patent holder should already know without the benefit of discovery); *Easton v. Asplundh Tree Experts*, 2017 WL 5483769, at *4 (W.D. Wash. Nov. 15, 2017) (excluding damages where "[a]t no point in this litigation did plaintiff quantify—even roughly—the amount of actual damages she suffered as a result of her layoff"); *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008) (finding plaintiffs who opt in to actions under the Fair Labor Standards Act must make Rule

-10-

1    26(a) damages disclosures).  To the extent Defendants' citation to *Hoffman* is intended to suggest

2    that Waymo could be precluded from seeking damages on its misappropriation by acquisition claim

3    without a finding of willfulness or bad faith, it is highly misleading.  That is not the law in the Ninth

4    Circuit.  In the Ninth Circuit, if preclusion, "in practical terms . . . amount[s] to dismissal of a claim,"

5    the district court must consider (i) whether  the alleged non-compliance involved willfulness, fault

6    or bad faith, and (ii) whether lesser sanctions are available.  *R & R Sails, Inc. v. Ins. Co. of Penn.*,

7    673 F.3d 1240, 1247 (9th Cir 2012).  Defendants have never claimed, because there is no evidence

8    supporting such a claim, that Waymo has acted with willfulness, fault or bad faith.

9

10            Finally, Defendants' citation to out-of-context, hypothetical deposition questions posed to

11   Waymo's now excluded damages expert could not be more irrelevant to whether Waymo has

12   preserved damages based solely on acquisition.   Waymo's Interrogatory Responses and the

13   Amended Joint Pretrial Order are clear that Waymo has preserved such a damages claim.  *See* Dkt.

14   2406-2 at 2–6, 8–9.

15

16

17   DATED:  December 19, 2017              QUINN EMANUEL URQUHART & SULLIVAN, LLP

18                                           By  */s/ Charles K. Verhoeven*
                                                 _____
19                                               Charles K. Verhoeven
                                                 Attorneys for WAYMO LLC
20

21

22

23

24

25

26

27

28

-11-