QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan Jaffe (Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC, | CASE NO. 3:17-cv-00939 |
| Plaintiff, | **PLAINTIFF WAYMO'S REPLY SUBMISSION TO SPECIAL MASTER COOPER REGARDING UBER'S OBLIGATION TO PRODUCE JACOBS LETTER AND RELATED DOCUMENTS** |
| vs. | |
| UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC, | |
| Defendants. | Trial Date:   February 5, 2018 |

1    As Waymo showed in its Opening Brief, the Jacobs documents are responsive to multiple document requests and Court orders. The facts set forth in the documents are responsive to multiple interrogatories. Waymo served a document request seeking documents regarding the "MISAPPROPRIATED MATERIALS." The Jacobs letter, which specifically references the Waymo litigation and theft of Waymo trade secrets, is responsive to this request. Similarly, Waymo served a request seeking documents relating to the negotiation of Uber's acquisition of Otto. The Jacobs letter, which discusses the negotiations between Travis Kalanick and Anthony Levandowski and that Uber acquired an eight-month old company for $680 million, is responsive to this request. The same is true of the other document requests, interrogatories, and Court orders identified by Waymo. Uber fails to substantively rebut any of this.

Uber tries to obscure the reality that the Jacobs documents are responsive to Waymo's discovery requests and various Court orders with a variety of excuses. These excuses do not justify Uber's failure to produce relevant, responsive documents. Uber has tried to create a sideshow by arguing that the Jacobs documents did not hit on any negotiated search terms and therefore did not need to be produced. In its responsive brief, however, Uber does not deny one key point: ***Uber knew about the documents***. There is no dispute that Ms. Padilla was aware of the Waymo litigation, received the Jacobs letter, and understood that the Jacobs letter included the allegation that Uber stole Waymo's trade secrets. (11/29/2017 Hr'g Tr. at 14:2-17:14.) There is also no dispute that Ms. Padilla shared the Jacobs letter with Uber compliance attorneys and Travis Kalanick (*id.* at 15:17-20, 48:1-49:5), or that the Board of Directors got the Jacobs letter. (*Id.* at 20:7-17.) Indeed, recently produced documents reveal that the Uber Board ████████ ████████████████████████████████████████████████ ████████████████████████████████████ making clear Uber's understanding of the overlapping issues in the Waymo and Jacobs matters. (Ex. 17.) There is also no dispute that Ms. Padilla and others at Uber intentionally chose not to disclose the Jacobs letter to the in-house attorneys managing this litigation. (11/29/17 Hr'g Tr. at 47:8-25.) Not one of the many cases Uber cites in its responsive brief holds that it is acceptable for a party to withhold a ***known, relevant document*** that is responsive to the other party's discovery requests. Not one. Thus,

setting aside the question of whether Uber's outside defense team knew about the Jacobs letter, there is no question and no dispute that *Uber*, the party to this litigation, knew about this document and its relevance to the Waymo litigation, but deliberately withheld it.

Further, although Uber and its counsel are withholding information that would provide the full picture of which MoFo and Boies Schiller attorneys knew of the existence of the Jacobs documents, his allegations against Uber, and Uber's Jacobs investigation, the information provided thus far has revealed that Uber's counsel's representations to the Court were half-truths at best. Uber's counsel represented that only two members of the MoFo trial team received the resignation email. But those two attorneys, Arturo Gonzalez and Eric Tate, were included on other emails about that document. And, two other MoFo trial team members—Sylvia Rivera and Wendy Ray—had communications about the resignation email and e-discovery. Moreover, Boies Schiller trial team members had communications about the Jacobs investigation in the same week that Uber chose to disclose Jacobs and his allegations to the U.S. Attorney, but not to Waymo. While it is undisputed that *Uber* knew about the Jacobs documents and their relevance to the Waymo litigation, there is also a lot of smoke suggesting Uber's outside counsel did too.

Uber also does not dispute that the parties **never** entered into an agreement under which the parties agreed that they each only needed to use search terms to try to locate responsive documents. Uber did not point the Court to any such agreement, and does not now identify one to the Special Master. No such agreement exists. To the contrary, as Waymo showed in its opening brief, the parties' course of conduct reveals that **both sides** expected that the parties' searches for responsive documents would not be limited to using the negotiated search terms and indeed both parties produced responsive documents that were located without the use of the negotiated search terms. Although Uber cites to meet and confer correspondence and notes from telephonic meet and confers, it does not address these points. The negotiated search terms do not excuse Uber's failure to produce these responsive documents.

