**quinn emanuel** trial lawyers | san francisco

50 California Street, 22nd Floor, San Francisco, California 94101 | TEL (415) 875-6600

July 28, 2017

Magistrate Judge Jacqueline Scott Corley

Re:  *Waymo LLC v. Uber Technologies, Inc., et al.*, N.D. Cal., Case 3:17-cv-00939-WHA
<u>**Waymo's Opposition to Uber's Motion to Compel**</u>

Dear Judge Corley:

Please find below Plaintiff Waymo LLC's ("Waymo") opposition to Uber's motion to compel (Dkt. 1032).

Sincerely,

*/s/ Charles K. Verhoeven*

Charles K. Verhoeven

**UNREDACTED VERSION OF DOCUMENT FILED UNDER SEAL**

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

Through its motion to compel, Uber is seeking **all documents and communications** regarding topics such as "Waymo's financial viability" (RFP 61), "Waymo's performance" (RFP 62), and "Waymo's business plans, strategic plans, financial plans, sales plans, and investment plans for its ride-sharing business" (RFP 93). Waymo objected to RFP 62 and RFP 93 as overbroad (Nardinelli Decl. Ex. 1), and Waymo objects to Uber's current interpretation of RFP 61 as overbroad as well. But Waymo is not refusing to produce documents in response to any of these requests.

To the contrary, Waymo has produced presentations made to executives at Alphabet regarding Waymo's business; Waymo's financial statements; Waymo's P&Ls; Waymo's business plan; and slide decks that – at Waymo – serve as the primary vehicle for discussions and debate on business, strategy, and operations issues. (Nardinelli Decl. ¶ 2.) Indeed, Waymo has produced hundreds of pages containing detailed information regarding, for example: where and when to launch various phases of Waymo's ride-sharing service; historical cost information broken out by month and cost center; projections of revenue, net revenue, cash flow, and cumulative cash flow based on dozens of identified inputs; commentary by named Waymo employees regarding those inputs; cost projections in various forms (per/mile and broken out by costs for hardware, fuel, maintenance, depot ops, insurance, etc.); sensitivity analyses regarding adoption rates, trip lengths, vehicle costs, etc.; discussions of various business models (███████████████ ████████████████████); discussions related to ████████████████████ █████; discussions of long-term positioning and differentiation; discussions of risks and mitigation strategies related to competition, software development, regulation, hardware costs, user adoption, scaling, vehicle supply, logistics, etc.; discussions of options and possibilities with respect to ████████████████████████████████████████████████████ ██████████████████ etc.; financial plans, resource asks, and headcount projections; strategies surrounding the formation of Waymo; details related to fleet sizing in early launch geographies; timelines integrating technical and commercial milestones under different scenarios; discussions of marketing goals and approaches; discussions of strategies for customer retention and loyalty; and so on. (Nardinelli Decl. ¶ 2.) This information was provided throughout the relevant time period, so that the evolution of various analyses and strategies can be assessed. (Nardinelli Decl. ¶ 3.) And all of this was produced **in addition to** emails that reflect Waymo's discussion or analysis of Uber or its ride-sharing business, which Waymo agreed to produce in response to RFPs 96 and 97 (not at issue here). (Nardinelli Decl. Ex. 1; Ex. 5.)

Thus, Uber's assertion that Waymo is not producing documents that reflect "analyses and discussion" (Motion at 1) or "differing or dissenting opinions" (Motion at 3) is wrong. Waymo has produced exactly those documents. As Waymo's counsel has explained (*e.g.*, Dkt. 1032-3, at 2-4) and as Waymo's witnesses have testified (Nardinelli Exs. 2, 3), Waymo has produced the very documents that constitute and reflect analysis and discussion at Waymo. As one example, Waymo has produced documents reflecting ongoing discussions regarding the pros and cons of operating ██████████ -- including information regarding how ██████████ would affect Waymo's business in a variety of scenarios – over the course of years. (Nardinelli Decl. ¶ 4.) As another example, Waymo has produced documents reflecting one team member's detailed analysis in support of █████████████████████████████████████████, even

1

though Waymo has not adopted that approach.  (Nardinelli Decl. ¶ 5.)  Dozens more examples could be provided.[1]

Moreover, Uber's complaints that Waymo has included in its production high-level presentations to executives (Motion at 1, 3) or that Waymo has produced emails related to Uber's business but not Waymo's business (Waymo at 2) are disingenuous.  During the meet and confer process, *Uber* made clear that it wanted presentations to executives, especially presentations to executives at Alphabet.  (*E.g.*, Dkt. 1032-3, at 11.)  Waymo agreed to produce those:  some are only a page and might be considered high-level; others are dozens of pages and delve into a considerable number of details.   (Nardinelli Decl. ¶ 6.)  Similarly, during the meet and confer process, when the parties were discussing the RFPs at issue here regarding Waymo's business together with the RFPs not at issue here regarding Uber's business, it was *Uber* who asked for emails responsive to the latter but not the former.  (Nardinelli Ex. 5.)  That distinction makes sense to some degree (*i.e.*, not every document at Waymo discusses Uber's business), and Waymo agreed to Uber's request.  (*Id.*)  It was only after Waymo agreed to do what Uber asked that Uber moved the goalposts yet again, asking for all emails regarding Waymo's business.  (*Id.*)

