July 31, 2017

**VIA ECF**

Magistrate Judge Jacqueline Scott Corley
USDC, Northern District of California
San Francisco Courthouse Courtroom F - 15th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

Re:     *Waymo LLC v. Uber Technologies, Inc., et al.*, N.D. Cal. Case No. 3:17-cv-00939-WHA

Dear Magistrate Judge Corley:

Plaintiff Waymo LLC ("Waymo") submits this letter brief in support of Waymo's motion to compel Defendants Uber Technologies, Inc. and Ottomotto LLC (collectively, "Uber") to (1) produce all documents and communications on the subject matter of the reasons for Anthony Levandowski's downloading of Waymo files and the reasons for his pleading the Fifth Amendment; and (2) produce an unredacted copy of the presentation Travis Kalanick and Cameron Poetzscher made to Uber's Board of Directors on April 11, 2016 to obtain approval for the Otto deal.

I.  Uber Waived Privilege Concerning Levandowski's Fifth Amendment Assertion and Levandowski's Reasons for Downloading the 14,000 Files

On June 28, (Dkt. 755), Uber disclosed for the first time its "ransom" or "bonus" explanation for why it contends Anthony Levandowski downloaded 14,000 proprietary Waymo files before he left Waymo to start a company that would be acquired by Uber.  Uber stated that it "believes that the downloading was done in relation to Levandowski's employment at Google, specifically to ensure the expected payment of Levandowski's $120 million bonus from Google." (*Id.* at 13.)  Since then, Uber has repeatedly expounded upon the bonus theory in both public filings and open court.  (*See*, *e.g.*, Dkt. 854 at 10 ("For example, after the allegations in this case arose, but before he took the Fifth, Levandowski told Travis Kalanick (and perhaps others) that he downloaded files in relation to the payment of his bonus from Google"); Dkt. 1050 at 91:6-7 ("THE COURT: Who is that person who heard him say that?  MS. DUNN: Mr. Kalanick heard him say that.").)  At his July 27 deposition, however, Mr. Kalanick revealed it was not just him that heard Mr. Levandowski's "bonus" explanation.  Rather, Mr. Kalanick testified that this was part of a conversation in the presence of numerous lawyers in meetings concerning Mr. Levandowski's assertion of his Fifth Amendment privilege.  As detailed further below, and unfortunately in a manner consistent with its conduct throughout this case, Uber seeks to waive the privilege as to *some* of these communications with counsel, but preclude Waymo from discovery into other communications with counsel on this very same subject.  This is improper and instead results in subject matter waiver.

Mr. Kalanick testified that, on an evening shortly before Mr. Levandowski pleaded the Fifth Amendment, he had a series of meetings at Uber's headquarters, over the course of many hours, with Mr. Levandowski, in-house and outside counsel for Uber, and Mr. Levandowski's personal counsel.[1]  (Ex. 1 at 76:6-18.) Sometimes Mr. Kalanick was alone with Uber's attorneys; other times Mr. Levandowski and/or his personal counsel were present. (*Id.* at 88:7-89:5.)  However, Mr. Kalanick testified that *every* conversation he had with Mr. Levandowski about the "bonus" explanation was in the presence of attorneys:

> Q. (By Mr. Verhoeven) Did you ever have conversations about this bonus explanation without attorneys in the room?
> A. No.

(Ex. 1 at 122:10-13.)  Mr. Kalanick testified extensively about these communications, describing how Mr. Levandowski told him he downloaded the files because "he was incredibly worried at the time about a very large bonus he was supposed to get from Google," how Mr. Kalanick responded, "That's pretty [] dumb," how Mr. Levandowski acknowledged that "he realize[d] how dumb it was, too," and how Mr. Levandowski admitted he got the bonus without ever mentioning the files to Google.  (*See*, *e.g.*, *id.* at 91:19-101:6.)

Mr. Kalanick also testified that Mr. Levandowski communicated the "bonus" explanation as part of the discussion with Mr. Kalanick about Mr. Levandowski's assertion of the Fifth Amendment.  (*See id.* at 76:6-80:15; 88:7-91:2.)  These conversations, too, were in the presence of counsel:

---

[1]  Mr. Kalanick did not remember the specific date, but this likely occurred just before Uber requested the secret "In-Chambers Conference" to discuss Mr. Levandowski's assertion of the Fifth Amendment on March 28.  (Dkt. 122.)  A calendar invitation produced by Uber (Ex. 2) shows that Mr. Kalanick was invited to a meeting on the evening of March 26-27th from 11:00 p.m. to 1 a.m., which included Mr. Levandowski, Uber in-house attorneys, and Uber's outside counsel.

