# EXHIBIT 1

# FILED UNDER SEAL

ATTORNEYS' EYES ONLY

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4

5    WAYMO LLC

6         Plaintiff,

7              vs.              Case No.

8    UBER TECHNOLOGIES,INC.;    17-cv-00939-WHA

9    OTTOMOTTO, LLC; OTTO

10   TRUCKING LLC,

11        Defendants.

12   _____

13

14              **ATTORNEYS' EYES ONLY**

15

16     VIDEOTAPED DEPOSITION OF TRAVIS KALANICK

17             San Francisco, California

18             Thursday, July 27, 2017

19                    Volume I

20

21   REPORTED BY:

22   REBECCA L. ROMANO, RPR, CSR No. 12546

23   JOB NO. 2665725

24

25   PAGES 1 - 329

                                        Page 1

1      UNITED STATES DISTRICT COURT
2      NORTHERN DISTRICT OF CALIFORNIA
3      SAN FRANCISCO DIVISION
4
5  WAYMO LLC
6      Plaintiffs,
7      vs.      Case No.
8  UBER TECHNOLOGIES,INC.;   17-cv-00939-WHA
9  OTTOMOTTO, LLC; OTTO
10 TRUCKING LLC,
11     Defendants.
12 _____
13
14
15
16     VIDEOTAPED DEPOSITION OF TRAVIS KALANICK,
17 taken on behalf of the Plaintiffs, at Orrick,
18 Herrington & Sutcliffe LLP, 405 Howard Street,
19 San Francisco, California, commencing at 8:18 a.m.,
20 Thursday, July 27, 2017 before Rebecca L. Romano,
21 Certified Shorthand Reporter No. 12546
22
23
24
25
                                                    Page 2

1  APPEARANCES OF COUNSEL
2
3  For the Plaintiff:
4
5      QUINN EMANUEL URQUHART & SULLIVAN, LLP
6      BY: CHARLES K. VERHOEVEN
7      BY: JAMES D. JUDAH
8      BY: DAVID A. PERLSON
9      Attorneys at Law
10     50 California Street
11     22nd Floor
12     San Francisco, California 94111-4788
13     (415) 875-6600
14     charlesverhoeven@quinnemanuel.com
15     jamesjudah@quinnemanuel.com
16     davidperlson@quinnemanuel.com
17
18
19
20
21
22
23
24
25
                                                    Page 3

1  APPEARANCES OF COUNSEL (cont'd)
2
3  For the Defendants - Uber Technologies, Inc. and
4  Ottomotto:
5      BOIES SCHILLER FLEXNER
6      BY: KAREN LEAH DUNN
7      BY: MICHAEL BRILLE
8      BY: MARTHA L. GOODMAN
9      Attorneys at Law
10     1401 New York Avenue NW
11     Washington, DC 20005
12     (202)237-2727
13     kdunn@bsfllp.com
14     mbrille@bsfllp.com
15     mgoodman@bsfllp.com
16
17 For the Defendant - Otto Trucking LLC:
18     GOODWIN PROCTER LLP
19     BY: I. NEEL CHATTERJEE
20     Attorney at Law
21     135 Commonwealth Drive
22     Menlo Park, California 94025
23     (650) 752-3256
24     nchatterjee@goodwinlaw.com
25
                                                    Page 4

1  APPEARANCES OF COUNSEL (cont'd)
2
3  For the Defendant - Otto Trucking, LLC:
4      GOODWIN PROCTER LLP
5      BY: HONG AN VU
6      Attorney at Law
7      601 South Figueroa Street
8      41st Floor
9      Los Angeles, California 90017
10     (213) 426-2557
11     hvu@goodwinlaw.com
12
13 For the Deponent:
14     ORRICK, HERRINGTON & SUTCLIFFE, LLP
15     BY: MELINDA HAAG
16     Attorney at Law
17     The Orrick Building
18     405 Howard Street
19     San Francisco, California 94105
20     (415) 773-5495
21     mhaag@orrick.com
22
23 ALSO PRESENT:
24     Aaron Bergstrom, In-house Counsel Uber
25     Jeffree Anderson, Videographer
                                                    Page 5

2 (Pages 2 - 5)

1        I N D E X
2  DEPONENT                    EXAMINATION
3  TRAVIS KALANICK                  PAGE
4  VOLUME I
5    BY MR. VERHOEVEN              14
6
7
8        E X H I B I T S
9  NUMBER                          PAGE
10       DESCRIPTION
11 Exhibit 365   Agreement and Plan of Merger,   152
12       UBER00016453 - UBER00016523;
13
14 Exhibit 366   Newco Notes, UBER00060321 -   164
15       UBER00060347;
16
17 Exhibit 367   Miscellaneous Document, 62   194
18       Pages;
19
20 Exhibit 368   Email 1/5/2016 Subject:   207
21       Structure, UBER00060661;
22
23 Exhibit 369   Email String Subject: Newco   213
24       milestones, UBER00063615 -
25       UBER00063616;

Page 6

1        E X H I B I T S (cont'd)
2  NUMBER                          PAGE
3       DESCRIPTION
4  Exhibit 377   Text Message, UBER00073891;   246
5
6  Exhibit 378   Email 3/31/2016 Subject:   248
7       Whiteboard translation TK
8       points, UBER00075047 -
9       UBER00075048;
10
11 Exhibit 379   Email 4/11/2016 & attached Zing   256
12       Board Slides, UBERT00100344 -
13       UBER00100352;
14
15 Exhibit 380   Minutes of Special Meeting   259
16       4/11/2016, UBER00101482 -
17       UBER00101498;
18
19 Exhibit 381   Joint Defense, Common Interest   275
20       and Confidentiality Agreement,
21       UBER00074893 - UBER00074903;
22
23 Exhibit 382   Indemnification Agreement,   276
24       UBER00074855 - UBER00074875;
25

Page 8

1        E X H I B I T S (cont'd)
2  NUMBER                          PAGE
3       DESCRIPTION
4  Exhibit 370   Email String Subject: Newco   217
5       Update/Urgent Response Needed,
6       UBER00060147 - UBER00060156;
7
8  Exhibit 371   Email String Subject: Newco   220
9       Update/Urgent Response Needed,
10       UBER00060665 - UBER00060676;
11
12 Exhibit 372   Email String Subject: Newco,   227
13       UBER00063618 - UBER00063622;
14
15 Exhibit 373   Email 1/28/2016 Subject:   233
16       Newco, UBER00063617;
17
18 Exhibit 374   Google Calendar Meeting   235
19       3/11/2016, UBER00071424;
20
21 Exhibit 375   Email 3/21/2016 Subject: Newco   240
22       timing, UBER00060643 -
23       UBER00060644;
24
25 Exhibit 376   Text Message, LEV_002310;   244

Page 7

1        E X H I B I T S (cont'd)
2  NUMBER                          PAGE
3       DESCRIPTION
4  Exhibit 383   Text Message, UBER00073820;   278
5
6  Exhibit 384   Text Message, UBER00073809 -   280
7       UBER00073811;
8
9  Exhibit 385   Email String Subject:  Quick   285
10       updates, UBER00070012 -
11       UBER00070013;
12
13 Exhibit 386   Email String Subject:  Quick   290
14       Updates, UBER00063707 -
15       UBER00063708;
16
17 Exhibit 387   Email String Subject:   295
18       Messaging Notes, UBER00064468 -
19       UBER00064469;
20
21 Exhibit 388   Email String Subject:   298
22       UBER000064406 - UBER000644007;
23
24
25

Page 9

3 (Pages 6 - 9)

**Page 10**

```
 1        E X H I B I T S (cont'd)
 2  NUMBER                        PAGE
 3         DESCRIPTION
 4  Exhibit 389   Email 9/20/2016, Subject:   306
 5         Birdhouse LIDAR discussion,
 6         UBER00076770;
 7
 8  Exhibit 390   Retained;               311
 9
10  Exhibit 391   Letter 6/20/2017.       319
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 11**

```
 1  San Francisco, California; Thursday, July 27, 2017
 2          8:18 a.m.
 3          ---o0o---
 4
 5          THE VIDEOGRAPHER:  Good morning.  We are   08:18:16
 6  on the record at 8:18 a.m. on July 27th, 2017.
 7      This is the video-recorded deposition of
 8  Travis Kalanick.  My name is Jeffree Anderson, here
 9  with our court reporter, Rebecca Romano.
10      We are here from Veritext Legal Solutions   08:18:31
11  at the request of counsel for the plaintiff.
12      This deposition is being held at
13  405 Howard Street in San Francisco, California.
14      The caption of this case is Waymo, LLC,
15  versus Uber Technologies.  Case number is 17-00939.   08:18:44
16      Please note that audio and video
17  recording will take place unless all parties agree
18  to go off the record.  Microphones are sensitive
19  and may pick up whispers, private conversations,
20  and cellular interference.  And please be aware of   08:18:53
21  that.
22      Please state your name and the firm you
23  represent, beginning with the noticing attorney.
24      MR. VERHOEVEN:  Charles Verhoeven,
25  Quinn Emanuel, representing Waymo.   08:19:10
```

**Page 12**

```
 1          MR. JUDHA:  James Judha, Waymo.   08:19:14
 2          MR. PERLSON:  David Perlson,
 3  Quinn Emanuel, Waymo.
 4          MS. GOODMAN:  Martha Goodman,
 5  Boies Schiller, on behalf of Uber Technologies and   08:19:16
 6  Ottomotto.
 7          MR. BERGSTROM:  Aaron Bergstrom, in-house
 8  counsel, Uber.
 9          MR. BRILLE:  Mike Brille, Boies Schiller,
10  on behalf of Uber and Ottomotto.   08:19:30
11          MS. HAAG:  Melinda Haag,
12  Orrick Herrington & Sutcliffe, on behalf of
13  Mr. Kalanick.
14          MS. DUNN:  Karen Dunn, from
15  Boies Schiller Flexner, on behalf of Uber and   08:19:36
16  Ottomotto.
17          MS. VU:  Hong-An Vu of Goodwin Procter,
18  on behalf of Otto Trucking.
19          MR. CHATTERJEE:  Neel Chatterjee of
20  Goodwin Procter, on behalf of Otto Trucking.   08:19:44
21          THE VIDEOGRAPHER:  Thank you.
22          The witness will be sworn in and counsel
23  may begin the examination.
24          THE REPORTER:  If you could raise your
25  right hand for me, please.   08:20:06
```

**Page 13**

```
 1          THE DEPONENT:  (Complies.)   08:20:06
 2          THE REPORTER:  You do solemnly state,
 3  under penalty of perjury, that the testimony you
 4  are about to give in this deposition shall be the
 5  truth, the whole truth, and nothing but the truth?   08:20:06
 6          THE DEPONENT:  I do.
 7
 8
 9
10                              08:20:06
11
12
13
14
15                              08:20:06
16
17
18
19
20                              08:20:06
21
22
23
24
25  /////                       09:37:59
```

Page 14

1          TRAVIS KALANICK,              09:37:59
2 having been administered an oath, was examined and
3 testified as follows:
4
5          EXAMINATION                   09:37:59
6 BY MR. VERHOEVEN:
7     Q.  Good morning, Mr. Kalanick.
8     A.  Good morning.
9     Q.  Do you know when Waymo filed the
10 complaint in this action?              08:20:13
11    A.  I think that is sometime in February.
12    Q.  Do you know what day?
13    A.  I do not know.
14    Q.  Do you know when Anthony Levandowski
15 first asserted the Fifth Amendment in the Waymo   08:20:28
16 litigation?
17    A.  Sometime in March.
18    Q.  Do you know which day?
19    A.  I do not know.
20    Q.  And how did you find out about that?   08:20:41
21    A.  I found out there were sort of a couple
22 meetings.  They were with attorneys.
23    Q.  Did you ever talk with
24 Anthony Levandowski about whether he took Google
25 documents or Waymo documents?         08:21:06

Page 15

1     A.  Yes.                           08:21:08
2     Q.  When was the first time you had such a
3 conversation?
4     A.  It was upon the complaint.  The -- the
5 all-hands the day after the complaint, he   08:21:20
6 discussed -- he discussed working from home and
7 downloading files in that regard.
8     Q.  So the complaint was filed, and then
9 there was an all-hands meeting?
10    A.  Yeah.  Correct.                 08:21:55
11    Q.  Were you involved in setting up the
12 all-hands meeting?
13    A.  No, I wasn't.
14    Q.  Did you -- you need to speak up a little
15 bit.                                   08:22:01
16    A.  Sorry.  No, I wasn't.  I apologize.
17    Q.  Who -- who set the meeting?
18    A.  I don't know.
19    Q.  Did you attend the meeting?
20    A.  I did.                          08:22:07
21    Q.  All right.  Who was at the meeting?
22    A.  I think it was all of the San Francisco
23 and Pittsburgh ATG employees.  At the time I think
24 we called it ATC.
25    Q.  Anyone else from management?     08:22:30

Page 16

1     A.  Yeah.  There were -- I know we had our   08:22:34
2 head of litigation in the room.
3     Q.  And who do you mean by that?
4     A.  Angela Padilla.
5     Q.  Anyone else?                    08:22:44
6     A.  I mean, certainly the leaders of ATG were
7 there.
8     Q.  Anyone else that you remember?
9     A.  Not that I remember.  But that doesn't
10 mean they weren't there.  I just -- I don't   08:23:00
11 remember.
12        Probably came in a few minutes late, so I
13 was --
14    Q.  Okay.
15    A.  -- rushing in to the meeting.    08:23:07
16    Q.  And you spoke directly with
17 Mr. Levandowski?
18    A.  He was speaking to the whole -- to the
19 whole company -- or to the whole group.
20    Q.  After the complaint was filed, did you   08:23:16
21 personally reach out to Mr. Levandowski and say,
22 What's going on here?
23        MS. DUNN:  Objection to form.
24        THE DEPONENT:  I don't have a specific
25 recollection about a specific conversation, but I   08:23:28

Page 17

1 do -- I do feel like some kind of interaction   08:23:33
2 happened post the complaint.
3     Q.  (By Mr. Verhoeven)  Why do you feel like
4 that?
5     A.  I don't know.  It's just like a vague   08:23:43
6 sort of understanding, like a vague feeling.
7     Q.  Do you remember learning that the
8 complaint was filed?
9     A.  Yes.
10    Q.  Before that time, had you known anything   08:23:53
11 about Mr. Levandowski downloading Google
12 documents --
13    A.  No.
14    Q.  -- and taking them with him?
15        MS. DUNN:  Objection to form.   08:24:03
16        THE DEPONENT:  No.
17    Q.  (By Mr. Verhoeven)  So you were surprised
18 then when you read the complaint?
19    A.  I haven't read the complaint.
20    Q.  You've never read the complaint?   08:24:10
21    A.  No.
22    Q.  How did you find out about the
23 allegations in the complaint?
24    A.  John Quinn called me upon -- I don't know
25 if it was when he -- when the -- when it was filed,   08:24:19

1 but it was right around the time it was filed.  08:24:22
2   Q.  And what did you do next?
3   A.  I went to my next meeting.
4   Q.  So did you do anything with -- next with
5 respect to the allegations of the complaint?  08:24:31
6   A.  I mean, we had an all-hands the next day.
7   Q.  So you didn't reach out to
8 Mr. Levandowski before he spoke to the whole group?
9       MS. DUNN:  Objection to form.
10      THE DEPONENT:  I may have.  I don't  08:24:44
11 remember specifically.
12   Q.  (By Mr. Verhoeven)  Well, do you remember
13 having the -- withdrawn.
14      Do you remember the substance of the
15 first conversation you personally had with him  08:24:52
16 after the filing of the complaint relating to this
17 allegation of the download of Google documents?
18   A.  The first substantive conversation that I
19 recall was at the all-hands.
20   Q.  Okay.  What happened at the all-hands on  08:25:07
21 this subject -- well, just generally, what happened
22 at the all-hands?
23   A.  We got -- we sort of -- we were -- we
24 wanted to talk about the technology that we built
25 and that we had built it from the ground up.  08:25:24

Page 18

1       We wanted to give the employees the  08:25:27
2 confidence that we had that the technology was
3 built from the ground up.
4   Q.  Was the meeting called in connection with
5 the filing of the lawsuit?  08:25:36
6   A.  Yes.
7   Q.  Okay.  And who spoke on that subject?
8   A.  So I spoke for part of it.  Anthony spoke
9 for part of it.  A large portion of the speaking
10 time was taken by James Haslam, who was the head of  08:26:00
11 the laser effort at ATG.
12      Angela spoke.  And, I mean, other people
13 may have, but I don't remember.
14   Q.  Did you have a discussion with
15 Mr. Levandowski before the meeting started to  08:26:25
16 discuss what he was going to speak about and what
17 you were going to speak about?
18   A.  I don't recall specific discussion, but I
19 may have.
20   Q.  Would you expect that you would have?  08:26:37
21   A.  I -- I certainly would have liked to.
22   Q.  Do you have any reason to believe you did
23 not?
24   A.  I just don't remember specific
25 discussion.  Doesn't mean I didn't have it, I  08:26:51

Page 19

1 just -- I don't remember.  08:26:54
2       You know, the -- I had my -- my meetings.
3 My days are just scheduled sort of -- they're very
4 full.  They start early in the morning and they go
5 sometimes till 11:00 p.m. or midnight.  And  08:27:04
6 sometimes it could be, you know, just I talked to
7 somebody in the minutes between meetings.
8 Sometimes the meetings just keep rolling.
9 Sometimes they go long.
10   Q.  But you -- you saw him and you interacted  08:27:16
11 with him at this all-hands meeting, correct?
12   A.  Correct.  Yes.
13   Q.  Did you ask him, What's the deal with
14 these allegations about downloading documents?
15   A.  I don't remember specifically saying  08:27:27
16 that, but that feels, of course, like something
17 that I would want to know.
18   Q.  What did you -- what do you remember
19 saying?
20   A.  I -- I don't remember that -- like that  08:27:34
21 kind of interaction specifically.  But he certainly
22 explained himself during that -- during that
23 meeting.
24   Q.  Wouldn't you expect that you would ask
25 him that question personally?  08:27:51

Page 20

1       MS. DUNN:  Objection to form.  08:27:54
2       THE DEPONENT:  Generally, yeah.  I mean,
3 general- --
4   Q.  (By Mr. Verhoeven)  You don't remember
5 it?  08:27:59
6   A.  Don't remember specifically.
7   Q.  What did Mr. Levandowski say at the
8 meeting?
9   A.  He said that he worked from home and that
10 he downloaded files when he worked from home --  08:28:09
11 when he worked from home.
12   Q.  Anything else?
13   A.  There may have been other things.  That
14 was certainly something I remember from his -- from
15 his comments.  08:28:26
16   Q.  Do you remember anything else though?
17   A.  I mean, I remember James showing the
18 laser that he built.
19   Q.  No.  I mean -- I'm sorry.  I apologize.
20 I meant with respect to what Mr. Levandowski said.  08:28:36
21   A.  I don't remember anything else, no.
22   Q.  Okay.  Did he specify in any more detail
23 than just saying he downloaded files?
24   A.  I don't think so.
25   Q.  Did you have a discussion with him during  08:28:50

Page 21

6 (Pages 18 - 21)

**Page 22**

1 or after the meeting about his admission that he        08:28:53
2 downloaded files?
3         MS. DUNN: Objection to form.
4         THE DEPONENT: I don't remember a
5 specific discussion, but I do -- I do remember like        08:28:58
6 hearing that, Did any files get to Uber?  And doing
7 everything we can to make sure they didn't.
8         Q.  (By Mr. Verhoeven)  Were you aware prior
9 to the meeting that Mr. Levandowski had Google
10 files that he'd taken with him?        08:29:19
11         MS. DUNN: Objection to form.
12         THE DEPONENT: We had -- we had -- there
13 was a discussion during -- during the deal phase in
14 the March time frame -- this is 2016 -- where he
15 had -- where he had told a group of people, and I        08:29:41
16 was in that meeting, that he had some discs and
17 some content from his previous employer.
18         Q.  (By Mr. Verhoeven)  What did he --
19         A.  Backup discs, or something like that.
20         Q.  Did he say "backup discs"?        08:29:59
21         A.  I think so.
22         Q.  And what did he say about what was on
23 those discs?
24         A.  He didn't.
25         Q.  Did he -- did he indicate that those        08:30:08

**Page 23**

1 discs contained Google files?        08:30:10
2         A.  He indicated that they had some kind of
3 content from his previous employer.
4         Q.  Okay.  He didn't say they have some kind
5 of content, did he?        08:30:20
6         A.  I don't know what his specific words
7 were.
8         Q.  Okay.  And did you say anything in
9 response to that?
10         A.  I did.        08:30:30
11         Q.  What did you say?
12         A.  I said that he -- we -- that we, as a
13 whole, need to make sure that that content does not
14 make it to Uber, and that he needs to talk to
15 attorneys to figure out how to make sure that's        08:30:43
16 done properly.
17         Q.  But you don't remember at this meeting
18 asking him what is it that's on the files?
19         A.  No.
20         Q.  You don't remember asking him about any        08:31:11
21 of the circumstances surrounding the files?
22         A.  No, I do not.  I just wanted to make sure
23 that files from his previous employer or anywhere
24 else were not making it to Uber.
25         Q.  Did anyone -- who else was at the        08:31:27

**Page 24**

1 meeting?        08:31:28
2         A.  Cameron.  I am trying to think who else.
3 Nina.  Anthony was there.  I was there.
4         There may have been others.  I don't -- I
5 don't remember.        08:31:47
6         Q.  This was an in-person meeting?
7         A.  Yeah.
8         Q.  Where was it?
9         A.  It was at Uber HQ, 1455 Market Street.
10         Q.  Why would Mr. Levandowski tell you at        08:32:03
11 this meeting that he had had five discs of Google
12 files?
13         MS. DUNN: Objection to form.
14         THE DEPONENT: I don't know why he told
15 us.  But it's important when you do a deal that        08:32:15
16 people sort of disclose if there's any -- any
17 things that need to be discussed before a deal is
18 consummated.
19         Q.  (By Mr. Verhoeven)  Were there some
20 circumstances that made it appropriate at this        08:32:30
21 meeting for him to disclose that, that you're aware
22 of?
23         A.  I don't remember.  I don't remember
24 anything specific.
25         Q.  What was the purpose of the meeting?        08:32:38

**Page 25**

1         A.  You know, I think as we get closer to        08:32:45
2 deals, we have to have discussions about, Okay,
3 what are the things we need to do to get a deal
4 done?
5         I don't -- I don't know the specific        08:32:53
6 purpose though.
7         Q.  You don't remember?
8         A.  No.
9         Q.  Going back to the all-hands meeting --
10         A.  Yeah.        08:33:05
11         Q.  -- you don't remember having a discussion
12 with Mr. Levandowski after he made his
13 presentation?
14         A.  I mean, I've had many discussions with
15 Levandowski like over the years.        08:33:19
16         Q.  I meant -- I meant -- let me --
17         A.  Yeah.
18         Q.  I'm sorry.  The question was vague.
19         A.  Yeah.
20         Q.  You don't remember any conversation        08:33:26
21 during the meeting, after he made the presentation,
22 with Mr. Levandowski?
23         A.  Well, the meeting was -- I mean, the
24 meeting wasn't a discussion between him and me.
25 The meeting was us sort of speaking to the company.        08:33:38

7 (Pages 22 - 25)

**Page 26**

1   Q.   And after it broke up, did you go up and   08:33:44
2 talk to him?
3   A.   I don't think so.
4   Q.   Why not?
5   A.   I got a full day. I mean, I should   08:33:52
6 probably look at my calendar and see what the
7 schedule was.
8   Q.   So you maintain a calendar?
9   A.   Yeah, of course.
10   Q.   How is that maintained?   08:34:03
11   A.   My assistant maintains it.
12   Q.   And the name of your assistant, please?
13   A.   Tyler Blum.
14   Q.   And is it stored in a file somewhere? Is
15 it in a program?   08:34:15
16   A.   It's on Google servers.
17   Q.   Is there an application that she uses?
18   A.   Tyler is a guy.
19   Q.   I'm sorry.
20   A.   That's okay.   08:34:26
21   Q.   Is there a application that Mr. Bloom
22 uses?
23   A.   Blum.
24   Q.   Blum?
25   A.   Yeah.   08:34:33

**Page 27**

1     It's called -- it's called   08:34:32
2 Google Calendar. I'm sure your client would be
3 happy about that.
4   Q.   What did you say at this all-hands
5 meeting?   08:35:02
6   A.   I spoke about how it has always been
7 important for us to build technology from the
8 ground up, that Uber, we're innovators at Uber. At
9 Uber, we're leaders.
10     And we made sure during the deal process,   08:35:17
11 as well as subsequent -- you know, following that,
12 that the technology we made was ours.
13     And this is really about -- you know,
14 we've got literally, at this point, hundreds, if
15 not close to 1,000 at the point -- at that point,   08:35:35
16 hundreds of people who built this technology
17 themselves with their own hands, with their own
18 minds. And we're being accused of not having done
19 so.
20     And for them it was an emotional thing.   08:35:49
21     Right. So James Haslam, the guy who
22 built our laser team and built the laser which we
23 have been -- you know, we have been trying to get
24 to market, he didn't work at Google. He didn't see
25 any files.   08:36:08

**Page 28**

1     He built this thing with his own blood,   08:36:10
2 sweat, and tears. And be accused of -- of doing
3 that, of -- of taking something, he...
4   Q.   Are you finished with your answer?
5   A.   Well, I was in the middle of my answer.   08:36:34
6   Q.   I'm listening.
7   A.   Well, okay. To be accused of doing
8 something that he didn't do when he put in his
9 own -- his own mind, his own effort to make
10 something he was proud of was -- was an emotional   08:36:49
11 thing for him, and I think for a lot of people.
12   Q.   So are you just saying what you believe
13 he -- he was thinking, or are you talking about
14 something he said?
15   A.   I'm talking about how a large group of   08:37:01
16 people felt --
17   Q.   Okay.
18   A.   -- post that complaint.
19   Q.   Do you remember what Mr. Haslam said at
20 the meeting?   08:37:12
21   A.   Yeah. He talked about the laser that he
22 built and how he built it, how his team built it.
23 You know, he talked about the different components
24 and things you would only know if you built it.
25 And, of course, he never worked at Google.   08:37:26

**Page 29**

1   Q.   Did he -- what else did he say when he   08:37:30
2 spoke at the meeting?
3   A.   I think that was the majority of it.
4   Q.   Do you remember anything else that
5 Mr. Haslam said when he spoke at the meeting?   08:37:40
6   A.   I do not.
7   Q.   What about Ms. Padilla?
8   A.   Ms. Padilla, she spoke about our
9 confidence that we had built this technology from
10 the ground up, and spoke about, sort of at a high   08:38:01
11 level, sort of the kind of processes we go through
12 to make sure that the technology we build is -- is
13 ours.
14   Q.   And what processes did she talk about?
15   A.   She didn't go into the process -- any   08:38:21
16 processes in detail, but, you know, just our
17 values, you know, and the things we do, just at a
18 high level, to make sure that we built things the
19 right way.
20   Q.   And what things did -- did that -- that   08:38:37
21 Uber does --
22   A.   Yeah.
23   Q.   -- did she mention?
24   A.   I don't remember specifically what those
25 were that she mentioned.   08:38:45

8 (Pages 26 - 29)

ATTORNEYS' EYES ONLY

Page 30

```
 1    Q.  Do you remember any process to ensure    08:38:47
 2  that Google didn't use other people's proprietary
 3  information that she mentioned during the meeting
 4  when she spoke?
 5       MS. DUNN:  Objection to form.    08:39:00
 6       MR. CHATTERJEE:  Join.
 7       MS. DUNN:  And Charlie, you might want to
 8  rephrase the question.
 9       MR. VERHOEVEN:  Okay.  I did misspeak.  I
10  apologize.    08:39:08
11       THE DEPONENT:  I am not familiar with
12  Google's processes.
13    Q.  (By Mr. Verhoeven)  Yes, I meant to say
14  Uber.
15    A.  That's okay.  Can you say the question    08:39:14
16  again.
17    Q.  Yes, I will.
18       Do you remember any process to ensure
19  that Uber didn't use other people's proprietary
20  information that she mentioned during the meeting    08:39:22
21  when you spoke?
22    A.  Yeah.  I don't -- I don't think she
23  mentioned specific processes, but she did talk
24  about our confidence that we were going to win the
25  case.    08:39:34
```

Page 31

```
 1    Q.  What did she say about that?    08:39:35
 2    A.  She said we're going to win.
 3    Q.  Anything else?
 4    A.  She may have, but I do remember that
 5  part.    08:39:42
 6    Q.  Do you remember anything else?
 7    A.  Not specifically.
 8    Q.  Generally, that she said?
 9    A.  I think -- I think I have spoken to that.
10    Q.  So you've told me everything you    08:39:52
11  generally remember?
12    A.  Yeah.
13    Q.  Okay.
14    A.  Yeah.
15    Q.  Did anyone ask any questions at the    08:40:03
16  all-hands meeting?
17    A.  Yes.
18    Q.  Who asked questions?
19    A.  I don't know.
20    Q.  Do you remember any of the questions    08:40:12
21  generally?
22    A.  No.
23    Q.  Did anyone ask about whether the
24  allegations in the complaint about downloading
25  documents were true?    08:40:23
```

Page 32

```
 1    A.  Yes, I think so.    08:40:24
 2    Q.  Okay.  What do you remember about that?
 3    A.  Well, I remember Anthony's answer.
 4    Q.  Do you remember -- okay.
 5       What was Anthony's answer?    08:40:33
 6    A.  Anthony's answer was that he downloaded
 7  files when he worked from home.
 8    Q.  The same thing you remembered him saying
 9  before?
10    A.  Correct.  Yes.    08:40:41
11    Q.  Do you remember anything else about what
12  he said in his answer?
13    A.  I do not.
14    Q.  Okay.
15    A.  I think it was -- it was -- I remember it    08:40:48
16  being a short answer.
17    Q.  Were you surprised by that answer?
18    A.  I was not, no.
19    Q.  Why not?
20    A.  I don't know.  I -- I feel like -- I    08:40:58
21  think there's a couple things.  One is I kind of
22  felt like -- like I'm not sure if it's post
23  complaint but before the all-hands that we had had
24  some kind of discussion about it, I can't remember,
25  or just simply so much confidence that we had done    08:41:12
```

Page 33

```
 1  the right thing and that we built this from the    08:41:16
 2  ground up, that it sounded like a normal answer.
 3    Q.  So it wasn't surprising to you that he
 4  downloaded -- he had downloaded Google/Waymo
 5  documents in his possession?    08:41:30
 6       MS. DUNN:  Objection to form.
 7       THE DEPONENT:  I think it was -- if
 8  indeed that's what happened, that's certainly
 9  unfortunate.  I was not happy about that.
10    Q.  (By Mr. Verhoeven)  Do you remember not    08:41:40
11  being happy?
12    A.  Yeah.  Certainly, over time I became more
13  and more unhappy about it, but yes.
14    Q.  Did you -- I think you mentioned, but
15  correct me if I'm wrong, that when you spoke --    08:42:02
16    A.  Yeah.
17    Q.  -- at the meeting, you talked about steps
18  that were taken during the process of the
19  acquisition that ensured that no information made
20  it to Uber?    08:42:15
21    A.  I mean, I didn't get into steps, but I
22  talked about our confidence, the confidence I had
23  in the team that did the deal, and generally the
24  team that built processes to make sure that content
25  from anybody's previous employer, and certainly    08:42:33
```

9 (Pages 30 - 33)

1 Google in this particular transaction, didn't make 08:42:36
2 it to Uber.
3 Q. And what team were you referring to?
4 A. You know, the deal team. So this would
5 be like Cameron on bus dev and corp dev; Salle Yoo, 08:42:44
6 our general counsel, and her team, you know; and
7 various other folks that were involved.
8 Q. I assume -- well, let me ask you. Was
9 there any transcript or video of the all-hands
10 meeting? 08:43:04
11 A. I don't know.
12 Q. Before the complaint was filed -- let me
13 back up. I'm now scoping out again --
14 A. Yeah.
15 Q. -- and ask you general questions. 08:43:18
16 A. Yeah, yeah.
17 Q. You've already testified that you recall
18 a conversation before the complaint was filed in
19 which Mr. Levandowski referred to these discs.
20 A. Yeah. 08:43:32
21 Q. Okay.
22 A. Some sort of backup discs or something,
23 yeah.
24 Q. Other than that conversation, do you
25 recall any conversation that you had with 08:43:38

Page 34

1 Mr. Levandowski about whether or not he had Google 08:43:40
2 or Waymo files before the filing of the complaint?
3 A. No.
4 Q. Do you -- do you recall any conversation
5 that you had with anybody about whether 08:43:53
6 Mr. Levandowski took Google or Waymo files prior to
7 the filing of the complaint?
8 A. No. I mean, outside -- sorry. Excuse
9 me. Outside of discussions -- a couple of
10 discussions with attorneys as we were going through 08:44:12
11 a diligence process.
12 Q. Okay. So there was a couple of
13 discussions with attorneys that covered that
14 subject?
15 A. Yeah. 08:44:20
16 Q. Okay. What do you remember?
17 MS. DUNN: Objection.
18 I'm going to instruct the witness not to
19 answer about conversations that he had with
20 attorneys. 08:44:28
21 Q. (By Mr. Verhoeven) Do you remember when?
22 A. It was leading up to the deal -- leading
23 up to the closing of the deal, yeah.
24 Q. So August 2016?
25 A. Sorry. Leading up to the signing of the 08:44:45

Page 35

1 deal. 08:44:48
2 Q. So can you give me a time frame?
3 A. Sorry. Let's call it March/April of
4 2016, in that time period.
5 Q. You had a conversation concerning whether 08:45:02
6 or not Mr. Levandowski downloaded Google/Waymo
7 documents, correct?
8 MS. DUNN: Objection to form.
9 THE DEPONENT: Can you restate the
10 question. 08:45:13
11 MS. DUNN: Also --
12 MR. VERHOEVEN: I can read it back.
13 MS. DUNN: The only conversations that
14 we've talked about are conversations with
15 attorneys. And the witness has been instructed not 08:45:19
16 to answer.
17 Q. (By Mr. Verhoeven) You had conversations
18 during this time frame that concern the subject
19 matter of Mr. Levandowski and whether or not he
20 took Google or Waymo documents, correct? 08:45:36
21 MS. DUNN: Objection. Same basis.
22 The witness is instructed not to answer.
23 He has already told you that the only conversation
24 he has had and you have asked about are with
25 counsel. 08:45:50

Page 36

1 MR. VERHOEVEN: Yes. But he's also 08:45:53
2 testified that he had conversations on that
3 subject. I'm simply confirming that.
4 MS. DUNN: Well, if you believe he's
5 testified to it, you don't need to confirm it. 08:45:59
6 The witness is instructed not to answer.
7 Q. (By Mr. Verhoeven) Who was at the -- how
8 many meetings do you recall in March or April?
9 MS. DUNN: Objection to form.
10 MR. CHATTERJEE: Join. 08:46:09
11 THE DEPONENT: I don't know. Two or
12 three. I can't say for sure, but that feels about
13 right.
14 Q. (By Mr. Verhoeven) And why did you have
15 these meetings? 08:46:22
16 MS. DUNN: Objection. Same basis.
17 And I'm happy to stop this deposition if
18 we're going to continue to have questions that just
19 get to privileged communications.
20 Q. (By Mr. Verhoeven) Is there anything -- 08:46:32
21 MR. VERHOEVEN: He's allowed to testify
22 about nonprivileged aspects of my questions,
23 Counsel.
24 MS. DUNN: That's not what you're asking
25 about. 08:46:38

Page 37

10 (Pages 34 - 37)

1  Q.  (By Mr. Verhoeven)  Did you have this          08:46:40
2  meeting because attorneys required you or asked you
3  to?
4       MS. DUNN:  Objection.  Same basis.
5       You're instructed not to answer.          08:46:46
6  Q.  (By Mr. Verhoeven)  What was the purpose
7  of the meeting?
8       MS. DUNN:  Objection.  Same basis.
9       MR. VERHOEVEN:  I'm making my record,
10 Counsel.                                    08:46:56
11      MS. DUNN:  Well, you -- you made your
12 record.
13      MR. VERHOEVEN:  No.  I have to make my
14 record so that when I go and move to compel later,
15 I have a basis.  And I can say -- demonstrate to     08:47:02
16 the Court the specific questions that you
17 instructed on.
18      So I'm going to ask the questions.
19      MS. DUNN:  Charlie, as you know, if you
20 continue to ask the same questions about the same     08:47:15
21 privileged information, that's improper.
22 Q.  (By Mr. Verhoeven)  Who was at the first
23 of these meetings?
24 A.  So what I can do is I can speak to the
25 meeting I had that didn't have attorneys.          08:47:27

Page 38

1  Q.  Okay.                                    08:47:29
2  A.  So --
3  Q.  Which meeting was that?
4  A.  That was the meeting that had Cameron and
5  Nina and Anthony, and possibly others, I just can't     08:47:37
6  remember.  And this is the meeting we spoke to
7  earlier -- that I spoke to earlier.
8  Q.  Okay.  So this is the meeting about the
9  five discs or that -- in which the five discs came
10 up?                                         08:47:54
11 A.  Well, I -- I'm not sure how many discs I,
12 but it was something like that, yes.
13 Q.  Okay.  And why were you having that
14 meeting?
15 A.  Okay.  We were having that meeting          08:48:06
16 because -- well, I don't remember the exact, like,
17 calendar request or purpose, but we were getting
18 through a deal process and we wanted to sort of get
19 to the -- see if we can get to closure on the deal.
20 Q.  Did someone at the meeting ask          08:48:28
21 Mr. Levandowski whether or not he had any Google
22 documents?
23 A.  I don't remember that.
24 Q.  Do you remember whether he volunteered it
25 or whether it was in response to a question?          08:48:38

Page 39

1  A.  I don't remember specifically.          08:48:44
2  Q.  Was anything else discussed at the
3  meeting?
4  A.  I think so, yes.
5  Q.  Can you tell me what you remember.          08:48:50
6  A.  I don't remember much of it.
7  Q.  Do you remember anything, though?
8  A.  Not really.
9  Q.  Okay.  So the answer is no?
10 A.  The answer is not really.          08:49:02
11 Q.  But you don't remember -- you can't
12 identify for me anything else that occurred in the
13 meeting, correct?
14      MS. DUNN:  Objection to form.
15      THE DEPONENT:  I'm trying to think if     08:49:13
16 there's anything.  I mean, other than generally
17 just talking about the deal and getting the deal to
18 closure, I -- I don't have more specifics on that.
19 Q.  (By Mr. Verhoeven)  Okay.  Did you have
20 another meeting during the March/April time frame     08:49:36
21 on the subject of Levandowski and Google or Waymo
22 documents?
23 A.  I had at least a couple meetings with my
24 general counsel about diligence, generally.
25 Q.  Was the subject of Google documents          08:50:03

Page 40

1  discussed during those meetings?          08:50:06
2       MS. DUNN:  Objection.  The content of
3  those meetings would be privileged.
4       You're instructed not to answer.
5  Q.  (By Mr. Verhoeven)  And when you say          08:50:17
6  "general counsel," who was that at the time?
7  A.  Salle Yoo.
8  Q.  Was the subject of diligence concerning
9  Mr. Levandowski discussed at this meeting?
10      MS. DUNN:  Objection.  Content of the     08:50:38
11 meeting and discussions is privileged.
12      You're instructed not to answer.
13 Q.  (By Mr. Verhoeven)  There was a couple of
14 meetings, correct?
15 A.  I remember -- I remember a couple.  Like     08:50:49
16 it -- it's -- it feels like it was a couple.  I
17 don't know for sure, but something like that.
18 Q.  Who was at the first meeting?
19 A.  I don't know.  I know that our general
20 counsel was.  I'm not sure if there were others     08:51:05
21 there or not.  I can't remember.
22 Q.  Do you remember if there were outside
23 counsel?
24 A.  I can't remember.  I don't think so.
25 Q.  Was anyone from Morrison Foerster there?     08:51:15

Page 41

Veritext Legal Solutions
866 299-5127

1    A.  I don't know.                    08:51:22
2    Q.  Was anyone from O'Melveny Myers there?
3    A.  I don't know.
4    Q.  Same questions for the second meeting.
5 Do you remember who was there?          08:51:30
6    A.  No, not specifically.
7    Q.  You do remember that general counsel
8 Salle Yoo was there?
9    A.  Yes.
10   Q.  Was anyone else from Uber there?   08:51:39
11   A.  Possibly, but I just -- I just don't
12 remember.
13   Q.  Was anyone from Otto there?
14   A.  I don't know.  I don't think so.
15   Q.  Was Mr. Levandowski there?         08:51:51
16   A.  I don't think so.
17   Q.  And that goes for the -- the first of
18 those two meetings, too?
19   A.  Yeah.
20   Q.  Did you learn that -- at either of these  08:52:09
21 meetings, did you learn that Mr. Levandowski had
22 taken Google documents when he left?
23       MS. DUNN:  Objection.  Contents of the
24 meeting would be privileged communications.
25       The witness is instructed not to answer.  08:52:23

Page 42

1        MR. VERHOEVEN:  To just whether he    08:52:29
2 learned it.
3        MS. DUNN:  What he learned at those
4 meetings would be privileged.
5        MR. VERHOEVEN:  Okay.  I'm just        08:52:34
6 clarifying --
7        MS. DUNN:  I understand.
8        MR. VERHOEVEN:  -- you're instructing on
9 that.
10       MS. DUNN:  I'm instructing on that.    08:52:40
11   Q.  (By Mr. Verhoeven)  Going back out, any
12 other conversations concerning Levandowski's taking
13 the Google documents, other than what you've
14 already testified about --
15   A.  Yeah.                                  08:52:53
16   Q.  -- prior to filing of the complaint, that
17 you remember?
18   A.  No.
19       MS. DUNN:  Objection to form.
20       MR. CHATTERJEE:  Join.               08:52:57
21   Q.  (By Mr. Verhoeven)  Okay.  Prior to the
22 filing of the complaint, are there any other
23 conversations that you've had with anyone that you
24 can recall that concerned the subject matter of
25 Mr. Levandowski taking Google or Waymo documents,  08:53:13

Page 43

1 other than the ones you've already testified about?  08:53:17
2        MS. DUNN:  Objection to form.
3        MR. CHATTERJEE:  Join.
4        THE DEPONENT:  No.
5    Q.  (By Mr. Verhoeven)  After the -- we're  08:53:36
6 still way out.  After the all-hands meeting --
7    A.  Yeah.
8    Q.  -- moving forward from that --
9    A.  Yeah.
10   Q.  -- what was the next conversation, if    08:53:49
11 any, that you had with Mr. Levandowski concerning
12 the subject of whether or not he took Google/Waymo
13 documents?
14   A.  I don't remember the next conversation
15 specifically.  But regarding this topic, I was     08:54:01
16 pretty -- I was pretty serious with him about
17 making sure that these files had not and will not
18 make it to Uber.
19   Q.  And can you explain what you mean by
20 "pretty serious about."                            08:54:49
21   A.  We believe in building things, and we
22 believe in building things the right way.  And I
23 wanted to make it absolutely clear that no files of
24 any kind from anybody's previous employer make it
25 to Uber.  And I have always made that very clear to  08:55:10

Page 44

1 many people at the company.                        08:55:13
2        And when you hear of something like
3 somebody downloading files, you say, Look, have --
4 has any of these files made it over to Uber?
5        And you get through that question, and    08:55:28
6 then the next question or the next sort of
7 statement or command is, You need to make sure that
8 nothing of any kind that comes from any previous
9 place makes it to this company, period.
10   Q.  What did you say to Mr. Levandowski on    08:56:08
11 that subject?
12   A.  I made it very clear to him that we -- I
13 made it very -- well, the first question is, Did
14 anything make it to Uber?
15        And he made it very clear to me that      08:56:22
16 absolutely nothing that he downloaded made it to
17 Uber in any way.
18        And the second part is, I made it very
19 clear to him how important it was to me that that
20 was the case and that we would look into          08:56:37
21 everything, every server, every person at the
22 company, to make sure that that was true.
23   Q.  Okay.  So -- when -- when did this
24 conversation happen?
25   A.  I don't remember -- I don't remember when  08:56:50

Page 45

Veritext Legal Solutions
866 299-5127

ATTORNEYS' EYES ONLY

```
 1  this specific conversation happened or like the    08:56:52
 2  exact date or time, but I know that that kind of
 3  conversation happened with him.
 4      Q.  How do you know that?
 5      A.  I just -- I just generally recollect that   08:57:07
 6  kind of conversation.
 7      Q.  But you don't remember when it happened?
 8      A.  No.
 9      Q.  Do you remember what month it happened
10  in?                                                 08:57:18
11      A.  I mean, I can guess that it was pretty
12  close to the all-hands meeting.
13      Q.  Was it after or before the all-hands
14  meeting?
15      A.  I feel like that was after, but I don't     08:57:31
16  know for sure.  It may have been after the
17  complaint and before the all-hands, but I -- I
18  can't remember for sure.
19      Q.  Was it in February of 2017?
20      A.  I mean, whenever the complaint was and      08:57:50
21  the all-hands, there was probably, I don't know,
22  maybe 12 to 24 hours in between.  It was either in
23  that portion of time or in the hours following the
24  all-hands meeting.  And I don't know exactly --
25      Q.  Was the conversation in person?            08:58:00
                                            Page 46
```

```
 1      A.  I don't know for sure.                     08:58:04
 2      Q.  Was it over the phone?
 3      A.  It may have been.
 4      Q.  But you don't remember if it was in
 5  person or over the phone?                          08:58:14
 6      A.  I do not know.
 7      Q.  Was anyone else present during the
 8  conversation or on the line?
 9      A.  I don't know for sure.  I mean, on the
10  line, my guess is probably not if it were over the  08:58:23
11  phone.  If it were in person, it could have just
12  been like passing in the hall, or it could have
13  been that I was with an attorney.  I just don't --
14  I don't remember.
15      Q.  Would that have been set on your           08:58:41
16  calendar?
17      A.  It may have been.  I don't know.  I -- I
18  don't -- I don't know.
19      Q.  Did you schedule a meeting with him about
20  it?                                                08:58:54
21      A.  I don't remember a specific meeting about
22  it other than the all-hands, of course.
23      Q.  What did you say to him specifically?
24      A.  I don't remember what I specifically
25  said.                                              08:59:25
                                            Page 47
```

```
 1      Q.  What did you say to him generally?         08:59:25
 2      A.  I generally said -- well, the -- the
 3  first -- the first thing is, Did any of these files
 4  make it over to Uber?
 5      Q.  Okay.  So you asked him that question.     08:59:38
 6      A.  Yes.
 7      Q.  What did he say?
 8      A.  He said, Absolutely not.
 9      Q.  Did you ask him, Did you take Google
10  files with you?                                    08:59:48
11      A.  I did not ask him.
12      Q.  Why not?
13      A.  I -- I don't know.  I just didn't.
14      Q.  Wouldn't that be important to you to
15  know?                                              08:59:56
16          MS. DUNN:  Objection to form.
17          THE DEPONENT:  My biggest concern was
18  that nothing from Google ended up at Uber.  That
19  was the most important thing for me.
20      Q.  (By Mr. Verhoeven)  But you were           09:00:09
21  concerned that -- that -- about the allegation that
22  he downloaded 14,000 proprietary files from Google
23  before he left and joined your company, weren't
24  you?
25          MS. DUNN:  Objection to form.              09:00:19
                                            Page 48
```

```
 1          THE DEPONENT:  I was very -- I didn't      09:00:21
 2  know the details of the allegation.  We were going
 3  to -- we were going to look into that allegation
 4  and find out what the details were.
 5          But in the -- in the moment of that        09:00:33
 6  complaint and sort of let's call it the following
 7  days, my No. 1 concern is that nothing from Google
 8  ended up at Uber.  Period.
 9          And I was not just going to ask and find
10  out, Hey, did anything make it?  But I was also    09:00:50
11  going to do everything in my power to verify that
12  that was true.
13      Q.  (By Mr. Verhoeven)  But my question was,
14  certainly you were concerned about the allegation
15  that had been made in the complaint that           09:01:04
16  Mr. Levandowski took files with him when he left
17  Google to join Uber.
18          MS. DUNN:  Objection to form.
19      Q.  (By Mr. Verhoeven)  Weren't you concerned
20  about that?                                        09:01:19
21      A.  Anytime there's an allegation, and
22  including this kind of allegation, you're going to
23  have some kind of concern.  And then the next thing
24  is you have to start looking into it and find out
25  what's true.                                       09:01:31
                                            Page 49
```

                                    13 (Pages 46 - 49)

1    Q.  At the time you had the conversation, you    09:01:32
2  were concerned about that, right?
3    A.  Yes.  But what I -- but what I was most
4  concerned about was making sure that nothing from
5  Google -- verifying that nothing from Google had    09:01:43
6  made it over to Uber.
7        Now, I was generally confident that
8  nothing had.  But when an allegation like that
9  comes, you need to double- and triple-check.
10    Q.  But you are sure you didn't ask him    09:01:57
11  whether he downloaded those files?
12    A.  He admitted that he downloaded files.
13    Q.  Okay.  Did you talk about that with him
14  when you had this conversation shortly after the
15  complaint?    09:02:07
16    A.  I don't remember doing that, no.
17    Q.  Why wouldn't you?
18        MS. DUNN:  Objection to form.
19        THE DEPONENT:  I was most concerned about
20  whether files had made it to Uber and had -- that's    09:02:22
21  where I'm starting.
22        You can imagine being in my position.
23  The first thing you're going to ask, Did anything
24  that you have from your previous employer make it
25  to Uber?    09:02:32

Page 50

1        And then you get a very confirma- -- I    09:02:34
2  got a very confirmatory, Absolutely not.
3        And then my second thing is, We are going
4  to make sure that that is the case.  We are going
5  to have independent investigators look into this    09:02:44
6  and find out whether that is true.  And you need to
7  make sure that that continues to be true.
8    Q.  (By Mr. Verhoeven)  Okay.  Do you
9  remember what you said to him about having
10  independent investigators --    09:03:02
11    A.  No.
12    Q.  -- make sure?
13    A.  I don't remember the specifics, but we
14  certainly had an investigation that started looking
15  through every server forensically, and started    09:03:15
16  interviewing -- started interviewing, you know,
17  many engineers, dozen of engineers, to verify that
18  they hadn't seen any files, and verify that those
19  files never touched us.
20    Q.  Did you direct that specifically to    09:03:33
21  happen?
22    A.  Our chief security officer, Joe Sullivan,
23  did.
24    Q.  And how do you know that?
25    A.  At some point I was told that that was    09:03:42

Page 51

1  going on.    09:03:45
2    Q.  By whom?
3    A.  I don't remember.
4    Q.  You don't remember?
5    A.  No.    09:03:48
6    Q.  What conversations did you have within
7  Uber about this investigation that you referred to?
8        MS. DUNN:  I will just caution the
9  witness to only answer to the extent that it
10  doesn't involve conversations with counsel.    09:04:02
11        THE DEPONENT:  Yeah.
12        MR. VERHOEVEN:  So just for the record,
13  Counsel, you're instructing the witness not to
14  answer any conversations he had with counsel about
15  the subject of any investigations that were done    09:04:10
16  after the filing of the complaint?
17        MS. DUNN:  I am -- I am instructing the
18  witness to answer your question only to the extent
19  that it doesn't involve privileged communications
20  with counsel.  That's my instruction.    09:04:21
21        MR. VERHOEVEN:  Including conversations
22  on the subject of investigations done after the
23  complaint?
24        MS. DUNN:  Charlie, your responsibility
25  is to ask the question.    09:04:29

Page 52

1    Q.  (By Mr. Verhoeven)  Do you remember any    09:04:30
2  discussions you had with anyone within Uber about
3  investigations done after the filing of the
4  complaint?
5    A.  I do.    09:04:38
6    Q.  Okay.
7    A.  Those -- all of those conversations
8  happened with attorneys for -- with the company.
9    Q.  And for the record, how many -- what --
10  what did you discuss?    09:04:50
11        MS. DUNN:  Objection on grounds of
12  privilege.
13        The witness is instructed not to answer.
14    Q.  (By Mr. Verhoeven)  How many discussions
15  did you have?    09:04:57
16    A.  I can't remember.
17    Q.  What's your best estimate?
18    A.  I would say a few to a handful.  And
19  these could have been brief things like, What's the
20  status?  Or What's the update?    09:05:11
21        Sorry.
22        MS. DUNN:  The witness is instructed not
23  to answer to the extent that it concerns content of
24  the conversations.
25    Q.  (By Mr. Verhoeven)  What was -- so you    09:05:19

Page 53

14 (Pages 50 - 53)

1 asked what was the status --                    09:05:20
2    A.  Yeah.
3    Q.  -- of the investigation at these meetings
4 with counsel?
5    A.  These are conversations --               09:05:27
6        MS. DUNN:  I'm sorry.  Hold on.  I have
7 to -- I mean...
8        (Discussion off the stenographic record.)
9        MS. DUNN:  Objection on grounds of
10 privilege.                                      09:06:19
11       The witness is instructed not to answer.
12   Q.  (By Mr. Verhoeven)  When was the first of
13 those meetings?
14   A.  I can't remember.
15   Q.  How many were there exactly?              09:06:30
16   A.  I can't remember.
17   Q.  Over what period of time did they occur?
18   A.  Over the months following the complaint.
19   Q.  And what did you learn from those
20 meetings with counsel?                          09:06:47
21       MS. DUNN:  Objection on grounds of
22 privilege.
23       The witness is not -- instructed not to
24 answer.
25   Q.  (By Mr. Verhoeven)  Did you receive       09:06:58

Page 54

1 reports during those meetings of the status of the   09:06:59
2 investigation?
3        MS. DUNN:  Objection on grounds of
4 privilege.
5        The witness is instructed not to answer.   09:07:04
6    Q.  (By Mr. Verhoeven)  Let's go back --
7        MS. DUNN:  Can we get a time check.
8        THE VIDEOGRAPHER:  We have been on the
9 record for 49 minutes.
10       THE DEPONENT:  Six hours and 11 minutes.   09:07:25
11       MS. DUNN:  Oh, this might be a good time
12 to mention.  So our position is, as I emailed you
13 last night --
14       MR. VERHOEVEN:  Let's do that off the
15 record because I don't want to use up time.       09:07:31
16       MS. DUNN:  Okay.
17   Q.  (By Mr. Verhoeven)  Let's go back to this
18 conversation that -- where you talked about the two
19 things --
20   A.  Yeah.                                      09:07:40
21   Q.  -- with Mr. Levandowski.
22   A.  Yeah.
23       And, again, that's like a general -- like
24 I can't remember the specific conversation, but I
25 recollect those being the important things, and I    09:07:53

Page 55

1 remember having an interaction like that of some   09:07:55
2 kind.
3    Q.  Is that the best you can recall?
4    A.  That's the best, yeah.
5    Q.  All right.  Let's -- let's scope out       09:08:03
6 again.
7    A.  Okay.
8    Q.  And let me ask, for the record, other
9 than this general recollection you have --
10   A.  Yeah.  Yeah.                               09:08:32
11   Q.  -- did you have any other conversations
12 with Mr. Levandowski after the complaint was filed
13 concerning the subject of whether he took
14 Google/Waymo documents?
15   A.  I mean, the general recollection, like     09:08:50
16 that kind of conversation could have happened more
17 than once.  I don't know for sure.
18   Q.  You have no specific recollection.
19   A.  No.
20   Q.  Do you have any recollection that's --     09:09:01
21 that's in any way concrete of speaking to
22 Mr. Levandowski after the complaint was filed,
23 other than this general recollection you have given
24 me --
25   A.  Yeah, no.                                  09:09:13

Page 56

1    Q.  -- on the subject of whether or not he     09:09:13
2 took Google/Waymo proprietary information?
3    A.  Well, I think the -- the all-hands was a
4 very specific recollection.
5    Q.  Other than that.                           09:09:27
6    A.  No.
7    Q.  At any time?
8    A.  No.
9    Q.  Why didn't you fire Mr. Levandowski after
10 the complaint was filed?                          09:09:43
11   A.  I did.
12   Q.  I mean right after the complaint was
13 filed.
14   A.  Oh, well, look, at Uber we have -- you
15 know, we see a number of allegations and           09:09:55
16 complaints.  And the way we think about that is,
17 when we see an allegation, we take it really
18 seriously.
19       We look into it.  We investigate it.  We
20 get to the bottom of it.  And then we make a       09:10:14
21 decision about what to do about it.
22       And so immediately following an
23 allegation, we have to look into the allegation and
24 see what the details are before we take some kind
25 of action.                                        09:10:29

Page 57

15 (Pages 54 - 57)

1     Q.   Why didn't you fire Mr. Levandowski after    09:10:30
2 you learned from him -- from Mr. Levandowski
3 himself, that he did download Google documents at
4 the all-hands meeting?
5     A.   I think his explanation at the all-hands    09:10:44
6 meeting was that he was downloading files to work
7 from home.
8     Q.   So -- but you didn't ask him whether or
9 not he still had those and whether or not he was
10 using those files?                 09:11:00
11     MS. DUNN:   Objection to form.
12     THE DEPONENT:   Like I said, I made sure
13 that none of those files made it to Uber and that
14 they were not being used.
15     Q.   (By Mr. Verhoeven)   Did you specifically    09:11:07
16 ask him, Did any of those files you downloaded
17 make -- make it to Uber?
18     A.   Absolutely.
19     Q.   What did he say?
20     A.   Absolutely not.            09:11:16
21     Q.   Did you ask him, Do you still have those
22 files?
23     A.   I did not ask him that.
24     Q.   Why not?
25     A.   I don't -- I don't know. I was -- I was    09:11:23

Page 58

1 mostly -- I was most concerned that content data,    09:11:25
2 et cetera, from a previous employer was not being
3 used to build what we build here at Uber.
4     Q.   Well, you knew that Mr. Levandowski took
5 his personal laptop to work, right?        09:11:39
6     MS. DUNN:   Objection to form.
7     THE DEPONENT:   I didn't know that.
8     Q.   (By Mr. Verhoeven)   You didn't know there
9 were any restrictions on that, did you?
10     MS. DUNN:   Objection to form.         09:11:48
11     THE DEPONENT:   I am just not in the weeds
12 of that kind of stuff.
13     Q.   (By Mr. Verhoeven)   People take their
14 personal laptops to work all the time at Uber,
15 don't they?                  09:11:55
16     MS. DUNN:   Objection to form.
17     THE DEPONENT:   I don't think that's a
18 normal process -- a normal thing. I think it
19 might -- maybe happens. You know, maybe it happens
20 with some employees, but it's not something that we    09:12:06
21 generally do.
22     Q.   (By Mr. Verhoeven)   It's not prohibited,
23 is it?
24     A.   I don't think so.
25     MS. DUNN:   Objection to form.         09:12:14

Page 59

1     Q.   (By Mr. Verhoeven)   People work from home    09:12:19
2 at Uber all the time, too, don't they?
3     A.   Yes.
4     Q.   How common a practice is that, generally?
5     A.   More common than I would like.       09:12:28
6     Q.   So can you be any more specific about
7 that?
8     A.   About what, specifically?
9     Q.   People do it a lot?
10     A.   You know, I would say not a lot,     09:12:39
11 but it -- but I would say people at Uber work
12 pretty hard.
13     Q.   Right.
14     A.   And sometimes that means it's after
15 having dinner with -- you know, with the family or    09:12:48
16 something, and that's at home.
17     Q.   Looking at your documents, it looks like
18 there's communications all the way up past
19 midnight.
20     Is that pretty routine at Uber?       09:12:58
21     MS. DUNN:   Objection to form. And -- I
22 will leave it at that for now. Objection to form.
23     THE DEPONENT:   I take pride in our work
24 ethic.
25     Q.   (By Mr. Verhoeven)   So it is pretty     09:13:11

Page 60

1 routine.                    09:13:12
2     A.   I mean, for some people yes, for some
3 people no.
4     Q.   And --
5     A.   As an owner in the business, I would like    09:13:15
6 it to be more routine.
7     Q.   And you don't expect them to -- to be at
8 the office at that point in time, right?
9     A.   It just depends, but not generally.
10     Q.   So it's okay if they're responding from    09:13:26
11 emails at home, right?
12     A.   Yeah.
13     Q.   I may have asked this before, and I
14 apologize if I did. But you learned at the
15 all-hands meeting that Mr. Levandowski had      09:13:53
16 downloaded documents, correct?
17     A.   Yes, but there may have been a -- there
18 may have been some conversation after the complaint
19 but before the all-hands where we discussed it. I
20 just can't remember the specifics of it or whether    09:14:11
21 it happened or not. I just can't remember.
22     Q.   Did you take any disciplinary action
23 against Mr. Levandowski once you learned that?
24     I mean, not later -- not two or three
25 months later, but in direct response to learning    09:14:21

Page 61

16 (Pages 58 - 61)

1    that.                                09:14:24
2        A.  No.  We -- we look into the allegations
3    first, then decide what kind of disciplinary
4    actions to take.  That's generally how we -- we
5    approach things.                      09:14:35
6        Q.  But you knew personally that he had
7    downloaded Google documents at that time, right?
8        MR. CHATTERJEE:  Form.
9        THE DEPONENT:  We learned -- I think, in
10   the all-hands, you know, he stated that he    09:14:43
11   downloaded files while working from home --
12       Q.  (By Mr. Verhoeven)  So you did --
13       A.  -- when he was working at Google, which
14   doesn't -- that -- we have to look into the details
15   about the complaint, we have to understand what he   09:15:00
16   said, we have to get to the bottom of it, and then
17   decide what kind of action we should take.
18       Q.  Somebody asked him does he still have
19   those files at that time, didn't they?
20       MS. DUNN:  Objection to form.      09:15:12
21       THE DEPONENT:  Not a conversation I know
22   about.
23       Q.  (By Mr. Verhoeven)  So you don't know
24   whether anyone asked him, Do you still have those?
25       A.  I don't know.                 09:15:19

Page 62

1        Q.  And you didn't know whether he still had   09:15:24
2    the files at that time?
3        A.  I didn't know specifically, no.
4        Q.  And that wasn't of concern to you whether
5    he still had them or not?              09:15:34
6        MS. DUNN:  Objection to form.
7        THE DEPONENT:  I may have assumed he just
8    didn't have them.  Right.  When somebody's -- when
9    somebody's downloading files when they're working
10   at their employer, that -- that's -- I think that's   09:15:45
11   okay.
12       And then if you -- you know, then -- then
13   in the transaction itself, we went through a
14   diligence process that I felt, you know, my
15   people -- I have a lot of trust in their expertise   09:15:59
16   and how they -- how they do things to make sure
17   that these files just weren't over at Uber.
18       So I felt good about our processes.
19       Q.  (By Mr. Verhoeven)  Part of that
20   diligence process, correct me if I'm wrong --   09:16:13
21       A.  Yeah.
22       Q.  -- is to ask the employee coming over
23   whether or not the employee has any files from the
24   former employer, correct?
25       A.  So these kinds of conversations may have   09:16:25

Page 63

1    happened with attorneys in the room that, for   09:16:27
2    obvious reasons, I can't speak to.
3        Q.  Well, you had that discussion with
4    Mr. Levandowski without attorneys in the room where
5    you learned that he had files from Google, right?   09:16:37
6        A.  Well, in that discussion there was an
7    attorney in the room, but it was a -- it was an
8    all-hands.
9        Q.  No, I'm talking about in the intake
10   process back in March of 2016 --       09:16:50
11       A.  Yeah, that's true.  There was that one
12   meeting, yeah.
13       Q.  Yeah.  That was part of the transaction,
14   right?
15       A.  Correct.  Yeah.               09:16:58
16       Q.  You don't remember specifically --
17       A.  Yeah.
18       Q.  -- what step it was --
19       A.  Yeah.
20       Q.  -- but -- and you would agree that part   09:17:02
21   of Uber's process when they're taking in an
22   employee from a competitor would be to determine
23   whether or not the -- they have any of that former
24   employer's confidential documents in their laptop,
25   right?                               09:17:22

Page 64

1        MS. DUNN:  Objection to form.       09:17:22
2        MR. CHATTERJEE:  Join.
3        THE DEPONENT:  When you do a transaction,
4    an M & A transaction, or something of that nature,
5    there's generally going to be a diligence process   09:17:32
6    that, you know, does everything -- or, you know,
7    really sort of has general processes to try to
8    prevent these -- prevent content to come from the
9    previous employer to where they're going, yes.
10       Q.  (By Mr. Verhoeven)  So you would have   09:17:52
11   expected that you would have learned already if he
12   had down- -- had downloaded Google documents,
13   right --
14       MS. DUNN:  Objection to form.
15       Q.  (By Mr. Verhoeven)  -- before the   09:17:59
16   all-hands -- before the complaint was filed?
17       MR. CHATTERJEE:  Form.
18       MS. DUNN:  Objection to form.
19       THE DEPONENT:  I have executives that
20   work for me, that have a lot of experience, a lot   09:18:10
21   of expertise in doing diligence and transactions,
22   and I depend on them to make sure those things
23   happen -- the right things happen.
24       Q.  (By Mr. Verhoeven)  I understand that.
25       A.  Yeah.                         09:18:23

Page 65

17 (Pages 62 - 65)

ATTORNEYS' EYES ONLY

1    Q.  But you've testified that Uber is very    09:18:24
2  careful about that and that they take steps to
3  ensure that that doesn't happen, right?
4    A.  Yeah.  We -- I -- I -- I generally
5  understand that to be true, yes.    09:18:34
6    Q.  And you would expect that your executives
7  would find out, as part of the intake process,
8  whether or not the employee coming in has
9  confidential files that they've taken from their
10  former employer, right?    09:18:48
11    MS. DUNN:  Objection to form.
12    THE DEPONENT:  We would -- in any
13  transaction we are going to make sure to take --
14  you know, to take the important steps you -- you
15  have to take to -- to make sure these files don't    09:19:05
16  get across.  Files from whatever employer, whether
17  it's the previous one or two previous ones.
18    And I'm not in the weeds of all the
19  details of what that process looks like, but I am
20  confident -- I'm confident in my people that do    09:19:22
21  that.
22    And in -- generally, I believe that they
23  did a good job in that because everything we've
24  seen since shows that nobody's seen these files and
25  these files haven't made it to Uber.    09:19:39

Page 66

1  with him --    09:20:38
2    MS. DUNN:  Objection to form.
3    Q.  (By Mr. Verhoeven)  -- that he had taken
4  from Google?
5    Wouldn't that be surprising?    09:20:44
6    MS. DUNN:  Objection to form.
7    MR. CHATTERJEE:  Join.
8    THE DEPONENT:  It would certainly be
9  disappointing.
10    Q.  (By Mr. Verhoeven)  And wouldn't you have    09:20:55
11  expected that you would have asked Mr. Levandowski
12  about that?
13    A.  I did.
14    Q.  And what did he say about it?
15    A.  You know, like I said before, he first    09:21:03
16  said that he had downloaded files when working from
17  home, that he had made sure that -- that I -- when
18  I -- upon me asking, Did any files make it to Uber,
19  has it informed anything that we've done, he made
20  it very clear that that was not the case.    09:21:24
21    Q.  But you didn't ask him, Do you still have
22  stolen files?
23    MS. DUNN:  Objection to form.
24    MR. CHATTERJEE:  Join.
25    THE DEPONENT:  I did not.    09:21:32

Page 68

1    Q.  (By Mr. Verhoeven)  So you would have    09:19:41
2  expected that when Mr. Levandowski was being
3  processed by these people, they would have asked
4  him, Do you have any Google documents that you've
5  taken with you, correct?    09:19:51
6    MS. DUNN:  Objection to form.
7    MR. CHATTERJEE:  Join.
8    THE DEPONENT:  Those questions may have
9  been asked.  I just don't know the details of that
10  process.    09:19:59
11    Q.  (By Mr. Verhoeven)  But you would have
12  expected that they would have determined that,
13  right?
14    A.  What I --
15    MS. DUNN:  Objection to form.    09:20:05
16    MR. CHATTERJEE:  Join.
17    THE DEPONENT:  What I would expect is
18  that they take the necessary steps to make sure
19  that files from a previous employer don't make it
20  to Uber, and files from a previous employer are not    09:20:17
21  informing how people build things.
22    Q.  (By Mr. Verhoeven)  Okay.  So wouldn't it
23  be surprising to learn later, after that process
24  had been completed by your executives or your team,
25  that, in fact, Mr. Levandowski had downloaded files    09:20:33

Page 67

1    Q.  (By Mr. Verhoeven)  You didn't ask him,    09:21:33
2  Do you still have any Google documents in your
3  laptops or any of your devices?
4    A.  Those questions may have been asked with
5  attorneys in the room.  But I certainly didn't have    09:21:40
6  that conversation with him one on one.
7    Q.  You are aware that Ottomotto was run out
8  of Mr. Levandowski's house before it was acquired
9  by you, right?
10    A.  Yes.    09:21:59
11    Q.  And during that time before the
12  acquisition, you're aware that Mr. Levandowski was
13  working with folks at Uber on the subject of AV,
14  and specifically on the subject of LiDAR, correct?
15    MS. DUNN:  Objection to form.    09:22:29
16    MR. CHATTERJEE:  Form.
17    THE DEPONENT:  What time period are you
18  talking about?
19    Q.  (By Mr. Verhoeven)  Prior to the
20  acquisition, during the time when Mr. Levandowski    09:22:35
21  was working from his home.
22    A.  I was aware there were meetings, yeah,
23  meetings going on, sure.
24    Q.  On those subjects.
25    A.  Are we talking -- I just don't know the    09:22:40

Page 69

18 (Pages 66 - 69)

ATTORNEYS' EYES ONLY

1 specific time frame you're talking about. 09:22:42
2   Q. I'm talking about after he left Google --
3   A. Yeah.
4   Q. -- when -- and formed a company.
5   A. Yeah. 09:22:53
6   Q. Let's just call it Ottomotto --
7   A. Yes.
8   Q. -- generally --
9   A. Yeah.
10  Q. -- and before he became an employee of 09:22:56
11 Uber.
12  A. Okay.
13  Q. During that time period.
14  A. Okay.
15  Q. He, while he was working at home -- 09:23:04
16  A. Yeah.
17  Q. -- was working with members of your
18 technical team in AV and helping them.
19  A. Yeah.
20  Q. And specifically that included the 09:23:17
21 technical -- technological area of LiDAR.
22     You were aware of that, right?
23  A. What I'm aware of is post-signing an
24 agreement in sort of the April time frame that he
25 started consulting with Uber. The general -- the 09:23:36

Page 70

1 general area was around autonomy, like broadly. 09:23:41
2     I'm not aware of any specific
3 conversations about LiDAR. They -- I'm not saying
4 they didn't happen, but I'm not aware of any
5 specific conversations that happened. 09:23:54
6   Q. But he was consulting on the technology
7 of AV, generally?
8   A. Yes.
9     MR. CHATTERJEE: Form.
10    THE DEPONENT: Correct. 09:24:01
11  Q. (By Mr. Verhoeven) And you were aware
12 that he was doing that from his house?
13    MS. DUNN: Objection to form.
14    THE DEPONENT: I -- I didn't know that
15 for certain. I don't -- I don't know that for 09:24:07
16 certain.
17  Q. (By Mr. Verhoeven) Are you aware of any
18 offices that Ottomotto had during that time frame
19 that we're talking about?
20  A. I remember them talking about some kind 09:24:21
21 of Oakland office, but I wasn't sure if that got
22 started up or not. I don't know if they had that
23 space or not.
24     I -- I do know they had some space in
25 Palo Alto as well. And I know they had some space 09:24:31

Page 71

1 in San Francisco, and it sort of depends on the 09:24:36
2 time frame. I'm just not sure.
3   Q. The time frame I'm asking about was the
4 one we --
5   A. Yeah, but they -- there may have been 09:24:43
6 multiple different situations during that. And I
7 don't know specifically when a lease was taken out
8 or...
9   Q. Did you ever visit Mr. Levandowski during
10 that time period at his house? 09:24:53
11  A. Once, yes.
12  Q. Okay.
13  A. Well, maybe not during that period. I
14 think I visited him prior to the deal happening. I
15 took a ride in one of their trucks, which was an 09:25:07
16 interesting experience.
17  Q. After -- at some point you learned that
18 Mr. Levandowski was taking -- was refusing to
19 provide any testimony or documents --
20  A. Yeah. 09:25:46
21  Q. -- in this litigation based on his
22 assertion of the Fifth Amendment?
23    MS. DUNN: Charlie, if you're switching
24 gears, I think we've been going for more than an
25 hour, and I think it would be good to take a break. 09:25:51

Page 72

1     MR. VERHOEVEN: Do you need a break now? 09:25:55
2     THE DEPONENT: I would take a break, take
3 five minutes, ten minutes, something like that.
4     MR. VERHOEVEN: Okay.
5     THE DEPONENT: Does that work? 09:26:04
6     MS. DUNN: Yeah.
7     What's the time?
8     THE VIDEOGRAPHER: Going off the record.
9 The time is 9:25.
10    (Recess taken.) 09:26:10
11    THE VIDEOGRAPHER: We are back on the
12 record. The time is 9:38.
13  Q. (By Mr. Verhoeven) Mr. Kalanick, did you
14 talk with anyone about this case on the break that
15 we just took? 09:38:51
16  A. No.
17  Q. Let's go back to the question I had
18 before the break. At some point you became aware
19 that Mr. Levandowski had -- was refusing to testify
20 or produce documents on the basis of an assertion 09:39:09
21 of the Fifth Amendment right against incrimination,
22 correct?
23  A. Correct.
24  Q. When did you learn that?
25  A. I don't remember the exact date. There 09:39:21

Page 73

19 (Pages 70 - 73)

ATTORNEYS' EYES ONLY

1  was a meeting at Uber with all attorneys and me, so    09:39:26
2  I was the only nonattorney.  But there was a
3  meeting there where we were -- that I first
4  understood that it was a possibility that Anthony
5  may -- may do that.                                    09:39:47
6      Q.  Do you remember what time that meeting
7  was?
8      A.  It feels like an evening meeting.  I feel
9  like it was an evening meeting, and it -- and --
10         MS. DUNN:  I will caution the witness to     09:40:05
11  answer, not about the content of the meetings,
12  since it was only attorneys and you.
13         THE DEPONENT:  Yeah.  Okay.
14      Q.  (By Mr. Verhoeven)  I think the question
15  was:  Do you remember when the meeting was?        09:40:17
16         I think that was the question.
17      A.  Yeah, it was -- it was in -- it felt like
18  it was in the evening, and it -- there were a
19  couple meetings on this topic leading up to him
20  actually deciding not to testify or declare.        09:40:40
21      Q.  Do you know why you were at these
22  meetings?
23         Well, let me ask this:  You said -- you
24  testified at least the first one you recall you
25  were the only nonattorney?                          09:41:06

Page 74

1      A.  Yeah.                                        09:41:09
2      Q.  So why were you the only nonattorney?  Do
3  you know why?
4      A.  I mean, there was a litigation matter.  I
5  was being updated on a litigation matter, so...      09:41:17
6      Q.  Okay.  Your general counsel wasn't there?
7      A.  I can't remember if she was or not.  I --
8  I certainly remember Angela Padilla, our head of
9  litigation, was there.  And there were others,
10  outside counsel, internal counsel.                  09:41:38
11      Q.  Okay.  Did you personally have an opinion
12  on whether or not Mr. Levandowski should assert the
13  Fifth Amendment?
14      A.  Definitely.
15      Q.  Did you express that in the meetings?       09:41:52
16      A.  I most -- I don't know if I can say, if I
17  am allowed to say, whether I can or not, in the
18  meetings.
19      Q.  Did you express your opinion at all to
20  anyone?                                             09:42:05
21      A.  Oh, definitely.
22      Q.  Okay.  To who?
23      A.  To attorneys, as well as in later
24  meetings, Anthony himself.
25      Q.  Okay.  Well, we -- you already testified   09:42:21

Page 75

1  about everything that you can remember about Google   09:42:24
2  documents in your conversations with
3  Mr. Levandowski, right?
4      A.  I mean, I -- I spoke to sort of the
5  complaint, the all-hands, et cetera, yes.           09:42:36
6      Q.  Okay.  So did you have meetings with
7  Mr. Levandowski about his assertion of the
8  Fifth Amendment?
9      A.  I did.
10      Q.  Okay.  How many?                            09:42:47
11      A.  Probably -- I -- I don't know exactly.
12  It feels -- it was like a very long night with
13  attorneys at Uber.  Some of those discussions
14  included Anthony.  Some of them did not.
15      Q.  Okay.                                       09:43:07
16      A.  So I don't know how to say how many
17  meetings, but I can tell you it was a whole lot of
18  hours.
19      Q.  What did you say on that subject?
20      A.  I don't think I can -- I think because     09:43:17
21  of -- there were so many attorneys there, I -- I
22  may not be able to -- I don't -- I don't know.  I'm
23  confused.
24         If I am allowed to answer, then let me --
25  I'm confused whether I can or not.                  09:43:30

Page 76

1         MS. DUNN:  I think there's some -- as we     09:43:32
2  recognized last time, there's -- there's confusion
3  just about the specificity of timing.  And so if
4  you could rephrase the question.
5      Q.  (By Mr. Verhoeven)  What did you say on    09:43:46
6  the subject?
7         MR. CHATTERJEE:  Form.
8         THE DEPONENT:  I can tell you how I felt.
9  I can certainly tell you how I felt about him
10  declaring the Fifth.                                09:43:59
11      Q.  (By Mr. Verhoeven)  I will get to that,
12  but I just want to understand your
13  communications --
14      A.  Yeah.
15      Q.  -- with people about how you felt.  You    09:44:05
16  want to start with how you felt, that's fine.
17         MS. DUNN:  Charlie, I would like to take
18  a break.  Because the witness is -- is confused by
19  the bounds of the privilege.  So I would like to
20  take a -- a five-minute break.                      09:44:20
21         MR. VERHOEVEN:  I would rather not.  You
22  can instruct him if you would like.
23         MS. DUNN:  I think you'd get a better
24  record.
25         MR. VERHOEVEN:  Well, I will take the       09:44:30

Page 77

20 (Pages 74 - 77)

1  risk.                               09:44:31
2      Okay?
3      MS. DUNN: It's your risk.
4      MR. VERHOEVEN: Okay.
5      Q. (By Mr. Verhoeven) I will just go back    09:44:40
6  and ask the question again, so -- I don't want to
7  confuse you.
8      You had an opinion -- let's just get
9  out -- let's just get out what your opinion -- what
10 your feeling was before I get to who you expressed    09:44:48
11 it to.
12     Okay?
13     A. Yeah.
14     Q. What was your feeling?
15     A. My feeling is, he should -- he should    09:44:55
16 testify. That -- that he should say what happened,
17 why, how, and he should cooperate with the company
18 and the Court in getting to the facts of the
19 matter. And I felt pretty passionately about it.
20     Q. Okay. Did you have a conversation with    09:45:20
21 Mr. Levandowski about that subject?
22     A. Yes.
23     Q. What did you say to him?
24     Well, first of all, when -- when did you
25 have that conversation?                09:45:31

                                        Page 78

1      A. Yeah. I mean, this was in -- this was    09:45:32
2  around the time of him pleading the Fifth, and it
3  was right before.
4      Q. Was it a conversation outside of meeting
5  with attorneys?                      09:45:42
6      A. No. No, it was not.
7      Q. So you never spoke to him outside
8  meetings with attorneys about the assertion of the
9  Fifth amendment? You never, like, pulled him aside
10 and said anything?                   09:45:57
11     A. No.
12     Q. What did you -- what did you say to him
13 about the subject during your meetings with
14 attorneys?
15     A. I really -- I really wanted him just to    09:46:17
16 testify and tell the Court whatever he had to say.
17     Q. And you -- you said that during the
18 meeting?
19     A. I made it very clear to him that we
20 wanted him to testify.               09:46:25
21     Q. And what did he say?
22     A. He felt like -- well, my -- my sense is
23 that he wanted to.
24     Q. Okay. I'm not asking about your sense.
25     What did he say?                  09:46:39

                                        Page 79

1      A. When we had -- we had discussions about    09:46:41
2  how do we -- how do we -- like, is there a way we
3  can get -- is there a way that he can testify
4  without him being -- his -- his personal attorney
5  feeling so uncomfortable that he would plead the    09:46:59
6  Fifth.
7      So his personal counsel is telling him to
8  take the Fifth. We would much prefer him not to.
9      Q. Okay. And why would -- what did his
10 personal counsel say about why he was going to have    09:47:13
11 to take the Fifth?
12     MS. DUNN: Objection to form.
13     THE DEPONENT: I don't know the reasons
14 why, other than just being conservative in his
15 approach.                           09:47:27
16     Q. (By Mr. Verhoeven) What do you remember
17 him saying?
18     MS. DUNN: Objection. I'm going to
19 instruct the witness not to answer.
20     MR. VERHOEVEN: Okay. My position is    09:47:37
21 that he waived the attorney-client privilege on
22 this meeting.
23     MS. DUNN: I don't -- Charlie, there's
24 not even a specific meeting you are talking about.
25     THE DEPONENT: Yeah.              09:47:48

                                        Page 80

1      MS. DUNN: This is like an exercise in    09:47:49
2  extreme line blurring. So I -- our position is, we
3  have waived no attorney-client privilege.
4      MR. VERHOEVEN: So you are going to
5  instruct him on that question; is that right?    09:48:06
6      MS. DUNN: I'm instructing him on that
7  question.
8      MR. VERHOEVEN: Okay.
9      MS. DUNN: And, also --
10     MR. VERHOEVEN: I don't need a speaking    09:48:12
11 objection.
12     MS. DUNN: Well, it seems like we have a
13 lot of confusion going on here, and that you are
14 cultivating this confusion. And so I think that we
15 should make sure that the witness is not entirely    09:48:19
16 confused by your line of questioning.
17     MR. VERHOEVEN: Object to the speaking
18 objection.
19     Q. (By Mr. Verhoeven) You can't remember
20 the specific meetings, can you?            09:48:29
21     A. I can remember the specific meetings. I
22 can't give you exact. So I certainly can remember
23 specific meetings.
24     Q. Okay.
25     A. I can't tell you the exact time of the    09:48:43

                                        Page 81

21 (Pages 78 - 81)

1 specific meetings.                                    09:48:47

2    Q.   Okay.  What was the first meeting that

3 you had on the subject of the Fifth?

4    A.   The first meeting was a meeting with

5 attorneys where -- where we were under the            09:48:56

6 impression that they -- that he may take the Fifth,

7 and there was a discussion as to --

8         MS. DUNN:  I will caution the witness not

9 to answer about conversations with attorneys.  And

10 we are going to take a break, which we are entitled    09:49:15

11 to do at any time.

12        MR. VERHOEVEN:  I object.

13        MS. DUNN:  You can object.

14        THE VIDEOGRAPHER:  Going off the

15 record -- you want me to go off the record?            09:49:29

16        MR. VERHOEVEN:  Yeah, there's no need

17 just to have a blank chair.

18        THE VIDEOGRAPHER:  Going off the record.

19 The time is 9:49 a.m.

20        (Recess taken.)                                 09:49:42

21        THE VIDEOGRAPHER:  We are back on the

22 record.  The time is 9:54.

23        MR. CHATTERJEE:  Just for the record, I

24 want to make sure it's clear.  I'm going to move to

25 strike the question from 9:45 that's on the record     09:55:10

Page 82

1 to 9:48.  And the objection is as to form.             09:55:13

2        MS. HAAG:  If I could just put on the

3 record we have an agreement that I'm going to try

4 to keep my involvement to a minimum, and I think

5 everybody agrees that -- I will -- I am joining any    09:55:24

6 objection.

7        MS. DUNN:  And I am going to join

8 Otto Trucking's objection.

9        MR. VERHOEVEN:  And the basis is, other

10 than -- it's all just to form?                          09:55:35

11        MR. CHATTERJEE:  Oh, the basis is that

12 the judge also lets us object to form at this point

13 in the proceeding, so I think the objection is

14 based on a standing order.

15        And, also, we will object to the extent         09:55:47

16 it invokes attorney-client privilege issues, but

17 it's all move to strike.

18        MR. VERHOEVEN:  Anything else?

19        MS. DUNN:  Join.

20        MR. VERHOEVEN:  Any other reasons?              09:56:03

21        MR. CHATTERJEE:  I think there's only two

22 the judge also allows at this point in the

23 proceedings.

24        MR. VERHOEVEN:  That's not what I asked

25 you, but...                                             09:56:14

Page 83

1        MR. CHATTERJEE:  I can't object against         09:56:16

2 the Court's court.

3        MR. VERHOEVEN:  Does other counsel have

4 any objections that we haven't yet identified?

5        MS. DUNN:  I also am following the               09:56:22

6 judge's order.  And we are only allowed to object

7 to form and based on privilege.  We object to both.

8        MR. VERHOEVEN:  Okay.  And so it's clear

9 that there's no other objections than form and

10 attorney-client privilege.                             09:56:38

11        MS. DUNN:  Are you aware of any other

12 available objections, Charlie?

13        MR. VERHOEVEN:  I am trying to get a

14 record.

15        MS. DUNN:  Okay.                                 09:56:42

16        MR. CHATTERJEE:  You have a record.  The

17 judge said what we can object to.  We did it.

18        Let's move on.

19        MR. VERHOEVEN:  I will take that as a no.

20    Q.   (By Mr. Verhoeven)  Did you say anything        09:57:02

21 in response -- in response to the statement at this

22 meeting -- withdrawn.

23        Going back to the meeting we were talking

24 about, where you expressed your concerns --

25    A.   Which meeting are we talking about?             09:57:14

Page 84

1 Which meeting, specifically?                            09:57:15

2    Q.   The meeting about the Fifth Amendment.

3    A.   Okay.

4        MS. DUNN:  Objection.

5    Q.   (By Mr. Verhoeven)  Do you remember your        09:57:22

6 testimony about there's a meeting about the

7 Fifth Amendment, and you expressed your concerns?

8        Do you remember that?

9    A.   I do.

10    Q.   Okay.  That meeting, is what I'm talking        09:57:27

11 about.

12    A.   Okay.

13    Q.   Did you say anything in response to

14 Mr. Levandowski's personal attorney when he told

15 you that he would be -- that Mr. Levandowski was       09:57:40

16 uncomfortable testifying and would plead the Fifth?

17        MS. DUNN:  Objection on the basis of

18 privilege.  I'm going to instruct the -- the

19 witness not to answer.

20        And since you are seeking alternative           09:57:56

21 bases for objections, there -- there would be

22 beyond form.

23        MR. VERHOEVEN:  Are you moving to strike

24 -- just for clarity, Counsel, so I don't have to

25 compare lines and pages --                             09:58:12

Page 85

22 (Pages 82 - 85)

ATTORNEYS' EYES ONLY

1        MS. DUNN:  Yes, objection and move to        09:58:15
2  strike lines --
3        MR. VERHOEVEN:  No, no, I'm just asking
4  this.
5        MS. DUNN:  Sure.        09:58:19
6        MR. VERHOEVEN:  Are you moving to strike
7  Mr. Kalanick's testimony about what he said during
8  the meeting?
9        MS. DUNN:  I would have to have the
10  court reporter read that back at this point. All I        09:58:31
11  see right now is that the question on the table is
12  a misstatement of Mr. Kalanick's previous
13  testimony.
14        MR. VERHOEVEN:  Well, that's the
15  testimony I'm talking about.        09:58:37
16        MS. DUNN:  Well, do you want to take the
17  time to find his -- we could do that.
18        Q.  (By Mr. Verhoeven)  What did you say
19  during the meeting about your concern?
20        A.  Okay.        09:58:55
21        MS. DUNN:  Objection.  I'm going to
22  instruct the witness not to answer on the basis of
23  privilege.
24        Q.  (By Mr. Verhoeven)  Do you remember
25  testifying that you really, really wanted to tell        09:59:20

Page 86

1  the Court whatever Mr. Levandowski had to say        09:59:23
2  during that meeting?
3        MR. CHATTERJEE:  Same objections as the
4  motion to strike.
5        THE DEPONENT:  I remember being very        09:59:32
6  clear with Mr. Levandowski and with others in the
7  room my desire for Uber and the Court to be able to
8  get to the bottom of this and get to the facts.
9        Q.  (By Mr. Verhoeven)  And did you express
10  that to Mr. Levandowski?        09:59:54
11        A.  Yes, I did.
12        Q.  And what did he say?
13        MR. CHATTERJEE:  Same objections.
14        THE DEPONENT:  I don't remember what he
15  said, specifically.        10:00:02
16        Q.  (By Mr. Verhoeven)  What did he say
17  generally?
18        A.  He -- he seemed to want to testify.
19        Q.  Okay.  Did he -- how did he express that?
20  I mean, it's hard for me to understand when you say        10:00:15
21  something like, he seemed to want to.
22        A.  Yeah.
23        Q.  So that's why I am asking these
24  questions.
25        A.  Yeah.        10:00:20

Page 87

1        Q.  What -- what do you base that on?        10:00:26
2        A.  Well, he was -- he was pushing his
3  attorney.
4        MS. DUNN:  Objection on the basis of
5  privilege.  I'm going to instruct the witness not        10:00:38
6  to answer.
7        Q.  (By Mr. Verhoeven)  Did he say anything
8  to you during the meeting on this subject,
9  Mr. Levandowski?
10        A.  Yes.        10:00:47
11        Q.  What did he say?
12        A.  So there's -- the reason this is a little
13  bit confusing or tricky for me is that there were
14  different people in that room at different times.
15  In some cases, his personal attorney; in some        10:01:07
16  cases, various attorneys from our side.  So I am...
17        Q.  When you made the statement --
18        A.  Right.
19        Q.  -- that you testified to earlier --
20        A.  Yeah.        10:01:20
21        Q.  -- were there attorneys at the meeting?
22        A.  Which statement are we talking about?
23        Q.  When you expressed your concern?
24        A.  Concern?
25        Q.  About the Fifth Amendment assertion?        10:01:29

Page 88

1        A.  Yeah, there were.        10:01:31
2        Q.  You said that you were -- you very, very
3  much wanted --
4        A.  Yes.
5        Q.  -- to tell the story?        10:01:35
6        So I believe you said that
7  Mr. Levandowski's private attorney responded to
8  that statement?
9        A.  So there were -- there was a concern --
10  sorry.  I made it clear where I stood.  I know        10:01:45
11  Angela Padilla was in the room.  I know that
12  Anthony was in the room.
13        At some point, we had Anthony's personal
14  attorney come to the office, so we could have a --
15  a -- we could get into a higher fidelity        10:02:02
16  conversation, if that makes sense.
17        Q.  Okay.
18        A.  There are different parts of this
19  conversation, some of it with -- so, earlier, some
20  of it with Angela Padilla, myself, Anthony, maybe        10:02:14
21  others; and then later in that conversation,
22  Anthony's personal attorney.
23        Q.  Okay.
24        A.  So it's not, I think, what you're
25  characterizing as a conversation I was having where        10:02:31

Page 89

23 (Pages 86 - 89)

1 a personal attorney responded, was not necessarily   10:02:35
2 how it happened.
3     But I can tell you what -- I can say
4 what -- where I was, how I generally felt and the
5 opinions that I expressed during that discussion.   10:02:47
6   Q.  Okay.  Before I ask you about that --
7   A.  Yeah.
8   Q.  -- I think you already testified to this,
9 but I'm little confused.  I'm going to ask again.
10   A.  Okay.                        10:02:58
11   Q.  Did you ever -- did you have any
12 conversations with Mr. Levandowski about his
13 assertion of the Fifth Amendment when there weren't
14 attorneys in the room, privately?
15   A.  I did not.                    10:03:08
16   Q.  Okay.  What did you -- sorry, I'm just
17 checking on something.  I will be just one second.
18     What opinions did you express during the
19 discussion that you just referenced to two answers
20 ago?                              10:04:00
21     MS. DUNN:  Objection to form.
22     THE DEPONENT:  It was really important
23 for Uber to get to the bottom of the allegations
24 that Waymo made.  There's a lot of work we can do
25 without Anthony, but there's a lot of things that   10:04:17

Page 90

1 only Anthony could answer.            10:04:19
2     It was very important for him to provide
3 those facts.  And it was very important for him to
4 cooperate with Uber and very important for him to
5 cooperate with the Court.             10:04:31
6   Q.  (By Mr. Verhoeven)  Okay.  And what did
7 Mr. -- Mr. Levandowski was in the room when you
8 said this, correct?
9   A.  Yes.
10   Q.  What did he say in response?      10:04:40
11   A.  I don't remember his specific response,
12 but I remember him being very willing and wanting
13 to go into those facts and cooperate with the
14 Court.
15   Q.  Did he tell you at that meeting what the   10:04:58
16 facts were?
17   A.  Yes.
18   Q.  What did he say?
19   A.  He -- he repeated the -- the downloading
20 while at home explanation, but also added that he   10:05:15
21 was incredibly worried at the time about a very
22 large bonus that he was supposed to get from
23 Google.
24     And he felt, essentially, like Google was
25 going to stiff him on his bonus.  And he wanted   10:05:38

Page 91

1 to -- he wanted to have the sort of the work that   10:05:50
2 he did, so he could show that he earned that bonus.
3   Q.  So he admitted that he still had the
4 files?
5     MS. DUNN:  Objection to form.      10:06:35
6     THE DEPONENT:  No, he did not admit that.
7   Q.  (By Mr. Verhoeven)  What files did he say
8 he had?
9   A.  He didn't say he had any files.
10   Q.  Did you ask him?               10:06:43
11   A.  I don't remember if we did or not.  We
12 may have.  I don't think he did, though.
13   Q.  Did you come to learn during this meeting
14 whether or not he still had stolen Google files?
15     MS. DUNN:  Objection to form.      10:07:02
16     MR. CHATTERJEE:  Join.
17     THE DEPONENT:  My -- my recollection is
18 that he did not have any Google files.
19   Q.  (By Mr. Verhoeven)  And what is that
20 based on?                         10:07:09
21   A.  The conversation.
22   Q.  Okay.  So did someone say that to you?
23   A.  I can't remember specifically words or
24 what have you, but that's my recollection of the
25 conversation.                     10:07:24

Page 92

1   Q.  Who did you learn -- where did that --   10:07:24
2 withdrawn.  Sorry.
3     That recollection you are talking about,
4 did somebody say something that gave you that
5 recollection or gave you the information that you   10:07:32
6 are recalling?
7     MS. DUNN:  Objection to form.
8     THE DEPONENT:  I feel like that was part
9 of the conversation, but I can't specifically
10 pinpoint who said what.               10:07:43
11   Q.  (By Mr. Verhoeven)  What did Levandowski
12 say about whether he had the files or not?
13   A.  I don't -- I don't remember.
14   Q.  Did it seem strange to you, this story he
15 was telling about wanting to have the files to show   10:08:00
16 this contribution?
17     MS. DUNN:  Objection to form.
18     THE DEPONENT:  It seemed unfortunate.
19 Whether it was strange or not, I don't know, but it
20 was certainly unfortunate.            10:08:16
21   Q.  (By Mr. Verhoeven)  Why would -- why
22 would it make sense for an employee to steal
23 corporate files for the purpose of showing that
24 they are entitled to a bonus?
25     MS. DUNN:  Objection to form.      10:08:28

Page 93

24 (Pages 90 - 93)

1      MR. CHATTERJEE:  Join.          10:08:29
2      THE DEPONENT:  I am not saying what he
3  did was smart.
4      Q.  (By Mr. Verhoeven)  Okay.  Wouldn't the
5  employer just immediately not give him the bonus      10:08:39
6  once they learned that the files had been stolen?
7      MS. DUNN:  Objection to form.
8      THE DEPONENT:  I -- I can't speak for
9  Google on that matter.
10     Q.  (By Mr. Verhoeven)  What would you do if      10:08:50
11 a top one of your engineers left and joined a
12 competitor and called you up and said, you better
13 give me this bonus that I'm due because I have
14 taken your files?
15     MR. CHATTERJEE:  Form.          10:09:05
16     MS. DUNN:  Objection to form.
17     THE DEPONENT:  Well, first, it's not
18 clear that that is what happened in this case.
19     Q.  (By Mr. Verhoeven)  Right.
20     A.  So I --          10:09:12
21     Q.  But in that scenario, what you would do?
22     MS. DUNN:  Objection to form.
23     THE DEPONENT:  I would --
24     MR. CHATTERJEE:  Join.
25     THE DEPONENT:  I would respond pretty      10:09:18

Page 94

1  seriously to that kind of discussion.          10:09:19
2      Q.  (By Mr. Verhoeven)  What -- how -- in
3  what way?
4      A.  I mean, it's -- there's a lot of details
5  beyond that, that I would have to look into in that      10:09:28
6  particular hypothetical, but I would take that
7  conversation very seriously and take very serious
8  action.
9      Q.  It's fair to say that wouldn't increase
10 the likelihood that you'd pay them the bonus?      10:09:37
11     MS. DUNN:  Objection to form.
12     THE DEPONENT:  Look, I certainly wouldn't
13 wait a year to do something about it.
14     Q.  (By Mr. Verhoeven)  But in my
15 hypothetical, if you were presented with the fact      10:09:49
16 that this -- this -- this -- excuse me.  Let me
17 start again.
18     In my hypothetical, the fact that you
19 were presented with stolen documents by this former
20 employee certainly wouldn't increase the likelihood      10:10:03
21 that Uber would pay this employee the bonus?
22     MS. DUNN:  Same objection.
23     Q.  (By Mr. Verhoeven)  Is that fair?
24     MR. CHATTERJEE:  Form.
25     THE DEPONENT:  In -- in that          10:10:13

Page 95

1  hypothetical, I would agree, yes.          10:10:14
2      Q.  (By Mr. Verhoeven)  So did you say to
3  Mr. Levandowski, that doesn't make any sense?
4      A.  Something along those lines, yes.
5      Q.  What do you remember saying?          10:10:25
6      A.  I remember insulting his intelligence.
7      Q.  Okay.  So you said something like, that's
8  stupid, or what did you say?
9      A.  That's pretty F'ing dumb.
10     Q.  Okay.  I appreciate you editing yourself      10:10:47
11 there.
12     A.  Yeah, I -- I was trying to find the way
13 to do that.
14     Q.  You were pretty pissed off?
15     A.  I was more just disappointed.          10:10:58
16     Q.  What did he say.
17     You okay?
18     A.  Yeah, I'm okay.
19     Q.  You want to take a break?
20     A.  No, no, let's keep going.          10:11:09
21     Q.  You need some more water or anything?
22     A.  No.  It's okay.  I was just disappointed,
23 as you can imagine.
24     Q.  Okay.  What did he say?
25     A.  Let's see.  I think he agreed.  Yes.      10:11:19

Page 96

1      Q.  But you don't recall asking if he still      10:11:28
2  had those files?
3      A.  I don't recall --
4      MR. CHATTERJEE:  Form.
5      THE DEPONENT:  -- that specific --          10:11:32
6  that -- that specific part of that discussion.  I
7  do recollect coming out of that meeting feeling
8  like he didn't have any -- that he did not have in
9  his possession any files.
10     Q.  (By Mr. Verhoeven)  Do you remember him      10:11:52
11 saying anything else about this story that he's
12 telling you?
13     MS. DUNN:  Objection to form.
14     THE DEPONENT:  No.
15     Q.  (By Mr. Verhoeven)  Did you -- he          10:12:01
16 previously told everyone that he just had files --
17 had those files so he could work from home, right?
18     A.  Correct.
19     MR. CHATTERJEE:  Form.
20     Q.  (By Mr. Verhoeven)  So what he was saying      10:12:10
21 now is inconsistent with what he said previously;
22 fair?
23     MR. CHATTERJEE:  Form.
24     MS. DUNN:  Objection to form.
25     THE DEPONENT:  It was -- it was in          10:12:15

Page 97

25 (Pages 94 - 97)

**Page 98**

1  addition to working from home and downloading      10:12:17
2  files, he brought this new information, yes.
3      Q.   (By Mr. Verhoeven)  So did you say, why
4  the heck didn't you tell us about this before?
5      A.   It was more like, why are you so F'ing --      10:12:29
6      Q.   Stupid.
7      A.   -- stupid, yeah.  Because, yeah, it just
8  didn't make -- it was just not...
9      Q.   It didn't make any sense?
10     A.   Yeah.  It -- it -- it felt like he was so      10:12:51
11 insecure about this bonus that he started doing
12 irrational things.
13     Q.   Did you ask him?  You know, did you
14 explain that this seemed irrational and asked him
15 why he did it?      10:13:06
16     MR. CHATTERJEE:  Form.
17     MS. DUNN:  Form.
18     THE DEPONENT:  I remember something along
19 those lines.  I can't say the specifics words, but
20 he didn't have -- he didn't have a really -- I -- I      10:13:22
21 think he realized how dumb it was, too.
22     Q.   (By Mr. Verhoeven)  Do you remember what
23 he said -- how he expressed that?
24     A.   It was more just acknowledging my point,
25 almost as if it were a rhetorical question.      10:13:35

**Page 99**

1      Q.   Did you ask him any questions about,      10:13:43
2  well, what did he do with these files?  Did he use
3  them to get his bonus?
4      MS. DUNN:  Objection to form.
5      MR. CHATTERJEE:  Join.      10:14:00
6      THE DEPONENT:  Not -- it was -- it was
7  more like he -- he had a moment of insecurity and
8  just did something dumb.
9      Q.   (By Mr. Verhoeven)  Did you ask him
10 whether he told Google about these files, since he      10:14:13
11 took them for the purpose of showing his
12 contributions in order to get a bonus?
13     MR. CHATTERJEE:  Form.
14     THE DEPONENT:  I don't rem- ---
15     MS. DUNN:  Form.      10:14:28
16     THE DEPONENT:  I don't remember whether
17 that specific question was asked, but I remember
18 feeling like that conversation with Google never
19 happened, that -- I feel like he got his bonus,
20 is -- is my recollection of how that conversation      10:14:45
21 went.
22     Q.   (By Mr. Verhoeven)  Fair to say you came
23 away with the impression that he didn't need to use
24 those documents or didn't disclose those documents
25 in connection with getting his bonus?      10:14:55

**Page 100**

1      A.   Correct.      10:14:57
2      MS. DUNN:  Objection to form.
3      MR. CHATTERJEE:  Join.
4      Q.   (By Mr. Verhoeven)  But you don't recall
5  anyone asking him if he used the documents in      10:15:05
6  connection with trying to get the bonus?
7      MS. DUNN:  Same objection.
8      THE DEPONENT:  Yeah, I don't --
9      MR. CHATTERJEE:  Join.
10     THE DEPONENT:  I don't remember a      10:15:12
11 specific part of a dialogue like that, but I
12 certainly --
13     Say that question one more time.  I want
14 to make sure I get it right.
15     (Discussion off the stenographic record.)      10:15:37
16     Q.   (By Mr. Verhoeven)  So the question was:
17 You don't recall anyone asking him if he used the
18 documents, the stolen documents, in connection with
19 trying to get his bonus?
20     MR. CHATTERJEE:  Form.      10:15:53
21     MS. DUNN:  Form.
22     THE DEPONENT:  So I don't recollect that,
23 like -- I don't recollect the conversation or a
24 specific part of a question answered like that.
25     I remember coming away from it feeling      10:16:03

**Page 101**

1  like he got his bonus and didn't have to have that      10:16:07
2  kind of conversation or...
3      Q.   (By Mr. Verhoeven)  But for the record,
4  you don't remember anything more specific than
5  that?      10:16:19
6      A.   That's correct.
7      Q.   Okay.  Did you consider what he did to be
8  illegal?
9      MS. DUNN:  Objection.
10     MR. CHATTERJEE:  Form.      10:16:25
11     MS. DUNN:  Form.
12     Q.   (By Mr. Verhoeven)  Taking the documents?
13     A.   In that discussion, I was starting to
14 learn what the law -- what is the law around these
15 things.      10:16:35
16     Q.   Did you consider it improper?
17     A.   Yes.
18     MR. CHATTERJEE:  Form.
19     MS. DUNN:  Objection.  Form.
20     THE DEPONENT:  Yes.      10:16:39
21     Q.   (By Mr. Verhoeven)  Why didn't you fire
22 him then?
23     A.   I was really hopeful that he would
24 cooperate and tell the Court the facts of the
25 matter, cooperate with our investigation.  And that      10:17:02

26 (Pages 98 - 101)

1  was part of what this discussion was about, was        10:17:05
2  just make the declaration, testify.
3          And it may be that I was holding onto
4  that possibility, trying to -- trying to get him to
5  cooperate with the Court, with our investigation        10:17:26
6  internally.
7          And, you know, it was F'ing stupid.  It
8  was -- it -- it -- yeah.  It it just felt like if
9  he could -- if he could just say what he did and
10 why, and that -- if you just cooperate, that would      10:17:55
11 have been great.
12     Q.  Is the reason you didn't fire him because
13 you still wanted him to cooperate in the defense of
14 the case?
15         MS. DUNN:  Objection to form.              10:18:05
16         THE DEPONENT:  I wanted to him cooperate
17 with the Court and the Court's order.
18     Q.  (By Mr. Verhoeven)  Did you feel that
19 fire -- firing him would make him less likely to do
20 that?                                          10:18:15
21         MS. DUNN:  Objection to form.
22         THE DEPONENT:  I didn't feel that
23 specifically, no.
24     Q.  (By Mr. Verhoeven)  But you understood at
25 that meeting that, in fact, Mr. Levandowski          10:18:31

Page 102

1  intended to just -- was going to assert the          10:18:33
2  Fifth Amendment, correct?
3      A.  We -- we understood -- I understood from
4  that meeting that it was likely.  And I -- and I
5  think I held hope -- held onto hope that either he    10:18:44
6  wouldn't or that we could eventually get him to
7  not.
8      Q.  Okay.  But you were told that he would at
9  that meeting?
10     A.  We were told that he most likely would,     10:18:56
11 yes.
12     Q.  Okay.  And was that before he actually
13 did assert the Fifth Amendment?
14     A.  I think so.
15         MS. DUNN:  Objection to form.              10:19:04
16     Q.  (By Mr. Verhoeven)  How soon?
17         MR. CHATTERJEE:  Join.
18         THE DEPONENT:  It felt very close to the
19 timing.  I don't know exactly, but it felt very
20 close.                                         10:19:13
21     Q.  (By Mr. Verhoeven)  Do you recall anyone
22 else at the meeting saying anything about this new
23 story that he told?
24         MS. DUNN:  Objection to form.
25         MR. CHATTERJEE:  Join.                     10:19:39

Page 103

1          THE DEPONENT:  I mean, the whole         10:19:40
2  conversation was basically about the nuances of
3  pleading the Fifth, privilege, you know, legal
4  things that I didn't always understand.  But -- but
5  for me just felt so straightforward, and was        10:20:03
6  obviously disappointed.
7      Q.  (By Mr. Verhoeven)  Did he or his
8  attorneys say why he was -- he was asserting the
9  Fifth?
10         MS. DUNN:  Objection to form.            10:20:12
11         MR. CHATTERJEE:  Join.
12         THE DEPONENT:  Yes.
13     Q.  (By Mr. Verhoeven)  What did they say?
14         MS. DUNN:  Objection.  I'm going to
15 instruct the witness not to answer.                10:20:21
16         MR. VERHOEVEN:  He waived the
17 attorney-client privilege.
18         MS. DUNN:  That's not true.  The
19 witness --
20         MR. VERHOEVEN:  I'm going to move to      10:20:31
21 compel, so you know.
22         MS. DUNN:  So I make my record, the
23 witness has explained that there wasn't one
24 meeting --
25         MR. VERHOEVEN:  I don't need -- I don't   10:20:35

Page 104

1  need you to coach the witness.                    10:20:36
2          MS. DUNN:  I am not.
3          MR. VERHOEVEN:  Okay.
4          MS. DUNN:  He's already testified to
5  this.                                          10:20:40
6          MR. VERHOEVEN:  I don't need you to talk
7  about what the witness has said.
8          All right?
9          MS. DUNN:  Charlie.
10         MR. VERHOEVEN:  You got a legal          10:20:44
11 objection, put it on the record.
12         MS. DUNN:  I would like to get my record.
13         MR. VERHOEVEN:  No.  I strongly object to
14 you coaching the witness.  You're prohibited from
15 doing so by Judge Alsup's orders.                 10:20:52
16         MS. DUNN:  And I am not --
17         MR. VERHOEVEN:  You can object to the
18 form or you can assert to attorney-client
19 privilege.  If you want to say something in a brief
20 later, that's fine.                             10:21:00
21         MS. HAAG:  I can walk out with
22 Mr. Kalanick, if you would like me to.  You can
23 make a record outside of his presence.
24         MR. VERHOEVEN:  That's perfectly fine
25 with me.                                       10:21:15

Page 105

27 (Pages 102 - 105)

ATTORNEYS' EYES ONLY

| | |
|---|---|
| 1      MS. DUNN: That's a great idea.    10:21:19 | 1   The time is 10:24.        10:24:47 |
| 2      THE VIDEOGRAPHER: Shall we -- shall we | 2      (Recess taken.) |
| 3   go off the record? | 3      THE VIDEOGRAPHER: This marks the |
| 4      MR. VERHOEVEN: No, just stay on the record. | 4   beginning of DVD No. 2 in the deposition of |
| 5      MR. VERHOEVEN: Yeah, this won't count    10:21:22 | 5   Travis Kalanick. Going back on the record. The    10:35:56 |
| 6   for our time. | 6   time is 10:35 a.m. |
| 7      Agreed? | 7      Q. (By Mr. Verhoeven) Did you have any |
| 8      MS. DUNN: I will agree to that. | 8   conversation during this break about your testimony |
| 9      So the witness has already testified -- | 9   with Counsel? |
| 10      MR. VERHOEVEN: Do you want this on the    10:21:29 | 10      A. I did not.        10:36:10 |
| 11   record or not? | 11      Q. What about the last break? |
| 12      MS. DUNN: Yes, this is on the record. | 12      A. No. |
| 13      Are we on the record? | 13      Q. Okay. |
| 14      THE VIDEOGRAPHER: We are on the record. | 14      A. I watched YouTube videos. |
| 15      MS. DUNN: The witness has --    10:21:37 | 15      Q. So when you learned this story about    10:36:33 |
| 16      MR. VERHOEVEN: Note this. | 16   Mr. Levandowski taking the Google documents |
| 17      THE VIDEOGRAPHER: You want -- | 17   allegedly for use in connection with his bonus, you |
| 18      MR. VERHOEVEN: I just want you to note | 18   didn't fire him as a result of that immediately, |
| 19   when this started. | 19   right? |
| 20      THE VIDEOGRAPHER: Thank you.    10:21:43 | 20      MS. DUNN: Form.        10:36:59 |
| 21      Continue. | 21      MR. CHATTERJEE: Form. |
| 22      MS. DUNN: The witness has already | 22      THE DEPONENT: That is correct. |
| 23   testified that this was an evening with not just | 23      Q. (By Mr. Verhoeven) You knew, generally, |
| 24   one meeting in it, and that there were people in | 24   what areas he was working on at Google, right? |
| 25   and out. And so we -- his testimony just now is    10:21:51 | 25      A. Yes.        10:37:16 |
| Page 106 | Page 108 |

| | |
|---|---|
| 1   about a conversation that he had with    10:21:57 | 1      Q. And you knew that he was working on those    10:37:17 |
| 2   Mr. Levandowski. | 2   same areas at Uber, right? |
| 3      And it remains unestablished who also was | 3      MS. DUNN: Form. |
| 4   in the room during that conversation. And Counsel | 4      MR. CHATTERJEE: Form. |
| 5   is asking him about other conversations that he had    10:22:08 | 5      THE DEPONENT: I would disagree with    10:37:25 |
| 6   that he's testified to. | 6   that. It's just -- the kind of work that he was |
| 7      So we -- the conversation that | 7   doing at Uber was different. |
| 8   Mr. Kalanick has just testified to where | 8      Q. (By Mr. Verhoeven) How so? |
| 9   Mr. Levandowski explained to him the reason for the | 9      A. Because he was overseeing a really large |
| 10   downloading is not a privileged conversation.    10:22:26 | 10   division, like several hundred to even maybe a    10:37:36 |
| 11      There were other conversations in that | 11   thousand people and overseeing large parts, like -- |
| 12   same night that are privileged. And so we are | 12   a vast majority of which was not related to what he |
| 13   waiving no privileges, but we maintain the | 13   was doing before. |
| 14   privilege over the conversations that were | 14      Q. He was overseeing all of your AV research |
| 15   privileged.    10:22:39 | 15   and development?        10:37:51 |
| 16      And the conversation that Mr. Kalanick | 16      A. Correct. |
| 17   has just testified to is not privileged. | 17      Q. And his work when he was at Google |
| 18      MR. VERHOEVEN: I obviously disagree with | 18   concerned AV, right? |
| 19   virtually everything you just said. | 19      A. My understanding was, his work was very |
| 20      MS. DUNN: I assumed you would.    10:22:52 | 20   focused on the hardware and sensor side of things    10:38:02 |
| 21      MR. VERHOEVEN: The record -- record will | 21   at his previous employer, yeah. |
| 22   speak for itself. | 22      Q. In the AV area? |
| 23      MS. DUNN: Well, I'm sure we'll do more | 23      A. Correct, yes. |
| 24   speaking on this topic. | 24      Q. Okay. And you -- your understanding was |
| 25      THE VIDEOGRAPHER: Going off the record.    10:24:47 | 25   focused on the -- I am sorry, the hardware and    10:38:16 |
| Page 107 | Page 109 |

28 (Pages 106 - 109)

**Page 110**

1   software of what?                10:38:18
2      A.  Sorry, the hardware and sensors.
3      Q.  Okay.
4      A.  That's my understanding of where he was
5   focused on.                      10:38:23
6      Q.  The lidar sensors?
7      A.  Yes.
8      Q.  Okay.  Now, when you learned this, I will
9   just call it the "new theory."  You know what I'm
10  talking about when I say that?   10:38:34
11     MS. DUNN:  Objection.  Form.
12     Q.  (By Mr. Verhoeven)  Or I'll use whatever
13  catch phrase you'd like to use so I don't have to
14  repeat it.
15        You learned his bonus story?   10:38:40
16     A.  The bonus explanation.
17     MS. DUNN:  Objection to form.
18     THE DEPONENT:  The bonus explanation.
19     Q.  (By Mr. Verhoeven)  The bonus
20  explanation.  That's better.     10:38:45
21     A.  Okay.
22     Q.  When you learned the bonus explanation,
23  you didn't -- you don't recall telling him to --
24  strike that -- withdraw that.
25        When you learned the bonus explanation,  10:39:00

**Page 111**

1   did -- to your knowledge, did you or anyone else   10:39:02
2   attempt to determine what the content of those
3   documents that he talked about were?
4      MS. DUNN:  Form.
5      MR. CHATTERJEE:  Form.        10:39:13
6      THE DEPONENT:  The -- the general
7   understanding I had coming out of that discussion
8   was that he did not possess any of these files.
9      Q.  (By Mr. Verhoeven)  Regardless of whether
10  he possessed them or not, do you recall whether you   10:39:26
11  or Uber attempted to learn what the subject matter
12  of the information contained in those documents
13  was?
14     MS. DUNN:  Form.
15     THE DEPONENT:  No.             10:39:37
16     Q.  (By Mr. Verhoeven)  Okay.  Given that you
17  knew he worked on lidar, the hardware and sensors,
18  at -- whether it was at Google --
19     A.  No.
20     Q.  -- why didn't you make sure that he   10:39:53
21  didn't have any input at this point in time at Uber
22  with regard to those same technological areas?
23     MS. DUNN:  Form.
24     MR. CHATTERJEE:  Form.
25     THE DEPONENT:  I mean, I -- my belief is,   10:40:09

**Page 112**

1   generally, he didn't.  He didn't have very much   10:40:09
2   input into those things from the beginning.
3      Q.  (By Mr. Verhoeven)  Did you take steps
4   to -- you personally -- take any steps to ascertain
5   whether he did or didn't?         10:40:23
6      A.  I mean, I had members of my team
7   obviously look into that and, overall, just conduct
8   an investigation about how did we build our
9   lidar -- sort of our ongoing lidar sensor.
10     Q.  And --                     10:40:42
11     A.  It was part of this litigation, of
12  course.  There was a huge effort: discovery,
13  otherwise.  You know, you -- I think there were
14  situations where Waymo's people could go into our
15  offices and inspect and, like, look at servers and   10:40:57
16  things like this.
17        Yeah, so I -- I feel like we had a pretty
18  broad effort to make sure that we had built our
19  lidar system from the ground up.  And I continue to
20  be very confident that we did.    10:41:15
21     Q.  So I'm asking you, though, not -- not the
22  whole organization.
23     A.  I mean, look, I -- I oversee a lot more
24  than just -- I mean, this is one very small part of
25  the overall thing.                10:41:27

**Page 113**

1      Q.  I am not trying to suggest you should   10:41:28
2   know.  I'm just trying to understand what you do
3   know.
4      A.  Yeah.  So I depend on my people to do
5   those things.                     10:41:35
6      Q.  Right.
7         So did you talk to anyone who wasn't an
8   attorney about this investigation?  Did you
9   instruct anyone, or was it all through the
10  attorneys?                        10:41:44
11     A.  It was all through the attorneys.
12     Q.  And did you -- when you talk about the
13  inspections there, did you know that those
14  inspections were Court ordered?
15     A.  The inspections where Waymo people came   10:41:57
16  to Uber's offices?
17     Q.  Yes.
18     A.  Yes.
19     Q.  Okay.  What was your understanding of the
20  order?                            10:42:04
21     A.  I mean, I don't have an overall
22  understanding of the order.  I mean, I know that --
23  I know certain parts of it, but I don't -- I don't
24  know the details of it.
25     Q.  How did you learn about the inspections?   10:42:16

29 (Pages 110 - 113)

| | |
|---|---|
| 1   A.  I think attorneys told me about it.    10:42:20 | 1   A.  I was holding on to the prospect of him    10:45:06 |
| 2   Q.  How did you learn about the searches on | 2  cooperating with the company on its investigation. |
| 3  the servers? | 3  I felt -- you know, I -- I -- I felt like it was |
| 4      MS. DUNN:  I will instruct the witness | 4  possible that he would testify. |
| 5  not to answer on the basis of privilege things that    10:42:28 | 5   Q.  But at that time, you were being --    10:45:34 |
| 6  he learned solely from attorneys. | 6   A.  Yeah. |
| 7   Q.  (By Mr. Verhoeven)  So is it all solely | 7   --  informed that he would not, correct? |
| 8  through attorneys? | 8   A.  Yeah.  (Deponent nods head.) |
| 9   A.  Correct. | 9   Q.  He reported directly to you, |
| 10   Q.  Do you personally remember trying to make    10:42:45 | 10  Mr. Levandowski, correct?    10:45:41 |
| 11  it -- you, not the company and not the attorneys, | 11   A.  Correct. |
| 12  just you. | 12   Q.  At some point, you learned that he had |
| 13   A.  Yeah. | 13  taken the Fifth Amendment in court? |
| 14   Q.  And -- and I'm not saying you should | 14   A.  Yeah. |
| 15  have.  I'm just asking -- I'm just trying to figure    10:42:54 | 15   Q.  Do you remember when that was?    10:45:51 |
| 16  out what you did. | 16   A.  It was, you know, right around the time |
| 17   A.  Okay. | 17  he did. |
| 18   Q.  After you heard the bonus explanation, | 18   Q.  Shortly after the meeting? |
| 19  did you personally take any steps to ensure that | 19   A.  Yeah. |
| 20  the -- that those documents and the information    10:43:08 | 20   Q.  Okay.  Did you have any conversation with    10:45:59 |
| 21  contained therein weren't -- weren't used at Uber? | 21  Mr. Levandowski after that point about him taking |
| 22   A.  So I personally only interacted with | 22  the Fifth? |
| 23  various other attorneys to make sure that -- to | 23      MS. DUNN:  Form. |
| 24  verify, I would say, first, ask the question:  Did | 24      THE DEPONENT:  Only -- if -- if at all, |
| 25  those files come across or not?    10:43:37 | 25  it was with attorneys in the room.    10:46:12 |
| Page 114 | Page 116 |

| | |
|---|---|
| 1      And verify if -- if we -- all the    10:43:40 | 1   Q.  (By Mr. Verhoeven)  Okay.  Do you    10:46:14 |
| 2  information we got is that they hadn't, let's | 2  remember any conversation you had with |
| 3  verify that.  Let's make sure.  And prior to the | 3  Mr. Levandowski about his taking the Fifth other |
| 4  bonus explanation or pleading the Fifth, we had | 4  than what you've already testified to? |
| 5  already done a huge amount of work to verify that    10:43:55 | 5   A.  Other than attorneys being in the room,    10:46:25 |
| 6  that was the case. | 6  no. |
| 7   Q.  So I think my question was directed to | 7   Q.  So after he took the Fifth, you don't |
| 8  you and what you did and -- | 8  remember -- going forward in time -- having any |
| 9   A.  And -- | 9  conversations with him about him taking the Fifth |
| 10   Q.  Let me just ask the question.    10:44:15 | 10  or taking any documents?    10:46:35 |
| 11      So after you learned the bonus | 11      MS. DUNN:  Objection to form. |
| 12  explanation, did you personally do anything in | 12      THE DEPONENT:  I don't remember.  I don't |
| 13  addition to what your attorneys were doing as a | 13  remember any specific conversation to that -- in -- |
| 14  result of that? | 14  in that regard. |
| 15      MR. CHATTERJEE:  Form.    10:44:31 | 15   Q.  (By Mr. Verhoeven)  How about generally?    10:46:43 |
| 16      MS. DUNN:  Form. | 16   A.  Again, like, there may have been -- there |
| 17      THE DEPONENT:  I am trying to remember | 17  may have been something with an attorney in the |
| 18  anything specifically.  I don't know if anything | 18  room, but not outside. |
| 19  specific comes to mind on that front, simply | 19   Q.  Once you learned that he had taken the |
| 20  because there was already such a very serious and    10:44:43 | 20  Fifth in open court, at that point, why didn't you    10:46:56 |
| 21  broad and -- just effort with huge resources put to | 21  fire him?  I mean, you said before -- |
| 22  it it to -- to -- along those lines. | 22   A.  Yeah. |
| 23   Q.  (By Mr. Verhoeven)  Once you learned from | 23   Q.  -- you hoped he wouldn't, but then he |
| 24  Mr. Levandowski himself about the bonus | 24  did. |
| 25  explanation, why didn't you fire him?    10:45:00 | 25      So at that point, why didn't you fire    10:47:07 |
| Page 115 | Page 117 |

Veritext Legal Solutions
866 299-5127

1 him?                          10:47:09
2       MS. DUNN:  Form.
3       THE DEPONENT:  You know, I just -- I felt
4 that he had done something that was F'ing stupid.
5 I -- I didn't feel like he had stolen anything.  I   10:47:26
6 knew that it hadn't gotten over to Uber.
7       I felt a little bullied by Google
8 generally with how the initial complaint was and
9 where it -- where the facts actually were.  You
10 know, if I were to do it over again, I probably     10:47:47
11 would have immediately.  It took a little more
12 time, but I eventually got there.
13      Q.  (By Mr. Verhoeven)  You say you felt he
14 didn't do anything, but you didn't know that
15 because he was taking the Fifth Amendment, correct?   10:48:01
16      MS. DUNN:  Form.
17      THE DEPONENT:  I believe -- I believe
18 then, and continue to believe, the explanation that
19 I got on that evening.
20      Q.  (By Mr. Verhoeven)  So why did he take    10:48:16
21 the Fifth, given that explanation?
22      MR. CHATTERJEE:  Form.
23      MS. DUNN:  Form.
24      THE DEPONENT:  This is what -- this was a
25 big part of what that discussion was about.  I -- I   10:48:23

Page 118

1 personally don't believe he should have.          10:48:25
2      Q.  (By Mr. Verhoeven)  What's your
3 understanding of why he did it?
4      MS. DUNN:  Form.
5      MR. CHATTERJEE:  Join.             10:48:35
6      THE DEPONENT:  My understanding --
7      MS. DUNN:  Wait -- sorry.
8      Q.  (By Mr. Verhoeven)  You can answer the
9 question.
10     A.  My understanding is that he got advice   10:48:40
11 from his counsel to take -- to plead the Fifth.
12     Q.  And what -- for what reason?
13     MS. DUNN:  I'm going to caution the
14 witness not to answer anything that he knows solely
15 from meetings with Mr. Levandowski and his counsel.   10:48:58
16     THE DEPONENT:  I think in -- I guess what
17 I could say is, in an abundance of caution.
18     Q.  (By Mr. Verhoeven)  Did Mr. Levandowski
19 tell you he was concerned about being criminally
20 prosecuted for what he did?              10:49:17
21     A.  I think he expressed his lawyer's concern
22 over that.
23     Q.  What did he say?
24     MS. DUNN:  I'm going to caution the
25 witness not to answer anything he knows solely from   10:49:30

Page 119

1 Mr. Levandowski in the presence of his counsel.     10:49:34
2      THE DEPONENT:  I probably can't answer
3 that question.  I cannot answer that question.
4      Q.  (By Mr. Verhoeven)  Did he -- let me ask
5 you this without disclosing what he said.        10:49:42
6      Did he say -- did he say something to you
7 about that?
8      MS. DUNN:  Same --
9      Q.  (By Mr. Verhoeven)  Yes or no?
10     MS. DUNN:  -- instruction to the witness.    10:49:53
11     THE DEPONENT:  I can't speak to this
12 because of the -- his -- his counsel being in the
13 room for this part of the discussion.
14     MR. VERHOEVEN:  Will you let him answer
15 yes or no whether Mr. Levandowski spoke to him at    10:50:04
16 that meeting about this subject?
17     MS. DUNN:  Since you asked --
18     MR. VERHOEVEN:  You can just tell me, yes
19 or no.
20     MS. DUNN:  He's -- well, the problem --    10:50:15
21     MR. VERHOEVEN:  I don't want a speech.
22     MS. DUNN:  I understand you don't want a
23 speech.
24     MR. VERHOEVEN:  I withdraw the question.
25     MS. DUNN:  Well --                 10:50:20

Page 120

1      MR. VERHOEVEN:  I withdraw the question.    10:50:20
2 If you want to answer yes or no, I don't want a
3 speech.
4      Q.  (By Mr. Verhoeven)  Let me just repeat
5 it, so the record is clear.              10:50:29
6      I'm just asking you, yes or no, not what
7 was said or anything like that, and the question
8 is:  Did Mr. Levandowski personally express to
9 you -- did he say to you why he was concerned about
10 being criminally prosecuted?              10:50:44
11     MS. DUNN:  Objection to form.
12     MR. CHATTERJEE:  Join.
13     THE DEPONENT:  Not -- probably not
14 specifically the way you have put that question.
15 There were --                       10:51:00
16     Q.  (By Mr. Verhoeven)  Did he say it
17 generally to you?
18     A.  Say what generally?  Like --
19     Q.  What his concern was for why he's
20 asserting the Fifth Amendment.            10:51:06
21     A.  I think his attorney spoke to that.
22     Q.  Did -- so my question is:  Did
23 Mr. Levandowski --
24     A.  I don't --
25     Q.  -- say to you --               10:51:18

Page 121

31 (Pages 118 - 121)

**Page 122**

1      A.  I don't recall him saying that.          10:51:20
2          MS. DUNN:  The witness was instructed not
3  to answer anything that he knows based only on
4  conversations with Mr. Levandowski and
5  Mr. Levandowski's personal attorney in the room.     10:51:30
6  So if you --
7      Q.  (By Mr. Verhoeven)  Did you --
8          MS. DUNN:  You can ask about meetings
9  that did not contain those people.
10      Q.  (By Mr. Verhoeven)  Did you ever have      10:51:40
11  conversations about this bonus explanation without
12  attorneys in the room?
13      A.  No.
14      Q.  What about his taking of the
15  Fifth Amendment?  Did you ever have any          10:51:49
16  conversations with Mr. Levandowski about taking the
17  Fifth Amendment without attorneys in the room?
18      A.  No.
19      Q.  There a came a time when the public was
20  informed that Mr. Levandowski had been removed from   10:52:06
21  working in -- on the area -- that was a bad
22  question.  I withdraw it.
23          There came a time when the public was
24  informed that Mr. Levandowski was walled off from
25  working in the area of LiDAR technology at Uber?    10:52:21

**Page 123**

1      A.  Yes.                          10:52:26
2      Q.  Do you recall that?
3      A.  Yes.
4      Q.  Did you make that decision?
5      A.  I was part of that decision, yes.       10:52:34
6      Q.  Did you make it?  Were you the guy who
7  made the call?
8      A.  I mean, I ultimately approved a
9  recommendation, yes.
10      Q.  Okay.  So you could -- you were the guy   10:52:41
11  who could have disapproved or approved; you were
12  the ultimate decision-maker, correct?
13      A.  I approved the recommendation that was
14  made to me.
15      Q.  Okay.  And what was the recommendation?   10:52:51
16      A.  That he not work on LiDAR-related
17  activities.
18      Q.  Was there a recommendation that he be
19  fired at that point in time?
20      A.  I think there was a --             10:53:06
21          MS. DUNN:  Object on the basis of
22  privilege.  The witness is instructed not to answer
23  based on information he only knows from
24  conversations with attorneys.
25      Q.  (By Mr. Verhoeven)  Was a -- I will      10:53:19

**Page 124**

1  repeat the question.                    10:53:20
2          Was there a recommendation made to fire
3  Mr. Levandowski at that point in time?
4          MS. DUNN:  Same objection.  You are
5  instructed not to answer if you can only answer     10:53:29
6  based on what your conversations were with counsel.
7          THE DEPONENT:  I cannot answer that
8  question.
9      Q.  (By Mr. Verhoeven)  Was the
10  recommendation that you referred to about removing   10:53:39
11  him from LiDAR based on a conversation with
12  attorneys?
13      A.  It was based on a bunch of conversations,
14  some of which were with attorneys.
15      Q.  Okay.  Which ones weren't with attorneys?  10:53:55
16      A.  I can't remember specific --
17  specifically.  Just knowing that that kind of
18  conversation happened, sometimes with attorneys;
19  sometimes without.
20      Q.  Okay.  What do you remember about the     10:54:07
21  conversations without attorneys?
22      A.  That having him work outside of the area
23  of this specific technology, which was where the
24  complaint was mostly focused, was probably a good
25  idea.                            10:54:35

**Page 125**

1      Q.  And what was your understanding of what   10:54:37
2  was the reason for that conversation to occur at
3  that time?
4          MS. DUNN:  Form.
5          THE DEPONENT:  I don't remember.  I don't   10:54:45
6  remember the specifics.
7      Q.  (By Mr. Verhoeven)  Was there some event
8  that occurred that resulted in this conversation?
9          MS. DUNN:  Form.
10          THE DEPONENT:  This was before the       10:54:58
11  preliminary injunction order?
12      Q.  (By Mr. Verhoeven)  Yes, it was before
13  the preliminary injunction.
14      A.  So it's just -- look, I mean, there's not
15  a lot of days between the complaint and the PI     10:55:08
16  order.  It wasn't a long period of time.  So I
17  think we are learning as we go, and we are trying
18  to figure out what is the right thing to do, given
19  the facts we know and what we are learning as we
20  go.                             10:55:25
21      Q.  Okay.  I understand that.  But I am just
22  trying to probe your recollection of conversations.
23          And you've testified that you had some
24  conversations about removing from Mr. Levandowski
25  from his work on LiDAR that were with others that   10:55:36

32 (Pages 122 - 125)

1  were -- where attorneys weren't present, correct?    10:55:40
2     A.  Yeah, and I don't remember the specifics,
3  like specific conversations, but know that it was a
4  general topic of conversation amongst people, some
5  of which were attorneys; some weren't.    10:55:53
6     Q.  Which ones did you discuss it where
7  they -- who -- another bad question.  Sorry.
8     A.  That's okay.
9     Q.  What conversations on this subject do you
10  recall with non-attorneys?    10:56:02
11     A.  I don't recall specifically which
12  conversations.  I just know that it was a general
13  topic of conversation because of all the press and
14  everything that was going on.
15     Q.  Do you recall with whom you had these    10:56:19
16  conversations that were general?
17     A.  Not specifically.
18     Q.  Do you remember any specific nonlawyer --
19  withdraw the question.
20     Do you remember any nonlawyer that you    10:56:32
21  had such a conversation with?
22     A.  No.
23     Q.  Who made you the recommendation to remove
24  Mr. Levandowski from LiDAR?
25     MS. DUNN:  Object on the basis of    10:56:54

Page 126

1  privilege, and the witness is instructed not to    10:56:54
2  answer if it's only something he can answer based
3  on communications with counsel.
4     THE DEPONENT:  I can't answer that
5  question.    10:57:01
6     Q.  (By Mr. Verhoeven)  So your lawyers made
7  the recommendation?
8     A.  I cannot speak to that question.
9     Q.  Do you have an understanding as to why
10  the recommendation was made?    10:57:26
11     MS. DUNN:  Same instruction.
12     THE DEPONENT:  I can't answer that
13  question.
14     Q.  (By Mr. Verhoeven)  Were there any other
15  recommendations made?    10:57:40
16     MS. DUNN:  Same objection and
17  instruction.
18     MR. VERHOEVEN:  On the basis of
19  privilege?
20     MS. DUNN:  Yes.    10:57:47
21     Q.  (By Mr. Verhoeven)  So why didn't you
22  fire Mr. Levandowski at that point in time --
23     MS. DUNN:  Objection to form.
24     Q.  (By Mr. Verhoeven)  -- when this
25  recommendation was made?    10:58:03

Page 127

1     A.  I'm -- I'm fairly certain I answered this    10:58:04
2  one.
3     Q.  Well, can you humor me.  I am sorry.  I
4  don't remember it.
5     A.  Okay.  Well, your memory is a little    10:58:11
6  short-term.
7     Q.  It is, indeed.
8     A.  Okay.  There's a few things we -- we -- I
9  was still hopeful that he would testify.  I was
10  still hopeful that he would make a declaration.    10:58:39
11     And given what we knew at this point, and
12  given what seemed to be a desire from him to do so,
13  we may have been maybe unrealistically hopeful, but
14  what we felt at that time, it felt like he would.
15     And so we were trying to get to get him    10:59:02
16  to cooperate with the Court and try to get him to
17  cooperate with our own internal investigation, as
18  well.
19     And looking back, maybe -- you know,
20  maybe we were too hopeful.  But that's -- that's    10:59:14
21  where we ended up.
22     Q.  Okay.  You did answer that, but I think I
23  it was when I asked in point in time with the
24  Fifth Amendment.
25     So this question was specifically to you    10:59:25

Page 128

1  at the point in time when the recommendation --    10:59:28
2     A.  Yeah.
3     Q.  -- was made about LiDAR.
4     A.  Oh.
5     Q.  And the answer is the same?    10:59:36
6     At the point in time --
7     A.  Yeah, these -- well, there wasn't that
8  much time between taking him off of LiDAR and when
9  we ultimately made the decision to terminate him.
10  There was not many days between that, between those    10:59:49
11  two.
12     Q.  Okay.  But just for the record -- I don't
13  know what that means.  You have to tell me.  So
14  just for the record, the point in time I'm talking
15  about is the point in time in which --    11:00:03
16     A.  Yeah.
17     Q.  -- you approved the recommendation to
18  remove him from LiDAR --
19     A.  Yeah.
20     Q.  -- before the preliminary injunction    11:00:11
21  issued.
22     Are you with me there?
23     A.  Yeah.
24     Q.  And my question was at that point in
25  time.    11:00:18

Page 129

1    A.  Yeah.                          11:00:18
2    Q.  Would you have the same answer?
3    A.  Same answer.  Yes, yes.  Yeah.
4    Q.  You were still hopeful --
5    A.  Yeah.                          11:00:24
6    Q.  -- that --
7    A.  Yeah.
8    Q.  What you said before?
9    A.  Yeah.
10   Q.  Okay.  How did you become aware that a    11:00:26
11   preliminary injunction had issued in this case?
12   A.  I --
13       MS. DUNN:  Just instruct the witness not
14   to answer things that he only knows based on
15   communications with counsel.           11:00:46
16       MR. VERHOEVEN:  From counsel?  Yeah.
17   Q.  (By Mr. Verhoeven)  Okay.  Why didn't you
18   fire Mr. Levandowski upon issuance of the
19   preliminary injunction?
20   A.  I think there were -- there was a    11:01:10
21   decision pretty shortly after that to do so.
22   Q.  Do you recall any events between the
23   preliminary injunction -- that's a bad question.
24       There's a period of time that -- there
25   was a date when the preliminary injunction    11:01:26

Page 130

1    issued --                          11:01:27
2    A.  Yeah.
3    Q.  -- and there's a date -- and I can give
4    you the dates if you want -- when at least it was
5    announced that Mr. Levandowski had been fired?    11:01:35
6    A.  Yeah.
7    Q.  And my question is:  Do you recall any
8    discussions that you were in, in that time period,
9    about whether or not he should be fired?
10   A.  Those discussions all had counsel.    11:01:49
11   Q.  Okay.  Did you have any discussions with
12   Mr. Levandowski on those subjects during that time
13   period?
14   A.  I did not.
15   Q.  When the decision was -- who made the    11:01:59
16   decision to fire Mr. Levandowski?
17   A.  I ultimately did.
18   Q.  Okay.  Did you personally tell him?
19   A.  I did not.
20   Q.  Okay.  How was he informed?    11:02:10
21   A.  I mean, there was a series of letters.  I
22   think there was a letter after the preliminary
23   injunction.  There was then also a --
24   Q.  Sorry.
25   A.  No, it's okay.                  11:02:30

Page 131

1       So there's a letter we sent him after the    11:02:31
2    preliminary injunction letting him know that he
3    must -- he's got to cooperate with the Court.  And
4    then there was a letter two weeks -- something like
5    that, something around two weeks -- prior to his    11:02:45
6    formal termination that told him that we were going
7    to terminate him.
8    Q.  Okay.
9    A.  Yeah, something like that, yeah.
10   Q.  So did the lawyers inform him, to the    11:03:00
11   best of your recollection?
12   A.  I am not sure who informed him.
13   Q.  Okay.  Did you have any discussions with
14   him personally about it?
15   A.  No.                          11:03:10
16   Q.  Have you had any discussions with
17   Mr. Levandowski since that time?
18   A.  About termination or --
19   Q.  About anything.
20   A.  He sent one note to me after my mother    11:03:20
21   passed away.
22   Q.  Other than that?
23   A.  And sent a brief note after I resigned.
24   And they were very short.
25   Q.  Okay.  Was the board of directors in any    11:03:34

Page 132

1    way involved in decision to fire Mr. Levandowski?    11:03:38
2    A.  They -- they -- they definitely made
3    their -- different board members had different
4    opinions on this, but they definitely made their
5    opinions known to me.                 11:03:54
6    Q.  Okay.  When was the first time you recall
7    that someone from the board contacted you and made
8    their opinions known to you?
9        MS. DUNN:  Form.
10       MR. CHATTERJEE:  Join.           11:04:07
11       THE DEPONENT:  I can't remember, for
12   sure, like the first.  Certainly, probably the
13   first time I heard was before the PI -- or the
14   first time I remember like a very -- like a very
15   clear conversation about this.           11:04:26
16       But it doesn't mean it didn't happen
17   earlier.  I just can't remember one before that.
18   Q.  (By Mr. Verhoeven)  I think I need to
19   clear the record.
20   A.  Yeah.                          11:04:37
21   Q.  Do you remember any conversation with the
22   board member about this case before the PI?
23   A.  Yes.  But we also had an attorney in the
24   room.
25   Q.  Okay.  Was there anytime when someone    11:04:48

Page 133

34 (Pages 130 - 133)

1 from the board called you and expressed their  11:04:50
2 opinions on this case or made some suggestions or
3 asked for any information?
4     A. I am trying to remember. I don't
5 remember a specific phone call on this topic.  11:05:05
6     Q. There were -- but there were meetings, at
7 least one meeting --
8     A. Yeah.
9     Q. -- with someone on the board prior to the
10 issuance of the preliminary injunction, that you  11:05:16
11 can recall?
12        MS. DUNN: The witness is instructed to
13 answer only to the extent that these weren't
14 conversations -- privileged conversations with
15 attorneys.  11:05:24
16        MR. VERHOEVEN: I'm only asking you
17 whether or not there was such a meeting.
18        THE DEPONENT: I mean, we have regular
19 board meetings.
20     Q. (By Mr. Verhoeven) So it was discussed  11:05:33
21 during regular board meetings?
22     A. I can't say.
23     Q. Because of the attorney-client privilege?
24     A. Correct. Correct.
25     Q. Okay. Was it ever discussed with any  11:05:42

Page 134

1 board member outside of the regular meetings?  11:05:45
2     A. I can't remember any specific
3 conversation. I don't know for sure. I can't say
4 for sure it didn't, but I don't -- I can't recall a
5 specific conversation.  11:06:00
6     Q. Okay. What was the nature of the board's
7 involvement in the decision to fire
8 Mr. Levandowski?
9        MS. DUNN: Same instruction to the
10 witness.  11:06:32
11        THE DEPONENT: I can't answer.
12     Q. (By Mr. Verhoeven) So was there -- I
13 think you said they made their opinions known
14 earlier --
15     A. Yeah.  11:06:43
16     Q. -- in connection with the firing issue,
17 right?
18     A. Yes.
19     Q. Okay. So you are testifying that that
20 was in a meeting with counsel that they made their  11:06:49
21 opinions known?
22     A. Yes.
23     Q. Okay.
24     A. Or sometimes --
25        MS. DUNN: I don't --  11:06:59

Page 135

1        THE DEPONENT: Go.  11:07:01
2        MS. DUNN: The witness is instructed not
3 to speak about the content of those meetings.
4     Q. (By Mr. Verhoeven) I am sorry. What
5 were you going to say, "or what"?  11:07:06
6     A. I was going to say something my attorney
7 wasn't going to let me say.
8     Q. Okay. Let's switch subjects.
9        At some point, you and Mr. Levandowski
10 had a conversation about him leaving Google and  11:07:31
11 coming over to your team, right?
12     A. Correct.
13     Q. When was the first time that subject came
14 up that you can recall?
15     A. I mean, I can't remember a specific  11:07:49
16 conversation; but, generally, late December, early
17 January is when some kind of conversations were
18 happening. And they didn't start there, but they
19 eventually got to a place where, like, maybe you
20 should come to Uber.  11:08:09
21     Q. When did they start?
22     A. My conversations -- my conversations with
23 Anthony started late December timeframe.
24     Q. Of which year?
25     A. Sorry. '15.  11:08:24

Page 136

1     Q. Okay. Can you describe to me, generally,  11:08:26
2 the circumstances of -- of that discussion in
3 December of 2015?
4     A. So, I mean, late December 2015, I started
5 getting brought into conversations that various  11:08:52
6 other members of my team were having with him, and
7 I don't know if other members of his team. And I
8 would get brought into those meetings on occasion
9 by late December.
10     Q. Did Uber approach Mr. Levandowski on this  11:09:09
11 subject?
12     A. I am not sure. I am not sure how the
13 conversation started.
14     Q. And you are not sure whether Levandowski
15 approached Uber or Uber approached Levandowski?  11:09:20
16     A. Yeah, I don't know.
17     Q. You weren't personally recruiting him?
18     A. Not when we started talking to him, no.
19     Q. Okay. Who were these other people
20 that -- that brought you into the conversation?  11:09:34
21     A. So there was Jeff Holden,
22 Brian McClendon. There may have been others. I
23 can't remember.
24     Q. What did they say about it to you once
25 they brought you in?  11:09:56

Page 137

35 (Pages 134 - 137)

1   A.  This is something who is a great talent       11:09:57
2  in the autonomy space.  We are having conversations
3  with him.  We are not sure where we are going to
4  end up, but you may want to meet him.
5   Q.  Did you know him before that       11:10:10
6  December 2015 timeframe?
7   A.  No.
8   Q.  Okay.  At that point in time, just so we
9  have a record on this, what was the state of Uber's
10  research and development in the AV -- in the AV       11:10:28
11  area?
12   A.  I think we got started sort of in the
13  late 2014, early 2015 timeframe.  We had a growing
14  team in Pittsburgh.
15   Q.  So at this point in time, you had a team       11:10:45
16  in Pittsburgh?
17   A.  Yeah, a fairly large team by that point,
18  I think.
19   Q.  Okay.  I understand there was a lot of
20  hires out of Carnegie Mellon?       11:10:55
21   A.  Yeah.
22   Q.  Had those hires started at that point in
23  time, or --
24   A.  Yeah.
25   Q.  Okay.  So there -- there was a team of       11:11:02

Page 138

1  Carnegie Mellon people already working in       11:11:03
2  Pittsburgh at that time?
3   A.  Yeah, it was -- it was a mix of folks who
4  had worked for, like, a military contractor, or
5  some folks from CMU, some folks from -- from a lab.       11:11:14
6  But they had been working for a year at that point,
7  close to it.
8   Q.  Was there any member of the Pittsburgh
9  team that was also in that group that brought you
10  in the first time about Mr. Levandowski?       11:11:30
11   A.  I don't know for sure.  There may have
12  been.  I don't know.
13   Q.  You can't think of one, though?
14   A.  I -- I don't know who was specifically in
15  the meeting when I first met him.       11:11:45
16   Q.  Okay.  Did -- did the folks that you
17  brought in explain why they thought it would be a
18  good move to hire Mr. Levandowski?
19       MS. DUNN:  Form.
20       THE DEPONENT:  I think when we first       11:12:06
21  started discussions, it wasn't clear, like, were we
22  going to hire him, or were we going to partner,
23  what -- what -- what we were going to do.
24   Q.  (By Mr. Verhoeven)  Okay.  But they
25  suggested you meet him?       11:12:19

Page 139

1   A.  Yeah.       11:12:20
2   Q.  And did you subsequently meet him?
3   A.  Yeah.
4   Q.  And can you just describe, generally, the
5  circumstances of that meeting?       11:12:26
6   A.  I -- I don't specifically remember that
7  meeting and the nature of it.  So I don't know much
8  about it.
9   Q.  Was it one-on-one?
10   A.  No.       11:12:40
11   Q.  So it was a group of people?
12   A.  Yeah.
13   Q.  Do you remember who -- who from Uber was
14  at that meeting?
15   A.  I don't remember specifically, but       11:12:49
16  there -- you know, there are various folks who were
17  part of that discussion and sort of intro'ing me.
18  I don't know if they were at that first meeting or
19  not, like who was at that first meeting.
20       But, again, you know, Brian McClendon and       11:13:06
21  Jeff Holden come to mind.  There may have been
22  businesspeople in that meeting, too.  I just -- I
23  just can't remember.
24   Q.  It's fair to say that you and
25  Mr. Levandowski have had a lot of one-on-one       11:13:15

Page 140

1  conversations prior to him leaving Google about him       11:13:19
2  possibly joining you?
3       MS. DUNN:  Form.
4       THE DEPONENT:  I don't know if that's
5  fair to say.       11:13:28
6   Q.  (By Mr. Verhoeven)  Okay.  Have you had
7  any?  Did you have any?
8   A.  Prior to him leaving?  Maybe.  Maybe.  I
9  don't know for sure.
10   Q.  You don't remember having one-on-one       11:13:37
11  conversations with him before he decided to leave?
12   A.  Like, I am trying to place, like, the --
13  the -- like when, generally, he left and when,
14  generally, we started spending more time together.
15       And my -- my general recollection is that       11:13:52
16  the time -- when we started spending more and more
17  time was as we were, like, really starting to work
18  on getting the deal done.
19       So, for me, that feels like February and
20  March is when we started spending more time       11:14:13
21  together, and really even past that is when I think
22  it got -- is, you know, when we really started
23  spending time.  But in the early days, I was
24  brought into meetings that existed.
25   Q.  Okay.  So who was driving the train       11:14:36

Page 141

36 (Pages 138 - 141)

1 during that early time?                    11:14:38
2    A.  It was -- in the early time, it was
3 mostly -- I think it was our deal team, probably
4 mostly Cameron.
5    Q.  Okay.                               11:14:45
6    A.  And he may have had one or two other
7 people with him.  And Jeff Holden.
8    Q.  Okay.
9    A.  And -- yeah.
10   Q.  And then they would bring you in      11:14:52
11 occasionally to give you updates?
12   A.  Give me updates or get me involved in a
13 discussion, yeah.
14   Q.  Did you have any input -- assuming you
15 had input at some point.  When is the first time   11:15:06
16 you remember having -- instead of just hearing
17 status reports and -- and talking to people, when
18 is the first time that you remember providing input
19 yourself on whether this would be a good move or
20 not?                                      11:15:20
21      MS. DUNN:  Form.
22      THE DEPONENT:  Well, it is like it wasn't
23 clear what move.  But if you have ever been in a
24 meeting with me, which you have not, I am going to
25 provide input all the time, so...          11:15:32
                                        Page 142

1    Q.  (By Mr. Verhoeven)  Okay.  Do you      11:15:36
2 remember what your initial input was, generally?
3    A.  No, it was probably just sort of opinions
4 on different options and probably just exploratory.
5 I don't know if I had a strong -- like, a strong    11:15:48
6 opinion one way or the other in early meetings.
7    Q.  Did there come a time when you started to
8 have an opinion that was more formed?
9    A.  Probably.
10   Q.  Yeah.  Do you remember, roughly, when    11:16:04
11 that was?
12   A.  For me, it feels like teams
13 early/mid-January.
14   Q.  Of what year?
15   A.  2016.                              11:16:14
16   Q.  Okay.  Do you remember if it was before
17 or after Mr. Levandowski left Google?
18   A.  Well, if it was early/mid-January, I
19 mean, that -- it's possible it was when he was
20 still at Google.                          11:16:30
21   Q.  Do you remember any conversations that
22 you had personally with Mr. Levandowski before he
23 left Google?
24   A.  I mean, I just have a general
25 recollection of the kinds of conversations that    11:16:44
                                        Page 143

1 were being had, the kinds of meetings we were      11:16:47
2 having.  But a specific one, not really.
3    Q.  Outside of attending meetings, do you
4 recall any conversations you had had with
5 Mr. Levandowski prior to his leaving Google?       11:16:58
6    A.  I don't have a recollection of a specific
7 conversation or specific meeting.
8    Q.  Did you have conversations with him prior
9 to him leaving -- let me finish the question.
10   A.  Yeah.                             11:17:12
11   Q.  Did you have conversations with him prior
12 to him leaving Google outside of the meetings?
13      MS. DUNN:  Form.
14      THE DEPONENT:  I can't say for sure.
15   Q.  (By Mr. Verhoeven)  You are not sure     11:17:25
16 about that?
17   A.  I am not sure.  Not sure.  You know, I
18 guess what I would say is, in the early days, it
19 was -- it was meetings that I was joining, for the
20 most part.  I am not sure if there was -- I can't   11:17:47
21 remember, specifically, meetings beyond that.
22   Q.  Why did Uber hire Stroz or Stroz to do an
23 investigation of Mr. Levandowski?
24      MS. DUNN:  I will caution the witness not
25 to answer things he only knows from communications  11:18:09
                                        Page 144

1 with his lawyers, with the company's lawyers.      11:18:12
2      THE DEPONENT:  I can't answer that.
3    Q.  (By Mr. Verhoeven)  Were you involved in
4 any way in the decision to hire forensic -- an
5 independent forensic firm to do an investigation of  11:18:24
6 certain diligence to employees in connection with
7 the transaction that you did with Ottomotto?
8    A.  No.
9    Q.  Were you aware of it?
10   A.  Yes.                              11:18:43
11   Q.  When was the first time you became aware
12 of it?
13   A.  I am not sure the -- the first time, but
14 it feels like the March timeframe, march 2016.
15   Q.  And how did you become aware of it?      11:18:57
16   A.  Probably with a conversation with an
17 attorney.
18   Q.  Okay.  What was your understanding of the
19 reason why it was being done?
20      MS. DUNN:  I will caution the witness not   11:19:09
21 to answer to the extent he only knows this based on
22 conversations with attorneys for the company.
23      THE DEPONENT:  She's answered for me.
24   Q.  (By Mr. Verhoeven)  So you -- you can't
25 answer -- it was all -- your understanding is      11:19:22
                                        Page 145

37 (Pages 142 - 145)

1 completely from attorneys?                    11:19:24
2     A.  Well, state your -- restate your
3 question.
4     Q.  What was your understanding as to why
5 this investigation into these diligence employees    11:19:29
6 was being done?
7     A.  Oh.  We were contemplating an M & A
8 transaction.  M & A transactions often have
9 diligence.
10     Q.  Are you familiar with M & A transactions    11:19:46
11 being done where employees' devices are imaged and
12 analyzed by an independent third party?
13         MS. DUNN:  Form.
14         THE DEPONENT:  Yes.
15     Q.  (By Mr. Verhoeven) Which transactions    11:20:05
16 are you aware of?
17     A.  I mean, just usually complex transactions
18 and transactions that involve individuals that may
19 have worked at a competitor.
20     Q.  Can you name one that you know besides    11:20:19
21 this one?
22     A.  I would have to think about it.  Just --
23 we haven't done a lot of M & A transactions at
24 Uber.  And this is the only one with -- with a
25 group of individuals who had previously worked at a    11:20:37

Page 146

1 competitor.                    11:20:40
2         But just general chatter in
3 Silicon Valley in the industry, this is the kind of
4 thing -- so I can't specifically name a -- a
5 transaction, but it's one -- it's the kind of thing    11:20:50
6 you hear about generally.
7     Q.  Do you remember hearing about it with any
8 specificity from anyone?
9     A.  Not really.
10     Q.  Just -- so your basis for saying that is    11:21:02
11 just general chatter?
12     A.  Yeah.
13     Q.  Okay.
14     A.  Real quick, if I could go to the
15 bathroom, that would be good.                11:21:10
16         MR. VERHOEVEN:  Sure.
17         THE DEPONENT:  Thanks.
18         THE VIDEOGRAPHER:  Going off the record.
19 The time is 11:21.
20         (Recess taken.)              11:21:48
21         THE VIDEOGRAPHER:  We are back on the
22 record.  The time is 11:28.
23     Q.  (By Mr. Verhoeven) Did there come a time
24 when you became aware of any results from the Stroz
25 investigation?                    11:29:02

Page 147

1     A.  What Stroz investigation are you    11:29:08
2 referring to?
3     Q.  I'm referring to -- remember, before the
4 break I asked you about the March time frame, we
5 talked about the March time frame --        11:29:18
6     A.  Okay.  Yeah.
7     Q.  -- when there was a Stroz investigation?
8     A.  Yes.  You're speaking March 2016,
9 correct?
10     Q.  Starting at that point.            11:29:26
11     A.  Yeah.
12     Q.  But then the question is, did there come
13 a time after the start of that investigation --
14     A.  Yeah.
15     Q.  -- when you became aware -- let me ask a    11:29:31
16 more particular question.
17         Did you -- did you become aware of any
18 report or information provided by Stroz as a result
19 of them being retained in the March time frame?
20     A.  Those -- those -- the information that I    11:29:54
21 received along those lines was with company
22 counsel.
23     Q.  But you did receive some information?
24     A.  I got maybe a couple of updates along the
25 way.                        11:30:06

Page 148

1     Q.  Okay.  Do you remember when you received    11:30:10
2 the first update?
3     A.  I do not.
4     Q.  Was it before Uber entered into the terms
5 and conditions agreement?            11:30:17
6     A.  I think so.
7     Q.  Okay.  And what were you told?
8     A.  I can't -- I can't speak to that.
9     Q.  So you were told by attorneys?
10     A.  Yes.                    11:30:32
11     Q.  You said there was another time, a couple
12 of times?
13     A.  Yeah.
14     Q.  What's the other time you remember?
15     A.  I can't remember specific dates, but I    11:30:41
16 remember there were a couple of times, maybe, where
17 I was updated on where we were in the process.
18     Q.  When was the -- relative to the timeline,
19 when was the last time that you remember receiving
20 any report on this?                11:30:54
21     A.  I mean, it was certainly before we signed
22 any deal, yeah.
23     Q.  Was it before the put call agreement?
24         MR. CHATTERJEE:  Form.
25         THE DEPONENT:  What -- what do you mean?    11:31:08

Page 149

38 (Pages 146 - 149)

1  What...                                    11:31:08
2    Q.  (By Mr. Verhoeven)  There's an agreement
3  that you signed, I believe, that --
4    A.  Okay.
5    Q.  -- allowed the parties to have options, a    11:31:13
6  put call.
7       MR. CHATTERJEE:  Form.
8       MS. DUNN:  Form.
9    Q.  (By Mr. Verhoeven)  Are you familiar with
10  that agreement?                           11:31:20
11      MR. CHATTERJEE:  Same thing.
12      THE DEPONENT:  Are you talking --
13    Q.  (By Mr. Verhoeven)  You want me to show
14  it to you?
15    A.  Okay.                               11:31:26
16    Q.  Or unless you're familiar --
17    A.  Okay.
18    Q.  -- unless you know it.
19    A.  Please show me.  I want to make sure I
20  understand what you're saying.            11:31:34
21    Q.  Are you familiar with -- you don't
22  remember a put call agreement that was signed?
23    A.  I don't remember the term "put call," but
24  I just -- if you can show me, that would be
25  helpful.                                  11:31:54
                                            Page 150

1    Q.  I will just show it, so there's no    11:32:03
2  ambiguity.  I guess that's the safest thing to do.
3       While they're looking for that, I will
4  keep asking you questions.
5    A.  Okay.                               11:32:26
6    Q.  Did you know that the Stroz investigation
7  was investigating, in part at least, the subject of
8  bad acts by the diligence employees?
9       MR. CHATTERJEE:  Form.
10      MS. DUNN:  Form.                      11:32:42
11      THE DEPONENT:  I don't know what you're
12  specifically referring to.
13    Q.  (By Mr. Verhoeven)  Do you remember
14  seeing any documents referring to bad acts
15  associated with this transaction?         11:32:57
16    A.  I do not.
17      MR. CHATTERJEE:  Same objection.
18    Q.  (By Mr. Verhoeven)  Did you read any
19  agreements that talked about bad acts in connection
20  with this transaction?                    11:33:03
21    A.  No.
22      MS. DUNN:  Form.
23    Q.  (By Mr. Verhoeven)  Did your counsel tell
24  you about bad acts associated with this
25  transaction?                             11:33:14
                                            Page 151

1       MS. DUNN:  The witness is instructed not    11:33:15
2  to answer based on communications with counsel.
3       But, generally, I want to make sure that
4  the witness understands that he can answer to the
5  extent he has an independent recollection.     11:33:21
6       MR. VERHOEVEN:  He's already testified
7  about that.
8    Q.  (By Mr. Verhoeven)  Let me just say this
9  way.  Including counsel and non-counsel, just yes
10  or no, did you become aware of any documents    11:33:34
11  concerning -- that mentioned bad acts in connection
12  with this transaction?
13    A.  I don't remember.  I don't remember.
14    Q.  Okay.
15    A.  Yeah.                               11:33:48
16    Q.  Did you -- did there come a time when --
17  this is the agreement I was talking about.
18      Maybe I should -- should have called this
19  something else.
20      MR. VERHOEVEN:  Let's mark this as      11:34:04
21  Exhibit 365.
22      (Exhibit 365 was marked for
23  identification by the court reporter and is
24  attached hereto.)
25      THE DEPONENT:  Would you like me to read    11:34:15
                                            Page 152

1  this right now?                            11:34:16
2    Q.  (By Mr. Verhoeven)  No.
3       Does this refresh your recollection -- I
4  think you signed it.  You might as well check that.
5       MR. CHATTERJEE:  Do you have another    11:34:26
6  copy, Charlie?
7    Q.  (By Mr. Verhoeven)  Is that your
8  signature?
9    A.  That is, yeah.
10    Q.  Does this refresh your recollection of --    11:34:36
11    A.  Well, I mean it says, "Agreement and Plan
12  Merger."
13    Q.  Okay.  Let's call it that.
14    A.  Yeah.
15    Q.  That's what I was referring to.        11:34:44
16    A.  Okay.  I mean, I haven't -- I mean, I --
17  I have not read this document, but -- but certainly
18  have -- you know, I see my signature on it, so yes.
19    Q.  Did you read it before you signed it?
20    A.  No.  No.  I was certainly briefed on it,    11:34:59
21  though.
22    Q.  Did your briefing include anything about
23  bad acts?
24    A.  I don't recall anything like that.
25    Q.  Did it include anything about a Stroz    11:35:11
                                            Page 153

39 (Pages 150 - 153)

1 investigation?                              11:35:14
2     A.  I was aware that -- I was aware that
3 Stroz was conducting -- that there was a diligence
4 process underway and that we were looking into
5 content, devices, et cetera.                 11:35:31
6     Q.  Was your brief- -- I'm talking about your
7 briefing --
8     A.  Yeah --
9     Q.  -- on this before you signed it?
10    A.  Yeah.                                11:35:41
11    Q.  Did that briefing discuss the
12 investigation and the results of the investigation?
13    A.  You know, I'm just sort of -- I'm kept up
14 to date on a deal as it's coming along.  So it's
15 not like there's like a -- the final briefing, so    11:35:54
16 to speak, might be on the final areas of the deal
17 that were being solved.
18    Q.  Okay.
19    A.  So I can't -- yeah.  So it's -- it's
20 different -- you get different parts at different    11:36:09
21 times.  I can't say what the final one was.
22    Q.  Okay.
23    A.  And, generally, they're -- you know, in
24 most of these, there would be an attorney in the
25 room.                                        11:36:18
                                              Page 154

1     Q.  Okay.                               11:36:18
2     A.  But, yeah, I don't know.
3     Q.  Okay.  And I think we've already covered
4 any information you have about the results of the
5 investigation are covered by the -- were from    11:36:31
6 attorneys --
7     A.  Yeah.
8     Q.  -- is that right?
9     A.  Of course, yeah.
10    Q.  Did you know that this agreement had an    11:36:38
11 indemnification clause for Mr. Levandowski?
12        MR. CHATTERJEE:  Form.
13        THE DEPONENT:  I mean, I would be
14 surprised if it didn't.
15    Q.  (By Mr. Verhoeven)  Would you be    11:36:50
16 surprised if Uber indemnified Mr. Levandowski for
17 committing prior bad acts with respect to Google?
18        MS. DUNN:  Form.
19        THE DEPONENT:  I mean, I generally
20 understand how indemnification agreements work.    11:37:03
21     They're typically about what somebody has
22 disclosed and what they haven't disclosed, and how
23 they get indemnified against things that they
24 disclose.
25    Q.  (By Mr. Verhoeven)  Have you ever heard    11:37:21
                                              Page 155

1 of an indemnification agreement that indemnifies a    11:37:21
2 person for intentional bad acts?
3        MS. DUNN:  Form.
4        THE DEPONENT:  Well, I guess my
5 understanding is indemnification agreements    11:37:36
6 generally indemnify people against things that they
7 disclose.
8     And you don't need indemnification for
9 things that -- like walking down the street,
10 there's no indemnity for walking down the street.    11:37:49
11    But it's really about what people
12 disclose and what they don't disclose.  It's just
13 generally how indemnification agreements work.
14    Q.  (By Mr. Verhoeven)  Okay.  Are you aware
15 of any indemnification agreements -- well, let    11:38:00
16 me -- let me back up.
17    Are you familiar with any of the terms of
18 the indemnification agreement between Uber and
19 Mr. Levandowski?
20    A.  No, not -- not specifically.    11:38:08
21    Q.  Is Uber indemnifying Mr. Levandowski in
22 this litigation?
23        MR. CHATTERJEE:  Form.
24        MS. DUNN:  Form.
25        THE DEPONENT:  I don't know.    11:38:19
                                              Page 156

1     Q.  (By Mr. Verhoeven)  Is Uber paying for    11:38:20
2 Mr. Levandowski's attorneys?
3        MS. DUNN:  Form.
4        MR. CHATTERJEE:  Form.
5        THE DEPONENT:  I don't know.    11:38:27
6     Q.  (By Mr. Verhoeven)  Have you ever heard
7 of an indemnification agreement that talks about
8 pre-deal bad acts?
9     A.  Those specific words?
10    Q.  Yeah.                              11:38:38
11    A.  No.
12    Q.  Have you -- is it correct that you have
13 exchanged text messages with Mr. Levandowski?
14    A.  Yes.
15    Q.  Are you aware that on May 11th of this    11:38:59
16 year the court ordered Uber to make available for
17 inspection any text messages you exchanged with
18 Mr. Levandowski pertaining to Uber's LiDAR work?
19        MS. DUNN:  Form.
20        THE DEPONENT:  I wasn't aware of that    11:39:13
21 specific order, but I generally understand the
22 Court wanted my text messages.
23    Q.  (By Mr. Verhoeven)  What do you
24 understand about that?
25    A.  That they want my -- all my text    11:39:26
                                              Page 157

40 (Pages 154 - 157)

1 messages.                          11:39:27
2    Q.  Do you remember when you learned that?
3    A.  Not really.  I mean, I think somebody in
4 the company asked for my phone.
5    Q.  When did that happen?            11:39:35
6    A.  I don't remember specifically.
7    Q.  Can you estimate it for me?  Was it a
8 week ago?  Was it a month ago?  Was it six months
9 ago?
10    A.  It was certainly months ago.      11:39:46
11    Q.  Months ago?
12    A.  Yeah.
13    Q.  Okay.
14    A.  I mean, I...
15    Q.  And this is your cell phone they asked   11:39:51
16 for?
17    A.  Yeah.
18    Q.  Okay.  And did you give it to them right
19 away or what happened?
20    A.  When somebody -- somebody came to ask for  11:39:59
21 my cell phone, and I gave them my cell phone.
22    Q.  Okay.  And -- and how long were you
23 without the cell phone?
24        Let me -- let me with- -- let me
25 withdraw.                          11:40:12

Page 158

1        Did they give it back to you?      11:40:13
2    A.  Yes, they did.
3    Q.  Okay.  So what was the period of time
4 between --
5    A.  Yeah.                          11:40:16
6    Q.  -- when you gave it and they gave it back
7 to you?
8    A.  Hours.
9    Q.  Hours?
10    A.  Yeah.                          11:40:20
11    Q.  Okay.  What was your understanding of
12 what they were doing with your cell phone?
13    A.  They were getting all of the text
14 messages from it.
15    Q.  Okay.                          11:40:32
16    A.  Specific to what they needed.
17    Q.  And this -- you got your cell phone back
18 months ago?
19    A.  Yes.
20    Q.  Okay.  Did you have any discussions with   11:40:43
21 anybody after that point in time about what was on
22 your cell phone?
23    A.  I mean, only with attorneys.
24    Q.  Did you have discussions with attorneys
25 about what was on your cell phone?      11:40:55

Page 159

1    A.  Brief -- brief discussions.  I mean...   11:40:57
2    Q.  Do you have a practice -- withdrawn.
3        You did exchange text messages with
4 Mr. Levandowski, right?
5    A.  Correct.                          11:41:12
6    Q.  Do you recall deleting any of those
7 texts?
8    A.  I do not, no.
9    Q.  Do you have any practices with respect to
10 deleting texts on your phone?            11:41:23
11    A.  Outside of just the auto-delete, the
12 30-day auto-delete, no.
13    Q.  And what's the 3A auto-delete?
14    A.  Thirty -- the 30-day auto-delete is just
15 a setting on my phone --               11:41:35
16    Q.  Okay.
17    A.  -- where after 30 days the -- the texts
18 disappear.
19    Q.  Do you still have -- is that still your
20 setting on your phone?                 11:41:44
21    A.  No.
22    Q.  What is your setting now?
23    A.  It's -- keeps forever now.
24    Q.  And when did you change the setting?
25    A.  A few weeks ago.                 11:41:51

Page 160

1    Q.  "Few" meaning two, three --        11:41:52
2    A.  Something like that.  I don't know the
3 exact.
4    Q.  Okay.
5    A.  I'm sure the attorneys can figure that   11:42:08
6 out when that happened.
7    Q.  All right.  You ready for documents?
8    A.  Let's do it.
9        (Discussion off the stenographic record.)
10    Q.  (By Mr. Verhoeven)  A good question I   11:42:55
11 forgot to ask --
12    A.  Yeah.
13    Q.  -- is, have you exchanged any texts with
14 Mr. Levandowski since your phone has been returned
15 to you?                                11:43:02
16    A.  No.
17    Q.  Okay.  I'm going to try to shorten this
18 based on your answers, so there may be some pauses.
19 I apologize for that.
20        You've already answered a lot of my   11:43:19
21 questions, and so --
22    A.  That's nice of you.
23    Q.  -- I apologize for that.
24    A.  That's all right.  Apology accepted.
25    Q.  Do you think that -- is it your belief   11:43:36

Page 161

1 that -- withdrawn.                    11:43:38
2     It is your belief, correct me if I'm
3 wrong, that AV technology represents an existential
4 threat to Uber's business model.
5     MR. CHATTERJEE:  Form.         11:43:52
6     MS. DUNN:  Form.
7     THE DEPONENT:  I would say it
8 differently.  I would say that it is -- in order
9 for Uber to exist in the future, we will likely
10 need to be a leader in the AV autonomous vehicle   11:44:11
11 space.
12     Q.  (By Mr. Verhoeven)  And why is that?
13     A.  Because autonomous vehicles are going to
14 be far safer than human-driven vehicles.  And a
15 service that's very safe compared to human-driven   11:44:32
16 vehicles is going to be one that consumers want.
17     And it will also ultimately be far
18 cheaper than a human-driven vehicle.  And consumers
19 that can get safer rides far cheaper are going to
20 be the consumer -- those consumers are going to go   11:44:52
21 to the service that provides that.
22     And if you don't provide that, I don't
23 believe you're going to be able to sustain your
24 business.
25     Q.  When did you recall coming to this   11:45:13

Page 162

1 belief?                          11:45:17
2     A.  This was really late 2014.
3     Q.  And what did you do based on coming to
4 this conclusion?
5     A.  We started our autonomous -- what we   11:45:28
6 called the Advanced Technology Center in
7 Pittsburgh.  You know, we...
8     Q.  As of January 1, 2015, what was the
9 status of that project?
10     A.  It was -- that was right around the time   11:45:45
11 when it was being put together.  So I don't know
12 the exact date in January of that year --
13     Q.  Okay.
14     A.  -- but it was right around that year --
15 or, sorry, right around that time.    11:45:54
16     Q.  And what was the -- to the extent you
17 know or remember, what was the business plan about
18 that period of time with respect to AV?
19     A.  It was to get -- to build software that
20 can drive safer and more cost efficiently than   11:46:15
21 traditional human-driven vehicles.
22     Q.  This is one of those times I'm shortening
23 the deposition.
24     A.  That's all right.  I'm appreciating.
25 This is one of the few times I'm going to thank   11:46:42

Page 163

1 you.                           11:46:44
2     Q.  All right.  Who is John Bares?
3     A.  He was one of the original members of the
4 team in Pittsburgh.
5     Q.  You said "was."  What's he doing   11:47:20
6 currently?
7     A.  No.  He's still -- he's still one of the
8 original members of the team.
9     Q.  Okay.
10     A.  But he -- his role changed.  So at first   11:47:31
11 he was running all of the Pittsburgh operation, and
12 now he's doing a smaller portion of it.
13     Q.  What was his role in -- in December of
14 2015, so at the end of the year?
15     I was talking earlier about the beginning   11:47:53
16 of the year.
17     A.  Yeah.
18     Q.  At the end of the year, what was his
19 position?
20     A.  He was -- if I recall, he was still   11:47:58
21 running the Pittsburgh operation.
22     MR. VERHOEVEN:  All right.  Let's mark as
23 Exhibit 366 an Excel spreadsheet produced by Uber.
24     (Exhibit 366 was marked for
25 identification by the court reporter and is   11:48:22

Page 164

1 attached hereto.)                  11:48:22
2     Q.  (By Mr. Verhoeven)  Okay.  Do you
3 recognize this as an Excel spreadsheet printout?
4     A.  I mean, I don't -- I don't know if it's
5 an Excel spreadsheet, but I recognize that it's a   11:48:42
6 piece of paper that has words on it.
7     Q.  Do you recognize the format of this
8 document as a printout from a spreadsheet that Uber
9 would have in its software?
10     A.  No.                      11:49:01
11     Q.  Okay.
12     A.  But I see it.  I see the document.
13     Q.  Okay.  Yeah.
14     You see at the bottom -- I know it's in
15 small print, I apologize for that --    11:49:11
16     A.  That's all right.
17     Q.  -- there's a bottom green line?
18     A.  Yeah.
19     Q.  And you see it says, "Meeting with TK"?
20     A.  Yup.                     11:49:19
21     Q.  That would be you?
22     A.  I assume so.
23     Q.  I will represent to you that these are
24 Mr. Bares' -- this is Mr. Bares' spreadsheet --
25     A.  Okay.                    11:49:33

Page 165

42 (Pages 162 - 165)

1  Q.  -- just so you know.            11:49:33
2      And I will represent to you that this
3  meeting occurred on December 22, according to
4  Mr. Bares.
5  A.  Is this notes from a meeting or what is    11:49:42
6  this?
7  Q.  Yes.
8  A.  Okay.
9  Q.  So if you turn the page, there is some
10 description of notes from the meeting.          11:49:57
11     Do you see that?
12 A.  Okay.
13 Q.  And you see it says, "TK, what we want"?
14 A.  Yeah.
15 Q.  And then it says, "Source," and goes on.    11:50:08
16 A.  Okay.  Yeah.
17 Q.  Do you remember meeting with Mr. Bar --
18 Bares?  Is it Bares?  Is that how you pronounce it?
19 A.  Bares.
20 Q.  Bares.                                     11:50:21
21 A.  John Bares.
22 Q.  Do you remember meeting with Mr. Bares --
23 A.  Yeah.
24 Q.  -- in or around December 22, where you
25 discussed the subject of "What we want" in     11:50:32

Page 166

1  connection with the deal with Mr. Levandowski?   11:50:33
2  A.  I mean, I don't remember specifically.
3  No.  I can't say it didn't happen, I just don't
4  remember.
5  Q.  Do you remember talking about wanting        11:50:48
6  something related to source?
7  A.  No.
8  Q.  What does source mean, in your opinion?
9  A.  I -- I don't know.
10 Q.  You don't know what Mr. Bares meant by      11:50:57
11 that?
12 A.  No.  It could be that -- I mean, there's
13 a lot of -- I could speculate as what he meant, but
14 I don't know what he meant.
15 Q.  What do you think -- I mean, if you were    11:51:08
16 asked, what do you think he meant?
17     MS. DUNN:  Form.
18     THE DEPONENT:  I mean, it could be
19 that -- I just don't know, what is the timing of
20 this -- what is the timing of this note?  Like when  11:51:16
21 was this note made?
22 Q.  (By Mr. Verhoeven) I will represent to
23 you it was --
24 A.  Yeah.
25 Q.  -- December 22 --                           11:51:22

Page 167

1  A.  December 22.                               11:51:24
2  Q.  -- of 2015.
3  A.  Of 2015.
4      And do we know that this is -- I -- I
5  just don't -- I don't know what this is referring   11:51:38
6  to.  I can't say for sure what this is about.
7  Q.  Okay.  Okay.  What about -- you agree
8  that basically saying that you said, "What we
9  want," and provides a list?
10     MS. DUNN:  Form.                           11:51:51
11 Q.  (By Mr. Verhoeven)  TK is you.
12 A.  I agreed that it says, "TK, what we
13 want," but I don't know what that means.
14 Q.  What do you think -- you don't
15 remember saying that you want all of their data?   11:52:01
16 A.  I don't even know who "they" is.
17 Q.  Okay.  So you don't understand, looking
18 at this, that this is about a potential deal with
19 Mr. Levandowski?
20 A.  I have no idea.                            11:52:19
21 Q.  You see down below, it says, "AL says"?
22 A.  Yes.  It does say that, yeah.
23 Q.  Quote, AL says that our biggest threat is
24 Google, but also doesn't have faith in Google
25 pulling it off.                                11:52:30

Page 168

1      Do you see that?                          11:52:32
2  A.  I do.
3  Q.  Okay.  Do you remember having a meeting
4  in or about December 22 of 2015 where there was a
5  discussion about a deal with AL, Mr. Levandowski,   11:52:41
6  that you attended?
7  A.  I mean, I don't remember the specific
8  meeting.
9      I mean, I'm sure you could ask John about
10 this.                                         11:53:11
11 Q.  I know.  I'm just trying to --
12 A.  Yeah.
13 Q.  -- get what your understanding is and
14 what your recollection is.
15 A.  Yeah.  I don't really have much.           11:53:15
16 Q.  So this document doesn't refresh your
17 recollection?
18 A.  No.
19 Q.  Doesn't trigger anything in your memory?
20 A.  No, but I -- I do like, "He is very        11:53:21
21 focused and unstoppable about getting things done."
22     I like that part.
23 Q.  You like it, but you don't remember.
24 A.  No, but I definitely like that.  If it's
25 talking about me, I'm -- I'm excited.          11:53:33

Page 169

43 (Pages 166 - 169)

1    Q.  Now you know what people say behind your    11:53:40
2  back.
3       If you look down further --
4    A.  Yeah.
5    Q.  -- just above the green horizontal line    11:53:42
6  on this page, which is, for the record, UBER
7  60322 --
8    A.  Hold on.
9    Q.  -- it says --
10    A.  603 -- what is this?  Where is this?    11:53:50
11    Q.  That's the control number on the bottom
12  right-hand side.
13    A.  Oh, yeah, yeah, yeah, yeah.
14       So what am I looking at?
15    Q.  Just above the green horizontal line --    11:53:57
16    A.  Yes.
17    Q.  -- it says, "January 12, he quits."  And
18  then, "January 1 through 12 period is twitchy.  He
19  is still G employee but on trajectory out."
20    A.  Yeah.    11:54:14
21    Q.  Do you see that?
22    A.  Yeah.
23    Q.  Do you remember having any discussions in
24  December of 2015 about a date when Mr. Levandowski
25  would quit or a period that was twitchy?    11:54:24

Page 170

1       MS. DUNN:  Form.    11:54:29
2       THE DEPONENT:  I don't remember -- I
3  mean, no.  I don't -- I don't specifically remember
4  a discussion about that.
5       But I think your question said December    11:54:40
6  and --
7    Q.  (By Mr. Verhoeven)  Yeah,
8  December 22, 2015.
9    A.  Okay.  Yeah.  No, I don't remember that,
10  no.    11:54:48
11    Q.  Do you remember you generally having
12  discussions about a possible deal with
13  Mr. Levandowski in December of 2015?
14    A.  I remember deal -- sort of deal
15  discussions more in the January time frame.    11:55:04
16    Q.  Did -- so you -- could they have happened
17  in December as well?
18    A.  It's possible.
19    Q.  Well, doesn't this document show it?
20    A.  I don't know what the hell this document    11:55:23
21  is.
22    Q.  Okay.  If you turn the page.
23    A.  Okay.  All right.
24    Q.  And if you look -- just for the record,
25  page 323.    11:55:41

Page 171

1    A.  Yeah.    11:55:42
2    Q.  If you look, it's right below the little
3  pink box, the very first pink box --
4    A.  Uh-huh.
5    Q.  -- it says, quote, How many people are    11:55:50
6  you really taking?  Close quote.
7    A.  Where is this?
8    Q.  I can point to it.
9    A.  Oh, yeah, yeah.  I see it.  Yeah, yeah.
10    Q.  Okay.  Do you remember any discussions    11:55:59
11  with anyone during the December 2015 time period
12  about Mr. Levandowski taking a bunch of people from
13  Google when he left?
14    A.  I remember more of that kind of
15  discussion in the January time frame.    11:56:18
16    Q.  Okay.
17    A.  But --
18    Q.  What do you remember?
19    A.  I remember being very aggressive about
20  hiring great talent.    11:56:27
21    Q.  Do you remember specifically, though,
22  discussions about hiring folks that were employed
23  by Google in the AV area as part of the deal, in
24  addition to Mr. Levandowski?
25    A.  Generally, we were very interested in    11:56:59

Page 172

1  hiring the best talent, and much of the best talent    11:57:00
2  was at Google, for sure.
3    Q.  And do you remember that Uber and you
4  wanted to hire as many good people as possible from
5  Google as part of this deal?    11:57:10
6       MS. DUNN:  Form.
7       THE DEPONENT:  I don't -- I'm not sure it
8  was part of this deal, but we were generally
9  interested and continue to be interested -- very
10  interested in hiring as many great scientists and    11:57:20
11  engineers from Google as possible -- as is
12  possible.  And we have been very successful in
13  doing that.
14    Q.  (By Mr. Verhoeven)  Do you remember
15  discussions with Mr. Levandowski about targeting    11:57:33
16  Google employees in the AV area, for him to bring
17  with him or recruit after he came over to you?
18       MS. DUNN:  Form.
19       THE DEPONENT:  I remember discussions
20  about how we should best go about hiring the great    11:57:47
21  talent at Google, and figuring out what are the
22  best ways to do that while staying within certain
23  legal constructs.
24    Q.  (By Mr. Verhoeven)  And when -- this is
25  with Mr. Levandowski, these discussions?    11:58:04

Page 173

44 (Pages 170 - 173)

1    A.  Sure.  Yeah.                        11:58:05
2    Q.  Okay.  And was it -- so is it fair to say
3    that those discussions were in the context of the
4    AV technology?
5    A.  It wasn't about AV technology.  It was    11:58:17
6    about people and -- who are very talented in the AV
7    space.
8    Q.  Okay.
9    A.  Yeah.
10   Q.  The AV space.                     11:58:24
11   But it was -- it was about people in the
12   AV space.
13   A.  Yeah.
14   Q.  Okay.
15   A.  Yeah.                            11:58:30
16   Q.  And how many people do you remember
17   talking about hiring?
18   MS. DUNN:  Form.
19   MR. CHATTERJEE:  Form.
20   THE DEPONENT:  I mean, it wasn't    11:58:39
21   typically about individuals, but more -- well,
22   sometimes about individuals.
23   But it was -- it was about, you know, how
24   many great people do we think there are, what kind
25   of process can we go through to recruit them, and    11:58:55

Page 174

1    how do we make it a reality for them to come to a    11:59:01
2    place which we feel is sort of more commercially
3    oriented, more sort of just works harder, you know,
4    just a better environment to innovate in the space.
5    Q.  (By Mr. Verhoeven)  Do you remember any    11:59:21
6    discussion about compensation to Levandowski in
7    this potential deal being based on how many Google
8    folks in the AV space he was successful in hiring
9    away?
10   MR. CHATTERJEE:  Form.              11:59:41
11   MS. DUNN:  Objection to form.
12   THE DEPONENT:  I don't remember that
13   being tied to the deal.  It may have been, but I
14   don't remember that.
15   I don't remember it being in milestones    11:59:49
16   that we ended up with.
17   But I do know that we were depend- -- for
18   him to -- come across in an ultimate deal, we
19   were interested in his sense of who the great
20   people were and how we could recruit them to come    12:00:10
21   across.
22   Q.  (By Mr. Verhoeven)  Do you remember
23   discussions asking him who the great people are
24   during this process?
25   MS. DUNN:  Form.                     12:00:23

Page 175

1    THE DEPONENT:  Generally, yes.        12:00:24
2    Q.  (By Mr. Verhoeven)  Do you remember
3    anybody he identified specifically?
4    A.  No, not specifically.
5    Q.  Okay.  Would it surprise you if part of    12:00:28
6    the deal included -- withdrawn.
7    Would it surprise you if Levandowski's
8    payments as part of the tool was conditioned upon
9    him recruiting away from Google a certain number of
10   Google employees in the AV space?          12:00:50
11   MS. DUNN:  Objection to form.
12   MR. CHATTERJEE:  Form.
13   THE DEPONENT:  Yeah, I don't know how
14   that translates into the deal itself.  But I'll --
15   you know, again, we were very up front about our    12:01:00
16   desire to recruit great talent from Google.
17   Q.  (By Mr. Verhoeven)  And that was part of
18   what you were envisioning -- or let me withdraw
19   that.
20   That was part of what you hoped would    12:01:14
21   happen in connection with Mr. Levandowski coming
22   over.
23   MS. DUNN:  Objection to form.
24   MR. CHATTERJEE:  Join.
25   THE DEPONENT:  It wasn't just about    12:01:24

Page 176

1    Google.  It was about great talent in the space,    12:01:25
2    period, coming from all the companies that are
3    working on it.
4    Q.  (By Mr. Verhoeven)  But you don't
5    remember having discussions about Mr. Levandowski    12:01:32
6    hiring as many people as he could from Google's AV
7    space after he came over?
8    MS. DUNN:  Objection to form.
9    MR. CHATTERJEE:  Join.
10   THE DEPONENT:  Generally, we wanted to    12:01:47
11   recruit as many great Google employees as we
12   possibly could.
13   We needed to figure out what were the
14   right processes to do that, but we were very
15   excited about somebody -- having somebody on our    12:02:00
16   team who was a visionary in the space who could
17   attract that great talent.
18   Q.  (By Mr. Verhoeven)  Okay.  But do you
19   remember having any -- my question was, do you
20   remember having any conversations about it?    12:02:15
21   A.  I would say -- I don't remember any
22   specific conversations, but I would generally say
23   that -- I would acknowledge that conversations like
24   that occurred.
25   Q.  I direct your attention to -- back to the    12:02:32

Page 177

45 (Pages 174 - 177)



1 document, Exhibit 366, and to the same page we were     12:02:33
2 looking at.
3     A.  336?
4     Q.  366.  This is just the exhibit number of
5 the document you're looking at.     12:02:48
6     A.  Okay.  Sorry.  I was looking for the
7 right page.
8     Q.  The same page.
9     A.  Okay.  Yeah.
10     Q.  And then the second-to-last line on the     12:02:54
11 page says, quote, If the sensor idea is so good,
12 why limiting scope to trucking?  Close quote.
13         Do you see that?
14     A.  Yeah.
15     Q.  And that's talking about a LiDAR sensor?     12:03:07
16     MS. DUNN:  Form.
17     MR. CHATTERJEE:  Join.
18     THE DEPONENT:  I -- I don't know what
19 that's about.
20     Q.  (By Mr. Verhoeven)  Do you remember     12:03:18
21 having discussions about Mr. Levandowski's idea
22 about a LiDAR sensor?
23     MS. DUNN:  Form.
24     MR. CHATTERJEE:  Form.
25     THE DEPONENT:     12:03:28

Page 178

1     12:03:29
2
3
4
5     Q.  (By Mr. Verhoeven)  Okay.     12:03:46
6     A.  I don't know if that's referring to this
7 or not.
8     Q.  Okay.  And what do you remember about the
9 discussion?
10     I mean, what was -- what was being     12:03:54
11 pitched to you?
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 179

1     12:04:43
2
3
4
5         And so that was sort of the -- the range     12:04:53
6 of things we were considering.
7     Q.  Okay.  And what time frame would you say
8 that -- is that the December/January time frame?
9     A.  That feels, yeah, sort of like really --
10 it's -- the meat of that feels like January,     12:05:05
11 possibly late December, but probably mostly
12 January.
13     Q.  Okay.  And did there come a time when you
14 chose one of those options?
15     A.  Definitively, yes.     12:05:24
16     Q.  Which -- which one was chosen?
17     A.  I think we ultimately ended up in an
18 acquisition disposition, yeah.
19     Q.  And do you have any information about
20 what the pros and cons of -- of the choices were     12:05:37
21 that led Uber to arrive at that decision?
22     MS. DUNN:  Form.
23     THE DEPONENT:  Yeah.  Yeah.  I mean,
24 generally, we would -- we would explore all the
25 options and what was possible.  And it wasn't just     12:05:51

Page 180

1 about what we wanted.  It's also about where -- you     12:05:53
2 know, where they are.  Could -- does -- does a
3 partnership make sense or does going deeper make
4 sense?
5         You know, yes, pros and cons across all     12:06:05
6 options, of course.
7     Q.  (By Mr. Verhoeven)  And why wasn't the
8 decision just to hire Mr. Levandowski straightaway?
9     A.  I mean, I would say though this was
10 technically an acquisition, it was very much like     12:06:21
11 hiring him.
12     Q.  Okay.  So --
13     A.  Yeah.
14     Q.  -- it was just structured as an
15 acquisition.     12:06:29
16     A.  Yeah.  It was like -- it was -- there are
17 different things on acquisition.  You have this
18 thing called an acquihire.  Then you have like an
19 acquisition of a very mature company.  And there's
20 lots of stuff in between.     12:06:38
21         We basically were hiring him and his
22 team, but getting some -- like a sort of small
23 acquisition along with it.  It was sort of -- it
24 was a -- it was a hybrid of the two.
25     Q.  And what was the small acquisition?     12:07:01

Page 181

46 (Pages 178 - 181)

ATTORNEYS' EYES ONLY

1    A.  Well, I mean, he'd set up the company.    12:07:03
2  He had, of course, recruited a team.  He had -- he
3  had -- you know, he had trucks that were -- you
4  know, let's call them self-driving trucks, of
5  course, with a safety driver.    12:07:18
6        I was in one of them.  Glad there was a
7  safety driver.
8        You know, so he was getting down that
9  path and building something that he had a team that
10  was passionate about, but it was early, you know.    12:07:31
11    Q.  I see.
12    A.  Yeah.  I mean -- yeah.
13    Q.  What was the -- what was the benefit of
14  doing a structure where you hired him and his team
15  through an acquisition as opposed to just hiring    12:07:45
16  them directly?
17    A.  Well, I mean, one was because he wanted
18  to -- he was -- he was -- he was building
19  something.  Like we didn't come up with an
20  agreement until, I think, April of '16.  He was    12:08:02
21  building one way or the other.  Right?
22    Q.  Okay.
23    A.  So I would have loved to have hired him
24  for $100,000 a year -- that would have been
25  amazing -- and been able to recruit lots of    12:08:19

Page 182

1  wonderful engineers as well.  But it's a two-way    12:08:21
2  street.  Right?  The other side, of course, has to
3  be excited about what they're doing.
4    Q.  Right.
5    A.  You know, they have to feel like they're    12:08:34
6  being valued at what they're worth.
7        You know, a lot of -- my understanding is
8  a lot of Google employees had gotten very huge
9  bonuses.  So you're just going to have a tougher
10  time just recruiting in a situation like that.    12:08:46
11    Q.  Okay.
12    A.  And that's why they went and built their
13  company and started, because I -- they're like,
14  Well, if, you know, we're going to start building
15  something, and if you want to be -- us to be a part    12:09:00
16  of it, you're going to have to acquire it.
17    Q.  I apologize.  I was just talking about
18  the January/December time frame, but I appreciate
19  your answer.
20    A.  No.    12:09:12
21    Q.  During January and December,
22  Mr. Levandowski was still a Google employee,
23  right -- or a Waymo employee?
24    MS. DUNN:  Form.
25    Q.  (By Mr. Verhoeven)  One of the two.    12:09:20

Page 183

1    A.  Yeah.    12:09:21
2    Q.  Okay.
3    A.  Yeah.  So I think in the December -- at
4  some point in January he wasn't a Google employee.
5  I'm not sure exactly what that date is.    12:09:27
6    Q.  It's January 27.
7    A.  Okay.
8    Q.  The -- so I apologize.
9    A.  That's okay.
10    Q.  So at that time he didn't have a company    12:09:38
11  yet, right?
12    A.  Yeah.  I mean, I don't know what the date
13  was when he structured his company.  I don't know.
14  But he was certainly a Google employee at that
15  time.    12:09:52
16    Q.  All right.  So just going back, though,
17  to that time in January --
18    A.  Yeah.
19    Q.  -- what was the reason why either you or
20  he wanted to do a deal that was an acquisition    12:10:01
21  rather than just hiring him straightaway?
22    MS. DUNN:  Form.
23    THE DEPONENT:  I think he was just
24  adamant about building a company.
25    Q.  (By Mr. Verhoeven)  Well, the plan -- the    12:10:15

Page 184

1  plan was that he would build a company that would    12:10:17
2  be acquired by Uber, wasn't it?
3    MR. CHATTERJEE:  Form.
4    MS. DUNN:  Form.
5    THE DEPONENT:  Ultimately, in the April    12:10:25
6  time frame we signed an agreement to acquire --
7  upon certain conditions, but essentially acquire
8  his company.  That was April, a few months after he
9  had left Google.
10    Q.  (By Mr. Verhoeven)  Well, there was    12:10:39
11  discussion about that structure --
12    A.  Yes.
13    Q.  -- way back in January, right?  That
14  was -- one of the options was --
15    A.  Yeah.    12:10:47
16    Q.  -- instead of hiring him straight out, he
17  form a company, and then after a little while you
18  would buy the company.
19        That was discussed.
20    A.  That -- that was discussed.    12:10:54
21    Q.  It was discussed before he left Google,
22  right?
23    A.  That's -- that's correct.
24    Q.  Okay.  And that's the -- there's more
25  specifics.  But, generally, that's the structure    12:11:04

Page 185

47 (Pages 182 - 185)

ATTORNEYS' EYES ONLY

1 that ended up -- that you ended up going with,  12:11:07
2 right?
3      MS. DUNN:  Form.
4      THE DEPONENT:  I don't know if the
5 structure that was talked about in January is where  12:11:12
6 we ultimately ended up.
7      My guess -- just my recollection -- is
8 that things changed pretty dramatically over those
9 three months in terms of what the structure of the
10 deal would look like and where we ultimately ended  12:11:23
11 up.
12      But, generally, acquiring a company that
13 he built was certainly on the table and certainly
14 something we were considering.
15      Q.  (By Mr. Verhoeven)  You were discussing  12:11:35
16 milestones that he would achieve before he left
17 Google, right?
18      A.  I don't know the specific dates, so I
19 can't say for sure.
20      But, again, I think there were a broad  12:11:48
21 range of discussions in the January time frame.
22      Q.  Okay.  So they could have included
23 milestones?
24      A.  I don't know for sure.  I just don't
25 know.  12:12:01

Page 186

1      (Discussion off the stenographic record.)  12:12:13
2      Q.  (By Mr. Verhoeven)  All right.  Going
3 back to Exhibit 366, which you're looking at, same
4 page.
5      The last line says, quote, What about  12:13:23
6 Google's IP, worried about stomping on this,
7 question mark.
8      Do you see that?
9      A.  Yes, I do.
10      Q.  Again, this is -- these are notes that  12:13:34
11 Mr. Bares took in December of 2015.
12      Do you remember having a discussion about
13 Google's IP in connection with the Levandowski
14 transaction in or around this time?
15      MS. DUNN:  Form.  12:13:55
16      THE DEPONENT:  I mean, I remember
17 generally being pretty adamant about making sure
18 that none of Google's IP ended up at Uber.
19      Q.  (By Mr. Verhoeven)  And how did that
20 subject come up?  12:14:07
21      A.  Like if you're talking to somebody who
22 works at a competitor, the topic naturally comes
23 up.  I don't know specifically how it did.
24      Q.  Do you remember why -- if it's true, do
25 you remember why Uber was, quote, worried about  12:14:22

Page 187

1 stomping, close quote, on Google's IP?  12:14:25
2      MS. DUNN:  Form.
3      THE DEPONENT:  I mean, these aren't my
4 notes.
5      Q.  (By Mr. Verhoeven)  I know.  12:14:30
6      A.  Right.  So all I can say is that I was
7 always very adamant about making sure that none of
8 Google's IP ended up at Uber.
9      Q.  Okay.  You don't remember having this
10 discussion in December?  12:14:41
11      A.  No.
12      Q.  Okay.  Now, turn to the same document,
13 Exhibit 336.
14      Do you see those control numbers at the
15 bottom there, on the bottom right?  12:14:55
16      A.  Sorry.  What do you want me to do right
17 now?
18      Q.  Do you see those control numbers?
19      A.  Yes.  60333.
20      Q.  I'm going to use those to help you get to  12:15:02
21 the page.  All right?
22      A.  Yeah.
23      Q.  So using those numbers, can you turn to
24 page 331.
25      A.  Yeah.  All right.  12:15:07

Page 188

1      Q.  And the second horizontal green --  12:15:16
2      A.  Yeah.
3      Q.  -- bar --
4      A.  Yeah.
5      Q.  -- it says, "21 January meeting."  12:15:22
6      A.  Yeah.
7      Q.  Do you see that?
8      A.  Yeah.
9      Q.  And "TK" -- TK would be you, right?
10      A.  Uh-huh.  12:15:28
11      Q.  You have to say "yes" or "no."
12      A.  Yes.  Yes.
13      Q.  And Emil, who is that?
14      A.  At the time, my head of business
15 development.  12:15:34
16      Q.  And Cam is who?
17      A.  Works for Emil, head of corporate
18 development.
19      Q.  And just tell me the name.
20      A.  Sorry?  12:15:42
21      Q.  Cam means -- the person's name.
22      A.  Cameron?
23      Q.  Yeah.
24      A.  Yeah.
25      Q.  Full name.  12:15:48

Page 189

48 (Pages 186 - 189)

ATTORNEYS' EYES ONLY

Page 190

1  A. Cameron Poetzscher.  12:15:49
2  Q. Okay. Same thing with Emil, what's Emil?
3  A. Emil Michael.
4  Q. Okay. And then what is that? Is that
5  Bam?  12:16:03
6  What is -- what's your understanding of
7  Bam?
8  A. Brian McClendon.
9  Q. And then it says, "No hold - on plane."
10  A. Okay.  12:16:11
11  Q. Do you remember a meeting in January 21st
12  with these gentlemen?
13  A. Not specifically.
14  Q. Do you remember generally meeting in
15  January with them?  12:16:21
16  A. Yeah. I mean, sometime in that time
17  frame, sure.
18  Q. And discussion was the deal -- potential
19  deal with Mr. Levandowski?
20  A. It may have been, yeah.  12:16:34
21  Q. This says, on the bottom line within this
22  meeting --
23  A. Yeah.
24  Q. -- quote, TK's advice on legal: Tell
25  them we are going to do it, ask how to minimize  12:16:47

Page 191

1  risk, minimize pain.  12:16:51
2  A. Yeah.
3  Q. Close quote.
4  A. Yeah.
5  Q. Did you say that during the meeting?  12:16:57
6  A. I don't know. I could have. I don't
7  know.
8  Q. You don't have any reason to believe
9  these notes are inaccurate, right?
10  MS. DUNN: Form.  12:17:05
11  THE DEPONENT: I just don't -- I don't
12  know. I didn't write them, but I'm not saying, Oh,
13  I definitively didn't. I just don't remember.
14  Q. (By Mr. Verhoeven) You told the team
15  that, We are going to do this deal, and tell legal,  12:17:15
16  We are going to do this deal --
17  A. Uh-huh.
18  Q. -- period, and they needed to minimize
19  the risk and minimize the pain --
20  MS. DUNN: Form.  12:17:26
21  Q. (By Mr. Verhoeven) -- correct?
22  MR. CHATTERJEE: Form.
23  THE DEPONENT: I don't know. That's
24  possible.
25  Q. (By Mr. Verhoeven) What's the risk do  12:17:34

Page 192

1  you think that's being talked about here?  12:17:34
2  MR. CHATTERJEE: Form.
3  THE DEPONENT: I mean, anytime you're
4  going to do -- if -- if you are going to do a deal,
5  you need to minimize the risk in doing any deal.  12:17:46
6  Q. (By Mr. Verhoeven) Is it -- is it the
7  risk that Uber would be sued by Google or Waymo?
8  MS. DUNN: Form.
9  THE DEPONENT: I don't know specifically
10  on this.  12:17:58
11  Q. (By Mr. Verhoeven) Did you have
12  discussions in January about that?
13  A. Anytime we do a transaction, we're going
14  to have that discussion, so I would say yes.
15  Q. And "minimize pain," what is that in  12:18:13
16  reference to?
17  MS. DUNN: Form.
18  THE DEPONENT: You know, I think a lot of
19  times when you are minimizing risk, you come up
20  with a lot of rules and processes and bureaucracy.  12:18:21
21  And so you have to find a way to do the right thing
22  while also letting people who build things continue
23  to be builders. Otherwise, you're just -- you're
24  just going to get caught in bureaucracy and nobody
25  builds anything.  12:18:43

Page 193

1  Q. (By Mr. Verhoeven) As of January 21, you  12:18:44
2  had decided that you wanted to do the deal, right?
3  MS. DUNN: Form.
4  MR. CHATTERJEE: Form.
5  THE DEPONENT: I -- I can't say for sure.  12:18:49
6  It -- it may have been that I was super interested
7  in doing the deal. You know, this -- this could
8  have been like -- like a green light, Hey, we're --
9  we're interested in doing this, but we've got to
10  work through some legal stuff.  12:19:00
11  So I don't know.
12  Q. (By Mr. Verhoeven) Well, setting this
13  down and just --
14  A. Yeah.
15  Q. -- thinking about your memory --  12:19:05
16  A. Yeah.
17  Q. -- in January --
18  A. Yeah.
19  Q. -- do you remember deciding, Hey, we want
20  to do this deal?  12:19:12
21  You don't have the structure yet.
22  A. Yeah.
23  Q. We need to negotiate it, but I want to do
24  this deal.
25  A. That feels right.  12:19:17

Veritext Legal Solutions
866 299-5127

| | |
|---|---|
| 1    Q.  Okay.  All right.  You can set that          12:19:19 | 1    A.  It's possible.                      12:22:47 |
| 2  aside. | 2    Q.  Okay. |
| 3        MR. VERHOEVEN:  Let's mark as Exhibit 367 | 3    A.  It's possible. |
| 4  another spreadsheet produced by Uber. | 4    Q.  It says -- one, two, three -- four lines |
| 5        (Exhibit 367 was marked for          12:20:42 | 5  down, quote, Lasers, data, advice, are the three    12:22:56 |
| 6  identification by the court reporter and is | 6  things. |
| 7  attached hereto.) | 7       Do you see that? |
| 8        THE DEPONENT:  Would you like me to read | 8    A.  Yeah. |
| 9  this whole document -- | 9    Q.  What's that referring to, if you know? |
| 10    Q.  (By Mr. Verhoeven)  No.          12:21:06 | 10       MS. DUNN:  Form.                12:23:07 |
| 11    A.  -- before questioning? | 11       THE DEPONENT:  I don't know.  I mean, you |
| 12    Q.  No, sir. | 12  should ask John.  He would know.  I don't -- I |
| 13       I'll represent to you that this is | 13  don't know what this is. |
| 14  another document from John Bares. | 14    Q.  (By Mr. Verhoeven)  Did Levandowski tell |
| 15    A.  Yeah.                      12:21:12 | 15  you that the three things he brought to the table    12:23:17 |
| 16    Q.  And you see on the right-hand side | 16  were lasers, data, and advice? |
| 17  there's page numbers? | 17    A.  No. |
| 18    A.  Yeah.  Yeah. | 18    Q.  The second-to-last line -- withdrawn. |
| 19    Q.  Can you turn to page 40 -- | 19       Sticking with that quote I just gave you, |
| 20    A.  Yeah.                      12:21:26 | 20  did you tell the folks at this meeting on          12:23:33 |
| 21    Q.  -- which is Control No. -- | 21  January 4th, 2016, that lasers, data, and advice, |
| 22    A.  I got it. | 22  are the three things? |
| 23    Q.  For the record, it's Control No. 60504. | 23    A.  I don't know.  I still don't totally know |
| 24       Are you there? | 24  what it means.  I know what lasers are.  I know |
| 25    A.  Yeah.                      12:21:43 | 25  what advice is.  I don't know, necessarily, what |
| Page 194 | Page 196 |

| | |
|---|---|
| 1    Q.  Okay.  You see at the top, on the left,    12:21:43 | 1  data being referred to here.                12:23:57 |
| 2  it says, "TK, 4 January 2016." | 2    Q.  Okay. |
| 3    A.  Yeah. | 3    A.  I just don't know. |
| 4    Q.  And TK is -- is yourself, right? | 4    Q.  What are lasers? |
| 5    A.  I -- I didn't write this, but I would    12:21:56 | 5    A.  Lasers are like a sensor that shoots    12:24:02 |
| 6  assume so. | 6  beams into the world and gets a reflection back. |
| 7    Q.  Okay. | 7    Q.  It's a references to LiDAR, right? |
| 8       And AL would refer to Levandowski, right? | 8       MS. DUNN:  Form. |
| 9    A.  Yeah. | 9       THE DEPONENT:  Yeah.  Yeah.  Probably. |
| 10    Q.  And if you look down below the AL, to the    12:22:08 | 10    Q.  (By Mr. Verhoeven)  The second-to-last    12:24:16 |
| 11  rite of it, there's a number of sentences there. | 11  line there says, quote, TK believes that lasers |
| 12       Do you see those? | 12  will be the longest pole, and we need access to |
| 13       First one says, quote, TK met up with him | 13  tech.  And then it says, paren, "This part is" -- |
| 14  over the weekend and is a big fan. | 14  and, let's see -- "This part is easy," close paren. |
| 15    A.  Okay.                      12:22:25 | 15       Do you see that?                12:24:35 |
| 16    Q.  Do you see that? | 16    A.  Yeah. |
| 17    A.  Yeah. | 17    Q.  Have you ever heard of something being |
| 18    Q.  Do you remember what that's referring to, | 18  referred to as the longest pole? |
| 19  meeting up with Mr. Levandowski over the weekend -- | 19    A.  Yeah. |
| 20    A.  I mean, I don't --                12:22:31 | 20    Q.  What does it -- what's your understanding    12:24:44 |
| 21    Q.  -- in January? | 21  of what that -- what that means when someone says |
| 22    A.  Yeah, I mean, I don't know specifics, but | 22  that? |
| 23  I don't do a deal until I'm a big fan of what -- | 23    A.  It means like it's going to -- like if -- |
| 24  who somebody is and what they're doing. | 24  if you don't -- like -- let me give you an example. |
| 25    Q.  You met up with -- Mr. Levandowski?    12:22:42 | 25       Like if it were a reference to, like,    12:24:56 |
| Page 195 | Page 197 |

50 (Pages 194 - 197)

**Page 198**

1 lasers being the longest pole, nobody, even today,   12:24:57
2 is making lasers -- LiDAR at scale.
3        If you're going to have a million cars on
4 the road, there's literally nobody on the planet
5 who's making enough lasers to put on these cars.   12:25:10
6    Q.   Okay.
7    A.   So you need to start working on something
8 like scale production of lasers or a vendor who
9 provides them at scale if you're going to get a
10 million cars.  You could have software that works,   12:25:23
11 you could have all the cars, everything, but if you
12 don't have enough lasers to put on these cars,
13 these cars will not be able to drive themselves.
14    Q.   So this sentence is basically saying, The
15 thing we need to work on the most is lasers and we   12:25:35
16 need that technology.
17        MS. DUNN:  Form.
18        MR. CHATTERJEE:  Form.
19        THE DEPONENT:  Not exactly.
20    Q.   (By Mr. Verhoeven)  Okay.   12:25:43
21    A.   Right.  So it doesn't --
22    Q.   Use your words then.
23    A.   Yeah, yeah.  It doesn't mean that it's
24 the thing we need to work on the most, but it means
25 that if you don't -- if you don't have an effort to   12:25:50

**Page 199**

1 start working on it, it could slow all the other   12:25:55
2 efforts down.
3        Like, you know, how to put it, it's like
4 you could have a car fully built, like a new Tesla,
5 all the whiz, bam, awesome things that are on it,   12:26:10
6 but if it didn't have tires, like if you couldn't
7 get tires on the car, that would be your longest
8 pole.
9    Q.   I see.
10    A.   It doesn't necessarily mean that you're   12:26:23
11 going to spend all your time making tires, it may
12 even be the tires are easy.  But if you don't have
13 tires, your Tesla is going nowhere.  And it's kind
14 of like that.
15    Q.   Okay.  So using that anal- -- using that   12:26:35
16 explanation --
17    A.   Yeah.
18    Q.   -- this sentence is saying, If you don't
19 have lasers, then you're not going to be able to --
20 to have the AV vehicle.   12:26:45
21        MR. CHATTERJEE:  Form.
22        THE DEPONENT:  That -- that is for sure,
23 yeah.
24    Q.   (By Mr. Verhoeven)  And --
25    A.   Well, it's not -- excuse me.  It's not   12:26:50

**Page 200**

1 necessarily for sure.  There are other ways to   12:26:53
2 do -- to work on autonomous vehicles without
3 lasers.
4    Q.   Okay.
5    A.   But the general consensus in the   12:27:01
6 industry, that not everybody agrees with, but the
7 general consensus, most people would agree that
8 doing -- that having lasers is the easier way of
9 doing it.
10    Q.   Okay.  And -- and this sentence is   12:27:12
11 basically saying that, right?  That lasers will be
12 the longest pole -- that's basically saying that
13 for -- for Uber lasers will be the longest pole,
14 right?
15        MS. DUNN:  Form.   12:27:31
16        THE DEPONENT:  I don't think it's just
17 for Uber; I think it's for anybody in the autonomy
18 space.
19    Q.   (By Mr. Verhoeven)  Okay.  And then it
20 says, "And we need access to tech.  This part is   12:27:37
21 easy."
22        Do you see that?
23    A.   Yeah.
24    Q.   What's that a reference to?
25    A.   I mean, I -- I can't say for sure.   12:27:45

**Page 201**

1    Q.   Well, let me ask you --   12:27:51
2    A.   Yeah.
3    Q.   -- were you referring to Mr. Levandowski
4 in connection with that statement, "We need access
5 to tech"?   12:27:57
6        MS. DUNN:  Form.
7        THE DEPONENT:  Well, I mean, at this time
8 we're looking at a bunch of different vendors of
9 laser technology.
10        So there's -- there's like -- there's a   12:28:05
11 company called Quanergy.  There's a company called
12 Velodyne.  There's a company called Luminar.
13        We're looking at that, and getting access
14 to those lasers is super important, somebody who
15 knows those vendors, knows the products that they   12:28:23
16 have, and what's possible, what's not.
17        Are they scaling their manufacturing or
18 not?  How does scale manufacturing of lasers work?
19        Like that's super important.  So I don't
20 know -- I don't know exactly what this means, but   12:28:37
21 it could be something like that.
22    Q.   (By Mr. Verhoeven)  Well, it looks like
23 this is saying, in this meeting that you're in,
24 that you stated, in connection with your
25 discussions with Mr. Levandowski that, We need   12:28:48

51 (Pages 198 - 201)

1 access to this LiDAR technology.          12:28:52
2       MS. DUNN: Form.
3    Q. (By Mr. Verhoeven) Is that a fair
4 reading of this document?
5       MR. CHATTERJEE: Form.          12:29:01
6       MS. DUNN: Form.
7       THE DEPONENT: I mean, you should ask
8 John Bares.
9       My -- my statement is -- or, sorry, my
10 explanation is simply that Uber didn't -- we didn't   12:29:04
11 know much about lasers, to be honest. We knew a
12 little bit. We had some people who knew it, but
13 certainly at the leadership level, we felt like we
14 needed more expertise in this.
15       And, again, understanding who the vendors   12:29:21
16 were, who's making what, who's got a chance to
17 scale manufacturing, who doesn't, should we make it
18 ourselves, like all those questions are things that
19 we were only just beginning to learn how to answer.
20 And getting people who knew that space well is   12:29:37
21 super important.
22    Q. (By Ms. Dunn) Why would you have said,
23 just so I understand -- I understand you don't
24 remember specifics --
25    A. Yeah.          12:29:48
                                        Page 202

1    Q. -- so I'm just going to ask you, why   12:29:48
2 would you have said in January of 2006 that --
3    A. '16.
4    Q. '16. Thank you.
5       -- that laser, that -- referring to   12:29:58
6 lasers --
7    A. Yeah.
8    Q. -- that, quote, This part is easy? Close
9 quote.
10       MS. DUNN: Form.          12:30:06
11       MR. CHATTERJEE: Join.
12       THE DEPONENT: Well, it maybe -- I mean,
13 again, access to tech -- like, again, if you're
14 talking to Quanergy and Luminar and these things,
15 and they're vendors, and you need to assess whether   12:30:17
16 those things work or not, that's not -- that's -- a
17 lot harder would be not using lasers. That would
18 be a lot harder.
19    Q. (By Ms. Dunn) Okay. So you don't think
20 he's referring to the access to the tech?   12:30:31
21    A. Well, I just don't know -- again, I -- I
22 think you need to ask John what exactly he means by
23 this.
24    Q. You don't remember saying that at this
25 meeting?          12:30:41
                                        Page 203

1    A. No, not exactly. I -- you know, I'm   12:30:43
2 trying to guess what I'm -- what -- what -- how I
3 think about these things to help you understand
4 these notes maybe. But I think John took these
5 notes, and I'm doing the best I can.          12:30:55
6    Q. I understand.
7       You don't have any reason to believe that
8 these notes are inaccurate, do you?
9    A. I'm sure there's inaccuracies in here. I
10 just -- I -- I can't say specifically.          12:31:08
11    Q. Do you see any inaccuracies over the
12 stuff we just went over?
13       MR. CHATTERJEE: Form.
14       MS. DUNN: Form.
15       THE DEPONENT: I just -- I -- I -- I   12:31:15
16 don't know. I don't know. I don't understand what
17 all that means, so it's hard to know what's
18 inaccurate.
19    Q. (By Ms. Dunn) But you don't see anything
20 that you know is inaccurate looking at it right   12:31:26
21 now?
22       MR. CHATTERJEE: Form.
23       MS. DUNN: Form.
24       THE DEPONENT: My understanding of this
25 document is inaccurate, but I just don't know
                                        Page 204

1 enough.          12:31:35
2    Q. (By Ms. Dunn) Just for the record --
3    A. Yeah.
4    Q. -- is there anything in this area of the
5 page, which is page 40, and the reference to the   12:31:43
6 January 4th, 2016, meeting down to -- from the top
7 down to the last row before TRB panel -- do you see
8 that section?
9    A. Yeah, yeah.
10    Q. In that section, is there anything in   12:32:09
11 there that's stated that is inaccurate, to your
12 knowledge?
13       MS. DUNN: Form.
14       THE DEPONENT: Look, when I look at this
15 overall page, there are inaccuracies on here.   12:32:18
16    Q. (By Ms. Dunn) What's inaccurate?
17    A. "Assume TK is working for me."
18    Q. Okay.
19    A. I promise you, I did not work for
20 John Bares.          12:32:29
21    Q. Where is that?
22    A. That's on the second line after "Org
23 ideas."
24       Like I -- I am absolutely certain I never
25 worked for John Bares.          12:32:38
                                        Page 205

52 (Pages 202 - 205)

1    Q.  Okay.  I was asking you about a different    12:32:39
2  part of the page.
3          Did you understand that my question was
4  directed from the top of the page down to above --
5  immediately above where it says, "TRB panel"?    12:32:53
6    A.  No.
7    Q.  Do you see that?
8    A.  Yeah.  Yeah, I see that.
9    Q.  In that section of the page --
10   A.  I see.    12:33:03
11   Q.  -- is there anything there that you are
12 reading now or you see now that is inaccurate?
13       MS. DUNN:  Form.
14       MR. CHATTERJEE:  Form.
15       THE DEPONENT:  I don't understand what    12:33:20
16 each line says.
17   Q.  (By Ms. Dunn)  No, I'm just asking if
18 something stands out as being inaccurate.
19       MS. DUNN:  Form.
20       THE DEPONENT:  I can't find anything --    12:33:26
21       MR. CHATTERJEE:  Form.
22       THE DEPONENT:  -- that I do understand
23 that is inaccurate.
24   Q.  (By Mr. Verhoeven)  Okay.  Thank you.
25   A.  But I promise you, I didn't work for    12:33:34

Page 206

1  John.    12:33:36
2        (Discussion off the stenographic record.)
3    Q.  (By Ms. Dunn)  Direct your attention, in
4  the same document, to -- and this is Exhibit 367,
5  direct your attention to page 46.    12:35:11
6    A.  Okay.
7    Q.  I'm self-editing myself, so I'm not going
8  to ask you any more questions about this document.
9    A.  Okay.
10       MR. VERHOEVEN:  Let's mark as    12:36:42
11 Exhibit 368, an email from Cameron --
12   Q.  (By Mr. Verhoeven)  How do you pronounce
13 her last name?
14   A.  Poetzscher.
15       MR. VERHOEVEN:  -- Poetzscher to several    12:36:54
16 people, including Travis Kalanick, dated
17 January 5th, 2016.
18       (Exhibit 368 was marked for
19 identification by the court reporter and is
20 attached hereto.)    12:37:09
21   Q.  (By Mr. Verhoeven)  This is an email from
22 Cameron to you and some other people, correct?
23   A.  Yeah.  Yes.
24   Q.  And what is Newco that's referred to
25 there?    12:37:29

Page 207

1    A.  It's a -- is an internal subsidiary, but    12:37:32
2  valued separately for some period.
3    Q.  Newco is referring to the company that in
4  the future would be what Anthony Levandowski
5  created, correct?    12:37:49
6    A.  That's fair.  It was like a project name.
7    Q.  Okay.  And what is this -- what's your
8  understanding of what this is summarizing?
9    A.  I don't know.  I have to read the whole
10 thing.  Let me see.    12:38:03
11   Q.  Let me just ask you a question and see if
12 you can answer it.
13   A.  Okay.
14   Q.  Is this summarizing a potential deal with
15 Mr. Levandowski in which he would form a company    12:38:35
16 and it would be bought by Uber?
17   A.  I'm not sure who got -- I'm just working
18 through it here.
19       It looks like it's something along those
20 lines.    12:39:01
21       So I would say it appears to be.
22   Q.  Okay.
23   A.  But I haven't read the whole document,
24 but it appears to be true, that it appears to be an
25 accurate description.    12:39:13

Page 208

1    Q.  Okay.  Do you remember discussing a deal    12:39:14
2  structure in or around January 5th with folks at
3  Uber for a potential deal with Mr. Levandowski in
4  which he would first form a company and then later
5  Uber would buy that company?    12:39:34
6        MS. DUNN:  Form.
7        MR. CHATTERJEE:  Form.
8        THE DEPONENT:  I mean, certainly in
9  January we had discussions about some kind of --
10 like the different structures we could potentially    12:39:45
11 go into in acquiring a company.
12   Q.  (By Mr. Verhoeven)  Why would it make any
13 sense to do a structure where you agree that first
14 Mr. Levandowski and his team would form a company
15 and then later Uber would buy that company versus    12:40:07
16 just hiring Mr. Levandowski and -- and his team?
17       MR. CHATTERJEE:  Form.
18       MS. DUNN:  Form.
19       THE DEPONENT:  I mean, you would have
20 to -- I think there's a couple of reasons.    12:40:24
21       One is you -- you would have to come up
22 with some kind of -- some kind of structure to
23 bring those employees in if you wanted to.
24       And if you didn't -- if they didn't --
25 if -- if there are a group of people who wanted to    12:40:46

Page 209

53 (Pages 206 - 209)

1 come across, but they wanted to prevent us from          12:40:49
2 hiring each individual, I could imagine wanting to
3 structure a company they were all a part of, and
4 then requiring us to buy that structure in order to
5 get all of them.                                          12:41:02
6      So it was almost like -- kind of
7 collective bargaining almost.
8      Q.  (By Mr. Verhoeven)  Who -- who would want
9 to prevent you from hiring the people directly?  I
10 didn't understand.                                       12:41:11
11     A.  So let's say -- let's say there was a
12 group -- let's say hypothetically you had a group
13 of 20 people who wanted to go start something
14 together, but they were getting persuaded or
15 convinced, like, hey maybe they should start that       12:41:23
16 something or build that something with a
17 partnership with somebody else.
18     Q.  Okay.
19     A.  Those folks might be really, really
20 worried about us talking to each of the individuals      12:41:34
21 and getting a far better deal for us by picking
22 them off one a time versus being forced to do the
23 whole thing at once.  Right?
24     Q.  Did Mr. Levandowski, was he pushing this
25 structure?  Do you remember?                             12:41:55

Page 210

1      MR. CHATTERJEE:  Form.                               12:41:59
2      THE DEPONENT:  I mean, generally, he was
3 not -- he was not okay or in any way tolerant of a
4 situation where we hired individuals.
5      Q.  (By Mr. Verhoeven)  And what did he say        12:42:08
6 to you about that?
7      A.  He said, I'm going to start a company.
8 It's going to be a trucking company.
9      I mean, eventually, he got there.  He had
10 a lot of different options at the beginning, a lot     12:42:17
11 of different areas he was exploring.
12     And if you want -- if you want access to
13 this kind of talent, you're going to have to buy
14 the whole thing.  Kind of all or nothing.
15     Q.  And this was -- is it your recollection         12:42:33
16 that --
17     A.  Yeah.
18     Q.  -- this was discussed in or around
19 January 5th of 2016 with him?
20     A.  I mean, this sort of describes a                12:42:41
21 structure that we would acquire, but it's --
22 it's -- it's -- it doesn't look like where we
23 ultimately ended up.
24     So I don't know -- I mean, I think things
25 changed over time, but this is one potential thing     12:42:57

Page 211

1 that didn't really happen like this, but that's         12:43:06
2 fine.
3      Q.  Well, I guess my question was this,
4 referring to this document, Exhibit 368, was
5 discussed in January not -- not eventually, but in     12:43:23
6 January in 2016.
7      A.  Yeah, but this is not the structure we
8 ended -- we didn't end up with this structure.  So
9 this was like an option, but it doesn't seem like
10 we ended up with something that looked like this.      12:43:35
11     Q.  I understand that.
12     A.  Okay.
13     Q.  Sorry.  I'm just asking you, in January
14 of 2016, does this look like what was being
15 discussed, referring to the exhibit?                   12:43:44
16     A.  Well, I mean, the email was sent, so
17 yeah.
18     MR. VERHOEVEN:  Before we do another
19 document, do we need a break?
20     THE DEPONENT:  Yes.                                 12:44:00
21     MR. VERHOEVEN:  All right.  Let's go off
22 the record.
23     THE VIDEOGRAPHER:  Okay.  Going off the
24 record.  The time is 12:43.
25     (Recess taken.)                                     12:44:28

Page 212

1      THE VIDEOGRAPHER:  This marks the              01:21:15
2 beginning of DVD No. 3 in the deposition of
3 Travis Kalanick.  Going back on the record.  The
4 time is 1:21.
5      (Exhibit 369 was marked for               01:21:23
6 identification by  the court reporter and is
7 attached hereto.)
8      MR. VERHOEVEN:  I would like to mark as
9 Exhibit 369 an email from Cameron Poetzscher?
10     A.  Poetzscher.                             01:21:35
11     Q.  Poetzscher?
12     A.  Yeah.
13     Q.  To -- Mr. Kalanick and some other folks,
14 January 9th, 2016.  What is "Project Dollar Sign"?
15     A.  I think that's referring to this project.   01:22:13
16     Q.  Why was it called Project Dollar Sign?
17     A.  Because I -- I started calling this -- I
18 started talking about Uber super-duper.
19     Q.  Uber super-duper?
20     A.  Uber super-duper, which was U.S.D., and      01:22:37
21 dollar sign just seemed like a more fun way of
22 doing it.
23     Q.  And why did you call it Uber super-duper?
24     A.  I don't know.
25     Q.  You thought it was a super-duper deal?       01:22:49

Page 213

54 (Pages 210 - 213)

1    A.  Yeah, I just -- you know, I'm always        01:22:51
2  having fun.
3    Q.  Okay.  This is an email that you received
4  on January 9th, 2016, correct?
5    A.  Yeah.  Yeah, I think so.  Yeah.        01:23:01
6    Q.  And it states, "He came back to us with
7  proposed milestones yesterday.  See attached."
8       Do you see that?
9    A.  Yeah.
10    Q.  And below that email, it's -- it's in        01:23:16
11  response to an earlier email from yourself,
12  correct?
13    A.  Yeah.
14    Q.  And that's dated same day; it's
15  January 9th, 2016?        01:23:25
16    A.  Yeah.
17    Q.  And you sent that email, correct?
18    A.  Looks like it, yes.
19    Q.  Do you remember discussing milestones --
20  negotiating milestones with Mr. Levandowski in        01:23:37
21  January -- in or about January 9 of 2017?
22    A.  I know people were talking about
23  different structures, and milestones was certainly
24  one of them.  And I wasn't involved in the details
25  on this, but certainly, it looks like, being kept        01:23:54

Page 214

1  abreast of it.        01:24:01
2    Q.  And if you turn to the next -- the back
3  page that has the list of draft milestones.
4       Do you see that?
5    A.  Yeah.        01:24:07
6    Q.  Is that what it looks like to you?
7       MR. CHATTERJEE:  Form.
8       THE DEPONENT:  Yeah.  It looks like
9  different types of milestones.
10    Q.  (By Mr. Verhoeven)  Well, this was sent        01:24:30
11  to you in January, right?
12    A.  Yeah.  Yes.
13    Q.  And at this time, Mr. Levandowski was
14  still a Google employee, right?
15    A.  Yeah, I believe so.        01:24:42
16    Q.  And this was contemplating an acquisition
17  of a company to be formed in the future, correct?
18    A.  I think so, yeah.
19    Q.  And then these are milestones that
20  Mr. Levandowski and his group would need to achieve        01:25:00
21  in order to get the percentage compensations listed
22  on the right, correct?
23       MS. DUNN:  Form.
24       THE DEPONENT:  Yeah, I don't know what
25  the percents are on the right.  That might be what        01:25:15

Page 215

1  it is.  I am not sure.        01:25:18
2    Q.  (By Mr. Verhoeven)  Do you -- they refer
3  to compensation, right?
4    A.  Again, I don't know.  I just don't -- I
5  don't know.        01:25:29
6    Q.  Well, setting down the document, was it
7  your understanding -- you -- you remember a
8  discussion of milestones, right?
9    A.  Yes.
10    Q.  And you remember that the milestones        01:25:40
11  would be associated with the compensation as part
12  of the deal, right?
13    A.  Yes.
14    Q.  Okay.
15    A.  Yes.        01:25:51
16    Q.  So you don't have any reason to believe
17  those percentages aren't associated with the
18  compensation, right?
19       MS. DUNN:  Form.
20       MR. CHATTERJEE:  Form.        01:25:59
21       THE DEPONENT:  I -- I don't know
22  what they -- what they refer to.  They -- they
23  could very well refer to that.
24    Q.  (By Mr. Verhoeven)  Okay.  You can set
25  that document aside.        01:26:20

Page 216

1    A.  Okay.        01:26:22
2       MR. VERHOEVEN:  I would like to mark as
3  Exhibit 370 an email string bearing Control Numbers
4  60147 through 156.
5       (Exhibit 370 was marked for        01:26:50
6  identification by the court reporter and is
7  attached hereto.)
8    Q.  (By Mr. Verhoeven)  Mr. Kalanick, I don't
9  want you to read this whole thing --
10    A.  Okay.        01:27:07
11    Q.  -- but feel free to familiarize yourself
12  with the string.  I am going to have a question on
13  the page that bears Control Number 150?
14    A.  Okay.  Okay.
15    Q.  And there's an email from        01:27:29
16  Cameron Poetzscher to Emil Michael, and you are
17  cc'd on it.  It is dated January 20th, 2016.
18       Do you see that?
19    A.  Yeah.  I think it's from Emil to Cameron.
20    Q.  I'm directing you just to the bottom.        01:27:49
21    A.  Oh, I see.  Sorry.  I missed that.  Yeah.
22    Q.  You see that one?
23    A.  Yeah.
24    Q.  Go ahead and read that to yourself, the
25  text.        01:28:00

Page 217

55 (Pages 214 - 217)

1    A.  Okay.                    01:28:21
2    Q.  There's another paragraph to it, but...
3    A.  Oh.
4    Q.  Okay.  Going back to the first paragraph
5  on May 25 -- this -- sticking with this email --    01:28:39
6    A.  Uh-huh.
7    Q.  -- do you see where it says ████?
8    A.  Yeah.
9    Q.  That's ████
10   A.  Yeah.                    01:28:48
11   Q.  What -- what is your under-- -- well, you
12 were involved -- I take it you were involved in
13 this discussion with your management team about
14 negotiating the financial terms of the deal with
15 Mr. Levandowski?                 01:29:02
16   A.  Yeah, that's true.
17   Q.  Okay.  Can you tell me what this ████
18 ███████ is in reference to?
19   A.  I don't know.  I don't know for sure.
20 It's --                        01:29:13
21   Q.  ████████████████
22 ████████████████
23   A.  ████████████
24   Q.  Yeah.  So you interpret this ████
███████████████              01:29:26

Page 218

1    ██████                    01:29:29
2    Q.  And that's the way you were negotiating
3  with Mr. Levandowski at this time?
4    A.  It -- yeah, probably.  I mean, I -- I --
5  my understanding, we ended up different than what   01:29:38
6  this is sort of contemplating.  But that appears to
7  be what's going on here.
8    Q.  And then if you look up to the top email
9  on page 150, that's an email from Emil Michael to
10 Cameron Poetzscher, and cc'ing yourself, correct?    01:29:54
11   A.  Yeah.
12   Q.  And Emil says, "But that's" -- all caps
13 -- "a LOT of money for 25 people.  A lot."
14       Do you see that?
15   A.  Yeah.  Yeah.                01:30:08
16   Q.  Do you remember having any discussions
17 with Mr. Michael about this payment and whether it
18 was too much?
19   A.  I don't remember specific conversations,
20 but I think also it -- it may have been a       01:30:18
21 misunderstanding of the structure of the deal
22 itself, due to a -- a misunderstanding of the
23 structure of the deal.
24   Q.  Did you have a discussion with
25 Mr. Michael about any misunderstanding he had of    01:30:32

Page 219

1  the deal?                      01:30:35
2    A.  I don't remember specifically.
3    Q.  Okay.  Would you agree that ████████
4  ██████ at this time, would be a lot of money for
5  25 people?                     01:30:47
6       MS. DUNN:  Form.
7       THE DEPONENT:  Well, I think it's very
8  much dependent upon how that compensation is
9  structured.
10   Q.  (By Mr. Verhoeven)  Okay.  But -- all    01:31:02
11 right.  That's a fair -- I will move on.
12       You can go to a new exhibit --
13   A.  What's that?
14   Q.  You can put that aside.
15   A.  Okay.                    01:31:16
16       MR. VERHOEVEN:  Let's mark as Exhibit 371
17 an email string bearing Control Numbers 60665 --
18 Uber 60665 through 676.
19       (Exhibit 371 was marked for
20 identification by the court reporter and is
21 attached hereto.)
22   Q.  (By Mr. Verhoeven)  Now, this is a long
23 string.  Feel free to familiarize yourself with it
24 to the extent you need to.
25       My question -- my first question concerns   01:32:21

Page 220

1  the email on page 665 through 666, on the bottom of   01:32:27
2  665, from Cameron, where it says,
3  "Cameron Poetzscher wrote..."?
4    A.  Yeah.  Okay.  What about it?
5    Q.  If you go to the end, it says, "Jeff, I   01:32:53
6  think we need to do some quick work on per capita
7  equity for these guys versus other recent hires to
8  show them their math is wrong on not getting a
9  sufficient premium to off-the-street folks."
10       Do you see that?                01:33:15
11   A.  Uh-huh.
12   Q.  That's referring to -- where it says
13 "them," that's referring to Mr. Levandowski and his
14 team?
15   A.  Yeah.  I mean, that seems about right.    01:33:28
16   Q.  And they were demanding a premium over
17 people you could just buy in the industry?
18       MS. DUNN:  Form.
19       THE DEPONENT:  I think there's a
20 difference between when you just hire individuals   01:33:39
21 that come in through resumes, your job Website,
22 versus a group of people who have worked together,
23 you know.
24   Q.  (By Mr. Verhoeven)  What extra value does
25 that give you?                  01:33:54

Page 221

56 (Pages 218 - 221)

**Page 222**

1    A.  It means you can -- you get a team of     01:33:56
2  people that work together, you are going to -- you
3  are going to -- you are going to move faster.  You
4  are going to be able to build and innovate faster
5  than you otherwise would.                          01:34:10
6    Q.  And why is that?
7    A.  Like, if you take somebody in, and they
8  are used to working one way, they put on a team
9  that's used to working another way.  Everybody has
10  to get to know each other.  It just takes a lot of   01:34:24
11  time to get people gelling as a team.
12    Q.  Did you have any discussions with
13  Mr. Levandowski or his team concerning his request
14  for premium over off-the-street folks?
15    MS. DUNN:  Form.                         01:34:43
16    THE DEPONENT:  I mean, this whole deal
17  was about a premium over off-the-street folks.  I
18  mean, the whole deal was about how do -- how does
19  Uber bring on a large group -- as large as possible
20  group of people that are super talented in the    01:34:58
21  space -- in a space that is, you know, getting more
22  and more interest from more and more big tech
23  companies, where talent -- there's not a lot of
24  talent that -- that has the experience in the
25  space.                                           01:35:14

**Page 223**

1    So we felt that it was important to move    01:35:16
2  fast on talent and that that was worth a premium.
3    Q.  (By Mr. Verhoeven)  They knew what to do
4  and what not to do?
5    MR. CHATTERJEE:  Form.                     01:35:26
6    MS. DUNN:  Form.
7    THE DEPONENT:  I mean, look, if I were --
8  if I were in the car manufacturing business, I
9  would do better for myself to hire people who are
10  in the car manufacturing business versus somebody   01:35:43
11  who builds toys for kids.
12    Right?
13    Q.  (By Mr. Verhoeven)  Right.
14    A.  Because they know they have experience
15  doing the things that they are going to be doing.    01:35:52
16  And that's typically how hiring works.
17    Q.  They would know how to proceed; whereas,
18  the person that was the toy manufacturer, I think
19  you said, would not, correct?
20    A.  Yeah.  They just have --                01:36:06
21    MR. CHATTERJEE:  Form.
22    MS. DUNN:  Objection to form.
23    THE DEPONENT:  Sorry.  Yeah, they have
24  experience in that space.  And that's important.
25    Q.  (By Mr. Verhoeven)  The toy manufacturer   01:36:14

**Page 224**

1  would do things that were dumb and make mistakes;    01:36:15
2  whereas, the person with experience would know
3  that's not the way you want to go; you want to go
4  somewhere else, right?
5    MS. DUNN:  Objection to form.             01:36:24
6    THE DEPONENT:  The toy manufacturer would
7  have to do a lot of research, understanding sort of
8  industry-known techniques for building cars;
9  whereas, the person who is already in the
10  car-building industry already knows those basics.    01:36:38
11    Q.  (By Mr. Verhoeven)  But, here, we are
12  talking about folks in the AV tech industry versus
13  folks in the AV tech industry, right?
14    MR. CHATTERJEE:  Form.
15    MS. DUNN:  Objection to form.             01:36:55
16    THE DEPONENT:  I don't know if that's
17  clear; but, certainly, getting a team of people
18  together that's worked -- that's some of the best
19  experts in the world, and get them on board,
20  working as a team as quickly as possible, is        01:37:09
21  incredibly valuable.
22    I mean, you look at the deals that were
23  going on at this time.  You have, like, a cruise
24  deal that was in, like, the billion-dollar range.
25  You have companies like Amazon, Apple, others sort   01:37:19

**Page 225**

1  of sniffing around, bringing on talent at, like,    01:37:23
2  exorbitant rates.
3    And to be honest, if you just look at any
4  scan of AV acquisitions or machine learning or
5  other types that are related, the kinds of          01:37:38
6  acquisitions and the kind of premium that the
7  talent is getting right now, it's not really
8  disputable that that's just normal.
9    Q.  (By Mr. Verhoeven)  Why are they getting
10  such a premium?                                     01:37:50
11    A.  Because they are in high demand.
12    Q.  Well, that begs the question:  Why are
13  they in high demand?
14    A.  What's that?
15    Q.  Why are they in high demand?          01:37:59
16    A.  Because, like, there are only so many
17  people who are really good at machine learning as
18  it relates to perception software, and there's a
19  lot more demand for those people than there is
20  people that can do it.  And so the price goes up.    01:38:18
21    Q.  Did Mr. Levandowski's group offer a
22  better -- higher value to you than some other group
23  in the AV industry?
24    MS. DUNN:  Form.
25    MR. CHATTERJEE:  Form.                     01:38:30

57 (Pages 222 - 225)

**Page 226**

1    THE DEPONENT: I mean, this was just a    01:38:32
2  high-quality team.
3    Q.  (By Mr. Verhoeven)  Well, you thought it
4  was the highest quality around, right?
5    A.  I think that -- so at that -- yeah, at    01:38:43
6  the time, I was -- I was convinced that Anthony was
7  one of the best minds in the world in autonomy.
8  And I still think that is probably the case.
9    Q.  Direct your attention to page -- with the
10 Control Number 668.  And I want to ask you a    01:39:02
11 question about the top email --
12   A.  Uh-huh.
13   Q.  -- from Jeff Holden.
14      Do you see that?
15   A.  Yeah.  Yeah.    01:39:20
16   Q.  And he says, "Travis' guidance on this
17 was to move as fast as possible and to try to get
18 the definitive docs signed by a few days after he's
19 back if the office."
20   A.  Yeah.    01:39:36
21   Q.  Do you remember pushing to get the deal
22 done as fast as possible?
23   A.  I do that with every deal.
24   Q.  So -- so do you remember it?
25   A.  No, but that doesn't surprise me.    01:39:50

**Page 227**

1    Q.  Okay.  And why would you want to have the    01:39:53
2  deal done as fast as possible?
3    A.  Deals don't happen when you take too much
4  time.
5    Q.  Why?    01:40:05
6    A.  I don't know.  It's just a human thing.
7    Q.  What happens to break them down if they
8  take too long?
9       MS. DUNN:  Form.
10      MR. CHATTERJEE:  Form.    01:40:32
11      THE DEPONENT:  They maybe get an offer
12 from another -- from another company that's
13 interested in them.  Maybe they lose interest in
14 working with you.  Maybe they think that you are
15 not interested.  I mean, it could be a whole host    01:40:39
16 of reasons.
17      Q.  (By Mr. Verhoeven)  You can put that
18 exhibit away.
19      MR. VERHOEVEN:  I would like to mark as
20 Exhibit 372 an email string bearing Control Numbers    01:41:08
21 Uber 63618 to 622.
22      (Exhibit 372 was marked for
23 identification by the court reporter and is
24 attached hereto.)
25      Q.  (By Mr. Verhoeven)  Again, this is a    01:41:41

**Page 228**

1  string of emails.  So if you need to, feel free to    01:41:41
2  review it to get context.  I am not going to ask
3  you about the whole thing.
4    Q.  But you want to -- should I read it?
5    Q.  No.  I'm just letting you know, if you    01:41:52
6  want to.  It said this with all of the emails,
7  beginning with the strings.
8    A.  Okay.  Just give me a second.
9    Q.  Just for your information, it is on
10 page 3620.    01:42:17
11   A.  Okay.  Just give me a second to read
12 through this.
13      MS. DUNN:  Take the time you need.
14      THE DEPONENT:  Okay.
15      Q.  (By Mr. Verhoeven)  Direct your attention    01:44:02
16 to the page bearing 3620?
17   A.  Yup.
18   Q.  At the bottom, there's an email from
19 Cameron Poetzscher, dated January 27th, in which
20 you are cc'd.    01:44:18
21      Do you see that?
22   A.  Yes.
23   Q.  And it says, "We have a tentative deal
24 with respect to Newco."
25      Do you see that?    01:44:27

**Page 229**

1    A.  Oh, yeah.  Yeah, I see that.    01:44:28
2    Q.  And that's a reference -- Newco is a
3  reference to the Anthony Levandowski structure,
4  right?
5       MS. DUNN:  Form.    01:44:38
6       THE DEPONENT:  I think we just called --
7  we just called the deal Newco.
8       Q.  (By Mr. Verhoeven)  Okay.  So it's a
9  reference to the deal with Anthony Levandowski?
10   A.  Yeah.    01:44:45
11   Q.  Okay.  And at the bottom, it says, ████
12 ████████████████████████████████████████████████
13 ████████████████████████████████████████████████
14      Do you see that?
15   A.  Yeah.    01:44:58
16   Q.  So what -- that's referring to ████
17 ███████████████████████████████████████
18   A.  Yeah.
19 ████████████████████████████████████████████████
20 ████████████████████████████████████████████████    01:45:10
21 ████████████████████████████████████████████████
22   A.  I think it's that; plus, they need to hit
23 milestones.
24   Q.  Okay.  At this point, the milestones are    01:45:23
25 agreed, according to this document, correct?    01:45:23

1    A.   That's what it appears to be.          01:45:26
2    Q.   Okay.  It says, "As part of the deal,
3  Levandowski wants to report directly to you."
4         Do you see that sentence?
5    A.   Yeah.                                  01:45:36
6    Q.   It's right above the milestone sentence?
7    A.   Yeah, I see it.
8    Q.   What is your understanding of what his
9  reasons were for that?
10   A.   Everybody wants to report to me.       01:45:44
11   Q.   Just that he would have access to you; is
12 that your understanding?
13   A.   Yeah.  It's one of the hardest parts of
14 my job, is convincing people not to work for me.
15   Q.   Okay.  If you look at the last          01:45:55
16 paragraph of this email?
17   A.   Mm-hm.  Yeah.
18   Q.   It says, "We should not let Salesky know
19 anything further about this," and then it goes on.
20        Do you see that?                        01:46:09
21   A.   Yeah, Salesky.
22   Q.   Who is Salesky?
23   A.   He -- he has his own autonomy start-up at
24 this point.  He used to work --
25   Q.   What's -- what's his name, first name?   01:46:22

Page 230

1    A.   I don't remember.  He's always been      01:46:23
2  referred to as Salesky.  I've never met him in
3  person.
4    Q.   Okay.
5    A.   But he has his own autonomy start-up.  He  01:46:30
6  used to work for Google.
7    Q.   I see.
8    A.   Yeah.  And he was talking -- there were
9  some conversations, if I understand -- I never met
10 him -- but there were some conversations between   01:46:46
11 him and our team around the same time.
12   Q.   And then --
13   A.   Lots of people were looking to leave
14 Google at this time.  And most of their top people
15 were leaving.                                      01:47:02
16   Q.   And what is your understanding of why --
17 if you have one, why Cameron is saying that Uber
18 shouldn't let him know anything about this deal?
19        MS. DUNN:  Form.
20        THE DEPONENT:  Because Salesky was -- my   01:47:16
21 understanding -- again, I've never met him, but my
22 understanding of the meetings they had with him,
23 you could never quite trust him.
24        And so he was talking to us about working
25 with us in some way.  We weren't sure if he was    01:47:35

Page 231

1  talking to us about working with us or talking to   01:47:40
2  us and then going back to Google and telling him --
3  telling them everything that he learned by talking
4  to us.
5    Q.   (By Mr. Verhoeven)  And you didn't want     01:47:51
6  him to do that?
7    A.   No.
8    Q.   Why not?
9    A.   Because we try to keep our -- what we do
10 confidential.                                       01:47:58
11   Q.   Was one reason that you didn't want him
12 to do that because you were -- you thought Google
13 might object or take action?
14        MS. DUNN:  Form.
15        MR. CHATTERJEE:  Form.                       01:48:11
16        THE DEPONENT:  You know, look, if we are
17 talking to a bunch of employees of Google about
18 coming over to Uber, you don't go over to Google
19 and say, hey, I'm talking to your employees.
20        Right?                                       01:48:25
21   Q.   (By Mr. Verhoeven)  Fair enough.
22   A.   It's just a normal thing.
23   Q.   But the reason you don't do that is
24 because they would get upset, correct?
25        MS. DUNN:  Form.                             01:48:33

Page 232

1        THE DEPONENT:  Yeah.  Either they get        01:48:33
2  upset, or they get -- they find ways to retain
3  those people versus them moving to another company.
4    Q.   (By Mr. Verhoeven)  And at the bottom, it
5  says, "I am quite worried about what he may say to   01:48:46
6  Larry."
7         Do you see that?
8    A.   Yeah, I do.
9    Q.   That's a reference to Larry Page?
10   A.   Likely.                                      01:48:55
11   Q.   You can put that one away.
12   A.   Okay.
13        MR. VERHOEVEN:  Let's mark as Exhibit 373
14 an email dated January 26th, 2016 from
15 Cameron Poetzscher to Travis Kalanick.              01:49:19
16        (Exhibit 373 was marked for
17 identification by the court reporter and is
18 attached hereto.)
19   Q.   (By Mr. Verhoeven)  This is an email from
20 Cameron to you, dated January 28th, 2016, correct?  01:49:50
21   A.   Looks like it, yes.
22   Q.   And the subject is Newco?
23   A.   Yes.
24   Q.   And it is -- it says, "Did you tell
25 Anthony that you would indemnify them if they get   01:50:03

Page 233

**59 (Pages 230 - 233)**

1  sued by G as part of or after the deal?"          01:50:07
2      Do you see that?
3  A.  Yeah.
4  Q.  G refers to Google?
5  A.  Likely.                                        01:50:16
6  Q.  Do you remember this email?
7  A.  No.
8  Q.  Do you remember talking with Cameron
9  about indemnifying Mr. Levandowski if he got sued
10 by Google as part of the deal that you were talking   01:50:29
11 with him about?
12     MS. DUNN:  Form.
13     THE DEPONENT:  I don't remember that, no.
14 Q.  (By Mr. Verhoeven)  Did you, in fact,
15 tell Anthony that you would indemnify his group if    01:50:40
16 they got sued by Google as a result of the deal?
17 A.  I don't remember that specifically.
18 Q.  Do you have any reason to believe you did
19 not?
20 A.  I just don't remember.                          01:50:57
21 Q.  It says, "They are under that
22 impression."
23     Do you see that?
24 A.  Uh-huh.
25 Q.  That's a yes?                                   01:51:06

Page 234

1  A.  Yes.  Sorry.  Yes.                             01:51:07
2  Q.  They are under that impression because
3  they think you told him that, right?  Is that how
4  you read this?
5  A.  It looks like they are under the             01:51:18
6  impression that they would get indemnified if they
7  were sued by Google.  It doesn't appear to be that
8  they were under the impression that I told them.
9  Q.  Okay.  And you have no recollection of
10 any of this?                                        01:51:35
11 A.  I -- I don't.
12 Q.  Do you have any recollection of
13 discussing indemnification as part of the deal?
14 A.  No.
15     MR. VERHOEVEN:  I'm going to mark as          01:51:45
16 Exhibit 374 a meeting notice on Google Calendar
17 bearing Control Number UB1424.
18     (Exhibit 374 was marked for
19 identification by the court reporter and is
20 attached hereto.)                                   01:52:43
21 Q.  (By Mr. Verhoeven)  You see this is a
22 calendar note, dated March 11, 2016 to yourself?
23 A.  Yeah.  Yup.  I see that, yes.
24 Q.  Okay.  And under "More Details," it says
25 "Newco meeting with principals."                    01:53:11

Page 235

1      Do you see that?                               01:53:16
2  A.  Yeah.
3  Q.  Do you remember having a meeting --
4  A.  Yeah.
5  Q.  -- with Mr. Levandowski or his people --       01:53:19
6  A.  Yeah.
7  Q.  -- in or about March 11th --
8  A.  Yeah.
9  Q.  -- 2016?
10 A.  Yeah, yeah.  This -- this is actually the     01:53:27
11 meeting -- this is the meeting we were referring to
12 earlier.
13 Q.  About the five discs?
14 A.  Yeah, correct.  Or the discs, generally,
15 yes.                                                01:53:38
16 Q.  Yeah.  Okay.  It says -- if you look at
17 the little dash bullets --
18 A.  Yeah.
19 Q.  -- with the little dashes on them --
20 A.  Yeah.                                           01:53:46
21 Q.  -- the last dash bullet says, "Number of
22 diligence employees for forensic diligence."
23 A.  Yeah.
24 Q.  Does that refresh your recollection about
25 any discussions that there would be diligence       01:53:59

Page 236

1  employees that Stroz would conduct forensic          01:54:03
2  diligence on?
3  A.  It certainly refreshes my memory of what
4  the topics of the meeting were sort of about.
5  Q.  What was the forensic diligence going to      01:54:17
6  be on?
7  A.  Yeah, it was going to be on this -- you
8  know, the -- group of people we were doing the
9  transaction with.
10 Q.  Did the discussion of doing a forensic       01:54:31
11 diligence -- withdrawn.
12     Was the discussion of doing forensic
13 diligence the result of Mr. Levandowski's
14 disclosure that he had discs that contained Google
15 information?                                         01:54:47
16 A.  I think my understanding is, we were
17 doing that diligence regardless of that disclosure.
18 Q.  Okay.  Did someone tell you that at this
19 meeting?
20 A.  I don't know.  I don't know.                  01:55:01
21 Q.  But you don't believe that, at this
22 meeting, there was any discussion of doing forensic
23 diligence as a result of Mr. Levandowski's
24 disclosure that he had files containing Google
25 information?                                         01:55:16

Page 237

60 (Pages 234 - 237)

1    A.  My recollection is, his disclosure came    01:55:18
2  at the end of the meeting.
3    Q.  So it was after the discussion of
4  diligence employees and forensic diligence?
5    A.  That's my assumption.  My -- you know,    01:55:29
6  it's been a long time since the meeting.  I --
7  that's my best guess.
8    Q.  What do you remember about a discussion
9  of the number of diligence employees in forensic
10  diligence at this meeting?    01:55:42
11    A.  I don't remember anything about it.
12    Q.  Why is it that you remember the
13  disclosure of the files that had Google information
14  on them at this meeting, but not the discussion of
15  forensic diligence?    01:55:56
16    MR. CHATTERJEE:  Form.
17    MS. DUNN:  Form.
18    THE DEPONENT:  Some things in a meeting
19  are more eventful and memorable than others.
20    Q.  (By Mr. Verhoeven)  So it was more    01:56:04
21  memorable to you that he disclosed that?
22    A.  For sure.
23    Q.  What was your reaction when he disclosed
24  it at this meeting?
25    MR. CHATTERJEE:  Form.    01:56:14

Page 238

1    THE DEPONENT:  My reaction was that no    01:56:15
2  files -- no content from his former employer can
3  come to Uber under any conditions and that he
4  needed to talk to an attorney to figure out how to
5  properly do that.    01:56:27
6    Q.  (By Mr. Verhoeven)  Why -- why did he
7  tell you that he had those files at this meeting?
8    MS. DUNN:  Form.
9    MR. CHATTERJEE:  Form.
10    THE DEPONENT:  He probably felt like we    01:56:48
11  were going to find out one way or another.
12    Q.  (By Mr. Verhoeven)  Do you remember what
13  he said one way or the other?
14    MR. CHATTERJEE:  Form.
15    THE DEPONENT:  I am sorry.  I didn't    01:57:00
16  understand the question.
17    Q.  (By Mr. Verhoeven)  Do you remember what
18  he said one way or the other at this meeting?
19    A.  I don't remember specifically what he
20  said, but I remember, generally, him making some    01:57:07
21  kind of disclosure about having some kind of either
22  backup disc or some kind of content that was from
23  his former employer.  It was like backup data from
24  former employer, something like that.
25    Q.  And that was after the discussion of --    01:57:30

Page 239

1  of the fact that, as part of the deal, there would    01:57:31
2  be forensic diligence on his devices?
3    MS. DUNN:  Form.
4    THE DEPONENT:  This was -- I remember
5  that being at the end of the meeting.  So I don't    01:57:45
6  know if we talked about the number of the diligence
7  employees.  I don't remember.  But if we did cover
8  all of this, then it would have come after that.
9    Q.  (By Mr. Verhoeven)  Okay.  You can put
10  that away.    01:57:59
11    MR. VERHOEVEN:  Let's mark -- let's mark
12  as Exhibit 375 an email dated March 21, 2016 from
13  Cameron Poetzscher to Travis Kalanick, bearing
14  Control Numbers Uber 60643 through 644.
15    (Exhibit 375 was marked for    01:58:38
16  identification by the court reporter and is
17  attached hereto.)
18    Q.  (By Mr. Verhoeven)  You will see that the
19  attachment to this document has been withheld for
20  privilege.    01:59:10
21    Do you see that?
22    A.  Yeah.  Yeah, I see that.
23    Q.  And for the record, we object to that
24  fact and intend to move to compel that.
25    The -- the attachment said -- or the    01:59:24

Page 240

1  email on the attachments line, it says,    01:59:26
2  "Project Zing, timing update."
3    Do you see that?
4    A.  Yeah.
5    Q.  What does Project Zing refer to?    01:59:36
6    A.  No idea.
7    Q.  Is that another name for the deal with
8  Mr. Levandowski?
9    A.  I have no idea what it is.
10    Q.  Well, this was sent to you, right?    01:59:50
11    A.  Correct.
12    Q.  It says in the first paragraph, "They
13  were supposed to get us their diligence materials
14  by last Sunday night, and we only got Anthony's
15  questionnaire on Friday and are still waiting on    02:00:06
16  three other employees, also still waiting on the IP
17  diligence info from them."
18    Do you see that?
19    A.  I do.
20    Q.  So does this refresh your recollection    02:00:18
21  that Project Zing concerned the deal with
22  Anthony Levandowski?
23    A.  I mean, I assume it had something to do
24  with that.  I just don't remember anything about
25  anything called Project Zing.    02:00:33

Page 241

61 (Pages 238 - 241)

1    Q.  Do you remember getting this email?    02:00:40
2    A.  No.
3    Q.  Do you remember hearing that
4  Mr. Levandowski and his team were late on getting
5  diligence materials to the Stroz people?    02:00:51
6    A.  Say that question again, please.
7    Q.  Do you remember hearing that
8  Anthony Levandowski and his team were late in
9  getting their materials to the Stroz people?
10    MR. CHATTERJEE:  Object to the form.    02:01:12
11    MS. DUNN:  Form.
12    THE DEPONENT:  I don't remember.
13    Q.  (By Mr. Verhoeven)  Okay.  Do you
14  remember the part of the diligence concerning IP?
15    A.  I know that there was diligence and that    02:01:30
16  IP diligence is a big part of any diligence that
17  you do in a transaction.
18    Q.  It says, "Also still waiting on the IP
19  diligence info from them."
20    Do you see that?    02:01:44
21    A.  I do.
22    Q.  What was that referring to?
23    A.  I have no idea.
24    MR. CHATTERJEE:  Form.
25    Q.  (By Mr. Verhoeven)  No idea?    02:01:50
Page 242

1    A.  I have no idea.    02:03:07
2    Q.  Okay.  Put that one aside.
3    MR. VERHOEVEN:  Let's mark as Exhibit 376
4  what appears to be a part of a text message bearing
5  Control Numbers LEV2310.    02:03:39
6    (Exhibit 376 was marked for
7  identification by the court reporter and is
8  attached hereto.)
9    MR. VERHOEVEN:  Before you give it to
10  him, let me hand them out.  Yeah.  Hold on.    02:03:58
11    Does anyone have any objections if I give
12  the -- show the witness this?  You can see the
13  witnesses' names on it.
14    MS. DUNN:  I do see that.  Let me check
15  with my boss.    02:04:17
16    MS. GOODMAN:  I think the protective
17  order allows for authors who are seeking some
18  documents marked confidential or AEO to see them in
19  deposition.
20    MR. VERHOEVEN:  Okay.  Go ahead and give    02:04:28
21  it to him?
22    Q.  (By Mr. Verhoeven)  Is this a printout of
23  a text message Mr. Levandowski sent to you?
24    A.  It may be, yeah.  Looks like it.
25    Q.  Okay.  And it says, "Yes, we were slow on    02:04:50
Page 244

1    A.  No idea.    02:01:51
2    Q.  Did you ask Cameron what it was referring
3  to, based on this email?
4    A.  I don't think so.
5    Q.  It says, "A detailed status update is    02:02:06
6  attached."
7    Do you see that?  Second-to-last?
8    A.  Yeah.  Yeah.
9    Q.  Do you remember receiving status updates
10  on diligence materials from your team?    02:02:17
11    A.  I got a couple diligence updates from my
12  general counsel, so...
13    Q.  This looks like to me like you are
14  getting a diligence update from Cameron.  Is that
15  what it looks like to you?    02:02:42
16    MS. DUNN:  Form.
17    THE DEPONENT:  It does, yeah.
18    Q.  (By Mr. Verhoeven)  Okay.
19    A.  Let's see.  Hold on -- let me -- before I
20  -- one second.  It's not clear that I'm getting a    02:02:51
21  diligence update here, actually.  It's some kind of
22  update.  It says a "detailed status update."  It's
23  not clear to me that it's a diligence update.
24    Q.  Did Project Zing refer to the diligence
25  that was being done?    02:03:06
Page 243

1  two items.  They were the diligence questionnaires    02:04:55
2  (dumb questions, like how many email accounts I
3  have) and product design questionnaires for IP
4  check."
5    Do you see that?    02:05:07
6    A.  I do.
7    Q.  Do you have any recollection of having
8  discussions with Mr. Levandowski about these
9  diligence questionnaires?
10    A.  No.    02:05:17
11    Q.  This indicates that you had texts with
12  him about the diligence questionnaires, right?
13    A.  Yeah, it appears to be that, yes.
14    Q.  But you don't remember any of these?
15    A.  No, no.    02:05:28
16    Q.  What about the design questionnaires for
17  the IP check?
18    A.  Yeah, no.
19    Q.  You have no recollection of that?
20    A.  I do not.    02:05:38
21    Q.  But you -- but it looks like you had
22  texts with Mr. Levandowski concerning that, right?
23    MS. DUNN:  Form.
24    THE DEPONENT:  It appears to be so.
25    MR. VERHOEVEN:  Okay.  Let's mark as    02:05:49
Page 245

62 (Pages 242 - 245)

1 Exhibit 377 another text message from          02:06:15
2 Anthony Levandowski, bearing Control Number Uber
3 73891.
4        (Exhibit 377 was marked for
5 identification by the court reporter and is     02:06:27
6 attached hereto.)
7        MR. VERHOEVEN:  Counsel I assume there's
8 no problems with giving -- showing this to --
9        MS. DUNN:  Yeah, no problem.
10        MR. VERHOEVEN:  Okay.  Go ahead and give     02:06:49
11 it to him.  Sorry.
12     Q.  (By Mr. Verhoeven)  And do you see under
13 "participants," colon?
14     A.  Yeah.
15     Q.  And there's a phone number?          02:07:14
16     A.  Yeah.
17     Q.  Is that your phone number?
18        I promise we will keep it confidential.
19     A.  Yes, it is my phone number.
20     Q.  Okay.  So this is a text, in part, to     02:07:23
21 you, correct?
22     A.  Yeah.
23     Q.  -- from Mr. Levandowski?
24     A.  Yes.
25     Q.  And he's -- this is time-stamped          02:07:34

Page 246

1 March 26th, 2016?          02:07:36
2     A.  Yes.
3     Q.  And he says, "Really happy we are doing
4 the light approach."
5        Do you see that?          02:07:45
6     A.  Yeah.
7     Q.  What is the "light approach"?
8     A.  I don't know.  I don't know what that is
9 referring to.
10     Q.  You have no recollection of any          02:07:53
11 discussions about a light approach?
12     A.  No.
13     Q.  Do you have any -- if you are reading
14 this, what -- how would you interpret the reference
15 to light approach?          02:08:03
16        MR. CHATTERJEE:  Form.
17        MS. DUNN:  Form.
18        THE DEPONENT:  I just don't know what it
19 is referring to.  I don't know what approach we are
20 talking about here.  I just don't know.          02:08:13
21     Q.  (By Mr. Verhoeven)  Have you ever used
22 that -- that term, referring to the light approach,
23 in talking about a deal?
24     A.  No.  I mean, it's not something I would
25 normally do, or not something that I have done,          02:08:23

Page 247

1 like, in a normal course of business.  It's not.          02:08:26
2 So...
3     Q.  That's fine.  You can put that away.
4        MR. VERHOEVEN:  Let's mark as Exhibit 378
5 a document bearing Control Numbers Uber 75047          02:08:49
6 through 48.
7        (Exhibit 378 was marked for
8 identification by the court reporter and is
9 attached hereto.)
10     Q.  (By Mr. Verhoeven)  First email is from          02:09:27
11 Mr. Levandowski to JH.
12        Do you see that?
13     A.  Yeah.
14     Q.  Who is JH?
15     A.  That's Jeff Holden.          02:09:37
16     Q.  Oh.  So this is an email from
17 Mr. Levandowski to Mr. Holden, dated March 31st,
18 2016; is that right?
19     A.  Appears to be so.
20     Q.  And the subject line says, "Whiteboard          02:09:47
21 translation TK points."
22        Do you see that?
23     A.  Yeah.
24     Q.  TK refers to you, right?
25     A.  Usually does.          02:09:58

Page 248

1     Q.  Okay.  If you look at the attachment,          02:09:59
2 there's a whiteboard with red writing on it.
3        Do you see that?
4     A.  Yeah.
5     Q.  Did you have a meeting with          02:10:13
6 Mr. Levandowski -- or withdrawn.
7        Did you have a meeting around this date
8 where you wrote all this on the whiteboard?
9     A.  It's possible.
10     Q.  Is this your handwriting?          02:10:31
11     A.  Yes, it is.
12     Q.  Okay.  Do you remember having a
13 meeting -- do you remember the meeting associated
14 with this picture?
15     A.  No.          02:10:42
16     Q.  Under No. 1 in the picture, it says,
17 "Pittsburgh ++~ I know some," S word?
18     A.  Yes.
19     Q.  Do you see that?
20     A.  I do.          02:11:01
21     Q.  Okay.  What does that mean?
22        MR. CHATTERJEE:  Form.
23        THE DEPONENT:  I can't -- I mean, I don't
24 know.  But if he's consulting for us helping to
25 bring some advice and sort of consultative approach          02:11:17

Page 249

63 (Pages 246 - 249)

ATTORNEYS' EYES ONLY



1 to what's going in, Pittsburgh would be helpful.   02:11:21
2    Q.  (By Mr. Verhoeven) So the "I" in that
3 reference is Mr. Levandowski?
4    A.  I don't know.  I don't know for sure.
5 But it could be.  I just don't know.   02:11:30
6    Q.  Does it look like it is?
7    A.  Well, I read this here.
8    Q.  You are referring to the email?
9    A.  Yeah.
10    Q.  What did you read?   02:11:39
11    A.  It says, "Pittsburgh ++."
12    Q.  S word?
13    A.  "Help ATC with calls by using our team's
14 experience and knowledge."
15       So I would -- I don't remember writing   02:11:51
16 this, but that's one interpretation of it.
17    Q.  You were at a meeting where
18 Mr. Levandowski said this, right?
19       MS. DUNN:  Form.
20       THE WITNESS:  I was at a meeting, and   02:12:08
21 then it looks like Levandowski sent this to Holden,
22 sort of interpreting what I was trying to say.
23    Q.  (By Mr. Verhoeven)  And he interpreted,
24 "I know some," S word, "to mean that he would help
25 ATC avoid pitfalls by using Mr. Levandowski's
                                        Page 250

1 teams' experience and knowledge," correct?   02:12:27
2       MS. DUNN:  Form.
3       THE DEPONENT:  Correct.
4    Q.  (By Mr. Verhoeven)  Do you have any
5 recollection of a discussion about Mr. Levandowski   02:12:38
6 helping Pittsburgh avoid pitfalls?
7    A.  We certainly have always believed in
8 people who have great expertise, experience,
9 knowledge working for our team and helping us
10 innovate and invent the future.   02:13:00
11    Q.  Did Mr. Levandowski, indeed, help the
12 Pittsburgh team avoid some pitfalls?
13       MR. CHATTERJEE:  Form.
14       MS. DUNN:  Form.
15       THE DEPONENT:  I'm sure -- I'm sure he   02:13:13
16 did.
17    Q.  (By Mr. Verhoeven)  Does any of them come
18 to mind?
19    A.  Well, like one of the things that the
20 Pittsburgh team was working on was like a -- was   02:13:22
21 a -- what was it?  I am trying to remember.
22
23
24
25       And that's, like, a cool, "sciencey"   02:13:45
                                        Page 251

1 thing to work on,                      02:13:51
2 y
3       And I remember, you know, at some point
4 while he was helping that team get up to speed, we
5 were just like,                        02:14:03
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page 252

1
2
3
4
5
6
7
8
9
10    Q.  (By Mr. Verhoeven) So your ATC group,   02:15:13
11 what is it called now?
12    A.  ATG.
13    Q.  ATG?
14    A.  Yeah.
15    Q.  And that's just a new name for the same   02:15:19
16 group?
17    A.  Well, when it was ATC, it was just
18 Pittsburgh.  And ATG was about when we had more
19 than one site.
20    Q.  Okay.                          02:15:27
21    A.  So it was a group.  So instead of a
22 center, it's --
23    Q.  Bigger -- bigger group, bigger AV group,
24 still the AV --
25    A.  Because it's over multiple sites instead   02:15:37
                                        Page 253



1  of a center, it was a group.        02:15:40
2     Q.  Oh, I see.  Got it?
3     A.  Yeah.

Page 254

1  ▓▓▓▓▓                              02:17:41
2     A.  Yeah.
3     Q.  Is there any particular software in your
4  company for this or --
5     A.  My guess is, it's all Google Docs.        02:17:45
6     Q.  Okay.  Let's move on.  You can put that
7  away.
8        MR. VERHOEVEN:  Let's mark as Exhibit 379
9  a Google document bearing Control Numbers
10 Uber 344 -- 100344 through 352.        02:18:13
11       (Exhibit 379 was marked for
12 identification by the court reporter and is
13 attached hereto.)
14    Q.  (By Mr. Verhoeven)  Have you seen
15 Exhibit 379 before?        02:19:00
16    A.  I don't know.  I don't remember it.
17    Q.  You see the cover, the first page of --
18    A.  Yeah.
19    Q.  -- 379?
20    A.  Yeah.        02:19:09
21    Q.  It's an email from Cameron Poetzscher to
22 you --
23    A.  Yeah.
24    Q.  -- dated April 11th, 2016?
25    A.  Yeah.  Yeah.        02:19:18

Page 256

1     Q.  Does that date have any significance to        02:19:18
2  you?
3     A.  4/11/2016?
4     Q.  Correct.
5     A.  Not particularly.        02:19:28
6     Q.  Do you remember that was the date on
7  which the contract we looked at earlier, the merger
8  contract, was signed?
9     A.  I -- I didn't know that, but I'll take
10 your word for it.  This is deal overview.        02:19:45
11       (Discussion off the stenographic record.)
12    Q.  (By Mr. Verhoeven)  I'm going to place
13 before you an exhibit you've previously seen,
14 Exhibit 365, agreement and planned merger.
15    A.  Yeah.        02:20:19
16    Q.  Do you see it's dated as of April 11th?
17    A.  Okay.
18    Q.  Do you see that?
19    A.  I do.
20    Q.  And that's the same date as this email,        02:20:26
21 right?
22    A.  It sure is.  Yeah.
23    Q.  Okay.  And this says in the subject line
24 of this email, "Here's the revised deck with
25 milestones."  And then below that, it says, "Zing        02:20:37

Page 257

1  board slides," and that's the attachment, right?     02:20:42
2     A.  Yeah.  I see that, yeah.
3     Q.  If you turn to the attach- -- you see the
4  attachment follows?
5     A.  What do you mean?  I am sorry.         02:20:51
6     Q.  The next page --
7     A.  Yeah, yeah, yeah.
8     Q.  -- is the attachment?
9     A.  Yeah.
10    Q.  And it's titled "Project Zing Review"?     02:20:55
11    A.  Yeah.
12    Q.  And if you look through this --
13    A.  Yeah.
14    Q.  I don't want you to read every word.
15    A.  You do?                   02:21:04
16    Q.  I don't.
17    A.  Oh, you don't.  Okay.
18    Q.  Is this a slide deck that was presented
19 to the board of directors on April 11th?
20    A.  It appears to be so.            02:21:13
21    Q.  And would you have been the person
22 presenting this?
23    A.  No.
24    Q.  Is this -- does this reflect -- who led
25 the discussion regarding this potential        02:21:26
                                               Page 258

1  acquisition?                      02:21:30
2     A.  I am going to assume it's Cameron.
3     Q.  Okay.
4     A.  It may have been that Emil spoke, too;
5  but I would assume that it's Cameron.        02:21:39
6     Q.  Were you involved?
7     A.  I was maybe going to chime in if I saw
8  something, but this is not a discussion I led.
9     Q.  Okay.  I am not trying to play any tricks
10 on you, but I'm going to give you a document.     02:21:54
11       MR. VERHOEVEN:  Let's mark it as 380.
12       (Exhibit 380 was marked for
13 identification by the court reporter and is
14 attached hereto.)
15       THE DEPONENT:  You want me to put this     02:22:02
16 away or hold it?
17    Q.  (By Mr. Verhoeven)  Just keep it.  Go
18 ahead.
19       It is entitled "Minutes of Special
20 board -- special meeting of boards of directors"?     02:22:08
21    A.  Yeah.
22    Q.  "Uber Technologies, Inc., April 11th,
23 2016."  It bears Control Numbers Uber 101482
24 through 498.  And if you look at item 1 on the
25 first page --                    02:22:39
                                               Page 259

1     A.  Yeah.                    02:22:39
2     Q.  -- merger agreement?
3     A.  Yeah, yeah.
4     Q.  It says, "Mr. Kalanick and Mr. Poetzscher
5  led" --                      02:22:44
6     A.  So just real quick, just so it will make
7  it easier, just say, Poetzscher.
8     Q.  Poetzscher?  Okay.
9     A.  Yeah.
10    Q.  Poetzscher?  I knew I've been messing up     02:22:54
11 that name the whole time.
12    A.  We could just say "Cam," too.  If you
13 want to just go there, I'm very okay with that.
14    Q.  Poetzscher.  I can remember Poetzscher.
15       Okay.  Let's go back to the record.       02:23:04
16       It says there, "Mr. Kalanick and
17 Mr. Poetzscher led a discussion regarding a
18 potential acquisition and described key aspects of
19 the proposed transaction."
20    A.  Yeah.                    02:23:18
21    Q.  Does this refresh your recollection as to
22 your involvement in making this presentation?
23    A.  You know, look, my guess is, before --
24 I'm guessing here -- you know, it could be that
25 before Cam got started, I was, like, all right, we     02:23:32
                                               Page 260

1  are, you know, maybe a high-level overview.  But I     02:23:36
2  can -- I know I didn't talk to the details that are
3  in these slides here.
4        I may have just been sort of the vision
5  guy, and maybe that's my part of leading this     02:23:48
6  discussion.  But in terms of really leading this
7  discussion and going through these slides, I -- I'm
8  very certain that I was not doing that.
9     Q.  Okay.  By "these slides," you mean the
10 slides attached to Exhibit 379?           02:24:04
11    A.  Yes.
12    Q.  379?
13    A.  Yeah.
14    Q.  Let's go back to 379.
15    A.  What is 379?                02:24:31
16    Q.  That's the slides.
17    A.  Okay.  Got it.  Yes.
18    Q.  So it looks like Project Zing is the deal
19 being -- the deal is being referred to as
20 Project Zing now?                  02:24:47
21    A.  Yeah.  And I just -- you know, I got used
22 to the Newco thing.  But it looks like they changed
23 the same at some point.
24    Q.  Okay.  Do you see on page 346 it says
25 "deal overview"?                   02:24:59
                                               Page 261

66 (Pages 258 - 261)



**Page 262**

1  A.  Yes, I do.                          02:25:01
2  Q.  And what is this?
3  A.  It looks like a breakdown of sort of the
4  structure of the deal and compensation for it.
5  Q.  You see on the left side, there's these    02:25:22
6  boxes, these colored boxes -- I know this is black
7  and white.
8  A.  That's okay.  I see it.
9  Q.  And the first box at the top says
10 "Rationale"?                            02:25:30
11 A.  Yeah.
12 Q.  And the first item listed under Rationale
13 says, ███████████████████████████
14 ███████████████████████████"          02:25:44
15
16 ███████████████
17 A. ████
18 Q.  And that's referring to LiDAR lasers,
19 right?
20 A.  Correct.                          02:25:53
21 Q.  And did you explain to the board how
22 ███████████████████████████
23 ███████████████████████████
24 A. ███████████████████████████
25 ███████████████████████████    02:26:05

**Page 263**

1  ███████████████████████████
2  ███████████████████████████
3  ███████████████████████████
4  ███████████████████████████
5  ███████████████████████████
6  ███████████████████████████
7  A.  Yeah.
8  Q.  So does that mean something other than it
9  just makes it happen faster?
10 MS. DUNN:  Form.                       02:26:37
11 THE DEPONENT: ████████████████
12 ███████████████████████████
13 ███████████████████████████
14 Q.  (By Mr. Verhoeven)  Right.
15 ███████████████████████████
16 ███████████████████████████
17 ███████████████████████████
18 ███████████████████████████
19 ███████████████████████████
20 ███████████████████████████
21 ███████████████████████████
22 ███████████████████████████
23 ███████████████████████████
24 ███████████████████████████
25 ███████████████████████████

**Page 264**

1  Q.  No, as of this point in time, though.    02:27:16
2  A.  There was some --
3  Q.  There was --
4  A.  There were --
5  Q.  You were trying to develop -- I am sorry?  02:27:20
6  A.  Apologize.
7  Q.  At this point in time, April 11th --
8  A.  Yeah.
9  Q.  -- you were trying to develop your own
10 custom LiDAR in -- as part of the work going in    02:27:27
11 Pittsburgh, correct?
12 A.  They had some laser work going on, but it
13 was pretty early at the time, is my understanding.
14 Q.  But one of their projects was to develop
15 an in-house LiDAR system, right?            02:27:41
16 A.  It was one of the areas they were
17 exploring. ███████████████████████
18 ███████████████████████████
19 ███████████████████████
20 Q.  Right.                          02:27:52
21 A.  Yeah.
22 Q. ███████████████████████████
23 ███████████████████████
24 A. ███████████████████████
25 Q.  Right.                          02:27:59

**Page 265**

1  A.  Yeah.                          02:27:59
2  Q.  And before this -- before -- as of
3  April 11th, the way you were pursuing that was
4  through the Pittsburgh folks, right?
5  A.  There was something going on there.  I    02:28:10
6  don't know if it was -- like, I don't know how
7  substantive that work was.  We felt that the
8  Ottomotto deal, this deal, generally, would really
9  help us get going on an internal laser program.
10 Q.  What was said at the board meeting on    02:28:30
11 this subject?
12 MS. DUNN:  Objection to form.
13 THE DEPONENT:  I don't remember
14 specifically what was said on this subject at the
15 board meeting.                         02:28:41
16 Q.  (By Mr. Verhoeven)  Generally?
17 A.  It's generally what I'm telling you right
18 now.  You know, just --
19 Q.  Okay.
20 A.  -- as we go through the slide.          02:28:48
21 Q.  So nothing more generally than what you
22 told me?
23 A.  Yeah.  And probably a lot less, is my
24 guess.
25 Q.  Under terms, down one box --          02:28:56

1    A.   Yeah.                          02:29:00
2    Q.   -- last bullet says, "Uber will indemnify
3  a minimum of five key employees in Ottomotto for
4  specific claims from former employers EGIP,
5  non-solicit subject to certain restrictions and   02:29:16
6  limitations."
7       Do you see that?
8    A.   Yeah, I sure do.
9    Q.   What specific claims is that referring
10 to?                                    02:29:27
11   A.   I don't know.  I am not sure.
12   Q.   Well, do you recall any discussion of
13 specific claims from former employers that --
14 during the board meeting?
15   A.   No, I don't.  I don't recollect anything   02:29:39
16 specific.
17   Q.   You would agree that that is referring
18 to Google, right?
19   A.   It -- it most likely is, yeah.  But, I
20 mean, there were some folks that came from other   02:29:53
21 places, but it was -- it said "employers," so
22 there's more than one former employer.  But -- but,
23 yes, Google is definitely one of them.
24   Q.   And as part of talking about this deal
25 with the board, one of things you talked about was   02:30:06

1  whether or not Google would bring an action based   02:30:11
2  on IP theft or solicitation of employees?
3       MS. DUNN:  Objection to form.
4    Q.   (By Mr. Verhoeven)  Isn't that a fair --
5  fair statement?                        02:30:21
6    A.   Anytime you do a transaction that
7  includes really smart, really talented people
8  that -- that used to work at a competitor, this is
9  just one of the considerations you have to take
10 into account.                          02:30:37
11   Q.   So the -- is the answer "yes" then?
12   A.   The answer is, yes.
13   Q.   Yes.  Okay.
14      Do you remember anything any of the other
15 board members besides yourself said on this        02:30:49
16 subject?
17   A.   Not really, no.
18   Q.   Was there any concern expressed about a
19 Google suit?
20      MS. DUNN:  Objection to form.          02:31:00
21      THE DEPONENT:  I don't remember
22 specifically.
23   Q.   (By Mr. Verhoeven)  Do you have any
24 general rec- -- recollection of that being
25 discussed?                             02:31:07

1    A.   Not really.                      02:31:09
2    Q.   What about just Google's reaction, was
3  that discussed among the board?
4    A.   I don't think so.
5    Q.   Wouldn't that be a concern that your --   02:31:16
6  your proposed deal would be hiring away, you know,
7  at least 30 of their folks from their AV group?
8  Wouldn't that be a concern to the board that Google
9  might be upset about that?
10      MR. CHATTERJEE:  Form.              02:31:34
11      MS. DUNN:  Objection to form.
12      THE DEPONENT:  I can't say for sure, but
13 I understand the notion.  We were -- you know, we
14 were excited to hire.  We were incredibly excited
15 to hire employees, like really talented -- really   02:31:48
16 talented individuals in this space that may -- you
17 know, many of whom previously worked at Google.  We
18 were excited about that.
19   Q.   (By Mr. Verhoeven)  Right.  But my
20 question is:  During this -- this was a meeting in   02:32:03
21 which the board was going to approve or disapprove
22 of the deal, right?
23   A.   Correct.
24   Q.   And so my question is:  Wouldn't you
25 expect that one of the subjects discussed at that   02:32:16

1  board meeting in connection with whether to do this   02:32:19
2  deal is the potential blowback from Google?
3       MS. DUNN:  Objection to form.
4       THE DEPONENT:  It was certainly a
5  consideration.  I don't know if it was at this      02:32:31
6  board meeting, but it was generally a
7  consideration.
8    Q.   (By Mr. Verhoeven)  And the board?  Was
9  it a consideration of the board?
10   A.   I can't remember.                 02:32:40
11      MS. DUNN:  Objection to form.
12   Q.   (By Mr. Verhoeven)  Would you expect that
13 that would have been a consideration the board took
14 into account?
15      MR. CHATTERJEE:  Form.              02:32:45
16      MS. DUNN:  Form.
17      THE DEPONENT:  I cannot remember if the
18 board discussed that or not.  I just can't.
19      I can tell you that it was generally a
20 consideration that I had going into this deal.      02:32:53
21   Q.   (By Mr. Verhoeven)  Okay.  So one of the
22 considerations you had going into the deal with
23 Mr. Levandowski was potential blowback from Google;
24 fair?
25      MS. DUNN:  Objection to form.        02:33:14

68 (Pages 266 - 269)

1        THE DEPONENT: When you have a small        02:33:15
2 group -- or I shouldn't say small, but when you
3 have a group of, let's say, 250 people working on
4 this kind of project -- and I'm referring to, let's
5 say, Google or Waymo, in specific; but, generally,        02:33:27
6 if that's a situation going on.
7        And dozens, if not close to 100 of your
8 people, leave to go elsewhere. That's not --
9 it's -- it's -- that's not a fun -- that's not fun
10 if you are losing your best people.        02:33:47
11        And sometimes people react emotionally to
12 that kind of thing, and I think that's exactly what
13 we saw from Google.
14    Q. (By Mr. Verhoeven) And that's what --
15 that's what you were -- you had that as a concern        02:34:01
16 personally when you were evaluating this deal,
17 right?
18    A. When you do a transaction where lots of
19 people are coming from a particular competitor or
20 were recently at a particular competitor, that is a        02:34:20
21 very natural concern.
22    Q. Okay. I understand that.
23    A. Yeah.
24    Q. But I'm trying to establish whether or
25 not that was a concern for you --        02:34:32

Page 270

1    A. Yeah.        02:34:33
2    Q. -- personally as part of this deal that
3 there would be blowback from Google.
4    A. We weren't sure whether there would be
5 blowback from Google, but we understood it to be a        02:34:43
6 possibility.
7    Q. And that was a concern?
8    A. It was a consideration.
9    Q. It wasn't a concern to you?
10    A. It was --        02:34:54
11        MS. DUNN: Form.
12        THE DEPONENT: It was -- it was a
13 consideration that we had when doing this deal and
14 thinking about it, and also led to our efforts to
15 make sure no -- no Google content or IP got to        02:35:07
16 Uber.
17        Because we understood that so many people
18 were leaving Google generally, not just to go to
19 Uber, but to go to -- elsewhere. People just
20 didn't want to be there anymore.        02:35:21
21        But with so many coming to us, we had a
22 feeling that there would be an emotional response
23 to that, and I think that's what we saw.
24    Q. (By Mr. Verhoeven) So that
25 consideration, you said, led to your efforts to        02:35:51

Page 271

1 make sure that no IP got to Uber, right?        02:35:53
2    A. Correct, yeah.
3    Q. And those efforts were the commissioning
4 of Stroz to do the diligence?
5    A. I think --        02:36:02
6        MR. CHATTERJEE: Form.
7        THE DEPONENT: -- it's just all of the
8 efforts we took. I think the diligence process was
9 one of those things.
10    Q. (By Mr. Verhoeven) Direct your attention        02:36:34
11 to the page bearing Control Number 348. This is
12 Exhibit 379. And this is a slide entitled
13 "Walkaway rights and indemnity obligations."
14        Do you see that?
15    A. Yeah.        02:36:57
16    Q. And it says, "Do we still indemnify," up
17 at the top right-hand side?
18    A. Yup.
19    Q. And then the first bullet says, "Yes (for
20 diligenced employees in Ottomotto relating to        02:37:12
21 actions of diligenced employees) for the following
22 claims," colon, and the first bullet is "IP/trade
23 secret misappropriation or infringement."
24        Do you see that?
25    A. Yes, I do.        02:37:34

Page 272

1    Q. So does this reflect your recollect- --        02:37:35
2 withdrawn.
3        Does this refresh your recollection that,
4 at this board meeting, there was a discussion of
5 indemnifying certain diligenced employees for        02:37:50
6 possible Google lawsuit based on IP or trade secret
7 misappropriation?
8        MR. CHATTERJEE: Form.
9        MS. DUNN: Form.
10        THE DEPONENT: Yeah, I think this is for        02:38:04
11 claims of that, yes. That's what it appears to be.
12    Q. (By Mr. Verhoeven) But you don't
13 remember the substance of that?
14    A. Not really.
15    Q. Well --        02:38:16
16    A. Sorry. No, no. But, again, I am just
17 reading -- I am reading the slide here. And, you
18 know, and there's -- these are claims. I am not
19 sure what they mean by identifying claims versus
20 actual infringement.        02:38:31
21        And there may be a difference there. I
22 don't know. I haven't -- I haven't read the
23 indemnity agreement.
24    Q. Okay. You were aware that there was an
25 indemnity agreement, right? You may not remember        02:38:43

Page 273

69 (Pages 270 - 273)

1 it now, but you were aware at the time, right?    02:38:47
2    A.  I mean, I would be incredibly surprised
3 if an M & A transaction didn't have an indemnity
4 agreement; and, specifically, to this, I assumed it
5 did, yes.                                         02:38:56
6    Q.  Okay.  Well, it was discussed at the
7 board meeting, right?
8    A.  Fair enough.
9    Q.  As part of the approval of the whole
10 deal, right?                                     02:39:04
11    A.  Fair enough.
12    Q.  Yes?
13    A.  Yes.
14        MR. VERHOEVEN:  Counsel, I'm going to
15 note for the record that a slide in this board   02:39:19
16 presentation on page No. 350, it says, "Detailed
17 indemnity summary" has been entirely redacted, and
18 we object to that and tend to move to compel.
19        MS. DUNN:  Can we check the time on the
20 record so far.                                   02:39:48
21        THE VIDEOGRAPHER:  Yes.  We are at five
22 hours and five minutes.
23        MR. VERHOEVEN:  You want to take a break?
24        THE DEPONENT:  Let's take a little break.
25 How about 10 minutes.                            02:40:01

Page 274

1        THE VIDEOGRAPHER:  Going off the record.   02:40:02
2 The time is 2:39.
3        (Recess taken.)
4        THE VIDEOGRAPHER:  We are back on the
5 record.  The time is 2:54.                        02:54:18
6        MS. DUNN:  Since we are back on the
7 record, we would like to designate this transcript
8 AEO.
9        (Exhibit 381 was marked for
10 identification by the court reporter and is       02:54:25
11 attached hereto.)
12    Q.  (By Mr. Verhoeven)  Okay.  Let's mark as
13 Exhibit 381 the Joint Defense and Common Interest
14 and Confidentiality Agreement, dated -- well, I
15 don't know what the date is, but it bears Control 02:54:44
16 Number 74893.  I believe it's dated April 11th,
17 2016.
18        So it's -- it bears Control Numbers Uber
19 74893 through 903.
20        Do you recognize this agreement?          02:55:17
21    A.  I do not.
22    Q.  Turn to the last page.
23    A.  Okay.
24    Q.  I believe your signature is on there.
25 Can you locate it?                               02:55:34

Page 275

1    A.  Yeah, hold on.                            02:55:36
2        Yes, I see it, yes.
3    Q.  What page is it on?
4    A.  I don't -- 899, or the last three digits.
5    Q.  Of the control number, right?            02:55:49
6    A.  Yeah.
7    Q.  Okay.  Does that refresh your
8 recollection with respect to this agreement?
9    A.  No, it does not.
10    Q.  Did you read this agreement before you    02:56:00
11 signed it?
12    A.  Likely, no, I don't think so.  Actually,
13 I would just say, no.
14    Q.  Okay.  Did you know what you were
15 signing?                                         02:56:08
16    A.  I knew that I was signing, like, probably
17 a large set of documents relating to the
18 transaction.
19    Q.  Okay.  Yeah.  So this is one of the large
20 set of documents that you signed on April 11th?  02:56:19
21    A.  That's my assumption, yes.
22        (Exhibit 382 was marked for
23 identification by the court reporter and is
24 attached hereto.)
25    Q.  (By Mr. Verhoeven)  All right.  Let's     02:56:23

Page 276

1 mark as Exhibit 382 an indemnification agreement  02:56:24
2 bearing Control Numbers Uber 4855 through 4874.
3        Do you recognize this indemnification
4 agreement?
5    A.  No.                                        02:57:10
6        MR. VERHOEVEN:  For the record, Counsel,
7 there's redacted portions of this agreement, and we
8 object to that and intend to move to compel, unless
9 you have the agreement now in a form that I can
10 use.                                             02:57:27
11        MS. DUNN:  I think you should use your
12 document.
13        MR. VERHOEVEN:  So -- so you don't have
14 one here, right?
15        MS. DUNN:  No.                            02:57:34
16    Q.  (By Mr. Verhoeven)  I direct your
17 attention to page 4873 on the control numbers.
18    A.  Okay.
19    Q.  That's your signature?
20    A.  Yes, it is.                               02:57:55
21    Q.  Did you read this document before you
22 signed it?
23    A.  I did not.
24    Q.  Did you know what it was?
25    A.  I knew it was part of a larger set of     02:58:00

Page 277

1  documents related to the transaction.          02:58:03
2      Q.  Do you have any recollection of signing
3  an indemnification agreement in connection with the
4  transaction?
5      A.  I do not.                              02:58:10
6          (Exhibit 383 was marked for
7  identification by the court reporter and is
8  attached hereto.)
9      Q.  (By Mr. Verhoeven)  Let's mark as
10 Exhibit 383 a document.  It looks like a text    02:58:30
11 message from Anthony Levandowski, bearing Control
12 Number Uber 73820.
13         Do you see your phone number on there?
14     A.  Yes, I do.
15     Q.  This is a text from Mr. Levandowski to   02:59:06
16 you, time-stamped May 5th, 2016?
17     A.  Correct.
18     Q.  And Mr. Levandowski texts you saying,
19 "Driving to SF to meet with Scott, ATC, laser guy
20 and guide the team."                             02:59:22
21         Do you see that?
22     A.  I do.
23     Q.  Who is Scott?
24     A.  I am not sure.  I think maybe is the guy
25 at ATC that works on lasers, maybe.              02:59:31

Page 278

1      Q.  ATC is your group?                      02:59:35
2      A.  Yeah.
3      Q.  You don't know if Scott is the guy who
4  works on lasers?
5      A.  I would assume he is, but I don't know   02:59:44
6  for sure.
7      Q.  Do you remember any discussions with
8  Mr. Levandowski about this text?
9      A.  No, I do not.
10     Q.  Did you have any discussions with        02:59:52
11 Mr. Levandowski about his input to the folks in
12 Pittsburgh or with Scott, referenced here,
13 concerning LiDAR?
14     A.  I do not.
15     Q.  Same question, but concerning him guiding  03:00:12
16 the team with respect to LiDAR?
17         MS. DUNN:  Form.
18         THE DEPONENT:  You know, I see the text
19 as it's -- as it is.
20     Q.  (By Mr. Verhoeven)  But you have no       03:00:23
21 recollection?
22     A.  No.
23     Q.  That's a no?
24     A.  Sorry.  No.
25 /////                                            03:00:28

Page 279

1          (Exhibit 384 was marked for             03:00:28
2  identification by the court reporter and is
3  attached hereto.)
4      Q.  (By Mr. Verhoeven)  I need the -- let's
5  mark as Exhibit 384 a couple of texts bearing   03:00:33
6  Control Number 73811 through 809.
7          Actually, to correct the record,
8  Exhibit 384 is two text messages:  The first one
9  dated May 10, 2016, bears Control Number 73809; and
10 the second dated May 10th, 2016, bears the Control  03:01:28
11 Number Uber 73811.
12         Directing your attention to the text
13 message bearing the Control Numbers 38111, which is
14 your second page, I believe.
15         Is your phone number on this page?       03:02:08
16     A.  Yeah.
17     Q.  So this is a text from Mr. Levandowski to
18 yourself?
19     A.  It appears to be so, yes.
20     Q.  And is time-stamped May 10th, 2016.      03:02:16
21         Do you see that?
22     A.  Yeah.  Yes, I do.
23     Q.  And Mr. Levandowski says, "Wow.  I am
24 super pissed at what is going on at ATC.  There's
25 no one who is pushing for the right things."     03:02:29

Page 280

1          Do you see that?                        03:02:33
2      A.  It says there's "one one," but --
3      Q.  Oh, I see.
4      A.  -- I could -- I could imagine that it --
5  I just see what it says.  There is "one one."    03:02:39
6      Q.  Would you interpret that as no one?
7      A.  I think that's a likely possibility.
8      Q.  Okay.
9      A.  Yeah.
10     Q.  Do you remember having a discussion with  03:02:50
11 Mr. Levandowski on or about May of 2016 about him
12 being angry about what is going on at ATC?
13     A.  I don't remember anger, but, certainly,
14 surprise and disappoint, yeah.
15     Q.  And what did he say to you about that, or  03:03:09
16 text you about that?
17     A.  I mean, I think as he got deeper into our
18 existing efforts, he was not pleased with how we
19 were approaching the problem.
20     Q.  Okay.  And what did he -- what did he do   03:03:34
21 about that?
22     A.  I think he -- he went to Pittsburgh,
23 spent time with the team and tried to reorient them
24 in a way that made them prioritize better, work
25 harder, focus on the right things, work as a team,  03:03:52

Page 281

71 (Pages 278 - 281)



1 better culture, stand up for what's right, not be          03:03:56
2 political.
3          Probably got into the weeds on -- on the
4 technology itself.  I -- I don't.  I am not as
5 privy to that kind of stuff.  But I think he just          03:04:07
6 went in there and tried to correct and sort of
7 reorient us towards a more -- a more successful
8 approach.
9     Q.  What about this last sentence that uses
10 the F word.                                                 03:04:25
11          Do you see it?
12     A.  I do, yes.
13     Q.  Do you remember any discussions with
14 Mr. Levandowski in or about this time, May of 2016,
15 regarding the software?                                     03:04:33
16     A.  Yeah.  I mean, I just think that we had a
17 bunch of scientists.  I mean, we hired a bunch of
18 folks from CMU.  They were professors and
19 scientists.
20
21
22
23
24
25
                                                   Page 282

1
2
3
4
5
6     Q.  (By Mr. Verhoeven)  Okay.  And this is
7 software that would use the LiDAR system as input,
8 correct?
9     A.  Yeah, or just sensors generally, but it
10 doesn't -- a lot of that software doesn't touch the          03:06:42
11 LiDAR stuff.  But it's generally the intelligence
12 to move a car autonomously through space.
13     Q.  And Pittsburgh was working on software
14 whose input would be info from LiDAR sensors,
15 right?                                                       03:07:05
16          MS. DUNN:  Objection to form.
17          THE DEPONENT:  There was input from lots
18 of places; but, yes, LiDAR, too.
19     Q.  (By Mr. Verhoeven)  Okay.  You can put
20 that aside.                                                  03:07:23
21          MR. VERHOEVEN:  Let's mark as Exhibit 385
22 an email string bearing Control Number Uber 70012
23 through 13.
24          (Exhibit 385 was marked for
25 identification by the court reporter and is                  03:07:35
                                                   Page 284

1
2
3
4
5
6
7
8
9
10
11
12
13
14     Q.  And he actually spent a lot of time
15 developing in -- in the -- withdrawn.                        03:05:45
16          He'd actually spent a lot of time with
17 his team trying to develop such a device, right --
18          MS. DUNN:  Form.
19     Q.  (By Mr. Verhoeven)  -- while he was at
20 Google?                                                      03:05:59
21          MS. DUNN:  Objection to form.
22          MR. CHATTERJEE:  Form.
23          THE DEPONENT:
24
25                                                              03:06:07
                                                   Page 283

1 attached hereto.)                                            03:07:35
2     Q.  (By Mr. Verhoeven)  So that top email is
3 authored by yourself?
4     A.  Yeah.
5     Q.  So you sent this email on May 14, 2006 to          03:07:57
6 Jeff Holden.
7     A.  Okay.
8     Q.  Is that what it says?
9     A.  It looks like it, yes.
10     Q.  Okay.  And you said, "Love the updates.            03:08:04
11 Read them all."
12     A.  Or "read them all."
13     Q.  Okay.  Did you read all of the updates
14 you got from the ATC group?
15     A.  I can't say that I did.                             03:08:23
16     Q.  Okay.  If you look at Mr. Holden's email,
17 to which you had just responded --
18     A.  Yeah.
19     Q.  -- which is dated May 13th --
20          Do you see that?                                   03:08:34
21     A.  I sure do.
22     Q.  If you look at the third bullet down,
23 third solid bullet down?
24     A.  Yeah.
25     Q.  It said, "We also discussed the laser              03:08:46
                                                   Page 285

72 (Pages 282 - 285)



1  plan."                              03:08:52
2       Do you see that?
3  A.  Yeah.
4  Q.  And, I am sorry, if you look at one
5  bullet up, this is in reference to a meeting with   03:08:57
6  Anthony Levandowski.
7       Do you see that?
8  A.  I mean, I -- I see there's something
9  about Drew.
10  Q.  Oh, let's go to the second bullet.   03:09:08
11  A.  Okay.  So the second bullet is about
12  Anthony.
13  Q.  It says, "Met with Anthony today," and
14  then it goes on.
15       Do you see that?           03:09:17
16  A.  Yeah.
17  Q.  And then the next bullet says, "We also
18  discussed the laser plan."
19       Do you see that?
20  A.  Yeah.                        03:09:22
21  Q.  So that was a discussion with Anthony,
22  right?
23  A.  I don't know if that's clear.
24       MS. DUNN:  Do you need more time to --
25       THE DEPONENT:  Yeah, here, why don't I   03:09:30
                                        Page 286

1  Q.  Okay.                        03:12:00
2  
3  
4  
5       MR. CHATTERJEE:  Form.        03:12:13
6       MS. DUNN:  Objection to form.
7       THE DEPONENT:
8  
9  Q.  (By Mr. Verhoeven)  Did you have any
10  conversations with Mr. Levandowski or anyone else   03:12:20
11  about this laser design that's mentioned here?
12       MS. DUNN:  Objection to form.
13       THE DEPONENT:  Not -- not -- not that I
14  recall.
15       (Discussion off the stenographic record.)   03:12:41
16  Q.  (By Mr. Verhoeven)  Do you remember
17  having a conversation with anyone within ATC about
18  
19  
20  A.  I don't remember anything specific on   03:13:15
21  that.
22  Q.  Do you remember something generally?
23  A.  Generally, we -- we want -- we wanted to
24  produce our own lasers, and I know the team was
25  working on it.  But I just wasn't in the weeds on   03:13:27
                                        Page 288

1  just read this real quick.  But it's not clear.   03:09:31
2  Because the first bullet was Drew, and the second
3  bullet was Anthony, but let me just read it and --
4  just give me a second.
5  Q.  (By Mr. Verhoeven)  Okay.        03:09:40
6  A.  Yes, I have read.
7  Q.  Now, directing your attention to the
8  third bullet --
9  A.  Yeah.
10  Q.  -- the solid bullet down --       03:11:32
11  A.  Yeah.
12  Q.  -- of Mr. Holden's May 13th, 2016
13  email --
14  A.  Yeah.  Yeah, yeah, yeah.
15  Q.  -- where it says, "We also discussed the   03:11:41
16  laser plan."
17       That was a discussion with
18  Mr. Levandowski, right?
19  A.  I think it's a fair assumption.
20  Q.  And then it says,               03:11:48
21  
22       Do you see that?
23  A.  Yeah.
24  Q.  What's that a reference to?
25  A.  Sounds like something to do with lasers.   03:11:59
                                        Page 287

1  this.                            03:13:30
2  Q.  Did you know that Mr. Levandowski had
3  developed a new laser design?
4  A.  No.
5       MS. DUNN:  Objection to form.   03:13:35
6  Q.  (By Mr. Verhoeven)  Then it says -- the
7  last sentence says, "I would like to be -- it
8  will" -- withdrawn.
9       The last sentence in this bullet says,
10                                   03:13:48
11  
12  
13       Do you see that?
14  A.  I do.
15  Q.  And that's referring to Mr. Levandowski's   03:14:02
16  estimate, right?
17       MS. DUNN:  Objection to form.
18       THE DEPONENT:  I assume so.
19  Q.  (By Mr. Verhoeven)  Okay.  Do you
20  remember discussing that Mr. Levandowski's new   03:14:11
21  design would be
22  
23  A.  I -- I don't remember pricing as it
24  related to a new design, but I do remember
25  understanding that, over time, the price of those   03:14:29
                                        Page 289

73 (Pages 286 - 289)



Page 290

1 laser units goes down substantially.      03:14:30
2      And my guess is, that's based on design,
3 but also manufacturing methods, supply chain
4 volume, and -- and things like that.
5      Q.  Do you see -- actually, in the interest   03:14:47
6 of time, I won't ask you any more questions on this
7 one.
8      MS. DUNN:  I'm just asking to not get
9 ahead of me when I'm --
10      MR. VERHOEVEN:  Then say it on the      03:15:08
11 record, then.
12      MS. DUNN:  I am on the record.
13      MR. VERHOEVEN:  Okay.
14      THE DEPONENT:  Are we done with this one?
15      Q.  (By Mr. Verhoeven)  Yes, sir.      03:15:16
16      Okay.
17      MR. VERHOEVEN:  Mark as Exhibit 386 an
18 email string bearing Control Numbers Uber 63707
19 through 708.
20      (Exhibit 386 was marked for      03:15:25
21 identification by the court reporter and is
22 attached hereto.)
23      Q.  (By Mr. Verhoeven)  You ready?
24      A.  Yes.
25      Q.  The email on the top of the first page   03:16:23

Page 291

1 here is an email from yourself to Jeff Holden,   03:16:24
2 dated May 16th, 2016, correct?
3      A.  Yes.
4      Q.  And then below that is an email dated
5 May 13th, 2016, that was sent to you by      03:16:36
6 Jeff Holden, correct?
7      A.  Yeah.  Yeah.
8      Q.  And what you say in your response is,
9 "Comments below."
10      Do you see that?      03:16:46
11      A.  Yep.
12      Q.  And so is it correct that, below, you
13 have added text where you were commenting on what
14 Mr. Holden said, that we find your comments in --
15 in the email directly below your email?      03:17:00
16      A.  Yes.
17      Q.  Okay.  Direct your attention to the third
18 paragraph at the bottom?
19      A.  Okay.
20      Q.  And I believe this is Mr. Holden saying,   03:17:17
21 "We also discussed the laser plan. ▓▓▓▓▓▓▓
22 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
23 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
25 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Page 292

1      Do you see that?      03:17:35
2      A.  I do.
3      Q.  And the next bit of text is two lines, is
4 your comment, correct?
5      A.  Yes.  Yeah.      03:17:41
6      Q.  And you say, ▓▓▓▓▓▓▓▓▓▓▓
7 ▓▓▓▓, but I get it.  Once work is settled down,
8 I will need to have some combos on lasers."
9      A.  Yeah.
10      Q.  And that was your comment, right?      03:17:54
11      A.  Yes.
12      Q.  So you -- you -- whether you remember it
13 now or not, at the time, you did receive this
14 information and did comment on it, correct?
15      A.  Yes.      03:18:05
16      Q.  And then you indicate that you need to
17 have some more conversations on lasers, right?
18      A.  Correct.
19      Q.  Do you remember those conversations?
20      A.  I don't think they happened.      03:18:17
21      Q.  Sorry?
22      A.  I don't think they happened.
23      Q.  Does this refresh your recollection of
24 any discussion you had about ▓▓▓▓▓▓▓
25 ▓▓▓▓▓▓, based on Mr. Levandowski's new   03:18:26

Page 293

1 design?      03:18:33
2      MS. DUNN:  Objection to form.
3      THE DEPONENT:  Again, I think I generally
4 understood that through scale engineering, through
5 sort of continuation on design, that the price of   03:18:39
6 lasers goes down.
7      But I don't think I ever followed up on
8 this and had these discussions on lasers.
9      Q.  (By Ms. Dunn)  Okay.  My question is, I
10 guess, a legalistic one --      03:18:50
11      A.  Okay.
12      Q.  -- but do you know what it means when I
13 say "refresh your recollection"?
14      A.  Not really.
15      Q.  Okay.  What -- what I'm asking, to be   03:18:59
16 more specific, is if by looking at this document,
17 it triggers something in your memory and you say,
18 oh, now I remember.
19      A.  I -- I remember -- this refreshes my
20 recollection in that it reminds of the time at   03:19:12
21 which I sent this email and gives me, like, a
22 little bit of texture of what was going on at that
23 time, like it is -- it is familiar.
24      Q.  Okay.
25      A.  Yeah.      03:19:30

74 (Pages 290 - 293)

1    Q.  So, vaguely, you -- this triggers a        03:19:31
2  memory that --
3    A.  Yeah.
4    Q.  -- you were having this conversation?
5    A.  Correct.                                    03:19:36
6        MS. DUNN:  Objection to form.
7        THE DEPONENT:  It -- I most definitely
8  remember -- I remember writing this email.
9    Q.  (By Ms. Dunn)  Oh, you do?
10   A.  Yeah.                                       03:19:48
11   Q.  Okay.
12   A.  Yeah.  And it's kind of fun to -- like, I
13 still got it, you know.  It's...
14   Q.  Okay.  Did you, at any point, ask about
15 -- ask to see this new design that was predicted to   03:20:00
16 ███████████████████████████
17   A.  No.
18   Q.  Was that exciting to you?
19   A.  If -- if that could be done, of course,
20 yes.  That's interesting.                         03:20:11
21   Q.  Did you talk to anybody about it?
22   A.  I did not.
23       MR. VERHOEVEN:  All right.  Let's mark as
24 Exhibit 387 an email string bearing Control
25 Numbers Uber 64468 through 69.                    03:20:32

Page 294

1        (Exhibit 387 was marked for              03:20:35
2  identification by the court reporter and is
3  attached hereto.)
4    Q.  (By Mr. Verhoeven)  You see this is an
5  email from yourself, dated August 16th, 2016,    03:21:06
6  during the subject line messaging notes?
7    A.  Yeah.
8    Q.  What did you mean by messaging notes?
9    A.  I mean, this -- this is right around the
10 announcement, so I -- I don't know what these notes   03:21:22
11 are from, per se, but my guess is, it's about how
12 do we want to talk about the effort and the
13 acquisition.
14       MS. DUNN:  You need time to read the
15 document.  Take your time.                        03:21:46
16       THE DEPONENT:  Okay.
17   Q.  (By Mr. Verhoeven)  When was the first
18 time that you let anybody outside of Uber know
19 about this deal?
20       MS. DUNN:  Objection to form.              03:21:54
21   Q.  (By Mr. Verhoeven)  Was it the
22 announcement?
23       MS. DUNN:  Same objection.
24       THE DEPONENT:  I'm -- I'm thinking.  I
25 mean, that was the intention.  I am trying to think   03:22:06

Page 295

1  if there was any other time where anybody outside   03:22:10
2  Uber would have been told.  I mean, there's
3  lawyers, outside lawyers.  But that doesn't really
4  count.
5        I can't -- I can't think of anything.      03:22:21
6    Q.  (By Mr. Verhoeven)  The intention was to
7  keep it private and confidential --
8    A.  Yeah.
9    Q.  -- up until the time you announced it
10 publicly, right?                                  03:22:27
11   A.  Correct.  Yes.
12   Q.  Why didn't you tell anybody about it
13 after you signed the merger agreement?
14   A.  Because I think there's still a potential
15 for the -- for the merger to ultimately not happen;   03:22:44
16 and second is that, until we were ready to announce
17 it, like, where we're going to merge the entire
18 effort, the whole thing, you shouldn't talk about
19 it.
20       So we were in a situation where there was   03:23:02
21 a consulting piece, and then there was a, "okay, we
22 are actually going to put these things together"
23 piece.  So...
24   Q.  But the merger agreement was where you
25 said you signed on the dotted line that you were   03:23:13

Page 296

1  going to put these things together, right?       03:23:14
2        MS. DUNN:  Objection to form.
3        THE DEPONENT:  I believe there are
4  certain constraints or limitations or -- or
5  criteria by which it wouldn't happen.  And that's   03:23:20
6  why you had to go -- well, we just had a period of
7  time where it was in this middle area, post-signing
8  pre-closing.
9        So until it closed, we didn't want to       03:23:37
10 talk about it.
11   Q.  (By Mr. Verhoeven)  Don't most companies
12 announce these -- these types of transactions upon
13 a completion of the merger deal, before the
14 closing?
15   A.  I think most deals -- not all deals.  I     03:23:51
16 mean, I have worked on deals where that didn't
17 happen.  So...
18   Q.  Most time, that's what -- what
19 happens, right?
20       MS. DUNN:  Objection to form.               03:24:01
21       THE DEPONENT:  I'm thinking of
22 acquisitions we have done -- literally,
23 acquisitions that Uber has done -- where we
24 announce post-closing.
25   Q.  (By Mr. Verhoeven)  Which ones?            03:24:09

Page 297

75 (Pages 294 - 297)

1    A.  The China deal.                          03:24:09
2    Q.  Okay.
3    A.  I think we did the same thing with our
4  acquisition in Toronto recently.  We waited until
5  closing.                                         03:24:18
6    Q.  And why would you wait till closing
7  instead of the time of the merger?
8    A.  Because a lot of times, pre-closing,
9  there may be reasons why the -- why the agreement
10 ultimately doesn't -- like, why the merger or the  03:24:27
11 acquisition doesn't actually happen.  There --
12 there can be criteria, reasons, et cetera, why it
13 doesn't close.
14    MR. VERHOEVEN:  Okay.  Let's mark as
15 Exhibit 388 an email string bearing Control Numbers  03:24:46
16 Uber 64406 through 407.
17       (Exhibit 388 was marked for
18 identification by the court reporter and is
19 attached hereto.)
20    Q.  (By Mr. Verhoeven)  So the top email is  03:25:18
21 an email from Emil Michael, dated August 19th,
22 2016, to Mr. Levandowski and yourself, correct?
23    A.  Sorry.  I was reading this email.  Can
24 you say that again.
25    Q.  Okay.  The top email --                  03:25:38

Page 298

1    A.  Yeah.                                     03:25:41
2    Q.  -- is an email from Mr. Michael, dated
3  August 19th, 2016 --
4    A.  Yeah.
5    Q.  -- to Anthony Levandowski and yourself,  03:25:46
6  correct?
7    A.  Yeah.
8    Q.  And I notice the email address for
9  Anthony Levandowski is not an Uber email address;
10 it's an Otto email address; is that right?        03:25:58
11    A.  Yeah.
12    Q.  So did Mr. Levandowski work -- still work
13 in August from his Otto email account?
14    A.  A lot of times when you're sending
15 emails, it just pops up the one you are used to    03:26:12
16 sending it to.  I assume that all these got merged
17 onto the same system, ultimately.
18    Q.  Do you have any recollection of him not
19 wanting to use the Uber email account?
20    A.  Post-acquisition, no.                     03:26:31
21    Q.  Do you have --
22    A.  Let's call it post-closing, for sure.
23    Q.  Do you have any recollection of not
24 liking to send emails?
25    A.  Not really.  I don't -- I didn't see a    03:26:40

Page 299

1  lot of emails from him.  I don't know what that was  03:26:42
2  about.  He usually -- he's just a more disorganized
3  kind of person.
4    Q.  So how did he communicate, if he didn't
5  send a lot of emails?                             03:26:54
6    A.  Meetings, phone calls.
7    Q.  He didn't like to leave a written record
8  of what he was doing, did he?
9       MS. DUNN:  Objection to form.
10       MR. CHATTERJEE:  Form.                     03:27:08
11       THE DEPONENT:  I wouldn't -- I wouldn't
12 characterize it that way at all.
13    Q.  (By Mr. Verhoeven)  So if you look down
14 the page, there's an email from John Krafcik.
15    A.  Yeah.                                     03:27:20
16    Q.  Who is he?
17    A.  He's the guy who runs Google's autonomy
18 effort.
19    Q.  The CEO of Waymo today, right?
20    A.  Correct.                                  03:27:38
21    Q.  And it's from Mr. Krafcik to Mr. Michael,
22 correct?
23    A.  Yeah.
24    Q.  This email was forwarded to you, correct?
25    A.  It looks like it, yes.                    03:27:48

Page 300

1    Q.  And it characterizes a meeting that       03:27:49
2  Mr. Krafcik had with Mr. Michael, right?  Or, I
3  apologize, a call that Mr. Michael had with
4  Mr. Krafcik, correct?
5    A.  Hold on.  Let me just read this.          03:28:00
6       Yeah, appears to be so, yeah.
7    Q.  Okay.  And in his summary of this
8  telephone call, Mr. Michael says, "Only one
9  thing" -- I am sorry.  I mischaracterized it.
10      In this an email from Mr. Krafcik --        03:28:38
11    A.  Yes.
12    Q.  -- to Mr. Michael, one of the things that
13 Mr. Krafcik says is, "The only one thing you said
14 surprised me -- that the auto acquisition was about
15 'assembling talent.'"                             03:28:52
16    A.  Yeah.
17    Q.  Do you see that?
18    A.  I sure do.
19    Q.  And then in the email that Mr. Michael
20 forwards to you --                                03:29:00
21    A.  Yeah.
22    Q.  -- he says, "You guys will love this
23 S word..."
24      Do you see that?
25    A.  Yes, I do.                                03:29:11

Page 301

76 (Pages 298 - 301)

1    Q.  What did he mean?                03:29:11
2         MS. DUNN:  Objection to form.
3         MR. CHATTERJEE:  Form.
4    Q.  (By Mr. Verhoeven)  Did you understand
5  this when you received it?             03:29:15
6    A.  Yes.
7    Q.  Okay.  What was your understanding?
8    A.  John was -- John was upset about the deal
9  and pretending like he wasn't.
10   Q.  What do you mean by that?        03:29:37
11   A.  Well, he's trying to -- he's talking
12 trash on the people that were part of the deal,
13 that were his own employees not too long before.
14   Q.  Okay.
15   A.  And, like, if he wasn't upset about the  03:29:45
16 deal -- sorry, if it wasn't upset about the talent,
17 it's very strange that two or three months later,
18 that they would sue in arbitration for us
19 assembling that talent.
20   Q.  Why would he try to pretend he's not  03:29:58
21 upset?
22   A.  Maybe because he's insecure.
23   Q.  That's you speculating?
24   A.  Probably.
25        MS. DUNN:  Objection to form.    03:30:10
                                        Page 302

1    Q.  (By Mr. Verhoeven)  Do you have any   03:30:10
2  discussions with Mr. Michael about -- about this
3  telephone call?
4    A.  I don't remember specific discussion, but
5  I did enjoy this email.                03:30:20
6    Q.  You enjoyed it?
7    A.  It's strange for a leader to talk trash
8  on the people that he hired just because they leave
9  and work somewhere else.
10   Q.  Where is he talking trash?       03:30:33
11   A.  He basically said, "Only one thing you
12 said surprised me, that the auto acquisition was
13 about assembling talent."
14        He said he knows the CV's and the
15 pedigrees of all the folks that came from his team.  03:30:45
16 And it's like he's literally talking trash about
17 the people that used to work for him --
18   Q.  And --
19   A.  -- saying that they are -- they are not
20 that good.                             03:30:56
21   Q.  And you knew they were good?
22   A.  Well, I certainly felt that they were.
23 They don't -- I mean, I am not in the details to
24 work with all these individuals, it's just -- it's
25 kind of a lowbrow thing to do.          03:31:06
                                        Page 303

1    Q.  Okay.  But you were laughing because you   03:31:11
2  know they were very good, right?
3    A.  Well, I feel like they were, yeah.
4    Q.  Okay.  Was there a meeting in July or
5  August of 2016 that you recall with Mr. Krafcik?   03:31:36
6    A.  I don't remember the date.  I do remember
7  a meeting in Mountain View with Krafcik, Drummond,
8  David Drummond, as well as -- I think Emil was
9  there, too.
10   Q.  Okay.                           03:31:56
11   A.  I think so.  I don't know for sure, but I
12 think he was.
13   Q.  Anyone else you remember at the meeting?
14   A.  No.
15   Q.  Okay.  What was the purpose of the   03:32:03
16 meeting?
17   A.  To see if we could put a partnership
18 together.
19   Q.  I am sorry, what was -- what date do you
20 remember it being?                     03:32:11
21   A.  I don't remember.
22   Q.  Was it in 2016?
23   A.  Yes.
24   Q.  Okay.  And what happened at the meeting?
25   A.  I think there was a lot of small talk.   03:32:24
                                        Page 304

1  It was our -- I think it was the first time we were   03:32:26
2  meeting Krafcik.  He gave us a tour of the -- some
3  of the facility, and then we spent the conversation
4  with us talking -- you know, myself and Emil
5  talking about our ideas for how we could partner.   03:32:44
6         And Krafcik really sort of not deeply
7  engaging in the -- in the conversation.
8    Q.  He wasn't interested?
9    A.  It didn't --
10        MS. DUNN:  Objection to form.    03:32:59
11        THE DEPONENT:  It didn't seem that he
12 was.
13   Q.  (By Mr. Verhoeven)  Do you remember
14 anything specific that he said?
15   A.  No, it was just like, you know, you know   03:33:04
16 in a business deal whether somebody is interested
17 or not, sometimes they say, oh, that's -- that's
18 interesting.  Let me get back to you.  That may not
19 mean they are interested.
20   Q.  Were you making a pitch to partner with   03:33:18
21 them?
22   A.  I was constantly making a pitch to
23 partner with them.
24   Q.  Okay.  Did Mr. Drummond say anything at
25 the meeting?                           03:33:27
                                        Page 305

77 (Pages 302 - 305)

1  A. Little bit, but, you know, David is well   03:33:28
2 known for saying very little.
3  Q. Do you remember anything he said?
4  A. No.
5  Q. Okay. Can we pause for a second and get   03:33:41
6 a time?
7       THE VIDEOGRAPHER: Yes. Going off the
8 record. The time is 3:33.
9       (Recess taken.)
10      THE VIDEOGRAPHER: Okay. This marks the   03:45:22
11 beginning of DVD No. 4 in the deposition of
12 Travis Kalanick. Going back on the record. The
13 time is 3:45.
14      MR. VERHOEVEN: Let's mark as Exhibit 389
15 a document bearing Control Number Uber 76770.   03:45:38
16      (Exhibit 389 was marked for
17 identification by the court reporter and is
18 attached hereto.)
19  Q. (By Mr. Verhoeven) Do you see that you
20 are referenced in this document, TK says, TK   03:46:10
21 question?
22  A. Yeah.
23  Q. What -- what does Birdhouse LiDAR
24 discussion refer to?
25  A. Birdhouse started out as, like, a regular   03:46:24

Page 306

1 meeting that we had about ████████   03:46:33
2 ████████████████   And, over time, it
3 became our regular update on what's going on.
4       I am not sure where this is in that
5 timeline, but that was generally what Birdhouse was   03:46:54
6 about.
7  Q. Well, the date is --
8  A. Yeah, I see the date. I just --
9 apologize. Go ahead. I'm sorry.
10  Q. I was just going to say, the date is   03:47:04
11 September 19th, 2016; is that how you read that?
12  A. Yes. Yeah.
13  Q. Go ahead. If you want to finish, go
14 ahead.
15  A. Yeah, I just don't know where that sits   03:47:12
16 in terms of how Birdhouse ████████████
17 ████████████████████████   -- to
18 a general review of autonomy and how we were doing,
19 if there was a transition, sort of a general, slow
20 transition to the latter. I am not sure where   03:47:30
21 September 19th was in that -- in that.
22  Q. I am not going to ask you about all the
23 TK references, just -- just a couple.
24  A. Uh-huh.
25  Q. So there's six solid flush-left bullets,   03:47:57

Page 307

1 there's a big space, and then there's a seventh   03:48:02
2 that says, "TK questions."
3  A. Yeah.
4  Q. Do you see that?
5  A. Yeah.   03:48:10
6  Q. Well, before I get -- before I get into
7 the specifics, who was -- who were members of the
8 Birdhouse group?
9  A. And, again, it depends on the timing,
10 like -- but the latest Birdhouse would be -- the   03:48:24
11 latest -- the latest Birdhouse meeting would be the
12 leads in autonomy. So the overall leads for the
13 effort.
14      When it first started, it was about
15 hard -- the sort of hardware team, and the -- like,   03:48:46
16 one guy from hardware -- well, not even that. One
17 guy from the -- two guys from business development
18 who are dealing with the auto manufacturers, one
19 guy from safety, myself and maybe one or two other
20 people.   03:49:18
21      ████████████████████████
22 ████████████████████   This is sort of in
23 the middle of the timeline of where we started to
24 where we ended up, so that's why I'm a little bit
25 not totally sure.   03:49:28

Page 308

1      Again, the end would be the leads for --   03:49:30
2 for the autonomy effort, meaning all the people
3 that directly report to Anthony; ████████████
4 ████████████████████████████████
5 ████████████████████████   03:49:44
6  Q. Okay. Looking at the second bullet, it
7 says, ████████████████████████████████
8 ████████████████████████████
9      Do you see that?
10  A. Yes, I do.   03:50:09
11  Q. What does that mean?
12  A. I think what it means is that we -- ████
13 ████████████████████████████████████
14 ████████████████████████████████████
15 ████████████████████████████████████
16  Q. What is T1 and T2?
17  A. This is tier 1 and tier 2.
18  Q. I see.
19      And then the one, two, three, four, fifth
20 bullet down says, ████████████████████████   03:50:44
21 ████████████████████████████████
22      Do you see that?
23  A. Yeah.
24  Q. What's your -- what's your understanding
25 of that bullet?   03:50:57

Page 309

78 (Pages 306 - 309)

ATTORNEYS' EYES ONLY

1    A.  It sounds like he wants to make lasers.    03:51:05
2    Q.  Okay.  And then the bullet says, "auto
3  timing"?
4    A.  Yeah.
5    Q.  And does -- there's a bunch of    03:51:11
6  sub-bullets?
7    A.  Yeah.
8    Q.  Second-to-the-bottom sub-bullet says,
9  "Using fiber lasers."
10      Do you see that?    03:51:21
11    A.  I do.
12    Q.  Is this a ref-- -- what is this a
13  reference to?
14    A.  That, I don't know.  I don't know what --
15  I just don't know -- I can't get to that level of    03:51:28
16  specificity on the technology.
17    Q.  Have you ever heard of a spider design?
18    A.  Yes, I have.
19    Q.  Okay.  What did you hear about that?
20      MS. DUNN:  Objection to form.    03:51:43
21      THE DEPONENT:  The first time I heard
22  about it was in one of your filings.
23    Q.  (By Mr. Verhoeven)  Okay.  Same -- same
24  question with Fuji design?
25    A.  Yeah, so Fuji was our own design, if I    03:51:52

Page 310

1  remember correctly.    03:51:55
2    Q.  And what was the first time you heard the
3  phrase "Fuji design"?
4    A.  I can't say for sure it was in your
5  filing.  I can't say for sure.  I spent a lot more    03:52:05
6  time reading that term once your filing came out.
7    So -- but I understand it to generally be our
8  effort to make our own lasers.
9    Q.  Did you have any involvement in a
10  decision to -- for Uber to switch from pursuing    03:52:31
11  this spider design and transition to using a Fuji
12  design?
13    A.  No.
14    Q.  Did anyone ever talk to you about it?
15    A.  Not that I know of.    03:52:49
16      MR. VERHOEVEN:  Let's mark as Exhibit 390
17  an email dated January 18th, 2017, from Mr. -- from
18  Travis to Travis Kalanick.  And it bears Control
19  Numbers Uber 651, 67.
20      (Exhibit 390 was marked for    03:53:31
21  identification by the court reporter and is
22  attached hereto.)
23    Q.  (By Mr. Verhoeven)  Do you see there's an
24  email below from Salle to Anthony.
25      Do you see that?    03:54:11

Page 311

1    A.  Yeah.  Yup.    03:54:14
2      MS. DUNN:  Can we pause for a second?  In
3  looking at this document, I am not entirely sure.
4      MR. VERHOEVEN:  Let's go off.
5      MS. DUNN:  Yeah, I would like to go off    03:54:22
6  the record.
7      MR. VERHOEVEN:  Let's go off the record.
8  We are not using my time.
9      THE VIDEOGRAPHER:  Going off the record.
10  The time is 3:54.    03:54:28
11      (Recess taken.)
12      THE VIDEOGRAPHER:  We are back on the
13  record at 3:57.
14      MS. DUNN:  Uber's position on Exhibit 390
15  is that it has been inadvertently produced, and our    03:58:13
16  position is that we are going to claw this
17  exhibit back.
18      MR. VERHOEVEN:  We object to that, but,
19  obviously, you have a right to claw it back.
20      MS. DUNN:  Thanks.    03:58:29
21    Q.  (By Mr. Verhoeven)  Was there a period of
22  time in which Mr. Drummond was on the Uber board?
23  And did there come a time when Uber shut him out
24  from the board?
25      MR. CHATTERJEE:  Object to form.    03:58:54

Page 312

1      THE DEPONENT:  Yes.    03:58:56
2    Q.  (By Mr. Verhoeven)  When did that happen?
3    A.  I would characterize it as asking him to
4  recuse himself from board meetings.  Let's put it
5  that way.    03:59:01
6    Q.  Okay.  When did that first happen?
7    A.  My recollection is, that happened around
8  October of 2014.
9    Q.  '14?
10    A.  Yup.  Yup.  I think so.  There's a    03:59:14
11  point --
12    Q.  I am sorry.  Go ahead.
13    A.  There's a point he formally resigned from
14  the board, and that is different when he stopped
15  attending board meetings.    03:59:36
16    Q.  Okay.  And what -- on what occasions did
17  you exclude him from board meetings before he
18  resigned?
19      MS. DUNN:  Objection to form.
20      THE DEPONENT:  I think it was a mutual    03:59:47
21  understanding that he probably shouldn't attend.
22    Q.  (By Mr. Verhoeven)  Any or just when a
23  certain subject matter was discussed?
24    A.  Any.
25    Q.  Okay.  So around the date you gave in    03:59:57

Page 313

79 (Pages 310 - 313)

1  2014, from then on, you didn't attend any board   04:00:01
2  meetings?
3      A.  Correct.
4      Q.  Okay.  Do you remember any discussions
5  with him about the decision that he shouldn't   04:00:09
6  attend any board meetings?
7      A.  I do.
8      Q.  Okay.  What did you say to him?  What did
9  he say to you?
10      A.  He said that Google is intending to   04:00:20
11  compete with Uber in the ridesharing space.  And
12  that the efforts were substantive enough and
13  serious enough that he felt compelled to tell us
14  that that was happening.
15      Q.  Okay.  Did he do that orally or in   04:00:45
16  writing?
17      A.  That was orally.
18      Q.  Okay.  And who was present when he said
19  that?
20      A.  Just me.   04:00:55
21      Q.  All right.  And what did you say to him?
22      A.  I -- I think I expressed disappointment.
23      Q.  I thought I saw you smile a little bit.
24  Did you say something?
25      A.  No.  No.  I was -- it was -- that was not   04:01:05

Page 314

1  a smile.   04:01:07
2      Q.  Okay.  What did you say?  How did you
3  express your disappointment?
4      A.  My face looked sullen.  And just how does
5  somebody express disappointment?  They are just   04:01:24
6  like, I'm really sorry to hear that.  And that's
7  unfortunate.  And I don't remember my exact words,
8  but I remember feeling disappointed a little bit, a
9  little burned by the relationship.  And it was just
10  generally unfortunate.   04:01:39
11      Q.  Do you remember anything else you or he
12  said during that conversation?
13      A.  Not really.
14      Q.  Did the discussion of his attendance at
15  board meetings come up in that discussion?   04:01:50
16      A.  It may have, but I don't remember
17  specifically.
18      Q.  And this conversation, when Mr. Drummond
19  told you that, can you pinpoint when that occurs as
20  best you can?   04:02:03
21      A.  It was in October 2014, just following a
22  board meeting.
23      Q.  Okay.  Did you have any discussions with
24  Mr. Drummond in relation to his decision to resign
25  from the board?   04:02:24

Page 315

1      A.  I can't remember if there was a phone   04:02:33
2  call or not.  I don't remember.  He either called
3  me, or Emil.  I can't remember each one.  It may
4  have been -- you know what, it was me.  Yup.  There
5  was a phone.  I think he called -- either he called   04:02:46
6  me, or we arranged a time to talk on the phone.
7      Q.  Okay.  And when was that?
8      A.  I don't remember.  There's probably three
9  or four ways to find out.  I don't remember the
10  exact date.   04:03:01
11      Q.  What did he say to you, and what did you
12  say to him?
13          MS. DUNN:  Objection to form.
14          THE DEPONENT:  He said, look, whether
15  it's some kind of conflict or -- he just felt --   04:03:05
16  his -- his approach for the entire -- his and my
17  approach were very similar in the period
18  following --
19      Q.  (By Mr. Verhoeven)  Go ahead.  I am
20  sorry.   04:03:28
21      A.  Yeah, no, it's okay.  His approach and my
22  approach were similar in the time period following
23  where he let me know that he was competing.  We
24  both were trying to find a way for Uber and Google
25  to partner autonomy and ridesharing together, like   04:03:44

Page 316

1  some way to partner together.   04:03:50
2          He was a big believer it was the right
3  thing.  I was a big believer it was the right
4  thing.  I could get my company behind that.  But
5  David couldn't get -- couldn't get, you know, Larry   04:03:59
6  and other folks and just Google, essentially,
7  behind that notion.
8      Q.  Do you remember anything more specific --
9      A.  No.
10      Q.  -- with that discussion?   04:04:28
11      A.  Oh, what the --
12      Q.  What happened on the phone call.
13      A.  Yeah.  So -- sorry, I lost myself.  I
14  remembered that beforehand.
15      Q.  So that was before the phone call?   04:04:37
16      A.  That was before.  So that's context for
17  what leads up to that phone call.
18      Q.  Okay.
19      A.  And I think his overall communication was
20  that we had just gotten to a point where maybe   04:04:46
21  there's just no way for us to partner, and the fact
22  that he -- it doesn't look good that we are --
23      Q.  Keep going.
24      A.  It doesn't look good that we're competing
25  while he's also on the board.   04:05:00

Page 317

80 (Pages 314 - 317)

1    Q.  I was doing two things at once.  I didn't    04:05:06
2  mean to --
3    A.  No, that's okay.
4    Q.  Just trying to speed things up.
5    A.  That's all right.                   04:05:11
6    Q.  In connection with your departure from
7  the position of CEO of Uber --
8    A.  Yeah.
9    Q.  -- did the discussion -- was there any
10  discussion of the Waymo lawsuit?         04:05:25
11       MS. DUNN:  Objection to form.
12       THE DEPONENT:  There was not a discussion
13  of the Waymo lawsuit when I resigned, no.
14    Q.  (By Mr. Verhoeven) Okay.  [REDACTED]
[REDACTED]
[REDACTED]
18       MS. DUNN:  Objection to form.
19       THE DEPONENT:  [REDACTED]
20    Q.  (By Mr. Verhoeven) [REDACTED]
[REDACTED]
[REDACTED]
[REDACTED]
25  /////

Page 318

1    A.  I believe so.  I mean, I would have to    04:07:24
2  read the whole thing compared to what I have --
3    Q.  Well, take your time.
4    A.  -- but it looks approximately the same.
5    Q.  Take your time.                   04:07:29
6    A.  Okay.  Let me just read it real quick.
7       Okay.
8    Q.  Just one second.
9    A.  Okay.
10    Q.  Okay.  Do you need the question again?   04:08:44
11    A.  Yeah.
12    Q.  [REDACTED]
[REDACTED]
[REDACTED]
15       Do you remember that testimony?       04:08:59
16       MS. DUNN:  Objection to form.
17       THE DEPONENT:  I do.
18    Q.  (By Mr. Verhoeven) And you referred to a
19  letter.
20       Do you remember that?            04:09:05
21    A.  Yes.
22    Q.  Is this the letter?
23    A.  Yes.
24    Q.  Okay.  Do you need to take a minute?
25    A.  No, let's keep going.            04:09:14

Page 320

1       (Exhibit 391 was marked for         04:06:05
2  identification by the court reporter and is
3  attached hereto.)
4       MR. VERHOEVEN:  Okay.  Let's mark as
5  Exhibit 391 an email dated June 20th, 2017, bearing    04:06:10
6  Control Numbers Uber 99109 through 9910.
7       MS. DUNN:  Pursuant to the Court's order
8  on the motion in limine, I'm going to instruct the
9  witness he can answer questions about this, to the
10  extent that the questions have to do with this    04:06:47
11  lawsuit.
12       MR. VERHOEVEN:  Okay.
13       MS. DUNN:  Thanks.
14       MR. VERHOEVEN:  We object to that.  I'm
15  not sure we will have a problem, but we object to    04:06:58
16  that.  I certainly don't recall any instruction
17  from the judge on that.
18    Q.  (By Mr. Verhoeven) So is this the letter
19  that you are referring to?
20       I apologize that it's hardly legible, but    04:07:12
21  that's the way it was produced by your counsel.
22    A.  This looks like it, yeah.
23    Q.  Well, I need to know, yes or no.
24    A.  Yes.  Yes.
25    Q.  This is the letter you were referring to?    04:07:23

Page 319

1    Q.  And do you recall any -- not everything    04:09:15
2  there, but just the Waymo lawsuit.  Do you remember
3  any discussion you had with this decision on the
4  subject of the Waymo lawsuit beyond this letter?
5    A.  There was none.                   04:09:39
6    Q.  Okay.  In October of 2016, do you
7  remember having a discussion with Mr. Larry Page?
8    A.  Yes.  Yes.
9    Q.  Okay.  Did you call him?
10    A.  I think he called me.             04:09:58
11    Q.  Did you -- did you ask him to call you?
12    A.  Yes, that's -- I did.  That's usually how
13  it works with him, I think.
14    Q.  Okay.  Did you tell him you wanted to
15  talk about his interest in flying -- what was it --    04:10:07
16  flying -- what -- what did you tell him you wanted
17  to talk about?
18    A.  I wanted to talk him about flying cars.
19    Q.  That's it.
20    A.  How could you forget that?         04:10:25
21    Q.  I didn't know the right name for it.  I
22  was going to say flying cars, but I thought that
23  would be too simplistic.
24    A.  We call them -- what's the other word for
25  it -- oh, yeah, VTOL, vertical takeoff and landing.    04:10:39

Page 321

81 (Pages 318 - 321)

1    Q.  And -- and so a call happened in October   04:10:45
2 of 2016?
3    A.  Yes.
4    Q.  Okay.  Was there any discussion on that
5 call about driverless cars?   04:10:55
6    A.  I definitely -- I mean, for me, it was --
7 it was starting with flying cars, but also talking
8 about --
9    Q.  Sure.
10    A.  -- hey, is there a potential partner --   04:11:12
11 is there a potential partner together.  Those are
12 two big things I wanted to speak about.
13      So, yes, partnering on driverless cars,
14 sorry.
15    Q.  Okay.   04:11:21
16    A.  Yeah.
17    Q.  So what did you say to him about
18 partnering on -- in this conversation --
19    A.  Yeah.
20    Q.  -- about partnering on driverless cars?   04:11:26
21    A.  I don't remember the specific details,
22 but I -- was very similar to all the considerations
23 I have had over the years, which is:  You guys
24 have -- you guys have been working on this quite a
25 while.  You have great expertise.  We have   04:11:43

Page 322

1 developing expertise, but we haven't been in this   04:11:46
2 industry as long.  We certainly have a lot of
3 ridesharing things going on.  There could be a
4 really interesting -- interesting potential in
5 partnering those two efforts.   04:11:58
6    Q.  And what did he say on that subject in
7 response to you during that call?
8    A.  He said, still not very interested.  And
9 maybe we can talk about that again in the new year.
10    Q.  Did he say anything else that you can   04:12:12
11 recall on the subject?
12    A.  On -- on the partnering subject?
13    Q.  Yes, or the subject of driverless car
14 technology.
15    A.  He -- he was -- he was upset about what   04:12:22
16 he -- what he kept talking about was us taking his
17 IP.
18    Q.  So what did he say about that?
19    A.  He kept saying that he -- that -- that we
20 have taken his IP.  And I kept responding and   04:12:45
21 telling him that hiring his people is not taking
22 his IP.
23    Q.  And what did he say in response to you
24 when you said that?
25    A.  It was like we were having --   04:12:59

Page 323

1    Q.  A disagreement?   04:13:04
2    A.  -- a --
3      MS. DUNN:  Objection to form.
4      THE DEPONENT:  It was like we were
5 having -- it was -- I felt like he wasn't -- we   04:13:09
6 didn't understand each other.  It was just strange.
7 Because he -- I was trying to tell him, like, just
8 because we have hired his people, we haven't taken
9 his IP.  And he kept not understanding that, but
10 not explaining himself either.  He wasn't getting   04:13:29
11 into details or in any way sort of helping me
12 understand his issue.
13    Q.  (By Mr. Verhoeven) Did you say you would
14 look into it?
15    A.  I told him, we will open up our facility   04:13:39
16 if you think we have taken IP.  Like, come take a
17 look.  We will have your people take a look.  We
18 will dig deep and make sure.  But we were very
19 confident about the process of acquisition and the
20 process we have in hiring people.   04:13:54
21    Q.  Do you remember saying that to Mr. Page?
22    A.  I do.
23    Q.  Okay.  And what did he say in response?
24    A.  He -- he kind of just kept repeating the
25 same thing.  This is what I remember.  I don't   04:14:06

Page 324

1 remember the specific words, but it was -- it felt   04:14:07
2 like he was repeating the same thing over and over
3 again.
4    Q.  So you don't remember beyond that what he
5 said?   04:14:14
6    A.  No.
7    Q.  Do you remember anything else during that
8 conversation on the subject of driverless cars
9 beyond what you already testified to?
10    A.  I don't remember anything else.   04:14:26
11      MR. VERHOEVEN:  All right.  I have no
12 further questions at this time.
13      Oh.  Sorry.  I have a couple more
14 questions.
15      THE DEPONENT:  Okay.   04:14:36
16      MR. VERHOEVEN:  Won't be long.
17      (Discussion off the stenographic record.)
18    Q.  (By Mr. Verhoeven) What did you do to
19 get prepared for today?
20    A.  Spent a lot of hours sort of -- spent a   04:14:49
21 lot of hours just trying to understand what a
22 deposition is about, try to understand how I should
23 approach this, generally.
24    Q.  Did you meet with people?
25    A.  Yeah.   04:15:07

Page 325

82 (Pages 322 - 325)

1   Q.  Other than attorneys, did you ever      04:15:09
2   have -- in preparation for this deposition, did you
3   have conversations with non-attorneys?
4      A.  No.
5      Q.  When did you meet with the attorneys?   04:15:18
6      A.  Some on Monday; some on Tuesday; some on
7   Wednesday.
8      Q.  So you prepped for three days?
9      A.  I did some amount of time on each of
10  those days, yes.                    04:15:30
11     Q.  Can you give some sense of how much you
12  spent on each day?
13     A.  It was sort of like it ranged from four
14  to eight hours.
15     Q.  Okay.                        04:15:50
16     A.  On each day.
17     Q.  On each day.
18        What is that, 12 to --
19     A.  Yeah, it wasn't 24.  Because it was
20  like -- I think it may have been like four hours on  04:15:56
21  the shortest day and eight hours on the longest.
22     Q.  Okay.
23     A.  And -- and one more thing on this, just
24  to be clear, is like there -- that wasn't like a
25  straight eight hours.  So, like, some of that time,  04:16:13

Page 326

1   I'd just go work and then come back in.  It wasn't  04:16:15
2   straight.  But it was back and forth during that
3   time period.
4      Q.  Okay.  Did you do any prep for this
5   deposition before that week?              04:16:29
6      A.  No.
7      Q.  Okay.
8         MR. VERHOEVEN:  At this time, I have no
9   further questions.  I have to say some things on
10  the record, though.                    04:16:35
11        So we reserve this time to ask further
12  questions at a later time because there's privilege
13  fights that have not been resolved yet; document
14  production has not been completed; the text issue
15  is still being worked on.                04:16:56
16        And just for the record, we disagree that
17  we are limited to an aggregate of seven hours.  We
18  can deal with that later; but, for the record, we
19  disagree with that.
20        MS. DUNN:  For the record, our position   04:17:16
21  is you are limited to seven hours.  And we will
22  just ask how much time has been reserved within
23  that seven, so...
24        THE VIDEOGRAPHER:  Once I am done, I will
25  give you the tally.                    04:17:26

Page 327

1         MS. DUNN:  Okay.  Great.  Thank you.     04:17:27
2   Charlie.
3         MR. VERHOEVEN:  Nothing further.
4         THE VIDEOGRAPHER:  This marks the end of
5   DVD No. 4 in the deposition of Travis Kalanick.  We   04:17:34
6   are going off the record.  The time is 4:17.
7         (Recess taken.)
8         THE VIDEOGRAPHER:  Six hours and 15
9   minutes.  So 45 minutes left.
10        MS. DUNN:  Forty-five minutes left.      04:19:03
11  Thank you.
12        (TIME NOTED:  4:19 p.m.)
13
14
15  _____
16        TRAVIS KALANICK
17
18
19
20
21
22
23
24
25

Page 328

1      I, Rebecca L. Romano, a Certified Shorthand
2   Reporter of the State of California, do hereby
3   certify:
4      That the foregoing proceedings were taken
5   before me at the time and place herein set forth;
6   that any witnesses in the foregoing proceedings,
7   prior to testifying, were administered an oath;
8   that a record of the proceedings was made by me
9   using machine shorthand which was thereafter
10  transcribed under my direction; that the foregoing
11  transcript is true record of the testimony given.
12     Further, that if the foregoing pertains to the
13  original transcript of a deposition in a Federal
14  Case, before completion of the proceedings, review
15  of the transcript [ ] was [x] was not requested.
16     I further certify I am neither financially
17  interested in the action nor a relative or employee
18  of any attorney or any party to this action.
19     IN WITNESS WHEREOF, I have this date
20  subscribed my name.
21     Dated:  July 28, 2017
22
23
24     Rebecca L. Romano, RPR,
25     CSR. No 12546

Page 329

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.