1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Charles K. Verhoeven (Bar No. 170151)
2     charlesverhoeven@quinnemanuel.com
      David A. Perlson (Bar No. 209502)
3     davidperlson@quinnemanuel.com
      Melissa Baily (Bar No. 237649)
4     melissabaily@quinnemanuel.com
      John Neukom (Bar No. 275887)
5     johnneukom@quinnemanuel.com
      Jordan Jaffe (Bar No. 254886)
6     jordanjaffe@quinnemanuel.com
    50 California Street, 22nd Floor
7   San Francisco, California 94111-4788
    Telephone:    (415) 875-6600
8   Facsimile:    (415) 875-6700

9   Attorneys for WAYMO LLC

10                  UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13  WAYMO LLC,                        CASE NO. 3:17-cv-00939

14            Plaintiff,              **PLAINTIFF WAYMO'S OFFER OF
                                      PROOF REGARDING DEFENDANTS'
15       vs.                          DISCOVERY MISCONDUCT**

16  UBER TECHNOLOGIES, INC.;
    OTTOMOTTO LLC; OTTO TRUCKING
17  LLC,                              Trial Date:   February 5, 2018

18            Defendants.
                                      **REDACTED VERSION OF DOCUMENT
19                                    SOUGHT TO BE SEALED**

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION................................................................................................................1

OFFER OF PROOF ...........................................................................................................2

I.    Uber's Failure To Produce The Jacobs Documents Concealed Material
      Evidence. ...............................................................................................................2

      A.    Defendants Improperly Withheld The Jacobs Documents...........................3

            1.    The Special Master Has Determined That The Jacobs Letter
                  Was Responsive To Waymo's RFPs And Uber Should Have
                  Produced It. ....................................................................................3

            2.    Further Discovery Confirms That Uber Should Have
                  Produced The Jacobs Documents....................................................4

            3.    Uber's Attempt To Downplay Its Failure To Produce Are
                  Meritless. .......................................................................................6

      B.    Defendants Thwarted Waymo's Investigation Into The Jacobs
            Documents Through Further Discovery Misconduct...................................7

      C.    Discovery Has Corroborated Key Allegations In The Jacobs Letter
            Material To Waymo's Claims. ...................................................................12

            1.    Uber Used Its ThreatOps Division To Systematically Collect
                  Intelligence On Waymo And Other Competitors...........................12

            2.    Uber Used Non-Attributable Devices To Avoid Discovery
                  Into Its Activities. ........................................................................17

            3.    Uber Used Ephemeral Communication Platforms To Avoid
                  Discovery Into Its Activities. .......................................................20

            4.    Uber Used Contrived Attorney-Client Privilege Designations
                  To Avoid Discovery Into Its Activities. .......................................22

            5.    Uber's Consideration Of Aggressive And Controversial
                  Data-Retention Policies Raises Further Concerns Regarding
                  Spoliation Of Evidence. ...............................................................24

      D.    Uber Paid Off Jacobs In An Effort To Conceal His Allegations. ..............26

II.   Defendants' Discovery Misconduct With Regards To The Jacobs
      Documents Is Consistent With Their Prior Conduct in This Case...........................26

      A.    Defendants Have Committed Severe Spoliation Of Evidence....................27

            1.    Defendants Have Used Ephemeral Messaging Services
                  Throughout Their Organization To Avoid Discovery In
                  Potential Litigation. ......................................................................27

2.  Uber's Senior Management Instructed Anthony Levandowski To Destroy Five Hard Drives Of Waymo Information That He Had Improperly Retained. ..............28

3.  Defendants Systematically Destroyed Evidence Regarding Ottomotto's Formation And Early Development..........................29

4.  Defendants Withheld Information And Discovery Regarding Levandowski's Two Non-Uber Laptops "Used for Uber Work." ....................................................................................30

5.  Defendants Structured the Tyto "Acquisition" to Destroy All Tyto Email Archives .......................................................32

B.  Defendants Have Made A Habit Of Violating The Court's Orders ............34

1.  Defendants Violated The Expedited Discovery Order And Paragraphs 2 and 4 Of The Provisional Relief Order....................34

2.  Defendants Violated Paragraph 5 Of The Provisional Relief Order..............................................................................35

C.  Defendants Have Repeatedly Failed To Adequately Search For And Produce Documents In This Case. ..............................................36

1.  Defendants Neglected To Produce Anthony Levandowski Documents From Ottomotto, Necessitating The First Trial Continuance..........................................................................36

2.  Defendants Waited Until The Eve Of The December Trial Date To Produce Shred Works Receipts Relating To Levandowski's Destruction Of The Five Drives.............................38

D.  Defendants Have Abused The Attorney-Client Privilege Throughout This Litigation. ................................................................39

1.  Defendants Cloaked the Stroz Due Diligence Process in "Work Product" Claims Only to Selectively Waive When Convenient ..........................................................................40

2.  Defendants Misused "Attorney-Client Privilege" Designations to Avoid Discovery ................................................42

3.  Defendants Have Used the Attorney-Client Privilege As Both a Sword and a Shield ...............................................42

4.  Defendants Have Used the Fifth Amendment and Common Interest Privileges as Both a Sword and a Shield..........................43

E.  Defendants Have Obstructed Discovery into Tyto ......................................44

1    Pursuant to the Court's orders (Dkt. 2331, 2447) and guidance at recent hearings (Dkt. 2310
2  [11/29/17 Hr'g Tr.] at 161:19-163:1; Dkt. 2342 [12/4/17 Hr'g Tr.] at 36:15-39:11, 45:14-23),
3  Plaintiff Waymo LLC ("Waymo") submits this offer of proof regarding its discovery efforts since
4  the Court's most recent continuance and how the discovered evidence relates to Defendants' overall
5  discovery misconduct.

6                                    **INTRODUCTION**

7    Defendants have engaged in a "constellation" of misconduct throughout this case.  (Dkt.
8  2310 [11/29/17 Hr'g Tr.] at 162:24-163:1.)  Even before the previously withheld Jacobs allegations
9  came to light, the evidence showed that Defendants concealed evidence of their trade secret
10 misappropriation through extensive spoliation of evidence.   After Waymo filed this case,
11 Defendants obstructed discovery at every turn, by concealing sources of relevant evidence and
12 repeatedly violating the Court's orders.  Defendants also frustrated Waymo's investigation through
13 overbroad assertions of the attorney-client privilege, including over the Stroz Friedberg due
14 diligence report which shows that Uber has known all along that Anthony Levandowski had stolen
15 Waymo's confidential information.

16   The recently uncovered allegations of former Uber employee Ric Jacobs simply reinforce
17 the pattern of Defendants' misconduct.  The Jacobs allegations were only brought to the Court's
18 attention by the U.S. Attorney on the eve of trial, and the Special Master has already determined
19 that the Jacobs Letter was wrongfully withheld by Uber in this case.  Additional discovery has shown
20 that key allegations in the Jacobs Letter are both true and material.  At the behest of their senior-
21 most executives, Defendants engaged in a vast "competitive intelligence" gathering operation that
22 relied upon "non-attributable" devices, the improper use of messaging applications to evade
23 discovery, abuse of attorney-client privilege, and spoliation of evidence.  In the autonomous vehicle
24 field, this competitive intelligence operation targeted Waymo as its "top priority," was directed by
25 Uber ATG managers (and Ottomotto co-founders) Anthony Levandowski and Lior Ron, and
26 coincided in time with Uber's decision to "pivot" to development of the Fuji LiDAR device that is
27 based on the information Levandowski stole.  This previously undisclosed evidence both supports
28 Waymo's substantive claims and highlights the extremes to which Defendants have gone to cover

up evidence of wrongdoing.

Taken together, all of Defendants' misconduct requires severe sanctions and a strongly worded instruction permitting the jury to take full account of Defendants' behavior.[1]   These measures are necessary not only to deter such tactics in the future, but also to cure the prejudice to Waymo resulting from Defendants' efforts to evade discovery and destruction of relevant evidence.

## OFFER OF PROOF

## I.   Uber's Failure To Produce The Jacobs Documents Concealed Material Evidence.

On April 14, 2017, while Waymo's motion for preliminary injunction was pending, former Uber employee Ric Jacobs sent a resignation email ("Jacobs Email") to Uber executives, including then-CEO Travis Kalanick and General Counsel Salle Yoo, alleging ███████████ ████████ (Ex. 1.)[2]  On May 5, 2017, as discovery in this action was just beginning, Jacobs' attorney sent Uber Head of Litigation Angela Padilla a 37-page settlement demand letter ("Jacobs Letter" and, together with the Jacobs Email, "Jacobs Documents"), which alleges various unlawful activities, including a corporate practice of systematically destroying evidence and efforts to steal trade secrets from Waymo and others.  (Ex. 2 at 12-13 ("Jacobs is aware that Uber used the MA team to steal trade secrets at least from Waymo in the U.S. . . .").)

Despite being widely circulated amongst senior management and members of Uber's Board of Directors (Dkt. 2310 [11/29/2017 Hr'g Tr.] at 15:16-24, 20:7-13, 21:8-15, 25:2-6), Uber intentionally withheld the Jacobs Documents, as well as details of its subsequent investigation into the Jacobs Documents, throughout the months of ordinary discovery in this case.  The Jacobs Documents only came to light on the eve of the December 4 trial when, on November 22, the U.S. Attorney's office informed this Court of the existence of the Jacobs Letter.  (Dkt. 2260-1.)  Because the Jacobs Letter undermined Uber's oft-repeated claim that "no Waymo confidential information had ever reached Uber's servers," the Court continued the December 4 trial date—the second trial continuance in as many months—and reopened discovery so that Waymo could "get to the bottom"

---

[1]  With this Offer of Proof, Waymo is filing a precis requesting the Court's authorization to file a Motion for Relief based on the entirety of Defendants misconduct.

[2]  Citations to "Ex. __" refer to the corresponding Declaration of Jeff Nardinelli.

1    of the newly discovered evidence.  (Dkt. 2315.)

2          Discovery into the Jacobs allegations is now complete and the results are troubling, to say

3    the least.  First, as the Special Master has now confirmed—and, as Defendants do not seriously

4    contest—Defendants wrongfully withheld the Jacobs Letter and evidence of its allegations

5    throughout the course of normal discovery, resulting in yet another trial continuance.  Second,

6    Defendants have compounded the prejudice to Waymo by persisting in their obstructionist behavior

7    even during this reopened discovery period, including by abusing the attorney-client privilege,

8    failing to provide complete answers to interrogatories, and thwarting Waymo's ability to conduct

9    complete depositions.  While Waymo has worked diligently to prioritize Defendants' continuing

10   discovery failures and bring them to the Magistrate Judge, the compressed discovery schedule has

11   allowed Defendants to "run out the clock," and once again provide less than full and complete

12   discovery.  Third, discovery over the past month has confirmed the truth and materiality of key

13   allegations in the Jacobs' Letter, revealing a covert operation to gather competitive intelligence on

14   competitors in the autonomous vehicle space, including Waymo, while leaving minimal traces of

15   such behavior for discovery in potential litigation.  Although evidence has undoubtedly been

16   destroyed, and Defendants' witnesses have sought to minimize damaging documents in self-serving

17   testimony, the evidence that remains demonstrates that Uber used its "ThreatOps" division to pursue

18   confidential Waymo information at a time and in a manner that dovetails with Waymo's claims of

19   trade secret misappropriation.

20          **A.      Defendants Improperly Withheld The Jacobs Documents.**

21                 **1.      The Special Master Has Determined That The Jacobs Letter Was
                         Responsive To Waymo's RFPs And Uber Should Have Produced It.**

22

23          As an initial matter, the continuance of the December 4 trial and the entire supplemental

24   discovery process was a result of Defendants and their outside counsel improperly withholding the

25   Jacobs Letter.  During the parties' December 4 hearing, the Court specifically noted that Uber's

26   level of "culpability" in not producing the Jacobs Documents was a key issue for discovery because

27   it "helps inform me as to how much the jury should learn about all this." (Dkt. 2342 [12/4/17 Hearing

28   Tr.] at 39:16-20.)  To help determine Uber's level of culpability, the Court assigned the Special

1   Master to determine "under the way in which this case was conducted on both sides and through the

2   document requests, whether or not the email and/or 37-page and/or settlement agreement were

3   required to be produced by Uber." (*Id.* at 32:1-18; *see also* Dkt. 2334.)

4         The parties briefed Uber's nonproduction of the Jacobs Documents (Dkt. 2367-3 (Waymo);

5   Dkt. 2352-3 (Uber)), and the Special Master heard oral argument on December 12.  On December

6   15, the Special Master issued a written report, finding that the Jacobs Letter was responsive to

7   Waymo's Request for Production Nos. 29 and 73.  (Dkt. 2396 at 18-19.)  While the Special Master

8   found that the Jacobs Email was not responsive to discovery requests (*id.*), production of the Jacobs

9   Letter would certainly have led to discovery of the Email as well as all the other previously

10  unproduced evidence outlined in this Offer of Proof.  Defendants were given until December 22 to

11  object to the Special Master's report but, as the Court recognized, Defendants' "response" on

12  December 22 (Dkt. 2435) only "superficially disagreed with the special master's conclusion" but

13  did not object to it.  (Dkt. 2444).

14        The Special Master's conclusion that Uber improperly withheld evidence was undeniably

15  correct.  As the Special Master found, the Jacobs Documents were known to Uber's then-CEO

16  Travis Kalanick, general counsel Salle Yoo, and head of litigation Angela Padilla.  (Dkt. 2396 at 6-

17  8.)  Padilla admitted that she understood and appreciated the relevance of the Jacobs Letter to the

18  Waymo litigation.  (Dkt. 2310 [11/29/2017 Hr'g Tr.] at 17:2-14, 18:7-10.)  Regardless of whether

19  these documents happened to trigger the parties' search terms for email and custodial documents,

20  Uber's attorneys were obligated to ensure that known, relevant material was produced in this

21  litigation.  (Dkt. 2396 at 17 (noting that while search terms may be appropriate where a party "faces

22  the prospect of having to look for lots of needles in lots of haystacks," "[t]his needle was in Uber's

23  hands the whole time.").)

