MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzález@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Tel: 415.268.7000 / Fax: 415.268.7522

KAREN L. DUNN (*Pro Hac Vice*)
kdunn@bsfllp.com
HAMISH P.M. HUME (*Pro Hac Vice*)
hhume@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington DC  20005
Tel:  202.237.2727 / Fax:  202.237.6131

WILLIAM CARMODY (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
SHAWN RABIN (*Pro Hac Vice*)
srabin@susmangodfrey.com
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019-6023
Tel:  212.336.8330 / Fax:  212.336.8340

Attorneys for Defendants
UBER TECHNOLOGIES, INC.
and OTTOMOTTO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>                              Plaintiff,<br><br>         v.<br><br>UBER TECHNOLOGIES, INC.,<br>OTTOMOTTO LLC; OTTO TRUCKING<br>LLC,<br><br>                              Defendants. | Case No. 3:17-cv-00939-WHA<br><br>**DEFENDANTS UBER TECHNOLOGIES,<br>INC. AND OTTOMOTTO LLC'S RESPONSE<br>TO WAYMO'S PRECIS IN SUPPORT OF<br>ITS REQUEST TO FILE A MOTION FOR<br>RELIEF BASED ON DEFENDANTS'<br>LITIGATION MISCONDUCT**<br><br>Date:    TBD<br>Time:    TBD<br>Ctrm:   8, 19th Floor<br>Judge:  Honorable William H. Alsup<br>Trial Date:    February 5, 2018 |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    Nothing in Waymo's 50-page offer of "proof" with five binders of exhibits warrants any

2    sanction.  Yet Waymo wants to file another motion to substitute sanctions for evidence—because

3    it cannot prove its trade secret claims.  That request should be denied.  This case should be tried

4    on its merits instead of unwarranted inferences based on irrelevant innuendo.  The issues Waymo

5    raises have been briefed extensively, and the Jacobs allegations do not provide any reason to brief

6    them further.  As Uber's response to Waymo's Offer of Proof will make clear, discovery into the

7    Jacobs allegations has confirmed that there is nothing relevant to the eight trade secrets at issue.

8    Enough is enough.  It is time for Waymo to stop whining, and try its case.

9    **I.      TERMINATING SANCTIONS ARE NOT WARRANTED.**

10   Waymo came to this Court with trumpets blaring, declaring that it had slam dunk evidence

11   of trade secret theft.  When discovery confirmed that was not true, Waymo decided to raise a

12   series of excuses, based on false allegations of discovery and other abuses, designed to have this

13   Court bail them out.  This Court should not do so.  Waymo obtained extensive discovery into the

14   Jacobs allegations—17 depositions and over 16,000 pages of documents.  None of this turned up

15   any wrongdoing connected to Waymo, much less the specific trade secrets at issue.  As Uber's

16   response will show, no one in Uber's self-driving group engaged in the misconduct alleged by

17   Jacobs, including the use of non-attributable devices, anonymous servers, or knowingly improper

18   attorney-client privilege designations.  There is simply no evidence that Waymo was prejudiced

19   in any way because any relevant evidence was hidden or destroyed.  FED. R. CIV. P. 37(e)(1).

20   The same is true of ephemeral messaging.  Uber employees were instructed that if they

21   were subject to a litigation hold, they should not use ephemeral communications to discuss

22   anything covered by the hold.  (Declaration of Camila Tapernoux Exhibits ("Exs.") A-D.)  There

23   is no evidence that ephemeral messaging was used for discussing anything relevant to this case.

24   (Exs. C, E.)  Moreover, Waymo employees have used ephemeral messaging as a matter of course

25   since the company's founding, and Google employees have used it for a decade.  (Ex. F.)

26   Google's decision to default to ephemeral messaging arose because it ███████████████

27   ██████████████████████████████████████  (Ex. G.)  Google has even argued in

28   prior litigation (1) that a default setting to not retain chats comported with ██████████████

1    ████████████████████ and was ████████████████

2    (Ex. H, ¶ 8), as well as (2) that Google's default "off-the-record" setting for its chat was not

3    improper and did not support a finding of spoliation, because such chats were akin to "hallway

4    conversation[s]" and the proper avenue for discovery regarding these messages was depositions.

5    (Ex. I, *Function Media v. Google*, No. 2007-CV-279, No. 483 at 155:17-156:12 (E.D. Tex. Oct.

6    21, 2010) (post-trial motions hearing on spoliation).)  Like Uber, Google has instructed

7    employees subject to an existing litigation hold to change individual chat settings to "on the

8    record" for communications subject to a litigation hold.  (Ex. H; Ex. I at 154:15-20.)

9          The precedent on which Waymo relies does not support sanctions.  To the contrary, the

10   relevant case law highlights that Waymo's request is improper.  First, a request for terminating

11   sanctions may only be granted upon a finding of willfulness, bad faith, or fault—a standard

12   Waymo tellingly fails to identify, let alone provide evidence of.  *See Brookhaven Typesetting*

13   *Serv., Inc. v. Adobe Sys., Inc.* 332 Fed. App'x 387, 389 (9th Cir. 2009) ("'Where the drastic

14   sanctions of dismissal or default are imposed … the losing party's noncompliance must be due to

15   willfulness, fault, or bad faith.'") (affirming that terminating sanctions were not warranted);

16   *Mitchell v. Acumed, LLC,* No. 11-CV-00752 SC (NC), 2012 WL 761705, at *2 (N.D. Cal. Mar. 8,

17   2012 ("sanction orders taking the plaintiff's allegations as established and awarding judgment on

18   that basis are the most severe penalty . . . . To justify the imposition of such a harsh sanction, the

19   court must find the violations were due to willfulness, bad faith, or fault of the party.") (internal

20   citations omitted); *Mech. Mktg., Inc. v. Sixxon Precision Mach. Co.*, No. C 11-1844 EJD PSG,

21   2013 WL 1563251, at *2-3 (N.D. Cal. Apr. 12, 2013) (denying sanctions that "would have the

22   effect of entering partial judgment for [plaintiff], at least on the issue of damages[,]" noting that a

23   "terminating sanction is considered very severe and should only be imposed if the party acted

24   with willfulness, bad faith, and fault.") (internal citation omitted); *Network Appliance, Inc. v.*

25   *Bluearc Corp.*, No. C 03-5665 MHP, 2005 WL 1513099, at *3 (N.D. Cal. June 27,

26   2005), *aff'd*, 205 F. App'x 835 (Fed. Cir. 2006) ("the imposition of preclusive sanctions may be

27   tantamount to dismissal of a plaintiff's claims or entry of default judgment against a

28   defendant.  Under those circumstances . . .  a showing of bad faith is required.") (internal citation

1  omitted); *Nuance Commc'ns, Inc. v. ABBYY Software House*, No. C 08-02912 JSW (MEJ), 2012

2  WL 5904709, at *2 (N.D. Cal. Nov. 26, 2012) (denying jury instruction to take as established that

3  defendant copied trade dress, which would be "tantamount to [granting] a directed verdict...").

4      Waymo cannot make the requisite showing of bad faith. *See, e.g., Network Appliance*,

5  2005 WL 1513099 at *1 (denying sanctions upon finding of no bad faith where defendant did not

6  produce responsive damages documents earlier because "its [CFO] had concluded that … [they]

7  were not responsive"). Even if it could, its request would fail upon consideration of the five

8  factor balancing test. The "key factors are prejudice and availability of lesser sanctions."

9  *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990). As discussed above, Waymo has not

10  suffered prejudice, especially to the extent reflected in cases where this factor weighed in favor of

11  granting sanctions. Waymo has had the opportunity to conduct full discovery into the evidence at

12  issue, which courts in this district agree is sufficient to remedy any potential prejudice from

13  belated discovery. *Mitchell* 2012 WL 761705 at *3 (finding no prejudice from discovery delay

14  because trial was continued); *Nuance Commc'ns, Inc. v. ABBYY Software House*, No. C 08-02912

15  JSW MEJ, 2012 WL 5904709, at *3 (N.D. Cal. Nov. 26, 2012) (denying motion for issue

16  preclusion sanctions due to late productions where "a discovery extension would have alleviated

17  any prejudice that was caused by Defendants' malfeasance, and, most importantly, permitted the

18  Court and a jury to resolve Plaintiff's trade dress claims on the merits."). Waymo has also not

19  suffered prejudice because, as Uber's Response to Waymo's Offer of Proof will show, the

20  evidence at issue was of minimal if any relevance. *Keithley v. Homestore.com, Inc.*, No. C-03-

21  04447 SI (EDL), 2009 WL 55953, at *3 (N.D. Cal. Jan. 7, 2009) (denying sanctions due to

22  finding of no prejudice where late-produced documents had "little if any relevance to [the] case").

23      The cases on which Waymo relies to argue for prejudice are readily distinguishable. In

24  *Valley Engineers Inc. v. Electric Engineering Co.*, the evidence at issue was a "smoking gun."

25  158 F.3d 1051, 1054 (9th Cir. 2000). Here, as this Court has repeatedly observed, there is no

26  smoking gun. No one in ATG used non-attributable devices or anonymous servers. While there

27  was limited gathering of publicly-available information about Waymo, Waymo points to no

28  evidence of any trade secret misappropriation—because there was none. (Tapernoux Decl., Exs.

