# EXHIBIT 2

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Case No. 3:17-cv-00939-WHA


WAYMO LLC,

                    Plaintiff,

vs.

UBER TECHNOLOGIES, INC.; OTTOMOTTO

LLC; OTTO TRUCKING LLC,

                    Defendants.

_____/


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEOTAPED DEPOSITION OF CRAIG CLARK

FRIDAY, DECEMBER 22, 2017




Reported by:

Kelli Ann Willis, RPR, CRR

JOB No. 2780742


PAGES 1 - 387

Page 46

```
 1   person's name, I would know her.  Julie, I want to      10:00:15
 2   say.  I know -- yeah, beyond that, I would be           10:00:20
 3   guessing.                                               10:00:31
 4       Q.   Did you have any interaction with the ATG      10:00:32
 5   group while you were at Uber?                           10:00:34
 6            MR. STUMPHAUZER:  Object to form.              10:00:38
 7            THE WITNESS:  So, interaction, I've seen       10:00:39
 8       presentations.  I've -- I've worked with -- I       10:00:43
 9       worked with people in ATG on -- what have I         10:00:48
10       worked with ATG on?  There was -- there was         10:00:56
11       some penetration testing that was done              10:01:00
12       vis-a-vis the -- kind of their -- like,             10:01:02
13       facilities.                                         10:01:05
14            There was an encampment of homeless people     10:01:07
15       near Harrison Street that was camped out in         10:01:13
16       their -- in the area, and I was -- and they         10:01:15
17       solicited some advice from me.                      10:01:19
18   BY MS. TARAZI:                                          10:01:22
19       Q.   You said that you have seen presentations      10:01:22
20   made by ATG; is that correct?  Did I recall that        10:01:32
21   correctly?                                              10:01:35
22       A.   Yes.                                           10:01:35
23       Q.   Have you ever given presentations to the       10:01:36
24   ATG group?                                              10:01:37
25       A.   No.                                            10:01:38
```

Page 132

```
1   at the meeting, or small kind of admin something.  I       12:08:57
2   don't require -- I don't recall -- I don't recall          12:09:01
3   using that, like, being a power user.                      12:09:06
4        Q.   What were the default retention settings          12:09:10
5   at UChat?                                                   12:09:14
6        A.   I don't know.  I think at one point it            12:09:15
7   was -- I think it varied.  I think UChat was --             12:09:16
8   you'd have to talk to the Uber company person.              12:09:22
9        Q.   Did you use HipChat?                              12:09:27
10        A.   I did.                                            12:09:28
11        Q.   What did you use HipChat for?                     12:09:29
12        A.   The same way I used UChat: infrequently.          12:09:31
13   It's a terrible product.  Horribly insecure.               12:09:34
14        Q.   "Horribly insecure," what does that mean?         12:09:38
15        A.   It means that the communication platform         12:09:41
16   itself is not secure.  It's been hacked multiple           12:09:43
17   times.                                                     12:09:46
18        Q.   Is UChat secure?                                  12:09:48
19        A.   I don't know.  I'm not a security -- I'm          12:09:51
20   not a security expert, but I'm not aware of                12:09:54
21   compromises of UChat.                                      12:09:57
22        Q.   Have you used Wickr?                              12:09:59
23        A.   Yes.                                              12:10:00
24        Q.   And what did you use Wickr for?                   12:10:01
25        A.   I used Wickr for everything from                  12:10:03
```

Page 139

| | | |
|---|---|---|
| 1 | Q.   How many such discussions? | 12:16:26 |
| 2 | A.   I don't know.  Twenty. | 12:16:28 |
| 3 | Q.   And what instructions did you give | 12:16:29 |
| 4 | employees regarding when to use a particular | 12:16:31 |
| 5 | communications platform as opposed to another | 12:16:34 |
| 6 | communications platform? | 12:16:36 |
| 7 | A.   If you are -- if you are on legal hold, | 12:16:37 |
| 8 | you can't use ephemeral communications. | 12:16:40 |
| 9 | Q.   Is that the only instruction that you ever | 12:16:44 |
| 10 | provided to Uber employees regarding the use of | 12:16:46 |
| 11 | ephemeral communications? | 12:16:52 |
| 12 | A.   I don't know.  To the best of the | 12:16:59 |
| 13 | recollection, that's the one that sticks out I would | 12:17:04 |
| 14 | tell people. | 12:17:06 |
| 15 | Q.   Did you ever instruct employees to use | 12:17:09 |
| 16 | ephemeral communications platforms in order to avoid | 12:17:12 |
| 17 | the retention of such communications? | 12:17:16 |
| 18 | A.   Absolutely not. | 12:17:18 |
| 19 | Q.   I think I asked you about the retention -- | 12:17:38 |
| 20 | the default retention of UChat, and I think you said | 12:17:44 |
| 21 | you don't know what the default retention period | 12:17:47 |
| 22 | was; is that correct? | 12:17:50 |
| 23 | A.   I don't know for sure.  It has changed, | 12:17:52 |
| 24 | but I think at one point it was maybe seven days. | 12:17:54 |
| 25 | But I'm not -- but I'm not certain. | 12:17:59 |

Page 145

```
 1    be done through technical investigation, but then,      12:24:19

 2    ultimately, you need to sit down with the person and    12:24:21

 3    talk.  Oftentimes, it's, like, No, I did have a         12:24:23

 4    legitimate reason for looking at this.                  12:24:26

 5          So, that's why I would use Oscar.                 12:24:28

 6       Q.   Did you use Oscar for any other                 12:24:33

 7    investigations?                                         12:24:35

 8       A.   Not that I recall.                              12:24:36

 9       Q.   Did you use Oscar for any investigations        12:24:36

10    into Google or Waymo?                                   12:24:39

11       A.   No.                                             12:24:41

12       Q.   Did you communicate with Oscar using           12:24:45

13    Wickr?                                                  12:24:48

14       A.   I did.                                          12:24:49

15       Q.   Why did you communicate with Oscar using       12:24:50

16    Wickr?                                                  12:24:51

17       A.   It's a great secure communication              12:24:51

18    platform.                                               12:24:54

19       Q.   What does "secure" mean?                        12:25:06

20       A.   Secure means end-to-end encrypted, and         12:25:08

21    it's ephemeral.  The best -- the best -- the most       12:25:12

22    secure way to store something is to not have it.        12:25:18

23       Q.   Did you use Oscar and TAL Global -- did         12:25:23

24    you communicate with Oscar and TAL Global via Wickr     12:25:27

25    to avoid your discussions being discovered by           12:25:35
```

```
                                                   Page 146
1    government investigators or parties to this      12:25:38
2    litigation?                                      12:25:40
3        A.   No.                                     12:25:40
4        Q.   You were starting to say something there?  12:25:42
5        A.   No, because I saw where you were going.  12:25:43
6    It's just -- let's continue.                     12:25:45
7        Q.   Do you find the question offensive?     12:25:57
8        A.   I do.                                    12:25:59
9        Q.   Why is that?                             12:25:59
10       A.   Because it's accusing me of -- I find it  12:26:00
11   accusatory.                                       12:26:03
12       Q.   I'm handing you a document that we will  12:26:09
13   mark as Exhibit 9704.                            12:26:12
14           (The referred-to document was marked by  12:26:24
15        the court reporter for Identification as     12:26:24
16        Deposition Exhibit 9704.)                    12:26:24
17   BY MS. TARAZI:                                    12:26:24
18       Q.   When you find it accusatory, what do you  12:26:26
19   mean by that?                                     12:26:28
20       A.   The question felt accusatory.            12:26:30
21       Q.   Who is         ?                         12:26:47
22       A.   Can I have a minute with the document?   12:26:50
23       Q.   Sure.                                    12:26:52
24       A.        , I don't know if he's a            12:27:37
25   principal or employee of     .                    12:27:41
```

