# EXHIBIT 6

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


WAYMO LLC,

    Plaintiff,

          vs.          Case No.

UBER TECHNOLOGIES,INC.;  17-cv-00939-WHA

OTTOMOTTO, LLC; OTTO

TRUCKING LLC,

    Defendants.

————————————————————————————————————


CONFIDENTIAL


VIDEOTAPED DEPOSITION OF UBER TECHNOLOGIES, INC.

30(b)(6) REPRESENTATIVE - RANDY HAIMOVICI

San Francisco, California

Thursday, December 21, 2017

Volume I


REPORTED BY:

REBECCA L. ROMANO, RPR, CSR No. 12546

JOB NO. 2779670


PAGES 1 - 190

Page 19

```
 1      A.    Sure.                                    10:12:33

 2      Q.    Starting with the Nick Gicinto, what did

 3   you discuss with Nick Gicinto?

 4      A.    I spoke with Nick Gicinto about the use

 5   of nonattributable devices.  He would call that    10:12:42

 6   misattributable devices.

 7      Q.    And so when you say "misattributable

 8   devices," you use that term interchangeably with

 9   "nonattributable devices"?

10      A.    I do.                                     10:13:00

11      Q.    Okay.  And when you use that term,

12   what -- what is your understanding of what term

13   means?

14      A.    Yeah, so those are devices that are used

15   that can't be linked back to Uber.  So by way of   10:13:05

16   example of how Nick described it to me, if there's

17   a physical threat to the company, and we want to

18   investigate that physical threat, we want to be

19   able to do that without having that investigation

20   linked back to the company; and probably more --   10:13:24

21   more importantly, the employees doing it, for

22   safety reasons.

23      Q.    And what -- what did you and Nick Gicinto

24   discuss specifically about nonattributable devices?

25      A.    Pretty much what I just told you.  He     10:13:44
```

1   gave me an example of how they are used.  He          10:13:46

2   described the purpose.  And -- and mentioned that

3   based on his knowledge, they were only used by

4   people in the security department.

5        Q.   When you say that you discussed with       10:14:04

6   Mr. Gicinto how nonattributable devices are used,

7   what did he say in terms of how they were used?

8        A.   In the same way I just described.

9        Q.   Okay.  Nothing addition- -- nothing

10   beyond what you've already --                        10:14:15

11        A.   Not that I recall.

12        Q.   Okay.  And in terms of discussing the

13   purpose of using nonattributable devices, did he

14   say anything further than what you've already

15   provided?                                            10:14:23

16        A.   Not that I recall.  It was just basically

17   what I told you.

18        Q.   You said you spoke with Eric Meyhofer?

19        A.   I did.

20        Q.   What you did and Eric Meyhofer discuss?    10:14:34

21        A.   So Eric and I talked about use of

22   nonattributable devices.  And he confirmed that

23   they are not used by ATG.  As I'm sure you know,

24   he's the head of ATG.

25             We talked about the use of ephemeral       10:14:47

1   communications, and he confirmed that his use of          10:14:50

2   ephemeral communications were limited to social

3   reasons almost exclusively, but that there are

4   times when he's talking about performance issues

5   for employees, where he's used it, that he's never       10:15:03

6   used ephemeral communications to discuss anything

7   related to this case.

8          That he has an understanding of what and

9   how the attorney-client privilege should be used.

10  And he's adhered to the knowledge he was given and       10:15:18

11  the training he was given.

12      Q.   And in your conversations with

13  Mr. Meyhofer, were you talking about his use

14  specifically or ATG more generally?

15      A.   His use specifically -- well, when you          10:15:33

16  say "use," just tell me what you mean.

17      Q.   So let me -- let me break it down.

18      A.   Okay.

19      Q.   So for -- for nonattributable devices,

20  you said that Mr. Meyhofer told you that they're         10:15:42

21  not used by anyone in ATG; is that right?

22      A.   That's correct.

23      Q.   Okay.  When you were talking about

24  ephemeral communications, did you discuss with

25  Mr. Meyhofer whether they are used by others in ATG      10:15:50

Page 22

1    in addition to him?                                     10:15:56

2        A.   We talked about his use of it.  We talked

3    about his knowledge of Levandowski's use of it, his

4    communications with Travis.  We did not go over

5    everybody in ATG.                                       10:16:08

6        Q.   Okay.  So when you say that Mr. Meyhofer

7    told you that nonattributable devices are not used

8    by anyone in ATG, what -- what time frame does that

9    cover?  Is that for all time?

10       A.   Yeah.  Did not put any limitation on it.      10:16:26

11   No time limitation.  They have not been used.

12       Q.   And then you said you discussed with him

13   the use of ephemeral communications with

14   Travis Kalanick; is that right?

15       A.   Right.                                         10:16:42

16       Q.   And what did he tell you about that?

17       A.   That any communications he had with

18   Travis Kalanick, what we are calling ephemeral

19   communications, were purely and 100 percent social.

20       Q.   And you said he also told you about          10:16:53

21   ephemeral communications with Anthony Levandowski;

22   is that right?

