# EXHIBIT 7

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

WAYMO LLC,

        Plaintiff,

vs.                                             Case No.

UBER TECHNOLOGIES, INC.;            3:17-cv-00939-WHA

OTTOMOTTO LLC; OTTO TRUCKING LLC,

        Defendants.

_____/

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF MATHEW HENLEY

FRIDAY, DECEMBER 22, 2017

Reported by:

Anrae Wimberley

CSR No. 7778

Job No. 2771361B

PAGES 1 - 145

```
                                                          Page 11
 1   he's identified in the preceding paragraph.            13:55:09
 2           Do you recall having any conversations
 3   with Mr. Jacobs where he complained about any
 4   practice by the threat operations team at all?
 5       A.   No.                                           13:55:24
 6       Q.   So whether it was ephemeral communications
 7   or anything, you have no recollection of him
 8   complaining about whether it was proper for threat
 9   operations to engage in any type of investigative
10   activity; is that correct?                             13:55:38
11       A.   I don't have any recollection of him
12   complaining about illegal practices at all.
13       Q.   And do you have any recollection of him
14   complaining about any practice, whether it was legal
15   or illegal?                                            13:55:54
16       A.   He complained about being inhibited in his
17   ability to do certain things, but not complaining
18   about, in general, the practices of the team.
19       Q.   So as far as your experience with him, you
20   have no recollection of an instance where he           13:56:13
21   complained and said to you that the team is engaging
22   in some type of behavior that I think is improper?
23       A.   Yeah, I have never heard that before from
24   him.
25       Q.   Did he ever express any concern to you        13:56:28
```

```
                                                           Page 12
1    about the use of ephemeral communications?           13:56:30
2         A.   He never -- never once.
3         Q.   Did he ever express any concern to you
4    about the use of non-attributable devices?
5         A.   Again, we wouldn't have used that term.  I  13:56:44
6    believe -- Ric's -- I'm not going to go down that
7    path --
8         Q.   Well, I --
9         A.   If I can finish it, we never discussed him
10   having concerns about our research laptops ever.     13:56:54
11        Q.   Okay.  So just a few moments ago, your
12   counsel asked you some questions -- or, excuse me,
13   Uber's counsel asked you some questions about the
14   term "non-attributable devices" and you answered the
15   question, you didn't have any trouble with the term.  13:57:05
16             So if I -- I'd just ask for the same
17   courtesy, that if I use a term that you've used in
18   your communication with her and she's used the term
19   "non-attributable devices" and you understood what
20   she meant and you answered the question, then to     13:57:17
21   move this along, you can treat me the same way.
22   Okay?  Does that seem fair?
23        A.   I understand that.  When you bury certain
24   things in your questions is when I have issues.
25        Q.   My question to you is, did he ever express  13:57:36
```

```
                                                                Page 13
 1    any concern to you about the use of non-attributable        13:57:38
 2    devices?
 3         A.    No.
 4         Q.    Did Mr. Jacobs ever express any concern to       13:57:51
 5    you about the improper use of "attorney-client
 6    privilege" on any document?
 7         A.    No, not to my knowledge.
 8         Q.    Did Mr. Jacobs ever express any concern to
 9    you about the use of the designation "draft" on any
10    document?                                                   13:58:08
11         A.    No, not to my knowledge.
12         Q.    Did he ever express any concern to you
13    about his belief that Uber was engaging in the theft
14    of trade secrets?
15         A.    Definitely never, to my knowledge.               13:58:19
16         Q.    Did he ever express any concern to you
17    that Uber was trying to avoid its discovery
18    obligations in civil litigation?
19         A.    No.
