# EXHIBIT 8

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


WAYMO LLC,

        Plaintiff,

vs.                                        Case No.

UBER TECHNOLOGIES, INC.;        3:17-cv-00939-WHA

OTTOMOTTO LLC; OTTO TRUCKING LLC,

        Defendants.

_____/


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEOTAPED 30(b)(6) DEPOSITION OF MATHEW HENLEY

FRIDAY, DECEMBER 22, 2017


Reported by:

Anrae Wimberley

CSR No. 7778

Job No. 2771361A


PAGES 1 - 145

```
                                                              Page 63
 1       A.   Three.  We can limit it to three.  You're       10:44:29
 2   correct, it's three.
 3            On December 19th at 10:45 in the morning,
 4   I get this alert from LinkedIn telling me that Jeff,
 5   who is in this room, is viewing my profile.  Right.      10:44:40
 6   This tells me a lot.  Right.  This is -- it's not
 7   unexpected, but it's -- please let me finish --
 8       Q.   No, I mean --
 9       A.   You asked me to explain what the documents
10   are, and I'm going to explain what the documents         10:44:56
11   are.
12       Q.   Okay.  I'm going to withdraw the question
13   again.  Okay.
14       MR. LYONS:  Let's go off the record, Counsel.
15   BY MR. LYONS:                                            10:45:02
16       Q.   You can tell me what this is, but this is
17   not --
18       A.   I'm trying to tell you what this is.
19       MR. UMHOFER:  Hang on.  Time out.  Let's just
20   go off the record and take one step at a time.           10:45:06
21       THE VIDEOGRAPHER:  Going off the record at
22   10:45 a.m.
23            (Discussion off the record.)
24       THE VIDEOGRAPHER:  Back on the record at
25   10:57 a.m.                                               10:57:33
```

Page 64

1    MR. LYONS:  So I believe the witness has come    10:57:34
2    with multiple copies of a three-page exhibit that he
3    would like to explain.  Counsel and I have had a
4    conversation off the record.  So I think we're going
5    to proceed in this fashion.    10:57:47
6    BY MR. LYONS:
7        Q.   Mr. Henley, you have a three-page exhibit
8    here.  Why don't you tell me what your purpose in
9    bringing this exhibit was today.
10       A.   Yes.    10:57:57
11       MR. LYONS:  And we'll just mark this next in
12   order.
13            (Plaintiff's Exhibit 9777 was marked.)
14       THE WITNESS:  So my only reason for bringing
15   this today was -- these are often foreign concepts    10:58:17
16   as to why people use what are being termed as
17   "non-attributable devices" and why we use things
18   like MiFis and AWS.
19            So over the past couple weeks, these are
20   things that show up in my inbox that give me notice.    10:58:37
21   And I'm by no means saying this is wrong, but it's
22   just to relate to something that you guys will
23   understand so I'm hoping that you will then take
24   this to understand why we do it.
25            So I don't know who Jeff is.  I do now,    10:58:54

1  but, you know . . .                                              10:58:58
2         And, Jeff, I sent you a LinkedIn request
3  you didn't accept, after you viewed it.
4         MR. NARDINELLI:  I don't think I got that
5  e-mail.  I'm not very talented with LinkedIn.                    10:59:06
6         THE WITNESS:  But it gives context around that
7  Jeff is looking at my stuff.  And then on my
8  personal website, there's triggers that will fire
9  off links here.  And what these two are, it shows
10 that the Quinn office is poking around on my                     10:59:21
11 personal website on December 20th at 11:28.
12        And, you know, very open records here.  If
13 I check out -- that IP on the third page with Arin
14 shows that, in fact, the IP does belong to your law
15 firm.                                                            10:59:37
16        So these are the things -- if you could
17 put this in the concept of the SSG team and dealing
18 with a hostile group, let's say, ███████████████
███████████████████████████████████████
███████████████████████████████████████████████    ███████
███████████████████████████████████████████████
███████████████████████████████
23        They use a separate laptop so that they
24 don't -- they avoid what happened to Jeff here.
25 Like Jeff using LinkedIn for his personal stuff is               11:00:06

```
                                                              Page 66
 1   not something we want to cross over into his work         11:00:10
 2   stuff, which was preparing for my deposition.
 3          The same thing goes for the IP addresses.
 4   We don't want them showing that the IP addresses are
 5   coming from an Uber office.  We want it coming from       11:00:25
 6   a MiFi, which is -- blends in with a bunch of other
 7   people.
 8          So it's just a document that I wanted you
 9   guys to use for context in helping you understand
10   something that I know as lawyers isn't something          11:00:33
11   that's normal, but it's something very normal in the
12   security industry.
13   BY MR. LYONS:
14      Q.   What would be very helpful for me now is
15   to make sure I understand the nomenclature of the         11:00:42
16   concepts that you've described.  Because I think you
17   understand the concepts and, for some reason, we
18   have not been able to get past the nomenclature.
19          So on page 3, you have a record here that
20   apparently you believe shows you some information.        11:01:03
21          So what information are you telling me is
22   demonstrated by what is on page 3?
23      A.   On page 3 of my document?
24      Q.   Yes.
25      A.   So page 3, it is referencing the IP               11:01:16
```

