# EXHIBIT 27

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

WAYMO LLC,

        Plaintiff,

vs.                         Case No. 3:17-cv-00939-WHA

UBER TECHNOLOGIES, INC.;
OTTOMOTTO LLC; OTTO TRUCKING LLC,
        Defendants.
_____/

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF SALLE YOO

VOLUME II

THURSDAY, DECEMBER 14, 2017

Reported by:

Anrae Wimberley

CSR No. 7778

Job No. 2771310

Pages 163 - 495

Page 191

```
1         MR. VERHOEVEN:  Okay.                              09:30:03
2         MR. BRILLE:  So --
3    BY MR. VERHOEVEN:
4         Q.   What fact --
5         MR. BRILLE:  Sorry.                                09:30:04
6              I don't formulate the questions, so if
7    you'd like me to take a second and figure out if she
8    can answer it, we're happy to do that so that we can
9    allow this to proceed.
10   BY MR. VERHOEVEN:                                       09:30:14
11        Q.   Ms. Yoo, what facts are you aware of
12   relating to API scraping going on within Uber prior
13   to April of 2017?  I'm not asking for requests for
14   legal advice or legal advice provided.  I'm only
15   asking for what factual information you're aware of    09:30:28
16   going on at the company.
17        MR. BRILLE:  Give you the same instruction.
18        THE WITNESS:  The information that I received
19   would have been from counsel based on their
20   investigation.                                         09:30:46
21   BY MR. VERHOEVEN:
22        Q.   Again, just for the record, you're talking
23   about factual information about what was going on at
24   Uber; correct?
25        A.   Correct.                                     09:30:56
```

```
                                                              Page 195
 1    not to answer that question?                             09:33:51
 2         MR. BRILLE:  Let's have the question back.
 3         THE WITNESS:  Yes.  Can your read the question
 4    back?
 5         MR. BRILLE:  Let's hear the question back.          09:33:53
 6         MR. VERHOEVEN:  I only have two more questions
 7    if I can get answers . . .
 8         MR. BRILLE:  Let's hear the question.
 9              (Discussion off the record.)
10              (Record read by reporter as follows:           09:34:21
11              "Question:  And what if the e-mail asks
12              for legal advice that characterizes the
13              document?  Do you think that turns the
14              document into something that's
15              privileged?")                                  09:34:21
16         THE WITNESS:  So the practice and policies at
17    Uber were to make sure that teams were informed that
18    simply putting "Attorney-client privilege" on a
19    document did not render it privileged.  That
20    privilege attaches when legal advice is sought from     09:34:48
21    a lawyer.
22              And our practice was that teams were
23    taught that adding a lawyer to a thread and
24    saying -- adding Salle for privilege did not render
25    that communication or that document privileged.         09:35:08
```

```
                                                          Page 196
1              As you know, privilege in litigation is an      09:35:13
2     issue that is determined by outside counsel in
3     looking at every document to determine whether or
4     not privilege would attach.  And that is my belief,
5     my understanding, and that was my practice at Uber.     09:35:27
6     BY MR. VERHOEVEN:
7         Q.   Last question on this subject.
8              Suppose there's -- there's an e-mail to a
9     lawyer that recites factual information, like a
10    witness -- what a witness interview says -- what the    09:35:46
11    witness said about facts or some other factual
12    information and then, in another part of the e-mail,
13    asks for legal advice.
14             Is it your understanding that the
15    non-legal portion of that, that talks about facts,      09:36:01
16    is not privileged?
17        MR. BRILLE:   I'm going to object to the form.
18        THE WITNESS:  So I just want to make sure I
19    understand your question.
