# EXHIBIT 2

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Case No. 3:17-cv-00939-WHA


WAYMO LLC,

                    Plaintiff,

vs.

UBER TECHNOLOGIES, INC.; OTTOMOTTO

LLC; OTTO TRUCKING LLC,

                    Defendants.

_____/


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEOTAPED DEPOSITION OF CRAIG CLARK

FRIDAY, DECEMBER 22, 2017




Reported by:

Kelli Ann Willis, RPR, CRR

JOB No. 2780742


PAGES 1 - 387

Page 46

```
 1   person's name, I would know her.  Julie, I want to      10:00:15
 2   say.  I know -- yeah, beyond that, I would be           10:00:20
 3   guessing.                                               10:00:31
 4        Q.   Did you have any interaction with the ATG     10:00:32
 5   group while you were at Uber?                           10:00:34
 6             MR. STUMPHAUZER:  Object to form.             10:00:38
 7             THE WITNESS:  So, interaction, I've seen      10:00:39
 8        presentations.  I've -- I've worked with -- I      10:00:43
 9        worked with people in ATG on -- what have I        10:00:48
10        worked with ATG on?  There was -- there was        10:00:56
11        some penetration testing that was done             10:01:00
12        vis-a-vis the -- kind of their -- like,            10:01:02
13        facilities.                                        10:01:05
14             There was an encampment of homeless people    10:01:07
15        near Harrison Street that was camped out in        10:01:13
16        their -- in the area, and I was -- and they        10:01:15
17        solicited some advice from me.                     10:01:19
18   BY MS. TARAZI:                                          10:01:22
19        Q.   You said that you have seen presentations     10:01:22
20   made by ATG; is that correct?  Did I recall that        10:01:32
21   correctly?                                              10:01:35
22        A.   Yes.                                          10:01:35
23        Q.   Have you ever given presentations to the      10:01:36
24   ATG group?                                              10:01:37
25        A.   No.                                           10:01:38
```

Page 132

1    at the meeting, or small kind of admin something.  I        12:08:57

2    don't require -- I don't recall -- I don't recall          12:09:01

3    using that, like, being a power user.                      12:09:06

4         Q.   What were the default retention settings         12:09:10

5    at UChat?                                                  12:09:14

6         A.   I don't know.  I think at one point it           12:09:15

7    was -- I think it varied.  I think UChat was --            12:09:16

8    you'd have to talk to the Uber company person.             12:09:22

9         Q.   Did you use HipChat?                             12:09:27

10        A.   I did.                                           12:09:28

11        Q.   What did you use HipChat for?                    12:09:29

12        A.   The same way I used UChat: infrequently.         12:09:31

13   It's a terrible product.  Horribly insecure.              12:09:34

14        Q.   "Horribly insecure," what does that mean?        12:09:38

15        A.   It means that the communication platform         12:09:41

16   itself is not secure.  It's been hacked multiple          12:09:43

17   times.                                                    12:09:46

18        Q.   Is UChat secure?                                 12:09:48

19        A.   I don't know.  I'm not a security -- I'm         12:09:51

20   not a security expert, but I'm not aware of               12:09:54

21   compromises of UChat.                                     12:09:57

22        Q.   Have you used Wickr?                             12:09:59

23        A.   Yes.                                            12:10:00

24        Q.   And what did you use Wickr for?                  12:10:01

25        A.   I used Wickr for everything from                 12:10:03

Page 139

1       Q.    How many such discussions?                    12:16:26

2       A.    I don't know.  Twenty.                         12:16:28

3       Q.    And what instructions did you give            12:16:29

4    employees regarding when to use a particular           12:16:31

5    communications platform as opposed to another          12:16:34

6    communications platform?                               12:16:36

7       A.    If you are -- if you are on legal hold,        12:16:37

8    you can't use ephemeral communications.                12:16:40

9       Q.    Is that the only instruction that you ever    12:16:44

10   provided to Uber employees regarding the use of        12:16:46

11   ephemeral communications?                              12:16:52

12      A.    I don't know.  To the best of the              12:16:59

13   recollection, that's the one that sticks out I would   12:17:04

14   tell people.                                           12:17:06

15      Q.    Did you ever instruct employees to use        12:17:09

16   ephemeral communications platforms in order to avoid   12:17:12

17   the retention of such communications?                  12:17:16

18      A.    Absolutely not.                                12:17:18

19      Q.    I think I asked you about the retention --    12:17:38

20   the default retention of UChat, and I think you said   12:17:44

21   you don't know what the default retention period       12:17:47

22   was; is that correct?                                  12:17:50

23      A.    I don't know for sure.  It has changed,        12:17:52

24   but I think at one point it was maybe seven days.      12:17:54

25   But I'm not -- but I'm not certain.                     12:17:59

Page 145

```
 1   be done through technical investigation, but then,        12:24:19
 2   ultimately, you need to sit down with the person and      12:24:21
 3   talk.  Oftentimes, it's, like, No, I did have a           12:24:23
 4   legitimate reason for looking at this.                    12:24:26
 5           So, that's why I would use Oscar.                 12:24:28
 6       Q.   Did you use Oscar for any other                  12:24:33
 7   investigations?                                           12:24:35
 8       A.   Not that I recall.                               12:24:36
 9       Q.   Did you use Oscar for any investigations         12:24:36
10   into Google or Waymo?                                     12:24:39
11       A.   No.                                              12:24:41
12       Q.   Did you communicate with Oscar using            12:24:45
13   Wickr?                                                    12:24:48
14       A.   I did.                                           12:24:49
15       Q.   Why did you communicate with Oscar using       12:24:50
16   Wickr?                                                    12:24:51
17       A.   It's a great secure communication              12:24:51
18   platform.                                                 12:24:54
19       Q.   What does "secure" mean?                         12:25:06
20       A.   Secure means end-to-end encrypted, and         12:25:08
21   it's ephemeral.  The best -- the best -- the most         12:25:12
22   secure way to store something is to not have it.          12:25:18
23       Q.   Did you use Oscar and TAL Global -- did         12:25:23
24   you communicate with Oscar and TAL Global via Wickr       12:25:27
25   to avoid your discussions being discovered by             12:25:35
```

Page 146

```
 1   government investigators or parties to this          12:25:38
 2   litigation?                                          12:25:40
 3       A.   No.                                         12:25:40
 4       Q.   You were starting to say something there?   12:25:42
 5       A.   No, because I saw where you were going.     12:25:43
 6   It's just -- let's continue.                         12:25:45
 7       Q.   Do you find the question offensive?         12:25:57
 8       A.   I do.                                       12:25:59
 9       Q.   Why is that?                                12:25:59
10       A.   Because it's accusing me of -- I find it    12:26:00
11   accusatory.                                          12:26:03
12       Q.   I'm handing you a document that we will      12:26:09
13   mark as Exhibit 9704.                                12:26:12
14            (The referred-to document was marked by     12:26:24
15       the court reporter for Identification as         12:26:24
16       Deposition Exhibit 9704.)                        12:26:24
17   BY MS. TARAZI:                                       12:26:24
18       Q.   When you find it accusatory, what do you    12:26:26
19   mean by that?                                        12:26:28
20       A.   The question felt accusatory.               12:26:30
21       Q.   Who is ███████████?                         12:26:47
22       A.   Can I have a minute with the document?      12:26:50
23       Q.   Sure.                                       12:26:52
24       A.   ████████, I don't know if he's a           12:27:37
25   principal or employee of ██████.                     12:27:41
```

Page 199

```
 1        A.   I have.                                    02:29:19

 2        Q.   When did you instruct employees at Uber to 02:29:19

 3   designate documents attorney-client privileged?      02:29:23

 4        A.   When they were seeking legal advice.       02:29:26

 5        Q.   Is that --                                 02:29:31

 6        A.   And even if the specter of legal advice is 02:29:32

 7   there, all right?  So -- so, if I'm communicating -- 02:29:36

 8   so this label thing is very interesting to me.       02:29:40

 9             In that time, the way I see it, a label is 02:29:44

10   a tag, right?  So, ultimately, privileged            02:29:46

11   determinations are made by judges.  And they are     02:29:49

12   made by judges based on advocacy by the parties'     02:29:51

13   clients who are making decisions when they are       02:29:55

14   producing documents about what they think is         02:29:57

15   privileged or not privileged.                        02:29:59

16             Whether something has a tag on it really   02:30:01

17   facilitates review:  Hey, heads up, document         02:30:04

18   reviewers, this might be privileged.                 02:30:08

19             So, I see where you're going with this     02:30:10

20   line, Counselor, and maybe I can short-circuit it    02:30:15

21   with that.  Let's move on to your next question.     02:30:17

22        Q.   Did you provide an instruction to anyone   02:30:24

23   at Uber to mark documents as attorney-client         02:30:27

24   privileged when you believed the documents were not  02:30:30

25   privileged?                                          02:30:35
```

