# EXHIBIT 6

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

WAYMO LLC,

Plaintiff,

vs. Case No.

UBER TECHNOLOGIES,INC.; 17-cv-00939-WHA

OTTOMOTTO, LLC; OTTO

TRUCKING LLC,

Defendants.

---

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF UBER TECHNOLOGIES, INC.

30(b)(6) REPRESENTATIVE - RANDY HAIMOVICI

San Francisco, California

Thursday, December 21, 2017

Volume I

REPORTED BY:

REBECCA L. ROMANO, RPR, CSR No. 12546

JOB NO. 2779670

PAGES 1 - 190

A. Sure. 10:12:33

Q. Starting with the Nick Gicinto, what did you discuss with Nick Gicinto?

A. I spoke with Nick Gicinto about the use of nonattributable devices. He would call that 10:12:42 misattributable devices.

Q. And so when you say "misattributable devices," you use that term interchangeably with "nonattributable devices"?

A. I do. 10:13:00

Q. Okay. And when you use that term, what -- what is your understanding of what term means?

A. Yeah, so those are devices that are used that can't be linked back to Uber. So by way of 10:13:05 example of how Nick described it to me, if there's a physical threat to the company, and we want to investigate that physical threat, we want to be able to do that without having that investigation linked back to the company; and probably more -- 10:13:24 more importantly, the employees doing it, for safety reasons.

Q. And what -- what did you and Nick Gicinto discuss specifically about nonattributable devices?

A. Pretty much what I just told you. He 10:13:44

gave me an example of how they are used. He described the purpose. And -- and mentioned that based on his knowledge, they were only used by people in the security department. 10:13:46

Q. When you say that you discussed with Mr. Gicinto how nonattributable devices are used, what did he say in terms of how they were used? 10:14:04

A. In the same way I just described.

Q. Okay. Nothing addition- -- nothing beyond what you've already -- 10:14:15

A. Not that I recall.

Q. Okay. And in terms of discussing the purpose of using nonattributable devices, did he say anything further than what you've already provided? 10:14:23

A. Not that I recall. It was just basically what I told you.

Q. You said you spoke with Eric Meyhofer?

A. I did.

Q. What you did and Eric Meyhofer discuss? 10:14:34

A. So Eric and I talked about use of nonattributable devices. And he confirmed that they are not used by ATG. As I'm sure you know, he's the head of ATG.

We talked about the use of ephemeral 10:14:47

communications, and he confirmed that his use of ephemeral communications were limited to social reasons almost exclusively, but that there are times when he's talking about performance issues for employees, where he's used it, that he's never used ephemeral communications to discuss anything related to this case.

That he has an understanding of what and how the attorney-client privilege should be used. And he's adhered to the knowledge he was given and the training he was given.

Q. And in your conversations with Mr. Meyhofer, were you talking about his use specifically or ATG more generally?

A. His use specifically -- well, when you say "use," just tell me what you mean.

Q. So let me -- let me break it down.

A. Okay.

Q. So for -- for nonattributable devices, you said that Mr. Meyhofer told you that they're not used by anyone in ATG; is that right?

A. That's correct.

Q. Okay. When you were talking about ephemeral communications, did you discuss with Mr. Meyhofer whether they are used by others in ATG

in addition to him? 10:15:56

A. We talked about his use of it. We talked about his knowledge of Levandowski's use of it, his communications with Travis. We did not go over everybody in ATG. 10:16:08

Q. Okay. So when you say that Mr. Meyhofer told you that nonattributable devices are not used by anyone in ATG, what -- what time frame does that cover? Is that for all time?

A. Yeah. Did not put any limitation on it. 10:16:26 No time limitation. They have not been used.

Q. And then you said you discussed with him the use of ephemeral communications with Travis Kalanick; is that right?

A. Right. 10:16:42

Q. And what did he tell you about that?

A. That any communications he had with Travis Kalanick, what we are calling ephemeral communications, were purely and 100 percent social.

