# EXHIBIT 8

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


WAYMO LLC,

              Plaintiff,

vs.                          Case No.

UBER TECHNOLOGIES, INC.;       3:17-cv-00939-WHA

OTTOMOTTO LLC; OTTO TRUCKING LLC,

              Defendants.

_____/


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEOTAPED 30(b)(6) DEPOSITION OF MATHEW HENLEY

FRIDAY, DECEMBER 22, 2017




Reported by:

Anrae Wimberley

CSR No. 7778

Job No. 2771361A


PAGES 1 - 145

Page 63

1      A.   Three.  We can limit it to three.  You're          10:44:29

2   correct, it's three.

3           On December 19th at 10:45 in the morning,

4   I get this alert from LinkedIn telling me that Jeff,

5   who is in this room, is viewing my profile.  Right.        10:44:40

6   This tells me a lot.  Right.  This is -- it's not

7   unexpected, but it's -- please let me finish --

8      Q.   No, I mean --

9      A.   You asked me to explain what the documents

10  are, and I'm going to explain what the documents           10:44:56

11  are.

12     Q.   Okay.  I'm going to withdraw the question

13  again.  Okay.

14          MR. LYONS:  Let's go off the record, Counsel.

15  BY MR. LYONS:                                              10:45:02

16     Q.   You can tell me what this is, but this is

17  not --

18     A.   I'm trying to tell you what this is.

19          MR. UMHOFER:  Hang on.  Time out.  Let's just

20  go off the record and take one step at a time.             10:45:06

21          THE VIDEOGRAPHER:  Going off the record at

22  10:45 a.m.

23          (Discussion off the record.)

24          THE VIDEOGRAPHER:  Back on the record at

25  10:57 a.m.                                                 10:57:33

Page 64

1    MR. LYONS:  So I believe the witness has come            10:57:34

2  with multiple copies of a three-page exhibit that he

3  would like to explain.  Counsel and I have had a

4  conversation off the record.  So I think we're going

5  to proceed in this fashion.                               10:57:47

6  BY MR. LYONS:

7    Q.   Mr. Henley, you have a three-page exhibit

8  here.  Why don't you tell me what your purpose in

9  bringing this exhibit was today.

10    A.   Yes.                                               10:57:57

11    MR. LYONS:  And we'll just mark this next in

12  order.

13         (Plaintiff's Exhibit 9777 was marked.)

14    THE WITNESS:  So my only reason for bringing

15  this today was -- these are often foreign concepts       10:58:17

16  as to why people use what are being termed as

17  "non-attributable devices" and why we use things

18  like MiFis and AWS.

19         So over the past couple weeks, these are

20  things that show up in my inbox that give me notice.     10:58:37

21  And I'm by no means saying this is wrong, but it's

22  just to relate to something that you guys will

23  understand so I'm hoping that you will then take

24  this to understand why we do it.

25         So I don't know who Jeff is.  I do now,           10:58:54

Page 65

```
 1   but, you know . . .                                    10:58:58
 2           And, Jeff, I sent you a LinkedIn request
 3   you didn't accept, after you viewed it.
 4       MR. NARDINELLI:  I don't think I got that
 5   e-mail.  I'm not very talented with LinkedIn.          10:59:06
 6       THE WITNESS:  But it gives context around that
 7   Jeff is looking at my stuff.  And then on my
 8   personal website, there's triggers that will fire
 9   off links here.  And what these two are, it shows
10   that the Quinn office is poking around on my          10:59:21
11   personal website on December 20th at 11:28.
12           And, you know, very open records here.  If
13   I check out -- that IP on the third page with Arin
14   shows that, in fact, the IP does belong to your law
15   firm.                                                 10:59:37
16           So these are the things -- if you could
17   put this in the concept of the SSG team and dealing
18   with a hostile group, let's say, ███████████
██   ██████████████████████████████████
██   █████████████████████████████████         ███████████
██   ████████████████████████████████████
██   █████████████████████████
23           They use a separate laptop so that they
24   don't -- they avoid what happened to Jeff here.
25   Like Jeff using LinkedIn for his personal stuff is    11:00:06
```

1   not something we want to cross over into his work          11:00:10

2   stuff, which was preparing for my deposition.

3          The same thing goes for the IP addresses.

4   We don't want them showing that the IP addresses are

5   coming from an Uber office.  We want it coming from       11:00:25

6   a MiFi, which is -- blends in with a bunch of other

7   people.

