# EXHIBIT 9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

WAYMO LLC,

        Plaintiff,

vs.                     Case No. 3:17-cv-00939-WHA

UBER TECHNOLOGIES, INC.;

OTTOMOTTO LLC; OTTO TRUCKING LLC,

        Defendants.

_____/

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF RICHARD JACOBS

WEDNESDAY, DECEMBER 20, 2017

Reported by:

Anrae Wimberley

CSR No. 7778

Job No. 2771350

Pages 1 - 218

1  there in Pittsburgh.  Shortly after that fact, he
2  described to me what they had done there and the
3  details that I just provided.
4       Q.   And by "he," you're referring to
5  Mr. Gicinto?
6       A.   Correct.  Yes.
7       Q.   Okay.  I am -- so I still have some time
8  left, but Mr. Gonzalez has some questions.
9       MR. PERLSON:  So I'm going to stop for now, and
10 I'll reconvene with whatever questions I have left
11 after that.
12      MR. GONZALEZ:  Let's go off the record just so
13 we can switch spots.
14      THE VIDEOGRAPHER:  Off the record at 4:20.
15           (Off the record.)
16      THE VIDEOGRAPHER:  Back on the record at 4:21.
17                    EXAMINATION
18 BY MR. GONZALEZ:
19      Q.   Mr. Jacobs, have you and I spoken since
20 you testified in court before Judge Alsup?
21      A.   No.
22      Q.   I have just a few follow-up questions.
23 Hopefully it won't take too long.
24           Have you ever been to the Pittsburgh
25 facility that -- where Uber has their autonomous

1    vehicle group?
2         A.   No.
3         Q.   You testified earlier about trips that
4    Mr. Russo and Mr. Gicinto and Mr. Nocon made to
5    Pittsburgh.
6              Did you participate in any type of
7    telephone conference with them while they were
8    there?
9         A.   I don't remember.
10        Q.   So is it fair to say that you do not have
11   firsthand knowledge of what they may have told the
12   people in Pittsburgh?
13             Is that fair?
14        MR. PERLSON:   Objection, form.
15        THE WITNESS:   I have no firsthand knowledge of
16   what they told them.  I was not there.
17   BY MR. GONZALEZ:
18        Q.   Have you ever communicated with anybody in
19   Pittsburgh's autonomous group with a
20   non-attributable device?
21        A.   No.
22        Q.   Did you ever provide a non-attributable
23   device to anybody in Pittsburgh's autonomous vehicle
24   group?
25        A.   No.

1      Q.   Do you know whether or not anybody in the
2   autonomous vehicle group anywhere at Uber ever used
3   a non-attributable device?
4      MR. PERLSON:  Objection; form.
5      THE WITNESS:  No.
6   BY MR. GONZALEZ:
7      Q.   Have you ever communicated with anybody in
8   the autonomous vehicle group in Pittsburgh by Wickr?
9      A.   I don't think so.
10     Q.   There's been some testimony about labeling
11  documents as privileged when they may not be.  I'd
12  like to ask you about that.
13          Do you have any firsthand knowledge that
14  anyone at Uber's autonomous vehicle group ever
15  labeled a document as privileged when it was not?
16     A.   No.
17     Q.   Do you have any knowledge that anyone in
18  the vehicle autonomous group at Uber ever purposely
19  labeled the document as privileged in order to hide
20  it from discovery?
21     MR. PERLSON:  Objection; form.
22     THE WITNESS:  Could you restate the question,
23  please.
24  BY MR. GONZALEZ:
25     Q.   Yes.

 1                Do you have any knowledge that anyone in
 2     the autonomous vehicle group at Uber ever marked a
 3     document as privileged in order to hide it from
 4     discovery?
 5          A.   No.
 6          Q.   You mentioned some presentations by a
 7     lawyer named Mr. Clark.
 8                Did you ever attend a presentation by
 9     Mr. Clark to the autonomous vehicle group at Uber?
10          A.   No.
11          Q.   Do you know that the lawsuit that you're
12     testifying in involves the alleged theft of trade
13     secrets by Uber?
14          A.   That's my understanding, yes.
15          Q.   Do you know what those trade secrets are
16     that Uber allegedly stole?
17          A.   I don't.
18          Q.   Do you have any idea?
19          A.   I would be speculating, but I would -- I
20     think there might be something about LiDAR
21     technology.
22          Q.   Fair enough.
23                Other than knowing that it might involve
24     LiDAR, do you have any idea what the trade secrets
25     are that were allegedly stolen?

