# EXHIBIT 11

Page 504

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


WAYMO LLC,

     Plaintiff,


         vs.             Case No. 17-cv-00939-WHA

UBER TECHNOLOGIES, INC.;

OTTOMOTTO, LLC; OTTO
TRUCKING LLC,
     Defendants.

_____


HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

VIDEO DEPOSITION OF TRAVIS KALANICK

San Francisco, California

Thursday, December 14, 2017

Volume III


REPORTED BY:

REBECCA L. ROMANO, RPR, CSR No. 12546

JOB NO. 2771242


PAGES 504 - 668

Page 537

```
 1              MR. PERLSON:  Sure.                    01:04:04

 2              THE DEPONENT:  -- that weren't attorneys.

 3         Q.   (By Mr. Perlson)  Do you have an

 4    understanding of what a "non-attributable device"

 5    is?                                              01:04:09

 6         A.   In prep- -- in preparation for this

 7    deposition, yes.

 8         Q.   All right.  Separate and apart from what

 9    you've talked about with your lawyers, is that a

10    term that you've ever used?                      01:04:18

11         A.   No.

12         Q.   Had you heard of, while you were CEO of

13    Uber, people using devices for their work at Uber

14    that were obtained by third parties such that they

15    couldn't be attributed back to Uber?             01:04:43

16         A.   No.  No.

17         Q.   Do you recall whether you, personally,

18    received a litigation hold notice in this case?

19         A.   I -- I did.

20         Q.   Okay.  And --                          01:05:14

21         A.   I don't recall receiving it, but I think,

22    as we have gone through this litigation, that's

23    something that I think certain folks have looked

24    at, and I'm aware of it, yes.

25         Q.   In -- in relation to that litigation    01:05:26
```

Page 541

```
1    of training with various attorneys, including our      01:09:48

2    general counsel, but -- what was I going to say.

3    The --

4           MS. DUNN:  So -- and, I'm sorry, David,

5    I'm going to interrupt your answer.                     01:09:57

6           The -- I -- I want to instruct the

7    witness not to go into advice that he may have been

8    given by attorneys; although, I think the question,

9    as you asked it, is an answerable question.

10          THE DEPONENT:  Okay.  Understood.                01:10:11

11          MS. DUNN:  I don't know if you --

12          THE DEPONENT:  Can you restate the

13   question real quick.

14       Q.  (By Mr. Perlson)  Sure.

15          Are you aware of any training that was           01:10:22

16   done --

17       A.  Yeah.

18       Q.  -- at Uber to instruct people on how to

19   use the "attorney-client privilege" Designations to

20   avoid having documents revealed in litigation?         01:10:32

21       A.  Yeah, so I'm aware of

22   attorney-client-privilege trainings that existed,

23   but I think they did the opposite, which is, they

24   instructed people on not using attorney-client

25   privilege in ways that it shouldn't be.                01:10:47
```

Page 637

```
 1    involved in any investigation on this.  The company      04:56:59
 2    certainly has conducted an investigation I have not
 3    seen the results of.
 4         Q.   (By Mr. Perlson)  Okay.  So sitting here
 5    today, you really are not in a position to say           04:57:12
 6    whether what's in here is true or not?
 7         A.   I can only say that I have -- like, with
 8    all the questions you've asked, I don't have any
 9    knowledge of those things that I've indicated I
10    have zero knowledge of.                                  04:57:25
11              It feels like this is a lot of creative
12    writing ex- -- creative writing exercise.  But we
13    have an investigation that will get to the bottom
14    of that.
15         Q.   Right.  Which you're not a part of?           04:57:39
16         A.   That's correct.
17              (Exhibit 9119 was marked for
18    identification by the court reporter and is
19    attached hereto.)
20              (Discussion off the stenographic record.)    04:58:23
21         Q.   (By Mr. Perlson)  I have handed you
22    what's been marked as Exhibit 9119, an email from
23    Halunen Law to Angela Padilla.
24              So have you seen this document before?
25         A.   No.                                           04:59:38
```

Page 638

```
 1        Q.   You're aware of its existence, correct?     04:59:49

 2        A.   Yes.

 3        Q.   And when were you first made aware of the

 4   existence of this May 5th letter on 919- -- 9119?

 5        A.   I don't know the exact date that I was      05:00:04

 6   made aware.  It was sort of, like, a -- a vague

 7   reference to a long letter that I had never seen.

 8        Q.   Okay.  Do you think it was close in time

 9   to the date of the letter, May 5th?

10        A.   I don't know for sure.  It felt like        05:00:23

11   it -- like -- it felt like there -- like it had

12   existed for a while when I heard of it, but I

13   wasn't at Uber much longer.  I mean, I had left --

14   leave of absence maybe a month after this and

15   resigned a month and a half -- so -- but it felt     05:00:40

16   like it -- it is the way it was -- the way it was

17   mentioned, it felt like it had been around for a

18   while.

19        Q.   Do you recall who -- who -- who would

20   have first told you about it?                         05:00:57

21        A.   It -- I -- it may have been Angela or --

22   or Joe.  I -- I can't remember which one, but it --

23   it's just my recollection was like this -- like a

24   vague, sort of, reference to a letter.  And

25   somebody said like 37 pages.                          05:01:17
```

