# EXHIBIT 12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


WAYMO LLC,

    Plaintiff,


      vs.            Case No. 17-cv-00939-WHA


UBER TECHNOLOGIES,INC.;

OTTOMOTTO, LLC; OTTO

TRUCKING LLC,

    Defendants.

_____


**CONFIDENTIAL - ATTORNEYS' EYES ONLY**


VIDEO DEPOSITION OF KEVIN MAHER

San Francisco, California

Tuesday, December 12, 2017

Volume I


REPORTED BY:

REBECCA L. ROMANO, RPR, CSR No. 12546

JOB NO. 2771230

PAGES 1 - 299

1

1    statement with him during this conversation?

2         A.   No.

3         Q.   Do you recall having conversations with

4    any other Uber employees about ephemeral

5    communications, prior to receiving the legal hold

6    notice?

7         A.   I'm sure I spoke about it with Matt near

8    the time when I started.

9         Q.   Can you recall anything about that

10   conversation?

11        A.   I recall Matt saying that -- referring to

12   the security team that we are a -- primarily a

13   Wickr shop.  Meaning that that is the standard

14   communication tool of the security team.

15        Q.   Anything else?

16        A.   No.

17        Q.   Now, with regard to this conversation

18   that you had with Mr. Clark after you received the

19   legal hold notice, what do you recall discussing

20   with him?

21        A.   I recall him either ending an email or

22   telling our team that we could not discuss anything

23   relevant to the legal hold using Wickr.

24        Q.   So with regard to your use of Wickr, how

25   did that change after you received the legal hold?

1    don't -- well, I don't need -- the testimony is

2    what the testimony is, but you'll recall there was

3    an incident or at least a concern that you had that

4    caused to have a meeting with Mr. Clark on your

5    staff.

6         A.   Yes.

7         Q.   All right.  And that you attributed the

8    reason for that to a desire to have a correct

9    application of the attorney-client privilege.

10        A.   Correct.

11        Q.   And we talked about some communications

12   that you may have had with individuals where you

13   felt the privilege was not being exercised

14   correctly?

15        A.   No.  I said there were remarks about it

16   where they were potentially going to use it

17   incorrectly, but not that they had.

18        Q.   Okay.  So let me ask it this way:  Are

19   you aware of any instance in which an Uber person

20   or employee improperly marked something privileged

21   that it was not?

22        A.   No.

23        Q.   Okay.  Had you heard that that was done?

24        A.   No.

25        Q.   Are you aware of it being done?

Page 148

1          A.   No.

2          Q.   Have you seen any instance of that?

3          A.   No.

4          Q.   Okay.  You were not at Uber at the time

5    of this email.

6          A.   Correct.

7          Q.   Your understanding, though, of the

8    attorney-client privilege would be that it would be

9    incorrect to mark something attorney-client

10   privileged if the person was not seeking legal

11   advice or acting under the direction of a lawyer,

12   correct?

13              MR. BERRY:  Object to form.

14              THE DEPONENT:  If none of these people

15   were lawyers and no one was requesting legal

16   advice, then, yes, that would be an incorrect usage

17   of the -- of the mark "AC privileged," but I'm --

18   I'm not an expert.

19         Q.   (By Mr. Lyons)  Do you recall any

20   instance where people were told that they should

21   not communicate via email so that there should

22   be -- would be no record of a communication?

23         A.   No.

24         Q.   Now, before the break, we were looking at

25   the Legal Overview document that Mr. Clark

1        A.    The AWS server space -- proxies that I

2   described earlier.   However, the computers that

3   we -- that everyone on my team used were directly

4   purchased by Uber and did not operate only on MiFi

5   devices.

6        Q.    To your knowledge, the computers that

7   your team used were purchased by Uber and did not

8   operate only on MiFi devices?

9        A.    Correct.

10        Q.    Prior -- did you -- strike that.

11              Do you know that to be true for the time

12   period predating your employment with Uber?

13        A.    I don't know.

14        Q.    It continues on at the bottom of the

15   page:   "By storing this data on non-attributable

16   devices, Uber believed it would avoid detection and

17   never be subject to legal discovery.   This is

18   because a standard preservation of evidence order

19   typically focused on Uber work laptops, Uber

20   network, and Uber mobile devices.   Non-attributable

21   devices were deemed as not reasonably subsumed by

22   any such preservation order and the team could, and

23   did, 'legally' (not so) dispose of any evidence or

24   documentation held on" those devices," and

25   continues on from there.

1          Do you see that?

2     A.   Yes.

3     Q.   Did you have any knowledge about what I

4  just read?

5          MR. NORTON:  Objection to form.

6          THE DEPONENT:  Nothing in this

7  paragraph is true, from my perspective.

8     Q.   (By Mr. Lyons)  Well, the reference there

9  of what -- what is standard

10  preservation-of-evidence order focused on -- do you

11  have any knowledge about that?

12    A.   Standard -- no.  From my perspective,

13  every device that we used was an Uber laptop, and,

14  specifically, that preservation-of-evidence order

15  applied to everything that we touched.

16    Q.   So if I understand your -- your

17  testimony, you are not familiar with any non-Uber

18  laptops or non-Uber networks or mobile devices?

