# EXHIBIT 19

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

_____

WAYMO LLC,                          )
                                    )
            Plaintiff,              )
                                    )
      vs.                           )  Case No.
                                    )  3:17-cv-00939-WHA
UBER TECHNOLOGIES, INC.,            )
OTTOMOTTO LLC; OTTO                 )
TRUCKING LLC,                       )
                                    )
            Defendants.             )
_____)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEOTAPED DEPOSITION OF LIOR RON

San Francisco, California

Monday, June 19, 2017

Volume I


Reported by:

SUZANNE F. GUDELJ

CSR No. 5111

Job No. 2641996


PAGES 1 - 311

1      Q    Do you know whether Tyto Lidar, prior to
2  its acquisition, had done any LiDAR work in relation
3  to autonomous vehicles?
4      A    I don't know for sure.  I do know that
5  they've done LiDAR development, if I recall --        03:22:05
6  remember to a mapping.  And maybe some of it could
7  be repurposed.  But I believe they were focusing on
8  mapping primarily.
9      Q    Was acquiring Tyto Uber's idea or Otto's?
10     A    I think it was -- I'm actually not sure.  I  03:22:35
11 think it was Otto's, but I'm not sure for certain.
12     Q    Okay.  You weren't involved in that
13 decision-making --
14     A    I was.
15     Q    -- for Otto?                                 03:22:51
16     A    My involvement as it relates to Tyto was
17 mostly twofold.  One is I've helped procure or get
18 sampling from Tyto for the Otto engineers to examine
19 and sort of see what they think about it before the
20 acquisition.                                          03:23:13
21          And then once the examination came back
22 positive and the team was excited about doing
23 something with them, I help on some of the
24 negotiation or mostly facilitating that transaction.
25     Q    Who -- who would you be -- who were you     03:23:31

Page 175

1  negotiating with?
2      A    On the -- on the Tyto side?
3      Q    Yeah.
4      A    I think the primary point of contact on the
5  Tyto side was Ognen.  I don't know how to pronounce          03:23:45
6  his last name.
7      Q    Okay.  And now, Tyto Lidar was Mr.
8  Levandowski's company, wasn't it?
9           MR. PATCHEN:  Objection to form.
10          MR. HUME:  Objection to form.                       03:24:05
11          THE WITNESS:  Tyto Lidar?
12 BY MR. PERLSON:
13     Q    Yes.
14     A    Not that I'm aware.
15     Q    You're not aware of any affiliation that            03:24:10
16 Mr. Levandowski had with Tyto Lidar?
17          MR. PATCHEN:  Objection to the form.
18          MR. HUME:  Join.
19          THE WITNESS:  Not aware of any of those
20 affiliations.  I was aware that he knew Ognen in             03:24:19
21 some friendly capacity from the DARPA days.  I think
22 they were working together.  I saw a picture in some
23 magazine of both of them.  I think they were part of
24 the same team maybe working on the motorcycle.  So I
25 was aware of that.  And I was aware Anthony knew at          03:24:48

1  least some of the team.

2  BY MR. PERLSON:

3      Q    Okay.  So -- so do you know who owned Tyto
4  Lidar when Otto purchased it?

5      A    I don't know for certain.  Ognen was                03:25:11
6  representing essentially the ownership, and we were
7  doing the entire negotiation with him.

8      Q    Okay.  But you didn't know who the
9  ownership was?

10     A    I knew that Ognen is representing that, and    03:25:27
11 I knew that basically he's the point of contact to
12 negotiate whatever agreement we came up with.

13     Q    Okay.  But you sought no information
14 concerning who actually owned Tyto Lidar?

15         MR. PATCHEN:  Objection to form.                03:25:42

16         THE WITNESS:  I think I have sought or we
17 have sought from the lawyer some information from
18 him about ownership.  And I think -- I don't recall
19 the specifics.  I think some of it, it ended up as
20 part of the deal documents.  And we have actually    03:26:05
21 submitted those deal documents or shared them with
22 Uber as well, because at that point, Uber -- this
23 was post definitive, preacquisition, so Uber was
24 informed on the negotiation.  So we've done that.

