# EXHIBIT 21

Page 400

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

WAYMO LLC,

        Plaintiff,

vs.                      Case No. 3:17-cv-00939-WHA

UBER TECHNOLOGIES, INC.;

OTTOMOTTO LLC; OTTO TRUCKING LLC,

        Defendants.

_____/

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF

LIOR RON, IN HIS INDIVIDUAL CAPACITY

VOLUME III

TUESDAY, DECEMBER 12, 2017

Reported by:

Anrae Wimberley

CSR No. 7778

Job No. 2771228A

Pages 400 - 580

1  individual testimony.  I've premarked as
2  Exhibit 9001 to the deposition the deposition
3  notice.  It's there in front of you.  I'm not going
4  to discuss the deposition notice in detail.
5         So later this afternoon we'll get to the
6  representative testimony.
7         I wanted to ask you about a division at
8  Uber called ThreatOps.
9         Do you have any familiarity with this
10 division?
11     A.  I have some familiarity.
12     Q.  What familiarity do you have with
13 ThreatOps?
14     A.  I believe I met members of that team a few
15 times earlier in the year.
16     Q.  When did these meetings take place?
17     A.  I don't recall the exact dates, but I
18 would say early in the year.
19     Q.  This year, 2017?
20     A.  Yes, I believe so.
21     Q.  When was the last time you met with
22 individuals at ThreatOps?
23     A.  I don't recall when the last meeting was.
24 But again, I would say early in the year.
25     Q.  Do you recall approximately how many times

```
 1   you had meetings with individuals at ThreatOps?
 2       A.   Probably a handful.
 3       Q.   More or less than five?
 4       A.   I don't recall the exact number.  A
 5   handful.
 6       Q.   I'm just trying to get a sense of what a
 7   handful means to you.  Is a handful six, seven?  Is
 8   a handful three, four?
 9            Can you just define it for me?
10       A.   It was a few times.  I don't recall the
11   exact number.  Definitely I believe less than ten,
12   but I don't remember the exact number.
13       Q.   What were the purpose of these meetings
14   with ThreatOps?
15       A.   The team approached us offering to help
16   with some market data.
17       Q.   What do you mean when you say offering to
18   help you with some market data?
19       A.   Just information on market players,
20   competitors.
21       Q.   And when you say that the team approached
22   you, do you mean you individually or are you
23   including somebody else in who they approached?
24            MR. RABIN:  Objection; form.
25            THE WITNESS:  I don't recall exactly how was
```

Page 412

1  the first introduction, but it was me and a few of
2  my colleagues as well.
3  BY MR. SCHMIDT:
4       Q.   What colleagues?
5       A.   Can you clarify the question, "What
6  colleagues?"
7       Q.   Which colleagues did the ThreatOps team
8  approach of yours?
9       A.   I believe it was myself and then Anthony
10 Levandowski as well.
11      Q.   Anyone else?
12      A.   Those -- I believe those are the initial
13 introductions or contacts that I can recall.
14      Q.   What was Mr. Levandowski's role at Uber at
15 this time?
16      A.   I believe he was heading the ATG group at
17 that time.
18      Q.   And was your position at this time the
19 same as it is now?
20      A.   No, it was not.
21      Q.   What was your position at the time the
22 ThreatOps group approached you in early 2017?
23      A.   At that time, besides helping with Uber
24 Freight, I also helped on the product side of
25 self-driving.

