# EXHIBIT 23

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

WAYMO LLC,

    Plaintiff,

        vs.          Case No.

UBER TECHNOLOGIES, INC.;   17-cv-00939-WHA

OTTOMOTTO, LLC; OTTO

TRUCKING LLC,

    Defendants.

_____

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF JOE SPIEGLER

San Francisco, California

Friday, December 22, 2017

Volume I

REPORTED BY:

REBECCA L. ROMANO, RPR, CSR No. 12546

JOB NO. 2771356

PAGES 1 - 307

```
                                                            Page 43
 1        A.   Yeah, which I think was an                 08:39:47
 2   internally-developed instant messaging.
 3        Q.   Did you use HipChat or uChat while you
 4   were at Uber?
 5        A.   Yes.                                       08:39:55
 6        Q.   Do you know what the -- what the
 7   retention settings were for HipChat?
 8        A.   No.
 9        Q.   What about uChat?
10        A.   No.                                        08:40:08
11        Q.   Do you know if you had the ability to
12   change the settings yourself on the chats you were
13   conducting through those services?
14        A.   I don't know.
15        Q.   While you were at Uber, were you aware     08:40:27
16   that other people in the company were using
17   ephemeral communications to carry on business?
18             MR. JACOBS:  Objection.  Vague.
19             Are you -- are you including HipChat and
20   uChat in that?                                       08:40:39
21             MR. EISEMAN:  Let me -- that's a good
22   objection.  So let me ask a different question.
23        Q.   (By Mr. Eiseman)  Were you familiar with
24   the fact that people at Uber were using Wickr to --
25   to carry on business activities?                     08:40:50
```

```
                                                                  Page 44
 1         A.   At the time I was employed by the                08:40:53
 2    company?
 3         Q.   Right.
 4         A.   I don't -- I don't know if they were.  I
 5    have no independent knowledge that employees of the        08:41:06
 6    company use that or other ephemeral software.
 7         Q.   So when you say you don't have any
 8    independent knowledge, you are separating out some
 9    other kind of knowledge you have?
10         A.   Well, I recall receiving at some point an        08:41:19
11    email from Wickr, or something that looked like a
12    Wickr-related email, and I -- I didn't install
13    anything.  I didn't use it.
14              I then recall there was an email from the
15    litigation group about potentially using Wickr, and        08:41:38
16    then an email followed up shortly after saying not
17    to use Wickr.
18         Q.   Who did you -- do you recall who you
19    received the email from?
20         A.   I don't recall.  I don't.                        08:41:51
21         Q.   Remember, Ground Rule No. 3, that we
22    didn't talk about, is that I need to try to let you
23    finish your answer before I ask my next question,
24    and -- and vice-versa, hopefully.
25         A.   Okay.                                            08:41:58
```

```
                                                          Page 45
 1         Q.   Are you familiar with the term              08:42:03
 2    "nonattributable devices"?
 3         A.   No.
 4         Q.   Were you ever instructed at Uber to use
 5    ephemeral communications to carry out business        08:42:27
 6    activities?
 7         A.   No.
 8         Q.   Do you recall any training sessions at
 9    Uber regarding the use of ephemeral communications?
10         A.   Again, I -- to the extent HipChat or        08:42:44
11    uChat are considered ephemeral, I recall there
12    was a -- a company meeting on the -- you know, on
13    the launch of uChat.  There's some people that
14    weren't very happy with it and...
15         Q.   Why is that?                                08:43:00
16         A.   I think it was kind of spotty, so --
17    but -- but other than HipChat or uChat, no, I don't
18    recall any discussions or --
19         Q.   Were you --
20         A.   -- training.                                08:43:11
21         Q.   I'm sorry.  Were you ever encouraged or
22    instructed to use Zoom or telephone conferences to
23    carry out business activities, so that there
24    wouldn't be a record of the communications?
25         A.   No.                                         08:43:24
```

Page 53

| | |
|---|---|
| 1   given, that that is -- that you agree that is not a | 09:01:37 |
| 2   waiver of the privilege. | |
| 3           MR. EISEMAN:  And I do agree that's not a | |
| 4   waiver of the privilege. | |
| 5           MR. JACOBS:  Terrific.  So I think -- | 09:01:44 |
| 6   well, so, you can ask the ones you are interested | |
| 7   in. | |
| 8       Q.   (By Mr. Eiseman)  The first question I | |
| 9   have is:  I asked you, Mr. Spiegler, about training | |
| 10  that Mr. Clark performed to the ATG group in | 09:01:56 |
| 11  Pittsburgh regarding the use of the attorney-client | |
| 12  privilege. | |
| 13          Are you aware that he conducted -- | |
| 14      A.   I'm not aware that he did conduct that. | |
| 15      Q.   All right.  Are you aware that | 09:02:06 |
| 16  Mr. Kalanick instructed employees to mark documents | |
| 17  as privileged, so that they would not be subject to | |
| 18  discovery? | |
| 19      A.   No. | |
| 20      Q.   Are you aware of any other Uber employees | 09:02:21 |
| 21  instructing other employees to mark documents as | |
| 22  privileged so that they would not be subject to | |
| 23  discovery? | |
| 24          MR. JACOBS:  If the answer is, I have no | |
| 25  such awareness, you can answer that; if you have | 09:02:33 |

