1

2
QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Charles K. Verhoeven (Bar No. 170151)
   charlesverhoeven@quinnemanuel.com
3   David A. Perlson (Bar No. 209502)
   davidperlson@quinnemanuel.com
4   Melissa Baily (Bar No. 237649)
   melissabaily@quinnemanuel.com
5   John Neukom (Bar No. 275887)
   johnneukom@quinnemanuel.com
6   Jordan Jaffe (Bar No. 254886)
   jordanjaffe@quinnemanuel.com
7 50 California Street, 22nd Floor
San Francisco, California 94111-4788
8 Telephone:      (415) 875-6600
Facsimile:      (415) 875-6700
9
Attorneys for WAYMO LLC
10
UNITED STATES DISTRICT COURT
11
NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION
12

13 WAYMO LLC,

14            Plaintiff,

15      vs.

16 UBER TECHNOLOGIES, INC.;
OTTOMOTTO LLC; OTTO TRUCKING
17 LLC,

18            Defendants.

19

20

CASE NO. 3:17-cv-00939-WHA

**DECLARATION OF FELIPE CORREDOR IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC. AND OTTOMOTTO LLC'S ADMINISTRATIVE MOTION TO FILE UNDER SEAL THEIR RESPONSE TO WAYMO'S OFFER OF PROOF**

21

22

23

24

25

26

27

28

I, Felipe Corredor, declare as follows:

1.      I am an attorney licensed to practice in the State of California and am admitted to practice before this Court.  I am an associate at the law firm Quinn Emanuel Urquhart & Sullivan, LLP, counsel for the Plaintiff Waymo LLC ("Waymo").  I have personal knowledge of the matters set forth in this Declaration, and if called as a witness I would testify competently to those matters.

2.      I make this declaration in support of Defendants' Uber Technologies, Inc. and Ottomotto LLC's Administrative Motion to File Under Seal Their Response to Waymo's Offer of Proof (the "Administrative Motion").  The Administrative Motion seeks an order sealing highlighted portions of Defendants' Response to Waymo's Offer of Proof ("Uber's Response"), of Uber's Response to Waymo's Appendix A, and of Exhibits 2-3 5-8, 17-18, 22, 25, 27, 33, 37, 56, 72, to the Chang Declaration, as well as the entirety of Exhibits 10, 24, 28-29, 31, 38-50, 55, 57, 59, 65-66, 68-69, and 71 thereto.

3.      The portions of Uber's Response and Exhibits 3, 10, 24, 38-44, 46, 48-49, and 59 identified below contain or refer to confidential business information and/or attorney advice, which Waymo seeks to seal.

4.      Uber's Response (portions marked in red boxes in version filed herewith), Exhibit 10 (portions highlighted in green in version filed herewith), Exhibit 42 (portions highlighted in green in version filed herewith), Exhibits 43-44 (entire documents), and Exhibit 59 (portions highlighted in green in version filed herewith) contain, reference, and/or describe highly confidential and sensitive business information.  The information Waymo seeks to seal regards confidential policies regarding off-the-record communications.  I understand that this confidential business information is maintained by Waymo as secret.  The public disclosure of this information would give Waymo's competitors access to information about Waymo's business practices.  If such information were made public, I understand that Waymo's competitive standing would be significantly harmed.

5.      Uber's Response (portions marked in red boxes in version filed herewith), Exhibit 10 (portions highlighted in green in version filed herewith), and Exhibits 43-44 (entire documents) additionally contain, reference, and/or describe Waymo's confidential attorney advice.  The information Waymo seeks to seal regards confidential attorney advice regarding company policy on

off-the-record communications.  I understand that this confidential information is maintained by Waymo as secret and that it is subject to Waymo's attorney-client privilege and work product protection, which have not been waived, pursuant to the Court's Order Pursuant to Rule 502, Fed. R. Ev. (Dkt. 2363).  The public disclosure of this information would be contrary to the Court's Order.  If such information were made public, I understand that Waymo's competitive standing would be significantly harmed by exposure of its confidential legal strategy and advice.

6.      Uber's Response (portions marked in red boxes in version filed herewith), Exhibit 3 (portions highlighted in green), Exhibit 10 (portions highlighted in green in version filed herewith), Exhibit 24 (portions highlighted in green in version filed herewith), Exhibits 38-39 (portions highlighted in green in version filed herewith), Exhibit 41 (portions highlighted in green in version filed herewith), Exhibit 46 (entire document), and Exhibits 48-49 (entire documents) contain, reference, and/or describe Waymo's highly confidential and sensitive business information.  The information Waymo seeks to seal regards confidential details regarding Waymo and Google's business, including customer-related details, competitive analysis efforts, potential partnerships and/or acquisitions, employee compensation details, and/or product strategy.  I understand that this confidential business information is maintained by Waymo and Google as secret.  The public disclosure of this information would give Waymo's competitors access to Waymo's business strategy for its autonomous vehicle system as well as to sensitive business information related to Google's chat products.  If such information were made public, I understand that Waymo and Google's competitive standing would be significantly harmed.

7.      Finally, Exhibits 39-42 (portions highlighted in green in version filed herewith) and Exhibit 43 (entire document) contain email addresses and/or phone numbers of Waymo and Google employees and/or former employees involved in this case, the disclosure of which would cause Waymo, Google, and those employees substantial harm due to the high public profile of this litigation. Waymo seeks to seal this information.

8.      Waymo's request to seal is narrowly tailored to those portions of Uber's Response and Exhibits 3, 10, 24, 38-44, 46, 48-49, and 59 that merit sealing.

1   I declare under penalty of perjury under the laws of the State of California and the United

2   States of America that the foregoing is true and correct, and that this declaration was executed in San

3   Francisco, California, on January 23, 2018.

4   By _/s/ Felipe Corredor_____

5       Felipe Corredor
        Attorneys for WAYMO LLC

6

7

8   **<u>ATTESTATION</u>**

9   In accordance with Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this

10  document has been obtained from Felipe Corredor.

11

12  By: _/s/ Charles K. Verhoeven_____
        Charles K. Verhoeven

1   MICHAEL A. JACOBS (CA SBN 111664)
    MJacobs@mofo.com
2   ARTURO J. GONZÁLEZ (CA SBN 121490)
    AGonzález@mofo.com
3   MORRISON & FOERSTER LLP
    425 Market Street
4   San Francisco, California 94105-2482
    Tel: 415.268.7000 / Fax: 415.268.7522
5
6   KAREN L. DUNN (*Pro Hac Vice*)
    kdunn@bsfllp.com
    HAMISH P.M. HUME (*Pro Hac Vice*)
7   hhume@bsfllp.com
    BOIES SCHILLER FLEXNER LLP
8   1401 New York Avenue, N.W.
    Washington DC 20005
9   Tel: 202.237.2727 / Fax: 202.237.6131
10  WILLIAM CARMODY (*Pro Hac Vice*)
    bcarmody@susmangodfrey.com
11  SHAWN RABIN (*Pro Hac Vice*)
    srabin@susmangodfrey.com
12  SUSMAN GODFREY LLP
    1301 Avenue of the Americas, 32nd Floor
13  New York, NY 10019-6023
    Tel: 212.336.8330 / Fax: 212.336.8340
14
15  Attorneys for Defendants
    UBER TECHNOLOGIES, INC.
16  and OTTOMOTTO LLC

17                  UNITED STATES DISTRICT COURT

18                NORTHERN DISTRICT OF CALIFORNIA

19                   SAN FRANCISCO DIVISION

20

21   WAYMO LLC,                          Case No. 3:17-cv-00939-WHA

22              Plaintiff,               **DEFENDANTS UBER
                                         TECHNOLOGIES, INC. AND
23        v.                             OTTOMOTTO LLC'S RESPONSE TO
                                         WAYMO'S OFFER OF PROOF**
24   UBER TECHNOLOGIES, INC.,
     OTTOMOTTO LLC; OTTO TRUCKING        Trial Date: February 5, 2018
25   LLC,

26              Defendants.

27

28        **UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

**Page**

SUMMARY OF UBER'S RESPONSE ................................................................................. 1

I.     WAYMO'S OFFER OF PROOF REGARDING PRACTICAL
       IMPLEMENTATION FALLS SHORT ....................................................................... 4

II.    NO MATERIAL EVIDENCE WAS CONCEALED BECAUSE THE JACOBS
       ALLEGATIONS ARE UNTRUE OR IRRELEVANT ................................................ 5

       A.    Mr. Jacobs Admits He Has No Knowledge of Any Theft of Trade Secrets
             by Uber ......................................................................................................... 5

       B.    The Use of Non-Attributable Devices Has No Bearing on Issues in This
             Case ............................................................................................................... 7

             1.    No One Working on Autonomous Vehicles at Uber Used Non-
                   Attributable Devices, and There Is No Evidence Such Devices
                   Were Used to Obtain or Hide Waymo Confidential Information ............... 7

             2.    The SSG and MA Groups Used Non-Attributable Devices for
                   Legitimate Purposes ................................................................................. 9

             3.    All Relevant Information on the SSG Secure Server Was Produced ........ 11

       C.    Uber's Use of Ephemeral Communications Is Not New or Relevant, and
             Any Marginal Relevance Is Outweighed by the Danger of Confusing the
             Issues and Misleading the Jury ................................................................... 12

             1.    Waymo Knew Prior to the Jacobs Demand Letter That Uber
                   Employees Used Ephemeral Communications ...................................... 12

             2.    Google and Waymo Employees Also Use Ephemeral Messaging .......... 14

             3.    Uber, Like Waymo, Used Ephemeral Communication for Normal
                   Business Purposes ................................................................................. 16

       D.    The Jacobs Allegations of Illegitimate Competitive Intelligence Activities
             at Uber Fall Flat .......................................................................................... 18

             1.    Competitive Intelligence into Waymo Was Based on Publicly
                   Available Information ............................................................................ 18

             2.    Uber's Competitive Intelligence Research Is Irrelevant to the Issues
                   Here ...................................................................................................... 20

             3.    Waymo Relies on Rank Speculation to Argue that Uber
                   Implemented a Comprehensive Collection Plan for Google's
                   Confidential Information ....................................................................... 22

             4.    Levandowski and Ron Did Not Lead an Effort to Use ThreatOps to
                   Obtain Waymo Confidential Information ................................................ 27

III.   UBER DID NOT ABUSE THE ATTORNEY-CLIENT PRIVILEGE, AND
       WAYMO WAS NOT DEPRIVED OF ANY DISCOVERABLE INFORMATION ....... 28

       A.    There Is No Evidence that Uber's Autonomous Vehicle Group Improperly
             Labeled Documents as Privileged ............................................................... 29

       B.    Uber Trains Its Employees on the Proper Use of Privilege Labels ..................... 30

       C.    Outside Counsel Independently Assess Whether Each Document Is
             Privileged .................................................................................................... 32

**TABLE OF CONTENTS**
(continued)

Page

D. There Is No Evidence That Uber Otherwise Misused Attorney-Client Privilege Designations to Avoid Discovery .......................................................... 32

E. Incorrect Privilege Designations Have No Relevance and Would Be Prejudicial and Confusing .................................................................... 33

IV. BECAUSE THE JACOBS DOCUMENTS HAVE TURNED OUT "TO BE A NOTHING" IN CONNECTION WITH THE ISSUES IN *THIS* CASE, THERE IS NO BASIS FOR RAISING THE JACOBS DEMAND LETTER OR SETTLEMENT AT TRIAL .................................................................................. 34

V. UBER DID NOT INTENTIONALLY CONCEAL THE JACOBS DEMAND LETTER FROM WAYMO OR THE COURT .............................................. 36

VI. UBER DID NOT INTERFERE WITH WAYMO'S EFFORTS TO TAKE JACOBS-RELATED DISCOVERY ............................................................. 40

A. Uber's Document Production Was Timely and Fulsome ..................................... 40

B. Uber Did Not Frustrate Discovery Directed to Its Outside Counsel ..................... 42

C. Uber Responded in Good Faith to Interrogatory No. 1 ....................................... 43

D. It Is Not Surprising that Many Responsive Documents Were Withheld as Privileged, Given the Subject Matter at Issue and Involvement of In-House and Outside Lawyers ................................................................................. 44

E. Uber Did Not Improperly Instruct Witnesses During Deposition, and Waymo Waived Any Arguments to the Contrary ................................................. 45

VII. WAYMO'S ATTEMPT TO CONNECT THE JACOBS MATERIALS TO OTHER ALLEGED MISCONDUCT IS MERITLESS ............................................ 48

A. Waymo's Attempt to Connect the Jacobs Allegations to Other Alleged Improper Use of the Attorney-Client Privilege Is Meritless .................................. 48

1. Defendants' Assertion of Privilege As to the Stroz Materials Was Made in Good Faith .......................................................................... 48

2. Waymo's Rehashed "Sword and Shield" Arguments Do Not Constitute Discovery Misconduct .................................................. 52

B. Uber Diligently Complied with the Court's Provisional Relief and Expedited Discovery Orders and Did Not Improperly Withhold Documents ...... 53

C. Waymo Uncovered No Evidence that Resuscitates Its Meritless Spoliation Claims ............................................................................................. 58

1. There Is No Spoliation as a Result of Ephemeral Messaging ................... 58

2. There Was No Spoliation of the Five Hard Drives ................................. 59

3. There Was No Spoliation of Evidence Regarding Ottomotto's Formation and Early Development ...................................................... 60

4. There Was No Spoliation of Levandowski's Non-Uber Laptops ............. 60

5. There Was No Spoliation of Tyto Email Archives or Obstruction into Tyto Discovery .................................................................... 61

**TABLE OF CONTENTS**
(continued)

Page

VIII.   WAYMO'S EVIDENCE AND ARGUMENTS REGARDING UBER'S ████████████████████████ ARE IRRELEVANT AND INADMISSIBLE ............................................................................................ 62

CONCLUSION ............................................................................................................................ 64

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Aniplex, Inc. v. Upper Deck Co.*,
  No. 2:08-CV-00442-HDM, 2011 WL 3889566 (D. Nev. Sept. 2, 2011) ............................5, 63

5

6

*Banks v. Office of the Senate Sergeant-at-Arms*,
  222 F.R.D. 1 (D.D.C. 2004) ....................................................................................................46

7

*Function Media v. Google*,
  No. 2007-CV-279, No. 483 (E.D. Tex. Oct. 21, 2010) ............................................................16

8

9

*In re Google Inc.*,
  462 F. App'x 975 (Fed. Cir. 2012) ....................................................................................50, 51

10

11

*In re Grand Jury Subpoena Dated October 22, 2001*,
  282 F.3d 156 (2d Cir. 2002) ..................................................................................................45

12

*In re Imperial Corp. of Am.*,
  174 F.R.D. 475 (S.D. Cal. 1997) ............................................................................................43

13

14

*PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*,
  2011 WL 5417090 (N.D. Cal. Oct. 27, 2011) ......................................................................4, 59

15

16

*Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns LLC*,
  No. 11-2684-JWL, 2015 WL 1204975 (D. Kan. Mar. 17, 2015) ............................................44

17

*U.S. Bank N.A. v. PHL Variable Life Ins. Co.*,
  2013 U.S. Dist. LEXIS 143398 (S.D.N.Y. Oct. 3, 2013) ......................................................46

18

19

*Upjohn Co. v. United States*,
  449 U.S. 383 (1981) ..................................................................................................52, 53, 54

20

21

22

**Statutes and Other Authorities**

23

Fed. R. Civ. P.
  37..........................................................................................................................60, 61, 63
  37(e)(1)........................................................................................................................13

24

25

26

27

28

Fed. R. Evid.

401 ...................................................................................................................................33
402 ...................................................................................................................................33
801(d)(2)(C) ....................................................................................................................19
803(6) ..............................................................................................................................19
805 ...................................................................................................................................59
807 .....................................................................................................................................4
807(a) ................................................................................................................................4
901(a), (b)(1) ...................................................................................................................57

1

**SUMMARY OF UBER'S RESPONSE**

2      The Court nailed it.  Waymo's Offer of Proof confirms that the Jacobs allegations have

3   turned out "to be a nothing."  (Dkt. 2309, 11/28/17 Hr'g Tr. at 147:21-22.)  Waymo took

4   17 depositions, and Uber produced thousands of documents pertaining to the allegations.  The

5   bottom line, to answer the Court's question, is that there is no "truthful information in the Jacobs

6   materials" relevant to *this* case that was not already known to Waymo.  (Dkt. 2447.)  Waymo has

7   known about the use of ephemeral communications platforms since at least June 2017.  And there

8   is no evidence that anyone at Uber (or Ottomotto, for that matter) working on autonomous

9   vehicles used non-attributable devices—the use of those devices was limited to SSG and MA.

10   Most importantly, Mr. Jacobs and his lawyer have both admitted that they have no evidence that

11   Uber ever misappropriated trade secrets from Waymo, Google, or anyone else.

12      For these reasons, the Jacobs allegations have no place in this trial.  This Court has

13   already excluded from trial a number of extraneous "Uber is bad" issues:

14

15

16

> We're not going to tell the jury that Uber is plagued with all of
> these problems that it has from sexual harassment to Greyball, and
> all of those other bad acts, unless Uber opens the door by saying
> that it's a good corporate citizen.

17   (Dkt. 775, 6/29 Hr'g Tr. at 4:8-22; *see also* Dkt. 1885 at 4 (order excluding evidence of

18   Benchmark's suit against Uber's former CEO, except for impeachment purposes).)  The Jacobs

19   allegations fall into the same classic Rule 403 bucket:  largely irrelevant, with any marginal

20   relevance substantially outweighed by the danger of unfair prejudice, confusing the issues, and

21   wasting valuable jury time.  This is especially true here since the lawyer who wrote the demand

22   letter admitted that the reference to stealing Waymo secrets was "an error in communication"

23   with his client.  (Ex. 28 at CFL000300.)[1]  And Mr. Jacobs testified in deposition (consistent with

24   his testimony in Court) that with respect to the issues this Court was interested in, there is no

25   "truthful information" for the jury:

26

27      [1] All citations to "Ex." are to the Declaration of Esther Kim Chang in Support of
Defendants Uber Technologies, Inc. and Ottomotto LLC's Response to Waymo's Offer of Proof,

28   filed herewith.

1

Q:  Do you know whether or not anybody in the autonomous
vehicle group anywhere at Uber ever used a non-attributable

2

device?
. . . .

3

A:  No.

4

\*\*\*

5

Q:  Other than knowing that it might involve LiDAR, do you have
any idea what the trade secrets are that were allegedly stolen?

6

A:  No.

7

Q:  Have you ever seen any of the 14,000 documents that Anthony
Levandowski allegedly took from Waymo?

8

A:  I mean, I don't know what the documents are, but not to my
knowledge.

9

10

Q:  Did you ever have any conversation with Mr. Levandowski
about the alleged theft of trade secrets from Google or Waymo?
A:  Nope.

11

Q:  **Do you know whether any documents from Google or**

12

**Waymo ever made it to Uber**?
A:  **No**.

13

14

(Ex. 9 (Jacobs Dep. at 178:1-16, 179:23-180:13 (emphasis added)).)

15

        In Waymo's Offer of Proof, the only supposed "truthful information" Waymo cites is the

16

limited surveillance of Waymo vehicles on public roads and research on Waymo from public

17

sources, both of which are legal and, more importantly, irrelevant to whether Uber

18

misappropriated the eight alleged trade secrets.  If Waymo's technology can be copied (and the

19

trade secrets ascertained) merely from observing Waymo's vehicles on public roads, then, by

20

definition, they cannot be trade secrets.  Waymo cannot have it both ways.  Either the surveillance

21

is irrelevant to the issues in this case, or Waymo's alleged trade secrets are not trade secrets

22

because they are readily ascertainable.  Waymo's suggestion that a company would only observe

23

a competitor's vehicles if the competition was using the same (copied) technology is

24

outlandish.  Many companies monitor their competition.  In fact, Waymo also uses surveillance

25

techniques to track competitor vehicles.

26

        With respect to ephemeral communications—as Uber noted during the evidentiary hearing

27

in November—Waymo knew as early as June 2017 that Uber used ephemeral communications

28

(Dkt. 2309, 11/28/17 Hr'g Tr. at 155:22-156:7; Ex. 19 (Ron 6/19/17 Dep. at 206:10-15, 206:23-

207:8); González Decl. ¶ 8, Ex. B), but Waymo chose not to make it an issue in this litigation. And now we know why: In addition to developing and using multiple ephemeral messaging systems, for a decade, Google has been deleting *all* of its employees' chat messages on Google Hangouts, unless the user takes affirmative steps to save them. (Ex. 10 (Johnston Dep. at 15:9-17, 28:12-25).) Waymo has followed this policy since its inception. (*Id.* at 75:3-7.)

The 37-page demand letter from Mr. Jacobs's attorney ("Jacobs demand letter," Dkt. 2307-2) also alleges that Uber improperly used attorney-client privilege designations based on supposed training by Craig Clark, a former Uber in-house lawyer. There is no admissible and relevant "truthful information" here either. Mr. Clark's testimony shows otherwise. (Ex. 2 (Clark Dep. at 215:11-228:17; 199:2-21).) Mr. Clark did not provide training to the autonomous vehicle group (*id.* at 46:23-25), and there is no evidence that Uber improperly labeled documents as privileged to shield them from discovery in connection with this litigation. Uber's outside counsel reviewed documents for privilege and made independent determinations as to whether a document should be produced. (Ex. 6 (Haimovici 30(b)(6) Dep. at 25:3-10, 36:23-37:4).) Uber's production demonstrates the independence of that review; documents were produced even if they contained a privilege legend if they were deemed not privileged. (*E.g.,* Exs. 65-69.)

While the Special Master determined that the Jacobs demand letter was responsive to two (out of 344) document requests (Dkt. 2396), Waymo has not been prejudiced. It received substantial discovery pertaining to the Jacobs allegations, discovery which has now confirmed that there was nothing to hide. The only revelation after a month of discovery is that a lawyer seeking money wrote a demand letter making false assertions relating to Waymo. Even if the Jacobs demand letter had been produced months ago, the result would have been no different. The Jacobs demand letter would have been excluded as hearsay and on relevance and 403 grounds because, at least with respect to the issues our jury is to consider, there is no "there" there.

Finally, this Court asked the parties to comment on the admissibility of the Jacobs demand letter and related documents. Waymo's response confirms that the Jacobs demand letter should not come into evidence. Remarkably, Waymo contends that the Jacobs demand letter is

1   admissible as an "adoptive admission" or pursuant to the residual exception of Rule 807.  (*See*

2   Appendix A at Ex. 2.)  A second year law student would obliterate this argument.  Uber has not

3   done anything that "manifests an adoption or belief" in the truth of the statements in the Jacobs

4   demand letter, and the letter has no "guarantees of truthworthiness" as required by Rule 807.

5   Waymo has made similarly weak arguments in connection with the resignation email, a

6   declaration from Mr. Jacobs's lawyer, and other documents.  We address them in this brief and in

7   response to Waymo's Appendix A and B.

8   **I.     WAYMO'S OFFER OF PROOF REGARDING PRACTICAL**
    **IMPLEMENTATION FALLS SHORT**

9

10      Waymo carries the burden of proving both admissibility and foundation for every

11   document and topic area.  Importantly, Waymo failed to comply with this Court's order to

12   "***specifically explain*** the practical details of how it will implement its offer of proof."  (Dkt. 2447

13   (emphasis added).)  Throughout Appendices A and B to its Offer of Proof, Waymo sets forth

14   nothing more than a mere list of potential hearsay exceptions without any support or explanation

15   why those exceptions apply.  Providing a mere list of evidentiary rules does not satisfy the

16   Court's requirement to explain with specificity how an exhibit overcomes hearsay objections.

17   Waymo's failure to comply with the Court's order improperly places the burden on Uber to

18   explain the inapplicability of an exception without notice of how Waymo intends to satisfy its

19   evidentiary burden.  *See PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, 2011

20   WL 5417090, at *9 (N.D. Cal. Oct. 27, 2011) ("A party seeking to admit a hearsay statement on

21   the grounds that it falls into one of these exceptions bears the burden of proving that the exception

22   is applicable by a preponderance of the evidence").

23      For several documents, Waymo cites to the residual exception of Fed. R. Evid. 807.  To be

24   admissible under Rule 807, a hearsay statement must satisfy several requirements:  (1) have

25   "equivalent circumstantial guarantees of trustworthiness"; (2) be "offered as evidence of a

26   material fact"; (3) be "more probative on the point for which it is offered than any other evidence

27   that the proponent can obtain through reasonable efforts"; and (4) "admitting it will best serve the

28   purposes of these rules and the interests of justice."  Fed. R. Evid. 807(a). Waymo makes no

1   attempt to satisfy its burden on these requirements.  As we note in our responses to Appendix A

2   and B (Uber's responses attached hereto as Appendix A and Appendix B), the exhibits Waymo

3   intends to use the residual exception for do not meet these requirements and the exception does

4   not apply.

5       Waymo claims that the Jacobs resignation email, the Jacobs demand letter, and even a

6   declaration from Mr. Jacobs's lawyer are all admissible as "adoptive admission[s]."  (App. A at 1,

7   2, 55.)  It is difficult to fathom this argument, but in any case, Waymo offers no suggestion of

8   who supposedly manifested an "adoption or belief" regarding the truth of the many statements in

9   these documents.  They are all blatant hearsay and are not admissible.

10  **II.     NO MATERIAL EVIDENCE WAS CONCEALED BECAUSE THE JACOBS**
        **ALLEGATIONS ARE UNTRUE OR IRRELEVANT**

11

12          **A.     Mr. Jacobs Admits He Has No Knowledge of Any Theft of Trade Secrets by**
                **Uber**

13      The situation here is a textbook illustration of why lawyer demand letters are not

14  admissible in jury trials.  *See Aniplex, Inc. v. Upper Deck Co.*, No. 2:08-CV-00442-HDM, 2011

15  WL 3889566, at *2 (D. Nev. Sept. 2, 2011) ("Demand letters constitute inadmissible hearsay.").

16  A lawyer can say virtually anything when making a demand for money.  There are no

17  ramifications for saying something untrue.  It is quite another thing altogether to back up those

18  assertions under oath in front of a judge.  Mr. Jacobs's testimony before this Court could not be

19  clearer.  The headline-creating assertion in the Jacobs demand letter that Mr. Jacobs was aware

20  that Uber had used the Marketplace Analytics ("MA") team to "steal trade secrets at least from

21  Waymo" (OOP Ex. 2, Jacobs demand letter at 12) turns out to be false.  Mr. Jacobs emphatically

22  and repeatedly rejected this allegation:

23              Q: Do you stand by that statement?
                A: No.
24              Q: So your lawyer got it wrong?
                A: I don't stand by that statement.
25
                            * * *
26
                Q: What were you aware of with respect to Uber's use of the MA
27              team to steal trade secrets from Waymo?
                A: Nothing.
28

* * *

> Q: What were you aware of with respect to the MA team and its interaction with the Waymo litigation?
> A: Nothing.

(Dkt. 2309, 11/28/17 Hr'g Tr. at 57:3-17, 58:23-25.)

Even when Waymo's counsel tried desperately to squeeze something—even something inadmissible—from this witness, Mr. Jacobs remained firm and unwavering in testifying that he had no knowledge of any trade secret theft at all:

> Q: Were you aware **with hearsay** or information that the MA team tried to obtain trade secrets **from anybody**, let's say, first in the United States?

> A: No.  **Absolutely no**.  No firsthand or secondhand, no surmising about work, the MA team against firms in the U.S., and **certainly not Waymo**.

