1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Charles K. Verhoeven (Bar No. 170151)
2     charlesverhoeven@quinnemanuel.com
      David A. Perlson (Bar No. 209502)
3     davidperlson@quinnemanuel.com
      Melissa Baily (Bar No. 237649)
4     melissabaily@quinnemanuel.com
      Jordan Jaffe (Bar No. 254886)
5     jordanjaffe@quinnemanuel.com
    50 California Street, 22nd Floor
6   San Francisco, California 94111-4788
    Telephone:      (415) 875-6600
7   Facsimile:      (415) 875-6700

8   Attorneys for WAYMO LLC

9                    UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                   SAN FRANCISCO DIVISION

12  WAYMO LLC,                          CASE NO. 3:17-cv-00939

13           Plaintiff,                 **PLAINTIFF WAYMO LLC'S OFFER OF
                                        PROOF REGARDING ADMISSIBILITY
14       vs.                            OF CERTAIN MARKET AND
                                        FINANCIAL INFORMATION**
15  UBER TECHNOLOGIES, INC.;
    OTTOMOTTO LLC; OTTO TRUCKING        **PUBLIC REDACTED VERSION OF
16  LLC,                               DOCUMENT SOUGHT TO BE SEALED**

17           Defendants.
                                        Trial Date:   December 4, 2017
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 2

II.  OFFER OF PROOF ............................................................................................. 3

     A.   At the time of the misappropriation, Waymo believed that the first player to
          commercialize self-driving cars was likely to capture all or most of the
          TaaS market............................................................................................................ 4

     B.   At the time of the misappropriation, Uber also believed that it needed to be
          among the first to commercialize self-driving technology and that it needed
          to accelerate its development efforts. ..................................................................... 5

     C.   Both Waymo And Uber Perceived That They Were Competing For All Or
          Most Of A Significant Market And That Perception Influenced Their
          Behavior ................................................................................................................. 6

     D.   Uber understood that accelerating its LiDAR development would accelerate
          its overall self-driving timeline. ........................................................................... 7

III. THE PROFFERED TESTIMONY AND EVIDENCE SHOULD BE ADMITTED ........... 7

     A.   Evidence Of The Perceived Size Of The Market Opportunity For Self-
          Driving Is Admissible To Prove Uber's Motive For Misappropriating
          Waymo's Trade Secrets ......................................................................................... 7

     B.   Evidence Of The Perceived Size Of The Market Opportunity For Self-
          Driving And Evidence Of Waymo's Revenue And Profit Forecasts Are
          Admissible To Establish Trade Secret Status ........................................................ 8

     C.   Evidence Of The Perceived Size Of The Market Opportunity For Self-
          Driving And Evidence Of Waymo's Revenue And Profit Forecasts Are
          Admissible As Factors That Would Significantly Impact The Hypothetical
          Negotiation ............................................................................................................. 9

IV.  CONCLUSION .................................................................................................. 9

## I.      INTRODUCTION

Waymo submits this offer of proof in advance of (i) eliciting testimony from Uber and Waymo trial witnesses regarding the perceived size of the potential market for autonomous vehicles at the time of the misappropriation, and (ii) introducing into evidence the revenue and profit forecasts contained in Waymo's baseline profit and loss statemen.[1]

Evidence of the perceived size of the potential market for autonomous vehicles is relevant to this case by Uber's and Ottomotto's own admission.  For purposes of this case, Uber and Ottomotto (collectively, "Uber") retained a Ph.D. economist (Dr. Michael Jacobs) as an expert on mergers and acquisitions (M&A) issues to testify about Uber's acquisition of Ottomotto.  In setting out his opinions, Dr. Jacobs recounted various "[f]orecasts of the autonomous vehicle business," including a May 2014 estimate of $87 billion by 2030, an April 2015 estimate of $102 billion by 2030, a January 2016 estimate of $1.5 trillion by 2040, a July 2016 estimate of $41.7 billion by 2025, and a March 2017 estimate of $22 to $26 billion by 2025.  (Ex. 1 [Jacobs Report], ¶ 27.)  He concluded that "the perceived size of the potential market has grown over time" and that this "has several implications for transaction economics in the 2016 time frame."  (*Id.* ¶¶ 27, 29.)  He went on to explain that these "substantial forecasts" – along with the fact that "strategic players…needed to have development done" and the fact that there was "a small group of experienced engineers" – "created the economics that we see in the transactions in the [autonomous vehicle] marketplace."  (*Id.* ¶ 29.)  Uber's expert says that these "economics" explain why Uber placed such a high value on Ottomotto – which had been in existence for less than two months when the term sheet was signed) – in early 2016.  The very same economics explain why Uber would place a high value on a trade secret license in a hypothetical negotiation with Waymo in the very same time frame.  This is especially true where, as here, Uber executives were convinced that Uber could not survive if it was not among the first to commercialize self-driving

