QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David A. Perlson (Bar No. 209502)
  davidperlson@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  John Neukom (Bar No. 275887)
  johnneukom@quinnemanuel.com
  Jordan Jaffe (Bar No. 254886)
  jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>              Plaintiff,<br><br>        vs.<br><br>UBER TECHNOLOGIES, INC.;<br>OTTOMOTTO LLC; OTTO TRUCKING<br>LLC,<br><br>              Defendants. | CASE NO. 3:17-cv-00939-WHA<br><br>**PLAINTIFF WAYMO LLC'S<br>ADMINISTRATIVE MOTION TO FILE<br>UNDER SEAL ITS OFFER OF PROOF<br>WITH RESPECT TO WAYMO'S<br>DEVELOPMENT EXPENSES** |

Pursuant to Civil L.R. 7-11 and 79-5, Plaintiff Waymo LLC ("Waymo") respectfully requests to file under seal portions of exhibits to its Offer of Proof With Respect To Waymo's Development Expenses. ("Waymo's Offer of Proof").  Specifically, Waymo requests an order granting leave to file under seal the portions of the documents as listed below:

| Document | Portions to Be Filed Under Seal | Designating Party |
|---|---|---|
| Waymo's Offer of Proof | Highlighted in blue | Defendants |
|  | Highlighted in green | Waymo |
| Exhibit 1 to Waymo's Offer of Proof | Entire document | Defendants |
| Exhibit 2 to Waymo's Offer of Proof | Entire document | Defendants |
| Exhibit 3 to Waymo's Offer of Proof | Entire document | Defendants |
| Exhibit 4 to Waymo's Offer of Proof | Entire document | Defendants |
| Exhibit 5 to Waymo's Offer of Proof | Highlighted in green | Waymo |
|  | Entire document | Defendants |
| Exhibit 6 to Waymo's Offer of Proof | Entire document | Waymo & Defendants |
| Exhibit 7 to Waymo's Offer of Proof | Entire document | Waymo |

## I.    LEGAL STANDARD

Civil Local Rule 79-5 requires that a party seeking sealing "establish[] that the document, or portions thereof, are privileged, protectable as a trade secret or otherwise entitled to protection under the law" (*i.e.*, is "sealable").  Civil L.R. 79-5(b).  The sealing request must also "be narrowly tailored to seek sealing only of sealable material."  *Id.*  In the context of non-dispositive motions, materials may be sealed so long as the party seeking sealing makes a "particularized showing" under the "good cause" standard of Federal Rule of Civil Procedure 26(c).  *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1180 (9th Cir. 2006) (quoting *Foltz v. State Farm Mutual Auto Insurance Co.*, 331 F.3d 1122, 1135, 1138 (9th Cir. 2003)).

## II.    DEFENDANTS' CONFIDENTIAL INFORMATION

Waymo seeks to seal identified portions of these documents because Defendants have designated the information confidential and/or highly confidential.  Declaration of Lindsay Cooper ("Cooper Decl.") ¶ 3.  Waymo takes no position on the merits of sealing the designated material, and expects Defendants to file one or more declarations in accordance with the Local Rules.

### III. THE COURT SHOULD SEAL WAYMO'S CONFIDENTIAL INFORMATION

The Court should seal the portions of Waymo's Offer of Proof and exhibits thereto as identified by Waymo in the table above.  Waymo seeks to file this information under seal because it discloses Waymo's trade secrets and confidential business information. *See* Cooper Decl. ¶ 4.  Courts have determined that trade secret information merits sealing. *Music Grp. Macao Commercial Offshore Ltd. v. Foote*, No. 14–cv–03078–JSC, 2015 WL 3993147, at *1 (N.D. Cal. June 30, 2015) (quoting *Kamakana*, 447 F.3d at 1179); *see also Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. C 10-3428 PSG, 2013 WL 211115, at *1, *3 (N.D. Cal. Jan. 17, 2013) (granting request to seal document that "consists entirely of descriptions of Brocade's trade secrets.").  Waymo seeks to seal trade secret information that fit squarely within these categories. Cooper Decl. ¶ 4.  Waymo maintains this information as a trade secret (*see* Dkt. 25-31) and ensures the information remains secret with strict secrecy and security protocols (*see* Dkt. 25-47; Dkt. 25-49.). *Id.*  Waymo has narrowly tailored its requests to only information meriting sealing. *Id.*  The disclosure of Waymo's trade secrets would harm Waymo. Cooper Decl. ¶ 4.  Moreover, the scope of information that Waymo is seeking to seal is consistent with other administrative motions to seal that have already been granted by the Court in this case. (*See e.g.*, Dkt. 681.)  Thus, the Court should grant Waymo's administrative motion to seal.

### IV. CONCLUSION

In compliance with Civil Local Rule 79-5(d), redacted and unredacted versions of the above listed documents accompany this Administrative Motion.  For the foregoing reasons, Waymo respectfully requests that the Court grant Waymo's administrative motion to file under seal.

DATED:  January 26, 2018

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By */s/ Charles Verhoeven*

Charles Verhoeven
Attorneys for WAYMO LLC

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David A. Perlson (Bar No. 209502)
  davidperlson@quinnemanuel.com
  Melissa Baily (Bar No. 237649)
  melissabaily@quinnemanuel.com
  John Neukom (Bar No. 275887)
  johnneukom@quinnemanuel.com
  Lindsay Cooper (Bar No. 254886)
  jordanjaffe@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

Attorneys for WAYMO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>                 Plaintiff,<br><br>        vs.<br><br>UBER TECHNOLOGIES, INC.;<br>OTTOMOTTO LLC; OTTO TRUCKING<br>LLC,<br><br>                 Defendants. | CASE NO. 3:17-cv-00939-WHA<br><br>**DECLARATION OF LINDSAY COOPER IN SUPPORT OF PLAINTIFF WAYMO LLC'S ADMINISTRATIVE MOTION TO FILE UNDER SEAL ITS OFFER OF PROOF WITH RESPECT TO WAYMO'S DEVELOPMENT EXPENSES** |

I, Lindsay Cooper, declare as follows:

1.    I am an attorney licensed to practice in the State of California and am admitted to practice before this Court.  I am an associate at the law firm Quinn Emanuel Urquhart & Sullivan, LLP, counsel for the Plaintiff Waymo LLC ("Waymo").  I have personal knowledge of the matters set forth in this Declaration, and if called as a witness I would testify competently to those matters.

