1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Charles K. Verhoeven (Bar No. 170151)
2    charlesverhoeven@quinnemanuel.com
     David A. Perlson (Bar No. 209502)
3    davidperlson@quinnemanuel.com
     Melissa Baily (Bar No. 237649)
4    melissabaily@quinnemanuel.com
     Jordan Jaffe (Bar No. 254886)
5    jordanjaffe@quinnemanuel.com
   50 California Street, 22nd Floor
6  San Francisco, California 94111-4788
   Telephone:     (415) 875-6600
7  Facsimile:     (415) 875-6700

8  Attorneys for WAYMO LLC

9                     UNITED STATES DISTRICT COURT

10                   NORTHERN DISTRICT OF CALIFORNIA

11                         SAN FRANCISCO DIVISION

12 | WAYMO LLC,                         | CASE NO. 3:17-cv-00939
13 |         Plaintiff,                 | **PLAINTIFF WAYMO LLC'S OFFER OF PROOF REGARDING ADMISSIBILITY OF CERTAIN MARKET AND FINANCIAL INFORMATION**
14 |    vs.                             |
15 | UBER TECHNOLOGIES, INC.;           |
   | OTTOMOTTO LLC; OTTO TRUCKING       | **PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**
16 | LLC,                               |
17 |         Defendants.                | Trial Date: December 4, 2017

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................................2

II.   OFFER OF PROOF ..............................................................................................................3

      A.   At the time of the misappropriation, Waymo believed that the first player to
           commercialize self-driving cars was likely to capture all or most of the
           TaaS market ................................................................................................................4

      B.   At the time of the misappropriation, Uber also believed that it needed to be
           among the first to commercialize self-driving technology and that it needed
           to accelerate its development efforts. ........................................................................5

      C.   Both Waymo And Uber Perceived That They Were Competing For All Or
           Most Of A Significant Market And That Perception Influenced Their
           Behavior .....................................................................................................................6

      D.   Uber understood that accelerating its LiDAR development would accelerate
           its overall self-driving timeline. .................................................................................7

III.  THE PROFFERED TESTIMONY AND EVIDENCE SHOULD BE ADMITTED ............7

      A.   Evidence Of The Perceived Size Of The Market Opportunity For Self-
           Driving Is Admissible To Prove Uber's Motive For Misappropriating
           Waymo's Trade Secrets .............................................................................................7

      B.   Evidence Of The Perceived Size Of The Market Opportunity For Self-
           Driving And Evidence Of Waymo's Revenue And Profit Forecasts Are
           Admissible To Establish Trade Secret Status ............................................................8

      C.   Evidence Of The Perceived Size Of The Market Opportunity For Self-
           Driving And Evidence Of Waymo's Revenue And Profit Forecasts Are
           Admissible As Factors That Would Significantly Impact The Hypothetical
           Negotiation .................................................................................................................9

IV.   CONCLUSION .....................................................................................................................9

## I. INTRODUCTION

Waymo submits this offer of proof in advance of (i) eliciting testimony from Uber and Waymo trial witnesses regarding the perceived size of the potential market for autonomous vehicles at the time of the misappropriation, and (ii) introducing into evidence the revenue and profit forecasts contained in Waymo's baseline profit and loss statemen.[1]

Evidence of the perceived size of the potential market for autonomous vehicles is relevant to this case by Uber's and Ottomotto's own admission. For purposes of this case, Uber and Ottomotto (collectively, "Uber") retained a Ph.D. economist (Dr. Michael Jacobs) as an expert on mergers and acquisitions (M&A) issues to testify about Uber's acquisition of Ottomotto. In setting out his opinions, Dr. Jacobs recounted various "[f]orecasts of the autonomous vehicle business," including a May 2014 estimate of $87 billion by 2030, an April 2015 estimate of $102 billion by 2030, a January 2016 estimate of $1.5 trillion by 2040, a July 2016 estimate of $41.7 billion by 2025, and a March 2017 estimate of $22 to $26 billion by 2025. (Ex. 1 [Jacobs Report], ¶ 27.) He concluded that "the perceived size of the potential market has grown over time" and that this "has several implications for transaction economics in the 2016 time frame." (*Id.* ¶¶ 27, 29.) He went on to explain that these "substantial forecasts" – along with the fact that "strategic players…needed to have development done" and the fact that there was "a small group of experienced engineers" – "created the economics that we see in the transactions in the [autonomous vehicle] marketplace." (*Id.* ¶ 29.) Uber's expert says that these "economics" explain why Uber placed such a high value on Ottomotto – which had been in existence for less than two months when the term sheet was signed) – in early 2016. The very same economics explain why Uber would place a high value on a trade secret license in a hypothetical negotiation with Waymo in the very same time frame. This is especially true where, as here, Uber executives were convinced that Uber could not survive if it was not among the first to commercialize self-driving

