MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzalez@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Tel: 415.268.7000 / Fax: 415.268.7522

KAREN L. DUNN (*Pro Hac Vice*)
kdunn@bsfllp.com
MICHAEL BRILLE (*Pro Hac Vice*)
mbrille@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington DC 20005
Tel: 202.237.2727 / Fax: 202.237.6131

WILLIAM CARMODY (*Pro Hac Vice*)
bcarmody@susmangodfrey.com
SHAWN RABIN (*Pro Hac Vice*)
srabin@susmanGodfrey.com
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel: 212.336.8330 / Fax: 212.336.8340

Attorneys for Defendants
UBER TECHNOLOGIES, INC.
and OTTOMOTTO LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WAYMO LLC,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.,<br>OTTOMOTTO LLC; OTTO TRUCKING LLC,<br><br>Defendants. | Case No. 3:17-cv-00939-WHA<br><br>**DEFENDANTS UBER TECHNOLOGIES, INC. AND OTTOMOTTO LLC'S RESPONSE TO WAYMO'S OFFER OF PROOF RE DEVELOPMENT EXPENSES**<br><br>Judge: The Honorable William Alsup<br><br>Trial Date: February 5, 2018 |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## I. INTRODUCTION

Waymo's motivations are transparent: having abdicated its responsibility to develop a coherent damages model, it seeks to show to the jury as many billion dollar figures as possible in order to skew any damages award. The numbers that Waymo seeks to admit are not "development costs" for the eight trade secrets; they are program costs for Waymo's entire autonomous vehicle program since inception. For each trade secret, Waymo has just taken Google's total spend on anything related to its autonomous vehicle program—including cameras, radar, sensors, software, firmware, on-board computers, and building its own vehicles—from 2009 to the date Waymo claims the alleged trade secret was finalized. Josephs Decl., Ex. 1, Bananzadeh 30(b)(6) Dep. at 78:7-13; 94:3-25; 102:9-103:23; 105:4-17; 109:1-12; 146:20-147:6. Among other things, these program costs include the cost of all the other 113 trade secrets alleged in this case, including the trade secret upon which summary judgment was already granted in Uber's favor, along with the costs associated with the patents that have all been dropped.

These aggregate program costs are not probative of the independent economic value of the trade secrets because they have nothing to do with the eight trade secrets. And they do nothing to inform the damages analysis because any unjust enrichment or royalty would be for the alleged trade secrets—not for Waymo's entire autonomous vehicle program. It would be unfairly prejudicial and would mislead the jury to permit Waymo to wave around billion dollar numbers that bear no connection to the alleged trade secrets.

Waymo knows that these numbers do not represent development costs for the actual trade secrets. In response to Uber's interrogatory on development costs, Waymo promised to provide actual development costs through an expert, stating that " [REDACTED] " Dkt. 2325 (Plaintiff's Amended Fourth Supplemental Objections and Responses to Uber's Interrog. Nos. 1-11 at Interrog. 6). Waymo's 30(b)(6) witness on development costs promised the same thing, stating that he did not know what the trade secrets were, could not allocate costs to any trade secret, and that an expert would do this:

      Q Do you understand that you were designated corporate witness, so you're supposed to do testify on behalf of the company regarding the cost of each of the alleged trade secrets? Are you not prepared to testify as to that today?

      A So—so I'm—I'm prepared to testify. And—and I have been trying to testify about the numbers and the costs incurred by this program. **I am not technically minded to say that a trade secret involved this cost versus that cost. I think that's a more expert-based formulation.** And I'm not prepared or capable of—of creating—like, I'm not an expert, right. Like, my understanding is you—you have expert reports on these kinds of things, and there will be a whole, you know, rigmarole around that. But I am prepared to tell you about what are the costs and what we have been discussing about what the expenses that we're showing in these various years.

