1    MICHAEL A. JACOBS (CA SBN 111664)
     MJacobs@mofo.com
2    ARTURO J. GONZÁLEZ (CA SBN 121490)
     AGonzalez@mofo.com
3    MORRISON & FOERSTER LLP
     425 Market Street
4    San Francisco, California 94105-2482
     Tel:    415.268.7000 / Fax:   415.268.7522
5
     KAREN L. DUNN (*Pro Hac Vice*)
6    kdunn@bsfllp.com
     HAMISH P. M. HUME (*Pro Hac Vice*)
7    hhume@bsfllp.com
     BOIES SCHILLER FLEXNER LLP
8    1401 New York Avenue, N.W.
     Washington, D.C. 20005
9    Tel:    202.237.2727 / Fax:   202.237.6131

10   WILLIAM C. CARMODY (*Pro Hac Vice*)
     bcarmody@susmangodfrey.com
11   SHAWN J. RABIN (*Pro Hac Vice*)
     srabin@ susmangodfrey.com
12   SUSMAN GODFREY LLP
     1301 Avenue of the Americas, 32nd Floor
13   New York, New York 10019
     Tel:    212.336.8330 / Fax:   212.336.8340
14
     Attorneys for Defendants
15   UBER TECHNOLOGIES, INC.
     and OTTOMOTTO LLC

16

17

18                    UNITED STATES DISTRICT COURT

19                   NORTHERN DISTRICT OF CALIFORNIA

                        SAN FRANCISCO DIVISION
20

21   WAYMO LLC,                          Case No. 3:17-cv-00939-WHA

22              Plaintiff,               **DEFENDANTS UBER TECHNOLOGIES,
                                         INC. AND OTTOMOTTO LLC'S
23        v.                             RESPONSE TO COURT'S PENULTIMATE
                                         JURY INSTRUCTIONS ON TRADE
24   UBER TECHNOLOGIES, INC.,            SECRET MISAPPROPRIATION (DKT.
     OTTOMOTTO LLC; OTTO TRUCKING LLC,   2449)**
25
                Defendants.              Judge:     Hon. William H. Alsup
26                                       Trial Date: February 5, 2018

27

28

1   Defendants Uber Technologies, Inc. and Ottomotto LLC (together, "Defendants" or "Uber"

2   unless otherwise noted) respectfully submit the following objections and proposed modifications to the

3   Court's January 3, 2018 Penultimate Jury Instructions on Trade Secret Misappropriation ("PJI"). Dkt.

4   2449. Uber understands these instructions to be limited to trade-secret misappropriation, and that other

5   standard instructions—including on the burden of proof, for example—will be identified at a later time.

6   **PJI III**

7   Uber objects to the jury being instructed that Uber Technologies, Inc. may be liable for

8   misappropriation based on disclosure. Waymo neither pursued nor properly disclosed a theory that Uber

9   Technologies, Inc. had misappropriated the alleged trade secrets by disclosing them to vendors or

10  anyone else. As set forth in Uber's trial brief, Waymo failed to disclose this theory of liability in its

11  initial disclosures and in three interrogatories that called for the disclosure of such a theory of

12  misappropriation and any claimed damages caused by it. Dkt. 2517 at 4–5. To this day, Waymo has not

13  disclosed a theory of damages or a computation of damages stemming from any alleged disclosure by

14  Uber Technologies, Inc. to its vendors (or anyone else) as required by Rule 26(a)(1). Uber asks that PJI

15  III, XIII, XVIII, XX and XXV be modified to clarify that Waymo's only theory of disclosure liability is

16  against Ottomotto LLC, and that it has chosen to only proceed on a theory of misappropriation by use

17  against Uber Technologies, Inc.

18  **PJI VII**

19  Uber objects to the sentence "Nor may they memorize or photocopy or download to take their

20  prior employer's trade secrets with them" because it may confuse the jury into thinking that any such

21  memorization, photocopying, or downloading ***alone*** triggers liability. As Uber previously observed, by

22  removing the necessary elements of improper use or disclosure, this sentence introduces the idea of

23  liability for acquisition alone. Dkt. 2279 at 1. Yet the Court has already decided that Waymo has chosen

24  not to pursue a theory of acquisition-based liability, and must be held to its disclosures to date—which

25  include no such theory. Dkt. 2495. Even if Waymo had preserved a theory of acquisition-based liability

26  (which it did not), this sentence improperly supplants the statutory definition of improper acquisition,

27  wrongly relieving Waymo of its burden to prove that any such memorization, photocopying, or

28  downloading in this case constituted improper means of acquiring trade secrets. *See* PJI XIV (Waymo

1

1    must prove improper means such as theft, misrepresentation, and breach or inducing a breach of a duty

2    to maintain secrecy). Moreover, this sentence is out of place in PJI VII, which instructs the jury on the

3    distinction between trade secrets, on the one hand; and engineers' professional skills, talents, abilities

4    (and the practical lessons that supplement those skills, talents, and abilities) on the other. The sentence

5    quoted above does not aid the jury in drawing that distinction. Instead, it is likely to confuse the jury by

6    suggesting that the presence of memorization, photocopying, or downloading is an element of a test to

7    distinguish trade secrets from professional skills.

