1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT

6

7          FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   WAYMO LLC,                                    No. C 17-00939 WHA

10          Plaintiff,

11   v.                                           **OMNIBUS ORDER ON
                                                   EXTENT TO WHICH
12   UBER TECHNOLOGIES, INC.;                      ACCUSATIONS RE UBER'S
     OTTOMOTTO LLC; and OTTO                       LITIGATION MISCONDUCT
13   TRUCKING LLC,                                 MAY FEATURE AT TRIAL**

14          Defendants.

15   _____/

16                        **INTRODUCTION**

17          This lawsuit for trade secret misappropriation suffers from a deluge of accusations by

18   plaintiff that defendants tossed out evidence and engaged in litigation misconduct.  This order

19   addresses the extent to which the jury will be allowed to hear those accusations and the proof

20   behind them.

21                         **STATEMENT**

22          Plaintiff Waymo LLC commenced this civil action on February 23, 2017.  An order

23   dated March 16 set a schedule for expedited discovery (Dkt. No. 61) and another order dated

24   May 11 granted in part Waymo's motion for provisional relief (Dkt. No. 426).  Waymo's case

25   has since been reduced to claims against defendants Uber Technologies, Inc., and Ottomotto

26   LLC (collectively, "Uber") for misappropriation of eight alleged trade secrets.  The trial date

27   has since been continued twice and currently remains set for February 5.[1]

28

_____

[1] For the benefit of the court of appeals and with apologies to the public, all record citations herein are
to the unredacted versions of the documents cited.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1   Waymo's imagination has not slept in conceiving of ways it has been wronged by

2   Uber's alleged litigation misconduct.  Over the course of this action, Waymo's complaints have

3   provoked multiple motions, motions *in limine*, and various requests for relief.  Various motions

4   by both sides have already drawn rulings and those rulings remain operative even though only a

5   few are cross-referenced herein.  With the benefit of extensive briefing, multiple hearings, and a

6   clear view of the full constellation of issues implicated by Waymo's grievances, this order now

7   resolves all remaining issues.  Here follows a summary of the relevant events to date.

8   On June 21, 2017, Waymo moved for an order to show cause why Uber should not be

9   held in contempt for three alleged violations of the expedited discovery and provisional relief

10  orders (Dkt. No. 676-4).  After briefing on that motion, on August 7, Waymo filed a

11  supplemental brief to complain of yet another alleged violation of the expedited discovery order

12  (Dkt. No. 1095).  During the motion hearing on August 16, the undersigned judge explained

13  that he was not inclined to hold anyone in contempt but would consider telling the jury about

14  Uber's pertinent misconduct, if any, and asked Waymo to propose a non-argumentative

15  instruction (*see* Dkt. No. 1261 at 26:21–27:21, 33:8–18, 45:5–9).  On September 10, Waymo

16  proposed an argumentative jury instruction along with a "corrected" supplemental brief that

17  complained of yet three more alleged violations of prior orders and requested both remedial and

18  adverse-inference instructions against Uber (Dkt. Nos. 1501-4, 1501-6).  The argumentative

19  jury instruction was unusable and will not be given at trial.[2]

20  Meanwhile, in June 2017 and pursuant to the discovery referral in this action, Magistrate

21  Judge Jacqueline Corley ordered Uber to produce certain evidence pertaining to a due diligence

22  investigation performed by non-party Stroz Friedberg for Uber before its acquisition of

23  Ottomotto and Otto Trucking (collectively, "Otto") (Dkt. No. 566).  The undersigned judge

24  overruled all objections to that order (Dkt. No. 685).  Non-party Anthony Levandowski (but not

25  Uber) then petitioned the Federal Circuit for a writ of mandamus, thereby suspending

26  production of the due diligence materials until the Federal Circuit rejected all his arguments and

27

28      [2]  Some of Waymo's complaints extended to defendant Otto Trucking LLC and to that extent became
moot after Otto Trucking prevailed on summary judgment (*see* Dkt. Nos. 2151 at 8–13, 2161).

dismissed his petition on September 13 (Dkt. No. 1733).  An avalanche of document production followed.  Faced with this belated and bone-crushing production of evidence, on September 16, Waymo moved to continue the trial date then set for October 10 (Dkt. No. 1603-4).

Shortly thereafter, on September 28, the parties alerted Judge Corley that Uber had just "discovered" a trove of unproduced documents once belonging to Levandowski (from his time at Ottomotto).  The trove contained approximately fifteen thousand emails and 85 gigabytes of other documents (*see* Dkt. No. 1890 at 5:14–7:21).  As the owner of the newly-discovered trove, Uber produced it, but the delay damage had been done.  That late production piled onto the mountain of unexamined due diligence documents Waymo received on the eve of trial.  Under the circumstances and after a hearing on October 3, the undersigned judge felt compelled to grant Waymo its first continuance and postponed the trial date to December 4 (*see* Dkt. Nos. 1954, 1965 at 36:22–41:12).

On October 23, Waymo filed a second supplemental brief on its contempt motion complaining of another two alleged violations of the expedited discovery and provisional relief orders (Dkt. No. 2053-4).  That brief reiterated Waymo's request for an adverse-inference instruction against Uber.

On November 13, Waymo filed a new motion seeking yet another adverse-inference instruction against Uber for spoliation of evidence (Dkt. No. 2197-4).

On November 22, while briefing on Waymo's new motion proceeded and the new trial date approached, the undersigned judge received a letter from the Office of the United States Attorney.  The letter explained that, during a pending criminal investigation, the government had interviewed a former Uber employee named Richard Jacobs whose allegations about Uber seemed relevant to the trade secret misappropriation claims in this case.  Moreover, Jacobs's attorney had laid out his allegations in a 37-page demand letter dated May 5, 2017, to Attorney Angela Padilla, Uber's associate general counsel (Dkt. No. 2383).  Prior to that communication from the Office of the United States Attorney, no mention of Jacobs, his allegations, or the letter had surfaced in this civil action despite months of grueling discovery.

United States District Court
For the Northern District of California

3

United States District Court

For the Northern District of California

After the Court passed this sensational information on to counsel, Waymo requested a second trial continuance (Dkt. No. 2281-4 at 19–20). The second final pretrial conference previously set for November 28 morphed into a two-day evidentiary hearing featuring testimony from Jacobs and Attorney Padilla, among other witnesses. The evidentiary hearing unearthed the existence of a resignation email that Jacobs had sent to Uber's leadership on April 14, 2017, further detailing his allegations against Uber, and a subsequent confidential settlement agreement between Jacobs and Uber. The demand letter, resignation email, and settlement agreement (collectively, "the Jacobs materials") contained a barrage of scandalous allegations against Uber ranging from deliberate spoliation and systemic abuse of attorney-client privilege to hacking and corporate espionage. At least some allegations, discussed further below, seemed to bear directly on Waymo's claims in this case (*see, e.g.*, Dkt. No. 2307-2 at 13). Under the circumstances, the undersigned judge agreed to grant Waymo its second continuance and postponed the trial date to February 5, and further granted supplemental discovery to investigate the sensational Jacobs materials (*see* Dkt. No. 2315).

At a further case management conference on December 4, the undersigned judge ordered Waymo to submit a complete offer of proof by January 12 of this year, covering not only any new evidence uncovered in supplemental discovery but also how it related, if at all, to the issues under consideration in this case, including Waymo's previous accusations that Uber had engaged in litigation misconduct and other bad behavior (*see* Dkt. No. 2342 at 45:14–23; *see also* Dkt. No. 2447). On January 12 of this year, Waymo filed a 47-page offer of proof (Dkt. No. 2466-3). On January 19, Uber filed a 64-page rebuttal (Dkt. No. 2500-4).

The instant, comprehensive order is based on Waymo's offer of proof, Uber's response thereto, and all prior briefing and oral argument relating to the constellation of issues raised by Waymo's complaints that Uber engaged in litigation misconduct. (To repeat, however, it does not undo any prior evidentiary ruling.)

**ANALYSIS**

An overarching guide for this order should be plainly stated at the outset. This was and remains a civil action based on Uber's alleged misappropriation of eight trade secrets. The trial

will be a trial on Waymo's claims of trade secret misappropriation, not a trial on Uber's litigation practices or corporate culture. Of course, evidence of Uber's litigation misconduct or other bad behavior may be relevant and admissible insofar as it reasonably bears on actual claims and defenses in this case. For example, facts like Uber's use of ephemeral messaging may be used to explain gaps in Waymo's proof that Uber misappropriated trade secrets or to supply proof that is part of the res gestae of the case (like the due diligence report).[3]

Such evidence will *not* be permitted, however, to the extent that it becomes cumulative, invites improper speculation, vilifies Uber without proving much else, or threatens to overwhelm the trial and distract from the merits of the case. Nor will the Court short-circuit the ordinary process of proof in a jury trial by ushering in such "evidence" through adverse-inference instructions (except as explained below). Both sides will have to prove their cases to the jury the old-fashioned way — by laying the necessary foundation and relying on admissible evidence and properly-designated witnesses. While this order rules that certain instances of "misconduct" will be relevant and admissible at trial, this order does not bless any particular method of proof and the parties must still employ non-objectionable ways to present their evidence at trial.[4]

### 1.   ALLEGED VIOLATIONS OF PRIOR ORDERS.

As stated, Waymo had an opportunity to propose a non-argumentative instruction that would present to the jury relevant facts about shortfalls in Uber's compliance with the expedited discovery and provisional relief orders. Instead, Waymo proposed an argumentative jury instruction unsuitable for use at trial (*see* Dkt. No. 1501-6). To repeat, that argumentative instruction will not be given to the jury.

This order now re-examines each of Waymo's accusations that Uber violated the expedited discovery and provisional relief orders, denies Waymo's requests for an adverse-

---

[3] Waymo previously moved *in limine* to preclude Uber from presenting evidence or argument that Uber relied on the due diligence investigation to prevent trade secret misappropriation. A prior order denied that motion (Dkt. No. 2493).

