Pages 1 - 145

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

WAYMO, LLC                          )
                                    )
             Plaintiff,             )
   vs.                              ) No. C 17-00939 WHA
                                    )
UBER TECHNOLOGIES, LLC., OTTO       )
TRUCKING, LLC, and OTTOMOTTO, LLC,  )
                                    )  San Francisco, California
             Defendants.            )  Tuesday
                                    )  January 30, 2018
_____     )  8:00 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**              QUINN, EMANUEL, URQUHART, OLIVER
                                 & SULLIVAN, LLP
                                50 California Street
                                22nd Floor
                                San Francisco, California 94111
                         BY:    **CHARLES KRAMER VERHOEVEN, ESQ.**
                                **JORDAN R. JAFFE, ESQ.**
                                **DAVID ANDREW PERLSON, ESQ.**
                                **MELISSA J. BAILY, ESQ.**
                                **DAVID EISEMAN, ESQ.**
                                **ANDREA PALLIOS ROBERTS, ESQ.**
                                **JAMES DUBOIS JUDAH, ESQ.**


                                QUINN, EMANUEL, URQUHART, OLIVER
                                 & SULLIVAN, LLP
                                1299 Pennsylvania Avenue, NW
                                Suite 825
                                Washington, DC 20004
                         BY:    **JARED WESTON NEWTON, ESQ.**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*  *Debra L. Pas, CSR 11916, CRR, RMR*
                *Katherine Sullivan CSR 5812, CRR, RMR*
                *Official Reporters - US District Court*

```
 1   APPEARANCES (Continued)

 2   For Defendants:          MORRISON & FOERSTER, LLP
                              425 Market Street
 3                            San Francisco, California 94105
                         BY:  ARTURO J. GONZÁLEZ, ESQ.
 4                            MICHAEL A. JACOBS, ESQ.
                              ESTHER KIM CHANG, ESQ.
 5

 6
     For Defendants:          BOIES, SCHILLER AND FLEXNER, LLP
 7                            5301 Wisconsin Avenue, NW
                              Washington, DC 20015
 8                       BY:  KAREN LEAH DUNN, ESQ.

 9
                              BOIES, SCHILLER AND FLEXNER, LLP
10                            435 Tasso Street
                              Suite 205
11                            Palo Alto, California 94301
                         BY:  MICHAEL BRILLE, ESQ.
12                            MEREDITH R. DEARBORN, ESQ.

13

14   For Defendants:          SUSMAN, GODFREY, LLP
                              1000 Louisiana Street
15                            Suite 5100
                              Houston, Texas, 77002
16                       BY:  JOSEPH S. GRINSTEIN, ESQ.

17

18   For Defendants:          SUSMAN, GODFREY, LLP
                              1301 Avenue of the Americas
19                            32nd Floor
                              New York, New York 10019
20                       BY:  WILLIAM CARMODY, ESQ.
                              SHAWN RABIN, ESQ.
21

22

23          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

24

25
```

```
 1   APPEARANCES:   (CONTINUED)

 2

                            SUSMAN, GODFREY, LLP
 3                          1201 Third Avenue
                            Suite 3800
 4                          Seattle, Washington 98101
                      BY:  MATTHEW ROBERT BERRY, ESQ.
 5

 6

 7   Special Master:        FARELLA BRAUN & MARTEL, LLP
                            Russ Building, 30th Floor
 8                          235 Montgomery Street
                            San Francisco, California 94104
 9                    BY:  JOHN L. COOPER, ESQ.

10                       -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

```
 1                    P R O C E E D I N G S

 2    JANUARY 30, 2018                              8:02 A.M.

 3                        ---oOo--

 4           THE COURT:  Good morning.

 5       (Counsel greeted the Court.)

 6           THE COURT:  Have a seat.

 7           THE CLERK:  Calling Civil Action 17-939, Waymo LLC v.

 8    Uber Technologies, Inc., et al.

 9       Counsel, please approach the podium and state your

10    appearances for the record.

11           MR. VERHOEVEN:  Good morning, Your Honor.  Charles

12    Verhoeven.

13       With me is David Perlson, Melissa Baily, James Judah,

14    Andrea Roberts, David Eiseman, and Jordan Jaffe.  And we're

15    ready to proceed.

16           THE COURT:  Thank you.

17           MR. GONZÁLEZ:  Good morning, Your Honor, Arturo

18    González for Morrison & Foerster.

19       With me is Michael Jacobs and Esther Kim Chang.

20           THE COURT:  Good morning.

21           MS. DUNN:  Good morning.  Karen Dunn with Boies

22    Schiller and Flexner.

23       And at counsel table, Michael Brille and Meredith

24    Dearborn.

25           THE COURT:  Thank you.
```

1          **MR. CARMODY:**  Good morning, Your Honor.  Bill Carmody

2    with Susman Godfrey.  And I have Shawn Rabin, Joe Grinstein,

3    and Matt Berry with us here.

4          **THE COURT:**  Thank you.

5          **MR. COOPER:**  Good morning, Your Honor.  John Cooper,

6    special master.

7          **THE COURT:**  Mr. Cooper, welcome.

8       We're here for the third final pretrial conference, the

9    final final pretrial conference.  And I'll try to go over as

10   many things as we absolutely need to, but you lawyers want me

11   to serve up on a silver platter every possible ruling in

12   advance so you'll know what every answer is.  But it can't be

13   done.  So we're going to do this like a normal trial.

14      Meaning that, for example, the final jury instructions

15   will not be known to you until just before the closing

16   arguments.  So you cannot have a guarantee that those

17   penultimate jury instructions are solid.  I think they are

18   close, but I have under consideration the objections.  And I

19   need time to work through it.  And I also want to have the

20   benefit of the evidence before deciding what the final jury

21   instructions should be.

22      So you have to do what?  You have to be flexible enough in

23   your presentation of evidence to plan accordingly.

24      But that leads me to -- I want to give each of you a week

25   from today at noon to file your response to the other side's

PROCEEDINGS

 1   objections.

 2      And brevity would -- let's say -- I don't think you

 3   need -- can we agree that your response will be one half the

 4   length of whatever you're responding to?

 5           MR. EISEMAN:  That's fine, Your Honor.

 6           THE COURT:  All right.  So if the other side had 12

 7   pages, you get 6.  All right?

 8           MR. GONZÁLEZ:  Yes.

 9           THE COURT:  Good.  Because all you're going to do is

10   repeat what's in your briefs anyway.

11      (Laughter)

12           THE COURT:  Maybe better this time.

13      All right.  Remember your first list of rolling -- I

14   think, is it seven witnesses is due how many hours?  38 hours

15   ahead.

16           MR. GONZÁLEZ:  Actually, your order says that they're

17   due the day after opening statement.

18           THE COURT:  No.  We're going to have -- we're going to

19   have witnesses on the first day.

20           MR. GONZÁLEZ:  I'm sorry.  After jury selection.

21   Sorry, Your Honor.  I misspoke.

22           THE COURT:  I know you're nervous, Mr. González.

23      (Laughter)

24           MR. GONZÁLEZ:  I'm shaking.

25           THE COURT:  You can't do that to me.

PROCEEDINGS

 1          All right.  So that's Thursday then; correct?

 2          **MR. GONZÁLEZ:**  Yes, by 5:00 p.m. Thursday is what your

 3    order says.

 4          **THE COURT:**  All right.  Now, one of the things I want

 5    to go over is the difference between impeachment -- and this is

 6    one of the issues raised in one of your trial briefs.  If it's

 7    true impeachment, you don't have to disclose the document.

 8    However, it doesn't come into evidence.  So let's go over --

 9    some lawyers don't know what true impeachment means.

10          A true impeachment is the witness said the light was

11    green, but in the email they said the light was red.  That's a

12    direct contradiction by that witness.

13          You can save that and hold it back in reserve and wait and

14    see what the witness says.  If the witness, though, conforms to

15    what was said in the email, you don't get to use the email

16    because you didn't disclose it.

17          This is so fundamental.  And it's the way it worked, at

18    least in my courtroom, for 19 years.  And I'm not going to

19    change now.  It's got to be true impeachment.

20          Some lawyers think the following is impeachment, but it's

21    not.  The witness is on the stand and says the light was green.

22    Some other witness, although with the same company, but some

23    other witness said the light was red.  And you want to use that

24    for impeachment?  No way.  That's not impeachment.  You've got

25    to bring that other witness in.

PROCEEDINGS

```
1          I know you're going to try this.  On both sides, you're

2   going to try this.  I've seen it.  Big firms think impeachment

3   is anything that seems to contradict the general themes of the

4   other side's case.  No.  It's something that that witness

5   previously said that is directly opposite of what they're

6   saying on the stand now.  That is true impeachment.

7          So if you want to take the gamble -- I'm pointing at Waymo

8   here because the other side raised this point.  If you want to

9   take the gamble that you're going to get away with impeachment,

10  sometimes that's a good gamble.  Okay.  But if you don't, you

11  can't use it in your case-in-chief.

12         Wait a minute.  Wait.  I'm not done.

13         There was a second point, and I forgot what it was now.

14         Sometimes with experts, you can go broader than that

15  particular witness.  I want to be clear about that.  Because,

16  you see, these experts are nothing but hired guns.  And they're

17  going to get up there and talk and say, "Well, I've read 42,000

18  documents, and here's what I think."

19         And it's okay with you to say, "Okay.  But how about the

20  next document you didn't read?  Wouldn't that change your..."

21  okay.  That's fair for experts.

22         But for percipient witnesses, you can't do that.  It's got

23  to be a direct contradiction from that particular witness if

24  you're going to treat it as impeachment.  And even then, all

25  that comes into evidence is what you read into evidence, the
```

PROCEEDINGS

1   single line from the email that says the light was red.  And
2   the email itself will not come into evidence except in an
3   extraordinary case.  I can't say never, but, honestly, usually
4   it doesn't come in.

5        You wanted to say something.  Go ahead.

6        MR. VERHOEVEN:  Thank you, Your Honor.  Just for
7   clarification.

8        So this point applies globally whether it's a hostile
9   direct or it's a cross-examination?

10        THE COURT:  Correct.

11        MR. VERHOEVEN:  And, secondly, just so I have some --
12   we don't have a hiccup before the actual jury.  Say I'm
13   crossing a witness, and I have an admitted piece of evidence
14   where another witness has said something contrary to that
15   witness.  It's an admitted piece of evidence.  Are you saying
16   it's inappropriate for me to show that witness what the other
17   witness said and say, "Well, this guy" --

18        THE COURT:  Well, did they say it in front of the
19   jury?  I don't understand --

20        MR. VERHOEVEN:  Yeah.  Assuming that it's happened or
21   that it's an admitted exhibit already.

22        THE COURT:  If another -- are we talking just fact
23   witnesses now?

24        MR. VERHOEVEN:  Yes.  Exactly.

25        THE COURT:  It's usually improper to do what you're

PROCEEDINGS

 1   talking about.

 2       In other words, here's what you want to do, and this is

 3   what they're going to want to do.  But I'm not going to allow

 4   it because it's just argument.

 5       Some prior witness says the light was green -- I'm sorry.

 6   The light was red.  Some prior witness said the light was red.

 7   And let's say even the jury heard that.

 8           MR. VERHOEVEN:  Right.

 9           THE COURT:  Scenario 2 is it was in a deposition and

10   the jury never heard it.  Then you have a completely different

11   witness on the stand who says the light was green.  And what

12   you want to do is say, "Oh," and then you turn to the jury with

13   a flourish, "Oh."

14       (Laughter)

15           THE COURT:  "Do you mean that witness X, who was in

16   here three days ago, was lying?"

17           MR. VERHOEVEN:  No, that's not what I'm talking about.

18           THE COURT:  You're not going to be allowed to do that.

19   And you're not going to be allowed to refer back to some other

20   witness and say, "Oh, another witness said that the light was a

21   different color.  Do you stand by..."  No, we're not going to

22   do that.

23           MR. VERHOEVEN:  What if I were to say, "Another

24   witness said X.  Do you agree with that?"

25           THE COURT:  No.  That's improper.  That's totally

PROCEEDINGS

```
 1   improper.

 2          MR. VERHOEVEN:  Okay.  Well, I'm glad I asked the

 3   questions.

 4       (Laughter)

 5          THE COURT:  Yeah, yeah, yeah.  I can't say totally

 6   improper.  There are worse things in life than doing that.

 7       No, we're not -- you're there to ask that witness

 8   questions, drag out of that witness and not start saying what

 9   the -- now, if you both go off and stipulate, "Oh, we don't

10   care about the rules of evidence," then I'll let you do

11   whatever you want.  It can just be -- but I don't think you're

12   going to agree to that.

13       All right.  So that's the way impeachment works.  So you

14   on both sides have got to make a strategic call.  Do I want

15   this document in evidence?  If so, maybe I better designate it

16   for use in case-in-chief with this witness as opposed to

17   holding it back for impeachment.

18          MR. VERHOEVEN:  I'm sorry, Your Honor.

19          THE COURT:  Okay.

20          MR. VERHOEVEN:  But my counsel -- my colleague wants

21   to clarify.  That applies -- does that apply even if you've

22   listed the exhibits in advance for that witness, what you just

23   said?

24          THE COURT:  Don't we have a rule here that you're

25   going to list -- for Witness X you're going to list the 17
```

PROCEEDINGS

```
 1   documents that you're going to use with that witness?

 2           MR. VERHOEVEN:  Yes, Your Honor.

 3           THE COURT:  All right.  If they're listed expressly in

 4   advance --

 5           MR. VERHOEVEN:  Right.

 6           THE COURT:  -- then those are eligible to be moved

 7   into evidence, assuming foundation is laid, if they're listed.

 8   But impeachment documents, you don't have to list.

 9           MR. VERHOEVEN:  So just for clarity -- and I

10   apologize; I think you've already answered this.  So I've

11   listed the documents.  And one of the documents is already

12   admitted -- I don't need to admit it; it's already admitted --

13   has, Joe says X.  And on the stand I say, "Joe said X.  Do you

14   agree with Joe?"  Is that something I'm not allowed to do?

15           THE COURT:  You're not supposed to even do the "Joe

16   said X.  Do you agree with it?"  That's not a proper form of

17   question.

18           MR. VERHOEVEN:  Well, for example, "Do you agree that

19   X?"  And he says "No."  And I'll say -- or "I don't remember."

20   And then I say, "Direct your attention to Exhibit 1.  Here you

21   see your co-worker said X.  You know, do you think that this is

22   correct or incorrect?"

23           THE COURT:  I generally do not allow that line of

24   questions at all because you're supposed to be getting -- if

25   you have a direct document from that guy on the stand --
```

PROCEEDINGS

```
 1            MR. VERHOEVEN:  Yeah, I understand.

 2            THE COURT:  -- that says the opposite, of course you

 3     can use that.

 4            MR. VERHOEVEN:  Yes.

 5            THE COURT:  But to try to do an impeachment via

 6     something somebody else said is not impeachment.  That's not

 7     true impeachment.  That's just argument.

 8            MR. VERHOEVEN:  I understand, Your Honor.  And that's

 9     true whether it's disclosed or not; correct?

10            THE COURT:  No.  The purpose of the disclosure of

11     which documents you're going to use with the witness is so the

12     other side can prepare to meet those documents.  And when those

13     are going to be moved into evidence, they can say, no, that

14     foundation is not laid.

15         In addition to those documents that are listed, you can

16     secretly hold back anything, whether it's in evidence or not,

17     that you plan to use if necessary for impeachment purposes.

18     But it must be what I call true impeachment and not -- and not

19     big-firm impeachment.  Big-firm impeachment is exactly what

20     you've been describing, which is trying to impeach a witness

21     with not something they said, but something somebody else said.

22         So that's what --

23            MR. VERHOEVEN:  I've got it, Your Honor.

24            THE COURT:  I've just learned the hard way, we will

25     never end this trial if we allow big-firm impeachment.
```

PROCEEDINGS

1          **MR. VERHOEVEN:**  Thank you, Your Honor.

2          **THE COURT:**  Do you understand the ground rules over

3    there on your side?

4          **MR. GONZÁLEZ:**  We do, Your Honor.

5          **THE COURT:**  You are just as guilty as they are, I'm

6    sure.  You've been having evil thoughts.

7       (Laughter)

8          **THE COURT:**  All right.  Go ahead.

9          **MS. DUNN:**  Your Honor, just to clarify with experts.

10         **THE COURT:**  Yeah.

11         **MS. DUNN:**  So I understand that you -- we can show

12   experts exhibits that they may or may not have reviewed.

13         **THE COURT:**  Correct.

14         **MS. DUNN:**  If those exhibits have not yet been

15   admitted, some courts have a rule where they say if this can be

16   proved up later, then I'll allow you to show the expert.  I

17   wanted to ask if Your Honor has that same rule.

18         **THE COURT:**  Well, yeah.  That's called -- what's the

19   Latin term for that?  *De bene* or something like that.

20   Mr. Carmody is probably the only one in the courtroom who knows

21   what I'm referring to.

22      But, yes, I will do that if the lawyers don't abuse it.

23   So I have to actually trust you that you're going to deliver on

24   your promise that it will come into evidence later.

25         **MS. DUNN:**  That's fair.

PROCEEDINGS

1          **THE COURT:**  And if it turns out that you let me down,

2    then I don't trust you anymore and I have to give a curative

3    instruction.  So only go there when you really are positive

4    you're going to get it into evidence.

5          **MS. DUNN:**  Thank you, Your Honor.  That's helpful.

6          **THE COURT:**  All right.  Okay.  So enough on that one.

7          Let's go over the jury -- my law clerk is going to hand

8    out a couple of things.  And one of these is top secret for

9    now.  Do we also have the -- yes, we've got the list of alleged

10   trade secrets.

11         Go ahead and hand all of this out.

12         So what we have here, if you look at the very last page,

13   this is something we'll come to in a minute.  But this is the

14   list -- our version of the list of alleged trade secrets.  But

15   it's pretty close to what -- I think it may be exactly what you

16   submitted in your joint statement.  But we'll come to that in a

17   minute.

18         For present purposes, I want us to look at the one-page

19   thing on top, which is the questionnaire for the jury,

20   prospective members of the jury.

21         And let's go over how this part is going to work and what

22   suggestions you may have to improve on it.

23         We're now within about 24 hours of when this process will

24   start.  And as we speak, there are good citizens all over this

25   district who are trying to figure out how they're going to get

PROCEEDINGS

1    here tomorrow, what they're going to do with their children or

2    their elderly parents, and they're going through and wondering

3    why they have to be here.  Anyway, they will come to the jury

4    assembly room.  And about 8 o'clock, we'll have them in here.

5    Maybe 8:30 at the latest.

6         So when they come in, that whole side on my left will

7    definitely be taken up and maybe one row on the -- or two

8    possibly on the right.  So that means --

9         I'm sorry.  Are the members of the press here at all?  If

10   they are, raise your hand.

11        (Show of hands.)

12        **THE COURT:**  If that's all there are, probably there

13   will be enough seats for you.  But I don't know.  You can

14   see -- I don't know how many of these other people are lawyers

15   from the law firms, but I'm going to require that the lawyers

16   just -- you can't even -- I'm not even going to let you take

17   that row over there.  I think you're all going to have to fit

18   into that front row over there somehow or maybe sit in that --

19   I'll let you sit over there.

20        But I have to have enough room for the venire plus the

21   press and the public.  We will try to have an overflow room

22   with a TV camera that will be underway at that time.

23        Anyway, to come back to this questionnaire, when they come

24   in, we will hand this out and take 15 minutes of silence and

25   let them fill it out.

PROCEEDINGS