I. **UBER FAILS TO REBUT THAT THE JACOBS DOCUMENTS WERE RESPONSIVE AND SHOULD HAVE BEEN PRODUCED IN RESPONSE TO SEVERAL WAYMO RFPS.[1]**

   A. **The Jacobs Letter and Resignation Email Are Responsive to Multiple Document Requests.**

As Waymo showed in its opening brief, the Jacobs letter and resignation email are responsive to Waymo's document requests. Uber's initial response to questions as to whether the Jacobs documents should have been produced is that they did not hit on any negotiated search terms. Uber now contends that the documents are not called for by Waymo's document requests at all or that Waymo's requests were somehow objectionable in a way that Uber did not raise during discovery. Uber's arguments lack merit.

   1. The Jacobs Letter and Resignation Email Are Responsive to RFP 73 Because They Discuss Theft of Waymo Trade Secrets.

Uber does not dispute that the Jacobs letter explicitly references the theft of Waymo trade secrets, saying, among other things, that "[t]hese facts corroborate Google's legal theory in pending litigation that Otto was simply a shell company whose sole purpose was to dissemble Uber's conspiracy to *steal Waymo's intellectual property*." (Ex. 1, at 13 (emphasis added).) Nor does Uber dispute that the resignation email also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 2.) Instead, Uber argues that the definition of "misappropriated materials" is limited to materials stolen by former Google/Waymo employees, which are not explicitly referenced in the Jacobs documents. This is not credible. The Jacobs letter says that the facts alleged therein "corroborate Google's theory in the pending litigation . . . " (Ex. 1, at 13.) Google's/Waymo's theory in the pending litigation is that former employees stole trade secrets and then left to join Uber. *Jacobs says the facts corroborate that theory.* And who would be stealing Waymo trade secrets for Uber if not former employees? Only a party looking to evade discovery would concoct an explanation such as this and the Special Master and Court should not give it credence.

---

[1] Uber argues that it is not obligated to produce the Jacobs documents simply because they are generally relevant to the case. Waymo did not argue that Uber was obligated to do so. Rather, Uber was required to produce these documents because they are responsive to several discovery requests and Court orders.

Further, at the December 4 hearing, Uber argued that this request was "way overbroad . . . you could drive a truck through it." (12/4/17 Hr'g Tr. 35:7-13.) But, while Uber objected to the request as overbroad, when the parties met and conferred about RFP No. 73, ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." (Rivera Ex. E, at 6.)

### 2. The Jacobs Letter Is Responsive to RFP No. 29 Seeking Documents and Communications Regarding Negotiations Over Uber's Acquisition of Ottomotto.

Uber does not dispute that the Jacobs letter states that Ed Russo provided a "fictionalized account" of two CEOs secretly meeting to discuss an acquisition. (Ex. 1, at 13.) It is also undisputed that Jacobs surmised that Russo was talking about the negotiations between Travis Kalanick and Anthony Levandowski regarding Uber's acquisition of Otto (*id.*), and that Russo confirmed that he told the group to whom he made the presentation that he was talking about Kalanick and Levandowski. (11/28/17 Hr'g Tr., 121:19-22.) Hence, the Jacobs letter is responsive to RFP No. 29 because it discusses the negotiations between Kalanick and Levandowski that led to the Otto acquisition. Uber did seek to narrow this request after Uber had the Jacobs letter in its possession to "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" (Rivera Ex. E.) But that does not make the Jacobs letter non-responsive as Uber contends. The Jacobs letter is responsive to RFP No. 29 as narrowed. It references the negotiations between Kalanick and Levandowski, which undoubtedly included discussions about consideration and the IP acquired. Certainly, Uber does not say otherwise. Moreover, Uber produced many documents relating to the negotiations that do not fall directly into these three categories. Examples include calendar invites for meetings, emails discussing Levandowski's reputation, and emails discussing the value of the team Levandowski would bring over and the value of the acquisition. In other words, Uber rightfully produced negotiation documents that are not strictly about ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. This shows that Uber did not read the narrowed RFP 29 as narrowly as it now does. The Jacobs letter should have been produced.