When Uber's mischaracterizations are set aside, there are only two disputes.  The first is whether Waymo should search for and produce ***all emails*** responsive to requests for documents related to "Waymo's financial viability" (RFP 61), "Waymo's performance" (RFP 62), and "Waymo's business plans, strategic plans, financial plans, sales plans, and investment plans for its ride sharing business" (RFP 93).  As already described, the information that Uber says it wants – including detailed analyses of operational and strategic points and commentary thereon – is least likely to be in email and most likely to be (and is) in the documents that Waymo has already produced.  Moreover, there is no useful way to search for emails on these subjects.  Indeed, Uber has proposed the use of generic search terms (like "Waymo," "self-driving," "perform*," etc.) that generate tens of thousands of hits, including what appears to be a vast number of documents unrelated to any reasonable interpretation of the RFPs.[2]  In light of these realities, when Waymo

---

[1]  Uber contends that, "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇," and argues that it needs communications on that subject.  (Motion at 3.)  But just a few questions at a recent deposition cleared up Uber's confusion – *i.e.*, Uber was told how ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  (Nardinelli Ex. 3.)  Regardless, both the business plan and the P&L is ultimately a reflection of decisions made based on the commentary and ideas reflected in the documents that Waymo has already produced.

[2]  The parties have been negotiating electronic search terms to locate additional responsive documents in response to these and other RFPs.  Uber proposed that Waymo run the following search strings on emails:

(TaaS OR Lyft* OR rideshar* OR ridesharing OR (ride /5 shar*) OR carpool* OR (Waze /10 Ride*)) w/15 (market or compet* OR partner* OR entr* OR enter* OR collab* OR Chauff* OR Chaff*)

2

served discovery on Uber for the types of information that Uber seeks here, Waymo requested documents "sufficient to show" various subjects rather than seeking "all documents and communications relating to" those subjects. (Nardinelli Ex. 4.)

The second dispute is whether Waymo should search for documents responsive to these RFPs at Google or Alphabet, rather than just at Waymo. (Motion at 4.) As described above, Waymo has already produced documents that reflect responsive information that Waymo has shared with Google or Alphabet. And, especially because most information regarding Waymo's self-driving car program is confidential to Waymo even within Google/Alphabet (Nardinelli Ex. 3), Waymo does not expect there to be any non-duplicative information outside of Waymo.[3]

In light of the detailed information that has already been produced (including emails discussing or analyzing Uber's business), the low likelihood of finding non-duplicative information in email, the difficulties associated with determining reasonable email search parameters, and Waymo's own requests seeking only "documents sufficient to show" the subject matter at issue here, Waymo should not be compelled to search for additional documents responsive RFPs 61, 62, and 93.

In the last two paragraphs of its Motion, Uber separately moves to compel documents relating to "Waymo's estimates of the size of the ride-sharing market in the United States for each of the last six years," "Waymo's forecasts of the size of the ride-sharing market in the United States for each of the next six years," "Waymo's forecasts regarding the number of Waymo's ride-sharing vehicles in the United States for each of the next six years," and "Waymo's analysis of any barriers to entry in the ride-sharing market." (Motion at 4.) Again, this information has already been produced. For example, during expedited discovery, Waymo produced spreadsheets detailing demand for mapping vehicles, validation/test vehicles, and service vehicles by quarter by city from 2016 to 2030. (Nardinelli Decl. ¶ 7.) Waymo has produced other forecasts (to the extent Waymo has them) in the form of its detailed P&Ls. (Nardinelli Decl. ¶ 8.) And commentary regarding these forecasts – along with all aspects of competition – is included in the hundreds of pages already produced by Waymo and described above. Indeed, Uber asked one of the Waymo witnesses most knowledgeable about these subjects hardly any questions on these

---

(Chaff* OR Chauf* OR Waymo OR Self-driving OR selfdriving OR autonom* OR AV OR SDC) /15 (Projection* OR forecas* OR ridership OR "business plan" OR roadmap* OR viab* OR gantt OR valu* OR commercial* OR perform*)

Waymo objected to running these search strings because of the number of hits generated (tens of thousands) and because the types of information sought by the strings are more likely to be (and are) in non-email documents. As Waymo clearly outlined in the meet and confer correspondence (Nardinelli Ex. 5), email searching using such generic terms (including all or parts of these strings) is not appropriate for the small number of RFPs at issue here, especially when the information sought has already been produced.

[3] The statement that there are "responsive documents created at Alphabet" (Dkt. 1032-8) was an inadvertent error made based on the labeling of various presentations that were prepared *for* Alphabet (by Waymo) rather than *by* Alphabet.

3

subjects (and did not use all of its deposition time), belying the purported need for more information than the data and commentary already provided.

Waymo has already produced the information that Uber is asking for in the formats in which it most logically and likely exists (spreadsheets, discussion documents, presentations, working documents, etc.). Uber's motion for more, with respect to the small number of overbroad RFPs at issue here, should be denied.