> Q. So you never spoke to him outside meetings with attorneys about the assertion of the Fifth amendment? You never, like, pulled him aside and said anything?
> A. No.

(Ex. 1 at 79:7-11.)  Nevertheless, Mr. Kalanick testified extensively about them, with the only objections being objections to form.  (*Id.* at 76:6-80:15; 88:7-91:2; 102:24-103:12.)  For example:

> Q. (By Mr. Verhoeven) Do you recall anyone else at the meeting saying anything about this new story that he told?
> MS. DUNN: Objection to form.
> MR. CHATTERJEE: Join.
> THE DEPONENT: I mean, the whole conversation was basically about the nuances of pleading the Fifth, privilege, you know, legal things that I didn't always understand. But -- but for me just felt so straightforward, and was obviously disappointed.
> Q. (By Mr. Verhoeven) Did he or his attorneys say why he was -- he was asserting the Fifth?
> MS. DUNN: Objection to form.
> MR. CHATTERJEE: Join.
> THE DEPONENT: Yes.

(Ex. 1 at 103:21-104:12.)  Mr. Kalanick also testified about things that Mr. Levandowski's personal counsel said – either to Mr. Levandowski (as reported by Mr. Levandowski) or directly to Mr. Kalanick:

> Q. What did you -- what did you say to him about the subject during your meetings with attorneys?
> A. I really -- I really wanted him just to testify and tell the Court whatever he had to say.
> Q. And you -- you said that during the meeting?
> A. I made it very clear to him that we wanted him to testify.
> Q. And what did he say?
> A. He felt like -- well, my -- my sense is that he wanted to.
> Q. Okay. I'm not asking about your sense.  What did he say?
> A. When we had -- we had discussions about how do we -- how do we -- like, is there a way we can get -- is there a way that he can testify without him being -- his -- his personal attorney feeling so uncomfortable that he would plead the Fifth.
> So his personal counsel is telling him to take the Fifth.  We would much prefer him not to.
> Q. Okay. And why would -- what did his personal counsel say about why he was going to have to take the Fifth?
> MS. DUNN: Objection to form.
> THE DEPONENT: I don't know the reasons why, other than just being conservative in his approach.

(Ex. 1 at 79:12-80:15.)  While Uber allowed Mr. Kalanick to testify about *some* communications at these meetings on the subject of Mr. Levandowski's "bonus" explanation and assertion of the Fifth Amendment (both of which Uber has repeated in open Court as well) , Uber instructed Mr. Kalanick not to testify about certain *other* communications where attorneys were present on the very same subject matter.  The basis for the instruction as to these other conversations was that counsel was present.  For example:

> Q. (By Mr. Verhoeven) Do you remember testifying that you really, really wanted to tell the Court whatever Mr. Levandowski had to say during that meeting?
> MR. CHATTERJEE: Same objections as the motion to strike.

THE DEPONENT: I remember being very clear with Mr. Levandowski and with others in the room my desire for Uber and the Court to be able to get to the bottom of this and get to the facts.

Q. (By Mr. Verhoeven) And did you express that to Mr. Levandowski?

A. Yes, I did.

Q. And what did he say?

MR. CHATTERJEE: Same objections.

THE DEPONENT: I don't remember what he said, specifically.

Q. (By Mr. Verhoeven) What did he say generally?

A. He -- he seemed to want to testify.

Q. Okay. Did he -- how did he express that?  I mean, it's hard for me to understand when you say something like, he seemed to want to.

A. Yeah.

Q. So that's why I am asking these questions.

A. Yeah.

Q. What -- what do you base that on?

A. Well, he was -- he was pushing his attorney.

MS. DUNN: Objection on the basis of privilege. I'm going to instruct the witness not to answer.

….

Q. (By Mr. Verhoeven) So why did he take the Fifth, given that explanation [about downloading the files to secure his bonus]?

MR. CHATTERJEE: Form.

MS. DUNN: Form.

THE DEPONENT: This is what -- this was a big part of what that discussion was about. I -- I personally don't believe he should have.

Q. (By Mr. Verhoeven) What's your understanding of why he did it?

MS. DUNN: Form.

MR. CHATTERJEE: Join.

THE DEPONENT: My understanding --

MS. DUNN: Wait -- sorry.