            **2.      Further Discovery Confirms That Uber Should Have Produced The
                      Jacobs Documents.**

24

25        Apart from the Special Master's report, further evidence has come to light demonstrating

26  that the Jacobs Documents were improperly withheld.  At the evidentiary hearing, Padilla claimed

27  that after handing the Jacobs Letter off to Uber's compliance department, she understood that the

28

issue was "no longer my work" and that she "should not discuss the letter with anyone inside or outside of the company for fear of jeopardizing the internal investigation." (Dkt. 2310 [11/29/17 Hr'g Tr.] at 16:4-10.) But, contrary to Padilla's testimony that she merely reviewed the Jacobs Letter "in brief" (Dkt. 2310 [11/29/2017 Hr'g Tr.] at 15:16-24), and as explained below, the evidence shows that Padilla remained closely involved with the issues surrounding the Letter while discovery in this case was ongoing.

Specifically, discovery has shown Uber's General Counsel at the time, Salle Yoo, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. A [12/14/2017 Yoo Dep. Tr. Vol. 2] at 253:25-254:5; Ex. B [12/22/2017 Padilla Dep. Tr. Vol. 2] at 130:20-131:1.) In this role, Padilla communicated directly with Jacobs' personal attorney who made ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Ex. 3 at UBER00332645 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮".).) Padilla also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ (Ex. 5), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 6 UBER00332473-77), and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 7). A Court-ordered log of Padilla's withheld communications that discuss "the Jacobs letters, any investigations being done as a result of Jacobs' accusations, and the settlement with Jacobs" (Dkt. 2415 at 2), yielded ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 8) and, as detailed below, just yesterday Defendants belatedly supplemented their Padilla log to add ▮▮ new entries, bringing the log total to ▮▮▮ entries. (Ex. 104.) All of this evidence demonstrates that the Jacobs Documents were, in fact, very much part of Padilla's "work" throughout this litigation, contrary to her November 29 testimony before the Court.

At the November 29 hearing, Padilla also sought to excuse her failure to share the Jacobs Letter with counsel handling the Waymo case day-to-day in part because she had been instructed to "not discuss the letter with anyone inside or outside of the company for fear of jeopardizing the internal investigation." (Dkt. 2310 [11/29/17 Hr'g Tr.] at 16:4-10.) Not only does the broad distribution of the Jacobs Letter undermine this claim, but Padilla did not even otherwise follow this

1  supposed directive herself.  For example, Padilla admitted at her deposition ███████████

2  ████████████████████████████████████████████████████████████████████

3  ███████████████████████████████████████████.  (Ex. B

4  [12/22/2017 Padilla Dep. Tr. Vol. 2] at 163:22-169:24; Ex. 4.)  In sum, Padilla's supposed excuse

5  of having limited involvement in the Jacobs investigation does not hold water.

6       Moreover, the facts regarding Uber's outside counsel's knowledge of the Jacobs documents

7  and allegations has evolved since they were revealed.  Uber counsel Arturo González represented

8  to the Court on November 28 that "nobody on this defense team knew about that letter before we

9  got your order and . . . the letter from the U.S. Attorney" (Dkt. 2309 [11/28/2017 Hr'g Tr.] at 150:8-

10  11).  Six days later, in the December 4 hearing, Mr. González clarified that he and Eric Tate, both

11  counsel of record in this case, received the Jacobs Email.  He further stated that two other Morrison

12  & Foerster ("MoFo") partners received the Jacobs Letter.  (Dkt. 2342 [12/4/2017 Hr'g Tr.] at 46:1-

13  50:1.)  But, subsequent discovery has shown that even Mr. González's clarification was wrong, and

14  that ██████ and ████████, additional MoFo attorneys of record in this case, were involved

15  in communications regarding the Jacobs Email.

16       During reopened discovery, a December 12 log of communications between Uber and MoFo

17  regarding the Jacobs Documents (which was intended to obviate the need for Waymo to depose

18  outside counsel) initially included ██████ (Ex. 9 (12/12/2017 log).)  This is inconsistent with  Mr.

19  Gonzalez's representations to the Court that dissemination of the Jacobs Documents at MoFo was

20  limited.  Four days later, on December 16, MoFo's log of Jacobs communications swelled even

21  further to ██████.  (Ex. 10.)  Contrary to Mr. Gonzalez's clarification, several of the entries on

22  the log reflect communications involving MoFo attorneys ████████ and ████████, who are

23  both counsel of record in this case.  (Ex. 10 at entries 3, 5, 6, 7, 8, 9, 16, 17, 18, 19, & 20.)  All of

24  the entries on the MoFo communication log occurred ████████████████████████████

25  ████████.  This raises troubling questions regarding the scope and timing of outside

26  counsel's knowledge of the unproduced Jacobs Documents.

27           **3.**    **Uber's Attempt To Downplay Its Failure To Produce Are Meritless.**

28       Uber's primary excuse for not producing the Jacobs Documents in its "response" to the

Special Master's report is that all of this is a "collateral issue." (Dkt. 2435 at 1.) But Uber's withholding of the Jacobs Documents led directly to the latest continuance, which has wasted the resources of the Court and the parties, and has further delayed Waymo's ability to obtain relief on the merits for Uber's trade secret misappropriation. Uber's willingness to conceal this relevant evidence, while pushing aggressively towards trial, also demonstrates the lengths to which Uber will go to avoid lawful discovery and further illustrates why any "lack-of-evidence" argument by either Uber or its outside counsel should not be trusted. Uber's claim that discovery into the Jacobs Documents has not yielded any relevant evidence is simply false. To the contrary, as outlined below (*infra* Section I.C), discovery over the past month has revealed, for example, that Uber's ThreatOps Group—with the guidance of ATG directors Anthony Levandowski and Lior Ron—engaged in a competitive intelligence gathering operation against Waymo that included, among other things,

███████████████████████████████████████████████████████

████████. Uber's interest in Waymo's technology supports Waymo's trade secret misappropriation claims because, *inter alia*, it indicates that Uber understood that it was developing the same technology.

**B.     Defendants Thwarted Waymo's Investigation Into The Jacobs Documents Through Further Discovery Misconduct.**

If, as Uber claims, the Jacobs allegations were truly baseless and irrelevant to this litigation, Uber should have been open and forthcoming during this reopened discovery period. (*Cf.*, Dkt. 2309 [11/28/2017 Hr'g Tr.] at 157:2-5 ("[Y]ou should be the one saying: We're going to open our doors. We are going to get all the way to the bottom of this. We're going to show you, Judge, that this is false. And instead, you're fighting over every little thing.").) While Uber did provide deponents and documents, some only after motions to compel, there was no "open door" to "get to the bottom" of the Jacobs allegations.

For example, Uber limited and delayed its document production, rendering it impossible for Waymo to take complete depositions of relevant witnesses during the abbreviated discovery period. In its written responses to Waymo's RFPs, Uber objected to the shortened discovery period (which was created by its own misconduct) and caveated its response as follows: "[a]ny production that is

1  made and all searches performed are limited to what is possible to do in such a short amount of

2  time." (Ex. 12.) Despite its "limited" search and production, however, Uber still failed to comply

3  with the timetables ordered by the Special Master and the Court.

4        The Special Master ordered that Uber complete its production of documents responsive to

5  Waymo's RFPs by Friday December 8 so that Waymo could analyze the documents in advance of

6  the start of depositions on December 11. (Dkt. 2376-6 at 1.) Uber did not do so. It produced over

7  a thousand documents between December 11 and December 13 and refused, even as depositions

8  began, to confirm that its production was complete. Waymo thus was forced to move to compel

9  Uber to complete its production, but even after Judge Corley ordered Uber to complete its

10  production by December 14 (Dkt. 2395 [12/13/2017 Hr'g] at 21:22-22:8), documents continued to

11  trickle in on December 15, 16, 19, 20, 23, 28. On December 29—over a week after the supplemental

12  discovery period had closed, and mere hours before Waymo filed its final motion to compel—Uber's

13  outside counsel informed Waymo that a "set of search results inadvertently was not pushed to us for

14  review" (Ex. 59 [12/29/2017 email from S. Rivera]), which resulted in a production of 24 additional

15  documents on December 30. In total, nearly two-thirds of Uber's production (by number of pages)

16  was produced *after* the deadline originally imposed by the Special Master.

17        Uber also frustrated Waymo's attempt to investigate the extent to which its outside counsel

18  was aware of the Jacobs documents during regular discovery in this case. As discussed previously

19  (*supra* Section I.A), after Uber objected to Waymo's request to depose MoFo attorneys who

20  received the Jacobs Documents, Waymo agreed to accept, by December 10, a log of

21  communications between Uber and outside counsel regarding the Jacobs Documents and

22  investigation. (Dkt. 2376-7 at 2 ¶ 2.) Uber eventually produced that log, ███████████, two

23  days late and improperly limited it to only those communications between Uber and MoFo that

24  "Substantively Refer" to the Jacobs Documents. (Ex. 9.) Again, Waymo was forced to seek relief

25  from the Court which, four days later, yielded an entirely new log containing ████████—more

26  than double the number initially identified. (Ex. 10.) The evolving story of what communications

27  exist and which outside counsel knew what about the Jacobs Documents is concerning. Even now,

28

1    Waymo lacks a coherent explanation of which counsel knew what, and when.[3]

2          Further, Waymo served an interrogatory asking that Uber identify each employee or former

3    employee who was "aware" of the Jacobs Documents prior to November 22, 2017, and to provide

4    details of such awareness.  (Ex. 11 at Interrogatory No. 1.)  This interrogatory tracked the Court's

5    Order that Waymo may serve discovery into "the identities of all defendants' personnel who were

6    *aware* of Jacobs's letter or email before November 22," (Dkt. 2315 (emphasis added).)  Yet, Uber

7    objected that the term "aware," was "undefined and vague."  (Ex. 48 ("Response" to Interrogatory

8    No. 1).)  On this basis, Uber refused to fully answer the interrogatory.  Rather, it limited its response

9    to a list of personnel who merely *received* the Jacobs email or letter.  (Dkt. 2441-5.)  Waymo had to

10   move to compel.   Judge Corley noted that Uber's efforts to unilaterally narrow Waymo's

11   interrogatory were "not well taken."  (Dkt. 2454 at 1.)  Uber's court-ordered supplemental response

12   has yielded additional, relevant evidence such as that fact that ████████████████ was

13   aware of the Jacobs Letter (despite having not received it) prior to November 22.   (Ex. 48

14   ("Supplemental Response" to Interrogatory No. 1.)

15          Moreover, Uber has represented that it is claiming privilege over approximately *4,000*

16   documents responsive to Waymo's recent RFPs. (Dkt. 2395 [12/13/17 Hearing Tr.] at 23:22-24:1.)

17   Based on this representation regarding the volume of allegedly privileged documents, Judge Corley

18   declined to require Uber to provide a complete, individualized privilege log, but left open the

19   possibility that Uber would be required to provide additional information upon a showing of

20   relevance to a claim or defense in the case. (*Id.* at 27:17-28:3.)   In advance of the deposition of

21   Angela Padilla, Waymo obtained an order from Judge Corley requiring Uber to "produce a fully

22   compliant privilege log for documents that Uber is withholding that involve communications with

23   Ms. Padilla . . . and discuss the Jacobs letters, any investigation being done as a result of Jacobs'

24   accusations, and the settlement with Jacobs." (Dkt. 2415 at 2.)  But, when Uber served its ████████

25

26   _____

27         [3]   For example, the declarations from MoFo do not clearly explain whether and when counsel
     of record in this litigation learned of the <u>substance</u> of each of the Jacobs Documents.  (Ex. 52 [Tate
28   Declaration]; Ex. 53 [Duross Declaration].)

1   Padilla log on December 22 (Ex. 8), it also produced 87 new Padilla documents that Uber had

2   apparently improperly withheld until required to provide the log.  Thus, by its own admission, when

3   Uber is required to justify its assertion of privilege on an item-by-item basis, it is forced to produce

4   additional documents, that never should have been withheld in the first place, at a rate of over 10%.[4]

5        Judge Corley ordered that the Padilla privilege log "shall be produced by 5:00 p.m. on

6   December 21, 2017" (Dkt. 2415 at 2), so that Waymo would have the information in advance of

7   Ms. Padilla's December 22 deposition.  But, as discussed above, on December 29, Uber notified

8   Waymo that it had discovered a set of previously un-reviewed documents and informed Waymo that

9   it may supplement Ms. Padilla log in review of this discovery.  (Ex. 59 [12/29/2017 email from S.

10  Rivera].)  After 11:00 p.m. just last evening—a full **21 days** after Judge Corley's order—Uber

11  supplemented its Padilla privilege log to add ███████████, bringing the log total to ████.  (Ex.

12  104 (1/11/2017 log).)  Waymo has not yet had an opportunity to analyze this newly produced log,

13  but Uber's incredibly late production is yet another obviously prejudicial and yet another violation

14  of the Court's orders.  This should result in waiver of the privilege of these ██████████████

15  (J. Alsup Standing Order ¶ 18 ("Failure to furnish [] information [sufficient to justify the privilege]

16  at the time of the assertion will be deemed a waiver of the privilege or protection.").)

17       Also, during depositions into the Jacobs allegations, Uber's outside counsel repeatedly and

18  improperly used the attorney-client privilege to instruct witnesses not to answer questions about

19  *facts* to the extent such facts happened to have been communicated from an attorney.  (*E.g.*, Ex. C

20  [12/14/2017 Sullivan Dep. Tr.] at 218:11-22, 221:13-222:5; Ex. A [12/14/2017 Yoo Dep. Tr. Vol.

21  2] at 191:10-192:5; Ex. D [12/15/2017 Trujillo Dep. Tr.] at 74:10-74:17, 74:20-75:3, 75:4-75:11,

22

---

23     [4]  In light of this and other demonstrated irregularities with Uber's assertions of privilege, Judge
    Corley ordered Uber to provide, for *in camera* inspection, 50 pages of redacted documents chosen

24  by Waymo.[4]  (Dkt. 2454 at 2.)  Based on that review, Uber was ordered to produce full copies of 4
    documents that it had previously improperly redacted.  (Dkt. 2461.)  One of these newly unredacted

25  documents ████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████.  (Ex. 49.)