1   J-M (Russo at 20:18-21:7, 37:20-38:18; Henley at 106:16-20, 107:15-23, 108:4-6; Nocon at 45:9-

2   19; Gicinto at 145:12-19, 208:15-24, 281:16-282:16).)  Additionally, the *Valley Engineers* court

3   found that the severity of the defendant's conduct in hiding and lying about the document

4   intentionally throughout the litigation warranted severe sanctions because it "so damage[d] the

5   integrity of the discovery process that there [could] never be assurance of proceeding on the true

6   facts."  158 F.3d at 1059.  Similarly, in *Fair Housing of Marin v. Combs*, defendant

7   "misrepresented to both counsel and to the district court that the documents did not exist" when in

8   fact "[t]he documents were in Combs' one-bedroom apartment."  285 F.3d 899, 905-906 (2002)

9   There is no such evidence here.  Waymo also relies on *Fair Housing of Marin* and *Henry* for the

10  proposition that a last-minute production does not cure prejudice.  (Dkt. No. 2472 at 2-3.)  But,

11  unlike here, the parties in those cases did not have the opportunity to conduct discovery into the

12  late-produced evidence.  Waymo obtained extensive follow-up discovery here, and the cases cited

13  above make clear that such an opportunity remedies any potential prejudice.

14      The availability of less drastic sanctions also weighs against granting terminating

15  sanctions.  Waymo's case, *Alexsam, Inc. v IDT Corp.*, 715 F.3d 1336 (Fed. Cir. 2013), applies a

16  far more lenient standard from the Fifth Circuit.  Further, in that case, the defendant had already

17  received less drastic sanctions, yet continued to not comply with its obligations; it was then twice-

18  warned of the risk of future sanctions before the court granted terminating sanctions.  *Id.* at 1344.

19      Waymo misleadingly claims that one of the continuances "has been determined to have

20  resulted from the intentional concealment of evidence."  (Dkt. No. 2472-3 at 2:19 (Waymo

21  Precis).)  There is no citation to any such "determination," nor could there be.  And, the public

22  policy favoring disposition of cases on their merits strongly outweighs the remaining factors here.

23  Waymo should not be permitted to bypass the utter lack of evidence of misappropriation of the

24  eight trade secrets at issue via a sanction based on meritless and exaggerated allegations.

25      **II.    REMEDIAL JURY INSTRUCTIONS ARE NOT NECESSARY.**

26      This issue has already been extensively briefed.  (*See* Dkt Nos. 1591-4, 2240-4, and

27  2804.)  As noted there, and as will be discussed further in Uber's response to Waymo's Offer of

28  Proof, Uber has not violated any Court Orders or destroyed evidence.  Remedial jury instructions

1  are not warranted.  Waymo should try its case on the merits and should not be permitted to use

2  irrelevant allegations to influence the jury into finding wrongdoing where there is none.

3  **III.   EVIDENTIARY SANCTIONS ARE NOT WARRANTED.**

4  Waymo points to no specific concealment of evidence that has compromised its

5  evaluation of Uber's independent development such that evidentiary sanctions are warranted.

6  First, Uber substantially complied with its logging obligation.  (Dkt. 1591-4 at 2 (Uber conducted

7  over 170 interviews, reviewed over 25,000 documents and spent over 700 hours preparing the

8  "LiDAR log," and voluntarily included references not just to LiDAR but to lasers, lenses, and

9  point clouds, as well as communications where others may have mentioned LiDAR and related

10  concepts to Mr. Levandowski.).  Second, Uber legitimately asserted privilege over the Stroz

11  materials, and it was not in a position to unilaterally waive the privilege when Mr. Levandowski

12  continued to assert it.  *United States v. Gonzalez*, 669 F.3d 974, 982 (9th Cir. 2012) ("the case law

13  is clear that one party to a JDA cannot unilaterally waive the privilege for other holders.").  And

14  in another half-truth, Waymo complains that it did not receive the Stroz materials "until after the

15  close of fact discovery," but fails to mention that Mr. Levandowski, not Uber, appealed this

16  Court's ruling on that issue.  Waymo also conveniently omits that it received ample discovery

17  into the Stroz diligence after the Federal Circuit ruled.  Lastly, in a final half-truth, Waymo

18  complains that it was not able to question two Uber engineers (Mr. Haslim and Mr. Boehmke)

19  about the Stroz materials.  But they fail to mention that they only requested to depose a different

20  engineer, Mr. Gruver, about the Stroz materials.  Waymo never asked to depose Mr. Haslim or

21  Mr. Boehmke after the Stroz report was released.

22  **IV.   ADDITIONAL TIME AT TRIAL IS NOT WARRANTED.**

23  Waymo should not be given additional time at trial to do nothing more than present more

24  baseless allegations of discovery misconduct in an effort to mislead the jury into thinking Waymo

25  has an actual case.  Nothing has emerged from the Jacobs letter that warrants inclusion at trial, as

26  discussed above and as will be detailed in Uber's response to Waymo's Offer of Proof.  The

27  remaining factors to which Waymo points—the due diligence process and the Ottomotto and Tyto

28  transactions—were known when the Court set the initial time allocations that Waymo agreed to.

1

2
Dated:  January 14, 2018                    MORRISON & FOERSTER LLP

3

4
                                          By:      /s/ Arturo J. González
                                              ARTURO J. GONZÁLEZ

5
                                          Attorneys for Defendants
6                                         UBER TECHNOLOGIES, INC. and
                                          OTTOMOTTO LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  MICHAEL A. JACOBS (CA SBN 111664)
   MJacobs@mofo.com
2  ARTURO J. GONZÁLEZ (CA SBN 121490)
   AGonzález@mofo.com
3  MORRISON & FOERSTER LLP
   425 Market Street
4  San Francisco, California  94105-2482
   Tel: 415.268.7000 / Fax: 415.268.7522
5
   KAREN L. DUNN (*Pro Hac Vice*)
6  kdunn@bsfllp.com
   HAMISH P.M. HUME (*Pro Hac Vice*)
7  hhume@bsfllp.com
   BOIES SCHILLER FLEXNER LLP
8  1401 New York Avenue, N.W.
   Washington DC  20005
9  Tel:  202.237.2727 / Fax: 202.237.6131

10 WILLIAM CARMODY (*Pro Hac Vice*)
   bcarmody@susmangodfrey.com
11 SHAWN RABIN (*Pro Hac Vice*)
   srabin@SusmanGodfrey.com
12 SUSMAN GODFREY LLP
   1301 Avenue of the Americas, 32nd Floor
13 New York, NY  10019-6023
   Tel: 212.336.8330 / Fax: 212.336.8340
14

15 Attorneys for Defendants
   UBER TECHNOLOGIES, INC.
16 and OTTOMOTTO LLC

17               UNITED STATES DISTRICT COURT

18             NORTHERN DISTRICT OF CALIFORNIA

19               SAN FRANCISCO DIVISION

20

21 WAYMO LLC,                          | Case No.     3:17-cv-00939-WHA

22         Plaintiff,                   | **DECLARATION OF CAMILA
                                        | TAPERNOUX IN SUPPORT OF
23      v.                              | DEFENDANTS UBER
                                        | TECHNOLOGIES, INC. AND
24 UBER TECHNOLOGIES, INC.,             | OTTOMOTTO LLC'S RESPONSE TO
   OTTOMOTTO LLC; OTTO TRUCKING         | WAYMO'S PRECIS IN SUPPORT OF
25 LLC,                                 | ITS REQUEST TO FILE A MOTION
                                        | FOR RELIEF BASED ON
26         Defendants.                  | DEFENDANTS' LITIGATION
                                        | MISCONDUCT
27
                                        | Trial Date:  February 5, 2018
28

I, Camila Tapernoux, declare as follows:

1.      I am an attorney with the law firm of Morrison & Foerster LLP.  I am a member in good standing of the Bar of the State of California.  I make this declaration based on personal knowledge and, if called as a witness, I could and would testify competently to the matters set forth herein.  I make this declaration in support of Defendants Uber Technologies, Inc. and Ottomotto LLC's ("Uber") Response to Waymo's Precis in Support of Its Request to File a Motion for Relief Based on Defendants' Litigation Misconduct.

2.      Attached hereto as **Exhibit A** are relevant pages from the deposition of Craig Clark, taken on December 22, 2017.

3.      Attached hereto as **Exhibit B** are relevant pages from the deposition of Kevin Maher, taken on December 12, 2017.

4.      Attached hereto as **Exhibit C** are relevant pages from the 30(b)(6) deposition of Randy Haimovici, taken on December 21, 2017.

5.      Attached hereto as **Exhibit D** are relevant pages from the deposition of Salle Yoo, taken on December 14, 2017.

6.      Attached hereto as **Exhibit E** are relevant pages from the deposition of Lior Ron, taken on December 12, 2017.

7.      Attached hereto as **Exhibit F** are relevant pages from the deposition of Scott Johnston, taken on December 14, 2017.

8.      Attached hereto as **Exhibit G** is a true and correct copy a document produced in this litigation bearing Bates numbers WAYMO-UBER-00145156―WAYMO-UBER-00145157.

9.      Attached hereto as **Exhibit H** is a true and correct copy a document produced in this litigation bearing Bates numbers WAYMO-UBER-00145114―WAYMO-UBER-00145127.

10.      Attached hereto as **Exhibit I** is a true and correct copy of the transcript of Motions Hearing in *Function Media, LLC v. Google, Inc.*, No. 2007-CV-279, No. 483 (E.D. Tex. Oct. 21, 2010).

11.      Attached hereto as **Exhibit J** are relevant pages from the deposition of Edward Russo, taken on December 20, 2017.

TAPERNOUX DECL ISO UBER'S RESPONSE TO WAYMO'S PRECIS RE DEFTS' LITIGATION MISCONDUCT
Case No. 3:17-cv-00939-WHA
sf-3858315

1

1        12.       Attached hereto as **Exhibit K** are relevant pages from the deposition of

2 Matthew Henley, taken on December 22, 2017.

3        13.       Attached hereto as **Exhibit L** are relevant pages from the deposition of

4 Jake Nocon, taken on December 19, 2017.

5        14.       Attached hereto as **Exhibit M** are relevant pages from the 30(b)(6) deposition of

6 Nick Gicinto, taken on December 21, 2017.

8        I declare under penalty of perjury that the foregoing is true and correct.  Executed this

9 14th day of January, 2018 at San Francisco, California.