Page 199

```
1        A.    I have.                                    02:29:19

2        Q.    When did you instruct employees at Uber to  02:29:19

3   designate documents attorney-client privileged?        02:29:23

4        A.    When they were seeking legal advice.        02:29:26

5        Q.    Is that --                                  02:29:31

6        A.    And even if the specter of legal advice is  02:29:32

7   there, all right?  So -- so, if I'm communicating --   02:29:36

8   so this label thing is very interesting to me.         02:29:40

9             In that time, the way I see it, a label is   02:29:44

10   a tag, right?  So, ultimately, privileged              02:29:46

11   determinations are made by judges.  And they are       02:29:49

12   made by judges based on advocacy by the parties'       02:29:51

13   clients who are making decisions when they are         02:29:55

14   producing documents about what they think is           02:29:57

15   privileged or not privileged.                          02:29:59

16             Whether something has a tag on it really     02:30:01

17   facilitates review:  Hey, heads up, document           02:30:04

18   reviewers, this might be privileged.                   02:30:08

19             So, I see where you're going with this       02:30:10

20   line, Counselor, and maybe I can short-circuit it      02:30:15

21   with that.  Let's move on to your next question.       02:30:17

22        Q.    Did you provide an instruction to anyone    02:30:24

23   at Uber to mark documents as attorney-client           02:30:27

24   privileged when you believed the documents were not    02:30:30

25   privileged?                                            02:30:35
```

Page 202

```
 1        all I'm asking.                              02:32:51
 2              MS. GOODMAN:  Was it Uber's policy to tell   02:32:52
 3        people to mark documents "attorney-client       02:32:55
 4        privileged" if they were not privileged?        02:32:57
 5              You can answer that question.             02:33:01
 6              THE WITNESS:  No.                         02:33:06
 7  BY MS. TARAZI:                                        02:33:07
 8        Q.    Did you ever tell people to mark documents  02:33:07
 9  as "attorney-client privileged" when they were not    02:33:09
10  privileged?                                           02:33:12
11              MR. STUMPHAUZER:  The same issue.        02:33:13
12              MS. GOODMAN:  You can answer that        02:33:15
13        question.                                       02:33:15
14              THE WITNESS:  I'm sorry, you said I can   02:33:16
15        answer that question?                           02:33:18
16              MS. GOODMAN:  Did you ever tell people, as  02:33:19
17        a matter of policy, to mark documents as       02:33:21
18        "attorney-client privileged" when they were not  02:33:23
19        privileged?                                     02:33:25
20              THE WITNESS:  You're saying I can answer   02:33:25
21        that question?                                  02:33:32
22              No.                                       02:33:33
23              MS. GOODMAN:  If you want to find out what  02:33:40
24        he did, in fact, tell people, show him law dog   02:33:41
25        presentation that he's referenced multiple      02:33:46
```

Page 203

```
 1       times now.                                    02:33:49
 2            MS. TARAZI:  We'll come to that.          02:33:49
 3    BY MS. TARAZI:                                    02:34:00
 4       Q.   Well, the law dog presentation, was that 02:34:01
 5    the only presentation provided by Uber lawyers    02:34:02
 6    regarding the topic of when to designate documents 02:34:08
 7    "attorney-client privileged"?                     02:34:12
 8            MS. GOODMAN:  Object to form.             02:34:13
 9            THE WITNESS:  I don't purport to have     02:34:16
10       knowledge of all of the presentations that    02:34:18
11       legal has given to everybody.  I also don't   02:34:19
12       characterize what that presentation does.     02:34:23
13    BY MS. TARAZI:                                    02:34:33
14       Q.   Did you attend a meeting in Pittsburgh,  02:34:33
15    Pennsylvania, relating to the use of the          02:34:35
16    attorney-client privilege or dropped designations? 02:34:37
17       A.   I've never been to Pittsburgh.           02:34:42
18       Q.   So that's a no?                           02:34:44
19            MS. TARAZI:  The court reporter is going 02:35:18
20       to hand you a document marked Exhibit 9709.   02:35:25
21            (The referred-to document was marked by  02:35:32
22       the court reporter for Identification as       02:35:32
23       Deposition Exhibit 9709.)                      02:35:32
24    BY MS. TARAZI:                                    02:35:44
25       Q.   Mr. Clark, is that the law dog           02:35:44
```

                                                            Page 205

```
 1            MS. GOODMAN:  To be clear, meta data may    02:37:21
 2        be associated with these documents.  You may    02:37:22
 3        just not have it at your fingertips.            02:37:25
 4            MS. TARAZI:  The question was, do you have  02:37:27
 5        it, and I said I do not.                        02:37:29
 6    BY MS. TARAZI:                                      02:37:32
 7        Q.   Did you create a version of this document  02:37:32
 8    that did not have the Uber logo on it?              02:37:34
 9        A.   No.                                        02:37:37
10        Q.   Did you ever give a presentation using a   02:37:37
11    deck similar to this that did not have the Uber logo 02:37:43
12    on it?                                              02:37:47
13        A.   No.  This page -- this first page is       02:37:47
14    always the same with the exception of dates.  Some  02:37:50
15    of them may have been dated different, but... so, I  02:37:53
16    wouldn't always catch the date.  But every version  02:37:57
17    of this presentation had the same slide.  This is   02:37:59
18    the Uber slide of a woman walking on a sidewalk in   02:38:05
19    San Francisco, and it is notable because we often   02:38:11
20    joke about where she's going and what she's doing.  02:38:15
21        Q.   How many times did you give a presentation  02:38:32
22    using this document?                                02:38:33
23        A.   Using this specific deck?  I don't know.   02:38:35
24        Q.   How many times did you give a presentation  02:38:39
25    using a version of this deck?                       02:38:40
```

Page 213

1    presentations, do you just recall discussing the          02:46:35

2    need for or the desire to provide this presentation        02:46:38

3    with anyone other than Mat Henley?                         02:46:42

4         A.   I'm sorry?                                       02:46:44

5         Q.   Do you recall discussing this presentation       02:46:44

6    with anyone other than Mat Henley?                         02:46:46

7         A.   Yes.  I discussed it with many people.           02:46:49

8         Q.   What did you discuss about the                   02:46:50

9    presentation?                                              02:46:52

10        A.   Like use it.  Other people in legal wanted       02:46:52

11   it.  I was -- when I was putting it together, I was        02:46:55

12   asking around if anybody had created decks about           02:46:59

13   privilege, and people saying, Yeah, it's a great           02:47:02

14   idea, you should do it.                                    02:47:05

15             So, several people in litigation.  I             02:47:06

16   talked to Sullivan about it, perhaps.  Yeah, a lot         02:47:10

17   of people I talked to about the presentation.              02:47:17

18        Q.   What did you talk to Sullivan about it?          02:47:19

19        A.   I said I'm going to give a presentation.         02:47:21

20        Q.   Did you tell him what the presentation was       02:47:28

21   about?                                                     02:47:30

22        A.   Yeah.  I'm going give a legal overview.          02:47:31

23        Q.   Did you tell him any more than that?             02:47:33

24        A.   I don't recall.                                  02:47:35

25        Q.   How much do you recall about what you told       02:47:39

Page 214

```
 1   people as you showed each slide?                    02:47:42
 2        A.   Oh, quite a bit, probably.                02:47:44
 3        Q.   Why did you use dogs?                      02:47:46
 4        A.   I love dogs.  Do you not like dogs,        02:47:48
 5   Counsel?                                             02:47:50
 6        Q.   It's not my deposition.                    02:47:52
 7        A.   Okay.                                       02:47:53
 8        Q.   What -- let's turn to the fourth page.     02:47:56
 9   It's marked 340308.                                  02:48:06
10        A.   340308?                                     02:48:11
11        Q.   Yes.                                        02:48:15
12        A.   Yes, I see it.                              02:48:15
13        Q.   You put:  "Law! Equals Science"?  What is  02:48:16
14   that?                                                 02:48:20
15        A.   Actually, it says:  Law, Bang, Equals       02:48:21
16   Equal Science."  That's Javascript for:  Law does     02:48:23
17   not equal science.                                    02:48:27
18        Q.   I learned something.                        02:48:28
19        A.   I'm presenting this --                      02:48:28
20        Q.   Exclamation point equal equal is the        02:48:33
21   "not," Javascript for --                              02:48:35
22        A.   Java script, does not equal.  Bang.  The    02:48:37
23   programmers use bang for their exclamation point.     02:48:41
24   "Bang equal equal" means "does not equal" in          02:48:45
25   Javascript.                                           02:48:49
```