23       A.   He did.

24       Q.   What did he tell you about that?

25       A.   He said it was mostly social, but there      10:17:03

Page 24

```
 1    discussions about the current litigation, or would      10:18:06

 2    it also include sort of the underlying facts, for

 3    example, discussions about the acquisition of Otto?

 4         A.   I did not ask him specifically about the

 5    acquisition of Otto; but, in general, what he said      10:18:21

 6    is, he only used it for social reasons and to talk

 7    about employee issues, and for no other reason.

 8              I followed up and said, "Did you talk

 9    about anything related to this case?"  He said, no.

10              And I said, "Have you ever used ephemeral      10:18:37

11    communications to discuss anything about

12    competitors?"  And he said, no.

13         Q.   You said you also talked to Wendy Ray

14    to --

15         A.   I did.                                          10:18:53

16         Q.   -- prepare for your testimony?

17              And Wendy Ray is an attorney at Morrison

18    & Foerster; is that right?

19         A.   That is correct.

20         Q.   And what did you and Ms. -- and Ms. Ray        10:18:59

21    discuss?

22         A.   Yeah, so we talked about privilege review

23    in this case pursuant to the document production.

24    And we talked about the collection of names of --

25    we talked about the -- the -- their efforts to          10:19:17
```

1    collect -- identify people at the company that used       10:19:19

2    ephemeral messaging.

3         Q.   And what did Ms. Ray tell you about the

4    privilege review in this case?

5         A.   That the process was, when documents were       10:19:35

6    collected, they were sent to Morrison & Foerster,

7    and Morrison & Foerster reviewed those documents to

8    determine whether they were privileged or not

9    privileged.  And that was Morrison & Foerster's

10   responsibility.                                             10:19:49

11        Q.   And did they review each document, or did

12   they rely on, I guess, computer programs that --

13   that might be able to exclude privilege

14   information?

15             MR. BRILLE:  Objection.  Form.                    10:20:02

16             THE DEPONENT:  Okay.  I didn't get into

17   the specifics of how they did it.

18        Q.   (By Ms. Roberts)  Okay.

19        A.   I just confirmed the fact that the

20   responsibility of reviewing the document production      10:20:10

21   and making privileged determinations was done by

22   Morrison & Foerster.

23        Q.   Okay.  But you don't know the actual

24   steps they took to go through that process?

25        A.   I don't.                                          10:20:21

Page 28

1      A.   You got it.                                    10:22:53

2      Q.   So this is the list that you discussed

3   with Ms. Ray?

4      A.   That's correct.

5      Q.   Okay.  Other than privilege review in          10:23:04

6   this case and the efforts to determine who at Uber

7   uses ephemeral messaging, is there anything else

8   that you discussed with Ms. Ray to prepare for your

9   testimony today?

10     A.   Not that I remember.                           10:23:15

11     Q.   You also identified Sidney Majalya as

12  someone you spoke with?

13     A.   I did.

14     Q.   What did you and Mr. Majalya discuss?

15     A.   I spoke with Sidney about whether, as          10:23:24

16  somebody who works in compliance, it was reported

17  to him that somebody misused the attorney-client

18  privilege.

19          So, in other words, marking a document

20  privileged that shouldn't be; and if that had been   10:23:38

21  reported to him, what he would have done in

22  response.

23          And Sidney said that -- that had not been

24  reported to him.  But that if it had been, that he

25  would have taken whatever appropriate, you know,     10:23:51

1   remediation was necessary, training or -- or          10:23:56

2   otherwise.

3       Q.   Is there anything else you discussed with

4   Mr. Majalya?

5       A.   Nope.  That's what I remember.            10:24:09

6       Q.   And so you -- you asked him if he'd ever

7   received any reports of misuse of the

8   attorney-client designation; is that right?

9       A.   That's exactly what I asked him.

10      Q.   And he said, no, he never received any      10:24:19

11  such reports?

12      A.   That is what he said.

13      Q.   Okay.  Did you discuss Mr. Jacobs's

14  allegations with him?

15      A.   I did not.                      10:24:26

16      Q.   Okay.  So because Mr. Jacobs -- I am not

17  sure, have you read Mr. Jacobs' --

18      A.   I have.

19      Q.   Okay.  So Mr. Jacobs says that -- that

20  employees at Uber misused the attorney-client       10:24:37

21  privilege designation.

22           You are aware that he has alleged that?

23           MR. BRILLE:  I'm going to object to form

24  and scope.  And I will note for the record that

25  based on the topics of -- in the 30(b)(6), that we    10:24:47

Page  33

1        Q.    You said she's in ER?                       10:27:35

2        A.    Employee relations.

3        Q.    Employee relations?

4        A.    Right.

5        Q.    Okay.  And you could not remember her        10:27:40

6   last name?

7        A.    No, I know her last name.  I just don't

8   want to --

9        Q.    So you can't pronounce her last name?

10             Sorry.  Sorry.                               10:27:46

11             MR. BRILLE:  You need to just slow down

12   for her.

13             THE DEPONENT:  She's a friend of mine, so

14   I don't want to mispronounce it.  But the

15   discussion with her was, you know, very identical     10:27:55

16   discussion I had with Sidney.  And the results were

17   the same.

18        Q.    (By Ms. Roberts)  So you asked Pam if

19   she'd received any reports of misuse of the

20   attorney-client privilege designation?                10:28:10

21        A.    That is correct.  In essence.

22        Q.    Okay.  And did you limit the scope of

23   that to excluding the Jacobs letter?