20         Q.    Did he ever express any concern to you           13:58:34
21    about any unethical or illegal practice of any kind?
22         A.    No.
23         Q.    Looking at the second paragraph -- excuse
24    me -- that second paragraph of this e-mail, the
25    next-to-last sentence of that paragraph says, "For          13:59:07
```

```
                                                            Page 72
 1    BY MR. LYONS:                                         15:29:25
 2         Q.   Okay.  Are you aware of anyone in
 3    ThreatOps ever responding to any discovery requests?
 4    Because you yourself haven't, so --
 5         A.   Yeah, I mean, we -- we get the letter and   15:29:31
 6    we acknowledge it.  And it goes back to our lawyers
 7    that we've acknowledged that we won't destroy things
 8    based on a claim.
 9         Q.   Okay.  That's a letter -- we'll call that
10    a document hold letter, saying hold on to stuff.      15:29:49
11              Now, have you ever received any request to
12    give me something?
13         A.   No.
14         Q.   So --
15         A.   Not that I can think of.                    15:29:57
16         Q.   So have you ever had to search for any
17    documents pursuant to any requests by a lawyer?
18         A.   That's all handled by our eDiscovery and
19    IT staff, right, who has access to all of your
20    machines.                                             15:30:13
21         Q.   So the answer would be, to your knowledge,
22    you have not?
23         A.   Yeah.
24         Q.   So Mr. Jacobs makes some allegations here.
25    We're looking at that paragraph that said that Uber   15:30:27
```

```
                                                          Page 73
 1   had "efforts to evade current and future discovery        15:30:33
 2   requests, court orders and government
 3   investigations."
 4            Was that true or not true?
 5       A.   Again, that's a very long sentence here.         15:30:49
 6   No, there were -- there was no concerted effort to
 7   lead any sort of concealment.  It was -- anything
 8   that we did was around securing either the people
 9   working on the research themselves or protecting the
10   data from future theft or abuse, but nothing around      15:31:12
11   evading or any of that.
12       Q.   Did Mr. Jacobs ever advocate for a secure
13   and encrypted centralized database?
14       A.   Yes.
15       Q.   Was that ever done?                             15:31:26
16       A.   It was passed through to our engineering
17   team for scoping requirements on what it would take
18   to get it built.  It was -- ultimately did not make
19   the prioritization cut for that half.  So the
20   company, as you can imagine, has a set number of        15:31:49
21   engineering resources.  Set number of projects get
22   submitted as they do their planning for the year.
23   And they draw a line, and our line was -- our
24   project was below that line.
25       Q.   So Mr. Jacobs did advocate for a secure         15:32:06
```

```
                                                          Page 74
 1   and encrypted centralized database, that's true;       15:32:09
 2   correct?
 3       A.   That's true, yeah.
 4       Q.   And his request for that was denied; is
 5   that true?                                             15:32:18
 6       A.   By the engineering department.
 7       Q.   Did you approve his request?
 8       A.   Yeah.
 9       Q.   Now, he says, "discussions broke down" --
10   going to the last paragraph on that page, that "He    15:32:35
11   presented draft proposals to managers Henley and
12   Clark."
13            Did you see any proposals from him
14   regarding a centralized database?
15       A.   Well, of course.  We had pushed them         15:32:47
16   forward to engineering.
17       Q.   And he says, "However, discussions broke
18   down immediately because they objected to preserving
19   any intelligence that would make preservation and
20   legal discovery a simple process for future           15:32:58
21   litigants."
22            I assume you think that's not a true
23   statement.
24       A.   That's not a true statement or we would
25   not have pushed it forward to engineering for         15:33:07
```