1   address on the previous page.  And I'm asking Arin,          11:01:21
2   A-r-i-n -- not Aaron at the end of the table, he
3   wouldn't have any clue on this stuff -- who owns
4   that IP address.  Arin replies that Quinn Emanuel
5   owns that IP address, which gives me the indications       11:01:39
6   that Quinn is looking at it.
7           The way this is used in an offensive
8   manner by people we are looking at is -- you could
9   imagine if I know that you guys aren't careful with
10  this stuff and you start looking at mine, maybe I          11:01:59
11  show you a different website, right, and I don't
12  show you what it is because I don't want you looking
13  at it.
14          And this is why obfuscation is important.
15  Again, if you were researching someone that had            11:02:09
16  violent tendencies, I'm sure you wouldn't want your
17  attorneys being called out specifically who is doing
18  it.
19      Q.  Again, I appreciate that.  I don't know
20  that we're here today to discuss the reasons why           11:02:21
21  things were done the way that they were done, but I
22  understand that you felt the need to clarify that.
23  I think I'm more interested in finding out what
24  actually was done.  And I think one way to get that
25  would be to make certain that I understand the             11:02:34

```
                                                                    Page 73
 1       Q.    What was the purpose of utilizing chat              11:09:55
 2   products?
 3       A.    Communication.
 4       Q.    List for me the reasons that you
 5   recommended Wickr Messenger over other chat                   11:10:12
 6   products.
 7       A.    Wickr Messenger provided end-to-end
 8   encryption.  It provided both desktop and mobile
 9   versions.  It provided ephemerality, and it provided
10   group conversations.                                          11:10:38
11       Q.    Were there any other advantages to Wickr
12   Messenger over other chat products that you
13   identified?
14       A.    Those were the main components that I was
15   looking at when evaluating my personal preference             11:10:49
16   around chat products.
17       Q.    Did you share these features as -- strike
18   that.
19             In suggesting that other people utilize
20   Wickr Messenger, did you inform them of these                 11:11:04
21   benefits that you identified?
22       A.    I don't remember, but I'm sure that I
23   would have had those discussions.
24       Q.    With regard to ephemerality, do you recall
25   having any conversations with anyone at Uber at any           11:11:16
```

Page 114

| | | |
|---|---|---|
| 1 | Did you ever have any conversations with | 12:48:57 |
| 2 | Mr. Sullivan about this topic? | |
| 3 | A.   We told him about the situation.  And Joe | |
| 4 | sending this back to Craig and I -- and this is me | |
| 5 | speculating, but this is how we read an e-mail like | 12:49:12 |
| 6 | from Joe, is to let us know that he has made Anthony | |
| 7 | aware of the situation. | |
| 8 | Q.   You see at the bottom of the e-mail, | |
| 9 | there's a reference -- there's a statement that | |
| 10 | says, "Because it was prepared for/by legal, this is | 12:49:24 |
| 11 | privileged." | |
| 12 | Do you see that? | |
| 13 | A.   I do. | |
| 14 | MS. CHANG:  Objection; outside the scope of the | |
| 15 | 30(b)(6) topics for which this witness has been | 12:49:32 |
| 16 | designated. | |
| 17 | Are you done with the 30(b)(6)? | |
| 18 | MR. LYONS:  No.  I will come back to this | |
| 19 | exhibit if you want.  I promise you I won't forget | |
| 20 | about it.  To make life easier, I thought I'd get to | 12:49:42 |
| 21 | it now. | |
| 22 | MS. CHANG:  Okay. | |
| 23 | BY MR. LYONS: | |
| 24 | Q.   So we're going to come back to this topic. | |
| 25 | Let me just ask you:  Do you recall | 12:49:53 |

```
                                                                 Page 115
 1   receiving any instructions at any time by anyone to       12:49:55
 2   put that type of notation at the bottom of any
 3   e-mail?
 4       A.   Specifically, "Because it was prepared
 5   for/by legal, this is privileged"?                        12:50:06
 6       Q.   Not specifically those words, but that
 7   concept.
 8       A.   You know, if it was something I was
 9   working on for our legal department, generally that
10   would be something I would -- I would -- I would          12:50:20
11   send.  But, again, I'm not a lawyer and it was
12   more -- yeah, I don't know.  If it was something
13   that was specifically done at the direction of a
14   lawyer, I would note it as --
15       Q.   My question was simply, do you recall            12:50:43
16   receiving any instructions by anyone to put that
17   type of notation at the bottom of any e-mail?
18       A.   Not the way you just answer -- or asked
19   that question.
20       Q.   Okay.  Was it your practice to put that          12:50:57
21   notation at the bottom of your e-mails, that --
22   where you did something for a lawyer?
23       A.   If I was working on work product for a
24   lawyer, then it would be designated as such.
25       Q.   That was your practice; is that what             12:51:23
```

```
                                                              Page 125
 1    parties have in place relating to litigation holds        13:06:15
 2    and ephemeral messaging.
 3           MR. LYONS:  Okay.
 4           THE WITNESS:  My conversation was that this was
 5    making the company less secure and putting us more        13:06:26
 6    at risk by pushing this policy.
 7    BY MR. LYONS:
 8        Q.   Was that your position?
 9        A.   That was my position.
10        Q.   Did anybody have a similar position or           13:06:41
11    express a similar view in that meeting?
12        A.   Yes.
13        Q.   Who?
14        A.   Joe Sullivan.
15        Q.   Did Mr. Clark express any views?                 13:06:50
16        A.   Yes.
17        Q.   What did he say?
18        A.   He had the same position.
19        Q.   And what were the reasons that you felt
20    that this was making the company less secure?             13:06:59
21        ▮ ██████████████████████████████████
   ▮ ████████████████████████████
   ▮ ████████████████   ████████████████████
   ▮ ████████  ████████████████████████
   ▮ ██████████████████████████                                 13:07:20
```