20    BY MR. VERHOEVEN:                                       09:36:19
21        Q.   Okay.
22        A.   So someone sends you an e-mail, Charlie,
23    and they recite --
24        Q.   You're going to put it on me.
25        A.   You're a lawyer, just like I am.               09:36:30
```

```
 1        Q.   Let's do 2013 to April 2017.                      09:50:08
 2        A.   I'm not aware of scraping happening in
 3   2013.  As I mentioned, in 2014 I received a request
 4   and -- for legal advice.  And then Katherine Tassi
 5   joined in August of 2014.  And when she joined, she  09:50:28
 6   took over giving advice on issues related to her
 7   area of expertise.
 8        Q.   So prior to her joining, you're not aware
 9   that anyone had that responsibility?
10        A.   Prior to her joining, it would have been   09:50:41
11   the entire legal department.  And as I've said, I
12   did receive a question about that in 2014.
13        Q.   Prior to April of 2017, are you aware of
14   any instance in which anyone at Uber hacked a
15   competitor's private information?                    09:51:02
16        A.   I am --
17        THE WITNESS:  Go ahead.
18        MR. BRILLE:  I'm going to issue the same
19   instruction.  To the extent that this was
20   information provided to you in the context of       09:51:21
21   seeking legal advice as counsel for Uber, I would
22   instruct you not to divulge the content of that
23   information.
24        THE WITNESS:  I was not aware of any instance
25   where Uber hacked.                                   09:51:31
```

```
                                                            Page 210
 1    BY MR. VERHOEVEN:                                       09:51:40
 2         Q.   Were you aware prior to April of 2017 of
 3    any instance in which Uber or anyone within Uber
 4    made tape recordings of conversations with people or
 5    tapped their phones, period?                            09:51:53
 6         MR. BRILLE:  I'm going to issue the same
 7    instruction.
 8         THE WITNESS:  I was not aware of any such
 9    instance.
10    BY MR. VERHOEVEN:                                       09:52:12
11         Q.   Prior to April of 2017, were you aware of
12    any instance in which anyone at Uber was stamping
13    "Attorney-client privilege" on non-privileged
14    documents for the purpose of shielding those
15    documents under the privilege designation?              09:52:30
16         A.   So --
17         MR. BRILLE:  Same instruction.
18         THE WITNESS:  -- just to be clear, there's no
19    such thing as stamping.  I think what you mean is
20    writing --                                              09:52:42
21    BY MR. VERHOEVEN:
22         Q.   Okay.
23         A.   -- "Attorney-client privilege" on an
24    e-mail.
25              And as I've answered before, the practice    09:52:47
```

```
                                                        Page 218
 1         THE WITNESS:  As I said, I believed that this      10:01:38
 2   was a carryover.
 3         MR. VERHOEVEN:  Move to object, nonresponsive.
 4   BY MR. VERHOEVEN:
 5         Q.   So you won't answer the question if you       10:01:46
 6   believed it's a practice or not?
 7         MR. BRILLE:  Objection.
 8             She answered the question.
 9         THE WITNESS:  So if by "practice" you mean did
10   I see it happening over and over again?                  10:01:57
11   BY MR. VERHOEVEN:
12         Q.   Sure.
13         A.   I did.  If by "practice" you mean was it a
14   formal policy and something everyone was asked to
15   do, as I said, I'm not aware of that.                    10:02:08
16         Q.   Prior to April of 2017, did you have any
17   factual information that individuals within the
18   ThreatOps groups -- group was advising your
19   employees to use the attorney-client privilege
20   designation as a way to avoid discovery?                 10:02:33
21         A.   No.
22         Q.   When was the first time you heard that
23   allegation?
24         A.   I read it in the letter from Ric Jacobs.
25         Q.   In the May letter, May 5th letter?            10:02:48
```