Page 202

```
 1        all I'm asking.                              02:32:51
 2            MS. GOODMAN:  Was it Uber's policy to tell  02:32:52
 3        people to mark documents "attorney-client    02:32:55
 4        privileged" if they were not privileged?     02:32:57
 5            You can answer that question.            02:33:01
 6            THE WITNESS:  No.                        02:33:06
 7    BY MS. TARAZI:                                   02:33:07
 8        Q.   Did you ever tell people to mark documents  02:33:07
 9    as "attorney-client privileged" when they were not  02:33:09
10    privileged?                                      02:33:12
11            MR. STUMPHAUZER:  The same issue.        02:33:13
12            MS. GOODMAN:  You can answer that        02:33:15
13        question.                                    02:33:15
14            THE WITNESS:  I'm sorry, you said I can  02:33:16
15        answer that question?                        02:33:18
16            MS. GOODMAN:  Did you ever tell people, as  02:33:19
17        a matter of policy, to mark documents as     02:33:21
18        "attorney-client privileged" when they were not  02:33:23
19        privileged?                                  02:33:25
20            THE WITNESS:  You're saying I can answer  02:33:25
21        that question?                               02:33:32
22            No.                                      02:33:33
23            MS. GOODMAN:  If you want to find out what  02:33:40
24        he did, in fact, tell people, show him law dog  02:33:41
25        presentation that he's referenced multiple   02:33:46
```

Page 203

```
 1        times now.                                    02:33:49

 2            MS. TARAZI:  We'll come to that.          02:33:49

 3   BY MS. TARAZI:                                     02:34:00

 4        Q.  Well, the law dog presentation, was that 02:34:01

 5   the only presentation provided by Uber lawyers     02:34:02

 6   regarding the topic of when to designate documents 02:34:08

 7   "attorney-client privileged"?                      02:34:12

 8            MS. GOODMAN:  Object to form.             02:34:13

 9            THE WITNESS:  I don't purport to have     02:34:16

10        knowledge of all of the presentations that   02:34:18

11        legal has given to everybody.  I also don't  02:34:19

12        characterize what that presentation does.    02:34:23

13   BY MS. TARAZI:                                     02:34:33

14        Q.  Did you attend a meeting in Pittsburgh,  02:34:33

15   Pennsylvania, relating to the use of the           02:34:35

16   attorney-client privilege or dropped designations? 02:34:37

17        A.  I've never been to Pittsburgh.           02:34:42

18        Q.  So that's a no?                          02:34:44

19            MS. TARAZI:  The court reporter is going  02:35:18

20        to hand you a document marked Exhibit 9709.  02:35:25

21            (The referred-to document was marked by  02:35:32

22        the court reporter for Identification as      02:35:32

23        Deposition Exhibit 9709.)                    02:35:32

24   BY MS. TARAZI:                                     02:35:44

25        Q.  Mr. Clark, is that the law dog           02:35:44
```

Page 205

```
 1          MS. GOODMAN:  To be clear, meta data may        02:37:21
 2      be associated with these documents.  You may        02:37:22
 3      just not have it at your fingertips.                02:37:25
 4          MS. TARAZI:  The question was, do you have      02:37:27
 5      it, and I said I do not.                            02:37:29
 6  BY MS. TARAZI:                                          02:37:32
 7      Q.   Did you create a version of this document      02:37:32
 8  that did not have the Uber logo on it?                  02:37:34
 9      A.   No.                                            02:37:37
10      Q.   Did you ever give a presentation using a       02:37:37
11  deck similar to this that did not have the Uber logo    02:37:43
12  on it?                                                  02:37:47
13      A.   No.  This page -- this first page is           02:37:47
14  always the same with the exception of dates.  Some      02:37:50
15  of them may have been dated different, but... so, I     02:37:53
16  wouldn't always catch the date.  But every version      02:37:57
17  of this presentation had the same slide.  This is       02:37:59
18  the Uber slide of a woman walking on a sidewalk in      02:38:05
19  San Francisco, and it is notable because we often       02:38:11
20  joke about where she's going and what she's doing.      02:38:15
21      Q.   How many times did you give a presentation     02:38:32
22  using this document?                                    02:38:33
23      A.   Using this specific deck?  I don't know.       02:38:35
24      Q.   How many times did you give a presentation     02:38:39
25  using a version of this deck?                           02:38:40
```

```
 1    presentations, do you just recall discussing the      02:46:35

 2    need for or the desire to provide this presentation    02:46:38

 3    with anyone other than Mat Henley?                     02:46:42

 4         A.   I'm sorry?                                   02:46:44

 5         Q.   Do you recall discussing this presentation   02:46:44

 6    with anyone other than Mat Henley?                     02:46:46

 7         A.   Yes.  I discussed it with many people.       02:46:49

 8         Q.   What did you discuss about the               02:46:50

 9    presentation?                                          02:46:52

10         A.   Like use it.  Other people in legal wanted   02:46:52

11    it.  I was -- when I was putting it together, I was    02:46:55

12    asking around if anybody had created decks about       02:46:59

13    privilege, and people saying, Yeah, it's a great       02:47:02

14    idea, you should do it.                                02:47:05

15              So, several people in litigation.  I         02:47:06

16    talked to Sullivan about it, perhaps.  Yeah, a lot     02:47:10

17    of people I talked to about the presentation.          02:47:17

18         Q.   What did you talk to Sullivan about it?      02:47:19

19         A.   I said I'm going to give a presentation.     02:47:21

20         Q.   Did you tell him what the presentation was   02:47:28

21    about?                                                 02:47:30

22         A.   Yeah.  I'm going give a legal overview.      02:47:31

23         Q.   Did you tell him any more than that?         02:47:33

24         A.   I don't recall.                              02:47:35

25         Q.   How much do you recall about what you told   02:47:39
```

Page 214

```
 1    people as you showed each slide?                  02:47:42
 2        A.   Oh, quite a bit, probably.               02:47:44
 3        Q.   Why did you use dogs?                     02:47:46
 4        A.   I love dogs.  Do you not like dogs,       02:47:48
 5    Counsel?                                           02:47:50
 6        Q.   It's not my deposition.                   02:47:52
 7        A.   Okay.                                      02:47:53
 8        Q.   What -- let's turn to the fourth page.   02:47:56
 9    It's marked 340308.                                02:48:06
10        A.   340308?                                   02:48:11
11        Q.   Yes.                                       02:48:15
12        A.   Yes, I see it.                            02:48:15
13        Q.   You put:  "Law! Equals Science"?  What is 02:48:16
14    that?                                              02:48:20
15        A.   Actually, it says:  Law, Bang, Equals    02:48:21
16    Equal Science."  That's Javascript for:  Law does 02:48:23
17    not equal science.                                 02:48:27
18        Q.   I learned something.                      02:48:28
19        A.   I'm presenting this --                    02:48:28
20        Q.   Exclamation point equal equal is the     02:48:33
21    "not," Javascript for --                           02:48:35
22        A.   Java script, does not equal.  Bang.  The 02:48:37
23    programmers use bang for their exclamation point.  02:48:41
24    "Bang equal equal" means "does not equal" in       02:48:45
25    Javascript.                                         02:48:49
```