Q. And you said he also told you about 10:16:53 ephemeral communications with Anthony Levandowski; is that right?

A. He did.

Q. What did he tell you about that?

A. He said it was mostly social, but there 10:17:03

discussions about the current litigation, or would 10:18:06
it also include sort of the underlying facts, for
example, discussions about the acquisition of Otto?
A. I did not ask him specifically about the
acquisition of Otto; but, in general, what he said 10:18:21
is, he only used it for social reasons and to talk
about employee issues, and for no other reason.
I followed up and said, "Did you talk
about anything related to this case?" He said, no.
And I said, "Have you ever used ephemeral 10:18:37
communications to discuss anything about
competitors?" And he said, no.
Q. You said you also talked to Wendy Ray
to --
A. I did. 10:18:53
Q. -- prepare for your testimony?
And Wendy Ray is an attorney at Morrison
& Foerster; is that right?
A. That is correct.
Q. And what did you and Ms. -- and Ms. Ray 10:18:59
discuss?
A. Yeah, so we talked about privilege review
in this case pursuant to the document production.
And we talked about the collection of names of --
we talked about the -- the -- their efforts to 10:19:17

collect -- identify people at the company that used ephemeral messaging. 10:19:19

Q. And what did Ms. Ray tell you about the privilege review in this case?

A. That the process was, when documents were collected, they were sent to Morrison & Foerster, and Morrison & Foerster reviewed those documents to determine whether they were privileged or not privileged. And that was Morrison & Foerster's responsibility. 10:19:35 10:19:49

Q. And did they review each document, or did they rely on, I guess, computer programs that -- that might be able to exclude privilege information?

MR. BRILLE: Objection. Form. 10:20:02

THE DEPONENT: Okay. I didn't get into the specifics of how they did it.

Q. (By Ms. Roberts) Okay.

A. I just confirmed the fact that the responsibility of reviewing the document production and making privileged determinations was done by Morrison & Foerster. 10:20:10

Q. Okay. But you don't know the actual steps they took to go through that process?

A. I don't. 10:20:21

A. You got it. 10:22:53
Q. So this is the list that you discussed with Ms. Ray?
A. That's correct.
Q. Okay. Other than privilege review in this case and the efforts to determine who at Uber uses ephemeral messaging, is there anything else that you discussed with Ms. Ray to prepare for your testimony today? 10:23:04
A. Not that I remember. 10:23:15
Q. You also identified Sidney Majalya as someone you spoke with?
A. I did.
Q. What did you and Mr. Majalya discuss?
A. I spoke with Sidney about whether, as somebody who works in compliance, it was reported to him that somebody misused the attorney-client privilege. 10:23:24

So, in other words, marking a document privileged that shouldn't be; and if that had been reported to him, what he would have done in response. 10:23:38

And Sidney said that -- that had not been reported to him. But that if it had been, that he would have taken whatever appropriate, you know, 10:23:51

remediation was necessary, training or -- or otherwise. 10:23:56

Q. Is there anything else you discussed with Mr. Majalya?

A. Nope. That's what I remember. 10:24:09

Q. And so you -- you asked him if he'd ever received any reports of misuse of the attorney-client designation; is that right?

A. That's exactly what I asked him.

Q. And he said, no, he never received any such reports? 10:24:19

A. That is what he said.

Q. Okay. Did you discuss Mr. Jacobs's allegations with him?

A. I did not. 10:24:26

Q. Okay. So because Mr. Jacobs -- I am not sure, have you read Mr. Jacobs' --

A. I have.

Q. Okay. So Mr. Jacobs says that -- that employees at Uber misused the attorney-client privilege designation. 10:24:37

You are aware that he has alleged that?