8          So it's just a document that I wanted you

9   guys to use for context in helping you understand

10  something that I know as lawyers isn't something          11:00:33

11  that's normal, but it's something very normal in the

12  security industry.

13  BY MR. LYONS:

14      Q.   What would be very helpful for me now is

15  to make sure I understand the nomenclature of the        11:00:42

16  concepts that you've described.  Because I think you

17  understand the concepts and, for some reason, we

18  have not been able to get past the nomenclature.

19          So on page 3, you have a record here that

20  apparently you believe shows you some information.       11:01:03

21          So what information are you telling me is

22  demonstrated by what is on page 3?

23      A.   On page 3 of my document?

24      Q.   Yes.

25      A.   So page 3, it is referencing the IP            11:01:16

1    address on the previous page.  And I'm asking Arin,          11:01:21

2    A-r-i-n -- not Aaron at the end of the table, he

3    wouldn't have any clue on this stuff -- who owns

4    that IP address.  Arin replies that Quinn Emanuel

5    owns that IP address, which gives me the indications     11:01:39

6    that Quinn is looking at it.

7          The way this is used in an offensive

8    manner by people we are looking at is -- you could

9    imagine if I know that you guys aren't careful with

10   this stuff and you start looking at mine, maybe I       11:01:59

11   show you a different website, right, and I don't

12   show you what it is because I don't want you looking

13   at it.

14          And this is why obfuscation is important.

15   Again, if you were researching someone that had         11:02:09

16   violent tendencies, I'm sure you wouldn't want your

17   attorneys being called out specifically who is doing

18   it.

19      Q.   Again, I appreciate that.  I don't know

20   that we're here today to discuss the reasons why        11:02:21

21   things were done the way that they were done, but I

22   understand that you felt the need to clarify that.

23   I think I'm more interested in finding out what

24   actually was done.  And I think one way to get that

25   would be to make certain that I understand the          11:02:34

Page  73

1     Q.    What was the purpose of utilizing chat       11:09:55

2   products?

3     A.    Communication.

4     Q.    List for me the reasons that you

5   recommended Wickr Messenger over other chat          11:10:12

6   products.

7     A.    Wickr Messenger provided end-to-end

8   encryption.  It provided both desktop and mobile

9   versions.  It provided ephemerality, and it provided

10  group conversations.                                 11:10:38

11    Q.    Were there any other advantages to Wickr

12  Messenger over other chat products that you

13  identified?

14    A.    Those were the main components that I was

15  looking at when evaluating my personal preference    11:10:49

16  around chat products.

17    Q.    Did you share these features as -- strike

18  that.

19          In suggesting that other people utilize

20  Wickr Messenger, did you inform them of these        11:11:04

21  benefits that you identified?

22    A.    I don't remember, but I'm sure that I

23  would have had those discussions.

24    Q.    With regard to ephemerality, do you recall

25  having any conversations with anyone at Uber at any  11:11:16

Page  114

```
 1              Did you ever have any conversations with      12:48:57

 2  Mr. Sullivan about this topic?

 3       A.   We told him about the situation.  And Joe

 4  sending this back to Craig and I -- and this is me

 5  speculating, but this is how we read an e-mail like    12:49:12

 6  from Joe, is to let us know that he has made Anthony

 7  aware of the situation.

 8       Q.   You see at the bottom of the e-mail,

 9  there's a reference -- there's a statement that

10  says, "Because it was prepared for/by legal, this is   12:49:24

11  privileged."

12              Do you see that?

13       A.   I do.

14       MS. CHANG:  Objection; outside the scope of the

15  30(b)(6) topics for which this witness has been        12:49:32

16  designated.

17              Are you done with the 30(b)(6)?

18       MR. LYONS:  No.  I will come back to this

19  exhibit if you want.  I promise you I won't forget

20  about it.  To make life easier, I thought I'd get to   12:49:42

21  it now.

22       MS. CHANG:  Okay.

23  BY MR. LYONS:

24       Q.   So we're going to come back to this topic.

25              Let me just ask you:  Do you recall        12:49:53
```

Page 115

1    receiving any instructions at any time by anyone to        12:49:55

2    put that type of notation at the bottom of any

3    e-mail?

4        A.    Specifically, "Because it was prepared

5    for/by legal, this is privileged"?                          12:50:06

6        Q.    Not specifically those words, but that

7    concept.