1      A.   No.
2      Q.   Have you ever seen any of the 14,000
3  documents that Anthony Levandowski allegedly took
4  from Waymo?
5      A.   I mean, I don't know what the documents
6  are, but not to my knowledge.
7      Q.   Did you ever have any conversation with
8  Mr. Levandowski about the alleged theft of trade
9  secrets from Google or Waymo?
10     A.   Nope.
11     Q.   Do you know whether any documents from
12 Google or Waymo ever made it to Uber?
13     A.   No.
14     Q.   Are you an engineer?
15     A.   No.
16     Q.   Do you even know how the LiDAR works?
17     A.   I don't know how any LiDAR works, no.
18     Q.   When you took the 150 to 400 documents --
19 or transferred them to your personal computer, did
20 you understand that that was Uber information?
21     MS. KOLLIOS:  Objection to form.
22     THE WITNESS:  I don't think I can answer that
23 question.  I don't understand it.
24 BY MR. GONZALEZ:
25     Q.   I guess -- I'm not trying to trick you.

1  I'm trying to draw a distinction between your own
2  personal documents and Uber documents.
3         Did you understand, when you transferred
4  the 150 to 400 documents, that many of those
5  documents were Uber documents as opposed to your own
6  personal documents?
7     A.   I wouldn't characterize it that way.
8     Q.   How would you characterize it?
9     A.   It was a very finite set of documents that
10 were relevant to potential litigation where I was
11 concerned that there would be a cover up and where I
12 had reason to ensure that the record was kept.
13    Q.   The resignation e-mail that you sent,
14 which has been marked as Exhibit 9629, who wrote
15 that?
16    MS. KOLLIOS:  Object to the extent that calls
17 for attorney-client communications.  I would
18 instruct him not to answer with respect to any of
19 that information.
20 BY MR. GONZALEZ:
21    Q.   Did you write it?
22    MS. KOLLIOS:  Same objection.
23    THE WITNESS:  I won't answer that.
24 BY MR. GONZALEZ:
25    Q.   Sorry?

1     A.    I won't answer that.
2     Q.    Had you already consulted with legal
3  counsel about the possibility of bringing an action
4  against Uber at the time that the resignation e-mail
5  was prepared?
6           MS. KOLLIOS:  You can answer whether you spoke
7  to legal counsel or not, not the substance of that
8  communication.
9           THE WITNESS:  Yes.
10 BY MR. GONZALEZ:
11    Q.    Was that legal counsel Mr. Halunen?
12    A.    My legal counsel at the time of
13 resignation was the Collier Law Firm and Gwilliam
14 Ivary Chiosso.  The latter firm was not retained
15 throughout my settlement discussions with Uber.
16 Halunen was later brought on.
17    Q.    The Halunen letter is dated May 5, and
18 your resignation e-mail is dated April 14.
19          When did you first make contact with
20 Mr. Halunen?
21    A.    I don't recall the specific date.
22    Q.    Somewhere in between those two dates?
23    A.    That's fair to say, yes.
24    Q.    With respect to your consulting agreement,
25 would it be fair to say that one of the things that

Page 193

1      A.    Thank you.
2      Q.    Are you aware of any Uber employees who
3  work in Pittsburgh as part of the autonomous vehicle
4  group who ever marked a document as privileged in
5  order to prevent it from being seen in litigation?
6      A.    No.
7      Q.    Now the same question with San Francisco,
8  because I realize you have some people here, too.
9      A.    Sure.
10     Q.    Are you aware of any Uber employees in San
11 Francisco who work on the design or development of
12 autonomous vehicles who marked a document as
13 privileged in order to prevent it from being seen in
14 litigation?
15     A.    No.
16     MR. GONZALEZ:  Okay.  Let's go off the record.
17     THE VIDEOGRAPHER:  Off the record at 4:47.
18          (Recess taken.)
19     THE VIDEOGRAPHER:  Back on the record at 4:52.
20              EXAMINATION RESUMED
21 BY MR. PERLSON:
22     Q.    Hello again, Mr. Jacobs.
23     A.    Sir.
24     Q.    On -- during Mr. Gonzalez's examination,
25 he had asked whether you had ever marked a document

```
 1         FEDERAL CERTIFICATE OF DEPOSITION OFFICER
 2         I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby
    declare:
 3         That, prior to being examined, the witness
    named in the foregoing deposition was by me duly
 4  sworn pursuant to Section 30(f)(1) of the Federal
    Rules of Civil Procedure and the deposition is a
 5  true record of the testimony given by the witness;
 6         That said deposition was taken down by me in
    shorthand at the time and place therein named and
 7  thereafter reduced to text under my direction;
 8         --X---   That the witness was requested to
    review the transcript and make any changes to the
 9  transcript as a result of that review pursuant to
    Section 30(e) of the Federal Rules of Civil
10  Procedure;
11         -----   No changes have been provided by the
    witness during the period allowed;
12         -----   The changes made by the witness are
13  appended to the transcript;
14         -----   No request was made that the
    transcript be reviewed pursuant to Section 30(e) of
15  the Federal Rules of Civil Procedure.
16         I further declare that I have no interest in
    the event of the action.
17         I declare under penalty of perjury under the
18  laws of the United States of America that the
    foregoing is true and correct.
19         WITNESS my hand this 21st day of December, 2017.
20
21
22
23
24                      [signature: Anrae Wimberley]

25         ANRAE WIMBERLEY, CSR NO. 7778
```

Page 218