Page 640

```
 1        A.    Okay.  Let me just read it real quick.        05:03:19
 2              Okay.
 3        Q.    Do you see that it indicates:  "Clark and
 4   Henley helped implement and directed the
 5   almost-exclusive use of ephemeral and encrypted         05:05:05
 6   communications software, including WickrMe (and
 7   later Wickr SCIF), to communicate sensitive
 8   information within ThreatOps"?
 9        A.    Yeah, I see that.
10        Q.    Do you have any knowledge of -- of that       05:05:22
11   occurring?
12        A.    No.
13        Q.    Were the operations of ThreatOps
14   something that you would have had insight to while
15   you were CEO?                                            05:05:38
16        A.    No.
17              MS. DUNN:  Objection to form.
18        Q.    (By Mr. Perlson)  If you look at --
19   actually, I told you I wasn't going to ask you
20   about the second paragraph and now I am, but --         05:05:51
21        A.    It's okay.  I read it.
22        Q.    The -- it says "Further, Clark and Henley
23   directly instructed Jacobs to conceal documents in
24   violation of Sarbanes-Oxley by attempting to
25   'shroud' them with attorney-client privilege or         05:06:08
```

Page 641

```
 1    work product protections.  Clark taught the          05:06:10

 2    ThreatOps team that if they marked communications

 3    as 'draft,' asked for a legal opinion, at the

 4    beginning of" the "email, and simply wrote

 5    'attorney-client privilege' on documents, they        05:06:20

 6    would be immune from discovery."

 7              Are you aware of any training to that

 8    effect by the -- to the ThreatOps team?

 9        A.   No.

10        Q.   Are you aware of any training to that         05:06:34

11    effect for -- at Uber outside of the ThreatOps

12    team?

13        A.   No.

14        Q.   If you see in the -- on page 7, it's --

15    title is "Concealment and Destruction of Records       05:07:18

16    Using Non-attributable Hardware."

17              Do you see that?  B?

18        A.   Where is this?  B?

19        Q.   It's the heading.

20        A.   Oh, yeah, yeah.  Sorry.  Yes.                 05:07:33

21        Q.   And then in the third -- third

22    paragraph it says "By storing this data on

23    non-attributable devices, Uber believed it would

24    avoid detection and never be subject to legal

25    discovery."                                            05:07:50
```

Page 642

```
 1              Are you aware of any use of        05:07:52

 2    non-attributable devices for that purpose at Uber?

 3        A.   No.

 4        Q.   If you look on the next page 8,

 5    section C, it starts "Clark developed training on    05:08:24

 6    how to use attorney-client privilege to further

 7    conceal activities described in any non-ephemeral

 8    communication channel.  Specifically, he developed

 9    a training using innocuous legal examples and the"

10    lower -- "'lawyer dog' meme to" protect -- "to      05:08:41

11    produce a slide deck that taught the ThreatOps team

12    how to utilize attorney-client privilege to impede

13    discovery."

14              Are you familiar with any such training

15    at Uber?                                             05:08:59

16        A.   I am not.

17        Q.   Do you know what he's referring to there

18    with the "lawyer dog"?

19        A.   No.

20        Q.   You never saw anything like that?          05:09:03

21        A.   No.

22        Q.   You didn't re- -- you didn't attend any

23    lawyer -- lawyer dog presentations?

24        A.   No.

25              MS. DUNN:  Objection to form.             05:09:20
```

Page 650

```
 1        A.   Generally briefed by Dara and by Tony.         05:20:54

 2        Q.   If you look under the bullet points,

 3   there's -- it says "These tactics were employed

 4   clandestinely through a distributed architecture of

 5   anonymous servers, telecommunications architecture,    05:21:28

 6   and non-attributable hardware and software."

 7             Do you see that?

 8        A.   Yeah.

 9        Q.   Are you aware of the use of anonymous

10   servers by Uber?                                        05:21:39

11        A.   No.

12        Q.   If you look on the bottom of page 12, it

13   says "Jacobs is aware that Uber used the MA team to

14   steal trade secrets at least from Waymo in the US."

15             Do you see that?                              05:22:36

16        A.   "Jacobs is aware..."

17        Q.   It's the last sentence.

18        A.   "He" -- "He vetted insiders" -- oh,

19   Jacobs is aware" -- there we go.  Yeah, I see it.

20   Yeah.                                                   05:22:47

21        Q.   Do you have any knowledge of

22   Marketplace Analytics doing that?

23        A.   Absolutely not.

24        Q.   Why don't you read the -- the two

25   paragraphs under "Waymo" on page 13, and let me        05:23:06
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1        I, Rebecca L. Romano, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

         That the foregoing proceedings were taken

4    before me at the time and place herein set forth;

5    that any witnesses in the foregoing proceedings,

6    prior to testifying, were administered an oath;

7    that a record of the proceedings was made by me

     using machine shorthand which was thereafter

8    transcribed under my direction; that the foregoing

9    transcript is true record of the testimony given.

10        Further, that if the foregoing pertains to the

11   original transcript of a deposition in a Federal

12   Case, before completion of the proceedings, review

13   of the transcript [ ] was [x] was not requested.

14        I further certify I am neither financially

     interested in the action nor a relative or employee

15   of any attorney or any party to this action.

16        IN WITNESS WHEREOF, I have this date

17   subscribed my name.

18

19   Dated:  December 15, 2017

20

21

22

23

24   _____

         Rebecca L. Romano, RPR,

             CSR. No 12546

25

                                    Page 668