19    A.   I think a couple people on the team used

20  personal devices at times to do business.  But the

21  group of laptops that we purchased for the team

22  were all purchased by Uber and were all subject to

23  standard preservation-of-evidence orders.

24    Q.   And are you aware of documents stored on

25  any non-Uber network?

1        Q.   Now, are you aware of any other detached

2   corporate infrastructure other than what you have

3   described so far?

4        A.   No.

5        Q.   It continues on in that paragraph -- the

6   next paragraph:  "According to sources, the server

7   needed to remain invisible to hackers and

8   competitors.  Even if Uber's own systems were

9   hacked, the company wanted to make sure that this

10  system remained hidden.  In addition to being

11  issued non-attributable laptops that couldn't be

12  traced back to the company, employees also had

13  access to pre-paid phones and Mi-Fi wireless

14  Internet devices."

15            Do you see that?

16       A.   Yes.

17       Q.   Are you familiar with members of the MA

18  team being issued nonattributable laptops?

19       A.   No.  Every laptop that we had was

20  purchased by Uber and was not nonattributable.

21       Q.   Are you familiar with employees having

22  access to prepaid phones?

23       A.   Yes.  We discussed that earlier.

24       Q.   And what about MiFi wireless Internet

25  devices?

```
 1        A.   They were owned by Uber.  They were

 2   subject to any preservation orders, and they would

 3   not send traffic to the Internet unless someone was

 4   opening a Web browser or something like that.

 5        Q.   So you would not have called those

 6   laptops "nonattributable laptops"?

 7        A.    No, we had our names on them.  Like we

 8   all logged in to them as -- with separate accounts,

 9   but it was --

10        Q.   When you say "separate accounts," what do

11   you mean?

12        A.   With non-Uber access controls.

13        Q.   Okay.  So, I mean, look, I don't want to

14   belabor the point here, so if I have to ask the

15   questions over again, I will do that, but did

16   the -- when we have been talking about

17   nonattributable devices --

18        A.   Right.

19        Q.    -- did you understand that phrase to

20   refer to an effort to keep the user's identity

21   secret?

22             MR. BERRY:  Object to form.

23             MR. NORTON:  Objection to form.

24             THE DEPONENT:  No.

25        Q.   (By Mr. Lyons)  No.
```

1      A.   Yes.

2      Q.   Okay.  For purposes of these

3   conversations that we are having, did you

4   understand "nonattributable devices" to be

5   devices -- whether they were paid for by Uber or

6   not, but designed to keep secret the fact that Uber

7   employees were utilizing the devices?

8           MR. BERRY:  Object to form.

9           THE DEPONENT:  The devices themselves

10   were purchased in ways that were traceable to Uber.

11   The traffic emanating from these devices and the

12   traffic emanating from other Uber devices was often

13   sent through proxies that were nonattributable.

14           So the specific answer to your question

15   of was everything done on these laptops in a way

16   that could immediately be traced back to Uber would

17   be no.  However, my understanding of whether or not

18   the -- the devices were known to be owned by Uber,

19   and in an obvious and traceable way, they were --

20   they were Uber devices.  They were not paid for

21   with cash.

22      Q.   (By Mr. Lyons)  What is a

23   "nonattributable laptop"?

24           MR. BERRY:  Object to form.

25           THE DEPONENT:  I don't think there's a

Page 257

1    more secure server," so I'm trying to get a sense

2    of whether it's just one or more than one.

3              MR. NORTON:  Objection.  Form.

4              THE DEPONENT:  It was probably in the low

5    tens, like 20 or 30, and a Redshift instance within

6    Amazon Web Services, which is like a database.

7         Q.   (By Mr. Lyons)  And are you familiar with

8    all that -- that was stored on that server?

9         A.   Not everything specifically.

10        Q.   Okay.  If someone wanted to store or

11   place something on the server, was there a protocol

12   that had to be followed in order for them to do

13   that?

14        A.   No.  It was -- it was the results of the

15   data collection that we did, so that was -- that

16   was what was stored there.

17        Q.   Are you aware of any other types of

18   detached corporate infrastructure systems used by

19   any other group?

20        A.   No.

21        Q.   Do you know whether anyone at Uber was

22   ever instructed to use a nonattributable device,

23   whether hardware or software, to prevent their

24   documents from being subject to discovery orders?

25        A.   No.

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    I, Rebecca L. Romano, a Certified Shorthand

2 Reporter of the State of California, do hereby

3 certify:

4    That the foregoing proceedings were taken

before me at the time and place herein set forth;

5 that any witnesses in the foregoing proceedings,

6 prior to testifying, were administered an oath;

7 that a record of the proceedings was made by me

using machine shorthand which was thereafter

8 transcribed under my direction; that the foregoing

9 transcript is true record of the testimony given.

10    Further, that if the foregoing pertains to the

11 original transcript of a deposition in a Federal

12 Case, before completion of the proceedings, review

13 of the transcript [ ] was [x] was not requested.

   I further certify I am neither financially

14 interested in the action nor a relative or employee

15 of any attorney or any party to this action.

16    IN WITNESS WHEREOF, I have this date

17 subscribed my name.

18

19 Dated:  December 13, 2017

20

21

22

23

24
_____

   Rebecca L. Romano, RPR,

25    CSR. No 12546

                              Page  299