25 BY MR. PERLSON:                                       03:26:28

 1   of communication between you and Mr. Levandowski
 2   while he was at Uber?
 3       A    I don't know if preferred --
 4            (Reporter clarification.)
 5            I'm trying to think if there was a                04:33:26
 6   preferred way.  Anthony was very busy, so a lot of
 7   our communications were verbal when he was actually
 8   at the office.  That probably have been the main
 9   communication method.
10       Q    Did you ever use Telegram with Mr.                04:33:51
11   Levandowski?
12       A    I have used Telegram with Anthony later
13   on --
14       Q    When was that?
15       A    -- in some capacity.                              04:34:03
16       Q    First of all, what do you understand
17   Telegram to be?
18       A    Instant messaging.
19       Q    Okay.  And are there any particular
20   attributes of Telegram that may be different than        04:34:14
21   other instant messaging apps?
22       A    I think it's more secure, more encrypted.
23       Q    Do -- are messages sent with Telegram
24   saved?
25       A    I think you can either save them, or I           04:34:36

1   think there's maybe an option to also not save them.
2       Q    Okay.  And do you know which option Mr.
3   Levandowski used?
4       A    I'm -- I don't know for certain.  I think
5   definitely there were messages that were not saved.    04:34:59
6   I think there was also messages that saved, but I'm
7   not sure exactly how Telegram works in terms of
8   saving or not.
9       Q    How about on your end, do the messages that
10  you've had with Mr. Levandowski, did you use           04:35:12
11  Telegram in a manner that your communications would
12  be saved or not saved?
13      A    I don't know for certain 'cause I rarely go
14  back and check messages.  I think some of the
15  communication, 'cause I remember there was some sort  04:35:38
16  of like message on the messages that it's expiring,
17  I know at least some were not saved.
18      Q    Okay.  And what time frame did that occur
19  in that some messages with Mr. Levandowski would not
20  be saved?                                              04:35:58
21      A    What time frame in terms of what time of
22  the year or --
23      Q    Just like, you know, was this a week ago,
24  three months ago, a year ago?
25           MR. HUME:  Object to the form.                04:36:17

1          THE WITNESS:  I don't recall exactly when.
2    I think those communications didn't happen in
3    Telegram -- I don't recall using Telegram or being
4    introduced to Telegram at -- before the acquisition.
5    So I think those happened after the acquisition, if      04:36:40
6    I recall correctly.
7    BY MR. PERLSON:
8        Q    When's the last time you would have
9    communicated with Mr. Levandowski using Telegram?
10       A    I don't remember exactly, but maybe a week       04:36:57
11   or two ago.
12       Q    And in your conversations with Mr.
13   Levandowski from a week or two ago, would those
14   messages have expired?
15       A    I don't know for certain.  I'd have to           04:37:11
16   check.
17       Q    You have -- have you done anything in
18   relation to your use of the Telegram app to ensure
19   that messages with Mr. Levandowski are saved?
20       A    I have not done anything that will that         04:37:25
21   way.
22       Q    Has Uber instructed you to save your
23   communications with Mr. Levandowski?
24       A    It has.
25       Q    And -- but you haven't done anything to do      04:37:37

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4  That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were duly sworn; that a record
   of the proceedings was made by me using machine
8  shorthand which was thereafter transcribed under my
9  direction; that the foregoing transcript is a true
10 record of the testimony given.
11 Further, that if the foregoing pertains to
12 the original transcript of a deposition in a Federal
   Case, before completion of the proceedings, review
13 of the transcript [X] was [ ] was not requested.
14 I further, certify I am neither financially
15 interested in the action nor a relative or employee
16 of any attorney or party to this action.
17 IN WITNESS WHEREOF, I have this date
18 subscribed my name.
19 Dated: June 20, 2019
20
21
22
23       *[signature: Suzanne F. Gudelj]*
24       SUZANNE F. GUDELJ
25       CSR No. 5111

Page 311

Veritext Legal Solutions
866 299-5127