1            And what I do recall is sort of to discuss
2   product capabilities at large.
3            And two examples of that were in the
4   cities or the geographies, that some of the
5   companies were deploying self-driving cars, and then
6   they sort of extended the size of those experiments
7   in those geographies.
8   BY MR. SCHMIDT:
9       Q.   Did you ever discuss your competitors'
10  LiDAR technology efforts with ThreatOps in early
11  2017?
12      A.   Not that I can recall.
13      Q.   Did you ever discuss your competitors'
14  self-driving car software development efforts with
15  ThreatOps in early 2017?
16      A.   Not that I can recall on specific software
17  capabilities.  Again, the discussion was more
18  broadly on product capabilities.
19      Q.   Do you recall discussing software
20  generally?
21      A.   Again, it depends on the definition of
22  what you mean by "software."
23           But in terms of overall sort of product
24  capabilities, software is part of that.
25      Q.   Okay.  What discussions can you recall

Page 418

1  involving software of your competitors with
2  ThreatOps in early 2017?
3       A.   Well, as I've mentioned before, in terms
4  of sort of what -- which geos or which cities that
5  software were being tested on.
6       Q.   Other than the cities that the software
7  happened to be tested in, was there any other
8  discussions of the software?
9       A.   And that's not how I'll put that.
10      Q.   Other than the cities that the software
11 happened to be tested in, did you have any other
12 discussions of competitors' software with ThreatOps
13 in early 2017?
14      A.   I think we had in the -- in one of the
15 discussions, basically, examples of some of the sort
16 of public driving of those cars in those cities.
17      Q.   What do you mean when you say examples of
18 public driving of the cars?
19      A.   As I've mentioned before, sort of the
20 characteristics of were they driving wide streets or
21 narrow streets and such.
22      Q.   And how did you understand that this
23 information or these examples were gathered?
24      A.   I believe they were gathered by the
25 Freight Ops [sic] team.

1    ThreatOps provided you helped you validate public
2    information; correct?
3        A.   Yes.
4        Q.   How did you know that the information was
5    public in the first place?
6        A.   I believe, if I can recall correctly, that
7    the information that there were experiments being
8    conducted outside of Phoenix with a fleet of
9    self-driving cars was publicly available.
10       Q.   Where do you recall that information being
11   available publicly?
12       A.   I don't recall the exact source.
13       Q.   But you recall believing that this was
14   public information at the time?
15       A.   Yes, I believe so.
16       Q.   Was there any information that you ever
17   received from ThreatOps that you did not believe was
18   public information?
19       A.   Well, I think all the information was
20   basically gathered from sort of -- on public roads.
21   Some of it I wasn't fully aware of before.
22       Q.   What did you learn that you weren't fully
23   aware of before?
24            MR. RABIN:  Objection; form.
25            THE WITNESS:  I think, as we've discussed

1  before, the specific geographies or the neighborhood
2  those experiments were conducted in.
3          And again, I can't recall right now even
4  that specific information, because it wasn't
5  actually useful in any future decision making.  But
6  you know, that neighborhood -- or that neighborhood
7  in -- outside of Phoenix, I think.
8  BY MR. SCHMIDT:
9      Q.  When you had these meetings with
10 ThreatOps, who did you meet with?
11     A.  I don't recall all the participants in
12 every meeting.  I think there were meetings where --
13 some meetings were with Mat, I believe -- I forgot
14 his last name.
15         Some meetings had Nick.  Again, I don't
16 recall his last name.
17         And some meetings we had with Anthony.
18     Q.  Okay.  Just to run through those.
19         You referenced Mat.  Do you believe that
20 was Mat Henley?
21     MR. PATCHEN:  Objection to form.
22     THE WITNESS:  I believe so, but I don't know
23 for sure.  I think his last name is Henley, but I'm
24 not certain.
25 BY MR. SCHMIDT:

1      THE WITNESS:  Not necessarily.  Again, you will
2  have to ask him what he meant by competitive risks.
3  That wasn't me phrasing that, but I understand this
4  to be generally sort of commenting on other
5  competitors in the market.
6  BY MR. SCHMIDT:
7      Q.   Okay.  Did you find this information
8  interesting?
9      MR. PATCHEN:  Objection to the form.
10     THE WITNESS:  Can you clarify?  Are you asking
11  me sort of now or at the time?
12  BY MR. SCHMIDT:
13     Q.   At the time.
14     A.   I don't recall, actually, that e-mail at
15  the time, so it's hard for me to comment.
16     Q.   Looking at the report in Exhibit 9002
17  today, does it look like it would be information
18  that would have been of interest to you in late
19  2016?
20     MR. RABIN:  Objection; form.
21     THE WITNESS:  It would be somewhat of interest
22  to have sort of a summary of some of the news on the
23  marketplace.
24          But looking at the list, I mean, most of
25  this is probably stuff that I've sort of read in the

1  news, regardless.