Page 54

1  some awareness based on an investigation you                09:02:36
2  conducted, then I instruct not to answer.
3          THE DEPONENT:  No, I don't have any
4  awareness.
5      Q.  (By Mr. Eiseman)  One other question that           09:02:44
6  Mr. Jacobs gave you an instruction on had to do
7  with the investigations that you discussed with
8  Mr. Clark when you were at Uber.
9          Apart -- well, and I think you told us
10 that you didn't discuss the Jacobs' allegations              09:02:57
11 with Mr. Clark; is that right?
12     A.  I believe that's right.
13     Q.  Do you recall discussing any other
14 investigations with Mr. Clark --
15     A.  Yes.                                                 09:03:11
16     Q.  -- specifically?
17     A.  Yes.
18         MR. JACOBS:  And, here, if the proposed
19 answer is something -- is along the lines of, none
20 of them are even remotely close to issues in the             09:03:16
21 Waymo case, he can answer that.
22         I don't think getting into specific
23 investigations he might have conducted is
24 appropriate.
25         MR. EISEMAN:  I may ask one other                    09:03:28

```
 1    clarify my answer, again my -- my recommendations          11:15:23
 2    to her as my peer was that we should not be sharing
 3    the allegations to implicated parties.
 4         Q.   (By Mr. Eiseman)  Did you have any
 5    discussions with Ms. Padilla about sharing                 11:15:36
 6    Mr. Jacobs' allegations with anyone else in the
 7    Uber legal department?
 8         A.   I -- I do recall having some discussions.
 9         Q.   What discussions did you have?
10         A.   I -- I was concerned about whether -- I          11:15:56
11    was concerned about the wide dissemination of this
12    information for a variety of reasons.
13         Q.   Why were you concerned?
14         A.   Well, one reason is that the security
15    team itself -- that is authorized by the company to        11:16:14
16    conduct investigations of certain alleged
17    misconduct, you know, for instance, misuse of -- of
18    company assets, and as a result of that, they have
19    investigative tools that they are authorized to
20    utilize, and that includes email review.                   11:16:30
21              And these individuals had been made aware
22    that there were allegations against them, and I was
23    concerned that they may try to obtain improperly,
24    in my view, information about the investigation or
25    its progress.  And so the more broadly that                11:16:48
```

```
                                                          Page 152
 1    information was disseminated, the greater            11:16:52
 2    likelihood that they could do so.
 3           Second, I recall -- and this may be
 4    incorrect, but I recall that one of Angela's direct
 5    reports was very good friends with one of the       11:17:03
 6    implicated parties, and I didn't want to put him in
 7    an awkward position where he would be sitting on
 8    information about a good friend.  And I didn't see
 9    how -- I -- I didn't know what information or -- or
10    support, aside from email collection, that the      11:17:28
11    litigation team could provide to a compliance
12    investigation.
13           So since my general protocol is put --
14    you know, provide information on a need-to-know
15    basis, I didn't see the need, again, for the        11:17:44
16    litigation team, other than our ediscovery manager,
17    for purposes of email holds and, you know, to allow
18    for email review, there was really no -- there was
19    no need to share this information.  And of course
20    there's other principles of investigations for me   11:18:00
21    come into play, which are to protect the integrity
22    and reputation of the individuals against whom
23    allegations are raised.  These were serious
24    allegations.  I don't know if they are true, I
25    don't know if they are not true, but I certainly    11:18:13
```

Page 153

1  don't think it's in anybody's interest to make                11:18:17
2  others aware of allegations that may turn out not
3  to be true, particularly since there is really
4  nobody in the litigation department, aside from the
5  ediscovery manager, that would participate in the              11:18:31
6  investigation and play any role in the compliance
7  investigation.
8        Q.   Who was Ms. Padilla's direct report that
9  you were worried about having access to this
10 information because of that person's relationship              11:18:45
11 with one of the implicated parties?
12            MR. JACOBS:  And just to be clear, I'm
13 going to designate this transcript as outside
14 counsel only, and we will request review pursuant
15 to our usual 30-day review or whatever we have                 11:18:57
16 agreed to.
17            Obviously this is now getting into
18 sensitive, you know, people information.
19            THE DEPONENT:  Yeah.
20            MR. JACOBS:  Is there a way you can ask             11:19:12
21 this that doesn't require identification of the
22 person?
23            I think what you wanted -- you want to
24 know is if this -- what this person's role was in
25 litigation vis-a-vis the Waymo litigation perhaps,             11:19:19

1        I, Rebecca L. Romano, a Certified Shorthand
2    Reporter of the State of California, do hereby
3    certify:
4        That the foregoing proceedings were taken
5    before me at the time and place herein set forth;
6    that any witnesses in the foregoing proceedings,
7    prior to testifying, were administered an oath;
8    that a record of the proceedings was made by me
9    using machine shorthand which was thereafter
10   transcribed under my direction; that the foregoing
11   transcript is true record of the testimony given.
12        Further, that if the foregoing pertains to the
13   original transcript of a deposition in a Federal
14   Case, before completion of the proceedings, review
15   of the transcript [X] was [ ] was not requested.
16        I further certify I am neither financially
17   interested in the action nor a relative or employee
18   of any attorney or any party to this action.
19        IN WITNESS WHEREOF, I have this date
20   subscribed my name.
21        Dated:  December 26, 2017
22
23        *[signature: Rebecca L. Romano]*
24        Rebecca L. Romano, RPR,
25        CSR. No 12546

Page 307