(Dkt. 2309, 11/28/17 Hr'g Tr. at 61:20-25 (emphasis added.)  This testimony confirms that the assertion in the Jacobs demand letter most relevant to the issues in this case turns out to have been a complete fabrication.

Other allegations in the Jacobs demand letter have similarly been debunked.  (*See, e.g.*, Ex. 2 (Clark Dep. at 290:18-25 ("Q: Are you aware of Uber ever remotely accessing confidential corporate communications and data from Waymo? … A: No.")); Ex. 27 (Yoo 12/14/17 Dep. at 209:13-25 (unaware of Uber allegedly hacking a competitor's private information)); *id.* at 210:2-9 (unaware of Uber allegedly recording conversations or tapping phones)); *id.* 218:16-21 (unaware of anyone in ThreatOps allegedly advising employees to abuse privilege to avoid discovery); *id.* at 222:22-25 (unaware of anyone within Uber allegedly using ephemeral communications about Waymo).)

Notably, Waymo chose not to take the deposition of Mr. Jacobs's lawyer, likely because Waymo knew that he too would admit that the relevant allegations were false.  (Ex. 28, CFL000297 at CFL000300.)  Instead, Waymo obtained a declaration from that lawyer regarding how many hours his firm worked on this matter.  (*See* Dkt. 2470-17.)  That declaration is hearsay and should not be considered.  Waymo's assertion that it is an "adoptive admission" (Appendix A at 55) is ridiculous.

**B.     The Use of Non-Attributable Devices Has No Bearing on Issues in This Case**

**1.     No One Working on Autonomous Vehicles at Uber Used Non-Attributable Devices, and There Is No Evidence Such Devices Were Used to Obtain or Hide Waymo Confidential Information**

There is no "truthful information" that anyone working on autonomous vehicles at Uber (or Ottomotto, for that matter) ever used non-attributable devices.  Tellingly, Waymo identifies no such evidence.  Mr. Jacobs so testified at the November 2017 hearing:

> Q. Do you have any information of anyone outside of SSG or M.A.
> using those devices?
> A. No.

(Dkt. 2309, 11/28/17 Hr'g Tr at 99:3-5; *see also id.* at 51:3-7, 77:24-78:1.)  He further specifically testified that he had no knowledge of non-attributable devices "being used with regard to the autonomous technology groups."  (*Id.* at 77:24-78:1; *see also* Ex. 9 (Jacobs Dep. at 178:1-5).)  As the Court suspected (Dkt. 2447 (Order Re Forthcoming Offer of Proof and Response Thereto)), extensive discovery has confirmed that the use of non-attributable devices (also referred to as mis-attributable devices or research laptops) was "confined to SSG and MA," and not used by ATG.  (Declaration of Kevin Faulkner in Support of Defendants' Response to Waymo's Offer of Proof ("Faulkner Decl.") ¶ 3; Ex. 6 (Haimovici 30(b)(6) Dep. at 20:20-24, 22:6-11, 120:2-9); Ex. 22 (Russo Dep. at 141:5-24); Ex. 12 (Maher Dep. at 257:17-25); Ex. 17 (Nocon Dep. at 137:15-24); Ex. 27 (Yoo 12/14/17 Dep. at 226:14-227:4); Ex. 20 (Ron 30(b)(6) 12/12/17 Dep. at 406:25-407:5); Ex. 26 (Sullivan Dep. at 305:1-7); Ex. 8 (Henley 30(b)(6) Dep. at 141:4-15); Ex. 2 (Clark Dep. at 356:3-357:1).)  Further, contrary to the hearsay allegations in the Jacobs demand letter (Dkt. 2307-2 at 9), the individuals referenced in the Jacobs demand letter as being allegedly involved confirmed that they never provided training to ATG regarding the use of non-attributable devices.  (Ex. 5 (Gicinto Dep. at 87:17-24); Dkt. 2309, 11/28/2017 Tr. at 138:9-21 (Russo); Ex. 17 (Nocon Dep. at 113:10-12).)

Waymo admits that it "did not uncover evidence that other departments utilized third party vendors to acquire devices paid for by Uber for the express purpose of ensuring those devices could not be traced back to Uber."  (Dkt. 2466-3, Plaintiff Waymo's Offer of Proof Regarding Defendants' Discovery Misconduct ("OOP"), at 19.)  Indeed, only a handful of individuals— all

1    from the SSG or MA groups—are known to use or have used non-attributable devices.[2]

2    (Dkt. 2470-8; Ex. 60 (1/16/2018 list of non-attributable devices).)

3         Moreover, witnesses confirmed that to the extent non-attributable devices were used

4    within ThreatOps, Waymo or Google confidential information or trade secrets were not accessed

5    using these devices.  (Ex. 5 (Gicinto Dep. at 78:5-20, 79:7-18, 103:16-104:18, 334:18-335:4);

6    Dkt. 2310, 11/29/2017 Hr'g Tr. at 146:17-148:3.)

7         In addition, Stroz Friedberg searched all the non-attributable devices and anonymous

8    servers and found no non-public Google or Waymo information.  (Faulkner Decl. ¶¶ 4-5.)

9         Finding no evidence that anyone besides SSG and MA group members used

10   non-attributable devices or that their use had anything to do with collecting confidential Waymo

11   information, Waymo resorts to arguing that Levandowski's use of personal laptops for Uber work

12   amounts to use of non-attributable devices to acquire Waymo confidential information.  The

13   Jacobs allegations have nothing to do with Levandowski's personal laptops.  The non-attributable

14   devices at issue were purchased by or for Uber; they were not personal equipment.  (Ex. 22

15   (Russo Dep. at 109:2-24); Ex. 12 (Maher Dep. at 248:17-20; 250:1-4; 252:2-21).)

16        Further, Waymo has known about Levandowski's use of personal laptop computers since

17   at least June 5, 2017, when Uber stated in an interrogatory response that Levandowski had used a

18   personal laptop to access the Uber network.  (Ex. 54, Uber's Responses to First Set of Expedited

19   Interrogatories (No. 3).)  Uber's records showed that Levandowski had used only one personal

20   laptop "to access Uber's networks," and thus only one personal laptop was identified in Uber's

21   interrogatory response.  Unsatisfied, Waymo moved to compel a further response (Dkt. 681-3 at

22

23        [2] Waymo's complaint that Uber "unilaterally limited" its search and production of
     documents regarding non-attributable devices in response to the Court's order at the
24   November 28 hearing is not well-taken.  (*See* OOP at 19 n.15.)  As a practical matter, it was not
     possible for Uber to execute a search of 15,000+ personnel in just six days.  On November 29,
25   Waymo wrote "[w]e expect that . . . [Uber's] searches will include everyone in the SSG and MA
     groups (including their predecessor groups), as well as other appropriate
26   custodians."  (Ex. 52 (11/29/17 Andrea Roberts email).)  In an effort to be transparent, so that any
     problems could be addressed at the December 4 hearing, Uber met and conferred with Waymo
27   twice on November 30, 2017, about the proposed scope of Uber's search.  The parties agreed that
     this was where Uber should start, and Waymo reserved its right to seek more.  Waymo did not
28   raise the issue at the December 4 hearing.  Uber produced 955 documents on December 4.

1  5-6), and Uber, in opposing the motion, provided a declaration stating that no other personal

2  devices belonging to Levandowski—other than what was identified in response to the

3  interrogatory—had accessed Uber's servers (Dkt. 749-8, (Faulkner Decl. ¶¶ 3-8).)  Judge Corley

4  found Uber's response sufficient and denied Waymo's motion.  (Dkt. 881 at 2.)  On Fifth

5  Amendment grounds, Levandowski refused to turn over any personal laptops to Uber for

6  searching, but agreed to allow his personal counsel at Goodwin Proctor to run searches on those

7  machines and provide results to Uber.  (Dkt. 2018-3, ¶ 2.)  Uber provided the filenames, hash

8  values, and the parties' search terms for the 14,000 files to Goodwin.  Around June 19, 2017,

9  Uber produced responsive documents from the search results to Waymo.  (*Id.*; Dkt. 2020

10 ¶ 5.)  Uber did not conceal any facts related to Levandowski's laptops, as Waymo alleges.  (OOP

11 at 31.)  Waymo's attempts to manufacture a connection between this previously raised and

12 already resolved issue should fail.

<h3 align="center">2.      The SSG and MA Groups Used Non-Attributable Devices for<br>Legitimate Purposes</h3>

15         To the extent that non-attributable devices were used at Uber, they were used for

16 legitimate purposes.  This Court heard directly from some of the SSG and MA employees who

17 used those devices.  Uber employees face violent opposition in many parts of the world.  Certain

18 Uber employees are tasked with trying to identify violent groups and to prevent such acts.  When

19 engaged in such online research, the last thing these employees should face is for their real names

20 and employer to be revealed to their potential assailants.  Internet websites track information,

21 such as the IP addresses of computers that are accessing the site.  Accordingly, some Uber

22 employees used non-attributable devices when investigating security threats in order to avoid

23 detection that would compromise their safety or those of others.  (*See* Dkt. 2310, 11/29/2017 Hr'g

24 Tr. at 114:25-115:7, 125:5-126:10 (Henley); Ex. 6 (Haimovici 30(b)(6) Dep. at 19:7-22); Ex. 5

25 (Gicinto Dep. at 89:1-11, 89:20-25, 94:1-22); Ex. 22 (Russo Dep. at 109:13-20); Ex. 7 (Henley

26 30(b)(6) Dep. at 63:3-65:24, 66:3-7, 67:14-18).)  Mr. Jacobs similarly testified as to the limited

27 use of these devices by SSG and MA.  (Dkt. 2309, 11/28/2017 Hr'g Tr. at 50:1-21.)  Although

28 non-attributable devices were also used to conduct research into Uber's competitors to learn about

1    the competition, that research involved only *public* information.  (Ex. 5 (Gicinto Dep. at 103:20-

2    104:2, 78:5-20, 79:7-18); Dkt. 2310, 11/29/2017 Hr'g Tr. at 125:5-126:10.)

3         SSG and MA witnesses confirmed that non-attributable devices were not used for the

4    purpose of evading discovery.  (Ex. 26 (Sullivan Dep. at 305:1-7 ("Do you know whether anyone

5    at Uber was ever instructed to use nonattributable hardware or software to prevent documents

6    from being subject to legal discovery? . . . A. I have never heard of that happening."); *id*. at

7    301:25-302:8); Ex. 2 (Clark Dep. at 259:25-260:6 ("Q. Are you aware of Uber storing data on

8    non-attributable devices to avoid detection, including in connection with legal discovery? . . . The

9    witness: No."); Ex. 22 (Russo Dep. at 132:4-20 ("A. If you're asking me, did the misattributable

10   devices exist to avoid discovery, then the answer is no.  If I understand the question, was this –

11   were these used to avoid legal discovery, then the answer is no.")); Ex. 7 (Henley Dep. at 72:24-

12   73:11); Ex. 12 (Maher Dep. at 240:14-241:7); Ex. 11 (Kalanick 12/14/17 Dep. at 641:21-642:3).)

13        Waymo argues that the ThreatOps team's alleged refusal to implement *Mr. Jacobs's*

14   suggestion for a centralized intelligence database supports its contention that Uber engaged in

15   "efforts to conceal documents from discovery."  (OOP at 19.)  Waymo ignores the overwhelming

16   evidence to the contrary.  In particular, witnesses testified that the proposal was made by the

17   entire ThreatOps team, not Mr. Jacobs alone (Ex. 5 (Gicinto Dep. at 191:22-192:10)); the team,

18   including Mr. Jacobs's manager, supported the proposal (Ex. 7 (Henley Dep. at 73:25-74:8,

19   74:13-75:1); Ex. 5 (Gicinto Dep. at 192:11;193:7); Ex. 22 (Russo Dep. at 181:3-13); Ex. 2 (Clark

20   Dep. at 249:13-24)); and the database was not implemented due to resource constraints—not to

21   evade discovery (Ex. 5 (Gicinto Dep. at 192:17-193:1); Ex. 22 (Russo Dep. at 181:3-13); Ex. 7

22   (Henley Dep. at 73:12-24)).

23        In its brief, Waymo complains about its belated awareness of the security group's use of

24   virtual machines, as described in a document entitled "Virtual Ops Capability Playbook."  (OOP

25   at 17, citing Ex. 217 (Dkt. 2467).)  But Waymo fails to identify any evidence that the "Virtual

26   Ops Capability Playbook" or Uber's virtual machines were used for any wrongdoing or for

27   anything relating to the trade secrets at issue in this case.  It cannot.  As confirmed by testimony,

28   virtual machines were used by the security group in conjunction with non-attributable devices to

protect the identity of persons investigating threats:

> Q. Was the purpose of this [Virtual Ops Capability Playbook] document solely to establish standards with respect to doing research in connection with individuals or groups who are threatening Uber?
> A. Yes. That's what a POI [person of interest] or a GOI [group of interest] is in our vernacular.
>
> Q. Okay.  So a POI or GOI refers only to folks who are potential threats to Uber?
> A. Correct. The physical security team maintains a list of persons of interest and groups of interest because of some sort of a threatening posture—threats that they've actually made to the company, physical issues that have been observed on the platform, something to that effect—all over the world.  And so this virtual ops capability playbook is in support of what would be, you know, misattributable research into those types of entities to protect Uber, to protect the identity of the researcher.

(Ex. 5 (Gicinto Dep. at 305:20-306:15).)

### 3.   All Relevant Information on the SSG Secure Server Was Produced

The security team stored data collected with non-attributable devices on a secure cloud server—at first, Dropbox and then NextCloud.  (Ex. 22 (Russo Dep. at 125:22-25, 109:21-24); Ex. 5 (Gicinto Dep. at 71:13-17).)  The purpose of the cloud server was to allow the security team "to collaborate on projects safely and securely" and to prevent the information from being hacked.  Ex. 5 (Gicinto Dep. at 68-3-8, 68:13-23, 89:20-25); Ex. 22 (Russo Dep. at 114:3-7).)  Access to these servers was limited to only a handful of people from SSG and ThreatOps:

> Q. How many different people used the system?
> A. Let's see. Seven or eight or so.
>
> Q. These were all folks who were in the SSG group?
> A. Or ThreatOPs.

(Ex. 22 (Russo Dep. at 115:15-20); *see also* Ex. 5 (Gicinto Dep. at 70:8-10).)  These servers included sensitive information, such as budgets and intelligence reports, but not Google or Waymo confidential information.  (Ex. 5 (Gicinto Dep. at 74:12-17); Ex. 22 (Russo Dep.at 118:20-119:1).)

The contents of the security team's Dropbox accounts were moved to the NextCloud server, NextCloud was retired earlier in 2017, and Mr. Gicinto downloaded its contents before it

1  was retired.  (Ex. 5 (Gicinto Dep. at 75:21-76:4); Ex. 22 (Russo Dep. at 116:2-16).)  Uber

2  searched and produced responsive documents from the downloaded contents of that cloud server

3  used by the security team.  (Declaration of Sylvia Rivera in Support of Defendants' Response to

4  Waymo's Offer of Proof ("Rivera Decl."), filed herewith, ¶ 18.)  Waymo complains about the

5  scarcity of documents produced from the secure servers.  (OOP at 18-19.)  But given that the

6  security team testified that it conducted limited competitive intelligence into Waymo (Ex. 5

7  (Gicinto Dep. at 34:6-12, 46:10-18, 58:7-59:5, 78:2-20, 158:12-17); Ex. 7 (Henley Dep. at

8  107:15-19); Ex. 22 (Russo Dep. at 259:6-20, 311:2-9; Ex. 17 (Nocon Dep. at 56:8-11)), it is not

9  surprising that only a few documents regarding Google or Waymo exist.  Moreover, the manager

10  of the SSG group confirmed that no confidential information belonging to Google or Waymo

11  existed on these secure cloud servers.  (Ex. 5 (Gicinto Dep. at 334:18-335:4).)  Because all

12  responsive documents relating to Google or Waymo have been produced, there is no prejudice to

13  Waymo.

14     **C.      Uber's Use of Ephemeral Communications Is Not New or Relevant, and Any
                 Marginal Relevance Is Outweighed by the Danger of Confusing the Issues
15               and Misleading the Jury**

16           **1.      Waymo Knew Prior to the Jacobs Demand Letter That Uber
                        Employees Used Ephemeral Communications**
17

18          This Court correctly observed that Waymo knew before seeing the Jacobs demand letter

19  that Uber used ephemeral communications.  (Dkt. 2447.)  Lior Ron was deposed on June 19,

20  2017, and testified that he and Anthony Levandowski sometimes used the ephemeral application

21  Telegram:

22              Q: Did you ever use Telegram with Mr. Levandowski?
                A: I have used Telegram with Anthony later on --
23              Q: When was that?
                A: --in some capacity.
24
                                           * * *
25
                Q: Do – are messages sent with Telegram saved?
26              A: I think you can either save them, or I think there's maybe an
                option to also not save them.
27              Q: Okay.  And do you know which option Mr. Levandowski used?
                A: I'm—I don't know for certain.  I think **definitely there were**
28              **messages that were not saved**.  I think there was also messaged

1

2

that saved, but I'm not sure exactly how Telegram works in terms
of saving or not.

* * *

3

4

Q: When's the last time you would have communicated with
Mr. Levandowski using Telegram?
A: I don't remember exactly, but maybe a week or two ago.

5

6

(Ex. 19 (Ron 6/19/17 Dep. at 206:10-15, 206:23-207:8); González Decl. ¶ 8, Ex. B.)  And on

7

August 18, 2017, Eric Meyhofer also testified that he had communicated with Levandowski using

8

Telegram.  (Ex. 14 (Meyhofer Dep. at 38:10-18); González Decl. ¶ 8, Ex. C.)

9

        There is no evidence that **any** relevant information was exchanged over Telegram or any

10

other ephemeral messaging service.  During the 17 supplemental depositions, no witness testified

11

that any information in any way relevant to the subject matter of this case was exchanged using

12

ephemeral messaging.  Levandowski and Ron had Wickr accounts only for a brief period of time

13

in 2017—after this lawsuit was filed.  There is no indication that they used Wickr or any other

14

ephemeral messaging service when negotiations relating to Uber's acquisition of Ottomotto took

15

place, or that they ever used Wickr or any ephemeral messaging service to discuss LiDAR.

16

(Ex. 33 (UBER00338417); Ex. 20 (Ron 30(b)(6) 12/12/17 Dep. at 342:21-25, 354:7-22, 378:5-

17

379:9).  Witnesses key to the issues in this case—for example, James Haslim, Gaetan Pennecot,

18

Daniel Gruver, and Scott Boehmke—did not use Wickr or other ephemeral messaging services;

19

(OOP Ex. 30 (ephemeral list provided to court); *see also* Ex. 6 (Haimovici 30(b)(6) Dep. at

20

20:20-21:7, 183:19-184:6 (Eric Meyhofer, the head of ATG, never used ephemeral

21

communications to discuss anything related to this case, and made clear that any attempt to

22

conceal information from discovery in litigation was unacceptable)); Ex. 13 (Majalya Dep. at

23

51:23-52:4); Ex. 23 (Spiegler Dep. at 43:23-44:17, 45:4-7, 45:21-25).)  Further, Mr. Clark

24

testified that he instructed employees not to use ephemeral communications if they were on legal

25

hold.  (Ex. 2 (Clark Dep. at 139:3-8); *see also* Ex. 27 (Yoo 12/14/17 Dep. at 412:7-11).  Uber's

26

legal hold explicitly instructs employees on litigation holds to "refrain from discussing anything

27

that may relate to the potential claims . . . , including by using chat applications or any other

28

instant messaging application."  (Ex. 63 (Uber litigation hold.)  There is no evidence of any loss

1  of relevant information through the use of these services, and Waymo therefore suffered no

2  prejudice.  Fed. R. Civ. P. 37(e)(1).

3  **2.     Google and Waymo Employees Also Use Ephemeral Messaging**

4  This Court suspected that Waymo probably also "evaporated documents."  (Dkt. 2309,

5  Tr. 11/28/2017 Hr'g Tr. at 157:23-25.)  The Court's suspicions were spot on.  ***In part because***

6  ***Google was*** ███████████████████████████████████████ as of September

7  2008, Google announced that it would "make 'off the record' the Google corporate default

8  setting" for its in-house messaging applications.  (Ex. 43 (WAYMO-UBER-00145156).)  One of

9  Google's motivations to make its employees' chats evaporate was ████████████████████

10 ███████████████████████████████████████████████████████████████

11 ████████████████████████████ (*Id.*)  The testimony of Waymo's

12 corporate representative was particularly illuminating.  What Waymo never disclosed to Uber

13 during regular discovery (or in response to the Court's pointed questions at the hearings related to

14 the Jacobs issues), but that Waymo's corporate representative admitted, is the following:

15 1.   ██████████████████████████████████████████████

16 ████████████████████████████████████████████████.

17 (Ex. 10 (Johnston Dep. at 12:13-16).)

18 2.   Google employees use chat for business purposes.  (*Id.* at 26:1-3.)

19 3.   The "vast majority" of Google employees communicate via chat.  (*Id.* at 27:17-28:1.)

20 4.   Communications on chat include substantive, important issues.  (*Id.* at 26:4-6.)

21 5.   Nonetheless, in September 2008, Google changed its policy and made "**off the record**"

22 the default setting within Google Hangouts, which means that **every Google chat is**

23 **automatically destroyed** unless the employee takes specific measures to save the chat.  (*Id.* at

24 28:12-25.)

25 6.   ██████████████████████████████████████████████

26 ████████████████████████████████ (*Id.* at 24:15-20.)

27 7.   Although Uber requested the information, Google refused to answer interrogatories

28 regarding whether any disclosed Google or Waymo trial witnesses had ██████████████████

1 ██████████████████████████████████████████ (Ex. 59,

2 Waymo's 12/19/2017 Responses and Objections to Defendant's Ninth Set of Interrogatories, Rog.

3 51.)

4      8. There are ████████ companies that use Google's chat service, and the default setting

5 that Google provides to these companies is to indefinitely save all chats, ████████████████

6 ████████████████████████████████████████

7 (Ex. 10 (Johnston Dep. at 38:18-22).)

8      9. Although Google's customers can choose to alter the default setting (which is set to

9 save all chats), ██████████████████████████████████████

10 ██████████████████████████████████ (Id. at 41:1-4,

11 14-16.)

12      10. ████████████████████████████████████

13 ██████████████████████████████████ (Id. at

14 41:14-19.)

15      11. If a Google customer requires use of a non-Google chat service for communication,

16 then Google employees would use that customer's preferred chat application in communicating

17 with that customer. (Id. at 69:11-16.)

18      12. Google employees are allowed to download other ephemeral applications onto their

19 Google computers for personal use. (Id. at 64:6-9, 21-24.)

20      13. Google's 30(b)(6) representative testified that he has used "about 14" non-Google

21 messenger applications, including Slack, Telegram, WhatsApp, WeChat, Luna, Symphony,

22 Snapchat, HipChat, and Facebook Messenger. (Id. at 62:11-14, 63:12-64:5.)

23      14. Waymo employees follow the same chat preservation policy (███████████████

24 █████████████) as Google employees. (Id. at 75:3-7.)

25      Thus, it turns out that while Waymo seeks an adverse jury instruction based, in part, on

26 Uber's use of ephemeral messaging (Dkt. 2472 at 3-5), Google has been automatically destroying

27 nearly all of its employees' chats for the past decade by setting the default for its chats to "off the

28 record," and Waymo has followed the same formal Google policy since its inception. None of

1   this was previously disclosed to Uber or to this Court in this litigation.

2          In one final ironic twist, Uber has learned that in a different legal proceeding involving

3   Google, the opposing party sought an adverse inference jury instruction against Google based on

4   its failure to preserve chat messages.  There, Google argued that the default setting to not retain

5   instant message chat records (making them ephemeral communications) comported with

6   "accepted, widespread, and reasonable industry standards" and likened these ephemeral chat

7   messages to "hallway conversation[s]."  (Ex. 61, *Function Media v. Google*, No. 2007-CV-279,

8   No. 483 at 147:8-18, 155:17-156:12 (E.D. Tex. Oct. 21, 2010) (post-trial motions hearing on

9   spoliation).)  Google further successfully argued that it had instructed employees to save chats

10  related to that litigation, and the court in that case declined to give an adverse instruction.  (*See*

11  Ex. 42 Declaration of Theresa Beaumont (Google Discovery Counsel), ¶ 9; Ex. 62 *Function*

12  *Media, L.L.C. vs. Google, Inc. et al*, No. 2007-CV-279, No. 416 (E.D. Tex. Jan. 26, 2010)

13  (rejecting proposed adverse inference instruction).)  In that litigation, Google sealed the briefing

14  relating to this issue, so Google's views and arguments on adverse instructions for its destruction

15  of chat messages remain sealed and obscured from the public and this Court until this recent

16  round of discovery.  (*Function Media*, Nos. 386 and 393 (Jan. 15, 2010 and Jan. 18, 2010) (sealed

17  filings)).)

18          **3.      Uber, Like Waymo, Used Ephemeral Communication for Normal**
                     **Business Purposes**
19

20          Discovery has shown that Uber employees use ephemeral communications, like Wickr,

21  because the ephemerality and end-to-end encryption make it a more secure means of

22  communication.  (Ex. 5 (Gicinto Dep. at 19:12-17); Ex. 8 (Henley 30(b)(6) Dep. at 73:7-10);

23  Ex. 22 (Russo Dep. at 90:25-91:11, 95:8-18); Ex. 2 (Clark Dep. at 145:15-22).)  In addition, using

24  ephemeral communications is a best practice because it results in less data for the company to

25  secure.  (Ex. 26(Sullivan Dep. at 224:22-225:16).)  This is not just a theoretical concern for

26  Uber—Uber's data has been targeted multiple times by cyber hackers.  (Ex. 8 (Henley 30(b)(6)

27  Dep. at 125:4-6 (discontinuing ephemeral messaging was "making the company less secure and

28  putting us more at risk")); *id*. at 126:1-3 (█████████████████████████████

1 ███████████████████████████████████████

2 ██████); Ex. 2 (Clark Dep. at 132:9-17 (Uber's previous messaging system, HipChat, is "a

3 terrible product," "[h]orribly insecure," and has "been hacked multiple times.").)

4       Waymo makes the unsupported argument that its use of ephemeral communications is for

5 "normal business purposes," while Uber's use of similar ephemeral communications must be "for

6 the purpose of thwarting discovery in ongoing of further litigation." (OOP at 21.) The

7 overwhelming evidence is to the contrary. Witnesses have consistently testified that ephemeral

8 communications were neither used to hide or obtain Google or Waymo trade secrets nor to evade

9 discovery. (Dkt. 2310, 11/29/2017 Hr'g Tr. at 148:7-14 (Gicinto); Ex. 8 (Henley 30(b)(6) Dep. at

10 141:7-10); Ex. 2 (Clark Dep. at 139:15-18, 145:23-146:2); Ex. 22 (Russo Dep. at 95:8-12, 105:1-

11 15).) And the allegation in the Jacobs demand letter that the ThreatOps group provided training

12 to ATG on the use of ephemeral communications has been refuted. (Dkt. 2309, 11/28/17 Tr. at

13 138:9-21 (Russo); Ex. 22 (Russo Dep at 93:5-14, 141:17-24); Ex. 17 (Nocon Dep. at 113:6-9).)