---

[1]  Waymo intends to introduce at trial some portions of its baseline P&L statement – including, for example, those portions that reflect Waymo's launch and scaling plans – through normal procedures.  The instant offer of proof is provided solely with respect to the admission of Waymo's future revenue and profit forecasts, which are also contained in the same baseline P&L. (Ex. 19.)

technology in TaaS (transportation as a service) and where, as here, the trade secrets to be licensed relate to LiDAR technology, which Uber believed to be the ███████ of its own lagging development efforts.

The revenue and profit forecasts contained in Waymo's baseline profit and loss statement are also relevant to the hypothetical negotiation. In his analysis of "transaction economics in the 2016 time frame" to justify the high value Uber placed on Ottomotto (*id.* ¶ 29), Uber's and Ottomotto's own expert thought it important that "Morgan Stanley has estimated that Waymo is currently worth $70 billion just based on its intention to use its driverless cars to obtain a fraction of the ride marketplace" (*id.* ¶ 27). Though Waymo does not seek to rely on Morgan Stanley's valuation, it should be permitted to rely on its own forecasts ██████████████████ (Ex. 19 [TX-4980]) as evidence of the "economics" that would similarly impact a negotiation between Uber and Waymo for a trade secret license. Like Uber, Waymo viewed the autonomous vehicle market as "winner take all" or "winner take most." (Ex. 2 [TX-1031]; Ex. 3 [TX-1033].) Thus all or most of Waymo's forecasted profits were viewed as contingent on Waymo using its technical lead to become the first and best at offering self-driving TaaS. Waymo's projections – and the effect a shrinking technical lead would have on those projections – would have been front and center for Waymo at any hypothetical negotiation with a competitor like Uber for a license to Waymo trade secrets. And again, this is especially true where, as here, the trade secrets to be licensed relate to the very area of technology that Uber believed to be the ██████ of its development efforts and thus most likely to impact Uber's overall self-driving timeline.

## II.  OFFER OF PROOF

By 2016, both Uber and Waymo believed that ride-sharing fleets would become ██████ ████████ in our lifetimes, making the commercialization of self-driving technology a massive market opportunity. Both Uber and Waymo also believed that time-to-market was of critical importance because the market opportunity was likely to be winner-take-all or winner-take-most. Waymo believed that its ability to capitalize on this opportunity hinged in large part on its technical lead and its resulting ability to enter the market first and as long before the next entrant as possible. Indeed, this drove Waymo's projections of market share and revenues.

1    Similarly, Uber believed that Waymo's technical lead was an existential threat and that it had to

2    close the gap with Waymo or risk losing its large share of the TaaS market.  For the same reasons

3    that Uber has contended that the huge amount of money in play – as evidenced by various

4    valuations of  overall market potential and of Waymo – explains why Uber highly valued a two-

5    month old company like Ottomotto, the same evidence would have an effect on a negotiation

6    between competitors for a license to LiDAR-related trade secrets.

> **A.** **At the time of the misappropriation, Waymo believed that the first player to commercialize self-driving cars was likely to capture all or most of the TaaS market.**

9    1)    The evidence at trial will show that Waymo was the first to heavily invest in the

10   development of self-driving technology and that Waymo was the first to understand that the

11   technology could be safely commercialized in the near term rather than decades from now.  And,

12   from a business perspective, Waymo has always understood that its technical lead would be key to

13   its success in whatever market(s) it chose to enter.

14   2)    By 2016, Waymo had decided that its business strategy should prioritize

15   commercialization of self-driving technology for TaaS (over other applications like trucking or

16   personal car ownership).  Waymo understood the potential size of the autonomous TaaS market.

17   And Waymo understood that its technical lead would drive its success in that market, especially

18   vis-à-vis established manned TaaS players like Uber.