2.    I make this declaration in support of Waymo's Administrative Motion to File Under Seal its Offer of Proof With Respect To Waymo's Development Expenses ("Waymo's Administrative Motion").  Waymo's Administrative Motion seeks an order sealing the following materials:

| Document | Portions to Be Filed Under Seal | Designating Party |
|---|---|---|
| Waymo's Offer of Proof | Highlighted in blue | Defendants |
| | Highlighted in green | Waymo |
| Exhibit 1 to Waymo's Offer of Proof | Entire document | Defendants |
| Exhibit 2 to Waymo's Offer of Proof | Entire document | Defendants |
| Exhibit 3 to Waymo's Offer of Proof | Entire document | Defendants |
| Exhibit 4 to Waymo's Offer of Proof | Entire document | Defendants |
| Exhibit 5 to Waymo's Offer of Proof | Highlighted in green | Waymo |
| | Entire document | Defendants |
| Exhibit 6 to Waymo's Offer of Proof | Entire document | Waymo & Defendants |
| Exhibit 7 to Waymo's Offer of Proof | Entire document | Waymo |

3.    Portions of Waymo's Offer of Proof and the attached exhibits contain information that Defendants have designated as confidential and/or highly confidential.

4.    Portions of Waymo's Offer of Proof and exhibits thereto also contain, reference, and/or describe Waymo's asserted trade secrets, including as misappropriated by Defendants.  Waymo therefore seeks to seal portions of Waymo's Offer of Proof and the exhibits thereto as identified above.  Specifically, Waymo's Offer of Proof and the attached exhibits referenced above describes certain technical specifications of Waymo's trade secrets.  I understand that these trade secrets are maintained as secret by Waymo (Dkt. 25-47) and are valuable as trade secrets to Waymo's business (Dkt. 25-31).  The public disclosure of this information would give Waymo's competitors access to in-depth descriptions—and analysis—of the functionality of Waymo's autonomous vehicle system. Waymo's Offer of Proof and the attached exhibits referenced above also contain or refer to confidential business information, including internal development costs, which Waymo maintains as

secret.  If such information were made public, I understand that Waymo's competitive standing would be significantly harmed.   Waymo's request to seal is narrowly tailored to only the confidential information.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed in San Francisco, California, on January 26, 2018.

By /s/ Lindsay Cooper
Lindsay Cooper
Attorneys for WAYMO LLC

**SIGNATURE ATTESTATION**

Pursuant to Local Rule 5-1(i)(3), I attest under penalty of perjury that concurrence in the filing of this document has been obtained from Lindsay Cooper.

/s/ Charles K. Verhoeven
Charles K. Verhoeven

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

WAYMO LLC,

      Plaintiff,

  vs.

UBER TECHNOLOGIES, INC.;
OTTOMOTTO LLC; OTTO TRUCKING
LLC,

      Defendants.

CASE NO. 3:17-cv-00939-WHA

**[PROPOSED] ORDER GRANTING PLAINTIFF WAYMO LLC'S ADMINISTRATIVE MOTION TO FILE UNDER SEAL ITS OFFER OF PROOF WITH RESPECT TO WAYMO'S DEVELOPMENT EXPENSES**

1    Plaintiff Waymo LLC ("Waymo") has filed an Administrative Motion to File Under Seal

2  ("Waymo's Administrative Motion") certain information in its Offer of Proof With Respect To

3  Waymo's Development Expenses ("Waymo's Offer").

4    Having considered Waymo's Administrative Motion, and good cause to seal having been

5  shown, the Court **GRANTS** Waymo's Administrative Motion and **ORDERS** sealed the

6  documents listed below:

| Document | Portions to Be Filed Under Seal |
|---|---|
| Waymo's Offer of Proof | Highlighted in blue |
|  | Highlighted in green |
| Exhibit 1 to Waymo's Offer of Proof | Entire document |
| Exhibit 2 to Waymo's Offer of Proof | Entire document |
| Exhibit 3 to Waymo's Offer of Proof | Entire document |
| Exhibit 4 to Waymo's Offer of Proof | Entire document |
| Exhibit 5 to Waymo's Offer of Proof | Highlighted in green |
|  | Entire document |
| Exhibit 6 to Waymo's Offer of Proof | Entire document |
| Exhibit 7 to Waymo's Offer of Proof | Entire document |

15    **IT IS SO ORDERED.**

16  Dated: _____, 2018

17  _____

18  HON. WILLIAM ALSUP
    United States District Court Judge

1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
       Charles K. Verhoeven (Bar No. 170151)
2      charlesverhoeven@quinnemanuel.com
       David A. Perlson (Bar No. 209502)
3      davidperlson@quinnemanuel.com
       Melissa Baily (Bar No. 237649)
4      melissabaily@quinnemanuel.com
       Jordan Jaffe (Bar No. 254886)
5      jordanjaffe@quinnemanuel.com
    50 California Street, 22nd Floor
6   San Francisco, California 94111-4788
    Telephone:     (415) 875-6600
7   Facsimile:     (415) 875-6700

8   Attorneys for WAYMO LLC

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12  WAYMO LLC,                          CASE NO. 3:17-cv-00939

13              Plaintiff,              **PLAINTIFF WAYMO LLC'S OFFER OF
                                        PROOF WITH RESPECT TO WAYMO'S
14       vs.                            DEVELOPMENT EXPENSES**

15  UBER TECHNOLOGIES, INC.;            **PUBLIC REDACTED VERSION OF
    OTTOMOTTO LLC; OTTO TRUCKING        DOCUMENT SOUGHT TO BE SEALED**
16  LLC,

17              Defendants.             Trial Date:  December 4, 2017

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................................................2

II.  OFFER OF PROOF ...........................................................................................................3

III.  THE COSTS OF DEVELOPING THE ASSERTED TRADE SECRETS ARE
     RELEVANT TO WHETHER THE INFORMATION HAS INDEPENDENT
     ECONOMIC VALUE ......................................................................................................15