---

[1] Waymo intends to introduce at trial some portions of its baseline P&L statement – including, for example, those portions that reflect Waymo's launch and scaling plans – through normal procedures. The instant offer of proof is provided solely with respect to the admission of Waymo's future revenue and profit forecasts, which are also contained in the same baseline P&L. (Ex. 19.)

1  technology in TaaS (transportation as a service) and where, as here, the trade secrets to be licensed
2  relate to LiDAR technology, which Uber believed to be the ▇▇▇▇ of its own lagging
3  development efforts.
4      The revenue and profit forecasts contained in Waymo's baseline profit and loss statement
5  are also relevant to the hypothetical negotiation.  In his analysis of "transaction economics in the
6  2016 time frame" to justify the high value Uber placed on Ottomotto (*id.* ¶ 29), Uber's and
7  Ottomotto's own expert thought it important that "Morgan Stanley has estimated that Waymo is
8  currently worth $70 billion just based on its intention to use its driverless cars to obtain a fraction
9  of the ride marketplace" (*id.* ¶ 27).  Though Waymo does not seek to rely on Morgan Stanley's
10 valuation, it should be permitted to rely on its own forecasts ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Ex.
11 19 [TX-4980]) as evidence of the "economics" that would similarly impact a negotiation between
12 Uber and Waymo for a trade secret license.  Like Uber, Waymo viewed the autonomous vehicle
13 market as "winner take all" or "winner take most."  (Ex. 2 [TX-1031]; Ex. 3 [TX-1033].)  Thus all
14 or most of Waymo's forecasted profits were viewed as contingent on Waymo using its technical
15 lead to become the first and best at offering self-driving TaaS.  Waymo's projections – and the
16 effect a shrinking technical lead would have on those projections – would have been front and
17 center for Waymo at any hypothetical negotiation with a competitor like Uber for a license to
18 Waymo trade secrets.  And again, this is especially true where, as here, the trade secrets to be
19 licensed relate to the very area of technology that Uber believed to be the ▇▇▇▇ of its
20 development efforts and thus most likely to impact Uber's overall self-driving timeline.
21 **II.  OFFER OF PROOF**
22     By 2016, both Uber and Waymo believed that ride-sharing fleets would become ▇▇▇▇
23 ▇▇▇▇▇▇ in our lifetimes, making the commercialization of self-driving technology a
24 massive market opportunity.  Both Uber and Waymo also believed that time-to-market was of
25 critical importance because the market opportunity was likely to be winner-take-all or winner-
26 take-most. Waymo believed that its ability to capitalize on this opportunity hinged in large part on
27 its technical lead and its resulting ability to enter the market first and as long before the next
28 entrant as possible.  Indeed, this drove Waymo's projections of market share and revenues.

Similarly, Uber believed that Waymo's technical lead was an existential threat and that it had to close the gap with Waymo or risk losing its large share of the TaaS market.  For the same reasons that Uber has contended that the huge amount of money in play – as evidenced by various valuations of overall market potential and of Waymo – explains why Uber highly valued a two-month old company like Ottomotto, the same evidence would have an effect on a negotiation between competitors for a license to LiDAR-related trade secrets.

### A. At the time of the misappropriation, Waymo believed that the first player to commercialize self-driving cars was likely to capture all or most of the TaaS market.