Josephs Decl., Ex. 1, Bananzadeh 30(b)(6) Dep. at 95:1-21 (emphasis added); *see also id.* at 88:2-89:3.  Indeed, Waymo's 30(b)(6) witness could not even estimate the development costs associated with LiDAR, again deferring questions to some expert.[1]

      In total, Waymo's 30(b)(6) witness deferred to this undisclosed expert over 25 times.   He also distanced himself from the argument that Waymo is now making to the Court:

      I think you said that my testimony was that it costs ▇▇▇▇▇ to formulate those two trade secrets.  So I just want to say first that, like, that's – *that's not my testimony*. What—what I'm saying is that insofar is that an expert calculated this, it's—I'm showing the—my testimony is that in the years 2009 through 2015, those were the expenses incurred. With respect to your—the—the core of the question or, like, the latter part of what you just said of: Is there a double count, I don't think I am technically minded enough to say whether that is true or not.

*Id.* at 94:12-25 (emphasis added); *see also* 93:11-15 ("Again, like, my under—my understanding is, like, that's the method the expert used to surmise the—the data—the costs incurred based upon historical spend that we—that I—that we provided.").

      Waymo's promised expert testimony never materialized, and Waymo has never provided any estimates of actual development costs for the eight trade secrets—notwithstanding an interrogatory directly calling for it and a Rule 30(b)(6) deposition on that very topic.  Undeterred, Waymo now tries to characterize its overall program costs as development costs for the eight alleged trade secrets, and argues that they are relevant for two reasons: (1) to show that the trade

---

[1] *Id.* at 75:17-21 ("My understanding is that we have experts who are going to provide the reports and provide, like, a conclusion about a number that relates to that. So at least that's my understanding of what's going on in this litigation."); *id.* at 78:2-6 ("[I]f you're asking for the LiDAR-related cost of, like, developing a LiDAR system in an SDS system, I think this is a fundamentally, like, technical question that I—I'm not prepared to answer for you, right.").

1  secrets have independent economic value and (2) for reasonable royalty and damages purposes.
2  Both arguments are meritless and should be rejected.  Waymo's offer of proof underscores the
3  concerns expressed by this Court—Waymo has utterly failed to produce any evidence regarding
4  the costs it incurred in developing the eight alleged trade secrets that the jury will evaluate.
5  Waymo's overall program costs should be excluded both because they are irrelevant and because
6  any marginal relevance is substantially outweighed by the probability that the jury will be misled
7  and Uber will be unfairly prejudiced.

**II.    ARGUMENT**

**1.  Waymo's Aggregate Program Costs Are Not Probative Of The Independent Economic Value of the Trade Secrets**

By definition, whether a trade secret has <u>independent</u> economic value is based on the competitive advantage afforded by that specific trade secret.  *See Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 959 (C.D. Cal. 2011) (stating that a trade secret "derives independent economic value from not being generally known when its secrecy 'provides a business with a substantial business advantage.'") (citing *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997) (internal quotation marks omitted)).  Waymo's aggregate program costs reflect the amount that Waymo claims it spent on its entire autonomous vehicle program, including cameras, multiple radar systems, telematics, computers, domes, software, and firmware.  Indeed, Waymo's AV hardware is itself comprised of at least 

1  Dkt. 1617 at 9.  That Waymo spent millions or billions developing self-driving vehicles does
2  nothing to show the independent economic value of the specific trade secrets at issue in this case.
3  In addition, Waymo's aggregate program costs also include the cost to develop the patents that
4  Waymo has now dropped from the case and the purported trade secret (96) on which the Court
5  granted summary judgment—Waymo obviously cannot recover development costs for the patents
6  it has dropped and the trade secret claim that it lost.

7      To the extent that Waymo is arguing that its program costs represent development costs
8  for the trade secrets because everything is iterative and the product of prior work, this argument is
9  meritless and contradicted by Waymo's prior promises to provide actual development costs for
10  the trade secrets.  It is nonsensical to suggest that things like the concept of a
11  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ required years of work on wholly unrelated hardware and software
12  systems at a cost of ▓▓▓▓▓▓.  *See, e.g.*, Dkt. 2531 at 9.  And, under Waymo's methodology,
13  anything developed in 2015—whether the most groundbreaking invention or entirely worthless—
14  would have necessarily cost ▓▓▓▓▓▓ because it was the product of all the prior work.  *See*
15  Josephs Decl., Ex. 1, Bananzadeh 30(b)(6) Dep. at 90:25-91:3 ("So I—again, I think my
16  understanding of how the expert who created that value is that they took the numbers of spend
17  historically since inception through a certain date.").  This is wholly illogical, and confirms that
18  Waymo's purported "development expenses" are not probative in any way to demonstrating
19  independent economic value.