8          If this instruction is to be given, Uber suggests that the Court append the following clause to the

9    end of the sentence: "and use them at their new employer." Without this, the jury may seize upon this

10   sentence out of context to find that the listed activities alone are a violation of law, when they are not.

11   **PJI VIII**

12         Based on Waymo's allegations and the evidence to be presented at trial, Uber believes that PJI

13   VIII is inapplicable to Alleged Trade Secret 111 (the only "negative" alleged trade secret at issue), and

14   therefore objects to this instruction. As the Ninth Circuit has held:

15
         In addition, there must be a sufficient evidentiary foundation to support giving the
         instruction. *Mendez v. County of San Bernardino*, 540 F.3d 1109, 1117–18 (9th
16       Cir.2008). Whether there is sufficient evidence to support an instruction is reviewed for
         abuse of discretion. *Galdamez v. Potter*, 415 F.3d 1015, 1021 (9th Cir. 2005); *see also*
17       *United States v. Hairston*, 64 F.3d 491, 494 (9th Cir. 1995).

18   *Yan Fang Du v. Allstate Ins. Co.*, 697 F.3d 753, 757 (9th Cir. 2012).

19         In Alleged Trade Secret 111, Waymo purports to claim as a trade secret all "[k]now-how

20   regarding the risks and costs" of a particular jettisoned system, without limitation to either the specific

21   failed design or the specific difficulties that led Waymo to abandon that design. As the Court has already

22   recognized, all trade secrets must be disclosed with "reasonable particularity." Dkt. 2151 at 13–14

23   (citing Cal. Civ. Code § 2019.210 and *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal.

24   App. 4th 826, 836 (2005), among others). Yet with Alleged Trade Secret 111, Waymo is attempting to

25   claim as a trade secret the broad practical lessons its engineers learned while working on a failed

26   project—precisely the sort of information that engineers in California are entitled to retain when they

27   change jobs. *See* PJI VII. Moreover, Waymo's allegations are predicated on nothing more than the claim

28   that Mr. Levandowski recommended that the team pursue a particular broad approach that happened to

2

exclude the specific system at issue. Should this kind of activity incur liability for trade-secret misappropriation, such a finding would be contrary to California's strong public policy in favor of employee mobility. Cal. Bus. & Prof. Code § 16600.

The few cases to interpret the "negative trade secrets" doctrine under California law demonstrate the narrowness of the doctrine, as Uber previously briefed, particularly in light of California's strong public policies. *See* Dkt. 2231 at 5–7.  In *Courtesy Temporary Service, Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1287–88 (1990), the only California state-court case to discuss negative trade secrets, the negative information at issue was protectable only because its use disclosed a positive trade secret:

> This concept of "negative" research was emphasized in the case of *Hollingsworth Solderless Terminal Co. v. Turley* (9th Cir. 1980) 622 F.2d 1324. If a customer list is acquired by lengthy and expensive efforts which, from a negative viewpoint, indicate those entities that have not subscribed to plaintiff's services, it deserves protection as a "trade secret" under the act. According to *Hollingsworth*, even if the customers' names could be found in telephone or trade directories, such public sources "'would not disclose the persons who ultimately made up the list of plaintiff's customers.'" (*Id*. at p. 1333.) It is the list of persons who actually purchase Courtesy's services that constitute confidential information.

And in *Cinebase Software, Inc. v. Media Guaranty Trust Inc.*, No. C98-1100 FMS, 1998 WL 661465, at *12 (N.D. Cal. Sept. 22, 1998), the district court found:

> "Negative research" can be protectable as a trade secret. *See Courtesy Temporary Service v. Camacho*, 222 Cal. App. 3d 1278, 1287–88, 272 Cal. Rptr. 352 (2d Dist., 1990). Information stored in the minds of employees rather than being recorded is also protectable. *See Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 66 Cal. Rptr. 2d 731, 736 (1st Dist. 1997). Plaintiff's designation of the defendant software engineers' "technical know-how" regarding what does and does not work in the process of designing digital media management software is simply too nebulous a category of information to qualify for trade secret protection, however. In *Courtesy Temporary Service*, the court determined that information about potential customers who did not subscribe to plaintiff's services was protectable as a trade secret. *Id*. at 1288, 272 Cal.Rptr. 352. The trade secret, in other words, was the fact that certain entities were not worth soliciting for business. In contrast, plaintiff here does not identify any specific design routes that the defendants should be restrained from using, but instead seeks to restrain them from designing any digital media management software at all. *See* Plaintiff's Proposed Order Granting Preliminary Injunction. Given that these defendants had substantial experience designing digital media management software before coming to Cinebase, and that Cinebase never secured non-disclosure agreements from them, such a restraint is overbroad and unwarranted.

Accordingly, in light of the narrowness of the doctrine, the facts at trial, and Waymo's disclosures, Uber objects to this instruction.