[4] One reason this order cannot bless any particular method of proof is that Waymo, in its most recent offer of proof, failed to explain how particular witnesses would sponsor particular items of evidence without running into hearsay objections, as discussed further below (*see* Dkt. No. 2470-36).

1    inference and remedial instruction, and explains the extent to which Waymo may attempt to

2    present the relevant facts to the jury (assuming, of course, that Waymo can do so through

3    admissible and properly-designated evidence).

**A.    Original Contempt Motion.**

5        In its contempt motion, Waymo claims Uber violated two provisions of the expedited

6    discovery and provisional relief orders.  *First*, Paragraph 4 of the expedited discovery order

7    provided (Dkt. No. 61 at 2):

> By March 31, defendants shall produce for inspection all files and
> documents downloaded by Anthony Levandowski, Sameer
> Kshirsagar, or Radu Raduta before leaving plaintiff's payroll and
> thereafter taken by them.  Defendants shall also produce for
> copying the card reader, thumb drive, or other media used for the
> downloads, as well as all subsequent emails, memoranda,
> PowerPoints, text messages, or notes that have forwarded, used, or
> referred to any part of said downloaded material.  If any part of
> said downloaded material has been deleted, destroyed, or modified,
> then defendants shall state the extent thereof and produce all
> documents bearing on said deletion, destruction, or modification.

*Second*, Paragraph 2 of the provisional relief order provided (Dkt. No. 426 at 23):

> Defendants must immediately and in writing exercise the full
> extent of their corporate, employment, contractual, and other
> authority to (a) prevent Anthony Levandowski and all other
> officers, directors, employees, and agents of defendants from
> consulting, copying, or otherwise using the downloaded materials;
> and (b) cause them to return the downloaded materials and all
> copies, excerpts, and summaries thereof to Waymo (or the Court)
> by **MAY 31 AT NOON**.

As now explained, however, this order concludes that Uber, for the most part,

substantially complied with the foregoing provisions; that the extent of Uber's noncompliance

may be presented to the jury through admissible evidence and percipient witnesses (including

lawyers if properly designated); and that no jury instruction will be given as a substitute for

evidence on this issue, with the sole exception that the Court will inform the jury as to the

existence of the aforementioned orders and as to two particular violations of the expedited

discovery and provisional relief orders.[5]

---

[5]  To be clear, "downloaded materials," as used in prior orders and herein, is *not* synonymous with
"alleged trade secrets."  A device, server, or document might contain some of the former but none of the latter.
And, some or all of the alleged trade secrets may fail to qualify for trade secret protection under the law.  Of

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

### *(1)* *Stroz Friedberg.*

Waymo contends Uber violated Paragraph 2 of the provisional relief order by failing to compel Stroz to return the downloaded materials in its possession even though Stroz has been acting as Uber's agent and providing e-discovery and digital forensics services in this litigation (Dkt. No. 676-4 at 4–5). Waymo acknowledges that Uber's counsel wrote to Stroz in a letter dated June 12, 2017, stating (Dkt. No. 677-5):

> We are sending this letter to Stroz to make the following points abundantly clear:
>
> 1.      Uber and Ottomotto do not want Stroz to retain possession of *any* materials it gathered from Levandowski.  Uber and Ottomotto are therefore instructing Stroz not to retain any such materials.
>
> 2.      Uber and Ottomotto do not want Stroz to destroy or delete any materials it gathered from Levandowski.  Uber and Ottomotto are therefore instructing Stroz not to destroy or delete such materials.
>
> 3.      Uber and Ottomotto want Stroz to produce to Waymo any materials that it gathered from Levandowski that may constitute or contain any Google information, or that might possibly contain or reference any Google information, whether reasonably considered "proprietary" information or not ("Google Information").  The term "Google Information" should be interpreted as broadly as possible to include any document that was created at Google (or any affiliate) or that refers to Google (or any affiliate) or anything created at Google (or any affiliate).
>
> 4.      While we want to see the actions described in items 1–3 above happen, we appreciate that based on the March 21 Levandowski-Stroz Agreement, it appears that Uber and Ottomotto do not have the contractual power to order Stroz to produce such materials to Waymo.  For that reason, we are writing to Levandowski today to confirm that if he wishes to cure his failure to cooperate with Uber and Ottomotto's prior directives, he must instruct Stroz to produce these materials to Waymo.  We attach a copy of that letter to this letter.  Of course, if Stroz takes a different view of its contractual obligations under these circumstances, and believes it is able to produce any Google Information it may have to Waymo based solely on the wishes expressed by Uber and Ottomotto in this letter, but without the consent of Levandowski, it may do so immediately.

_____

course, Waymo may present evidence and argument to the jury about the downloaded materials as a step in proving Uber's alleged misappropriation of trade secrets, but Waymo must take care not to conflate these issues.

United States District Court

For the Northern District of California

Waymo argues, however, that this letter was "plainly less than the full extent of Uber and Ottomotto's authority" because it explains near the end that "Uber and Ottomotto do not have the contractual power to order Stroz" to comply with the directives in the letter (Dkt. No. 676-4 at 5, 9). This is a non sequitur. It is not "less than the full extent" of Uber's authority for Uber to acknowledge the limits of that authority. Significantly, Waymo does not dispute that Uber had no contractual authority to order Stroz to produce documents it had obtained from Levandowski under a separate agreement between Stroz and Levandowski. Instead, Waymo faults Uber for being "lukewarm and equivocal" in the June 12 letter (*id.* at 10). But this is merely Waymo's subjective characterization of the letter. This order declines to find any violation of the provisional relief order based on the mere fact that Uber, in Waymo's view, should have used more zealous wording.

Waymo further contends Uber could have threatened Stroz with termination or withholding of future business "as another lever to pressure Stroz" to comply with Uber's demands. This contention fails to come to grips with Uber's point that the requests it made of Stroz in the June 12 letter exceeded Uber's actual *authority* in the first instance. Waymo essentially faults Uber for failing to exercise the full extent of its bargaining, pressuring, or persuasive powers over Stroz (*see* Dkt. Nos. 676-4 at 10, 886-3 at 5). But Paragraph 2 of the provisional relief order required Uber to exercise the full extent of its "corporate, employment, contractual, or other *authority*," not any and all non-authoritative *influence* it could bring to bear. What Waymo really seems to be arguing is that Uber was less than enthusiastic in pressuring Stroz to voluntarily turn over materials it received from Levandowski, and that this lack of zeal indicates reluctance to reveal evidence probative of Waymo's claims. But Waymo may make that argument to the jury with qualified witnesses and evidence, instead of asking the Court to carry Waymo's water by repeating its message with an instruction simply stating outright that Uber "disobeyed" orders (*see* Dkt. No. 1501-6 at 1–2).

Waymo also points out that Uber's June 12 letter to Stroz came *after* the provisional relief order's May 31 deadline (Dkt. No. 676-4 at 10–11). Waymo vaguely complains that this delay violated the order because of "the sensitive nature of the documents, the risks that Waymo

United States District Court
For the Northern District of California

1  suffers by having these documents in others' hands, and the compressed nature of this

2  litigation" (*id.* at 11).  These abstract buzzwords insinuate but fail to actually show that Uber's

3  twelve-day delay in sending the June 12 letter to Stroz really prejudiced Waymo so as to require

4  a remedial jury instruction.  Under these circumstances, the better course is for Waymo, if it

5  wishes, to simply tell the jury through admissible evidence that Uber missed a deadline by

6  twelve days and to make its point, if any, to the jury based on that evidence.[6]

7  ***(2)     Morrison & Foerster.***

8  Also on June 12, 2016, Uber's counsel at Boies Schiller Flexner LLP emailed Waymo

9  to, among other things, clarify that (Dkt. No. 677-8):

10  > [Uber's counsel at Morrison & Foerster LLP] does not have any
11  > downloaded materials (or any copies, excerpts or summaries
     > thereof), except to the extent that any such material may appear:
12  > (1) excerpted in or as an exhibit to the Stroz Report, which is
     > privileged; and (2) in certain materials AL and other persons
13  > provided to Stroz to which MoFo was given limited access during
     > the Stroz investigation pursuant to the terms of the AL-Stroz
14  > contract and the protocol governing the investigation, and under
     > strict conditions preventing MoFo from sharing those materials
15  > with anyone, including Uber.

16  Waymo contends Uber violated both the expedited discovery and provisional relief orders

17  because it failed to compel MoFo to return the downloaded materials in its possession (Dkt. No.

18  676-4 at 7–8, 13).  As Uber points out, Waymo's argument is unpersuasive as to the first

19  category of downloaded materials because that category remained subject to privilege issues

20  pending before the Federal Circuit at the time.  As to the second category identified in BSF's

21  June 12 email, MoFo subsequently "confirmed that it does not have any such materials in its

22  possession or control other than as included as exhibits to the Stroz Report, which already is

23  covered by the first category" (Dkt. No. 885 at 14–15).

24

25  _____

26  [6]  Occasionally, Waymo's brief strays from arguing that Uber violated the provisional relief order to
     arguing that Uber also violated the expedited discovery order with respect to Stroz (*see* Dkt. No. 676-4 at
27  11–12).  This serves only to muddy up Waymo's arguments, which in any event enjoy greater force as to the
     provisional relief order.  The gravamen of Waymo's complaint with respect to Stroz remains that Uber
28  supposedly failed to exercise the full extent of its "corporate, employment, contractual, [or] other authority" as
     required by the provisional relief order.  This order therefore focuses on that issue notwithstanding Waymo's
     inconsistent references to the expedited discovery order.

9

United States District Court

For the Northern District of California

In its opposition brief, Uber revealed it had learned for the first time on July 11, 2017, that "MoFo has some materials that Levandowski provided to Stroz, and that Levandowski authorized Stroz to provide to MoFo *in its former role as personal counsel for Levandowski since the inception of the arbitrations brought by Google* (and not from the Stroz diligence investigation or anything else preceding this litigation)" (*id.* at 15 (emphasis in original); *see also* Dkt. No. 883 ¶¶ 6–8, 21–23). In its reply, Waymo complained at length that Uber's new discovery was inconsistent with BSF's June 12 email and with other communications between counsel. Even based on Waymo's own arguments, however, the worst that can be said of Uber's counsel is that they had to correct certain representations to opposing counsel as this litigation progressed and did so within about a month.