```
 1        I will give them the admonition they can't do any
 2   research, can't go online, all of that.  I will do that.
 3        In that connection, by 3:00 p.m. today, I need your final
 4   witness list.  And I want you to include anybody who is even
 5   remotely possible.  In other words, I'm going to exclude some
 6   people, for sure; however, I don't know for sure who will get
 7   excluded.  So you've got to err on the side of overinclusion.
 8   And that list will be part of this thing, and they will circle
 9   who they know or think they know.
10        So that will take about 15 minutes.
11        Let me stop there.  Any questions on that so far?
12            MR. GONZÁLEZ:  I have one question, Your Honor.
13            THE COURT:  Please.  Go ahead.
14            MR. GONZÁLEZ:  Did you say that you're going to give
15   this form to the entire pool?
16            THE COURT:  Yes.  Everybody.
17            MR. GONZÁLEZ:  Okay.
18            THE COURT:  Everybody in the venire.
19            MR. GONZÁLEZ:  Yes.
20            THE COURT:  All right.  So then -- so then we -- when
21   they look like they're all ready to go, I'm going to give them
22   the social media speech that you've all agreed that I can give
23   them, which basically is these good lawyers are not going to do
24   any social media searches on you until the case is over, and
25   that -- then it works both ways; that the jurors can't do any
```

PROCEEDINGS

 1  social media searches or Internet searches of any type on the

 2  lawyers or the case.

 3      And since it works both ways, I think that helps encourage

 4  the jurors to be good.

 5      Then we will start calling forward one person at a time.

 6      Oh, I forgot to say that I will get rid of anybody who is

 7  hacking, coughing, got the flu, bronchitis, colds.  Anything

 8  that is remotely contagious, they're going to leave

 9  immediately.  That way, if we have 70, we'll go down to 60

10  probably right there.

11      But, otherwise, the jurors who remain are going to be

12  worried that they're going to get sick.  And we'll worry about

13  that.  And we don't want to have to worry about that.

14      All right.  So as they come up one at a time, I'm going to

15  look at this.  And I would like to have your permission if

16  they -- if they answer certain questions in a certain way that

17  I can automatically exclude them so I don't have to call you

18  both up to the sidebar, "Can I exclude this guy because he's

19  got strong opinions?"  And the questions that I -- help me find

20  this.

21      Okay.  Question 9B:  "Do you have strong opinions

22  favorable or unfavorable about Google, Uber, Waymo, or

23  Ottomotto?"

24      If they say "yes," I'd like to be able to exclude them

25  automatically without further inquiry.

PROCEEDINGS

 1        So, yes.

 2              **MR. GONZÁLEZ:**  No objection here.

 3              **THE COURT:**  How about on your side?

 4              **MR. VERHOEVEN:**  Once again, ask a point of

 5    clarification.  So what if they say something ambiguous instead

 6    of "yes"?  For example, I've had situations where they might

 7    write in "I like Google's products" or something like that.

 8              **THE COURT:**  Well, if it's strong.  The key operative

 9    word is "strong."  If they say they've got a strong opinion,

10    favorable or unfavorable, and it's a yes, even if they say "I

11    like -- I like Google products," or "I like Uber ride service,"

12    then the fact that it's a strong opinion, that's the operative

13    part.

14        And what we're going to wind up doing is somebody is going

15    to try to -- you're going to try -- or both sides will try to

16    figure out if that witness is leaning, who they're leaning

17    toward, and then try to save them.  We'll just waste time on

18    that.  It's probably not going to work.

19              **MR. VERHOEVEN:**  Okay.  So just so -- I think what

20    you're saying is if they say yes, then they're out, but if they

21    just say something like "I like Google's products" or "I take

22    Uber" --

23              **THE COURT:**  Well, they've got to say yes or no.

24    They've got to check "yes" or "no."  I wouldn't excuse them

25    unless they actually checked the "yes" box.  If they checked

PROCEEDINGS

1   the "yes" box, the rest of that blank doesn't matter.

2           MR. VERHOEVEN:  Okay.  Thank you, Your Honor.

3           THE COURT:  All right.  Now, then there was one other

4   one like that.  Here we go.  On the next page on Number G:  "Do

5   you have a strong opinion favorable or unfavorable about any of

6   the following potential witnesses?  Sergey Brin, Travis

7   Kalanick, Anthony Levandowski, Larry Page?"

8       "Yes, I have a strong opinion."  "No, I have no strong

9   opinion."

10      I would like to do the same thing there.  Agreed?

11          MR. GONZÁLEZ:  Yes, Your Honor.

12          MR. VERHOEVEN:  Yes, Your Honor.

13          THE COURT:  Okay.  So I have your permission on that.

14      And then there's H:  "Do you have a strong opinion or

15  impression favorable or unfavorable about this lawsuit?"

16      "Yes, I have a strong opinion or impression."  "No, I have

17  no strong opinion or impression."  The word operative is

18  "strong."

19          MR. VERHOEVEN:  Yes, Your Honor.

20          THE COURT:  Agreed?

21          MR. GONZÁLEZ:  Correct.

22          THE COURT:  All right.  So the rest of these

23  questions, I think they might raise questions, and then we can

24  follow up.  But I feel like they are not automatic exclusions.

25  All right?  Agreed?

PROCEEDINGS

1          **MR. GONZÁLEZ:**  Agreed.

2          **THE COURT:**  So we will have to wait and see how the

3    voir dire turns out.  Okay.  That's good.

4          Now, to be clear, if they circle a name on the list of

5    trial witnesses as somebody they think they know, that is not

6    an automatic exclusion.  It may lead to an exclusion, but

7    sometimes it's a different person and sometimes they say,

8    "Years ago, I worked at Google.  I happen to know that person,

9    meet him in the hall one time, and I think it won't have any

10   effect."  So I wouldn't think that that's -- just be clear,

11   that's not an automatic exclusion.  We've identified what the

12   automatic -- and is it okay if I just exclude them if the "yes"

13   box is checked without further ado, without bringing you

14   forward?

15         **MR. GONZÁLEZ:**  Yes.

16         **THE COURT:**  You can check me later, but I don't want

17   to take the time with everyone here.

18         **MR. VERHOEVEN:**  This is going back to the three

19   questions you asked about?

20         **THE COURT:**  Just the three.

21         **MR. VERHOEVEN:**  Yes.

22         **THE COURT:**  I'll let you see the questionnaires

23   afterwards so you know I'm not playing some game with you.

24         **MR. GONZÁLEZ:**  However, Your Honor, that's what I was

25   going to ask.  We're not going to see the questionnaire at all

PROCEEDINGS

```
 1   until after the voir dire is completed?
 2          THE COURT:  No.  Then, if they get into -- that's a
 3   very good question.  Then let's say, "Okay.  Take Seat
 4   Number 1."
 5        Then we're going to -- every two or three people, somebody
 6   on my team -- I don't have big teams like you do, but they will
 7   go out and copy.  Each side will get one copy of that
 8   questionnaire.  That's whenever you first get the
 9   questionnaire, is after they are seated in the jury box.  And
10   that's to protect their privacy --
11          MR. GONZÁLEZ:  Thank you.
12          THE COURT:  -- until they're actually subject to
13   something.  Okay.  Great.
14        Now, did you hand out the social media speech?  No, you
15   did not.  Okay.  All right.
16        The list of alleged trade secrets.  This goes to the
17   question of what do we give the jury?  Once we have a jury,
18   what do we give them to help guide them through understanding
19   the case?
20        One of the things that I think they ought to have is a
21   handy-dandy list in the back of their steno pads of the list of
22   alleged trade secrets so that as -- because we're going to be
23   referring to this by number.  So Alleged Trade Secret Number 9.
24   Well, they're not going to remember what 9 is.  So they can
25   glance in the back and see what Number 9 is.
```

PROCEEDINGS

```
 1        I plan to give them this one unless somebody has a better
 2   one or has a good objection to this one.
 3             MR. JAFFE:  Thank you, Your Honor.
 4        For Waymo, this looks fine as-is.  The only proposed edit
 5   we would have is for some of the trade secrets, they refer to
 6   specific documents.  Adding an exhibit number for those
 7   documents so that the jury can look at them would be our only
 8   edit.
 9             THE COURT:  I'm not sure I understand.  What do you
10   say to that?  Maybe you understand, Mr. Jaffe.
11             MR. JACOBS:  I do know what he's -- so if you look,
12   for example, at 90.
13             THE COURT:  Yeah.
14             MR. JACOBS:  That would refer to what they would
15   propose to do is refer to an exhibit number.
16             THE COURT:  What do you say to that?
17             MR. JACOBS:  I don't think that helps, Your Honor.  In
18   fact, I think our concern is going in a slightly different
19   direction, which is, we need to simplify this for them somehow.
20   And we've gone back and forth with Waymo overnight about some
21   short-form descriptions that would not reveal the trade secret
22   themselves.  We can give them this list.  But it would be
23   helpful to have a -- kind of a five-word-or-less what is this
24   trade secret about?
25        And what -- we've been going back and forth --
```

PROCEEDINGS

```
 1            THE COURT:  Wouldn't that hurt you?  I mean, in other

 2    words, if the alleged trade secret is something so broad as to

 3    be -- I don't want to say something, might give something away.

 4    But something so broad like how to -- how to split up the

 5    diodes on -- the 64 diodes, then that's so broad, of course you

 6    have a system for doing that.  And the jury might think, well,

 7    you violated it because you have the same kind of thing.

 8         I don't know.  Why would you want to give that to the

 9    jury?

10            MR. JACOBS:  Well, your order on this, on how we're

11    going to try and conduct the trial --

12            THE COURT:  Yeah.

13            MR. JACOBS:  -- referred to alleged trade secret

14    number, and I forget the exact words, but it was something like

15    "short description."

16            THE COURT:  Yeah.

17            MR. JACOBS:  So that's what we've been struggling with

18    is coming up with a short description.  So that if we want to

19    not use the number over and over again, we can refer to it by

20    something else.

21            THE COURT:  I see.  In other words, you want to have a

22    second -- so instead of saying Trade Secret Number 2, you would

23    say, paren --

24            MR. JACOBS:  Exactly.  I can tell you, for example,

25    what Waymo's proposal is for that because, obviously, Waymo --
```

PROCEEDINGS

```
1              THE COURT:  All right.  Give me Waymo's proposal.

2              MR. JACOBS:  That can go in the public domain.  So for

3    alleged Trade Secret 2, their proposal -- their proposal is

4    "Transmit PCB Configuration."

5              THE COURT:  Why wouldn't we put that in parentheses

6    after Number 2, and then still have this longer description?

7              MR. JACOBS:  Yes, exactly, Your Honor.

8              THE COURT:  Okay.  All right.

9              MR. JACOBS:  So really --

10             THE COURT:  Okay.  I thought you just wanted to

11   have -- okay.  You want to add a short description?

12             MR. JACOBS:  Yes.

13             THE COURT:  That's a good idea, isn't it?

14             MR. JAFFE:  As Mr. Jacobs mentioned, we've been

15   meeting and conferring on this.  They filed a proposal

16   yesterday we hadn't seen before.  We responded.  They responded

17   late last night.  I sent an email at 6:15 this morning to

18   further that along.

19        We're not opposed to that in principle, but it needs to be

20   a description that doesn't disclose the subject matter of the

21   trade secret and is not argumentative.  I think we're there --

22   we're close on about four or five of them, but we're not all

23   the way there.  And we're meeting and conferring.  We're happy

24   to continue doing so.

25             THE COURT:  All right.  Here's what I will ask you to
```

PROCEEDINGS

```
 1   do is to take the list I've given you, with the idea it's just
 2   going to be a parenthetical after the number.  And the
 3   parenthetical will be something that can be said in public in
 4   open court that you two will agree on.
 5        You've got to help me out here, please.  We need this.
 6   And so nonargumentative is correct.  You know, broad enough to
 7   be speakable in court.  Okay?
 8             MR. JACOBS:  You bet, Your Honor.
 9             THE COURT:  You two can do this.  All right.  Great.
10        Now, in that connection, the timeline.  I thought the
11   timeline that Uber submitted was pretty good.  There will be
12   others that are pretty good too.  But why can't you all agree
13   on a timeline that we can give to the jury?
14        What's this?  Oh, here's Waymo's response.
15        All right.  So you've got, like, 11 or 12 items that you
16   want to have.
17             MR. JUDAH:  Your Honor, we have ten, ten total dates.
18   There's basically five areas of dispute.  Two of them are in
19   the wording of dates on Uber's timeline, and then three of them
20   are dates that Uber didn't include but that Waymo thinks are
21   important for jury context.
22             THE COURT:  Well, why don't we include all of the
23   dates that you want on both sides.  That's more than I would
24   like.  But you can't all agree on nonargumentative
25   designations?
```

PROCEEDINGS

1   **A.**    Judge, there's two that are -- that are sort of remain in

2   dispute, Your Honor.  One is over whether the

3   December 11th uses the term "download."  Uber apparently

4   disputes that, but doesn't want the word "download" to appear.

5   We think that just saying that "Levandowski logged in to SVN"

6   doesn't really explain what happened on December 11th, and why

7   that's an important date.

8        And then the other issue is Levandowski's last day at

9   Uber.  We used neutral language for the Waymo one, which

10  doesn't say "Levandowski resigned without notice"; it just says

11  "his last day."  That's neutral.

12       Uber wants Levandowski's last day at Uber to be that he

13  was terminated.  We proposed "last day."  And those are the

14  only two disputes about wording.

15            **THE COURT:**  All right.

16            **MR. GONZÁLEZ:**  So just a brief response, Your Honor.

17  Starting with the last one, they don't want us to say that

18  Mr. Levandowski was terminated.  That is an undisputed fact in

19  the joint pretrial statement.  The joint --

20            **THE COURT:**  Is that true?

21            **MR. JUDAH:**  I don't have it in front of me.  But we

22  don't -- we aren't opposed to that language if --

23            **THE COURT:**  Well, you don't have to -- maybe you know

24  it by heart.

25            **MR. GONZÁLEZ:**  I have it here, Your Honor.  I can read

PROCEEDINGS

1  it.  "Undisputed Fact Number 9:  Uber fired Anthony

2  Levandowski."

3       We can use those exact four words.

4            THE COURT:  That's stipulated?

5            MR. GONZÁLEZ:  It's stipulated in the joint pretrial

6  order.

7            THE COURT:  Well, if it's stipulated, how --

8            MR. GONZÁLEZ:  Exactly.

9            THE COURT:  -- can you object to that?

10            MR. JUDAH:  Well, Your Honor, we don't.  Assuming that

11  the January 27th date is his last day, it's that he resigned

12  without notice.

13            THE COURT:  Is that stipulated to?

14            MR. GONZÁLEZ:  No.  The stipulated fact says:  "Uber

15  fired Anthony Levandowski."  We should just use those four

16  words.  We use "terminate" --

17            THE COURT:  How about January 27?  What do you

18  stipulate to there?

19            MR. GONZÁLEZ:  Levandowski left Waymo.  And we put

20  "Levandowski left Google," because Levandowski never worked for

21  Waymo.  So we're just trying to be accurate.

22            THE COURT:  Why don't we just say "Levandowski's last

23  day"?

24            MR. GONZÁLEZ:  Fine.  But you see my point?  He never

25  worked for Google, so I don't want to mislead them right off

PROCEEDINGS

1    the bat.

2              MR. CARMODY:  Waymo.

3              MR. GONZÁLEZ:  Waymo.

4              THE COURT:  Maybe he did.  Maybe he did work for

5    Waymo.  I don't know.

6              MR. GONZÁLEZ:  No, Waymo wasn't formed until after he

7    left.  It didn't exist.  There was no such thing as Waymo.

8    That's one piece of the trial that will be a little confusing.

9    We'll try to clarify it.

10             THE COURT:  Okay.  Well, I don't know.  He was working

11   for somebody over there.

12             MR. GONZÁLEZ:  Google.

13             THE COURT:  All right.  "Levandowski's last day."

14   That will be enough.

15        And then Levandowski, whatever the exact wording was of

16   the stipulation.

17        All right.  Let's go back to the does Uber -- this part,

18   "Anthony Levandowski accesses Google's SVN server."  That much

19   is stipulated to; right?

20             MR. GONZÁLEZ:  Yes, Your Honor.

21             THE COURT:  All right.  Does Uber agree that he

22   downloaded more than 14,000 files?

23             MR. GONZÁLEZ:  Well, here's the problem, Your Honor,

24   with that.  And this is why it's argumentative.  That suggests

25   that Anthony Levandowski picked out 14,000 files and downloaded

PROCEEDINGS

```
 1    them.
 2         If you recall, if you follow the directions for how to log
 3    on, they're automatically downloaded.  And so we just didn't
 4    want to get into --
 5              THE COURT:  Do you agree that he downloaded something?
 6              MR. GONZÁLEZ:  Yes.
 7              THE COURT:  All right.  Put it this way:  "Anthony
 8    Levandowski accesses Google's SVN server and downloads,"
 9    period.
10              MR. GONZÁLEZ:  Fine.
11              THE COURT:  All right.  Does that now take care of all
12    your problems?
13              MR. JUDAH:  I believe so, Your Honor.
14              THE COURT:  All right.  So you two come up with a
15    big -- something -- do a little test so that it is readable
16    from the jury box.  But it's going to be on a big
17    four-foot-by-eight-foot thing over here so the jury can look at
18    this timeline while the witness is on the stand and see where
19    the story that witness has fits in the overall timeline.
20    That's the purpose of this.
21         And I think it's very useful to the -- it's very useful in
22    the first half of the trial because the jury is just learning
23    that -- just learning the chronology.  It takes several
24    witnesses before they even can get a chronology.  That helps
25    them.  Later on in the trial, it's not as useful, but the first
```

PROCEEDINGS

```
 1   half of the trial it's very useful.

 2        Okay.  What -- you've already agreed to this, so I'm not

 3   going to go back and reopen any of this.

 4             MR. GONZÁLEZ:  No, no.  We have, Your Honor.

 5             THE COURT:  All right.  Good.

 6             MR. GONZÁLEZ:  The only point -- the only point was,

 7   we submitted seven dates because you had said to submit

 8   something short.  They've added some dates that you've now

 9   suggested should be on the --

10             THE COURT:  Why not?

11             MR. GONZÁLEZ:  I'm not objecting.

12             THE COURT:  Put them in there.

13             MR. GONZÁLEZ:  Yeah, I'm not objecting to those.  I

14   guess the question is we had one or two other dates that we

15   would have put on had we known you were going to go past seven.

16   So I just want to make it clear.  We'll confer --

17             THE COURT:  Can't you just help me out and just give

18   up on those other dates?

19             MR. GONZÁLEZ:  We'll confer, Your Honor, and work it

20   out.  Understood.

21             THE COURT:  You know --

22             MR. JUDAH:  Your Honor, I mean, I thought we had an

23   agreement.  So if we're going to meet and confer, I don't know

24   what we'll accomplish here today.

25        What are the dates -- I mean --
```

PROCEEDINGS

```
 1            THE COURT:  You know what I'm going to do?  If you
 2    don't have this, one of the first items is I'm going to say, I
 3    tried to get these lawyers to agree on a simple chart of some
 4    of the key dates and they couldn't even do that, ladies and
 5    gentlemen.
 6       Do you want me to start the trial that way?  You better
 7    cooperate and get this done.  The jury will appreciate it.
 8       All right.
 9            MR. GONZÁLEZ:  Thank you.
10            MR. JUDAH:  Understood.
11            THE COURT:  Now, let's come to the role of MoFo in
12    this case.
13       I have two things to say here.  Previously, we had an
14    agreement that you would identify yourselves by your names, but
15    you would not identify your law firms as you're trying the
16    case.
17       And that still stands.  But, I have an important caveat.
18    It could be that despite good faith on both sides and by the
19    judge it will become obvious to the jury that MoFo is the same
20    MoFo -- I'm sorry, that you lawyers are the same MoFo that did
21    the due diligence report.  I'm going to say the odds are 50/50
22    it will work out that way.
23       So despite our best efforts to keep that out of the trial,
24    it may come into the trial and it may be fair for it to come
25    into the trial.
```

PROCEEDINGS

 1          So I bring this up because I don't want you later, if it
 2   becomes important, that the -- the -- I can't tell you how, but
 3   I can imagine ways.  If it comes up, I don't want you saying,
 4   "Oh, Judge, you've got to exclude that because we're trial
 5   counsel."
 6          You have known about this problem.  That's why you have --
 7   you're the lead lawyer, right, Mr. Carmody?
 8          **MR. CARMODY:**  Yes, Your Honor.
 9          **THE COURT:**  All right.  So if it turns out that Arturo
10   and Mike Jacobs and the rest of your team have to recede into
11   the background, that's just the way it is.  And you're prepared
12   for that.  And I just don't want that to be an extra burden and
13   worry on me.  And we will try in good faith to see how far we
14   can get without that becoming an issue.  All right?
15          **MR. GONZÁLEZ:**  Understood.
16          **THE COURT:**  All right.
17          For your opening statements -- oh, by the way, I am going
18   to give you at least 45 minutes per side and maybe up to an
19   hour per side for voir dire, individual voir dire.
20          I will ask the questions at first.  But at some point, I'm
21   going to turn it over to you and let you ask questions.
22          Now, I don't like voir dire where you try to condition the
23   jury.  If you do that, the judge may ask you to just sit down.
24   Please don't do that.  Ask proper -- you're supposed to be
25   getting at life experiences and opinions that they have, that

 1    might be grounds for cause.

 2        You shouldn't be saying, well, if we bring in witness X

 3    and he says what a bad company they were, will you believe

 4    those witnesses?  Well, that's ridiculous.  You can't ask

 5    questions like that.  I'm exaggerating a bit because I know you

 6    wouldn't do that.  But you will try to get as close to that as

 7    you can.  Please don't do that.

 8        All right.  Now, on the opening statements, you each have

 9    70 minutes, I think.  Is that what I gave you?

10            **MR. VERHOEVEN:**  Yes, Your Honor.

11            **THE COURT:**  Then you ought to exchange your slides so

12    the other side can look at them.  Maybe you've already done

13    that.  Have you done that yet?

14            **MR. CARMODY:**  Your Honor, counsel and I spoke about

15    that issue.  And I think, generally, we have some agreement as

16    to what we're going to do on that score.  But there's one big

17    picture issue which came up, which is we understand the Court's

18    preference to have the opening statement be open to the public.

19    But there's certainly going to be visuals we intend to show

20    that are going to get into the details of the trade secrets.

21        So what we would propose is have a portion, part of the

22    opening be open to the public.  And then when we get into the

23    actual details of the eight trade secrets at issue that we

24    would close the courtroom.

25            **THE COURT:**  Would you do those back to back, the

PROCEEDINGS

1   private -- the closed parts back to back?

2          **MR. CARMODY:**  Yeah, we would make it efficient.  In

3   other words, we would probably start out where everybody in the

4   courtroom can be here because you'll be talking very high

5   level.  And then probably the latter portion of the opening

6   statement would deal with the eight trade secrets we're accused

7   of misappropriating.  And we would obviously have to, to defend

8   ourselves, get into the details.

9          **THE COURT:**  Yeah.

10      What do you say to that?

11         **MR. VERHOEVEN:**  Your Honor, firstly, I don't think

12  that it would be very useful to kick the public out right in

13  the middle of an opening statement.  I think that this is a

14  general statement and that the parties can discuss it just like

15  you've admonished us, to try and discuss things around it to

16  the extent we can.

17      We have a procedure, I believe, that we've worked out,

18  where we can show the jurors and Your Honor and opposing

19  counsel a visual on a screen that depicts trade secret

20  information while the public screening is turned off.

21      And my suggestion would be to the extent that someone

22  feels compelled, that we need to actually address the specific

23  technologies that are alleged to be trade secret, that what you

24  could do is show the slide and then say you see what -- you

25  know, as you see this, what it says here, without actually

PROCEEDINGS