3. <u>The Jacobs Letter and Resignation Email Are Responsive to RFP No. 72 Because They Discuss Policies for Employees' Use of Other Devices While Working at or for Uber.</u>

Uber does not dispute that the Jacobs letter discusses Uber's instructions to use non-attributable devices for work, and specifically that SSG members traveled to Pittsburgh to educate the Uber ATG team on use of ephemeral communications, non-attributable devices, and false attorney-client privilege designations to prevent discovery after Levandowski joined ATG and was using non-Uber-issued computers in connection with his work there. (Ex. 1, at 13.) Nor does Uber dispute that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (Ex. 2.) While Waymo agreed to narrow this request after Uber had already failed to produce the Jacobs documents to Levandowski's use of a personal computer *and other devices*, the Jacobs documents are still responsive. Although Uber points to the narrowing of this request, it does not dispute that to the extent that Levandowski used non-attributable devices, the Jacobs letter is responsive because it discusses policies advocating use of such non-attributable devices.

4. <u>The Jacobs Letter and Resignation Email Are Responsive to RFP 91 Because They Refer to the Use of Non-Attributable Devices.</u>

Uber does not dispute that both the Jacobs letter and resignation email refer to the use of non-attributable devices. As Waymo argued in its opening brief, to the extent Levandowski used non-attributable devices, both documents would be responsive to this request. Uber contends that the Jacobs documents do not mention Levandowski authorized devices, and that there has never been evidence that Levandowski used non-attributable devices. This is a circular argument. Because Uber withheld the Jacobs document and the use of non-attributable devices by Uber, Waymo had no reason to take discovery from Levandowski or anyone else as to whether Levandowski ever used a non-attributable device. Notably, Uber does not submit a declaration saying that he never did.[2] If he did, the Jacobs documents are responsive to RFP 91.

---

[2] On December 4, Uber disclosed an "inventory" of non-attributable devices. (Exs. 18, 19.) But it noted that the inventory was based on information "developed to date," and there is no indication of whether that is a current inventory or that it reflects all non-attributable devices ever used by Uber employees. If it is only a current inventory, then it is not surprising that Levandowski is not on the list. Waymo has not yet had the opportunity to take discovery on this issue, and Uber refuses to provide a narrative description of the results of its investigation into the extent of use of non-attributable devices by Uber.

-5-

### 5. Uber's Remaining Arguments About Waymo's Document Requests Are Meritless.

Uber's other arguments regarding whether the Jacobs documents are responsive should be rejected. Initially, Uber complains about the definitions in Waymo's requests. (*Id.* at 6.) For example, Uber claims that Waymo's definition of "DOCUMENTS" is overbroad. But Uber never made this objection previously so it was waived. (Rivera Ex. A); *Amatrone v. Champion*, 2017 WL 1064976, *2 (N.D. Cal Mar. 21, 2017) (slip copy) ("To the extent that Plaintiffs now offer a different reason for their failure to respond . . . Plaintiffs waived that objection by failing to make it in their responses.") Further, even if the definition of "DOCUMENT" was overbroad, that does not mean that Uber did not have an obligation to produce responsive documents. Regardless of the definition, the Jacobs letter is obviously a document. Uber does not, nor could it, credibly claim otherwise. The same is true of Uber's belated objections to Waymo's definition of "COMMUNICATIONS."[3]

Uber also cites case law that is inapplicable to this situation. (Uber Resp. Brief, at 4-6.) The cited cases arise out of motions to compel and therefore are procedurally distinguishable. Those cases address whether a party should be compelled to produce a document or category of documents. That is not the issue before the Special Master here. The issue here is whether these documents that have now been produced should have been produced earlier.

Uber's cited cases also repeat the standard in Rule 34 that a request for production must be reasonably particular. Just because Uber has voluminous documents regarding the negotiation of the Otto acquisition, however, does not make a request for all such documents not reasonably particular. Moreover, whether Waymo's document requests are reasonably particular is now moot because Uber already stated objections where it had them, and the parties met and conferred and

---

[3] And as Uber recognizes in a footnote, Uber's definitions of "DOCUMENTS," "COMMUNICATIONS," and "REGARDING" are equally broad. (Uber Resp. Brief, at 8 n.1; Ex. 24 (Uber giving DOCUMENTS, for example, the "broadest possible meaning"). Uber argues that the fact that it used broad definitions does not "excuse" Waymo from purportedly violating the Federal Rules by using broad definitions. (Uber Resp. Brief, at 8.) This makes no sense. Uber is apparently claiming even though it also used broad definitions in its document requests, it is not obligated to produce responsive documents because Waymo's definitions are broad. Further, the cases Uber cites for this proposition are not relevant. They address the situation in which a party tries to excuse non-disclosure on the other side's non-disclosure. That is not the situation here.