Q. (By Mr. Verhoeven) You can answer the question.

A. My understanding is that he got advice from his counsel to take -- to plead the Fifth.

Q. And what -- for what reason?

MS. DUNN: I'm going to caution the witness not to answer anything that he knows solely from meetings with Mr. Levandowski and his counsel.

THE DEPONENT: I think in -- I guess what I could say is, in an abundance of caution.

Q. (By Mr. Verhoeven) Did Mr. Levandowski tell you he was concerned about being criminally prosecuted for what he did?

A. I think he expressed his lawyer's concern over that.

Q. What did he say?

MS. DUNN: I'm going to caution the witness not to answer anything he knows solely from Mr. Levandowski in the presence of his counsel.

THE DEPONENT: I probably can't answer that question. I cannot answer that question.

(Ex. 1 at 86:24-88:6 and 119:2-120:3; *see also id.* at 79:24-80:19; 82:2-11; 82:23-84:19; 85:5-19; 86:18-23; 103:21-104:15; 121:19-122:9.)  But, as discussed above, Mr. Kalanick confirmed that counsel was present for *all* discussions regarding the bonus explanation and pleading the Fifth with Mr. Levandowski, *including* those that Uber's counsel allowed him to testify about and have now revealed to the Court and parties on multiple occasions.

Yet, again, there is no legitimate basis for Uber's selective waiver. Under Federal Rule of Evidence 502(a), Uber's intentional disclosure of these privileged communications – both by Mr. Kalanick at his deposition and by Uber in filings and at hearings – waives the privilege with respect to any communications or information that concern the same subject matter.[2]  Fed. R. Evid. 502(a) (waiver based on disclosure of a communication or information covered by the attorney-client privilege or work product protection extends to undisclosed communication or information where "(1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together."); *United States v. Gurtner*, 474 F.2d 297, 298-99 (9th Cir. 1973) (holding that defendant's "failure to assert the privilege when the evidence was first presented constituted a voluntary waiver of the right," and "once the subject matter is disclosed by a knowing failure to object there is nothing left to protect from disclosure").

Subject matter waiver is appropriate here, as a matter of fundamental fairness, because Uber is using the privilege as both a sword and shield. Where Uber thinks that privileged communications would advance its defenses, Uber has selectively disclosed them.  On the subject matter of Mr. Levandowski's reasons for downloading the files – where the evidence strongly supports the inference that he downloaded them to use at Uber – Uber has selectively disclosed privileged communications about Mr. Levandowski's alternative "bonus" explanation.  On the subject matter of Mr. Levandowski's reasons for pleading the Fifth Amendment – where the overwhelming evidence shows that Mr. Levandowski's testimony would be harmful to Uber – Uber has selectively disclosed privileged communications about how Uber "really wanted him just to testify and tell the Court whatever he had to say" (Ex. 1 at 79:15-16), and "would love to put Mr. Levandowski on the stand to explain to you what happened, because I think he has a good story to tell" (Dkt. 131 at 16:8-10), and that Mr. Levandowski himself "wanted to" testify, but that "his personal counsel [was] telling him to take the Fifth" (Ex. 1 at 79:22-80:8).  But Uber is simultaneously using the privilege as a shield to prevent Waymo from obtaining full discovery into communications Uber has had with Mr. Levandowski (and others) about these same subjects.  Additional discovery, from both Mr. Kalanick and others, may very well reveal holes in Mr. Levandowski's late-disclosed "bonus" explanation, as well as further evidence that Uber knows that Mr. Levandowski's testimony would hurt – not help – its case.  *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) ("The privilege which protects attorney-client communications may not be used both as a sword and a shield."); *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349-50 (Fed. Cir. 2005) ("The widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to all other communications relating to the same subject matter.  The waiver extends beyond the document initially produced out of concern for fairness, so that a party is prevented from disclosing communications that support its position while simultaneously concealing communications that do not.") (internal citations omitted).