27       Given, Defendants' history of wrongfully withholding documents under the guise of the
    attorney-client privilege, Waymo asked Judge Corley for a much broader *in camera* review.  (*See*

28  Dkt. 2441-4 at 2-4.)  Waymo expects to file a Motion for Relief from Judge Corley's Order that
    limited the *in camera* review to a mere 50 pages of documents that Defendants redacted.

91:23-92:6, 92:21-93:4, 109:17-110:1, 118:11-19; Ex. E [12/19/2017 Huffington Dep. Tr.] at 49:7-
17, 52:20-53:7, 71:23-73:9, 74:8-18, 82:14-22, 84:20-85:4, 86:15-87:4, 87:16-22, 91:7-14, 91:22-
92:3 102:19-25, 160:20-161:7; Ex. F [12/20/2017 Majalya Dep. Tr.] at 49:23-50:5, 50:17-24; Ex. G
[12/20/2017 Russo Dep. Tr.] at 203:1-18.)  Uber also allowed the personal attorneys of certain Uber
SSG employees to block answers to questions based on purported "national security concerns."
(*E.g.*, Ex. H [12/19/2017 Nocon Dep. Tr.] at 16:17-17:4; Ex. G [12/20/2017 Russo Dep. Tr.] at 31:2-
17, 157:21-158:24; Ex. I [12/21/2017 Gicinto Dep. Tr.] at 36:6-37:4, 60:2-22, 138:24-140:8,
142:10-17, 205:15-206:5, 225:5-226:13.)

       In addition, Uber's outside counsel repeatedly instructed attorney-witnesses not to answer
questions that would reveal their "mental impressions," even when the questioning sought
information far afield from any conceivable claim of work product.  (*E.g.*, Ex. A [12/14/2017 Yoo
Dep. Tr. Vol. 2] at 254:6-15, 289:5-24, 346:5-9, 354:2-7, 387:23-388:14, 415:11-24, 430:21-431:23,
432:7-11; Ex. F [12/20/2017 Majalya Dep. Tr.] at 34:5-24, 125:14-20, 162:24-163:6, 164:9-165:23,
176:25-177:12, 252:4-15; Ex. J [12/22/2017 Clark Dep. Tr.] at 124:3-125:11, 126:22-127:13, 182:6-
25, 199:22-200:11, 247:7-13, 344:20-345:11; Ex. B [12/22/2017 Padilla Dep. Tr. Vol. 2] at 129:23-
130:18, 153:14-23, 164:18-24, 171:16-24, 178:9-25, 185:23-186:9, 188:12-189:12, 189:18-25,
191:11-18, 221:8-14; Ex. K [12/22/2017 Spiegler Dep. Tr.] at 89:6-22, 169:19-171:9, 192:24-
193:18, 283:24-284:7.)  To take one example, Craig Clark was improperly instructed not to answer
whether he had ever marked a document "attorney-client privileged" when he did not believe such
document was privileged, on the grounds that such an answer would disclose Clark's "mental
impressions" and thus his work product.  (Ex. J [12/22/2017 Clark Dep. Tr.] at 195:19-197:10.)
Padilla was even instructed not to reveal her "mental impressions" regarding subject matter she had
previously disclosed (without objection) in her testimony at the evidentiary hearing.  Padilla was
instructed not to expound upon her thought process in failing to provide the Jacobs Letter to either
in-house or outside counsel handling the Waymo matter even though she provided, without
objection, a high-level explanation on this same subject during the evidentiary hearing.  (*Compare,
e.g.*, Ex. B [12/22/2017 Padilla Dep. Tr. Vol. 2] at 153:14-23, *with* Dkt. 2310 [11/29/2017 Hr'g Tr.]
at 17:15-18:23.)  In light of these selective assertions of "work product," Uber should be precluded

1  from offering any explanation for its failure to turn over this material evidence during discovery.

2       Uber's obstructionism over the past month of supplemental discovery has complicated what

3  was already an aggressive schedule for investigating the Jacobs Documents.   Again, the Court

4  should take appropriate measures to ensure that Uber is not able to capitalize on its misconduct.

**C.     Discovery Has Corroborated Key Allegations In The Jacobs Letter Material To Waymo's Claims.**

       The new Jacobs-related discovery that Waymo has been able to pry from Uber has led to

material evidence pertaining to the merits of Waymo's trade secret claims.   In accordance with the

Court's request, Waymo summarizes below the key evidence discovered during the reopened

discovery period, how this evidence was previously unknown to Waymo, and the relevance of such

evidence to Waymo's allegations in this case.   Attached hereto in Appendix A, Waymo provides

the practical details of how it will implement its offer of proof, including the names of specific

sponsoring witnesses for documentary evidence that Waymo intends to rely upon in its case-in-chief

at trial, and an explanation as to how Waymo will overcome hearsay objections for such documents.

**1.     Uber Used Its ThreatOps Division To Systematically Collect Intelligence On Waymo And Other Competitors.**

       Uber used its "ThreatOps" group (which included its Strategic Services Group ("SSG")) to

engage in a vast, previously undisclosed, "competitive intelligence" gathering program against

competitors in the autonomous vehicle market, including primarily Waymo.   As detailed below,

Uber ThreatOps coordinated these efforts with ATG personnel, including Anthony Levandowski

and Lior Ron, shortly after Uber's ATG group "pivoted" to development of the Fuji medium-range

LiDAR sensor that Waymo contends incorporates its trade secret designs.   Uber's keen interest in

the performance of Waymo's self-driving cars at this time is probative to Uber's intent and

knowledge that it was developing derivative technology that it understood would perform similarly

to the Waymo technology under surveillance.

       Uber's techniques for collecting intelligence on competitors ███████████████████

████████████████████████████████████████████ (Ex. 13.)

SSG employee Ed Russo testified ███████████████████████

████████. (Ex. G [12/20/17 Russo Dep. Tr.] at 295:5-13, 11:6-8.)



1 

2 (Ex. 13 at

3 UBER00336620.)

4 

5 (*Id.* at UBER00336625 (emphasis added).)

6 

7 

8 

9 (*Id.* at UBER00336621, UBER00336622-27.)

10 The document also discusses

11 

12 (*Id.* at UBER00336628; *see*

13 *also* Ex. G [12/20/17 Russo Dep. Tr.] at 314:23-316:4; Ex. I [12/21/17 Gicinto Dep. Tr.] at 176:13-

14 178:1.)   In other words, SSG

15 

16 .[6]  Before the reopened discovery period, Waymo was unaware of this

17 intelligence gathering effort against autonomous vehicle competitors.

18         Documentation indicates that Uber executed upon its Collection Plan and provided regular

19 updates of its progress.  In December 2016, Uber's Strategic Services Group (a sub-group within

20 "ThreatOps") created a presentation titled           (Ex. 18.)  Again, the        was Uber's

21 

22 _____

   [5]   Uber's code word for the autonomous vehicle market was the "     ," and the code word

23 "     " corresponded to Google.  (Ex. 14.)

24   [6]   Uber's practice of gathering intelligence on competitors

25 

26 " (Ex. 17 at
   UBER00338182.)

27 (*Id.* (emphasis added).)

28 (*Id.*)

1    code word for the autonomous vehicle market and █████████ was Uber's code word for ████████

2    (Ex. 14.) ████████████████████████████████████████████████████████

3    ██████████████████████████████████████████████████ (Ex. 18 at

4    UBER00330930-31.) ████████████████████████████████ (*Id.* at UBER00330939.)

5    Before the supplemental discovery period, Waymo was unaware of Uber's efforts to conduct

6    "research" into autonomous vehicle competitors with a focus on acquiring "████████."

7          Uber's ATG Group was keenly aware and interested in Uber's competitive intelligence

8    gathering efforts.  On October 23, 2016, former Ottomotto co-founders and Uber ATG managers

9    Anthony Levandowski and Lior Ron ████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████████

11   ██████████ (Ex. 15.) ████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████

13   ████████████████████████ (*Compare* Ex. 15, *with* Ex. 16 at 2 ████████████

14   ████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████

16   ██████████████████████████████████████ (Ex. 15.)  While

17   the specific October 2016 email was produced before the Jacobs letter (although after normal

18   discovery, as it was among the "non-migrated" Levandowski Ottomotto emails), the significance of

19   Levandowski's interest in competitive intelligence gathering only became apparent in the context

20   of the other, newly discovered Jacobs material.

21          Levandowski and Ron also interfaced directly with ThreatOps in regards to competitive

22   intelligence gathering.  In late January 2017, Mat Henley, the director of Uber "Threat Ops,"

23   ████████████████████████████████████████████. (Ex. 19.)

24   ████████████████████████████████████████████████████████████████████

25

26   _____

27   [7]   Jacobs testified that, to his knowledge, ████████████████████████████████
     ████████████████████████████████████████████████████████████████████

28   ████████████ (Ex. L [12/20/2017 Jacobs Dep. Tr.] at 205:2-12; *see also* Ex. Z [12/22/2017
     Henley Dep. Tr.] at 108:7-109:13.)



1   ▮▮▮▮ (*Id.*) ▮▮▮▮

2   ▮▮▮▮ (*Id.*)  Shortly thereafter, a meeting

3   invitation reflecting a January 31 meeting was circulated ▮▮▮▮

4   ▮▮▮▮. (Ex. 20.)  Before the supplemental discovery period, Waymo was unaware

5   of Uber senior ATG members collaborating with Uber's intelligence gathering operation within

6   ThreatOps.[8]

7       SSG memoranda further reflect that Lior Ron and Anthony Levandowski had meetings with

8   ThreatOps personnel in early 2017.  (Exs. 21 & 22.) ▮▮▮▮

9   ▮▮▮▮ (Ex. 21.)

10  ▮▮▮▮

11  ▮▮▮▮.[9]  (Ex. G [12/20/2017 Russo Dep. Tr.] at 272:12-273:3, 278:5-16.)

12  Other ThreatOps personnel confirmed ▮▮▮▮

13  ▮▮▮▮.  (Ex. C [12/14/2017 Sullivan Dep. Tr.] at 63:5-13,

14  66:15-67:1; Ex. I [12/21/2017 Gicinto Dep. Tr.] at 23:19-25:1, 33:4-20, 33:21-34:17, 44:14-45:6,

15  148:15-150:7; Ex. Z [12/22/2017 Henley Dep. Tr.] at 98:7-23, 125:8-126:2, 126:23-127:3.)

16  ▮▮▮▮

17  ▮▮▮▮[10]  (Ex. 21 at UBER00336616

18  _____

19  [8]  Uber did previously produce one calendar invite for a February 14, 2017 meeting between

20  Levandowski, Ron, Mat Henley, and Nick Gicinto (among others), but there was no information in
    the produced invitation about the subject matter of the meeting or role of Henley or Ginincto (for
    example, the meeting topic was identified merely as "Mat Lior Nick").  (*See* Ex. 39.)

21  [9]  Lior Ron ▮▮▮▮ listed in Exhibit 21 (Ex.

22  X [12/12/2017 Ron Dep. Tr. Vol. 3] at 528:2-17, 529:6-13, 534:3-15).

23  [10]  Ed Russo testified that ▮▮▮▮

24  ▮▮▮▮.  (Ex. G [12/20/2017 Russo Dep. Tr]. at 278:17-
    280:15.)  However, the little documentary evidence that was produced and/or remains shows
    otherwise.  A ▮▮▮▮

25  ▮▮▮▮

26  ▮▮▮▮

27  ▮▮▮▮

28  ▮▮▮▮ (Ex. 24.)  Before the supplemental
    discovery period, Waymo was unaware of ▮▮▮▮

1   ("█████████████████████████████████████████████████████████

2   ████████████████████"); *see* 18 U.S.C. § 1839 (defining "misappropriation" to include

3   "acquisition of a trade secret of another by a person ***who knows or has reason to know*** that the trade

4   secret was acquired by improper means") (emphasis added)).   A similar memorandum dated

5   February 15, 2017 indicates ███████████████████████████████████████████████

6   ████████████████████████ (Ex. 22.)  Before the supplemental discovery period, Waymo

7   was unaware of Uber senior ATG members directing Uber's intelligence group to obtain

8   confidential information about Waymo and other autonomous vehicle competitors.

9        The collaboration between Uber ATG and ThreatOps culminated in an intensive surveillance

10  program in the Spring of 2017.[11] ████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████

12  ████████████████████████.[12]  (Ex. I [12/21/2017 Gicinto Dep. Tr.] at 23:19-34:19.)  With this

13  submission, Waymo will lodge selected copies of these videos for the Court's viewing as Exhibits

14  25 and 26.  At the time, ████████████████████████████████████████████████

15  ████████████████████████.[13]  (Ex. I [12/21/2017 Gicinto Dep. Tr.]

16  at 24:13-25:1, 32:8-13.)  And the code word that Uber SSG used for Waymo ██████████████

17  ████████████  (Ex. I [12/21/2017 Gicinto Dep. Tr.] at 136:11-14; Ex. G [12/20/2017 Russo Dep.

18  _____

19  ████████████████████████████

20  [11]   Uber's competitive intelligence gathering efforts against Waymo also resulted in ████████

21  ███████████████████████████████████████████████████████████████████.  (Ex.

    45.)  Again, this report reflects Uber's interest in the performance of Waymo's technology at a time

22  █████████████████████████████████████████████████████████████████.

23  [12]   Again, Ron's testimony ████████████████████████████████████████████████

24  █████████████████████████████████████████████████████  (Ex. X

    [12/12/2017 Ron Dep. Tr. Vol. 3] at 547:1-550:15.)

25  [13]   Uber witnesses have insisted that their competitive intelligence gathering efforts relied

26  entirely on "open source" information.  But, as shown above, the documentary evidence suggests
    otherwise.  (*Supra* n.10.)  Also, the question of whether Uber's competitive research relied upon

27  proper or improper means is beside the point—regardless of the methods used, Uber's collection of
    information on Waymo is evidence of ***past*** misappropriation, because it reflects a level of interest

28  in the performance of Waymo's vehicles that Uber would not have had unless it was aware that its
    own Fuji system would perform similarly.