                           */s/    Camila Tapernoux*

                           CAMILA TAPERNOUX

Tapernoux Decl ISO Uber's Response to Waymo's Precis re Defts' Litigation Misconduct
Case No. 3:17-cv-00939-WHA
sf-3858315

2

1

**ATTESTATION OF E-FILED SIGNATURE**

2

I, Arturo J. Gonzalez, am the ECF User whose ID and password are being used to file this

3

Declaration.  In compliance with Civil L.R. 5-1(i)(3), I hereby attest that Camila Tapernoux has

4

concurred in this filing.

5

Dated:  January 14, 2018                                    /s/ Arturo J. González

6

ARTURO J. GONZÁLEZ

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TAPERNOUX DECL ISO UBER'S RESPONSE TO WAYMO'S PRECIS RE DEFTS' LITIGATION MISCONDUCT
Case No. 3:17-cv-00939-WHA
sf-3858315

3

# EXHIBIT A

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4          Case No. 3:17-cv-00939-WHA

5

6   WAYMO LLC,

7                    Plaintiff,

8   vs.

9   UBER TECHNOLOGIES, INC.; OTTOMOTTO

10  LLC; OTTO TRUCKING LLC,

11                   Defendants.

12  _____/

13

14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

16      VIDEOTAPED DEPOSITION OF CRAIG CLARK

17          FRIDAY, DECEMBER 22, 2017

18

19

20

21  Reported by:

22  Kelli Ann Willis, RPR, CRR

23  JOB No. 2780742

24

25  PAGES 1 - 387

                                    Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   How many such discussions? | 12:16:26 |
| 2 | A.   I don't know.  Twenty. | 12:16:28 |
| 3 | Q.   And what instructions did you give | 12:16:29 |
| 4 | employees regarding when to use a particular | 12:16:31 |
| 5 | communications platform as opposed to another | 12:16:34 |
| 6 | communications platform? | 12:16:36 |
| 7 | A.   If you are -- if you are on legal hold, | 12:16:37 |
| 8 | you can't use ephemeral communications. | 12:16:40 |
| 9 | Q.   Is that the only instruction that you ever | 12:16:44 |
| 10 | provided to Uber employees regarding the use of | 12:16:46 |
| 11 | ephemeral communications? | 12:16:52 |
| 12 | A.   I don't know.  To the best of the | 12:16:59 |
| 13 | recollection, that's the one that sticks out I would | 12:17:04 |
| 14 | tell people. | 12:17:06 |
| 15 | Q.   Did you ever instruct employees to use | 12:17:09 |
| 16 | ephemeral communications platforms in order to avoid | 12:17:12 |
| 17 | the retention of such communications? | 12:17:16 |
| 18 | A.   Absolutely not. | 12:17:18 |
| 19 | Q.   I think I asked you about the retention -- | 12:17:38 |
| 20 | the default retention of UChat, and I think you said | 12:17:44 |
| 21 | you don't know what the default retention period | 12:17:47 |
| 22 | was; is that correct? | 12:17:50 |
| 23 | A.   I don't know for sure.  It has changed, | 12:17:52 |
| 24 | but I think at one point it was maybe seven days. | 12:17:54 |
| 25 | But I'm not -- but I'm not certain. | 12:17:59 |

Page 139

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                 C E R T I F I C A T E

 2    STATE OF FLORIDA      )

 3                          : ss

 4    COUNTY OF MIAMI-DADE )

 5

 6            I, KELLI ANN WILLIS, a Registered

 7        Professional, Certified Realtime Reporter and

 8        Notary Public within and for The State of

 9        Florida, do hereby certify:

10            That CRAIG CLARK, the witness whose

11        deposition is hereinbefore set forth was duly

12        sworn by me and that such Deposition is a true

13        record of the testimony given by the witness.

14            I further certify that I am not related

15        to any of the parties to this action by blood

16        or marriage, and that I am in no way interested

17        in the outcome of this matter.

18            IN WITNESS WHEREOF, I have hereunto set

19        my hand this 26th day of December, 2017.

20

21

22

23        KELLI ANN WILLIS, RPR, CRR

24

25
```

Page 387

# EXHIBIT B

CONFIDENTIAL - ATTORNEYS EYES ONLY

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

5   WAYMO LLC,

6        Plaintiff,

7

              vs.              Case No. 17-cv-00939-WHA

8

9   UBER TECHNOLOGIES,INC.;

10  OTTOMOTTO, LLC; OTTO

    TRUCKING LLC,

11       Defendants.

12  _____

13

14      **CONFIDENTIAL - ATTORNEYS' EYES ONLY**

15

16        VIDEO DEPOSITION OF KEVIN MAHER

17           San Francisco, California

18          Tuesday, December 12, 2017

19                 Volume I

20

21

22  REPORTED BY:

23  REBECCA L. ROMANO, RPR, CSR No. 12546

24  JOB NO. 2771230

25  PAGES 1 - 299

                                    Page 1

CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    statement with him during this conversation?        10:33:43

 2         A.   No.

 3         Q.   Do you recall having conversations with

 4    any other Uber employees about ephemeral

 5    communications, prior to receiving the legal hold   10:33:52

 6    notice?

 7         A.   I'm sure I spoke about it with Matt near

 8    the time when I started.

 9         Q.   Can you recall anything about that

10    conversation?                                       10:34:03

11         A.   I recall Matt saying that -- referring to

12    the security team that we are a -- primarily a

13    Wickr shop.  Meaning that that is the standard

14    communication tool of the security team.

15         Q.   Anything else?                            10:34:23

16         A.   No.

17         Q.   Now, with regard to this conversation

18    that you had with Mr. Clark after you received the

19    legal hold notice, what do you recall discussing

20    with him?                                           10:34:39

21         A.   I recall him either ending an email or

22    telling our team that we could not discuss anything

23    relevant to the legal hold using Wickr.

24         Q.   So with regard to your use of Wickr, how

25    did that change after you received the legal hold?  10:35:00
```

Page 76

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    I, Rebecca L. Romano, a Certified Shorthand

2  Reporter of the State of California, do hereby

3  certify:

4    That the foregoing proceedings were taken

    before me at the time and place herein set forth;

5  that any witnesses in the foregoing proceedings,

6  prior to testifying, were administered an oath;

7  that a record of the proceedings was made by me

    using machine shorthand which was thereafter

8  transcribed under my direction; that the foregoing

9  transcript is true record of the testimony given.

10    Further, that if the foregoing pertains to the

11  original transcript of a deposition in a Federal

12  Case, before completion of the proceedings, review

13  of the transcript [ ] was [x] was not requested.

    I further certify I am neither financially

14  interested in the action nor a relative or employee

15  of any attorney or any party to this action.

16    IN WITNESS WHEREOF, I have this date

17  subscribed my name.

18

19  Dated:  December 13, 2017

20

21

22

23

24

    Rebecca L. Romano, RPR,

        CSR. No 12546

25

                                    Page 299

# EXHIBIT C

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO DIVISION

4

5   WAYMO LLC,

6        Plaintiff,

7            vs.          Case No.

8   UBER TECHNOLOGIES,INC.;   17-cv-00939-WHA

9   OTTOMOTTO, LLC; OTTO

10  TRUCKING LLC,

11       Defendants.

    _____

12

13    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15   VIDEOTAPED DEPOSITION OF UBER TECHNOLOGIES, INC.

16     30(b)(6) REPRESENTATIVE - RANDY HAIMOVICI

17          San Francisco, California

18          Thursday, December 21, 2017

19               Volume I

20

21  REPORTED BY:

22  REBECCA L. ROMANO, RPR, CSR No. 12546

23  JOB NO. 2779670

24

25  PAGES 1 - 190

                                    Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    gave me an example of how they are used.  He          10:13:46

 2    described the purpose.  And -- and mentioned that

 3    based on his knowledge, they were only used by

 4    people in the security department.

 5         Q.   When you say that you discussed with        10:14:04

 6    Mr. Gicinto how nonattributable devices are used,

 7    what did he say in terms of how they were used?

 8         A.   In the same way I just described.

 9         Q.   Okay.  Nothing addition- -- nothing

10    beyond what you've already --                          10:14:15

11         A.   Not that I recall.

12         Q.   Okay.  And in terms of discussing the

13    purpose of using nonattributable devices, did he

14    say anything further than what you've already

15    provided?                                              10:14:23

16         A.   Not that I recall.  It was just basically

17    what I told you.

18         Q.   You said you spoke with Eric Meyhofer?

19         A.   I did.

20         Q.   What you did and Eric Meyhofer discuss?      10:14:34

21         A.   So Eric and I talked about use of

22    nonattributable devices.  And he confirmed that

23    they are not used by ATG.  As I'm sure you know,

24    he's the head of ATG.