Page 215

| | | |
|---|---|---|
| 1 | You've got to understand, I'm dealing with | 02:48:50 |
| 2 | a lot of technical people, coders and things like | 02:48:51 |
| 3 | this.  Another way I'm able to get rapport and work | 02:48:55 |
| 4 | with these people, have them come to me, is to try | 02:48:58 |
| 5 | to speak their language.  They would typically laugh | 02:49:00 |
| 6 | at me when they see that.  They'd go:  Look at the | 02:49:01 |
| 7 | Javascript, the old guy trying to -- the old boy | 02:49:02 |
| 8 | trying to use Java script. | 02:49:06 |
| 9 | Q.   And I clearly didn't understand it.  I | 02:49:06 |
| 10 | definitely do not speak Javascript. | 02:49:14 |
| 11 | What did you mean by law "does not equal | 02:49:15 |
| 12 | science"? | 02:49:16 |
| 13 | A.   So, again, I'm dealing with very technical | 02:49:17 |
| 14 | people who are -- they -- they probably think in | 02:49:20 |
| 15 | math and in equations, if you will.  They like | 02:49:25 |
| 16 | answers that are absolute.  And the law is anything | 02:49:28 |
| 17 | but absolute.  The law is not math.  The law is not | 02:49:35 |
| 18 | science. | 02:49:40 |
| 19 | Q.   If you turn to the slide marked 340311? | 02:49:43 |
| 20 | A.   340311.  Yes. | 02:49:51 |
| 21 | Q.   It looks like a mock-up of an email with | 02:49:57 |
| 22 | an X over it. | 02:50:01 |
| 23 | A.   Yes.  Let me explain.  So, most of these | 02:50:02 |
| 24 | slides, I wouldn't say most, but many of these | 02:50:05 |
| 25 | slides have had animation that's not reflected in | 02:50:09 |

Page 216

| | | |
|---|---|---|
| 1 | the printout. | 02:50:12 |
| 2 | Q.   Okay. | 02:50:13 |
| 3 | A.   So, carry on. | 02:50:13 |
| 4 | Q.   What was the slide attempting to reflect? | 02:50:19 |
| 5 | A.   So, I've got to back up a little bit. | 02:50:23 |
| 6 | So, I've gone through -- at this point, | 02:50:26 |
| 7 | I've gone through the elements of privilege, and | 02:50:28 |
| 8 | then I'm giving them -- I'm showing them emails, and | 02:50:31 |
| 9 | saying:  Is this -- what do you guys think? | 02:50:34 |
| 10 | Privileged, not privileged? | 02:50:37 |
| 11 | Q.   Underneath the X, it's a little tricky to | 02:50:44 |
| 12 | read, but it looks like the text of the email that | 02:50:49 |
| 13 | you have included in the presentation says, | 02:50:52 |
| 14 | "Attached are the" -- do you recall what this says? | 02:50:54 |
| 15 | A.   No. | 02:51:00 |
| 16 | Q.   "Attached are the" -- something.  It looks | 02:51:00 |
| 17 | like it might be say, "numbers for last quarter." | 02:51:04 |
| 18 | Does that sound like it could be right? | 02:51:07 |
| 19 | A.   Could be. | 02:51:11 |
| 20 | Q.   "We need to discuss ASAP.  I am marking | 02:51:11 |
| 21 | this attorney-client privilege due to sensitivity." | 02:51:15 |
| 22 | Obviously, quite a number of those letters | 02:51:17 |
| 23 | are blacked out, but does that sound right to you? | 02:51:21 |
| 24 | A.   It sounds right. | 02:51:23 |
| 25 | Q.   Then there's an X over that. | 02:51:24 |

Page 217

```
 1                Does that indicate that you informed the      02:51:27
 2   attendees at the presentation that that email was      02:51:31
 3   not privileged?                                        02:51:33
 4        A.   This is an example that I used to say --      02:51:34
 5   again, you have got to back up to the presentation.    02:51:36
 6                So, at this point, I've kind of also       02:51:39
 7   walked people through -- there's a lot of people who   02:51:41
 8   aren't -- aren't Americans, either.  You've got        02:51:46
 9   people from all over.  We're a very diverse group of   02:51:48
10   people.                                                02:51:51
11                So, I've given them a slight overview, a   02:51:51
12   quick overview of what -- of the litigation system    02:51:54
13   and the idea of privilege.                             02:51:59
14                At this point, I've made -- I've already   02:52:00
15   said at least once or twice that we don't make these   02:52:02
16   determinations; judges make these determinations.     02:52:05
17                So, I'm up there.  I give them this       02:52:08
18   hypothetical.  I have them read it, and people raise   02:52:11
19   their hand.  Okay, so, based upon what you've         02:52:13
20   learned so far, who thinks it's privileged?  I get     02:52:16
21   the responses.  And then the red X comes out.  I       02:52:19
22   would make the determination that this is not          02:52:23
23   privileged.  It is not concerning legal advice and     02:52:25
24   other elements are missing from it.                    02:52:40
25        Q.   What other elements are missing from it?     02:52:42
```

Page 218

```
 1        A.    So, I'm not going to sit and analyze it,     02:52:45

 2   but it doesn't look like it's -- the To and the        02:52:48

 3   From, yeah.                                             02:52:52

 4        Q.    Well, I'm not asking you now, but I'm        02:52:54

 5   interested in what you told the people who attended     02:52:57

 6   the presentation as to why this would not be           02:53:00

 7   privileged.                                             02:53:02

 8        A.    We should just get on the record that Uber   02:53:03

 9   has waived privilege on this deck itself, correct?     02:53:05

10        MS. GOODMAN:   You can discuss the contents        02:53:09

11     of this deck and the presentation you gave           02:53:11

12     surrounding the deck.                                 02:53:16

13        THE WITNESS:   Okay.  I'm sorry.  Can you          02:53:17

14     ask your question again?                             02:53:21

15   BY MS. TARAZI:                                          02:53:23

16        Q.    Sure.  My question was:  What did you tell   02:53:30

17   the attendees at your presentation as to why this       02:53:32

18   email was not privileged?                               02:53:39

19        A.    So I -- look, I didn't necessarily do        02:53:42

20   that.  I've already given them all the -- all the       02:53:44

21   elements.  And so, look, I don't -- when I'm            02:53:48

22   presenting, I try to be pretty dynamic.  I don't        02:53:51

23   stick to -- I want to use images because it's my        02:53:55

24   firm belief, and the best presenters that I've ever     02:53:58

25   seen don't put words on PowerPoints.  The presenter     02:54:00
```

Page 219

```
 1    presents the -- this should just be demonstrative.      02:54:03
 2           So, at this point, I've given -- I've           02:54:07
 3    gotten the poll.  I've gotten everybody's idea.  No     02:54:09
 4    red Xs; let's go to the next one.                       02:54:11
 5       Q.   So, if this is not the correct slide I          02:54:13
 6    should be asking about, why don't you direct me to      02:54:17
 7    the slide I should be asking about, so you can tell     02:54:19
 8    me what it is that you told the attendees as to when    02:54:23
 9    a document is protected by the attorney-client          02:54:25
10    privilege.                                              02:54:28
11       A.   Okay.  Back up one.  And this is               02:54:29
12    difficult -- this is difficult because the animation    02:54:32
13    is not there.                                           02:54:34
14       Q.   Okay.                                          02:54:35
15       A.   And guys on the phone, I'm really sorry        02:54:37
16    about this because you're going to have no idea what    02:54:39
17    I'm talking about.                                      02:54:41
18           So, this is the picture -- I've got to          02:54:43
19    slow down talking to you.  I'm so sorry.  I'll slow     02:54:45
20    down.                                                   02:54:48
21           Underneath there, you see two -- it looks       02:54:49
22    like tin cans, underneath the images.                   02:54:51
23       Q.   Yes, I see that.  Yes.                         02:54:55
24       A.   Do you see that?                               02:54:55
25       Q.   Uh-huh.                                        02:54:56
```

Page 220

```
 1      A.   So, that's the first image that pops up on     02:54:56
 2  the slide, and I'm walking through the elements, and    02:55:00
 3  there's a string between those two cans.                02:55:02
 4           I say:  What does the attorney-client          02:55:04
 5  privilege cover?  It covers a communication.  It        02:55:06
 6  could be any kind of communication.  It could be a      02:55:08
 7  conversation.  It could be an email.  It can be a       02:55:11
 8  memo.  It could be a Wickr.  It could be a -- a --      02:55:14
 9  whatever it is, it just has to be a communication.      02:55:17
10           And then I say:  Next element, it has to       02:55:21
11  be between a lawyer, our little law dog main guy         02:55:23
12  pops up here, and a client.  And our little dog with    02:55:29
13  glasses over there pops up.  All right?  So then        02:55:34
14  I've got them following along.                          02:55:37
15           You can't see this really at all, but you     02:55:39
16  see it looks like there's a top of a road sign that     02:55:40
17  pops up there, and I say:  It has to be of and          02:55:43
18  concerning legal advice.                                02:55:50
19           And the sign post is up there, and it has     02:55:51
20  help, support, advice, blah, blah, blah.  I give        02:55:54
21  some examples about it.  These other images you         02:55:59
22  cannot see here, but I think there's a dog that         02:56:02
23  looks very embarrassed like it did something wrong.     02:56:05
24  There's another one of a dog biting the finger          02:56:08
25  there.  And then there's Kujo in the cage down at       02:56:12
```