24        A.    Right.

25        Q.    Okay.  So you specifically limited the      10:28:20

Page 34

1    scope when you were talking to her?                    10:28:24

2         A.   Yes.

3         Q.   Okay.  And what did she say in response?

4         A.   Same thing Sidney said.  She's never

5    received any reports like that, that came            10:28:32

6    through -- that she had to investigate.  So it

7    wasn't anything that had come to her for her to

8    take action on; but that if it did, she would --

9    you know, she would do the same thing Sidney did.

10         She would take whatever steps are          10:28:51

11   necessary to correct it, provide training, whatever

12   the course may be.  And she mentioned that not as a

13   result of investigating that claim, but in her

14   work, if she saw somebody who was stating something

15   that was privileged when it was not, she would      10:29:06

16   correct that person based on the training she has.

17        Q.   You said Pam is in employee relations; is

18   that right?

19        A.   That's correct.

20        Q.   Is she an attorney?                         10:29:23

21        A.   She is not.

22        Q.   Okay.  Can you just explain for -- for

23   me -- Mr. Majalya is a compliance attorney; Pam is

24   in employee relations -- sort of what method,

25   reports of misuse of privilege would get escalated   10:29:35

```
 1        A.   We talked about document productions.  We     10:30:36
 2   talked about privilege review.  We talked about
 3   document retention.
 4        Q.   Anything else?
 5        A.   That's what I remember right now.             10:30:51
 6        Q.   And who is Mr. Murray?
 7        A.   He is our global head of ediscovery and
 8   information governance.
 9        Q.   Is he an attorney?
10        A.   He is not.                                    10:31:03
11        Q.   But he works internally at Uber on
12   ediscovery issues, is that --
13        A.   Ediscovery and information governance.
14        Q.   When you say "information governance,"
15   what -- what do you mean by that?                       10:31:14
16        A.   I mean, the -- that's a broad question,
17   but I'll give you a high-level broad answer.
18             I mean the way the company manages its
19   information, all of it, everything.
20        Q.   You -- you said you discussed with          10:31:29
21   Mr. Murray document production?
22        A.   I did.
23        Q.   Okay.  What did you discuss about that?
24        A.   We talked about the process for privilege
25   view.  And he confirmed that when we're in             10:31:35
```

```
 1   litigation, and we have a document production, that    10:31:38

 2   the document production is sent to our outside

 3   counsel, and that the outside counsel is

 4   responsible for conducting a privilege review.

 5      Q.   You also listed privilege review as           10:31:51

 6   something that you discussed with -- with

 7   Mr. Murray.

 8         Did you discuss anything else beyond what

 9   you just said?

10      A.   No.                                           10:31:58

11      Q.   Okay.  And you said you discussed

12   document retention with Mr. Murray.

13         What did you discuss about that?

14      A.   I don't remember all of the conversation,

15   but, in essence, what the document retention is for   10:32:07

16   emails and documents, chat applications, you know,

17   normally when people are on litigation hold, that's

18   the essence -- it was the essence for our

19   conversation.

20      Q.   Anything other than document privilege        10:32:27

21   review and document retention discussed with

22   Mr. Murray?

23      A.   Not that I remember.

24      Q.   You also said you talked to Mia Mazza?

25      A.   I did.                                         10:32:41
```

Page 48

```
 1      Q.   -- can you tell me what you did to      10:44:32

 2  prepare to testify on that topic?

 3      A.   Give me one second here.

 4      Q.   Sure.

 5      A.   I mean, it would be all the same things  10:44:43

 6  I've already identified to you with respect to the

 7  use of the attorney-client privilege.

 8           I have talked to a lot of the same

 9  people, reviewed a lot of the same docs.  And then,

10  of course, just based on my own knowledge of        10:44:57

11  company policies and procedures.

12      Q.   Going back to the people you spoke with

13  about attorney-client privilege, which included

14  Mr. Majalya and Pam --

15      A.   Uh-huh.                                    10:45:16

16      Q.   -- why is it that you asked them about

17  whether they were aware of any reports of misuse of

18  the privilege designation?

19      A.   Because they -- they are the two people I

20  know in the company that if there was a report      10:45:26

21  about the misuse of it, they are likely to be the

22  ones that would investigate it.

23           So they are a good resource to know if

24  this is something that is being reported and

25  something that needs investigation.                 10:45:37
```

Page 50

```
 1   knowledge of reports of misuse of the            10:46:31

 2   attorney-client privilege designation?

 3        A.   I did not.  But, like I said, I think,

 4   more than likely, that would go to those two

 5   individuals.                                      10:46:40

 6        Q.   Mr. Majalya isn't the only compliance

 7   attorney in the company; is that correct?

 8        A.   He's not.

 9        Q.   Okay.  Is there some reason why you

10   thought that it -- only speaking with him and not 10:46:54

11   other compliance attorneys would be sufficient?

12        A.   I did.  Because he oversees compliance.

13   He's in charge of compliance.

14        Q.   Okay.

15        A.   And the same applies to Pam.  I mean,   10:47:05

16   she's in charge of ER.

17        Q.   Gotcha.

18             For Topic 3.3, you said to -- to prepare

19   for it, you -- you talked to the same people and

20   reviewed the same documents; is that correct?     10:47:26

21        A.   In essence, yes, related to

22   attorney-client privilege used.  And, plus, my own

23   knowledge of what happens at the company with

24   respect to training on attorney-client privilege

25   and policies.                                     10:47:40
```