1  scoping.                                                          15:33:10

2      Q.   Do you recall the Ergo investigation

3  coming up in any of your conversations with

4  Mr. Jacobs?

5      A.   You know, it came up in different              15:33:57

6  trainings of kind of what not to do, so I'm sure it

7  came up in conversations.

8      Q.   Do you ever recall Mr. Clark saying that

9  he did not want to repeat the errors of the Ergo

10 investigation?                                          15:34:15

11     A.   I can see him saying that, yes.  I don't

12 recall it, but . . .

13     Q.   Did you ever say that you did not want to

14 repeat the errors of the Ergo investigation?

15     A.   I don't recall saying that.                    15:34:25

16     Q.   Let me ask you to turn to page 13.  This

17 paragraph -- there's a paragraph on this page that

18 deals with Waymo.

19          Do you see that?

20     A.   I do see that.                                 15:35:21

21     Q.   So I want you to take a moment and read

22 that to yourself, the first paragraph, and let me

23 know when you're finished.

24     A.   All right.

25          (Witness reviews document.)                    15:35:33

```
                                                            Page 107
 1   with the definition on specifically.                   16:45:33
 2       Q.   Well, do you have a concern or belief that
 3   there was some type of information of Waymo's that
 4   was uncovered?  Because I can just work backwards.
 5            Why don't you tell me all the information     16:45:55
 6   related to Waymo that you believe was uncovered as a
 7   result of these efforts.
 8       A.   All of our efforts against Waymo that I'm
 9   aware of occurred in public space.
10       Q.   And when you say "public space," you're       16:46:12
11   referring to surveillance?
12       A.   Yeah, observation.
13       Q.   So observation of vehicles?
14       A.   Yes.
15       Q.   And so you're not aware of any other          16:46:19
16   research activity or surveillance or investigative
17   tool that was utilized against Waymo other than this
18   physical surveillance of vehicles; is that correct?
19       A.   Yeah.
20       Q.   So anything that you observed would have      16:46:32
21   been the observation of these vehicles in the public
22   space?
23       A.   Yes, driving around.
24       Q.   And based on that, are you aware of having
25   discovered any trade secrets of Waymo?                 16:46:43
```

```
 1   guessing he was.  But those are really the -- those      16:53:28
 2   were the two that I knew.
 3        Q.   You're not aware of anyone else?
 4        A.   No.  We didn't work with them routinely.
 5        Q.   So I'm going to show you a video.  I'm         16:54:04
 6   going to ask you some questions about it.
 7        A.   Okay.
 8        Q.   So just take a second to get this set up.
 9        MR. LYONS:  So I'm going -- I'll identify this
10   document for the record.  The Bates number is            16:54:33
11   UBER00336963.mp4.
12   BY MR. LYONS:
13        Q.   So I'm going to place this computer in
14   front of you.  And then you can start it by pressing
15   the space bar, I believe, and then --                    16:54:51
16        THE REPORTER:  Can I ask you what the procedure
17   is for the record.
18        MR. LYONS:  Just say, "Video played."
19        THE REPORTER:  Thank you.
20             (Video played.)                                16:55:16
21   BY MR. LYONS:
22        Q.   So are you able to identify any of the
23   voices on that document [sic]?
24        A.   Yes.
25        Q.   And whose voices do you recognize?             16:56:15
```

```
                                                              Page 112
 1       A.   Jake Nocon and myself.                          16:56:18
 2       Q.   And so do you recall what you said, if
 3   anything, on that video?
 4       A.   Yeah.  I believe that Jake's question was,
 5   is there anything to this Google lawsuit or is it        16:56:33
 6   them just trying to screw with us?
 7            And I think I answered something along the
 8   lines, I think they're just trying to screw with us.
 9   There may be something with Anthony.  And I said, I
10   hope this audio doesn't leave the car.                   16:56:54
11            And then he said, no, recordings are off.
12   And then he said, oh, wait, no, it's not, and then
13   turned it off.
14       Q.   So what were you referring to then with
15   regard to the Anthony stuff?                             16:57:05
16       A.   Purely what I had read in the press.  You
17   know, I don't know the dates of when this was going
18   on.  You know, there was the battle between Anthony
19   himself.  I had no personal knowledge of this case
20   really at all up until two weeks ago.  And so            16:57:28
21   whatever it was, it felt like it wasn't something
22   that was massive, but more of a war with Anthony.
23   And so that's what I meant.
24       Q.   What was your concern about anything you
25   said leaving the car?                                    16:57:48
```

```
                                                             Page 126
 1   into the observation assignments, to get them that      17:20:46
 2   data.
 3       Q.   Under B, it says, "Key personnel provide