Page 126

1  ████████████████████████████████████████  ████

2  ████████████████████████████████████████

3  ███████████████████████████████ And

4  now you were forcing us to go back to that again due

5  to what I believe are optics.                              13:07:42

6       Q.   Was there any discussion about not

7  complying with this policy?

8       A.   Not complying?

9       Q.   Yes.

10      A.   No.                                              13:07:50

11      Q.   Now, after the policy went into effect,

12 what communications do you recall having about this

13 policy?

14      A.   I would say they were very similar.  My

15 continued ranting that this made Uber a worse place       13:08:00

16 from a risk perspective in the context of security

17 of our employees, drivers and riders.

18      MR. LYONS:  Mark this as our next in order.

19           (Plaintiff's Exhibit 9786 was marked.)

20 BY MR. LYONS:                                              13:09:16

21      Q.   This is an e-mail from Nick Gicinto to

22 several people; Anna Chung, Ed Russo, Jake Nocon,

23 Jimmy Stelter, Julie Ambrose, Randy Wanis and

24 Shawnee Delaney.

25           Do you see that?                                 13:09:30

```
 1   together this list.  But as far as people that I          13:35:11
 2   know I had instructed to onboard, those were the two
 3   individuals.
 4        Q.   Are you aware of anyone in the ATG group
 5   that uses a non-attributable device?                       13:35:26
 6        A.   I'm not aware of anyone in the ATG group.
 7        Q.   Are you aware of the use of Wickr to
 8   discuss any Waymo trade secrets?
 9        A.   I'm not aware of any use of Wickr to
10   discuss Waymo trade secrets.                              13:35:57
11        Q.   Are you aware of the use of
12   non-attributable devices to hide Waymo trade
13   secrets?
14        A.   I'm not aware of any non-attributable
15   devices used to hide Waymo trade secrets.                 13:36:14
16        MS. CHANG:  No further questions.
17        MR. LYONS:  I may have one or two follow-ups
18   maybe.
19                    FURTHER EXAMINATION
20   BY MR. LYONS:                                             13:37:07
21        Q.   When counsel was asking you some questions
22   a moment ago, she asked you, "Are you aware of the
23   use of non-attributable devices to hide Waymo trade
24   secrets?"
25             What did you understand the term                13:37:17
```

```
 1         FEDERAL CERTIFICATE OF DEPOSITION OFFICER
 2
           I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby
 3    declare:
 4         That, prior to being examined, the witness
      named in the foregoing deposition was by me duly
 5    sworn pursuant to Section 30(f)(1) of the Federal
      Rules of Civil Procedure and the deposition is a
 6    true record of the testimony given by the witness;
 7         That said deposition was taken down by me in
      shorthand at the time and place therein named and
 8    thereafter reduced to text under my direction;
 9         --X---    That the witness was requested to
      review the transcript and make any changes to the
10    transcript as a result of that review pursuant to
      Section 30(e) of the Federal Rules of Civil
11    Procedure;
12         -----     No changes have been provided by the
13    witness during the period allowed;
           -----     The changes made by the witness are
14    appended to the transcript;
15         -----     No request was made that the
      transcript be reviewed pursuant to Section 30(e) of
16    the Federal Rules of Civil Procedure.
17         I further declare that I have no interest in
18    the event of the action.
           I declare under penalty of perjury under the
19    laws of the United States of America that the
20    foregoing is true and correct.
           WITNESS my hand this 26th day of December,
21    2017.
22
23
24           [signature: Anrae Wimberley]
25         ANRAE WIMBERLEY, CSR NO. 7778
```

Page 145