Page 222

1    secrets to Uber.  So to the extent that your                10:06:29
2    question is was I aware of confidential information,
3    in general, as you said, prior to April 2017, yes,
4    because my team was part of the team working with
5    outside counsel to ensure that trade secrets did not         10:06:47
6    come to Uber.
7    BY MR. VERHOEVEN:
8         Q.   Previously when you were asked about that
9    subject matter, you were instructed not to answer.
10        MR. BRILLE:  And she will be again.                     10:06:57
11        MR. VERHOEVEN:  That's what -- I'm trying to
12   set the foundation, Counsel, so we don't waste time.
13        MR. VERHOEVEN:  So if I go into any substance
14   of that due diligence process, counsel is going to
15   instruct not to answer?                                      10:07:08
16        MR. BRILLE:  Depends on the question, Charlie.
17   But we're going to maintain consistent
18   instructions from --
19        MR. VERHOEVEN:  Along the lines of the --
20        MR. BRILLE:  I think that's correct, yes.               10:07:17
21   BY MR. VERHOEVEN:
22        Q.   Prior to February of 2017, were you aware
23   of anyone within Uber using an ephemeral device to
24   communicate about Waymo?
25        A.   No.                                                10:07:28

Page 226

| | | |
|---|---|---|
| 1 | A. There were some employment-related actions | 10:11:30 |
| 2 | that were to be taken. And we were conversing about | |
| 3 | timing-related issues. I don't remember the | |
| 4 | specifics, but it was related to when certain | |
| 5 | actions could take place. | 10:11:47 |
| 6 | Q. Which employment individuals were | |
| 7 | involved? | |
| 8 | A. It was related to employment actions | |
| 9 | coming out -- it was related to ▮▮▮▮▮▮▮▮. | |
| 10 | Q. Anyone else? | 10:12:13 |
| 11 | A. No. | |
| 12 | Q. Did you ever use Wickr? | |
| 13 | A. No. | |
| 14 | Q. Were you aware prior to April of 2017 of | |
| 15 | anyone within the ThreatOps group using | 10:12:33 |
| 16 | non-attributable devices? | |
| 17 | A. No. | |
| 18 | Q. What about within the entire company? | |
| 19 | Were you aware within the entire company of anyone | |
| 20 | using non-attributable devices prior to April 2017? | 10:12:45 |
| 21 | A. No. | |
| 22 | Q. Were you aware of anyone within Uber prior | |
| 23 | to 2017 -- start over. | |
| 24 | Prior to April 2017, were you aware of | |
| 25 | anyone within Uber who had a communication system | 10:13:00 |

```
                                                              Page 227
1    that would not be -- would not pass through Uber's        10:13:05
2    server system?
3         MR. BRILLE:  Objection to form.
4         THE WITNESS:  No.
5    BY MR. VERHOEVEN:                                         10:13:20
6         Q.   Did Uber have any policy prior to April of
7    2017 with respect to non-attributable devices?
8         A.   I don't recall any policy, but our general
9    policy was that Uber business needed to be conducted
10   on Uber e-mail and within the Uber ecosystem.             10:13:36
11        Q.   There was a change in policy in 2017; is
12   that right?
13        A.   In which policy?
14        MR. BRILLE:  In which policy?
15   BY MR. VERHOEVEN:                                         10:13:47
16        Q.   The policy you're talking about with
17   respect to communications and what they need to be
18   on and not on.
19        A.   There was a change in the chat policy.
20             Is that what you're talking about?              10:13:56
21        Q.   Sure.
22             When was that?
23        A.   There were many changes to the chat policy
24   as chat evolved.  And the latest change to the chat
25   policy was in September of 2017.                          10:14:08
```

1    anything with the May 5th letter after, say, May 20?                11:01:58
2        A.   As I said, Ms. Padilla was responsible for
3    the -- for resolution of the wrongful termination
4    claim.  And so Ms. Padilla would have and did
5    continue that work.                                                 11:02:22
6        Q.   Okay.  You understood, when you read the
7    May 5th demand letter, that the allegations with
8    respect to Waymo's trade secrets that are contained
9    in that letter were material to the Waymo/Uber
10   litigation, didn't you?                                             11:03:02
11       MR. BRILLE:  I'm going to instruct the witness
12   not to answer the question because you're asking her
13   about her mental impressions.  If you'd like to ask
14   a different question, fine, but the instruction
15   stands.                                                             11:03:17
16       MR. VERHOEVEN:  Okay.  Did you attend the
17   evidentiary hearing?
18       MR. BRILLE:  I was there.
19       MR. VERHOEVEN:  Because if raise this with
20   Judge Alsup, he's going to make her answer.                         11:03:26
21       MR. BRILLE:  You are asking a lawyer about her
22   mental impressions regarding the Waymo litigation.
23       MR. VERHOEVEN:  You're instructing her not to
24   answer that question?
25       MR. BRILLE:  Correct.                                           11:03:35