Page 215

```
 1              You've got to understand, I'm dealing with    02:48:50
 2    a lot of technical people, coders and things like      02:48:51
 3    this.  Another way I'm able to get rapport and work    02:48:55
 4    with these people, have them come to me, is to try     02:48:58
 5    to speak their language.  They would typically laugh   02:49:00
 6    at me when they see that.  They'd go:  Look at the     02:49:01
 7    Javascript, the old guy trying to -- the old boy       02:49:02
 8    trying to use Java script.                             02:49:06
 9         Q.   And I clearly didn't understand it.  I       02:49:06
10    definitely do not speak Javascript.                    02:49:14
11              What did you mean by law "does not equal      02:49:15
12    science"?                                              02:49:16
13         A.   So, again, I'm dealing with very technical   02:49:17
14    people who are -- they -- they probably think in       02:49:20
15    math and in equations, if you will.  They like         02:49:25
16    answers that are absolute.  And the law is anything    02:49:28
17    but absolute.  The law is not math.  The law is not    02:49:35
18    science.                                               02:49:40
19         Q.   If you turn to the slide marked 340311?      02:49:43
20         A.   340311.  Yes.                                02:49:51
21         Q.   It looks like a mock-up of an email with     02:49:57
22    an X over it.                                          02:50:01
23         A.   Yes.  Let me explain.  So, most of these     02:50:02
24    slides, I wouldn't say most, but many of these         02:50:05
25    slides have had animation that's not reflected in      02:50:09
```

Page 216

```
 1   the printout.                                    02:50:12

 2       Q.   Okay.                                    02:50:13

 3       A.   So, carry on.                            02:50:13

 4       Q.   What was the slide attempting to reflect?  02:50:19

 5       A.   So, I've got to back up a little bit.    02:50:23

 6            So, I've gone through -- at this point,   02:50:26

 7   I've gone through the elements of privilege, and  02:50:28

 8   then I'm giving them -- I'm showing them emails, and  02:50:31

 9   saying:  Is this -- what do you guys think?       02:50:34

10   Privileged, not privileged?                       02:50:37

11       Q.   Underneath the X, it's a little tricky to  02:50:44

12   read, but it looks like the text of the email that  02:50:49

13   you have included in the presentation says,        02:50:52

14   "Attached are the" -- do you recall what this says?  02:50:54

15       A.   No.                                       02:51:00

16       Q.   "Attached are the" -- something.  It looks  02:51:00

17   like it might be say, "numbers for last quarter."  02:51:04

18   Does that sound like it could be right?            02:51:07

19       A.   Could be.                                 02:51:11

20       Q.   "We need to discuss ASAP.  I am marking   02:51:11

21   this attorney-client privilege due to sensitivity."  02:51:15

22            Obviously, quite a number of those letters  02:51:17

23   are blacked out, but does that sound right to you?  02:51:21

24       A.   It sounds right.                          02:51:23

25       Q.   Then there's an X over that.              02:51:24
```

Page 217

1          Does that indicate that you informed the          02:51:27

2  attendees at the presentation that that email was          02:51:31

3  not privileged?                                            02:51:33

4      A.   This is an example that I used to say --          02:51:34

5  again, you have got to back up to the presentation.        02:51:36

6          So, at this point, I've kind of also              02:51:39

7  walked people through -- there's a lot of people who       02:51:41

8  aren't -- aren't Americans, either.  You've got            02:51:46

9  people from all over.  We're a very diverse group of       02:51:48

10  people.                                                   02:51:51

11          So, I've given them a slight overview, a          02:51:51

12  quick overview of what -- of the litigation system        02:51:54

13  and the idea of privilege.                                02:51:59

14          At this point, I've made -- I've already          02:52:00

15  said at least once or twice that we don't make these      02:52:02

16  determinations; judges make these determinations.         02:52:05

17          So, I'm up there.  I give them this               02:52:08

18  hypothetical.  I have them read it, and people raise      02:52:11

19  their hand.  Okay, so, based upon what you've             02:52:13

20  learned so far, who thinks it's privileged?  I get        02:52:16

21  the responses.  And then the red X comes out.  I         02:52:19

22  would make the determination that this is not             02:52:23

23  privileged.  It is not concerning legal advice and       02:52:25

24  other elements are missing from it.                       02:52:40

25      Q.   What other elements are missing from it?         02:52:42

Page 218

```
 1       A.   So, I'm not going to sit and analyze it,       02:52:45

 2   but it doesn't look like it's -- the To and the         02:52:48

 3   From, yeah.                                              02:52:52

 4       Q.   Well, I'm not asking you now, but I'm           02:52:54

 5   interested in what you told the people who attended      02:52:57

 6   the presentation as to why this would not be            02:53:00

 7   privileged.                                              02:53:02

 8       A.   We should just get on the record that Uber     02:53:03

 9   has waived privilege on this deck itself, correct?      02:53:05

10       MS. GOODMAN:  You can discuss the contents          02:53:09

11       of this deck and the presentation you gave          02:53:11

12       surrounding the deck.                                02:53:16

13       THE WITNESS:  Okay.  I'm sorry.  Can you            02:53:17

14       ask your question again?                             02:53:21

15   BY MS. TARAZI:                                           02:53:23

16       Q.   Sure.  My question was:  What did you tell     02:53:30

17   the attendees at your presentation as to why this       02:53:32

18   email was not privileged?                               02:53:39

19       A.   So I -- look, I didn't necessarily do          02:53:42

20   that.  I've already given them all the -- all the       02:53:44

21   elements.  And so, look, I don't -- when I'm            02:53:48

22   presenting, I try to be pretty dynamic.  I don't        02:53:51

23   stick to -- I want to use images because it's my        02:53:55

24   firm belief, and the best presenters that I've ever     02:53:58

25   seen don't put words on PowerPoints.  The presenter     02:54:00
```

Page 219

```
 1   presents the -- this should just be demonstrative.      02:54:03

 2           So, at this point, I've given -- I've            02:54:07

 3   gotten the poll.  I've gotten everybody's idea.  No      02:54:09

 4   red Xs; let's go to the next one.                        02:54:11

 5       Q.   So, if this is not the correct slide I          02:54:13

 6   should be asking about, why don't you direct me to       02:54:17

 7   the slide I should be asking about, so you can tell      02:54:19

 8   me what it is that you told the attendees as to when     02:54:23

 9   a document is protected by the attorney-client           02:54:25

10   privilege.                                               02:54:28

11       A.   Okay.  Back up one.  And this is                02:54:29

12   difficult -- this is difficult because the animation    02:54:32

13   is not there.                                            02:54:34

14       Q.   Okay.                                           02:54:35

15       A.   And guys on the phone, I'm really sorry         02:54:37

16   about this because you're going to have no idea what     02:54:39

17   I'm talking about.                                       02:54:41

18           So, this is the picture -- I've got to           02:54:43

19   slow down talking to you.  I'm so sorry.  I'll slow      02:54:45

20   down.                                                    02:54:48

21           Underneath there, you see two -- it looks        02:54:49

22   like tin cans, underneath the images.                    02:54:51

23       Q.   Yes, I see that.  Yes.                          02:54:55

24       A.   Do you see that?                                02:54:55

25       Q.   Uh-huh.                                         02:54:56
```

Page 220

```
 1        A.   So, that's the first image that pops up on      02:54:56
 2   the slide, and I'm walking through the elements, and      02:55:00
 3   there's a string between those two cans.                  02:55:02
 4             I say:  What does the attorney-client           02:55:04
 5   privilege cover?  It covers a communication.  It          02:55:06
 6   could be any kind of communication.  It could be a        02:55:08
 7   conversation.  It could be an email.  It can be a         02:55:11
 8   memo.  It could be a Wickr.  It could be a -- a --        02:55:14
 9   whatever it is, it just has to be a communication.        02:55:17
10             And then I say:  Next element, it has to        02:55:21
11   be between a lawyer, our little law dog main guy          02:55:23
12   pops up here, and a client.  And our little dog with      02:55:29
13   glasses over there pops up.  All right?  So then          02:55:34
14   I've got them following along.                            02:55:37
15             You can't see this really at all, but you       02:55:39
16   see it looks like there's a top of a road sign that      02:55:40
17   pops up there, and I say:  It has to be of and            02:55:43
18   concerning legal advice.                                  02:55:50
19             And the sign post is up there, and it has       02:55:51
20   help, support, advice, blah, blah, blah.  I give         02:55:54
21   some examples about it.  These other images you          02:55:59
22   cannot see here, but I think there's a dog that          02:56:02
23   looks very embarrassed like it did something wrong.      02:56:05
24   There's another one of a dog biting the finger          02:56:08
25   there.  And then there's Kujo in the cage down at        02:56:12
```