MR. BRILLE: I'm going to object to form and scope. And I will note for the record that based on the topics of -- in the 30(b)(6), that we 10:24:47

Q. You said she's in ER? 10:27:35
A. Employee relations.
Q. Employee relations?
A. Right.
Q. Okay. And you could not remember her last name? 10:27:40
A. No, I know her last name. I just don't want to --
Q. So you can't pronounce her last name?
Sorry. Sorry. 10:27:46
MR. BRILLE: You need to just slow down for her.
THE DEPONENT: She's a friend of mine, so I don't want to mispronounce it. But the discussion with her was, you know, very identical 10:27:55 discussion I had with Sidney. And the results were the same.
Q. (By Ms. Roberts) So you asked Pam if she'd received any reports of misuse of the attorney-client privilege designation? 10:28:10
A. That is correct. In essence.
Q. Okay. And did you limit the scope of that to excluding the Jacobs letter?
A. Right.
Q. Okay. So you specifically limited the 10:28:20

scope when you were talking to her? 10:28:24

A. Yes.

Q. Okay. And what did she say in response?

A. Same thing Sidney said. She's never received any reports like that, that came 10:28:32 through -- that she had to investigate. So it wasn't anything that had come to her for her to take action on; but that if it did, she would -- you know, she would do the same thing Sidney did.

She would take whatever steps are 10:28:51 necessary to correct it, provide training, whatever the course may be. And she mentioned that not as a result of investigating that claim, but in her work, if she saw somebody who was stating something that was privileged when it was not, she would 10:29:06 correct that person based on the training she has.

Q. You said Pam is in employee relations; is that right?

A. That's correct.

Q. Is she an attorney? 10:29:23

A. She is not.

Q. Okay. Can you just explain for -- for me -- Mr. Majalya is a compliance attorney; Pam is in employee relations -- sort of what method, reports of misuse of privilege would get escalated 10:29:35

A. We talked about document productions. We talked about privilege review. We talked about document retention. 10:30:36

Q. Anything else?

A. That's what I remember right now. 10:30:51

Q. And who is Mr. Murray?

A. He is our global head of ediscovery and information governance.

Q. Is he an attorney?

A. He is not. 10:31:03

Q. But he works internally at Uber on ediscovery issues, is that --

A. Ediscovery and information governance.

Q. When you say "information governance," what -- what do you mean by that? 10:31:14

A. I mean, the -- that's a broad question, but I'll give you a high-level broad answer.

I mean the way the company manages its information, all of it, everything.

Q. You -- you said you discussed with Mr. Murray document production? 10:31:29

A. I did.

Q. Okay. What did you discuss about that?

A. We talked about the process for privilege view. And he confirmed that when we're in 10:31:35

litigation, and we have a document production, that the document production is sent to our outside counsel, and that the outside counsel is responsible for conducting a privilege review. 10:31:38

Q. You also listed privilege review as something that you discussed with -- with Mr. Murray. 10:31:51

Did you discuss anything else beyond what you just said?

A. No. 10:31:58

Q. Okay. And you said you discussed document retention with Mr. Murray.

What did you discuss about that?

A. I don't remember all of the conversation, but, in essence, what the document retention is for emails and documents, chat applications, you know, normally when people are on litigation hold, that's the essence -- it was the essence for our conversation. 10:32:07

Q. Anything other than document privilege review and document retention discussed with Mr. Murray? 10:32:27

A. Not that I remember.

Q. You also said you talked to Mia Mazza?

A. I did. 10:32:41

Q. -- can you tell me what you did to prepare to testify on that topic? 10:44:32
A. Give me one second here.
Q. Sure.
A. I mean, it would be all the same things I've already identified to you with respect to the use of the attorney-client privilege. 10:44:43
I have talked to a lot of the same people, reviewed a lot of the same docs. And then, of course, just based on my own knowledge of company policies and procedures. 10:44:57
Q. Going back to the people you spoke with about attorney-client privilege, which included Mr. Majalya and Pam --
A. Uh-huh. 10:45:16
Q. -- why is it that you asked them about whether they were aware of any reports of misuse of the privilege designation?
A. Because they -- they are the two people I know in the company that if there was a report about the misuse of it, they are likely to be the ones that would investigate it. 10:45:26
So they are a good resource to know if this is something that is being reported and something that needs investigation. 10:45:37

knowledge of reports of misuse of the 10:46:31
attorney-client privilege designation?