8        A.    You know, if it was something I was

9    working on for our legal department, generally that

10   would be something I would -- I would -- I would           12:50:20

11   send.  But, again, I'm not a lawyer and it was

12   more -- yeah, I don't know.  If it was something

13   that was specifically done at the direction of a

14   lawyer, I would note it as --

15       Q.    My question was simply, do you recall            12:50:43

16   receiving any instructions by anyone to put that

17   type of notation at the bottom of any e-mail?

18       A.    Not the way you just answer -- or asked

19   that question.

20       Q.    Okay.  Was it your practice to put that          12:50:57

21   notation at the bottom of your e-mails, that --

22   where you did something for a lawyer?

23       A.    If I was working on work product for a

24   lawyer, then it would be designated as such.

25       Q.    That was your practice; is that what            12:51:23

Page 125

```
1   parties have in place relating to litigation holds        13:06:15

2   and ephemeral messaging.

3        MR. LYONS:  Okay.

4        THE WITNESS:  My conversation was that this was

5   making the company less secure and putting us more        13:06:26

6   at risk by pushing this policy.

7   BY MR. LYONS:

8        Q.   Was that your position?

9        A.   That was my position.

10       Q.   Did anybody have a similar position or           13:06:41

11   express a similar view in that meeting?

12       A.   Yes.

13       Q.   Who?

14       A.   Joe Sullivan.

15       Q.   Did Mr. Clark express any views?                 13:06:50

16       A.   Yes.

17       Q.   What did he say?

18       A.   He had the same position.

19       Q.   And what were the reasons that you felt

20   that this was making the company less secure?             13:06:59

21
                                                               13:07:20
```

Page 126

1   ████████████████████████████████     ██████

██  ██████████████████████████████████

██  ██████████████████████████  And

4   now you were forcing us to go back to that again due

5   to what I believe are optics.                          13:07:42

6        Q.    Was there any discussion about not

7   complying with this policy?

8        A.    Not complying?

9        Q.    Yes.

10       A.    No.                                          13:07:50

11       Q.    Now, after the policy went into effect,

12  what communications do you recall having about this

13  policy?

14       A.    I would say they were very similar.   My

15  continued ranting that this made Uber a worse place    13:08:00

16  from a risk perspective in the context of security

17  of our employees, drivers and riders.

18       MR. LYONS:   Mark this as our next in order.

19            (Plaintiff's Exhibit 9786 was marked.)

20  BY MR. LYONS:                                          13:09:16

21       Q.    This is an e-mail from Nick Gicinto to

22  several people; Anna Chung, Ed Russo, Jake Nocon,

23  Jimmy Stelter, Julie Ambrose, Randy Wanis and

24  Shawnee Delaney.

25            Do you see that?                             13:09:30

Page 141

```
 1    together this list.  But as far as people that I        13:35:11

 2    know I had instructed to onboard, those were the two

 3    individuals.

 4        Q.   Are you aware of anyone in the ATG group

 5    that uses a non-attributable device?                    13:35:26

 6        A.   I'm not aware of anyone in the ATG group.

 7        Q.   Are you aware of the use of Wickr to

 8    discuss any Waymo trade secrets?

 9        A.   I'm not aware of any use of Wickr to

10    discuss Waymo trade secrets.                            13:35:57

11        Q.   Are you aware of the use of

12    non-attributable devices to hide Waymo trade

13    secrets?

14        A.   I'm not aware of any non-attributable

15    devices used to hide Waymo trade secrets.               13:36:14

16        MS. CHANG:  No further questions.

17        MR. LYONS:  I may have one or two follow-ups

18    maybe.

19                  FURTHER EXAMINATION

20    BY MR. LYONS:                                           13:37:07

21        Q.   When counsel was asking you some questions

22    a moment ago, she asked you, "Are you aware of the

23    use of non-attributable devices to hide Waymo trade

24    secrets?"

25             What did you understand the term            13:37:17
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

FEDERAL CERTIFICATE OF DEPOSITION OFFICER

I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby declare:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction;

--X---   That the witness was requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure;

-----   No changes have been provided by the witness during the period allowed;

-----   The changes made by the witness are appended to the transcript;

-----   No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event of the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

WITNESS my hand this 26th day of December, 2017.

ANRAE WIMBERLEY, CSR NO. 7778

Page 145