2  BY MR. SCHMIDT:

3      Q.  Well, you see above Mr. Meyhofer's message
4  that Mr. Levandowski found the report to be very
5  interesting.

6          Do you see that?

7      A.  Yes, I do.

8      Q.  Did you agree with that assessment?

9      A.  It's hard for me to recall exactly what I
10 thought at that time.  I would say it's somewhat
11 interesting to have a summary.  But again, I don't
12 feel that this has much more than what I would read
13 in sort of public news, as is.

14     Q.  It looks like, in response to
15 Mr. Levandowski's message, you had both yourself and
16 him added to this alias ATC Competitive
17 Intelligence; correct?

18         MR. RABIN:  Objection; form.

19         THE WITNESS:  It appears to be the case, just
20 reading this e-mail now.

21 BY MR. SCHMIDT:

22     Q.  After you were added to this alias, do you
23 recall receiving reports like the one we see in 9002
24 on a regular basis thereafter?

25         MR. RABIN:  Objection; form.

1      Q.   Were these sort of notations for
2  attorney-client privilege on other e-mails that you
3  received around this same time?
4      MR. RABIN:  Objection; form.
5      THE WITNESS:  No, not that I can recall
6  specifically.
7  BY MR. SCHMIDT:
8      Q.   Do you recall ever being instructed to
9  mark communications as attorney-client privileged?
10     A.   No, not that I can recall.
11     Q.   Do you remember ever communicating with
12  attorneys at all in your work at Uber ATG?
13     MR. RABIN:  Objection; form.
14     THE WITNESS:  I'm sure I've communicated with
15  lawyers as part of my work.
16  BY MR. SCHMIDT:
17     Q.   Can you remember any specific examples,
18  other than related to this litigation?
19     MR. RABIN:  And to the extent the question
20  would cause you to reveal the nature of the
21  communication, I instruct you not to answer.
22  BY MR. SCHMIDT:
23     Q.   So the question was:  Do you remember any
24  specific examples, that are unrelated to this
25  litigation, of communicating with a lawyer in your

1  document says that competitors' quality of the ride
2  is ATG's single highest priority.
3          Do you remember that?
4      MR. RABIN:  Objection; form.
5      THE WITNESS:  Okay.
6  BY MR. SCHMIDT:
7      Q.  Do you believe that the quality of the
8  ride can be assessed by video?
9      MR. RABIN:  Objection; form.
10     THE WITNESS:  Again, I'm not sure exactly what
11 is meant.  We discussed quality of the ride.  But as
12 we discussed before, I'm not sure what it means by
13 that.
14         I was focusing in my discussion on the
15 geos and the size of the fleets.
16         And so again, if the meaning of quality of
17 the ride is assessing the ride of a self-driving
18 car, my guess, some of it can be assessed by video.
19 I'm not an expert to that topic.
20 BY MR. SCHMIDT:
21     Q.  Do you remember providing feedback to
22 ThreatOps as to what they should attempt to video in
23 order to give you better information about the
24 quality of the ride?
25     MR. RABIN:  Objection; form.