14 All that Waymo can say is that Uber's use of ephemeral communications "would have the effect

15 of avoiding discovery in ongoing or anticipated litigation." (OOP at 21.) But that would be the

16 case whenever any company uses ephemeral communications. Further, discovery has shown that

17 when Uber employees are placed on litigation holds, they are explicitly instructed not to use

18 ephemeral messaging applications in a manner that would have the effect of avoiding discovery

19 in ongoing or anticipated litigation (and are specifically instructed not to use ephemeral

20 communications to discuss the subject matter covered by a litigation hold). (Ex. 6 (Haimovici

21 30(b)(6) Dep. at 77:5-22, 85:19-25); Ex. 27 (Yoo 12/14/17 Dep. at 412:7-11); Ex. 2 (Clark Dep.

22 at 139:3-8); Ex. 12 (Maher Dep. at 76:17-23); Ex. 22 (Russo Dep. at 101:22-102:5, 102:12-20).)

23 Waymo cites no evidence that any Uber employee failed to comply with the litigation hold in this

24 case.

25       Further, Uber's legal hold relating to ephemeral messaging is considerably more stringent

26 than Waymo's, which is more permissive." (*Compare* Ex. 63 ("Please **refrain from discussing**

27 **anything that may relate to the potential claims** described above, including by using chat

28 applications or any other instant messaging application.") (Uber litigation hold); *with* Ex. 44,

1   WAYMO-UBER-00145158

2

3                                                     ) (emphases added) (Waymo

4   litigation hold).)

5           Discovery has shown that there is no merit to the Jacobs allegations regarding Uber's

6   alleged misuse of ephemeral communications.  These allegations were likely driven by a desire to

7   obtain a favorable settlement.  Mr. Jacobs never raised this concern during his employment.  (Ex.

8   7 (Henley Dep. at 11:25-12:2 ("Q. Did he ever express any concern to you about the use of

9   ephemeral communications? A. He never -- never once.")); Ex. 5 (Gicinto Dep. at 196:9-12; Ex.

10  17 (Nocon Dep. at 231:23-232:3); *see also* Ex. 7 (Henley Dep. at 13:16-22); Ex. 22 (Russo Dep.

11  at 106:3-8).)

12      **D.      The Jacobs Allegations of Illegitimate Competitive Intelligence Activities at
                 Uber Fall Flat**
13

14          **1.      Competitive Intelligence into Waymo Was Based on Publicly Available
                     Information**
15

16          Uber relied only on publicly available information, such as Waymo vehicles driving on

17  public streets and open-source information on leading personalities in the AV field, for its

18  competitive intelligence research into Waymo.  (Ex. 22 (Russo Dep. at 44:5-24; Ex. 5 (Gicinto

19  Dep. at 34:6-12; Ex. 21 (Ron 12/12/17 Dep. at 435:16-436:7).)  Defendants have uncovered that

20  Waymo conducted similar intelligence gathering on its competitors, including Uber.  This is not

21  surprising, because gathering public information on competitors is a common (and legal) business

    practice.

22          Waymo fails to explain how the fact that Uber followed Waymo vehicles on public roads
23
    is relevant to the issues that the jury will decide.  Waymo engages in similar activities.  Although
24
    Waymo insists that it does not conduct "surveillance," Waymo's corporate representative on
25
    Waymo's surveillance activities explained that
26

27

28



7    (Ex. 45 at WAYMO-UBER-00145215; Ex. 47 at WAYMO-UBER00145218.)  Thus,

8    Waymo complains about Uber's surveillance activities (OOP at 12-17), but neglects to mention

9    that it also uses surveillance to track the movements of competitor vehicles.[3]

10          In addition to public surveillance of Waymo vehicles, Uber conducted open-source

11   research on competitors, including Waymo.  Ed Russo testified that when he was doing

12   assessments on Google's AV program, he reviewed and summarized "articles and blog features"

13   and provided an assessment based on online research.  (Ex. 22 (Russo Dep. at 44:5-24).)  Nick

14   Gicinto also testified that his team would look through press articles to find any identifying

15   features of Waymo's cars to make public surveillance efficient.  (Ex. 5 (Gicinto Dep. at 104:3-

16   18.)  And Mat Henley testified that his team would look "for open source research into, you

17   know, who were the senior engineers making up different aspects of different programs at

18   different companies."  (Ex. 7 (Henley Dep. at 126:12-22.)

19          Google similarly conducts research on Uber.  For example, in a December 2016 email

20   chain titled "Re: [chauffeur-industryinfo] Self driving Uber spotted in SF," Google employees

21   _____

22   [3] Waymo points to a recorded conversation where Mat Henley commented to another
     coworker about the merits of the Waymo litigation.  This was speculation, and Mr. Henley
23   testified that he had no evidence of any Google or Waymo confidential information or trade
     secrets at Uber.  (Ex. 7 (Henley Dep. at 111:22-112:23).)  It is also inadmissible.  First,
24   Mr. Henley's speculative comments were not on a matter within the scope of his employment,
     making Federal Rule of Evidence 801(d)(2)(C) inapplicable.  Second, the comments plainly are
25   not present sense impressions under Rule 803(3).  Third, even if the video itself were a business
     record under Rule 803(6), that rule does not apply to the embedded hearsay comment Waymo
26   emphasizes.  Waymo cites no other hearsay exceptions for the video in its Appendix A, and does
     not argue that the video is relevant for a non-hearsay purpose.  Finally, even if Waymo could
27   overcome the rule against hearsay (which it cannot), Mr. Henley's speculative comments are
     inadmissible under Rule 402, because they are irrelevant speculation, and Rule 403, because the
28   risk of prejudice to Uber vastly outweighs the non-existent probative value of Mr. Henley's
     uninformed speculation.



1   discussed a sighting of Uber's self-driving vehicle, as well as the status of Uber's California

2   testing permit based on their online research in DMV records.  (*See* Ex. 40, WAYMO-UBER-

3   00027031.)  In addition,

4   . (Ex. 24 (Stewart Dep. at 11:5-24).)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   (Ex. 48, WAYMO-UBER-00145160.)  Defendants' limited discovery into Waymo's competitive

24   intelligence gathering revealed striking similarities between these practices at Waymo and Uber.

25           **2.      Uber's Competitive Intelligence Research Is Irrelevant to the Issues
                       Here**

26

27           In any event, that Uber employees followed Waymo vehicles for a few days on public

28   roads and conducted some background research through newspaper articles and online sources

1    has no bearing on whether Uber misappropriated eight alleged trade secrets or on LiDAR

2    development generally.  If Waymo's alleged trade secrets are ascertainable from public sources,

3    then they are not trade secrets.  Waymo cannot have it both ways:  Waymo cannot claim that

4    public observation is evidence of trade secret misappropriation, and still claim trade secret status

5    on information that is ascertainable from public observation.

6           The written report of Uber's public surveillance of Waymo's vehicles shows no

7    information relating to LiDAR development and testing.  Witnesses confirmed that the public

8    surveillance of Waymo's vehicles did not result in the acquisition of any Waymo confidential

9    information or trade secrets.  (Ex. 22 (Russo Dep. at 137:3-13); Ex. 5 (Gicinto Dep. at 120:14-

10   121:12, 159:20-160:7); Ex. 21 (Ron 12/12/17 Dep. 435:16-436:7).)  Waymo does not identify any

11   evidence to the contrary.  As evidenced by the documents, Uber tracks much of the same

12   information of its competitors ██████████████ such as license plate number, number of

13   occupants, and photos of the vehicle.  (*Compare* OOP Exhibit 45 *with* Ex. 49, Stewart Ex. 2305.)

14          Witnesses further testified they were unaware of anyone at Uber obtaining confidential

15   information or trade secrets from a third party, including from Waymo or Google:

16                  Q. Are you aware of anyone in your group or outside of your group
                    at Uber, including vendors, that engaged in unauthorized
17                  solicitation, receipt, use or replication of trade secret information or
                    confidential information of a third party?
18                  A. No."

19   (Ex. 5 (Gicinto Dep. at 131:16-22; *see also id.* at 78:2-20, 79:3-18, 80:5-81:1, 84:17-25).

20                  Q. Did you ever witness anyone at Uber obtain confidential
                    information or trade secrets from a third party?
21                  A. No."

22   (Ex. 22 (Russo Dep. at 135:10-13; *see also id.* at 69:25-70:5, 72:2-9, 137:3-13; 148:1-12).)

23   Uber's former chief security officer likewise testified that he knew of no attempts to steal trade

24   secrets from anyone:

25                  Q. Do you have personal knowledge whether the marketplace
                    analytics team as a whole stole trade secrets or not?
26
                    A. I would be shocked if they had engaged in something like that.
27                  My understanding was that their mission related exclusively to one
                    type of work, which was the scraping, and that that work was
28

directly overseen by a number of lawyers, and -- and that was the limitations to their work.

(Ex. 26 (Sullivan Dep. at 273:8-17).)  Waymo, on the other hand, admitted that Google employees have shared former employers' confidential information with others at Google.

(Ex. 71, 08/30/17 Waymo Fourth Supp. Objs. and Responses to Uber Fifth Set of Interrogatories Nos. 20, 24.)

Waymo argues that Uber's competitive intelligence activity, regardless whether it was proper or not, is evidence of past misappropriation because it reflects an interest in the performance of Waymo's vehicles that would not be present if Uber was not aware that Fuji would perform similarly.  (OOP at 16 n.3.)  This theory merely highlights the weakness of Waymo's case.  It ignores the reasons for Uber's research of competitors as revealed in discovery (and not contrived from innuendo and speculation), such as evaluating where it stands relative to its competitors.  (Ex. 22 (Russo Dep. at 13:8-15 (explaining that Uber's purpose for conducting surveillance was to assess its place in the competitive landscape)).)  Waymo's corporate representative admitted that such information has "some value."  (Ex. 24 (Stewart Dep. at 34:23-24).)  Further, Waymo's own document describes ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████ (Ex. 48, WAYMO-UBER-00145160 at 2.)  Moreover, Waymo does not specify how public surveillance of Waymo's cars on public roads (a practice that Waymo also engages in) could possibly establish trade secret misappropriation, other than to say that it indicates an interest in Waymo's technology (OOP at 16).  By that same inane logic, it would follow that Waymo's surveillance of Uber's vehicles on public roads indicates trade secret misappropriation of *Uber's* trade secrets.

**3.      Waymo Relies on Rank Speculation to Argue that Uber Implemented a Comprehensive Collection Plan for Google's Confidential Information**

Waymo points to a draft document entitled "A Collection Strategy:  Autonomous

1    Vehicles: Mapping the Competitive Landscape" to argue that Uber executed a nefarious

2    intelligence collection plan against Waymo.  (*See* OOP at 12-13.)  Waymo ignores that this was a

3    draft document and that its author, Ed Russo, testified that the strategy outlined in the draft

4    document was never implemented.  (Ex. 22 (Russo Dep. at 295:8-296:4, 313:15-314:8, 319:19-

5    23; *see also* Ex. 5 (Gicinto Dep. at 145:12-19, 151:21-25, 152:14-20, 165:11-16).)  Mr. Russo

6    further testified that he created this document shortly after he started at Uber and it was a "purely

7    conceptual" document conveying one "philosophical approach to looking at the autonomous

8    vehicle competitive landscape."  (Ex. 22 (Russo Dep. at 310:21-22); Ex. 5 (Gicinto Dep. at

9    144:22-145:4).)  Other than the public surveillance of Waymo vehicles and related background

10   research discussed above, Uber did not implement any of the other collection objectives listed for

11   "Giraffe," i.e., Google.  (Ex. 22 (Russo Dep. at 308:19-22 ("Q. So it looks like a lot of these

12   collection objectives for Google were never met. A. Correct.")).)  For example, Uber did not

13   investigate what OEM Google was partnering with or what technology Google was outsourcing

14   (aside from the public knowledge that Velodyne is or was the supplier of LiDAR for all AV

15   companies, *see* Ex. 64 (https://www.eetimes.com/document.asp?doc_id=1330321) as an

16   example).  (Ex. 22 (Russo Dep. at 304:14-25; Ex. 5 (Gicinto Dep. at 155:23-156:5).)  As another

17   example, although the draft collection plan mentions meetings to further assess competitors'

18   claims regarding their progress, Russo confirmed such meetings never occurred.  (Ex. 22 (Russo

19   Dep. at 313:18-314:3).)

20          Waymo also ignores that witnesses confirmed that there was no one in ThreatOps, which

21   includes SSG and the team formerly led by Mr. Jacobs, collecting any technical data about

22   Waymo.  (Ex. 22 (Russo Dep. at 311:2-9); Ex. 5 (Gicinto Dep. at 159:20-160:7)) or speaking with

23   former employees of competitors to get information about how those competitors structure their

24   AV Program (Ex. 22 (Russo Dep. at 40:18-23, 43:16-20, 142:20-143:7); Ex. 5 (Gicinto Dep. at

25   158:12-17, 168:2-18).)  Waymo ignores testimony that:  "Vendor 1" in the draft collection plan

26   was a hypothetical entity; a "Vendor 1" was never retained; and there are no other document

27   discussing this hypothetical "Vendor 1."  (Dkt. 2450 at 6; Ex. 5 (Gicinto Dep. at 172:19-173:24).)

28   In fact, Judge Corley denied Waymo's motion to compel additional documents on "Vendor 1"

1    because she was satisfied "that Uber is not withholding responsive documents."  (Dkt. 2454.)

2             Left with nothing, Waymo mischaracterizes documents and ignores contrary testimony in

3    arguing that SSG elicited confidential information and source code from competitors and supply

4    chain members of competitors.  For example, Waymo cites to a "CES 2017 – Priorities of Effort"

5    document (OOP Ex. 23) as evidence that SSG attended the CES conference to collect confidential

6    information, such as source code.  (*See* OOP at 15 n. 10.)  But Mr. Russo, who authored the

7    document and attended CES 2017, testified that the document was simply a list of priorities

8    regarding information of interest at CES 2017.  (Ex. 22 (Russo Dep. at 252:14-21, 253:4-16); *see*

9    *also* Ex. 5 (Gicinto Dep. at 319:15-320:2).)  He testified that the plan was to pay attention to

10   *public* statements at CES 2017 regarding these issues at various presentations:

11            Q: Was it -- was it your intention in collecting information at CES
             2017, with respect to competitors' source code, simply to attend
12            presentations that your competitors were giving to see if they
             mentioned anything about source code?
13
             A. Just that simple.
14

15   (Ex. 22 (Russo Dep. at 256:6-12; *see also id.* at 255:3-10).)  As Mr. Russo explained, at a "large-

16   scale event" such as CES 2017, people want to showcase their success, so it did not seem

17   improbable that someone would discuss information on the priorities list.  (*Id.* at 253:17-254:3.)

18   There was nothing nefarious about Mr. Russo's plan to listen to presentations at CES 2017 and

19   keep an ear out for discussion of source code.  (*Id.*; *see also* Ex. 5 (Gicinto Dep. at 321:1-25).)

20   Moreover, witnesses confirmed that they were ultimately unable to learn anything about

21   competitors' source code at CES 2017.  (Ex. 22 (Russo Dep. at 254:17-23, 256:15-17); Ex. 5

22   (Gicinto Dep. at 322:21-323:2).)

23            Waymo also mischaracterizes Exhibit 24, a report regarding what Jung Sang Lidar, a

24   Korean LiDAR company, openly shared with an SSG employee at CES 2017, as evidence that

25   Uber elicited "non-public Google information" from vendors.  (*See* OOP at 15 n. 10.)  Setting

26   aside that such alleged "non-public Google information" is not a trade secret, the information

27   gleaned from Jung Sang Lidar is unremarkable:  that Google X employees attended CES 2017 to

28   seek potential LiDAR vendors; that the resolution of Google's LiDAR sensor was less than ideal;

1   and Google requested follow-up information on Jung Sang Lidar's sensor.  (*See* Ex. 31,

2   UBER00330899.)  These statements, which were made openly by a vendor at a large global trade

3   show, are not "non-public" or confidential trade secret information of any kind, let alone directed

4   to the eight alleged trade secrets here.  Further, these conversations were initiated by Jung Sang

5   Lidar representatives while advertising its LiDAR sensors.  (*See id.*)  When questioned about this

6   report, witnesses testified that they believed Jung Sang Lidar made those statements to attract

7   customers and that they largely discounted them.  (Ex. 22 (Russo Dep. at 265:3-17, 265:18-21);

8   Ex. 5 (Gicinto Dep. at 323:22-324:1, 324:20-325:5).)

9           Similarly, Waymo cites to a single sentence in a February 7, 2017 memorandum stating

10  that "[s]upply chain members are 'chatty' and are good sources of insight into a competitors'

11  plans, intentions, and capabilities" as evidence that Uber ATG directed the ThreatOps team to

12  elicit confidential information from supply chain members.  (OOP at 16.)  Waymo again ignores

13  repeated testimony that ThreatOps employees never spoke with any supply chain vendors to

14  acquire any information about Uber's competitors, including Waymo:

15          Q. Well, it doesn't say that here. It just says: "Supply chain
            members are chatty and are good sources of insight into a
16          competitor's plans, intentions and capabilities." Right?

17          A. Well, if Mr. Russo is paraphrasing there, it's unclear specifically
            what Mr. Ron was referring to. But I can state that our team did not
18          engage any supply chain members that I am aware of in order to
            gain insight into plans, intentions and capabilities.
19
            Q. Okay. And did any of Uber's vendors do that, to your
20          knowledge?

21          A. Not to my knowledge.

22          Q. Is there any reason for you to believe that there was a vendor
            engaged by Uber that spoke with supply chain vendors or suppliers
23          to any autonomous vehicle competitor of Uber's?

24          A. Not to my knowledge. To my knowledge, SSG isn't even aware
            of who the supply chain members are related to Waymo.
25
            Q. Did you ever make any effort to identify who the supply chain
26          members to Waymo are?

27          A. Nope.

28  (Ex. 5 (Gicinto Dep. at 295:20-296:23); *see also* Ex. 22 (Russo Dep. at 278:17-23, 280:14-23;

1    Ex. 7 (Henley Dep. at 127:4-8).).[4]

2          Waymo also claims that a presentation titled "Zoo Update" (OOP Ex. 18) is evidence of

3    execution of the Collection Plan, because it included a slide titled "Baseline Research," which

4    included a bullet on "source code."  (OOP at 14.)  Waymo again mischaracterizes the document

5    and related testimony.  Mr. Russo, who was the lead drafter of the document, testified that the

6    "Baseline Research" slide was a result of some preliminary interviews with ATG personnel and

7    indicated the aspects of a self-driving system that ATG considered most important.  (Ex. 22

8    (Russo Dep. at 238:5-8, 242:24-243:10); Ex. 5 (Gicinto Dep. at 250:15-251:1, 254:13-24).)  The

9    information in the presentation was intended to provide "a sense of the lay of the land, as it were,

10   regarding the various leaders in the autonomous vehicles field"—not a collection strategy.

11   (Ex. 22 (Russo Dep. at 237:16-21).)  Mr. Russo further explained that the phrase "[f]or 2017,

12   SSG's priority effort will be Giraffe" in the presentation meant "[t]hat the bulk of our research

13   efforts would be tracking Giraffe's success or efforts to improve its autonomous vehicle

14   program."  (*Id*. at 247:13-20).)  At the time, Mr. Russo felt it would be important for Uber to

15   track the success of Google's autonomous program "because Google was the leader in the field,

16   and if Uber was going to succeed or be the one to win the race, it wanted to have an

17   understanding of how Giraffe [Google] was proceeding or progressing."  (*Id.* at 247:21-248:3.)

18   Like Uber's other competitive intelligence activities, research into autonomous vehicles described

19   in the presentation was a result of open-source research from ***public*** sources.  (*Id*. at 240:1-4,

20   240:13-19, 241:1-4; Ex. 5 (Gicinto Dep. at 149:7-18, 161:24-162:18).)  There is nothing nefarious

21   about such activities, and those activities are not relevant to Uber's alleged misappropriation of

22   the eight alleged trade secrets still in this case.

23

24   _____

25        [4] Waymo also cites Exhibit 22, a February 15, 2017 memorandum regarding a follow-up
     meeting on February 14, 2017 between SSG and ATG that Levandowski attended.  This meeting
26   was already listed on the LiDAR log produced by Uber.  (OOP at 15; *see also* Ex. 56,
     September 5, 2017 Supplement to Non-Privileged Item 5 Log at No. 926.)  There was no
27   discussion in the memorandum of any Google or Waymo trade secrets or confidential
     information, or any direction from ATG to SSG to acquire Google or Waymo trade secret or
28   confidential information.

#### 4.    Levandowski and Ron Did Not Lead an Effort to Use ThreatOps to Obtain Waymo Confidential Information

Waymo asserts again and again that the "competitive intelligence operation . . . was directed by Uber ATG managers (and Ottomotto co-founders) Anthony Levandowski and Lior Ron." (OOP at 1; *see also id.* at 7 (claiming ThreatOps gathered information "with the guidance of ATG directors Anthony Levandowski and Lior Ron"), 12, 14-15.)  The evidence obtained in discovery flatly contradicts this assertion.

First, despite Waymo's suggestion that the operation came from within ATG, the evidence shows that in early 2017, the ThreatOps "team approached [Levandowski and Ron] offering to help with some market data. . . . [j]ust information on market players, competitors."  (Ex. 21 (Ron 12/12/17 Dep. at 410:25-412:10).)

Second, Messrs. Levandowski and Ron met with ThreatOps personnel only a handful of times in early 2017—timing that has nothing to do with Waymo's actual misappropriation allegations in this case.  (*Id.* at 542:23-544:18; 429:9-18.)  The chronology does not support Waymo's representations to the Court.

Third, Waymo vastly overstates the so-called "guidance" Messrs. Levandowski and Ron provided to ThreatOps.  Levandowski's discussion with ThreatOps related to collecting information in San Francisco.  Levandowski was "skeptical" of the "usefulness" or "practicality" of information from ThreatOps.  (*Id.* at 543:4-544:18.)  Mr. Ron's communication with ThreatOps was similarly high-level, focusing on "geos [i.e., geographies] and the size of the fleets" and "examples of some of the sort of public driving of those cars in those cities."  (*Id.* at 540:10-15, 417:25-418:25 (describing discussions with ThreatOps team).)  There is nothing remarkable in the information that was discussed with ThreatOps, and more importantly, nothing relevant to the issues in this case.

Waymo makes the unsubstantiated leap from these limited ThreatOps meetings to a conclusion that Messrs. Levandowski and Ron were "directing" "Uber's intelligence group to obtain confidential information about Waymo and other autonomous vehicle competitors."  (OOP at 15-16.)  Waymo fails to identify, however, any confidential information Messrs. Levandowski

1  and Ron "directed" ThreatOps to obtain or a single piece of Waymo confidential information that

2  ThreatOps did obtain as a result of any efforts.  (*See* OOP at 15-16 & n.10 (attempting to ascribe

3  suspicion to a ThreatOps document describing a chatty vendor who claimed Google was

4  interested in its LiDAR technology, but who revealed no confidential information); OOP at 16

5  (describing surveillance of Waymo cars on public roads).  Waymo's speculative theory finds no

6  support in the actual evidence.

7  Waymo also complains about periodic "competitive intelligence" emails, yet admits that

8  the emails merely "summarized publicly gathered information on various autonomous vehicle

9  competitors" (OOP at 14), as corroborated by the testimony of Mr. Ron.  (Ex. 21 (Ron 12/12/17

10  Dep. at 459:16-460:1.))  Review of the "competitive intelligence" emails confirms this

11  conclusion; they contain no more than summaries of news clips from public sources, such as

12  Reuters, Fortune, SF Chronicle, Autoblog, and TechCrunch.  (Ex. 50 (Ron Dep. Ex. 9002 at

13  UBER00329740).)  Waymo circulates similar emails internally.  (Ex. 40, WAYMO-UBER-

14  00027031 (December 2016 email to the "chauffeur-industryinfo" alias regarding competitive

15  intelligence on Uber).)  Despite having no evidence to substantiate its claims, Waymo speculates

16  that the distribution of public news articles regarding Waymo must have been nefarious given the

17  timing of Uber's "pivot" from Spider to Fuji.  (OOP at 14.)  This Court should not credit such

18  speculation as a substitute for the evidence that Waymo must set forth to prove its trade secret

19  misappropriation claims.

20  **III.   UBER DID NOT ABUSE THE ATTORNEY-CLIENT PRIVILEGE, AND WAYMO**
        **WAS NOT DEPRIVED OF ANY DISCOVERABLE INFORMATION**
21

22  Waymo's claim that Uber improperly "shrouded" documents with the attorney-client

23  privilege to prevent them from being produced in this case is refuted by the record evidence.

24  There is no evidence that anyone in Uber's self-driving group purposefully labeled documents

25  attorney-client privileged to prevent discovery.  Uber trains its employees in the proper use of

26  privilege, including to correct any misunderstandings gleaned from prior employers such as

27  Google.  Most importantly, it is undisputed that Uber relied on the independent judgment of its

28  outside counsel in this case to determine whether a document is privileged and should be

1  produced—irrespective of any label applied by an employee.  As a result, Uber has produced and

2  Waymo has received the information to which it was entitled, and Waymo has not been deprived

3  of relevant information.

4          Waymo attempts to leverage the Jacobs allegations to relitigate issues that it previously

5  brought before the Court.  These disputes should not persuade the Court to admit evidence of

6  Mr. Jacobs's unproven allegations.

7          **A.      There Is No Evidence that Uber's Autonomous Vehicle Group Improperly
                      Labeled Documents as Privileged**

8

9          The heart of Waymo's privilege argument is a training presentation prepared by Craig

10  Clark, a former Uber in-house lawyer.  (OOP at 22-23.)  But Mr. Jacobs admitted that he has

11  never been to Pittsburgh and thus has no admissible basis for knowing what training, if any, was

12  provided to ATG employees.  (Ex. 9 (Jacobs Dep. at 176:24-177:2, 193:2-6).)  Further, Mr. Clark

13  testified that he never led any training for Uber's self-driving car group; in fact, he has never even

14  been to Pittsburgh, where the ATG training allegedly occurred.  (Ex. 2 (Clark Dep. at 46:23-25,

15  203:14-17).)  And the evidence is overwhelming that ATG employees and others outside of ATG

16  did not intentionally mark documents privileged for any improper purpose.  (*See* Ex. 22 (Russo

17  Dep. at 141:5-142:7); Ex. 12 (Maher Dep. at 147:18-148:3); Ex. 2 (Clark Dep. at 202:2-6, 16-22);

18  Ex. 17 (Nocon Dep. at 113:13-16; Ex. 13 (Majalya Dep. at 54:13-19; Ex. 23 (Spiegler Dep. at

19  53:15-54:4); Ex. 27 (Yoo 12/14/17 Dep. at 195:15-196:5, 386:3-7, 391:16-22, 392:7-21; Ex. 11

20  (Kalanick 12/14/17 Dep. at 541:15-25, 640:22-641:13); Ex. 6 (Haimovici 30(b)(6) Dep. at 28:15-

21  29:12, 48:12-25, 181:19-183:1; Ex. 7 (Henley Dep. at 138:7-10); Ex. 21 (Ron 12/12/17 Dep.

22  465:1-10).)

23          Mr. Clark's presentation on its face instructs the audience on the proper use of the

24  attorney-client privilege.[5]  As Mr. Clark testified, a goal of the training was to "disabuse[]

25  _____

26          [5] Waymo's claim that the version of Mr. Clark's presentation Jacobs claims to have seen
    was "lost or destroyed" is rank speculation.  (OOP at 22.)  Mr. Clark testified he never created or

27  gave a version of the presentation that lacked the Uber logo, (Ex. 2 (Clark Dep. at 205:7-20)), and
    there is no evidence corroborating Jacobs's assertion that there was a version of the presentation

28  that lacked Uber branding.  (Ex. 6 (Haimovici 30(b)(6) Dep. at 142:12–143:16 (Jacobs is "just
    wrong" that any version of the presentation lacked Uber branding)).)  Waymo also did not show

1  everybody of the notion of marking something privileged is going to somehow magically protect

2  them."  (Ex. 2 (Clark Dep. at 233:9-12).)  Thus, when asked if he ever instructed employees to be

3  over-inclusive in their privilege designations, Mr. Clark responded:

> No. This is, I hope, demonstrating the exact opposite.  It is meaningless to do so.
> Ultimately, an arbit[er] of what is privileged or not privileged is a judge.  And the
> designation and the propriety of those designations are done by outside counsel,
> typically, who are doing productions.