19   3)    Waymo will introduce evidence to show that, by 2016, it was operating under the

20   premise that the first company to achieve self-driving TaaS at scale was likely to win a majority of

21   the market in any given region.  (Ex. 2 [TX-1031] (noting that a "single player (in any region) will

22   likely earn majority of profits in TaaS"); Ex. 3 [TX-1033] (discussing assumption that AV-based

23   TaaS market is "most likely a winner take most").

24   4)    The evidence at trial will also show that, as of 2016, Waymo believed that it had a

25   two to five year technical advantage over its self-driving competitors.  Waymo believed this lead

26   would allow Waymo to launch and scale a self-driving TaaS service before another competitor

27   with an existing TaaS service (like Uber) could develop self-driving technology and deploy it

28   within its existing network.  (*See* Ex. 3 [TX-1033] (discussing Waymo's technology lead and

various strategy implications depending on the size of Waymo's lead).)   Indeed, the evidence will show that Waymo's emphasis on obtaining as much of a lead as possible – while ensuring safety and operating within other constraints – had come to inform nearly every aspect of its business plan by 2016.

      **B.**     **At the time of the misappropriation, Uber also believed that it needed to be among the first to commercialize self-driving technology and that it needed to accelerate its development efforts.**

      5)     The evidence at trial will show that, by 2016, Travis Kalanick, Uber's then-CEO, had become convinced that being among the first to commercialize self-driving for TaaS was "existential" for Uber.  Mr. Kalanick has stated that: "████████████████████████████ ███████████████████████████████." (Ex. 4 [TX-387].)  Mr. Kalanick has stated that succeeding in self-driving is ███████████████" and ████████████████████████████ ██████████████ (Ex. 5 [TX-5472].)

      6)     The evidence at trial will show that this view permeated Uber.  For example, in an email regarding "██████████████" and noting a ████████████████ Jeff Holden – Uber's Chief Product Officer – stated: ████████████████████████ (Ex. 6 [TX-4481].)  John Bares, former director of Uber's ATG program in Pittsburgh, has also agreed that █████████████████████████████████ (Ex. 7 [Bares 6/16/27 Depo. Tr.] at 122:14-16.)

      7)     The evidence at trial will show that Uber understood it was lagging behind Waymo in the development of self-driving technology and that it needed to close the gap.  Mr. Kalanick has said: ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████ (Ex. 8 [TX-291].)  Cameron Poetzscher, Uber's Vice President of Corporate Development, has explained: ████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████ (Ex. 9 [Poetzscher 8/11/17 Depo. Tr.] at 464:16-20.)  Mr. Poetzscher has testified: ███████████████████

1 ██████████████████████████████████████████████████

2 █████████████   (*Id.* at 465:5-14.)

3   **C.   Both Waymo And Uber Perceived That They Were Competing For All Or**
      **Most Of A Significant Market And That Perception Influenced Their**
4     **Behavior**

5       8)      Uber and Ottomotto have offered an expert opinion regarding the perceived growth

6   of the self-driving industry in order to justify Uber's high valuation of Ottomotto, a company that

7   existed for less than two months at the time Uber was assessing its value and negotiating to

8   acquire it.  Their M&A expert, Dr. Michael Jacobs, opined that "dramatic growth is possible over

9   the next ten to fifteen years" in the autonomous vehicle industry.  (Ex. 1 [Jacobs Report], ¶ 27.)

10  He recounted various "[f]orecasts of the autonomous vehicle business," enumerating a May 2014

11  estimate of $87 billion by 2030, an April 2015 estimate of $102 billion by 2030, a January 2016

12  estimate of $1.5 trillion by 2040, a July 2016 estimate of $41.7 billion by 2025, and a March 2017

13  estimate of $22 to $26 billion by 2025.  (*Id.* ¶ 27.)

14      9)      According to Dr. Jacobs, "the perceived size of the potential market has grown over

15  time," which motivated Uber to avoid being "left out" and to place great value on the opportunity

16  to acquire Ottomotto.  (*Id.* ¶ 29.)

17      10)     The evidence at trial will show that the perceived size of the market opportunity

18  was an important consideration for Uber, and one that animated Uber's conduct in many respects,

19  including vis-à-vis Waymo, its most significant rival in self-driving.  Indeed, the evidence will

20  show that the perceived size of the market opportunity – combined with the common belief that

21  the market would play out as "winner take all" or "winner take most" – explains why Mr.

22  Kalanick was intent on accelerating Uber's development of self-driving technology at all costs and

23  why at least some at Uber valued the acceleration of its development timeline at many millions of

24  dollars per day.  (Ex. 10 [TX-299]; Ex. 11 [McClendon 8/1/17 Depo. Tr.] at 179:17-180:17

25  (explaining that Kalanick █████████████████████████████████████████

26  ███████████████████████████████████████████████████

27  ███████████████████████████████).)