IV.  WAYMO'S DEVELOPMENT COSTS ARE RELEVANT TO DAMAGES ...................17

V.  CONCLUSION ................................................................................................................19

1    **I.      INTRODUCTION**

2         Each of the asserted trade secrets resulted from a development process that began in 2009,

3    when Waymo decided to explore whether it was even possible for self-driving technology to be

4    commercialized safely in the near term.  Over the course of seven years, Waymo worked to

5    identify and understand the myriad of problems that needed to be solved for autonomous vehicles

6    to become feasible for widespread use in our lifetimes.  How could every driving scenario be

7    predicted and addressed?  What hardware could provide the data needed to handle the relevant

8    scenarios?  Were lasers even necessary, or could radar, cameras, some other sensor, or some

9    combination thereof be sufficient?  How complex did each individual piece of hardware need to be

10   to generate a sum total of data that would be sufficiently robust to address all possible driving

11   scenarios?  Can hardware of the necessary complexity be manufactured reliably or would the yield

12   for certain designs be too low and thus cost-prohibitive?  Could software algorithms and artificial

13   intelligence fill in gaps in the data (or account for noise in the data), such that the hardware could

14   be less complex and less costly?  Or would the necessary "compute" power then overrun the

15   system?  Waymo was the first to identify the specific iterations of these questions and others that

16   presented themselves at every step on the path toward commercializing self-driving technology.

17   For Waymo, every tried and failed design, every solution to one hardware problem that created too

18   many issues on the software side, every software solution that could make up for a simplified

19   hardware implementation, every experience with manufacturing processes and yields – was

20   necessary to bring Waymo to the precipice of success.  And it was just when Waymo arrived at

21   that precipice that Waymo's trade secrets were misappropriated.

22        The jury will hear how Waymo needed to bring to bear all of its research and development

23   efforts to launch the first ever truly self-driving TaaS service.  The jury will hear how Waymo's

24   research and development efforts informed each specific asserted trade secret – from identifying

25   the questions to be addressed and problems to be solved all the way to tweaking a particular

26   implementation and validating the results.  The costs of those efforts constitute relevant evidence

27   that the asserted trade secrets are trade secrets (i.e., that they derive independent economic value

28   from not being generally known), and the costs of those efforts constitute relevant evidence of the

1   value that Waymo and Uber would have ascribed to the asserted trade secrets at the time of the

2   misappropriation.

3   **II.      OFFER OF PROOF**

4          1)      Waymo witnesses will testify about Waymo's initial decision to develop self-

5   driving car technology.  Waymo began its program as a "moonshot," at a time when the industry

6   thought that fully autonomous vehicles were an impossibility, at least in our lifetimes.  Dmitri

7   Dolgov, who was one of Waymo's original employees and who currently leads the development

8   of its self-driving technology, will testify that Waymo's initial goal was to understand the

9   problems associated with self-driving in the real world.  Dr. Dolgov will testify that, in 2009,

10  research and development in the field was based on self-driving in controlled settings like the

11  DARPA challenge courses.  He will explain that Waymo was the first to focus on real-world

12  driving.  Waymo began developing its technology from the ground up, without knowing the

13  specific nature of the problems it would encounter or even any success could be achieved in the

14  near term.

15         2)      Dr. Dolgov will testify that an integral and "but for" part of Waymo's technology

16  development has been the accumulation of driven miles in its self-driving vehicles, whether in the

17  real world or via simulation.  Waymo has accumulated millions of these miles, which has allowed

18  Waymo to collect enormous amounts of data about even rare events that a self-driving vehicle

19  encounters in the real world.  Waymo invests significant resources into the accumulation of test

20  miles, with a dedicated fleet of test vehicles and operations drivers to seek out diverse real-world

21  settings.

22         3)      Dr. Dolgov and other Waymo engineers will explain that Waymo analyzes this

23  data to determine the most critical scenarios that its technology must be able to handle.  At least

24  some Waymo witnesses refer to these critical scenarios as corner cases.  Waymo witnesses will

25  explain that the corner cases are the hardest problems that must be solved.  These corner cases

26  eventually become the critical test scenarios used at Waymo.  The witnesses will testify that

27  identifying the corner cases, defining them as test scenarios, and solving for them in the self-

28  driving platform is an iterative process that requires extensive data analysis and testing.  In some

1  instances, Waymo has defined a test scenario too simplistically only to realize through driving

2  more miles that the problem is more complex than Waymo's proposed solution had anticipated.

3  In other instances, testing reveals that Waymo has defined a test scenario as too complex, leading

4  to an unnecessarily complicated and costly design.  Waymo witnesses will testify that, especially

5  in its early years of development, Waymo dedicated significant resources to identify and refine its

6  test scenarios in order to capture the set that could define the requirements for a safe,

7  commercially feasible self-driving car.

8     4) There will be evidence introduced at trial demonstrating that the importance of

9  driving "real miles" to inform research and development efforts was not lost on Uber.  Jeff

10  Holden, Uber's Chief Product Officer, has testified that Uber had done ███████████████

11  ████████████████████  (Ex. 1 [Holden 8/15/17 Depo. Tr.] at 91:24-92:1.)  And John Bares, a

12  Director in Uber's ATG  group, believed such limited real-world testing was a problem:  he

13  testified that, in the first half of 2016 (as Uber was negotiating the Otto acquisition), he was "in a

14  pretty low place because we were getting beat up on real miles.  We were -- Google was logging

15  15,000 a week, and we were at zero a week."  (Ex. 2 [Bares 8/11/17 Depo. Tr.] at 475:20-476:1.)