1) The evidence at trial will show that Waymo was the first to heavily invest in the development of self-driving technology and that Waymo was the first to understand that the technology could be safely commercialized in the near term rather than decades from now.  And, from a business perspective, Waymo has always understood that its technical lead would be key to its success in whatever market(s) it chose to enter.

2) By 2016, Waymo had decided that its business strategy should prioritize commercialization of self-driving technology for TaaS (over other applications like trucking or personal car ownership).  Waymo understood the potential size of the autonomous TaaS market.  And Waymo understood that its technical lead would drive its success in that market, especially vis-à-vis established manned TaaS players like Uber.

3) Waymo will introduce evidence to show that, by 2016, it was operating under the premise that the first company to achieve self-driving TaaS at scale was likely to win a majority of the market in any given region.  (Ex. 2 [TX-1031] (noting that a "single player (in any region) will likely earn majority of profits in TaaS"); Ex. 3 [TX-1033] (discussing assumption that AV-based TaaS market is "most likely a winner take most").

4) The evidence at trial will also show that, as of 2016, Waymo believed that it had a two to five year technical advantage over its self-driving competitors.  Waymo believed this lead would allow Waymo to launch and scale a self-driving TaaS service before another competitor with an existing TaaS service (like Uber) could develop self-driving technology and deploy it within its existing network.  (*See* Ex. 3 [TX-1033] (discussing Waymo's technology lead and

1  various strategy implications depending on the size of Waymo's lead).)   Indeed, the evidence will
2  show that Waymo's emphasis on obtaining as much of a lead as possible – while ensuring safety
3  and operating within other constraints – had come to inform nearly every aspect of its business
4  plan by 2016.

**B.   At the time of the misappropriation, Uber also believed that it needed to be among the first to commercialize self-driving technology and that it needed to accelerate its development efforts.**

5) The evidence at trial will show that, by 2016, Travis Kalanick, Uber's then-CEO, had become convinced that being among the first to commercialize self-driving for TaaS was "existential" for Uber. Mr. Kalanick has stated that: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (Ex. 4 [TX-387].) Mr. Kalanick has stated that succeeding in self-driving is "▮▮▮▮▮▮▮▮▮▮▮▮" and "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (Ex. 5 [TX-5472].)

6) The evidence at trial will show that this view permeated Uber. For example, in an email regarding "▮▮▮▮▮▮▮▮▮▮▮▮" and noting a ▮▮▮▮▮▮▮▮▮▮▮▮ Jeff Holden – Uber's Chief Product Officer – stated: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 6 [TX-4481].) John Bares, former director of Uber's ATG program in Pittsburgh, has also agreed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 7 [Bares 6/16/27 Depo. Tr.] at 122:14-16.)

7) The evidence at trial will show that Uber understood it was lagging behind Waymo in the development of self-driving technology and that it needed to close the gap. Mr. Kalanick has said: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 8 [TX-291].) Cameron Poetzscher, Uber's Vice President of Corporate Development, has explained: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 9 [Poetzscher 8/11/17 Depo. Tr.] at 464:16-20.) Mr. Poetzscher has testified: ▮▮▮▮▮▮

1 ▮▮▮

2 ▮▮▮ (*Id.* at 465:5-14.)

### C. Both Waymo And Uber Perceived That They Were Competing For All Or Most Of A Significant Market And That Perception Influenced Their Behavior

8) Uber and Ottomotto have offered an expert opinion regarding the perceived growth of the self-driving industry in order to justify Uber's high valuation of Ottomotto, a company that existed for less than two months at the time Uber was assessing its value and negotiating to acquire it. Their M&A expert, Dr. Michael Jacobs, opined that "dramatic growth is possible over the next ten to fifteen years" in the autonomous vehicle industry. (Ex. 1 [Jacobs Report], ¶ 27.) He recounted various "[f]orecasts of the autonomous vehicle business," enumerating a May 2014 estimate of $87 billion by 2030, an April 2015 estimate of $102 billion by 2030, a January 2016 estimate of $1.5 trillion by 2040, a July 2016 estimate of $41.7 billion by 2025, and a March 2017 estimate of $22 to $26 billion by 2025. (*Id.* ¶ 27.)