20      **2.  Waymo's Aggregate Program Costs Are Irrelevant to Damages**

21      Waymo's program costs are similarly not relevant to damages, and their introduction
22  would be unfairly prejudicial.  We know these program costs are *not* Waymo's costs to develop
23  the eight alleged trade secrets.  The cases cited by Waymo all involve the use of the plaintiff's
24  development costs for the trade secrets at issue; none permit a plaintiff to use its aggregate
25  program costs to establish the value of one out of thousands of components.  Indeed, Waymo has
26  claimed that there are at least 113 other trade secrets related to LiDAR alone, Dkt. 25-7, showing
27  that the alleged trade secrets are even a small part of LiDAR, let alone a fully autonomous
28

vehicle.[2]  In *Nilssen v. Motorola, Inc.*, No. 93 C 6333, 1998 WL 513090, at *6 (N.D. Ill. Aug. 14, 1998) (Illinois UTSA), the district court highlighted the problem of admitting non-apportioned damages evidence:

> Hence even if Motorola itself (rather than Nilssen, as Motorola contends) had valued Nilssen's entire technology at $50 million, Motorola unquestionably did *not* place that value, or any identifiable portion of that value, on the trade secrets that are at issue in this litigation. It would thus create a gross potential for unfair prejudice and jury confusion if the $50 million figure were to be placed before the jury in any guise. So even if the $50 million overall evaluation were somehow able to pass muster for admissibility under Rule 401 (a highly doubtful proposition at best), Rule 403 would still require its exclusion.

*Id.*

Waymo cites to an unpublished California Court of Appeals case, *Syntron Bioresearch, Inc. v. Fan*, No. D033894, 2002 WL 660446 (Cal. App. 4th 2002), to suggest that aggregate development costs can be used and strict apportionment is not required, but the facts in that case bear no resemblance to the facts here. There, a former employee misappropriated extensive trade secrets relating to pregnancy test kits, which allowed his new company to immediately clone the products and become "instantaneously commercially active." *Id.* at *13. The kits "played the dominant role in generating income for both [the plaintiff and defendant]," and the court of appeals concluded that the trial court engaged in a reasonable apportionment analysis whereby it concluded that roughly 75% of plaintiff's research and development costs were attributable to the kits and the defendant received the full benefit of those expenditures. *Id.*

Here, Waymo claims hundreds (if not thousands) of trade secrets are embodied in its LiDAR technology alone, which is only one of ▮▮▮▮▮▮▮▮▮▮ within a self-driving car. And there is no evidence that Uber was able to take the eight alleged trade secrets and gain the benefit of all of Waymo's development work for the prior seven years. In short, *Syntron* and the other cases cited by Waymo stand for the unremarkable proposition that a plaintiff alleging an

---

[2] That Waymo has asserted other trade secrets against Uber highlights one of the problems with Waymo's evidence. It will presumably assert the exact same program costs for each trade secret and try to get the jury to award the same damages over and over. Even within the confines of the case, Waymo is inviting the jury to double-count (or more) damages by claiming the same program costs for multiple trade secrets.

intentional tort need not apportion with surgical precision; they do not permit a plaintiff to sidestep apportionment all together, or to do it with a baseball bat.

Further, even assuming arguendo that there were any connection between Waymo's program costs and the trade secrets (which there is not), Waymo would still need to show how Waymo's costs could be probative as to Uber's costs. Waymo has absolutely no evidence that Uber's costs would be comparable to Waymo's costs. Different companies have different processes, priorities, and personnel.[3] *See* Dkt. 2176 at 15 ("It seems unlikely that this type of simple comparison between two very different corporations' expenses could add much probative value[.]"); *see also* Dkt. 2516 at 2-3. And having started seven years after Waymo in a fast-developing field, Uber had the benefit of experienced engineers, improved technology, and extensive public research into autonomous vehicles, including Waymo's own patent applications, which disclose extensive details about its programs and prototypes. *See* Josephs Decl., Ex. 2, Bares 6/16/2017 Dep. at 129:3-7 ("I thought we could catch up and technology of course is on our side, computers get faster every year, storage gets cheaper. So starting later in this game has an inherited advantage just of that."). Having designated no expert on the subject nor conducted any development cycle analysis, Waymo has no evidence upon which the jury could rationally infer that Waymo's costs are in any way a proxy for Uber's saved costs.