//

3

**PJI XVI**

Uber respectfully requests that the Court clarify PJI XVI to eliminate a possible source of jury confusion. Waymo is likely to argue that the jury should infer (1) that Anthony Levandowski retained possession of Waymo documents embodying alleged trade secrets while working for Uber; (2) that Levandowski consulted or studied those documents while working for Uber; and (3) that Levandowski relied on his consultation or study of those documents to guide or direct Uber's LiDAR development efforts. The proposed phrasing "studied the copy while working on the next employer's own design" would mislead the jury into believing that (1) and (2), *without* (3), are sufficient for liability. Uber proposes the following revision to clarify for the jury that there must be a link between studying the secret design and *using* the secret information to aid the new design:

> Use ~~is~~ of a trade secret does not ~~limited to~~ require direct copying ~~but includes studying and consulting.~~. For example, if someone took a copy of a trade secret design with him to his next employer and then studied the copy ~~while working on the next employer's own~~ and relied on information from it to create a similar design, for his next employer, such ~~studying~~ conduct would constitute use even though the two designs differed.

These revisions are necessary for two reasons. First, for study to constitute "use," and especially for study to constitute use creating liability for the new employer, the new employer's design must actually make some use of the trade secret information studied *for its own advantage*. It is therefore not enough that the secret design was studied simultaneously with the creation of the new design. The Restatement of Unfair Competition emphasizes that "use" requires actual exploitation of the trade secret information resulting in damages:

> c. Improper use or disclosure. There are no technical limitations on the nature of the conduct that constitutes "use" of a trade secret for purposes of the rules stated in Subsection (b). As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" under this Section. Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret (see § 42, Comment f) all constitute "use." The nature of the unauthorized use, however, is relevant in determining appropriate relief. See §§ 44 and 45.

> The unauthorized use need not extend to every aspect or feature of the trade secret; use of any substantial portion of the secret is sufficient to subject the actor to liability. Similarly, the actor need not use the trade secret in its original form. Thus, an actor is liable for using the trade secret with independently created improvements or modifications if the result is substantially derived from the trade secret. The extent to which the actor's sales or other benefits are attributable to such independent improvements or modifications, however, can affect the computation of monetary relief. See § 45, Comment f. However,

4

1
2
3
4

if the contribution made by the trade secret is so slight that the actor's product or process can be said to derive from other sources of information or from independent creation, the trade secret has not been "used" for purposes of imposing liability under the rules stated in Subsection (b). Although the trade secret owner bears the burden of proving unauthorized use, proof of the defendant's knowledge of the trade secret together with substantial similarities between the parties' products or processes may justify an inference of use by the defendant.

5  Restatement (Third) of Unfair Competition, § 40 cmt. c (Am. Law Inst. 1995) (emphasis added). The

6  Ninth Circuit, citing the Restatement and applying the Idaho Trade Secrets Act (substantially identical in

7  relevant part to CUTSA and DTSA), has likewise held:

8
9
10
11
12
13
14
15
16
17
18

The term "use" in the context of misappropriation of a trade secret generally contemplates some type of use that reduces the value of the trade secret to the trade secret owner. *See* 1 Trade Secrets Law § 3:20 ("The primary interest of the plaintiff in trade secret cases is the preservation of the exclusive rights to, and the continued secrecy of, the appropriated information.... In some cases, such as where the trade secret has not been disclosed or used, an injunction may be the only appropriate remedy."); *see also Omnitech Int'l, Inc. v. Clorox Co.,* 11 F.3d 1316, 1325 (5th Cir. 1994) (the purpose of the trade secrets statute is to prevent someone from profiting from another's trade secret, thus acquiring a free competitive advantage); *Univ. Computing Co. v. Lykes–Youngstown Corp.,* 504 F.2d 518, 539 (5th Cir. 1974) ("The defendant must have actually put the trade secret to some commercial use. The law governing protection of trade secrets essentially is designed to regulate unfair business competition, and is not a substitute for criminal laws against theft or other civil remedies for conversion."). "[T]o sustain a trade secrets action under the 'use' prong of the statutory definition of 'misappropriation,' a plaintiff must necessarily demonstrate that the defendant received some sort of unfair trade advantage." *Omnitech Int'l, Inc.,* 11 F.3d at 1325 (interpreting Louisiana's misappropriation statute, which requires "disclosure or use of a trade secret of another without express or implied consent by a person who ... at the time of *disclosure* or *use,* knew or had reason to know that his knowledge of the trade secret was ... acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." (citing La.Rev.Stat. Ann. § 51:1431(2)(b)(ii)(bb))).

19  *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1130 (9th Cir. 2010). Applying these principles, the court held

20  that a software developer did not improperly use trade secrets when he deleted all copies of his

21  employer's source code from the employer's computers, taking exclusive possession of the code, and

22  then used his control over that code as leverage in compensation negotiations. *Id.* at 1130–31; *accord*

23  *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 224 (2010), *overruled on other grounds by*

24  *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 246 P.3d 877 (2011) ("One clearly engages in the

25  'use' of a secret, in the ordinary sense, when one directly exploits it for his own advantage, e.g., by

26  incorporating it into his own manufacturing technique or product.").