Waymo also baldly asserts that "MoFo was obliged to produce these materials in response to the Expedited Discovery Order" but fails to explain why (*see* Dkt. No. 886-3 at 3–4). This order agrees with Uber that it did not violate the expedited discovery and provisional relief orders by failing to compel MoFo to produce copies of downloaded materials that, unbeknownst to Uber, MoFo had received and retained in its *former role as Levandowski's counsel in separate arbitration proceedings*.

In short, no jury instruction is warranted based on Waymo's claim that Uber violated orders by failing to compel MoFo to produce the downloaded materials. Nor do the underlying facts described above bear any reasonable nexus to any issues relevant to the claims and defenses in this case. Their probative value, if any, is substantially outweighed by their likelihood of confusing the issues, misleading the jury, and consuming undue time at trial. They are therefore excluded under Federal Rule of Evidence 403.

### *(3)      The Five Discs.*

On June 8, 2017, Uber responded to one of Waymo's interrogatories as follows (Dkt. No. 677-2 at 4):

> On or about March 11, 2016, Mr. Levandowski reported to Mr. Kalanick, Nina Qi and Cameron Poetzscher at Uber as well as Lior Ron that he had identified five discs in his possession containing Google information. Mr. Kalanick conveyed to Mr. Levandowski in response that Mr. Levandowski should not bring any Google information into Uber and that Uber did not want any Google

> information.  Shortly thereafter, Mr. Levandowski communicated to Uber that he had destroyed the discs.  Uber never received those discs, and does not know whether those discs contained any of the "DOWNLOADED MATERIALS."

Poetzscher, who remains Uber's vice president of corporate development, also confirmed in his deposition on June 19 that he had known since March 2016 about the supposed destruction of the five disks (*see* Dkt. No. 676-14 at 259:1–260:7).

Waymo contends Uber's failure to sooner disclose the supposed destruction of the five discs violated Paragraph 4 of the expedited discovery order because "these facts and circumstances raise an exceedingly strong inference that the discs did indeed contain downloaded materials" (Dkt. No. 676-4 at 13–14).  Uber does not dispute that it should have sooner disclosed the supposed destruction of the five discs and expresses regret for its "oversight" (Dkt. No. 885 at 3).  Uber insists, however, that it did not intentionally conceal that information from Waymo (*see id.* at 15–18).  According to Uber, it withheld the information as "privileged" for months until the Court ordered it to decide by June 1 whether or not it would waive any privilege.  Only then did Uber revisit its assertions of privilege and conclude that the information about the five discs was not privileged after all, leading to the belated disclosure of that information to Waymo (*see id.* at 17).

Uber's vague hand-wringing about the "difficult privilege issues raised in this case" fails to explain how there could have been any confusion on the specific question of whether or not the information about the five discs was privileged.  Clearly, it was not.  Even a generous reading of this record suggests that Uber liberally asserted privilege over broad swaths of information at the outset of this litigation and only bothered to closely examine the validity of those assertions when faced with the possibility that it would not be able to use information favorable to its own defense absent a timely waiver.  In other words, insofar as Uber claims simple carelessness as its excuse, that carelessness proved suspiciously convenient to Uber and its defense strategies.

In a similar vein, Uber rationalizes that it "devoted enormous resources" and "conducted a massive investigation" to comply with the expedited discovery order (*see* Dkt. No. 885 at 4–6, 16–17).  These protestations miss the point.  The five discs hardly constituted needles in a

11

United States District Court

For the Northern District of California

1   haystack but stood out as a vital element in the narrative at the core of this case, plainly bearing

2   on the crucial question of whether or not Levandowski funneled Waymo's trade secrets to Uber.

3   It was and remains known to Uber's leadership, including Travis Kalanick, Nina Qi, and

4   Cameron Poetzscher, who all learned about the five discs and their supposed destruction from

5   Levandowski himself.  Under these circumstances, Uber's failure to timely disclose the five

6   discs and their supposed destruction — even viewed through the excuse that Uber's counsel

7   apparently let frivolous assertions of privilege go conveniently unchecked for months —

8   constituted a violation of the expedited discovery order.  At trial, the Court will inform the jury

9   of these facts and will instruct the jury that it may, but need not, draw any adverse inference

10  therefrom.  It will remain up to the jury to decide what inference, if any, to draw.

11                    **B.        Waymo's First Supplemental Brief on Contempt Motion.**

12           On August 4, 2017, Uber's in-house counsel Attorney Padilla submitted a declaration

13  describing a meeting that took place on March 29, 2017, between her, Kalanick, and

14  Levandowski.  According to Padilla, Levandowski revealed to her and Kalanick during that

15  meeting that he had downloaded and deleted Waymo files (Dkt. No. 1082-1 ¶ 6).  In its first

16  supplemental brief, Waymo pointed to this declaration and meeting as further evidence that

17  Uber violated the expedited discovery order by failing to timely disclose Levandowski's

18  destruction of downloaded materials (Dkt. No. 1095).

19           Significantly, Kalanick testified about the contents of the March 29 meeting at his

20  deposition on July 27.  Uber then insisted the March 29 meeting was *not* privileged to begin

21  with, this to avoid subject-matter waiver as a result of Kalanick's testimony.  Judge Corley

22  disagreed, finding that the meeting had been privileged — but that Uber had waived privilege as

23  to the subject matter of that testimony.  The undersigned judge overruled Uber's objections to

24  Judge Corley's ruling (Dkt. Nos. 1172, 1267).  As even Waymo recognizes, however, this also

25  means the March 29 meeting was indeed privileged in the first instance, so Uber's failure to

26  disclose information from that meeting could not have constituted a violation of the expedited

27  discovery order.  Under these circumstances, the appropriate remedy for Uber's actions was

28

12

United States District Court
For the Northern District of California

1    Judge Corley's ruling of subject-matter waiver, not a jury instruction that Uber violated the

2    expedited discovery order.

3              **C.      Waymo's "Corrected" Supplemental Brief on Contempt Motion.**

4              During a prior hearing on July 26, 2017, the undersigned judge set forth certain ground

5    rules pertaining to Levandowski's expected invocation of his Fifth Amendment privilege at

6    trial.  In relevant part, the ground rules would instruct the jury that it may, but need not, infer

7    that the testimony Levandowski refused to give would be adverse *to him*.  Whether or not that

8    would further lead to an adverse inference against *Uber*, however, would be up to the jury to

9    decide based on all the evidence and argument in the case (*see* Dkt. No. 1050 at 99:3–100:8).

10             Not content with this ruling and the opportunity to propose a non-argumentative

11   instruction about Uber's alleged violations of orders, Waymo filed a "corrected" supplemental

12   brief urging the Court to extend any adverse inference against Levandowski to include Uber "as

13   an additional sanction" for said violations (*see* Dkt. No. 1501-4 at 1).  While Waymo left

14   ambiguous how exactly this "extension" would occur, Waymo's arguments suggest it wants to

15   instruct the jury that any adverse inference drawn against Levandowski must automatically

16   extend to Uber as well.  The sanction Waymo proposes would pose a serious risk of invading

17   the fact-finding province of the jury and hampering the resolution of this action on the merits,

18   particularly since any nexus between Uber's alleged violations of orders and the substance of

19   Waymo's misappropriation claims remains tenuous at best.  In its "corrected" supplemental

20   brief, Waymo complains that Uber violated prior orders in three additional ways but ultimately

21   provides no reason or authority why such drastic relief is warranted, as now addressed.

22                         *(1)      Levandowski's Devices.*

23             Waymo contends Uber violated both the expedited discovery and provisional relief

24   orders by failing to disclose that Stroz had received and possessed approximately one hundred

25   hard drives from Levandowski in connection with the due diligence investigation.  Waymo cites

26   Paragraph 4 of the expedited discovery order and Paragraph 2 of the provisional relief order

27   (both discussed above), and further claims Uber violated Paragraph 4 of the provisional relief

28   order, which provided (Dkt. No. 426 at 24):

                                        13

United States District Court

For the Northern District of California

> With respect to all other persons, including those with Stroz
> Friedberg, defendants shall conduct a thorough investigation and
> provide a detailed accounting under oath setting forth every person
> who has seen or heard any part of any downloaded materials, what
> they saw or heard, when they saw or heard it, and for what
> purpose. . . .  The accounting shall not be limited to downloaded
> materials that happened to make their way into some due diligence
> report but shall cover any and all downloaded materials.  The
> accounting shall also identify the complete chains of custodians for
> every copy of any downloaded materials or due diligence report
> referencing downloaded materials.  Defendants must also use the
> full extent of their authority and influence to obtain cooperation
> with the foregoing procedure from all involved.  For example, if a
> potential custodian refuses to cooperate, then defendants'
> accounting shall set forth the particulars, including all efforts made
> to obtain cooperation. The accounting must be filed and served by
> **JUNE 23 AT NOON**.

Insofar as Waymo's "corrected" supplemental brief simply riffs on its complaint that Uber could have done more to pressure Stroz to turn over materials it received from Levandowski, it does not warrant any further relief for the reasons stated above (Dkt. No. 1501-4 at 2–3).

With respect to Paragraph 4 of the provisional relief order, Waymo accuses Uber of misrepresentation because Uber's accounting disclosed that Stroz "collected *and imaged* Anthony Levandowski's personal devices for the purpose of preparing a due diligence report" but did not also specifically call out devices that Stroz collected *but never imaged* (*see id.* at 3–4; Dkt. No. 715 at 2 (emphasis added)).  On this record, however, the worst that can be said of Uber is that it left ambiguous whether Stroz imaged every device collected from Levandowski and failed to provide a detailed list of those devices — details not explicitly required by the provisional relief order in the first place (*see* Dkt. No. 426 ¶ 4 (requiring an accounting of "every person who has seen or heard any part of any downloaded materials, what they saw or heard, when they saw or heard it, and for what purpose")).