```
1   disclosing the -- verbally disclosing it.  This is something
2   I've done many times in trials.  And that way, you wouldn't
3   have to interrupt the opening statements and remove the jurors.
4       And, by the way, we'd have to do that twice if we were to
5   use a procedure where -- where the jurors would -- or, excuse
6   me, the public would be excluded, because we certainly don't
7   agree to structure our opening statement so that -- so it
8   matches up --
9           THE COURT:  I have the authority to just order it.
10      Come on.  We're not going to -- if we do it, we're going
11  to have a secret session and a public session, and you both get
12  to go one time and divide your 70 minutes between the two.
13      The judge can do this.  So I don't need your agreement.
14          MR. VERHOEVEN:  Understood, Your Honor.
15          THE COURT:  But why can't you -- what's wrong with
16  what Mr. Verhoeven said?  Why can't you do the -- show the jury
17  on the screen and circle some piece and say, This part of the
18  alleged trade secret, there's no way we do this.  And that's
19  the end of the case.
20      Why can't you -- why do you need to verbalize it?
21          MR. CARMODY:  Because, in fairness, Your Honor, this
22  is the opening statement, the preview of the evidence to come
23  in the trial in a case in which is the biggest in the history
24  of Uber.
25      We're getting sued here for misappropriating eight
```

PROCEEDINGS

 1  different trade secrets.  If we can't, in the opening

 2  statement, adequately explain the trade secrets to talk about

 3  the supposed science behind them, to decide so the jury has

 4  some sneak preview whether or not these are even trade secrets,

 5  whether we improperly acquired them, whether we used them, I

 6  mean, how can we adequately defend ourselves?  Frankly, it's a

 7  due process issue.

 8       They've sued us on the trade secrets, but they don't want

 9  us telling the jury about the trade secrets they've sued us on.

10       It's real simple.  We can do the first part of the opening

11  open to the public.  And then the second part of the opening,

12  where we get into the technology --

13       THE COURT:  How long will your trade secret details

14  part be of your 70 minutes?

15       MR. CARMODY:  I haven't rehearsed it, Your Honor, but

16  I suppose about half or so of the opening, maybe 25 or so

17  minutes.

18       I would think the bigger portion of the opening is

19  probably something that the public can sit in on.  But we,

20  obviously, have to get into the science because that's what

21  we're sued on.

22       THE COURT:  Seems to me the right answer here is we

23  have two openings.  The public part, and you can use as much of

24  the 70 minutes as you want.  And whatever time you have

25  remaining, then we'll proceed to a closed session where the

1    trade secrets can be frankly discussed.

2        But it might be better -- this -- this might be better:

3    What do you think about on the trade secrets part, you go

4    first?  That way you would have the opportunity to know what

5    you're responding to.

6            MR. VERHOEVEN:  We would object to that, Your Honor.

7    We're not sure that -- we haven't -- if we're going to be -- we

8    have been preparing under the assumption that we could do the

9    screen thing that I was talking about.  I don't see why that's

10   a problem.  And if we're going to have two sessions, that's

11   something I'd need to consider.

12           THE COURT:  All right.

13           MR. VERHOEVEN:  But, really, we're going -- I would

14   have to consider what you're suggesting.

15           THE COURT:  All right.  Well, I'm going to order it.

16   So there.  We're going to have two sessions.  And you can

17   use -- you can do it public or not.  It's up to you.  You're

18   the one with the trade secrets.  But you on the -- I agree that

19   an advocate -- they're being accused of -- you want lots of

20   money from them, and they ought to have the opportunity to

21   explain with the best skills advocacy and not compromise with

22   having to circle things like John Madden on the screen.

23       Uber is right on this one.  So we'll have a closed

24   session.  You can reserve as much of the 70 minutes.  Waymo

25   will go first in that session.  You go second.

PROCEEDINGS

1          MR. CARMODY:  Thank you, Your Honor.

2          THE COURT:  All right.  Enough on that one.

3     No, not enough on that one.  You need to tell me when

4     you're going to exchange your slides.

5          MR. CARMODY:  I think we have an agreement, Your

6     Honor, that we're actually not going to exchange slides.  We

7     have an agreement that we've kind of worked out, that we

8     haven't signed up yet, but we, I think, expect to probably have

9     something today.

10         THE COURT:  Listen.  This is no good.  You can't do

11    this to me.  If you're not going -- you will wind up objecting

12    in the middle --

13         MR. CARMODY:  We have an agreement, Your Honor, where

14    we're not going to object.  I mean, the agreement goes

15    something like this, as we've both done this before.  And

16    instead of taking each other's slides and taking advantage or

17    incentivizing parties to submit dummy slides to the other, the

18    agreement goes something like this:

19         Number one, we agree not to disclose slides to the other.

20    Number two, we agree that there will be no objections by either

21    side to the use of the slides that were not disclosed.

22         We define the term slides to include not only trial

23    exhibits but demonstratives.  But we have a proviso that

24    basically is something to the effect that notwithstanding the

25    fact that we're not going to be standing up and objecting

PROCEEDINGS

1   during each other's opening to the showing of those before the

2   jury, we are going to be reserving objections to the

3   admissibility of those trial exhibits if and when they are ever

4   offered.

5        And we have another agreement, I believe, that basically

6   says we're both obligated in good faith to use slides that are

7   nonargumentative.  That's the general agreement, Your Honor, to

8   make the opening go smooth so we're not standing up and

9   objecting.

10       **THE COURT:**  And what if somebody -- do you both agree

11  you won't jump up and say they violated the agreement?

12       **MR. CARMODY:**  Yeah, we have one other -- one last

13  thing.  You raised a fair point, Your Honor.  The last proviso

14  that I forgot to mention is:  Any visual we show the jury can't

15  violate any of this Court's orders.  In other words, motions in

16  limine or any other order.  And so we've agreed --

17       **THE COURT:**  What happens whenever Mr. Verhoeven jumps

18  up and says you violated some obscure ruling four months ago?

19       **MR. CARMODY:**  I don't think that's going to happen

20  because we've looked at the Court's rulings.  I don't think

21  he's going to step up and do that.  And I am positive our

22  opening would not violate, Your Honor, any of your court

23  orders.  But it makes for a much smoother opening for the jury

24  on both sides.

25       **THE COURT:**  All right.  Let's hear from Mr. Verhoeven.

PROCEEDINGS

1  What do you say to this problem?

2       MR. VERHOEVEN:  Your Honor, we're willing to agree to

3  this.  But if Your Honor prefers, we're also willing to

4  disclose our slides.  But I'm willing to -- if Mr. Carmody

5  prefers not to, I'm willing to trust him that he's not going to

6  violate a motion in limine.  Obviously, if he does, that's

7  something I'll raise after the close of the argument.  But he's

8  represented he won't, and I have no intention to.

9       MR. CARMODY:  I mean, we've tried a case against each

10  other before, Your Honor.  I don't foresee any problems.  It's

11  not that complicated.

12       (Laughter)

13       MR. CARMODY:  The opening statement.  Just the opening

14  statement.

15       THE COURT:  So, see, right off the bat, you're trying

16  to put me in a position where you both get to make opening

17  statements that have not been vetted, and you're basically

18  reserving objections and grounds for appeal that I never got a

19  chance to rule on.

20       All right.  I'm going to go along with your plan, but I'm

21  now speaking to the Court of Appeals.  I want the Court of

22  Appeals to please, please, take notice that the lawyers are

23  doing this and agreeing to this procedure.  And if they want to

24  cry foul after the fact, it's going to be too bad, really.  It

25  would have to be a super egregious thing.

PROCEEDINGS

```
 1        So don't think you're going to -- you know, small errors
 2   or even medium-sized errors will go unchecked.  I mean, they
 3   will go unchecked because you're not giving me a chance to rule
 4   on it in advance.
 5        So you both understand?
 6            MR. VERHOEVEN:  Yes, Your Honor.
 7            MR. CARMODY:  Yes, Your Honor.
 8            THE COURT:  All right.  Okay.
 9            MR. CARMODY:  Thank you.
10            THE COURT:  Okay.  Next, it would be useful to the
11   jury, in the same reason we have the timelines, to have a
12   one-page list of key individuals that they could stick in the
13   back of their steno pad that would be, like, let's say, the top
14   dozen people, the most important witnesses.
15        I'm not going to order you to do this, but I will suggest
16   to you that it would be useful to the jury.  And I would like
17   for you to try to do it.  And it would just be something simple
18   like the name of the person and their position at the company,
19   and the dates they were at the company.  Maybe six people from
20   each side.  Or whoever -- you each get to name six people, I
21   guess is the way I would put it.  Regardless of which side
22   they're with.
23        That way when the testimony is coming in and the jury is
24   hearing witness X repeat some conversation that they had with
25   somebody else, it would help the jury maybe to know if that
```

PROCEEDINGS

1    person is on that list.

2        Okay.  There is someone named John Gardner.  Is he here?

3    John Gardner here?

4        **MS. BALDWIN:**  Your Honor, I'm representing John

5    Gardner.

6        **THE COURT:**  Okay.  You come forward, please, and make

7    your motion about to intervene and so forth.  All right.

8        **MS. BALDWIN:**  Thank you, Your Honor.  Merri Baldwin

9    from Rogers Joseph O'Donnell on behalf of John Gardner and

10   Donahue Fitzgerald.

11       **THE COURT:**  Thank you.  Welcome.

12       Please, go ahead.

13       **MS. BALDWIN:**  We've moved to intervene for the limited

14   purpose of bringing to this court the motion that we have

15   brought pursuant to Federal Rule of Evidence 611 and Federal

16   Rule of Civil Procedure 16(a), which is expressly designed to

17   limit potential disruption at trial caused by the likely

18   necessity to assert privilege objections during Mr. Gardner's

19   direct testimony.

20       We've brought this motion because of Mr. Gardner's role as

21   an attorney for Mr. Levandowski as well as a number of the

22   entities who will be at issue in this trial.

23       We have requested that we have disclosure in advance of

24   the questions that Waymo intends to ask Mr. Gardner precisely

25   to allow advance consideration, Your Honor, of the complex

PROCEEDINGS

```
1   privilege issues, allowing Mr. Gardner to weigh those privilege
2   issues to consider whether privileged information is implicated
3   and allow the Court, Your Honor, to consider those objections
4   in advance rather than disrupting the trial, which, as you've
5   repeatedly made clear, is something that's a significant
6   priority.
7          THE COURT:  All right.  Thank you for being succinct.
8      What does Waymo say?
9          MS. ROBERTS:  Your Honor, Waymo's under no obligation
10  to provide an advance copy of its questions to Mr. Gardner
11  before he takes the stand.  But we don't think there's going to
12  be an issue here.  We don't have any intention of asking him
13  questions that would elicit privileged information.
14      We took his deposition.  Ms. Gardner [sic] defended him
15  and knows the subject matter that was covered.  We'll question
16  him about the facts covered in his deposition but don't intend
17  to ask questions where either he was instructed not to answer
18  or he refused not to answer on basis of privilege.  We don't
19  think there's going to be an issue here.
20      Frankly, Your Honor, we have limited time.  We don't want
21  to spend a lot of time with a witness on the stand, slowing
22  things down with privileged objections either.  So there's
23  really not a need for this extraordinary relief.  And, as we
24  laid out in our briefing, there's no support either.
25          THE COURT:  So you're committing to ask only questions
```

PROCEEDINGS

```
 1    that were asked in the deposition to which no objection was
 2    made?
 3              MS. ROBERTS:  That is our plan, Your Honor.
 4              THE COURT:  What's wrong with that?
 5              MS. BALDWIN:  Nothing, Your Honor.  That's not our
 6    understanding coming in here today.  But if Waymo is willing to
 7    limit its questions to questions asked at the deposition for
 8    which no objection was made, that's significantly different
 9    than has been represented to us.
10         For example, the list of topics that were disclosed for
11    Mr. Gardner's testimony include topics that, frankly, were not
12    covered in any depth at his deposition.
13              THE COURT:  What do you say to that?
14              MS. ROBERTS:  Well, I don't think that's correct.  We
15    said in our brief --
16              THE COURT:  Wait.  Do you stand by your statement --
17    someone came up from the rear to whisper in your ear just a
18    moment ago.  And I need now to ask, do you stand by what you
19    told me, that you will only ask questions that were asked in
20    the deposition to which no objection was made?
21              MS. ROBERTS:  That is our intention, Your Honor.
22              THE COURT:  All right.  Motion then -- with that
23    understanding, the motion is denied.  But you've got to stick
24    to what you said.
25         And you're going to be here to keep him honest; right?
```

PROCEEDINGS

1       **MS. BALDWIN:**  Yes, Your Honor.

2       **THE COURT:**  Okay.  Thank you for your time.

3       **MS. BALDWIN:**  Thank you.

4       **THE COURT:**  All right.

5      So how are my court reporters?  I guess you're swapping

6  out; right?  Okay.  So you're both doing good.

7      We have some -- we have a request by Waymo to present

8  financial evidence at trial.  So let's -- let's go over that.

9       **MS. BAILY:**  Good morning, Your Honor.  Melissa Baily

10  for Waymo.

11      So we did submit an offer of proof, as Your Honor

12  requested, with respect to two categories of financial

13  information.  One category is the perception of the overall

14  market opportunity presented by self-driving.  The other is

15  internal projections regarding the same opportunity.

16      And I would submit, Your Honor, that we're in a little bit

17  of an unusual position because Uber has actually taken the

18  position in this case that that evidence is relevant.

19      So Uber had a Ph.D. economist as an expert submit an

20  opinion about why Uber valued Ottomotto as highly as it did and

21  what the economics were, at the time, driving that transaction.

22      And so they put in evidence an analysis of a transaction

23  in the self-driving industry related to lasers in 2016.  So an

24  analogous transaction basically to the hypothetical negotiation

25  that would be at issue here.

PROCEEDINGS

```
 1        We have a transaction.  The hypothetical negotiation of
 2   the transaction would be for the license, hypothetical license,
 3   would be at the precise moment of their acquisition of
 4   Ottomotto.  The trade secrets relate to lasers.  Basically, the
 5   same economics would be in play.
 6        And what their expert said was, okay, there are three
 7   things driving the economics at the time.
 8        One is the perception of the market opportunity.  And he
 9   listed, and we listed in our brief, several market analysts and
10   other data related to the growth of the perception of the
11   opportunity.  And they said that's one of three factors that
12   were really driving the economics, along with the need for
13   strategic players like Uber to get onboard and get development
14   going, and the fact that there aren't a lot of people out there
15   who could do this stuff because it's new.
16        THE COURT:  I'm sorry.  Wait.
17        I thought you were trying to get Waymo documents into
18   evidence.  Am I right about that?  Your own company documents.
19   The other side's documents, you can use.  But no -- I mean,
20   those would be -- I assume you've got plenty of access to
21   those.  But I think what you're trying to do is get your own
22   self-serving documents into evidence.  That's the problem I
23   have.
24        MS. BAILY:  Okay.  Well, it would be both.  So we want
25   to elicit testimony, and I appreciate Your Honor confirming
```

PROCEEDINGS

```
1   that we can always elicit testimony from Uber witnesses about
2   the perception of the market opportunity.  And we do want --
3            THE COURT:  No.  You're overstating what I said.
4            MS. BAILY:  I apologize.
5            THE COURT:  I'm just drawing a distinction between the
6   Uber documents don't have the hearsay problem the Waymo
7   documents have when Waymo is presenting them.  There could be
8   other reasons why Uber documents should be excluded, for 403
9   reasons, for example.
10       So I -- that's the only distinction that I was making.
11  But I understood your offer of proof to be either totally or
12  mostly dealing with trying to get your own documents, your own
13  internal Waymo documents into evidence.
14           MS. BAILY:  I think it's partly that.  And I'll
15  address that.
16       But just to be clear, it's to get -- to elicit testimony
17  from both sides regarding the perception of the market
18  opportunity.  And then, with respect to Waymo, its own internal
19  understanding of how that opportunity -- how they expected that
20  opportunity to play out.
21       So that is internal Waymo information.  We will have --
22           THE COURT:  But what is that relevant to?
23           MS. BAILY:  Well, I think this case is a little bit
24  unusual on just that point, because both parties here, the
25  evidence will be, thought that this was a winner-take-all or
```

1    winner-take-most opportunity.

2         So there is this notion, and it comes out very heavily,

3    really in the evidence of both sides, but especially with Uber

4    and Mr. Kalanick's perceptions and ideas about what was driving

5    him to do what he was doing with respect to self-driving at

6    Uber; that it really was a race; that who got there first and

7    how far behind the second player was going to be really, really

8    mattered.  And that was going to matter for a sustained amount

9    of time as the industry grew.

10        And that's what both sides believed, that they were

11   competing for a pie; and that they perceived the pie to be

12   large; and that they perceived the race to be critical to who

13   was going to get that pie; and that whoever got the pie was

14   going to get all or most of it.

15        And I'm not sure that that's really how competitors

16   perceive it in other, perhaps, established industries or even

17   in other developing industries.  But the evidence is

18   overwhelming that that's how both parties thought of it here.

19        **THE COURT:**  Are you talking -- okay.  I'm confused.

20        Your internal documents probably never will be allowed in

21   evidence.  I can't say never because maybe you can find some --

22   but they're hearsay.  They're just standard hearsay.  On the

23   other hand, the Uber in-house documents would normally be

24   admissible; at least, they're not hearsay.

25        So testimony is not hearsay usually.  So if someone --

1    let's take a hypothetical example.  Let's say that the head of

2    your company -- who would that be?  Who would --

3            **MS. BAILY:**  John Krafcik.

4            **THE COURT:**  He comes in and says, "I was there at the

5    time, and we thought this was a two-person race, and whoever

6    got there first would win the whole pie."

7            So let's say that he can actually say that from actual

8    memory and it's legitimate testimony.  That's not hearsay.

9    That's just repeating what he had in his mind at the time.  But

10   what is it relevant to?  Okay.  I don't know.

11           I thought this whole thing was just documents.  That's

12   all.  I didn't realize that you're talking about testimony.

13           **MS. BAILY:**  Yes, testimony.

14           **THE COURT:**  Hold that thought for a second.

15           **MS. BAILY:**  Waymo testimony.

16           **THE COURT:**  I want to hear from Mr. Carmody.

17           Mr. Carmody, when Waymo is telling the story with its

18   witnesses and they bring in a witness who says, "I was there at

19   the time and we -- LiDAR was important; self-driving cars was

20   going to be huge.  We thought this was a race to the death.

21   And I was there at the time, and everything I'm telling you I

22   know firsthand," why shouldn't the jury hear that?

23           **MR. CARMODY:**  We don't have a problem, Your Honor,

24   with a witness on either side who can competently testify under

25   Rule 602 firsthand knowledge of what you're talking about.  But

PROCEEDINGS

```
 1   that was not -- you're right.  That was not the basis of their
 2   motion.  I mean, we've read their motion.  We responded to
 3   their motion.
 4           THE COURT:  All right.  So testimony, firsthand,
 5   competent, you're okay with both sides telling their story --
 6           MR. CARMODY:  Talking about the importance of the
 7   transaction.
 8           THE COURT:  All right.  So testimony -- okay.  So now
 9   let's turn to the document.  I'm going to just say, as a
10   general matter, that kind of testimony from competent
11   witnesses, okay.
12           MS. BAILY:  Okay.  So with respect to documents, which
13   would essentially say the same thing as the testimony.  I mean,
14   our P&L, for example, is --
15           THE COURT:  No.
16           MS. BAILY:  -- is a business record.
17           THE COURT:  Wait, wait, wait.  P&L.  Give me an
18   example on the P&L.  What line item would you like to put in?
19           MS. BAILY:  Our baseline profit and loss statement
20   that is -- I just want to make sure that we're talking about
21   the same thing.  Right?
22       Our motion was brought related to the financial
23   information.  Right?
24           THE COURT:  You went off and told me it was on
25   testimony.
```

```
 1          MS. BAILY:  Right.  But the testimony is going to be

 2   the same as the documents, which are business records; that the

 3   size of this opportunity was, you know, in ranges of numbers,

 4   and that Waymo perceived its ability to capture a certain

 5   number with respect to the market.  Right?

 6      So we can have somebody testify about that, and they will

 7   testify from percipient knowledge and provide that testimony

 8   orally.

 9      We think our P&L --

10          THE COURT:  Give me the specific number so we have

11   something concrete I can evaluate.  The name of the witness and

12   the specific dollar amount.

13          MS. BAILY:  Your Honor, I would need to confer with my

14   client on the confidentiality issue, whether to come out with

15   it here when it's not even clear that it's going to come in at

16   trial.

17          THE COURT:  Give me this.  Just say X dollars and give

18   me the name of the witness and what the line item is in the

19   financial.

20          MS. BAILY:  So, for example, Dan Chu or Jennifer

21   Haroon have information where they would say that Waymo

22   believed at the time of the hypothetical negotiation -- so

23   ballpark early 2016 -- that Waymo's capture of an X dollar

24   potential market was Y dollars.

25          THE COURT:  Okay.  What's wrong with that,
```

PROCEEDINGS

```
 1   Mr. Carmody?

 2          MR. CARMODY:  Several things, Your Honor.  First of

 3   all, we have a huge 403 problem.  But, number one, none of this

 4   stuff was disclosed.  Their financials -- what they're talking

 5   about and what their motion referred to is they want to use

 6   forecasts, revenue forecast, profit forecast, not only their

 7   own, but for the whole self-driving car --

 8          THE COURT:  No, no, no.  She said these were profit

 9   and loss statements, not forecasts.

10          MS. BAILY:  But our profit -- I apologize, Your Honor.

11          MR. CARMODY:  No profits and losses.  The business

12   hadn't started.

13          THE COURT:  I misunderstood.

14          MS. BAILY:  This document is called a profit and loss

15   statement.  But to be absolutely clear, it is a projection

16   document.

17          THE COURT:  Well, that's just pie in the sky.

18          MR. CARMODY:  That's my point.

19          THE COURT:  That's pie in the sky.  And it's hearsay,

20   and it could be trumped up just for litigation.  It's highly

21   unreliable.

22          MS. BAILY:  Well, we would put in evidence about its

23   reliability and actually everything that went into it.

24          And I would just say, with respect to our percipient

25   witnesses who were there when it was developed and who
```

PROCEEDINGS

 1   developed it and had input into it themselves, their ability to

 2   testify about this goes directly to an issue.

 3        And, again, just come to it -- and I apologize if I'm not

 4   being clear -- that they themselves said was relevant when it

 5   suited their purposes.  Right?

 6        So when they want to explain why they valued Ottomotto at

 7   this pie-in-the-sky number, they want to be able to talk about,

 8   well, the market opportunity was perceived to be in the tens to

 9   hundreds of billions of dollars, and it's a race to get that

10   market.  And that's what is motivating us because we're going

11   to get, you know, all or most of that market if we win.

12        They want to say that when it comes to why are they

13   valuing Ottomotto at a pie-in-the-sky number.

14             THE COURT:  Yeah.  What do you say to that,

15   Mr. Carmody?

16             MS. BAILY:  When they come to the hypothetical

17   negotiation --

18             THE COURT:  You're trying to have it both ways.  What

19   do you say to that?

20             MR. CARMODY:  We don't want it both ways, Your Honor.

21             THE COURT:  It sounds like you do.  So tell me why.

22   Are you going to make the argument that Ms. Baily just told me

23   you're going to make?

24             MR. CARMODY:  I don't think so, but I'm not exactly

25   sure what she said.

1          **THE COURT:**  Who over there knows?

2          **MR. CARMODY:**  If I can respond, Your Honor, I mean,

3    this whole thing started off with Ms. Baily talking about our

4    M&A expert and what he's going to do.  She knows he's not on

5    our witness list.  He's not going to be called.  That's point

6    one.

7          **THE COURT:**  Wait a minute.  Is that true?

8          **MS. BAILY:**  Yes.

9          **THE COURT:**  The one you're talking about, about

10   Ottomotto, you now know that they're not even going to call

11   that witness?

12         **MS. BAILY:**  I didn't get to finish, but yes.

13       So they have taken that position.  And now faced --

14   they've had him on their witness list.  And now, faced with our

15   offer of proof, for the first time they said, "Oh, he's our

16   former expert.  We're not going to call him anymore."

17       But it sort of doesn't matter because the point is that

18   they've taken the position that it's relevant.  And they know

19   that it is because the evidence is so clear that this was

20   driving Mr. Kalanick and this was driving Uber's behavior.

21   That's why they put it in an expert report.  That's why they

22   had a Ph.D. economist talk about it.

23       They're withdrawing it because now we want to say the same

24   thing.  I'm not sure that that is actually relevant to whether

25   we should be permitted to use it for the same purpose.

PROCEEDINGS

```
 1           MR. CARMODY:  Your Honor, if I can respond.