-6-

1  reached agreement on the scope of the requests.  In any event, as shown above, the Jacobs letter
2  and resignation email are responsive to Waymo's document requests, even as narrowed by the
3  parties.  Finally, the cases Uber cites do not address this situation where a specific, responsive
4  document is identified as having been withheld.  And, not one of those cases holds that it is
5  acceptable to withhold a known, responsive document.

6      B.      **<u>The Search Protocol Did Not Limit the Parties' Obligations to Using Search Terms.</u>**

It is undisputed that the issue of search terms is not relevant to Uber's obligation to locate and produce hard copy versions of the Jacobs letter or resignation email.  An electronic search protocol is irrelevant to locating hard copy documents.  Although Waymo asked whether there were hard copies of the Jacobs letter or resignation email a week ago, Uber has not responded and does not address this point in its responsive brief.  Waymo cited in its opening brief the evidence suggesting that there are likely hard copies of these documents.  (Waymo Opening Brief, at 5-6 (citing Ms. Padilla's testimony).)

With respect to electronic copies of the documents, the fact that the Jacobs letter and resignation email would not have hit on negotiated search terms does not excuse Uber's failure to produce these known documents.  In a meet and confer last week, the Special Master indicated that he thought it was important whether the parties entered into an agreement that their searches would be limited to the use of the negotiated terms.  Uber nevertheless does not dispute that the parties **<u>never</u>** entered into an agreement under which the parties agreed that they each only needed to use search terms to try to locate responsive documents.  Uber does not point to any such agreement.  There isn't one.  To the contrary, **<u>both parties</u>** expected that the other side would not limit its searches to the negotiated search terms and **<u>both parties</u>** did not limit their searches for responsive documents to documents hitting on negotiated search terms.  Uber does not deny that its counsel warned Waymo that: "***Waymo has an obligation to conduct a reasonable search for responsive documents separate and apart from any search term negotiations***."  (Ex. 5 (7/20/17 Email from M. Pritt) (emphasis added)); *see also* (Ex. 4 (7/6/17 Email from M. Pritt)).  Nor does Uber dispute that on multiple occasions, Waymo wrote that it was conducting searches that went

-7-
WAYMO'S REPLY SUBMISSION TO SPECIAL MASTER COOPER

beyond the negotiated search terms, such as saying "[w]e conducted a reasonably diligent search in response to Defendants' document requests using appropriate search terms, *as well as additionally searching for responsive documents in various custodial and non-custodial repositories without the use of electronic search terms*."  (Ex. 6 (7/25/17 Letter from A. Roberts to M. Pritt) (emphasis added)); Dkt. 1090; (Ex. 7 (8/8/17 J. Nardinelli Email)).  Uber also does not dispute that Waymo's counsel made representations like this by phone.  And, Uber does not dispute that Uber itself did not limit its searches for responsive documents to using the negotiated search terms, having produced documents that do not hit on search terms, such as the Board of Directors meeting minutes, and searching beyond custodial emails.  (UBER00101507, UBER00101505); (Ex. 8 (6/14/17 Email from A. Roberts)); (Ex. 9 (7/3/17 Email from A. Roberts to E. Takashima); (Ex. 10 (Attachment to 7/3/17 Email from S. Rivera)).  All of this demonstrates that the parties' agreement and course of conduct was that they would agree on a set of negotiated terms, but that did <u>not</u> absolve the parties of the obligation to search for responsive documents using other means or to produce known, responsive documents.  Uber does not even try to show otherwise.

Rather than contest this history, Uber cites to various other statements in the parties' correspondence and meet and confers, none of which are inconsistent with the above, undisputed statements.  For example, as it did at the December 4 hearing, Uber cites to an August 8 email from Jeff Nardinelli, arguing that Waymo took the position that searches were limited to the agreed terms.  (Ex. 7; Rivera Ex. 10.)  As Waymo pointed out in its opening brief, that is incorrect.  Instead, in that email, Mr. Nardinelli wrote to Max Pritt that Mr. Nardinelli's responses were "inline in bold."  (Ex. 7.)  Then, in those inline responses, Mr. Nardinelli wrote, regarding RFP 165, "[i]n addition to running the terms agreed to by the parties over the list of custodians agreed to by the parties, Waymo is additionally searching for documents sufficient to show the amount and timing of all payments made to employees under the Project Chauffeur bonus program."  (Ex. 7.)  And, as to RFP 166, Mr. Nardinelli wrote, "Waymo has produced responsive documents located after talking with HR personnel and will further produce all responsive documents located by running the terms agreed to by the parties over the list of custodians agreed to by the parties."

1 (*Id.*)  Uber ignores this altogether.