Uber's waiver therefore extends to all privileged testimony (from Mr. Kalanick and others) *and* documents on the subjects of (1) Mr. Levandowski's reasons for downloading Waymo's files and (2) Mr. Levandowski's reasons for pleading the Fifth Amendment.  *Theranos, Inc. v. Fuisz Techs., Ltd.*, No. C 11-5236 PSG, 2013 WL 2153276, at *3 (N.D. Cal. May 16, 2013) (the party asserting privilege bears the "burden to show that fairness does not require waiver of the privilege over documents relating to the same subject matter as the documents disclosed."); *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-CV-03424-JCS, 2016 WL 7475820, at *7-8 (N.D. Cal. Dec. 29, 2016) (finding that fairness required subject matter waiver as to the "the *issues* that Rosenbaum, Dang, and

---

[2]  The fact that Uber's selective waiver of these privileged communications was first made on June 28 – four weeks after the Court's deadline for Uber to waive privilege "on pain of preclusion" (Dkt. 438) – is a separate issue that will be subject to a renewed Motion in Limine.

Portnoy discussed in the privileged communications disclosed in the reexamination, and is not limited to what they knew about those issues at the time") (emphasis in original).  The Court should order that Uber has waived the attorney client privilege and work product protection on these subject matters, that Uber must produce all written documents and documents on these subject matters, and that Waymo be permitted to fully examine Uber's witnesses about these subject matters.

II.  Uber Must Produce Unredacted Copies of the "Project Zing Review" Board Presentation

The latest example of Uber's "relentless concealment of likely probative evidence" (Dkt. 433 at 8) is the redaction of key portions of the "Project Zing Review" presentation that Mr. Kalanick and Cameron Poetzscher, Uber's Vice President of Corporate Development, made to Uber's Board of Directors on April 11, 2016.  (Ex. 3.)  This presentation was made not for the purpose of obtaining legal advice from the Board, but rather for the business purpose of obtaining Board approval of the Otto deal.  (Ex. 5.)  Once that approval was obtained, at that April 11, 2016 Board of Directors meeting, Uber executed the Put Call Agreement, the Indemnification Agreement, and the Joint Defense Agreement just hours later the same day.  (*See*, *e.g.*, Ex. 4.)  The attorney-client privilege does not extend to business advice or other non-legal advice.  *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002).  To qualify for protection under the attorney-client privilege, the party asserting the privilege must demonstrate that the communications were made "primarily for the purpose of generating legal advice."  *United States v. Chevron Corp.*, 1996 WL 264769, at \*3 (N.D. Cal. Mar. 13, 1996) amended, 1996 WL 444597 (N.D. Cal. May 30, 1996) (internal quotations and citations omitted).  Uber has not and cannot make that showing for any portion of this presentation, which was communicated to Uber's Board of Directors primarily for a business purpose.

III.  Mr. Kalanick's Second Deposition

At the July 20 hearing, the Court raised the issue of Mr. Kalanick's missing text messages and instructed Uber that "all of those text messages need to be turned over," putting Uber "on notice" that it should be "all hands on deck" because July 20 was already "really late" for such highly relevant evidence to be unproduced.  (7/20/2017 Hearing Tr. at 8:20-9:6.)  Waymo noted that Mr. Kalanick's deposition was only a week away, and the Court cautioned Uber that if it failed to produce all of Mr. Kalanick's text messages "enough time in advance," then Mr. Kalanick "will come back for his deposition."  (*Id.* at 9:20-22.)  Waymo followed up on July 24 when no text messages had been produced since the hearing, but none of the missing text messages were produced by the date of Mr. Kalanick's deposition.

Now, eleven days after the July 20 hearing, Uber has **still** not produced Mr. Kalanick's text messages – and has apparently taken no action since the hearing in furtherance of their recovery and production.  Rather, Uber has abdicated all responsibility for the text messages, passing the buck to Mr. Kalanick's personal counsel at Orrick, Herrington & Sutcliffe ("Orrick").  Orrick has apparently retained its own digital forensics expert, who has recovered over 400 of the deleted text messages, including text messages Mr. Kalanick sent to Mr. Levandowski.  Orrick represents that these text messages will be produced to Waymo by tomorrow, August 1.  Orrick has also represented that its expert is continuing to recover deleted text messages, and that any additional recoverable text messages will be produced later this week.  Consistent with the Court's instructions from the July 20 hearing, Uber has agreed that Mr. Kalanick will be made available for a second deposition, and that Waymo will have more than seven total hours of deposition time.  To the extent there is a dispute as to the length of time that Mr. Kalanick will be made available for the second deposition, or the scope of that deposition, Waymo will raise that issue with the Court separately once Waymo has had sufficient opportunity to review the recovered text messages and once the privilege issues raised in this motion are resolved.

5

Respectfully,

*/s/ Charles K. Verhoeven*
Charles K. Verhoeven
cc:      All counsel of record; Special Master John Cooper

9455242.1