---

1   ████████████████████████████████████████████████ (*Id.*
2   at UBER00327815-17.)  SSG employee Jack Nocon testified that ████████████
3   ████████████████████████████████████████████████████████
4   ██████████████████████████████████████ (Ex. H [12/19/2017
5   Nocon Dep. Tr.] at 124:14-125:13.)
6   ████████████████████████████████████████ (*Id.* at 125:14-
7   127:12.)   Before the supplemental discovery period, Waymo was unaware of Uber conducting
8   research in this manner using virtual machines, dedicated "research" computers, and non-
9   attributable MiFi connections to access specifically designed to host information separate from
10  Uber's main servers.

11        In addition to managers like Craig Clark and Mat Henley, Joe Sullivan (Uber's former Chief
12  Security Officer and a member of Uber's executive leadership team) knew of, and ostensibly
13  approved, the use of non-attributable devices for research purposes.  Sullivan ████████
14  ████████████████████████████████████████████████████████
15  ████. (Ex. C [12/14/17 Sullivan Dep. Tr.] at 124:17-125:2, 125:22-25, 276:1-6.)

16        SSG employees Ed Russo and Nick Gicinto testified that ████████████████
17  ████████████████████████████████████████████████████████
18  ████████████████████████████████████████████████. (Ex. G
19  [12/20/2017 Russo Dep. Tr.] at 110:6-111:14, 113:5-8; Ex. I [12/21/2017 Gicinto Dep. Tr.] at 67:23-
20  71:24,  75:3-76:21.)
21  ████████████████████████████████████████████████████████
22  ████████████████ (Ex. G [12/20/2017 Russo Dep. Tr.] at 113:9-114:2, 123:20-
23  126:8; Ex. I [12/21/2017 Gicinto Dep. Tr.] at 89:12-90:22.)  Ed Russo testified that ████████
24  ████████████████ (*Id.* at 119:24-120:9.)  It is unclear what form these reports
25  took, but Waymo has located few, if any, documents that would meet Russo's description of these

___

27        [14]  Ed Russo testified that ████████████████████████████████
28  ████████████████████████ (Ex. G [12/20/2017
Russo Dep. Tr.] at 108:24-109:24.)

1   reports in Uber's production of documents during this discovery period.  Ed Russo testified that

2   ████████████████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████. (Ex. G [12/20/2017 Russo Dep. Tr.] at 132:21-134:10.)

4   Before the supplemental discovery period, Waymo was unaware of Uber hosting a ████████ server

5   to ████████████████████████████████████████.

6       At his deposition, Jacobs testified that ██████████████████████████████████

7   ████████████████████████████████████████████████████████████████████████████

8   ██████████████████" (Ex. L [12/20/2017 Jacobs Dep. Tr.] at 93:9-16.)  Jacobs also testified that

9   ████████████████████████████████████████████████████████████████████████████

10  ██████████████████████ (Id. at 108:11-109:11.)  This reinforces Uber's

11  efforts to conceal documents from discovery concerning at least ThreatOps' activities.

12      In its January 3 Order, the Court asked whether it was true that the issue of non-attributable

13  devices "was a problem confined to SSG and MA." (Dkt. 2447)  It is true that Uber served a log on

14  December 4 (Ex. 28)—which was supplemented and expanded immediately after Waymo

15  completed depositions on December 22 (Ex. 29)—of "non-attributable" device users that appears to

16  be limited to ThreatOps personnel.[15]  In preparing these logs, Uber appears to have unilaterally

17  limited its definition of "non-attributable" devices to the "research laptops" used by ThreatOps and

18  described during the November 29 evidentiary hearing.  (See, e.g., Dkt. 2310 [11/29/17 Hr'g Tr.] at

19  146:17-148:3 (describing "non-attributable devices" as "research laptops" that were incapable of

20  storing data).)  Defendants' logs aside, it is also true that in the supplemental round of discovery,

21  Waymo did not uncover evidence that other departments utilized third party vendors to acquire

22  devices paid for by Uber for the express purpose of ensuring those devices could not be traced back

23  to Uber.  However, as explained below, Uber was aware that Levandowski was using two non-Uber

24

25  ───────────────

26      [15]   The Court also ordered that Uber search for and produce "[a]ll documents in the entire
    company that have anything to do with . . . non-attributable devices . . . ." (Dkt. 2309 [11/28/2017
27  Hr'g Tr.] at 147:10-15.)   In email correspondence, Uber unilaterally limited its search and
    production of documents to those within the custody of certain persons at Uber (i.e. previously
28  agreed-upon document custodians, additional personnel identified in Defendants' forensic expert
    report, and SSG and MA personnel).  (Ex. 46.)

laptops "for Uber work" while running its self-driving car program (despite also knowing that he had retained vast amounts of Waymo confidential information after he resigned), an arrangement that gave Uber all the benefits of any misconduct committed with them, but none of the attribution. (*See* Section II.A.4. *infra*.)

### 3. Uber Used Ephemeral Communication Platforms To Avoid Discovery Into Its Activities.

At the November 28, 2017 hearing, the Court ordered Uber to provide a log of all Uber personnel who used "Wickr or any other self-deleting communication system." (Dkt. 2309 [11/28/2017 Hr'g Tr.] at 153:20-157:7.)   On November 30, Defendants counsel proposed unilaterally limiting its self-deleting communication log to only certain categories of persons at Uber (*i.e.* previously agreed-upon document custodians, additional personnel identified in Defendants' forensic expert report, and SSG and MA personnel).[16]   (Ex. 46).   A subsequent email from Defendants' counsel confirmed that this unilateral limitation on Uber's log was, in fact, imposed. (Ex. 47 at 2 ("On the call yesterday, Sylvia confirmed that Uber's productions in response to the Court's order have followed that proposal.").)

Despite these limitations, Uber's log served on December 4 (Ex. 30), which was also supplemented on December 22 (Ex. 31), identifies no less than 334 individuals and five teams "in general" that used Wickr or a "similar platform" at Uber (Ex. 31).  Not identified on Defendants' self-deleting communications log are Uber's company-wide chat program "uChat" and its predecessor "HipChat" (*see* Ex. 32), even though Uber's own witness, Ed Russo, testified that both uChat and HipChat are "███████████████████" (Ex. G [12/20/2017 Russo Dep. Tr.] at 93:15-22.)  Thus, if Uber had included users of HipChat and UChat in its court-ordered logs, the number of users would have been substantially larger.

Throughout this reopened discovery period, Uber has attempted to draw an equivalence between its use of self-destructing messaging applications (such as Wickr, Telegram, and Snapchat)

---

[16]  In its email correspondence, Uber purported to disclose the scope of personnel searched and queried in the interest of transparency.  (Ex. 46.)  In subsequent meet-and-confer conferences with the Special Master, Waymo made clear that that it believed this was improper and less than what the Court ordered.

1   and Google's employees' use of the "Google Hangouts" application, which includes an "off-the-

2   record" setting.  The use of these applications by Google and Uber, however, could not be more

3   different.  Discovery has shown that Uber employees used these ephemeral messaging applications

4   in a manner that would have the effect of avoiding discovery in ongoing or anticipated litigation.

5   (Ex. C [12/14/2017 Sullivan Dep. Tr.] at 214:1-12, 236:8-13, 237:3-20, 239:16-240:4; 243:6-11);

6   Ex. H [12/19/2017 Nocon Dep. Tr.] at 220:17-221:10, 221:11-14, 226:8-17; Ex. G [12/20/2017

7   Russo Dep. Tr.] at 100:6-101:2, 101:8-21; Ex. I [12/21/2017] Gicinto Dep. Tr. at 53:20-54:8, 54:9-

8   55:15; Ex. Z [12/22/2017 Henley Dep. Tr.] at 64:24-65:9, 120:20-123:4.)  For example, just one

9   month after Uber announced uChat as its standard, company-wide chat program, ▮▮▮▮▮

10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11  ▮▮▮▮▮▮▮ (Ex. 34.) ▮▮▮▮▮▮▮▮▮▮ (Ex. Y [12/12/2017

12  Ron 30(b)(6) Vol. 2 Dep. Tr]. at 373:21-374:22; *see also* Ex. 35.)[17]

13      By contrast, Google and Waymo witnesses have testified that their employees use Google

14  Hangouts for normal business purposes, and that there is no similar program or instruction at Google

15  or Waymo to use ephemeral messaging applications for the purpose of thwarting discovery in

16  ongoing or future litigation. ▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮ (Ex. 33.)  Google and Waymo 30(b)(6) witnesses have

19  testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮ (Ex. M [12/14/2017 Johnston 30(b)(6) Dep. Tr.] at 102:10-103:19.)

21      In its January 3 Order, the Court asked whether the "ephemeral messaging" issue was

22  previously known to Waymo.  (Dkt. 2447.)  Although Waymo had previously learned that certain

23  individuals used the ephemeral messaging application "Telegram," Waymo was previously unaware

24  of Uber personnel using the other logged communication platforms, including Wickr, and was also

25  _____

26  [17] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮. (Ex. Y [12/12/2017 Ron 30(b)(6) Vol. 2 Dep. Tr.] at

28  372:21-373:18.) ▮▮▮▮▮▮▮▮ (*Id.* at 374:24-379:9.)

1  unaware of the scale and scope of use of these ephemeral messaging platforms.  Waymo was also

2  unaware that Uber's ThreatOps had specifically set up Levandowski and Ron with Wickr access

3  while Levandowski and Ron were requesting that ███████████████████████████████████

4  ████████████████████████████████████.

**4.      Uber Used Contrived Attorney-Client Privilege Designations To Avoid Discovery Into Its Activities.**

Uber's competitive intelligence gathering operations were shrouded through improper use

of the attorney-client privilege.  The Jacobs Letter references a training presentation given by

ThreatOps attorney Craig Clark that included the "lawyer dog meme." (Ex. 2 at 8.)  The Jacobs

Letter states that "[w]hile the presentation slides themselves did not depict or explain any unethical

or illegal practices involving attorney-client privilege," Jacobs observed Clark using the

presentation to "verbally coach[] the participants on how to use attorney-client privilege to ensure

sensitive intelligence collection activities would not surface in litigation." (*Id.*)  Discovery confirms

that a version of this presentation does in fact exist (Ex. 36), █████████████████████████

████████████████████████████████. (Ex. L [12/20/2017

Jacobs Dep. Tr.] at 76:16-77:16.)  This indicates that versions of Clark's presentation were lost or

destroyed.

Jacobs testified that ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████[18] (Ex. L [12/20/2017 Jacobs Dep. Tr.] at 80:18-81:5.)  ███████████████

_____

[18]     Uber witnesses have █████████████████████████████████████████████

███████████████████ For example, Padilla testified that ██████████████████████

████████████████████████████████████ (Ex. B [12/22/2017 Padilla Dep. Tr. Vol.

2] at 198:16-203:11.) ██████████ And it would not be surprising for Clark to omit from the presentation to Padilla the

more controversial aspects of his normal presentation.  Indeed, during Uber's investigation of Clark

and other ThreatOps personnel, █████████████████████████████ (Ex. 54 at UBER00334507-08; Ex. K

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ████████████████████████ (*Id.* at 81:13-82:8.)

4    ████████████████████████████████████████████████████████

5 ████████████████████████ (Ex. G [12/20/2017 Russo Dep. Tr.] at 74:13-84:4; Ex. I

6 [12/21/2017 Gicinto Dep. Tr.] at 80:6-181:5.)  Based on this training, certain ThreatOps personnel

7 were clearly left with an overbroad understanding of the use of the privilege.  For example, Russo

8 testified that ██████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████████

10 ██████ (Ex. G [12/20/2017 Russo Dep. Tr.] at 79:8-9; *see also* Ex. H [12/19/2017 Nocon Dep. Tr.]

11 at   171:13-172:11;  Ex. AA [12/22/2017 Henley 30(b)(6) Dep. Tr.] at 115:15-116:22.)   Before

12 learning of the Jacobs Documents, Waymo was unaware of Clark's training ThreatOps personnel in

13 regards to attorney-client privilege designations.

14        The ThreatOps documents that have been produced reflect a pattern of improperly

15 designating material as attorney-client privileged.  For example, the "████████████████" document

16 authored by Russo discussed above (Ex. 13) is prominently marked as "Attorney-Client Privilege,"

17 "Confidential Work Product," and a "Eyes Only" document.  The weekly competitive intelligence

18 email ████████████████████████████████████ contains an "A/C privilege"

19 notation in its subject line (Ex. 15.)  The December 2016 ████████████████████ is labeled as

20 "Attorney-Client  Privilege"  and  "Confidential  Work  Product."   (Ex. 18.)   The ██████████

21 ████████████████████████████████████ (Exs. 21 & 22), as well as the ████████

22 ████████████████████████████████████ (Ex. 24) are all marked as being

23 "Created at the Direction of Legal – Attorney-Client Privilege & Confidential Work Product."   The

24 fact that all of these documents have now been produced confirms that Uber acknowledges that

25 these  designations  were  improper.  ██████████████████████████████████████

26 ████████████████████████████████████████████████████████████

27

28
_____
[12/22/2017 Spiegler Dep. Tr.] at 220:9-222:19.)

Irrelevant

1  ██████████  Before the supplemental discovery period, Waymo was unaware of any of these

2  documents or their improper attorney-client privilege designations.

3  Further, newly produced documents show that ████████████████████

4  ████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████

6  ████████████████████████████  (Ex. 37.)

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10  ████████████  (Ex. 38.)  There is no question these privilege designations were improper—Uber

11  itself has now been forced to produce these documents, again showing they were improperly

12  marked, this time at ████████████direction.  Before the supplemental discovery period, Waymo was

13  unaware of any of senior Uber management directing the use of contrived attorney-client privilege

14  designations.[19]

**5.  Uber's Consideration Of Aggressive And Controversial Data-Retention Policies Raises Further Concerns Regarding Spoliation Of Evidence.**

16

17  Discovery into the Jacobs documents has also revealed that ████████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████  (Ex. A [12/14/2017 Yoo Dep. Tr. Vol. 2] at 434:1-435: 8, 447:4-9; Ex. B [12/22/2017

20  Padilla Dep. Tr. Vol. 2] at 244:19-24, 2501:11-251:25.)  According to Padilla, ████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████  (Ex. B [12/22/2017 Padilla Dep. Tr. Vol. 2] at 257:16-258:14; *see also* Ex. A

23  [12/14/2017 Yoo Dep. Tr. Vol. 2] at 435:9-436:9.)