25              We talked about the use of ephemeral         10:14:47
```

Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    communications, and he confirmed that his use of        10:14:50

 2    ephemeral communications were limited to social

 3    reasons almost exclusively, but that there are

 4    times when he's talking about performance issues

 5    for employees, where he's used it, that he's never      10:15:03

 6    used ephemeral communications to discuss anything

 7    related to this case.

 8            That he has an understanding of what and

 9    how the attorney-client privilege should be used.

10    And he's adhered to the knowledge he was given and      10:15:18

11    the training he was given.

12        Q.   And in your conversations with

13    Mr. Meyhofer, were you talking about his use

14    specifically or ATG more generally?

15        A.   His use specifically -- well, when you          10:15:33

16    say "use," just tell me what you mean.

17        Q.   So let me -- let me break it down.

18        A.   Okay.

19        Q.   So for -- for nonattributable devices,

20    you said that Mr. Meyhofer told you that they're        10:15:42

21    not used by anyone in ATG; is that right?

22        A.   That's correct.

23        Q.   Okay.  When you were talking about

24    ephemeral communications, did you discuss with

25    Mr. Meyhofer whether they are used by others in ATG     10:15:50
```

Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    business.                                         11:27:57

2         Q.   As of when?

3         A.   Same -- same time, the September time

4    frame.  I don't remember the exact date, but in the

5    same time frame we have been discussing.          11:28:04

6         Q.   Okay.  So prior to this policy change in

7    September 2017, it was permissible for Uber

8    employees to use Telegram for business purposes?

9         A.   I don't know if I'd say it that broadly.

10   It was used, and I -- I think it was authorized.   11:28:17

11        Q.   Okay.  WickrMe, you said that was a

12   non-enterprise version?

13        A.   That's right.  WickrMe.

14        Q.   WickrMe.  Okay.

15             That's a non-enterprise version of Wickr, 11:28:31

16   correct?

17        A.   As stated, yes.

18        Q.   Okay.  And it is not -- is that -- is use

19   of WickrMe currently permitted for business

20   purposes?                                          11:28:41

21        A.   No.

22        Q.   Okay.  Prior to September 2017, was use

23   of WickrMe permitted for business purposes?

24        A.   For some businesses purposes, yes.

25        Q.   When you say, "for some business          11:28:52
```

Page 76

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | purposes," were there specific business purposes it | 11:28:53 |
| 2 | was -- | |
| 3 |     A.   I don't know if they were specific, but I | |
| 4 | know people on the security team used it. | |
| 5 |     Q.   Was there any guidance provided to | 11:29:02 |
| 6 | employees about when it was appropriate to use | |
| 7 | WickrMe for business purposes? | |
| 8 |     A.   Well, there was -- there's guidance on | |
| 9 | when not to use it and -- but it doesn't just apply | |
| 10 | to WickrMe.  It applies to all chat applications. | 11:29:16 |
| 11 | And the guidance was not to use it to discuss | |
| 12 | topics that are subject to a litigation hold. | |
| 13 |     Q.   And that was a guidance for all chat | |
| 14 | applications -- | |
| 15 |     A.   Yes. | 11:29:31 |
| 16 |     Q.   -- is that what you said? | |
| 17 |         And so that, that guidance to not use | |
| 18 | these chat applications for subjects covered by a | |
| 19 | litigation hold, that would really only come into | |
| 20 | play once there was some reason to have a | 11:29:49 |
| 21 | litigation hold -- | |
| 22 |     A.   That is correct. | |
| 23 |     Q.   -- correct? | |
| 24 |         Okay.  So, for example, the -- Uber | |
| 25 | acquired Otto well before this lawsuit was filed. | 11:29:59 |

Page 77

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    look at the bottom of Exhibit 9729 --              11:38:55

 2         A.   Okay.

 3         Q.   -- the paragraph that says, "Uber Chat

 4    Applications are the following" --

 5         A.   Yes.                                      11:39:05

 6         Q.   -- and does that list uChat and

 7    Google Hangouts as authorized chat applications?

 8         A.   Well, it -- it -- it identifies them in

 9    there, and then it talks about them on the next

10    page.  But, yes.                                    11:39:18

11         Q.   And this paragraph says that, "All other

12    chat applications, including but not limited to

13    Wickr, Telegram, Signal, WeChat, and Snapchat, are

14    not Uber Chat Applications and employees are

15    prohibited from using these for business            11:39:28

16    communications," correct?

17         A.   That is correct as of the date this

18    policy went into place in September, true.

19         Q.   And prior to this date, employees were

20    not prohibited from using any of -- any of those    11:39:41

21    communications applications listed there?

22         A.   Well, except for the fact they were

23    prohibited from using them if they wanted to talk

24    about things that were subject to a litigation

25    hold.                                               11:39:53
```

Page 85

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   only when appropriate.                              02:41:14

 2        Q.   Did you ask him about any training that's

 3   been provided to the ATG group about

 4   attorney-client privilege designations?

 5        A.   I didn't because I don't -- I don't know   02:41:23

 6   that he would know about that.  I did not.

 7        Q.   If we go back to Topic 2 -- and I don't

 8   know if you want to get it in front of you or

 9   not --

10        A.   Right.                                     02:41:42

11        Q.   -- but it asks about defendants' use

12   of -- use of methods or strategies to conceal facts

13   from discovery by external parties and litigation

14   or government investigations.

15             And then it lists, including improper      02:41:50

16   attorney-client and other privileged designations,

17   ephemeral or encrypted communications,

18   nonattributable devices or anonymous servers.

19             In preparing for your testimony today,

20   did you ask anybody about other methods or           02:42:07

21   strategies to conceal facts from discovery by

22   external parties?

23        A.   I focused on the ones you identified.

24        Q.   So in your discussions with Mr. Meyhofer,

25   you didn't ask him whether there are other methods   02:42:22
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   or strategies that the ATG group uses to conceal        02:42:25

2   facts from discovery by external parties?

3        A.   I didn't feel the need to ask him because

4   it was clear in my discussion with him that any

5   attempt to conceal information from discovery in       02:42:36

6   litigation was unacceptable.

7        Q.   Who said that, you or him?

8        A.   That's my summary of our discussion.  I

9   didn't feel the need to ask him, was there anything

10  else other than the three things identified in your    02:42:50

11  notice.  Because in whatever words he used, he made

12  it clear to me that doing so would be unacceptable.

13       Q.   So he told --

14       A.   Regardless of methodology.

15       Q.   And when you spoke with Mr. Gicinto, did     02:43:00

16  you ask him about the use of methods or strategies

17  to conceal facts from discovery other than those

18  specifically outlined in the topic?

19       A.   Not in way you are phrasing it, no.  I

20  don't recall that coming up.                           02:43:15

21       Q.   I'm sorry, I don't understand what you're

22  saying, not in -- not in the way you're phrasing

23  it.

24       A.   I didn't discuss that topic with him the

25  way you phrased it in your question.                   02:43:23

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        I, Rebecca L. Romano, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4        That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath;

8    that a record of the proceedings was made by me

9    using machine shorthand which was thereafter

10   transcribed under my direction; that the foregoing

11   transcript is true record of the testimony given.

12       Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [ ] was [X] was not requested.

16       I further certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or any party to this action.

19       IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21       Dated:  December 22, 2017

22

23

24       Rebecca L. Romano, RPR,

25       CSR. No 12546

                                        Page 190

# EXHIBIT D

Page 163

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

WAYMO LLC,

              Plaintiff,
                                        Case
vs.                                     No. 3:17-cv-00939-WHA


UBER TECHNOLOGIES, INC.;
OTTOMOTTO LLC; OTTO TRUCKING LLC,
              Defendants.
_____/


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEOTAPED DEPOSITION OF SALLE YOO

VOLUME II

THURSDAY, DECEMBER 14, 2017




Reported by:

Anrae Wimberley

CSR No. 7778

Job No.  2771310

Pages 163 - 495

Page 412

```
 1        A.   I'm not sure.                               15:50:06

 2        Q.   You're aware of one hold?

 3        A.   I'm aware of at least one.

 4        Q.   Does Uber's litigation hold include

 5   language regarding ephemeral chat platforms?          15:50:14

 6        A.   As I sit here, I don't know.

 7        Q.   Are you aware of any language in the hold

 8   document that concerns ephemeral messaging systems?

 9        A.   I don't know.  But the policy of the

10   company was that if you were on hold, that you did     15:50:34

11   not talk about those topics on any sort of chat app.

12        MR. VERHOEVEN:   I'll move to strike as

13   nonresponsive everything after "I don't know."

14   BY MR. VERHOEVEN:

15        Q.   When did the Uber litigation hold go into    15:50:57

16   effect with respect to this lawsuit?

17        A.   I don't have the exact date, but it would

18   be shortly after the lawsuit was filed and we

19   received notice of it.

20        Q.   In February, March, April?                   15:51:10

21        A.   No, I don't think it was April.  I would

22   think it was either in February or early March,

23   depending on when it was implemented.

24        Q.   Did Uber implement a litigation hold in

25   connection with the Stroz investigation?               15:51:21
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      FEDERAL CERTIFICATE OF DEPOSITION OFFICER

2      I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby declare:

3      That, prior to being examined, the witness named in the foregoing deposition was by me duly

4  sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a

5  true record of the testimony given by the witness;

6      That said deposition was taken down by me in shorthand at the time and place therein named and

7  thereafter reduced to text under my direction;

8      --X---   That the witness was requested to review the transcript and make any changes to the

9  transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil

10  Procedure;

11      -----   No changes have been provided by the witness during the period allowed;

12      -----   The changes made by the witness are

13  appended to the transcript;

14      -----   No request was made that the transcript be reviewed pursuant to Section 30(e) of

15  the Federal Rules of Civil Procedure.

16      I further declare that I have no interest in the event of the action.

17      I declare under penalty of perjury under the

18  laws of the United States of America that the foregoing is true and correct.

19      WITNESS my hand this 15th day of December,

20  2017.

21

22

23

24

25      ANRAE WIMBERLEY, CSR NO. 7778

Page 495

# EXHIBIT E

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4                --oOo--

5   WAYMO LLC,

6              Plaintiff,

7

    vs.                    Case No. 3:17-cv-00939-WHA

8

9   UBER TECHNOLOGIES, INC.;

    OTTOMOTTO LLC; OTTO TRUCKING LLC,

10             Defendants.

11   _____/

12

13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15      30(b)(6) VIDEOTAPED DEPOSITION OF LIOR RON

16                VOLUME II

17         TUESDAY, DECEMBER 12, 2017

18

19

20   Reported by:

21   Anrae Wimberley

22   CSR No. 7778

23   Job No. 2771228B

24

25   Pages 306 - 434

                                    Page 306

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1   will work and be most convenient for you.              17:26:43

 2         But you know, look.  You closed the last

 3   deposition, and I'll give you some wiggle room if

 4   you made a mistake.  It's okay.

 5       MR. SCHMIDT:  All right.  I'm going to move on    17:26:53

 6   because this is wasting my time.

 7       MR. RABIN:  So how do you want to proceed?

 8       MR. SCHMIDT:  I'm going to ask the questions

 9   that I think need to be asked.  And if the witness

10   refuses to answer the questions, then we'll take it   17:27:07

11   up later as appropriate.

12         I think the transcript is very clear on

13   what's going on here.

14   BY MR. SCHMIDT:

15       Q.  Sir, was Slack used at Ottomotto in          17:27:21

16   conjunction with the negotiations that led to the

17   acquisition of Ottomotto by Uber?

18       A.  No.  I do not believe we've used Slack to

19   communicate with Uber on any matters related to the

20   negotiation.                                          17:27:41

21       Q.  Were any forms of communication that you

22   consider ephemeral communications used during the

23   negotiations that led to the acquisition of

24   Ottomotto by Uber?

25       A.  No, not to the best of my knowledge.          17:27:58
```