Page 221

```
 1    the bottom there.                               02:56:15

 2           So, I'm giving them examples of what is of  02:56:15

 3    and concerning legal advice.  Well, it could be    02:56:18

 4    broad, it could be narrow, but it's usually        02:56:20

 5    something where you're thinking, man, I've got to  02:56:22

 6    talk to a lawyer.                                  02:56:24

 7           There's somebody in the lobby who has       02:56:25

 8    chained himself to a bench and they're protesting, 02:56:28

 9    and you're calling me for -- what are we going to do 02:56:32

10    to remove them, right?  How do we engage with law  02:56:36

11    enforcement?                                       02:56:40

12           There's somebody -- somebody has --         02:56:40

13    there's been a horrific homicide in the city that we 02:56:43

14    are operating in, and the -- and we need to -- we  02:56:49

15    need to mobilize to get information to law         02:56:53

16    enforcement.                                       02:56:56

17           There's a contract that you've worked on    02:56:57

18    that you think has maybe been breached.            02:56:58

19           So, those are the examples that I go        02:57:02

20    through with this.                                 02:57:03

21           And then the last dog, our -- our bulldog   02:57:04

22    here pops out, and I said:  It cannot be used to    02:57:08

23    commit a crime or fraud.                           02:57:11

24      Q.   That's the dog with the sunglasses?         02:57:14

25      A.   Yeah, that's our gangster bulldog there.    02:57:18
```

Page 222

1   Pretty nefarious, huh?                              02:57:21

2       Q.   Did you provide any other guidance other   02:57:24

3   than the guide you just described?                  02:57:27

4       A.   Yes.  I continue through the deck.         02:57:31

5       Q.   On this slide regarding generally the      02:57:32

6   contours of attorney-client privilege?              02:57:34

7       A.   So, that's it in a nutshell.  Now, because 02:57:38

8   I don't follow a book when I'm presenting these     02:57:42

9   things, certainly there's some variance.  It would  02:57:44

10  be unlikely I used the exact same examples and      02:57:48

11  certainly not the same language each time.          02:57:51

12          MS. TARAZI:  Let's go off the record.       02:57:54

13          THE VIDEOGRAPHER:  Off the record.          02:57:57

14      2:55 p.m.  This is the end of Media Unit No. 3.  02:57:57

15          (Thereupon, a recess was taken, after       02:58:18

16      which the following proceedings were held:)      02:58:18

17          THE VIDEOGRAPHER:  We are back on the        03:03:11

18      record at 3:01 p.m.  This is the beginning of    03:03:11

19      Media Unit No. 4.                                03:03:14

20  BY MS. TARAZI:                                       03:03:16

21      Q.   Mr. Clark, did you ever instruct the       03:03:16

22  employees to be over-inclusive in their privilege   03:03:19

23  designations?                                        03:03:22

24          MS. GOODMAN:  You may answer that           03:03:26

25      question.                                        03:03:27

Page  223

```
 1              THE WITNESS:  No.  This is, I hope,        03:03:28
 2         demonstrating the exact opposite.  It is       03:03:36
 3         meaningless to do so.  Ultimately, an arbitrary 03:03:43
 4         of what is privileged or not privileged is a   03:03:44
 5         judge.  And the designation and the propriety  03:03:50
 6         of those designations are done by outside      03:03:54
 7         counsel, typically, who are doing productions. 03:03:56
 8    BY MS. TARAZI:                                       03:03:58
 9         Q.   Let's turn to the slide that's Bates      03:04:04
10    stamped 340312.                                      03:04:06
11         A.   340312.                                    03:04:10
12         Q.   Two pages on.                              03:04:14
13         A.   Yes.                                       03:04:15
14         Q.   So, again, I don't really want to try to  03:04:15
15    read through the X here, but I believe what it --   03:04:20
16    but I'm going to do it anyway.  I believe what the  03:04:22
17    email underneath the X states that I'm happy to --  03:04:25
18         A.   I'm happy to report that the -- hmm.      03:04:31
19         Q.   Something for department performance?     03:04:38
20         A.   Yeah.                                      03:04:41
21         Q.   Are --                                     03:04:42
22         A.   Oh, yeah.  I can give you the gist of     03:04:44
23    this.                                                03:04:46
24         Q.   Sure, that would be really helpful.       03:04:46
25         A.   So, this is -- see, you've got the From   03:04:48
```

Page 224

```
 1    and To.  So, it's from legal bud.  I don't know if       03:04:50
 2    I -- no.  It's legal budget.  So, legal budget.  And     03:04:53
 3    it's coming from the legal budget person to Johnny       03:04:58
 4    Law, who is senior counsel of whoever, and it's an       03:05:02
 5    operations update and attorney-client privileged.        03:05:05
 6            And it says, "I'm happy to report" -- you        03:05:10
 7    know, whatever.  This is about budget and spend for      03:05:12
 8    outside counsel, and it's -- the budget for outside      03:05:15
 9    counsel has declined.                                    03:05:19
10        Q.   The written transcript will not reflect         03:05:21
11    that, but there was a note of pride in your voice.       03:05:24
12    Outside counsel found, amusing.                          03:05:31
13        A.   And it's -- it's marked "privileged" and        03:05:37
14    then I -- I'm sorry, there's no question pending.        03:05:39
15    Why don't you ask.                                       03:05:42
16        Q.   I think you guessed where I was going,          03:05:43
17    which was, this is an example of the kind of             03:05:45
18    communication that you instructed attendees at the       03:05:48
19    presentation would not be privileged?                    03:05:50
20        A.   This gets the red X.                            03:05:53
21        Q.   Indicating that it was not privileged?          03:05:57
22        A.   Correct.                                        03:05:59
23        Q.   And I think we covered this earlier:  Does      03:06:00
24    the red X on the prior page also indicate that this      03:06:04
25    is a communication that you did not -- that you          03:06:07
```

Page 225

```
 1    instructed the attendees at the presentation would    03:06:10
 2    not be considered privileged?                          03:06:12
 3        A.    Correct.                                     03:06:15
 4        Q.    That was a very long sentence.               03:06:18
 5              The next page, the page marked 313, the      03:06:23
 6    subject line of that email looks like it needs         03:06:28
 7    your -- an A.  Is that "advice" under there?           03:06:32
 8        A.    I think so.                                  03:06:34
 9        Q.    I don't want you to guess.                   03:06:37
10        A.    I need your -- yeah, ASAP.  Maybe I need     03:06:39
11    your advice, need your advice ASAP, or something to    03:06:45
12    that effect.                                           03:06:49
13        Q.    Is this an example of a communication that   03:06:49
14    you instructed attendees would be considered           03:06:54
15    privileged?                                            03:06:58
16        A.    I will walk you through and give you a       03:06:59
17    little context.  This one I try to get a little        03:07:01
18    tricky with them.                                      03:07:04
19              So, I've got it coming from the bis dev      03:07:05
20    department, once again, to Johnny Law, who I think     03:07:07
21    is only counsel this time.  Poor Johnny.               03:07:09
22              It says:  I need your advice.  It says:      03:07:11
23    I'm concerned about a something deal.  Is the          03:07:14
24    indemnity provision okay?                              03:07:16
25              What does everybody think?  And so some      03:07:19
```