Page 51

```
 1        Q.   And so, is there anything further that    10:47:49

 2   you did to prepare to testify on Topics 2, and 3.3

 3   that we haven't discussed already?

 4        A.   Not that I remember.

 5        Q.   You mentioned your awareness of the       10:48:02

 6   training that's done on attorney-client privilege?

 7        A.   I did.

 8        Q.   Okay.  Can you tell me what -- what

 9   training is done?

10        A.   So at a high level, when new employees    10:48:12

11   are hired, they receive training on the

12   attorney-client privilege, and then there's

13   training that happens periodically throughout the

14   year for different groups in the business.

15        Q.   Who does the trainings?                   10:48:33

16        A.   Different people -- mostly, the people I

17   know are all in the legal department.  Many of

18   those people are in my department.  But different

19   people do it.

20        Q.   So let me break it down.                  10:48:45

21             You said there's training for new hires?

22        A.   Uh-huh.  That's correct.

23        Q.   Who is responsible for trainings for new

24   hires?

25        A.   I -- I don't know specifically who is     10:48:52
```

Page 52

```
 1    responsible for it, but there's -- there is          10:48:54

 2    training that goes on.  It's not -- it's a video.

 3         Q.   Okay.  And then you said there's periodic

 4    training?

 5         A.   That's correct.                             10:49:09

 6         Q.   Okay.  And the periodic training is for

 7    various different departments at different times?

 8         A.   That's right.

 9         Q.   Okay.  And it's put on by somebody in

10    legal at all times?                                   10:49:20

11         A.   Typ- -- typically, a lawyer in legal.  I

12    would say almost always a lawyer in legal.

13         Q.   And is there a particular group within

14    legal that is responsible for that?

15         A.   There's not.  Not formally.  But a lot of   10:49:34

16    the times, people in my department do it.

17         Q.   And when you say your department, you

18    mean litigation?

19         A.   I do.

20         Q.   Okay.  Have you ever done one of these      10:49:44

21    trainings?

22         A.   You know, I was scheduled to do one, and

23    then it got canceled.  And I'm scheduled to do one

24    either in January or March.  But others in my

25    department have.  And I participate in the            10:49:53
```

Page 53

1    preparation of the materials for the training.        10:49:57

2        Q.   Are there -- is it the same materials

3    that are used for trainings over and over, or do

4    they get changed?

5        A.   In essence, they are the same, you know.    10:50:13

6    In essence, they are the same.  Sometimes there is

7    tweaks to it for the particular audience that you

8    are talking to.  All right?

9            We are talking to nonlawyers, so we've

10   got to try to present it in a way that, you know,     10:50:24

11   will be palatable to them and -- and capture their

12   attention.  We want them to pay attention.

13           So nothing really in substance changes as

14   far as, you know, what the goals of the training

15   are.  But little tweaks to the presentations are      10:50:37

16   sometimes present.

17       Q.   Is there -- are these periodic trainings

18   given on any sort of routine basis?

19       A.   I wouldn't call it routine.  I would just

20   say as needed.                                         10:50:59

21       Q.   When you say "as needed," how is it

22   determined that it is as needed?

23       A.   It could be a variety of different ways.

24   We could be asked.  We -- and when I say "we," I

25   mean we in the litigation department or people in     10:51:14

Page 54

```
 1   legal.  We could be asked.  We could make a          10:51:16
 2   determination on our own that it should be done.
 3          Those are the ways I know of.
 4      Q.   When the legal department is asked to do
 5   one of these periodic trainings about               10:51:32
 6   attorney-client privilege, is that because, you
 7   know, people need a refresher on how to do it
 8   properly?
 9      A.   I -- I don't recall why people have
10   asked.  I just know it's been asked for.  I can't    10:51:41
11   tell you what the reasons for it were.  You know,
12   the goals remain the same, so it's irrelevant to me
13   whether somebody asks or whether we decide to
14   affirmatively do it.  The goal is the same.
15      Q.   And when the legal department decides to      10:51:55
16   affirmatively do it, is that because somebody in
17   the legal department has noticed these nonlawyers
18   kind of need more training?  They -- they are not
19   doing it right?
20      A.   Well, the reason for it is this, right?       10:52:06
21   And it's probably hard to get if you've -- you
22   know, you are a lawyer.  You've spent your life at
23   a firm, but just -- just think about dealing with a
24   company of mostly nonlawyers.  They don't know
25   anything about litigation.  They don't know about    10:52:19
```

Page 55

```
 1   discovery.  They don't know probably what the          10:52:23

 2   attorney-client privilege means.

 3              And we know.  We have new people come to

 4   the company all the time.  And so we will go out

 5   there periodically and just make sure we do the        10:52:32

 6   training because we want people to understand what

 7   the privilege is and make sure they are trained

 8   appropriately on it.

 9       Q.   So there -- you don't recall any of these

10   periodic trainings being because of, like, a           10:52:44

11   particular need to -- or identification of people

12   not using the privilege correctly?

13       A.   No, no.

14       Q.   All right.  Let's talk about ephemeral

15   messaging in a little bit more detail.                 10:53:03

16       A.   Okay.

17       Q.   So we'll -- we'll start with Exhibit 9726

18   that you have.

19       A.   Uh-huh.

20       Q.   And Tab 1 is the personnel who have used      10:53:22

21   Wickr or similar platform; is that right?

22       A.   I'm there.  Yup.

23       Q.   And you've discussed this with Ms. Ray,

24   correct?

25       A.   I did.                                        10:53:36
```