 4   insight into a program's direction, capabilities and
 5   weaknesses.  It also allows ATG to maintain             17:21:16
 6   situational awareness of skilled and experienced
 7   individuals who may become available as competitors
 8   tweak their rosters in order to right size their
 9   efforts."
10            Do you see that?                               17:21:29
11       A.   Yes, I do.
12       Q.   What was SSG's role with regard to key
13   personnel, if any?
14       A.   This was in support of the recruiting
15   team's sourcing.  Might be a word that's just used      17:21:41
16   by companies, but the sourcing component of a
17   recruiting house is finding high-quality candidates
18   for open positions that you might want to go after.
19   And so they were looking for open source research
20   into, you know, who were the senior engineers making    17:22:01
21   up different aspects of different programs at
22   different companies.
23       Q.   And then there's reference to priority of
24   effort.  Is Google, ████████████████ and
25   others -- do you recall that being the order of         17:22:50
```

```
                                                        Page 127
1     priority that SSG was instructed to follow?        17:22:56
2          A.   That would have been the priority list
3     given to us by Lior.
4          Q.   What does "Supply chain members are
5     chatty" refer to?                                  17:23:14
6          A.   I don't know.  That would have been a Lior
7     thing, and it doesn't ring a bell to me.  I was
8     looking at that as I was reading.  I don't know.  I
9     know what supply chain is, but . . .
10         MR. LYONS:  Let's mark this as next in order.  17:24:03
11              (Plaintiff's Exhibit 9794 was marked.)
12    BY MR. LYONS:
13         Q.   This e-mail refers to a criminal
14    investigation into greyballing.
15              Are you familiar with that term?          17:24:35
16         A.   I do know the term "greyballing."
17         Q.   How did you become familiar with it?
18         A.   I believe I first heard it from our fraud
19    team.  Not a system that my teams used.  Minimal
20    hallway conversation sort of stuff.                 17:24:59
21         MS. CHANG:  Objection; outside the scope of the
22    subject matter that was ordered by the court in this
23    phase of supplemental discovery.  I'll allow some
24    limited questioning, but at some point, I'm going to
25    instruct him not to answer.                         17:25:19
```

```
                                                          Page 138
 1   advice?                                              17:44:27
 2        A.   I'm definitely not an expert in the
 3   nuances of this stuff, but if I were looking at this
 4   one and was being asked, I would have a hard time
 5   figuring out where that one would be asking for      17:44:39
 6   legal advice.
 7        Q.   Do you recall receiving any instructions
 8   by anyone to mark a document as attorney-client
 9   privilege to avoid the document being discovered?
10        A.   No.                                        17:45:22
11        Q.   Do you have the presentation in front of
12   you?
13        A.   I do.
14        Q.   Can you turn to Bates number stamp 0326.
15        A.   Um-hum.                                    17:45:59
16        Q.   You'll see the reference to "best
17   practices" there.
18        A.   Um-hum.
19        Q.   Do you know what -- those are best
20   practices of what?                                   17:46:10
21        A.   I don't know.  I mean, I need to --
22   they're kind of -- I can speculate on some of them.
23   I'm not sure.  It's not a communication flow,
24   necessarily.  There's different things out of it.
25   I'm guessing these are talking points that Craig    17:46:39
```

```
 1         FEDERAL CERTIFICATE OF DEPOSITION OFFICER
 2
 3         I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby
 4    declare:
           That, prior to being examined, the witness
 5    named in the foregoing deposition was by me duly
      sworn pursuant to Section 30(f)(1) of the Federal
 6    Rules of Civil Procedure and the deposition is a
 7    true record of the testimony given by the witness;
           That said deposition was taken down by me in
 8    shorthand at the time and place therein named and
 9    thereafter reduced to text under my direction;
           --X---   That the witness was requested to
10    review the transcript and make any changes to the
      transcript as a result of that review pursuant to
11    Section 30(e) of the Federal Rules of Civil
12    Procedure;
           -----    No changes have been provided by the
13    witness during the period allowed;
           -----    The changes made by the witness are
14    appended to the transcript;
           -----    No request was made that the
15
16    transcript be reviewed pursuant to Section 30(e) of
      the Federal Rules of Civil Procedure.
17         I further declare that I have no interest in
18    the event of the action.
           I declare under penalty of perjury under the
19    laws of the United States of America that the
20    foregoing is true and correct.
           WITNESS my hand this 26th day of December,
21    2017.
22
23
24
25         ANRAE WIMBERLEY, CSR NO. 7778
```

Page 145