Page 289

```
 1   BY MR. VERHOEVEN:                                          11:51:50
 2        Q.   And it was very important to Uber and the
 3   SMC that the investigation be independent; right?
 4        A.   That is correct.
 5        Q.   So I have a question why Mr. Sullivan is         11:52:02
 6   being sent this resignation letter since he clearly
 7   isn't independent?
 8        MR. BRILLE:  Object to form.
 9        THE WITNESS:  So I'm not certain why Joe
10   Sullivan received this letter or -- the resignation        11:52:23
11   letter.  So I'm not certain.
12   BY MR. VERHOEVEN:
13        Q.   Do you recall thinking, hey, the people at
14   security shouldn't be handling this?
15        MR. BRILLE:  I'll instruct the witness not to         11:52:42
16   answer.
17             The question calls for her to reveal her
18   mental impressions.
19        THE WITNESS:  I'm sorry.  I was instructed not
20   to answer.                                                 11:53:21
21   BY MR. VERHOEVEN:
22        Q.   So you're not answering that?
23        A.   I'm not answering on the instruction of
24   counsel.
25        Q.   Was there any discussion to the effect           11:53:26
```

```
                                                          Page 346
 1        A.   I did.                                    14:02:26
 2        Q.   So you read this statement that I read
 3   into the record; right?
 4        A.   I did.
 5   ███ ████████████████████████████████████ ███
██ ████████████████████████████████
 7        MR. BRILLE:  Objection.
 8             Instruct the witness not to answer.
 9             Calls for her mental impression.
10   BY MR. VERHOEVEN:                                   14:02:45
11   ███ ██████████████████████████████
██ ██████████████████████████████████
██ ████████████████████████████
██ ██████████████████████████████
██ ███ ██████████████████████████████ ███
██ ████████████████████████████████████
██ ██████████████████████
██ ███ ██████████████████████████████████
██ ████████████████████████████████████████
██ ██████████████████████████████████ ███
██ ████████████████████████████████████████
██ ████████████████████████████
██ ███ ██████
██ ███ ████████████████████████████████
██ ██████████████████████████████████████ ███
```

Page 354

1    BY MR. VERHOEVEN:                                               14:13:32
2        Q.   My only question here I'm trying to get at
3    is, were you concerned when you read this?
4        MR. BRILLE:   I'm going to object and instruct
5    the witness not to answer to the extent it would               14:13:37
6    call for her to divulge her mental impressions about
7    this.
8    BY MR. VERHOEVEN:
9        Q.   From a political standpoint, from a unity
10   of organizational standpoint, was there a concern              14:13:48
11   that you had?
12       MR. BRILLE:   Same instruction.
13       THE WITNESS:   From a political standpoint, no.
14   BY MR. VERHOEVEN:
15       Q.   What about -- I assume that part of your              14:13:58
16   job was to try and make sure that everyone worked
17   together well; right?
18       A.   My job was to ensure that the company
19   received accurate legal advice regardless of how
20   people felt about it.                                          14:14:13
21       Q.   Okay.  And you didn't coordinate at all
22   with Mr. Sullivan; is that right?
23       MR. BRILLE:   Object to form.
24       THE WITNESS:   I'm sorry.  I don't understand
25   the question.                                                  14:14:20

```
                                                             Page 386
 1    BY MR. VERHOEVEN:                                     14:54:15
 2        Q.   Well, that's what you wanted, right, was
 3    to make sure he cooperated with Uber?
 4        A.   On a very high level, that was the intent,
 5    but I don't know what was specifically behind those   14:54:25
 6    provisions.
 7        Q.   And you didn't want him to talk to anybody
 8    besides you about his allegations.
 9        MR. BRILLE:  Objection.
10        THE WITNESS:  That is not true.  That is not      14:54:34
11    what I said.  We wanted to ensure that he cooperated
12    fully not only with the internal investigation, but
13    any government investigation that would require his
14    testimony.  We wanted him to cooperate.
15    BY MR. VERHOEVEN:                                     14:54:47
16        Q.   Well, you had him sign a strict
17    confidentiality provision; right?
18        MR. BRILLE:  Object to the form.
19        THE WITNESS:  My recollection is that that
20    confidentiality provision -- and all of these         14:54:58
21    documents, none of them prohibited -- in fact, I
22    think they required him to participate in any
23    government investigation.
24    BY MR. VERHOEVEN:
25        Q.   That said, you made him sign a               14:55:09
```

```
                                                              Page 391
 1          A.   Yes.                                         15:20:53
 2          Q.   If you look below, there's -- she's
 3    forwarding an e-mail.  And this is from Jared Lenow
 4    from the Department of Justice to Randall Lee at
 5    Wilmer and some other folks.                            15:21:11
 6               Do you see that?
 7          A.   Yes.
 8          Q.   And Mr. Lenow says, "When we spoke earlier
 9    this month, we understood that Wilmer was about to
10    present its findings to the special matters             15:21:28
11    committee and that the findings would then be shared
12    with the government."
13               Do you see that?
14          A.   Yes.
15          Q.   Did Wilmer -- withdrawn.                     15:21:41
16               Has Wilmer presented its findings to the
17    special matters committee?
18          A.   I don't know for sure.
19          Q.   Do you believe they have?
20          A.   I believe that they have shared some         15:21:53
21    findings.  I don't know that they have shared their
22    complete findings on their investigation.  I'm not
23    privy to that.
24          Q.   And were you at a board meeting where any
25    findings were discussed?                                15:22:12
```