Page 221

1    the bottom there.                                          02:56:15

2          So, I'm giving them examples of what is of          02:56:15

3    and concerning legal advice.  Well, it could be           02:56:18

4    broad, it could be narrow, but it's usually               02:56:20

5    something where you're thinking, man, I've got to         02:56:22

6    talk to a lawyer.                                         02:56:24

7          There's somebody in the lobby who has               02:56:25

8    chained himself to a bench and they're protesting,        02:56:28

9    and you're calling me for -- what are we going to do      02:56:32

10   to remove them, right?  How do we engage with law         02:56:36

11   enforcement?                                              02:56:40

12         There's somebody -- somebody has --                 02:56:40

13   there's been a horrific homicide in the city that we      02:56:43

14   are operating in, and the -- and we need to -- we         02:56:49

15   need to mobilize to get information to law                02:56:53

16   enforcement.                                              02:56:56

17         There's a contract that you've worked on            02:56:57

18   that you think has maybe been breached.                   02:56:58

19         So, those are the examples that I go                02:57:02

20   through with this.                                        02:57:03

21         And then the last dog, our -- our bulldog           02:57:04

22   here pops out, and I said:  It cannot be used to          02:57:08

23   commit a crime or fraud.                                  02:57:11

24   Q.    That's the dog with the sunglasses?                 02:57:14

25   A.    Yeah, that's our gangster bulldog there.            02:57:18

Page 222

```
 1    Pretty nefarious, huh?                            02:57:21

 2         Q.   Did you provide any other guidance other  02:57:24

 3    than the guide you just described?               02:57:27

 4         A.   Yes.  I continue through the deck.     02:57:31

 5         Q.   On this slide regarding generally the  02:57:32

 6    contours of attorney-client privilege?          02:57:34

 7         A.   So, that's it in a nutshell.  Now, because 02:57:38

 8    I don't follow a book when I'm presenting these  02:57:42

 9    things, certainly there's some variance.  It would 02:57:44

10    be unlikely I used the exact same examples and   02:57:48

11    certainly not the same language each time.       02:57:51

12              MS. TARAZI:  Let's go off the record.  02:57:54

13              THE VIDEOGRAPHER:  Off the record.     02:57:57

14         2:55 p.m.  This is the end of Media Unit No. 3. 02:57:57

15              (Thereupon, a recess was taken, after  02:58:18

16         which the following proceedings were held:) 02:58:18

17              THE VIDEOGRAPHER:  We are back on the   03:03:11

18         record at 3:01 p.m.  This is the beginning of 03:03:11

19         Media Unit No. 4.                            03:03:14

20    BY MS. TARAZI:                                    03:03:16

21         Q.   Mr. Clark, did you ever instruct the   03:03:16

22    employees to be over-inclusive in their privilege 03:03:19

23    designations?                                     03:03:22

24              MS. GOODMAN:  You may answer that       03:03:26

25         question.                                    03:03:27
```

Page  223

```
 1              THE WITNESS:  No.  This is, I hope,        03:03:28
 2      demonstrating the exact opposite.  It is          03:03:36
 3      meaningless to do so.  Ultimately, an arbitrary   03:03:43
 4      of what is privileged or not privileged is a      03:03:44
 5      judge.  And the designation and the propriety     03:03:50
 6      of those designations are done by outside         03:03:54
 7      counsel, typically, who are doing productions.    03:03:56
 8  BY MS. TARAZI:                                        03:03:58
 9      Q.   Let's turn to the slide that's Bates         03:04:04
10  stamped 340312.                                       03:04:06
11      A.   340312.                                       03:04:10
12      Q.   Two pages on.                                 03:04:14
13      A.   Yes.                                          03:04:15
14      Q.   So, again, I don't really want to try to     03:04:15
15  read through the X here, but I believe what it --     03:04:20
16  but I'm going to do it anyway.  I believe what the    03:04:22
17  email underneath the X states that I'm happy to --    03:04:25
18      A.   I'm happy to report that the -- hmm.         03:04:31
19      Q.   Something for department performance?        03:04:38
20      A.   Yeah.                                         03:04:41
21      Q.   Are --                                        03:04:42
22      A.   Oh, yeah.  I can give you the gist of        03:04:44
23  this.                                                 03:04:46
24      Q.   Sure, that would be really helpful.          03:04:46
25      A.   So, this is -- see, you've got the From      03:04:48
```

1    and To.  So, it's from legal bud.  I don't know if      03:04:50

2    I -- no.  It's legal budget.  So, legal budget.  And   03:04:53

3    it's coming from the legal budget person to Johnny      03:04:58

4    Law, who is senior counsel of whoever, and it's an      03:05:02

5    operations update and attorney-client privileged.      03:05:05

6            And it says, "I'm happy to report" -- you       03:05:10

7    know, whatever.  This is about budget and spend for     03:05:12

8    outside counsel, and it's -- the budget for outside     03:05:15

9    counsel has declined.                                   03:05:19

10       Q.   The written transcript will not reflect        03:05:21

11   that, but there was a note of pride in your voice.      03:05:24

12   Outside counsel found, amusing.                         03:05:31

13       A.   And it's -- it's marked "privileged" and       03:05:37

14   then I -- I'm sorry, there's no question pending.       03:05:39

15   Why don't you ask.                                      03:05:42

16       Q.   I think you guessed where I was going,         03:05:43

17   which was, this is an example of the kind of            03:05:45

18   communication that you instructed attendees at the     03:05:48

19   presentation would not be privileged?                   03:05:50

20       A.   This gets the red X.                           03:05:53

21       Q.   Indicating that it was not privileged?         03:05:57

22       A.   Correct.                                       03:05:59

23       Q.   And I think we covered this earlier:  Does     03:06:00

24   the red X on the prior page also indicate that this     03:06:04

25   is a communication that you did not -- that you         03:06:07

Page 225

```
 1    instructed the attendees at the presentation would    03:06:10
 2    not be considered privileged?                         03:06:12
 3         A.   Correct.                                    03:06:15
 4         Q.   That was a very long sentence.              03:06:18
 5              The next page, the page marked 313, the     03:06:23
 6    subject line of that email looks like it needs        03:06:28
 7    your -- an A.  Is that "advice" under there?          03:06:32
 8         A.   I think so.                                 03:06:34
 9         Q.   I don't want you to guess.                  03:06:37
10         A.   I need your -- yeah, ASAP.  Maybe I need    03:06:39
11    your advice, need your advice ASAP, or something to   03:06:45
12    that effect.                                          03:06:49
13         Q.   Is this an example of a communication that  03:06:49
14    you instructed attendees would be considered          03:06:54
15    privileged?                                           03:06:58
16         A.   I will walk you through and give you a      03:06:59
17    little context.  This one I try to get a little       03:07:01
18    tricky with them.                                     03:07:04
19              So, I've got it coming from the bis dev     03:07:05
20    department, once again, to Johnny Law, who I think    03:07:07
21    is only counsel this time.  Poor Johnny.              03:07:09
22              It says:  I need your advice.  It says:     03:07:11
23    I'm concerned about a something deal.  Is the         03:07:14
24    indemnity provision okay?                             03:07:16
25              What does everybody think?  And so some     03:07:19
```

```
 1    people who -- no matter what they say, I say:  But      03:07:23
 2    it's not marked.  It's not marked privileged.           03:07:25
 3              They go:  Oh, yeah.                            03:07:28
 4              I said green check.  It's still               03:07:31
 5    privileged.  The marking means nothing.  The marking    03:07:32
 6    is irrelevant to whether a communication qualifies      03:07:36
 7    for privileged treatment.                               03:07:40
 8         Q.   Let's turn to the next slide.                 03:07:44
 9         A.   I love Fido over here.                        03:07:49
10         Q.   I'm really getting a sense of your love of    03:07:52
11    dogs in general --                                      03:07:54
12         A.   Agree.                                        03:07:55
13         Q.   -- in your presentations.                     03:07:57
14              Are these various quotes scattered over       03:07:59
15    the next two slides quotes that you discussed with      03:08:01
16    the attendees at the presentation?                      03:08:08
17         A.   Yes.  So, again, there's animation here       03:08:10
18    that obviously doesn't come through on the printout,    03:08:13
19    but, so, all you have coming up first is this chain     03:08:15
20    of dogs.                                                03:08:19
21              So, we've got -- we've got a big old          03:08:20
22    bulldog over here who's -- and I give them a little     03:08:25
23    setup.  So, there's no red Xs and there's no green      03:08:27
24    checkmarks at this point.  So, they're just looking     03:08:30
25    at it and I take them through this.                     03:08:33
```