A. I did not. But, like I said, I think, more than likely, that would go to those two individuals. 10:46:40

Q. Mr. Majalya isn't the only compliance attorney in the company; is that correct?

A. He's not.

Q. Okay. Is there some reason why you thought that it -- only speaking with him and not 10:46:54 other compliance attorneys would be sufficient?

A. I did. Because he oversees compliance. He's in charge of compliance.

Q. Okay.

A. And the same applies to Pam. I mean, 10:47:05 she's in charge of ER.

Q. Gotcha.

For Topic 3.3, you said to -- to prepare for it, you -- you talked to the same people and reviewed the same documents; is that correct? 10:47:26

A. In essence, yes, related to attorney-client privilege used. And, plus, my own knowledge of what happens at the company with respect to training on attorney-client privilege and policies. 10:47:40

 Q. And so, is there anything further that you did to prepare to testify on Topics 2, and 3.3 that we haven't discussed already? 10:47:49
A. Not that I remember.
Q. You mentioned your awareness of the training that's done on attorney-client privilege? 10:48:02
A. I did.
Q. Okay. Can you tell me what -- what training is done?
A. So at a high level, when new employees are hired, they receive training on the attorney-client privilege, and then there's training that happens periodically throughout the year for different groups in the business. 10:48:12
Q. Who does the trainings? 10:48:33
A. Different people -- mostly, the people I know are all in the legal department. Many of those people are in my department. But different people do it.
Q. So let me break it down. 10:48:45
You said there's training for new hires?
A. Uh-huh. That's correct.
Q. Who is responsible for trainings for new hires?
A. I -- I don't know specifically who is 10:48:52

responsible for it, but there's -- there is 10:48:54
training that goes on. It's not -- it's a video.
Q. Okay. And then you said there's periodic training?
A. That's correct. 10:49:09
Q. Okay. And the periodic training is for various different departments at different times?
A. That's right.
Q. Okay. And it's put on by somebody in legal at all times? 10:49:20
A. Typ- -- typically, a lawyer in legal. I would say almost always a lawyer in legal.
Q. And is there a particular group within legal that is responsible for that?
A. There's not. Not formally. But a lot of 10:49:34 the times, people in my department do it.
Q. And when you say your department, you mean litigation?
A. I do.
Q. Okay. Have you ever done one of these 10:49:44 trainings?
A. You know, I was scheduled to do one, and then it got canceled. And I'm scheduled to do one either in January or March. But others in my department have. And I participate in the 10:49:53

preparation of the materials for the training. 10:49:57

Q. Are there -- is it the same materials that are used for trainings over and over, or do they get changed?

A. In essence, they are the same, you know. 10:50:13 In essence, they are the same. Sometimes there is tweaks to it for the particular audience that you are talking to. All right?

We are talking to nonlawyers, so we've got to try to present it in a way that, you know, 10:50:24 will be palatable to them and -- and capture their attention. We want them to pay attention.

So nothing really in substance changes as far as, you know, what the goals of the training are. But little tweaks to the presentations are 10:50:37 sometimes present.

Q. Is there -- are these periodic trainings given on any sort of routine basis?

A. I wouldn't call it routine. I would just say as needed. 10:50:59

Q. When you say "as needed," how is it determined that it is as needed?

A. It could be a variety of different ways. We could be asked. We -- and when I say "we," I mean we in the litigation department or people in 10:51:14

legal. We could be asked. We could make a determination on our own that it should be done. 10:51:16

Those are the ways I know of.