1    give them any feedback on that question, and I don't
2    recall specifics.
3    BY MR. SCHMIDT:
4        Q.   Do you know if anybody else was able to
5    give them feedback on that question?
6        MR. RABIN:  Objection; form.
7        THE WITNESS:  No, I don't recall the specifics.
8    They might have asked me, but I'm not sure if I was
9    actually in a position to help with that question.
10   BY MR. SCHMIDT:
11       Q.   Okay.  So I mean that's a different --
12   that's an answer to a different question than I
13   asked.
14       My question was:  Do you know if anybody
15   else provided the answer?
16       I understand you didn't provide the
17   answer.
18       Do you have knowledge of anybody else
19   providing an answer to that question?
20       MR. RABIN:  Objection; form.
21       THE WITNESS:  No, not that I can recall.
22   BY MR. SCHMIDT:
23       Q.   These meetings with ThreatOps that you had
24   in early 2017, do you recall Mr. Levandowski
25   participating?

1   A.   He participated in a meeting or two.  I
2   don't remember the exact number, but very few.  I
3   would say one to maybe three meetings, at most.
4   Q.   Do you remember Mr. Levandowski providing
5   any feedback whatsoever to ThreatOps?
6   A.   If I recall -- what I do recall is
7   initially he provided some feedback on basically
8   those experiments.  And so the same -- those -- the
9   same questions, sort of the geographies and the
10  potential sort of size of the fleet.  So I do
11  remember that early on.
12       And I do remember later on he was probably
13  somewhat skeptical of the usefulness of any of that
14  for anything practical.
15  Q.   What do you remember about the feedback
16  that Mr. Levandowski provided relating to the
17  experiments of Uber's competitors in the
18  self-driving car market?
19  A.   I remember he provided feedback for one
20  question.  I actually don't remember what did he end
21  up indicating was the feedback.
22       But one of the questions was sort of is
23  collecting data -- sort of helping with that market
24  information in Phoenix or San Francisco will be more
25  beneficial.

1          So I remember he actually opined on that
2   question.  I don't actually remember if his answer
3   was San Francisco or Phoenix.
4       Q.    Do you remember Mr. Levandowski telling
5   ThreatOps specific maneuvers that he would like
6   information about competitors' cars performing?
7          MR. RABIN:  Objection; form.
8          THE WITNESS:  No, I don't recall feedback he
9   provided on specific maneuvers.
10             I do recall that some of the videos that
11  were presented had sort of, you know, maneuvers of
12  those self-driving cars.  But I actually don't
13  remember his commentary on those.
14             I do remember sort of, at least my
15  impression after the meeting, or after a second
16  meeting, that he was, like, skeptical of the
17  usefulness or the practicality of any of that
18  information.
19         MR. RABIN:  We've been going about an hour and
20  15 minutes.
21         MR. SCHMIDT:  Okay.  Let's take a break.
22         THE VIDEOGRAPHER:  Going off the record.
23             The time is 3:39.
24             (Recess taken.)
25  //

```
 1        FEDERAL CERTIFICATE OF DEPOSITION OFFICER
 2        I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby
    declare:
 3        That, prior to being examined, the witness
    named in the foregoing deposition was by me duly
 4  sworn pursuant to Section 30(f)(1) of the Federal
    Rules of Civil Procedure and the deposition is a
 5  true record of the testimony given by the witness;
 6        That said deposition was taken down by me in
    shorthand at the time and place therein named and
 7  thereafter reduced to text under my direction;
 8        --X---    That the witness was requested to
    review the transcript and make any changes to the
 9  transcript as a result of that review pursuant to
    Section 30(e) of the Federal Rules of Civil
10  Procedure;
11        -----    No changes have been provided by the
    witness during the period allowed;
12        -----    The changes made by the witness are
13  appended to the transcript;
14        -----    No request was made that the
    transcript be reviewed pursuant to Section 30(e) of
15  the Federal Rules of Civil Procedure.
16        I further declare that I have no interest in
    the event of the action.
17        I declare under penalty of perjury under the
18  laws of the United States of America that the
    foregoing is true and correct.
19        WITNESS my hand this 13th day of December,
20  2017.
21
22
23
24           [signature: Anrae Wimberley]
25        ANRAE WIMBERLEY, CSR NO. 7778
```

Page 580