7  (*Id.* at 222:21-223:7.)  Mr. Clark walked Waymo's counsel through the presentation and made

8  clear that he properly trained Uber employees on the privilege.  (*Id.* at 213:25-235:12.)

9  Mr. Jacobs admitted that he has no knowledge that "anyone at Uber's autonomous group

10  ever labeled a document as privileged when it was not" or that "anyone in the autonomous

11  vehicle group at Uber ever purposely labeled the document as privileged in order to hide it from

12  discovery."  (Ex. 9 (Jacobs Dep.  at 178:10-16, 179:1-5; *see also* Dkt. 2309, 11/28/17 Hr'g Tr. at

13  83:2-84:8 (Jacobs) (disavowing allegations regarding ATG training and refusing to "stand by"

14  them).)  Moreover, the three Uber employees who supposedly provided training to ATG are not

15  lawyers, have never provided training to anyone in ATG regarding assertion of privilege, and

16  emphatically denied these allegations.  (Ex. 17 (Nocon Dep. at 113:13-16, 161:20-162:3, 164:15-

17  165:2,166:7-168-24, 170:15-22, 178:1-179:22, 181:13-182:14, 208:2-6); Ex. 5 (Gicinto Dep. at

18  179:25-180:5); Ex. 22 (Russo Dep. at 141:5-142:7).)

19  **B.    Uber Trains Its Employees on the Proper Use of Privilege Labels**

20  The evidence is also clear that Uber trains its employees, including specifically the

21  employees at ATG, in the proper use of the attorney-client privilege.  (Ex. 6 (Haimovici 30(b)(6)

22  Dep. at 50:18-55:8 (new Uber employees receive a training on the attorney-client privilege, and

23  they receive periodic training for different groups in the business as well); 20:20-21:11; 182:7-

24  183:1 (ATG employees understood to use attorney-client privilege labels only when seeking legal

25  advice from a lawyer)).)  Part of the importance of that training is to encourage employees to lose

26

27  Jacobs during his deposition the three other versions of the presentation Uber located and
   produced after a diligent search.  (Exs. 34-36 (UBER00340331, UBER00340360,

28  UBER00340391).)

1    the bad habits they picked up from prior employers—including Google.  As Ms. Padilla

2    explained, Google employees came to Uber with a habit of adding a lawyer to an email chain and

3    simply asking "any legal advice?"  (Ex. 18 (Padilla 12/22/17 Dep. at 204:24-205:4).)

4          Waymo's assertion that certain Uber personnel had an "overbroad understanding" of the

5    privilege (OOP at 23) is also refuted by the record.  For example, Mr. Russo explained that

6    "based on the training I had, I understood there to be two – two categories for labeling something

7    attorney-client privilege.  Right?  When soliciting advice or guidance or if you're preparing a

8    product that had been at the direction of legal, those were the times I would use attorney-client

9    privilege."  (Ex. 22 (Russo Dep. at 82:22-83:16); *see also* Ex. 17 (Nocon Dep. at 197:6-198:6,

10   182:9-14 (part of Mr. Clark's training was that it was improper to add someone from legal to an

11   email for the purpose of claiming privilege)); Ex. 8 (Henley 30(b)(6) Dep. at 114:8-115:24

12   (witness understood that, when working on work product "specifically done at the direction of a

13   lawyer," it was proper to tag it privileged)).)  Particularly given Mr. Clark's training that the

14   privilege label is a "tag," (Ex. 2 (Clark Dep. at 199:6-18 ("[A] label is a tag. . . . [w]hether

15   something has a tag on it really facilitates review: Hey, heads up, document reviewers, this might

16   be privileged.")), these witnesses' understanding of the use of the label is consistent with both

17   Mr. Clark's training and the law.  Moreover, when those who received his training mis-tagged a

18   document as privileged, Mr. Clark took steps to correct it.  (Ex. 37, UBER00355965; *see also*

19   Ex. 2 (Clark Dep. at 371:23-375:22); Ex. 6 (Haimovici 30(b)(6) Dep. at 132:17-22, 141:9-19 (it

20   would be "inconsistent with our training" to instruct an employee on the privilege improperly)).)

21   For example, when an SSG employee sent Mr. Clark a document and said "for your review, and

22   legal advice," Mr. Clark responded:

23              [T]his really shows abuse of the ac priv statement like we talked
              about last week. Is thanking her really for my review and advice?
24

25   (Ex. 37 at UBER00355966.)

26          Mr. Clark then raised the issue with that employee's supervisor (i.e., Richard Jacobs) and

27   conveyed that he was "disheartened by the fact that my legal priv training did not sink in."  (*Id.* at

28

1    UBER00355965.)[6]

2        **C.    Outside Counsel Independently Assess Whether Each Document Is Privileged**

3            Finally, Uber relies on its outside counsel to determine independently whether a document

4    is privileged. (Ex. 6 (Haimovici 30(b)(6) Dep. at 24:20-25:2; 36:20-37:4).)  Thus, Uber's most

5    recent document production and its productions throughout this case have included documents

6    marked privileged, including competitive intelligence documents. (Ex. 6 (Haimovici 30(b)(6)

7    Dep. at 25:3-22, 36:24-37:10, 29:3-12, 33:18-34:16, 48:12-25); Ex. 27 (Yoo 12/14/17 Dep. at

8    195:16-196:5; Ex 2 (Clark Dep. at 199:6-18, 222:1-7); Ex. 18 (Padilla 12/22/17 Dep. at 206:4-

9    207:25); *see also e.g*., Ex. 68 (UBER00285865); Ex. 29 (UBER00063696); Ex. 65

10   (UBER00218222) (documents produced in regular discovery).)  In fact, every one of Waymo's

11   examples was produced to Waymo without any motion to compel. (OOP at 24; Waymo Exs. 13,

12   15, 18, 21, 22, 24, 37, 38.)  Importantly, there is nothing in these documents relevant to whether

13   Uber misappropriated the eight trade secrets that remain at issue in this case.  At Waymo too,

14   employees mark documents privileged that are adjudged to be not privileged by outside counsel

15   and then produced. (*E.g.*, Ex. 38 (WAYMO-UBER-00006373); Ex. 39 (WAYMO-UBER-

16   00009646); Ex. 41 (WAYMO-UBER00034071).)

17       **D.    There Is No Evidence That Uber Otherwise Misused Attorney-Client
              Privilege Designations to Avoid Discovery**
18

19           Waymo also claims that Uber executives and employees in business units (in addition to

20   ATG) "were trained to designate non-privileged materials with 'Attorney-Client Privilege'

21   headers." (OOP at 42.)  Not true.  That Waymo does not cite to any deposition testimony in

22   support of its position is telling. (*Id*.)  The depositions Waymo took show why.  As discussed

23   above, Uber trains its employees on the proper use of privilege labels.  For example, Ms. Yoo

24   testified "the practice and policies at Uber were to make sure that teams were informed that

25   simply putting 'Attorney-client privilege' on a document did not render it privileged.  That

26   privilege attaches when legal advice is sought from a lawyer.  And our practice was that teams

27   _____

28           [6] Ironically, this email exchange is one that Mr. Jacobs exfiltrated before leaving Uber.

1  were taught that adding a lawyer to a thread and saying—adding Salle for privilege did not render

2  that communication or that document privileged."  (Ex. 27 (Yoo 12/14/17 Dep. at 195:16-25).)

3  Her statements are supported by many other Uber employees, including Uber's corporate

4  representative on this topic.  (*See* Ex. 13 (Majalya Dep. at 54:13-19); Ex. 23 (Spiegler Dep. at

5  53:15-54:4); Ex. 11 (Kalanick 12/14/17 Dep. at 541:15-25, 640:22-641:13); Ex. 6 (Haimovici

6  30(b)(6) Dep. at 28:14-29:12, 181:19-183:1); Ex. 18 (Padilla 12/22/17 Dep. at 206:4-207:25).)

7          Waymo also tries to ascribe blame because certain documents that were produced bear the

8  label "Privileged and Confidential" or "Attorney Work Product."  (OOP at 41.)  In support,

9  Waymo takes issue with the timing of Uber's production of the Stroz retainer letters.  But Waymo

10  leaves out that these documents were produced to defend against Waymo's baseless theory of

11  imputed liability, which Waymo concocted after months of discovery failed to turn up any

12  evidence to support its case as initially pled.  (*See* Dkt. 824.)  In light of these circumstances, the

13  decision to produce the Stroz retainer letters, much like the "privileged and confidential" mark on

14  the face of those documents that was reconsidered and ultimately found to be incorrect by Uber's

15  outside counsel, reflects no wrongdoing.

16          Waymo also cites the "Project Zing Review" as an example of a document that was

17  labeled as attorney-client privileged, but later produced.  To be clear, Waymo does not—and

18  cannot—argue that the "Project Zing Review" document was improperly withheld.  When this

19  issue was addressed before Judge Corley in August, Uber agreed to produce an unredacted

20  version because Uber determined that the attorney input regarding the document was business,

21  not legal, advice on further investigation.  (Dkt. 1082.)  The other two documents to which

22  Waymo points (OOP Exs. 83, 84) again show that Uber's process of having outside counsel

23  independently assess whether a document is privileged, and queue up mis-labeled documents for

24  production, worked just as it should have—or else Waymo would not have the documents in its

25  hands at all.  *See supra* § III.C (response to I.C.4).

26      **E.    Incorrect Privilege Designations Have No Relevance and Would Be
              Prejudicial and Confusing**

27

28          At bottom, Waymo has not substantiated that it has been denied any discovery through

1   improper privilege designations, and any incorrect designation is inadmissible because it has no

2   relevance to Waymo's trade secret claims.  Fed. R. Evid. 401, 402; *see also* Dkt. 1885 at 3

3   (granting motion *in limine* to exclude overruled privilege claims absent leave of Court).  To the

4   extent there is any marginal relevance, it is outweighed by its unfairly prejudicial nature and

5   likelihood to confuse the issues for the jury and waste the Court's and jury's time.  Fed. R.

6   Evid. 403.

7   **IV.    BECAUSE THE JACOBS DOCUMENTS HAVE TURNED OUT "TO BE A**
       **NOTHING" IN CONNECTION WITH THE ISSUES IN *THIS* CASE, THERE IS**

8       **NO BASIS FOR RAISING THE JACOBS DEMAND LETTER OR SETTLEMENT**
       **AT TRIAL**

9

10      Uber argued, and the Special Master agreed, that the resignation email and settlement

11  agreement were not responsive to any document request, and that none of the three documents at

12  issue (including the Jacobs demand letter) were responsive to any Court order.  (Dkt. 2396.)  Uber

13  disagrees with the Special Master's conclusion that the Jacobs demand letter was responsive to

14  two document requests because nothing in the Jacobs demand letter concerns either "the

15  negotiation of the consideration for the Uber-Ottomotto transaction, the IP acquired, and the

16  satisfaction of certain closing conditions," as requested by RFP 29 (*see* Dkt. 2396, Special Master

17  Report at 13:10-13), or the "digital or physical" documents or materials that any former Google

18  employee "retained," as requested by RFP 73 (*see* definition of "Misappropriated Materials").

19  Further, Waymo conceded that the Jacobs demand letter did not hit on the parties' extensively

20  negotiated search terms.  (Ex. 58 at 6 (Waymo's Submission to Special Master).)  Nonetheless,

21  Uber chose not to contest the Special Master's recommendation because it ultimately does not

22  matter:  the question to be tried in this case is whether Uber misappropriated eight purported trade

23  secrets from Waymo, and there is no "truthful information" that Uber did any such thing—neither

24  in the Jacobs demand letter nor as revealed by the supplemental discovery last month.

25      Waymo asserts that the Jacobs demand letter is admissible as an "adoptive admission"

26  (Appendix A at Ex. 2), but it does not even try to explain how that exception applies here.  It

27  cannot.  Uber never manifested "an adoption or belief" of the statements in the Jacobs demand

28  letter, as required by Rule 801(d)(2))(B).  That Waymo would advance such a meritless argument

1   is telling.

2       Moreover, that Uber settled with Mr. Jacobs—and the amount of that settlement—should

3   also be excluded.  Waymo's contention that Mr. "Jacobs was paid off" in order to prevent him

4   from disclosing the facts of which he was aware is unsupported.  (OOP at 26.)  Uber settled

5   Mr. Jacobs's employment claims out of legitimate consideration of the likely monetary cost of

6   litigating his wide-ranging claims, the likely disruption to Uber's business, the reputational harm

7   that could result from Mr. Jacobs's salacious allegations, and the risks to the safety of Uber

8   personnel abroad.  (Dkt. 2310, 11/29/17 Hr'g Tr. at 82:22-83:23; *id.* at 84:15-22.)  Moreover, by

9   the Settlement Agreement's express terms, Mr. Jacobs remains free to report his allegations to

10  any agency without running afoul of any confidentiality obligation or triggering a clawback.

11  (OOP Ex. 56 ¶ 11 ("Nothing in this Agreement . . . prevents Jacobs from filing a charge or

12  complaint with, providing documents or information to or initiating or participating in an

13  investigation or proceeding conducted by . . . any [] federal, state, or local agency charged with

14  the enforcement of any laws or regulations."); *see also* OOP Ex. 57 ¶ 7 ("Nothing in this

15  [a]greement limits or affects consultant's ability to initiate or participate in an investigation or

16  proceeding by any federal, state, or local agency charged with the enforcement of any laws or

17  regulations, including by providing documents or other information."); Dkt. 2310, 11/29/17 Hr'g.

18  Tr. at 30:6-11 ("[W]e have been scrupulous about having settlement agreements that specifically

19  and expressly preserve the employee's right to go to the Government, to go to every possible

20  Government agency and to act as a whistleblower and to, you know, vindicate their rights in

21  whatever way they wish with respect to governing agencies.").)

22      Most importantly, we now know that neither Mr. Jacobs nor his attorney has anything

23  probative to say about the alleged theft of trade secrets from Waymo or spoliation of

24  communications relating to issues in this case.  Thus, even if we assume that Uber did not want

25  Mr. Jacobs to disclose certain information, that information (such as alleged bribery of officials

26  overseas) has no bearing on this case.  Because Mr. Jacobs admitted that he has no evidence of

27  trade secret theft—and because his lawyer admitted that the allegation of theft in his demand

28  letter was false—there is no relevance to the amount of the settlement.  To the extent the Court

1  finds there is any marginal relevance, that relevance is substantially outweighed by the danger of

2  unfair prejudice, confusing the issues, and misleading the jury with the myriad of unrelated

3  allegations raised by Mr. Jacobs.  The settlement of Mr. Jacobs's claims thus should be excluded.

4  **V.  UBER DID NOT INTENTIONALLY CONCEAL THE JACOBS DEMAND
       LETTER FROM WAYMO OR THE COURT**

5

6  Waymo's pleas notwithstanding, it would not be fair to conclude that Uber intentionally

7  hid the Jacobs demand letter from Waymo or this Court.  Waymo concedes—and the Special

8  Master has acknowledged—that the parties negotiated search terms and custodians, and that the

9  search terms did not "hit" on the resignation email, the Jacobs demand letter, or the settlement

10 agreement.  (Ex. 58 at 6 (Waymo's Submission to Special Master); Dkt. 2396 at 16 (Report of

11 Special Master).)  That goes a long way toward explaining why the Jacobs demand letter was not

12 produced.  And while it is easy to criticize Uber in-house counsel Angela Padilla for not

13 providing the Jacobs demand letter to the litigation team, she manages a docket of hundreds of

14 cases and had been instructed to be careful about the distribution of the document so as not to

15 compromise the investigation, as evidenced by testimony from the compliance team:

16         Q. Did you have any discussions with Ms. Padilla about sharing
           Mr. Jacobs' allegations with anyone else in the Uber legal
17         department?
           A. I -- I do recall having some discussions.
18
           Q. What discussions did you have?
19         A. I -- I was concerned about whether -- I was concerned about the
           wide dissemination of this information for a variety of reasons. . . .
20         So since my general protocol is put -- you know, provide
           information on a need-to-know basis, I didn't see the need, again,
21         for the litigation team, other than our ediscovery manager, for
           purposes of email holds and, you know, to allow for email review,
22         there was really no -- there was no need to share this information.

23 (Ex. 23 (Spiegler Dep. at 151:4-153:7); *see also* Ex. 13 (Majalya Dep. at 130:25-131:16;

24 160:2-12; Dkt. 2310, 11/29/17 Tr. at 11:5-6, 21:16-24.)  Ms. Padilla emphatically rejected the

25 suggestion that she purposefully hid the Jacobs demand letter from Waymo or this Court.

26 (Dkt. 2310, 11/29/2017 Hr'g Tr. at 84:23 – 85:6 ("When you settled that matter, did you do it

27 because you didn't want Judge Alsup to find out about it?  A. Hell no.  Q. And to be clear,

28

DEFENDANTS UBER AND OTTOMOTTO'S RESPONSE TO WAYMO'S OFFER OF PROOF
Case No. 3:17-cv-00939-WHA
sf-3847021

36

1   because I don't think it is, you've got to tell this judge: When you didn't give that document to

2   the lawyers at this table, was that purposely intending to keep it away from Google? . . . THE

3   WITNESS: Absolutely not.").)

4       Waymo's arguments to the contrary are unpersuasive. ***First,*** Waymo falsely asserts that

5   Uber "intentionally withheld" the resignation email and that the Special Master concluded that

6   Uber withheld "evidence of [the Jacobs demand letter's] allegations"—as distinguished from the

7   Jacobs demand letter itself. (OOP at 2, 3.) But the Special Master concluded that the resignation

8   email was not responsive to any document request or Court order. (Dkt. 2396.) Thus, Uber did

9   not "withhold" it, because Uber had no duty to produce it. (*Id.*) Further, the Special Master

10  declined to conclude that Uber had a duty to disclose Mr. Jacobs's allegations, apart from

11  producing the Jacobs demand letter itself. (*Id.* at 13.) Waymo's assertions to the contrary are

12  false.[7]

13      ***Second,*** Waymo's attempt to manufacture inconsistencies between Ms. Padilla's

14  testimony at the November 29 evidentiary hearing and the testimony from the subsequent

15  discovery period (*see* OOP at 5-6) is unavailing. Waymo complains that through discovery it

16  learned that Ms. Padilla was tasked with resolving Mr. Jacobs's employment claims, attended the

17  mediation, negotiated the settlement with Mr. Jacobs, and coordinated the cooperation of

18  Mr. Jacobs and his attorney with Uber's compliance investigation. But Ms. Padilla already

19  testified to such matters at the evidentiary hearing. Ms. Padilla testified that she took the

20  following actions with respect to the Jacobs demand letter and allegations therein:

21  • Convinced Mr. Jacobs's lawyer to put all of Mr. Jacobs's allegations in a letter for the

22      purpose of assessing and understanding them (Dkt. 2310, 11/29/17 Hr'g Tr. at 15:11-15);

23

24      [7] Waymo similarly overreaches in asserting that Uber's "outside counsel" were involved
in the "improper[] withholding" of the Jacobs demand letter. (OOP at 3.) The undisputed
25  evidence is that Uber did not share the Jacobs demand letter with its outside counsel in this
litigation. (Gonzalez Decl. ¶¶ 2, 6; Ray Decl. ¶¶2, 5; Tate Decl. ¶¶ 2, 7; Rivera Decl. ¶¶ 11, 15;
26  Dkt. 2352-4 at 17 (Uber's Response to Waymo's Special Master submission).); Dkt. 2329,
12/4/2017 H'rg Tr. at 47:2-15, 48:10-15; Dkt. 2355-17 (12/7/17 Email from L. Randall re
27  Waymo v. Uber –Log of First Communications); Dkt. 2355-18 (12/8/17 Email from K. Dunn re
Waymo v. Uber Boies Schiller log).) There is no evidence that outside counsel did anything that
28  remotely could be characterized as "improperly withholding" the Jacobs demand letter.

- After she received the Jacobs demand letter, she met with Joe Spiegler (Uber compliance attorney), Sidney Majalya (same), and Salle Yoo (Uber General Counsel) (*id.* at 15:16-20);

- She escalated the Jacobs demand letter to the Special Matters Committee and the Audit Committee of the Uber Board (*id.* at 21:11-15);

- In consultation with the Special Matters Committee, she directed outside counsel to disclose the Jacobs matter to the U.S. Attorney's Office (*id.* at 29:17-23; *id.* at 33:17-25);

- She was involved in the mediation of Mr. Jacobs's employment claims, including direct communications with the mediator, ███████, about his communications with Mr. Jacobs/his counsel during the mediation, and information about theories Mr. Jacobs advanced during the mediation (*id.* at 28:20-29:7; *id.* at 67:20-68:1);

- She helped resolve Mr. Jacobs's employment law claims through settlement (*id.* at 34:9-16); and

- She was knowledgeable about the negotiation of the settlement with Mr. Jacobs and the specific provisions of the settlement and consulting agreements (*id.* at 57:1-9; *id.* at 59:3-8; *id.* at 60:1-4; 63:21-23).

Nor does the privilege log of communications involving Ms. Padilla move the needle. Most of the privileged documents on the log involve the mediation and settlement of Mr. Jacobs's employment claims—in which Ms. Padilla testified she was involved.  (OOP Ex. 104 (more than 540 entries involving Littler's Theodora Lee, Uber's outside counsel for Mr. Jacobs's employment dispute; over 500 entries involving Jason Allen, in-house counsel who worked on Mr. Jacobs's employment claims).)  That Ms. Padilla forwarded the Jacobs demand letter to two senior members of Uber's Communications Department on June 22, 2017, is not inconsistent with her decision to abide by the guidance she had received not to share the Jacobs demand letter with persons other than those investigating the allegations.  (*See* OOP at 6.)  On or about that date, the Special Matters Committee had decided that it would self-report the Jacobs demand letter to the government.  (OOP Ex. B (Padilla 12/22/17 Dep.) at 165:9 - 166:24; Ex. 4.)  Mr. Jacobs had threatened to go to the press the next day, so Ms. Padilla forwarded the Jacobs demand letter to

1    two senior members of Uber's Communications department with a request that they not to

2    circulate it further, because they would need to be aware of it if Mr. Jacobs involved the press.

3    (Ex. 18 (Padilla 12/22/17 Dep. at 169:10 - 170:11.)  In short, there is nothing inconsistent

4    between Ms. Padilla's testimony about the Jacobs demand letter at the evidentiary hearing and the

5    subsequent discovery record.

6         **Third,** the undisputed evidence demonstrates that Uber's outside counsel of record in this

7    litigation did not receive the Jacobs demand letter and were not aware of the letter's allegations.

8    (Declaration of Arturo Gonzalez in Support of Defendants' Response to Waymo's Offer of Proof

9    ("Gonzalez Decl.") ¶¶ 2, 6; Declaration of Eric Tate in Support of Defendants' Response to

10   Waymo's Offer of Proof ("Tate Decl.") ¶¶ 2, 7; Rivera Decl. ¶¶ 11, 15; Declaration of Wendy

11   Ray in Support of Defendants' Response to Waymo's Offer of Proof ("Ray Decl.") ¶¶ 2, 5.)  As

12   Uber informed the Court on December 4, the Jacobs resignation email was forwarded to Messrs.

13   Gonzalez and Tate.  (Dkt. 2342, 12/4/17 Hr'g Tr. at 46-50.)  In the subsequent course of

14   preparing a privilege log, Uber's counsel determined that in April 2017 one of the two MoFo

15   partners who were handling the compliance matter for Uber had sent an email seeking

16   information about ediscovery at Uber for purposes of planning and commencing ediscovery on

17   the compliance matter.  (Rivera Decl. ¶ 12; Ray Decl. ¶ 3.)  Ms. Rivera and Ms. Ray, counsel of

18   record for Uber in this litigation, responded to the email with information about Uber's

19   ediscovery resources and personnel.  (Rivera Decl. ¶ 13; Ray Decl. ¶ 3.)  The bottom of that email

20   chain included the Jacobs resignation email, but Ms. Rivera and Ms. Ray were not involved in

21   any discussions about it and did not notice the resignation email.  (Rivera Decl. ¶ 14; Ray

22   Decl. ¶ 3.)  Indeed, given that the emails were exchanged on April 26-27, 2017, while Uber's

23   team was busy preparing Uber's sur-reply on preliminary injunction due April 28, and that it was

24   not necessary to review the resignation email to answer Ms. Sprenkel's eDiscovery questions, it is

25   unlikely they read the resignation email.  (Rivera Decl. ¶ 14; Ray Decl. ¶ 4.)  In any event, as the

26   Special Master concluded, the resignation email was not responsive to any Waymo document

27   request or Court order.  (Dkt. 2396.)  Critically, the statement from Mr. Gonzalez that Waymo

28   cites on page 6 of its Offer of Proof remains 100% corroborated:  "nobody on this defense team

1   knew about that letter before we got your order and . . . the letter from the U.S. Attorney." (OOP

2   at 6 (quoting Dkt. 2309 (11/28/17 Hr'g. Tr. at 150:8-11)).)

3       The 37 pages of allegations in the Jacobs demand letter are either irrelevant to the claims

4   and defenses in this litigation or, where arguably relevant, demonstrably false, as demonstrated

5   above (*supra* Section II). Uber had no motive to intentionally conceal the Jacobs demand letter

6   from Waymo or the Court, and it did not so conceal it.

7   **VI.   UBER DID NOT INTERFERE WITH WAYMO'S EFFORTS TO TAKE
         JACOBS-RELATED DISCOVERY**

8

9       During the last round of discovery, Waymo obtained supplemental discovery related to the

10  Jacobs allegations, including 17 depositions and thousands of documents. Waymo's contention

11  that Uber thwarted Waymo's supplemental discovery efforts is a massive overreach. (OOP at 7-

12  12.) Waymo's Offer of Proof takes issue with every petty alleged transgression it could marshal,

13  but its arguments fail because Uber did not engage in misconduct, Waymo was not prejudiced,

14  and Waymo waived certain arguments by failing to raise them with Judge Corley.

15      **A.   Uber's Document Production Was Timely and Fulsome**

16      On an extraordinarily compressed schedule, Uber responded to 42 supplemental document

17  requests from Waymo, produced approximately 7,000 documents, and identified another 4,000+

18  responsive but privileged documents (compared to the 13 documents Waymo produced and the

19  10 it logged in response to Uber's supplemental document requests). (Rivera Decl. ¶ 2.) Uber

20  cooperated with Waymo's attempt to cast a wide net, agreeing to nearly all of Waymo's broad

21  document requests. (Rivera Decl. Exs. A, B.) Uber had only two weeks from the day it received

22  Waymo's document requests to identify custodians and collect and review their data for

23  production. In that short period of time, Uber collected documents from at least 40 new

24  custodians who previously were not custodians in this litigation, performed supplemental

25  collections for certain pre-existing custodians, and reviewed more than 135,000 documents during

26  the supplemental discovery period. (*Id.* ¶ 4.) By December 14, the date by which Judge Corley

27  directed Uber to complete its production, Uber had produced approximately 4,500 documents and

28  identified over 4,000 privileged documents. (*Id.* ¶ 7.)