28      11)     The evidence at trial will how that Waymo also acted in light of the large market

1   opportunity.  Waymo's current Plan of Record document discusses the need to ███████████

2   ██████████████████████ and █████████████████" (Ex. 12 [TX-1147], at 5).  This

3   strategy is in line with Waymo's belief that the first company to achieve self-driving TaaS at scale

4   was likely to win a majority of the market in any given region.  (Ex. 2 [TX-1031] (noting that a

5   "single player (in any region) will likely earn majority of profits in TaaS"); Ex. 3 [TX-1033]

6   (discussing assumption that AV-based TaaS market is "most likely a winner take most").

   **D.   <u>Uber understood that accelerating its LiDAR development would accelerate its overall self-driving timeline.</u>**

7   12)   By 2016, Uber recognized that LiDAR technology specifically was a key driver of

8   its ability to succeed with self-driving technology.  (Ex. 13 [TX-910] █████████████

9   █████████████████); Ex. 14 [TX-171] ████████████████████████████████████

10  ███████████████████████████████████████████████████████████████████████████

11  ████████ Ex. 15 [TX-678] █████████████████████████████████████████

12  (Ex. 16 [TX-367] (Kalanick: ██████████████████████████████████

13  ██████).)

14  13)   The evidence at trial will show that lasers were the "longest pole" with respect to

15  Uber's own self-driving technology development efforts.  (Ex. 16 [TX-367] (discussing Mr.

16  Levandowski, ████████████████████████████████████ *id.*

17  (discussing the ████████████  As Mr. Kalanick has explained, ████████ refers to the

18  hardest problem Uber had to solve: ███████████████████████████████████

19  ████████████" (Ex. 17 [Kalanick 7/27/17 Depo. Tr.] at 198:1-199:2.)  Indeed,

20  the evidence will show that Uber believed that ████████████████████████████████

21  ████████████████████████████████████████████ (Ex. 18 [TX-

22  170] (discussing Levandowski's potential value-add, John Bares wrote, ████████████████

23  ███████████████████████████████████████████████████████████

24  ████████ )

   **III.   THE PROFFERED TESTIMONY AND EVIDENCE SHOULD BE ADMITTED**

   **A.   <u>Evidence Of The Perceived Size Of The Market Opportunity For Self-Driving Is Admissible To Prove Uber's Motive For Misappropriating Waymo's Trade</u>**

1    Secrets

2        As demonstrated above, by 2016, Uber had come to understand (i) the size of the potential

3    market opportunity associated with self-driving technology and (ii) that, to capture the "winner

4    take all" or "winner take most" self-driving TaaS market, it needed to narrow the technical lead

5    that Waymo had over Uber.  This dual understanding motivated Uber's ███████████████" when it

6    came to self-driving, including its misappropriation of Waymo's secrets.  (Ex. 11 [McClendon

7    8/1/17 Depo. Tr.] at 179:17-180:17.)  Waymo should be permitted to explain to the jury

8    exactly what Uber understood to be on the line at the time of the misappropriation.  *See LinkCo,*

9    *Inc. v. Fujitsu*, 232 F. Supp. 2d 182 n.9 (S.D.N.Y. 2002) (admitting sales projections "for the

10   limited purpose of explaining Fujitsu's motive to engage in the alleged [trade secret

11   misappropriation]").  For this reason alone, Waymo should be able to elicit testimony regarding

12   the perceived size of the market opportunity for self-driving.

13       **B.    Evidence Of The Perceived Size Of The Market Opportunity For Self-Driving
              And Evidence Of Waymo's Revenue And Profit Forecasts Are Admissible To
14            Establish Trade Secret Status**

15       In order to prevail on its trade secret misappropriation claim, Waymo must establish that

16   its asserted trade secrets derive actual or potential independent economic value from not being

17   generally known.  *MAI Sys. Corp. v. Peak Comp. Inc.*, 991 F.2d 511, 520-21 (9th Cir. 1993).  The

18   "long-term lucrative potential" of a field is circumstantial evidence that "incremental

19   advancements" in that field derive economic value from not being known.  *Altavion, Inc. v.*

20   *Konica Minolta Sys. Lab. Inc.*, 226 Cal. App. 4th 26, 65 (2014) (upholding a finding of substantial

21   economic value based on evidence that "if successfully implemented, DST could be very lucrative

22   because of potential applications in many different industries" and testimony that "the technology

23   had the potential to earn vast sums on check scanning in the banking industry").  Here, Waymo's

24   trade secrets are valuable in large part because of their specific development in the context of self-

25   driving technology.  Waymo should be permitted to establish the "long-term lucrative potential"

26   of that technology in connection with meeting its burden of proving that its confidential technical

27   information is properly afforded trade secret status.  For this reason as well, testimony regarding

28   the general perception of the market opportunity for self-driving and evidence of Waymo's

1   specific assessment of that market opportunity (in the form of its projections) should be admitted

2   at trial.