16     5) Waymo's engineers will explain that creating a set of hardware requirements from

17  its understanding of the test scenarios (derived from driving real-world and simulated miles) that

18  should be solved by the overall self-driving platform is a complex process that involves

19  coordination among multiple teams within Waymo.  For example, Dr. Dolgov will explain that

20  the design and development process for Waymo's LiDAR sensors implicates the balancing of a

21  variety of factors across all hardware and software capabilities.  If the hardware team reduces the

22  complexity of a sensor so that it can be manufactured more easily or so that it can better meet

23  cost or space goals, then the software team may have to develop more complex algorithms to

24  process the less robust data that the sensor collects (or the software team may determine that the

25  data generated by the less complex hardware is too noisy or non-uniform to be useful at all

26  without burdening the overall system with excessive "compute" requirements).  If, on the other

27  hand, the hardware team increases the sophistication of a sensor so that it produces richer data,

28  then some software algorithms may be simplified, but the hardware may prove too costly, too big,

1   or too complex for mass manufacture.  Dr. Dolgov will explain how this necessarily iterative

2   balancing has led Waymo to dead ends, significant design changes, and important design tweaks,

3   which eventually led Waymo to the asserted trade secrets.

4            6)      For example, Waymo developed a version of its short-range LiDAR sensor, called

5   TBr, with a hardware design that included ████████████████████████████████████

6   ████████████████████████████████████████  But, after building and

7   testing TBr, Waymo determined that ████████████████████████████████████████

8   ████████████████████████████████████  The software team

9   also encountered unexpected difficulties fusing the TBr data with more robust data from

10  Waymo's in-development and necessarily more complex medium-range sensor.  This led to

11  complications such as ████████████████████████████████████████████

12  ████████████████████████████████.  And this is just a small number of the

13  issues Waymo needed to address in the context of this particular aspect and iteration of

14  development.

15           7)      Dr. Dolgov will also testify that some issues do not even immediately present

16  themselves in this way.  The development process requires extensive testing and evaluation to

17  determine whether Waymo's LiDAR sensors meet its defined test scenarios and performance

18  requirements after proposed solutions are implemented.  After Waymo designs and prototypes a

19  sensor, it tests the sensor in three different settings: the real world, simulated test environments,

20  and controlled "structured test" environments.  The simulated and structured test environments

21  allow Waymo to replicate its test scenarios and to evaluate how well the LiDAR sensors, other

22  hardware, or a combination thereof are able to detect the scenarios and how well software is able

23  to process the resulting data to classify objects and make driving decisions.  The real world tests

24  have at times raised new issues not identified by the other test environments.  Dr. Dolgov and

25  other Waymo engineers will provide examples of how the testing and evaluation process has led

26  to significant hardware and software design iterations, especially in the early years of the research

27  and development process.

28           8)      There will be evidence at trial that this reality of the development process was also

1    known to Uber. ████████████████████████████████████████

2    █████████████████████████████████████████████████████

3    █████   (Ex. 3 [TX-0085], at 11-12.)  Later, Uber's internal test plan for its Fuji sensor similarly

4    recognized ███████████████████████████████████████

5    ██████████████████████████████.  (Ex. 4 [TX-124].)

       9)      The evidence at trial will show that each of the asserted trade secrets resulted from the development process discussed above.  Said differently, Waymo's extensive investments into iterative, cross-functional development process were necessary for Waymo to arrive at the trade secrets, and much of the value of the trade secrets resides in the fact that they resulted from just this time and resource intensive process.

       2.    *Trade Secret No. 2*

       10)     Trade Secret No. 2 is directed to ████████████████████████████████ ████████████████████ of Waymo's GBr3 LiDAR device.  Waymo engineers will testify that Waymo arrived at ███████████ only as a result of the research and development cycles described in paragraphs 1 through 9 above.

       11)     For example, Waymo engineers will testify that the ████████████████████ █████████████████████████████████ requirements for Waymo's mid-range LiDAR could be defined only in conjunction with identifying, describing, testing, and refining the test scenarios that Waymo created to ensure the safety of its self-driving technology and proposing potential combinations of hardware and software to solve those test scenarios in a way that not only works but also minimizes complexity and maximizes reliability across the self-driving platform.  Waymo engineers will testify that the question of how to ██████████████ in a LiDAR device was an integral part of that overall design process.

       12)     Those engineers will testify that ████████████████████████ █████████████████████████████████████ thus affecting the resolution of the data generated and the usefulness of that data to solve different test scenarios.  ██████████████████████ must meet physical requirements related to, for example, space, manufacturing, and cost.  The software must be able to process the data

1  generated by the LiDAR, accounting for the differences in data sets caused by █████████

2  And so on.

3       13)    Waymo engineers will testify that, in early generations of its medium-range

4  LiDAR sensor, GBr, Waymo determined that ████████████████████████████████

5  ████████████████████████ Over time, however, Waymo came to understand that█

6  ██████████████████████████████████████████████████ because its

7  then current combination of LiDAR, radar, cameras, software, and other technology could not

8  meet certain difficult test scenarios.  In particular, Waymo determined from its ongoing test

9  driving that ████████████████████████ was needed from its mid-range LiDAR in

10  order for the self-driving system as a whole to classify, identify, define, and make decisions in

11  response to a small subset of these test scenarios.

12       14)    Among other things, Waymo originally considered ███████████

13  ████████████████████ But Waymo engineer Pierre Droz will testify about

14  how Waymo's LiDAR team arrived at a better solution.  Waymo had previously thought that the

15  █████████████████████████████████████████████████████████

16  ████████████████████████ But, from its experience manufacturing

17  GBr2, Waymo intuited that it could likely ████████████████████████████

18  █████████████████████████ This would result in ██████

19  █████████████████████████████████████████████

20  █████████████████████████████████████████████████

21  █████████████ that could result in the necessary ██████████████ Mr. Droz will testify that

22  testing has revealed that the arrangement met Waymo's ██████████████ requirements, that

23  manufacturing has proven out the feasibility of █████████ and overall design, that the changes

24  did not significantly increase the complexity of the software needed to process the resulting data,

25  and that the design has become a critical element for the third generation of Waymo's GBr

26  medium-range LiDAR sensor.

27       15)    Waymo testimony and documentary evidence will show that the research and

28  development that was necessary before Waymo could arrive at this trade secret cost

1    approximately $1.1 billion.  That is not to say that all of the benefits derived from that research

2    and development are discernible from the acquisition of this trade secret alone or that all of the

3    benefits derived from that research and development can be obtained from the misappropriation

4    of this trade secret alone.  Indeed, the value of that research and development in its full form (all

5    of the data, all of the learning, all of the analysis, all of the experience) would be worth many

6    times Waymo's $1.1 billion investment, at least by any measure of Waymo, Uber, and many

7    market analysts.  Nevertheless, the evidence will show that Trade Secret No. 2 was informed by –

8    and would not exist without – Waymo's expenditure of $1.1 billion in research and development.