9) According to Dr. Jacobs, "the perceived size of the potential market has grown over time," which motivated Uber to avoid being "left out" and to place great value on the opportunity to acquire Ottomotto. (*Id.* ¶ 29.)

10) The evidence at trial will show that the perceived size of the market opportunity was an important consideration for Uber, and one that animated Uber's conduct in many respects, including vis-à-vis Waymo, its most significant rival in self-driving. Indeed, the evidence will show that the perceived size of the market opportunity – combined with the common belief that the market would play out as "winner take all" or "winner take most" – explains why Mr. Kalanick was intent on accelerating Uber's development of self-driving technology at all costs and why at least some at Uber valued the acceleration of its development timeline at many millions of dollars per day. (Ex. 10 [TX-299]; Ex. 11 [McClendon 8/1/17 Depo. Tr.] at 179:17-180:17 (explaining that Kalanick ▮▮▮ ▮▮▮ ▮▮▮).)

11) The evidence at trial will how that Waymo also acted in light of the large market

1  opportunity.  Waymo's current Plan of Record document discusses the need to ▮▮▮▮▮
2  ▮▮▮▮▮ and ▮▮▮▮▮" (Ex. 12 [TX-1147], at 5).  This
3  strategy is in line with Waymo's belief that the first company to achieve self-driving TaaS at scale
4  was likely to win a majority of the market in any given region.  (Ex. 2 [TX-1031] (noting that a
5  "single player (in any region) will likely earn majority of profits in TaaS"); Ex. 3 [TX-1033]
6  (discussing assumption that AV-based TaaS market is "most likely a winner take most").

   **D.   Uber understood that accelerating its LiDAR development would accelerate its overall self-driving timeline.**

   12)   By 2016, Uber recognized that LiDAR technology specifically was a key driver of its ability to succeed with self-driving technology.  (Ex. 13 [TX-910] ▮▮▮▮▮); Ex. 14 [TX-171] ▮▮▮▮▮  Ex. 15 [TX-678] ▮▮▮▮▮ (Ex. 16 [TX-367] (Kalanick: ▮▮▮▮▮).)

   13)   The evidence at trial will show that lasers were the "longest pole" with respect to Uber's own self-driving technology development efforts.  (Ex. 16 [TX-367] (discussing Mr. Levandowski, ▮▮▮▮▮ *id.* (discussing the ▮▮▮▮▮  As Mr. Kalanick has explained, ▮▮▮▮▮ refers to the hardest problem Uber had to solve: ▮▮▮▮▮" (Ex. 17 [Kalanick 7/27/17 Depo. Tr.] at 198:1-199:2.)  Indeed, the evidence will show that Uber believed that ▮▮▮▮▮ (Ex. 18 [TX-170] (discussing Levandowski's potential value-add, John Bares wrote, ▮▮▮▮▮ )

   **III.  THE PROFFERED TESTIMONY AND EVIDENCE SHOULD BE ADMITTED**

   **A.   Evidence Of The Perceived Size Of The Market Opportunity For Self-Driving Is Admissible To Prove Uber's Motive For Misappropriating Waymo's Trade**

1 **Secrets**

2 As demonstrated above, by 2016, Uber had come to understand (i) the size of the potential
3 market opportunity associated with self-driving technology and (ii) that, to capture the "winner
4 take all" or "winner take most" self-driving TaaS market, it needed to narrow the technical lead
5 that Waymo had over Uber. This dual understanding motivated Uber's ▮▮▮▮▮▮▮▮▮" when it
6 came to self-driving, including its misappropriation of Waymo's secrets. (Ex. 11 [McClendon
7 8/1/17 Depo. Tr.] at 179:17-180:17.) Waymo should be permitted to explain to the jury
8 exactly what Uber understood to be on the line at the time of the misappropriation. *See LinkCo,*
9 *Inc. v. Fujitsu*, 232 F. Supp. 2d 182 n.9 (S.D.N.Y. 2002) (admitting sales projections "for the
10 limited purpose of explaining Fujitsu's motive to engage in the alleged [trade secret
11 misappropriation]"). For this reason alone, Waymo should be able to elicit testimony regarding
12 the perceived size of the market opportunity for self-driving.