Lastly, in addition to the unfair prejudice and confusion, the admission of Waymo's program costs will create a sideshow at trial because they are wrong: contemporaneous management presentations show that, as of September 25, 2015 (three months before the alleged misappropriation), Waymo had expended only ▮▮▮▮▮▮. Josephs Decl., Ex. 3, Chauffeur Presentation at 3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Uber should not be required to waste its precious time delving into this irrelevant topic.

---

[3] As just one example of the differences, Waymo has spent extensive resources building its own vehicle, while Uber has always focused on outsourcing to OEMs.

### 3. Waymo Is Precluded From Adducing Evidence Of Program Costs

Waymo should also be barred under Rule 37 from offering its program costs as a proxy for development costs. Waymo was served with an interrogatory asking it to identify how much each trade secret cost to develop. In response, Waymo did not claim that it was impossible, just that "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Dkt. 2325. Waymo then presented an unprepared Rule 30(b)(6) witness who knew nothing about the trade secrets or the costs associated with them and deferred questions to the undisclosed expert. Josephs Decl., Ex. 1, Bananzadeh 30(b)(6) Dep. at 88:2-9; 95:1-21. Waymo ultimately never disclosed any such expert testimony, and now—on the eve of trial—wants to misleadingly suggest to the jury that its aggregate program costs are the same as the development costs of the trade secrets. In addition to being irrelevant and unfairly prejudicial, this evidence should additionally be precluded under Rule 37.

### 4. Waymo Does Not Have a Sponsoring Witness for its Program Costs

An offer of proof is typically required to identify the witnesses who will offer testimony or introduce evidence. While Waymo's offer of proof identifies Dr. Dolgov and Mr. Droz for background testimony on various trade secrets, Waymo generically cites "Waymo testimony and documentary evidence" as the basis for the program costs. *See* Dkt. 2531 at 7, 9, 10, 13, 14, 15. In the absence of a sponsoring witness, this evidence cannot be admitted, and Uber further objects on that basis. For example, Mr. Droz, who was initially designated as Waymo's corporate representative on development costs, is plainly unqualified to testify on that issue:

Q. ████████████████████████████████████████████

MR. JAFFE: Objection; form; outside the scope.

A. ████████████████████████████████████████████████████████████████████████████

Q. So, you're not prepared to talk about the cost of development of Trade Secret No. 2 as Waymo's corporate designated witness; is that correct?

A. I'm not.

Josephs Decl., Ex. 4, Droz 8/3/2017 30(b)(6) Dep. at 155:23-156:13.

Finally, to the extent that Waymo is now going to try to identify a percipient witness, it is far too late for that. Waymo has never identified any percipient witness to testify regarding the cost of developing the eight purported trade secrets.

### III. CONCLUSION

For the foregoing reasons, the Court should exclude evidence of Waymo's purported development costs under Rules 402 and 403 and FRCP 37.

Dated: January 28, 2018

MORRISON & FOERSTER LLP
BOIES SCHILLER FLEXNER LLP
SUSMAN GODFREY LLP

By: */s/ William Christopher Carmody*

Attorneys for Defendants
UBER TECHNOLOGIES, INC. and
OTTOMOTTO LLC

**ATTESTATION OF E-FILED SIGNATURE**

I, Michael A. Jacobs, am the ECF User whose ID and password are being used to file this Response. In compliance with Civil L.R. 5-1(i)(3), I hereby attest that William Christopher Carmody has concurred in this filing.

Dated: January 28, 2018                             */s/ Michael A. Jacobs*
                                                              Michael A. Jacobs