27  Second, study alone cannot give rise to any conceivable damages in this case. As the CACI

28  instructions related to trade secrets state, "generally the jury should be instructed only on matters

5

1  relevant to damage claims." CACI 4400 Directions for Use; CACI 4405 Directions for Use. Like

2  damages relating to acquisition alone, Waymo has never disclosed or preserved any theory that would

3  permit it to recover damages based on simply "studying" or "consulting" alleged trade secrets without

4  incorporating the lessons of those trade secrets into Uber's LiDAR designs; indeed, Waymo's Offer of

5  Proof on Trade Secret Misappropriation attempts to show that Uber has actually relied on each of the

6  Alleged Trade Secrets, and never presents an alternative theory that Uber "used" the Alleged Trade

7  Secrets without incorporating them into its own designs. *See* Dkt. 1371. The Court has already observed

8  that Waymo's only properly asserted damages theory is founded on a claim of actual use. Dkt. 2495 at 5

9  ("Defendants do not dispute that it is generally possible for a plaintiff to disclose, pursue, and preserve a

10  damages theory based on something other than actual, full use of misappropriated trade secrets.

11  Defendants' point is that Waymo has not done so here. This order agrees."); *id.* at 6 ("What seems to be

12  going on here is that this civil action began with vehement accusations that Uber had stolen Waymo's

13  alleged trade secrets and used them to jump-start Uber's own LiDAR development for its competing

14  self-driving car program. Yet subsequent discovery and inspections, Uber contends, failed to reveal

15  much, if any, such use. . . . Waymo must be held to prove its showcase contention.").

16        Moreover, the new employer cannot be unjustly enriched unless the employee actually leverages

17  the secret design to aid the new employer's design in a substantial way. As the Restatement explains, "if

18  the contribution made by the trade secret is so slight that the actor's product or process can be said to

19  derive from other sources of information or from independent creation, the trade secret has not been

20  'used' for purposes of imposing liability" for damages. Restatement (Third) of Unfair Competition, § 40

21  cmt. c; *see also* PJI XVII (for misappropriation by use to yield unjust enrichment damages, the use must

22  be a substantial factor in causing the unjust enrichment). Uber's proposed revision to this instruction

23  ensures that the jury is not misled into finding liability without proof of actual use resulting in damages.

24                                            **PJI XX**

25        Uber respectfully suggests the following edits to PJI XX:

26        To decide the dollar amount of any unjust enrichment to a defendant, first determine the dollar
          value of that defendant's actual benefit separately for each trade secret that would not have been
          achieved except for its use or disclosure. Then subtract from that amount that defendant's
27        reasonable expenses, including the dollar value of its own independent research and
          development. You must take care to ensure that your award of unjust enrichment only includes

28

6

the wrongful benefit any defendant obtained, and not the benefits it obtained through its legitimate efforts, creativity, and hard work.

The first edit—to add "separately for each trade secret"—conforms the instruction to the verdict form.

The second edit—the final sentence—is drawn from the *Mattel* trade secret case:

> Even if the Bratz concept, sketches, and sculpt were trade secrets that MGA misappropriated, the unjust enrichment from the use of the trade secret does not include the profits generated by MGA's "hard work," "creativity," and "legitimate efforts." *Cf. Mattel, Inc. v. MGA Entmn't*, Inc., 616 F.3d 904, 910–11 (9th Cir.2010) (finding equitable relief that captured "sweat equity" to be overbroad). This is because not all enrichment is unjust: "A person is enriched if he has received a benefit. A person is unjustly enriched if the retention of the benefit would be unjust." Restatement of Restitution, section 1, comment a. It is not unjust for a defendant like MGA to retain the "fruits of [its] own labors or legitimate efforts." *See Mattel*, 616 F.3d at 910 (quoting Dan B. Dobbs, Dobbs Law of Remedies: Damages–Equity–Restitution § 6.6(3) (2d ed.1993)). To the contrary, "it is not equitable [to] forc[e] MGA to hand over its sweat equity." *Mattel*, 616 F.3d at 911.

*Mattel, Inc. v. MGA Entm't, Inc.*, No. CV 04-9049 DOC RNBX, 2011 WL 836418, at *2 (C.D. Cal. Mar. 4, 2011).

### PJI XXI

Uber renews its objections to instructing the jury on exemplary damages, and to permitting the jury to award those damages on the jury verdict form. *See* Dkt. 2228 at 1–2. Under the plain language of both the CUTSA and the DTSA, and the commentary to CACI, the amount of punitive damages to award is an issue for the Court—not the jury—to decide.

Under the CUTSA, "If willful and malicious misappropriation exists, ***the court*** may award exemplary damages in an amount not exceeding twice any award made under subdivision (a) or (b)." Cal. Civ. Code § 3426.3(c) (emphasis added). CACI 4411's Directions for Use state:

> Once the jury finds "willful and malicious" conduct, it appears that the court should decide the amount of punitive damages. (*See Robert L. Cloud & Assocs. v. Mikesell* (1999), 69 Cal.App.4th 1141, 1151, fn. 8 [82 Cal.Rptr.2d 143].). This would be consistent with the Uniform Trade Secrets Act, on which the [CUTSA] is based. (*See* Uniform Trade Secrets Act § 3, 2005 com…)

As the CACI Directions for Use recognize, the commentary to the UTSA is clear:

> If willful and malicious misappropriation is found to exist, Section 3(b) authorizes the court to award a complainant exemplary damages in addition to the actual recovery under section 3(a) in an amount not exceeding twice that recovery. This provision follows federal patent law in leaving discretionary trebling to the judge even though there may be a jury, compare 35 U.S.C. § 284.