Waymo's real point seems to be that Stroz's failure to image certain devices from Levandowski is probative of Waymo's misappropriation theory because it undermines Uber's narrative that it quarantined Levandowski's devices in a "vault" to keep any purloined trade secrets away from Uber (*see* Dkt. No. 1501-4 at 4).  Of course, this point goes to the merits of the case and Waymo may try to present its argument through evidence admissible at trial.  This

United States District Court

For the Northern District of California

1    does not further show, however, that Uber violated the provisional relief order.  The adverse-

2    inference instruction sought by Waymo remains unwarranted on this basis.

3                        *(2)        Communications Log.*

4          In its "corrected" supplemental brief, Waymo further contends Uber violated Paragraph

5    5 of the provisional relief order, which provided (Dkt. No. 426 at 25):

6                Also by JUNE 23 AT NOON, defendants shall provide Waymo's
               counsel and the Court with a complete and chronologically
7                organized log of all oral and written communications — including,
               without limitation, conferences, meetings, phone calls, one-on-one
8                conversations, texts, emails, letters, memos, and voicemails —
               wherein Anthony Levandowski mentioned LiDAR to any officer,
9                director, employee, agent, supplier, or consultant of defendants.
               The log shall identify for each such communication the time, place
10               (if applicable), mode, all persons involved, and subjects discussed,
               as well as any and all notes or records referencing the
11               communication.

12   Waymo points out that, despite the June 23 deadline, Uber continued to supplement its

13   communications log until September 5, and further complains that even Uber's latest

14   supplementation failed to capture many LiDAR-related communications between Levandowski

15   and Uber personnel (Dkt. No. 1501-4 at 4–11).  Uber responds that it was simply doing the best

16   it could under the "blazingly fast discovery schedule in this case," that Waymo itself prioritized

17   some document productions while delaying others, and that innocent explanations exist for the

18   specific un-logged communications complained of by Waymo (Dkt. No. 1591-4 at 2–3).

19         As stated, the Court will inform the jury as to aspects of the provisional relief order.

20   Uber does not and cannot dispute that it provided an incomplete log prior to June 23 and then

21   proceeded to supplement that log until September 5 (*see* Dkt. No. 1469).  The Court will also

22   inform the jury of that fact.  Waymo will not, however, be allowed to waste time at trial by

23   unnecessarily parading dozens of examples of communications that arguably fell within the

24   scope of the provisional relief order, as it did in briefing on this issue (*see* Dkt. No. 1501-4 at

25   5–10).  While individual examples of un-logged communications may prove relevant to the case

26   in other ways and to that extent may be presented to the jury, generic flyspecking would add

27   little, if any, probative value to the core point that Uber simply did not provide a complete

28

                                        15

United States District Court

For the Northern District of California

1   communications log by June 23.  If Waymo attempts to go down the latter path at trial, it will

2   likely be excluded under FRE 403.

3        Possibly, as Uber argues, its belated supplementation reflected nothing more than the

4   understandable consequences of a compressed discovery schedule.  By contrast, it was also

5   possibly symptomatic of something more sinister.  Under these circumstances, however, the

6   question of whether and to what extent Uber's belated supplementation indicated its liability

7   should be answered by the jury, not decided via an adverse-inference instruction imposed as a

8   "sanction" for imperfect logging of voluminous communications.

9                        *(3)*      ***Sword-and-Shield Disputes.***

10       Finally, in its "corrected" supplemental brief, Waymo complains that Uber has been

11  using privilege as both a sword and a shield throughout this litigation, both with its own

12  assertions of privilege and with Levandowski's assertions of his Fifth Amendment privilege

13  (Dkt. No. 1501-4 at 11–14).  Setting aside for the moment Waymo's conflation of two very

14  different privileges asserted by different parties, its grievance has no discernible nexus to its

15  requested relief.  Aside from a single nebulous and conclusory comment that Uber's alleged

16  abuse of privilege "adds to the pattern of intentional non-compliance with this Court's orders,"

17  Waymo offers no explanation as to how these allegations, even taken as true, show that Uber

18  violated any order.  Waymo's familiar sword-and-shield complaints are quintessentially

19  discovery disputes that should have been brought before Judge Corley for resolution.  Waymo,

20  of course, knows this, having done so — and prevailed — before (*see, e.g.*, Dkt. No. 1267).

21  Waymo's regurgitation of these issues in its "corrected" supplemental brief fails to justify any

22  jury instruction, much less the adverse-inference instruction requested by Waymo.

23       Insofar as this argument also implicates Waymo's motion *in limine* regarding the subject

24  of Levandowski's cooperation (or non-cooperation) with Uber, it is addressed further below.

25                **D.      Waymo's Second Supplemental Brief on Contempt Motion.**

26       Waymo also filed a second supplemental brief in furtherance of its quest for a jury

27  instruction and adverse inference against Uber.  Waymo's second supplemental brief raises two

28  additional issues, neither of which justifies the relief requested by Waymo.

United States District Court
For the Northern District of California

### *(1)* *Levandowski's Laptops.*

Levandowski first asserted his Fifth Amendment privilege in this action on March 29, 2017. At the same time, Uber's counsel mentioned that they did not have access to Levandowski's personal devices (*see* Dkt. No. 131 at 5:14–18, 11:25–12:3). On April 20, Uber's in-house counsel Attorney Padilla emailed Levandowski to demand that he turn over for inspection and imaging two personal laptops he had used for Uber work, citing "internal company policies" requiring his compliance (Dkt. No. 2053-5). Levandowski refused through his personal counsel at Goodwin Procter LLP. (Uber later cited this refusal as a ground for terminating his employment (*see* Dkt. No. 519-2).) Uber's counsel then asked Goodwin, as an alternative, to run search terms on Levandowski's personal computers and provide the results to Uber. Goodwin did not share any details about the actual searches with Uber but on May 17 transmitted the purported results of those searches to Uber's counsel, who then turned the results over to Waymo (Dkt. No. 2018-3).[7]

Waymo contends this handling of the situation with Levandowski's two personal laptops violated the expedited discovery and provisional relief orders. *First*, Waymo seems to complain that Uber's counsel did not do enough to look for the downloaded materials despite obtaining search results from Goodwin. Waymo points to no actual evidence that those search results were incomplete but nevertheless speculates that the requested search parameters could have missed the downloaded materials in various ways — for example, if said materials "were stored in certain types of encrypted, container-type files" (Dkt. No. 2053-4 at 11–12). This argument misses the point. The request between counsel for Uber and counsel for Levandowski was just that — a request between counsel. It was not made pursuant to any "corporate, employment, contractual, and other authority" of Uber's. Levandowski himself made that abundantly clear when, as an Uber employee, he refused Padilla's unequivocal demand to turn over those laptops for inspection and imaging. In short, there is no merit to Waymo's suggestion that Uber somehow failed to exercise its authority over Levandowski just because Uber's counsel did not persuade Levandowski's counsel to voluntarily run more exhaustive searches.

---

[7] By this point, MoFo no longer represented Levandowski in his personal capacity (Dkt. No. 883 ¶ 6).

United States District Court

For the Northern District of California

*Second*, Waymo states in conclusory terms that Uber did not use "the full extent of [its] authority to cause Mr. Levandowski and his agents to return any downloaded materials on the two laptops to Waymo or the Court" (Dkt. No. 2053-4 at 12). This assertion is meritless for the same reasons stated above.

To be clear, Waymo may, of course, try to prove to the jury that it sought to inspect Levandowski's personal laptops but was refused, just as Waymo may try to prove that Uber allowed Levandowski to use those laptops for work despite the very real possibility that he could consult any misappropriated trade secrets stored thereon while guiding the development of Uber's self-driving technology. Uber, for its part, may try to prove that it asked Levandowski to turn over his laptops but was refused and may also try to prove to the jury MoFo's efforts to run searches on the laptops through Goodwin. These facts are unquestionably germane to the merits of the case. But, to repeat, in pursuit of these points, both sides must lay the necessary foundation and rely on admissible evidence and witnesses properly designated for trial, including, if necessary, attorneys from MoFo, Goodwin, and Quinn Emanuel Urquhart & Sullivan, LLP. For example, if Uber tries to go down this path, it must prove that the laptops searched by Goodwin were in fact the same personal laptops used by Levandowski for his work at Uber. (Without testimony from Levandowski, this may prove difficult.) Unless and until Uber lays the full foundation, it may *not* claim before the jury that it obtained and turned over search results from the latter (though it may describe its efforts to do so) or otherwise exceed in argument the scope of what admissible evidence and percipient witnesses will support.

Waymo's instant motion, however, does not concern whether or not both sides may present the foregoing narratives to the jury. Rather, it concerns Waymo's contention that Uber violated orders so as to justify an adverse-inference instruction against Uber. As explained, this order denies such relief with respect to Uber's handling of Levandowski's personal laptops.

*Third*, Waymo complains that Uber's accounting pursuant to Paragraph 4 of the provisional relief order did not refer to any efforts to obtain Levandowski's laptops from his personal counsel at Goodwin, nor did the accounting disclose the two laptops in a section titled "Other Potentially Downloaded Materials" (*id.* at 12–14). Again, Paragraph 4 of the

**United States District Court**
For the Northern District of California

1    provisional relief order required an accounting of "every person who has seen or heard any part

2    of any downloaded materials, what they saw or heard, when they saw or heard it, and for what

3    purpose."  The accounting also had to "identify the complete chains of custodians for every

4    copy of any downloaded materials or due diligence report referencing downloaded materials."

5    As Uber points out, however, the Goodwin searches unearthed no downloaded materials.

6    Waymo does not contend otherwise but nevertheless suggests Uber should have included the

7    searches and laptops in its accounting because some downloaded materials could have slipped

8    past the search parameters.  This argument rests on speculation and fails to show Uber violated

9    the provisional relief order such that an adverse-inference instruction would be warranted.