 2           THE COURT:  Yes, please.

 3           MR. CARMODY:  Yeah.  I mean, this is kind of going

 4   this way and this way.  If I can just take it a step at a time.

 5        Now, I think what counsel is talking about is motive,

 6   which of course is not an element of a trade secret claim.  It

 7   doesn't appear in even your penultimate jury charge.

 8           THE COURT:  Motive may not be element.  Motive isn't

 9   always relevant to help show that they did --

10           MR. CARMODY:  But not these speculative financial

11   forecasts.

12        Let's talk about what's in their motion.  What their

13   motion wants you to allow is witnesses to take the stand here,

14   talk about financial forecasts, revenue forecasts, and profit

15   forecasts inside of Waymo that are entirely speculative because

16   the business hadn't happened yet.  There are no profits and

17   losses yet.

18        And with the whole self-driving car business, of course,

19   the Court knows this isn't a lost profits case.  They don't

20   claim this is relevant to unjust enrichment.

21        What they say is this is for our reasonable royalty.  This

22   Court knows, better than I do, the Federal Circuit's rules.

23   There's no connection whatsoever between these speculative

24   financials and the eight trade secrets at issue.  Zero

25   connection.
```

PROCEEDINGS

1       And so what the Federal Circuit has said over and over and

2   over, even if documents like that could be marginally relevant,

3   they skew the damages horizon for the jury in any reasonable

4   royalty case.

5       That's what we have here, Your Honor.  I don't care.

6   We're not going to sit here and object that this was an

7   important deal, the Uber Ottomotto thing.  But it's the

8   speculative financials that nothing has happened.  And you want

9   to put them in, the Federal Circuit is just going to take this

10  away.  You can't do that.

11          MS. BAILY:  I'd just --

12          MR. VERHOEVEN:  It's a major 403 issue.

13          THE COURT:  Wait, wait.

14          MS. BAILY:  I would just like to make a clear record

15  here because I hear the argument about 403.  I just -- Uber is

16  the one who presented the argument in the first place.  I

17  just -- I have to make clear --

18          THE COURT:  It's off the table now.  And they -- so

19  you're trying to hold them to something they don't want to be

20  held to.

21          MS. BAILY:  But they've conceded the relevance,

22  because it's the truth, that what is animating Uber when

23  they're acquiring Ottomotto is the perceived notion of the pie.

24  And they had somebody put in evidence of the estimates of the

25  pie because that was what was on the line when they were buying

PROCEEDINGS

1    Ottomotto.

2        So all I'm saying is I know that they're not going to call

3    Dr. Jacobs now that we have made this offer of proof.  They

4    decided he's their former expert.  All I'm saying is that, for

5    the very same reasons that they know that this animates what

6    goes on in this industry right now, and that that was

7    explicitly -- he testified, Mr. Kalanick, driving him and

8    driving his decisions with respect to how much to pay and for

9    what, and what business practices to do.  That drove their

10   decision to value Ottomotto highly.  It would drive the same --

11   it would drive them in the same, at least, qualitative way at a

12   hypothetical negotiation.  It's exactly the same transaction

13   time, transaction technology.

14       And so they can withdraw Mr. Jacobs, but they know that

15   this is true in this industry.  They had an expert say so.  And

16   we should be able to elicit the testimony.

17           **MR. CARMODY:**  Your Honor, quick comeback.  Counsel

18   said two or three times we put into evidence.  The trial hasn't

19   begun.  There's no evidence of anything yet.

20       Number two, we withdrew Mr. Jacobs.  He hasn't been on

21   this witness list for a while.  It certainly happened before

22   they filed this.  So this is a complete red herring.

23       The bottom line is, of course this Court knows a huge

24   amount of money was paid for Anthony Levandowski's Ottomotto.

25   And, of course, the Court has already recognized that that went

1   for the talent that these people brought to the table.

2       There's no way you can apportion taking forecasts,

3   financial forecasts for an industry that hasn't yet begun years

4   into the future and somehow say those are connected to the

5   eight trade secrets at issue such that the jury, for some

6   reasonable royalty analysis which may never happen if the

7   unjust enrichment phase happens and the jury finds there may be

8   some unjust enrichment damages, this is all incredibly 403

9   problematic under so much Federal Circuit law that we're just

10  running into a buzz saw.

11      **MS. BAILY:**  Just for the record, Your Honor, my

12  colleague, Mr. Verhoeven, reminded me that -- I mean, we should

13  be able to call Dr. Jacobs ourselves.

14      **MR. CARMODY:**  He's not on your list.  Come on.

15      **MS. BAILY:**  Well, you just removed him, in the face of

16  our offer of proof, from your list.

17      **THE COURT:**  Well, I don't know about that.  Maybe you

18  can; maybe you can't.

19      Here's the way I see it.  This case started out with over

20  a hundred trade secrets.  Am I right about that?

21      **MR. CARMODY:**  Yep.

22      **THE COURT:**  Now we're down to eight.  So if the jury

23  is going to award damages, it's got to be tied in and tethered

24  to those eight.

25      And, to my mind, if we allow huge numbers of what the

PROCEEDINGS

1   overall self-driving car market is worth, it is several steps

2   removed from these eight.

3       Here are the steps:  There's the genuine universe of

4   self-driving cars and what that market is worth.  And then

5   there's the subpart of that, that is the LiDAR part.  And then

6   within the LiDAR part, there are things that are trade secrets,

7   things that are not trade secrets.  Some are just the value of

8   the engineers as opposed to the trade secrets.  And then within

9   the hundred-plus trade secrets, we're now down to eight.

10      So if we put big numbers out there, there's a risk that

11  the jury will fall for the old thing that we see all the time

12  in the patent cases where the plaintiff wants to put those big

13  numbers out there and make the jury think, hey, look, but for

14  this Trade Secret Number 90 there, they would have never gotten

15  there; therefore, we get a big --

16      I just think the risk of that -- and it doesn't prove very

17  much.  So --

18          MS. BAILY:  Your Honor.

19          THE COURT:  I'm ruling against you, Ms. Baily.  So

20  you've got to accept the ruling.

21          MS. BAILY:  That's fine, Your Honor.  I had another

22  point to make, but I won't make it.

23          THE COURT:  All right.

24      Now, but I do think it's fair, for background, for

25  witnesses on both sides to testify competently that they saw

PROCEEDINGS

 1    the self-driving car market as huge.  No problem.  But not

 2    saying "And we projected a certain number."  No, you can't do

 3    that.  You say, "We saw this as a huge thing.  We devoted 300

 4    employees to this project.  We set up a big factory for it."

 5        You could say those kind of things.  And that LiDAR was an

 6    important part of it and why LiDAR was important.  And I think

 7    that kind of background would be useful for the jury.  But what

 8    I'm ruling out are these internal financial projections by

 9    Waymo.  That, I am ruling out.

10        And I am open to the idea that, if you have an Uber

11    document, I will -- I will not necessarily rule that out even

12    though it's a projection for the overall car market.

13        So do you understand that?  If you have an Uber document

14    that says the overall car market is going to be $42 billion,

15    then maybe that's going to come in.  I'm not saying yes to that

16    yet.  That's an easier case for Ms. Baily to make than what

17    we've been talking about.

18        **MR. CARMODY:**  We hear your point, Your Honor, and I

19    think, for example, you didn't reference it by name, but you

20    may be thinking in your head about a Nina Qi document that we

21    talked about quite a bit.

22        **THE COURT:**  That document, for sure, is coming into

23    evidence.

24        **MR. CARMODY:**  And the one thing we request, Your

25    Honor, is if they want to try to move that document into

 1  evidence, because of the same problem, it's not --

 2        THE COURT:  I'm going to let that in.  Come on.  That

 3  document -- that's like the first nail in your coffin.  You

 4  can't -- you're going to have to live with that document.

 5        Okay.  I'm not saying you're dead yet.

 6        (Laughter)

 7        THE COURT:  I'm just saying that's a big one.  You're

 8  not going to get out of that document.

 9        All right.  We need to take a break for a few minutes.

10  15 minutes.  But we're not done.  We've got more to go over.

11        Let's see what we've got.  Well, you all be thinking about

12  how much more damage I can do.  Then I'll resume as soon as we

13  come back out.  All right.  Thanks.

14        THE CLERK:  The Court is in recess.

15        (Whereupon there was a recess in the proceedings

16        from 9:24 a.m. until 9:38 a.m.)

17        THE COURT:  Okay.  Let's go back to work.  Please have

18  a seat.

19        Now we're turning to the issue of saved development costs

20  and documents.

21        Here's what I -- I think it's the same problem.  Waymo

22  wants to introduce some more documents about saved R&D.  And

23  the thing is I believe it has to be reasonably apportioned to

24  these eight trade secrets.  And if you can find a way to get to

25  that, then I'm open to some possibility here.

PROCEEDINGS

1    But that's not what your offer of proof is.  Your offer of

2  proof is on saved development costs and much more -- a greater

3  universe.

4    So, all right.  That's my tentative thought.  So let's

5  hear from you, Ms. Baily.

6    **MS. BAILY:**  So, Your Honor, I guess two things.  And

7  so I understand it as two issues.  There's the issue of the

8  overall number and then the issue that you raised of

9  apportionment.

10    So, I mean, I do want to say that this situation, again,

11  is a little bit unique because Waymo was the first to do what

12  they did.  And it took a lot of work for them to even identify

13  the problems that needed to be solved, that led to solutions,

14  that led to trade secrets.

15    So it's very hard to say, oh, the trade secret development

16  started at this late date when it actually, as a matter of

17  fact -- and we did offer 13 pages of proof -- wouldn't have

18  happened if Waymo didn't do so much of what it had done before.

19    And so setting aside the issue of the connection of the

20  eight trade secrets to damages, which I will get to -- I mean,

21  I understand that's an issue -- Uber's going to argue that a

22  lot of our trade secrets aren't trade secrets.

23    And I just think that for us -- Waymo should be able to

24  explain to the jury why they really are trade secrets and why

25  in this technology, when Waymo started developing it, you know,

PROCEEDINGS

1   seven years before Uber even thought it was going to be a thing

2   and that it was possible, and we did all of that foundational

3   work, that really was "but for," the trade secrets wouldn't

4   exist but for it, that we should be able to put on our case as

5   to all of the expenditures and resources that was required.

6        And we are willing to spend time at trial, of which we

7   have, you know, very little -- and the parties agreed --

8   explaining why that is.  And we did submit, you know, 12 pages

9   about exactly why that is.

10       Uber says that it's nonsense and they don't believe us.

11   But in order to establish trade secret status, we ought to be

12   able to tell the jury and lay that foundation of all of this

13   work and why it really is all relevant ultimately to the trade

14   secrets.

15       Now, we were really upfront in our brief.  We are not

16   trying to say that, because all of that cost was necessary to

17   get to the trade secret, that, by misappropriating the trade

18   secret, they automatically get all of the value from all of

19   that work.  Right?  Because they're getting a trade secret;

20   they're not getting, you know, necessarily all of our data or,

21   you know, all of the intuitions and know-how that came from the

22   program just by getting the trade secret.

23       But it doesn't take away from the fact that the whole

24   reason our trade secrets are so valuable is because they came

25   from this extensive process that was built from the ground up

PROCEEDINGS

1   and that nobody else has done.

2       So for that reason, and also because that notion of that

3   value not only sort of imbues the trade secrets with trade

4   secret status, but the parties would understand that that is

5   why they're so valuable if they're negotiating a royalty, that

6   somebody who picks something out of the sky, you know, as a

7   trade secret, that's not the same as Waymo, who's done seven

8   more years of work than anybody else in this field having come

9   to the resolution that, with a million competing factors, this

10  is the way to go.

11      So, from that perspective, we feel strongly that the

12  overall number needs to come in, especially in connection, you

13  know, with Waymo's burden of proof to establish trade secret

14  status.

15      With respect to -- if Your Honor says that, okay, well, it

16  could come in potentially for the trade secret status, you

17  know, with respect to damages, you have to do more, Uber put in

18  its brief evidence from which it -- you know, from which R&D

19  costs could be apportioned.  Right?

20      Uber says apportionment is required.  You know, look at

21  this evidence about the system.  You know, there will be

22  evidence at trial from which apportionment could be done.

23  Right?

24      So I don't know exactly how that's going to come in,

25  standing here now, in terms of, you know, which details are

PROCEEDINGS

 1   going to come in to sort of frame that.  But that is another

 2   piece of the puzzle.

 3        I don't think that that piece of the puzzle is necessary

 4   to the conclusion that, for the reasons I already stated, the

 5   number should come in.  And we will be very upfront with the

 6   jury about what the relevance of that number is.

 7              THE COURT:  Mr. Carmody.

 8              MR. CARMODY:  Sure, Your Honor.

 9        I mean, obviously, what they want to do is talk about a

10   number that has a B behind it and say that this number is their

11   total development costs for the many, many years they've had a

12   self-driving car program.

13        The problem we know, Your Honor, is that they've admitted

14   in their sworn interrogatory answers and in their 30(b)(6)

15   deposition that they haven't tracked that number that begins

16   with a B on a trade secret-by-trade secret basis.

17        So what we're then left with is that number that begins

18   with a B covers not only these eight trade secrets; it covers

19   Number 96 you knocked out; it covers the patents that are gone;

20   it covers the other hundred-plus trade secrets that they say

21   are in this suit; it covers all their AV portfolio, IP

22   portfolio of autonomous vehicles.

23        The point is they have a wicked apportionment problem.

24   There's no connection whatsoever between that big fat number

25   and the trade secrets in this suit.  And because of that, we

1   have a major 403 problem, which is why counsel can't even

2   identify, in response to your question, a single witness who

3   can sponsor this and somehow apportion that billion dollar

4   number to the trade secrets in suit.

5          That's the problem, Your Honor.

6          **MS. BAILY:**  Your Honor, the problem here is that the

7   defendants, right, they don't like the facts.  And you can see

8   in their opposition to our offer of proof.  They just actually

9   ignore the 12 pages of evidence that we put forward, that we

10  are willing to spend time at trial talking about.

11         With respect to exactly why, in this circumstance, the

12  costs that we have combined are relevant and "but for" costs to

13  the trade secrets, that is a separate issue.

14         With respect to the apportionment issue, there will be

15  evidence at trial from which a jury could apportion.

16         And the fact that we don't track our trade secrets, I

17  mean, there's case law, you know, and --

18         **THE COURT:**  I don't know what that evidence is from

19  which they could apportion.

20         **MS. BAILY:**  Well, for --

21         **THE COURT:**  I'm convinced there is no such evidence

22  right now.  But maybe you could convince me to the contrary.

23         **MS. BAILY:**  Well, even in Uber's own submission, they

24  said, you know, there's this number of parts to a self-driving

25  car.  Right?  There's this number of hardware parts.

PROCEEDINGS

```
 1        And there will be -- you know, they will be approximate

 2   ways.  They are not going to be --

 3        THE COURT:  You're relying on their proof to prove

 4   your case?

 5        MS. BAILY:  No, no.  I'm just saying that it is in

 6   some ways easy to conceive of the apportionment; whereas, I

 7   think, you know, your perspective is that it's hard to perceive

 8   of the apportionment.

 9        But if we're talking about the kind of approximations the

10   case law permits in cases like this, because it is not the

11   case, hardly ever, that a plaintiff keeps track of information

12   on a trade secret-by-trade secret basis -- businesses just

13   don't do that.  And so the law recognizes that.  And the law

14   says, you know, a jury can look at the evidence of the system

15   and, you know, draw inferences, make approximations with

16   respect to apportionment.

17        So, you know, there will be evidence about the different

18   facets of an autonomous vehicle.  There will also be evidence

19   that Uber believed that lasers was the long pole of their

20   development process; that if they didn't have lasers, that was

21   what was driving their whole timeline and their whole issue

22   with respect to catching up with Waymo.

23        So lasers to them is going to be more important than other

24   aspects that they didn't feel like were the long pole of their

25   development efforts and that, you know, weren't as critical to
```

PROCEEDINGS

 1  this sort of need to catch up with Waymo.

 2        So there's going to be, you know, all kinds of evidence

 3  that relates to the value.  And among that evidence is going to

 4  be evidence from which a jury can apportion.

 5        MR. GONZÁLEZ:  Your Honor, the quick comeback here is

 6  you gave them ample time in their offer of proof to lay it out

 7  and connect the dots.  They didn't there, they haven't now.

 8  Because if you think about that big billion dollar number,

 9  there is tons of software in that number.  Who on this planet

10  can come in as a fact witness with 602 first-hand knowledge and

11  try to apportion that huge number, which contains so much

12  intellectual property, according to the other side, to these

13  eight trade secrets?  Nobody, which is why they haven't

14  answered that question in their offer of proof and why they

15  can't answer it this morning.

16        So we have a wicked 403 problem, and we respectfully

17  request that the Court deny their motion.

18        THE COURT:  All right.  Here is the answer.  Wait.

19  Ms. Bailey, you were waiving your hand.  Please go ahead.

20        MS. BAILEY:  I apologize.  I was just going to point

21  out that the software problem is something that, you know, I

22  would seize on, right?  Because, again, there is the two issues

23  about the value of the trade secrets and the but-for R&D costs

24  that got them to where they needed to be and the issue of

25  apportionment.  And as we said in our offer of proof at length,

PROCEEDINGS

1   that software was key with respect to the development of our

2   trade secrets.

3        You know, it's not -- it's not a thing where you can -- I

4   mean, the whole point is that our trade secrets were developed

5   with reference to what could work with software.  Is the

6   software algorithm going to be too complicated?  If it's going

7   to be too complicated, we have to have less complicated

8   software and we have to tweak the hardware this way.  You can't

9   just look at it independently.

10       And the jury should hear about all of the reasons why we

11  arrived at our trade secrets.  That's what gives them their

12  value.

13            **THE COURT:**  All right.  Here is the answer.  It would

14  be -- again, it would be okay to tell the Waymo story without

15  getting into these aggregate numbers.  You can say:  We started

16  seven years before anyone, if that's actually true.  I don't

17  know if that's true.  You say that, but you started seven years

18  before anyone else.  You built a factory.  You had 1600

19  engineers working on the problem over the course of seven years

20  and you came out with your first car in such-and-such timeline

21  and first LiDAR at such-and-such timeline and here are the

22  problems we had to solve in the software.  You can describe all

23  that without getting into the big numbers.

24       And so you're not allowed to use those big numbers under

25  Rule 403 until such time, if ever, there is adequate proof in

PROCEEDINGS

```
1    the record that would allow the jury, in my judgment, to
2    apportion the eight trade secrets.
3        If that ever occurred, then I would reconsider and maybe
4    allow you in rebuttal or allow you at some point to bring that
5    up.  So that's the ruling.
6        Now, as with all of these other rulings, I have seen this
7    time and time again; that the person in Uber's position having
8    won, you open the door to it.  You try to get greedy and you
9    put a witness on the stand and elicit testimony; say, an expert
10   witness.  And then on cross examination I might just allow
11   Ms. Bailey to ask exactly these kind of questions and to -- if
12   you, in fact, did open the door to it.
13       So it is -- I'm making this ruling on the record I have
14   now, but I have seen the door open so many times in the past
15   that you've got to proceed with caution.  And if you come to me
16   and say:  Judge, will this open the door?  I might not be
17   willing to tell you.  Because sometimes lawyers candy coat what
18   their offer of proof is and then it turns out to be a little
19   bit worse than that.  So I may not even tell you.  You have to
20   take your own chances.
21       Anyway, enough on that.  For better or worse, that's my
22   ruling.
23       All right.  Next we go to some trial witnesses that you
24   wanted to add to your list, right?  Or have I already, more or
25   less, taken care of that?
```

PROCEEDINGS

```
 1           MR. GONZÁLEZ:  Your Honor, you ruled previously on one
 2    of the witnesses, Bananzadeh.
 3           THE COURT:  Yes.  But let's hear again, what's the
 4    argument for Bananzadeh?
 5           MR. EISEMAN:  Your Honor, David Eiseman.  Thank you.
 6        The difference is, is the time your Honor ruled on that
 7    motion, we had inadvertently left Mr. Bananzadeh off of our
 8    witness list.  We have since added him.  At the time your Honor
 9    ruled that we would only be allowed to call him if Uber called
10    or used his testimony as a 30(b)(6) witness.  That was before
11    your Honor excluded our damages expert.
12        And this is tied to the R&D costs.  We are offering
13    Mr. Bananzadeh to testify regarding R&D costs.
14        So my suggestion would be that your Honor deferred ruling
15    whether we can put that number in, if and when your Honor says
16    that we can, we would like to offer it through Mr. Bananzadeh.
17    He has been on our list for three months.  He was deposed for a
18    full day as a 30(b)(6) witness on our development costs.  And
19    so --
20           THE COURT:  So you're saying if I decide that the --
21    that those numbers should go before the jury, you would like to
22    have him come, because they have already deposed him, and you
23    would limit yourself to what's in the deposition?
24           MR. EISEMAN:  That's correct, your Honor.
25           THE COURT:  Okay.  Well, what's wrong with that?
```

PROCEEDINGS

1    **MR. GONZÁLEZ:**  So, your Honor, he testified as a

2    30(b)(6).  And what you said before was that if we use his

3    30(b)(6) deposition, they can call him in their case-in-chief.

4    And we're still on board with that.

5        **THE COURT:**  Yeah.  Well, I want to know if you're on

6    board with what I just heard as a somewhat different scenario.

7        **MR. GONZÁLEZ:**  So the scenario being that if the Court

8    should decide that some of the documents we have just been

9    discussing are admissible, can they bring him?

10       **THE COURT:**  Yeah.  Let's say that I -- that eventually

11   you open the door, which probably you will in some way because

12   you will be greedy and you will want to overreach and you will

13   try to skirt by something.  Okay.  Let's say you do that and

14   you open the door.  So, then, how are they going to get into

15   evidence these numbers?

16       Well, maybe -- maybe it would be fair to let

17   Mr. Bananzadeh testify at that point about these numbers.  I

18   don't know.

19       **MR. GONZÁLEZ:**  Your Honor, perhaps -- perhaps we can

20   submit a two-page pocket brief.

21       But here is what I would say in response.  This issue was

22   not raised until just now.  And here is our response --

23       **THE COURT:**  What do you mean it wasn't raised?

24       **MR. GONZÁLEZ:**  Well, this issue about maybe we'll use

25   him if the Court should decide that some of these documents

PROCEEDINGS

1    come in.

2         But here is my response to that.  It's the same thing

3    Mr. Carmody has just been saying.  This witness was asked

4    whether he can apportion and whether he can tell us what goes

5    with respect to the eight trade secrets.  He couldn't.  He

6    didn't have a clue.  So I don't know what offer of proof they

7    are making --

8         **THE COURT:**  But maybe there will be some other proof

9    elsewhere in the record by the point we get to that stage,

10   where I say, Okay, I can see a way to apportion it.  I kind of

11   doubt it, but I don't know.  I can't say never right now.

12        **MR. GONZÁLEZ:**  Your Honor, if --

13        **THE COURT:**  So at that point, I -- they have got to

14   have some way to put it in.  And you've already deposed this

15   guy.  So what's the harm to you?

16        **MR. GONZÁLEZ:**  Right.  So, your Honor, I guess the

17   point that I want to make is this.  He doesn't have any

18   personal knowledge to do any of this stuff.

19        I understand what you're saying.  You're saying you want

20   to reserve your right to hear the evidence.  That's all fine.

21   I get that.  But what I want you to know is that this gentleman

22   has already testified he doesn't have a clue about these eight

23   trade secrets.  Doesn't have a clue about apportionment.

24        And I just want the record to be clear right now that I

25   have no idea what offer of proof they are talking about, but he

PROCEEDINGS

```
 1   cannot come in and say stuff that's inconsistent with what he

 2   said as a 30(b)(6), your Honor.  He was their 30(b)(6).  He

 3   cannot come in now and start making stuff up once they take him

 4   to the Google woodshed.  That's our point.