2  Uber also cites correspondence from the parties' first week of search term negotiations, 3 arguing that during a July 1 meet and confer, Mr. Nardinelli said that there should be a 4 presumption that if the parties used the agreed upon search terms, the searches would be sufficient. 5 (Uber Resp. Brief, at 13.)  Uber, however, relies on its counsel's own notes from that meet and 6 confer and still does not quote Mr. Nardinelli's full statement: "How would this affect challenges 7 to productions in response to RFPs after we agree on these terms and custodians?  ***Would we still*** 8 ***be able to challenge a production on a given RFP?  I don't think we necessarily want to give up*** 9 ***our right to challenge***, but it seems like there should at least be a presumption that if we use the 10 agreed upon search terms and custodians that the production is sufficient."  (Brimer Dec., Ex. A) 11 (emphasis added).  Uber also ignores that this was the parties' very first discussion about whether 12 they would exchange search terms.  No specific terms of an agreement were proposed on that call, 13 and none were agreed to.  The parties never entered into an agreement that there was a 14 "presumption" that a production was sufficient, or that the opposing party could not challenge a 15 production.

16  Similarly, Uber points to a July 7 meet and confer and says that, according to Uber's 17 counsel's notes, Andrea Roberts stated that Waymo wanted to reach agreement on the 18 "boundaries" of discovery.  (Uber Resp. Brief, at 13.)  However, the notes Uber relies on reveal 19 that Ms. Roberts was referring to a statement in Mr. Pritt's email indicating that *Uber* would be 20 demanding more searches of Waymo.  (Brimer Dec., Ex. C.)  Waymo wanted an understanding of 21 the full scope of the searches that *Uber* would demand Waymo conduct.  At no point did Waymo 22 ever say its searches for responsive documents would be limited to Uber-proposed search terms. 23 Nor would that make any sense.  Uber continued to serve requests for production on Waymo well 24 after proposing search terms.  Waymo still responded to those later-served document requests and 25 searched for and produced responsive documents, even if the negotiated search terms were not 26 directed at those requests.  Had Waymo not done so and pointed to the negotiated search terms as 27 an excuse, Uber surely would have complained.

28  Uber also argues that Waymo never took issue with the non-custodial sources that Uber

-9-

searched. (Uber Resp. Brief, at 15.) It is unclear what the relevance of this is. But, based on Uber's productions and the parties' meet and confer discussions, Waymo did not have reason to believe that Uber was not searching appropriate non-custodial sources. Since Waymo had no idea of the existence of the Jacobs letter, how could Waymo have known that Uber was withholding it?

Lastly, Uber cites case law supporting using search terms to search ESI. (Uber Resp. Brief, at 12.) This law has no relevance here. Indeed, Waymo does not dispute that search terms can be an effective way to search for responsive documents. That is why Waymo suggested negotiating an ESI Order in the first place. But that does not mean that searches for responsive documents were strictly limited to using the negotiated search terms. As demonstrated above, and as is undisputed by Uber, there was no such agreement. Thus, the fact that the Jacobs letter and resignation email—both ***known documents***—did not hit on negotiated search terms is no excuse for withholding the documents.

### C. **The Jacobs Letter and Resignation Email Were Known to Uber and Its Counsel.**

As Waymo explained in its opening brief, search terms are useful to help parties search large volumes of ESI to find responsive documents; they do not obviate a party's discovery obligations once responsive documents are already found. Here, there is no dispute that the Jacobs letter and resignation email were already found; they were known to Uber and its counsel. Waymo laid out the evidence supporting this point in its opening brief, and Uber did not respond. (Waymo Opening Brief, at 10-11.)

In addition to the facts shown in Waymo's opening brief, Waymo has learned more about the extent of Uber's counsel's knowledge through the WilmerHale communications log. According to the log, MoFo attorneys were having frequent communications with Uber and Wilmer about the Jacobs investigation in the days and weeks prior to Uber receiving the May 5 Jacobs letter. (Ex. 20.) Although counsel's representations to the Court left the impression that MoFo's involvement in the investigation ended on May 4, before the Jacobs letter was received, the Wilmer log shows continued communications into June 2016. The Wilmer log also reveals the names of additional MoFo attorneys involved in these discussions who were not previously

disclosed, Joshua Hill and Sue Sedgwick.  (*Id.*)  Waymo also learned that Karen Dunn and Ed Takashima from Boies Schiller discussed the Jacobs investigation with Uber and Wilmer in late June 2016.  According to the log, the documents themselves were not discussed.  (*Id.*)  That is of no matter because if Wilmer, Uber and outside counsel were discussing Jacobs' allegations and investigation, it should have been obvious to outside counsel that there may be documents laying out those allegations.  In any event, Boies Schiller's involvement was right around the time that Uber voluntarily decided to disclose Jacobs and his allegations to the U.S. Attorney—but not Waymo—and just a few days before Ed Takashima proposed on the parties' July 1 meet and confer that the parties exchange search terms.  (Brimer Dec., Ex. A.)