24  ████████████████████████████████████████████████████████████

25  _____

26  [19]  During her deposition, ████████████████████████████████████████

27  ████████████████████████████████  (Ex. B [12/22/2017 Padilla Dep. Tr. Vol. 2] at

203:18-206:2.)  Besides Padilla's second-hand, litigation-inspired, speculation in a nonresponsive answer during her deposition, Uber has no evidence, much less admissible evidence, to support this theory.

28



1  (Ex. N [12/14/2017 Kalanick Dep. Tr. Vol. 3] at 606:5-618:7.)

2  ███████████████████████████████████████████████████████

3  ███████████████████████████████████. (Ex. A [12/14/2017 Yoo

4  Dep. Tr. Vol. 2] at 437:14-438:20; Ex. B [12/22/2017 Padilla Dep. Tr. Vol. 2] at 252:25-254:13,

5  255:9-259:9.) █████████████████████████████████████████

6  ██████████ (Ex. B [12/22/2017 Padilla Dep. Tr. Vol. 2] at 280:18-281:11), █████████

7  ████████████████. (Ex. B [12/22/2017 Padilla Dep. Tr. Vol. 2] at 264:11-265:5;

8  Ex. A [12/14/2017 Yoo Dep. Tr. Vol. 2] at 436:10-19, 437:3-439:12.)

9       Padilla  testified  that  █████████████████████████████

10  █████████████████████. (Ex. B [12/22/2017 Padilla Dep. Tr. Vol. 2]

11  at  269:12-272:6,  291:1-13.)   According to Padilla, █████████████████

12  █████████████████████████████████████████████████████

13  █████████████████████████████████████████████████████

14  █████████ (*Id.* at 291:1-13.)  Padilla also testified that ████████████████

15  █████████████████████████████████████████████████████

16  ████████████████████████████████████ (*Id.* at 271:21-24.)  But, when

17  █████████████████████████████████████████████████████

18  █████████████████████████████████████████████████████

19  ████████████████████████ (Exs. 40 & 41), ██████████████████

20  █████████████████████████████████████████████████████

21  ████████████████████. (Ex. 42 ¶ 6 & 43 ¶¶ 6, 7).  Additionally, Padilla's testimony

22  █████████████████████████████████████████████████████

23  ████████[20]  (Ex. 44.)  In fact, ██████████████████████████

24  ██████████████████████████████████████[.]"  (Ex. 44.)  Padilla also █████

25  █████████████████████████████████████████████████████.

26  (*Compare* Ex. 44 ("█████████████████████████████████████

27

28
_____

[20]  Uber does not appear to have produced performance reviews for █████████

1  █████████.”), *with* Ex. B [12/22/2017 Padilla Dep. Tr. Vol. 2] at 291:18-292:14

2  (testifying that ██████████████████████████████████████████

3  ████████████.)

4  Uber claims ████████████. (Ex. B [12/22/2017 Padilla Dep. Tr. Vol. 2]

5  at 285:10-19.)  But its willingness to consider such a controversial policy, and the internal reaction

6  thereto, raises serious concerns regarding its preservation of relevant data in this case.

7  **D.    Uber Paid Off Jacobs In An Effort To Conceal His Allegations.**

8  Uber settled Jacobs' claims in August 2017 by agreeing to pay $4.5 million to Jacobs and

9  $3 million to his attorneys.[21]  (Dkt. 2447 [11/29/2017 Hr'g Tr.] at 62:18-63:12; Ex. 56 ¶ 2(a)

10  [UBER00326370] (Settlement Agreement).)

11  Of the $4.5 million paid to Jacobs, $2.5 million was paid over a twelve month period

12  pursuant to a consulting agreement.  (Dkt. 2447 [11/29/2017 Hr'g Tr.] at 63:6-15; Ex. 57.)  With

13  the settlement, ████████████████████████████████████

14  ██████████████████████████████████████████

15  ██████████████████████████████████████████

16  █████████████████████" (Ex. 56 ¶ 7 [UBER00326370] (Jacobs Confidentiality

17  Agreement); Ex. 58 ¶ 3 [UBER00326386] (Counsel Confidentiality Agreement).)    Jacobs'

18  settlement agreement also included a "clawback" provision that would require Jacobs to forfeit his

19  settlement proceeds in the event of a breach of confidentiality, nondisparagement, or failure to

20  cooperate.  (Dkt. 2447 [11/29/2017 Hr'g Tr.] at 57:16-58:14; Ex. 56 ¶ 2(b).)  Taken together, the

21  magnitude, structure, and timing of the Jacobs settlement strongly suggest that Jacobs was paid off

22  to ensure that his allegations would never see the light of day.

23  **II.   Defendants' Discovery Misconduct With Regards To The Jacobs Documents Is Consistent With Their Prior Conduct in This Case.**

24

25  ───────────────

26  [21]  Clayton Halunen, Jacobs' lead attorney, has submitted a Declaration stating that his firm "did not maintain time records sufficient to show the time spent on Mr. Jacobs' matter or send invoices to Mr. Jacobs reflecting its work on the matter."  (Ex. 55 [Halunen Decl.].)  He estimated

27  that the time his firm spent working on the matter was approximately 230 hours.  (*Id.*)  He did not have personal knowledge of the amount of time spent by co-counsel, but presumed it was also

28  approximately 230 hours.  (*Id.*)

1    Uber's failure to produce the Jacobs Documents and information relating to the Jacobs

2    allegations is unfortunately, hardly the first time Defendants and their agents have sought to conceal

3    material information in this litigation.  Rather, this failure is simply one small part of a larger pattern

4    of discovery misconduct that has come to characterize this case.  As discussed below, Uber and its

5    agents have engaged in systematic destruction of evidence, concealed sources of material

6    information, and violated Court orders and discovery obligations.   Additionally, the recently

7    discovered evidence demonstrating that ThreatOps personnel used nonattributable devices,

8    ephemeral communications to avoid discovery, and contrived attorney-client privilege designations

9    harkens back to similar, but far-more widespread conduct, uncovered by Waymo during normal

10   discovery in this case.  Waymo has previously briefed many of these issues and, on August 25,

11   provided the Court with a then-comprehensive list of Defendants' Discovery Misconduct.  (Dkt.

12   1356.)   Pursuant to the Court's directions at the December 4 hearing, Waymo collects and

13   summarizes the most salient of those prior instances here, as they relate to the recent Jacobs-related

14   concealment and misconduct.

**A.    Defendants Have Committed Severe Spoliation Of Evidence.**

**1.    Defendants Have Used Ephemeral Messaging Services Throughout Their Organization To Avoid Discovery In Potential Litigation.**

Prior to the U.S. Attorney's disclosure of the Jacobs Letter, Waymo was aware that central

witnesses in this case—including Levandowski, Kalanick, and Eric Meyhofer (the current head of

Uber ATG)—used Telegram, an encrypted messaging application that, according to its FAQ page,

offers "Secret Chats with self-destructing messages, photos, and videos."[22]  Waymo also believed,

as explained more fully in Waymo's Motion for Jury Instruction Based on Spoliation (Dkt. 2197-4),

that Kalanick used a 30 day auto-delete setting on his iPhone that effectively turned his text

messages into ephemeral communications, resulting in the spoliation of hundreds of text messages

with Levandowski.[23]  Waymo's concerns regarding this conduct have been reinforced by the newly

---

[22]    *See* Telegram FAQ page, available at https://telegram.org/faq, at "Who is Telegram for?" and "How are secret chats different?").)

[23]    As set forth in the two declarations provided by Matthew Schroeder, Waymo's forensic

1    discovered evidence related to the Jacobs Letter, as discussed above. (*Supra* Section I.C.3.)

2              **2.    Uber's Senior Management Instructed Anthony Levandowski To**
                       **Destroy Five Hard Drives Of Waymo Information That He Had**
3                      **Improperly Retained.**

4           As set forth fully in Waymo's Motion for Jury Instruction Based on Spoliation (Dkt. 2197-4),

5    from the Stroz Report, Uber and its outside counsel have known all along in this case that

6    Levandowski retained, and then allegedly destroyed, five disks of confidential Google information.

7    An April 2, 2016 memorandum summarizing Stroz Friedberg's interview with Anthony

8    Levandowski states that Levandowski told Stroz Friedberg that in the course of gathering

9    information for the due diligence investigation, he realized he was in possession of 5 hard drives

10   containing Waymo proprietary "████████████████████████████████████████

11   ██████████████████████." (Ex. 60 at STROZ_0001571.)  According to the notes of

12   Morrison & Foerster attorney Eric Tate, the 5 drives contained "████████████████████████

13   ████████." (Ex. 61 at UBER00324024.)  Levandowski told Stroz that he had informed Uber

14   executives Travis Kalanick, Cameron Poetzcher, and Nina Qi about the disks.  (Ex. 60 at

15   STROZ_0001571.)  In response, Kalanick told Levandowski to "██████████████████████" (*Id.*

16   at STROZ_001572.)  When Levandowski told Kalanick ████████████████████████████████

17   ████. (*Id.*) Levandowski then claimed to Stroz that ████████████████████ (*id.*), though ████

18   ████████████████████████████████████. (Ex. 62 at UBER00312688.)  There is

19   no doubt that Uber reasonably contemplated litigation with Waymo at the time ████████████

20   ████████████████████████████—such reasonable expectation of

21   litigation is the basis for Uber having claimed privilege over the Stroz due diligence in the first

22   place.  The fact that Uber's CEO, in the presence of senior management, and while under reasonable

23   expectation of potential litigation, would ████████████████████████████████████████

24   ██████████ further confirms Uber's willingness to engage in evidence spoliation.

25          Further, as previously briefed by Waymo (Dkt. 676-4 at 13-14), Uber's failure to timely

26   _____

27   consultants have been unable to corroborate Kalanick's assertion that he used the 30 day auto-delete
     setting, and Kalanick's expert has not identified which portion(s) of Kalanick's iPhone's
28   configuration files reflect the use of that setting at time, let alone for the time period prior to the
     imaging of the phone in June 2017.  (*See* Dkt. 2197-12 and 2265-5.)

1   inform the Court and Waymo of this destruction of evidence violated the Court's Expedited

2   Discovery Order, which required Defendants, by March 31, to produce all files and documents

3   downloaded by Anthony Levandowski and, to the extent such files or documents had been "deleted,

4   destroyed, or modified," ordered Defendants to "state the extent thereof and produce all documents

5   bearing on said deletion, destruction, or modification." (Dkt. 61 ¶ 4.)  Neither Uber, nor Morrison

6   & Foerster, disclosed Levandowski's claim to have destroyed the drives until serving an

7   interrogatory response on June 5—the **same day** Judge Corley issued her Order compelling

8   Defendants to produce the Stroz due diligence report that included a description of Levandowski's

9   claims.

10             **3.     Defendants Systematically Destroyed Evidence Regarding Ottomotto's
                        Formation And Early Development**

11

12             As detailed in Waymo's Motion for Jury Instruction Based on Spoliation (Dkt. 2197-4),

13   Defendants have also engaged in severe, bad faith evidence spoliation beyond that disclosed by the

14   Jacobs Documents.   Text messages between Levandowski and Uber personnel, including Travis

15   Kalanick and Nina Qi during the negotiations for Uber's acquisition of Ottomotto, were destroyed.  (*Id.*

16   at 7-9.)   Ottomotto executives, including Anthony Levandowski and Lior Ron deleted, in real time,

17   communications regarding Ottomotto's formation and early development.  (*Id.* at 11-12.)  Further, as

18   discussed below (*infra* Section II.A.5), Defendants ███████████████████████████████

19   ████████████████████████████████████████████████████████████████████████████

20   ███████.  (*See also* Dkt. 2197-4 at 12-13.)   Also, as explained above (*supra* Section II.A.2),

21   Levandowski claimed to Stroz that while he was an executive at Ottomotto and a consultant for Uber,

22   and at the direction of Uber's then-CEO Travis Kalanick, he ████████████████████████

23   ████████████████████████████.  (*See also* Dkt. 2197-4 at 10-11.)   This

24   intentional, bad-faith destruction of evidence occurred at a time when Uber and Ottomotto—both their

25   own admission in this litigation and elsewhere—reasonably anticipated litigation with Waymo regarding

26   the very claims at issue here.[24]  (*Id.* at 2-7.)  All of this spoliation of evidence by Defendants is incredibly

27        _____

          [24]   Additionally, an email produced from Stroz Friedberg's internal files indicates that after the due

28   diligence report was prepared, John Gardner—Anthony Levandowski's personal attorney—sent what

                                                        -29-

1    troubling, as it occurred during Ottomotto's formative stages, likely breaking the clearest chain of

2    evidence that would trace Uber's current technology back to Waymo and resulting in the loss of

3    contemporaneous documents reflecting the knowledge and intent of Uber.

4              **4.    Defendants Withheld Information And Discovery Regarding
                       Levandowski's Two Non-Uber Laptops "Used for Uber Work."**

5

6              Since the outset of the case, the centerpiece of Defendants' defense has been that there was

7    no evidence that stolen Waymo files ever made it to "Uber's servers."  Because Ottomotto and Uber

8    policy allowed Levandowski to use non-Uber devices for work, the existence and contents of any

9    such computers is critical evidence, even if they are not so-called "Uber servers."   Forensic

10   investigation of the computers Levandowski provided to Stroz (much of which was uncovered by

11   Waymo's own analysis after the Federal Circuit ruling) only highlighted that relevance, given that

12   Stroz failed to collect from Levandowski, let alone "vault," devices and external media that may

13   well have been used to copy and transfer Waymo trade secret files.  (Dkt. 2063 at ¶¶ 25-53.)