Page 342

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   What methods of communications were used | 17:42:28 |
| 2 | regarding the negotiations for Uber's acquisition of | |
| 3 | Ottomotto? | |
| 4 | A.   Again, the topic here is around ephemeral, | |
| 5 | and so are you asking in my personal capacity sort | 17:42:43 |
| 6 | of all the communication channels? | |
| 7 | Q.   I just want to know whatever communication | |
| 8 | channels you can recall that were used to | |
| 9 | communicate about the acquisition of Ottomotto by | |
| 10 | Uber. | 17:43:00 |
| 11 | MR. RABIN:  You can answer.  If it's ephemeral, | |
| 12 | you can do it in your corporate capacity.  If it's | |
| 13 | not ephemeral, you can do it in your individual | |
| 14 | capacity. | |
| 15 | THE WITNESS:  Right.  So I don't think -- in my | 17:43:08 |
| 16 | corporate capacity, I don't think any of the | |
| 17 | communication methods were ephemeral, meaning sort | |
| 18 | of used in communication channels that are designed | |
| 19 | to not store messages by default. | |
| 20 | In my personal capacity I believe there | 17:43:22 |
| 21 | was e-mail and text messages used, if I recall | |
| 22 | correctly. | |
| 23 | MR. RABIN:  And let me just stop one second. | |
| 24 | So just for the record, I'm allowing you | |
| 25 | to proceed on this basis so as not to impede it. | 17:43:36 |

Page 354

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        A.   Well, as I've conversed with James, I        18:16:43

2   don't believe he used it, and he does -- to the best

3   of my understanding and his understanding, nobody on

4   his team has used that tool as well.

5             And as we've discussed before, Anthony got   18:16:56

6   an invitation to that tool, but I'm not aware of any

7   communication whatsoever that Anthony had on the

8   tool at all, and on the tool specifically relating

9   to LiDAR.

10       Q.   Did you ask Mr. Levandowski if he            18:17:15

11  communicated on Wickr about LiDAR development?

12       MR. RABIN:  Objection; form.

13       THE WITNESS:  I have not asked Anthony directly

14  that question.  But it is my understanding that he

15  got an invitation from the ThreatOps team as a       18:17:33

16  follow-up to our meeting on market data, and it had

17  nothing to do with LiDAR development whatsoever.

18  That's my understanding.

19  BY MR. SCHMIDT:

20       Q.   What's that understanding based on?         18:17:46

21       A.   It's based on the dates of that invitation

22  being sent in the time frame of our discussion with

23  the ThreatOps team.

24            It's based on the fact that the invitation

25  came on the same e-mail to the two of us, and only   18:18:04
```

Page 378

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | the two of us, and not to any other sort of LiDAR | 18:18:08 |
| 2 | team members. | |
| 3 | And it came -- and it stems from my | |
| 4 | understanding that the LiDAR team has not used Wickr | |
| 5 | for their job. | 18:18:22 |
| 6 | And I believe I haven't seen names of | |
| 7 | LiDAR team members on that list of Wickr users at | |
| 8 | Uber, but I'm happy to take another look to refresh | |
| 9 | my memory and be definitive on that answer. | |
| 10 | Q.   I'm sorry, I just don't have time to help | 18:18:40 |
| 11 | you prepare for your corporate testimony.  So if | |
| 12 | you're not able to say -- | |
| 13 | MR. RABIN:  Counsel, please be respectful to | |
| 14 | the witness. | |
| 15 | MR. SCHMIDT:  Counsel, don't make speaking | 18:18:50 |
| 16 | objections. | |
| 17 | MR. RABIN:  I'm not.  I'm asking you to please, | |
| 18 | as an officer of the Court, be respectful in the | |
| 19 | deposition to the witness.  What you're doing is not | |
| 20 | respectful. | 18:18:58 |
| 21 | MR. SCHMIDT:  All right.  I'm moving on. | |
| 22 | You're wasting my time again. | |
| 23 | MR. RABIN:  And don't tell me I'm wasting your | |
| 24 | time.  I'm trying to ask you to be respectful. | |
| 25 | Okay? | 18:19:05 |

Page 379

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1        FEDERAL CERTIFICATE OF DEPOSITION OFFICER
2        I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby
     declare:
3        That, prior to being examined, the witness
     named in the foregoing deposition was by me duly
4    sworn pursuant to Section 30(f)(1) of the Federal
     Rules of Civil Procedure and the deposition is a
5    true record of the testimony given by the witness;
6        That said deposition was taken down by me in
     shorthand at the time and place therein named and
7    thereafter reduced to text under my direction;
8        --X---    That the witness was requested to
     review the transcript and make any changes to the
9    transcript as a result of that review pursuant to
     Section 30(e) of the Federal Rules of Civil
10   Procedure;
11       -----    No changes have been provided by the
     witness during the period allowed;
12       -----    The changes made by the witness are
13   appended to the transcript;
14       -----    No request was made that the
     transcript be reviewed pursuant to Section 30(e) of
15   the Federal Rules of Civil Procedure.
16       I further declare that I have no interest in
     the event of the action.
17       I declare under penalty of perjury under the
18   laws of the United States of America that the
     foregoing is true and correct.
19       WITNESS my hand this 13th day of December,
20   2017.
21
22
23
24
25       ANRAE WIMBERLEY, CSR NO. 7778

                                       Page 434
```

# EXHIBIT F

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT G

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT H

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT I

1

```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF TEXAS

 3                         MARSHALL DIVISION

 4   FUNCTION MEDIA, LLC,      )(

 5                             )(   CIVIL DOCKET NO.

 6                             )(   2:07-CV-279-CE

 7   VS.                       )(   MARSHALL, TEXAS

 8                             )(

 9   GOOGLE, INC, ET AL        )(   AUGUST 19, 2010

10                             )(   9:00 A.M.

11                         MOTIONS HEARING

12          BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM

13                 UNITED STATES MAGISTRATE JUDGE

14

15   APPEARANCES:

16

17   FOR THE PLAINTIFF:   (See attached sign-in sheet.)

18
     FOR THE DEFENDANTS:  (See attached sign-in sheet.)
19

20
     COURT REPORTER:      MS. SHELLY HOLMES, CSR
21                        Deputy Official Court Reporter
                          2593 Myrtle Road
22                        Diana, Texas  75640
                          (903) 663-5082
23

24

25   (Proceedings recorded by mechanical stenography,
```

transcript produced on a CAT system.)

2

1                    I N D E X

2

3   August 19, 2010

4                                              Page

5       Appearances                            1

6       Hearing                                3

7       Court Reporter's Certificate          180

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                LAW CLERK:  All rise.

 2                THE COURT:  Please be seated.

 3                All right.  We've got a hearing on some

 4   post-trial motions in Case 2:07-CV-279, Function Media

 5   against Google.

 6                What says the plaintiff?

 7                MR. TRIBBLE:  Your Honor, Max Tribble.  I'm

 8   here with Joe Grinstein, Justin Nelson, Stacy Schultz,

 9   Warren Burns, Calvin Capshaw, and Chris Bunt.  Plaintiff

10   is ready to proceed, Your Honor.

11                THE COURT:  All right.  For Google?

12                MR. DEFRANCO:  Good morning, Your Honor.

13   Ed DeFranco for Defendant Google.  I'm here with Patrick

14   Curran and Amy Candido.  Also with me is Melissa Smith,

15   Your Honor, and John Labar from Google.

16                THE COURT:  All right.

17                MR. DEFRANCO:  Mr. Verhoeven sends his

18   apologies, Your Honor.  He had a long-planned family

19   vacation in between trials, or otherwise he would be

20   here.