Page 226

```
 1    people who -- no matter what they say, I say:  But      03:07:23
 2    it's not marked.  It's not marked privileged.          03:07:25
 3              They go:  Oh, yeah.                           03:07:28
 4              I said green check.  It's still              03:07:31
 5    privileged.  The marking means nothing.  The marking   03:07:32
 6    is irrelevant to whether a communication qualifies     03:07:36
 7    for privileged treatment.                              03:07:40
 8         Q.   Let's turn to the next slide.                03:07:44
 9         A.   I love Fido over here.                       03:07:49
10         Q.   I'm really getting a sense of your love of   03:07:52
11    dogs in general --                                     03:07:54
12         A.   Agree.                                       03:07:55
13         Q.   -- in your presentations.                    03:07:57
14              Are these various quotes scattered over      03:07:59
15    the next two slides quotes that you discussed with     03:08:01
16    the attendees at the presentation?                     03:08:08
17         A.   Yes.  So, again, there's animation here      03:08:10
18    that obviously doesn't come through on the printout,   03:08:13
19    but, so, all you have coming up first is this chain    03:08:15
20    of dogs.                                               03:08:19
21              So, we've got -- we've got a big old         03:08:20
22    bulldog over here who's -- and I give them a little    03:08:25
23    setup.  So, there's no red Xs and there's no green     03:08:27
24    checkmarks at this point.  So, they're just looking    03:08:30
25    at it and I take them through this.                    03:08:33
```

Page 227

```
 1              Here is our bulldog.  He's an outside        03:08:35
 2    vendor, and he's negotiating a contract with our bis   03:08:39
 3    dev dog here.  And them bis dev dog communicates       03:08:41
 4    with Fido, who gives his advice and very sensitive     03:08:49
 5    strategy back to bis dev dog, and then bis dev         03:08:52
 6    dog -- that's got to be driving the court reporter     03:08:59
 7    crazy -- and then bis dev dog sends it over as an      03:08:59
 8    FYI, in case you are interested, and he sends it to    03:09:06
 9    this group, the round table dogs down below.           03:09:09
10              So, I walk them through each stage and        03:09:12
11    say:  Okay, what do you guys think?  Is this           03:09:14
12    privileged?  Is this not privileged?                   03:09:17
13              So, the first one gets a red X.  It's an     03:09:21
14    arm's length negotiation.  An outsider.                03:09:23
15              Here, we've got bis dev dog and Fido going   03:09:26
16    back and forth.  It seems like all the elements are    03:09:30
17    there.                                                 03:09:33
18              Then I say:  Look, it's unclear.  I don't    03:09:33
19    know these -- who the round table dogs are.  Are       03:09:35
20    they internal people?  Are they external people?  Do   03:09:38
21    they need to know these things?  Should they have      03:09:42
22    been included in the first place?                      03:09:44
23              This is where, remember, guys, law does      03:09:46
24    not equal science.  Law does not equal math.  There    03:09:48
25    are -- there are states, and the evidence laws in      03:09:51
```

Page 228

```
 1    states are different.  Everywhere, judges may look      03:09:55

 2    at the same set of facts and come to different          03:09:59

 3    conclusions.  So, it's tenuous, but we're going to      03:10:01

 4    give it a no.                                           03:10:04

 5         Q.   Let's turn to the next slide, marked 316,     03:10:06

 6    then.                                                   03:10:11

 7         A.   Yes.  I'm sorry.  316?                         03:10:11

 8         Q.   Sorry.  Two after the one you were just       03:10:16

 9    describing.                                             03:10:18

10         A.   Okay.                                         03:10:20

11         Q.   What did you tell the participants when       03:10:22

12    you showed them this slide?                             03:10:25

13         A.   So, I was giving them a real world,           03:10:27

14    close-to-home, hard-hitting example of illustrating     03:10:29

15    the points that I've gone through on privilege; that    03:10:32

16    ultimately it's a judge that makes decisions about      03:10:35

17    whether something is privileged or not.                 03:10:38

18         Q.   Did you discuss the Meyer case with them      03:10:39

19    in connection with this slide or the next slide?        03:10:43

20         A.   Briefly, yes.                                 03:10:47

21         Q.   What did you tell them?                       03:10:47

22         A.   I told them that it was a situation where     03:10:48

23    the -- the -- there was a request to -- this is --      03:10:51

24    I'm sorry, I have to check with counsel, like how --    03:10:57

25    is that any different?  You've waived on the entire     03:11:01
```

Page 229

```
 1   presso, yeah.                                           03:11:05

 2        MS. GOODMAN:  The question is:  What did          03:11:07

 3      you tell them about these next two slides?  You     03:11:08

 4      can answer that question.                           03:11:10

 5        THE WITNESS:  Okay.  So, I gave them a            03:11:11

 6      brief synopsis of the -- of the facts in Meyer      03:11:13

 7      and the -- and the side show that was the --        03:11:16

 8      that ultimately was litigated, and I walked         03:11:24

 9      them through Judge Rakoff's order, or at            03:11:27

10      least -- I didn't walk them through every page.     03:11:33

11      In fact, this -- I didn't walk them through         03:11:38

12      every page of the order.  I gave them a little      03:11:39

13      bit of background on that and highlighted --        03:11:41

14      I'm sorry.  Do you want me to keep going?  Do       03:11:44

15      you have a question?                                03:11:47

16   BY MS. TARAZI:                                          03:11:47

17      Q.   Well, I was going to ask you a question        03:11:47

18   about the next slide, which is a slide marked 317.      03:11:49

19   It looks like you boxed out a portion of the order      03:11:51

20   in the Meyer case.                                      03:11:55

21      A.   I did.                                          03:11:57

22      Q.   And the portion of the order you boxed out     03:11:58

23   is -- the full, complete sentence in that box reads,    03:12:00

24   "The question here however" --                          03:12:03

25      A.   Do you want me to read it?                     03:12:10
```

Page 230

1       Q.   "The questions here presented, however,          03:12:11

2   are whether such dubious practices in waiver result       03:12:14

3   in waiver of attorney-client privilege and work           03:12:17

4   product protection and whether disciplinary action        03:12:21

5   is warranted."                                            03:12:23

6            My version is very faint.                        03:12:25

7       A.   Yes, you read it correctly.                      03:12:28

8       Q.   What did you tell the participants about         03:12:30

9   that?                                                     03:12:31

10      A.   So -- so, I'm illustrating the prior --          03:12:32

11  now we've come full circle, and we're -- we've got a      03:12:34

12  judge that is examining privileged documents to           03:12:38

13  determine -- in camera to determine whether or not        03:12:45

14  they are, in fact, privileged.                            03:12:47

15      Q.   Let's turn to the next slide.  It reads --       03:12:57

16  the underlying portion reads:  "Uber and Ergo" --         03:13:00

17  who is Ergo?                                              03:13:06

18      A.   Ergo was a vendor.                               03:13:08

19      Q.   What services did the vendor provide?            03:13:10

20      A.   They provided some investigative services.       03:13:13

21      Q.   To who at Uber?                                  03:13:16

22      A.   To Uber.                                         03:13:19

23      Q.   To anyone in particular at Uber?                 03:13:19

24      A.   To the -- I think the -- well, to the            03:13:21

25  security group.                                           03:13:24

Page 231

```
 1         Q.    To the Threat Ops Group?                03:13:25

 2         A.    To Threat Ops, yes.                      03:13:27

 3         Q.    And Threat Ops to SSG?                   03:13:28

 4         A.    No, this may have been before SSG.       03:13:32

 5         Q.    To Market Analytics?                     03:13:35

 6         A.    No.                                      03:13:36

 7         Q.    Just generally Threat Ops?               03:13:37

 8         A.    This is the -- this would be more -- yes, 03:13:38

 9    just generally Threat Ops.  This is very early in my 03:13:43

10    tenure.                                             03:13:48

11         Q.    "Uber and Ergo claimed attorney-client   03:13:48

12    privilege and/or work product protection over       03:13:52

13    numerous documents and voice recordings, and the    03:13:52

14    Court indicated it would need to review the         03:13:54

15    materials in camera to determine whether privilege  03:13:57

16    was correctly ascertained and/or whether the crime  03:13:59

17    fraud exception to the privilege applied."          03:14:02

18             What did you tell participants about that  03:14:04

19    slide?                                              03:14:07

20         A.    So, I just walked them through this, and, 03:14:07

21    again, I'm saying:  Look, you've got a federal judge 03:14:08

22    who has issued -- this was a fairly long order, and  03:14:12

23    I think it was a 31-page-order, or something like    03:14:15

24    that -- a 31-page order.  Upfront and center, on the 03:14:18

25    first page of the order, is where he's going.        03:14:22
```