Page 61

```
 1       A.   It would be platforms or chat apps,      10:59:26
 2  whatever words you want to use that are considered
 3  ephemeral.
 4       Q.   And when you say "ephemeral," what do you
 5  mean by that?                                       10:59:32
 6       A.   Well, I mean temporary.  So that's all
 7  ephemeral means, is that it's retained for a
 8  certain period of time.  Sort of like Google and
 9  off the record.  Right?  It's temporary.
10            Same with Wickr.  It's temporary.         10:59:44
11       Q.   Okay.  And so HipChat was not?
12       A.   HipChat had a retention to it.  But I
13  just don't think people typically thought of
14  HipChat as ephemeral, the way they think of
15  Google Hangouts or Wickr.                           10:59:58
16       Q.   And did you discuss with anybody whether
17  HipChat qualified as being ephemeral or not?
18       A.   I did not.  It was just based on -- I
19  don't know if I talked to anybody about that
20  specifically.  I really don't remember.  But        11:00:21
21  just -- I just don't think people consider it to be
22  ephemeral the way they do Google Hangouts with off
23  the record or Wickr.
24            So that's -- that's the most I can tell
25  you.                                                11:00:33
```

Page 63

```
 1        Q.    Did -- did Uber have an account and        11:01:39

 2    provide HipChat to -- to users?

 3        A.    Yes, yes.

 4        Q.    Okay.  For uChat, you said there was a

 5    transition to uChat earlier this year; is that      11:01:51

 6    correct?

 7        A.    I did.

 8        Q.    Okay.  And uChat is not listed on Tab 1?

 9        A.    Same reasons.  Same answers.

10        Q.    And so we have a clear record, what is --   11:02:02

11    what is the reason -- your understanding of why

12    uChat wasn't included?

13        A.    The same reason, that I don't think the

14    way people think about ephemeral communications

15    they considered uChat to be ephemeral.              11:02:16

16        Q.    You've mentioned Google Hangouts,

17    correct?

18        A.    I did.

19        Q.    Okay.  And that does appear on

20    Tab 1 occasionally.                                 11:02:53

21             What is your understanding of Hangouts?

22        A.    That it's a chat application that has off

23    the record and on the record, so it can be

24    ephemeral.  And that's the full extent of what I

25    know.                                               11:03:12
```

Page 77

```
 1   purposes," were there specific business purposes it        11:28:53

 2   was --

 3        A.   I don't know if they were specific, but I

 4   know people on the security team used it.

 5        Q.   Was there any guidance provided to               11:29:02

 6   employees about when it was appropriate to use

 7   WickrMe for business purposes?

 8        A.   Well, there was -- there's guidance on

 9   when not to use it and -- but it doesn't just apply

10   to WickrMe.  It applies to all chat applications.         11:29:16

11   And the guidance was not to use it to discuss

12   topics that are subject to a litigation hold.

13        Q.   And that was a guidance for all chat

14   applications --

15        A.   Yes.                                              11:29:31

16        Q.   -- is that what you said?

17             And so that, that guidance to not use

18   these chat applications for subjects covered by a

19   litigation hold, that would really only come into

20   play once there was some reason to have a               11:29:49

21   litigation hold --

22        A.   That is correct.

23        Q.   -- correct?

24             Okay.  So, for example, the -- Uber

25   acquired Otto well before this lawsuit was filed.       11:29:59
```

Page 85

```
 1   look at the bottom of Exhibit 9729 --              11:38:55

 2        A.   Okay.

 3        Q.   -- the paragraph that says, "Uber Chat

 4   Applications are the following" --

 5        A.   Yes.                                      11:39:05

 6        Q.   -- and does that list uChat and

 7   Google Hangouts as authorized chat applications?

 8        A.   Well, it -- it -- it identifies them in

 9   there, and then it talks about them on the next

10   page.  But, yes.                                    11:39:18

11        Q.   And this paragraph says that, "All other

12   chat applications, including but not limited to

13   Wickr, Telegram, Signal, WeChat, and Snapchat, are

14   not Uber Chat Applications and employees are

15   prohibited from using these for business            11:39:28

16   communications," correct?

17        A.   That is correct as of the date this

18   policy went into place in September, true.

19        Q.   And prior to this date, employees were

20   not prohibited from using any of -- any of those    11:39:41

21   communications applications listed there?

22        A.   Well, except for the fact they were

23   prohibited from using them if they wanted to talk

24   about things that were subject to a litigation

25   hold.                                               11:39:53
```