Page 392

```
 1        A.   My understanding is that whatever --         15:22:13
 2        MR. BRILLE:  I think he's just asking -- he
 3   just said were you at a board meeting where the
 4   findings were discussed.  That's the basic question.
 5        THE WITNESS:  The answer is no.                   15:22:24
 6   BY MR. VERHOEVEN:
 7        Q.   Okay.  But your understanding is that some
 8   of the findings have already been presented to the
 9   special matters committee?
10        A.   Yes.                                         15:22:39
11        Q.   What were those findings?
12        A.   I don't know what the findings were.
13        Q.   Do you know generally?
14        A.   I know --
15        MR. BRILLE:  I'm not --                           15:22:55
16        THE WITNESS:  So do I know generally?  No.
17   BY MR. VERHOEVEN:
18        Q.   Do you know if the findings were good or
19   bad for Uber?
20        MR. BRILLE:  Objection.                           15:23:04
21             Instruct the witness not to answer.
22   BY MR. VERHOEVEN:
23        Q.   The letter continues, "We wanted to follow
24   up on this and express our hope to be briefed on the
25   findings of the investigation as soon as possible,     15:23:14
```

```
                                                           Page 412
 1       A.   I'm not sure.                                15:50:06
 2       Q.   You're aware of one hold?
 3       A.   I'm aware of at least one.
 4       Q.   Does Uber's litigation hold include
 5   language regarding ephemeral chat platforms?          15:50:14
 6       A.   As I sit here, I don't know.
 7       Q.   Are you aware of any language in the hold
 8   document that concerns ephemeral messaging systems?
 9       A.   I don't know.  But the policy of the
10   company was that if you were on hold, that you did   15:50:34
11   not talk about those topics on any sort of chat app.
12       MR. VERHOEVEN:  I'll move to strike as
13   nonresponsive everything after "I don't know."
14   BY MR. VERHOEVEN:
15       Q.   When did the Uber litigation hold go into   15:50:57
16   effect with respect to this lawsuit?
17       A.   I don't have the exact date, but it would
18   be shortly after the lawsuit was filed and we
19   received notice of it.
20       Q.   In February, March, April?                  15:51:10
21       A.   No, I don't think it was April.  I would
22   think it was either in February or early March,
23   depending on when it was implemented.
24       Q.   Did Uber implement a litigation hold in
25   connection with the Stroz investigation?             15:51:21
```

```
 1        FEDERAL CERTIFICATE OF DEPOSITION OFFICER
 2        I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby
    declare:
 3        That, prior to being examined, the witness
    named in the foregoing deposition was by me duly
 4  sworn pursuant to Section 30(f)(1) of the Federal
    Rules of Civil Procedure and the deposition is a
 5  true record of the testimony given by the witness;
 6        That said deposition was taken down by me in
    shorthand at the time and place therein named and
 7  thereafter reduced to text under my direction;
 8        --X---   That the witness was requested to
    review the transcript and make any changes to the
 9  transcript as a result of that review pursuant to
    Section 30(e) of the Federal Rules of Civil
10  Procedure;
11        -----   No changes have been provided by the
    witness during the period allowed;
12        -----   The changes made by the witness are
13  appended to the transcript;
14        -----   No request was made that the
    transcript be reviewed pursuant to Section 30(e) of
15  the Federal Rules of Civil Procedure.
16        I further declare that I have no interest in
    the event of the action.
17        I declare under penalty of perjury under the
18  laws of the United States of America that the
    foregoing is true and correct.
19        WITNESS my hand this 15th day of December,
20  2017.
21
22
23
24                  [signature: Anrae Wimberley]
25        ANRAE WIMBERLEY, CSR NO. 7778
```

Page 495