Page 227

```
 1              Here is our bulldog.  He's an outside       03:08:35
 2    vendor, and he's negotiating a contract with our bis  03:08:39
 3    dev dog here.  And them bis dev dog communicates      03:08:41
 4    with Fido, who gives his advice and very sensitive    03:08:49
 5    strategy back to bis dev dog, and then bis dev        03:08:52
 6    dog -- that's got to be driving the court reporter    03:08:59
 7    crazy -- and then bis dev dog sends it over as an     03:08:59
 8    FYI, in case you are interested, and he sends it to   03:09:06
 9    this group, the round table dogs down below.         03:09:09
10              So, I walk them through each stage and      03:09:12
11    say:  Okay, what do you guys think?  Is this          03:09:14
12    privileged?  Is this not privileged?                 03:09:17
13              So, the first one gets a red X.  It's an    03:09:21
14    arm's length negotiation.  An outsider.              03:09:23
15              Here, we've got bis dev dog and Fido going  03:09:26
16    back and forth.  It seems like all the elements are  03:09:30
17    there.                                               03:09:33
18              Then I say:  Look, it's unclear.  I don't   03:09:33
19    know these -- who the round table dogs are.  Are     03:09:35
20    they internal people?  Are they external people?  Do 03:09:38
21    they need to know these things?  Should they have    03:09:42
22    been included in the first place?                    03:09:44
23              This is where, remember, guys, law does    03:09:46
24    not equal science.  Law does not equal math.  There  03:09:48
25    are -- there are states, and the evidence laws in    03:09:51
```

1  states are different.  Everywhere, judges may look          03:09:55

2  at the same set of facts and come to different              03:09:59

3  conclusions.  So, it's tenuous, but we're going to          03:10:01

4  give it a no.                                               03:10:04

5      Q.   Let's turn to the next slide, marked 316,          03:10:06

6  then.                                                       03:10:11

7      A.   Yes.  I'm sorry.  316?                             03:10:11

8      Q.   Sorry.  Two after the one you were just            03:10:16

9  describing.                                                 03:10:18

10     A.   Okay.                                              03:10:20

11     Q.   What did you tell the participants when            03:10:22

12  you showed them this slide?                                03:10:25

13     A.   So, I was giving them a real world,                03:10:27

14  close-to-home, hard-hitting example of illustrating        03:10:29

15  the points that I've gone through on privilege; that       03:10:32

16  ultimately it's a judge that makes decisions about         03:10:35

17  whether something is privileged or not.                    03:10:38

18     Q.   Did you discuss the Meyer case with them           03:10:39

19  in connection with this slide or the next slide?           03:10:43

20     A.   Briefly, yes.                                      03:10:47

21     Q.   What did you tell them?                            03:10:47

22     A.   I told them that it was a situation where          03:10:48

23  the -- the -- there was a request to -- this is --         03:10:51

24  I'm sorry, I have to check with counsel, like how --       03:10:57

25  is that any different?  You've waived on the entire        03:11:01

Page 229

```
 1   presso, yeah.                                        03:11:05
 2          MS. GOODMAN:  The question is:  What did      03:11:07
 3      you tell them about these next two slides?  You   03:11:08
 4      can answer that question.                         03:11:10
 5          THE WITNESS:  Okay.  So, I gave them a        03:11:11
 6      brief synopsis of the -- of the facts in Meyer    03:11:13
 7      and the -- and the side show that was the --      03:11:16
 8      that ultimately was litigated, and I walked       03:11:24
 9      them through Judge Rakoff's order, or at          03:11:27
10      least -- I didn't walk them through every page.   03:11:33
11      In fact, this -- I didn't walk them through       03:11:38
12      every page of the order.  I gave them a little    03:11:39
13      bit of background on that and highlighted --      03:11:41
14      I'm sorry.  Do you want me to keep going?  Do     03:11:44
15      you have a question?                              03:11:47
16   BY MS. TARAZI:                                       03:11:47
17      Q.   Well, I was going to ask you a question      03:11:47
18   about the next slide, which is a slide marked 317.   03:11:49
19   It looks like you boxed out a portion of the order   03:11:51
20   in the Meyer case.                                   03:11:55
21      A.   I did.                                       03:11:57
22      Q.   And the portion of the order you boxed out   03:11:58
23   is -- the full, complete sentence in that box reads, 03:12:00
24   "The question here however" --                       03:12:03
25      A.   Do you want me to read it?                   03:12:10
```

Page 230

```
 1        Q.    "The questions here presented, however,      03:12:11

 2   are whether such dubious practices in waiver result     03:12:14

 3   in waiver of attorney-client privilege and work         03:12:17

 4   product protection and whether disciplinary action      03:12:21

 5   is warranted."                                          03:12:23

 6           My version is very faint.                       03:12:25

 7        A.    Yes, you read it correctly.                  03:12:28

 8        Q.    What did you tell the participants about     03:12:30

 9   that?                                                   03:12:31

10        A.    So -- so, I'm illustrating the prior --      03:12:32

11   now we've come full circle, and we're -- we've got a    03:12:34

12   judge that is examining privileged documents to         03:12:38

13   determine -- in camera to determine whether or not      03:12:45

14   they are, in fact, privileged.                          03:12:47

15        Q.    Let's turn to the next slide.  It reads --   03:12:57

16   the underlying portion reads:  "Uber and Ergo" --       03:13:00

17   who is Ergo?                                            03:13:06

18        A.    Ergo was a vendor.                           03:13:08

19        Q.    What services did the vendor provide?        03:13:10

20        A.    They provided some investigative services.   03:13:13

21        Q.    To who at Uber?                              03:13:16

22        A.    To Uber.                                     03:13:19

23        Q.    To anyone in particular at Uber?             03:13:19

24        A.    To the -- I think the -- well, to the        03:13:21

25   security group.                                         03:13:24
```

Page 231

```
 1        Q.    To the Threat Ops Group?                  03:13:25

 2        A.    To Threat Ops, yes.                        03:13:27

 3        Q.    And Threat Ops to SSG?                     03:13:28

 4        A.    No, this may have been before SSG.         03:13:32

 5        Q.    To Market Analytics?                       03:13:35

 6        A.    No.                                        03:13:36

 7        Q.    Just generally Threat Ops?                 03:13:37

 8        A.    This is the -- this would be more -- yes,  03:13:38

 9   just generally Threat Ops.  This is very early in my  03:13:43

10   tenure.                                               03:13:48

11        Q.    "Uber and Ergo claimed attorney-client    03:13:48

12   privilege and/or work product protection over         03:13:52

13   numerous documents and voice recordings, and the      03:13:52

14   Court indicated it would need to review the           03:13:54

15   materials in camera to determine whether privilege    03:13:57

16   was correctly ascertained and/or whether the crime    03:13:59

17   fraud exception to the privilege applied."            03:14:02

18            What did you tell participants about that    03:14:04

19   slide?                                                03:14:07

20        A.    So, I just walked them through this, and,  03:14:07

21   again, I'm saying:  Look, you've got a federal judge   03:14:08

22   who has issued -- this was a fairly long order, and    03:14:12

23   I think it was a 31-page-order, or something like      03:14:15

24   that -- a 31-page order.  Upfront and center, on the   03:14:18

25   first page of the order, is where he's going.          03:14:22
```

```
 1              And I'm kind of showing them:  Look, now,      03:14:24
 2    the judge is saying he's got all the documents in        03:14:28
 3    front of him, and he's going to look at them and see      03:14:31
 4    if it meets the elements of privilege, and he's          03:14:33
 5    going to see if the crime fraud exception applies to      03:14:36
 6    vitiate the privilege.                                   03:14:42
 7        Q.   What did you tell the participants in           03:14:46
 8    connection with the next slide?                          03:14:49
 9        A.   So these are -- I'm looking at Bates            03:14:51
10    ending in 319; is that correct?                          03:14:54
11        Q.   That's correct.                                 03:14:56
12        A.   So, I'm showing, saying:  These are            03:14:59
13    clippings that were taken straight from media            03:15:01
14    reports of the -- of this case.                          03:15:04
15              So -- and here you have -- you can see on      03:15:07
16    the -- the screen capture that's on the reader's         03:15:10
17    left.  There is a message from Salle Yoo to Joe          03:15:16
18    Sullivan that has an antitrust lawsuit, SDNY against     03:15:21
19    Travis.                                                  03:15:27
20              It's got -- the next text is                   03:15:27
21    attorney-client communication-privilege.  Salle         03:15:30
22    writing to Joe:  Joe, can we find out a little more      03:15:33
23    about this plaintiff?                                    03:15:36
24              Joe responds.  Joe sends it to Mat and         03:15:37
25    says:  Please do a careful check on the plaintiff,       03:15:40
```