Q. When the legal department is asked to do one of these periodic trainings about attorney-client privilege, is that because, you know, people need a refresher on how to do it properly? 10:51:32

A. I -- I don't recall why people have asked. I just know it's been asked for. I can't tell you what the reasons for it were. You know, the goals remain the same, so it's irrelevant to me whether somebody asks or whether we decide to affirmatively do it. The goal is the same. 10:51:41

Q. And when the legal department decides to affirmatively do it, is that because somebody in the legal department has noticed these nonlawyers kind of need more training? They -- they are not doing it right? 10:51:55

A. Well, the reason for it is this, right? And it's probably hard to get if you've -- you know, you are a lawyer. You've spent your life at a firm, but just -- just think about dealing with a company of mostly nonlawyers. They don't know anything about litigation. They don't know about 10:52:06 10:52:19

discovery. They don't know probably what the attorney-client privilege means. 10:52:23

And we know. We have new people come to the company all the time. And so we will go out there periodically and just make sure we do the training because we want people to understand what the privilege is and make sure they are trained appropriately on it. 10:52:32

Q. So there -- you don't recall any of these periodic trainings being because of, like, a particular need to -- or identification of people not using the privilege correctly? 10:52:44

A. No, no.

Q. All right. Let's talk about ephemeral messaging in a little bit more detail. 10:53:03

A. Okay.

Q. So we'll -- we'll start with Exhibit 9726 that you have.

A. Uh-huh.

Q. And Tab 1 is the personnel who have used Wickr or similar platform; is that right? 10:53:22

A. I'm there. Yup.

Q. And you've discussed this with Ms. Ray, correct?

A. I did. 10:53:36

A. It would be platforms or chat apps, whatever words you want to use that are considered ephemeral. 10:59:26

Q. And when you say "ephemeral," what do you mean by that? 10:59:32

A. Well, I mean temporary. So that's all ephemeral means, is that it's retained for a certain period of time. Sort of like Google and off the record. Right? It's temporary.

Same with Wickr. It's temporary. 10:59:44

Q. Okay. And so HipChat was not?

A. HipChat had a retention to it. But I just don't think people typically thought of HipChat as ephemeral, the way they think of Google Hangouts or Wickr. 10:59:58

Q. And did you discuss with anybody whether HipChat qualified as being ephemeral or not?

A. I did not. It was just based on -- I don't know if I talked to anybody about that specifically. I really don't remember. But just -- I just don't think people consider it to be ephemeral the way they do Google Hangouts with off the record or Wickr. 11:00:21

So that's -- that's the most I can tell you. 11:00:33

Q. Did -- did Uber have an account and provide HipChat to -- to users? 11:01:39

A. Yes, yes.

Q. Okay. For uChat, you said there was a transition to uChat earlier this year; is that correct? 11:01:51

A. I did.

Q. Okay. And uChat is not listed on Tab 1?

A. Same reasons. Same answers.

Q. And so we have a clear record, what is -- what is the reason -- your understanding of why uChat wasn't included? 11:02:02

A. The same reason, that I don't think the way people think about ephemeral communications they considered uChat to be ephemeral. 11:02:16

Q. You've mentioned Google Hangouts, correct?

A. I did.

Q. Okay. And that does appear on Tab 1 occasionally. 11:02:53

What is your understanding of Hangouts?

A. That it's a chat application that has off the record and on the record, so it can be ephemeral. And that's the full extent of what I know. 11:03:12

purposes," were there specific business purposes it was -- 11:28:53

A. I don't know if they were specific, but I know people on the security team used it.

Q. Was there any guidance provided to employees about when it was appropriate to use WickrMe for business purposes? 11:29:02

A. Well, there was -- there's guidance on when not to use it and -- but it doesn't just apply to WickrMe. It applies to all chat applications. And the guidance was not to use it to discuss topics that are subject to a litigation hold. 11:29:16

Q. And that was a guidance for all chat applications --

A. Yes. 11:29:31

Q. -- is that what you said?

And so that, that guidance to not use these chat applications for subjects covered by a litigation hold, that would really only come into play once there was some reason to have a litigation hold -- 11:29:49