1  Waymo objects that additional documents "trickled in" on December 15, 16, 19, 20, and

2  23 (OOP at 8), but that assertion is misleading.  Working around the clock, on December 15 at

3  2:07 a.m. Uber produced just 80 documents that had not been produced two hours earlier, by

4  December 14 at midnight.  (Rivera Decl. ¶ 8.)  Most involved communications with in-house

5  counsel and were produced with redactions for privilege, which delayed the review and

6  production process.  (*Id.*)  The December 16 production consisted of only 13 documents related to

7  MoFo's communications regarding the Jacobs documents that were produced pursuant to a

8  December 13 telephonic hearing with Magistrate Judge Corley.  (*Id.*)  That was not a late

9  production.  Nor were the productions on December 19 or 28, which consisted of two documents

10  that Waymo had only requested from Uber on December 16, late.  (*Id.*)  On December 20, Uber

11  produced just six documents, which it had only recently identified.  (*Id.*)  Contrary to the

12  statement in Waymo's Offer of Proof, Uber did not produce any documents on December 23.

13  (*Id.*)

14  As Waymo notes, Uber produced 24 documents on December 30 as a result of an issue

15  detected by Uber ediscovery specialists over the Christmas holiday:  Uber's document review

16  team was inadvertently provided an incomplete set of results for one of the searches run on in-

17  house counsel emails.  (*Id.* ¶ 9.)  On December 29, Uber informed Waymo of this error and stated

18  that it would thus be making a small supplemental production and would supplement the Padilla

19  privilege log as needed.  (*Id.*)  Uber made the production the next day and on January 11 served a

20  supplemental privilege log.  (*Id.*)  Waymo already attempted to assert to Judge Corley that those

21  documents were being improperly withheld from production (Dkt. 2441-4 at 3 n.2), but Judge

22  Corley took no action after Uber explained the circumstances (Dkt. 2450 at 5 n.2; 2454.)

23  Thus, looking past the surface of Waymo's protestations, it is clear that only a small

24  number of documents were produced after the expedited production deadline.  Critically, Waymo

25  does not contend, much less demonstrate, that it suffered any prejudice as a result.  And with one

26  exception noted above, Waymo failed to raise this issue with Judge Corley, thus waiving it.

27  Instead, Waymo merely complains that "nearly two-thirds of Uber's production (by

28  number of pages) was produced after the deadline originally imposed by the Special Master," a

1   figure that is grossly misleading.  While it is true that the Special Master stated that Uber should

2   complete its production by December 8, just six business days from receipt of Waymo's

3   42 document requests (and Uber produced over 3,000 documents by that date), Judge Corley gave

4   Uber until December 14 because Uber's counsel believed Uber could complete its production by

5   that time.  (Dkt. 2395, 12/13/17 Hr'g Tr. at 21-22; Rivera Decl. ¶ 7.)  Moreover, the plurality of

6   documents from Uber's production consists of the documents that Mr. Jacobs had transferred to a

7   thumb drive or stole and then returned to Uber – 13,470 pages.  The parties disputed their

8   relevance and responsiveness; on December 20, Judge Corley ruled that they might be relevant,

9   and Uber produced them on December 22.  (*Id.* ¶ 10.)  Excluding that production, nearly 73% of

10  Uber's production was completed by December 8, and over 97% by December 14.  (*Id.*)

11          At bottom, Uber made a Herculean effort to collect, review, and produce data for scores of

12  new custodians on a highly expedited two-week schedule, produced virtually all such documents

13  by December 14, and Waymo does not—because it cannot—show that it was prejudiced by any

14  production received after that date.

15          **B.      Uber Did Not Frustrate Discovery Directed to Its Outside Counsel**

16          Waymo's contention that Uber frustrated its attempt to investigate the extent to which

17  Uber's outside counsel was aware of the Jacobs documents during regular discovery (OOP at 8-9)

18  was already rejected by Judge Corley.  In briefing before Judge Corley on December 20, Waymo

19  trotted out the same complaint about the privilege log of MoFo communications and sought a

20  finding that Uber waived privilege over certain log entries and *in camera* review of all of the

21  others.  (Dkt. 2415.)  Judge Corley squarely rejected Waymo's request:

22              The Court declines to find that Uber has waived the attorney-client
                privilege with respect to the 60 newly logged documents given the
23              expedited time frame it has had to respond to Waymo's discovery
                requests. Having reviewed the highlighted privilege log, the Court
24              is not concerned that any of the logged documents has been
                improperly withheld; indeed, Waymo does not point to anything
25              that suggests these documents are not privileged.

26  (Dkt. 2415 at 2.)  Waymo did not move for relief from that order.

27          Nor did Waymo subsequently renew its request to depose Uber's outside counsel, much

28  less move for an order, despite its purported concerns about "which counsel knew what, and

1    when." (OOP at 9.)  At any rate, as discussed above and in the concurrently filed declarations,

2    the undisputed evidence reflects that Uber's trial team did not know of the Jacobs allegations

3    before November 22.

4         **C.    Uber Responded in Good Faith to Interrogatory No. 1**

5              Uber's initial response to this interrogatory identified 19 current or former Uber personnel

6    who received the Jacobs resignation email or demand letter before November 22, 2017, along

7    with the date of receipt, and objected on vagueness and other grounds to the request to identify

8    persons who were merely "aware" of the Jacobs demand letter or resignation email.  Although

9    Judge Corley overruled Uber's objection, she did not find that Uber's objection was made in bad

10   faith and her order provided some clarity that previously was missing:  the interrogatory seeks the

11   identity of persons aware of the Jacobs demand letter or email, not just of the allegations made

12   therein.  (Dkt. 2454.)  During the parties' meet-and-confer, Waymo indicated that it sought to

13   know "who was aware of the documents and the fact that the allegations were contained in the

14   Jacobs documents," without specifying which allegations.  (Ex.   (12/28/17 email summary of

15   meet-and-confer).)  Based on the order, Uber's supplemental response identified five others who

16   were "aware" of the Jacobs demand letter but did not receive it, and four others who were

17   "aware" of the resignation email but did not receive it.  Five of those personnel were also

18   deponents.  Waymo asked two of them about their awareness of the Jacobs demand letter (Ex. 11

19   (Kalanick Dep. at 637:21-638:18); Ex. 2 (Clark Dep. at 301:23-302:9)) and questioned another

20   about a June 21, 2017 email sent on behalf of Jake Nocon, Edward Russo, and Nick Gicinto

21   regarding the Jacobs allegations.  (Ex. 17 (Nocon Dep. at 235:6-241:25).)  Waymo could have

22   explored these topics with these deponents as much as it wanted.  As to the others, Waymo cites

23   only the fact that Uber's CEO Dara Khosrowshahi became aware of the Jacobs demand letter at

24   some point before November 22 (OOP at 9), but does not explain how that is relevant to the

25   claims or defenses in this action.  Nor does Waymo assert, let alone persuade, that it was

26   prejudiced in any way.

27

28

1

**D.      It Is Not Surprising that Many Responsive Documents Were Withheld as Privileged, Given the Subject Matter at Issue and Involvement of In-House and Outside Lawyers**

2

3      Waymo also assails Uber for withholding several thousand documents on privilege

4   grounds.  (OOP at 9-10.)  It is not surprising that there would be many privileged documents,

5   considering the subject matter and that documents were collected from numerous in-house

6   counsel (and, in some instances, outside counsel). *Cf. In re Imperial Corp. of Am.*,

7   174 F.R.D. 475, 478–79 (S.D. Cal. 1997) (where subpoenas called for hundreds of thousands of

8   documents created by plaintiff and their counsel, "it would be foolish to believe that very many of

9   those documents would be other than protected by the attorney-client privilege or work product"

10  doctrine).  With specific regard to Ms. Padilla's communications, most of those documents

11  involve the mediation and settlement of Mr. Jacobs's employment claims, topics for which one

12  would expect numerous privileged communications.  (*See supra* Section V.)

13     Regurgitating the same argument it made to Judge Corley without success, Waymo makes

14  much of approximately 80 documents Uber produced on December 22 involving Ms. Padilla.

15  (OOP at 10.)  Those documents were provisionally deemed privileged and subsequently

16  voluntarily de-designated or determined to warrant production with redactions.  (Ex. 72 (12/22/17

17  Rivera email to Roberts).)  As Judge Corley noted in response, "given the compressed time frame

18  [Uber] had for production it is unsurprising that some documents would have been initially

19  improperly withheld or inconsistently redacted."  (Dkt. 2454 at 2.)  Nothing about these events

20  supports admitting evidence of the Jacobs issues at trial.

21     Nor is Waymo's complaint about Uber's supplemental Padilla privilege log well taken.  In

22  a one-liner, Waymo contends that Uber's service on January 11 of a supplemental log "should

23  result in waiver of the privilege of these 548 additional entries."  (OOP at 10.)  Not so.  As

24  explained above, Uber informed Waymo on December 29 of documents that inadvertently were

25  missing from the search results it reviewed and that it would be supplementing the Padilla

26  privilege log as a result.  (Ex. 70.)  Waymo brought this to Judge Corley's attention in its final

27  motion to compel in support of its unsuccessful request for in camera review of nearly 1,000

28  documents, but it did not argue that Uber waived privilege over any new documents that would

1   appear on the log.  Waymo therefore waived any such argument.  Moreover, although Waymo

2   asserts in a conclusory manner that the production of the supplemental Padilla log is "obviously

3   prejudicial" (OOP at 10), it fails to explain how.  Waymo did not challenge the "privileged"

4   status of even a single entry on the 755-entry Padilla privilege log Uber served on December 21.

5   Nor has it challenged any entry on the supplemental January 11 log.  Indeed, it seems the only

6   reason Waymo wanted a privilege log of Ms. Padilla's communications was to report the number

7   of log entries in its Offer of Proof, which it has done.  *Cf. Sprint Commc'ns Co. L.P. v. Comcast*

8   *Cable Commc'ns LLC*, No. 11-2684-JWL, 2015 WL 1204975, at *2 (D. Kan. Mar. 17, 2015)

9   (precluding plaintiff from relying on "sheer volume of privileged communications" to add willful

10  infringement claim or present evidence of defendants' retention of counsel).  Once again, there is

11  simply no prejudice.

      **E.     Uber Did Not Improperly Instruct Witnesses During Deposition, and Waymo Waived Any Arguments to the Contrary**

14        Waymo complains that Uber improperly instructed eleven deponents not to answer

15  questions based on attorney-client privilege, work product, and "national security" grounds.

16  (OOP at 10-12.)  Yet Waymo never raised any such issues with Judge Corley as to even one

17  deposition, even though it filed multiple discovery motions during the most recent round of

18  discovery.  Having failed to raise these issues with Judge Corley, Waymo has waived its right to

19  now claim that any instruction was improper.

20        If Waymo had raised these issues with Judge Corley, it would have lost.  Waymo first

21  complains that Uber improperly instructed witnesses not to answer questions about facts to the

22  extent such facts happened to have been communicated from an attorney (OOP at 11), but a

23  review of the testimony reveals that Waymo is wrong.  For example, Ms. Yoo could not discuss

24  what she knows about API scraping because doing so would divulge the *results of an*

25  *investigation performed by counsel*.  (Ex. 27 (Yoo 12/14/17 Dep. at 191:11-20)); *cf. In re Grand*

26  *Jury Subpoena Dated October 22, 2001*, 282 F.3d 156, 161 (2d Cir. 2002) ("While it may well be

27  that work product is more deeply concerned with the revelation of an attorney's opinions and

28  strategies, . . . we see no reason why work product cannot encompass facts as well.").

Similarly, Waymo asked Uber Board members about the results of WilmerHale's investigation into the Jacobs allegations, whether WilmerHale had made recommendations to the Special Matters Committee, and what the Board members knew about certain subjects (*e.g.*, the use of non-attributable devices and ephemeral communications)—all questions that called for privileged communications regarding the results of WilmerHale's investigation.  (OOP Ex. E [12/19/17 Huffington Dep. Tr.] at 49:7-17, 86:4-87:4, 91:7-14; 12/15/17 Trujillo Dep. Tr. at 74:10-74:17, 74:20-75:3.)  For the same reason, Mr. Sullivan could not testify to why Uber stopped or changed its use of ephemeral communications in the fall of 2017 because, as he stated during his deposition, doing so would divulge the substance of privileged communications with Uber's legal department.  (OOP Ex. C (Sullivan Dep. at 221:13-222:5).)  Each is a proper invocation of privilege.

Waymo's assertion that Uber "allowed" the personal attorneys of Messrs. Russo, Gicinto, and Nocon to block answers to a handful of questions, primarily about whether certain SSG personnel and vendors were formerly employed by an intelligence agency (OOP at 11), is similarly misplaced.  Uber does not control those individuals' personal attorney, and Uber did not instruct the witnesses not to answer.

Nor is there any merit to Waymo's complaint that Uber's counsel improperly instructed attorney-witnesses not to answer questions that would reveal their "mental impressions." Counsel's "mental impressions," even if not reduced to writing, are protected from discovery. *U.S. Bank N.A. v. PHL Variable Life Ins. Co.*, 2013 U.S. Dist. LEXIS 143398, *23-*24 (S.D.N.Y. Oct. 3, 2013) ("Although work product protection typically accrues to documents and tangible things, the doctrine also protects a witness from answering questions that "reveal [his] attorneys' legal opinions, thought processes, [or] strategy." ) (quoting *Securities and Exchange Commission v. Gupta*, 281 F.R.D. 169, 171 (S.D.N.Y. 2012)); *see also Banks v. Office of the Senate Sergeant-at-Arms*, 222 F.R.D. 1, 4 (D.D.C. 2004) ("The federal courts also protect work product even if it has not been memorialized in a document.  Questions of a witness that would disclose counsel's mental impressions, conclusions, opinions or legal theories may be interdicted to protect 'intangible work product.'").  Uber's counsel properly instructed attorney-witnesses not to answer

1   questions that call for an attorney's mental impressions.  For example, Waymo asked Ms. Yoo for

2   her legal opinion on whether the allegations in the Jacobs demand letter were material to the

3   Waymo litigation, her opinion on whether personnel in security should have been involved in the

4   investigation of the Jacobs allegations, and whether she agreed or disagreed with certain opinions

5   voiced by Uber's outside counsel regarding the investigation.  (Ex. 27 (Yoo 12/14/17 Dep. at

6   254:6-15; 289:5-24; 346:5-9).)  Each of those questions calls for her "mental impressions" as a

7   lawyer, which is protected from disclosure.  Waymo similarly asked current and former Uber in-

8   house counsel:  (i) about what they learned in the course of investigatory tasks; (ii) to identify

9   specific allegations from the Jacobs resignation email that were of concern; and (iii) to determine

10  whether certain activity is legal or illegal.  (OOP Ex. K (Spiegler Dep. at 89:6-22); Ex. F

11  (Majalya Dep. at 125:14-20); Ex. J (Clark Dep. at 182:6-25).)  That would invade Uber's

12  privilege.

13       In the specific example Waymo discusses involving Mr. Clark, Waymo grossly misstates

14  the testimony.  (OOP at 11.).  Contrary to Waymo's assertion (*id.*), Uber did not instruct

15  Mr. Clark not to answer whether he had ever marked a document as privileged "when he did not

16  believe such document was privileged."  The question was whether he had ever so marked a

17  document "when [he] [was] not providing legal advice in a document" (OOP Ex. J (Clark Dep. at

18  195:23-25).)  Those two questions are not synonymous.  And in the specific example Waymo

19  provides for Ms. Padilla (OOP at 11), Waymo cites deposition testimony in which Ms. Padilla

20  was instructed not to answer questions about her state of mind regarding the Jacobs resignation

21  email—not about the Jacobs demand letter, as Waymo incorrectly argues (*id.*).  (OOP Ex. B

22  (Padilla 12/22/17 Dep. at 153:14-23).)  Ms. Padilla did not testify about the resignation email at

23  the evidentiary hearing.

24       Finally, in many instances, the witnesses actually answered the questions Waymo

25  complains they were instructed not to answer.  (*Compare* OOP Ex. C, 12/14/17 Sullivan Dep. at

26  218:11-22 *with id.* at 218:23-219:8, 221: 1-4; *compare* OOP Ex. D, 12/15/17 Trujillo Dep. at

27  75:4-11 *with id.* at 75:14-23 ; *compare* OOP Ex. D, 12/15/17 Trujillo Dep. at 91:23-92:6 *with id.*

28  at 92:7-16; OOP Ex. G (Gicinto Dep. at 225:5-226:13).)  In the case of attorney-witnesses,

1   witnesses answered where they could without running afoul of privilege/work product

2   protections.  (*Compare* OOP Ex. A, 12/14/17 Yoo Dep. at 354:2-7 *with id.* at 354:9-13; OOP

3   Ex. F (Majalya Dep. at 162:24-163:6, 164:9-165:10-23); *compare* OOP Ex. B (Padilla 12/22/17

4   Dep. at 164:18-24) *with* Chang Decl. Ex. 18 (Padilla Dep. at 165:1-169:24).)

5          The discovery record during this latest round of discovery is clear:  Uber worked

6   diligently to provide Waymo with an extensive amount of document and deposition discovery in

7   an extraordinarily short period of time.  It is equally clear that despite all of that discovery,

8   Waymo found nothing that is relevant to its claim that Uber misappropriated its alleged trade

9   secrets.

10  **VII.   WAYMO'S ATTEMPT TO CONNECT THE JACOBS MATERIALS TO OTHER**
        **ALLEGED MISCONDUCT IS MERITLESS**
11

12         After a month of intensive discovery into the Jacobs documents, Waymo has come up

13  empty.  Lacking a compelling tale of spoliation, Waymo seeks to amplify its allegations by

14  recycling past discovery issues that were raised—sometimes repeatedly—and resolved long ago.

15         **A.     Waymo's Attempt to Connect the Jacobs Allegations to Other Alleged**
                **Improper Use of the Attorney-Client Privilege Is Meritless**
16

17         Waymo attempts to use the Jacobs allegations to relitigate issues that it lost before Judge

18  Corley, such as Uber's assertion of privilege over post-April 11, 2016 documents concerning the

19  Stroz due diligence.  These now-resolved disputes should not persuade the Court to admit

20  Mr. Jacobs's unsubstantiated allegations.

21                 **1.      Defendants' Assertion of Privilege As to the Stroz Materials Was**
                        **Made in Good Faith**
22

23         Waymo argues Uber's assertion of privilege over the Stroz materials ***delayed*** the

24  production of relevant information (OOP at 40), but it cannot argue it ***prevented*** production of

25  relevant material.  Any delay was the result of Uber's good-faith assertion of privilege.  There has

26  been no finding Uber acted in bad faith in asserting the privilege.  Moreover, Uber did not appeal

27  this Court's decision about the Stroz materials to the Federal Circuit; Levandowski did, and Uber

28  could not unilaterally waive the privilege over his objection.  The only document Waymo cites in

1   support of its claim that the privilege here must have been in bad faith is its ***own prior briefing***.

2   (Dkt. 2053-4.)  Neither Judge Corley nor this Court has ever so held.[8]

3       Judge Corley recognized the privilege issues involved with the Stroz investigation were

4   "complicated" issues of "first impression."  (Dkt. 734, 6/23/17 Hr'g Tr. at 40:11-12.)  This Court

5   also acknowledged the argument that Uber (and Waymo) "acted in good faith" in their respective

6   privilege assertions (Dkt. 1872, 9/27/17 Hr'g Tr. at 25:14-20), and cautioned Waymo that it

7   would vigorously police Waymo's attempts to point the finger at Uber regarding any delay in

8   production of the Stroz materials, because Levandowski was the one who appealed the Court's

9   rulings to the Federal Circuit—not Uber.  (*See id.* at 24:21-23 ("And, by the way, there came a

10  point where Uber did not oppose producing.  It was Levandowski who was the one who was

11  resisting it."); 30:20-31:2 ("If they say the word 'they,' I'm going to interrupt and tell the jury

12  that's not a true statement.  It wasn't 'they.'  It was Levandowski who appealed.  That's the way

13  you always present it, is 'they.'  But I know the truth.  And the truth is that Uber was willing to

14  turn that over earlier; much earlier.  So if you do present that argument, you've got to say

15  Levandowski caused the delay; not that Uber did.").)

16      Uber's assertion of privilege over the Stroz materials was no more improper than

17  Waymo's various (overruled) assertions of privilege.  Judge Corley overruled Waymo's privilege

18  assertions on multiple occasions.  (Dkts. 1272 (holding Waymo waived privilege over forensic

19  investigation), 1511 (holding Waymo improperly claimed privilege over non-privileged

20  communication).)  It also took a Court order for Waymo to produce documents within the scope

21  of its privilege waiver over the forensic investigation into Levandowski, which Judge Corley

22  described as "the centerpiece" of Waymo's case.  (Dkt. 1414, 8/28/17 Hr'g Tr. 14:22-15:22; *see*

23

24      [8] Waymo asserts that "no [c]ourt who considered the issue" has upheld Uber's assertion of
    privilege over the Stroz investigation (OOP at 41).  Waymo is wrong.  At a hearing on January 11
25  and in a public order issued January 16, San Francisco Superior Court Judge Harold Kahn held
    that the Stroz materials, including the final report and exhibits, all drafts of the report, "any
26  interim summaries, findings, or analyses by Stroz" and "all interview memoranda or summaries
    related to the 'diligenced' former Google employees" are protected by the attorney-client
27  privilege, and that the privilege was not waived or lost when Uber, Otto, Anthony Levandowski,
    and Lior ron shared those materials between themselves because the parties shared a common
28  interest at the time.  (Chang Decl. ¶ 1, 2 (Ex. 75 (State Court Order).)  While Uber recognizes that
    this Court disagrees, Uber's assertion of privilege has always been made in good faith.

1   *also* Dkt. 1272.)  Surely, Waymo would readily agree that Judge Corley's disagreement with

2   Waymo's privilege calls does not mean Waymo acted in bad faith when pursuing its claims of

3   privilege.  And Waymo would certainly disagree that its "stonewalling" with respect to the

4   production of key documents relating to its forensic investigation necessarily means that it acted

5   in bad faith.  (Dkt. 1872, 9/27 Hr'g Tr. 28:9-15 ("So -- but the fact is that you stonewalled, and

6   didn't turn this information over until very late in the game. And you claimed that it was because

7   of privilege, which the Judge overruled you on.  All right.  Now, maybe you had a good-faith

8   basis; but [Uber] had a good faith-basis on the Due Diligence Report.  And if one is going to

9   come in, the other's going to come in.").)

10       Uber's occasional appeals of Judge Corley's rulings are not indications of bad faith.

11   Indeed, Google—Waymo's parent company—unsuccessfully appealed privilege issues ***from this***

12   ***Court to the Federal Circuit*** just a few years ago.  *In re Google Inc.*, 462 F. App'x 975, 976

13   (Fed. Cir. 2012).  In *Oracle v. Google*, Google clawed back all versions of an allegedly privileged

14   email from Timothy Lindholm—an email on which the author had copied a lawyer on a

15   nonprivileged document at the very last minute, and slapped on an "attorney-client privilege"

16   header without ever seeking legal advice.  When Google failed to convince Judge Ryu that the

17   document was privileged, Google appealed to this Court.  When Google then lost before this

18   Court as well, it appealed to the Federal Circuit.  Only when it lost before the Federal Circuit was

19   the issue resolved.  *Id*. at 977.

20       Waymo points to other case events to attempt to bolster its claim that Uber improperly

21   asserted privilege here.  Yet again, Waymo misleadingly omits important context, including

22   leaving out the details of extensive motion practice before Judge Corley:

23   • Waymo argues that the privilege logs associated with the Stroz materials suffered from

24       "deficiencies," again citing only its own motion as evidence.  (OOP at 40, citing Dkt.

25       321.)  Waymo omits that Judge Corley found Uber's log to be sufficient after Uber made a

26       few modifications, holding that "[w]hile the above discussion shows there are deficiencies

27       with the current log, the Court does not find them so egregious that Uber should have to

28       produce otherwise protected material, especially given the volume of log entries and the

1    brief period Uber had to reevaluate the privilege log in light of the MTC Order."

2    (Dkt. 731 at 6.)

3    •    Waymo argues that, unlike other Ottomotto employee attestations, Levandowski's

4         attestation "did not attest that he had not stolen trade secrets from his former employer,"

5         and complains that Uber incorrectly withheld this document on privilege grounds.  (OOP

6         at 42 (contrasting Ex. 90 with Ex. 103).)  But that is false.  Waymo compares a document

7         that new hires signed when joining ***Ottomotto*** (Waymo Ex. 90) with a document that only

8         the five diligenced employees signed (Waymo Ex. 103) after completing the ***Stroz*** due

9         diligence. Uber has never asserted privilege over Ottomotto attestations, and Waymo

10        received those attestations in April.  (OOP at 42 n. 25.)  Uber only asserted attorney-client

11        privilege over the ***Stroz*** attestations until the privilege issues surrounding the Stroz

12        diligence were resolved by the Federal Circuit, at which point Uber produced them.

13        Uber's privilege positions on these two distinct sets of documents are not in conflict and

14        do not reflect any wrongdoing.

15   •    Waymo argues that "Defendants created the convoluted 'due diligence' apparatus, layered

16        with and purportedly directed by attorneys, for no reason other than to establish a pretext

17        against discoverability in civil litigation."  (OOP at 41.)  But Stroz Friedberg's

18        co-President confirmed that Stroz is generally retained by "outside counsel acting on

19        behalf of their corporate clients in order to give their corporate clients legal advice."

20        (Ex. 4 (Friedberg Dep. at 23:24-24:5).)  And Waymo knows that there is nothing nefarious

21        about structuring engagements this way because ***Google has likewise directed its outside***

22        ***counsel to retain Stroz Friedberg to conduct forensic analyses***.  (*See* Ex. 53 (June 3,

23        2010 Source Code Analysis report, at 1) ("Stroz Friedberg was retained by Perkins Coie,

24        on behalf of Google, to evaluate the source code of an executable…").)

25   As noted above, Uber's good-faith assertion of privilege over the diligence process is not an

26   unjustifiable position to take in litigation, as Google well knows.  *See In re Google Inc.*,

27   426 F. App'x at 976.

28

### 2. Waymo's Rehashed "Sword and Shield" Arguments Do Not Constitute Discovery Misconduct

Waymo's tired "sword and shield" arguments ring hollow.  All of the issues it raises have either been fully litigated or were never raised before the Court when Waymo had a chance to do so.

First, Waymo points to motion practice regarding a conversation about Levandowski's downloading of Google documents.  (OOP at 42-43.)  The Court resolved this issue five months ago, finding that Uber could not present evidence of the March 29 conversations at trial, subject to stated exceptions.  (Dkt. 1267; *see also* Dkt. 1885 (granting Waymo MIL to preclude introduction of evidence as to why Levandowski downloaded Google documents)).)  The Court has already granted Waymo all of the relief to which it could possibly be entitled.  Waymo's own glass house is on full display here, as Waymo fails to acknowledge that it too aggressively litigated its claims of privilege and that Judge Corley overruled Waymo's assertion of privilege over its forensic investigation into Levandowski and other former employees.  (Dkt. 1272.)  This Court has likewise already ruled how it will handle at trial evidence and argument of ***both sides'*** assertions of privilege throughout this litigation—that the parties cannot reference any assertions without first fully vetting the issue with the Court.  (Dkt. 1885.)