3       **C.**   **Evidence Of The Perceived Size Of The Market Opportunity For Self-Driving**
        **And Evidence Of Waymo's Revenue And Profit Forecasts Are Admissible As**
4       **Factors That Would Significantly Impact The Hypothetical Negotiation**

5       As demonstrated above, Uber's own view is that both the perceived size of the market

6   opportunity for self-driving and the valuation of Waymo as a self-driving enterprise inform

7   the "transaction economics" at play in the self-driving industry in 2016.  Uber makes use of this

8   information to explain why it placed such a high value on the acquisition of Ottomotto.  Waymo

9   should be entitled to rely on the same information to explain why Uber would be willing to pay a

10  high royalty for the acquisition of trade secrets from Waymo in the parties' hypothetical

11  negotiation.

12      Indeed, as outlined above, the evidence at trial will show that both Uber and Waymo

13  believed that the market opportunity for self-driving TaaS was on the order of at least many tens

14  of billions of dollars; that the market would be "winner take all" or "winner take most"; that time

15  to market would be critical (if not determinative of winners and losers); and that Waymo had a

16  two to five year technology lead on Uber, while Uber already had an established TaaS

17  business.  Regardless of starting point (Uber's valuation of accelerated development, Uber's

18  valuation of Ottomotto, Waymo's research and development costs, etc.), this specific constellation

19  of factors would drive up the royalty that Uber would pay (and Waymo would demand) for a

20  license to Waymo trade secrets related to the very technological area (LiDAR) that Uber

21  considered to be the ███████████ of its own development efforts.  The evidence at trial will

22  show that the size of this winner-take-all (or most) market opportunity was front and center every

23  step of the way for Uber, and it would have been front and center for both Uber and

24  Waymo during their hypothetical negotiation.  Accordingly, Waymo should be permitted to elicit

25  testimony regarding the parties' perceptions of the market opportunity and should be permitted to

26  introduce documentary evidence of its projected revenues and forecasts.

27  **IV.   CONCLUSION**

28      For the foregoing reasons, the Court should allow Waymo to (i) elicit testimony from Uber

-9-

1   and Waymo trial witnesses regarding the perceived size of the potential market for autonomous

2   vehicles at the time of the misappropriation, and (ii) introduce into evidence the revenue and profit

3   forecasts contained in Waymo's baseline profit and loss statement.

4

5   DATED:  January 26, 2018                   QUINN EMANUEL URQUHART & SULLIVAN,
                                              LLP
6
                                       By  */s/ Charles K. Verhoeven*
7                                            Charles K. Verhoeven
8                                            Attorneys for WAYMO LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Charles K. Verhoeven (Bar No. 170151)
2     charlesverhoeven@quinnemanuel.com
      David A. Perlson (Bar No. 209502)
3     davidperlson@quinnemanuel.com
      Melissa Baily (Bar No. 237649)
4     melissabaily@quinnemanuel.com
      John Neukom (Bar No. 275887)
5     johnneukom@quinnemanuel.com
      Jordan Jaffe (Bar No. 254886)
6     jordanjaffe@quinnemanuel.com
   50 California Street, 22nd Floor
7  San Francisco, California 94111-4788
   Telephone:    (415) 875-6600
8  Facsimile:    (415) 875-6700

9  Attorneys for WAYMO LLC

10                  UNITED STATES DISTRICT COURT

11     NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

12  WAYMO LLC,                          CASE NO. 3:17-cv-00939-WHA

13              Plaintiff,              **DECLARATION OF JEFF NARDINELLI
                                        IN SUPPORT OF WAYMO'S OFFER OF
14       vs.                            PROOF REGARDING ADMISSIBILITY
                                        OF CERTAIN MARKET AND
15  UBER TECHNOLOGIES, INC.;            FINANCIAL INFORMATION**
    OTTOMOTTO LLC; OTTO TRUCKING
16  LLC,

17              Defendants.

18

19

20

21

22

23

24

25

26

27

28

I, Jeff Nardinelli, hereby declare as follows.