9    Indeed, that is exactly what makes the trade secret – even in and of itself – so valuable.

10              3.    *Trade Secret Nos. 7 and 9*

11         16)    Trade Secret Nos. 7 and 9 relate to █████████████████████████

12    ████████████████████████ n Waymo's LiDAR devices.  Waymo engineers will testify

13    that Waymo arrived at these trade secrets only as a result of the research and development cycles

14    described in paragraphs 1 through 9 above.  The engineers will explain that these trade secrets

15    were developed in response to ███████████████████████████████████████████

16    ██████████████████████████████████████████

17    █████████████████████████

18         17)    For example, Waymo engineers will testify that ██████████████████████

19    █████████████████████████████████████████████

20    █████████████████████████████████████████████

21    ██████████████ Waymo engineers will testify that, as a result, ███████████████

22    █████████████████████████████████████████████

23    ████████████████████████████████████

24    ████████████████████████████

25         18)    Waymo's engineers will explain that, after multiple design iterations, Waymo

26    proposed that █████████████████████████████████████████████

27    █████████████████████████████████████████

28    ███████████████████████████ In order to implement

1   that solution, however, Waymo had to figure out (among other things) how to ██████████

2   ████████████   In connection with working on that problem, Waymo engineers hypothesized

3   that ████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████

6          19)     Waymo engineers will testify that, once these solutions were proposed, the details

7   of the FAC lens had to be specified, suppliers for the lens had to be procured, and techniques for

8   ████████████████████████████████   had to be developed.  The hardware had to be

9   manufactured and tested to see if it solved all or some of ████████████████████████

10  ██████████████████   while still meeting other sensor and system requirements and without

11  introducing new problems.  Ultimately, for example, there needed to be more analysis and testing

12  of the ██████████████   to ensure that drawbacks, such as ██████████████, could be

13  overcome and to ensure that reliable techniques for ████████████████████████████

14  ██████████████   could be developed.

15         20)     Waymo testimony and documentary evidence will show that the research and

16  development that was necessary before Waymo could arrive at these trade secrets cost

17  approximately $120 million.  That is not to say that all of the benefits derived from that research

18  and development are discernible from the acquisition of these trade secrets alone or that all of the

19  benefits derived from that research and development can be obtained from the misappropriation of

20  these trade secrets.  Indeed, the value of that research and development in its full form (all of the

21  data, all of the learning, all of the analysis, all of the experience) would be worth many times

22  Waymo's investment, at least by any measure of Waymo, Uber, and many market analysts.

23  Nevertheless, the evidence will show that Trade Secret Nos. 7 and 9 were informed by – and they

24  would not exist without – Waymo's expenditure of approximately $120 million in research and

25  development.  Indeed, that is exactly what makes these trade secrets so valuable.

26                 4.     *Trade Secret Nos. 13 and 14*

27         21)     Trade Secret Nos. 13 and 14 are also directed to techniques for ██████████

28  ████████████████████████████████████████████████   Waymo engineers will

1  testify that Waymo arrived at these trade secrets only as a result of the research and development

2  cycles described in paragraphs 1 through 9 above.  Waymo engineers will testify that these

3  development cycles revealed that ████████████████████████████████████

4  ███████████ could play a critical role in achieving performance goals under various other

5  constraints, but ████████████████ involved various challenges from a manufacturing and

6  cost perspective.

7        22)    During the design and build process for an early LiDAR design, GBr, Waymo

8  observed that ████████████████████████████████████████

9  ████████████████████████████████████████████████████

10  ████████████. Waymo engineers will testify that they researched and evaluated different

11  techniques for addressing ████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████████████ Waymo evaluated the different options against cost, supply, and

14  performance requirements and ultimately developed a technique – described in Trade Secret No.

15  13 – that would meet its criteria.

16        23)    Also during the design and build process for GBr, Waymo developed a technique

17  to help enable ████████████████████████████████████████████

18  ████████████████████ Waymo engineers will testify that they researched and evaluated

19  different techniques for improving ████████████████████ and eventually arrived at a

20  technique – described in Trade Secret No. 14 – that allowed for ████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████

23        24)    Waymo testimony and documentary evidence will show that the research and

24  development that was necessary before Waymo could arrive at these trade secrets cost

25  approximately $120 million.  That is not to say that all of the benefits derived from that research

26  and development are discernible from the acquisition of these trade secrets alone or that all of the

27  benefits derived from that research and development can be obtained from the misappropriation

28  of these trade secrets.  Indeed, the value of that research and development in its full form (all of

the data, all of the learning, all of the analysis, all of the experience) would be worth many times

Waymo's investment, at least by any measure of Waymo, Uber, and many market analysts.

Nevertheless, the evidence will show that Trade Secret Nos. 13 and 14 were informed by – and

they would not exist without – Waymo's expenditure of approximately $120 million in research

and development.  Indeed, that is exactly what makes these trade secrets so valuable.

        5.    *Trade Secret No. 25*

25)    Trade Secret No. 25 relates to Waymo's self-driving car test scenarios and sensor

requirements.  Waymo engineers including Dr. Dolgov will testify that these test scenarios and

requirements resulted from six years of development work.  The engineers will explain that ███

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

26)    Waymo engineers will explain that Waymo drives millions of real-world test miles

in order to accumulate data about the types of objects, environments, and conditions that vehicles

encounter.  The engineers will testify that, after collecting this data, it is analyzed it to identify

and define test scenarios that Waymo's self-driving platform must be able to address.  For

example, Waymo engineer Ben Ingram testified that Waymo's sensing parameters are "things

that, through the years of driving and the millions of miles in driving that we've done, we have

come to understand are likely to drive a LiDAR design." (Ex. 5 [Ingram 8/16/17 Depo.Tr.] at

63:10-63:13.) Waymo's technical expert Dr. Hesselink similarly testified that "there is

significant value for somebody who has just gone through this process over at Waymo where one

and a half million miles or so have apparently been driven." (Ex. 6 [Hesselink 9/26/17 Depo. Tr.]

at 118:7-10.)  Specifically, the miles that Waymo has driven are "actionable" because they allow

"a designer of the LiDAR and of the software to come up with specific solutions to solve." (*Id.* at

118:11-15.)