13  **B.   Evidence Of The Perceived Size Of The Market Opportunity For Self-Driving And Evidence Of Waymo's Revenue And Profit Forecasts Are Admissible To Establish Trade Secret Status**
14

15 In order to prevail on its trade secret misappropriation claim, Waymo must establish that
16 its asserted trade secrets derive actual or potential independent economic value from not being
17 generally known. *MAI Sys. Corp. v. Peak Comp. Inc.*, 991 F.2d 511, 520-21 (9th Cir. 1993). The
18 "long-term lucrative potential" of a field is circumstantial evidence that "incremental
19 advancements" in that field derive economic value from not being known. *Altavion, Inc. v.*
20 *Konica Minolta Sys. Lab. Inc.*, 226 Cal. App. 4th 26, 65 (2014) (upholding a finding of substantial
21 economic value based on evidence that "if successfully implemented, DST could be very lucrative
22 because of potential applications in many different industries" and testimony that "the technology
23 had the potential to earn vast sums on check scanning in the banking industry"). Here, Waymo's
24 trade secrets are valuable in large part because of their specific development in the context of self-
25 driving technology. Waymo should be permitted to establish the "long-term lucrative potential"
26 of that technology in connection with meeting its burden of proving that its confidential technical
27 information is properly afforded trade secret status. For this reason as well, testimony regarding
28 the general perception of the market opportunity for self-driving and evidence of Waymo's

1  specific assessment of that market opportunity (in the form of its projections) should be admitted
2  at trial.

### C. Evidence Of The Perceived Size Of The Market Opportunity For Self-Driving And Evidence Of Waymo's Revenue And Profit Forecasts Are Admissible As Factors That Would Significantly Impact The Hypothetical Negotiation

As demonstrated above, Uber's own view is that both the perceived size of the market opportunity for self-driving and the valuation of Waymo as a self-driving enterprise inform the "transaction economics" at play in the self-driving industry in 2016. Uber makes use of this information to explain why it placed such a high value on the acquisition of Ottomotto. Waymo should be entitled to rely on the same information to explain why Uber would be willing to pay a high royalty for the acquisition of trade secrets from Waymo in the parties' hypothetical negotiation.

Indeed, as outlined above, the evidence at trial will show that both Uber and Waymo believed that the market opportunity for self-driving TaaS was on the order of at least many tens of billions of dollars; that the market would be "winner take all" or "winner take most"; that time to market would be critical (if not determinative of winners and losers); and that Waymo had a two to five year technology lead on Uber, while Uber already had an established TaaS business. Regardless of starting point (Uber's valuation of accelerated development, Uber's valuation of Ottomotto, Waymo's research and development costs, etc.), this specific constellation of factors would drive up the royalty that Uber would pay (and Waymo would demand) for a license to Waymo trade secrets related to the very technological area (LiDAR) that Uber considered to be the ▮▮▮▮▮▮ of its own development efforts. The evidence at trial will show that the size of this winner-take-all (or most) market opportunity was front and center every step of the way for Uber, and it would have been front and center for both Uber and Waymo during their hypothetical negotiation. Accordingly, Waymo should be permitted to elicit testimony regarding the parties' perceptions of the market opportunity and should be permitted to introduce documentary evidence of its projected revenues and forecasts.

### IV. CONCLUSION

For the foregoing reasons, the Court should allow Waymo to (i) elicit testimony from Uber

1  and Waymo trial witnesses regarding the perceived size of the potential market for autonomous
2  vehicles at the time of the misappropriation, and (ii) introduce into evidence the revenue and profit
3  forecasts contained in Waymo's baseline profit and loss statement.

5  DATED:  January 26, 2018                    QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                               By */s/ Charles K. Verhoeven*
                                                  Charles K. Verhoeven
                                                  Attorneys for WAYMO LLC