UTSA § 3 Commissioners' Comment.

7

1    The DTSA, which is based on § 3(b) of the UTSA, should be interpreted similarly. *See* 18 U.S.C.

2    § 1836(b)(3)(C) ("in a civil action brought under this subsection with respect to the misappropriation of

3    a trade secret, ***a court*** may … if the trade secret is willfully and maliciously misappropriated, award

4    exemplary damages in an amount not more than 2 times the amount of the damages awarded under

5    subparagraph (B)") (emphasis added). As the legislative history states:

6    > Subparagraph (C) authorizes an award of exemplary damages, not exceeding twice the
     > compensatory damages awarded, if the trade secret is willfully and maliciously
7    > misappropriated. This provision is similar to § 3(b) of the UTSA.

8    S. Rep. No. 114-220 (2016).

9    The existing case law further demonstrates that whether to award exemplary damages is for the

10   Court, not the jury, to decide. For example, the court in *O2 Micro International Limited v. Monolithic*

11   *Power Systems, Inc.*, set the amount of a reasonable royalty, after observing:

12   > As noted by O2 Micro, because the jury found that MPS' misappropriations were willful
     > and malicious, the Court has the discretion to award exemplary damages. Cal. Civ.Code §
13   > 3246.3(c) ("If willful and malicious misappropriation exists, the court may award
     > exemplary damages in an amount not exceeding twice any award" of reasonable royalty,
14   > or compensatory or unjust enrichment damages).

15   > O2 Micro argues that the maximum amount of exemplary damages should be awarded
     > because the reprehensibility of MPS' conduct is high; the harm to O2 Micro was great;
16   > MPS' financial condition is such that enhancement of damages is appropriate; and an
     > award of exemplary damages will punish and deter MPS from future misconduct. MPS
17   > fails to address O2 Micro's arguments directly. Instead, MPS argues that the correct
     > UTSA standard for determining exemplary damages follows patent law. *See* UTSA §
18   > 3 Commissioners' Comment ("This provision follows federal patent law in leaving
     > discretionary trebling to the judge."). But, as O2 Micro correctly notes, the
19   > Commissioners' Comments only state that, as in patent law, exemplary damages are for
     > the judge, not jury, to determine. The comments do not state that patent decisions and
20   > standards apply to exemplary damages under the UTSA; nor do the comments support
     > following patent law when there are California cases on point.

21

22   399 F. Supp. 2d 1064, 1078–79 (N.D. Cal. 2005), *as amended*, 420 F. Supp. 2d 1070 (N.D. Cal. 2006),

23   *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007). And in *Mattel, Inc. v. MGA Entertainment, Inc.*, 801 F. Supp.

24   2d 950, 952 (C.D. Cal. 2011), the Court awarded exemplary damages, noting:

25   > The California Uniform Trade Secrets Act (CUTSA) proscribes the misappropriation of
     > information that has independent economic value from not being generally known and is
26   > the subject of reasonable efforts to maintain secrecy. Cal. Civ. Code § 3426.1. The
     > remedy for misappropriation is the greater of (1) the victim's actual damages or (2) the
27   > misappropriator's unjust enrichment. *Id*., § 3426.3. "If willful and malicious
     > misappropriation exists, the court may award exemplary damages in an amount not
28   > exceeding twice" the compensatory award. *Id*. Though the existence of willful and

8

1

2

3

4

malicious misappropriation is ordinarily considered a fact that a jury must find by clear and convincing evidence, the court calculates the amount of exemplary damages. *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064, 1078 (N.D. Cal. 2005); *see also Ice Corp. v. Hamilton Sundstrand Corp.*, 615 F.Supp.2d 1266, 1268 (D.Kan.2009) (noting that UTSA was modeled on federal patent law); *but see Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1111 (9th Cir.2001) (suggesting that clear and convincing evidence is unnecessary).

5

6

7

If the jury is to be instructed that it should decide exemplary damages (which it should not be), Uber respectfully requests that the phrase "if any" be inserted into the sentence "If you so find, then you must determine what amount, ***if any***, of exemplary damages Waymo should recover from that defendant."