10       This issue also ties in to Waymo's motion *in limine* regarding the subject of

11   Levandowski's cooperation (or non-cooperation) with Uber and to that extent is addressed

12   further below.

13                    *(2)    **Due Diligence Materials.***

14       Uber previously moved to exclude evidence or argument about assertions of attorney-

15   client or work-product privilege in this litigation, even those that were ultimately rejected by

16   final court order (*see, e.g.*, Dkt. No. 1546).  This case, however, does not present mere

17   assertions of privilege that ultimately failed.  As described further below in the context of the

18   spoliation issue, the underlying story about the Otto acquisition and its elaborate setup —

19   including the due diligence investigation and a carefully constructed artifice of interlocking

20   privileges intended to shroud the whole affair in a fog of secrecy — remains vital to the story of

21   the whole case.  It cannot simply be excised for fear of revealing to the jury how that elaborate

22   artifice of "privilege" was actually invoked in this litigation.  For fairness and balance,

23   however, the undersigned judge ruled that, if Waymo mentions to the jury Uber's assertion of

24   privilege over the due diligence investigation, then Uber may also tell the jury about Waymo's

25   assertions of privilege ultimately rejected by final court order (*e.g.*, the Sasha Zbrozek story) —

26   notwithstanding Waymo's protestations, like Uber's, that it acted in good faith (*see* Dkt. No.

27   1863 at 24:17–30:12).  Uber would thus be able to defend itself against insinuations that it

28

United States District Court

For the Northern District of California

1  wrongfully asserted privilege to conceal damning evidence by retorting that Waymo itself

2  asserted privilege in the same way.

3     In its second supplemental brief, however, Waymo seeks to do more than just present

4  the complete due diligence story to the jury.  It wants an adverse-inference instruction based on

5  Uber violating the accounting requirement in the provisional relief order with respect to the due

6  diligence materials — including by failing to disclose information or produce materials that

7  remained subject to pending issues of privilege at the time.  Waymo's actual complaints,

8  however, bear little or no relation to the accounting requirement it cites.

9     *First*, Waymo criticizes various representations made by Uber and its counsel that,

10  according to Waymo, did not fully reflect the truth that the due diligence report and its exhibits

11  contained some downloaded materials.  For example, Waymo faults Uber for saying that MoFo

12  viewed "potentially" downloaded materials and Levandowski "allegedly" downloaded a

13  spreadsheet even though the due diligence report and its exhibits would have put both

14  equivocations to rest (Dkt. Nos. 2053-4 at 16–17).  Significantly, however, Uber made all the

15  complained-of representations while the due diligence materials remained subject to privilege

16  issues pending before the Federal Circuit.  This helps explain ambiguities in Uber's

17  representations at the time.  On this record, the worst that can be said of Uber is that it

18  temporized and occasionally used slick rhetoric to gloss over pending privilege issues and

19  potentially unfavorable facts.  Once Uber and Levandowski lost on the privilege issues, Uber

20  came clean.  These circumstances are not so egregious as to warrant an adverse inference

21  instruction (though Waymo remains free to put in its proof on this point to the jury).

22     *Second*, Waymo points out that Stroz possessed a Relativity database with data extracted

23  from Levandowski's personal devices, including downloaded materials.  On April 4, 2017,

24  Stroz sent a copy of the database to John Gardner, Levandowski's personal counsel, apparently

25  pursuant to a separate agreement between Stroz and Gardner.  Since then, Uber apparently

26  made no attempt to recover the Relativity database from Gardner or to prevent him from sharing

27  it with Levandowski.  Waymo apparently sees this as a violation of Paragraph 2 of the

28  provisional relief order, which required Uber to prevent Levandowski from "consulting,

United States District Court

For the Northern District of California

copying, or otherwise using the downloaded materials" (*id.* at 17–18).  Yet Waymo makes no attempt to show that Stroz acted as Uber's agent when it sent Gardner the Relativity database, that Uber had any "corporate, employment, contractual, [or] other authority" to prevent Stroz from doing so, or that Uber had any "corporate, employment, contractual, [or] other authority" to compel Gardner to return the Relativity database.[8]

*Third*, Waymo again dissects various comments made by Uber and its counsel and essentially argues that said comments were misleading, incomplete, or otherwise undermined by certain evidence in the due diligence materials (*id.* at 18–20).  This rehashes Waymo's first point and similarly fails to warrant an adverse-inference instruction.  Waymo also revives its complaints about Uber's failure to sooner disclose the five discs (*see id.* at 20–21).  That grievance, however, has already been addressed above.

Importantly, of course, counsel should not mislead the Court, mislead opposing counsel, or misstate the record.  The instant complex of motions and supplements, however, is not an unfettered forum to lodge all manner of complaints about counsel's half-truths and other slick litigation conduct (of which both sides have been guilty).[9]

The problem remains that Waymo fails to explain how Uber's counsel's comments in hearings, even if misleading, constituted a violation of the expedited discovery or provisional relief orders such that an adverse-inference instruction is warranted.  Yes, buried in the complex of motions and supplements lurk some legitimate criticisms of Uber and its counsel.  But it also must be said that Waymo has whined — often without good reason — at every turn in this case, making it hard to separate the wheat from the chaff.  Countless hours of time have gone into sorting these issues instead of the merits.  Less time would have been consumed had Waymo focused on its best examples of misconduct instead of piling on every miscellaneous grievance.

---

[8]  Relativity is a software company and platform that provides tools for e-discovery.

[9]  It bears repeating that neither side in this contentious litigation has been above using exaggeration, spin, or other misleading rhetorical flourishes to advance their cause.  If the Court were to issue an adverse-inference instruction for every time that a lawyer for either side, including Waymo, told a half-truth, the merits of this case would never see the light of day (*see, e.g.*, Dkt. No. 1965 at 10:7–16).

To repeat, the central issue in this case remains whether or not Uber misappropriated Waymo's trade secrets, not whether or not Uber is an evil corporation. Waymo's decision to devote so much time and effort to pursuing matters with so little connection to the merits raises the troubling possibility that Waymo is unwilling or unable to prove up a solid case on the merits and instead seeks to inflame the jury against Uber with a litany of supposed bad acts. This order remains sensitive to this concern while also allowing certain facts about Uber's misconduct to go before the jury insofar as they may actually help explain that weak spots in Waymo's case may well be the result of Uber's spoliation or obstruction of discovery.

### E.    Summary re Alleged Violations of Orders.

In summary, the jury will be instructed as to relevant aspects of the expedited discovery and provisional relief orders and the obligations they imposed on Uber. The jury will also be instructed that, despite Paragraph 4 of the expedited discovery order, Uber did not timely disclose information in its possession regarding the supposed destruction of the five discs. Similarly, the jury will be instructed that, despite Paragraph 5 of the provisional relief order, Uber did not provide a complete communications log by June 23 but continued to supplement that log through September 5. The jury will *not* further be directed to draw any adverse inference against Uber based on these facts but will be free to do so (or not) of its own accord.

In addition, Waymo may adduce proof before the jury about Uber's June 12 letter to Stroz and may argue that timing and tone of that letter reflected a reticence to turn up relevant evidence, if Waymo believes such argument is worth its time at trial. Again, Waymo must lay the necessary foundation and rely on admissible evidence and percipient witnesses properly designated for trial. Waymo may *not*, however, further argue that Uber or MoFo violated prior orders by failing to disclose information or produce materials that, at the time, remained subject to privilege issues pending before the Federal Circuit. Nor may Waymo present evidence or argument regarding MoFo's receipt or possession of materials from Levandowski in its role as Levandowski's personal counsel and without Uber's knowledge. *See* FED. R. EVID. 403.

United States District Court

For the Northern District of California

### 2.    MOTION RE SPOLIATION.

All of the foregoing dealt with Waymo's contempt motion and supplements thereto based on Uber's alleged violations of earlier orders.  We now turn to Waymo's separate motion for relief for spoliation.

Waymo moves under both Federal Rule of Civil Procedure 37(e) and the Court's inherent authority for an adverse-inference instruction against Uber on the basis that Uber spoliated evidence (Dkt. No. 2197-4).  Because the evidence in question consists of electronically-stored information, FRCP 37(e), not inherent authority, supplies the controlling legal standard.  *See* F.R.C.P. 37(e) Advisory Committee's Note to 2015 Amendment (FRCP 37(e) "authorizes and specifies measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures.  It therefore forecloses reliance on inherent authority or state law to determine when certain measures should be used"); *see also Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1364 n.7 (Fed. Cir. 2017) (relying on the Advisory Committee's Notes to construe FRCP 37(e)'s supersession of prior case law).

FRCP 37(e) provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1)  upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2)  only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A)  presume that the lost information was unfavorable to the party;
> > >
> > > (B)  instruct the jury that it may or must presume the information was unfavorable to the party; or
> > >
> > > (C)  dismiss the action or enter a default judgment.

## A.    Anticipation of Litigation.

"Many court decisions hold that potential litigants have a duty to preserve relevant information when litigation is reasonably foreseeable.  Rule 37(e) is based on this common-law duty."  F.R.C.P. 37(e) Advisory Committee's Note to 2015 Amendment.  Spoliation is the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.  *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. Aug. 21, 2012) (Judge Lucy Koh) (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)).  "This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011); *see also Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1345–47 (Fed. Cir. 2011) (litigation does not need to be certain or imminent to be reasonably foreseeable).  As the Federal Circuit explained in *Micron*:

> When litigation is "reasonably foreseeable" is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry.  This standard does not trigger the duty to preserve documents from the mere existence of a potential claim or the distant possibility of litigation.  However, it is not so inflexible as to require that litigation be "imminent, or probable without significant contingencies."