 5            MR. EISEMAN:  Your Honor --

 6            THE COURT:  Wait.  Wait.  Wait.  You said you would

 7   only ask the same questions that were asked in the depo.

 8            MR. EISEMAN:  Yes.  Because, your Honor,

 9   Mr. Bananzadeh is testifying about financial matters.  He's not

10   testifying about technical matters.  We will have other

11   witnesses come into court, as Ms. Bailey said, who we believe

12   will establish enough evidence to apportion.  And if your Honor

13   then says, Okay, you can put the numbers in, then we call

14   Mr. Bananzadeh.

15            THE COURT:  These are numbers that can be found in the

16   deposition?

17            MR. EISEMAN:  Yes, your Honor.

18            THE COURT:  Does he actually have firsthand knowledge?

19   Even though you designate him as a 30(b)(6), that doesn't

20   mean -- that means they get to use him, but it doesn't mean you

21   get to use him.

22            MR. EISEMAN:  He's a Waymo financial witness.  He

23   works in the financial group at Waymo and he has personal

24   knowledge of the costs that were spent, and he will testify to

25   that effect.  And they deposed him for a full day on this very
```

PROCEEDINGS

1   subject.

2        THE COURT:  All right.  Here is what I think we ought

3   to do.  This is a narrow ruling.

4        In the contingency that I am satisfied in the course of

5   the trial that there is a way to apportion, then the fact that

6   he was not previously designated won't be held against Waymo.

7        But to be clear, I am not saying that he has the requisite

8   foundation to give any testimony.  He could be totally

9   self-serving and straight out of the woodshed and straight out

10  of the -- you know, that he has been fed information.

11       So there may be -- it may be that he doesn't have the

12  foundation to testify even though -- but I'm going to, in that

13  contingency, forgive the failure to designate since the other

14  side did take his deposition.

15       So that's a very limited ruling.  All right.  That's

16  Mr. Bananzadeh.

17       All right.  Now we go to Prabir Adakar.

18       MR. EISEMAN:  Your Honor, we are not going to call

19  that witness and so you can take that one off your list.

20       THE COURT:  Okay.  Then the last one was an Uber

21  custodian of records.

22       MR. EISEMAN:  That's correct, your Honor.

23       THE COURT:  All right.  I have never heard of such a

24  procedure.  I'm not going to do this.  There is no such

25  procedure as giving you a deposition during the trial to try to

PROCEEDINGS

1    authenticate documents you didn't bother to authenticate along

2    the way.  And I'm just not going to do that.

3        Now, you can -- you've got to call witnesses, individually

4    named witnesses, and bring them into court, unless the other

5    side is going to try to get away with the same kind of gimmick,

6    in which case I will reconsider.

7            MR. EISEMAN:  Your Honor, for the record, we did cite

8    the *McAsset Recovery* case, in which a Rule 45 trial subpoena

9    was issued to a custodian of records to authenticate documents

10   that had been produced by the corporate guardian.  And the

11   Court there said there is no prejudice to the party who

12   produced the documents; they produced them and you're just

13   having a custodian come there and authenticate the documents.

14           THE COURT:  But that sounds like it was a Rule 45

15   subpoena to a third party.

16           MR. EISEMAN:  No.  It was to the party in the case,

17   your Honor.

18           THE COURT:  Well --

19           MR. EISEMAN:  And, your Honor --

20           THE COURT:  It just is -- no.

21           MR. EISEMAN:  Let me just make --

22           THE COURT:  No.  Here we have had millions and

23   millions of dollars spent, hundreds -- I bet you -- I bet you

24   all have spent $300 million on attorney's fees in this case.

25   And here we come down and there is still documents that you

PROCEEDINGS

1   haven't authenticated yet?

2        MR. EISEMAN:  Your Honor, Mr. Wagner, our damages

3   expert, would have been in a position to testify about some of

4   them, but because your Honor excluded him, this problem arose.

5   And we're trying to take care of it.

6        And, your Honor, we're willing, because these are business

7   records that came right out of Uber's file, to have a

8   stipulation of authenticity if Uber will give us one and we'll

9   go from there.

10       We don't need to call another witness --

11            THE COURT:  How many documents are there?

12       MR. EISEMAN:  There are four or five, your Honor.

13            THE COURT:  How thick are these documents?

14       MR. EISEMAN:  They are not thick.

15            THE COURT:  Hand up to me --

16       MR. EISEMAN:  I have copies --

17            THE COURT:  Hand up the first document to me.  Let me

18   look at it now.

19       MR. EISEMAN:  I'm going to hand up the skinny one

20   first, your Honor.

21            THE COURT:  Smart.

22       (Whereupon document was tendered to the Court.)

23            THE COURT:  Okay.  So what's been handed up to me has

24   got very fine print.  Called "Sensitivity Analysis Ten-Year

25   NPV."

PROCEEDINGS

```
 1        What does NPV mean?

 2             MR. EISEMAN:  Net Present Value, your Honor.

 3             THE COURT:  Now, is this something that Uber prepared?

 4             MR. EISEMAN:  Yes.  It came out of the files of Uber

 5   and it underlies the analysis that Ms. Qi performed, that your

 6   Honor has already said is coming into trial.

 7        So this is just --

 8             THE COURT:  Are you going to call her as a witness?

 9             MR. EISEMAN:  We are.

10             THE COURT:  Why can't you just use this and get in it

11   through her?

12             MR. EISEMAN:  We can try.  We don't know if she's

13   going to say that she has seen it or not.  And so that's why we

14   want to cover our bases.

15             THE COURT:  All right.  What do you say to this,

16   Mr. González?

17             MR. GONZÁLEZ:  Your Honor, these are discovery issues.

18   This -- I view this more as a foundational issue, which is what

19   is this document?  He just hasn't handed this to me.  And I'm

20   not going to pretend that I know this document.  I don't.

21        But the question is, even their expert couldn't lay the

22   foundation for this document.  And so this is all stuff you've

23   got to do in discovery.

24             THE COURT:  Well, not necessarily.  Calling in a

25   custodian is one thing.
```

PROCEEDINGS

 1          What's the name of the witness again?  Ms. who?

 2          **MR. EISEMAN:**  Qi.

 3          **THE COURT:**  How do you say that?

 4          **MR. VERHOEVEN:**  Well, it's spelled Q-I, but she

 5     pronounces it "she."

 6          **THE COURT:**  Qi, all right.

 7          So when Ms. Qi is on the stand, I can imagine the

 8     following -- are you going to be doing the examination?

 9          **MR. EISEMAN:**  I don't believe I am, your Honor.

10          **THE COURT:**  So let's say you're doing the examination.

11     Mr. Eiseman says:  Well, let me show you this document.

12          And then she looks at it and then says:  Well, I don't

13     remember this document.

14          So then you try to refresh her memory and say:  Well, you

15     see this number right here?  It's exactly the same number that

16     was in your memo.  Don't you see that?  You know, eight digit

17     number, same number?  Does that refresh your recollection that

18     you used this in preparing your memo?

19          Again she says:  I don't remember.

20          Well, at that point I would allow -- I would turn to

21     Mr. González and probably in front of the jury and say:  Who

22     could tell us where this document came from?  And you better

23     have a good answer because you won't get away with that kind of

24     gimmickery.

25          If this is a relevant enough document that was produced by

PROCEEDINGS

 1  your side, it doesn't have any Bates number on it, but

 2  nevertheless I would say:  Find a witness who can authenticate

 3  this.  Or maybe I would just -- if it was produced -- was it

 4  produced in discovery?

 5          MR. EISEMAN:  It was.

 6          THE COURT:  All right.  Then here is what I would do.

 7  I would let you bring in, in that case, your legal assistant or

 8  somebody on your team to testify that Uber produced this

 9  document in discovery, and it must have come from Uber.  I

10  would probably allow that.

11      I've done that in other cases.  You don't even need to

12  have a custodian from them.  I would say this can be inferred

13  that it's their document.

14      All right.  So this one, you probably wind up being able

15  to use.

16      Give me your next one.

17          MR. GONZÁLEZ:  Your Honor, that little exception or

18  ground rule that you just laid out, I assume would be mutual?

19          THE COURT:  Of course.

20          MR. GONZÁLEZ:  Okay.

21      (Whereupon document was tendered to the Court.)

22          THE COURT:  Next one is called Project Rubicon.

23          MR. EISEMAN:  And, your Honor, this is another

24  document.  Project Rubicon was a project within Uber that was

25  looking at the self-driving car market going forward and Ms. Qi

PROCEEDINGS

1   was relying on analyses put together by the people on the

2   Project Rubicon team that informed her analysis.

3        Again, your Honor has already said is going to come in at

4   the trial.

5            **THE COURT:**  Well, look.  If this is an Uber

6   document -- it looks like it definitely is, right?

7            **MR. EISEMAN:**  It is, your Honor.

8            **THE COURT:**  All right.  Then, we're going to get this

9   into trial one way or the other.  So you can either fight and

10  struggle and lose before the jury, which is probably not what

11  you want to do, or you can just say -- stipulate to letting it

12  come in.

13           **MR. GONZÁLEZ:**  So, I guess, your Honor, there are a

14  whole lot of issues here that we're not talking about.

15           **THE COURT:**  Okay.

16           **MR. GONZÁLEZ:**  This was not a document that Ms. Qi

17  relied on.  It was created many months after.  And so before we

18  go too far down --

19           **THE COURT:**  Does she have something to do with this

20  document?

21           **MR. GONZÁLEZ:**  I believe the answer is no, your Honor.

22  That's my point.

23           **THE COURT:**  All right.  That's a different problem.

24  If you're just trying to do what big-firm impeachment --

25           **MR. GONZÁLEZ:**  Yes, that's my point.

PROCEEDINGS

```
 1          THE COURT:  -- we don't do big-firm impeachment.
 2          MR. GONZÁLEZ:  They are just grabbing documents that
 3   have big numbers.
 4          THE COURT:  You told me this was a Qi document.
 5          MR. EISEMAN:  Your Honor, I didn't mean to be unclear.
 6   Mrs. Qi, I said -- and this is how it worked.  She was relying
 7   on the Project Rubicon team to provide analysis to her that
 8   went into the analysis that Qi presented and that the Uber
 9   board saw when it was deciding the Ottomotto transaction.
10          THE COURT:  No, that's not good enough.  If she didn't
11   actually see it or somehow can vouch for the information or the
12   part of it that you're interested in, then you don't just get
13   to parade it before the jury.  You would have to call some
14   other -- you would have to call one of these people here.
15   Looks like Anthony Levandowski, Jeff Schneider, Justin Hough.
16   There are a list of people.  One of those people could maybe
17   get it into evidence.
18          MR. EISEMAN:  Well, your Honor, none of those people
19   are on our witness list, other than Mr. Levandowski.  That was
20   the purpose of the custodian of records, to lay the foundation
21   and then we would go from there.
22          THE COURT:  Well, it might be if -- I don't know.
23          MR. GONZÁLEZ:  What they are trying to do, your Honor,
24   is the big-firm thing:  Legal assistants, find any document you
25   can find in their production that's got a big number and then
```

PROCEEDINGS

1    let's go to Judge Alsup and say:  Can we have them bring a

2    custodian to say these are all their documents?  Well, that's

3    not enough to get it into evidence.

4         **THE COURT:**  If it's your document with your big

5    number, it's different from their own self-serving big numbers.

6         **MR. GONZÁLEZ:**  Understood, your Honor.  But our big

7    numbers aren't necessarily relevant.  Depends on who created

8    them, when, why?  What the foundation is for the document.

9    There's a lot of work here that should have been done months

10   ago.

11        **THE COURT:**  I'm going to tell you that just glancing

12   through this, it seems like something that would be fair game

13   to go before the jury, even if it does have big numbers in it

14   because it might help explain why, if true, Uber was willing to

15   engage in what the Plaintiff says they did.

16        So I'm inclined to say this ought to be able to come into

17   evidence, but the problem is you didn't designate somebody who

18   is able to get it into evidence.

19        **MR. EISEMAN:**  That's why we're here asking your Honor

20   to let us call a custodian of records.  Or if your Honor would

21   let us amend our witness list to call one of the witnesses who

22   prepared the document, we would be more than willing to do

23   that.

24        There is one witness I think who is involved in all of

25   the --

PROCEEDINGS

1          THE COURT:  Before I rule on that, let me see the

2     other ones that you have --

3          MR. EISEMAN:  Here is another Project Rubicon

4     document, your Honor.

5          MR. GONZÁLEZ:  Your Honor, while he is handing that to

6     you --

7          THE COURT:  Each one gets thicker.

8          MR. GONZÁLEZ:  Exactly.  At some point, this becomes

9     cumulative as well, your Honor.

10         (Whereupon document was tendered to the Court.)

11         MR. EISEMAN:  Your Honor, these documents were

12     prepared at different times and contain different projections,

13     so I don't think it's cumulative.

14         THE COURT:  But it is thicker.

15         This one is June 2nd, 2016, the thicker one.  The other

16     one is July 11th, 2016.

17         MR. EISEMAN:  And then the third is May the 20th.  But

18     they contain different analyses, your Honor, and that's part of

19     the point.

20         THE COURT:  All right.  Who are the authors on this

21     one?

22         MR. EISEMAN:  I think it includes the same people,

23     your Honor, as the last document we just looked at.

24         THE COURT:  Can I see your other documents?

25         MR. EISEMAN:  There is only one more, and that's an

PROCEEDINGS

```
 1   email exchange between certain witnesses.  And I don't believe

 2   they are testifying in the trial, that's the problem.

 3   Mr. Bares, I think, is testifying by deposition.  He's outside

 4   the subpoena power of the Court.

 5        And the other two witnesses I don't believe are

 6   testifying.  If they do testify, we could obviously show this

 7   email to them and go that route.

 8        (Whereupon document was tendered to the Court.)

 9             THE COURT:  Who is Bares?

10        MR. PERLSON:  Mr. Bares, I think, is a former

11   employee.  He was in the ATG Group in Pittsburgh working on

12   the -- and he's now a consultant to Uber.  He was working on

13   the self-driving car project.

14             THE COURT:  McClendon, who is he?

15        MR. EISEMAN:  He's a former employee, also a former

16   ATG employee of Uber.

17             THE COURT:  And Holden?

18        MR. EISEMAN:  Mr. Holden still works at Uber, and he

19   also works in the ATG Group.

20        And Mr. Judah just informed me that he's the head of

21   product for Uber.

22             THE COURT:  So now let's go back to the one that's

23   Exhibit 4442.

24        You know how shocked the jury will be when they see

25   numbers like Exhibit 4442?  They think you're going to show
```

PROCEEDINGS

1    them thousands of exhibits.  So that's what will be -- it will

2    take them awhile to adjust to that possibility.

3         Okay.  So what is the part of this 16-page document that

4    you think is most important?

5         MR. EISEMAN:  Your Honor, there are -- there are

6    references in the document.  I'm not sure I can turn you to the

7    page where they talk about the timing of entering into the

8    market and how many cities.  So, for instance --

9         So beginning on Page 11 of the document, it's Uber 63690,

10   is a forecast talking about volume.  And so we would rely on

11   that page and the pages that follow, including the Page 13 of

12   the document where they talk about the number of cities that

13   they are going to launch in, in 2018, and 2019, and 2020.

14   That's probably the most important page, your Honor.

15        THE COURT:  Page 12?

16        MR. EISEMAN:  It's Bates No. 63692, Page 13 of the

17   presentation.

18        THE COURT:  20 cities, 50 cities, 120 cities.

19        To me, this is a pretty good document, fair document to --

20   I don't understand why you would be objecting to this on the

21   Uber side?

22        MR. GONZÁLEZ:  Your Honor, what we're objecting to is

23   what they are requesting.

24        THE COURT:  Which is?

25        MR. GONZÁLEZ:  Well, it keeps changing, your Honor.

PROCEEDINGS

1    But what they are requesting is to add witnesses who have never

2    been disclosed to talk about things that they've never

3    disclosed.

4         **THE COURT:**  Well, I can short circuit.  I can just

5    order this admitted.  It's so clearly an Uber document.  And

6    then you won't have anyone to defend it.  It will just sail in.

7    I could do that.  I've done that in many cases.  It's the only

8    way to deal with these big-firm objections sometimes.

9         **MR. EISEMAN:**  Your Honor, to be clear, if your Honor

10   orders the document to be admitted, we're not going to ask you

11   to call any new witnesses.

12        **THE COURT:**  Well, look.  I'm just going to rule now.

13   4442 is in evidence, since Mr. Gonzalez is being unreasonable.

14       (Trial Exhibit4442 received in evidence)

15        **THE COURT:**  821 is in evidence.

16       (Trial Exhibit821 received in evidence)

17        **THE COURT:**  That short one you showed me.  It doesn't

18   have an exhibit number on it, and I'm going to reserve judgment

19   on it until I hear a little bit more from the witness Ms. Qi.

20       And then the last one, the big thick 4749, there's too

21   much information in here and a lot of numbers and I'm

22   uncomfortable giving you a blank check on that one.

23       So I urge you both to meet-and-confer and figure out a way

24   to solve this problem because, Mr. Gonzalez, you're going to

25   have the same problem.  You're going to have the same problem,

1   and you are going to want to get some -- cut some slack.  And

2   then they are going to make the same argument that you're now

3   making, and I'm not going to be sympathetic to them either.

4        So I -- this is something you lawyers should never try to

5   keep out of evidence, your own documents that you know are

6   eventually going to come in.

7             MR. EISEMAN:  Thank you, your Honor.

8             THE COURT:  You're welcome.  All right.  So there are

9   two you haven't won on yet.  Remember that.

10            MR. EISEMAN:  We understand.

11            THE COURT:  I'm going to hand this back.  I don't want

12  to have to keep track of these.

13       (Whereupon document was tendered to counsel.)

14            MR. GONZÁLEZ:  Your Honor, on witnesses --

15            THE COURT:  You don't need any custodians yet.

16       All right.  Go ahead.

17            MR. GONZÁLEZ:  Yeah.  On witnesses, while we're still

18  on witnesses, we had raised in our trial brief before, and we

19  raised it now, that there are eight witnesses who they had

20  never previously disclosed under Rule 26.  And I just want know

21  what your ground rules are going to be.

22       Can the parties just come in and start adding names to

23  their witness list?  Because, if so, that will guide us.  And,

24  obviously, it should apply both ways.

25            THE COURT:  Are these individuals who are deposed?

PROCEEDINGS