The log that MoFo served on December 10 further reveals that the resignation email was known to members of the MoFo trial team, including Arturo Gonzalez, Sylvia Rivera, and Wendy Ray.  (Ex. 21.)  Indeed, according to the log, Mr. Gonzalez and Mr. Tate, who received the resignation email, were on multiple emails regarding that email.  And, Ms. Rivera and Ms. Ray were on multiple communications about the resignation email as well.  (*Id.*)  According to the log, Ms. Rivera and Ms. Ray were involved in communications about "legal advice and work product regarding Uber's ediscovery systems."  (*Id.*)  And, the Special Master should be aware from having overseen months of meet and confers in this case that both Ms. Rivera and Ms. Ray handled defensive document production issues in this case, and Ms. Rivera seemed to be primarily responsible for that portion of the case.  What could these MoFo defense team members have been discussing which related to the resignation email *and* e-discovery?  It certainly looks like they were discussing how to avoid disclosure of the resignation email in e-discovery.  Indeed, when the parties ultimately agreed to exchange the search terms that they used on July 3, Ms. Rivera circulated Uber's initial set of terms, which did not include "Waymo" as a search term, and only searched for emails with the word "Otto" through August 24, 2016.  (Ex. 10.)  Put another way, Uber's outside litigation counsel provided search terms that would not hit on the Jacobs documents, and those search terms served as the starting point for the parties' negotiations.

Waymo also notes that the outside counsel communication logs only reveal <u>written</u> communications; Uber has not disclosed the extent to which defense counsel orally communicated

about the Jacobs documents or investigation. Given Uber's undisputed knowledge of these documents, however, they should have been produced.

## II. THE INFORMATION IN THE DOCUMENTS AT ISSUE SHOULD HAVE BEEN DISCLOSED IN RESPONSE TO INTERROGATORIES.

The information disclosed in the Jacobs letter and resignation email is responsive to Common Interrogatory No. 8 and Expedited Interrogatory No. 6. Initially, as to both, Uber argues that the interrogatories call for *facts*, not documents. The facts set forth in the Jacobs documents are responsive to both interrogatories. Thus, even if Uber was not required to cite to the documents in the interrogatory responses, Uber was required to disclose the facts therein. It did not. Of course, had Uber responded acknowledging the facts disclosed in the Jacobs letter, that would have allowed the parties to pursue them during fact discovery, as opposed to in a rushed manner after a second extension of the trial date.

### A. The Facts in the Jacobs Documents Are Responsive to Common Interrogatory No. 8 Seeking Policies and Practices With Respect to the Retention and/or Destruction of Documents.

Uber does not dispute that the Jacobs letter includes allegations about policies for destruction of documents. Uber argues that these facts are not responsive to the interrogatory because the allegations are untrue. Uber does not cite *any* evidence to support this. It does not submit any declarations or cite any witness testimony in support of the assertion that the statements in the Jacobs letter about policies and practices with respect to retention and/or destruction of documents "do not reflect Uber's actual policies and practices." (Uber Resp. Brief, at 5.) Moreover, Uber does not dispute that Uber employees use ephemeral communications and non-attributable devices for business purposes. (Exs. 14, 17.) The policies and practices with respect to retention and destruction of ephemeral communications or documents on non-attributable devices are responsive to this interrogatory, and neither are addressed in Uber's response.

### B. The Facts in the Jacobs Documents Are Responsive to Expedited Interrogatory No. 6 Seeking Uber's Efforts to Preserve Evidence Relevant to This Case.