14   However, as set forth in Waymo's Second Supplemental Brief in Support of its Motion for an Order

15   to Show Cause (Dkt. 2053-4) and Motion for Jury Instruction Based on Spoliation (Dkt. 2197-4),

16   Defendants concealed information and discovery about at least two off-server Levandowski laptops.

17             Recounting the timeline of Defendants' evolving representations and disclosures about these

18   computers takes at least eight pages.  (Dkt. 2053-4 at 3-10.)  Waymo therefore only summarizes

19   some of the most salient issues. On April 20, 2016— just six days after receiving Jacobs' resignation

20   email—Angela Padilla sent an email to Levandowski, cc-ing Kalanick, stating that "I understand

21   that there are two laptop computers in your possession that you've used for Uber work that have not

22   yet been provided to us for inspection in the Waymo litigation. ███████████████████████

23   ████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████████

25   █████████████████████████████████."  (Ex. 63 [UBER00324612] (emphasis in

26   original).)  Defendants withheld this email as privileged until Waymo moved to compel based on

27   _____

28   Eric Friedberg characterized as a "███████████████████████████" (Ex. 50), which letter Uber is
     currently withholding on its privilege logs.  (*See* Ex. 51 at entry 4889.)

Defendants' improper use of the privilege as a sword and shield, and it was not produced to Waymo until September 21—after the close of fact discovery.

Unknown to Waymo at the time (or the Court) – who was told **repeatedly** by Defendants that they did not have access to Levandowski's personal computers because Levandowski was being uncooperative – sometime in April and/or May, "[a]t Uber's request, Levandowski provided the two computers to Goodwin [Levandowski's attorneys in the Google-Levandowski arbitration, as well as counsel for Otto Trucking] for Goodwin to run searches provided by Uber. Goodwin ran those searches and provided the results to Uber." (Dkt. 2019-1 [10/17/2017 R. Walsh Declaration] at 1-2.) Defendants then produced seven documents purportedly from Levandowski's non-Uber computers to Waymo, without indicating that they came from the supposedly inaccessible computers. After the close of fact discovery, Uber's hired expert from Stroz included the computers among those searched as part of his report on "whether any Waymo LLC ('Waymo') confidential material was placed on Uber's computer systems." (Dkt. 2017-5 [9/7/2017 Expert Report of Kevin Faulkner] at 1.) To date, Waymo still does not know what searches were purportedly run, what documents may have been withheld, what documents had been destroyed before the search, and what happened to the laptops (and any forensic artifacts of same) after Goodwin Procter ran the searches for Uber.

In addition to concealing communications about these non-Uber computers behind a range of purported privileges (attorney-client, Fifth Amendment, common-interest), Defendants and their experts withheld even facts. As just one example, on May 22, just five days after "Goodwin Procter transmitted the results of the searches of Levandowski's computers to Morrison & Foerster" (Dkt. 2018-3 [10/17/2017 A. González Declaration] at 1), Waymo served its First Set of Expedited Interrogatories, including one asking Uber to "**IDENTIFY all** Uber Devices and **Non-Uber Devices** . . . that **LEVANDOWSKI has used** . . . or that **LEVANDOWSKI could have used** to access any of DEFENDANTS' Networks[.]" (Ex. 64 [1st Set of Expedited Rogs] at Interrogatory No. 3 (emphasis added).) Uber's response, on June 5, identified only one responsive "personal MacBook Pro (not issued by Uber)" that was used "to access Uber's networks[.]" (Ex. 65 [Uber's Response to 1st Set Expedited Rogs] at 5-6.) At that time, of course, Padilla, Kalanick, and Morrison &

1    Foerster all knew that Levandowski had *two* non-Uber computers (both of which, according to

2    Faulkner's expert report, were MacBook Pros) responsive to the Interrogatory.  On June 21, Waymo

3    moved to a compel "a complete response to Interrogatory No. 3." (Dkt. 681-4 at 7).  In opposition,

4    Uber filed a declaration from its hired expert Faulkner, that stated that "[m]y team at Stroz Friedberg

5    worked for counsel for Uber and Uber to investigate what information the company had related to

6    the devices used by Anthony Levandowski on Uber's network" and that "[b]ased on Stroz

7    Friedberg's investigation to date, Stroz Friedberg has not identified any other Levandowski devices

8    that accessed Uber's network" beyond those disclosed in the interrogatory response. (Dkt. 749-8.)

9    Judge Corley denied Waymo's motion, ruling that "[w]ith the filing of the Declaration of Kevin

10    Faulkner, Uber's response is sufficient." (Dkt. 881 at 2.)

11        To date, Defendants have never provided the factual basis for Padilla's April 20, 2016

12    "understand[ing]" in her letter to Levandowski that Levandowski used the second MacBook Pro

13    "for Uber work," instructing Padilla not to answer questions about conversations she had with

14    anyone about the laptops other than Levandowski's lawyers on grounds of privilege and/or work

15    product protection. (Ex. P [10/2/2017 A. Padilla Dep. Tr.] at 58:21-66:16.)

16        The upshot of this convoluted procedural history is that Defendants have claimed, in formal

17    discovery channels, that they did not have any access to Levandowski's personal devices.  At the

18    same time, however they secretly arranged for Goodwin Proctor to conduct some limited searches

19    on these devices that could be used in their forensic expert reports to justify their claims that "the

20    files never made it to Uber"—all the while shrouding the entire process and methodology in

21    privilege and avoiding producing of harmful evidence on the laptops.  This is completely improper.

22            **5.    Defendants Structured the Tyto "Acquisition" to Destroy All Tyto Email
                     Archives**

23

24        As explained in Waymo's Motion for Jury Instruction Based on Spoliation (Dkt. 2197-4),

25    Tyto—a LiDAR company owned and controlled by Levandowski and through which Defendants

      improperly acquired Waymo's Trade Secret No. 90—was "acquired" by Defendants in a deal structured

26    to exclude, and then destroy, all Tyto email archives.  Important communications between Levandowski,

27    James Haslim, Kalanick, and others involved in Tyto's LiDAR work and/or acquisition have either been

28

-32-

1   destroyed, withheld on grounds of purported privileges, or are otherwise missing.

2   Uber executives began discussing "████████████████" with Levandowski in mid-

3   January 2016, when Levandowski was still a Google employee.  (*See* Ex. 66 [UBER00068740].)

4   According to John Bares, then-head of ATG, "Tyto" was the "████████████" that "████████████

5   ████████████" (Ex. 67 [UBER00218264].)  An ████████ line item for the Tyto "██████" was included in

6   the first Newco Operating Plan sent to Uber.  (Ex. 68 [UBER00218400 and UBER00218401].  The

7   April 11 Put Call Agreement, signed by then-Uber CEO Travis Kalanick, required Ottomotto to "████

8   ███████████████████████████████████████████████████████████████████████████" (Ex.

9   69 [UBER00016983] at Section 4.3.)

10  One week later, late on the evening of April 17/early morning of April 18, Levandowski spoke

11  with Kalanick, texting him afterwards, "████████████████████████████████" (Ex. 70

12  [UBER00073859].)  Later on April 18, Levandowski texted Lior Ron, "██████████████████

13  ████████████████████████████" (Ex. 71 [RON0022532] (emphasis added).)

14  A little over an hour later, Ron texted Levandowski, "████████████████████████████" (Ex.

15  72 [RON0022531] (emphasis added).)  The Ottomotto-Tyto term sheet was executed on April 28, with

16  no involvement by any of Defendants' attorneys until just the day before.  (Ex. 73 [TYTO-001331]; Ex.

17  74 [8/30/2017 Defendants' Tyto Categorical Privilege Log].)

18  Ron emailed Kalanick and Poetzscher, cc-ing Levandowski, the "████████████████████

19  ████████████████" on May 4.  (Ex. 75 [UBER00109892; UBER00109893; UBER00109919].)

20  That Asset Purchase Agreement excluded from the acquisition a handful of Tyto's assets, most

21  conspicuously "████████████████████████████████" (*Id.* at Schedule C

22  [UBER00109922].)  The next day, Poetzscher emailed, "██████████████████████████████████

23  ████████." (Ex. 76 [UBER00071397] (emphasis added).)  On May 10, Poetzscher emailed Kalanick

24  to inform him that ██████ had "████████." (Ex. 77 [UBER00100343].)

25  Ognen Stojanovski, Levandowski's long-time friend and Tyto's nominal "manager," testified

26  that the exclusion of the Tyto email archives from the acquisition "[p]robably originated from my side,

27  from the Tyto side," and that after the closing the emails were destroyed because "I didn't need to have

28  access to Tyto LiDAR e-mail anymore, so there wasn't any sense in paying for ongoing e-mail hosting

services."  (Ex. Q [7/20/2017 O. Stojanovski Dep. Tr.] at 308:3-311:2.)

**B.**     **Defendants Have Made A Habit Of Violating The Court's Orders**

**1.**     **Defendants Violated The Expedited Discovery Order And Paragraphs 2 and 4 Of The Provisional Relief Order.**

The Court issued very clear orders early in the case requiring Defendants to produce to Waymo any files taken by Levandowski, as well as the devices used to take them.  (Dkt. 61 at 2 ¶ 4; Dkt. 426 at 23 ¶ 2.)  Both deadlines passed without the return of a single one of the misappropriated files.  Moreover, the Court's March 16 Expedited Discovery Order required Defendants to state "the full extent" of the destruction of "any part of said downloaded materials."  (Dkt. 61 at 2 ¶ 4.)  Again, that deadline came and went without the disclosure of a single instance of shredding or electronic deletion.  As explained in Waymo's Motion for an Order to Show Cause (Dkt. 676-4), Reply in support of same (Dkt. 886-3), Response to MoFo and Stroz's Order to Show Cause Responses (Dkt. 915), August 7 Supplemental Brief in Support of its Motion for an Order to Show Cause (Dkt. 1095), September 10 Corrected Supplemental Brief in Support of its Motion for an Order to Show Cause (Dkt. 1501-4), and Second Supplemental Brief in Support of its Motion for an Order to Show Cause (Dkt. 2053-4), Defendants and their agents willfully violated the Court's Orders.

Waymo discovered that Defendants' agents Stroz, Epiq, MoFo were sitting on literally thousands of files that should have been, but were not, disclosed in response to the Court's Orders.  The Court's PI Order required Defendants to "immediately and in writing exercise the full extent of their corporate, employment, contractual, and other authority" to return the misappropriated files.  (Dkt. 426 at 23 ¶ 2.)  Defendants were also ordered to provide a detailed accounting of all individuals who have received downloaded materials.  (*Id.* at 24 ¶ 4.)  Instead of complying with the Court's Orders, Defendants concealed Stroz's possession of over 100 Levandowski devices, including several devices that contained thousands of Waymo files.  (Dkt. 1501-4 at 2-4.)  These devices are not and could not be protected by any privilege, but even so, they were never produced—or even disclosed on any of Defendants' privilege logs.

Defendants also took full advantage of the lengthy appeals process over their privilege assertions in order to obscure, and often misrepresent, the downloaded material described in the Stroz Report and

1  in the possession of their agents.  One particularly egregious example is the so-called "Sliver" that MoFo

2  received in March 2017, denied having, and whose existence Waymo only learned based on an email

3  from another of Defendants' law firms (Boies Schiller) in June.  Before the Federal Circuit rejected

4  Defendants' meritless privilege argument, counsel at MoFo repeatedly characterized what they had as

5  nothing more than just a "sliver" of Stroz materials.  (*See, e.g.*, Dkt. 1260 at 29:1-5 ("This is – this is a

6  small sliver."))  Counsel at MoFo also repeatedly represented that none of the documents in their

7  possession—either in this "Sliver" or among the exhibits to the Stroz Report—had been misappropriated

8  by Levandowski from Waymo.  (*See, e.g., id.* at 28:8-10 ("Your Honor, the notion that Morrison &

9  Foerster has the stolen documents or ever had the stolen documents is completely baseless.").)  In fact,

10  as Waymo learned once the Federal Circuit ruled, the "Sliver" was over **68,000** files and many of them

11  were photographs of confidential Waymo documents taken when Levanodwski was still working there

12  and retained after he left.  (Dkt. 1928-4 at 13.)  But had the Federal Circuit not affirmed the Courts'

13  orders compelling the Stroz Materials, Defendants' narrative about the "Sliver" would remain the only

14  one known to the public, Waymo, or the Court.  (*See generally* Dkt. 2053-4 at 14-21.)

15      Waymo also learned that exhibits to the Stroz Report included documents that Waymo had

16  specifically alleged to be "stolen documents."  (Dkt. 2053-4 at 14-17.)  These Waymo documents are

17  not and could not be privileged either, but were not produced in response to any of the Court's Orders.

18  Nor did Defendants identify these undisputedly responsive "downloaded materials" in the Paragraph 4

19  accounting, referring rather to generalized categories of "**potentially** downloaded materials."  (*See*, *e.g.*,

20  Dkt. 1170 (emphasis added).)

21          **2.      Defendants Violated Paragraph 5 Of The Provisional Relief Order.**

22      The Court's PI Order required Defendants to provide, at the outset of discovery, a "complete

23  and chronologically organized log of all oral and written communications – including, without

24  limitation, conferences, meetings, phone calls, one-on-one conversations, texts, emails, letters, memos,

25  and voicemails—wherein Anthony Levandowski mentioned LiDAR to any officer, director, employee,

26  agent, supplier, or consultant of defendants."  (Dkt.  426 at 25 ¶ 5.)  As set forth in Waymo's September

27  10 Corrected Supplemental Brief in Support of its Motion for an Order to Show Cause (Dkt. 1501-4),

28  Defendants grossly violated that Order, failing to log hundreds of LiDAR-related communications

between Levandowski and Uber executives and engineers (including James Haslim, Travis Kalanick, Eric Meyhofer, and Daniel Gruver) until after the close of fact discovery. Even that tardy disclosure (the fifth such supplementation of a log that was supposed to be "complete" by June 23) omitted important LiDAR communications, which Waymo had to uncover itself from Defendants' rolling productions. As just one example, Defendants have never disclosed on any version of their Paragraph 5 logs the January 3, 2016 late-night white-boarding session Levandowski and Kalanick, in which the topics included (among other things) how " ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇." (Ex. 78 [UBER00311294].)