21                THE COURT:  All right.  Well, you can do his

22   time for him and --

23                MR. DEFRANCO:  That's why I'm here, Your

24   Honor.

25                THE COURT:  I'm being facetious.  Well, good
```

1          So it's not the case where we just sort of

2     switched everybody to off the record and said, "You

3     know, oh, well, that's our new policy."  Those people

4     were told to preserve instant messages that were

5     relevant by putting them on the record.

6          It's in the record that Theresa Beaumont's

7     first declaration makes it clear, Google can't change --

8     the setting has to be the same -- the default setting

9     across the entire, like, 30,000 Google employees.  So

10    it's not an instance where we could have just said,

11    "Okay, let's put Sergey Brin or Susan Wojcicki or

12    whomever's IMs on -- on the record default and everybody

13    else is on off the record."  Everybody's had to either

14    be on or off.

15         You know, and for larger data management

16    and policy reasons, Google made the decision to switch

17    to off the record -- and because they couldn't put those

18    people individually on -- on the record, they told them

19    for pertinent communications related to this litigation

20    hold, you need to put them on the record.

21         Now, those witnesses --

22         THE COURT:  How was that communicated?

23         MS. CANDIDO:  Excuse me?

24         THE COURT:  How was that communicated to

25    these employees?

1          MS. CANDIDO:  I believe that that was

2     communicated to those employees -- at least in the first

3     instance, with the policy change, as part of the

4     announcement of the policy change.  And then I think

5     also in connection with document -- so the

6     communications they have with individuals at the

7     beginning of a lawsuit about collecting documents and

8     things like that, I believe those were orally -- well, I

9     don't want to reveal privilege, but I -- I think they

10    were additional reinforcements about policy --

11         THE COURT:  But you swore out an affidavit

12    that said that.

13         MS. CANDIDO:  Yes, there -- there's a sworn

14    affidavit right here that they were told that.

15         THE COURT:  I just was interested in how

16    that was communicated.

17         MS. CANDIDO:  Well, I know that it was

18    communicated in connection with the policy change when

19    it took place.

20         You know, I just want to refer, too, to that

21    Malletier case where the Court specifically says that

22    a -- the claim that a defendant was required to log

23    every chat was, quote, akin to a demand that a party to

24    litigation install a system to monitor and record phone

25    calls coming into its office on the hypothesis that some

1   of them may contain relevant information.

2            There's no such requirement.  And really

3   it's just the same hypothesis that -- that Mr. Nelson is

4   putting forth here that there might -- there just --

5   there might be these chats or by putting chats off the

6   record, it enables people to have secret chats about

7   things that aren't -- well, I mean, you can have a

8   hallway conversation, you can have a phone call

9   conversation.  It's no different than that.

10            And to the extent they want discovery with

11   respect to those things, that's what depositions are

12   for.  At depositions, they were free to ask all these

13   witnesses, "What did you communicate with people in the

14   hallway about X subject or did you have telephone

15   communications about Y subject?  Did you have instant

16   message communications?  What did you say?  When did you

17   have them?"  I mean, they can ask all the same questions

18   they could ask about phone calls or hallway

19   communications with respect to -- to IM messages.

20            And I think it's important to -- to note

21   that despite the existence of two snippets of IMs that

22   were pasted into e-mails that are non -- that are in

23   some ways substantive, Mr. Brin, Ms. Wojcicki -- they've

24   all testified that they use IMs very different than what

25   plaintiff is hypothesizing.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4

5      _____

6    WAYMO LLC,                    )

7            Plaintiff,            )

8          v.                    ) Case No.

9    UBER TECHNOLOGIES, INC.;      ) 3:17-cv-00939-WHA

10   OTTOMOTTO LLC;                )

11   OTTO TRUCKING,                )

12            Defendants.          )

13   _____)

14

15    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16

17      VIDEOTAPED DEPOSITION OF EDWARD RUSSO

18         WEDNESDAY, DECEMBER 20, 2017

19

20

21    REPORTED BY:

22    PAUL J. FREDERICKSON, CCR, CSR

23    JOB NO. 2771335

24

25    PAGES 1 - 367

                                        Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    surveillance?  Do you know?                    08:17:37

 2         A.    I don't.                            08:17:38

 3         Q.    Did you ever see a report about     08:17:39

 4    it?                                            08:17:40

 5         A.    I did not.                          08:17:41

 6         Q.    Did you talk to anyone about it?    08:17:41

 7         A.    Nick Gicinto told me, you know,     08:17:43

 8    this was something that had taken place, and   08:17:45

 9    I -- I forget the dates, but it would have been 08:17:47

10    in the spring, I guess, of 2016.               08:17:49

11         Q.    Okay.                               08:17:51

12               And what was the context of him     08:17:53

13    telling you that?  Why -- why was he telling    08:17:54

14    you that?                                      08:17:56

15         A.    Just to inform me on some of the    08:17:57

16    stuff that had -- the team had done prior to my 08:17:59

17    arrival.                                       08:18:02

18         Q.    Other than the surveillance of      08:18:09

19    ███████  that happened on two separate occasions 08:18:10

20    --                                             08:18:10

21         A.    Right.                              08:18:13

22         Q.    -- and the surveillance of Waymo    08:18:14

23    in Arizona and the surveillance of ██████ that  08:18:16

24    you mentioned, are there any other instances    08:18:19

25    that you're aware of, whether you're personally 08:18:20
```

                                                    Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | aware of it or because you heard from someone | 08:18:23 |
| 2 | else, of any surveillance that Uber did of | 08:18:25 |
| 3 | competitors? | 08:18:29 |
| 4 |     A.    No. | 08:18:29 |
| 5 |     Q.    You haven't heard anything else; | 08:18:30 |
| 6 | right? | 08:18:31 |
| 7 |     A.    No. | 08:18:31 |
| 8 |     Q.    And explain to me the context or | 08:18:35 |
| 9 | the purpose of the due diligence surveillance | 08:18:38 |
| 10 | that was done in connection with ████. | 08:18:41 |
| 11 |     A.    It was my understanding that ATG | 08:18:46 |
| 12 | was ████████████████████████████████████ | 08:18:48 |
| 13 | ████████████████████████████████████ | 08:18:52 |
| 14 | ████████████████████████████████████ | 08:18:57 |
| 15 |     ATG's -- Mr. Levandowski, Mr. Ron | 08:19:03 |
| 16 | had asked for certain -- for ████ to provide | 08:19:06 |
| 17 | certain things so they could assess the | 08:19:07 |
| 18 | technology to determine whether this would be a | 08:19:09 |
| 19 | wise business decision on -- on Uber's part. | 08:19:11 |
| 20 |     Apparently ████ was not | 08:19:14 |
| 21 | forthcoming to their -- to their liking. | 08:19:16 |
| 22 | They -- they felt they were -- they lacked the | 08:19:20 |
| 23 | information they needed.  So they asked us if | 08:19:23 |
| 24 | we could videotape one of their cars so they | 08:19:25 |
| 25 | could get a sense of how good the technology | 08:19:28 |

Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.  Of 2017? | 08:33:57 |
| 2 | A.  Yes. | 08:33:57 |
| 3 | Q.  The surveillance that happened at | 08:34:07 |
| 4 | Waymo in Arizona, can you tell me how that | 08:34:09 |
| 5 | arose? | 08:34:11 |
| 6 | A.  To be perfectly honest, I'm less | 08:34:15 |
| 7 | clear on the genesis of that.  After we did the | 08:34:17 |
| 8 | ███ surveillance and provided the videos, | 08:34:20 |
| 9 | about a week later, if I remember correctly, | 08:34:25 |
| 10 | Mr. Gicinto called me and said that | 08:34:29 |
| 11 | Mr. Levandowski and Mr. Ron would be interested | 08:34:31 |
| 12 | in similar videos of the Waymo cars in Arizona. | 08:34:34 |
| 13 | Q.  You said a week after the ███ | 08:34:40 |
| 14 | surveillance.  Were you referring to the | 08:34:42 |
| 15 | March -- | 08:34:44 |
| 16 | A.  Yes. | 08:34:45 |
| 17 | Q.  -- 2017 surveillance? | 08:34:45 |
| 18 | A.  Yeah, the March.  Because we -- we | 08:34:47 |
| 19 | did the Waymo videotaping in mid April. | 08:34:49 |
| 20 | Q.  What did Mr. Gicinto tell you the | 08:34:59 |
| 21 | purpose of getting videos of the Waymo cars in | 08:35:03 |
| 22 | Arizona was? | 08:35:06 |
| 23 | A.  As I recall, it was just that | 08:35:08 |
| 24 | Mr. Levandowski and Mr. Ron were interested in | 08:35:11 |
| 25 | videos of Waymo cars.  I -- I was unaware of a | 08:35:14 |

Page 37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | bigger purpose behind it. | 08:35:17 |
| 2 | Q. And what did you do in connection | 08:35:19 |
| 3 | with doing that surveillance of Waymo cars in | 08:35:21 |
| 4 | Arizona? | 08:35:23 |
| 5 | A. Same as I just described with | 08:35:25 |
| 6 | ███. Jake Nocon, myself went down. One of | 08:35:27 |
| 7 | the █████████ came down or contractors came | 08:35:31 |
| 8 | down, and we videotaped the Waymo cars. | 08:35:35 |
| 9 | Q. How long did that project last? | 08:35:51 |
| 10 | A. Three or four days. | 08:35:53 |
| 11 | Q. Did you get any feedback from | 08:35:57 |
| 12 | Mr. Ron or Mr. Levandowski or Mr. Gicinto or | 08:36:02 |
| 13 | anyone else about the video that you took | 08:36:06 |
| 14 | there? | 08:36:07 |
| 15 | A. As I recall, the -- I mean, they | 08:36:11 |
| 16 | were happy we had the video, but I mean, there | 08:36:13 |
| 17 | was no specific -- specific comments that I | 08:36:15 |
| 18 | remember. | 08:36:17 |
| 19 | Q. Do I understand correctly that | 08:36:23 |
| 20 | from August of 2016 when you were hired at Uber | 08:36:24 |
| 21 | and March of 2017, you're not aware of any | 08:36:28 |
| 22 | surveillance activities that Uber engaged? | 08:36:32 |
| 23 | A. Other than the one I just -- we | 08:36:37 |
| 24 | talked about that took place before my being | 08:36:39 |
| 25 | hired there, right, yeah. I'm -- | 08:36:41 |