Page 232

```
 1              And I'm kind of showing them:  Look, now,      03:14:24
 2    the judge is saying he's got all the documents in       03:14:28
 3    front of him, and he's going to look at them and see    03:14:31
 4    if it meets the elements of privilege, and he's         03:14:33
 5    going to see if the crime fraud exception applies to    03:14:36
 6    vitiate the privilege.                                  03:14:42
 7         Q.   What did you tell the participants in         03:14:46
 8    connection with the next slide?                         03:14:49
 9         A.   So these are -- I'm looking at Bates          03:14:51
10    ending in 319; is that correct?                         03:14:54
11         Q.   That's correct.                               03:14:56
12         A.   So, I'm showing, saying:  These are          03:14:59
13    clippings that were taken straight from media           03:15:01
14    reports of the -- of this case.                         03:15:04
15              So -- and here you have -- you can see on     03:15:07
16    the -- the screen capture that's on the reader's        03:15:10
17    left.  There is a message from Salle Yoo to Joe         03:15:16
18    Sullivan that has an antitrust lawsuit, SDNY against    03:15:21
19    Travis.                                                 03:15:27
20              It's got -- the next text is                  03:15:27
21    attorney-client communication-privilege.  Salle        03:15:30
22    writing to Joe:  Joe, can we find out a little more     03:15:33
23    about this plaintiff?                                   03:15:36
24              Joe responds.  Joe sends it to Mat and        03:15:37
25    says:  Please do a careful check on the plaintiff,      03:15:40
```

Page 233

```
1    the one who is the driver named -- part of the case.    03:15:42
2         Q.   Is that Spencer Meyer?                         03:15:46
3         A.   Yes, yes.                                      03:15:50
4              But what I'm illustrating from this is,        03:15:52
5    like, here's a communication that is marked              03:15:54
6    privileged from the general counsel to Joe Sullivan.     03:15:56
7    And it's been disclosed in the case, and it is --        03:15:59
8    and it is in the news.                                   03:16:02
9              So, to the extent I hope I disabused            03:16:04
10   everybody of the notion of marking something             03:16:07
11   privileged is going to somehow magically protect         03:16:09
12   them.                                                    03:16:13
13        Q.   The topping off from Joe Sullivan to Mat       03:16:13
14   Henley reads, and it's a little hard to read on my       03:16:15
15   copy, but I think it says, "Please do a careful          03:16:15
16   check on this plaintiff, the person who is the           03:16:19
17   driver named party in the case."                         03:16:21
18             Is it Uber's general practice to do a          03:16:23
19   careful check on plaintiffs in litigation against        03:16:25
20   Uber?                                                    03:16:28
21             MS. GOODMAN:  Object to form.                  03:16:30
22             You can answer that question, but that is      03:16:36
23        way outside the scope of this case.                 03:16:36
24             THE WITNESS:  I can't comment on general       03:16:38
25        practice.  It is good security practice to          03:16:40
```

Page 234

```
 1          investigate people who may be a threat to Uber,     03:16:43
 2          to Uber's riders and drivers, and certainly to      03:16:45
 3          executives of the company.                          03:16:49
 4     BY MS. TARAZI:                                           03:16:50
 5          Q.   Did Uber do a careful check of Waymo?          03:16:50
 6               MS. GOODMAN:  Object to form.                  03:16:55
 7               THE WITNESS:  I am unaware of any              03:16:57
 8          investigations with respect to -- I don't even      03:16:59
 9          know how to answer that question.  I mean, I        03:17:04
10          don't know.                                         03:17:08
11               MR. STUMPHAUZER:  Talking about Waymo.         03:17:10
12          That's progress.                                    03:17:11
13     BY MS. TARAZI:                                           03:17:13
14          Q.   Did Uber do a careful check of Google?         03:17:13
15               MS. GOODMAN:  Object to form.                  03:17:17
16               THE WITNESS:  Not to my knowledge.             03:17:18
17     BY MS. TARAZI:                                           03:17:19
18          Q.   If you turn over two pages, or maybe           03:17:19
19     three, to the one marked 322, it looks like a            03:17:21
20     picture of Edward Snowden.                               03:17:25
21               What did you tell --                           03:17:26
22          A.   Let me get there.  Let me get there.           03:17:31
23          Q.   -- the people that you presented this deck     03:17:31
24     to --                                                    03:17:34
25          A.   So, I think it's -- what did I tell them       03:17:34
```

Page 235

```
 1   about?  Hopefully, the image speaks for itself.          03:17:36
 2             So, we're kind of -- so, underneath the         03:17:44
 3   picture of Snowden is the famous picture of Hillary       03:17:47
 4   Clinton on her BlackBerry with her sunglasses on,         03:17:51
 5   right?  So, this is before the election, and so           03:17:55
 6   it's -- I mean, it was a different time.                  03:17:57
 7             And I say, you know:  Look, emails are          03:18:01
 8   everywhere.  Emails are -- can be taken out of            03:18:05
 9   context.  There's important things in emails that         03:18:09
10   people write all the time.  And guess what?  Snowden      03:18:14
11   pops up.  There's always somebody out there that's        03:18:18
12   going to read them.                                       03:18:21
13       Q.   Do you know who Rick Jacobs is?                  03:18:22
14       A.   Yes, I do.                                       03:18:25
15       Q.   Did you work with him?                           03:18:25
16       A.   He worked in Threat Ops.  I was a lawyer         03:18:29
17   embedded with Threat Ops.  So, yes, projects we           03:18:32
18   worked on.                                                03:18:34
19       Q.   What kind of projects did you work on?           03:18:36
20       A.   Oh, I don't -- am I -- can I talk about --       03:18:38
21   I guess you could talk about subtopics.                   03:18:47
22             MS. GOODMAN:  You can answer that question      03:18:49
23        as a general subject matter level that would be     03:18:50
24        on a privilege log, what kind of things did you     03:18:53
25        work with him on.                                    03:18:58
```

Page 249

1    states:  "Early in his tenure, Jacobs advocated for        03:44:24

2    a secure and encrypted centralized database to             03:44:26

3    ensure confidentiality and recordkeeping, but              03:44:29

4    provide access to intelligence for Threat Ops             03:44:32

5    personnel.  He presented a draft proposal to              03:44:35

6    managers Henley and Clark."                                03:44:37

7              I don't think this is what is meant here,        03:44:41

8    but you did not manage Mr. Jacobs, correct?                03:44:42

9         A.   I did not manage Mr. Jacobs.                     03:44:47

10        Q.   Do you recall receiving a draft proposal         03:44:51

11   for a centralized database?                                03:44:53

12        A.   Not specifically, no.                            03:44:56

13        Q.   Do you remember discussing the centralized       03:44:58

14   database referenced on page 5 of the Jacobs letter?        03:45:02

15        A.   I don't know what Jacobs is referencing on       03:45:07

16   page 5.  And the sentence that you just read, while        03:45:08

17   I do recall a centralized -- a desire for a                03:45:11

18   centralized database that Mat Henley wanted to get         03:45:15

19   done, that I believe Jacobs was tasked to complete.        03:45:21

20        Q.   Did you object to the creation of such a         03:45:30

21   database?                                                  03:45:32

22             MS. GOODMAN:  You can answer that                03:45:35

23        question.                                             03:45:36

24             THE WITNESS:  No.                                03:45:36

25

Page 259

```
 1        acquisition --                              03:55:19
 2           MR. STUMPHAUZER:  No.  This one is, did  03:55:20
 3        you provide guidance.                       03:55:21
 4           MS. GOODMAN:  Did you provide guidance.  03:55:23
 5        I'm sorry, the live feed is not accurately  03:55:25
 6        reflecting your question, so, could you please  03:55:27
 7        repeat it?                                  03:55:32
 8   BY MS. TARAZI:                                   03:55:33
 9        Q.   Did you provide guidance to SSG with   03:55:33
10   respect to the acquisition of non-attributable   03:55:35
11   hardware?                                        03:55:38
12           MS. GOODMAN:  Right.  And that question  03:55:39
13        calls for legal advice, and I instruct you not  03:55:40
14        to answer.                                  03:55:42
15           MS. TARAZI:  Same instruction if I ask   03:55:45
16        about software?                             03:55:47
17           MS. GOODMAN:  What are you going to ask  03:55:52
18        about software?                             03:55:53
19   BY MS. TARAZI:                                   03:55:54
20        Q.   Did you provide guidance to SSG with   03:55:54
21   respect to the acquisition of non-attributable   03:55:56
22   software?                                        03:55:59
23           MS. GOODMAN:  Same instruction.          03:55:59
24   BY MS. TARAZI:                                   03:56:03
25        Q.   Are you aware of Uber storing data on  03:56:09
```