Page 120

```
 1              But, again, I don't know.                01:03:03
 2      Q.   And remind me:  Your understanding that
 3   the security department is the only department that
 4   has used nonattributable devices, what is that
 5   based on?                                           01:03:11
 6      A.   It's based on my own personal knowledge,
 7   my discussion with Nick Gicinto and my discussion
 8   with Eric Meyhofer and -- and just my own
 9   knowledge.
10      Q.   Would the security department track the     01:03:24
11   use of nonattributable devices by other
12   departments?
13      A.   No, they would not.
14      Q.   Okay.
15      A.   I'm not --                                  01:03:34
16      Q.   Sorry.
17      A.   That was my fault.  You go ahead.
18      Q.   That's -- knowing the total use of
19   nonattributable devices within the company is
20   part -- not part of the umbrella of the security    01:03:42
21   department's obligations or duties?
22      A.   Well, that's -- that's a strange way to
23   ask the question.  So let me answer it this way:  I
24   wouldn't think Nick, who provided this information,
25   would be analyzing that for other departments.      01:03:57
```

Page 132

```
 1   department?                                    01:18:35

 2        A.   Yes.

 3        Q.   Do nonlawyers provide trainings or

 4   guidance on when other employees should use

 5   attorney-client privilege designations?        01:18:46

 6        A.   Not that aware of, but I didn't want to

 7   be 100 percent on that it's only people in the

 8   legal department.  Because, for example, I

 9   explained to you that Pam said that if she saw

10   somebody using the privilege in a way they       01:18:58

11   shouldn't be doing it, she would correct them.

12        Q.   And did you investigate whether, for

13   example, department heads give trainings to their

14   employees about the use of the attorney-client

15   privilege?                                      01:19:09

16        A.   I -- I did not.

17        Q.   Does Uber instruct its employees to

18   include attorneys in the "to" line of emails so

19   that Uber can argue that the email is privileged?

20             MR. BRILLE:  Objection.  Form.        01:19:40

21             THE DEPONENT:  That would be inconsistent

22   with our training.

23        Q.   (By Ms. Roberts)  And you are not aware

24   of whether individual employees have done that?

25        A.   I am not.                             01:19:47
```

Page 141

```
 1   Craig Clark.                                          01:31:28
 2        Q.   He's cc'd on the email, correct?
 3        A.   Right.  Yes.
 4        Q.   And Craig Clark is an attorney?
 5        A.   He is.                                       01:31:33
 6        Q.   And he was an internal Uber attorney,
 7   correct?
 8        A.   Yes.
 9        Q.   Okay.  And is this consistent with --
10   with Uber policy to add an attorney and label          01:31:42
11   everything privileged?
12             MR. BRILLE:  Objection.  Form.
13             THE DEPONENT:  Yeah.  So I don't know the
14   context of this document, so you are asking me on
15   the fly.  I would say, that's not consistent with      01:31:54
16   our policy; and, again, why we have our outside
17   counsel making the privilege calls, which is also
18   how you -- just like the other documents you have
19   shown me, this is how it got into your hands.
20        Q.   (By Ms. Roberts)  I'm going to hand you       01:32:32
21   what was previously marked as Exhibit 9022.
22             Let me know when you are ready.
23             Have you seen this document before?
24        A.   I have.
25        Q.   When did you see this document?             01:33:03
```

Page 142

1      A.   You know, I looked at it in preparing for     01:33:04

2   the deposition, but I had seen it before.

3      Q.   When did you see it before?

4      A.   I don't recall, at some -- some point in

5   the last year.                                        01:33:10

6      Q.   Did you see it before Mr. Jacobs' letter

7   was disclosed in this litigation?

8      A.   Yes.

9      Q.   Okay.  So you saw it outside of the

10  context of what's going on in this case?              01:33:23

11     A.   As I said, yes.

12     Q.   And if you could take a minute, but

13  I'm -- I'm wondering if this is the same version

14  that you saw.

15     A.   Okay.  Let me look through and see.          01:33:36

16          I think this is the same version I saw.

17     Q.   Do you know if there are more than one

18  version of this presentation?

19     A.   I don't think there are.  I can't -- I

20  mean, I can't be 100 percent, but I really don't      01:34:13

21  think there are.  There is -- sorry.

22     Q.   I will represent to you that in

23  Mr. Jacobs' letter, he says that the presentation

24  that he saw Mr. Clark give didn't have any Uber

25  branding on it.                                       01:34:27

Page 143

```
 1              Whereas, the first page of this exhibit    01:34:28
 2    does have Uber.  So that's why I was asking if you
 3    were aware of other versions.
 4         A.   Yeah.  I -- you know, again, I wasn't
 5    responsible for the Jacobs investigation.  But I --   01:34:40
 6    I -- you know, I just think he's wrong about that.
 7         Q.   In what context did you see this
 8    presentation prior to today?
 9         A.   It was in discussing with others in the
10    department, giving training on the use of the         01:35:01
11    attorney-client privilege.  This was sent to me in
12    the context of that.  I think Craig forwarded it to
13    Angela, and Angela sent it to me.
14         Q.   And what was discussed about training in
15    the context of this presentation?                     01:35:15
16              MR. BRILLE:  I'm going to object to the
17    extent you are asking him to disclose privileged
18    communications, but...
19              THE DEPONENT:  Okay.  I'm not going to
20    disclose privileged communications --                 01:35:24
21              MR. BRILLE:  Yeah.
22              THE DEPONENT:  -- but just to make it
23    easier, we discussed training.
24         Q.   (By Ms. Roberts)  Was this presentation
25    used in more than one training?                       01:35:31
```