Page 233

```
 1    the one who is the driver named -- part of the case.    03:15:42
 2         Q.   Is that Spencer Meyer?                         03:15:46
 3         A.   Yes, yes.                                      03:15:50
 4              But what I'm illustrating from this is,        03:15:52
 5    like, here's a communication that is marked             03:15:54
 6    privileged from the general counsel to Joe Sullivan.    03:15:56
 7    And it's been disclosed in the case, and it is --       03:15:59
 8    and it is in the news.                                  03:16:02
 9              So, to the extent I hope I disabused           03:16:04
10    everybody of the notion of marking something            03:16:07
11    privileged is going to somehow magically protect        03:16:09
12    them.                                                   03:16:13
13         Q.   The topping off from Joe Sullivan to Mat      03:16:13
14    Henley reads, and it's a little hard to read on my      03:16:15
15    copy, but I think it says, "Please do a careful         03:16:15
16    check on this plaintiff, the person who is the          03:16:19
17    driver named party in the case."                        03:16:21
18              Is it Uber's general practice to do a         03:16:23
19    careful check on plaintiffs in litigation against       03:16:25
20    Uber?                                                   03:16:28
21              MS. GOODMAN:  Object to form.                 03:16:30
22              You can answer that question, but that is     03:16:36
23         way outside the scope of this case.                03:16:36
24              THE WITNESS:  I can't comment on general      03:16:38
25         practice.  It is good security practice to         03:16:40
```

Page 234

```
 1          investigate people who may be a threat to Uber,    03:16:43
 2          to Uber's riders and drivers, and certainly to     03:16:45
 3          executives of the company.                         03:16:49
 4     BY MS. TARAZI:                                          03:16:50
 5          Q.   Did Uber do a careful check of Waymo?         03:16:50
 6               MS. GOODMAN:  Object to form.                 03:16:55
 7               THE WITNESS:  I am unaware of any             03:16:57
 8          investigations with respect to -- I don't even     03:16:59
 9          know how to answer that question.  I mean, I       03:17:04
10          don't know.                                        03:17:08
11               MR. STUMPHAUZER:  Talking about Waymo.        03:17:10
12          That's progress.                                   03:17:11
13     BY MS. TARAZI:                                          03:17:13
14          Q.   Did Uber do a careful check of Google?        03:17:13
15               MS. GOODMAN:  Object to form.                 03:17:17
16               THE WITNESS:  Not to my knowledge.            03:17:18
17     BY MS. TARAZI:                                          03:17:19
18          Q.   If you turn over two pages, or maybe          03:17:19
19     three, to the one marked 322, it looks like a           03:17:21
20     picture of Edward Snowden.                              03:17:25
21               What did you tell --                          03:17:26
22          A.   Let me get there.  Let me get there.          03:17:31
23          Q.   -- the people that you presented this deck    03:17:31
24     to --                                                   03:17:34
25          A.   So, I think it's -- what did I tell them      03:17:34
```

Page 235

```
 1    about?  Hopefully, the image speaks for itself.       03:17:36
 2             So, we're kind of -- so, underneath the      03:17:44
 3    picture of Snowden is the famous picture of Hillary   03:17:47
 4    Clinton on her BlackBerry with her sunglasses on,     03:17:51
 5    right?  So, this is before the election, and so       03:17:55
 6    it's -- I mean, it was a different time.              03:17:57
 7             And I say, you know:  Look, emails are        03:18:01
 8    everywhere.  Emails are -- can be taken out of        03:18:05
 9    context.  There's important things in emails that     03:18:09
10    people write all the time.  And guess what?  Snowden  03:18:14
11    pops up.  There's always somebody out there that's    03:18:18
12    going to read them.                                  03:18:21
13        Q.   Do you know who Rick Jacobs is?              03:18:22
14        A.   Yes, I do.                                  03:18:25
15        Q.   Did you work with him?                      03:18:25
16        A.   He worked in Threat Ops.  I was a lawyer    03:18:29
17    embedded with Threat Ops.  So, yes, projects we      03:18:32
18    worked on.                                           03:18:34
19        Q.   What kind of projects did you work on?      03:18:36
20        A.   Oh, I don't -- am I -- can I talk about --  03:18:38
21    I guess you could talk about subtopics.              03:18:47
22             MS. GOODMAN:  You can answer that question   03:18:49
23        as a general subject matter level that would be   03:18:50
24        on a privilege log, what kind of things did you   03:18:53
25        work with him on.                                03:18:58
```

```
 1    states:  "Early in his tenure, Jacobs advocated for      03:44:24

 2    a secure and encrypted centralized database to           03:44:26

 3    ensure confidentiality and recordkeeping, but            03:44:29

 4    provide access to intelligence for Threat Ops            03:44:32

 5    personnel.  He presented a draft proposal to             03:44:35

 6    managers Henley and Clark."                              03:44:37

 7              I don't think this is what is meant here,      03:44:41

 8    but you did not manage Mr. Jacobs, correct?              03:44:42

 9         A.   I did not manage Mr. Jacobs.                   03:44:47

10         Q.   Do you recall receiving a draft proposal       03:44:51

11    for a centralized database?                              03:44:53

12         A.   Not specifically, no.                          03:44:56

13         Q.   Do you remember discussing the centralized     03:44:58

14    database referenced on page 5 of the Jacobs letter?      03:45:02

15         A.   I don't know what Jacobs is referencing on     03:45:07

16    page 5.  And the sentence that you just read, while      03:45:08

17    I do recall a centralized -- a desire for a              03:45:11

18    centralized database that Mat Henley wanted to get       03:45:15

19    done, that I believe Jacobs was tasked to complete.      03:45:21

20         Q.   Did you object to the creation of such a       03:45:30

21    database?                                                03:45:32

22              MS. GOODMAN:  You can answer that              03:45:35

23         question.                                           03:45:36

24              THE WITNESS:  No.                              03:45:36

25
```

Page 259

```
 1        acquisition --                              03:55:19
 2            MR. STUMPHAUZER:  No.  This one is, did  03:55:20
 3        you provide guidance.                        03:55:21
 4            MS. GOODMAN:  Did you provide guidance.   03:55:23
 5        I'm sorry, the live feed is not accurately   03:55:25
 6        reflecting your question, so, could you please  03:55:27
 7        repeat it?                                   03:55:32
 8   BY MS. TARAZI:                                    03:55:33
 9        Q.   Did you provide guidance to SSG with    03:55:33
10   respect to the acquisition of non-attributable    03:55:35
11   hardware?                                         03:55:38
12            MS. GOODMAN:  Right.  And that question  03:55:39
13        calls for legal advice, and I instruct you not  03:55:40
14        to answer.                                   03:55:42
15            MS. TARAZI:  Same instruction if I ask   03:55:45
16        about software?                              03:55:47
17            MS. GOODMAN:  What are you going to ask   03:55:52
18        about software?                              03:55:53
19   BY MS. TARAZI:                                    03:55:54
20        Q.   Did you provide guidance to SSG with    03:55:54
21   respect to the acquisition of non-attributable    03:55:56
22   software?                                         03:55:59
23            MS. GOODMAN:  Same instruction.          03:55:59
24   BY MS. TARAZI:                                    03:56:03
25        Q.   Are you aware of Uber storing data on   03:56:09
```