A. That is correct.

Q. -- correct?

Okay. So, for example, the -- Uber acquired Otto well before this lawsuit was filed. 11:29:59

look at the bottom of Exhibit 9729 -- 11:38:55
A. Okay.
Q. -- the paragraph that says, "Uber Chat Applications are the following" --
A. Yes. 11:39:05
Q. -- and does that list uChat and Google Hangouts as authorized chat applications?
A. Well, it -- it -- it identifies them in there, and then it talks about them on the next page. But, yes. 11:39:18
Q. And this paragraph says that, "All other chat applications, including but not limited to Wickr, Telegram, Signal, WeChat, and Snapchat, are not Uber Chat Applications and employees are prohibited from using these for business 11:39:28 communications," correct?
A. That is correct as of the date this policy went into place in September, true.
Q. And prior to this date, employees were not prohibited from using any of -- any of those 11:39:41 communications applications listed there?
A. Well, except for the fact they were prohibited from using them if they wanted to talk about things that were subject to a litigation hold. 11:39:53

But, again, I don't know. 01:03:03

Q. And remind me: Your understanding that the security department is the only department that has used nonattributable devices, what is that based on? 01:03:11

A. It's based on my own personal knowledge, my discussion with Nick Gicinto and my discussion with Eric Meyhofer and -- and just my own knowledge.

Q. Would the security department track the use of nonattributable devices by other departments? 01:03:24

A. No, they would not.

Q. Okay.

A. I'm not -- 01:03:34

Q. Sorry.

A. That was my fault. You go ahead.

Q. That's -- knowing the total use of nonattributable devices within the company is part -- not part of the umbrella of the security department's obligations or duties? 01:03:42

A. Well, that's -- that's a strange way to ask the question. So let me answer it this way: I wouldn't think Nick, who provided this information, would be analyzing that for other departments. 01:03:57

department? 01:18:35

A. Yes.

Q. Do nonlawyers provide trainings or guidance on when other employees should use attorney-client privilege designations? 01:18:46

A. Not that aware of, but I didn't want to be 100 percent on that it's only people in the legal department. Because, for example, I explained to you that Pam said that if she saw somebody using the privilege in a way they 01:18:58 shouldn't be doing it, she would correct them.

Q. And did you investigate whether, for example, department heads give trainings to their employees about the use of the attorney-client privilege? 01:19:09

A. I -- I did not.

Q. Does Uber instruct its employees to include attorneys in the "to" line of emails so that Uber can argue that the email is privileged?

MR. BRILLE: Objection. Form. 01:19:40

THE DEPONENT: That would be inconsistent with our training.

Q. (By Ms. Roberts) And you are not aware of whether individual employees have done that?

A. I am not. 01:19:47

Craig Clark. 01:31:28
Q. He's cc'd on the email, correct?
A. Right. Yes.
Q. And Craig Clark is an attorney?
A. He is. 01:31:33
Q. And he was an internal Uber attorney, correct?
A. Yes.
Q. Okay. And is this consistent with -- with Uber policy to add an attorney and label 01:31:42 everything privileged?
MR. BRILLE: Objection. Form.
THE DEPONENT: Yeah. So I don't know the context of this document, so you are asking me on the fly. I would say, that's not consistent with 01:31:54 our policy; and, again, why we have our outside counsel making the privilege calls, which is also how you -- just like the other documents you have shown me, this is how it got into your hands.
Q. (By Ms. Roberts) I'm going to hand you 01:32:32 what was previously marked as Exhibit 9022.
Let me know when you are ready.
Have you seen this document before?
A. I have.
Q. When did you see this document? 01:33:03

A. You know, I looked at it in preparing for the deposition, but I had seen it before. 01:33:04
Q. When did you see it before?
A. I don't recall, at some -- some point in the last year. 01:33:10
Q. Did you see it before Mr. Jacobs' letter was disclosed in this litigation?
A. Yes.
Q. Okay. So you saw it outside of the context of what's going on in this case? 01:33:23
A. As I said, yes.
Q. And if you could take a minute, but I'm -- I'm wondering if this is the same version that you saw.
A. Okay. Let me look through and see. 01:33:36
I think this is the same version I saw.
Q. Do you know if there are more than one version of this presentation?
A. I don't think there are. I can't -- I mean, I can't be 100 percent, but I really don't think there are. There is -- sorry. 01:34:13
Q. I will represent to you that in Mr. Jacobs' letter, he says that the presentation that he saw Mr. Clark give didn't have any Uber branding on it. 01:34:27