Second, Waymo takes issue with evidence showing that Levandowski was terminated from Uber for failing to cooperate with Uber in this lawsuit.  (OOP at 43-44.)  This is the topic of a pending motion *in limine*.  (Dkts. 1551-4, 1552-5, 2041-4, 2092-4.)  The admissibility of that evidence has nothing to do with the admissibility of Jacobs-related issues.  Without rehashing that briefing, Uber corrects two errors in Waymo's revisionist history.  At Levandowski's August 22 deposition, Uber appropriately asked Levandowski about the ***fact*** of his non-cooperation and then appropriately asserted privilege in response to Waymo's inquiries about "what specifically did ***Uber's lawyers tell you***…" (OOP at 44 (citing Levandowski Dep. at 271:13-272:18, 296:11-299:10 (emphasis added).)  Waymo continues to ignore the hornbook distinction between privileged communications and non-privileged facts.  *See Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981) (privilege "only protects disclosure of communications; it does not protect

1  disclosure of the underlying facts … A fact is one thing and a communication of that fact is an

2  entirely different thing.") (internal citations omitted).

3      Waymo also selectively cites Judge Corley's order regarding the production of documents

4  bearing on Levandowski's non-cooperation.  (OOP at 43 (citing Dkt. 1506).)  But that order,

5  when read in full, demonstrates that there is no sword and shield issue.  Judge Corley noted that

6  there are several communications bearing on Levandowski's non-cooperation that Waymo "does

7  not contend" are privileged.  (Dkt. 1506 at 2.)  In other words, Uber can establish Levandowski's

8  non-cooperation without resort to any privileged communications.  Moreover, after ordering Uber

9  to produce two additional documents that were referenced in those non-privileged

10 communications, Judge Corley rejected Waymo's sword-and-shield argument as "unpersuasive

11 and unsupported by citation to any authority."  (*Id.*)  The order went on to observe that, "[u]nder

12 Waymo's reasoning," Waymo likewise would have engaged in a selective (and impermissible)

13 waiver of privilege.  (*Id.*)  In short, if this type of privilege dispute amounted to evidence of

14 discovery misconduct (and it does not), then Waymo is just as culpable.

15                                    ***

16     Waymo opportunistically argues at the eleventh hour and through procedurally improper

17 means that Uber's previously-acceptable privilege calls are suddenly improper.  If Waymo

18 disagreed with privilege invocations during depositions that occurred in August and October of

19 last year, it should have moved to compel.  It did not.  If Waymo disagreed with Judge Corley's

20 privilege determinations regarding communications bearing on Levandowski's non-cooperation,

21 it should have sought relief from those orders.  It did not.  If Waymo disagreed with Judge

22 Corley's and this Court's privilege determinations regarding post-April 11, 2016 documents

23 related to the Stroz investigation, it should have sought relief from the Federal Circuit.  It did not.

24 These invocations were not improper at the time, and they are not now.

25     **B.    Uber Diligently Complied with the Court's Provisional Relief and Expedited
         Discovery Orders and Did Not Improperly Withhold Documents**

26

27     Waymo's arguments regarding Uber's purported "habit" of violating the Court's orders

28 and failing in its discovery obligations are erroneous or, at best, are based on a grossly incomplete

1   recitation of the record, and are unaccompanied by any showing that Waymo has suffered actual

2   prejudice.  Uber addresses each of Waymo's contentions in turn.

3       *First*, continuing its pattern of half-truths, Waymo claims that Uber "willfully" violated

4   Paragraph 4 of the Court's March 16, 2017 Order Re Expedited Discovery and Related Matters

5   (Dkt. 61) and Paragraphs 2 and 4 of the Court's Order Granting in Part and Denying in Part

6   Plaintiff's Motion for Provisional Relief (Dkt. 426).  (OOP at 34:4-26.)  Repurposing the

7   arguments it made nearly three months ago, Waymo claims that Uber:  (1) failed to disclose

8   Stroz's possession of "over 100 Levandowski devices," and (2) somehow "took full advantage"

9   of Levandowski's Federal Circuit appeal to prevent Waymo from discovering "downloaded

10  material" in the possession of Uber's agents, in particular, a "sliver" of documents in the

11  possession of MoFo.  (OOP at 34-35.)  Uber addressed these arguments in September and

12  October.  (*See* Dkts. 1502, 2084.)  The arguments were meritless then and remain so today.

13      Uber never "concealed" that certain Levandowski devices were in the possession of Stroz.

14  (OOP at 34.)  Uber's Paragraph 4 accounting accurately stated:  "Stroz retained all personal

15  devices except for Levandowski's phone."[9]  (Dkt. 1170 at 7.)  Uber also took steps to compel

16  Levandowski to turn over his devices for inspection.  (*See* Dkt. 2084 at 2:1-16.)  When he

17  refused, Uber worked through his counsel to search the devices for the 14,000 files referenced in

18  Waymo's preliminary injunction papers, along with the related hash values and search terms.

19  (*Id.*)  Although Uber provided those search results to Waymo on June 19, 2017, Waymo chose

20  not to inspect them.  (*Id.*)  Thus, far from "conceal[ing]" the existence of Levandowski's devices,

21  Uber took steps to disclose the information available to it.

22      Waymo's claim that Uber failed to adequately disclose the "sliver" of documents at

23  MoFo—something Waymo calls an "egregious example" of Uber violating this Court's orders—

24  is similarly erroneous.  (OOP at 35.)  Waymo ignores that Uber did not know that MoFo had the

25  "sliver," because the sliver was received by MoFo after this lawsuit was filed as part of MoFo's

26  _____

27      [9] Waymo fails to mention that Stroz collected *all* of Levandowski's personal devices,
    some of which were "very old" and had nothing to do with his time with, or work for, Waymo.
28  (*See* Dkt. 1261, 8/16/2017 Hr'g. Tr. at 21:18-22:15.)

1   short-lived representation of Levandowski in the separate arbitration.  (*See* Dkt. 1261, 8/16/2017

2   Hr'g Tr. at 20:11-23:16 (noting, in part, that "The information that we [MoFo] have, we don't

3   plan to use at all, is information that we received while we represented Mr. Levandowski in the

4   arbitration.  And the only reason we are withholding it, Your Honor, is because -- the same reason

5   we've already discussed.  Mr. Levandowski has informed us in writing that he's asserting his

6   rights which you've acknowledged that he has under *Hubbell* and *Fisher*.").)  Uber cannot be

7   sanctioned for something it was not aware of, and MoFo held it not in its capacity as counsel for

8   Uber but as counsel for Levandowski.  Further, Waymo omits that Uber disclosed as early as

9   August 2017, in response to this Court's question, that the "sliver" consisted of ***tens of thousands***

10  of files.  (*Id.* at 21:18-22.)  Finally, Waymo's arguments fail to take into account the impact of

11  Levandowski's appeal to the Federal Circuit.  Neither the "sliver" nor the exhibits to the Stroz

12  Report could have been produced until Levandowski's appeal was resolved, long after Uber's

13  responses to the Court's orders came due.  Uber can hardly be faulted for bearing with

14  Levandowski's assertion of his privileges while the appeal was pending.

15       ***Second***, Waymo's assertion that Uber violated Paragraph 5 of the Court's Order Granting

16  in Part and Denying in Part Plaintiff's Motion for Provisional Relief (Dkt. 426) is meritless.

17  Waymo claims that Uber's efforts to log LiDAR-related communications were insufficient.

18  Nonsense.  As Uber stated on September 15, 2017, "Uber conducted over 170 interviews,

19  reviewed over 25,000 documents and spent over 700 hours preparing the 'LiDAR log' concerning

20  communications with Mr. Levandowski required by Paragraph 5."  (Dkt. 1592 at 2:3-5.)  Uber

21  also took steps to ensure that its log was overly inclusive by listing "references not just to LiDAR

22  but to lasers, lenses, and point clouds, as well as communications where others *may* have

23  mentioned LiDAR and related concepts to Mr. Levandowski."  (*Id.* at 2:7-9 (emphasis in

24  original).)  To be sure, Uber timely supplemented its log whenever it identified additional

25  information through the course of discovery, including Uber's review of hundreds of thousands of

26  documents in the months after the log was initially due.  But Uber's efforts to ensure complete

27  disclosure are hardly a basis for claiming that Uber "willfully" violated the Court's orders.

28  Indeed, if Uber *hadn't* supplemented its log, Waymo would have certainly cried foul.  Finally,

1   Waymo fails to mention that none of the messages included in Uber's "tardy disclosure"

2   explicitly mentioned "LiDAR," thus explaining why they were not captured in Uber's initial,

3   expedited review.  (*Id.* at 2:15-26.)[10]

4       **Third**, Waymo's complaints regarding the timing of production for certain custodians

5   vis-à-vis their depositions should be summarily rejected.  Uber moved heaven and earth to

6   comply with the fast discovery schedule in this case, including making every effort to produce

7   documents in advance of each deposition.  For the most part, Uber was successful.  And, when it

8   wasn't, Waymo suffered no prejudice, because Waymo reserved deposition time with certain

9   witnesses to use once the Federal Circuit ruled on Levandowski's appeal; Waymo also deposed

10  these witnesses on documents unrelated to Stroz that were produced after their first depositions.

11  (*See* Dkt. 1592 at 3:6-18 & n.1.)  Like Uber, Waymo attempted to prioritize productions based on

12  the deposition schedule, but, as Waymo fails to mention, its efforts were far less successful.

13  Waymo repeatedly produced documents a day or two before key depositions, including those of

14  Dmitri Dolgov, David Drummond, and John Krafcik.  (*Id.* at 3:12-13.)  Worse yet, ***Waymo***

15  ***produced more than 7,350 documents, one-third of its entire production, on the very last day of***

16  ***discovery***.  (*Id.* at 3:13-15.)

17      **Fourth**, Uber's discovery, and disclosure, that certain Ottomotto documents had not been

18  searched as part of Uber's discovery efforts does not constitute discovery "misconduct."

19  (OOP at 38.)  As Uber disclosed previously, Uber learned during the course of expert deposition

20  preparation that, in contrast to the general practice after the Ottomotto acquisition, certain

21  documents had not been migrated to Uber.  (Dkt. 1929 at 2:20-21.)  As detailed in the four

22  declarations Uber submitted to explain what happened (Dkts. 1893-4, 1912, 1913, 1916), the

23

---

24      [10] Waymo cites Uber's purported failure to log a January 3, 2016 white-boarding session
    involving Levandowski and Mr. Kalanick as an example of Uber's violation of the Court's order.

25  Uber has already addressed this.  Mr. Kalanick and other Uber personnel (Mr. Holden) present at
    the meeting did not recall the meeting just from looking at a cover email referencing it and did

26  not have calendar entries that could have been used to refresh their recollections.  (Dkt. 1592 at
    2:27-3:1.)  Further, the notes from the meeting were not picked up by the parties' agreed-upon

27  search parameters.  Rather, "Waymo requested the notes at 10:07 p.m. on August 23, based on a
    link to the document in an email, . . . and Uber promptly produced them the next day."  (*Id.* at

28  3:3-5.)

error was wholly inadvertent, and Uber moved swiftly to correct it.  Crucially, apart from a single, conclusory statement that the belated production of these documents "prejudiced Waymo's overall investigation" (OOP at 38), Waymo identifies no prejudice suffered as a result of this unfortunate error.  In fact, the documents were not relevant to any of the eight alleged trade secrets at issue in this litigation.  Waymo's trial exhibit list includes only four largely irrelevant exhibits from this belated production.  (*See* Exhibit List No. 5879, 5880, 5881, 9079.) And Waymo in its Offer of Proof only argues that a single document from this production is relevant, i.e., Exhibit 5881.  (OOP at 37.)  The only alleged relevance of Exhibit 5881 (OOP Ex. 96) is Waymo's reliance on this document to support its theory that Mr. Ron knew about Levandowski's role in the Tyto ownership structure.  (OOP at 46, 46 n.27.)  Even if true, that fact has no bearing on Waymo's trade secret claims, and Waymo was not prejudiced by the timing of its production.  Exhibit 5879 is nothing more than a notification that Levandowski received Mr. Ron's "ATC visit summary" on April 18, 2016, and Exhibit 5880 similarly contains nothing of substance in its summary of a meeting between Levandowski and Mr. Kalanick.  Finally, any alleged prejudice Waymo may have suffered due to the timing of production of Exhibit 7909 was cured by Waymo's subsequent questioning of one of the relevant witnesses, Don Burnette, about this document at his deposition.  (Ex. 1 (Burnette 10/13/17 Dep. at 329:12-330:20).)

*Finally*, Waymo's complaints about the Shred Works receipts are not evidence of discovery misconduct.  (OOP at 38-39.)  The relevant receipts were promptly produced after Rhian Morgan, an Uber ATG employee and former head of HR for Ottomotto, found them while searching her home for documents needed to prepare her personal taxes.[11]  (Ex. 16 (Morgan 11/21/17 Dep. at 390:7-392:1).)  For completeness, Uber also produced a non-responsive March 1, 2016 Shred Works receipt, which had been provided to MoFo in late April 2017 and about which Ms. Morgan testified on October 4, 2017.  Uber immediately offered to produce Ms. Morgan for a further deposition.  Although Waymo suggests that Uber limited the deposition

---

[11] Ms. Morgan's discovery of the receipts was truly unexpected to Uber's counsel.  At her October 4, 2017 deposition, Ms. Morgan testified that she "[p]robably threw [the receipts] away." (Ex. 15 (Morgan 10/4/17 Dep. at 268:13-270:3).)

1   to 30 minutes (OOP at 39), in fact, Waymo demanded a full hour with Ms. Morgan, and Uber did

2   not object.  (*See* Ex. 51 (11/19/17 @ 8:32 PM email from Arturo Gonzalez).)

3        Waymo's claims of prejudice as a result of the Shred Works receipts ring hollow.  Waymo

4   argues that it was prevented from pursuing third party discovery regarding the authenticity of the

5   receipts.  But Waymo has no good-faith basis for questioning the authenticity of the receipts,

6   because in the 30-minute deposition it took of Ms. Morgan, she authenticated them.  *See* FRE

7   901(a), (b)(1); (Ex. 16. (Morgan 11/21/17 Dep. at 394:2-12, 399:9-19, 399:20-400:3,

8   404:18-405:2)).

9        ### C.   Waymo Uncovered No Evidence that Resuscitates Its Meritless Spoliation
10           Claims

11        The Court requested that Waymo be "very specific" in its Offer of Proof as to how (if at

12   all) the Jacobs material "relates to other alleged concealment, spoliation, Tyto, due diligence, any

13   of those other subjects."  (Dkt. 2342, 12/4/17 Hr'g Tr. at 45:14-22.)  Discovery into the Jacobs

14   material has proven that there is no relation between the allegations in the Jacobs demand letter

15   and Waymo's allegations of misconduct in this case.  Despite having discovered no additional

16   bases for spoliation or any new "truthful information" relevant to its already-briefed spoliation

17   claims, Waymo has used what have proven to be meritless and irrelevant allegations from the

18   Jacobs demand letter as an excuse to rehash this issue.  (OOP at Section II(A).)  Uber has briefed

19   its responses to the allegations repeated in Section II.A of Waymo's Offer of Proof at Dkt. 2240-

20   4, but will address Waymo's arguments again briefly here, particularly where Waymo appears to

21   imply that the Jacobs material has somehow bolstered these unsubstantiated allegations.

22        ### 1.   There Is No Spoliation as a Result of Ephemeral Messaging

23        Huffing and puffing aside, Waymo never actually contends that it has discovered any

24   evidence of ephemeral messaging usage that bears on its spoliation claims, nor could it.  As

25   detailed thoroughly above (*Supra* Section II.C), Waymo has long-known of Uber's use of

26   ephemeral messaging.  Waymo uncovered no evidence that ephemeral messages were used to

27   discuss, much less intentionally conceal, any communications relevant to this case.  Waymo

28   newly takes issue with the chat programs uChat and HipChat, but fails to note that (1) these are

1    not ephemeral platforms, and (2) Waymo has known of Uber's use of these platforms since Uber

2    served it August 14, 2017 Interrogatory Responses.  (Ex. 55, 8/14/2017 Uber Response to

3    Waymo Interrogatory No. 8 at 4 ("From 2014 to November 29, 2016, Uber retained [HipChat]

4    rooms for seven days or seventy-five messages.  After November 29, 2016, (prior to this case

5    being filed), the [HipChat] retention setting was set to indefinite.  On April 24, 2017, Uber rolled

6    out uChat, a proprietary chat messaging application designed by Uber, to replace HipChat.  Uber

7    retains all uChat messages for personnel on legal hold during the hold, and otherwise retains all

8    messages for seven days.")  (Ex. 6 (Haimovici 30(b)(6) Dep. at 61:4-15; 63:8-15).)  Finally, none

9    of the Jacobs-related discovery has any bearing on the auto-delete setting on Mr. Kalanick's

10   phone text messages, other than inspiring Waymo to characterize Mr. Kalanick's texts as

11   "effectively" ephemeral.  (OOP at 27:22-23.)  Uber has already thoroughly addressed Waymo's

12   claims regarding the auto-delete function at Dkt. 2240-4, 14:13-15:26.

### 2.    There Was No Spoliation of the Five Hard Drives

14   Nor is there any new support for Waymo's claims based on the five Drobo 5D hard-

15   drives.  Rather, Waymo focuses on evidence produced in September that it could have included in

16   its November motion for sanctions.  One such exhibit, a Stroz Memorandum (OOP Ex. 62), is

17   nothing more than inadmissible hearsay that purports to present what Mr. Kalanick and

18   Mr. Poetzscher told Levandowski, as characterized by Levandowski in his statements to Stroz

19   Friedberg, and as further characterized by Stroz Friedberg.  *See* FRE 805 (each level of hearsay

20   requires an admissible basis); *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*,

21   No. C 10-00544 JW, 2011 WL 5417090, at *9 (N.D. Cal. Oct. 27, 2011) (proponent of evidence

22   must show each level of hearsay admissible pursuant to an exception).  This account has been

23   disputed by every other meeting participant.  Mr. Kalanick, Mr. Poetzscher, Ms. Qi, and Mr. Ron

24   all testified that Mr. Kalanick told Levandowski not to bring the discs to Uber and/or to consult a

25   lawyer.  (*See* Dkt. 2094-6, Kalanick Dep. at 22:4-23:16; Dkt. 2096-10, Qi Dep. at 279:4-284:12;

26   Dkt. 2096-11, Poetzscher Dep. at 253:3-256:7; Dkt. 2243-1, Ron Dep. at 30:5-15.)  And as Uber

27   has already detailed, there was no duty to preserve evidence at the time of the alleged spoliation

28   (Dkt. 2240-4 at 6:3-12:4), and the evidence shows no intent to deprive Waymo of the use of the

1  hard drives in this litigation.  (*Id.* at 13:15-14:12, 16:9-14.)  Uber has also already responded to

2  Waymo's allegations of untimeliness regarding its disclosure of information related to the five

3  discs (Dkt. 806 at 5:22-25), and in any event Waymo does not claim prejudice, which of course it

4  cannot given that it has known about these discs since June.

### 3.  There Was No Spoliation of Evidence Regarding Ottomotto's Formation and Early Development

7  Here Waymo reiterates a smattering of its previous arguments without even attempting to

8  imply that the Jacobs discovery has led to any information that would affect the merits of these

9  claims.  Uber's previous response makes clear that in each of these instances, there was no

10  destruction of evidence done with the intent to deprive Waymo of its use in this litigation

11  (Dkt. 2240-4 at 13:13-17:5), nor was there a duty to preserve evidence at the time of the alleged

12  destruction.  (*Id.* at 6:3-12:4.)

### 4.  There Was No Spoliation of Levandowski's Non-Uber Laptops

14  Waymo has known about Levandowski's use of personal laptop computers since at least

15  June 8, 2017, when Uber identified a personal Levandowski laptop in an interrogatory response.

16  (Ex. 54, Uber's Responses to First Set of Expedited Interrogatories (No. 3).)   In fact, Waymo

17  moved on this very issue, and Judge Corley denied Waymo's motion.  (Dkt. 682 at 5-6; Dkt. 881

18  at 2.)  As an initial matter, this issue has nothing to do with spoliation—Waymo has not shown

19  that any evidence was destroyed, as opposed to being unavailable due to Levandowski's Fifth

20  Amendment invocation.  After Levandowski exercised his Fifth Amendment right to not provide

21  his computers to the parties for inspection, Levandowski's counsel agreed as a compromise to run

22  certain search terms and provide any hits.  Waymo does not dispute that Uber has no control over

23  those computers, and is in no position to criticize Uber for Levandowski's failure to turn over his

24  personal computers.  Additionally, Rule 37 sanctions are inapplicable to information that is not in

25  control of the party accused of spoliation (Fed. R. Civ. P. 37, 2015 Amendment Committee Notes

26  on Subdivision (e)), and Uber does not and has never had control of these laptops.

27

28

1

### 5. There Was No Spoliation of Tyto Email Archives or Obstruction into Tyto Discovery

2

3    In sections II(A)(5) and II(E) of its brief, Waymo continues to take advantage of its Offer

4    of Proof as an opportunity to cite additional evidence that was produced well before its November

5    sanctions motion. This time, it does so to elaborate on its fantasy that Tyto was part of a

6    convoluted, years-long conspiracy to pilfer trade secrets.

7    Regarding spoliation, Waymo's only actual claim remains that the Tyto acquisition was

8    structured to intentionally destroy Tyto's email archives—an allegation that has already been

9    thoroughly refuted. (Dkt. 2240-4 at 16:15-17:3.) In short, the Tyto email accounts were excluded

10   from the purchase agreement because "it really wasn't part of what Ottomotto was interested in

11   acquiring, which was primarily the engineering talent and maybe the Owl sensor," the Tyto email

12   accounts "never really came up" during the negotiations, and Mr. Stojanovski "eventually closed

13   down the [Tyto] e-mail accounts" after the asset purchase because Tyto "no longer was an

14   ongoing concern with real business opportunities" and because he "didn't need to have access to

15   Tyto LiDAR e-mail anymore, so there wasn't any sense in paying for ongoing e-mail hosting

16   services." (Dkt. 2243-3.) Moreover, Mr. Stojanovski testified *in July* that he wasn't sure whether

17   the emails were permanently destroyed. (*Id.*) It is difficult to reconcile Waymo's eleventh hour

18   contention that these emails would have contained critical support for its allegation that Uber

19   misappropriated trade secrets through Tyto on one hand, with its decision to forego the

20   opportunity for basic follow-up on whether these emails could have been restored on the other.

21   As for Waymo's claims that Uber obstructed discovery into Tyto, the bottom line is that

22   Tyto and the other entities Waymo lists are third parties over which Uber has no control. Waymo

23   ignores Lior Ron and Ognen Stojanovski's testimony that they did not know whether

24   Levandowski had an indirect ownership interest in Tyto. (Ex. 25 (Stojanovski Dep. at 33:16-18;

25   34:6-11.) Moreover, the "confidentiality issues" about which Waymo complains were issues

26   Tyto raised that prevented Uber from determining aspects of Tyto's ownership structure, not

27   information Uber was withholding for confidentiality reasons. (OOP Ex. 92 at 2: "The members

28   and ultimate owners of Sandstone Group LLC were not disclosed to Ottomotto or Uber during the

1   transaction. In response to the issue you raised, we are trying to obtain details about Sandstone

2   Group LLC's ownership, but are running into confidentiality issues."; Rivera Decl. ¶ 17.)

3   Nonetheless, Uber worked diligently to respond to Waymo's interrogatories even though the

4   requested information concerned third parties over which Uber had no control.  (OOP Ex. 92 at 2,

5   "We are continuing to make inquires, however, and will let you know if we ascertain the ultimate

6   owner(s) of Tyto LiDAR LLC.")  In any event, Waymo ultimately received full information

7   about the ownership structure of Tyto from third parties; Waymo suffered no prejudice.

8           Moreover, the issue has no bearing on Waymo's trade secret claims.  There is nothing

9   nefarious about the fact that both Uber and Ottomotto were interested in acquiring Tyto for its

10  engineering talent, and discussed doing so.  In fact, Google ████████████████████

11  ██████████████████████████████ (Ex. 3, (Cooper Dep. at 39:16-45:2).)  And

12  none of the cited communications about the acquisition imply a desire for secrecy or destruction

13  of evidence, or indicate that additional conversations relevant to this case took place.  Waymo

14  simply has no evidence to corroborate its speculation that there are any relevant, "[i]mportant

15  communications between Levandowksi, James Haslim, [Travis] Kalanick, and others involved in

16  Tyto's LiDAR work and/or acquisition" that were "destroyed," "withheld," or are "missing."

17  (OOP at 32:26-33:1.)  Moreover, if there had been any Tyto emails with Mr. Kalanick at his Uber

18  email, those exchanges would be on Uber's email system and would be retained.

19          Finally, nothing about the discovery process as it relates to Tyto hindered Waymo's

20  ability to conduct discovery into whether alleged trade secret misappropriation occurred.  The

21  only allegation Waymo makes in regards to Tyto that has any potential relevance to its claims in

22  this case is that Levandowski "instructed Haslim regarding the details of LiDAR technology that

23  Waymo claims as Trade Secret No. 90."  (OOP at 47:11-13.)  Waymo was in no way obstructed

24  from obtaining discovery from Mr. Haslim on this issue—which is unrelated to Tyto's ownership

25  structure—as evidenced by Waymo's own summary of this evidence.  (OOP at 45:11-28.)

26  **VIII.   WAYMO'S EVIDENCE AND ARGUMENTS REGARDING UBER'S
           ████████████████████████████████████ ARE IRRELEVANT AND**

27  **       INADMISSIBLE**

28          Venturing even further afield from the trade secrets at issue, Waymo seeks to bring

1   evidence into this trial regarding █████████████████████████████

2   ████████████████████, that Uber considered but never implemented.  Waymo also seeks

3   to introduce completely irrelevant evidence of █████████████████████

4   ██████████████████████████. Evidence relating to █████████████

5   ████████████████████has no bearing on the trade secret allegations at issue here.  Moreover, neither

6   ████████████████ are mentioned in the Jacobs demand letter. [12]  This evidence should

7   not be presented to a jury.  Fed. R. Evid. 403.

8   ████ was never implemented, no information was ever deleted as a result of ████ and there

9   are no plans to implement ██ in the future.  (Ex. 6 (Haimovici Dep. at 155:4-21, 165:20-24;

10  Ex. 18 (Padilla Dep. at 263:22-24, 285:10-19).) █████████████████████

11  ██████████████████████████████████████████████████████████

12  ██████████████ (Ex. 6 (Haimovici Dep. a██████████████████████

13  ██████████████████████████████████████████████████

14  ██████████████████████████████████████████████████

15  ████████████████████████████████████ [13]  (Ex. 18 (Padilla Dep. at

16  245:11-25.)  In developing the ███████████████████████████████

17  ██████████████████████████████████████████████████

18  ███████████████████████████████████████ (Ex. 18 (Padilla

19  Dep. at 248:14-250:10, 257:6-15); Ex. 6 (Haimovici Dep. at 160:17-161:1).)

20  Waymo points to ███████████████████ to suggest that Uber attempted to cover

21  up the ██████████. But because the program was never implemented and nothing was deleted,

22  there can be nothing to cover up.  ████████████████████████████████

23  ████████████████████████████ is irrelevant.