1.     I am a member of the bar of the State of California and an associate with Quinn Emanuel Urquhart & Sullivan, LLP, counsel for Plaintiff Waymo LLC ("Waymo").  I make this declaration of personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently as follows.

2.     Attached as Exhibit 1 is a true and correct excerpted copy of the September 7, 2017 Expert Report of E. Allen Jacobs.

3.     Attached as Exhibit 2 is a true and correct copy of a document produced by Waymo in this case bearing Bates number WAYMO-UBER-00004175.

4.     Attached as Exhibit 3 is a true and correct copy of document produced by Waymo in this case bearing Bates number WAYMO-UBER-00004108.

5.     Attached as Exhibit 4 is a true and correct copy of document produced by Uber in this case bearing Bates number UBER00064468.

6.     Attached as Exhibit 5 is a true and correct copy of document produced by Stroz Friedberg in this case bearing Bates number STROZ_R_000003106.

7.     Attached as Exhibit 6 is a true and correct copy of document produced by Uber in this case bearing Bates number UBER00070108.

8.     Attached as Exhibit 7 is a true and correct excerpted copy of the June 16, 2017 deposition of John Bares.

9.     Attached as Exhibit 8 is a true and correct copy of document produced by Anthony Levandowski in this case bearing Bates number LEV_000777.

10.     Attached as Exhibit 9 is a true and correct excerpted copy of the August 11, 2017 deposition of Cameron Poetzscher.

11.     Attached as Exhibit 10 is a true and correct copy of document produced by Uber in this case bearing Bates number UBER00069030.

12.     Attached as Exhibit 11 is a true and correct excerpted copy of the August 1, 2017 deposition of Brian McClendon.

13.     Attached as Exhibit 12 is a true and correct copy of document produced by Waymo in this case bearing Bates number WAYMO-UBER-00031805.

14.     Attached as Exhibit 13 is a true and correct copy of document produced by Uber in this case bearing Bates number UBER00109871.

15.     Attached as Exhibit 14 is a true and correct copy of document produced by Uber in this case bearing Bates number UBER00060147.

16.     Attached as Exhibit 15 is a true and correct copy of document produced by Uber in this case bearing Bates number UBER00065989.

17.     Attached as Exhibit 16 is a true and correct copy of document produced by Uber in this case bearing Bates number UBER00060504.

18.     Attached as Exhibit 17 is a true and correct excerpted copy of the July 27, 2017 deposition of Travis Kalanick.

19.     Attached as Exhibit 18 is a true and correct copy of document produced by Uber in this case bearing Bates number UBER00060321.

20.     Attached as Exhibit 19 is a true and correct copy of document produced by Uber in this case bearing Bates number WAYMO-UBER-00032541.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:  January 26, 2018                    */s Jeff Nardinelli*
                                                          Jeff Nardinelli

## <u>SIGNATURE ATTESTATION</u>

Pursuant to Local Rule 5-1(i)(3), I attest under penalty of perjury that concurrence in the filing of this document has been obtained from Jeff Nardinelli.

*/s/ Charles K. Verhoeven*
Charles K. Verhoeven

# EXHIBIT 1

# FILED UNDER SEAL

# EXHIBIT 2

# FILED UNDER SEAL

# EXHIBIT 3

# FILED UNDER SEAL

# EXHIBIT 4

# FILED UNDER SEAL

# EXHIBIT 5

# FILED UNDER SEAL

# EXHIBIT 6

# FILED UNDER SEAL

# EXHIBIT 7

# FILED UNDER SEAL

# EXHIBIT 8

# FILED UNDER SEAL

# EXHIBIT 9

# FILED UNDER SEAL

# EXHIBIT 10

# FILED UNDER SEAL

# EXHIBIT 11

# FILED UNDER SEAL

# EXHIBIT 12

# FILED UNDER SEAL

# EXHIBIT 13

# FILED UNDER SEAL

# EXHIBIT 14

# FILED UNDER SEAL

# EXHIBIT 15

# FILED UNDER SEAL

# EXHIBIT 16

# FILED UNDER SEAL

# EXHIBIT 17

# FILED UNDER SEAL

# EXHIBIT 18

# FILED UNDER SEAL

# EXHIBIT 19

# FILED UNDER SEAL