27)    Waymo engineers will further explain that extensive data collection and analysis

was the *only* way to develop these test scenarios because the problem Waymo was trying to solve

was previously undefined; no other companies or researchers had attempted to define the

1   scenarios that a LiDAR sensor for a fully autonomous self-driving vehicle should detect in the

2   real world.

3       28)    The evidence will establish that the scenarios described in Trade Secret No. 25 are

4   carefully chosen to ensure that Waymo's sensors are able to detect anticipated and unanticipated

5   events in real-world driving conditions.  Dr. Dolgov and other Waymo engineers will explain that

6   Waymo refers to the most critical scenarios as "corner cases."  These corner cases represent the

7   hardest problems that must be solved in order for the sensor to work in a real world setting.  The

8   goal is to get to a place where it is reasonable to conclude that, if a sensor meets each of the

9   corner cases, then it should be able to handle any unanticipated scenarios that it encounters in the

10  real world.

11      29)    The witnesses will testify that identifying and selecting Waymo's test scenarios is

12  an iterative process that requires extensive data analysis and testing.  In some instances, Waymo

13  has defined the test scenarios too simplistically only to determine through testing that the problem

14  is more complex than Waymo had anticipated.  In other instances, testing reveals that Waymo's

15  test scenarios were too complex and would lead to an unnecessarily complicated sensor design.

16      30)    Waymo engineers will further testify that, based on the test scenarios, Waymo

17  develops hardware requirements for its different sensors (*e.g.*, short-range, medium-range, long-

18  range LIDAR, radar, cameras, etc.) and that these requirements are protected by Trade Secret No.

19  25.  The requirements include information such as ██████████████████████████

20  ████████████████████████████████████  After the

21  requirements are defined, Waymo prototypes sensors to meet the requirements and tests the

22  sensors in the real world and in simulated environments to determine whether they meet the

23  defined test scenarios.

24      31)    Waymo engineers will explain that developing a set of hardware requirements

25  involves coordination among multiple teams within Waymo.  For a given test scenario, Waymo

26  engineers determine what data is required from each sensor (*e.g.*, LiDAR, radar, cameras).

27  Waymo's LiDAR team then combines the LiDAR requirements into specifications for its

28  different LiDAR sensors (*e.g.*, short-range, medium-range, and long-range).  The specifications

1   include requirements like ▮▮▮▮▮▮▮▮▮▮▮▮—all of which are selected to meet

2   Waymo's test scenarios.  Waymo then designs and builds its LiDAR sensors to meet these

3   specifications.

4          32)   Waymo engineers will explain that the design and development process for

5   Waymo's LiDAR sensors involves balancing hardware and software capabilities.  If the hardware

6   team develops a less expensive or easier to manufacture sensor, then the software team may have

7   to develop more complex algorithms in order to process the data that the sensor collects.  Or the

8   software team may determine that the data is too noisy or non-uniform to be useful.  If, on the

9   other hand, the hardware team develops a sophisticated sensor that produces rich data, then it

10  simplifies the software development.  These tradeoffs influenced the sensor requirements

11  protected by Trade Secret No. 25.

12         33)   Waymo testimony and documentary evidence will show that the research and

13  development that was necessary before Waymo could arrive at this trade secret cost approximately

14  $1.1 billion.  That is not to say that all of the benefits derived from that research and development

15  are discernible from the acquisition of this trade secret alone or that all of the benefits derived

16  from that research and development can be obtained from the misappropriation of this trade secret

17  alone.  Indeed, the value of that research and development in its full form (all of the data, all of the

18  learning, all of the analysis, all of the experience) would be worth many times Waymo's $1.1

19  billion investment, at least by any measure of Waymo, Uber, and many market analysts.

20  Nevertheless, the evidence will show that Trade Secret No. 25 was informed by, and would not

21  exist without, Waymo's expenditure of $1.1 billion in research and development.

22        6.   *Trade Secret No. 90*

23         34)   Trade Secret No. 90 relates to fiber laser technology developed by Waymo for

24  long-range LiDAR.  Long-range detection allows its self-driving vehicles to identify and classify

25  objects such as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Waymo engineers

26  will testify that Waymo arrived at its fiber laser technology as a result of research and

27  development cycles as described in paragraphs 1 through 9 above.

28         35)   As just one example, Waymo engineers will testify that they considered different

-13-

1   sensors for long-range detection, including radar and cameras, but came to believe that these

2   sensors would continue to have problems detecting certain scenarios like ███████████

3   and that software would not be able to resolve those problems.  Waymo ultimately proposed a

4   fiber-based LiDAR sensor as a potential solution for long-range detection.  Waymo initially

5   ████████████████████████████████████████████████████

6   to meet Waymo's performance requirements at an appropriate cost.  These efforts ultimately

7   failed and Waymo decided to develop its own custom fiber laser technology, Trade Secret No.

8   90.

9          36)     The evidence will be that Waymo's custom fiber laser technology resulted from

10  several years of research, development, and testing work, including over seven different versions

11  of a long range fiber-based laser.  All of this work was informed by experiences with short and

12  medium range LiDAR, combining and processing different LiDAR outputs using different

13  software algorithms, and learnings derived from different implementations of the self-driving

14  platform as a whole.

15         37)     Waymo testimony and documentary evidence will show that the research and

16  development that was necessary before Waymo could arrive at this trade secret cost

17  approximately $1.1 billion.  That is not to say that all of the benefits derived from that research

18  and development are discernible from the acquisition of this trade secret alone or that all of the

19  benefits derived from that research and development can be obtained from the misappropriation

20  of this trade secret.  Indeed, the value of that research and development in its full form (all of the

21  data, all of the learning, all of the analysis, all of the experience) would be worth many times

22  Waymo's investment, at least by any measure of Waymo, Uber, and many market analysts.

23  Nevertheless, the evidence will show that Trade Secret 90 was informed by – and would not exist

24  without – Waymo's expenditure of approximately $1.1 billion in research and development.