8

## PJI XXIII

9

10

11

12

13

14

15

16

17

18

19

20

Defendants renew their previous objections to PTJI XXIII.[1] In addition to those objections, this instruction addresses an issue that is simply not relevant. This Court has correctly concluded that Waymo has not pursued a claim arising solely from acquisition. Dkt. 2495. The issue is whether Uber or Otto used or disclosed the Alleged Trade Secrets. *Id.* at 6. Use or disclosure by Uber and Otto cannot arise from imputed acquisition by Stroz or MoFo. Yet this instruction improperly suggests to the jury that acquisition by Stroz or MoFo may be sufficient to satisfy all or part of Waymo's burden. Waymo has never pursued any theory that Defendants' alleged use or disclosure was the result of imputed acquisition or that Stroz or MoFo used or disclosed Waymo trade secrets. And Waymo does not intend to ask for damages based on Stroz or MoFo's use or disclosure of Waymo's trade secrets. Dkt. 2539 at 8. Giving an instruction based on imputation under these circumstances is misleading, confusing, and at odds with what the Court has ordered. Given the Court's rulings, imputation is not relevant to Waymo's claims.

21

22

23

In addition, the reference to "information" as opposed to "trade secrets" in PJI XXIII would be confusing for the jury within the larger context of the instructions. Uber maintains that, in the trade-secret context, there can be no presumption that an agent's knowledge or acquisition can be imputed to a

24

25

26

27

28

---

[1] Uber renews and preserves its prior objections to this instruction, including its irrelevance to the claims and defenses in this case, its conflict with the substantive law of trade secrets, its misallocation of the burden of proof, its conflict with the contractual obligations imposed through the Stroz Retention Agreement and Protocol, and the adverse consequences of its holding as a policy matter for all companies undergoing due diligence. *See, e.g.*, Dkt. 1750 at 42, 84; Dkt. 1735 at 17–19; Dkt. 2076 at 3–7; Dkt. 2279 at 2–6; Dkt. 824; 7/26/17 Hr'g Tr. 34:17–39:21; *see also Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 792–93 (9th Cir. 1976).

1    principal, as there has been no invasion of the rights that trade-secret law is designed to protect.

2    *Droeger*, 541 F.2d at 793; *see also* Dkt. 1735 at 46. While changing PJI XXIII to say "information"

3    theoretically makes this instruction a general statement of agency law, in context it creates more

4    problems than it solves. The only other instructions about acquisition refer to "trade secrets," not

5    "information," making this instruction out of step with the remainder. *See, e.g.*, PJI XIV. Moreover, not

6    all of the Alleged Trade Secrets are in the materials that MoFo and Stroz received as part of the

7    diligence effort.[2] By substituting "information" for "trade secret" in this lone instruction, the jury could

8    be misled into believing that MoFo's or Stroz's acquisition of ***any*** information is the same thing as

9    improper acquisition of a trade secret, when the two are not factually or legally equivalent.

10        While Uber does not believe any instruction on this point is relevant, Uber has prepared this

11   alternative language to address the point that we believe the Court intended to address:

12
13   > You have heard evidence that during the due diligence process, Stroz and MoFo received
     > information pertaining to Google. That is not a basis for liability in this case. To prove
     > misappropriation, Waymo must prove that Uber or Ottomotto improperly used or
     > disclosed the Alleged Trade Secrets.

14

15   **PJI XXV**

16        This instruction should not be given, for the same reasons detailed above. Waymo has admitted

17   that it will not seek damages based on acquisition, use, or disclosure by MoFo or Stroz. Dkt. 2190 at 2

18   ("Waymo will not seek damages at trial from Uber or Ottomotto accruing solely from Stroz's and/or

19   MoFo's wrongful acquisition of Waymo's trade secrets."); Dkt. 2539 at 8 ("Waymo does not intend to

20   ask for damages based on MoFo or Stroz's use or disclosure of Waymo's trade secrets"). Nor is any

21   such theory available to Waymo. Acquisition is not the basis for damages at all in this case. Dkt. 2495.

22   As for damages based on use or disclosure by MoFo or Stroz, Waymo has never pled or disclosed any

23   such theory. There is no such reference in Waymo's Complaint or its Rule 26 disclosures, its

24   interrogatory responses, or in any of Waymo's offers of proof. *Cf.* Dkt. 1371; Dkt. 2190-1; Dkt. 2517 at

25

26   ───────────────
     [2] The Hesselink Supplemental Report lists just twelve files from the Stroz Friedberg production
     metadata that allegedly even relate to Waymo's Alleged Trade Secrets. Dkt. 2057 Ex. 1 at Ex. B. And

27   Hesselink's report indicates that these twelve files relate only to Alleged Trade Secrets 2, 25, 90, or 111.
     *Id.* at 5–7, 21–23. Waymo has never asserted that any files in Stroz's (or MoFo's) possession even relate
     to, let alone actually disclose, Alleged Trade Secrets 7, 9, 13 or 14.

28

1    4. Instructions should not be given where Waymo cannot lay sufficient evidentiary foundations for them.

2    *Yan Fang Du*, 697 F.3d at 757.  It would be error to invite the jury to award damages that Waymo has

3    never identified, pleaded, disclosed, or sought.

4           To the extent that Waymo claims that it intends to show that Uber "wrongfully acquired the trade

5    secrets at issue when its agents MoFo and Stroz took possession of them," Dkt. 2539 at 8, Waymo

6    merely claims that such evidence would support "an award of injunctive relief." (*Id.*) But injunctive

7    relief is equitable, and not for the jury to decide. If this Court is inclined to allow Waymo to pursue a

8    theory that it has never pled, without conceding liability, Uber would not oppose an injunction requiring

9    MoFo and Stroz to return or destroy all of the materials they received as part of the Otto acquisition due

10   diligence after the end of this litigation, subject to any applicable preservation obligations, and after

11   notice and an opportunity to object is given to affected parties. Thus, there is no need for this issue to be

12   presented to the jury.