645 F.3d at 1320 (citations omitted).

Here, the record clearly shows (and this order finds) not only that a reasonable party in Uber's circumstances would have reasonably foreseen this litigation in January 2016, but also that Uber *actually* foresaw this litigation in January 2016 when it commenced the process of acquiring Otto.  Uber itself previously insisted as much while trying to withhold evidence about the acquisition by arguing to Judge Corley that the parties thereto anticipated, foresaw, and painstakingly planned for this very litigation so as to give rise to joint-defense and common-interest privileges between them (*see, e.g.*, Dkt. No. 1414 at 82:4–7).  But now, facing accusations of spoliation, Uber has reversed course and, in a performance deserving of an Academy Award, claims the exact opposite — that it did *not* reasonably foresee this litigation in

24

United States District Court

For the Northern District of California

1    2016 and thus supposedly had no duty to preserve evidence (*see* Dkt. No. 2240-4 at 6–13).

2    Uber's own statements show otherwise.

3        In January 2016, Uber consulted and retained MoFo as litigation counsel to obtain legal

4    advice regarding potential liability exposure arising out of its planned acquisition of Ottomotto

5    and Otto Trucking (collectively, "Otto"), including for potential claims that could be brought by

6    Waymo specifically.  Otto was founded by former Waymo employees Levandowski and Lior

7    Ron.  Like Waymo, Otto focused on self-driving technology.  Based on these factors, the parties

8    to the Otto acquisition entered into a joint-defense agreement by February 2016 (*see* Dkt. No.

9    378 ¶¶ 2–3, 5–6).  Also in February 2016, the parties signed a term sheet that included detailed

10   indemnity provisions in the event of "super duper litigation" brought by Waymo for certain

11   "Bad Acts," including trade secret misappropriation (*see* Dkt. No. 515-14 at 4–5, 50–51).[10]

12       In March 2016, in light of the litigation risks presented by the acquisition, Uber also

13   took the unusual step of retaining Stroz to perform a due diligence investigation that would

14   facilitate MoFo's provision of legal analysis and advice (*see* Dkt. No. 378 ¶¶ 9–10).  Stroz's

15   engagement letter explained that Uber retained its services to ascertain, among other things,

16   "whether certain current or prospective employees . . . of Ottomotto have improperly retained

17   on devices or in storage repositories not belonging to former employers, confidential

18   information belonging to former employers" (Dkt. No. 2197-9 at 1).

19       As it turned out, much of Stroz's due diligence investigation and report focused on the

20   possibility that Levandowski and other Otto employees might have retained highly confidential

21   and proprietary information from Waymo (*see generally* Dkt. No. 1928-24 (due diligence

22   report)).  It has also become clear over the course of this litigation that the purported joint-

23   defense and common-interest privileges among the parties to the Otto acquisition were an

24   elaborate artifice carefully and meticulously constructed for the purpose of shrouding the

25   acquisition and "due diligence" process in secrecy.

26

27

28       [10]  Technically, Levandowski and other Otto employees worked for Google Inc. before its self-driving
     car project spun out to become Waymo, a separate subsidiary under the same parent company.  For simplicity,
     however, this order refers only to Waymo.

United States District Court

For the Northern District of California

Uber argues at length that specific fragments of this picture — *e.g.*, the retention of litigation counsel, the retention of Stroz, and the indemnification and joint-defense agreements — show at most that Uber anticipated "potential litigation," not that this litigation was "reasonably foreseeable" so as to give rise to a duty to preserve evidence (Dkt. No. 2240-4 at 10–13). Uber attempts to split hairs that cannot be split. The elements of the Otto acquisition must be viewed as a whole because it is simply implausible that the pieces of such an intricate scheme hatched in isolation. For example, it would strain credulity to suggest that Uber's concern over trade secret misappropriation sprung into being when it signed the term sheet in February 2016 and retained Stroz in March 2016 but did not previously exist when Uber retained MoFo in January 2016, or that a transaction as anomalous as the Otto acquisition grew around "the mere existence of a potential claim or the distant possibility of litigation" as opposed to the "reasonable foreseeability" of litigation. *See Micron*, 645 F.3d at 1320.

This order finds that any reasonable party in Uber's position would have reasonably foreseen litigation from Waymo for trade secret misappropriation related to the defections of Levandowski and other Otto employees. *See ibid.* ("When litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry."). Indeed, the record indicates Uber *actually* foresaw this litigation and constructed the byzantine architecture of the Otto acquisition at least in part as a prophylactic measure to defend it. This order concludes, based on these findings and pursuant to FRCP 37(e), that Uber had a duty to preserve evidence at least as of January 2016.[11]

### B.   Spoliation of Evidence.

Waymo contends Uber failed to take reasonable steps to preserve five categories of evidence. *First*, hundreds of text messages among Levandowski, Ron, Kalanick, and Qi have been deleted. *Second*, Levandowski and Ron also deleted their electronic communications, files, and Slack records. *Third*, as already stated, Levandowski supposedly destroyed five discs.

---

[11]  To be clear, these findings are made only to explain the applicability of FRCP 37(e) and the appropriateness of the remedies authorized thereunder. These findings are *not* a jury instruction or adverse inference to be used against Uber at trial. Counsel shall not argue otherwise.

United States District Court

For the Northern District of California

*Fourth*, emails and email archives from Tyto LIDAR, LLC, were apparently deleted after its acquisition by Ottomotto.  *Fifth*, Waymo repeats that it was denied access to Levandowski's personal laptops.[12]

Waymo's "spoliation" argument regarding Levandowski's personal laptops (Dkt. No. 2197-4 at 13–14) can be summarily rejected.  Waymo's point seems to be that Uber "spoliated" evidence on those laptops because it did not make the data on them available to Waymo's satisfaction.  As explained, however, it was Levandowski's assertion of his Fifth Amendment privilege — not anyone else's failure to preserve evidence — that shielded his personal laptops from scrutiny in this litigation.  And, as far as this record shows, Uber in fact undertook efforts to make available any evidence on those laptops by demanding their production from Levandowski.  Even when those efforts failed, Uber's counsel continued to pursue the matter and apparently convinced Goodwin to run certain searches on what is claimed to have been those laptops.  No doubt, those personal laptops — which Uber allowed Levandowski to use for work — rank high as potential archives of downloaded materials, but for spoliation purposes the point remains that Uber never controlled, destroyed, or otherwise failed to preserve the information on those laptops, as least as far as the record shows.  No amount of lawyer argument could transform these facts into anything resembling "spoliation."

As to the other four categories of evidence mentioned in Waymo's motion, Uber does not dispute that such evidence has been lost and cannot be restored or replaced through additional discovery.  Instead, Uber contends no sanction is appropriate because (1) Waymo's motion came too late (Dkt. No. 2240-4 at 1–5), (2) the spoliated evidence was irrelevant (*id.* at 19–20), and (3) Uber acted in good faith (*id.* at 20–22).

*First*, Uber's timeliness argument is not well taken.  True, Waymo first caught wind of certain instances of spoliation, like the destruction of the five discs, in June 2017.  But as Waymo points out, the issue accreted for several months thereafter.  Waymo also reasonably expended additional time investigating the circumstances under which evidence had been lost

---

[12]  Slack is a collection of tools and services — including, for example, chat messages — used to facilitate communication and collaboration in a digital workspace.

United States District Court

For the Northern District of California

1    (*see* Dkt. No. 2199-4 (production of evidence on August 23, 2017, regarding automatic deletion

2    settings for Kalanick's cell phone)).  And, until the eventual court-ordered production of the due

3    diligence materials in September 2017, Waymo did not even have a clear view of the facts

4    underlying the Otto acquisition.  This hindered, for example, Waymo's ability to assess the

5    significance of the five destroyed discs and the deleted messages between Levandowski, Ron,

6    Kalanick, and Qi.  Indeed, the spoliation issue continued to evolve even *after* Waymo filed its

7    motion with the eleventh-hour discovery of the Jacobs materials, discussed further below.

8    Under these circumstances, Waymo did not file its motion too late to obtain relief.

9           *Second*, Uber's arguments that the spoliated evidence was irrelevant are similarly

10   meritless.  Uber posits that the hundreds of deleted text messages among Levandowski, Ron,

11   Kalanick, and Qi would have involved innocuous business matters, not trade secret

12   misappropriation, and points out that other contemporaneous evidence supports its

13   proclamations of innocence.  Tell this to the jury.  Facts about what transpired between

14   Levandowski, Ron, Kalanick, and Qi in connection with Uber's acquisition of Otto go to the

15   very heart of this case.  Having frustrated its adversary's attempts to mine these facts for

16   damning evidence, Uber cannot now evade spoliation by speculating that all of the lost

17   information was benign.

18          In this connection, Uber claims the five discs destroyed by Levandowski could not have

19   contained relevant information because they were destroyed before he joined Uber.  And, Uber

20   points out, Waymo's searches of *other* devices and servers have turned up no evidence of any

21   misappropriated trade secrets.  The glaring fact remains, however, that those five discs, like

22   Levandowski's personal laptops, could easily have held Waymo's alleged trade secrets and

23   could have been a link in the chain showing how Levandowski funneled those trade secrets to

24   Uber (if he in fact did so).  And, viewed in context, evidence that Uber itself directed

25   Levandowski to destroy those five discs could potentially support either Uber's narrative that it

26   was trying to *avoid* misappropriation or Waymo's narrative that it was trying to *conceal* it.

27          In a similar vein, Uber claims no Tyto emails could be relevant because they predated

28   the Otto acquisition and therefore cannot contain evidence of misappropriation.  But Waymo

United States District Court

For the Northern District of California

1  can argue — and has argued — that Levandowski brought its trade secrets to Uber indirectly by

2  developing technology at Tyto and Otto that were later absorbed by Uber via a series of

3  corporate acquisitions.  Waymo also can argue — and has argued — that the plot for

4  Levandowski to funnel its misappropriated secrets to Uber predated the Otto acquisition itself.

5  Again, under these circumstances, Uber's unfounded insistence that the evidence it failed to

6  preserve would have been irrelevant does not bar Waymo's requests for relief.