```
 1   Are these individuals who work for your company so that you
 2   know good and well what they're going to testify to?
 3              MR. GONZÁLEZ:  Yes, Your Honor.
 4              THE COURT:  I need to know the particulars.
 5              MR. GONZÁLEZ:  So I believe that most of them were
 6   deposed, not all of them.  I think there may have been one that
 7   was not.
 8        Previously you had said that that's not the standard for
 9   whether they get to testify in trial.  That the standard is
10   what you disclosed in Rule 26.  Because, obviously, the
11   questions would have been different in deposition had we known
12   that they were going to present these people on X, Y, and Z
13   topics.
14              THE COURT:  The rule is that a failure to disclose is
15   bad, yes, but preclusion is not warranted if it's either a
16   substantial justification for late disclosure or it's harmless.
17        Now, arguably -- I won't say always -- it's harmless if
18   they've already been deposed and -- or they work for you
19   because you can go interview them.  You're not prejudiced too
20   much.
21        All right.  Let me ask your name, please.
22              MS. ROBERTS:  Andrea Roberts.
23              THE COURT:  Roberts?
24              MS. ROBERTS:  Yes.
25              THE COURT:  Ms. Roberts, are you going to stick to
```

 1   specific questions that were asked in the deposition of all

 2   these people or are you going to go beyond that?

 3       MS. ROBERTS:  Well, your Honor, I don't know that we

 4   could stick to specific questions because that's what -- it's

 5   what they were asking about.  But the subject matter would be

 6   generally the same subject matter that they covered.

 7       All of the -- there is one witness -- Mr. González is

 8   correct -- that was not deposed, but the other seven were all

 9   deposed.  Some of them multiple times.  A few of them are on

10   Uber's own initial disclosures.  So, clearly, they knew about

11   them even before they were deposed, and a few of them are on

12   their own trial witness list.

13       So as you say, your Honor, it's harmless.

14       THE COURT:  Wait.  Wait a minute, wait a minute.  Is

15   that right?  Some of these are on your own trial witness list?

16       MR. GONZÁLEZ:  Your Honor, I don't remember, but it's

17   probably correct because Mr. Krafcik is on this list.

18       But, again, that's not the question.  They are on our

19   trial list because we want to ask them about X.  If they want

20   to bring them in and ask them about Y or Z, they're supposed to

21   disclose that.

22       THE COURT:  What do you say to that?

23       MS. ROBERTS:  Your Honor, again, I think this -- this

24   is harmless.  These -- these people, their names come up on

25   tons of documents, so they know their relevance, to the extent

PROCEEDINGS

 1    there is any relevance to the case, and we don't think they all

 2    are relevant to the case, but they know where they fit in.

 3         They chose to depose them.  They identified them.  We put

 4    them up.  They've taken their depositions, some of them

 5    multiple times.  They know -- they know what could come up,

 6    your Honor.  And so there is no prejudice here.

 7              THE COURT:  All right.  I'm not going to rule on any

 8    particular one here, but here is -- we'll do it -- you know, on

 9    the day they are going to testify we'll have a little fight

10    right here.

11         But here are the things that I would be interested in

12    knowing when it comes up.  And that is:  What is the subject

13    matter you're going to cover with this witness?  Were they

14    deposed on that subject matter?  Do they work for the other

15    side?  Was this witness designated to testify for the other

16    side on that same subject matter?

17         Those would be some of the questions I would want to know.

18    And we'll fight it out one by one.

19         Now, again, Mr. Gonzalez, you know you're going to have

20    the same -- I promise you, before the trial is over, you will

21    be asking for the same relief.  So I think this is the kind of

22    thing that maybe you ought to talk about or stipulate to

23    something out of court.  Think about it, anyway.

24         But I won't make a ruling now because I think I need to do

25    it one witness by one -- each witness one at a time.  And we'll

 1   do it on the day they're going to testify.

 2          **MR. GONZÁLEZ:**  Understood.  Your Honor, this is a

 3   related question.  Maybe you plan to handle it the same way.  I

 4   just want to know the ground rules.

 5          The related question, which we raise in our trial brief is

 6   that now they are trying to introduce testimony that goes far

 7   beyond the Rule 26 disclosures.  And so I'd like to know how

 8   you plan to handle that.

 9          If they designated witness Mr. Smith to talk about A and B

10   and now they want Mr. Smith to talk about A, B, C, D and E, we

11   have a concern about that.  And so we'd just like to know how

12   your Honor would like to handle that during the trial.

13          **MS. ROBERTS:**  And, your Honor, if I could add.  For

14   this group of witnesses, every single one of them is either a

15   current Uber employee or was an Uber employee at the outset of

16   this case.  So these are all people that they have had access

17   to that they could talk to about what they know.

18          **THE COURT:**  Well, if they are formers, we've seen they

19   may not have a good relationship with -- so that -- but if they

20   are current employees, yes, that's true.

21          **MS. ROBERTS:**  And I would -- sorry.

22          **THE COURT:**  What is it?  I've forgotten what his point

23   was.

24          **MR. GONZÁLEZ:**  My point was, your Honor, that I

25   believe that they intend to ask witnesses questions that go far

PROCEEDINGS

1   beyond what they disclose in their Rule 26.

2           THE COURT:  I see.  All right.

3           MR. GONZÁLEZ:  Just one example, your Honor, is

4   apportionment.  You can see now they're struggling on this

5   apportionment issue.  And so we suspect that they're going to

6   try to sneak some apportionment stuff in through somebody that

7   had never been disclosed on that topic and we were never able

8   to question.

9       So I'd just like to know what the ground rules are and

10  what the appropriate way of objecting is.

11          THE COURT:  We will object at 7:30 a.m. on the day

12  they're going to testify, or maybe the day before they testify,

13  and we will fight out what the contested testimony is and

14  whether or not it's the same considerations that I just gave

15  you.

16          MR. GONZÁLEZ:  Fair enough.

17          THE COURT:  I would take that into account.

18          MR. GONZÁLEZ:  And, unfortunately, because we

19  obviously don't always know what they are going to ask, if they

20  start asking the witness questions that go beyond the scope of

21  the Rule 26, I'm assuming the appropriate objection would be to

22  stand up in open court and object at that time.

23          THE COURT:  Yes, that would be right.

24      But here is another thing.  Let's say, Ms. Roberts --

25  right?

PROCEEDINGS

```
 1              MS. ROBERTS:  (Nodding.)
 2              THE COURT:  Ms. Roberts asks about A, B, and C; and
 3     then you ask about D, E, and F.
 4              MR. GONZÁLEZ:  Yes, of course.
 5              THE COURT:  And she gets back up and asks about D, E,
 6     and F; and you stand up and object and say that's beyond the
 7     scope.
 8              MR. GONZÁLEZ:  I would not object, your Honor.
 9              THE COURT:  I hope you wouldn't, but --
10              MR. GONZÁLEZ:  That's fair.  I appreciate that.  Thank
11     you.
12              MS. ROBERTS:  Your Honor, if I could -- we'll follow
13     that procedure, but since Mr. Gonzalez pointed out objecting to
14     going beyond the scope of the initial disclosures, I just want
15     to reiterate that he's referring to our initial disclosures
16     that we served on June 21st.  That was before we took any
17     depositions.
18         So we didn't know the full scope of the information that
19     their witnesses had, which has since been --
20              THE COURT:  Did you update your initial disclosures?
21              MS. ROBERTS:  We served our witness list on
22     September 16th.  Now, we did not -- we updated initial
23     disclosures a few weeks ago, your Honor, to have it be in line
24     with our witness list.
25              THE COURT:  You did or you didn't?
```

PROCEEDINGS

1        **MS. ROBERTS:**  We did.  And I would like to --

2        **THE COURT:**  That will just be one of the facts I've

3   got to take into account is, if the initial disclosures were

4   updated before discovery closed, then that's better than if

5   they were updated a couple weeks before trial.  That's better

6   for you.

7        I -- but even that does not -- I've got to -- it's just

8   too many factors to take into account to tell you for sure.

9        **MR. GONZÁLEZ:**  That's our concern, your Honor, is that

10  the disclosure we just got two weeks ago goes far beyond

11  anything that ever indicated.  So that's why I think we're

12  going to have issues.

13       **THE COURT:**  We'll have to sort through them one at a

14  time, but we can't do that in an omnibus way.

15       **MR. GONZÁLEZ:**  Your Honor, may I raise one very quick

16  question about the jury?  This will be a quick one.

17       Your standing order says that when you're going to have 8

18  jurors, you select 14 initially; but it says if I'm going to

19  have more than 8 -- and here we're going to have 10 -- I would

20  select more.

21       So I'm just wondering, how many do you plan to call into

22  the box?

23       **THE COURT:**  That's a very good question.  Thank you

24  for bringing it up.

25       What we need to do is put -- and I'll mention this to my

PROCEEDINGS

```
1    staff.  We need to put two more chairs out there so that we can

2    get 16 people there.  And each of you have get three strikes,

3    and that will go down to 10.  We will make that -- we'll have

4    to figure a way to do that.

5              MR. GONZÁLEZ:  And would our Special Master be in Seat

6    Number 7?

7        I really am --

8              THE COURT:  If you both stipulate that he can serve on

9    the jury.

10             MR. COOPER:  I'm willing.

11             THE COURT:  I would be delighted to have him over

12   there.

13             MR. GONZÁLEZ:  I just want to know how you line them

14   up, your Honor.  Is Number 1 closest to the witness in the

15   front row?

16             THE COURT:  Yeah.  Number 1 is closest to the court

17   reporter.  And then it goes over to Number 7, where Mr. Cooper

18   is.  And then eventually -- and then -- and then over here will

19   be 8, going over to -- normally over to 14.  Except for when we

20   start with the trial, we'll have five on the front row and five

21   on the back.  I'll realign them so that they are all closer,

22   closer to --

23             MR. GONZÁLEZ:  And the people outside of the box will

24   be 15 and 16?

25             THE COURT:  Yes, but for -- I don't want to confuse
```

PROCEEDINGS

1    you.  I'm using two different time points.

2        For purposes of selecting the jury, we're going to go 1

3    through 8, with the -- with one of the seats outside the box.

4            MR. GONZÁLEZ:  I got you.

5            THE COURT:  And then 9 to 16, the last seat being

6    outside the box.

7            MR. GONZÁLEZ:  Thank you.  Thank you.

8            THE COURT:  And, remember, after all strikes are done,

9    you have to stand up and say, "We strike Number 8,

10   Mr. So-and-so."  And then he is excused and leaves.  And then

11   the next side.  I'm going to swap it back and forth.  So

12   whoever is left will be the jury.

13           MR. GONZÁLEZ:  Right.

14           THE COURT:  Now, let's say you both -- that you both

15   pass, you have consecutive passes.

16           MR. GONZÁLEZ:  Done.

17           THE COURT:  Unlikely to happen, but it could.  So if

18   that were to happen, then that would mean we would probably

19   have -- consecutive passes would mean that we would have -- or

20   you could have -- you actually would have -- you could have

21   just one pass at the end.

22       If you did that, then we would have -- the lowest numbered

23   individuals by seat would be the jury.

24           MR. GONZÁLEZ:  Correct.  The lower ten.

25           THE COURT:  Lower ten.

PROCEEDINGS

1          **MR. GONZÁLEZ:**  So, your Honor, one other question --

2          **THE COURT:**  And, by the way, let's say the number --

3   the first seat gets excused and near the end of the whole

4   process we bring forward -- you had another person there.

5   They're the last one called forward.  Nevertheless, they have

6   the top priority because they are in Seat Number 1.  They are

7   not the last one.  They're not likely Number 16.  They are

8   sitting in Seat Number 1, so they have top priority.

9          **MR. GONZÁLEZ:**  Okay.  That's what I wanted to clarify.

10  Because let's just assume you said you're going to knock some

11  people out based on the questionnaire.  Let's assume you knock

12  out Juror Number 9, the top row.  Are you then going to bring

13  somebody from the audience to sit in Seat Number 9?

14         **THE COURT:**  Yeah.

15         **MR. GONZÁLEZ:**  Ahh.  Wow.  Okay.

16         **THE COURT:**  We're not even going to begin the normal

17  voir dire until we get all 16 up here.  So if I have to knock

18  somebody out with an automatic "yes" answer because they have a

19  strong opinion about something, then that person leaves and we

20  call the next person on the list, the random list.

21         **MR. GONZÁLEZ:**  So if you -- if you knock somebody for

22  cause as a result of the voir dire, are you going to do the

23  same thing?  Are you going to pick people from the audience or

24  just move people forward?

25         **THE COURT:**  No, no, no.  We pick somebody to fill in

 1   that blank spot.  And that person, even though they come later

 2   in the process, will have the priority of the seat number that

 3   they are in.

 4       MR. GONZÁLEZ:  Thank you, your Honor.  That's what I

 5   needed to clarify.  Thank you.

 6       MR. EISEMAN:  Your Honor, can I ask one related

 7   question?

 8       THE COURT:  Sure.

 9       MR. EISEMAN:  Some Courts ask the jurors, the members

10   of the venire, to line up in a certain order and they just

11   call -- or do you do that, or do you let the venire members sit

12   wherever they want?

13       THE COURT:  They can just sit wherever they want, and

14   then we will call them at random.  And that way you don't get

15   to see who the next person is going to be.

16       MR. EISEMAN:  That was my question.

17       THE COURT:  Okay.  Any more questions on the jury

18   part?

19       MR. EISEMAN:  I guess one other issue that I have is

20   the parties submitted a joint statement of the case to your

21   Honor, I think, yesterday.

22       THE COURT:  Did we get that?

23       MR. EISEMAN:  We have an agreement on everything but

24   the last paragraph, and I don't think we need to argue it.  I'm

25   happy to argue as to why we think we should have ours be the

PROCEEDINGS

1   one that's read.  But if you want to hear argument on it, I'm

2   prepared to do that.

3         THE COURT:  Just a minute.  I have not looked at it

4   yet.

5       (Whereupon document was tendered to the Court.)

6         THE COURT:  So this is a --

7         MR. EISEMAN:  That's actually defendant's proposal.

8         THE COURT:  And then we've got B.

9         MR. EISEMAN:  That's our proposal, your Honor.

10         THE COURT:  So the last paragraph is the one that

11   you --

12         MR. EISEMAN:  And then there is one other difference

13   between the two, which is they talk about Waymo's "alleged

14   trade secrets."  We call them Waymo's "claimed trade secrets."

15   But it is the last paragraph that's the issue.

16         MR. RABIN:  What we did, your Honor, to make it as

17   neutral as possible, is we simply pulled the language that was

18   in your penultimate jury instructions paragraph four word for

19   word.  So that way there would be no discussion or concern.

20         THE COURT:  Yeah, but then you're going to claim that

21   I'm locked into that language.  I'm not locked into it.

22         MR. RABIN:  The other option we had was there's no

23   need for the last paragraph.  It's not necessary in either way.

24   And so --

25         THE COURT:  Look, what I would prefer you do is, in

PROCEEDINGS

```
 1   your opening statements, you tell the jury what you think are

 2   the requirements and what you intend to prove or not prove.

 3   And if you happen to misstate the law at some point, I may have

 4   to say to the jury:  By the way, Uber's lawyer misstated the

 5   law to you.  It's actually X.  Which sometimes happens.

 6        Okay.  You take your chances on that.  But I'm not

 7   prepared to -- yet, to give them a --

 8             MR. RABIN:  So we would propose just deleting the

 9   entire last paragraph in both.

10             THE COURT:  That's fine with me.

11             MR. EISEMAN:  Your Honor, we took our last paragraph

12   from what your Honor read to the jury in Oracle versus Google.

13             THE COURT:  What did I say there?

14             MR. EISEMAN:  I can hand up the transcript from the

15   day you did voir dire in that case.  We basically think it's

16   important to tell the jury what they're going to be asked to

17   decide in the case.

18        We're not talking about the elements of the claims.  We're

19   just saying you're going to decide whether our claim -- Waymo's

20   claimed trade secrets are enforceable and whether Uber and

21   Ottomotto are --

22             THE COURT:  I don't see anything -- what's actually

23   wrong with it?

24             MR. RABIN:  What's wrong with it is, first, it's

25   questionable whether the jury will be instructed on things that
```

1   they say.  For example, you will decide the damages Waymo

2   should be awarded and you will decide whether the

3   misappropriation was willful and malicious.  That goes beyond

4   what you may allow ultimately, especially the pending Rule 50

5   motions and things of that sort.

6       Our view was we should do something where it lists in a

7   neutral way:  You need to decide if it's a trade secret,

8   improperly acquired and used.

9       Or we should simply just say:  You are going to be

10  deciding questions that I will pose to you at the end of the

11  case relating to these trade secret claims -- and be very vague

12  to give yourself and the parties room if it does change.

13          MR. EISEMAN:  And, your Honor --

14          THE COURT:  You know, I think Waymo's is pretty close

15  to what I should give, so I'm going to give Waymo's.

16      But in the -- in your opening statement -- or I'm going to

17  give something very close to Waymo's.  I may tweak it myself.

18      But in your opening statement, it's okay for you on the

19  Uber side to say, taking a -- you can say:  Listen, one of the

20  things they've got to prove on the other side here, Waymo has

21  got to prove it, is that this was an enforceable trade secret.

22  And we're going to bring in witness after witness that says

23  everybody knows this stuff.  And there is no way this is a

24  trade secret.

25      And then the other thing is, you're going to find out that

PROCEEDINGS

 1    these designs are totally different.  And there is -- they're

 2    not going to be able to find a single one of these trade

 3    secrets.

 4         So -- I -- I guess that's your point, right?  So, to me,

 5    it's okay to kind of crib from these instructions that I've

 6    told you I'm probably going to give, but I don't want you

 7    quoting them in the way you have.  I don't like the idea that

 8    I'm going to feel importuned to stick with something that I

 9    might change my mind on over the course of the evidence.

10         **MR. RABIN:**  That's fair.  So if we do go with Waymo's,

11    we would just add -- to make clear that, when, for example, you

12    say you may award damages, if any, or something along that --

13         **THE COURT:**  I'll think about it.  You're worrying too

14    much.  It's important for the jury to get an overview of what

15    their job in the case is going to be.  And they're not going to

16    take any kind of cue from what I -- how I phrase it.  I promise

17    you.

18         **MR. RABIN:**  If it would assist, your Honor, we also

19    have Word versions of this on a thumb drive we can hand to you.

20         **THE COURT:**  What do you mean?

21         **MR. RABIN:**  Word versions of Waymo's version and ours.

22    So if you do want to make changes or --

23         **THE COURT:**  I'm just going to have this -- I don't

24    need anything further.  I've got everything I need right here.

25         **MR. RABIN:**  Perfect.

PROCEEDINGS

1          **THE COURT:**  All right.  Thank you.

2          **MR. RABIN:**  Thank you.

3          **THE COURT:**  Speaking of Special Masters, who is over

4    there generating quite a lot of attorney's fees.

5          (Laughter.)

6          **THE COURT:**  But not nearly as much as you all are.

7    I -- one thing we've got to decide is whether or not we want

8    the Special Master here.  And I suggest to you that, at least

9    until we get the case on an even keel, I would like for the

10   Special Master to be here to help me -- to help me -- to tell

11   me -- you'll have discovery.  Mr. Gonzalez will jump up and

12   say:  Oh, they never did that in discovery.  And the Special

13   Master can tell me whether they did or they didn't.

14        I think it would be -- now, the time might come where we

15   say, Okay, we don't need the expense of the Special Master

16   anymore.  But for starters, I'd like to have him here in the

17   courtroom somewhere.

18        Is that okay with you lawyers?  And you have to pay for

19   it, of course.

20         **MR. GONZÁLEZ:**  No objection, your Honor.

21         **MR. VERHOEVEN:**  That's okay, your Honor.

22        **THE COURT:**  Is that okay with you?

23        **MR. COOPER:**  I'll be here.

24         **THE COURT:**  Okay.  What else can I help the lawyers

25   with?

PROCEEDINGS

1          **MR. GONZÁLEZ:**  So, your Honor, I have four things,

2     actually, that we've agreed on that I just want to advise the

3     Court about and put on the record.  And if there's anything

4     that I say that doesn't quite get it right, I will be

5     corrected.

6          **THE COURT:**  We will stop after each one so Mr. Eiseman

7     can say "yes" or "no."

8          **MR. GONZÁLEZ:**  The first one is, as I indicated

9     earlier, your order says that a list of seven witnesses will be

10    disclosed Thursday at 5:00 p.m.  We have agreed that those

11    seven will be in the order in which they will be presented.

12         **MR. EISEMAN:**  And the only caveat is that if there is

13    a change because of unforeseen circumstances, the party that

14    wants to make the change will notify the other side

15    immediately.  But with that caveat, we're in agreement.

16         **MR. GONZÁLEZ:**  The second thing is --

17         **THE COURT:**  Wait.  Do you accept the caveat?

18         **MR. GONZÁLEZ:**  I accept the caveat.  The friendly

19    amendment is accepted, your Honor.

20         **THE COURT:**  Okay.  Good.  Go ahead.

21         **MR. GONZÁLEZ:**  The second item is, as the Court knows,

22    there's a related arbitration going on involving

23    Mr. Levandowski, and there have been some 30 depositions taken

24    in that case.  Waymo has access to those depositions.  Uber

25    does not because Uber is not a party.

PROCEEDINGS

```
 1        We have agreed that neither side will use those

 2   depositions in any way during this trial.  I assume that they

 3   could conceivably use to impeach somebody.  We pointed out it

 4   wasn't fair because we don't have them all.

 5        They have agreed they are not going to do that, so neither

 6   side will be using the arbitration transcripts for any purpose.

 7             THE COURT:  Agreed?

 8             MR. VERHOEVEN:  I agree with that, your Honor.  I also

 9   think that the arbitration itself should not be referred to in

10   this case at all.  It's not relevant to this case.  And there

11   will be a -- you know, my -- I can agree broadly, but if they

12   start raising stuff about the arbitration, then that might open

13   the door to --

14             THE COURT:  I think the jury has got to know -- let me

15   see.

16        Do you agree with what I just heard?

17             MR. GONZÁLEZ:  No, your Honor.  I think that you've

18   already addressed this issue.  And my recollection is that

19   you've already indicated, more than once perhaps, that you

20   think that the jury needs to know that there is an arbitration

21   proceeding against Mr. Levandowski.

22             THE COURT:  I didn't say "arbitration," but I -- I did

23   say "proceeding."