Again, Uber does not dispute that the Jacobs letter describes systems set up for the purpose

of destroying evidence.  Information about those systems is responsive to Uber's response regarding its efforts to preserve evidence relevant to this case.  Uber argues that the Jacobs documents are not called for by this interrogatory because it asks about document preservation for <u>this case</u>, and Jacobs does not allege failure to preserve documents in this case.  (Uber Resp. Brief, at 4.)  But, he does.  Jacobs alleges: "Henley and Clark implemented this program of ephemeral and encrypted communications for the express purpose of destroying evidence of illegal or unethical practices to avoid discovery in actual or potential litigation" (Ex. 1, at 6); "Clark and Henley directly instructed Jacobs to conceal documents in violation of Sarbanes-Oxley by attempting to 'shroud' them with attorney-client privilege or work product protections" (*id.*); "Clark taught the ThreatOps team that if they marked communications as "draft," asked for a legal opinion at the beginning of an email, and simply wrote "attorney-client privilege" on documents, they would be immune from discovery" (*id.* at 6-7); "By storing this data on non-attributable devices, Uber believed it would avoid detection and never be subject to legal discovery. This is because a standard preservation of evidence order typically focused on Uber work laptops, Uber networks, and Uber mobile devices" (*id.* at 7).  Jacobs clearly alleges: "Clark and Henley's directives described above ***specifically implicate ongoing discovery disputes, such as those in Uber's litigation with Waymo***."  (*Id.* at 9) (emphasis added).  Further, Waymo learned that some custodians used Wickr and other ephemeral communications (Ex. 14), but Uber's interrogatory response does not disclose that.  Waymo also learned from recently produced documents that ███████████████████████████████████████████████████ (Ex. 22), and ███████████████████████████████████ (Ex. 23).  This suggests that they were likely aware of the shadow systems disclosed in the Jacobs letter and used them.  To the extent that their use did not comply with Uber's litigation hold, that should have been disclosed in response to this interrogatory.

III. **THE JACOBS LETTER WAS RESPONSIVE AND SHOULD HAVE BEEN PRODUCED PURSUANT TO THE COURT'S ORDERS.**

The April 14 resignation email and May 5 Jacobs letter should have been produced in response to this Court's orders, specifically the March 16 Expedited Discovery Order, April 4

Order, and Preliminary Injunction Order.

Uber argues that the Jacobs documents are not responsive to the March 16 expedited discovery order because they do not refer to downloading by Levandowski, Kshirsagar, and Raduta, whereas the Court's order does:

> By March 31, defendants shall produce for inspection all files and documents downloaded by Anthony Levandowski, Sameer Kshirsagar, or Radu Raduta before leaving plaintiff's payroll and thereafter taken by them. Defendants shall also produce for copying the card reader, thumb drive, or other media used for the downloads, as well as all subsequent emails, memoranda, PowerPoints, text messages, or notes that have forwarded, used, or referred to any part of said downloaded material. If any part of said downloaded material has been deleted, destroyed, or modified, then defendants shall state the extent thereof and produce all documents bearing on said deletion, destruction, or modification.

(Dkt. 61 ¶ 4.) But, the Jacobs letter references misappropriation of Waymo trade secrets and describes efforts by Uber to delete and destroy evidence of such misappropriation. (Ex. 1, at 9-10.) Just because the letter does not call Levandowski out by name does not mean that the letter is not responsive. Under Uber's logic, Waymo would first need to prove misappropriation by Levandowski or the other two former employees referenced before Uber would be obligated to do anything in response to the Court's order. Jacobs specifically referenced the Waymo litigation in his letter, and Waymo alleges that Levandowski stole Waymo trade secrets and took them to Uber. The misappropriation of Waymo trade secrets referenced in the Jacobs letter is the same misappropriation alleged by Waymo.

The Court's April 4 Order asked Defendants to provide "[a] list of all servers (and their locations) used at any time in any way for defendants' LiDAR-related activities. Do not leave anything off the list merely because some other server supposedly houses the same materials." (Dkt. 144.) Uber does not dispute that the Jacobs letter says that Uber had a "distributed architecture of anonymous servers, telecommunications architecture, and non-attributable hardware and software." (Ex. 1, at 12.) Uber contends that it did not need to disclose them in response to the April 4 letter because the Jacobs letter does not mention servers used for LiDAR-related activities. Again, the Jacobs letter specifically references that the allegations of Uber's tactics implicate the Waymo litigation. Even if the Jacobs letter does not identify whether the

referenced anonymous servers were used for LiDAR-related activities, if they were, Uber was obligated to identify them in response to the April 4 Order.  Notably, Uber does not state that the anonymous servers referenced in the Jacobs letter are <u>not</u> used for LiDAR-related activities.