Defendants' non-compliance with Paragraph 5 of the PI Order also highlights their discovery gamesmanship. Defendants would routinely withhold documents from relevant custodians until the eve of their deposition, greatly prejudicing Waymo's ability to prepare exhibits and examination topics. As just one example, Defendants first logged dozens of LiDAR text messages between Haslim and Levandowski on June 30—without corresponding Bates numbers. Defendants did not include Bates numbers for those text messages because they hadn't yet been produced to Waymo – and would not be, for almost six weeks, until a document dump the day before Haslim's deposition. (*See* Dkt. 1501-4 at 6-8.) Defendants engaged in similar practices with regard to LiDAR communications between Levandowski and, among others, Scott Boehmke, Eric Meyhofer, Don Burnette, and Daniel Gruver. (*Id.* at 7-11.)

### C. Defendants Have Repeatedly Failed To Adequately Search For And Produce Documents In This Case.

#### 1. Defendants Neglected To Produce Anthony Levandowski Documents From Ottomotto, Necessitating The First Trial Continuance.

Even before the continuance to investigate the Jacobs Documents, the Court was forced to continue the originally scheduled October 10 trial date based on Defendants' failure to produce documents from the most important witness in this case, Anthony Levandowski. (Dkt. 1965 [10/3/2017 Hr'g Tr.] at 39:21-40:1 ("[A]nd then word comes from Uber that oh, my God, they had not produced Levandowski's own Ottomotto files, which seemed remarkable to me after 25 years of doing what you lawyers are doing, and now 18 years doing this, that the most important witness in the case somehow his own files got overlooked. Very suspicious.").

On September 20, counsel for Defendants represented to the Court that "Ottomotto documents were migrated onto the Uber computer system at the time that it was acquired.  And, therefore, when we searched for documents in response to document requests we would have searched not only Uber but anything that may have migrated over from Ottomotto."  (Dkt. 1723 [9/20/2017 Hr'g Tr.] at 37:17-38:17.)  That representation turned out to be false.  Seven days later, on September 27—less than 2 weeks before the original October 10 trial start date—Defendants' counsel notified Waymo that it had come to their attention that there "may be emails and documents from an Anthony Levandowski Ottomotto account that was not migrated over to Uber."  (Ex. 79.)  The next day, Waymo learned that this new cache of unsearched documents includes at least 16,000 emails and 85 GB of Google drive documents from an Ottomotto domain used by Levandowski.  (Dkt. 1928-4 at 7.)

As Waymo noted in its October 2 Supplemental Motion for a Continuance, there was simply no excuse for Defendants' failure to produce these Levandowski documents from Ottomotto in light of Waymo's document requests (which were directed to both Uber and Ottomotto separately) and the Stroz report, which clearly disclosed to Defendants the Levandowski ottomotto.com domain from which these documents were drawn.  (Dkt. 1925.)  Indeed, it appears that Defendants only took action to look for the missing Levandowski Ottomotto emails at all because **Waymo's** expert noticed references to the domain in the Stroz Report and commented in his report on the suspicious lack of such emails in Defendants' document production.  (*See* Dkt. 1928-4 at 9.)  The withheld documents were also material to Waymo's case.  For example, at least two documents from this belated production are cited elsewhere in this order of proof (*see* Exs. 15 & 96)—including one that has never been produced in any form other than in the Levandowski Ottomotto cache.  (*See* Ex 96.)

On September 28, Judge Corley ordered Uber to file by noon on September 29, a declaration that details how the emails and documents were found, where they were found, and why Uber did not find them earlier. (Dkt. 1890 at 7.)  Over two hours after the court-ordered deadline, Defendants filed a vague declaration from their paid expert at Stroz Friedberg, which Judge Corley found completely inadequate because it was "replete with hearsay regarding what unidentified Uber people supposedly said or did" and failed to "explain what information Uber had regarding the Levandowski Otto Accounts." (Dkt. 1903.)  Defendants later filed two additional declarations (Dkts. 1912 & 1913), but as

1   Waymo explained in its Supplemental Motion for Continuance (Dkt. 1928-4 at 9), these declarations

2   were also inadequate because they failed to explain why Uber had failed to migrate the withheld

3   Ottomotto documents onto its own servers in the first place.

4          Documents from Levandowski during his time at Ottomotto obviously go to the heart of

5   Waymo's trade secret claims in this case.  To this day, Defendants have not provided any persuasive

6   explanation as to how these documents could have gone unnoticed, and have not suffered any

7   consequence for their late production.  This misconduct prejudiced Waymo's overall investigation, and

8   led directly to the first trial continuance.

9               **2.      Defendants Waited Until The Eve Of The December Trial Date To
                         Produce Shred Works Receipts Relating To Levandowski's Destruction
10                       Of The Five Drives.**

11         As discussed above (*supra* Section II.A.2), the Stroz Report indicates that Anthony

12  Levandowski was instructed by Uber management to destroy 5 hard drives of Waymo confidential

13  information, but Stroz was unable to confirm that this destruction ever occurred.  (*See, e.g.*, Ex. 62

14  [UBER00312684] (Stroz Report Exhibit 23, "Memorandum: Follow-Up Investigation regarding Shred

15  Works facility")).  Defendants have known the relevance of Shred Works receipts since April 2016, and

16  throughout the entirety of this litigation.  Nevertheless, Shred Works receipts in the possession of Uber

17  employees – and even in the possession of outside counsel – were withheld until just weeks before trial

18  was set to begin in December.  Although never previously briefed, this concealment and 11th hour

19  production is yet another example of Defendants' discovery misconduct.

20         According to counsel for Defendants, Rhian Morgan, former HR lead for Ottomotto and current

21  Uber ATG employee, provided Morrison & Foerster in April 2017 with a Shred Works receipt for "2

22  hard drives," dated March 1, 2016.  (Ex. 80 [11/17/2017 W. Ray email].)  Defendants withheld that

23  receipt from Waymo for the entirety of the discovery period.  At the time, the receipt would be unhelpful

24  to Uber because Waymo did not have the Stroz materials and did not have evidence of Ottomotto's

25  massive document destruction prior to the acquisition.

26         In September, the Federal Circuit Order affirmed the Courts' orders overruling Defendants'

27  privilege objections over the Stroz investigation.  At that point, the March 1, 2016 Shred Works receipt

28  was no longer particularly harmful to Uber, because it was cumulative of the spoliation documented in

1   the Stroz Report.   Nevertheless, the March 1, 2016 Shred Works receipt remained unproduced

2   throughout the extended discovery period, and even until after the original trial date.

3         It was not until November 16 (over a month after the original trial date) that Defendants first

4   notified Waymo of their possession of the receipt.  Significantly, Defendants only disclosed that receipt

5   after Morgan purported to have "found" a hard copy of *another* Shred Works receipt at her house "while

6   looking for something else."  (Ex. 81 [11/16/2017 W. Ray email].)  This receipt was dated March 14,

7   2016, and was for "5 hard drives."  Apparently, this receipt better fit Defendants' preferred timeline and

8   narrative that Levandowski destroyed the 5 disks, and it was produced later that same day, along with

9   the previously withheld March 1 receipt and another purportedly recently discovered Shred Works

10  receipt.  Defendants also immediately added the March 14, 2016 receipt to a "fourth supplemental trial

11  exhibit list" also served on November 16.  (Ex. 82 [11/16/2017 T. Na email].)  Defendants' offered

12  explanation for not producing the highly relevant March 1, 2016 receipt during the discovery period was

13  that at the time they received it from Morgan, in April 2017, "Uber was responding to multiple expedited

14  depositions and document requests and moving to compel arbitration."  (Ex. 80 [11/17/2017 W. Ray

15  email].)

16        Although Defendants offered to make Morgan available for an additional "30 minute deposition

17  about the receipts" (*id.*), and Waymo did depose Morgan on November 21, Defendants' inexcusable

18  delay in locating and/or producing the Shred Works receipts until after the close of fact discovery, and

19  barely two weeks before the (then) trial date, severely prejudiced Waymo.  As just one example, Waymo

20  was prevented from pursuing any third party discovery to investigate the authenticity of the purported

21  March 14, 2016 Shred Works receipt.

22        **D.   Defendants Have Abused The Attorney-Client Privilege Throughout This
           Litigation.**

23

24        Discovery arising from the Jacobs Letter has revealed a variety of practices at Uber intended to

25  improperly game the protections of the attorney-client privilege in order to conceal information from

26  civil litigation.  That same gamesmanship – not limited to attorney-client privilege, but extending to

27  other privileges including the common-interest privilege and Fifth Amendment privilege – has been

28  rampant in this case.

1

**1.  Defendants Cloaked the Stroz Due Diligence Process in "Work Product" Claims Only to Selectively Waive When Convenient**

2

3          Defendants have aggressively asserted the attorney-client privilege in this litigation in order to

4     delay the production of highly relevant material.  The background and procedural history underlying the

5     Stroz due diligence report and related documents is the most notorious example.

6          During a March 28 nonpublic conference requested by Defendants, Uber disclosed for the first-

7     time that it was claiming a common interest privilege over a report of "due diligence" prepared by a

8     third-party in advance of Uber's acquisition of Ottomotto.  (Dkt. 131 [3/29/17 Hr'g Tr.] at 12-13.)  On

9     April 4, Anthony Levandowski—at that time the head of Uber's entire self-driving car program—moved

10    to intervene and, invoking his own privilege against self-incrimination, asked the Court relieve Uber of

11    its obligation to disclose the identity of the third-party who conducted the due diligence investigation.

12    (Dkt. 147.)  The Court rejected Levandowski's requested relief and on April 10 ordered Defendants to

13    prepare a complete privilege log (Dkt. 202), but that order was partially stayed pending Levandowski's

14    petition to the Federal Circuit for a writ of mandamus.  (Dkt. 242.)  Over the course of the next month,

15    Defendants served various iterations of their bevy of privilege logs, which ultimately reflected that

16    Defendants were withholding in excess of 3,500 due diligence related documents.  All of these logs

17    suffered from deficiencies, as Waymo outlined in its Motion to Compel production of the due diligence

18    documents.  (Dkt. 321.)

19          As the proceedings on Waymo's Motion to Compel unfolded, Defendants' privilege claims

20    slowly unraveled.  At the May 3 provisional relief hearing, the Court ordered Uber to finally produce

21    the acquisition documents relating to Uber's purchase of Ottomotto.  (Dkt. 502 [5/3/2017 Hr'g Tr.

22    Public, a.m. session] at 30:14-32:16 ("That document should never have been withheld.").)  And, at a

23    May 25 hearing, Judge Corley ordered Defendants to produce an unredacted version of the deal Term

24    Sheet.  (Dkt. 516 [5/25/2017 Hr'g] at 15:25-16:23.)  On June 5, Judge Corley granted Waymo's motion

25    to compel documents predating the April 11, 2016 signing of the Uber-Ottomotto Put-Call Agreement

26    (Dtk. 549), and on June 21, the Court overruled Defendants' request for relief from Judge Corley's order

27    (Dkt. 685).  Production of the due diligence materials, however, was delayed further by Levandowski's

28    second petition for a writ of mandamus, which was finally denied by the Federal Circuit on September

13, 2017.

The Stroz due diligence report and related materials has proven itself to be a key piece of evidence because it clearly demonstrates that Uber was on notice of Levandowski's theft of Waymo confidential information prior to Uber acquiring Levandowski's company, installing him as its head of its self-driving car effort, and allowing him unrestricted access to use his personal computer devices for his LiDAR development work at Uber.  (Dkt. 1603-4 at 4-10.)  It is clear that Defendants created the convoluted "due diligence" apparatus, layered with and purportedly directed by attorneys, for no reason other than to establish a pretext against discoverability in civil litigation.  (*See* Dkt. 2053-4 at 14-21.) While no Court who considered the issue was ever fooled, the overbroad assertions of privilege by Defendants and their allies did succeed in depriving Waymo of critical evidence for nearly six full months and until well after ordinary discovery had closed.

As with other non-privileged documents that Defendants have never intended to see the light of day in litigation, all of the Stroz materials were marked with "Privileged and Confidential" or "Attorney Work Product" designations.  (*See, e.g.*, Dkt. 1928-24 [Stroz Report].)  While Defendants zealously fought to conceal the results of the Stroz investigation on grounds of privilege and work product protection, they did not hesitate to produce Stroz-related documents whenever doing so would be helpful to their overall litigation position – regardless of whether the document was marked as "Privileged."  For example, Defendants produced unredacted copies of the Stroz retainer letters (labeled "Privileged and Confidential") to Waymo on July 7, months before the Federal Circuit Order, in order to rely on them for their Brief Regarding Imputation (filed the same day).  (*See* Dkt. 824-1; Ex. 87 [UBER00086466]; Ex. 88 [UBER00086483].)

Defendants also attempted to extend the (frivolous) "Stroz Due Diligence Privilege" to conceal documents that were not generated by or for Stroz.  In addition to the underlying source materials collected by Stroz (*see supra*, Section II.B.1.), Defendants, for example, initially withheld dozens of Ottomotto non-privileged "Employee Attestations" (which attested that the employees had not, among other things, misappropriated trade secrets from their former employer) because they were attached to emails that had been logged on a 700 page privilege log prepared in response to the March 16 Expedited

Discovery Order.[25]  Defendants subsequently produced the vast majority of the Employee Attestations in May.  (*See* Ex. 89 [Cross Reference for 4/10 Priv Log and Prod 33]; Ex. 90 [UBER00017154].)  However, Defendants continued to withhold Attestations for the five "Diligenced Employees" even though these, too, were not privileged.  Once these long-concealed Employee Attestations were finally produced, after the Federal Circuit ruling, it became apparent why Defendants tried to hide them: unlike the produced Employee Attestations, Levandowski, for example, did not attest that he had not stolen trade secrets from his former employer.  (Ex. 103 [UBER00319664].)