Page 38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    You're referring to ███? | 08:36:42 |
| 2 | A.    The ███, yeah. | 08:36:45 |
| 3 | Q.    Other than that, you're not aware | 08:36:46 |
| 4 | of anything? | 08:36:47 |
| 5 | A.    I'm not aware of anything. | 08:36:48 |
| 6 | [Discussion off the record.] | 08:37:01 |
| 7 | Q.    I should have given you that | 08:37:02 |
| 8 | caveat at the beginning. | 08:37:04 |
| 9 | A.    It's okay. | 08:37:06 |
| 10 | Q.    In terms of the research that you | 08:37:24 |
| 11 | mentioned of third parties -- third-party | 08:37:26 |
| 12 | competitors -- | 08:37:28 |
| 13 | A.    Yes. | 08:37:31 |
| 14 | Q.    -- did you or are you aware of | 08:37:31 |
| 15 | anyone else at Uber ever attempting to gather | 08:37:34 |
| 16 | that research by speaking to individuals who | 08:37:39 |
| 17 | were employed at these third parties? | 08:37:43 |
| 18 | A.    Say that question again now. | 08:37:50 |
| 19 | Q.    Sure. | 08:37:51 |
| 20 | Did you or are you aware of anyone | 08:37:56 |
| 21 | else at Uber ever attempting to gather research | 08:37:59 |
| 22 | about competitors of Uber by speaking to | 08:38:04 |
| 23 | individuals who were employed at those | 08:38:08 |
| 24 | competitors? | 08:38:11 |
| 25 | A.    No. | 08:38:14 |

Page 39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                    Witness my hand this 21st day

2       of December 2017.

3

4

5

6             PAUL J. FREDERICKSON, CCR, CSR

7             WA CCR 2419   CA CSR 13164

8             Expiration date:  March 31, 2018

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page 367

# EXHIBIT K

HIGHLY CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4

 5    WAYMO LLC,

 6                    Plaintiff,

 7    vs.                              Case No.

 8    UBER TECHNOLOGIES, INC.;         3:17-cv-00939-WHA

 9    OTTOMOTTO LLC; OTTO TRUCKING LLC,

10                    Defendants.

11    _____/

12

13        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15        VIDEOTAPED DEPOSITION OF MATHEW HENLEY

16              FRIDAY, DECEMBER 22, 2017

17

18

19

20    Reported by:

21    Anrae Wimberley

22    CSR No. 7778

23    Job No. 2771361B

24

25    PAGES 1 - 145
```

                                              Page 1

HIGHLY CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

1    that I'm limiting this to collection based on these        16:44:23

2    objectives.

3          I'm simply asking you right now, based on

4    this product -- this project, which was -- the

5    autonomous project was Zoo, I believe you said that        16:44:35

6    you understood that there was research that was

7    going to be done on some of the leading companies in

8    that space, including Google or Waymo --

9          A.   Yes.

10         Q.   -- and that you believe that the code name      16:44:52

11   Giraffe refers to Google or Waymo.

12         A.   Um-hum.

13         Q.   So I think that's been established by your

14   testimony.

15         A.   Yes.                                            16:45:02

16         Q.   Now, in light of that project, are you

17   aware of Uber uncovering any confidential

18   information of Waymo's?

19         A.   I'm not aware of any confidential

20   information.                                               16:45:17

21         Q.   Are you aware of any trade secret

22   information of Waymo's being uncovered in connection

23   with this effort to conduct research into the

24   autonomous space?

25         A.   "Trade secret" is something I need help        16:45:29

Page 106

HIGHLY CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

```
 1    with the definition on specifically.              16:45:33

 2         Q.   Well, do you have a concern or belief that

 3    there was some type of information of Waymo's that

 4    was uncovered?  Because I can just work backwards.

 5         Why don't you tell me all the information       16:45:55

 6    related to Waymo that you believe was uncovered as a

 7    result of these efforts.

 8         A.   All of our efforts against Waymo that I'm

 9    aware of occurred in public space.

10         Q.   And when you say "public space," you're    16:46:12

11    referring to surveillance?

12         A.   Yeah, observation.

13         Q.   So observation of vehicles?

14         A.   Yes.

15         Q.   And so you're not aware of any other       16:46:19

16    research activity or surveillance or investigative

17    tool that was utilized against Waymo other than this

18    physical surveillance of vehicles; is that correct?

19         A.   Yeah.

20         Q.   So anything that you observed would have   16:46:32

21    been the observation of these vehicles in the public

22    space?

23         A.   Yes, driving around.

24         Q.   And based on that, are you aware of having

25    discovered any trade secrets of Waymo?              16:46:43
```

Page 107

```
 1        A.   Again, I don't know the definition of      16:46:46

 2   "trade secret," but if my previous statement agrees

 3   with that, then, yes.

 4        Q.   Certainly no one ever told you that they

 5   discovered any Waymo trade secrets; is that correct?   16:47:05

 6        A.   Correct.

 7        Q.   Let me ask you to take a look at the

 8   fourth paragraph of this -- on page 625.  The last

 9   sentence of the fourth paragraph reads, "Little, if

10   any, protected data or technical information has       16:48:21

11   leaked into the public domain."

12             Do you see that?

13        A.   The last sentence?

14        MR. UMHOFER:  Right there (indicating).

15   BY MR. LYONS:                                          16:48:35

16        Q.   What do you understand the term "protected

17   data" to refer to?

18        A.   If I'm thinking of protected data, I'm

19   thinking of data that is being secured or contained

20   within the entity that owns it.                        16:49:06

21        Q.   Were there any programs in place at Uber

22   to conduct research to see if any protected data had

23   leaked into the public domain?

24        A.   The biggest thing I would -- that I think

25   potentially that could get into an area like that      16:49:32
```

Page 108

HIGHLY CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

```
 1    would be we would monitor GitHub, which is a source      16:49:36

 2    code repository.  The public GitHub.  We would

 3    monitor the public Web and -- you know, looking for

 4    context that would be usually inadvertently dropped

 5    out of there by an engineer, et cetera.                  16:50:00

 6         Q.   Did you ever -- looking at that sentence,

 7    do you agree that little, if any, protected data or

 8    technical information regarding Waymo has leaked

 9    into the public domain?

10         A.   To the best of my knowledge, we've never      16:50:31

11    run across any -- anything that I would consider

12    protected data through something like our GitHub

13    public monitoring or web scraping.

14         Q.   Let me ask you to turn to page 627.

15    Actually, just for context, please turn to 626.  And    16:50:55

16    you'll see this references is a two-prong collection

17    method.  Prong 1 is "Establish and maintain the

18    baseline."  And 2 refers to "Internal resources."

19              And then, under 2, it says, "In order to

20    build the subject matter expertise necessary to         16:51:23

21    drive collection, SSG would like to meet on a

22    semi-routine basis with our own AV experts at

23    Iden I, Iden J, and elsewhere."

24              Do you know who those companies are?

25         A.   I don't know if they are -- if they are       16:51:37
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      FEDERAL CERTIFICATE OF DEPOSITION OFFICER
2
       I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby
3  declare:
4      That, prior to being examined, the witness
   named in the foregoing deposition was by me duly
5  sworn pursuant to Section 30(f)(1) of the Federal
   Rules of Civil Procedure and the deposition is a
6  true record of the testimony given by the witness;
7      That said deposition was taken down by me in
   shorthand at the time and place therein named and
8  thereafter reduced to text under my direction;
9      --X---    That the witness was requested to
   review the transcript and make any changes to the
10 transcript as a result of that review pursuant to
   Section 30(e) of the Federal Rules of Civil
11 Procedure;
12     -----    No changes have been provided by the
13 witness during the period allowed;
       -----    The changes made by the witness are
14 appended to the transcript;
15     -----    No request was made that the
   transcript be reviewed pursuant to Section 30(e) of
16 the Federal Rules of Civil Procedure.
17     I further declare that I have no interest in
18 the event of the action.
       I declare under penalty of perjury under the
19 laws of the United States of America that the
20 foregoing is true and correct.
       WITNESS my hand this 26th day of December,
21 2017.
22
23
24
25      ANRAE WIMBERLEY, CSR NO. 7778

                                    Page 145

# EXHIBIT L

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

           Case No. 3:17-cv-00939-WHA

5    _____

6    WAYMO LLC,                        )

7              Plaintiff,              )

                                       )

8          v.                          )

                                       )

9    UBER TECHNOLOGIES, INC.;          )

     OTTOMOTTO LLC;                    )

10   OTTO TRUCKING,                    )

11            Defendants.              )

     _____)

12

13    HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

14

15           VIDEOTAPED DEPOSITION OF

                   JAKE NOCON

16        DATE TAKEN:  DECEMBER 19, 2017

17

18

19

20

21   REPORTED BY:

22   PAUL J. FREDERICKSON, CCR, CSR

23   JOB NO. 2771324

24

25   Pages 1 - 273

                                      Page 1

| | | |
|---|---|---|
| 1 | Did this happen outside the United | 09:57:36 |
| 2 | States? | 09:57:38 |
| 3 | A.    No, it did not. | 09:57:39 |
| 4 | Q.    Okay. | 09:57:39 |
| 5 | So in terms of any human | 09:57:40 |
| 6 | surveillance that you performed, that was | 09:57:41 |
| 7 | exclusively within the United States? | 09:57:43 |
| 8 | A.    Yes. | 09:57:47 |
| 9 | Q.    Did you ever perform any | 09:57:48 |
| 10 | surveillance of any individuals who worked for | 09:57:57 |
| 11 | Waymo? | 09:57:59 |
| 12 | A.    I never surveilled any individuals | 09:58:06 |
| 13 | that worked for Waymo. | 09:58:06 |
| 14 | Q.    What types of surveillance did you | 09:58:08 |
| 15 | do on Waymo? | 09:58:10 |
| 16 | A.    Our team was tasked with | 09:58:16 |
| 17 | conducting observations of Waymo's vehicles | 09:58:17 |
| 18 | from public places, but it was not specific to | 09:58:19 |
| 19 | any individual. | 09:58:22 |
| 20 | Q.    Focusing on -- on that, who gave | 09:58:34 |
| 21 | you the instructions for any of the | 09:58:44 |
| 22 | surveillances that you did on Waymo? | 09:58:47 |
| 23 | A.    If I recall correctly, it was Nick | 09:58:50 |
| 24 | Gicinto. | 09:58:53 |
| 25 | Q.    And how many separate surveillance | 09:58:53 |