Page 260

```
 1   non-attributable devices to avoid detection,          03:56:13
 2   including in connection with legal discovery?         03:56:15
 3            THE WITNESS:  Counsel for Uber?              03:56:20
 4            MS. GOODMAN:  You may answer that            03:56:24
 5        question.                                        03:56:25
 6            THE WITNESS:  No.                            03:56:25
 7   BY MS. TARAZI:                                        03:56:25
 8        Q.   Under heading C, the heading is            03:56:32
 9   "Concealment, Cover-Up and Falsification of Records   03:56:37
10   Through the Abuse of Attorney-Client Privilege        03:56:41
11   Designations."                                        03:56:43
12            In the second paragraph, the second          03:56:50
13   sentence, beginning "during the presentation," it     03:56:52
14   states:  "Clark verbally coached the participants on  03:56:55
15   how to use attorney-client privilege to ensure        03:56:57
16   sensitive intelligence collection activities would    03:56:59
17   not surface in litigation."                           03:57:03
18            Is that correct?                             03:57:05
19            THE WITNESS:  Counsel for Uber?              03:57:06
20            MS. GOODMAN:  You may answer that.           03:57:07
21            THE WITNESS:  Sorry?                         03:57:09
22            MS. GOODMAN:  You may answer that.           03:57:09
23            THE WITNESS:  No.                            03:57:10
24   BY MS. TARAZI:                                        03:57:10
25        Q.   The next sentence reads:  "Clark also       03:57:10
```

Page 290

```
 1    redacted.                                          04:53:50

 2            THE WITNESS:  Counsel?                      04:53:51

 3            MS. GOODMAN:  Object to form.  And, again,  04:53:52

 4       you're asking a question, does Mr. Clark        04:53:53

 5       understand whether Uber worked unlawfully to    04:53:56

 6       obtain trade secrets generally.                 04:53:59

 7            You cannot ask that question without       04:54:01

 8       asking him to reveal his legal conclusions and  04:54:03

 9       mental judgments.                               04:54:05

10            Also, the question has nothing to do --    04:54:06

11       or the part of the letter from which you are    04:54:08

12       reading has nothing to do with Waymo, and the   04:54:10

13       thing is, there's a redaction about who         04:54:12

14       Mr. Jacobs is alleging in this context.  That's 04:54:16

15       not relevant to this case.  So, you should move 04:54:19

16       on.                                             04:54:21

17    BY MS. TARAZI:                                     04:54:24

18       Q.   Are you aware of Uber ever remotely        04:54:24

19    accessing confidential corporate communications and 04:54:27

20    data from Waymo?                                   04:54:31

21            MS. GOODMAN:  If you can answer that       04:54:33

22       question without revealing information in the   04:54:34

23       course of an attorney-client communication,    04:54:36

24       then go ahead and do so.                        04:54:43

25            THE WITNESS:  No.                          04:54:45
```

Page 301

```
 1   probably much more than that.                    05:15:07
 2        Q.   Did any litigation hold that you received   05:15:09
 3   in connection with the Jacobs allegation instruct   05:15:11
 4   you not to use Wickr to discuss the case?          05:15:14
 5        A.   I don't recall the specific hold.  I need   05:15:16
 6   to see it.  But it should be in my documents.      05:15:20
 7        Q.   Do you recall ceasing to use Wickr to      05:15:22
 8   discuss Jacobs' allegations after receiving the    05:15:26
 9   litigation hold?                                   05:15:29
10        A.   Yes.  I would not discuss the substance of   05:15:30
11   a matter that was on legal hold on an ephemeral    05:15:33
12   communication tool.                                05:15:40
13        Q.   Did you turn over your personal cell phone   05:15:41
14   in connection with the litigation hold placed in   05:15:47
15   connection with the Jacobs matter?                 05:15:51
16            MS. GOODMAN:  Objection, asked and         05:15:53
17        answered.                                      05:15:53
18            THE WITNESS:  No.                          05:15:54
19            MS. TARAZI:  For the record, I have        05:16:08
20        withdrawn the exhibit previously marked as     05:16:09
21        Exhibit 9712.                                  05:16:11
22   BY MS. TARAZI:                                      05:16:20
23        Q.   Did you have any -- did you ever play --   05:16:20
24   strike that.  I'll start again.                    05:16:23
25            Did you play any role in investigating the   05:16:24
```

Page 302

```
 1    allegations in the Jacobs letter?                  05:16:26

 2         A.   I was interviewed.  My machine was imaged.  05:16:29

 3         Q.   Who were you interviewed by?             05:16:35

 4         A.   Lawyers from WilmerHale.                 05:16:37

 5         Q.   Were you interviewed by anyone in-house at  05:16:45

 6    Uber in connection with that investigation?        05:16:50

 7         A.   I was with Angela Padilla and a lawyer   05:16:55

 8    from Littler, as well.  I believe she was from     05:16:58

 9    Littler.                                           05:17:01

10         Q.   From Littler?                            05:17:02

11         A.   Littler Mendelson.  It's a law firm.     05:17:03

12         Q.   And, also, you said by WilmerHale?       05:17:06

13         A.   Yes.                                     05:17:11

14         Q.   Are you aware of who at Uber was involved  05:17:12

15    in the investigation into the Jacobs allegations?  05:17:15

16              THE WITNESS:  Counsel?                   05:17:19

17              MS. GOODMAN:  The question is, if you    05:17:20

18         know, who at Uber was involved in the         05:17:21

19         allegations and the investigation of the Jacobs  05:17:24

20         allegations.                                  05:17:27

21              THE WITNESS:  So, I don't know everybody  05:17:28

22         that was involved, but I can give you names of  05:17:29

23         people who I believe were involved.  Is that  05:17:32

24         what you would like me to do?                 05:17:35

25
```

Page 356

```
 1        cannot do of a lawyer.                         06:57:13
 2   BY MS. TARAZI:                                      06:57:17
 3        Q.   Did Uber use non-attributable devices to 06:57:23
 4   perform competitive intelligence on Uber -- I'm    06:57:26
 5   sorry, on Waymo?                                    06:57:31
 6             MS. GOODMAN:  You can answer that question 06:57:33
 7        if you can do so without revealing the contents 06:57:34
 8        of an attorney-client communication.          06:57:37
 9             THE WITNESS:  I don't know what you mean   06:57:41
10        by "unattributable device," but not to my     06:57:42
11        knowledge.                                     06:57:45
12   BY MS. TARAZI:                                      06:57:45
13        Q.   Did Uber use any devices that could not be 06:57:45
14   traced to Uber to perform competitive intelligence 06:57:48
15   on Waymo?                                           06:57:51
16             MS. GOODMAN:  Object to the form.         06:57:54
17             Same instruction with regard to the       06:57:54
18        privilege.                                     06:57:56
19             THE WITNESS:  Not to my knowledge.        06:57:57
20   BY MS. TARAZI:                                      06:57:59
21        Q.   Did Uber use any devices that could not be 06:57:59
22   attributed to Uber to perform competitive          06:58:02
23   intelligence on Google?                            06:58:05
24             MS. GOODMAN:  Object to the form.         06:58:07
25             Same instruction regarding the privilege. 06:58:08
```

Page 357

```
 1              THE WITNESS:  Not to my knowledge.          06:58:10
 2   BY MS. TARAZI:                                         06:58:20
 3        Q.   Have you ever heard the phrase,              06:58:21
 4   "augmented, non-attributable Internet collection"?    06:58:22
 5              MS. GOODMAN:  Yes or no?                     06:58:28
 6              THE WITNESS:  No.                           06:58:31
 7   BY MS. TARAZI:                                         06:58:31
 8        Q.   Has Uber ever used vendors to perform        06:58:31
 9   competitive intelligence tasks using devices that     06:58:35
10   could not be attributed to Uber?                      06:58:38
11              MS. GOODMAN:  Same instruction with         06:58:41
12        respect to the privilege.                        06:58:42
13              THE WITNESS:  Not to my knowledge.          06:58:47
14   BY MS. TARAZI:                                         06:58:52
15        Q.   Who was involved in the competitive          06:58:53
16   intelligence gathering that Uber conducted of Waymo?  06:58:57
17   When I say "Waymo" in this context, I'm referring to  06:59:05
18   Waymo and Google's self-driving car division.         06:59:08
19              THE WITNESS:  Counsel for Uber?             06:59:13
20              MS. GOODMAN:  Object to the form of the     06:59:16
21        question.                                        06:59:17
22              You may answer that to the extent you can   06:59:17
23        do so without revealing the contents of an       06:59:19
24        attorney-client communication.                   06:59:22
25              THE WITNESS:  Okay.  Can you re-ask the     06:59:23
```