Page 154

```
 1   ██████████████████████                          01:56:51
 2          MR. BRILLE:  Same objection.
 3          THE DEPONENT:  Yes.  We were -- we were
 4   working on a project that people commonly referred
 5   to as ████████████████████████.  It            01:57:03
 6   would take me a long time to explain it.
 7          Do you have a specific question related
 8   to it?
 9      Q.   (By Ms. Roberts)  Well, so when I asked
10   you what ████ was sort of a few minutes ago --   01:57:15
11      A.   Yeah.
12      Q.   -- and you said it's ████████████
██   ██████████████ --
14      A.   Yes.
15      Q.   -- I want to talk specifically about the  01:57:24
16   ████████████████████████████████████
██   ██████████████████████████████
18      A.   Okay.
19      Q.   Can you describe for me what that project
20   was?                                             01:57:35
21      A.   ██████████████████████████
██   ██████████████████████████████████████
██   ██████████████████████████████
██   ██████████████████████████████████████
██   ██████████████████████████████████    01:57:54
```

Page 155

1 ██████████████████████████████  ██████

  ██████████████████████████████████

  ████████████

4     Q.   And has that ████████ been

5   implemented?                                    01:58:16

6     A.   No.

7     Q.   Was it tested?

8     A.   It -- what do you mean by tested?

9     Q.   Well, let's take a step back.

10          When you say the project involved     01:58:26

11  ███████████████████████████

    ██████████████████████████████████

    ████████████████████████

14    A.   I did say that.

15    Q.   Okay.  So what -- ████████████  ██████

    ████████████████████████████

    ██████████████████████████

18          MR. BRILLE:  Objection.  Form.  Scope.

19          THE DEPONENT: ████████████████

    ████████  ██████████████████████████  ██████

    ██████████████████

    ████████████████████████████████

    ████  ██████████████████████  ████████

    ██████████████████  ████████████████

    ████████████████████                           01:59:24

Page 157



```
 1        A.   All right.   Andrea, I'm going to help you        02:00:24

 2   out here.

 3             MR. BRILLE:   Same objections.

 4             THE DEPONENT:
```

02:01:15

Page 158

1   █████████████████████████████████████   █████████

2  █ ████████████████████████████

3        Q.   (By Ms. Roberts)  ██████  ████████████

4  █ ████████████████████████

5            MR. BRILLE:  Yeah, I'm going to -- I'm          02:01:27

6   just going to caution you to not disclose any

7   privileged information.  I don't know if you

8   consider it privileged.  I'm just going to caution

9   you.

10            THE DEPONENT:  I don't consider this          02:01:35

11   privileged.

12            MR. BRILLE:  Okay.

13            THE DEPONENT:  ████████████████████

14  █ ██████████████████  ████████████████

15  █ ███████████████████████████   █████████

16  █ ███████████████████  ███████████████

17  █ ████████████████████████████████████

18  █ ██████████████████████████████████

19  █ ███████

20        Q.   (By Ms. Roberts)  ██████  ████████████   ██████████

21  █ ███████████████████████████████

22  █ ██████████████████  ██████████████

23  █   ██  ████████████

24  █   ██  ████████  ████████████

25  █   ██  ██████                                        02:02:05



Page 159

```
 1      Q.   I got it right?                             02:02:06

 2      A.   That's correct.  You got it right.  Good

 3  work.

 4      Q.   Thank you.

 5           Were any law firms involved in the         02:02:15

 6  analysis about whether to implement this ████

    ██  ██████?

 8      A.   Right.  So you have read the documents.

 9  ██████████████████████████████████████████████

    ██  ████████████████████████████████████         02:02:30

11      Q.   And when did Uber start considering

12  the -- what we are calling the ███████████?

13      A.   You know, that's before my time.  But my

14  best estimation would be in the summer/fall

15  of 2016, but prior to my arrival at Uber.         02:02:55

16      Q.   And I know you said this at the

17  beginning, but you started in late 2016?

18      A.   Yeah, November 7th of 2016.

19      Q.   Okay.  Then you said ██████████████████

    ██  ████████████████████████████████████  ████████

    ██  ██████████████████████████████

22           Were there law firms that were not

23  authorized that provided the advice?

24      A.   Any other law firm was not authorized.

25      Q.   ███████████████████████████████████      02:03:25
```

Page 160



24      A.    Yes.

25      Q.    Okay.  What's -- what's his background?        02:04:21



Page 162



23      Q.    I see.   Okay.   Thanks.

24            Do you know why Uber was ████████████

                                                02:06:52

Page 163



1          MR. BRILLE:  Objection.  Form.  Scope.          02:06:54

2          THE DEPONENT:

02:08:03



Page 164

```
 1                                        02:08:07
 2          MR. BRILLE:  Objection.  Form.  Scope.
 3          THE DEPONENT:  Quite the opposite.
 4     Q.   (By Ms. Roberts)  Okay.
 5     A.
 9     Q.   Okay.
10
```