Page 260

```
 1   non-attributable devices to avoid detection,        03:56:13

 2   including in connection with legal discovery?        03:56:15

 3           THE WITNESS:  Counsel for Uber?              03:56:20

 4           MS. GOODMAN:  You may answer that            03:56:24

 5       question.                                        03:56:25

 6           THE WITNESS:  No.                            03:56:25

 7   BY MS. TARAZI:                                       03:56:25

 8       Q.   Under heading C, the heading is             03:56:32

 9   "Concealment, Cover-Up and Falsification of Records  03:56:37

10   Through the Abuse of Attorney-Client Privilege       03:56:41

11   Designations."                                       03:56:43

12           In the second paragraph, the second          03:56:50

13   sentence, beginning "during the presentation," it    03:56:52

14   states:  "Clark verbally coached the participants on 03:56:55

15   how to use attorney-client privilege to ensure       03:56:57

16   sensitive intelligence collection activities would   03:56:59

17   not surface in litigation."                          03:57:03

18           Is that correct?                             03:57:05

19           THE WITNESS:  Counsel for Uber?              03:57:06

20           MS. GOODMAN:  You may answer that.           03:57:07

21           THE WITNESS:  Sorry?                         03:57:09

22           MS. GOODMAN:  You may answer that.           03:57:09

23           THE WITNESS:  No.                            03:57:10

24   BY MS. TARAZI:                                       03:57:10

25       Q.   The next sentence reads:  "Clark also       03:57:10
```

Page 290

```
 1    redacted.                                            04:53:50

 2              THE WITNESS:  Counsel?                     04:53:51

 3              MS. GOODMAN:  Object to form.  And, again, 04:53:52

 4         you're asking a question, does Mr. Clark        04:53:53

 5         understand whether Uber worked unlawfully to    04:53:56

 6         obtain trade secrets generally.                 04:53:59

 7              You cannot ask that question without       04:54:01

 8         asking him to reveal his legal conclusions and  04:54:03

 9         mental judgments.                               04:54:05

10              Also, the question has nothing to do --    04:54:06

11         or the part of the letter from which you are    04:54:08

12         reading has nothing to do with Waymo, and the   04:54:10

13         thing is, there's a redaction about who         04:54:12

14         Mr. Jacobs is alleging in this context.  That's 04:54:16

15         not relevant to this case.  So, you should move 04:54:19

16         on.                                             04:54:21

17    BY MS. TARAZI:                                       04:54:24

18         Q.  Are you aware of Uber ever remotely         04:54:24

19    accessing confidential corporate communications and 04:54:27

20    data from Waymo?                                     04:54:31

21              MS. GOODMAN:  If you can answer that       04:54:33

22         question without revealing information in the   04:54:34

23         course of an attorney-client communication,     04:54:36

24         then go ahead and do so.                        04:54:43

25              THE WITNESS:  No.                          04:54:45
```

Page 301

```
 1    probably much more than that.                    05:15:07

 2        Q.   Did any litigation hold that you received  05:15:09

 3    in connection with the Jacobs allegation instruct   05:15:11

 4    you not to use Wickr to discuss the case?        05:15:14

 5        A.   I don't recall the specific hold.  I need  05:15:16

 6    to see it.  But it should be in my documents.    05:15:20

 7        Q.   Do you recall ceasing to use Wickr to    05:15:22

 8    discuss Jacobs' allegations after receiving the   05:15:26

 9    litigation hold?                                 05:15:29

10        A.   Yes.  I would not discuss the substance of  05:15:30

11    a matter that was on legal hold on an ephemeral   05:15:33

12    communication tool.                              05:15:40

13        Q.   Did you turn over your personal cell phone  05:15:41

14    in connection with the litigation hold placed in  05:15:47

15    connection with the Jacobs matter?               05:15:51

16            MS. GOODMAN:  Objection, asked and        05:15:53

17        answered.                                    05:15:53

18            THE WITNESS:  No.                         05:15:54

19            MS. TARAZI:  For the record, I have       05:16:08

20        withdrawn the exhibit previously marked as    05:16:09

21        Exhibit 9712.                                05:16:11

22    BY MS. TARAZI:                                   05:16:20

23        Q.   Did you have any -- did you ever play --  05:16:20

24    strike that.  I'll start again.                  05:16:23

25            Did you play any role in investigating the  05:16:24
```

Page 302

```
 1    allegations in the Jacobs letter?                   05:16:26

 2        A.   I was interviewed.  My machine was imaged.  05:16:29

 3        Q.   Who were you interviewed by?                05:16:35

 4        A.   Lawyers from WilmerHale.                     05:16:37

 5        Q.   Were you interviewed by anyone in-house at  05:16:45

 6    Uber in connection with that investigation?          05:16:50

 7        A.   I was with Angela Padilla and a lawyer       05:16:55

 8    from Littler, as well.  I believe she was from       05:16:58

 9    Littler.                                             05:17:01

10        Q.   From Littler?                               05:17:02

11        A.   Littler Mendelson.  It's a law firm.        05:17:03

12        Q.   And, also, you said by WilmerHale?          05:17:06

13        A.   Yes.                                        05:17:11

14        Q.   Are you aware of who at Uber was involved   05:17:12

15    in the investigation into the Jacobs allegations?    05:17:15

16             THE WITNESS:  Counsel?                       05:17:19

17             MS. GOODMAN:  The question is, if you        05:17:20

18        know, who at Uber was involved in the            05:17:21

19        allegations and the investigation of the Jacobs  05:17:24

20        allegations.                                      05:17:27

21             THE WITNESS:  So, I don't know everybody     05:17:28

22        that was involved, but I can give you names of   05:17:29

23        people who I believe were involved.  Is that     05:17:32

24        what you would like me to do?                    05:17:35

25
```

Page 356

```
 1        cannot do of a lawyer.                          06:57:13

 2   BY MS. TARAZI:                                       06:57:17

 3        Q.   Did Uber use non-attributable devices to  06:57:23

 4   perform competitive intelligence on Uber -- I'm      06:57:26

 5   sorry, on Waymo?                                     06:57:31

 6             MS. GOODMAN:  You can answer that question 06:57:33

 7        if you can do so without revealing the contents 06:57:34

 8        of an attorney-client communication.            06:57:37

 9             THE WITNESS:  I don't know what you mean    06:57:41

10        by "unattributable device," but not to my       06:57:42

11        knowledge.                                       06:57:45

12   BY MS. TARAZI:                                       06:57:45

13        Q.   Did Uber use any devices that could not be 06:57:45

14   traced to Uber to perform competitive intelligence   06:57:48

15   on Waymo?                                            06:57:51

16             MS. GOODMAN:  Object to the form.          06:57:54

17             Same instruction with regard to the        06:57:54

18        privilege.                                       06:57:56

19             THE WITNESS:  Not to my knowledge.          06:57:57

20   BY MS. TARAZI:                                       06:57:59

21        Q.   Did Uber use any devices that could not be 06:57:59

22   attributed to Uber to perform competitive            06:58:02

23   intelligence on Google?                              06:58:05

24             MS. GOODMAN:  Object to the form.          06:58:07

25             Same instruction regarding the privilege.  06:58:08
```