Whereas, the first page of this exhibit does have Uber. So that's why I was asking if you were aware of other versions. 01:34:28

A. Yeah. I -- you know, again, I wasn't responsible for the Jacobs investigation. But I -- I -- you know, I just think he's wrong about that. 01:34:40

Q. In what context did you see this presentation prior to today?

A. It was in discussing with others in the department, giving training on the use of the attorney-client privilege. This was sent to me in the context of that. I think Craig forwarded it to Angela, and Angela sent it to me. 01:35:01

Q. And what was discussed about training in the context of this presentation? 01:35:15

MR. BRILLE: I'm going to object to the extent you are asking him to disclose privileged communications, but...

THE DEPONENT: Okay. I'm not going to disclose privileged communications -- 01:35:24

MR. BRILLE: Yeah.

THE DEPONENT: -- but just to make it easier, we discussed training.

Q. (By Ms. Roberts) Was this presentation used in more than one training? 01:35:31

01:56:51

MR. BRILLE: Same objection.

THE DEPONENT: Yes. We were -- we were working on a project that people commonly referred to as . It would take me a long time to explain it. 01:57:03

Do you have a specific question related to it?

Q. (By Ms. Roberts) Well, so when I asked you what was sort of a few minutes ago -- 01:57:15

A. Yeah.

Q. -- and you said it's --

A. Yes.

Q. -- I want to talk specifically about the 01:57:24

A. Okay.

Q. Can you describe for me what that project was? 01:57:35

A.

01:57:54



Q. And has that [REDACTED] been implemented? 01:58:16

A. No.

Q. Was it tested?

A. It -- what do you mean by tested?

Q. Well, let's take a step back.

When you say the project involved 01:58:26

A. I did say that.

Q. Okay. So what --

MR. BRILLE: Objection. Form. Scope.

THE DEPONENT:

01:59:24

A. All right. Andrea, I'm going to help you out here. 02:00:24

MR. BRILLE: Same objections.

THE DEPONENT:

02:01:15

[redacted]

Q. (By Ms. Roberts) [redacted]

[redacted]

MR. BRILLE: Yeah, I'm going to -- I'm just going to caution you to not disclose any privileged information. I don't know if you consider it privileged. I'm just going to caution you. 02:01:27

THE DEPONENT: I don't consider this privileged. 02:01:35

MR. BRILLE: Okay.

THE DEPONENT: [redacted]

Q. (By Ms. Roberts) [redacted]

02:02:05

Q. I got it right? 02:02:06
A. That's correct. You got it right. Good work.
Q. Thank you.
Were any law firms involved in the 02:02:15 analysis about whether to implement this [redacted] [redacted]?
A. Right. So you have read the documents.
[redacted]
[redacted] 02:02:30
Q. And when did Uber start considering the -- what we are calling the [redacted]?
A. You know, that's before my time. But my best estimation would be in the summer/fall of 2016, but prior to my arrival at Uber. 02:02:55
Q. And I know you said this at the beginning, but you started in late 2016?
A. Yeah, November 7th of 2016.
Q. Okay. Then you said [redacted]
[redacted] [redacted]
[redacted]
Were there law firms that were not authorized that provided the advice?
A. Any other law firm was not authorized.
Q. [redacted] 02:03:25

A. Yes.

Q. Okay. What's -- what's his background? 02:04:21

02:05:28

[redacted]

Q. I see. Okay. Thanks.

Do you know why Uber was [redacted] 02:06:52

MR. BRILLE: Objection. Form. Scope. 02:06:54

THE DEPONENT:

02:08:03

02:08:07

MR. BRILLE: Objection. Form. Scope.

THE DEPONENT: Quite the opposite.