24  _____

25  [12] To the extent that there is any relevance at all to the issues here, █████████████

26  ██████████████████████████████████████████████████████

27  [13] Indeed, the Rules Committee, in amending the Federal Rules of Civil Procedure the
    year before Uber considered ████ acknowledged that there are "serious problems resulting from
    the continued exponential growth in the volume of [ESI]."  Fed. R. Civ. P. 37, 2015 Amendment

28  Committee Notes on Subdivision (e).

1        Waymo's conclusion that ▮ is relevant because it "raises serious concerns regarding its

2   preservation of relevant data in this case" is nothing more than speculation and hearsay based

3   solely on ▮▮▮▮▮▮▮▮▮▮. Such evidence is irrelevant and inadmissible,

4   and the Court should not allow such a sideshow. *See Aniplex, Inc. v. Upper Deck Co*, No. 2:08-

5   CV-00442-HDM-PAL, 2011 WL 3889566, at *2 (D. Nev. Sept. 2, 2011) ("Demand letters

6   constitute inadmissible hearsay.").

7   <div align="center">**CONCLUSION**</div>

8        There is no "truthful information" relevant to this case in the Jacobs documents that was

9   not already known by Waymo.  The few specific allegations that touched upon Waymo or Uber's

10   ATG turned out to be nothing but smoke, created by a lawyer who was seeking to justify the

11   exorbitant dollar figure he demanded from Uber.  For Uber to get a fair trial, it is critical that the

12   Court continue to exclude all of the irrelevant, scandalous allegations that have been thrown

13   Uber's way.  The issues relating to the Jacobs allegations have been a distraction, and it is time

14   for the parties and the Court to focus on the issues the jury will decide:  whether Waymo's

15   alleged trade secrets are actually trade secrets, whether Uber has misappropriated them, and if so,

16   whether there are any damages.  We urge the Court to allow the parties to try those issues without

17   the fog of the Jacobs documents.

18

19   Dated:  January 19, 2018           MORRISON & FOERSTER LLP

20

21                                   By:     */s/ Arturo J. Gonzalez*

22                                        ARTURO J. GONZÁLEZ

23                                      Attorneys for Defendants

24                                      UBER TECHNOLOGIES, INC. and
                                   OTTOMOTTO LLC

25

26

27

28

# EXHIBIT 10

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

WAYMO LLC,

     Plaintiff,


vs.                      No. 3:17-cv-00939-WHA


UBER TECHNOLOGIES, INC.;
OTTOMOTTO LLC; OTTO TRUCKING,

INC.,
     Defendants.
_____/


HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

30(b)(6) VIDEOTAPED DEPOSITION OF SCOTT JOHNSTON

SAN FRANCISCO, CALIFORNIA

THURSDAY, DECEMBER 14, 2017




BY:  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

CSR LICENSE NO. 9830

JOB NO. 2773322


Pages 1 - 107

Page 12

```
 1          Does it run anywhere from two days to        09:44
 2   indefinite?                                          09:44
 3      A   Yes.  It's a fairly standard retention       09:44
 4   definition.  You know, typically, we see the legal  09:44
 5   department making that decision.  And then it's      09:44
 6   implemented by an administrator, which is a          09:44
 7   configuration in what we call the control panel.     09:44
 8      Q   All right.                                    09:44
 9          So the only thing that Google would control   09:44
10   with respect to "on" in 2006 is how long Google's own 09:44
11   chats would be saved?                                09:45
12      A   Exactly.                                      09:45
```

██         █     ███████████████████████████      ███

██               ███████████████████████████      ███

██         █     █████████████████ ██████████████ ███

██      ███████████                                ███

██         █   █████████                           09:45

```
18      A   On -- on -- the "history on" chats, just to  09:45
19   be specific.                                         09:45
20      Q   Yeah, so that -- let me make sure I've got    09:45
21   this right.                                          09:45
22      A   Yeah.                                         09:45
```

```
23         █     ███████████████████████████       ███
```

██         █     ██████████████████████████        ███

██      █████████████████████████████████          09:46

Page 15

```
 1      Q   In 2008.                                        09:48
 2   █  █ ████████████████████████████████          █████
     █  ██████████████████████████████               █████
     █  █ ████████████████████                        █████
     █  █ ████████████████ ████████ ████              █████
     █  █ ██████████████                              █████
     █  █ ███████                                     █████
     █      ██████████████████████████████████████   █████
 9      Q   By the way, what's your position?             09:48
10      A   I'm a director of product management.         09:48
11      Q   And how long have you been at Google?         09:48
12      A   Just over 11 years.                           09:48
13      Q   Just generally, what are your job             09:49
14   responsibilities?                                    09:49
15      A   I own the real-time communication             09:49
16   applications, which includes messaging, voice, and   09:49
17   video, so meetings and telephony, so Google Voice.   09:49
18          So the products are Hangouts Chat, Hangouts   09:49
19   Voice, and Google Voice -- sorry.  Hangouts Chat,    09:49
20   Hangouts Meet, and Google Voice.                     09:49
21      Q   When did you first learn that there was going 09:49
22   to be a change in 2008 to go "off the record"?       09:49
    █     █ ███████████████████████████████        █████
    █     █████████████████████████████████████    █████
    █     ████████████████████████████████         █████
```

Page 24

```
 1    go "on the record"?                                    09:59
 2        A   Correct.                                       09:59
 3        Q   Anything more than that?                       09:59
 4        A   No.                                            09:59
 5        Q   Does any -- strike that.                       09:59
 6            Do you have any idea how many chats, if any,   09:59
 7    have been saved in connection with this case, pursuant 09:59
 8    to this lit hold?                                      09:59
 9        A   I don't.                                       10:00
10        Q   Does anyone monitor chats in any way to        10:00
11    ensure that █████████████████████████████████ ███████
 █    ████████████                                           10:00
13        A   To ensure that -- ask that one more time.      10:00
14    I'm sorry.                                             10:00
15        Q   Yes.   ████████████████████████████    ██████
 █    █████████████████████████████████████                 10:00
17            My question is ███████████████████      ██████
 █    █████████████████████████████████████████████  ██████
 █    ████████████                                   ██████
 █        █   ███                                    ██████
 █        █   █████████████████████                  ██████
 █            ████████████   ███████████             ██████
 █            ██████████████  █  █████████████████   ██████
 █    ██████████████   ████████████████████████████  ██████
 █        █   ████████████████████████████████              10:00
```

Page 26

1      Q   Isn't it true that there are people at Google   10:01
2   that will use chat for business purposes?              10:01
3      A   That is the main use of it.                      10:01
4      Q   And isn't it true that some of the               10:01
5   communications on chat are substantive?  Important?    10:01
6      A   Yes.                                             10:01
7      Q   Is there a policy -- I got some policies from    10:01
8   your lawyers, and I've got them all here.  I couldn't   10:02
9   find the policy that tells the Google employee when     10:02
10  the employee should use chat as opposed to e-mail.      10:02
11         Do you understand my point?                      10:02
12     A   I do.                                             10:02
13     Q   Is there such a policy?                           10:02
14     A   No.                                               10:02
15     Q   So what guidance, if any, are employees given    10:02
16  as to when they should use chat instead of e-mail?      10:02
17     A   The only guidance that we give specifically      10:02
18  with communications like that is ███████████████  ████
    ██  ████████████████████                                10:02
20     Q   But, ███████████████████████   the             10:02
21  employee has the discretion to use chat or e-mail?      10:02
22     A   Whatever is most efficient for them.             10:02
23     Q   Just curious:  ████████████████████  ████
    ██  ██████                                   ████
    ██       ██████████████████████                 10:03

Page 27

```
 1      A    ██   ██████████████████████              10:03

 2      Q    All right.                               10:03

 3           The chats between 2006 and 2008, ██████  ██████  10:03
   ██   ██████████████    what records are kept as to how many  10:03

 5   chats were stored on Google servers at that time?   10:03

 6      A    At that time, how many -- we're -- we're past  10:04

 7   the point of any -- any saved logs.              10:04

 8      Q    So, at that time, let's say 2006 and 2007 --  10:04

 9   just take those two years ████████████ -- how   10:04

10   many chats were -- were saved ██████████?       10:04

11           Is it billions?                         10:04

12      A    I don't have a good estimate right now.  10:04

13      Q    Hundreds of millions?                   10:04

14           MR. BAKER:  Objection to form.          10:04

15           THE WITNESS:  You know, I don't recall right  10:04

16   now.                                            10:04

17           MR. GONZALEZ:  Q.  How many Google employees  10:04

18   were there in that 2006-2007 time period.       10:04

19      A    I don't know off the top of my head.    10:04

20      Q    Do you remember approximately?          10:05

21      A    I want to say ██████                    10:05

22      Q    And would you agree that all ██████ of them  10:05

23   were chatting every day?                        10:05

24           MR. BAKER:  Objection to form.          10:05

25           THE WITNESS:  The vast majority of Google  10:05
```

Page 28

```
1    communicates via chat, yes.                          10:05

2         MR. GONZALEZ:  I'm not too good at math.  I'm    10:05

3    doing it in my head.                                  10:05

4    ▮    █████████████████████████           ██          

     ███████████████████████████████████████           ██

     ██   ██████                                          10:05

7       A   It -- it's dependent on what the custom- --    10:05

8    sorry -- what the employee chooses for settings.      10:05

9    ▮    ████████████████████████           ██

██   ██████████████████████████████████           ██

██   ▮    ████                                   ██

██   ▮    ██████████████████████           ██

██   ██████████████████████████████           ██

██   ██████████████████████████████████           ██

██   ████████████                           ██

██   ▮    ████████                          ██

██   ▮    ██████████████████████████           ██

██   ██████████████████████████████████           ██

██   ██████████████████████████           ██

██   ██████████████████████████████           ██

██   ▮    ████   ████████████████████           ██

██   ██████████████   ████████████████           ██

██   ██████████████████████████████           ██

██   ██████████████████████████           ██

██   ████████                                   10:06
```

Page 38

```
 1    settings and options?                                 10:17

 2        A   Yeah.                                         10:17

 3        Q   Does Google give any guidance or suggestions  10:17

 4    to your ██████████ companies as to how long they     10:17

 5    should save chats, if they choose to save them at all? 10:18

 6        A   No.                                           10:18

 7        Q   Do you give them any advice or guidance as to 10:18

 8    whether their default should be "on" or "off"?        10:18

 9        A   No.                                           10:18

10        Q   What is the default?                          10:18

11            Is it automatically "off" for the ██████████  10:18

12    companies?                                            10:18

13        A   When a -- when a G Suite company adopts        10:18

14    G Suite, the default in the administration panel is    10:18

15    "history on."                                         10:18

16        Q   Meaning that they would be saved ██████████?  10:18

17        A   They would be saved indefinitely.             10:18

18        Q   So that the ██████████ companies, when they   10:18

19    first sign up for G Suite, the default on the system  10:19

20    that you give them is that they indefinitely save all 10:19

21    of their chats?                                       10:19

22        A   Correct.                                      10:19

23        Q   And do they then have the option to change    10:19

24    that?                                                 10:19

25        A   Yes.                                          10:19
```

Page 41

```
 1        Q   It sounds like roughly ██ percent go with    10:22
 2   your standard default of saving everything, unless the  10:22
 3   user decides not to?                                     10:22
 4        A   Correct.                                        10:22
 5        Q   So I have a question.  It's just --             10:22
 6        A   Sure.                                           10:22
 7        Q   -- it sounds like what Google does is           10:22
 8   ████████████████████████████████████████ ████           10:22
 9 █ ████████████████████████████████████                    10:22
10        MR. BAKER:  Objection to form.                      10:22
11        THE WITNESS:  It is -- █████████████████ ████       10:22
12 █ ████████████████████████████████████                    10:22
13        MR. GONZALEZ:  Yeah.                                10:22
14        Q   It sounds like ██████████████████████ ████      10:22
15 █ ██████████████████████████████; is that right?          10:22
16        A   Correct.                                        10:22
17        Q   And █████████████████████████████████████████   10:22
18   roughly?                                                 10:23
19        A   Roughly.                                        10:23
20        Q   Do you guys do any surveys to ask your          10:23
21   customer -- your corporation customers why they choose   10:23
22   various options?                                         10:23
23        A   My product management team is -- is regularly   10:23
24   talking to customers.  That is not a particularly        10:23
25   contentious area.                                        10:23
```

Page 62

| | | |
|---|---|---|
| 1 | their computers? | 11:09 |
| 2 | MR. BAKER:  Objection; form. | 11:09 |
| 3 | THE WITNESS:  I don't know. | 11:09 |
| 4 | MR. GONZALEZ:  Q.  Is it hundreds, the number | 11:09 |
| 5 | of messaging apps that have been approved for use by | 11:10 |
| 6 | Google employees. | 11:10 |
| 7 | A   I don't know.  Our policies are -- are -- | 11:10 |
| 8 | there's no specific list of allowed messaging apps for | 11:10 |
| 9 | personal use. | 11:10 |
| 10 | Q   I want to make sure I understand this part. | 11:10 |
| 11 | How many messaging apps do you use for personal use, | 11:10 |
| 12 | other than the Google stuff? | 11:10 |
| 13 | A   So -- | 11:10 |
| 14 | Q   You mentioned -- you mentioned a couple. | 11:10 |
| 15 | MR. BAKER:  I'm just going to object as | 11:10 |
| 16 | outside the scope again. | 11:10 |
| 17 | You can answer. | 11:10 |
| 18 | THE WITNESS:  Okay.  I use about 14. | 11:10 |
| 19 | MR. GONZALEZ:  Q.  Why so many. | 11:10 |
| 20 | A   In my role, I force my friends and family to | 11:10 |
| 21 | use different apps. | 11:10 |
| 22 | Q   That's fair. | 11:10 |
| 23 | A   Yeah. | 11:10 |
| 24 | Q   Part of your job is to kind of know what the | 11:10 |
| 25 | competitors are doing? | 11:10 |

Page 63

```
 1      A    Exactly.                                11:10

 2      Q    And how theirs works?                   11:10

 3      A    Right.                                  11:11

 4      Q    And if theirs has some fancy bell and   11:10

 5    whistle, then maybe you might want to add that to  11:11

 6    yours?                                          11:11

 7      A    Maybe people love Peaches more than I   11:11

 8    thought.                                        11:11

 9      Q    Exactly.                                11:11

10           Do you use that one?                    11:11

11      A    I have at one time.  I do not right now. 11:11

12      Q    What are the ones that you use?         11:11

13      A    I mainly, in my personal life, use WhatsApp. 11:11

14    It's a -- that's mainly for non-U.S. friends.  I use  11:11

15    Facebook Messenger.  I use Slack.  Those are the main  11:11

16    ones I use.  I have one friend that uses Telegram and  11:11

17    won't talk to me on anything else.             11:11

18      Q    What other ones do you use even just a little  11:11

19    bit?                                            11:11

20           You mentioned 14.                       11:11

21      A    WeChat, Luna, Symphony.  I think that's -- I  11:11

22    mentioned Facebook Messenger.  I have not used Signal  11:12

23    in a while.                                     11:12

24      Q    But you have used it?                   11:12

25      A    Uh-huh.  I use Snapchat.                11:12
```

Page 64

```
 1              That's all I can recall right now.          11:12
 2     Q    HipChat?                                        11:12
 3     A    I'm not currently using HipChat, no.            11:12
 4     Q    Have you ever used it?                          11:12
 5     A    Yes.                                            11:12
 6     Q    And these various messaging applications, did  11:12
 7  you have to get approval from someone at Google in      11:13
 8  order to use those on your Google machine?              11:13
 9     A    Not that I recall, no.                          11:13
10     Q    So how do you use those in your Google          11:13
11  machine?  Just download them?                           11:13
12     A    They're mainly mobile, and so I use them on    11:13
13  one of my phones.                                       11:13
14     Q    Is that a Google-issued phone?                  11:13
15     A    No.  It's -- I have a number of -- again, in   11:13
16  my role, which is strange, I have between ten and 15     11:13
17  devices that I'm rotating between.                       11:13
18              An average person would -- would install it  11:13
19  either on their personal device or a Google-issued      11:13
20  device.                                                 11:13
21     Q    And for the standard person who is installing   11:13
22  it on their personal or Google-issued device, do they   11:13
23  need to get permission from Google to do that?          11:13
24     A    Not that I'm aware of.                          11:13
25     Q    And mechanically, the way I would install one   11:14
```

Page 69

| | | |
|---|---|---|
| 1 | I'm just trying to see if you guys will just exchange | 11:19 |
| 2 | that information or give us that information. | 11:19 |
| 3 | MR. BAKER:  Well, I'll consider your request, | 11:19 |
| 4 | but I would like to see a formal discovery request. | 11:19 |
| 5 | Actually, I don't even think we need a formal | 11:19 |
| 6 | discovery request, because I don't think you're | 11:19 |
| 7 | entitled to any additional discovery. | 11:20 |
| 8 | But I'll consider your request. | 11:20 |
| 9 | MR. GONZALEZ:  Okay.  Just let us know.  If | 11:20 |
| 10 | the answer is "no," we'll know how to proceed. | 11:20 |
| 11 | Q   If a customer does require a specific chat | 11:20 |
| 12 | service for communication, as indicated here in the | 11:20 |
| 13 | policy, then Google would use that chat service for | 11:20 |
| 14 | communications with that customer? | 11:20 |
| 15 | A   The people that were -- required that -- | 11:20 |
| 16 | whose -- whose job required that communication, yes. | 11:20 |
| 17 | Q   And so, with respect to those types of chats, | 11:20 |
| 18 | if a Google employee is communicating with a | 11:20 |
| 19 | non-Google messaging app service, how long would that | 11:20 |
| 20 | chat be saved? | 11:20 |
| 21 | A   It would be dependent on the chat application | 11:20 |
| 22 | they were using. | 11:20 |
| 23 | Q   Yeah, that's what I was trying to get at. | 11:20 |
| 24 | So all this stuff you said earlier about | 11:20 |
| 25 | ████    and all that stuff won't apply if it's a | 11:21 |

Page 75

```
 1    use that one because it presents security risks?      11:27

 2        A   No.                                            11:27

 3        Q   I think I asked you this, but in case I        11:27

 4    forgot, the Waymo employees follow the same            11:28

 5    preservation policies as the Google employees; is that 11:28

 6    right?                                                 11:28

 7        A   Correct.                                       11:28

 8            (Document marked Exhibit 2302                  11:28

 9             for identification.)                          11:29

10            MR. GONZALEZ:  Sir, you've been handed a       11:29

11    document that we have marked as Exhibit 2302.  It's a  11:29

12    declaration from Theresa Beaumont, who I understand,   11:29

13    at least at some point, was a Google employee.         11:29

14        Q   Have you seen this before?                     11:29

15        A   I have not.                                    11:29

16        Q   So, if you look at paragraph 8, she says:      11:29

17    ███████████████████████████████████████      ████████

██   ████████████████████████████████████            ████████

██   █████████████████████████████████████████       ████████

██   ████████████████████████████████████████████████

██   ████████████████████████████████████████████     11:29

22            Do you have any understanding as to what she   11:29

23    means by ████████████████████████████████          ████████

██   ████████████████████████                           11:30

25            MR. BAKER:  Objection; form.                   11:30
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1                    CERTIFICATE OF REPORTER

2

3           I, ANDREA M. IGNACIO, hereby certify that the

4      witness in the foregoing deposition was by me duly

       sworn to tell the truth, the whole truth, and nothing

5      but the truth in the within-entitled cause;

6           That said deposition was taken in shorthand

7      by me, a disinterested person, at the time and place

8      therein stated, and that the testimony of the said

       witness was thereafter reduced to typewriting, by

9      computer, under my direction and supervision;

10          That before completion of the deposition,

11     review of the transcript [ ] was [x] was not

12     requested.  If requested, any changes made by the

       deponent (and provided to the reporter) during the

13     period allowed are appended hereto.

14          I further certify that I am not of counsel or

15     attorney for either or any of the parties to the said

       deposition, nor in any way interested in the event of

16     this cause, and that I am not related to any of the

17     parties thereto.

18     Dated: December 15, 2017

19

20

21

22

23     _____

24          ANDREA M. IGNACIO,

25       RPR, CRR, CCRR, CLR, CSR No. 9830
```

Page 107

# EXHIBIT 24

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

WAYMO LLC,

            Plaintiff,

vs.                    Case No. 3:17-cv-00939-WHA

UBER TECHNOLOGIES, INC.;
OTTOMOTTO LLC; OTTO TRUCKING LLC,
            Defendants.

_____/


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEOTAPED 30(b)(6) DEPOSITION OF SHAUN STEWART

TUESDAY, DECEMBER 19, 2017




Reported by:

Anrae Wimberley

CSR No. 7778

Job No. 2778194


Pages 1 - 43

Page 10

```
 1        Q.   Yeah.                                 10:18:01

 2             Like take Uber as an example.

 3             Does Waymo document when an Uber

 4    autonomous vehicle leaves the building?

 5        A.   No.                                    10:18:14

 6        Q.   Or what routes it takes?

 7        A.   No.

 8        Q.   Does Waymo have any information, to your

 9    knowledge, about what routes are taken by Uber

10    autonomous vehicles?                            10:18:25

11        A.   No.

12        Q.   Or how many autonomous vehicles Uber has

13    on the road?

14        A.   Only through public articles that mention

15    vehicle fleet size or quotes from Uber personnel.  10:18:38

16        Q.   Has Waymo ever retained any third parties

17    for the purpose of gathering information about its

18    competitors?

19        A.   No.

20        Q.   To your knowledge, has Google done that?  10:18:50

21        A.   No, not to my knowledge.

22        Q.   When you started working at Waymo, was it

23    already called Waymo or was it still with Google?

24        A.   It was called Chauffeur.

25        Q.   So when you first started working, you     10:19:07
```

Page 11

1   were a Google employee?                                    10:19:09

2         A.    Correct.

3         Q.    And when did you become a Waymo employee?

4         A.    December of last year.

5         Q.    Is there somebody at Waymo that's              10:19:23

6   responsible for ███████████████████████

███   ███████████████████████████████████

███   ████████████

9         A.    Yes.

10        Q.    Who would that be?                             10:19:35

11        A.    ██████████████████

12        Q.    Does that team report to you?

13        A.    Yes.

14        Q.    And when you say that ███████████████

███   ██████████████████████████████████████   █████████

███   ███████████████████████████████

███   █████████████

███   ███   █████████████████████████████

███   ██████████████

███   ███   ████████████████████████████   ██████████

███   ████████████████████

███   ████████████   ███████████████████

███   █████████████   █████████████████

███   ████████████████

25   BY MR. GONZALEZ:                                          10:20:26



[redacted] 10:21:34

Page 13

1 ██ ████████████████████████ ████

██ █████████████████████████

██ ██ ███████████████████

██ ██ ███████████████████████ ███████

██ █████████████          10:21:51

6      Q.   Who manages ██████████████?

7      A.   I do.

8      Q.   You do?

9      A.   (Witness nods head affirmatively.)

10     Q.   So do ███████████████████ come   10:22:01

11 to you?

12     A.   Um-hum.

13     Q.   "Yes"?

14     A.   Yes.

15     Q.   And then from there, do you determine who   10:22:08

16 to forward them to?

17     A.   We determine the appropriate audience to

18 review and sign off on them.

19     Q.   Are these like PowerPoints or memos or

20 something else?                              10:22:21

21     A.   They can be all of those.

22     Q.   And how many such ██████████

██    ████████████   have you received since Waymo was

24 formed?

25     A.   I don't know the exact number.          10:22:31

Page 15

1    conversations with him?                      10:23:34

2       A.   I manage him, so I know how his work is

3    completed.

4       Q.   And so can you describe for me how his

5    work is completed?                   10:23:42

6       A.   Can you be more specific about what you're

7    looking to learn about how his work is completed?

8       Q.   Yeah, I was just using your words.

9          I just want to know how he goes about

10   putting these things together.         10:23:52

11      A.   Sure.

12         He has a question he needs to answer, █████

██   ████████████████████████████████████████████

██   ████████████████████████████████████████████

██   ██████████████████████████         10:24:02

16      Q.   And where do the questions come from?

17      A.   Different areas of the business.

18      Q.   So Mr. Johnson gets information about ████

██   ████████████████████████████████████████████

██   ████████████████████████████████   10:24:17

21      A.   Correct.

22      Q.   And other than -- strike that.

23         With respect to the type of information

24   that Mr. Johnson compiles, would it include ████

██   ████████████████████████████████████  10:24:39

Page 16

```
 1        A.   It could.                            10:24:41

 2        Q.   ████████████████████████████████████

   ██   ██████

 4        A.   It could.  That's typically hard to

 5   gather.                                        10:24:49

 6             ██   ████████████████████████

   ██   ██   ██████████████████████████

   ██   ████████████████████████████████

 9        Q.   In performing your job duties, have you

10   ever been curious about what routes your competitors  10:25:04

11   are using?

12        MR. BAKER:  Objection to form.

13        THE WITNESS:  No.  Routes doesn't tell us much.

14   BY MR. GONZALEZ:

15        Q.   Why do you say that?                 10:25:15

16        MR. BAKER:  Objection to form.

17        THE WITNESS:  There's not a lot to learn from

18   understanding a route.

19   BY MR. GONZALEZ:

20        Q.   What about how well your competitors are  10:25:27

21   maneuvering on the road; is that of interest to you?

22        A.   Not for any beneficial purpose other than

23   understanding the status of where they are.

24        Q.   But would you agree that seeing the car

25   actually drive on the road would be helpful to  10:25:46
```

Page 19

```
 1        Q.   Anything else?                        10:27:41

 2        A.   You can ask me about topics and I can tell

 3   you whether we've done ████████████████████████

     █   █████

 5        Q.   Sitting here today, what other topics do  10:27:50

 6   you recall Mr. Johnson's ██████████████████████

     █   ██████████████████████████████████████████

     █   ██████████████████████

     █      ███   █████████████████████████████████

     █   ██████████████████████████████████   █████████

     █   ███████████████████████████

     █      ███   █████████████████████████████████

     █   ███████████████████████

14        A.   Correct.

15        Q.   Who assigned that task to that intern?  10:28:24

16        A.   I did.

17        Q.   Did you give the intern guidance as to how

18   he or she could ████████████████████████████████

     █   ████████████████████████████████

20        A.   Yes.                                   10:28:38

21        Q.   What guidance did you give the intern?

22        A.   That they could █████████████████████████

     █   ███████████████████████████████████████████

24        Q.   Did you get work product?

25        A.   Yes.                                   10:28:49
```

Page 21

```
 1        Q.   What other detail did it have?              10:29:47

 2        A.   What other detail are you interested in?

 3        Q.   I would like to know what you know about

 4   the document, because you've seen it and I haven't.

 5        A.   It had a summary of ████████ ████

 6   ██ █████████

 7        Q.   Who was the intern?

 8        A.   Christoph Meyer.

 9        Q.   M-e-y-e-r?

10        A.   M-e-y-e-r.  Like the lemon.              10:30:10

11        MR. GONZALEZ:  Counsel, do you know if any of

12   these have been produced, either ████████

13   ██ ████████?

14        MR. BAKER:  No, not sitting here right now.

15        MR. GONZALEZ:  We would ask that they be      10:30:37

16   produced ASAP if they have not been.

17        MR. BAKER:  I'll consider the request.  Can you

18   explain to me how they fall within the scope of the

19   topic?

20        MR. GONZALEZ:  Yeah.  ████████████ ████

21   ██ ████████████ ██████████

22   ██ ████████████

23        MR. BAKER:  We absolutely disagree with that.

24        MR. GONZALEZ:  Okay.  So I take it that it's

25   your position then that they don't have to be      10:30:58
```