25  Indeed, that is exactly what makes this trade secret so valuable.

26                 7.     *Trade Secret No. 111*

27         38)     Trade Secret No. 111 relates to know-how regarding the risks and costs of a

28  ███████████████████████████████ LiDAR system.  Waymo engineers will testify

-14-

1   that one of their early LiDAR designs called Mama Bear ("MBr") used a ███████████
2   ████████████████████████████████████████████████████████  The
3   engineers will explain that Waymo considered the MBr design to be beneficial from a hardware
4   perspective because ████████████████████████████████████████████
5   ███████████████████  The engineers will further testify that Waymo spent more
6   than a year on the research and development of MBr, including designing, building, and testing
7   prototypes.  (See Ex. 7 [TX-1824].)

8          39)     As outlined in paragraphs 1 through 9 above, Dr. Dolgov will explain that the
9   design and development process for Waymo's LiDAR sensors involves balancing hardware and
10  software capabilities.  If the hardware team develops a less expensive or easier to manufacture
11  sensor, then the software team may have to develop more complex algorithms in order to process
12  the data that the sensor collects.  Or the software team may determine that the data is too noisy or
13  non-uniform to be useful.  Dr. Dolgov will testify that this was the case with MBr.  After
14  expending significant resources designing and developing an MBr prototype, Waymo's software
15  team determined that sensor ████████████████████████████████████
16  ███████████████████████████████████████████████████████████
17  ███████████████████

18         40)     After a substantial investigation over the course of a month, Waymo determined
19  that the problem resulted from ████████████████████████—a problem that Waymo
20  could not have anticipated at the outset of the design process.  Waymo engineers will testify that
21  they attempted to develop a solution, including ████████████████████████████
22  ███████████████████████  Ultimately, Waymo determined that a solution was not feasible
23  for self-driving and abandoned the MBr design in favor of GBr, ████████████████
24         41)     Waymo testimony and documentary evidence will show that the research and
25  development costs associated with Waymo's work on its ████████████████████████
26  ███████████████, as recited in Trade Secret No. 111, totaled approximately $50 million.
27  **III.    THE COSTS OF DEVELOPING THE ASSERTED TRADE SECRETS ARE**
        **RELEVANT TO WHETHER THE INFORMATION HAS INDEPENDENT**
28

1    **ECONOMIC VALUE**

2        As plaintiff, Waymo bears the burden of proving that each of the asserted trade secrets is a

3    protectable trade secret.  *Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*, 944 F. Supp.

4    2d 775, 779-80 (N.D. Cal. 2013).  To qualify as a trade secret, information must derive actual or

5    potential independent economic value from not being generally known.  *MAI Systems Corp. v.*

6    *Peak Comp. Inc.,* 991 F.2d 511, 520-21 (9th Cir. 1993).  Evidence of the substantial investment of

7    time and money expended by Waymo to develop the asserted trade secrets is relevant to this

8    economic value inquiry.  *Calif. Intern. Chem. Co., Inc. v. Sister H. Corp.*, 168 F.3d 498, 1999 WL

9    50891 at *3 (9th Cir. 1999) (technology was a trade secret where the evidence strongly indicated

10   that it had value because developing it required "a substantial expenditure of time and money");

11   *see also Copart, Inc. v. Sparta Consulting, Inc.*, 2017 WL 4269921, at *15 (E.D. Cal. 2017)

12   (noting that "circumstantial evidence of [a plaintiff's] investment of resources in producing the

13   information" is relevant to establishing its trade secret status and finding plaintiff's investment of

14   two years and $10 million designing and building the system at issue relevant to that inquiry);

15   *Shapiro v. Hasbro, Inc.*, 2016 WL 9176559, *12 (C.D. Cal. 2016) (independent economic value

16   can be established by circumstantial evidence, including of "the amount of resources invested by

17   the plaintiff in the production of the information").  Generally, "the more difficult information is

18   to obtain, and the more time and resources expended … in gathering it, the more likely a court will

19   find such information constitutes a trade secret." *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514,

20   1522 (1997); *Farmers Ins. Exch. v. Steele Ins. Agency, Inc*., 2013 WL 2151553, at *7 (E.D. Cal.

21   2013) (finding customer list information a protectable trade secret where plaintiff invested

22   "significant time, labor and capital" in compiling it).  In this context, even "negative" information,

23   such as "the results of lengthy and expensive research which proves that a certain process will not

24   work," has value.  *Spring Design,* 2010 WL 5422556, at *5 (N.D.Cal. 2010) (quoting *Courtesy*

25   *Temp. Serv. v. Camacho*, 222 Cal.App.3d 1278, 1287 (Cal. Ct. App. 1990)).

26       Waymo has offered significant proof regarding the extent of the research and development

27   that was required for Waymo to arrive at its trade secrets.  Waymo has also offered significant

28   proof as to why those research and development efforts were necessarily so extensive.  Waymo

-16-

1    was the first to develop a self-driving platform for commercial use.  It did so from the ground up.

2    It did so without knowing what problems would arise, which technologies might be used to

3    address those problems, or what iterations of those technologies could ultimately be combined into

4    a low cost, reliable, and safe system.  Waymo had to expend substantial time and resources to

5    develop its trade secrets, and that very fact establishes their independent economic value.

6         At trial, Uber intends to dispute that Waymo's asserted trade secrets deserve trade secret

7    protection.  (Dkt. 2519-3 [Joint Pre-Trial Order, Uber's Submission], at 4:4-5 ("[T]he alleged

8    trade secrets are not protectable trade secrets under either DTSA or CUSTA.").)  Waymo should

9    be permitted to present the jury with all of its evidence, including its development costs, to meet

10   its burden of proof on this issue.

11   **IV.    WAYMO'S DEVELOPMENT COSTS ARE RELEVANT TO DAMAGES**

12        Evidence of the full cost to Waymo of developing the asserted trade secrets is also directly

13   relevant to the amount of reasonable royalty damages to which Waymo is entitled.  Royalty

14   damages are calculated by reference to a hypothetical value that the parties "would have agreed to

15   as a fair licensing price at the time that the misappropriation occurred." *Atlantic Inertial Systems*

16   *Inc. v. Condor Pacific Industries of California, Inc.*, 2015 WL 3825318, at *4 (C.D. Cal. 2015).