13                                          **PJI XXVI**

14          Uber preserves for appeal its prior objections that this instruction should not be given and Mr.

15   Levandowski should not be called to the stand to invoke, as the Ninth Circuit has never permitted a non-

16   party's invocation to be admissible against a party. *See*, *e.g.*, Dkt. 821; Dkt. 900-3. If this instruction is

17   to be given, Uber proposes the following limited modifications:

18          When Anthony Levandowski was called upon to testify ~~testified~~ at our trial, he invoked
            his right not to incriminate himself under the Fifth Amendment in our Bill of Rights. This
19          was his right to do so~~.~~, and the exercise of that right does not mean that he is guilty of a
            crime. Nevertheless, you may but are not required to find that the questions called for
20          answers that would have ~~incriminated him and that these answers would have been~~
            ~~adverse to his position. That, however~~ been adverse to him. This is called an "adverse
21          inference."

22          That an answer would have been adverse to Mr. Levandowski, however, ~~That, however,~~
            would not necessarily be the same as being adverse to the position of Uber or Ottomotto
23          or Waymo. Before finding that the answer would have also been adverse to ~~another~~a
            party in the case, you should consider ~~all of the other evidence and circumstances.~~
24          whether it is trustworthy and fair to apply the adverse inference against the party under
            all of the other evidence and circumstances. ~~You are not required to find that any answer~~
25          ~~by him would have been adverse to him or to any party herein.~~

26          ***First***, Uber proposes striking the proposition that the answer to any given question "would have"

27   incriminated Mr. Levandowski, and explaining to the jury what may be a counterintuitive axiom: "the

28   exercise of that right does not mean the person is guilty of a crime." As the Supreme Court has held:

                                          11

We have held that the privilege's protection extends only to witnesses who have "reasonable cause to apprehend danger from a direct answer." [*Hoffman v. United States*, 341 U.S. 479, 486 (1951).] That inquiry is for the court; the witness' assertion does not by itself establish the risk of incrimination. *Ibid*. A danger of "imaginary and unsubstantial character" will not suffice. *Mason v. United States*, 244 U.S. 362, 366, 37 S.Ct. 621, 61 L.Ed. 1198 (1917). But we have never held, as the Supreme Court of Ohio did, that the privilege is unavailable to those who claim innocence. To the contrary, we have emphasized that one of the Fifth Amendment's "basic functions ... is to protect *innocent* men ... 'who otherwise might be ensnared by ambiguous circumstances.' " *Grunewald v. United States*, 353 U.S. 391, 421, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) (quoting *Slochower v. Board of Higher Ed. of New York City*, 350 U.S. 551, 557–558, 76 S.Ct. 637, 100 L.Ed. 692 (1956)) (emphasis in original). In *Grunewald*, we recognized that truthful responses of an innocent witness, as well as those of a wrongdoer, may provide the government with incriminating evidence from the speaker's own mouth. 353 U.S., at 421–422, 77 S.Ct. 963.

*Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (emphasis in original). The Fifth Amendment can be invoked where an answer would not itself incriminate but could merely form a "link in the chain" of evidence needed to prosecute a crime. *Hoffman v. United States*, 341 U.S. 479, 486 (1951):

The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. *(Patricia) Blau v. United States*, 1950, 340 U.S. 159, 71 S.Ct. 223. But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. *Mason v. United States*, 1917, 244 U.S. 362, 365, 37 S.Ct. 621, 622, 61 L.Ed. 1198, and cases cited. The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, *Rogers v. United States*, 1951, 340 U.S. 367, 71 S.Ct. 438, and to require him to answer if 'it clearly appears to the court that he is mistaken.' *Temple v. Commonwealth*, 1880, 75 Va. 892, 899. However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' See Taft, J., in Ex parte Irvine, C.C.S.D.Ohio, 1896, 74 F. 954, 960.

*Id*. at 486–87. Here, Mr. Levandowski invoked the Fifth as to every single question relating to his employment either at Google or at Uber—even what he ate for breakfast at Google. 4/14/17 A. Levandowski Dep. 85:8–12; 85:17–86:6; 8/22/17 A. Levandowski Dep. 193:9–194:22 (Q: "Mr. Levandowski, based on reading your earlier deposition transcript, my understanding is that you plan to invoke your Fifth Amendment rights to virtually every question asked about what happened after you became a Google employee; is that correct? A: Yep. . . . Q: So, if I ask you about what you had for

12

1   breakfast at Google, you're going to invoke your rights? A: That's correct."). Given the breadth of Mr.

2   Levandowski's invocations, it is unlikely that the answer to *every* question would incriminate him. At

3   the very least, the Court should state that the answers to questions "could" have incriminated Mr.