7       *Third*, Uber argues that there is no evidence of bad faith in its failure to preserve

8  evidence.  This argument goes to FRCP 37(e)(2), which requires the Court to find that the party

9  that failed to preserve evidence "acted with the intent to deprive another party of the

10  information's use in the litigation" before granting certain forms of relief.

11       On this record, there is considerable ground for Waymo to argue that Uber had the

12  requisite intent to warrant relief under FRCP 37(e)(2), particularly in light of evidence

13  stemming from the Jacobs materials discussed further below.  At this stage, however, we face a

14  different problem.  In advance of Waymo's offer of proof regarding the Jacobs materials and

15  their relationship to the spoliation and misconduct issues in this case, a prior order specifically

16  asked Waymo to "explain the practical details of how it will implement its offer of proof,

17  including the names of specific sponsoring witnesses and how they will overcome hearsay

18  objections" (Dkt. No. 2447).  In response, Waymo provided a bare-bones chart that lists various

19  documents, the names of potential sponsoring witnesses, and boilerplate summaries of rules

20  governing potential hearsay exceptions with no analysis whatsoever of how those exceptions

21  might apply here (*see* Dkt. No. 2470-36).  This underscores the recurring problem that Waymo

22  seems unwilling or unable to prove its case at trial with qualified witnesses and evidence and

23  seeks to have the Court fill in the gaps with adverse inferences instead.[13]

24

25

---

26  [13]  In yet another example of this recurring problem, Waymo previously sought permission to file yet
another "motion for relief based on defendants' litigation misconduct."  In addition to repeating Waymo's

27  requests for remedial and adverse-inference instructions, the proposed motion would have sought evidentiary
and terminating sanctions as to Uber's *liability for trade secret misappropriation*.  The proposed motion would

28  also have argued that "Waymo should be allocated an additional two hours of time at trial, *and Defendants
should be docked two hours*" (Dkt. No. 2472 (emphasis added)).  A prior order denied Waymo's request to file
this proposed motion (Dkt. No. 2494).

United States District Court
For the Northern District of California

1    This order therefore reserves decision on the question of whether or not Uber spoliated

2    evidence with the intent to deprive another party of its use in litigation, and further reserves

3    decision as to whether or not the jury will be instructed that it may or must presume the lost

4    information was unfavorable to Uber.  *See* F.R.C.P. 37(e)(2)(B).  These questions will be

5    decided after Waymo presents its case-in-chief at trial, during which at least some proof of the

6    facts underlying the spoliation motion (to the extent admissible), and possibly additional

7    evidence on point, will go before the jury anyway.  The undersigned judge will use this

8    presentation of proof and any additional evidence on point to supplement the current motion

9    record on the issue of intent for spoliation purposes.

10            **3.      OFFER OF PROOF RE JACOBS MATERIALS.**

11    A wholly third universe of Uber's alleged "misconduct" has flowed from the Jacobs

12    affair.  After so many pages, the reader will be forgiven for forgetting that Richard Jacobs was a

13    former Uber employee turned "whistleblower" whose attorney sent Uber a 37-page demand

14    letter dated May 5, 2017, filled with scandalous accusations that led to a jackpot settlement.

15    This order draws three conclusions from Waymo's lengthy offer of proof regarding the

16    Jacobs materials and Uber's response thereto, as explained in detail below.  *First*, this order

17    rules on Waymo's request to present certain instances of Uber's purported "discovery

18    misconduct" to the jury.  In that connection, if either side presents evidence or argument

19    regarding the Jacobs letter at trial, the Court will likely inform the jury that Uber withheld the

20    Jacobs letter and explain that the jury may, but need not, draw some adverse inference against

21    Uber based on that fact.  *Second*, Waymo may adduce certain facts before the jury to show that

22    Uber sought information about the technical details of Waymo's self-driving technology, and

23    that Uber sought to minimize its "paper trail" by using ephemeral communications, but other

24    facts and allegations stemming from the Jacobs materials will be excluded under FRE 403.

25    *Third*, the Jacobs materials themselves will be excluded at trial as hearsay, among other things

26    (unless a door is opened), except that they may be used to impeach Jacobs if he testifies at trial.

27    Now follow the details.

28

30

A.    Uber's "Discovery Misconduct" and Concealment of Jacobs Letter.

The Court agrees with the special master that Uber should have produced the Jacobs letter in discovery (Dkt. Nos. 2396, 2444).  Uber's failure to do so falls into a broader category of "discovery misconduct" complained of by Waymo, as this order now addresses.

Waymo previously moved *in limine* to prevent Uber from presenting any evidence or argument that it made good faith efforts to locate the downloaded materials over the course of this litigation (*see* Dkt. No. 913).  Uber responded that it should be allowed to adduce facts before the jury showing that Uber (1) conducted extensive searches of its own servers and systems, (2) fired Levandowski for not cooperating with its litigation efforts, and (3) let Waymo conduct eleven inspections of Uber's facilities and LiDAR designs (*see* Dkt. No. 978).  During the motion hearing, the undersigned judge ruled that both sides could present their narratives about Uber's "good citizen" and "bad citizen" behavior to the jury (*see* Dkt. No. 1050 at 72:6–14).  Pursuant to that ruling, Waymo submitted a list of 23 instances of Uber's "discovery misconduct" that Waymo wished to present to the jury, to be vetted before trial (Dkt. No. 1356).  This order rules on Waymo's proposals as follows:

| | |
|---|---|
| 1.  Uber's failure to timely disclose the destruction of the five discs. | As stated, the Court will inform the jury of this fact and instruct the jury that it may, but need not, draw any adverse inference from it. |
| 2/3.  MoFo's receipt and retention of downloaded materials in its former role as Levandowski's personal counsel. | Excluded as unfounded and irrelevant to the extent and for the reasons stated herein. |
| 4.  Uber's failure to compel Stroz to produce downloaded materials. | Excluded as unfounded and irrelevant to the extent and for the reasons stated herein. |
| 5.  Stroz's receipt and retention of unexamined devices from Levandowski. | Excluded as unfounded and irrelevant to the extent and for the reasons stated herein. |
| 6/9/10/11/12/13/15/16.  Uber's assertions of privilege throughout this litigation, including over information and materials that were | Permitted to the extent stated in prior rulings but excluded under FRE 403 to the extent stated herein insofar as Waymo just wants to complain to the |

| | |
|---|---|
| withheld during the pendency of the Federal Circuit appeal and turned over after the Federal Circuit's decision. | jury that Uber violated prior orders. The latter grievances are largely meritless, offer little to no probative value, risk confusing the issues and unduly consuming time at trial, and are cumulative of other facts that will be presented to the jury regarding said violations. |
| 7.  Uber's supplementation of its communications log after the deadline imposed by the provisional relief order. | As stated, the Court will inform the jury of this fact and instruct the jury that it may, but need not, draw any adverse inference from it. |
| 8/22/23.  Waymo's complaints about Otto Trucking's conduct. | Excluded as irrelevant because Otto Trucking has been dismissed. |
| 14.  Uber's supplementation of its accounting after the deadline imposed by the provisional relief order. | The Court will inform the jury of this fact for the same reasons and under the same conditions as with Uber's belated supplementation of its communications log. |
| 17.  Imperfections in Uber's production of text messages between Levandowski and Kalanick that were *not* deleted. | Excluded under FRE 403 because this grievance about text messages that were ultimately produced adds little to no probative value over and above Uber's failure to preserve other text messages.  It would just further distract from the merits and consume undue time at trial. |
| 18.  The deletion of text messages between Levandowski and Kalanick. | As stated, Waymo will be allowed to adduce facts showing this to the jury, but this order reserves decision on whether or not to give an adverse-inference instruction as well. |
| 19.  Uber's failure to disclose what Waymo claims to be the connection between Levandowski and Tyto. | Waymo may present evidence and argue before the jury that Uber knew about but concealed Levandowski's connection to Tyto.  Uber may present evidence and argue to the contrary (*see* Dkt. No. 1534 at 6).  Such evidence and argument will be allowed while they remain probative of Waymo's theory that Uber and Levandowski surreptitiously siphoned off trade secrets via a series of corporate transactions, but |

United States District Court

For the Northern District of California

32

United States District Court

For the Northern District of California

| | |
|---|---|
| | will be excluded if they devolve into more whining about Uber's supposed obstruction of discovery. |
| 20.  Uber produced many documents near the end of discovery, some of which, according to Waymo, seemed relevant to Uber's defense. | Excluded because this has no discernible relevance to anything in the case.  Waymo does not even bother to explain why producing documents near the end of discovery would constitute "misconduct." |
| 21.  Uber's claim that Levandowski refused to cooperate in this litigation. | This topic is encompassed by and addressed below in the context of Waymo's motion *in limine*. |

In addition to the foregoing, if Waymo uses the Jacobs letter at trial to impeach Jacobs, then the Court will likely inform the jury that Uber should have produced the letter in discovery but failed to do so.  Counsel may not reference the letter from the Office of the United States Attorney or the Jacobs materials without prior permission of the Court (but may, of course, reference Jacobs himself).

**B.**     **Admissible Evidence Stemming from Jacobs Materials.**

Now we turn to certain subjects stemming from the Jacobs materials and the extent to which those subjects (separate and apart from the Jacobs materials themselves) may be pursued via otherwise admissible evidence before the jury.

Uber's interest in and efforts to collect data about the technical details of Waymo's self-driving technology for competitive purposes are reasonably probative of Uber's state of mind regarding competition with Waymo, and therefore of Waymo's theory that Uber misappropriated Waymo's trade secrets to improve its own self-driving technology.  Waymo will be permitted to present evidence and argument on these issues at trial, provided, of course, that it can do so through qualified witnesses and evidence (*see* Dkt. No. 2466-3 at 12–17). Waymo will not, however, be permitted to further present evidence and argument that Uber also surveilled other competitors because such evidence and argument would be too attenuated from Waymo's misappropriation claims, substantially more prejudicial than probative, and therefore excluded under FRE 403.  If Waymo opens the door, however, by claiming that Uber spied on

United States District Court
For the Northern District of California

1    it, Uber will be allowed to respond with evidence and argument that it spied on everyone and

2    Waymo was not special in that regard.  In all events, Uber will be allowed to respond with

3    evidence and argument that its competitive intelligence-gathering efforts were all legitimate and

4    that Waymo itself engaged in similar activities (*see* Dkt. No. 2500-4 at 18–20).