24        Here's the risk.  Here's the risk.  It's perfectly okay

25   for the jury to understand that there is another lawsuit
```

1  actually proceeding -- we can call it -- between your side,

2  Waymo, and Mr. Levandowski.  And it's important, I think, for

3  the jury to understand that because of what I call off-track

4  reasoning.

5       Wait a minute.  Mr. Gonzalez is not paying attention.

6            **MR. GONZÁLEZ:**  I am paying attention, your Honor.

7            **THE COURT:**  No, you're not.  You're not paying

8  attention.

9       Off-track reasoning is where the jury, because the judge

10 did a poor job of explaining something to them, goes off on a

11 track that was not intended and, really, no one foresaw.  I

12 hope I can -- I am not guilty of that, but I strive not to be

13 guilty of that.

14      Now, one off-track reasoning that occurs, can occur in

15 this case, is that the jury says -- let's say the jury

16 hypothetically concludes Levandowski, really, he downloaded

17 those documents.  He went to Uber.  You know, he really has got

18 to pay.  He's really got to pay for that, for what he did.  And

19 the only way to make -- you know, we've got to rule for Waymo.

20 We've just got to rule for Waymo.  So they kind of gloss over

21 the fact they don't know there is a different proceeding going

22 on.  So they say Uber is liable, even though they really mean

23 Levandowski is liable.

24      I think we've got to explain that they have to connect the

25 dots to Uber, not just connect the dots to Levandowski and that

 1   there is a separate proceeding.  So I -- and there is

 2   absolutely no harm in telling them that.  And there is a lot of

 3   good in telling them that.  So that the jury will understand

 4   what their role is and that you chose to sue Uber not

 5   Levandowski.

 6        All right.

 7             MR. VERHOEVEN:  Well, your Honor --

 8             THE COURT:  I'll hear what you have to say.

 9             MR. VERHOEVEN:  Your Honor, I think there is great

10   prejudice to us if Uber is allowed to stand up and say:  Look,

11   they have -- you know, they are suing Levandowski.  You

12   should -- you shouldn't do anything because they have already

13   sued Levandowski.  They can play the other way around it.

14             THE COURT:  Are you going to make that argument,

15   anything even close to it?

16             MR. GONZÁLEZ:  We're not going to make that argument,

17   your Honor.

18             THE COURT:  Well, if you even came close to that, I

19   would give a counter instruction that would throw that out the

20   window.

21             MR. GONZÁLEZ:  Yeah, we're not going to make that

22   argument, your Honor.

23             THE COURT:  I would not let you make that argument.

24   And I would tell the jury that -- if they prove the case

25   against you, it doesn't matter that they can also prove the

 1    case against Levandowski.  Maybe I should say that in the -- in

 2    the instruction.  I don't mind putting that in there.

 3             MR. VERHOEVEN:  We have proposed language very similar

 4    to that in our last proposal, your Honor.

 5             THE COURT:  All right.  I will look at that.

 6             MR. GONZÁLEZ:  Your Honor, just for the record, you

 7    did -- they did make this argument, what I was thinking of, I

 8    couldn't remember the number, but it was Motion in Limine

 9    Number 9 and you denied it previously.

10             THE COURT:  It concerned what?

11             MR. GONZÁLEZ:  They were trying to prevent us from

12    bringing in evidence of the arbitration, and you denied it.

13             MR. VERHOEVEN:  That was one of your original

14    tentative rulings.

15             MR. GONZÁLEZ:  Your ruling was consistent with what

16    you just said today.

17             THE COURT:  Good to know.  Okay.

18             MR. GONZÁLEZ:  Here is what I would like to do, your

19    Honor --

20             THE COURT:  You said you had four points?

21             MR. GONZÁLEZ:  Yeah, I do.  I do.  But since he raised

22    this arbitration thing, I will agree to everything they wanted

23    in that timeline, but that timeline should also have the date

24    of this other proceeding.  And we can call it whatever you

25    want.

PROCEEDINGS

```
 1        If there is something about -- I don't know what the
 2   problem is with "arbitration," but if you want to say
 3   "proceeding," fine.
 4        THE COURT:  Why does that need to be in there?
 5        MR. GONZÁLEZ:  Because, your Honor, it shows when they
 6   knew that Mr. Levandowski did something wrong.
 7        What's wrong with that?
 8        THE COURT:  But they didn't sue him for the downloads.
 9   They sued him for stealing employees.
10        MR. GONZÁLEZ:  Nonetheless, your Honor, they sued him
11   because they knew then he had done something wrong.
12        MR. VERHOEVEN:  Your Honor, this is an empty chair
13   argument they are planning to make.  And it's highly
14   prejudicial.  And this is what -- they shouldn't be allowed to
15   inject the issues of the arbitration into this case.  If they
16   do so, then I would submit that, you know, they risk opening
17   the door to the facts.
18        MR. GONZÁLEZ:  We are not getting to into the issues
19   on --
20        MR. VERHOEVEN:  And, your Honor, we talked about this
21   before when we -- when they tried to move the whole case to
22   arbitration.  I said I'm not going to talk about any of that.
23   And --
24        THE COURT:  Well, that is -- that is a fair point.
25   And it would be most unfair to Waymo, who is committed to not
```

PROCEEDINGS

 1   bringing up some things on account of not having arbitrated.

 2   But if you bring them up, it would -- you can't then blame him

 3   later for responding.

 4        Look, I -- on the bigger point, the fact that there is a

 5   proceeding between Waymo and Levandowski is something the jury

 6   should know.  How much more beyond that, I am not sure.  I'm

 7   going to say it does not have to be on the timeline, but you

 8   can bring it up.  In appropriate places where it actually is

 9   relevant, you can bring it up.

10        MR. GONZÁLEZ:  Thank you, your Honor.

11        The third item that we've agreed to is there are three

12   witnesses, Mr. Kalanick, Sasha, and Eric Friedberg from Stroz,

13   where we have agreed that the cross examination by our side can

14   go beyond the scope of direct.  So those witnesses do not have

15   to come back a second time.

16        THE COURT:  You're calling Sasha in your case?

17        MR. VERHOEVEN:  Yes, we are, your Honor.

18        THE COURT:  All right.  Do you agree to that?

19        MR. VERHOEVEN:  Yes.  We're trying to save time, your

20   Honor.  And, you know, if we can reach agreement on others as

21   we go along, that would be great.  That's what we've agreed to

22   so far.

23        THE COURT:  That's great.  Okay.  Last point.

24        MR. GONZÁLEZ:  The last point, your Honor, is that we

25   gave the Court an instruction in closing the courtroom.  We've

PROCEEDINGS

 1  agreed on the language.  The Court may want to tinker with it.

 2  The point of the instruction is we don't want the jury to think

 3  that because Judge Alsup is closing the courtroom, wow, this

 4  must really be secret information, right?  That's what we're

 5  concerned about.

 6       **THE COURT:**  That's a fair point.  I will make sure

 7  that I'm not saying one way or the other whether it's a trade

 8  secret.

 9       **MR. GONZÁLEZ:**  I'm sorry, and I think, your Honor,

10  that the appropriate time to give that instruction would be

11  during opening statements right as you're about to close it for

12  part of the openings.

13       **THE COURT:**  The first time it comes up, for sure I

14  will.

15       Okay.

16       **MR. EISEMAN:**  A related issue.  In your Honor's

17  November 21st order, you asked the parties to advise you to

18  what extent the Court could order jurors not to disclose

19  Waymo's trade secret information, regardless of whether the

20  trade secrets are found enforceable or unenforceable.  And,

21  your Honor, I think we have reached agreement that that

22  instruction should be given to the jury.  It's an issue of

23  timing.

24       We think that the instruction to the jury should come when

25  you talk about closing the courtroom.  So that the jurors have

 1    in mind, as the trial goes on, that when the courtroom is

 2    closed and they are hearing trade secret information, that's

 3    stuff that they have to keep in their minds and not disclose

 4    once they are discharged as jurors.

 5            **THE COURT:**  That's fair.  That's good.  But, you know,

 6    it would be a legitimate question for voir dire to say to the

 7    jury:  Listen, we're going to have a special instruction in

 8    this case.  You're going to learn all these alleged trade

 9    secrets.  They may not really be trade secrets, but we have to

10    treat them that way for the time being, and you're going to

11    learn all that.  And you -- you will be under an order to keep

12    all of that to yourself, not even disclose it to your loved

13    ones even after the case is over.  And are you able?  Is that

14    the kind of thing you're able to do for year after year after

15    year?

16        And they may say:  Listen, I can't promise.

17        Then we may have to excuse somebody who would otherwise be

18    a great juror because they aren't willing to give that

19    commitment.

20            **MR. EISEMAN:**  I think that is a subject matter that we

21    are likely to go into.

22        If I could hand up to your Honor the language that we

23    would propose for the instruction, so that we can take care of

24    this?

25

PROCEEDINGS

```
 1          (Whereupon document was tendered to the Court.)

 2          THE COURT:  Now, listen, if you go into it, it's okay.

 3   I think it's fair for you to go into.  But at the same time, if

 4   it's pitched in a way that makes it sound like we're about to

 5   open the crown jewels and you're going to get to see something

 6   that no one has ever seen before, if you just overdramatize it,

 7   then somebody may have to say to the jury, maybe me:  Hey,

 8   look, this is in debate.  That's your side.  The other side

 9   says these are all publicly known.

10       Nevertheless, help me out on that and don't dramatize

11   this.

12          MR. EISEMAN:  We understand, your Honor.

13          THE COURT:  What is this you handed to me?

14          MR. EISEMAN:  This is the instruction that we propose.

15   The language in red is where we would ask your Honor to

16   instruct the jurors that they are going to have to keep this

17   information secret.

18          THE COURT:  I think we have to do this.

19          MR. GONZÁLEZ:  Hold on, your Honor.  Let me just say

20   this.  The minor edits that they have here in Paragraph 2, of

21   what you have in your hand, we have no problem with.

22       Here is the problem with Paragraph 1.  What you should

23   tell the jurors is what you always tell them.  They shouldn't

24   talk about anything in this case to anyone while they are here.

25   They can't even talk to each other.
```

PROCEEDINGS

1        If you give them that general instruction, there is no

2   reason to then give them another instruction that's essentially

3   the same thing when we're closed, because that just reinforces

4   what we're concerned about, is that, oh, wow, this is really

5   secret.  We're about to hear --

6        **THE COURT:**  No.  No.  What we should say as to this

7   category, is that even when the trial is over and I release

8   them from their admonition, they still are dutibound not to

9   disclose this information.

10       **MR. GONZÁLEZ:**  So let's talk about that, your Honor.

11  Because that instruction, what you have raised, that

12  suggestion, we should wait until the end of trial to give that

13  kind of an instruction.  There is no reason to tell them now --

14       **THE COURT:**  Yes, there is.  What if they tell me now

15  they are unwilling to abide by such an instruction?

16       **MR. GONZÁLEZ:**  Well, that's different, your Honor.

17  I'm okay with them asking in voir dire whether they would be

18  willing to keep stuff secret if the judge orders them to.

19  That's fine.  That's fine.  But if they all say "yes" and they

20  are sworn in as jurors, that ought to be adequate.  Especially

21  when you then tell them:  Everything you hear is information

22  that you should not discuss with anybody.  Everything they

23  hear.

24       **THE COURT:**  For the rest of your life, maybe.  Or at

25  least until the Federal Circuit rules.

 1          **MR. EISEMAN:**  That's the problem, your Honor, is there

 2     is going to be information that all the jurors, I think, have

 3     the right to disclose after they are done.  But not trade

 4     secret information.  And that's why they need to be told --

 5          **THE COURT:**  No.  I think this is -- this is -- I'm

 6     going to do what is right here.  Mostly, I agree with Waymo.

 7     And I'll just come up with my own words.

 8          So I think you're -- Mr. Gonzalez, you're trying to fight

 9     for atmospherics here.  Atmospherics and image and optics, and

10     I don't know.  We've got the practical problem of running a

11     trial.  Mostly Waymo is right on this one.

12          **MR. GONZÁLEZ:**  I have a suggestion about the practical

13     running of the trial.  And you've mentioned this before, and we

14     have not been able to reach agreement.

15          You mentioned previously that you thought it would be

16     prudent, and we completely agree, to have back-to-back experts.

17     We've already agreed that Mr. Kalanick and these other two

18     people will go back-to-back, meaning we can go beyond the

19     scope.

20          But now we're not -- we're not in agreement on

21     back-to-back experts.  And we would like to do that.  We think

22     the jury would benefit to hear their expert talk about X; to

23     hear our expert talk about X.  Instead of our expert coming in

24     two weeks later and talking about X, and they are trying to

25     remember what the heck X was.

1          So we think there is a lot of value of going back to back.

2    And we would like the Court's guidance there because we can't

3    reach agreement.

4          **THE COURT:**  I'm not going to force them to agree on

5    that.  I have the authority to do that, but it's -- I think

6    from an advocacy point of view, if Mr. Verhoeven doesn't want

7    to accommodate you on that, then, I'm not going to force him

8    to.  So end of that story.

9          Okay.  Anything more?

10          **MR. GONZÁLEZ:**  I have two other issues that we raised

11    in our trial brief that we haven't discussed, your Honor.  One

12    is disclosure to vendors.  They have now tried to introduce

13    that into the case --

14          **THE COURT:**  Well, listen, from day one, they had the

15    thing to the Gorilla company, Gorilla Circuits.

16          **MR. GONZÁLEZ:**  Yes.  And that was there, your Honor,

17    because it was relevant to when they had notice, according to

18    them, of some kind of a potential claim.  They have never said

19    in the Complaint.  They have never said in a Rule 26

20    disclosure.  They have never said in an interrogatory response

21    that Uber is liable for misappropriation --

22          **THE COURT:**  Just a second.

23          Mr. Verhoeven.

24          **MR. VERHOEVEN:**  There's so many issues to be raised, I

25    can't address this one.

PROCEEDINGS

```
 1          THE COURT:  All right.  Other than the Gorilla

 2   Circuits, what other vendor do you have in mind?

 3          MR. NEWTON:  Your Honor, Jared Newton for Waymo.

 4          THE COURT:  Please.

 5          MR. NEWTON:  So, I'm sorry.  I missed the question.

 6          THE COURT:  The question is:  What vendor will your

 7   evidence show that Uber disclosed the trade secrets to other

 8   than Gorilla Circuits?

 9          MR. NEWTON:  So, your Honor, we put this in our --

10          THE COURT:  Listen.  When you say "so"...

11      Who sits over there that's the "so" expert?

12      (Mr. Jaffe raised his hand.)

13          THE COURT:  When you start your answer with "so," I

14   know you're going to be evasive.  So give me a direct answer.

15   Name the companies.

16          MR. NEWTON:  Yes, your Honor.  So Gorilla Circuits.

17   Corwil Technology is another one.

18          THE COURT:  Okay.

19          MR. NEWTON:  Nalux is another one related to Trade

20   Secret Number 9.

21      And then we also have RDC Machine, Incorporated.

22          THE COURT:  What do you say to the point?

23      Now with Gorilla Circuits I would make an exception

24   because that was Exhibit A in the case.

25      But where did you ever disclose those others to Uber?
```

 1            **MR. NEWTON:**   The disclosure came in the documents that
 2    we relied on in our expert report that we relied on in
 3    depositions with Uber's witnesses that are emails attaching
 4    circuit schematics, diagrams from printed circuit boards,
 5    things like that, that Uber sent to these vendors.
 6        So what we did in our expert report is we walked through
 7    all these documents.   They have been front and center in the
 8    case.
 9            **THE COURT:**   Which expert, please?
10            **MR. NEWTON:**   This is Dr. Hesselink.
11            **THE COURT:**   All right.   Is that the part that I
12    knocked out, or the part that I left in?
13            **MR. NEWTON:**   This is still in.
14            **THE COURT:**   All right.   So what do you say to that?
15            **MR. GONZÁLEZ:**   What I say to that, your Honor, is that
16    it is not timely disclosure to say in an expert report, after
17    discovery has closed, that, by the way, you are liable for
18    trade secrets misappropriation because you disclosed our
19    secrets to Corwil, Natix and RDC.   That is not timely
20    disclosure under Rule 26.
21        Had we known all of that, we would have gone to Corwil,
22    Natix and RDC and asked them a lot of questions, including
23    what -- did you receive the information?   What did you do with
24    it?
25        Because here's the problem --

 1              THE COURT:  Well, wait.  Aren't there emails or

 2   something?  What is your proof that there was disclosed?

 3              MR. NEWTON:  These are emails from Uber.  Uber

 4   documents that they produced in this case that are emails to

 5   these different vendors.

 6              THE COURT:  And these emails tracked exactly on your

 7   trade secret list?

 8              MR. NEWTON:  Yes.  Exactly.  This is the analysis that

 9   we have in our expert report.

10              THE COURT:  So -- so is that right?

11              MR. GONZÁLEZ:  We say number one, no.  It doesn't

12   track exactly.

13         And number two, your Honor, damages.  What are the

14   damages?  What did these people do with the information that

15   they now claim we sent them?

16         This is the type of information that you know would have

17   been the subject of extensive discovery.  If they had told us:

18   You are liable for lots of money because you disclosed stuff to

19   these companies, there would have been a lot of discovery.

20              THE COURT:  Read to me the interrogatory that you

21   propounded to the other side that was propounded after you had

22   given them those emails so that they would have been on notice.

23   Read that to me so that I can see it was called for and they

24   failed to give it to you.

25              MR. GONZÁLEZ:  So, your Honor, what I don't know right

1   now, obviously, is when these documents were produced.  I'm not

2   going to make that representation.

3        THE COURT:  All right.  Then, we'll come back to that

4   part.  But read to me the interrogatory.

5        MR. GONZÁLEZ:  Your Honor, Number 28.

6        "Describe in detail how Uber's acquisition, use,

7    or disclosure of such trade secret was a substantial

8    factor in causing Waymo's harm, including identifying

9    whether the act was acquisition, use or disclosure."

10   So in response to that --

11       THE COURT:  And what was their response?

12       MR. GONZÁLEZ:  Their response said nothing about these

13   vendors.

14       THE COURT:  Did it say anything about disclosure?

15       MR. GONZÁLEZ:  I don't have -- do we have the full

16   response?

17       MR. NEWTON:  Your Honor, I can answer that.

18       THE COURT:  All right.  What did he say on disclosure

19   on that point?

20       MR. NEWTON:  So we identified disclosure as having

21   caused and is causing Waymo irreparable harm.  We further said

22   for each trade secret, on a trade secret-by-trade secret basis,

23   though the risk that the defendants will disclose trade secret

24   number "X" is another substantial factor in causing Waymo harm;

25   although not one that Waymo can necessarily quantify.

PROCEEDINGS

```
 1            THE COURT:  But the point they are making is that you
 2   didn't disclose these vendors.
 3        Now, had that discovery been provided to you yet?
 4            MR. NEWTON:  I can't answer whether it had been
 5   provided at the time that we answered the specific
 6   interrogatory.
 7        But I think the bigger point is, number one, this
 8   interrogatory is not getting at our specific theory of
 9   liability.  It's getting at the reasons for substantial harm.
10   And we talked about this, this came up in the last hearing in
11   November, where you noted that it had this qualifier of what is
12   the substantial factor in causing Waymo's harm or Uber/Otto's
13   unjust enrichment.
14        And in our response we focused on the -- some key issues
15   in this case that have damaged Waymo based on the fact that
16   Uber has this technology and is using it unfairly to compete in
17   the self-driving car market.
18            MR. GONZÁLEZ:  Your Honor -- I'm sorry.
19            MR. NEWTON:  The other point I would like to make
20   about the interrogatories in general is when Uber asked
21   interrogatories about our theories of misappropriation, they
22   asked three of them and each one was specifically limited to
23   use by Uber.  They did not ask about disclosure.
24            THE COURT:  The one you just -- he just read to me had
25   the word "disclosure."
```

PROCEEDINGS

 1        **MR. GONZÁLEZ:**  Acquisition, use --

 2        **MR. NEWTON:**  Had the word, but when they asked

 3   interrogatories, it was farther than that.  What are your

 4   theories of liability?

 5        They focusing exclusively on use.  They didn't say tell us

 6   your theories of liability on disclosure.

 7        **THE COURT:**  Well --

 8        **MR. GONZÁLEZ:**  I have a fact for you, your Honor, that

 9   is going to make this easier for you.

10        When was this response?  I was just educated.  The last

11   day of discovery.  The last day of discovery is when we got

12   this response.

13        **THE COURT:**  When did you produce the emails?

14        **MR. GONZÁLEZ:**  I'm fairly certain it would have been

15   before that if this is the last day of discovery.

16        And, your Honor -- and, your Honor, they had a duty to

17   supplement.  If they want to come into court and make some

18   argument, based upon a subsequently acquired document or

19   subsequently acquired fact, they have got to supplement.

20        But here is the key.  You just heard it.  You asked them a

21   very simple question.  What did you say about disclosure?  They

22   didn't even mention the vendors.  They didn't even mention

23   them, your Honor.  Not until later on some expert, this guy

24   Hesselink will say -- whatever they tell him to say, he will

25   say it.  Anything.  Hesselink comes in and says:  Oh, wait a

PROCEEDINGS

```
 1   minute.  They disclosed it to the vendors.  Great.

 2       How did that lead to any damages?  How have they been

 3   damaged by that?

 4           MR. NEWTON:  Your Honor --

 5           THE COURT:  That's a separate question from the

 6   disclosure problem.

 7       Here is -- I'm not going to answer this now.  Here is what

 8   I want you to do.  I want you to agree upon a timeline of when

 9   the questions were answered in the interrogatories and when the

10   documents that referred to these vendors had been produced.  So

11   if it turns out that the Waymo side had these documents for

12   some time and failed to put Uber on proper notice, that's a

13   problem.  And I might have to grant this motion, except for

14   Gorilla Circuits.  Gorilla Circuits, I think you are on notice

15   of that from day one in this case.

16       All right.  So that's the best I can do on that one.

17   Both, I wish you would agree on a stipulated timeline so I

18   can --

19           MR. GONZÁLEZ:  We will try to do that, your Honor.

20           THE COURT:  All right.

21           MR. GONZÁLEZ:  Your Honor, I just had one other issue,

22   I think, in our trial brief, and this -- this, I think, has

23   been rendered partially moot by your ruling last night, your

24   lengthy ruling last night that I won't discuss because it's

25   sealed.
```

PROCEEDINGS

```
1          And that is, there has never been an assertion that Uber

2   is somehow liable because of use or disclosure by Stroz or by

3   MoFo.  And they admit in their response that they are not

4   seeking damages for that.

5          Well, if they are not seeking damages for it, why is it

6   even relevant?  And their answer is:  It's relevant to

7   injunctive relief.  And I want to make sure you caught this in

8   the pile of paper that everybody has been filing.

9          You don't need this to go to the jury for injunctive

10  relief.  Uber will stipulate right now, and we said it in our

11  papers, if you want to issue an order that says to Stroz or

12  MoFo, "destroy or return whatever," fine.  We're not going to

13  object to that.

14         Now, there are going to be issues with respect to

15  Mr. Levandowski.  There are going to be issues with respect to

16  that there are pending investigations.  And we'll deal with all

17  of that.

18         But my point is they have never alleged use or disclosure

19  by MoFo or Stroz.  They now admit they are not seeking damages

20  for that.  The only reason why they now claim it's somehow

21  relevant is injunctive relief.  We don't even need a trial for

22  that.

23              MR. VERHOEVEN:  Your Honor --

24              THE COURT:  Please, go ahead.

25              MR. VERHOEVEN:   -- not only have we made allegations
```

PROCEEDINGS

1   to that effect, we -- that Stroz's knowledge is attributable to

2   Uber, that MoFo's knowledge is attributable to Uber, that

3   Stroz's acquisition as an agent of Uber is attributable to

4   Uber.  Not only have we made those points, your Honor, but you

5   ordered and took extensive briefing on those points, on the

6   agency issue.

7        So the notion that this is something that we have never

8   raised is --

9        THE COURT:  You definitely have raised it, but -- at

10  least the general subject.  But is it true you're not seeking

11  damages for anything that MoFo or Stroz did?

12        MR. VERHOEVEN:  I believe they are nodding their heads

13  yes, your Honor.

14        THE COURT:  All right.

15        MR. VERHOEVEN:  That doesn't mean that it's not

16  important for us to talk about the fact that Uber knew about

17  all this stuff and elected to move forward.

18        THE COURT:  I agree mostly with Mr. Verhoeven.

19        Here is the problem.  I've learned this in other trials.

20  I don't want to make a snap judgment here based on a snazzy

21  argument that sounds good but it turns out to be unfair.

22        In this case, the role of Stroz, the due diligence report,

23  the role of MoFo, and this whole elaborate contrived artifice

24  called the due diligence investigation, I'm putting it slightly

25  favorable to Waymo now, is part of the res gestae of the case.

PROCEEDINGS

1          And you really cannot even understand this case until you

2     see the elaborate lengths to which the -- Waymo -- not Waymo,

3     Otto and Uber went.  And we cannot try this case without

4     explaining the role of Stroz and the role of MoFo.

5          Now, after -- and including all this privileged stuff.

6     They have got to understand that these elaborate privileges

7     were -- the jury has to understand that these elaborate

8     privileges all wrapped in secrecy, and eventually that was

9     pierced through.  And now the jury gets to see what really

10    happened.

11         The jury has to understand that.  That's part of the

12    res gestae of the case.  It may even be -- if it's not

13    Exhibit A, it's Exhibit B.  So that's point one.

14         Now, point two, though, is what -- once the jury

15    understands -- and once I understand the case and see all of

16    the evidence, it will be still open to me to say, possibly,

17    you've heard all this evidence about MoFo and Stroz.  Let's be

18    clear, Waymo is not seeking any damages in this case on account

19    of use by MoFo, use by Stroz.  It has to be use by Uber that

20    counts.

21         If that -- if -- if I understand the -- I can -- I can

22    properly instruct the jury at the end, even if along the way

23    they hear some miscellaneous evidence or even some important

24    evidence that is -- that I have to put in a different context

25    with the jury instruction.

1       So I think -- I think -- I'm not going to rule this out of

2   limits now.  I will fix you up whatever I need to fix up, if

3   need be, at the end when I give the jury instructions.  So I'm

4   not going to restrict them on Stroz and MoFo.  So that's --

5   that's the last point.

6       All right?  Now, have we done everything today that we

7   need to do?

8           MR. VERHOEVEN:  I have been waiting patiently for

9   Mr. Gonzalez to finish his list.

10          MR. GONZÁLEZ:  I think that's all my list for now,

11  your Honor, but I will look at my notes while counsel proceeds.

12          MR. VERHOEVEN:  I have a couple issues but much, much

13  shorter.

14          THE COURT:  Please.  Go ahead.

15          MR. VERHOEVEN:  One point of clarification.  I think

16  you earlier said openings were 70 minutes each.

17          THE COURT:  What you all wanted before.

18          MR. VERHOEVEN:  I actually think it was 75.

19          MR. CARMODY:  No, it was 70.  Seven-zero.

20          THE COURT:  I remember seven-zero.  I don't want to

21  change that.  That's too much time.

22          MR. VERHOEVEN:  Oh, well, I was told it's 75.  I

23  apologize, your Honor.

24      Second, just as logical housekeeping.  This isn't a great

25  place to do an opening, from this lectern.  How do you usually

PROCEEDINGS

 1   do openings?

 2         THE COURT:  Let me first say to you and the good

 3   people out there who have avoided hacking and coughing, because

 4   I know you all think I'm a little bit of a nut on this, but

 5   here's where I'm coming from.

 6         I believe in advocacy and giving whoever has got the floor

 7   the undivided attention of the -- the jury's undivided

 8   attention.

 9         So I give you a lot of flexibility.  As long as you don't

10   get closer than 3 feet and you keep your voice up, you can walk

11   up and down in front of the jury box, as far as I'm concerned,

12   but you can't get closer than 3 feet.

13         Or you can turn that lectern around and face the jury or

14   you can put the lectern on your counsel table.  Some lawyers do

15   that.  So that you -- at least three options that I can think

16   of.  Or if you want to even bring in a small lectern to perform

17   and put it...

18         That's okay.  You are the advocate, and advocacy to me an

19   extremely important.  So you're going to get the undivided

20   attention of the jury, and you're going to get to set yourself

21   up with as many easels around the courtroom as you want.

22         MR. VERHOEVEN:  Thank you, your Honor.

23         THE COURT:  All right.

24         MR. VERHOEVEN:  Another housekeeping matter.  This

25   case is going to involve physical exhibits and witnesses

PROCEEDINGS

1   explaining them.

2         **THE COURT:**  Sure.

3         **MR. VERHOEVEN:**  And some of those are tiny.  And so

4   there's really -- we've thought about it.  There's really no

5   way to -- we were thinking we could use the ELMO to display it

6   and magnify it and then have a witness stick a pencil or

7   something in.

8         There's really no way for the witness to do that from the

9   stand.  So I think we have agreement that, with your Honor's

10  permission, if a witness is intending to do something like

11  that, they could come down and leave the stand and go to the

12  into the well.

13        **THE COURT:**  That's okay with me, but the court

14  reporters sometimes don't like it.  They -- they can't hear the

15  witness.  Yeah, that's okay.  Occasional visits.

16        Another thing you can do -- let's say you have got a

17  transistor.  You can pass it around the jury box.  Let the jury

18  hold it in their hands, take a moment or two to do that if you

19  want.  Or put it on the ELMO and let the witness come down

20  there.  Yeah, that's fine.

21        **MR. VERHOEVEN:**  Thank you, your Honor.

22        I feel compelled to address the Fifth Amendment issue

23  again, your Honor, for the opening statement.  I've read the

24  order from last night, your Honor; and in that order your Honor

25  is permitting the other side to make argument that

1    Mr. Levandowski didn't cooperate and that they asked him to

2    cooperate and he didn't cooperate and portray this in a certain

3    way.

4        I think it's, my opinion, very unfair that I can't explain

5    to the jury why he didn't cooperate.  What he did was assert

6    his Fifth Amendment rights.  And I don't think it's right for

7    them to be able to dance around that issue, start saying he

8    didn't cooperate and that's why we fired him without the jury

9    knowing the story.

10       I know that the inference is in play here, and there has

11   to be corroboration for your Honor's instruction on the

12   inference, but that's not the opening statement.

13       The opening statement is to say what the jurors are going

14   to see, and it's just a fact.  This witness has taken the Fifth

15   Amendment.  It's a factual thing and it's -- and the -- I

16   should be able to just tell the jury that this witness has

17   taken the Fifth Amendment and especially if I -- I need to

18   address their comments about why he didn't cooperate.

19       I think that's only fair, your Honor.  And so I would

20   re-urge the Court -- I know we already addressed this, but

21   reurge the Court to allow me in my opening statement to mention

22   that Mr. Levandowski has taken the Fifth Amendment.

23           MR. GONZÁLEZ:  A couple of things briefly, your Honor.

24   First of all, we've given you the case law, and I don't want to

25   reargue it now.  There is still an open question as to what

 1    Mr. Levandowski is going to do in this case, and the Court has

 2    to make an important decision once you hear the evidence about

 3    whether or not he should be called at all.

 4        Second, if he is called, because we're going to argue,

 5    your Honor -- we have argued -- that it's prejudicial to have

 6    him assert the Fifth Amendment on the stand.

 7        Second, your Honor, you've made it clear that we can't

 8    question Mr. Levandowski until we see what the record is.

 9        So we suggest we stick with your Honor's ruling.  Let's

10    see what the evidence is.  Then your Honor can make a final

11    decision on whether they get to call him to assert the Fifth

12    Amendment.

13        **THE COURT:**  I'm standing by my ruling on this.  So I'm

14    not changing anything from what I've ruled on Levandowski

15    previously.

16        All right.  What's your last point?

17        **MR. VERHOEVEN:**  Last point -- it is my last point,

18    your Honor -- is we were discussing logistics this morning and

19    it became clear that there is an issue for us as to Uber's

20    corporate representative.  We had previously agreed, and your

21    Honor had directed, that the corporate representative could be

22    in trial for the whole trial.  He didn't need to be

23    sequestered.  We have no problem with that.

24        But there's a sub-problem, which is that the person that

25    we've now learned they are disclosing is the head of their

 1   driverless car operation and that they are taking the position

 2   that he must be allowed to be in the courtroom to -- during the

 3   closed courtroom sessions where our trade secrets are talked

 4   about.

 5       You know, the protective order, in the beginning of this

 6   case we were careful in our agreements as to who could see

 7   trade secret information to provide that those -- you know, the

 8   person on either side who could see that stuff couldn't be in a

 9   position where they had competitive aspects of what they are

10   doing.  I don't have the exact language.

11           THE COURT:  What is the name of this person?

12           MR. CARMODY:  Eric Meyhofer.

13           MR. VERHOEVEN:  Meyhofer.

14           THE COURT:  Why would you do this to me?  I don't like

15   the idea that somebody in that position gets to hear their

16   trade secrets.

17           MR. CARMODY:  Your Honor, quick response.  First of

18   all, we are happy to have him sign the protective order or a

19   different version of the protective order that would suit this

20   Court.  But the bottom line, your Honor, is Uber, as a company,

21   has been sued for misappropriation of these eight trade

22   secrets, they call them.

23       He is Uber for purposes of this trial.  You can't say:

24   Uber, you cannot have a corporate representative here during

25   trial.

 1          They have no case law to support.  We have case law --

 2          **THE COURT:**  Yes, you can.  This is a civil case.

 3          **MR. CARMODY:**  Your Honor, it's a due process issue, in

 4    all fairness.  We have case law in support of the assistance we

 5    can and will get from Mr. Meyhofer to help us during trial.  He

 6    will sign onto a protective order as we just said.  And the

 7    truth is, if we already used these trade secrets as the other

 8    side is saying, it's like what's the big deal anyway?

 9          But the real important point, your Honor --

10          **THE COURT:**  You say you didn't use them.  And if you

11    turn to me right now --

12          **MR. CARMODY:**  The important point, your Honor, is this

13    is a -- there's no legal support whatsoever for saying Uber

14    cannot have its corp representative and not be defended during

15    a portion of this trial, especially when Uber will agree to any

16    reasonable protective order that limits him from ever using

17    these trade secrets or disclose them in any way.

18          **THE COURT:**  Who do you have at Uber that is signed

19    onto the protective order?

20          **MR. CARMODY:**  Only two in-house counsel, your Honor.

21          **THE COURT:**  Who are they?

22          **MR. CARMODY:**  Well, they're sitting in the courtroom.

23    Nicole Bartow and Aaron Bergstrom.

24          **THE COURT:**  So one possibility would be that if

25    Mr. Big gets excused during closed sessions and one of those

PROCEEDINGS

```
 1    would be at counsel table so that you would always have a
 2    corporate representative present.
 3            MR. VERHOEVEN:  May I respond, please?
 4            THE COURT:  Yes, please.
 5            MR. VERHOEVEN:  I did get the language, and the
 6    parties agreed to this, that the people who could see the
 7    highly confidential, the trade secret stuff would have -- a
 8    requirement would be, quote, who has no involvement in
 9    competitive decision-making, close quote.
10        This is the head of their -- of their competing
11    department.  And it would be highly prejudicial for us to --
12    for him to sit in and hear what we're doing and the
13    circumstances around it that are -- that relate directly to our
14    trade secrets.
15        They have a big company.  They have in-house counsel, like
16    you said.  They also have other people that don't have
17    competitive decision-making in this area that they could
18    designate if they chose to do so, your Honor.
19        So it's not a violation of due process for us -- for us to
20    lose protection of our trade secrets because they want a
21    particular individual who's head of a competitive division to
22    see our trade secrets.
23            MR. CARMODY:  Your Honor, there's a quick response.
24    You're not going to lose your trade secrets.
25        Listen, we already have two people who have signed up.  We
```

 1  will have a third person.  But they cannot determine who Uber

 2  will call as a corporate representative.

 3        THE COURT:  I can determine -- I can determine and I

 4  may determine against you because I don't like the idea that

 5  somebody in that position is learning the crown jewels.  Now, I

 6  don't know if there really are crown jewels, but I've got to

 7  assume they are for these purposes.

 8        MR. CARMODY:  Why can't we cure that, your Honor, with

 9  a simple protective order limiting his ability to do what

10  counsel is suggesting --

11        THE COURT:  Will you agree that he won't work for the

12  company for a year after that case?  See, you wouldn't do that.

13  So he's going to go back into the workplace.  He's going to

14  know all these trade secrets.

15      I'm not going to rule right now, but I'm leaning against

16  Uber on this.

17        MR. CARMODY:  May we submit a pocket brief on this,

18  your Honor?

19        THE COURT:  I thought you said you already had.  I

20  thought you said you briefed it.

21        MR. CARMODY:  I don't recall briefing this issue right

22  here.

23        THE COURT:  Do we have briefing on this?

24        THE LAW CLERK:  No.

25        THE COURT:  You can each submit a five-page brief on

PROCEEDINGS

1    this point.

2         Anything else on your side, Mr. Verhoeven?

3         **MR. VERHOEVEN:**  I thought I was done, but my partner

4    gave me a note which we should probably address.

5         There is an important witness in this case, Mr. Bares, and

6    he is a consultant currently for Uber.  His name came up

7    earlier today.  He's not within the trial subpoena power of the

8    Court.  And, as far as I understand, he's refusing -- we would

9    love to call him live, but he's...

10        We would love to call him live but he's outside the

11   subpoena power and his attorney says no.  And they have him

12   listed as a call-live witness on their witness list.  So if

13   they are going to call him live, in fairness, we should be able

14   to call the fellow too.

15        **THE COURT:**  Did you depose him?  Did you take his

16   deposition?

17        **MR. VERHOEVEN:**  We did.  But, you know, a live witness

18   is much better than playing a video.  And they -- if they can

19   compel him to come for their case, they certainly can compel

20   him to come for our case.  He's a consultant of theirs, and

21   we've just been getting the runaround about --

22        **THE COURT:**  Why can't you accommodate him so the jury

23   doesn't have to hear deposition testimony that you produce him

24   live in the plaintiff's case?

25        **MR. BRILLE:**  First of all, your Honor, let me clear

1    something up.  We're not calling him live in our case.  He's

2    designated to testify, if at all in our case, by deposition

3    testimony.

4            THE COURT:  By what?

5            MR. BRILLE:  Deposition testimony.

6            THE COURT:  That's good to know.  But, nevertheless,

7    he's your consultant, right?

8            MR. BRILLE:  He's a former employee.  He currently has

9    a consulting agreement, which expires on January 31st.  So as

10   of the trial date in this case.  And I want to make something

11   clear.  As of the trial date in this case, we will have no

12   affiliation with him commercially whatsoever.

13        That consulting agreement, just to be clear with the

14   Court, was entered on September 8th, which was the effective

15   date of his resignation, which meant that he was available as a

16   consultant for the first trial had there not been a

17   continuance, the second trial had there not been a continuance.

18   So it's purely circumstance that it expires on that date.

19        But here's the real issue, your Honor.  We're not calling

20   him in our case.  We haven't requested that he appear.  We have

21   communicated their request.  He doesn't want to come.  He's

22   been deposed for 14 hours over two separate days.  They have

23   his deposition testimony.  We have no ability to compel him to

24   come, and we're not calling him live.

25           THE COURT:  All right.  So it's a much different

 1   kettle of fish.

 2          **MR. PERLSON:**  Your Honor, I think this is the first

 3   we've heard of this expiration date that, coincidentally,

 4   occurs right before the trial.

 5          **THE COURT:**  Wait a minute.  Wait a minute.  Wait a

 6   minute.  I mean, you're the one that wanted two continuances.

 7   So the reason we're here -- come on.

 8          **MR. PERLSON:**  Well, your Honor, so they're precluding

 9   us from contacting him because they say that they represent him

10   because he's a consultant.  And, apparently, now that ends two

11   days from now.

12      And are we, then, not able to contact him ourselves

13   because they continue to represent him?

14          **THE COURT:**  I'm going to order that they can contact

15   him directly.

16      Any problem with that?

17          **MR. BRILLE:**  Your Honor, he's represented.  We

18   represent him for purposes of this litigation.

19          **THE COURT:**  Will you accept the subpoena on his

20   behalf?

21          **MR. BRILLE:**  No, because it's an ineffective subpoena.

22   He does not want to come and testify at trial.

23          **THE COURT:**  Yes, he can.  Maybe he can.  Maybe he will

24   happen to be going through the SFO airport.

25          **MR. BRILLE:**  The point here, your Honor, is they could

PROCEEDINGS

1   issue a Rule 45 subpoena, which would be completely invalid.

2   He does not -- the man lives in Pittsburgh, Pennsylvania, has

3   always lived there.  They've always known that.  They have

4   taken his deposition for two days for 14 hours.

5        He doesn't work for us anymore.  He won't be a consultant

6   for us, and he has communicated to us that he has no desire to

7   come here at their request.

8        **THE COURT:**  Look.  Waymo loses this one.  In light of

9   what I've heard, I don't think that it -- it expires on the

10  31st.  They don't have the authority over him to get him here,

11  and I'm not going to require them to do something like that.

12       However -- wait.  If you catch him at the airport or catch

13  him at Uber or catch him someplace where he can be served with

14  a subpoena within our subpoena power, God bless you.  Then I

15  will enforce that.

16       **MR. PERLSON:**  Two, your Honor.  One, can we get the

17  consulting agreement to confirm what we've heard?  Because we

18  haven't seen it yet.

19       And then, second of all, I think we should be able to

20  contact him --

21       **THE COURT:**  I want to see that January 31 date.

22       **MR. BRILLE:**  You'd like to see it?

23       **THE COURT:**  I'd like to see it, and I want you to show

24  counsel that January -- show them at least that -- you don't

25  have to show him the terms and conditions of the consulting

1   agreement, but show where it says January 31.

2        (Document was shown to the counsel.)

3        **MR. BRILLE:**  I will read this into the record:

4           "The company requests that you remain available

5        to provide services as an independent consultant to

6        the company from September 8th, 2017 through

7        January 31st, 2018 and you agreed to do so."

8        This agreement was entered on September 8th, which was

9   before the date of the first continuance.

10       **THE COURT:**  Do you have any subsequent agreement of

11  any type with him?

12       **MR. BRILLE:**  No.  There is no other agreement.

13       **THE COURT:**  No oral agreement to continue this?

14       **MR. BRILLE:**  No.

15       **THE COURT:**  So, all right.

16       **MR. PERLSON:**  It seems we should be able to contact

17  him if he's not their consultant anymore.

18       **THE COURT:**  On February 1 you can.

19       **MR. PERLSON:**  Thank you, your Honor.

20       **MR. BRILLE:**  Your Honor, if I may.  He is -- the

21  notion that he can be contacted by them when he is represented

22  by counsel would seem to me to be completely improper.

23       **THE COURT:**  That's wrong.  Unless you agree to accept

24  service of the subpoena on his behalf, I'm going to let them

25  try to serve him with a subpoena.

PROCEEDINGS

```
 1        You're contacting him only for purposes of serving a
 2   subpoena.  That's it.  You can't -- you can't ask him about an
 3   interview.  You can't -- since the other side is being a
 4   stonewall -- a stonewall -- then I'm giving you permission to
 5   contact him and say:  Mr. Bares, we're trying to serve you with
 6   a subpoena.  Where can we do that?
 7        And he says:  Screw you.
 8        Then you're out of luck, I guess.  But you can at least go
 9   that far.
10        MR. PERLSON:  Understood, your Honor.
11        THE COURT:  All right.
12   I'm running out of steam.  Do you have anything more?
13        MR. VERHOEVEN:  I keep saying I'm done.
14        THE COURT:  You have one more point, and we're going
15   to bring it to a close.
16        MR. VERHOEVEN:  Yes, your Honor.  This is an agreement
17   that the parties have reached that I want to make sure is okay
18   with your Honor.
19        Given the time constraints in the trial and the need to
20   move quickly, both sides have agreed to take the risk and not
21   use the original exhibits with the witness but hand up a binder
22   of the -- of copies of the exhibits for each witness so that we
23   don't have to take the time of individually going and getting
24   the exhibits.  We'll just use binders.
25        And I'm sure, if there is an error in one or another's
```

PROCEEDINGS

 1   binders, that we will call it out to each other.

 2        And I think I've done this many, many times.  It makes it

 3   a little bit more efficient.  Given we both have 16 hours, that

 4   I think it would make sense.

 5        **MR. GONZÁLEZ:**  That would be fine, your Honor.  We'll

 6   act in good faith.

 7        **THE COURT:**  I will let you do that.  It's against my

 8   better judgment.  But if you screw it up, then I have to

 9   explain to the jury that some of the evidence they got is

10   bogus.

11        So, all right.  You've agreed to it.  Please help me out

12   here and be accurate.

13        **MR. GONZÁLEZ:**  Your Honor, I just have a question for

14   the Court.

15        **THE COURT:**  Yeah.

16        **MR. GONZÁLEZ:**  I notice that during the trial, on the

17   Court's calendar you have schedules on Thursdays.  I'd just

18   like to know whether we're going to be dark --

19        **THE COURT:**  We will be in session every day from 7:30

20   until 1:00, and I will move those calendars to the afternoon.

21        **MR. GONZÁLEZ:**  Thank you, your Honor.

22        **THE COURT:**  Once the jury starts to deliberate, they

23   can go as late as they want each day, but we will stop sharply

24   at 1:00.

25        **MR. GONZÁLEZ:**  Thank you.

PROCEEDINGS

1          THE COURT:  All right?

2      All right.  I want to say we're starting the big event

3  tomorrow.  You lawyers are great.  You're excellent.  I want

4  you to behave.  Good luck to both sides.  See you then.

5          THE CLERK:  Court is now in recess.

6      (Proceedings adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

_____

Katherine Sullivan, CSR 5812, CRR, RMR

Tuesday, January 30, 2018