Lastly, as Judge Alsup already recognized, the Jacobs letter and email should have been disclosed in response to the May 11 Provisional Relief Order.  (11/28/2017 Hr'g Tr. at 14:13-17 ("Morrison & Foerster and the rest of the Uber lawyers withheld evidence. There was a direct order to produce stuff like that in the provisional relief order.  And to get – to – to have hidden this from the lawyers and the judge and not be upfront about it, it just is so upsetting.").)  Uber argues that these materials are not responsive because Jacobs did not see or hear the downloaded materials and did not allege that Levandowski used ephemeral communications to discuss LiDAR.  Uber does not present any evidence that he did not do so.  And, Uber should know this because it was required under the provisional relief order to log all communications wherein Levandowski mentioned LiDAR.  Yet, Uber did not include <u>any</u> communications via Wickr or Telegram—which it now admits Levandowski used for business purposes—on its LiDAR communications log.  To the extent Mr. Levandowski was using these forms of communication to develop LiDAR technology, that too would have been responsive to the Court's Order.  Uber does not dispute this point.

IV. **THE JACOBS LETTER AND RESIGNATION EMAIL SHOULD HAVE BEEN PRODUCED BECAUSE THEY DIRECTLY CONTRADICT MULTIPLE REPRESENTATIONS MADE BY UBER AND ITS COUNSEL.**

The existence of the Jacobs letter and email is also responsive to deposition questions asked of Uber witnesses.  In those circumstances, Uber was obligated to produce it.  Uber argues that Waymo does not cite any legal authority for this premise.  But, Waymo cited to Judge Alsup's statements at the December 4 hearing:

> Let's say that a particular document had never been requested, but that in deposition testimony the CEO of the company, some important witness, just gave testimony that was just flat out opposite of what was in a letter.  Then I think maybe in that kind of circumstance the lawyer may have a duty to turn the letter over, because you can see the problem.  It's – you know, otherwise they are putting forth a story that is directly contradicted by things they haven't produced even though they weren't called for.

(12/4/17 Hr'g Tr., 34:6-12.)

Waymo set forth specific testimony and attorney argument that is contradicted by the Jacobs letter. Uber does not substantively rebut the testimony or attorney argument, but says that the testimony and attorney argument do not contradict the Jacobs letter. Waymo disagrees and, more importantly, so does Judge Alsup. As he explained at the November 28 hearing:

> I would look like a fool if Uber were to fool me on this. You told me many times there were -- none of these documents ever hit the server.
>
> MR. GONZÁLEZ: We stand by that.
>
> THE COURT: Okay. Well, it turns out the server is only for the dummies, and that the real stuff goes on, on the shadow system. So now you deny that, but that's what -- that's one way to read this record so far. And it would not be fair to the other side to not give them a chance -- you should have come clean with this long ago. He should have given me that letter back in May so they could have investigated it.

(11/28/17 Hr'g Tr. at 149:7-18.) The Jacobs letter contradicts both counsel's arguments to the Court and the deposition testimony of Ms. Padilla and Mr. Kalanick regarding Uber's searches.

## V. **UBER DID INTENTIONALLY WITHHOLD THE JACOBS DOCUMENTS.**

Finally, Uber includes in its responsive brief a separate section arguing that it did not intentionally withhold the Jacobs documents because outside counsel did not get copies of the Jacobs letter. But, *Uber*—the party to this lawsuit—knew about all of these documents. And, *Uber* made the intentional decision to not disclose the Jacobs letter to the in-house counsel running this litigation. Ms. Padilla testified that the internal Uber compliance lawyers instructed her not to disclose the Jacobs letter to anyone, which included litigation counsel running the litigation. (11/29/17 Hr'g Tr. at 47:8-25.) Ms. Padilla also claimed that she thought if Uber disclosed the Jacobs letter to the U.S. Attorney, the U.S. Attorney would produce the Jacobs letter to the Court and Waymo. (*Id.* at 53:14-54:5.) The Court did not find that to be credible. (*Id.* at 54:6-16.) Regardless of what the outside defense team knew or did not know, the facts suggest that *Uber* intentionally withheld these documents.[4]

---

[4] Uber references Waymo's use of ephemeral communications in its brief. That has no relevance here. The question before the Special Master is whether Uber should have produced the Jacobs documents to Waymo. Whether Waymo uses ephemeral communications has no bearing on that question.

-16-
WAYMO'S REPLY SUBMISSION TO SPECIAL MASTER COOPER

## VI. CONCLUSION

For the foregoing reasons, the Special Master should find and recommend to Judge Alsup that Uber should have produced the Jacobs documents to Waymo during discovery.

DATED: December 21, 2017

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By /s/ Charles K. Verhoeven
Charles K. Verhoeven
Attorneys for WAYMO LLC