### 2. Defendants Misused "Attorney-Client Privilege" Designations to Avoid Discovery

Similar to ThreatOps personnel, Uber executives and employees in ATG and business units were trained to designate non-privileged materials with "Attorney-Client Privilege" headers.  Indeed, Defendants have produced dozens of documents with such markings that are not, and never have been, privileged, but which were apparently designated that way by Uber personnel in an attempt to avoid discovery in civil litigation.  Critical, non-privileged documents, such as the "Project Zing Review" presentation that Kalanick made to Uber's Board of Directors on April 11 to approve the Ottomotto deal, are labelled with "Privileged and Confidential" designations on every page.  Moreover, these erroneous markings have repeatedly delayed production of non-privileged documents due to apparent confusion by Defendants' outside counsel.  As just one example, Uber produced in July redacted versions of two ATC "Competitive Intelligence Updates" emails, both of which had been circulated with  "Attorney Client Privilege" headers  (Ex. 83 [UBER00099182]; Ex. 84 [UBER00099282].)  It was apparently not until the following month that Defendants' determined that the headers were incorrectly applied in the first instance, and produced unredacted versions of these non-privileged documents.  (Ex. 85 [UBER00218666]; Ex. 86 [UBER00218437].)

### 3. Defendants Have Used the Attorney-Client Privilege As Both a Sword and a Shield

The Court is well aware of Defendants' repeated use of the privilege as both a sword and a shield, and in particular Defendants' "slick practice of including its lawyers in meetings and communications

---

[25]    A subset of these "Employee Attestations" were also produced in April, but the majority were produced for the first time with the May 22 production.

and deciding after the fact if a lawyer was actually included for the purpose of providing legal advice, all in accordance with what happens to be convenient for Uber's case." (Dkt. 1267 at 3.)  The specific conduct at issue in that Order—Angela Padilla's declaration describing a conversation with Levandowski and Kalanick that was intended to support Defendants' now-rejected "Bonus Theory"— was not only an attempt to abuse the attorney-client privilege, but also, as explained in Waymo's August 7 Supplemental Brief in Support of its Motion for an Order to Show Cause (Dkt. 1095), a violation of the Court's Expedited Discovery Order.  That Order required Defendants to disclose any deletion of downloaded material by no later than March 31, 2017.  The conversation that Padilla disclosed in her publicly filed declaration (Dkt. 1082-1) took place on March 29, just two days before that deadline.  However, it was not disclosed until months later – after Defendants' hatched the "Bonus Theory" in an attempt to turn Levandowksi's pleading of the Fifth Amendment to their own advantage.

### 4.   Defendants Have Used the Fifth Amendment and Common Interest Privileges as Both a Sword and a Shield

As set forth in Waymo's September 10 Corrected Supplemental Brief in Support of its Motion for an Order to Show Cause (Dkt. 1501-4), Defendants have improperly used Levandowski's assertion of the Fifth Amendment privilege as both a sword and shield.  Since (belatedly) terminating Levandowski, Defendants have cynically shifted their theory of the case—instead of defending Levandowski, they are now trying to throw him under the bus.  As part of the new litigation strategy, Defendants have been touting Levandowski's "non-cooperation" on the one hand while withholding any discovery to the contrary under claims of "privilege."   Judge Corley recognized Defendants' gamesmanship in finding that Uber had waived privilege over the April 20 Padilla email about the two concealed Levandowski non-Uber laptops.  (Dkt. 1506.)  Since then, Defendants' have continued to obstruct any discovery into Levandowski's involvement with their defense in this case.  For example, at Angela Padilla's October 2 deposition, she was repeatedly instructed not to answer questions about Levandowski's cooperation with defense counsel regarding (among other things) the May 3, 2017 Zoom meeting he attended on "Judge Alsup's order, 10 questions"; questions about LiDAR technology; the identification of relevant witnesses; and information for use at depositions taken by Defendants.  (Ex. P [10/2/2017 A. Padilla Dep. Tr.] at 55:11-57:22.)  Similarly, at Levandowski's October 18 deposition,

counsel for Defendants instructed Levandowski not to answer questions about Uber's involvement in the Goodwin Procter-led searches of the two non-Uber laptops "used for Uber work." (Ex. R [10/18/2017 A. Levandowski Dep. Tr.] at 444:13-451:4.)  And Defendants' sword/shield approach was on full display at Levandowski's August 22 deposition, where they first asked him questions purporting to demonstrate his refusal to cooperate. (*E.g.*, Ex. S [8/22/2017 A. Levandowski Dep. Tr.] at 271:13-272:18 ("MS. DUNN: Q. But you would not cooperate with Uber's investigation in this case, right?" A: invocation of the Fifth Amendment."), but when **Waymo** asked questions about this purported non-cooperation (*e,g.*, "Q Was -- what specifically did you tell Uber you would not do in relation to Uber's investigation in relation to this litigation?"; "what specifically did Uber's lawyers tell you to do in relation to Uber's investigation, in relation to this litigation, that you refused to do?"), Uber instructed Levandowski not to answer on grounds of attorney-client privilege. (*Id.* at 296:11-299:10.)

### E.     Defendants Have Obstructed Discovery into Tyto

From the very outset of the case, Defendants and their agents have obstructed Waymo's attempts to unravel the truth about Tyto.  Tyto was a LiDAR company that Levandowski set-up to misappropriate and exploit Waymo's trade secret information.  (*Supra* Section II.A.5.)  As discussed above, the acquisition of Ottomotto by Uber was structured so that Ottomotto would first acquire Tyto, ensuring that Tyto's stolen technology would be available to Uber after closing.  (*Id.*)

Tyto was owned by an entity called the Sandstone Group, which in turn was owned by an Alaska irrevocable trust called the Bismuth Trust.  Uber and its witnesses, however, refused to come clean regarding the details of Tyto's ownership and management structure.  Only after serving more than a dozen subpoenas was Waymo able to determine that it was Levandowski who ultimately owned and controlled Tyto through a byzantine structure of shell companies.[26]

Both Defendants and their witnesses concealed Levandowski's involvement with Tyto.  Waymo

---

[26]    In order to penetrate the "Russian nesting doll" ownership structure of Tyto (Dkt. 1887-8 [Timmins Expert Report] at 27-28), and identify Anthony Levandowski at its center, Waymo was forced to serve subpoenas on lawyers Ognen Stojanovski and John Gardner; accountants Stephen Nunnemaker and Nunnemaker & Associates, Inc.; holding companies Sandstone Group LLC; Narwhal Energy, LLC; and Pouch Holdings, LLC; trustees ████████ and ████████; and the Bismuth Trust.

included an interrogatory in its first set seeking information about "the ownership of TYTO and/or ODIN WAVE," but in response, Defendants identified only "████████████████." (Ex. 65 [Responses to 1st Set Exp. Rogs].)  Defendants argued that they could not provide additional information about Tyto's ownership because "we are running into confidentiality issues."  (Ex. 92 [6/9/2017 S. Rivera email].)  As for Defendants' witnesses, at deposition they were less than forthcoming.  For example, James Haslim, Uber's lead LiDAR hardware engineer who submitted a declaration in opposition to Waymo's motion for a preliminary injunction, was a former Tyto employee.  When Haslim was deposed early in this case (*see* Dkt. 180), he testified "I don't know of any involvement of Anthony Levandowski and Tyto LiDAR or Oden Wave."   (Ex. T [4/18/2017 J. Haslim Dep. Tr.] at 17:2-6.)  However, subsequent discovery casts doubt on Haslim's testimony.

Haslim admitted that Levandowski personally contacted him and interviewed him about the Tyto position while Haslim was still at Velodyne.  (Ex. U [8/9/2017 J. Haslim Dep. Tr.] at 493:12-25, 495:14-21; Ex. T [4/18/2017 J. Haslim Dep. Tr.] at 22:7-23:12.)  Once he started at Tyto, in September 2016, Haslim prepared a list of "Questions for Anthony" in order to orient himself to the status of Tyto's technical development.  (Ex. 101 [TYT0-001600]; Ex. U [8/9/2017 J. Haslim Dep. Tr.] at 522:18-523:9; 531:1-6.)  In his work at Tyto, Haslim ordered LiDAR parts that were invoiced directly to Levandowski.  (Ex. 100 [TYTO-001599]; Ex. 101 [TYTO-001600].)  And, Levandowski personally instructed Haslim on the proprietary fiber laser design claimed in Waymo's Trade Secret No. 90.  (Ex. V [5/4/2017 J. Haslim Dep. Tr.] at 129:24-132:13.)  Of particular note, Haslim texted Levandowski on May 1, 2016, immediately after the Tyto term sheet was signed, noting that "██ ██████████████████████████████████████████████████████████ ██████████████" and saying he was "██████████████████████████████████ ███████.  (Ex. 102 [Haslim-AL text message compilation] at UBER00199177.)  According to Haslim, in response to that text, Levandowski "ma[d]e an adjustment to my bonus associated with this acquisition" – from $██████ to $██████, i.e. over ██████████ dollars.  (Ex. U [8/9/2017 J. Haslim Dep. Tr.] at 564:23-565:11; 573:14-574:10.)  In light of all of this evidence, Haslim's testimony that he did not know of "any involvement of Anthony Levandowski" in Tyto is simply not credible.

1    Lior Ron—Anthony Levandowski's co-founder of Ottomotto and currently a Senior Director

2   at Uber—similarly denied any knowledge of an affiliation between Levandowski and Tyto.  (Ex. W

3   [6/19/2017 L. Ron Dep. Tr.] at 175:8-177:22; 179:19-182:3.)  But in March 2016, Ron asked Ognen

4   Stojanovski (Tyto's purported manager) to ████████████████████████████████████████, and

5   Stojanovski informed him that ██████████████████ (which was the code name for Tyto) "████

6   ██████████████████████████████████████████████████."   (Ex.  93

7   [STROZ_R_000176128; Ex. 94 [STROZ_R_000176134].)  Instead of asking why the Ottomotto-Tyto

8   deal would be a "██████████████████████" (which it would not be absent an affiliation between

9   Levandowski  and  Tyto),  Ron  asked  Stojanovski,  "█████████████████████████████████████

10  █████████████████████████████"  (Ex. 95 [STROZ_R_000176238].)  Additionally, on

11  April 19, 2016, Ron emailed Levandowski about ████████ (*i.e.*, Tyto), asking whether ████████ would

12  be "████████████" or "█████████████████." (Ex. 96 [UBER_AL_00014042].[27]) ████

13  obviously referred to Stojanovski, and ████████ obviously referred to the Bismuth Trust (through which

14  Levandowski owned and controlled Tyto).  Two days later, Stojanovski wrote Ron, regarding the Tyto

15  deal, that "████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████████████████████

17  ████████████████████████████████."  (Ex. 97 [RON0024085].)  Again, all of this

18  evidence cannot be squared with Ron's testimony that he was unaware of Levandowski's affiliation with

19  Tyto.[28]

20    Finally, Ognen Stojanovski, currently Uber ATG's Head of Policy and Government Relations,

21  also implausibly claimed to be unaware of Levandowski's involvement in Tyto.  (Ex. Q [7/20/2017 O.

22

23  ────────────────────

24  [27]    This email was not produced until after the close of fact discovery, as it was among the
     missing Levandowski Ottomotto emails that necessitated the first continuance.  (*Supra* Section

25  II.C.1.)

26  [28]    Discovery into Tyto and witnesses' knowledge regarding same has also been obstructed by,
     among other things, the withholding of communications related to the Tyto deal between Ron and

27  Stojanovski on the grounds of purported attorney-client privilege, even though they were ostensibly on
     opposite sides of the transaction.  (*See*, *e.g.*, Ex. 98 [Tyto Privilege Log] at Entry Nos. 13- 15, 84, 87,

28  88, 99, 100-103.)

1   Stojanovski Dep. Tr.] at 28:25-37:20.)  Yet, Stojanovski was the "manager" of Tyto and of Tyto's

2   nominal owner, the Sandstone Group.  Stojanovski was also copied on a July 16, 2013 email from

3   Levandowski to ███████████████████████████████ in which Levandowski

4   ██████████ that ██████████████████████████████. (Ex.  X

5   [STROZ_R_000000806].)  Stojanovswki also admitted that he was recommended for the Sandstone

6   Group role by Levandowski, and Levandowski had made a series of loans to Sandstone in 2015 (which

7   were used to capitalize Tyto), totaling approximately $██████.[29] (Ex. Q [7/20/2017 O. Stojanovski

8   Dep. Tr.] at 30:20-33:15; 128:17-132:20.)  Stojanovski's claim that he did not know of Levandowski's

9   involvement with Tyto rings hollow.

10          The concealment by Defendants and their witnesses of Levandowski's central role at Tyto

11   is particularly nefarious.  As discussed above, James Haslim has admitted that while Levandowski

12   was a Google employee, he personally instructed Haslim regarding the details of LiDAR technology

13   that Waymo claims as Trade Secret No. 90.  (*Supra* Section II.A.5.)  Haslim then admitted that this

14   technology, developed at Tyto, was then adopted into Uber's own Spider LiDAR unit:

15          **Q**. ████████████████ that was incorporated into the Spider
            project was a continuation of the ██████████ that was done at Tyto
16          LiDAR, wasn't it?

17          **THE WITNESS**: The ██████████ investigation was developed
            using similar parts and a similar architecture or approach to the ████
18          ██████████████████ that Anthony first made me aware of.

19   (Ex. U [8/9/2017 J. Haslim Dep. Tr.] at 509:8-17.)  Thus, in attempting to conceal Levandowski's

20   role at Tyto, Defendants were, in fact, concealing evidence that their own long-range LiDAR

21   program was tainted by Waymo intellectual property.

---

27   [29] Over 150 known communications between Stojanovski and Levandowski have been withheld
28   based on an asserted attorney-client privilege.  (*See* Ex. 98 [Tyto Privilege Log] at Entry Nos. 7, 16-
     18, 20, 33-34, 37, 40-41, 44-45, 47, 50, 65, 81, 83; *generally* Ex. 99 [AL Stroz Privilege Log].).

1    DATED:  January 12, 2018                QUINN EMANUEL URQUHART & SULLIVAN,
                                             LLP
2
                                             By /s/ Charles K. Verhoeven
3                                               Charles K. Verhoeven
4                                               Attorneys for WAYMO LLC

WAYMO'S OFFER OF PROOF REGARDING DEFENDANTS' DISCOVERY MISCONDUCT