Page 45

```
 1              C E R T I F I C A T E
 2
 3              I, PAUL J. FREDERICKSON, CA
 4    Certified Shorthand Reporter No. 13164 and
      WA Certified Court Reporter No. 2419, do
 5    hereby certify:
 6              That prior to being examined,
      the witness named in the foregoing
 7    deposition was by me duly sworn or affirmed
 8    to testify to the truth, the whole truth and
      nothing but the truth;
 9              That said deposition was taken
10    down by me in shorthand at the time and
11    place therein named, and thereafter reduced
12    to print by means of computer-aided
      transcription; and the same is a true,
13    correct and complete transcript of said
14    proceedings.
15              I further certify that I am not
16    interested in the outcome of the action.
17              Witness my hand this 20th day
18    of December 2017.
19
20
21
22
23      PAUL J. FREDERICKSON, CCR, CSR
24        WA CCR 2419  CA CSR 13164
25      Expiration date:  March 31, 2018
```

Page 273

# EXHIBIT M

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1               UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF CALIFORNIA
3                 SAN FRANCISCO DIVISION
4
             Case No. 3:17-cv-00939-WHA
5      _____
6   WAYMO LLC,                        )
                                      )
7             Plaintiff,              )
                                      )
8          v.                         )
                                      )
9   UBER TECHNOLOGIES, INC.;          )
    OTTOMOTTO LLC;                    )
10  OTTO TRUCKING,                    )
                                      )
11            Defendants.             )
       _____)
12
13    HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY
14           VIDEOTAPED DEPOSITION OF
15               NICHOLAS GICINTO
16      DATE TAKEN:  DECEMBER 21, 2017
17
18
19
20
21  REPORTED BY:
22  PAUL J. FREDERICKSON, CCR, CSR
23  JOB NO. 2771353
24
25  Pages 1 - 338

                                          Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A. It appears to be a philosophical | 13:18:30 |
| 2 | approach to looking at the autonomous vehicle | 13:18:33 |
| 3 | competitive landscape and -- from a collection | 13:18:37 |
| 4 | standpoint. | 13:18:41 |
| 5 | Q. And do you see in the next | 13:18:42 |
| 6 | paragraph, it says: | 13:18:43 |
| 7 | "The primary collection | 13:18:44 |
| 8 | methodologies will be open-source and HUMINT | 13:18:45 |
| 9 | and will be conducted by assets, both internal | 13:18:48 |
| 10 | employees and external vendors"? | 13:18:52 |
| 11 | A. I see that. | 13:18:54 |
| 12 | Q. And did you have understanding | 13:18:56 |
| 13 | that Uber's primary collection methodologies in | 13:18:59 |
| 14 | terms of gaining competitive intelligence were | 13:19:06 |
| 15 | the things that are listed here? | 13:19:07 |
| 16 | A. No, I disagree with that. I mean, | 13:19:12 |
| 17 | this strategy or this -- this document here, | 13:19:13 |
| 18 | what was outlined, was never actually carried | 13:19:17 |
| 19 | out. | 13:19:21 |
| 20 | Q. You haven't read the whole | 13:19:21 |
| 21 | document yet, have you? | 13:19:22 |
| 22 | A. I haven't read the whole document, | 13:19:23 |
| 23 | but insofar as what you've pointed out to me, | 13:19:25 |
| 24 | these are not things that were -- that were | 13:19:28 |
| 25 | undertaken. | 13:19:30 |

Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | And one of the individuals -- the | 14:37:28 |
| 2 | first individual we interacted with as a | 14:37:33 |
| 3 | vendor, who we later called ███, traveled to | 14:37:38 |
| 4 | ███████ in response to the requirements that Ric | 14:37:41 |
| 5 | Jacobs drafted. | 14:37:45 |
| 6 | The information itself wasn't -- | 14:37:45 |
| 7 | wasn't particularly earth-shattering, but the | 14:37:49 |
| 8 | quality of the writing, the quality of the | 14:37:54 |
| 9 | assessment, was at such a higher level of -- of | 14:37:57 |
| 10 | what -- what the business was used to seeing, | 14:38:01 |
| 11 | that it was clear that we were working with a | 14:38:04 |
| 12 | vendor that had just a higher level of | 14:38:07 |
| 13 | expertise than what the business had been used | 14:38:11 |
| 14 | to working with. | 14:38:13 |
| 15 | Q.    Other than what we've discussed | 14:38:14 |
| 16 | today with respect to the surveillance of ███ | 14:38:16 |
| 17 | and Waymo vehicles, are there any other | 14:38:20 |
| 18 | activities you can recall that were engaged in | 14:38:24 |
| 19 | by these folks that you call ███ that were | 14:38:28 |
| 20 | hired by your group with respect to collecting | 14:38:32 |
| 21 | information about competitors in the AV market? | 14:38:39 |
| 22 | A.    I don't recall those individuals | 14:39:07 |
| 23 | engaging in any other collection related to AV | 14:39:11 |
| 24 | besides what we previously discussed. | 14:39:14 |
| 25 | MR. KAPGAN:  Do you want to take a | 14:39:16 |

Page 208

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    chain category?                                16:58:02

 2         A.     Hypothetically it would have been  16:58:05

 3    for that.  But, again, we didn't engage in     16:58:07

 4    supply chain research, so none of the money    16:58:09

 5    went to that.  We did engage in some sourcing  16:58:11

 6    activities, as I mentioned, related to a couple 16:58:14

 7    of entities, neither of which were Waymo or     16:58:18

 8    Google.                                         16:58:22

 9         Q.     Did the ATG group specify that      16:58:26

10    efforts should be taken with respect to ████    16:58:28

11    ███████████████████████████████████  with       16:58:31

12    respect to the autonomous vehicle competitors?  16:58:33

13         A.     They listed those as areas of       16:58:36

14    interest.                                        16:58:37

15         Q.     All right.                           16:58:40

16                Was any money out of the ███         16:58:50

17    ████████████  budget spent on focusing on        16:58:52

18    Google with respect to the ██████████?           16:58:57

19         A.     No.                                  16:58:57

20         Q.     Was any of the ████████████████      16:59:00

21    budget focused on Google with respect to         16:59:02

22    ████████?                                         16:59:06

23         A.     No.                                  16:59:06

24         Q.     Was any of the ████████████████      16:59:08

25    budget that was approved for 2017 focused on     16:59:10
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Google with respect to ████████? | 16:59:15 |
| 2 | A.    Yes. | 16:59:15 |
| 3 | Q.    Tell me what you know about that. | 16:59:21 |
| 4 | A.    The -- this budget funded our | 16:59:24 |
| 5 | public observation activities in the Phoenix | 16:59:27 |
| 6 | area as we previously discussed. | 16:59:30 |
| 7 | Q.    And is that the only activity with | 16:59:32 |
| 8 | respect to Google that was -- which came under | 16:59:35 |
| 9 | this ████████ budget? | 16:59:42 |
| 10 | A.    Yes. | 16:59:42 |
| 11 | Q.    Was there any other budget in the | 16:59:45 |
| 12 | SSG Group that related to activities focused on | 16:59:47 |
| 13 | Google for 2017? | 16:59:49 |
| 14 | A.    No. | 16:59:51 |
| 15 | Q.    What about for 2016? | 16:59:51 |
| 16 | A.    No. | 16:59:51 |
| 17 | Q.    Was all of the budget for 2000 -- | 17:00:09 |
| 18 | first of all, how much budget was there for | 17:00:10 |
| 19 | 2016 with respect to autonomous vehicles in | 17:00:13 |
| 20 | your group? | 17:00:15 |
| 21 | A.    We didn't have a budget.  We | 17:00:16 |
| 22 | weren't funded by ATG in 2016. | 17:00:18 |
| 23 | Q.    Okay. | 17:00:20 |
| 24 | You didn't have a budget at all? | 17:00:23 |
| 25 | A.    I had a -- I had a budget, but I | 17:00:24 |

Page 282

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              C E R T I F I C A T E

 2

 3              I, PAUL J. FREDERICKSON, CA
        Certified Shorthand Reporter No. 13164 and
 4      WA Certified Court Reporter No. 2419, do
        hereby certify:
 5              That prior to being examined,
        the witness named in the foregoing
 6      deposition was by me duly sworn or affirmed
 7      to testify to the truth, the whole truth and
 8      nothing but the truth;
 9              That said deposition was taken
        down by me in shorthand at the time and
10      place therein named, and thereafter reduced
11      to print by means of computer-aided
12      transcription; and the same is a true,
13      correct and complete transcript of said
14      proceedings.
                I further certify that I am not
15      interested in the outcome of the action.
16              Witness my hand this 22nd day
17      of December 2017.

18

19

20

21

22

23      PAUL J. FREDERICKSON, CCR, CSR
24      WA CCR 2419  CA CSR 13164
25      Expiration date:  March 31, 2018
```

Page 338