Page 371

```
 1          Q.   Do you have any knowledge that anyone in    07:27:23
 2     the autonomous vehicle group at Uber ever             07:27:25
 3     purposefully labeled a document as privileged in      07:27:28
 4     order to hide it from the court overseeing this       07:27:30
 5     litigation?                                           07:27:33
 6          A.   I'm sorry, can you -- can you -- can you     07:27:34
 7     reword it?                                            07:27:36
 8          Q.   Do you have any knowledge that anyone in    07:27:37
 9     the autonomous vehicle group at Uber ever             07:27:39
10     purposefully labeled a document as privileged in      07:27:42
11     order to hide it from the court overseeing this       07:27:44
12     litigation?                                           07:27:47
13          A.   No.                                         07:27:48
14          Q.   Did you ever mark a document as             07:27:51
15     "attorney-client privileged" in order to hide it      07:27:52
16     from Waymo or Google?                                 07:27:57
17          A.   No.                                         07:27:58
18          Q.   Would you ever do that?                     07:27:58
19          A.   No.                                         07:27:59
20          Q.   Did you ever direct anyone to destroy       07:28:00
21     evidence?                                             07:28:03
22          A.   No.                                         07:28:03
23          Q.   I would like to show you a document that    07:28:05
24     we will mark 9715.  This is a document bearing Bates  07:28:08
25     label UBER 00355965, which I understand is being      07:28:29
```

Page 372

```
 1   introduced to Waymo today in connection with a        07:28:33
 2   variety of discovery requests that they have put on    07:28:37
 3   us at this close of discovery.                         07:28:39
 4            Do you have the document in front of you?      07:28:41
 5       A.   I don't have it.  You didn't give the         07:28:46
 6   court reporter a chance to mark it.                     07:28:47
 7            (The referred-to document was marked by        07:28:58
 8       the court reporter for Identification as            07:28:58
 9       Deposition Exhibit 9715.)                           07:28:58
10   BY MS. GOODMAN:                                         07:29:01
11       Q.   I ask you to review this document.             07:29:03
12            (A discussion was held off the record,         07:29:46
13       after which the following proceedings were          07:29:46
14       held:)                                              07:29:46
15   BY MS. GOODMAN:                                         07:29:54
16       Q.   Have you had a chance?                          07:29:54
17       A.   Almost.                                         07:29:55
18       Q.   Okay.                                           07:29:56
19       A.   Yes, I read the document.                       07:30:27
20       Q.   All right.  I will direct your attention        07:30:28
21   to page 966, the bottom of the email string.           07:30:30
22            Alberto Fittarelli writes, "Craig, for         07:30:33
23   your review and legal advice.  Thanks, Nicoletta.      07:30:38
24   Appreciate it."                                         07:30:40
25            Do you see that?                                07:30:42
```

Page 373

```
 1      A.   I do.                                    07:30:42

 2      Q.   And you respond, "This really shows the  07:30:42

 3 use of the A/C priv statement like we talked about 07:30:42

 4 last week.  Is thanking her really for my review and 07:30:46

 5 advice?  It just proves overuse."                   07:30:49

 6           What did you mean by that?               07:30:51

 7      A.   Well, I meant that this is -- I don't see 07:30:54

 8 the elements of privilege in this.                  07:30:57

 9           I think I was -- you know, Alberto is    07:31:00

10 Italian, and I think the -- and in Europe, and so I 07:31:02

11 think -- look, the concept of privilege is hard     07:31:06

12 enough for Americans who have dealt with it, and    07:31:10

13 it's -- it's -- I think people who are not of the   07:31:14

14 United States have a much more difficult time.  So, 07:31:17

15 I'm trying to make my point.                        07:31:19

16           I think I was -- looking at this, I think 07:31:21

17 I was pretty frustrated with Alberto on this.  It   07:31:24

18 must have been close in time to a presentation that 07:31:28

19 I gave.                                             07:31:29

20           So, I -- what I'm showing here is that   07:31:31

21 it's -- the label means nothing.                    07:31:36

22      Q.   And if you look at page -- the first page, 07:31:40

23 965, after you and Mr. Fittarelli have an exchange  07:31:42

24 about the use of privilege, you forward the string  07:31:50

25 to Rick@Uber.com.  Is that Mr. Jacobs?              07:31:54
```

Page 374

```
 1       A.   It appears to be.                    07:31:58

 2       Q.   And you say to him, "I had a long talk  07:32:00

 3  with Alberto this morning.  I was disheartened by  07:32:02

 4  the fact that my legal priv training did not sink  07:32:05

 5  in, even though this is almost identical to an     07:32:09

 6  example I had them all discuss and go through."    07:32:11

 7            Why did you share with Mr. Jacobs the fact  07:32:15

 8  that you were disheartened that your legal priv    07:32:20

 9  training did not sink in to Mr. Fittarelli?       07:32:22

10       A.   Jacobs was Mr. Fittarelli's manager.    07:32:25

11       Q.   And you wanted his manager to know to get  07:32:27

12  feedback about this?                              07:32:31

13       A.   Yeah.  It's frustrating when you spend all  07:32:32

14  of that time and fight all these dogs to put      07:32:35

15  together in a deck.                               07:32:38

16       Q.   You see the top email is from Rick Jacobs  07:32:41

17  to █████████████████?                             07:32:44

18       A.   Yes.                                    07:32:48

19       Q.   And I noticed when you were reviewing this  07:32:48

20  document, you might have chuckled to yourself.  I'm  07:32:50

21  wondering if you chuckled in response to that     07:32:53

22  forward of the communication from himself to his  07:32:55

23  personal email?                                   07:32:57

24       A.   Yes, I did find that interesting.       07:32:59

25       Q.   What do you find interesting about that?  07:33:01
```

```
 1       A.   Well, this is information -- internal        07:33:03

 2   information that he has exfiltrated.                  07:33:05

 3       Q.   And what's the date on Mr. Jacobs' forward   07:33:09

 4   to himself?                                           07:33:12

 5       A.   April 13, 2017, at 5:50 p.m.                 07:33:15

 6       Q.   Do you recall the date of Mr. Jacobs'        07:33:28

 7   resignation email?                                    07:33:32

 8       A.   I don't.                                     07:33:34

 9       Q.   Do you have Exhibit 9711 in front of you?    07:33:35

10       A.   Let me take a look.  Ninety-seven what?      07:33:40

11       Q.   Eleven.                                      07:33:44

12       A.   Yes.                                         07:34:01

13       Q.   And if you flip to the last -- the page      07:34:02

14   ending 655 --                                         07:34:05

15       A.   Yes.                                         07:34:10

16       Q.   -- the email from Rick Jacobs that begins    07:34:11

17   sort of a third down the page?                        07:34:15

18       A.   Yes.                                         07:34:17

19       Q.   Is that his resignation email?               07:34:17

20       A.   It appears to be.                            07:34:19

21       Q.   And what is the date on that?                07:34:21

22       A.   April 14, 2017, 10:38 a.m.                   07:34:22

23            MS. GOODMAN:  No further questions.  I       07:34:27

24       pass the question to your counsel.                07:34:29

25            MR. STUMPHAUZER:  Actually, I think the      07:34:31
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              C E R T I F I C A T E
 2    STATE OF FLORIDA      )
 3                          : ss
 4    COUNTY OF MIAMI-DADE )
 5
 6              I, KELLI ANN WILLIS, a Registered
 7         Professional, Certified Realtime Reporter and
 8         Notary Public within and for The State of
 9         Florida, do hereby certify:
10              That CRAIG CLARK, the witness whose
11         deposition is hereinbefore set forth was duly
12         sworn by me and that such Deposition is a true
13         record of the testimony given by the witness.
14              I further certify that I am not related
15         to any of the parties to this action by blood
16         or marriage, and that I am in no way interested
17         in the outcome of this matter.
18              IN WITNESS WHEREOF, I have hereunto set
19         my hand this 26th day of December, 2017.
20
21
22
23         KELLI ANN WILLIS, RPR, CRR
24
25
```

Page 387