02:08:57

Page 165



1

2

3          MR. BRILLE:  Objection.  Form.  Scope.

4          THE DEPONENT:  We had ideas about it, but

5   no final decision had been made.                    02:09:11

6      Q.   (By Ms. Roberts)

23          MR. BRILLE:  Objection.  Form.  Scope.

24

                                                         02:10:09

Page 181

```
 1      A.   Right.                                   02:31:38

 2      Q.   -- dated November 16th, 2016?

 3      A.   Right.

 4      Q.   Do you see at the -- the first line there

 5  says, "A number of ATG users recently lost email    02:31:42

 6  older than 180 days.  A restore is in progress"?

 7      A.   I see that.

 8      Q.   Okay.  Do you have any information about

 9  that?

10      A.   I don't.                                 02:31:51

11           MS. ROBERTS:  Why don't we take a break.

12  I'm close to done.  I just need to organize my

13  notes here.

14           THE VIDEOGRAPHER:  We are off the record

15  at 2:32 p.m.                                       02:32:16

16           (Recess taken.)

17           THE VIDEOGRAPHER:  We are back on the

18  record at 2:39 p.m.

19      Q.   (By Ms. Roberts)  Going back to beginning

20  of the day when we talked about your discussions   02:39:39

21  with Mr. Meyhofer to prepare for your testimony --

22      A.   Sure.

23      Q.   -- you said you talked to him about

24  nonattributable devices and ephemeral

25  communications.                                    02:39:49
```

```
                                                        Page 182
 1              Did you discuss with him the use of      02:39:49

 2   attorney-client privilege designations by ATG

 3   members?

 4       A.   I mean, yes, we talked about how the

 5   attorney-client privilege should be used, and he    02:40:05

 6   told me what his thoughts were on that.

 7       Q.   Okay.  And can you --

 8       A.   And -- and we also talked about -- your

 9   sort of sparking a memory here.  I think we also

10   did talk about the use of attorney-client privilege 02:40:21

11   as it related to the Waymo case.

12              And I'm trying to remember.  Yeah, we did

13   talk about the attorney-client privilege and how --

14   how it should be used.

15       Q.   And what did Mr. Meyhofer tell you?        02:40:43

16       A.   He relayed to me that it was important to

17   use it only when appropriate, only when seeking

18   legal advice from a lawyer.

19       Q.   And did you ask him about his personal

20   use of the attorney-client privilege designation or 02:40:58

21   the use within the group?

22       A.   The discussion was more his

23   understanding, and as the leader of ATG, his

24   expectations of the people that report to him,

25   which is everybody in ATG.  That should be used     02:41:11
```

Page 183

```
 1    only when appropriate.                        02:41:14

 2         Q.   Did you ask him about any training that's

 3    been provided to the ATG group about

 4    attorney-client privilege designations?

 5         A.   I didn't because I don't -- I don't know  02:41:23

 6    that he would know about that.  I did not.

 7         Q.   If we go back to Topic 2 -- and I don't

 8    know if you want to get it in front of you or

 9    not --

10         A.   Right.                               02:41:42

11         Q.   -- but it asks about defendants' use

12    of -- use of methods or strategies to conceal facts

13    from discovery by external parties and litigation

14    or government investigations.

15              And then it lists, including improper   02:41:50

16    attorney-client and other privileged designations,

17    ephemeral or encrypted communications,

18    nonattributable devices or anonymous servers.

19              In preparing for your testimony today,

20    did you ask anybody about other methods or         02:42:07

21    strategies to conceal facts from discovery by

22    external parties?

23         A.   I focused on the ones you identified.

24         Q.   So in your discussions with Mr. Meyhofer,

25    you didn't ask him whether there are other methods   02:42:22
```

Page 184

1   or strategies that the ATG group uses to conceal          02:42:25

2   facts from discovery by external parties?

3        A.   I didn't feel the need to ask him because

4   it was clear in my discussion with him that any

5   attempt to conceal information from discovery in         02:42:36

6   litigation was unacceptable.

7        Q.   Who said that, you or him?

8        A.   That's my summary of our discussion.  I

9   didn't feel the need to ask him, was there anything

10  else other than the three things identified in your      02:42:50

11  notice.  Because in whatever words he used, he made

12  it clear to me that doing so would be unacceptable.

13       Q.   So he told --

14       A.   Regardless of methodology.

15       Q.   And when you spoke with Mr. Gicinto, did       02:43:00

16  you ask him about the use of methods or strategies

17  to conceal facts from discovery other than those

18  specifically outlined in the topic?

19       A.   Not in way you are phrasing it, no.  I

20  don't recall that coming up.                             02:43:15

21       Q.   I'm sorry, I don't understand what you're

22  saying, not in -- not in the way you're phrasing

23  it.

24       A.   I didn't discuss that topic with him the

25  way you phrased it in your question.                     02:43:23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      I, Rebecca L. Romano, a Certified Shorthand

2  Reporter of the State of California, do hereby

3  certify:

4      That the foregoing proceedings were taken

5  before me at the time and place herein set forth;

6  that any witnesses in the foregoing proceedings,

7  prior to testifying, were administered an oath;

8  that a record of the proceedings was made by me

9  using machine shorthand which was thereafter

10  transcribed under my direction; that the foregoing

11  transcript is true record of the testimony given.

12      Further, that if the foregoing pertains to the

13  original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript [ ] was [X] was not requested.

16      I further certify I am neither financially

17  interested in the action nor a relative or employee

18  of any attorney or any party to this action.

19      IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21      Dated:  December 22, 2017

22

23

24      Rebecca L. Romano, RPR,

25      CSR. No 12546

Veritext Legal Solutions
866 299-5127