Page 357

```
 1              THE WITNESS:  Not to my knowledge.        06:58:10
 2   BY MS. TARAZI:                                       06:58:20
 3       Q.   Have you ever heard the phrase,            06:58:21
 4   "augmented, non-attributable Internet collection"?  06:58:22
 5              MS. GOODMAN:  Yes or no?                  06:58:28
 6              THE WITNESS:  No.                         06:58:31
 7   BY MS. TARAZI:                                       06:58:31
 8       Q.   Has Uber ever used vendors to perform      06:58:31
 9   competitive intelligence tasks using devices that   06:58:35
10   could not be attributed to Uber?                     06:58:38
11              MS. GOODMAN:  Same instruction with      06:58:41
12         respect to the privilege.                     06:58:42
13              THE WITNESS:  Not to my knowledge.        06:58:47
14   BY MS. TARAZI:                                       06:58:52
15       Q.   Who was involved in the competitive        06:58:53
16   intelligence gathering that Uber conducted of Waymo? 06:58:57
17   When I say "Waymo" in this context, I'm referring to 06:59:05
18   Waymo and Google's self-driving car division.        06:59:08
19              THE WITNESS:  Counsel for Uber?           06:59:13
20              MS. GOODMAN:  Object to the form of the   06:59:16
21         question.                                     06:59:17
22         You may answer that to the extent you can     06:59:17
23         do so without revealing the contents of an    06:59:19
24         attorney-client communication.                06:59:22
25              THE WITNESS:  Okay.  Can you re-ask the   06:59:23
```

```
 1          Q.   Do you have any knowledge that anyone in      07:27:23
 2   the autonomous vehicle group at Uber ever               07:27:25
 3   purposefully labeled a document as privileged in        07:27:28
 4   order to hide it from the court overseeing this         07:27:30
 5   litigation?                                             07:27:33
 6          A.   I'm sorry, can you -- can you -- can you     07:27:34
 7   reword it?                                              07:27:36
 8          Q.   Do you have any knowledge that anyone in     07:27:37
 9   the autonomous vehicle group at Uber ever               07:27:39
10   purposefully labeled a document as privileged in        07:27:42
11   order to hide it from the court overseeing this         07:27:44
12   litigation?                                             07:27:47
13          A.   No.                                          07:27:48
14          Q.   Did you ever mark a document as              07:27:51
15   "attorney-client privileged" in order to hide it        07:27:52
16   from Waymo or Google?                                   07:27:57
17          A.   No.                                          07:27:58
18          Q.   Would you ever do that?                      07:27:58
19          A.   No.                                          07:27:59
20          Q.   Did you ever direct anyone to destroy        07:28:00
21   evidence?                                               07:28:03
22          A.   No.                                          07:28:03
23          Q.   I would like to show you a document that     07:28:05
24   we will mark 9715.  This is a document bearing Bates    07:28:08
25   label UBER 00355965, which I understand is being        07:28:29
```

Page 372

```
 1   introduced to Waymo today in connection with a        07:28:33
 2   variety of discovery requests that they have put on   07:28:37
 3   us at this close of discovery.                         07:28:39
 4           Do you have the document in front of you?      07:28:41
 5       A.   I don't have it.  You didn't give the         07:28:46
 6   court reporter a chance to mark it.                     07:28:47
 7           (The referred-to document was marked by        07:28:58
 8       the court reporter for Identification as           07:28:58
 9       Deposition Exhibit 9715.)                          07:28:58
10   BY MS. GOODMAN:                                        07:29:01
11       Q.   I ask you to review this document.            07:29:03
12           (A discussion was held off the record,         07:29:46
13       after which the following proceedings were        07:29:46
14       held:)                                             07:29:46
15   BY MS. GOODMAN:                                        07:29:54
16       Q.   Have you had a chance?                        07:29:54
17       A.   Almost.                                       07:29:55
18       Q.   Okay.                                         07:29:56
19       A.   Yes, I read the document.                     07:30:27
20       Q.   All right.  I will direct your attention     07:30:28
21   to page 966, the bottom of the email string.          07:30:30
22           Alberto Fittarelli writes, "Craig, for        07:30:33
23   your review and legal advice.  Thanks, Nicoletta.     07:30:38
24   Appreciate it."                                        07:30:40
25           Do you see that?                               07:30:42
```

Page 373

```
 1      A.   I do.                                      07:30:42

 2      Q.   And you respond, "This really shows the   07:30:42

 3 use of the A/C priv statement like we talked about  07:30:42

 4 last week.  Is thanking her really for my review and 07:30:46

 5 advice?  It just proves overuse."                    07:30:49

 6           What did you mean by that?                 07:30:51

 7      A.   Well, I meant that this is -- I don't see  07:30:54

 8 the elements of privilege in this.                   07:30:57

 9           I think I was -- you know, Alberto is      07:31:00

10 Italian, and I think the -- and in Europe, and so I  07:31:02

11 think -- look, the concept of privilege is hard      07:31:06

12 enough for Americans who have dealt with it, and     07:31:10

13 it's -- it's -- I think people who are not of the    07:31:14

14 United States have a much more difficult time.  So,  07:31:17

15 I'm trying to make my point.                         07:31:19

16           I think I was -- looking at this, I think  07:31:21

17 I was pretty frustrated with Alberto on this.  It    07:31:24

18 must have been close in time to a presentation that  07:31:28

19 I gave.                                              07:31:29

20           So, I -- what I'm showing here is that     07:31:31

21 it's -- the label means nothing.                     07:31:36

22      Q.   And if you look at page -- the first page, 07:31:40

23 965, after you and Mr. Fittarelli have an exchange   07:31:42

24 about the use of privilege, you forward the string   07:31:50

25 to Rick@Uber.com.  Is that Mr. Jacobs?               07:31:54
```

Page 374

```
 1      A.   It appears to be.                      07:31:58

 2      Q.   And you say to him, "I had a long talk  07:32:00

 3  with Alberto this morning.  I was disheartened by 07:32:02

 4  the fact that my legal priv training did not sink  07:32:05

 5  in, even though this is almost identical to an     07:32:09

 6  example I had them all discuss and go through."    07:32:11

 7           Why did you share with Mr. Jacobs the fact 07:32:15

 8  that you were disheartened that your legal priv    07:32:20

 9  training did not sink in to Mr. Fittarelli?        07:32:22

10      A.   Jacobs was Mr. Fittarelli's manager.    07:32:25

11      Q.   And you wanted his manager to know to get 07:32:27

12  feedback about this?                               07:32:31

13      A.   Yeah.  It's frustrating when you spend all 07:32:32

14  of that time and fight all these dogs to put       07:32:35

15  together in a deck.                                07:32:38

16      Q.   You see the top email is from Rick Jacobs 07:32:41

17  to ███████████████████?                            07:32:44

18      A.   Yes.                                      07:32:48

19      Q.   And I noticed when you were reviewing this 07:32:48

20  document, you might have chuckled to yourself.  I'm 07:32:50

21  wondering if you chuckled in response to that       07:32:53

22  forward of the communication from himself to his    07:32:55

23  personal email?                                     07:32:57

24      A.   Yes, I did find that interesting.         07:32:59

25      Q.   What do you find interesting about that?   07:33:01
```

Page 375

```
 1       A.   Well, this is information -- internal      07:33:03

 2   information that he has exfiltrated.                07:33:05

 3       Q.   And what's the date on Mr. Jacobs' forward 07:33:09

 4   to himself?                                         07:33:12

 5       A.   April 13, 2017, at 5:50 p.m.               07:33:15

 6       Q.   Do you recall the date of Mr. Jacobs'      07:33:28

 7   resignation email?                                  07:33:32

 8       A.   I don't.                                   07:33:34

 9       Q.   Do you have Exhibit 9711 in front of you?  07:33:35

10       A.   Let me take a look.  Ninety-seven what?    07:33:40

11       Q.   Eleven.                                    07:33:44

12       A.   Yes.                                       07:34:01

13       Q.   And if you flip to the last -- the page    07:34:02

14   ending 655 --                                       07:34:05

15       A.   Yes.                                       07:34:10

16       Q.   -- the email from Rick Jacobs that begins  07:34:11

17   sort of a third down the page?                      07:34:15

18       A.   Yes.                                       07:34:17

19       Q.   Is that his resignation email?             07:34:17

20       A.   It appears to be.                          07:34:19

21       Q.   And what is the date on that?              07:34:21

22       A.   April 14, 2017, 10:38 a.m.                 07:34:22

23            MS. GOODMAN:  No further questions.  I     07:34:27

24   pass the question to your counsel.                  07:34:29

25            MR. STUMPHAUZER:  Actually, I think the    07:34:31
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              C E R T I F I C A T E

 2   STATE OF FLORIDA      )

 3                         : ss

 4   COUNTY OF MIAMI-DADE )

 5

 6          I, KELLI ANN WILLIS, a Registered

 7      Professional, Certified Realtime Reporter and

 8      Notary Public within and for The State of

 9      Florida, do hereby certify:

10          That CRAIG CLARK, the witness whose

11      deposition is hereinbefore set forth was duly

12      sworn by me and that such Deposition is a true

13      record of the testimony given by the witness.

14          I further certify that I am not related

15      to any of the parties to this action by blood

16      or marriage, and that I am in no way interested

17      in the outcome of this matter.

18          IN WITNESS WHEREOF, I have hereunto set

19      my hand this 26th day of December, 2017.

20

21

22

23      KELLI ANN WILLIS, RPR, CRR

24

25
```

Page 387