Q. (By Ms. Roberts) Okay.

A.

Q. Okay.

02:08:57

[redacted]

MR. BRILLE: Objection. Form. Scope.

THE DEPONENT: We had ideas about it, but no final decision had been made. 02:09:11

Q. (By Ms. Roberts) [redacted]

MR. BRILLE: Objection. Form. Scope.

[redacted] 02:10:09

A. Right. 02:31:38

Q. -- dated November 16th, 2016?

A. Right.

Q. Do you see at the -- the first line there says, "A number of ATG users recently lost email 02:31:42 older than 180 days. A restore is in progress"?

A. I see that.

Q. Okay. Do you have any information about that?

A. I don't. 02:31:51

MS. ROBERTS: Why don't we take a break. I'm close to done. I just need to organize my notes here.

THE VIDEOGRAPHER: We are off the record at 2:32 p.m. 02:32:16

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record at 2:39 p.m.

Q. (By Ms. Roberts) Going back to beginning of the day when we talked about your discussions 02:39:39 with Mr. Meyhofer to prepare for your testimony --

A. Sure.

Q. -- you said you talked to him about nonattributable devices and ephemeral communications. 02:39:49

Did you discuss with him the use of attorney-client privilege designations by ATG members? 02:39:49

A. I mean, yes, we talked about how the attorney-client privilege should be used, and he told me what his thoughts were on that. 02:40:05

Q. Okay. And can you --

A. And -- and we also talked about -- your sort of sparking a memory here. I think we also did talk about the use of attorney-client privilege as it related to the Waymo case. 02:40:21

And I'm trying to remember. Yeah, we did talk about the attorney-client privilege and how -- how it should be used.

Q. And what did Mr. Meyhofer tell you? 02:40:43

A. He relayed to me that it was important to use it only when appropriate, only when seeking legal advice from a lawyer.

Q. And did you ask him about his personal use of the attorney-client privilege designation or the use within the group? 02:40:58

A. The discussion was more his understanding, and as the leader of ATG, his expectations of the people that report to him, which is everybody in ATG. That should be used 02:41:11

only when appropriate. 02:41:14

Q. Did you ask him about any training that's been provided to the ATG group about attorney-client privilege designations?

A. I didn't because I don't -- I don't know 02:41:23 that he would know about that. I did not.

Q. If we go back to Topic 2 -- and I don't know if you want to get it in front of you or not --

A. Right. 02:41:42

Q. -- but it asks about defendants' use of -- use of methods or strategies to conceal facts from discovery by external parties and litigation or government investigations.

And then it lists, including improper 02:41:50 attorney-client and other privileged designations, ephemeral or encrypted communications, nonattributable devices or anonymous servers.

In preparing for your testimony today, did you ask anybody about other methods or 02:42:07 strategies to conceal facts from discovery by external parties?

A. I focused on the ones you identified.

Q. So in your discussions with Mr. Meyhofer, you didn't ask him whether there are other methods 02:42:22

or strategies that the ATG group uses to conceal facts from discovery by external parties? 02:42:25

A. I didn't feel the need to ask him because it was clear in my discussion with him that any attempt to conceal information from discovery in litigation was unacceptable. 02:42:36

Q. Who said that, you or him?

A. That's my summary of our discussion. I didn't feel the need to ask him, was there anything else other than the three things identified in your notice. Because in whatever words he used, he made it clear to me that doing so would be unacceptable. 02:42:50

Q. So he told --

A. Regardless of methodology.

Q. And when you spoke with Mr. Gicinto, did you ask him about the use of methods or strategies to conceal facts from discovery other than those specifically outlined in the topic? 02:43:00

A. Not in way you are phrasing it, no. I don't recall that coming up. 02:43:15

Q. I'm sorry, I don't understand what you're saying, not in -- not in the way you're phrasing it.

A. I didn't discuss that topic with him the way you phrased it in your question. 02:43:23

I, Rebecca L. Romano, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: December 22, 2017

Rebecca L. Romano, RPR,

CSR. No 12546