Page 29

```
 1          Q.   And then, in some cases, it says ████   ████
 2 █ ███████████████████████████████████
 3          Do you see that?
 4     A.   Yes.
 5          Q.   And then there's a link where it includes   10:39:50
 6 some photographs.
 7          Do you see that?
 8     A.   Yes.
 9          Q.   And do you know how they got those
10 photographs?                                              10:39:58
11     A.   By taking a photo.
12     Q.   That's probably right.
13          So how did Waymo get this information if
14 you don't do surveillance on your competitors?
15     MR. BAKER:   Objection to form.                       10:40:10
16     THE WITNESS:   This isn't surveillance.  ████
17 █ ████████████████████████████████
18 █ ██████████████████████████████████
19 █ ██████████████████████████████████
20 █ ████████████████████████████████████  ████
21 █ █████████████████████
22 BY MR. GONZALEZ:
23     Q.   Let me break that down.
24          When you say "a driver driving around,"
25 who are you referring to there?                           10:40:37
```

Page 34

```
 1          Q.   Okay.  Then what is your understanding?    10:44:50
 2     I'm not trying to trick you.
 3              I'm just trying to figure out -- if it's
 4     not what they're doing in Phoenix, then how did they
 5     get this information?                                 10:44:58
 6          MR. BAKER:  Objection to form.
 7          THE WITNESS:  My guess is it's similar to what
 8     we do in Phoenix.  I don't know.  I didn't create
 9     the document.
10     BY MR. GONZALEZ:                                      10:45:04
11          Q.   All right.  And is there somebody in
12     San Francisco who is in charge of this type of
13     information?
14          A.   No.
15              This information is completely useless to   10:45:18
16     us.
17          Q.   Why do you say that?
18          A.   What can you do with █████████████
       ██  ████████████████████████
20          Q.   If it's useless, why would someone take    10:45:31
21     the time to ████████████████████████████?
22          MR. BAKER:  Objection to form.
23          THE WITNESS:  There may be some value to the
24     ████████████████████
25     BY MR. GONZALEZ:                                      10:45:43
```

Page 41

```
 1          Q.   Do you see on 2305 that there are a number   10:57:32
 2     of dates on the bottom that are 2017?
 3          A.   Yep.  So I was employed at Waymo for
 4     those.
 5          Q.   And you didn't know about these entries?   10:57:40
 6          A.   Those five, no.
 7          Q.   And you don't know whether there are any
 8     others since then?
 9          A.   No.
10          Q.   You don't know whether San Francisco is   10:57:49
11     continuing to prepare whatever forms they prepared
12     in order to compile the information on 2305;
13     correct?
14          MR. BAKER:  Objection to form.
15          THE WITNESS:  I know we don't operate in   10:57:59
16     San Francisco because my drivers are necessary for
17     that information.  And if this is a driver-led form,
18     then I would know about it.
19     BY MR. GONZALEZ:
20          Q.   Did you operate in San Francisco in   10:58:10
21     January and February of this year?
22          A.   No.
23          Q.   So do you have any information as to how
24     this was compiled if it wasn't from your drivers?
25          A.   No.  As I said, I've never seen it.   10:58:21
```

Page 42

```
 1          Q.   All right.  So somebody compiled this        10:58:25
 2    information, but you're not aware of who that was?
 3          A.   No.
 4          Q.   Or how it was compiled?
 5          A.   It's similar in format to what we use in     10:58:34
 6    Phoenix.  That's the only basis I have to conclude
 7    from.
 8          Q.   But the difference is that, unlike
 9    Phoenix, you've never had autonomous vehicles
10    driving around San Francisco; right?                     10:58:46
11          A.   We may have in these dates prior to I was
12    here.
13          Q.   But you don't know that you did?  You
14    don't know?
15          A.   No.                                           10:58:53
16          Q.   What about in 2017; did you have
17    autonomous vehicles then?
18          A.   No.
19          MR. GONZALEZ:  Okay.  Thank you.
20          THE VIDEOGRAPHER:  This concludes today's         10:59:05
21    deposition of the Waymo 30(b)(6), Shaun Stewart,
22    witness.
23               Total number of media used is one.  Going
24    off the record at 10:59 a.m.
25    (Whereupon, the deposition was concluded at 10:59 p.m.)
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       FEDERAL CERTIFICATE OF DEPOSITION OFFICER

2       I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby
declare:

3       That, prior to being examined, the witness
named in the foregoing deposition was by me duly

4  sworn pursuant to Section 30(f)(1) of the Federal
Rules of Civil Procedure and the deposition is a

5  true record of the testimony given by the witness;

6       That said deposition was taken down by me in
shorthand at the time and place therein named and

7  thereafter reduced to text under my direction;

8    -----   That the witness was requested to
review the transcript and make any changes to the

9  transcript as a result of that review pursuant to
Section 30(e) of the Federal Rules of Civil

10  Procedure;

11    -----   No changes have been provided by the
witness during the period allowed;

12    -----   The changes made by the witness are

13  appended to the transcript;

14    --X---   No request was made that the
transcript be reviewed pursuant to Section 30(e) of

15  the Federal Rules of Civil Procedure.

16       I further declare that I have no interest in
the event of the action.

17       I declare under penalty of perjury under the

18  laws of the United States of America that the
foregoing is true and correct.

19       WITNESS my hand this 19th day of December, 2017.

20

21

22

23

24

25      ANRAE WIMBERLEY, CSR NO. 7778

Page 43

# EXHIBIT 38

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# Google

## Status Change Request Form

| | |
|---|---|
| **Employee Name:** | **Anthony Levandowski** |
| **Employee ID No.:** | EMP 42131 |
| **Status Change Effective Date:** | |

**Type of Change**

| ☐ **Salary Action** | ☐ **Job Action** | ☑ **Bonus** | ☐ **Stock Grant** |
|---|---|---|---|
| ☐ Market Adjustment | ☐ Promotion | ☐ Spot Bonus | ☐ Other (Explain below) |
| ☐ Promotion | ☐ Transfer | ☐ Employee Referral | ☐ Termination (Explain below) |
| ☐ Other (Explain below) | ☐ Reclass | ☐ Relocation | ☐ CC Transfer/Mgr. Change |
| _____ | ☐ Slotting | ☐ Peer Bonus | |
| | | ☐ Non-Cash | |
| | | ☑ Indicate Amount | |
| | | ██████  ☑ Gross | |
| | | ☐ Net | |

**Comments / Justifications**

Project Eisenhower - Retention Bonuses per Agreement, upon the effective date of the transaction

| *Current Status* | *Proposed Status* |
|---|---|
| Cost Center #: _____ | Cost Center #: _____ |
| Manager: _____ | Manager: _____ |
| HRIS Title: _____ | HRIS Title: _____ |
| MOMA Title: _____ | MOMA Title: _____ |
| Grade Level: _____  Job Code: _____ | Grade Level: _____  Job Code: _____ |
| Emp. Status: < Select Status >  OTE: _____ | Emp. Status: < Select Status >  OTE: _____ |
| Work Status: < % FTE > | Work Status: < % FTE > |
| Currency: < Select Currency > | Currency: < Select Currency > |
| Current Salary: _____ | New Salary: _____ |
| | Proposed Stock: _____ |
| | Vesting Schedule: _____ |
| | Vesting Commence: _____ |

**Termination**

| | | |
|---|---|---|
| Hire Date: _____ | Last Day Worked: _____ | Final Stock Vesting Date: _____ |
| Pay Through Date: _____ | Term Code: < Select Code > | Exit Interview Date/Time: _____ |

| *Approvals from Transferring Department* | *Approvals* | |
|---|---|---|
| Manager: _____  Date: _____ | Manager: _____ | Date: _____ |
| HR: _____  Date: _____ | HR: _____ | Date: _____ |
| Dept. Dir./VP: _____  Date: _____ | Dept. Dir./VP: _____ | Date: _____ |

*Note: All necessary approvals must be obtained before employee is notified of a change in status.*

For HR Use – HRIS Completed: _____  Date: 5/15/07

SC 5/24/07

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                          WAYMO-UBER-00006373

# EXHIBIT 39

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**From:** "Andrew Chatham (Google Docs)"

**To:**

**Received:** Thu, 19 Mar 2015 12:58:57 -0700 (PDT)

**Subject:** Chauffeur Strategy - Entering the TaaS Market - PRIVILEGE...

Andrew Chatham added comments to Chauffeur Strategy - Entering the TaaS Market - PRIVILEGED AND CONFIDENTIAL (new)

Andrew Chatham

Daniel Chu

Yep, definitely want your input here. Intended to be a start to thinking through what are the areas we'd need to ramp up if we wanted to

Andrew Chatham

I agree in general.

**ReplyOpen**

Andrew Chatham

Daniel Chu

Yep, we debated this one as well. Worth for us to mention it under the in-vehicle experience. I'd still say that its a bit of a draw...for some folks (like me)

Andrew Chatham

FWIW, I took an uber 15 minutes after I typed this comment and the driver inserted himself into our conversation 3 times during the trip.

**ReplyOpen**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

You received this email because you are a participant in the updated discussion threads.Change what Google Docs sends you.You can not reply to this email.



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

WAYMO-UBER-00009647

# EXHIBIT 40

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**From:** Mike Marx ████████████
**To:** John Krafcik ████████████
**Sent:** Fri, 9 Dec 2016 09:39:18 -0800
**Subject:** Re: [chauffeur-industryinfo] Self driving Uber spotted in SF
**Cc:** Ron Medford ████████████ Ethan Stark ████████ ████████ Alex McCarthy ████████████
Chauffeur Industry Info ████████████████████, Romain Thibaux ████████████

Here's the current text (https://www.dmv.ca.gov/portal/dmv/detail/vr/autonomous/testing):

As of December 8, 2016, DMV has issued Autonomous Vehicle Testing Permits to the following entities:

- Volkswagen Group of America
- Mercedes Benz
- Google
- Delphi Automotive
- Tesla Motors
- Bosch
- Nissan
- GM Cruise LLC
- BMW
- Honda
- Ford
- Zoox, Inc.
- Drive.ai, Inc.
- Faraday & Future Inc.
- Baidu USA LLC
- Wheego Electric Cars Inc.
- Valeo North America, Inc.
- NextEV USA, Inc.
- Telenav, Inc.
- NVIDIA Corporation

On Fri, Dec 9, 2016 at 9:37 AM, John Krafcik ████████████████ wrote:

what does it say?

On Fri, Dec 9, 2016 at 9:25 AM, Ron Medford ████████████ wrote:

Interesting, the DMV list was updated yesterday.

On Fri, Dec 9, 2016 at 9:10 AM, Ethan Stark ████████████ wrote:

A friend on social media posted about getting picked up by one.... Granted that may have still just been mapping or prep.

On Fri, Dec 9, 2016 at 9:04 AM Ron Medford ████████████ wrote:

Uber still does not have a CA testing permit according the DMV website. So they must be mapping and preparing to test.

On Fri, Dec 9, 2016 at 7:49 AM, Alex McCarthy ████████████ wrote:

... and another moments later at Harrison and 4th.

First vehicle was an SUV with single driver (I think), second was a normal car (sedan?) With a co-driver

-Alex

On Dec 9, 2016 07:46, "Alex McCarthy" ████████████ wrote:

Saw another one while walking at 4th and Bryant this morning

-Alex

On Oct 24, 2016 08:55, "Romain Thibaux"  wrote:

From my social media circle. Same sensor setup as last sighting as far as I can tell. Just a black car this time.

--

You received this message because you are subscribed to the Google Groups "Chauffeur Industry Info" group.

To unsubscribe from this group and stop receiving emails from it, send an email to

To post to this group, send email to

--

You received this message because you are subscribed to the Google Groups "Chauffeur Industry Info" group.

To unsubscribe from this group and stop receiving emails from it, send an email to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

To post to this group, send email to ████████████████████

--

You received this message because you are subscribed to the Google Groups "Chauffeur Industry Info" group.

To unsubscribe from this group and stop receiving emails from it, send an email to ████████
████████████████████████

To post to this group, send email to ██████████████████████████.

    --
You received this message because you are subscribed to the Google Groups "Chauffeur Industry Info" group.
To unsubscribe from this group and stop receiving emails from it, send an email to ████████
████████████████████████

To post to this group, send email to ██████████████████████████

--
  • **John Krafcik**
  • CEO, Self-Driving Cars

████████████████████████

--
You received this message because you are subscribed to the Google Groups "Chauffeur Industry Info" group.
To unsubscribe from this group and stop receiving emails from it, send an email to ████████
████████████████████████

To post to this group, send email to ██████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 41

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**From:**     Meiling Tan
**To:**       Juliet Rothenberg ██████████████
**Sent:**     Tue, 30 May 2017 17:55:27 -0700
**Subject:**  Re: In-ride experience reveal next steps
**Cc:**       Dan Chu ████████████, Margo Maddux ████████████████, Johnny Luu ████████████████, Min Li
Chan ████████████████, Ryan Powell

████████████████████████████████████████████████████████████████████
██████████████████████ *REDACTED - PRIVILEGE* ██████████████████████████
████████████████████████████████████████████████████████████████████

**Meiling Tan**
Head of Marketing
Mobile: ████████████
waymo.com

On Tue, May 30, 2017 at 5:48 PM, Juliet Rothenberg ████████████████ wrote:

> Attorney-client privileged and confidential

Thanks, Meiling!  I went through and added comments.
+Dan and Margo --
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

Margo is coming to the in-car UX weekly on Thursday, and this will be a key topic of discussion.  In the meantime,
Margo, if you have a chance to look through <u>Meiling's doc</u>, it'd be great to start there as a launching point ████████████

On Tue, May 30, 2017 at 2:51 PM, Meiling Tan ████████████████ wrote:

> +Johnny
> Hi all, Thanks for the follow-up sync today!

## 1) TIMING:

Shared context for timing live today. Here's the link to the ████████████ deck. @Min Li happy to chat you through
this live when you're back. To recap:

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

Given the knowledge that ████████████████████████████ one possible and **tentative** timeline is as follows:

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

However let's vet exactly ██████████████████ as that could drive timing forwards or backwards.

**2) CONTENT:**

We talked through the ███████████████ which are awesome and exactly the story we want to help you to tell! I've now updated our previous <u>brief</u> to include our latest hypothesis of ████████████████. This will continue to evolve as we build this into a storyboard.

**3) NEXT STEPS:**

Pinged folks in the <u>brief</u>, but could you look at ██████████████████ and:

████████████████████████████████████████████████████████████████

Thanks for your help!

Meiling



**Meiling Tan**
Head of Marketing
Mobile: ████████████
waymo.com

On Tue, May 23, 2017 at 7:50 AM, Juliet Rothenberg ███████████████wrote:

Meiling, do you still want comments on the doc?  It looks like it's been locked down for discussion at GTM. A few high-level thoughts until then:

WAYMO-UBER-00034072

███████

On Mon, May 22, 2017 at 11:54 AM, Meiling Tan ████████████████ wrote:

One more high level Q: ███████████████████████████████████████████
████████████████████████████████████████ (Know timing there is tricky.)

Trying to get a high level understanding of concerns/issues/opportunities overall, and we'll update this to a more definite proposal after we get the early input for everyone.

   **Meiling Tan**
Head of Marketing
Mobile: ████████████
waymo.com

On Mon, May 22, 2017 at 11:14 AM, Meiling Tan ████████████████ wrote:

Hi Product/UX team,
Thanks for the helpful brainstorm a couple of weeks ago about our UI/UX reveal! We're now targeting ████████
████████████ and so I'm hoping to get us all aligned so you have enough lead time to prepare any necessary materials.

Here's **a brief to get us started** - could you take a look and comment in detail? I'm still sharing with PR as well, so a lot of this may continue to evolve, but I still want to give you a preview ASAP. I've tagged you in a couple of specific comments/questions.

Please also avoid sharing this doc out more broadly at this stage. It's at draft 0.5 and I'd prefer to include other folks later, when our needs are more defined!

Best,
Meiling

   **Meiling Tan**
Head of Marketing
Mobile: ████████████
waymo.com

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 42

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

IN UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FUNCTION MEDIA, L.L.C.,

v.

GOOGLE, INC. AND YAHOO!, INC.

Civil Case No. 2:07-cv-279 (CE)

FILED UNDER SEAL

JURY TRIAL DEMANDED

<u>DECLARATION OF THERESA H. BEAUMONT</u>

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

I, Theresa H. Beaumont, hereby declare,

      1.    I have personal knowledge of the facts stated herein.  If called and sworn as a witness, I could and would testify competently thereto.

      2.    I am submitting this declaration in support of Google's Opposition to Function Media's Emergency Motion for Adverse Inference Instruction Regarding Google's Destruction of Evidence.

      3.    I am Discovery Counsel at Google Inc. ("Google"), a role I have occupied since May 2008.  I am responsible for facilitating information-gathering and document collections of electronically-stored information in response to discovery obligations.

      4.    Google provides an internal corporate "chat" network for employees that allows them to communicate with colleagues via instant messages.  These instant messages allow employees to determine whether colleagues are available and engage in informal communications not unlike the texting that takes place on a cell phone.

      5.    An instant message is a real-time dialogue between two or more people. It most closely resembles a telephone or face-to-face conversation.  The conversation usually appears in a small window on a user's computer screen.  The conversation is ephemeral and disappears from view when a user closes the instant messaging window.  Employees often use instant messages for conversations that are purely procedural – e.g., determining whether a co-worker is free for a call – or completely irrelevant to their work – e.g., making plans to meet for lunch.

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                      WAYMO-UBER-00145115



01980.51542/3279642.3

3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11.     In this case, Google has produced more than 5 million pages of documents.

12.     I understand that Function Media takes issue with the lack of duplicates of a particular email in Google's document production.  It is standard, widespread, and reasonable industry practice to "de-dupe" electronically-stored information, to the extent possible, to minimize the time, effort and expense of pre-production document review, and to avoid dumping unnecessarily voluminous quantities of documents on the opposing side in litigation.  However, the fact that a particular email was produced from the files of Ms. Wojcicki does not mean that the other copies of that email in other employees' files, including Mr. Brin's files, were not preserved.  As an example, at Google, there are many email aliases, such as ███████ which are akin to a distribution list of numerous Google employees.  During the document collection and review process, Google makes its best efforts to "de-dupe" such identical emails.  If Google did not do that, the volume of Google's document productions would increase exponentially, but would be populated with numerous identical duplicate emails.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this __15__ day of January, 2010 at New York, New York.

_____
Theresa H. Beaumont

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**                **WAYMO-UBER-00145117**

# EXHIBIT 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Leslie Altherr - 7/30/2009
ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION


FUNCTION MEDIA LLC,

                    Plaintiff,

    vs.                           No. 2007-CV-279 (CE)

GOOGLE, INC. and YAHOO!, INC.,

                    Defendants.

_____/


            *** ATTORNEYS' EYES ONLY ***


      VIDEOTAPED DEPOSITION OF LESLIE ALTHERR

        30(b)(6) DEPOSITION OF GOOGLE, INC.

                July 30, 2009




Reported by:
Natalie Y. Botelho
CSR No. 9897

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          WAYMO-UBER-00145119

Leslie Altherr - 7/30/2009
ATTORNEYS' EYES ONLY

Page 40

1    Does Google have any sort of explanation as to why
2    there's been no instant messaging production?
3    A.          A user --
4              MR. WOLFF:  Objection.
5              THE WITNESS:  A user can change their
6    settings to be off the record, which means that the
7    text of the messages are not stored anywhere.
8    They're not logged in the e-mail.  If you're on the
9    record, the text of the IM is stored with the mail.
10   So when we pull the mail from the mail server, you
11   would get those messages.
12             MR. GRINSTEIN:  Q.  Do Google employees,
13   in your experience, in gathering documents for
14   lawsuits, typically do their instant messaging off
15   the record?
16   A.          I can't speak to all of Google and what
17   they do with their instant messaging, and there's
18   no -- it's up to the user.  Instant messaging is
19   really supposed to be used to say, "Hey, are you
20   there?  Did you see my e-mail?"  It's not -- it's
21   for short messages.  I don't know if you text on
22   your phone, but it's the same idea.
23   Q.          What happens to instant messages that are
24   sent off the record after they're sent?  I should
25   be -- that's a bad question.  Let me ask again.

Leslie Altherr - 7/30/2009
ATTORNEYS' EYES ONLY

Page 41

1   How, if at all, are instant messages that are sent
2   by Google employees off the record retained?
3           MR. WOLFF:  Objection.
4           THE WITNESS:  If your setting is off the
5   record, they're not stored in your e-mail.
6   They're -- there's no log of them.
7           MR. GRINSTEIN:  Q.  So once the message is
8   sent, there is no permanent record of the message
9   kept; is that your testimony?
10  A.          If it's off -- if it's off the record.
11  Q.          If it's off the record?
12  A.          Correct.
13  Q.          All right.  If you can turn with me to the
14  page that has Bates Number 633, please.  This
15  document's entitled "EMG Reports."  Do you see that?
16  A.          Yes.
17  Q.          Do you know what the abbreviation "EMG"
18  stands for?
19  A.          "Executive Management Group."
20  Q.          And you see the first bullet point, it
21  says, "What are EMG Reports?  These weekly reports
22  provided the Executive Management Group status
23  updates for the various groups and departments."  Do
24  you see that?
25  A.          Yes.

# EXHIBIT 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY              WAYMO-UBER-00145122

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

--oOo--

FUNCTION MEDIA, L.L.C.,          )
                                 )
            Plaintiff,           )
                                 )
      vs.                        ) Case No. 2:07CV279
                                 )
GOOGLE, INC.                     )
                                 )
            Defendant.           )
_____)

DEPOSITION OF

SERGEY BRIN

_____

Thursday, January 14, 2010

**HIGHEST LEVEL OF CONFIDENTIALITY

UNDER PROTECTIVE ORDER**

REPORTED BY: COREY W. ANDERSON, CSR 4096 (425290)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          WAYMO-UBER-00145123

Page 89

1    didn't receive a lot of e-mails from your file.

2    This e-mail is actually from Ms. Wojcicki's files.

3    My question to you would be why we didn't receive

4    this e-mail from your files.

5         A.    I would have to ask the folks who produced

6    this or stuff.  I mean, I imagine that since you

7    already had it -- well, actually, wait a second.

8              Well, this e-mail was only sent to Susan

9    Wojcicki.  The one that it refers to inside was sent

10   to EMG.

11        Q.    Right.

12        A.    Yeah.

13        Q.    Okay.  You do not have a policy of

14   deleting e-mails.

15             Is that right?

16        A.    No.  I can try to search for it for you.

17   But you already have it.

18        Q.    Do you -- well, I'm not particularly

19   worried about this e-mail.

20        A.    Hmm.

21        Q.    I'm worried about the other e-mails that I

22   might not have that were sent to Susan Wojcicki

23   is -- that were not sent to Susan Wojcicki, excuse

24   me.

25             Do you use instant messaging?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          WAYMO-UBER-00145124

Page 90

1      A.   We have a feature in Gmail built in called

2   gmail chat or Google talk -- or Google Talk, sorry.

3   Can't remember how we branded it exactly.

4           But anyway, we have a chat feature built

5   into gmail.

6      Q.   Do you use that?

7      A.   Uh-huh.

8      Q.   The e-mails are stored within Google and

9   gmail, or are they all off the record?

10     A.   Sorry, are you talking about chats?

11     Q.   Yes.

12

13

14

15

16

17

18

19     Q.   You never exchange anything meaningful --

20   let me back up.

21          You have never exchanged anything

22   meaningful by means of instant message conversation?

23     A.   That's a universal, so probably going a

24   little bit overboard.  But chat is generally

25   reserved for, you know, like can you take a look at

Sergey Brin - 1/14/2010
Highest Level of Confidentiality Under Protective Order

Page 91

1    this, where I point to something, you know, point to

2    an e-mail or point to a document or something, or --

3    but that wouldn't typically be the case, I don't

4    know.

5        Q.    Sometimes you would have substantive

6    conversations or take a look at this or relevant

7    issues that would take place by instant message?

8            MR. DeFRANCO:  Objection to form.

9            Go ahead.

10           THE WITNESS:  I -- I don't know about -- I

11   mean, I can't think of an instance of that.  So...

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sergey Brin - 1/14/201ᴜ
Highest Level of Confidentiality Under Protective Order

Page 92



8       Q.      Does Google have a way to search documents
9    electronically over the entire network?
10       A.      Over the entire network?
11       Q.      Yeah.
12       A.      Well, what kinds of documents?
13       Q.      E-mails.
14       A.      Oh, yeah, e-mails we can search, uh-huh.
15    I mean, oh, sorry, we can search all the ones that
16    are stored within gmail.  If somebody is using
17    different e-mails, then that would not have...
18       Q.      And so you can do one, put in a search
19    term and it will search the entire company's
20    e-mails.
21              Is that right?
22       A.      Oh, sorry.
23       Q.      I just want to be sure we are on the same
24    page here so there is no misunderstanding.
25       A.      Okay, I see what you are saying.  Oh.  You

# EXHIBIT 59

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
David Perlson (Cal. Bar No. 209502)
davidperlson@quinnemanuel.com
Melissa J. Baily (Cal. Bar No. 237649)
melissabaily@quinnemanuel.com
John Neukom (Cal. Bar No. 275887)
johnneukom@quinnemanuel.com
Jordan R. Jaffe (Cal. Bar No. 254886)
jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California  94111-4788
(415) 875-6600
(415) 875-6700 facsimile

Attorneys for Plaintiff WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC<br><br>          Plaintiffs,<br><br>          v.<br><br>UBER TECHNOLOGIES, INC.;<br>OTTOMOTTO, LLC; OTTO TRUCKING<br>LLC,<br><br>          Defendants. | Case No. 17-cv-00939-JCS<br><br>**PLAINTIFF'S RESPONSES AND<br>OBJECTIONS TO UBER'S<br>INTERROGATORY NOS. 51-56** |

1

## SPECIFIC OBJECTIONS AND RESPONSES

2      Waymo expressly incorporates the above objections as though set forth fully in response to

3  each of the following individual interrogatories, and, to the extent that they are not raised in the

4  particular response, Waymo does not waive those objections.

5

6  **INTERROGATORY NO. 51:**

7      Identify any Waymo or Google employee who ████████████████████████████████████

8  ████████████████████████████████████████

9

10  **RESPONSE TO INTERROGATORY NO. 51:**

11     Waymo objects to this interrogatory on the grounds that it is vague and ambiguous,

12  including with respect to the phrases ████████████████████████████████████████████

13  ██████████████████████████████  Waymo further objects to this interrogatory to the

14  extent that it is unduly burdensome, oppressive, overly broad, and not proportional to the needs of

15  the case.  Waymo further objects to this interrogatory to the extent that it seeks information that is

16  confidential or protected by the attorney-client privilege or the work product doctrine or that is

17  otherwise privileged or protected from discovery.  Waymo further objects to this interrogatory on

18  the grounds that it seeks information that is not relevant to the parties' claims and defenses.

19  Waymo further objects to this request to the extent that it seeks information beyond the scope of

20  the limited discovery of Waymo ordered by the Court, in particular, the Court's requirement that

21  Defendants "take the 30(b)(6) [deposition of Waymo] first," before propounding any other

22  discovery requests.  (Dkt. 2342 [12/4 Hr'g. Tr.], at 61:7-17.)

23

24  **INTERROGATORY NO. 52:**

25     Identify, by Bates range, any Google Talk or Google Hangouts messages produced in this

26  case for Waymo or Google employees.

27

28

the limited discovery of Waymo ordered by the Court, in particular, the Court's requirement that Defendants "take the 30(b)(6) [deposition of Waymo] first," before propounding any other discovery requests.  (Dkt. 2342 [12/4 Hr'g. Tr.], at 61:7-17.)

DATED:  December 19, 2017                QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                         By  */s/ Charles K. Verhoeven*
                                            Charles K. Verhoeven
                                            Attorneys for WAYMO LLC