17   Development costs are often found relevant to that hypothetical value. *See Lucini Italia Co. v.*

18   *Grappolini*, 2003 WL 1989605, *11 (N.D. Ill. 2003) ("the Court finds that a reasonable royalty

19   would be at least the substantial sum [plaintiff] spent developing the information"); *University*

20   *Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974) ("In calculating

21   what a fair licensing price would have been had the parties agreed, the trier of fact should consider

22   such factors as . . . the total value of the secret to the plaintiff, including the plaintiff's

23   development costs.").  Here, both Waymo and Uber would have come to the hypothetical

24   negotiating table knowing full well that Waymo was years ahead of anyone else with respect to

25   developing self-driving technology and that any licensed technology would reflect years of

26   iterative work that was exclusively in Waymo's possession and that necessarily informed its trade

27   secrets.  Waymo would expect a reasonable licensing fee to acknowledge this value, and Uber

28   would expect to pay a premium for trade secrets that resulted from Waymo's extensive

1    expenditure of time and money.

2        What is more, there will be substantial evidence in the record regarding the state of Uber's

3    development program at the time of the misappropriation and the role of the asserted trade secrets

4    in the context of the overall self-driving platform.  Such evidence will offer the jury one or more

5    paths (depending on their assessment of the evidence) for approximating[1] an unjust enrichment

6    award based on an apportionment of Waymo's research and development costs.  *GlobeRanger*

7    *Corp. v. Software AG USA, Inc.*, 836 F.3d 477, 499-500 (5th Cir. 2016) (no abuse of discretion

8    where expert presented evidence of research and development costs to support $19.7 million

9    damages opinion on an unjust enrichment theory); *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704,

10   709-10 (9th Cir. 2003) (affirming "burn rate," or "development cost," of $3 million per year of

11   saved development costs as an unjust enrichment award); *PQ Labs, Inc. v. Yang Qi,* 2014 WL

12   4954161, *5, *11 (N.D. Cal. 2014) (calculating amount defendants were unjustly enriched by

13   referencing plaintiff's research and development costs); *Johns-Manville Corp. V. Guardian*

14   *Industries Corp.*, 718 F. Supp. 1310, 1315-16 (E.D. Mich. 1989) ("the Court finds the proper

15

16      [1]  Courts recognize a distinction in the burden of proof required to show "the fact of damage"
17   and "the extent of the damage."  *Story Parchment Co v. Paterson Parchment Paper Co.*, 282 U.S.
     555, 562-63 (1931) ("It is true that there was uncertainty as to the extent of the damage, but there
18   was none as to the fact of damage; and there is a clear distinction between the measure of proof
     necessary to establish the fact that petitioner had sustained some damage and the measure of proof
19   necessary to enable the jury to fix the amount . . . The wrongdoer is not entitled to complain that
     they cannot be measured with the exactness and precision that would be possible if the case, which
20   he alone is responsible for making, were otherwise."); *Pace Indus., Inc. v. Three Phoenix Co*., 813
     F.2d 234, 240 (9th Cir. 1987) ("[U]ncertain damages, which prevent recovery, are distinguishable
21   from uncertain extent of damage, which does not prevent recovery. The former denotes failure to
     establish an injury, while the latter denotes imprecision with regard to the scope or extent of the
22   injury. The question of whether there is a right to recovery is not to be confused with the difficulty
     in ascertaining the scope or extent of the injury.") (internal citations omitted).  Accordingly, once
23   the fact of damages is established, juries are permitted to approximate damages based on existing
     evidence relevant to the value of the asserted trade secrets.  *See Telex Corp. v. Int'l Bus. Mach.*
24   *Corp.*, 367 F.Supp. 258, 309 (N.D. Okl. 1973) (court finding a "reasonable basis in the evidence to
     fairly approximate the damages"), *aff'd by Telex Corp. v. Int'l. Bus. Mach. Corp.,* 510 F.2d 894,
25   931 (10th Cir. 1975), *abrogated on other grounds by Novell, Inc. v. Microsoft Corp*., 731 F.3d
     1064, 1072 (10th Cir. 2013) (affirming unjust enrichment damages award based on saved
26   research costs where, "while such may not have been established with mathematical precision,
     they do meet the 'degree of likelihood' test. The fact that such damages may be difficult to pin
27   down should not militate in favor of the wrongdoer.")

28

1   measure of unjust enrichment in this case is the entire sum that [the plaintiff] expended in

2   developing the HERM technology that [the defendant] misappropriated."). In *Syntron*

3   *Bioresearch, Inc. v. Fan*, 2002 WL 660446, at *12 (Cal. App. 4th 2002), the court affirmed an

4   unjust enrichment award based on "75 percent of Syntron's research and development costs

5   incurred from 1990 through 1997." *Id.* (internal quotations omitted).  Even where defendant

6   argued that this "apportionment does not reasonably reflect the unjust enrichment for those trade

7   secrets actually misappropriated" because plaintiff's witness acknowledged that it would be

8   "difficult to segregate research and development costs on a product-by-product basis because

9   Syntron simply did not do so in its accounting," the Court of Appeal affirmed.  *Id.*  It noted that,

10  "[g]ranted, the court's $2.7 million unjust enrichment award may not have been established with

11  mathematical precision.  Nevertheless, it is reasonable in light of the whole record, as the

12  difficulty in ascertaining damages 'should not militate in favor of the wrongdoer.'"

13  **V.      CONCLUSION**

14          For the foregoing reasons, the Court should allow Waymo to elicit testimony and introduce

15  evidence regarding its development expenses as described herein.

16

17

18  DATED:  January 26, 2018                        QUINN EMANUEL URQUHART & SULLIVAN,
                                                     LLP
19
20                                               By  */s/ Charles K. Verhoeven*
                                                     Charles K. Verhoeven
21                                                   Attorneys for WAYMO LLC

22

23

24

25

26

27

28