4   Levandowski rather than "would" have done so. If the Court retains the reference to incrimination, the

5   instruction should also clarify that any incrimination would not be for the claims at issue in this case.

6       *Second*, Uber proposes removing references to Mr. Levandowski's "position," and the reference

7   to him as "another" party in this case. As the Court notes in PJI XXVII, Mr. Levandowski is not a party.

8   He therefore has no "position" here and it would be confusing to the jury to say otherwise. It is simpler,

9   and consistent with the Court's orders, to say that the inference is adverse "to him." 7/26/17 Hr'g Tr.

10  99:1–100:8 ("I want to be clear, the adverse inference is adverse to him."); Dkt. 1535, ¶ 4 ("the jury will

11  be instructed, if the Fifth Amendment is invoked, that it may, but is not required to, draw inferences

12  adverse to ***Levandowski*** based on his assertion of his Fifth Amendment privilege.") (emphasis in

13  original). Levandowski's invocations are also not "testimony," so Uber proposes clarifying that Mr.

14  Levandowski was "called upon to testify," rather than that he "testified."

15      *Finally*, as detailed in prior briefing, Uber proposes to explain to the jury that it must be

16  "trustworthy and fair to apply the adverse inference against the party under all of the other evidence and

17  circumstances." *See* Dkt. 821. While the Ninth Circuit has never held that it is appropriate to apply a

18  non-party's invocation against a party (and Uber maintains that the Ninth Circuit should not permit the

19  inference at all), if the inference is to be applied, this addition would give more guidance to the jury. It

20  was the animating force behind *Libutti v. United States*, which laid out factors that courts may consider

21  in determining whether to apply an adverse inference from a non-party witness's invocation to a party:

> Whether these or other circumstances unique to a particular case are considered by the
> trial court, the overarching concern is fundamentally whether the adverse inference is
> trustworthy under all of the circumstances and will advance the search for the truth. *See,*
> *e.g.*, *Idaho v. Wright*, 497 U.S. 805, 819 (1990) (analyzing the admissibility of a hearsay
> statement under Fed.R.Evid. 803(24)) ("We agree that 'particularized guarantees of
> trustworthiness' must be shown from the totality of the circumstances, but we think the
> relevant circumstances include only those that surround the making of the statement and
> that render the declarant particularly worthy of belief.").

26  107 F.3d 110, 124 (2d Cir. 1997).[3]

---

[3] *LiButti* has not been considered or adopted by the Ninth Circuit because, as Uber previously briefed,
the Ninth Circuit has never had the opportunity to consider whether a non-party's invocation can *ever* be
applied against a party, and under what conditions. Dkt. 891, Dkt. 900.

Uber anticipates that Waymo will argue in its jury instruction brief that the jury should only be permitted to draw an inference against Uber—not Waymo. *See* Dkt. 896-4 at 10 (Waymo's response to Uber's adverse inferences brief, arguing that an adverse inference cannot be applied against Waymo). The Court has rejected this argument before, and it should reject it again. *See* Dkt. 1535 (order noting that "both sides intend to ask the jury to draw adverse inferences based on non-party Anthony Levandowski's expected assertion of his Fifth Amendment privilege at trial"). Mr. Levandowski is invoking the Fifth as to facts that relate ***both*** to his employment at Google ***and*** to his employment at Uber. Uber will seek to draw its own inferences from Mr. Levandowski's testimony. Under the unique circumstances of this case, the jury may consider whether Mr. Levandowski is taking the Fifth for reasons that have anything to do with his work at either Google/Waymo or Uber.

## WAYMO'S BAD FAITH

Defendants renew their request that the Court charge the jury on Waymo's bad faith. Dkt. 1750 at 96; Dkt. 1735 at 56–57.

## ADDITIONAL INSTRUCTION—SEALING THE COURTROOM

Uber proposes the following instruction to eliminate a possible source of jury confusion. Uber and Waymo are currently meeting and conferring regarding this proposed instruction.

> From time to time, I may order that the public be excluded from the courtroom. That is sometimes necessary in cases that involve confidential business information. You should not assume that my closing of the courtroom means that I believe the testimony involves trade secret information. You will decide the trade secret issues in the case.

## JURY VERDICT FORM

As Uber has previously briefed, and as noted above, Uber respectfully submits that (a) the issue of exemplary damages is not for the jury to decide and (b) "disclosure" and "use" should be separately identified on the jury verdict form. *See* Dkt. 2228; Dkt. 2279 at 5.

Finally, consistent with its proposed change to PJI III, Uber asks that the first part of the verdict form relating to it be revised to remove references to disclosure because Waymo has neither disclosed nor pursued a theory of misappropriation by disclosure against Uber Technologies, Inc. Specifically, the column headings in Question 1 and the text in Question 2 should omit any reference to disclosure.

Dated:  January 29, 2018

MORRISON & FOERSTER LLP
BOIES SCHILLER FLEXNER LLP
SUSMAN GODFREY LLP


By:  */s/ Karen L. Dunn*_____
       KAREN L. DUNN

Attorneys for Defendants
UBER TECHNOLOGIES, INC. and
OTTOMOTTO LLC

15