5         Uber's use of ephemeral communications is also relevant as a possible explanation for

6    why Waymo has failed to turn up more evidence of misappropriation in this case.  Waymo will

7    therefore also be permitted to present evidence and argument on this subject at trial, provided

8    that it can do so through qualified witnesses and evidence (*see* Dkt. No. 2466-3 at 20–22).  Of

9    course, Uber will be allowed to present its own evidence and argument that its use of ephemeral

10   communications shows no wrongdoing, including by pointing out Waymo's own use of

11   ephemeral communications (*see* Dkt. No. 2500-4 at 14–18).

12        If Jacobs testifies at trial, then the Jacobs materials themselves, and evidence regarding

13   Jacobs's settlement with Uber, may be used for impeachment purposes only (*see, e.g.*, Dkt. No.

14   2466-3 at 26 (Waymo's offer of proof regarding the settlement)).  To be clear, such use would

15   only be permissible as to specific passages that actually contradict Jacobs's testimony at trial.

16   The Jacobs materials as a whole will not sail into evidence under the pretext of impeachment.

17                **C.    Inadmissible Evidence Stemming from Jacobs Materials.**

18        Uber's use of non-attributable devices is excluded under FRE 403 because, as Waymo

19   admits, that problem remained confined to SSG and MA, neither of which are implicated by

20   Waymo's claims of trade secret misappropriation.  The closest Waymo comes to showing any

21   connection is by pointing out that Levandowski used two personal laptops for his work at Uber

22   (*see* Dkt. No. 2466-3 at 17–20).  But there is no indication whatsoever that Levandowski's use

23   of personal laptops had anything to do with Uber's systemic use of non-attributable devices in

24   the SSG and MA groups.  If anything, Waymo's transparent attempt to conflate two disparate

25   topics by distorting the meaning of the phrase "non-attributable devices" merely confirms that

26   permitting evidence of Uber's use of non-attributable devices would invite confusion and

27   prejudice Uber without contributing any probative value at trial.

28

Uber's internal policies and practices regarding privilege designations are also excluded under FRE 403. While this information is arguably relevant to show Uber's efforts to conceal its paper trail, the same point can be made through evidence concerning Uber's spoliation of evidence and use of ephemeral communications. Its probative value is further diminished because, regardless of how Uber internally designated its documents, its counsel in this litigation separately assessed whether or not to produce those documents. Actual assertions of privilege in this litigation have been hotly contested and examined at length by the special master, Judge Corley, the undersigned judge, and the Federal Circuit. In light of all this, it would be misleading for Waymo to suggest to the jury that Uber's internal privilege designations translated neatly into obstruction of discovery in this litigation. Finally, allowing Waymo to delve into Uber's internal privilege designations would invite a counter by Uber that Waymo itself has taken liberties with the appropriate bounds of privilege. We already run the risk that our trial will devolve into finger-pointing over who used the worst litigation gimmicks. The kerfuffle about overbroad internal designations of privilege does not justify further exacerbating this risk.[14]

Waymo's offer of proof also strays far out of bounds in describing at length Uber's consideration of an "Information Governance Initiative to review its process for retaining documents . . . to retain 'the smallest amount of required data.'" Waymo does not dispute that Uber *never implemented this initiative* but nevertheless insinuates that Uber's "willingness to consider such a controversial policy, and the internal reaction thereto, raises serious concerns regarding its preservation of relevant data in this case" (*see id.* at 24–26). In other words, Waymo devoted time and effort to describing salacious and inflammatory details about Uber that have no discernible relevance to the claims in this case in an apparent bid to poison the judge, if not the jury, against Uber. This entire narrative is excluded under FRE 403. Indeed, these tactics by Waymo further demonstrate why it remains particularly important in this case to exclude irrelevant and prejudicial evidence and to keep the trial focused on the merits.

---

[14] As stated, however, pursuant to a prior ruling, Waymo may present evidence that the due diligence process was shrouded in elaborately-contrived privileges that were ultimately rejected by final court order.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Waymo's offer of proof also perpetuates its habit of complaining at length about Uber's

2   supposed obstruction of discovery, including via alleged uses of privilege as both sword and

3   shield (*see* Dkt. No. 2466-3 at 7–12, 36–47).  Most of these complaints concern disputes that

4   should have been brought to Judge Corley for resolution in the ordinary course of discovery.

5   No further relief is warranted for such disputes.  And, insofar as Waymo's litany of recurring

6   grievances remains relevant only for the single basic point that Uber supposedly obstructed

7   discovery, that point can be more than adequately presented to the jury via the evidence and

8   argument permitted above.  The rest of Waymo's laundry list would be cumulative and would

9   offer little to no probative value, while threatening to overshadow the merits.  It is therefore

10   excluded under FRE 403.  To repeat, Waymo will not be permitted to transform this trial on

11   alleged trade secret misappropriation into a trial on Uber's litigation conduct (or misconduct).

12    Waymo's offer of proof further regurgitates its protests regarding Uber's spoliation of

13   evidence and violations of prior orders (*see id.* at 27–36).  Those issues will be dealt with as

14   previously described.  No further relief is warranted at this time based on Waymo's offer of

15   proof — although, as stated, this order reserves the possibility of instructing the jury that it may

16   or must presume the evidence Uber failed to preserve would have been unfavorable to Uber.

17    **4.    WAYMO'S MIL NO. 14 RE LEVANDOWSKI'S COOPERATION.**

18    One last loose end.  Waymo previously moved *in limine* to prevent Uber from

19   presenting evidence or argument that Anthony Levandowski has not cooperated with its defense

20   of this action.  Waymo contends Levandowski has in fact cooperated when doing so served his

21   purposes but he and Uber have prevented Waymo from discovering the true degree of

22   cooperation under the guise of privilege, raising a sword-and-shield problem (*see* Dkt. No.

23   1551-4).  Insofar as Waymo essentially complains (again) that Uber improperly asserted

24   privilege, this is yet another garden-variety discovery dispute that should have been presented to

25   Judge Corley for resolution.

26    A different problem remains, however, in that Uber's assertions of privilege on this

27   subject, even if proper, still conceal significant swaths of a larger picture from view.  It would

28   be misleading and unfair for Uber to make broad representations to the jury about

Levandowski's supposed non-cooperation while Waymo remains hamstrung in attempting to counter with evidence of selective cooperation. To mitigate this unfairness, Uber, like Waymo, will be allowed to show non-privileged examples of where Levandowski failed to cooperate but will not be allowed to further argue in general terms that Levandowski rarely or never cooperated, since any such argument would necessarily make implicit representations about the entire field of interactions — privileged or not — on this subject. Should Uber fail to abide by these ground rules at trial, the Court may consider allowing Waymo to adduce before the jury that Uber asserted privilege on this subject, possibly with excerpts of Uber's privilege log to show entries that cast doubt on Uber's claims of non-cooperation. Waymo's motion is **GRANTED** only to the extent stated herein and is otherwise **DENIED**.

## 5.    SUMMARY.

As stated, this order resolves the remaining constellation of issues in this litigation concerning Uber's alleged litigation misconduct and other bad behavior, many of which have waited until now to facilitate a comprehensive and consistent analysis. The subjects addressed herein fall into three categories, which this order now briefly recaps.

*First*, the Court itself will inform the jury that, despite the expedited discovery and provisional relief orders, Uber failed to timely disclose the destruction of the five discs and repeatedly supplemented both its communications log and accounting after the ordered deadlines. The Court will instruct the jury that it may, but need not, draw any adverse inference from these facts, and will further explain that the nature of any adverse inference likewise remains up to the jury. To take a hypothetical example, even if the jury infers that Uber deliberately concealed the destruction of the five discs, Uber may argue (and the jury may believe) that it did so not to conceal any misappropriation of trade secrets but for other reasons. (This example is included herein for clarity only and will not be described to the jury.) In addition, please remember that this order reserves the possibility of an adverse-inference instruction pursuant to FRCP 37(e) based on Uber's spoliation of evidence.

*Second*, as explained above, evidence of Uber's litigation misconduct or corporate culture may be relevant and admissible insofar as it reasonably bears on the merits of this case.

This includes evidence and argument that Waymo has been unable to find stronger proof of its claims due to Uber's obstruction tactics.  But such evidence will not be allowed to consume the trial to the point that it becomes a distraction from the merits or turns into a public exercise in character assassination.  Again, the point is to maintain a fair balance between allowing Waymo to reasonably explain any weaknesses in its case on the one hand, and preventing Waymo from sidestepping its burden of proof by inflaming the jury against Uber on the other.

*Third*, all other subjects not expressly ruled out herein (or in earlier orders) may be pursued via qualified and properly-disclosed witnesses and evidence.  Additionally, even evidence excluded under FRE 403 herein may become admissible if the opposing side opens the door.  In a similar vein, this order is without prejudice to the possibility that, depending on how events unfold at trial, the balance of considerations may sua sponte shift so as to warrant a second look at rulings made under FRE 403 herein.  But please, no motions for reconsideration.

No witness or lawyer in this case may reference this order or any finding herein before the jury.  No opening statement or voir dire question may reference the Court's intention to inform the jury of certain facts.  The Court will do so in due course.  The opening statements may, however, reference counsel's intention to prove up underlying facts, *e.g.*, in connection with Uber's violations of prior orders.

## CONCLUSION

Plaintiff's requests for relief are **GRANTED** only to the extent stated herein and are otherwise **DENIED**.  Any request for relief by either side arising out of the constellation of issues discussed herein but not addressed by this or any prior order is hereby **DENIED**.

**IT IS SO ORDERED.**

Dated:  January 29, 2018.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE